*P-Send*

ENTERED
CLERK, U.S. DISTRICT COURT

JAN 12 2006

CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION        BY DEPUTY

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(D).

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

CARTER BRYANT,

                Plaintiff,

v.

MATTEL, INC.,

                Defendant.

and related actions.

)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO. CV-04-9049-SGL

(Consolidated with cases CV-04-9059 and CV-05-2727)

ORDER REGARDING MATTEL'S MOTION FOR LEAVE TO AMEND

       This case has, increasingly, become one of the proverbial tail wagging the proverbial dog.

       Back in April, 2004, Mattel, Inc., ("Mattel") filed a complaint in Los Angeles County Superior Court against its former employee and the reputed creator of the BRATZ dolls, Carter Bryant.  The complaint pressed five separate state-law theories relating to certain agreements Bryant signed while an employee with Mattel, namely, an Employee Confidential Information and Inventions Agreement ("Inventions Agreement") and a Conflict of Interest Questionnaire ("COI Questionnaire").  Although couched in state law terms and ostensibly pled as a simple employment action, lurking beneath the allegations in the complaint was whether Bryant had either misappropriated Mattel's intellectual property or

1   resources in creating and/or developing the BRATZ dolls or whether he continued

2   to develop his BRATZ design while still working in Mattel's employ.  In either event,

3   the rights to the BRATZ dolls could become the property of Mattel, either through

4   infringement or through operation of the agreements noted above.  The case was

5   later removed to this Court and was assigned the case number CV-04-9059.  MGA

6   Entertainment, Inc. ("MGA"), the maker of the BRATZ doll line, then intervened "to

7   protect its rights to Bratz dolls" that were at stake in the action.  Mattel, Inc. v.

8   Bryant, 446 F.3d 1011, 1012 (9th Cir. 2006); see also id. at 1013 ("Mattel argues, 'a

9   significant risk of prejudice' to MGA [exists] if the ownership of rights to intellectual

10  property, i.e., the Bratz creations, were decided in the absence of MGA").

11       In the interim, Bryant filed a declaratory judgment action in this Court,

12  seeking for the Court to declare that his BRATZ doll creations did not infringe

13  Mattel's copyright in its Toon Teens products.  See Court's July 18, 2006, Order at

14  3 (noting that, although "Bryant's complaint . . . makes reference to 'other Mattel

15  products,' . . . the substance of his allegations all address the product 'Toon

16  Teens'").  The declaratory judgment action was assigned the case number CV-04-

17  9049.

18       MGA then filed an action against Mattel in this Court broadening the scope

19  of the controversy beyond that concerned with the ownership rights to the BRATZ

20  doll line.  MGA's complaint asserted various Lanham Act claims and their California

21  state law equivalent arising out of Mattel's alleged "habitual and unfair tactics of

22  competition-by-intimidation and serial copycatting of MGA's products." (Compl.

23  ¶ 7).  In essence, although the prior actions were concerned with ownership in the

24  rights to the BRATZ doll line, the allegations in 05-2727 concerned whether there

25  had been unlawful efforts to block the marketing of those rights in the BRATZ dolls.

26  MGA's complaint did make mention of other products that were affected by Mattel's

27  alleged predatory business practices, but by far the largest portion of its complaint

28  concerned Mattel's conduct in undermining (or seeking to undermine) MGA's rival

1  line of BRATZ dolls.[1]

2  　　　By Order dated June 19, 2006, the Court consolidated all three cases "for all

3  purposes" as they "involve[d] a number of common issues of law and fact." As the

4  Court later noted in its August 10, 2006, Order: "At its heart, this case asks the

5  question: Who owns the rights to the Bratz dolls?" Resolution of this question lies

6  at the heart of or, at the very least, affects many of the other claims set forth in

7  each of the three respective cases. For instance, even though the allegations in

8  05-2727 concern Mattel's alleged efforts at defeating the marketing of the BRATZ

9  dolls, resolution of who owned the rights to the BRATZ dolls could serve to moot

10  many of those allegations. It is hard to imagine how it is unlawful for a company to

11  thwart or otherwise undermine the marketing of a product it owns. Thus, if Mattel

12  owned the rights to the BRATZ dolls, many of the allegations in the 05-2727

13  complaint would become moot. That said, such consolidation did not do away with

14  the distinctions that do exist between the three cases. As the Court highlighted in

15  its consolidation order, when either party files a pleading in the case, "the first

16  paragraph of [that] document . . . shall inform the Court to which case(s) the

17  document relates."

18  　　　On July 18, 2006, the Court dismissed Bryant's declaratory judgment action,

19  04-9049, finding there existed no reasonable apprehension of an imminent

20  copyright infringement claim being filed against him by Mattel based on Mattel's

21  Toon Teen intellectual property. See Court's July 18, 2006, Order at 4. The

22  Court's Order was predicated entirely upon counsel for Mattel's representation

23  during oral argument that it "will not maintain that Bratz infringes the copyright in

24  Toon Teens." Owing to this representation, the Court, in dismissing the declaratory

25  judgment action, made clear that any future "claim by Mattel of copyright

26

27  　　　[1] That the marketing of the BRATZ dolls lies at the heart of the issues
between the rival doll makers in the 05-2727 case is best illustrated by the Court's

28  discussion of those allegations in its August 26, 2005, Order, Granting in Part and
Denying Part Mattel's Motion to Strike portions of MGA's complaint.

1  infringement based on the Toon Teens product is barred by counsel's
2  representation." July 18, 2006, Order at 4.
3       Presently before the Court is Mattel's request for leave to file an amended
4  complaint in the 04-9059 action.  The complaint broadens considerably the nature
5  of the action from its genesis in state court.  Whereas before the complaint simply
6  sought to litigate alleged contractual and fiduciary breaches by Bryant while in the
7  employ of Mattel (no doubt geared toward procuring a legal basis for Mattel to lay
8  claim to the BRATZ doll line), the amended complaint adds five more defendants
9  and nine new legal claims, alleging a wide range of commercial disputes between
10 the rival doll makers that spans three countries.  For instance, the amended
11 complaint now contains RICO claims, a misappropriation of trade secrets claim,
12 and various aiding and abetting claims all stemming from allegations that MGA
13 cherry-picked certain high-ranking Mattel executives in foreign markets (many also
14 named as defendants in the amended complaint) or designers (namely, Bryant),
15 and then enticed or encouraged those same individuals to steal various trade and
16 proprietary secrets (be it sales plans, sales projections, customer profiles, or
17 intellectual property) from Mattel and hand them over to MGA before going to work
18 at MGA.
19      Moreover, the amended complaint expands upon the existing breaches of
20 contract and fiduciary duty claims in the original complaint by expanding the
21 universe of former employees (namely, the cherry-picked executives) to whom
22 those claims now apply.
23      Finally, Mattel now makes plain what was always lurking in its original
24 complaint — a copyright claim, but one directed not only to Bryant but also to MGA,
25 MGA's Hong Kong subsidiary, and MGA's President and CEO Isaac Larian.
26 Moreover, Mattel characterizes its copyright claim somewhat differently from that at
27 issue in Bryant's declaratory relief action: "The Amended Complaint does not
28 include a claim for infringement of copyrights in Toon Teens, but rather

4

1   infringement of copyrights in Bratz." (Reply to MGA Opp. at 11).  Toward that end,

2   Mattel has recently filed copyright registrations with the U.S. Copyright Office

3   claiming ownership in various BRATZ doll design drawings penned by Bryant.

4   A.    ANALYSIS

5         Federal Rule of Civil Procedure 15(a) provides that, once a responsive

6   pleading has been served, "a party may amend the party's pleading only by leave of

7   court or by written consent of the adverse party; and leave shall be freely given

8   when justice so requires."  With no consent to Mattel's proposed filing proffered by

9   MGA and Bryant, determining whether to grant Mattel leave to file an amended

10  complaint is gauged by looking to the familiar formulation of factors set forth by the

11  Supreme Court in Forman v. Davis:

12  
13              In the absence of any apparent or declared
                reason—such as undue delay, bad faith or dilatory
                motive on the part of the movant, repeated failure to
14              cure deficiencies by amendments previously allowed,
                undue prejudice to the opposing party by virtue of
15              allowance of the amendment, futility of amendment,
                etc.—the leave sought should, as the rules require, be
16              'freely given.' Of course, the grant or denial of an
                opportunity to amend is within the discretion of the
17              District Court, but outright refusal to grant the leave
                without any justifying reason appearing for the denial is
18              not an exercise of discretion; it is merely abuse of that
                discretion and inconsistent with the spirit of the Federal
19              Rules.

20  371 U.S. 178, 182 (1962).

21        MGA and Bryant offer the following reasons for denying Mattel leave to

22  amend:  (1) Mattel has long known of the factual predicates underlying its copyright

23  and intentional interference claims but delayed in asserting them; (2) the proposed

24  amendment to add the copyright claim and the intentional interference claims

25  (against the new defendants) are futile because they are barred by the applicable

26  statute of limitations; (3) the copyright claim had been brought in bad faith by Mattel

27  because of its prior public disavowal of an intent to assert such a claim; and (4)

28  MGA and Bryant would incur undue prejudice were the copyright claim added to the

1   suit because of alleged spoilation of evidence issues involving Mattel's ZEUS

2   computer system used by doll designers at Mattel and its e-mail system.  None of

3   these arguments are persuasive.

4           1.     Awareness of Factual Predicate for Copyright and Intentional

5                  Interference Claims

6         MGA argues that Mattel has long known about the factual predicate for its

7   recently added copyright claim, observing that, "[o]ver four years ago, in August

8   2002, Mattel CEO Bob Eckert received an anonymous letter stating that Bryant

9   created the project that became the 'Bratz' dolls — and worked with MGA to 'steal'

10  that project — while still employed at Mattel."  (MGA Opp. at 9).  Similarly, MGA

11  argues that Mattel has long known of the factual predicate for its intentional

12  interference claim with respect to Bryant's contract given that, "[b]y Mattel's own

13  admission, it learned in November 2003 — more than three years ago — that

14  Bryant had signed a contract with MGA 'dated as of' a month prior to his final day at

15  Mattel."  (MGA Opp. at 11-12).

16        At the outset it must be observed that "[m]ere delay in proffering an

17  amendment does not justify denying leave to amend." Sierra Club v. Union Oil Co.

18  of California, 813 F.2d 1480, 1493 (9th Cir. 1987), vacated on other grounds by,

19  485 U.S. 931 (1988), and reinstated by, 853 F.2d 667 (9th Cir. 1988).  Seizing upon

20  this point of law, Mattel argues that "only in . . . cases" when "granting leave would

21  require discovery to be reopened after summary judgment motions have been filed"

22  has the Ninth Circuit found the denial of leave "justified" based on the passage of

23  time alone. (Reply to MGA Opp. at 3).  That is incorrect.  There is a line of cases

24  from the Ninth Circuit finding that, if a "party seeking amendment knows or should

25  know of the facts underlying the amendment when the original complaint is filed,

26  the motion to amend may be denied." Sierra Club, 813 F.2d at 1493 (citing Jordan

27  v. County of Los Angeles, 669 F.2d 1311, 1324 (9th Cir. 1982)).  And, recently, the

28  Ninth Circuit upheld the denial of leave to amend based on the passage of time

even though the requested leave to amend was tendered <u>before</u> the time, as set forth in a Rule 16(b) pre-trial scheduling order, for amending pleadings had expired. <u>See</u> <u>AmerisourceBergen Corp. v. Dialysist West, Inc.</u>, 465 F.3d 946 (9th Cir. 2006). The Ninth Circuit observed that, even when a request for leave to amend is timely under a Rule 16(b) schedule for pretrial motions, the district court may nonetheless still deny the request based on any of the <u>Forman</u> factors. <u>Id</u>. at 951-52. The Ninth Circuit then noted that the issue of untimeliness (regardless of whether the amendment is tendered "within the period of time allotted by the district court in a Rule 16 scheduling order") in seeking to amend can constitute a justification for denying leave to amend if "the moving party knew or should have known the facts and theories raised by the amendment in the original pleading." <u>Id</u>. at 953. Toward that end, the Ninth Circuit observed that "an eight month delay between the time of obtaining a relevant fact and seeking a leave to amend is unreasonable." <u>Id</u>. In this regard, the Ninth Circuit in <u>Dialysist</u> was unpersuaded by the fact that, even though the moving party had known of the facts prompting the amendment for a long period of time, there still remained eight more months of discovery for the parties to marshal facts against the allegations raised by the amended pleading: "Even though eight months of discovery remained, requiring the parties to scramble and attempt to ascertain whether the Procrit purchased by AmerisourceBergen was tainted, would have unfairly imposed potentially high, additional litigation costs on Dialysist West that could have easily been avoided had AmerisourceBergen pursued its 'tainted product' theory in its original complaint or reply." <u>Id</u>. Thus, absent "a satisfactory explanation" for the delay in amending the complaint, the Court is well within its rights to deny leave to amend. <u>Id</u>.

Mattel proffers the following reasons for taking the time that it did before presenting its amended complaint: (1) Acting out of an abundance of caution to its obligations under Rule 11 to present "factual contentions [that] have evidentiary support," Mattel waited until its claims were better supported by evidence

1  uncovered in discovery; and (2) the delay in the proceedings caused by "the year-

2  long stay and the parties' prior jurisdictional disputes" have left the case still in its

3  "nascent stage." (Reply to MGA Opp. at 2, 4).

4      The first reason is not well-founded. Rule 11 specifically allows parties to

5  aver factual allegations that "are likely to have evidentiary support after a

6  reasonable opportunity for further investigation or discovery" so long as the party

7  makes clear in its pleading that its factual contentions on those points are with the

8  caveat that they are based on a good faith belief that further discovery would

9  unearth evidence to support them. See FED. R. CIV. P. 11(b)(3). Simply put, Rule

10  11 did not stand in the way of Mattel averring the factual contentions it now claims it

11  "merely suspected" as being the case based on the limited information before it.

12  Mattel could have gone ahead and made such suspected factual allegations so

13  long as it caveated those claims with the declaration that it reasonably believed that

14  those allegations would be borne out by further discovery. Perhaps the time by

15  which Mattel could have reasonably believed such allegations would be borne out

16  by further discovery occurred after the dates noted by MGA, but it is hard to fathom

17  that such materialization took three or four years to occur.

18      The second reason would have some merit to it but for the fact that the

19  information that alerted (or should have alerted) Mattel to the existence of its now

20  asserted copyright and intentional interference claims was brought to Mattel's

21  attention well before the case was stayed on May 20, 2005. The stay, therefore,

22  did not operate as an obstacle to Mattel asserting its claims; nor even if it did, the

23  stay does not explain why Mattel waited nearly six months after the stay was lifted

24  on May 16, 2006, to present those claims now.

25      All of that being said, the one thing that gives the Court pause in denying

26  leave based on the tardiness in Mattel's presentation is the lack of any evidence

27  that MGA or Bryant have been prejudiced by the delay.   Delay unconnected to

28  some showing of prejudice, be it prejudice to the parties or disruption in judicial

1    management of the case, does not suffice to deny granting leave to amend.  The

2    Ninth Circuit has noted that, "where a defendant is on notice of the facts contained

3    in an amendment to a complaint, there is no serious prejudice to defendant in

4    allowing the amendment" even if it is made tardily.  Sierra Club, 813 F.2d at 1493.

5    Indeed, the denial of leave was proper in the Dialysist case not simply because of

6    the length of the delay, but because the delay itself was "detrimental" in that it

7    would entail the opposing party to have "unfairly" incurred "potentially high,

8    additional litigation costs" that could have been avoided if the moving party had

9    made clear its intentions earlier.  465 F.3d at 953.

10        Here, as well demonstrated in Mattel's papers, it is readily apparent from the

11   pleadings filed by MGA and Bryant in this case that both have been aware for some

12   time of the factual predicates now underlying Mattel's copyright claim and

13   intentional interference claim.  (See MGA Opp. at 5 ("As Bryant and MGA

14   suspected at the time of filing — and Mattel now concedes by conduct — those

15   deceptively-pled state-law claims [in 04-9059] were copyright infringement claims all

16   along")(emphasis added)).  The parties have engaged in meaningful discovery

17   regarding many of the facts touched upon by these new claims, be it tracking down

18   experts in various forensic fields or taking depositions of various of the key players

19   to those claims.   In point of fact, in their papers filed with this Court before this

20   present motion, both Bryant and MGA have made it abundantly clear that they have

21   long suspected that a copyright infringement claim was in the offing as evidenced

22   by Bryant's filing of the declaratory judgment action and MGA's intervention in the

23   05-9059 matter to protect its rights to the BRATZ dolls.  Similarly, MGA and Bryant

24   have been on notice to the facts comprising the interference claim concerning

25   Bryant's contract as evidenced by the identity of the individuals who have been

26   deposed by Mattel, as well as the nature of the questions posed and the testimony

27   proffered at those depositions.  MGA's argument that, with the amendments, it

28   faces the prospect of defending "against stale claims" owing to faded memories and

loss of documents caused by the great passage of time, (see MGA Opp. at 3, 13), is diminished by the fact that (no doubt owing to the sophistication of all counsel involved) discovery on these very issues have been proceeding apace by both sides long before Mattel filed its proposed amendments.  This is simply not a case where "additional litigation costs" will be "unfairly" visited upon Bryant and MGA by allowing the proposed amendments; much of those costs have already been borne by the parties for some time.

       2.    Spoilation of Evidence

       MGA next argues that Mattel's delay in bringing the amended complaint has caused it prejudice as, in the interim, critical pieces of evidence have been or are suspected of having become lost.  For instance, MGA asserts that Mattel's Rule 30(b)(6) witness concerning its Zeus computer system, Julia Marine, testified that, "although Mattel identified and segregated its most relevant backup tapes available for Zeus, Mattel allowed its tape backup system to expire the database for those backup tapes, thereby eliminating all information about what was actually stored on those backup tapes."  (MGA Opp. at 9-10).  Information on the Zeus computer system is critical because of Mattel's assertion that part of its copyright claim rests on Bryant's exposure to Mattel development programs.  (First Am. Compl. ¶ 26(a)).  As explained by MGA: "[C]oncept data and drawings created by [Mattel] design center personnel are stored on Zeus.  Thus, the electronic documents stored on Zeus – which should include the metadata showing who created, edited and accessed Mattel's concept drawings and designs – during the time Bryant worked in the design center at Mattel is vitally important to defending against Mattel's claims."  (MGA Opp. at 14).  MGA's argument is neither an accurate characterization of Ms. Marine's testimony nor of the nature of Mattel's exposure claim.

       Ms. Marine did not testify that the information on the backup tapes (some fifty in total) was lost, but rather that Mattel no longer carried the type of hardware

1   that could restore the information still found on those tapes:

2          Q.    So if you wanted to restore that 2002 backup

3                  tape[s] then, how would you go about doing that?

                     . . . .

4          A.    You need the hardware so if we don't have the

5                  hardware — if [the technology used by the tape

6                  is] DLT we don't have the hardware and you've got to buy it and – well, first you have to find a

7                  place to put it with adequate power which we don't have in the design center.  You need to

8                  have a tape library.  You need to have the tape drives that carried those tapes. You need a

9                  server that has the capability to – that's big enough to handle all of the hardware.  You need

10                 the software – the license for the backup software[, Net Backup].  You need the disk space

11                 to restore it to and then you have to start reading in all those tapes.

12         Q.    You said that you don't have that in the design

13                 center.  Do you have that hardware anywhere else in the company?

14         A.    DLT? No, no.

15         Q.    At what point did you get rid of the hardware?

16         A.    Once the last backups — DLT backups expired

17                 so it would have been a couple years ago probably.

18  (Decl. Diana Torres, Ex. K at 118-119).

19         The above testimony clearly denotes the difficulty in restoring what was on

20  Mattel's Zeus computer system during the relevant time frame, but it certainly does

21  not demonstrate that the information on those backup tapes has been "eliminated"

22  or forever lost.  Undoubtedly it will be a costly endeavor to recover that information

23  (not to mention to later search and sort through it); but to argue, as MGA does, that

24  the information is "unavailable" or "lost", (MGA Opp. at 9, 14), exaggerates its

25  plight.  Indeed, Ms. Marine's testimony indicates that the difficulty in retrieving the

26  information on the Zeus backup tapes has been present for some time (maybe

27  since 2004 or perhaps even earlier).  This is important because it undermines

28  MGA's claim that Mattel's undue delay in bringing its amended complaint will cause

1   it to suffer prejudice it otherwise would not have faced if the amendments were

2   brought sooner.  Such prejudice has been present for years, and Mattel's failure to

3   bring its amended complaint sooner would not have changed this situation.

4          Similarly, MGA's point that access to what was on the Zeus computer

5   system is vital in demonstrating that Bryant was not exposed to or otherwise did not

6   hack the system to steal other designers work is diminshed to some extent by the

7   fact that Bryant himself testified that he did not use the Zeus computer system and

8   was "pretty much computer illiterate" while employed at Mattel.  Admittedly, the

9   ability to point to information on the Zeus system backup tapes to prove that Bryant

10  did not access other designers drawings or to prove the date those drawings were

11  created by those other designers would be useful evidence to negate Mattel's

12  factual claims.  Nonetheless, such evidence still would not discount other avenues

13  outside of the Zeus computer system by which Mattel could seek to prove that

14  Bryant was exposed to its copyrighted works, e.g., witness testimony that Bryant

15  saw drawings of the same posted on other designers' cubicles.

16         MGA next surmises that Mattel's e-mail records have disappeared, not

17  because it has any proof on that point, but simply because Mattel has postponed

18  the deposition of the individual most knowledgeable of Mattel's e-mail records until

19  after the hearing on Mattel's motion for leave to amend.  (MGA Opp. at 10).

20  Speculation of spoilation does not suffice.  That MGA's argumentation on this point

21  is nothing more than speculation is best exhibited by the evidence it has proffered

22  in support of its argument:  "[I]f the sole retained backup for Zeus is no longer

23  available, it is not hard to imagine that Mattel's electronic mail archives are similarly

24  out of reach." (MGA Opp. at 15 (emphasis added)).  MGA then makes much of a

25  deposition from a Mattel executive, Alan Kaye, who testified that e-mails in his

26  inbox would be automatically deleted if they had remained there for more than a

27  certain time period. (Decl. Diana Torres, Ex. H at 292-93).  MGA takes from this

28  acknowledgment that Mattel has an "automatic email deletion system" that has

1  compromised Mattel's "duty to preserve documents." (MGA's Opp. at 14).

2  Noticeably absent from MGA's argument is any evidence that the e-mails so

3  deleted from a Mattel employee's inbox are forever lost or, as is far more likely,

4  whether such information remains or is otherwise archived on some backup file on

5  Mattel's computer system. Absent concrete proof that spoilation has occurred,

6  nothing in MGA's argument forms a basis for denying Mattel its requested leave to

7  amend.

8         3.   <u>Statute of Limitations</u>

9         MGA next argues that Mattel's copyright and intentional interference claims

10  are futile as both are barred by the applicable statute of limitations. This argument

11  was pressed emphatically at oral argument. With respect to the copyright claim,

12  MGA argues that the applicable statute of limitations is three years, with the

13  limitations period accruing from when a party has knowledge of a violation or when

14  a reasonably diligent person would have been put on inquiry of the infringement.

15  (MGA Opp. at 16 (citing <u>Roley v. New World Pictures</u>, 19 F.3d 479, 481 (9th Cir.

16  1994)). MGA argues that Mattel was put on notice about its copyright claim in

17  August, 2002, upon the receipt of the anonymous letter to Mattel's CEO that Bryant

18  had stolen the idea for BRATZ while working at Mattel. Thus, according to MGA,

19  the limitations period on Mattel's claim expired in August, 2005, rendering Mattel's

20  current copyright claim stale.

21         The problem with MGA's analysis is it fails to take into account the relations-

22  back principles found in Rule 15(c), which provides that "[a]n amendment of a

23  pleading relates back to the date of the original pleading when "the claim . . . in the

24  amended pleading arose out of the conduct, transaction, or occurrence set forth . . .

25  in the original pleading," or if such relation back is otherwise permissible by the

26  state "law that provides the statute of limitations applicable to the action." By

27  MGA's own admission Mattel's copyright claim arises out of the same conduct or

28  transaction contained in the original complaint filed in April, 2004, well within the

applicable limitations period.[2]  (MGA Opp. at 12 ("These very same allegations [contained in the original complaint] underlie the copyright infringement and intentional interference contract claims Mattel now seeks to allege against MGA, Mr. Larian and Bryant")).

MGA's statute of limitations argument with respect to the intentional interference claims fares no better.  According to MGA, the applicable statute of limitations is two years for an intentional interference with contract claim and Mattel was aware of the facts alerting it to this claim (insofar as Bryant's contract is concerned) on November 24, 2003, when it learned "that Bryant worked with MGA to develop the 'Bratz' dolls prior to his last day of employment by Mattel and, hence, prior to the expiration of his contractual relationship with Mattel."[3]  (MGA Opp. at 18 (citing Knoell v. Petrovich, 76 Cal. App.4th 164, 168 (1999)) .  Such a time line would, according to MGA, mean that the applicable limitations period expired on Mattel's interference with Bryant's contract claim on November 24, 2005, well before Mattel sought leave to file its amended complaint.  (Id).  The problem again with MGA's argument is that it ignores that through Rule 15(c) Mattel's intentional interference claim would relate back to when it filed its original complaint in April,

---

[2]  The same would appear to be true — that the amendments would be timely — if the amendments related back to Mattel's answer (filed on May 13, 2005) to MGA's complaint in the 05-2727 case.

[3]  With respect to Mattel's interference with contract claim as to one of its former executives, Ron Brawer, MGA claims Mattel was put on notice of that claim on September 17, 2004, when Brawer informed Mattel that he leaving to go to work for MGA.  (MGA Opp. at 19-20).  The problem with this argument is that nothing from that simple event — Brawer's declaration of his intent to leave — in any way would apprise Mattel that MGA had encouraged Brawer to engage in nefarious conduct (the stealing of proprietary information) causing Brawer to breach his contract with Mattel that he would not do anything to help a competitor while working for them.  MGA's contention that Mattel must have known of those misdeeds in mid-September is nothing more than speculation.  Futility cannot be founded on what might or might not be the case; either a claim is futile to bring or it is not.

2004, well before the limitations period expired.[4]

Accordingly, MGA's futility argument is not well-founded.

4.      Prior Disavowals of Asserting a Copyright Claim

Finally, MGA takes umbrage with the cageyness to which Mattel has taken in this case as to whether or not it is asserting a copyright infringement claim against it.  To MGA, such ducking and weaving on Mattel's part renders its effort to now bring such a copyright claim as one done in bad faith.  No doubt the Court itself has been subjected to Mattel's overly vague statements on this point, but in the end nothing in those statements has ever foreclosed the possibility that such a claim may be in the offing.  Indeed, during the oral argument on Mattel's motion to dismiss Bryant's declaratory judgment action, the Court pressed Mattel's counsel as to whether it would assert such a copyright claim against Bryant as it is currently seeking to do.  The most that Mattel's counsel would proffer was that Mattel would not assert a copyright claim against Bryant based on Mattel's copyright rights in TOON TEENS.  At that point, the Court directed the parties to engage in a meet and confer based on counsel for Mattel's representation and to provide a report to the Court based on those discussions.  The report submitted to the Court made clear that, although Mattel was willing to accede that it would not bring a copyright claim based on TOON TEENS, it refused to accede to Bryant's broader request that "Bryant 'never copied anything' and that no Mattel product has any 'relevance' to any claim that Mattel has or ever will assert against Bryant."  This by itself should have dispelled any illusion either Bryant or MGA was operating under that Mattel's prior statements had foreclosed any potential copyright claim against them.[5]

---

[4] Again the relations-back principle would also seem to render its claim timely if it were filed as an amended answer (the original having been filed in May, 2005) in the 05-2727 case.

[5] MGA also argues that Mattel's effort to substitute MGA and its CEO, Isaac Larian, for the "Doe" defendants listed in its original complaint is improper because Mattel knew of their identity when it filed the original complaint.  The argument is

1   That said, Mattel's allegation in the amended complaint as to how it is

2   seeking to lay claim to the copyright in BRATZ is disconcerting.  Paragraph 26,

3   subsection a, in the amended complaint alleges that Bryant "misappropriated and

4   misused Mattel property" by "using his exposure to Mattel development programs to

5   create the concept, design and name of Bratz." (First Am. Compl. ¶ 26(a)).  Such

6   "exposure" could include Bryant misappropriating the Mattel design concept in

7   TOON TEENS in drawing his inspiration for the BRATZ doll.  Were Mattel's

8   copyright claim so predicated it would be barred by this Court's July, 2006, Order,

9   dismissing Bryant's declaratory judgment action.  Mattel was pressed on this point

10  during oral argument and conceded that such "exposure" to Mattel "development

11  programs" did not include TOON TEENS.  With this representation, nothing in

12  Mattel's proposed copyright claim is barred under the rubric of bad faith.

13      5.      Judicial Economy Considerations

14      In his opposition, Bryant adds an additional reason for denying leave beyond

15  those contained in MGA's papers — the amendment would muddy the waters in the

16  04-9059 by adding "tangential" issues that would only serve to delay resolution of

17  the key issue lying at the heart of the complaint:  Who owns the rights to the

18  BRATZ line of dolls. (Bryant Opp. at 2 ).  Bryant notes that the case has proceeded

19  apace in moving toward resolving that issue, and the amendment would "transform

20

21  ─────────────────────────────

22  misplaced.  As made clear by Mattel, California law allows a plaintiff to substitute in a
    defendant for a "Doe" if the plaintiff was ignorant of that defendant's identity or
23  ignorant of the basis for liability at the time the complaint was filed.  See Miller v.
    Thomas, 121 Cal.App.3d 440 (1981).  MGA does not dispute this legal contention
24  but at oral argument disputed that Mattel did not know the basis for liability against
    itself or Mr. Larian due to the "uncanny" similarity between the allegations averred in
25  the original complaint and those now proffered against the two in the amended
    complaint.  Specifically, MGA notes that the original complaint spoke of Bryant
26  working for one of Mattel's competitors and of that employee's theft of Mattel's
    intellectual property before leaving to work for that competitior.  At most, all this
27  shows is that Mattel knew that Bryant went to work for MGA, not that MGA or Mr.
    Larian encouraged Bryant's alleged unlawful behavior recited in the original
28  complaint.

1  what Mattel has always claimed was a straightforward employment action against

2  an individual defendant into a global commercial dispute against Mattel's primary

3  competitor, MGA," that "will last years" thereby "delay[ing]" resolution of who owns

4  BRATZ.[6]  (Bryant Opp. at 2).  Mattel argues that "the law does not deny leave to

5  amend because claims are 'tangential'" and then reiterates its point that some

6  showing of prejudice, namely, seeking leave after expiration of discovery, is

7  necessary.  (Reply to Bryant Opp. at 3).  That is not entirely correct.

8        As noted previously, the Ninth Circuit recently upheld a denial for leave to

9  amend because the amendment would have "drastically changed" the litigation,

10  even though the leave request was tendered before the time, as set forth in a Rule

11  16(b) pre-trial scheduling order, for filing a motion to amend had expired and well

12  before the discovery cut-off.  See AmerisourceBergen Corp. v. Dialysist West, Inc.,

13  465 F.3d 946, 953 (9th Cir. 2006).  In justifying its reasoning the Ninth Circuit cited

14  approvingly to the following statement from a well-respected treatise: "If an

15  amendment substantially changes the theory on which the case has been

16  proceeding and is proposed late enough so that the opponent would be required to

17  engage in significant new preparation, the court may deem it prejudicial."  Id. at 953

18  n.2 (quoting 6 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE,

19  FEDERAL PRACTICE AND PROCEDURE § 1487 (2nd ed. 1990)).  Thus, Dialysist

20  recognized that the introduction of "different legal theories" and/or proof of

21  materially different facts well into the litigation can itself be a basis for finding

22  prejudice regardless of whether the period for discovery has expired (or is even

23  close to expiring) or the parties have already filed summary judgment motions.  Id.

24  at 953-54.

25        Although the parties can safely be said to be at this point well into the

26

27        _____

         [6]  Bryant also brings intricate legal arguments about the sufficiency of the
28  allegations Mattel has averred in building its RICO claims against him.  Such
    considerations are best left to be resolved on a properly filed motion to dismiss.

1    litigation in this consolidated action (as evidenced by the protracted discovery

2    disputes contained in the docket sheet that the parties have had before the

3    magistrate judge and now the special master, and the litigation of motions to

4    dismiss in both the 04-9049 and 04-9059 cases), the fact remains that, as Mattel

5    has made painfully clear in its papers, no scheduling order has been entered in this

6    case.[7]  This takes away somewhat from the prejudice <u>Dialysist</u> found to exist when

7    a "drastic change [in a party's] litigation theory" takes place mid-stream in the

8    litigation process.  <u>Id.</u> at 953.  Simply put, without a schedule for the filing of pre-trial

9    motions and other matters (<u>e.g.</u>, discovery cutoff), the parties have been given free

10   reign in how to conduct the litigation in this case.

11         That the delay in bringing the proposed amendments and the relative length

12   of time into the litigation when those amendments were brought may not neatly fold

13   into <u>Dialysist</u>'s reasoning does not mean that leave must nonetheless be granted.

14   The 04-9059 action, as it is presently constituted, is not a complex one.  It asks a

15   rather narrow and straightforward question — Did anything from Bryant's

16   employment at Mattel during the 1999-2000 period give Mattel ownership rights to

17   the BRATZ doll line?  The proposed amendments would radically alter the litigation

18   in that case to include far ranging disputes involving multiple parties and concerning

19   events not connected with the BRATZ ownership issue.  That the original action

20   was a relatively simple and straight-forward matter raises another point beyond the

21   change in the action's litigation posture — whether entangling the rival doll makers'

22   other commercial disputes into this particular case would serve to muddy the waters

23   and make the matter that much more difficult to manage from the Court's

24   perspective.

25   _____

26         [7]  Mattel's repeated refrain that the matter is in its nascent stage as evidenced
     by the fact that the parties only just recently exchanged in initial disclosures is
27   misleading.  The exchange of initial disclosures referred to by Mattel is in the 05-
     2727 case.  With respect to the 04-9059 case it appears that such initial disclosures
28   were completed long ago as evidenced by the fact that discovery disputes appeared
     in that case as far back as January, 2005.

1    As has long been recognized, equally important in determining whether to

2  grant such leave is what impact such amendments would have on the court's ability

3  to manage the case.  See 3 JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE

4  § 15.15[1] at 15-42.1 to 15-43 (3rd ed. 2006)("A court should also consider judicial

5  economy and its ability to manage the case. . . .  The court should also temper the

6  policy favoring freely granting leave to amend with consideration of the ability of the

7  district court to manage the case adequately if amendment is allowed").  As Judge

8  Clark for the Fifth Circuit once observed: "In keeping with the purposes of the rule,

9  the court should consider judicial economy and whether the amendments would

10  lead to expeditious disposition of the merits of the litigation.  Finally, the court

11  should consider whether the amendment adds substance to the original allegations,

12  and whether it is germane to the original case of action."  Chitimacha Tribe of

13  Louisiana v. Harry L. Laws Co., 690 F.2d 1157, 1163 (5th Cir. 1982); see also

14  Sierra Club v. Union Oil Co. of California, 813 F.2d 1480, 1493 (9th Cir.

15  1987)("General considerations of judicial economy also justify allowing the

16  amendments. The violations included in the proposed amendment relate to the

17  same subject matter as the original complaint.  Allowing the amendment will further

18  the federal policy of 'wrapping in one bundle all matters concerning the same

19  subject matter.'").

20    Mattel's amendments do not add substance to the claims contained in its

21  original complaint.  Rather, they would expand the universe of claims and

22  defendants stretching well-beyond the questions raised in the original complaint

23  over whether Bryant's conduct while in the employ of Mattel subjected his later

24  attributed creation of the BRATZ dolls to the provisions in Mattel's Inventions

25  Agreement or otherwise rendered his creation subject to an infringement action.

26  Nowhere does Mattel seek to reconcile the breadth of its present amendments with

27  the narrowness of the allegations contained in its original complaint.  In fact, the

28  precise opposite is true.  Mattel acknowledges that its proposed amendments bear

19

1    more congruity to the allegations leveled against it in MGA's Lanham Act case than

2    to those in the action to which it seeks to add them:

3                        [M]any of the matters raised by Mattel's proposed
4                   Amended Complaint are and will remain at issue
                    because of MGA's Complaint, whether or not leave to
5                   amend is granted. MGA's claims allege that a broad
                    array of purported Mattel conduct across the globe,
6                   starting at least as early as 1999, has violated the
                    Lanham Act and unfair competition law. This includes
7                   Mattel's alleged infringement of Bratz and other MGA
                    products. As a result, <u>issues in the proposed Amended</u>
8                   <u>Complaint are already part and parcel of Mattel's</u>
                    <u>defenses to MGA's unfair competition claims</u>, including
9                   because they show that MGA and Bryant, and not
                    Mattel, are ones who stole the products and other
10                  properties involved.

11   (Reply to Bryant Opp. at 7 (emphasis added)). Mattel apparently finds this

12   discongruity unimportant because "all of these matters have been consolidated with

13   the <u>Bryant</u> case." (<u>Id.</u> at 7). As noted earlier, the fact that the cases have been

14   consolidated does not mean that the parties can ignore the distinctions that still

15   exist between them. If, as Mattel acknowledges, the present amendments are

16   nothing more than re-formulated defenses and counterclaims it presently has to

17   MGA's complaint against it in the 05-2727 case, then such amendments should be

18   brought in the form of an amended answer and counterclaim in that case.

19         Consideration of the distinctions between the two cases is wise as it serves

20   as a useful tool in providing the Court a better means to manage the cases now

21   that they have been consolidated. The proverbial dog (ownership in BRATZ)

22   should be wagging the proverbial tail (the remaining commercial disputes), not the

23   other way around. Admittedly, the dog's tail has grown in size both by MGA's filing

24   of its complaint in the 05-2727 action and Mattel's response thereto through its

25   proposed amendments. Nonetheless, it is readily apparent to the Court that the

26   crown jewel in this action still remains the ownership rights to the BRATZ dolls. The

27   parties have engaged in extensive and undoubtedly expensive discovery on this

28   very issue (from hiring world-renowned experts to test the age of Bryant's design

1   drawings to technically complex discovery of what is on each other's computers).

2        Indeed the separateness of the two matters is reflected in how the cases are

3   currently structured, namely, the narrowness of the issue involved in 04-9059 and

4   the expansiveness of the facts at issue in 05-2727.  In light of this fact, the Court

5   believes a two-track scheduling order wherein the 04-9059 matter's discovery cut

6   off and trial date are set well-ahead of those in 05-2727 makes the most sense.  As

7   noted earlier, many of the legal claims being pressed in 05-2727 will be affected by

8   the result of the litigation in 04-9059.  If, for instance, Mattel does own the rights to

9   the BRATZ dolls (either owing to Bryant's stealing his idea from one of Mattel's

10  "development programs" or by way of the Inventions Agreement because he

11  continued to work on his designs while at Mattel), then large portions of MGA's

12  Lanham Act infringement claims may become moot.  By the same token, if Mattel

13  does not own rights to BRATZ, then some of the defenses and counterclaims set

14  forth as independent claims in the present amended complaint may become moot,

15  including Mattel's copyright infringement claim as well as portions of its remaining

16  RICO, misappropriation, and aiding and abetting claims.  If, however, the Court

17  were to allow the amended complaint to be filed in the 04-9059 action, such case

18  management would be difficult, if not impossible as many of the issues being

19  litigated in the 05-2727 case would have been poured into the 04-9059 case by the

20  amendment.  Due to this substantial overlap in claims and facts, a two-track

21  scheduling order utilizing the case number distinctions would be impossible to craft.

22  When pressed by the Court at oral argument as to which of its proposed claims it

23  believed would not undermine the BRATZ ownership posture of the 04-9059 case,

24  Mattel cited to its copyright and RICO claims.  However, upon further questioning

25  by the Court, counsel for Mattel acknowledged that much of those claims were, like

26  the claims at issue in 05-2727, dependent upon resolution of the ownership issue.

27       In light of the burden allowing Mattel's amendment to proceed would have on

28  this Court's ability to efficiently manage these consolidated matters denial of

1   Mattel's request to amend its complaint in the 04-9059 matter is justified.  See

2   Perrian v. O'Grady, 958 F.2d 192, 195 (7th Cir. 1992)("The burden to the judicial

3   system can justify a denial of a motion to amend 'even if the amendment would

4   cause no hardship at all to the opposing party'").  Buttressing the Court's decision is

5   the fact that, even with such a denial, Mattel may file (and the Court provides leave

6   to Mattel to so file) an amended answer and counterclaim in the 05-2727 case

7   raising all the new claims and defendants presently sought to be achieved through

8   amendment of its complaint in the 04-9059 action.  None of the substantive

9   concerns raised by MGA and Bryant to the present amended complaint, e.g.,

10  statutes of limitations, would appear to be affected if the new claims and

11  defendants were brought as defenses and counterclaims in the 05-2727 case as

12  opposed to the 04-9059 one.

13          Accordingly, the Court GRANTS Mattel's motion for leave to file its proposed

14  amendments, but only insofar as they are pled in the form of an amended answer

15  and counterclaim in the 05-2727 case.

16          Finally, the lack of a scheduling order in this case is problematic; one should

17  have been entered long ago.  See Fed. R. Civ. P. 16(b)(noting that a scheduling

18  "order shall issue as soon as practicable but in any event within 90 days after the

19  appearance of a defendant and within 120 days after the complaint has been

20  served on a defendant").  In light of the fact that entry of a scheduling order is

21  woefully overdue in this case, the Court hereby ORDERS that a Rule 16(b)

22  scheduling conference be held in this consolidated matter on February 12, 2007, at

23  1:30 p.m. in Courtroom One.  The parties are directed to file a Joint Rule 26(f)

24  report with the Court by February 5, 2007.

25          IT IS SO ORDERED.

26  DATE:  _1-11-07_

27

28                                             STEPHEN G. LARSON
                                               UNITED STATES DISTRICT JUDGE

22