worldwide business strategies. As detailed below, MGA and Larian approached three employees of Mattel's Mexican subsidiary ("Mattel Mexico"), enticed them to steal Mattel's most sensitive business planning materials, and then hired them to assist in establishing and running MGA's new Mexican subsidiary.

### A.   MGA Hires Three Senior Mattel Employees in Mexico

38.   Carlos Gustavo Machado Gomez ("Machado") was the Senior Marketing Manager, Boys Division, for Mattel Mexico, a position of trust and confidence. He was employed at Mattel Mexico from April 1, 1997 until April 19, 2004. His duties included short, medium and long-term marketing planning, generating product sales projections, and assisting in creation of the media plan. In his position, Machado had access to highly confidential and sensitive marketing and product development information. Machado had an employment agreement with Mattel in which he agreed to maintain the confidentiality of Mattel's protected information. Mattel's policies also required Machado to protect Mattel's proprietary information and not to disclose it to competitors.

39.   Mariana Trueba Almada ("Trueba") was the Senior Marketing Manager, Girls Division, for Mattel Mexico, a position of trust and confidence. She was employed at Mattel Mexico from November 3, 1997 until April 19, 2004. Like Machado, her duties included short, medium and long-term marketing planning, generating product sales projections, and assisting in creation of the media plan. In her position, Trueba had access to highly confidential and sensitive marketing and product development information. Trueba had an employment agreement with Mattel in which she agreed to maintain the confidentiality of Mattel's protected information. Mattel's policies also required Trueba to protect Mattel's proprietary information and not to disclose it to competitors.

40.   Pablo Vargas San Jose ("Vargas") was a Senior Trade Marketing Manager with Mattel Mexico, a position of trust and confidence. He was employed at Mattel Mexico from March 29, 2001 until April 19, 2004. Vargas was

1  responsible for ensuring that point-of-sale promotions were carried out, analyzing
2  the results of such promotions, negotiating promotion budgets, and generally
3  managing promotional activities. Vargas also had access to highly confidential and
4  sensitive marketing and product development information. Vargas had an
5  employment agreement with Mattel in which he agreed to maintain the
6  confidentiality of Mattel's protected information. Mattel's policies also required
7  Vargas to protect Mattel's proprietary information and not to disclose it to
8  competitors.

9       41.    Beginning in late 2003 or early 2004, Machado, Trueba and
10  Vargas began planning to leave Mattel Mexico to join MGA. In connection with
11  that plan, and with the encouragement of Larian and other MGA officers operating
12  in the United States, they began accessing, copying and collecting proprietary
13  Mattel documents to take with them. On April 19, 2004, Machado, Trueba and
14  Vargas each resigned their positions with Mattel, effective immediately. They
15  stated that they had been hired by a Mattel competitor, but refused to identify that
16  competitor. In fact, they had been offered and accepted employment by MGA to
17  establish and run MGA's new operation in Mexico.

**B.    Machado, Trueba and Vargas Stole Dozens of Confidential Trade
     Secret Marketing and Sales Documents for MGA's Benefit**

20       42.    Following these resignations, Mattel discovered that Machado,
21  Trueba and Vargas had been in frequent telephonic and e-mail contact with MGA
22  personnel, including Larian, for over three months prior to their resignations. The
23  primary vehicle for these communications in furtherance of their "plot" was an
24  America Online e-mail account with the address <plot04@aol.com>. On
25  information and belief, during this time, Machado, Trueba and Vargas supplied
26  Larian with certain Mattel confidential and proprietary information in order to
27  prove their value to MGA and to improve their negotiating position vis-à-vis their
28  respective employment contracts with MGA.

07934/2001691.1

FIRST AMENDED COMPLAINT

EXHIBIT  14    PAGE  215

43.   In March 2004, Machado, Trueba and Vargas were making plans to travel from Mexico to Los Angeles to meet with MGA personnel in person prior to resigning their positions at Mattel.  Also, by at least March 3, 2004, Machado, Trueba and Vargas were discussing with MGA personnel, including Larian, specific details regarding setting up MGA offices in Mexico City.  On information and belief, prior to their resignations, Larian and others at MGA directed Machado, Trueba and Vargas to steal virtually all Mattel confidential and proprietary information that they could access and bring it with them to MGA.  This was reflected in, among things, e-mail messages that Mattel had discovered after Machado, Trueba and Vargas had resigned.  For example, on March 22, 2006, approximately one month before they resigned, Machado, Trueba and Vargas wrote an e-mail message from the <plot04@aol.com> e-mail account addressed to Larian, MGA's General Manager Susan Kuemmerle and another MGA officer Thomas Park.  In that e-mail message, Machado, Trueba and Vargas sought to prove their value in this endeavor to MGA by writing: "Attached you will find our analysis for future discussion.  We will be available during the nights of the week after 16:30 Los Angeles time . . . ."  In another e-mail message, showing that the participants intentionally sought to maximize the damage to Mattel from their conduct, Kuemmerle wrote to Larian and Park: "Gustavo, Mariana and Pablo want to resign (all at the same time, and you can believe my smile!) next Wednesday."

44.   Beginning on April 12, 2004, a week before his resignation and after numerous communications and meetings with Larian and other MGA personnel, Machado began transferring additional Mattel confidential and proprietary information to a portable USB storage device (also know as a "thumb drive") that he connected to his Mattel computer.  On Friday, April 16, 2004, the last business day before he gave notice, Machado copied at least 70 sensitive documents to the portable USB storage device.

07934/2001691.1

FIRST AMENDED COMPLAINT

EXHIBIT 14  PAGE 214

45.   Starting on April 12, 2004, Vargas also copied a host of confidential and proprietary materials to a portable USB storage device, including sales plans, sales projections and customer profiles.

46.   On April 16, 2004, Trueba also copied Mattel confidential and proprietary information to a portable USB storage device connected to her Mattel computer.

47.   With full knowledge that she was going to leave Mattel for a competitor, Trueba also took steps to increase further her access to Mattel's confidential information shortly before her resignation.  For example, just four days before leaving, Trueba went out of her way to seek to attend a meeting at which Mattel personnel analyzed BARBIE programs for the United States, Canada and South America.  Two days before her resignation, she contacted both a Mattel employee located in El Segundo, California and Mattel's advertising agency to request updated confidential information about advertising plans for BARBIE.  On information and belief, Trueba acted at the direction of MGA and Larian and did so in order to obtain further information that would allow MGA to obtain unfair competitive advantage over Mattel.

48.   Machado, Trueba and Vargas stole virtually every type of document a competitor would need to enter the Mexican market and to unlawfully compete with Mattel in Mexico, in the United States, and elsewhere.  They stole global internal future line lists that detailed anticipated future products, production and shipping costs for Mattel products; daily sales data for Mattel products; customer data; sales estimates and projections; marketing projections; documents analyzing changes in sales performance from 2003 to 2004; budgets for advertising and promotional expenses; strategic research reflecting consumer responses to products in development; media plans; consumer comments regarding existing Mattel products customer discounts and terms of sale; customer inventory level data; assessments of promotional campaign success; market size historical data and

1 │ projections; marketing plans and strategies; merchandising plans; retail pricing and
2 │ marketing strategies; and other similar materials.

3 │         49.   The stolen data was not limited to the Mexican market.  The
4 │ information stolen would, and did, give MGA an unfair competitive advantage in
5 │ the United States and around the world.  Further, the stolen information was not
6 │ located exclusively in Mexico, but included confidential and proprietary
7 │ information that resided on Mattel computers in Phoenix, Arizona and El Segundo,
8 │ California, and/or documents which were originally created by personnel in El
9 │ Segundo.  Included among these stolen documents was one of Mattel's earliest
10 │ internal global line lists, which included information for BARBIE products for the
11 │ upcoming year and included, for each product, the expected profit margin,
12 │ advertising expenditures, expected volume and marketing strategy.  On information
13 │ and belief, Machado, Trueba or Vargas delivered that internal line list to Larian or
14 │ another MGA officer during their negotiations with MGA.

15 │         50.   MGA has used the information taken from Mattel to obtain an
16 │ unfair advantage over Mattel, including in both the United States and Mexico.  In
17 │ fact, MGA later publicized its claim that, in 2005, it had increased its Mexican
18 │ market share by 90 percent over the prior year.  This increase came at the expense
19 │ of Mattel, which lost market share during 2004 in Mexico and was forced to
20 │ increase its advertising and promotional spending to offset further losses.

21 │         51.   Machado, Trueba and Vargas attempted to conceal their
22 │ widespread theft of Mattel's proprietary information.  For example, Machado ran a
23 │ software program on his Mattel personal computer in an attempt to erase
24 │ information, including information that would reveal the addresses to which he had
25 │ sent, or from which he had received, e-mail messages.  On information and belief,
26 │ for the same purpose Machado also damaged the hard drive of the personal
27 │ computer that he used at Mattel.

28 │

FIRST AMENDED COMPLAINT

EXHIBIT __14__ PAGE __218__

52.   On information and belief, on April 19, 2004, immediately after Machado, Trueba and Vargas simultaneously resigned, they traveled from Mexico to Los Angeles to meet with MGA personnel, including Larian, in person.

53.   Mattel notified Mexican authorities about the theft of its trade secret and confidential information.  On October 27, 2005, the Mexican Attorney General Office obtained a search warrant from the Mexican Federal Criminal Courts for MGA's facilities in Mexico City.  In that search, the Mexican authorities found and seized from MGA's offices both electronic and paper copies of a large number of documents containing Mattel trade secrets, including those that Mattel discovered through its forensic investigations, plus many others that Mattel had not known had been stolen.

54.   Based on Machado's "performance" in Mexico, Isaac Larian subsequently promoted Machado and he was transferred to MGA's main office in Van Nuys, California.  On information and belief, Machado currently resides in the County of Los Angeles, California.

## V.   MGA HIRES MATTEL'S SENIOR VICE PRESIDENT AND GENERAL MANAGER TO FACILITATE ITS THEFT AND USE OF MATTEL'S HIGHLY VALUABLE BUSINESS METHODS AND PRACTICES

55.   On October 1, 2004, Mattel's Senior Vice President and General Manager, Ron Brawer, left Mattel and joined MGA.  Tyco Toys, Inc. ("Tyco"), a predecessor to Mattel, had hired Brawer on April 22, 1996.  The same day, Brawer entered into an Employee Invention & Trade Secret Agreement with Tyco.  On April 9, 1997, Brawer became a Marketing Director for Mattel in Mount Laurel, New Jersey, and remained bound by his Employee Invention & Trade Secret Agreement.

FIRST AMENDED COMPLAINT

EXHIBIT _14_   PAGE _219_

56.   In January 2003, while Brawer held a position of trust and
confidence at Mattel, Mattel's "Code of Conduct" was circulated to all Mattel
employees worldwide.  Included in the Code of Conduct were statements that:

> Employees and Directors have an obligation to protect the
> confidentiality of Mattel's proprietary information.  Proprietary
> information is any information not generally known to the public
> that is useful to Mattel, that would be useful to its competitors or
> other third parties or that would be harmful to Mattel or its
> customers if disclosed.  Proprietary information includes trade
> secrets, revenue and profit information and projections, new
> product information, marketing plans, design and development
> efforts, manufacturing processes and any information regarding
> potential acquisitions, divestitures and investments.

> We can protect the security of Mattel's proprietary information
> by limiting access to it.  Confidential information should not be
> discussed with those who are not obligated to maintain the
> information in confidence and in public places where the
> information is not likely to be kept secret, such as planes,
> restaurants and elevators.  The obligation to preserve confidential
> information continues even after employment ends.

The Code of Conduct applied to Brawer and required that he meet his obligations
under the Code of Conduct.

57.   By 2003, Brawer had advanced within Mattel to a Senior Vice
President position over customer marketing, a position of trust and confidence.  In
his executive position, Brawer was provided access to information that was both
sensitive and confidential, including, but not limited to, detailed information related
to development, manufacture, marketing, pricing, shipping, and performance of

1  Mattel's then-current and anticipated future product lines, and other confidential

2  business plans between Mattel and its most significant retail customers.

3      58.   In December 2003, Alan Kaye, Mattel's Senior Vice President of

4  Human Resources, asked Brawer whether he was discussing potential employment

5  with MGA.  Brawer denied that he had been in contact with MGA and represented

6  that he would not talk to MGA.  Throughout 2004, Mattel reminded and stressed to

7  its employees, including Brawer, the importance of protecting Mattel's confidential

8  and proprietary materials and information.

9      59.   On March 18, 2004, in response to a survey from the President of

10  Mattel Brands, Matt Bousquette, confirming compliance with Mattel's Code of

11  Conduct, Brawer wrote back that he "applaud[ed] the company's vigorous

12  protection of it's [sic] intellectual property," reflecting Brawer's clear

13  understanding that Mattel required its proprietary information to be kept

14  confidential.

15      60.   In April 2004, Mattel promoted Brawer to Senior Vice

16  President/General Manager.  The General Manager position also is an executive

17  position of trust and confidence.  The role of a General Manager is to lead a cross-

18  functional "Customer Business Team."  Each General Manager is accountable for a

19  strategic partnership with a key Mattel retailer, covering all aspects of the business,

20  including both traditional toy sales and retail development of licensed products.

21      61.   In or about late May 2004, Brawer began performing General

22  Manager duties, working with one of Mattel's major retail customer accounts.

23  Thereafter, Brawer began receiving information related not only to the Senior Vice

24  President, Customer Marketing position that he still formally held, but also began

25  receiving detailed information related to his role as General Manager.  Brawer

26  began requesting and analyzing detailed information related to Mattel and its four

27  key retail accounts.

28

-18-

62.   On September 15, 2004, Brawer left work at noon for observance
of Rosh Hashanah.  As Brawer left, he carried a large cardboard box with binders
and other materials.  Several hours after his departure, Brawer instructed his
assistant to print Mattel's 2004 Sales Plan for one of Mattel's significant customers
and to provide it to him, falsely claiming he needed it for a meeting

63.   On September 17, 2004, Brawer returned to Mattel and
immediately informed his supervisor that he was leaving Mattel, effective October
1, 2004, to work for competitor MGA.

64.   On September 20, 2004, Mattel hand-delivered a letter to Brawer
reminding him of his continuing obligation to preserve the confidentiality of
Mattel's proprietary information and trade secrets not only through October 1,
2004, but continuing beyond the termination of his employment.

65.   At his exit interview on September 29, 2004, Mattel reminded
Brawer that he had ongoing duties of confidentiality to Mattel, even after the
termination of his employment.  Brawer was given a copy of his Original
Confidentiality Agreement, which he had signed on April 22, 1996, and another
copy of the Code of Conduct.  During the exit interview, however, Brawer noted
that he had not signed the Code of Conduct, which he intended and Mattel
understood to mean that Brawer believed he was not bound by Mattel's policy
because he had not signed it.  Brawer was unwilling to complete or sign the form
that sought to confirm that Brawer understood his ongoing obligations under the
Code of Conduct, which included the obligation to preserve the confidentiality of
Mattel's proprietary and trade secret information.

66.   On October 1, 2004, Brawer's final day of employment with
Mattel, Mattel hand-delivered to Brawer a letter that, among other things, reminded
Brawer of his confidentiality obligations to Mattel under the Code of Conduct.

67.   Upon joining MGA, Brawer became its Executive Vice-
President of Sales and Marketing.  In that role he was responsible for MGA's sales

1  worldwide. As part of those responsibilities, Brawer had and continues to have

2  responsibility for MGA's accounts with the same retailers that he worked with

3  while at Mattel.

4       68.   Brawer represented during his Mattel exit interview that he had

5  returned all proprietary information to Mattel. That representation was false. On

6  information and belief, Brawer removed proprietary and trade secret information

7  from Mattel that he did not return. Mattel is informed and believes that Brawer did

8  not return to Mattel, for example, the information contained in his contacts file.

9  The contacts file included contact information for Mattel customers, most notably

10  TRU, and extensive contact information for Mattel employees, including titles, e-

11  mail addresses and telephone numbers.

12       69.   Mattel has recently learned that Brawer has been using that

13  contact information on a regular basis, including within recent months. Since

14  leaving Mattel, Brawer has had contacts with Mattel employees, both by telephone

15  and by electronic mail. Based on his knowledge of Mattel's operations and the

16  roles of certain Mattel employees, he has targeted certain Mattel employees who

17  have broad access to Mattel proprietary information in an effort to induce and

18  encourage them to join MGA and to steal or otherwise wrongfully misappropriate

19  Mattel confidential information and trade secrets. Brawer has done so by

20  promising these Mattel employees salaries 25 percent or more higher than they earn

21  at Mattel and stating to them that they should not be concerned by legal action

22  taken by Mattel to protect its trade secrets and its rights because such claims are

23  hard to prove and easy to defeat.

24  **VI. MGA STEALS MATTEL TRADE SECRETS IN CANADA**

25       70.   In an effort to increase its market share and sales in Canada and

26  elsewhere, MGA stole Mattel trade secrets regarding Mattel's customers, sales,

27  projects, advertising and strategy, not only for Canada, but the United States and

28  the rest of the world.

71.   Janine Brisbois was a Director of Sales for the Girls Division in Canada. Mattel hired her as a National Account Manager in August 1999. When she was hired as a Mattel employee, Brisbois agreed that she would preserve and would not disclose Mattel's proprietary or confidential information. For example, Brisbois agreed:

> You must keep Mattel's Proprietary Information confidential, and you may only use or disclose such information as necessary to perform your job responsibilities in accordance with Mattel policies. Your obligation to keep Mattel's Proprietary Information confidential will continue even after any termination of your employment with your employer.
>
> . . .
>
> Mattel takes steps to maintain the secrecy and confidential nature of Mattel's Proprietary Information and, if a competitor discovered Mattel's Proprietary Information, it could significantly damage Mattel and your Employer.

72.   While with Mattel, Brisbois had responsibility for Mattel's account with TRU and later had responsibility for Mattel's Wal-Mart account. In her capacity as Sales Director-Wal-Mart/CTC/Girls Team, Brisbois had access to Mattel confidential and proprietary information regarding Mattel's future product lines, advertising and promotional campaigns and product profitability.

73.   On September 26, 2005, Brisbois resigned from Mattel to take a position as Vice President of Sales at MGA. Mattel is informed and believes that in that position Brisbois has responsibility for MGA's accounts with both TRU and Wal-Mart. During Brisbois' exit interview she was specifically asked whether she was "taking anything." Brisbois responded, "No." Both during and after her exit interview, Brisbois was advised by Mattel of her obligations to preserve Mattel's confidential and proprietary information.

74.   Mattel is informed and believes that Brisbois spoke with Isaac Larian, MGA's CEO, on September 22, 2005 at approximately 8:30 p.m., when he called Ms. Brisbois at her home.  Mattel subsequently learned that on the same day that she spoke with Mr. Larian and four days before she resigned, Brisbois copied approximately 45 Mattel documents on to a USB or "thumb" drive with the volume label "BACKPACK."  On information and belief, Brisbois removed the thumb drive from Mattel Canada's office by concealing it in her backpack or gym bag the last time that she left that office.  These documents contained Mattel trade secret and proprietary information, and included:

- a document containing the price, cost, sales plan and quantity of every Mattel product ordered by every Mattel customer in 2005 and 2006;
- the BARBIE television advertising strategy and information concerning sales increases generated by television advertisements;
- competitive analysis of Mattel vis-à-vis its competitors in Canada;
- an analysis of Mattel's girls business sales beginning in 2003 and forecasts through 2006;
- profit and loss reviews for Mattel's products being sold in Wal-Mart, including margins and profit in not only Canada, but in the United States and Mexico; and
- a document containing the product launch dates and related advertising for all Mattel new products between Fall 2005 and Spring 2006.

75.   After Mattel discovered that Brisbois had copied these sensitive documents to a thumb drive, Mattel notified Canadian law enforcement authorities. Canadian law enforcement authorities recovered from Brisbois a thumb drive with the volume label "BACKPACK" containing the documents that Brisbois had copied from Mattel's computer system.  Mattel later learned that while she was working as a Vice President of Sales at MGA, Brisbois accessed and modified documents on that thumb drive.

07934/2001691.1

-22-

76. After joining MGA, Brisbois repeatedly traveled to MGA's offices in Van Nuys, California and met with Larian and Brawer. In February, 2006, knowing that Mattel trade secrets had been seized from MGA's Mexico City offices and that at least three MGA employees were under criminal investigation, MGA nonetheless issued a press release trumpeting its 2005 performance, with Larian himself concluding, "Our international teams in Mexico and Canada have done a fantastic job."

## VII. MGA PERSUADES OTHER EMPLOYEES LEAVING MATTEL TO JOINT MGA TO MISAPPROPRIATE MATTEL TRADE SECRETS FOR THE BENEFIT OF MGA

77. In the past few years, MGA has hired directly from Mattel's United States operations at least 25 employees, from Senior Vice-President level to lower level employees. On information and belief, many of these employees were specifically targeted and recruited by MGA, including by Larian and Brawer, based on the Mattel confidential and proprietary information they could access. Many of these employees had access to information that Mattel considers to be highly proprietary and confidential. Mattel believes that some of those former Mattel employees may be observing their obligations not to misappropriate, disclose or use Mattel's confidential and proprietary information. Mattel is informed and believes, however, that certain additional employees accessed, copied and took from Mattel confidential and proprietary information, including Mattel's strategic plans; business operations, methods and systems; marketing and advertising strategies and plans; future product lines; product profit margins; and customer requirements. The misappropriated confidential and proprietary information included information that these Mattel employees were not authorized to access. On information and belief, the misappropriated confidential and proprietary information taken from Mattel is being disclosed to and used by MGA for the benefit of MGA and to the detriment of Mattel.

07934/2001691.1

-23-

EXHIBIT __14__ PAGE __226__

## VIII. LARIAN MAKES MISREPRESENTATIONS TO RETAILERS
##   ABOUT MATTEL'S PRODUCTS

78.   Defendants have engaged in other illegal practices in their efforts to compete unfairly with Mattel. Larian has a practice of sending e-mail messages to a "Bratz News" distribution list that Larian created or that was created for him. Mattel is informed and believes that the recipients of e-mail messages sent to the "Bratz News" distribution list include members of the media as well as representatives of many of Mattel's most significant customers.

79.   On May 12, 2006, Larian sent an e-mail message to the "Bratz News" distribution list that included a reference to Mattel's updated MY SCENE MY BLING BLING product with real gems. Mattel had not publicly announced this product at the time that Larian sent his May 12, 2006 e-mail. In fact, Mattel had guarded the identification of this particular product.

80.   Shortly thereafter, Larian engaged in a campaign of calling Mattel's most significant customers, including but not limited to Target and TRU, regarding the MY SCENE MY BLING BLING product with real gems. In an effort to dissuade these retailers from purchasing Mattel's MY SCENE MY BLING BLING product with real gems, Larian knowingly made false factual statements about that product to each retailer. As of the writing of this First Amended Complaint, Mattel is aware that Larian represented to each retailer that each was the only retailer to purchase the product and that Mattel would not be supporting the product with television advertising. At the time that Larian made these statements, he knew them to be false. As a result of Larian's misrepresentations, at least one retailer cancelled its order for 75,000 units of the MY SCENE MY BLING BLING product with real gems. Only after Mattel learned of Larian's misrepresentations and was able to correct them was Mattel able to assure the retailer that Larian's representations were false and to persuade the retailer to reinstate the order.

-24-

1    81.    Such conduct is not an isolated incident.  MGA and Larian, in an

2    effort to gain an unfair competitive advantage, repeatedly issued false and

3    misleading press releases.  In these press releases, MGA and Larian have

4    misrepresented Bratz's sales, Bratz's market share, Bratz's position vis-à-vis

5    Mattel's BARBIE products, sales of Mattel's BARBIE products, and the market

6    share of Mattel's BARBIE products.

7                              **CLAIMS FOR RELIEF**

8                                  **First Claim**

9                              **Copyright Infringement**

10           **(Against MGA, MGA Entertainment (HK) Limited,**

11                     **Larian, Bryant and Does 4 through 10)**

12    82.    Mattel repeats and realleges each and every allegation set forth in

13    paragraphs 1 through 81, above, as though fully set forth at length.

14    83.    Mattel is the owner of copyrights in works that are fixed in

15    tangible media of expression and that are the subject of valid, and subsisting,

16    copyright registrations owned by Mattel.  These include, without limitation, the

17    works that are the subject of Registrations VA 1-378-648, VA 1-378-649, VA 1-

18    378-650, VA 1-378-651, VA 1-378-652, VA 1-378-653, VA 1-378-654, VA 1-

19    378-655, VA 1-378-656, VA 1-378-657, VA 1-378-658, VA 1-378-659, VA 1-

20    378-660, VAu 715-270, VAu 715-271 and VAu 715-273.

21    84.    Defendants have reproduced, created derivative works from and

22    otherwise infringed upon the exclusive rights of Mattel in its protected works

23    without Mattel's authorization.  Defendants' acts violate Mattel's exclusive rights

24    under the Copyright Act, including without limitation Mattel's exclusive rights to

25    reproduce its copyrighted works and to create derivative works from its

26    copyrighted works, as set forth in 17 U.S.C. §§ 106 and 501.

27    85.    Defendants' infringement (and substantial contributions to the

28    infringement) of Mattel's copyrighted works is and has been knowingly made

07934/2001691.1

-25-

1  without Mattel's consent and for commercial purposes and the direct financial

2  benefit of defendants.  Defendants, moreover, have deliberately failed to exercise

3  their right and ability to supervise the infringing activities of others within their

4  control to refrain from infringing Mattel's copyrighted works and have failed to do

5  so in order to deliberately further their significant financial interest in the

6  infringement of Mattel's copyrighted works.  Accordingly, defendants have

7  engaged in direct, contributory and vicarious infringement of Mattel's copyrighted

8  works.

9          86.   By virtue of defendants' infringing acts, Mattel is entitled to

10  recover Mattel's actual damages plus defendants' profits, Mattel's costs of suit and

11  attorneys' fees, and all other relief permitted under the Copyright Act.

12          87.   Defendants' actions described above have caused and will

13  continue to cause irreparable damage to Mattel, for which Mattel has no remedy at

14  law.  Unless defendants are restrained by this Court from continuing their

15  infringement of Mattel's copyrights, these injuries will continue to occur in the

16  future.  Mattel is accordingly entitled to injunctive relief restraining defendants

17  from further infringement.

18                          **Second Claim**

19  **Violation of the Racketeer Influenced and Corrupt Organizations Act**

20                  **18 U.S.C. §§ 1962(c) and 1964(c)**

21                      **(Against All Defendants)**

22          88.   Mattel repeats and realleges each and every allegation set forth in

23  paragraphs 1 through 87, above, as though fully set forth at length.

24          89.   Beginning at various times from approximately 1999 through the

25  filing of this First Amended Complaint, in the Central District of California and

26  elsewhere, defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico

27  Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas and

28  Brisbois were employed by and associated-in-fact with an enterprise engaging in,

07934/2001691.1

-26-

EXHIBIT __14__  PAGE __229__

1 | and the activities of which affect, interstate and foreign commerce (the "MGA
2 | Criminal Enterprise").  The MGA Criminal Enterprise is made up of the MGA
3 | Group (MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian,
4 | certain of the Doe defendants and Brawer), the Bryant Group (Bryant and certain of
5 | the Doe defendants), the Mexican Group (Machado, Trueba and Vargas) and the
6 | Canadian Group (Brisbois).

7 |         90.   MGA, MGA Entertainment (HK) Limited, MGA de Mexico,
8 | Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas,
9 | Brisbois, and the Other Former Employees, and each of them, for the purpose of
10 | executing and attempting to execute the scheme to improperly defraud Mattel and
11 | steal its trade secret or otherwise confidential and proprietary information, by
12 | means of tortious, fraudulent and criminal conduct, did and do unlawfully, willfully
13 | and knowingly conduct and participate, directly and indirectly, in the conduct of
14 | the MGA Criminal Enterprise's affairs through a pattern of racketeering activity.
15 | Their actions include multiple, related acts in violation of:  18 U.S.C. § 1341 (mail
16 | fraud), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1512 (tampering with a witness
17 | victim, or informant), 18 U.S.C. § 1952 (interstate and foreign travel to aid
18 | racketeering), and 18 U.S.C. § 2319(a) and 17 U.S.C. § 506(a)(1)(A) (criminal
19 | copyright infringement).

20 |         91.   MGA, MGA Entertainment (HK) Limited, MGA de Mexico,
21 | Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas,
22 | Brisbois, and the Other Former Employees, and each of them, shared the common
23 | purpose of enabling MGA to obtain confidential, proprietary and otherwise
24 | valuable Mattel property through improper means in order to assist MGA in
25 | illegally competing with Mattel domestically and throughout the world.

26 |         92.   The MGA Criminal Enterprise as described herein is at all
27 | relevant times a continuing enterprise because, among obvious reasons, it is
28 | designed and did unlawfully acquire the confidential business information and

-27-

1  property of Mattel and incorporated this information and property into MGA's
2  ongoing business, marketing strategies and business methods, practices and
3  processes. The conduct of the enterprise continues through the date of this First
4  Amended Complaint and is ongoing by virtue of MGA's continuing use of Mattel's
5  information and property, all to the detriment of Mattel.

6      93.   The pattern of racketeering activity, as defined by 18 U.S.C.
7  §§ 1961(1) and (5), presents both a history of criminal conduct and a distinct threat
8  of continuing criminal activity. This activity consists of multiple acts of
9  racketeering by each member of the MGA Criminal Enterprise, is interrelated, not
10 isolated and is perpetrated for the same or similar purposes by the same persons.
11 This activity extends over a substantial period of time, up to and beyond the date of
12 this First Amended Complaint. These activities occurred after the effective date of
13 18 U.S.C. §§ 1961 *et seq.*, and the last such act occurred within 10 years after the
14 commission of a prior act of racketeering activity. These racketeering activities
15 included repeated acts of:

16      (a)   Mail Fraud:  Defendants MGA, MGA Entertainment (HK)
17                Limited, MGA de Mexico, Larian, Bryant, Machado and Does 4
18                through 10, aided and abetted by each other and some or all of the
19                remaining members of the MGA Criminal Enterprise, having
20                devised a scheme or artifice to defraud Mattel of its confidential
21                trade secret information and property by conversion, false
22                representations, concealment and breaches of fiduciary duty, did
23                for the purpose of furthering and executing such a scheme or
24                artifice to defraud, deposited or caused to be deposited matters or
25                things to be sent or delivered by the Postal Service, or any private
26                or commercial interstate carrier, or took or received matters or
27                things therefrom, or knowingly caused matters or things to be
28                delivered by mail or such carrier according to the direction

07934/2001691.1

-28-

FIRST AMENDED COMPLAINT

EXHIBIT __14__ PAGE __231__

thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 2, as alleged with greater particularity in the foregoing paragraphs and as set forth in Exhibit C;

(b) <u>Wire Fraud</u>:  Defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and Does 4 through 10, aided and abetted by each other and some or all of the remaining members of the MGA Criminal Enterprise, having devised a scheme or artifice to defraud Mattel of its confidential and trade secret information and property by conversion, false representations, concealment and breaches of fiduciary duty, did for the purpose of furthering and executing such a scheme or artifice to defraud, transmit and cause to be transmitted by means of wire communications in interstate or foreign commerce, writing, signs, signals, pictures or sound, in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 2, as alleged with greater particularity in the foregoing paragraphs and as set forth in Exhibit C;

(c) <u>Tampering With a Witness, Victim or Informant</u>:  Defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and Does 4 through 10, aided and abetted by each other and some or all of the remaining members of the MGA Criminal Enterprise, did corruptly alter, destroy, mutilate, or conceal a record, document, or other object, or attempted to do so, with the intent to impair the object's integrity or availability for use in an official proceeding.  Such actions are in violation of 18 U.S.C. § 1512 and 18 U.S.C. § 2, as alleged with greater particularity in the foregoing paragraphs;

(d) <u>Interstate and Foreign Travel in Aid of Racketeering Enterprises</u>: Defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and Does 4 through 10, aided and abetted by each other and some or all of the remaining members of the MGA Criminal Enterprise, traveled in interstate and foreign commerce, or used the mail or any facility in interstate or foreign commerce, with the intent to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of unlawful activity, *i.e.* bribery, in violation of the laws of the State of California, *Cal. Penal Code* § 641.3, all in violation of 18 U.S.C. § 1952 and 18 U.S.C. § 2, as alleged with greater particularity in the foregoing paragraphs;

(e) <u>Criminal Copyright Infringement</u>: Defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and Does 4 through 10, aided and abetted by each other and some or all of the remaining members of the MGA Criminal Enterprise, willfully infringed Mattel's copyrights, including with respect to documents containing Mattel trade secret and confidential information, for purposes of commercial advantage and private financial gain, all in violation of 18 U.S.C. § 2319(a) and 17 U.S.C. § 506(a)(1)(A), as alleged with greater particularity in the foregoing paragraphs.

94.    The persons alleged herein to have violated 18 U.S.C. § 1962(c) are separate from, though employed by or associated with, MGA, the MGA Group, the Bryant Group, the Mexican Group and the Canadian Group.

95.    MGA had a role in the racketeering activity that was distinct from the undertaking of those acting on its behalf.  MGA also attempted to benefit,

1 and did benefit, from the activity of its employees and agents alleged herein, and

2 thus was not a passive victim of racketeering activity, but an active perpetrator.

3       96.    Mattel has been injured in its business or property as a direct

4 and proximate result of the defendants' and the other enterprise members' violations

5 of 18 U.S.C. § 1962(c), including injury by reason of the predicate acts constituting

6 the pattern of racketeering activity.

7       97.   As a result of the violations of 18 U.S.C. § 1962(c), by the MGA

8 Group, the Bryant Group, the Mexican Group and the Canadian Group, Mattel has

9 suffered substantial damages, in an amount to be proved at trial.  Pursuant to 18

10 U.S.C. § 1964(c), Mattel is entitled to recover treble its general and special

11 compensatory damages, plus interest, costs and attorneys, fees, incurred by reason

12 of defendants' violations of 18 U.S.C. § 1962(c).

### Third Claim

### Conspiracy To Violate the Racketeer

### Influenced And Corrupt Organizations Act

### (18 U.S.C. §§ 1962(d) and 1964(c))

### (Against All Defendants)

18      98.   Mattel repeats and realleges each and every allegation set forth in

19 paragraphs 1 through 97, above, as though fully set forth at length.

20      99.   Beginning at various times from approximately 1999 through the

21 filing of this First Amended Complaint, in the Central District of California and

22 elsewhere, defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico,

23 Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas,

24 Brisbois and the Other Former Employees willfully, knowingly and unlawfully, did

25 conspire, combine, confederate and agree together to violate 18 U.S.C. § 1962(c).

26      100.  These conspirators were employed by and associated-in-fact with

27 the MGA Criminal Enterprise engaging in, and the activities of which affect,

28 interstate and foreign commerce.  Specifically, the MGA Group, the Bryant Group,

07934/2001691.1

FIRST AMENDED COMPLAINT

EXHIBIT __14__ PAGE __234__

1    the Mexican Group and the Canadian Group, constituting a group of individuals

2    associated-in-fact, did unlawfully, willfully, and knowingly participate in and

3    conduct, directly and indirectly, the MGA Criminal Enterprise's affairs through a

4    pattern of racketeering activity.

5          101. The pattern of racketeering activity, as defined by 18 U.S.C.

6    §§ 1961(1) and (5), including acts of mail fraud in violation of 18 U.S.C. § 1341

7    and 18 U.S.C. § 2; acts of wire fraud in violation of 18 U.S.C. § 1343 and 18

8    U.S.C. § 2; acts of tampering with witnesses, victims or informants in violation of

9    18 U.S.C. § 1512 and 18 U.S.C. § 2; acts of interstate and foreign travel in aid of

10    racketeering enterprises in violation of 18 U.S.C. § 1952 and 18 U.S.C. § 2; and

11    acts of criminal copyright infringement in violation of 18 U.S.C. § 2319(a) and 17

12    U.S.C. § 506(a)(1)(A).

13          102. Defendants and the other members of the MGA Criminal

14    Enterprise schemed to defraud Mattel and steal its property and trade secret

15    information by means of false representation, breaches of fiduciary duty,

16    conversation and concealment, as more fully set forth in the foregoing paragraphs.

17          103. In furtherance of this unlawful conspiracy, and to effect its

18    objectives, defendants and various co-conspirators committed numerous overt acts,

19    including but not limited to those set forth in the foregoing paragraphs.

20          104. Mattel has been injured in its business or property as a direct and

21    proximate result of the defendants' and the other enterprise members' violations of

22    18 U.S.C. § 1962(d), including injury by reason of the predicate acts constituting

23    the pattern of racketeering activity.

24          105. As a result of the conspiracies between and among all defendants

25    and the other conspirators to violate 18 U.S.C. § 1962(c), Mattel has suffered

26    substantial damages, in an amount to be proved at trial. Pursuant to 18 U.S.C.

27    § 1964(c), Mattel is entitled to recover treble its general and special compensatory

28

-32-

1 | damages, plus interest, costs and attorneys, fees, incurred by reason of defendants'
2 | violations of 18 U.S.C. § 1962(d).

3 | ### Fourth Claim
4 | ### Misappropriation of Trade Secrets
5 | ### (Against Defendants MGA, MGA de Mexico,
6 | ### Larian, Machado and Does 4 through 10)

7 | 106. Mattel repeats and realleges each and every allegation set forth in
8 | paragraphs 1 through 105, above, as though fully set forth at length.

9 | 107. As used herein, "Trade Secret Material" shall mean the
10 | documents, materials and information stolen by Machado, Trueba, Vargas,
11 | Brisbois, the Other Former Employees, and other persons acting for, on behalf of or
12 | at the direction of MGA and/or Larian. Prior to their theft by defendants, the Trade
13 | Secret Materials gave Mattel a significant competitive advantage over its existing
14 | and would-be competitors, including MGA. This advantage, as to MGA, has now
15 | been compromised as a result of defendants' unlawful activities.

16 | 108. Mattel made reasonable efforts under the circumstances to
17 | maintain the confidentiality of the Trade Secret Materials, including by having
18 | employees and consultants who may have access the Trade Secret Materials sign
19 | confidentiality agreements that oblige them not to disclose the Trade Secret
20 | Materials or characteristics of the Trade Secret Materials; by limiting the
21 | circulation of said materials within Mattel; by protecting and limiting access to
22 | computers with log-in identifications and passwords; by limiting each employee's
23 | access to electronic files to those that the particular employee needs to access; by
24 | educating employees on the nature of Mattel's information that is confidential and
25 | proprietary; and by reminding employees on a regular and periodic basis of their
26 | obligation to protect and maintain Mattel's confidential and proprietary
27 | information.
28 |

FIRST AMENDED COMPLAINT

EXHIBIT ___14___ PAGE _236_

1    109. Mattel's Trade Secret Materials derive independent economic

2    value from not being generally known to the public or to other persons who can

3    obtain economic benefit from their disclosure.

4    110. Defendants have illegally obtained the trade secret materials, as

5    set forth above, and through other means of which Mattel is presently unaware.

6    111. Defendants have used and disclosed Mattel's Trade Secret

7    Materials without Mattel's consent and without regard to Mattel's rights, and

8    without compensation, permission, or licenses for the benefit of themselves and

9    others.

10    112. Defendants' conduct was, is, and remains willful and wanton,

11    and was taken with blatant disregard for Mattel's valid and enforceable rights.

12    113. Defendants' wrongful conduct has caused and, unless enjoined

13    by this Court, will continue in the future to cause irreparable injury to Mattel.

14    Mattel has no adequate remedy at law for such wrongs and injuries. Mattel is

15    therefore entitled to a permanent injunction restraining and enjoining defendants,

16    and each of them, as well as their agents, servants, and employees, and all persons

17    acting thereunder, in concert with, or on their behalf, from further using in any

18    manner Mattel's trade secrets.

19    114. In addition, as a proximate result of defendants' misconduct,

20    Mattel has suffered actual damages, and defendants have been unjustly enriched.

21    115. The aforementioned acts of the defendants were willful and

22    malicious, including in that defendants misappropriated Mattel's trade secrets with

23    the deliberate intent to injure Mattel's business and improve their own. Mattel is

24    therefore entitled to enhanced damages. Mattel is also entitled to reasonable

25    attorney's fees.

26

27

28

07934/2001691.1

-34-

## Fifth Claim

### Breach of Contract

### (Against Bryant)

116. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 115, above, as though fully set forth at length.

117. Pursuant to his Employment Agreement, Bryant agreed that he would not, without Mattel's express written consent, engage in any employment or business other than for Mattel or assist in any manner any business competitive with the business or future business plans of Mattel during his employment with Mattel. Pursuant to his Mattel Employment Agreement, Bryant further assigned to Mattel all right, title and interest in "inventions," including without limitation "designs" and other works that he conceived, created or reduced to practice during his employment by Mattel. In addition, pursuant to the Conflict Questionnaire, Bryant certified that, other than as disclosed, he had not worked for any competitor of Mattel and had not engaged in any business venture or transaction involving a Mattel competitor that could be construed as a conflict of interest. Bryant further promised that he would notify his supervisor immediately of any change in his situation that would cause him to change any of the foregoing certifications or representations.

118. The Employment Agreement and the Conflict Questionnaire are valid, enforceable contracts, and Mattel has performed each and every term and condition of the Employment Agreement and Conflict Questionnaire required to be performed by Mattel.

119. Bryant materially breached the foregoing contracts with Mattel, in that, among other things, he secretly aided, assisted and worked for a Mattel competitor during his employment with Mattel without the express written consent of Mattel.

07934/2001691.1

-35-

120.  As a consequence of Bryant's breach, Mattel has suffered and will, in the future, continue to suffer damages in an amount to be proven at trial. Such damages include, without limitation, the amounts paid by the competitor to Bryant during his Mattel employment; the amounts paid by MGA to Bryant during his Mattel employment; the amount that Mattel paid Bryant during the time he wrongfully worked with MGA; the value of information and intellectual property owned by Mattel which Bryant provided to MGA; the value of the benefits that MGA obtained from Bryant during the time he was employed by Mattel; and the value of the benefits that MGA obtained from Bryant as a result of the work he performed for or with MGA during his Mattel employment.

121.  Bryant's conduct has caused, and unless enjoined will continue to cause, irreparable injury to Mattel that cannot be adequately compensated by money damages and for which Mattel has no adequate remedy at law.  Bryant specifically acknowledged in his Employment Agreement that his breach of the Agreement "likely will cause irreparable harm" to Mattel and that Mattel "will be entitled to injunctive relief to enforce this Agreement, in addition to damages and other available remedies."  Accordingly, Mattel is entitled to orders mandating Bryant's specific performance of his contracts with Mattel and restraining Bryant from further breach.

### Sixth Claim

### Intentional Interference with Contract

### (Against MGA, Larian and Does 4 through 10)

122.  Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 121, above, as though fully set forth at length.

123.  Valid agreements existed between Mattel and Bryant, Brawer, Machado, Trueba, Vargas, Brisbois and the Other Former Employees (collectively, the "Mattel Employees")

FIRST AMENDED COMPLAINT

EXHIBIT __14__ PAGE __239__

124. At all times herein mentioned, MGA, Larian and Does 4 through 10 knew that the Mattel Employees had a duty under their agreements not to work for or assist any competitor of Mattel, such as MGA. In addition, at all times mentioned herein, MGA, Larian and Does 4 through 10 knew that Bryant had assigned to Mattel, and was obligated to disclose to Mattel all inventions, including designs and other works, created, conceived or reduced to practice during their employment with Mattel.

125. Despite such knowledge, defendants MGA, Larian and Does 4 through 10 intentionally and without justification solicited, induced and encouraged the Mattel Employees to breach their contracts with Mattel.

126. As a direct and proximate result of defendants' efforts and inducements, the Mattel Employees did breach their contracts with Mattel.

127. As a result of said breaches, Mattel has suffered damages and will imminently suffer further damages, including the loss of its competitive position and lost profits, in an amount to be proven at trial.

128. Defendants performed the aforementioned conduct with malice, fraud and oppression, and in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to recover exemplary damages from defendants in an amount to be determined at trial.

## Seventh Claim

### Breach of Fiduciary Duty

### (Against Bryant and Machado)

129. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 128, above, as though fully set forth at length.

130. Bryant and Machado held positions of trust and confidence with Mattel. In their positions, Bryant and Machado had access to and were entrusted with Mattel's proprietary and confidential information, supervised the work of others, exercised discretion and worked independently in many of their job

-37-

1  assignments and duties.  In their positions, Bryant and Machado also represented
2  Mattel in its dealings with third parties and, in actions in the course and scope of
3  their employment with Mattel, were agents of Mattel.  They confirmed their
4  relationship of trust with Mattel in respective employee agreements.  Bryant and
5  Machado thus owed Mattel a fiduciary duty that included, but was not limited to,
6  an obligation not to take any action that would be contrary to Mattel's best interests
7  or that would deprive Mattel of any opportunities, profit or advantage which Bryant
8  or Machado might bring to Mattel.

9      131.  Bryant breached his fiduciary duty to Mattel in that, while
10  employed by Mattel, he secretly aided and assisted a competitor of Mattel,
11  including without limitation by entering into an agreement with a Mattel
12  competitor.  As alleged above, Bryant also breached the aforementioned duty by
13  using Mattel property and resources for the benefit of, and to aid and assist, himself
14  personally and MGA.

15      132.  Machado breached his fiduciary duty to Mattel, in that while
16  employed by Mattel, he secretly aided and assisted a competitor of Mattel by,
17  among other things, misappropriating Mattel trade secret and proprietary
18  information and providing said information to officers of MGA.  Machado also
19  breached the aforementioned duty by using Mattel property and resources for the
20  benefit of, and to aid and assist, himself personally and MGA.

21      133.  As a direct and proximate result of defendants' wrongful conduct,
22  Mattel has incurred damages in an amount to be determined at trial.

23      134.  Defendants acted with malice, fraud and oppression, and in
24  conscious disregard of Mattel's rights.  Accordingly, Mattel is entitled to an award
25  of exemplary damages against defendants in an amount to be determined at trial.

26      135. Furthermore, defendants' conduct has caused, and unless
27  enjoined will continue to cause, irreparable injury to Mattel that cannot be
28  adequately compensated by money damages and for which Mattel has no adequate

07934/2001691.1

-38-

1  remedy at law.  Accordingly, Mattel is entitled to an order restraining further

2  breach of Bryant's fiduciary duty to Mattel and/or restraining defendants from

3  continuing to benefit from such breach.

### Eighth Claim

### Aiding and Abetting Breach of Fiduciary Duty

### (Against MGA, Larian and Does 4 through 10)

7      136.  Mattel repeats and realleges each and every allegation set forth in

8  paragraphs 1 through 135, above, as though fully set forth at length.

9      137.  At all times herein mentioned, MGA, Larian and Does 4 through

10  10 knew that Bryant held a position of trust and confidence at Mattel.  At all times

11  herein mentioned, MGA, Larian and Does 4 through 10 knew that Bryant owed a

12  fiduciary duty to Mattel not to take any action that would be contrary to Mattel's

13  best interests, including but not limited to secretly developing and designing Bratz

14  while employed by Mattel and by secretly assisting Larian and MGA .

15      138.  At all times herein mentioned, MGA, Larian and Does 4 through

16  10 knew that the Mattel Employees (excluding Bryant) held positions of trust and

17  confidence at Mattel.  At all times herein mentioned, MGA, Larian and Does 4

18  through 10 knew that the Mattel Employees (excluding Bryant) owed a fiduciary

19  duty to Mattel not to take any action that would be contrary to Mattel's best

20  interests, including but not limited to taking confidential trade secret information

21  from Mattel's premises and providing that information to a competitor.

22      139.  Despite such knowledge, defendants MGA, Larian and Does 4

23  through 10 intentionally and without justification solicited, encouraged, aided and

24  abetted and gave substantial assistance to the Mattel Employees to breach their

25  fiduciary duties to Mattel, knowing that their conduct would constitute breaches of

26  their fiduciary duties to Mattel.

27      140.  As a direct and proximate result of defendants' efforts, the Mattel

28  Employees did breach their fiduciary duties to Mattel and Mattel has incurred

-39-

1   damages in an amount to be proven at trial. Mattel, therefore, is entitled to recover

2   compensatory damages in an amount to be determined at trial.

3       141. In taking the aforesaid actions, MGA, Larian and Does 4 through

4   10 acted with malice, fraud and oppression, and in conscious disregard of Mattel's

5   rights. Accordingly, Mattel is entitled to recover exemplary damages from

6   defendants in an amount to be determined at trial.

7                      **Ninth Claim**

8               **Breach of Duty of Loyalty**

9            **(Against Bryant and Machado)**

10       142. Mattel repeats and realleges each and every allegation set forth in

11   paragraphs 1 through 141, above, as though fully set forth at length.

12       143. As employees of Mattel, Bryant and Machado owed a duty of

13   undivided loyalty to Mattel. Pursuant to this duty, Bryant and Machado could not

14   compete with Mattel or assist a competitor of Mattel during their employment with

15   Mattel. Pursuant to this duty, Bryant and Machado were required to always give

16   preference to Mattel's business over their own, similar interests during the course of

17   their employment with Mattel.

18       144. Bryant and Machado breached their duty of loyalty to Mattel in

19   that, while employed by Mattel, they secretly aided, assisted and worked for a

20   competitor of Mattel, including without limitation by entering into agreements with

21   a Mattel competitor. As alleged above, they also breached the aforementioned duty

22   by using Mattel property and resources for the benefit of, and to aid and assist,

23   themselves personally and the competitor of Mattel.

24       145. As a direct and proximate result of defendants' wrongful conduct,

25   Mattel has incurred damages in an amount to be determined at trial.

26       146. Defendants acted with malice, fraud and oppression, and in

27   conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to an award

28   of punitive damages against defendants in an amount to be determined at trial.

07934/2001691.1

EXHIBIT _14_ PAGE _243_

147. Furthermore, defendants' conduct has caused, and unless enjoined will continue to cause, irreparable injury to Mattel that cannot be adequately compensated by money damages and for which Mattel has no adequate remedy at law. Accordingly, Mattel is entitled to an order restraining further breach of defendants' duty of loyalty to Mattel and/or restraining defendants from continuing to benefit from such breach.

148. In breaching their duty of loyalty to Mattel, Bryant and Machado acted with malice, fraud and oppression, and in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to recover exemplary damages from defendants in an amount to be determined at trial.

## Tenth Claim

### Aiding and Abetting Breach of Duty of Loyalty

### (Against MGA, Larian and Does 4 through 10)

149. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 148, above, as though fully set forth at length.

150. MGA, Larian and Does 4 through 10 knew that Bryant, as an employee of Mattel, owed a duty of loyalty to his employer. MGA, Larian and Does 4 through 10 knew that this duty included an obligation on the part of Bryant not to compete with Mattel or assist a competitor of Mattel during the term of his employment with Mattel. MGA, Larian and Does 4 through 10 also knew that Bryant was required to give preference to Mattel's business over his own, similar interests or those of Mattel's competitors. or those of Mattel's competitors during the course of his employment with Mattel.

151. MGA, Larian and Does 4 through 10 knew that the Mattel Employees (excluding Bryant) were employed by Mattel, and, as employees of Mattel, that they owed duties of loyalty to Mattel. MGA, Larian and Does 4 through 10 knew that these duties included an obligation on the part of the Mattel

-41-

1  Employees (excluding Bryant) not to compete with Mattel or assist a competitor of

2  Mattel during their Mattel employment.

3      152.  Despite such knowledge, defendants MGA, Larian and Does 4

4  through 10 intentionally and without justification solicited, encouraged, aided and

5  abetted and gave substantial assistance to the Mattel Employees to breach their

6  duties of loyalty to Mattel, knowing that their conduct would constitute breaches of

7  their duties of loyalty to Mattel.

8      153.  As a further consequence of defendants' efforts, Mattel has

9  suffered injury and is entitled to compensatory damages in an amount to be proven

10  at trial.

11      154.  In taking the aforesaid actions, MGA, Larian and Does 4 through

12  10 acted with malice, fraud and oppression, and in conscious disregard of Mattel's

13  rights.  Accordingly, Mattel is entitled to recover exemplary damages from

14  defendants in an amount to be determined at trial.

15                  **Eleventh Claim**

16                  **Conversion**

17              **(Against All Defendants)**

18      155.  Mattel repeats and realleges each and every allegation set forth in

19  paragraphs 1 through 154, above, as though fully set forth at length.

20      156.  Defendants wrongfully converted Mattel property and resources

21  by appropriating and using them for their own benefit and gain and for the benefit

22  and gain of others, without the permission of Mattel.

23      157.  Mattel was entitled to, among other things, the exclusive right

24  and enjoyment in property and tangible materials owned by Mattel, including

25  without limitation such proper and materials that were created by Bryant while he

26  was a Mattel product designer.  Such property was taken by Bryant from Mattel to

27  further his own interests and, in at least some instances, provided by Bryant to

28  Larian and MGA in furtherance of the interests of Bryant, Larian and MGA.

07934/2001691.1

-42-

FIRST AMENDED COMPLAINT

EXHIBIT __14__ PAGE __245__

158.  In addition, defendants wrongfully converted Mattel's property by removing the Trade Secret Materials in electronic and paper form from Mattel's offices.  Defendants did so without Mattel's permission and continue to possess them.

159.  As a direct and proximate result of defendants' wrongful conversion of Mattel property, including those relating to Bratz and Mattel's Trade Secret Materials, Mattel has incurred damages.  Mattel, therefore, is entitled to recover compensatory damages in an amount to be determined at trial.

160.   As a result of defendants' acts of conversion, Mattel is entitled to damages in an amount sufficient to indemnify Mattel for the loss suffered, which is not measured by the value of the property misappropriated, but includes the lost profits that Mattel suffered as a result of the conversion or, alternatively, the profits generated by the defendants that would not have been generated but for the conversion.  Only such a measure of damages would fully and fairly compensate Mattel for the injury it suffered due to defendants' acts of conversion.

161.  Defendants performed the aforementioned conduct with malice, fraud and oppression, and in conscious disregard of Mattel's rights.  Accordingly, Mattel is entitled to recover exemplary damages from defendants in an amount to be determined at trial.

162.  Furthermore, defendants' conduct has caused, and unless enjoined will continue to cause, irreparable injury to Mattel that cannot be adequately compensated by money damages and for which Mattel has no adequate remedy at law.  Accordingly, Mattel is entitled to an order restraining defendants from further conversion of Mattel property and resources and/or restraining defendants from continuing to benefit from such conversion.

FIRST AMENDED COMPLAINT

EXHIBIT __14__ PAGE __246__

## Twelfth Claim

### Unfair Competition

### (Common Law and *Cal. Bus. & Prof. Code* § 17200)

### (Against All Defendants)

163. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 162, above, as though fully set forth at length.

164. Section 17200 of the California Business and Professions Code prohibits unfair competition, including "any unlawful, unfair or fraudulent business act or practice . . . ."

165. By engaging in the foregoing conduct, defendants have, individually and in combination, engaged in unlawful, unfair and/or fraudulent acts of unfair competition in violation of both the common law of the state of California and *Cal. Bus. & Prof. Code* § 17200 *et seq.* Such conduct included, without limitation, MGA's commercial bribery of Bryant in violation of *Cal. Penal Code* § 641.3 and misappropriation of trade secrets in violation of 18 U.S.C. § 1832(a). Such conduct also included, without limitation, MGA's and Larian's disparagement of Mattel's products and misrepresentations as alleged above.

166. As a result of the aforementioned conduct, Mattel has suffered damages and will imminently suffer further damages, including but not limited to lost profits in an amount to be proven at trial. No adequate remedy at law exists for the wrongs and injuries Mattel has suffered and will continue to suffer, and Mattel is entitled to an injunction enjoining defendants' continued wrongful acts. Mattel is also entitled to recover compensatory and exemplary damages pursuant to the doctrine of common law unfair competition and *Cal. Civ. Code* § 3294.

07934/2001691.1

-44-

1

2

3

## **Thirteenth Claim**

### **Declaratory Relief**

### **(Against All Defendants)**

4       167.  Mattel repeats and realleges each and every allegation set forth in

5   paragraphs 1 through 166, above, as though fully set forth at length.

6       168.  As shown in the foregoing paragraphs above, an actual

7   controversy exists between Mattel and defendants regarding defendants' lack of

8   ownership interests in Bratz and Mattel's rights in the same.

9       169.  Accordingly, Mattel seeks a declaration of the Court that

10  defendants have no valid or protectable ownership rights or interests in Bratz, and

11  that Mattel is the true owner of the same, and further seeks an accounting and

12  imposition of a constructive trust over Bratz, including without limitation

13  registrations and applications for registrations relating thereto made or filed by

14  defendants and third parties, and over all revenues and other monies or benefits

15  derived or obtained from MGA's and Bryant's purported ownership, use, sale,

16  distribution and licensing of Bratz.

17      170.  Mattel seeks a declaration of the Court that any and all

18  agreements between Bryant, on the one hand, and MGA, on the other hand, in

19  which Bryant purports to assign to MGA any right, title or interests in any work

20  that he conceived, created or reduced to practice while a Mattel employee,

21  including but not limited to the Bratz designs, is void and of no effect, including

22  without limitation because Bryant had previously assigned said right, title or

23  interest to Mattel and because Mattel was otherwise the owner of said right, title or

24  interest.

### **Prayer for Relief**

26  WHEREFORE, Mattel respectfully requests judgment:

27      1.    For a declaration that defendants have no valid or protectable

28  ownership interests or rights in Bratz designs and works conceived, created or

1  reduced to practice by Bryant during the term of his Mattel employment and/or by

2  any others then-employed by Mattel, as well as in all derivatives prepared

3  therefrom, and that Mattel is the true owner of the foregoing;

4          2.      For a declaration that any agreement between Bryant, on the one

5  hand, and MGA or any person or entity, on the other hand, in which Bryant

6  purported to assign any right, title or interests in any work that he conceived,

7  created or reduced to practice while a Mattel employee, including but not limited to

8  the Bratz designs, is void and of no effect;

9          3.      For an Order enjoining and restraining defendants, their agents,

10  servants and employees, and all persons in active concert or participation with

11  them, from further wrongful conduct, including without limitation from imitating,

12  copying, distributing, importing, displaying, preparing derivatives from and

13  otherwise infringing Mattel's copyright-protected works;

14          4.      For an Order, pursuant to 17 U.S.C. § 503(a) and other

15  applicable law, impounding all of defendants' products and materials that infringe

16  Mattel's copyrights, as well as all plates, molds, matrices and other articles by

17  which copies of the works embodied in Mattel's copyrights may be reproduced or

18  otherwise infringed;

19          5.      For an Order mandating that defendants return to Mattel all

20  tangible items, documents, designs, diagrams, sketches or any other

21  memorialization of inventions created or reduced to practice during Bryant's

22  employment with Mattel as well as all Mattel property converted by defendants;

23          6.      For an Order mandating specific performance by Bryant to

24  comply with and satisfy Bryant's contractual obligations to Mattel;

25          7.      That Mattel be awarded, and defendants be ordered to disgorge,

26  all payments, revenues, profits, monies and royalties and any other benefits derived

27  or obtained as a result of the conduct alleged herein, including without limitation of

28

-46-

1   all revenues and profits attributable to defendants' infringement of Mattel's

2   copyrights under 17 U.S.C. § 504;

3          8.    For an accounting of all profits, monies and/or royalties from the

4   exercise of ownership, use, distribution, sales and licensing of Bratz;

5          9.    For the imposition of a constructive trust over Bratz, including

6   without limitation registrations and applications for registrations relating thereto

7   made or filed by defendants and third parties, and all profits, monies, royalties and

8   any other benefits derived or obtained from defendant's exercise of ownership, use,

9   sale, distribution and licensing of Bratz;

10         10.   That Mattel recover its actual damages and lost profits;

11         11.   That defendants be ordered to pay exemplary damages in a sum

12   sufficient to punish and to make an example of them, and deter them and others

13   from similar wrongdoing;

14         12.   That defendants be ordered to pay treble its general and special

15   damages, plus interest, costs and attorney's fees incurred by reason of defendants'

16   violations of 18 U.S.C. §§ 1962(c)-(d).

17         13.   That defendants be ordered to pay double damages due to their

18   willful and malicious misappropriation of Mattel's trade secrets with deliberate

19   intent to injure Mattel's business and improve its own;

20         14.   That defendants pay to Mattel the full cost of this action and

21   Mattel's attorneys' and investigators' fees; and

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

EXHIBIT __14__ PAGE __250__

1    15.   That Mattel have such other and further relief as the Court may

2   deem just and proper.

3

4   DATED:  November 19, 2006          QUINN EMANUEL URQUHART OLIVER &
                                       HEDGES, LLP
5

6                                      By  John B Quinn /var

7                                         John B. Quinn
                                          Attorneys for Plaintiff
8                                         Mattel, Inc.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

07934/2001691.1

FIRST AMENDED COMPLAINT

EXHIBIT  14  PAGE 251

# DEMAND FOR JURY TRIAL

Plaintiff Mattel, Inc. respectfully requests a jury trial on all issues triable thereby.

DATED:  November 19, 2006

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

By _John B Quinn line_____

John B. Quinn
Attorneys for Plaintiff
Mattel, Inc.

07934/2001691.1

-49-

FIRST AMENDED COMPLAINT

EXHIBIT __14__ PAGE __252__

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Exhibit A**

07934/2001691.1

EXHIBIT __14__ PAGE __253__

FIRST AMENDED COMPLAINT

# EMPLOYEE CONFIDENTIAL INFORMATION AND INVENTIONS AGREEMENT

I acknowledge that Mattel, Inc. (the "Company") operates in a competitive environment and that it enhances its opportunities to succeed by establishing certain policies, including those included in this Agreement. This Agreement is designed to make clear that: [i] I will maintain the confidentiality of the Company's trade secrets; [ii] I will use those trade secrets for the exclusive benefit of the Company; [iii] inventions that I create will be owned by the Company; [iv] my prior and continuing activities separate from the Company will not conflict with the Company's development of its proprietary rights; and [v] when and if my employment with the Company terminates, I will not use my prior position with the Company to the detriment of the Company. In consideration of my employment with the Company and other good and valuable consideration, I agree that:

## 1. Provisions Related to Trade Secrets

[a] I acknowledge that the Company protects and will continue to develop and acquire valuable Proprietary Information (as defined below), including information that I may develop or discover as a result of my employment with the Company. The value of that Proprietary Information depends on it remaining confidential. The Company depends on me to maintain that confidentiality, and I accept that position of trust.

[b] As used in this Agreement, "Proprietary Information" means any information (including formula, pattern, compilation, device, method, technique or process) that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use, and includes information on the Company: its customers, suppliers, joint ventures, licensors, licensees, distributors and other persons and entities with whom the Company does business.

[c] I will not disclose or use at any time either during or after my employment with the Company, any Proprietary Information except for the exclusive benefit of the Company as required by my duties for the Company, or as the Company expressly may consent to in writing. I will cooperate with the Company and use my best efforts to prevent the unauthorized disclosure, use or reproduction of all Proprietary Information.

[d] Upon leaving employment with the Company for any reason, I immediately will deliver to the Company all tangible, written, graphical, machine readable and other materials (including all copies) in my possession or under my control containing or disclosing Proprietary Information.

## 2. Ownership of Inventions

[a] I agree to communicate to the Company as promptly and fully as practicable all Inventions (as defined below) conceived or reduced to practice by me (alone or jointly with others) at any time during my employment by the Company. I hereby assign to the Company and/or its nominees all my right, title and interest in any patents, copyrights, patent applications or copyright applications based thereon. I will assist the Company and/or its nominees (without charge but at no expense to me) at any time in every proper way to obtain for its and/or their own benefit, patents and copyrights for all such Inventions anywhere in the world and to enforce its and/or their rights in legal proceedings.

[b] As used in this Agreement, the term "Inventions" includes, but is not limited to, all discoveries, improvements, processes, developments, designs, know-how, data computer programs and formulae, whether patentable or unpatentable.

[c] Any provision in this agreement requiring me to assign my rights in any Invention does not apply to an Invention which qualifies under the provision of Section 2870 of the California Labor Code. That section provides that the requirement to assign "shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities or trade secret information except for those inventions that either [1] relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or [2] result from any work performed by the employee for the employer." I understand that I bear the burden of proving that an Invention qualifies under Section 2870.

[d] I hereby irrevocably designate and appoint the Company and each of its duly authorized officers and agents as my agent and attorney-in-fact to act for and in my behalf and stead to execute and file any document and to do all other lawfully permitted acts to further the prosecution, issuance and enforcement of patents, copyrights and other proprietary rights with the same force and effect as if executed and delivered by me.

## 3. Conflicts with Other Activities

[a] My employment with the Company requires my undivided attention and effort. Therefore, during my employment with the Company I will fully comply with the Company's Conflict of Interest Policy, as it may be amended from time to time. I shall not, without the Company's express written consent, engage in any employment or business other than for the Company, or invest in or assist (in any manner) any business competitive with the business or future business plans of the Company.

## 4. Miscellaneous

[a] My obligations under this Agreement may not be modified or terminated, in whole or in part, except in writing signed by a Vice-President of the Company. Any waiver by the Company of a breach on any provision of this Agreement will not operate or be construed as a waiver of any subsequent breach.

[b] Each provision of this Agreement will be treated as a separate and independent clause, and the unenforceability of any one provision will in no way impair the enforceability of any other provision. If any provision is held to be unenforceable, such provision will be construed by the appropriate judicial body by limiting or reducing it to the minimum extent necessary to make it legally enforceable.

[c] My obligation under this Agreement will survive the termination of my employment, regardless of the manner of such termination. This Agreement will inure to the benefit of and be binding upon the successor and assigns of the Company.

[d] I understand that the provisions of this Agreement are a material condition to my employment with the Company. I also understand that this Agreement is not an employment contract, and nothing in this Agreement creates any right to my continuous employment by the Company, or to my employment for any particular term.

[e] Any breach of this Agreement likely will cause irreparable harm to the Company for which money damages could not reasonably or adequately compensate the Company. Accordingly, I agree that the Company will be entitled to injunctive relief to enforce this Agreement, in addition to damages and other available remedies.

[f] This agreement will be governed by and interpreted in accordance with the laws of the State of California.

[g] This Agreement contains the complete agreement between the Company and me concerning the subject matter hereof and supersedes all other agreements and understandings. This Agreement may be executed in counterparts. This Agreement will be deemed effective as of the start of Employee's employment with the Company.

**CAUTION: THIS AGREEMENT CREATES IMPORTANT OBLIGATIONS OF TRUST AND AFFECTS THE EMPLOYEE'S RIGHTS TO INVENTIONS THE EMPLOYEE MAY MAKE DURING HIS OR HER EMPLOYMENT.**

Employee Signature _(Carter H. Bryant)_

Employee Name (print): CARTER H. BRYANT

Date: 01/04/99

Witness Signature _(Teresa Newcomb)_

Name of Witness (print): TERESA NEWCOMB

M 0001622

EXHIBIT _14_ PAGE _254_

1

**Exhibit B**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

07934/2001691.1

-51-

## CONFLICT OF INTEREST QUESTIONNAIRE

BRYANT, CARTER H.          PROJECT DESIGNER

Name (Last, First, M.I.)                Job Title                    Department

**Instructions:** The purpose of this questionnaire is to confirm the propriety of relations between our key employees and our suppliers and competitors. Please read the definitions below and Mattel policies concerning Conflicts of Interest. Then answer the questions by checking the correct answer. Base your answers on personal knowledge. There is no need to make inquiries or seek additional information since lack of knowledge of a situation indicates that there is no conflict of interest. Your answers to questions 1 through 8 should cover the past twelve months and the term "you" should include members of your immediate family.

**Mattel Supplier** is interpreted broadly for purposes of this questionnaire. A Mattel supplier is any person, partnership, trust, corporation, or other enterprise which during the past twelve months has done business or currently contemplates doing business with Mattel or any Mattel subsidiary.

**Mattel Competitor** is interpreted broadly for purposes of this questionnaire. A Mattel competitor is any person, partnership, trust, corporation, or other enterprise which has done business or contemplates doing business in any field that is in competition with Mattel or any Mattel subsidiary.

**Interest** means direct or indirect ownership of any stock, bond, option or right to purchase any security, share in profits, investment, partnership interest or other profit participation or equity interest whatsoever. Interest also means any agreement to perform services for or consult with or to deliver materials to or to receive compensation of any kind from any supplier or competitor. You may disregard mutual investment trusts and publicly-owned corporations whose securities are traded publicly, in which you own not more than $25,000 in market value, but not to exceed 10% of an individual's net worth.

**Recipient of any commission, etc...** means receipt of anything of value, in cash or in kind, over $60 on any one occasion or over $300 total during the past twelve months.

- ○ YES ● NO  1. Have you owned, directly or indirectly, any interest in a Mattel supplier?
- ○ YES ● NO  2. Have you owned, directly or indirectly, and interest in a Mattel competitor?
- ○ YES ● NO  3. Have you been the recipient of any commission, fee, loan, trip, gift, benefit or anything else of value that is derived in any way from a Mattel supplier?
- ● YES ○ NO  4. Have you been the recipient of any commission, fee, loan, trip, gift, benefit or anything else of value that is derived in any way from a Mattel competitor?
- ● YES ○ NO  5. Have you or any relative of yours by blood or marriage been a director, officer, consultant, agent, employee, or representative of or acted for any Mattel competitor in any capacity?
- ○ YES ● NO  6. Have you or any relative of yours by blood or marriage been a director, officer, consultant, agent, employee, or representative of or acted for any Mattel supplier in any capacity?
- ○ YES ● NO  7. Have you engaged in any activity including the acquisition or ownership of any interest, for personal profit, not expressly within the scope of the foregoing with respect to any supplier or competitor?
- ○ YES ● NO  8. Excepting normal everyday transactions (purchase of toys, etc.) have you engaged in any business venture or transaction involving a Mattel supplier or competitor or engaged in any activity which could be objectively construed as being a conflict of interest or allegiance?
- ○ YES ● NO  9. Are you aware of any activity of any employee which you believe could be construed as a potential conflict of interest with Mattel?

If your answer to any of the above questions is "yes," please explain in the space below:

4, 5, freelance design & artwork in 1998, from appx. 5/98 - 11/98 for the Ashton Drake galleries.

I certify that I have read Mattel's policies concerning Conflicts of Interest and the answers to the above questions are true. I understand that failure to answer this questionnaire fully and truthfully constitutes grounds for immediate termination of my employment. I agree that if any change any company information to unauthorized recipients. I also agree to notify my superior immediately of any change in my situation that would cause me to answer any of the above questions differently. I further certify that, to the best of my knowledge, neither I nor any member of my immediate family is or has been engaged in any capacity which creates a Conflict of Interest.

Signature: Carter H. Bryant          Date: 01/04/98

M 0001621

EXHIBIT __14__ PAGE __256__

# EXHIBIT C

## CURRENTLY KNOWN PREDICATE ACTS BY DEFENDANTS RE MAIL AND WIRE COMMUNICATIONS

| Date | Type of Communication | Bates Reference (if applicable) |
|------|----------------------|--------------------------------|
| 4/15/2001 | Email from Isaac Larian (MGA) Aldo Horvat (GIG ITALY) | MGA000746 |
| 3/28/2001 | Email from Stephen Lee (MGA Hong Kong) to Earlylight (vendor) | MGA000747 |
| 4/15/2001 | Email from Isaac Larian Stephen Lee and Stanley Li | MGA000748-750 |
| 4/11/2001 | Email from Isaac Larian to Stephen Lee | MGA000766-767 |
| 4/10/2001 | Email from Isaac Larian to Pedro Feist (Concentra) | MGA001027-29 |
| 4/5/2001 | Email from Dave Malacrida (MGA) to Gary Cogland | MGA001030-32 |
| 4/3/2001 | Email from Isaac Larian to John Young | MGA001040-44 |
| 1/9/2000 | Email from Martin Hitch (MGA Hong Kong) to Pedro Feist | MGA001061-64 |
| 4/2/2001 | Email from Isaac Larian to Ron Stover | MGA001099-1100 |
| On or about 4/3/2001 | Fed Ex shipment from Isaac Larian to Ron Stover | MGA001099-1100 |
| 4/2/2001 | Email from Isaac Larian to Craig Cunningham (Eckerd Drugs) | MGA001105 |
| 3/28/2001 | Email from Isaac Larian to Stephen Lee | MGA001113-14 |
| On or about 3/28/2001 | Letter from Isaac Larian sent to Ron Stover | MGA001116-17 |
| 4/18/2001 | Email from Victoria O'Connor (MGA) to Avi Kreisel (Kreisel Dist.) | MGA001208-09 |
| 4/17/2001 | Email from Isaac Larian to Stephen Lee and Stanley Li | MGA001213-14 |
| On or about 4/18/2001 | Shipment from Stephen Lee to Isaac Larian | MGA001219-20 |
| 4/4/2001 | Email from Isaac Larian to John Young | MGA001278-82 |
| 3/10/2001 | Email from Isaac Larian to John Young | MGA001289-90 |
| 6/12/2003 | Facsimile transmission from MGA Entertainment to Jessie Ramirez | MGA001310 |
| 10/4/2000 | Email from David Rosenbaum (attorney for MGA) to Anne Wang (attorney for Carter Bryant) | MGA001320-29 |

07934/2001691.1

-52-

| | | | |
|---|---|---|---|
| 1 | 10/26/2000 | Email from Mercedeh Ward (MGA) to Samuel Wong, Cecilia Kwok and Franki Tsang (MGA Hong Kong) | MGA000012-13 |
| 2 | 10/25/2000 | Email from Mercedeh Ward Samuel Wong, Cecilia Kwok and Franki Tsang | MGA000015-17 |
| 3 | | | |
| 4 | 10/30/2000 | Email from Mercedeh Ward to Cecilia Kwok and Paula Treantafelles | MGA000019-21 |
| 5 | | | |
| 6 | 11/3/2000 | Email from Mercedeh Ward to Victor Lee and Paula Treantafelles | MGA000043-45 |
| | 11/4/2000 | Email from Isaac Larian to Carter Bryant and Paula Treantafelles | MGA000046-47 |
| 7 | 11/11/2000 | Email from Judy Rich to Cecilia Kwok and Mercedeh Ward | MGA000049 |
| 8 | 11/15/2000 | Emails between Paula Treantafelles and Samuel Wong and Franki Tsang | MGA000071-74 |
| 9 | | | |
| 10 | 12/8/2000 | Email from Mercedeh Ward to Cecilia Kwok and Samuel Wong | MGA000077-81 |
| 11 | On or about 12/23/2000 | Package sent from MGA Hong Kong to MGA Los Angeles per instructions from MGA Los Angeles | MGA000089-90 |
| 12 | | | |
| 13 | 12/15/2000 | Email from Paula Treantafelles to Samuel Wong and Mercedeh Ward | MGA000091-92 |
| 14 | 12/16/2000 | Email from Mercedeh Ward to Samuel Wong | MGA000097-104 |
| 15 | 12/16/2000 | Email from Isaac Larian to Franki Tsang | MGA000109-112 |
| 16 | On or about 12/16/2000 | Package of fabric swatches sent from MGA Los Angeles to MGA Hong Kong | MGA000113-122 |
| 17 | | | |
| 18 | On or about 12/20/2000 | Package of samples sent from MGA Los Angeles to MGA Hong Kong | MGA000124-125 |
| 19 | 12/20/2000 | Email from Mercedeh Ward to Cecilia Kwok | MGA000124-125 |
| 20 | 12/12/2000 | Fed Ex shipment from MGA Los Angeles to Cecilia Kwok | MGA000131-132 |
| 21 | 12/19/2000 | Email from Mercedeh Ward to Cecilia Kwok and Wendy Reed | MGA000131-132 |
| 22 | 12/20/2000 | Email from Paula Treantafelles to Jimmy Cheng, Samuel Wong, Cecilia Kwok | MGA000140-141 |
| 23 | 12/10/2000 | Email from Mercedeh Ward to Sarah Halpern | MGA000147-149 |
| 24 | 12/22/2000 | Email from Mercedeh Ward to Samuel Wong and Judy Rich | MGA000190 |
| 25 | 12/22/2000 | Email from Paula Treantafelles to Samuel Wong, Judy Rich and Mercedeh Ward | MGA000197-199 |
| 26 | | | |
| 27 | 12/29/2000 | Email from Mercedeh Ward to Samuel Wong and Cecilia Kwok | MGA000211 |
| 28 | 12/16/2000 | Email from Isaac Larian to Franki Tsang | MGA000212-217 |

FIRST AMENDED COMPLAINT

EXHIBIT __14__ PAGE __258__

| | | | |
|---|---|---|---|
| 1 | 12/27/2000 | Email from Paula Treantafelles to Franki Tsang et al. | MGA000212-217 |
| 2 | 12/26/2000 | Email from Paula Treantafelles to Carter Bryant | MGA000219 |
| 3 | 12/27/2000 | Email from Mercedeh Ward to Samuel Wong | MGA000234-236 |
| 4 | 12/27/2000 | Email from Mercedeh Ward to Cecilia Kwok | MGA000249-250 |
| 5 | 12/27/2000 | Email from Paula Treantafelles to Cecilia Kwok and Mercedeh Ward | MGA000253 |
| 6 7 | 12/27/2000 | Email from Paula Treantafelles to Samuel Wong | MGA000254, 256 |
| | 12/29/2000 | Email from Mercedeh Ward to Samuel Wong | MGA000322 |
| 8 9 | 12/29/2000 | Email from Paula Treantafelles to Carter Bryant and Mercedeh Ward | MGA000333 |
| 10 | 1/16/2001 | Email from Paula Treantafelles to Samuel Wong et al. | MGA000366-368 |
| 11 | 1/17/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000369-370 |
| 12 | 1/18/2001 | Email from Paula Treantafelles to Cecilia Kwok, Judy Rich and Carter Bryant | MGA000371-378 |
| 13 14 | 1/18/2001 | Email from Paula Treantafelles to Carter Bryant, Cecilia Kwok and Samuel Wong | MGA000379-381 |
| 15 | 2/27/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000406-414 |
| 16 | 9/27/2000 | Email from Paula Treantafelles to Franki Tsang and Judy Rich | MGA000422 |
| 17 | 10/5/2000 | Email from Isaac Larian to Carter Bryant | MGA000423 |
| 18 | 10/18/2000 | Email from Mercedeh Ward to Franki Tsang and Victor Lee | MGA000425-426 |
| 19 | 12/27/2000 | Email from Mercedeh Ward to Cecilia Kwok and Paula Treantafelles | MGA000482 |
| 20 21 | 12/22/2000 | Email from Isaac Larian to Franki Tsang, Mercedeh Ward and Paula Treantafelles | MGA000524-528 |
| 22 | 12/20/2000 | Email from Mercedeh Ward to Samuel Wong and Cecilia Kwok | MGA000530-531 |
| 23 | 10/26/2000 | Email from Paula Treantafelles to Cecilia Kwok, Isaac Larian, and Carter Bryant | MGA000539-541 |
| 24 25 | 11/2/2000 | Email from Paula Treantafelles to Cecilia Kwok | MGA000539-541 |
| | 11/2/2000 | Email from Paula Treantafelles to Cecilia Kwok and Isaac Larian | MGA000539-541 |
| 26 27 | 2/27/2001 | Email from Paula Treantafelles to Cecilia Kwok, Samuel Wong, and Judy Rich | MGA000545 |
| 28 | 2/27/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000546-547 |

07934/2001691.1

-54-

FIRST AMENDED COMPLAINT
EXHIBIT 14 PAGE 2-57

| | | |
|---|---|---|
| 2/26/2001 | Email from Paula Treantafelles to Samuel Wong, Cecilia Kwok, and Carter Bryant | MGA000548 |
| 2/26/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000549 |
| 2/26/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000550 |
| 2/24/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000551 |
| 2/23/2001 | Email from Paula Treantafelles to Cecilia Kwok and Samuel Wong | MGA000554 |
| 2/21/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000556-557 |
| 2/23/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000558 |
| 2/23/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000560 |
| 2/21/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000561 |
| On or about 2/20/2001 | Fed Ex shipment from Carter Bryant to Cecilia Kwok | MGA000566 |
| 2/20/2001 | Email from Paula Treantafelles to Cecilia Kwok | MGA000566 |
| 2/19/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000568 |
| 2/19/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000569-570 |
| 2/17/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000571-572 |
| 2/16/2001 | Emails from Paula Treantafelles to Cecilia Kwok | MGA000573, 574, 576, 582, 589-90 |
| 2/16/2001 | Emails from Paula Treantafelles to Carter Bryant | MGA000575, 579, 588 |
| 2/12/2001 | Email from Lon Ross (MGA) to Carter Bryant et al. | MGA000583-587 |
| 2/5/2001 | Email from Paula Treantafelles to Carter Bryant, Cecilia Kwok et al. | MGA000599 |
| 2/5/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000600 |
| 2/5/2001 | Email from Paula Treantafelles to Carter Bryant and Cecilia Kwok | MGA000602 |
| 2/3/2001 | Email from Paula Treantafelles to Cecilia Kwok and Judy Rich | MGA000603-05 |
| 2/2/2001 | Email from Paula Treantafelles to Carter Bryant and Cecilia Kwok | MGA000606 |

07934/2001691.1

-55-

EXHIBIT __14__ PAGE __260__   FIRST AMENDED COMPLAINT

| | | | |
|---|---|---|---|
| 1 | 1/31/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000608 |
| 2 | 1/30/2001 | Email from Paula Treantafelles to Carter Bryant and Judy Rich | MGA000609 |
| 3 | On or about 1/30/2001 | Shipment from MGA Los Angeles to Carter Bryant | MGA000609 |
| 4 | | | |
| 5 | 1/26/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000610 |
| 6 | 1/24/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000611 |
| 7 | 1/22/2001 | Email from Paula Treantafelles to Carter Bryant and Samuel Wong | MGA000612 |
| 8 | 1/22/2001 | Email from Paula Treantafelles to Carter Bryant and Cecilia Kwok | MGA000613 |
| 9 | 3/26/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000617 |
| 10 | 3/11/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000618 |
| 11 | 3/11/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000620 |
| 12 | 3/6/2001 | Email from Paula Treantafelles to Carter Bryant and Cecilia Kwok | MGA000621-622 |
| 13 | 3/6/2001 | Email from Paula Treantafelles to Cecilia Kwok and Samuel Wong | MGA000625-626 |
| 14 | 3/5/2001 | Email from Paula Treantafelles to Carter Bryant and Cecilia Kwok | MGA000625-626 |
| 15 | 3/3/2001 | Email from Paula Treantafelles to Cecilia Kwok | MGA000634 |
| 16 | On or about 3/2/2001 | Fed Ex shipment from MGA Los Angeles to MGA Hong Kong | MGA000634 |
| 17 | 4/10/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000635 |
| 18 | 4/7/2001 | Email from Paula Treantafelles to Cecilia Kwok | MGA000635 |
| 19 | 4/30/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000654 |
| 20 | 5/14/2001 | Email from Paula Treantafelles to Carter Bryant and Cecilia Kwok | MGA000655 |
| 21 | | | |
| 22 | 5/11/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000656-664 |
| 23 | 5/9/2001 | Email from Paula Treantafelles to Cecilia Kwok and Samuel Wong | MGA000666 |
| 24 | 10/20/2000 | Email from Kerri Legg (MGA) to Steve Linker and Liz Hogan | MGA0008032 |
| 25 | | Letter from Mattel de Mexico employee to Thomas Park and Isaac Larian (MGA) | |
| 26 | 3/30/2004 | Letter to Carlos Gustavo Machado Gomez from Isaac Larian | |
| 27 | | | |
| 28 | 3/30/2004 | Letter to Mariana Trueba Almada from Isaac Larian | |

FIRST AMENDED COMPLAINT
EXHIBIT 14 PAGE 261

| | | |
|---|---|---|
| 3/30/2004 | | Letter to Pablo Vargas San Jose from Isaac Larian |
| | | Email from Pablo Vargas San Jose to Mattel de Mexico |
| 4/15/2004 | | Email from Karla Papayanopulos Carvajal to Mariana Trueba Almada |
| 1/25/2004 | | Email from Mariana Trueba Almada to Carlos Gustavo Machado Gomez |
| 4/15/2004 | | Email from Therese Wilbur to Carlos Gustavo Machado Gomez |
| 4/15/2004 | | Email from Mariana Trueba Almada to Carlos Gustavo Machado Gomez attaching confidential documents |
| 3/15/2004 | | Email from Susana Kuemmerle to "plot04@aol.com" |
| 3/16/2004 | | Email from Susana Kuemmerle to "plot04@aol.com" |
| 3/22/2004 | | Email from "plot04@aol.com" to Isaac Larian copying Susana Kuemmerle and Thomas Park |
| 3/22/2004 | | Email from Isaac Larian to "plot04@aol.com" copying Susana Kuemmerle and Thomas Park |
| 3/23/2004 | | Email from Marlene Parker (MGA) to Isaac Larian and "plot04@aol.com" |
| 3/30/2004 | | Email from Thomas Park to "plot04@aol.com" copying Isaac Larian |
| 4/2/2004 | | Email from Maria de Carmen Mendez to Isaac Larian, Thomas Park, and Susana Kuemmerle |
| 4/4/2004 | | Email from Maria de Carmen Mendez to Susana Kuemmerle |
| 4/7/2004 | | Email from Maria de Carmen Mendez to Thomas Park |
| 4/12/2004 | | Email from Thomas Park to "plot04@aol.com" |
| 4/14/2004 | | Email from "plot04@aol.com" to Isaac Larian and Thomas Park |
| 4/14/2004 | | Email from Isaac Larian to "plot04@aol.com", Thomas Park and Daphne Gronich |

07934/2001691.1

-57-

| | | |
|---|---|---|
| 1 | 4/14/2004 | Email from "plot04@aol.com" to Thomas Park copying Isaac Larian and Susana Kuemmerle |
| 2 | | |
| 3 | 4/14/2004 | Email from Susana Kuemmerle to Isaac Larian and Thomas Park copying "plot04@aol.com" |
| 4 | 4/15/2004 | Email from Jean Paul Farah to "plot04@aol.com" copying Daphne Gronich |
| 5 | | |
| 6 | 4/15/2004 | Email from "plot04@aol.com" to Thomas Park copying Jean Paul Farah and Isaac Larian |
| 7 | 4/12/2004 | Email from Susana Kuemmerle to "plot04@aol.com" |
| 8 | | |
| 9 | 4/15/2004 | Email from "plot04@aol.com" to Jean Paul Farah copying Daphne Gronich and Isaac Larian |
| 10 | 4/15/2004 | Email from Mariana Trueba Almada to Andrea Ramirez |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

07934/2001691.1

-58-

FIRST AMENDED COMPLAINT

EXHIBIT __14__ PAGE __263__