# EXHIBIT 19

RECEIVED

DEC 1 0 2004

*SEND*

1   M. RANDALL OPPENHEIMER (S.B. #77649)
    DIANA M. TORRES (S.B. #162284)
2   O'MELVENY & MYERS LLP
    400 South Hope Street
3   Los Angeles, California 90071-2899
    Telephone: (213) 430-6000
4   Facsimile: (213) 430-6407

5
    Attorneys for Applicant-Intervenor
6   MGA ENTERTAINMENT, INC.

FILED
CLERK, U.S. DISTRICT COURT

DEC 7 2004

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

7
8                  UNITED STATES DISTRICT COURT
9                  CENTRAL DISTRICT OF CALIFORNIA
10
11   MATTEL, INC., a Delaware        Case No. CV 04-9059 NM (RNBx)
     Corporation,
12                                   STIPULATION PERMITTING MGA
                    Plaintiff,       TO INTERVENE AS A PARTY TO
13                                   THIS ACTION ✓ ᴏ ᴠ ᴅ ᴇ ᴠ
            v.
14                                   Hon. Nora Manella
     CARTER BRYANT, an individual;
15   and DOES 1 through 10, inclusive,
16                  Defendant.
17
18
19
20
21                                        DOCKETED ON CM
22                                         DEC 8 2004        006
23
24                                   BY
25
26
27
28
                                     STIPULATION PERMITTING MGA TO
                                        INTERVENE AS A PARTY

EXHIBIT 19  PAGE 375

1   WHEREAS, on April 27, 2004, Plaintiff Mattel, Inc. ("Mattel") filed suit

2   against Carter Bryant ("Bryant") and ten unnamed "Does" alleging breach of

3   contract, breach of the duty of loyalty, breach of fiduciary duty, conversion and

4   unjust enrichment.

5   WHEREAS, MGA, believes, at this time, that it has a significantly

6   protectable interest relating to the subject matter of the action, that the disposition

7   of the action may impair or impede MGA's ability to protect its interest absent

8   intervention, and that MGA's interest is not adequately represented by the existing

9   parties.

10   WHEREAS, Mattel is agreeable to the filing of the Answer in Intervention as

11   a procedural matter pursuant to this Stipulation, without waiver of, or prejudice to,

12   its rights, defenses or positions in this or any other action or to the Answer in

13   Intervention, including without limitation to Mattel's jurisdictional objections;

14   WHEREAS, Bryant is agreeable to the filing of the Answer in Intervention as

15   a procedural matter pursuant to this Stipulation, without waiver of, or prejudice to,

16   his rights, defenses or positions in this or any other action;

17   NOW THEREFORE, MGA, Mattel and Bryant hereby stipulate, subject to

18   this Court's approval, as follows:

19       1.    MGA may intervene as a party to this action; and

20   //

21   //

22   //

23   //

24   //

25   //

26   //

27   //

28   //

- 1 -

EXHIBIT  19  PAGE 376

1     2.    MGA shall be permitted to file its Answer in Intervention, lodged

2  concurrently with this Stipulation.

3

4    Dated:     December 3, 2004    O'MELVENY & MYERS LLP

5

6                                By:_____
                                     Diana M. Torres

7                                 Attorneys for Applicant-Intervenor
                                 MGA ENTERTAINMENT, INC.

8

9    Dated:     December___, 2004    QUINN EMANUEL URQUHART
                                 OLIVER & HEDGES LLP

10

11

12                                 By:_____
                                     Michael T. Zeller

13                                   Attorneys for Plaintiff
                                 MATTEL, INC.

14

15    Dated:     December___, 2004    LITTLER MENDELSON, P.C.

16

17                                 By:_____
                                     Keith A. Jacoby

18                                   Attorneys for Defendant
                                 CARTER BRYANT

19  IT IS SO ORDERED.

20

21    Dated:     December___, 2004

22                                   Hon. Nora M. Manella

23                                   United States District Judge

24

25

26

27

28

EXHIBIT __19__ PAGE 377

2.    MGA shall be permitted to file its Answer in Intervention, lodged concurrently with this Stipulation.

Dated:       December____, 2004       O'MELVENY & MYERS LLP


By:_____
        Diana M. Torres
Attorneys for Applicant-Intervenor
MGA ENTERTAINMENT, INC.


Dated:       December____, 2004       QUINN EMANUEL URQUHART
                                      OLIVER & HEDGES LLP


By:_____
        Michael T. Zeller
Attorneys for Plaintiff
MATTEL, INC.


Dated:       December____, 2004       LITTLER MENDELSON, P.C.


By:_____
        Keith A. Jacoby
Attorneys for Defendant
CARTER BRYANT

IT IS SO ORDERED.

Dated:       December____, 2004


                              _____
                              Hon. Nora M. Manella
                              United States District Judge

- 2 -

EXHIBIT __19__ PAGE __378__

2. MGA shall be permitted to file its Answer in Intervention, lodged concurrently with this Stipulation.

Dated: December ___, 2004      O'MELVENY & MYERS LLP

By: _____
Diana M. Torres
Attorneys for Applicant-Intervenor
MGA ENTERTAINMENT, INC.

Dated: December ___, 2004      QUINN EMANUEL URQUHART
OLIVER & HEDGES LLP

By: _____
Michael T. Zeller
Attorneys for Plaintiff
MATTEL, INC.

Dated: December 3, 2004      LITTLER MENDELSON, P.C.

By: _____
Keith A. Jacoby
Attorneys for Defendant
CARTER BRYANT

IT IS SO ORDERED.

Dated: December 7th, 2004

_____
Hon. Nora M. Manella
United States District Judge

- 2 -

EXHIBIT __19__ PAGE 379

# EXHIBIT 20

~FILED

1   DALE M. CENDALI
    (of counsel, not admitted in California)
2   DIANA M. TORRES (S.B. #162284)
    PAULA E. AMBROSINI (S.B. #193126)
3   O'MELVENY & MYERS LLP
    400 South Hope Street
4   Los Angeles, CA  90071-2899
    Telephone:  (213) 430-6000
5   Facsimile:   (213) 430-6407
    email:       dtorres@omm.com
6
7   PATRICIA GLASER (S.B. # 55668)
    CHRISTENSEN, MILLER, FINK,
    JACOBS, GLASER, WEIL &
8   SHAPIRO LLP
    10250 Constellation Boulevard, 19th Floor
9   Los Angeles, CA  90067
    Telephone:  (310) 553-3000
10  Facsimile:   (310) 556-2920

11  Attorneys for Plaintiff
    MGA Entertainment, Inc.

12

13

14          **UNITED STATES DISTRICT COURT**

15        **CENTRAL DISTRICT OF CALIFORNIA**

CV 05 - 0272 7  CBM(RZx)

| | |
|---|---|
| 16  MGA ENTERTAINMENT, INC., | Case No. |
| 17         Plaintiff, | **COMPLAINT FOR FALSE DESIGNATION OF ORIGIN, AFFILIATION, ASSOCIATION OR SPONSORSHIP (15 U.S.C. § 1125 (a)); UNFAIR COMPETITION (15 U.S.C. § 1125 (a), Cal. Bus. & Prof. Code § 17200 *et seq.* and California Common Law); DILUTION (15 U.S.C. § 1125 (c), Cal. Bus. & Prof Code § 14330 and California Common Law); AND UNJUST ENRICHMENT** |
| 18     v. | |
| 19  MATTEL, INC., a Delaware Corporation, and DOES 1-10, | |
| 20 | |
| 21         Defendants. | |
| 22 | |
| 23 | **DEMAND FOR JURY TRIAL** |

24

25

26

27

28

EXHIBIT 20   PAGE 380

Plaintiff MGA Entertainment, Inc. for its complaint against Defendants Mattel, Inc. and DOES 1-10 alleges and avers as follows:

## PARTIES

1.     Plaintiff MGA Entertainment, Inc. ("MGA") is a California corporation organized and existing under the laws of the State of California, with a principal place of business in Van Nuys, California.

2.     MGA is informed and believes, and based thereon alleges, that Defendant Mattel, Inc. ("Mattel") is a Delaware corporation with a principal place of business in El Segundo, California.

3.     MGA is ignorant of the true names and capacities of the defendants sued herein under the fictitious names DOES 1 through 10 inclusive.  MGA will seek leave of court to amend this complaint to allege such names and capacities when they are ascertained.  MGA is informed and believes, and based thereon alleges, that each of the fictitiously named DOE defendants is responsible in some manner for the wrongful conduct alleged herein.  MGA further alleges that each defendant acted in concert with, as agent or representative for, or at the request or on behalf of another or Mattel.  Each charging allegation contained herein is, therefore, also hereby alleged against each fictitiously named DOE defendant.

## JURISDICTION AND VENUE

4.     Through this action MGA asserts claims against Mattel arising under the Lanham Act, 15 U.S.C. Sections 1125 (a) and (c), California Business and Professions Code Sections 17200 *et seq.*, California Business and Professions Code Section 14330 and California common law.  This Court has original subject matter jurisdiction over MGA's federal claims pursuant to 15 U.S.C. Sections 1116 and 1121, 28 U.S.C. Section 1338(a), and 28 U.S.C. Section 1331, and supplemental

1

EXHIBIT __20__ PAGE __381__

1   subject matter jurisdiction over MGA's state law claims pursuant to 28 U.S.C.

2   Section 1367(a).

3       5.     This Court has specific personal jurisdiction over Mattel, as it has

4   purposefully committed, within the State of California, the acts from which these

5   claims arise and/or has committed tortious acts outside California, knowing and

6   intending that such acts would cause injury to MGA within the state.  The Court

7   also has general personal jurisdiction over Mattel, as it conducts continuous,

8   systematic and routine business within the State of California and the County of

9   Los Angeles.

10      6.     Venue is proper in the United States District Court for the Central

11  District of California pursuant to 28 U.S.C. Sections 1391(b) and 1391(c).

12

13                      **FACTUAL BACKGROUND**

14      7.     MGA seeks by this action to halt Mattel's habitual and unfair tactics of

15  competition-by-intimidation and serial copycatting of MGA's products, which

16  Mattel has used in an unbridled effort to cause confusion in the market place and

17  eliminate MGA as a competitor in the toy and fashion doll market long dominated

18  and controlled by Mattel.

19      8.     MGA is a privately-held company in the San Fernando Valley that

20  began in 1979 as a small consumer electronics business.  In 1987, the company

21  made its first foray into the toy business when it secured rights to market handheld

22  LCD games featuring licensed Nintendo® characters.  Building on that small

23  success, the company began marketing products for popular licensed properties

24  such as the "Power Rangers"® and "Hello Kitty"®.  This little-known but

25  successful company, however, was propelled into the limelight after its daring

26  release in June 2001 of an innovative line of fashion dolls called "BRATZ".

27  "BRATZ" are multi-ethnic fashion dolls that sport a fresh new urban and

28  contemporary look and fashion.  At the time of the release of "BRATZ", "Barbie"

2

EXHIBIT __20__ PAGE __382__

1   sales were in a slump, Mattel was in turmoil, and the market was ripe for something

2   new, exciting and inventive.  "BRATZ" fit the bill.  It is the first fashion doll that

3   has been able to seriously challenge "Barbie" for market share, and begin to loosen

4   Mattel's 50-year iron-fisted grip on the fashion doll market.

5        9.    Mattel has not taken kindly to the challenge.  Either unable or

6   unwilling to compete against "BRATZ" fairly, and on a level-playing field, Mattel

7   has, instead, taken a more expeditious approach, resorting to unfair and anti-

8   competitive business practices.  Wielding its substantial clout and influence in the

9   toy industry, Mattel has tried to muscle MGA out of business.  MGA is informed

10  and believes that Mattel has intimidated, coerced and threatened retailers, licensees,

11  suppliers and others in the industry – both in the U.S. and internationally – in order

12  to inhibit and stifle MGA's ability to compete with Mattel and to prevent MGA

13  from obtaining licensees, contracts and supplies for its products.  Mattel has also

14  serially imitated and copy-catted the look of MGA products, trade dress,

15  trademarks, themes, ideas, advertising and packaging, including for the "BRATZ"

16  line of dolls.  MGA brings this action to stop Mattel's tortious, unfair and anti-

17  competitive conduct and to recover the extensive damage that Mattel's illicit

18  behavior has caused, and continues to cause, MGA.  Mattel's own website states:

19  "As the global leader in the toy industry, we believe that how we achieve success is

20  just as important as the success itself."  It also proclaims that "unwavering integrity

21  defines our corporate culture on every level, guiding how we work and how we do

22  business."  Mattel's own corporate governance standards require it to "play by the

23  rules," complete fairly and be a good corporate citizen.  Mattel's actions, however,

24  speak louder than its words.

25

26

27

28

3

EXHIBIT __20__ PAGE _383_

## Mattel History and Performance

10.     Mattel is the world's largest toy company, but it owes its immense success chiefly to a single product: "Barbie." Since her debut in 1959, "Barbie" has been the fuel for Mattel's growth and success, turning Mattel into an international powerhouse. By the late 1990's, Mattel's annual sales of the doll approached or topped $1.8 billion and Mattel stock reached a record high of approximately $45.00 a share. At that time, the average American girl had eight "Barbie" dolls, and "Barbie" was the world's best-selling toy.

11.     Mattel's reliance on a single, 40-year old product for as much as 50% of its business turned out to be a risky business model, however. Resting on its laurels, Mattel failed to react to the shifting tastes of consumers, changing dynamics in the industry, and an increasing focus on technologically advanced and interactive toys. "Barbie's" record sales fell into a tailspin. According to one report, Adrienne Fontanella, Mattel's "Barbie" brand president, would later be quoted as saying that, "The world changed very quickly, and we missed a beat. . . Barbie wasn't talking to girls. She just wasn't hitting it."

12.     Sales began to plunge in 1997, and Mattel began posting a series of net income losses. In the first quarter of 1998, sales of the "Barbie" brand dropped 17%. This steep slide was followed by another in the second quarter, when sales fell again, down by 15%. By the end of 1998, Mattel reported an overall 14% decline in "Barbie" sales for the year and analysts were using words such as "devastating" and "a catastrophe" to describe Mattel's earnings. The company's stock fell as much as 27% in a single day. "Barbie" was having a crisis.

13.     Jill Barad, who had taken over as Mattel's chairman and chief executive in January 1997, at the height of Mattel's success, had to do something fast. Instead of focusing on and investing in new product development, however, which would obviously take time, Mattel embarked on a series of acquisitions that were seemingly aimed at quickly diversifying the company's product line and

EXHIBIT __20__ PAGE __384__

reducing its reliance on "Barbie" and on traditional retailers, such as Toys-R-Us and Wal-Mart. Mattel spent a reported $881 million in March 1997 to purchase Tyco Toys and acquire the "Matchbox" toy car brand. Just more than a year later, it spent $700 million for the Pleasant Co., a mail-order doll company and maker of the "American Girl" doll collection. And in December 1998, Mattel announced plans to fork out a monumental $3.5 billion to buy the Learning Company, followed quickly by Mattel's purchase, in March 1999, of a software company, Purple Moon.

14.   Despite these acquisitions, the company continued to struggle. The retail environment and buying patterns had unquestionably changed, but Mattel had not kept up. Despite Mattel's feverish acquisitions, Mattel's mainstay and primary profit-generator was still "Barbie." But "Barbie" had grown stale, and sales languished. Posting additional losses in the first quarter of 1999, Mattel announced that it would lay off 3,000 employees – 10% of its work force.

15.   Mattel's stock plummeted again in late 1999, dropping 30% on Mattel's announcement that it would fall as much as 55% short of analysts' earning estimates for the third quarter. Mattel blamed its troubles primarily on its expensive, $3.5 billion acquisition of the Learning Company, which had turned out to be a disaster fraught with licensing and distribution problems, bad debt, high product returns and high advertising costs.

16.   By early 2000, Mattel's stock had crashed to as low as $8 per share, and some analysts considered Mattel vulnerable to a takeover. Investors clamored for Ms. Barad's resignation, and got their wish.

17.   Jill Barad resigned from Mattel in February 2000.

18.   For three months, the company was without a permanent chief executive until Robert Eckert took the helm in May 2000. Mr. Eckert had spent 23 years at Kraft Foods, a subsidiary of Altria Group, Inc., and was widely credited

5

EXHIBIT __20__ PAGE __385__

1    with reviving its ailing cheese business.  Investors looked for him to do the same

2    for Mattel.

3        19.    Upon his arrival at Mattel, Mr. Eckert's promise, according to *Wall*

4    *Street Journal* reports, was to deliver a "leaner and meaner" Mattel.

5        20.    The "leaner" Mattel came quickly.  Mr. Eckert laid off hundreds,

6    closed factories in the United States, shipped production to Mexico, and sold off the

7    Learning Company at a fraction of what Mattel had paid for it.  It helped Mattel's

8    bottom-line, but did nothing to spur sales growth.  Even under Mr. Eckert's "leaner

9    meaner" leadership, domestic "Barbie" sales remained in a slump into 2001.  In an

10   industry that had become increasingly driven by consumer whims and fads, and the

11   hot, must-have toys of the moment, Mattel remained disinterested in devoting its

12   resources to searching for or developing a new blockbuster toy.  Mr. Eckert's

13   business plan was not to diversify, but to build upon and expand sales of its existing

14   brands.  Mattel was, after all, still generating billions in revenue despite the decline

15   of "Barbie."  And so, Mattel remained committed to its age-worn icon and its two

16   other core brands, Fisher-Price and Hot Wheels, with each of the three accounting

17   for approximately a third of the company's sales.

18       21.    Then came the competition – MGA's "BRATZ".

19

20   **"BRATZ" Dolls Revolutionize The Fashion Doll Market**

21       22.    "BRATZ" challenged "Barbie's" half-century domination of the

22   fashion-doll market like nothing ever before had been able to do.

23       23.    MGA unveiled a preliminary sample of the "BRATZ" doll at the Hong

24   Kong Toy Fair in January 2001, while continuing to finalize the product throughout

25   that spring.  Finished products were first shipped in May 2001.  MGA introduced

26   the line to consumers in June 2001.

27

28

EXHIBIT __20__ PAGE __386__

24.   Unlike "Barbie" dolls, the "BRATZ" line of dolls and branded products sported a hip, multi-ethnic urban look that appealed to contemporary teenage and pre-teen girls.

### MGA's "BRATZ"



25.   At approximately 9.5 to 10 inches tall, the "BRATZ" dolls were intentionally shorter than "Barbie" dolls and looked like no other, with disproportionately large heads, big, dramatic eyes and lips, small, thin bodies, oversized feet (to emphasize shoe fashion and to stand on their own, unlike "Barbie," which requires a stand), and up-to-date fashions.

7

EXHIBIT 20  PAGE 387

26.    Indeed, the classic "Barbie" look was nowhere to be seen in these dolls; they would never be confused with "Barbie".

**MGA's "BRATZ"**                    **Mattel's "Barbie"**




27.    Featuring and embodying the slogan "The Girls With a Passion for Fashion!", "BRATZ" dolls revitalized, transformed and expanded the fashion doll market, in particular proving popular among "tween" age girls – those between childhood and adolescence – who had been all but abandoned as a market by Mattel.

28.    The "BRATZ" line – with its unique and distinctive look – is well recognized and has been critically acclaimed and praised by consumers, retailers and toy industry analysts alike.  In 2001, the "BRATZ" line won the Toy Industry Association ("TIA") People's Choice Toy of the Year Award, the Family Fun Toy of the Year Award and Toy Wishes Hot Pick Award.  In 2002, the "BRATZ" line again won the TIA People's Choice Toy of the Year Award and the Family Fun Toy of the Year Award.  LIMA, the licensing industry's official arm, awarded MGA's "BRATZ" the best character license of the year as well as the overall best licensed property of the year for 2003.  MGA's "BRATZ" also earned the coveted TIA "Property of the Year" and "Girl Toy of the Year" for 2003, as well as the Family Fun Toy of the Year Award.  MSNBC named "BRATZ" the "Hottest Toy of the Year," and both MGA and "BRATZ" received several other accolades in

8

EXHIBIT 20  PAGE 388

2004, including the Suppliers Performance Award by Retail Category (the "SPARC" award) in the Girls' Toys category sponsored by DSN Retailing Today/Apparel Merchandising.

29.     Although but a tiny fraction of Mattel's size, with "BRATZ", MGA was able to chip away at Mattel's stranglehold on the fashion doll market, gaining shelf space and market share as "Barbie" sales remained flat or, at times, declined.

30.     The competition that MGA (once a licensee of Mattel!) and "BRATZ" posed to Mattel was unexpected and unwelcomed by Mattel. Where "Barbie" had once enjoyed a 90% share of the fashion doll market in 1997, that share had already slipped to 85% or less by the time of the release of "BRATZ". With the company still struggling under Mr. Eckert to overcome prior years of declining sales and mounting debt, "Barbie," Mattel – and Mr. Eckert – simply could not afford the untimely competition. Mr. Eckert's "leaner" Mattel was not enough to battle more potential erosion in "Barbie's" market share. Mattel had to combat "BRATZ" and MGA, and in the process revealed Mr. Eckert's "meaner" Mattel.

**Mattel's Response to "BRATZ" and Efforts to Thwart MGA's Competition**

31.     Mattel was not poised to nimbly respond to "BRATZ" with a new, creative product of its own -- indeed, it had been antithetical to Mattel's corporate culture and mentality for Mattel to even conceive that a product might vie for shelf space with "Barbie", let alone be available for sale to consumers mere months after first being shown to retailers. Mattel had to take a more expeditious route.

32.     Instead of fairly competing, Mattel waged war against MGA using a wide-array of tortious, unfair and anti-competitive practices including systematic, serial copycatting and intellectual property infringement, aided by intimidation, threats and other acts of unfair competition and anti-competitive conduct, all with one goal in mind – to banish MGA from the market – or minimize its ability to capture any meaningful share before it could do any real harm to Mattel.

9

EXHIBIT _2-0_ PAGE _389_

**Mattel's serial copycatting and intellectual property infringement**

33.   Mattel's serial copycatting of MGA's product lines began with the "BRATZ" dolls themselves, but quickly extended to MGA's packaging, themes, accessories, advertising and even other product lines.

34.   The first four "BRATZ" dolls that MGA launched in 2001, named Jade, Yasmin, Cloe and Sasha, met their wannabe "BRATZ PACK" members in October 2002 with Mattel's launch of three "My Scene" dolls named Madison, Chelsea and "Barbie." This was no ordinary "Barbie", however. Indeed, not even close. Mattel designed its "My Scene" dolls to evoke the unique and distinctive look of the "BRATZ" – also with disproportionately oversized heads, artfully made-up almond-shaped eyes, large, overly-lined and lipsticked lips, trendy, hip clothes and hair styles, and over-sized feet.

<u>**Mattel's Traditional "Barbie"**</u>          <u>**Mattel's "My Scene" Doll**</u>

circa 2002                     circa 2004

  

 

10

EXHIBIT __20__ PAGE __390__

35.     These confusingly similar "BRATZ" imitators may have been originally intended to buy Mattel time while it worked to release another product the following summer, called "Flavas". MGA's founder, Isaac Larian, was quoted by the media as having predicted that the move would backfire on Mattel, and it did. Released in July 2003, Mattel's "Flavas" dolls took the urban, "hip-hop" look too far, and were widely viewed as portraying a trampy, "bad-girl" image. The dolls were not well-received, and rumor has it that Mattel had to sell them at below cost prices to get rid of inventory. Most apparently wound up in discount bins, and Mattel has seemingly abandoned the line.

36.     Realizing that "My Scene" was its best bet for riding MGA's successful coattails and capitalizing on the unique and inherently distinctive look that MGA had developed in its "BRATZ" dolls – and MGA's substantial goodwill – Mattel has systematically proceeded to modify the "My Scene" dolls since their original release, particularly their eyes, to increase their similarity to "BRATZ" more and more over time.

37.     Indeed, when Mattel found out that its initial line of "My Scene" dolls had trouble competing with "BRATZ", they simply *became* "BRATZ", in every version, whether blonde, brunette or African American. A few pictures here are worth a thousand words.

**BLONDE**

| Mattel's Traditional "Barbie" | Mattel's Original "My Scene" | Mattel's Recent "My Scene" |
|---|---|---|
|  |  |  |

11

EXHIBIT __20__ PAGE __391__

| Mattel's Traditional "Barbie" | Mattel's Original "My Scene" | Mattel's Recent "My Scene" |
|---|---|---|



**BRUNETTE**

| Mattel's Traditional "Theresa" | Mattel's Original "My Scene" | Mattel's Recent "My Scene" |
|---|---|---|



12

EXHIBIT __20__ PAGE __392__

## AFRICAN AMERICAN

| Mattel's Traditional "Barbie" | Mattel's Original "My Scene" | Mattel's Recent "My Scene" |
|---|---|---|

38.    The original "My Scene" eye, as shown here, for example, has recently turned into a virtual carbon-copy of the "BRATZ" eye.

### Original Mattel "My Scene" Eye




13

EXHIBIT __20__ PAGE __393__

39.    The "My Scene" eye pictured above, for instance, has lashes that radiate almost straight out, circumferentially, from the eyelids and, although the eye is more almond shaped than a "Barbie" eye, the eye is not so sleepy and heavy lidded as a "BRATZ" eye and is only lightly shadowed.  The new "My Scene" eye, in contrast, is dramatically more similar to a "BRATZ" eye, as shown below in a side-by-side comparison.  The doe-eyed innocent look of the "My Scene" eye shown above is gone; replaced with a sultrier look, characteristic of "BRATZ."  The new "My Scene" eye, as shown below, boasts lashes that sweep out and away from the outer corner of the eye, just like the "BRATZ" eye.  The new "My Scene" eye is also more heavy lidded and thickly lined, and the make-up is more markedly pronounced and dramatic.

**MGA's "BRATZ" Eye**                      **New Mattel "My Scene" Eye**

                

40.    Indeed, the progression of the "My Scene" eye, as it has departed from "Barbie" and edged closer and closer to "BRATZ", is readily apparent from virtually every angle, as shown here:

14

EXHIBIT _20_ PAGE _394_



EXHIBIT __20__ PAGE __395__



16

EXHIBIT _20_ PAGE_396_

41.   Mattel has not stopped at the eyes, however.  Mattel has also incrementally but steadily modified its "My Scene" packaging, and the manner in which the dolls are displayed, to more closely mimic the packaging, trade-dress and overall look and total image of MGA's "BRATZ".

42.   To illustrate, Mattel's "My Scene" dolls were initially marketed like this:

### Mattel's Early "My Scene" Packaging



43.   Little by little, however, the packaging has changed, creeping ever closer and closer to the open and transparent style of the "BRATZ" packaging.  First, the panels seen running down each side of the front of the "My Scene" box shown above, framing the doll and giving the packaging a closed-in look, were changed as shown here:

### Intermediate Mattel "My Scene" Packaging



17

EXHIBIT __20__ PAGE __397__

44.    Mattel replaced this intermediate packaging style with another that looked even more similar to the "BRATZ" packaging, as shown here in a side-by-side comparison:

**MGA's "BRATZ"**
**"Wintertime Wonderland" Packaging**

**Mattel's "My Scene"**
**"Chillin' Out" Packaging**





45.    Then later, Mattel changed its packaging and product display yet again to look even more closely and confusingly similar to MGA's packaging and "*tout ensemble*," as shown here

**MGA's "BRATZ"**
**"SPORTZ" Packaging**

**Mattel's Recent "My Scene"**
**"MIAMI GETAWAY" Packaging**





18

EXHIBIT __20__ PAGE __398__

46.    In this incarnation, Mattel notably abandoned the signature figure-eight style design that had appeared on its prior "My Scene" packaging, making this recent version clearer and more transparent on the front and sides than ever before, and much more like "BRATZ", accordingly.  Mattel also discarded its traditional, rectangular shaped box and, like "BRATZ", adopted an unusual, non-rectangular shaped box.  Mattel even adopted the "flying banner" ribbon-style slogan running across the middle of the box, similar to that used on the "BRATZ" packaging.

47.    As if these pointed and deliberate efforts to confuse and mislead consumers were not enough, Mattel exacerbated the confusion, and furthered the impression that the "My Scene" line and the "BRATZ" line are related, by taking up MGA's practice of regularly releasing new dolls in connection with a theme – but not just *any* theme, often *MGA's theme.*

48.    For example, when MGA released its "Wintertime Wonderland" theme in Fall 2003, Mattel released its "Chillin Out!" theme.  Each doll in MGA's line came with winter-sports accessories, such as a snowboard or skis and ski boots.  Each doll in Mattel's line featured winter sports accessories, also including snowboards or ski and ski boots.  Even MGA's color schemes and some of the clothing styles seemed to have made their way into the Mattel products.

49.    When MGA released its "Formal Funk" theme, Mattel released its "Night on the Town" theme.  "BRATZ Formal Funk" was an elaborately themed line with its dolls in hip formalwear; so was Mattel's "Night on the Town."

50.    When MGA released its distinctive "Sun-Kissed Summer" theme, Mattel released its confusingly similar "Jammin' in Jamaica" theme.  Each line featured a bright blue-and-orange color scheme, beach accessories, such as surfboards, and beachwear clothing.  Mattel's "Jammin' in Jamaica" "Guava Gulch Tiki Lounge" playset also contained elements remarkably similar to MGA's "Sun-Kissed Summer" playset.

19

EXHIBIT _20_ PAGE _399_

51.   Mattel also began running television commercials for its "My Scene" dolls bearing a remarkable similarity to "BRATZ" commercials, combining live action with animated sequences set to similar sounding pop music and lyrics.

52.   Mattel even stooped so low as to mimic "BRATZ" accessories and related products in order to further create consumer confusion in the marketplace.

53.   For instance, when MGA came up with its distinctive "BRATZ" "Runway Disco", Mattel came out with a "My Scene" Sound Lounge with packaging that imitated MGA's trapezoidal box.

54.   Mattel's conduct cannot be explained by sheer coincidence, nor is it merely fair competition.  It is a calculated and intentional effort unquestionably designed to trade off of MGA's hard work and goodwill, create confusion in the marketplace, steal MGA's thunder and momentum, and dilute and blur away the novelty and distinctiveness of MGA's products.  Out of the seemingly endless possibilities that Mattel could have chosen for a new line of dolls, packaging, themes, color schemes, commercials, accessories and playsets, Mattel deliberately chose *not* to come out with something unique, new or different and has, instead, focused its efforts and resources on flooding the market with something so close to "BRATZ" that the public will, can, and does, simply mistake it for "BRATZ".

55.   As yet another example of this, when MGA came out with a "BRATZ" "Funky Fashion Makeover Head," Mattel came out with a confusingly similar – indeed, practically identical – "My Scene" styling head.

20

EXHIBIT __20__ PAGE __400__

| MGA's "BRATZ"<br>"Funky Fashion Makeover Head" | Mattel's "My Scene"<br>"Stylin' Head" |

  

   

56.    Indeed, Mattel's "My Scene" styling head is so close to the "BRATZ" styling head that even the press have mistakenly pictured and identified it as MGA's "BRATZ". The picture of Mattel's "My Scene" styling head shown below, for instance, appeared in the press with a caption indicating that the child was trying out different hairstyles "on a *Bratz* hair and makeup doll head."



Hairstyle practice

21

EXHIBIT _20_ PAGE _401_

57.   Creating further confusion, Mattel's television commercial for its "My Scene" styling head was like watching a re-run of MGA's commercial for its "Funky Fashion Makeover Head".

58.   At one point in time, Mattel also used a portion of the "BRATZ" dolls' now-famous trademarked tag line "The Girls With a Passion for Fashion" on Mattel's' website for its "Diva Starz" dolls, asking its website users:  "Do you have a passion for fashion?"

59.   Mattel has even recently come out with a confusingly similar line of "My Scene" plush pets, which adopt the distinctive look of MGA's "BRATZ" line. The "My Scene" pets feature large, humanlike eyes and wear clothing making them remarkably and confusingly similar to "BRATZ" products, including "BRATZ PETZ", as seen in this example where the pets each wear a jacket, a cap and carry a purse:

**MGA's "BRATZ Dogz"**          **Mattel's "My Scene" dog**

   

60.   And here too, Mattel chose to package its pets the same way that MGA packaged its "BRATZ PETZ", sitting in an open box, with no top and with partial side panels that slope from a narrow front panel to a higher back panel.

61.   Indeed, the similarity of the "My Scene" pets to "BRATZ PETZ" has confused even sophisticated retailers who have mistakenly merchandised "My Scene" dogs in the middle of the "BRATZ" section of a retail display, next to and as if they were part of MGA's "BRATZ Petz" line.  It comes as no surprise that

22

EXHIBIT __20__ PAGE __402__

1    customers too have been confused.

2         62.   Indeed, Mattel's television commercials and "My Scene" products

3    have become so confusingly similar to MGA's that even advertising executives

4    have expressed concern.  One went so far as to say that although imitation is the

5    best form of flattery, what the individual had seen at Mattel's showroom, and how

6    its "My Scene" dolls now look so confusingly similar to "BRATZ", was

7    "shocking."  This person further opined that it was clear that Mattel is intending to

8    confuse customers and capture "BRATZ" market share, and even asked MGA if it

9    was considering legal action.

10        63.   The press also has taken notice of Mattel's attempts to confuse

11   consumers.  On or about February 18, 2005, a visitor to MGA's showroom from a

12   prominent news publication stated, "Oh my, I just came from Mattel's showroom

13   and their new 'My Scene' packaging is just like 'BRATZ' minus the handle."

14   Another member of the press visiting MGA's showroom offered the unsolicited

15   comment, "have you seen the new 'My Scene' dolls eyes are exactly like

16   'BRATZ'?"  Yet another opined that Mattel's "My Scene" line was exactly like

17   "BRATZ", indeed, so much so that the reporter confusingly thought that Mattel had

18   bought "BRATZ", and still another has commented on Mattel's imitation of MGA.

19   On or about February 16, 2005, during an interview of a Mattel representative on

20   local network news in New York, "My Scene Barbie" was displayed by a Mattel

21   representative.  During conversation about the dolls, the interviewer exclaimed that

22   they looked like "BRATZ".  The Mattel representative just laughed – but this is no

23   laughing matter.  This colloquy was available for replay and viewing, and was even

24   transcribed, on the internet.

25        64.   Customers too have been similarly confused.  Some actually contacted

26   MGA seeking to purchase "My Scene" dolls.

27        65.   Mattel's conduct is planned, deliberate and intentional.  Mattel has

28   systematically, copied, imitated and liberally borrowed many of the distinctive,

23

EXHIBIT 20   PAGE 403

essential elements that identify and make "BRATZ" dolls "BRATZ" dolls, diluting the brand, creating customer confusion, and unfairly stifling competition.

66.    Ironically, Mattel sued one of its other competitors in Europe for doing much the same thing: "systematically copying and borrowing elements" from "My Scene", on grounds that "this conduct constitutes unfair competition and passing off." Indeed it does.

67.    What is more, Mattel's conduct has reached beyond "BRATZ" and "BRATZ"-related products to include other new MGA toy lines.

68.    For example, MGA's "4-Ever Best Friends" line was the obvious, and well-recognized model for Mattel's "Wee 3 Friends" line. Mattel even adopted changes to the color scheme of its similarly-shaped packaging to create confusion with MGA's distinctive packaging.

<u>**MGA's "4-Ever Best Friends"**</u>        <u>**Mattel's "Wee 3 Friends"**</u>







EXHIBIT ___20___ PAGE ___404___

69.   In the second half of 2002, MGA's "Mommy's Little Patient," originally designed as the first in a series of "Mommy's Little . . ." dolls, was followed by Mattel's "Little Mommy" doll.

| MGA's "Mommy's Little Patient" | Mattel's "Little Mommy Potty Training Baby Doll" |
|---|---|
|  |  |

70.   Sparing nothing, Mattel has also extended its monkey-see monkey-do behavior into its boys' line.  When MGA came out with its "Alien Racers" line of toy racing vehicles, for instance, Mattel rushed to revamp and rename one of its "Hot Wheels" lines.  Although well-known and clearly branded for decades as "Hot Wheels", Mattel's answer to MGA's "Alien Racers" was to re-brand and market its Hot Wheels Highway 35 line under an "AcceleRacerS" logo.  MGA's line consists of "extreme" radio controlled racing vehicles marketed in connection with a strong, almost battle-like, science fiction theme.  MGA's logo accentuates the "A", "R", and "S" in compressed block lettering.  Mattel's line also consists of extreme racing vehicles marketed in connection with a strong, almost battle-like, theme.  Mattel's logo too accentuates the "A", "R", and "S" in compressed block lettering.

25

EXHIBIT ___20___ PAGE ___405___

71.     Here, too, Mattel's mimicry has spilled over into Mattel's advertising and thematic presentation and marketing of this toy line.  In particular, Mattel has adopted MGA's "other-worldly" theme in its commercials.  For instance, in Mattel's commercials, the product, whose logo appears as "AcceleRacerS", now compete against alien-like Cyborgs engaged in a "race to save the world," mimicking MGA's alien theme and commercials in which MGA's "Alien Racers" are engaged in a "race to save the universe."

72.     None of this is coincidence.  Mattel has deliberately adopted a pattern and practice of coming out with variations of MGA's products to create confusion in the marketplace, interfere with MGA's business and divert profits away from MGA.  Mattel says, on its website, that it is in the business of creating "[t]he world's premier toy brands [of] today and tomorrow."  It seemingly does so, however, by borrowing liberally from its competitors, even when it refreshes its own existing brands and products.

73.     MGA has suffered extensive injury from Mattel's conduct.  Mattel's habitual, serial simulation of MGA's products, product lines and trade dress has allowed Mattel to take a free ride on the extensive amount of time, expense and creative development MGA expends on developing new products, product packaging and presentation, giving Mattel an unfair advantage, and making it virtually impossible for MGA to compete with Mattel on a level playing field.

**Mattel's additional unfair, manipulative, anti-competitive conduct**

74.     This already substantial injury has been exacerbated by the strong-arm tactics, and other illegitimate, unfair and anti-competitive means that Mattel has used to manipulate the market and ensure that its control and domination of the industry can continue unabated.

26

EXHIBIT 20 PAGE 406

75.     For example, wielding the litigation privilege as a potential shield for intimidating conduct, Mattel has sent threatening letters to several of its former employees who now work for MGA warning them not to disclose ***even publicly available information*** about Mattel, including the names and positions of Mattel employees.  Mattel even went so far as to sue one of its former senior executives, after he had the temerity to resign and join MGA in October 2004.  Not only was Mattel's lawsuit dismissed for failure to state a viable claim, but Mattel thereafter seemingly could not muster up a shred of evidence sufficient to support an amended complaint.  As a result, Mattel's case against its former executive was dismissed with prejudice.

76.     Mattel has also warned a number of companies, including the biggest publishing entity in the United Kingdom, not to license MGA products, or risk retribution.  The threats are not idle.  In May 2004, Mattel terminated one of its licensees, apparently in retribution for licensing "BRATZ".  While some companies have been courageous enough to take the risk, others have not, and MGA has lost valuable licensing opportunities as a result.

77.     Mattel has used similar intimidation to pressure distributors and retailers, particularly in foreign countries, not to distribute "BRATZ", to reduce shelf and display space for "BRATZ" and to place "BRATZ" in unfavorable locations at retail outlets.

78.     When MGA faced a shortage of doll hair in October 2002, MGA is informed and believes that the reason for that shortage was that Mattel had locked MGA out by buying up the supply from the two main hair supply companies.

79.     Mattel has also manipulated the retail market.  For instance, Mattel merchandisers have been caught tampering with MGA's retail displays, replacing favorably located MGA merchandise with Mattel merchandise instead.  MGA is also informed and believes that Mattel has falsely told a major United States retailer that MGA was giving another major United States retailer below-market pricing

EXHIBIT  20  PAGE 407

1    and falsely told a United Kingdom retailer that MGA was discontinuing one of its

2    lines, in order to make such line less attractive to buyers and thereby attempt to

3    increase sales of the competitive Mattel product and improve its own sales, at

4    MGA's expense.

5        80.    Even supposedly unbiased and impartial industry organizations have

6    fallen prey to Mattel's abusive wield of power, to MGA's detriment.

7        81.    NPD Funworld ("NPD"), for one, is the leading supplier of sales

8    statistics in the toy industry.  Accurate NPD statistics are essential for efficient

9    product-line management.  Without these statistics, it is difficult, if not impossible,

10   for toy companies to assess and measure the relative success of their products in

11   key categories.  It is, however, a subscription service, and NPD restricts the manner

12   in which its subscribers may use the data it provides.

13       82.    Mattel has regularly ignored the restrictions – using NPD data about

14   Mattel's comparative standing relative to other companies in press releases and in

15   communications with retailers and financial investors who are not NPD subscribers.

16       83.    Mattel generates substantially more annual subscription revenue for

17   NPD than does MGA, and carries more clout.

18       84.    After MGA had subscribed to the service for more than 12 years, NPD

19   terminated MGA's subscription in 2003 theoretically on the grounds that MGA

20   misused NPD data in a press release.

21       85.    MGA is informed and believes that the termination was the result of

22   pressure from Mattel, notwithstanding Mattel's own frequent violations of NPD's

23   restrictions.

24       86.    In addition to this, the market share numbers that NPD generates are

25   heavily dependent on the category in which NPD places a particular product.  MGA

26   is informed and believes that Mattel also pressured NPD into changing certain

27   product classifications for its "BRATZ" products in order to manipulate the data

28

28

EXHIBIT  20  PAGE  408

1   and preserve Mattel's market share rankings in the critical fashion doll category –
2   and thereby lower MGA's.

3       87.   The Children's Advertising Review Unit ("CARU") is another
4   organization that, upon information and belief, appears to have been subject to
5   improper influence by Mattel.  CARU is the toy industry's supposedly independent
6   self-regulatory body in charge of maintaining standards in advertising.  CARU's
7   approval is considered critical within the toy industry to avoiding regulatory action
8   by the Federal Trade Commission.

9       88.   CARU is heavily subsidized by Mattel.

10      89.   Upon information and belief, Mattel has used its influence as a major
11  contributor to CARU's budget to induce CARU to place onerous restrictions on
12  MGA advertisements, and require MGA to amend aspects of commercials that have
13  gone unchallenged in other parties' commercials.

14      90.   As a result of CARU's restrictions, MGA has been forced to incur
15  unnecessary costs for reshooting and producing or re-editing its commercials.

16      91.   On several occasions, CARU has also either strongly suggested, if not
17  also required, that MGA respond to inquiries about its website policies and make
18  substantial changes to the "BRATZ" website notably and significantly in excess of
19  restrictions imposed on Mattel and others.

20      92.   Even TIA, the toy industry's trade association, is apparently not
21  untainted by Mattel's influence and power.  Each year, TIA presents the Toy-of-
22  the-Year Awards, the most prestigious of which had been the award for Toy of the
23  Year.  Winning the Toy of the Year Award is a significant achievement that not
24  only very likely increases the sales of the winning toy, but also denotes the winning
25  company as a leader in toy innovation and generates substantial goodwill with
26  retailers, distributors, licensees, and customers.

27      93.   For the years 2000 (the first year of the award), 2001 and 2002, the
28  Toy of the Year award was chosen by consumer vote.  The awards ceremony was

EXHIBIT   20   PAGE   409

1  then held the following year, at a dinner in New York. (For example, the awards

2  dinner for the year 2000 award was held in February 2001). Leap Frog won the

3  2000 People's Choice Toy of the Year Award and MGA won the 2001 and 2002

4  People's Choice Toy of the Year Awards. With the 2003 Toy of the Year Award,

5  however, the rules suddenly changed. Now, the award is selected by members of

6  the industry.

7       94.   Upon information and belief, this change was orchestrated by a Fisher

8  Price (a Mattel subsidiary) executive who, until recently, served as the Chairman of

9  TIA.

10      95.   Perhaps not surprisingly given this change in the winner selection

11  procedures, "Hokey Pokey Elmo" ("Elmo"), a Fisher Price toy, won for the year

12  2003 (awarded in 2004), beating out the other leading nominee, "BRATZ Formal

13  Funk Super Stylin' Runway Disco."

14      96.   TIA has refused to provide MGA with the vote count procedure and

15  totals for this award, despite repeated requests.

16      97.   MGA is also informed and believes that Mattel was instrumental in

17  attempting to keep MGA from participating as a sponsor in this year's "Kids'

18  Choice Awards."

19      98.   Mattel has clearly engaged in tortious, illegal and unethical behavior in

20  its unfettered efforts to disrupt, if not destroy, MGA. Indeed, this is apparently

21  Mattel's current *modus operandi* when it comes to "competing" in the industry.

22  The once immensely successful "LeapFrog" interactive learning product, for

23  example, has apparently been one of Mattel's other recent victims.

24      99.   Mattel may not shield its illegal, unfair and unethical business practices

25  from the public eye. It is time for the truth to be told, and the world to know of

26  Mattel's unfair, unethical and illegal business practices and unfair competition.

27  "Barbie" does not "play nice" with others (particularly her competitors), and needs

28  to be taught how "to share" (at least in the fashion doll marketplace). She cannot be

EXHIBIT __20__ PAGE __410__

1  allowed to continue to be the playground bully and trample on the rights of others,
2  including MGA.
3       100.  As a result of Mattel's manipulative, illegal, unfair, unethical and anti-
4  competitive conduct, MGA has suffered and, unless abated, will continue to suffer
5  lost sales, lost licensing fees, lost contracts, lost relationships, lost business
6  opportunities and other damages and harm for which there is no adequate remedy at
7  law. Its ability to enter new markets and product lines has been hampered and
8  delayed. Its production costs have increased, its reputation and relationships with
9  important players in the industry have been negatively impacted, the value of its
10  business has been diminished, and its ability to attract, hire and retain employees
11  has been affected.
12
13  **FIRST CLAIM FOR RELIEF**
14  **(False Designation of Origin or Affiliation in Violation of 15 U.S.C. § 1125 (a))**
15       101.  MGA repeats and realleges the allegations contained in paragraphs 1
16  through 100 of this Complaint and incorporates them by reference as though fully
17  and completely set forth herein.
18       102.  MGA's "BRATZ" line has a unique and distinctive style and
19  distinctive characteristics, such as the disproportionately large head, large dramatic
20  eyes with a distinctive presentation (including the eye shape, make-up and lashes),
21  pouty, plump lips with a distinctive presentation (including the lip shape and make-
22  up), small, thin bodies, oversized feet, and up-to-date fashions. MGA's "BRATZ"
23  line is known for and recognized by the total image that is presented by its product
24  and the style and arrangement of the packaging and display. This "*tout ensemble*"
25  is representatively described and depicted herein. The characteristics of MGA's
26  "BRATZ" line, alone or in combination, have come to identify the "BRATZ" line
27  and its source, MGA, and thus serve as protectable trade dress. MGA's trade dress
28  in its "BRATZ" line is purely aesthetic and non-functional or, if any utility exists, it

31

EXHIBIT _20_ PAGE _41_

1   is not essential to the purpose, quality or source identifying attributes of the

2   aesthetics.  MGA's trade dress in its "BRATZ" line is inherently distinctive or has

3   acquired distinction within the meaning of the Lanham Act.

4       103.  Similarly, MGA's "BRATZ PETZ," part of the "BRATZ" line, also

5   has its own unique and distinctive characteristics, such as the humanlike eye and

6   unusual appearance of the animals dressed in clothing.  MGA's "BRATZ PETZ"

7   line has become known for and recognized by the total image that is presented by

8   the product and the style and arrangement of its packaging.  This *"tout ensemble"* is

9   representatively described and depicted herein.  The characteristics of MGA's

10  "BRATZ PETZ", alone or in combination, have come to identify the "BRATZ

11  PETZ" line and its source, MGA, and thus serve as protectable trade dress.  MGA's

12  trade dress in its "BRATZ PETZ" line is purely aesthetic and non-functional or, if

13  any utility exists, it is not essential to the purpose, quality or source identifying

14  attributes of the aesthetics.  MGA's trade dress in its "BRATZ PETZ" line is

15  inherently distinctive or has acquired distinction within the meaning of the Lanham

16  Act.

17      104.  Mattel's production, sale and marketing of "My Scene" dolls,

18  including styling heads and doll heads, and "My Scene" pets that are confusingly

19  similar to MGA's "BRATZ" line (including its "BRATZ PETZ"), without MGA's

20  permission or consent, constitutes designation and use of a term, symbol, device or

21  combination thereof that is false or misleading within the meaning of 15 U.S.C.

22  Section 1125 and is likely to cause confusion, or to cause mistake, or to deceive as

23  to the affiliation, connection, or association, or as to the origin, sponsorship, or

24  approval of Mattel's goods or commercial activities, within the meaning of 15

25  U.S.C. Section 1125.  MGA has been damaged by Mattel's acts.

26      105.  Mattel's conduct has been intentional and willful, and is calculated

27  specifically to trade off the goodwill that MGA has developed in its successful

28  "BRATZ" line.  By its aforesaid acts, particularly its imitation of the distinctive

EXHIBIT  20  PAGE  412

features of MGA's "BRATZ" line in connection with goods sold and distributed in interstate commerce, Mattel has infringed and is likely to continue to infringe on MGA's substantial rights in and to the "BRATZ" line trade dress. In so doing, Mattel has falsely represented and designated to the public generally and consumers of fashion doll products specifically the source and origin of Mattel's "My Scene" fashion doll products in violation of 15 U.S.C. § 1125(a).

106. MGA has been damaged by, and Mattel has profited from, Mattel's wrongful conduct in an amount to be proven at trial.

107. For each act of infringement, MGA is entitled to recover its actual damages as well as Mattel's profits from such infringement.

108. Monetary relief alone, however, is not adequate to address fully the irreparable injury that Mattel's illegal actions have caused and will continue to cause MGA, if not enjoined. MGA is therefore entitled to preliminary and permanent injunctive relief to stop Mattel's ongoing infringement of MGA's trade dress.

## SECOND CLAIM FOR RELIEF

### (Unfair Competition in Violation of 15 U.S.C. § 1125 (a) and Unfair Competition and Unfair Business Practices in Violation of Cal. Bus. & Prof. Code § 17200 *et seq.* and California Common Law)

109. MGA repeats and realleges the allegations contained in paragraphs 1 through 108 of this Complaint and incorporates them by reference as though fully and completely set forth herein.

110. Mattel has deliberately and, indeed, repeatedly adopted, imitated and mimicked the make-up, appearance, features, trade dress, and image of MGA's products, packaging and advertising, including its repackaging and refreshing of older Mattel toys. Mattel's actions were and are done with the intent to deceive consumers, cause confusion and mistake, and interfere with the ability of consumers to identify the source of goods by appearance and packaging. By this

33

EXHIBIT _20_ PAGE _43_

conduct, Mattel pirates and exploits, by subliminal or conscious association with MGA, the goodwill and reputation of MGA and derives benefit therefrom.

111.  Mattel has particularly and deliberately poached upon the commercial magnetism of MGA's "BRATZ" and the success of "BRATZ".  Mattel's conduct has been intentional and willful, and is calculated specifically to trade off the goodwill that MGA has developed in its successful "BRATZ" line.

112.  By its acts, including its intentional imitation of the distinctive features of MGA's "BRATZ" dolls, which has progressively become closer and closer, as well as its imitation of "BRATZ" themes, packaging and the overall look, feel and total image of the "BRATZ" line, imitation of other MGA products, packaging and advertising, and other conduct alleged herein, Mattel has engaged in unfair competition under both federal and California state law.

113.  Mattel has also willfully and maliciously used its power, influence and intimidation to threaten certain retailers, suppliers, licensees, distributors and manufacturers so as to limit, if not prevent, MGA from doing business with these retailers, suppliers, licensees, distributors and manufacturers, using its power and influence to intimidate and manipulate industry bodies.  Mattel has further used its power and influence to attempt to, if not actually, intimidate and threaten MGA's current and potential employees so as to cause MGA competitive injury.

114.  Alone, in combination, or in totality, Mattel's actions discussed and alleged herein constitute unfair competition and unfair business practices within the meaning of federal law, California statutory law and/or California common law.

115.  As a result of its conduct, Mattel has derived substantial monetary and non-monetary benefit and business advantage.  Mattel has also wrongfully diverted profits away from MGA and to Mattel and, on information and belief, deprived MGA of the patronage of a large number of actual and potential customers.

116.  MGA has been damaged by, and Mattel has profited from, Mattel's wrongful conduct in an amount to be proven at trial.

EXHIBIT 20 PAGE 414

117. Monetary relief alone, however, is not adequate to address fully the irreparable injury that Mattel's actions have caused and will continue to cause MGA, if not enjoined. MGA is therefore entitled to preliminary and permanent injunctive relief to stop Mattel, and all persons acting in concert with Mattel, from engaging in acts of unfair competition and unfair business practices.

118. MGA is further entitled to relief whereby Mattel is ordered to pay restitution for damages resulting from Mattel's unfair competition and unfair business practices.

## THIRD CLAIM FOR RELIEF

### (Dilution in Violation of 15 U.S.C. § 1125 (c); Cal. Bus. & Prof. Code § 14330 and California Common Law)

119. MGA repeats and realleges the allegations contained in paragraphs 1 through 118 of this Complaint and incorporates them by reference as though fully and completely set forth herein.

120. The look and trade dress of the MGA products referenced herein are distinctive and famous, and have been since before Mattel launched its similar versions. By its aforesaid acts, Mattel caused and continues to cause blurring and dilution of the distinctive look of MGA's products and trade dress, which previously served as a unique source identifier for MGA, within the meaning of the Lanham Act, California Business and Professions Code § 14330 and/or California common law.

121. Mattel's conduct has been intentional and willful, calculated specifically to trade on MGA's goodwill and reputation and to cause dilution of MGA's famous marks, particularly those connected with MGA's famous and successful "BRATZ" doll head, "BRATZ" doll product line, "BRATZ Funky Fashion Makeover Head" and "BRATZ PETZ" line.

122. MGA has been damaged by, and Mattel has profited from, Mattel's wrongful conduct in an amount to be proven at trial.

35

EXHIBIT __20__ PAGE __415__

123.   Monetary relief alone, however, is not adequate to address fully the irreparable injury that Mattel's actions have caused and will continue to cause MGA, if not enjoined.  MGA is therefore entitled to preliminary and permanent injunctive relief to stop Mattel's ongoing dilution.

## FOURTH CLAIM FOR RELIEF

### (Unjust Enrichment)

124.   MGA repeats and realleges the allegations contained in paragraphs 1 through 123 of this Complaint and incorporates them by reference as though fully and completely set forth herein.

125.   As a result of the conduct alleged herein, Mattel has been unjustly enriched to MGA's detriment.  MGA seeks a worldwide accounting and disgorgement of all ill-gotten gains and profits resulting from Mattel's inequitable activities.

## PRAYER FOR RELIEF

WHEREFORE, MGA prays for relief, as follows:

1.   That Mattel, its agents, servants and employees and all persons acting in concert be restrained preliminarily and permanently from directly or indirectly:

    a.   using confusingly similar trade dress;

    b.   improperly influencing, or attempting to improperly influence, standard-setting and industry organizations;

    c.   engaging in unfair competition and unfair business practices; and

    d.   diluting MGA's trade dress;

2.   For general and actual damages, according to proof at trial but believed to reach or exceed tens of millions of dollars;

3.   For the disgorgement of all profits derived by Mattel for its acts of:

    a.   false designation of origin or affiliation;

36

EXHIBIT   20   PAGE   416

b.    unfair competition and unfair business practices; and

c.    dilution;

4.    For costs of suit and reasonable attorneys' fees;

5.    For punitive and/or exemplary damages as a result of Mattel's willful and malicious conduct to the extent allowable by law; and

6.    For such other and further relief as the Court deems just and proper.

Dated:      April 13, 2005                    PATRICIA GLASER
                                              CHRISTENSEN, MILLER, FINK,
                                              JACOBS, GLASER, WEIL &
                                              SHAPIRO LLP

                                              DALE M. CENDALI
                                              DIANA M. TORRES
                                              PAULA E. AMBROSINI
                                              O'MELVENY & MYERS LLP


                                              By:
                                              Diana M. Torres
                                              Attorneys for Plaintiff
                                              MGA ENTERTAINMENT, INC.

37

EXHIBIT 20 PAGE 417

## DEMAND FOR JURY TRIAL

MGA hereby demands a jury trial on all triable issues.

Dated:        April 13, 2005

PATRICIA GLASER
CHRISTENSEN, MILLER, FINK,
JACOBS, GLASER, WEIL &
SHAPIRO LLP

DALE M. CENDALI
DIANA M. TORRES
PAULA E. AMBROSINI
O'MELVENY & MYERS LLP

By: _____
Diana M. Torres
Attorneys for Plaintiff
MGA ENTERTAINMENT, INC.

38

EXHIBIT __20__ PAGE __418__

# EXHIBIT 21

CALENDARED   RECEIVED

JUN 2 3 2006

**PRIORITY SEND &
ENTER JS-6**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
CIVIL MINUTES -- GENERAL

Case No.    CV 05-02727 SGL(RNBx)                    Date: June 19, 2006

Title:    MGA ENTERTAINMENT, INC. -v- MATTEL, INC.
═══════════════════════════════════════════════════════════════════

PRESENT:  HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

        Jim Holmes                          None Present
        Courtroom Deputy                    Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:    ATTORNEYS PRESENT FOR DEFENDANTS:

None present                          None present

PROCEEDINGS:    MINUTE ORDER (IN CHAMBERS) RE CONSOLIDATION

        On May 16, 2006, this Court issued orders to show cause why the following three cases
should not be consolidated:  Bryant v. Mattel, Inc., CV 04-09049; Mattel, Inc. v. Bryant, CV 04-
09059; MGA Entertainment, Inc. v. Mattel, Inc., CV 05-02727. All parties have responded, and the
Court has reviewed those responses. Because the Court has determined that these actions
involve a number of common issues of law and fact, the Court orders that these three cases be
consolidated for all purposes.

        Mattel's request that the Court stay MGA Entertainment, Inc. v. Mattel, Inc., CV 05-02727,
pending the outcome of the other two cases. The Court denies this request.

        For ease of record keeping, the Court **ORDERS** that all further documents and proceedings
occur under Bryant v. Mattel, 04-09049 SGL, and that Case Number CV 04-09059 and 05-02727
be **CLOSED** by the Clerk. Counsel are directed to file all further documents under Case Number
CV 04-09049. The first paragraph of any document filed with the Court shall inform the Court to
which case(s) the document relates.

        IT IS SO ORDERED.

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
Priority  ___✓___   Send  ___✓___
Entered  _____   Closed  ___✓___
JS-5/JS-6  _____   JS-2/JS-3  _____   /Initials of Deputy Clerk  jh
Scan Only  _____   Docketed on CM  _____
_____ THIS CONSTITUTES NOTICE OF
ENTRY AS REQUIRED BY FRCP 77(d)
JUN 20 2006
EASTERN DIVISION

MINUTES FORM 90
CIVIL -- GEN

EXHIBIT __21__ PAGE __419__

# EXHIBIT 22

CALENDARED

JAN 1 6 2007

P-Send

ENTERED
CLERK, U.S. DISTRICT COURT

JAN 1 2 2006

CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION    BY DEPUTY

FILED

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(D).

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

CARTER BRYANT,

                    Plaintiff,

v.

MATTEL, INC.,

                    Defendant.

and related actions.

CASE NO. CV-04-9049-SGL

(Consolidated with cases CV-04-9059 and CV-05-2727)

ORDER REGARDING MATTEL'S MOTION FOR LEAVE TO AMEND

This case has, increasingly, become one of the proverbial tail wagging the proverbial dog.

Back in April, 2004, Mattel, Inc., ("Mattel") filed a complaint in Los Angeles County Superior Court against its former employee and the reputed creator of the BRATZ dolls, Carter Bryant.  The complaint pressed five separate state-law theories relating to certain agreements Bryant signed while an employee with Mattel, namely, an Employee Confidential Information and Inventions Agreement ("Inventions Agreement") and a Conflict of Interest Questionnaire ("COI Questionnaire").  Although couched in state law terms and ostensibly pled as a simple employment action, lurking beneath the allegations in the complaint was whether Bryant had either misappropriated Mattel's intellectual property or

EXHIBIT 22 PAGE 420

1-12

1   resources in creating and/or developing the BRATZ dolls or whether he continued

2   to develop his BRATZ design while still working in Mattel's employ.  In either event,

3   the rights to the BRATZ dolls could become the property of Mattel, either through

4   infringement or through operation of the agreements noted above.  The case was

5   later removed to this Court and was assigned the case number CV-04-9059.  MGA

6   Entertainment, Inc. ("MGA"), the maker of the BRATZ doll line, then intervened "to

7   protect its rights to Bratz dolls" that were at stake in the action.  Mattel, Inc. v.

8   Bryant, 446 F.3d 1011, 1012 (9th Cir. 2006); see also id. at 1013 ("Mattel argues, 'a

9   significant risk of prejudice' to MGA [exists] if the ownership of rights to intellectual

10  property, i.e., the Bratz creations, were decided in the absence of MGA").

11        In the interim, Bryant filed a declaratory judgment action in this Court,

12  seeking for the Court to declare that his BRATZ doll creations did not infringe

13  Mattel's copyright in its Toon Teens products.  See Court's July 18, 2006, Order at

14  3 (noting that, although "Bryant's complaint . . . makes reference to 'other Mattel

15  products,' . . . the substance of his allegations all address the product 'Toon

16  Teens'").  The declaratory judgment action was assigned the case number CV-04-

17  9049.

18        MGA then filed an action against Mattel in this Court broadening the scope

19  of the controversy beyond that concerned with the ownership rights to the BRATZ

20  doll line.  MGA's complaint asserted various Lanham Act claims and their California

21  state law equivalent arising out of Mattel's alleged "habitual and unfair tactics of

22  competition-by-intimidation and serial copycatting of MGA's products." (Compl.

23  ¶ 7).  In essence, although the prior actions were concerned with ownership in the

24  rights to the BRATZ doll line, the allegations in 05-2727 concerned whether there

25  had been unlawful efforts to block the marketing of those rights in the BRATZ dolls.

26  MGA's complaint did make mention of other products that were affected by Mattel's

27  alleged predatory business practices, but by far the largest portion of its complaint

28  concerned Mattel's conduct in undermining (or seeking to undermine) MGA's rival

EXHIBIT  22  PAGE  421

line of BRATZ dolls.[1]

By Order dated June 19, 2006, the Court consolidated all three cases "for all purposes" as they "involve[d] a number of common issues of law and fact." As the Court later noted in its August 10, 2006, Order: "At its heart, this case asks the question: Who owns the rights to the Bratz dolls?" Resolution of this question lies at the heart of or, at the very least, affects many of the other claims set forth in each of the three respective cases. For instance, even though the allegations in 05-2727 concern Mattel's alleged efforts at defeating the marketing of the BRATZ dolls, resolution of who owned the rights to the BRATZ dolls could serve to moot many of those allegations. It is hard to imagine how it is unlawful for a company to thwart or otherwise undermine the marketing of a product it owns. Thus, if Mattel owned the rights to the BRATZ dolls, many of the allegations in the 05-2727 complaint would become moot. That said, such consolidation did not do away with the distinctions that do exist between the three cases. As the Court highlighted in its consolidation order, when either party files a pleading in the case, "the first paragraph of [that] document . . . shall inform the Court to which case(s) the document relates."

On July 18, 2006, the Court dismissed Bryant's declaratory judgment action, 04-9049, finding there existed no reasonable apprehension of an imminent copyright infringement claim being filed against him by Mattel based on Mattel's Toon Teen intellectual property. See Court's July 18, 2006, Order at 4. The Court's Order was predicated entirely upon counsel for Mattel's representation during oral argument that it "will not maintain that Bratz infringes the copyright in Toon Teens." Owing to this representation, the Court, in dismissing the declaratory judgment action, made clear that any future "claim by Mattel of copyright

---

[1] That the marketing of the BRATZ dolls lies at the heart of the issues between the rival doll makers in the 05-2727 case is best illustrated by the Court's discussion of those allegations in its August 26, 2005, Order, Granting in Part and Denying Part Mattel's Motion to Strike portions of MGA's complaint.

3

EXHIBIT 22 PAGE 422

1   infringement based on the Toon Teens product is barred by counsel's

2   representation." July 18, 2006, Order at 4.

3          Presently before the Court is Mattel's request for leave to file an amended

4   complaint in the 04-9059 action.  The complaint broadens considerably the nature

5   of the action from its genesis in state court.  Whereas before the complaint simply

6   sought to litigate alleged contractual and fiduciary breaches by Bryant while in the

7   employ of Mattel (no doubt geared toward procuring a legal basis for Mattel to lay

8   claim to the BRATZ doll line), the amended complaint adds five more defendants

9   and nine new legal claims, alleging a wide range of commercial disputes between

10  the rival doll makers that spans three countries.  For instance, the amended

11  complaint now contains RICO claims, a misappropriation of trade secrets claim,

12  and various aiding and abetting claims all stemming from allegations that MGA

13  cherry-picked certain high-ranking Mattel executives in foreign markets (many also

14  named as defendants in the amended complaint) or designers (namely, Bryant),

15  and then enticed or encouraged those same individuals to steal various trade and

16  proprietary secrets (be it sales plans, sales projections, customer profiles, or

17  intellectual property) from Mattel and hand them over to MGA before going to work

18  at MGA.

19         Moreover, the amended complaint expands upon the existing breaches of

20  contract and fiduciary duty claims in the original complaint by expanding the

21  universe of former employees (namely, the cherry-picked executives) to whom

22  those claims now apply.

23         Finally, Mattel now makes plain what was always lurking in its original

24  complaint — a copyright claim, but one directed not only to Bryant but also to MGA,

25  MGA's Hong Kong subsidiary, and MGA's President and CEO Isaac Larian.

26  Moreover, Mattel characterizes its copyright claim somewhat differently from that at

27  issue in Bryant's declaratory relief action: "The Amended Complaint does not

28  include a claim for infringement of copyrights in Toon Teens, but rather

4

EXHIBIT _22_ PAGE _423_

infringement of copyrights in Bratz." (Reply to MGA Opp. at 11).  Toward that end, Mattel has recently filed copyright registrations with the U.S. Copyright Office claiming ownership in various BRATZ doll design drawings penned by Bryant.

A.      ANALYSIS

Federal Rule of Civil Procedure 15(a) provides that, once a responsive pleading has been served, "a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires."  With no consent to Mattel's proposed filing proffered by MGA and Bryant, determining whether to grant Mattel leave to file an amended complaint is gauged by looking to the familiar formulation of factors set forth by the Supreme Court in Forman v. Davis:

> In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.' Of course, the grant or denial of an opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules.

371 U.S. 178, 182 (1962).

MGA and Bryant offer the following reasons for denying Mattel leave to amend:  (1) Mattel has long known of the factual predicates underlying its copyright and intentional interference claims but delayed in asserting them; (2) the proposed amendment to add the copyright claim and the intentional interference claims (against the new defendants) are futile because they are barred by the applicable statute of limitations; (3) the copyright claim had been brought in bad faith by Mattel because of its prior public disavowal of an intent to assert such a claim; and (4) MGA and Bryant would incur undue prejudice were the copyright claim added to the

5

EXHIBIT 22  PAGE 424

1   suit because of alleged spoliation of evidence issues involving Mattel's ZEUS

2   computer system used by doll designers at Mattel and its e-mail system.  None of

3   these arguments are persuasive.

4          1.     Awareness of Factual Predicate for Copyright and Intentional

5                 Interference Claims

6         MGA argues that Mattel has long known about the factual predicate for its

7   recently added copyright claim, observing that, "[o]ver four years ago, in August

8   2002, Mattel CEO Bob Eckert received an anonymous letter stating that Bryant

9   created the project that became the 'Bratz' dolls — and worked with MGA to 'steal'

10  that project — while still employed at Mattel."  (MGA Opp. at 9).  Similarly, MGA

11  argues that Mattel has long known of the factual predicate for its intentional

12  interference claim with respect to Bryant's contract given that, "[b]y Mattel's own

13  admission, it learned in November 2003 — more than three years ago — that

14  Bryant had signed a contract with MGA 'dated as of' a month prior to his final day at

15  Mattel."  (MGA Opp. at 11-12).

16        At the outset it must be observed that "[m]ere delay in proffering an

17  amendment does not justify denying leave to amend."  Sierra Club v. Union Oil Co.

18  of California, 813 F.2d 1480, 1493 (9th Cir. 1987), vacated on other grounds by,

19  485 U.S. 931 (1988), and reinstated by, 853 F.2d 667 (9th Cir. 1988).  Seizing upon

20  this point of law, Mattel argues that "only in . . . cases" when "granting leave would

21  require discovery to be reopened after summary judgment motions have been filed"

22  has the Ninth Circuit found the denial of leave "justified" based on the passage of

23  time alone.  (Reply to MGA Opp. at 3).  That is incorrect.  There is a line of cases

24  from the Ninth Circuit finding that, if a "party seeking amendment knows or should

25  know of the facts underlying the amendment when the original complaint is filed,

26  the motion to amend may be denied."  Sierra Club, 813 F.2d at 1493 (citing Jordan

27  v. County of Los Angeles, 669 F.2d 1311, 1324 (9th Cir. 1982)).  And, recently, the

28  Ninth Circuit upheld the denial of leave to amend based on the passage of time

EXHIBIT 22 PAGE 425

even though the requested leave to amend was tendered <u>before</u> the time, as set forth in a Rule 16(b) pre-trial scheduling order, for amending pleadings had expired. <u>See</u> <u>AmerisourceBergen Corp. v. Dialysist West, Inc.</u>, 465 F.3d 946 (9th Cir. 2006). The Ninth Circuit observed that, even when a request for leave to amend is timely under a Rule 16(b) schedule for pretrial motions, the district court may nonetheless still deny the request based on any of the <u>Forman</u> factors. <u>Id</u>. at 951-52. The Ninth Circuit then noted that the issue of untimeliness (regardless of whether the amendment is tendered "within the period of time allotted by the district court in a Rule 16 scheduling order") in seeking to amend can constitute a justification for denying leave to amend if "the moving party knew or should have known the facts and theories raised by the amendment in the original pleading." <u>Id</u>. at 953. Toward that end, the Ninth Circuit observed that "an eight month delay between the time of obtaining a relevant fact and seeking a leave to amend is unreasonable." <u>Id</u>. In this regard, the Ninth Circuit in <u>Dialysist</u> was unpersuaded by the fact that, even though the moving party had known of the facts prompting the amendment for a long period of time, there still remained eight more months of discovery for the parties to marshal facts against the allegations raised by the amended pleading: "Even though eight months of discovery remained, requiring the parties to scramble and attempt to ascertain whether the Procrit purchased by AmerisourceBergen was tainted, would have unfairly imposed potentially high, additional litigation costs on Dialysist West that could have easily been avoided had AmerisourceBergen pursued its 'tainted product' theory in its original complaint or reply." <u>Id</u>. Thus, absent "a satisfactory explanation" for the delay in amending the complaint, the Court is well within its rights to deny leave to amend. <u>Id</u>.

Mattel proffers the following reasons for taking the time that it did before presenting its amended complaint: (1) Acting out of an abundance of caution to its obligations under Rule 11 to present "factual contentions [that] have evidentiary support," Mattel waited until its claims were better supported by evidence

EXHIBIT 22 PAGE 426

1  uncovered in discovery; and (2) the delay in the proceedings caused by "the year-

2  long stay and the parties' prior jurisdictional disputes" have left the case still in its

3  "nascent stage." (Reply to MGA Opp. at 2, 4).

4          The first reason is not well-founded.  Rule 11 specifically allows parties to

5  aver factual allegations that "are likely to have evidentiary support after a

6  reasonable opportunity for further investigation or discovery" so long as the party

7  makes clear in its pleading that its factual contentions on those points are with the

8  caveat that they are based on a good faith belief that further discovery would

9  unearth evidence to support them.  See FED. R. CIV. P. 11(b)(3).  Simply put, Rule

10  11 did not stand in the way of Mattel averring the factual contentions it now claims it

11  "merely suspected" as being the case based on the limited information before it.

12  Mattel could have gone ahead and made such suspected factual allegations so

13  long as it caveated those claims with the declaration that it reasonably believed that

14  those allegations would be borne out by further discovery.  Perhaps the time by

15  which Mattel could have reasonably believed such allegations would be borne out

16  by further discovery occurred after the dates noted by MGA, but it is hard to fathom

17  that such materialization took three or four years to occur.

18          The second reason would have some merit to it but for the fact that the

19  information that alerted (or should have alerted) Mattel to the existence of its now

20  asserted copyright and intentional interference claims was brought to Mattel's

21  attention well before the case was stayed on May 20, 2005.  The stay, therefore,

22  did not operate as an obstacle to Mattel asserting its claims; nor even if it did, the

23  stay does not explain why Mattel waited nearly six months after the stay was lifted

24  on May 16, 2006, to present those claims now.

25          All of that being said, the one thing that gives the Court pause in denying

26  leave based on the tardiness in Mattel's presentation is the lack of any evidence

27  that MGA or Bryant have been prejudiced by the delay.   Delay unconnected to

28  some showing of prejudice, be it prejudice to the parties or disruption in judicial

8

EXHIBIT 22 PAGE 427

1  management of the case, does not suffice to deny granting leave to amend.  The

2  Ninth Circuit has noted that, "where a defendant is on notice of the facts contained

3  in an amendment to a complaint, there is no serious prejudice to defendant in

4  allowing the amendment" even if it is made tardily.  Sierra Club, 813 F.2d at 1493.

5  Indeed, the denial of leave was proper in the Dialysist case not simply because of

6  the length of the delay, but because the delay itself was "detrimental" in that it

7  would entail the opposing party to have "unfairly" incurred "potentially high,

8  additional litigation costs" that could have been avoided if the moving party had

9  made clear its intentions earlier.  465 F.3d at 953.

10        Here, as well demonstrated in Mattel's papers, it is readily apparent from the

11  pleadings filed by MGA and Bryant in this case that both have been aware for some

12  time of the factual predicates now underlying Mattel's copyright claim and

13  intentional interference claim. (See MGA Opp. at 5 ("As Bryant and MGA

14  suspected at the time of filing — and Mattel now concedes by conduct — those

15  deceptively-pled state-law claims [in 04-9059] were copyright infringement claims all

16  along")(emphasis added)).  The parties have engaged in meaningful discovery

17  regarding many of the facts touched upon by these new claims, be it tracking down

18  experts in various forensic fields or taking depositions of various of the key players

19  to those claims.   In point of fact, in their papers filed with this Court before this

20  present motion, both Bryant and MGA have made it abundantly clear that they have

21  long suspected that a copyright infringement claim was in the offing as evidenced

22  by Bryant's filing of the declaratory judgment action and MGA's intervention in the

23  05-9059 matter to protect its rights to the BRATZ dolls.  Similarly, MGA and Bryant

24  have been on notice to the facts comprising the interference claim concerning

25  Bryant's contract as evidenced by the identity of the individuals who have been

26  deposed by Mattel, as well as the nature of the questions posed and the testimony

27  proffered at those depositions.  MGA's argument that, with the amendments, it

28  faces the prospect of defending "against stale claims" owing to faded memories and

9

EXHIBIT 22 PAGE 428

1   loss of documents caused by the great passage of time, (see MGA Opp. at 3, 13),

2   is diminished by the fact that (no doubt owing to the sophistication of all counsel

3   involved) discovery on these very issues have been proceeding apace by both

4   sides long before Mattel filed its proposed amendments. This is simply not a case

5   where "additional litigation costs" will be "unfairly" visited upon Bryant and MGA by

6   allowing the proposed amendments; much of those costs have already been borne

7   by the parties for some time.

8       2.    Spoilation of Evidence

9       MGA next argues that Mattel's delay in bringing the amended complaint has

10  caused it prejudice as, in the interim, critical pieces of evidence have been or are

11  suspected of having become lost. For instance, MGA asserts that Mattel's Rule

12  30(b)(6) witness concerning its Zeus computer system, Julia Marine, testified that,

13  "although Mattel identified and segregated its most relevant backup tapes available

14  for Zeus, Mattel allowed its tape backup system to expire the database for those

15  backup tapes, thereby eliminating all information about what was actually stored on

16  those backup tapes." (MGA Opp. at 9-10). Information on the Zeus computer

17  system is critical because of Mattel's assertion that part of its copyright claim rests

18  on Bryant's exposure to Mattel development programs. (First Am. Compl. ¶ 26(a)).

19  As explained by MGA: "[C]oncept data and drawings created by [Mattel] design

20  center personnel are stored on Zeus. Thus, the electronic documents stored on

21  Zeus – which should include the metadata showing who created, edited and

22  accessed Mattel's concept drawings and designs – during the time Bryant worked

23  in the design center at Mattel is vitally important to defending against Mattel's

24  claims." (MGA Opp. at 14). MGA's argument is neither an accurate

25  characterization of Ms. Marine's testimony nor of the nature of Mattel's exposure

26  claim.

27      Ms. Marine did not testify that the information on the backup tapes (some

28  fifty in total) was lost, but rather that Mattel no longer carried the type of hardware

EXHIBIT 22 PAGE 489

1   that could restore the information still found on those tapes:

2       Q.      So if you wanted to restore that 2002 backup
                tape[s] then, how would you go about doing that?
3
                        . . . .
4
        A.      You need the hardware so if we don't have the
5               hardware — if [the technology used by the tape
                is] DLT we don't have the hardware and you've
6               got to buy it and — well, first you have to find a
                place to put it with adequate power which we
7               don't have in the design center. You need to
                have a tape library. You need to have the tape
8               drives that carried those tapes. You need a
                server that has the capability to — that's big
9               enough to handle all of the hardware. You need
                the software — the license for the backup
10              software[, Net Backup]. You need the disk space
                to restore it to and then you have to start reading
11              in all those tapes.

12      Q.      You said that you don't have that in the design
                center. Do you have that hardware anywhere
13              else in the company?

14      A.      DLT? No, no.

15      Q.      At what point did you get rid of the hardware?

16      A.      Once the last backups — DLT backups expired
                so it would have been a couple years ago
17              probably.

18  (Decl. Diana Torres, Ex. K at 118-119).

19      The above testimony clearly denotes the difficulty in restoring what was on

20  Mattel's Zeus computer system during the relevant time frame, but it certainly does

21  not demonstrate that the information on those backup tapes has been "eliminated"

22  or forever lost. Undoubtedly it will be a costly endeavor to recover that information

23  (not to mention to later search and sort through it); but to argue, as MGA does, that

24  the information is "unavailable" or "lost", (MGA Opp. at 9, 14), exaggerates its

25  plight. Indeed, Ms. Marine's testimony indicates that the difficulty in retrieving the

26  information on the Zeus backup tapes has been present for some time (maybe

27  since 2004 or perhaps even earlier). This is important because it undermines

28  MGA's claim that Mattel's undue delay in bringing its amended complaint will cause

                                    11

EXHIBIT 22 PAGE 430

1   it to suffer prejudice it otherwise would not have faced if the amendments were

2   brought sooner.  Such prejudice has been present for years, and Mattel's failure to

3   bring its amended complaint sooner would not have changed this situation.

4         Similarly, MGA's point that access to what was on the Zeus computer

5   system is vital in demonstrating that Bryant was not exposed to or otherwise did not

6   hack the system to steal other designers work is diminished to some extent by the

7   fact that Bryant himself testified that he did not use the Zeus computer system and

8   was "pretty much computer illiterate" while employed at Mattel.  Admittedly, the

9   ability to point to information on the Zeus system backup tapes to prove that Bryant

10  did not access other designers drawings or to prove the date those drawings were

11  created by those other designers would be useful evidence to negate Mattel's

12  factual claims.  Nonetheless, such evidence still would not discount other avenues

13  outside of the Zeus computer system by which Mattel could seek to prove that

14  Bryant was exposed to its copyrighted works, e.g., witness testimony that Bryant

15  saw drawings of the same posted on other designers' cubicles.

16        MGA next surmises that Mattel's e-mail records have disappeared, not

17  because it has any proof on that point, but simply because Mattel has postponed

18  the deposition of the individual most knowledgeable of Mattel's e-mail records until

19  after the hearing on Mattel's motion for leave to amend.  (MGA Opp. at 10).

20  Speculation of spoilation does not suffice.  That MGA's argumentation on this point

21  is nothing more than speculation is best exhibited by the evidence it has proffered

22  in support of its argument:  "[I]f the sole retained backup for Zeus is no longer

23  available, it is not hard to imagine that Mattel's electronic mail archives are similarly

24  out of reach." (MGA Opp. at 15 (emphasis added)).  MGA then makes much of a

25  deposition from a Mattel executive, Alan Kaye, who testified that e-mails in his

26  inbox would be automatically deleted if they had remained there for more than a

27  certain time period.  (Decl. Diana Torres, Ex. H at 292-93).  MGA takes from this

28  acknowledgment that Mattel has an "automatic email deletion system" that has

12

EXHIBIT __22__ PAGE __431__

1   compromised Mattel's "duty to preserve documents." (MGA's Opp. at 14).

2   Noticeably absent from MGA's argument is any evidence that the e-mails so

3   deleted from a Mattel employee's inbox are forever lost or, as is far more likely,

4   whether such information remains or is otherwise archived on some backup file on

5   Mattel's computer system.  Absent concrete proof that spoilation has occurred,

6   nothing in MGA's argument forms a basis for denying Mattel its requested leave to

7   amend.

8       3.   Statute of Limitations

9       MGA next argues that Mattel's copyright and intentional interference claims

10  are futile as both are barred by the applicable statute of limitations.  This argument

11  was pressed emphatically at oral argument.  With respect to the copyright claim,

12  MGA argues that the applicable statute of limitations is three years, with the

13  limitations period accruing from when a party has knowledge of a violation or when

14  a reasonably diligent person would have been put on inquiry of the infringement.

15  (MGA Opp. at 16 (citing Roley v. New World Pictures, 19 F.3d 479, 481 (9th Cir.

16  1994)).  MGA argues that Mattel was put on notice about its copyright claim in

17  August, 2002, upon the receipt of the anonymous letter to Mattel's CEO that Bryant

18  had stolen the idea for BRATZ while working at Mattel.  Thus, according to MGA,

19  the limitations period on Mattel's claim expired in August, 2005, rendering Mattel's

20  current copyright claim stale.

21      The problem with MGA's analysis is it fails to take into account the relations-

22  back principles found in Rule 15(c), which provides that "[a]n amendment of a

23  pleading relates back to the date of the original pleading when "the claim . . . in the

24  amended pleading arose out of the conduct, transaction, or occurrence set forth . . .

25  in the original pleading," or if such relation back is otherwise permissible by the

26  state "law that provides the statute of limitations applicable to the action." By

27  MGA's own admission Mattel's copyright claim arises out of the same conduct or

28  transaction contained in the original complaint filed in April, 2004, well within the

13

EXHIBIT 22 PAGE 432

1  applicable limitations period.[2] (MGA Opp. at 12 ("These very same allegations

2  [contained in the original complaint] underlie the copyright infringement and

3  intentional interference contract claims Mattel now seeks to allege against MGA,

4  Mr. Larian and Bryant")).

5      MGA's statute of limitations argument with respect to the intentional

6  interference claims fares no better. According to MGA, the applicable statute of

7  limitations is two years for an intentional interference with contract claim and Mattel

8  was aware of the facts alerting it to this claim (insofar as Bryant's contract is

9  concerned) on November 24, 2003, when it learned "that Bryant worked with MGA

10 to develop the 'Bratz' dolls prior to his last day of employment by Mattel and, hence,

11 prior to the expiration of his contractual relationship with Mattel."[3] (MGA Opp. at 18

12 (citing Knoell v. Petrovich, 76 Cal. App.4th 164, 168 (1999)). Such a time line

13 would, according to MGA, mean that the applicable limitations period expired on

14 Mattel's interference with Bryant's contract claim on November 24, 2005, well

15 before Mattel sought leave to file its amended complaint. (Id). The problem again

16 with MGA's argument is that it ignores that through Rule 15(c) Mattel's intentional

17 interference claim would relate back to when it filed its original complaint in April,

18

19

20      [2] The same would appear to be true — that the amendments would be timely

21 — if the amendments related back to Mattel's answer (filed on May 13, 2005) to

22 MGA's complaint in the 05-2727 case.

23      [3] With respect to Mattel's interference with contract claim as to one of its

24 former executives, Ron Brawer, MGA claims Mattel was put on notice of that claim

on September 17, 2004, when Brawer informed Mattel that he leaving to go to work

25 for MGA. (MGA Opp. at 19-20). The problem with this argument is that nothing from

that simple event — Brawer's declaration of his intent to leave — in any way would

26 apprise Mattel that MGA had encouraged Brawer to engage in nefarious conduct

(the stealing of proprietary information) causing Brawer to breach his contract with

27 Mattel that he would not do anything to help a competitor while working for them.

MGA's contention that Mattel must have known of those misdeeds in mid-September

28 is nothing more than speculation. Futility cannot be founded on what might or might

not be the case; either a claim is futile to bring or it is not.

14

EXHIBIT 22 PAGE 433

1    2004, well before the limitations period expired.[4]

2           Accordingly, MGA's futility argument is not well-founded.

3       4.   Prior Disavowals of Asserting a Copyright Claim

4           Finally, MGA takes umbrage with the cageyness to which Mattel has taken in

5    this case as to whether or not it is asserting a copyright infringement claim against

6    it. To MGA, such ducking and weaving on Mattel's part renders its effort to now

7    bring such a copyright claim as one done in bad faith. No doubt the Court itself has

8    been subjected to Mattel's overly vague statements on this point, but in the end

9    nothing in those statements has ever foreclosed the possibility that such a claim

10   may be in the offing. Indeed, during the oral argument on Mattel's motion to

11   dismiss Bryant's declaratory judgment action, the Court pressed Mattel's counsel as

12   to whether it would assert such a copyright claim against Bryant as it is currently

13   seeking to do. The most that Mattel's counsel would proffer was that Mattel would

14   not assert a copyright claim against Bryant based on Mattel's copyright rights in

15   TOON TEENS. At that point, the Court directed the parties to engage in a meet

16   and confer based on counsel for Mattel's representation and to provide a report to

17   the Court based on those discussions. The report submitted to the Court made

18   clear that, although Mattel was willing to accede that it would not bring a copyright

19   claim based on TOON TEENS, it refused to accede to Bryant's broader request

20   that "Bryant 'never copied anything' and that no Mattel product has any 'relevance'

21   to any claim that Mattel has or ever will assert against Bryant." This by itself should

22   have dispelled any illusion either Bryant or MGA was operating under that Mattel's

23   prior statements had foreclosed any potential copyright claim against them.[5]

24

25           [4] Again the relations-back principle would also seem to render its claim timely

26   if it were filed as an amended answer (the original having been filed in May, 2005) in the 05-2727 case.

27           [5] MGA also argues that Mattel's effort to substitute MGA and its CEO, Isaac

28   Larian, for the "Doe" defendants listed in its original complaint is improper because Mattel knew of their identity when it filed the original complaint. The argument is

15

EXHIBIT 22 PAGE 434

1    That said, Mattel's allegation in the amended complaint as to how it is
2  seeking to lay claim to the copyright in BRATZ is disconcerting.  Paragraph 26,
3  subsection a, in the amended complaint alleges that Bryant "misappropriated and
4  misused Mattel property" by "using his exposure to Mattel development programs to
5  create the concept, design and name of Bratz."  (First Am. Compl. ¶ 26(a)).  Such
6  "exposure" could include Bryant misappropriating the Mattel design concept in
7  TOON TEENS in drawing his inspiration for the BRATZ doll.  Were Mattel's
8  copyright claim so predicated it would be barred by this Court's July, 2006, Order,
9  dismissing Bryant's declaratory judgment action.  Mattel was pressed on this point
10  during oral argument and conceded that such "exposure" to Mattel "development
11  programs" did not include TOON TEENS.  With this representation, nothing in
12  Mattel's proposed copyright claim is barred under the rubric of bad faith.

13    5.    Judicial Economy Considerations
14    In his opposition, Bryant adds an additional reason for denying leave beyond
15  those contained in MGA's papers — the amendment would muddy the waters in the
16  04-9059 by adding "tangential" issues that would only serve to delay resolution of
17  the key issue lying at the heart of the complaint:  Who owns the rights to the
18  BRATZ line of dolls.  (Bryant Opp. at 2 ).  Bryant notes that the case has proceeded
19  apace in moving toward resolving that issue, and the amendment would "transform
20

21  misplaced.  As made clear by Mattel, California law allows a plaintiff to substitute in a
22  defendant for a "Doe" if the plaintiff was ignorant of that defendant's identity or
    ignorant of the basis for liability at the time the complaint was filed.  See Miller v.
23  Thomas, 121 Cal.App.3d 440 (1981).  MGA does not dispute this legal contention
24  but at oral argument disputed that Mattel did not know the basis for liability against
    itself or Mr. Larian due to the "uncanny" similarity between the allegations averred in
25  the original complaint and those now proffered against the two in the amended
    complaint.  Specifically, MGA notes that the original complaint spoke of Bryant
26  working for one of Mattel's competitiors and of that employee's theft of Mattel's
    intellectual property before leaving to work for that competitior.  At most, all this
27  shows is that Mattel knew that Bryant went to work for MGA, not that MGA or Mr.
28  Larian encouraged Bryant's alleged unlawful behavior recited in the original
    complaint.

EXHIBIT  22  PAGE  435

1    what Mattel has always claimed was a straightforward employment action against

2    an individual defendant into a global commercial dispute against Mattel's primary

3    competitor, MGA," that "will last years" thereby "delay[ing]" resolution of who owns

4    BRATZ.[6]  (Bryant Opp. at 2).  Mattel argues that "the law does not deny leave to

5    amend because claims are 'tangential'" and then reiterates its point that some

6    showing of prejudice, namely, seeking leave after expiration of discovery, is

7    necessary.  (Reply to Bryant Opp. at 3).  That is not entirely correct.

8         As noted previously, the Ninth Circuit recently upheld a denial for leave to

9    amend because the amendment would have "drastically changed" the litigation,

10   even though the leave request was tendered <u>before</u> the time, as set forth in a Rule

11   16(b) pre-trial scheduling order, for filing a motion to amend had expired and well

12   before the discovery cut-off.  <u>See AmerisourceBergen Corp. v. Dialysist West, Inc.</u>,

13   465 F.3d 946, 953 (9th Cir. 2006).  In justifying its reasoning the Ninth Circuit cited

14   approvingly to the following statement from a well-respected treatise: "If an

15   amendment substantially changes the theory on which the case has been

16   proceeding and is proposed late enough so that the opponent would be required to

17   engage in significant new preparation, the court may deem it prejudicial."  <u>Id</u>. at 953

18   n.2 (quoting 6 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE,

19   FEDERAL PRACTICE AND PROCEDURE § 1487 (2nd ed. 1990)).  Thus, <u>Dialysist</u>

20   recognized that the introduction of "different legal theories" and/or proof of

21   materially different facts well into the litigation can itself be a basis for finding

22   prejudice regardless of whether the period for discovery has expired (or is even

23   close to expiring) or the parties have already filed summary judgment motions.  <u>Id</u>.

24   at 953-54.

25        Although the parties can safely be said to be at this point well into the

26   _____

27        [6]  Bryant also brings intricate legal arguments about the sufficiency of the
     allegations Mattel has averred in building its RICO claims against him.  Such
28   considerations are best left to be resolved on a properly filed motion to dismiss.

EXHIBIT __22__ PAGE __436__

litigation in this consolidated action (as evidenced by the protracted discovery disputes contained in the docket sheet that the parties have had before the magistrate judge and now the special master, and the litigation of motions to dismiss in both the 04-9049 and 04-9059 cases), the fact remains that, as Mattel has made painfully clear in its papers, no scheduling order has been entered in this case.[7] This takes away somewhat from the prejudice Dialysist found to exist when a "drastic change [in a party's] litigation theory" takes place mid-stream in the litigation process. Id. at 953. Simply put, without a schedule for the filing of pre-trial motions and other matters (e.g., discovery cutoff), the parties have been given free reign in how to conduct the litigation in this case.

That the delay in bringing the proposed amendments and the relative length of time into the litigation when those amendments were brought may not neatly fold into Dialysist's reasoning does not mean that leave must nonetheless be granted. The 04-9059 action, as it is presently constituted, is not a complex one. It asks a rather narrow and straightforward question — Did anything from Bryant's employment at Mattel during the 1999-2000 period give Mattel ownership rights to the BRATZ doll line? The proposed amendments would radically alter the litigation in that case to include far ranging disputes involving multiple parties and concerning events not connected with the BRATZ ownership issue. That the original action was a relatively simple and straight-forward matter raises another point beyond the change in the action's litigation posture — whether entangling the rival doll makers' other commercial disputes into this particular case would serve to muddy the waters and make the matter that much more difficult to manage from the Court's perspective.

---

[7] Mattel's repeated refrain that the matter is in its nascent stage as evidenced by the fact that the parties only just recently exchanged in initial disclosures is misleading. The exchange of initial disclosures referred to by Mattel is in the 05-2727 case. With respect to the 04-9059 case it appears that such initial disclosures were completed long ago as evidenced by the fact that discovery disputes appeared in that case as far back as January, 2005.

EXHIBIT 22 PAGE 437

As has long been recognized, equally important in determining whether to grant such leave is what impact such amendments would have on the court's ability to manage the case. See 3 JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE § 15.15[1] at 15-42.1 to 15-43 (3rd ed. 2006)("A court should also consider judicial economy and its ability to manage the case. . . . The court should also temper the policy favoring freely granting leave to amend with consideration of the ability of the district court to manage the case adequately if amendment is allowed"). As Judge Clark for the Fifth Circuit once observed: "In keeping with the purposes of the rule, the court should consider judicial economy and whether the amendments would lead to expeditious disposition of the merits of the litigation. Finally, the court should consider whether the amendment adds substance to the original allegations, and whether it is germane to the original case of action." Chitimacha Tribe of Louisiana v. Harry L. Laws Co., 690 F.2d 1157, 1163 (5th Cir. 1982); see also Sierra Club v. Union Oil Co. of California, 813 F.2d 1480, 1493 (9th Cir. 1987)("General considerations of judicial economy also justify allowing the amendments. The violations included in the proposed amendment relate to the same subject matter as the original complaint. Allowing the amendment will further the federal policy of 'wrapping in one bundle all matters concerning the same subject matter.'").

Mattel's amendments do not add substance to the claims contained in its original complaint. Rather, they would expand the universe of claims and defendants stretching well-beyond the questions raised in the original complaint over whether Bryant's conduct while in the employ of Mattel subjected his later attributed creation of the BRATZ dolls to the provisions in Mattel's Inventions Agreement or otherwise rendered his creation subject to an infringement action. Nowhere does Mattel seek to reconcile the breadth of its present amendments with the narrowness of the allegations contained in its original complaint. In fact, the precise opposite is true. Mattel acknowledges that its proposed amendments bear

19

EXHIBIT 22 PAGE 438

1   more congruity to the allegations leveled against it in MGA's Lanham Act case than
2   to those in the action to which it seeks to add them:

3           [M]any of the matters raised by Mattel's proposed
4           Amended Complaint are and will remain at issue
            because of MGA's Complaint, whether or not leave to
5           amend is granted. MGA's claims allege that a broad
            array of purported Mattel conduct across the globe,
6           starting at least as early as 1999, has violated the
            Lanham Act and unfair competition law. This includes
7           Mattel's alleged infringement of Bratz and other MGA
            products. As a result, issues in the proposed Amended
8           Complaint are already part and parcel of Mattel's
            defenses to MGA's unfair competition claims, including
9           because they show that MGA and Bryant, and not
            Mattel, are ones who stole the products and other
10          properties involved.

11  (Reply to Bryant Opp. at 7 (emphasis added)). Mattel apparently finds this
12  discongruity unimportant because "all of these matters have been consolidated with
13  the Bryant case." (Id. at 7). As noted earlier, the fact that the cases have been
14  consolidated does not mean that the parties can ignore the distinctions that still
15  exist between them. If, as Mattel acknowledges, the present amendments are
16  nothing more than re-formulated defenses and counterclaims it presently has to
17  MGA's complaint against it in the 05-2727 case, then such amendments should be
18  brought in the form of an amended answer and counterclaim in that case.
19          Consideration of the distinctions between the two cases is wise as it serves
20  as a useful tool in providing the Court a better means to manage the cases now
21  that they have been consolidated. The proverbial dog (ownership in BRATZ)
22  should be wagging the proverbial tail (the remaining commercial disputes), not the
23  other way around. Admittedly, the dog's tail has grown in size both by MGA's filing
24  of its complaint in the 05-2727 action and Mattel's response thereto through its
25  proposed amendments. Nonetheless, it is readily apparent to the Court that the
26  crown jewel in this action still remains the ownership rights to the BRATZ dolls. The
27  parties have engaged in extensive and undoubtedly expensive discovery on this
28  very issue (from hiring world-renowned experts to test the age of Bryant's design

20

EXHIBIT 2-2 PAGE 439

1  drawings to technically complex discovery of what is on each other's computers).

2      Indeed the separateness of the two matters is reflected in how the cases are

3  currently structured, namely, the narrowness of the issue involved in 04-9059 and

4  the expansiveness of the facts at issue in 05-2727. In light of this fact, the Court

5  believes a two-track scheduling order wherein the 04-9059 matter's discovery cut

6  off and trial date are set well-ahead of those in 05-2727 makes the most sense. As

7  noted earlier, many of the legal claims being pressed in 05-2727 will be affected by

8  the result of the litigation in 04-9059. If, for instance, Mattel does own the rights to

9  the BRATZ dolls (either owing to Bryant's stealing his idea from one of Mattel's

10  "development programs" or by way of the Inventions Agreement because he

11  continued to work on his designs while at Mattel), then large portions of MGA's

12  Lanham Act infringement claims may become moot. By the same token, if Mattel

13  does not own rights to BRATZ, then some of the defenses and counterclaims set

14  forth as independent claims in the present amended complaint may become moot,

15  including Mattel's copyright infringement claim as well as portions of its remaining

16  RICO, misappropriation, and aiding and abetting claims. If, however, the Court

17  were to allow the amended complaint to be filed in the 04-9059 action, such case

18  management would be difficult, if not impossible as many of the issues being

19  litigated in the 05-2727 case would have been poured into the 04-9059 case by the

20  amendment. Due to this substantial overlap in claims and facts, a two-track

21  scheduling order utilizing the case number distinctions would be impossible to craft.

22  When pressed by the Court at oral argument as to which of its proposed claims it

23  believed would <u>not</u> undermine the BRATZ ownership posture of the 04-9059 case,

24  Mattel cited to its copyright and RICO claims. However, upon further questioning

25  by the Court, counsel for Mattel acknowledged that much of those claims were, like

26  the claims at issue in 05-2727, dependent upon resolution of the ownership issue.

27      In light of the burden allowing Mattel's amendment to proceed would have on

28  this Court's ability to efficiently manage these consolidated matters denial of

EXHIBIT 22 PAGE 440

1   Mattel's request to amend its complaint in the 04-9059 matter is justified.  See
2   Perrian v. O'Grady, 958 F.2d 192, 195 (7th Cir. 1992)("The burden to the judicial
3   system can justify a denial of a motion to amend 'even if the amendment would
4   cause no hardship at all to the opposing party'").  Buttressing the Court's decision is
5   the fact that, even with such a denial, Mattel may file (and the Court provides leave
6   to Mattel to so file) an amended answer and counterclaim in the 05-2727 case
7   raising all the new claims and defendants presently sought to be achieved through
8   amendment of its complaint in the 04-9059 action.  None of the substantive
9   concerns raised by MGA and Bryant to the present amended complaint, e.g.,
10  statutes of limitations, would appear to be affected if the new claims and
11  defendants were brought as defenses and counterclaims in the 05-2727 case as
12  opposed to the 04-9059 one.

13          Accordingly, the Court GRANTS Mattel's motion for leave to file its proposed
14  amendments, but only insofar as they are pled in the form of an amended answer
15  and counterclaim in the 05-2727 case.

16          Finally, the lack of a scheduling order in this case is problematic; one should
17  have been entered long ago.  See Fed. R. Civ. P. 16(b)(noting that a scheduling
18  "order shall issue as soon as practicable but in any event within 90 days after the
19  appearance of a defendant and within 120 days after the complaint has been
20  served on a defendant").  In light of the fact that entry of a scheduling order is
21  woefully overdue in this case, the Court hereby ORDERS that a Rule 16(b)
22  scheduling conference be held in this consolidated matter on February 12, 2007, at
23  1:30 p.m. in Courtroom One.  The parties are directed to file a Joint Rule 26(f)
24  report with the Court by February 5, 2007.

25          IT IS SO ORDERED.

26  DATE:  /-//-07

27

28                                          STEPHEN G. LARSON
                                            UNITED STATES DISTRICT JUDGE

                                        22

EXHIBIT 22 PAGE 441