# EXHIBIT 1

RightFAX                8/30/2007 2:34   PAGE 002/006   Fax Server

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
Priority ___
Entered ___
JS-5/JS-6 ___
Scan Only___
___ THIS CONSTITUTES NOTICE OF
ENTRY AS REQUIRED BY FRCP 77(d)

Send ___
Closed ___
JS-2/JS-3 ___
Docketed on CM ___

8/29/07

EASTERN DIVISION
BY___ DEPUTY

# PRIORITY SEND
## & ENTERED

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA  92501
CIVIL MINUTES — GENERAL

Case No.    CV 04-09049 SGL (RNBx)            Date:  August 27, 2007

Title:     CARTER BRYANT -v- MATTEL, INC.
           AND CONSOLIDATED ACTIONS
==================================================================
PRESENT:   HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

         Gina L. Guzman                    Theresa Lanza
         Courtroom Deputy Clerk            Court Reporter

ATTORNEYS PRESENT FOR CARTER         ATTORNEYS PRESENT FOR MATTEL:
BRYANT:

John W. Keker, Esq.                  John B. Quinn, Esq.
(morning session only)               Michael T. Zeller, Esq.
                                     Jon D. Corey, Esq.

ATTORNEYS PRESENT FOR MGA:

Patricia Glaser, Esq.
Diana M. Torres, Esq.

PROCEEDINGS:     ORDER DENYING MOTION FOR TERMINATING SANCTIONS;
                 ORDER DENYING REQUEST FOR INTERLOCUTORY
                 APPEAL; ORDER REQUIRING FILING OF AFFIDAVITS RE
                 EVIDENCE PRESERVATION

     This matter is before the Court on MGA's and Carter Bryant's Motion for Terminating
Sanctions, filed on July 24, 2007 (docket #889).  This matter was heard on August 27, 2007, at
which time it was taken under submission.  The Court has considered the moving, opposition, and
reply briefs, as well as the many declarations and other evidence presented by the parties.  The

MINUTES FORM 90                                  Initials of Deputy Clerk _ glg
CIVIL — GEN                                       Time: 02/52
                          1                       Docket No. 895

EXHIBIT ___1___ PAGE ___3___

Court has also considered the arguments presented at the August 27 hearing and the sworn testimony given by Michael C. Moore, in-house counsel for Mattel. Although at the hearing the Court indicated it would defer ruling on the present motion pending further filings by all parties regarding their efforts to preserve evidence, upon further reflection the Court sees no reason to delay ruling on the current motion.[1]  As set forth below, the Court **DENIES** the motion.

Based on their inherent power to sanction for "abusive litigation practices," district courts may impose sanctions against a party who destroys evidence, including the ultimate sanction of dismissal.  Leon v. IDX Systems Corp., 464 F.3d 951, 958 (9th Cir. 2006).  Dismissal is a harsh sanction, which may nonetheless be imposed upon those parties who have "engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings." Anheuser-Busch, Inc. v. Natural Beverage Distributors, 69 F.3d 337, 348 (9th Cir. 1995).  However, before imposing the ultimate sanction of dismissal, district courts should consider five factors: "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions." Id.  Nevertheless, district courts need not make explicit findings regarding each of these factors and, in any event, "a finding of willfulness, fault, or bad faith is required for dismissal to be proper." Leon, 464 F.3d 951, 958 (9th Cir. 2006) (internal quotation marks and citation omitted).

"A party's destruction of evidence qualifies as willful spoliation if the party has 'some notice that the documents were potentially relevant to the litigation before they were destroyed.'" Id. at 959 (quoting United States v. Kitsap Physicians Serv., 314 F.3d 995, 1001 (9th Cir. 2002) (finding no willful spoliation where documents were destroyed in the routine course of business)).  Neither Leon nor Kitsap elaborate on when a party has the "notice" necessary to trigger the duty to preserve evidence.  However, in In re Napster, Inc. Copyright Litigation, 462 F.Supp.2d 1060, 1068 (N.D. Cal. 2006), the district court presented a persuasive discussion of the standard, first rejecting an argument that the duty to preserve evidence arises only when litigation is "imminent," and then setting forth a lesser standard.  Specifically, the Napster court noted that the duty arose "when a party should have known that the evidence may be relevant to future litigation," and that any such "future litigation" must be "probable," and not merely "possibl[e]." (Internal quotation marks and citation omitted).

Keeping in mind these standards, the Court turns to the categories of evidence MGA and Bryant allege that Mattel has despoiled.  As articulated by the Court at the hearing on this matter, those categories are (1) Mattel employees' emails, (2) documents maintained on the Zeus document storage system, (3) the delay in producing certain Rule 30(b)(6) witnesses, (4) Carter

---

[1]  By the same token, upon further reflection, the Court sees no reason to delay ruling on MGA's request for interlocutory appeal of the present order.  See 28 U.S.C. § 1292(b) (stating that certifications for interlocutory appeal should be set forth in the order to be appealed).  The Court's ruling on that matter appears infra.

EXHIBIT ___1___ PAGE ___4___

Bryant's missing phone records, and (5) Carter Bryant's missing time records.

In considering the arguments of the parties regarding when Mattel's duty to begin to preserve evidence arose, the Court determines that November 24, 2003, marks the date when litigation between Mattel and Bryant became more than merely speculative and in fact became probable. On this date, in-house counsel for Mattel received in discovery in an unrelated action a copy of a contract between MGA and Bryant that pre-dated Bryant's resignation from Mattel. This contract appeared to Mattel to violate certain employment agreements executed by Bryant and Mattel, thus giving rise to one of the current consolidated actions. Although prior to this date an internal investigation may have raised a <u>suspicion</u> on Mattel's part that litigation might arise, there was no evidence presented to the Court that Mattel should have known it had a viable claim against Bryant before November 2003. <u>Cf.</u> Fed. R. Civ. P. 11(b)(3) ("By presenting to the court . . . a pleading . . . , an attorney . . . is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, . . . the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery . . . .").

The Court heard testimony from Michael C. Moore, in-house counsel for Mattel, regarding the efforts to preserve email communications and other evidence. Counsel for MGA and Bryant cross-examined Mr. Moore at the hearing on this matter. The Court credits his testimony. The efforts Mr. Moore described regarding the preservation of emails is reasonable, and certainly does not amount to spoliation. Moore described communications with specific individuals identified by Mattel as those most likely to have information relevant to the litigation and efforts made to preserve any evidence those individuals had in their custody or control. Emails not otherwise archived from the relevant time period – mostly September and October, 2000 – had already been deleted from Mattel's email servers in accordance with its email retention policies. Mattel cannot be faulted for deleting these emails in the regular course of business before it had notice of its claims against Bryant.

In April, 2005, the current litigation took a dramatic turn, when MGA filed suit against Mattel. At that time, <u>all</u> Mattel employees were instructed to maintain any evidence potentially relevant to the litigation. When that suit was filed, Mattel took action to preserve all of its emails, capturing emails that date back to December, 2004. They retain these backup tapes to this day. MGA and Bryant make much of Mattel's failure to suspend its 90-day auto-delete policy regarding emails, but fail to address two key points: First, Mattel altered only the storage mechanism for its emails, it did not actually delete any emails; and second, Mattel, a number of years ago, informed MGA that it was not planning on suspending its 90-day auto-delete policy, and MGA did not at that time object.

As for the Zeus tapes, there is simply no evidence of spoliation. First and foremost, as the system has been described to the Court, the system is a cumulative file system that continues to accumulate. The system is still in operation, does not have an auto-delete function, and

Initials of Deputy Clerk __glg__
Time: 02/52

**Docket No. 895**

3

EXHIBIT ____1____ PAGE __5__

information dating back to all relevant time period in this case may be accessed from it. Additionally, Mattel's in-house counsel testified as to the existence of several backup tapes that it can make available to MGA and Bryant. Finally, outside of pure speculation, there is no evidence that anyone has deleted anything from the Zeus system. Although production issues may still remain with respect to these data, preservation of this data, in the Court's view, is simply not an issue based on the record before the Court.

The delay in producing certain Rule 30(b)(6) witnesses is not a proper basis for terminating sanctions in this case. No motions to compel were brought to compel these witnesses's depositions at earlier times, and MGA and Bryant's accusations that the delay in producing them for deposition is part of a cover-up of the destruction of evidence is mere unfounded speculation. Moreover, the Court is mindful that MGA has been found by the discovery master to be guilty of the very same unexcused delay of which it accuses Mattel. See August 14, 2007, J. Infante Order, at 8 and 9 (attached to the Supplemental Proctor Decl. as Ex. 1).

Although Mattel is at a loss to explain the missing phone records from the critical month of October, 2000, there is no evidence that the records were destroyed. Moreover, other evidence presented by Mattel, especially phone records produced by Bryant that show he was in contact with MGA during that time period, suggest that the missing records would not assist Bryant.

The "missing" time records were either never created or were deleted. There is no evidence that the latter occurred. In fact, the only evidence on this point, from Mattel's Rule 30(b)(6) witness, is that although deletion of time records is possible, he was unaware of any instances of that occurring. Artavia Depo. 116, 170-71.

In sum, MGA and Bryant have failed to present any evidence regarding the "willfulness, fault, or bad faith" required to justify the imposition of terminating sanctions. Leon, 464 F.3d at 958. Many of MGA and Bryant's allegations, especially those raised in connection with Mattel's failure to suspend its auto-delete policy (portrayed as a wholesale failure to preserve emails less than 90-days old) and the availability of data from the Zeus system, are nothing more than rhetoric laced with hyperbole. Other allegations, such as Mattel's motive for delaying certain Rule 30(b)(6) depositions, and the destruction of Bryant's October, 2000, phone records and time records, are nothing more than sheer speculation, unsupported by evidence. Although counsel impressed upon the Court MGA's conviction of the righteousness of its cause, such overzealous conviction as witnessed by the Court at the hearing is no substitute for proof.

Accordingly, the Court DENIES MGA's and Bryant's Motion for Terminating Sanctions.

At the hearing, counsel for MGA and Bryant requested the Court certify the present order for interlocutory appeal. That request is DENIED. Permissive interlocutory appeals are governed by 28 U.S.C. § 1292(b):

When a district judge, in making in a civil action an order not otherwise

MINUTES FORM 90
CIVIL – GEN

Initials of Deputy Clerk ___plg_____
Time: 02/52

4

Docket No. 895

EXHIBIT ___1___ PAGE ___6__

> appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order.

*Id.* Here, there is no "controlling question of law" in controversy. The law is quite settled. Accordingly, certification for interlocutory appeal of the present order is unwarranted.

As stated at the hearing, the Court **ORDERS** all parties to set forth, in affidavit form, their preservation efforts and policies with respect to the present litigation on or before September 10, 2007.

**IT IS SO ORDERED.**

MINUTES FORM 90
CIVIL – GEN

Initials of Deputy Clerk __glg_____
Time: 02/52

5

**Docket No. 895**

EXHIBIT ____1____ PAGE _7_

**EXHIBIT 2**

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-443-3000 FAX 213-443-3100

WRITER'S DIRECT DIAL NO.
(213) 443-3112

WRITER'S INTERNET ADDRESS
dylanproctor@quinnemanuel.com

September 21, 2007

<u>VIA FACSIMILE AND U.S. MAIL</u>

Michael Page, Esq.
Keker & Van Nest, LLP
710 Sansome Street
San Francisco, CA 94111

James W. Spertus, Esq.
Law Offices of James W. Spertus
12100 Wilshire Blvd., Ste. 620
Los Angeles, CA 90025

Diana Torres, Esq.
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA 90071-2899

Re:    <u>Mattel, Inc. v. Bryant</u>

Dear Counsel:

I write regarding several Defendants' apparent non-compliance with the Court's Order dated August 27, 2007.

In the Court's Order of August 27, 2007, Judge Larson ordered "***all*** parties to set forth, in affidavit form, their preservation efforts and policies with respect to the present litigation on or before September 10, 2007." (Emphasis added.) Notwithstanding that Order, the terms of which appear to be clear, Mattel has been served with a declaration regarding the preservation efforts only of MGA Entertainment, Inc. None of the other five defendants -- MGA Entertainment (HK) Ltd., MGAE de Mexico S.R.L. de C.V., Isaac Larian, Carter Bryant, or Carlos Gustavo Machado Gomez -- served Mattel with such a declaration or appears to have filed the Court-ordered declaration.

**quinn emanuel urquhart oliver & hedges, llp**

NEW YORK | 51 Madison Avenue, 22nd Floor, New York, New York 10010 | TEL 212-849-7000 FAX 212-849-7100
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94111 | TEL 415-875-6600 FAX 415-875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL 650-801-5000 FAX 650-801-5100

07209/2229939 1

EXHIBIT __2__ PAGE __8__

Please advise whether the Defendants other than MGA Entertainment, Inc. intend to file a declaration regarding their preservation efforts as ordered by the Court. If not, please consider this a request to meet and confer pursuant to Local Rule 7-3, and advise regarding your availability for such a conference.

Very truly yours,

B. Dylan Proctor

BDP:lak

07209/2229939.1

2

EXHIBIT __2__ PAGE __9__

# QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

**NEW YORK**
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
Facsimile: (212) 849-7100

**LOS ANGELES**
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000
Facsimile: (213) 443-3100

**SAN FRANCISCO**
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600
Facsimile: (415) 875-6700

**SILICON VALLEY**
555 Twin Dolphin Drive, Suite 560
Redwood Shores, CA 94065
(650) 801-5000
Facsimile: (650) 801-5100

## LOS ANGELES OFFICE
## FACSIMILE TRANSMISSION

**DATE:**   September 21, 2007

**NUMBER OF PAGES, INCLUDING COVER:** 3

| NAME/COMPANY | PHONE NO. | FAX NO. |
|---|---|---|
| Diana Torres, Esq. **O'Melveny & Myers, LLP** | (213) 430-6000 | (213) 430-6407 |
| Michael H. Page, Esq. **Keker & Van Nest, LLP** | (415) 391-5400 | (415) 397-7188 |
| James W. Spertus, Esq. **Law Offices of James W. Spertus** | (310) 826-4700 | (310) 826-4711 |

**FROM:**   B. Dylan Proctor, Esq.

**RE:**   *Bryant v. Mattel*

**MESSAGE:**


FAXED
SEP 2 1 2007

---

07209/2221816.1

| CLIENT #  | 7209 | ROUTE/ RETURN TO: | Tiffany Garcia/3rd Floor | ☒ CONFIRM FAX ☒ INCLUDE CONF. REPORT |
|---|---|---|---|---|
| OPERATOR: | | | CONFIRMED?  ☐ NO  ☐ YES: _____ | |

The information contained in this facsimile is confidential and may also contain privileged attorney-client information or work product. The information is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this communication is strictly prohibited. If you have received the facsimile in error, please immediately notify us by telephone, and return the original message to us at the address above via the U.S. Postal Service. Thank you.

**IF YOU DO NOT RECEIVE ALL OF THE PAGES, PLEASE PHONE (213) 443-3000 AS SOON AS POSSIBLE.**

EXHIBIT ___2___  PAGE ___10___

09/21/2007 16:42 FAX 12134433100          QEUOH-LAO                              ☑001

```
*********************************
***    MULTI TX/RX REPORT    ***
*********************************

TX/RX NO          2241
PGS.              3
TX/RX INCOMPLETE
                  -----

TRANSACTION OK
                  (1)  2*12134306407
                  (2)  2*14153877188
                  (3)  2*13109264711

ERROR INFORMATION
                  -----
```

# QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

**NEW YORK**
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
Facsimile: (212) 849-7100

**LOS ANGELES**
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000
Facsimile: (213) 443-3100

**SAN FRANCISCO**
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600
Facsimile: (415) 875-6700

**SILICON VALLEY**
555 Twin Dolphin Drive, Suite 560
Redwood Shores, CA 94065
(650) 801-5000
Facsimile: (650) 801-5100

## LOS ANGELES OFFICE
## FACSIMILE TRANSMISSION

**DATE:**    September 21, 2007

**NUMBER OF PAGES, INCLUDING COVER: 3**

| NAME/COMPANY | PHONE NO. | FAX NO. |
|---|---|---|
| Diana Torres, Esq.<br>**O'Melveny & Myers, LLP** | (213) 430-6000 | (213) 430-6407 |
| Michael H. Page, Esq.<br>**Keker & Van Nest, LLP** | (415) 391-5400 | (415) 397-7188 |
| James W. Spertus, Esq.<br>**Law Offices of James W. Spertus** | (310) 826-4700 | (310) 826-4711 |

**FROM:**    B. Dylan Proctor, Esq.

**RE:**    *Bryant v. Mattel*

**MESSAGE:**

EXHIBIT __2__ PAGE __11__

# EXHIBIT 3

RECEIVED
SEP 2 7 2007

LAW OFFICES

# KEKER & VAN NEST
## LLP

710 SANSOME STREET
SAN FRANCISCO, CA 94111-1704
TELEPHONE (415) 391-5400
FAX (415) 397-7188
WWW.KVN.COM

JOHN E. TRINIDAD
JTRINIDAD@KVN.COM

September 25, 2007

**VIA FACSIMILE & U.S. MAIL**

B. Dylan Proctor
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543

Re: *Mattel, Inc. v. Bryant*
United States District Court, Central District of California
Case No. CV 04-09049 SGL (RNBx) (consolidated with CV 04-9059 & 05-2727)

Dear Dylan:

I write in response to your letter dated September 21, 2007 regarding the Court's August 27, 2007 Order.

In that letter you assert that the Court's Order requires all defendants, including Carter Bryant, to provide a declaration regarding document preservation efforts. We disagree. The hearing transcript makes clear that the only parties required to provide such a declaration were MGA Entertainment, Inc. and Mattel:

> THE COURT: What I want from **both parties** is **two singular declarations,** under penalty of perjury, setting forth exactly the preservation policies. **I want it from MGA. I want it from Mattel.** And I don't want to just hear about witnesses. I want to know who those 35 people are. I don't want to hear just about 'We were asked to save everything, because obviously, MGA is not saving every e-mail in their entire company. You've got criteria as well. Transcript 119:9-16 (emphasis added).

403303.01

EXHIBIT ___3___ PAGE __12__

B. Dylan Proctor
September 25, 2007
Page 2

       There is no Court order requiring Carter Bryant to provide a declaration regarding preservation efforts, nor does Bryant intend to file such a declaration.

Very truly yours,

John Trinidad

JET/jas

cc:   Diana Torres
      Amman Khan

EXHIBIT __3__ PAGE __13__

**EXHIBIT 4**

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-443-3000 FAX 213-443-3100

WRITER'S DIRECT DIAL NO.
**(213) 443-3112**

WRITER'S INTERNET ADDRESS
dylanproctor@quinnemanuel.com

September 26, 2007

**VIA FACSIMILE AND U.S. MAIL**

John B. Trinidad, Esq.
Keker & Van Nest LLP
710 Sansome Street
San Francisco, CA 94111

Re:   Mattel, Inc. v. Bryant

Dear John:

I write in response to your letter of yesterday regarding the Court's August 27, 2007 Order, and Mattel's prior request that Mr. Bryant and other defendants fulfill their obligation to provide a declaration of their preservation efforts as ordered by the Court.

You correctly point out in your letter that during the hearing on MGA's and Bryant's joint motion for terminating sanctions, the Court stated it wanted MGA and Mattel to provide preservation declarations. However, the Court also made clear, in its closing comments, that it intended to "issue a minute order directing further proceedings in this matter." The Court issued that Order later that same day and, as discussed in my letter of September 21, 2007, required "all parties" to provide declarations of their preservation efforts. The Order could not be more clear. Mr. Bryant's contention that "there is no Court order requiring Carter Bryant to provide a declaration regarding preservation efforts" simply ignores the Order's unequivocal terms. I have enclosed a copy of the Court's Order with this letter for your convenience.

Mattel invites a discussion of this matter and remains hopeful that it can be resolved without involving the Court. Also, I have not heard back from counsel for the other non-MGA

EXHIBIT ___4___ PAGE _14_

**quinn emanuel urquhart oliver & hedges, llp**

NEW YORK | 51 Madison Avenue, 22nd Floor, New York, New York 10010 | TEL 212-849-7000 FAX 212-849-7100
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94111 | TEL 415-875-6600 FAX 415-875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL 650-801-5000 FAX 650-801-5100

07209/2233050.1

Entertainment, Inc. parties.  We request a prompt response from Defendants as to their positions and/or availability for a conference of counsel.

Very truly yours,

B. Dylan Proctor

BDP:lak
Enclosure

cc:    Diana Torres, Esq.
       Amman Kahn, Esq.
       James Spertus, Esq.

EXHIBIT ___4___ PAGE ___15___

RightFAX                    8/30/2007 2:34     PAGE 002/006    Fax Server

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
Priority ___✓___   Send _____
Entered ___✓___   Closed _____
JS-5/JS-6 _____   JS-2/JS-3 _____
Scan Only_____   Docketed as CM __✓__
_____ THIS CONSTITUTES NOTICE OF
ENTRY AS REQUIRED BY FRCP 77(d)
8 29 07
EASTERN DIVISION
BY _____ DEPUTY

## PRIORITY SEND
### & ENTERED

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
CIVIL MINUTES -- GENERAL

Case No.    CV 04-09049 SGL (RNBx)                     Date: August 27, 2007

Title:      CARTER BRYANT -v- MATTEL, INC.
            AND CONSOLIDATED ACTIONS

===========================================================================

PRESENT:    HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

            Gina L. Guzman                          Theresa Lanza
            Courtroom Deputy Clerk                  Court Reporter

ATTORNEYS PRESENT FOR CARTER              ATTORNEYS PRESENT FOR MATTEL:
BRYANT:

John W. Keker, Esq.                        John B. Quinn, Esq.
(morning session only)                     Michael T. Zeller, Esq.
                                           Jon D. Corey, Esq.

ATTORNEYS PRESENT FOR MGA:

Patricia Glaser, Esq.
Diana M. Torres, Esq.

PROCEEDINGS:      ORDER DENYING MOTION FOR TERMINATING SANCTIONS;
                  ORDER DENYING REQUEST FOR INTERLOCUTORY
                  APPEAL; ORDER REQUIRING FILING OF AFFIDAVITS RE
                  EVIDENCE PRESERVATION

     This matter is before the Court on MGA's and Carter Bryant's Motion for Terminating
Sanctions, filed on July 24, 2007 (docket #689). This matter was heard on August 27, 2007, at
which time it was taken under submission. The Court has considered the moving, opposition, and
reply briefs, as well as the many declarations and other evidence presented by the parties. The

MINUTES FORM 90                                      Initials of Deputy Clerk ___glg___
CIVIL -- GEN                                         Time: 02/52
                              1                      Docket No. 895

EXHIBIT ___4___ PAGE ___16___

Court has also considered the arguments presented at the August 27 hearing and the sworn testimony given by Michael C. Moore, in-house counsel for Mattel.  Although at the hearing the Court indicated it would defer ruling on the present motion pending further filings by all parties regarding their efforts to preserve evidence, upon further reflection the Court sees no reason to delay ruling on the current motion.[1]  As set forth below, the Court DENIES the motion.

Based on their inherent power to sanction for "abusive litigation practices," district courts may impose sanctions against a party who destroys evidence, including the ultimate sanction of dismissal.  Leon v. IDX Systems Corp., 464 F.3d 951, 958 (9th Cir. 2006).  Dismissal is a harsh sanction, which may nonetheless be imposed upon those parties who have "engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings."  Anheuser-Busch, Inc. v. Natural Beverage Distributors, 69 F.3d 337, 348 (9th Cir. 1995).  However, before imposing the ultimate sanction of dismissal, district courts should consider five factors:  "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions."  Id.  Nevertheless, district courts need not make explicit findings regarding each of these factors and, in any event, "a finding of willfulness, fault, or bad faith is required for dismissal to be proper."  Leon, 464 F.3d 951, 958 (9th Cir. 2006) (internal quotation marks and citation omitted).

"A party's destruction of evidence qualifies as willful spoliation if the party has 'some notice that the documents were potentially relevant to the litigation before they were destroyed.'"  Id. at 959 (quoting United States v. Kitsap Physicians Serv., 314 F.3d 995, 1001 (9th Cir. 2002) (finding no willful spoliation where documents were destroyed in the routine course of business)).  Neither Leon nor Kitsap elaborate on when a party has the "notice" necessary to trigger the duty to preserve evidence.  However, in In re Napster, Inc. Copyright Litigation, 462 F.Supp.2d 1060, 1068 (N.D. Cal. 2006), the district court presented a persuasive discussion of the standard, first rejecting an argument that the duty to preserve evidence arises only when litigation is "imminent," and then setting forth a lesser standard.  Specifically, the Napster court noted that the duty arose "when a party should have known that the evidence may be relevant to future litigation," and that any such "future litigation" must be "probable," and not merely "possibl[e]."  (internal quotation marks and citation omitted).

Keeping in mind these standards, the Court turns to the categories of evidence MGA and Bryant allege that Mattel has despoiled.  As articulated by the Court at the hearing on this matter, those categories are (1) Mattel employees' emails, (2) documents maintained on the Zeus document storage system, (3) the delay in producing certain Rule 30(b)(6) witnesses, (4) Carter

---

[1]  By the same token, upon further reflection, the Court sees no reason to delay ruling on MGA's request for interlocutory appeal of the present order.  See 28 U.S.C. § 1292(b) (stating that certifications for interlocutory appeal should be set forth in the order to be appealed).  The Court's ruling on that matter appears infra.

MINUTES FORM 90
CIVIL -- GEN

Initials of Deputy Clerk ___gig_____
Time: 02/52

2

Docket No. 895

EXHIBIT   4      PAGE   17

RightFAX          8/30/2007 2:34     PAGE 004/006     Fax Server

Bryant's missing phone records, and (5) Carter Bryant's missing time records.

In considering the arguments of the parties regarding when Mattel's duty to begin to preserve evidence arose, the Court determines that November 24, 2003, marks the date when litigation between Mattel and Bryant became more than merely speculative and in fact became probable. On this date, in-house counsel for Mattel received in discovery in an unrelated action a copy of a contract between MGA and Bryant that pre-dated Bryant's resignation from Mattel. This contract appeared to Mattel to violate certain employment agreements executed by Bryant and Mattel, thus giving rise to one of the current consolidated actions. Although prior to this date an internal investigation may have raised a suspicion on Mattel's part that litigation might arise, there was no evidence presented to the Court that Mattel should have known it had a viable claim against Bryant before November 2003. Cf. Fed. R. Civ. P. 11(b)(3) ("By presenting to the court . . . a pleading . . . , an attorney . . . is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, . . . the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery . . . .").

The Court heard testimony from Michael C. Moore, in-house counsel for Mattel, regarding the efforts to preserve email communications and other evidence. Counsel for MGA and Bryant cross-examined Mr. Moore at the hearing on this matter. The Court credits his testimony. The efforts Mr. Moore described regarding the preservation of emails is reasonable, and certainly does not amount to spoliation. Moore described communications with specific individuals identified by Mattel as those most likely to have information relevant to the litigation and efforts made to preserve any evidence those individuals had in their custody or control. Emails not otherwise archived from the relevant time period – mostly September and October, 2000 – had already been deleted from Mattel's email servers in accordance with its email retention policies. Mattel cannot be faulted for deleting these emails in the regular course of business before it had notice of its claims against Bryant.

In April, 2005, the current litigation took a dramatic turn, when MGA filed suit against Mattel. At that time, all Mattel employees were instructed to maintain any evidence potentially relevant to the litigation. When that suit was filed, Mattel took action to preserve all of its emails, capturing emails that date back to December, 2004. They retain these backup tapes to this day. MGA and Bryant make much of Mattel's failure to suspend its 90-day auto-delete policy regarding emails, but fail to address two key points: First, Mattel altered only the storage mechanism for its emails, it did not actually delete any emails; and second, Mattel, a number of years ago, informed MGA that it was not planning on suspending its 90-day auto-delete policy, and MGA did not at that time object.

As for the Zeus tapes, there is simply no evidence of spoliation. First and foremost, as the system has been described to the Court, the system is a cumulative file system that continues to accumulate. The system is still in operation, does not have an auto-delete function, and

MINUTES FORM 90
CIVIL -- GEN

3

Initials of Deputy Clerk __glg_____
Time: 02/52

Docket No. 895

EXHIBIT ___4___   PAGE __18__

information dating back to all relevant time period in this case may be accessed from it. Additionally, Mattel's in-house counsel testified as to the existence of several backup tapes that it can make available to MGA and Bryant. Finally, outside of pure speculation, there is no evidence that anyone has deleted anything from the Zeus system. Although production issues may still remain with respect to these data, preservation of this data, in the Court's view, is simply not an issue based on the record before the Court.

The delay in producing certain Rule 30(b)(6) witnesses is not a proper basis for terminating sanctions in this case. No motions to compel were brought to compel these witnesses's depositions at earlier times, and MGA and Bryant's accusations that the delay in producing them for deposition is part of a cover-up of the destruction of evidence is mere unfounded speculation. Moreover, the Court is mindful that MGA has been found by the discovery master to be guilty of the very same unexcused delay of which it accuses Mattel. See August 14, 2007, J. Infante Order, at 8 and 9 (attached to the Supplemental Proctor Decl. as Ex. 1).

Although Mattel is at a loss to explain the missing phone records from the critical month of October, 2000, there is no evidence that the records were destroyed. Moreover, other evidence presented by Mattel, especially phone records produced by Bryant that show he was in contact with MGA during that time period, suggest that the missing records would not assist Bryant.

The "missing" time records were either never created or were deleted. There is no evidence that the latter occurred. In fact, the only evidence on this point, from Mattel's Rule 30(b)(6) witness, is that although deletion of time records is possible, he was unaware of any instances of that occurring. Artavia Depo. 116, 170-71.

In sum, MGA and Bryant have failed to present any evidence regarding the "willfulness, fault, or bad faith" required to justify the imposition of terminating sanctions. Leon, 464 F.3d at 958. Many of MGA and Bryant's allegations, especially those raised in connection with Mattel's failure to suspend its auto-delete policy (portrayed as a wholesale failure to preserve emails less than 90-days old) and the availability of data from the Zeus system, are nothing more than rhetoric laced with hyperbole. Other allegations, such as Mattel's motive for delaying certain Rule 30(b)(6) depositions, and the destruction of Bryant's October, 2000, phone records and time records, are nothing more than sheer speculation, unsupported by evidence. Although counsel impressed upon the Court MGA's conviction of the righteousness of its cause, such overzealous conviction as witnessed by the Court at the hearing is no substitute for proof.

Accordingly, the Court DENIES MGA's and Bryant's Motion for Terminating Sanctions.

At the hearing, counsel for MGA and Bryant requested the Court certify the present order for interlocutory appeal. That request is DENIED. Permissive interlocutory appeals are governed by 28 U.S.C. § 1292(b):

When a district judge, in making in a civil action an order not otherwise

EXHIBIT __4__  PAGE __19__

appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order.

Id. Here, there is no "controlling question of law" in controversy. The law is quite settled. Accordingly, certification for interlocutory appeal of the present order is unwarranted.

As stated at the hearing, the Court ORDERS all parties to set forth, in affidavit form, their preservation efforts and policies with respect to the present litigation on or before September 10, 2007.

IT IS SO ORDERED.

MINUTES FORM 90
CIVIL — GEN

5

Initials of Deputy Clerk ___pjg_____
Time: 02:52
Docket No. 895

EXHIBIT __4__ PAGE __20__

# QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

**NEW YORK**
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
Facsimile: (212) 849-7100

**LOS ANGELES**
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000
Facsimile: (213) 443-3100

**SAN FRANCISCO**
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600
Facsimile: (415) 875-6700

**SILICON VALLEY**
555 Twin Dolphin Drive, Suite 560
Redwood Shores, CA 94065
(650) 801-5000
Facsimile: (650) 801-5100

## LOS ANGELES OFFICE

## FACSIMILE TRANSMISSION

**DATE:**   September 26, 2007          **NUMBER OF PAGES, INCLUDING COVER: 8**

| NAME/COMPANY | PHONE NO. | FAX NO. |
|---|---|---|
| John E. Trinidad, Esq.<br>**Keker & Van Nest, LLP** | (415) 391-5400 | (415) 397-7188 |
| Diana Torres, Esq.<br>**O'Melveny & Myers LLP** | (213) 430-6000 | (213) 430-6407 |
| Amman A. Khan, Esq.<br>**Christensen, Glaser, Fink, Jacobs,<br>Weil & Shapiro LLP** | (310) 553-3000 | (310) 556-2920 |
| James W. Spertus, Esq.<br>**Law Offices of James W. Spertus** | (310) 826-4700 | (310) 826-4711 |

**FROM:**   B. Dylan Proctor, Esq.

**RE:**   *Bryant v. Mattel, Inc.*

FAXED
SEP 2 6 2007

**MESSAGE:**

07209/2233578 l

| CLIENT # | 7209 | ROUTE/<br>RETURN TO: | Tiffany Garcia/3rd Floor | ☒ CONFIRM FAX<br>☒ INCLUDE CONF. REPORT |
|---|---|---|---|---|

**OPERATOR:**                    CONFIRMED?   ☐ No   ☐ YES: _____

The information contained in this facsimile is confidential and may also contain privileged attorney-client information or work product. The information is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this communication is strictly prohibited. If you have received the facsimile in error, please immediately notify us by telephone, and return the original message to us at the address above via the U.S. Postal Service. Thank you.

IF YOU DO NOT RECEIVE ALL OF THE PAGES, PLEASE PHONE (213) 443-3000 AS SOON AS POSSIBLE.

EXHIBIT ___4___ PAGE _21_

```
                        *******************************
                        ***   MULTI TX/RX REPORT   ***
                        *******************************

TX/RX NO             3660
PGS.                    8
TX/RX INCOMPLETE

TRANSACTION OK
                     (1)  1*14153977188
                     (2)  1*12134306407
                     (3)  1*13105562920
                     (4)  1*13108284711

ERROR INFORMATION       -----
```

# QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

**NEW YORK**
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
Facsimile: (212) 849-7100

**LOS ANGELES**
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000
Facsimile: (213) 443-3100

**SAN FRANCISCO**
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600
Facsimile: (415) 875-6700

**SILICON VALLEY**
555 Twin Dolphin Drive, Suite 560
Redwood Shores, CA 94065
(650) 801-5000
Facsimile: (650) 801-5100

## LOS ANGELES OFFICE
# FACSIMILE TRANSMISSION

**DATE:**    September 26, 2007          **NUMBER OF PAGES, INCLUDING COVER: 8**

| NAME/COMPANY | PHONE NO. | FAX NO. |
| --- | --- | --- |
| John E. Trinidad, Esq.<br>**Keker & Van Nest, LLP** | (415) 391-5400 | (415) 397-7188 |
| Diana Torres, Esq.<br>**O'Melveny & Myers LLP** | (213) 430-6000 | (213) 430-6407 |
| Amman A. Khan, Esq.<br>**Christensen, Glaser, Fink, Jacobs,**<br>**Weil & Shapiro LLP** | (310) 553-3000 | (310) 556-2920 |
| James W. Spertus, Esq.<br>**Law Offices of James W. Spertus** | (310) 826-4700 | (310) 826-4711 |

**FROM:**    B. Dylan Proctor, Esq.

**RE:**    *Bryant v. Mattel, Inc.*

EXHIBIT __4__ PAGE __22__

.

# EXHIBIT 5

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-443-3000 FAX 213-443-3100

WRITER'S DIRECT DIAL NO.
**(213) 443-3436**

WRITER'S INTERNET ADDRESS
stephenhauss@quinnemanuel.com

October 25, 2007

**VIA FACSIMILE AND U.S. MAIL**

Alexander H. Cote, Esq.
Overland Borenstein Scheper & Kim LLP
300 South Grand Avenue, Suite 2750
Los Angeles, CA 90071

Re:     Mattel v. Bryant et al.

Dear Alex:

I write further to our telephone conversation of today, October 25, 2007, regarding Mr. Machado's Amended Answer and other matters.

First, as to Mr. Machado's statute of limitations affirmative defense, you did not identify a legal or factual basis for the defense, but were not willing to withdraw or amend it at this time. Mattel accordingly intends to proceed with a motion as to that and the other defenses we identified as being legally deficient or as failing to provide fair notice.

Second, you informed me that Mr. Machado will provide a declaration setting forth his preservation efforts and policies with respect to this litigation. You also stated, however, that you do not know when Mr. Machado will provide that declaration because Mr. Machado is restricted from leaving Mexico as a result of the criminal proceedings against him for the theft of Mattel's trade secrets. You similarly stated that because of these restrictions, you cannot provide dates for his deposition at this time.

We disagree that this serves as a legitimate excuse for Mr. Machado's failure to provide the declaration. Nothing requires him to travel to the United States to review and approve the declaration, and he undoubtedly has access to computers and fax machines in Mexico. In one

**EXHIBIT   5   PAGE   23**

**quinn emanuel urquhart oliver & hedges, llp**

NEW YORK | 51 Madison Avenue, 22nd Floor, New York, New York 10010 | TEL 212-849-7000 FAX 212-849-7100
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94111 | TEL 415-875-6600 FAX 415-875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL 650-801-5000 FAX 650-801-5100
SAN DIEGO | 4445 Eastgate Mall, Suite 200, San Diego, California 92121 | TEL 858-812-3100 FAX 858-812-3300

07975/2266727.1

last effort to avoid a motion on this subject, please provide us with a proposed date by which Mr. Machado will provide the preservation declaration.

With respect to the deposition, Mattel is willing to take Mr. Machado's deposition in Mexico so as to obviate any travel issues on his part. Accordingly, please provide us with dates when Mr. Machado is available for deposition by Tuesday, October 30, 2007.

Finally, you asked me over the phone about Mattel's position on the Court's mediation proposal, including the use of Ambassador Prosper as a mediator. A separate letter had been sent to you and other counsel for defendants yesterday on that subject, which I am attaching for your convenience. We would appreciate it if you could let us know whether Mr. Machado is amenable to Ambassador Prosper as a mediator in this case.

I look forward to hearing from you.

Very truly yours,

Stephen Hauss

EXHIBIT __5__ PAGE __24__

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-443-3000 FAX 213-443-3100

October 24, 2007

<u>**VIA FACSIMILE AND U.S. MAIL**</u>

Thomas Nolan, Esq.
Carl Roth, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue, Suite 3400
Los Angeles, CA 90071

John Keker, Esq.
Michael Page, Esq.
Keker & Van Nest, LLP
710 Sansome Street
San Francisco, California 94111

Mark Overland, Esq.
Alexander Cote, Esq.
Overland Borenstein Scheper & Kim LLP
300 South Grand Avenue, Suite 2750
Los Angeles, California 90071

Re:    <u>Mattel, Inc. v. Bryant</u>

Dear Counsel:

I write to follow up on Judge Larson's request that the parties agree on Ambassador Prosper as a mediator. Mattel agrees that Mr. Prosper can, and should, mediate this case.

Mattel understands that Mr. Prosper's primary employment is teaching law. Mattel understands, however, that he also holds the title of "Counsel" in the Washington, D.C. and Los Angeles office of the Arent Fox firm. As you may be aware, Robert O'Brien, of Arent Fox's Los Angeles office, represents Margo Eldridge and her associates, who have provided services to both MGA and Mattel, in connection with subpoenas served upon them by MGA. Mattel has agreed to pay Mr. O'Brien for the fees incurred in connection with their representation. Further, we do not believe that Mr. Prosper possesses or has provided any services in connection with that

**EXHIBIT  5  PAGE  25**

quinn emanuel urquhart oliver & hedges, llp

NEW YORK | 51 Madison Avenue, 22nd Floor, New York, New York 10010 | TEL 212-849-7000 FAX 212-849-7100

SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94111 | TEL 415-875-6600 FAX 415-875-6700

SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL 650-801-5000 FAX 650-801-5100

07209/2261798.1

representation.  We do not believe that this precludes Ambassador Prosper from mediating this matter.

Please let me know whether you respective clients will agree to Ambassador Prosper as a mediator at your earliest convenience.

Best regards,

Jon D. Corey

JDC:jcl
07209/2261798.1

07209/2261798.1                                                    2

EXHIBIT __5__ PAGE __26__

# EXHIBIT 6

1        UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA

3        EASTERN DIVISION

4        - - -

5        HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6        - - -

**CERTIFIED COPY**

7    CARTER BRYANT,                    )
                                       )
8                    PLAINTIFF,        )
                                       )
9         VS.                          )    NO. ED CV 04-09049
                                       )    (LEAD LOW NUMBER)
10   MATTEL, INC.,                     )
                                       )
11                   DEFENDANT.        )
     _____    )    BRYANT'S MOTION FOR
12   AND RELATED ACTIONS,              )    TERMINATING SANCTIONS
     _____    )

13

14

15        REPORTER'S TRANSCRIPT OF PROCEEDINGS

16        RIVERSIDE, CALIFORNIA

17        MONDAY, AUGUST 27, 2007

18        11:06 A.M.

19

20

21

22

23        THERESA A. LANZA, RPR, CSR
          FEDERAL OFFICIAL COURT REPORTER
24        3470 12TH STREET, RM. 134
          RIVERSIDE, CALIFORNIA  92501
25        (951) 274-0844
          CSR11457@SBCGLOBAL.NET          EXHIBIT __6__ PAGE __27__

1   APPEARANCES:

2

3   ON BEHALF OF PLAINTIFF/COUNTER DEFENDANT MATTEL, INC.:

4

5                       QUINN EMANUEL
                        BY:  JOHN B. QUINN
                        BY:  MICHAEL T. ZELLER
6                       BY:  JON C. COREY
                        865 S. FIGUEROA STREET,
7                       10TH FLOOR
                        LOS ANGELES, CALIFORNIA  90017
8                       (213) 624-7707

9

10  ON BEHALF OF PLAINTIFF/COUNTER COMPLAINANT/DEFENDANT,
    CARTER BRYANT:

11

12                      KEKER & VAN NEST
                        BY:  MICHAEL H. PAGE
                        710 SANSOME STREET
13                      SAN FRANCISCO, CALIFORNIA  94111-1704
                        (415) 391-5400

14

15

16  ON BEHALF OF MGA ENTERTAINMENT:

17                      O'MELVENY & MYERS LLP
                        BY:  DIANA M. TORRES
18                      400 SOUTH HOPE STREET
                        LOS ANGELES, CALIFORNIA  90071-2899
19                      (213) 430-6000

20                      CHRISTENSEN, GLASER, FINK,
                         JACOBS, WEIL & SHAPIRO, LLP
21                      BY:  PATRICIA GLASER
                        10250 CONSTELLATION BOULEVARD
22                      LOS ANGELES, CALIFORNIA  90067
                        (310) 553-3000

23

24

25                      EXHIBIT __6__ PAGE _28_

JULY 24, 2006                    ED CV 04-09049

```
1                           I N D E X

2                                                   PAGE

3    ARGUMENT.....................................    4

4    TESTIMONY....................................    83

5

6

7
     WITNESS         DIRECT      CROSS      REDIRECT      RECROSS
8    MICHAEL MOORE

9    BY THE COURT     83
     BY MS. GLASER    86
10
```

EXHIBIT __6__ PAGE __29__

JULY 24, 2006                    ED CV 04-09049

4

1       RIVERSIDE, CALIFORNIA; MONDAY, AUGUST 27, 2007; 11:06 A.M.

2                              -oOo-

3           **THE CLERK:**  CALLING CALENDAR ITEM SEVEN, CV

4    04-9049-SGL, CARTER BRYANT VERSUS MATTEL, INC.

5           MAY WE HAVE COUNSEL PLEASE COME FORWARD AND STATE                    11:06

6    YOUR APPEARANCES FOR THE RECORD.

7           **MR. QUINN:**  JOHN QUINN, MIKE ZELLER, AND JON COREY

8    FOR MATTEL.

9           **MS. GLASER:**  PATRICIA GLASER FOR MGA AND DIANA TORRES

10   FOR MGA.                                                                    11:06

11          **MR. PAGE:**  MICHAEL PAGE FOR CARTER BRYANT.

12          **THE COURT:**  GOOD MORNING, COUNSEL.

13          WE'RE ON CALENDAR FOR MGA'S MOTION FOR TERMINATING

14   SANCTIONS.  AND JUST TO CLEAR IT UP, BECAUSE IT APPEARS IN

15   DIFFERENT WAYS OR IS PHRASED IN DIFFERENT WAYS IN DIFFERENT                 11:07

16   PAPERS BROUGHT BY THE DEFENSE, AS I UNDERSTAND IT, THIS IS BOTH

17   MGA AND CARTER BRYANT'S MOTION; IS THAT CORRECT?

18          **MR. PAGE:**  THAT'S CORRECT, YOUR HONOR.

19          **THE COURT:**  ALL RIGHT.  VERY WELL.

20          THE COURT HAS RECEIVED AND REVIEWED A RATHER                         11:07

21   EXTENSIVE AMOUNT OF INFORMATION CONCERNING THIS.

22          AS I UNDERSTAND IT, AS I'VE BROKEN IT DOWN MYSELF,

23   WE'VE GOT ESSENTIALLY FIVE DIFFERENT CATEGORIES OR AREAS THAT

24   MGA AND CARTER BRYANT EXPRESSES GRAVE CONCERN ABOUT MATTEL'S

25   COMPLIANCE WITH ITS DISCOVERY OBLIGATIONS.  THE FIRST IS IN                 11:07

EXHIBIT ___6___ PAGE ___30___

JULY 24, 2006              ED CV 04-09049

1   THIS CATEGORY OF E-MAILS AND THE SAVING OF THE E-MAILS, THE

2   AUTO-DELETE POLICY; THE SECOND IS THE DELAY IN THE PRODUCTION

3   OF THE 30(B) DEPOSITION WITNESSES REGARDING THE COMPUTER DATA

4   STORAGE; THE THIRD IS IN REGARD TO THE ZEUS COMPUTER SYSTEM AND

5   THE ABSENCE OF HARDWARE TO READ THE BACKUP TAPES; AND THEN THE    11:08

6   FOURTH AND FIFTH AREAS REFER TO THE RETENTION OF AND LOCATION

7   OF CARTER BRYANT'S PHONE RECORDS AND TIME RECORDS.

8        WHAT I'D LIKE TO DO IS GO THROUGH EACH ONE OF THESE

9   SEPARATELY, ALTHOUGH I CERTAINLY UNDERSTAND THAT IT'S THE

10  COLLECTIVE CONCERN THAT MOTIVATES THE DEFENSE MOTION FOR        11:08

11  TERMINATING SANCTIONS.

12       I ALSO TRUST THAT WE HAVE MR. MOORE PRESENT?

13       **MR. QUINN:**  YES, YOUR HONOR.

14       **THE COURT:**  VERY WELL; THE COURT HAD SOME QUESTIONS

15  CONCERNING HIS DECLARATION.                                     11:08

16       LET ME BEGIN WITH COUNSEL FOR DEFENSE.

17       WHO'S GOING TO SPEAK ON BEHALF OF THE DEFENSE IN

18  TERMS OF THE MOVING PAPERS?

19       **MS. GLASER:**  I AM, YOUR HONOR.

20       **THE COURT:**  ALL RIGHT.  LET'S BEGIN WITH YOU,         11:09

21  COUNSEL.

22       **MS. GLASER:**  PATRICIA GLASER, FOR THE RECORD.

23       IF I MIGHT -- AND I APPRECIATE THE BREAKDOWN -- I

24  HAVE PREPARED A SHORT LITTLE CHRONOLOGY THAT I WOULD LIKE TO

25  HAND TO COUNSEL AND TO THE COURT, BECAUSE I THINK IT WOULD BE   11:09

EXHIBIT __6__ PAGE __31__

JULY 24, 2006                    ED CV 04-09049

1   EASIER TO FOLLOW OUR ARGUMENT, IF THE COURT WOULD INDULGE ME.

2           THE COURT:   I'LL BE CURIOUS TO SEE HOW IT COMES UP

3   WITH MY CHRONOLOGY HERE; THAT'S FINE.

4           YOURS LOOKS LIKE IT'S A LOT NEATER THAN MY NOTES.

5           MS. GLASER:   THANK YOU, YOUR HONOR.                    11:10

6           MAY I START WITH QUOTING YOUR HONOR, IF I MIGHT?

7           THE COURT:   OKAY.  YES, YOU MAY.

8           MS. GLASER:   AND I ALWAYS TRY TO QUOTE JUDGES

9   CORRECTLY.

10          THE COURT:   I APPRECIATE THAT.                         11:10

11          MS. GLASER:   IN YOUR COURT ORDER ON THE MOTION TO

12  AMEND IN JANUARY OF 2007, YOUR HONOR STATED -- AND I THINK YOU

13  WERE A LITTLE SLAPPING THE HAND, PERHAPS, OF MGA -- YOU SAID,

14  AND I'M QUOTING, "NOTICEABLY ABSENT FROM MGA'S ARGUMENT IS ANY

15  EVIDENCE THAT E-MAILS SO DELETED FROM MATTEL'S EMPLOYEES' INBOX  11:10

16  ARE FOREVER LOST, OR, AS IS MORE LIKELY, WHETHER SUCH

17  INFORMATION REMAINS OR IS OTHERWISE ARCHIVED ON SOME BACKUP

18  FILE ON MATTEL'S COMPUTER SYSTEM," END OF QUOTE.

19          WHEN YOU MADE THAT STATEMENT, YOUR HONOR, MATTEL WAS

20  PRESENT, OF COURSE.  MATTEL DID NOT CORRECT YOUR HONOR.  IT DID  11:11

21  NOT CORRECT THE RECORD, EVER.  MATTEL DID NOT TELL THE TRUTH

22  THEN.  AND, IN FACT, IN OUR VIEW, MATTEL HID THE TRUTH AS LONG

23  AS POSSIBLE.

24          THEY TOLD YOU AT THAT PROCEEDING ON THE MOTION TO

25  AMEND THAT THEY HAD PRESERVED ZEUS BACKUP TAPES, DIRECTLY       11:11

EXHIBIT __6__ PAGE __32__

JULY 24, 2006                    ED CV 04-09049

1   CONTRARY TO MS. MARINE'S SWORN DEPOSITION TESTIMONY FROM '98 TO

2   2001, AND THEY SAID THAT THERE IS, QUOTE, "NO EVIDENCE THAT

3   E-MAILS HAD DISAPPEARED."

4          THAT SIMPLY WASN'T THE CASE.

5          **THE COURT:** LET ME STOP YOU HERE, THOUGH, COUNSEL,            11:11

6   BECAUSE MAYBE THIS IS A MISUNDERSTANDING ON MY PART.   LET'S NOT

7   CONFLATE THE ZEUS PROGRAM AND THE E-MAILS.

8          **MS. GLASER:** I'M NOT.  I'M HOLDING THEM SEPARATE.

9          **THE COURT:** ALL RIGHT.

10         **MS. GLASER:** THEY MAKE TWO SEPARATE REPRESENTATIONS.          11:12

11  THEY MADE THE REPRESENTATION THAT ZEUS BACKUP TAPES EXISTED FOR

12  THE '98 TO 2001 TIME PERIOD, AND THEY TOLD THE COURT THAT THERE

13  WAS NO EVIDENCE THAT E-MAILS HAD DISAPPEARED, I.E., 'OKAY, SO

14  WE HAVE AN AUTO-DELETE POLICY,' WHICH, BY THE WAY, YOUR HONOR,

15  CONTINUES UNTIL THIS DAY.                                             11:12

16         'FORGET ABOUT THAT, DON'T WORRY ABOUT THAT IN

17  CONNECTION WITH THE E-MAILS, BECAUSE WE HAVE BACKUP TAPES.'

18         AND YOUR HONOR WAS LED TO BELIEVE, EITHER BY SILENCE

19  OR AFFIRMATIVE STATEMENTS, THAT INDEED, E-MAIL -- I'M NOT

20  TALKING ABOUT ZEUS -- E-MAIL BACKUP TAPES EXISTED.  AND THE         11:12

21  TRUTH WAS, WE NOW FIND OUT FROM SWORN 30(B)(6) WITNESSES

22  PRODUCED ONLY IN JUNE, THAT, INDEED, TWO THINGS ARE TRUE:

23  MS. MARINE SAYS THERE ARE NO ZEUS BACKUP TAPES, ZEUS BACKUP

24  TAPES, GOING BACK ANY FURTHER AT LEAST NO EARLIER THAN 2005,

25  AND SHE WASN'T SURE.                                                11:13

EXHIBIT __6__ PAGE 33

1    WITH RESPECT TO THE E-MAIL TAPES, WE KNOW FOR A FACT

2  NOT ONLY HAS THE AUTO-DELETE POLICY NEVER BEEN PUT AWAY WITH,

3  EVEN WITH KEY WITNESSES, BUT WITH RESPECT TO BACKUP, THE BACKUP

4  TAPES FOR E-MAILS DON'T EXIST EARLIER THAN, QUOTE, "SOMETIME IN

5  2005; PROBABLY APRIL OF 2005."                              11:13

6    SO THEY ARE GONE; WE DON'T HAVE ACCESS TO THEM.

7    SO WHEN YOUR HONOR -- I'M NOT SUGGESTING TO YOUR

8  HONOR, BECAUSE YOU'VE READ THE TRANSCRIPT, I'M SURE -- I'M NOT

9  SUGGESTING THAT WAS THE ONLY BASIS FOR YOUR GRANTING THE

10  MOTION.  BUT YOU WERE RELIEVED, I THINK IT'S FAIR TO SAY, YOU   11:13

11  WERE COMFORTABLE, THAT WE WERE RAISING AN ARGUMENT THAT DID NOT

12  YET PROVE TO BE A PROBLEM, BECAUSE THE BACKUP TAPES FOR ZEUS

13  AND THE BACKUP TAPES FOR E-MAIL EXISTED.  AND IT WASN'T TRUE,

14  YOUR HONOR, AND THEY ARE NOT EXISTING AT A KEY POINT IN TIME.

15    AND THAT'S WHAT I WANT TO ADDRESS.                       11:13

16    **THE COURT:**  LET'S TALK ABOUT THAT KEY POINT IN TIME,

17  BECAUSE PART OF THE KEY POINT IN TIME IS NOTICEABLY ABSENT FROM

18  YOUR TIMELINE, AND THAT'S THE '98 TO 2001 PERIOD.

19    YOU START WITH THE MGA RELEASE OF BRATZ IN JUNE OF

20  2001, BUT EVIDENCE OF WHAT WAS GOING ON BETWEEN CARTER BRYANT   11:14

21  AND MATTEL AND CARTER BRYANT AND MGA, WHICH IS GOING TO BE

22  IMPORTANT TO THIS CASE, OR AT LEAST THE ISSUES RAISED IN THE

23  VARIOUS CLAIMS, GOES BACK TO THAT PERIOD OF '98 TO 2001.

24    **MS. GLASER:**  I WANT TO ADDRESS THAT.

25    **THE COURT:**  I'LL THROW OUT MY CONCERN AND THEN YOU   11:14

EXHIBIT __6__ PAGE _34_

JULY 24, 2006          ED CV 04-09049

1    CAN ADDRESS IT FULLY.

2            MY CONCERN, TO THE EXTENT THAT REALLY IS THE PERIOD,

3    EVEN BY YOUR OWN VIEW OF WHEN MATTEL SHOULD HAVE SEEN

4    LITIGATION AS PROBABLE, THESE E-MAILS AND THESE ZEUS BACKUP

5    TAPES PURSUANT TO COMPANY POLICY WOULD HAVE BEEN LONG GONE EVEN          11:14

6    UNDER THAT SCENARIO, OR SO IT WOULD SEEM.

7            MS. GLASER:   THAT IS ACTUALLY NOT AT ALL CLEAR.

8            SO, FOR EXAMPLE, WE KNOW THEY WERE INVESTIGATING

9    BRATZ, CARTER BRYANT'S CONNECTION TO BRATZ, AND, IN FACT,

10   ALLEGATIONS HAD BEEN MADE BY EMPLOYEES AT MATTEL AT LEAST AS            11:15

11   EARLY AS MARCH 2002, AND, WE THINK, AS EARLY AS WHEN BRATZ CAME

12   OUT IN JUNE OF 2001.

13           AS YOUR HONOR SITS HERE AND AS I SIT HERE TODAY, IT

14   IS ABSOLUTELY NOT CLEAR, WHEN THEY WERE DOING THEIR

15   INVESTIGATIONS STARTING AS EARLY AS JUNE OF 2001, MAYBE AS LATE        11:15

16   AS MARCH OF 2002, WE HAVE NO IDEA WHAT THEY WERE ABLE TO LOOK

17   AT AND EXTRACT FROM THEIR RECORDS IN DOING THEIR

18   INVESTIGATIONS, WHICH ARE FOREVER GONE FROM US.

19           THE COURT:   WELL, STARTING WITH THE INVESTIGATION --

20   AND I DON'T MEAN TO MIX ISSUES HERE, BUT AS FAR AS DETERMINING         11:15

21   WHEN LITIGATION IS PROBABLE AS OPPOSED TO POTENTIAL --

22           MS. GLASER:   WELL, POTENTIAL IS ACTUALLY THE TEST.   I

23   MEAN, WE BELIEVE.   IT'S NOT JUST PROBABLE; IT IS LIKELY.   THE

24   WORD 'PROBABLE' IS A LITTLE LIKE 'IT'S GOING TOO FAR,' AND I'M

25   NOT SAYING SPECULATION ABOUT LITIGATION; THAT'S GOING TOO FAR         11:16

EXHIBIT ___6___ PAGE 35

JULY 24, 2006                    ED CV 04-09049

1   THE OTHER DIRECTION.  BUT CERTAINLY, THERE'S A REASONABLE

2   LIKELIHOOD THAT THERE WILL BE LITIGATION IN MARCH OF 2002.

3   THEY CLEARLY UNDERSTOOD THAT BRATZ AND CLEARLY UNDERSTOOD THAT

4   ALLEGATIONS WERE BEING MADE THAT CARTER BRYANT CREATED BRATZ ON

5   MATTEL'S TICKET.                                                11:16

6           AND INDEED, YOU WILL NOTE, YOUR HONOR, MR. DE ANDA --

7   ONE OF THE DOCUMENTS THAT HAS BEEN PROVIDED TO YOUR HONOR IS AN

8   E-MAIL -- WHERE MR. DE ANDA ACTUALLY SAYS 'I'VE BEEN

9   INVESTIGATING THIS FOR MONTHS AND I KNOW ABOUT THIS

10  CONNECTION.'  THAT'S IN CONNECTION WITH THE LETTER THAT         11:16

11  MR. ECKERT GETS DELIVERED TO HIM IN AUGUST, AND MR. DE ANDA

12  SAYS 'I'VE GOT THIS UNDER CONTROL; I'VE BEEN INVESTIGATING THIS

13  FOR MONTHS, THAT CONNECTION.'

14          THE COURT:  LET'S USE MARCH OF 2002; WE'RE TALKING

15  ABOUT A 90-DAY AUTO-DELETE POLICY.                             11:16

16          MS. GLASER:  I'M NOT SURE WE ARE.

17          EXCUSE ME.  THAT'S AUTO-DELETE.  THAT'S NOT THE

18  BACKUP RECORDS.  THAT'S THE AUTO-DELETE; THAT'S WHEN YOU AND I

19  CAN PUSH OUR BUTTON AND GET AUTO-DELETE.  BUT THE BACKUP

20  RECORDS, I WILL SUBMIT TO YOUR HONOR, I CAN'T HONESTLY TELL     11:17

21  YOU -- I DON'T THINK THE COURT KNOWS, AND I'M NOT SURE MATTEL

22  KNOWS, OR MAYBE THEY WILL PUT UP ANOTHER 30(B)6 WITNESS --

23          THE COURT:  THAT'S WHY MR. MOORE IS HERE TODAY.

24          MS. GLASER:  MR. MOORE, IN OUR VIEW, MISREPRESENTED

25  GROSSLY, TWICE, AND MR. ZELLER, TWICE, TO THIS COURT ABOUT      11:17

EXHIBIT ___6___ PAGE _36_

1   BACKUP TAPES EXISTING FOR ZEUS.  AND I'M NOT TALKING ABOUT

2   E-MAILS.  I'M TALKING ABOUT ZEUS.

3           AND THE IRONY OR THE PARTICULAR CONCERN IS THAT

4   MS. MARINE -- AND I'M SWITCHING ON YOU -- ON THE ZEUS TAPES,

5   MS. MARINE WAS PREPARED FOR HER DEPOSITION IN PART BY                    11:17

6   MR. MOORE; HE WAS IN THE PREPARATION SESSIONS; THIS IS FOR THE

7   JUNE 2007 DEPOSITION; HE WAS THERE.  HE THEN ATTENDS HER

8   DEPOSITION AND LISTENS TO HER TESTIFY UNDER PENALTY OF PERJURY,

9   YOUR HONOR, THAT THE ZEUS BACKUP TAPES DO NOT EXIST FOR ANY

10  FURTHER BACK THAN 2005.                                                   11:18

11          AND THEN THIS GENTLEMAN SUBMITS A DECLARATION TO YOUR

12  HONOR UNDER PENALTY OF PERJURY TWO MONTHS LATER, SAYING, 'YES

13  THEY DO.  ABSOLUTELY.  THERE'S A '98, A '99, A 2000.'

14          IN FACT, IT GAVE MONTHS AND OTHER YEARS.

15          THEN HE SAYS 'FOR AFTER THAT, WE HAVE THEM TOO, BUT            11:18

16  WE DON'T KNOW WHICH ONES.'  BUT HE DIDN'T TELL YOU WHICH ONES.

17          YOUR HONOR, THAT'S NOT OKAY.  THAT IS NOT OKAY TO

18  MAKE THOSE KINDS OF REPRESENTATIONS.

19          EITHER I -- AND I USE THIS KIND OF LANGUAGE

20  ADVISEDLY -- EITHER HE WAS SUBORNING PERJURY WHEN MS. MARINE          11:18

21  TESTIFIED UNDER PENALTY OF PERJURY WHILE HE WAS SITTING THERE,

22  OR HE'S NOT TELLING THE TRUTH IN HIS DECLARATION THAT HE

23  SUBMITTED TWO MONTHS LATER.

24          AND THEN, WHAT YOUR HONOR WAS GIVEN, I GUESS ON

25  FRIDAY -- AND I DON'T KNOW IF YOUR HONOR CONSIDERED THEM OR          11:19

**EXHIBIT  6  PAGE  37**

1   NOT.

2       **THE COURT:**  I RECEIVED THE DECLARATION WHICH READ

3   MORE LIKE A SURREPLY THAN A DECLARATION, BUT I DID READ IT.

4       **MS. GLASER:**  THAT WAS MY IMPRESSION AS WELL.

5       HOWEVER, IN THAT SURREPLY, YOU WERE TOLD, 'WHAT ARE          11:19

6   YOU? CRAZY, MGA? YOU ARE ACTUALLY THINKING THAT SHE WAS A

7   30(B)(6) WITNESS?' WHEN I HAVE TWO SOURCES, ONE IN FRONT OF

8   THE DISCOVERY MASTER IN THIS CASE IN APRIL OF 2007;

9   SPECIFICALLY IN FRONT OF THAT DISCOVERY MASTER, THE MATTEL

10  LAWYER SAYS 'WE ARE DESIGNATING MS. MARINE AS THE ZEUS 30(B)(6)   11:19

11  WITNESS; SHE'S THE LADY WHO KNOWS EVERYTHING.'

12      **THE COURT:**  SO YOU DID BRING A MOTION TO COMPEL.

13      ADMITTEDLY, I DIDN'T GO THROUGH ALL OF THE VARIOUS

14  MOTIONS THAT HAVE BEEN BROUGHT BEFORE THE DISCOVERY MASTER IN

15  GREAT DETAIL.                                                   11:19

16      WAS THE WHOLE ISSUE OF THE 30(B)(6) WITNESSES ON THE

17  COMPUTER DATA STORAGE, WAS THAT FULLY GET LITIGATED BEFORE THE

18  DISCOVERY MASTER?

19      **MS. GLASER:**  I DON'T THINK IT WAS ACTUALLY A MOTION.

20  LET ME TELL YOU WHAT I THINK HAPPENED.                          11:20

21      THERE WERE 30(B)6 WITNESSES, BACK IN THE END OF 2006

22  ON ZEUS, ON E-MAILS, AND THERE WAS A LIMITATION -- IN OUR VIEW,

23  AN ARTIFICIAL LIMITATION -- PLACED ON THE TIME PERIOD '98, '99,

24  AND 2000. WE WEREN'T SATISFIED WITH THAT, AND WE WENT BACK AND

25  FORTH. AND FINALLY JUDGE INFANTE, I DON'T THINK VERY HAPPILY,    11:20

**EXHIBIT  6  PAGE  38**

JULY 24, 2006              ED CV 04-09049

1   ENGAGED IN A -- PARTICIPATED IN A MEET AND CONFER AMONG

2   COUNSEL, AND THAT WAS IN APRIL OF 2007, BECAUSE WE COULDN'T GET

3   THESE -- TO GET TO THE REST OF THE TIME PERIOD, WE COULDN'T GET

4   THEM BACK ON TRACK.

5           THEN THERE WERE DEPOSITIONS THAT OCCURRED IN JUNE,          11:20

6   AND I GUESS JULY ALSO, BUT JUNE, JULY, OF THIS YEAR, 30(B)(6)'S

7   THAT WENT BEYOND THE ORIGINAL TIME PERIOD, PURSUANT TO

8   JUDGE INFANTE'S ORDER.

9           THEN WHAT HAPPENS IS THAT BOTH AT MS. MARINE'S

10  DEPOSITION BUT ALSO -- WHICH IS IN JUNE, I BELIEVE OF 2007; I     11:21

11  CAN GET YOU THE PRECISE DATE -- BUT ALSO WITH JUDGE INFANTE

12  SITTING THERE IN APRIL OF 2007 WHEN HE'S TRYING TO ORGANIZE ALL

13  OF THE CATS, TRYING TO HERD ALL THE CATS, THEY SPECIFICALLY

14  REPRESENT THAT MS. MARINE, NOT MR. MOORE, NOT MR. ZELLER, BUT

15  MS. MARINE, IS THE MATTEL 30(B)(6) DESIGNEE; SHE'S THE ONE WHO    11:21

16  KNOWS ABOUT ZEUS.

17          I'M NOT TALKING ABOUT E-MAILS NOW, I'M TALKING ABOUT

18  ZEUS.

19          SHE COMES TO TESTIFY FOR THAT DEPOSITION AND SHE SAYS

20  UNDER PENALTY OF PERJURY -- AND IT'S ATTACHED TO OUR PAPERS AND   11:21

21  I CAN GET YOU THE PRECISE CITE -- SHE TESTIFIES UNDER PENALTY

22  OF PERJURY WE DON'T HAVE -- COUNSEL, MR. JENAL, WHO WAS

23  ACTUALLY EXAMINING HER, SAID 'WHAT ABOUT '99?

24          NOPE.

25          2000?                              EXHIBIT  6   PAGE  39    11:21

1          NOPE.

2          AND HE GOES THROUGH EVERY YEAR, AND WHEN HE GETS TO

3    2005, SHE SAYS MAYBE.  SHE'S NOT SURE.  BUT CERTAINLY NO

4    EARLIER THAN 2005, AFTER THE REPRESENTATIONS WERE MADE TO YOUR

5    HONOR.                                                          11:22

6          THAT'S NOT OKAY.  THAT'S JUST NOT OKAY.

7          NOW, I WANT TO COME BACK TO YOUR QUESTION.

8          THERE WERE A VARIETY OF INVESTIGATIONS THAT HAVE

9    OCCURRED WHERE -- AND MANY OF THEM RELATE TO CARTER BRYANT --

10   THIS IS BY MATTEL -- OVER THE YEARS; AND AT THOSE CRITICAL      11:22

11   POINTS IN TIME -- AND THAT'S ONE OF THE REASONS WE LAID THIS

12   OUT IN OUR PERHAPS POOR ATTEMPT AT A CHRONOLOGY.

13         THE COURT:  THIS IS FINE.

14         MS. GLASER:  IN THAT EFFORT, A NUMBER OF TIMES THERE

15   WERE INVESTIGATIONS, AND IF I COULD JUST SPEND A MINUTE,        11:22

16   BECAUSE I WANT TO ADDRESS YOUR QUESTIONS AS DIRECTLY AS I CAN,

17   BECAUSE IT DOES MATTER, YOUR HONOR.

18         THE COURT:  I'LL ALWAYS GIVE YOU A MINUTE.

19         MS. GLASER:  WHAT WE ATTEMPT TO DO WITH THIS TIMELINE

20   IS TO DEPICT WHAT THEY KNEW AND WHEN THEY KNEW IT AND THE       11:22

21   PURPORTED COVERUP.

22         IF YOU LOOK AT 2001, YOUR HONOR, YOU'LL SEE THAT IN

23   JUNE OF 2001, MGA RELEASES BRATZ.

24         IN THE SUMMER OF 2001, MATTEL EMPLOYEES -- AND

25   SPECIFICALLY, YOU CAN SEE FROM THE PAPERS WE SUBMITTED,         11:23

EXHIBIT  6   PAGE  40

JULY 24, 2006                    ED CV 04-09049

1  MS. JILL NORDQUIST AND A WOMAN NAMED ANN PARDUCCI, PART OF

2  SENIOR MANAGEMENT, ARE AWARE OF MR. BRYANT'S INVOLVEMENT WITH

3  BRATZ, THE MGA BRATZ.  IN FACT, THEY CLAIM, WRONGFULLY, THAT

4  CARTER BRYANT PLAGIARIZED A LILY MARTINEZ DESIGN TO CREATE

5  BRATZ.                                                          11:23

6           SO BACK IN JUNE, JULY, AUGUST OF 2001, THAT CLAIM WAS

7  OUT THERE AND SENIOR MANAGEMENT HAD THAT RELAYED TO THEM.

8           SO YOUR HONOR COULD SAY, 'WELL, OKAY, WHAT EXISTED IN

9  THE SUMMER OF 2001?'

10          YOUR HONOR, I KNOW THEY AUTO-DELETED EVERYTHING AFTER  11:23

11  90 DAYS, SO THAT DIDN'T EXIST.  I AGREE WITH YOU.

12          BUT THE BACKUP TAPES WERE SUPPOSED TO BE THERE.

13          WHERE ARE THEY?

14          **THE COURT:**  COUNSEL, FIRST OF ALL, WE'VE GOT TO APPLY

15  NOT EXISTING LAW ON DISCOVERY, OR THE EXISTING RULES OF        11:24

16  PROCEDURE ON 2001; WE HAVE TO APPLY EXISTING LAW.  COUNSEL FOR

17  A COMPANY CANNOT ADVISE THEIR CLIENTS TO COMPLY WITH LAWS OR

18  PROCEDURES THAT HAVE NOT YET BEEN ADOPTED; SO WE'RE NOT TALKING

19  ABOUT THE AMENDMENTS OR THE FEDERAL RULES THAT COME INTO PLAY

20  IN THE MID-DECADE.                                             11:24

21          WE'RE TALKING ABOUT THE RULES OF PROCEDURE THAT

22  EXISTED IN 2001.

23          **MS. GLASER:**  LET ME TELL YOU THE ONE THING THAT

24  DOESN'T EXIST TODAY, BACK IN 2000 OR 1998:  THERE'S NOT A RULE

25  THAT YOU START PRESERVING E-MAIL BACKUPS AND THAT YOU CONTINUE  11:24

1  TO AUTO-DELETE ONE YEAR AFTER YOU FILE A LAWSUIT, UNDER THE OLD

2  RULES, THE IN-BETWEEN RULES, OR THE RULES TODAY.  AND THAT'S

3  WHAT HAPPENED HERE, YOUR HONOR; THAT'S EXACTLY WHAT HAPPENED

4  HERE.

5          THE COURT:  WE DON'T HAVE A LAWSUIT FILED IN 2001.          11:24

6          MS. GLASER:  IN 2004, THEY FILED THEIR LAWSUIT.  THEY

7  DON'T START -- THEY HAVE NEVER STOPPED THE AUTO-DELETE PORTION,

8  AND THEY DON'T START PRESERVING BACKUP UNTIL A YEAR LATER.

9          THE COURT:  HELP ME OUT HERE.

10         I'M TRYING TO COME UP WITH A DATE THAT I CAN FIND          11:25

11  SHOULD HAVE BEEN THE DATE WHERE IT WAS LIKELY, PROBABLE --

12  WHATEVER PHRASE WE END UP USING -- THAT COUNSEL SHOULD HAVE

13  BEEN ON NOTICE AND THAT THEY SHOULD HAVE TAKEN REASONABLE STEPS

14  TO PRESERVE EVIDENCE.

15         MS. GLASER:  THE LATEST IS MARCH OF 2002.          11:25

16         THE COURT:  I KNOW THAT'S YOUR ARGUMENT, BUT ALL THEY

17  HAVE IN MARCH OF 2002, THEY HAVE THE SUMMER OF 2001 KNOWLEDGE

18  THAT MGA HAS RELEASED BRATZ; ALLEGATIONS BY NORDQUIST AND A FEW

19  OTHERS, THAT, 'HEY, THEY STOLE THIS; CARTER BRYANT STOLE THIS

20  FROM US'; AND THEY START THEIR OWN INTERNAL INVESTIGATION.          11:25

21         IS THAT REALLY ENOUGH TO TRIGGER A DUTY TO PRESERVE

22  EVERYTHING IN ANTICIPATION OF LITIGATION AGAINST MGA?

23         MS. GLASER:  ABSOLUTELY.  ABSOLUTELY.

24         AND WHAT MAKES IT WORSE, YOU COULD SAY THAT, YOUR

25  HONOR, IF --          11:25

JULY 24, 2006          ED CV 04-09049

**EXHIBIT** ___6___ **PAGE** 42

17

1    **THE COURT:**  I DIDN'T SAY ANYTHING; I JUST ASKED THE

2    QUESTION.

3    **MS. GLASER:**  I UNDERSTAND THAT.

4    THIS IS THE PROBLEM:  THEY DO AN INVESTIGATION.  I

5    HAVE NO IDEA WHAT THAT INVESTIGATION IS, BECAUSE WHATEVER            11:26

6    E-MAILS THEY LOOKED AT OR WHATEVER ZEUS DESIGNS THEY LOOKED AT,

7    I WILL NEVER SEE.  AND YOU CAN'T RECONSTRUCT THAT.  SO THEY HAD

8    ENOUGH TO DO A FULL-SCALE INVESTIGATION BECAUSE MR. DE ANDA IN

9    AUGUST, WHEN HE GETS THE ECKERT LETTER --

10   THE COURT:  I UNDERSTAND THAT YOU CAN'T SEE THAT.            11:26

11   BUT DOES A COMPANY HAVE AN OBLIGATION WHEN THEY ARE SIMPLY

12   DOING THEIR OWN INTERNAL INVESTIGATION, NOT KNOWING WHERE THAT

13   INTERNAL INVESTIGATION IS GOING TO GO.  FOR ALL THEY KNOW,

14   COULD HAVE FOUND OUT AT THE END OF THAT INTERNAL INVESTIGATION,

15   'NORDQUIST IS WRONG; THIS WAS ALL LEGITIMATE; THERE'S NO            11:26

16   PROBLEM HERE, WE'RE DONE.'

17   **MS. GLASER:**  YOUR HONOR, THEY ACTUALLY TELL YOU THAT

18   THEY DON'T DISCOVER THAT CARTER BRYANT WAS WORKING FOR MGA.

19   THEY ACTUALLY PUT THIS IN A PLEADING FILED IN THIS COURT UNTIL

20   LATE IN 2003.            11:26

21   WE KNOW THAT'S NOT TRUE, BECAUSE WE KNOW THEY KNEW

22   ABOUT IT IN JUNE OF 2001.

23   **THE COURT:**  BUT THAT MAY BE TRUE, AND THERE MAY BE A

24   WHOLE BUNCH OF THINGS THAT ARE PROBLEMATIC AND DISTURBING OR

25   WHATEVER, BUT LET'S TRY TO KEEP OUR EYE ON THE BALL HERE.            11:27

1      WHEN WERE THEY OF THE UNDERSTANDING THAT LITIGATION

2   AGAINST MGA WAS LIKELY?

3      JUST KNOWING THAT CARTER BRYANT WORKED FOR THEM,

4   WHETHER IT WAS 2005 OR 2002 OR 2001 OR WHENEVER IT WAS, DOESN'T

5   MAKE LITIGATION LIKELY OR PROBABLE.                    11:27

6      **MS. GLASER:**  THE GENERAL COUNSEL IS DIRECTLY INVOLVED

7   IN AUGUST OF 2002.  YOU CAN TELL THAT FROM DE ANDA'S E-MAIL

8   WHERE HE SPECIFICALLY TALKS ABOUT HOW THIS HAS BEEN TURNED OVER

9   TO COUNSEL.

10      **THE COURT:**  THIS IS THE ANONYMOUS LETTER.        11:27

11      **MS. GLASER:**  THAT'S NOT JUST THE ANONYMOUS LETTER;

12   IT'S WHATEVER THE INVESTIGATION IS GOING ON.  YOU CAN SEE THAT

13   FROM DE ANDA, AND I WOULD BE GLAD TO POINT THAT OUT TO YOUR

14   HONOR.  HE CLEARLY IS NOW INVOLVED; IT'S NOT JUST A SECURITY

15   ISSUE; IT IS A 'WE'RE INVOLVING THE GENERAL COUNSEL IN THIS.    11:27

16   PERIOD.'  SO ABSOLUTELY.

17      AND, YOUR HONOR, AN INVESTIGATION -- I'M GOING OFF ON

18   MY TANGENT AGAIN -- AN INVESTIGATION IS OCCURRING; AUTO-DELETE

19   IS OCCURRING; AND BACKUP TAPES ARE NOT BEING MAINTAINED.

20      THAT'S NOT FAIR.  IT'S JUST NOT FAIR.              11:28

21      SO IF I MAY JUST BRIEFLY CONTINUE, BECAUSE THERE ARE

22   POINTS IN TIME TOO.  YOU CAN'T JUST LOOK THERE.

23      IF I MIGHT, AGAIN, I TALK ABOUT THE AUGUST 2002 --

24   I'M GOING BACK TO MY CHRONOLOGY -- THAT'S THE ANONYMOUS LETTER

25   THAT WAS SENT TO MR. ECKERT REGARDING CARTER BRYANT ACTUALLY    11:28

JULY 24, 2006                ED CV 04-09049

EXHIBIT  6  PAGE  44

1   CREATING BRATZ WHILE A MATTEL EMPLOYEE.

2         DECEMBER OF 2003, MATTEL LAUNCHES 'MY SCENE' DOLLS TO

3   COMPETE WITH BRATZ.

4         ANOTHER POINT, JULY OF 2003, THERE'S ACTUALLY --

5   MATTEL PLACES A WALL STREET JOURNAL ARTICLE THAT MENTIONS

6   MR. BRYANT BORROWING MATTEL DESIGNS REGARDING ANOTHER DOLL

7   CALLED FLAVAS, F-L-A-V-A-S, TO CREATE BRATZ.

8         MATTEL INVESTIGATES MR. BRAUR, FORMER EMPLOYEE,

9   ALLEGING THAT HE MISAPPROPRIATED TRADE SECRETS.

10        A YEAR LATER, THEY SUE HIM.

11        THEY SAID THAT MR. BRAUR -- BY THE WAY, IN

12  INVESTIGATING MR. BRAUR, THESE ARE NOT TIMID PEOPLE, THEY USE

13  HIS SOCIAL SECURITY NUMBER TO REVIEW HIS E-MAILS; THEY SEARCHED

14  HIS PHONE RECORDS AND THEY SEARCHED HIS CORPORATE APARTMENT IN

15  NEW YORK; THESE ARE NOT PEOPLE WHO DON'T KNOW WHAT THEY ARE

16  DOING.  THESE ARE NOT PEOPLE THAT DON'T HAVE A REASONABLE

17  NOTICE THAT THIS IS GOING TO BE A PROBLEM.

18        BRAUR GOES TO MGA, YOUR HONOR.  THEY KNOW BRAUR GOES

19  TO MGA.

20        IN DECEMBER OF 2003, MATTEL INVESTIGATES MGA'S

21  ALLEGED MISAPPROPRIATION OF TRADE SECRETS REGARDING FLAVAS.

22        NOW, IN 2004, THE MY SCENE DOLLS ARE CHANGED TO LOOK

23  MORE LIKE BRATZ.

24        APRIL 2004 MATTEL SUES CARTER BRYANT, AS YOUR HONOR

25  WELL KNOWS.  AND FOR A WHOLE YEAR AFTER THAT, THEY CONTINUE TO

11:28
11:29
11:29
11:29
11:29
11:30

1   DELETE E-MAILS AND WIPE OUT THE BACKUP TAPES, FOR A WHOLE YEAR.

2          **THE COURT:**  BY THIS TIME WE'RE DEFINITELY INTO -- IT

3   APPEARS TO THE COURT ANYWAY -- THAT WE'RE INTO TERRITORY WHERE

4   MATTEL SHOULD HAVE BEEN AWARE.

5          **MS. GLASER:**  AND YOUR HONOR IS ASKING, 'OKAY,          11:30

6   MS. GLASER,' YOU'RE SAYING, 'WELL, BUT THEY WOULD HAVE ALREADY

7   DELETED THE STUFF BACK IN '98, '99, 2000.'

8          I SAY TO YOUR HONOR, I DON'T KNOW IF THEY DID OR NOT.

9   I'M NOT TALKING ABOUT THE AUTO-DELETE; I UNDERSTAND THAT.  BUT

10  NOT THE BACKUP TAPES.  THEY HAVE ACCESS TO THAT AS THIS          11:30

11  INVESTIGATION IS GOING ON, AND I DON'T GET ANY OF THAT AND THEY

12  CONTINUE DOING IT FOR A WHOLE YEAR AFTER THE LAWSUIT IS FILED?

13         AND THEN, YOUR HONOR, LET ME GO ON.

14         MR. BRYANT SERVES HIS 30(B)(6) NOTICES FOR THE E-MAIL

15  MAVEN, THE ZEUS MAVEN, AND OTHER ISSUES, BACK IN DECEMBER OF    11:31

16  2004, AND YOU REALIZE THOSE DEPOSITIONS, YOUR HONOR, WERE NOT

17  TAKEN UNTIL THE END OF 2006 AND THE TRUTH DID NOT COME OUT

18  UNTIL THE MIDDLE OF 2007?

19         **THE COURT:**  WELL, THAT LEAVES THAT SECOND ISSUE, THAT

20  30(B)6 DEPOSITION; THAT'S WHY I ASKED YOU THE QUESTION I DID,   11:31

21  COUNSEL.

22         YOU CERTAINLY ARE CAPABLE OF FILING A MOTION TO

23  COMPEL IF YOU THINK THEY ARE DRAGGING THEIR FEET.

24         APPARENTLY, THAT DID NOT HAPPEN.

25         **MS. GLASER:**  LET ME BE CLEAR.

1   MGA, I'M NOR SURE IF YOU'RE REFERRING TO GENERIC

2   COUNSEL OR NOT, BUT MGA COMES INTO THIS IN APRIL OF 2005.

3       THE COURT:  OKAY.  WELL --

4       MS. GLASER:  MGA SENDS ITS FIRST LETTER FOR MATTEL TO

5   PRESERVE.                                                    11:31

6       ON MAY 23, 2005, THERE'S A STAY ENTERED; THAT'S THE

7   STAY THAT NINTH CIRCUIT, TO BE FAIR TO EVERYBODY.

8       THE COURT:  RIGHT.

9       MS. GLASER:  THAT WAS A LITTLE OVER A YEAR THAT STAY

10  IS IN PLACE.                                                 11:31

11      IN OCTOBER OF 2005, MATTEL INSTIGATES A RAID OF MGA'S

12  OFFICES IN MEXICO BY MEXICAN AUTHORITIES.  THAT'S BASED ON THE

13  PRIOR SUMMER OR THE EARLIER 2004, DE ANDA IS INVESTIGATING

14  MEXICO; AND THAT'S CONFIRMED BY MR. ZELLER.

15      NOW, 2006 COMES -- AND THIS IS AUGUST 10TH, 2006 --      11:32

16  MGA SEEKS DEPO DATES FOR THE ZEUS AND E-MAIL 30(B)(6)

17  WITNESSES.  ON NOVEMBER 2006, MATTEL MOVES TO AMEND; THAT'S THE

18  MOTION THAT, YOUR HONOR, I QUOTED YOU ON FROM EARLIER.

19      MGA IS BROUGHT IN FOR THE FIRST TIME BY MATTEL AS A

20  DEFENDANT.  WE'RE ALLEGED TO HAVE AIDED AND ABETTED.  WE'RE    11:32

21  ALLEGED TO HAVE COMMITTED COPYRIGHT INFRINGEMENT.

22      CARTER BRYANT IS ALLEGED TO HAVE MISAPPROPRIATED --

23  THE AMENDMENT GOES TO HIS MISAPPROPRIATION OF TRADE SECRETS.

24      ON DECEMBER 28TH, 2006, MATTEL SUBMITS MR. ZELLER'S

25  DECLARATION REGARDING THE PRESERVATION OF E-MAILS; THAT WAS    11:33

EXHIBIT ___6___ PAGE _47_

22

1   ABSOLUTELY MISREPRESENTED TO YOUR HONOR, AND I'LL BE GLAD TO

2   QUOTE FROM IT.

3            IN JANUARY OF 2000, MATTEL BRINGS ITS TRADE SECRET

4   CLAIMS AGAINST BRYANT AND MGA AFTER THEY HAVE MISREPRESENTED TO

5   THE COURT REGARDING THE STATE OF THE RECORDKEEPING.          11:33

6            ON JANUARY 17, 2007, MR. KAWASHIMA, WHO IS THEIR

7   30(B)(6) WITNESS ON E-MAILS; HE SAYS THERE ARE NO BACKUP TAPES

8   FOR '98 THROUGH 2000 AND HE IS INSTRUCTED NOT TO ANSWER ANY

9   QUESTIONS FOR A PERIOD AFTER THAT.

10           HE DOES NOT TELL YOU -- IT'S NOT CLEAR TO ME, AND I'M   11:33

11  THE FIRST TO ACKNOWLEDGE THIS -- WHEN THOSE BACKUP TAPES WERE

12  DESTROYED, BUT WE KNOW THEY DON'T EXIST AS OF THE TIME OF HIS

13  DEPOSITION IN JANUARY OF 2007:

14           ON JANUARY 30, 2007, JUDGE INFANTE ORDERS THE

15  PRODUCTION OF MATTEL'S INVESTIGATION FILES.  THAT'S THE FIRST   11:34

16  TIME WE LEARN ABOUT DE ANDA'S INVESTIGATION AND THE FIRST TIME

17  WE SEE MR. ECKERT'S LETTER.

18           ON JUNE 19TH, MR. KAWASHIMA'S SECOND DEPOSITION IS

19  TAKEN AND HE REVEALS THAT THE AUTO-DELETE POLICY IS STILL IN

20  EFFECT, AND THE BACKUP TAPES ARE PRESERVED ONLY BACK TO        11:34

21  SOMETIME IN APRIL OF 2005; THIS IS THREE YEARS AFTER THEY

22  STARTED AN INVESTIGATION AND ONE YEAR AFTER MATTEL HAS SUED

23  CARTER BRYANT.

24           ON JUNE 26, 2007, MS. MARINE'S 30(B)(6) DEPOSITION IS

25  TAKEN REGARDING ZEUS; THAT'S THE THIRD DAY OF HER DEPOSITION.   11:34

JULY 24, 2006                    ED CV 04-09049

EXHIBIT __6__ PAGE __48__

1  SHE TESTIFIES THERE ARE NO ZEUS BACKUP TAPES GOING BACK TO '98,

2  AND THERE MIGHT BE ONE IN 2002 BUT SHE'S NOT SURE.

3          THIS IS THE DEPOSITION THAT MR. MOORE ATTENDED AND

4  WHICH HE ALSO, BY HER TESTIMONY, MET WITH HER TO PREPARE HER

5  FOR HER DEPOSITION.                                          11:35

6          AND FINALLY ON OUR TIMELINE, AUGUST OF 2007, MATTEL'S

7  AUTO-DELETION OF E-MAILS CONTINUES TO THIS DAY.

8          YOUR HONOR, IF THE COURT LOOKED AT NOTHING ELSE IN

9  CONNECTION WITH THIS VERY SERIOUS REQUEST FOR DISMISSAL, I HAVE

10  A FEW DOCUMENTS -- BECAUSE I KNOW THAT THERE WERE A MANIFOLD   11:35

11  NUMBER OF DOCUMENTS THAT WERE PUT IN FRONT OF YOU -- I ASK YOU

12  TO LOOK AT JUST A FEW DOCUMENTS.

13          IF I COULD GIVE YOU THE CITES, I'LL DO THEM FOR THE

14  RECORD.

15          **THE COURT:**  IF YOU WOULD LIKE TO, COUNSEL.           11:35

16          **MS. GLASER:**  THE MARCH 2002 INVESTIGATION NOTES;

17  THAT'S EXHIBIT 4 TO THE JULY 25, 2007, BURR DECLARATION;

18          THE AUGUST 5, 2002 LETTER TO MR. ECKERT; THAT'S

19  EXHIBIT 6 TO THE JULY 25TH, 2007 BURR DECLARATION;

20          MR. DE ANDA'S E-MAIL TO ALAN KAYE; EXHIBIT 7 TO THE    11:36

21  JULY 25, 2007 BURR DECLARATION;

22          THE INVESTIGATIVE LOG REGARDING THE MAY 10, 2004

23  ENTRY, WHICH IS PART OF THE EXHIBITS.  I DON'T KNOW THE EXACT

24  CITE, BUT I CAN GET THAT FOR YOUR HONOR;

25          THE REPORTER'S TRANSCRIPT OF THE MARCH 15 MEET AND     11:36

24

1   CONFER; THIS IS BEFORE THE PRESERVATION OF BACKUP TAPES FOR

2   E-MAILS BEGAN; THIS IS THE REPORTER'S TRANSCRIPT, EXHIBIT 3 TO

3   THE AUGUST 20, 2007, BURR DECLARATION;

4          MATTEL'S REPLY BRIEF OF DECEMBER 28, 2006, REGARDING

5   ITS MOTION TO AMEND; THAT'S EXHIBIT 18 TO THE JULY 25, 2007          11:36

6   BURR DECLARATION; THAT'S WHERE THE MISREPRESENTATION REGARDING

7   MATTEL'S SPOLIATION HAS OCCURRED.

8          I WOULD ASK YOU PLEASE, IN THAT REGARD, TO PLEASE

9   LOOK AT MR. ZELLER'S DECEMBER 28TH, 2006 DECLARATION,

10  PARAGRAPH 14, PAGE 3.  IT'S EXHIBIT 19 TO THE JULY 25, 2007          11:37

11  BURR DECLARATION;

12         THERE IS AN ORDER REGARDING MATTEL'S MOTION TO AMEND,

13  PART OF WHICH I READ TO YOUR HONOR, WHICH IS EXHIBIT 20 OF THE

14  JULY 25, 2007 BURR DECLARATION;

15         THERE IS A DECLARATION OF MR. MICHAEL MOORE, WHICH IS          11:37

16  DATED AUGUST 13, 2007.

17         I'D ASK YOU, AND WE BROUGHT WITH US TODAY,

18  MS. MARINE'S DEPOSITION, SOME OF WHICH IS NOT IN THE RECORD

19  BEFORE YOUR HONOR, BUT IT DIRECTLY REFUTES WHAT YOUR HONOR HAS

20  HAD REPRESENTED TO HIM BY MR. MOORE AND MR. ZELLER;          11:37

21         AND THERE, OF COURSE, IS THE TRANSCRIPT OF

22  JUDGE INFANTE'S MEET AND CONFER, WHICH I'VE ALREADY ALLUDED TO,

23  AND I'LL BE GLAD TO GET THE PRECISE CITE.

24         YOUR HONOR, I HAVE JUST A FEW MORE MINUTES AND THEN I

25  WILL CERTAINLY SIT DOWN, BUT I DO WANT TO POINT OUT A COUPLE          11:38

1    MORE THINGS THAT I WOULD ASK YOUR HONOR TO LOOK AT.

2            THE COURT:   COUNSEL, LET ME ASK YOU A FEW QUESTIONS

3    THAT I HAVE IN THIS TIME.

4            MS. GLASER:   SURE; PLEASE.

5            THE COURT:   ON THE ZEUS COMPUTER SYSTEM, ON THE ISSUE    11:38

6    OF THE UNAVAILABILITY OF THE HARDWARE TO READ THE ZEUS BACKUP

7    TAPES THAT MATTEL APPARENTLY DOESN'T HAVE ANY MORE.

8            DOES THAT HARDWARE EXIST.

9            AND I'M NOT TALKING ABOUT FROM MATTEL, BUT IS THIS

10   SOMETHING THAT MGA IS CAPABLE OF READING?                        11:38

11           MS. GLASER:   THE ANSWER IS I HAVE NO IDEA AS I STAND

12   HERE TODAY.

13           THE COURT:   WHY DO YOU NOT HAVE ANY IDEA?

14           MS. GLASER:   FIRST OF ALL, WE WERE TOLD FOR QUITE

15   AWHILE THEY DIDN'T EXIST AT ALL; SO WE DON'T HAVE THOSE ZEUS     11:38

16   BACKUP TAPES.

17           THE COURT:   BY WHOM WERE YOU TOLD THAT IT DIDN'T

18   EXIST AT ALL?

19           MS. GLASER:   MS. MARINE SAID THAT IT DIDN'T EXIST AT

20   ALL.                                                            11:39

21           THE COURT:   I SUSPECT YOU JUST DON'T TAKE OPPOSING

22   SIDE'S WORD FOR IT?

23           MS. GLASER:   WHEN THEY ARE UNDER OATH, I DO; FORGIVE

24   ME, BUT I DO.

25           SHE'S UNDER OATH, SHE'S THE WOMAN MOST KNOWLEDGEABLE,    11:39

1   AND SHE SAYS THEY DON'T EXIST; THAT'S NUMBER ONE.

2        NUMBER TWO, THE EQUIPMENT WAS -- AND I'M GOING TO USE

3   MY WORD, BUT -- WAS PHYSICALLY DESTROYED.  IT'S GONE FROM

4   MATTEL AFTER THEY FILED THE LAWSUIT.  SO THEY HAVE THE

5   EQUIPMENT; BUT WHEN THEY FILED THE LAWSUIT, IT'S DISCARDED.        11:39

6   I'LL USE THE NICER WORD.  IT'S 'DISCARDED.'

7        EXPLAIN THAT TO ME.

8        IF THE ZEUS TAPES EXIST, WHY ARE THEY DISCARDING THE

9   EQUIPMENT NECESSARY TO LOOK AT IT?

10        NOW, IF THERE'S A THIRD PARTY VENDOR THAT CAN DO IT,        11:39

11   WE, MGA, DOESN'T HAVE THE CAPABILITY.  I DON'T KNOW IF A THIRD

12   PARTY VENDOR COULD, IF IT EXISTED.

13        **THE COURT:**  FAIR ENOUGH.

14        REGARDING THE CARTER BRYANT PHONE RECORDS AND THE

15   TIME RECORDS, IS THERE ANY EVIDENCE BEFORE THE COURT THAT --        11:40

16   AND I UNDERSTAND THAT THEY ARE NOT AROUND, AND ASSUMING THAT

17   THEY EXISTED TO BEGIN WITH, WHICH I DO, BASED ON WHAT IS BEFORE

18   THE COURT -- IS THERE ANYTHING WHICH WOULD INDICATE THAT THEY

19   WERE LOST, STOLEN, DESTROYED, OR MISPLACED?

20        IS THERE ANYTHING WHICH WOULD POINT THE COURT IN ONE        11:40

21   DIRECTION VERSUS ANOTHER?

22        **MS. GLASER:**  YES.

23        **THE COURT:**  DO YOU UNDERSTAND THE QUESTION?

24        **MS. GLASER:**  I UNDERSTAND THE QUESTION, AND I'M GOING

25   TO ANSWER IT SPECIFICALLY, BECAUSE I HAVE TO BREAK IT UP; THE        11:40

JULY 24, 2006                    ED CV 04-09049

EXHIBIT __6__ PAGE __52__

1    PHONE RECORDS AND THE TIME RECORDS.

2             THE COURT:  YES.

3             MS. GLASER:  IF YOU LOOK AT THE PHONE RECORDS, IT'S A

4    MIRACLE:  OCTOBER 2000 IS MISSING.

5             DO I KNOW IF THEY WERE DESTROYED?                          11:40

6             I HAVE NO IDEA.

7             THE COURT:  I DIDN'T ADD SUPERNATURAL CAUSES TO THE

8    LIST OF THINGS, BUT I SUPPOSE YOU CAN THROW THAT IN AS WELL.

9             MS. GLASER:  IT'S AS GOOD OF AN EXPLANATION THAT

10   WE'VE RECEIVED SO FAR.  BUT THEY ARE GONE, AND IT'S            11:40

11   CARTER BRYANT'S PHONE RECORDS.

12            THIS IS A TIME WHEN MATTEL SAYS --

13            THE COURT:  BUT AGAIN, IS THERE ANY EVIDENCE THAT I

14   HAVE TO WEIGH BEFORE ME THAT THE OCTOBER 2000 RECORDS ARE LOST,

15   STOLEN, CONCEALED, OR NEVER EXISTED?                           11:41

16            MS. GLASER:  THE PHONE RECORDS WERE TURNED OVER TO

17   LEGAL, AND THERE IS TESTIMONY FROM A SPECIFIC WITNESS ON THAT

18   POINT, AND WE DON'T HAVE THOSE PHONE RECORDS.

19            THE COURT:  THE PHONE RECORDS, AS I UNDERSTAND THAT

20   EVIDENCE, THE PHONE RECORDS IN MASSE WERE TURNED OVER TO LEGAL.   11:41

21   LEGAL SAYS THEY NEVER WERE THERE.  'WHEN WE WENT TO LOOK FOR

22   THEM, THEY WERE MISSING.'

23            HOW DO I REACH A CONCLUSION THAT THEY WERE DESTROYED?

24            MS. GLASER:  THEY DON'T SAY THEY WERE NEVER THERE.

25   THEY SAY THAT THEY DON'T HAVE THE OCTOBER 2000 OF MR. BRYANT.    11:41

JULY 24, 2006                    ED CV 04-09049

EXHIBIT __6__ PAGE 53

1          THE COURT:  RIGHT.

2          MS. GLASER:  THEY DON'T KNOW IF THEY WERE EVER THERE.

3  ALL I KNOW IS THAT THEY ARE MISSING.

4          THE COURT:  FAIR ENOUGH.

5          MS. GLASER:  AND I ACKNOWLEDGE THAT.                    11:41

6          I'M NOT GOING TO REPRESENT TO THE COURT I KNOW THEY

7  WERE PROLOINED [SIC] OR BURNED OR WHATEVER.

8          THE COURT:  WHAT ABOUT THE TIME RECORDS?

9          MS. GLASER:  THERE ARE NO TIME RECORDS FOR MR. BRYANT

10 AFTER SEPTEMBER 8, 2000.  AND THE TESTIMONY GIVEN BY -- AND   11:42

11 THIS IS AT THE BURR DECLARATION, EXHIBIT 27, PAGE 116 -- THAT

12 EXPERT, THAT 30(B)6 WITNESS FROM MATTEL SAYS, QUOTE, "THEY

13 COULD HAVE BEEN DELETED WITHOUT..."  BUT THEY HAVE NO RECORD

14 THAT THEY HAVE BEEN DELETED.  AND, WORSE, THEY HAVE NO

15 ABILITY TO -- AND I USE THIS WORD ADVISEDLY -- 'MANIPULATE,' SO  11:42

16 YOU COULDN'T GO BACK AND TELL IF THEY HAD BEEN INTENTIONALLY

17 DELETED OR NOT.

18         I'M GIVING YOU EXACTLY WHAT I KNOW; NO MORE, NO LESS.

19 I KNOW THE E-MAILS WERE DELETED.  I KNOW THE ZEUS WAS DELETED.

20 I KNOW THERE IS A BACKUP FOR THOSE.  I CAN'T TELL YOU -- THE   11:42

21 TIME RECORDS, IT JUST SEEMS RATHER STRANGE THAT FROM

22 SEPTEMBER 8, 2000 ON, THERE ARE NO TIME RECORDS.

23         AND WE HAVE A GENTLEMAN TESTIFYING, AND I HAVE NO

24 REASON TO DISBELIEVE HIM, FROM MATTEL, SAYING, THAT AFTER

25 SEPTEMBER 8, 2000, HE MAY NOT HAVE SUBMITTED TIME RECORDS?   11:43

1        YOUR HONOR, YOU HAVE TO ASK YOURSELF.  I THINK IT'S

2   FAIR FOR US TO SAY TO EACH OTHER, IF NO ONE ELSE, YOU HAVE TO

3   SAY TO EACH OTHER, 'WAIT A MINUTE.  MR. BRYANT IS WORKING FOR

4   YOU; YOU HAVE NO REASON TO BELIEVE, UNDER YOUR OWN THEORY, THAT

5   HE'S LEAVING TO GO TO MGA; YOU DON'T HAVE ANY TIME RECORDS FOR        11:43

6   HIM FOR SEPTEMBER 8TH ONWARD.  HE STAYS, UNDER YOUR TESTIMONY,

7   UNTIL SOME TIME IN THE LATTER PART OF OCTOBER.  YOU DON'T ASK

8   HIM FOR TIME RECORDS; THERE'S NO QUESTION ABOUT WHERE THE TIME

9   RECORDS ARE; NOTHING; HE'S JUST OKAY DOING WHATEVER HE'S

10  DOING.'                                                              11:43

11        I DON'T BELIEVE THAT, YOUR HONOR.  ESPECIALLY, I

12  DON'T BELIEVE IT AFTER WHAT HAS BEEN MISREPRESENTED TO US AND

13  TO THE COURT SO FAR.

14        ALL I KNOW IS I KNOW THAT MATTEL COULD HAVE DELETED

15  THOSE AND YOU AND I WOULD NOT KNOW IT.                               11:43

16        **THE COURT:**  THANK YOU, COUNSEL.

17        WHAT I'M GOING TO DO RIGHT NOW, IT'S 11:40 -- THERE'S

18  ONE BRIEF STATUS CONFERENCE THAT WAS CALENDERED FOR 11:00, AND

19  I SEE COUNSEL IS PRESENT, I'M GOING TO TAKE THAT MATTER UP

20  BECAUSE IT RELATES TO A TRIAL THAT POTENTIALLY IS GOING             11:44

21  TOMORROW, AND THEN WE'LL RESUME WITH THIS AT 1:15; WE'LL TAKE

22  OUR BREAK FOR LUNCH.

23        **MS. GLASER:**  THANK YOU, YOUR HONOR.

24        **THE COURT:**  I WANT TO MAKE SURE THAT EVERYBODY HAS AN

25  OPPORTUNITY TO ADDRESS THIS.

JULY 24, 2006                    ED CV 04-09049
                                 EXHIBIT___6___PAGE_55

1          **MR. PAGE:** YOUR HONOR, I HAVE A SPEAKING ENGAGEMENT

2   IN SANTA MONICA. WOULD IT BE ALL RIGHT IF.I HAD MS. GLASER

3   REPRESENT ME?

4          **THE COURT:** IF YOU'RE WILLING TO DEFER TO YOUR

5   CO-COUNSEL, THAT'S ENTIRELY UP TO YOU.                              11:44

6          **MS. GLASER:** HE'S A BRAVE MAN, YOUR HONOR.

7          **THE COURT:** VERY GOOD.  I'LL SEE YOU ALL BACK HERE AT

8   1:15 AND THEN I'LL TAKE UP THE OTHER MATTER.

9          (LUNCH BREAK; CASE RECALLED.)

10         **THE CLERK:** RECALLING ITEM NUMBER SEVEN, CASE NUMBER   01:17

11  ED CV 04-9049-SGL, CARTER BRYANT VERSUS MATTEL, INC.

12  COUNSEL?

13         **MS. GLASER:** PATRICIA GLASER, YOUR HONOR, FOR MGA AND

14  DIANA TORRES FOR MGA.

15         **MR. QUINN:** JOHN QUINN, MIKE ZELLER, JON COREY FOR     01:17

16  MATTEL.

17         **THE COURT:** COUNSEL, YOU MAY PROCEED.

18         **MS. GLASER:** THANK YOU, YOUR HONOR.

19         YOUR HONOR, WE HAD A BRIEF DISCUSSION BEFORE THE

20  BREAK WITH RESPECT TO WHAT THE LAW WAS WITH REGARD TO WHEN YOU    01:18

21  HAD TO START PRESERVING, AND I WANTED TO CLARIFY THAT.

22         **THE COURT:** THE ISSUE OF WHETHER OR NOT -- YOU SAID

23  "LIKELY" AS OPPOSED TO "PROBABLE."

24         **MS. GLASER:** AND I WANT TO QUOTE FROM A COUPLE OF

25  CASES, BECAUSE I THINK IT'S AN IMPORTANT ISSUE:  WHEN DOES THE    01:18

31

1   DUTY TO PRESERVE ARISE?

2          AND I'M QUOTING, "THE DUTY TO PRESERVE MATERIAL

3   EVIDENCE ARISES NOT ONLY DURING LITIGATION, BUT EXTENDS TO THAT

4   PERIOD BEFORE THE LITIGATION, WHEN A PARTY REASONABLY SHOULD

5   KNOW THAT THE EVIDENCE MAY BE RELEVANT TO ANTICIPATED            01:18

6   LITIGATION."

7          THAT'S THE SILVESTRI V. GENERAL MOTORS CASE, 271 F.3D

8   583 AT 591; IT'S A FOURTH CIRCUIT 2001 CASE.

9          THE COURT:  SO "ANTICIPATED LITIGATION."

10         MS. GLASER:  "RELEVANT TO ANTICIPATED LITIGATION."        01:19

11         AS SOON AS A SPOLIATING PARTY HAD NOTICE OF POTENTIAL

12   CLAIMS.  THAT'S THE CECCONI CASE.  THAT'S A 2007 BANKRUPTCY

13   LEXIS 1323, NORTHERN DISTRICT OF CALIFORNIA, APRIL 17, 2007.

14         THE COURT:  THAT'S NOTICE OF POTENTIAL CLAIMS BEING

15   BROUGHT AGAINST THEM.                                          01:19

16         MS. GLASER:  YES, SIR.

17         THEN I CAN GO ON AND ON.

18         THE COURT:  I UNDERSTAND.  BUT NONE OF THESE ARE

19   NECESSARILY FITTING WHAT WE HAVE RIGHT HERE.  THIS IS A

20   SITUATION WHERE YOU'RE SUGGESTING THAT ONCE THEY THOUGHT THEY   01:19

21   WERE GOING TO SPRING OR PURSUE LITIGATION -- AND THAT'S THE

22   STANDARD THAT I'M GOING TO HAVE TO TRY TO COME UP WITH.

23         MS. GLASER:  LET ME BE CLEAR.  THEY THOUGHT, THEY

24   THOUGHT WHEN YOU CLAIM A WORK PRODUCT PRIVILEGE, I THINK WE

25   WOULD ALL AGREE, YOU ANTICIPATE LITIGATION.  THAT'S WHEN THE    01:19

1   WORK PRODUCT PRIVILEGE APPLIES.

2           THEY TOOK THE POSITION IN THIS LITIGATION THAT THE

3   WORK PRODUCT PRIVILEGE APPLIES TO THE INVESTIGATION OCCURRING

4   IN 2002.  FOR EXAMPLE -- AND I'M JUST USING IT AS AN EXAMPLE --

5   ONE OF THE EXHIBITS, EXHIBIT 7 TO THE BURR DECLARATION OF

6   JULY 25, 2007, IS THIS ALLEN K. E-MAIL, WHICH I'M SURE THE

7   COURT HAS LOOKED AT MORE THAN YOU WANT TO.  THIS IS THE ONE

8   THAT TALKS ABOUT, "I'M AWARE OF THE SITUATION" -- THIS IS TO

9   ALLEN FROM MR. DE ANDA -- "I'M AWARE OF THE SITUATION AND HAVE

10  BEEN WORKING ON IT FOR SEVERAL MONTHS.  MY FRUSTRATION IN THIS

11  MATTER WAS THE GENESIS OF" -- THEN THERE'S A BLANK -- "AND THAT

12  IS NOW IN THE HANDS OF ROBERT NORMILE," N-O-R-M-I-L-E, WHO, AT

13  THAT TIME, WAS THE GENERAL COUNSEL OF MATTEL.  "THE TRUTH OF

14  THE MATTER IS THAT CARTER BRYANT DID WORK FOR MATTEL; HOWEVER"

15  -- THEN THERE'S ANOTHER REDACTION.

16          IT IS THIS DOCUMENT AND DOCUMENTS ARISING OUT OF THIS

17  TIME PERIOD, FROM MARCH TO AUGUST OF 2002, THAT THEY'RE

18  CLAIMING THE WORK PRODUCT PRIVILEGE ON; SO CLEARLY, THEY

19  THOUGHT IT WAS ANTICIPATION OF LITIGATION; THAT'S THE POSITION

20  THEY TOOK.

21          NOW, LET ME JUST MAKE A FEW OTHER POINTS THAT WERE

22  TOUCHED ON.  I WANT TO BE VERY CLEAR ABOUT THE RECORD.

23          YOU ASKED ABOUT A MOTION TO COMPEL.  MR. KAWASHIMA,

24  WE KNEW TO COMPEL IN JANUARY OF 2007.  WE GOT AN ORDER THAT THE

25  DEPOSITION HAD TO OCCUR -- MR. KAWASHIMA IS THE E-MAIL GUY, THE

01:20
01:20
01:20
01:20
01:21

1   30(B)(6) E-MAIL GUY.

2        **THE COURT:**  RIGHT.  AND HIS DEPOSITION TOOK PLACE ON

3   JANUARY 17TH.

4        **MS. GLASER:**  JANUARY 17TH.

5        HE WAS SUBSTITUTED IN FOR SOMEBODY ELSE BECAUSE WE          01:21

6   COULDN'T -- HE KEPT -- THE OTHER FELLOW WHO THEY HAD ORIGINALLY

7   DESIGNATED WAS NOT AVAILABLE OVER SEVERAL -- HIS DEPOSITION HAD

8   TO BE DELAYED SEVERAL TIMES.  I'M NOT REMEMBERING HIS NAME.

9        **MR. ZELLER:**  MR. KAYANO.

10       **MS. GLASER:**  MR. KAYANO.                              01:21

11       **THE COURT:**  BUT, COUNSEL, AT THE END OF THE DAY,

12  CERTAINLY, DELAYS IN DEPOSITION SCHEDULING, IN THE ABSENCE OF

13  MOTIONS TO COMPEL, ARE NOT GOING TO BE THE BASIS FOR

14  TERMINATING SANCTIONS.

15       **MS. GLASER:**  I COULDN'T AGREE WITH YOU MORE, AND I'M   01:21

16  NOT SUGGESTING THAT.  I JUST WANTED TO MAKE SURE THAT -- YOU

17  HAD ASKED US ABOUT A MOTION TO COMPEL, AND ONE WAS MADE.

18       **THE COURT:**  RIGHT.

19       **MS. GLASER:**  NOW, IN THE ZEUS CHRONOLOGY, I WANTED TO

20  BE CLEAR ABOUT THAT.  MS. MARINE IS DEPOSED IN DECEMBER OF     01:22

21  2006.  THEY IMPOSED AN ARTIFICIAL LIMITATION OF 1998 THROUGH

22  2000.  JUDGE INFANTE, IN APRIL, AFTER WE GO BACK AND FORTH AND

23  SAY THAT'S AN ARTIFICIAL ONE, HE ORDERS THE DEPOSITION TO

24  RESUME, GOING A GREATER PERIOD, AND THAT IS IN THE APRIL OF

25  2007 MEET AND CONFER, OVER WHICH HE PRESIDES.  IT IS IN JUNE OF  01:22

34

1   2007 THAT MS. MARINE IS THEN DEPOSED AGAIN, AND SHE'S ACTUALLY

2   DEPOSED A THIRD DAY.

3           A COUPLE MORE THINGS --

4           **THE COURT:**  COUNSEL, I UNDERSTAND THIS RECORD, BUT

5   WHAT ARE THE POINTS OF THESE --                                    01:22

6           **MS. GLASER:**  I'M SIMPLY TRYING TO ADDRESS SOME ISSUES

7   THAT YOU HAD RAISED THIS MORNING, YOUR HONOR.  I APOLOGIZE IF

8   IT DOESN'T SEEM RELEVANT, BUT I'LL TRY TO GET TO THE RELEVANCE.

9           YOU ASKED ABOUT PHONE RECORDS AND WHETHER THERE WAS

10  ANY EVIDENCE OF ANYBODY DELIBERATELY TRYING TO GET RID OF PHONE    01:22

11  RECORDS.

12          **THE COURT:**  YES.

13          **MS. GLASER:**  THE TRUTH IS, IT'S THEIR COMPUTER

14  SYSTEM.  I CAN'T EXPLAIN WHY THEY DON'T HAVE THIS PARTICULAR

15  TIME FRAME THAT'S, BY THEIR DEFINITION, SO CRITICAL; BUT I         01:23

16  THINK IT'S THEIR OBLIGATION TO EXPLAIN, NOT OUR OBLIGATION TO

17  EXPLAIN, YOUR HONOR, WITH ALL DUE RESPECT TO THEM AND TO THE

18  COURT.

19          I WANT TO GO ON TO JUST A COUPLE MORE THINGS.

20          **THE COURT:**  COUNSEL, AGAIN, ARE YOU SUGGESTING THAT A   01:23

21  FAILURE TO OFFER UP WHAT, TO THIS POINT, YOU VIEW AS AN

22  UNSATISFACTORY EXPLANATION AS A BASIS FOR TERMINATING

23  SANCTIONS?

24          **MS. GLASER:**  NO.  BUT IT'S A BASIS FOR SANCTIONS.

25  THE TERMINATING SANCTIONS COME FROM NOT PRESERVING E-MAILS, NOT    01:23

JULY 24, 2006                 ED CV 04-09049

EXHIBIT __6__ PAGE __60__

1   PRESERVING THE ZEUS SYSTEM, NOT PRESERVING BACKUP, NOT EVEN

2   ATTEMPTING TO DO BACKUP UNTIL A YEAR AFTER THE ORIGINAL

3   LITIGATION WAS FILED.  BUT LET ME GO ON.

4          YOU ASKED ANOTHER QUESTION:  'WELL, WHY IS THIS

5   RELEVANT?  WHY IS THIS TIME PERIOD RELEVANT?'                01:23

6          YOU ASKED THAT NICELY A COUPLE OF DIFFERENT WAYS.

7          **THE COURT:**  YES.

8          **MS. GLASER:**  I WANT TO GO INTO A COUPLE OF THINGS.

9          ONE:  THEY CLEARLY THOUGHT IT WAS RELEVANT, BECAUSE

10  THEY ARE CLAIMING WORK PRODUCT PRIVILEGE WITH RESPECT TO IT.   01:24

11         TWO:  THERE ARE --

12         **THE COURT:**  I HARDLY THINK THAT'S THE STANDARD,

13  COUNSEL, FOR DETERMINING RELEVANCY.

14         **MS. GLASER:**  WELL, NOT RELEVANCY.  BUT, YOUR HONOR,

15  THERE ARE INVESTIGATORY E-MAILS THAT WE WILL NEVER SEE DURING  01:24

16  THIS INVESTIGATION PERIOD THAT DISCUSS CARTER BRYANT AND

17  CARTER BRYANT'S INVOLVEMENT OR LACK OF INVOLVEMENT IN A WHOLE

18  VARIETY OF THINGS HAVING TO DO WITH MATTEL'S CLAIM THAT

19  MR. BRYANT IS A THIEF.

20         I'LL NEVER SEE THOSE; WE WILL NEVER SEE THOSE          01:24

21  E-MAILS.

22         ONE OF OUR KEY DEFENSES, WHICH YOUR HONOR HAS

23  ALLOWED -- AND YOU'LL BE SEEING -- IF YOU DON'T TERMINATE,

24  THERE WILL BE A MOTION FOR SUMMARY JUDGMENT, IF WE CAN GATHER

25  THE DOCUMENTS -- IS A LACHES DEFENSE.  WE BELIEVE -- ONE OF THE  01:24

JULY 24, 2006          ED CV 04-09049

EXHIBIT ___6___ PAGE _61_

1    THINGS ON OUR CHRONOLOGY THAT YOU WILL SEE, YOUR HONOR, IS THAT

2    MR. BRYANT TESTIFIED ON BEHALF OF MATTEL IN 2003.

3         WHAT A COINCIDENCE THAT SEVEN MONTHS LATER, NOT

4    BEFORE, SEVEN MONTHS LATER, AFTER THEY'VE DONE THEIR

5    INVESTIGATION, BUT SEVEN MONTHS AFTER HE TESTIFIES, THEY BRING

6    A LAWSUIT AGAINST MR. BRYANT.

7         HOW DO WE KNOW WHAT THEY KNEW IN 2002?  HOW DO WE

8    KNOW THAT, BECAUSE THE E-MAILS ARE GONE?  HOW DO WE KNOW WHAT

9    THEY KNEW IN 2003, WHEN THEY USED HIM AS A WITNESS?  CERTAINLY,

10   HOW DO WE KNOW WHAT THEY KNEW IN 2004, UP UNTIL 2005?

11        THERE IS NO EVIDENCE.  IT'S BEEN DESTROYED.

12        THERE ARE VARIOUS E-MAIL EXCHANGES WHICH UNDOUBTEDLY

13   OCCURRED AS A RESULT OF THE WALL STREET JOURNAL ARTICLE, WHICH

14   IS IN 2003, WITH RESPECT TO CARTER BRYANT BEING INVOLVED; AND,

15   AGAIN, THEFT OF MATTEL'S PRODUCT, MATTEL'S DESIGNS, MATTEL'S

16   DOLLS.

17        WE DON'T HAVE ANY OF THAT.  IT'S GONE.

18        HOW ABOUT WHEN MATTEL ANNOUNCES ITS LAWSUIT AGAINST

19   CARTER BRYANT -- THEY DO THESE -- RIGHT OR WRONG; I'M NOT BEING

20   CRITICAL OF THIS -- IN THESE TOWN HALL SETTINGS, "WE HAVE NOW

21   SUED CARTER BRYANT."

22        NONE OF THOSE E-MAILS --

23        HOW ABOUT AN E-MAIL THAT WOULD SAY, FOR EXAMPLE, "WHY

24   IN THE WORLD ARE THEY DOING THAT?"

25        THEY KNOW THAT HE DIDN'T DO X, Y, Z. WE HAVE NO IDEA,

1  BECAUSE THOSE ARE GONE.  THEY'VE DESTROYED THEM.

2         I GO BACK TO THE LACHES DEFENSE.  WE BELIEVE, AND WE

3  WILL BE ASSERTING THIS AND HAVE ASSERTED THIS ALL ALONG, THAT

4  THEY DELIBERATELY DELAYED IN BRINGING THE LAWSUIT.  THAT'S BEEN

5  POOH-POOH'D UP UNTIL NOW.  WE KNOW THAT THEY USED CARTER BRYANT         01:26

6  AS A WITNESS IN SEPTEMBER OF 2003, AND WE KNOW THEY DIDN'T SUE

7  UNTIL APRIL.

8         THE VERY THINGS THEY WERE INVESTIGATING IN 2002 OR

9  WHAT THEY WAITED UNTIL APRIL OF 2004 TO SUE MR. BRYANT FOR, WE

10 KNOW THAT THEY MADE REPRESENTATIONS TO THIS COURT IN ORDER TO         01:26

11 BRING MGA IN AS A DEFENDANT IN JANUARY OF 2007, AND THEY

12 MISREPRESENTED THE STATE OF THE RECORD TO YOUR HONOR.  AND

13 THAT'S PART OF THE BASIS, NOT THE ENTIRE BASIS, BUT CERTAINLY A

14 SIGNIFICANT PART OF THE REASON WHY YOUR HONOR GRANTED AN

15 AMENDMENT, GRANTED THEM THE RIGHT TO SUE MGA.  THAT WAS THE         01:27

16 WRONG THING TO DO.  THEY SHOULD NOT HAVE DONE THAT.

17         **THE COURT:**  COUNSEL, LET ME GIVE AN OPPORTUNITY TO

18 MR. QUINN AND MATTEL TO RESPOND.

19         **MS. GLASER:**  JUST ONE LAST THING.

20         ONE OF THE KEY THINGS HERE IS, DID MR. BRYANT MEET         01:27

21 HIS EMPLOYMENT OBLIGATIONS TO MATTEL?

22         I CERTAINLY BELIEVE, YOUR HONOR, THAT IN 2002, 2003,

23 AND 2004, THERE HAD TO HAVE BEEN CORRESPONDENCE, CERTAINLY IF

24 FOR NO OTHER REASON, BECAUSE OF THE INVESTIGATION, ABSOLUTELY

25 RELATING TO THAT.         01:27

1          AND WE DON'T HAVE IT, AND WE NEVER WILL.

2          THE COURT:  I'LL CERTAINLY GIVE YOU AN OPPORTUNITY TO

3   RESPOND.

4          MS. GLASER:  THANK YOU, YOUR HONOR.

5          THE COURT:  THANK YOU, COUNSEL.                    01:27

6          MS. GLASER:  YOUR HONOR, THE LAST THING.

7          THE COURT:  YES.

8          MS. GLASER:  ONE OF THE THINGS YOU ORDERED -- IF YOUR

9   HONOR IS WILLING, I KNOW YOU ORDERED MR. MOORE TO BE HERE.  WE

10  HAVE AN EXAMINATION OF MR. MOORE.  I REALIZE YOU MAY NOT HAVE   01:27

11  TIME TODAY, BUT IF IT BECOMES APPROPRIATE, WE WOULD LIKE TO

12  CROSS-EXAMINE MR. MOORE, BECAUSE WE THINK SOMEONE HAS A LOT OF

13  EXPLAINING TO DO.

14         THANK YOU.

15         THE COURT:  THANK YOU, COUNSEL.                   01:28

16         MR. QUINN?

17         MR. QUINN:  THANK YOU, YOUR HONOR.

18         I'VE KNOWN MS. GLASER FOR MANY YEARS, AND I'VE ALWAYS

19  ADMIRED HER ADVOCACY.  I THINK, THOUGH, IN THIS CIRCUMSTANCE,

20  ON THIS MOTION, THERE'S SOME THINGS THAT HAVE JUST GOTTEN    01:28

21  CONFUSED, AND I'M JUST GOING TO WALK THROUGH THEM ONE AT A

22  TIME.

23         THE COURT:  ONE OF THE THINGS THAT WOULD BE HELPFUL

24  TO THE COURT, MR. QUINN, IS JUST TO GET A BETTER OR CLEARER

25  SENSE OF EXACTLY WHAT POINT COUNSEL, EITHER INSIDE OR OUTSIDE   01:28

JULY 24, 2006          ED CV 04-09049

EXHIBIT ___6___ PAGE _64_

1    COUNSEL, DIRECTED MATTEL TO PRESERVE DOCUMENTS AND PRECISELY

2    WHAT THEY DID.

3         ONE OF THE REASONS WHY I WANTED MR. MOORE TO BE HERE

4    IS THAT SEVERAL OF THE STATEMENTS IN THE DECLARATION THAT HE

5    SUBMITTED TO THE COURT WERE VAGUE IN TERMS OF WHAT SPECIFICALLY

6    WAS ADDRESSED AND FOR WHAT TIME PERIODS.

7         MR. QUINN:  RIGHT.

8         THE COURT:  WHETHER WE DO THIS THROUGH YOU OR WHETHER

9    MR. MOORE TESTIFIES, I REALLY DON'T CARE.  I REALLY WANT TO

10   HAVE A CLEAR SENSE OF WHAT WAS SAID AND WHEN, AND THEN

11   CERTAINLY I'LL GIVE THE DEFENSE AN OPPORTUNITY TO RESPOND TO

12   THAT.

13        MR. QUINN:  I UNDERSTAND, YOUR HONOR, AND I'M

14   PREPARED TO ADDRESS THAT, AND MR. MOORE IS AS WELL.  BUT JUST

15   AS A PLACE TO START, YOUR HONOR, IF WE COULD PERHAPS START WITH

16   THE INFAMOUS ZEUS TAPES.

17        ONE OF MY COLLEAGUES HAD SUGGESTED, 'WELL, LET'S

18   BRING THE TAPES TO COURT SO WE HAVE THEM THERE AND WE CAN SHOW

19   THE JUDGE THAT WE HAVE THEM.'  I SAID, 'NO, THAT'S NOT GOING TO

20   BE NECESSARY.  WHEN WE REPRESENT TO THE COURT THAT WE HAVE

21   THESE TAPES, I'M SURE THAT WILL BE THE END OF THE MATTER.'

22        I'M NOW BEGINNING TO WONDER IF I MADE A MISTAKE AND

23   WE ACTUALLY SHOULD HAVE BROUGHT THE ZEUS TAPES, WHICH WE HAVE,

24   TO COURT.

25        THE COURT:  WELL, START WITH DESCRIBING EXACTLY WHAT

1   IS THE EXTENT OF THE ZEUS TAPES, AS YOU HAVE THEM.

2           MR. QUINN:   THE ZEUS TAPES, IT'S A DOCUMENT

3   MANAGEMENT -- OR IT'S NOT A DOCUMENT MANAGEMENT SOFTWARE

4   SYSTEM; IT'S A STORAGE SYSTEM WHICH HAS NO AUTO-DELETE FEATURE.

5   NOTHING GOES OFF ZEUS UNLESS SOMEBODY DELIBERATELY GOES IN AND          01:30

6   DELETES IT.

7           WE HAVE ZEUS BACKUP TAPES FOR APRIL, MAY, AUGUST,

8   SEPTEMBER, AND DECEMBER 1998; JANUARY AND FEBRUARY 1, 1999;

9   FEBRUARY, MARCH, APRIL, MAY, JUNE, JULY, AUGUST, AND

10  DECEMBER 2000; AND JANUARY AND JULY OF 2001; AND THAT'S THE           01:30

11  RELEVANT TIME FRAME THAT THE DEFENDANTS ARE REALLY RAISING AN

12  ISSUE ABOUT.

13          WE ALSO HAVE TAPES AFTER THAT.  AND, IN FACT, IN

14  2004, WE DID A COMPLETE BACKUP OF THE ZEUS SYSTEM TO SAVE

15  EVERYTHING THAT WAS THERE.                                           01:30

16          BUT I'M SORRY TO SAY, YOUR HONOR, THERE REALLY HAVE

17  BEEN SOME STATEMENTS MADE TO THE COURT TODAY --

18          THE COURT:   LET ME JUST STOP YOU HERE SO I UNDERSTAND

19  THAT.

20          THERE'S NOTICEABLE MONTHS ABSENT FROM THAT PERIOD,           01:31

21  FROM APRIL 1998 THROUGH, SAY, JULY OF 2001.

22          MR. QUINN:   YOUR HONOR, THESE WERE FOUND -- THESE

23  WERE KEPT OUT OF POLICY.  THESE, BY RIGHTS UNDER MATTEL'S

24  POLICY, SHOULD HAVE BEEN DESTROYED BACK IN THAT TIME FRAME.

25  THEY WERE FOUND AT A LOCATION IN PHOENIX, AND FORTUNATELY, THEY       01:31

41

1    EXISTED AND WE HAVE THEM.

2            THE COURT:  AT WHAT POINT IN TIME, IF EVER, DID

3    DIRECTION GO OUT FROM EITHER OUTSIDE COUNSEL OR MR. MOORE, OR

4    SOMEONE INSIDE MATTEL, THAT ALL ZEUS BACKUPS WOULD BE SAVED

5    FROM THIS POINT FORWARD?  OR HAS THAT EVER HAPPENED?          01:31

6            MR. QUINN:  IF I MAY TURN THE FLOOR TO MR. COREY,

7    YOUR HONOR.

8            THE COURT:  YES.

9            MR. COREY:  YOUR HONOR, THAT'S NEVER HAPPENED,

10   BECAUSE THERE'S NO AUTO-DELETE PROVISION ON ZEUS.  THINGS JUST  01:32

11   CONTINUE TO RESIDE ON ZEUS, AND IT GETS BIGGER AND BIGGER AND

12   BIGGER.  WE'VE MADE PROPHYLACTIC BACKUP TAPES OF ZEUS.

13           THE COURT:  FROM WHAT POINT FORWARD DO YOU HAVE A

14   COMPLETE BACKUP OF EVERYTHING THAT WAS PLACED INTO ZEUS?

15           MR. COREY:  I'M SURE THAT THERE'S A 2002 BACKUP TAPE   01:32

16   THAT'S COMPLETE.  I KNOW THAT WE HAVE ALMOST COMPLETE BACKUPS

17   OF ZEUS IN THE 2000 TO 1998 TIME PERIOD, BUT I BELIEVE THAT

18   THERE'S A TAPE OR TWO MISSING FROM THOSE SETS.

19           THE COURT:  WELL, THAT'S WHAT MR. QUINN JUST

20   ADDRESSED.  BUT FROM 2002 FORWARD, DO YOU HAVE EVERYTHING?    01:32

21           MR. COREY:  YES.  WE HAVE A COMPLETE SET OF BACKUP

22   TAPES FOR ZEUS FROM 2002 FORWARD.

23           THE COURT:  TO THE PRESENT?

24           MR. COREY:  YES.

25           THE COURT:  NOW, DOES MATTEL CONTINUE TO USE THIS     01:32

JULY 24, 2006              ED CV 04-09049

EXHIBIT    6    PAGE 67

42

1    ZEUS SYSTEM?

2          MR. COREY:  YES.

3          THE COURT:  SO WHAT IS THE PROBLEM, THEN, WITH BEING

4    ABLE TO READ THE ZEUS SYSTEM IF YOU ARE STILL USING THE ZEUS

5    SYSTEM?                                                          01:33

6          MR. COREY:  I'M NOT SURE I UNDERSTAND THE QUESTION.

7          THE COURT:  THERE'S AN ALLEGATION THAT YOU DO NOT

8    HAVE THE HARDWARE OR THE CAPABILITY TO READ ZEUS.

9          MR. COREY:  ARE YOU ASKING ABOUT THE ABILITY TO READ

10   THE BACKUP, THE OLDER BACKUP TAPES FROM ZEUS?                    01:33

11         THE COURT:  YES.

12         MR. COREY:  I DON'T THINK THERE IS A PROBLEM.

13         MATTEL HAS IDENTIFIED A VENDOR WHO HAS THAT HARDWARE,

14   AND WE'VE USED THE VENDOR TO RESTORE THOSE BACKUP TAPES, SEARCH

15   THE BACKUP TAPES, AND PRODUCE RESPONSIVE DOCUMENTS FROM THOSE    01:33

16   OLDER BACKUP TAPES.  THERE'S NO PROBLEM.

17         THE COURT:  SO FROM 2002 TO THE PRESENT, YOU HAVE

18   EVERYTHING ON ZEUS?

19         MR. COREY:  CORRECT.

20         THE COURT:  AND UP TO 2002, YOU HAVE THESE DATES THAT     01:33

21   MR. QUINN JUST REPRESENTED TO THE COURT?

22         MR. COREY:  THAT'S CORRECT.

23         THE COURT:  AND THERE'S NO AUTO DELETE ON ZEUS?

24         MR. QUINN:  THAT'S CORRECT, YOUR HONOR.

25         THE COURT:  COUNSEL, YOU MAY CONTINUE.                    01:33

JULY 24, 2006                    ED CV 04-09049

EXHIBIT  6  PAGE 68

1    MR. QUINN:  THERE HAVE BEEN STATEMENTS MADE TODAY

2  THAT A WITNESS, A MS. MARINE, JULIA MARINE, DENIED IN HER

3  DEPOSITION THAT THERE WERE ANY ZEUS TAPES.

4    THE COURT:  YES.

5    MR. QUINN:  LET'S BACK UP FOR A SECOND.                     01:33

6    THE COURT:  THAT WAS YOUR 30(B) DEPOSITION WITNESS;

7  CORRECT?

8    MR. QUINN:  YES.

9    BUT THE TESTIMONY SHE WAS REFERRING TO WAS IN A

10  DEPOSITION WHERE SHE HAD BEEN DESIGNATED ON A DIFFERENT TOPIC.  01:34

11  SHE HAD PREVIOUSLY, SEVEN AND A HALF MONTHS BEFORE, BEEN

12  DESIGNATED AS THE PERSON MOST KNOWLEDGEABLE WITH RESPECT TO

13  ZEUS.  THEY SENT AN ASSOCIATE TO TAKE THAT DEPOSITION.

14  INEXPLICABLY, THAT ASSOCIATE DID NOT ASK, "WHAT ZEUS TAPES DO

15  YOU HAVE?"                                                    01:34

16    SEVEN AND A HALF MONTHS LATER, SHE'S DESIGNATED TO

17  TESTIFY ON A DIFFERENT SUBJECT, AND SHE FORGETS WHAT SHE HAD

18  BEEN TOLD IN PREPARATION FOR HER DEPOSITION THAT MATTEL HAD

19  LOCATED THESE ZEUS TAPES IN PHOENIX, AND SHE TESTIFIED, NOT

20  THAT THEY DON'T EXIST, AS MS. GLASER REPRESENTED TO YOUR HONOR;  01:34

21  SHE TESTIFIED SHE JUST DIDN'T KNOW.

22    THAT'S PAGE 239 OF JULIA MARINE'S TESTIMONY, THE

23  PROCTOR DECLARATION, EXHIBIT 22.

24    "TO YOUR KNOWLEDGE, THERE WERE NO BACKUPS LONGER THAN

25  TWO YEARS WHEN YOU RESUMED YOUR RESPONSIBILITIES TO ADMINISTER  01:35

1    ZEUS IN 2003?"

2          THE WITNESS:  "YEAH.  I'M SORRY.  I JUST DON'T KNOW."

3          SHE DIDN'T DENY THAT THEY DIDN'T EXIST; SHE JUST SAID

4    SHE DOESN'T KNOW; AND WE WOULD INVITE THE COURT TO READ

5    PAGE 239 AND THE PREVIOUS FOUR PAGES.                              01:35

6          NOW, THAT TESTIMONY WAS ELICITED BY MR. JENAL, WHO IS

7    SITTING HERE AND LISTENING TO MS. GLASER MAKE THESE

8    REPRESENTATIONS TO YOU.

9          THEY FAULT MR. MOORE FOR BEING IN THAT DEPOSITION AND

10   NOT SAYING SOMETHING.                                             01:35

11         NOW, LET'S STOP FOR A MINUTE, YOUR HONOR.

12         MR. MOORE IS HEARING AN EMPLOYEE DENY THE EXISTENCE

13   OF ELECTRONIC DATA WHICH HE KNOWS EXISTS.  THIS IS NOT

14   TESTIMONY THAT HE LIKES OR WANTS TO HEAR.  HE KNOWS THE TRUTH.

15   HE REMEMBERS BECAUSE HE'S THE GUY WHO WENT TO PHOENIX AND GOT     01:36

16   THESE TAPES.

17         (WHEREUPON, A SOTTO VOCE DISCUSSION WAS HAD

18         BETWEEN MR. QUINN AND CO-COUNSEL.)

19         MR. QUINN:  HE DIDN'T GO TO PHOENIX.  THEY WERE SENT

20   FROM PHOENIX TO HIM.                                              01:36

21         IF HE HAD SPOKEN UP, OR, DURING A RECESS IN THE

22   DEPOSITION, HAD SAID, "JULIA, YOU FORGOT; REMEMBER, SEVEN AND A

23   HALF MONTHS" -- I THINK MR. MOORE MIGHT HAVE BEEN FAULTED FOR

24   COACHING THE WITNESS.  HE DIDN'T WANT TO HEAR HER SAY, "I DON'T

25   KNOW."  HE WANTED TO HEAR HER SAY, "YEAH, WE GOT THE TAPES."     01:36

1      THE WHOLE IDEA THAT HE --

2           **THE COURT:**  WHY IS THIS HERE, MR. QUINN, ON THIS

3   PARTICULAR ISSUE?

4           **MR. QUINN:**  I DON'T KNOW, YOUR HONOR.  I DON'T KNOW.

5           AS WE'VE SAID IN OUR PAPERS, MR. ZELLER HAS OFFERED

6   MULTIPLE TIMES, "IF YOU WANT THE ZEUS TAPES, THEY'RE AVAILABLE.

7   ALL ELECTRONIC DATA WE'VE GOT OF THAT NATURE IS AVAILABLE TO

8   YOU."  WE SAID THAT IN OUR PAPERS, YOUR HONOR.

9           **THE COURT:**  WHAT ABOUT THE E-MAILS?

10          **MR. QUINN:**  BEFORE WE LEAVE THAT, YOUR HONOR...

11          **THE COURT:**  PLEASE.

12          **MR. QUINN:**  THESE BACKUP ZEUS TAPES ARE DLT TAPES,

13   AND YOU DO NEED A CERTAIN DEVICE.  I GUESS THESE ARE NOT IN

14   FASHION ANYMORE, AND YOU NEED A CERTAIN DEVICE TO BE ABLE TO

15   READ THOSE.

16          MS. GLASER IS EXCORIATING US SAYING, AND I QUOTE,

17   THAT WE'VE MADE IT IMPOSSIBLE -- THAT WE'VE DESTROYED THEIR

18   ABILITY TO READ THESE TAPES, WHEN SHE CAN'T ANSWER THE COURT'S

19   QUESTION ABOUT WHETHER IT'S POSSIBLE THAT THERE ARE VENDORS OUT

20   THERE THAT CAN HELP YOU DO THAT.

21          WE KNOW THE ANSWER TO THAT BECAUSE WE'VE DONE IT.

22   THERE ARE SUCH VENDORS.  THESE TAPES -- I'M INVOLVED IN ANOTHER

23   CASE THAT INVOLVES DLT TAPES, AND A PARTY TO THE CASE WENT ON

24   E-BAY AND FOR $80 GOT A READER THAT MADE IT POSSIBLE TO READ

25   THESE TAPES.  THIS SIMPLY IS NOT AN ISSUE HERE.  THIS HAS NO

01:36

01:36

01:37

01:37

01:37

1   BUSINESS COMING BEFORE THE COURT.  THEY HAVE MADE A

2   REPRESENTATION TO THE COURT ABOUT WHAT THE TESTIMONY WAS, ABOUT

3   WHAT WE'VE DONE.  IT'S A COMPLETELY MADE-UP ISSUE.

4        WE HAVE THE TAPES.  WE'VE OFFERED THEM THE TAPES.

5   THEY WOULD RATHER BRING A MOTION.                            01:38

6        AND THERE'S A THEME HERE, YOUR HONOR, BECAUSE AS I GO

7   THROUGH THIS, THIS IS GOING TO COME UP AGAIN AND AGAIN.  THE

8   COURT'S GOING TO SEE THAT THERE'S A PATTERN; THAT RATHER THAN

9   FIND OUT THE FACTS AND GET THE EVIDENCE, THEY WOULD RATHER COME

10  TO THIS COURT WITH A MOTION, TAKE THEIR SHOT AT A MOTION FOR   01:38

11  TERMINATING SANCTIONS.

12       THE TIME RECORDS:  SHE, MS. GLASER, REPRESENTED TO

13  THE COURT THAT THERE WAS SOMETHING SUSPICIOUS; THAT THEY DON'T

14  EXIST; THAT THEY WERE GIVEN TO THE LAWYERS; THAT THE WITNESS

15  WHO'S KNOWLEDGEABLE ABOUT THE TIME RECORDS, MR. ARNOLD ARTAVIA  01:38

16  (PHONETIC), TESTIFIED THAT THEY COULD HAVE BEEN DELETED.

17       THERE IS ABSOLUTELY NO SUCH TESTIMONY, YOUR HONOR.

18  THAT IS NOT WHAT HE TESTIFIED.

19       HE TESTIFIED THAT THE REASON THERE WERE NOT ANY

20  CARTER BRYANT TIME ENTRIES AFTER SEPTEMBER 8, 2000, WAS BECAUSE  01:39

21  CARTER BRYANT DID NOT KEY THEM IN; HE SIMPLY DID NOT KEY IN HIS

22  TIME ENTRIES.

23       AND HE ACTUALLY TESTIFIED THAT HE WAS AWARE OF NO

24  CIRCUMSTANCE WHERE DATA HAD BEEN DELETED OR CHANGED.

25       AGAIN, THAT WAS MR. JENAL WHO ELICITED THAT TESTIMONY   01:39

1   FROM THE WITNESS.

2          THERE'S SIMPLY NOTHING SUSPICIOUS HERE.

3          MR. BRYANT WAS A DESIGNER.  HE ISN'T PAID OFF OF TIME

4   RECORDS LIKE AN ASSOCIATE IN A LAW FIRM.  IT'S NOT A SITUATION

5   WHERE IF YOU DIDN'T ENTER YOUR TIME RECORDS, BELLS AND WHISTLES

6   WOULD GO OFF AND YOUR PAYCHECK WOULD BE WITHHELD.  IT'S NOT

7   LIKE A LAW FIRM.  IT'S BASICALLY ONE DEVICE THAT'S USED FOR

8   ALLOCATING COSTS.  AND FROM SEPTEMBER 8, 2000, UNTIL HE LEFT

9   ABOUT A MONTH LATER, HE SIMPLY DIDN'T KEY IN ANY TIME.  THAT IS

10  THE TESTIMONY.  AND I WOULD REFER THE COURT TO ARNOLDO

11  ARTAVIA'S DEPOSITION, SEPTEMBER 21, 2006.  IT'S ATTACHED AS

12  EXHIBIT 10 TO THE SUPPLEMENTAL ZELLER DECLARATION.

13         THAT IS WHY THERE ARE NO TIME RECORDS FOR THAT

14  PERIOD.

15         MATTEL HAS ALL DATA FROM THE TIME RECORDS, ALL OF IT,

16  GOING BACK TO 1995, FROM ITS TIME RECORD SYSTEM.  NOTHING IS

17  MISSING.  AN EMPLOYEE STILL HAS TO KEY IN WHAT HE OR SHE IS

18  DOING.

19         THE PHONE RECORDS, MISSING PHONE RECORDS, FROM

20  OCTOBER 2000:  AND FOR THE LIFE OF ME, YOUR HONOR, I CAN'T

21  UNDERSTAND WHY THEY ARE SO INTERESTED IN THIS.  THIS IS THE

22  TIME PERIOD WHERE IT'S NOW UNDISPUTED THAT CARTER BRYANT IS

23  WORKING FOR BOTH; HE'S WORKING FOR MGA, AND HE'S WORKING FOR

24  MATTEL.  HE'S MAKING PHONE CALLS -- WE WOULD LOVE TO HAVE THOSE

25  RECORDS FROM HIS PHONE AT MATTEL.  WHY THEY THINK IT HELPS THEM

48

 1   OR WOULD BE HELPFUL TO THEM, I HAVE NO IDEA.  BUT, AGAIN, THIS

 2   IS A COMPLETE NON-ISSUE.

 3          THE COURT HAS DECLARATIONS AND HAS THE TESTIMONY.

 4   THE COMPUTER THAT THE PHONE RECORDS WOULD GO INTO ONLY HAS

 5   CAPACITY FOR 2.5 MONTHS WORTH OF PHONE RECORDS, AT THE OUTSIDE,      01:41

 6   AND BECAUSE OF THAT LIMITATION, THOSE RECORDS ARE TAKEN OFF THE

 7   COMPUTER AND ARCHIVED ON A TAPE EVERY MONTH.  THOSE ARCHIVES

 8   LAST FOR THREE YEARS.

 9          **THE COURT:**  BUT THE CONCERN HERE, MR. QUINN, IS THAT

10   JUST THAT MONTH IS MISSING; THAT YOU HAVE THE MONTH BEFORE, YOU     01:41

11   HAVE THE MONTH AFTER, YOU JUST DON'T HAVE OCTOBER OF 2000.

12          **MR. QUINN:**  IT'S UNACCOUNTABLE.  WE DON'T KNOW WHY.

13          IN 2003, WHEN WE WENT LOOKING FOR IT, NO ONE COULD

14   FIND THE TAPE FOR OCTOBER.

15          (WHEREUPON, A DISCUSSION WAS HAD

16          BETWEEN MR. QUINN AND CO-COUNSEL.)

17          **MR. QUINN:**  I'M TOLD WE ALSO DON'T HAVE THE DECEMBER

18   TAPE, YOUR HONOR.

19          SO WHEN WE WENT LOOKING FOR THEM IN 2003, THEY SIMPLY

20   DIDN'T EXIST.                                                       01:42

21          NOW, THE REPRESENTATION WAS MADE TO THE COURT TODAY

22   THAT AN OCTOBER TAPE, OR PHONE RECORDS FOR THAT PERIOD, WERE

23   DELIVERED TO THE LAW DEPARTMENT AND THEN DISAPPEARED.  THAT WAS

24   NOT THE TESTIMONY.  THE WITNESS WHO TESTIFIED ON THAT WAS A

25   ROD PALMER.  HE WAS THE DESIGNATED EXPERT, PERSON MOST            01:42

JULY 24, 2006                    ED CV 04-09049

EXHIBIT __6__ PAGE 74

49

1   KNOWLEDGEABLE ON THIS SUBJECT.  HIS TESTIMONY, PAGE 104 FROM

2   HIS DEPOSITION, IS BEFORE THE COURT.

3           QUESTIONED BY MR. JENAL, AGAIN, WHO IS SITTING HERE:

4   "DO YOU KNOW WHETHER ARCHIVED TAPES FOR THE MONTH OF OCTOBER

5   2000 WERE PROVIDED TO THE LEGAL DEPARTMENT?"                           01:42

6           ANSWER:  "I DON'T KNOW."

7           AND THE REPRESENTATION WAS MADE THAT SOMEHOW THESE

8   WERE GIVEN TO THE LEGAL DEPARTMENT AND THEN DISAPPEARED AND

9   THAT THERE'S SOMETHING SINISTER ABOUT THAT.

10          THERE'S SIMPLY NO EVIDENCE TO SUPPORT THAT, YOUR              01:42

11  HONOR.  IT'S CONTRARY TO WHAT THE EVIDENCE IS.

12          NOW THE E-MAILS.

13          THE CASE THAT WE ARE BRINGING HERE -- FIRST, I THINK

14  WE HAVE TO BEAR IN MIND, WHAT IS THE CLAIM THAT'S BEING PURSUED

15  HERE?                                                                01:43

16          THE CLAIM BEING PURSUED HERE IS THAT CARTER BRYANT

17  CREATED BRATZ WHILE HE WAS EMPLOYED BY MATTEL, AND, THEREFORE,

18  BY VIRTUE OF HIS AGREEMENT WITH MATTEL, WE OWN IT.  THAT'S THE

19  CLAIM THAT'S ASSERTED HERE.

20          MATTEL HAD NO NOTICE OF THAT CLAIM, THAT POTENTIAL           01:43

21  CLAIM, UNTIL NOVEMBER OF 2003, WHEN MATTEL OBTAINED A COPY OF

22  THE CONTRACT BETWEEN MGA AND MR. BRYANT, WHICH IS DATED DURING

23  THE TIME PERIOD THAT HE WAS EMPLOYED BY MATTEL.

24          THAT'S THE CLAIM THAT WE ARE PURSUING HERE.

25          THERE ARE OTHER CLAIMS THAT WERE THE SUBJECT OF              01:44

1    INVESTIGATION, YOUR HONOR.

2          **THE COURT:**  COUNSEL, I'LL SAVE YOU SOME TIME HERE,

3    BECAUSE THE COURT, IN REVIEWING THE DOCUMENTS PREPARING FOR

4    THIS HEARING -- NOVEMBER OF 2003 WAS THE DATE THAT I CAME UPON

5    AS WELL.  AND MY QUESTION FOR YOU OR MR. MOORE OR WHOEVER ELSE      01:44

6    CAN ANSWER THIS QUESTION IS, WHAT WAS DONE IN 2003 TO PRESERVE

7    THESE E-MAILS?

8          **MR. QUINN:**  WHAT WAS DONE IN --

9          **THE COURT:**  NOVEMBER OF 2003, SPECIFICALLY.

10         **MR. QUINN:**  I TAKE IT THE COURT DOES NOT NEED TO HEAR      01:44

11   WHAT THE INVESTIGATION WAS, WHAT MS. GLASER HAS REFERRED TO.

12         **THE COURT:**  I THINK I HAVE A PRETTY GOOD SENSE, AND

13   IF I HAVE QUESTIONS IN THE COURSE OF YOUR RESPONSE, I WILL ASK

14   THEM.

15         **MR. QUINN:**  ALL RIGHT.

16         **THE COURT:**  WHAT I WANT TO KNOW SPECIFICALLY IS, WHAT

17   IN NOVEMBER OF 2003, GIVING YOU THAT FOR THE MOMENT, WHAT DID

18   YOU, OR, MORE SPECIFICALLY, IN-HOUSE COUNSEL, DO IN 2003 TO

19   PRESERVE THE STATE OF THE RECORD FOR THIS ANTICIPATED

20   LITIGATION?                                                        01:44

21         IT WAS PRETTY CLEAR AT THAT POINT IN TIME THAT THIS

22   WAS HEADED FOR LITIGATION ON THE CLAIM THAT YOU JUST SUGGESTED.

23         **MR. QUINN:**  RIGHT.

24         WHAT WE DID DO AND WHAT WE DIDN'T DO?

25         **THE COURT:**  PLEASE.                                      01:45

51

1        MR. QUINN:  SO NOVEMBER OF 2003, WE ARE -- REMEMBER,

2   MR. BRYANT LEAVES IN OCTOBER OF 2000, SO WE'RE A COUPLE OF

3   YEARS BEYOND THAT.

4        AT THAT POINT, WE IDENTIFIED EMPLOYEES WHO WORKED

5   WITH CARTER BRYANT, IN THE VICINITY OF CARTER BRYANT, WHO MIGHT        01:45

6   HAVE SOME VISIBILITY INTO HIS ACTIVITIES.  THERE WERE

7   APPROXIMATELY 35 EMPLOYEES.  WE IMAGED ALL OF THEIR COMPUTERS.

8   WE HAVE ALL OF THAT DATA.

9        WE WENT AROUND -- WE PERSONALLY --

10       THE COURT:  LET ME STOP YOU THERE FOR A SECOND.        01:45

11       WHEN YOU SAY 'IMAGED' A COMPUTER, WOULD THAT CAPTURE

12   ANYTHING THAT WOULD BE ON THAT COMPUTER, EITHER SAVED ON THAT

13   COMPUTER, DELETED ON THAT COMPUTER, BUT STILL SOMEPLACE IN ITS

14   HARD DRIVE?  ARE YOU TALKING ABOUT IMAGING THE ACTUAL HARD

15   DRIVES ASSOCIATED WITH THOSE COMPUTER TERMINALS?        01:45

16       MR. COREY:  YES.

17       MR. QUINN:  YES, YOUR HONOR.

18       THE COURT:  AND YOU'VE PRODUCED THOSE OR PROVIDED

19   THOSE OR MADE THOSE AVAILABLE TO MGA?

20       MR. QUINN:  WELL, SUBJECT TO THE FEDERAL RULES OF        01:46

21   CIVIL PROCEDURE AND PROPER REQUESTS BEING MADE.  THAT

22   INFORMATION, TO THE EXTENT IT'S RELEVANT AND IS PROPERLY ASKED

23   FOR, ET CETERA, IS AVAILABLE.

24       THE COURT:  HAS THAT INFORMATION BEEN SEARCHED FOR

25   RESPONSIVE DOCUMENTS?        01:46

JULY 24, 2006                    ED CV 04-09049

EXHIBIT___6___PAGE___77___

52

1          MR. ZELLER:  WITH RESPECT TO THE HARD DRIVES THAT

2     HAVE BEEN IMAGED, SOME OF THEM HAVE BEEN; SOME OF THEM HAVE NOT

3     BEEN.  BUT FROM OUR PERSPECTIVE, THAT'S NOT A PRESERVATION

4     ISSUE; THAT'S AN ISSUE OF PRODUCTION.

5          OBVIOUSLY, THERE'S A COST ASSOCIATED WITH, YOU KNOW,     01:46

6     SEARCHING THE ENTIRETY OF THESE IMAGED HARD DRIVES.  SOME OF

7     THEM, WE BELIEVE, ARE MORE LIKELY TO HAVE EVIDENCE THAN OTHERS.

8     SO WE HAVE SEARCHED A NUMBER OF THEM.  DOCUMENTS THAT WE FOUND

9     THAT WERE RESPONSIVE AND NON PRIVILEGED FROM THE HARD DRIVES

10    THAT WE HAVE SEARCHED HAVE BEEN PRODUCED.  THOSE WERE PRODUCED    01:46

11    SOME TIME AGO IN THIS CASE.

12          BUT I DON'T WANT THE COURT TO THINK --

13          WE'VE ALSO COLLECTED A NUMBER OF HARD DRIVES.  IN

14    FACT, IT'S IN EXCESS OF A HUNDRED HARD DRIVES THAT WE HAD FOUND

15    BACK FROM THAT RELEVANT TIME PERIOD THAT WERE IN THE I.T.     01:47

16    DEPARTMENT'S POSSESSION, AND WE HAVE SEARCHED A NUMBER OF THOSE

17    AS WELL.  BUT BECAUSE WE HAVE A VERY LARGE MOUNTAIN OF DATA,

18    INCLUDING THROUGH THESE HARD DRIVES AND THE IMAGES AND

19    EVERYTHING ELSE -- WE HAVE DONE SEARCHES ON SOME, BUT NOT --

20          THE COURT:  WHAT YOU'RE SUGGESTING NOW IS A     01:47

21    PRODUCTION ISSUE AND NOT A PRESERVATION ISSUE, AND I'M NOT

22    BEING CALLED UPON TO PASS ON THE PRODUCTION ISSUE.

23          MR. QUINN:  EXACTLY.

24          THE COURT:  THAT IS CERTAINLY PRESERVED, POTENTIALLY,

25    FOR ANOTHER DAY.  THE ISSUE HERE IS THE ALLEGATION BY MGA THAT     01:47

53

1    YOU DID NOT PRESERVE.

2              SO MR. QUINN, CONTINUE WITH WHAT YOU DID PRESERVE.

3              **MR. QUINN:**  ALL RIGHT.

4              **THE COURT:**  YOU IDENTIFIED THESE 34 WITNESSES; YOU

5    IMAGED THEIR COMPUTERS.                                        01:47

6              **MR. QUINN:**  POTENTIAL WITNESSES; IMAGED THEIR

7    COMPUTERS; SPOKE TO THEM INDIVIDUALLY; ASKED THEM WHAT THEY

8    HAD, WHAT THEY HAD IN THEIR POSSESSION.

9              **THE COURT:**  AND THIS IS ALL IN NOVEMBER OF 2003?

10             **MR. QUINN:**  IN THAT TIME FRAME.                   01:47

11             **THE COURT:**  WHAT TIME FRAME?

12             **MR. QUINN:**  WELL, MR. ZELLER CAN, PERHAPS, BRACKET

13   IT.

14             **MR. ZELLER:**  I THINK I CAN.

15             SOME OF THIS HAS OCCURRED AS OF NOVEMBER OF 2003.     01:48

16   THERE WAS OBVIOUSLY THE INVESTIGATION THAT WAS DONE IN THE

17   MONTHS PRIOR TO NOVEMBER OF 2003, WHEN MATTEL FIRST RECEIVED A

18   COPY OF THAT CONTRACT WITH CARTER BRYANT AND MGA; SO THERE WAS

19   AN INVESTIGATION THAT WAS IN PLACE FOR THOSE CLAIMS.

20             SO, OBVIOUSLY, A FAIR AMOUNT OF INFORMATION -- HARD   01:48

21   DRIVES, E-MAILS, THAT SORT OF THING -- WERE COLLECTED AS PART

22   OF THE INVESTIGATION.

23             EVERYTHING UP UNTIL NOVEMBER OF 2003 WAS PRESERVED;

24   EVERYTHING THAT HAD BEEN COLLECTED AS OF THAT TIME.  OBVIOUSLY,

25   THEN, ONCE IT BECAME -- REALLY, WHERE WE GET TO GETTING THE     01:48

JULY 24, 2006              ED CV 04-09049

EXHIBIT ___6___ PAGE _79_

54

1   CONTRACT, AND IT BECOMES MORE LIKELY THAT THERE IS A LAWSUIT,

2   CERTAINLY BY THAT JUNCTURE, THEN THOSE FORMAL KINDS OF

3   PRESERVATION EFFORTS WERE UNDERTAKEN AND EXPANDED.

4        THE COURT:  WHAT FORMAL PRESERVATION EFFORTS WERE

5   UNDERTAKEN?  WHO TOOK THE LEAD ON THAT?                          01:48

6        MR. ZELLER:  THAT WAS MR. MOORE.

7        THE COURT:  WHAT EXACTLY DID HE DO?

8        MR. ZELLER:  WELL, A NUMBER OF THESE THINGS OCCURRED

9   BOTH BEFORE AND AFTER.  SOME OF IT --

10        THE COURT:  WHAT DID HE DO IN NOVEMBER OF 2003?           01:49

11        MR. QUINN:  IF I COULD JUST CONTINUE, YOUR HONOR, I

12   DO HAVE A LIST.

13        THE COURT:  ALL RIGHT, AS LONG AS WE'RE -- I JUST

14   DON'T WANT A LIST OF THINGS DONE IN THE COURSE OF THE HISTORY

15   OF THIS CASE.                                                   01:49

16        MR. QUINN:  NO, NO.  WE'RE TALKING ABOUT THINGS THAT

17   WERE DONE IN THE NOVEMBER 2003 TIME FRAME, GIVE OR TAKE MONTHS

18   ON EITHER SIDE.

19        THE COURT:  ALL RIGHT.

20        MR. QUINN:  THESE 35 INDIVIDUALS WERE INDIVIDUALLY         01:49

21   MET WITH, AND WHATEVER HARD INFORMATION THEY HAD, WHATEVER DATA

22   THEY HAD -- SOME OF THEM HAD E-MAILS AND HARD COPIES -- THAT

23   WAS ALL COLLECTED.

24        IN ADDITION, THE LIVE SERVERS, THAT THEN IN EXISTENCE

25   WERE LIVE, WERE SEARCHED FOR SOME 39 PEOPLE, AND E-MAILS WERE   01:49

JULY 24, 2006            ED CV 04-09049

EXHIBIT __6__ PAGE 80

1   PULLED OFF OF THE LIVE SERVERS.

2           SOME PEOPLE -- ALSO THERE'S -- ON THE MATTEL SYSTEM,

3   THERE'S AN ABILITY TO KEEP E-MAILS ON NETWORK DRIVES.  PEOPLE

4   WILL HAVE SOME OF THEIR OWN SPACE ON A NETWORK DRIVE.  AND FOR

5   SOME NUMBER OF THESE PEOPLE, THOSE DRIVES WERE ALSO GONE INTO,

6   THEIR SHARE OF THAT SPACE ON THE NETWORK DRIVES, AND E-MAILS

7   WERE COLLECTED OFF OF THAT AS WELL.

8           **THE COURT:**  AGAIN, I NEED A LITTLE BIT MORE IN THE

9   WAY OF SPECIFICS.

10          WHO'S DECIDING WHICH E-MAILS?  IS IT ALL E-MAILS

11  RELATED TO CARTER BRYANT AND/OR BRATZ AND/OR ANY OF THIS

12  LITIGATION THAT MIGHT COME UP?  OR IS IT JUST THAT -- BECAUSE I

13  WANT TO MAKE SURE THIS IS PRESERVATION THAT WE'RE TALKING ABOUT

14  AND NOT PRODUCTION.

15          **MR. QUINN:**  IT IS PRESERVATION, YOUR HONOR.

16          MR. ZELLER CAN GIVE SOME MORE SPECIFICS.

17          **MR. ZELLER:**  YOUR HONOR, SOME OF THESE PRESERVATION

18  EFFORTS ARE OBVIOUSLY BEYOND THE E-MAILS.  BUT FOCUSING ON THE

19  E-MAIL PORTION OF IT, FOR EXAMPLE, THE E-MAILS PULLED FROM THE

20  SHARED DRIVES, I MEAN, THAT WAS EVERYTHING THEY HAD.  THESE ARE

21  NOT SEARCHES THAT WERE DONE BY A SPECIFIC KEY WORD, IN THE

22  SENSE OF SAYING, OKAY, WE'RE GOING TO GO ON TO THIS PARTICULAR

23  DRIVE OR THIS PARTICULAR LIVE SERVER AND ONLY PULL OFF E-MAILS.

24  THEY WERE DONE BY PEOPLE WE THOUGHT WERE RELEVANT AND NOT BY

25  KEY WORD.

01:5C
01:5C
01:5C
01:51
01:51

56

1    THERE WERE ALSO KEY WORD TYPE SEARCHES DONE, AND

2    THOSE TYPES OF THINGS WERE PRESERVED; BUT THAT WAS A DIFFERENT

3    EFFORT.

4          **THE COURT:**  VERY WELL.

5          **MR. QUINN:**  IN ADDITION, AS MR. ZELLER MENTIONED, WE     01:51

6    TRACKED DOWN SOME 130-PLUS OLDER HARD DRIVES THAT MATTEL I.T.

7    HAD IN ITS POSSESSION; TOOK CUSTODY OF THOSE AND MADE SURE THAT

8    THEY WERE NOT DISPOSED OF.  WE BACKED UP THE NETWORK SERVERS

9    THAT WE THOUGHT MIGHT CONCEIVABLY HAVE RELEVANT INFORMATION AND

10   PRESERVED THOSE AS WELL.                                        01:51

11         SO THOSE ARE ALL OF THE THINGS THAT WERE DONE IN THIS

12   TIME FRAME, AFTER WE RECEIVED A COPY OF THIS CONTRACT.

13         GOING FORWARD, WE DID MAKE A DECISION NOT TO SUSPEND

14   THE AUTOMATIC E-MAIL DELETION POLICY.  AND THE REASON WE MADE

15   THAT DECISION AT THAT TIME IS THE FOLLOWING:                    01:52

16         THESE CONCERNED EVENTS GOING BACK TWO AND A HALF

17   YEARS, OR WHATEVER THE NUMBER IS, IT SEEMED TO US PRETTY

18   UNLIKELY THAT THERE WOULD BE E-MAILS THAT PEOPLE WOULD THEN BE

19   CREATING THAT WOULD HAVE SOME BEARING ON THOSE EVENTS WHEN

20   MR. BRYANT LEFT MATTEL TWO AND A HALF -- OR WHATEVER THE        01:52

21   NUMBER -- THE PERIOD OF TIME WAS BEFORE, BACK IN OCTOBER, IN

22   2000.

23         **THE COURT:**  COUNSEL, YOU SERIOUSLY MAINTAIN THAT IN

24   ANY LITIGATION IN WHICH THE ALLEGATIONS GO FAR BEYOND, AS THIS

25   ONE DOES -- IT GOES FAR BEYOND SIMPLY WHAT CARTER BRYANT DID OR  01:52

JULY 24, 2006                    ED CV 04-09049

EXHIBIT __6__ PAGE __82__

57

1    DID NOT DO BACK IN 2000; IT TALKS ABOUT ONGOING CONDUCT, AS

2    ALLEGED IN YOUR MOST RECENT COMPLAINT AGAINST MGA -- THAT THERE

3    WOULD NOT BE INFORMATION GENERATED IN THESE INTERNAL

4    INVESTIGATIONS THAT MIGHT HAVE SOME RELEVANCE OR BEARING?

5              **MR. QUINN:**  YOUR HONOR, THESE INTERNAL                    01:53

6    INVESTIGATIONS -- WE SORT OF SKIPPED OVER THAT -- THAT CONCERNS

7    SOMETHING QUITE DIFFERENT, WHICH WE DECIDED WE DID NOT HAVE A

8    CLAIM, THAT THERE WAS NO CLAIM.  AND WE DIDN'T TALK ABOUT THAT.

9              ONE OF THE PROBLEMS HERE IN DEALING WITH THIS IS, WE

10   HAVE KIND OF A HINDSIGHT BIAS.  WE ARE NOW SITTING HERE KNOWING   01:53

11   WHAT WE KNOW, LOOKING AT THE SIZE OF THE CASE THAT WE ARE NOW

12   LOOKING AT; AND IT'S TEMPTING TO TRY TO ASSUME THAT BACK IN

13   NOVEMBER OF 2003, WE KNEW WHAT WE KNOW NOW AND THAT WE KNEW

14   THAT WE HAD CLAIMS AGAINST MGA.

15             I SUBMIT, YOUR HONOR, WE DID NOT KNOW THAT.  ALL WE      01:53

16   KNEW WAS THAT THIS MAN HAD SIGNED A CONTRACT.  WE DIDN'T KNOW

17   WHETHER MGA HAD INDUCED HIM TO DO THIS; HAD PAID HIM; WE DIDN'T

18   KNOW THEY HAD PAID HIM WHILE HE WAS WORKING FOR US.  WE DIDN'T

19   KNOW WHAT THEY KNEW.

20             **THE COURT:**  THAT NEVER CROSSED THE MIND OF ANYBODY AT   01:54

21   MATTEL, THAT PERHAPS CARTER BRYANT WAS INDUCED AWAY FROM

22   MATTEL, ALONG WITH THE PRODUCTS OR DESIGNS THAT HE HAD MADE?

23             **MR. QUINN:**  NO, I'M NOT GOING TO SAY IT NEVER CROSSED

24   ANYBODY'S MIND, YOUR HONOR.  BUT WE HAD NO WAY OF KNOWING

25   WHETHER THERE WAS A VIABLE CLAIM AGAINST MGA.  FOR ALL WE KNEW,   01:54

58

1   THIS MAN HAD SIGNED A CONTRACT WITH MGA.  WE DIDN'T KNOW

2   WHETHER OR NOT MGA KNEW THEN THAT HE WAS WORKING FOR MATTEL.

3   WE DIDN'T KNOW WHETHER MGA KNEW THAT HE HAD AN INVENTIONS

4   AGREEMENT WITH MATTEL THAT MEANT THAT ANYTHING HE BROUGHT TO

5   MGA, WE OWNED.  WE SIMPLY DID NOT KNOW THAT AT THAT TIME.          01:54

6           WE DIDN'T EVEN KNOW, FOR SURE, WHAT THIS PRODUCT WAS;

7   WHAT THE ASSIGNMENT WAS THAT HE HAD BEEN GIVEN.  IT'S TURNED

8   OUT THERE WAS MORE THAN ONE THING THAT HE DID FOR MGA WHILE HE

9   WAS WORKING FOR US.

10          THE COURT:  WELL, WHAT DID YOU DO WITH RESPECT TO THE    01:54

11  E-MAILS GOING FORWARD, IF ANYTHING?

12          MR. QUINN:  I'VE IDENTIFIED FOR THE COURT THE EFFORT

13  THAT WE TOOK TO TRY TO IDENTIFY PEOPLE WHO MIGHT HAVE

14  KNOWLEDGE.

15          THE COURT:  YES.                                          01:55

16          MR. QUINN:  WE TOLD ALL OF THOSE PEOPLE TO KEEP ANY

17  DOCUMENTS THAT MIGHT BE RELEVANT TO THIS SITUATION, INCLUDING

18  E-MAILS, TO RETAIN THEM.  TO SUSPEND THE AUTO-DELETE POLICY --

19  AND WE'VE SUBMITTED DECLARATIONS FROM TECHNICAL PEOPLE -- WOULD

20  CREATE SERIOUS, SERIOUS PROBLEMS.  IT COULD CRASH THE COMPANY'S  01:55

21  SERVERS.  THE ZUBULAKE CASE SAYS YOU DON'T HAVE TO TAKE

22  EXTRAORDINARY MEASURES THAT THREATEN THE COMPANY'S ONGOING

23  OPERATIONS.

24          THE COURT:  BUT ON OR ABOUT NOVEMBER OF 2003, THESE

25  35 PEOPLE WERE ADVISED THAT IF THEY GENERATE OR RECEIVE ANY      01:55

JULY 24, 2006                    ED CV 04-09049

EXHIBIT ___6___ PAGE __84__

59

1   E-MAILS RELATED TO THESE CLAIMS, THAT THOSE E-MAILS WERE TO BE

2   RETAINED.

3        **MR. QUINN:**  YES.  OR THIS SUBJECT.

4        AND NOT JUST E-MAILS, ANY DOCUMENTS.

5        **THE COURT:**  TO INCLUDE E-MAILS.                        01:55

6        **MR. QUINN:**  YES, YOUR HONOR.

7        IF THEY SAW ANYTHING LIKE THIS, THEY WERE TO KEEP IT.

8   WE PUT THAT LITIGATION HOLD IN PLACE.

9        IN ADDITION, WE PUT IN PLACE A SYSTEM -- IT'S A

10  SECURITY TOOL -- THAT SEARCHES E-MAILS AUTOMATICALLY BY CERTAIN    01:56

11  KEY WORDS, GOING FORWARD; SO E-MAILS THAT WERE CREATED THAT

12  TRIPPED ONE OF THESE WORDS WOULD BE CAUGHT AND GO TO A CERTAIN

13  MAILBOX.

14       **THE COURT:**  I ASSUME "CARTER BRYANT" AND "MGA" WERE

15  AMONGST THOSE WORDS?                                             01:56

16       **MR. QUINN:**  I THINK YOU CAN ASSUME THAT, YOUR HONOR.

17       SO WE SET THAT IN PLACE.

18       THE ONE THING WE DIDN'T DO IS SUSPEND THE AUTOMATED

19  DELETION POLICY.

20       **THE COURT:**  YOU'VE SAID THAT.  I UNDERSTAND THAT.       01:56

21       WHAT ELSE HAVE YOU DONE AS THE COURSE OF THE

22  LITIGATION HAS EVOLVED?  BECAUSE IT CERTAINLY HAS, AT VARIOUS

23  POINTS, TAKEN ON A MUCH BROADER SCOPE THAN SIMPLY A DISCUSSION

24  OVER CARTER BRYANT AND WHAT HE DID OR DIDN'T DO.

25       **MR. QUINN:**  RIGHT.                                      01:56

JULY 24, 2006                ED CV 04-09049

EXHIBIT ___6___ PAGE _85_

60

1    AS OF APRIL OF 2005, WE ACTUALLY BEGAN TO PRESERVE

2    ALL OF THE BACKUP TAPES.  AND THAT GOES BACK -- SO THAT WOULD

3    CAPTURE E-MAILS AS OF DECEMBER 2004.

4          THE COURT:  THESE ARE BACKUP TAPES FOR THE E-MAILS?

5          MR. QUINN:  YES, YOUR HONOR.

6          AGAIN, WE DID NOT SUSPEND THE AUTO DELETE.  COUNSEL

7    IS RIGHT, E-MAILS ARE BEING DELETED TO THIS DAY.  WHEN THEY

8    SENT US THE PRESERVATION LETTER SAYING, 'YOU SHOULD SUSPEND

9    AUTO DELETE,' WE WROTE RIGHT BACK IMMEDIATELY, WITHIN DAYS, AND

10   SAID, 'WE'RE NOT DOING THAT.'

11         THE COURT:  BUT YOU DO HAVE BACKUPS FOR ALL OF THE

12   E-MAILS FROM DECEMBER 2004 TO THE PRESENT?

13         MR. QUINN:  ALL OF THEM, YOUR HONOR.  ALL OF THEM.

14         THE COURT:  AND THOSE ARE AVAILABLE TO MGA.

15         MR. QUINN:  THOSE ARE AVAILABLE TO BE SEARCHED, AND

16   WE HAVE PRODUCED DOCUMENTS OUT OF THOSE, YOUR HONOR.

17         THE ZUBULAKE CASE SAYS YOU DON'T NEED TO KEEP

18   DUPLICATES --

19         THE COURT:  I UNDERSTAND.

20         MR. QUINN:  -- YOU CAN MAKE REASONABLE JUDGMENTS AS

21   TO THE BEST WAY TO KEEP INFORMATION.  AND THAT'S EXACTLY WHAT

22   WE HAVE DONE.

23         AND WE CAN GO INTO MORE DETAIL, YOUR HONOR, ABOUT

24   THINGS IF THE --

25         THE COURT:  I WANT TO GIVE MGA A CHANCE TO RESPOND TO

01:57
01:57
01:57
01:58
01:58

1   THIS, BECAUSE, OBVIOUSLY, THEY CAN HARDLY CONTAIN THEMSELVES.

2          MR. QUINN:  CAN I RESPOND TO A COUPLE MORE THINGS,

3   YOUR HONOR, BECAUSE I SAT THROUGH SOME OF THIS AS WELL.

4          THE COURT:  VERY WELL.

5          MR. QUINN:  ON THE LACHES ISSUE, THAT WAS NEVER

6   RAISED IN THEIR MOTION PAPERS AT ALL.  IT'S NOT AN ISSUE THAT'S

7   BEEN BRIEFED.  IT'S NOT A BASIS FOR THIS MOTION.  THE SHORT

8   ANSWER TO IT, THOUGH, IS THAT IF A CLAIM IS BROUGHT WITHIN THE

9   STATUTE OF LIMITATIONS, PRESUMPTIVELY, THERE ISN'T A LACHES

10  PROBLEM.  AND THE COURT HAS DETERMINED THAT BECAUSE OF THE

11  RELATION BACK, THIS CLAIM WAS BROUGHT WITHIN THE STATUTE OF

12  LIMITATIONS.

13         THE WALL STREET JOURNAL ISSUE -- THEY KEEP SAYING WE

14  PLANTED THIS STORY.  THERE'S SIMPLY NO EVIDENCE OF IT; THAT

15  THAT WAS OUR STORY, THAT WE PUT IT.  THE AUTHOR OF THE WALL

16  STREET JOURNAL ARTICLE SAYS PEOPLE WITHIN MATTEL ARE --

17         THE COURT:  THAT IS NOT BEFORE THE COURT.

18         MR. QUINN:  ALL RIGHT.

19         THE FINAL POINT I WANT TO MAKE, YOUR HONOR, IS THAT,

20  IN MAKING THESE JUDGMENTS ABOUT PRESERVATION, LAWYERS HAVE TO

21  MAKE JUDGMENTS.  THERE OFTEN IS NOT A BRIGHT LINE ABOUT WHAT IS

22  A REASONABLE EFFORT TO PRESERVE EVIDENCE AND WHAT ISN'T A

23  REASONABLE EFFORT.

24         ONE THING THAT WOULD BE USEFUL TO US IN SORT OF

25  ASSESSING THE REASONABLENESS OF MATTEL'S CONDUCT HERE IS TO

JULY 24, 2006                   ED CV 04-09049

EXHIBIT __6__ PAGE __87__

1    KNOW WHAT MGA'S CONDUCT WAS, WHAT THEY THOUGHT WAS REASONABLE

2    IN ORDER TO PRESERVE EVIDENCE.

3          AND WE'RE DOING THAT IN A VACUUM HERE, BECAUSE MGA

4    HAS COMPLETELY BLOCKED ANY EFFORT -- AND THIS IS RELEVANT

5    BECAUSE OF THE UNCLEAN HANDS ISSUE THAT WE BRIEFED -- HAS

6    BLOCKED ANY EFFORT FOR US TO LEARN ABOUT WHAT THEY DID TO

7    PRESERVE EVIDENCE.   AND JUDGE INFANTE HAS SO FOUND.

8          THEY WERE ORDERED TO PROVIDE A 30(B)(6) WITNESS ON

9    THEIR DOCUMENT PRESERVATION EFFORTS.   JUDGE INFANTE FOUND THAT

10   THEY FAILED TO PRODUCE A WITNESS; HE FOUND THAT WAS A WILLFUL

11   VIOLATION OF HIS ORDER; HE SAID IT WAS, QUOTE, "FLAGRANT AND

12   EGREGIOUS," CLOSED QUOTE.

13         WE HAVE NEVER BEEN FOUND TO VIOLATE ANY ORDER THAT

14   JUDGE INFANTE HAS ENTERED.

15         WE HAVE NO IDEA WHAT MGA HAS DONE TO PRESERVE

16   EVIDENCE BECAUSE THEY WON'T TELL US; THEY WON'T RESPOND TO

17   REQUESTS.   THEY VIOLATED JUDGE INFANTE'S ORDER THAT THEY

18   PROVIDE US WITH A WITNESS ON THAT SUBJECT.

19         WE DO KNOW THEY PRODUCED THEIR HEAD OF I.T., ONE

20   KEN LOCKHART, WHO TESTIFIED THAT -- WHEN ASKED WHAT WAS DONE TO

21   PRESERVE EVIDENCE, HE TESTIFIED THAT HE KNOWS THAT IN 2005, A

22   SEARCH WAS DONE OF MR. LARIAN'S COMPUTER.   THAT'S THE ONLY

23   THING HE SAID HE WAS AWARE OF.   AND THAT'S 2005.   MR. LARIAN IS

24   THE CEO OF THE COMPANY AND A DEFENDANT IN THIS ACTION.

25         THERE IS AN MGA EMPLOYEE BY THE NAME OF KERRI BRODE,

1   WHO WE KNOW, WE KNOW, WORKED ON BRATZ CLEAR BACK IN 2000.  SHE

2   TESTIFIED THAT THE FIRST TIME THAT SHE WAS TOLD TO PRESERVE

3   DOCUMENTS WAS IN APRIL 2005.  SO WHAT INFORMATION WE'VE GOT AND

4   WHAT MGA THINKS IS REASONABLE TO PRESERVE IN TERMS OF TRYING TO

5   ASSESS THE RELATIVE EFFORTS OF THE PARTIES AND WHETHER WHAT          02:01

6   MATTEL HAS DONE IS REASONABLE IS VERY, VERY LIMITED.  BUT WHAT

7   WE DO KNOW ON THAT SUBJECT CERTAINLY INDICATES THAT MGA'S

8   CONDUCT IN THIS REGARD HAS HARDLY BEEN A MODEL OF COMPLIANCE.

9            **THE COURT:**  THANK YOU, COUNSEL.

10           **MS. GLASER:**  THANK YOU, YOUR HONOR.                      02:01

11           **THE COURT:**  PLEASE.

12           **MS. GLASER:**  A FEW THINGS.

13           I HAVE NO DOUBT ABOUT MR. QUINN'S INTEGRITY.  I WANT

14  TO BE VERY CLEAR ABOUT THAT.  BUT HE'S BEEN TOLD THE WRONG

15  INFORMATION, AND HE'S PROVIDING IT TO YOUR HONOR.                    02:02

16           LET ME READ FROM MS. MARINE'S DEPOSITION; NOT MINE,

17  NOT A LAWYER; THEIR 30(B)(6) WITNESS.  THIS IS VOLUME III,

18  TAKEN ON JUNE 26, 2007.

19           **THE COURT:**  JUST AS A PREFACE TO YOUR READING IT,

20  COUNSEL, WAS SHE CALLED FOR THIS TO BE A 30(B)(6) WITNESS?           02:02

21           **MS. GLASER:**  YOU BET SHE WAS.  AND LET ME BE VERY

22  CLEAR ABOUT THAT.

23           AT HER FIRST DEPOSITION, MR. COREY, WHO'S IN THE

24  COURTROOM HERE TODAY, SAID HE WANTED TO STATE ON THE RECORD

25  THAT MS. MARINE IS THE 30(B)(6) DESIGNEE REGARDING THE ZEUS          02:02

JULY 24, 2006                ED CV 04-09049

EXHIBIT __6__ PAGE 89

64

1    SYSTEM.  ON APRIL 4, 2007, MR. COREY AGAIN SAID, "WITH RESPECT

2    TO THE DOCUMENT MANAGEMENT SYSTEM USED BY THE DESIGNERS, I.E.,

3    THE ZEUS SYSTEM, THE 30(B)(6) DESIGNEE WAS JULIA MARINE";

4    SPECIFICALLY IDENTIFIED BY MR. COREY.

5            **THE COURT:**  ALL RIGHT.

6            **MS. GLASER:**  SO THIS NONSENSE IS GOING TO STOP.

7            NOW, LET ME TELL YOU WHAT MS. MARINE SAYS IN HER

8    DEPOSITION:

9            THIS IS A QUESTION ASKED ON PAGE 243, LINE 11:

10           "DO YOU KNOW WHETHER MATTEL HAS PRESERVED BACKUP         02:03

11   TAPES FOR THE ZEUS FILE SERVER FROM 1999?"

12           ANSWER, LINE 14:  "I'M NOT AWARE OF BACKUPS THAT

13   OLD."

14           QUESTION:  "ARE YOU AWARE OF WHETHER MATTEL HAS

15   PRESERVED BACKUP TAPES FROM THE ZEUS SERVER FROM THE YEAR     02:03

16   2000?"

17           "I DON'T THINK WE HAVE ANYTHING GOING BACK SO FAR,"

18   SHE SAYS, UNDER OATH.

19           SHE'S THEN ASKED ABOUT EACH YEAR, AND NOT UNTIL

20   2005 -- AND IT'S ALL -- I'M READING FROM PAGE 243.            02:03

21           **THE COURT:**  BUT, COUNSEL, IF I ACCEPT THAT, THAT MAY

22   SUGGEST THAT THEY PUT FORWARD A VERY POOR 30(B) WITNESS; IT

23   DOESN'T INDICT THE REPRESENTATION THAT, IN FACT,

24   NOTWITHSTANDING HER FAILURE TO BE AWARE OF THE BACKUP TAPES,

25   THAT THERE WERE AND THAT THERE ARE, IN FACT, BACKUP TAPES.    02:04

JULY 24, 2006                    ED CV 04-09049

EXHIBIT __6__ PAGE 90

65

1        MS. GLASER:  OKAY.

2        MR. MOORE WAS SITTING AT HER DEPOSITION.  MR. MOORE

3   PREPARED HER FOR HER DEPOSITION, YOUR HONOR.  SHE TESTIFIED,

4   WHEN ASKED, "WHAT DID YOU DO TO PREPARE FOR YOUR DEPOSITION?"

5   THAT HE PREPARED HER FOR THE DEPOSITION.  SHE'S ONLY THERE TO    02:04

6   TALK ABOUT THE ZEUS SYSTEM.  SHE'S NOT THERE TO TALK ABOUT

7   ANYTHING ELSE.  AND MR. MOORE DOESN'T SAY A WORD.

8        THE COURT:  THAT'S NOT HOW DEPOSITIONS ARE CONDUCTED,

9   COUNSEL.

10        MS. GLASER:  OKAY.                                          02:04

11        TWO MONTHS LATER, WE MAKE A MOTION FOR SPOLIATION.

12   WELL, SHE DIDN'T CORRECT HER DEPOSITION.  SHE'S NOT CORRECTING

13   HER DEPOSITION.  THE LAWYERS ARE READING THE DEPOSITION.  THE

14   ONLY REASON WE THEORETICALLY KNOW THE TRUTH TODAY IS BECAUSE WE

15   MADE A SPOLIATION MOTION.                                       02:04

16        NOW, WHAT IS THAT ABOUT?

17        THE COURT:  WELL, YOU SHOULD NOT HAVE HAD TO DO THAT

18   TO GET TO THE BOTTOM LINE.  BUT AT THE SAME TIME, IS WHAT

19   MR. QUINN IS TELLING ME OR REPRESENTING TO THE COURT TRUE OR

20   NOT TRUE?                                                       02:05

21        MS. GLASER:  I HAVE NO IDEA, YOUR HONOR, BECAUSE

22   MS. MARINE SAYS THEY DON'T EXIST; MR. MOORE SAYS THEY DO; I'VE

23   NEVER SEEN THEM; THEY'VE NEVER BEEN PROVIDED TO US; AND THE

24   CONCEPT THAT YOUR HONOR IS BEING TOLD AND WE'RE BEING TOLD

25   TODAY, 'OH, WE'RE PROVIDING DOCUMENTS.  WE HAVE PROVIDED        02:05

66

1   DOCUMENTS FROM THE ZEUS SYSTEM FROM THAT BACKUP.'

2          I HAVE NO IDEA IF THAT'S TRUE, BECAUSE WE DON'T KNOW;

3   WE'VE NEVER SEEN THEM; WE HAVE NOT HAD AN ABILITY WHATSOEVER TO

4   INDEPENDENTLY LOOK.

5          THAT'S JUST THE ZEUS SYSTEM, THOUGH.  LET'S TALK

6   ABOUT THE E-MAIL SYSTEM FOR A MINUTE.

7          YOU JUST HEARD --

8          THE COURT:  WELL, BEFORE WE MOVE ON FROM THE ZEUS

9   SYSTEM TO THE E-MAIL, BECAUSE THESE ARE THE TWO BIG ISSUES IN

10  MY MIND AT THIS POINT, THE ZEUS AND THE E-MAIL, PUTTING ASIDE

11  WHAT MS. MARINE SAID -- AND IT'S CLEAR THAT SHE SAID -- THE

12  QUESTION WAS ASKED, AS YOU JUST PHRASED IT, "DO YOU KNOW

13  WHETHER," AND SHE SAID, "I AM NOT AWARE," WHICH KIND OF

14  UNDERCUTS HER FOUNDATION --

15         MS. GLASER:  NO, NO.  SHE THEN SAYS, IN A FOLLOW-UP

16  QUESTION, "ARE THERE ANY BACKUP TAPES FOR 1999?"  SHE SAYS SHE

17  DOESN'T KNOW OF ANY; SHE DOESN'T THINK THAT ANY GO BACK THAT

18  FAR.

19         THE COURT:  THAT'S A FOUNDATIONAL PROBLEM WITH HER

20  TESTIMONY.  SHE DOESN'T KNOW.  SHE'S NOT SAYING, YES,

21  DEFINITIVELY THERE ARE OR, NO, DEFINITIVELY THERE ARE NOT.

22  SHE'S SAYING, "I DON'T KNOW."

23         NOW, I UNDERSTAND YOUR FRUSTRATION, AND I'M VERY

24  SYMPATHETIC TO THE FRUSTRATION OF CALLING FOR A 30(B) WITNESS

25  AT A DEPOSITION AND NOT GETTING A STRAIGHT ANSWER.

02:05

02:05

02:06

02:06

02:06

JULY 24, 2006            ED CV 04-09049

EXHIBIT __6__ PAGE _92_

67

1          MS. GLASER:  BY THE WAY, SHE WASN'T PRESENTED ONCE AS

2    A 30(B)(6).  NOT TWICE.  THREE TIMES, YOUR HONOR, OVER A PERIOD

3    OF NINE MONTHS.  AND WE STILL, AS WE STAND HERE TODAY, ARE

4    BEING TOLD NOW THERE ARE TAPES.  OH, AND BY THE WAY, YOU'RE

5    BEING TOLD DOCUMENTS HAVE BEEN PRODUCED FROM THESE TAPES?          02:06

6          I HAVE NO WAY OF KNOWING THAT.

7          WE HAVEN'T SEEN ANY.

8          THE COURT:  BUT GETTING BACK TO MY POINT, WHEN YOU'RE

9    IN THAT KIND OF DEPOSITION AND YOU'RE HEARING FROM THE WITNESS,

10   "I'M NOT AWARE," OR "I DON'T KNOW" --                             02:07

11         MS. GLASER:  NO.  SHE'S NOT SAYING, "I DON'T KNOW."

12         YOUR HONOR, SHE SAYS RIGHT HERE -- THE PAGES I CITED

13   YOU, "WE DON'T HAVE BACKUP TAPES GOING BACK THAT FAR."

14         MR. QUINN:  LET'S HEAR THE TESTIMONY.

15         THE COURT:  COUNSEL, I THINK I HEARD IT MYSELF TO SAY        02:07

16   THAT "I'M NOT AWARE" AND "I DON'T KNOW."

17         MR. QUINN:  THE TESTIMONY IS, "TO YOUR KNOWLEDGE" --

18         THE COURT:  MR. QUINN, COUNSEL IS MORE THAN CAPABLE.

19         MR. QUINN:  I APOLOGIZE.

20         THE COURT:  THANK YOU.                                      02:07

21         MS. GLASER:  "ARE YOU AWARE OF WHETHER MATTEL HAS

22   PRESERVED BACKUP TAPES FROM THE ZEUS SERVER FROM THE YEAR

23   2000?"

24         "I DON'T THINK WE HAVE ANYTHING GOING BACK THAT FAR."

25         CALL ME CRAZY.  I ACTUALLY --                               02:07

68

1    **THE COURT:**  IT'S THE THIRD WORD THAT SHE USED IN THAT

2  SENTENCE:  "I DON'T 'THINK.'"

3    AND WHEN YOU'VE GOT A WITNESS HERE SAYING, "I DON'T

4  THINK," OR "I'M NOT AWARE," YOU DON'T HAVE A VERY GOOD 30(B)

5  WITNESS.  AND THAT'S SOMETHING YOU'RE ENTITLED TO, AND THAT       02:07

6  WOULD HAVE BEEN A REALLY GOOD TIME TO STOP THAT DEPOSITION AND

7  SAY, "GET US SOMEBODY WHO'S NOT THINKING OR GUESSING OR

8  SPECULATING OR IS NOT AWARE, AND GET US SOMEBODY WHO KNOWS WHAT

9  THEY'RE TALKING ABOUT."

10    BASED ON THAT RECORD, IT'S HARD FOR ME TO SAY NOW        02:08

11  THAT YOU WERE -- YOU'RE ASKING ME TO CALL MR. QUINN AND THESE

12  LAWYERS HERE LIARS.

13    **MS. GLASER:**  I'M ASKING YOU TO CALL THIS GENTLEMAN

14  BACK HERE NOT A TRUTHTELLER, YOUR HONOR.  AND I SAY THAT VERY

15  RELUCTANTLY.  I DON'T THINK MR. QUINN IS A LIAR.        02:08

16    **THE COURT:**  MR. MOORE DID NOT INTERRUPT AN ONGOING

17  DEPOSITION TO INTERJECT.

18    **MS. GLASER:**  NO.  MR. MOORE DIDN'T CORRECT THE

19  DEPOSITION AND DIDN'T HAVE MS. MARINE CORRECT THE DEPOSITION

20  WHEN HE PURPORTEDLY, IN HIS DECLARATION TWO MONTHS LATER, KNOWS   02:08

21  THAT THERE ARE ALLEGEDLY ZEUS TAPES THAT WE HAVE NEVER SEEN, WE

22  HAVE NEVER BEEN GIVEN ACCESS TO, AND WE DON'T HAVE DOCUMENTS

23  FROM.

24    **THE COURT:**  HOW WOULD THAT DEPOSITION HAVE BEEN

25  CORRECTED, FROM YOUR PERSPECTIVE?        02:08

69

1    LET'S ASSUME THAT MR. QUINN IS TELLING US THE TRUTH

2    TODAY, AS THE COURT IS DOING, HOW WOULD THAT DEPOSITION HAVE

3    BEEN CORRECTED?  YOU WOULD HAVE GOTTEN A LETTER FROM MR. MOORE

4    SAYING, "OUR 30(B)(6) WITNESS DIDN'T MEAN TO SAY, 'I WASN'T

5    AWARE'"?  SHE WAS AWARE?                                    02:09

6         SHE CAN'T SAY THAT IF SHE WASN'T AWARE.

7         **MS. GLASER:**  NO.  WHAT SHE WOULD HAVE SAID IS --

8    MR. MOORE WOULD SAY, "LOOK, WE HAVE THESE" -- NOT TO ME -- "WE

9    HAVE THESE TAPES.  NOW YOU UNDERSTAND THAT WE HAVE THESE BACKUP

10   TAPES.  YOU OR I NEED TO CORRECT THE RECORD, BECAUSE THOSE     02:09

11   BACKUP TAPES EXIST, AND WE HAVE MISLED MGA AND WE HAVE MISLED

12   THE COURT."

13        THAT'S WHAT THEY SHOULD HAVE DONE.  IT DOESN'T

14   HAPPEN, ALLEGEDLY, UNTIL WE MAKE A MOTION FOR SPOLIATION.

15        **THE COURT:**  BUT DO YOU SEE HOW THIS HAS CHANGED?    02:09

16   YOU'VE GONE FROM AN ARGUMENT WHICH SAYS I SHOULD ISSUE

17   TERMINATING SANCTIONS BECAUSE THEY HAVE DESTROYED EVIDENCE, TO

18   I SHOULD ISSUE TERMINATING SANCTIONS BECAUSE, 'WELL, THEY

19   REALLY HAVEN'T DESTROYED EVIDENCE, BUT THEY KIND OF LED US TO

20   BELIEVE THAT THEY MIGHT HAVE DESTROYED EVIDENCE, BUT THEY      02:09

21   REALLY DIDN'T.'

22        **MS. GLASER:**  THAT WAS THE LAST THING I SAID BEFORE I

23   SAT DOWN.

24        I THINK IT IS INCUMBENT -- I SAY THIS RESPECTFULLY TO

25   THE COURT -- THAT MR. MOORE -- NOT TODAY, BECAUSE I UNDERSTAND  02:09

JULY 24, 2006                    ED CV 04-09049

EXHIBIT ___6___ PAGE 95

1   YOU HAVE OTHER MATTERS -- BE PUT UNDER OATH, BECAUSE WE DON'T

2   LEARN ABOUT THESE ZEUS BACKUP TAPES ALLEGEDLY UNTIL HE FILES A

3   DECLARATION IN OPPOSITION TO THIS MOTION.

4          I DON'T BELIEVE HIM.  I DON'T BELIEVE THAT WE HAVE

5   BEEN PROVIDED DOCUMENTS FROM THE ZEUS BACKUP TAPES.  I DON'T

6   THINK THE COURT HAS BEEN PROVIDED THOSE DOCUMENTS.

7          THE COURT:  COUNSEL, TODAY IS THE DAY FOR THE

8   EVIDENTIARY HEARING.  IF YOU WOULD LIKE TO CALL MR. MOORE AND

9   ASK HIM ABOUT THAT, YOU MAY DO SO.

10         MS. GLASER:  I WOULD LIKE TO, AND I WOULD LIKE TO

11  MAKE A COUPLE MORE COMMENTS.

12         I HEARD MR. QUINN CAREFULLY TALK ABOUT THE E-MAIL

13  SYSTEM.

14         THE COURT:  YES.  AND WHAT THEY DID --

15         MS. GLASER:  LEFT TO THE JUDGMENT OF AN UNKNOWN GROUP

16  OF 35 PEOPLE -- BY THE WAY, THERE IS NO -- AND I'M NOT DOUBTING

17  MR. QUINN FOR A MOMENT; I'M SURE THAT'S WHAT HE'S BEEN TOLD.

18  THERE IS NO DECLARATION THAT SAYS, 'BY THE WAY, WE ARBITRARILY

19  PICKED 35 PEOPLE.'

20         THE COURT:  WAIT A SECOND.  I THOUGHT I DID READ

21  SOMETHING TO THAT EFFECT.

22         I'M GOING TO HAVE TO RELY ON PLAINTIFF'S COUNSEL TO

23  DIRECT ME TO IT, BUT I THOUGHT THEY DID LIST THOSE INDIVIDUALS

24  THAT THEY CONTACTED IN THE SURREPLY.

25         MS. GLASER:  NO.

02:10
02:10
02:10
02:10
02:11

JULY 24, 2006                    ED CV 04-09049

EXHIBIT  6  PAGE  96