EXHIBIT  1

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-443-3000 FAX 213-443-3100

WRITER'S DIRECT DIAL NO.
**(213) 443-3223**

WRITER'S INTERNET ADDRESS
**timalger@quinnemanuel.com**

March 29, 2007

**VIA FACSIMILE AND U.S. MAIL**

James P. Jenal, Esq.
O'Melveny & Myers, LLP
400 South Hope Street
Los Angeles, California  90071

Re:   <u>Mattel, Inc. v. MGA Entertainment, Inc.</u>

Dear Jim:

This letter confirms our telephone discussion of March 19 and subsequent exchange of emails, in which we agreed that Mattel and MGA would make their productions of documents as single-page TIFF digital files accompanied by Concordance and Opticon load files.  At MGA's request, to accommodate MGA's document vendor, Mattel will (1) produce color documents to MGA in JPEG format (rather than TIFF), (2) when compression is appropriate, use Group 4 compression (rather than LZW), and will provide Summation load files.  We acknowledged that there might be special circumstances where small-quantity productions on paper might be necessitated by the nature of the documents or extreme limitations as to time.  When such departures from the norm occur, the producing party will inform the receiving party of the departure from the norm as soon as possible in advance of the production, and explain the need for the departure.

On occasion, a receiving party might wish to obtain from the producing party a document's metadata and/or a copy of the document in its native format, and, by agreeing to the procedure in the paragraph above, the parties do not waive their rights to such discovery.  We agreed that the receiving party should notify the producing party of such a request in writing, specifying the documents at issue by Bates number.  If the producing party declines to produce the documents or information as requested, the parties will engage in a meet-and-confer process and, if appropriate, any party may bring a motion seeking relief pursuant to the Stipulation for Appointment of a Discovery Master dated December 6, 2006.

**quinn emanuel urquhart oliver & hedges, llp**

NEW YORK | 515 Madison Avenue, 17th Floor, New York, New York 10017 | TEL 212-702-8100 FAX 212-702-8200
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94111 | TEL 415-875-6600 FAX 415-875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL 650-801-5000 FAX 650-801-5100
PALM SPRINGS | 45-025 Manitou Drive, Suite 10, Indian Wells, California 92210 | TEL 760-345-4757 FAX 760-345-2414
SAN DIEGO | 4445 Eastgate Mall, Suite 200, San Diego, California 92121 | TEL 858-813-3107 FAX 858-813-3136



**EXHIBIT 1**

James P. Jenal, Esq.
March 29, 2007
Page 2

This agreement is not binding on Carter Bryant, nor does it control the manner of production by any other party to Carter Bryant.

If this letter accurately states our agreement, please countersign below, and return this letter to me at your earliest convenience.

Very truly yours,

Timothy L. Alger

MGA agrees and stipulates to the foregoing.

_____
James P. Jenal

EXHIBIT 1   5

EXHIBIT  2

**om:**   Name:   United States District Court
312 North Spring Street
Los Angeles, CA 90012
Voice Phone:  (213) 894-5474

**D:**   Name:   Michael Zeller
Company:

865 S Figueroa St, 10th Floor,
City/State:  Los Angeles, CA 90017-2543
Fax Number:  213-443-3100

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA



## Automated Document Delivery Service

*Notice pursuant to Rule 77(d) FRCiv.P*
*The attached copy is hereby served upon you pursuant to Federal Rule of Civil Procedure 77(d).*

**x Notes:**

se 2:04-CV-09049 : CARTER BRYANT V. MATTEL INC

*rsuant to General Order 06-07, Section F, the following documents shall be submitted in the traditional manner: Pen Registers, Search*
*larrants, Seizure Warrants, Wire Taps, Bond Related Documents, Under Seal and In-Camera Documents, and All Charging Documents*
*(Complaints, Informations, Indictments, and Superseding Charging Documents). All other documents filed in cases unassigned to a*
*judge shall be filed electronically with a copy e-mailed to the criminal intake mailbox for the appropriate division. The proper e-mail*
*address for each division is as follows:*

*Western Division:  CrimIntakeCourtDocs-LA@cacd.uscourts.gov*
*Southern Division:  CrimIntakeCourtDocs-SA@cacd.uscouts.gov*
*Eastern Division:  CrimIntakeCourtDocs-RS@cacd.uscourts.gov.*

*For additional information and assistance, please refer to the CM/ECF page on the Court website at www.cacd.uscourts.gov.*

**Switch to e-mail delivery and get these documents sooner!**
**To switch, complete and submit**
**Optical Scanning Enrollment / Update form G-76.**
**Call 213-894-5474 for help and free technical support.**

*you received this document in error because the attorney with whom this document is directed is no longer the attorney on the case,*
*a Notice of Change of Attorney Information, form G-6, must be filed. If there are other cases which you've received documents for*
*hich you are no longer the attorney, separate notices must be filed for each case. Failure to do so will result in the continued sending*
*of documents to you. Form G-6 is available on the court's website at www.cacd.uscourts.gov or at the Clerk's Office.*

te and time of transmission:          **Wednesday, June 27, 2007 3:04:20 PM**
mber of pages including this cover sheet:  37

## EXHIBIT 2

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
Priority _____ Send _____
Entered _____ Closed _____
JS-5/JS-6 _____ JS-2/JS-3 _____
Scan Only_____ Docketed on CM _____
____THIS CONSTITUTES NOTICE OF
ENTRY AS REQUIRED BY FRCP 77(d)

JUN 27 2007

EASTERN DIVISION
BY _____ DEPUTY

FILED - EASTERN DIVISION
CLERK, U.S. DISTRICT COURT

JUN 27 2007

CENTRAL DISTRICT OF CALIFORNIA
BY    JIM HOLMES    DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

CARTER BRYANT,

               Plaintiff,

v.

MATTEL, INC.,

               Defendant,

_____

AND CONSOLIDATED ACTIONS

CASE NO. CV 04-09049 SGL

CONSOLIDATED WITH
    CV 04-09059 SGL
    CV 05-02727 SGL

ORDER RE MOTIONS HEARD ON
JUNE 11, 2007

     Presently before the Court is a multitude of motions filed by a number of
parties in these consolidated cases. The factual allegations underlying the present
actions are expansive and complex. They are set forth below only to the extent
necessary for the Court's consideration of the present motions. At their essence,
although involving a number of other legal and factual issues, these cases involve
the rights to certain fashion dolls.

     The present motions, six in total, focus on four basic issues: Two of the
motions, filed by certain counter-defendants, address the sufficiency of the
allegations made by Mattel, Inc. ("Mattel") in its counterclaims; most notably, these
motions challenge the sufficiency of the allegations which underlie Mattel's claims
based on the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.

Docket No. 577

**EXHIBIT** 2    7    06/27/07

1   §§ 1961-1968 ("RICO").  Another motion challenges the Court's exercise of

2   personal jurisdiction over a foreign corporation, MGAE de México, S.R.L. de C.V.

3   ("MGA Mexico").  Two additional motions seek review of a ruling, issued by a court-

4   appointed discovery master, overruling objections made during a party's deposition

5   that were based on the attorney-client and joint-defense privileges.  A final motion

6   heard on June 11, 2007, addresses the Court's scheduling order that divided the

7   issues to be tried in these consolidated cases into two phases.  This last motion will

8   be addressed in a separate order.

9        The Court has reviewed the parties' filings regarding these motions and held

10  a hearing on June 11, 2007.  For the reasons and in the manner set forth more fully

11  herein, the Court makes the following rulings regarding these motions:

12       1.      Motion of MGA Entertainment, Inc., ("MGA") and Issac Larian

13  ("Larian") to Dismiss Mattel's Amended Answer and Counterclaims (docket # 189):[1]

14  **GRANTED IN PART AND DENIED IN PART.**

15       2.      Motion of Carter Bryant to Dismiss Counterclaims II, III, V, VII, IX, and

16  XI (docket # 191):  **GRANTED IN PART AND DENIED IN PART.**

17       3.      Motion of MGA Mexico to Dismiss Mattel's Amended Answer and

18  Counterclaims (docket # 266):  **DENIED.**

19       4.      Motion of MGA Objecting to Discovery Master's March 7, 2007, Order

20  (docket # 308):  **GRANTED IN PART AND DENIED IN PART.**

21       5.      Motion of Carter Bryant Objecting to Discovery Master's March 7,

22  2007, Order (docket # 306):  **GRANTED IN PART AND DENIED IN PART.**

23

24

25

26

27

28
_____

   [1] Joining in this Motion were MGA Entertainment (HK) Ltd. ("MGA Hong
Kong"), Carter Bryant ("Bryant"), and MGA Mexico.

**EXHIBIT 2**    8

# I. Factual Allegations

The following allegations appear in the Amended Answer and Counterclaims ("AAC"):

## A.    Bryant's Employment by Mattel

Carter Bryant was hired by Mattel as a Barbie product designer in January 1999. (AAC ¶ 21.) At that time, Bryant signed an "Employee Confidential Information and Inventions Agreement," wherein he agreed not to assist or work for a Mattel competitor while employed by Mattel and that the designs and inventions he created while employed by Mattel were Mattel property. (AAC ¶¶ 22-23.) Bryant also executed a "Conflict of Interest Questionnaire" wherein he certified that, other than as disclosed, he had not worked for a Mattel competitor in the past year, had not engaged in a business transaction with a Mattel competitor that could create a conflict of interest, and that he would inform Mattel immediately if such an event occurred. (AAC ¶¶ 24-25.) While still employed by Mattel, Bryant used Mattel property and resources to develop and design the Bratz concept. (AAC ¶ 26.) Bryant also allegedly enlisted other Mattel employees to perform work on the Bratz line, in some cases, falsely informing those employees that they were working on a Mattel project. (AAC ¶ 27.)

## B.    MGA's Involvement in Bryant's Conduct

MGA knew of and encouraged Bryant's misappropriation of Mattel property and resources. (AAC ¶ 33). Bryant made affirmative misrepresentations to Mattel, including that he was leaving Mattel for "non-competitive" pursuits. (AAC ¶ 28.) Bryant and MGA concealed from Mattel that Bryant developed Bratz while employed by Mattel, that Bryant worked with MGA during the time he was employed by Mattel, and that Larian and others, not Bryant, were the creators of Bratz. (AAC ¶ 35.) Prior to his departure from MGA, Bryant entered into a contract with MGA to provide design services to MGA on a "top priority" basis. (AAC ¶ 36.) Bryant left Mattel's employ on October 20, 2000; three weeks later, MGA

EXHIBIT 2    9

1    showed the Bratz prototypes to focus groups and retailers. (AAC ¶ 29.) Soon

2    thereafter, MGA showed the Bratz line to retailers at the Hong Kong Toy Fair in

3    January, 2001, and then began manufacturing and selling the dolls to retailers for

4    an annual revenue in the excess of $500 million. (AAC ¶¶ 31-32.)

5    **C.    Proprietary Information**

6        **1.    Mexico**

7        Counter-defendant Carlos Gustavo Machado Gomez ("Machado"), nonparty

8    Mariana Trueba Almada ("Trueba"), and nonparty Pablo Vargas San Jose

9    ("Vargas") were upper-level employees at Mattel Mexico. (AAC ¶¶ 38-40.) In the

10   three months before all three simultaneously resigned from Mattel Mexico on April

11   19, 2004, they were in contact with MGA via an email account with the address

12   "plot04@aol.com". (AAC ¶ 42.) The three former employees allegedly used this

13   account to supply MGA with confidential and proprietary Mattel information. (AAC

14   ¶ 42.) The three also copied various proprietary Mattel documents onto USB flash

15   drives prior to resigning. (AAC ¶ 44-46.) Shortly before her departure, Trueba

16   increased her access to Mattel's confidential information and attended a meeting at

17   which Mattel personnel analyzed Barbie programs for the United States, Canada,

18   and South America. (AAC ¶ 47.)

19       Among them, Machado, Trueba, and Vargas stole documents containing

20   information regarding Mattel's future products, production and shipping costs, sales

21   information, customer information, marketing information, and strategic research

22   information both in Mexico and worldwide. (AAC ¶ 48.) The stolen data was not

23   limited to the Mexican market; rather, the information stolen had the potential, and

24   in fact did, give MGA an unfair competitive advantage in the United States and

25   around the world. (AAC ¶ 49.)

26       In an attempt to conceal his actions, Machado ran a software program on his

27   Mattel computer in order to erase information pertaining to his contact with MGA.

28   (AAC ¶ 51.) When Mattel alerted Mexican authorities about the theft, they seized

4                                        **EXHIBIT** 2  10

1   from MGA's Mexico City offices, pursuant to a search warrant, a large number of

2   documents containing Mattel trade secrets and confidential information.  (AAC

3   ¶ 53.)

4        Shortly after the theft, Machado, Trueba, and Vargas traveled to Los

5   Angeles to meet face-to-face with MGA personnel.  (AAC ¶ 52.)

6        2.    **Canada**

7        Jane Brisbois was the Director of Sales for the Girls Division in Canada.

8   (AAC ¶ 71.)  When she was hired in 1999, she agreed to preserve and not disclose

9   Mattel's proprietary information.  (AAC ¶ 71.)  While still employed by Mattel,

10  Brisbois spoke with Larian on September 22, 2005.  (AAC ¶ 74.)  That same day,

11  Brisbois copied approximately 45 Mattel documents containing Mattel trade secret

12  information into a USB flash drive that she took from the Mattel Canada office.

13  (AAC ¶ 74.)  The files taken by Brisbois included documents regarding Mattel sales,

14  advertising strategies, market analyses, product launch dates, and profit margins in

15  Canada, Mexico, and the United States.  (AAC ¶ 74.)  Four days later, she resigned

16  from Mattel.  (AAC ¶ 74.)

17       When Mattel learned of Brisbois' misappropriation of Mattel documents, it

18  notified Canadian law enforcement officials, who were able to recover the flash

19  drive and the documents from Brisbois.  (AAC ¶ 75.)

20       3.    **United States**

21       Ron Brawer was Mattel's Senior Vice President and General Manager.

22  (AAC ¶ 55.)  On September 17, 2004, Brawer informed Mattel that he was leaving

23  Mattel to work for MGA.  (AAC ¶ 63.)  During Brawer's exit interview, he falsely

24  represented that he had returned all proprietary information to Mattel; specifically,

25  Brawer took the information in his contacts file which included contact information

26  for Mattel customers and Mattel employees.  (AAC ¶ 68.)  Brawer has since used

27  the contact information to induce certain Mattel employees to join MGA and

28  misappropriate Mattel trade secrets.  (AAC ¶ 69.)

**EXHIBIT** 2          \\

1    MGA has also allegedly hired at least 25 other Mattel employees, some of

2    whom have provided MGA with Mattel's confidential information.  (AAC ¶ 77.)

3    **D.**    **Larian's Communications Regarding Mattel's New Product Line**

4        On May 12, 2006, Larian sent an email message to an email distribution list

5    that included a reference to a new Mattel Barbie line ("MY SCENE MY BLING

6    BLING") which Mattel had not yet made public.  (AAC ¶ 79.)  The distribution of the

7    email included members of the media and many of Mattel's most significant

8    customers.  (AAC ¶ 78.)  Soon after sending the email, Larian began calling these

9    significant customers and making false representations about the product;

10   specifically, Larian told each that it was the only retailer to purchase the product

11   and that Mattel would not be supporting the product with television advertising.

12   (AAC ¶ 80.)

13   **E.**    **Exhibit C**

14       In Exhibit C to the AAC, Mattel references a number of communications,

15   numbering well over one hundred, that it contends constitutes predicate acts of mail

16   fraud or wire fraud.  Exhibit C does not describe the contents of those

17   communications.

18                      **II. Counterclaims Asserted**

19       Based on these allegations, Mattel asserts the following counterclaims:

20   (1) Copyright Infringement, including willful, vicarious, and contributory

21   infringement, asserted against MGA, MGA Hong Kong, Larian and Bryant;

22   (2) violation of RICO's substantive prohibition, 18 U.S.C. § 1962(c), asserted as

23   authorized by 18 U.S.C. § 1964(c) against all defendants, which alleges predicate

24   acts of, *inter alia*, mail fraud, wire fraud, and criminal copyright infringement; (3) a

25   violation of RICO's prohibition against conspiracies, 18 U.S.C. § 1962(d), asserted

26   against all defendants; (4) state-law misappropriation of trade secrets against MGA,

27   MGA Mexico, Larian, and Machado; (5) breach of contract, asserted against Bryant

28   only and based on certain employment agreements between Bryant and Mattel;

6

**EXHIBIT 2**            12

1   (6) intentional interference with contract, asserted against MGA and Larian and

2   based on Bryant's employment agreements; (7) breach of fiduciary duty, asserted

3   against Bryant and Machado; (8) aiding and abetting breach of fiduciary duty,

4   asserted against MGA and Larian; (9) breach of the duty of loyalty, asserted

5   against Bryant and Machado; (10) aiding and abetting breach of the duty of loyalty,

6   asserted against MGA and Larian; (11) conversion, asserted against all counter-

7   defendants; (12) violation of California's unfair competition law, Cal. Bus. & Prof.

8   Code § 17200, asserted against all counter-defendants; and finally, (13) a claim for

9   declaratory relief.

10       **III. Counter-Defendants' Motions to Dismiss for Failure to State a Claim**

11           The parties have moved to dismiss a number of Mattel's counterclaims on

12   various grounds. The Court addresses each claim in turn, considering at all times

13   the standard for dismissal pursuant to Fed. R. Civ. P. 12(b)(6).

14   A.    <u>Standard for Dismissal Pursuant to Fed. R. Civ. P. 12(b)(6)</u>

15           In lieu of an answer, a party may, as the counter-defendants have here, file a

16   motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), which provides that such a

17   motion may be made where the pleader has "fail[ed] to state a claim upon which

18   relief can be granted." <u>Id.</u> In deciding a Rule 12(b)(6) motion, the Court must also

19   consider the requirements of Fed. R. Civ. P. 8(a), which requires only a "short and

20   plain statement of the claim showing that the pleader is entitled to relief" or, when

21   the claim at issue avers fraud or mistake, the motion must be considered in

22   conformity with Fed. R. Civ. P. 9(b), which requires fraud and mistake to be pleaded

23   with particularity. <u>See</u> 5A Charles A. Wright & Arthur Miller, <u>Federal Practice and</u>

24   <u>Procedure</u>, §1356 (1990); James Wm. Moore, <u>Moore's Federal Practice</u>, Vol. 2

25   § 12.34[1][c].

26           In bringing a motion pursuant to Rule 12(b)(6), the moving party has the

27   burden of persuading the Court that the complaint has failed to state a claim upon

28   which relief can be granted. <u>Kehr Packages, Inc. v. Fidelcor, Inc.</u>, 926 F.2d 1406,

**EXHIBIT** 2      13

1   1409 (3d Cir.), cert. denied, 501 U.S. 1222 (1991). In considering the motion,

2   "courts must consider the complaint in its entirety," and read it in the light most

3   favorable to the plaintiff, accepting as true all factual allegations in the complaint, as

4   well as reasonable inferences to be drawn therefrom. Tellabs, Inc. v. Makor Issues

5   & Rights, Ltd., __ U.S. __, No. 06-484, 2007 WL 1773208, at *9 (June 21, 2007);

6   Pareto v. F.D.I.C., 139 F.3d 696, 699 (9th Cir. 1998). However, the Court need not

7   accept any unwarranted deductions of fact, or conclusory legal statements cast in

8   the form of factual allegations.  See Western Mining Council v. Watt, 643 F.2d 618,

9   624 (9th Cir.), cert. denied, 454 U.S. 1031 (1981).

10          Generally, a court cannot consider evidence in deciding a Rule 12(b)(6)

11  motion; however, a court may consider exhibits attached to the complaint as well as

12  documents that are not physically attached to the complaint but "whose contents

13  are alleged in [the] complaint and whose authenticity no party questions." Branch v.

14  Tunnell, 14 F.3d 449, 453-54 (9th Cir. 1994), cert. denied, 512 U.S. 1219 (1994).

15  Facts of which a court may take judicial notice pursuant to Fed. R. Evid. 201 are

16  also properly considered.  Mir v. Little Company of Mary Hospital, 844 F.2d 646,

17  649 (9th Cir. 1988).

18  **B.     RICO Claims**

19          The counter-defendants devote most of their motions to the sufficiency of the

20  allegations regarding Mattel's RICO claims. The Court's analysis begins, as it must

21  when considering a federal statute, with the language of that statute. The

22  substantive RICO prohibition at issue is found in 18 U.S.C. § 1962(c):

23          It shall be unlawful for any person employed by or associated

24          with any enterprise engaged in, or the activities of which affect,

25          interstate or foreign commerce, to conduct or participate, directly or

26          indirectly, in the conduct of such enterprise's affairs through a pattern

27          of racketeering activity or collection of unlawful debt.

28  Id. Conspiracies to violate this substantive prohibition are themselves prohibited by

8

EXHIBIT 2        14

1   § 1962(d), which states that "[i]t shall be unlawful for any person to conspire to

2   violate any of the provisions of subsection (a), (b), or (c) of this section."  Id.  Many

3   of these terms are defined by the statutory language, including "racketeering

4   activity," "enterprise," and "pattern of racketeering activity":

5       (1) "racketeering activity" means . . . (B) any act which is

6   indictable under any of the following provisions of title 18, United

7   States Code: . . . section 1341 (relating to mail fraud), section 1343

8   (relating to wire fraud), . . . section 1512 (relating to tampering with a

9   witness, victim, or an informant), . . . section 1952 (relating to

10  [interstate and foreign travel or transportation in aid of racketeering

11  enterprises]), [and] section 2319 (relating to criminal infringement of a

12  copyright)[.]

13          . . . .

14      (4) "enterprise" includes any individual, partnership,

15  corporation, association, or other legal entity, and any union or group

16  of individuals associated in fact although not a legal entity;

17      (5) "pattern of racketeering activity" requires at least two acts of

18  racketeering activity, one of which occurred after the effective date of

19  this chapter and the last of which occurred within ten years (excluding

20  any period of imprisonment) after the commission of a prior act of

21  racketeering activity[.]

22  18 U.S.C. § 1961.

23      In considering a Rule 12(b)(6) motion seeking to dismiss a RICO claim, the

24  Court measures the sufficiency of alleged predicate acts of wire fraud and mail

25  fraud by the Rule 9(b) "pleading-with-particularity" standard; however, the Court

26  measures the sufficiency of all other predicate acts by the more lenient standard set

27  forth in Rule 8(a).  Compare Fed. R. Civ. P. 9(b) ("In all averments of fraud or

28  mistake, the circumstances constituting fraud or mistake shall be stated with

EXHIBIT 2                    15

1   particularity.  Malice, intent, knowledge, and other condition of mind of a person

2   may be averred generally.")  with Fed. R. Civ. P. 8(a) ("A pleading which sets forth a

3   claim for relief, . . . shall contain . . . (2) a short and plain statement of the claim

4   showing that the pleader is entitled to relief . . . ."); see Lancaster Community Hosp.

5   v. Antelope Valley Hosp. Dist., 940 F.2d 397, 405 (9th Cir. 1991) (applying Rule

6   9(b) standard to allegations of mail fraud and noting that "[t]he Ninth Circuit has

7   repeatedly insisted that [Rule 9(b)] be followed in RICO actions alleging the

8   predicate act of mail fraud."), cert. denied, 502 U.S. 1094 (1992).

9        In order to state its claim under § 1962(c), Mattel "must allege (1) conduct

10  (2) of an enterprise (3) through a pattern (4) of racketeering activity (5) causing

11  injury to [its] business or property."  Ove v. Gwinn,  264 F.3d 817, 825 (9th Cir.

12  2001) (internal quotation marks and citation omitted).  Here, counter-defendants'

13  motions challenge the first, second, fourth, and fifth elements.

14       1.      "Conduct or Participate"

15       Bryant contends that his role in any alleged scheme or enterprise is too

16  tenuous to constitute the "conduct" necessary to impose RICO liability.  In order to

17  have RICO liability imposed upon him, a defendant must "conduct or participate,

18  directly or indirectly, in the conduct of [an] enterprise's affairs through a pattern of

19  racketeering activity . . . ."  18 U.S.C. § 1962(c).  The United States Supreme Court

20  has elaborated on this statutory language in Reves v. Ernst & Young, 507 U.S. 170,

21  179 (1993), wherein it noted:

22            [T]he word "participate" makes clear that RICO liability is not limited to

23            those with primary responsibility for the enterprise's affairs, just as the

24            phrase "directly or indirectly" makes clear that RICO liability is not

25            limited to those with a formal position in the enterprise, but some part

26            in directing the enterprise's affairs is required.

27  Id.  Here, Mattel has alleged that Bryant secretly developed Bratz while employed

28  by Mattel and using Mattel's resources and employees, that he concealed that fact

**EXHIBIT 2**                    16

1   when he had a duty to disclose it, and that he did these things in order to facilitate

2   the development of the Bratz concept by Mattel's direct competitor, in violation of,

3   *inter alia*, criminal copyright law.  These allegations, if proven to be true, are

4   sufficient to impose RICO liability on Bryant.

5       **2.    Enterprise**

6           Bryant's motion challenges the sufficiency of the allegations regarding a

7   RICO enterprise.  That enterprise is alleged to be an "association-in-fact" enterprise

8   comprised of the counter-defendants, Brawer, Trueba, Vargas, Brisbois, and

9   others.  (AAC ¶ 89.)  Mattel alleges that counter-defendants participated in or

10  conducted the affairs of the association-in-fact enterprise through a pattern of

11  racketeering activities, including, as detailed in the AAC, predicate acts of mail

12  fraud, wire fraud, evidence tampering, interstate and foreign travel to aid

13  racketeering activities, and criminal copyright infringement.  (AAC ¶ 90.)  The

14  counter-defendants' goal is alleged to have been to "execut[e] or attempt to

15  execut[e] [a] scheme to improperly defraud Mattel and steal its trade secret or

16  otherwise confidential and proprietary information . . . ."  (AAC ¶ 90.)

17          A recent *en banc* decision of the Ninth Circuit sets forth a comprehensive

18  analysis of the sufficiency of allegations regarding a RICO enterprise necessary to

19  state a claim.  See Odom v. Microsoft Corp., 486 F.3d 541, 2007 WL 1297249 (9th

20  Cir. 2007) (designated for publication).  That decision provides the blueprint for the

21  Court's present analysis.

22          *Odom* involved an alleged scheme involving consumers who purchased

23  computers from Best Buy retail stores.  Id. at 543.  The computers would include a

24  Microsoft compact disc that the cashier would scan; the consumer's credit card was

25  also scanned for purchase.  Id.  The credit card information was transmitted to

26  Microsoft, and Microsoft would, at some point, begin making unauthorized charges

27  to the credit card used to purchase the computer, ostensibly for Microsoft's

28  provision of internet services.  Id.  Odom brought substantive RICO and RICO

**EXHIBIT** 2          17

1   conspiracy claims based on these allegations. Id. at 544.

2       The Ninth Circuit first noted the evidenced judicial resistance to RICO in the

3   lower courts, contrasted with the Supreme Court's four reversals of such narrow

4   readings of RICO. Id. at 545–47 (citing United States v. Turkette, 452 U.S. 576

5   (1981) (rejecting notion that RICO prohibited only the infiltration of legitimate

6   businesses by organized crime); Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 481

7   (1985) (rejecting notion that RICO could be used to impose civil liability only where

8   the defendant had been criminally convicted and that such liability was limited to a

9   narrow measure of damages); National Organization for Women v. Scheidler, 510

10  U.S. 249 (1994) (rejecting the notion that RICO liability could be imposed only when

11  the acts of a RICO enterprise had an economic motive); and Cedric Kushner

12  Promotions v. King, 533 U.S. 158 (2001) (reversing lower court's ruling that no

13  RICO claim was stated where president and sole shareholder of a corporation was

14  alleged to have associated with his wholly owned corporation as a RICO

15  "enterprise," and relying on fact that person and corporation were separate legal

16  entities). In Odom, the Ninth Circuit understandably viewed these four holdings as

17  a "general instruction that we should not read the statutory terms of RICO

18  narrowly." Odom, 486 F.3d at 547 (internal citation omitted).

19      In Odom, the Ninth Circuit clarified -- and relaxed -- the standard for pleading

20  and proving an "associated-in-fact" enterprise such as the one alleged here:

21          The definition of "enterprise" in the text of RICO is fairly

22      straightforward. In its entirety, the definition is as follows: "'enterprise'

23      includes any individual, partnership, corporation, association, or other

24      legal entity, and any union or group of individuals associated in fact

25      although not a legal entity." 18 U.S.C. § 1961(4). As is evident from

26      the text, this definition is not very demanding. A single "individual" is

27      an enterprise under RICO. Similarly, a single "partnership," a single

28      "corporation," a single "association," and a single "other legal entity"

EXHIBIT 2

1   are all enterprises.  At issue in this case is the last kind of enterprise

2   listed in the definition -- a "group of individuals associated in fact."  It is

3   undisputed that a corporation can be an "individual" for purposes of

4   an associated-in-fact enterprise.

5   Id. at 548.

6        The Ninth Circuit acknowledged that "enterprise" must be something greater

7   than merely a pattern of racketeering activity; however, the court rejected the notion

8   that an enterprise must have a particular ascertainable organizational structure.  Id.

9   at 551 ("We take this opportunity to join the circuits that hold that an

10  associated-in-fact enterprise under RICO does not require any particular

11  organizational structure, separate or otherwise.") (citations omitted).  A party need

12  only set forth factual allegations of "a group of persons associated together for a

13  common purpose of engaging in a course of conduct," "evidence of an ongoing

14  organization, formal or informal," and "evidence that the various associates function

15  as a continuing unit."  Id. at 552 (internal citations and quotation marks omitted).

16       As for the common purpose, it was met in Odom, where the plaintiff had

17  alleged the following:

18           [D]efendants had the common purpose of increasing the

19           number of people using Microsoft's Internet Service, and doing so by

20           fraudulent means.  Best Buy furthered this common purpose by

21           distributing Microsoft Internet Trial CD's and conveying its customers'

22           debit and credit card information to Microsoft.  Microsoft then used the

23           information to activate customer accounts.

24  Id.  Here, Mattel has alleged the common purpose of attempting to defraud Mattel

25  and steal its trade secrets.  Mattel's many factual allegations, detailed herein,

26  support this alleged common purpose.

27       As for the "ongoing organization" requirement, the Ninth Circuit in Odom

28  noted that the plaintiffs had met that element, which was met where the

EXHIBIT 2

19

1  organization was alleged to be "a vehicle for the commission of two or more

2  predicate crimes." Id. (internal quotation marks and citation omitted).  The Ninth

3  Circuit noted the following factual allegations:

4          Microsoft and Best Buy established mechanisms for

5      transferring plaintiffs' personal and financial information from Best Buy

6      to Microsoft. That information then allowed Microsoft to activate

7      plaintiffs' Internet accounts without their knowledge or permission.

8      These mechanisms enabled Microsoft to bill plaintiffs improperly for

9      MSN services in 2001, 2002 and 2003.

10  Id. Here, plaintiffs have alleged that the counter-defendants coordinated their many

11  efforts at depriving Mattel of its proprietary information and its intellectual property.

12  The allegations regarding common use of the "plot04@aol.com" email address to

13  transfer confidential Mattel information to MGA support the finding of an "ongoing

14  organization." So, too, do the allegations regarding the repeated communications

15  between Bryant and MGA.

16      The "continuing unit" requirement does not appear to the Court to mandate

17  that the organization continues to this day;[2] rather, the requirement is related to the

18  notion that RICO was not meant to address discrete instances of fraud or criminal

19  conduct.  "[T]he continuity requirement focuses on whether the associates'

20  behavior was 'ongoing' rather than isolated activity." Id. at 553 (internal quotation

21  marks and citation omitted).  Related to that concern, it is also clear to the Court

22  that this requirement is related to the duration of the racketeering activities. See id.

23  ("An almost two-year time span is far more than adequate to establish that Best

24  Buy and Microsoft functioned as a continuing unit.").  Here, the allegations do not

25  reveal that the conduct complained of was mere isolated activity; rather, Mattel sets

26  forth allegations of racketeering activity that spanned a period of three years.  The

27  ────────────────

28      [2] Nevertheless, Mattel alleges that the enterprise exists to this day by virtue
of its continued use of Mattel's information and property.

14            EXHIBIT 2      20

1   allegations describe a scheme consisting of corporate warfare between competitors

2   that has been waged over a long period of time and waged on a number of fronts,

3   both foreign and domestic.  The "continuing unit" requirement is therefore satisfied.

4          Accordingly, the Court finds that Mattel has sufficiently pleaded the existence

5   of a RICO enterprise.

6          3.       **Predicate Acts of Racketeering Activity**

7                   a.       **Mail Fraud and Wire Fraud**

8          The criminal prohibition against mail fraud is found at 18 U.S.C. § 1341:

9                   Whoever, having devised or intending to devise any scheme or

10          artifice to defraud, . . . for the purpose of executing such scheme or

11          artifice or attempting so to do, places in any post office or authorized

12          depository for mail matter, any matter or thing whatever to be sent or

13          delivered by the Postal Service, or deposits or causes to be deposited

14          any matter or thing whatever to be sent or delivered by any private or

15          commercial interstate carrier, or takes or receives therefrom, any such

16          matter or thing, . . . shall be fined under this title or imprisoned not

17          more than 20 years, or both.

18   Id.  The Ninth Circuit has described the elements of mail fraud as "(1) proof of a

19   scheme to defraud; (2) using or causing the use of the mails to further the

20   fraudulent scheme; and (3) specific intent to defraud."  United States v. Rogers, 321

21   F.3d 1226, 1229 (9th Cir. 2003) (internal citation omitted).

22          The criminal prohibition against wire fraud is similar:

23                  Whoever, having devised or intending to devise any scheme or

24          artifice to defraud, . . . transmits or causes to be transmitted by means

25          of wire, radio, or television communication in interstate or foreign

26          commerce, any writings, signs, signals, pictures, or sounds for the

27          purpose of executing such scheme or artifice, shall be fined under this

28          title or imprisoned not more than 20 years, or both.

**EXHIBIT** 2         21

1   18 U.S.C. § 1343.  The Ninth Circuit has described the elements of wire fraud as

2   "(1) a scheme to defraud; (2) use of the wires in furtherance of the scheme; and

3   (3) a specific intent to deceive or defraud."  United States v. Shipsey, 363 F.3d 962,

4   971 (9th Cir. 2004) (citations omitted).

5        As all parties acknowledge, the predicate acts of mail fraud and wire fraud

6   must be pleaded with particularity pursuant to Fed. R. Civ. P. 9(b).  Specifically,

7   Mattel must detail "the time, place, and manner of each act of fraud, [and it must

8   set forth] the role of each defendant in each scheme."  Lancaster Community

9   Hosp., 940 F.2d at 405.  This standard applies in RICO actions alleging predicate

10  acts of mail fraud.  Id.

11       Here, Mattel sets forth allegations of predicate acts of mail fraud and wire

12  fraud referenced in Exhibit C to the AAC.  However, these alleged predicate acts

13  are insufficiently pleaded because they fail to adequately describe the contents of

14  the communications; specifically, they fail to detail time, place and manner of "each

15  act of fraud."  The substantive RICO claim is therefore dismissed to the extent it is

16  premised on those communications.  Mattel is **GRANTED** leave to amend the RICO

17  claim based on this insufficiency; Mattel must attach to the Second Amended

18  Answer and Counterclaims ("SAAC") copies of the referenced communications.

19  The contents of packages referenced in Exhibit C must be described in order to

20  meet the Rule 9(b) requirements.

21       At oral argument, counsel for MGA argued that the substance of many, if not

22  all of the communications, cannot be read to further a scheme to defraud.  That

23  argument will be considered another day, after Mattel files the SAAC.  However, the

24  Court takes the opportunity today to note that, given the broad scope of the alleged

25  scheme to defraud, including the criminal copyright infringement allegations,

26  otherwise innocuous and routine communications regarding day-to-day operations

27  and product development may be found to be in furtherance of that scheme.  See

28  Tellabs, Inc. v. Makor Issues & Rights, Ltd., __ U.S. __, No. 06-484,  2007 WL

EXHIBIT 2        22

1   1773208, at *9 (June 21, 2007) (noting that, in considering a Rule 12(b)(6) motion,

2   "courts must consider the complaint in its entirety").

3        Counter-defendants also argue that Mattel failed to plead each defendant's

4   role in furtherance of the scheme to defraud.  As interpreted by the Ninth Circuit,

5   the Rule 9(b) standard clearly requires that a plaintiff so plead.  Lancaster

6   Community Hosp., 940 F.2d at 405.  However, the Court will view the

7   communications alleged to constitute mail and wire fraud in conjunction with all the

8   allegations set forth regarding the alleged scheme in the counterclaims.  See Flood

9   v. Makowski, No. 3:CV-03-1803, 2004 WL 1908221, at *14 (M.D. Pa., Aug. 24,

10  2004) (applying the principle that reasonable inferences in favor of a plaintiff must

11  be made when considering a Rule 12(b)(6) motion and noting that "[a]lthough

12  Plaintiffs' Complaint does not expressly identify how each particular mail or wire

13  communication furthered the scheme, the Complaint clearly alleges facts which

14  create an unquestionable inference that the alleged communications furthered the

15  scheme.").

16       Counter-defendants also argue that, because the emails alleged to

17  constitute wire fraud were sent among individuals physically located in the same

18  state, Mattel will not be able to establish the interstate nature of the

19  communications.  See 18 U.S.C. § 1343 (setting forth the requirement that

20  communications be transmitted "in interstate or foreign commerce").  Mattel has

21  alleged that the communications were transmitted in interstate or foreign

22  commerce.  (AAC ¶ 93(b).)  This suffices at the pleadings stage; however,

23  eventually Mattel will be called upon to support these allegations with evidence.

24  See First Pacific Bancorp, Inc. v. Bro, 847 F.2d 542, 547 (9th Cir. 1988) (implicitly

25  holding that wire fraud must be supported, at the summary judgment stage, by

26  evidence of interstate wire fraud).

27       The Court dismisses the RICO claim to the extent it is based on the alleged

28  predicate acts of mail fraud and wire fraud because those acts are not pleaded with

EXHIBIT 2        23

1  particularity as required by Rule 9(b).  Mattel is **GRANTED** ten days' leave to file a

2  SAAC that incorporates and attaches and/or describes the communications and the

3  contents of packages referenced in Exhibit C.

**b.   Evidence Tampering**

5        Unlike the mail fraud and wire fraud allegations, the allegations regarding the

6  remaining predicate acts are governed by the more lenient pleading standards of

7  Rule 8(a).  See Slade v. Gates, No. 01-8244-RMT, 2002 WL 31387263, at *6 (C.D.

8  Cal., Oct. 11, 2002).  The Court considers the sufficiency of those remaining

9  allegations pursuant to this Rule.

10       The criminal prohibition against tampering with evidence is found at 18

11  U.S.C. § 1512:

12            Whoever corruptly . . . alters, destroys, mutilates, or conceals a

13        record, document, or other object, or attempts to do so, with the intent

14        to impair the object's integrity or availability for use in an official

15        proceeding . . . shall be fined under this title or imprisoned not more

16        than 20 years, or both.

17  Id.  Mattel's opposition makes clear that its evidence tampering allegations are

18  based upon two categories of documents:  The first category of documents,

19  perhaps composed of only one multi-page document, involves the alleged alteration

20  of Bryant's contract with MGA to remove a fax header showing that the date of its

21  execution, which predated the effective date of Bryant's resignation from Mattel.[3]

22  The second category of documents are those filed with the United States Copyright

23  Office, which are alleged to omit the disclosure that certain Bratz drawings were

24  "works for hire," and which are alleged to have had alterations made to certain

---

26        [3] The AAC merely alleges that counter-defendants Bryant and MGA
27  "tamper[ed] with and defac[ed] documents which showed that . . . Bryant was a
    Mattel employee while he was working for and with MGA . . . ." (AAC ¶ 35.)
28  However, it is clear from other filings by the parties that, at a minimum, this
    allegation refers to MGA's contract with Bryant.

**EXHIBIT 2**          24

1    relevant dates.  (See AAC ¶ 35; Mattel Opp. to MGA's Motion at 9.)

2          As to the first category, a predicate act is sufficiently alleged.  Mattel has

3    alleged that a document was altered in a manner designed to conceal critical

4    evidence, highly relevant to the present official proceeding, regarding the timing of

5    the execution of the document.

6          Conversely, it is unclear whether Mattel has alleged a predicate act with

7    respect to the second category of documents.  The issue of whether submitting

8    fraudulent registrations and "altering relevant dates" on documents submitted to the

9    United States Copyright Office has not been fully briefed by the parties; the issue

10   was framed in this manner only upon the filing of the reply.[4]  Therefore, the Court

11   reserves this issue for a later date, and anticipates that it will be addressed by the

12   parties in a motion to dismiss the SAAC.

13          c.     **Travel Act Violation**

14         Federal criminal law prohibits interstate or foreign travel to aid in

15   racketeering activities.  18 U.S.C. § 1952; see also 18 U.S.C. § 1961 (defining a

16   violation of § 1962 as a RICO predicate act).  In relevant part, the criminal

17   prohibition states:

18          Whoever travels in interstate or foreign commerce or uses the

19          mail or any facility in interstate or foreign commerce, with intent to . . .

20          promote, manage, establish, carry on, or facilitate the promotion,

21          management, establishment, or carrying on, of any unlawful activity,

22          and thereafter performs or attempts to perform . . . [such an act,] shall

23          be fined under this title, imprisoned not more than 5 years, or

24          both . . . .

25                              . . . .

26          As used in this section . . . "unlawful activity" means . . .

27   _____

28          [4] The Court does not view this failure as the fault of any party.

1  extortion, bribery, or arson in violation of the laws of the State in which

2  committed or of the United States . . . .

3  Id. Mattel alleges that Bryant and others traveled in interstate commerce to commit

4  commercial bribery in violation of California's prohibition against commercial

5  bribery, which in relevant part provides:

6      (a) Any employee who solicits, accepts, or agrees to accept

7  money or any thing of value from a person other than his or her

8  employer, other than in trust for the employer, corruptly and without

9  the knowledge or consent of the employer, in return for using or

10  agreeing to use his or her position for the benefit of that other person,

11  and any person who offers or gives an employee money or any thing

12  of value under those circumstances, is guilty of commercial bribery.

13  Cal. Penal Code § 641.3.  Several allegations support a violation of § 641.3(a),

14  which in turn supports a violation of 18 U.S.C. § 1952.  Mattel has alleged that

15  Bryant, while still employed by Mattel, entered into a contract with MGA to provide

16  design services to MGA on a "top priority" basis, and used Mattel property,

17  employees, and resources to develop and design the Bratz concept.

18      Counter-defendants argue that the requirement under California's

19  commercial bribery statute that a violator act "corruptly" is not met because Bryant

20  did not intend to injure Mattel.  Such an intent is not required; rather it is sufficient

21  that Bryant is alleged to have intended to defraud Mattel.  See Cal. Penal Code

22  § 341.3(d)(3) (defining "corruptly" as involving the intent "to injure *or* defraud")

23  (emphasis added).

24      d.   **Criminal Copyright Violations**

25      The parties dispute the relevant pleading standard that governs the

26  allegations which underlie the criminal copyright violation claim.  Counter-

27  defendants would have the Court apply the more exacting Rule 9(b) standards

28  because, in their assessment, the claim "sounds in fraud."  Mattel, however,

**EXHIBIT 2**  26

Case 2:04-cv-09049-DOC-RNB   Document 1195-2   Filed 12/07/07   Page 26 of 41   Page ID #:...

RightFAX                   6/...2007 3:04 #:5...PAGE 022/037        ax Server

1   contends that there is no reason to depart from the more lenient Rule 8(a) standard

2   generally applied to copyright claims because, in its assessment, the claims "sound

3   in copying, not fraud." (Mattel Opposition to MGA's Motion at 4.)

4         The recent Ninth Circuit case on this issue, cited by both parties, stands for

5   the unremarkable proposition that, consistent with Rule 9(b), all *averments* of fraud

6   must be pleaded with particularity, regardless of whether fraud is an essential

7   element of the claim to which the averment relates. See Vess v. Ciba-Geigy Corp.

8   USA, 317 F.3d 1097, 1103 (9th Cir. 2003); Fed. R. Civ. P. 9(b) ("In all *averments*

9   of fraud or mistake, the circumstances constituting fraud or mistake shall be stated

10  with particularity.") (emphasis added).

11        Considering Rules 8(a), 9(b), and the teachings of Vess, a spectrum

12  emerges. At the left end of this spectrum are claims that do not involve any

13  allegations of fraud. Those need only satisfy Rule 8(a)'s "short and plain

14  statement" standard. At the opposite end of the spectrum are claims based solely

15  on fraud, and the facts underlying such a claim must be alleged with particularity

16  pursuant to Rule 9(b). Lying closer to the Rule 9(b) end of the spectrum is a

17  category of claims discussed in Vess:

18        In cases where fraud is not a necessary element of a claim, a

19        plaintiff may choose nonetheless to allege in the complaint that the

20        defendant has engaged in fraudulent conduct. In some cases, the

21        plaintiff may allege a unified course of fraudulent conduct and rely

22        entirely on that course of conduct as the basis of a claim. In that

23        event, the claim is said to be "grounded in fraud" or to "sound in

24        fraud," and the pleading of that claim as a whole must satisfy the

25        particularity requirement of Rule 9(b).

26  Vess, 317 F.3d at 1103-04 (internal citations omitted). It is into this category MGA

27  contends that the allegations of criminal copyright claims fit, and MGA therefore

28  contends that all allegations regarding the criminal copyright claims must be

**EXHIBIT 2**      27

1   pleaded with particularity.

2       However, Vess sets up another category, lying closer to the Rule 8(a) part of

3   the spectrum (but nevertheless requiring pleading with some particularity):

4         In other cases, however, a plaintiff may choose not to allege a

5       unified course of fraudulent conduct in support of a claim, but rather

6       to allege some fraudulent and some non-fraudulent conduct.  In such

7       cases, only the allegations of fraud are subject to Rule 9(b)'s

8       heightened pleading requirements. . . . The rule does not require that

9       allegations supporting a claim be stated with particularity when those

10      allegations describe non-fraudulent conduct.

11        [In other words,] in a case where fraud is not an essential

12      element of a claim, only allegations ("averments") of fraudulent

13      conduct must satisfy the heightened pleading requirements of Rule

14      9(b).  Allegations of non-fraudulent conduct need satisfy only the

15      ordinary notice pleading standards of Rule 8(a).

16   Id. at 1104-05.

17       Whether fraud is an essential element of criminal copyright infringement

18   must be determined by reference to the statutory language and any interpretative

19   case law.  In relevant part, the prohibition against criminal copyright infringement

20   provides: "Any person who violates section 506(a) (relating to criminal offenses) of

21   title 17 shall be punished as provided [herein] in and such penalties shall be in

22   addition to any other provisions of title 17 or any other law." 18 U.S.C. § 2319.  In

23   turn, the relevant provision in 17 U.S.C. § 506 states that "[a]ny person who willfully

24   infringes a copyright shall be punished as provided under section 2319 of title 18, if

25   the infringement was committed . . . for purposes of commercial advantage or

26   private financial gain . . . ." 17 U.S.C. § 506(a)(1)(A).  The elements of the offense

27   are easily gleaned from the straightforward statutory language:  "Criminal

28   infringement of copyright has three elements: (1) infringement of a copyright

**EXHIBIT 2**        28

1   (2) done wilfully (3) for purposes of commercial advantage or private financial gain."

2   United States v. Goss, 803 F.2d 638, 642 (11th Cir. 1986).

3        Clearly, fraud is not an essential element of a criminal copyright claim, taking

4   it out of the category at the far end of the spectrum described above, and

5   necessitating an inquiry into whether Mattel has chosen to incorporate a fraud

6   element into its criminal copyright claim.  The AAC at ¶ 93(e) reveals that the

7   criminal copyright claim is premised upon the "willfull[] infringe[ment of] Mattel's

8   copyrights, including with respect to documents containing Mattel trade secret and

9   confidential information . . . ."  The Opposition fills in more details regarding this

10  claim, noting that the criminal copyright claim is premised upon the Bratz-related

11  works, Bratz-derivative works, and works contained within Mattel's allegedly

12  purloined trade secrets and confidential information.  (Mattel Opposition to MGA's

13  Motion at 5).

14       These allegations do not "allege a unified course of fraudulent conduct and

15  rely entirely on that course of conduct as the basis of a claim" such that the claim

16  could be said to "sound in fraud" and therefore require pleading with particularity as

17  to the entire claim.  The allegations establish that much of the conduct complained

18  of consists of simple copying of the Bratz-related works or the creation of Bratz-

19  derivative works.  Such allegations are unrelated to allegations of fraud.  Therefore,

20  if this claim falls anywhere on the spectrum other than the Rule 8(a) category, it

21  falls in the category described by Vess as those claims in which a claimant chooses

22  to "allege some fraudulent and some non-fraudulent conduct."  Id. at 1104.

23       When one considers that the alleged predicate acts of criminal copyright

24  infringement are but a small part of a larger, and singular, claim brought pursuant to

25  RICO, it is evident that the RICO claim falls neatly into the category of claims that

26  are based partly on fraudulent and partly on non-fraudulent conduct.  The Court

27  has already found that certain fraudulent conduct -- that supporting the alleged

28  predicate acts of mail fraud and wire fraud -- is insufficiently pleaded.  The current

EXHIBIT 2                27

1   focus, however, is whether the allegations supporting the predicate acts of criminal

2   copyright infringement involve fraudulent conduct.

3        Here, there are two types of works allegedly infringed.  The first type is the

4   Bratz-related and Bratz-derivative works.  The second type is Mattel's other trade

5   secrets and confidential information.  Both types are alleged -- with particularity -- to

6   have been procured by MGA through fraudulent conduct, but the *criminal copyright*

7   *infringement predicate acts do not implicate that fraudulent conduct.*  Rather, they

8   implicate only questions of whether counter-defendants wilfully infringed Mattel's

9   works for commercial advantage or private financial gain.  Here, Mattel has

10  sufficiently alleged predicate acts of criminal copyright infringement by alleging that

11  MGA and other counter-defendants willfully infringed its copyrights for purposes of

12  gaining commercial advantage and private financial gain.  As Mattel correctly

13  contends, state of mind, in this instance willfulness, may be pleaded generally.  <u>See</u>

14  <u>Ferguson Beauregard/Logic Controls v. Mega systems, LLC</u>, 350 F.3d 1327, 1343

15  (Fed. Cir. 2003).

16        **4.    <u>Injury to Business or Property</u>**

17        "Recovery under RICO is limited to those injuries flowing from predicate

18  acts . . . ." <u>Resolution Trust Corp. v. Keating</u>, 186 F.3d 1110, 1117 (9th Cir. 1999)

19  (citing <u>Sedima, S.P.R.L. v. Imrex Co., Inc.</u>, 473 U.S. 479, 497 (1985)).  Here, Mattel

20  has alleged damages flowing from the alleged acts of racketeering activity.  (AAC

21  ¶ 96).  Damages easily flow from theft of trade secrets and confidential information

22  committed by a direct competitor and from infringement of copyrights that are

23  alleged to have been used to make millions -- if not billions -- of dollars.

24        Counter-defendants argue that Mattel lacks standing to sue on behalf of its

25  subsidiaries.  This issue arises because many of the allegations of the thefts of

26  trade secrets involve actions taken in Mexico or Canada by employees of Mattel's

27  foreign subsidiaries.  Mattel argues that it is not attempting to sue for damages

28  incurred by its subsidiaries; rather, Mattel alleges that much of the confidential

24                **EXHIBIT 2**        30

1   information stolen by the employees of Mattel's subsidiaries belonged not to

2   Mattel's subsidiaries, but to Mattel itself.  Based on these allegations, Mattel may

3   sue for damages it sustained.  Mattel may not sue for damages incurred by its

4   foreign subsidiaries.

5          **5.     Ruling on Motions to Dismiss**

6          The Motions to Dismiss the RICO claims are **GRANTED** in part.  As set forth

7   herein, the alleged predicate acts of mail fraud and wire fraud are insufficiently

8   alleged, and Mattel is **GRANTED** leave to amend the AAC.

9   **C.     Trade Secrets**

10         MGA contends that Mattel has failed to plead its trade secrets with sufficient

11  particularity to comply with its duties under Cal. Code Civ. P. § 2019.210, which

12  provides:

13              In any action alleging the misappropriation of a trade secret

14          under the Uniform Trade Secrets Act . . . , before commencing

15          discovery relating to the trade secret, the party alleging the

16          misappropriation shall identify the trade secret with reasonable

17          particularity subject to any orders that may be appropriate under

18          Section 3426.5 of the Civil Code [involving in camera reviews and

19          sealing of court documents].

20  Id.  Based on the unambiguous language of the statute, the Court agrees with

21  Mattel's characterization of this requirement as one related to discovery rather than

22  related to pleading.

23         The Court also agrees that, by identifying documents in discovery by Bates-

24  stamp number, Mattel has complied with the dictates of § 2019.210.  See

25  Advanced Modular Sputtering, Inc. v. Superior Court, 132 Cal.App.4th 826, 835-36,

26  (2005) (internal quotation marks and citations omitted) ("[Reasonable particularity]

27  means that the plaintiff must make some showing that is reasonable, i.e., fair,

28  proper, just and rational[,] . . . under all of the circumstances to identify its alleged

EXHIBIT 2          31

1    trade secret in a manner that will allow the trial court to control the scope of

2    subsequent discovery, protect all parties' proprietary information, and allow them a

3    fair opportunity to prepare and present their best case or defense at a trial on the

4    merits."). MGA's complaints regarding the volume of documents so identified, and

5    their skepticism of Mattel appropriately attaching such an identification to many of

6    those identified documents, are not properly addressed at this stage of the

7    proceedings.

8            The motion to dismiss the trade secrets claim on this basis is therefore

9    **DENIED.**

10   **D.**   **Duplicative State-Law Claims**

11           Bryant's motion to dismiss Mattel's duplicative state-law claims is **DENIED.**

12   The state-law counterclaims asserted against Bryant in the AAC admittedly overlap

13   with the claims asserted against him in the 04-9059 case, however, the factual

14   allegations underlying the claims asserted in the AAC are broader in scope than

15   those underlying the claims asserted in the 04-9059 case.

16           **IV. Motion to Dismiss for Lack of Personal Jurisdiction**

17           MGA Mexico challenges this Court's exercise of personal jurisdiction over it.

18   As set forth below, the Court concludes that it may, consistent with California law

19   and the federal Due Process Clause, exercise specific personal jurisdiction over

20   this admittedly foreign corporation.

21   **A.**   **The Constitutional Exercise of Personal Jurisdiction**

22           Where a party moves to dismiss a claim for lack of personal jurisdiction, the

23   party asserting the claim bears the burden of demonstrating that jurisdiction is

24   appropriate. Schwarzenegger v. Fred Martin Motor Co., 374 F.3d 797, 800 (9th Cir.

25   2004). However, in opposing a motion to dismiss for lack of personal jurisdiction,

26   the party asserting the claim need only make a *prima facie* showing of jurisdictional

27   facts. Id. Disputed facts are to be resolved in favor of the exercise of personal

28   jurisdiction. Id.

**EXHIBIT 2**          **32**

Case 2:04-cv-09049-DOC-RNB   Document 1195-2   Filed 12/07/07   Page 32 of 41   Page ID #:...

RightFAX                6/2  2007 3:04:5    PAGE 028/037     x Server

Because there is no applicable federal statute governing personal jurisdiction, the Court applies the law of the state in which the district court sits. Id. (citations omitted). "Because California's long-arm jurisdictional statute is coextensive with federal due process requirements, the jurisdictional analyses under state law and federal due process are the same." Id. at 800-01 (citations omitted). In order for a court's exercise of personal jurisdiction over a nonresident defendant to be constitutionally permissible, the defendant must have "minimum contacts" with the forum state "such that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice." Id. at 801 (internal quotation marks and citation omitted).

Personal jurisdiction may be either general or specific. For general personal jurisdiction to apply, a defendant (or here, a counter-defendant) "must engage in continuous and systematic general business contacts . . . that approximate a physical presence in the forum state." Id. (internal quotation marks and citations omitted).

To determine whether it has specific personal jurisdiction over a nonresident defendant, the Court employs a three-part test:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

Id. at 802.

The party asserting the claim bears the burden of establishing the first two parts of the test. Id. If that party establishes the first two parts, then the burden

27

EXHIBIT 2    23

1   shifts to the party resisting the Court's exercise of personal jurisdiction "to present a

2   **compelling case** that the exercise of jurisdiction would not be reasonable." Id.

3   (emphasis added).

4        The first part of the test is satisfied by either "purposeful availment" or

5   "purposeful direction." Id. Purposeful availment is shown when a defendant avails

6   itself of the privilege of doing business in a forum state, usually met when the

7   defendant took some action in the forum, such as executing or performing a

8   contract there. Id. By virtue of such actions, a defendant "purposefully avails itself

9   of the privilege of conducting activities within the forum State, thus invoking the

10  benefits and protections of its laws." Hanson v. Denckla, 357 U.S. 235, 253 (1958).

11  When taking advantage of these "benefits and protections," a defendant must also

12  "submit to the burdens of litigation in that forum." Burger King Corp. v. Rudzewicz,

13  471 U.S. 462, 476 (1985).

14       By contrast, purposeful direction, involves actions by the defendant outside

15  of the forum state but that are directed at the forum. Schwarzenegger, 374 F.3d at

16  803. The purposeful direction analysis is derived from a three-part "effects test"

17  that finds its roots in the Supreme Court's decision in Calder v. Jones, 465 U.S. 783

18  (1984). Pursuant to this analysis, the defendant must "have (1) committed an

19  intentional act, (2) expressly aimed at the forum state, (3) causing harm that the

20  defendant knows is likely to be suffered in the forum state." Id.; Schwarzenegger,

21  374 F.3d at 803. All three parts of the test must be satisfied. The second part of

22  the effects test is described by the Ninth Circuit as the "express aiming"

23  requirement, and requires that the counter-defendants "expressly aimed" its

24  intentional act at California. See Schwarzenegger, 374 F.3d at 806. Specifically,

25  "express aiming" is found where the defendant is alleged to have engaged in

26  wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident

27  of the forum state." Bancroft & Masters, Inc. v. Augusta Nat. Inc., 223 F.3d 1082,

28

**EXHIBIT 2**      34

1   1087 (9th Cir. 2000).[5]

2          Assuming that the party asserting a claim can establish that the party

3   resisting the Court's exercise of personal jurisdiction has met either the purposeful

4   availment or express aiming part of the three-part test regarding the exercise of

5   specific personal jurisdiction, courts next consider whether the claim arises out of or

6   relates to the forum-related activities.  In making this determination, the Court

7   considers whether the contacts with the forum gave rise to the claims asserted,

8   employing a "but for" standard.  See Doe v. Unocal Corp., 248 F.3d 915, 924 (9th

9   Cir. 2001).

10         Once the purposeful availment/express aiming and relatedness requirements

11  are established, the burden shifts to the party resisting the Court's exercise of

12  jurisdiction to show that exercise of jurisdiction is unreasonable.  In determining

13  reasonableness, the Court considers seven factors:

14         1) the extent of the defendant's purposeful interjection into the forum

15         state's affairs; 2) the burden on the defendant; 3) conflicts of law

16         between the forum and defendant's home jurisdiction; 4) the forum's

17         interest in adjudicating the dispute; 5) the most efficient judicial

18         resolution of the dispute; 6) the plaintiff's interest in convenient and

19         effective relief; and 7) the existence of an alternative forum.

20

21         [5] What constitutes, or doesn't constitute, "express aiming" is best
   illustrated by example.  For instance, in Pebble Beach Co. v. Caddy, 453 F.3d
22  1151 (9th Cir. 2006), no express aiming was found where the owner of a bed-and-
   breakfast in England (overlooking a pebbly beach) used the term "pebblebeach,"
23  the name of a famous golf course located in California, on its web site.  Id. at
   1153, 1156-57.  The Ninth Circuit acknowledged that it might be foreseeable that
24  the defendant's use of the web site might have some effect on California, but
   noted that mere foreseeability of effect in a forum state is not enough to constitute
25  express aiming.  Id. at 1157.  In contrast to Pebble Beach is the case of
   Panavision Intern., L.P. v. Toeppen, 141 F.3d 1316, 1321 (9th Cir. 1998), in which
26  the Ninth Circuit found that the express aiming requirement was met where the
27  defendant registered plaintiff's marks as Internet domain names in order to force a
   California plaintiff to pay him money.
28

29

EXHIBIT 2        35

1   Roth v. Garcia Marquez, 942 F.2d 617, 623 (9th Cir. 1991) (internal citation

2   omitted).  No factor is dispositive and the Court must balance all seven.  Id.

3   (internal citation omitted).

4   **B.    MGA Mexico's Contacts with the Forum State**

5          The AAC alleges that Issac Larian and other MGA officers, while in

6   California, executed a plot to target three high-level employees of Mattel Mexico,

7   and entice them to steal Mattel's trade secrets.  In written offers of employment to

8   these three individuals, Issac Larian held himself out to be the CEO of MGA

9   Mexico.  This plot was facilitated by a number of cross-border communications

10  among the participants as well as travel to the United States by the targeted

11  employees.

12  **C.    The Court May Exercise Personal Jurisdiction over MGA Mexico**

13         The AAC repeatedly alleges that Larian, who held himself out to be MGA

14  Mexico's CEO, and who was designated as MGA Mexico's "legal agent" in Mexican

15  registration document actively sought to induce others to access and steal Mattel's

16  trade secrets while located in the California.  See Velázquez Decl. Exs. A-C; Salem

17  Decl. Ex. B.  This constitutes purposeful availment.

18         To the extent that any of the actions taken in Mexico by the three Mexican

19  employees may be imputed to Mattel Mexico, there is also purposeful direction.

20  The alleged actions taken on behalf of MGA Mexico were specifically engineered to

21  result in the alleged illegal acquisition of trade secrets belonging to Mattel, a

22  California resident.[6]

23         The relatedness requirement is also clearly met.  The contacts with

24  California involve actions allegedly taken in order to further the illegal acquisition of

25  Mattel's trade secrets, leading to the present claims against MGA Mexico for

26  misappropriation of trade secrets and the related RICO claims.

27  _____

28         [6]  The AAC alleges the theft of trade secrets belonging not only to Mattel's
    Mexican subsidiary, but also to Mattel itself, which is a California corporation.

                                    30

                              **EXHIBIT 2**          36

The burden, therefore, is on MGA Mexico to show that the exercise of jurisdiction is unreasonable.[7]  As noted previously, the Court considers seven factors.  The first factor the Court considers is the defendant's purposeful interjection.  For the reasons the Court has found purposeful availment and purposeful direction, this factor favors the exercise of personal jurisdiction.

MGA Mexico argues, without elaboration, that the burden of defending itself in California is "significant."  However, the assumption underlying this argument is that the present action is more properly litigated by MGA's and Mattel's Mexican subsidiaries.  This assumption misses the point of Mattel's claim against MGA Mexico; Mattel, the parent company, was itself injured by MGA's Mexico's alleged misappropriation of its own trade secrets because the alleged misappropriation was not limited to trade secrets belonging to its Mexican subsidiary.  The argument based on this faulty assumption is therefore unconvincing.  In order to show unreasonableness, the burden on the defendant must be great.  See Panavision, 141 F.3d at 1323 ("A defendant's burden in litigating in the forum is a factor in the assessment of reasonableness, but unless the inconvenience is so great as to constitute a deprivation of due process, it will not overcome clear justifications for the exercise of jurisdiction.") (internal quotation marks and citation omitted).

As to the third and seventh factors, regarding conflicts of law and the

---

[7]  In its reply, MGA Mexico declares that it "made a 'compelling case' in support of its motion to dismiss that it would be unreasonable to force it to litigate in this forum."  MGA Mexico Reply at 10.  However, MGA Mexico's motion papers fail to acknowledge that they bear the burden on this issue.  See MGA Mexico's Memorandum of Points and Authorities at 10 ("Finally, Mattel has failed to satisfy the third element required for specific jurisdiction – that the exercise of jurisdiction over the defendant would be reasonable.").  As Mattel accurately predicted in its opposition papers, MGA Mexico implicitly acknowledged its burden in the reply, and used the occasion to improperly present additional arguments for the first time.  Although the Court ordinarily would not consider such arguments, it does so here because it does not change the Court's ultimate conclusion.  See In re Intuit Privacy Litigation, 138 F.Supp.2d 1272, 1275 n.3 (C.D. Cal. 2001) ("this court does not consider arguments raised anew for the first time in a reply brief as to do so would unfairly deny the non-moving party an opportunity to respond.").

31

**EXHIBIT 2**            37

1   existence of an alternative forum, MGA Mexico makes veiled references to the

2   criminal action in Mexico as constituting a choice of forum made by Mattel,

3   apparently implying that Mattel, having chosen to pursue criminal charges in

4   Mexico, should be precluded from invoking the power of this Court.  It appears to

5   the Court that MGA Mexico has failed to fully and clearly articulate this argument

6   because it is untenable.  Whether Mexican authorities pursue criminal charges

7   based on the same conduct underlying the claims in this action is irrelevant to

8   whether this Court may constitutionally exercise personal jurisdiction over MGA

9   Mexico.  Therefore, MGA Mexico's argument on this issue is unpersuasive.

10          The fourth factor, the interest in adjudicating the dispute, weighs in favor of

11   the exercise of personal jurisdiction, as does the sixth, the plaintiff's interest in

12   convenient and effective relief.

13          MGA Mexico argues that the fifth factor weighs in its favor when the Court

14   considers that the site of injury, which it does not believe is California, is the most

15   efficient forum.  However, this argument is premised on the rejected assumption

16   that the present action is more properly litigated between MGA's and Mattel's

17   Mexican subsidiaries.

18          On balance, a consideration of the reasonableness factors reveals that MGA

19   Mexico has fallen far short of establishing the "compelling case" necessary to

20   render the Court's exercise of personal jurisdiction unreasonable.

21          The Court concludes that Mattel has established the first two parts of the

22   specific personal jurisdiction test, and that MGA Mexico has failed to establish that

23   the Court's exercise of personal jurisdiction over it is otherwise unreasonable.

24   Accordingly, the Court **DENIES** MGA Mexico's motion to dismiss.

### V. MGA's and Bryant's Motions Regarding

### the Discovery Master's March 7, 2007, Order

27          MGA and Bryant seek review of a decision that resolved discovery disputes

28   that arose during Bryant's deposition, and that was rendered by the Court-

32

**EXHIBIT 2**            38

1   appointed discovery master, Judge Edward A. Infante (Ret.), on March 7, 2007.

2   The Court's order appointing Judge Infante provides that his orders resolving

3   discovery disputes shall be reviewed in the same manner as those made by a

4   magistrate judge of this Court.

5        Pursuant to Fed. R. Civ. P. 72(a), when the parties object to the ruling of a

6   magistrate judge on a non-dispositive manner, such as a discovery dispute, the

7   district judge may modify or set aside only those portions of the magistrate judge's

8   order that are "clearly erroneous or contrary to law." Id.

9        The "clearly erroneous" language refers to factual findings. See e.g.,

10  Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension

11  Trust, 508 U.S. 602, 622 (1993) (discussing the clearly erroneous standard). Here,

12  there were no explicit factual findings or legal conclusions made by Judge Infante

13  regarding the relevant rulings; therefore, the Court reviews the record presented to

14  Judge Infante to determine whether his rulings are contrary to law. See March 7,

15  2007, Order.

16       Questions that do not seek the substance of attorney-client communications

17  generally do not implicate the attorney-client privilege. United States v. Carrillo, 16

18  F.3d 1046, 1050 (9th Cir. 1994) (finding no violation of the attorney-client privilege

19  where prosecutor, who asked whether a criminal defendant had consulted with his

20  attorney during a recess in order to raise an inference of attorney coaching of

21  testimony during the trial, stopped short of asking defendant the substance of

22  defendant's communications with his attorney). Therefore, questions such as the

23  one addressed by objection No. 38, asking whether Bryant talked to counsel for

24  MGA during a break from his deposition, are not subject to objection based on the

25  attorney-client privilege. This conclusion is consistent with Judge Infante's Order.

26       Mattel's question regarding who is paying Bryant's legal fees, addressed by

27  objection No. 42, is likewise not objectionable. MGA and Bryant argue that state

28  law applies; however, because the present consolidated actions involve both

EXHIBIT 2   39

1   federal and state-law claims, the federal law of privilege applies.  Agster v.

2   Maricopa County, 422 F.3d 836, 839-40 (9th Cir. 2005) ("Where there are federal

3   question claims and pendent state law claims present, the federal law of privilege

4   applies.").  To that end, consistent with federal privilege law, fee-payment

5   arrangements are relevant to credibility and bias, and if asked in discovery, Bryant

6   must disclose who is paying his legal fees.  See United States v. Blackman, 72 F.3d

7   1418, 1424 (9th Cir. 1995) ("As a general rule, client identity and the nature of the

8   fee arrangement between attorney and client are not protected from disclosure by

9   the attorney-client privilege.").  This conclusion is also consistent with Judge

10  Infante's Order.

11          However, in this case, the joint-defense privilege protects from disclosure the

12  substance of certain statements made by Bryant and his attorneys in the presence

13  of attorneys representing MGA.  "The joint defense privilege protects

14  communications between an individual and an attorney for another when the

15  communications are 'part of an on-going and joint effort to set up a common

16  defense strategy.'"  United States v. Bay State Ambulance and Hosp. Rental

17  Service, Inc., 874 F.2d 20, 28 (1st Cir. 1989) (internal quotation marks and citation

18  omitted).  Generally, to rely on the joint-defense privilege, a party must establish

19  three elements:  "(1) [T]he communications were made in the course of a joint

20  defense effort, (2) the statements were designed to further the effort, and (3) the

21  privilege has not been waived."  Id.

22          The Court finds the first element was met.  The Court, based on its review of

23  the record pending before Judge Infante, is satisfied that the parties had in place at

24  the time of Bryant's deposition, and have in place today, a valid joint-defense

25  agreement.  The Court also finds that the second element was met.  Mattel cannot

26  seriously contend that MGA's interests are not aligned with Bryant's in this action,

27  or that counsels' thorough preparation of Bryant for his deposition was not designed

28  to further the joint defense effort.  Finally, as for the third element, there is no

34                           **EXHIBIT 2**        40

1    suggestion in the record that any party has waived the attorney-client privilege.

2    Accordingly, the Court holds that Judge Infante's rulings on Objection Nos.

3    39 and 50 are contrary to law to the extent those rulings require Bryant to divulge

4    the substance of his communications with counsel for MGA.

### VII. Conclusion

5

6    In the manner set forth more fully herein, the Court makes the following

7    rulings:

8    1.     Motion of MGA Entertainment, Inc., ("MGA") and Issac Larian

9    ("Larian") to Dismiss Mattel's Amended Answer and Counterclaims (docket # 189):

10   **GRANTED IN PART AND DENIED IN PART.**

11   2.     Motion of Carter Bryant to Dismiss Counterclaims II, III, V, VII, IX, and

12   XI (docket # 191): **GRANTED IN PART AND DENIED IN PART.**

13   3.     Motion of MGA Mexico to Dismiss Mattel's Amended Answer and

14   Counterclaims (docket # 266): **DENIED.**

15   4.     Motion of MGA Objecting to Discovery Master's March 7, 2007, Order

16   (docket # 308): **GRANTED IN PART AND DENIED IN PART.**

17   5.     Motion of Carter Bryant Objecting to Discovery Master's March 7,

18   2007, Order (docket # 306): **GRANTED IN PART AND DENIED IN PART.**

19   Mattel is **GRANTED** ten days' leave to amend the AAC in conformity with

20   this Order.  The Counter-defendants shall answer or otherwise respond to the

21   SAAC no later than thirty days after the filing of the SAAC.

22

23

24

25

26

27

28

**EXHIBIT 2**              41

1    The Motion Re Trial Structure (docket #462) has been the subject of further

2    briefing by the parties and is set for further oral argument on July 2, 2007.  Ruling

3    on that matter is **DEFERRED** pending oral argument.

4        DATE: June 27, 2007

5                                          STEPHEN G. LARSON

6                                          UNITED STATES DISTRICT JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

36                         **EXHIBIT 2**    42