# EXHIBIT 8

Wachovia Corporation
Legal Division
NC0630
One Wachovia Center
301 South College Street
Charlotte, NC 28288

Tel 704 374-6611

Fenita M. Shepard
Vice President
Assistant General Counsel
Direct Dial 704-383-4448
Fax 704-383-0649
*fenita.shepard@wachovia.com*

WACHOVIA

November 15, 2005

**VIA FAX AND US MAIL**
Robert G. Wilson, Esq.
Cotkin, Collins, & Ginsburg
300 South Grand Avenue, 24th Floor
Los Angeles, CA 90071-3134

**RE: LARIAN V. LARIAN ARBITRATION**

Dear Mr. Wilson:

Not only do I concur with Mr. Feldman's position, but also there is absolutely no way that I can produce the documents to you by tomorrow. There are three (3) boxes of loan documents that need to be reviewed for responsiveness and privilege. Only after such a review, can these documents be made available.

Also, Mr. Laugton will be on vacation from November 21, 2005 through November 28, 2005. Please let me know if you are agreeable to a stipulation as to the authenticity of the documents so that Mr. Laughton will not have to appear. Otherwise, please let me know when, this week, you will need Mr. Laughton to testify.

Very truly yours,

Fenita M. Shepard

Fenita M. Shepard

Cc: Richard L. Kellner, Esq.
Robert M. Turner, Esq.

CC 00570

Wachovia Corporation
Legal Division
NC0630
One Wachovia Center
301 South College Street
Charlotte, NC 28288

Tel 704 374-6611

Fe' M. Shepard
Vice . . esident
Assistant General Counsel
Direct Dial 704-383-4448
Fax 704-383-0649
fenita.shepard@wachovia.com

WACHOVIA

November 15, 2005

**VIA FAX AND US MAIL**
Robert G. Wilson, Esq.
Cotkin, Collins, & Ginsburg
300 South Grand Avenue, 24th Floor
Los Angeles, CA 90071-3134

RE: LARIAN V. LARIAN ARBITRATION

Dear Mr. Wilson:

It is my understanding that the Defendants in the above referenced matter have filed a Motion to Quash ("Motion") seeking to quash the third party subpoena (duces tecum) served on Bruce Laughton, an employee of Wachovia Bank, N.A. Without waiving any objections it may have to the third party subpoena, Wachovia Bank, N.A. will await a ruling from the Arbitration panel on Defendant's Motion before it responds to the subpoena. Should you wish to discuss this further, please feel free to contact me.

Very truly yours,

Fenita M. Shepard

Cc: Richard L. Kellner, Esq.
Robert M. Turner, Esq.

# EXHIBIT 9

ORIGINAL

William C. Conkle (SB# 076103)
Mark D. Kremer (SB# 100978)
Eric S. Engel (SB# 105656), members of
CONKLE & OLESTEN
Professional Law Corporation
3130 Wilshire Boulevard, Suite 500
Santa Monica, California 90403-2403

Telephone: (310) 998-9100

Attorneys for Plaintiff Farhad Larian

FILED
LOS ANGELES SUPERIOR COURT
FEB 28 2005
JOHN A. CLARKE, EXECUTIVE OFFICER/CLERK
BY J. SUNGA, DEPUTY

Case assigned to Judge Paul Gutman D24

SUMMONS ISSUED

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

FARHAD LARIAN,

Plaintiff,

v.

MORAD ZARABI, ISAAC LARIAN AND KAMBIZ ZARABI AND DOES 1 through 5, INCLUSIVE

Defendants.

CASE NO. BC329501

VERIFIED COMPLAINT FOR:

1) FRAUD
2) NEGLIGENT MISREPRESENTATION
3) CONSPIRACY
4) DECLARATORY RELIEF
5) CONSTRUCTIVE TRUST
6) INJUNCTIVE RELIEF

Plaintiff alleges as follows:

1. Plaintiff, Farhad Larian also known as Fred Larian ("FRED") is now and at all times relevant to this Complaint was a resident of Los Angeles County California.

2. Defendant, Morad Zarabi ("MORAD") is now and at all times relevant to this Complaint was a resident of Los Angeles County California.

CASE: BC329501 LEA/DEF#: RECEIPT #: CCH380104037 DATE PAID: 02/28/05 02:07:02 PM PAYMENT: $299.50 RECEIVED: CHECK: CASH: CHANGE: CARD: 299.50 0310

3. Defendant, Isaac Larian ("ISAAC") is now and at all times relevant to this Complaint was a resident of Los Angeles County California.

4. Defendant Kambiz Robert Zarabi ("KAMBIZ") is now and at all times relevant to this Complaint was a resident of Los Angeles County California.

5. Plaintiff is unaware of the true names and capacities of Does 1 through 5 and therefore sues such defendants by such fictitious names. Plaintiff will amend this Complaint to identify the true names and capacities of these defendants if and when additional information against them is ascertained. Plaintiff is informed and believes that each of the doe defendants is liable in some manner for the acts and omissions and the injuries and damages alleged in this Complaint.

6. At all times relevant to this Complaint, each defendant was the agent or employee of each of the other defendants as the case may have been, and was acting within the course of the scope of such agency or employment in performing the acts alleged in this Complaint.

7. FRED and ISAAC are brothers who for over 20 years engaged in business as partners through equal ownership of several businesses and ventures they co-founded. They shared profits and losses on an equal basis.

8. The businesses they co-founded included the companies known as ABC International Traders, Inc. ("ABC") and MGA Entertainment Hong Kong Ltd. ("MGAEHK"). ABC and MGAEHK collectively are referred to as "MGA". At all times relevant to this Complaint FRED and ISAAC each owned 45% of the outstanding stock, while their brother in law Jangahir Makabi ("MAKABI") owned 10% of MGA. FRED's 45% interest amounted to 10,000,000 shares of common stock in ABC and

450 shares of common stock in MGAEHK (collectively "FRED's Stock"). Over time FRED and ISAAC divided responsibilities in MGA's business: ISAAC, as CEO assumed responsibility for finance, sales, marketing and product development while FRED, as Executive Vice President was responsible for operations, including customs, warehousing, distribution and facilities.

9. MORAD is the uncle of ISAAC and FRED.

10. In the spring of 2000 ISAAC offered to buy FRED's 45% interest in MGA for $9,000,000 valuing MGA at $20,000,000. FRED responded that he wanted an appraisal of MGA to consider selling his interest. Consequently, ISAAC and FRED continued to negotiate a buy-sell agreement for ISAAC to buy FRED's Stock. ISAAC told FRED that he only wanted to appraise MGA as of December 31, 1999. FRED demanded a current appraisal. To avoid an appraisal ISAAC suggested using a process by which he or FRED would make an offer to buy the other's interest which if not accepted would require the refusing party to purchase the offeror's interest for the same price. FRED rejected the method telling ISAAC that FRED did not want to be a buyer. Ultimately ISAAC refused to go through with a buy-sell agreement that required three appraisals of MGA.

11. From the inception of their partnership, FRED and ISAAC had agreed that their salaries and other compensation from MGA would always be equal. They had followed this agreement for more than twenty years, taking equal raises and pay-cuts at the same time. In early 2000, however, while he was attempting to buy FRED out of MGA, ISAAC secretly gave himself a $100,000 raise to about $325,000. ISAAC later demanded that the MGA Board of Directors raise his salary to $500,000, ratify $750,000 as a bonus for 1999, authorize a $1,500,000 bonus for 2000, and give him a 4% royalty on items he "personally develops for MGA's 2001 line or products".

EXHIBIT 9 PAGE 209

Subsequently, Isaac's two brothers in-law purporting to act as MGA directors increased ISAAC's salary to always be three times that of FRED's salary and authorized an additional bonus of up to 50% of ISAAC's tripled salary. FRED is informed and believes that ISAAC engineered the compensation increase to put additional pressure on FRED to sell out his interests in MGA. FRED is further informed and believes that in exchange for MAKABI's vote, ISAAC promised MAKABI some portion of FRED's Stock if FRED agreed to sell it to ISAAC.

12. In or around the summer of 2000, following ISAAC's refusal to proceed with the buy-sell agreement, MORAD contacted FRED and urged him to let MORAD arbitrate the impasse between ISAAC and FRED over the stock sale. MORAD told FRED that FRED should not wait any longer to resolve his disputes with ISAAC as ISAAC was attempting to "take over the company" by the enormous raise in compensation which MORAD said was "just a part of ISAAC's plans to oust FRED". MORAD suggested that he determine which brother should sell his interest in MGA and at what price. FRED responded that he did not want to be a buyer and required for any arbitration, that the price of his stock be determined by an appraisal of the current value of MGA, as ISAAC had control of the financial and business information. FRED also told MORAD he required a resolution of certain other partnership accounts. In response MORAD promised FRED that the price of FRED's interest in MGA would be determined by a current and accurate appraisal of MGA that MORAD would obtain. MORAD called the appraisal "the central piece of the arbitration". MORAD also promised to resolve the accounting of the other partnership accounts.

13. In several communications with FRED, MORAD stressed his unique position to serve as an arbitrator. MORAD held out his familial relationship to the brothers as assuring his impartiality and trustworthiness. MORAD promised to treat each brother "as one of his eyes", an expression meaning that MORAD would allow

EXHIBIT 9 PAGE 210

no harm to come to either of them. MORAD claimed that his business experience would assure the accuracy of the appraisal and the accounting and that he would hire a CPA, Mike Shenassafar, to assist him. MORAD said that he would serve as an arbitrator free of charge, requiring reimbursement only for expenses, such as fees for the appraisal and the CPA. MORAD told FRED that he could trust MORAD to resolve the brothers' dispute, ending the unhappiness it was causing their family.

14. MORAD presented FRED with an Agreement for Arbitration and Selection of Arbitrator ("Arbitration Agreement"), a copy of which is attached as Exhibit 1 to this Complaint. FRED is informed and believes that MORAD's attorney Ellis Stern drafted it. MORAD told FRED that he should not hire an attorney to advise him about the Arbitration Agreement because "attorneys are in it for themselves and would never allow this to end until they got all of the money for themselves". MORAD reiterated to FRED that he could trust MORAD.

15. In reliance on the representations of MORAD, on or about September 28, 2000 FRED signed the Arbitration Agreement without the advice of counsel and did not hire counsel to represent him in the arbitration.

16. Plaintiff is informed and believes that the representations of MORAD were false when made in and around the summer of 2000 prior to FRED's execution of the Arbitration Agreement. MORAD engaged in misrepresentations and concealments to induce FRED's agreement to allow MORAD to arbitrate the controversy with ISAAC so that MORAD could fix the sale price without an appraisal. MORAD never intended to engage in any neutral arbitration using an accurate and current appraisal of MGA and never intended to use a CPA to assist him with the appraisal. MORAD intended to trick FRED to sell his interest in MGA to ISAAC and settle the other partnership accounts by making FRED believe the price for FRED's

Stock had been established by an accurate appraisal and accounting, but in fact was pre-determined by MORAD. In furtherance of his plan, MORAD concealed from FRED MORAD's inability to competently read and write English.

17. Plaintiff is informed and believes that MORAD made his false representations pursuant to an agreement and plan formed between MORAD and ISAAC to induce FRED to give MORAD authority to determine a value for MGA and trick FRED into selling his interests in MGA at a price pre-determined by ISAAC without an appraisal. Under the plan and agreement with ISAAC, MORAD agreed to induce FRED's consent to the Arbitration Agreement, by promising FRED an accurate and complete appraisal, but would fix the price for which FRED would sell his Stock to ISAAC and settle the partnership accounts, at or below the $9,000,000 ISAAC had previously offered to pay for FRED's Stock, irrespective of the true appraised value of MGA.

18. Following execution of the Arbitration Agreement, MORAD took steps in accordance with his intent and the plan to defraud FRED into accepting a price for his interests not determined by an appraisal including the following:

18.1 Consistent with ISAAC's earlier proposal to avoid an appraisal, prior to commissioning the appraisal MORAD induced FRED to give him a written offer to purchase ISAAC's 45% interest in MGA based upon a value of $17,500,000. FRED withdrew the offer the same day.

18.2 MORAD hired National Business Appraisers ("NBA") to perform an appraisal of ABC, and in order to lower the appraised value of ABC, allowed NBA to restrict the valuation period to the end of December 1999 thereby eliminating year 2000 financial and business information from the appraisal, including information relating to the "Bratz" product line.

EXHIBIT 9 PAGE 212

18.3   MORAD allowed NBA to value only ABC and omit valuation of MGAEHK.

18.4   Upon receiving the initial draft of NBA's appraisal of ABC with a value of $26,942,000 as of December 31, 1999, MORAD instructed NBA to reduce the valuation to get close to $20,000,000 which would yield a price of $9,000,000 for FRED's interest.

18.5   MORAD subsequently concealed from FRED that the final reduced appraisal of ABC was at $21,600,000 and represented that the appraisal found the value of MGA to be $17,500,000.

18.6   On information and belief MORAD never involved the CPA in the appraisal process, never showed the appraisal to the CPA, nor allowed him to review it for accuracy.

19.   In or around late November or early December 2000, MORAD came to FRED with a proposed price of $8,775,000 for sale of FRED's Stock to ISAAC calculated on 45% of a combined valuation of $19,500,000 for MGA and the other partnership accounts. MORAD represented to FRED that the appraisal placed the value of MGA at $17,500,000.   MORAD said   the   $2,000,000 difference between   the appraisal of $17,500,000 and the $19,500,000 was to satisfy the amount due from ISAAC to FRED for the other partnership accounts. Believing in his uncle's integrity, FRED trusted MORAD's representation of the value found by the appraisal.   In reliance on MORAD's representations, FRED agreed to settle his disputes with ISAAC by selling his interest at the price MORAD represented was determined by the appraisal of MGA and the partnership accounts.

20.   MORAD's personal attorney Ellis Stern drew up agreements for the sale and settlement of FRED's interest in MGA to ISAAC and the partnership accounts including an Agreement for Sale of Stock, Pledge Agreement, Promissory Note, Mutual

Release and Consulting Agreement (collectively "December 2000 Agreement"). FRED asked MORAD if FRED should have an attorney to advise him about the transaction. MORAD said no. MORAD said that he would make sure the agreements accurately reflected the transaction and protected both FRED and ISAAC. Based on MORAD's representation, FRED did not have counsel advise him with respect to the transaction and signed the December 2000 Agreement.

21. In inducing FRED's agreement to sell FRED's Stock to ISAAC, MORAD continued to conceal his fraud and deceit from FRED. MORAD assured FRED that the sale price based on a combined valuation of $19,500,000 for MGA and the partnership accounts was determined by the appraisal and accounting. MORAD convinced FRED to agree to resolve any disputes with ISAAC over the December 2000 Agreement by arbitrating them before MORAD or if MORAD was unavailable before his son KAMBIZ. MORAD repeated to FRED that he should keep resolution of such matters in the family and FRED could trust both MORAD and KAMBIZ. MORAD also claimed that as a director of MGA and as the arbitrator, he would be in a position to protect FRED's interest. In reliance on MORAD's representations including that the appraised value of MGA had been $17,500,000 upon which the sale price for his interest in MGA was based, FRED agreed to the provisions for resolving any disputes over the December 2000 Agreement by arbitrating before MORAD (and if MORAD was unavailable to serve, MORAD's son KAMBIZ) ("December Arbitration Provisions").

22. MORAD's representations to FRED that FRED should trust him to continue to act as an impartial and honest arbitrator of disputes that might arise under the December 2000 Agreement were false and were made to conceal MORAD's fraud and deceit in the appraisal and valuation of MGA and to induce FRED's agreement to the December Arbitration Provisions so to allow MORAD to hide his wrongful acts and

omissions and/or conspiracy with ISAAC. MORAD had not honestly and impartially acted as an arbitrator in the past and had no intent to arbitrate or otherwise act impartially and honestly to resolve any disputes that might arise under the December 2000 Agreement. MORAD intended only to use his position as arbitrator to continue to conceal his fraud and deceit and other wrongful acts and omissions toward FRED.

23. Under the December 2000 Agreement, MORAD became a director of MGA and took possession of the share certificates for FRED's Stock as Trustee to be held as collateral for ISAAC's payment of the full purchase price to FRED.

24. Following the execution of the December 2000 Agreement, MORAD requested FRED to "return the favor" for what MORAD called his "pro-bono arbitration work" in 2000. MORAD requested $10,000.00 from FRED for MORAD's relative. MORAD told FRED that ISAAC had already paid an identical amount. FRED paid the money MORAD requested. In June 2004 FRED's attorneys asked MORAD to disclose and produce evidence of these payments. MORAD, through his attorney Ellis Stern, refused. In or around June 2004, in relation to FRED's inquiry about these payments, MORAD publicly threatened that he "will destroy FRED and make him equal to dirt". On information and belief MORAD sought and obtained a larger payment from ISAAC for MORAD's "pro-bono arbitration work" and for that reason refused to disclose such payments.

25. In 2001, ISAAC was unable to make the payment under the promissory note given FRED as part of the December 2000 Agreement. MORAD induced FRED to extend the due date of the note and advanced money on behalf of ISAAC to FRED for payments on the promissory note.

26. In or around the summer of 2002, FRED became aware of facts that suggested the valuation of MGA in 2000 represented by MORAD may have been inaccurate and that the actual valuation of MGA was significantly higher because of a license and plans for a product line called "Bratz" which were undisclosed to FRED. FRED requested a copy of the appraisal of MGA performed in 2000. MORAD refused, maintaining that he was legally not allowed to disclose it. FRED did not suspect MORAD of any wrong doing at this time, believing instead that ISAAC had withheld the Bratz information from both FRED and MORAD without MORAD's knowledge or consent.

27. Subsequently FRED submitted to MORAD his claim that FRED had been defrauded by ISAAC.

28. A few months after FRED's submission of his claim to MORAD for the fraud in the sale of FRED's Stock, MORAD called a meeting at his offices on January 26, 2003. He advised FRED that no lawyers would be allowed and that no evidence would be presented as this was an infonnal meeting. MORAD tape recorded the meeting which lasted less than two hours. After ISAAC left the meeting, he called MORAD and MORAD reported to FRED that ISAAC said "figure out a way to pay FRED something and get rid of him". On or about September 14, 2004 MORAD declared under oath that the meeting occurred on a different day and was an "arbitration hearing" upon which he "took the matter under submission"!

29. After the January meeting in several communications, MORAD and KAMBIZ advised FRED ways to settle the claim against ISAAC including buying back a portion of FRED's Stock, which MORAD said he had convinced ISAAC to allow.

30. In 2003, FRED learned that sometime after the January 26, 2003 meeting MORAD had commissioned another appraisal of MGA ("2003 Appraisal"). MORAD told FRED he had commissioned the 2003 Appraisal but did not show it to him. In December 2004 FRED learned that the valuation date of the 2003 Appraisal was as of December 31, 2000 (the effective date under the December 2000 Agreement) and that it found the value of ABC to be $33,805,000. In December 2004 FRED also learned that in or about April 2004, MORAD had commissioned yet another appraisal of MGA based on a valuation date ending December 31, 2001 ("2004 Appraisal").

31. Throughout 2003, FRED again asked MORAD and also KAMBIZ to provide FRED a copy of the appraisals. They initially refused to disclose any of the documentation for the appraisals. FRED filed suit in August 2003 against ISAAC for fraud arising from the non-disclosure of the Bratz line (The "Bratz Action"). In September 2003, MORAD promised to give FRED all documents and records relating to the 2000 and 2003 appraisals in exchange for payment of $15,000. MORAD's attorney, Ellis Stern corroborated MORAD's promise to give FRED all of the documents and records related to the appraisal. FRED paid MORAD the $15,000 but then MORAD refused to provide all of the records to FRED. MORAD said instead he had turned over his records and files to his attorney Stern who refused to produce copies to FRED.

32. When FRED continued to press for production of MORAD's entire file concerning the 2000 and 2003 appraisals, ISAAC opposed production and demanded that no records from the appraisal be produced. Finally after the Court in the Bratz Action ordered discovery, MORAD's attorneys produced certain of the documents related to the 2000 appraisal but refused to produce documents related to the 2003 Appraisal. MORAD's attorney Stern represented to have produced all of the 2000 appraisal documentation and provided a privilege log which he later filed in Court. No

draft appraisals were produced to FRED by MORAD personally or by his attorneys. The draft of the 2000 appraisal, the 2004 Appraisal, and some correspondence from NBA relating to the 2000 appraisals were neither produced nor listed on the privilege log Stern had submitted to FRED and the Court. FRED pursued discovery of NBA and the appraiser but both ISAAC and MORAD opposed it. Ultimately it was not until FRED went to NBA directly in December 2004 that he discovered the extent and nature of MORAD's wrongful acts. The documents and information provided by NBA also revealed that MORAD's attorney, Stern had submitted a false privilege log to FRED and to the Court.

33. In or around April to July 2004 FRED learned of translations that MORAD had ordered including translations related to a January 30, 2003 letter MORAD had received from FRED's attorney, and of MORAD's need to use translators in the contemplated arbitration of FRED's claims against ISAAC. These facts and documents were suppressed from FRED by MORAD and his attorney.

34. In or around January 2004, FRED demanded of MORAD that FRED's Stock held by MORAD as trustee pursuant to the December 2000 Agreement be maintained pending resolution of FRED's claims against ISAAC. Through his attorney Stern, MORAD agreed. In or around December 2004, FRED demanded that MORAD show FRED the stock certificates. MORAD refused.

35. In or around December 2004, FRED obtained documentation and information directly from NBA disclosing that:

35.1 NBA had never provided MORAD with an appraisal valuing ABC or MGA at $17,500,000 as MORAD had represented to FRED;

35.2 In or around October 2000 NBA transmitted to MORAD an initial draft appraisal valuing ABC at $26,942,000. MORAD then instructed NBA to decrease

EXHIBIT 9 PAGE 218

the value to get close to $20,000,000 and allowed the valuation date to be as of December 31, 1999;

35.3 NBA's final reduced appraisal in November 2000 was $21,600,000.00 for the period ending December 31, 1999 and excluded MGAEHK from the valuation;

35.4 Commencing in February 2003, NBA met with MORAD and KAMBIZ concerning the November 2000 appraisal because of FRED's claim against ISAAC for fraud;

35.5 In February 2003, MORAD commissioned the appraisal of MGA as of December 31, 2000 (2003 Appraisal) without consideration of the Bratz License and product line. This appraisal found the value to be $33,805,000.00;

35.6 MORAD subsequently requested NBA to reduce the 2003 Appraisal by applying a minority shareholder discount.

35.7 In 2000, NBA had given the draft 2000 appraisal to MORAD and his attorneys.

35.8 In 2004, MORAD's attorneys advised NBA to destroy any drafts of the 2000 appraisal.

35.9 In 2004 MORAD commissioned the appraisal of ABC as of December 31, 2001 (2004 Appraisal) to obtain a valuation lower than the 2003 Appraisal. The 2004 Appraisal, the draft 2000 appraisal, and some correspondence from NBA relating to the 2000 appraisals had been suppressed from FRED and omitted from the privilege log Stern submitted to both FRED and the Court.

36. FRED is informed and believes that MORAD's suppression of the appraisals, his attempts to destroy and prevent discovery of evidence, and his lies to FRED were calculated to conceal his fraud in the inducement of the Arbitration Agreement and December Arbitration Provisions, his corruption of the appraisal in

2000, and/or in furtherance of the conspiracy with ISAAC to trick FRED into selling Fred's Stock at a price pre-determined by ISAAC and/or MORAD.

**FIRST CAUSE OF ACTION FOR PROMISSORY FRAUD INDUCING CONSENT TO THE ARBITRATION AGREEMENT AGAINST MORAD ZARABI**

37. Plaintiff realleges paragraphs 1 through 36 of this Complaint.

38. MORAD's representations to Plaintiff concerning MORAD's intention to neutrally, honestly, completely and accurately appraise the current value of MGA, and account for the other partnership matters, to resolve Plaintiff's disputes with ISAAC were false and known by MORAD to be false when he made them. The misrepresentations and omissions were material and made to induce Plaintiff to consent to the Arbitration Agreement and selection of MORAD as arbitrator. The true facts were that MORAD never intended to engage in an accurate, complete and current appraisal of MGA or accounting of the other partnership matters, but rather to set a pre-determined price for the sale of FRED's Stock to ISAAC. In furtherance of this intent, MORAD concealed his disability in reading and writing English.

39. Reasonably relying on MORAD's representation of what MORAD intended to do as an arbitrator and that Plaintiff could trust him, Plaintiff was induced to sign the Arbitration Agreement and selection of MORAD as the arbitrator. Had Plaintiff known MORAD's true intentions, Plaintiff would not have signed the Arbitration Agreement, and would not have agreed to the December Arbitration Provisions.

40. As a result of the fraud and deceit alleged herein, Plaintiff is entitled to rescission of the Arbitration Agreement and the December Arbitration Provisions

proximately caused by it as well as restitution of all sums obtained by MORAD from Plaintiff because of them.

**SECOND CAUSE OF ACTION FOR NEGLIGENT MISREPRESENTATIONS INDUCING CONSENT TO THE ARBITRATION AGREEMENT AGAINST MORAD ZARABI**

41. Plaintiff realleges paragraphs 1 through 36 of this Complaint.

42. MORAD owed a duty of reasonable care in making representations and statements to Plaintiff regarding MORAD's ability and intentions with respect to the appraisal of MGA and the accounting of the other partnership matters.

43. MORAD breached his duty to Plaintiff by making misrepresentations of material facts and by omitting and failing to disclose material facts which he knew or in the exercise of reasonable care should have known were untrue or inaccurate and which he was under a duty to disclose to Plaintiff, including without limitation, his inability to competently read and write English, his intent to set a pre-determined price for Fred's Stock and the value of the other partnership accounts.

44. MORAD made the misrepresentations and omissions with the intent to induce Plaintiff to agree to the Arbitration Agreement consenting to arbitrate before MORAD as the arbitrator of the disputes between Plaintiff and ISAAC over MGA and the other partnership matters.

45. Plaintiff actually, reasonably and justifiably relied upon the false statements and omissions of MORAD and consented to the Arbitration Agreement. Had Plaintiff known the true facts, Plaintiff would not have entered into the Arbitration

EXHIBIT 9 PAGE 221

Agreement and selection of MORAD as the arbitrator, and would not have given MORAD authority as arbitrator to determine the price at which Plaintiff would sell his interest in MGA and the other partnership accounts.

46. As a result of the misrepresentation alleged herein, FRED is entitled to rescission of the Arbitration Agreement and the December Arbitration Provisions proximately caused by it and restitution of all sums obtained by MORAD from Plaintiff because of them.

**THIRD CAUSE OF ACTION FOR CONSPIRACY TO COMMIT PROMISSORY FRAUD INDUCING CONSENT TO THE ARBITRATION AGREEMENT AGAINST MORAD ZARABI AND ISAAC LARIAN**

47. Plaintiff realleges paragraphs 1 through 36 of this Complaint.

48. Plaintiff is informed and believes that commencing in or around the summer and fall of 2000, ISAAC and MORAD conspired and agreed together to induce FRED to give MORAD power and authority as an arbitrator to set a price pre-determined by ISAAC and/or MORAD, at which ISAAC would purchase FRED's shares in MGA.

49. In furtherance of the conspiracy, MORAD made the misrepresentations and omissions of material facts alleged in this Complaint to induce FRED to consent to arbitration before MORAD and to execute the Arbitration Agreement. MORAD's representations were false and known by MORAD and ISAAC to be false when made.

50. In reasonable reliance on the representations of MORAD, Plaintiff executed the Arbitration Agreement.

51. Plaintiff is entitled to rescission of the Arbitration Agreement and the December Arbitration Provisions proximately caused by it and restitution of all sums obtained by MORAD from Plaintiff because of them.

**FOURTH CAUSE OF ACTION FOR DECLARATORY RELIEF OVER VALIDITY OF THE ARBITRATION AGREEMENT AND THE DECEMBER ARBITRATION PROVISIONS AGAINST MORAD ZARABI AND ISAAC LARIAN**

52. Plaintiff reallages paragraphs 1 though 36 of this Complaint.

53. An actual justiciable controversy exists between Plaintiff on the one hand, and Defendants MORAD and ISAAC on the other hand in that Plaintiff contends that the Arbitration Agreement was void ab initio due to the fraud and deceit of MORAD and/or ISAAC inducing Plaintiff's consent to it; and that the December Arbitration Provisions are likewise void because they were proximately caused by Plaintiff's consent to the Arbitration Agreement. Plaintiff is informed and believes that Defendants MORAD and ISAAC contend that the Arbitration Agreement is valid and enforceable and that there is no basis for invalidating or voiding the Arbitration Agreement or the December Arbitration Provisions.

54. Plaintiff has no accurate remedy at law and the parties require a judicial declaration of their legal rights and obligations with respect to the Arbitration Agreement and the December Arbitration Provisions.

**FIFTH CAUSE OF ACTION FOR FRAUD IN THE INDUCEMENT OF THE DECEMBER ARBITRATION PROVISIONS AGAINST MORAD ZARABI**

55. Plaintiff realleges paragraphs 1 through 36 of this Complaint.

56. MORAD's representations to FRED in or around the end of November or the beginning of December 2000 concerning the accuracy of the appraisal of MGA, the appraised value being $17,500,000, and MORAD's honesty and trustworthiness were false when made and known by MORAD to be false when made. The true facts were that MORAD concealed the appraisal showing the value of MGA to be significantly greater than the representation to Plaintiff, and concealed the fact that he had corrupted and acted to distort the appraisal of MGA by ordering the appraiser to reduce the value to close to $20,000,000. In making the misrepresentations and omissions, MORAD intended to induce Plaintiff to agree to resolve any disputes arising from the December 2000 Agreement by arbitration before MORAD and/or KAMBIZ, so that MORAD could continue to conceal his fraud and deceit and his wrongful acts and omissions.

57. The misrepresentations and omissions to Plaintiff were material and Plaintiff reasonably relied on them to his detriment and by them was induced to enter into the December Arbitration Provisions.

58. As the result of MORAD's fraud and deceit, Plaintiff is entitled to rescission of the December Arbitration Provisions and restitution of all sums obtained by MORAD from Plaintiff because of them.

EXHIBIT 9 PAGE 224

**SIXTH CAUSE OF ACTION FOR NEGLIGENT MISREPRESENTATION INDUCING CONSENT TO THE DECEMBER ARBITRATION PROVISIONS AGAINST MORAD ZARABI**

59. Plaintiff realleges paragraphs 1 through 36 of this Complaint.

60. MORAD owed a duty of reasonable care in making representations and statements to Plaintiff regarding the appraised value of MGA and the accounting of the other partnership matters.

61. MORAD breached his duty to Plaintiff by making misrepresentations of material facts and by omitting and failing to disclose material facts which he knew or in the exercise of reasonable care should have known were inaccurate and which he was under a duty to disclose to Plaintiff, including without limitation, the true and correct valuation of MGA found by NBA's appraisal.

62. MORAD made the misrepresentations and omissions with the intent to induce Plaintiff to consent to the December Arbitration Provisions selecting MORAD and his son KAMBIZ as the arbitrators with sole authority to determine disputes between Plaintiff and ISAAC arising from the December 2000 Agreement.

63. Plaintiff actually, reasonably and justifiably relied upon the false statements and omissions of MORAD. Had Plaintiff known the true facts, Plaintiff would not have entered into the December Arbitration Provisions which selected MORAD and his son KAMBIZ as the arbitrators.

64. As a result of MORAD's misrepresentations Plaintiff is entitled to rescission of the December Arbitration Provision and restitution of all sums obtained by MORAD from Plaintiff because of them.

**SEVENTH CAUSE OF ACTION FOR CONSPIRACY TO FRAUDULENTLY INDUCE EXECUTION OF THE DECEMBER ARBITRATION PROVISIONS AGAINST MORAD ZARABI AND ISAAC LARIAN**

65. Plaintiff realleges paragraphs 1 through 36 of this Complaint.

66. Plaintiff is informed and believes that the misrepresentations and omissions by MORAD in late November to December 2000 were carried out pursuant to a conspiracy and agreement between MORAD and ISAAC to induce FRED to agree to arbitrate all disputes before MORAD and KAMBIZ so they could continue to conceal MORAD's and ISAAC's fraud and conspiracy.

67. In furtherance of the conspiracy, MORAD committed the acts alleged in this Complaint, including without limitation manipulating and corrupting the appraisal, lying to FRED about the appraised value of MGA and inducing FRED to resolve all disputes arising out of the agreement by arbitration before MORAD or KAMBIZ in order to conceal the conspiracy.

68. As the result of the misrepresentations by MORAD pursuant to the conspiracy of ISAAC and MORAD which induced FRED's consent to the December Arbitration Provisions, Plaintiff is entitled to rescission of the December Arbitration Provisions and restitution of all sums obtained by MORAD from Plaintiff because of them.

## EIGHTH CAUSE OF ACTION FOR DECLARATORY RELIEF OVER VALIDITY OF THE DECEMBER ARBITRATION PROVISIONS AGAINST ISAAC LARIAN

69. Plaintiff reallages paragraphs 1 though 36 of this Complaint.

70. An actual justiciable controversy exists between Plaintiff on the one hand and ISAAC on the other hand in that Plaintiff contends that the December Arbitration Provisions were void ab initio due to the fraud and deceit of MORAD and/or ISAAC inducing Plaintiff's consent to them while Plaintiff is informed and believes that ISAAC contends that the December Arbitration Provisions are valid and enforceable and that there is no basis for invalidating or voiding them, in whole or part.

71. Plaintiff has no adequate remedy at law and the parties require a judicial declaration of their legal rights and obligations with respect to the December Arbitration Provisions.

## NINTH CAUSE OF ACTION FOR DECLARATORY JUDGMENT OVER THE DISQUALIFICATION OF MORAD ZARABI AND KAMBIZ ROBERT ZARABI FROM SERVING AS ARBITRATORS AGAINST ISAAC LARIAN, MORAD ZARABI AND KAMBIZ ROBERT ZARABI

72. Plaintiff realleges paragraphs 1 through 36 of this Complaint.

73. An actual justiciable controversy exists between Plaintiff on the one hand and Defendants on the other hand in that Plaintiff contends that as a result of the position, facts and circumstances concerning MORAD and KAMBIZ alleged in this Complaint, they are disqualified under California law from exercising any power or authority as an arbitrator of any disputes between Plaintiff and Defendant ISAAC

LARIAN; while Plaintiff is informed and believes that Defendants and each of them contend that MORAD and KAMBIZ are not so disqualified.

74. Plaintiff has no adequate remedy at law and the parties require a judicial declaration of their legal rights and obligations with respect to the ability of MORAD and KAMBIZ to exercise power and authority as arbitrators under the December 2000 Agreement.

**TENTH CAUSE OF ACTION FOR DECLARATORY JUDGMENT OVER ENFORCEABILITY OF ARBITRATION AGREEMENTS AGAINST ISAAC LARIAN**

75. Plaintiff realleges paragraphs 1 through 36 of this Complaint.

76. An actual justiciable controversy exists between Plaintiff on the one hand and Defendant ISAAC LARIAN on the other hand in that Plaintiff contends that the Arbitration Agreement and the December Arbitration Provisions are unenforceable in that they are agreements to arbitrate solely before MORAD ZARABI and in the case of the December Arbitration Provisions, KAMBIZ ZARABI if MORAD is unavailable or such arbitrators as either of them might appoint if MORAD and KAMBIZ are both unavailable. Because MORAD and KAMBIZ are disqualified under California law, neither may serve as arbitrator or appoint arbitrators. Plaintiff is informed and believes that Defendant ISAAC LARIAN disputes the disqualification of MORAD and KAMBIZ ZARABI and that notwithstanding any disqualification of MORAD and KAMBIZ, contends the arbitration agreements are legally enforceable.

77. Plaintiff has no adequate remedy at law and the parties require judicial declaration of their rights and obligations with respect to the Arbitration Agreement and the December Arbitration Provisions and their enforceability.

EXHIBIT 9 PAGE 228

**ELEVENTH CAUSE OF ACTION FOR RESCISSION OF THE DECEMBER 2000 AGREEMENT BASED ON PROMISSORY FRAUD INDUCING CONSENT TO ARBITRATION AGREEMENT AGAINST MORAD ZARABI AND ISAAC LARIAN**

78. Plaintiff realleges paragraphs 1 through 36 of this Complaint.

79. The fraud and deceit of MORAD and/or conspiracy of MORAD and ISAAC to deceive and defraud, inducing Plaintiff to consent to the Arbitration Agreement proximately caused Plaintiff's consent to the December 2000 Agreement. As a consequence of Plaintiff's entitlement to rescission of the Arbitration Agreement, Plaintiff is also entitled to rescission of the December 2000 Agreement, including the Pledge Agreement and restitution of his stock in MGA subject to any accounting required by law.

80. As a proximate result of Defendants wrongful conduct, Plaintiff has been damaged in an amount and of a nature according to proof at trial.

81. MORAD's wrongful acts were conducted maliciously, oppressively and fraudulently with the intent to injure Plaintiff. Plaintiff is therefore entitled to an award of punitive damages sufficient to punish MORAD and deter such conduct in the future.

**TWELFTH CAUSE OF ACTION FOR RESCISSION OF THE DECEMBER 2000 AGREEMENT AGAINST MORAD ZARABI AND ISAAC LARIAN**

82. Plaintiff realleges paragraphs 1 through 36 of this Complaint.

83. MORAD's fraud and deceit and/or the conspiracy of MORAD and ISAAC to defraud and deceive, inducing Plaintiff into believing that MORAD had carried out

EXHIBIT 9 PAGE 224

an accurate, complete, and current appraisal of MGA which purportedly had determined the value of MGA to be $17,500,000 proximately caused Plaintiff to consent to the December 2000 Agreement and consequently Plaintiff is entitled to rescission of it, including the Pledge Agreement and restitution of his stock in MGA subject to any accounting required by law.

84. As a proximate result of Defendants wrongful conduct, Plaintiff has been damaged in an amount and of a nature according to proof at trial.

85. MORAD's wrongful acts were conducted maliciously, oppressively and fraudulently with the intent to injure Plaintiff. Plaintiff is therefore entitled to an award of punitive damages sufficient to punish MORAD and deter such conduct in the future.

**THIRTEENTH CAUSE OF ACTION FOR RESCISSION BASED ON NEGLIGENT MISREPRESENTATIONS INDUCING THE DECEMBER 2000 AGREEMENT AGAINST MORAD ZARABI**

86. Plaintiff realleges paragraphs 1 through 36 of this Complaint.

87. MORAD owed a duty of reasonable care in making representations and statements to Plaintiff regarding a) his purported intention to impartially arbitrate the sale of Plaintiff's interest in MGA by an accurate, complete, and current appraisal and b) the true and correct appraised value of MGA and the accounting of the other partnership matters.

88. MORAD breached his duty to Plaintiff by making misrepresentations of material facts and by omitting and failing to disclose material facts which he knew or in the exercise of reasonable care should have known were inaccurate and which he

EXHIBIT 9 PAGE 230

was under a duty to disclose to Plaintiff, including without limitation, MORAD's true intentions regarding setting the price for Plaintiff's stock and the true and correct valuation of MGA found by NBA's appraisal.

89. MORAD's misrepresentations induced Plaintiff's execution of the December 2000 Agreement and Plaintiff is entitled to rescission of it, including the Pledge Agreement and to restitution of his stock in MGA subject to an accounting required by law.

90. As a proximate result of Defendants wrongful conduct, Plaintiff has been damaged in an amount and of a nature according to proof at trial.

**FOURTEENTH CAUSE OF ACTION FOR DECLARATORY RELIEF OVER VALIDITY OF THE DECEMBER 2000 AGREEMENT AGAINST ISAAC LARIAN**

91. Plaintiff realleges paragraphs 1 through 36 of this Complaint.

92. An actual justiciable controversy exists between Plaintiff on the one hand and Defendant ISAAC on the other hand in that Plaintiff contends that the December 2000 Agreement was void ab initio due to the fraud and deceit of MORAD and/or ISAAC inducing Plaintiff's consent to it while Plaintiff is informed and believes that ISAAC contends the December 2000 Agreement is valid, enforceable and that there is no basis for invalidating or voiding it.

93. Plaintiff has no accurate remedy at law and the parties require a judicial declaration of their legal rights and obligations with respect to the December 2000 Agreement.

EXHIBIT 9 PAGE 231

**FIFTEENTH CAUSE OF ACTION FOR CONSTRUCTIVE TRUST, PRELIMINARY INJUNCTION AND ACCOUNTING AGAINST MORAD ZARABI AND ISAAC LARIAN**

94. Plaintiff realleges paragraphs 1 through 36 of this Complaint.

95. The share certificates for FRED's Stock were held in trust by MORAD pursuant to a pledge agreement made by ISAAC in connection with the December 2000 Agreement. Plaintiff has made demand on MORAD to show him the share certificates, but MORAD has failed and refused to do so. Plaintiff is informed and believes that MORAD has turned over the stock certificates or other instruments affecting the stock certificates to ISAAC.

96. By virtue of their fraudulent acts, Plaintiff is entitled to rescission of the December 2000 Agreement and to restitution of his stock in MGA subject to an accounting by the Court of any amount of the consideration Plaintiff received for his stock that must be returned to Isaac, which Plaintiff hereby offers to restore. Defendants and each of them hold FRED's Stock as a constructive trustee for Plaintiff's benefit. Plaintiff is informed and believes that the stock certificates may be voided, lost or destroyed and Plaintiff's stock interest diluted or altered to Plaintiff's detriment unless Defendants and each of them are enjoined and restrained from taking any acts of any nature with respect to Plaintiff's stock certificates and stock interest.

97. Plaintiff does not know what amounts, if any have accrued or been distributed on account of Plaintiff's MGA stock and an accounting is therefore necessary to determine what amounts, if any are due Plaintiff on account of his MGA stock.

EXHIBIT 9 PAGE 232

WHEREFORE, Plaintiff prays for judgment as follows:

1. That the September 28, 2000 Agreement to Arbitrate and Selection of Arbitrator is declared void ab initio or is rescinded;

2. That the December Arbitration Provisions are declared void ab initio or are rescinded;

3. That MORAD ZARABI is judicially declared as disqualified from serving as an arbitrator of any disputes between Plaintiff and Defendant ISAAC LARIAN;

4. That KAMBIZ ROBERT ZARABI is judicially declared as disqualified from serving as an arbitrator of any disputes between Plaintiff and Defendant ISAAC LARIAN;

5. That Defendants and each of them and their agents and employees hold Plaintiff's MGA Stock as constructive trustees for Plaintiff's benefit;

6. That Defendants and each of them, their agents, employees and all those in active concert and participation with them are preliminarily and permanently enjoining from transferring, disposing of, or altering FRED's Stock certificates or interest in MGA;

7. That the December 2000 Agreement (including all related agreements) is declared void ab initio or is rescinded;

8. That Plaintiff's stock in MGA be restored to him;

9. For an accounting of all monies accruing to or distributed on account of Plaintiff's stock in MGA;

10. For damages as allowed by law and according to proof at trial;

11. For reasonable attorneys fees;

12. For costs as allowed by law;

13. For punitive damages as allowed by law and according to proof at trial; and

14. For such other relief as the Court deems just and proper.

Dated: February 24, 2005

William C. Conkle
Mark D. Kremer
Eric S. Engel, members of
CONKLE & OLESTEN
Professional Law Corporation

By: [signature]
Mark D. Kremer
Attorneys for Plaintiff

# VERIFICATION

I have read the foregoing **Verified Complaint** and know its contents.

☒ I am a party to this action. The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

☐ I am ______ of ______, a party to this action, and am authorized to make this verification for and on its behalf, and I make this verification for that reason.

☐ I am informed and believe and on that ground allege that the matters stated in the foregoing document are true.

☒ The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

☐ I am one of the attorneys for ______, a party to this action. Such party is absent from the county of aforesaid where such attorneys have their offices, and I make this verification for and on behalf of that party for that reason. I am informed and believe and on that ground allege that the matters stated in the foregoing document are true.

Executed on February 25, 2005.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Farhad Larian
Print Name of Signator

[signature]
Signature

ORIGINAL

CM-010

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, state bar number, and address)
Mark D. Kremer
Conkle & Olesten, Professional Law Corporation
3130 Wilshire Blvd., Suite 500

Santa Monica, CA 90403
TELEPHONE NO 310-998-9100 FAX NO: 310-998-9109
ATTORNEY FOR (Name) Plaintiff

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles
STREET ADDRESS: 111 N. Hill Street
MAILING ADDRESS
CITY AND ZIP CODE Los Angeles, CA 90012-3014
BRANCH NAME Central District

CASE NAME: Farhad Larian v. Morad Zarabi, et al.

FOR COURT USE ONLY

FILED
LOS ANGELES SUPERIOR COURT
FEB 28 2005
JOHN A. CLARKE, EXECUTIVE OFFICER/CLERK
BY J. SUNGA, DEPUTY

## CIVIL CASE COVER SHEET

[X] Unlimited (Amount demanded exceeds $25,000) [ ] Limited (Amount demanded is $25,000 or less)

Complex Case Designation
[ ] Counter [ ] Joinder
Filed with first appearance by defendant (Cal. Rules of Court, rule 1811)

CASE NUMBER: BC 329501
JUDGE:
DEPT:

*All five (5) items below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Asbestos (04)
- [ ] Product liability (24)
- [ ] Medical malpractice (45)
- [ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [ ] Business tort/unfair business practice (07)
- [ ] Civil rights (08)
- [ ] Defamation (13)
- [ ] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [ ] Other non-PI/PD/WD tort (35)

**Employment**
- [ ] Wrongful termination (36)
- [ ] Other employment (15)

**Contract**
- [ ] Breach of contract/warranty (06)
- [ ] Collections (09)
- [ ] Insurance coverage (18)
- [X] Other contract (37)

**Real Property**
- [ ] Eminent domain/Inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [ ] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re: arbitration award (11)
- [ ] Writ of mandate (02)
- [ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 1800–1812)**
- [ ] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [ ] Mass tort (40)
- [ ] Securities litigation (28)
- [ ] Environmental/Toxic tort (30)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition *(not specified above)* (43)

2. This case [ ] is [X] is not complex under rule 1800 of the California Rules of Court. If case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states or countries, or in a federal court
   f. [ ] Substantial post-judgment judicial supervision
3. Type of remedies sought *(check all that apply)*:
   a. [X] monetary b. [X] nonmonetary; declaratory or injunctive relief c. [X] punitive
4. Number of causes of action *(specify)*: 15
5. This case [ ] is [X] is not a class action suit.

Date: February 24, 2005

Mark D. Kremer
(TYPE OR PRINT NAME)

(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

### NOTICE

- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate, Family, or Welfare and Institutions Code). (Cal. Rules of Court, rule 201.8.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 1800 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a complex case, this cover sheet shall be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2003]

CIVIL CASE COVER SHEET

Cal. Rules of Court, rules 201.8, 1800–1812;
Standards of Judicial Administration, § 19

Legal Solutions Plus

EXHIBIT 9 PAGE 236

ORIGINAL

SHORT TITLE: Farhad Larian v. Morad Zarabi, et al. | CASE NUMBER BC329501

# CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

This form is required pursuant to LASC Local Rule 2.0 in all new civil case filings in the Los Angeles Superior Court.

Item I. Check the types of hearing and fill in the estimated length of hearing expected for this case:
JURY TRIAL? [X] YES CLASS ACTION? [ ] YES LIMITED CASE? [ ] YES TIME ESTIMATED FOR TRIAL 7 [ ] HOURS/ [X] DAYS.

Item II. Select the correct district and courthouse location (4 steps – If you checked "Limited Case", skip to Item III, Pg. 4):

**Step 1:** After first completing the Civil Case Cover Sheet Form, find the main civil case cover sheet heading for your case in the left margin below, and, to the right in Column **A**, the Civil Case Cover Sheet case type you selected.

**Step 2:** Check one Superior Court type of action in Column **B** below which best describes the nature of this case.

**Step 3:** In Column **C**, circle the reason for the court location choice that applies to the type of action you have checked. For any exception to the court location, see Los Angeles Superior Court Local Rule 2.0.

**Applicable Reasons for Choosing Courthouse Location (See Column C below)**

1. Class Actions must be filed in the County Courthouse, Central District.
2. May be filed in Central (Other county, or no Bodily Injury/Property Damage).
3. Location where cause of action arose.
4. Location where bodily injury, death or damage occurred.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.
7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office.

**Step 4:** Fill in the information requested on page 4 in Item III; complete Item IV. Sign the declaration.

| | A<br>Civil Case Cover Sheet Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons - See Step 3 Above |
|---|---|---|---|
| Auto Tort | Auto (22) | [ ] A7100 Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| Auto Tort | Uninsured Motorist (46) | [ ] A7110 Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1., 2., 4. |
| Other Personal Injury/Property Damage/Wrongful Death Tort | Asbestos (04) | [ ] A6070 Asbestos Property Damage | 2. |
| | | [ ] A7221 Asbestos - Personal Injury/Wrongful Death | 2. |
| | Product Liability (24) | [ ] A7260 Product Liability (not asbestos or toxic/environmental) | 1., 2., 3., 4., 8. |
| | Medical Malpractice (45) | [ ] A7210 Medical Malpractice - Physicians & Surgeons | 1., 2., 4. |
| | | [ ] A7240 Other Professional Health Care Malpractice | 1., 2., 4. |
| | Other Personal Injury Property Damage Wrongful Death (23) | [ ] A7250 Premises Liability (e.g., slip and fall) | 1., 2., 4. |
| | | [ ] A7230 Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.) | 1., 2., 4. |
| | | [ ] A7270 Intentional Infliction of Emotional Distress | 1., 2., 3. |
| | | [ ] A7220 Other Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| Non-Personal Injury/Property Damage/Wrongful Death Tort | Business Tort (07) | [ ] A6029 Other Commercial/Business Tort (not fraud/breach of contract) | 1., 2., 3. |
| | Civil Rights (08) | [ ] A6005 Civil Rights/Discrimination | 1., 2., 3. |
| | Defamation (13) | [ ] A6010 Defamation (slander/libel) | 1., 2., 3. |
| | Fraud (16) | [ ] A6013 Fraud (no contract) | 1., 2., 3. |
| | Intellectual Property (19) | [ ] A6016 Intellectual Property | 2., 3. |

EXHIBIT 9 PAGE 237

SHORT TITLE: Farhad Larian v. Morad Zarabi, et al. | CASE NUMBER

| | A<br>Civil Case Cover Sheet Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons - See Step 3 Above |
|---|---|---|---|
| Non-Personal Injury/Property Damage/ Wrongful Death Tort (Cont'd.) | Professional Negligence (25) | [ ] A6017 Legal Malpractice | 1., 2., 3. |
| | | [ ] A6050 Other Professional Malpractice (not medical or legal) | 1., 2., 3. |
| | Other (35) | [ ] A6025 Other Non-Personal Injury/Property Damage tort | 2., 3. |
| Employment | Wrongful Termination (36) | [ ] A6037 Wrongful Termination | 1., 2., 3. |
| | Other Employment (15) | [ ] A6024 Other Employment Complaint Case | 1., 2., 3. |
| | | [ ] A6109 Labor Commissioner Appeals | 10. |
| Contract | Breach of Contract/ Warranty (06) (not insurance) | [ ] A6004 Breach of Rental/Lease Contract (not Unlawful Detainer or wrongful eviction) | 2., 5. |
| | | [ ] A6008 Contract/Warranty Breach-Seller Plaintiff (no fraud/negligence) | 2., 5. |
| | | [ ] A6019 Negligent Breach of Contract/Warranty (no fraud) | 1., 2., 5. |
| | | [ ] A6028 Other Breach of Contract/Warranty (not fraud or negligence) | 1., 2., 5. |
| | Collections (09) | [ ] A6002 Collections Case-Seller Plaintiff | 2., 5., 6. |
| | | [ ] A6012 Other Promissory Note/Collections Case | 2., 5. |
| | Insurance Coverage (18) | [ ] A6015 Insurance Coverage (not complex) | 1., 2., 5., 8. |
| | Other Contract (37) | [X] A6009 Contractual Fraud | 1., (2.) 3., 5. |
| | | [ ] A6031 Tortious Interference | 1., 2., 3., 5. |
| | | [ ] A6027 Other Contract Dispute (not breach/insurance/fraud/negligence) | 1., 2., 3., 8. |
| Real Property | Eminent Domain/Inverse Condemnation (14) | [ ] A7300 Eminent Domain/Condemnation Number of parcels ______ | 2. |
| | Wrongful Eviction (33) | [ ] A6023 Wrongful Eviction Case | 2., 6. |
| | Other Real Property (26) | [ ] A6018 Mortgage Foreclosure | 2., 6. |
| | | [ ] A6032 Quiet Title | 2., 6. |
| | | [ ] A6060 Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2., 6. |
| Unlawful Detainer | Unlawful Detainer - Commercial (31) | [ ] A6021 Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer - Residential (32) | [ ] A6020 Unlawful Detainer-Residential (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer - Drugs (38) | [ ] A6022 Unlawful Detainer-Drugs | 2., 6. |
| Judicial Review | Asset Forfeiture (05) | [ ] A6108 Asset Forfeiture Case | 2., 6. |
| | Petition re Arbitration (11) | [ ] A6115 Petition to Compel/Confirm/ Vacate Arbitration | 2., 5. |

EXHIBIT 9 PAGE 238

| SHORT TITLE: Farhad Larian v. Morad Zarabi, et al. | CASE NUMBER |
|---|---|

| | A<br>Civil Case Cover Sheet Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons - See Step 3 Above |
|---|---|---|---|
| Judicial Review (Cont'd.) | Writ of Mandate (02) | A6151 Writ - Administrative Mandamus | 2., 8. |
| | | A6152 Writ - Mandamus on Limited Court Case Matter | 2. |
| | | A6153 Writ - Other Limited Court Case Review | 2. |
| | Other Judicial Review (39) | A6150 Other Writ / Judicial Review | 2., 8. |
| Provisionally Complex Litigation | Antitrust/Trade Regulation (03) | A6003 Antitrust/Trade Regulation | 1., 2., 8. |
| | Construction Defect (10) | A6007 Construction defect | 1., 2., 3. |
| | Claims Involving Mass Tort (40) | A6006 Claims Involving Mass Tort | 1., 2., 8. |
| | Securities Litigation (28) | A6035 Securities Litigation Case | 1., 2., 8. |
| | Toxic Tort Environmental (30) | A6036 Toxic Tort/Environmental | 1., 2., 3., 8. |
| | Insurance Coverage Claims from Complex Case (41) | A6014 Insurance Coverage/Subrogation (complex case only) | 1., 2., 5., 8. |
| Enforcement of Judgment | Enforcement of Judgment (20) | A6141 Sister State Judgment | 2., 9. |
| | | A6160 Abstract of Judgment | 2., 6. |
| | | A6107 Confession of Judgment (non-domestic relations) | 2., 9. |
| | | A6140 Administrative Agency Award (not unpaid taxes) | 2., 8. |
| | | A6114 Petition/Certificate for Entry of Judgment on Unpaid Tax | 2., 8. |
| | | A6112 Other Enforcement of Judgment Case | 2., 8., 9. |
| Miscellaneous Civil Complaints | RICO (27) | A6033 Racketeering (RICO) Case | 1., 2., 8. |
| | Other Complaints (Not Specified Above) (42) | A6030 Declaratory Relief Only | 1., 2., 8. |
| | | A6040 Injunctive Relief Only (not domestic/harassment) | 2., 8. |
| | | A6011 Other Commercial Complaint Case (non-tort/non-complex) | 1., 2., 8. |
| | | A6000 Other Civil Complaint (non-tort/non-complex) | 1., 2., 8. |
| Miscellaneous Civil Petitions | Partnership/Corporation Governance (21) | A6113 Partnership and Corporate Governance Case | 2., 8. |
| | Other Petitions (Not Specified Above) (43) | A6121 Civil Harassment | 2., 3., 9. |
| | | A6123 Workplace Harassment | 2., 3., 9. |
| | | A6124 Elder/Dependent Adult Abuse Case | 2., 3., 9. |
| | | A6190 Election Contest | 2. |
| | | A6110 Petition for Change of Name | 2., 7. |
| | | A6170 Petition for Relief from Late Claim Law | 2., 3., 4., 8. |
| | | A6100 Other Civil Petition | 2., 9. |

EXHIBIT 9 PAGE 239

| SHORT TITLE: Farhad Larian v. Morad Zarabi, et al. | CASE NUMBER |
|---|---|

Item III. Statement of Location: Enter the address of the accident, party's residence or place of business, performance, or other circumstance indicated in Item II., **Step 3** on Page 1, as the proper reason for filing in the court location you selected.

| REASON: CHECK THE NUMBER UNDER COLUMN C WHICH APPLIES IN THIS CASE | | | ADDRESS: |
|---|---|---|---|
| ☐1. ☒2. ☐3. ☐4. ☐5. ☐6. ☐7. ☐8. ☐9. ☐10. | | | 20120 Plummer Street |
| CITY: Chatsworth | STATE: CA | ZIP CODE: 91311 | |

Item IV. *Declaration of Assignment:* I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that the above-entitled matter is properly filed for assignment to the Stanley Mosk courthouse in the Central District of the Los Angeles Superior Court (Code of Civ. Proc., § 392 et seq., and LASC Local Rule 2.0, subds. (b), (c) and (d)).

Dated: February 24, 2005

(SIGNATURE OF ATTORNEY/FILING PARTY)

**PLEASE HAVE THE FOLLOWING DOCUMENTS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.
2. If filing a Complaint, a completed Summons form for issuance by the Clerk.
3. Civil Case Cover Sheet form JC 982.2(b)(1).
4. Complete Addendum to Civil Case Cover Sheet form CIV 109 ____________ (eff. Date).
5. Payment in full of the filing fee, unless fees have been waived.
6. Signed order appointing the Guardian ad Litem, JC form 982(a)(27), if the plaintiff or petitioner is a minor under 18 years of age, or if required by Court.
7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

# EXHIBIT 10

Westlaw.

123 Cal.App.4th 751, 19 Cal.Rptr.3d 916, 04 Cal. Daily Op. Serv. 9657, 04 Cal. Daily Op. Serv. 10,191, 2004 Daily Journal D.A.R. 13,211
**(Cite as: 123 Cal.App.4th 751)**

**H**
Larian v. Larian
Cal.App. 2 Dist.,2004.

Court of Appeal, Second District, Division 5, California.
Farhad LARIAN, Plaintiff and Respondent,
v.
Isaac LARIAN, Defendant and Appellant.
**No. B171891.**

Oct. 28, 2004.
As Modified on Denial of Rehearing Nov. 16, 2004.

**Background:** Shareholder in family corporation sued president of corporation, alleging, inter alia, fraud in arbitration process leading to shareholder's sale of shares at below market value. President moved to compel arbitration pursuant to parties' agreement to arbitrate. The Superior Court, Los Angeles County, No. BC301371,Rodney E. Nelson, J., denied motion, and president appealed.

**Holding:** The Court of Appeal, Turner, P.J., held that there was no evidence of fraud in inception or execution of arbitration agreement, and thus shareholder's claim that president's fraud was sufficient to warrant nonenforcement of arbitration agreement was to be resolved in arbitral forum.

Reversed with directions.

Mosk, J., filed an opinion concurring in the result.
West Headnotes
**[1] Alternative Dispute Resolution 25T ⚷117**

25T Alternative Dispute Resolution
25TII Arbitration
25TII(A) Nature and Form of Proceeding
25Tk117 k. Preemption. Most Cited Cases
(Formerly 33k2.2 Arbitration)

**States 360 ⚷18.15**

360 States
360I Political Status and Relations
360I(B) Federal Supremacy; Preemption
360k18.15 k. Particular Cases, Preemption or Supersession. Most Cited Cases
(Formerly 33k2.2 Arbitration)
The United States Arbitration Act was inapplicable to judicial resolution of arbitration agreement that provided that California law applied. 9 U.S.C.A. § 1 et seq.

**[2] Alternative Dispute Resolution 25T ⚷113**

25T Alternative Dispute Resolution
25TII Arbitration
25TII(A) Nature and Form of Proceeding
25Tk113 k. Arbitration Favored; Public Policy. Most Cited Cases
(Formerly 33k1.2 Arbitration)
California law favors enforcement of arbitration agreements.

**[3] Alternative Dispute Resolution 25T ⚷139**

25T Alternative Dispute Resolution
25TII Arbitration
25TII(B) Agreements to Arbitrate
25Tk136 Construction
25Tk139 k. Construction in Favor of Arbitration. Most Cited Cases
(Formerly 33k7.1 Arbitration)
Any doubts as to whether an arbitration clause applies to a particular dispute should be resolved in favor of requiring the parties to arbitrate.

**[4] Alternative Dispute Resolution 25T ⚷112**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 3 of 12

123 Cal.App.4th 751

Page 2

123 Cal.App.4th 751, 19 Cal.Rptr.3d 916, 04 Cal. Daily Op. Serv. 9657, 04 Cal. Daily Op. Serv. 10,191, 2004 Daily Journal D.A.R. 13,211
**(Cite as: 123 Cal.App.4th 751)**

25T Alternative Dispute Resolution
25TII Arbitration
25TII(A) Nature and Form of Proceeding
25Tk112 k. Contractual or Consensual Basis. Most Cited Cases
(Formerly 33k2.2 Arbitration)

**Alternative Dispute Resolution 25T ⚿134(1)**

25T Alternative Dispute Resolution
25TII Arbitration
25TII(B) Agreements to Arbitrate
25Tk131 Requisites and Validity
25Tk134 Validity
25Tk134(1) k. In General. Most Cited Cases
(Formerly 33k6.2 Arbitration)
The right to compel arbitration depends upon the existence of a valid agreement to arbitrate between the parties, and this question is determined by reference to the law applicable to contracts generally.

**[5] Alternative Dispute Resolution 25T ⚿112**

25T Alternative Dispute Resolution
25TII Arbitration
25TII(A) Nature and Form of Proceeding
25Tk112 k. Contractual or Consensual Basis. Most Cited Cases
(Formerly 33k1.1 Arbitration)
Although California has a strong public policy in favor of arbitration, there is no preference for the arbitral forum when the parties have not agreed to arbitrate.

**[6] Alternative Dispute Resolution 25T ⚿210**

25T Alternative Dispute Resolution
25TII Arbitration
25TII(D) Performance, Breach, Enforcement, and Contest
25Tk204 Remedies and Proceedings for Enforcement in General
25Tk210 k. Evidence. Most Cited Cases
(Formerly 33k23.10 Arbitration)
Before a party may be compelled to arbitrate a claim, the petitioning party has the burden of proving the existence of a valid arbitration clause and the dispute is covered by the agreement.

**[7] Alternative Dispute Resolution 25T ⚿210**

25T Alternative Dispute Resolution
25TII Arbitration
25TII(D) Performance, Breach, Enforcement, and Contest
25Tk204 Remedies and Proceedings for Enforcement in General
25Tk210 k. Evidence. Most Cited Cases
(Formerly 33k23.10 Arbitration)
If a party moving to compel arbitration meets its burden of proving the existence of a valid arbitration clause and the dispute is covered by the agreement, the opponent of arbitration has to prove by a preponderance of the evidence any defense to the petition or motion to compel the dispute to be arbitrated.

**[8] Alternative Dispute Resolution 25T ⚿134(3)**

25T Alternative Dispute Resolution
25TII Arbitration
25TII(B) Agreements to Arbitrate
25Tk131 Requisites and Validity
25Tk134 Validity
25Tk134(3) k. Validity of Assent. Most Cited Cases
(Formerly 33k6.2 Arbitration)
There was no evidence of fraud in inception or execution of agreement to arbitrate between shareholder and president of family corporation, and thus shareholder's claim that president's fraud in arbitration process, leading to shareholder's sale of shares at below market value, was sufficient to warrant nonenforcement of arbitration agreement was to be resolved in arbitral forum; shareholder's evidence indicated only fraud in inducement, which was not sufficient to render agreement unenforceable.
*See 6 Witkin, Cal. Procedure (4th ed. 1997) Proceedings Without Trial, §§ 501, 502; Knight et al., Cal. Practice Guide: Alternative Dispute Resolution (The Rutter Group 2003) ¶ 5:112 et*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 10 PAGE 242

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split&rs=WLW7.1... 11/29/2007

Page 4 of 12

123 Cal.App.4th 751

Page 3

123 Cal.App.4th 751, 19 Cal.Rptr.3d 916, 04 Cal. Daily Op. Serv. 9657, 04 Cal. Daily Op. Serv. 10,191, 2004 Daily Journal D.A.R. 13,211
**(Cite as: 123 Cal.App.4th 751)**

*seq. (CAADR Ch. 5-D); Cal. Jur. 3d, Arbitration and Award, § 36; Cal. Civil Practice (Thomson/West 2003) Procedure, § 26:49.*

**917 Kaye Scholer LLP, Larry R. Feldman, Robert M. Turner, and J. Andrew Sjoblom, Los Angeles, for Defendant and Appellant.
Howarth & Smith, Don Howarth, Suzelle M. Smith, Brian D. Bubb, and Robert D. Brain, Los Angeles, for Plaintiff and Respondent.TURNER, P.J.

*754 I. INTRODUCTION

Defendant, Isaac Larian, appeals from an order denying his motion to compel arbitration. The lawsuit containing numerous causes of action was filed by plaintiff, Farhad Larian. Plaintiff and defendant are brothers. We conclude there is no evidence the parties signed the September 28, or December 4, 2000, arbitration agreements because of any fraud in the inception or execution as defined by the California Supreme Court in *Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 415-416, 58 Cal.Rptr.2d 875, 926 P.2d 1061. In the absence of evidence of fraud in the inception or execution of the September 28 or December 4, 2000, arbitration agreements, the trial court was required to grant defendant's motion to compel the parties to arbitrate their dispute. We reverse the order denying the motion to compel arbitration.

II. BACKGROUND

A. The Complaint

The complaint, containing 10 causes of action, was filed on August 25, 2003. It alleges plaintiff and defendant formed an equal partnership in 1979 to import and distribute name brand consumer products. In 1982, the partnership was incorporated as a closely held corporation, ABC International Traders, Inc. In 1985 or 1986, plaintiff and defendant sold 10 percent of their stock to their brother-in-law. After the sale, plaintiff and defendant each owned 45 percent of the stock of the company. In 1994, plaintiff and defendant became equal 45 percent shareholders in MGA Hong Kong, Limited and operated part of ABC International Traders, Inc. through this entity. In 2002, the name of ABC International Traders, Inc. was changed to MGA Entertainment, Inc. In 1993, plaintiff and defendant began having disputes over the operation of the company. Plaintiff and defendant discussed having one brother buy out the other's equity interest. An outside appraisal of the company valued the company at $35 million to $40 million.

**918 By 1999, defendant, as president, assumed control of sales, product development, and financial matters. Plaintiff was less involved in the day-to-day sales and financial control of the company. In late 1999 or early 2000, *755 defendant became aware of "Bratz" dolls, a new product line which had a tremendous potential. The complaint alleges that, after learning of the product line, defendant devised a plan to keep the business opportunity, the Bratz doll product line, secret from plaintiff and to gain control of the company. The complaint alleged that defendant intended to gain control of MGA Entertainment, Inc. by buying plaintiff's shares at a depressed value. The buyout would not include the potential business opportunity involving the new doll line.

In "early" 2000, defendant called a meeting to discuss the new Bratz product line with selected members of the company. Defendant concealed the meeting and discussion about the proposed new product line from plaintiff. In February 2000, defendant tried to dissuade plaintiff from attending the New York Toy Fair. Plaintiff had routinely attended the New York Toy Fair in the past. Defendant was furious with plaintiff for attending the toy fair, where discussions and research for market potential and new product lines take place. Defendant expelled plaintiff from meetings plaintiff tried to attend. Plaintiff was excluded from any discussions defendant may have had relating to the Bratz product line at the fair.

In early March 2000, defendant offered to purchase all of plaintiff's 45 percent interest in the company, MGA Entertainment, Inc., for $9 million. The

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 10 PAGE 243

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split&rs=WLW7.1... 11/29/2007

Page 5 of 12

123 Cal.App.4th 751 Page 4

123 Cal.App.4th 751, 19 Cal.Rptr.3d 916, 04 Cal. Daily Op. Serv. 9657, 04 Cal. Daily Op. Serv. 10,191, 2004 Daily Journal D.A.R. 13,211
**(Cite as: 123 Cal.App.4th 751)**

offer was based on a total value of the company at $20 million. This did not include plans and actions already taken regarding the Bratz product line, which allegedly would bring $3 billion in sales in the next few years. The financial information at the company was handled by defendant and its controller, Dennis Medici.

The complaint further alleged that throughout 2000, defendant repeatedly and routinely shared with plaintiff misleading financial information showing the company was performing poorly. In May 2000, defendant instructed Mr. Medici not to share any information about the financial operation of MGA Entertainment, Inc. with plaintiff. Defendant continued to conceal the company's plans and actions regarding the new doll line.

It is alleged that, on September 18, 2000, defendant caused the company to enter into a worldwide licensing agreement of the Bratz dolls and related items. Defendant concealed the existence of the licensing agreement from plaintiff. During September 2000, defendant continued to seek to buy plaintiff's interest in MGA Entertainment, Inc. The complaint alleges: "[Defendant] kept the Bratz opportunity and other information about the true financial *756 condition of the Company hidden from [plaintiff] in an effort to secure [plaintiff's] agreement to a proposed arbitration process with their uncle, Morad Zarabi. [Defendant] agreed, and induced [plaintiff] to agree, to the arbitration process without disclosing that during the arbitration he would conceal the Company's plans and actions undertaken regarding the Bratz line, and other financial information about the Company so that such information would not be included in Mr. Zarabi's valuation of the Company."

On September 28, 2000, plaintiff and defendant executed an "Agreement to Arbitrate and Selection of Arbitrator." Plaintiff alleges he was unaware of the true facts before executing the arbitration agreement; had he known the true facts, he would not have entered into the agreement to arbitrate and would not have **919 agreed to sell his shares; he would have placed greater restrictions and obligations on the powers of any arbitrator including a requirement that the company be valued by an independent appraiser outside of the family; and defendant fraudulently concealed the true facts from plaintiff and the arbitrator during the arbitration process.

On December 4, 2000, as a result of the September 28, 2000, agreement to arbitrate the sale of the stock, the parties entered into a settlement and resolution of their differences, whereby plaintiff agreed to sell his shares to defendant at a below fair market price of less than $9 million. Plaintiff discovered the true facts in spring or summer 2002. Plaintiff requested rescission and damages based on the following theories: fraud and deceit in the inducement of the arbitration agreement (first); fiduciary duties breach (second); fraud and deceit in the arbitration process (third); breach of the implied covenant of good faith and fair dealing in the arbitration agreement (fourth); violation of California Corporations Code (fifth and sixth); fraud and deceit regarding the December 4, 2000 agreement (seventh); negligent misrepresentation (eighth); unfair competition in violation of Business and Professions Code section 17200 et seq. (ninth); and rescission based on mistake (10th).

B. The Motion to Compel Arbitration

On October 24, 2003, defendant moved to compel arbitration of the action on the grounds the parties entered into a broad arbitration agreement which covers the disputes alleged in the complaint; by executing the September 28, 2000, agreement, plaintiff agreed to submit the fraud claim asserted in the complaint to the arbitrator; and the arbitrator must decide the fraud claims as a matter of law. In support of the motion, defendant attached a copy of the *757 September 28, 2000, arbitration agreement. Paragraph 5 of the September 28, 2000, arbitration agreement gave an uncle, Morad Zarabi, the power to arbitrate the disputes between the brothers.

Defendant declared that the parties participated in the arbitration. The arbitrator, Mr. Zarabi, retained an appraiser, an accountant, and attorneys. Mr.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 20 PAGE 214

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split&rs=WLW7.1... 11/29/2007

Page 6 of 12

123 Cal.App.4th 751 Page 5

123 Cal.App.4th 751, 19 Cal.Rptr.3d 916, 04 Cal. Daily Op. Serv. 9657, 04 Cal. Daily Op. Serv. 10,191, 2004 Daily Journal D.A.R. 13,211
**(Cite as: 123 Cal.App.4th 751)**

Zarabi also gathered information and conducted hearings. In December 2000, Mr. Zarabi, the arbitrator, issued his award. The December 4, 2000, agreement required defendant to purchase plaintiff's stock. According to defendant, "[The award] was embodied in the Agreement for Sale of Stock drafted by the arbitrator's attorneys, Stern & Goldberg." Under the terms of the December 4, 2000, agreement, plaintiff was to receive $8,775,000 for his stock. For the stock, defendant was to pay plaintiff $500,000 at the closing of escrow. Defendant was also obligated to execute a promissory note for the balance. Under the terms of the promissory note, defendant was required to pay plaintiff $2 million by April 15, 2001. Moreover, defendant was obligated to pay plaintiff $83,798.90 commencing the first of each month commencing June 1, 2001. Interest was to accrue at the rate of 9.5 percent per annum on unpaid sums. Paragraph 9 of the December 4, 2000, sales agreement contains the following arbitration clause: "[A]ny controversy between the parties arising out of this Agreement or the Agreements contained in the Exhibits attached hereto shall be submitted to [Mr. Zarabi] who shall serve as sole arbitrator with respect to said disputes. The decision of [Mr. Zarabi] shall be final and binding upon both parties. "

On January 26, 2003, plaintiff submitted a list of claims to the arbitrator, Mr. Zarabi. Plaintiff asserted these claims were subject to arbitration. The list included: "The December 2000 appraisal of MGA, **920 which the arbitrator relied upon to establish the value of MGA, was substantially understated as a result of [defendant's] concealment of the Bratz doll license agreement. That license agreement was material to the value of MGA but was not considered in setting MGA's value because of [defendant's] concealment from the arbitrator."

Plaintiff opposed the motion to compel arbitration on the grounds the court, not the arbitrator, must decide whether a party was fraudulently induced to consent to an arbitration agreement; fraud in the inducement of the arbitration agreement was not submitted to any arbitrator; and the court should resolve the fraud in the inducement claim because the arbitration proceedings could be void. Plaintiff declared that on September 18, 2000, defendant secretly finalized and obtained a worldwide license agreement for *758 the Bratz dolls. The September 18, 2000, agreement provided that defendant and MGA Entertainment, Inc. were the exclusive worldwide distributors of Bratz dolls and related products. Ten days later, on September 28, 2000, defendant induced plaintiff to sign the arbitration agreement without disclosing the Bratz opportunity and licenses. The Bratz product line has generated several hundred million dollars in revenues for MGA Entertainment, Inc. and is expected to earn more than $1 billion annually for the company. Further, according to plaintiff, Mr. Zarabi never returned an award. Rather, the December 4, 2000, stock sale agreement was the result of negotiations between plaintiff and defendant.

In reply to the opposition, defendant argued plaintiff did not dispute the critical facts which required arbitration of the dispute. Those facts included that the parties agreed to arbitrate the sale of the stock in September 2000. Mr. Zarabi, the arbitrator, decided which party should sell his stock to the other and the price. On December 4, 2000, the brothers signed the sales agreement incorporating the price and terms as determined by the arbitrator, Mr. Zarabi. The parties have fully performed the sales transaction. Defendant contended plaintiff submitted the fraud issue to the arbitrator in January 2003. Defendant further argued that the complaint only alleges fraud during the events leading up to the agreements; it does not allege facts showing fraud in the inducement or execution of the arbitration clauses. According to defendant, the issue of whether he fraudulently withheld information during the arbitration process must be decided by the arbitrator.

The trial court denied the motion to compel concluding that the allegation of fraud in the execution of the arbitration agreement as alleged in the complaint must be decided by the court. In denying the motion, the court cited Code of Civil Procedure section 1281 [FN1]; *Rosenthal v. Great Western Fin. Securities Corp., supra,* 14 Cal.4th at

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 10 PAGE 245

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split&rs=WLW7.1... 11/29/2007

Page 7 of 12

123 Cal.App.4th 751

Page 6

123 Cal.App.4th 751, 19 Cal.Rptr.3d 916, 04 Cal. Daily Op. Serv. 9657, 04 Cal. Daily Op. Serv. 10,191, 2004 Daily Journal D.A.R. 13,211
**(Cite as: 123 Cal.App.4th 751)**

page 419, 58 Cal.Rptr.2d 875, 926 P.2d 1061; and *Bolter v. Superior Court* (2001) 87 Cal.App.4th 900, 906, 104 Cal.Rptr.2d 888. The trial court ruled that the complaint adequately alleged that had plaintiff known about the pending Bratz product line, he would not have: signed the arbitration agreement, agreed to participate in the arbitration, and agreed to sell his shares in MGA Entertainment, Inc. The trial court further ruled: "It is true ... that there are references to the arbitration process in the [f]irst [c]ause of [a]ction. The concealment of the Bratz line from the arbitrator was a **921 ... piece of the process. That is, plaintiff would have no complaint if the full facts had been revealed in the arbitration. Both those references do not eliminate the allegations that he would not have entered into the arbitration agreement but for the alleged fraud."

FN1. All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

*759 III. Discussion

A. Overview

[1][2][3][4][5] The outcome of this appeal is controlled by the provisions of the California Arbitration Act. The September 28, 2000, arbitration agreement explicitly provides it is subject to the California Arbitration Act. Further, the December 4, 2000, agreement provides it is to be applied pursuant to California law. Hence, the United States Arbitration Act, title 9 United States Code section 1 et seq., is inapplicable to this appeal. (*Volt Information Sciences, Inc. v. Board of Trustees of Leland* (1989) 489 U.S. 468, 470, 109 S.Ct. 1248, 103 L.Ed.2d 488; accord, *Mount Diablo Medical Center v. Health Net of California, Inc.* (2002) 101 Cal.App.4th 711, 714-726, 124 Cal.Rptr.2d 607.) California law favors enforcement of arbitration agreements. ( *Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 97, 99 Cal.Rptr.2d 745, 6 P.3d 669; *Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 9, 10 Cal.Rptr.2d 183, 832 P.2d 899.)Section 1281 provides: "A written agreement to submit to arbitration an existing controversy or a controversy thereafter arising is valid, enforceable and irrevocable, save upon such grounds as exist for the revocation of any contract." The trial court has authority to compel arbitration pursuant to section 1281.2, which provides in part: "On petition of a party to an arbitration agreement alleging the existence of a written agreement to arbitrate a controversy and that a party thereto refuses to arbitrate such controversy, the court shall order the petitioner and respondent to arbitrate the controversy if it determines that an agreement to arbitrate the controversy exists, unless it determines that ... [¶] (b) Grounds exist for the revocation of the agreement." Plaintiff argues that he was fraudulently induced to enter into the September 28, 2000, arbitration agreement. It is this fraud that plaintiff argues warrants revocation, or to be more precise, nonenforcement of the September 28, 2000, arbitration agreement. Any doubts as to whether an arbitration clause applies to a particular dispute should be resolved in favor of requiring the parties to arbitrate. (*Vianna v. Doctors' Management Co.* (1994) 27 Cal.App.4th 1186, 1189, 33 Cal.Rptr.2d 188; *United Transportation Union v. Southern Cal. Rapid Transit Dist.* (1992) 7 Cal.App.4th 804, 808, 9 Cal.Rptr.2d 702.) However, the right to compel arbitration depends upon the existence of a valid agreement to arbitrate between the parties. (*County of Contra Costa v. Kaiser Foundation Health Plan, Inc.* (1996) 47 Cal.App.4th 237, 245, 54 Cal.Rptr.2d 628; *Marsch v. Williams* (1994) 23 Cal.App.4th 250, 255, 28 Cal.Rptr.2d 398.) The question of whether a valid agreement to arbitrate exists is determined by reference to the law applicable to contracts generally.*760 *Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 971-973, 64 Cal.Rptr.2d 843, 938 P.2d 903; *Kinney v. United HealthCare Services, Inc.* (1999) 70 Cal.App.4th 1322, 1327-1328, 83 Cal.Rptr.2d 348.) Although, as noted, California has a strong public policy in favor of arbitration, there is no preference for the arbitral forum when the parties have not agreed to arbitrate. (*Freeman v. State Farm Mut. Auto. Ins. Co.* (1975) 14 Cal.3d 473, 481, 121 Cal.Rptr. 477, 535 P.2d 341; *Cione v. Foresters Equity Services, Inc.* (1997) 58

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 10 PAGE 246

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split&rs=WLW7.1... 11/29/2007

Page 8 of 12

123 Cal.App.4th 751

Page 7

123 Cal.App.4th 751, 19 Cal.Rptr.3d 916, 04 Cal. Daily Op. Serv. 9657, 04 Cal. Daily Op. Serv. 10,191, 2004 Daily Journal D.A.R. 13,211
**(Cite as: 123 Cal.App.4th 751)**

Cal.App.4th 625, 634, 68 Cal.Rptr.2d 167.)

**922 [6][7] Before a party may be compelled to arbitrate a claim, the petitioning party has the burden of proving the existence of a valid arbitration clause and the dispute is covered by the agreement. (*Engalla v. Permanente Medical Group, Inc., supra,* 15 Cal.4th at p. 972, 64 Cal.Rptr.2d 843, 938 P.2d 903; *Rosenthal v. Great Western Fin. Securities Corp., supra,* 14 Cal.4th at pp. 413-414, 58 Cal.Rptr.2d 875, 926 P.2d 1061.) If the moving party meets its burden, the opponent of arbitration has to prove by a preponderance of the evidence any defense to the petition or motion to compel the dispute to be arbitrated. (*Engalla v. Permanente Medical Group, Inc., supra,* 15 Cal.4th at p. 972, 64 Cal.Rptr.2d 843, 938 P.2d 903; *Rosenthal v. Great Western Fin. Securities Corp., supra,* 14 Cal.4th at p. 413, 58 Cal.Rptr.2d 875, 926 P.2d 1061.) Each case must be decided on its own facts. (*King v. Larsen Realty, Inc.* (1981) 121 Cal.App.3d 349, 357, 175 Cal.Rptr. 226; *Williams Constr. Co. v. Standard-Pacific Corp.* (1967) 254 Cal.App.2d 442, 454, 61 Cal.Rptr. 912.)

B. Supreme Court Authority

Three Supreme Court decisions define the limited scope of judicial review of a claim that fraud prevents enforcement of an arbitration clause. In *Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc. v. 100 Oak Street* (1983) 35 Cal.3d 312, 315, 197 Cal.Rptr. 581, 673 P.2d 251, a lease contained an arbitration clause. A dispute arose about the air conditioning in the premises and the tenant, a law firm, filed suit. The tenant argued it was fraudulently induced to enter into the lease which contained the arbitration clause. The trial court accepted the tenant's fraudulent inducement defense to the arbitration clause contention. The trial court entered an order denying the lessor's motion to compel arbitration.

The Supreme Court held that claims of fraud in the inducement must be resolved by the arbitrator: " Therefore, in the absence of indication of contrary intent, and where the arbitration clause is reasonably susceptible of such an interpretation, claims of fraud in the inducement of the contract (as distinguished from claims of fraud directed to the arbitration clause itself) *761 will be deemed subject to arbitration." (*Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc. v. 100 Oak Street, supra,* 35 Cal.3d at p. 323, 197 Cal.Rptr. 581, 673 P.2d 251.) Associate Justice Joseph R. Grodin then explained that the trial court's order denying the motion to compel the parties to arbitrate because of the fraudulent representations which induced the tenant to execute the lease which contained the arbitration clause was in error: " Indeed, the claim of substantive breach-that the air conditioning did not perform properly-is totally embraced within the claim of fraud-that the lessor knew, at the time of the lease, that the air conditioning would not perform. Thus, if the trial court were to proceed to determine the fraud claim it would almost certainly have to decide the claim of substantive breach as well, and the original expectations of the parties-that such questions would be determined through arbitration-would be totally defeated. However the fraud claim were determined, there would be virtually nothing left for the arbitrator to decide. We conclude that the arbitration clause is broad enough to include this claim of fraud in the inducement." (*Id.* at p. 324, 197 Cal.Rptr. 581, 673 P.2d 251.)

In *Rosenthal v. Great Western Fin. Securities Corp., supra,* 14 Cal.4th at page 415, 58 Cal.Rptr.2d 875, 926 P.2d 1061, the Supreme Court explained the distinction between arbitrable and nonarbitrable fraud claims which are asserted as grounds for voiding an arbitration clause: **923 " California law distinguishes between fraud in the ' execution' or 'inception' of a contract and fraud in the 'inducement' of a contract. In brief, in the former case " 'the fraud goes to the inception or execution of the agreement, so that the promisor is deceived as to the nature of his act, and actually does not know what he is signing, or does not intend to enter into a contract at all, mutual assent is lacking, and [the contract] is *void.* In such a case it may be disregarded without the necessity of rescission.' "(*Ford v. Shearson Lehman American Express, Inc.* (1986) 180 Cal.App.3d 1011, 1028

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 10 PAGE 247

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split&rs=WLW7.1... 11/29/2007

Page 9 of 12

123 Cal.App.4th 751

Page 8

123 Cal.App.4th 751, 19 Cal.Rptr.3d 916, 04 Cal. Daily Op. Serv. 9657, 04 Cal. Daily Op. Serv. 10,191, 2004 Daily Journal D.A.R. 13,211
**(Cite as: 123 Cal.App.4th 751)**

[225 Cal.Rptr. 895].) Fraud in the inducement, by contrast, occurs when " 'the promisor knows what he is signing but his consent is *induced* by fraud, mutual assent is present and a contract is formed, which, by reason of the fraud, is *voidable.* In order to escape from its obligations the aggrieved party must *rescind....*' " (*Ibid.*)"(*Rosenthal v. Great Western Fin. Securities Corp., supra,* 14 Cal.4th at p. 415, 58 Cal.Rptr.2d 875, 926 P.2d 1061; see *Pacific State Bank v. Greene* (2003) 110 Cal.App.4th 375, 389, fn. 7, 1 Cal.Rptr.3d 739.)

The Supreme Court then explained that when fraud in the inception or execution of the *arbitration clause* is present (the first of the two types of fraud identified in the immediately preceding citation), the dispute is not arbitrable: "[C]laims of fraud in the execution of the entire agreement are not arbitrable under either state or federal law. If the entire contract is void *ab initio* because of fraud, the parties have not agreed to arbitrate any controversy . ... [¶] [By contrast,] fraud in the inducement relating to other *762 contractual terms does not render the arbitration agreement unenforceable, even when it might justify rescission of the contract as a whole. By entering into the arbitration agreement, the parties established their intent that disputes coming within the agreement's scope be determined by an arbitrator rather than a court; this contractual intent must be respected even with regard to claims of fraud in the inducement of the contract generally." (*Rosenthal v. Great Western Fin. Securities Corp., supra,* 14 Cal.4th at p. 416, 58 Cal.Rptr.2d 875, 926 P.2d 1061.) The Supreme Court summarized its analysis thusly: "Claims that a party has employed fraud in inducing consent specifically to the arbitration agreement (e.g., by actively concealing its existence or misrepresenting its meaning or value) are, under *Prima Paint* [ *v. Flood & Conklin* (1967) 388 U.S. 395, 404, 87 S.Ct. 1801], to be decided by the court, because they go to the valid making of the arbitration clause itself. Claims that, due to fraud in the execution of the agreement as a whole, the parties reached no contract containing an arbitration clause, are also to be decided by the court. But claims that the contract as a whole was obtained through fraud in the inducement are, in the absence of evidence of the parties' contrary intent, arbitrable under *Prima Paint.* Included in this rule of arbitrability are claims of a 'grand scheme' of fraud, or fraud ' permeating' the transaction." (*Rosenthal v. Great Western Fin. Securities Corp., supra,* 14 Cal.4th at p. 419, 58 Cal.Rptr.2d 875, 926 P.2d 1061.)

In *Rosenthal,* when defining fraud in the inception or execution as it relates to an arbitration clause, the Supreme Court adverted directly to section 163 of the Restatement Second of Contracts including comments a and c, at pages 443-444. (*Rosenthal v. Great Western Fin. Securities Corp., supra,* 14 Cal.4th at p. 420, 58 Cal.Rptr.2d 875, 926 P.2d 1061.) Section 163 of the Restatement Second of Contracts which is part of the discussion of misrepresentation states, "If a misrepresentation as to the character or essential terms of a proposed contract induces conduct that appears**924 to be a manifestation of assent by one who neither knows nor has reasonable opportunity to know of the character or essential terms of the proposed contract, his conduct is not effective as a manifestation of assent." Comment a to section 163 of the Restatement Second of Contracts which is cited in *Rosenthal* states in part: "*Rationale.* Under the general principle stated in § 19(2), a party's conduct is not effective as a manifestation of his assent unless he knows or has reason to know that the other party may infer from it that he assents. This Section involves an application of that principle where a misrepresentation goes to what is sometimes called the 'factum' or the 'execution' rather than merely the 'inducement.' If, because of a misrepresentation as to the character or essential terms of a proposed contract, a party does not know or have reasonable opportunity to know of its character or essential terms, then he neither knows nor has reason to know that the other party may infer from his conduct that he assents to that contract." Comment c to section 163 of the Restatement Second of *763 Contracts which is cited in *Rosenthal* part merely indicates that an agreement described in this provision is a "void contract."

In *Rosenthal,* the Supreme Court reviewed the evidence presented by the different plaintiffs in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 10 PAGE 248

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split&rs=WLW7.1... 11/29/2007

Page 10 of 12

123 Cal.App.4th 751

Page 9

123 Cal.App.4th 751, 19 Cal.Rptr.3d 916, 04 Cal. Daily Op. Serv. 9657, 04 Cal. Daily Op. Serv. 10,191, 2004 Daily Journal D.A.R. 13,211
**(Cite as: 123 Cal.App.4th 751)**

order to determine whether there was fraud in the inception or execution of the arbitration agreement. The fraud in the inception or execution evidence as it related to the arbitration clauses in *Rosenthal* differed amongst the plaintiffs. For varying reasons, some plaintiffs had not read the agreements containing the arbitration clauses. The Supreme Court adopted the following test for evaluating the fraud in the inception or execution claims of the plaintiffs which were asserted as a basis for voiding the arbitration clauses: "California law, like the Restatement, requires that the plaintiff, in failing to acquaint himself or herself with the contents of a written agreement before signing it, not have acted in an objectively unreasonable manner. One party's misrepresentations as to the nature or character of the writing do not negate the other party's apparent manifestation of assent, if the second party had ' reasonable opportunity to know of the character or essential terms of the proposed contract.' (Rest.2d Contracts, § 163, p. 443.) If a party, with such reasonable opportunity, fails to learn the nature of the document he or she signs, such 'negligence' precludes a finding the contract is void for fraud in the execution. (*C.I.T. Corporation v. Panac* [ (1944) ] 25 Cal.2d [547,] 549 [154 P.2d 710].)[¶] It follows that one party's *unreasonable* reliance on the other's misrepresentations, resulting in a failure to read a written agreement before signing it, is an insufficient basis, under the doctrine of fraud in the execution, for permitting that party to avoid an arbitration agreement contained in the contract." ( *Rosenthal v. Great Western Fin. Securities Corp., supra,* 14 Cal.4th at p. 423, 58 Cal.Rptr.2d 875, 926 P.2d 1061; see *Lovejoy v. A T & T Corp.* (2004) 119 Cal.App.4th 151, 161, 14 Cal.Rptr.3d 117; *Pacific State Bank v. Greene, supra,* 110 Cal.App.4th at p. 393, 1 Cal.Rptr.3d 739.) Based on this legal premise concerning the scope of fraud in the inception or execution, the Supreme Court concluded some of the plaintiffs acted unreasonably in not reading the arbitration clauses. As to these plaintiffs, the trial court was not authorized to pass on their fraud defenses posited in response to the motion to compel arbitration. (*Rosenthal v. Great Western Fin. Securities Corp., supra,* 14 Cal.4th at pp. 425-426, 58 Cal.Rptr.2d 875, 926 P.2d 1061.) But the Supreme Court noted that other plaintiffs who executed investment contracts containing**925 arbitration clauses, some of whom had very limited understandings of English, were blind, or suffered from Alzheimer's disease, could reasonably rely on defendants' agents' representations as to the contents of the agreements including the arbitration clauses. This latter group of plaintiffs were entitled to have the trial judge evaluate their fraud defenses to the arbitration clauses. (*Id.* at pp. 427-428, 58 Cal.Rptr.2d 875, 926 P.2d 1061; *Jones v. Adams Financial Services* (1999) 71 Cal.App.4th 831, 837, 84 Cal.Rptr.2d 151 [legally blind signatory to agreement suffering from dementia entitled to void arbitration clause on fraud in execution grounds].)

*764 It bears emphasis that *Rosenthal* merely held that a fraud in the inception or execution defense to an arbitration demand was to be decided by a judge. A party is still entitled to argue a fraud defense before an arbitrator as a ground for invalidating the arbitration clause. The Supreme Court cautioned, " Whether a fraud claim that is insufficient as a defense to an arbitration demand may, if proven, nonetheless form the basis for equitable or other relief in the arbitral forum, is a separate issue, with which we have no concern in this case." (*Rosenthal v. Great Western Fin. Securities Corp., supra,* 14 Cal.4th at p. 423, 58 Cal.Rptr.2d 875, 926 P.2d 1061.)

The third Supreme Court case to hold that courts evaluate fraud in the inception or execution defense to an arbitration demand was *Engalla v. Permanente Medical Group, Inc., supra,* 15 Cal.4th at pages 973-984, 64 Cal.Rptr.2d 843, 938 P.2d 903. In *Engalla,* the plaintiffs presented evidence that defendant, a medical group, made misrepresentations concerning its arbitration clause. The relevant portion of the health care plan made the following representations as to the promised speed of the arbitration process provided by the medical group: " 'Within 30 days after initial service on a Respondent, Claimant and Respondent each shall designate an arbitrator and give written notice of such designation to the other, and Claimant shall forward $150, made payable to Kaiser Foundation [¶] Health Plan Arbitration Account, to Kaiser Foundation Health Plan.... This

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 10 PAGE 249

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split&rs=WLW7.1... 11/29/2007

Page 11 of 12

123 Cal.App.4th 751

Page 10

123 Cal.App.4th 751, 19 Cal.Rptr.3d 916, 04 Cal. Daily Op. Serv. 9657, 04 Cal. Daily Op. Serv. 10,191, 2004 Daily Journal D.A.R. 13,211
**(Cite as: 123 Cal.App.4th 751)**

$150 will be deposited with Respondent's $150 in a special account maintained by Bank of America National Trust and Savings Association [and will] ... provide the initial funds to pay the fees of the neutral arbitrator and expenses of arbitration as approved by him or her.... Within 30 days after these notices have been given and payments made, the two arbitrators so selected shall select a neutral arbitrator and give notice of the selection to Claimant and all Respondents served, and the three arbitrators shall hold a hearing within a reasonable time thereafter ...."(*Id.* p. 962, fn. 3, 64 Cal.Rptr.2d 843, 938 P.2d 903.)There was evidence that in fact the arbitration process provided by the health care group took years to complete. The plaintiffs also presented evidence the medical group knew its agents would not timely appoint arbitrators nor move towards and arbitration hearing. (*Id.* at pp. 974-976, 64 Cal.Rptr.2d 843, 938 P.2d 903.) The Supreme Court concluded: "In sum, we conclude there is evidence to support the [plaintiffs'] claims that [the defendant] fraudulently induced [the plaintiffs] to enter the arbitration agreement in that it misrepresented the speed of its arbitration program, a misrepresentation on which [the plaintiffs'] employer relied by selecting [the defendant's] health plan for its employees, and that the [plaintiffs] suffered delay in the resolution of its malpractice dispute as a result of that reliance, despite [the plaintiffs'] own reasonable diligence. The trial court, on remand, must resolve conflicting factual evidence in order to properly adjudicate **926 [the defendant's] petition to compel arbitration." (*Engalla v. Permanente Medical Group, Inc., supra,* 15 Cal.4th at pp. 981-982, 64 Cal.Rptr.2d 843, 938 P.2d 903, fns. omitted.) It bears emphasis that the misrepresentations constituting fraud in *765 the inception or execution related to whether the extraordinarily dilatory arbitral method at issue was really consistent with the promised arbitration process. In other words, in *Engalla,* there was evidence that the arbitral forum the defendant provided was far different from the promised manner in which arbitration hearings are normally conducted. (Knight et al., Cal. Practice Guide: Alternative Dispute Resolution (The Rutter Group 2003) ¶ 5:116.1, pp. 5-59-5-60 (rev.# 1, 2002).)

[8] In this case, there is no evidence of fraud in the inception or execution of the agreement as it relates to the arbitration clause. There is no evidence that plaintiff, to paraphrase section 163 of the Restatement Second of Contracts, as cited in *Rosenthal,*"neither kn[ew] nor ha[d a] reasonable opportunity to know of the character or essential terms of the" September 28 or December 4, 2000, arbitration agreements. Rather, the only evidence adduced by plaintiff indicates he was induced to enter into the September 28 arbitration and December 4, 2000, stock sale agreements because of defendant's misrepresentations concerning the prospective Bratz doll venture and the financial status of MGA Entertainment, Inc. which is fraud in the inducement. There is no evidence, as in *Engalla,* that the arbitration before Mr. Zarabi resulting from the September 28, 2000, arbitration agreement was other than as promised or reasonably expected. Further, there is no evidence of any false representations concerning any contemplated arbitral proceedings that will result from the arbitration clause in the December 4, 2000, stock sale agreement. Whether the alleged fraud concerning the concealment of the value and business prospects of MGA Entertainment, Inc. is legally or equitably sufficient to warrant nonenforcement of the September 28 or December 4, 2000, arbitration agreements is to be resolved in the arbitral forum. (*Rosenthal v. Great Western Fin. Securities Corp., supra,* 14 Cal.4th at p. 423, 58 Cal.Rptr.2d 875, 926 P.2d 1061.) Hence, the trial court was required to grant the motion to compel arbitration.

Given our resolution of the fraud in the inception or execution issues, we need not address the parties' remaining contentions. Further, our resolution of the fraud in the inception or execution issues renders all of defendant's judicial notice and additional evidence requests moot. They are denied on that basis. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1058, fn. 6, 60 Cal.Rptr.2d 225, 929 P.2d 544 [judicial notice]; *No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 89, fn. 26, 118 Cal.Rptr. 34, 529 P.2d 66 [new evidence on appeal].)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 10 PAGE 250

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split&rs=WLW7.1... 11/29/2007

Page 12 of 12

123 Cal.App.4th 751 Page 11

123 Cal.App.4th 751, 19 Cal.Rptr.3d 916, 04 Cal. Daily Op. Serv. 9657, 04 Cal. Daily Op. Serv. 10,191, 2004 Daily Journal D.A.R. 13,211
**(Cite as: 123 Cal.App.4th 751)**

IV. DISPOSITION

The order denying the petition to compel arbitration is reversed. Upon issuance of the remittitur, the trial court is to grant the motion to compel *766 arbitration and stay civil proceedings. Defendant, Isaac Larian, is awarded his costs on appeal from plaintiff, Farhad Larian.

I concur: GRIGNON, J.MOSK, J., Concurring.
I concur in the result.

There was an arbitration pursuant to the September 28, 2000 Agreement to Arbitrate and Selection of Arbitrator. The arbitrator issued an award. Thus, because the arbitration had already taken place, there was no need to compel arbitration **927 under that agreement. The parties entered into a new agreement on December 4, 2000, and pursuant to that agreement signed mutual general releases. Therefore, the only existing agreement between the parties was the December 4, 2000 agreement. That agreement contained an arbitration provision. I believe that arbitration should be compelled on the basis of that arbitration provision.

The December 4, 2000 agreement that contains the operative arbitration provisions includes the following choice-of-law clause. "This agreement shall be construed in accordance with and be governed by the laws of the State of California." The majority conclude that this clause renders the Federal Arbitration Act, title 9, United States Code section 1, et seq. (FAA) "inapplicable."

I am not so certain that the choice-of-law clause does exclude the application of the FAA. The issue is whether the applicable choice-of-law clause manifests an intention to be governed by California procedural rules applicable to arbitrations. (See *Mount Diablo Medical Center v. Health Net of California, Inc.* (2002) 101 Cal.App.4th 711, 722, 124 Cal.Rptr.2d 607.) In *Mastrobuono v. Shearson Lehman Hutton, Inc.* (1995) 514 U.S. 52, 58-59, 115 S.Ct. 1212, 131 L.Ed.2d 76, the United States Supreme Court concluded that a choice-of-law clause dealing with a clause specifying that the agreement "shall be governed by the laws of the State of New York" did not preclude the applicability of the FAA. In *Blue Cross of California v. Superior Court* (1998) 67 Cal.App.4th 42, 62-63, fn. 8, 78 Cal.Rptr.2d 779, we said that *Volt Information Sciences, Inc. v. Board of Trustees* (1989) 489 U.S. 468, 109 S.Ct. 1248, 103 L.Ed.2d 488"does not stand for the proposition a general choice of law provision evidences in all cases an express intent to incorporate a state's arbitration rules into an arbitration agreement."

*767 If we did apply federal law, the result would be the same. Both federal and California state law have adopted the principle of separability by which the arbitrator is given the power to determine the validity of the contract without calling into question the validity of the arbitration clause from which he or she derives his or her power. (*Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc. v. 100 Oak Street* (1983) 35 Cal.3d 312, 315, 197 Cal.Rptr. 581, 673 P.2d 251; *Prima Paint Corp. v. Flood & Conklin Mfg. Co.* (1967) 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270; 1 Domke on Commercial Arbitration (3d ed.2003) § 11.2, pp. 11.6-11.10.)

Accordingly, I agree with the conclusion of the majority.

Cal.App. 2 Dist.,2004.
Larian v. Larian
123 Cal.App.4th 751, 19 Cal.Rptr.3d 916, 04 Cal. Daily Op. Serv. 9657, 04 Cal. Daily Op. Serv. 10,191, 2004 Daily Journal D.A.R. 13,211

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 10 PAGE 251

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split&rs=WLW7.1... 11/29/2007