# EXHIBIT 17

RDB copy

HOWARTH & SMITH
ATTORNEYS AT LAW
800 WILSHIRE BOULEVARD
SUITE 750
LOS ANGELES, CALIFORNIA 90017
TELEPHONE: (213) 955-9400
FAX: (213) 622-0791
www.howarth-smith.com

DON HOWARTH

April 6, 2004

DHowarth@howarth-smith.com
Direct Line: (213) 955-9400 Ext. 109

**VIA FACSIMILE AND U.S. MAIL**
Larry R. Feldman, Esq.
Kaye Scholer LLP
1999 Avenue of the Stars
Suite 1700
Los Angeles, California 90067

Re: *Larian v. Larian*

Dear Larry:

This letter is to follow up on our meeting at your office on February 26, 2004, and our conversation by phone more recently. Since then I have also received a letter from you dated March 29, 2004 asking about our progress in getting back to you. I trust you received my message that I was out of the office in Hawaii last week and that I would get back to you with a written response upon my return. This letter is the promised written response.

The facts of which we are presently aware clearly show that it is not correct, as you stated in our meeting, that at the end of 2000, Isaac believed Bratz was just another doll, or that Fred knew everything that Isaac knew. Indeed, even the limited evidence immediately available without discovery having yet occurred demonstrates just the reverse. For example:

- The July 18, 2003, Wall Street Journal reports that sometime in 1999 Isaac had a conversation with a buyer from Wal-Mart in which the idea for a Bratz-type doll germinated. The article quotes Isaac as saying that "he was motivated by a challenge from a Wal-Mart Stores, Inc. buyer to 'give me something that can compete with Barbie.'" Isaac kept this conversation secret from Fred, and Fred found out about it for the first time when he read the published article.

04 L181001 086

**HS 03235**

EXHIBIT *17* PAGE *299*

Larry R. Feldman, Esq.
April 6, 2004
Page 2

• By late 1999, Isaac had decided that MGA's challenger to Barbie should be
a fashion-type doll. MGA had previously distributed other types of dolls,
but never a fashion doll, as the WSJ article confirms. For the first time
ever, Isaac conducted a contest to select a design for the doll, and selected
Carter Bryant's Bratz doll line as the winner of the contest. It is plain that
Isaac did not consider Bratz to be just another doll for MGA. The existence
of this contest was concealed from Fred, and, in fact, Fred was never told
that the Company was looking for a fashion-type doll to compete with
Barbie or that the Bratz line was being developed by Isaac and MGA during
1999 and 2000, despite Fred's position as Isaac's partner and a co-founder
of MGA.

• In late 1999, and continuing at least through the spring of 2000, Isaac
ordered MGA employees to stop sharing financial information with Fred.
Isaac threatened at least one employee's job if the employee did not follow
Isaac's instructions and cut Fred out of the information loop. In addition,
Isaac instructed an employee to stop sending Fred daily sales reports that up
to that point, Fred had routinely received. The result of this concerted
concealment effort was that Fred did not, and could not, know the complete
financial picture of the Company.

• In February 2000, Isaac tried to keep Fred from attending the N.Y. Toy
Fair, the venue in which information about new, upcoming products is
reviewed.

• Beginning in early 2000, Isaac began systematically portraying Fred, both
internally and to the outside world, as someone who had no role in the
management and decision making of the Company; and that Isaac alone
controlled the strategic moves for MGA. In or about February 2000, Isaac
had Fred's name removed from the Company profile, and changed the
document (and history) to list only Isaac as the founder of MGA. When
Fred raised this issue with Isaac, he was told that "there is . . . a lot more to
come."

• In the Spring of 2000, before the Agreement to Arbitrate was signed and
before Isaac had announced his plans for Bratz either publicly or to Fred,
Isaac took steps to personally profit from the Bratz program. On April 11,

04:L181001.086

EXHIBIT /7 PAGE 300

HS 03236

Larry R. Feldman, Esq.
April 6, 2004
Page 3

2000, Isaac sought the following from the Company's Board of Directors:
(1) an increase in his annual salary from $221,000 to $500,000; (2) a bonus
of $750,000 for 1999; (3) a bonus of $1.5 million in 2000 if EBITA for the
year reached $8 million; and (4) a separate bonus of a 4% royalty on any
new toy idea he personally developed in MGA's 2001 line. Paying Isaac a
royalty for anything that he "personally developed" was an absolute first for
the Company, and the target figures in (3) and (4) plainly indicate an
unannounced, but real plan to exploit the Bratz market beginning in 2001.
A successful Bratz roll-out in 2001 would allow Isaac personally to profit
(at the expense of his fiduciary Fred) from the Bratz opportunity.

• In or about July or August 2000, Isaac called internal meetings with top
management at MGA about Bratz and his plans for seizing the opportunity
presented by the doll line. Isaac expressed optimism in these meetings that
the Bratz line could directly compete with Barbie, would appeal to an even
wider range of girls than did Barbie, and presented an opportunity he had
been looking to find for years. Fred, a 45% shareholder and officer of
MGA, was intentionally excluded from those meetings, and from the
special handling of Bratz.

• Roughly contemporaneously with these internal meetings, Isaac began
negotiating with Carter Bryant and eventually obtained from him the
worldwide licensing rights to Bratz. The license was unique in several
important respects. For the first time in the Company's history, the Bratz
license made Isaac and MGA the licensor of the product, allowing MGA to
control the licensing in an unlimited number of product categories
worldwide. In previous deals, MGA was just a distributor/licensee of a
product. The difference between being a licensee and a licensor is
enormous and becoming a licensor is something Isaac had wanted for a very
long time. Further, the Bratz deal was unique because MGA paid more for
that license of that doll than it ever had paid for a license of any other doll
in the Company's history. Fred was not told anything about the
unprecedented scope of the Bratz license prior to signing the Agreement to
Arbitrate, or the Stock Sales Agreement in December 2000.

04.L181001.086

EXHIBIT _17_ PAGE _301_

HS 03237

Larry R. Feldman, Esq.
April 6, 2004
Page 4

- In the fall of 2000, Isaac began to develop the Bratz product line, including
  ordering prototypes and filing additional trademarks. Fred was intentionally
  kept unaware of the scope of Isaac's plans to develop and market Bratz at
  that time.

- During this time, including in the fall of 2000, Isaac followed a practice of
  passing along to Fred only negative financial news about the Company,
  such as a $2 million loss from cancelled Toys-R-Us orders, thus making the
  Company seem worth much less than it actually was. Isaac did not disclose
  to Fred news which would have a positive financial effect on the value of
  the Company, such as his plans for Bratz or other potential revenue streams
  for the Company.

- On December 11, 2000 MGA filed, and Isaac personally signed,
  applications for five new trademarks, including one for each of the names
  of the Bratz dolls. Isaac's personally signing such applications facilitated a
  plan to keep knowledge about the scope of the Bratz program tightly
  controlled.

- Then, in February 2001, with Fred out of the picture after his execution of
  the December Stock Sale Agreement, Isaac went public about the scope and
  significance of Bratz. He introduced the dolls at the February 2001 N.Y.
  Toy Fair with the public assertion that it was now "a Bratz world."

- Isaac's view of Bratz was further documented in June 2001, confirming that
  Bratz was MGA's "first intellectual property" and his belief that it was
  "sure to revolutionize the world of fashion dolls."

All of this and other evidence strongly indicates that Isaac made a concerted effort
to get Fred out of the company so that he could exploit the unique Bratz opportunity
without sharing the benefits with Fred.

When we met, you provided us with three e-mails which you claimed
demonstrated that Fred knew all of what Isaac knew about Bratz when he signed the
Agreement to Arbitrate. They do not. The e-mails – dated November 15, 2000,
November 22, 2000, and April 30, 2001 – were all sent *after* execution of the September

04 L181001.086

EXHIBIT _17_ PAGE _302_

HS 03238

Larry R. Feldman, Esq.
April 6, 2004
Page 5

2000 Agreement to Arbitrate. Further, none of them give any indication of anything
unusual about Bratz that would alert Fred to its impact on the valuation of the Company.

You also asserted that the e-mails illustrate Fred's awareness of the Bratz program
earlier than the time alleged in the complaint on file in the action. Again that is not
correct. Paragraph 28 of the Complaint alleges that in late spring or summer 2002, Fred
first became aware of the "true scope of the Company's extraordinary plans, efforts and
history regarding the Bratz product line and other financial information about the
Company that had been concealed from him by Isaac, as the license had been concealed
from him." Nothing in the three e-mails is inconsistent with this allegation.

Additional evidence that Isaac attempted to defraud Fred into signing the
Agreement to Arbitrate and to pay him less than the true value of his shares comes from
Mr. Dutcher's appraisal. As may have been reported to you from the hearing on our
motion to take Mr. Dutcher's deposition, the Court recognized the significance of this
information, saying that, "[t]his information is directly relevant as it goes to whether
[plaintiff] was defrauded because information about this new product was withheld from
him." From what we can tell from the November 7, 2000, appraisal we have (and have
given to you), it seems apparent that Isaac did not provide Mr. Dutcher with information
about the Company's plans for Bratz or projections of its revenue potential for 2000,
2001 and beyond. We are advised that Isaac engaged in regular financial modeling for
the Company and that in those forecasts, revenue streams were projected for each item the
Company sold or was planning to sell. There is nothing in the appraisal itself indicating
that Mr. Dutcher received such 2000 or 2001 projections, either for the Company as a
whole or for Bratz. Further, it does not appear that the value of MGA Entertainment, HK
was included in the appraisal at all, and Fred's shares in that company were certainly part
of what was covered in the Agreement to Arbitrate. In any event, we will know more
about the information provided to Mr. Dutcher and how he proceeded when we get Mr.
Dutcher's files and take his deposition now that our motion has been granted.

You indicated to me that the Company actually lost money for 2000 after realizing
a profit in 1999, and thus using the 1999 figures in the appraisal worked in Fred's favor in
valuing the Company. First, it is not apparent to us that the Company lost money in 2000,
as Isaac has not provided to Fred the tax returns or necessary financial information to
verify that claim. From what we know, both sales and profits were expected to be much
greater in 2000 than they were in 1999. If there was a loss in 2000, it certainly could have
been the result of any number of things which would be largely irrelevant to a valuation

04 L181001 086

HS 03239

EXHIBIT 17 PAGE 303

Larry R. Feldman, Esq.
April 6, 2004
Page 6

of the Company – things such as one time writeoffs for non-repeating events, deferring revenue and profit recognition into the future (perhaps as to Hallmark?), payment of large bonuses to management, shifting profits into subsidiaries; etc. We do not yet know what reserves were taken that may have reduced profits and we do not know what revenues were attributed to or held by MGA Hong Kong. Until we are provided with the financial information that will enable us to analyze the Company's P/L statement, cash statement, cash flow analysis, and the like, and to have things fully audited, it is not helpful to be advised there was a stated loss, especially on rising revenues.

We do note that in the November 7, 2000 valuation, Mr. Dutcher states that "The most recent year (1999) was weighted only minimally as the EBDITA appears unreasonably high based on the two prior years." Mr. Dutcher was looking at EBDITA of $2,915,000 for 1997; EBDITA of a loss of $86,000 for 1998; and EBDITA of $5,651,000 for 1999. Looking at just those numbers, one can see why he might assume that the 1999 numbers were "high" based on a 1998 loss of $86,000. However, as Isaac knew, the 1999 revenues were not at all "unreasonably high" compared to the prior years because in 1998 there was a one-time loss of approximately $10 million in revenues and $4.5 million in profits due to a Toys-R-Us sanction of refusing to do business for 1 year. Further, the actual numbers for 2000 were consistent with the Company's strong growth, and had Mr. Dutcher had those numbers, he would have seen that the 1999 numbers were not unreasonably high. When we have complete information accounted for, it appears there was a strong progression of $2.9 million for 1997, $4.5 million for 1998 and $5.6 million for 1999.

Because they are not as subject to management and accounting choices - which we will need to examine - sales are important in looking at company valuation. It appears that sales were about $40,732,000 in 1998, $66,350,000 in 1999 (from tax returns which Dutcher used), and we believe they were much higher in 2000. However, Dutcher used $70,331,000 as revenues for 2000 (a pro forma 6% increase over 1999). We have now seen documents suggesting that revenues were already higher than this in 2000, perhaps as high as $90,000,000 or more.

Further evidence of how far off Mr. Dutcher was led by what Isaac gave him and withheld from him is apparent when one looks at his 2003 projected revenues of $72,793,000 (3.5% pro forma over 2002). The Wall Street Journal article reports

EXHIBIT _17_ PAGE _304_

HS 03240

Larry R. Feldman, Esq.
April 6, 2004
Page 7

expected sales of $800 million for 2003, 65% of which is accounted for by Bratz. The
appraisal without the information on Bratz was thus more than 10 times lower in its
projection for 2003 than it should have been.

　　　When Isaac chose not to share key pieces of information about the scope of the
Bratz project with Fred, and to selectively provide him and the appraiser with other
financial information about the Company during 1999 and 2000 and projections for the
future, there is no doubt that he violated California law requiring him as a fiduciary to
disclose all such information to his partner and co-venturer, Fred. Being a fiduciary
means that each owes the other the "duty of highest loyalty and utmost good faith, being
charged not to take any unfair advantage or secret profit." *Universal Sales Corp. v.
California Press Mfg. Co.*, 20 Cal. 2d 751, 772 (1942); BAJI 12.36. A fiduciary has a
duty to make a full and fair disclosure of all facts which materially affect the rights and
interest of the person to whom the duty is owed. A fiduciary must give priority to the best
interest of the persons to whom the duty is owed. When there is a "fiduciary relationship
any transaction by which one of the co-adventurers secures an advantage over the other or
others is presumptively fraudulent and casts a burden on such party gaining advantage to
show fairness and good faith in all respects." *Boyd v. Bevilacqua*, 247 Cal. App. 2d 272,
291 (1966).

　　　It is also a well-settled and fundamental precept that a fiduciary such as Isaac may
not usurp business opportunities such as Bratz for himself at the expense of Fred as his
co-fiduciary. In *MacIsaac v. Pozzo*, 81 Cal. App. 2d 278 (1947), the parties entered into a
partnership to do business together and had agreed to split profits equally. However,
plaintiff went out on its own and improperly made a deal with a customer, Utah Fuel Co.,
and got the defendant to agree to take only 15% of the profit. When the proceeds from
the Utah Fuel deal came in, a declaratory judgment action was instigated by the plaintiff
and Pozzo defended on the ground that the agreement to split the profits 85/15 was
procured by fraud. In agreeing with Pozzo, the court held the following:

　　　[I]f there is presented to a corporate officer or director a business
　　opportunity which the corporation is financially able to undertake, is, from
　　its nature, in the line of the corporation's business and is of practical
　　advantage to it, is one in which the corporation has an interest or reasonable
　　expectancy, and, by embracing the opportunity, the self-interest of the
　　officer or director will be brought into conflict with that of his corporation,
　　the law will not permit him to seize the opportunity for himself. And, if in

04 L181001 086

EXHIBIT *17* PAGE *305*

HS 03241

Larry R. Feldman, Esq.
April 6, 2004
Page 8

such circumstances, the interests of the corporation are betrayed, the corporation may elect to claim all the benefits for itself, and the law will impose a trust in favor of the corporation upon the property, interests and profits so acquired.

The facts bring the case within the stated rule. While it has been applied so generally in corporation cases to have become known as the doctrine of corporate opportunity, it is founded in the doctrine of loyalty in business which applies in all situations in which trust is reposed. *The fiduciary is held to the utmost measure of loyalty and accordingly he may not use a trust opportunity for personal advantage.* "The policy of the law is to put fiduciaries beyond the reach of temptation by making it unprofitable for them to yield to it."

The primary duty of the parties was to take no advantage of each other within their fiduciary relationship by means of the slightest concealment, misrepresentation, or adverse pressure. Defendant was entitled to a complete disclosure as to the negotiations with Utah Fuel Co., and an equal opportunity to take advantage of them. Plaintiff contrived to appropriate for itself the major share of the profits with the result that the firm, when it took the contract and assumed the responsibility, stood committed to an unequal division. Defendant could not be deprived of its rights in this matter.

The judgment properly awarded defendant the amount by which plaintiff profited through breach of duty. Whether it be regarded as damages presumed to have been suffered through deprivation of a business opportunity or as profits unjustly received by a plaintiff is immaterial.

*Id.* at 284-85 (emphasis supplied; extensive internal citations omitted). *See also, e.g.,* Witkin, 9 Summary of California Law § 20, p. 419 (9th ed. 1990) ("The fiduciary relationship . . . obviously makes applicable the rule which, in corporation law, is known as the doctrine of 'corporate opportunities'"); *Air Purification v. Carle*, 99 Cal. App. 2d 258, 265 (1950) (holding ("[In] a trust relationship . . . one of the parties will not be allowed to deal with the subject matter of the association for his own advantage.").

04:L181001 086

EXHIBIT 17 PAGE 306

HS 03242

Larry R. Feldman, Esq.
April 6, 2004
Page 9

Based on just what we know without discovery it is clear that Isaac has ignored the
requirement that he not engage in "the slightest concealment." When Isaac put together
the licensing deal for Bratz without informing Fred of his plans or sharing with Fred the
financial expectations and rewards deriving therefrom, Isaac violated his duties as a
fiduciary, and he will have to account to Fred.

In addition to Isaac's duties to disclose to Fred all material information relating to
the Company, and to refrain from usurping a business opportunity – both of which arose
from his fiduciary relationship with Fred – Isaac's actions in isolating the Bratz and other
financial information from Fred also created an independent duty of disclosure. As
Witkin notes, "The duty to disclose may arise without any confidential relationship where
the defendant alone has knowledge of material facts which are not accessible to the
plaintiff." Bernard E. Witkin, 5 Summary of California Law, § 700, p. 801 (9th ed. 1990;
citations omitted). Here, as recited above – from holding secret meetings to instructing
Company employees not to give Fred information – Isaac went to great lengths to make
sure the material facts about the Bratz doll project were "not accessible" to Fred, when he
had a duty to inform him of the scope of the Bratz program before entering into the
Agreement to Arbitrate and Stock Purchase Agreement. It was impermissible for Isaac to
keep his plans for the scope of the Bratz program secret. Also, note that ¶ 6 of the
buy/sell agreement itself makes clear that it is Isaac, not Fred, who has "full knowledge of
business prospects."

Isaac has indicated to Fred a willingness to address the merits and provide us with
documents in his possession and control, including those held by the companies. Our
outstanding discovery requests are a good listing of what we need, but in summary, we
certainly need each of the following:

1. All documents that relate to Bratz from 1999 through 2003, including
trademarks, license agreement negotiations with Carter Bryant, notes or agendas of
meetings re: Bratz, prototypes, designs, correspondence with attorneys re: the license
agreement or trademarks, and financial documents, including sales and revenue
projections, audited and unaudited;

2. All documents that relate to the value, revenues and costs of MGA, ABC and
MGA Hong Kong from 1999 through the present, including all internal materials,
projections and tax returns, all reserves, write downs and supporting documentation;

04 L181001 086

EXHIBIT __17__ PAGE __307__

HS 03243

Larry R. Feldman, Esq.
April 6, 2004
Page 10

3. All information that Isaac and/or the companies provided to Morad and/or Mr. Dutcher;

4. All corporate minutes, shareholder resolutions, stock options grants or proposals and related documentation, and general ledgers for ABC, MGA and MGA Hong Kong.

In addition to this documentation from Isaac, we also need his reconfirmed agreement to allow Morad to release his file. We also need written confirmation by Isaac that he wants full and honest disclosure by any person who is a witness to the events herein; that he will not directly or indirectly retaliate against any person based on what they disclose; and that he is encouraging and requesting them to give Fred a candid, honest, and complete response to any questions Fred may have of them. In exchange for such complete disclosure, Fred is also willing to produce his records now.

Once we have received the above, and do our homework in connection with what we find, we will be in a position to make a recommendation as to proceeding with a binding reference of this matter to a retired judge, and what the order of reference would provide. We also have some candidates to put forward in this regard. If in the meantime you are interested in a non-binding mediation, we are prepared to support that immediately, and without further discovery beyond production of the materials indicated. We have some thoughts as to who might be able to get this sorted out between these brothers, so that the matter can be closed. Please let me know if this is an option.

Very truly yours,

Don Howarth

04.L18100l.086

EXHIBIT 17 PAGE 308

**HS 03244**

Larry R. Feldman, Esq.
April 6, 2004
Page 11

bcc:   Mr. Farhad Larian (via U.S. Mail)

04-L181001.086

EXHIBIT _17_ PAGE _309_

HS 03245

# Howarth & Smith

ATTORNEYS AT LAW
800 Wilshire Boulevard
Suite 750
Los Angeles, California 90017
(213) 955-9400
Fax: (213) 622-0791

# FAX COVER SHEET

*The information contained in this facsimile message is information protected by attorney-client and/or the attorney/work product privilege. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by facsimile. If the person actually receiving this facsimile or any other reader of the facsimile is not the named recipient or the employee or agent responsible to deliver it to the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone and return the original message to us at the above address via U.S. Postal Service.*

FAX NUMBER TRANSMITTED TO: (310) 788-1200

To:        Larry R. Feldman, Esq.


From:      Brian D. Bubb, Esq.

Number of pages including this page: 11

*        IF YOU DO NOT RECEIVE <u>ALL</u> PAGES, PLEASE TELEPHONE US IMMEDIATELY AT (213) 955-9400.

Sent by:      Jason Sickler                                    Date: April 6, 2004

Re:    Larian v. Larian

COMMENTS:

EXHIBIT __17__ PAGE __310__

HS 03246

Confirmation Report—Memory Send

```
                                        Time       : Apr-05-2004  11:37pm
                                        Tel line 1 :
                                        Tel line 2 :
                                        Name       : HOWARTH
```

| | | |
|---|---|---|
| Job number | : | 375 |
| Date | : | Apr-05 11:33pm |
| To | : | 5308#498#001#13107881200# |
| Document Pages | : | 011 |
| Start time | : | Apr-05 11:33pm |
| End time | : | Apr-05 11:37pm |
| Pages sent | : | 011 |
| Status | : | OK |

Job number     : 375                    *** SEND SUCCESSFUL ***

**Howarth & Smith**
ATTORNEYS AT LAW
800 Wilshire Boulevard
Suite 750
Los Angeles, California 90017
(213) 955-9400
Fax: (213) 622-0791

# FAX COVER SHEET

*The information contained in this facsimile message is information protected by attorney-client and/or the attorney/work product privilege. It is intended only for the use of the Individual named above and the privileges are not waived by virtue of this having been sent by facsimile. If the person actually receiving this facsimile or any other reader of the facsimile is not the named recipient or the employee or agent responsible to deliver it to the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone and return the original message to us at the above address via U.S. Postal Service*

FAX NUMBER TRANSMITTED TO: (310) 788-1200

To:          Larry R. Feldman, Esq.

From:        Brian D. Bubb, Esq

Number of pages including this page: 11

•      IF YOU DO NOT RECEIVE ALL PAGES, PLEASE TELEPHONE US IMMEDIATELY AT (213) 955-9400

Sent by:     Jason Sickler                                    Date: April 6, 2004

Re:    Larian v. Larian

COMMENTS:

EXHIBIT 17 PAGE 31

HS 03247

# EXHIBIT 18

**Juan Pablo Alban**

**To:**        Jon Corey
**Subject:**    RE: Mattel/MGA


----- Original Message -----
From: Kennedy, Raoul <RKENNEDY@skadden.com>
To: Jon Corey
Cc: Park, Amy <APARK@skadden.com>; Allen, Jose <JRALLEN@skadden.com>
Sent: Wed Dec 05 10:09:13 2007
Subject: RE: Mattel/MGA

As previously mentioned, our clients have no objection in principle to this idea but we
have questions concerning the operative details. Jose Allen, who is handling a number of
third party subpoena issues, will be back to you no later than Thursday with the
specifics.


_____

From: Jon Corey [mailto:joncorey@quinnemanuel.com]
Sent: Tuesday, December 04, 2007 11:51 AM
To: Kennedy, Raoul
Cc: Park, Amy
Subject: Mattel/MGA


Dear Raoul,

I am writing to follow up on Mattel's request that Isaac Larian agree that documents
sought from third parties related to the Larian v. Larian disputes may be produced
pursuant to the protective order operative in this case.  Please let me know what Mr.
Larian's position is at your earliest convenience.

Best regards,


Jon Corey
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Main Phone: (213) 443-3000
Main Fax:   (213) 443-3100
E-mail:  joncorey@quinnemanuel.com <blocked::mailto:username@quinnemanuel.com>
Web:  www.quinnemanuel.com <blocked::http://www.quinnemanuel.com/>

The information contained in this e-mail message is intended only for the personal and
confidential use of the recipient(s) named above.  This message may be an attorney-client
communication and/or work product and as such is privileged and confidential.  If the
reader of this message is not the intended recipient or agent responsible for delivering
it to the intended recipient, you are hereby notified that you have received this document
in error and that any review, dissemination, distribution, or copying of this message is
strictly prohibited.  If you have received this communication in error, please notify us
immediately by e-mail, and delete the original message.


------------------------------------------------------------------------
To ensure compliance with Treasury Department regulations, we advise you that, unless
otherwise expressly indicated, any federal tax advice contained in this message was not
intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-

1

EXHIBIT 18  PAGE 312

related penalties under the Internal Revenue Code or applicable state or local tax law
provisions or (ii) promoting, marketing or recommending to another party any tax-related
matters addressed herein.

****************************************************
This e-mail and any attachments thereto, is intended only for use by the addressee(s)
named herein and may contain legally privileged and/or confidential information. If you
are not the intended recipient of this e-mail, you are hereby notified any dissemination,
distribution or copying of this email, and any attachments thereto, is strictly
prohibited. If you receive this email in error please immediately notify me at (212)
735-3000 and permanently delete the original copy and any copy of any e-mail, and any
printout thereof.

Further information about the firm, a list of the Partners and their professional
qualifications will be provided upon request.
****************************************************
==============================================================================

# EXHIBIT 19

12-06-07   12:50pm   From-CHR   SEN GLASER                    310-556-29        T-292   P.002/002   F-252

LAW OFFICES

## CHRISTENSEN, GLASER, FINK, JACOBS, WEIL & SHAPIRO, LLP

10250 CONSTELLATION BOULEVARD
NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90067
(310) 553-3000
FAX (310) 556-2920

DIRECT DIAL NUMBER
  (310) 282-6287
EMAIL: AMORGENTHALER@CHRISGLASE.COM

December 6, 2007

☰ MERITAS LAW FIRMS WORLDWIDE

### VIA FACSIMILE AND U.S. MAIL

Juan Pablo Alban, Esq.
Quinn Emanuel Urquhart Oliver
 & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017

       Re:   Mattel v. Bryant, Case No. CV 04-9049 SGL (RNBx)

Dear Mr. Alban:

       This is in response to your letter of November 26, 2007.

       Farhad Larian will agree to modify the protective orders entered in Larian v. Larian, Los Angeles Superior Court Case No. BC 301371, and in Larian v. Larian, ADRS Case No. 05-2096-ABH, to allow for the production of documents which Mr. Larian otherwise agrees to produce in response to the subpoena served on him by Mattel provided that (i) the other parties to those actions similarly agree to such modification; and (ii) suitable arrangements are made to have the documents covered by the protective order entered in the Mattel litigation. It is of course understood that Mr. Larian is not agreeing at this time to produce all non-privileged documents responsive to Mattel's subpoena which are covered by the protective orders; he is merely agreeing at this time to modify the protective orders as specified above to allow the production of documents responsive to the subpoena which he has agreed to produce which are being held solely on the basis that they are covered by the protective orders.

       Please do not hesitate to contact me if you have questions regarding the foregoing.

                                      Very truly yours,

                                      Alisa Morgenthaler Lever
                                      of CHRISTENSEN, GLASER, FINK, JACOBS,
                                         WEIL & SHAPIRO, LLP

AML/eb
cc:   Patricia L. Glaser, Esq.
      Amy Park, Esq. (via facsimile)
      Scott Gizer, Esq.

      611927.1

EXHIBIT 19 PAGE 314

12-06-07    12:50pm    From-CHR    ſEN GLASER              310-556-2ſ              T-292    P.001/002    F-252

---

LAW OFFICES
CHRISTENSEN, GLASER, FINK, JACOBS,
WEIL & SHAPIRO, LLP
10250 CONSTELLATION BOULEVARD
NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90067

☰ MERITAS LAW FIRMS WORLDWIDE

FROM:    Alisa Morgenthaler Lever, Esq.

DATE:    December 6, 2007

**FAX TRANSMISSION**

TELEPHONE NO.: (310) 553-3000
FACSIMILE NO.:    (310) 556-2920

Number of Pages:
(including this page)    2

Client Reference No.:    03460-009

---

TO:

Juan Pablo Albán, Esq.

FAX NO.:

213-443-3100

CONFIRMATION NO:

213-443-3000

---

**Sender's Comments:**

---

**If you have received this Transmission in error, please call: (310) 553-3000 and mail it to the above address. Thank you.**

NOTE: THE INFORMATION CONTAINED IN THIS FAX MESSAGE IS INTENDED ONLY FOR THE PERSONAL AND CONFIDENTIAL USE OF THE DESIGNATED RECIPIENTS NAMED ABOVE. THIS MESSAGE MAY BE AN ATTORNEY-CLIENT COMMUNICATION AND, AS SUCH, IS PRIVILEGED AND CONFIDENTIAL. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT YOU HAVE RECEIVED THIS DOCUMENT IN ERROR, AND THAT ANY REVIEW, DISSEMINATION, DISTRIBUTION OR COPYING OF THIS MESSAGE IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE BY MAIL. THANK YOU.

---

606368-1

EXHIBIT 19 PAGE 3/5

# EXHIBIT 20

11-14-05

DIANA M. TORRES (S.B. #162284)
PAULA E. AMBROSINI (S.B. #193126)
O'MELVENY & MYERS, LLP
400 South Hope Street
Los Angeles, California 90071-2899
Telephone: (213) 430-6000
Facsimile: (213) 430-6407
email: dtorres@omm.com

DALE M. CENDALI (of counsel, not admitted in California)
O'MELVENY & MYERS, LLP
7 Times Square
New York, New York 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061

Attorneys for Third Party,
MGA Entertainment, Inc.

**ARBITRATION BEFORE**

**ADR SERVICES, INC.**

| | |
|---|---|
| FARHAD LARIAN, | **ADRS Case No.: 05-2096-ABH** |
|     Plaintiff, | **THIRD PARTY MGA ENTERTAINMENT INC.'S MOTION FOR PROTECTIVE ORDER** |
|     v. | |
| ISAAC LARIAN, | |
|     Defendant. | |

**CC 00342**

MGA'S MOTION FOR PROTECTIVE ORDER

EXHIBIT *20* PAGE *3/6*

## I.   INTRODUCTION

Third party, MGA Entertainment Inc., ("MGA") has received a subpoena from Plaintiff, Farhad Larian ("Farhad Larian"), requesting that MGA produce documents that contain an extensive amount of highly confidential, commercially sensitive material. Farhad Larian has already demonstrated a disregard for the confidentiality of MGA's proprietary and trade secret information *and* his willingness to cooperate with MGA's competitors and adversaries in other litigation. MGA has also received word that Farhad Larian has issued subpoenas to and intends to call as witnesses many of its key employees and former employees and contractors to testify about MGA's product development. MGA seeks a protective order, accordingly, to ensure that its documents, their contents, and testimony elicited in this arbitration concerning MGA's business operations cannot be disseminated to others outside of the arbitration and will not be used for any purpose other than the arbitration.

## II.   BACKGROUND FACTS

MGA is the maker of the highly successful "Bratz" line of dolls and related products. After its initial launch in Spain in June 2001, MGA introduced those dolls in the United States later that year. The "Bratz" dolls, with their hip, edgy fashions were a sudden – and surprising – hit among the "tween"-age girls who had years ago lost interest in the long-reigning but stale "Barbie" doll. (*See* Declaration of Daphne Gronich ("Gronich Decl.") filed concurrently ¶ 2.)

In April 2004, Mattel, Inc. filed suit against Carter Bryant, a consultant for MGA who had created the initial "Bratz" drawings. Bryant, a former Mattel employee, had twice left his employment at Mattel, the second time to work for MGA in October 2000. Although it had been three and a half years since Bryant had left Mattel, Mattel filed suit apparently after reading a 2003 *Wall Street Journal* article that inaccurately reported that MGA had begun working on the "Bratz" dolls in 1999 after conducting a fashion doll "contest." (*Id.* ¶ 3.) At that time, Mattel was suffering substantial losses in a variety of

- 2 -

MGA'S MOTION FOR PROTECTIVE ORDER

CC 00343

EXHIBIT _20_ PAGE _312_

1   product lines including "Barbie," which reportedly was being dethroned even more

2   rapidly with the increase in the "Bratz" dolls' popularity.  According to published reports,

3   the "Barbie" line accounted for the great majority of Mattel's revenues.  (*Id.*)

4        Since that time, MGA has learned that Mattel has been in contact with a wide

5   variety of people involved in litigation against MGA.  First, Mattel entered into an

6   information sharing agreement with a company in Hong Kong that was producing and

7   distributing counterfeit "Bratz" products.  Second, Mattel has been in contact with Art

8   Attacks, LLC, a company suing MGA for purported trademark infringement of its

9   "Spoiled Brats" airbrush art.  Finally, and importantly, Mattel appears to have been

10   providing Mr. Larian with assistance in this arbitration.  All of Mattel's efforts have been

11   designed to undermine MGA's rights to the "Bratz" line of products in a last-ditch effort

12   to save its ailing "Barbie" line.  (*Id.* ¶ 4.)

13        Mattel has been unable to conduct discovery of MGA in its case against Bryant

14   since May 2005 because of an interlocutory appeal Mattel filed at that time.  (*Id.* ¶ 5.)  In

15   Farhad Larian, however, Mattel has found an ally eager and willing to help Mattel bypass

16   the discovery stay.  Using home address lists he improperly took from MGA, Farhad

17   Larian has spent the past few months repeatedly calling MGA's current and former

18   employees and contractors in an effort to obtain confidential information about MGA's

19   product development.  He persisted in these efforts even though MGA – and those he

20   called – complained about his harassing conduct.  MGA also learned that Mattel was

21   calling many of these very same witnesses at or about the same time that Farhad Larian

22   was calling them.  (*Id.* ¶¶ 6-7.)  And, MGA has learned that Farhad Larian apparently has

23   obtained information from Mattel and provided that information to Art Attacks.  (*See*

24   Declaration of Paula E. Ambrosini ("Ambrosini Decl.") filed concurrently ¶¶ 3-4.)

25        MGA is not a party to the instant dispute between its CEO Isaac Larian and his

26   brother Farhad Larian, and has not participated in this matter.  MGA is nonetheless

27   legitimately concerned that Farhad Larian seeks to use this arbitration as a means of

28   obtaining information that he can then disclose, to MGA's detriment, to MGA's

- 3 -

MGA'S MOTION FOR PROTECTIVE ORDER

CC 00344

EXHIBIT 20 PAGE 3/8

1    competitors and adversaries. (Gronich Decl. ¶ 8.)  Neither MGA's corporate interest nor

2    the interests of its many employees who have worked tirelessly on the "Bratz" line of

3    products should be compromised in this way because of what is essentially a dispute

4    among family members. (*Id.* ¶ 14.)

5    **III.    MGA IS ENTITLED TO PROTECT FROM DISCLOSURE THE
           CONFIDENTIAL, PROPRIETARY, TRADE SECRET AND**
6          **COMMERCIALLY SENSITIVE INFORMATION SOUGHT BY FARHAD**
           **LARIAN.**
7
           The ADR rules specifically give the arbitrator power and authority to "issue orders
8
     to protect the confidentiality of proprietary information, trade secrets or other sensitive
9
     information."[1] (*See* ADR Rule 27.)  A third party – such as MGA is here – is
10
     presumptively entitled to a protective order limiting the disclosure of its confidential,
11
     proprietary information. *See. e.g., Harris v. Sup. Ct.,* 3 Cal. App. 4th 661, 668 (1992)(trial
12
     court required to limit the scope of inquiry to the extent necessary to a fair resolution of
13
     the case).  Such an order is appropriate and should issue here.[2]
14
           **A.    Farhad Larian Seeks To Obtain and Use Confidential and Trade**
15                **Secret Documents Belonging to MGA.**

16         At the hearing, Farhad Larian seeks to obtain and use confidential and proprietary,

17   trade secret documents.  Farhad Larian has issued a subpoena for, among other things,

18   internal and private financial information relating to MGA's product pricing, costs, sales

19   and projections.  He also seeks documents that contain trade secret and proprietary details

20   relating to MGA's development, marketing, licensing and sale of a wide array of products,

21   including MGA's "Bratz" line of fashion dolls and related toys and accessories.  Indeed,

22   some of the documents depict trade secret ideas, designs and concepts that have not yet

23

24   [1] Even if the ADR rules do not specifically apply to this arbitration, Rule 27 is representative of
     the powers the arbitrator has.  California and Federal Rules of Civil Procedure confer similar
25   power and authority on California and Federal Courts Judges to issue protective orders limiting
     the use and dissemination of confidential information. *See* Cal. Code Civ. Proc. 2031.060 (b)(5)
26   (authorizing court to order that "a trade secret or other confidential research, development, or
     commercial information not be disclosed, or be disclosed only to specified person or only in a
27   specified way"); Fed. R. Civ. Proc. 26 (c)(7) (authorizing court to order "that a trade secret or
     other confidential research, development, or commercial information not be revealed or be
28   revealed only in a designated way").
     [2] A Proposed Order is attached hereto as Exhibit A.

                                              - 4 -                    MGA'S MOTION FOR PROTECTIVE
                                                                                        ORDER

                                                                  CC 00345

                              EXHIBIT 20   PAGE 319

1   been commercially marketed by MGA.  Others include detailed specifications for "Bratz'"

2   eye designs and facial features, including paint colors for the eyelids, eye shadow, iris

3   color, lip and cheek color and color placement, and detailed specifications for "Bratz" hair

4   characteristics, including color, weight and curl size.  Still others disclose confidential

5   product production and development information including production and development

6   schedules lead times, capacity information and ramp-up times.  Certain documents

7   additionally disclose confidential concept drawings and proposed names of "Bratz"

8   characters that have never been publicly revealed. (Gronich Decl. ¶ 9.)  Apart from the

9   fact that such information cannot reasonably be deemed relevant to a dispute relating to

10  events taking place in 2000 well before the "Bratz" dolls were fully developed, finalized

11  or commercially introduced, this type of information too is unquestionably proprietary,

12  trade secret or competitively sensitive information and, thus, entitled to protection.  ADR

13  Rule 27; *see Sprinturf, Inc. v. Southwest Recreational Industries, Inc.*, 216 F.R.D. 320,

14  324 (E.D.Pa. 2003)(finding proprietary information regarding the development of product

15  line to be confidential, sensitive and appropriate for protective order); *see also, e.g., Vacco*

16  *Inds., Inc. v. Van Den Berg*, 5 Cal. App. 4th 34 (1992)(drawings, plans, designs and

17  similar documents relating to a company's products may constitute trade secrets);

18  *Components for Research, Inc. v. Isolation Prods., Inc.*, 241 Cal. App. 2d 726, 728-29

19  (1966)(production techniques and manufacturing "know-how" may be trade secret); *MAI*

20  *Sys. Corp. v. Peak Computer, Inc*, 991 F.2d 511, 522 (9th Cir. 1993)(technical data, not

21  generally known to the public, is trade secret); *Formulabs, Inc. v. Hartley Pen Co.*, 318

22  F.2d 485 (9th Cir. 1963)(formulas and dyes used in product manufacturing, and product

23  testing procedures, are trade secret).

24          Indeed, the detailed information that Farhad Larian has asked MGA to produce

25  would provide a virtual road-map for the production of a "Bratz" doll and could obviously

26  be used to MGA's competitive injury and disadvantage. Collectively, the documents

27  disclose exactly how MGA took "Bratz" from idea, to concept, to design, to production,

28  how long it took, what steps MGA followed, what its internal approval processes were,

-5-                     MGA'S MOTION FOR PROTECTIVE ORDER

CC 00346

EXHIBIT __20__ PAGE 320

1   what designs it considered and rejected and similar information. Such information would

2   be of great value to MGA's competitors and, in the wrong hands, could wreak havoc on

3   MGA's business, jeopardize its competitive position in the toy industry, and cause MGA

4   severe and extensive damage.

**B.   Farhad Larian Seeks Testimony From MGA Personnel and Contractors Concerning MGA Proprietary and Trade Secret Information.**

7   The disclosure of its documents is not MGA's only concern. Many of the people

8   that Farhad Larian intends to call as witnesses at the arbitration, apparently to testify at the

9   arbitration about the conception and development of the "Bratz" dolls, will also be

10  prominent witnesses in MGA's litigation with Mattel on the same subjects. Thus, the

11  testimony generated during the arbitration is also likely to disclose MGA trade secrets and

12  proprietary and confidential financial and product development information. MGA, as a

13  third party, however, will not be able to object or otherwise attempt to curtail such

14  disclosures. Nor will MGA be able to cross-examine the witnesses or present rebuttal

15  testimony and evidence. MGA is, thus, also concerned about the potential disclosure of

16  information obtained through the testimony of its witnesses during the arbitration hearing.

**C.   MGA Has Legitimate Concerns That Farhad Larian May Share Its Confidential, Proprietary Trade Secret Information With MGA's Competitors And Adversaries.**

19  MGA is – and has reason to be – concerned that documents produced and

20  testimony generated during the course of this arbitration will be disclosed to its

21  competitors or to other parties adverse to MGA. MGA is currently involved in a high-

22  stakes litigation with its fiercest competitor, Mattel, over the ownership rights to the

23  "Bratz" line of dolls (*Mattel v. Bryant*, case number CV 04-9059 NM (RnBx) in the

24  United States District Court for the Central District of California.)[3]). In the course of that

25  litigation, MGA has learned that Mattel has entered into at least one document sharing

[3] In a nutshell, Mattel contends that it owns the rights to the "Bratz" line of dolls by virtue of the fact that the creator of the original "Bratz" artwork is a former Mattel employee. Mattel sued the creator in April 2004, and MGA has intervened to protect its rights. That case is pending in the United States District Court in Los Angeles but all discovery in the case is currently stayed pending the outcome of an interlocutory appeal over federal jurisdiction.

- 6 -

MGA'S MOTION FOR PROTECTIVE ORDER

CC 00347

EXHIBIT 20 PAGE 321

1   agreement with a party adverse to MGA in another litigation, through which Mattel has

2   received information and documents produced in that case. (Gronich Decl. ¶ 4;

3   Ambrosini Decl. ¶ 2.)  Because Mattel currently manufactures and sells fashion dolls that

4   directly compete with "Bratz" dolls in the same market for the same customers, it

5   obviously has a keen interest in obtaining any competitively sensitive information it can

6   regarding "Bratz," from any source.  The Protective Order in place in the *Mattel v. Bryant*

7   case, however, prevents Mattel from using the information that it obtains there for

8   purposes other than that litigation.  If Mattel could get the same information from another

9   source, however, such as Farhad Larian, it would potentially be free to use the information

10  in any way it chose. (Ambrosini Decl. ¶ 2.)

11       Farhad Larian appears to be in close, cooperative contact with Mattel and other

12  MGA adversaries.  He has already obtained a partial transcript of a deposition taken in the

13  Mattel litigation (which could have been obtained only from Mattel) and given it to

14  another party adverse to MGA, Art Attacks Ink, LLC, who is suing MGA for trademark

15  infringement in the Southern District of California. (Ambrosini Decl. ¶¶ 3-4.)  In addition

16  to this, Farhad Larian has moved to intervene in the Art Attacks' case for the sole purpose

17  of obtaining confidential MGA documents. (Ambrosini Decl. ¶ 5.)[4]  Indeed, Farhad

18  Larian has used this arbitration as an excuse for trying to obtain access to confidential

19  documents in the Art Attacks case -- claiming he needs them for the arbitration when, in

20  fact, the arbitration will be over before his motion will be heard.[5]  (*Id.*)

21       **D.   MGA Is Entitled To Stringent Protective Measures To Prevent**
22            **The Disclosure Of Its Confidential, Proprietary and Trade Secret**
            **Information.**

23       There is no reason that MGA should have to run the risk that its confidential,

24  proprietary and trade-secret information may become freely available to all, just because it

25  and its employees have been served with third-party subpoenas.  On the contrary, the

26  Larian arbitration is a private proceeding, arranged by contract; it is not a public trial. *See*

27  [4] A true and correct copy of the Motion is attached to the Ambrosini Declaration as Exhibit 1.
28  [5] Farhad Larian's Motion for Intervention to allow him access to confidential information in the Art Attacks case is currently scheduled to be heard on December 12. (Ambrosini Decl. ¶ 5.)

MGA'S MOTION FOR PROTECTIVE ORDER

CC 00348

EXHIBIT 20 PAGE 322

1    *O'Flaherty v. Belgum,* 115 Cal. App. 4th 1044, 9 Cal. Rptr. 3d 286 (2004)("Arbitration is

2    a private proceeding, arranged by contract.")(citing *Rifkind & Sterling, Inc., v. Rifkind,* 28

3    Cal. App. 4th 1282, 1290, 33 Cal. Rptr. 2d 282 (1994)). In fact, ADR Rule 13 requires

4    that "[t]he arbitrator and ADR Services shall maintain the privacy of the hearings unless

5    the law provides to the contrary." Thus, whereas a public Court may balance the public's

6    right to access against a litigant's need to protect confidential information, such

7    considerations have no application here. Indeed, as ADR notes on its website, the private,

8    confidential nature of arbitration is one of its attractive benefits. (*See*

9    adrservices.org/processes.htm (mentioning a number of advantages that arbitration

10   provides over a court trial, including that "the arbitration process is private and

11   confidential" and stating that "[c]ontractual arbitration and arbitration by stipulation are

12   private. . .").

13          An appropriate Protective Order restricting access to and use and dissemination of

14   MGA's documents and transcripts of the arbitration will fairly balance the interests of all

15   concerned, allowing Farhad Larian to arbitrate his claims, while guarding against

16   potentially harmful side effects that could compromise MGA's proprietary interests and

17   cause competitive injury and disadvantage to MGA. *See e.g., Moskowitz v. Sup. Ct.,* 137

18   Cal. App. 3d 313, 318-19 (1982)(limiting use of information to purposes related to lawsuit

19   and limiting access to persons with a legitimate interest in the lawsuit); *Brown Bag*

20   *Software v. Symantec Corp.,* 960 F.2d 1465, 1470 (9th Cir. 1992)(limiting access to trade

21   secret material to counsel of record); *see also, e.g., Liberty Felder v. Curtiss Anthony*

22   *Corp.,* 90 F.R.D. 80, 83 (S.D. Ohio 1981) (employing protective order to limit access and

23   use confidential information); *Chesa Intern., Ltd. v. Fashion Associates, Inc.,* 425 F.

24   Supp. 234, 237 (S.D.N.Y. 1977) (restricting access to competitive information to

25   "plaintiff's attorneys *only*")(emphasis in original); *Safe Flight Instr. Corp. v. Sundstrand*

26   *Data Control Inc.,* 682 F. Supp. 20, 22 (D. Del. 1988) (limiting access to attorneys only

27   of, among other things, confidential research and development information in patent

28   case); *Borden Co. v. Sylk,* 289 F. Supp. 847, 848-49 (E.D.Pa. 1968) (ordering discovery

- 8 -

MGA'S MOTION FOR PROTECTIVE ORDER

CC 00349

EXHIBIT *20* PAGE *323*

1   on condition that it not be revealed or used for any purpose other than preparation for

2   trial); *Miles v. Boeing Co.,* 154 F.R.D. 112, 116 (E.D.Pa. 1994) (placing restrictions on

3   access and use of confidential information).

4          Specifically, MGA requests an order – such as that appended hereto as Exhibit A –

5   providing (1) that the documents that MGA produces pursuant to the subpoena, the

6   information contained therein, and the testimony elicited during the arbitration shall not

7   be used for any purpose other than arbitrating Farhad Larian's claims against Isaac Larian;

8   (2) that, in keeping with the protective orders entered by the United States District Courts

9   for the Central and Southern Districts of California (as well as other tribunals), the

10  documents produced by MGA or concerning MGA's business and the testimony about

11  same shall be deemed "Attorneys Eyes Only" and Farhad Larian shall not be permitted to

12  view, obtain, access or copy those documents or the transcripts of the arbitration and that

13  such documents, transcripts and any copies thereof, shall be destroyed at the completion

14  of the arbitration and the expiration of any appeal (or time to appeal) thereof; and (3) that

15  neither Farhad Larian nor his counsel shall be permitted to share or disseminate the

16  documents or transcripts to others, remove them from the arbitration, make copies of

17  them, or inform third parties of their existence or content or otherwise disclose the same to

18  anyone, unless compelled by law.  In other words, whatever may be disclosed about

19  MGA's business, in privacy and confidence during the course of the arbitration, should

20  remain private and confidential both during – and after – the arbitration.  In addition,

21  MGA respectfully requests that the arbitrator exercise discretion and not allow Farhad

22  Larian to explore areas of confidential information that have no bearing on the instant

23  arbitration.

24         ADR Rule 27 gives the arbitrator power and authority to issue such an order and to

25  exercise such discretion.  For the reasons discussed, there is ample reason to do so.

26  MGA's Motion should be granted.

27  **IV.    CONCLUSION**

28         MGA's should be granted a Protective Order to restrict access to confidential,

- 9 -

MGA'S MOTION FOR PROTECTIVE ORDER

1    proprietary, trade secret and commercially and competitively sensitive information that

2    may be disclosed, in documents or testimony, during the course of this arbitration, limit

3    the use of such information to the purposes of this proceeding, and prohibit the

4    dissemination of such information to others not party to the proceeding.

5

6        Dated: November 14, 2005

7                                          DIANA M. TORRES
                                           PAULA E. AMBROSINI
8                                          O'MELVENY & MYERS LLP

9
                                    By: _____
10                                         Paula E. Ambrosini
11                                         Attorneys for Third-Party,
                                           MGA Entertainment, Inc.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                                                      CC 00351

28

                                    - 10 -          MGA'S MOTION FOR PROTECTIVE
                                                                      ORDER

EXHIBIT _20_ PAGE _325_

# EXHIBIT A

CC 00352

EXHIBIT 20 PAGE 324

1   DIANA M. TORRES  (S.B. #162284)
    PAULA E. AMBROSINI (S.B. #193126)
2   CARLOS M. LAZATIN  (S.B. #229650)
    O'MELVENY & MYERS, LLP
3   400 South Hope Street
    Los Angeles, California 90071-2899
4   Telephone: (213) 430-6000
    Facsimile:  (213) 430-6407
5   email:   dtorres@omm.com

6   DALE M. CENDALI (of counsel, not admitted in California)
7   O'MELVENY & MYERS, LLP
    7 Times Square
8   New York, New York 10036
    Telephone: (212) 326-2000
9   Facsimile:  (212) 326-2061

10  Attorneys for Third Party,
    MGA Entertainment, Inc.

11

12                  **ARBITRATION BEFORE**

13                   **ADR SERVICES, INC.**

14

15  FARHAD LARIAN,             **ADRS Case No.: 05-2096-ABH**

16        Plaintiff,       **[PROPOSED] PROTECTIVE ORDER**

17         v.

18  ISAAC LARIAN,

19        Defendant.

20

21

22

23

24

25

26

27

28

LA2:782144.1

CC 00353

EXHIBIT 20 PAGE 327

1  **1.    PURPOSES AND LIMITATIONS**

2           This arbitration will involve the disclosure of documents and information that

3  should be used only for the purpose of prosecuting, defending, or attempting to settle this

4  arbitration and for no other purpose, including any other dispute involving any Party

5  hereto or any non-party hereto.  Accordingly, the following Protective Order is hereby

6  imposed upon the parties to this arbitration, Isaac Larian and Farhad Larian, and their

7  employees, consultants, retained experts, counsel and support staff (the "Parties").

8  **2.    SCOPE**

9           Protection is conferred by this Protective Order on all documents produced by

10  third party MGA Entertainment, Inc. ("MGA") to Farhad Larian in response to a

11  subpoena, all information copied or extracted therefrom, all copies, excerpts, summaries,

12  or compilations thereof, and all testimony presented to the arbitrator, and transcripts of

13  such testimony from any current or former MGA employee or contractor pertaining to

14  MGA's business.  ("Protected Material").

15  **3.    DURATION**

16          The obligations imposed by this Protective Order shall remain in effect during and

17  after this arbitration and until the parties, Isaac Larian *and* Farhad Larian, and MGA agree

18  otherwise, in writing, or an arbitrator or court order otherwise directs.

19  **4.    ACCESS TO AND USE OF PROTECTED MATERIAL**

20
21          4.1    **Basic Principles:**  The Parties may use Protected Material in connection

22  with this case only for prosecuting, defending or attempting to settle this arbitration and

      may not use such material for any other purposes, including in connection with any other
23
      matters, including between the same parties.  Protected Material may be disclosed only to
24
      the categories of persons and under the conditions described in this Protective Order.
25
      When the arbitration has been terminated, the Parties must comply with the provision of
26
      section 5 below (FINAL DISPOSITION).  Protected Material must be stored and
27
      maintained by the Parties at a location and in a secure manner that ensure that access is
28

LA2:782144.1                                    - 2 -                        CC 00354

EXHIBIT 20 PAGE 38

1   limited to the persons authorized and for the purposes permitted under this Protective
2   Order.

3       **4.2    Disclosure of Protected Material:**  Unless otherwise ordered by a court or
4   jointly permitted in writing by Isaac Larian *and* MGA, Protected Material may be
5   disclosed only to:

6           (a)     counsel of record in this arbitration and employees of said counsel to
7   whom it is reasonably necessary to disclose the information for this arbitration, and who
8   have specifically agreed to be bound by the terms of this Protective Order by executing
9   the undertaking attached hereto as Exhibit A;

10          (b)     experts to whom disclosure is reasonably necessary for this
11  arbitration, and who have specifically agreed to be bound by the terms of this Protective
12  Order by executing the undertaking attached hereto as Exhibit A;

13          (c)     the arbitrator and his personnel;

14          (d)     court reporters, their staffs, and professional vendors to whom
15  disclosure is reasonably necessary for this arbitration, and who have specifically agreed to
16  be bound by the terms of this Protective Order by executing the undertaking attached
17  hereto as Exhibit A;

18          (e)     witnesses in the arbitration to whom disclosure is reasonably
19  necessary, and who have specifically agreed to be bound by the terms of this Protective
20  Order by executing the undertaking attached hereto as Exhibit A; and

21          (f)     the author of the document or the original source of the information.

22      **4.3    Identifying Legend:**  Protected Material shall be appropriately identified
23  and marked with the legend "Confidential" or "Confidential – Attorneys Only."
24  Transcripts shall further include a statement substantially in the following form:

25          This transcript contains material subject to Protective Order.  The transcript may not
26          be used for any purpose other than this arbitration and its contents may not be
27          disclosed to anyone other than those persons permitted to access Protected Material
28          under the terms of the Protective Order.

LA2:782144.1                          - 3 -                     CC 00355


EXHIBIT 20 PAGE 329

1    **4.4    Other Restrictions on Access to and Use of Protected Material:**  No

2    party or person shall be permitted to share or disseminate the documents produced by

3    MGA or the transcripts of these proceedings to others, remove them from the arbitration,

4    make copies of them, or inform third parties of their existence or content or otherwise

5    disclose the same to anyone, unless compelled by law.

6         In short, this is a private proceeding; whatever may be disclosed about MGA's

7    business, in privacy and confidence during the course of the arbitration, should remain

8    private and confidential both during – and after – the arbitration.

9    **5.    FINAL DISPOSITION**

10         Unless otherwise ordered or jointly agreed in writing by Isaac Larian **and**

11    Farhad Larian, within 10 days after the final termination of this arbitration and any appeal

12    (or, if no notice of appeal is filed, the deadline for filing a notice of appeal), all Protected

13    Material must be returned to its original source or destroyed, including all copies,

14    abstracts, compilations, summaries or any other form of reproducing or capturing any of

15    the Protected Material.  Whether the Protected Material is returned or destroyed, each

16    Party must submit a written certification to the other Party, *and* the person or entity from

17    whom the Protected Material was secured or subpoenaed, by the 10 day deadline that

18    identifies (by category, where appropriate) all of the Protected Material that was returned

19    or destroyed and that affirms that the Party has not retained any copies, abstracts,

20    compilations, summaries or other forms or reproducing or capturing any of the Protected

21    Material.  Notwithstanding this provision, counsel of record for each Party is entitled to

22    retain an archival copy of all pleadings, motion papers, legal memoranda, correspondence

23    or attorney work product.  Any such archival copies that contain or constitute Protected

24    Material, however, shall otherwise remain subject to this Protective Order.

25    **6.    PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED
26          IN OTHER LITIGATION**

27         If a Party is served with a subpoena or an order issued in other litigation that

28    would compel disclosure of any Protected Material, the Party receiving the subpoena must

LA2:782144.1                       - 4 -                    CC 00356

EXHIBIT _20_ PAGE _330_

1  notify the other Party *and* the person or entity from whom the Protected Material was

2  secured or subpoenaed, in writing, immediately and in no event more than two business

3  days after receiving the subpoena or order.  Such notification must include a copy of the

4  subpoena or court order.

5        The Party receiving the subpoena also must immediately inform, in writing, the

6  party who caused the subpoena or order to issue in the other litigation that some or all of

7  the material covered by the subpoena or order is the subject of this Protective Order.  In

8  addition, the Party receiving the subpoena must deliver a copy of this Protective Order

9  promptly to the Party in the other action that caused the subpoena or order to issue.

10        The purpose of imposing these duties is to alert the interested parties to the

11  existence of this Protective Order and afford the Parties in this case *and* the person or

12  entity from whom the Protected Material was secured or subpoenaed, an opportunity to try

13  to protect whatever confidentiality interest such Party may have in the court from which

14  the subpoena or order issued.

15

16  SO ORDERED:

17  DATED:_____      _____

18

19

20

21

22

23

24

25

26

27

28

LA2:782144.1                    - 5 -          **CC 00357**

EXHIBIT *20* PAGE *331*

```
1   UNDERTAKING RE
    PROTECTIVE ORDER
2
3
                    UNDERTAKING OF _____
4
5
6   I, _____, declare:
7
8        My address is _____
9   My present occupation is _____
10
11       1.    I have received a copy of the Protective Order operative in this action,
12  ADRS Case No. 05-2096-ABH.  I have carefully read and understand the provisions of
13  the Protective Order.
14       2.    I will comply with all of the provision of the Protective Order.  I will hold in
15  confidence, and will not disclose to anyone other than those persons specifically
16  authorized by the Protective Order, and will not copy or use except for the proceedings
17  concerning the matters in issue between the parties, any and all Protected Material that I
18  receive.
19       Executed this ____ day of _____, at _____.  I declare under
20  penalty of perjury under the laws of California that the foregoing is true and correct.
21
22                    _____
23
24
25
26
27
28
```

LA2:782144.1                          -6-                      CC 00358

EXHIBIT 20 PAGE 332

# PROOF OF SERVICE

I, Linda M. Rich, declare:

I am a resident of the State of California and over the age of eighteen years, and not a party to the within action; my business address is 400 South Hope Street, Los Angeles, California 90071-2899. On November 14, 2005, I served the within documents:

1. **THIRD PARTY MGA ENTERTAINMENT INC.'S MOTION FOR PROTECTIVE ORDER**

| | |
|---|---|
| ☒ | by transmitting via facsimile machine the document(s) listed above to the fax number(s) set forth below on this date. The outgoing facsimile machine telephone number in this office is (213) 430-6407. The facsimile machines used in this office create a transmission report for each outgoing facsimile transmitted. A copy of the transmission report(s) for the service of this document, properly issued by the facsimile machine(s) that transmitted this document and showing that such transmission was (transmissions were) completed without error, is attached hereto. |
| ☒ | by transmitting via e-mail the document(s) listed above to the e-mail address(s) set forth below on this date. |
| ☒ | by putting a true and correct copy thereof, together with an unsigned copy of this declaration, in a sealed envelope designated by the carrier, with delivery fees paid or provided for, for delivery the next business day to the person(s) listed above, and placing the envelope for collection today by the overnight courier in accordance with the firm's ordinary business practices. I am readily familiar with this firm's practice for collection and processing of overnight courier correspondence. In the ordinary course of business, such correspondence collected from me would be processed on the same day, with fees thereon fully prepaid, and deposited that day in a box or other facility regularly maintained by Federal Express, which is an express carrier. |

**PLEASE SEE ATTACHED SERVICE LIST**

I declare under penalty of perjury under the laws of the United States that the above is true and correct.

Executed on November 14, 2005, at Los Angeles, California.

_____
LINDA M. RICH

LA2:782602.1                                                    CC 00359

EXHIBIT _20_ PAGE _333_

1

**SERVICE LIST**

| | |
|---|---|
| Kabateck Brown Kellner LLP | Cotkin, Collins & Ginsburg |
| Michael R. Brown | Robert G. Wilson |
| Richard L. Kellner | 300 South Grand Avenue |
| 350 S. Grand Avenue | 24th Floor |
| 39th Floor | Los Angeles, CA 90071-3134 |
| Los Angeles, CA 90071 | (213) 688-9350 Telephone |
| (213) 217-5000 Telephone | (213) 688-9351 Fax |
| (213) 217-5010 Fax | rgw@ccglaw.cc |
| mrb@kbklawyers.com | |
| rlk@kbklawyers.com | |

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LA2:782602.1

**CC 00360**

EXHIBIT _20_ PAGE _334_