# EXHIBIT 34

Priority ✓
Send ✓
Enter ——
Closed ——
JS-5/JS-6 ——
JS-2/JS-3 ——
Scan Only ——

FILED - EASTERN DIVISION
CLERK, U.S. DISTRICT COURT

AUG I 0 2006

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARTER BRYANT,<br><br>              Plaintiff,<br><br>v.<br><br>MATTEL, INC.,<br><br>              Defendant,<br><br>and related actions. | CASE NO.  CV 04-9049 SGL (RNBx)<br><br>(Consolidated with cases CV-04-9059 and CV-05-2727)<br><br>ORDER DENYING MOTION FOR APPOINTMENT OF EXPERT WITNESSES |

Presently before the Court is Mattel, Inc.'s ("Mattel") motion for the appointment of expert witnesses pursuant to Federal Rule of Evidence 706, Carter Bryant and MGA Entertainment, Inc.'s ("MGA") opposition and response thereto, and Mattel's reply. For the reasons set forth below, the Court **DENIES** the motion for the appointment of expert witnesses.

Federal Rule of Evidence 706(a) provides

> The court may . . . on the motion of any party enter an order to show cause why expert witnesses should not be appointed, and may request the parties to submit nominations. The court may appoint any expert witnesses agreed upon by the parties, and may appoint expert witness of its own selection. An expert witness shall not be appointed by the court unless the witness consents to act.

DOCKETED ON CM

AUG I I 2006

BY                    044

EXHIBIT 34 PAGE 488

> A witness so appointed shall be informed of the witness'
> duties by the court in writing, a copy of which shall be filed
> with the clerk, or at a conference in which the parties shall
> have opportunity to participate.

The appointment of an expert by a federal court is a rare occurrence.  Much of this stems from a concept "[d]eeply ingrained" in the common law "that it is the responsibility of the parties to produce the evidence while the court looks on to assure that the rules are followed."  4 JOSEPH M. MCLAUGHLIN, WEINSTEIN'S FEDERAL EVIDENCE § 706.02[1], at 706-6 (2nd ed. 2006).  The reluctance of courts to intrude into the evidence-gathering function normally assigned to counsel is borne out of "the fear of ex parte communications between the court and its expert," as well as the unseemliness of "[c]ollecting a share of the expense [for the work performed by the court appointed expert] from a party who has been damaged by the expert's report." Id. at 706-6, 706-7.  As a result of these institutional concerns, "experts are usually appointed only in exceptional cases that present unwieldy, complex, or technical issues" or where "there is a need for an impartial, independent assessment of a disputed issue." Id. § 706.02[3], at 706-8 706-9.

Here, Mattel seeks for the court to appoint experts in the fields of questioned document examination, ink chemistry analysis, and paper chemistry analysis in order to "analyze and date (1) the originals of 'BRATZ' design drawings, (2) the faxed-version of the BRATZ-related contract between . . . Carter Bryant and MGA Entertainment, Inc., (3) MGA's internal documents relating to work performed by Anna Rhee on Bryant-related projects in the year 2000, and (4) a facsimile of BRATZ drawings bearing a fax header date of April 10, 2000," as well as "(5) any other documents that cannot be sampled or tested without destroying the sample tested or analyzed." (Mattel's Mot. Appt. Expert, Preface at 2).  The reason proffered for such an appointment is two-fold:  First, a generalized concern that, because the documents sought to be examined are "highly relevant" to the litigation, having a neutral expert perform the testing on the same may obviate a battle of the experts that would make

EXHIBIT 34 PAGE 489

1   the jury's function of sorting out the truth much more arduous; and second, concerns,
2   deduced during discovery, about the possible spoliation of key documents in the case
3   by MGA/Bryant and their counsel.

4   A.    AVERTING A BATTLE OF THE EXPERTS

5         Mattel's argument that the Court should appoint an expert because otherwise
6   each side will perform "separate, partisan destructive analyses of separate samples of
7   the documents" with "wide divergence" of opinion "virtually assured" is not well-
8   founded. (Mattel's Mot. Appt. Expert at 18, 20). Explicit in Mattel's argument is that
9   this feared divergence in each side's retained expert's opinions has yet to materialize.
10  This is not surprising as it appears that discovery in this case is in its nascent stage,
11  owed largely to the fact that the Court had earlier stayed the case while Mattel
12  appealed the denial of its motion to remand the case to state court. Mattel's argument
13  instead is that the Court should appoint an expert now to avoid the possibility that
14  there may be such wide divergence in each side's privately retained expert in the
15  future. Needless to say from the jabs each party took at the credibility and even
16  trustworthiness of the other side's retained expert during the oral argument on this
17  motion (one going so far as to label the competing ink chemistry experts as being the
18  modern day equivalent of one's Hatfield to the other's McCoy), such a possibility may
19  be more easier to imagine occurring here than in ordinary cases. Nevertheless, such
20  divergence, even if likely, is still that – a possibility, not an inevitability.

21        In those cases where an expert has been appointed by a court on account of
22  the excessive partisanship in the expert opinions retained by counsel, the rationale for
23  the appointment was based on the fact that the feared wide divergence in opinion had
24  already materialized. See Students of California Sch. for the Blind v. Honig, 736 F.2d
25  538, 548 (9th Cir. 1984)("the judge could not decide the merits of the students' seismic
26  safety claims on the basis of evidence presented at trial, so he reopened the case and
27  appointed a neutral expert to evaluate the adequacy of seismic testing at the Fremont
28  site"), vacated on other grounds, 471 U.S. 148 (1985); Eastern Air Lines, Inc. v.

3

EXHIBIT 34 PAGE 490

1   McDonnell Douglas Corp., 532 F.2d 957 (5th Cir. 1976); 4 WEINSTEIN § 706App.100 at

2   706App.-5 (noting that legal commentators' "imprecations against the parties' 'battle of

3   experts'", not the potential for such a battle, "led to the drafting of the Uniform Expert

4   Testimony Act in 1937," the precursor to Federal Rule of Evidence 706).

5        In no instance uncovered by the Court's research (or by Mattel's citation to

6   authority) has a court appointed an expert because of a fear, even one that is well-

7   founded, that such wide divergence in privately-retained expert testimony may

8   materialize in the future.  Were the Court to adopt Mattel's analysis, appointment of

9   experts by courts would expand exponentially, limited only by a court's assessment of

10  how partisan the experts in a given case may become in the future.  Such a

11  proliferation has not occurred precisely because courts generally require that the

12  divergent "horse" be placed before the expert witness "cart."  See FED. R. EVID. 706

13  advisory committee's note ("actual appointment is a relatively infrequent occurrence").

14  Unless and until this feared divergence in opinion becomes reality, the Court finds that

15  the potential (which itself cannot be quantified at this point) for its occurrence does not

16  warrant the Court's intrusion into the adversarial process through the appointment of

17  an expert at this stage.

18  B.   SPOILATION OF EVIDENCE

19       The question is much closer with respect to Mattel's other reason for the Court

20  to appoint an expert in this case:  Concern that opposing counsel or their clients may

21  have destroyed or altered key documents in the case.  Mattel's basis for such concern

22  is predicated on three facts uncovered during discovery.

23       1.   Evidence of spoilation

24       Before being deposed Bryant was asked to bring all his original BRATZ design

25  drawings.  When he arrived at his deposition, however, Bryant only had in his

26  possession a few of the originals.  (Decl. Michael T. Zeller ¶ 13).  Among these some

27  "contained holes where plugs apparently had already been removed.  Bryant

28  acknowledged . . . that his drawings had no holes in them when he gave them to his

1  lawyers." (Mattel's Mot. Appt. Expert at 2; see also Decl. Michael T. Zeller ¶ 14).

2  Specifically, at Bryant's deposition the following exchange took place between Bryant

3  and counsel for Mattel:

4           Q.  (By Mr. Quinn) I wanted to ask you about one of these original drawings that were produced today.

5

6              — what we're talking about here. This is — the Post-it says that's Bryant — that's the original of Bryant 192, Bates number 192, which has the heads on it, and this is one of the originals that your counsel was kind enough to have shipped here today for us to look at.

7

8

9           A.  Yes

10           Q.  And we were just looking at these this afternoon and we notice[d] that there's a bunch of holes on the page, including in the signature, as if somebody were taking ink samples.

11

12

13           A.  Uh-huh.

14           Q.  Do you see that?

15           A.  Yes.

16           Q.  Do you know anything about why those holes were made or how or when?

17           A.  I have no idea what those are.

18           Q.  I mean, when you had — when you had possession of this document did it have those holes in it?

19

20           A.  Not that I remember.

21           Q.  You certainly never had anything to do with that?

22           A.  No.  I don't know anything about those holes.

23           Q.  And, similarly, if you wouldn't mind holding this up to the camera, this is the original of Bryant 210 and it's also — if you take a look at it, I think you'll see it has some of those holes in it, although not as many as the last one we looked at.  Again, you don't know anything about how or why those holes got put on there?

24

25

26

27           A.  I don't.

28  (Decl. Michael T. Zeller, Ex. 7 at 161-163).

EXHIBIT 3[/] PAGE 4[/]2

1    Mattel has submitted the declaration of a questioned document analysis expert,

2   Lloyd Cunningham, who has opined that the holes described in the document

3   mentioned above are consistent with those that would be generated by taking

4   microplug samples to perform analysis of the ink found on a document. (Decl. Lloyd

5   Cunningham ¶ 5). Bryant and MGA eventually conceded (although at first refusing to

6   do so under the veil of work-product privilege) that they tested some of the original

7   BRATZ drawings by an expert they retained in the field of forensic chemistry, Erich J.

8   Speckin. (Response to Order to Show Cause ("Response") at 1-2).

9    Mr. Speckin states that in June, 2004, he performed a series of tests "on

10   various 'Bratz' documents" at the request of MGA's counsel.[1] (Decl. Erich J. Speckin

11   ¶ 8). Those tests included examining the documents in question under an infrared

12   light as well as performing sidelight testing, which involves "visually inspecting a

13   document by holding a side light up to the document at an oblique angel . . . to

14   determine preliminarily whether the document contains impressions, or markings

15   impressed upon the document by drawing and writing done on a sheet of paper laid

16   on top of the document being tested." (Decl. Erich J. Speckin ¶¶ 9, 10). Mr. Speckin

17   also performed an electrostatic detection apparatus to see if there was indented

18   impressions on the documents. (Decl. Erich J. Speckin ¶ 11). Finally, Mr. Speckin

19   "performed ink identifications tests" on the documents. (Decl. Erich Speckin ¶¶ 12-

20   13). Such testing involved Mr. Speckin removing "very small microplug samples from

21   the document at issue and testing the microplug." (Decl. Erich Speckin ¶13).

22   Nowhere is it averred by MGA, Bryant, or Mr. Speckin which or how many of the

23   original BRATZ drawings were subjected to this microplug sampling procedure, nor is

24   it averred from what parts of the documents that were tested was the microplug taken.

25   Instead, Mr. Speckin simply notes that in taking the microplugs he "le[ft] more than

26

27        [1] At the time the testing was done by Mr. Speckin, Bryant had already been
28   sued by Mattel for violating the terms of the invention agreement he signed when he
     worked for them from 1999 to 2000. (Response at 1).

6

EXHIBIT _3/_ PAGE _493_

1   sufficient material for another expert to test the exact same <u>documents</u>," but admits

2   that "another expert cannot test the very same microplug that I tested . . . ." (Decl.

3   Erich J. Specklin ¶14).

4        Another episode brought to light during discovery causing Mattel concern

5   relates to MGA's handling of the original Bryant/MGA contract before the inception of

6   the instant litigation.  At the deposition of a former MGA executive, Victoria O'Connor,

7   testimony was elicited that O'Connor, "on explicit instructions of MGA's [CEO] Isaac

8   Lariam, . . . [made] redact[ions from] the fax header . . . on the BRATZ contract

9   between Bryant and MGA for the year 2000 to conceal the fact that Bryant sent the

10  contract from Mattel's Design Center while he was still employed at Mattel." (Mattel's

11  Mot. Appt. Expert at 3).  O'Connor's deposition appears to indicate that such alteration

12  occurred before the present litigation began (indeed, perhaps even before MGA

13  marketed the BRATZ doll).

14        Q.      . . . Was there ever anything that you were asked to
                  do that you – made you feel kind of uncomfortable?
15
        A.      Yes.
16                       . . . .

17        Q.      And what was that?

18        A.      When the original contract was executed by Carter
                  Bryant, it was sent to me <u>via</u> fax, and on the top of
19                the fax listed the phone number from where it was
                  faxed, which said "Barbie Collectibles," and at one
20                point *my boss, Isaac Larian, asked me to* white that
                  out and send it to a lawyer, Patty Glaser.
21

22  (Decl. Michael T. Zeller, Ex. 19 at 306).  Upon further examination, however,

23  O'Connor stated that she did not participate in or have knowledge of any other

24  instances in which any other agreement between Bryant and MGA was directed to be

25  altered:

26        Q.      Were you ever asked to change the date on any
                  agreements between Mr. Bryant and MGA?
27
        A.      No.
28

7


EXHIBIT 34 PAGE 494

1   Q.   Are you aware of anybody being asked to change
         the date on any of those agreements?
2
    A.   No.
3
    Q.   I mean, do you have any reason to believe that any
4        agreement that was entered into between Mr. Bryant
         and MGA had a date altered or changed?
5
    A.   No.
6
    Q.   You never heard that from – from any source?
7
    A.   No.
8

9   (Decl. Paula E. Ambrosini, Ex. 3).

10       Finally, Mattel speculates that a drawing of some BRATZ doll accessories

11   faxed on April 10, 2000, had the fax header altered, much in the same manner

12   described in O'Connor's testimony vis-à-vis the MGA/Bryant faxed contract, as the

13   fields on the fax header for the sender's name and the sender's telephone number are

14   missing. (Decl. Michael T. Zeller ¶ 23 & Ex. 24).[2]  As explained by Mattel, "Because

15

16       [2] Mattel speculates that the time sheets produced by MGA for one of its
17   employees, Anna Rhee (who did doll face painting work for the BRATZ mock-up), from
     "mid-to-late 2000" were altered or recently created by MGA to show that Rhee worked
18   on projects called "Angel" or "Prayer Angel," when in fact she was working at the time
     painting faces for BRATZ dolls at the direction of Bryant. (Mattel's Mot. Appt. Expert at
19   3). The basis for this speculation is based on the fact that the initial disclosure by MGA
     of Rhee's time sheets comprised only 8 pages. (Decl. Michael T. Zeller ¶ 20). Then,
20   on January 7, 2005, Rhee produced 20 separate invoices of her work at MGA during
     mid-to-late 2000, indicating that Rhee performed work for MGA prior to Bryant's
21   departure from Mattel, most notably on June 12, 2000. (Decl. Michael T. Zeller ¶ 21).
     Within a couple of weeks after Rhee's production of invoices to Mattel, MGA
22   supplemented its earlier production of Rhee's time sheets showing that during the mid-
23   to-late 2000 period Rhee was working on a MGA project known as "Angel" or "Prayer
     Angels" and was not involved in any BRATZ-related work until after Bryant's departure
24   from Mattel. (Decl. Michael T. Zeller ¶ 22). Mattel's surmise that the supplemental time
     sheets were altered is allegedly bolstered by the fact that Rhee testified during her
25   deposition that the only work she performed in mid-to-late 2000 was on BRATZ and
     that the supplemental time sheets reference to the "Angel" and "Prayer Angel" was
26   nothing but a cover or code word for BRATZ-related work. This argument is hard to
27   accept. First, even the invoices Rhee turned over to Mattel contain the phrase "Angel"
     for the mid-2000 project she worked on. (Decl. Michael T. Zeller, Ex. 22 at 356-60,
28   362). It is not until December, 2000, that any of the invoices submitted by Rhee show

EXHIBIT 8 34  PAGE 495

1  facsimile machines normally insert senders' names and numbers as a matter of
2  course, and indeed is required by law [to do so], it appears likely that the document
3  was altered to conceal the sender's information. See 47 U.S.C. § 227(d)(1)(B)."
4  (Mattel's Mot. Appt. Expert at 10). The premise underlying Mattel's concern on this
5  topic is not unreasonable. The law requires such information to be found on any
6  document, like the one in question, that has been faxed. Additionally, the testimony
7  elicited from Ms. O'Connor that MGA altered the fax header for other documents
8  related to BRATZ from the same time period leads to an obvious inference that other
9  documents where spaces on other fax headers are absent suffered a similar fate.

10     2.   Analysis

11          a.   Microplug Ink Testing

12  Bryant and MGA begin by downplaying the significance of the spoliation issue
13  in this case. With respect to the holes on some of the original BRATZ design
14  drawings produced at Bryant's deposition, they note that, even with these holes,
15  nothing prevents Mattel from performing its own testing on the remaining portions of
16  the drawings on the document. "Indeed, the very fact that Mattel is asking for court-
17  appointed experts to perform ink and paper testing only underscores the fact that
18  nothing has been 'destroyed.'" (Joint Opp. at 2). Mr. Speckin makes similar assertions
19  in his declaration, stating that the fact that the same microplug cannot be tested "is
20  entirely irrelevant because there is more than enough ink on each of the documents I
21  tested to allow numerous microplug samples to be extracted and tested by different
22  experts." (Decl. Erich J. Speckin ¶ 14 (emphasis added); see also Response at 5-6
23  ("While another expert cannot test the very same microplug that Mr. Speckin tested,
24

25
26  her doing work on the BRATZ doll, well after Bryant had left Mattel. (Decl. Michael T.
    Zeller, Ex. 21 at 367, 370, 373). To accept Mattel's argument, not only would MGA
27  have had to alter the invoices it produced in the supplemental production, but the
    documents produced by Rhee would also have to be similarly altered. An alternative
28  and just as plausible explanation is that Rhee is simply mistaken as to when she began
    performing work on the BRATZ project.

9

1  that fact is entirely irrelevant because, unlike in a situation where the entire object is

2  destroyed during the testing, there is more than enough ink on each of the documents

3  Mr. Speckin tested to allow numerous microplug samples to be extracted and tested"

4  (emphasis added))). This argument is not persuasive. This is not a case where

5  everyone concedes that the documents in question were created at one point in time,

6  but dispute what that date may have been. In such a circumstance all the ink

7  markings on the documents are comparable to one another as it is conceded that all

8  the marks came from one point in time.

9       Here, however, it is Mattel's theory that Bryant made drawings in 1998 and then

10  periodically touched up or made refinements/additions to those drawings, adding more

11  marks in 1999 and 2000 during the time he was employed by Mattel. An ink mark

12  from one part of the document is not necessarily comparable to another set of ink

13  markings found elsewhere on the document. One ink mark on a drawing could have

14  been made in 1998, for example, while another ink mark found on the same drawing

15  could have been put there sometime later. In taking microplug samples from one of

16  these ink markings without the ability of the other side to test the same mark would

17  forever foreclose a potential avenue of crucial evidence in this case. It is on that point

18  that taking microplug samples of the marks on these drawings is akin to the spoliation.

19  Therefore the fact that another expert could test other parts of the document does not

20  mean that key relevant evidence found on that document has not been destroyed. As

21  MGA and Bryant make clear spoliation of evidence occurs through the "destruction or

22  significant alteration of evidence, or the failure to preserve property for another's use

23  as evidence in pending or reasonably foreseeable litigation." West v. Goodyear Tire &

24  Rubber Co., 167 F.3d 776, 779 (2nd Cir. 1999).[3]

25       At this point, it should not be lost that the documents in question are not

26

27  _____
    [3] The Court does not mean to suggest that Mattel's theory is correct. Instead,
    the Court simply notes this theory as refuting MGA and Bryant's argument that only the

28  complete destruction of a document would amount to spoilation under the particular
    circumstances in this case.

10

1   peripheral to the case. At its heart, this case asks the question: Who owns the rights
2   to the Bratz dolls? Bryant asserts that he came up with the idea for the Bratz dolls
3   while on a break from his employment at Mattel in 1998, and that he sold his idea to
4   MGA when he went to work for them in October, 2000. Mattel claims, among other
5   things, that Bryant "developed" or "continued to develop" his idea for Bratz dolls while
6   he was working for them from January, 1999, to October, 2000, and that pursuant to
7   an inventions agreement he signed with the Mattel when he went to work for them,
8   that idea now belongs to Mattel. As this clash of factual contentions makes clear, the
9   dating of the original BRATZ drawings and the markings contained thereon is a
10  fundamental, perhaps despositive, issue to this case. That there are serious
11  questions concerning the handling of these critical documents certainly causes the
12  Court much concern about whether the truth seeking functions of the adversarial
13  system have been fundamentally compromised in this case. As Mattel rightly notes,
14  "The adversarial process is not an end in itself; its value is in its ability to promote a
15  search for truth." (Mattel's Reply at 9).
16        Bryant and MGA concede that the sections that were holed out contained
17  markings, be they handwritten dates or other words or letters, that may be crucial to
18  the case. Indeed, one of the drawings -- Bryant 192 -- had a portion of the signature
19  line sampled. What is left unclear is whether, for those portions of the document
20  where ink or signatures were sampled, enough of the same part of the document in
21  question (meaning the same mark) remains to be sampled by Mattel. For instance, is
22  there enough of the signature line from Bryant 192 left to sample, or has too much of it
23  already been sampled? In that sense, MGA's and Bryant's argument that nothing has
24  been destroyed by the microplug testing procedure because other parts of the
25  document still exist is misplaced. Indeed, MGA and Bryant later admit that the
26  circumstances allowing for "multiple experts [to] remove multiple microplugs and test
27  the exact same paper and ink" is dependent upon there being the same exact paper
28  and ink there to test. (Joint Opp. at 15 ("[a]s long as there is paper and ink to test")).

1  The continued existence of the "exact same pen stroke" is the very issue that is now

2  left open because of the holes in some of Bryant's original BRATZ design drawings.

3  Is there anything left of that exact same pen stroke that was sampled by Mr. Speckin

4  remaining on the original drawing for Mattel to test?  None of these questions have

5  been addressed by MGA, Bryant, or Mr. Speckin in their papers.  Instead, they simply

6  make the observation that there remain other ink markings on the same drawings for

7  Mattel to test, a reason which, as explained above, is wholly insufficient to assure the

8  Court that Mattel has not been prejudiced by MGA's actions.

9        Given the absence of any representation by them on this point, the Court

10  pressed MGA's counsel about the same at oral argument:

11            THE COURT:  And part of your argument is that
      while a small portion of the small portion of the page may
12      be gone, as you in your most recent papers concede is
      gone, there are other portions of the page that can be
13      tested.  The concern I have, I guess -- and maybe you can
      clear this up for me -- I've seen some of the drawings and I
14      have a pretty good mental image of what the drawings look
      like.  But there is also writing on these drawings,
15      signatures, copyright registration indications; some are
      large, some are small.  As I gather from the plaintiff, from
16      Mattel, the concern is that these different drawings or
      writings were done at different times.  And I guess I can
17      understand why when those drawings or writings were
      done could be significant from an evidentiary standpoint.
18      So the concern is not so much there's another part of the
      paper that can be tested; it's whether or not the particular
19      marking in question has been so damages as to not permit
      a full further testing on that particular marking.  Does my
20      question make sense?

21            MS. CENDALI: Yes, it does, your Honor.  And I
      anticipated that.  Significant, we thought, in their papers
22      was that . . . they cited to the fact that Mr. Bryant admitted
      in his deposition that there were holes in some of the
23      documents that he didn't know how they got there
      originally.  As an example, if you look at part of Zeller,
24      Exhibit 17, Bates number Bryant 201, that's an example of
      one of the documents that's been tested.

25            THE COURT: One second so I have that in front of
26      me. Okay.

27            MS. CENDALI: There are many many others that were
      submitted that were also submitted to this type of ink
28      testing, but this is just an example of one of them.  And if

1             you look at the document, you would never know --
2             granted, this is smaller, so the actual drawing is even larger
              than this, so there's even more ink on the larger drawing
3             than there would be available on this reproduction size.

4                 But if you look at it -- and I'll represent to you that we
            didn't test the face; the face is absent before and after the
5             testing -- but if you look at it, you couldn't even see that
            there were any pin pricks to it. If you look very, very
6             carefully at the signature at the bottom, you can maybe see
            where it says "Ramona Prints, 8-26-99": that maybe there
7             was like a little tiny hole in one of the little slash marks; that
            was a teeny little pin prick hole that showed the testing .
8             There's ample amount of ink to do the testing on all of
            these documents. This is the normal course of procedure
9             that was done.

10       When asked by the Court whether it accepted MGA's representation that there

11 was "ample amount of ink" left on the same marks that the microplugs were taken

12 from for further microplug testing, Mattel, in seeming contradiction to its position in its

13 papers, said it did: "I agree with Ms. Cendali. <u>We do not maintain any portion of the</u>

14 <u>ink on a signature or an image has been so obliterated that you couldn't take a plug</u>

15 <u>now on any of it; that's not our point.</u>" (Emphasis added).

16       In light of this concession by Mattel, the Court finds that no colorable claim of

17 spoilation has been established at this time <u>vis-à-vis</u> Mr. Speckin's testing of the

18 documents to warrant the appointment of an expert by the Court to investigate the

19 same. <u>See</u> Sedrati v. Allstate Life Ins. Co., 185 F.R.D. 388, 393 (M.D. Ga.

20 1998)(sanction warranted where because "defendant's expert has conducted

21 destructive tests on the original documents," plaintiff's expert "cannot duplicate the

22 conditions of the original documents"). If there was any evidence indicating that MGA,

23 Bryant, or their counsel had engaged in acts that could compromise Mattel's ability to

24 discover crucial information in this case, the Court would be sympathetic to the

25 appointment of an expert to investigate the same. Here, no such evidence exists.

26 The tests done by Mr. Speckin have not left the marks that were micro-sampled or the

27 documents that were handled so compromised that Mattel cannot perform the exact

28 same tests on those exact same marks as performed by Mr. Speckin.

EXHIBIT 3/ PAGE 500

1      Indeed, the only basis for spoliation that Mattel has left to argue – that the

2   passage of time has left the ability to perform any meaningful ink testing at this time

3   problematic – is an argument that has nothing to do with MGA's conduct, but much

4   more with Mattel's own dereliction.  As the Court understands it, the process of dating

5   when ink was placed on a document has only a limited window of time in which it can

6   be accomplished because, eventually, the ink dries (be it in 2 years or 3 to 4 years),

7   leaving nothing capable of being sampled after that point to test (save to acknowledge

8   that the ink in question was put on the paper some time more than 3 to 4 years ago).

9   Mattel essentially argues that the impossibility of testing ink after a certain period

10  mandates that, if the other side is going to test ink while "fresh" ink remains on the

11  document, that party has an obligation to inform the other side so that they can do the

12  same before the ink "dries out"; failure to do so renders the test performed something

13  that cannot be replicated.[4]  By Mattel's own admission, they knew there had been

14  testing done on the BRATZ original drawings as far back as November, 2004, during

15  Bryant's deposition testimony when they saw some of the original BRATZ drawings

16  (drawings that had been tested by Mr. Speckin five months earlier).  Rather than

17  immediately seeking the production of those documents and having its own expert

18  perform similar tests on them, Mattel sat idly by, waiting until June of this year to do

19  anything, either by way of court-pleadings or formal requests made to MGA and

20  Braynt, related to having ink tests performed on the documents.  Nowhere has Mattel

21

22      [4] The basic factual assumption in Mattel's argument may indeed be faulty – that
    when MGA tested the ink there was enough "fresh" ink to test.  Mr. Speckin states that
23  "[i]nk takes approximately 3 to 4 years to dry on paper.  Thus, by testing the ink to
    determine if it is dry, it can be determined whether the document was created within the
24  last [3 to] 4 years, or whether the ink, and thus the drawing, is more than [3 to] 4 years
25  old." (Decl. Erich J. Speckin ¶ 13).  Given that Mr. Speckin performed his ink dating
    test in June, 2004, at best he could determine whether the ink had been put on the
26  paper on or after June, 2000.  Beyond that time frame his test could not tell when the
    now-dried ink was marked on the document.  Given that the relevant period in question
27  in this case is from August, 1998, to October, 2000, Mr. Speckin's test results would
28  appear to be only marginally relevant in adducing proof as to when the BRATZ
    drawings were made.

1  explained how MGA or Bryant had anything to do with it not having the ability to

2  perform such testing until now.  Mattel's allusion to the fact that a stay on discovery

3  was put in place by this Court in 2005 is misguided.  If Mattel thought that it was losing

4  valuable time on account of the stay, it could have at any time filed with this Court an

5  emergency request for relief from the stay to have such tests performed.  All it needed

6  to do was inform the Court that it had only a short period of time to perform the test on

7  account of the fact that ink dries; something which it never did in this case.

8        Mattel's citation to the case Edwardes v. Southampton Hospital Associates,

9  278 N.Y.S.2d 283 (1967) is equally unhelpful to their argument.  In that case, the court

10  was presented with an application to prevent the testing of a intramedullary pin for

11  discovery and testing.  Id. at 284.  The court held that, "[s]ince the pin is crucial to the

12  action it is not too difficult to appreciate that any change, however slight, assumes an

13  importance magnified proportionately. And undoubtedly tests which would destroy or

14  alter most or all of a particular article ought not be permitted in the first instance

15  without providing adequate safeguards to protect all concerned."  Id. at 286.  Here,

16  such an argument cannot be made because, for the reasons cited above, Mattel has

17  conceded that even in performing the tests of the original BRATZ drawings Mr.

18  Speckin left enough ink of the same pen stroke for its own experts to test.  In short,

19  there has been no alteration, however slight, made to the documents insofar as

20  Mattel's ability to replicate the exact same test is concerned.  The only change that

21  has occurred is in Mattel's ability to retrieve any relevant information from such a test

22  on account of the passage of time that has elapsed.  The test Mr. Speckin performed

23  is not responsible for this negative occurrence.  MGA is similarly not responsible for

24  the passage of time or Mattel's inability to retrieve useful information from the testing

25  process.  On that point, Mattel should look itself in the mirror for any finding of fault or

26  blame.

27        Moreover, aside from the potential for "destroying" key portions of the original

28  documents, it is alleged that MGA and Bryant's actions carry other means of

15

EXHIBIT 34 PAGE 502

1    prejudicing Mattel's ability to pursue lines of potential evidence in this case.  The

2    expert declaration submitted by Mattel notes another possible spoliation of the original

3    drawings even if there remained enough of the pertinent portion of the document in

4    question to sample: The sampling process itself may have contaminated the

5    document in question by obliterating potential crucial clues that were on the document

6    or otherwise the sampling process led to the introduction of foreign materials onto the

7    documents themselves which may complicate any future analysis.  As explained by

8    Mattel's expert:

9                    [P]erforming many such types of testing, even if described
                    as "non-destructive," on a particular original document
10                   carries the risk that potential evidence on it, including
                    indentations in the paper fiber, might be contaminated or
11                   destroyed in the process.  Furthermore, the order of the
                    types of testing to be performed on a given document
12                   might have an impact on developing potential evidence
                    during subsequent examinations. . . .
13
                    . . . . [With respect to the original BRATZ drawings
14                   containing holes in them,] it is possible that the destructive
                    testing performed on the document may have caused
15                   some form of contamination and/or alteration, which carries
                    the further prospect that subsequent examinations by
16                   experts may not enable them to develop potential evidence
                    or the same evidence that the other [earlier] expert
17                   developed.

18   (Decl. Lloyd Cunningham ¶¶ 4-5).

19          MGA has rebutted this risk of contamination argument by proffering Mr.

20   Speckin's declaration, the expert who actually performed the tests in question.  Mr.

21   Speckin states that he "exercised the utmost care in handling the documents [he]

22   tested," that a number of the tests he performed on the documents "has absolutely no

23   effect on the tested document whatsoever," and that with respect to those tests that

24   could effect the document he followed established procedures in carrying out the test

25   in question.  (Decl. Erich J. Speckin ¶¶ 8, 9, 10, 11, 12, 13).  Nowhere has Mattel

26   proffered any evidence rebutting or calling into question Mr. Speckin's

27   representations.  The Court therefore finds that, based on the evidence that is

28   currently before it, Mattel has not established a colorable claim of spoliation by way of

16

EXHIBIT 34 PAGE 573

1  contamination in the tests MGA performed on the documents in question.

2          b.    <u>Alteration of Fax Headers</u>

3       Insofar as O'Connor's deposition testimony relating to the white out of the fax

4  header on the October, 2000, contract between Bryant and MGA, this too is

5  downplayed by MGA and Bryant as being irrelevant because "there is no dispute that

6  Mr. Bryant faxed his signed contract from a fax machine at Mattel and, indeed, Mr.

7  Bryant readily admitted that fact at his deposition, which took place <u>before</u> Ms.

8  O'Connor's deposition." (Joint Opp. at 8 (emphasis in original)).  This argument seeks

9  to compare apples to oranges.  While it may be true that <u>now</u> there is no dispute by

10  MGA and Bryant that he faxed his portion of the contract to MGA from his office at

11  Mattel, at the time O'Connor did the white out of the fax header such a lack of dispute

12  was not apparent.  It is from that perspective in time – the prologue to the litigation —

13  that O'Connor's deposition testimony is to be judged.  And from that perspective her

14  testimony calls into question MGA's handling of relevant documents in its possession.

15       When the contract was first executed there is no indication that MGA and/or

16  Bryant would admit to the fact that Bryant negotiated his contract with MGA while he

17  was still working at Mattel; rather, at that point, that issue appeared to be an open one.

18  Indeed, the fact that MGA's CEO would direct O'Connor to tamper with the contract's

19  fax header clearly indicates that they would not admit to the fact.  If MGA mistreated

20  this document where an open issue existed, it is not unreasonable to infer that it may

21  have been just as cavalier with its obligations to maintain the other documents in their

22  possession – say, for instance, the original BRATZ drawings – where similar open

23  issues remained.  This concern with MGA's handling of documents in its possession at

24  the prologue to this litigation is reinforced by MGA and Bryant's blasé mention in a

25  footnote to their opposition that the original to this contract, the one which they

26  describe as being irrelevant, "has not been found." (Joint Opp. at 15 n.6).  Indeed, it

27  has been suggested that MGA and Bryant or their counsel have made representations

28  that they are not sure of the exact whereabouts of a number of the original BRATZ

EXHIBIT 34 PAGE 584

1  drawings. (Decl. Shane McKenzie ¶ 3 ("Mr. Bryant's counsel[, at the December 22 to

2  23, 2004, inspection of the originals by counsel for Mattel,] claimed not to have the

3  majority of the originals of BRATZ drawings and sketches, and further claimed not to

4  know where those originals were located")).

5      All that being said, the Court does not find that the alteration of the fax header

6  on the original Bryant/MGA contract warrants the appointment of an expert at this

7  time. Ms. O'Connor testified that, other than this one instance, she is aware of no

8  other documents that were purposefully altered by MGA. While the evidence related

9  to the missing fax header on the April, 2000, BRATZ accessories fax may indicate that

10 more than one document had been tampered with by MGA personnel, the Court has

11 nothing at this time to basis that conclusion on other than speculation and conjecture.

12 Without any tangible, concrete proof that MGA's mishandling of documents was more

13 widespread, the Court is left with what appears simply as an isolated instance of

14 tampering.

15      Accordingly, the motion for appointment of expert witnesses is **DENIED.**

16      IT IS SO ORDERED.

17

18 DATE:  $8 \text{-} 9 \text{-} 06$ .

19

20

21     STEPHEN G. LARSON
       UNITED STATES DISTRICT JUDGE

22

23

24

25

26

27

28

18

EXHIBIT 34 PAGE 505

# EXHIBIT 35

THIS EXHIBIT IS FILED UNDER SEAL
PURSUANT TO PROTECTIVE ORDER

# EXHIBIT 36

**THIS EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

# EXHIBIT 37

☒ AOL Mail

| | |
|---|---|
| Asunto: | RE: Mexico |
| Fecha: | Mar, 23 Mar 2004 5:24:48 PM Hora estándar de México |
| De: | Marlene Parker <MParker@mgae.com> |
| Para: | "Isaac Larian (President / CEO)" <Larian11@mgae.com>, "'Plot04@aol.com'" <Plot04@aol.com>, "'plot04@yahoo.com.mx'"<plot04@yahoo.com.mx> |
| Copiar a:: | "Susana (Argentrade)" <argentrade@aol.com>, "Tom Park (Chief Operating Officer)" <TPark@mgae.com> |

Enviado desde Internet (Detalles)

Hello Gustavo,

As Isaac has referenced below Tom is currently traveling in Canada and returns to the office this Thursday (Mar 18).
Tom has asked that I contact you to schedule a conference call with you on Thursday upon his return. Can you please advise your availability and I will make arrangements for you and Tom to connect? We will accommodate any timing that meets your schedule.

Kind regards,

Marlene
Marlene Parker
Executive Assistant to Chief Operating Officer
MGA Entertainment
Office: (818) 894-2525 x504
Fax:    (818) 894-7865
Mobile: (818) 207-0560

www.mgae.com

Meet the girls with a Passion for Fashion
www.BRATZpack.com

> -----Original Message-----
> **From:** Isaac Larian (President / CEO)
> **Sent:** Monday, March 22, 2004 10:22 PM
> **To:** 'Plot04@aol.com'; plot04@yahoo.com.mx
> **Cc:** Susana (Argentrade); Tom Park (Chief Operating Officer)
> **Subject:** RE: Mexico

Gustavo,


Thanks.

☒ F
Responder

☒ F
Reenviar

☒ F
Responder a Todos

☒ F
Agregar Direcciones

☑ A

EXHIBIT 37 PAGE 552

M 0059790

Congratulations to Mariana. She better STOP smoking!


The package we offered you give all of you the same or MORE than what you asked for. It just has a performance clause ( bonuses) based on performance.


As a company policy, we do not give anyone signing bonus.


Tom is traveling to Canada and be back Thursday and will explain the offer.


Isaac Larian
CEO
Please note my new e mail address below
MGA ENTERTAINMENT
*A Consumer Entertainment Product Company*
16730 Schoenborn Street
North Hills, California, 91343-6122
Tel: 818-894-3150
Fax:818-894-1267
Larian11@MGAE.COM
www.MGAE.COM
Meet the girls with Passion for Fashion
www.Bratzpack.com


-----Original Message-----
**From:** Plot04@aol.com [mailto:Plot04@aol.com]
**Sent:** Monday, March 22, 2004 6:36 PM
**To:** Larian11@mgae.com; plot04@yahoo.com.mx
**Cc:** Argentrade@aol.com; TPark@mgae.com
**Subject:** Re: Mexico

EXHIBIT 37 PAGE 553

M 0059791

Dear Isaac & Tom,

Please find attached our analisys, for our further discussion. We will be available weeknights after 16:30 LA time, please confirm.

Regards.

☑ Guardar Como ‖ ☑ Bo॥ ¦ ☑ Imr ¦          ☑ F4   2 de 7   ☑ F4

☐ Incluir el texto original en respuesta.

EXHIBIT _37_ PAGE _551_

M 0059792

# EXHIBIT 38

*(handwritten)* (one) ~~~~~~ ~~~~~~
Offer Letter - Mar 30

## MGAE DE MÉXICO, S. DE R. L. DE C.V.

March 30, 2004

Carlos Gustavo Machado Gomez
Médanos 94-2, Las Aguilas
México D.F. 14210

Dear Carlos,

It is our pleasure to extend on offer of employment to you for the position of Director of Marketing with MGAE de Mexico, S. de R. de L. de C.V. (the "Company"). As we discussed, this is a full-time position, with employment commencing on _____ (the "Start Date").

Your base salary will be the equivalent in Mexican pesos to $11,000.00 USD, calculated in accordance with the exchange rate published by the Central Bank (Banco de México) in the Federal Official Gazette (Diario Oficial de la Federación) on the Start Date. During the term of your employment, in order to facilitate the performance of your work activities, every three years counting as of the Start Date, you will be entitled to an allowance to be paid in accordance with the Company's regularly established policies, in the amount equal to the equivalent in Mexican pesos of $27,500.00 USD calculated in accordance with the exchange rate published by the Central Bank (Banco de México) in the Federal Official Gazette (Diario Oficial) on the date of every third anniversary of the Start Date, which allowance shall be used exclusively for the purchase of a car, as a labor tool. The employment term is indefinite. Your employment terms shall be revised every eighteen (18) months plus a $40,000.00 USD severance payment, if required, paid at the end of the contract period, which end date shall be 18 months after the start date or on such later date as may be agreed to in writing between the Company and you. You will also be entitled to receive employment benefits as generally provided by the Company's policies and benefit plans. Additional benefits and bonus structure are outlined below:

- Christmas Bonus of 30 days salary
- Vacation of 15 business days annually
- Vacation Bonus of 100%
- Major Medical Insurance
- Life Insurance

EXHIBIT 38  PAGE 535

M 0059766

Page 2
Carlos Gustavo Machado Gomez
March 30, 2004

• Sales Performance Bonus

| Sales | Bonus |
|---|---|
| $5.0 – 6.99 Million USD | $25,000.00 USD |
| $7.0 – 9.99 Million USD | $25,000.00 + $5,000.00 = $30,000.00 USD |
| $10.0 – 11.99 Million USD | $30,000.00 + $10,000.00 = $40,000.00 USD |
| $12.0 – 13.99 Million USD | $40,000.00 + $15,000.00 = $55,000.00 USD |
| $14.0 – 16.99 Million USD | $55,000.00 + $20,000.00 = $75,000.00 USD |
| $17.0 – 19.99 Million USD | $75,000.00 + $25,000.00 = $100,000.00 USD |
| $20.0 Million USD or more | $100,000.00 + .0025% for each million or $2,500.00 USD |

*For example: If the company achieves $$17.0 million in sales your annual compensation would be $220,000.00 USD*

We agree that you will devote your best efforts to the performance of your job; that you will not engage in any activity that might be competitive with the Company's business or pose a conflict of interest with that business; and that you will not misuse, nor improperly disclose, any confidential or other proprietary information of the Company. You will also be expected to comply with the Company's personnel policies, as set forth in the attached Employee Handbook, including referral of any disputes occurring between us to arbitration. This offer is contingent upon your signing our Arbitration, Confidentiality, and Proprietary Agreements.

Please indicate your agreement to the terms of this letter by signing one copy below and returning it to me.

Again, congratulations on your employment. We look forward to working with you.

Sincerely,

Isaac Larian, CEO

MGAE de México, S. de R. L. de C.V.

I understand and agree to the above terms.

Date: _____ Signature: _____
                                          Carlos Gustavo Machado Gomez

EXHIBIT 38 PAGE 556

M 0059767

# EXHIBIT 39

*Klarruna Trueba*
*Offer Letter*

## MGAE DE MÉXICO, S. DE R. L. DE C.V.

March 30, 2004

Mariana Trueba Almada
Cruz Verde 81, Torre A2, Depto. 008
Col. Coyoacan
Mexico D.F.

Dear Mariana,

It is our pleasure to extend on offer of employment to you for the position of Director of Marketing, Girls Division with MGAE de Mexico, S. de R. de L. de C.V. (the "Company"). As we discussed, this is a full-time position, with employment commencing on _____ (the "Start Date").

Your base salary will be the equivalent in Mexican pesos to $8,910.00 USD, calculated in accordance with the exchange rate published by the Central Bank (*Banco de México*) in the Federal Official Gazette (*Diario Oficial de la Federación*) on the Start Date.  During the term of your employment, in order to facilitate the performance of your work activities, every three years counting as of the Start Date, you will be entitled to an allowance to be paid in accordance with the Company's regularly established policies, in the amount equal to the equivalent in Mexican pesos of  $27,500.00 USD calculated in accordance with the exchange rate published by the Central Bank (*Banco de México*) in the Federal Official Gazette (*Diario Oficial*) on the date of every third anniversary of the Start Date, which allowance shall be used exclusively for the purchase of  a car, as a labor tool.  The employment term is indefinite.  Your employment terms shall be revised every eighteen (18) months plus a $40,000.00 USD severance payment, if required, paid at the end of the contract period, which end date shall be 18 months after the start date or on such later date as may be agreed to in writing between the Company and you.  You will also be entitled to receive employment benefits as generally provided by the Company's policies and benefit plans.  Additional benefits and bonus structure are outlined below:

- Christmas Bonus of 30 days salary

- Vacation of 15 business days annually

- Vacation Bonus of 100%

- Major Medical Insurance

- Life Insurance

EXHIBIT _39_ PAGE _557_

M 0059771

Page 2
Mariana Trueba Almada
March 30, 2004

- Sales Performance Bonus

| Sales | Bonus |
|---|---|
| $5.0 – 6.99 Million USD | $25,000.00 USD |
| $7.0 – 9.99 Million USD | $25,000.00 + $5,000.00 = $30,000.00 USD |
| $10.0 – 11.99 Million USD | $30,000.00 + $10,000.00 = $40,000.00 USD |
| $12.0 – 13.99 Million USD | $40,000.00 + $15,000.00 = $55,000.00 USD |
| $14.0 – 16.99 Million USD | $55,000.00 + $20,000.00 = $75,000.00 USD |
| $17.0 – 19.99 Million USD | $75,000.00 + $25,000.00 = $100,000.00 USD |
| $20.0 Million USD or more | $100,000.00 + .0025% for each million or $2,500.00 USD |

*For example: If the company achieves $$17.0 million in sales your annual compensation would be $220,000.00 USD*

We agree that you will devote your best efforts to the performance of your job; that you will not engage in any activity that might be competitive with the Company's business or pose a conflict of interest with that business; and that you will not misuse, nor improperly disclose, any confidential or other proprietary information of the Company. You will also be expected to comply with the Company's personnel policies, as set forth in the attached Employee Handbook, including referral of any disputes occurring between us to arbitration. This offer is contingent upon your signing our Arbitration, Confidentiality, and Proprietary Agreements.

Please indicate your agreement to the terms of this letter by signing one copy below and returning it to me.

Again, congratulations on your employment. We look forward to working with you.

Sincerely,

Isaac Larian, CEO

MGAE de México, S. de R. L. de C.V.

I understand and agree to the above terms.

Date: _____   Signature: _____
                                        Mariana Trueba Almada

EXHIBIT 39 PAGE 558

M 0059772

# EXHIBIT 40

## MGAE DE MÉXICO, S. DE R. L. DE C.V.

March 30, 2004

Pablo Vargas San José
Loma de Guadalupe 135 Col. Lomas de Guadalupe
C.P. 01720 Ciudad de México, México

Dear Pablo,

It is our pleasure to extend on offer of employment to you for the position of Director of Sales with MGAE de Mexico, S. de R. de L. de C.V. (the "Company"). As we discussed, this is a full-time position, with employment commencing on _____ (the "Start Date").

Your base salary will be the equivalent in Mexican pesos to $11,000.00 USD, calculated in accordance with the exchange rate published by the Central Bank (*Banco de México*) in the Federal Official Gazette (*Diario Oficial de la Federación*) on the Start Date. During the term of your employment, in order to facilitate the performance of your work activities, every three years counting as of the Start Date, you will be entitled to an allowance to be paid in accordance with the Company's regularly established policies, in the amount equal to the equivalent in Mexican pesos of $27,500.00 USD calculated in accordance with the exchange rate published by the Central Bank (*Banco de México*) in the Federal Official Gazzette (*Diario Oficial*) on the date of every third anniversary of the Start Date, which allowance shall be used exclusively for the purchase of a car, as a labor tool. The employment term is indefinite. Your employment terms shall be revised every eighteen (18) months plus a $40,000.00 USD severance payment, if required, paid at the end of the contract period, which end date shall be 18 months after the start date or on such later date as may be agreed to in writing between the Company and you. You will also be entitled to receive employment benefits as generally provided by the Company's policies and benefit plans. Additional benefits and bonus structure are outlined below:

- Christmas Bonus of 30 days salary

- Vacation of 15 business days annually

- Vacation Bonus of 100%

- Major Medical Insurance

- Life Insurance

EXHIBIT 40 PAGE 559

M 0059776

Page 2
Pablo Vargas San José
March 30, 2004

- Sales Performance Bonus

| Sales | Bonus |
|---|---|
| $5.0 – 6.99 Million USD | $25,000.00 USD |
| $7.0 – 9.99 Million USD | $25,000.00 + $5,000.00 = $30,000.00 USD |
| $10.0 – 11.99 Million USD | $30,000.00 + $10,000.00 = $40,000.00 USD |
| $12.0 – 13.99 Million USD | $40,000.00 + $15,000.00 = $55,000.00 USD |
| $14.0 – 16.99 Million USD | $55,000.00 + $20,000.00 = $75,000.00 USD |
| $17.0 – 19.99 Million USD | $75,000.00 + $25,000.00 = $100,000.00 USD |
| $20.0  Million USD or more | $100,000.00 + .0025% for each million or $2,500.00 USD |

*For example: If the company achieves $$17.0 million in sales your annual compensation would be $220,000.00 USD*

We agree that you will devote your best efforts to the performance of your job; that you will not engage in any activity that might be competitive with the Company's business or pose a conflict of interest with that business; and that you will not misuse, nor improperly disclose, any confidential or other proprietary information of the Company.  You will also be expected to comply with the Company's personnel policies, as set forth in the attached Employee Handbook, including referral of any disputes occurring between us to arbitration.  This offer is contingent upon your signing our Arbitration, Confidentiality, and Proprietary Agreements.

Please indicate your agreement to the terms of this letter by signing one copy below and returning it to me.

Again, congratulations on your employment.  We look forward to working with you.

Sincerely,

Isaac Larian, CEO

MGAE de México, S. de R. L. de C.V.


I understand and agree to the above terms.

EXHIBIT 40  PAGE 560

M 0059777

Date: _____ Signature:_____
                                          Pablo Vargas San José

EXHIBIT 40 PAGE 561

M 0059778