**Exhibit 16**

TRANSCRIPT OF AUDIOTAPED MEETING WITH

ERNEST DUTCHER, APPRAISER

**CERTIFIED**
**COPY**

Reported by:

JOHANNA M. BENNETT

CSR No. 5263

JOB No. 888989

ESQUIRE DEPOSITION SERVICES
(323) 938-2461

EXHIBIT *16* PAGE 263          KRANE 0039



1
2
3
4
5
6
7
8
9
10
11      Transcript of Audiotaped Meeting with
12   Ernest Dutcher, transcribed in Temple City,
13   California, on Wednesday, September 10, 2003,
14   by JOHANNA M. BENNETT, Certified Shorthand
15   Reporter No. 5263.
16
17
18
19
20
21
22
23
24
25

2

EXHIBIT *16* PAGE 264   KRANE 0040



KNOWN APPEARANCES:


            MORAD ZARABI

            A MALE VOICE

            ERNEST DUTCHER

3

EXHIBIT 16 PAGE 265        KRANE 0041

```
1                    *          *          *

2

3            MR. ZARABI:  Today is February 7.  I have a

4     meeting with Mr. Ernest.

5            MR. DUTCHER:  Ernest Dutcher.

6            MR. ZARABI:  Ernest, and -- today is February

7     7.  I have a meeting with Mr. Ernest and the gentleman,

8     he appraised ABC or MGA International and he allow me to

9     tape this conversation for the future if use it, if we

10    need it, even in the court.

11           Will you please say your name and everything,

12    please.

13           MR. DUTCHER:  My name is Ernest E. Dutcher.  My

14    designation is master certified business appraiser, and

15    my office is in Encino, California.

16           I received the instruction to provide a limited

17    letter report which means that the -- the valuation was

18    conducted in a manner that would be required for an

19    eventual full narrative report.

20           And at the time -- at the time of the appraisal

21    of December 31, 1999, I relied on information given to

22    me by management, and we provided the report and we've

23    come -- we've used three methodologies in trying to

24    determine or estimate the value of the company.

25           MR. ZARABI:  Mr. Ernest, I have a question for
```

4

EXHIBIT *16* PAGE 266     KRANE 0042

1   you.

2            MR. DUTCHER:  Uh-huh.

3            MR. ZARABI:  Have you appraised any toys

4   company before?

5            MR. DUTCHER:  I would have to research that

6   because I've been in this business for approximately 25

7   years, and I worked for some major companies and I'm

8   sure that during that time that that type of company

9   probably was one of the thing we did.

10           I can't say for sure, but I will say this, that

11  almost every company that is appraised is done almost

12  the same way.  It typically has many methodologies that

13  are available to the appraisers such as:  The income

14  approach, the market approach and the excess earnings

15  approach is three of them.  And that's the three I used

16  in doing this particular report.

17           And the reason that we can do it that way

18  instead of like one methodology -- one -- almost every

19  company that's appraised is appraised based on its

20  future earning potential.

21           And the fact that it's a toy company or a

22  manufacturer of doors and windows, it doesn't matter

23  because the basic bookkeeping, the basic financial

24  statements and so forth all resemble one another.

25           And based on that fact that we go through the

5

EXHIBIT *16* PAGE 267     KRANE 0043

1   potential of the company, we review the industry, which

2   in this case was rather, as I remember, rather volitile

3   at the time and probably still is, it's kind of a

4   volitile industry, up and down.

5            And so we felt and I still believe that we are

6   eminently qualified to do the job.

7            MR. ZARABI:  Okay.  My second question is:

8   Are you either, ah, licensee in this company?  Are you

9   base your appraisal is -- my (inaudible) there is the

10   (inaudible), if you see the licensee or you didn't see

11   the licensee affecting the appraisal or not?

12            MR. DUTCHER:  The licensee is a method to keep

13   the revenues rolling into the company.  We assume that

14   the licensee -- the license, which, by the way, can be

15   valued individually, with individual effort.  It would

16   not give the answers that you are looking for in this

17   appraisal.  You needed the overall value of the company

18   to determine what the buyout value of a 40 -- 45-percent

19   interest was.

20            It would serve no purpose to have a value of

21   each of the licenses.  And One other thing, licenses in

22   the toy industry, because of the fact that each toy

23   that's been designed has a quite a short life and there

24   has to be probably a lot of different licenses, so it

25   actually would be beyond the scope of what we were doing

6

EXHIBIT 16 PAGE 268       KRANE 0044

1   to try to evaluate each individual license.

2          MR. ZARABI:  All right.  I'm sure.

3          A MALE VOICE:  I'm sorry.  (Inaudible) Jerard.

4   I'm going to ask you a few questions myself.

5          MR. DUTCHER:  Sure.

6          A MALE VOICE:  You said that the valuation was

7   done December 31, 1999 or was that --

8          MR. DUTCHER:  Date of value.

9          A MALE VOICE:  In '99 you valued, end of '99

10   you valued or August or September of 2000?

11          MR. DUTCHER:  No.  That wasn't when I

12   valued it.  Somewhere probably in the mid -- I think

13   perhaps in July or August I probably received the

14   order.  I'd have to pull more of the file.  I didn't

15   have time to pull it all.

16          MR. ZARABI:  November -- the very first year

17   appraisal --

18          A MALE VOICE:  The appraisal is dated November

19   7, 2000, so your -- your --

20          MR. DUTCHER:  Let me see that.  I might be

21   looking at a different one.  I was looking at the first

22   one.  November 7, 2000.

23          A MALE VOICE:  So you --

24          MR. DUTCHER:  No, no, no, no.  The date of

25   valuation is December 31, 1999.  I have no right to use

7

EXHIBIT _16_ PAGE 269     KRANE 0045

1    anything that happened after that date.  Unless we move

2    this date up to December 31, 2000, I couldn't consider

3    anything that happened subsequent to this date.

4              A MALE VOICE:  Okay.  So that's when the

5    valuation was done?

6              MR. DUTCHER:  That's the date --

7              A MALE VOICE:  And you met with who for this

8    valuation?

9              MR. DUTCHER:  I met with Morad and I met with

10   the two shareholders.

11             A MALE VOICE:  The two main shareholders?

12             MR. DUTCHER:  Yes.

13             A MALE VOICE:  Isaac and Farhad?

14             MR. DUTCHER:  Right.

15             A MALE VOICE:  You met with both of them?

16             MR. DUTCHER:  With both of them one time, as I

17   recall.

18             A MALE VOICE:  At the same time, meeting in the

19   same meeting?

20             MR. DUTCHER:  Yes.

21             A MALE VOICE:  So you never had a separate

22   meeting with Farhad or Isaac, separately --

23             MR. DUTCHER:  I don't think so.  I do recall

24   it's back a ways, but I don't remember having any

25   separate valuations -- separate meetings.

8

EXHIBIT 16 PAGE 270     KRANE 0046

1          A MALE VOICE:  And you had it sitting with both

2     of them?

3          MR. DUTCHER:  At the same time and I think

4     Morad was present?

5          A MALE VOICE:  Were you present at that

6     meeting?

7          MR. ZARABI:  I don't remember.  I don't recall.

8          A MALE VOICE:  So you --

9          MR. ZARABI:  I don't remember, when you say --

10         A MALE VOICE:  But you didn't have a separate

11    meeting with Isaac?

12         MR. DUTCHER:  I don't -- no, I don't think so.

13         A MALE VOICE:  Okay.  And --

14         MR. ZARABI:  Have you had a meeting with the

15    controller?

16         A MALE VOICE:  Did you have meetings with the

17    accounting people?

18         MR. DUTCHER:  Was it a lady?

19         MR. ZARABI:  A lady or a guy.

20         MR. DUTCHER:  Just to give them the information

21    I needed to provide the report.

22         A MALE VOICE:  Okay.  What information, may I

23    ask, you asked them to give you?

24         MR. DUTCHER:  The financial data is for five

25    years.  I believe --

                                                      9

EXHIBIT 16 PAGE 271          KRANE 0047

1       A MALE VOICE:  Last five years?

2       MR. DUTCHER:  The prior five years --

3       A MALE VOICE:  Right.

4       MR. DUTCHER:  -- ending December 31, 1999.

5       A MALE VOICE:  Okay.

6       MR. DUTCHER:  And then kind of a tour of the

7   facilities and general description of what the business

8   was and the fact I was not providing a full narrative

9   report, the actual detailed description of the market

10  and so forth was not included with the report.  We have

11  what we call a phase 1 and a phase 2 in our appraisals.

12      The phase 1 covers a letter report which is not

13  a full narrative report.  The letter report is

14  restricted -- is restricted to providing the financial

15  data only.

16      A MALE VOICE:  Uh-huh.

17      MR. DUTCHER:  -- with this minimal description

18  of the data and that is typically enough for a

19  friendly --

20      A MALE VOICE:  Break up.

21      MR. DUTCHER:  Yeah.  -- for a friendly break

22  up.

23      A MALE VOICE:  So phase 1 would be for a

24  friendly buyout?

25      MR. DUTCHER:  Yes.

10

EXHIBIT 16 PAGE 272        KRANE 0048

1      A MALE VOICE:  And phase 2 would be?

2      MR. DUTCHER:  Phase 2 would be in case any

3  litigation was needed, and so forth, phase 2 had to be

4  created and it can be done at any time.

5      A MALE VOICE:  So for this purpose you only did

6  a phase 1?

7      MR. DUTCHER:  Phase 1, correct.

8      A MALE VOICE:  Okay.  So --

9      MR. ZARABI:  Let me ask a question.  The time

10  for the having meeting with Isaac, Farhad and his

11  controller or anybody in the MGA or ABC Corporation, did

12  they cooperate completely with you or not?

13      MR. DUTCHER:  They seemed to.  They seemed to

14  describe the business and so forth.  I had no reason to

15  believe that there was any problem between them and it's

16  not our --

17      MR. ZARABI:  Did you feel that anything they're

18  hiding for you something?

19      MR. DUTCHER:  I didn't get any -- any such

20  feeling, no.

21      MR. ZARABI:  No?

22      MR. DUTCHER:  I felt that everything was above

23  board.

24      A MALE VOICE:  I have further questions.

25      When you determined your future -- the

                                                    11

EXHIBIT 16 PAGE 273          KRANE 0049

1   future -- I mean, how did you determine the cost -- I

2   mean, did they give you any projections for the future

3   of the sales of this company?

4        MR. DUTCHER:  Typically I ask for their opinion

5   of what the future can be, and I just don't remember.

6   I'd have to go back and research the file completely,

7   and -- and if I didn't ask for them, it would be

8   unusual.

9        MR. ZARABI:  So you must have asked for them

10  and you would have kept --

11       MR. DUTCHER:  My guess, my best guess would be

12  that I would have asked what they thought the future was

13  because my -- again, as I repeat, in appraising is

14  not -- the value of the company doesn't lie on what it

15  has done.  It lies in what the future holds for that

16  company.

17       MR. ZARABI:  As well, yes.

18       MR. DUTCHER:  So very few people would invest

19  in Enron right now because it was a wonderful company in

20  the past.

21       MR. ZARABI:  Right.

22       MR. DUTCHER:  Right now it has zero value.  So

23  we try our best to get a forecast from the responsible

24  people, marketing, so forth, try to get a feel for what

25  they think that the future holds for the business.

12

EXHIBIT *16* PAGE 274          KRANE 0050

1          In addition, we check to see what the market

2    is, like our market approach consists of looking into

3    various public companies that are involved in the same

4    business such as Mattel and so forth.  We have a number

5    of them listed in the report.

6          We can get a feel for the -- actually, the toy

7    market or that type of market in general from that --

8    from that.  From -- from these sources, we then come up

9    with a conclusion of value based on our experience and

10   estimating what the likelihood of the continuation of

11   the company and whether it has any value related to the

12   future.  And the income approach and the other

13   approaches provide that for me.

14        A MALE VOICE:  I just have a couple of

15   questions.           Number one, you said that you

16   met with both of them.  Would you have written that in

17   your paperwork if you had met with both of them?

18        MR. DUTCHER:  Probably.  If I -- I could go

19   back and research that because I usually keep track for

20   my time.

21        A MALE VOICE:  I would like you, please, to do

22   that, doublecheck and make sure in that meeting when you

23   sat and gave them -- you wanted to sit down and discuss

24   with them, I want to make sure that both of them were

25   there or not, whether Fahrad's there or not.  I just --

13

EXHIBIT 16 PAGE 275          KRANE 0051

1          MR. DUTCHER:  Yes.

2          A MALE VOICE:  Are you sure?

3          MR. DUTCHER:  I'm positive they are both there

4    because Morad took me over to the location, which is

5    over behind the airport somewhere.

6          A MALE VOICE:  Right.

7          MR. DUTCHER:  And I remember going in and

8    meeting both of them at the time.

9          A MALE VOICE:  And sitting in the same meeting

10   with both of them present, when they were giving you

11   projections for the future?

12         MR. DUTCHER:  I think it all happened in the

13   same meeting.  I don't think there was more than one

14   meeting on gathering the information directly from the

15   people.

16         A MALE VOICE:  So, then, basically they both

17   sat there and gave you --

18         MR. ZARABI:  All the information.

19         A MALE VOICE:  -- all the information of what

20   they thought?

21         MR. DUTCHER:  That's my -- that's my

22   recollection of it, yes.

23         A MALE VOICE:  If you could go back and

24   doublecheck, we appreciate --

25         MR. DUTCHER:  I'll check the company notes on

14

EXHIBIT *16* PAGE 276          KRANE 0052

1    it, yes.

2         A MALE VOICE:  -- if you can send a letter on

3    that.

4         And secondly, again, going back to that same

5    meeting, report of the potential future sales, you think

6    both of them gave you that or was one of them more vocal

7    than the other one?

8         MR. DUTCHER:  No, I don't remember any -- I

9    don't remember any outstanding big shining potential

10   that they brought out other than --

11        LEFT2:  (Inaudible.)

12        MR. DUTCHER:  -- doing in a normal course of

13   business.

14        A MALE VOICE:  So you just basically took the

15   normal increases on a yearly basis and that's what you

16   did?

17        MR. DUTCHER:  Yes.  Yes.

18        MR. ZARABI:  Let me ask a question.

19        MR. DUTCHER:  Uh-huh.

20        MR. ZARABI:  Even the time you -- first of all,

21   how long you have experience for the appraising the

22   business, completely?  10 years?  20 years?

23        MR. DUTCHER:  I have 20, 25 years.

24        MR. ZARABI:  20 years.

25        MR. DUTCHER:  I've owned my own businesses and

                                                              15

EXHIBIT 16 PAGE 277          KRANE 0053

1    I've --

2            MR. ZARABI:  And you -- because of your

3    conversation you say every court of law accept your

4    appraisal, right?

5            MR. DUTCHER:  I've never found one that didn't.

6            MR. ZARABI:  Okay.

7            MR. DUTCHER:  I've never been denied a position

8    of expertise.

9            MR. ZARABI:  My final question is:  If the

10   contract came to the table by September 18, year 2000 --

11           A MALE VOICE:  This was a license of September

12   18, 2000.

13           MR. DUTCHER:  Okay.

14           MR. ZARABI:  If you have on the table --

15           MR. DUTCHER:  Uh-huh.

16           MR. ZARABI:  -- with the other licensees, it

17   was affecting the price or no?

18           MR. DUTCHER:  It could have, but I'd have to

19   have a lot more information.  I can't say it wouldn't.

20           A MALE VOICE:  (Inaudible) check each license.

21           MR. ZARABI:  You never check any license?

22           A MALE VOICE:  He never checked any license.

23           MR. DUTCHER:  However, if there was one that

24   was really, really outstanding.

25           A MALE VOICE:  Did you check each license?

16

EXHIBIT 16 PAGE 278    KRANE 0054

1        MR. DUTCHER:  No.

2        A MALE VOICE:  No, you didn't.

3        MR. DUTCHER:  No.

4        A MALE VOICE:  And none of them were furnished

5   to you?

6        MR. DUTCHER:  Another thing, to answer that

7   probably better, we know that through the period of the

8   company, let's take a look at the --

9        MR. ZARABI:  The (inaudible) --

10        MR. DUTCHER:  -- history.  Let's go back here

11   five years.  In 1995, we had 64 million in revenues.  In

12   1996 it dropped to 46 million in revenues.

13        In 1997 it recovers somewhat to 55 million in

14   revenues but dropped to 40 million, you know, that's a

15   big drop, by 1998.  Then it jumped in 1999 to 66 million

16   which told me this:  That at times they had a hot

17   product.  A hot product here, and they probably had a

18   hot product here --

19        A MALE VOICE:  In '97.

20        MR. DUTCHER:  -- another hot product here --

21        A MALE VOICE:  In --

22        MR. DUTCHER:  -- which we picked up here, and

23   then for the future it says, "These hot products will

24   come and go because the toy business is that way."

25        I don't say that because I know the toy

17

EXHIBIT 16 PAGE 279        KRANE 0055

1    business itself.

2            A MALE VOICE:  Uh-huh.

3            MR. DUTCHER:  But I do know when you see an

4    industry, there is such volatility --

5            A MALE VOICE:  Volatility in the sales.

6            MR. DUTCHER:  -- that tells the appraiser, that

7    you better be careful on how much growth you are

8    forecasting into the future because that is the basis of

9    your value.

10           A MALE VOICE:  How much growth did you --

11           MR. DUTCHER:  And I think the growth was

12   probably estimated at 5 percent.  Yes.

13           A MALE VOICE:  Yes.

14           MR. DUTCHER:  We forecast a growth of 5 percent

15   a year because you know with that much -- a big jump and

16   a big drop and a big jump, there is no one on earth that

17   can forecast with any degree of accuracy of what's

18   really going to happen.

19           MR. ZARABI:  With your experience, there is any

20   way you can imagine this sale after two years instead of

21   5 percent jump to 25 percent?

22           MR. DUTCHER:  Well, I would say that --

23           A MALE VOICE:  Possible because --

24           MR. ZARABI:  (Inaudible.)

25           MR. DUTCHER:  -- might do that, but I recognize

                                                        18

EXHIBIT 16 PAGE 280          KRANE 0056

1   that, that it did do that.  It jumped from 40 to 60.

2   That's a huge jump and then it dropped back to 40.  No,

3   and that --

4          MR. ZARABI:  It was not established company the

5   way you see it?

6          MR. DUTCHER:  Pardon?

7          MR. ZARABI:  It was not established number

8   company.

9          MR. DUTCHER:  Well, the only thing I see is a

10   begun of of hot products that came along, hot products

11   that boosted it temporarily, but it didn't have a long

12   life.

13          A MALE VOICE:  I have another question for

14   you.  And this is I think that I would like to ask you

15   somewhat of your experience not relating to this.

16          What happens when you value a company and then

17   the company goes drastically lower in sales?  So let's

18   say they were doing an average of 60 and 70, went down

19   to 20?  What happens to them?

20          MR. DUTCHER:  What happens to them is not

21   important at the time I do the appraisal because we

22   don't know what's going to happen to them.

23          We only can say based on history that the trend

24   has been up, but how can you forecast anything when the

25   trend is up and down and up and down.

19

EXHIBIT 16 PAGE 281                    KRANE 0057

```
 1          You could -- I could -- even if I knew the
 2   company went bankrupt the next year, I would still have
 3   to put the valuation based on what I could see if I was
 4   there on December 31, 1999.
 5          A MALE VOICE:  Right.
 6          MR. DUTCHER:  I could not change my opinion
 7   based on a subsequent event.
 8          A MALE VOICE:  Who gave you the authorization
 9   to go up to December 31, 1999?
10          MR. DUTCHER:  I think it was --
11          A MALE VOICE:  Morad?
12          MR. DUTCHER:  I think you had said --
13          A MALE VOICE:  Morad said to him that the
14   valuation has to be as of December 31 --
15          MR. ZARABI:  December 31, 1999.
16          A MALE VOICE:  I think (inaudible) I have a
17   question, from whatever happens?
18          MR. ZARABI:  I didn't have the experience to
19   say to --
20          A MALE VOICE:  (Inaudible.)
21          MR. ZARABI:  -- 1999, but I don't remember but
22   you said based on your experience, you go to the 1999,
23   correct?
24          MR. DUTCHER:  Well --
25          MR. ZARABI:  Because I don't remember --
```

                                                              20

**ESQUIRE DEPOSITION SERVICES**
(323) 938-2461

EXHIBIT *16* PAGE 282          KRANE 0058

1        MR. DUTCHER:  -- because 1999 was a full year.

2    December 31st was a full year.

3        A MALE VOICE:  Yes.

4        MR. DUTCHER:  And had we done a midyear which

5    we could do --

6        MR. ZARABI:  Uh-huh.

7        MR. DUTCHER:  -- I would do one as of the date

8    of that appraisal.

9        MR. ZARABI:  Because of the full year you had

10   the financial --

11       MR. DUTCHER:  Of course.

12       MR. ZARABI:  -- for 1999 --

13       MR. DUTCHER:  Of course.

14       MR. ZARABI:  -- you base it as of 1999?

15       MR. DUTCHER:  That is correct.

16       MR. ZARABI:  Even --

17       A MALE VOICE:  That was the record that they

18   could furnish him.  They couldn't furnish him -- if he

19   went there in September or October, he couldn't have

20   gotten information of what has happened in that -- in

21   that year because they wouldn't know because there would

22   be no physical audited information.  The only audited

23   information was end of '99.

24       MR. DUTCHER:  Plus the fact usually toward the

25   end of the year, there's year-end adjustments and things

21

EXHIBIT *16* PAGE 283

KRANE 0059

1    of that sort that happen.

2         So we have had -- we can do appraisals due at

3    the  midyear, but we put lower weight on that simply

4    because it's speculation.

5         A MALE VOICE:  Not (inaudible).

6         MR. ZARABI:  Robert says after (inaudible) base

7    of the company going down instead of 50 million

8    business, comes to the $20 million which is the

9    (inaudible) assets.  Now I'm --

10        A MALE VOICE:  That's the valuation --

11        MR. DUTCHER:  If it went down the following

12   year, it would not change the valuation because I would

13   have to change the date of value.

14        A MALE VOICE:  Okay.  And then would any court

15   be able to cancel the contract because of that reason?

16        MR. DUTCHER:  If there were -- if the event,

17   the sale took place based on the appraisal and the

18   appraisal date was December 31, 1999, I could see no way

19   that they can rule any other way accept to state that

20   what happened in 1999, December 31, then prior to that

21   was the only thing that we can use.

22        A MALE VOICE:  But don't you think that if --

23   if there was things going on in December or even

24   January, but you had -- but in fact you had your

25   appraisal done six months to eight months later --

22

EXHIBIT 16 PAGE 284      KRANE 0060

1   MR. DUTCHER:  Uh-huh.

2   A MALE VOICE:  -- the fact still remains that

3   they would have known the trend for the following year,

4   and they would have been able to tell you that in their

5   meeting, wouldn't you -- they?

6   MR. DUTCHER:  Well, I would think so.  It -- if

7   there was something on the horizon that was unusual, I

8   would think they would have brought it out at that

9   meeting.  I don't remember that.

10   A MALE VOICE:  Let's take it --

11   MR. ZARABI:  Opposite way.

12   A MALE VOICE:  -- the opposite way, okay?

13   MR. ZARABI:  Say, the dates are to which date

14   is this affecting.

15   A MALE VOICE:  The question is this:  In the

16   year 2000, let's take it the other way now, instead of

17   it going to 60 average million in sales it suddenly

18   jumped to 90 or 80 or 90 and probably jumps the year

19   after to a hundred and the following year jumps to

20   200,000 -- $200 million.

21   MR. DUTCHER:  Well, in other words, we can only

22   base our judgment on what has historically happened in

23   the past.  Typically, if we were to give an estimate out

24   in the future that it was going to grow at some

25   astronomical rate, we'd have to put a heavy discount

23

EXHIBIT 16 PAGE 285          KRANE 0061

1  rate on that, on the probability or possibility it may

2  not happen.

3      So we used a discount rate here of 20.75

4  percent which was probably based on the fact it was --

5  even this number was -- had some risk in reaching it.

6  In other words, that discount rate is a --

7      MR. ZARABI:  But the final question is:  You

8  appraise this company based on fairness, based on your

9  experience.

10      There is any influence from either party, me --

11  I'm Morad, Isaac, Farhad, (inaudible), anything that is

12  affecting your appraisal or no?

13      MR. DUTCHER:  I would say that there was not

14  iota of pressure put on me one way or the other by

15  either yourself or the other two parties to have a

16  higher or lower number.

17      This is precisely my opinion of value at that

18  time and was not influenced by anyone else's input

19  except for the financial part of it.

20      MR. ZARABI:  Okay.  I thank you very much.  I

21  really appreciate it for you coming over here.

22      A MALE VOICE:  We might need you --

23      MR. ZARABI:  We might meet again.  Maybe we ask

24  you for the subpoena in the court of law, and I hope we

25  expecting to your cooperation.

24

EXHIBIT 16 PAGE 286        KRANE 0062

1          MR. DUTCHER:   There's no question.   It's part

2     of my job.

3          MR. ZARABI:   Thank you very much and thanks

4     again.

5          MR. DUTCHER:   Okay.

6                         *        *        *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                        25

EXHIBIT 16 PAGE 287          KRANE 0063

1

2

3

4

5          I, the undersigned, a Certified Shorthand

6   Reporter of the State of California, do hereby certify:

7          That the foregoing audiotaped proceedings

8   were listened to and taken down by me using machine

9   shorthand which was thereafter transcribed under my

10  direction; further, that the foregoing is an accurate

11  transcription thereof.

12          I further certify that I am neither

13  financially interested in the action nor a relative or

14  employee of any attorney of any of the parties.

15          IN WITNESS WHEREOF, I have this date

16  subscribed my name.

17

18  Dated:      SEP 1 1 2003

19

20

21

22  JOHANNA M. BENNETT
    CSR No. 5263

23

24

25

EXHIBIT *16* PAGE 288          KRANE 0064

**Exhibit 17**

ORIGINAL

1  HOWARTH & SMITH
   DON HOWARTH (State Bar No. 53783)
2  SUZELLE M. SMITH (State Bar No. 113992)
   BRIAN D. BUBB (State Bar No. 137408)
3  ROBERT D. BRAIN (State Bar No. 98815)
   800 Wilshire Blvd.,  Suite 750
4  Los Angeles, California  90017

5  (213) 955-9400

6  Attorneys for Plaintiff
   FARHAD LARIAN

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                  FOR THE COUNTY OF LOS ANGELES

10

11  FARHAD LARIAN,                        )  CASE NO.  BC301371
                                          )
12       Plaintiff,                       )  VERIFIED COMPLAINT FOR:
                                          )
13  vs.                                   )  1)   FRAUD & DECEIT IN THE
                                          )       INDUCEMENT OF
14  ISAAC LARIAN and DOES 1 through       )       ARBITRATION
    50, inclusive,                        )       AGREEMENT;
15                                        )
         Defendants.                      )  2)   BREACH OF FIDUCIARY
16                                        )       DUTIES;
                                          )
17                                        )  3)   FRAUD & DECEIT IN THE
                                          )       CONDUCT OF
18                                        )       ARBITRATION PROCESS;
                                          )
19                                        )  4)   BREACH OF IMPLIED
                                          )       COVENANT OF GOOD
20                                        )       FAITH AND FAIR DEALING;
                                          )
21                                        )  5)   VIOLATION OF
                                          )       CALIFORNIA
22                                        )       CORPORATIONS CODE §§
                                          )       25401 AND  25501;
23                                        )
                                          )  6)   VIOLATION OF
24                                        )       CALIFORNIA
                                          )       CORPORATIONS CODE §§
25                                        )       25402 AND 25502;
                                          )
26                                        )  7)   FRAUD & DECEIT RE
                                          )       DECEMBER 2000
27                                        )       AGREEMENT;
                                          )
28

03:F391001.618                                            VERIFIED COMPLAINT

FILED
LOS ANGELES SUPERIOR COURT
AUG 2 5 2003
JOHN A. CLARKE, CLERK
C. L. Coleman
BY C. L. COLEMAN, DEPUTY

Case assigned to
Judge Rodney Nelson.

EXHIBIT 17 PAGE 289

| | |
|---|---|
| 1 | )    8)   NEGLIGENT MISREPRESENTATION; |
| 2 | ) |
| 3 | )    9)   UNFAIR COMPETITION, IN VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200; and |
| 4 | ) |
| 5 | ) |
| 6 | )    10)   RESCISSION BASED ON MISTAKE |

7

8            DEMAND FOR JURY TRIAL

9     Plaintiff, FARHAD LARIAN ("Plaintiff" or "Fred") alleges as follows:

10                  **COMMON ALLEGATIONS**

11 **Parties and Venue**

12       1.     Plaintiff Farhad Larian, also known as "Fred" Larian, is now, and at all

13 times herein mentioned was, a resident of the State of California.  He is currently residing

14 in Los Angeles County, California.

15       2.     Defendant Isaac Larian ("Isaac") is now, and at all time herein mentioned

16 was, a resident of Los Angeles County, California.

17       3.     Plaintiff is unaware of the true names and capacities of Defendant DOES 1

18 through 50, inclusive, and therefore sues such Defendants by fictitious names.  Plaintiff

19 will amend this complaint to show the true names and capacities of, and to make specific

20 allegations against, these Defendants if and when additional information against them is

21 ascertained.  Plaintiff is informed and believes and thereon alleges that each of the

22 Defendants, including each fictitiously named Defendant, is liable in some manner for the

23 events referred to in this complaint.

24       4.     At all times mentioned herein, each Defendant was the agent of each of the

25 other Defendants, and was acting within the course and scope of said agency in

26 performing the acts described herein.

27       5.     Venue is proper in Los Angeles County under California Code of Civil

28 Procedure § 395 because Defendant Isaac Larian resides in Los Angeles County.

2

03-P391001.618                                       VERIFIED COMPLAINT

EXHIBIT *17* PAGE 290

<u>**General Background**</u>

6.    In or about 1979, two brothers, Plaintiff Fred Larian and Defendant Isaac Larian formed an equal partnership to import and distribute name brand consumer products, splitting the profits and losses 50/50.

7.    In or about 1982 the partnership was incorporated as ABC International Traders, Inc. ("ABC"), a closely-held, not publicly traded company, with each brother owning an equal 50 percent of the corporation. Upon incorporation, the brothers continued as before to divide the work and to split equally the profits in running the business. In or about 2002, the name of ABC was changed to MGA Entertainment, Inc. ("MGA").

8.    In or about 1985 or 1986, Fred's and Isaac's shares were diluted when ABC sold stock to their brother-in-law, Jahangir "Eli" Makabi. Such sale left Fred and Isaac each with an equal 45 percent share of the ownership of ABC. After the sale of the stock to Mr. Makabi, the brothers continued as partners and joint venturers in operating the Company, both continued to divide the work at ABC, and each sharing equally 45 percent of its profits.

9.    In or about 1994, Fred and Isaac also became equal 45 percent shareholders (with 10 percent going to Mr. Makabi) in MGA Hong Kong, Limited (together with MGA and ABC, "the Company"), and operated part of their business through such entity. At all times referenced herein, Isaac has served as the President of the Company. More recently, Isaac also acquired the additional title of CEO.

10.    Starting as far back as 1993, disputes arose between the brothers over the operation of the Company. In part, this was because, as Isaac put it, they were "equal partners in the Company" yet had different ideas on how best to make the Company prosper. Over the years, Fred and Isaac discussed various ways to resolve these disputes.

///

///

///

3

EXHIBIT *17* PAGE 291

1     11.   One method the brothers' discussed was having one brother buy out the

2 other's equity interest.  Over the years, various such purchases were discussed and on one

3 occasion an outside appraisal of the Company, performed at the specific request of Isaac,

4 valued the Company at $35 million to $40 million.

5     12.   By 1999, Isaac, as President, had assumed control of sales, product

6 development and financial matters.  At Isaac's direction, Fred assumed responsibility for

7 major projects such as customs regulations, facilities management and warehouse

8 distribution control, and was not as involved in the day-to-day sales or financial control

9 of the Company.  For his role, Isaac took a significantly greater salary.

10

11 **Defendant's Concealment of the Bratz Doll Line**

12     13.   Plaintiff is informed and believes that beginning in or about late 1999 and

13 early 2000, Isaac became aware of a potential new product line that had tremendous

14 potential for the Company.  The new product line involved the "Bratz" dolls and related

15 products.  Bratz dolls are "hipper" and more "edgy" than Barbie and Barbie-type dolls,

16 and are aimed at the post-adolescent, pre-teen and early teen market, i.e., a market where

17 the allure of playing with Barbie-type dolls wanes.

18     14.   Plaintiff is informed and believes that during this same time period, Isaac

19 devised a plan to keep this business opportunity secret from Fred and to gain control of

20 the Company by buying Fred's shares at a value which did not include this new business

21 opportunity.  Isaac concealed from Plaintiff, his brother and partner and stockholder,

22 knowledge he had, as well as his intentions and actions undertaken, regarding the Bratz

23 product line.

24     15.   In or about early 2000, Isaac called a meeting to discuss the new Bratz

25 product line with selected individuals in the Company.  Plaintiff is informed and believes

26 that those present at the meeting spoke enthusiastically of the tremendous opportunity the

27 Bratz line presented for the Company as, *inter alia*, it captured a vacant market niche.

28 ///

4

03:P591001.618                           VERIFIED COMPLAINT

EXHIBIT 17 PAGE 292

1   Fred was not present for this meeting.  Upon information and belief, Isaac took steps to

2   conceal the results of the meeting from Fred.

3        16.     Also in or about February 2000, Isaac tried to dissuade Fred from attending

4   the New York Toy Fair, even though Fred had routinely and regularly attended such toy

5   fairs in the past.  The New York Toy Fair is an important venue for discussing and

6   researching the market potential of new product lines.  Isaac was furious when he

7   discovered that Plaintiff was traveling to New York for the fair.  Plaintiff was expelled by

8   Isaac from meetings he tried to attend and was excluded from any discussions Isaac may

9   have had relating to the Bratz line of products at the fair.

10       17.  .   In early March 2000, while continuing to conceal from Fred the Company's

11  plans for the Bratz line, Isaac offered to purchase all of Plaintiff's 45 percent interest in

12  the Company for $9 million.  The offer was based on a total value of the Company of $20

13  million.  Upon information and belief, Isaac knew at the time he made the offer of the

14  Company's plans already in place, and actions already undertaken, regarding the Bratz

15  line, and that such plans made the Company worth well in excess of $20 million.

16       18.     As set forth herein, the two brothers divided responsibilities with Isaac,

17  assuming control of sales, product development and financial matters, and Fred assuming

18  responsibility for major projects.  Financial information was handled by Isaac and the

19  Controller, Dennis Medici.  Throughout 2000 Isaac repeatedly and routinely shared with

20  Fred any financial information that showed the Company was performing poorly, while

21  withholding any positive financial information about the Company, including the plans

22  for the Bratz line.  Indeed, in May 2000 Isaac told the Company's the Controller, Dennis

23  Medici, that he was to no longer give Fred any information regarding the financial

24  operation of the Company. During this period, Isaac gave Fred only bleak financial news

25  about the Company and continued to conceal the Company's plans and actions

26  undertaken regarding Bratz.

27       19.     On or about September 18, 2000, Isaac caused the Company to enter into a

28  worldwide licensing agreement for the Bratz dolls and related items.  The existence of

5

03:P391001.61    VERIFIED COMPLAINT

EXHIBIT 17 PAGE 293

1    this license was concealed from Fred.  Upon information and belief, these important and

2    valuable rights are already generating revenues of in excess of $500 million a year and

3    are expected to exceed $3 billion in the next few years.

4

5    **Fraud Regarding the Arbitration Agreement**

6        20.    In or about September 2000, Isaac resumed his efforts to buy Fred's interest

7    in the Company.  Isaac kept the Bratz opportunity and other information about the true

8    financial condition of the Company hidden from Fred in an effort to secure Fred's

9    agreement to a proposed arbitration process with their Uncle Morad Zarabi.  Isaac agreed,

10    and induced Fred to agree, to the arbitration process without disclosing that during the

11    arbitration he would conceal the Company's plans and actions undertaken regarding the

12    Bratz line, and other financial information about the Company so that such information

13    would not be included in Mr. Zarabi's valuation of the Company.   In or about September

14    2000, Isaac and Fred executed the "Agreement to Arbitrate and Selection of Arbitrator"

15    ("Arbitration Agreement") attached hereto as Exhibit A.

16        21.    At all times before and up through his execution of the Arbitration

17    Agreement and for some considerable time thereafter, Fred was unaware of the true facts

18    regarding the new business opportunities and Bratz line of products, was unaware of the

19    true financial condition of the Company, and was unaware of the intention of Isaac to

20    conceal such material facts from the arbitrator and from him during the arbitration

21    process.  Had Fred been aware of the new business opportunities, the Bratz line of

22    products, the true financial condition of the Company, and/or the plans of Isaac to

23    conceal such material information from him and from the arbitrator, he would not have

24    agreed to enter into the arbitration process for the sale of his interest in the Company;

25    would not have agreed to the Arbitration Agreement; would not have agreed to have Mr.

26    Zarabi serve as arbitrator; and, would have placed greater restrictions and obligations on

27    the powers of any arbitrator, including without limitation a written requirement that the

28    Company be valued by an independent appraiser outside the family and that such

6

03:P391001.818                                                        VERIFIED COMPLAINT

EXHIBIT 17 PAGE 294

1    appraisal be distributed to the parties for comment before any decision in the arbitration

2    was reached.

3         22.    In or about, December 2000, as a result of the Arbitration Agreement, Fred

4    and Isaac entered into a settlement and resolution of their differences with Fred agreeing

5    to sell his shares to Isaac.  Fred and Isaac executed a written "Agreement for Sale of

6    Stock," dated as of December 4, 2000, ("December 2000 Agreement") attached hereto as

7    Exhibit B.  One of the factors in causing Fred to enter into the Agreement for Sale of

8    Stock was the fact that he had been fraudulently induced into entering into the Arbitration

9    Agreement.

10        23.    At the time Isaac agreed to have Mr. Zarabi arbitrate the value of the

11   Company and other issues, and at all relevant times thereafter, Isaac knew that he would

12   continue to conceal the existence of his and the Company's plans for the Bratz line from

13   Mr. Zarabi and Fred during the arbitration, and other financial information about the

14   Company, the result of which, Isaac knew and intended, would be a fraudulently

15   diminished value of Fred's shares from what they would be worth if all pertinent

16   financial information about the Company and its plans for the Bratz product line were

17   disclosed.  Isaac entered into the arbitration with the intent to induce Fred to rely on his

18   presenting Mr. Zarabi with all material information about the Company and its finances

19   so as to allow Mr. Zarabi to determine a fair value for the Company.  Fred did, in fact,

20   actually and reasonably rely on Isaac disclosing such material information in agreeing to

21   have Mr. Zarabi decide the value of the shares and other matters, and in executing the

22   "Arbitration Agreement".

23

24   <u>Fraud in the Conduct of the Ongoing Arbitration</u>

25        24.    Mr. Zarabi held various hearings and received financial and other

26   information about the Company in his role as arbitrator beginning in the Fall of 2000.

27   Isaac did not disclose to Fred the license the Company had obtained in September 2000

28   for the Bratz line, the plans the Company had to develop and distribute, or any other

7

EXHIBIT 17 PAGE 295

1   actions the Company had already undertaken regarding, the Bratz product line and other

2   business opportunities, the true financial condition of the Company, or the other matters

3   alleged heretofore.  Upon information and belief, during this period, Isaac did not

4   disclose to Mr. Zarabi the license the Company had obtained in September 2000 for the

5   Bratz line, the plans the Company had to develop and distribute, or any other actions the

6   Company had already undertaken regarding, the Bratz product line and other business

7   opportunities, the true financial condition of the Company, or the other matters alleged

8   heretofore.

9       25.   At the time Isaac agreed to have Mr. Zarabi arbitrate the value of the

10  Company and other issues, and at all relevant times thereafter, Isaac knew that he would

11  continue to conceal the existence of his and the Company's plans for the Bratz line from

12  Mr. Zarabi and Fred during the arbitration, and other financial information about the

13  Company, the result of which, Isaac knew and intended, would be a fraudulently

14  diminished value of Fred's shares from what they would be worth if all pertinent

15  financial information about the Company and its plans for the Bratz product line were

16  disclosed.  Isaac entered into the arbitration with the intent to induce Fred to rely on his

17  presenting Mr. Zarabi with all material information about the Company and its finances

18  so as to allow Mr. Zarabi to determine a fair value for the Company.  Fred did, in fact,

19  actually and reasonably rely on Isaac disclosing such material information in agreeing to

20  have Mr. Zarabi decide the value of the shares and other matters, and in agreeing to the

21  arbitration process.

22      26.   In or about, December 2000, as a result of the arbitration process,

23  Fred and Isaac entered into a settlement and resolution of their differences with Fred

24  agreeing to sell his shares to Isaac.  Fred and Isaac executed a written "Agreement for

25  Sale of Stock," dated as of December 4, 2000, ("December 2000 Agreement") attached

26  hereto as Exhibit B.  One of the factors in causing Fred to enter into the Agreement for

27  Sale of Stock was the fraud and facts set forth heretofore.

28  ///

8

EXHIBIT 17 PAGE 296

**Fraud In the Agreement for Sale of Stock**

27.     At all relevant times herein and during the negotiation of the December 2000 Agreement, Isaac continued his fraudulent concealment and nondisclosure as set forth herein of the Company's plans, assets and steps undertaken, regarding the Bratz product line as well as other financial information regarding the Company.  But for the fraud, and had Plaintiff known of the true facts regarding the Company's plans, assets and steps undertaken regarding the Bratz product line, the true financial information about the Company and the other matters alleged heretofore, he would not have agreed to sell his shares to Isaac under the terms of the December 2000 Agreement.

**Discovery of Fraud**

28.     In or about late spring and summer 2002, Plaintiff first became aware of the true scope of the Company's extraordinary plans, efforts and history regarding the Bratz product line and other financial information about the Company that had been concealed from him by Isaac, as the license had been concealed from him.  In or about the spring and summer 2002, Isaac asked Fred to audit payments that were due to the Company.  In that audit, Fred discovered information, for the first time, that the Company had been receiving or was expecting significant revenues based on the Bratz product line.

29.     Fred then asked Mr. Zarabi whether Isaac had disclosed that information to Mr. Zarabi and/or any appraiser involved with the arbitration.  Plaintiff was told by Mr. Zarabi that Isaac had not provided him with such information.  Plaintiff made a demand that Mr. Zarabi rectify the situation, but to date nothing has been done.   Thereafter, Plaintiff made a demand that Isaac pay the fair market value of Plaintiff's share of the company, but Isaac has failed and refused to do so.

///

///

///

///

9

EXHIBIT *17* PAGE 297

### FIRST CAUSE OF ACTION

#### (Fraud & Deceit in the Inducement of Arbitration Agreement)

30.     Plaintiff hereby reasserts and realleges Paragraphs 1 through 29 inclusive, as though set forth in full herein.

31.     In entering into the Arbitration Agreement, agreeing to participate in the arbitration process contemplated thereby, and offering to purchase Plaintiff's shares in the Company, Defendant knowingly made false representations of material fact to Plaintiff and/or concealed and/or failed to disclose material facts known to Defendant which he was under a duty to disclose to Plaintiff.  Such facts specifically include, without limitation, his intentions regarding the information he was planning to conceal from the arbitrator, otherwise fail to disclose during the course of the arbitration process, and/or had already concealed from Plaintiff, concerning the true and accurate financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line.

32.     Plaintiff actually, reasonably, and justifiably relied upon the false statements, concealments, and omissions of Defendant described above in agreeing to execute the Arbitration Agreement, participate in the arbitration process contemplated thereby, and sell his shares in the Company.  Had Plaintiff known of the true facts, specifically including the true facts concerning Defendant's intentions regarding, without limitation, the information he was planning to conceal from arbitrator, otherwise fail to disclose during the arbitration process and/or already had concealed from Plaintiff concerning the true and accurate financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line, Plaintiff would not have entered into the Arbitration Agreement, would not have agreed to participate in the arbitration process contemplated thereby, and would not have agreed to sell his shares of the Company.

33.     Defendant made the false representations, concealments and omissions alleged above with the intent to defraud Plaintiff and/or in reckless disregard of the truth

10

EXHIBIT 17 PAGE 298

1  for purposes of inducing Plaintiff to execute the Arbitration Agreement, agree to

2  participate in the arbitration process contemplated thereby, and sell his shares in the

3  Company at a below fair market price.

4      34.    At all material times, Plaintiff was unaware of the falsity of the

5  representations and disclosures of Defendant as alleged above and believed them to be

6  true.  At all material times, Plaintiff was unaware of the material omissions, concealments

7  and misstatements of material facts by Defendant, and could not, in the exercise of

8  reasonable care, made himself aware of the falsity of such misrepresentations and

9  nondisclosures, or the existence of such omissions or concealments.

10     35.    As a direct and proximate result of the fraudulent conduct alleged above,

11 Plaintiff has been damaged, without limitation, in that he was fraudulently induced to

12 enter the Arbitration Agreement, participate in the arbitration process contemplated

13 thereby, sell his shares of the Company to Defendant at a below fair market price of less

14 than $9 million, and enter into the December 2000 sale agreement.  Plaintiff is entitled to

15 rescission of the September agreement to arbitrate, rescission of the December 2000 stock

16 sale agreement and restitution of his shares in the Company.  In the alternative, Plaintiff

17 is entitled to damages, the amount of such damage is not presently ascertainable, but will

18 be proven at trial.

19     36.    The conduct of Defendant as alleged above, was fraudulent, malicious,

20 oppressive, and despicable; has subjected Plaintiff to unjust hardship in conscious

21 disregard of his rights; and was done to vex, annoy, and harass Plaintiff so as to justify an

22 award of punitive damages against Defendant.

23

24                    **SECOND CAUSE OF ACTION**

25                     **(Breach of Fiduciary Duties)**

26     37.    Plaintiff hereby reasserts and realleges Paragraphs 1 through 36 inclusive,

27 as though set forth in full herein.

28 ///

                              11

03:P391001.618                                    VERIFIED COMPLAINT

EXHIBIT 17 PAGE 299

1    38.    As alleged herein, as an officer, manager and major shareholder of the

2    Company in which Plaintiff was a shareholder, and as Plaintiff's partner and joint

3    venturer in the management and operation of the Company, and otherwise due to their

4    family relationship, Defendant owed Plaintiff fiduciary duties of loyalty, honesty, care

5    and fair dealing in all matters concerning the Company.

6    39.    At all times alleged herein, Plaintiff actually and reasonably reposed the

7    highest trust and confidence in Defendant's loyalty, honesty, care, and fair dealing in all

8    matters concerning the Company.

9    40.    Defendant repeatedly breached and violated such fiduciary duties owed

10   Plaintiff by, among other things, failing to inform Plaintiff, without limitation, of the true

11   and accurate financial condition of the Company, its financial prospects, its business

12   opportunities, the Company's plans and actions already undertaken concerning the Bratz

13   product line, and/or his intentions regarding the information he was planning to conceal

14   from the arbitrator and others in the course of the arbitration process stemming from the

15   Arbitration Agreement.

16   41.    Said breaches of fiduciary duties by Defendant have caused Plaintiff

17   damage, including but not limited to damages resulting from the sale of his shares of the

18   Company to Defendant at a below fair market price, in an amount not presently

19   ascertainable, but which will be proven at the time of trial.

20   42.    The conduct of Defendant, as alleged above, was fraudulent, malicious,

21   oppressive, and despicable; has subjected Plaintiff to unjust hardship in conscious

22   disregard of his rights; and was done to vex, annoy, and harass Plaintiff so as to justify an

23   award of punitive damages against Defendant.

24

25   **THIRD CAUSE OF ACTION**

26   **(Fraud & Deceit in the Conduct of the Arbitration Process)**

27   43.    Plaintiff hereby reasserts and realleges paragraphs 1 through 42, inclusive,

28   as though set forth in full herein.

12

03:P591001.518                                                    VERIFIED COMPLAINT

EXHIBIT 17 PAGE 300

1      44.    In participating in the arbitration process contemplated by the Arbitration

2  Agreement, Defendant knowingly made false representations of material fact and/or

3  concealed and/or failed to disclose material facts known to Defendant which he was

4  under a duty to disclose to the arbitrator and otherwise during the arbitration.  Such facts

5  specifically included, without limitation, information as to the true and accurate financial

6  condition of the Company, its financial prospects, its business opportunities, and/or the

7  Company's plans and actions already undertaken concerning the Bratz product line.

8      45.    Plaintiff actually, reasonably, and justifiably relied upon the false

9  statements, concealments, and omissions of Defendant described above in participating in

10  the arbitration process contemplated by the Arbitration Agreement.  Had Plaintiff known

11  of the true facts, specifically including, without limitation, the scope of the information

12  Defendant concealed from the arbitrator and otherwise not disclosed in the course of the

13  arbitration process regarding the true and accurate financial condition of the Company, its

14  financial prospects, its business opportunities, and/or the Company's plans and actions

15  already undertaken concerning the Bratz product line, Plaintiff would not have

16  participated in the arbitration process or agreed to sell his shares of the Company.

17      46.    Defendant made the false representations, concealments and omissions

18  alleged above with the intent to defraud Plaintiff and/or in reckless disregard of the truth

19  for purposes of inducing Plaintiff to participate in the arbitration process contemplated by

20  the Arbitration Agreement and to sell his shares of the Company to Defendant at a below

21  market price.

22      47.    At all material times, Plaintiff was unaware of the falsity of the

23  representations and disclosures of Defendant as alleged above and believed them to be

24  true.  At all material times, Plaintiff was also unaware of the material omissions,

25  concealments and misstatements of material facts by Defendant, and could not, in the

26  exercise of reasonable care, made himself aware of the falsity of such misrepresentations

27  and nondisclosures, or the existence of such omissions or concealments.

28  ///

13

03:P391001.618                                              VERIFIED COMPLAINT

EXHIBIT 17 PAGE 301

48.     As a direct and proximate result of the fraudulent conduct alleged above, Plaintiff has been damaged in that he was fraudulently induced to participate in the arbitration contemplated by the Arbitration Agreement and sell his shares of the Company to Defendant at a below fair market price.  Plaintiff is entitled to rescission of the December 2000 stock sale agreement and restitution of his shares in the Company.  In the alternative, Plaintiff is entitled to damages, the amount of such damage is not presently ascertainable, but will be proven at trial.

49.     The conduct of Defendant, as alleged above was fraudulent, malicious, oppressive, and despicable; has subjected Plaintiff to unjust hardship in conscious disregard of his rights; and was done to vex, annoy, and harass Plaintiff so as to justify an award of punitive damages against Defendant.

## FOURTH CAUSE OF ACTION

### (Breach of Implied Covenant of Good Faith and Fair Dealing in the Arbitration Agreement)

50.     Plaintiff hereby reasserts and realleges paragraphs 1 through 49, inclusive, as though set forth in full herein.

51.     The Arbitration Agreement contract executed by Plaintiff and Defendant contained an implied covenant of good faith and fair dealing which imposed the following, among others duties on Defendant: (a) a duty to act with honesty in fact in his performance under the agreement; (b) a duty of fair, open and honest disclosure to Plaintiff; (c) a duty to refrain from realizing secret gains at the expense of Plaintiff by connivance, deceit, suppression of facts, or other improper means; and (d) a duty to refrain from taking any action which would unfairly injure the rights of the Plaintiff or interfere in his ability to recognize his reasonable expectations under, and benefits of, the Agreement.

52.     By engaging in the conduct described above, specifically including, without limitation, concealing from the arbitrator and otherwise failing to disclose material facts

14

EXHIBIT 17 PAGE 302

1  in the course of the arbitration process information regarding the true and accurate

2  financial condition of the Company, its financial prospects, its business opportunities,

3  and/or the Company's plans and actions already undertaken concerning the Bratz product

4  line, Defendant has breached his duties of good faith and fair dealing set forth above.

5      53.   At all times herein relevant, Plaintiff has performed and discharged all

6  covenants, conditions, and duties required of him under the Arbitration Agreement,

7  including all duties imposed by the covenant of good faith and fair dealing, except those

8  obligations, if any, which have been prevented by Defendant, those obligations Defendant

9  has waived by his words and/or conduct, or those obligations which Defendant is

10 estopped from asserting that Plaintiff has not performed as a result of Defendant's

11 conduct alleged herein.

12     54.   As a direct and proximate result of Defendant's actions and breaches as

13 alleged herein, Plaintiff has suffered, and continues to suffer damages in an amount as yet

14 unascertained but which will be established at trial.

15     55.   The conduct of Defendant, as alleged above, was fraudulent, malicious,

16 oppressive, and despicable; has subjected Plaintiff to unjust hardship in conscious

17 disregard of his rights; and was done to vex, annoy, and harass Plaintiff so as to justify an

18 award of punitive damages against Defendant.

19

20                **FIFTH CAUSE OF ACTION**

21      **(Violation of California Corporations Code §§ 25401 and 25501)**

22     56.   Plaintiff hereby reasserts and realleges paragraphs 1 through 55, inclusive,

23 as though set forth in full herein.

24     57.   In committing the acts, omissions, and concealments alleged herein,

25 Defendant has violated California Corporations Code, Section 25401 by, among other

26 things, offering to purchase a security in this State: (a) by means of written and/or oral

27 communications containing untrue statements of material facts, specifically including

28 untrue facts regarding the true and accurate financial condition of the Company, its

15

EXHIBIT *17* PAGE 303

1   financial prospects, its business opportunities, and/or the Company's plans and actions

2   already undertaken concerning the Bratz product line; and/or (b) omitting to state material

3   facts necessary in order to make statements made, in light of the circumstances when they

4   were first made, not misleading, specifically regarding the true and accurate financial

5   condition of the Company, its financial prospects, its business opportunities, and/or the

6   Company's plans and actions already undertaken concerning the Bratz product line.

7       58.   As a direct and proximate result of the acts and conduct of Defendant,

8   Plaintiff is entitled to rescission of the sale and restitution of his shares of the Company

9   or damages under California Corporations Code § 25501, in an amount as yet

10  unascertained but which will be established at trial, plus such other relief as pled herein.

11

12                    **SIXTH CAUSE OF ACTION**

13        **(Violation of California Corporations Code §§ 25402 and 25502)**

14      59.   Plaintiff hereby reasserts and realleges paragraphs 1 through 58 inclusive,

15  as though set forth in full herein.

16      60.   At all times alleged herein, Defendant was an officer of the Company, a

17  director of the Company, a controlling person of the Company, and/or a person whose

18  relationship with the Company provided him access, directly and indirectly, to material

19  information about the Company, within the meaning of California Corporations Code §

20  25402.

21      61.   At all times alleged, Defendant had access to, and had information about,

22  the Company not generally available to the public or to Plaintiff, which would

23  significantly affect the value, and fair market price of the shares, of the Company,

24  specifically including, without limitation, information regarding the true and accurate

25  financial condition of the Company, its financial prospects, its business opportunities,

26  and/or the Company's plans and actions already undertaken concerning the Bratz product

27  line.

28  ///

                                16

EXHIBIT 7 PAGE 304

62.   At all times herein alleged, Defendant knew such information regarding, without limitation, the true and accurate financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line, was not generally available to the public or to Plaintiff, and was not intended to be available to the public or to Plaintiff.

63.   In committing the acts, omissions, and concealments alleged herein, Defendant has violated California Corporations Code, Section 25402 by, among other things, purchasing and offering to purchase from Plaintiff his shares of the Company at a time when he knew of material, non-public, undisclosed information about the Company gained from his status as an officer, director, controlling person, and individual with access to such information regarding, without limitation, the true and accurate financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line.

64.   As a direct and proximate result of the acts and conduct of Defendant, Plaintiff is entitled to rescission of the sale and restitution of his shares of the Company or damages pursuant to California Corporations Code § 25502 in an amount as yet unascertained but which will be established at trial, plus such other relief as pled herein.

### SEVENTH CAUSE OF ACTION

### (Fraud & Deceit Regarding the December 2000 Agreement)

65.   Plaintiff hereby reasserts and realleges paragraphs 1 through 64 inclusive, as though set forth in full herein.

66.   Prior to Plaintiff's entering into the December 2000 Agreement to sell Plaintiff's stock in the Company to Defendant, Defendant knowingly made false representations of material fact and/or concealed and/or failed to disclose material facts known to Defendant which he was under a duty to disclose to Plaintiff. Such facts specifically included, without limitation, the true and accurate financial condition of the

///

17

VERIFIED COMPLAINT

03:P391001.618

EXHIBIT 17 PAGE 305

1  Company, its financial prospects, its business opportunities, and/or the Company's plans

2  and actions already undertaken concerning the Bratz product line.

3      67.    Plaintiff actually, reasonably, and justifiably relied upon the false

4  statements, concealments, and omissions of Defendant described above in executing the

5  December 2000 Agreement and agreeing to sell his shares to Defendant.  Had Plaintiff

6  known of the true facts, specifically including, without limitation, the facts concerning

7  true and accurate financial condition of the Company, its financial prospects, its business

8  opportunities, and/or the Company's plans and actions already undertaken concerning the

9  Bratz product line, Plaintiff would not have entered into the December 2000 Agreement,

10  or otherwise agreed to sell his shares in the Company at that time.

11      68.    Defendant made the false representations, concealments and omissions

12  alleged above with the intent to defraud Plaintiff and/or in reckless disregard of the truth

13  for purposes of inducing Plaintiff to execute the December 2000 Agreement and to sell

14  his shares in the Company to the Defendant at a below fair market price.

15      69.    At all material times, Plaintiff was unaware of the falsity of the

16  representations and disclosures of Defendant as alleged above and believed them to be

17  true.  At all material times, Plaintiff was also unaware of the material omissions,

18  concealments and misstatements of material facts by Defendant, and could not, in the

19  exercise of reasonable care, made himself aware of the falsity of such misrepresentations

20  and nondisclosures, or the existence of such omissions or concealments.

21      70.    As a direct and proximate result of the fraudulent conduct alleged above,

22  Plaintiff has been damaged in that he was fraudulently induced to enter the December

23  2000 Agreement calling for the sale of his shares of the Company at a below fair market

24  price.  The amount of such damage is not presently ascertainable, but will be proven at

25  trial.

26  ///

27  ///

28  ///

18

03P391001.618

EXHIBIT 17 PAGE 306

71.   The conduct of Defendant, as alleged above, was fraudulent, malicious, oppressive, and despicable; has subjected Plaintiff to unjust hardship in conscious disregard of his rights; and was done to vex, annoy, and harass Plaintiff so as to justify an award of punitive damages against Defendant.

## EIGHTH CAUSE OF ACTION

### (Negligent Misrepresentation)

72.   Plaintiff hereby reasserts and realleges paragraphs 1 through 70 inclusive, as though set forth in full herein.

73.   Prior to Plaintiff's entering into the December 2000 Agreement to sell Plaintiff's stock in the Company, Defendant owed Plaintiff a duty of reasonable care regarding, without limitation, the accuracy and honesty of the statements made regarding the true and accurate financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line.

74.   Defendant breached his duty to Plaintiff by making misrepresentations of material facts, and by omitting and failing to disclose material facts, which he knew, or in the exercise of reasonable care, should have known were inaccurate and which he was under a duty to disclose to Plaintiff, specifically including, without limitation, information concerning the true and accurate financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line.

75.   Defendant made such misrepresentations and omissions concerning, without limitation, the true and accurate financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line with the intent to induce Plaintiff into executing the December 2000 Agreement and selling his shares to Defendant at below fair market value price.

19

EXHIBIT 17 PAGE 307

76.     Plaintiff actually, reasonably, and justifiably relied upon the false statements and omissions of Defendant described above in deciding to execute the December 2000 Agreement and sell his shares in the Company to Defendant.  Had Plaintiff known of the true facts, specifically including, without limitation, the true and accurate financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line, Plaintiff would not have entered into the December 2000 Agreement, or otherwise agreed to sell his shares in the Company at that time.

77.     As a direct and proximate result of the negligent conduct alleged above, Plaintiff has been damaged in that he was improperly induced to enter the December 2000 Agreement and sold his shares of the Company at a below fair market price.  The amount of such damage is not presently ascertainable, but will be proven at trial.

### NINTH CAUSE OF ACTION

**(Unfair Competition in Violation of California
Business & Professions Code §§ 17200 et seq.)**

78.     Plaintiff hereby reasserts and realleges paragraphs 1 through 77 inclusive, as though set forth in full herein.

79.     California Business and Professions Code §§ 17200 et seq. proscribes, in part, "any unlawful, unfair, or fraudulent business practice."

80.     By virtue of the conduct alleged above, Defendant has committed unlawful, unfair, and/or fraudulent business practices with regard to his dealings with Plaintiff.

81.     As a direct and proximate result of Defendant's violations Business and Professions Code §17200 et seq. alleged above, Plaintiff has been harmed and is entitled to restitution of the amounts to which he has been unjustly harmed, and Defendant unjustly enriched, and other relief as pled herein.

///

///

20

VERIFIED COMPLAINT

03P391001.618

EXHIBIT *17* PAGE 308

**TENTH CAUSE OF ACTION**

**(Rescission Based on Mistake)**

82.     Plaintiff hereby reasserts and realleges paragraphs 1 through 81, inclusive, as though set forth in full herein.

83.     In entering into both the Arbitration Agreement and the December 2000 Agreement, Plaintiff was mistaken in his belief that Defendant planned to inform the arbitrator, and otherwise to disclose during the course of the arbitration proceeding, and/or had already had disclosed to Plaintiff, without limitation true and accurate information concerning the financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line.

84.     The disclosure of true and accurate information to Plaintiff and to the arbitrator concerning, without limitation, the financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line was a basic assumption on which the Arbitration Agreement and/or the December 2000 Agreement rested.

85.     Defendant's failure to accurately disclose true and accurate information to Plaintiff and to the arbitrator regarding, without limitation, the financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line had a such material effect on the Arbitration Agreement and/or the December 2000 Agreement that enforcement of either agreement against Plaintiff would be unfair and unconscionable.

86.     Defendant both knew about, and was the cause of, Plaintiff's mistake in believing Defendant would accurately disclose to Plaintiff and to the arbitrator, without limitation, true and accurate information regarding the financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line at the time Plaintiff executed those agreements.

21

EXHIBIT *17* PAGE 309

87.     Plaintiff did not bear the risk of Defendant's entering into the Arbitration Agreement and/or the December 2000 Agreement without disclosing to Plaintiff and to the arbitrator, without limitation, true and accurate information regarding the financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

### ON THE FIRST AND SECOND CAUSES OF ACTION

1.     For rescission of the Arbitration Agreement;

2.     For rescission of Plaintiff's sale of his shares in the Company;

3.     For restitution of Plaintiff's shares in the Company;

4.     In the alternative of rescission of the sale of shares and restitution, for damages according to proof;

5.     For punitive damages in an amount necessary to punish the Defendant, to the extent permitted by law.

6.     For attorneys fees and cost of suit.

7.     For interest at the maximum rate allowed by law.

8.     For such other and further relief the Court may deem just, equitable, and/or proper.

### ON THE THIRD AND SEVENTH CAUSES OF ACTION

1.     For rescission of Plaintiff's sale of his shares in the Company;

2.     For restitution of Plaintiff's shares in the Company;

3.     In the alternative of rescission of the sale of shares and restitution, for damages according to proof;

4.     For punitive damages in an amount necessary to punish the Defendant, to the extent permitted by law.

22

03:P391001.618

VERIFIED COMPLAINT

EXHIBIT 17 PAGE 310

5.    For attorneys fees and cost of suit.

6.    For interest at the maximum rate allowed by law.

7.    For such other and further relief the Court may deem just, equitable, and/or proper.

## ON THE FOURTH AND EIGHTH CAUSES OF ACTION

1.    For damages according to proof;

2.    For attorneys fees and cost of suit.

3.    For interest at the maximum rate allowed by law.

4.    For such other and further relief the Court may deem just, equitable, and/or proper.

## ON THE FIFTH AND SIXTH CAUSES OF ACTION

1.    For rescission of Plaintiff's sale of his shares in the Company;

2.    For restitution of Plaintiff's shares in the Company;

3.    In the alternative of rescission of the sale of shares and restitution, for damages according to proof;

4.    For attorneys fees and cost of suit.

5.    For interest at the maximum rate allowed by law.

6.    For such other and further relief the Court may deem just, equitable, and/or proper.

## ON THE NINTH CAUSE OF ACTION

1.    For restitution in an amount necessary to restore to Plaintiff the amount by which Defendant has been unjustly enriched by means of the unlawful, unfair, and fraudulent acts alleged above.

2.    For attorneys fees and cost of suit.

3.    For interest at the maximum rate allowed by law.

23

03:P39100L.618

VERIFIED COMPLAINT

EXHIBIT 17 PAGE 311

1    4.    For such other and further relief the Court may deem just, equitable, and/or
2  proper.

3

4              **ON THE TENTH CAUSE OF ACTION**

5    1.    For rescission of Plaintiff's sale of his shares in the Company;

6    2.    For restitution of Plaintiff's shares in the Company;

7    3.    For attorneys fees and cost of suit.

8    4.    For interest at the maximum rate allowed by law.

9    5.    For such other and further relief the Court may deem just, equitable, and/or
10  proper.

11

12              **DEMAND FOR JURY TRIAL**

13    Plaintiff hereby demands a trial by jury herein on all causes of action so triable.

14

15  DATED: August **25**, 2003                    HOWARTH & SMITH
16                                               DON HOWARTH
                                                 SUZELLE M. SMITH
17                                               BRIAN D. BUBB
                                                 ROBERT D. BRAIN

18
19                                               By: _Don Howarth_
                                                      Don Howarth
20
                                                 Attorneys for Plaintiff
21                                               Farhad Larian

22
23
24
25
26
27
28

                            24

03:P391001.618                                   VERIFIED COMPLAINT

EXHIBIT 17 PAGE 312

## VERIFICATION

1  I, Farhad Larian, declare:

2  I am a party to this action, and I certify and declare that I have read the foregoing

3  **VERIFIED COMPLAINT** and know its contents thereof.  The same is true of my own

4  knowledge, except as to those matters which are therein alleged on information and

5  belief, and as to those matters, I believe them to be true.

6  I declare under penalty of perjury under the laws of the State of California that this

7  Verification was executed on August **22**, 2003, at Los Angeles, California and that the

8  foregoing is true and correct.

_____
Farhad Larian

03:P390001.618                                                    VERIFICATION

EXHIBIT 17 PAGE 313

## AGREEMENT TO ARBITRATE AND SELECTION OF ARBITRATOR

This Agreement is made between Isaac Larian ("Isaac"), Farhad Larian ("Farhad") and Morad Zarabi ("Morad") pursuant to the following recitals, terms and conditions.

A.   Isaac and Farhad each own a 45% shareholder interest in ABC Int'l Traders Inc., a California corporation ("Corporation").

B.   Disputes have arisen between Isaac and Farhad concerning the continuing operation of the Corporation and other matters such as partnerships. Isaac and Farhad have been unable to resolve their disputes and desire to conclude their disputes in an economical and timely manner, outside of the formal judicial process.

C.   Both Isaac and Farhad have great confidence in the business and personal judgment of Morad and desire to utilize the services of Morad as a binding arbitrator of the disputes between Isaac and Farhad.

D.   As an accommodation to Isaac and Farhad, Morad agrees to undertake the position as arbitrator.

Now Therefore, the parties agree as follows:

1.   Isaac and Farhad irrevocably appoint Morad to arbitrate their disputes with respect to the Corporation, its operation and their shareholder interests in the Corporation, and other disputes.

2.   Upon execution of this Agreement, Isaac and Farhad shall deliver their irrevocable shareholder proxy and share certificates to Morad so that Morad may vote their shares of Corporation as Morad so determines, including the voting for positions on the Board of Directors.

3.   Upon execution of this Agreement, Isaac and Farhad shall each deliver to Morad their personal check in the amount of $500,000.00 payable to the other, to be utilized as a down payment of the purchase price as determined in Section 5 of this Agreement for the Sale of either Isaac's or Farhad's shares of the Corporation to the other.

4.   Isaac and Farhad shall present their arguments and concerns to Morad in a manner as determined by Morad. Evidence may be admitted or excluded in the sole discretion of Morad. Morad shall then render his decisions with respect to the disputes and said decisions shall be binding and conclusive upon Isaac and Farhad.

5.   In rendering his decisions, Morad has the right and power to determine, among other issues, whether either Isaac or Farhad will have to sell his shares of Corporation to the other and the purchase price and terms of payment for said shares; setting the salaries of Isaac and Farhad; and the continuation of employment by the Corporation of either Isaac or Farhad.

EXH A

EXHIBIT 17 PAGE 314



6.  Isaac and Farhad agree to be bound by the terms of Morad's decisions and to implement the terms of Morad's decisions in the time parameters as established by Morad.

7.  Isaac and Farhad acknowledge that Morad has agreed to perform such services as arbitrator as an accommodation to Isaac and Farhad.  Isaac and Farhad agree to hold Morad harmless and to indemnify Morad from any cost, liability, suit, claim, damage or judgment, including court costs and reasonable attorneys' fees arising out of or relating to this Agreement and the decisions made by Morad pursuant to the terms of this Agreement.

8.  Isaac and Farhad agree to pay equally the costs and expenses of Morad incurred by him, including his attorneys' fees, in drafting and implementing the terms of this Agreement and performing his responsibilities herein.

9.  Isaac and Farhad agree and intend hereby that Morad's decisions will constitute a full and final resolution of all disputes, past or present, between Isaac and Farhad concerning the Corporation, its operation their shareholder interests in Corporation, and other disputes.

10. Any judgment or award rendered by Morad may be entered in any Court having jurisdiction over the disputes between Isaac and Farhad.

11. To the extent not otherwise provided by this Agreement or determined by Morad, the rules governing the arbitration and enforcement of the arbitration award shall be governed by the California Arbitration Act, California Code of Civil Procedure, Section 1280 et seq.

Dated:_____, 2000

_____     _____     _____

**ISAAC LARIAN**                **FARHAD LARIAN**                **MORAD ZARABI**

EXHIBIT *17* PAGE 315

## AGREEMENT FOR SALE OF STOCK

This Agreement, made this 4th day of December, 2000, by and between Farhad Larian ("SELLER"), and Isaac Larian ("BUYER").

Whereas, the SELLER is the owner of 10,000,000 shares of common stock of ABC International Traders Inc., a California corporation and 450 shares of MGA Entertainment Hong Kong Limited, a Hong Kong Corporation (collectively "CORPORATION"), with offices at 16730 Schoenborn Street, North Hills, California 91343-6122, and desires to sell to the BUYER, and the BUYER desires to purchase from the SELLER, these 10,000,000 and 450 shares of common stock of CORPORATION.

Now, therefore, in consideration of the promises and of the mutual covenants and agreements herein contained, the parties hereto hereby agree as follows:

1. At Closing, as defined hereinafter, SELLER shall sell, transfer and convey to BUYER and BUYER shall purchase from SELLER, SELLER'S 10,000,000 and 450 shares of common stock of CORPORATION.

2. The purchase price for said shares shall be the sum of Eight Million Seven Hundred Seventy Five Thousand Dollars ($8,775,000.00), payable as follows:

    a. The sum of $500,000.00 at Closing, as defined hereinafter; plus

    b. The sum of $8,275,000.00 evidenced by BUYER'S promissory note made payable to SELLER, in the form as attached hereto as Exhibit "A" and incorporated herein by reference. Said promissory note shall provide for a principal payment in the amount of $2,000,000.00, with interest at nine and one-half percent on or before April 15, 2001 and the remainder of the principal balance amortized in equal monthly payments of principal and interest over 120 months at an annual interest rate of nine and one-half percent commencing June

1

EXH B

EXHIBIT 17 PAGE 316

1, 2001.  The promissory note shall also provide that, in the event of default, BUYER agrees that SELLER'S personal residence located at 237 North Carolwood Drive, Los Angeles, CA shall be exempt from lien or attachment.

3.  BUYER agrees to secure his promissory note obligation to SELLER as follows:

BUYER shall execute a Pledge Agreement in favor of SELLER in the form as attached hereto as Exhibit "B" and incorporated herein by reference.  Said Pledge Agreement shall be for the purposes of securing BUYER'S total shareholder interest in CORPORATION in favor of SELLER until such time as BUYER'S obligations pursuant to his promissory note in favor of SELLER has been paid in full.  Said Pledge Agreement shall have restrictions imposed upon BUYER with respect to the amount of compensation paid to BUYER from CORPORATION during the period of time that BUYER'S promissory note in favor of SELLER remains outstanding.

4.  In addition to the purchase price as above stated, BUYER shall cause ABC International Traders Inc. to enter into a Consultation Agreement with BUYER in the form as attached hereto as Exhibit "C" and incorporated herein by reference.

5.  SELLER warrants and represents to the BUYER the following:

a.  That CORPORATION is a corporation duly organized, validly existing, and in good standing under the laws of California or Hong Kong, respectively, has all necessary corporate powers to own its properties and carry on its business as now owned and operated by it.

b.  That SELLER is the owner of and has the good and marketable title to the 10,000,000 shares and 450 shares, respectively, of stock agreed to be sold herein, representing 45% of the issued and outstanding shares of CORPORATION, and each of them, free of all encumbrances, liens and security interests.

2

EXHIBIT 17 PAGE 317

c.   That the authorized capital stock of CORPORATION consists of 100,000,000 shares and 1,000 shares respectively of common stock no or nominal par value, of which 22,200,000 shares of ABC International Traders Inc. are presently issued and outstanding and 1,000 shares of MGA Entertainment Hong Kong Limited are presently issued and outstanding.

d.   That any right of first refusal, stock option or any other agreement wherein SELLER has the right to purchase shares of CORPORATION is hereby terminated.

6.   BUYER acknowledges that he is a current shareholder of CORPORATION, has been the President and a Director of CORPORATION; and an employee of CORPORATION for at least 18 years for ABC International Traders Inc. and at least 7 years for MGA Entertainment Hong Kong Limited, since the inception of CORPORATION.   BUYER is thoroughly familiar with the operations of CORPORATION and purchases the shares of CORPORATION from SELLER with full knowledge of the business, prospects, liabilities, obligations, nature and salability of inventory, collectability of accounts receivable, condition of furniture, fixtures and equipment, and financial condition of CORPORATION.   SELLER makes no warranty, either express or implied as to the business of CORPORATION, its prospects, liabilities, obligations, nature and salability of inventory, collectability of accounts receivable, condition of furniture, fixtures and equipment, or financial condition.

7.   The consummation of the transaction contemplated by this Agreement ("Closing") shall take place at the offices of the CORPORATION on the 2nd day of January 2001, at 10:00 a.m., or such other time and place as the parties may agree.   The sale shall be effective as of the close of business on December 31, 2000, the end of the calendar and fiscal year of CORPORATION.   At the Closing the

3

EXHIBIT 17 PAGE 318

following documents and instruments shall be exchanged between the parties:

a.  SELLER shall deliver to BUYER:

(i).  CORPORATION'S share certificate number 3 issued in favor of SELLER representing 10,000,000 shares of ABC International Traders Inc.; and share certificated number 2 issued in favor of SELLER representing 450 shares of MGA Entertainment Hong Kong Limited, duly endorsed by SELLER in favor of BUYER.

(ii).  The resignation of SELLER as a Director and employee of CORPORATION.

(iii).  Any and all records of CORPORATION in the possession of SELLER.

(iv).  A Pledge Agreement executed by SELLER as the secured party in the form as attached hereto as Exhibit "B".

(v).  A Consultation Agreement executed by SELLER in the form as attached hereto as Exhibit "C".

(vi).  A Mutual Release executed by SELLER in the form as attached hereto as Exhibit "D".

b.  BUYER shall deliver to SELLER:

(i).  Cash in the sum of $500,000.00 in the form of a cashier's check, certified check or wired funds.

(ii).  BUYER'S Promissory Note in the amount of $8,275,000.00 made payable to SELLER in the form as attached hereto as Exhibit "A".

(iii).  A Pledge Agreement executed by BUYER as the securing party in the form as attached hereto as Exhibit "B".

(iv).  A Consultation Agreement executed by ABC International Traders Inc. in the form as attached hereto as Exhibit "C".

(vi).  A Mutual Release executed by BUYER in the form as attached

4

EXHIBIT 17 PAGE 319

hereto as Exhibit "D".

8.   The parties acknowledge that differences have arisen between them concerning the continued management and operation of CORPORATION, to the extent that the continued successful operation of CORPORATION is threatened unless one of the parties purchases the other party's shareholder interest.   The parties have each sought the assistance of Morad Zarabi ("Morad") as an "arbitrator" to determine the seller and buyer between the parties, the purchase price and the terms of the purchase.  The parties previously executed an Agreement To Arbitrate And Selection of Arbitrator setting forth their agreement in this regard.  Morad has determined the purchase price and terms of payment from consultations with each of the parties and by undertaking his own outside independent research as to the value of CORPORATION.  Morad shall not charge a fee for his services rendered herein.  The costs and expenses of Morad, including appraisal costs and attorneys' fees incurred by Morad in drafting this Agreement, the various Exhibits attached hereto and the Agreement To Arbitrate And Selection of Arbitrator shall be paid by the CORPORATION at time of closing.   The parties acknowledge that Morad agreed to undertake his duties as arbitrator as an accommodation to the parties.  Each of the parties agrees to indemnify Morad, his associates, employees, consultants, lawyers, family members and all other persons employed or consulted by Morad in connection with the consummation of this Agreement or the Agreements or other documents attached as Exhibits hereto, and hold him and them harmless from any suit, claim, liability, loss, expense or damage, including court costs and reasonable attorneys' fees, as a result Morad's actions as arbitrator or any other actions concerning the drafting or implementation of this Agreement or the Agreements or other documents attached as Exhibits hereto.

5

EXHIBIT 17 PAGE 320

9.  Except as otherwise provided in this Agreement, any controversy between the parties arising out of this Agreement or the Agreements contained in the Exhibits attached hereto shall be submitted to Morad who shall serve as sole arbitrator with respect to said disputes.  The decision of Morad shall be final and binding upon both parties.  In the event Morad is unavailable to so act, then Kambiz Zarabi shall serve as arbitrator.  Any arbitrator may appoint another person or entity to arbitrate, either currently or prospectively, in the event that both named arbitrators herein are unable to so act.

10.  The parties acknowledge that this Agreement, the Agreements attached hereto as Exhibits, and the Agreement To Arbitrate And Selection Of Arbitrator were drafted at the request of and on behalf of Morad by his attorneys, Stern & Goldberg.  The parties each acknowledge that Stern & Goldberg does not represent either party to this Agreement.  The parties have each been advised to seek legal counsel of their choice to represent their respective interests prior to entering into this Agreement and the Agreements attached hereto as Exhibits.  Each party shall have three business days from the date of signing this Agreement to consult with legal counsel of his choice concerning the terms and conditions of this Agreement.  Either party may terminate this Agreement without any further liability thereon, except to the extent such liability arises under the Agreement To Arbitrate And Selection of Arbitrator previously signed by the parties, in the event he notifies Morad and the other party in writing of his intent to do so within three business days from the signing of this Agreement.  In the event no such written notification has been given, it shall be assumed that each party has chosen either to have this Agreement reviewed by legal counsel of his choice and no objections to the form and content of this Agreement has been made; or said party has decided, in its unilateral discretion despite repeated warnings by

6

EXHIBIT 17 PAGE 321

Morad and his attorney to seek such independent legal review, not to seek such legal advice. The parties have initialed this section hereinafter indicating their knowledge of the provisions of this Section.

11. The parties agree that, to the extent required, the transfer of shares as contemplated by this Agreement will have been qualified with the California Commissioner of Corporations in accordance with the California Corporate Securities Law and the Commissioner's Rules and Regulations; and the appropriate Hong Kong governmental authorities, respectively. The parties agree to utilize their best efforts and timely file any applications, consents or notices to secure the Commissioner's and/or Hong Kong authorities consent to the transfer of shares as contemplated herein.

12. Each party represents and warrants that it has dealt with no broker or finder in connection with any transaction contemplated by this Agreement, and as far as it knows, no broker or other person is entitled to any commission or finder's fee in connection with any of these transactions. Each party will indemnify and hold one another harmless against any loss, liability, damage, cost, claim, or expense incurred by reason of any brokerage commission or finder's fee alleged to be payable because of any act, omission, or statement of the indemnifying party.

13. The parties intend that this Agreement and the parties timely compliance with the terms hereof shall resolve and settle all of the claims of either party against the other, including any claim one party may have against the other or CORPORATION for any prior monetary discrepancy whatsoever. The parties shall execute a Mutual Release in the form as attached hereto as Exhibit

7

EXHIBIT 7 PAGE 322

"D".

14.   BUYER agrees that, during the time that any portion of the promissory note from BUYER payable to SELLER as provided herein remains outstanding, BUYER shall cause CORPORATION to name Morad as a member of the Board of Directors of CORPORATION.

15.   This Agreement constitutes the entire agreement between the parties pertaining to the subject matter contained herein and supersedes all prior and contemporaneous agreements, representations, and understandings of the parties. No supplement, modification, or amendment to this Agreement shall be binding unless executed in writing by the parties.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provisions, whether or not similar, nor shall any waiver constitute a continuing waiver.  No waiver shall be binding unless executed in writing by the party making the waiver.

16.   This Agreement may be executed simultaneously in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

17.   This Agreement shall be binding on and shall inure to the benefit of the parties to it, and their respective heirs, legal representatives, successors and assigns; provided, however, no assignment by BUYER shall relieve BUYER of any of his obligations or duties under this Agreement.

18.   If any action or other proceeding is commenced to enforce the terms of this Agreement, the prevailing party, in addition to all other relief as appropriate under California law, shall be entitled to the recovery of court costs and reasonable attorneys fees.

19.   This Agreement shall be construed in accordance with and be governed

8

EXHIBIT 7 PAGE 323

by the laws of the State of California.

IN WITNESS WHEREOF, the parties to this Agreement have duly executed it effective the day and year first above written.

BUYER:                                    SELLER:

_____                   _____
ISAAC LARIAN                              FARHAD LARIAN

EXHIBIT 17 PAGE 324

## SPOUSAL CONSENT

The undersigned is the spouse of Farhad Larian.  To the extent that the undersigned now has a community property interest in the shares of ABC International Traders Inc. registered in the name of her husband, the undersigned hereby acknowledges that she has read this Agreement For Sale Of Stock, understands its contents and agrees that her community property interest in the shares of said corporation registered in the name of her husband shall be bound by and subject to the terms of this Agreement.

Dated: _____, 2000        _____

10

EXHIBIT *17* PAGE 325

## PROMISSORY NOTE

$8,275,000.00   Los Angeles, California,  January __ 2001

    In installments as herein stated, for value received, the undersigned promises to pay to Farhad Larian, or order, at Los Angeles, California, the sum of Eight Million Two Hundred Seventy Five Thousand Dollars, with interest from date of making on unpaid principal, at the rate of nine  and one-half percent per annum, payable in installments of principal and interest (amortized on $6,275,000.00 portion of note) of $83,798.90 or more on the first day of each successive month, commencing June 1, 2001. Principal and accrued interest on the above portion of the note shall be all due and payable on June 1, 2004.  The undersigned shall have a ten (10) day grace period from and after the due date of any payment prior to being in default of his obligation herein.  In addition thereto, the undersigned shall make a principal payment of $2,000,000.00, with interest thereon, on or before April 15, 2001.

    Should default be made in payment of any installment of principal or interest when due the whole sum of principal and interest shall become immediately due at the option of the holder of this note.  Principal and interest payable in lawful money of the United States.  If action be instituted on this note the undersigned promises to pay such sum as the Court may fix as attorney's fees.

    This Promissory Note is secured by a Pledge Agreement of even date executed by the undersigned and beneficiary herein.

    In the event of default, the principal residence of the undersigned, located at 237 North Carolwood Drive, Los Angeles, California 90077 shall not be subject to lien, attachment or seizure.

ISAAC LARIAN

EXHIBIT 17 PAGE 326

'01-81-01   17:13   From-Stern & Goldberg   +818 278 9821   T-785   P.003/007   F-722

## AMENDMENT TO PROMISSORY NOTE

On December 4, 2000, Farhad Larian ("Farhad"), Isaac Larian ("Isaac"), ABC International Traders Inc., a California corporation ("ABC") and/or Morad Zarabi ("Morad") entered into an Agreement For Sale of Stock, which included an $8,275,000.00 Promissory Note ("Note") executed by Isaac in favor of Farhad. The Note provided, in part, for a principal payment of $2,000,000.00 with interest thereon, on or before April 15, 2001.

Isaac and Farhad agree that the payment date for said $2,000,000.00 installment, plus interest, at the request of Isaac, be and is hereby extended to "on or before June 30, 2001".

All other terms of the Note shall remain in full force and effect.

Dated: 2/1/2001

_____
Farhad Larian

_____
Isaac Larian

EXHIBIT 17 PAGE 327

```
------------------------------------------------------------------
                                   12-04-2000  17:59:53 Pg  1
------------------------------------------------------------------

Compounding interval:  Monthly

Annual percentage rate......:    9.500%
Effective annual rate.......:    9.925%
Rate per compounding period.:    0.7917%
Equivalent daily rate.......:    0.02603%

Valuation date:  01-01-2001     Value:  $  6,275,000.00

CASH FLOW DATA
------------------------------------------------------------------
First date   Payment amount  -#- Interval    Last date
------------------------------------------------------------------
06-01-2001   $    83,798.90   35 Monthly    04-01-2004
05-01-2004   $ 5,211,001.13    1
```

AMORTIZATION SCHEDULE  -  Normal amortization

| Pmt | Date | Payment | Interest | Principal | Balance |
|-----|------|---------|----------|-----------|---------|
| | | | Balance at 01-01-2001 | | 6,275,000.00 |
| 1 | 06-01-2001 | 83,798.90 | 252,349.44 | 168,550.54- | 6,443,550.54 |
| 2 | 07-01-2001 | 83,798.90 | 51,011.44 | 32,787.46 | 6,410,763.08 |
| 3 | 08-01-2001 | 83,798.90 | 50,751.87 | 33,047.03 | 6,377,716.05 |
| 4 | 09-01-2001 | 83,798.90 | 50,490.25 | 33,308.65 | 6,344,407.40 |
| 5 | 10-01-2001 | 83,798.90 | 50,226.56 | 33,572.34 | 6,310,835.06 |
| 6 | 11-01-2001 | 83,798.90 | 49,960.78 | 33,838.12 | 6,276,996.94 |
| 7 | 12-01-2001 | 83,798.90 | 49,692.89 | 34,106.01 | 6,242,890.93 |
| 2001 totals | | 586,592.30 | 554,483.23 | 32,109.07 | |
| 8 | 01-01-2002 | 83,798.90 | 49,422.89 | 34,376.01 | 6,208,514.92 |
| 9 | 02-01-2002 | 83,798.90 | 49,150.74 | 34,648.16 | 6,173,866.76 |
| 10 | 03-01-2002 | 83,798.90 | 48,876.45 | 34,922.45 | 6,138,944.31 |
| 11 | 04-01-2002 | 83,798.90 | 48,599.98 | 35,198.92 | 6,103,745.39 |
| 12 | 05-01-2002 | 83,798.90 | 48,321.32 | 35,477.58 | 6,068,267.81 |
| 13 | 06-01-2002 | 83,798.90 | 48,040.45 | 35,758.45 | 6,032,509.36 |
| 14 | 07-01-2002 | 83,798.90 | 47,757.37 | 36,041.53 | 5,996,467.83 |
| 15 | 08-01-2002 | 83,798.90 | 47,472.04 | 36,326.86 | 5,960,140.97 |
| 16 | 09-01-2002 | 83,798.90 | 47,184.45 | 36,614.45 | 5,923,526.52 |
| 17 | 10-01-2002 | 83,798.90 | 46,894.58 | 36,904.32 | 5,886,622.20 |
| 18 | 11-01-2002 | 83,798.90 | 46,602.43 | 37,196.47 | 5,849,425.73 |
| 19 | 12-01-2002 | 83,798.90 | 46,307.95 | 37,490.95 | 5,811,934.78 |
| 2002 totals | | 1,005,586.80 | 574,630.65 | 430,956.15 | |
| 20 | 01-01-2003 | 83,798.90 | 46,011.15 | 37,787.75 | 5,774,147.03 |
| 21 | 02-01-2003 | 83,798.90 | 45,712.00 | 38,086.90 | 5,736,060.13 |

ATTACHMENT

EXHIBIT 17 PAGE 328

```
------------------------------------------------------------------------
                                      12-04-2000  17:59:53 Pg  2
------------------------------------------------------------------------

Pmt   Date        Payment        Interest       Principal        Balance
22 03-01-2003    83,798.90      45,410.48      38,388.42    5,697,671.71
23 04-01-2003    83,798.90      45,106.57      38,692.33    5,658,979.38
24 05-01-2003    83,798.90      44,800.25      38,998.65    5,619,980.73
25 06-01-2003    83,798.90      44,491.51      39,307.39    5,580,673.34
26 07-01-3003    83,798.90      44,180.33      39,618.57    5,541,054.77
27 08-01-2003    83,798.90      43,866.68      39,932.22    5,501,122.55
28 09-01-2003    83,798.90      43,550.55      40,248.35    5,460,874.20
29 10-01-2003    83,798.90      43,231.92      40,566.98    5,420,307.22
30 11-01-2003    83,798.90      42,910.77      40,888.13    5,379,419.09
31 12-01-2003    83,798.90      42,587.07      41,211.83    5,338,207.26
2003 totals   1,005,586.80     531,859.28     473,727.52

32 01-01-2004    83,798.90      42,260.81      41,538.09    5,296,669.17
33 02-01-2004    83,798.90      41,931.96      41,866.94    5,254,802.23
34 03-01-2004    83,798.90      41,600.52      42,198.38    5,212,603.85
35 04-01-2004    83,798.90      41,266.45      42,532.45    5,170,071.40
36 05-01-2004  5,211,001.13     40,929.73   5,170,071.40           0.00
2004 totals   5,546,196.73     207,989.47   5,338,207.26

Grand totals  8,143,962.63   1,868,962.63   6,275,000.00
```

EXHIBIT 17 PAGE 329

## PLEDGE AGREEMENT

THIS PLEDGE AGREEMENT made this __ day of __DEC.__, 2001, by and between Isaac Larian hereinafter referred to as "Pledgor"; and Farhad Larian hereinafter referred to as "Pledgee"; and Morad Zarabi hereinafter referred to as "Trustee".

## WITNESSETH

Pledgor, as security for the performance of his obligations under and pursuant to a promissory note payable to Pledgee of even date herewith in the principal amount of $8,275,000.00, as well as the performance of all other obligations contemplated hereby and pursuant to the terms of the Agreement For Sale Of Stock dated December __, 2000 between Pledgor and Pledgee, pledges, assigns and delivers to Trustee for the benefit of Pledgee the hereinafter described shares of stock of ABC International Traders Inc., a California corporation, and MGA Entertainment Hong Kong Limited, a Hong Kong corporation, hereinafter collectively referred to as "Company", subject to the terms and conditions hereinafter set forth.

NOW, THEREFORE, it is mutually agreed by the parties as follows:

1)    PLEDGE

(a)  Pledgor hereby delivers to Trustee certificates of stock in ABC International Traders Inc. numbered 1 and 3 representing a total of 20,000,000 shares of common stock of ABC International Traders Inc.; and certificates of stock in MGA Entertainment Hong Kong Limited numbered 1 and 2 representing a total of 900 shares of common stock of MGA Entertainment Hong

1

EXHIBIT 17  PAGE 330

Kong Limited issued in the name of Pledgor, together with an assignment
separate from certificate executed by Pledgor in favor of Pledgee assigning
said shares of common stock in Company to Pledgee, said stock certificates and
assignment to be held by Trustee as security for the payment of Pledgor's
promissory note and other obligations referred to above.

(b)   Pledgor warrants and represents that he owns said stock free
and clear of any liens or encumbrances except this Pledge Agreement; and
agrees not to encumber, transfer or otherwise hypothecate said stock during
the term of the Pledge Agreement.

(c)   In the event that during the term of this Pledge Agreement
any stock dividend, reclassification, readjustment, or other change is
declared or made in the capital stock of the Company which affects the pledged
shares, or any subscription, warrant, or other option is exercised with
reference to the pledged stock, all the new, substituted or additional shares,
or other securities issued pursuant to any such change or option shall be
delivered to Trustee by Pledgor and shall be held by Trustee under the terms
of this Pledge Agreement in the same manner as the stock originally pledged
hereunder.   Trustee shall have no duty or obligation to compel Pledgor to
deliver such new, substituted or additional shares, or other securities so
issued to Trustee.

2)   VOTING RIGHTS, DIVIDENDS AND OTHER RESTRICTIONS ON DISTRIBUTIONS:

(a)   Pledgor shall have the right to vote the stock pledged as
herein and to receive all cash dividends, as limited hereinafter, if any,
declared on said stock, so long as the Pledgor is not in default in the
performance of any of the terms of this Pledge Agreement, the Agreement For
Sale Of Stock or in the payment of the promissory note secured hereby during

2

EXHIBIT 17 PAGE 331

the term of this Pledge Agreement.  In the event Pledgee notifies the Trustee that Pledgor is in default hereunder, Pledgee shall be entitled to vote the shares for which payment is in default.  For voting purposes, Trustee shall be entitled to rely upon the written representations of Pledgee concerning a default relative to shares held by Trustee, and Trustee shall have no obligation to make any such determination unless Pledgee sends to Trustee a letter by certified mail specifying a default as set forth in Paragraph 4 below.

(b)  During the term of this Pledge Agreement, Pledgor and his immediate family members shall be limited in the aggregate annual amount of distributions from ABC International Traders Inc., whether as salary, dividends, perquisites or any other form to an amount no greater than the sum of the annual principal and interest payments payable to Pledgee under the promissory note plus the sum of $500,000.00 plus the amount of any federal and state taxes payable by Pledgor on said amounts.  Notwithstanding the above, this distribution limitation shall not apply with respect to any distributions to family members of Pledgor who are presently employed at Company.

3)  RETURN OF COLLATERAL:  At such time as Pledgor has presented to Trustee evidence satisfactory to Trustee of full payment of Pledgor's promissory note to Pledgee, and the complete performance of any other obligation imposed on Pledgor pursuant to the terms of the Agreement For Sale Of Stock above mentioned, Trustee shall deliver to Pledgor all of the stock held hereunder together with the assignment executed by Pledgor.

4)  DEFAULT:  An event of default by Pledgor as used in this Pledge Agreement shall be any and all of the following, provided, however, that the default shall not be deemed to occur until the Pledgee shall have notified the

3

EXHIBIT 17 PAGE 332

Pledgor in writing specifying the nature of the default, and until the time for curing the same, if any, following Pledgor's receipt of notice from Pledgee, has expired:

(a) The failure of Pledgor to pay the indebtedness evidenced by the promissory note in favor of Pledgee in accordance with the terms thereof, should Pledgor fail to make such payment within thirty (30) days from the due date of any payment thereunder.

(b) The failure of Pledgor to observe, keep or perform within ninety (90) days any covenant, agreement or condition required in this instrument or the Agreement For Sale Of Stock or the Promissory Note in favor of Pledgee herewith to be observed, kept or performed for the benefit of Pledgee.

(c) If Pledgor is adjudicated a bankrupt, or requests, either by way of petition or answer, that Pledgor be adjudicated a bankrupt, or if any involuntary petition in bankruptcy be filed against Pledgor and the same shall not have been determined in favor of Pledgor or dismissed within ninety (90) days from the date thereof.

5) RIGHTS ON DEFAULT:

(a) Upon the happening of any of the events specified in Paragraph 4, Pledgee may, at Pledgee's election and upon proper notice and after the appropriate curative periods set forth in Paragraph 4, declare any and all obligations of the Pledgor in default secured hereby immediately all due and payable, and Pledgee is given the full power and authority to take possession of all stock pledged hereunder by the Pledgor in default from Trustee, and, at Pledgee's option, to sell and deliver the whole or any part of the herein described stock held by Trustee, or any substitutions or

4

EXHIBIT 17 PAGE 333

additions thereto, at one or more private or public sales, with notice, as Pledgee shall determine.

(b)  Upon any such sale, Pledgee may become the purchaser of the whole, or any part, of such stock, discharged from any right of redemption, and after deducting all costs and expenses of collection, sale and delivery, including reasonable attorney's fees, may apply the residue of the proceeds of such collection, sale or sales, to the payment of the obligations secured hereby.  Any overage of the residue of the proceeds of such sales shall be forthwith returned to Pledgor.

(c)  In the event of any public sale of the stock hereunder, if any law or regulation of the Securities and Exchange Commission or the California Commissioner of Corporations, or any other Federal or state body having jurisdiction, shall require that the Company whose stock is pledged hereunder or Pledgee or Pledgor should take any action prior to the sale of said stock, each of the parties hereto shall use his or its respective best efforts to comply with all of the said requirements.  Pledgee agrees to indemnify and hold Pledgor and Company harmless against any liabilities incurred by either of them by virtue of Pledgee's sale of the stock in violation of any such law or regulation.

6)  LIENS:  Pledgor agrees to pay prior to delinquency all taxes, charges, liens and assessments against the stock pledged hereunder.

7)  CAPTIONS:  The paragraph captions are inserted in this Pledge Agreement merely for convenience and are not to be construed as a part of this Pledge Agreement, or in any way limiting or affecting the language of any paragraph in this Pledge Agreement.

8)  PLEDGE CONSENT:  Where the consent of the Pledgee is required in

5

EXHIBIT 17 PAGE 334

this Agreement, in connection with actions proposed to be taken by Pledgor, such consent shall not be withheld or delayed unreasonably.  Consent shall be deemed to have been given to any specific action by Pledgor if Pledgee has not responded to written request for such consent within fifteen (15) days after receipt of notice in accordance with paragraph 12 of this Agreement.

9)    GENDER:  In this Agreement, whenever the context so requires, the masculine gender herein written shall include the feminine or the neuter and the singular number shall include the plural.

10)    TRUSTEE:

(a)  Trustee, by its signature hereto, consents to act as Trustee hereunder upon the express understanding that it shall be solely responsible for the physical holding of the shares described herein, and shall deliver said shares of stock to Pledgee in the event of default as hereinabove provided, together with the attached assignment; or to Pledgor upon full satisfaction of the promissory note and obligations pursuant to the Agreement For Sale Of Stock, both above described.

(b)  It is expressly understood that the duties and obligations of the Trustee are to be strictly limited to the foregoing, and the parties acknowledge that they do hereby hold Trustee free and harmless from any and all liability, costs, and expenses, including attorney's fees, by reason hereof, and that said parties shall and do hereby indemnify Trustee therefrom. Pledgor does hereby acknowledge that the stock being deposited with Trustee hereunder is deposited upon the joint risk of Pledgor and Pledgee.  Any fees of Trustee for acting as Trustee shall be paid by Pledgor.

(c)  Trustee shall have the power to appoint, currently or prospectively, a successor Trustee to so serve under the terms of this Pledge

6

EXHIBIT 17 PAGE 335

Agreement in the event Trustee is unable or unavailable to so act.

11)   SUCCESSORS AND ASSIGNS:  This Pledge Agreement shall be binding upon the parties hereto, and upon their respective heirs, personal representatives, successors and assigns.

12)   NOTICES:  Any and all notices to be served on or given to either Pledgor or Pledgee hereto, shall be in writing and shall be deemed duly served and given when personally delivered to either of the parties or in lieu of such personal service, when deposited in the United States mail, first-class, postage prepaid, addressed to Pledgor at 237 North Carolwood Drive, Los Angeles, California 90077, or to Pledgee at 2142 Century Park Lane, #6108, Los Angeles, CA 90067.  Any and all notices to be served on or given to Trustee shall be in writing and shall be deemed duly served and given upon receipt by Trustee.

13)   GOVERNING LAW:  This Agreement shall be governed and interpreted in accordance with the laws of the State of California.


IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and year first above written.


PLEDGEE:                                    PLEDGOR:


_____                   _____
FARHAD LARIAN                               ISAAC LARIAN


                        TRUSTEE:


                        _____
                        MORAD ZARABI

                              7

EXHIBIT *17* PAGE 336

<u>CONSULTING AGREEMENT</u>

This Consulting Agreement is entered into this __1__ day of JAN _____.

2001, by and between ABC International Traders Inc., a California corporation

("Company") and Farhad Larian ("Consultant").

WHEREAS, CONSULTANT was a former shareholder, Director and employee of

COMPANY.

WHEREAS, COMPANY desires to have CONSULTANT perform certain services on

behalf of COMPANY as an Independent Contractor.

NOW, THEREFORE, for valuable consideration, it is hereby agreed by the

parties hereto as follows:

1.    <u>TERM</u>

The term of this Agreement shall be for a period of five years,

commencing January 1, 2001 and terminating December 31, 2005, unless earlier

terminated as provided hereinafter.

2.    <u>SERVICES</u>

(a)  CONSULTANT agrees to provide and make himself available

to perform general administrative services, at the request of COMPANY, and/or

otherwise make himself available to COMPANY for consultation by telephone, for

a total period of time not more than ten hours per month, during the normal

1

EXHIBIT 17 PAGE 337

business hours of COMPANY.

(b)   COMPANY hereby acknowledges that during the term of this Agreement, CONSULTANT may engage in any other business or professional activity provided that such activity does not directly compete with the business of COMPANY within Los Angeles County, California, and the performance of such activity does not interfere with his present work as a consultant for COMPANY.

(c)   CONSULTANT hereby acknowledges that he is being employed as an Independent Contractor to render the services described herein and that CONSULTANT shall be solely responsible for any Federal and State Income Tax withholding or Estimated Tax Payments that CONSULTANT may be required to file and/or pay.

3.   COMPENSATION

For all services rendered by CONSULTANT under this Agreement, COMPANY shall pay to CONSULTANT the sum of $7,500.00 per month payable on the first day of each month of the term hereof.

4.   TERMINATION

This Agreement may be terminated by either party for cause or for breach by the other party of any provision contained in this Agreement. COMPANY may not terminate CONSULTANT for a breach of this Agreement until COMPANY has furnished CONSULTANT with written notice of the breach contended by COMPANY and CONSULTANT fails to cure said breach within ten (10) days of receipt of said notice.

After five years from the date hereof but not before, this Agreement may be terminated by COMPANY upon payment in full of the promissory note given by Isaac Larian to CONSULTANT as part of the purchase of CONSULTANT'S shares of COMPANY.

2

EXHIBIT 17 PAGE 338

This Agreement may be terminated by CONSULTANT, at any time, without cause, upon giving COMPANY thirty (30) days prior written notice.

5.   **TRADE SECRETS**

CONSULTANT acknowledges and represents that the sources of COMPANY's services, techniques, methods, products, manufacturing techniques, manufacturing requirements, pricing, customer lists and vendor lists are a trade secret and the property of .COMPANY.  It is agreed that all such data is confidential and that it shall not be disclosed, directly or indirectly, or used by CONSULTANT in any way, except on behalf of COMPANY, either during the term of this Agreement or at any time thereafter.

6.   **NOTICES**

Any notice required or permitted to be given under this Agreement shall be sufficient if in writing and if sent by registered mail to the principal office of COMPANY or personal residence of CONSULTANT.

7.   **COUNTERPARTS**

The within Agreement may be executed in duplicate counterparts and each such signed duplicate counterpart shall be deemed to be an original.

8.   **TITLES AND CONSTRUCTION**

The titles of the paragraphs in this Agreement are set forth for convenience only.  This Agreement shall not be construed or interpreted for or against either of the parties hereto by reason of its draftsmanship by either party.

9.   **ASSIGNMENT**

The rights, benefits, duties and obligations of COMPANY and CONSULTANT under this Agreement may not be assigned without the express written permission of the other.

3

EXHIBIT *17* PAGE 339

10. **ARBITRATION**

Any controversy between the parties arising out of this Agreement shall be submitted to Morad Zarabi who shall serve as sole arbitrator with respect to said disputes. If Morad Zarabi is unable to so act, Kambiz Zarabi is appointed arbitrator. Either arbitrator can select another person or entity to serve as arbitrator, either currently or prospectively, if neither of the above two named arbitrators are available to so serve. The decision of the arbitrator shall be final and binding upon both parties.

11. **ATTORNEYS' FEES**

If any action or any other proceeding is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default, or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party or parties shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action or proceeding, in addition to any other relief to which they may be entitled.

12. **ENTIRE AGREEMENT**

(a) This Agreement constitutes the entire Agreement between the parties and contains all of the agreement between the parties with respect to the subject matter hereof; this Agreement supersedes any and all other agreements, either oral or in writing, between parties hereto with respect to the subject matter hereof.

(b) No change or modification of this Agreement shall be valid unless the same be in writing and signed by the person or party to be charged.

13. **GOVERNING LAW**

This Agreement shall be subject to and governed by the laws of the State of California.

4

EXHIBIT 7 PAGE 340

DATED: JAN 1, 2001

COMPANY:                                    CONSULTANT:

ABC INTERNATIONAL TRADERS INC.

                                           _Farhad Larian_
                                           FARHAD LARIAN

By: _____
    Isaac Larian, President

5

EXHIBIT 17 PAGE 341

## MUTUAL RELEASE

For valuable consideration, receipt of which is hereby acknowledged:

1.   Isaac Larian, an individual, and ABC International Traders Inc., a California corporation, and each of them, on behalf of themselves, their associates, owners, stockholders, predecessors, successors, heirs, assigns, directors, officers, partners, employees, representatives, and all other persons acting by, through, under, or in concert with them, or any of them, do hereby acquit, release and forever discharge Farhad Larian, an individual, and his spouse, associates, successors, heirs, assigns, agents, representatives, and all other persons acting by, through, under, or in concert with him or any of them, of and from any and all cause or causes of action, suits, claims, demands, obligations, liabilities, damages, liens, contracts, agreements, promises, losses, costs, or expenses of any nature whatsoever, known or unknown, fixed or in equity, from the beginning of time to the date hereof with the exception of those obligations imposed under the terms of the Agreement For Sale Of Stock between Isaac Larian and Farhad Larian for the sale by Farhad Larian of his shareholder interest in ABC International Traders Inc. to Isaac Larian and the agreements attached as Exhibits to the Agreement For Sale Of Stock.

2.   Farhad Larian, an individual, on behalf of himself, his spouse, associates, successors, heirs, assigns, agents, representatives, and all other persons acting by, through, under, or in concert with him or any of them, do hereby acquit, release and forever discharge Isaac Larian, an individual, and ABC International Traders Inc., a California corporation, and each of them, their respective associates, owners, stockholders, predecessors, successors, heirs, assigns, directors, officers, partners, employees, representatives, and all other persons acting by, through, under, or in concert with them, or any of them, of and from any and all cause or causes of action, suits, claims, demands, obligations, liabilities, damages, liens, contracts, agreements, promises, losses, costs, or expenses of any nature whatsoever, known or unknown, fixed or in equity, from the beginning of time to the date hereof with the exception of those obligations imposed under the terms of the Agreement For Sale Of Stock between Isaac Larian and Farhad Larian for the sale by Farhad Larian of his shareholder interest in ABC International Traders Inc. to Isaac Larian and the agreements attached as Exhibits to the Agreement For Sale Of Stock.

3.   The foregoing release is and shall be a release of all claims, whether known or unknown, and each of the undersigned parties waives all rights reserved to him, it or them, by Section 1542 of the Civil Code of the State of California, which provided, as follows:

> "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the Release which if known by him must have materially affected his settlement with the debtor."

4.   This Release shall be binding on, and shall inure to the benefit of, the parties to it and their respective heirs, legal representatives, successors and assigns.

Exhibit "D"

EXHIBIT /7 PAGE 342

5.   Each of the undersigned individuals represents that he signs this Release with the express authority of the party on whose behalf he signs.

IN WITNESS WHEREOF, the parties hereto have executed this Release on the 4TH day of DECEMBER , 2009.

_____          _____
ISAAC LARIAN                      FARHAD LARIAN


ABC INTERNATIONAL TRADERS INC.

By: _____
    Isaac Larian, President

EXHIBIT 17 PAGE 343

## AMENDMENT TO AGREEMENTS

On December 4, 2000, Farhad Larian ("Farhad"), Isaac Larian ("Isaac"), ABC International Traders Inc., a California corporation ("ABC") and/or Morad Zarabi ("Morad") entered into one or more of the following agreements concerning or relating to the sale by Farhad to Isaac of Farhad's shareholder interest in ABC and MGA Entertainment Hong Kong Limited, a Hong Kong corporation:

    A. Agreement For Sale of Stock.
    B. Promissory Note.
    C. Pledge Agreement.
    D. Consulting Agreement.
    E. Mutual Release.

The parties desire to amend the agreements as specifically provided herein, and in all other respects, ratify and confirm said agreements.

1. Agreement For Sale of Stock.

    a. There should be inserted as a second paragraph at section 12 on page 7 to read as follows:

    "BUYER shall, and shall additionally cause CORPORATION to, indemnify and hold SELLER harmless from and against any claim, suit, liability, cause of action or damages arising from or related to SELLER's employment by CORPORATION, ownership of the stock in CORPORATION and/or any personal guarantees given by SELLER in his capacity as a shareholder, officer or employee of CORPORATION, to the greatest extent permitted by law. The provisions of this paragraph shall survive any termination of this Agreement. In addition thereto, BUYER shall, and shall additionally cause CORPORATION to, utilize all commercially reasonable efforts to have SELLER removed as a guarantor of any of the obligations of CORPORATION. Notwithstanding the above, SELLER shall remain personally liable on the SBA guarantee concerning the real property located at 16730 Schoenborn Street, North Hills, CA 91343".

    b. There should be inserted at the end of section 14 on page 8 the following additional sentence:

    "BUYER shall execute in favor of Morad or any successor pledgeholder under the Pledge Agreement a limited proxy to vote his shares of CORPORATION for the purpose of electing Morad or any successor pledgeholder as a member of the board of directors of CORPORATION, so that Morad or the successor pledgeholder will serve in such capacity until such time as the promissory note issued by BUYER in favor of SELLER has been paid in full."

1

EXHIBIT 17 PAGE 344

2. Promissory Note.

    a. The date of making for purposes of interest accruals shall be January 1, 2001.

    b. There shall be added as Exhibit "1" to the Promissory Note the amortization schedule for the $6,275,000.00 principal as attached hereto.

    c. There shall be inserted the following additional paragraph between the first and second paragraphs:

"In the case of a sale of at least a majority of the shares of ABC International Traders Inc. ("ABC") by the maker hereof in a single transaction or in a series of related transactions; or the sale of at least a majority of ABC's assets in a single transaction or a series of related transactions, then, in any such case and notwithstanding anything to the contrary contained in this promissory note, all or a portion of the remaining unpaid principal and then accrued interest thereon shall then become due and payable in the same fractional proportion as determined by a fraction the numerator of which is the sale proceeds received and the denominator of which is the total value of ABC shares or assets, as the case may be. In the event of an exchange by the maker of shares of ABC for shares in another corporation, Morad Zarabi, designated arbitrator under the Agreement For Sale Of Stock between maker and beneficiary herein, shall determine, in his sole discretion, whether some or all of the newly acquired shares shall be transferred to beneficiary herein in payment of a portion of the promissory note; or whether said newly acquired shares shall instead be substituted for ABC shares under the Pledge Agreement executed between the maker, beneficiary and Morad Zarabi."

    d. There shall be added the following additional paragraph to the Promissory Note:

"Notwithstanding any other provision of this Promissory Note, any controversy between the parties concerning or arising from the Promissory Note shall be submitted to Morad Zarabi who shall serve as sole arbitrator with respect to said disputes. The decision of Morad shall be final and binding upon both parties. In the event Morad is unavailable to so act, then Kambiz Zarabi shall serve as arbitrator. Any arbitrator may appoint another person or entity to arbitrate, either currently or prospectively, in the event that both named arbitrators herein are unable to so act."

3. Pledge Agreement.

    a. There shall be added an additional section 14, as follows:

"14) <u>ARBITRATION:</u> Any controversy between the parties concerning or

2

EXHIBIT _17_ PAGE 345

arising from this Pledge Agreement shall be submitted to Morad Zarabi who shall serve as sole arbitrator with respect to said disputes. The decision of Morad shall be final and binding upon all parties. In the event Morad is unavailable to so act, then Kambiz Zarabi shall serve as arbitrator. Any arbitrator may appoint another person or entity to arbitrate, either currently or prospectively, in the event that both named arbitrators herein are unable to so act."

     4.  Consulting Agreement.

        a.  There shall be added an additional section 14, as follows:
"14.  <u>INDEMNIFICATION</u>
        To the maximum extent provided by law, COMPANY shall indemnify and hold CONSULTANT harmless from and against any claim, suit, liability, cause of action or damages arising from or related to CONSULTANT's services under the terms of this agreement or the past services of CONSULTANT as an employee of COMPANY.  The provisions of this paragraph shall survive any termination of this Agreement."

     In Witness Whereof, the parties execute this Amendment To Agreements on the 31 day of December, 2000.


_____
Farhad Larian

_____
Isaac Larian


ABC International Traders Inc.

By: _____
     Isaac Larian, President

_____
Morad Zarabi


3

EXHIBIT 17 PAGE 346

ORIGINAL CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, state bar number, and address):* | FOR COURT USE ONLY |
|---|---|

Don Howarth (SB# 53783), Brian D. Bubb, Esq. (SB# 137408)
800 Wilshire Boulevard, Suite 750, Los Angeles, California 90017
HOWARTH & SMITH
TELEPHONE NO: (213) 955-9400     FAX NO: (213) 622-0791
ATTORNEY FOR *(Name):* Plaintiff Farhad Larian

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles
STREET ADDRESS: 111 North Hill Street
MAILING ADDRESS:
CITY AND ZIP CODE: Los Angeles, California 90017
BRANCH NAME: Central District, Stanley Mosk Courthouse

CASE NAME:
FARHAD LARIAN v. ISAAC LARIAN, et al.

**FILED**
LOS ANGELES SUPERIOR COURT

AUG 2 5 2003

JOHN A. CLARKE, CLERK
BY C. L. COLEMAN, DEPUTY

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: BC 301371 |
|---|---|---|---|---|
| [✓] Unlimited (Amount demanded exceeds $25,000) | [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter   [ ] Joinder  Filed with first appearance by defendant (Cal. Rules of Court, rule 1811) | | JUDGE: |
| | | | | DEPT: |

*All five (5) items below must be completed (see instructions on page 2).*

**1. Check one box below for the case type that best describes this case:**

| Auto Tort | Contract | Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 1800–1812) |
|---|---|---|
| [ ] Auto (22) | [ ] Breach of contract/warranty (06) | [ ] Antitrust/Trade regulation (03) |
| [ ] Uninsured motorist (46) | [ ] Collections (09) | [ ] Construction defect (10) |
| **Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort** | [ ] Insurance coverage (18) | [ ] Mass tort (40) |
| [ ] Asbestos (04) | [✓] Other contract (37) | [ ] Securities litigation (28) |
| [ ] Product liability (24) | **Real Property** | [ ] Environmental/Toxic tort (30) |
| [ ] Medical malpractice (45) | [ ] Eminent domain/inverse condemnation (14) | [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41) |
| [ ] Other PI/PD/WD (23) | [ ] Wrongful eviction (33) | **Enforcement of Judgment** |
| **Non-PI/PD/WD (Other) Tort** | [ ] Other real property (26) | [ ] Enforcement of judgment (20) |
| [ ] Business tort/unfair business practice (07) | **Unlawful Detainer** | **Miscellaneous Civil Complaint** |
| [ ] Civil rights (08) | [ ] Commercial (31) | [ ] RICO (27) |
| [ ] Defamation (13) | [ ] Residential (32) | [ ] Other complaint *(not specified above)* (42) |
| [ ] Fraud (16) | [ ] Drugs (38) | **Miscellaneous Civil Petition** |
| [ ] Intellectual property (19) | **Judicial Review** | [ ] Partnership and corporate governance (21) |
| [ ] Professional negligence (25) | [ ] Asset forfeiture (05) | [ ] Other petition *(not specified above)* (43) |
| [ ] Other non-PI/PD/WD tort (35) | [ ] Petition re: arbitration award (11) | |
| **Employment** | [ ] Writ of mandate (02) | |
| [ ] Wrongful termination (36) | [ ] Other judicial review (39) | |
| [ ] Other employment (15) | | |

**2.** This case [ ] is [✓] is not complex under rule 1800 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
  a. [ ] Large number of separately represented parties       d. [ ] Large number of witnesses
  b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve       e. [ ] Coordination with related actions pending in one or more courts in other counties, states or countries, or in a federal court
  c. [ ] Substantial amount of documentary evidence       f. [ ] Substantial post-judgment judicial supervision

**3.** Type of remedies sought *(check all that apply):*
  a. [✓] monetary     b. [✓] nonmonetary; declaratory or injunctive relief     c. [✓] punitive

**4.** Number of causes of action *(specify):* 10

**5.** This case [ ] is [✓] is not a class action suit.

Date: August 25, 2003

Don Howarth, Esq.
(TYPE OR PRINT NAME)                         ▶ *Don Howarth*
                                        (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate, Family, or Welfare and Institutions Code). (Cal. Rules of Court, rule 201.8.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 1800 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use Judicial Council of California CM-010 [Rev. July 1, 2003] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 201.8, 1800–1812; Standards of Judicial Administration, § 19 www.courtinfo.ca.gov |
|---|---|---|

EXHIBIT 17 PAGE 347

# INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers**

If you are filing a first paper (for example, a complaint) in a civil case, you must complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must check all five items on the sheet. In item 1, you must check one box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the primary cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. You do not need to submit a cover sheet with amended papers. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 201.8(c) and 227 of the California Rules of Court.

**To Parties in Complex Cases**

In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 1800 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

## CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
  Medical Malpractice– Physicians & Surgeons
  Other Professional Health Care Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip and fall)
  Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  Intentional Infliction of Emotional Distress
  Negligent Infliction of Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
  Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/ Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
  Collection Case–Seller Plaintiff
  Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court Case Matter
  Writ–Other Limited Court Case Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rule 1800–1812)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Toxic Tort/Environmental (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of County)
  Confession of Judgment *(non-domestic relations)*
  Sister State Judgment
  Administrative Agency Award *(not unpaid taxes)*
  Petition/Certification of Entry of Judgment on Unpaid Tax
  Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non-harassment)*
  Mechanics Lien
  Other Commercial Complaint Case *(non-tort/non-complex)*
  Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief from Late Claim
  Other Civil Petition

EXHIBIT 47 PAGE 348

ORIGINAL

| SHORT TITLE | CASE NUMBER |
|---|---|
| FARHAD LARIAN v. ISAAC LARIAN, et al. | BC301371 |

### CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION
### (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

**This form is required in all new civil case filings in the Los Angeles Superior Court**

I. Check the types of hearing and fill in the estimated length of hearing expected for this case:

JURY TRIAL? ☒ YES   CLASS ACTION? ☐ YES   LIMITED CASE? ☐ YES   TIME ESTIMATED FOR TRIAL  10  ☐HOURS☒DAYS.

II. Select the correct district and courthouse location (4 steps – if you checked "Limited Case", skip to No. III, Pg. 4):

  **1** After first completing the Civil Case Cover Sheet Form, find the main civil case cover sheet heading for your case in the left margin below, and, to the right in Column **1**, the Civil Case Cover Sheet case type you selected.

  **2** Check **one** Superior Court type of action in Column **2** below which best describes the nature of this case.

  **3** In Column **3**, circle the reason for the court location choice that applies to the type of action you have checked.

  **Applicable Reasons for Choosing Courthouse Location (See Step 3 below)**

  1. Class Actions must be filed in the County Courthouse, Central District.
  2. May be filed in Central (Other county, or no Bodily Inj/Prop.Damage).
  3. Location where cause of action arose.
  4. Location where bodily injury, death or damage occurred.
  5. Location where performance required or defendant resides.
  6. Location of property or permanently garaged vehicle.
  7. Location where petitioner resides.
  8. Location wherein defendant/respondent functions wholly.
  9. Location where one or more of the parties reside.
  10. Location of Labor Commissioner Office.

  **4** Fill in the information requested on page 4 in item III; complete Item IV. Sign the certificate.

| | -1-<br>Civil Case Cover<br>Sheet Category No. | -2-<br>Type of Action<br>(Check only one) | -3-<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| **Auto Tort** | Auto (22) | ☐ A7100  Motor Vehicle - Personal Injury/Property Dam./Wrongful Death<br>Is this an uninsured motorist case? ☐Yes ☐No | 1., 2., 4. |
| **Other PI/PD/WD Tort** | Asbestos (04) | ☐ A6070  Asbestos Property Damage<br>☐ A7221  Asbestosis - Personal Injury/Wrongful Death | 2.<br>2. |
| | Product Liability (24) | ☐ A7260  Product Liability (not asbestos or toxic/environmental) | 1., 2., 3., 4., 8. |
| | Medical Malpractice (45) | ☐ A7210  Medical Malpractice - Physicians & Surgeons<br>☐ A7240  Other Professional Health Care Malpractice | 1., 2., 4.<br>1., 2., 4. |
| | Other PI/PD/WD (23) | ☐ A7250  Premises Liability (e.g., slip and fall)<br>☐ A7230  Intentional Bodily Injury/PD/WD (e.g., assault, vandalism, etc.)<br>☐ A7270  Intentional Infliction of Emotional Distress<br>☐ A7271  Negligent Infliction of Emotional Distress<br>☐ A7220  Other Personal Injury/Property Dam./Wrongful Death | 1., 2., 4.<br>1., 2., 4.<br>1., 2., 3.<br>1., 2., 3.<br>1., 2., 4. |
| **Non-PI/PD/WD Tort** | Business Tort (07) | ☐ A6029  Other Commercial/Business Tort (not fraud/breach of contract) | 1., 2., 3. |
| | Civil Rights (08) | ☐ A6005  Civil Rights/Discrimination | 1., 2., 3. |
| | Defamation (13) | ☐ A6010  Defamation (slander/libel) | 1., 2., 3. |
| | Fraud (16) | ☐ A6013  Fraud (no contract) | 1., 2., 3. |
| | Intellectual Property (19) | ☐ A6016  Intellectual Property | 2., 3. |

**CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION**        LASC Rule 2.0

CIV 109 04-02  *Marks Dean's Essential Forms*™                                    Page 1 of 4

EXHIBIT 17 PAGE 349

| SHORT TITLE: FARHAD LARIAN v. ISAAC LARIAN, et al. | CASE NUMBER |
| --- | --- |

| | -1-<br>Civil Case Cover Sheet Category No. | -2-<br>Type of Action<br>(Check only one) | -3-<br>Applicable Reasons -<br>See Step 3 Above |
| --- | --- | --- | --- |
| **Non-PI/PD/WD Tort** | Prof. Negligence (25) | ☐ A6017  Legal Malpractice<br>☐ A6050  Other Professional Malpractice (not medical or legal) | 1., 2., 3.<br>1., 2., 3. |
| **Employment** | Wrongful Termination (36) | ☐ A6037  Wrongful Termination | 1., 2., 3. |
| | Other Employment (15) | ☐ A6024  Other Employment Complaint Case<br>☐ A6109  Labor Commissioner Appeals | 1., 2., 3.<br>10. |
| **Contract** | Breach of Contract/ Warranty (06)<br>(not insurance) | ☐ A6004  Breach of Rental/Lease Contract (not UD or wrongful eviction)<br>☐ A6008  Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence)<br>☐ A6019  Negligent Breach of Contract/Warranty (no fraud)<br>☐ A6028  Other Breach of Contract/Warranty (not fraud or negligence) | 2., 5.<br>2., 5.<br>1., 2., 5.<br>1., 2., 5. |
| | Collections (09) | ☐ A6002  Collections Case-Seller Plaintiff<br>☐ A6012  Other Promissory Note/Collections Case | 2., 5., 6.<br>2., 5. |
| | Insurance Coverage (18) | ☐ A6015  Insurance Coverage (not complex) | 1., 2., 5., 6. |
| | Other Contract (37) | ☒ A6009  Contractual Fraud<br>☐ A6031  Tortious Interference<br>☐ A6027  Other Contract Dispute(not breach/insurance/fraud/negligence) | 1., 2., 3., 5.<br>1., 2., 3., 5.<br>1., 2., 3., 8. |
| **Real Property** | Emnt Dom/Inv. Cond. (14) | ☐ A7300  Eminent Domain/Condemnation Number of parcels_____ | 2. |
| | Wrongful Eviction (33) | ☐ A6023  Wrongful Eviction Case | 2., 6. |
| | Other Real Property (26) | ☐ A6018  Mortgage Foreclosure<br>☐ A6032  Quiet Title<br>☐ A6060  Other Real Property(not em. domain, landlord/tenant, foreclosure) | 2., 6.<br>2., 6.<br>2., 6. |
| **Unlawful Detainer** | Unlawful Detainer-Commercial (31) | ☐ A6021  Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer-Residential (32) | ☐ A6020  Unlawful Detainer-Residential (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer-Drugs (38) | ☐ A6022  Unlawful Detainer-Drugs | 2., 6. |
| **Judicial Review** | Asset Forfeiture (05) | ☐ A6108  Asset Forfeiture Case | 2., 6. |
| | Petition re Arbitration Award (11) | ☐ A6115  Petition to Compel/Confirm Arbitration | 2., 5. |

**CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION**   LASC Rule 2.0

EXHIBIT 17 PAGE 350

| SHORT TITLE. FARHAD LARIAN v. ISAAC LARIAN, et al. | | CASE NUMBER |
|---|---|---|

| | -1-<br>Civil Case Cover Sheet Category No. | -2-<br>Type of Action (Check only one) | -3-<br>Applicable Reasons - See Step 3 Above |
|---|---|---|---|
| **Judicial Review (Cont'd.)** | Writ of Mandate (02) | ☐ A6151  Writ - Administrative Mandamus | 2., 8. |
| | | ☐ A6152  Writ - Mandamus on Limited Court Case Matter | 2. |
| | | ☐ A6153  Writ - Other Limited Court Case Review | 2. |
| | Oth. Jud. Review (39) | ☐ A6150  Other Writ /Judicial Review | 2., 8. |
| **Provisionally Complex Litig.** | Antitrust/Trade Reg. (03) | ☐ A6003  Antitrust/Trade Regulation | 1., 2., 8. |
| | Construction Defect (10) | ☐ A6007  Construction defect | 1., 2., 3. |
| | Claims involving Mass Tort (40) | ☐ A6006  Claims Involving Mass Tort | 1., 2., 8. |
| | Securities Litig. (28) | ☐ A6035  Securities Litigation Case | 1., 2., 8. |
| | Tox. Tort/Environm (30) | ☐ A6036  Toxic Tort/Environmental | 1., 2., 3., 8. |
| | Ins Covrage Clms from Complex Case (41) | ☐ A6014  Insurance Coverage/Subrogation (complex case only) | 1., 2., 5., 8. |
| **Enforcement of Judgment** | Enforcement of Judgment (20) | ☐ A6141  Sister State Judgment | 2., 9. |
| | | ☐ A6160  Abstract of Judgment | 2., 6. |
| | | ☐ A6107  Confession of Judgment (non-domestic relations) | 2., 9. |
| | | ☐ A6140  Administrative Agency Award (not unpaid taxes) | 2., 8. |
| | | ☐ A6114  Petition/Certificate for Entry of Judgment on Unpaid Tax | 2., 8. |
| | | ☐ A6112  Other Enforcement of Judgment Case | 2., 8., 9. |
| **Misc. Civ. Cmplts** | RICO (27) | ☐ A6033  Racketeering (RICO) Case | 1., 2., 8. |
| | Other Complaints (Not Specified Above) (42) | ☐ A6030  Declaratory Relief Only | 1., 2., 8. |
| | | ☐ A6040  Injunctive Relief Only (not domestic/harassment) | 2., 8. |
| | | ☐ A6011  Other Commercial Complaint Case (non-tort/non-complex) | 1., 2., 8. |
| | | ☐ A6000  Other Civil Complaint (non-tort/non-complex) | 1., 2., 8. |
| **Misc. Civil Petitions** | Partnership/Corp. Governance(21) | ☐ A6113  Partnership and Corporate Governance Case | 2., 8. |
| | Other Petitions (Not Specified Above) (43) | ☐ A6121  Civil Harassment | 2., 3., 9. |
| | | ☐ A6123  Workplace Harassment | 2., 3., 9 |
| | | ☐ A6124  Elder/Dependent Adult Abuse Case | 2., 3., 9 |
| | | ☐ A6190  Election Contest | 2. |
| | | ☐ A6110  Petition for Change of Name | 2., 7. |
| | | ☐ A6170  Petition for Relief from Late Claim Law | 2., 3., 4., 8. |
| | | ☐ A6100  Other Civil Petition | 2., 9. |

**CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION**   LASC Rule 2.0

CIV 109 04-02  *Marsh Deen's Essential Forms™*                    Page 3 of 4

EXHIBIT 17 PAGE 351

| SHORT TITLE:   FARHAD LARIAN v. ISAAC LARIAN, et al. | CASE NUMBER |
|---|---|

-4-

III. Statement of Location: Enter the address of the accident, party residence or place of business, performance, or other circumstance indicated in No. II., Item 3 on Page 1 as the proper reason for filing in the court location you selected.

| REASON: CHECK THE NUMBER UNDER ITEM 3 WHICH APPLIES IN THIS CASE | ADDRESS: |
|---|---|
| ☐1. ☒2. ☐3. ☐4. ☐5. ☐6. ☐7. ☐8. ☐9. ☐10. | |

| CITY: | STATE: CA | ZIP CODE: | NO BODILY INJURY/PROPERTY DAMAGE |
|---|---|---|---|

IV. Certificate/Declaration of Assignment: The undersigned hereby certifies and declares that the above entitled matter is properly filed for assignment to the _Stanley Mosk_ courthouse in the __Central__ District of the Los Angeles Superior Court under Section 392 et seq., Code of Civil Procedure and Rule 2(b), (c) and (d) of this court for the reason checked above. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and this declaration was executed on _AUGUST 25, 2003_ at _Los Angeles_ California.

(date)                (city)

(SIGNATURE OF ATTORNEY/FILING PARTY)

## New Civil Case Filing Instructions

This addendum form is required so that the court can assign your case to the correct courthouse location in the proper district for filing and hearing. It satisfies the requirement for a certificate as to reasons for authorizing filing in the courthouse location, as set forth in Los Angeles Superior Court Local Rule 2.0. It must be completed and submitted to the court along with the Civil Case Cover Sheet and the original Complaint or Petition in ALL civil cases filed in any district (including the Central District) of the Los Angeles County Superior Court. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

**PLEASE HAVE THE FOLLOWING DOCUMENTS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.

2. If filing a Complaint, a completed Summons form for issuance by the Clerk (Summons forms available at the Forms Counter.).

3. Civil Case Cover Sheet form required by California Rule of Court 982.2(b)(1), completely filled out (Cover Sheet forms available at the Forms Counter).

4. This "Addendum to Civil Case Cover Sheet" form [Superior Court Form Number 982.2(b)(1)A, revised 7/99], completely filled out (Item II. does not apply in limited civil cases) and submitted with the Civil Case Cover Sheet.*

5. Payment in full of the filing fee (unless filing on behalf of state or local government or no fee is due for the type of case being filed) or an Order of the Court waiving payment of filing fees in forma pauperis (fee waiver application forms available at the Filing Window).

6. In case of a plaintiff or petitioner who is a minor under 18 years of age, an Order of the Court appointing an adult as a guardian ad litem to act on behalf of the minor (Guardian ad Litem Application and Order forms available at the Forms Counter).

7. Additional copies of documents presented for endorsement by the Clerk and return to you.

* With the exception of unlimited civil cases concerning property damage, bodily injury or wrongful death occurring in this County, Labor Commissioner Appeals, and those types of actions required to be filed in the Central District by Local Court Rule 2(b), all unlimited jurisdiction civil actions may be optionally filed either in the Central District or in whichever other court location the rule would allow them to be filed. When a party elects to file an unlimited jurisdiction civil action in Central District that would also be eligible for filing in one or more of the other court locations, this form must still be submitted with location and assignment information completed.

**CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION**    LASC Rule 2.0
Page 4 of 4

CIV 109 04-02   *Martin Dean's Essential Forms™*

EXHIBIT *17* PAGE 352