# EXHIBIT 31

Priority
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

FILED - EASTERN DIVISION
CLERK, U.S. DISTRICT COURT

**AUG 1 0 2006**

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARTER BRYANT,<br><br>                    Plaintiff,<br><br>v.<br><br>MATTEL, INC.,<br><br>                    Defendant,<br><br>and related actions. | CASE NO.  CV 04-9049 SGL (RNBx)<br><br>(Consolidated with cases CV-04-9059 and CV-05-2727)<br><br>ORDER DENYING MOTION FOR APPOINTMENT OF EXPERT WITNESSES |

Presently before the Court is Mattel, Inc.'s ("Mattel") motion for the appointment of expert witnesses pursuant to Federal Rule of Evidence 706, Carter Bryant and MGA Entertainment, Inc.'s ("MGA") opposition and response thereto, and Mattel's reply.  For the reasons set forth below, the Court **DENIES** the motion for the appointment of expert witnesses.

Federal Rule of Evidence 706(a) provides

> The court may . . . on the motion of any party enter an order to show cause why expert witnesses should not be appointed, and may request the parties to submit nominations.  The court may appoint any expert witnesses agreed upon by the parties, and may appoint expert witness of its own selection.  An expert witness shall not be appointed by the court unless the witness consents to act.

DOCKETED ON CM

**AUG 1 1 2006**

BY                    044

EXHIBIT _31_  PAGE _195_

(73)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

A witness so appointed shall be informed of the witness'
duties by the court in writing, a copy of which shall be filed
with the clerk, or at a conference in which the parties shall
have opportunity to participate.

The appointment of an expert by a federal court is a rare occurrence. Much of this stems from a concept "[d]eeply ingrained" in the common law "that it is the responsibility of the parties to produce the evidence while the court looks on to assure that the rules are followed." 4 JOSEPH M. MCLAUGHLIN, WEINSTEIN'S FEDERAL EVIDENCE § 706.02[1], at 706-6 (2nd ed. 2006). The reluctance of courts to intrude into the evidence-gathering function normally assigned to counsel is borne out of "the fear of ex parte communications between the court and its expert," as well as the unseemliness of "[c]ollecting a share of the expense [for the work performed by the court appointed expert] from a party who has been damaged by the expert's report." Id. at 706-6, 706-7. As a result of these institutional concerns, "experts are usually appointed only in exceptional cases that present unwieldy, complex, or technical issues" or where "there is a need for an impartial, independent assessment of a disputed issue." Id. § 706.02[3], at 706-8 706-9.

Here, Mattel seeks for the court to appoint experts in the fields of questioned document examination, ink chemistry analysis, and paper chemistry analysis in order to "analyze and date (1) the originals of 'BRATZ' design drawings, (2) the faxed-version of the BRATZ-related contract between . . . Carter Bryant and MGA Entertainment, Inc., (3) MGA's internal documents relating to work performed by Anna Rhee on Bryant-related projects in the year 2000, and (4) a facsimile of BRATZ drawings bearing a fax header date of April 10, 2000," as well as "(5) any other documents that cannot be sampled or tested without destroying the sample tested or analyzed." (Mattel's Mot. Appt. Expert, Preface at 2). The reason proffered for such an appointment is two-fold: First, a generalized concern that, because the documents sought to be examined are "highly relevant" to the litigation, having a neutral expert perform the testing on the same may obviate a battle of the experts that would make

EXHIBIT 31 PAGE 196

1   the jury's function of sorting out the truth much more arduous; and second, concerns,

2   deduced during discovery, about the possible spoliation of key documents in the case

3   by MGA/Bryant and their counsel.

4   A.      AVERTING A BATTLE OF THE EXPERTS

5          Mattel's argument that the Court should appoint an expert because otherwise

6   each side will perform "separate, partisan destructive analyses of separate samples of

7   the documents" with "wide divergence" of opinion "virtually assured" is not well-

8   founded. (Mattel's Mot. Appt. Expert at 18, 20). Explicit in Mattel's argument is that

9   this feared divergence in each side's retained expert's opinions has yet to materialize.

10  This is not surprising as it appears that discovery in this case is in its nascent stage,

11  owed largely to the fact that the Court had earlier stayed the case while Mattel

12  appealed the denial of its motion to remand the case to state court. Mattel's argument

13  instead is that the Court should appoint an expert now to avoid the possibility that

14  there may be such wide divergence in each side's privately retained expert in the

15  future. Needless to say from the jabs each party took at the credibility and even

16  trustworthiness of the other side's retained expert during the oral argument on this

17  motion (one going so far as to label the competing ink chemistry experts as being the

18  modern day equivalent of one's Hatfield to the other's McCoy), such a possibility may

19  be more easier to imagine occurring here than in ordinary cases. Nevertheless, such

20  divergence, even if likely, is still that – a possibility, not an inevitability.

21          In those cases where an expert has been appointed by a court on account of

22  the excessive partisanship in the expert opinions retained by counsel, the rationale for

23  the appointment was based on the fact that the feared wide divergence in opinion had

24  already materialized. See Students of California Sch. for the Blind v. Honig, 736 F.2d

25  538, 548 (9th Cir. 1984)("the judge could not decide the merits of the students' seismic

26  safety claims on the basis of evidence presented at trial, so he reopened the case and

27  appointed a neutral expert to evaluate the adequacy of seismic testing at the Fremont

28  site"), vacated on other grounds, 471 U.S. 148 (1985); Eastern Air Lines, Inc. v.

3

EXHIBIT 31  PAGE 197

1   McDonnell Douglas Corp., 532 F.2d 957 (5th Cir. 1976); 4 WEINSTEIN § 706App.100 at

2   706App.-5 (noting that legal commentators' "imprecations against the parties' 'battle of

3   experts'", not the potential for such a battle, "led to the drafting of the Uniform Expert

4   Testimony Act in 1937," the precursor to Federal Rule of Evidence 706).

5          In no instance uncovered by the Court's research (or by Mattel's citation to

6   authority) has a court appointed an expert because of a fear, even one that is well-

7   founded, that such wide divergence in privately-retained expert testimony <u>may</u>

8   materialize in the future.  Were the Court to adopt Mattel's analysis, appointment of

9   experts by courts would expand exponentially, limited only by a court's assessment of

10  how partisan the experts in a given case may become in the future.  Such a

11  proliferation has not occurred precisely because courts generally require that the

12  divergent "horse" be placed before the expert witness "cart."  <u>See</u> FED. R. EVID. 706

13  advisory committee's note ("actual appointment is a relatively infrequent occurrence").

14  Unless and until this feared divergence in opinion becomes reality, the Court finds that

15  the potential (which itself cannot be quantified at this point) for its occurrence does not

16  warrant the Court's intrusion into the adversarial process through the appointment of

17  an expert at this stage.

18  B.    <u>SPOILATION OF EVIDENCE</u>

19         The question is much closer with respect to Mattel's other reason for the Court

20  to appoint an expert in this case:  Concern that opposing counsel or their clients may

21  have destroyed or altered key documents in the case.  Mattel's basis for such concern

22  is predicated on three facts uncovered during discovery.

23         1.    <u>Evidence of spoilation</u>

24         Before being deposed Bryant was asked to bring all his original BRATZ design

25  drawings.  When he arrived at his deposition, however, Bryant only had in his

26  possession a few of the originals. (Decl. Michael T. Zeller ¶ 13).  Among these some

27  "contained holes where plugs apparently had already been removed.  Bryant

28  acknowledged . . . that his drawings had no holes in them when he gave them to his

1    lawyers." (Mattel's Mot. Appt. Expert at 2; see also Decl. Michael T. Zeller ¶ 14).

2    Specifically, at Bryant's deposition the following exchange took place between Bryant

3    and counsel for Mattel:

4          Q.    (By Mr. Quinn) I wanted to ask you about one of
                 these original drawings that were produced today.
5
                 – what we're talking about here.  This is – the Post-it
6                says that's Bryant – that's the original of Bryant
                 192, Bates number 192, which has the heads on it,
7                and this is one of the originals that your counsel was
                 kind enough to have shipped here today for us to
8                look at.

9          A.    Yes

10         Q.    And we were just looking at these this afternoon and
                 we notice[d] that there's a bunch of holes on the
11               page, including in the signature, as if somebody
                 were taking ink samples.
12
           A.    Uh-huh.
13
           Q.    Do you see that?
14
           A.    Yes.
15
           Q.    Do you know anything about why those holes were
16               made or how or when?

17         A.    I have no idea what those are.

18         Q.    I mean, when you had – when you had possession
                 of this document did it have those holes in it?
19
           A.    Not that I remember.
20
           Q.    You certainly never had anything to do with that?
21
           A.    No.  I don't know anything about those holes.
22
           Q.    And, similarly, if you wouldn't mind holding this up to
23               the camera, this is the original of Bryant 210 and it's
                 also – if you take a look at it, I think you'll see it has
24               some of those holes in it, although not as many as
                 the last one we looked at.  Again, you don't know
25               anything about how or why those holes got put on
                 there?
26
           A.    I don't.
27

28   (Decl. Michael T. Zeller, Ex. 7 at 161-163).

                                                    5
EXHIBIT 31  PAGE 199

1       Mattel has submitted the declaration of a questioned document analysis expert,

2  Lloyd Cunningham, who has opined that the holes described in the document

3  mentioned above are consistent with those that would be generated by taking

4  microplug samples to perform analysis of the ink found on a document. (Decl. Lloyd

5  Cunningham ¶ 5). Bryant and MGA eventually conceded (although at first refusing to

6  do so under the veil of work-product privilege) that they tested some of the original

7  BRATZ drawings by an expert they retained in the field of forensic chemistry, Erich J.

8  Speckin. (Response to Order to Show Cause ("Response") at 1-2).

9       Mr. Speckin states that in June, 2004, he performed a series of tests "on

10  various 'Bratz' documents" at the request of MGA's counsel.[1] (Decl. Erich J. Speckin

11  ¶ 8). Those tests included examining the documents in question under an infrared

12  light as well as performing sidelight testing, which involves "visually inspecting a

13  document by holding a side light up to the document at an oblique angel . . . to

14  determine preliminarily whether the document contains impressions, or markings

15  impressed upon the document by drawing and writing done on a sheet of paper laid

16  on top of the document being tested." (Decl. Erich J. Speckin ¶¶ 9, 10). Mr. Speckin

17  also performed an electrostatic detection apparatus to see if there was indented

18  impressions on the documents. (Decl. Erich J. Speckin ¶ 11). Finally, Mr. Speckin

19  "performed ink identifications tests" on the documents. (Decl. Erich Speckin ¶¶ 12-

20  13). Such testing involved Mr. Speckin removing "very small microplug samples from

21  the document at issue and testing the microplug." (Decl. Erich Speckin ¶13).

22  Nowhere is it averred by MGA, Bryant, or Mr. Speckin which or how many of the

23  original BRATZ drawings were subjected to this microplug sampling procedure, nor is

24  it averred from what parts of the documents that were tested was the microplug taken.

25  Instead, Mr. Speckin simply notes that in taking the microplugs he "le[ft] more than

26

27       [1] At the time the testing was done by Mr. Speckin, Bryant had already been

28  sued by Mattel for violating the terms of the invention agreement he signed when he
worked for them from 1999 to 2000. (Response at 1).

EXHIBIT *31* PAGE *200*

1  sufficient material for another expert to test the exact same <u>documents</u>," but admits

2  that "another expert cannot test the very same microplug that I tested . . . ." (Decl.

3  Erich J. Specklin ¶14).

4          Another episode brought to light during discovery causing Mattel concern

5  relates to MGA's handling of the original Bryant/MGA contract before the inception of

6  the instant litigation.  At the deposition of a former MGA executive, Victoria O'Connor,

7  testimony was elicited that O'Connor, "on explicit instructions of MGA's [CEO] Isaac

8  Lariam, . . . [made] redact[ions from] the fax header . . . on the BRATZ contract

9  between Bryant and MGA for the year 2000 to conceal the fact that Bryant sent the

10  contract from Mattel's Design Center while he was still employed at Mattel." (Mattel's

11  Mot. Appt. Expert at 3).  O'Connor's deposition appears to indicate that such alteration

12  occurred before the present litigation began (indeed, perhaps even before MGA

13  marketed the BRATZ doll).

14  Q.    . . . Was there ever anything that you were asked to
        do that you – made you feel kind of uncomfortable?

15

16  A.    Yes.
                                        . . . .

17  Q.    And what was that?

18  A.    When the original contract was executed by Carter
        Bryant, it was sent to me <u>via</u> fax, and on the top of

19        the fax listed the phone number from where it was
        faxed, which said "Barbie Collectibles," and at one

20        point my boss, Isaac Larian, asked me to white that
        out and send it to a lawyer, Patty Glaser.

21

22  (Decl. Michael T. Zeller, Ex. 19 at 306).  Upon further examination, however,

23  O'Connor stated that she did not participate in or have knowledge of any other

24  instances in which any other agreement between Bryant and MGA was directed to be

25  altered:

26  Q.    Were you ever asked to change the date on any
        agreements between Mr. Bryant and MGA?

27

28  A.    No.

[7]EXHIBIT 31  PAGE 201

1      Q.    Are you aware of anybody being asked to change
                 the date on any of those agreements?

2

3      A.    No.

       Q.    I mean, do you have any reason to believe that any
4                agreement that was entered into between Mr. Bryant
                 and MGA had a date altered or changed?

5

6      A.    No.

       Q.    You never heard that from – from any source?
7
       A.    No.
8

9  (Decl. Paula E. Ambrosini, Ex. 3).

10       Finally, Mattel speculates that a drawing of some BRATZ doll accessories

11 faxed on April 10, 2000, had the fax header altered, much in the same manner

12 described in O'Connor's testimony vis-à-vis the MGA/Bryant faxed contract, as the

13 fields on the fax header for the sender's name and the sender's telephone number are

14 missing. (Decl. Michael T. Zeller ¶ 23 & Ex. 24).[2] As explained by Mattel, "Because

15

16       [2] Mattel speculates that the time sheets produced by MGA for one of its

17 employees, Anna Rhee (who did doll face painting work for the BRATZ mock-up), from
   "mid-to-late 2000" were altered or recently created by MGA to show that Rhee worked

18 on projects called "Angel" or "Prayer Angel," when in fact she was working at the time
   painting faces for BRATZ dolls at the direction of Bryant. (Mattel's Mot. Appt. Expert at

19 3). The basis for this speculation is based on the fact that the initial disclosure by MGA
   of Rhee's time sheets comprised only 8 pages. (Decl. Michael T. Zeller ¶ 20). Then,

20 on January 7, 2005, Rhee produced 20 separate invoices of her work at MGA during
   mid-to-late 2000, indicating that Rhee performed work for MGA prior to Bryant's

21 departure from Mattel, most notably on June 12, 2000. (Decl. Michael T. Zeller ¶ 21).

22 Within a couple of weeks after Rhee's production of invoices to Mattel, MGA
   supplemented its earlier production of Rhee's time sheets showing that during the mid-

23 to-late 2000 period Rhee was working on a MGA project known as "Angel" or "Prayer
   Angels" and was not involved in any BRATZ-related work until after Bryant's departure

24 from Mattel. (Decl. Michael T. Zeller ¶ 22). Mattel's surmise that the supplemental time
   sheets were altered is allegedly bolstered by the fact that Rhee testified during her

25 deposition that the only work she performed in mid-to-late 2000 was on BRATZ and

26 that the supplemental time sheets reference to the "Angel" and "Prayer Angel" was
   nothing but a cover or code word for BRATZ-related work. This argument is hard to

27 accept. First, even the invoices Rhee turned over to Mattel contain the phrase "Angel"
   for the mid-2000 project she worked on. (Decl. Michael T. Zeller, Ex. 22 at 356-60,

28 362). It is not until December, 2000, that any of the invoices submitted by Rhee show

EXHIBIT 31 PAGE 202

1   facsimile machines normally insert senders' names and numbers as a matter of

2   course, and indeed is required by law [to do so], it appears likely that the document

3   was altered to conceal the sender's information.  See 47 U.S.C. § 227(d)(1)(B)."

4   (Mattel's Mot. Appt. Expert at 10).  The premise underlying Mattel's concern on this

5   topic is not unreasonable.  The law requires such information to be found on any

6   document, like the one in question, that has been faxed.  Additionally, the testimony

7   elicited from Ms. O'Connor that MGA altered the fax header for other documents

8   related to BRATZ from the same time period leads to an obvious inference that other

9   documents where spaces on other fax headers are absent suffered a similar fate.

10       2.    Analysis

11           a.    Microplug Ink Testing

12           Bryant and MGA begin by downplaying the significance of the spoliation issue

13   in this case.  With respect to the holes on some of the original BRATZ design

14   drawings produced at Bryant's deposition, they note that, even with these holes,

15   nothing prevents Mattel from performing its own testing on the remaining portions of

16   the drawings on the document.  "Indeed, the very fact that Mattel is asking for court-

17   appointed experts to perform ink and paper testing only underscores the fact that

18   nothing has been 'destroyed.'" (Joint Opp. at 2).  Mr. Speckin makes similar assertions

19   in his declaration, stating that the fact that the same microplug cannot be tested "is

20   entirely irrelevant because there is more than enough ink on each of the documents I

21   tested to allow numerous microplug samples to be extracted and tested by different

22   experts." (Decl. Erich J. Speckin ¶ 14 (emphasis added); see also Response at 5-6

23   ("While another expert cannot test the very same microplug that Mr. Speckin tested,

24

25  _____

26  her doing work on the BRATZ doll, well after Bryant had left Mattel.  (Decl. Michael T.
    Zeller, Ex. 21 at 367, 370, 373).  To accept Mattel's argument, not only would MGA
27  have had to alter the invoices it produced in the supplemental production, but the
    documents produced by Rhee would also have to be similarly altered.  An alternative
28  and just as plausible explanation is that Rhee is simply mistaken as to when she began
    performing work on the BRATZ project.

9

EXHIBIT 31   PAGE 203

1  that fact is entirely irrelevant because, unlike in a situation where the entire object is

2  destroyed during the testing, there is more than enough ink on each of the <u>documents</u>

3  Mr. Speckin tested to allow numerous microplug samples to be extracted and tested"

4  (emphasis added))).  This argument is not persuasive.  This is not a case where

5  everyone concedes that the documents in question were created at one point in time,

6  but dispute what that date may have been.  In such a circumstance all the ink

7  markings on the documents are comparable to one another as it is conceded that all

8  the marks came from one point in time.

9          Here, however, it is Mattel's theory that Bryant made drawings in 1998 and then

10  periodically touched up or made refinements/additions to those drawings, adding more

11  marks in 1999 and 2000 during the time he was employed by Mattel.   An ink mark

12  from one part of the document is not necessarily comparable to another set of ink

13  markings found elsewhere on the document.  One ink mark on a drawing could have

14  been made in 1998, for example, while another ink mark found on the same drawing

15  could have been put there sometime later.  In taking microplug samples from one of

16  these ink markings without the ability of the other side to test <u>the same mark</u> would

17  forever foreclose a potential avenue of crucial evidence in this case.  It is on that point

18  that taking microplug samples of the marks on these drawings is akin to the spoilation.

19  Therefore the fact that another expert could test other parts of the document does not

20  mean that key relevant evidence found on that document has not been destroyed.  As

21  MGA and Bryant make clear spoilation of evidence occurs through the "destruction or

22  significant alteration of evidence, or the failure to preserve property for another's use

23  as evidence in pending or reasonably foreseeable litigation." <u>West v. Goodyear Tire &</u>

24  <u>Rubber Co.</u>, 167 F.3d 776, 779 (2nd Cir. 1999).[3]

25          At this point, it should not be lost that the documents in question are not

26

27      [3] The Court does not mean to suggest that Mattel's theory is correct.  Instead,
   the Court simply notes this theory as refuting MGA and Bryant's argument that only the
28  <u>complete</u> destruction of a document would amount to spoilation under the particular
   circumstances in this case.

10

EXHIBIT 31 PAGE 204

1    peripheral to the case. At its heart, this case asks the question: Who owns the rights

2    to the Bratz dolls? Bryant asserts that he came up with the idea for the Bratz dolls

3    while on a break from his employment at Mattel in 1998, and that he sold his idea to

4    MGA when he went to work for them in October, 2000. Mattel claims, among other

5    things, that Bryant "developed" or "continued to develop" his idea for Bratz dolls while

6    he was working for them from January, 1999, to October, 2000, and that pursuant to

7    an inventions agreement he signed with the Mattel when he went to work for them,

8    that idea now belongs to Mattel. As this clash of factual contentions makes clear, the

9    dating of the original BRATZ drawings and the markings contained thereon is a

10   fundamental, perhaps despositive, issue to this case. That there are serious

11   questions concerning the handling of these critical documents certainly causes the

12   Court much concern about whether the truth seeking functions of the adversarial

13   system have been fundamentally compromised in this case. As Mattel rightly notes,

14   "The adversarial process is not an end in itself; its value is in its ability to promote a

15   search for truth." (Mattel's Reply at 9).

16          Bryant and MGA concede that the sections that were holed out contained

17   markings, be they handwritten dates or other words or letters, that may be crucial to

18   the case. Indeed, one of the drawings – Bryant 192 – had a portion of the signature

19   line sampled. What is left unclear is whether, for those portions of the document

20   where ink or signatures were sampled, enough of the same part of the document in

21   question (meaning the same mark) remains to be sampled by Mattel. For instance, is

22   there enough of the signature line from Bryant 192 left to sample, or has too much of it

23   already been sampled? In that sense, MGA's and Bryant's argument that nothing has

24   been destroyed by the microplug testing procedure because other parts of the

25   document still exist is misplaced. Indeed, MGA and Bryant later admit that the

26   circumstances allowing for "multiple experts [to] remove multiple microplugs and test

27   the exact same paper and ink" is dependent upon there being the same exact paper

28   and ink there to test. (Joint Opp. at 15 ("[a]s long as there is paper and ink to test")).

11

EXHIBIT 31  PAGE 205

1   The continued existence of the "exact same pen stroke" is the very issue that is now

2   left open because of the holes in some of Bryant's original BRATZ design drawings.

3   Is there anything left of that exact same pen stroke that was sampled by Mr. Speckin

4   remaining on the original drawing for Mattel to test? None of these questions have

5   been addressed by MGA, Bryant, or Mr. Speckin in their papers. Instead, they simply

6   make the observation that there remain other ink markings on the same drawings for

7   Mattel to test, a reason which, as explained above, is wholly insufficient to assure the

8   Court that Mattel has not been prejudiced by MGA's actions.

9         Given the absence of any representation by them on this point, the Court

10  pressed MGA's counsel about the same at oral argument:

11              THE COURT:   And part of your argument is that
                while a small portion of the small portion of the page may
12              be gone, as you in your most recent papers concede is
                gone, there are other portions of the page that can be
13              tested. The concern I have, I guess – and maybe you can
                clear this up for me – I've seen some of the drawings and I
14              have a pretty good mental image of what the drawings look
                like. But there is also writing on these drawings,
15              signatures, copyright registration indications; some are
                large, some are small. As I gather from the plaintiff, from
16              Mattel, the concern is that these different drawings or
                writings were done at different times. And I guess I can
17              understand why when those drawings or writings were
                done could be significant from an evidentiary standpoint.
18              So the concern is not so much there's another part of the
                paper that can be tested; it's whether or not the particular
19              marking in question has been so damages as to not permit
                a full further testing on that particular marking. Does my
20              question make sense?

21              MS. CENDALI: Yes, it does, your Honor. And I
                anticipated that. Significant, we thought, in their papers
22              was that . . . they cited to the fact that Mr. Bryant admitted
                in his deposition that there were holes in some of the
23              documents that he didn't know how they got there
                originally. As an example, if you look at part of Zeller,
24              Exhibit 17, Bates number Bryant 201, that's an example of
                one of the documents that's been tested.

25              THE COURT: One second so I have that in front of
26              me. Okay.

27              MS. CENDALI: There are many many others that were
                submitted that were also submitted to this type of ink
28              testing, but this is just an example of one of them. And if

EXHIBIT _31_ PAGE _206_

1    you look at the document, you would never know —
     granted, this is smaller, so the actual drawing is even larger
2    than this, so there's even more ink on the larger drawing
     than there would be available on this reproduction size.
3

4           But if you look at it — and I'll represent to you that we
     didn't test the face; the face is absent before and after the
5    testing — but if you look at it, you couldn't even see that
     there were any pin pricks to it. If you look very, very
6    carefully at the signature at the bottom, you can maybe see
     where it says "Ramona Prints, 8-26-99"; that maybe there
7    was like a little tiny hole in one of the little slash marks; that
     was a teeny little pin prick hole that showed the testing .
8    There's ample amount of ink to do the testing on all of
     these documents. This is the normal course of procedure
9    that was done.

10          When asked by the Court whether it accepted MGA's representation that there

11   was "ample amount of ink" left on the same marks that the microplugs were taken

12   from for further microplug testing, Mattel, in seeming contradiction to its position in its

13   papers, said it did: "I agree with Ms. Cendali. We do not maintain any portion of the

14   ink on a signature or an image has been so obliterated that you couldn't take a plug

15   now on any of it; that's not our point." (Emphasis added).

16          In light of this concession by Mattel, the Court finds that no colorable claim of

17   spoilation has been established at this time vis-à-vis Mr. Speckin's testing of the

18   documents to warrant the appointment of an expert by the Court to investigate the

19   same. See Sedrati v. Allstate Life Ins. Co., 185 F.R.D. 388, 393 (M.D. Ga.

20   1998)(sanction warranted where because "defendant's expert has conducted

21   destructive tests on the original documents," plaintiff's expert "cannot duplicate the

22   conditions of the original documents"). If there was any evidence indicating that MGA,

23   Bryant, or their counsel had engaged in acts that could compromise Mattel's ability to

24   discover crucial information in this case, the Court would be sympathetic to the

25   appointment of an expert to investigate the same. Here, no such evidence exists.

26   The tests done by Mr. Speckin have not left the marks that were micro-sampled or the

27   documents that were handled so compromised that Mattel cannot perform the exact

28   same tests on those exact same marks as performed by Mr. Speckin.

13

EXHIBIT _31_ PAGE _207_

1        Indeed, the only basis for spoliation that Mattel has left to argue – that the

2    passage of time has left the ability to perform any meaningful ink testing at this time

3    problematic – is an argument that has nothing to do with MGA's conduct, but much

4    more with Mattel's own dereliction.  As the Court understands it, the process of dating

5    when ink was placed on a document has only a limited window of time in which it can

6    be accomplished because, eventually, the ink dries (be it in 2 years or 3 to 4 years),

7    leaving nothing capable of being sampled after that point to test (save to acknowledge

8    that the ink in question was put on the paper some time more than 3 to 4 years ago).

9    Mattel essentially argues that the impossibility of testing ink after a certain period

10   mandates that, if the other side is going to test ink while "fresh" ink remains on the

11   document, that party has an obligation to inform the other side so that they can do the

12   same before the ink "dries out"; failure to do so renders the test performed something

13   that cannot be replicated.[4]  By Mattel's own admission, they knew there had been

14   testing done on the BRATZ original drawings as far back as November, 2004, during

15   Bryant's deposition testimony when they saw some of the original BRATZ drawings

16   (drawings that had been tested by Mr. Speckin five months earlier).  Rather than

17   immediately seeking the production of those documents and having its own expert

18   perform similar tests on them, Mattel sat idly by, waiting until June of this year to do

19   anything, either by way of court-pleadings or formal requests made to MGA and

20   Braynt, related to having ink tests performed on the documents.  Nowhere has Mattel

21

22        [4] The basic factual assumption in Mattel's argument may indeed be faulty – that
23   when MGA tested the ink there was enough "fresh" ink to test.  Mr. Speckin states that
     "[I]nk takes approximately 3 to 4 years to dry on paper.  Thus, by testing the ink to
24   determine if it is dry, it can be determined whether the document was created within the
     last [3 to] 4 years, or whether the ink, and thus the drawing, is more than [3 to] 4 years
25   old." (Decl. Erich J. Speckin ¶ 13).  Given that Mr. Speckin performed his ink dating
     test in June, 2004, at best he could determine whether the ink had been put on the
26   paper on or after June, 2000.  Beyond that time frame his test could not tell when the
     now-dried ink was marked on the document.  Given that the relevant period in question
27   in this case is from August, 1998, to October, 2000, Mr. Speckin's test results would
     appear to be only marginally relevant in adducing proof as to when the BRATZ
28   drawings were made.

1   explained how MGA or Bryant had anything to do with it not having the ability to

2   perform such testing until now.  Mattel's allusion to the fact that a stay on discovery

3   was put in place by this Court in 2005 is misguided.  If Mattel thought that it was losing

4   valuable time on account of the stay, it could have at any time filed with this Court an

5   emergency request for relief from the stay to have such tests performed.  All it needed

6   to do was inform the Court that it had only a short period of time to perform the test on

7   account of the fact that ink dries; something which it never did in this case.

8        Mattel's citation to the case Edwardes v. Southampton Hospital Associates,

9   278 N.Y.S.2d 283 (1967) is equally unhelpful to their argument.  In that case, the court

10  was presented with an application to prevent the testing of a intramedullary pin for

11  discovery and testing.  Id. at 284.  The court held that, "[s]ince the pin is crucial to the

12  action it is not too difficult to appreciate that any change, however slight, assumes an

13  importance magnified proportionately. And undoubtedly tests which would destroy or

14  alter most or all of a particular article ought not be permitted in the first instance

15  without providing adequate safeguards to protect all concerned." Id. at 286.  Here,

16  such an argument cannot be made because, for the reasons cited above, Mattel has

17  conceded that even in performing the tests of the original BRATZ drawings Mr.

18  Speckin left enough ink of the same pen stroke for its own experts to test.  In short,

19  there has been no alteration, however slight, made to the documents insofar as

20  Mattel's ability to replicate the exact same test is concerned.  The only change that

21  has occurred is in Mattel's ability to retrieve any relevant information from such a test

22  on account of the passage of time that has elapsed.  The test Mr. Speckin performed

23  is not responsible for this negative occurrence.  MGA is similarly not responsible for

24  the passage of time or Mattel's inability to retrieve useful information from the testing

25  process.  On that point, Mattel should look itself in the mirror for any finding of fault or

26  blame.

27        Moreover, aside from the potential for "destroying" key portions of the original

28  documents, it is alleged that MGA and Bryant's actions carry other means of

EXHIBIT _31_ PAGE _209_

1   prejudicing Mattel's ability to pursue lines of potential evidence in this case. The

2   expert declaration submitted by Mattel notes another possible spoliation of the original

3   drawings even if there remained enough of the pertinent portion of the document in

4   question to sample: The sampling process itself may have contaminated the

5   document in question by obliterating potential crucial clues that were on the document

6   or otherwise the sampling process led to the introduction of foreign materials onto the

7   documents themselves which may complicate any future analysis. As explained by

8   Mattel's expert:

9           [P]erforming many such types of testing, even if described
            as "non-destructive," on a particular original document
10          carries the risk that potential evidence on it, including
            indentations in the paper fiber, might be contaminated or
11          destroyed in the process. Furthermore, the order of the
            types of testing to be performed on a given document
12          might have an impact on developing potential evidence
            during subsequent examinations. . . .
13
                    . . . . [With respect to the original BRATZ drawings
14          containing holes in them,] it is possible that the destructive
            testing performed on the document may have caused
15          some form of contamination and/or alteration, which carries
            the further prospect that subsequent examinations by
16          experts may not enable them to develop potential evidence
            or the same evidence that the other [earlier] expert
17          developed.

18   (Decl. Lloyd Cunningham ¶¶ 4-5).

19          MGA has rebutted this risk of contamination argument by proffering Mr.

20   Speckin's declaration, the expert who actually performed the tests in question. Mr.

21   Speckin states that he "exercised the utmost care in handling the documents [he]

22   tested," that a number of the tests he performed on the documents "has absolutely no

23   effect on the tested document whatsoever," and that with respect to those tests that

24   could effect the document he followed established procedures in carrying out the test

25   in question. (Decl. Erich J. Speckin ¶¶ 8, 9, 10, 11, 12, 13). Nowhere has Mattel

26   proffered any evidence rebutting or calling into question Mr. Speckin's

27   representations. The Court therefore finds that, based on the evidence that is

28   currently before it, Mattel has not established a colorable claim of spoliation by way of

16

EXHIBIT 31 PAGE 210

1  contamination in the tests MGA performed on the documents in question.

2         b.   Alteration of Fax Headers

3      Insofar as O'Connor's deposition testimony relating to the white out of the fax

4  header on the October, 2000, contract between Bryant and MGA, this too is

5  downplayed by MGA and Bryant as being irrelevant because "there is no dispute that

6  Mr. Bryant faxed his signed contract from a fax machine at Mattel and, indeed, Mr.

7  Bryant readily admitted that fact at his deposition, which took place before Ms.

8  O'Connor's deposition." (Joint Opp. at 8 (emphasis in original)). This argument seeks

9  to compare apples to oranges. While it may be true that now there is no dispute by

10  MGA and Bryant that he faxed his portion of the contract to MGA from his office at

11  Mattel, at the time O'Connor did the white out of the fax header such a lack of dispute

12  was not apparent. It is from that perspective in time -- the prologue to the litigation —

13  that O'Connor's deposition testimony is to be judged. And from that perspective her

14  testimony calls into question MGA's handling of relevant documents in its possession.

15      When the contract was first executed there is no indication that MGA and/or

16  Bryant would admit to the fact that Bryant negotiated his contract with MGA while he

17  was still working at Mattel; rather, at that point, that issue appeared to be an open one.

18  Indeed, the fact that MGA's CEO would direct O'Connor to tamper with the contract's

19  fax header clearly indicates that they would not admit to the fact. If MGA mistreated

20  this document where an open issue existed, it is not unreasonable to infer that it may

21  have been just as cavalier with its obligations to maintain the other documents in their

22  possession – say, for instance, the original BRATZ drawings – where similar open

23  issues remained. This concern with MGA's handling of documents in its possession at

24  the prologue to this litigation is reinforced by MGA and Bryant's blasé mention in a

25  footnote to their opposition that the original to this contract, the one which they

26  describe as being irrelevant, "has not been found." (Joint Opp. at 15 n.6). Indeed, it

27  has been suggested that MGA and Bryant or their counsel have made representations

28  that they are not sure of the exact whereabouts of a number of the original BRATZ

1    drawings. (Decl. Shane McKenzie ¶ 3 ("Mr. Bryant's counsel[, at the December 22 to

2    23, 2004, inspection of the originals by counsel for Mattel,] claimed not to have the

3    majority of the originals of BRATZ drawings and sketches, and further claimed not to

4    know where those originals were located")).

5          All that being said, the Court does not find that the alteration of the fax header

6    on the original Bryant/MGA contract warrants the appointment of an expert at this

7    time. Ms. O'Connor testified that, other than this one instance, she is aware of no

8    other documents that were purposefully altered by MGA. While the evidence related

9    to the missing fax header on the April, 2000, BRATZ accessories fax may indicate that

10   more than one document had been tampered with by MGA personnel, the Court has

11   nothing at this time to basis that conclusion on other than speculation and conjecture.

12   Without any tangible, concrete proof that MGA's mishandling of documents was more

13   widespread, the Court is left with what appears simply as an isolated instance of

14   tampering.

15         Accordingly, the motion for appointment of expert witnesses is **DENIED**.

16         IT IS SO ORDERED.

17

18   DATE:  _8-9-06_ .

19

20                                    _S.S. Larso_

21                              STEPHEN G. LARSON
                               UNITED STATES DISTRICT JUDGE

22

23

24

25

26

27

28

                                              18

EXHIBIT _31_ PAGE _2/2_

# EXHIBIT 32

# QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

**SAN DIEGO**
4445 Eastgate Mall, Suite 200
San Diego, CA 92121
(858) 812-3107
Facsimile: (858) 812-3336

**PALM SPRINGS**
45-025 Manitou Drive, Suite 8
Indian Wells, CA 92210
(760) 345-4757
Facsimile: (760) 345-2414

**LOS ANGELES**
865 So. Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000
Facsimile: (213) 443-3100

**NEW YORK**
335 Madison Avenue, 17th Floor
New York, NY 10017-4611
(212) 702-8100
Facsimile: (212) 702-8200

**SAN FRANCISCO**
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600
Facsimile: (415) 875-6700

**SILICON VALLEY**
555 Twin Dolphin Drive, Suite 560
Redwood Shores, CA 94065
(650) 801-5000
Facsimile: (650) 801-5100

## LOS ANGELES OFFICE

## FACSIMILE TRANSMISSION

**DATE:**   November 2, 2004

**NUMBER OF PAGES, INCLUDING COVER: 2**

**TO/COMPANY:**

| NAME | PHONE NO. | FAX NO. |
|------|-----------|---------|
| Keith Jacoby Littler Mendelson, P.C. | 310-553-0308 | 310-553-5583 |

**FROM:**   Jon D. Corey

**RE:**   Mattel v. Bryant

**MESSAGE:**

Please see attached correspondence.



| CLIENT #:   7209 | ROUTE/ RETURN TO:  **Ivana Maiorano** | ☐ CONFIRM FAX ☐ INCLUDE CONF. REPORT |
|---|---|---|
| OPERATOR: | CONFIRMED?  ☐ NO  ☐ YES: | |

The information contained in this facsimile is confidential and may also contain privileged attorney-client information or work product. The information is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this communication is strictly prohibited. If you have received the facsimile in error, please immediately notify us by telephone, and return the original message to us at the address above via the U.S. Postal Service. Thank you.

**IF YOU DO NOT RECEIVE ALL OF THE PAGES, PLEASE PHONE (213) 443-3178 AS SOON AS POSSIBLE.**

EXHIBIT 32  PAGE 213

## Send Confirmation Report

Line 1: QUINN EMANUEL     ID: 213 6240643     2 Nov'04 7:13PM Page 1
Line 2: JetFax M920     ID: 1

| Job | Start time | Usage | Phone Number or ID | Type | Pages | Mode | Status |
|-----|-----------|-------|--------------------|------|-------|------|--------|
| 415 | 11/ 2  7:09PM | 0'00" | 9644#7209#1310553558 3# | Send............. | 0 | .......... | No dial tone, Line 2......... 97 |
| 415 | 11/ 2  7:12PM | 0'34" | 9644#7209#1310553558 3# | Send............. | 2/ 2 | EC144 | Completed............................... |

Total:  0'34"    Pages sent: 2    Pages printed: 0

### QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

LOS ANGELES OFFICE

### FACSIMILE TRANSMISSION

DATE:  November 2, 2004

NUMBER OF PAGES, INCLUDING COVER: 2

TO/COMPANY:

NAME        PHONE NO.       FAX NO.

Keith Jacoby
Littler Mendelson, P.C.     310-553-0308       310-553-5583

FROM:  Jon D. Corey

RE:  [Mattel v. Bryant]

MESSAGE:

Please see attached correspondence.

CLIENT #:  7209    ROUTE/ RETURN TO:  Irma Malerma    ☐ CONFIRM FAX    ☐ INCLUDE CONF. REPORT

OPERATOR:     CONFIRMED? ☐ No ☐ YES

The information contained in this facsimile is confidential and may also contain privileged attorney-client information or work product. The information is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this communication is strictly prohibited. If you have received this facsimile in error, please immediately notify us by telephone and return the original message to us at the address shown on the U.S. Postal Service. Thank you.

IF YOU DO NOT RECEIVE ALL OF THE PAGES, PLEASE PHONE (213) 443-3170 AS SOON AS POSSIBLE.

EXHIBIT 32 PAGE 214

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-443-3000   FAX 213-443-3100

November 1, 2004

<u>**VIA FACSIMILE**</u>
<u>**AND U.S. MAIL**</u>

Keith Jacoby, Esq.
Littler Mendelson, P.C.
2049 Century Park East, 5th Floor
Los Angeles, California  90067-3107

<u>Mattel, Inc. v. Bryant</u>

Dear Mr. Jacoby:

Given the importance of having available at Carter Bryant's deposition all potentially useful material about which we may wish to examine Mr. Bryant, Mattel requests that Bryant ensure that all originals of Mr. Bryant's document production, as well as the original physical items inspected by Tania Krebs yesterday afternoon, are available at Mr. Bryant's deposition in Missouri.  Please confirm with our office that you will have these items shipped to Missouri in time for the deposition on Thursday morning.  If you have any questions regarding the foregoing, please do not hesitate to call.

Best regards,

Jon D. Corey

07209/0616773.01

**quinn emanuel urquhart oliver & hedges, llp**

NEW YORK | 335 Madison Avenue, 17th Floor, New York, New York 10017 | TEL 212-702-8100  FAX 212-702-8200
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94111 | TEL 415-875-6600  FAX 415-875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL 650-801-5000  FAX 650-801-5100
NEW SESSION | 45-025 Manitou Drive, Suite 02, Indian Wells, California 92210 | TEL 760-345-5540  FAX 760-345-5424
SAN DIEGO | 4445 Eastgate Mall, Suite 200, San Diego, California 92121 | TEL 858-812-3100  FAX 858-812-3336

EXHIBIT 32  PAGE 215

# EXHIBIT 33

| | |
|---|---|
| **From:** | "Jacoby, Keith" <KJacoby@littler.com> |
| **To:** | "'Jon Corey'" <joncorey@quinnemanuel.com>, "'John Quinn'" <johnquinn@quinnemanuel.com> |
| **Date:** | 11/3/04 4:51PM |
| **Subject:** | Mattel v. Bryant |

I received your request this morning for Mr. Bryant to make available the originals of the Bratz drawings produced in this case for use in his deposition. It would have been easier if this request were made earlier, before my partner Douglas Wickham went to Missouri. Nevertheless, we will have these originals sent to Missouri. We have to retrieve them from the bank safety deposit box they are maintained in, so they will likely be available in Missouri on Friday.

Keith A. Jacoby, Esq.
Littler Mendelson, P.C.
2049 Century Park East
Fifth Floor
Los Angeles, California 90067
ph. (310) 553-0308
direct (310) 772-7284
fax (310) 553-5583
kjacoby@littler.com

----

This email may contain confidential and privileged material for the sole use of the intended recipient(s). Any review, use, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender by reply email and delete all copies of this message.

To reply to our email administrator directly, send an email to postmaster@littler.com

Littler Mendelson, P.C.
http://www.littler.com

EXHIBIT 33 PAGE 216

# EXHIBIT 34

COPY

1   ROBERT F. MILLMAN, Bar No. CA 062152
    DOUGLAS A. WICKHAM, Bar No. CA 127268
2   KEITH A. JACOBY, Bar No. 150233
    LITTLER MENDELSON
3   A Professional Corporation
    2049 Century Park East, 5th Floor
4   Los Angeles, CA 90067.3107
    Telephone:    310.553.0308
5   Facsimile:    310.553.5583

6   Attorneys for Defendant and Counter-Claimant
    CARTER BRYANT

7

8              UNITED STATES DISTRICT COURT

9            CENTRAL DISTRICT OF CALIFORNIA

10

11  MATTEL, INC., a Delaware            Case No. CV 04-9059 NM (RNBx)
    Corporation,
12                                      **DECLARATION OF KEITH A.**
                    Plaintiff,          **JACOBY IN SUPPORT OF**
13                                      **BRYANT'S PORTION OF JOINT**
            v.                          **STIPULATION RE MATTEL'S**
14                                      **INSPECTION OF BRYANT'S**
    CARTER BRYANT, an individual;       **ORIGINAL DOCUMENTS**
15  and DOES 1 through 10, inclusive,

16                  Defendant.

17  ─────────────────────────────       Magistrate Judge: Hon. Robert N. Block
    CARTER BRYANT, on behalf of
18  himself, all present and former     Judge:          Hon. Nora M. Manella
    employees of Mattel, Inc., and the
19  general public,                     Hearing Date:       March 15, 2005
                                        Time:               9:30 a.m.
20                  Counter-Claimant,   Place:              Room 450

21          v.
                                        Discovery Cut-Off:            TBD
22  MATTEL, INC., a Delaware            Pre-Trial Conference:         TBD
    Corporation,                        Trial Date:                   TBD
23
                    Cross-Defendant.
24

25

26

27

28

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
2049 Century Park East
5th Floor
Los Angeles, CA 90067.3107
310.553.0308

EXHIBIT 34 PAGE 217

2-18

## DECLARATION OF KEITH A. JACOBY

I, KEITH A. JACOBY, declare as follows:

1.      I am an attorney admitted to practice before all courts in the State of California, including this Court.  I am a shareholder of the law firm of Littler Mendelson, a Professional Corporation, counsel of record for Defendant and Counter-Claimant Carter Bryant ("Bryant") in this matter.  I have personal knowledge of the matters set forth herein and, if called as a witness, I could and would testify competently thereto.

2.      Bryant has never refused to produce the documents and things requested for inspection by Mattel.  Rather, Bryant has been more than accommodating of Mattel's requests in all respects.

3.      Bryant made all three-dimensional tangible things he produced in this litigation available for inspection shortly after Mattel's request.  On November 1, 2004, Mattel carried out this inspection.  There are no tangible things remaining which Mattel has not inspected.

4.      Bryant also made the majority of originals of the documents he has produced available for inspection over the course of two full days, on December 22 and 23, 2004.  Mattel conducted inspections of those documents on those days.

5.      Bryant has gone to extreme measures to accommodate Mattel's inspection requests.  On November 3, 2004, after counsel defending Bryant's deposition, my partner Douglas Wickham, had already left Los Angeles for Missouri, Mattel made an eleventh-hour request, for the first time, that original documents be produced there.  Bryant was forced to incur the significant expense of hand-delivering the irreplaceable documents to Missouri, on literally a few hours notice, and simply at Mattel's whim.  Remarkably, although the parties had engaged in several months of negotiation and motion practice before the deposition took place – notably because of Mattel's own failure to produce documents – Mattel had never requested that original documents be available until the day of the start of the deposition.   Original

1.

LITTLER MENDELSON
A Professional Corporation
2049 Century Park East
5th Floor
Los Angeles, CA  90067 3107
310.553.0308

EXHIBIT 34  PAGE 218

1    documents be available until the day before of the start of the deposition.  Original

2    documents were made available for inspection at Bryant's deposition over the course

3    of two full days, and were used during the deposition.

4    6.        Much of Bryant's 1588-page document production consisted of royalty

5    statements and telephone records, which comprised about one-fifth of his total

6    production.  A large number of those records are redacted to protect confidential,

7    and/or proprietary information.  Permitting Mattel to inspect the originals of

8    documents that were produced in redacted form would obviously render futile

9    Bryant's right to safeguard this protected information.  Such an inspection would

10   compromise Bryant's rights to safeguard his own confidential information, as well as

11   his obligation to safeguard the confidential information of others, found within those

12   documents.

13   7.        In the spirit of cooperation, Bryant invited Mattel to meet and confer to

14   determine a way for such an inspection to be conducted without impinging on

15   Bryant's rights and those of third parties, but Mattel failed to respond.

16   8.        Mattel has misused its right to inspect documents to gain an improper

17   advantage in the litigation, by forcing Bryant to expend undue time and expense in

18   accommodating unnecessarily lengthy document inspections.   On the three days

19   during which its attorneys inspected original documents at the offices of Bryant's

20   counsel, Mattel "inspected" an average of just over one hundred pages per day, for a

21   total of about three hundred and fifty (350) pages.   Each of the inspections was

22   concluded by Mattel's counsel at or near the close of business, and not due to a lack of

23   documents to inspect.  This delay was due to the fact that Mattel brought at least one

24   attorney, a videographer and a still photographer to each inspection.

25   9.        Mattel's approach to carrying out its inspections is a deliberate part of its

26   broader scorched-earth strategy to outspend Bryant, and to bury him under so much

27   paper that he can no longer effectively defend himself against Mattel's allegations.

28   10.       To date, Bryant has spent in excess of 50 hours in paralegal and attorney

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
2049 Century Park East
5th Floor
Los Angeles, CA 90067-3107
310.553.0308

2.

EXHIBIT 34 PAGE 219

1    hours attempting to accommodate Mattel's request for inspections of originals.

2    11.       There is no evidence that Bryant has conducted or intends to conduct any

3    destructive testing of the original documents at issue, because no such testing has

4    occurred or will take place.   Bryant has every interest in preserving all the

5    documentary evidence in his possession, given that it refutes Mattel's claims *and*

6    supports his counter-claims.

7    12.       Bryant has also requested that Mattel produce its original documents for

8    his inspection, but predictably, Mattel has completely stonewalled in response to

9    Bryant's request.   Bryant sought such inspection by written correspondence on

10   January 13, 2005.  Attached hereto as Exhibit "A" is a true and correct copy of an

11   email from me to Jon Corey, dated January 13, 2005 requesting an inspection of

12   Mattel's documents.   The parties then met and conferred regarding this issue on

13   January 14, 2005, at which point Mr. Corey stated he was "unable to commit with

14   respect to the inspection on behalf of Mattel."   A true and correct copy of the

15   transcript of that meet and confer is attached hereto as Exhibit "B."

16   13.       Despite Bryant's requests, Mattel has not yet agreed, even in principle,

17   to permit him to inspect a single original document Mattel has produced.

18       I declare under penalty of perjury under the laws of the United States of

19   America and the State of California that the foregoing is true and correct.

20       Executed this 18h day of February 2005, at Los Angeles, California.

21

22

23   Los_Angeles:393602.2 028307.1010                    KEITH A. JACOBY

24

25

26

27

28

LITTLER MENDELSON
A Professional Corporation
2049 Century Park East
5th Floor
Los Angeles, CA 90067 3107
310 553 0306

EXHIBIT 34 PAGE 220

# EXHIBIT 35

**THIS EXHIBIT IS FILED UNDER SEAL
PURSUANT TO PROTECTIVE ORDER**

# EXHIBIT 36

**THIS EXHIBIT IS FILED UNDER SEAL
PURSUANT TO PROTECTIVE ORDER**

# EXHIBIT 37

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
Priority _____   Send _____
Entered _____    Closed _____
JS-5/JS-6 _____  JS-2/JS-3 _____
Scan Only_____   Docketed on CM _____
_____ THIS CONSTITUTES NOTICE OF
ENTRY AS REQUIRED BY FRCP 77(d)

8/29/07

EASTERN DIVISION
BY _____ DEPUTY

**PRIORITY SEND**
**& ENTERED**

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA  92501
CIVIL MINUTES -- GENERAL

Case No.    CV 04-09049 SGL (RNBx)                    Date: August 27, 2007

Title:      CARTER BRYANT -v- MATTEL, INC.
            AND CONSOLIDATED ACTIONS

==================================================================================

PRESENT:   HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

            Gina L. Guzman                        Theresa Lanza
            Courtroom Deputy Clerk                Court Reporter

ATTORNEYS PRESENT FOR CARTER          ATTORNEYS PRESENT FOR MATTEL:
BRYANT:

John W. Keker, Esq.                    John B. Quinn, Esq.
(morning session only)                 Michael T. Zeller, Esq.
                                       Jon D. Corey, Esq.

ATTORNEYS PRESENT FOR MGA:

Patricia Glaser, Esq.
Diana M. Torres, Esq.

PROCEEDINGS:        **ORDER DENYING MOTION FOR TERMINATING SANCTIONS;**
                    **ORDER DENYING REQUEST FOR INTERLOCUTORY**
                    **APPEAL; ORDER REQUIRING FILING OF AFFIDAVITS RE**
                    **EVIDENCE PRESERVATION**

       This matter is before the Court on MGA's and Carter Bryant's Motion for Terminating
Sanctions, filed on July 24, 2007 (docket #689).  This matter was heard on August 27, 2007, at
which time it was taken under submission.  The Court has considered the moving, opposition, and
reply briefs, as well as the many declarations and other evidence presented by the parties.  The

MINUTES FORM 90                                    Initials of Deputy Clerk __ glg
CIVIL -- GEN                                       Time: 02/52
                            1                      **Docket No. 895**

EXHIBIT 37 PAGE 307

Court has also considered the arguments presented at the August 27 hearing and the sworn testimony given by Michael C. Moore, in-house counsel for Mattel. Although at the hearing the Court indicated it would defer ruling on the present motion pending further filings by all parties regarding their efforts to preserve evidence, upon further reflection the Court sees no reason to delay ruling on the current motion.[1]  As set forth below, the Court **DENIES** the motion.

Based on their inherent power to sanction for "abusive litigation practices," district courts may impose sanctions against a party who destroys evidence, including the ultimate sanction of dismissal.  Leon v. IDX Systems Corp., 464 F.3d 951, 958 (9th Cir. 2006).  Dismissal is a harsh sanction, which may nonetheless be imposed upon those parties who have "engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings." Anheuser-Busch, Inc. v. Natural Beverage Distributors, 69 F.3d 337, 348 (9th Cir. 1995).  However, before imposing the ultimate sanction of dismissal, district courts should consider five factors: "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions."  Id.  Nevertheless, district courts need not make explicit findings regarding each of these factors and, in any event, "a finding of willfulness, fault, or bad faith is required for dismissal to be proper." Leon, 464 F.3d 951, 958 (9th Cir. 2006) (internal quotation marks and citation omitted).

"A party's destruction of evidence qualifies as willful spoliation if the party has 'some notice that the documents were potentially relevant to the litigation before they were destroyed.'" Id. at 959 (quoting United States v. Kitsap Physicians Serv., 314 F.3d 995, 1001 (9th Cir. 2002) (finding no willful spoliation where documents were destroyed in the routine course of business)).  Neither Leon nor Kitsap elaborate on when a party has the "notice" necessary to trigger the duty to preserve evidence.  However, in In re Napster, Inc. Copyright Litigation, 462 F.Supp.2d 1060, 1068 (N.D. Cal. 2006), the district court presented a persuasive discussion of the standard, first rejecting an argument that the duty to preserve evidence arises only when litigation is "imminent," and then setting forth a lesser standard.  Specifically, the Napster court noted that the duty arose "when a party should have known that the evidence may be relevant to future litigation," and that any such "future litigation" must be "probable," and not merely "possib[le]." (Internal quotation marks and citation omitted).

Keeping in mind these standards, the Court turns to the categories of evidence MGA and Bryant allege that Mattel has despoiled.  As articulated by the Court at the hearing on this matter, those categories are (1) Mattel employees' emails, (2) documents maintained on the Zeus document storage system, (3) the delay in producing certain Rule 30(b)(6) witnesses, (4) Carter

---

[1]  By the same token, upon further reflection, the Court sees no reason to delay ruling on MGA's request for interlocutory appeal of the present order.  See 28 U.S.C. § 1292(b) (stating that certifications for interlocutory appeal should be set forth in the order to be appealed).  The Court's ruling on that matter appears infra.

EXHIBIT 37 PAGE 308

Bryant's missing phone records, and (5) Carter Bryant's missing time records.

In considering the arguments of the parties regarding when Mattel's duty to begin to preserve evidence arose, the Court determines that November 24, 2003, marks the date when litigation between Mattel and Bryant became more than merely speculative and in fact became probable. On this date, in-house counsel for Mattel received in discovery in an unrelated action a copy of a contract between MGA and Bryant that pre-dated Bryant's resignation from Mattel. This contract appeared to Mattel to violate certain employment agreements executed by Bryant and Mattel, thus giving rise to one of the current consolidated actions. Although prior to this date an internal investigation may have raised a <u>suspicion</u> on Mattel's part that litigation might arise, there was no evidence presented to the Court that Mattel should have known it had a viable claim against Bryant before November 2003. <u>Cf.</u> Fed. R. Civ. P. 11(b)(3) ("By presenting to the court . . . a pleading . . . , an attorney
. . . is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, . . . the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery . . . .").

The Court heard testimony from Michael C. Moore, in-house counsel for Mattel, regarding the efforts to preserve email communications and other evidence. Counsel for MGA and Bryant cross-examined Mr. Moore at the hearing on this matter. The Court credits his testimony. The efforts Mr. Moore described regarding the preservation of emails is reasonable, and certainly does not amount to spoliation. Moore described communications with specific individuals identified by Mattel as those most likely to have information relevant to the litigation and efforts made to preserve any evidence those individuals had in their custody or control. Emails not otherwise archived from the relevant time period – mostly September and October, 2000 – had already been deleted from Mattel's email servers in accordance with its email retention policies. Mattel cannot be faulted for deleting these emails in the regular course of business before it had notice of its claims against Bryant.

In April, 2005, the current litigation took a dramatic turn, when MGA filed suit against Mattel. At that time, <u>all</u> Mattel employees were instructed to maintain any evidence potentially relevant to the litigation. When that suit was filed, Mattel took action to preserve all of its emails, capturing emails that date back to December, 2004. They retain these backup tapes to this day. MGA and Bryant make much of Mattel's failure to suspend its 90-day auto-delete policy regarding emails, but fail to address two key points: First, Mattel altered only the storage mechanism for its emails, it did not actually delete any emails; and second, Mattel, a number of years ago, informed MGA that it was not planning on suspending its 90-day auto-delete policy, and MGA did not at that time object.

As for the Zeus tapes, there is simply no evidence of spoliation. First and foremost, as the system has been described to the Court, the system is a cumulative file system that continues to accumulate. The system is still in operation, does not have an auto-delete function, and

MINUTES FORM 90
CIVIL – GEN

                                              Initials of Deputy Clerk ___glg_____
                                              Time: 02/52

                        3                     Docket No. 895

EXHIBIT 37 PAGE 309

information dating back to all relevant time period in this case may be accessed from it. Additionally, Mattel's in-house counsel testified as to the existence of several backup tapes that it can make available to MGA and Bryant. Finally, outside of pure speculation, there is no evidence that anyone has deleted anything from the Zeus system. Although production issues may still remain with respect to these data, preservation of this data, in the Court's view, is simply not an issue based on the record before the Court.

The delay in producing certain Rule 30(b)(6) witnesses is not a proper basis for terminating sanctions in this case. No motions to compel were brought to compel these witnesses's depositions at earlier times, and MGA and Bryant's accusations that the delay in producing them for deposition is part of a cover-up of the destruction of evidence is mere unfounded speculation. Moreover, the Court is mindful that MGA has been found by the discovery master to be guilty of the very same unexcused delay of which it accuses Mattel. See August 14, 2007, J. Infante Order, at 8 and 9 (attached to the Supplemental Proctor Decl. as Ex. 1).

Although Mattel is at a loss to explain the missing phone records from the critical month of October, 2000, there is no evidence that the records were destroyed. Moreover, other evidence presented by Mattel, especially phone records produced by Bryant that show he was in contact with MGA during that time period, suggest that the missing records would not assist Bryant.

The "missing" time records were either never created or were deleted. There is no evidence that the latter occurred. In fact, the only evidence on this point, from Mattel's Rule 30(b)(6) witness, is that although deletion of time records is possible, he was unaware of any instances of that occurring. Artavia Depo. 116, 170-71.

In sum, MGA and Bryant have failed to present any evidence regarding the "willfulness, fault, or bad faith" required to justify the imposition of terminating sanctions. Leon, 464 F.3d at 958. Many of MGA and Bryant's allegations, especially those raised in connection with Mattel's failure to suspend its auto-delete policy (portrayed as a wholesale failure to preserve emails less than 90-days old) and the availability of data from the Zeus system, are nothing more than rhetoric laced with hyperbole. Other allegations, such as Mattel's motive for delaying certain Rule 30(b)(6) depositions, and the destruction of Bryant's October, 2000, phone records and time records, are nothing more than sheer speculation, unsupported by evidence. Although counsel impressed upon the Court MGA's conviction of the righteousness of its cause, such overzealous conviction as witnessed by the Court at the hearing is no substitute for proof.

Accordingly, the Court DENIES MGA's and Bryant's Motion for Terminating Sanctions.

At the hearing, counsel for MGA and Bryant requested the Court certify the present order for interlocutory appeal. That request is DENIED. Permissive interlocutory appeals are governed by 28 U.S.C. § 1292(b):

When a district judge, in making in a civil action an order not otherwise

MINUTES FORM 90
CIVIL – GEN

Initials of Deputy Clerk ___glg_____
Time: 02/52

4

Docket No. 895

EXHIBIT 37 PAGE 310

RightFAX                    8/   2007 2:34   #9567 008/008        x Server

appealable under this section, shall be of the opinion that such order involves a
controlling question of law as to which there is substantial ground for difference of
opinion and that an immediate appeal from the order may materially advance the
ultimate termination of the litigation, he shall so state in writing in such order.

Id.  Here, there is no "controlling question of law" in controversy.  The law is quite settled.
Accordingly, certification for interlocutory appeal of the present order is unwarranted.

As stated at the hearing, the Court **ORDERS** all parties to set forth, in affidavit form, their
preservation efforts and policies with respect to the present litigation on or before September 10,
2007.

**IT IS SO ORDERED.**

MINUTES FORM 90                           Initials of Deputy Clerk ___glg_____
CIVIL – GEN                               Time: 02/52
                         5                **Docket No. 895**

EXHIBIT __37__ PAGE __31__

RightFAX          8/     2007 2:34   PAGE 001/006      x Server

**From:**     Name:        United States District Court
                           312 North Spring Street
                           Los Angeles, CA  90012
              Voice Phone: (213) 894-5474


**To:**       Name:        Michael Zeller
              Company:

                           865 S Figueroa St,. 10th Floor,
              City/State:  Los Angeles, CA 90017-2543
              Fax Number:  213-443-3100



**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

## Automated Document Delivery Service
*Notice pursuant to Rule 77(d) FRCiv.P*
*The attached copy is hereby served upon you pursuant to Federal Rule of Civil Procedure 77(d).*

ax Notes:

ase 2:04-CV-09049 : CARTER BRYANT V. MATTEL INC

*Pursuant to General Order 06-07, Section F, the following documents shall be submitted in the traditional manner: Pen Registers, Search Warrants, Seizure Warrants, Wire Taps, Bond Related Documents, Under Seal and In-Camera Documents, and All Charging Documents (Complaints, Informations, Indictments, and Superseding Charging Documents). All other documents filed in cases unassigned to a judge shall be filed electronically with a copy e-mailed to the criminal intake mailbox for the appropriate division. The proper e-mail address for each division is as follows:*

*Western Division:  CrimIntakeCourtDocs-LA@cacd.uscourts.gov
Southern Division:  CrimIntakeCourtDocs-SA@cacd.uscourts.gov
Eastern Division:  CrimIntakeCourtDocs-RS@cacd.uscourts.gov*

*For additional information and assistance, please refer to the CM/ECF page on the Court website at www.cacd.uscourts.gov.*

**Switch to e-mail delivery and get these documents sooner!**
**To switch, complete and submit**
**Optical Scanning Enrollment / Update form G-76.**
**Call 213-894-5474 for help and free technical support.**

*If you received this document in error because the attorney with whom this document is directed is no longer the attorney on the case, a Notice of Change of Attorney Information, form G-6, must be filed. If there are other cases which you've received documents for which you are no longer the attorney, separate notices must be filed for each case. Failure to do so will result in the continued sending of documents to you. Form G-6 is available on the court's website at www.cacd.uscourts.gov or at the Clerk's Office.*

ate and time of transmission:        **Thursday, August 30, 2007 2:34:04 PM**
umber of pages including this cover sheet:  06

EXHIBIT 37 PAGE 312