# EXHIBIT 19

1  KEKER & VAN NEST, LLP
   JOHN W. KEKER - #49092
2  jkeker@kvn.com
   MICHAEL H. PAGE - #154913
3  mpage@kvn.com
   CHRISTA M. ANDERSON - #184325
4  canderson@kvn.com
   710 Sansome Street
5  San Francisco, CA  94111-1704
   Telephone:  (415) 391-5400
6  Facsimile:  (415) 397-7188

7  Attorneys for Plaintiff
   CARTER BRYANT
8

9
                    UNITED STATES DISTRICT COURT
10
                    CENTRAL DISTRICT OF CALIFORNIA
11
                          EASTERN DIVISION
12

13

14 CARTER BRYANT, an individual,          Case No. CV 04-09049 SGL (RNBx)
                                          (consolidated with CV 04-9059 & 05-
                    Plaintiff,            2727
15
16      v.                                CARTER BRYANT AND MGA
                                          DEFENDANTS' JOINT
17 MATTEL, INC. a Delaware                OPPOSITION TO MATTEL, INC.'S
   Corporation,                           MOTION FOR LEAVE TO SERVE
                                          A SUPPLEMENTAL
18                  Defendant.            INTERROGATORY REGARDING
                                          DEFENDANTS' AFFIRMATIVE
19                                        DEFENSES

20 CONSOLIDATED WITH MATTEL,              Date:    December 3, 2007
   INC., v. BRYANT and MGA                Time:    10:00 a.m.
21 ENTERTAINMENT, INC. v.                 Dept:    Courtroom 1
   MATTEL, INC.                           Judge:   Hon. Stephen G. Larson
22
                                          Date Comp. Filed:  April 13, 2005
23
                                          Discovery Cut-Off:  Jan. 28, 2008
24                                        Pre-Trial Conference:  May 5, 2008
                                          Trial Date:  May 27, 2008
25

26

27

28

_____
        CARTER BRYANT AND MGA DEFENDANTS' JOINT OPPOSITION TO MATTEL, INC.'S MOTION FOR
        LEAVE TO SERVE A SUPPLEMENTAL INTERROGATORY REGARDING DEFENDANTS' AFFIRMATIVE
                                          DEFENSES
                             CASE NO. CV 04-09049 SGL (RNBx)

406856.01

EXHIBIT 19 PAGE 214

# I.   INTRODUCTION

Mattel seeks leave to file at least 37 additional interrogatories—masquerading as one, but seeking a full account of all details supporting each and every affirmative defense raised—and to do so without counting them among the 50 interrogatories that the Court has already authorized per side in this litigation, and that Mattel has exhausted.  Such a vast expansion of Mattel's (and no other party's) interrogatories would be unduly burdensome and unfair to Bryant and the MGA defendants, and is neither necessary nor reasonable.  Nor would it satisfy Mattel's insatiable appetite for more discovery, through which Mattel seeks to make this relatively straightforward case as complex and burdensome as possible.  Mattel's motion should be denied.

# II.   ARGUMENT

Mattel seeks a vast and unreasonable expansion of the interrogatories the Court has authorized in this case, offering no real justification beyond Mattel's own failure to plan strategically.  The Court should not reward Mattel's lack of foresight or encourage its insatiable desire for discovery by imposing unreasonable burdens on Bryant and MGA, and should deny Mattel's motion.

## A.   Mattel must make a particularized showing of good cause to justify additional interrogatories.

Like any other form of discovery authorized under the Federal Rules, excess interrogatories may be permitted only where they are consistent with the general principles set forth in Federal Rule of Civil Procedure 26.  *See* Fed. R. Civ. P. 33(a) ("Leave to serve additional interrogatories shall be granted to the extent consistent with the principles of Rule 26(b)(2).").  Under Rule 26, the Court "shall" limit discovery (i) if "the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive, (ii) " if "the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought," *or* (iii) if

1

408656.01

EXHIBIT 19 PAGE 215

1   "the burden or expense of the proposed discovery outweighs its likely benefit,"

2   taking into account the needs of the case and other factors. Fed. R. Civ. P.

3   26(b)(2)(C). Accordingly, a "particularized showing" of need under the Rule 26

4   principles is required to support a request for additional interrogatories under Rule

5   33(a). *Archer Daniels Midland Co. v. Aon Risk Servs., Inc.*, 187 F.R.D. 578, 586-

6   87 (D. Minn. 1999); *see also Duncan v. Paragon Pub., Inc.*, 204 F.R.D. 127, 128

7   (S.D. Ind. 2001) ("The party seeking leave must set forth a 'particularized

8   showing' to exceed the limit of twenty-five interrogatories."); *Whittingham v.*

9   *Amherst College*, 163 F.R.D. 170, 171 (D. Mass. 1995) (Federal Rules require

10   party to make specific showing of necessity, and to first exhaust available

11   discovery before seeking leave of Court for supplemental discovery).

12       Mattel points to the Court's statements at the February 12, 2007 scheduling

13   conference that more interrogatories would be authorized "if there's a need for it,"

14   rather than evaluating its request under the rules outlined above. Bryant and the

15   MGA defendants appreciate that the Court is willing to provide additional

16   discovery, if needed, but Mattel must still demonstrate a particularized need under

17   the principles set forth in the Federal Rules. Mattel has not done so here, nor can

18   it.

19  **B.**   **The additional interrogatories Mattel seeks should be denied because they are not consistent with the principles of Rule 26.**

20

21       First, a clarification. Mattel repeatedly states that it seeks leave to serve "a

22   single interrogatory." *E.g.*, Motion at 1. However, its own analysis (applying

23   Judge Infante's ruling on exactly this point) indicates that the "single"

24   interrogatory is not in fact one, but the compound equivalent of at least 37 separate

25   interrogatories. *See* Motion at 3, 7; Proctor Decl. Exh. 15 (September 5, 2007

26   Discovery Order) at 7-8. The Court should disregard Mattel's attempt to minimize

27   the impact of the additional interrogatories it seeks, and should evaluate (and deny)

28   Mattel's request based on its true, extensive scope. By Mattel's own count, its

408658.01

EXHIBIT 19 PAGE 216

1  current request would increase the 50 interrogatories the Court has already

2  authorized by more than two-thirds, and would bring the total number of

3  interrogatories Mattel will have propounded to at least 87, more than three times

4  the presumptive limit of 25 authorized under Rule 33.  *See* Fed. R. Civ. P. 33(a).

5       Aside from this attempt to downplay the scope of what it seeks, Mattel's

6  principal justification for seeking more interrogatories is that it has used the 50

7  interrogatories the Court already authorized, on other matters, and does not have

8  enough left to ask all the questions it wants.  *See* Motion at 8 ("Because [Mattel's

9  additional interrogatories] cannot be asked and answered within the limits

10  previously set by the Court, the Court should grant Mattel leave to propound this

11  interrogatory as a stand-alone, supplemental interrogatory that does not count

12  towards the fifty interrogatory limit.").  In other words, Mattel claims it should get

13  more interrogatories because it wants them.  This is plainly insufficient under Rule

14  26(b), which sets standards precisely to impose a measure of judicial restraint on

15  litigants' desire for vast and burdensome discovery.  *See* Fed. R. Civ. P.

16  26(b)(2)(C).  Although the Court may increase the allowed interrogatories in the

17  face of a particularized showing of need, interrogatories are not intended to be

18  unlimited either under the current Rules or this Court's prior rulings.  *See id.*; 8A

19  Wright & Miller, Fed. Prac. & Proc. § 2168.1 (explaining that the current

20  numerical limits were adopted in 1993 in part because other mandatory discovery

21  disclosures reduce the need to rely on interrogatories).

22       Mattel also argues that it is entitled to additional interrogatories because they

23  would seek "relevant information Mattel is entitled to discover."  Motion at 8.  But

24  while additional interrogatories might indeed help Mattel to obtain relevant

25  information, that too is not the standard for more discovery under Rule 26.  *See*

26  Fed. R. Civ. P. 26(b)(2)(C).  The fact that the information sought is relevant is

27  certainly a necessary precondition for additional interrogatories—they would be

28

3

CARTER BRYANT AND MGA DEFENDANTS' JOINT OPPOSITION TO MATTEL, INC.'S MOTION FOR
LEAVE TO SERVE A SUPPLEMENTAL INTERROGATORY REGARDING DEFENDANTS' AFFIRMATIVE
DEFENSES
CASE NO. CV 04-09049 SGL (RNBx)

406656.01

EXHIBIT 19 PAGE 217

1  entirely inappropriate otherwise—but it is far from a sufficient one.  Mattel must

2  also demonstrate that it could not obtain the information through already-

3  authorized discovery means.  Mattel's claim that contention interrogatories are the

4  preferred form of discovery for obtaining the information it is seeking, regardless

5  of the burden such interrogatories place on Bryant and the MGA defendants, *see*

6  Motion at 9, does not satisfy its burden under Rule 26.

7         In sum, Mattel has failed to make a particularized showing of need to take

8  additional discovery through the means of contention interrogatories with respect

9  to any of the defendants' asserted affirmative defenses.

10  **C.  Mattel already has had ample opportunity through interrogatories and other discovery means to obtain the information it is seeking, and it should not be rewarded for the strategic decision to use its interrogatories to obtain information on other topics.**

11

12

13         Mattel already has been granted 50 interrogatories against each defendant in

14  this case.  In February 2007, the Court granted each side 50 interrogatories.

15  Proctor Decl. Exh. 8; *id.* Exh. 9.  The Discovery Master has since ruled that Mattel

16  may serve an identical interrogatory on all six defendants, using only one of its 50

17  interrogatories, making the actual count greatly lopsided in Mattel's favor.  *See*

18  Proctor Decl. Exh. 15 (September 5, 2007 Discovery Order), at 4 ("Although the

19  district court's order does not speak directly to this issue, the most reasonable

20  approach is to count one identical interrogatory served on all six of the Defendants

21  as one interrogatory.").  Thus, even without the supplemental interrogatories it

22  seeks here, Mattel already has been granted the right to serve 50 interrogatories on

23  each of the defendants in this case.  And Mattel has now used all of these 50

24  interrogatories.  Indeed, while the present motion was pending—and thus without

25  knowing or, apparently, caring whether it would obtain leave to serve additional

26  interrogatories relating to the defendants' affirmative defenses that it claims are so

27  important—Mattel elected to serve four additional sets of interrogatories (its

28  Fourth through Seventh), more than exhausting its last nine interrogatories.  *See*

4

CARTER BRYANT AND MGA DEFENDANTS' JOINT OPPOSITION TO MATTEL, INC.'S MOTION FOR
LEAVE TO SERVE A SUPPLEMENTAL INTERROGATORY REGARDING DEFENDANTS' AFFIRMATIVE
DEFENSES
CASE NO. CV 04-09049 SGL (RNBx)

406656.01

EXHIBIT 19 PAGE 218

1  Declaration of Audrey Walton-Hadlock ("Walton-Hadlock Decl.") Exhs. A–D;

2  Proctor Decl. Exh. 15 (September 5, 2007 Discovery Order).

3          Taken together with all of the other discovery Mattel has taken in this

4  litigation, those 50 interrogatories are more than adequate.  In addition to the 50

5  interrogatories it has now served on each defendant, Mattel has issued thousands of

6  requests for admission, many of which are disguised interrogatories that

7  improperly seek discovery, not admissions.  *See, e.g.*, Walton-Hadlock Decl. ¶ 3

8  (Mattel's Sixth Set of Requests for Admission to Bryant contains 782 RFAs); *id.*

9  Exh. E (Mattel's Fourth Set of Requests for Admission to Bryant (157 RFAs)); *cf.*

10  8A Wright & Miller, Fed. Prac. & Proc. Civ. 2d § 2168.1 (explaining that requests

11  for admission should not be used to substitute for other forms of discovery).

12  Mattel also has taken nearly twenty depositions to date, including three full days of

13  testimony from Carter Bryant.  And Mattel has issued hundreds of requests for

14  production, which have resulted in the production of more than three million pages

15  of documents by the defendants in this case.  In short, Mattel has had every

16  opportunity to explore and test Bryant and the MGA defendants' affirmative

17  defenses in this litigation, but it instead chose to focus its discovery on other

18  topics.

19          Despite Mattel's claims to the contrary, Mattel has known for a long time

20  that most of the affirmative defenses defendants have raised were at issue in the

21  case.  As stated in Mattel's Motion, Bryant raised nineteen affirmative defenses in

22  his May 14, 2004 answer to Mattel's original claims against him.  Motion at 1;

23  Proctor Decl. Exh. 1.  Most of the fourteen affirmative defenses in Bryant's most

24  recent pleading are identical to the defenses he raised more than three years ago in

25  that original answer to Mattel's original (and largely overlapping) claims against

26  him, although many now provide more factual detail.  *See* Walton-Hadlock Decl.

27  Exh. F (Bryant's Second Amended Reply to Counterclaims).  Similarly, many of

28

5

CARTER BRYANT AND MGA DEFENDANTS' JOINT OPPOSITION TO MATTEL, INC.'S MOTION FOR
LEAVE TO SERVE A SUPPLEMENTAL INTERROGATORY REGARDING DEFENDANTS' AFFIRMATIVE
DEFENSES
CASE NO. CV 04-09049 SGL (RNBx)

406656.01

EXHIBIT 19 PAGE 219

1   the claims raised in MGA's own complaint against Mattel plainly overlap with

2   MGA's affirmative defenses to Mattel's claims. *See* Walton-Hadlock Decl. Exh.

3   G (MGA's Complaint); Walton-Hadlock Decl. Exh. H (MGA's Amended

4   Answer); Motion at 3 (listing defenses). Thus, Mattel was on notice of many of

5   defendants' affirmative defenses well before the most recent pleadings reflecting

6   them, and before Mattel had expended its allotment of interrogatories.

7          Mattel could have chosen to reserve some of its 50 interrogatories to

8   investigate defendants' inevitable affirmative defenses, to the extent any defenses

9   might raise novel or surprising issues. It chose not to, squandered its wealth of

10  interrogatories, and now asks the Court simply to ignore that choice. The Court

11  should not reward Mattel for its own conscious strategic choices, especially when

12  Mattel has already had ample opportunity to obtain discovery in this litigation

13  through interrogatories and other means, and additional discovery would

14  unreasonably burden defendants. *See* Fed. R. Civ. P. 26(b)(2)(C). Rather, the

15  Court should consider Mattel's request for additional interrogatories in the broader

16  context of other discovery in this case, including Mattel's established pattern of

17  seeking ever-increasing discovery. That context, as well as the sweeping nature of

18  Mattel's request at issue, makes clear that judicial control—not additional

19  interrogatories—is called for here.

20         Mattel has made clear by its actions that whatever discovery the parties

21  agree to or the Court authorizes, Mattel will always want more. Indeed, separate

22  and apart from the additional interrogatories it is requesting in the present motion,

23  Mattel has stated in meet and confer correspondence with the defendants that it

24  intends to request leave to serve 10-15 more interrogatories on other topics. Mattel

25  also has indicated that it intends to seek leave to take dozens more depositions, for

26  a total number of depositions far beyond the limit of 24 imposed by the Court in

27  February 2007. Walton-Hadlock Decl. Exh. I (October 26, 2007 Letter from Zeller

28

6

CARTER BRYANT AND MGA DEFENDANTS' JOINT OPPOSITION TO MATTEL, INC.'S MOTION FOR
LEAVE TO SERVE A SUPPLEMENTAL INTERROGATORY REGARDING DEFENDANTS' AFFIRMATIVE
DEFENSES
CASE NO. CV 04-09049 SGL (RNBx)

406656.01

EXHIBIT 19 PAGE 220

1   to Nolan et al.); *id.* Exh. J (Order dated February 12, 2007). In light of Mattel's

2   past discovery conduct, and its stated intention to seek leave to serve still more

3   interrogatories, it is apparent that Mattel is either unwilling or unable to adhere to

4   reasonable discovery limits. Consequently, the Court must now step in and keep

5   the discovery in this case within reasonable bounds. The additional interrogatories

6   Mattel seeks here would impose further burdens, out of all proportion to the benefit

7   Mattel could conceivably obtain, by requiring each of the defendants to set out for

8   Mattel every detail supporting every element of every claimed affirmative defense.

9   Mattel's motion should be denied in its entirety.

10   **D.   Even if some expansion of interrogatories were warranted (which it is not), the Court should not grant Mattel's sweeping and one-sided**
11   **request, but should instead grant each side a narrowly-drawn and equal number of additional interrogatories based on a careful review of actual**
12   **need.**

13          Even if some additional interrogatories were warranted—which, as

14   explained above, they are not—Mattel should not be permitted the sweeping and

15   one-sided expansion of discovery it seeks, but should be required to identify more

16   carefully any areas it believes require further discovery.

17          In addition to the more basic problems with Mattel's request for

18   supplemental interrogatories spelled out above, Mattel's request is not at all

19   narrowly tailored to any purported need, and should not be granted in the form

20   sought. Mattel does not identify which of its 37 interrogatories it expects to gain

21   useful information by serving, among the many that will simply serve to harass

22   Bryant and MGA by forcing them to respond to pointless and duplicative

23   discovery. Instead, it bases its sweeping request on claims that "many" of the

24   asserted defenses "interject wholly new issues into this already complex litigation,"

25   and gives a few examples of defenses asserted by defendant Machado that

26   purportedly fall in this category. Motion at 8. But even if Mattel's claims were

27   accurate as to some affirmative defenses (which they are not), the discovery Mattel

28

7

406656.01

EXHIBIT 19 PAGE 221

1  requests would affect many other defenses for which they are demonstrably false.

2  For example, Mattel's summary of the defendants' affirmative defenses reveals

3  that some of those affirmative defenses (though plead as such to avoid any possible

4  waiver) merely negate elements of Mattel's own claims, and plainly inject no new

5  issues into the case, so they could not justify increasing discovery at this late date.

6  *See* Motion at 3 (listing, for example, "Information Readily Ascertainable," "Lack

7  of Causation" and "Lack of Ownership").

8      Moreover, Mattel's proposed interrogatory, which seeks to require the

9  defendants to "state *all* facts" and "IDENTIFY *all* PERSONS ... and *all*

10  DOCUMENTS that REFER OR RELATE to such facts", supporting each of their

11  affirmative defense is exactly the type of "blunderbuss" interrogatory that

12  numerous courts have held to be inappropriate and abusive. *Lawrence v. First*

13  *Kansas Bank & Trust, Co.*. 169 F.R.D. 657, 663-64 (D. Kan. 1996); *see also*

14  *Lucero v. Valdez*, 240 F.R.D. 591, 594 (D. N.M. 2007) ("Contention

15  interrogatories should not require a party to provide the equivalent of a narrative

16  account of its case, including every evidentiary fact, details of testimony of

17  supporting witnesses, and the contents of supporting documents."); *Grynberg v.*

18  *Total S.A.*, No. 03-cv-01280-WYD-BNB, 2006 WL 1186836, *6, (D. Colo. May 3,

19  2006) (ruling that interrogatory that asks defendant to "plead and prove its entire

20  case, and to marshal all evidence, in response to one written interrogatory" is

21  overbroad and "constitutes an abuse of the discovery process").  This is

22  particularly true with respect to the defendant's negatively-framed affirmative

23  defenses, such as "Lack of Causation" and "Lack of ownership", because the

24  universe of potentially responsive information to prove a negative is "almost

25  endless." *Safeco of Am. v. Rawstron*, 181 F.R.D. 441, 447-48 (C.D. Cal. 1998)

26  (rejecting discovery requests seeking "all facts, documents, and witnesses that

27  support the denial of a statement or allegation of fact").

28

8

408656.01

EXHIBIT 19 PAGE 222

1    In short, like many of Mattel's discovery requests, in this and other

2    litigation, the interrogatories it seeks leave to serve are thus "abusively drawn" in

3    that they make "no attempt . . . to tailor the information request to the immediate

4    needs of the case." *See Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792,

5    813 (9th Cir. 2003) (affirming district court's quashing of Mattel's abusive

6    subpoena). Accordingly, even if the Court were to find that some more narrowly-

7    drawn additional interrogatories might be appropriate (which it should not),

8    Mattel's sweeping request should be denied.

9    Mattel also seeks special treatment for its extra interrogatories, asking that

10   the Court not count them against any authorized number of interrogatories, but

11   instead allow them simply as unnumbered "supplemental" interrogatories. Motion

12   at 1. Such one-sided treatment in discovery would be absolutely unfair to

13   defendants, and should not be permitted. Even if the Court were to find that the

14   issues in this case required more extensive discovery (and it should not), that

15   discovery would still need to be fair, reasonable, and even-handed. *See* Fed. R.

16   Civ. P. 26. Any expansion of the interrogatories authorized in this litigation should

17   be equal for both sides, and every additional interrogatory should be counted and

18   considered. Defendants have adhered to the discovery limits previously imposed

19   by the Court and have planned their discovery accordingly. Given the Federal

20   Rules' basic goal of ensuring fairness in litigation, Mattel should not be allowed to

21   pretend that the interrogatories at issue in this motion do not "count" as part of the

22   oppressive and burdensome weight of discovery it has already imposed on

23   defendants, and will continue to increase until prevented by this Court.

### III.   CONCLUSION

25   For all the foregoing reasons, Mattel's motion for leave to file supplemental

26   interrogatories regarding defendants' affirmative defenses should be denied.

27                                                     Respectfully submitted,

28

CARTER BRYANT AND MGA DEFENDANTS' JOINT OPPOSITION TO MATTEL, INC.'S MOTION FOR
LEAVE TO SERVE A SUPPLEMENTAL INTERROGATORY REGARDING DEFENDANTS' AFFIRMATIVE
DEFENSES
CASE NO. CV 04-09049 SGL (RNBx)

406858.01

EXHIBIT 19 PAGE 223

1   Dated: November 19, 2007                      KEKER & VAN NEST, LLP

2

3                                        By:

4                                            MICHAEL H. PAGE
                                             Attorneys for Plaintiff
5                                            CARTER BRYANT

6
    Dated: November 19, 2007                      SKADDEN, ARPS, SLATE,
7                                                 MEAGHER & FLOM LLP

8

9                                        By:

10                                           THOMAS J. NOLAN
                                             Attorneys for Defendants
11                                           MGA DEFENDANTS

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                        10

406656.01

EXHIBIT 19 PAGE 224

# EXHIBIT 20

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA  92501
CIVIL MINUTES -- GENERAL

Case No.   CV 04-09049 SGL(RNBx)                    Date: December 3, 2007
Title:     CARTER BRYANT -v- MATTEL, INC.
           AND CONSOLIDATED ACTIONS
==========================================================================
=
PRESENT:   HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

           Jim Holmes                              Theresa Lanza
           Courtroom Deputy Clerk                  Court Reporter

ATTORNEYS PRESENT FOR CARTER               ATTORNEYS PRESENT FOR MATTEL:
BRYANT:

Matthew M. Werdegar                        Michael T. Zeller
                                           B. Dylan Proctor
                                           Jon D. Corey

ATTORNEYS PRESENT FOR MGA:                 ATTORNEY PRESENT FOR CARLOS
                                           GUSTAVO MACHADO GOMEZ:

Thomas J.  Nolan                           Alexander H. Cote
Carl A. Roth
Ryan Weinstein

PROCEEDINGS:    **ORDER GRANTING MOTION FOR LEAVE TO SERVE A SUPPLEMENTAL
                INTERROGATORY; ORDER DENYING MOTION TO STRIKE (OR
                ALTERNATIVELY, FOR SUMMARY JUDGMENT AS TO) AFFIRMATIVE
                DEFENSES**

     The Court heard argument on these motions on December 3, 2007.  For reasons discussed
on the record, the Court **GRANTS** the motion for leave to serve a supplemental interrogatory.
Mattel may serve on all opposing parties, and all parties served shall answer without objection
thereto, the following interrogatory:

          State the facts upon which YOU intend to rely at trial to support YOUR
     affirmative defenses, and IDENTIFY all PERSONS with knowledge of those facts and

MINUTES FORM 90                                    Initials of Deputy Clerk __jh_____
CIVIL -- GEN                        1              Time: 00/45

EXHIBIT 20 PAGE 225

Case 2:04-cv-09049-DOC-RNB   Document 1267-9   Filed 12/14/07   Page 15 of 67   Page ID
#:89534
Case 2:04-cv-09049-SGL-RNB   Document 4180   Filed 12/03/2007   Page 2 of 2

all DOCUMENTS that REFER OR RELATE TO those facts.

In light of the Court's granting of the motion for leave to file a supplemental interrogatory, the motion to strike (or alternatively, for summary judgment as to) MGA's affirmative defenses is **DENIED WITHOUT PREJUDICE** pending completion of discovery in this action.

IT IS SO ORDERED.

MINUTES FORM 90
CIVIL -- GEN

2

Initials of Deputy Clerk __jh_____
Time: 00/45

EXHIBIT 20 PAGE 226

# EXHIBIT 21

**EMPLOYEE CONFIDENTIAL INFORMATION AND INVENTION AGREEMENT**

I acknowledge that Mattel, Inc. (the "Company") operates in a competitive environment and that it enhances its opportunities to succeed by establishing certain policies, including those included in this Agreement. This Agreement is designed to make clear that (i) I will maintain the confidentiality of the Company's trade secrets; (ii) I will use those trade secrets for the exclusive benefit of the Company; (iii) inventions that I create will be owned by the Company; (iv) my prior and continuing activities separate from the Company will not conflict with the Company's development of its proprietary rights; and (v) when and if my employment with the Company terminates I will not use my prior position with the Company to the detriment of the Company. In consideration of my employment with the Company and other good and valuable consideration, I agree that:

**1. Provisions Related to Trade Secrets**

(a) I acknowledge that the Company possesses and will continue to develop and acquire valuable Proprietary Information (as defined below), including information that I may develop or discover as a result of my employment with the Company. The value of that Proprietary Information depends on it remaining confidential. The Company depends on me to maintain that confidentiality, and I accept that position of trust.

(b) As used in this Agreement, "Proprietary Information" means any information (including formula, pattern, compilation, device, method, technique or process) that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use, and includes information on the Company, its customers, suppliers, joint ventures, licensors, licensees, distributors and other persons and entities with whom the Company does business.

(c) I will not disclose or use at any time either during or after my employment with the Company, any Proprietary Information except for the exclusive benefit of the Company as required by my duties for the Company, or as the Company expressly may consent in writing. I will cooperate with the Company and use my best efforts to prevent the unauthorized disclosure, use or reproduction of all Proprietary Information.

(d) Upon leaving employment with the Company for any reason, I immediately will deliver to the Company all tangible, written, graphical, machine readable and other material (including all copies) in my possession or under my control containing or disclosing Proprietary Information.

**2. Ownership of Inventions**

(a) I agree to communicate to the Company as promptly and fully as is practicable all inventions (as defined below) conceived or reduced to practice by me (alone or jointly with others) at any time during my employment by the Company. I hereby assign to the Company and/or its nominees all my right, title and interest in such inventions, and all my right, title and interest in any patents, copyrights, patent applications or copyright applications based thereon. I will assist the Company and/or its nominees (without charge but at no expense to me) at any time in every proper way to obtain for its and/or their own benefit, patents and copyrights for all such inventions anywhere in the world and to enforce its and/or their rights in legal proceedings.

(b) As used in this Agreement, the term "inventions" includes, but is not limited to, all discoveries, improvements, processes, developments, designs, know-how, data computer programs and formulae, whether patentable or unpatentable.

(c) Any provision in this agreement requiring me to assign my rights in any invention does not apply to an invention which qualifies under the provision of Section 2870 of the California Labor Code. That section provides that the assignment to assign "shall not apply to an invention that the employee developed entirely on his or her own time without [using the employer's] equipment, supplies, facilities or trade secret information except for those inventions that either (1) relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer or (2) result from any work performed by the employee for the employer." I understand that I bear the burden of proving this no-invention applies under Section 2870.

(d) I hereby irrevocably designate and appoint the Company and each of its duly authorized officers and agents as my agent and attorney-in-fact to act for and in my behalf and stead to execute and file any document and to do all other lawfully permitted acts to further the prosecution, issuance and enforcement of patents, copyrights and other proprietary rights with the same force and effect as if executed and delivered by me.

**3. Conflicts with Other Activities**

(a) My employment with the Company requires my undivided attention and effort. Therefore, during my employment with the Company, I will fully comply with the Company's Conflict of Interest Policy, as it may be amended from time to time. I shall not, without the Company's express written consent, engage in any employment or business other than for the Company, or invest in or assist (in any manner) any business competitive with the business or future business plans of the Company.

**4. Miscellaneous**

(a) My obligations under this Agreement may not be modified or terminated, in whole or in part, except in writing signed by a Vice-President of the Company and a breach or any provision of this Agreement will not operate or be construed as a waiver of any subsequent breach. Any waiver by the Company of a breach on any provision of this Agreement will not operate or be construed as a waiver of any subsequent breach.

(b) Each provision of this Agreement will be treated as a separate and independent clause, and the unenforceability of any one provision will in no way impair the enforceability of any other provision. If any provision is held to be unenforceable, such provision will be construed by the appropriate judicial body by limiting or reducing it to the minimum extent necessary to make it legally enforceable.

(c) My obligation under this Agreement will survive the termination of my employment, regardless of the manner of such termination. This Agreement will inure to the benefit of and be binding upon the successors and assigns of the Company.

(d) I understand that the provisions of this Agreement are a material condition to my employment with the Company. I also understand that this Agreement is not an employment contract, and nothing in this Agreement creates any right to my continued employment by the Company, or to any employment for any particular term.

(e) Any breach of this Agreement likely will cause irreparable harm to the Company for which money damages could not adequately or adequately compensate the Company. Accordingly, I agree that the Company will be entitled to injunctive relief to enforce this Agreement, in addition to damages and other available remedies.

(f) This agreement will be governed and interpreted in accordance with the laws of the State of California.

(g) This Agreement contains the complete agreement between the Company and me concerning the subject matter hereof and supersedes all other agreements and understandings. This Agreement may be executed in counterparts. This Agreement will be deemed effective as of the start of (employee) employment with the Company.

**CAUTION: THIS AGREEMENT CREATES IMPORTANT OBLIGATIONS OF TRUST AND AFFECTS
THE EMPLOYEE'S RIGHTS TO INVENTIONS THE EMPLOYEE MAY MAKE DURING HIS OR HER EMPLOYMENT.**

Employee Signature: *Carter H. Bryant*

Employee Name (print): CARTER H. BRYANT

Date: 01/04/99

MATTEL, INC.
By: *Teresa Newcomb*
Signature

Name of Witness (print): TERESA NEWCOMB

EXHIBIT 21 PAGE 227

.

# EXHIBIT 22

CONFORMED COPY

1   QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
      John B. Quinn (Bar No. 90378)
2      (johnquinn@quinnemanuel.com)
      Michael T. Zeller (Bar No. 196417)
3      (michaelzeller@quinnemanuel.com)
      Jon D. Corey (Bar No. 185066)
4      (joncorey@quinnemanuel.com)
      Duane R. Lyons (Bar No. 125091)
5      (duanelyons@quinnemanuel.com)
    865 South Figueroa Street, 10th Floor
6   Los Angeles, California 90017-2543
    Telephone: (213) 443-3000
7   Facsimile: (213) 443-3100

8   Attorneys for Mattel, Inc.

9             UNITED STATES DISTRICT COURT

10          CENTRAL DISTRICT OF CALIFORNIA

11  CARTER BRYANT, an individual,        CASE NO. CV 04-9049 SGL (RNBx)

12              Plaintiff,                Consolidated With Case No. 04-9059 and
                                          Case No. 05-2727
13       v.
                                          MATTEL, INC.'S SECOND AMENDED
14                                        ANSWER IN CASE NO. 05-2727 AND
    MATTEL, INC., a Delaware              COUNTERCLAIMS FOR:
15  corporation,
                                          1.   COPYRIGHT INFRINGEMENT;
16              Defendant.                2.   VIOLATION OF THE
                                               RACKETEER INFLUENCED AND
17  _____           CORRUPT ORGANIZATIONS
                                               ACT;
18  MGA ENTERTAINMENT, INC. a          3.   CONSPIRACY TO VIOLATE THE
    California corporation,                    RACKETEER INFLUENCED AND
19                                             CORRUPT ORGANIZATIONS
                                               ACT;
20              Plaintiff,             4.   MISAPPROPRIATION OF TRADE
                                               SECRETS;
21       v.                           5.   BREACH OF CONTRACT;
                                       6.   INTENTIONAL INTERFERENCE
22  MATTEL, INC., a Delaware                   WITH CONTRACT;
    corporation, and DOES 1-10,        7.   BREACH OF FIDUCIARY DUTY;
23                                     8.   AIDING AND ABETTING
                Defendants.                    BREACH OF FIDUCIARY DUTY;
24                                     9.   BREACH OF DUTY OF
                                               LOYALTY;
25

26                                        **PUBLIC REDACTED VERSION**

27                                        **Volume I**

28  _____

EXHIBIT 22 PAGE 228

C 7   12 · C 7

SECOND AMENDED ANSWER AND COUNTERCLAIMS

2154363.2

| | | |
|---|---|---|
| 1 | MATTEL, INC., a Delaware corporation, | 10. AIDING AND ABETTING BREACH OF DUTY OF LOYALTY; |
| 2 | | |
| | Counter-claimant, | 11. CONVERSION; |
| 3 | | 12. UNFAIR COMPETITION; AND |
| | v. | 13. DECLARATORY RELIEF |
| 4 | | |
| 5 | MGA ENTERTAINMENT, INC., a California corporation; ISAAC | DEMAND FOR JURY TRIAL |
| 6 | LARIAN, an individual; CARTER BRYANT, an individual; MGA | |
| 7 | ENTERTAINMENT (HK) LIMITED, a Hong Kong Special Administrative | |
| 8 | Region business entity; MGAE DE MÉXICO, S.R.L. DE C.V., a | |
| 9 | Mexico business entity; CARLOS GUSTAVO MACHADO GOMEZ, an individual; and DOES 4 through 10, | |
| 10 | | |
| 11 | Counter-defendants. | |
| 12 | AND CONSOLIDATED CASES | |
| 13 | | |

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT 22 PAGE 229**

2154363.2

-2-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

## SECOND AMENDED ANSWER

Pursuant to the Court's Orders of January 12, 2007 and June 27, 2007, Defendant Mattel, Inc. ("Mattel") answers the Complaint of MGA Entertainment, Inc. ("Complaint") as follows:

### Preliminary Statement

The Complaint in this case contravenes <u>Rule</u> 8(a) of the <u>Federal Rules of Civil Procedure</u> in multiple respects. For example, in many places, the Complaint improperly mixes factual averments with argumentative rhetoric. The Complaint also includes a selective recitation of alleged historical facts and "rumor," much of which is both irrelevant and inflammatory in tone and content. In addition, many of the allegations of the Complaint are overly broad, vague or conclusory and include terms which are undefined and which are susceptible to different meanings. Accordingly, by way of a general response, all allegations are denied unless specifically admitted, and any factual averment admitted is admitted only as to the specific facts and not as to any conclusions, characterizations, implications or speculations which are contained in the averment or in the Complaint as a whole. These comments and objections are incorporated, to the extent appropriate, into each numbered paragraph of this Second Amended Answer.

Mattel further submits that the use of the headings throughout the Complaint is improper, and therefore no response to them is required. In the event that a response is required, Mattel denies those allegations.

The Complaint also contains many purported photographs of various items, and it uses one or more headings purporting to describe, either individually or in groups, these various photographs. The images of these photographs contained in the Complaint are all relatively small and some are of less than optimal quality, making it difficult to evaluate the adequacy of the photographs or their fairness and accuracy in depicting what they purport to represent. The Complaint also does not describe the circumstances or time frame in which these photographs were taken,

1 | and in many cases does not identify, or does not sufficiently or properly identify, the
2 | item depicted in the photographs.  All of these factors, as well as the use of these
3 | photographs and headings out of context, or with an insufficient context, impair the
4 | ability of Mattel to fully respond to these photographs and headings, or to any
5 | purported allegations involving, or relying upon, the use of such photographs and
6 | accompanying headings.  By way of a general response, Mattel therefore does not
7 | admit the authenticity of any photograph, or the accuracy or adequacy of any
8 | heading, nor does it admit any allegation or inference that is based on, or purports to
9 | be based on, any photograph or accompanying heading in the Complaint.  Mattel
10 | reserves the right to challenge the authenticity of any photograph and the accuracy
11 | or adequacy of any heading (either as included in the Complaint or in the context of
12 | additional material not included).  Further, with reference to all photographs and
13 | accompanying headings, or any averments based on the Complaint's use of such
14 | photographs and headings, which might be offered into evidence, Mattel specifically
15 | reserves its right to object to any use of such photographs, headings, and averments,
16 | or the Complaint as a whole or in part, in evidence for any purpose whatsoever.
17 |         To the extent that Mattel has endeavored to answer any particular
18 | allegation containing any such photographs and headings, any admission concerning
19 | the item purported to be depicted in such photograph, or described in such headings,
20 | shall not constitute an admission that the photograph is authentic, adequate, or
21 | admissible, nor that any heading is accurate, adequate, or admissible.  All such items
22 | purportedly depicted in such photographs, and described in such headings, "speak
23 | for themselves".  Accordingly, to the extent that any such referenced materials are
24 | deemed allegations against Mattel, they are denied.
25 |                                   <u>Responses</u>
26 |         1.     Answering paragraph 1 of the Complaint, Mattel admits that
27 | plaintiff MGA Entertainment, Inc. ("plaintiff" or "MGA") is a California
28 | corporation with a principal place of business in Van Nuys, California.

2154363.2

-4-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT 22 PAGE 237

1        2.     Answering paragraph 2 of the Complaint, Mattel admits that

2  Mattel is a Delaware corporation with a principal place of business in El Segundo,

3  California.

4        3.     Answering paragraph 3 of the Complaint, Mattel denies that

5  there has been wrongful conduct on its part and states that it is without knowledge

6  or information sufficient to form a belief as to the truth or falsity of the remaining

7  allegations set forth therein and, on that basis, denies them.

8        4.     Answering paragraph 4 of the Complaint, Mattel admits that

9  plaintiff purports to assert claims under the Lanham Act, 15 U.S.C. §§ 1125(a) and

10  (c), <u>California Business and Professions Code</u> §§ 17200 *et seq.*, <u>California Business</u>

11  <u>and Professions Code</u> § 14330 and California common law, denies that plaintiff is

12  entitled to any relief thereunder and denies the truth of the remaining allegations set

13  forth in paragraph 4.

14        5.     Answering paragraph 5 of the Complaint, Mattel admits that it is

15  subject to personal jurisdiction in this District and denies the truth of the remaining

16  allegations set forth in paragraph 5.

17        6.     Answering paragraph 6 of the Complaint, Mattel admits that

18  venue is proper in this District and denies the truth of the remaining allegations set

19  forth in paragraph 6.

20        7.     Answering paragraph 7 of the Complaint, Mattel admits that

21  MGA has filed the instant lawsuit and denies the truth of the remaining allegations

22  set forth in paragraph 7.

23        8.     Answering paragraph 8 of the Complaint, Mattel states that it is

24  without knowledge or information sufficient to form a belief as to the truth or falsity

25  of the allegations regarding MGA's history set forth therein and, on that basis,

26  denies them, states that MGA has made conflicting representations, including in

27  sworn statements, that are at odds with the allegations of the Complaint and denies

28  the truth of the remaining allegations set forth in paragraph 8.

2154363.2

**EXHIBIT 22 PAGE 241**

1        9.    Answering paragraph 9 of the Complaint, Mattel admits that

2    MGA filed this action, states that Mattel's web site and corporate governance

3    policies speak for themselves and denies the truth of the remaining allegations set

4    forth in paragraph 9.

5        10.    Answering paragraph 10 of the Complaint, Mattel admits that it

6    is the world's most successful toy company, states that the first doll in its BARBIE

7    line was publicly introduced in 1959 and that BARBIE-branded dolls have been the

8    world's best-selling toys, states that Mattel's sales and stock price speak for

9    themselves, and denies the truth of the remaining allegations set forth in paragraph

10   10.

11       11.    Answering paragraph 11 of the Complaint, Mattel admits that

12   Adrienne Fontanella is the former president for girls' toys at Mattel, states that it is

13   without knowledge or information sufficient to form a belief as to the truth or falsity

14   of the allegations regarding an alleged statement by Ms. Fontanella, and denies the

15   truth of the remaining allegations set forth in paragraph 11.

16       12.    Answering paragraph 12 of the Complaint, Mattel is without

17   knowledge or information sufficient to form a belief as to the truth or falsity of the

18   allegations regarding alleged statements by unidentified "analysts," states that

19   Mattel's sales and stock price speak for themselves, and denies the truth of the

20   remaining allegations set forth in paragraph 12.

21       13.    Answering paragraph 13 of the Complaint, Mattel admits that Jill

22   Barad became President and Chief Executive Officer of Mattel in January 1997, that

23   Mattel acquired Tyco Industries, Inc. ("Tyco") in March 1997, that Mattel acquired

24   Pleasant Company in 1998, Mattel acquired the Learning Company in May 1999,

25   that Mattel acquired Purple Moon in 1999, that the MATCHBOX brand was owned

26   by Tyco, that the AMERICAN GIRL line of dolls was made by Pleasant Company

27   at the time of that entity's acquisition, and denies the truth of the remaining

28   allegations set forth in paragraph 13.

154363.2

-6-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT 22 PAGE 245

14.     Answering paragraph 14 of the Complaint, Mattel states that its public announcements speak for themselves, and denies the truth of the remaining allegations set forth therein.

15.     Answering paragraph 15 of the Complaint, Mattel states that its stock price and its public announcements speak for themselves, and denies the truth of the remaining allegations set forth therein.

16.     Answering paragraph 16 of the Complaint, Mattel states that its stock price speaks for itself, states that it is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations regarding the alleged views of unnamed "analysts" and "[i]nvestors," and denies the truth of the remaining allegations set forth therein.

17.     Answering paragraph 17 of the Complaint, Mattel admits that Ms. Barad resigned in February 2000.

18.     Answering paragraph 18 of the Complaint, Mattel admits that Robert Eckert became Chairman and Chief Executive Officer of Mattel in May 2000 and that Mr. Eckert previously was employed at Kraft Foods, Inc. for 23 years, is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations regarding the views of unnamed "[i]nvestors" and others, and denies the truth of the remaining allegations set forth in paragraph 18.

19.     Answering paragraph 19 of the Complaint, Mattel admits that the *Wall Street Journal* published an article on August 10, 2000 the content of which speaks for itself, and denies the truth of the remaining allegations set forth therein.

20.     Answering paragraph 20 of the Complaint, Mattel admits that it disposed of the Learning Company in October 2000, states that its sales and revenues speak for themselves, states that the remainder of the allegations contained therein are characterizations, not factual assertions, and therefore no response is necessary under Fed. R. Civ. P. 8(b) and, to the extent any further response is required, denies the truth of any remaining allegations set forth in paragraph 20.

1    21.    Answering paragraph 21 of the Complaint, Mattel admits that

2  products in plaintiff's "Bratz" line compete with products in Mattel's BARBIE and

3  other product lines and states that the remainder of the allegation contained

4  therein—consisting of a sentence fragment—is unintelligible and on that basis

5  denies the truth of any such remaining allegation set forth therein.

6    22.    Answering paragraph 22 of the Complaint, Mattel admits that

7  products in plaintiff's "Bratz" line compete with Mattel products, states that the

8  remainder of the allegations contained therein are characterizations, not factual

9  assertions, and that therefore no response is necessary under <u>Fed. R. Civ. P.</u> 8(b)

10  and, to the extent any further response is required, denies the truth of any remaining

11  allegations set forth therein.

12    23.    Answering paragraph 23 of the Complaint, Mattel states that

13  MGA has made conflicting statements, including in sworn statements, that are

14  inconsistent with the allegations set forth in paragraph 23 of the Complaint and

15  states that it is therefore without knowledge or information sufficient to form a

16  belief as to the truth or falsity of the allegations set forth therein and, on that basis,

17  denies them.

18    24.    Answering paragraph 24 of the Complaint, Mattel states that the

19  "look" of the referenced dolls speak for themselves and denies the truth of the

20  remaining allegations set forth therein.  By way of further answer, Mattel states that

21  the photographs and their accompanying caption on page 7 of the Complaint are

22  false and misleading to the extent they are intended to suggest that MGA has

23  produced or used a consistent packaging shape or look or that it has protectible

24  rights in the matters depicted in the photographs.

25    25.    Answering paragraph 25 of the Complaint, Mattel admits that

26  Bratz dolls are between approximately 9.5 to 10 inches in height, states that the

27  appearances of the dolls speak for themselves, denies that "Bratz" dolls are or "were

28  intentionally shorter" than dolls in Mattel's BARBIE line, denies that the "Bratz"

2154363.2

-8-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT 22 PAGE 253

1  dolls "looked like no other" and denies the truth of the remaining allegations set

2  forth in paragraph 25.

3        26.    Answering paragraph 26 of the Complaint, Mattel states that the

4  use of the term "classic" is unintelligible, since Mattel has designed and sold

5  different dolls using different heads and with different fashions and themes over the

6  years, and denies the truth of any remaining allegations.  By way of further answer,

7  Mattel states that the image encaptioned "Mattel's 'Barbie'" on page 8 of the

8  Complaint is misleading in that it depicts one of the doll heads that have been used

9  as part of the BARBIE line for many years, and therefore ignores that Mattel has

10  long designed and sold an array of different BARBIE line dolls that use different

11  doll heads, including doll heads which depict different ethnicities, and that are

12  dressed in different clothing and fashion styles.

13        27.    Answering paragraph 27 of the Complaint, Mattel admits that

14  MGA has used the line "The Girls With a Passion for Fashion" in some contexts,

15  denies that MGA originated or otherwise has rights to that phrase, admits that one

16  audience for products in the "Bratz" line has been "tweens" and denies the truth of

17  the remaining allegations set forth in paragraph 27.

18        28.    Answering paragraph 28 of the Complaint, Mattel admits that

19  certain "Bratz" dolls have won certain awards, the terms of which speak for

20  themselves, states that it is without knowledge or information sufficient to form a

21  belief as to the truth or falsity of the allegations regarding the "awards" MGA claims

22  and, on that basis, denies them, denies that plaintiff has protectible rights and denies

23  the truth of any remaining allegations set forth in paragraph 28.

24        29.    Answering paragraph 29 of the Complaint, Mattel admits that

25  dolls in the "Bratz" line compete with dolls in Mattel product lines, denies that

26  Mattel has or has ever had a "stranglehold" on any market, states that the market

27  allegations contained in paragraph 29 are vague and ambiguous, including without

28  limitation in that the allegations fail to specify what products among the parties'

2154363.2

SECOND AMENDED ANSWER AND COUNTERCLAIMS

**EXHIBIT 22 PAGE 257**

1   respective lines are being referred to and what time period is being referred to, and

2   denies the truth of any remaining allegations set forth in paragraph 29.

3            30.    Answering paragraph 30 of the Complaint, Mattel admits that

4   MGA has been a licensee of Mattel, states that the market allegations are vague and

5   ambiguous, including without limitation in that the allegations fail to specify what

6   products are being referred to and what time periods or points in time are being

7   referred to, and states that the remainder of the allegations contained therein are

8   characterizations, not factual assertions, and therefore no response is necessary

9   under Fed. R. Civ. P. 8(b) and, to the extent any further response is required, denies

10   the truth of any remaining allegations set forth in paragraph 30.

11            31.    Answering paragraph 31 of the Complaint, Mattel states that the

12   allegations contained therein are characterizations, not factual assertions, and

13   therefore no response is necessary under Fed. R. Civ. P. 8(b) and, to the extent any

14   further response is required, denies the truth of the allegations set forth in paragraph

15   31.

16            32.    Answering paragraph 32 of the Complaint, Mattel denies the

17   truth of the allegations set forth therein.

18            33.    Answering paragraph 33 of the Complaint, Mattel denies the

19   truth of the allegations set forth therein.

20            34.    Answering paragraph 34 of the Complaint, Mattel states that it

21   has released various MY SCENE dolls, including MY SCENE dolls named

22   "Madison", "Chelsea" and "Barbie," states that the appearance of the Bratz and MY

23   SCENE dolls speak for themselves, denies that Mattel designed its MY SCENE

24   dolls to "evoke" or resemble the alleged "look" of "Bratz" dolls, denies that plaintiff

25   has protectible rights, states that MGA has made conflicting representations that are

26   at odds with the allegations of the Complaint and that it is therefore without

27   knowledge or information sufficient to form a belief as to the truth or falsity of the

28   allegations regarding the "launch" of Bratz dolls set forth therein and, on that basis,

1  denies them, and denies the truth of the remaining allegations set forth therein.  By
2  way of further answer, Mattel states that the photographs and their accompanying
3  captions on page 10 of the Complaint are misleading and false to the extent they are
4  intended to suggest that a particular Mattel doll has been changed over time as
5  purportedly depicted.  Among other things, Mattel has long designed and sold an
6  array of different BARBIE line dolls using different doll heads, and the photographs
7  encaptioned "Mattel's Traditional 'Barbie'" is one of the doll heads that has been
8  used, and continues to be used, as part of the BARBIE line.  In addition, the
9  photographs encaptioned MY SCENE doll "circa 2002" is, in fact, a Mattel doll
10  character called BARBIE that continues to be sold and/or marketed with that head,
11  and the photographs encaptioned MY SCENE doll "circa 2004" depict a MY
12  SCENE doll character separate and apart from the one depicted in the "circa 2002"
13  image (and is not a revised character as plaintiff apparently attempts to imply).

14      35.    Answering paragraph 35 of the Complaint, Mattel admits that
15  Mattel released a product line called FLAVAS, states that the appearance of the
16  FLAVAS dolls speaks for themselves, states that it is without knowledge or
17  information sufficient to form a belief as to the truth or falsity of the allegations
18  regarding the  "rumor" relied upon by plaintiff and the undefined "media"
19  purportedly quoting Isaac Larian and, on that basis, denies them, denies that Mattel
20  has abandoned the FLAVAS line, and denies the truth of the remaining allegations
21  set forth in paragraph 35.

22      36.    Answering paragraph 36 of the Complaint, Mattel denies the
23  truth of the allegations set forth therein.

24      37.    Answering paragraph 37 of the Complaint, Mattel denies the
25  truth of the allegations set forth therein.  By way of further answer, Mattel states that
26  the unnumbered photographs and their accompanying captions on pages 11 through
27  16 of the Complaint -- which apparently were included to purportedly support the
28  allegation that MY SCENE dolls "became 'Bratz,'" which allegation Mattel

2154363.2

EXHIBIT 22 PAGE 265

1   specifically denies -- are false and misleading.  Among other things, the heads

2   depicted are among an array of different doll heads that Mattel has used, and

3   continues to use, over the course of many years.  Moreover, the images purport to

4   compare different Mattel doll lines to show alleged changes in appearance even

5   though, in fact, each of the heads are currently sold and/or marketed to the public.

6   The "Blonde" series of photographs encaptioned "original" and "recent" MY

7   SCENE is further and specifically misleading in that it purports to compare two

8   differently named and outfitted dolls in the MY SCENE doll line, both of which

9   continue to be sold and/or marketed.

10          38.     Answering paragraph 38 of the Complaint, Mattel states that the

11  phrase "the 'BRATZ' eye" is unintelligible, denies that MGA has rights therein,

12  denies that MGA was the originator of or the first to use the eye shape or makeup

13  depicted as purportedly constituting "the 'BRATZ' eye," denies that Mattel has

14  copied the "the 'BRATZ' eye" and denies the truth of the remaining allegations

15  contained in paragraph 38.  By way of further answer, Mattel states that the

16  unnumbered photographs and accompanying caption on page 13 of the Complaint

17  are false and misleading.  Among other things, the purported "Original Mattel 'My

18  Scene' Eye" is one of the eye and makeup designs that Mattel has used over the

19  course of many years, and Mattel continues to sell and/or market dolls using the eye

20  and makeup design depicted therein.

21          39.     Answering paragraph 39 of the Complaint, Mattel states that the

22  phrase "the 'BRATZ' eye" is unintelligible, denies that MGA has rights therein,

23  denies that MGA was the originator of or the first to use the eye shape or makeup

24  purportedly described as constituting "the 'BRATZ' eye," denies that Mattel has

25  copied "the 'BRATZ' eye," states that the relevant dolls speak for themselves and

26  denies the truth of the remaining allegations contained in paragraph 39.  By way of

27  further answer, Mattel states that the unnumbered photographs and accompanying

28  captions on page 14 of the Complaint are false and misleading.  Among other things,

-12-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

2154363.2

EXHIBIT 22 PAGE 269

1  the purported "New Mattel 'My Scene' Eye" is one of the eye and makeup designs

2  that Mattel has used over the course of many years, and Mattel continues to sell

3  and/or market dolls using the eye and makeup design depicted on page 14 of the

4  Complaint.

5        40.     Answering paragraph 40 of the Complaint, Mattel denies the

6  truth of the allegations therein.  By way of further answer, Mattel states that the

7  unnumbered photographs and their accompanying captions on pages 15 to 16 are

8  false and misleading.  Among other things, the heads depicted are among an array of

9  different doll heads that Mattel has used, and continues to use, over the course of

10  many years.  Moreover, the photographs purport to compare different Mattel doll

11  lines to show alleged changes in appearance even though, in fact, each of the heads

12  are currently sold and/or marketed to the public.  The "Blonde" series of

13  photographs encaptioned "original" and "recent" MY SCENE is further and

14  specifically misleading in that it purports to compare two differently named and

15  outfitted dolls in the MY SCENE doll line, both of which continue to be sold and/or

16  marketed.

17        41.     Answering paragraph 41 of the Complaint, Mattel denies the

18  truth of the allegations set forth therein.

19        42.     Answering paragraph 42 of the Complaint, Mattel admits that the

20  photographs purport to depict two packages that were, among others, part of the MY

21  SCENE line, state that the packages speak for themselves and denies the truth of any

22  remaining allegations set forth therein.

23        43.     Answering paragraph 43 of the Complaint, Mattel admits that the

24  photograph purports to depict one of the packages that were, among others, part of

25  the MY SCENE line, states that the parties' packages speak for themselves, states

26  that MGA has failed to establish that it originated, or has protectible rights in, an

27  "open and transparent style" for packaging and denies the truth of the remaining

28  allegations set forth therein.

-13-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

**EXHIBIT 22 PAGE 273**

44.     Answering paragraph 44 of the Complaint, Mattel admits that one photograph purports to depict one of the packages that were, among others, part of the MY SCENE line, admits that the other photograph purports to depict one of the packages that were, among others, used as part of the Bratz line, states that the parties' packages speak for themselves, denies that MGA originated, or has protectible rights in, "the 'BRATZ' packaging" or in the packaging depicted in the Complaint and denies the truth of any remaining allegations set forth therein.

45.     Answering paragraph 45 of the Complaint, Mattel admits that one photograph purports to depict one of the packages that were, among others, part of the MY SCENE line, admits that the other photograph purports to depict one of the packages that were, among others, used as part of the Bratz line, states that the parties' packages speak for themselves, denies that MGA originated, or has protectible rights in, the packaging depicted in the Complaint and denies the truth of any remaining allegations set forth therein.

46.     Answering paragraph 46 of the Complaint, Mattel states that it has utilized a wide variety of packaging styles and shapes over the years, states that the relevant packaging speaks for itself, states that MGA lacks protectible rights in "non-rectangular shaped box" packaging or in the other elements MGA claims in paragraph 46, and denies the truth of the remaining allegations set forth therein.

47.     Answering paragraph 47 of the Complaint, Mattel denies that any alleged "theme" is "MGA's theme," denies that MGA originated or has rights to any theme and denies the truth of the remaining allegations set forth therein.

48.     Answering paragraph 48 of the Complaint, Mattel admits that it released a doll called "Chillin Out!", states that it has released such themed dolls over the course of many years, admits MGA released a "Wintertime Wonderland" themed doll, denies that MGA originated or has rights to such theme, states that the relevant products speak for themselves and denies the truth of the remaining allegations set forth therein.

2154363.2

-14-

EXHIBIT 22 PAGE 277

1        49.    Answering paragraph 49 of the Complaint, Mattel admits that it

2   released a doll called "Night on the Town", states that it has released such themed

3   dolls over the course of many years, admits MGA released a "Formal Funk" themed

4   doll, denies that MGA originated or has rights to such theme, states that the relevant

5   products speak for themselves and denies the truth of the remaining allegations set

6   forth therein.

7        50.    Answering paragraph 50 of the Complaint, Mattel admits that it

8   released a doll called "Jammin' in Jamaica" and a playset called "Guava Gulch Tiki

9   Lounge", states that it has released such themed dolls and products over the course

10  of many years, admits that MGA released a "Sun-Kissed Summer" themed doll and

11  playset, denies that MGA originated or has rights to such theme, states that the

12  relevant products speak for themselves and denies the truth of the remaining

13  allegations set forth therein.

14       51.    Answering paragraph 51 of the Complaint, Mattel admits that it

15  has aired television commercials for its MY SCENE line, states that such

16  commercials speak for themselves, denies the truth of the remaining allegations set

17  forth therein and specifically denies that MGA was the originator of or has rights to

18  commercials "combining live action with animated sequences" set to "pop music

19  and lyrics".

20       52.    Answering paragraph 52 of the Complaint, Mattel denies the

21  truth of the allegations set forth therein.

22       53.    Answering paragraph 53 of the Complaint, Mattel admits that it

23  released a MY SCENE "Sound Lounge", admits that MGA released a product called

24  "Runway Disco", states that the relevant products speak for themselves, denies that

25  it "imitated MGA's trapezoidal box," denies that MGA has rights thereto, and

26  denies the truth of the remaining allegations set forth therein.

27       54.    Answering paragraph 54 of the Complaint, Mattel denies the

28  truth of the allegations set forth therein.

2154363.2

1       55.    Answering paragraph 55 of the Complaint, Mattel admits that,

2   among the styling heads it has produced and sold over the course of many years, it

3   released a MY SCENE styling head, admits that MGA released a styling head called

4   "Funky Fashion Makeover Head", states that the relevant products speak for

5   themselves, denies that MGA has protectible rights and denies the truth of the

6   remaining allegations set forth in paragraph 55.

7       56.    Answering paragraph 56 of the Complaint, Mattel is without

8   knowledge or information sufficient to form a belief as to the truth or falsity of the

9   allegations set forth therein because plaintiff fails to identify the alleged instances of

10  confusion, including the source of the unidentified picture titled "Hairstyle practice",

11  and on that basis, denies them, and denies the truth of any remaining allegations set

12  forth in paragraph 56.

13      57.    Answering paragraph 57 of the Complaint, Mattel admits that it

14  has aired television commercials for its MY SCENE line, states that such

15  commercials speak for themselves and denies the truth of the remaining allegations

16  set forth therein.

17      58.    Answering paragraph 58 of the Complaint, Mattel admits that

18  MGA has used the line "The Girls With a Passion for Fashion" in some contexts,

19  denies that MGA originated that phrase or otherwise has rights to it, states that

20  Mattel's web site speaks for itself and denies the truth of the remaining allegations

21  set forth therein.

22      59.    Answering paragraph 59 of the Complaint, Mattel admits that,

23  among the plush products that it has produced and sold over the course of many

24  years, it has released plush dogs as part of its MY SCENE "Miami Getaway"

25  themed product line, states that Mattel has for many years sold plush pets of the type

26  used with its MY SCENE dog, admits that MGA has released various Bratz pets,

27  states that MGA was not the originator of and has no rights to the features and other

28

-16-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

**EXHIBIT 22 PAGE 285**

1 elements described therein, states that the relevant products speak for themselves
2 and denies the truth of the remaining allegations set forth therein.

3        60.    Answering paragraph 60 of the Complaint, Mattel admits that,
4 among the plush toys that it has released over the course of many years, its MY
5 SCENE dog has been sold in packaging depicted (in part) on page 22 of the
6 Complaint, states that Mattel has for many years sold plush pets and other plush
7 products in packaging of the type used with its MY SCENE dog, admits that MGA
8 has released a "Bratz" dog, states that MGA was not the originator of and has no
9 rights to the packaging described therein, states that the relevant packages speak for
10 themselves and denies the truth of the remaining allegations set forth therein.

11        61.    Answering paragraph 61 of the Complaint, Mattel denies that it
12 has intended to cause any consumer confusion and states that it is without
13 knowledge or information sufficient to form a belief as to the truth or falsity of the
14 allegations set forth therein concerning unnamed retailers, customers and others
15 because plaintiff fails to identify any source for the matters alleged and, on that
16 basis, denies them and denies the truth of any remaining allegations set forth therein.

17        62.    Answering paragraph 62 of the Complaint, Mattel denies that it
18 has intended to cause any confusion and states that it is without knowledge or
19 information sufficient to form a belief as to the truth or falsity of the allegations set
20 forth therein concerning alleged comments and conversations because plaintiff fails
21 to identify any source for the alleged comments and conversations and, on that
22 basis, denies them, and denies the truth of any remaining allegations set forth
23 therein.

24        63.    Answering paragraph 63 of the Complaint, Mattel denies that it
25 has intended to cause any confusion and states that it is without knowledge or
26 information sufficient to form a belief as to the truth or falsity of the allegations set
27 forth therein because plaintiff fails to identify any source for the alleged comments
28

-17-

1    and conversations and, on that basis, denies them, and denies the truth of any
2    remaining allegations set forth therein.

3           64.     Answering paragraph 64 of the Complaint, Mattel denies that it
4    has intended to cause any confusion and states that it is without knowledge or
5    information sufficient to form a belief as to the truth or falsity of the allegations set
6    forth therein because plaintiff fails to identify any source for the alleged comments
7    and conversations and, on that basis, denies them, and denies the truth of any
8    remaining allegations set forth therein.

9           65.     Answering paragraph 65 of the Complaint, Mattel denies the
10   truth of the allegations set forth therein.

11          66.     Answering paragraph 66 of the Complaint, Mattel admits that it
12   sued a competitor in the German courts for unfair competition for copying various
13   Mattel BARBIE line products, states that such claims exclusively arose under and
14   were the subject of German law, states that since that time the Federal Supreme
15   Court has rejected the contention made by MGA in paragraph 66 that
16   "systematically copying and borrowing elements" from competing dolls supports a
17   claim for unfair competition, and denies the truth of the remaining allegations set
18   forth therein.

19          67.     Answering paragraph 67 of the Complaint, Mattel denies the
20   truth of the allegations set forth therein.

21          68.     Answering paragraph 68 of the Complaint, Mattel admits that it
22   has released dolls called "Wee 3 Friends," admits that MGA has released dolls
23   called "4-Ever Best Friends," states that the relevant products speak for themselves,
24   denies that MGA's packaging is distinctive, denies that MGA has protectible rights
25   thereto and denies the truth of the remaining allegations set forth in paragraph 68.

26          69.     Answering paragraph 69 of the Complaint, Mattel admits that its
27   Fisher Price division has released, among other dolls called "Little Mommy," the
28   "Little Mommy Potty Training Baby Doll," admits that MGA has released a

-18-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

2154363.2

EXHIBIT 22 PAGE 293

1 | "Mommy's Little Patient" doll and denies the truth of the remaining allegations set
2 | forth therein.
3 |       70.   Answering paragraph 70 of the Complaint, Mattel admits that it
4 | has released die-cast cars and other products called "Acceleracers" as part of its
5 | HOT WHEELS line, admits that MGA has released products called "AlienRacers,"
6 | denies that MGA was the originator of or has rights to the elements and matters
7 | described in paragraph 70, states that the relevant products speak for themselves and
8 | denies the truth of the remaining allegations set forth therein.
9 |       71.   Answering paragraph 71 of the Complaint, Mattel admits that it
10 | has aired commercials relating to "Acceleracers," states that such commercials
11 | speak for themselves, denies the truth of the remaining allegations set forth therein
12 | and specifically denies that MGA originated or has rights to commercials and other
13 | matters described therein.
14 |       72.   Answering paragraph 72 of the Complaint, Mattel states that its
15 | web site speaks for itself, denies the truth of the remaining allegations contained in
16 | paragraph 72 and specifically denies that Mattel intended to create confusion in the
17 | marketplace.
18 |       73.   Answering paragraph 73 of the Complaint, Mattel denies the
19 | truth of the allegations set forth therein.
20 |       74.   Answering paragraph 74 of the Complaint, Mattel denies the
21 | truth of the allegations set forth therein.
22 |       75.   Answering paragraph 75 of the Complaint, Mattel admits that it
23 | has reminded certain former employees who became employed by MGA by letter of
24 | their contractual and fiduciary obligation to maintain the secrecy of all Mattel
25 | confidential and proprietary business information, states that such letters were
26 | prepared and sent to their recipients in good faith contemplation of litigation, admits
27 | that it filed a complaint for declaratory relief against Ronald Brawer in Los Angeles
28 | Superior Court, entitled Mattel, Inc. v. Brawer, Case No. BC323381, on October 21,

1   2004, states that pursuant to the Court's Order of August 25, 2005 it need not

2   respond to the allegations in paragraph 75 relating to that action, and denies the truth

3   of the remaining allegations set forth in paragraph 75.

4          76.    Answering paragraph 76 of the Complaint, Mattel states that

5   MGA cannot establish subject matter jurisdiction regarding extra-territorial acts,

6   including such acts that are lawful in foreign nations, and denies the truth of

7   allegations set forth therein.

8          77.    Answering paragraph 77 of the Complaint, Mattel states that

9   MGA cannot establish subject matter jurisdiction regarding extra-territorial acts,

10  including such acts that are lawful in foreign nations, and denies the truth of the

11  allegations set forth therein.

12         78.    Answering paragraph 78 of the Complaint, Mattel states that it is

13  without knowledge or information sufficient to form a belief as to the truth or falsity

14  of the allegations regarding MGA's claimed "shortage of doll hair" and, on that

15  basis, denies them and denies the truth of the remaining allegations set forth therein.

16         79.    Answering paragraph 79 of the Complaint, Mattel states that

17  MGA cannot establish subject matter jurisdiction regarding extra-territorial acts,

18  including such acts that are lawful in foreign nations, and denies the truth of

19  allegations set forth therein.

20         80.    Answering paragraph 80 of the Complaint, Mattel denies the

21  truth of the allegations set forth therein.

22         81.    Answering paragraph 81 of the Complaint, Mattel admits that

23  NPD Funworld ("NPD") supplies sales statistics in *inter alia* the toy, PC games and

24  video games industries, admits that to Mattel's knowledge NPD restricts the use of

25  its subscriber information, states that MGA was sued by NPD and states that it is

26  without knowledge or information sufficient to form a belief as to the truth or falsity

27  of the allegations regarding the need of unspecified "toy companies" for NPD

28

-20-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT 22 PAGE 301

1  statistics and, on that basis, denies them and denies the truth of any remaining
2  allegations set forth therein.

3      82.    Answering paragraph 82 of the Complaint, Mattel denies the
4  truth of the allegations set forth therein.

5      83.    Answering paragraph 83 of the Complaint, Mattel states that it is
6  without knowledge or information sufficient to form a belief as to the truth or falsity
7  of the allegations set forth therein because MGA fails to quantify its annual
8  subscription fees and, on that basis, denies them.

9      84.    Answering paragraph 84 of the Complaint, Mattel states that it is
10 without knowledge or information sufficient to form a belief as to the truth or falsity
11 of the allegations set forth therein and, on that basis, denies them.

12     85.    Answering paragraph 85 of the Complaint, Mattel states that
13 MGA was sued by NPD, states that it is without knowledge or information sufficient
14 to form a belief as to such nature and grounds for such litigation (to which Mattel
15 was not a party) and, on that basis, denies the allegations relating thereto, and denies
16 the truth of the remaining allegations set forth therein.

17     86.    Answering paragraph 86 of the Complaint, Mattel denies the
18 truth of the allegations set forth therein.

19     87.    Answering paragraph 87 of the Complaint, Mattel admits that the
20 Children's Advertising Review Unit ("CARU") is the children's arm of the
21 advertising industry's self-regulation program, states that compliance with CARU's
22 Privacy Program can provide FTC-approved Safe Harbor under the Children's
23 Online Privacy Protection Act ("COPPA"), and denies the truth of the remaining
24 allegations set forth therein.

25     88.    Answering paragraph 88 of the Complaint, Mattel admits that it
26 is one of dozens of CARU Supporters and denies the truth of the remaining
27 allegations set forth therein.

28

2154363.2

-21-

**EXHIBIT 22 PAGE 305**

1     89.  Answering paragraph 89 of the Complaint, Mattel denies the

2 truth of the allegations set forth therein.

3     90.  Answering paragraph 90 of the Complaint, Mattel states that it is

4 without knowledge or information sufficient to form a belief as to the truth or falsity

5 of the allegations as to the consequences to MGA of MGA's violations of CARU

6 standards and, on that basis, denies them.

7     91.  Answering paragraph 91 of the Complaint, Mattel states that it is

8 without knowledge or information sufficient to form a belief as to the truth or falsity

9 of the allegations as to the consequences to MGA of MGA violation of CARU

10 standards and, on that basis, denies them.

11     92.  Answering paragraph 92 of the Complaint, Mattel admits that the

12 Toy Industry Association, Inc. ("TIA") is a toy industry trade association, admits

13 that at certain times TIA has given awards called the People's Choice Toy of The

14 Year or the Toy of The Year Award, denies that Mattel wrongfully influenced TIA

15 and states that it is without knowledge or information sufficient to form a belief as

16 to the truth or falsity of the remaining allegations set forth therein and, on that basis,

17 denies them.

18     93.  Answering paragraph 93 of the Complaint, Mattel states that the

19 allegations set forth therein are vague and ambiguous, including in that they fail to

20 properly identify the years in which the referenced awards were given and/or the

21 particular product which won such awards, and accordingly lacks knowledge or

22 information sufficient to form a belief as to the truth or falsity of the allegations set

23 forth therein and, on that basis, denies them.

24     94.  Answering paragraph 94 of the Complaint, Mattel admits that

25 Neil Freidman was the chairman of TIA from approximately May 2002 to May

26 2004, states that Fischer Price is a division of Mattel and denies the truth of the

27 remaining allegations set forth therein.

28

-22-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT 22 PAGE 230

95.   Answering paragraph 95 of the Complaint, Mattel admits that Hokey Pokey Elmo won the Toy of the Year Award and denies the truth of the remaining allegations set forth therein.

96.   Answering paragraph 96 of the Complaint, Mattel states that it is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations set forth therein and, on that basis, denies them.

97.   Answering paragraph 97 of the Complaint, Mattel denies the truth of the allegations set forth therein.

98.   Answering paragraph 98 of the Complaint, Mattel denies the truth of the allegations set forth therein.

99.   Answering paragraph 99 of the Complaint, Mattel denies the truth of the allegations set forth therein.

100.   Answering paragraph 100 of the Complaint, Mattel denies the truth of the allegations set forth therein.

101.   Answering paragraph 101 of the Complaint, Mattel repeats its responses contained in paragraphs 1 through 100 of this Second Amended Answer and incorporates them by reference as though fully and completely set forth herein.

102.   Answering paragraph 102 of the Complaint, Mattel denies the truth of the allegations set forth therein and specifically denies that MGA's alleged trade dress is distinctive.

103.   Answering paragraph 103 of the Complaint, Mattel denies the truth of the allegations set forth therein and specifically denies that MGA's alleged trade dress is distinctive.

104.   Answering paragraph 104 of the Complaint, Mattel denies the truth of the allegations set forth therein.

105.   Answering paragraph 105 of the Complaint, Mattel denies the truth of the allegations set forth therein.

2154363.2

1    106.   Answering paragraph 106 of the Complaint, Mattel denies the
2  truth of the allegations set forth therein.

3    107.   Answering paragraph 107 of the Complaint, Mattel denies the
4  truth of the allegations set forth therein.

5    108.   Answering paragraph 108 of the Complaint, Mattel denies the
6  truth of the allegations set forth therein and specifically denies that plaintiff is
7  entitled to injunctive relief.

8    109.   Answering paragraph 109 of the Complaint, Mattel repeats its
9  responses contained in paragraphs 1 through 108 of this Second Amended Answer
10  and incorporates them by reference as though fully and completely set forth herein.

11    110.   Answering paragraph 110 of the Complaint, Mattel denies the
12  truth of the allegations set forth therein.

13    111.   Answering paragraph 111 of the Complaint, Mattel denies the
14  truth of the allegations set forth therein.

15    112.   Answering paragraph 112 of the Complaint, Mattel denies the
16  truth of the allegations set forth therein.

17    113.   Answering paragraph 113 of the Complaint, Mattel denies the
18  truth of the allegations set forth therein.

19    114.   Answering paragraph 114 of the Complaint, Mattel denies the
20  truth of the allegations set forth therein.

21    115.   Answering paragraph 115 of the Complaint, Mattel denies the
22  truth of the allegations set forth therein.

23    116.   Answering paragraph 116 of the Complaint, Mattel denies the
24  truth of the allegations set forth therein.

25    117.   Answering paragraph 117 of the Complaint, Mattel denies the
26  truth of the allegations set forth therein and specifically denies that plaintiff is
27  entitled to injunctive relief.

28

2154363.2

1       118.   Answering paragraph 118 of the Complaint, Mattel denies the

2   truth of the allegations set forth therein.

3       119.   Answering paragraph 119 of the Complaint, Mattel repeats its

4   responses contained in paragraphs 1 through 118 of this Second Amended Answer

5   and incorporates them by reference as though fully and completely set forth herein.

6       120.   Answering paragraph 120 of the Complaint, Mattel denies the

7   truth of the allegations set forth therein.

8       121.   Answering paragraph 121 of the Complaint, Mattel denies the

9   truth of the allegations set forth therein.

10      122.   Answering paragraph 122 of the Complaint, Mattel denies the

11  truth of the allegations set forth therein.

12      123.   Answering paragraph 123 of the Complaint, Mattel denies the

13  truth of the allegations set forth therein and specifically denies that plaintiff is

14  entitled to injunctive relief.

15      124.   Answering paragraph 124 of the Complaint, Mattel repeats its

16  responses contained in paragraphs 1 through 123 of this Second Amended Answer

17  and incorporates them by reference as though fully and completely set forth herein.

18      125.   Answering paragraph 125 of the Complaint, Mattel denies the

19  truth of the allegations set forth therein.

20

21                              __General Denial__

22      Unless specifically admitted herein, Mattel denies the truth of each and

23  every allegation set forth in plaintiff's Complaint and specifically denies that

24  plaintiff is entitled to any relief against Mattel.

25

26

27

28

2154363.2

## Affirmative Defenses

By alleging the Affirmative Defenses set forth below, Mattel does not agree or concede that it bears the burden of proof or the burden of persuasion on any of these issues, whether in whole or in part.

## First Affirmative Defense

Plaintiff's Complaint fails to state a claim upon which relief can be granted.

## Second Affirmative Defense

Plaintiff has no valid, enforceable or protectible rights or interest in the alleged trade dress or other matters asserted, including without limitation in that plaintiff has failed to establish that its alleged trade dress is distinctive as to plaintiff.

## Third Affirmative Defense

Plaintiff's claims, including without limitation plaintiff's claims based upon alleged extra-territorial acts, are barred in whole or in part by lack of subject matter jurisdiction.

## Fourth Affirmative Defense

Plaintiff's claims are barred in whole or in part by plaintiff's unclean hands.

## Fifth Affirmative Defense

Plaintiff's claims are barred in whole or in part by virtue of Mattel's prior-creation of the elements and other matters asserted in the Complaint.

## Sixth Affirmative Defense

Plaintiff's claims are barred in whole or in part by its lack of standing.

## Seventh Affirmative Defense

Plaintiff's claims are barred in whole or in part by the applicable statutes of limitation and the doctrine of laches.

## Eighth Affirmative Defense

Plaintiff's claims are barred in whole or in part by the doctrines of waiver, estoppel and acquiescence.

## Ninth Affirmative Defense

Plaintiff's claims are barred in whole or in part by Mattel's constitutional rights of free speech, petitioning and association, including without limitation by the litigation privilege as protected by and/or codified in *inter alia* Section 47(b) of the California Civil Code, the *Noerr-Pennington* doctrine, the common interest privilege and by other privileges.

## Tenth Affirmative Defense

Plaintiff's claims are barred in whole or in part by Mattel's federal and state constitutional rights of free speech, including without limitation under the First Amendment of the United States Constitution.

## Eleventh Affirmative Defense

Plaintiff's claims are barred in whole or in part by the competitor privilege.

2154363.2

Twelfth Affirmative Defense

Plaintiff's claims are in whole or in part preempted by the Copyright Act and barred by the *Sears-Compco* doctrine.

Thirteenth Affirmative Defense

Plaintiff's requested relief, including plaintiff's requests for punitive and/or enhanced damages, are barred in whole or in part because all of Mattel's actions were in good faith.

Fourteenth Affirmative Defense

Plaintiff's damages, if any, were not caused by Mattel and are not attributable to the acts or omissions of Mattel.

Fifteenth Affirmative Defense

Plaintiff has failed to mitigate its damages, if any.

Additional Defenses

Mattel has insufficient knowledge or information upon which to form a belief as to whether additional defenses are available.  Mattel reserves the right to amend this Second Amended Answer to add, delete, or modify additional defenses based on legal theories which may or will be divulged through clarification of the Complaint, through discovery, through change or clarification of the governing law or through further legal analysis of plaintiff's positions in this litigation.

Prayer for Relief

WHEREFORE, Mattel prays for relief as follows:

-28-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

2154363.2

EXHIBIT 22 PAGE 254

1          1.     That the Complaint be dismissed with prejudice;

2          2.     That plaintiff take nothing by reason of the Complaint against

3 Mattel and that judgment be entered in Mattel's favor;

4          3.     That Mattel recover its costs and attorneys' fees; and

5          4.     That this Court award such other and further relief as it deems

6 just and proper.

7

8                  **COUNTERCLAIMS**

9          Pursuant to the Court's Orders of January 12, 2007 and June 27, 2007,

10 and incorporating its [Proposed] Amended Complaint dated November 19, 2006,

11 Mattel, Inc. alleges as follows:

12               **Preliminary Statement**

13          1.     For years MGA Entertainment, Inc. has engaged in a pattern of

14 stealing and using Mattel, Inc.'s property and trade secrets.  MGA's use of the

15 stolen property and trade secrets caused and continues to cause significant harm to

16 Mattel.  MGA first stole "Bratz," a fashion doll, from Mattel, and then continued

17 stealing Mattel's confidential and proprietary information to fuel MGA's growth.

18          2.     Carter Bryant conceived, created and developed Bratz designs

19 while he was employed by Mattel as a doll designer.  He concealed his Bratz work

20 from Mattel and wrongfully sold Bratz to MGA while he was a Mattel employee.

21 As MGA knows, Mattel owns the Bratz designs that Bryant made.  As the rightful

22 owner of those Bratz designs, Mattel has registered copyrights for them and seeks

23 damages arising from MGA's repeated infringement of those copyrights.

24          3.     Emboldened by the success of its illegal conduct, MGA has

25 repeated—and even expanded—its pattern of theft on numerous occasions.  For

26 example, in or about 2004, MGA decided to expand into Mexico.  To do so, and

27 operating from its Southern California offices, MGA hired away three key Mattel

28 employees in Mexico, who, on their way out, stole virtually every category of

1   Mattel's sensitive and trade secret business plans and information for the Mexican
2   market, as well as a significant quantity of sensitive and trade secret information
3   for Mattel's U.S. and worldwide businesses, and took them to MGA.  Armed with
4   Mattel's confidential business plans and methods, MGA claimed to have increased
5   its market share in Mexico alone by 90% in a single year.
6          4.    In 2005, MGA needed help in Canada.  So MGA, again
7   operating from its Southern California headquarters, hired Janine Brisbois from
8   Mattel.  At that time, Ms. Brisbois was responsible for Mattel's account with Toys
9   'R Us ("TRU") and Wal-Mart.  MGA gave her responsibility for those same
10  accounts, and she took from Mattel documents containing proprietary advertising,
11  project, sales, customer and strategy information for not only Canada, but for the
12  United States.  Eliminating any doubt that MGA then proceeded to use those stolen
13  materials, Brisbois subsequently accessed and modified certain of those Mattel
14  documents while employed by MGA.
15         5.    These are not the only instances of such misconduct, which
16  MGA orchestrated and carried out from its headquarters in this District.  Counter-
17  defendants have engaged in an ongoing, widespread pattern of illegal acts,
18  consisting of inducing Mattel employees to steal Mattel's confidential information
19  or other property and take it with them to MGA to further MGA's business interests
20  and to harm Mattel.

**Jurisdiction**

22         6.    This Court has federal question jurisdiction over this action
23  pursuant to 28 U.S.C. §§ 1331, 17 U.S.C. §§ 101 *et seq.*, and 18 U.S.C. § 1964(c).
24  This Court has supplemental jurisdiction over Mattel's state law claims pursuant to
25  28 U.S.C. § 1367.

**Venue**

27         7.    Venue is proper in this District pursuant to 28 U.S.C.
28  §§ 1391(b)-(d), 1391(f) and 1400(a) and 18 U.S.C. § 1965.

-30-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

**EXHIBIT 22 PAGE 262**

## Parties

8.    Mattel is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in El Segundo, California.

9.    Counter-defendant MGA Entertainment, Inc. ("MGA") is a corporation organized and existing under the laws of the State of California, with its principal place of business in Van Nuys, California.  Mattel is informed and believes, and on that basis alleges, that ABC International Traders, Inc. is a predecessor corporation to MGA and that until September 16, 2002, MGA was incorporated and known as ABC International Traders, Inc.  Upon the filing of the Complaint, Mattel, being ignorant of the nature, extent and scope of MGA Entertainment, Inc.'s involvement and complicity in the conduct alleged therein and having designated MGA Entertainment, Inc. in the Complaint as Doe 1 and having discovered its involvement and complicity, Mattel hereby amends its Complaint by substituting MGA Entertainment, Inc. for the fictitious Doe name Doe 1.

10.    Counter-defendant Carter Bryant ("Bryant") is an individual who formerly was employed by Mattel and has worked for and continues to work as a contactor for MGA.  Mr. Bryant currently resides in the State of Missouri.

11.    Counter-defendant MGA Entertainment (HK) Limited is a business entity organized and existing under the laws of the Hong Kong Special Administrative Region, with its principal place of business in Hong Kong.  Upon the filing of the Complaint, Mattel, being ignorant of the nature, extent and scope of involvement and complicity of MGA Entertainment (HK) Limited in the conduct alleged therein and having designated MGA Entertainment (HK) Limited in the Complaint as Doe 2 and having discovered its involvement and complicity, Mattel hereby amends its Complaint by substituting MGA Entertainment (HK) Limited for the fictitious Doe name Doe 2.

2154363.2

-31-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

**EXHIBIT 22 PAGE 266**

12.   Counter-defendant MGAE de Mexico, S.R.L. de C.V. ("MGA de Mexico") is a business entity organized and existing under the laws of Mexico, with its principal place of business in Mexico City, Mexico.

13.   Mattel is informed and believes, and on that basis alleges, that Counter-defendant Larian is the President and CEO of MGA and an individual residing in the County of Los Angeles.   Upon the filing of the Complaint, Mattel, being ignorant of the nature, extent and scope of involvement and complicity of Larian in the conduct alleged therein and having designated Larian in the Complaint as Doe 3 and having discovered his involvement and complicity, Mattel hereby amends its Complaint by substituting Larian for the fictitious Doe name Doe 3.

14.   Counter-defendant Carlos Gustavo Machado Gomez is an individual who is employed by Counter-defendant MGA and who, on information and belief, currently resides in the County of Los Angeles.

15.   The true names and capacities of Counter-defendants sued herein as DOES 4 through 10, inclusive, are unknown to Mattel, which therefore sues said Counter-defendants by such fictitious names.  Mattel will amend its pleadings to allege their true names and capacities when the same are ascertained.

**Factual Background**

**I.   MATTEL**

16.   Mattel manufactures and markets toys, games, dolls and other consumer products.  Harold Mattson and Eliot and Ruth Handler founded Mattel in 1945.  The name of the company was created by incorporating the names of two of its founders, "MATT-son" and "EL-liot."  Originating from the Handlers' garage in Southern California, the company greatly expanded its operations following World War II.  During the next several decades, Mattel became famous for producing high-quality products at reasonable prices.

SECOND AMENDED ANSWER AND COUNTERCLAIMS

2154363.2

EXHIBIT 22 PAGE 270

17.    Critical to Mattel's success is its ability to design and develop new products. Mattel invests millions of dollars in product design and development and introduces hundreds of new products each year. Mattel maintains a 180,000 square-foot design center in El Segundo, California, that houses hundreds of designers, sculptors, painters and other artists, who work exclusively to create the products on which Mattel's business depends.

18.    Mattel also has invested substantial amounts over many years to develop its business methods and practices, including, without limitation, its marketing and advertising research, plans, methods and processes; its business research and forecasts; its costs, budgets, pricing, credit terms, deal terms and finances; its manufacturing, distribution, and sales methods and processes; and its inventory methods and processes. These represent a material part of the intellectual infrastructure of Mattel and are highly valuable.

## II.   MGA ENTERTAINMENT

19.    MGA is also a toy manufacturer. MGA began as a consumer electronics business, but expanded into the toy business with licenses to sell handheld electronic games. By approximately late 1999 or early 2000, MGA developed a strategy to expand its business and compete directly with Mattel by launching a fashion doll line, so it stole a fashion doll that was owned by Mattel – "Bratz."

20.    MGA intentionally stole not just specific Mattel property, such as Bratz designs, prototypes and related materials, but also a vast array of trade secrets and other confidential information that comprise Mattel's intellectual infrastructure. MGA's rapid growth was not organic, but rather was based upon its theft of Bratz. As a result, MGA lacked an appropriate intellectual infrastructure for a company of its size and it became increasingly difficult to manage. To deal with these problems, as detailed below, time and time again MGA simply stole Mattel's proprietary business methods, practices and information. This not only

1   allowed MGA to avoid expending time, money and effort necessary to build a

2   legitimate business, but also allowed MGA to unfairly compete against Mattel by

3   taking Mattel's playbook.

4   **III.  MGA STEALS A NEW LINE OF FASHION DOLLS FROM MATTEL**

5   　　　　21.　Carter Bryant is a former Mattel employee.  Bryant joined Mattel

6   in September 1995, where he worked in Mattel's Design Center as a BARBIE

7   product designer.  In or about April 1998, Bryant resigned his position with Mattel

8   and moved to Missouri to live with his parents.  Late in 1998, Bryant applied to

9   Mattel to be rehired.  On January 4, 1999, he began working at Mattel in Mattel's

10  Design Center, again as a product designer, for Mattel's BARBIE collectibles line.

11  　　　　22.　Upon his return to Mattel in January 1999, Bryant executed an

12  Employee Confidential Information and Inventions Agreement (the "Employment

13  Agreement"), a true and correct copy of which is attached hereto as Exhibit A.

14  　　　　23.　Pursuant to his Employment Agreement and as a condition of

15  and in consideration for his employment, Bryant agreed, among other things, that

16  he held a position of trust with Mattel, that the designs and inventions he created

17  during his Mattel employment (with certain exceptions not relevant here) were

18  owned by Mattel, and that he would be loyal to the company by agreeing not to

19  assist or work for any competitor of Mattel while he was employed by Mattel.

20  　　　　24.　On January 4, 1999, Bryant also executed Mattel's Conflict of

21  Interest Questionnaire (the "Conflict Questionnaire").  Among other things, Bryant

22  certified in the Conflict Questionnaire that, other than as disclosed, he had not

23  worked for any competitor of Mattel in the prior twelve months and had not

24  engaged in any business venture or transaction involving a Mattel competitor that

25  could be construed as a conflict of interest.  Bryant understood what the Conflict

26  Questionnaire required because, among other things, he disclosed on it the

27  freelance work he had performed while in Missouri for Ashton-Drake, which is

28

2154363.2

-34-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT 22 PAGE 278

1    unrelated to the conduct alleged herein.  A true and correct copy of the Conflict

2    Questionnaire executed by Bryant is attached hereto as Exhibit B.

3              25.   Pursuant to the Conflict Questionnaire, Bryant also agreed that

4    he would immediately notify his supervisor of any change in his situation that

5    would cause him to change any of the foregoing certifications.  Despite this

6    obligation, at no time did Bryant disclose to Mattel that he was engaging in any

7    business venture or transaction with MGA or any other Mattel competitor.

8              26.   More specifically, while Bryant was employed by Mattel, Bryant

9    and other Counter-defendants misappropriated and misused Mattel property and

10   Mattel resources for the benefit of Bryant and MGA.  Such acts included, but are

11   not limited to, the following:

12              a.    using his exposure to Mattel development programs to

13   create the concept, design and name of Bratz;

14              b.    using Mattel resources, and while employed by Mattel,

15   Bryant worked by himself and with other Mattel employees and contractors to

16   design and develop Bratz, including without limitation by creating drawings and

17   three-dimensional models of Bratz dolls, and fashion designs for the dolls'

18   associated clothing and accessories; and

19              c.    using Mattel resources, and while employed by Mattel,

20   Bryant took steps to assist MGA to produce Bratz dolls.

21              27.   During the time that he was employed by Mattel and thereafter,

22   Bryant concealed these actions from Mattel, including by failing to notify his

23   supervisor of the conflict of interest he created when he began working on MGA's

24   behalf and when he began receiving payments from MGA.  Bryant additionally

25   enlisted other Mattel employees to perform work on Bratz during the time he was

26   employed by Mattel and, by all indications, in at least some cases led them to

27   believe that they were performing work on a project for Mattel.

28

2154363.2

EXHIBIT 22 PAGE 282

28.    Bryant also made affirmative misrepresentations to Mattel management and employees immediately before his departure from Mattel on October 20, 2000.  For example, during his last few weeks at Mattel, Bryant told his co-workers and supervisors that he was going to leave Mattel for "non-competitive" pursuits.  Bryant's representations to his supervisors and his co-workers were false.  Bryant knew at the time that those representations were false and made those false statements to conceal from Mattel the fact that he was already working with MGA and that he had contracted with MGA to assign Bratz works to MGA and to provide design and development services to MGA, a Mattel competitor.

29.    As a result of the efforts of Bryant and other Mattel employees working on Bratz (which were done without Mattel's knowledge), the Bratz dolls had been designed and were far along in development during the time that Bryant was employed by Mattel and prior to the time that Bryant left Mattel on October 20, 2000.  Not only did Bryant create and develop designs for the dolls as well as other aspects of the products such as their fashion accessories during the time he was employed by Mattel, but MGA showed Bratz prototypes and/or product to both focus groups and retailers in November 2000, less than three weeks after Bryant left Mattel.  Bryant, Larian and others at MGA arranged these meetings while Bryant was still employed by Mattel.

30.    Bryant and MGA employees also repeatedly and continuously communicated with employees of MGA Entertainment (HK) Limited on subjects such as design and manufacturing of Bratz.  On information and belief, at all material times, MGA Entertainment (HK) Limited has maintained regular and continuous contacts with persons in the County of Los Angeles; it regularly has shipped products that it manufactures, or that are manufactured for it, to the County of Los Angeles; and such products have been distributed to retailers and sold to consumers in the County of Los Angeles.

2154363.2

-36-

31.    Bratz also were shown to retailers at the Hong Kong Toy Fair in January 2001.  By early 2001, only a few months after Bryant resigned from Mattel, MGA began having the Bratz fashion doll line and accessories manufactured and then, shortly thereafter, began selling them at retail.

32.    Since 2001, MGA has distributed and sold Bratz and Bratz-related products throughout the world.  Mattel is informed and believes that MGA also licenses Bratz to third parties.  Mattel is also informed and believes that MGA derives annual revenue from its sales and licenses of Bratz in excess of $500 million.  Mattel is further informed and believes that MGA and Bryant claim current ownership of Bratz, and all copyrights and copyright registrations attendant thereto.  MGA continues to market, sell and license Bratz and has expressed an intention to continue to do so.

33.    Mattel is informed and believes that MGA and Larian encouraged, aided and financed Bryant to develop Bratz, knowing full well that Bryant was still employed by Mattel at the time and that by performing such work, including design-related work, for his own benefit and/or the benefit of MGA, Bryant would be, and was, in breach of his contractual, statutory and common law duties to Mattel.  Mattel is also informed and believes that MGA proceeded to aid and encourage Bryant to develop Bratz with the goal of obtaining a valuable fashion doll line that would be commercially successful in the competitive, multi-billion dollar market for fashion dolls.

34.    Pursuant to Bryant's contract with Mattel, among other things, Mattel is the true owner of Bratz designs and works, including those specifically that were conceived, created or reduced to practice during Bryant's Mattel employment as well as all designs and works that are or have been derived therefrom.  Counter-defendants' continued use, sale, distribution and licensing of Bratz thus infringes upon Mattel's rights, injures Mattel and unlawfully enriches the Counter-defendants.

2154363.2

-37-

35.   Bryant and MGA deliberately and intentionally concealed facts sufficient for Mattel to suspect or to know that it was the true owner of Bratz. Their acts of concealment include, but are not limited to, concealing the fact that Bryant conceived, created, designed and developed Bratz while employed by Mattel, including by tampering with and defacing documents which showed that, in fact, Bryant was a Mattel employee while he was working for and with MGA; concealing the fact that Bryant worked with and assisted MGA during the time Bryant was employed by Mattel and was compensated for that assistance; concealing that Bryant was providing consulting services to MGA; concealing Bryant's role in Bratz by falsely claiming that Larian and others were the creators of Bratz; and concealing the fact that Mattel was the true owner of Bratz by, among other things, filing fraudulent registrations and/or amendments to registrations with the United States Copyright Office claiming MGA as the author of Bratz as a work for hire and altering relevant dates on such documents to further obscure the true facts of when the works were created.

36.   Because of Bryant's and MGA's acts of concealment and Bryant's misrepresentations to Mattel, Mattel had no reason to suspect that Bryant had worked with MGA, or assisted MGA, while he still employed by Mattel until approximately November 24, 2003, when Mattel received, through an unrelated legal action, a copy of Bryant's agreement with MGA which showed that the date of Bryant's agreement with MGA predated Bryant's departure from Mattel. It was then, as a result, that Mattel learned for the first time that Bryant had secretly aided, assisted and worked for and with MGA while employed at Mattel and in violation of his Mattel Employment Agreement. Specifically, Bryant's agreement with MGA obligated Bryant to provide product design services to MGA on a "top priority" basis. Bryant's agreement with MGA also provided that Bryant would receive royalties and other consideration for sales of products on which Bryant provided aid or assistance; that all works and services furnished by Bryant under

2154363.2

EXHIBIT 22 PAGE 294

1    the agreement, including those he purportedly provided while still a Mattel

2    employee, purportedly would be considered "works for hire" of MGA; and that all

3    intellectual property rights to preexisting works by Bryant, including Bratz designs,

4    purportedly were assigned to MGA.

5    **IV. MGA STEALS MATTEL TRADE SECRETS IN MEXICO**

6             37.    On information and belief, in or about late 2003 or early 2004,

7    MGA decided to open business operations in Mexico. Faced with the difficult task

8    of developing an overall strategy for expanding into a market in which it had only a

9    nominal presence and no operations, MGA elected to steal Mattel's plans, strategy

10    and business information for the Mexican market and materials related to Mattel's

11    worldwide business strategies. As detailed below, MGA and Larian approached

12    three employees of Mattel's Mexican subsidiary ("Mattel Mexico"), enticed them to

13    steal Mattel's most sensitive business planning materials, and then hired them to

14    assist in establishing and running MGA's new Mexican subsidiary.

15       **A.     MGA Hires Three Senior Mattel Employees in Mexico**

16             38.    Carlos Gustavo Machado Gomez ("Machado") was the Senior

17    Marketing Manager, Boys Division, for Mattel Mexico, a position of trust and

18    confidence. He was employed at Mattel Mexico from April 1, 1997 until April 19,

19    2004. His duties included short, medium and long-term marketing planning,

20    generating product sales projections, and assisting in creation of the media plan. In

21    his position, Machado had access to highly confidential and sensitive marketing

22    and product development information. Machado had an employment agreement

23    with Mattel in which he agreed to maintain the confidentiality of Mattel's protected

24    information. Mattel's policies also required Machado to protect Mattel's

25    proprietary information and not to disclose it to competitors.

26             39.    Mariana Trueba Almada ("Trueba") was the Senior Marketing

27    Manager, Girls Division, for Mattel Mexico, a position of trust and confidence.

28    She was employed at Mattel Mexico from November 3, 1997 until April 19, 2004.

**EXHIBIT 22 PAGE 298**

1  Like Machado, her duties included short, medium and long-term marketing
2  planning, generating product sales projections, and assisting in creation of the
3  media plan.  In her position, Trueba had access to highly confidential and sensitive
4  marketing and product development information.  Trueba had an employment
5  agreement with Mattel in which she agreed to maintain the confidentiality of
6  Mattel's protected information.  Mattel's policies also required Trueba to protect
7  Mattel's proprietary information and not to disclose it to competitors.

8         40.    Pablo Vargas San Jose ("Vargas") was a Senior Trade Marketing
9  Manager with Mattel Mexico, a position of trust and confidence.  He was employed
10  at Mattel Mexico from March 29, 2001 until April 19, 2004.  Vargas was
11  responsible for ensuring that point-of-sale promotions were carried out, analyzing
12  the results of such promotions, negotiating promotion budgets, and generally
13  managing promotional activities.  Vargas also had access to highly confidential and
14  sensitive marketing and product development information.  Vargas had an
15  employment agreement with Mattel in which he agreed to maintain the
16  confidentiality of Mattel's protected information.  Mattel's policies also required
17  Vargas to protect Mattel's proprietary information and not to disclose it to
18  competitors.

19         41.    Beginning in late 2003 or early 2004, Machado, Trueba and
20  Vargas began planning to leave Mattel Mexico to join MGA.  In connection with
21  that plan, and with the encouragement of Larian and other MGA officers operating
22  in the United States, they began accessing, copying and collecting proprietary
23  Mattel documents to take with them.  On April 19, 2004, Machado, Trueba and
24  Vargas each resigned their positions with Mattel, effective immediately.  They
25  stated that they had been hired by a Mattel competitor, but refused to identify that
26  competitor.  In fact, they had been offered and accepted employment by MGA to
27  establish and run MGA's new operation in Mexico.
28

2154363.2

-40-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

**EXHIBIT 22 PAGE 302**

**B.    Machado, Trueba and Vargas Stole Dozens of Confidential Trade Secret Marketing and Sales Documents for MGA's Benefit**

42.    Following these resignations, Mattel discovered that Machado, Trueba and Vargas had been in frequent telephonic and e-mail contact with MGA personnel, including Larian, for over three months prior to their resignations. The primary vehicle for these communications in furtherance of their "plot" was an America Online e-mail account with the address <plot04@aol.com>. On information and belief, during this time, Machado, Trueba and Vargas supplied Larian with certain Mattel confidential and proprietary information in order to prove their value to MGA and to improve their negotiating position vis-à-vis their respective employment contracts with MGA.

43.    In March 2004, Machado, Trueba and Vargas were making plans to travel from Mexico to Los Angeles to meet with MGA personnel in person prior to resigning their positions at Mattel. Also, by at least March 3, 2004, Machado, Trueba and Vargas were discussing with MGA personnel, including Larian, specific details regarding setting up MGA offices in Mexico City. On information and belief, prior to their resignations, Larian and others at MGA directed Machado, Trueba and Vargas to steal virtually all Mattel confidential and proprietary information that they could access and bring it with them to MGA. This was reflected in, among things, e-mail messages that Mattel had discovered after Machado, Trueba and Vargas had resigned. For example, on March 22, 2006, approximately one month before they resigned, Machado, Trueba and Vargas wrote an e-mail message from the <plot04@aol.com> e-mail account addressed to Larian, MGA's General Manager Susan Kuemmerle and another MGA officer Thomas Park. In that e-mail message, Machado, Trueba and Vargas sought to prove their value in this endeavor to MGA by writing: "Attached you will find our analysis for future discussion. We will be available during the nights of the week after 16:30 Los Angeles time . . . ." In another e-mail message, showing that the

-41-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

2154363.2

EXHIBIT 22 PAGE 306

1   participants intentionally sought to maximize the damage to Mattel from their

2   conduct, Kuemmerle wrote to Larian and Park:  "Gustavo, Mariana and Pablo want

3   to resign (all at the same time, and you can believe my smile!) next Wednesday."

4          44.   Beginning on April 12, 2004, a week before his resignation and

5   after numerous communications and meetings with Larian and other MGA

6   personnel, Machado began transferring additional Mattel confidential and

7   proprietary information to a portable USB storage device (also know as a "thumb

8   drive") that he connected to his Mattel computer.  On Friday, April 16, 2004, the

9   last business day before he gave notice, Machado copied at least 70 sensitive

10  documents to the portable USB storage device.

11         45.   Starting on April 12, 2004, Vargas also copied a host of

12  confidential and proprietary materials to a portable USB storage device, including

13  sales plans, sales projections and customer profiles.

14         46.   On April 16, 2004, Trueba also copied Mattel confidential and

15  proprietary information to a portable USB storage device connected to her Mattel

16  computer.

17         47.   With full knowledge that she was going to leave Mattel for a

18  competitor, Trueba also took steps to increase further her access to Mattel's

19  confidential information shortly before her resignation.  For example, just four days

20  before leaving, Trueba went out of her way to seek to attend a meeting at which

21  Mattel personnel analyzed BARBIE programs for the United States, Canada and

22  South America.  Two days before her resignation, she contacted both a Mattel

23  employee located in El Segundo, California and Mattel's advertising agency to

24  request updated confidential information about advertising plans for BARBIE.  On

25  information and belief, Trueba acted at the direction of MGA and Larian and did so

26  in order to obtain further information that would allow MGA to obtain unfair

27  competitive advantage over Mattel.

28

2154363.2

48.   Machado, Trueba and Vargas stole virtually every type of document a competitor would need to enter the Mexican market and to unlawfully compete with Mattel in Mexico, in the United States, and elsewhere.  They stole global internal future line lists that detailed anticipated future products, production and shipping costs for Mattel products; daily sales data for Mattel products; customer data; sales estimates and projections; marketing projections; documents analyzing changes in sales performance from 2003 to 2004; budgets for advertising and promotional expenses; strategic research reflecting consumer responses to products in development; media plans; consumer comments regarding existing Mattel products customer discounts and terms of sale; customer inventory level data; assessments of promotional campaign success; market size historical data and projections; marketing plans and strategies; merchandising plans; retail pricing and marketing strategies; and other similar materials.

49.   The stolen data was not limited to the Mexican market.  The information stolen would, and did, give MGA an unfair competitive advantage in the United States and around the world.  Further, the stolen information was not located exclusively in Mexico, but included confidential and proprietary information that resided on Mattel computers in Phoenix, Arizona and El Segundo, California, and/or documents which were originally created by personnel in El Segundo.  Included among these stolen documents was one of Mattel's earliest internal global line lists, which included information for BARBIE products for the upcoming year and included, for each product, the expected profit margin, advertising expenditures, expected volume and marketing strategy.  On information and belief, Machado, Trueba or Vargas delivered that internal line list to Larian or another MGA officer during their negotiations with MGA.

50.   MGA has used the information taken from Mattel to obtain an unfair advantage over Mattel, including in both the United States and Mexico.  In fact, MGA later publicized its claim that, in 2005, it had increased its Mexican

2154363.2

-43-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT 22 PAGE 235

1   market share by 90 percent over the prior year. This increase came at the expense

2   of Mattel, which lost market share during 2004 in Mexico and was forced to

3   increase its advertising and promotional spending to offset further losses.

4         51.   Machado, Trueba and Vargas attempted to conceal their

5   widespread theft of Mattel's proprietary information. For example, Machado ran a

6   software program on his Mattel personal computer in an attempt to erase

7   information, including information that would reveal the addresses to which he had

8   sent, or from which he had received, e-mail messages. On information and belief,

9   for the same purpose Machado also damaged the hard drive of the personal

10  computer that he used at Mattel.

11        52.   On information and belief, on April 19, 2004, immediately after

12  Machado, Trueba and Vargas simultaneously resigned, they traveled from Mexico

13  to Los Angeles to meet with MGA personnel, including Larian, in person.

14        53.   Mattel notified Mexican authorities about the theft of its trade

15  secret and confidential information. On October 27, 2005, the Mexican Attorney

16  General Office obtained a search warrant from the Mexican Federal Criminal

17  Courts for MGA's facilities in Mexico City. In that search, the Mexican authorities

18  found and seized from MGA's offices both electronic and paper copies of a large

19  number of documents containing Mattel trade secrets, including those that Mattel

20  discovered through its forensic investigations, plus many others that Mattel had not

21  known had been stolen.

22        54.   Based on Machado's "performance" in Mexico, Isaac Larian

23  subsequently promoted Machado and he was transferred to MGA's main office in

24  Van Nuys, California. On information and belief, Machado currently resides in the

25  County of Los Angeles, California.

26

27

28

1  **V.   MGA HIRES MATTEL'S SENIOR VICE PRESIDENT AND**
2  **GENERAL MANAGER TO FACILITATE ITS THEFT AND USE OF**
3  **MATTEL'S HIGHLY VALUABLE BUSINESS METHODS AND**
4  **PRACTICES**

5          55.   On October 1, 2004, Mattel's Senior Vice President and General
6  Manager, Ron Brawer, left Mattel and joined MGA.  Tyco Toys, Inc. ("Tyco"), a
7  predecessor to Mattel, had hired Brawer on April 22, 1996.  The same day, Brawer
8  entered into an Employee Invention & Trade Secret Agreement with Tyco.  On
9  April 9, 1997, Brawer became a Marketing Director for Mattel in Mount Laurel,
10  New Jersey, and remained bound by his Employee Invention & Trade Secret
11  Agreement.

12          56.   In January 2003, while Brawer held a position of trust and
13  confidence at Mattel, Mattel's "Code of Conduct" was circulated to all Mattel
14  employees worldwide.  Included in the Code of Conduct were statements that:

15          Employees and Directors have an obligation to protect the
16          confidentiality of Mattel's proprietary information.  Proprietary
17          information is any information not generally known to the public
18          that is useful to Mattel, that would be useful to its competitors or
19          other third parties or that would be harmful to Mattel or its
20          customers if disclosed.  Proprietary information includes trade
21          secrets, revenue and profit information and projections, new
22          product information, marketing plans, design and development
23          efforts, manufacturing processes and any information regarding
24          potential acquisitions, divestitures and investments.
25          We can protect the security of Mattel's proprietary information
26          by limiting access to it.  Confidential information should not be
27          discussed with those who are not obligated to maintain the
28          information in confidence and in public places where the

2154363.2

-45-

**EXHIBIT 22 PAGE 243**

1           information is not likely to be kept secret, such as planes,

2           restaurants and elevators. The obligation to preserve confidential

3           information continues even after employment ends.

4    The Code of Conduct applied to Brawer and required that he meet his obligations

5    under the Code of Conduct.

6         57.   By 2003, Brawer had advanced within Mattel to a Senior Vice

7    President position over customer marketing, a position of trust and confidence. In

8    his executive position, Brawer was provided access to information that was both

9    sensitive and confidential, including, but not limited to, detailed information related

10   to development, manufacture, marketing, pricing, shipping, and performance of

11   Mattel's then-current and anticipated future product lines, and other confidential

12   business plans between Mattel and its most significant retail customers.

13        58.   In December 2003, Alan Kaye, Mattel's Senior Vice President of

14   Human Resources, asked Brawer whether he was discussing potential employment

15   with MGA. Brawer denied that he had been in contact with MGA and represented

16   that he would not talk to MGA. Throughout 2004, Mattel reminded and stressed to

17   its employees, including Brawer, the importance of protecting Mattel's confidential

18   and proprietary materials and information.

19        59.   On March 18, 2004, in response to a survey from the President of

20   Mattel Brands, Matt Bousquette, confirming compliance with Mattel's Code of

21   Conduct, Brawer wrote back that he "applaud[ed] the company's vigorous

22   protection of it's [sic] intellectual property," reflecting Brawer's clear

23   understanding that Mattel required its proprietary information to be kept

24   confidential.

25        60.   In April 2004, Mattel promoted Brawer to Senior Vice

26   President/General Manager. The General Manager position also is an executive

27   position of trust and confidence. The role of a General Manager is to lead a cross-

28   functional "Customer Business Team." Each General Manager is accountable for a

SECOND AMENDED ANSWER AND COUNTERCLAIMS

2154363.2

EXHIBIT 22 PAGE 247

1  strategic partnership with a key Mattel retailer, covering all aspects of the business,

2  including both traditional toy sales and retail development of licensed products.

3        61.   In or about late May 2004, Brawer began performing General

4  Manager duties, working with one of Mattel's major retail customer accounts.

5  Thereafter, Brawer began receiving information related not only to the Senior Vice

6  President, Customer Marketing position that he still formally held, but also began

7  receiving detailed information related to his role as General Manager.  Brawer

8  began requesting and analyzing detailed information related to Mattel and its four

9  key retail accounts.

10       62.   On September 15, 2004, Brawer left work at noon for observance

11  of Rosh Hashanah.  As Brawer left, he carried a large cardboard box with binders

12  and other materials.  Several hours after his departure, Brawer instructed his

13  assistant to print Mattel's 2004 Sales Plan for one of Mattel's significant customers

14  and to provide it to him, falsely claiming he needed it for a meeting

15       63.   On September 17, 2004, Brawer returned to Mattel and

16  immediately informed his supervisor that he was leaving Mattel, effective October

17  1, 2004, to work for competitor MGA.

18       64.   On September 20, 2004, Mattel hand-delivered a letter to Brawer

19  reminding him of his continuing obligation to preserve the confidentiality of

20  Mattel's proprietary information and trade secrets not only through October 1,

21  2004, but continuing beyond the termination of his employment.

22       65.   At his exit interview on September 29, 2004, Mattel reminded

23  Brawer that he had ongoing duties of confidentiality to Mattel, even after the

24  termination of his employment.  Brawer was given a copy of his Original

25  Confidentiality Agreement, which he had signed on April 22, 1996, and another

26  copy of the Code of Conduct.  During the exit interview, however, Brawer noted

27  that he had not signed the Code of Conduct, which he intended and Mattel

28  understood to mean that Brawer believed he was not bound by Mattel's policy

SECOND AMENDED ANSWER AND COUNTERCLAIMS

2154363.2

**EXHIBIT 22 PAGE 251**

1   because he had not signed it. Brawer was unwilling to complete or sign the form

2   that sought to confirm that Brawer understood his ongoing obligations under the

3   Code of Conduct, which included the obligation to preserve the confidentiality of

4   Mattel's proprietary and trade secret information.

5          66.   On October 1, 2004, Brawer's final day of employment with

6   Mattel, Mattel hand-delivered to Brawer a letter that, among other things, reminded

7   Brawer of his confidentiality obligations to Mattel under the Code of Conduct.

8          67.   Upon joining MGA, Brawer became its Executive Vice-

9   President of Sales and Marketing. In that role he was responsible for MGA's sales

10  worldwide. As part of those responsibilities, Brawer had and continues to have

11  responsibility for MGA's accounts with the same retailers that he worked with

12  while at Mattel.

13         68.   Brawer represented during his Mattel exit interview that he had

14  returned all proprietary information to Mattel. That representation was false. On

15  information and belief, Brawer removed proprietary and trade secret information

16  from Mattel that he did not return. Mattel is informed and believes that Brawer did

17  not return to Mattel, for example, the information contained in his contacts file.

18  The contacts file included contact information for Mattel customers, most notably

19  TRU, and extensive contact information for Mattel employees, including titles, e-

20  mail addresses and telephone numbers.

21         69.   Mattel has recently learned that Brawer has been using that

22  contact information on a regular basis, including within recent months. Since

23  leaving Mattel, Brawer has had contacts with Mattel employees, both by telephone

24  and by electronic mail. Based on his knowledge of Mattel's operations and the

25  roles of certain Mattel employees, he has targeted certain Mattel employees who

26  have broad access to Mattel proprietary information in an effort to induce and

27  encourage them to join MGA and to steal or otherwise wrongfully misappropriate

28  Mattel confidential information and trade secrets. Brawer has done so by

2154363.2

-48-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT 22 PAGE 255

1  promising these Mattel employees salaries 25 percent or more higher than they earn

2  at Mattel and stating to them that they should not be concerned by legal action

3  taken by Mattel to protect its trade secrets and its rights because such claims are

4  hard to prove and easy to defeat.

5  **VI.  MGA STEALS MATTEL TRADE SECRETS IN CANADA**

6         70.  In an effort to increase its market share and sales in Canada and

7  elsewhere, MGA stole Mattel trade secrets regarding Mattel's customers, sales,

8  projects, advertising and strategy, not only for Canada, but the United States and

9  the rest of the world.

10         71.  Janine Brisbois was a Director of Sales for the Girls Division in

11  Canada.  Mattel hired her as a National Account Manager in August 1999.  When

12  she was hired as a Mattel employee, Brisbois agreed that she would preserve and

13  would not disclose Mattel's proprietary or confidential information.  For example,

14  Brisbois agreed:

15         You must keep Mattel's Proprietary Information confidential,

16         and you may only use or disclose such information as necessary

17         to perform your job responsibilities in accordance with Mattel

18         policies.  Your obligation to keep Mattel's Proprietary

19         Information confidential will continue even after any termination

20         of your employment with your employer.

21         . . .

22         Mattel takes steps to maintain the secrecy and confidential nature

23         of Mattel's Proprietary Information and, if a competitor

24         discovered Mattel's Proprietary Information, it could

25         significantly damage Mattel and your Employer.

26         72.  While with Mattel, Brisbois had responsibility for Mattel's

27  account with TRU and later had responsibility for Mattel's Wal-Mart account.  In

28  her capacity as Sales Director-Wal-Mart/CTC/Girls Team, Brisbois had access to