ORIGINAL

1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
     John B. Quinn (Bar No. 90378)
2    (johnquinn@quinnemanuel.com)
     Michael T. Zeller (Bar No. 196417)
3    (michaelzeller@quinnemanuel.com)
     Jon D. Corey (Bar No. 185066)
4    (joncorey@quinnemanuel.com)
     Timothy L. Alger (Bar No. 160303)
5    (timalger@quinnemanuel.com)
   865 South Figueroa Street, 10th Floor
6  Los Angeles, California 90017-2543
   Telephone: (213) 443-3000
7  Facsimile: (213) 443-3100

8  Attorneys for Mattel, Inc.

9              UNITED STATES DISTRICT COURT

10            CENTRAL DISTRICT OF CALIFORNIA

11                  EASTERN DIVISION

12  CARTER BRYANT, an individual,        CASE NO. CV 04-9049 SGL (RNBx)

13              Plaintiff,                Consolidated with
                                          Case No. CV 04-09059
14       v.                               Case No. CV 05-02727

15  MATTEL, INC., a Delaware             MATTEL, INC.'S FIRST SET OF
    corporation,                         REQUESTS FOR DOCUMENTS AND
16                                        THINGS TO ISAAC LARIAN

17              Defendant.

18  AND CONSOLIDATED CASES.

19
20
21
22
23
24
25
26
27
28

07209/2142932.1

MATTEL'S FIRST SET OF DOCUMENT REQUESTS TO ISAAC LARIAN

**EXHIBIT 9 PAGE 100**

1    Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Mattel,

2    Inc. hereby requests that defendant Isaac Larian ("Larian") respond to these

3    document requests ("Requests") and make available for inspection and copying

4    originals of the following documents within 30 days of service at the offices of

5    Quinn Emanuel Urquhart Oliver & Hedges, LLP, 865 South Figueroa Street, 10th

6    floor, Los Angeles, CA 90017.  Larian shall be obligated to supplement the

7    responses to these Requests at such times and to the extent required by Rule 26(e) of

8    the Federal Rules of Civil Procedure.

9

10   **I.    DEFINITIONS**

11

12    For purposes of these Requests, the following definitions apply:

13    A.    "YOU," "YOUR" and "LARIAN" mean Isaac Larian and any

14   individual or entity acting directly or indirectly by, through, under or on behalf of

15   Isaac Larian, including but not limited to current or former directors, officers,

16   agents, attorneys, employees, partners, joint venturers, contractors, accountants, or

17   representatives of Isaac Larian or any entity under the control or direction of Isaac

18   Larian (including but not limited to MGA), and any corporation, partnership,

19   association, trust, predecessor-in-interest and successor-in-interest, and any other

20   PERSON acting on behalf of Isaac Larian or pursuant to his authority or subject to

21   his control.

22    B.    "MGA" means MGA Entertainment, Inc. and all current or

23   former directors, officers, employees, agents, contractors, attorneys, accountants,

24   representatives, subsidiaries, divisions, AFFILIATES, predecessors-in-interest and

25   successors-in-interest, and any other PERSON acting on its behalf, pursuant to its

26   authority or subject to its control.

27    C.    "MATTEL" means Mattel, Inc. and all current or former

28   directors, officers, employees, agents, contractors, attorneys, accountants,

**EXHIBIT 9 PAGE 101**

1  representatives, subsidiaries, divisions, AFFILIATES, predecessors-in-interest and

2  successors-in-interest, and any other PERSON acting on its behalf, pursuant to its

3  authority or subject to its control.

4         D.   "BRYANT" means Carter Bryant, any of his current or former

5  agents, representatives, attorneys, employees, partners, joint venturers,

6  predecessors-in-interest and successors-in-interest, and any other PERSON acting

7  on his behalf, pursuant to his authority or subject to his control.  For purposes of

8  these Requests, "MGA" and "LARIAN" do not include "BRYANT."

9         E.   "DOCUMENT" or "DOCUMENTS" means all "writings" and

10  "recordings" as those terms are defined in <u>Rule</u> 1001 of the <u>Federal Rules of</u>

11  <u>Evidence</u> and <u>Rule</u> 34 of the <u>Federal Rules of Civil Procedure</u> and shall include all

12  writings, including but not limited to handwriting, typewriting, printing, image,

13  photograph, photocopy, digital file of any kind, transmittal by (or as an attachment

14  to) electronic mail (including instant messages and text messages) or facsimile,

15  video and audio recordings, and every other means of recording upon any tangible

16  thing, any form of communication or representation, and any record thereby created,

17  regardless of the manner in which the record has been stored, and all non-identical

18  copies of such DOCUMENTS, in the possession, custody, or control of YOU,

19  YOUR counsel, or any other PERSON acting on YOUR behalf.

20         F.   "COMMUNICATION," in the plural as well as the singular,

21  means any transmittal and/or receipt of information, whether such was oral or

22  written, and whether such was by chance, prearranged, formal or informal, and

23  specifically includes, but is not limited to, conversations in person, telephone

24  conversations, electronic mail (including instant messages and text messages),

25  voicemail, letters, memoranda, statements, media releases, magazine and newspaper

26  articles, and video and audio transmissions.

27         G.   "DESIGN" or "DESIGNS" means any and all representations,

28  whether two-dimensional or three-dimensional, and whether in tangible, digital,

07209/2142932.1

-3-

**EXHIBIT 9 PAGE 102**

1  electronic or other form, including but not limited to all works, designs, artwork,

2  sketches, drawings, illustrations, representations, depictions, blueprints, schematics,

3  diagrams, images, sculptures, prototypes, models, samples, rotocasts, reductions to

4  practice, developments, concepts, ideas, inventions and/or improvements, as well as

5  all other items, things and DOCUMENTS in which any of the foregoing are or have

6  been expressed, embodied, contained, fixed or reflected in any manner, whether in

7  whole or in part.

8      H.    "BRATZ" means any project, product, doll or DESIGN or any

9  portion thereof ever known by that name, that is now or has ever been known as, or

10  sold or marketed under, the name or term "Bratz" or that is now or has ever been

11  sold or marketed as part of the "Bratz" line, including without limitation all

12  prototypes, models, samples and versions thereof. As used herein, "products, dolls

13  or DESIGNS or any portion thereof" also includes without limitation any names,

14  fashions, accessories, artwork, packaging or any other works, materials, matters or

15  items included or associated therewith. Without limiting the generality of the

16  foregoing, "BRATZ" includes any such project, product, doll or DESIGN,

17  regardless of what any such project, product, doll or DESIGN has in fact been

18  called, and regardless of what any such project, product, doll or DESIGN is or has

19  been also, previously or subsequently called. Also without limiting the generality of

20  the foregoing, and contrary to MGA's recent assertions in connection with other

21  Mattel discovery requests, the term "BRATZ" does not require that there be a doll

22  existing at the time of the event, incident or occurrence that is the subject of, or

23  otherwise relevant or responsive to, the Requests herein.

24      I.    "ANGEL" refers to those projects, products, dolls or DESIGNS

25  or any portion thereof, sometimes called "Angel Faces" and/or "Prayer Angels," that

26  MGA has claimed are the subject of MGA000706-08, MGA000710-12,

27  MGA000714-16, MGA000718-20, MGA000724-28 and MGA000734, including

28  without limitation all prototypes, models, samples and versions thereof. As used

07209/2142932.1

-4-

**EXHIBIT 9 PAGE 103**

1  herein, "products, dolls or DESIGNS or any portion thereof" also includes without
2  limitation any names, fashions, accessories, artwork, packaging or any other works,
3  materials, matters or items included or associated therewith. Without limiting the
4  generality of the foregoing, "ANGEL" includes any such project, product, doll or
5  DESIGN, regardless of what any such project, product, doll or DESIGN has in fact
6  been called, and regardless of what any such project, product, doll or DESIGN is or
7  has been also, previously or subsequently called. Also without limiting the
8  generality of the foregoing, and contrary to MGA's recent assertions in connection
9  with other Mattel discovery requests, the term "ANGEL" does not require that there
10  be a doll existing at the time of the event, incident or occurrence that is the subject
11  of, or otherwise relevant or responsive to, the Requests herein.

12      J.      "AFFILIATES" means any and all corporations, proprietorships,
13  d/b/a's, partnerships, joint ventures and business entities of any kind that, directly or
14  indirectly, in whole or in part, own or control, are under common ownership or
15  control with, or are owned or controlled by a PERSON, party or entity, including
16  without limitation each parent, subsidiary and joint venture of such PERSON, party
17  or entity.

18      K.      "IDENTIFY" or "IDENTITY" means the following:
19          (a)      With reference to an individual, means such individual's
20  name, current or last known business title, current or last known business affiliation,
21  current or last known relationship to YOU, current or last known residential and
22  business address, and current or last known telephone number.
23          (b)      With reference to an entity or governmental organization,
24  means such entity's or organization's name, present or last-known address, and
25  present or last-known telephone number and the IDENTITY of each individual who
26  has served or participated as a contact for or on behalf of such entity or organization.
27          (c)      With reference to an account with a bank or financial
28  institution, means the name and address of the bank or financial institution, the

1  account number(s) for or otherwise associated with such account and the name of

2  each holder, including without limitation each beneficial holder, of each such

3  account.

4          (d)    With reference to a STORAGE DEVICE, means the

5  manufacturer name, brand, model name and number, serial number and all other

6  manufacturer identifiers, and the technical specifications and capacities of such

7  STORAGE DEVICE.

8          L.    "ACTION" means this action now consolidated under Case No.

9  04-9049 before the Hon. Stephen Larson and formerly Mattel, Inc. v. Bryant, first

10  filed in Los Angeles County Superior Court; Bryant v. Mattel, Inc.; and MGA

11  Entertainment, Inc. v. Mattel, Inc.; and all counterclaims, cross-claims and defenses

12  therein.

13          M.    "DIGITAL INFORMATION" means any information created or

14  stored digitally, including but not limited to electronically, magnetically or optically.

15          N.    "STORAGE DEVICE" means any computer hard drive,

16  memory, USB device, tape, storage array or any other device or medium that allows

17  a user, whether permanently, temporarily or otherwise, to create, generate, prepare,

18  transmit, copy, retain, store or maintain DIGITAL INFORMATION.

19          O.    "FAMILY MEMBER" means any PERSON who at any time is,

20  was or has been a parent, spouse, or child of another PERSON.

21          P.    "RELATING," "RELATING TO," "REFERRING OR

22  RELATING TO," or "REFER OR RELATE TO" means any and all of the following

23  terms and their synonyms: refer to, discuss, constitute, evidence, pertain to,

24  mention, support, contradict, negate, bear on, touch on, contain, embody, reflect,

25  identify, state, deal with, concern, comment on, summarize, respond to, relate to, or

26  describe.

27          Q.    "PERSON," in the plural as well as the singular, means any

28  natural person, association, partnership, corporation, joint venture, government

07209/2142932.1

-6-

MATTEL'S FIRST SET OF DOCUMENT REQUESTS TO ISAAC LARIAN

**EXHIBIT 9 PAGE 105**

1  entity, organization, trust, institution, proprietorship, or any other entity recognized

2  as having an existence under the laws in the United States or any other nation.

3      R.    "BRATZ PRODUCT" means any product, whether two-

4  dimensional or three-dimensional, and whether in tangible, digital, electronic or

5  other form: (i) that is or has ever been distributed, marketed or sold under the name

6  "Bratz" or as part of the "Bratz" line; (ii) that depicts, incorporates, embodies,

7  consists of or REFERS OR RELATES TO BRATZ; and/or (iii) that is or has ever

8  been distributed, marketed or sold in any packaging that includes the name "Bratz"

9  or depicts, incorporates, embodies, consists of or REFERS OR RELATES TO

10  BRATZ.

11      S.    "BRATZ DOLL" means any doll that is or has ever been

12  distributed, marketed, sold or offered for sale under the name "Bratz" or as part of

13  the "Bratz" line.

14      T.    "BRATZ MOVIE" means any motion picture or film that

15  depicts, incorporates, embodies, consists of or REFERS OR RELATES TO BRATZ

16  or any BRATZ DESIGN.

17      U.    "BRATZ TELEVISION SHOW" means any production

18  exhibited on television that depicts, incorporates, embodies, consists of or REFERS

19  OR RELATES TO BRATZ or any BRATZ DESIGN.

20      V.    "DIVA STARZ" means any project, product, doll or DESIGN or

21  any portion thereof ever known by that name, that is now or has ever been known

22  as, or sold or marketed under, the name or term "DIVA STARZ" or that is now or

23  has ever been sold or marketed as part of the "DIVA STARZ" line, including

24  without limitation "Chat Girls," "Brats," and "Chat Brats," and including without

25  limitation all prototypes, models, samples and versions thereof.  As used herein,

26  "products, dolls or DESIGNS or any portion thereof" also includes without

27  limitation any names, fashions, accessories, artwork, packaging or any other works,

28  materials, matters or items included or associated therewith.  Without limiting the

EXHIBIT 9 PAGE 106

1  generality of the foregoing, "DIVA STARZ" includes any such project, product, doll

2  or DESIGN, regardless of what any such project, product, doll or DESIGN has in

3  fact been called, and regardless of what any such project, product, doll or DESIGN

4  is or has been also, previously or subsequently called.  Also without limiting the

5  generality of the foregoing, and contrary to MGA's recent assertions in connection

6  with other Mattel discovery requests, the term "DIVA STARZ" does not require that

7  there be a doll existing at the time of the event, incident or occurrence that is the

8  subject of, or otherwise relevant or responsive to, the Requests herein.

9        W.    The singular form of a noun or pronoun includes within its

10  meaning the plural form of the noun or pronoun so used, and *vice versa*; the use of

11  the masculine form of a pronoun also includes within its meaning the feminine form

12  of the pronoun so used, and *vice versa*; the use of any tense of any verb includes

13  also within its meaning all other tenses of the verb so used, whenever such

14  construction results in a broader request for information; and "and" includes "or"

15  and *vice versa*, whenever such construction results in a broader disclosure of

16  documents or information

17

18  **II.    INSTRUCTIONS**

19

20        A.    YOU are to produce all requested DOCUMENTS in YOUR

21  possession, custody or control.

22        B.    If YOU contend that YOU are not required to produce certain

23  DOCUMENTS called for by these Requests on the grounds of a privilege or

24  protection that YOU are not prepared to waive, identify each such DOCUMENT

25  and provide the following information:

26        1.         the date and type of the DOCUMENT, the author(s) and

27                   all recipients;

28

07209/2142932.1

-8-

MATTEL'S FIRST SET OF DOCUMENT REQUESTS TO ISAAC LARIAN

**EXHIBIT 9 PAGE 107**

2.        the privilege or protection that YOU claim permits YOU to withhold the DOCUMENT;

3.        the title and subject matter of the DOCUMENT;

4.        any additional facts on which YOU base YOUR claim of privilege or protection; and

5.        the identity of the current custodian of the original of the DOCUMENT.

C.    DOCUMENTS shall be produced in their original file folders, or in lieu thereof, any writing on the file folder from which each such DOCUMENT is taken shall be copied and appended to such DOCUMENT and the PERSON for whom or department, division or office for which the DOCUMENT or the file folder is maintained shall be identified.

D.    The DOCUMENTS should be produced in their complete and unaltered form.  Attachments to DOCUMENTS should not be removed.  The DOCUMENTS should not be cut-up, pasted over, redacted or altered in any way for any reason, including alleged nonrelevance.  If emails are produced that had attachments, the attachments shall be attached when produced.

E.    DOCUMENTS in electronic form shall be produced in that form.

F.    In the event that any DOCUMENT called for by these requests has been destroyed or discarded, that DOCUMENT is to be identified by stating:

1.        the date and type of the DOCUMENT, the author(s) and all recipients;

2.        the DOCUMENT's date, subject matter, number of pages, and attachments or appendices;

3.        the date of destruction or discard, manner of destruction or discard, and reason for destruction or discard;

4.        the PERSONS who were authorized to carry out such destruction or discard;

5.      the PERSONS who have knowledge of the content, origins, distribution and destruction of the DOCUMENT; and

6.      whether any copies of the document exist and, if so, the name of the custodian of each copy.

## III.   REQUESTS FOR DOCUMENTS AND THINGS

REQUEST FOR PRODUCTION NO. 1:

All DOCUMENTS prepared, drafted, written, transmitted or received (whether in whole or in part) prior to December 31, 2001 RELATING TO BRATZ.

REQUEST FOR PRODUCTION NO. 2:

All DOCUMENTS RELATING TO BRATZ and RELATING TO any time prior to December 31, 2001 (regardless of when such DOCUMENT was prepared, written, transmitted or received, whether in whole or in part).

REQUEST FOR PRODUCTION NO. 3:

All DOCUMENTS RELATING TO the origin(s), conception and creation of BRATZ, including without limitation all DOCUMENTS RELATING TO the timing and the method and manner in which BRATZ first came to YOUR or MGA's attention.

REQUEST FOR PRODUCTION NO. 4:

All DOCUMENTS RELATING TO the modeling, prototyping, rotocasting, sculpting or DESIGN of BRATZ at any time prior to June 30, 2001, including without limitation all DOCUMENTS RELATING to the creation, preparation or modification of any three-dimensional representation of BRATZ.

07209/2142932.1

-10-

MATTEL'S FIRST SET OF DOCUMENT REQUESTS TO ISAAC LARIAN

EXHIBIT 9 PAGE 109

1    REQUEST FOR PRODUCTION NO. 120:

2           All transcripts and video and/or audio recordings of statements made

3    by any PERSON under oath, including without limitation all deposition transcripts,

4    trial transcripts and arbitration transcripts, that RELATING TO ANGEL (other than

5    those taken in this ACTION when Mattel's counsel was in attendance), including all

6    such declarations, affidavits and other sworn written statements of any other type or

7    form by or on behalf of YOU.

8

9    REQUEST FOR PRODUCTION NO. 121:

10          All DOCUMENTS RELATING TO the litigation encaptioned *The*

11   *Ships Carpenter, Inc. v. MGA Entertainment*, filed in Los Angeles Superior Court

12   on or about October 11, 2001, Case Nos. 01S03739 and 01S03740.

13

14   REQUEST FOR PRODUCTION NO. 122:

15          All DOCUMENTS seen, viewed or reviewed by YOU at any time in

16   preparation for the deposition of YOU that was taken in this ACTION on July 18,

17   2006.

18

19   REQUEST FOR PRODUCTION NO. 123:

20          All DOCUMENTS RELATING TO any and all arbitrations and suits

21   between YOU and Farhad Larian.

22

23   REQUEST FOR PRODUCTION NO. 124:

24          All DOCUMENTS filed, submitted or served in the suit and/or

25   arbitration proceedings brought by Farhad Larian against YOU, including without

26   limitation all declarations, affidavits, transcripts, video and/or audio recordings and

27   sworn testimony given by any PERSON in such suit or arbitration proceedings.

28

**EXHIBIT 9 PAGE 110**

1  **REQUEST FOR PRODUCTION NO. 125:**

2       All DOCUMENTS RELATING TO any and all settlements resolutions

3  or compromises of any suit and/or arbitration proceedings between YOU and Farhad

4  Larian.

5

6  **REQUEST FOR PRODUCTION NO. 126:**

7       All contracts or agreements between YOU or MGA and Farhad Larian.

8

9  **REQUEST FOR PRODUCTION NO. 127:**

10       All COMMUNICATIONS RELATING TO BRATZ between YOU or

11  MGA and Farhad Larian.

12

13  **REQUEST FOR PRODUCTION NO. 128:**

14       All DOCUMENTS RELATING TO COMMUNICATIONS between

15  YOU or MGA and Farhad Larian that REFER OR RELATE TO BRATZ, including

16  without limitation all diaries, notes, calendars, logs, phone records and letters, that

17  reflect, record or memorialize or otherwise RELATING TO any such

18  COMMUNICATIONS.

19

20  **REQUEST FOR PRODUCTION NO. 129:**

21       All COMMUNICATIONS RELATING TO BRYANT between YOU

22  or MGA and Farhad Larian.

23

24  **REQUEST FOR PRODUCTION NO. 130:**

25       All DOCUMENTS RELATING TO COMMUNICATIONS between

26  YOU or MGA and Farhad Larian that REFER OR RELATE TO BRYANT,

27  including without limitation all diaries, notes, calendars, logs, phone records and

28

07209/2142932.1

-36-

MATTEL'S FIRST SET OF DOCUMENT REQUESTS TO ISAAC LARIAN

**EXHIBIT 9 PAGE 111**

1  REQUEST FOR PRODUCTION NO. 273:

2        All DOCUMENTS RELATING TO the ownership of MGAE de

3  Mexico, S.r.l. de C.V.

4

5  REQUEST FOR PRODUCTION NO. 274:

6        An electronic copy of each DOCUMENT that YOU have produced in

7  this action, or that is responsive to these Requests, that is or was created, prepared,

8  generated, maintained or transmitted in digital form.

9

10  REQUEST FOR PRODUCTION NO. 275:

11        The metadata for each DOCUMENT that YOU have produced in this

12  action, or that is responsive to these Requests, that is or was created, prepared,

13  generated, maintained or transmitted in digital form.

14

15  REQUEST FOR PRODUCTION NO. 276:

16        To the extent not produced in response to any other Request for

17  Production, all DOCUMENTS and tangible things upon which YOU intend to rely

18  in this ACTION.

19

20  DATED:  June 13, 2007        QUINN EMANUEL URQUHART OLIVER &
                                 HEDGES, LLP
21

22

23        By  *Michael T. Zeller*/
                                 Michael T. Zeller
24                               Attorneys for Mattel, Inc.

25

26

27

28

07209/2142932.1

-64-

MATTEL'S FIRST SET OF DOCUMENT REQUESTS TO ISAAC LARIAN

**EXHIBIT 9 PAGE 112**

**PROOF OF SERVICE**

I am employed in the County of Los Angeles, State of California. I am over the age of eighteen years and not a party to the within action; my business address is 865 South Figueroa Street, 10th Floor, Los Angeles, California 90017-2543.

On June 13, 2007, I served true copies of the following document(s) described as **MATTEL, INC.'S FIRST SET OF REQUESTS FOR DOCUMENTS AND THINGS TO ISAAC LARIAN** on the parties in this action as follows:

John W. Keker, Esq.
Michael H. Page, Esq.
Christa M. Anderson, Esq.
KEKER & VAN NEST, LLP
710 Sansome Street
San Francisco, California 94111

**BY MAIL:** I am "readily familiar" with the practices of Quinn Emanuel Urquhart Oliver & Hedges for collecting and processing correspondence for mailing with the United States Postal Service. Under that practice, it would be deposited with the United States Postal Service that same day in the ordinary course of business. I enclosed the foregoing in sealed envelope(s) addressed as shown above, and such envelope(s) were placed for collection and mailing with postage thereon fully prepaid at Los Angeles, California, on that same day following ordinary business practices.

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on June 13, 2007, at Los Angeles, California.

*Elaine Chavarria*
Elaine Chavarria

09819/2143538.1

**EXHIBIT 9 PAGE 113**

## PROOF OF SERVICE

I am employed in the County of Los Angeles, State of California. I am over the age of eighteen years and not a party to the within action; my business address is 865 South Figueroa Street, 10th Floor, Los Angeles, California 90017-2543.

On June 13, 2007, I served true copies of the following document(s) described as **MATTEL, INC'.S FIRST SET OF REQUESTS FOR DOCUMENTS AND THINGS TO ISAAC LARIAN** on the parties in this action as follows:

Diana M. Torres, Esq.
O'Melveny & Myers, LLP
400 South Hope Street
Los Angeles, California 90071

**BY PERSONAL SERVICE:** I delivered such envelope(s) by hand to the office of the person(s) being served.

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on June 13, 2007, at Los Angeles, California.

_____
DAVE QUINTANA

**EXHIBIT 9 PAGE 114**

ORIGINAL

1     KAYE SCHOLER LLP
2     Larry R. Feldman, Bar Number 45126
     Robert M. Turner, Bar Number 44075
3     J. Andrew Sjoblom, Bar Number 199369
     1999 Avenue of the Stars, Suite 1700
4     Los Angeles, California 90067-6048
     Telephone: (310) 788-1000
5     Fax: (310) 788-1200

6     Attorneys for Defendant
     ISAAC LARIAN

7



8

9         SUPERIOR COURT FOR THE STATE OF CALIFORNIA

           FOR THE COUNTY OF LOS ANGELES

10

11   FARHAD LARIAN,          )   CASE NO. BC 301371

12          Plaintiff,       )   [Assigned to the Honorable Rodney E.

13        v.               )   Nelson]

14   ISAAC LARIAN and DOES 1 through 50, )   STIPULATION AND [PROPOSED]
     inclusive,                )   PROTECTIVE ORDER
15                           )

16          Defendants.      )       46

17

18      THIS STIPULATION is made with reference to the following facts:

19        A.    Documents have been produced by non-parties Morad Zarabi and National

20   Business Appraisers, LLC and have been marked as "BD" and/or "MZ." Some of these

21   documents contain confidential financial, commercial, personal or proprietary information.

22   These documents are identified on Exhibit "A". The documents and the information they

23   contain are hereinafter collectively referred to as "Confidential Material."

24        B.    The parties want to protect the unauthorized use or disclosure of the

25   Confidential Material. Plaintiff's agreement to this protective order is done as an

26   accommodation to defendant and is not intended as an agreement that any information

27   contained in Exhibit A meets the standard under California law for such protection.

28      NOW, THEREFORE, THE PARTIES HEREBY STIPULATE AND AGREE AS

LARP08 (1).wpd           STIPULATION AND [PROPOSED] PROTECTIVE ORDER

EXHIBIT 10 PAGE 115

FOLLOWS:

1.    This stipulation and protective order only applies to documents marked "ED" and/or "MZ" and shall not apply to or limit a party's use of documents or information (a) obtained by the party independently of the subpoenas heretofore by plaintiff Farhad Larian in this action, or (b) belonging to that party or containing its financial, commercial, personal or proprietary information.

2.    Persons obtaining access to "Confidential Material" specified in Exhibit A under or as a result of this Protective Order shall use the information only for preparation and trial of this lawsuit (including appeals and retrials, and/or any arbitration proceedings), and shall not use such information for any other purpose, including business, governmental, commercial, administrative, or judicial proceedings.  To that end, the parties agree that the Confidential Material specified in Exhibit A shall not be disclosed to other persons except pursuant to the terms of this Protective Order and the rules of law incorporated herein.

3.    Any party to this action may, at any time, request the modification or termination of this Protective Order.  Such a request may be granted by the Court only after due notice and hearing and upon a showing of good cause.

4.    Confidential Material specified in Exhibit "A" may only be disclosed to the parties hereto and to their counsel who have been advised of and agreed to be bound by this Protective Order; to the partners, associates, secretaries, paralegal assistants, and employees of said counsel who have been advised of and agreed to be bound by this Protective Order; and to court officials involved in this lawsuit (including court reporters, videographers operating recording equipment at depositions), and any special master, arbitrator or ADR personnel who the parties have agreed to and/or before whom the parties have been ordered to appear.  Confidential Material may also be disclosed to:

    a.  Any person designated by the Court in the interest of justice, upon such terms the Court may deem proper; and

    b.  Persons noticed for depositions;  persons preparing as trial witnesses;

KAYE SCHOLER LLP

1

LAAP00 (11/94)

**EXHIBIT 10 PAGE 116**

outside consultants; co-counsel or experts retained for the purpose of assisting counsel
in the lawsuit; third parties engaged solely in one or more aspects of organizing, filing,
coding, converting, storing, or retrieving data or designing programs for handling of
data connected with the lawsuit, provided however, that in all such cases the
individual to whom disclosure is to be made under subparagraph (b) has been advised
of this Protective Order and has agreed to comply with it.

5.      Nothing contained in this Protective Order is intended to prevent or govern the
use of Confidential Material at trial.  In the event that the parties are unable to agree to the
procedures for the use of Confidential Material at trial, any party may take such action with
the Court as it deems necessary and appropriate to resolve the dispute.

6.      If a party intends to file or lodge with the Court Confidential Material, to the
extent applicable, the parties shall comply with the procedures set forth in California Rules of
Court 243.1-243.2 for records sealed or proposed to be sealed with the Court; and the
Confidential Material shall be placed in a sealed envelope or other container marked on the
outside with the title of this action, identification of each document within and a statement
substantially as follows:

> Confidential Information - Subject to Protective Order.  This
> envelope contains material filed [lodged] under seal for the
> purpose of this litigation only.  It shall not be opened by a person
> other than the Court except by Court Order or by written
> stipulation of all parties filed with the Clerk of this Court, and is
> otherwise subject to the provisions of the Protective Order
> entered in this action on [date].

If Confidential Material is to be part of the record on appeal or used in an original proceeding
under California Rule of Court Rule 56, the parties shall comply with California Rules of
Court 12.5 and 56(e).

7.      In the event that any question is asked at a deposition which, in the opinion of
counsel for any party, calls for the disclosure of Confidential Information specified in Exhibit
"A", the witness shall nevertheless answer such question fully and completely, provided that
those in attendance are persons qualified to receive the information pursuant to the terms of
this Order.  Counsel for the party claiming confidentiality shall designate those portions of

KAYE SCHOLER llp

2

STIPULATION AND [PROPOSED] PROTECTIVE ORDER

EXHIBIT 10 PAGE 117

1   the deposition for which a claim of confidentiality is made at the deposition by making a

2   statement for inclusion in the deposition transcript, including specifying on the record the

3   beginning and ending portions of the deposition for which confidentiality is claimed, with

4   such portions thereafter being marked on the record by the Court Reporter and/or

5   videographer as contemplated below, and afterwards by notifying opposing counsel, in

6   writing, within 30 days after receiving the deposition transcript of the page and line of each

7   portion of the transcript deemed "Confidential."

8        In the event a party decides to designate testimony as "Confidential" not so designated

9   during the taking of the deposition itself, a party may give notice of additional testimony to

10   be designated as "Confidential" within the 30-day period after receipt of the deposition

11   transcript. The notice must include specific page and line designations. Absent a designation

12   as "Confidential" during the taking of the deposition or within the 30-day period specified

13   herein, testimony is not subject to this agreement. Until a specific designation as

14   "Confidential" is made by a party, testimony and evidence is not covered by this agreement.

15        As soon as reasonably possible, all such designated portions of the transcript shall be

16   marked with the legend "Confidential." If any portion of a deposition is designated as

17   "Confidential," then until expiration of the 30-day period or until such time as notification is

18   received, counsel and the reporter will treat the entire transcript as if it had been designated

19   as containing Confidential Information. If no party timely designates information as

20   confidential in a deposition, then none of the transcript or its exhibits with the exception of

21   those exhibits identified on Exhibit "A" of the Protective Order, will be treated as

22   confidential; if a timely designation is made, the confidential portions and the exhibits shall

23   be treated as confidential in the manner described in other parts of this Protective Order.

24   DATED: August 2, 2004        KAYE SCHOLER, LLP

25

26                      By

27                      Larry R. Feldman
                        Attorneys for Defendant ISAAC LARIAN

28

3

**EXHIBIT 10 PAGE 118**



DATED: August —, 2004
September 20

HOWARTH & SMITH

By: _____
Brian D. Bubb
Attorneys for Plaintiff, FARHAD LARIAN

IT IS SO ORDERED.

DATED: August 23 2004

_____
Judge of the Superior Court
RODNEY E. NELSON

4

LAWFOR (1).wpd          STIPULATION AND [PROPOSED] PROTECTIVE ORDER

EXHIBIT 10 PAGE 119



EXHIBIT "A"

1. The Appraisal Report (ED2-163).

2. October 16, 2000 Letter from Ellis Stern to National Business Appraisers and enclosures (ED164-178).

3. Income Tax Returns of MGA for 1994 through 1999 (ED179-465).

4. Audited Financial Statements of MGA for 1993 through 1998 (ED467-524).

5. Trial Balances and similar MGA accounting data (ED525-642).

6. Confidential reconciliations (MZ942-1948).

KAYE SCHOLER⊕

5

LAXPOR (1).wpd        STIPULATION AND [PROPOSED] PROTECTIVE ORDER

**EXHIBIT 10 PAGE 120**

00/00/2006        08:41        FIRST LEGAL SUPPORT    FAX (213) 250-1197

KAYE SCHOLER LLP
1999 by Mail/Federal Court 9/96

## PROOF OF SERVICE

1

2    STATE OF CALIFORNIA        )
                                )   ss
3    COUNTY OF LOS ANGELES      )

4        I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is KAYE SCHOLER LLP, 1999 Avenue of the Stars, Suite 1700, Los Angeles, California 90067-6048P.

6        On September 21, 2004, I served the foregoing document described as: STIPULATION AND [PROPOSED] PROTECTIVE ORDER by placing a true copy thereof
7    enclosed in a sealed envelope addressed as follows:

8        Don Howarth, Esq.
         Suzelle M. Smith, Esq.
9        Brian D. Bubb, Esq.
         Robert D. Brain, Esq.
10       HOWARTH & SMITH
         800 Wilshire Boulevard, Suite 750
11       Los Angeles, California  900017

12   [    ]    **BY FACSIMILE** The above-referenced documents (without exhibits and attachments thereto) were transmitted via facsimile transmission to the
13            addressee(s) as indicated above on the date thereof. The transmission was reported as completed and without error. Executed on September 21, 2004, at
14            Los Angeles, California.

15   [XXX]   **BY U.S. MAIL** (I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited
16            with U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on
17            motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in
18            affidavit.) Executed on September 21, 2004, at Los Angeles, California.

19   [    ]    **BY FEDERAL EXPRESS** I am readily familiar with KAYE SCHOLER LLP's business practices of collecting and processing items for pick-up and next
20            business day delivery by Federal Express. Under said practices, items to be
21            delivered the next business day are either picked up by Federal Express or deposited in a box or other facility regularly maintained by Federal Express in the
22            ordinary course of business on that same day with the cost thereof billed to KAYE SCHOLER LLP's account. I placed such sealed envelope for delivery by Federal
23            Express to the offices of the addressee(s) as above on the date hereof following
             ordinary business practices. Executed on September 21, 2004, at Los Angeles,
             California.

24

25

26

27

28

                                        1

**EXHIBIT 10 PAGE 121**



1   [XXX]   **STATE** I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

2   [   ]   **FEDERAL** I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

3

4

5

6

7   John Broderick

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT 10 PAGE 122**

STERN & GOLDBERG

ELLIS STERN*†
ALAN N. GOLDBERG*
KIEN C. TIET

*CERTIFIED SPECIALIST
TAXATION LAW
*CERTIFIED SPECIALIST,
PROBATE, ESTATE PLANNING
AND TRUST LAW
THE STATE BAR OF CALIFORNIA
BOARD OF LEGAL SPECIALIZATION

ATTORNEYS AT LAW
6345 BALBOA BOULEVARD
SUITE 200
ENCINO, CALIFORNIA 91316
(818) 758-3940
(310) 278-8886

JUSTIN J. LANSBERG
LAWRENCE W. HAIT
OF COUNSEL

FAX (818) 758-3950

E-MAIL  estern@sgattys.com
agoldberg@sgattys.com
ktiet@sgattys.com
jlansberg@sgattys.com

May 21, 2004

**Via Facsimile & U.S. Mail**

(213) 622-0791

Don Howarth, Esq.
Howarth & Smith
800 Wilshire Boulevard
Suite 750
Los Angeles, CA 90017

(310) 788-1200

Robert M. Turner, Esq.
Kaye Scholer LLP
1999 Avenue of the Stars
Suite 1700
Los Angeles, CA 90067-6048

RE:    Felina - International Traders
Larian v. Larian
LASC Case No.: BC 301371

Dear Gentlemen:

I am prepared to deliver to you the documents relating to Morad Zarabi's arbitration of the shareholder dispute between your respective clients, resulting in the Sales Agreements wherein Isaac purchased the shares of Farhad. The documents have been copied, one set for each of you. They are voluminous and will be available for pick-up in my office on May 27, 2004.

The documents responsive to the Deposition Subpoena for Production of Business Records to the Custodian of Records of National Business Appraisers, LLC, including the documents in the possession of National Business Appraisers and the supporting documents returned to me after the appraisal was rendered, are grouped as follows:

1.    Appraisal - 11/7/00
2.    Letters from me to National Business Appraisers, with enclosures - 10/2000

HS 03152

**EXHIBIT 11 PAGE 123**

05-21-04   14:28   From-Stern & Goldberg   8187583949   T-507   P 003/004   F-118

Don Howarth, Esq.
Robert Turner, Esq.
May 21, 2004
Page 2

The documents responsive to the initial Deposition Subpoena for Production of Business Records to the Custodian of Records for Morad Zarabi, followed by the request for delivery of such records in Howarth & Smith's letter to me dated May 13, 2004, are grouped as follows:

1.   Four (4) files of Confidential Reconciliations
2.   Documents relating to Texas Judgment and Lucasfilm dispute
3.   Resignation of Fred Larian as Officer and Director of MGA
4.   Packet entitled MGA Entertainment Confidential
5.   Disclosures in Connection with Purchase of Property on 1492 Stone Canyon
6.   MGA Entertainment Financial Statement for Years 2001 & 2000
7.   ABC Int'l Bad Debts from 1997-2000
8.   Signed Agreement to Arbitrate
9.   Agreement to Arbitrate and Selection of Arbitrator
10.  Agreement for Sale of Stock Between Farhad & Isaac
11.  Certificate of Amendment of Articles of Incorporation of ABC
12.  Fax to Daie Jaan/Fred Larian - List of Shareholders
13.  Amendment to Agreement - 12/13/00
14.  Handwritten Purchase Offer Between Fred & Isaac - 10/2000

Please note that I am not producing any of the documentation referring to Morad's efforts, investigations, and communications conducted in 2003 and thereafter with respect to Farhad's claim as I do not believe such documents are relevant to the issues in Farhad's Complaint and are otherwise privileged. Please see my letter dated December 1, 2003 setting forth my rationale.

I am confident that you will find my proposed method of delivery satisfactory in light of the volume of the documents. I believe the above mentioned documents satisfies the production requests set forth in the above referenced subpoenas.

HS 03153

**EXHIBIT 11 PAGE 124**

US-21-04   14:28   From Stern & Goldberg   818/583949   1-507   P 004/004   F-118

Don Howarth, Esq.
Robert Turner, Esq.
May 21, 2004
Page 3

        The documents will be available after 9:00 a.m. on May 27, 2004.  No further arrangements need be made with me prior to the pick-up.

                        Very truly yours,

                        STERN & GOLDBERG

                        ELLIS STERN

ES/kct

cc:    Morad Zarabi

HS 03154

EXHIBIT 11 PAGE 125

RECEIVED
OCT 1 3 2007

ELLIS STERN*†
ALAN N. GOLDBERG*
KIEN C. TIET

*CERTIFIED SPECIALIST,
TAXATION LAW
†CERTIFIED SPECIALIST,
PROBATE, ESTATE PLANNING
AND TRUST LAW
THE STATE BAR OF CALIFORNIA
BOARD OF LEGAL SPECIALIZATION

## STERN & GOLDBERG
ATTORNEYS AT LAW
6345 BALBOA BOULEVARD
SUITE 200
ENCINO, CALIFORNIA 91316
(818) 758-3940
(310) 278-8686

JUSTIN J. LANSBERG
LAWRENCE W. HAIT
OF COUNSEL

FAX (818) 758-3950

E-MAIL: estern@sgattys.com
agoldberg@sgattys.com
ktiet@sgattys.com
jlansberg@sgattys.com

October 16, 2007

**Via Facsimile and U.S. Mail**
**(213) 624-0643**

Juan Pablo Alban, Esq.
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017

Re:   Mattel, Inc. - Carter Bryant
      U.S.D.C. Case No. CV04-9049 SGL (RNBx)

Dear Mr. Alban:

This letter is to follow up our telephone discussion on October 11, 2007, and my letter to Ms. Morgenthaler Lever of October 12, 2007, regarding the above-entitled matter.

This letter is to advise you that we have not received any objection to our producing a copy of the privilege log, which we submitted to counsel for Isaac Larian and Farhad Larian in the action entitled **Larian v. Larian, L.A.S.C. Case No. BC 301371** ("Underlying Proceeding" herein). As such, I enclose a copy of that privilege log.

In connection with the five (5) items listed on the privilege log, it is my understanding that Item No. 4, the Appraisal Report from National Business Appraisers, dated February 13, 2003 was subsequently produced to both Isaac Larian and Farhad Larian in the Underlying Proceeding. In addition, Item Nos. 1, 2 and 5, the MGA Restructuring, Corporate Minutes and the letter from Isaac Larian to Morad Zarabi, dated August 29, 2003 are obviously in the possession of Isaac Larian. We no longer have possession of Item No. 3, the tape recording of the January 23, 2003 meeting, although, I believe we have a transcription of that tape.

I hope this concludes our involvement in the action, as the only documents which may not be otherwise available to your firm would be the internal documents created by Mr. Zarabi in his capacity as the arbitrator which were not previously disseminated to the parties in the Underlying Proceeding.

C:\wpdocs\MATTEL - BRYANT\ALBAN LTR 10-16-07

**EXHIBIT 12 PAGE 126**

Juan Pablo Alban, Esq.
Quinn Emanuel Urquhart Oliver & Hedges, LLP
October 16, 2007
Page 2

     If you have any questions or would like to discuss the matter further, please feel free to contact me.

          Sincerely,

          STERN & GOLDBERG

          ALAN N. GOLDBERG

ANG: cn
Enclosure

cc:    Jon Corey /Quinn Emanuel Urquhart Oliver & Hedges, LLP
       (w/encl., via facsimile)
       Marc Smith, Esq., Krane & Smith (w/encl., via facsimile)
       Bryant S. Delgadillo, Esq./Kaye Scholer, LLP (w/encl., via facsimile)
       Alisa Morgenthaler Lever, Esq./Christensen, Glaser, Fink, Jacobs, Weil & Shapiro, LLP
       (w/encl., via facsimile)
       Morad Zarabi

C:\wpdocs\MATTEL - BRYANT\ALBAN LTR 10-16-07

**EXHIBIT 12 PAGE 127**

**Felina - International Traders**
**Larian v. Larian**
**LASC Case No.: BC 301371**

**Privilege Log**

1.  MGA Restructuring  -  October 1, 2002

2.  Signed Unanimous Written Consent of Shareholders of ABC International Trader - September 13, 2002

3.  Tape Recording of January 23, 2003 Meeting

4.  Appraisal Report from National Business Appraisers - February 13, 2003

5.  Letter from Isaac to Morad - August 29, 2003

**EXHIBIT 12 PAGE 128**

**quinnemanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-443-3000 FAX 213-443-3100

WRITER'S INTERNET ADDRESS
juanpabloalban@quinnemanuel.com

October 25, 2007

**VIA FACSIMILE AND U.S. MAIL**
**818-758-3950**

Alan N. Goldberg
Stern & Goldberg
6345 Balboa Boulevard, Suite 200
Encino, California 91316

Re:   Mattel v. Bryant, Case No. CV 04-9049 SGL (RNBx)

Dear Mr. Goldberg:

This letter memorializes the telephone conference you, Jon Corey and I had on October 11, 2007 and provides a summary of our research regarding arbitral privilege under federal law. As we initially found and have now confirmed, no arbitral privilege applies to Mr. Zarabi in this case.

You stated that Isaac and Fahrad Larian may have in their possession some documents that you have, and which we seek. You also confirmed that you possess, and that they do not have documents that you withheld from them based on the attorney-client, work product and arbitral privileges. We appreciate your efforts to talk to Isaac's, Fahrad's and MGA's attorneys to persuade them to produce these documents. Your efforts, however, have apparently fallen on deaf ears. They have not responded to your October 12, 2007 letter advising them it would be prudent to produce responsive documents to Mattel. Neither Isaac nor Fahrad have produced documents in response to Mattel's document requests. So, we need to obtain these documents from you, as we have the right to do. See, e.g., U.S. v. American Optical Co., 39 F.R.D. 580, 583 (N.D. Cal. 1966) (if documents subpoenaed under Rule 45 are relevant and there is good cause for their production, the subpoena is enforced unless the documents are privileged or the subpoena is unreasonable, oppressive, annoying, or embarrassing); State Farm Mut. Auto. Ins. Co. v. Accurate Medical, P.C., 2007 WL 2993840, at *1 (E.D.N.Y. 2007) ("a person may not

**quinn emanuel urquhart oliver & hedges, llp**

NEW YORK | 51 Madison Avenue, 22nd Floor, New York, New York 10010 | TEL 212-849-7000 FAX 212-849-7100
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94111 | TEL 415-875-6600 FAX 415-875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL 650-801-5000 FAX 650-801-5100
SAN DIEGO | 4445 Eastgate Mall, Suite 200, San Diego, California 92121 | TEL 858-812-3107 FAX 858-812-3336

**EXHIBIT 13 PAGE 129**

Alan N. Goldberg
October 25, 2007

avoid a subpoena by saying that the evidence sought from him is obtainable from another.")
(quoting Covey Oil Co. v. Continental Oil Co., 340 F.2d 993, 998 (10th Cir. 1965)); see also
Fed. R. Civ. P. 26(d) (methods of discovery may be used in any sequence). As we mentioned
before, Mattel will cover the copying costs of these documents. Please let me know when Mattel
can expect them.

We confirmed that we do not have an issue with your withholding documents based on the
legitimate assertions of attorney-client and work product privileges. For now, you produced to
us the privilege log that you gave to Isaac and Fahrad identifying the documents you withheld
from them, which we appreciate. It appears, however, to include only documents that you
withheld from Isaac and Fahrad based on the arbitral privilege, the applicability of which we will
address below.

Mattel does not understand any of the documents to be communications between Stern &
Goldberg and Mr. Zarabi or Stern & Goldberg's work product, so those privileges would not
attach to those documents and they should be produced. Otherwise, Stern & Glodberg has not
identified any other responsive documents as to which it asserts any claim of privilege. Please
provide us with a privilege log identifying those documents and the privilege claimed.

**The Arbitral Privilege**

We agreed to get back to you with more authority as to why California Evidence Code § 703.5
and other bases for an "arbitral privilege" do not apply to our requests. Whether or not your
withholding documents from Fahrad and Isaac Larian based on the "arbitral privilege" was
appropriate with respect to their state law disputes, that privilege does not apply to the subpoena
Mattel served on you.

First, federal common law of privilege applies in federal question cases. Fed. R. Evid. 501; U.S.
v. Zolin, 491 U.S. 554, 562 (1989); Admiral Ins. Co. v. U.S. Dist. Court for Dist. of Arizona, 881
F.2d 1486, 1492 (9th Cir. 1989); Garrett v. City and County of San Francisco, 818 F.2d 1515,
1519 n. 6 (9th Cir. 1987). This is a federal question case, not based on diversity jurisdiction.
Mattel's complaint includes claims for federal copyright infringement, violation of RICO and
conspiracy to violate RICO. MGA has also asserted claims under the federal trademark statutes.
The origins, creation and development of Bratz -- the crux of the discovery Mattel seeks from
you, including what MGA and Isaac Larian were doing and concealing with respect to Bratz in
1999 and 2000 -- are also the crux of Mattel's federal claims. The presence of state law claims
does not change that result -- federal privilege law applies. Agster v. Maricopa County, 422 F.3d
836, 839-840 (9th Cir. 2005), cert. denied, 126 S.Ct. 473 (2005) ("Where there are federal
question claims and pendent state law claims present, the federal law of privilege applies.")
(citing Wm. T. Thompson Co. v. General Nutrition Corp., Inc., 671 F.2d 100, 104 (3d Cir.
1982)); Southern California Housing Rights Center v. Krug, 2006 WL 4122148, at *3 (C.D. Cal.
2006); Harbert v. Priebe, 466 F. Supp. 2d 1214, 1215 (N.D. Cal. 2006); Corser v. County of
Merced, 2006 WL 2536622, at *3 (E.D. Cal. 2006); see also Fed. R. Evid. 501, Advisory Comm.

2

**EXHIBIT 13 PAGE 130**

Alan N. Goldberg
October 25, 2007

Note ("It is also intended that the Federal law of privileges should be applied with respect to pendent State law claims when they arise in a Federal question case.").[1]

Second, any "arbitral privilege" that exists under federal law simply does not apply here. No provision in either the Federal Arbitration Act or the Federal Rules of Evidence is comparable to California Evidence Code § 703.5. The case we cited in our initial meet and confer letter, National Hockey League Players' Ass'n v. Bettman, explains the limits of the "arbitral privilege" under federal law:

> As for the so-called arbitral immunity, the principle that defendants invoke is not, strictly speaking, an evidentiary privilege. Rather, the federal courts have developed two related rules governing the status of arbitrators *in the context of litigation challenging the results of an arbitration* . . .

> First, arbitrators are immune from personal-damage liability for their decisions, because they occupy a position comparable to that of a judicial officer . . . .

> Second . . . *in actions addressing the results of an arbitration-whether it be a proceeding to enforce or to set aside an arbitrator's award*-the court is to exercise close supervision over the extent and nature of discovery, although the discovery rules are, at least in principle, applicable to such a proceeding.

1994 WL 38130, at *2, *6-7 (S.D.N.Y. 1994) (emphases added). Because Mattel does not seek discovery to challenge Mr. Zarabi's decisions, the limited federal arbitral privilege does not apply here.

Every other federal case we found is consistent with National Hockey League's explanation of the scope of the federal arbitral privilege. For example, in Matter of Andros Compania Maritima, S.A. (Marc Rich & Co., A.G.), 579 F.2d 691 (2nd Cir. 1978), on which National Hockey League relies, the Second Circuit started with the premise that "the discovery procedures of the Federal Rules of Civil Procedure are generally applicable to Title 9 proceedings." Id. at 702.[2] The court then held that, "in the *special context* of what are in effect *post hoc efforts to induce arbitrators to undermine the finality of their own awards*, we agree with the district court that any questioning of arbitrators should be handled pursuant to judicial supervision and limited to situations where clear evidence of impropriety has been presented." (emphases added). See also Lyeth v. Chrysler Corp., 929 F.2d 891, 900 (2nd Cir. 1991) ("*To the extent* that

---

[1]    We doubt Mr. Zarabi qualifies as an "arbitrator" within the meaning of the California statute anyway, but even if he could make such a threshold showing, the case law above makes clear that the state statute does not apply here.

[2]    Title 9 is a reference to the Federal Arbitration Act.

3

**EXHIBIT 13 PAGE 131**

Alan N. Goldberg
October 25, 2007

Chrysler's request to depose the individual arbitrator *was aimed at contesting Lyeth's Lemon Law award,* the district court properly denied discovery because Chrysler did not present clear evidence of any impropriety.") (citing Andros) (emphases added); Frere v. Orthofix, Inc., 2000 WL 1789641, at *5 (S.D.N.Y. 2000) ("As is evident both from Andros and from subsequent court decisions . . . that standard [i.e., the arbitral privilege] applies *only to discovery inquiries directed at the arbitrator* and *only when the goal is to impugn the validity of the arbitrator's decision.*") (emphasis added).

Ninth Circuit law is consistent with, and in fact has relied on, the precedent established in the Second Circuit. See, e.g., Woods v. Saturn Distribution Corp., 78 F. 3d 424, 430 (9th Cir. 1996) ("The Federal Rules of Civil Procedure do not apply to 'post hoc' questioning of arbitrators in Title 9 proceedings and 'any questioning of arbitrators should be handled pursuant to judicial supervision and limited to situations where clear evidence of impropriety has been presented.'") (quoting Andros). In Woods, the party seeking discovery was expressly challenging the prior arbitration decision. Id.. Accord Thomas Kinkade Co. v. Hazlewood, 2007 WL 217384, *2-4 (N.D. Cal. 2007) (allowing limited discovery in the context of a challenge to the arbitration); Empresa Constructora Contex Limitada v. Iseki, Inc., 106 F.Supp. 2d 1020, 1024-1025 (S.D. Cal. 2000); Corsini v. Prudential Securities, Inc., 1995 WL 663174, at *2 (S.D. Cal. 1995); Portland General Elec. Co. v. U.S. Bank Trust Nat. Ass'n, 38 F.Supp. 2d 1202, 1208-1210 (D. Or. 1999) (reversed on other grounds). In each of these district court cases, an arbitrator's right to withhold discovery related to his deliberations was limited to the context of subsequent proceedings challenging the arbitral award in some way. Again, that is not the case here. As the Second Circuit found in Andros, the standard discovery obligations and limitations under the Federal Rules of Civil Procedure apply.

We trust that the above-cited authority resolves any concerns you had regarding the "arbitral privilege" and hope we can come to an amicable resolution on this issue.

Documents that we believe are in your possession to which an arbitral privilege does not apply or which are otherwise discoverable from you include, without limitation, (1) each of the five sets of documents listed in the privilege log you sent us, (2) all documents relied upon for the February 13, 2003 appraisal,[3] (3) the transcript of the January 23, 2003 meeting, (4) the Appraisal Report bates stamped ED 2 - 163, (5) an October 16, 2000 letter from Mr. Stern to National Business Appraisers and enclosures bates stamped ED 164 -178, (6) MGA tax and accounting information bates stamped ED 179 - 642, and (6) "Confidential Reconciliations"

---

[3]   Howarth & Smith produced to us all documents in their possession that were not work product or subject to the attorney-client privilege. However, they confirmed that they never received the February 13, 2003 appraisal documents, and that they do not have *any* documents produced during the Larian v. Larian disputes. Though Howarth had them at one time, Fahrad took all such documents with him when he substituted Howarth with other counsel.

4

**EXHIBIT 13 PAGE 132**

Alan N. Goldberg
October 25, 2007

bates stamped MZ 942 - 1948. To avoid any doubt, your production should also include all information in your possession that MGA, Isaac or Fahrad provided to Mr. Zarabi and/or his appraiser (Ernest Dutcher and/or his company, National Business Appraisers) for purposes of any appraisals done between 2000 and 2004, inclusive.

We agreed to have another conference after you had a chance to talk to MGA's, Isaac's and Fahrad's attorneys. Please let us know if they responded to your October 12, 2007 letter, and if not, whether or not you intend to continue your discussion with Skadden Arps and Christensen Glaser. Otherwise, we should hold our conference as soon as possible. In that case, let us know a convenient time for you this week.

We look forward to hearing from you.

Very truly yours,

Juan Pablo Albán
07209/2252378.3

5

**EXHIBIT 13 PAGE 133**

# QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

**NEW YORK**
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
Facsimile: (212) 849-7100

**LOS ANGELES**
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000
Facsimile: (213) 443-3100

**SAN FRANCISCO**
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600
Facsimile: (415) 875-6700

**SILICON VALLEY**
555 Twin Dolphin Drive, Suite 560
Redwood Shores, CA 94065
(650) 801-5000
Facsimile: (650) 801-5100

## LOS ANGELES OFFICE

## FACSIMILE TRANSMISSION

**DATE:** October 25, 2007

**NUMBER OF PAGES, INCLUDING COVER 6**

| NAME/COMPANY | PHONE NO. | FAX NO. |
|---|---|---|
| Alan N. Goldberg<br>**Stern & Goldberg** | | 818-758-3949 |

**FROM:** Juan Pablo Albán, Esq.

**RE:** *Mattel v. Bryant*

**MESSAGE:**

**PLEASE SEE ATTACHED.**

```
FAXED
OCT 2 5 2007
```

07209/2236907.1

| CLIENT # | 7209 | ROUTE/<br>RETURN TO: | Lorraine R. - 4th Fl. | ☒ CONFIRM FAX<br>☒ INCLUDE CONF. REPORT |
|---|---|---|---|---|
| OPERATOR: | *Jeffrey* | | CONFIRMED? ☐ NO ☐ YES: | |

The information contained in this facsimile is confidential and may also contain privileged attorney-client information or work product. The information is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this communication is strictly prohibited. If you have received the facsimile in error, please immediately notify us by telephone, and return the original message to us at the address above via the U.S. Postal Service. Thank you.

**IF YOU DO NOT RECEIVE ALL OF THE PAGES, PLEASE PHONE (213) 443-3000 AS SOON AS POSSIBLE.**

**EXHIBIT 13 PAGE 134**

## Confirmation Report — Memory Send

```
Page      : 001
Date & Time: 10-25-2007   11:10am
Line 1    : 2134433100
Line 2    :
Machine ID : QUINN EMANUEL
```

| | | |
|---|---|---|
| Job number | : | 010 |
| Date | : | 10-25  11:07am |
| To | : | ☎76681❉7209❉18187583949 |
| Number of pages | : | 006 |
| Start time | : | 10-25  11:07am |
| End time | : | 10-25  11:10am |
| Pages sent | : | 006 |
| Status | : | OK |

| Job number | : 010 | *** SEND SUCCESSFUL *** |
|---|---|---|

---

## QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

NEW YORK
51 Madison Avenue, 22nd Floor
New York, NY  10010
(213) 849-7000
Facsimile: (212) 849-7100

LOS ANGELES
865 South Figueroa Street, 10th Floor
Los Angeles, CA  90017
(213) 443-3000
Facsimile: (213) 443-3100

SAN FRANCISCO
50 California Street, 22nd Floor
San Francisco, CA  94111
(415) 875-6600
Facsimile: (415) 875-6700

SILICON VALLEY
555 Twin Dolphin Drive, Suite 560
Redwood Shores, CA  94065
(650) 801-5000
Facsimile: (650) 801-5100

### LOS ANGELES OFFICE
## FACSIMILE TRANSMISSION

| DATE: | October 25, 2007 | NUMBER OF PAGES, INCLUDING COVER 6 |
|---|---|---|

| NAME/COMPANY | PHONE NO. | FAX NO. |
|---|---|---|
| Alan N. Goldberg | | 818-758-3949 |
| Stern & Goldberg | | |

FROM:      Juan Pablo Albán, Esq.

RE:        *Mattel v. Bryant*

MESSAGE:

PLEASE SEE ATTACHED.

---

| 07209/2236907 1 | | | | |
|---|---|---|---|---|
| CLIENT # | 7209 | ROUTE/ RETURN TO: | Lorraine R. – 4th Fl. | ☑ CONFIRM FAX  ☑ INCLUDE CONF. REPORT |
| OPERATOR: | | | CONFIRMED? ☐ NO ☐ YES: | |

The information contained in this facsimile is confidential and may also contain privileged attorney-client information or work product. The information is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this communication is strictly prohibited. If you have received the facsimile in error, please immediately notify us by telephone, and return the original message to us at the address above via the U.S. Postal Service. Thank you.

IF YOU DO NOT RECEIVE ALL OF THE PAGES, PLEASE PHONE (213) 443-3000 AS SOON AS POSSIBLE.

EXHIBIT 13 PAGE 135

ELLIS STERN*†
ALAN N. GOLDBERG*
KIEN C. TIET

*CERTIFIED SPECIALIST,
TAXATION LAW
†CERTIFIED SPECIALIST,
PROBATE, ESTATE PLANNING
AND TRUST LAW
THE STATE BAR OF CALIFORNIA
BOARD OF LEGAL SPECIALIZATION

## STERN & GOLDBERG

ATTORNEYS AT LAW
6345 BALBOA BOULEVARD
SUITE 200
ENCINO, CALIFORNIA 91316
(818) 758-3940
(310) 278-8686

JUSTIN J. LANSBERG
LAWRENCE W. HAIT
OF COUNSEL

FAX (818) 758-3950

E-MAIL: estern@sgattys.com
agoldberg@sgattys.com
ktiet@sgattys.com
jlansberg@sgattys.com

October 31, 2007

**Via Facsimile and U.S. Mail**
**(213) 624-0643**

Juan Pablo Alban, Esq.
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figucroa Street, 10th Floor
Los Angeles, California 90017

Re:   Mattel, Inc. - Carter Bryant
U.S.D.C. Case No. CV04-9049 SGL (RNBx)

Dear Mr. Alban:

This letter is to acknowledge receipt of your letter of October 25, 2007, regarding the Subpoena in a Civil Case ("Subpoena" herein), served by your office upon Stern & Goldberg in the above-entitled action.

Initially, I again note that you continue to send correspondence to our outgoing fax number. As such, I received the fax copy and the mailed version of your letter on Monday, October 29, 2007. Our facsimile number, which is stated on our letterhead, is (818) 758-3950. While, in your letter it referenced it was faxed to that number, however, on the fax cover sheet and the letter itself showed it was faxed to the incorrect number (a copy of the faxed version is enclosed). When that occurs, the faxes are mixed with our outgoing fax confirmation sheets and will not immediately, if at all, be delivered to me. In this case, I received it on October 29, 2007. In the future, I again request that you make sure that the person who is responsible for faxing documents to my office utilizes the correct facsimile number.

Again, I disagree with the entire contents of your letter. I will not again address all of the grounds for objection, as many grounds have previously been set forth in my letters to you of October 2, 2007 and October 8, 2007 and my letter to Michael Zeller of September 17, 2007. I simply reference those letters and the objections set forth therein. Further, please note that the conference call which you request, should also include counsel for MGA, Isaac Larian, and Farhad Larian, since it would relate to your client's attempt to obtain documents to which those parties clearly have a vested interest. I will address the remaining issues set forth in your letter in the order in which they appear.

C:\wpdocs\MATTEL - BRYANT\LETTERS\ALBAN LTR 10.31.0

**EXHIBIT 14 PAGE 136**

Juan Pablo Alban, Esq.
Quinn Emanuel Urquhart Oliver & Hedges, LLP
October 31, 2007
Page 2

### 1.   Documents Are Admittedly in Possession of Parties to the Litigation.

Initially, you acknowledge that Isaac and Farhad Larian may have in their possession, the documents which you seek from Stern & Goldberg. You then state they have not "produced documents in response to Mattel's document requests", but do not state why. Does it involve claims of privilege? In such case your client obviously has a remedy to seek those documents from the parties to the litigation. However, I do not believe the remedy is to harass a non-party. Indeed, your firm continues to refuse to even comply with the express requirements of the Stipulated Order Appointing a Discovery Master ("Discovery Stipulation"herein) which your firm authored. To date you continue to fail to send copies of all meet and confer correspondence to the parties to the action, as required by the Discovery Stipulation.

As I understand your letter, you do not dispute Stern & Goldberg's proper assertion of attorney-client and attorney work-product to the first two (2) categories of documents clearly described in my letter, dated October 12, 2007 to Alisa Morgenthaler Lever. Such description (which I also provided in our telephone conversation) clearly provides you with the information necessary to determine that they are privileged and you appear to acknowledge that fact. As such, no further information or identification appear necessary and will not be provided. As such, there is no necessity to provide a document by document listing. Indeed, any request to do so, would clearly indicate your intent is to harass and annoy.

As to category No. 3, we believe those documents are subject to the Arbitrator's privilege. As you were advised, there were five items listed on the privilege log which I sent to you on October 16, 2007. All of the those items, save and except for the tape recording of the January 23, 2003 meeting, are in the possession of Isaac Larian, Farhad Larian and their counsel of record in the underlying matters, including Kaye Scholer. Further, as I advised, we no longer have possession of the tape recording of the January 23, 2003 meeting. Although, I believe we have a transcription of that tape, it would clearly be subject to the attorney work-privilege since it was obtained by our firm in connection with its representation of Mr. Zarabi, and was not disseminated to anyone.

All of the remaining documents which you seek from Stern & Goldberg are in the possession, custody and control of parties to the litigation, namely MGA and Isaac Larian. They are also in the possession of Farhad Larian (I do not know if he is a party to this action). Based upon the description in your letter, you obviously have information that the parties possess those documents, as you identified many of the documents by batestamp numbers. Since those batestamp numbers were not placed upon the documents by our firm, it is apparent you either have the documents or one of the parties to the action has listed them on a privilege log. Please advise me which of those is correct. If not, please advise me how you obtained the information as to the batestamp numbers of those specific documents. Further, has any determination been made as to whether those documents are privileged or required to be produced in discovery by a party to the action.

C:\wpdocs\MATTEL - BRYANT\LETTERS\ALBAN LTR 10-29-07

**EXHIBIT 14 PAGE 137**

Juan Pablo Alban, Esq.
Quinn Emanuel Urquhart Oliver & Hedges, LLP
October 31, 2007
Page 3

As stated above, you continue to fail to provide the parties to the case with copies of the "meet and confer" correspondence you send to me. Such refusal, raises a concern that your office is trying to utilize the subpoena process to obtain documents outside of the normal scope of discovery. Indeed, your letter now purports to seek tax information which is clearly privileged under both federal and state law.

Your letter again fails to address that the "Ninth Circuit has long held that nonparties subject to discovery requests deserve extra protection from the Courts." [ See the discussion in my letter to you of October 2, 2007.]

## 2.  There is No Right to Obtain Discovery From An Arbitrator.

In your letter, you state there is no privilege provision in either the Federal Arbitration Act or under the Federal Rules of Evidence similar to California Evidence Code § 703.5.  I disagree. The cases you cite clearly hold that the deposition of arbitrators are repeatedly condemned by the Courts, and that documents utilized by the Arbitrator during his deliberative process are not subject to discovery. See Woods v. Saturn Distribution Corp. 78 F.3d 424, 430 (9th Cir. 1996); O.R. Securities, Inc. v. Professional Planning Associates, Inc., 857 F.2d 742, 748 ( 11th Cir. 1988); and Hoeft v. MVL Group, Inc. 343 F.3d 57, 67 (2d Cir. 2003) (citing numerous cases which hold that it is improper to submit an arbitrator to examination regarding the decision making process).

In National Hockey League Players Ass'n v. Bettman, WL 38130 (S.D.N.Y. 1994), in which you place great reliance, the court stated "under the Andros rule, the subpoenas issued to the arbitrators can have no effect unless the Court finds it appropriate". Id at p.*2. Further, case law establishes that it is only in situations in which the request of discovery is "plainly relevant to colorable claims of arbitral bias or misconduct" may discovery be properly granted from an arbitrator.  Id at p.*2.

Indeed, in Bettman, supra, the Court refused to allow a party to depose Mr. Bettman, stating: "most or all of the areas of relevant inquiry can be conducted through depositions of other League and team officials". Id at p.*5.

Finally, in Bettman, the Court refused to order the production of any documents when their "disclosure plainly would intrude upon the analytical basis for the arbitrator's decision, an area that is generally, and properly, viewed as not subject to inquiry." Id at p.*7.

Finally, the "cases are legion in which Courts have refused to permit parties to depose arbitrators or other judicial or quasi-judicial decision makers regarding the thought processes underlying their decisions." Hoeft, supra, 343 F.3d at p. 67. Such rule makes perfect sense and is equally applicable to our firm whose involvement was representing the Arbitrator in one of the

**EXHIBIT 14 PAGE 138**

Juan Pablo Alban, Esq.
Quinn Emanuel Urquhart Oliver & Hedges, LLP
October 31, 2007
Page 4

underlying Larian v. Larian cases.  You are simply trying to obtain documents which you are not entitled to obtain from the Arbitrator.

For all of the reasons set forth in my letters of September 17, 2007, October 2, 2007 and October 8, 2007, we believe the Subpoena was improperly served.  Indeed, its service raises serious questions as to whether it constitutes an abuse of discovery.  See e.g. **Mattel, Inc. v. Walking Mountain Productions**, 353 F.3d 792, 813-814 (9th Cir. 2003).

In any event, I look forward to engaging in a conference call with Mr. Corey, along with counsel for MGA, Isaac Larian and Farhad Larian.  Please note that I am available to participate in such a conference call on Wednesday, November 7, 2007 (in the morning), or Friday, November 9, 2007 (in the morning).  Please advise me of the date and time in which such call will take place, and confirm that all counsel are available to participate.

Your anticipated courtesy and cooperation is appreciated.  If you have any questions, please feel free to contact me.

Sincerely,

STERN & GOLDBERG

ALAN N. GOLDBERG

ANG: cn
Enclosure

cc:    Thomas J. Nolan, Esq., Skadden Arps Slate Meagher & Flom, LLP
       (via facsimile)
       Alisa Morgenthaler Lever, Esq., Christensen, Glaser, Fink, Jacobs, Weil & Shapiro, LLP
       (via facsimile)
       Marc Smith, Esq., Krane & Smith (via facsimile)
       Bryant S. Delgadillo, Esq., Kaye Scholer, LLP (via facsimile)
       Morad Zarabi

C\mydocs\MATTEL - DRYANT\LETTERS\ALBAN LTR 10-29-07

**EXHIBIT 14 PAGE 139**

# QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

**NEW YORK**
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
Facsimile: (212) 849-7100

**LOS ANGELES**
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000
Facsimile: (213) 443-3100

**SAN FRANCISCO**
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600
Facsimile: (415) 875-6700

**SILICON VALLEY**
555 Twin Dolphin Drive, Suite 560
Redwood Shores, CA 94065
(650) 801-5000
Facsimile: (650) 801-5100

## LOS ANGELES OFFICE
## FACSIMILE TRANSMISSION

DATE:   October 25, 2007                         NUMBER OF PAGES, INCLUDING COVER 6

| NAME/COMPANY | PHONE NO. | FAX NO. |
|---|---|---|
| Alan N. Goldberg<br>Stern & Goldberg | | 818-758-3949 |

FROM:   Juan Pablo Albán, Esq.

RE:   *Mattel v. Bryant*

MESSAGE:

PLEASE SEE ATTACHED.

07209/2236907 1

CLIENT #   7209

OPERATOR:

ROUTE/
RETURN TO:   Lorraine R. - 4th Fl.

CONFIRMED?   ☐ NO   ☐ YES: _____

☒ CONFIRM FAX
☒ INCLUDE CONF. REPORT

The Information contained in this facsimile is confidential and may also contain privileged attorney-client information or work product. The information is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this communication is strictly prohibited. If you have received the facsimile in error, please immediately notify us by telephone, and return the original message to us at the address above via the U.S. Postal Service. Thank you.

IF YOU DO NOT RECEIVE ALL OF THE PAGES, PLEASE PHONE (213) 443-3000 AS SOON AS POSSIBLE.

**EXHIBIT 14 PAGE 140**

# quinnemanuel trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-443-3000 FAX 213-443-3100

WRITER'S INTERNET ADDRESS
juanpabloalban@quinnemanuel.com

October 25, 2007

**VIA FACSIMILE AND U.S. MAIL**
818-758-3950

Alan N. Goldberg
Stern & Goldberg
6345 Balboa Boulevard, Suite 200
Encino, California 91316

Re:    Mattel v. Bryant, Case No. CV 04-9049 SGL (RNBx)

Dear Mr. Goldberg:

This letter memorializes the telephone conference you, Jon Corey and I had on October 11, 2007 and provides a summary of our research regarding arbitral privilege under federal law. As we initially found and have now confirmed, no arbitral privilege applies to Mr. Zarabi in this case.

You stated that Isaac and Fahrad Larian may have in their possession some documents that you have, and which we seek. You also confirmed that you possess, and that they do not have documents that you withheld from them based on the attorney-client, work product and arbitral privileges. We appreciate your efforts to talk to Isaac's, Fahrad's and MGA's attorneys to persuade them to produce these documents. Your efforts, however, have apparently fallen on deaf ears. They have not responded to your October 12, 2007 letter advising them it would be prudent to produce responsive documents to Mattel. Neither Isaac nor Fahrad have produced documents in response to Mattel's document requests. So, we need to obtain these documents from you, as we have the right to do. See, e.g., U.S. v. American Optical Co., 39 F.R.D. 580, 583 (N.D. Cal. 1966) (if documents subpoenaed under Rule 45 are relevant and there is good cause for their production, the subpoena is enforced unless the documents are privileged or the subpoena is unreasonable, oppressive, annoying, or embarrassing); State Farm Mut. Auto. Ins. Co. v. Accurate Medical, P.C., 2007 WL 2993840, at *1 (E.D.N.Y. 2007) ("a person may not

**quinn emanuel urquhart oliver & hedges, llp**

NEW YORK | 51 Madison Avenue, 22nd Floor, New York, New York 10010 | TEL 212-849-7000 FAX 212-849-7100
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94111 | TEL 415-875-6600 FAX 415-875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL 650-801-5000 FAX 650-801-5100
SAN DIEGO | 4445 Eastgate Mall, Suite 200, San Diego, California 92121 | TEL 858-813-3107 FAX 858-813-3106

**EXHIBIT 14 PAGE 141**

10-31-07    09:52    From-Stern & Goldberg              +818-758-3949         T-550   P.008/011   F-003
10-25-2007  11:08am   From-QUINN EMAN                   2134455100            T-152   P.005/006   F-010

Alan N. Goldberg
October 25, 2007

avoid a subpoena by saying that the evidence sought from him is obtainable from another.") (quoting Covey Oil Co. v. Continental Oil Co., 340 F.2d 993, 998 (10th Cir. 1965)); see also Fed. R. Civ. P. 26(d) (methods of discovery may be used in any sequence). As we mentioned before, Mattel will cover the copying costs of these documents. Please let me know when Mattel can expect them.

We confirmed that we do not have an issue with your withholding documents based on the legitimate assertions of attorney-client and work product privileges. For now, you produced to us the privilege log that you gave to Isaac and Fahrad identifying the documents you withheld from them, which we appreciate. It appears, however, to include only documents that you withheld from Isaac and Fahrad based on the arbitral privilege, the applicability of which we will address below.

Mattel does not understand any of the documents to be communications between Stern & Goldberg and Mr. Zarabi or Stern & Goldberg's work product, so those privileges would not attach to those documents and they should be produced. Otherwise, Stern & Goldberg has not identified any other responsive documents as to which it asserts any claim of privilege. Please provide us with a privilege log identifying those documents and the privilege claimed.

### The Arbitral Privilege

We agreed to get back to you with more authority as to why California Evidence Code § 703.5 and other bases for an "arbitral privilege" do not apply to our requests. Whether or not your withholding documents from Fahrad and Isaac Larian based on the "arbitral privilege" was appropriate with respect to their state law disputes, that privilege does not apply to the subpoena Mattel served on you.

First, federal common law of privilege applies in federal question cases. Fed. R. Evid. 501; U.S. v. Zolin, 491 U.S. 554, 562 (1989); Admiral Ins. Co. v. U.S. Dist. Court for Dist. of Arizona, 881 F.2d 1486, 1492 (9th Cir. 1989); Garrett v. City and County of San Francisco, 818 F.2d 1515, 1519 n. 6 (9th Cir. 1987). This is a federal question case, not based on diversity jurisdiction. Mattel's complaint includes claims for federal copyright infringement, violation of RICO and conspiracy to violate RICO. MGA has also asserted claims under the federal trademark statutes. The origins, creation and development of Bratz — the crux of the discovery Mattel seeks from you, including what MGA and Isaac Larian were doing and concealing with respect to Bratz in 1999 and 2000 — are also the crux of Mattel's federal claims. The presence of state law claims does not change that result — federal privilege law applies. Agster v. Maricopa County, 422 F.3d 836, 839-840 (9th Cir. 2005), cert. denied, 126 S.Ct. 473 (2005) ("Where there are federal question claims and pendent state law claims present, the federal law of privilege applies.") (citing Wm. T. Thompson Co. v. General Nutrition Corp., Inc., 671 F.2d 100, 104 (3d Cir. 1982)); Southern California Housing Rights Center v. Krug, 2006 WL 4122148, at *3 (C.D. Cal. 2006); Harbert v. Priebe, 466 F. Supp. 2d 1214, 1215 (N.D. Cal. 2006); Corser v. County of Merced, 2006 WL 2536622, at *3 (E.D. Cal. 2006); see also Fed. R. Evid. 501, Advisory Comm.

2

EXHIBIT 14 PAGE 142

Alan N. Goldberg
October 25, 2007

Note ("It is also intended that the Federal law of privileges should be applied with respect to pendent State law claims when they arise in a Federal question case.").

Second, any "arbitral privilege" that exists under federal law simply does not apply here. No provision in either the Federal Arbitration Act or the Federal Rules of Evidence is comparable to California Evidence Code § 703.5. The case we cited in our initial meet and confer letter, National Hockey League Players' Ass'n v. Bettman, explains the limits of the "arbitral privilege" under federal law:

> As for the so-called arbitral immunity, the principle that defendants invoke is not, strictly speaking, an evidentiary privilege. Rather, the federal courts have developed two related rules governing the status of arbitrators *in the context of litigation challenging the results of an arbitration* . . .

> First, arbitrators are immune from personal-damage liability for their decisions, because they occupy a position comparable to that of a judicial officer . . .

> Second . . . *in actions addressing the results of an arbitration—whether it be a proceeding to enforce or to set aside an arbitrator's award*—the court is to exercise close supervision over the extent and nature of discovery, although the discovery rules are, at least in principle, applicable to such a proceeding.

1994 WL 38130, at *2, *6-7 (S.D.N.Y. 1994) (emphases added). Because Mattel does not seek discovery to challenge Mr. Zarabi's decisions, the limited federal arbitral privilege does not apply here.

Every other federal case we found is consistent with National Hockey League's explanation of the scope of the federal arbitral privilege. For example, in Matter of Andros Compania Maritima, S.A. (Marc Rich & Co., A.G.), 579 F.2d 691 (2nd Cir. 1978), on which National Hockey League relies, the Second Circuit started with the premise that "the discovery procedures of the Federal Rules of Civil Procedure are generally applicable to Title 9 proceedings." Id. at 702.[2] The court then held that, "in the *special context* of what are in effect *post hoc efforts to induce arbitrators to undermine the finality of their own awards*, we agree with the district court that any questioning of arbitrators should be handled pursuant to judicial supervision and limited to situations where clear evidence of impropriety has been presented." (emphases added). See also Lyeth v. Chrysler Corp., 929 F.2d 891, 900 (2nd Cir. 1991) ("*To the extent that*

---

[1]  We doubt Mr. Zarabi qualifies as an "arbitrator" within the meaning of the California statute anyway, but even if he could make such a threshold showing, the case law above makes clear that the state statute does not apply here.

[2]  Title 9 is a reference to the Federal Arbitration Act.

3

EXHIBIT 14 PAGE 143

10-31-07    09:53    From-Stern & Gr⌐ berg                    +818-759-3949        T-550   P.010/011   F-003
10-25-2007   11:08am   From-QUINN EMANL                      2134433100           T-192   P.000/000   P-010

Alan N. Goldberg
October 25, 2007

Chrysler's request to depose the individual arbitrator *was aimed at contesting Lyeth's Lemon Law award*, the district court properly denied discovery because Chrysler did not present clear evidence of any impropriety.") (citing Andros) (emphases added); Frere v. Orthofix, Inc., 2000 WL 1789641, at *5 (S.D.N.Y. 2000) ("As is evident both from Andros and from subsequent court decisions . . . that standard [i.e., the arbitral privilege] applies *only to discovery inquiries directed at the arbitrator* and *only when the goal is to impugn the validity of the arbitrator's decision*.") (emphasis added).

Ninth Circuit law is consistent with, and in fact has relied on, the precedent established in the Second Circuit.  See, e.g., Woods v. Saturn Distribution Corp., 78 F.3d 424, 430 (9th Cir. 1996) ("The Federal Rules of Civil Procedure do not apply to 'post hoc' questioning of arbitrators in Title 9 proceedings and 'any questioning of arbitrators should be handled pursuant to judicial supervision and limited to situations where clear evidence of impropriety has been presented.'") (quoting Andros).  In Woods, the party seeking discovery was expressly challenging the prior arbitration decision. Id.  Accord Thomas Kinkade Co. v. Hazlewood, 2007 WL 217384, *2-4 (N.D. Cal. 2007) (allowing limited discovery in the context of a challenge to the arbitration); Empresa Constructora Contex Limitada v. Iseki, Inc., 106 F.Supp. 2d 1020, 1024-1025 (S.D. Cal. 2000); Corsini v. Prudential Securities, Inc., 1995 WL 663174, at *2 (S.D. Cal. 1995); Portland General Elec. Co. v. U.S. Bank Trust Nat. Ass'n, 38 F.Supp. 2d 1202, 1208-1210 (D. Or. 1999) (reversed on other grounds).  In each of these district court cases, an arbitrator's right to withhold discovery related to his deliberations was limited to the context of subsequent proceedings challenging the arbitral award in some way.  Again, that is not the case here.  As the Second Circuit found in Andros, the standard discovery obligations and limitations under the Federal Rules of Civil Procedure apply.

We trust that the above-cited authority resolves any concerns you had regarding the "arbitral privilege" and hope we can come to an amicable resolution on this issue.

Documents that we believe are in your possession to which an arbitral privilege does not apply or which are otherwise discoverable from you include, without limitation, (1) each of the five sets of documents listed in the privilege log you sent us, (2) all documents relied upon for the February 13, 2003 appraisal,[3] (3) the transcript of the January 23, 2003 meeting, (4) the Appraisal Report bates stamped ED 2 - 163, (5) an October 16, 2000 letter from Mr. Stern to National Business Appraisers and enclosures bates stamped ED 164 -178, (6) MQA tax and accounting information bates stamped ED 179 - 642, and (6) "Confidential Reconciliations"

---

[3]   Howarth & Smith produced to us all documents in their possession that were not work product or subject to the attorney-client privilege.  However, they confirmed that they never received the February 13, 2003 appraisal documents, and that they do not have *any* documents produced during the Larian v. Larian disputes.  Though Howarth had them at one time, Fahrad took all such documents with him when he substituted Howarth with other counsel.

4

**EXHIBIT 14 PAGE 144**

Alan N. Goldberg
October 25, 2007

bates stamped MZ 942 - 1948.  To avoid any doubt, your production should also include all information in your possession that MGA, Isaac or Fahrad provided to Mr. Zarabi and/or his appraiser (Ernest Dutcher and/or his company, National Business Appraisers) for purposes of any appraisals done between 2000 and 2004, inclusive.

We agreed to have another conference after you had a chance to talk to MGA's, Isaac's and Fahrad's attorneys.  Please let us know if they responded to your October 12, 2007 letter, and if not, whether or not you intend to continue your discussion with Skadden Arps and Christensen Glaser.  Otherwise, we should hold our conference as soon as possible.  In that case, let us know a convenient time for you this week.

We look forward to hearing from you.

Very truly yours,

Juan Pablo Albán
07209/2252378.3

5

**EXHIBIT 14 PAGE 145**

# STERN & GOLDBERG
Attorneys at Law
6345 Balboa Boulevard, Suite 200
Encino, California 91316
(818) 758-3940

ELLIS STERN*†
ALAN N. GOLDBERG*
JUSTIN J. LANSBERG
KIEN C. TIET

LAWRENCE W. HAIT
OF COUNSEL

Fax (818) 758-3950

*CERTIFIED SPECIALIST,
TAXATION LAW
†CERTIFIED SPECIALIST,
PROBATE, ESTATE PLANNING
AND TRUST LAW
THE STATE BAR OF CALIFORNIA
BOARD OF LEGAL SPECIALIZATION

## TELECOPIER/FAX COVER SHEET

Date:    October 31, 2007

To:

| NAME | FAX NO. | PHONE NO. |
|---|---|---|
| Juan Pablo Alban, Esq. | (213) 624-0643 | (213) 687-5252 |
| Marc Smith, Esq./Krane & Smith | (818) 382-4001 | (818) 382-4000 |
| Bryant Delgadillo, Esq./Kaye Scholer, LLP | (310) 788-1200 | (310) 788-1341 |
| Alisa Morgenthaler Lever/Christensen, Glaser, Fink, Jacobs, Weil & Shapiro, LLP | (310) 556-2920 | (310) 282-6217 |
| Thomas J. Nolan, Esq./Skadden Arps Slate Meagher & Flom LLP | (213) 621-5250 | (213) 687-5250 |

From:    ALAN N. GOLDBERG, ESQ.

RE:    MATTEL, INC. - CARTER BRYANT

| FILE NO.:    6717-005 | NUMBER OF PAGES, INCLUDING COVER:   11 |
|---|---|

THE PAGES COMPRISING THIS FACSIMILE TRANSMISSION CONTAIN CONFIDENTIAL INFORMATION FROM STERN & GOLDBERG. THIS INFORMATION IS INTENDED SOLELY FOR USE BY THE INDIVIDUAL OR ENTITY NAMED AS THE RECIPIENT HEREOF. IF YOU ARE NOT THE INTENDED RECIPIENT, BE AWARE THAT ANY DISCLOSURE, COPYING, DISTRIBUTION, OR USE OF THE CONTENTS OF THIS TRANSMISSION IS PROHIBITED. IF YOU HAVE RECEIVED THIS TRANSMISSION IN ERROR, PLEASE NOTIFY US BY TELEPHONE IMMEDIATELY SO WE MAY ARRANGE TO RETRIEVE THIS TRANSMISSION AT NO COST TO YOU.

IF FOR ANY REASON THERE IS ANY PROBLEM, PLEASE CONTACT THIS OFFICE AT (818) 758-3940.

ORIGINAL DOCUMENT TO FOLLOW VIA:

Regular Mail ____   Will Not Be Sent ____   Overnight Delivery ____   E-mail ____   Other  XX

MESSAGE:

**EXHIBIT 14 PAGE 146**

## DECLARATION OF MORAD ZARABI

I, Morad Zarabi, hereby declare:

1.    I am the uncle of Plaintiff Farhad Larian and Defendant Isaac Larian. I served as their arbitrator from 2000 to the present. The facts set forth in this Declaration are of my own personal knowledge, and if called as a witness, I could and would testify competently thereto.

2.    This Declaration is filed in opposition to Plaintiff Farhad Larian's Motion to Compel Production of Documents of Ernest Dutcher.

3.    In September, 2000, I was selected as the arbitrator to arbitrate a dispute which had arisen between Farhad and Isaac concerning their joint ownership in ABC International Traders, Inc. ("ABC" herein). I was expressly authorized to determine whether either Farhad or Isaac was to sell his shares to the other and the purchase price and terms of payment for the shares.

4.    Beginning in Fall of 2000, I gathered financial and other information and held hearings in my role as arbitrator. I engaged the services of National Business Appraisers, LLC ("National Business" herein) for the purpose of providing me with a valuation of ABC.

5.    In December, 2000, I rendered my decision which was embodied in a written Agreement for Sale of Stock dated December 4, 2000. As reflected in the Sale Agreement, Farhad was to be seller and Isaac was to be buyer, the price was to be $8,775,000.00, payable $500,000.00 at the closing, with a promissory note in the amount of $8,275,000.00.

6.    In Summer of 2002, Farhad alleged that Isaac concealed from Farhad and myself certain facts pertaining to a product line of ABC called the "Bratz doll," which allegedly was of great value and would have justified a substantially higher price for Farhad's shares.

7.    Thereafter, I began gathering financial and other information from Farhad and Isaac. In early 2003, I again engaged the services of National Business for the purpose of providing me, for my consideration and review in connection with my duties as arbitrator, with a valuation of ABC based upon information that I gathered in 2002.

8.    On or about February 7, 2003, I met with Farhad and Isaac to discuss the issues. I heard arguments from both sides and took the matter under submission. Prior to me rendering my decision, Farhad filed this instant action with the Court. I remain willing and able to

C:\Data\Fehna Larian\International Trader - Litigation\Opposition.wpd    9

HS 01285

EXHIBIT 15 PAGE 147

1  continue with my duties as arbitrator should the Court ultimately decide that the dispute be

2  arbitrated.

3      I declare under penalty of perjury, pursuant to the State of California, that the foregoing

4  is true and correct, and that this Declaration was executed on this __14__ day of September, 2004,

5  at Encino, California.

6

7

8                    MORAD ZARABI

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

C:\Docs\Folder Litgela\International Trader - LbigmotOpposition.wpd        10

OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS

EXHIBIT 15 PAGE 148

HS 01286

RDB copy

**HOWARTH & SMITH**
ATTORNEYS AT LAW
800 WILSHIRE BOULEVARD
SUITE 750
LOS ANGELES, CALIFORNIA 90017
TELEPHONE: (213) 955-9400
FAX: (213) 622-0791
www.howarth-smith.com

DON HOWARTH

April 6, 2004

DHowarth@howarth-smith.com
Direct Line: (213) 955-9400 Ext. 109

**VIA FACSIMILE AND U.S. MAIL**
Larry R. Feldman, Esq.
Kaye Scholer LLP
1999 Avenue of the Stars
Suite 1700
Los Angeles, California 90067

Re: *Larian v. Larian*

Dear Larry:

This letter is to follow up on our meeting at your office on February 26, 2004, and our conversation by phone more recently. Since then I have also received a letter from you dated March 29, 2004 asking about our progress in getting back to you. I trust you received my message that I was out of the office in Hawaii last week and that I would get back to you with a written response upon my return. This letter is the promised written response.

The facts of which we are presently aware clearly show that it is not correct, as you stated in our meeting, that at the end of 2000, Isaac believed Bratz was just another doll, or that Fred knew everything that Isaac knew. Indeed, even the limited evidence immediately available without discovery having yet occurred demonstrates just the reverse. For example:

- The July 18, 2003, Wall Street Journal reports that sometime in 1999 Isaac had a conversation with a buyer from Wal-Mart in which the idea for a Bratz-type doll germinated. The article quotes Isaac as saying that "he was motivated by a challenge from a Wal-Mart Stores, Inc. buyer to 'give me something that can compete with Barbie.'" Isaac kept this conversation secret from Fred, and Fred found out about it for the first time when he read the published article.

04 L181001 086

HS 03235

**EXHIBIT 16 PAGE 149**

Larry R. Feldman, Esq.
April 6, 2004
Page 2

- By late 1999, Isaac had decided that MGA's challenger to Barbie should be a fashion-type doll. MGA had previously distributed other types of dolls, but never a fashion doll, as the WSJ article confirms. For the first time ever, Isaac conducted a contest to select a design for the doll, and selected Carter Bryant's Bratz doll line as the winner of the contest. It is plain that Isaac did not consider Bratz to be just another doll for MGA. The existence of this contest was concealed from Fred, and, in fact, Fred was never told that the Company was looking for a fashion-type doll to compete with Barbie or that the Bratz line was being developed by Isaac and MGA during 1999 and 2000, despite Fred's position as Isaac's partner and a co-founder of MGA.

- In late 1999, and continuing at least through the spring of 2000, Isaac ordered MGA employees to stop sharing financial information with Fred. Isaac threatened at least one employee's job if the employee did not follow Isaac's instructions and cut Fred out of the information loop. In addition, Isaac instructed an employee to stop sending Fred daily sales reports that up to that point, Fred had routinely received. The result of this concerted concealment effort was that Fred did not, and could not, know the complete financial picture of the Company.

- In February 2000, Isaac tried to keep Fred from attending the N.Y. Toy Fair, the venue in which information about new, upcoming products is reviewed.

- Beginning in early 2000, Isaac began systematically portraying Fred, both internally and to the outside world, as someone who had no role in the management and decision making of the Company; and that Isaac alone controlled the strategic moves for MGA. In or about February 2000, Isaac had Fred's name removed from the Company profile, and changed the document (and history) to list only Isaac as the founder of MGA. When Fred raised this issue with Isaac, he was told that "there is . . . a lot more to come."

- In the Spring of 2000, before the Agreement to Arbitrate was signed and before Isaac had announced his plans for Bratz either publicly or to Fred, Isaac took steps to personally profit from the Bratz program. On April 11,

04:L181001.086

HS 03236

**EXHIBIT 16 PAGE 150**

Larry R. Feldman, Esq.
April 6, 2004
Page 3

2000, Isaac sought the following from the Company's Board of Directors: (1) an increase in his annual salary from $221,000 to $500,000; (2) a bonus of $750,000 for 1999; (3) a bonus of $1.5 million in 2000 if EBITA for the year reached $8 million; and (4) a separate bonus of a 4% royalty on any new toy idea he personally developed in MGA's 2001 line. Paying Isaac a royalty for anything that he "personally developed" was an absolute first for the Company, and the target figures in (3) and (4) plainly indicate an unannounced, but real plan to exploit the Bratz market beginning in 2001. A successful Bratz roll-out in 2001 would allow Isaac personally to profit (at the expense of his fiduciary Fred) from the Bratz opportunity.

- In or about July or August 2000, Isaac called internal meetings with top management at MGA about Bratz and his plans for seizing the opportunity presented by the doll line. Isaac expressed optimism in these meetings that the Bratz line could directly compete with Barbie, would appeal to an even wider range of girls than did Barbie, and presented an opportunity he had been looking to find for years. Fred, a 45% shareholder and officer of MGA, was intentionally excluded from those meetings, and from the special handling of Bratz.

- Roughly contemporaneously with these internal meetings, Isaac began negotiating with Carter Bryant and eventually obtained from him the worldwide licensing rights to Bratz. The license was unique in several important respects. For the first time in the Company's history, the Bratz license made Isaac and MGA the licensor of the product, allowing MGA to control the licensing in an unlimited number of product categories worldwide. In previous deals, MGA was just a distributor/licensee of a product. The difference between being a licensee and a licensor is enormous and becoming a licensor is something Isaac had wanted for a very long time. Further, the Bratz deal was unique because MGA paid more for that license of that doll than it ever had paid for a license of any other doll in the Company's history. Fred was not told anything about the unprecedented scope of the Bratz license prior to signing the Agreement to Arbitrate, or the Stock Sales Agreement in December 2000.

04.L181001.086

HS 03237

**EXHIBIT 16 PAGE 151**

Larry R. Feldman, Esq.
April 6, 2004
Page 4

- In the fall of 2000, Isaac began to develop the Bratz product line, including ordering prototypes and filing additional trademarks. Fred was intentionally kept unaware of the scope of Isaac's plans to develop and market Bratz at that time.

- During this time, including in the fall of 2000, Isaac followed a practice of passing along to Fred only negative financial news about the Company, such as a $2 million loss from cancelled Toys-R-Us orders, thus making the Company seem worth much less than it actually was. Isaac did not disclose to Fred news which would have a positive financial effect on the value of the Company, such as his plans for Bratz or other potential revenue streams for the Company.

- On December 11, 2000 MGA filed, and Isaac personally signed, applications for five new trademarks, including one for each of the names of the Bratz dolls. Isaac's personally signing such applications facilitated a plan to keep knowledge about the scope of the Bratz program tightly controlled.

- Then, in February 2001, with Fred out of the picture after his execution of the December Stock Sale Agreement, Isaac went public about the scope and significance of Bratz. He introduced the dolls at the February 2001 N.Y. Toy Fair with the public assertion that it was now "a Bratz world."

- Isaac's view of Bratz was further documented in June 2001, confirming that Bratz was MGA's "first intellectual property" and his belief that it was "sure to revolutionize the world of fashion dolls."

All of this and other evidence strongly indicates that Isaac made a concerted effort to get Fred out of the company so that he could exploit the unique Bratz opportunity without sharing the benefits with Fred.

When we met, you provided us with three e-mails which you claimed demonstrated that Fred knew all of what Isaac knew about Bratz when he signed the Agreement to Arbitrate. They do not. The e-mails – dated November 15, 2000, November 22, 2000, and April 30, 2001 – were all sent *after* execution of the September

04 L181001.086

HS 03238

**EXHIBIT 16 PAGE 152**

Larry R. Feldman, Esq.
April 6, 2004
Page 5

2000 Agreement to Arbitrate. Further, none of them give any indication of anything unusual about Bratz that would alert Fred to its impact on the valuation of the Company.

You also asserted that the e-mails illustrate Fred's awareness of the Bratz program earlier than the time alleged in the complaint on file in the action. Again that is not correct. Paragraph 28 of the Complaint alleges that in late spring or summer 2002, Fred first became aware of the "true scope of the Company's extraordinary plans, efforts and history regarding the Bratz product line and other financial information about the Company that had been concealed from him by Isaac, as the license had been concealed from him." Nothing in the three e-mails is inconsistent with this allegation.

Additional evidence that Isaac attempted to defraud Fred into signing the Agreement to Arbitrate and to pay him less than the true value of his shares comes from Mr. Dutcher's appraisal. As may have been reported to you from the hearing on our motion to take Mr. Dutcher's deposition, the Court recognized the significance of this information, saying that, "[t]his information is directly relevant as it goes to whether [plaintiff] was defrauded because information about this new product was withheld from him." From what we can tell from the November 7, 2000, appraisal we have (and have given to you), it seems apparent that Isaac did not provide Mr. Dutcher with information about the Company's plans for Bratz or projections of its revenue potential for 2000, 2001 and beyond. We are advised that Isaac engaged in regular financial modeling for the Company and that in those forecasts, revenue streams were projected for each item the Company sold or was planning to sell. There is nothing in the appraisal itself indicating that Mr. Dutcher received such 2000 or 2001 projections, either for the Company as a whole or for Bratz. Further, it does not appear that the value of MGA Entertainment, HK was included in the appraisal at all, and Fred's shares in that company were certainly part of what was covered in the Agreement to Arbitrate. In any event, we will know more about the information provided to Mr. Dutcher and how he proceeded when we get Mr. Dutcher's files and take his deposition now that our motion has been granted.

You indicated to me that the Company actually lost money for 2000 after realizing a profit in 1999, and thus using the 1999 figures in the appraisal worked in Fred's favor in valuing the Company. First, it is not apparent to us that the Company lost money in 2000, as Isaac has not provided to Fred the tax returns or necessary financial information to verify that claim. From what we know, both sales and profits were expected to be much greater in 2000 than they were in 1999. If there was a loss in 2000, it certainly could have been the result of any number of things which would be largely irrelevant to a valuation

04 L181001 086

HS 03239

**EXHIBIT 16 PAGE 153**

Larry R. Feldman, Esq.
April 6, 2004
Page 6

of the Company – things such as one time writeoffs for non-repeating events, deferring revenue and profit recognition into the future (perhaps as to Hallmark?), payment of large bonuses to management, shifting profits into subsidiaries; etc. We do not yet know what reserves were taken that may have reduced profits and we do not know what revenues were attributed to or held by MGA Hong Kong. Until we are provided with the financial information that will enable us to analyze the Company's P/L statement, cash statement, cash flow analysis, and the like, and to have things fully audited, it is not helpful to be advised there was a stated loss, especially on rising revenues.

We do note that in the November 7, 2000 valuation, Mr. Dutcher states that "The most recent year (1999) was weighted only minimally as the EBDITA appears unreasonably high based on the two prior years." Mr. Dutcher was looking at EBDITA of $2,915,000 for 1997; EBDITA of a loss of $86,000 for 1998; and EBDITA of $5,651,000 for 1999. Looking at just those numbers, one can see why he might assume that the 1999 numbers were "high" based on a 1998 loss of $86,000. However, as Isaac knew, the 1999 revenues were not at all "unreasonably high" compared to the prior years because in 1998 there was a one-time loss of approximately $10 million in revenues and $4.5 million in profits due to a Toys-R-Us sanction of refusing to do business for 1 year. Further, the actual numbers for 2000 were consistent with the Company's strong growth, and had Mr. Dutcher had those numbers, he would have seen that the 1999 numbers were not unreasonably high. When we have complete information accounted for, it appears there was a strong progression of $2.9 million for 1997, $4.5 million for 1998 and $5.6 million for 1999.

Because they are not as subject to management and accounting choices - which we will need to examine - sales are important in looking at company valuation. It appears that sales were about $40,732,000 in 1998, $66,350,000 in 1999 (from tax returns which Dutcher used), and we believe they were much higher in 2000. However, Dutcher used $70,331,000 as revenues for 2000 (a pro forma 6% increase over 1999). We have now seen documents suggesting that revenues were already higher than this in 2000, perhaps as high as $90,000,000 or more.

Further evidence of how far off Mr. Dutcher was led by what Isaac gave him and withheld from him is apparent when one looks at his 2003 projected revenues of $72,793,000 (3.5% pro forma over 2002). The Wall Street Journal article reports

04 L181001 086

HS 03240

EXHIBIT 16 PAGE 154

Larry R. Feldman, Esq.
April 6, 2004
Page 7

expected sales of $800 million for 2003, 65% of which is accounted for by Bratz. The appraisal without the information on Bratz was thus more than 10 times lower in its projection for 2003 than it should have been.

When Isaac chose not to share key pieces of information about the scope of the Bratz project with Fred, and to selectively provide him and the appraiser with other financial information about the Company during 1999 and 2000 and projections for the future, there is no doubt that he violated California law requiring him as a fiduciary to disclose all such information to his partner and co-venturer, Fred. Being a fiduciary means that each owes the other the "duty of highest loyalty and utmost good faith, being charged not to take any unfair advantage or secret profit." *Universal Sales Corp. v. California Press Mfg. Co.*, 20 Cal. 2d 751, 772 (1942); BAJI 12.36. A fiduciary has a duty to make a full and fair disclosure of all facts which materially affect the rights and interest of the person to whom the duty is owed. A fiduciary must give priority to the best interest of the persons to whom the duty is owed. When there is a "fiduciary relationship any transaction by which one of the co-adventurers secures an advantage over the other or others is presumptively fraudulent and casts a burden on such party gaining advantage to show fairness and good faith in all respects." *Boyd v. Bevilacqua*, 247 Cal. App. 2d 272, 291 (1966).

It is also a well-settled and fundamental precept that a fiduciary such as Isaac may not usurp business opportunities such as Bratz for himself at the expense of Fred as his co-fiduciary. In *MacIsaac v. Pozzo*, 81 Cal. App. 2d 278 (1947), the parties entered into a partnership to do business together and had agreed to split profits equally. However, plaintiff went out on its own and improperly made a deal with a customer, Utah Fuel Co., and got the defendant to agree to take only 15% of the profit. When the proceeds from the Utah Fuel deal came in, a declaratory judgment action was instigated by the plaintiff and Pozzo defended on the ground that the agreement to split the profits 85/15 was procured by fraud. In agreeing with Pozzo, the court held the following:

> [I]f there is presented to a corporate officer or director a business opportunity which the corporation is financially able to undertake, is, from its nature, in the line of the corporation's business and is of practical advantage to it, is one in which the corporation has an interest or reasonable expectancy, and, by embracing the opportunity, the self-interest of the officer or director will be brought into conflict with that of his corporation, the law will not permit him to seize the opportunity for himself. And, if in

04 L181001 086

HS 03241

**EXHIBIT 16 PAGE 155**

Larry R. Feldman, Esq.
April 6, 2004
Page 8

such circumstances, the interests of the corporation are betrayed, the corporation may elect to claim all the benefits for itself, and the law will impose a trust in favor of the corporation upon the property, interests and profits so acquired.

The facts bring the case within the stated rule. While it has been applied so generally in corporation cases to have become known as the doctrine of corporate opportunity, it is founded in the doctrine of loyalty in business which applies in all situations in which trust is reposed. *The fiduciary is held to the utmost measure of loyalty and accordingly he may not use a trust opportunity for personal advantage.* "The policy of the law is to put fiduciaries beyond the reach of temptation by making it unprofitable for them to yield to it."

The primary duty of the parties was to take no advantage of each other within their fiduciary relationship by means of the slightest concealment, misrepresentation, or adverse pressure. Defendant was entitled to a complete disclosure as to the negotiations with Utah Fuel Co., and an equal opportunity to take advantage of them. Plaintiff contrived to appropriate for itself the major share of the profits with the result that the firm, when it took the contract and assumed the responsibility, stood committed to an unequal division. Defendant could not be deprived of its rights in this matter.

The judgment properly awarded defendant the amount by which plaintiff profited through breach of duty. Whether it be regarded as damages presumed to have been suffered through deprivation of a business opportunity or as profits unjustly received by a plaintiff is immaterial.

*Id.* at 284-85 (emphasis supplied; extensive internal citations omitted). *See also, e.g.,* Witkin, 9 Summary of California Law § 20, p. 419 (9th ed. 1990) ("The fiduciary relationship . . . obviously makes applicable the rule which, in corporation law, is known as the doctrine of 'corporate opportunities'"); *Air Purification v. Carle,* 99 Cal. App. 2d 258, 265 (1950) (holding ("[In] a trust relationship . . . one of the parties will not be allowed to deal with the subject matter of the association for his own advantage.").

04:L181001 086

**HS 03242**

**EXHIBIT 16 PAGE 156**

Larry R. Feldman, Esq.
April 6, 2004
Page 9

Based on just what we know without discovery it is clear that Isaac has ignored the
requirement that he not engage in "the slightest concealment." When Isaac put together
the licensing deal for Bratz without informing Fred of his plans or sharing with Fred the
financial expectations and rewards deriving therefrom, Isaac violated his duties as a
fiduciary, and he will have to account to Fred.

In addition to Isaac's duties to disclose to Fred all material information relating to
the Company, and to refrain from usurping a business opportunity – both of which arose
from his fiduciary relationship with Fred – Isaac's actions in isolating the Bratz and other
financial information from Fred also created an independent duty of disclosure. As
Witkin notes, "The duty to disclose may arise without any confidential relationship where
the defendant alone has knowledge of material facts which are not accessible to the
plaintiff." Bernard E. Witkin, 5 Summary of California Law, § 700, p. 801 (9th ed. 1990;
citations omitted). Here, as recited above – from holding secret meetings to instructing
Company employees not to give Fred information – Isaac went to great lengths to make
sure the material facts about the Bratz doll project were "not accessible" to Fred, when he
had a duty to inform him of the scope of the Bratz program before entering into the
Agreement to Arbitrate and Stock Purchase Agreement. It was impermissible for Isaac to
keep his plans for the scope of the Bratz program secret. Also, note that ¶ 6 of the
buy/sell agreement itself makes clear that it is Isaac, not Fred, who has "full knowledge of
business prospects."

Isaac has indicated to Fred a willingness to address the merits and provide us with
documents in his possession and control, including those held by the companies. Our
outstanding discovery requests are a good listing of what we need, but in summary, we
certainly need each of the following:

1. All documents that relate to Bratz from 1999 through 2003, including
trademarks, license agreement negotiations with Carter Bryant, notes or agendas of
meetings re: Bratz, prototypes, designs, correspondence with attorneys re: the license
agreement or trademarks, and financial documents, including sales and revenue
projections, audited and unaudited;

2. All documents that relate to the value, revenues and costs of MGA, ABC and
MGA Hong Kong from 1999 through the present, including all internal materials,
projections and tax returns, all reserves, write downs and supporting documentation;

04 L181001 086

HS 03243

**EXHIBIT 16 PAGE 157**

Larry R. Feldman, Esq.
April 6, 2004
Page 10

3. All information that Isaac and/or the companies provided to Morad and/or Mr. Dutcher;

4. All corporate minutes, shareholder resolutions, stock options grants or proposals and related documentation, and general ledgers for ABC, MGA and MGA Hong Kong.

In addition to this documentation from Isaac, we also need his reconfirmed agreement to allow Morad to release his file. We also need written confirmation by Isaac that he wants full and honest disclosure by any person who is a witness to the events herein; that he will not directly or indirectly retaliate against any person based on what they disclose; and that he is encouraging and requesting them to give Fred a candid, honest, and complete response to any questions Fred may have of them. In exchange for such complete disclosure, Fred is also willing to produce his records now.

Once we have received the above, and do our homework in connection with what we find, we will be in a position to make a recommendation as to proceeding with a binding reference of this matter to a retired judge, and what the order of reference would provide. We also have some candidates to put forward in this regard. If in the meantime you are interested in a non-binding mediation, we are prepared to support that immediately, and without further discovery beyond production of the materials indicated. We have some thoughts as to who might be able to get this sorted out between these brothers, so that the matter can be closed. Please let me know if this is an option.

Very truly yours,

Don Howarth

04.L181001.086

HS 03244

**EXHIBIT 16 PAGE 158**

Larry R. Feldman, Esq.
April 6, 2004
Page 11

bcc:   Mr. Farhad Larian (via U.S. Mail)

04-L181001.086

HS 03245

EXHIBIT 16 PAGE 159

# Howarth & Smith
### ATTORNEYS AT LAW
800 Wilshire Boulevard
Suite 750
Los Angeles, California 90017
(213) 955-9400
Fax: (213) 622-0791

# FAX COVER SHEET

*The information contained in this facsimile message is information protected by attorney-client and/or the attorney/work product privilege. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by facsimile. If the person actually receiving this facsimile or any other reader of the facsimile is not the named recipient or the employee or agent responsible to deliver it to the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone and return the original message to us at the above address via U.S. Postal Service.*

FAX NUMBER TRANSMITTED TO: (310) 788-1200

To:          Larry R. Feldman, Esq.

From:        Brian D. Bubb, Esq.

Number of pages including this page: 11

\*       IF YOU DO NOT RECEIVE ALL PAGES, PLEASE TELEPHONE US IMMEDIATELY AT (213) 955-9400.

Sent by:     Jason Sickler                                    Date: April 6, 2004

Re:    Larian v. Larian

COMMENTS:

_____

**HS 03246**

**EXHIBIT 16 PAGE 160**

Confirmation Report—Memory Send

Time    : Apr-05-2004  11:37pm
Tel line 1 :
Tel line 2 :
Name    : HOWARTH

Job number        :    375

Date              :    Apr-05 11:33pm

To                :    5308#498#001#13107881200#

Document Pages    :    011

Start time        :    Apr-05 11:33pm

End time          :    Apr-05 11:37pm

Pages sent        :    011

Status            :    OK

Job number    :  375            *** SEND SUCCESSFUL ***

Howarth & Smith
ATTORNEYS AT LAW
800 Wilshire Boulevard
Suite 750
Los Angeles, California 90017
(213) 955-9400
Fax: (213) 622-0791

# FAX COVER SHEET

*The information contained in this facsimile message is information protected by attorney-client and/or the attorney/work product privilege. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by facsimile   If the person actually receiving this facsimile or any other reader of the facsimile is not the named recipient or the employee or agent responsible to deliver it to the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone and return the original message to us at the above address via U.S. Postal Service*

FAX NUMBER TRANSMITTED TO: (310) 788-1200

To:          Larry R. Feldman, Esq.

From:        Brian D. Bubb, Esq.

Number of pages including this page: 11

*   IF YOU DO NOT RECEIVE ALL PAGES, PLEASE TELEPHONE US IMMEDIATELY AT (213) 955-9400

Sent by:     Jason Sickler                                        Date: April 6, 2004

Re:    Larian v. Larian

COMMENTS:

HS 03247

EXHIBIT 16 PAGE 161



CONFORMED COPY
LODGED
FILED

2007 MAY 16  PM 1:59   2007 MAY 16  PM 2:00

CLERK U.S. DISTRICT COURT   CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.   CENTRAL DIST. OF CALIF.
RIVERSIDE   RIVERSIDE
BY_____   BY_____

1  | Hon. Edward A. Infante (Ret.)
   | JAMS
2  | Two Embarcadero Center
   | Suite 1500
3  | San Francisco, California  94111
   | Telephone:   (415) 774-2611
4  | Facsimile:   (415) 982-5287

5

6

7        UNITED STATES DISTRICT COURT

8        CENTRAL DISTRICT OF CALIFORNIA

9            EASTERN DIVISION

10

11  CARTER BRYANT, an individual,        CASE NO. C 04-09049 SGL (RNBx)
                                         JAMS Reference No. 1100049530
12          Plaintiff,

13      v.                               Consolidated with
                                         Case No. CV 04-09059
14  MATTEL, INC., a Delaware corporation, Case No. CV 05-2727

15          Defendant.                   **ORDER GRANTING MATTEL'S
                                         MOTION TO COMPEL PRODUCTION
16                                       OF DOCUMENTS AND
                                         INTERROGATORY RESPONSES BY
17  CONSOLIDATED WITH                    MGA
    MATTEL, INC. v. BRYANT and
18  MGA ENTERTAINMENT, INC. v. MATTEL,
    INC.
19

20

21                    I.  INTRODUCTION

22        On February 2, 2007, Mattel, Inc. ("Mattel") submitted its Motion To Compel Production

23  of Documents and Interrogatory Answers by MGA Entertainment, Inc. ("MGA").  On February

24  20, 2007, MGA submitted its opposition brief, and on February 26, 2007, Mattel submitted a

25  reply brief.  The matter was heard on March 5, 2007.  Thereafter the motion was taken under

26  submission pending the parties' submission of a proposed protective order, which was received

27

28
    Bryant v. Mattel, Inc.,                                           1
    CV-04-09049 SGL (RNBx)

**EXHIBIT 17 PAGE 162**

1  on April 23, 2007. Having considered the motion papers and comments of counsel at the hearing,

2  Mattel's motion to compel is granted.

3  ## II.  BACKGROUND

4  A. Requests for Documents

5  In June of 2004, two months after Mattel filed suit against Bryant, and before MGA

6  became a party to the action, Mattel served MGA with an eight-page subpoena for twenty-one

7  categories of documents, to be produced in ten days. MGA filed a motion to quash, which the

8  court granted because of the short amount of time provided for compliance with the subpoena.

9  The parties met and conferred in July of 2004, and reached an agreement to limit the scope of

10  some of Mattel's requests. In particular, the parties agreed to limit production to the "first

11  generation" Bratz dolls. On August 12, 2004, MGA produced documents.

12  In 2005, the parties stipulated to supplementing their document productions on May 16,

13  2005. Mattel agreed to continue limiting its discovery requests to "first generation" Bratz dolls.

14  In September of 2006, MGA made a supplemental production of documents. On February

15  5, 2007, MGA produced about 2,300 pages of documents to replace earlier produced documents

16  with legibility problems. On February 20, 2007, MGA produced an additional 224 pages of

17  documents to replace earlier produced documents with legibility problems.

18  Mattel now moves to compel MGA to produce documents responsive to its requests. As a

19  preliminary matter, Mattel contends that MGA's production is deficient because it contains

20  redactions and cut-off text. Further, Mattel contends that MGA's production is incomplete with

21  respect to essentially five categories of documents. First, Mattel contends that MGA is

22  withholding documents relating to the origins of Bratz and Bryant's work for MGA. Mattel

23  believes that MGA's production is incomplete based upon its review of documents that have been

24  produced by third party Steven Linker. According to Mattel, Linker's documents from October

25  of 2000 show that Bratz was much farther along before Bryant left Mattel than MGA or Bryant

26  previously represented. Mattel also contends that MGA's responses to the document requests

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

2

**EXHIBIT 17 PAGE 163**

1  contain inappropriate limitations, such as MGA's statement that it will produce "relevant and

2  responsive non-objectionable documents" or only that it will produce documents "sufficient" to

3  show when certain dates relating to Bratz occurred.  Mattel contends that these "carve outs

4  purport to allow MGA to cherry-pick what it will and will not produce to Mattel."  Mattel's

5  Separate Statement at 17:11-13.  Mattel also contends that the carve-outs fail to provide notice of

6  what is or is not being withheld.  Mattel also contends that MGA's objections based upon its

7  confidentiality concerns or the privacy rights of third parties are unwarranted in light of the

8  protective order in place.  In addition, Mattel contends that MGA's objection to producing

9  documents relating to activities or conduct in foreign countries is wholly improper because those

10  documents may contain information relevant to Mattel's claims.

11      Second, Mattel seeks documents relating to the origins of Bratz, regardless of whether

12  such documents relate to the "first generation" Bratz dolls.  Mattel argues that whether the work

13  ultimately resulted in Bratz dolls that were released at a particular time does not matter for

14  discovery purposes.  Mattel contends that the works created by Bryant during his Mattel

15  employment are highly relevant because Mattel owns them, regardless of whether they resulted in

16  a Bratz doll released at a particular time.[1]

17      Mattel next contends that MGA is improperly withholding documents about designs

18  Bryant created on Bratz dolls that were released after June 2001, even though such designs may

19  be derivative of work he did when employed by Mattel.  Mattel contends that it is entitled to

20  explore whether such works and the profits from Bratz dolls other than the "first generation"

21  Bratz dolls were derived from works owned by Mattel both for purposes of establishing liability

22  and damages.  Furthermore, Mattel asserts that the "first generation" limitation on discovery is

23  improper in light of Bryant's continuing duty not to use Mattel's confidential and proprietary

24  information as well as MGA's unfair competition claims.

25  _____

26      [1]  Mattel also reiterates many of the arguments it made previously in connection with its earlier filed motion
to compel Bryant to produce documents.

27

28

Bryant v. Mattel, Inc.,                                                                                   3
CV-04-09049 SGL (RNBx)

**EXHIBIT 17 PAGE 164**

1    Mattel also asserts that MGA is improperly withholding documents relating to products,
2    services and matters other than those relating to "dolls."  According to Mattel, it has evidence that
3    Bryant conceived of marketing and advertising ideas for the Bratz line while he was employed by
4    Mattel.  Mattel contends that any such ideas or contributions may belong to it pursuant to the
5    Inventions Agreement.
6        Third, Mattel seeks documents relating to all of MGA's payments to Bryant, and not just
7    payments for the "first generation" Bratz dolls.  Mattel asserts that such information is relevant
8    because (1) Mattel seeks all benefits Bryant received as a result of violating his duties to Mattel;
9    (2) under the Copyright Act, Mattel is entitled to all profits from infringement as well as actual
10   damages; and (3) payments may show when and what trade secret information Bryant and other
11   defendants allegedly misappropriated from Mattel.
12       Fourth, Mattel seeks documents relating to MGA's agreements with Bryant.  Mattel
13   contends that all agreements between Bryant and MGA are relevant, not just the original
14   September 18, 2000 agreement.  In particular, Mattel contends that it is entitled to discover all
15   documents relating to MGA and Bryant's alleged joint defense agreement because such
16   information would be relevant to demonstrate bias and lack of credibility.
17       Fifth, Mattel seeks production of all declarations, affidavits and other sworn written
18   statements from other cases that refer or relate to Bratz or Angel.  Mattel contends that such
19   information may reveal relevant information about the date of creation of Bryant's Bratz
20   drawings.
21       In response, MGA denies withholding responsive documents and asserts that it has
22   produced volumes of documents responsive to Mattel's requests.  In particular, MGA represents
23   that it has produced all responsive and relevant documents that it was able to locate in response to
24   request nos. 6, 7, 9, 26, 27, 32, 33, 34, 35, 36, 55, 69, and 70.  Further, MGA asserts that even
25   before the motion was filed, it had agreed to address the vast majority of the issues raised in this
26   motion.  In particular, MGA represents that it is diligently working to produce documents related
27
28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)                                                          4

**EXHIBIT 17 PAGE 165**

1   to Bratz other than "first generation" Bratz in response to request nos. 1, 2, 8, 10, 11, 43, 45, 46,

2   49, 50, 51, 53, 57, 59, 61, 63, 64, 66, 96, 97, 98, 99 and 100. MGA represents that it informed

3   Mattel that it would produce documents pertaining to subsequent generations of Bratz dolls that

4   have been released on the market. In addition, MGA represents that it has agreed to produce

5   documents relevant to Bratz or Prayer Angels that it received from Union Bank. More

6   specifically, MGA represents that it agreed to review and produce documents provided to it by

7   Union Bank for the years 1999 – 2001 concerning payments that it could identify as being for

8   Bratz or Prayer Angels. MGA also represents that it has agreed to produce royalty statements.

9   Therefore, MGA views the motion as unnecessary.

10        MGA next contends that Mattel's motion should be denied for the following additional

11   reasons. First, MGA contends that Mattel is not entitled to MGA's product design documents for

12   unreleased products. MGA asserts that its product design documents for its unreleased toy

13   concepts are among its most highly valuable trade secrets. Furthermore, MGA contends that

14   designs and drawings for products currently under development, over six years after Bryant first

15   created his original Bratz drawings, have no relevance to any of Mattel's claims. In the event that

16   documents relating to unreleased products are ordered produced, MGA requests a protective order

17   under Rule 26(c), Fed.R.Civ.P., that limits the dissemination of its documents more drastically

18   than the current protective order provides. In the alternative, MGA requests that any order

19   compelling production of documents relating to unreleased products should essentially be stayed

20   until after MGA's products are publicly released.

21        Second, MGA contends that Mattel is not entitled to information concerning Bryant's

22   attorneys' fees because the information is privileged. Furthermore, MGA contends that the

23   information is not relevant to demonstrate bias because "there is no dispute that Bryant's interests

24

25

26

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)                                                                          5

**EXHIBIT 17 PAGE 166**

1  in this case are aligned with those of MGA, and that Bryant is 'biased' in that sense." MGA's

2  Opposition at 24:9-12.[2]

3        Third, MGA asserts that Mattel is not entitled to review all non-public witness statements

4  and litigation documents concerning Bratz for a variety of reasons, including because Mattel has

5  refused to produce similar types of documents.  More significantly, MGA contends that Mattel's

6  requests for non-public witness statements are "a blatant attempt to avoid the discovery

7  limitations imposed by both the Federal Rules of Civil Procedure and those additional limitations

8  imposed by this Court." MGA's Opposition at 25:6-7.  MGA explains its position as follows.

9  MGA is involved in litigation against a number of counterfeiters and infringers in Asia.  In 2003,

10 Mattel allegedly began feeding documents concerning "Toon Teens" to those defendants in an

11 attempt to prove that Bryant created Bratz while working at Mattel, even though Mattel

12 abandoned its claims based upon "Toon Teens" in this court.  Thereafter, those defendants took

13 the position that MGA did not own, and therefore could not enforce, the rights to Bratz.  MGA

14 was thus forced to litigate the issue of ownership.  MGA contends that "[i]n effect, by prompting

15 foreign counterfeiters to espouse a theory that Mattel now admits has no merit, Mattel has created

16 a situation in which MGA has been forced to give testimony and provide evidence related to

17 issues in this case that Mattel now seeks to obtain wholesale." MGA's Opposition at 25:5-24.

18        Fourth, MGA contends that Mattel is not entitled to documents concerning a family

19 dispute between MGA's chief executive officer and his brother because such documents are in no

20 way relevant to this lawsuit.  MGA explains that the brothers were involved in an arbitration

21 proceeding relating to MGA's CEO's purchase of his brother's interest in MGA.  Moreover,

22 MGA contends that the brothers were bound by a protective order prohibiting the use of any

23 documents or testimony for any purpose other than the arbitration.

24

25 _____

26     [2]  Nevertheless, MGA represents that it has produced the only non-privileged document responsive to the request.

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)                                                                    6

**EXHIBIT 17 PAGE 167**

1    Fifth, MGA contends that Mattel is not entitled to its chief executive officer's personnel
2    files because they contain confidential information and are not relevant to the lawsuit. Sixth,
3    MGA contends that Mattel is not entitled to obtain documents from MGA that belong to, and are
4    in the possession, custody and control of, its indirect foreign subsidiary, MGA HK Ltd. Lastly,
5    MGA objects to producing documents relating to any testing performed to determine the date that
6    Bratz documents were created. MGA contends that such discovery is premature and should not
7    proceed until experts are designated.

8        B. <u>Interrogatories</u>

9        On April 28, 2005, Mattel served its Second Set of Interrogatories. On May 20, 2005,
10   however, the district court stayed the action. On May 17, 2006, the district court lifted the stay.
11   On May 30, 2006, MGA responded to the interrogatories.

12       Mattel contends that MGA's responses to the interrogatories were untimely. Further,
13   Mattel contends that the interrogatory responses to numbers five through eleven are deficient
14   because they lack substantive information and consist almost entirely of objections. MGA
15   responds that the motion is moot because it is prepared to provide supplemental responses to its
16   interrogatories. MGA does not otherwise assert any additional grounds for opposing Mattel's
17   motion to compel responses to interrogatories.

18                                   III. DISCUSSION

19       A. <u>Rule 26 of the Federal Rules of Civil Procedure</u>

20       Rule 26 of the Federal Rules of Civil Procedure provides that "[p]arties may obtain
21   discovery regarding any matter, not privileged, that is relevant to the claim or defense of any
22   party." Fed.R.Civ.P. 26(b)(1). "Relevant information need not be admissible at trial if the
23   discovery appears reasonably calculated to lead to the discovery of admissible evidence." <u>Id.</u>
24   Discovery shall, however, be limited by the court if it determines that: "(i) the discovery sought is
25   unreasonably cumulative or duplicative, or is obtainable from some other source that is more
26   convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample

27
28

**EXHIBIT 17 PAGE 168**

1   opportunity by discovery in the action to obtain the information sought; or (iii) the burden or

2   expense of the proposed discovery outweighs its likely benefit, taking into account the needs of

3   the case, the amount in controversy, the parties' resources, the importance of the issues at stake in

4   the litigation, and the importance of the proposed discovery in resolving the issues." Fed.R.Civ.P.

5   26(b)(2).

6       B. Document Requests

7           1.   Requests re Origins of Bratz and Bryant's Work for MGA (Nos. 6, 26, 27, 32, 33,

8                34, 35, 51, 53, 55, 64, 69, 96, 97, 98, 99, 100

9       The requests above seek discoverable information regarding the origins of Bratz and

10  Bryant's work for MGA.  MGA represents that it has produced all responsive documents in

11  response to request nos. 6, 26, 27, 32, 33, 34, 35, 55, and 69 (MGA's Opposition at 13:4-5), and is

12  "diligently working to produce documents in response to" request nos. 51, 53, 64, 96, 97, 98, 99,

13  and 100, including documents related to Bratz other than "first generation" (MGA's Opposition at

14  14:1-4 and note 39).  MGA does, however, object to producing design documents for unreleased

15  products and documents from MGA Hong Kong.

16      As a threshold matter, MGA's responses are inadequate to the extent MGA has restricted

17  its production to "relevant and responsive non-objectionable documents" or documents

18  "sufficient" to show when events relating to Bratz occurred.  These restrictions suggest that MGA

19  might be excluding documents that are responsive to the request based upon its unilateral

20  determination of what is "relevant" or "sufficient."  Mattel shall provide the responses to

21  document requests ordered herein without these restrictions.

22                          Design Documents for Unreleased Products

23      MGA's design documents for unreleased products are relevant to Mattel's claims and

24  defenses and must be produced.  See Order Modifying Protective Order.  On April 23, 2007, the

25  parties submitted a stipulation to modify the existing protective order to limit the disclosure of

26  design documents for unreleased products that constitute trade secret information.  See Stipulation

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

8

EXHIBIT 17 PAGE 169

1  to Modify Protective Order; And Proposed Order Thereon ("stipulation"). The parties' stipulation

2  has been approved and entered as an order of the court. MGA is ordered to produce design

3  documents for unreleased products that are responsive to Mattel's document requests in

4  accordance with the terms of the stipulation and order.

5                              Documents from MGA Hong Kong

6         Documents relating to activities or conduct in foreign countries are relevant and

7  discoverable because Mattel has evidence indicating that MGA Hong Kong was involved with

8  Bratz. Nevertheless, MGA objects to producing documents from Hong Kong unless Mattel

9  provides reciprocal discovery from its subsidiaries.

10        Whether MGA is entitled to discovery from Mattel's subsidiaries has not been briefed in

11  the context of this motion, and therefore is not addressed herein. MGA is ordered to produce

12  documents from MGA Hong Kong.

13        Mattel's motion is granted with respect to request nos. 6, 26, 27, 32, 33, 34, 35, 51, 53, 55,

14  64, 69, 96, 97, 98, 99, 100.

15             2. Additional Requests re Origins of Bratz (Nos. 7, 8, 9, 10, 11, 12, 13, 36, 46, 57, 59,

16                61, 63, 66, 67, 70, 88, 90, 91

17        Mattel contends that MGA is improperly limiting its document production to the "first

18  generation" Bratz dolls. MGA represents, however, that it has agreed to produce subsequent

19  generations of Bratz products (MGA's Opposition at 9:20-25, 13:6-14:1), except design

20  documents for yet unreleased products.

21        As stated previously, design documents for yet unreleased products are relevant and

22  discoverable. See Order Modifying Protective Order. Accordingly, MGA is ordered to produce

23  all non-privileged documents that are responsive to request nos. 7, 8, 9, 10, 11, 12, 13, 36, 46, 57,

24  59, 61, 63, 66, 67, 70, 88, 90, and 91.

25        //

26        //

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)                                                                    9

EXHIBIT 17 PAGE 170

1        3. <u>MGA's Payments to Bryant (Nos. 43, 45)</u>

2        MGA represents that it has already agreed to produce documents related to Bratz, without

3  limiting its production to "first generation" Bratz.  MGA's motion at 13:7-14:3.  Nevertheless,

4  Mattel is entitled to an order compelling production of such documents by a date certain.  Mattel's

5  motion is granted with respect to request nos. 43 and 45.

6        4. <u>MGA's Agreements with Bryant (Nos. 1, 2, 49, 50)</u>

7        MGA represents that it has already agreed to produce non-privileged documents

8  responsive to request nos. 1, 2, 49, and 50, even though it believes that such documents are not

9  relevant (MGA's motion at 13:7-14:3).  These requests seek documents relating to fee or

10  indemnity agreements between MGA and Bryant .

11        Fee or indemnity agreements are relevant to demonstrate bias and lack of credibility.

12  Accordingly, Mattel's motion is granted with respect to request nos. 1, 2, 49, and 50.  Any

13  responsive documents withheld on the basis of a privilege must be properly identified in a

14  privilege log.

15        5. <u>Declarations, Affidavits & Other Sworn Written Statements (Nos. 37, 38, 39, 40,</u>

16        <u>41,</u>

17        In request nos. 37, 38, 390, 40, and 41, Mattel seeks production of declarations, affidavits,

18  and other sworn written statements from cases that refer or relate to Bratz or Angel.  Mattel

19  anticipates that these documents could provide evidence relating to the conception date for Bratz.

20        Request nos. 37, 38, 39, 40, and 41 seek relevant information regarding the conception

21  date for Bratz.  MGA admits in its opposition brief that this issue was litigated in its suits against

22  alleged counterfeiters and infringers.[3]  The issue also appears to have been raised in the

23  arbitration proceedings between MGA's chief executive officer, Isaac Larian, and his brother

24  Farhad Larian.  In those proceedings, Farhad Larian alleged that Isaac Larian concealed from him

25  ————————————————————

26      [3] Although MGA questions the propriety of Mattel providing assistance to the alleged counterfeiters and infringers in raising ownership of Bratz as a defense against MGA's claims, MGA has not cited to any legal authority that prohibits Mattel's conduct.

27

28

**EXHIBIT 17 PAGE 171**

1   that MGA was developing Bratz by early 2000.  Nevertheless, MGA objects to producing

2   documents from the Larians' arbitration on the grounds that the arbitration was governed by a

3   protective order that prohibits the use of any documents or testimony for any purpose other than

4   the arbitration.  MGA, however, has not provided any evidence of the protective order.

5   Accordingly, Mattel's motion to compel is granted as to request nos. 37, 38, 39, 40 and 41.[4]

6           6. Documents Regarding Date-Testing (Request No. 92)

7           Mattel's request no. 92 seeks documents that refer or relate to "any testing of or sampling

8   from any documents that refer or relate to Bratz or Bryant, including without limitation any such

9   testing or sampling in connection with ink, paper or chemical analysis to date any such documents

10  and including without limitation all results and reports relating thereto."  MGA contends that the

11  request is premature, and should proceed in the course of expert discovery.

12          The request calls for relevant discovery and there is no basis for delaying production of

13  responsive documents, other than expert reports.  The timing of expert reports is governed by

14  Rule 26(a)(2)(C), Fed.R.Civ.P.  Accordingly, Mattel's motion is granted as to request no. 92.

15          C. Interrogatories

16          Mattel contends that MGA's responses to interrogatories were untimely, and therefore

17  MGA has waived its objections to the interrogatories.  Pursuant to Rule 33(b)(3), Fed.R.Civ.P.,

18  responses to interrogatories are due thirty days after service.  In this case, Mattel served its

19  interrogatories on April 28, 2005, and responses were initially due May 31, 2005.  The district

20  court, however, issued a stay on May 20, 2005, twenty-two days after the interrogatories were

21  served.  The district court lifted the stay on May 17, 2006.

22

23

24

---

25

26  [4]   In its discussion of the arbitration proceedings, MGA raises an objection to producing Isaac Larian's personnel file based upon privacy grounds.  The personnel file may have documents relevant to Bratz, and therefore

27  should be produced.  The protective order is sufficient to alleviate Mr. Isaac Larian's privacy concerns.

28

**EXHIBIT 17 PAGE 172**

1    Neither party has cited to any caselaw governing the calculation of the 30-day period

2   when there is an intervening stay in discovery.  In the absence of any caselaw, MGA's responses

3   will be treated as timely in order to preserve any valid objections MGA may have asserted.

4    Interrogatory No. 5 seeks the identity of each and every person who was involved in the

5   conception, origin, creation, design, development, sculpting, engineering, reduction to practice,

6   tooling or painting of, or who otherwise produced or contributed to any embodiment of Bratz

7   before December 31, 2001, including a description of each person's role and the start and end

8   dates of each person's involvement.  In response, MGA asserted numerous objections, but did

9   provide the names of five individuals.

10    The interrogatory clearly seeks information relevant to the claims at issue.  MGA's

11  objections are without merit.  The interrogatory is not vague, ambiguous, compound or overbroad.

12  Nor has MGA carried its burden of establishing that the interrogatory is unduly burdensome, calls

13  for confidential, proprietary or commercially sensitive information, or seeks information

14  protected by the attorney-client privilege.  Furthermore, MGA's response is incomplete insofar as

15  it fails to provide the description of each person's role and the start and end dates of each person's

16  involvement.  Accordingly, MGA is ordered to provide a complete response to Interrogatory No.

17  5 and identify documents in compliance with Rule 33(d), Fed.R.Civ.P.

18    Interrogatory No. 6 seeks the same information as Interrogatory No. 5 with respect to any

19  embodiment of Angel.  MGA is ordered to provide a complete response to Interrogatory No. 6 for

20  the reasons previously discussed in connection with Interrogatory No. 5.

21    Interrogatory No. 7 asks MGA to identify each and every embodiment of Bratz prior to

22  December 31, 2001.  In response, MGA asserted numerous objections and did not provide any

23  substantive information.

24    MGA's objections are without merit.  The interrogatory clearly seeks information relevant

25  to establishing when Bryant first conceived Bratz.  The interrogatory is not vague, ambiguous,

26  compound or overbroad.  Nor has MGA carried its burden of establishing that the interrogatory is

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)                                                                    12

**EXHIBIT 17 PAGE 173**

1  unduly burdensome, calls for confidential, proprietary or commercially sensitive information, or

2  seeks information protected by the attorney-client privilege.  Accordingly, MG is ordered to

3  provide a complete response to Interrogatory No. 7.

4      Interrogatory No. 8 asks MGA to identify each and every embodiment of Angel.  MGA is

5  ordered to provide a complete response to Interrogatory No. 8 for the reasons previously

6  discussed in connection with Interrogatory No. 7.

7      Interrogatory No. 9 requires MGA to identify each and every sworn statement that refers

8  or relates to the conception, origin, creation, design, development, sculpting, engineering, tooling

9  or painting of Bratz.  In response, MGA asserted numerous objections and did not provide any

10  substantive information.

11      The interrogatory seeks information relevant to establishing when Bryant first conceived

12  Bratz.  Furthermore, MGA's boiler-plate objections are unsubstantiated.  Accordingly, MGA is

13  ordered to provide a complete response to Interrogatory No. 9.

14      Interrogatory No. 10 requires MGA to identify each and every instance in which Bratz

15  was shown, displayed, or exhibited prior to June 1, 2001, including by stating the date(s) on

16  which each such instance occurred, the location of each show or exhibit, and the identity of

17  persons with knowledge of the shows or exhibits.  In response, MGA asserted numerous

18  objections and provided the following information:  Hong Kong Toy Fair in Hong Kong in or

19  about January 2001 and New York Toy Fair, New York, in or about February 2001.

20      Once again, MGA's boiler-plate objections are unsubstantiated.  The information is

21  potentially relevant to establish when Bryant conceived Bratz.  Further, the response is

22  incomplete insofar as it fails to identify any persons with knowledge.  Therefore, MGA is ordered

23  to provide a complete response to Interrogatory No. 10.

24      Interrogatory No. 11 requires MGA to state the "number for each and every telephone,

25  including without limitation each office, home and cell phone number, in the name of, for the

26  benefit of or for the account of Isaac Larian and any other telephone that Isaac Larian used from

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

13

**EXHIBIT 17 PAGE 174**

1   January 1, 1998 through the present, and IDENTIFY each and every carrier (including without

2   limitation any long-distance carrier) for each such number.  In response, MGA asserted numerous

3   boiler-plate objections.

4        Once again, MGA has failed to substantiate any of its objections with supporting

5   declarations or legal authorities.  Accordingly, all objections are overruled and MGA is ordered to

6   provide a full response to Interrogatory No. 11.

7                              IV. CONCLUSION

8        For the reasons set forth above, Mattel's motion to compel production of documents is

9   granted.  MGA shall produce all non-privileged documents that are responsive to the requests

10  identified in this Order.  Further, MGA shall produce all documents in un-redacted form, except

11  for redactions that are justified by the attorney-client privilege or work product doctrine.  Mattel's

12  motion to compel interrogatory answers is also granted.  MGA shall produce documents and

13  provide responses to interrogatories consistent with this Order, and produce a privilege log in

14  compliance with Rule 26(b)(5), Fed.R.Civ.P., no later than May 31, 2007.  Mattel's request for

15  sanctions is denied.

16       Pursuant to Paragraph 6 of the Stipulation and Order for Appointment of a Discovery

17  Master, Mattel shall file this Order with the Clerk of Court forthwith.

18

19

20

21  Dated: May /5, 2007

22                                      HON. EDWARD A. INFANTE (Ret.)
                                        Discovery Master

23

24

25

26

27

28

**EXHIBIT 17 PAGE 175**

## PROOF OF SERVICE BY E-MAIL

I, Anthony Sales, not a party to the within action, hereby declare that on May 15, 2007, I served the attached ORDER GRANTING MATTEL'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND INTERROGATORY RESPONSES BY MGA in the within action by e-mail addressed as follows:

| | | |
|---|---|---|
| Robert Millman Esq. | Littler Mendelson | rfmillman@littler.com |
| Douglas Wickham Esq. | Littler Mendelson | dwickham@littler.com |
| Keith Jacoby Esq. | Littler Mendelson | kjacoby@littler.com |
| Dominic Messiha Esq | Littler Mendelson | dmessiha@littler.com |
| Diba Rastegar Esq. | Littler Mendelson | drastegar@littler.com |
| Michelle Park Esq. | Littler Mendelson | mpark@littler.com |
| Alaya B. Meyers, Esq. | Littler Mendelson | ameyers@littler.com |
| Brady Mitchell, Esq. | Littler Mendelson | bmitchell@littler.com |
| Carol Miller, Esq. | Littler Mendelson | cmiller@littler.com |
| Ryan P. Eskin, Esq. | Littler Mendelson | reskin@littler.com |
| John Quinn Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | jbq@quinnemanuel.com |
| Michael Zeller Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | michaelzeller@quinnemanuel.com |
| Jon Corey Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | joncorey@quinnemanuel.com |
| Duane Lyons Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | duanelyons@quinnemanuel.com |
| Timothy Alger Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | timalger@quinnemanuel.com |
| Dominic Surprenant Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | DominicSurprenant@QuinnEmanuel.com |
| B. Dylan Proctor Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | dylanproctor@quinnemanuel.com |
| Shane McKenzie Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | shanemckenzie@quinnemanuel.com |
| Bridget Morris Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | bridgetmorris@quinnemanuel.com |
| Tamar Buchakjian Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | tamarbuchakjian@quinnemanuel.com |
| Juan Pablo Alban, Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | juanpabloalban@quinnemanuel.com |
| Dale Cendali Esq. | O'Melveny & Myers LLP | dcendali@omm.com |
| Diana Torres Esq. | O'Melveny & Myers LLP | dtorres@omm.com |
| James Jenal Esq. | O'Melveny & Myers LLP | jjenal@omm.com |
| Alicia Meyer Esq. | O'Melveny & Myers LLP | ameyer@omm.com |
| Jennifer Glad Esq. | O'Melveny & Myers LLP | jglad@omm.com |
| David Hurwitz, Esq. | O'Melveny & Myers LLP | dhurwitz@omm.com |
| Johanna Schmitt Esq. | O'Melveny & Myers LLP | jschmitt@omm.com |
| Patricia Glaser Esq. | Christensen, Glaser, Fink, Jacobs, Weil & Shapiro, LLP | pglaser@chrisglase.com |

I declare under penalty of perjury under the laws of the Untied States of America that the above is true and correct.

Executed on May 15, 2007, at San Francisco, California.

Anthony Sales

**EXHIBIT 17 PAGE 176**

## DECLARATION OF FARHAD "FRED" LARIAN

I, FARHAD LARIAN declare as follows:

1.  I am over the age of 18 and have personal knowledge of the facts herein and could and would competently testify thereto.

2.  By 1999, I had been business partners with my brother, Defendant Isaac Larian ("Isaac"), for over 20 years.  Our company ABC International Traders, Inc. (subsequently renamed by Isaac MGA Entertainment, Inc.) designs, licenses, imports and distributes toys worldwide.

3.  Some time before September 2000, Isaac came upon a very lucrative business opportunity for the company – becoming the exclusive distributor of a new line of dolls called "Bratz."  Isaac secretly negotiated for and on September 18, 2000, secretly finalized and obtained a worldwide license agreement making Isaac and the company the exclusive worldwide distributor of Bratz dolls and related products. (Attached hereto as Exhibit A is a true and correct copy of the Carter Bryant License Agreement.  The signed version is in the possession of Isaac Larian.)

4.  Just ten days later, on September 28, 2000, Isaac fraudulently induced me into signing the Arbitration Agreement that is the subject of the First Cause of Action, without disclosing the Bratz opportunity and license.  Based on newspaper articles, the Bratz product line has already generated several hundred million dollars in revenues for the company and is expected soon to earn more than $1 billion annually for the company.

5.  At the time Isaac sought my consent to the arbitration agreement, Isaac had managed to conceal from me his obtaining the Bratz license and other material information about the Company, and also hid from me his intention to continue to conceal such information during the arbitration.

6.  Isaac's goal was to use the arbitration process to award him my equity interest in the Company at a severely undervalued price.  Believing that Isaac had already disclosed to me, and would continue to disclose during the arbitration, all material financial information about the Company, and that there was nothing unknown to me that would affect the price of my stock, I

///

AA 154

1

**EXHIBIT 18 PAGE 177**

signed a written "Agreement to Arbitrate" dated September 28, 2000, ("Arbitration Agreement"), which, *inter alia*, appointed our Uncle, Mr. Morad Zarabi, as the arbitrator.

7.    During the course of the few meetings that were held pursuant to the Arbitration Agreement, Isaac continued to keep from me, and kept from Mr. Zarabi, the information he knew about the execution of the Bratz license agreement, and other vital material and financial information affecting the Company. This claim is set out in my Fourth Cause of Action for Fraud and Deceit in the Conduct of the Arbitration process.

8.    During the course of the arbitration hearings, which were halted without an award being issued, Isaac and I negotiated a resolution of our differences, which resulted in my selling my shares to Isaac under a written "Agreement for Sale of Stock" dated December 4, 2000, ("Stock Sales Agreement").

9.    I uncovered the truth about Isaac's fraud in the middle of 2002, and thereafter brought this suit.

10.    On August 25, 2003, I filed a Verified Complaint alleging ten common law and statutory causes of action. The 10 causes of action alleged in the Verified Complaint are: (1) Fraud and Deceit in the Inducement of the Arbitration Agreement; (2) Beach of Fiduciary Duties; (3) Fraud and Deceit in the Conduct of the Arbitration process; (4) Breach of the Implied Covenant of Good Faith and Fair Dealing; (5) Violation of Corporations Code §§ 25401, 25501; (6) Violation of Corporations Code §§ 25402, 25502; (7) Fraud and Deceit in the Inducement of the December 2000 Agreement; (8) Negligent Misrepresentation; (9) Violation of Business and Professions Code § 17200 et seq.; and (10) Rescission based on Mistake. I hereby reaffirm and incorporate by reference as though set out in full herein each and every statement therein.

11.    The principal allegation of the pending suit, set forth in the First Cause of Action, is that I was fraudulently induced by Isaac into executing the Arbitration Agreement. That is, Isaac tricked me into agreeing to arbitration, knowing that he had already concealed, and would continue to conceal during the arbitration process, the company's license for the Bratz product line and other material financial information about the company, thereby misrepresenting to me the value of Arbitration Agreement among other things. Had I known of this concealed    AA 155

2

**EXHIBIT 18 PAGE 178**

information, I would not have agreed to the arbitration or to any of the negotiations flowing from it and instead would have kept my shares in the company.  (See Verified Complaint ¶ 32)

12.    As plainly stated in my Verified Complaint under the heading "Fraud Regarding the Arbitration Agreement"

"21.  At all times before and up through the execution of the Arbitration Agreement and for some considerable time thereafter, Fred was unaware of the true facts regarding the new business opportunities and Bratz line of products, was unaware of the true financial condition of the Company, and was unaware of the intention of Isaac to conceal such material information from him and from the arbitrator and him during the arbitration process.  **Had Fred been aware of the new business opportunities, the Bratz line of products,** the true financial condition of the Company, and/or the plans of Isaac to conceal such material information from him and from the arbitrator, **he would not have agreed to enter into the arbitration process for the sale of his interest in the Company; would not have agreed to the Arbitration Agreement; would not have agreed to have Mr. Zarabi serve as arbitrator . . . ."** Verified Complaint ¶ 21 (emphasis added in bold.)

13.    In my Second Cause of Action, I allege breach of fiduciary duty against Isaac, alleging that Isaac breached duties of "honesty, loyalty, care and fair dealing" in keeping material financial information from me, his co-fiduciary, during the course of our partnership in running the business. (Verified Complaint ¶¶ 37-42)

14.    As separate claims, I have also alleged Fraud & Deceit in the Conduct of the Arbitration Process, alleging that Isaac deliberately chose not to provide material financial information during the course of the aborted arbitration hearings (Verified Complaint ¶¶ 43-49); and have alleged Fraud & Deceit in the Inducement of the Stock Sales Agreement, pleading that Isaac withheld information about the Bratz product line and other financial issues when we negotiated the Stock Sales Agreement. (Verified Complaint ¶¶ 65-71).

15.    Isaac moves to compel arbitration, arguing the claims alleged in the verified complaint are covered by the written arbitration agreement between us and have been submitted to the arbitrator for decision. Notice of Motion to Compel p.2 lns.8-11. My claim is <u>not</u> covered by and I have <u>not</u> submitted the issue of Isaac's fraudulent inducement into execution of the Arbitration Agreement for resolution in an arbitral forum.

/ / /

/ / /

AA 156

3

01-P427001.618

**EXHIBIT 18 PAGE 179**

16.     Isaac misrepresents my claim when he states: "Here, plaintiff's allegations do not [state] that plaintiff's consent to have his disputes decided by arbitration was induced by fraud." [This] is exactly what I allege in my First Cause of Action, entitled "Fraud & Deceit in the [Procurement] of Arbitration Agreement" (Verified Complaint p. 10). The allegations of the [Verified] Complaint make it plain that my principal contention in the First Cause of Action is that [Isaac] fraudulently obtained my consent to the Arbitration Agreement by concealing and [withholding] of material financial information about the company. (Verified Complaint ¶¶ 19-20)

17.     There was never any award by any arbitrator. Isaac suggests that I "submitted [my] fraud claims to the arbitrator for decision on January 26, 2003" and that this court should [re]send it to arbitration. I never asked for any arbitrator to decide my claim that *I was fraudulently induced into entering into the Arbitration Agreement and therefore the Arbitration Agreement should be set aside.*  Nowhere do I allege in my Verified Complaint that I submitted [the] issue of whether I was fraudulently induced into the Arbitration Agreement to an arbitrator. [In the] demurrer, Isaac suggests that because I asked Morad to "rectify the situation" that the [complaint] supports Isaac's assertion that the fraud-in-the-inducement of the Arbitration [Agreement] has been submitted to arbitration. (Verified Complaint ¶. 29) I have not.

18.     In the motion to compel arbitration, Isaac states there was a "one-day hearing" and [submitted] a list of issues to the arbitrator. In fact, the so-called one-day hearing, was about an [hour] or two discussion. I never asked Uncle Morad to decide the issue of whether I had been [fraudulently] induced by Isaac into entering the Arbitration Agreement and whether it should be [set] aside.

19.     Isaac suggests that the following written statement forms the basis to find that all [and] claims were submitted to the arbitrator:

> "The December 2000 appraisal of MGA, which the arbitrator relied upon to
> establish the value of MGA, was substantially understated as a result of Isaac
> Larian's concealment of the Bratz doll license agreement. That license agreement
> was material to the value of MGA but was not considered in setting MGA's value
> because of the concealment from the arbitrator." Motion To Compel Ex. C.   AA 157

4

03:P427001.618

**EXHIBIT 18 PAGE 180**

20.    The request submitted to Mr. Zarabi dealt only with Isaac's failure to come forward with information *as part of the arbitration process*, and not whether there was fraudulent inducement in September 2000 of my consent to the Arbitration Agreement.  When I found out that Isaac had failed to disclose material information to the arbitrator, the first thing I did was to find out if such information had been disclosed and then told the arbitrator.   Absolutely nothing in that statement suggests that I had asked the arbitrator to *set aside the Arbitration Agreement altogether because it had been induced by fraud.*  And certainly, it does not say that all fraud claims are to be submitted to arbitration.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 1st day of November, 2003 at Los Angeles, California.

FARHAD LARIAN

AA 158

5

**EXHIBIT 18 PAGE 181**

1   HOWARTH & SMITH
    DON HOWARTH (State Bar No. 53783)
2   SUZELLE M. SMITH (State Bar No. 113992)
    BRIAN D. BUBB (State Bar No. 137408)
3   ROBERT D. BRAIN (State Bar No. 98815)
    800 Wilshire Boulevard, Suite 750
4   Los Angeles, California 90017-4216

5   (213) 955-9400

6   Attorneys for Plaintiff
    FARHAD LARIAN

7

8                 SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                       FOR THE COUNTY OF LOS ANGELES

10

11  FARHAD LARIAN,                    )  CASE NO. BC301371
                                      )
12         Plaintiff,                 )  Assigned for all purposes to:
                                      )  Hon. Rodney E. Nelson
13                                    )
                                      )
14  vs.                              )   AMENDED NOTICE OF
                                      )  SUBPOENA TO CUSTODIAN OF
15                                    )  RECORDS OF MORAD ZARABI
    ISAAC LARIAN and Does 1 through 20,)  FOR PRODUCTION OF BUSINESS
16  inclusive,                        )  RECORDS
                                      )
17                                    )
         Defendants.                  )
18                                    )
                                      )
19                                    )
                                      )
20  _____   )

21

22

23  TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

24         PLEASE TAKE NOTICE THAT pursuant to sections 2020 and 2025 of the California

25  Code of Civil Procedure and the attached deposition subpoena (Exhibit "A"), the Custodian

26  of Records for Morad Zarabi has been commanded by Plaintiff Farhad Larian, by and

27  through his attorneys of record, Howarth & Smith, to deliver a true, legible and durable copy

28  of the business records described in Attachment 3 to the deposition subpoena, to the

---

1

HS 01882

EXHIBIT 19 PAGE 182

1 | designated deposition officer, Pacific Document Services, 350 South Figueroa Street, Suite

2 | 350, Los Angeles, California 90071, at 10:00 a.m. on October 7, 2003.

3

4 | DATED: September 19, 2003      HOWARTH & SMITH

5 |      DON HOWARTH
6 |      SUZELLE M. SMITH
     BRIAN D. BUBB
7 |      ROBERT D. BRAIN

8

9 | By: _____
10 |      Brian D. Bubb

11 |      Attorneys for Plaintiff
     FARHAD LARIAN

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

03:P402026.618

AMENDED NOTICE OF SUBPOENA TO CUSTODIAN OF RECORDS OF MORAD ZARABI FOR
PRODUCTION OF BUSINESS RECORDS

HS 01883

**EXHIBIT 19 PAGE 183**

982(a)(15.2)

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, state bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Don Howarth, Esq. (SB 53783); Brian D. Bubb, Esq. (SB 137408)<br>HOWARTH & SMITH<br>800 Wilshire Boulevard, Suite 750<br>Los Angeles, California 90017<br>TELEPHONE NO: (213) 955-9400   FAX NO: (213) 622-0791<br>ATTORNEY FOR *(Name):* Plaintiff Farhad Larian | |

NAME OF COURT: Los Angeles County Superior Court
STREET ADDRESS: 111 North Hill Street
MAILING ADDRESS:
CITY AND ZIP CODE: Los Angeles, California 90012
BRANCH NAME: Central District, Stanley Mosk

PLAINTIFF/ PETITIONER: Farhad Larian

DEFENDANT/ RESPONDENT: Isaac Larian

| DEPOSITION SUBPOENA<br>For Production of Business Records | CASE NUMBER:<br>BC 301371 |
|---|---|

THE PEOPLE OF THE STATE OF CALIFORNIA, TO *(name, address, and telephone number of deponent, if known):*
Custodian of Records for Morad Zarabi

**1. YOU ARE ORDERED TO PRODUCE THE BUSINESS RECORDS described in item 3, as follows:**

To *(name of deposition officer):* Pacific Document Services, attn: Jesse Mora
On *(date):* October 7, 2003                        At *(time):* 10:00 a.m.
Location *(address):* 350 South Figueroa Street, Suite 350, Los Angeles, California 90071
Do not release the requested records to the deposition officer prior to the date and time stated above.

a. [X] by delivering a true, legible, and durable copy of the business records described in item 3, enclosed in a sealed inner wrapper with the title and number of the action, name of witness, and date of subpoena clearly written on it. The inner wrapper shall then be enclosed in an outer envelope or wrapper, sealed, and mailed to the deposition officer at the address in item 1.

b. [  ] by delivering a true, legible, and durable copy of the business records described in item 3 to the deposition officer at the witness's address, on receipt of payment in cash or by check of the reasonable costs of preparing the copy, as determined under Evidence Code section 1563(b).

c. [  ] by making the **original** business records described in item 3 available for inspection at your business address by the attorney's representative and permitting copying at your business address under reasonable conditions during normal business hours.

2. *The records are to be produced by the date and time shown in item 1 (but not sooner than 20 days after the issuance of the deposition subpoena, or 15 days after service, whichever date is later). Reasonable costs of locating records, making them available or copying them, and postage, if any, are recoverable as set forth in Evidence Code section 1563(b). The records shall be accompanied by an affidavit of the custodian or other qualified witness pursuant to Evidence Code section 1561.*

**3. The records to be produced are described as follows:**
See Attachment 3

[  ] Continued on Attachment 3.

**4. IF YOU HAVE BEEN SERVED WITH THIS SUBPOENA AS A CUSTODIAN OF CONSUMER OR EMPLOYEE RECORDS UNDER CODE OF CIVIL PROCEDURE SECTION 1985.3 OR 1985.6 AND A MOTION TO QUASH OR AN OBJECTION HAS BEEN SERVED ON YOU, A COURT ORDER OR AGREEMENT OF THE PARTIES, WITNESSES, *AND* CONSUMER OR EMPLOYEE AFFECTED MUST BE OBTAINED BEFORE YOU ARE REQUIRED TO PRODUCE CONSUMER OR EMPLOYEE RECORDS.**

**DISOBEDIENCE OF THIS SUBPOENA MAY BE PUNISHED AS CONTEMPT BY THIS COURT. YOU WILL ALSO BE LIABLE FOR THE SUM OF FIVE HUNDRED DOLLARS AND ALL DAMAGES RESULTING FROM YOUR FAILURE TO OBEY.**

Date issued: September 17, 2003

Brian D. Bubb, Esq.
(TYPE OR PRINT NAME)

(SIGNATURE OF PERSON ISSUING SUBPOENA)
Attorney for Plaintiff Farhad Larian
(TITLE)

(Proof of service on reverse)

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>982(a)(15.2) [Rev. January 1, 2000] | DEPOSITION SUBPOENA FOR PRODUCTION<br>OF BUSINESS RECORDS | Code of Civil Procedure,<br>§§ 2020, 2025;<br>Government Code § 68097.1 |
|---|---|---|

HS 01884

**EXHIBIT 19 PAGE 184**

## ATTACHMENT 3

### DEFINITIONS AND INSTRUCTIONS

As used herein, the following definitions shall apply:

1.    The terms **"YOU"** or **"YOUR"** refers to Morad Zarabi, and each and every one of his agents, officers, employees, consultants, representatives, directors, attorneys, investigators and anyone else acting on his behalf, including any person who served in any such capacity at any time.

2.    The term "ISAAC LARIAN" refers to Defendant Isaac Larian, and each and every one of his agents, officers, employees, consultants, representatives, directors, attorneys, investigators and anyone else acting on his behalf, including any person who served in any such capacity at any time.

3.    The term "MGA" refers to MGA Entertainment, Inc., and each and every one of its subsidiaries, affiliates, agents, officers, employees, consultants, representatives, directors, partners, attorneys, investigators and anyone else acting on its behalf, including any person who served in any such capacity at any time.

4.    The term "ABC" refers to ABC International Traders, Inc., and each and every one of its subsidiaries, affiliates, agents, officers, employees, consultants, representatives, directors, partners, attorneys, investigators and anyone else acting on its behalf, including any person who served in any such capacity at any time.

5.    The term "BRATZ" refers to the Bratz line of dolls and all related products manufactured, licensed or sold by **MGA** or **ABC**.

6.    The term **"VERIFIED COMPLAINT"** refers to the complaint filed in this matter.

7.    The term **"ARBITRATION AGREEMENT"** refers to Exhibit A attached to the **VERIFIED COMPLAINT**.

8.    The term "STOCK SALE AGREEMENT" refers to Exhibit B attached to the **VERIFIED COMPLAINT**.

///

**HS 01885**

1

**EXHIBIT 19 PAGE 185**

9.    The term **"FINANCIAL ACCOUNT"** shall include all accounts at banks or any other financial institution, including, without limitation, bank accounts, passbook accounts, demand deposit accounts, certificates of deposit, letter of credit, money market accounts, and credit card accounts.

10.    The term **"DOCUMENT"** or **"DOCUMENTS"** shall mean any "writing" as defined in Section 250 of the California Evidence Code in **YOUR** actual or constructive possession, custody, or control, and includes all **DOCUMENTS** authored by **YOU**, received by **YOU**, and sent by **YOU** any other person or entity. The term **"DOCUMENT"** shall include all draft versions and the final version of any such "writing," and specifically includes, but is not limited to, all electronically mailed, or e-mail messages, letters, memoranda, reports, notes, minutes, and any other communications. The term **"DOCUMENT"** shall also mean originals and copies or reproductions of all such writings upon which notations in writing, print, by stamp, or otherwise have been made which do not appear in the originals of such **DOCUMENTS**.

11.    In producing the requested **DOCUMENTS**, **YOU** are hereby requested to furnish all **DOCUMENTS** known or available to **YOU**, regardless of whether these **DOCUMENTS** are possessed directly by **YOU**, **YOUR** agents, employees, representatives, or investigators, and by **YOUR** attorneys or their agents, employees, representatives, or investigators.

12.    The singular number shall be read and applied as a plural, and the plural number shall be read and applied as a singular, as the circumstance may make appropriate.

13.    In producing any requested **DOCUMENT** that currently exists in electronic form, e.g., an e-mail message, please produce that **DOCUMENT** in printed form and electronic form.

///

///

///

HS 01886

2

**EXHIBIT 19 PAGE 186**

1       14.    In producing the requested **DOCUMENTS**, **YOU** are hereby requested to

2 furnish all **DOCUMENTS** known or available to **YOU**, regardless of whether these

3 **DOCUMENTS** are possessed directly by **YOU**, **YOUR** agents, employees,

4 representatives, or investigators, and by **YOUR** attorneys or their agents, employees,

5 representatives, or investigators.

6

7                   **REQUESTS FOR PRODUCTION**

8 **REQUEST NO. 1:**

9      All **DOCUMENTS** which evidence, discuss, report, mention, or relate to the

10 **ARBITRATION AGREEMENT** entered into in or about September 2000, attached as

11 Exhibit A to the **VERIFIED COMPLAINT**.

12 **REQUEST NO. 2:**

13      All **DOCUMENTS** which evidence, discuss, report, mention, or relate to the

14 valuation of **MGA** from the date of its incorporation until present.

15 **REQUEST NO. 3:**

16      All **DOCUMENTS** which evidence, discuss, report, mention, or relate to the

17 valuation of **ABC** from the date of its incorporation until the present.

18 **REQUEST NO. 4:**

19      All **DOCUMENTS** which evidence, discuss, report, mention, or relate to the

20 value of **MGA** from the date of its incorporation until the present.

21 **REQUEST NO. 5:**

22      All **DOCUMENTS** which evidence, discuss, report, mention, or relate to the

23 value of **ABC** from the date of its incorporation until the present.

24 **REQUEST NO. 6:**

25      All **DOCUMENTS** which evidence, discuss, report, mention, or relate to the

26 **STOCK SALE AGREEMENT** entered into in or about December 2000 and attached as

27 Exhibit B to the **VERIFIED COMPLAINT**.

28 ///

**HS 01887**

3

**EXHIBIT 19 PAGE 187**

**REQUEST NO. 7:**

All **DOCUMENTS** which evidence, discuss, report, mention, or relate to any and all business opportunities presented to **MGA** between January 1, 1996 and the present.

**REQUEST NO. 8:**

All **DOCUMENTS** which evidence, discuss, report, mention, or relate to any and all business opportunities presented to **ABC** between January 1, 1996 and the present.

**REQUEST NO. 9:**

All **DOCUMENTS** which evidence, discuss, report, mention, or relate to any and all business opportunities considered by **MGA** between January 1, 1996 and the present.

**REQUEST NO. 10:**

All **DOCUMENTS** which evidence, discuss, report, mention, or relate to any and all business opportunities considered by **ABC** between January 1, 1996 and the present.

**REQUEST NO. 11:**

All **DOCUMENTS** which evidence, discuss, report, mention, or relate to the financial condition of **ABC** between January 1, 1996 and the present.

**REQUEST NO. 12:**

All **DOCUMENTS** which evidence, discuss, report, mention, or relate to the financial condition of **MGA** between January 1, 1996 and the present.

**REQUEST NO. 13:**

All **DOCUMENTS** which evidence, discuss, report, mention, or relate to anything of value received by **YOU** from **ISAAC LARIAN** between January 1, 1995 and the present.

**REQUEST NO. 14:**

All **DOCUMENTS** which evidence, discuss, report, mention, or relate to anything of value received by **YOU** from **ABC** between January 1, 1995 and the present.

**REQUEST NO. 15:**

All **DOCUMENTS** which evidence, discuss, report, mention, or relate to anything of value received by **YOU** from **MGA** between January 1, 1995 and the present.

4

HS 01888

**EXHIBIT 19 PAGE 188**

**REQUEST NO. 16:**

All **DOCUMENTS** exchanged between **YOU** and **ISAAC LARIAN** between January 1, 1996 and the present.

**REQUEST NO. 17:**

All **DOCUMENTS** exchanged between **YOU** and **ISAAC LARIAN** which evidence, discuss, report, mention, or relate to the **ARBITRATION AGREEMENT** entered into in or about September 2000 and attached as Exhibit A to the **VERIFIED COMPLAINT.**

**REQUEST NO. 18:**

All **DOCUMENTS** exchanged between **YOU** and **ISAAC LARIAN** which evidence, discuss, report, mention, or relate to the **STOCK SALE AGREEMENT** entered into in or about December 2000 and attached as Exhibit B to the **VERIFIED COMPLAINT.**

**REQUEST NO. 19:**

All **DOCUMENTS** exchanged between **YOU** and **ISAAC LARIAN** which evidence, discuss, report, mention, or relate to any and all proceedings conducted as a result of, or in connection with, the **ARBITRATION AGREEMENT.**

**REQUEST NO. 20:**

All **DOCUMENTS** which evidence, discuss, report, mention, or relate to any and all proceedings conducted as a result of, or in connection with, the **ARBITRATION AGREEMENT.**

**REQUEST NO. 21:**

All **DOCUMENTS** provided by **ISAAC LARIAN** to **YOU** as a result of or in connection with the **ARBITRATION AGREEMENT.**

**REQUEST NO. 22:**

All **DOCUMENTS** provided by Farhad Larian to **YOU** as a result of or in connection with the **ARBITRATION AGREEMENT.**

/ / /

**HS 01889**

5

**EXHIBIT 19 PAGE 189**

1    **REQUEST NO. 23:**

2         All **DOCUMENTS** provided by **MGA** to **YOU** as a result of or in connection

3    with the **ARBITRATION AGREEMENT.**

4    **REQUEST NO. 24:**

5         All **DOCUMENTS** provided by **ABC** to **YOU** as a result of or in connection with

6    the **ARBITRATION AGREEMENT.**

7    **REQUEST NO. 25:**

8         All **DOCUMENTS** provided by **YOU** to **ISAAC LARIAN** as a result of or in

9    connection with the **ARBITRATION AGREEMENT.**

10   **REQUEST NO. 26:**

11        All **DOCUMENTS** provided by **YOU** to **ISAAC LARIAN** as a result of or in

12   connection with the **STOCK SALE AGREEMENT.**

13   **REQUEST NO. 27:**

14        All **DOCUMENTS** provided by **YOU** to Farhad Larian as a result of or in

15   connection with the **ARBITRATION AGREEMENT.**

16   **REQUEST NO. 28:**

17        All **DOCUMENTS** provided by **YOU** to Farhad Larian as a result of or in

18   connection with the **STOCK SALE AGREEMENT.**

19   **REQUEST NO. 29:**

20        All **DOCUMENTS** provided by **YOU** to **ISAAC LARIAN** as a result of or in

21   connection with **ISAAC LARIAN'S** purchase of stock in **ABC** and/or **MGA** from

22   Farhad Larian.

23   **REQUEST NO. 30:**

24        All **DOCUMENTS** which evidence, discuss, report, mention, or relate to any

25   **FINANCIAL ACCOUNT** held by **MGA** in an account outside of the United States

26   between January 1, 1996 and present.

27   / / /

28   / / /

**HS 01890**

6

**EXHIBIT 19 PAGE 190**

1  **REQUEST NO. 31:**

2      All **DOCUMENTS** which evidence, discuss, report, mention, or relate to any

3  **FINANCIAL ACCOUNT** held by **ABC** in an account outside of the United States

4  between January 1, 1996 and present.

5  **REQUEST NO. 32:**

6      All **DOCUMENTS** which evidence, discuss, report, mention, or relate to any

7  attempt by any shareholder to sell his or her interest in **MGA**, or any part thereof, to any

8  other person or entity between January 1, 1996 and the present.

9  **REQUEST NO. 33:**

10      All **DOCUMENTS** which evidence, discuss, report, mention, or relate to any

11  attempt by any shareholder to sell his or her interest in **ABC**, or any part thereof, to any

12  other person or entity between January 1, 1996 and the present.

13  **REQUEST NO. 34:**

14      All **DOCUMENTS** which evidence, discuss, report, mention, or relate to Farhad

15  Larian between January 1, 1996 and the present.

16  **REQUEST NO. 35:**

17      All **DOCUMENTS** from **YOU** to Farhad Larian between January 1, 1996 and the

18  present.

19  **REQUEST NO. 36:**

20      All **DOCUMENTS** from Farhad Larian to **YOU** between January 1, 1996 and the

21  present.

22  **REQUEST NO. 37:**

23      All **DOCUMENTS** from **YOU** to Isaac Larian between January 1, 1996 and the

24  present.

25  **REQUEST NO. 38:**

26      All **DOCUMENTS** from Isaac Larian to **YOU** between January 1, 1996 and the

27  present.

28  / / /

**HS 01891**

7

**EXHIBIT 19 PAGE 191**

1   **REQUEST NO. 39:**

2       All **DOCUMENTS** which evidence, discuss, report, mention, or relate to

3   **BRATZ**.

4   **REQUEST NO. 40:**

5       All **DOCUMENTS** which evidence, discuss, report, mention, or relate to any

6   trademark filing or application for trademark for **BRATZ**.

7   **REQUEST NO. 41:**

8       All **DOCUMENTS** which evidence, discuss, report, mention, or relate to any

9   licensing of **BRATZ**.

10  **REQUEST NO. 42:**

11      All **DOCUMENTS** which evidence, discuss, report, mention, or relate to any

12  meeting in which **BRATZ** was discussed or otherwise mentioned between January 1,

13  1996 and the present.

14  **REQUEST NO. 43:**

15      All **DOCUMENTS** which evidence, discuss, report, mention, or relate to any

16  marketing meeting in which **BRATZ** was discussed or otherwise mentioned between

17  January 1, 1996 and the present.

18  **REQUEST NO. 44:**

19      All **DOCUMENTS** which evidence, discuss, report, mention, or relate to Carter

20  Bryant.

21  **REQUEST NO. 45:**

22      All **DOCUMENTS** which evidence, discuss, report, mention, or relate to the

23  corporate minutes of any corporate board meeting held by **ABC** between January 1, 1996

24  and the present.

25  **REQUEST NO. 46:**

26      All **DOCUMENTS** which evidence, discuss, report, mention, or relate to the

27  corporate minutes of any corporate board meeting held by **MGA** between January 1,

28  1996 and the present.

HS 01892

8

**EXHIBIT 19 PAGE 192**

**REQUEST NO. 47:**

All **DOCUMENTS** which evidence, discuss, report, mention, or relate to any corporate resolution of **ABC** between January 1, 1996 and the present.

**REQUEST NO. 48:**

All **DOCUMENTS** which evidence, discuss, report, mention, or relate to any corporate resolution of **MGA** between January 1, 1996 and the present.

**REQUEST NO. 49:**

All **DOCUMENTS** which evidence, discuss, report, mention, or relate to any shareholder resolution of **ABC** between January 1, 1996 and the present.

**REQUEST NO. 50:**

All **DOCUMENTS** which evidence, discuss, report, mention, or relate to any shareholder resolution of **MGA** between January 1, 1996 and the present.

**REQUEST NO. 51:**

All **DOCUMENTS** which evidence, discuss, report, mention or relate to any role MGA Entertainment Hong Kong, Limited had regarding **BRATZ** between January 1, 1999 and the present.

**REQUEST NO. 52:**

All **DOCUMENTS** which evidence, discuss, report, mention or relate to the value of MGA Entertainment Hong Kong, Limited between January 1, 1999 and the present.

**REQUEST NO. 53:**

All **DOCUMENTS** which evidence, discuss, report, mention or relate to the valuation of MGA Entertainment Hong Kong, Limited between January 1, 1999 and the present.

**REQUEST NO. 54:**

All **DOCUMENTS** which evidence, discuss, report, mention or relate to the valuation of MGA Entertainment Hong Kong, Limited by **YOU** between January 1, 1999 and the present.

9

**HS 01893**

**EXHIBIT 19 PAGE 193**

1   **REQUEST NO. 55:**

2       All **DOCUMENTS** which evidence, discuss, report, mention or relate to the value

3   of MGA Entertainment Hong Kong, Limited by **YOU** between January 1, 1999 and the

4   present.

5   **REQUEST NO. 56:**

6       All **DOCUMENTS** which evidence, discuss, report, mention, or relate to David

7   Rosenbaum between January 1, 1996 and December 31, 2000.

8   **REQUEST NO. 57:**

9       All **DOCUMENTS** which evidence, discuss, report, mention, or relate to any

10   communication **YOU** had with David Rosenbaum between January 1, 1996 and the

11   present.

12   **REQUEST NO. 58:**

13       All **DOCUMENTS** which evidence, discuss, report, mention, or relate to any

14   communication ABC had with David Rosenbaum between January 1, 1996 and the

15   present.

16   **REQUEST NO. 59:**

17       All **DOCUMENTS** which evidence, discuss, report, mention, or relate to any

18   communication MGA had with David Rosenbaum between January 1, 1996 and the

19   present.

20   **REQUEST NO. 60:**

21       All **DOCUMENTS** which evidence, discuss, report, mention, or relate to any

22   communication **YOU** had with any attorney regarding licensing or trademarking **BRATZ**

23   between January 1, 1996 and the present.

24   **REQUEST NO. 61:**

25       All **DOCUMENTS** which evidence, discuss, report, mention, or relate to any

26   communication ABC had with any attorney regarding licensing or trademarking **BRATZ**

27   between January 1, 1996 and the present.

28   / / /

**HS 01894**

10

**EXHIBIT 19 PAGE 194**

**REQUEST NO. 62:**

All **DOCUMENTS** which evidence, discuss, report, mention, or relate to any communication MGA had with any attorney regarding licensing or trademarking **BRATZ** between January 1, 1996 and the present.

**REQUEST NO. 63:**

All **DOCUMENTS** which evidence, discuss, report, mention or relate to any **BRATZ** licensing agreement.

**REQUEST NO. 64:**

All **DOCUMENTS** which evidence, discuss, report, mention or relate to any trademark of any **BRATZ**-related product.

**REQUEST NO. 65:**

All **DOCUMENTS** which evidence, discuss, report, mention or relate to any mockup or prototype of **BRATZ**.

**REQUEST NO. 66:**

All **DOCUMENTS** which evidence, discuss, report, mention or relate to any design of **BRATZ**.

**REQUEST NO. 67:**

All **DOCUMENTS** which evidence, discuss, report, mention or relate to the general ledger of ABC from January 1, 1996 through the present.

**REQUEST NO. 68:**

All **DOCUMENTS** which evidence, discuss, report, mention or relate to the general ledger of MGA from January 1, 1996 through the present.

**REQUEST NO. 69:**

All **DOCUMENTS** which evidence, discuss, report, mention or relate to stock options granted by ABC between January 1, 1996 and the present.

**REQUEST NO. 70:**

All **DOCUMENTS** which evidence, discuss, report, mention or relate to stock options granted by MGA between January 1, 1996 and the present.

HS 01895

11

**EXHIBIT 19 PAGE 195**

1    **REQUEST NO. 71:**

2        All **DOCUMENTS** which evidence, discuss, report, mention or relate to

3    information that **YOU** provided to any appraiser in connection with the **ARBITRATION**

4    **AGREEMENT.**

5    **REQUEST NO. 72:**

6        All **DOCUMENTS** which evidence, discuss, report, mention or relate to

7    information that **YOU** received from any appraiser in connection with the

8    **ARBITRATION AGREEMENT.**

9    **REQUEST NO. 73:**

10       All **DOCUMENTS** which evidence, discuss, report, mention or relate to

11   information that **YOU** provided to any appraiser in connection with the **STOCK SALE**

12   **AGREEMENT.**

13   **REQUEST NO. 74:**

14       All **DOCUMENTS** which evidence, discuss, report, mention or relate to

15   information that **YOU** received from any appraiser in connection with the **STOCK**

16   **SALE AGREEMENT.**

17   **REQUEST NO. 75:**

18       All **DOCUMENTS** which evidence, discuss, report, mention or relate to

19   information that **YOU** provided to any other person or entity in connection with the

20   **ARBITRATION AGREEMENT.**

21   **REQUEST NO. 76:**

22       All **DOCUMENTS** which evidence, discuss, report, mention or relate to

23   information that **YOU** received in connection with the **ARBITRATION**

24   **AGREEMENT.**

25   **REQUEST NO. 77:**

26       All **DOCUMENTS** which evidence, discuss, report, mention or relate to

27   information that **YOU** provided to any other person or entity in connection with the

28   **STOCK SALE AGREEMENT.**

**HS 01896**

12

**EXHIBIT 19 PAGE 196**

**REQUEST NO. 78:**

All **DOCUMENTS** which evidence, discuss, report, mention or relate to information that **YOU** received in connection with the **STOCK SALE AGREEMENT**.

**REQUEST NO. 79:**

All audio taped recordings that include, evidence, discuss, report, mention or relate to **ISAAC LARIAN**.

**REQUEST NO. 80:**

All audio taped recordings that include, evidence, discuss, report, mention or relate to Farhad Larian.

**REQUEST NO. 81:**

All audio taped recordings that include, evidence, discuss, report, mention or relate to Ernie Dutcher.

**REQUEST NO. 82:**

All audio taped recordings which evidence, discuss, report, mention or relate to the **ARBITRATION AGREEMENT**.

**REQUEST NO. 83:**

All audio taped recordings which evidence, discuss, report, mention or relate to the **STOCK SALE AGREEMENT**.

Dated: September 17, 2003          HOWARTH & SMITH

DON HOWARTH
SUZELLE M. SMITH
BRIAN D. BUBB
ROBERT D. BRAIN

By: _____
          Brian D. Bubb

Attorneys for Plaintiff
FARHAD LARIAN

**HS 01897**

13

**EXHIBIT 19 PAGE 197**

1                           **PROOF OF SERVICE**

2  STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

3         I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is 800 Wilshire Blvd.,

4  Suite 750, Los Angeles, California 90017.

5         On September 19, 2003, I served the foregoing documents described as:

6  **AMENDED NOTICE OF SUBPOENA TO CUSTODIAN OF RECORDS OF MORAD ZARABI  FOR PRODUCTION OF BUSINESS RECORDS**

7

8  on interested parties in this action by sending a true copy thereof as follows:

9  Mr. Isaac Larian
  c/o MGA Entertainment

10  16730 Schoenborn St.
  North Hills, CA 91343

11

12  [ ]    (BY PERSONAL SERVICE)  I caused such document to be delivered by hand to the office of the addressee.

13

14  [X]   (BY MAIL)  I caused such envelope with postage thereon fully prepaid to be placed in the United States mail at Los Angeles, California.

15  [ ]    (BY FEDERAL EXPRESS) I caused such document to be delivered by Federal Express to the office of the addressee.

16

17  [ ]    (FACSIMILE) I caused such document to be transmitted via facsimile to the fax number(s) set forth above on this date before 5:00 p.m.

18  [X]   (STATE)  I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

19

20  [ ]    (FEDERAL) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

21         Executed on September 19, 2003, at Los Angeles, California.

22

23

24                                  Lucy Tompkins

25

26

27

28

HS 01898

3

03:P402026.618                  AMENDED NOTICE OF SUBPOENA TO CUSTODIAN OF RECORDS OF MORAD ZARABI  FOR PRODUCTION OF BUSINESS RECORDS

**EXHIBIT 19 PAGE 198**