**Exhibit A**

EXHIBIT 8 PAGE 185

# EMPLOYEE CONFIDENTIAL INFORMATION AND INVENTIONS AGREEMENT

I acknowledge that Mattel, Inc. (the "Company") operates in a competitive environment and that it enhances its opportunities to succeed by establishing certain policies, including those included in this Agreement. This Agreement is designed to make clear that (i) I will maintain the confidentiality of the Company's trade secrets; (ii) I will use those trade secrets for the exclusive benefit of the Company; (iii) inventions that I create will be owned by the Company; (iv) my prior and continuing activities separate from the Company will not conflict with the Company's development of its proprietary rights; and (v) when and if my employment with the Company terminates I will not use my prior position with the Company to the detriment of the Company. In consideration of my employment with the Company and other good and valuable consideration, I agree that:

## 1. Provisions Related to Trade Secrets

(a) I acknowledge that the Company possesses and will continue to develop and acquire valuable Proprietary Information (as defined below), including information that I may develop or discover as a result of my employment with the Company. The value of that Proprietary Information depends on it remaining confidential. The Company depends on me to maintain that confidentiality, and I accept that position of trust.

(b) As used in this Agreement, "Proprietary Information" means any information (including formula, pattern, compilation, device, method, technique or process) that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use, and includes information on the Company, its customers, suppliers, joint ventures, licensors, licensees, distributors and other persons and entities with whom the Company does business.

(c) I will not disclose or use at any time either during or after my employment with the Company, any Proprietary Information except for the exclusive benefit of the Company as required by my duties for the Company, or as the Company expressly may consent to in writing. I will cooperate with the Company and use my best efforts to prevent the unauthorized disclosure, use or reproduction of all Proprietary Information.

(d) Upon leaving employment with the Company for any reason, I immediately will deliver to the Company all tangible, written, graphical, machine readable and other materials (including all copies) in my possession or under my control containing or disclosing Proprietary Information.

## 2. Ownership of Inventions

(a) I agree to communicate to the Company as promptly and fully as practicable all inventions (as defined below) conceived or reduced to practice by me (alone or jointly by others) at any time during my employment by the Company. I hereby assign to the Company and/or its nominees all my right, title and interest in such inventions, and all my right, title and interest in any patents, copyrights, patent applications or copyright applications based thereon. I will assist the Company and/or its nominees (without charge but at no expense to me) at any time in every proper way to obtain for its and/or their own benefit, patents and copyrights for all such inventions anywhere in the world and to enforce its and/or their rights in legal proceedings.

(b) As used in this Agreement, the term "inventions" includes, but is not limited to, all discoveries, improvements, processes, developments, designs, know-how, data computer programs and formulae, whether patentable or unpatentable.

(c) Any provision in this agreement requiring me to assign my rights in any invention does not apply to an invention which qualifies under the provision of Section 2870 of the California Labor Code. That section provides that the requirement to assign "shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities or trade secret information except for those inventions that either (1) relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development  of the employer; or (2) result from any work performed by the employee for the employer." I understand that I bear the burden of proving that an invention qualifies under Section 2870.

(d) I hereby irrevocably designate and appoint the Company and each of its duly authorized officers and agents as my agent and attorney-in-fact to act for and in my behalf and stead to execute and file any document and to do all other lawfully permitted acts to further the prosecution, issuance and enforcement of patents, copyrights and other proprietary rights with the same force and effect as if executed and delivered by me.

## 3. Conflicts with Other Activities

(a) My employment with the Company requires my undivided attention and effort. Therefore, during my employment with the Company, I will fully comply with the Company's Conflict of Interest Policy, as it may be amended from time to time. I shall not, without the Company's express written consent, engage in any employment or business other than for the Company, or invest in or assist (in any manner) any business competitive with the business or future business plans of the Company.

## 4. Miscellaneous

(a) My obligations under this Agreement may not be modified or terminated, in whole or in part, except in writing signed by a Vice-President of the Company. Any waiver by the Company of a breach on any provision of this Agreement will not operate or be construed as a waiver of any subsequent breach.

(b) Each provision of this Agreement will be treated as a separate and independent clause, and the unenforceability of any one provision will in no way impair the enforceability of any other provision. If any provision is held to be unenforceable, such provision will be construed by the appropriate judicial body by limiting or reducing it to the minimum extent necessary to make it legally enforceable.

(c) My obligation under this Agreement will survive the termination of my employment, regardless of the manner of such termination. This Agreement will inure to the benefit of and be binding upon the successors and assigns of the Company.

(d) I understand that the provisions of this Agreement are a material condition to my employment with the Company. I also understand that this Agreement is not an employment contract, and nothing in this Agreement creates any right to my continuous employment by the Company, or to my employment for any particular term.

(e) Any breach of this Agreement likely will cause irreparable harm to the Company for which money damages could not reasonably or adequately compensate the Company. Accordingly, I agree that the Company will be entitled to injunctive relief to enforce this Agreement, in addition to damages and other available remedies.

(f) This agreement will be governed by and interpreted in accordance with the laws of the State of California.

(g) This Agreement contains the complete agreement between the Company and me concerning the subject matter hereof and supersedes all other agreements and understandings. This Agreement may be executed in counterparts. This Agreement will be deemed effective as of the start of Employees' employment with the Company.

**CAUTION: THIS AGREEMENT CREATES IMPORTANT OBLIGATIONS OF TRUST AND AFFECTS THE EMPLOYEE'S RIGHTS TO INVENTIONS THE EMPLOYEE MAY MAKE DURING HIS OR HER EMPLOYMENT.**

Employee Signature

Employee Name (print)   CARTER H. BRYANT

Date   01/04/99

MATTEL, INC.

By  Signature

Name of Witness (print)   TERESA NEWCOMB

EXHIBIT H PAGE 80

M 0001622

EXHIBIT 8 PAGE 186

**Exhibit B**

EXHIBIT 8 PAGE 187

# CONFLICT OF INTEREST QUESTIONNAIRE

BRYANT, CARTER H.     PROJECT DESIGNER
Name (Last, First, M.I.)                    Job Title                    Department

**Instructions:** The purpose of this questionnaire is to confirm the propriety of relations between our key employees and our suppliers and competitors. Please read the definitions below and Mattel's policies concerning Conflicts of Interest. Then answer the questions by checking the correct answer. Base your answers on personal knowledge. There is no need to make inquiries or seek additional information since lack of knowledge of a situation indicates that there is no conflict of interest. Your answers to questions 1 through 8 should cover the past twelve months and the term "you" should include members of your immediate family.

**Mattel Supplier** is interpreted broadly for purposes of this questionnaire. A Mattel supplier is any person, partnership, trust, corporation, or other enterprise which during the past twelve months has done business or currently contemplates doing business with Mattel or any Mattel subsidiary.

**Mattel Competitor** is interpreted broadly for purposes of this questionnaire. A Mattel competitor is any person, partnership, trust, corporation, or other enterprise which has done business or contemplates closing business in any field that is in competition with Mattel or any Mattel subsidiary.

**Interest** means direct or indirect ownership of any stock, bond, option or right to purchase any security, share in profits, investment, partnership interest or other profit participation or equity interest whatsoever. Interest also means any agreement to perform services for or consult with or to deliver materials to or to receive compensation of any kind from any supplier or competitor. You may disregard mutual investment trusts and publicly-owned corporations whose securities are traded publicly, in which you own not more than $25,000 in market value, but not to exceed 10% of an individual's net worth.

**Recipient of any commission, etc.,** means receipt of anything of value, in cash or in kind, over $60 on any one occasion or over $300 total during the past twelve months.

○ YES  ● NO  1. Have you owned, directly or indirectly, any interest in a Mattel supplier?

○ YES  ● NO  2. Have you owned, directly or indirectly, and interest in a Mattel competitor?

○ YES  ● NO  3. Have you been the recipient of any commission, fee, loan, trip, gift, benefit or anything else of value that is derived in any way from a Mattel supplier?

● YES  ○ NO  4. Have you been the recipient of any commission, fee, loan, trip, gift, benefit or anything else of value that is derived in any way from a Mattel competitor?

● YES  ○ NO  5. Have you or any relative of yours by blood or marriage been a director, officer, consultant, agent, employee, or representative of or acted for any Mattel competitor in any capacity?

○ YES  ● NO  6. Have you or any relative of yours by blood or marriage been a director, officer, consultant, agent, employee, or representative of or acted for any Mattel supplier in any capacity?

○ YES  ● NO  7. Have you engaged in any activity including the acquisition or ownership of any interest, for personal profit, not expressly within the scope of the foregoing with respect to any supplier or competitor?

○ YES  ● NO  8. Excepting normal everyday transactions (purchase of toys, etc.) have you engaged in any business venture or transaction involving a Mattel supplier or competitor or engaged in any activity which could be objectively construed as being a conflict of interest or allegiance?

○ YES  ● NO  9. Are you aware of any activity of any employee which you believe could be construed as a potential conflict of interest with Mattel?

If your answer to any of the above questions is "yes," please explain in the space below:

4, 5, freelance design & artwork in 1998,
from appx. 5/98 - 11/98 for the Ashton Drake
galleries.

I certify that I have read Mattel's policies concerning Conflict of Interest and the answers to the above questions are true. I understand that failure to answer this questionnaire fully and truthfully constitutes grounds for immediate termination of my employment. I agree not to divulge any company information to unauthorized recipients. I also agree to notify my superior immediately of any changes in my situation that would cause me to answer any of the above questions differently. I further certify that, to the best of my knowledge, neither I nor any member of my immediate family is or has been engaged in any capacity which creates a Conflict of Interest.

Carter H Bryant                              01/04/98
Signature                                       Date

EXHIBIT _B_ PAGE _81_       M 0001621

**EXHIBIT 8 PAGE 188**

**EXHIBIT 9**

RightFAX          8/30/2007 2:34     PAGE 002/006    Fax Server

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
Priority ___    Send ___
Entered ___     Closed ___
JS-5/JS-6 ___   JS-2/JS-3 ___
Scan Only ___   Docketed on CM ___
___ THIS CONSTITUTES NOTICE OF
ENTRY AS REQUIRED BY FRCP 77(d)

8/29/07

EASTERN DIVISION
BY ___ DEPUTY

**PRIORITY SEND**
& ENTERED

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
<u>CIVIL MINUTES – GENERAL</u>

Case No.   CV 04-09049 SGL (RNBx)                Date:  August 27, 2007

Title:   CARTER BRYANT -v- MATTEL, INC.
         AND CONSOLIDATED ACTIONS
====================================================================
PRESENT:   HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

Gina L. Guzman                        Theresa Lanza
Courtroom Deputy Clerk                Court Reporter

ATTORNEYS PRESENT FOR CARTER          ATTORNEYS PRESENT FOR MATTEL:
BRYANT:

John W. Keker, Esq.                   John B. Quinn, Esq.
(morning session only)                Michael T. Zeller, Esq.
                                      Jon D. Corey, Esq.

ATTORNEYS PRESENT FOR MGA:

Patricia Glaser, Esq.
Diana M. Torres, Esq.

PROCEEDINGS:        **ORDER DENYING MOTION FOR TERMINATING SANCTIONS;
                    ORDER DENYING REQUEST FOR INTERLOCUTORY
                    APPEAL; ORDER REQUIRING FILING OF AFFIDAVITS RE
                    EVIDENCE PRESERVATION**

       This matter is before the Court on MGA's and Carter Bryant's Motion for Terminating
Sanctions, filed on July 24, 2007 (docket #889).  This matter was heard on August 27, 2007, at
which time it was taken under submission.  The Court has considered the moving, opposition, and
reply briefs, as well as the many declarations and other evidence presented by the parties.  The

MINUTES FORM 90                                   Initials of Deputy Clerk _ glg
CIVIL – GEN                                       Time: 02/62
                        1                         Docket No. 895

**EXHIBIT 9 PAGE 189**

Court has also considered the arguments presented at the August 27 hearing and the sworn testimony given by Michael C. Moore, in-house counsel for Mattel. Although at the hearing the Court indicated it would defer ruling on the present motion pending further filings by all parties regarding their efforts to preserve evidence, upon further reflection the Court sees no reason to delay ruling on the current motion.[1]  As set forth below, the Court DENIES the motion.

Based on their inherent power to sanction for "abusive litigation practices," district courts may impose sanctions against a party who destroys evidence, including the ultimate sanction of dismissal. Leon v. IDX Systems Corp., 464 F.3d 951, 958 (9th Cir. 2006). Dismissal is a harsh sanction, which may nonetheless be imposed upon those parties who have "engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings." Anheuser-Busch, Inc. v. Natural Beverage Distributors, 69 F.3d 337, 348 (9th Cir. 1995). However, before imposing the ultimate sanction of dismissal, district courts should consider five factors: "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions." Id. Nevertheless, district courts need not make explicit findings regarding each of these factors and, in any event, "a finding of willfulness, fault, or bad faith is required for dismissal to be proper." Leon, 464 F.3d 951, 958 (9th Cir. 2006) (internal quotation marks and citation omitted).

"A party's destruction of evidence qualifies as willful spoliation if the party has 'some notice that the documents were potentially relevant to the litigation before they were destroyed.'" Id. at 959 (quoting United States v. Kitsap Physicians Serv., 314 F.3d 995, 1001 (9th Cir. 2002) (finding no willful spoliation where documents were destroyed in the routine course of business)). Neither Leon nor Kitsap elaborate on when a party has the "notice" necessary to trigger the duty to preserve evidence. However, in In re Napster, Inc. Copyright Litigation, 462 F.Supp.2d 1060, 1068 (N.D. Cal. 2006), the district court presented a persuasive discussion of the standard, first rejecting an argument that the duty to preserve evidence arises only when litigation is "imminent," and then setting forth a lesser standard. Specifically, the Napster court noted that the duty arose "when a party should have known that the evidence may be relevant to future litigation," and that any such "future litigation" must be "probable," and not merely "possibl[e]." (internal quotation marks and citation omitted).

Keeping in mind these standards, the Court turns to the categories of evidence MGA and Bryant allege that Mattel has despoiled. As articulated by the Court at the hearing on this matter, those categories are (1) Mattel employees' emails, (2) documents maintained on the Zeus document storage system, (3) the delay in producing certain Rule 30(b)(6) witnesses, (4) Carter

---

[1]  By the same token, upon further reflection, the Court sees no reason to delay ruling on MGA's request for interlocutory appeal of the present order. See 28 U.S.C. § 1292(b) (stating that certifications for interlocutory appeal should be set forth in the order to be appealed). The Court's ruling on that matter appears infra.

MINUTES FORM 90
CIVIL – GEN

2

Initials of Deputy Clerk ___gja_____
Time: 02/52

Docket No. 895

EXHIBIT 9 PAGE 190

Bryant's missing phone records, and (5) Carter Bryant's missing time records.

In considering the arguments of the parties regarding when Mattel's duty to begin to preserve evidence arose, the Court determines that November 24, 2003, marks the date when litigation between Mattel and Bryant became more than merely speculative and in fact became probable. On this date, in-house counsel for Mattel received in discovery in an unrelated action a copy of a contract between MGA and Bryant that pre-dated Bryant's resignation from Mattel. This contract appeared to Mattel to violate certain employment agreements executed by Bryant and Mattel, thus giving rise to one of the current consolidated actions. Although prior to this date an internal investigation may have raised a <u>suspicion</u> on Mattel's part that litigation might arise, there was no evidence presented to the Court that Mattel should have known it had a viable claim against Bryant before November 2003. <u>Cf.</u> Fed. R. Civ. P. 11(b)(3) ("By presenting to the court . . . a pleading . . . , an attorney . . . is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, . . . the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery . . . .").

The Court heard testimony from Michael C. Moore, in-house counsel for Mattel, regarding the efforts to preserve email communications and other evidence. Counsel for MGA and Bryant cross-examined Mr. Moore at the hearing on this matter. The Court credits his testimony. The efforts Mr. Moore described regarding the preservation of emails is reasonable, and certainly does not amount to spoliation. Moore described communications with specific individuals identified by Mattel as those most likely to have information relevant to the litigation and efforts made to preserve any evidence those individuals had in their custody or control. Emails not otherwise archived from the relevant time period – mostly September and October, 2000 – had already been deleted from Mattel's email servers in accordance with its email retention policies. Mattel cannot be faulted for deleting these emails in the regular course of business before it had notice of its claims against Bryant.

In April, 2005, the current litigation took a dramatic turn, when MGA filed suit against Mattel. At that time, <u>all</u> Mattel employees were instructed to maintain any evidence potentially relevant to the litigation. When that suit was filed, Mattel took action to preserve all of its emails, capturing emails that date back to December, 2004. They retain these backup tapes to this day. MGA and Bryant make much of Mattel's failure to suspend its 90-day auto-delete policy regarding emails, but fail to address two key points: First, Mattel altered only the storage mechanism for its emails, it did not actually delete any emails; and second, Mattel, a number of years ago, informed MGA that it was not planning on suspending its 90-day auto-delete policy, and MGA did not at that time object.

As for the Zeus tapes, there is simply no evidence of spoliation. First and foremost, as the system has been described to the Court, the system is a cumulative file system that continues to accumulate. The system is still in operation, does not have an auto-delete function, and

MINUTES FORM 90
CIVIL – GEN

3

Initials of Deputy Clerk __glg__
Time: 02/52
Docket No. 895

EXHIBIT 9 PAGE 191

information dating back to all relevant time period in this case may be accessed from it. Additionally, Mattel's in-house counsel testified as to the existence of several backup tapes that it can make available to MGA and Bryant. Finally, outside of pure speculation, there is no evidence that anyone has deleted anything from the Zeus system. Although production issues may still remain with respect to these data, preservation of this data, in the Court's view, is simply not an issue based on the record before the Court.

The delay in producing certain Rule 30(b)(6) witnesses is not a proper basis for terminating sanctions in this case. No motions to compel were brought to compel these witnesses's depositions at earlier times, and MGA and Bryant's accusations that the delay in producing them for deposition is part of a cover-up of the destruction of evidence is mere unfounded speculation. Moreover, the Court is mindful that MGA has been found by the discovery master to be guilty of the very same unexcused delay of which it accuses Mattel. See August 14, 2007, J. Infante Order, at 8 and 9 (attached to the Supplemental Proctor Decl. as Ex. 1).

Although Mattel is at a loss to explain the missing phone records from the critical month of October, 2000, there is no evidence that the records were destroyed. Moreover, other evidence presented by Mattel, especially phone records produced by Bryant that show he was in contact with MGA during that time period, suggest that the missing records would not assist Bryant.

The "missing" time records were either never created or were deleted. There is no evidence that the latter occurred. In fact, the only evidence on this point, from Mattel's Rule 30(b)(6) witness, is that although deletion of time records is possible, he was unaware of any instances of that occurring. Artavia Depo. 116, 170-71.

In sum, MGA and Bryant have failed to present any evidence regarding the "willfulness, fault, or bad faith" required to justify the imposition of terminating sanctions. Leon, 464 F.3d at 958. Many of MGA and Bryant's allegations, especially those raised in connection with Mattel's failure to suspend its auto-delete policy (portrayed as a wholesale failure to preserve emails less than 90-days old) and the availability of data from the Zeus system, are nothing more than rhetoric laced with hyperbole. Other allegations, such as Mattel's motive for delaying certain Rule 30(b)(6) depositions, and the destruction of Bryant's October, 2000, phone records and time records, are nothing more than sheer speculation, unsupported by evidence. Although counsel impressed upon the Court MGA's conviction of the righteousness of its cause, such overzealous conviction as witnessed by the Court at the hearing is no substitute for proof.

Accordingly, the Court DENIES MGA's and Bryant's Motion for Terminating Sanctions.

At the hearing, counsel for MGA and Bryant requested the Court certify the present order for interlocutory appeal. That request is DENIED. Permissive interlocutory appeals are governed by 28 U.S.C. § 1292(b):

When a district judge, in making in a civil action an order not otherwise

MINUTES FORM 90
CIVIL -- GEN

4

Initials of Deputy Clerk ___plg___
Time: 02/52
Docket No. 895

EXHIBIT 9 PAGE 192

appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order.

Id. Here, there is no "controlling question of law" in controversy. The law is quite settled. Accordingly, certification for interlocutory appeal of the present order is unwarranted.

As stated at the hearing, the Court ORDERS all parties to set forth, in affidavit form, their preservation efforts and policies with respect to the present litigation on or before September 10, 2007.

IT IS SO ORDERED.

MINUTES FORM 90
CIVIL – GEN

5

Initials of Deputy Clerk __glg_____
Time: 02/52
Docket No. 895

EXHIBIT 9 PAGE 193

RightFAX          8/30/2007 2:34     PAGE 001/006     Fax Server

**From:**  Name:       United States District Court
                        312 North Spring Street
                        Los Angeles, CA  90012
            Voice Phone: (213) 894-5474

**To:**    Name:       Michael Zeller
           Company:
                        865 S Figueroa St, 10th Floor,
           City/State:  Los Angeles, CA 90017-2543
           Fax Number:  213-443-3100



### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

## Automated Document Delivery Service
*Notice pursuant to Rule 77(d) FRCiv.P*
*The attached copy is hereby served upon you pursuant to Federal Rule of Civil Procedure 77(d).*

Fax Notes:

Case 2:04-CV-09049 : CARTER BRYANT V. MATTEL INC

*Pursuant to General Order 06-07, Section F, the following documents shall be submitted in the traditional manner: Pen Registers, Search Warrants, Seizure Warrants, Wire Taps, Bond Related Documents, Under Seal and In-Camera Documents, and All Charging Documents (Complaints, Informations, Indictments, and Superseding Charging Documents). All other documents filed in cases unassigned to a judge shall be filed electronically with a copy e-mailed to the criminal intake mailbox for the appropriate division. The proper e-mail address for each division is as follows:*

Western Division:  CrimIntakeCourtDocs-LA@cacd.uscourts.gov
Southern Division:  CrimIntakeCourtDocs-SA@cacd.uscourts.gov
Eastern Division:  CrimIntakeCourtDocs-RS@cacd.uscourts.gov

*For additional information and assistance, please refer to the CM/ECF page on the Court website at www.cacd.uscourts.gov.*

**Switch to e-mail delivery and get these documents sooner!**
**To switch, complete and submit**
**Optical Scanning Enrollment / Update form G-76.**
**Call 213-894-5474 for help and free technical support.**

*If you received this document in error because the attorney with whom this document is directed is no longer the attorney on the case, a Notice of Change of Attorney Information, form G-6, must be filed. If there are other cases which you've received documents for which you are no longer the attorney, separate notices must be filed for each case. Failure to do so will result in the continued sending of documents to you. Form G-6 is available on the court's website at www.cacd.uscourts.gov or at the Clerk's Office.*

Date and time of transmission:       **Thursday, August 30, 2007 2:34:04 PM**
Number of pages including this cover sheet:  06

## EXHIBIT 9 PAGE 194

# EXHIBIT 10

# Webster's Encyclopedic Unabridged Dictionary of the English Language

The dictionary entries are based on the First Edition of *The Random House Dictionary of the English Language*

**PORTLAND HOUSE • NEW YORK**

EXHIBIT 10 PAGE 195

ACKNOWLEDGMENTS AND PERMISSIONS:

The "A Dictionary of the English Language" section of this book *(Webster's Encyclopedic Unabridged Dictionary)* is based on the first edition of *The Random House Dictionary of the English Language, the Unabridged Edition,* copyright © 1983.

*Atlas of the World,* copyright © 1989 by John Bartholomew & Son Limited. Reprinted by arrangement with John Bartholomew & Son Limited.

*A Manual of Style,* copyright © 1986 by Crown Publishers, Inc. Excerpted and reprinted by arrangement with Crown Publishers, Inc.

Krevisky, Joseph and Jordan L. Linfield—*The Bad Speller's Dictionary,* copyright © 1967, 1963 by Innovation Press. Reprinted by arrangement with Random House, Inc.

Stein, Jess, Ed.—*Rhyming Dictionary,* copyright © 1960 by Random House, Inc. Reprinted by arrangement with Random House, Inc.

Weiman, Ralph—*Living Language ™ Common Usage Dictionary, French-English/English-French,* copyright 1946, 1955, © 1968, 1974, 1983, 1985 by Crown Publishers, Inc. Reprinted by arrangement with Crown Publishers, Inc.

Martin, Genevieve A. and Theodor Bertram—*Living Language ™ Common Usage Dictionary, German-English/English-German,* copyright © 1956, 1985 by Crown Publishers, Inc. Reprinted by arrangement with Crown Publishers, Inc.

Martin, Genevieve A. and Mario Ciatti—*Living Language ™ Common Usage Dictionary, Italian-English/English-Italian,* copyright © 1956, 1985 by Crown Publishers, Inc. Reprinted by arrangement with Crown Publishers, Inc.

Weiman, Ralph and O. A. Succar—*Living Language ™ Common Usage Dictionary, Spanish-English/English-Spanish,* copyright 1946, © 1955, 1968, 1974, 1983, 1985 by Crown Publishers, Inc. Reprinted by arrangement with Crown Publishers, Inc.

*Webster's Crossword Puzzle Dictionary,* 1986 edition, copyright © 1963 by Fawcett Publications, Inc. and copyright © 1964 by Ottenheimer Publishers, Inc. Reprinted by arrangement with Ottenheimer Publishers, Inc.

Copyright © 1989 by dilithium Press, Ltd.
All rights reserved.

This 1989 edition is published by Portland House, a division of dilithium Press, Ltd., distributed by Outlet Book Company, Inc., a Random House Company, 225 Park Avenue South, New York, New York 10003.

Printed and Bound in the United States of America

Library of Congress Cataloging-in-Publication Data
Webster's encyclopedic unabridged dictionary of the English language.
     1. English language—Dictionaries.
PE1625.W46   1989
423—dc19                         89-3785
                                 CIP

ISBN 0-517-68781-X

10 9 8 7 6

**EXHIBIT 10 PAGE 196**

avifauna                              103                                    awry

a·vi·fau·na (ā′və fô′nə), n. the birds of a given region, considered as a whole. [AVI- + FAUNA] —a′vi·fau′nal, adj. —a′vi·fau′nal·ly, adv.

[AVI- + (NAVI)GATION] —a′vi·ga′tor, n.

A·vi·gnon (A·vē·nyôN′), n. a city in and the capital of Vaucluse, in SE France, on the Rhône River: papal residence 1309–77. 75,181 (1962).

Á·vi·la (Ä·vē·lä′), n. a city in central Spain. Ma·nuel (mä nwel′), 1897–1955, president of Mexico 1940–46.

a·vi·ón (ä vyōn′), n., pl. a·vi·o·nes (ä vyō′nes). French. airplane.

a·vi·on·ics (ā′vē on′iks, av ē-), n. (construed as sing.) the science and technology of the development and use of electrical and electronic devices in aviation. [AVI- + (ELEC)TRONICS]

a·vir·u·lent (ā vir′yə lənt, ā vir′ə-), adj. (of organisms) having no virulence, as a result of age, host, etc.; nonpathogenic. [A- + VIRULENT] —a·vir′u·lence, n.

A·vis (Ä′vis), n. a girl's given name. Also, A·vis.

a·vi·so (ə vī′zō), n., pl. a·vi·sos. 1. dispatch. 2. a boat used esp. for carrying dispatches. [< Sp. < LL advice(um). See ADVICE]

a·vi·ta·min·o·sis (ā vī′tə mə nō′sis, ā vit′ə mə nō′-), n. Pathol. any disease caused by a lack of vitamins. [A- + VITAMIN + -OSIS] —a·vi·ta·min·ot·ic (ā vī′tə mə not′ik), adj.

a·vi·va (ə vē′və), n. a girl's given name.

A·vi·va (ä vē′və), n. Valona.

a·vo (ä′vō), n., pl. a·vos. a money of account of Macao, the 100th part of a pataca, equivalent to about .0018 of a U.S. dollar. [< Pg.]

A·vo (ä′vō), n. a girl's given name.

A·von (ā′vən), n. a town in NE Pennsylvania. 3562 (1960).

av·o·ca·do (av′ə kä′dō, ä′və-), n., pl. -dos. 1. Also called alligator pear, a tropical American fruit, green to black in color and commonly pear-shaped, borne by the lauraceous tree, Persea americana, and its variety drymifolia, eaten raw, esp. as a salad fruit. 2. the tree. Cf. Sp. abogado. lit. lawyer (< Nahuatl aguacatl < Amer Sp aguacate < Nahuatl ahuacatl, lit. testicle. See ALLIGATOR PEAR]



Avocado, Persea americana

av·o·ca·tion (av′ə kā′shən), n. 1. a minor or occasional occupation; hobby. 2. one's regular occupation; calling, or vocation. 3. Archaic. diversion or distraction. 4. Obs. a calling away. [< L āvocātiōn- (s. āvocātiō) a calling away. See A-² VOCATION]

a·vo·ca·to·ry (ə vok′ə tôr′ē, -tōr′ē), adj. calling away, off, or back. [< ML āvocātōri(us) calling away, equiv. to L āvocāt(us) called away (ptp. of āvocāre; see A-² + vocāre to call) + -ory (ptp. suffix) + -āry(s -ory)]

av·o·cet (av′ə set′), n. any of several long-legged, web-footed shore birds of the genus Recurvirostra, having a long, slender bill that curves upward. Also, avoset. [earlier avoset < It avosetta(s)]

A·vo·ga·dro (ä′vō gä′drō; It. Ä′vō gä′drō), n. Count A·ma·de·o (ä′mä dā′ō), 1776–1856, Italian physicist and chemist.

Avoga′dro's law, Chem. the principle that equal volumes of all gases at the same temperature and pressure contain the same number of molecules. [named after Count Amadeo AVOGADRO]

A·vo·ga′dro's num·ber, Chem. the constant, 6.02 × 10²³, representing the number of atoms in a gram atom or the number of molecules in a gram molecule. Also, Avoga′dro num·ber. Also called A·vo·ga′dro con′stant. [see AVOGADRO'S LAW]

a·void (ə void′), v.t. 1. to keep away from; keep clear of; shun; evade: to avoid a person; to avoid danger. 2. Law. to make void or of no effect; invalidate. 3. Obs. to empty; eject or expel. [ME a·void·(e) < AF a(voider), equiv. to a- A-⁴ + voider(s) < OF vuider, s. vide(s) < L viduus, empty. See A-⁴ + -void-(er, n. —Syn. 1. elude. AVOID, ESCAPE mean to come through peril, actual or potential, without suffering serious consequences. To AVOID is to succeed in keeping away from something harmful or undesirable: to avoid meeting an enemy. ESCAPE suggests encountering peril but coming through it safely: to escape drowning. —Ant. 1. confront, face.

a·void·ance (ə void′əns), n. 1. act of keeping away from: avoidance of scandal. 2. Law. a making void; annulment. [ME; see AVOID, -ANCE]

avoid′ance play′, Bridge, a play by the declarer designed to prevent a particular opponent from taking the lead.

avoir., avoirdupois.

av·oir·du·pois (av′ər də poiz′), n. 1. See avoirdupois weight. 2. Informal. excess bodily weight: She's put on a lot of avoirdupois. [ME avoir de pois, lit. property of weight < OF (a)voir de (poids) < L habère to have + dē-(< L dē) + pois (raw. of peis < L pênsum)]

avoirdupois′ weight′, the system of weights in British and U.S. use for goods other than gems, precious metals, and drugs: 27¹¹/₃₂ grains = 1 dram; 16 drams = 1 ounce; 16 ounces = 1 pound; 112 pounds (Brit.) or 100 pounds (U.S.) = 1 hundredweight; 20 hundredweight = 1 ton. The pound contains 7000 grains. Abbr.: av., avoir., avdp.

A·von (ā′vən; for 2 also ä vôn′), n. 1. a river in central England, flowing SW past Stratford-on-Avon to the Severn. 96 mi. 2. a river in S England, flowing W to the mouth of the Severn ash. 75 mi. long. 3. a river in S England, flowing S to the English Channel. ab. 60 mi. long. 4. a town in central New York. 2772 (1960).

Av·on·dale (av′ən dāl′), n. a town in central Arizona. 6151 (1960).

A·von Lake′ (ā′vən), a town in N Ohio. 9403 (1960).

A·vonne (ä′von), n. a girl's given name.

à ou·tran·ce (A oo träns′; Eng. ä′ oo träns′). French. to your health.

a·vouch (ə vouch′), v.t. 1. to make frank acknowledgment or affirmation of; declare or assert with positiveness. 2. to assume responsibility for; guarantee. 3. to admit; confess. [ME avouch(e) < AF avouch(er), equiv. to a- A-⁴, VOUCH, ADVOCATE] —a·vouch′er, n. —a·vouch′ment, n.

a·vow (ə vou′), v.t. to declare frankly or openly; own; acknowledge; confess; admit: to avow one's principles. [ME avow(e) < OF avou(er) < L advocāre. See A·VOW]

a·vow·al (ə vou′əl), n. open statement of affirmation; frank acknowledgment or admission. [AVOW + -AL]

a·vowed (ə voud′), adj. acknowledged; declared: an avowed enemy. [AVOW + -ED] —a·vow′ed·ly (ə vou′id lē), adv. —a·vow′ed·ness, n.

a·vow·ry (ə vou′rē), n., pl. -ries. Law. a plea by a defendant in an action of replevin who admits taking the distrained goods and shows just cause for the taking. [ME avowrie < OF avouerie, equiv. to avou(er) (lit.) AVOW + -ERIE -RY]

A·vram (ā′vrəm, av′rəm), n. a boy's given name.

Av·ril (āv′ril), n. a boy's given name. Also, Averil, Averill.

a·vul·sed (ə vul′sid), adj. Surg. cut a wound having the tissue torn away. [avulse tear off < L āvuls(us), ptp. of āvellere, equiv. to ā- A-² + vuls- (perf. s. of vellere) to pull + -ed]

a·vul·sion (ə vul′shən), n. 1. a tearing away. 2. Law. the sudden removal of soil by change in a river's course or by a flood, from the land of one owner to that of another. 3. a part torn off. [< L āvulsiōn- (s. of āvulsiō), equiv. to āvuls- (see AVULSED) + -iōn- -ION]

a·vun·cu·lar (ə vung′kyə lər), adj. 1. of, pertaining to, or characteristic of an uncle: avuncular affection. 2. Obs. of or pertaining to a pawnbroker. [< L avunculus, a mother's brother, equiv. to av(us) a forefather + -unculus dim. suffix + -AR¹]

a·vun·cu·late (ə vung′kyə lit, -lāt′), n. Anthropol. a close social relationship between a maternal uncle and his nephew. [L avuncul(us) uncle (see AVUNCULAR) + -ATE¹]

AW (ō), interj. (used as an exclamation expressing protest, disbelief, disgust, or the like.)

AW, Article of War.

a.w., 1. actual weight. 2. (in shipping) all water. 3. atomic weight. Also, aw.

a·wa (ə wô′, ə wä′), adv. Scot. away.

a·wait (ə wāt′), v.t. 1. to wait for; expect; look for. 2. to be in store for; be ready for. 3. Obs. to lie in wait for. —v.i. 4. to wait, in expectation. [ME awaite(n) < OF (norht) awaitier, equiv. to a- A-⁴ + waitier to wait] —a·wait′er, n. —Syn. 3. See expect.

a·wake (ə wāk′), v., a·woke or a·waked, a·wak·ing, adj. —v.t. 1. to wake up; rouse from sleep. 2. to rouse to action; become active: His flagging interest awoke, and he once again became involved. 3. to come or bring to an awareness; become cognizant (often fol. by to): He awoke to the realities of life. —adj. 4. waking; not sleeping. 5. vigilant; alert: He was alive to the danger. [OS awacn, ptp. of awaecn(an)] —a·wake′ner, n.

a·wak·en (ə wā′kən), v.t., v.i. to awake; waken. [ME awak(e)n(en), OE awæcnian earlier onwæcnian. See A-¹, WAKEN] —a·wak′en·a·ble, adj.

a·wak·en·ing (ə wā′kə ning), adj. 1. rousing; quickening: an awakening interest. —n. 2. act or awaking from sleep. 3. a revival of interest or attention. 4. a recognition, realization, or coming into awareness of something: They had a rude awakening to the facts of life. 5. a renewal of interest in religion, esp. in a community; a revival. 6. (caps., Hist.) a sword (1920) by John Oakworthy. Cf. Forsyte Saga, The. [AWAKEN + -ING] —a·wak′en·ing·ly, adv.

a·ward (ə wôrd′), v.t. 1. to give as due or merited; assign or bestow: to award prizes. 2. to bestow by judicial decree; assign or appoint by deliberate judgment, as in arbitration. —n. 3. something awarded, as a payment, medal, 4. Law. a decision after consideration: a judicial sentence. 5. the decision of arbitrators on points submitted to them. [ME award(en), OF (es)guard(e)r, equiv. to es- + -guarder < Gmc; cf. OS wardon to watch] —a·ward′er, n. —a·ward′a·ble, adj.

a·ware (ə wâr′), adj. 1. having knowledge; conscious; cognizant: aware of the danger. 2. Informed; alert; knowledgeable; sophisticated: He is an aware young man politically aware young men around. [ME, var. of (OE gewær watchful (s. OE(s), OS gi wār) equiv. to ge- + wær< wær(en)] —a·ware′ness, n.

a·wash (ə wosh′, ə wôsh′), adj., adv. 1. Naut. a. just level or scarcely above the surface of the water, so that it is occasionally washed over: b. overflowing with water, as the upper deck of a ship in a heavy sea. 2. covered with water. 3. washing about; tossed about by the waves. [A-¹ + WASH]

a·way (ə wā′), adv. 1. from this or that place; off: to go away. 2. far; apart: away back; away from the subject. 3. aside; to another place; in another direction: to turn your eyes away; to turn away customers. 4. out of one's possession or use; to give money away. 5. out of existence or notice; into extinction: to fade away; to idle away the time of day. 6. continuously; repeatedly: He kept on hammering away. —adj. 7. absent: He's away. 8. distant: The river is a mile a min′ sec. away. —interj. 9. (used for or emphasis): away with you! away with him! 10. begone! Away with you! 9. be away with, a. to get rid of; abolish; stop. b. to kill: Bluebeard did away with all his wives. 10. where away? (of something from a ship) in which direction? where? —adv. 11. absent: to be away from home. 12. distant: six miles away. 13. immediately off and on its way: They got the order and were away. 14. Sports, played in a ball park, arena, or the like, other than the one that is or is assumed to be the center of operations of a team:

winners in their last three away games. Cf. home (def. 14). 16. Baseball. having been put out: with two away in the top of the seventh. 16. Golf. a. (of a golfer) having his ball farthest from the hole. b. (of a golfer) having each ball in bad lying required to play first. [ME OE aweg, dorw. of on eg. See ON, WAY¹]

a·way·-go·ing crop′ (ə wā′gō′ing), Law. a crop planted by a tenant that matures after the expiration of his tenancy and is rightfully his to harvest. Also called waygoing crop.

AWB, See air waybill.

a·we (ō), n., v., awed, aw·ing. —n. 1. an overwhelming feeling of reverence, admiration, fear, etc., produced by that which is grand, sublime, extremely powerful, or the like: in awe of God; in awe of authority. 2. Archaic. power to inspire fear or reverence. 3. Obs. fear or dread. —v.t. 4. to inspire with awe. 5. to influence or restrain by awe. [ME aghe, dorw. < Scand; cf. Icel agi fear, c. Goth agis, OE ege, Gk áchos ache] —Syn. 1. veneration.

a·weath·er (ə weth′ər), adv., adj. Naut. upon or toward the weather side of a vessel; in the direction of the wind (opposed to alee). [A-¹ + WEATHER]

a·wed (ōd), adj. filled with or expressing awe. [AWE + -ED²] —awed′ly, adv. —awed′ness, n.

a·weigh (ə wā′), adj. Naut. (of an anchor) just free of the bottom; atrip. [A-¹ + WEIGH²]

awe·less (ō′lis), adj. aweless. [AWE + -LESS] —awe′less·ness, n.

a·we·some (ō′səm), adj. 1. inspiring awe: an awesome sight. 2. characterized by awe. [AWE + -SOME¹] —awe′some·ly, adv. —awe′some·ness, n.

awe·struck (ō′struk′), adj. filled with awe. Also, awe′struck′, awe-strick·en, awe-strick·en (ō′strik′-ən).

aw·ful (ō′fəl), adj. 1. inspiring fear; dreadful; terrible. 2. extremely bad; unpleasant; ugly. 3. full of awe; reverential. 4. solemnly impressive; inspiring awe: the awful majesty of alpine peaks. —adv. 5. Informal. very; extremely: He did an awful good job of painting the corn crib. [ME, awe, -FUL; r. OE egeful dreadful] —aw′ful·ness, n.
—Usage. In informal use, there is no objection to AWFUL in the sense of "very bad, ugly, mean, etc.," but it has been so overworked that its ineffective. It is said in expository and informal use except in the sense of "awe-inspiring."

aw·ful·ly (ō′fə lē, ō′flē), adv. 1. very; extremely: That was awfully nice of you. She's behaving awfully grand these days. 2. in a manner provoking censure, disapproval, or the like: She behaved awfully all evening. 3. Archaic. a. in a manner inspiring awe; solemnly. b. in a manner expressing awe; awfully. c. to stare awfully.

a·while (ə hwīl′, ə wīl′), adv. for a short time or period: Stay awhile. [A-¹ + WHILE¹]
—Usage. The word AWHILE is an adverb meaning "for a short time" and should not be confused with the article and noun a while, usually in a prepositional phrase: Stay awhile. Stay for a little while longer.

a·whirl (ə hwûrl′, ə wûrl′), adj. rotating rapidly; spinning; whirling (usually used predicatively): dancers awhirl in the strains of a waltz. [A-¹ + WHIRL]

awk·ward (ôk′wərd), adj. 1. lacking skill or dexterity; clumsy; inept. 2. ungraceful; ungainly; uncouth: awkward gesture. 3. ill-adapted for use or handling; unwieldy; unmanageable: an awkward method; an awkward instrument. 4. requiring caution; somewhat hazardous; dangerous: There's an awkward step there. 5. hard to deal with; difficult; unpleasant: an awkward customer; an awkward situation. 6. embarrassing or inconvenient; inopportune: an awkward moment. 7. Obs. untoward; perverse. 8. Obs. out backhanded (< Scand; cf. Icel öfug(r) turned the wrong way) + -WARD] —awk′-ward·ly, adv. —awk′ward·ness, n.

awl (ôl), n. unskilful, unhandy. Inexpert. —Ant. 1. skills, adroit. 2. graceful.

awk·ward age′, early adolescence.

awl (ôl), n. a pointed instrument for piercing small holes in leather, wood, etc. [ME al, OE æl; akin to OHG ala (> G Ahle), Icel alr(s), Skt ārā]



A. Awls
B. Sewing awl

A.W.L., absent with leave. Also, a w.l.

awl·ess (ô′lis), adj. without awe; fearless; not to be awed. Also, aweless. [AWE + -LESS] —awl′less·ness, n.

awl·wort (ôl′wûrt′), n. a small, stemless, aquatic, cruciferous plant, Subularia aquatica, having slender, sharp-pointed leaves. [AWL + WORT²]

a·w·mous (ô′məs), n. (construed as pl.) Scot. almous.

awn (ôn), n. Bot. 1. a bristle-like appendage of a plant, esp. on the glumes of grasses. 2. such appendages collectively, as those forming the beard of wheat, barley, etc. 3. any similar bristle. [ME awne, agune < Scand; cf. Icel ögn hame, c. Goth ahana, OHG agana, ON ögn, OE egne] —awned, adj. —awn·less, adj.

awn·er (ô′nər), n. a machine for cutting the awns from grain. [AWN + -ER¹]

awn·ing (ô′ning), n. 1. a rooflike shelter of canvas or other material extending over a doorway, from the top of a window, over a deck, etc., in order to provide protection, as from the sun. 2. a shelter. [?] —awn′inged, adj.

awn′ing deck′, Naut. a weather deck supported on very light scantlings.

awn·ing win·dow, a window frame having one or more sashes hinged at the top and swinging outward.

awn·less brome′ grass′, See Hungarian brome grass. [AWN + -LESS]

a·woke (ə wōk′), v. a pt. and pp. of awake.

A.W.O.L. (pronounced as initials or, in Mil. slang, ā′wôl), away from military duties without permission, but without the intention of deserting. Also, a.w.o.l. (absent) W(ith)o(ut) L(eave)]

a·wo·lo·wo (ə wō′lō wō′), n. O·ba·fe·mi (ō bä′fə mē), born 1909, Nigerian lawyer and statesman.

a·wry (ə rī′), adv., adj. 1. with a turn or twist to one side; askew: to glance or look askance. 2. away from the expected or proper direction; amiss: wrong: Our plans went awry. [A-¹ on, WRY]

PRONUNCIATION KEY: act, āble, dâre, ärt; ebb, ēqual; if, īce; hot, ōver, ôrder, oil, bŏŏk, ōōze, out; up, ûrge; chief; sing; shoe; thin, that; zh as in measure. ə as in alone, e as in system, i as in easily, o as in gallop, u as in circus. ' as in button (but²ən), fire (fī°r); cradle (krād²l). See the full key inside the front cover.

EXHIBIT 10 PAGE 197

**EXHIBIT 11**

CERTIFIED COPY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, AN INDIVIDUAL, ) | |
| ) | |
| PLAINTIFF, ) | |
| ) | |
| V. ) | NO. CV 04-9040 SGL (RNBX) |
| ) | |
| MATTEL, INC., A DELAWARE ) | (CONSOLIDATED WITH |
| CORPORATION, ) | NO. 04-9059 AND |
| ) | CASE NO. 05-2727) |
| DEFENDANTS. ) | |
| ──────────────────────── ) | |
| ) | |
| AND CONSOLIDATED ACTIONS. ) | |
| ) | |

# TRANSCRIPT OF
# TELEPHONIC PROCEEDINGS

## JUNE 19, 2007



700 S. Flower Street
Suite 1100
Los Angeles, California 90017
Office: (213) 955-0070
Fax: (213) 955-0077

REPORTED BY:
EMILY MCCARY
CSR NO. 7584
JOB NO. 07EM059

EXHIBIT 11 PAGE 198

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVSION

| | |
|---|---|
| CARTER BRYANT, AN INDIVIDUAL, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| V. | ) CASE NO. |
| | ) |
| MATTEL, INC., A DELAWARE | ) CV 04-9049 SGL |
| CORPORATION, | ) (RNBX) |
| | ) [CONSOLIDATED WITH |
| DEFENDANTS. | ) NO. 04-9059 AND |
| | ) CASE NO. 05-2727] |
| | ) |
| AND CONSOLIDATED ACTION(S). | ) |
| | ) |

TRANSCRIPT OF TELEPHONIC PROCEEDINGS,
TAKEN BEFORE HON. EDWARD A. INFANTE, AT
865 SOUTH FIGUEROA STREET, TENTH FLOOR,
LOS ANGELES, CALIFORNIA, COMMENCING AT
1:34 P.M., TUESDAY, JUNE 19, 2007,
BEFORE EMILY MCCARY, CSR NO. 7584.

EXHIBIT 11 PAGE 199

```
1
2    BEFORE HON. EDWARD A. INFANTE (TELEPHONICALLY)
3
4    APPEARANCES OF COUNSEL:
5
6    FOR MATTEL, INC.:
7            QUINN EMANUEL URQUHART
             OLIVER & HEDGES, LLP
8            BY:  B. DYLAN PROCTOR, ESQ.
                  TIMOTHY L. ALGER, ESQ.
9            865 SOUTH FIGUEROA STREET
             TENTH FLOOR
10           LOS ANGELES, CALIFORNIA  90017
             (213) 624-7707
11
12
13   FOR MGA ENTERTAINMENT, INC.:
14           O'MELVENY & MYERS, LLP
             BY:  MICHAEL KEATS, ESQ.
15                MELANIE BRADLEY, ESQ.
             TIMES SQUARE TOWER
16           7 TIMES SQUARE
             NEW YORK, NEW YORK  10036
17           (212) 326-2000
             (TELEPHONICALLY)
18
19
     FOR THE PLAINTIFF:
20
             KEKER & VAN NEST, LLP
21           BY:  MICHAEL H. PAGE, ESQ.
             710 SANSOME STREET
22           SAN FRANCISCO, CALIFORNIA 94111
             (415) 391-5400
23           (TELEPHONICALLY)
24
25
```

A&E COURT REPORTERS (213) 955-0070 FAX: (213) 955-0077

3

**EXHIBIT 11 PAGE 200**

1   TO WHAT IT WAS LOGISTICALLY GOING TO TAKE,

2   PARTICULARLY WITH RESPECT TO HONG KONG, IT'S

3   JUST -- IT WAS JUST -- I WAS JUST TRYING TO BE

4   UPFRONT AND HONEST THAT IT WAS NOT SOMETHING THAT

5   I THOUGHT WAS FEASIBLE.

6           YOU KNOW, IT WASN'T THAT WE SAT ON

7   OUR HANDS FOR THE LAST FEW MONTHS.  WE CERTAINLY

8   HAVE BEEN LOOKING FOR DOCUMENTS.  WE HAVE BEEN

9   PRODUCING DOCUMENTS.  YOU KNOW, I DON'T KNOW WHAT

10  THE PRODUCTION COUNT IS, BUT I KNOW AT SOME POINT

11  RECENTLY WE HAD A PRODUCTION COUNT OF SOMEWHERE

12  AROUND THE ORDER OF 40,000 PAGES.  YOU KNOW, THE

13  STUFF IS ROLLING.

14          AND I THINK OUR ISSUE IS SIMPLY, YOU

15  KNOW, DISCOVERY CLOSES IN OCTOBER.  I HAVE A

16  FEELING THERE MAY BE SOME MOVEMENT ON THOSE

17  DATES, WHICH I'LL GET TO IN A SECOND, BUT WE

18  ARE -- YOU KNOW, WHAT I WAS LOOKING FOR WAS UP TO

19  60 DAYS.  I CERTAINLY WASN'T LOOKING -- I DON'T

20  NECESSARILY NEED THE FULL AMOUNT OF TIME.  I JUST

21  DON'T KNOW YET.  WE'RE STILL WORKING ON IT.  THE

22  THING IS FACING THE ORDER TO BE DONE, THAT IS --

23  THAT IS -- THAT IS, YOU KNOW, I THINK THE MAIN

24  ISSUE THERE.

25          ON THE QUESTION OF -- YOU KNOW, WE'VE

**EXHIBIT 11 PAGE 201**

1    OBVIOUSLY APPEALED SOME SPECIFIC ITEMS.   YOU

2    KNOW, WE'RE NOT LOOKING TO STAY THE WHOLE

3    30(B)(6) ORDER.   WE'VE OBVIOUSLY BEEN PRODUCING

4    30(B)(6) WITNESSES AND THE LIKE AND IDENTIFYING

5    PEOPLE.   THERE ARE A FEW THINGS WE APPEALED ON

6    THAT WE THINK WE HAVE SOME ARGUMENTS, BUT I DON'T

7    KNOW IF -- I DON'T KNOW IF YOU GET COPIES OF THE

8    PAPERS WE'VE FILED BEFORE JUDGE LARSON, BUT,

9    SIMPLY PUT, THE ISSUES ARE RELATING TO WHETHER OR

10   NOT THE COMMUNICATIONS AND DOCUMENTS RELATING TO

11   OUR CONSULTING EXPERT ARE DISCOVERABLE.   AND OUR

12   POSITION IS UNDER THE FEDERAL RULES THOSE KINDS

13   OF THINGS AREN'T.   AND, YOU KNOW, WE'LL JUST --

14   WE'LL JUST DEAL WITH IT.

15            THE OTHER IS SORT OF THE DOCUMENTS

16   AND THE 30(B)(6) WITNESS.   SORRY.   ACTUALLY, I

17   THINK IT'S JUST THE 30(B)(6) WITNESS ON THE

18   QUESTION OF NET WORTH.   AND M.G.A. DOESN'T

19   CALCULATE NET WORTH.   WE DON'T HAVE ANYBODY WHO'S

20   REALLY SORT OF CAPABLE OF DOING IT.   IT WOULD

21   REQUIRE US TO GET AN EXPERT.   AND THAT'S THE KIND

22   OF THING THAT USUALLY IS THE SUBJECT OF EXPERT

23   DISCOVERY, BUT THAT'S ANOTHER ITEM.

24            AND THE LAST THING THAT WE APPEALED

25   WAS THE NOTION THAT WE SHOULD HAVE TO PRODUCE A

**EXHIBIT 11 PAGE 202**

1   30(B)(6) WITNESS WHO WILL GO THROUGH ALL OF PRIOR

2   WITNESS STATEMENTS OF ANY SORT OF M.G.A. -- ANY

3   WITNESSES, YOU KNOW, OF M.G.A. OR OTHERWISE WHO

4   HAVE TESTIFIED ABOUT BRATZ.  AND WE JUST THINK

5   THAT THAT'S JUST A WAY THAT PLAINTIFFS ARE TRYING

6   TO CIRCUMVENT SORT OF THE LIMITATIONS ON THE

7   NUMBER OF DEPOSITIONS.  AND IT'S HARD TO GET

8   SOMEONE UP TO SPEED ON THE KNOWLEDGE OF OTHER

9   PEOPLE'S TESTIMONY.

10          YOU KNOW, THE ORDINARY COURSE WOULD

11  BE TO CONFRONT WITNESSES WITH THEIR PRIOR

12  STATEMENTS IF THEY'RE INCONSISTENT OR OTHERWISE.

13  AND WE JUST DIDN'T SEE A REASON TO DEPART FROM

14  THE ORDINARY COURSE.

15          JUDGE INFANTE:  WELL, I'M NOT HEARING THE

16  APPEAL, SO I DON'T CARE ABOUT DEPOSITIONS.

17          MR. KEATS:  NO, NO, NO.  I UNDERSTAND.  I'M

18  JUST LETTING YOU KNOW THE THINGS WE'RE SEEKING

19  STAYS ON THE 30(B)(6) ORDER ARE MORE LIMITED.

20  THAT'S ALL I'M SAYING.  IT'S LIMITED TO THE STUFF

21  THAT WE HAVE RAISED ON APPEAL.  THAT IS ALL I'M

22  SAYING.

23          I UNDERSTAND THAT THAT'S NOT BEFORE

24  YOU AND THAT'S BEFORE JUDGE LARSON.  AND I THINK

25  THAT'S BEING ARGUED, ACTUALLY, ON THIS COMING

**EXHIBIT 11 PAGE 203**

1    MONDAY.  SO, YOU KNOW, WE'LL HAVE THE ANSWER

2    THERE.

3              YOU KNOW, ONE OTHER ISSUE ON TIMING,

4    AND IT'S COME UP BECAUSE THERE WAS AN ORAL

5    ARGUMENT ON MONDAY, THIS PAST MONDAY, ON THE

6    MOTION TO DISMISS.  MATTEL HAS RAISED THE ISSUE

7    OF WHAT CLAIMS SHOULD BE TRIED IN THE PHASE ONE

8    TRIAL.  THERE'S BEEN A BUNCH OF MOTION PRACTICE

9    ON THAT.

10             AND M.G.A. AND MATTEL ARE -- WERE

11   CLOSE ON THE CLAIMS THAT SHOULD BE MOVED FROM

12   PHASE TWO TO PHASE ONE THAT WILL CHANGE THINGS,

13   OBVIOUSLY, FOR DISCOVERY AND PRIORITIES; BUT

14   THERE'S A WHOLE ISSUE OF WHETHER DAMAGES ARE

15   GOING TO BE TRIED IN PHASE ONE NOW.  AND MY SENSE

16   IS THAT THERE'S A GOOD CHANCE THINGS LIKE EXPERT

17   DISCOVERY DEADLINES AND POSSIBLY EVEN THE TRIAL

18   DATES MAY BE AFFECTED BECAUSE THIS STUFF HAS BEEN

19   PUT UP IN THE AIR.

20        JUDGE INFANTE:  WAIT A MINUTE.  I'M

21   OPERATING ON THE RECORD AS IT EXISTS AT THE TIME

22   I ISSUE MY ORDERS.  AND THE RECORD AS IT EXISTS

23   HAS NO BIFURCATED DISCOVERY.  END OF STORY.

24        MR. KEATS:  NO.  I AGREE WITH THAT, BUT THE

25   POSITION THAT THE PLAINTIFF -- SORRY.  I AGREE

**EXHIBIT 11 PAGE 204**

1  STATE OF CALIFORNIA        )

2                             ) SS.

3  COUNTY OF LOS ANGELES      )

4

5

6      I, EMILY MCCARY, CERTIFIED SHORTHAND

7  REPORTER, CERTIFICATE NO. 7584, FOR THE STATE OF

8  CALIFORNIA, HEREBY CERTIFY:

9      THE FOREGOING PROCEEDINGS WERE TAKEN BEFORE

10 ME AT THE TIME AND PLACE THEREIN SET FORTH;

11     THE TESTIMONY OF THE WITNESSES AND ALL

12 OBJECTIONS MADE AT THE TIME OF THE EXAMINATION

13 WERE RECORDED STENOGRAPHICALLY BY ME AND WERE

14 THEREAFTER TRANSCRIBED;

15     THE FOREGOING TRANSCRIPT IS A TRUE AND

16 CORRECT TRANSCRIPT OF MY SHORTHAND NOTES SO

17 TAKEN;

18     I FURTHER CERTIFY THAT I AM NEITHER COUNSEL

19 FOR NOR RELATED TO ANY PARTY TO SAID ACTION NOR

20 IN ANY WAY INTERESTED IN THE OUTCOME THEREOF;

21     IN WITNESS WHEREOF, I HAVE HEREUNTO

22 SUBSCRIBED MY NAME THIS 19TH OF JUNE, 2007,

23

24 _____

25      EMILY MCCARY

**EXHIBIT 11 PAGE 205**

**EXHIBIT 12**

Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION


-----------------------------------

CARTER BRYANT, an individual,       )

                    Plaintiff,      )

   vs.                              ) No. CV 04-0904

MATTEL, INC., a Delaware            )   (RNBx)  (c/w CV

corporation,                        )   04-9059 & 05-2727)

                    Defendant.      )

CONSOLIDATED WITH MATTEL, INC.,     )

V. BRYANT and MGA ENTERTAINMENT,    )

INC., v. MATTEL, INC.               )

-----------------------------------



    Transcript of Proceedings before

    the Honorable Edward A. Infante,

    via conference call, commencing at

    11:04 A.M., Friday, May 4, 2007,

    before Cynthia Manning, CSR 7645.



PAGES 1 - 39

Page 2

1    APPEARANCES OF COUNSEL:

2

3    FOR MATTEL, INC.:

4

5        QUINN EMANUEL URQUHART OLIVER & HEDGES

6        BY:  B. DYLAN PROCTOR, ESQ.

7        865 South Figueroa Street, 10th Floor

8        Los Angeles, California 90017

9        213.443.3000

10       dylanproctor@quinnemanuel.com

11

12

13   FOR MGA ENTERTAINMENT, INC:

14

15       O'MELVENY & MYERS LLP

16       BY:  DAVID HURWITZ, ESQ.

17       400 South Hope Street

18       Los Angeles, California 90071

19       213.430.6000

20       dhurwitz@omm.com

21

22

23

24

25

f1a7aa37-288b-49c4-8012-9d052aab6174

EXHIBIT 12 PAGE 207

Page 3

1    APPEARANCES OF COUNSEL (CONTINUED):

2

3       FOR CARTER BRYANT:

4

5          LITTLER MENDELSON

6          BY: KEITH JACOBY, ESQ.

7              BRIAN ESKIN, ESQ.

8          2049 Century Park East, 5th Floor

9          Los Angeles, California 90067

10         310.553.0308

11         kjacoby@littler.com

12         beskin@littler.com

13

14             -AND-

15

16         KEKER & VAN NEST LLP

17         BY:  MICHAEL H. PAGE, ESQ.

18         710 Sansome Street

19         San Francsico, California 94111

20         415.397.7188

21         mpage@kvn.com

22

23      ALSO PRESENT:  MICHELLE TAKAMOTO, LAW CLERK

24

25

f1a7aa37-288b-49c4-8012-9d052aab6174

**EXHIBIT 12 PAGE 208**

Page 11

1  objection that has an instruction, we move on to the

2  next question.  And if it's an objection that doesn't

3  have an instruction, then the witness can answer the

4  question if they understand that.  And I shouldn't have

5  to tell that to an attorney as senior as Mike Zeller.

6        And I certainly shouldn't have to explain on

7  the record the relevance of my question and be told that

8  I'm wasting the witness' time.  I'm not required to

9  explain.  Relevance isn't a standard in a deposition and

10  I'm not required to explain any question.  And I don't

11  think there is a question in that deposition that I

12  couldn't stand here right now and tell you exactly why

13  it's relevant to the core issues in this case.

14        And I'll give you an example.  In the motion I

15  was asking one of the witness if a Mattel employee in

16  the design department does a drawing of a house, are

17  they required to show that drawing to Mattel before they

18  use it for any other purpose.  And I was basically

19  personally berated for that, but that's the core issue

20  in this case; how Mattel enforces their Inventions and

21  Assignment Agreement, and what obligation Mattel places

22  on Mattel employees to show work that they created at

23  home on their own time to them, and what Mattel does

24  when those works are shown.

25        And so it's spot-on relevant and all I got for

EXHIBIT 12 PAGE 209

Page 12

1   it was an instruction not to answer and commentary from
2   Mr. Zeller.  And what that does is, coaches these
3   witnesses not to answer my questions.  It wastes my
4   time.  I'm billing now on this case at almost $500 an
5   hour and my client shouldn't have to spend a penny of
6   that money listening to Mr. Zeller berate me, and I just
7   think that the conduct has to stop.
8           JUDGE INFANTE:  Okay.  Thank you very much.
9           Does MGA have anything to add?
10          MR. HURWITZ:  No, Your Honor.
11          JUDGE INFANTE:  Okay.  I'll hear from Mattel's
12   counsel.
13          MR. PROCTOR:  Again, this is B. Dylan Proctor.
14          From Mattel's perspective, nearly all, the vast
15   majority, of the 135 excerpts that Bryant decided to
16   include in his separate statement, in nearly all cases
17   the instructions either should be sustained or, what's
18   much more common, there is no instruction not to answer
19   at all.  Bryant's counsel, I think through his motion
20   papers and at argument today, appears to be trying to
21   make Mattel's conduct appear comparable or, according to
22   him, even worse than Bryant's counsel's conduct at
23   Bryant's deposition.  But that's simply untrue.
24          And the court will recall in the Bryant
25   deposition Mattel included approximately 75 blanket

Veritext National Deposition & Litigation Services
213 623-5005

f1a7aa37-288b-49c4-8012-9d052aab6174

**EXHIBIT 12 PAGE 210**

Page 13

1   instructions not to answer, and Mattel studiously

2   avoided including in the separate statement things like

3   the numerous, many speaking objections and the kinds of

4   things that Bryant is putting at issue in this motion.

5   In his separate statements, even though there are 135

6   separate excerpts, there are only a handful of actual

7   instructions not to answer.  And to fill the void, and

8   to try and make --

9           JUDGE INFANTE:  I don't want to hear --

10          MR. PROCTOR -- paint a picture through

11   numbers --

12          JUDGE INFANTE:  Would you stop for a moment.

13          MR. PROCTOR:  Yes.

14          JUDGE INFANTE:  I don't want to hear another

15   word about the Bryant deposition.

16          MR. PROCTOR:  Fair enough.

17          JUDGE INFANTE:  I am focusing on these two

18   depositions.

19          MR. PROCTOR:  Okay.

20          JUDGE INFANTE:  And there is two issues.  One

21   issue --

22          MR. PROCTOR:  Yes.

23          JUDGE INFANTE:  -- is on a number of occasions

24   you instructed the witness not to answer, and the

25   question is whether that was proper or not for each

Veritext National Deposition & Litigation Services
213 623-5005

f1a7aa37-288b-49c4-8012-9d052aab6174

**EXHIBIT 12 PAGE 211**

1  question under Rule 30.

2        The second category of examination here is

3  whether or not you obstructed the deposition by coaching

4  the witness by the nature of your objections or comments

5  and colloquy.  Those are the two broad issues that I'm

6  going to decide.

7        MR. PROCTOR:  Okay.

8        JUDGE INFANTE:  If you wish to speak to them,

9  you may.

10        MR. PROCTOR:  Okay.  Thank you, Your Honor.

11        There are -- I suppose, because there are so

12  many excerpts, I'll try to address them by category.

13        First, there is a large issue, overarching

14  issue, relating to facts learned exclusively through

15  communications with counsel.  And this issue came up

16  primarily at the Kaye deposition.  It's Kaye's separate

17  statement excerpt 215, 17, 19, and several others, and

18  also Driskill's separate statement excerpt No. 2 deals

19  with this issue.  And the issue is whether facts the

20  witness knows only because the counsel told the witness

21  those facts must be disclosed or whether an admonition

22  not to disclose such facts is proper.

23        And I think that admonition is proper because

24  the witness has no personal knowledge of such facts, and

25  the question but for that admonition would be designed

Page 39

1   STATE OF CALIFORNIA   )

2          :ss

3   COUNTY OF SAN MATEO   )

4

5          I, CYNTHIA MANNING, CSR No. 7645, a Certified

6   Shorthand Reporter of the State of California, do hereby

7   certify:

8          That the foregoing proceedings were taken before

9   me at the time and place herein set forth; that any

10  witnesses in the foregoing proceedings, prior to

11  testifying, were placed under oath; that a verbatim

12  record of the proceedings was made by me using machine

13  shorthand which was thereafter transcribed under my

14  direction; further, that the foregoing is an accurate

15  transcription thereof.

16         I further certify that I am neither financially

17  interested in the action, nor a relative or employee of

18  any attorney of any of the parties.

19         IN WITNESS WHEREOF, I have this date subscribed

20  my name.

21

22  DATED: May 7, 2007

23

24

25         _____

            CYNTHIA MANNING, CSR No. 7645

Veritext National Deposition & Litigation Services
213 623-5005

f1a7aa37-288b-49c4-8012-9d052aab6174

**EXHIBIT 12 PAGE 213**

**EXHIBIT 13**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

- - -

HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

- - -

CARTER BRYANT,              )
                            )
              PLAINTIFF,    )
                            )
        VS.                 )    NO. ED CV 04-09049
                            )    (LEAD LOW NUMBER)
MATTEL, INC.,               )
                            )
              DEFENDANT.    )
_____)
AND RELATED ACTIONS,        )
                            )

# CERTIFIED COPY

REPORTER'S TRANSCRIPT OF PROCEEDINGS

RIVERSIDE, CALIFORNIA

MONDAY, JUNE 26, 2006

10:56 A.M.

THERESA A. LANZA, RPR, CSR
FEDERAL OFFICIAL COURT REPORTER
3470 12TH STREET, RM. 134
RIVERSIDE, CALIFORNIA  92501
(951) 274-0844
CSR11457@SBCGLOBAL.NET

**EXHIBIT 13 PAGE 214**

2

```
 1  APPEARANCES:

 2

 3  ON BEHALF OF PLAINTIFF/COUNTER DEFENDANT MATTEL, INC.:

 4

 5                    QUINN EMANUEL
                      BY:  JON D. COREY
 6                    BY:  JOHN B. QUINN
                      865 S. FIGUEROA STREET,
 7                    10TH FLOOR
                      LOS ANGELES, CALIFORNIA  90017
 8                    (213) 624-7707

 9

10  ON BEHALF OF PLAINTIFF/COUNTER COMPLAINANT/DEFENDANT,
    CARTER BRYANT:

11                    LITTLER MENDELSON
                      BY:  KEITH A. JACOBY
12                    BY:  DOUGLAS A. WICKHAM
                      2049 CENTURY PARK EAST,
13                    FIFTH FLOOR
                      LOS ANGELES, CALIFORNIA  90067
14                    (310) 553-0308

15

16  ON BEHALF OF MGA ENTERTAINMENT:

17                    O'MELVENY & MYERS LLP
                      BY:  DIANA M. TORRES
18                    BY:  DALE CENDALI
                      400 SOUTH HOPE STREET
19                    LOS ANGELES, CALIFORNIA  90071
                      (213) 430-6000
20

21

22

23

24

25
```

**EXHIBIT 13 PAGE 215**

JUNE 26, 2006          ED CV 04-9049-SGL

60

1          MR. QUINN:  WELL, NOTHING THAT WASN'T IN OUR PAPERS,

2    YOUR HONOR.  OUR VIEW OF THIS WAS THERE WAS ONE CASE THAT

3    RELATES TO THIS WORK THAT THIS PARTICULAR EMPLOYEE DID WHILE HE

4    WORKED FOR US, WE ALLEGE.  AND THAT RELATES TO HIS CONTRACT AND

5    WHO OWNS THAT.                                                    12:48

6          THEN WE HAVE MGA, THE COMPETITOR, COME IN.  WHO, BY

7    THE WAY, I'M CERTAIN IS PAYING POOR MR. BRYANT'S LEGAL FEES.

8          I COULDN'T RESIST BECAUSE IT'S SOMETHING COUNSEL

9    SAID.

10         THE COURT:  I UNDERSTAND.                                   12:48

11         MR. QUINN:  BUT THEN WE HAVE MGA COMING IN, AND I

12   DON'T KNOW WHETHER THE COURT HAD A CHANCE TO LOOK AT IT, BUT IT

13   RAISES A WHOLE HOST OF ISSUES ABOUT A LOT OF DIFFERENT

14   PRODUCTS; TRADE ASSOCIATION THINGS; ALL KINDS OF MEAN AND NASTY

15   THINGS THAT MATTEL IS DOING THAT'S UNFAIR FROM A COMPETITIVE     12:48

16   BASIS.

17         THAT IS A MUCH BROADER COMPLAINT THAT IS GOING TO

18   REQUIRE MORE DISCOVERY; IT'S A COMPLETELY DIFFERENT TRIAL.  TO

19   CONSOLIDATE ALL OF THIS FOR TRIAL, I SUBMIT -- THIS ONE ISSUE

20   ABOUT THIS ONE EMPLOYEE AND WHAT HE DID IN HIS CONTRACT IS      12:49

21   GOING TO GET SUBMERGED.

22         THE COURT:  I DON'T DISAGREE THAT WE MAY BE

23   REVISITING THIS ISSUE IN TERMS OF HOW WE STRUCTURE THE TRIAL,

24   HOW WE STRUCTURE THE HEARINGS.  THIS IS MORE FOR A MATTER OF

25   JUDICIAL EFFICIENCY IN TERMS OF HAVING MULTIPLE CASES ON THE    12:49

**EXHIBIT 13 PAGE 216**

61

1   DOCKET.  IT IS FOR ALL PURPOSES AT THIS POINT.  BUT WE WILL

2   REVISIT THIS ISSUE WHEN WE TALK ABOUT HOW THE TRIAL WILL BE

3   STRUCTURED.  I UNDERSTAND WHAT YOU'RE SAYING.  MY THOUGHT WAS

4   WE COULD REVISIT THOSE ISSUES DOWN THE ROAD.

5           MR. QUINN:  THE PART THAT IS MOOTED IN LIGHT OF THAT      12:49

6   IS THE DECLARATORY -- WE MADE THE MOTION TO DISMISS THAT PART

7   OF THE DECLARATORY RELIEF COMPLAINT THAT RELATED TO OWNERSHIP

8   OF BRATZ.  WE HAD CONTENDED THAT SHOULD BE A COMPULSORY

9   COUNTERCLAIM IN VIEW OF CONSOLIDATION.  THAT'S MOOT.

10          SO WHAT'S LEFT?  THE REMAINING ISSUE FOR THE COURT IS     12:50

11  THERE'S A DECLARATORY RELIEF CLAIM WHERE MR. BRYANT IS SEEKING

12  JUDICIAL DECLARATION THAT HIS BRATZ INVENTION DOES NOT INFRINGE

13  THE COPYRIGHT IN SOMETHING CALLED TOON TEENS, A DOLL THAT

14  MATTEL HAS COPYRIGHTED.  THERE'S TWO ISSUES ON THAT.  IT'S

15  BRIEFED FAIRLY WELL.  THERE'S EVEN BEEN SUPPLEMENTAL BRIEFS      12:50

16  FILED, SO I WON'T SPEND MUCH TIME ON IT, YOUR HONOR.

17          BUT MATTEL HAS NEVER, EVER MADE ANY CLAIM THAT BRATZ

18  INFRINGES THE COPYRIGHT OF TOON TEENS.  THERE'S NO CASE FOR

19  CONTROVERSY.  THERE'S A LOT OF CASE LAW IN THIS AREA,

20  ESPECIALLY IN THE PATENT AREA; YOU DO NOT WANT TO WRITE A       12:50

21  LETTER FOR FEAR THAT SOMEBODY MIGHT DJ YOU IN SOME DISTRICT

22  WHERE YOU DON'T WANT TO BE.

23          WE HAVE NEVER WRITTEN A LETTER; NEVER MADE A CLAIM;

24  NEVER ASSERTED IT.  AND WHAT THEY RELY ON TO SAY THERE'S A CASE

25  IS A WALL STREET JOURNAL ARTICLE WHICH REFERS TO SOME UNNAMED    12:51

**EXHIBIT 13 PAGE 217**

JUNE 26, 2006        ED CV 04-9049-SGL

62

1   INDIVIDUAL AT MATTEL WHO SUPPOSEDLY SAID -- SOMETHING THAT

2   SOMEBODY SAID IN HONG KONG -- NOTHING THAT MATTEL EVER DID OR

3   SAID.   THERE IS NO CASE OR CONTROVERSY ON THAT, YOUR HONOR.

4           AND LOOKING FORWARD TO THE STRUCTURE OF THIS CASE, TO

5   WHAT THE TRIAL MIGHT LOOK LIKE, TO INTRODUCE THIS COPYRIGHT       12:51

6   ISSUE ABOUT TOON TEENS IS GOING TO COMPLICATE IT; IT'S A RED

7   HERRING; AND IT'S NOT SOMETHING WE'VE EVER CLAIMED.

8           NOT TO MENTION THAT MR. BRYANT NO LONGER HAS ANY

9   STANDING HERE TO ASSERT THE COPYRIGHT CLAIM SINCE HE ASSIGNS

10  ALL HIS RIGHTS TO BRATZ TO MGA.                                   12:51

11          NOW, THEY SAY, 'WELL, IT POTENTIALLY COULD STILL BE A

12  PROBLEM FOR HIM BECAUSE HE CONTINUES TO CONSULT AND TALK ABOUT

13  IMPROVEMENTS TO BRATZ AND THINGS LIKE THAT.'  THERE'S NOTHING

14  ABOUT THAT IN THEIR DEC RELIEF COMPLAINT ITSELF ABOUT WHAT HE'S

15  DOING OR WHAT HE MIGHT DO AND HOW HE MIGHT BE LIABLE.             12:52

16          IT'S ONE ISSUE, I THINK, THE COURT CAN AND SHOULD

17  TAKE OUT OF THE CASE AT THIS STAGE.

18          THE COURT:   THE COURT WILL LOOK AT THAT.

19          MR. JACOBY:   JUST VERY BRIEFLY.

20          THE COURT:   JUST ON THIS DEC RELIEF ISSUE.              12:52

21          MR. JACOBY:   I WOULD SUGGEST TO THE COURT THAT

22  MR. BRYANT WOULD BE A FOOL IF HE DIDN'T HAVE A REASONABLE

23  APPREHENSION OF LITIGATION AS A RESULT OF TOON TEENS, AND

24  EXHIBIT NUMBER ONE IS THE COPYRIGHT REGISTRATION OF TOON TEENS

25  FILED BY THE QUINN EMANUEL FIRM; NOT IN 1998 AND 1999 WHEN THEY   12:52

**EXHIBIT 13 PAGE 218**

JUNE 26, 2006      ED CV 04-9049-SGL

1  WERE TRYING TO DEVELOP TOON TEENS AS A TOY, BUT IN THE VERY

2  SAME MONTH, NOVEMBER 2003, WHEN THEY ALLEGE IN THE MATTEL

3  VERSUS BRYANT COMPLAINT THAT THEY DISCOVERED BRYANT'S

4  ACTIVITIES.

5      NOW, WHY DO THEY DO THAT?  WHY DID THEY REGISTER A     12:52

6  COPYRIGHT REGISTRATION IF IT WASN'T GOING TO BE A PREDICATE TO

7  SUE MR. BRYANT, WHICH IT ABSOLUTELY IS UNDER COPYRIGHT LAW.

8      NOW HERE WE ARE IN JUNE OF 2006, AND YOU WON'T SEE

9  TOON TEENS IN ANY TOYS 'R US.  BUT WHAT YOU WILL SEE, IF YOU

10  READ THE DEPOSITION OF CARTER BRYANT, IS THOSE SAME QUINN     12:53

11  EMANUEL LAWYERS QUESTIONING MR. BRYANT AT LENGTH ABOUT THE

12  SUBSTANTIAL SIMILARITIES THEY ALLEGE BETWEEN TOON TEENS AND THE

13  BRATZ DRAWINGS.

14      THERE'S BEEN EXTENSIVE DISCOVERY ON THIS ISSUE, AND

15  WE HAVE OFFERED, WHEN WE PROPOUNDED THE P.M.K. NOTICE, SAID     12:53

16  'GIVE US THE PERSON MOST KNOWLEDGEABLE ABOUT TOON TEENS,' AND

17  THEY OBJECTED TO IT.  WE SAID 'WE WILL TAKE THIS OFF THE

18  TABLE.'

19      AND I EXTEND THE OFFER TODAY TO TAKE TOON TEENS ISSUE

20  OFF THE TABLE IF MATTEL WILL STIPULATE THEY ARE NOT AND WILL     12:53

21  NOT ALLEGE THAT BRYANT IS INFRINGING ON TOON TEENS.

22      THE COURT:  MR. QUINN?

23      MR. QUINN:  WE ARE NOT ALLEGING IT, AND WE HAVE NO

24  PRESENT INTENTION OF ALLEGING IT.

25      THE COURT:  THAT FALLS JUST SHORT OF WHAT COUNSEL     12:53

**EXHIBIT 13 PAGE 219**

JUNE 26, 2006     ED CV 04-9049-SGL

66

1    THE CLERK:   COURT STANDS IN RECESS.

2

3

4

5

6

7

8

9

10

11

12

13

14

15                         CERTIFICATE

16

17   I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
     STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
18   THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE ABOVE-
     ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
19   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
     THE UNITED STATES.

20

21   _____              7-3-06
     THERESA A. LANZA, RPR, CSR           _____
22   OFFICIAL COURT REPORTER                   DATE

23

24

25

**EXHIBIT 13 PAGE 220**

JUNE 26, 2006          ED CV 04-9049-SGL

**EXHIBIT 14**

1 | Hon. Edward A. Infante (Ret.)
  | JAMS
2 | Two Embarcadero Center
  | Suite 1500
3 | San Francisco, California  94111
  | Telephone:      (415) 774-2611
4 | Facsimile:       (415) 982-5287

5

6

UNITED STATES DISTRICT COURT

7

CENTRAL DISTRICT OF CALIFORNIA

8

EASTERN DIVISION

9

10

11 | CARTER BRYANT, an individual,
   |                                                          CASE NO. C 04-09049 SGL (RNBx)
   |                                                          JAMS Reference No. 1100049530
12 |                Plaintiff,

13 |        v.                                               Consolidated with
   |                                                          Case No. CV 04-09059
14 | MATTEL, INC., a Delaware corporation,                    Case No. CV 05-2727

15 |                Defendant.                                **ORDER GRANTING IN PART AND
   |                                                          DENYING IN PART MGA'S MOTION
16 |                                                          TO COMPEL DOCUMENTS
   |                                                          RESPONSIVE TO FIRST SET OF
17 |                                                          REQUESTS FOR PRODUCTION OF
   |                                                          DOCUMENTS DATED NOVEMBER
18 | CONSOLIDATED WITH                                        22, 2006**
   | MATTEL, INC. v. BRYANT and
19 | MGA ENTERTAINMENT, INC. v. MATTEL,
   | INC.
20 |                                                          I.  INTRODUCTION

21         On April 13, 2007, MGA Entertainment, Inc. ("MGA") submitted a motion to compel

22 | Mattel, Inc. ("Mattel") to produce documents responsive to MGA's First Set of Requests for

23 | Production of Documents dated November 22, 2006 (the "requests"), which generally seeks

24 | documents that MGA contends are relevant to its Lanham Act and unfair competition claims.  On

25 | April 25, 2007, Mattel submitted its opposition brief, and on May 2, 2007, MGA submitted a

26 | reply brief.  The matter was heard via telephonic conference on May 11, 2007.  Having

27

28 | Bryant v. Mattel, Inc.,
   | CV-04-09049 SGL (RNBx)                                                                              1

**EXHIBIT 14 PAGE 221**

1    considered the motion papers and comments of counsel at the hearing, MGA's motion to compel

2    is granted in part and denied in part.

3                                    II. BACKGROUND

4           There are two themes underlying MGA's claims for unfair competition against Mattel.

5    First, MGA alleges that Mattel has intentionally "serially imitated and copy-catted the look of

6    MGA products, trade dress, trademarks, themes, ideas, advertising and packaging, including for

7    the 'Bratz' line of dolls," to dilute MGA's brand, create customer confusion, and unfairly stifle

8    competition.  MGA's Complaint at ¶¶9, 65.  Second, MGA alleges, on information and belief,

9    that "Mattel has intimidated, coerced and threatened retailers, licensees, suppliers and others in

10   the industry – both in the U.S. and internationally – in order to inhibit and stifle MGA's ability to

11   compete with Mattel and to prevent MGA from obtaining licensees, contracts and supplies for its

12   products." Id. at ¶9.

13                              The Alleged Copy-catting

14          Mattel's alleged serial copycatting "began with the 'Bratz' dolls themselves, but quickly

15   extended to MGA's packaging, themes, accessories, advertising and even other product lines."

16   Id. at ¶33.  Mattel allegedly "designed its 'My Scene' dolls to evoke the unique and distinctive

17   look of the 'Bratz' – also with disproportionately oversized heads, artfully made-up almond-

18   shaped eyes, large, overly-lined and lipsticked lips, trendy, hip clothes and hair styles, and over-

19   sized feet." Id. at ¶34.  Mattel also allegedly "systematically proceeded to modify the 'My Scene'

20   dolls since their original release, particularly their eyes, to increase their similarity to 'Bratz' more

21   and more over time." Id.

22          Further, Mattel allegedly "modified its 'My Scene' packaging, and the manner in which

23   the dolls are displayed, to more closely mimic the packaging, trade-dress and overall look and

24   total image of MGA's 'Bratz.'" Id. at ¶41.  For example, Mattel allegedly changed its packaging

25   "to the open and transparent style of the 'Bratz' packaging." Id. at ¶43.  Mattel also allegedly

26   hung its packaging and product display to "look even more closely and confusingly similar to

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

                                                                          2

EXHIBIT 14 PAGE 222

1    MGA's packaging and '*tout ensemble.*'" I̲d̲. at ¶45. Mattel also allegedly "discarded its

2    traditional rectangular shaped box, and like 'Bratz', adopted an unusual, non-rectangular shaped

3    box." I̲d̲. at ¶46. Mattel also allegedly "adopted the 'flying banner' ribbon-style slogan running

4    across the middle of the box, similar to that used on the 'Bratz' packaging." I̲d̲.

5        In addition to the packaging changes, Mattel allegedly copied "MGA's practice of

6    regularly releasing new dolls in connection with a theme – but not just any theme, often MGA's

7    theme." I̲d̲. at ¶47. For example, when MGA released its "Wintertime Wonderland" theme,

8    Mattel allegedly released "Chillin Out." I̲d̲. at ¶48. Mattel also allegedly imitated Bratz

9    accessories and related products in order to create consumer confusion in the marketplace. I̲d̲. at

10   ¶52. Further, Mattel allegedly "began running television commercials for its 'My Scene' dolls

11   bearing a remarkable similarity to 'Bratz' commercials, combining live action with animated

12   sequences set to similar sounding pop music and lyrics." I̲d̲. at ¶51. MGA alleges that Mattel's

13   conduct described above "is a calculated and intentional effort unquestionably designed to trade

14   off of MGA's hard work and goodwill, create confusion in the marketplace, steal MGA's thunder

15   and momentum, and dilute and blur away the novelty and distinctiveness of MGA's products."

16   I̲d̲. at ¶54.

17       Further, MGA alleges that when it "came out with a 'Bratz' 'Funky Fashion Makeover

18   Head,' Mattel came out with a confusingly similar – indeed, practically identical – 'My Scene'

19   styling head." I̲d̲. at ¶55. Mattel also allegedly "used a portion of the Bratz doll's now-famous

20   trademarked tag line 'The Girls With a Passion for Fashion' on Mattel's website for its 'Diva

21   Starz' dolls, asking its website users: 'Do you have a passion for fashion?'" I̲d̲. at ¶58.

22       MGA also alleges that Mattel recently came out with a confusingly similar line of "My

23   Scene" plush pets that have the distinctive look of MGA's "Bratz" line. I̲d̲. at ¶59. In addition,

24   Mattel allegedly "chose to package its pets the same way that MGA packaged its 'Bratz Petz',

25   sitting in an open box, with no top and with partial side panels that slope from a narrow front

26   panel to a higher back panel." I̲d̲. at ¶60. MGA alleges that the similarity of the "My Scene" pets

27

28
     Bryant v. Mattel, Inc.,
     CV-04-09049 SGL (RNBx)                                                                          3

EXHIBIT 14 PAGE 223

1    and the "Bratz Petz" has confused sophisticated retailers who have mistakenly merchandised the

2    products together. Id. at ¶61.

3        MGA alleges that Mattel's television commercials and "My Scene" products have become

4    so confusingly similar to MGA's commercials and products that advertising executives have

5    expressed concern. Id. at ¶62. MGA also alleges that the press has taken notice of Mattel's

6    alleged attempts to confuse consumers. Id. at ¶63. Further, MGA alleges that some customers

7    have contacted MGA seeking to purchase "My Scene" dolls. Id. at ¶64.

8        MGA alleges that Mattel's conduct has reached beyond "Bratz" to include other new

9    MGA toy lines. Id. at ¶67. For example, Mattel allegedly modeled its "Wee 3 Friends" line of

10    dolls and packaging on MGA's "4-Ever Best Friends" line. Id. at ¶68. Mattel also allegedly

11    modeled its "Little Mommy Potty Training Baby Doll" on MGA's "Mommy's Little Patient." Id.

12    at ¶69. Mattel also allegedly revamped and renamed one of its "Hot Wheels" lines with the

13    "AcceleRacerS" logo based upon MGA's "AlienRacers" radio controlled racing vehicles. Id. at

14    ¶70.

15                    Additional Allegedly Anti-Competitive Conduct

16        MGA alleges that Mattel has engaged in additional allegedly anti-competitive conduct,

17    including "sending threatening letters to several of its former employees who now work for MGA

18    warning them not to disclose *even publicly available information* about Mattel, including the

19    names and positions of Mattel employees." Id. at ¶75 (emphasis in original). Mattel has also

20    allegedly "warned a number of companies, including the biggest publishing entity in the United

21    Kingdom, not to license MGA products, or risk retribution." Id. at ¶76. MGA alleges that it has

22    lost valuable licensing opportunities as a result of Mattel's conduct. Id.

23        MGA also alleges that "Mattel has used similar intimidation to pressure distributors and

24    retailers, particularly in foreign countries, not to distribute 'Bratz', to reduce shelf and display

25    space for 'Bratz' and to place 'Bratz' in unfavorable locations at retail outlets." Id. at ¶77. MGA

26    further alleges that "[w]hen MGA faced a shortage of doll hair in October 2002, MGA is

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

4

EXHIBIT 14 PAGE 224

1   informed and believes that the reason for that shortage was that Mattel had locked MGA out by

2   buying up the supply from the two main hair supply companies." Id. at ¶78.

3       MGA also alleges that Mattel manipulated the retail market. More specifically, MGA

4   alleges that "Mattel merchandisers have been caught tampering with MGA's retail displays,

5   replacing favorably located MGA merchandise with Mattel merchandise instead." Id. at ¶79.

6   MGA further alleges on information and belief that "Mattel has falsely told a major United States

7   retailer that MGA was giving another major United States retailer below-market pricing and

8   falsely told a United Kingdom retailer that MGA was discontinuing one of its lines, in order to

9   make such line less attractive to buyers and thereby attempt to increase sales of the competitive

10  Mattel product and improve its own sales, at MGA's expense." Id.

11      Next MGA alleges on information and belief that NPD Funworld ("NPD"), the leading

12  supplier of sales statistics in the toy industry, terminated MGA's subscription ostensibly for

13  misusing NPD data and that "the termination was the result of pressure from Mattel." Id. at ¶¶80-

14  85. MGA also alleges on information and belief that Mattel pressured NPD into changing certain

15  product classifications for "Bratz" products to manipulate the data and preserve Mattel's market

16  share rankings in the "fashion doll" category. Id. at ¶86.

17      MGA further alleges on information and belief that Mattel used its influence as a major

18  contributor to the Children's Advertising Review Unit ("CARU"), which is a unit of the Council

19  of Better Business Bureaus, to "place onerous restrictions on MGA advertisements, and require

20  MGA to amend aspects of commercials that have gone unchallenged in other parties'

21  commercials." Id. at ¶89. As a result of CARU's restrictions, MGA allegedly incurred

22  unnecessary costs for reshooting and producing or re-editing its commercials. Id. at ¶90.

23      MGA also alleges on information and belief that Mattel's subsidiary, Fisher Price,

24  "orchestrated" a change to the selection process for TIA's "Toy-of-the-Year Awards," which

25  allegedly resulted in a Fisher Price toy beating out "BRATZ Formal Funk Super Stylin' Runway

26  Disco." Id. at ¶¶92-96. MGA also alleges on information and belief that one year "Mattel was

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

5

EXHIBIT 14 PAGE 225

1   instrumental in attempting to keep MGA from participating as a sponsor in the 'Kids' Choice

2   Awards.'" Id. at ¶97.

3          As a result of Mattel's alleged conduct described above, MGA has allegedly suffered, and

4   unless abated, will continue to suffer lost sales, lost licensing fees, lost contracts, lost

5   relationships, lost business opportunities and other damages. Id. at ¶100.  MGA also alleges that

6   its ability to enter new markets and product lines has been hampered and delayed. Id.

7   Furthermore, MGA alleges that "[i]ts production costs have increased, its reputation and

8   relationships with important players in the industry have been negatively impacted, the value of

9   its business has been diminished, and its ability to attract, hire and retain employees has been

10  affected." Id. Based upon the foregoing, MGA asserts claims for (1) false designation of origin

11  or affiliation in violation of 15 U.S.C. §1125(a); (2) unfair competition in violation of 15 U.S.C.

12  §1125(a) and unfair competition and unfair business practices in violation of Cal. Bus. & Prof.

13  Code §17200 et seq. and California common law; (3) dilution in violation of 15 U.S.C. §1125(c),

14  Cal. Bus. & Prof. Code §14330 and California common law; and (4) unjust enrichment.

15              MGA's First Set of Requests for Production of Documents

16          On November 22, 2006, MGA propounded one hundred fifteen (115) document requests

17  seeking discovery regarding, among other things:  (a) Mattel's alleged copycatting efforts and

18  activities with respect to Bratz and other MGA product lines; (b) anti-competitive business

19  practices allegedly carried out by Mattel; and (c) any similar or related activities.  In response,

20  Mattel objected to many requests primarily on the grounds that they were overly broad and

21  unduly burdensome.  Mattel agreed, however, to produce documents responsive to many of the

22  requests.

23          The parties met and conferred in person on March 9, 2007.  MGA's counsel demanded

24  that Mattel withdraw all objections based on relevance.  Alger Decl. in Support of Mattel's

25  Opposition at ¶7.  Mattel's counsel responded that Mattel was producing responsive documents

26  and would continue to produce responsive documents, but had concerns over the "lack of focus

27

28

1 | and infinite scope" of MGA's document requests.  Id.  Mattel's counsel suggested that MGA

2 | narrow the requests to "those products, retailers, licensees, and time frames that MGA has put at

3 | issue in its Complaint and response to interrogatories."  Id.  MGA's counsel, however, rejected

4 | the proposal.  Id.

5 |      A few days later, counsel for MGA sent Mattel's counsel a letter offering several

6 | suggestions for limiting the requests.  Glad Decl. in Support of MGA's Motion, Ex. 1.  In

7 | particular, MGA stated that "it would be amenable to certain limitations on the number and

8 | identities of custodians whose files must be searched, so long as Mattel is willing to accept

9 | reciprocal accommodations for MGA's own document review."  Id.  Mattel did not respond to the

10 | letter, and the instant motion ensued.

11 | ### III. STANDARDS

12 |      Rule 26 of the Federal Rules of Civil Procedure provides that "[p]arties may obtain

13 | discovery regarding any matter, not privileged, that is relevant to the claim or defense of any

14 | party."  Fed.R.Civ.P. 26(b)(1).  Fishing expeditions to discover new claims, however, are not

15 | permitted.  See Fed.R.Civ.P. 26(b)(1); Rivera v. NIBCO, Inc., 364 F.3d 1057, 1072 (9th Cir.

16 | 2004) ("District courts need not condone the use of discovery to engage in 'fishing

17 | expeditions.'"); Bernstein v. Travelers Ins. Co., 447 F.Supp.2d 1100, 1102 (N.D. Cal. 2006)

18 | (citing Rule 26(b), Advisory Committee's Note to Amendments Effective December 1, 2000)

19 | (Congress' changes in the language of Rule 26(c), substituting the words "claim or defense" for

20 | the phrase "subject matter involved in the pending action," were intended to target discovery that

21 | swept far beyond the claims and defenses of the parties and that seemed designed not to fairly

22 | litigate the issues presented by the pleadings but to develop new claims or defenses.).  Further,

23 | pursuant to Rule 26(b)(2), Fed.R.Civ.P., the court shall limit discovery where "the burden or

24 | expense of the proposed discovery outweighs its likely benefit, taking into account the needs of

25 | the case, the amount in controversy, the parties' resources, the importance of the issues at stake in

26 | the litigation, and the importance of the proposed discovery in resolving the issues."

27 |

28 |

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

7

**EXHIBIT 14 PAGE 227**

## IV. DISCUSSION

A. General Objections

MGA contends that Mattel has improperly withheld documents based on three generalized objections. First, MGA contends that Mattel has asserted an objection based upon relevance to requests that are not related to facts specifically alleged in MGA's complaint. MGA contends the objection is improper because it essentially grafts a heightened pleading standard onto discovery requests, is inconsistent with the standard for discovery set forth in Rule 26(b), Fed.R.Civ.P., and goes against the very purpose of discovery. MGA denies "fishing" for new claims, contending that it is seeking discovery tending to support or refute existing claims.

Second, MGA contends that Mattel has improperly refused to produce "documents related to MGA's BRATZ dolls unless the documents are 'in the context' of Mattel's BARBIE or MY SCENE products." MGA's Motion at 9:10-11. MGA contends that all of the documents related to Bratz that it seeks are relevant, regardless of whether they refer to or contemplate Barbie or My Scene. In particular, MGA contends that documents related to Bratz, even if they do not refer to Barbie or My Scene, are relevant to its claims that (1) Mattel has exerted pressure on licensees not to license Bratz products; (2) Mattel has exerted pressure on retailers or distributors not to distribute Bratz products; (3) Mattel has tampered with Bratz displays; and (4) Mattel intentionally copied Bratz products.

Third, MGA contends that Mattel has improperly limited its production of My Scene documents to only those documents related to the specific acts of product and packaging infringement identified in MGA's complaint. MGA contends that it is entitled to far more, including documents concerning potential acts of infringement not mentioned in the complaint and documents concerning the development of the My Scene product line from inception of this suit to the present. In particular, MGA contends that documents concerning the current development of My Scene may tend to show continuing infringement, and therefore are relevant to prove that Mattel's conduct is willful.

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

8

**EXHIBIT 14 PAGE 228**

1    Mattel contends that it has produced documents in response to many of MGA's requests,

2    and will continue to do so.  Mattel objects, however, to those requests that require Mattel to

3    produce virtually every document, anywhere in the world, that mentions MGA, Larian, Bratz, or

4    any other MGA product.  Mattel contends that MGA is engaging in an improper fishing

5    expedition, casting its requests so broadly as to require production of documents relating to

6    products and entire product lines that are irrelevant to the suit.  Mattel also contends that the

7    requests are overbroad because they seek documents about subjects such as quality and pricing

8    which do not appear anywhere in MGA's pleadings.  Id.  Furthermore, Mattel contends that

9    MGA's requests are not linked in any manner to MGA's claims in the suit and do not reference

10    any particular alleged wrongdoing by Mattel.

11    Mattel also contends that responding to MGA's document requests would impose a

12    considerable, unjustifiable burden on Mattel.  Mattel emphasizes that it is a large company, with

13    over 140 subsidiaries and affiliates in approximately 43 different countries.  Mattel represents that

14    it has over 5,000 employees in the United States and more than 25,000 employees at subsidiaries

15    and affiliates worldwide.

16    Mattel also represents that its products are sold in thousands of stores.  It represents that it

17    deals with Wal-Mart, Target, K-Mart, and Toys "R" Us on a daily basis, and that these four

18    retailers have more than 4,500 stores in the United States.  Mattel also represents that it deals with

19    many hundreds more retailers domestically and overseas.  Further, Mattel represents that it has

20    relationships with more than 1,400 licensees and licensors.

21    Mattel also represents that the toys it produces vary widely, including collectible card

22    games, electronic handheld devices, toy cars, and the Barbie doll line.  Mattel asserts that it

23    introduces annually more than 2,000 different types of toys, dolls and other products in more than

24    150 nations throughout the world.  Mattel asserts that many products often involve the creation of

25    many categories of documents relating to design, marketing, consumer and market research,

26    planning, engineering, cost, manufacturing, distribution, sales and finance.  Mattel represents that

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

9

**EXHIBIT 14 PAGE 229**

1   these types of documents are stored on Mattel's over 800 computer servers worldwide, and that

2   countless others are stored in hardcopy or stored on individual employees' desktop computers and

3   laptops.  Furthermore, Mattel represents that many of its network systems, including its e-mail

4   system, are not readily searchable, or searchable at all, by use of keyword terms.  For example,

5   Mattel asserts that the computer system used by Mattel's designers and engineers overwhelmingly

6   consists of graphical files whose content cannot be searched by keywords.

7          Mattel estimates that MGA and its products are referenced in millions of pages of

8   documents and computer files at Mattel.  More specifically, Mattel contends that many groups

9   across Mattel, such as marketing, consumer research, sales, finance, human resources and safety

10  testing, have documents that refer or relate to MGA or its products in some way.  Mattel also

11  contends that a large volume of this information is from third party analysts and third party

12  sources, including retail sales reports that track doll sales across the entire industry, newspaper

13  and magazine articles, commercials and advertisements.  Mattel also represents that it collects

14  great quantities of documents about its competitors that are readily available on the Internet or

15  other public sources, including catalogs, advertising, press releases, and media reports, and from

16  retailers and distributors throughout the world.

17         Furthermore, Mattel represents that its documents, particularly its marketing and sales

18  research documents, often reference many competing products, not just the Bratz dolls at issue.

19  Mattel contends that these types of documents would be difficult to search and collect because, in

20  many instances, the only way to determine whether a particular document mentions Bratz would

21  be to review the entire document.

22         Mattel contends that virtually any employee at Mattel might have documents that are

23  responsive to MGA's requests.  Mattel estimates that "to locate all such documents would take

24  years, cost millions of dollars, and seriously interfere with the operation of Mattel's business."

25  Mattel's Opposition at 17.  Matter also asserts that "[s]uch efforts – including search of Mattel's

26  servers, its employees' computer workstations, hard copy files, computer disks, and video files –

27

28

1  would be in addition to the cost of attorney review of the materials before they are produced in

2  litigation." Id. Mattel also contends that the burden and expense of production is multiplied

3  several times further if Mattel is required to search the files in the possession of its worldwide

4  subsidiaries.

5      Mattel contends that even if the search for responsive documents could be accomplished,

6  the resulting document production would provide MGA with countless documents with little or

7  no relevance.  For example, Mattel anticipates that many documents would be discussions of the

8  competition in the context of irrelevant dolls, such as any number of mainline Barbie dolls.

9  Mattel contends that other documents would simply be third party market reports which are

10  equally available to MGA from public sources.  Accordingly, Mattel requests that the motion be

11  denied in full.

12      In its reply, MGA counters that the requests are not unduly burdensome.  MGA contends

13  that contrary to Mattel's assertions, the requests are factually self-limited, containing restrictive

14  language and defining the outer parameters for the documents sought.  Furthermore, MGA

15  contends that it told Mattel that it would be amenable to certain limitations on the number and

16  identities of custodians whose files must be searched, so long as Mattel was amenable to

17  reciprocal accommodations for MGA's own document review.  MGA contends that, at a

18  minimum, Mattel should be required to search the physical and electronic files of its employees.

19  MGA contends that Mattel should not be released wholesale from its discovery obligations based

20  on a purported burden, particularly when it failed to work with MGA in good faith to mitigate that

21  burden.

22      Lastly, MGA argues that any burden to Mattel is outweighed by the benefit to be secured

23  from the discovery.  MGA contends that it "realistically has no other way of obtaining documents

24  tending to support its claims that Mattel engaged in a pattern of conduct with suppliers,

25  distributors, licensees and others constituting unfair competition except from Mattel."  MGA's

26

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

11

**EXHIBIT 14 PAGE 231**

1    Reply at 10.  Therefore, MGA believes that the benefits of the discovery it seeks are

2    immeasurable and that in contrast, the burden to Mattel is not unreasonable.[1]

3    B. Document Requests

4         In addition to the three general objections described above, Mattel has asserted other

5    objections to certain categories of document requests which MGA contends are improper.  The

6    general objections stated above, as well as the additional objections asserted by Mattel, are

7    reviewed herein in the context of the nine categories of document requests at issue.

8                          1. Document Request Nos. 32-33, 61

9         Request nos. 32, 33 and 61 seek production of communications with sales personnel,

10   merchandisers and retailers relating to alteration of displays or retail spacing of MGA products

11   other than Bratz.  MGA contends that the documents it seeks are relevant to the allegation in

12   paragraph 79 of its complaint that "Mattel merchandisers have been caught tampering with

13   MGA's displays, replacing favorably located MGA merchandise with Mattel merchandise

14   instead."  In its reply brief, MGA clarifies that it "seeks information tending to show that at any

15   time after June 2001, Mattel sales personnel tampered with, or directed others to tamper with,

16   MGA's in-store displays."  MGA's Reply at 8.

17        During the meet and confer process, Mattel agreed to produce documents responsive to

18   request nos. 32-33 and 61 insofar as they related to displays, retail spacing, or shelf space for

19   Bratz, but refused to produce responsive documents relating to any other MGA products.  Glad

20   Decl. in Support of MGA's Motion, Ex. 1.  Mattel contends that request nos. 32 and 33 are

21   overbroad and unduly burdensome insofar as they require production of communications relating

22   to displays, retail spacing, or shelf-space for any other MGA products.  Mattel views the requests

23   as a directive to "go out and find, review and produce essentially all of its retailer

24   _____

25        [1] In a footnote, MGA mentions that Mattel has also withheld documents relating to conduct occurring
     outside of the United States, and that this issue will be addressed in a separate motion.  MGA's Motion at 10, n. 29.
26   Nothing in this Order is intended in any way to permit or foreclose discovery relating to conduct occurring outside of
     the United States.

27

28   Bryant v. Mattel, Inc.,                                                                                    12
     CV-04-09049 SGL (RNBx)

                              **EXHIBIT 14 PAGE 232**

1   communications about any 'change' in any 'display' or any 'retail spacing' for any MGA

2   product." Mattel's Opposition at 10.  Mattel contends that MGA, not Mattel, should bear the

3   burden of identifying specific incidents of alleged tampering, and thereafter Mattel will attempt to

4   find and produce pertinent documents relating to those incidents.  Id.

5        Mattel also contends that request no. 61 is overbroad and amounts to an improper fishing

6   expedition, seeking virtually all documents that mention MGA, Larian, Bratz, or any other MGA

7   product, whether or not they have anything to do with anything placed at issue by MGA.  Mattel's

8   Opposition at 7-8.  Mattel also contends that the request has no linkage to any possible consumer

9   confusion between Bratz and My Scene or between the other products mentioned in MGA's

10   complaint or MGA's responses to Mattel's contention interrogatories.  Id. at 8.

11        Request nos. 32, 33, and 61 seek documents relevant to MGA's allegation that "Mattel

12   merchandisers have been caught tampering with MGA's displays, replacing favorably located

13   MGA merchandise with Mattel merchandise instead."  MGA's allegation of tampering is broader

14   than just Bratz products, and therefore, Mattel's objection to producing responsive documents for

15   MGA products other than the Bratz line is overruled.

16        Further, the requests are not unduly burdensome.  Request nos. 32 and 33 are limited to

17   communications between Mattel and its sales personnel and merchandisers relating to alterations

18   of display or retail spacing for MGA products, and therefore do not require Mattel to search for

19   documents from every single one of its employees.  Request no. 61 is also reasonably tailored to

20   seek relevant information, requiring production of communications between Mattel and any

21   retailer, sales person or merchandiser referring or relating to the allocation of shelf space, altering

22   of retail displays, or placement of Bratz in retail stores, including but not limited to

23   communications concerning the placement of "Bratz" relative to My Scene.  Contrary to Mattel's

24   assertion, request no. 61 does not require Mattel to search for virtually all documents that mention

25   MGA, Larian, Bratz, or any other MGA product, whether or not they have anything to do with

26   anything placed at issue by MGA.  Instead request no. 61 is clearly limited to a defined category

27

28

1    of communications with certain individuals and/or entities regarding a defined subject matter.  In

2    addition, MGA indicates in its reply brief that it seeks documents and communications from June

3    2001 forward.  With this temporal limitation, MGA's motion is granted as to request nos. 32, 33

4    and 61.

5                                    2. Document Request Nos. 37-39

6            Request nos. 37 through 39 call for production of Mattel's communications with CARU

7    relating to MGA and restrictions to be placed on MGA, as well as documents supporting Mattel's

8    allegation in its answer that MGA violated CARU standards.  MGA contends that the documents

9    it seeks are relevant to its allegation in paragraph 89 of its complaint that "Mattel used its

10   influence as a major contributor to CARU's budget to induce CARU to place onerous restrictions

11   on MGA advertisements, and to require MGA to amend aspects of commercials that have gone

12   unchallenged in other parties' commercials."

13           In its opposition brief, Mattel represents that is prepared to produce documents that bear

14   on MGA's claims and Mattel's defenses involving CARU, but nothing further.  Mattel contends

15   that the sweep of these requests "goes far beyond any particular advertisements or the allegations

16   in MGA's complaint that Mattel pressured CARU or obtained better treatment different than

17   MGA."  Mattel's Opposition at 10.  Furthermore, Mattel contends that the requests are improper

18   because CARU investigates complaints and claims in confidence.

19           MGA's request nos. 37 and 39 seek information relevant to MGA's allegation that Mattel

20   influenced CARU to place restrictions on MGA's advertisements.  The Federal Rules of Civil

21   Procedure do not require MGA to identify every instance when CARU imposed restrictions or

22   required amendments to MGA's advertisements before propounding discovery on the subject.

23           Request no. 38 is much broader, however, seeking all communications between Mattel

24   and CARU referring or relating to MGA, Larian, Bratz, or MGA products.  Request no. 38 is not

25   limited to the subject of MGA's advertisements, or any other subject that is at issue in the case.

26   Further, request no. 38 is, to a certain extent, cumulative of request nos. 37 and 39.

27

28
     Bryant v. Mattel, Inc.,
     CV-04-09049 SGL (RNBx)                                                                        14

                                    EXHIBIT 14 PAGE 234

1    Accordingly, MGA's motion is granted with respect to request nos. 37 and 39, but denied

2    as to request no. 38.

3                              3. Document Request No. 43

4    Request no. 43 seeks documents relating to any attempts by Mattel to price My Scene

5    below Bratz.  MGA contends that the documents it seeks are likely to lead to admissible evidence

6    relating to whether Mattel has an "organic process" for setting prices, or whether it set prices

7    based on confidential information obtained from MGA.  MGA's Motion at 13:22.

8    Mattel contends that there is no allegation in MGA's complaint of below-market pricing.

9    Further, Mattel contends that the request is overbroad and seeks documents that have no relevance

10    to any other subject matter in suit.

11    Request no. 43 seeks documents that have no relevance to any claim or defense in the

12    case.  There is no allegation in MGA's complaint related to below-market pricing.  Nor is there

13    any allegation that Mattel misappropriated confidential pricing information from MGA.

14    Accordingly, MGA's motion is denied as to request no. 43.

15                              4. Document Request No. 47

16    Request no. 47 calls for production of documents relating to Mattel's communications

17    with buyers, merchandisers, general merchandise managers, or retailers relating to whether MGA

18    was giving any other U.S. retailer below-market pricing or whether MGA was discontinuing one

19    of its product lines.  MGA contends that these documents are relevant to the allegation in

20    paragraph 79 of its complaint that "Mattel has falsely told a major United States retailer that

21    MGA was giving another major United States retailer below-market pricing and falsely told a

22    United Kingdom retailer that MGA was discontinuing one of its lines."

23    Mattel contends that request no. 47 is improper because it demands documents about

24    "alleged statements to an unidentified retailer and an unidentified toy line" without giving Mattel

25    "a hint as to where to look in order to perform a good-faith search for documents."  Mattel's

26    Opposition at 12.

27

28
        Bryant v. Mattel, Inc.,
        CV-04-09049 SGL (RNBx)

                                                                                          15

EXHIBIT 14 PAGE 235

1          Request no. 47 seeks documents relevant to MGA's allegation that Mattel made a false

2    representation to a major United States retailer that MGA was giving another retailer below-

3    market pricing, and falsely told a United Kingdom retailer that MGA was discontinuing a product

4    line.  The Federal Rules of Civil Procedure do not require MGA to identify the businesses to

5    whom Mattel allegedly made the false statements as a precondition to propounding discovery.

6    Nor is MGA required to identify every instance in which Mattel allegedly made such false

7    representations before propounding discovery.  Nevertheless, the request is extremely broad and

8    burdensome, requiring Mattel to search for "all documents referring or relating to any

9    communications between Mattel" and buyers, merchandisers, general merchandise managers, or

10   retailers referring or relating to whether MGA was giving another United States retailer below-

11   marketing pricing, or whether MGA was discontinuing one of its lines.  To alleviate some of the

12   burden to Mattel, the request is hereby limited to require production of only Mattel's

13   communications with any buyers, merchandisers, general merchandise managers or retailers

14   about MGA providing below-market pricing or MGA discontinuing a product line.  With this

15   limitation, MGA's motion is granted as to request no. 47.

16                      5. Document Request Nos. 48 – 50

17         Request nos. 48 through 50 essentially seek all documents referring or relating to Mattel's

18   communications with any buyers, merchandisers, general merchandise managers, retailers,

19   suppliers, licensees, and potential licensees, referring or relating to Bratz, Larian or MGA

20   regarding the origins, design, development, product launch, sales, promotions, advertising,

21   quality, or price of Bratz or any other MGA product.  During the meet and confer, Mattel agreed

22   to produce some, but not all, responsive documents.  In particular, Mattel objected to producing

23   documents relating to the pricing of Bratz or any MGA product.  Mattel also objected to

24   producing documents relating to Bratz unless the documents also referenced Mattel's My Scene

25   or Barbie products.

26

27

28
     Bryant v. Mattel, Inc.,
     CV-04-09049 SGL (RNBx)                                                                  16

EXHIBIT 14 PAGE 236

1    MGA contends that these documents are relevant to its allegation that Mattel interfered

2   with its business dealings with third parties.  In its reply brief, MGA asserts that it seeks

3   documents and communications between Mattel and certain third parties "from June 2001 tending

4   to support or refute MGA's assertions that Mattel interfered with MGA's dealings with such

5   parties by providing false or misleading information concerning MGA products, the ownership of

6   'Bratz' and exerting pressure on these parties not to license or sell MGA products."  MGA's

7   Reply at 8.

8        Mattel contends that these requests are overbroad and amount to an improper fishing

9   expedition, seeking virtually all documents that mention MGA, Larian, Bratz, or any other MGA

10   product, whether or not they have anything to do with anything placed at issue by MGA.  Mattel's

11   Opposition at 7-8.  Mattel also contends that the requests have no linkage to any possible

12   consumer confusion between Bratz and My Scene or between the other products mentioned in

13   MGA's complaint or MGA's responses to Mattel's contention interrogatories.  Id. at 8.

14        This category of requests is clearly overbroad, requiring production of documents that

15   merely mention MGA, Larian, Bratz or other MGA products, regardless of whether or not they

16   have anything to do with the claims and defenses in the case.  MGA has not made any attempt to

17   link these requests to any of the numerous and far-ranging allegations of unfair competition set

18   forth in its complaint.  Instead MGA makes a very generalized argument that the requests seek

19   information relevant to its allegation that Mattel interfered with MGA's business dealings with

20   third parties.  Furthermore, Mattel has carried its burden of establishing that the burden and

21   expense of complying with the requests far exceed their likely benefit, taking into account the

22   needs of the case.  Accordingly, MGA's motion is denied as to request nos. 48 through 50.

23                      6. Document Request Nos. 51 – 55

24        This category of document requests requires production of essentially all documents

25   referring or relating to any communications between Mattel and any public relations firms,

26   members of the press, current or former MGA employees, or former Mattel employees, relating to

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

17

**EXHIBIT 14 PAGE 237**

1  Bratz, Larian, or MGA regarding the origins, design, development, product launch, sales,

2  promotions, advertising, quality, or price of Bratz or any other MGA product. During the meet

3  and confer process, Mattel agreed to produce some, but not all responsive documents.

4         MGA contends that these documents are relevant to its allegations that Mattel has engaged

5  in serial imitation of MGA products in an attempt to dilute their distinctiveness and create

6  confusion in the marketplace. MGA also contends that these documents are likely to lead to

7  admissible evidence relating to the creation and ownership of Bratz, Mattel's knowledge and

8  awareness of Bratz products and marketing and its attempt to imitate those products and dilute

9  their distinctiveness.

10         Mattel contends that these requests are overbroad and amount to an improper fishing

11  expedition, seeking virtually all documents that mention MGA, Larian, Bratz, or any other MGA

12  product, whether or not they have anything to do with anything placed at issue by MGA. Mattel's

13  Opposition at 7-8. Mattel also contends that the requests have no linkage to any possible

14  consumer confusion between Bratz and My Scene or between the other products mentioned in

15  MGA's complaint or MGA' responses to Mattel's contention interrogatories. Id. at 8.

16         Like the previous category of requests, this category of requests is grossly overbroad,

17  requiring production of documents that merely mention MGA, Larian, Bratz or other MGA

18  products, regardless of whether or not they have anything to do with the claims and defenses in

19  the case. MGA has not made any attempt to link these requests to any of the allegations of unfair

20  competition set forth in its complaint or to the responses it provided to Mattel's contention

21  interrogatories. Furthermore, Mattel has carried its burden of establishing that the burden and

22  expense of complying with these requests far exceed their likely benefit, taking into account the

23  needs of the case. Accordingly, MGA's motion is denied as to request nos. 51-55.

24                            7. Document Request Nos. 56 – 58

25         This category of requests requires production of all documents relating to business

26  dealings between any licensee, supplier, manufacturer, retailer, distributor, or merchandiser and

27

28

**EXHIBIT 14 PAGE 238**

1   MGA.  MGA contends that these document requests are specifically tailored to documents in

2   Mattel's possession, custody or control concerning MGA's business dealings with licensees,

3   suppliers, manufacturers, retailers, distributors, or merchandisers, and are directly relevant to its

4   claims that Mattel interfered with MGA's business dealings with third parties.

5        Again, Mattel contends that these requests are overbroad and amount to an improper

6   fishing expedition, seeking virtually all documents that mention MGA, Larian, Bratz, or any other

7   MGA product, whether or not they have anything to do with anything placed at issue by MGA.

8   Mattel's Opposition at 7-8.  Mattel also contends that the requests have no linkage to any possible

9   consumer confusion between Bratz and My Scene or between the other products mentioned in

10   MGA's complaint or MGA' responses to Mattel's contention interrogatories.  Id. at 8.  Mattel

11   also objects to request nos. 57 and 58 insofar as they require Mattel to produce documents that

12   refer "explicitly or implicitly" to business dealings involving MGA.

13        Like the previous two categories of document requests, this category of requests is grossly

14   overbroad.  Request nos. 56 and 57 require production of documents referring or relating to

15   MGA's business dealings, without specifying any products or other subject matter limitations.

16   Request no. 58 is narrower, but is unreasonable insofar as it requires Mattel to produce documents

17   that refer "explicitly or implicitly" to business deals involving MGA's Bratz or other products.

18   Furthermore, Mattel has carried its burden of establishing that the burden and expense of

19   complying with the requests far exceed their likely benefit, taking into account the needs of the

20   case.  Accordingly, MGA's motion is denied as to request nos. 56 through 58.

21                    8. Document Request Nos. 59, 60, 62-63, 99, 101

22        This category of requests requires production of all documents relating to (a) any

23   interference with or inhibition of the licensing or potential licensing of MGA's products, or

24   relating to any limitations or restrictions on any MGA licensee (request nos. 59, 62-63); (b) any

25   third party's licensing or potential licensing of MGA products (request no. 60); and (c)

26   communications between Mattel and MGA's licensees and distributors referring to MGA, Bratz

27

28

**EXHIBIT 14 PAGE 239**

1   or the claims in this lawsuit (request nos. 99, 101). MGA contends that the documents it seeks are

2   relevant to its allegation that Mattel exerted its influence on retailers and other third parties not to

3   do business with MGA.

4        Mattel contends that request nos. 59, 60, 62 and 63 are overbroad, seeking all documents

5   that might bear on MGA's business without identifying any particular business dealings. Mattel

6   also contends that they are overbroad insofar as they require production of all documents related

7   to "any MGA PRODUCT world wide," where "product" is defined as "each image, character,

8   logo, doll, toy, accessory, product, packaging or other thing or matter that is or has ever been

9   manufactured, marketed or sold by MGA or others under license." Mattel's Opposition at 9.

10       Mattel also contends that request nos. 99 and 101 are overbroad and amount to an

11  improper fishing expedition, seeking virtually all documents that mention MGA, Larian, Bratz, or

12  any other MGA product, whether or not they have anything to do with anything placed at issue by

13  MGA. Mattel's Opposition at 7-8. Mattel also contends that the requests have no linkage to any

14  possible consumer confusion between Bratz and My Scene or between the other products

15  mentioned in MGA's complaint or MGA' responses to Mattel's contention interrogatories. Id. at

16  8.

17       Request nos. 59, 60, 62, and 63 seek information relevant to MGA's allegations, including

18  among others, that Mattel "warned a number of companies, including the biggest publishing

19  entity in the United Kingdom, not to license MGA products, or risk retribution," and that Mattel

20  "terminated one of its licensees, apparently in retribution for licensing Bratz." MGA's Complaint

21  at ¶76. They are also reasonably tailored to require production of only those documents and

22  communications that refer or relate to interference with or inhibition of the licensing or potential

23  licensing of MGA's products, that refer or relate to any limitations or restrictions on any MGA

24  licensee, and that refer or relate to any third party's licensing or potential licensing of MGA

25  products. Mattel has not established that searching for theses types of responsive documents is

26  unduly burdensome. Therefore, MGA's motion is granted as to request nos. 59, 60, 62 and 63.

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

20

**EXHIBIT 14 PAGE 240**

1    In contrast, however, request nos. 99 and 101 are overbroad, requiring Mattel to search for

2    and produce all documents referring or relating to communications between Mattel and any MGA

3    licensee or distributor that refer or relate to MGA, Bratz, this lawsuit, other litigation involving

4    the parties or their employees, claims by MGA against Mattel or claims by Mattel against MGA

5    or its employees.  For example, the requests would potentially require production of documents

6    that merely mentioned MGA and Bratz but that otherwise have no relevance to the claims and

7    defenses in the suit.  Therefore, MGA's motion is denied as to request nos. 99 and 101.

8                                  9. Document Request Nos. 64, 65, 66, 67

9    This category of requests requires production of all documents relating to (a) any third

10   party's agreement or decision not to license, manufacture, promote, distribute or sell MGA

11   products or supply materials or services to MGA, or to limit, restrict, curtail or reduce such

12   activities (request nos. 64-65); and (b) any interference with or inhibition of the supply of goods

13   or services to MGA, or of MGA's distribution of its products (request nos. 66-67).  MGA

14   contends that these documents are relevant to its claims that Mattel interfered with MGA's

15   business dealings with distributors, retailers, and other third parties, as alleged in paragraphs 76-

16   79 of its complaint.

17   Mattel contends that these requests are overbroad, seeking all documents that might bear

18   on MGA's business without identifying any particular business dealings.  Mattel also contends

19   that they are overbroad insofar as they require production of all documents related to "any MGA

20   PRODUCT world wide," where "product" is defined as "each image, character, logo, doll, toy,

21   accessory, product, packaging or other thing or matter that is or has ever been manufactured,

22   marketed or sold by MGA or others under license."  Mattel's Opposition at 9.

23   These requests seek information relevant to MGA's allegation that Mattel interfered with

24   its business dealings.  In particular, MGA has alleged that Mattel "warned a number of

25   companies, including the biggest publishing entity in the United Kingdom, not to license MGA

26   products, or risk retribution," and that Mattel "terminated one of its licensees, apparently in

27

28
     Bryant v. Mattel, Inc.,
     CV-04-09049 SGL (RNBx)

                                                                                                    21

**EXHIBIT 14 PAGE 241**

1  retribution for licensing Bratz." MGA's Complaint at ¶76.  MGA's requests are reasonably

2  calculated to lead to information relevant to this allegation.  Although the definition of product is

3  broad, the definition does not render the requests overbroad because they are otherwise limited in

4  subject matter.  Further Mattel has failed to establish that it is unduly burdensome to search for

5  and produce documents responsive to this category of requests.  Therefore, MGA's motion is

6  granted as to request nos. 64, 65, 66, and 67.

7                     10. Document Request Nos. 102-104

8        This category of requests requires production of Mattel's communications with three

9  companies referring to MGA, Bratz or Larian.  MGA contends that these documents are relevant

10  to its claims that Mattel interfered with its business dealings with third parties.

11       Mattel now represents that it will produce communications with Nickelodeon that bear on

12  MGA's allegation regarding sponsorship of the 2005 Kids Choice Awards.  Mattel contends,

13  however, that communications with Cartoon Network or 4kids Entertainment are not relevant to

14  any claim or defense in suit.

15       Mattel's communications with Nickelodeon regarding MGA, Bratz or Larian are relevant

16  in light of MGA's allegation that Mattel was "instrumental in attempting to keep MGA from

17  participating as a sponsor in the 'Kids' Choice Awards.'"  Id. at ¶97.  Therefore, MGA's motion

18  is granted as to request nos. 102.  In contrast, MGA has failed to establish that similar

19  communications with Cartoon Network and 4kids Entertainment are relevant to a claim or

20  defense in suit.  Therefore, MGA's motion is denied as to request nos. 103 and 104.

21  //

22  //

23  //

24

25

26

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

22

**EXHIBIT 14 PAGE 242**

## V. CONCLUSION

For the reasons set forth above, MGA's motion to compel is granted in part as to document request nos. 32 ( as modified), 33 (as modified), 61 (as modified), 37, 39, 47 (as modified) , 59, 60, 62, 63, 64, 65, 66, 67, and 102, and denied in part as to document request nos. 38, 43, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 99, 101, 103 and 104.  MGA's request for sanctions is denied.  Mattel shall produce responsive documents as set forth above no later than June 15, 2007.

Pursuant to Paragraph 6 of the Stipulation and Order for Appointment of a Discovery Master, MGA shall file this Order with the Clerk of Court forthwith.

Dated: May 22, 2007

HON. EDWARD A. INFANTE (Ret.)
Discovery Master

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

23

EXHIBIT 14 PAGE 243

## PROOF OF SERVICE BY E-MAIL

I, Anthony Sales, not a party to the within action, hereby declare that on May 22, 2007, I served the attached ORDER GRANTING IN PART AND DENYING IN PART MGA'S MOTION TO COMPEL DOCUMENTS RESPONSIVE TO FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS DATED NOVEMBER 22, 2006 in the within action by e-mail addressed as follows:

| | | |
|---|---|---|
| Robert Millman Esq. | Littler Mendelson | rfmillman@littler.com |
| Douglas Wickham Esq. | Littler Mendelson | dwickham@littler.com |
| Keith Jacoby Esq. | Littler Mendelson | kjacoby@littler.com |
| Dominic Messiha Esq | Littler Mendelson | dmessiha@littler.com |
| Diba Rastegar Esq. | Littler Mendelson | drastegar@littler.com |
| Michelle Park Esq. | Littler Mendelson | mpark@littler.com |
| Alaya B. Meyers, Esq. | Littler Mendelson | ameyers@littler.com |
| Brady Mitchell, Esq. | Littler Mendelson | bmitchell@littler.com |
| Carol Miller, Esq. | Littler Mendelson | cmiller@littler.com |
| Ryan P. Eskin, Esq. | Littler Mendelson | reskin@littler.com |
| John Quinn Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | jbq@quinnemanuel.com |
| Michael Zeller Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | michaelzeller@quinnemanuel.com |
| Jon Corey Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | joncorey@quinnemanuel.com |
| Duane Lyons Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | duanelyons@quinnemanuel.com |
| Timothy Alger Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | timalger@quinnemanuel.com |
| Dominic Surprenant Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | DominicSurprenant@QuinnEmanuel.com |
| B. Dylan Proctor Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | dylanproctor@quinnemanuel.com |
| Shane McKenzie Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | shanemckenzie@quinnemanuel.com |
| Bridget Morris Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | bridgetmorris@quinnemanuel.com |
| Tamar Buchakjian Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | tamarbuchakjian@quinnemanuel.com |
| Juan Pablo Alban, Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | juanpabloalban@quinnemanuel.com |
| Dale Cendali Esq. | O'Melveny & Myers LLP | dcendali@omm.com |
| Diana Torres Esq. | O'Melveny & Myers LLP | dtorres@omm.com |
| James Jenal Esq. | O'Melveny & Myers LLP | jjenal@omm.com |
| Alicia Meyer Esq. | O'Melveny & Myers LLP | ameyer@omm.com |
| Jennifer Glad Esq. | O'Melveny & Myers LLP | jglad@omm.com |
| David Hurwitz, Esq. | O'Melveny & Myers LLP | dhurwitz@omm.com |
| Johanna Schmitt Esq. | O'Melveny & Myers LLP | jschmitt@omm.com |
| Patricia Glaser Esq. | Christensen, Glaser, Fink, Jacobs, Weil & Shapiro, LLP | pglaser@chrisglase.com |

I declare under penalty of perjury under the laws of the Untied States of America that the above is true and correct.

Executed on May 22, 2007, at San Francisco, California.

_____
ANTHONY SALES

EXHIBIT 14 PAGE 244

**EXHIBIT 15**

**MATTEL V. CARTER BRYANT AND CONSOLIDATED CASES**

SUPPLEMENTAL PRIVILEGE LOG

October 29, 2007

| No. | Document Type | Date | From/Author | To/Recipient(s) | Description of Document and/or Redaction | Privilege[1] |
|-----|---------------|------|-------------|-----------------|------------------------------------------|--------------|
| 1. | Board of Directors Meeting Minutes | March 12, 2004 | -- | -- | Discussion of potential litigation matter. | Attorney Client Privilege / Attorney Work Product |
| 2. | Board of Directors Meeting Minutes | April 26, 2004 | -- | -- | Discussion of potential litigation matter. | Attorney Client Privilege / Attorney Work Product |
| 3. | Handwritten Notes | August 10, 2004 | Michael Moore, Esq. | -- | Attorney notes regarding Cityworld. | Attorney Client Privilege / Attorney Work Product |
| 4. | Email with handwritten notes and calendar attachment | August 10, 2004 | Michael Moore, Esq. | -- | Attorney notes regarding Cityworld. | Attorney Client Privilege / Attorney Work Product |
| 5. | Handwritten Notes | August 9, 2004 | Michael Moore, Esq. | -- | Attorney notes regarding Cityworld. | Attorney Client Privilege / Attorney Work Product |

[1] An assertion of the work product privilege means that the document was prepared in anticipation of this action or another potential action.

079752278707.1

1 of 66

**EXHIBIT 15 PAGE 245**

1    In contrast, however, request nos. 99 and 101 are overbroad, requiring Mattel to search for

2    and produce all documents referring or relating to communications between Mattel and any MGA

3    licensee or distributor that refer or relate to MGA, Bratz, this lawsuit, other litigation involving

4    the parties or their employees, claims by MGA against Mattel or claims by Mattel against MGA

5    or its employees.  For example, the requests would potentially require production of documents

6    that merely mentioned MGA and Bratz but that otherwise have no relevance to the claims and

7    defenses in the suit.  Therefore, MGA's motion is denied as to request nos. 99 and 101.

8                          9. Document Request Nos. 64, 65, 66, 67

9        This category of requests requires production of all documents relating to (a) any third

10   party's agreement or decision not to license, manufacture, promote, distribute or sell MGA

11   products or supply materials or services to MGA, or to limit, restrict, curtail or reduce such

12   activities (request nos. 64-65); and (b) any interference with or inhibition of the supply of goods

13   or services to MGA, or of MGA's distribution of its products (request nos. 66-67).  MGA

14   contends that these documents are relevant to its claims that Mattel interfered with MGA's

15   business dealings with distributors, retailers, and other third parties, as alleged in paragraphs 76-

16   79 of its complaint.

17       Mattel contends that these requests are overbroad, seeking all documents that might bear

18   on MGA's business without identifying any particular business dealings.  Mattel also contends

19   that they are overbroad insofar as they require production of all documents related to "any MGA

20   PRODUCT world wide," where "product" is defined as "each image, character, logo, doll, toy,

21   accessory, product, packaging or other thing or matter that is or has ever been manufactured,

22   marketed or sold by MGA or others under license."  Mattel's Opposition at 9.

23       These requests seek information relevant to MGA's allegation that Mattel interfered with

24   its business dealings.  In particular, MGA has alleged that Mattel "warned a number of

25   companies, including the biggest publishing entity in the United Kingdom, not to license MGA

26   products, or risk retribution," and that Mattel "terminated one of its licensees, apparently in

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

21

**EXHIBIT 14 PAGE 241**