# EXHIBIT 5



QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
John B. Quinn (Bar No. 090378)
johnquinn@quinnemanuel.com
Michael T. Zeller (Bar No. 196417)
(michaelzeller@quinnemanuel.com)
Jon D. Corey (Bar No. 185066)
(joncorey@quinnemanuel.com)
Duane R. Lyons (Bar No. 125091)
(duanelyons@quinnemanuel.com)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

O'MELVENY & MYERS CALENDAR
NOV 20 2006
CAL. DKT.
ATTYS. DIANA TORRES

Attorneys for Plaintiff and Counter-Defendant Mattel, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

CARTER BRYANT, an individual,

Plaintiff,

vs.

MATTEL, INC., a Delaware corporation,

Defendant.

CASE NO. CV 04-9049 SGL (RNBx)

Consolidated With Case No. 04-9059 and Case No. 05-2727

Hon. Stephen G. Larson

MATTEL, INC.'S NOTICE OF MOTION AND MOTION FOR LEAVE TO FILE AMENDED COMPLAINT; AND

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

[Proposed Amended Complaint lodged concurrently herewith]

[Declaration of Jon D. Corey filed concurrently herewith]

Hearing Date: January 8, 2007
Time: 10:00 a.m.
Place: Courtroom 1

Discovery Cut-off: None Set
Pre-trial Conference: None Set
Trial Date: None Set

PERSONALLY SERVED 1:30 PM

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on January 8, 2006 at 10:00 a.m., or as soon thereafter as the matter may be heard in the courtroom of the Honorable Stephen G. Larson located at 3470 Twelfth Street, Riverside, California, 92501, Mattel, Inc. ("Mattel") will, and hereby does, move this Court pursuant to Rule 15 of the Federal Rules of Civil Procedure for an order granting Mattel leave to file an Amended Complaint lodged concurrently herewith, including to substitute Defendant MGA Entertainment, Inc. for Defendant Doe 1, defendant MGA Entertainment (HK) Limited for Defendant Doe 2, and defendant Isaac Larian for Defendant Doe 3.

This motion is made on the grounds that discovery in this case has revealed facts showing that Mattel has a right to additional and further relief against the named and additional defendants; defendants also have engaged in further conduct since Mattel's original Complaint was filed for which Mattel seeks relief; defendants will not be unduly prejudiced by amendment; Mattel has not unduly delayed seeking its requested relief; and Mattel's proposed amendment is made in good faith.

This Motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the concurrently-filed Declaration of Jon D. Corey, the concurrently-lodged proposed Amended Complaint, the pleadings and other papers on file in this action, any matters of which this Court may take judicial notice, and such further evidence and argument as may be presented at or before the hearing on this matter.

**Local Rule 7-3 Certification**

This motion is made following the conference of counsel in compliance with Local Rule 7-3, which took place on October 31, 2006 and thereafter.

DATED: November 19, 2006

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

By [signature]
John B. Quinn
Attorneys for Plaintiff and Counter-Defendant Mattel, Inc.

- 3 -
MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT

Exhibit 5 Page 100

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..... 1

STATEMENT OF FACTS ..... 2

ARGUMENT ..... 10

I. JUSTICE AND THE INTERESTS OF JUDICIAL ECONOMY REQUIRE THAT MATTEL BE PERMITTED TO MAKE ITS NON-PREJUDICIAL, TIMELY AND GOOD FAITH AMENDMENTS TO THE COMPLAINT. ..... 10

A. Amending Pleadings Is Strongly Favored ..... 10

B. Amendment Will Not Unfairly Prejudice Defendants ..... 11

C. All Other *Foman* Factors Either Support Granting Leave To Amend Or Are Neutral. ..... 12

1. Mattel Has Timely Sought To Amend Its Complaint ..... 12

2. Mattel Seeks To Amend The Complaint In Good Faith ..... 16

3. Mattel's Amendment Is Meritorious, Not Futile ..... 16

CONCLUSION ..... 17

# TABLE OF AUTHORITIES

**Page**

## Cases

Beery v. Hitachi Home Elecs. (Am.), Inc., 157 F.R.D. 481 (C.D. Cal. 1994) .... 9

DCD Programs, Ltd. v. Leighton, 833 F.2d 183 (9th Cir. 1987) .... 9, 10, 14

Eminence Capital, LLC v. Aspeon, Inc., 316 F.3d 1048 (9th Cir. 2003) .... 9, 10

Foman v. Davis, 371 U.S. 178 (1962) .... 10, 11, 15

Gabrielson v. Montgomery Ward & Co., 785 F.2d 762 (9th Cir. 1986) .... 9

Keller v. U.S., 667 F. Supp. 1351 (S.D. Cal. 1987) .... 12

Lindley v. General Electric Company, 780 F.2d 797 (9th Cir. 1986) .... 12

Miller v. Rykoff-Sexton, Inc., 845 F.2d 209 (9th Cir. 1988) .... 15

Rumberg v. Weber Aircraft Corp., 424 F. Supp. 294 (C.D. Cal. 1976) .... 12

SAES Getters, S.p.A. v. Aeronex, Inc., 219 F. Supp. 2d 1081 (S.D. Cal 2002) .... 10, 15

Sorosky v. Burroughs Corp., 826 F.2d 794 (9th Cir. 1987) .... 15

United States v. Webb, 655 F.2d 977 (9th Cir. 1981) .... 9

## Statutes

Cal. Bus. & Prof. Code § 17200 .... 14

Cal. Civ. Proc. Code § 583.210 .... 12

18 U.S.C. § 1962(c) .... 14

18 U.S.C. § 1964(c) .... 14

Federal Rule of Civil Procedure 15(a) .... 9

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiff and Counter-Defendant Mattel, Inc. ("Mattel") respectfully submits this motion for leave to amend its Complaint. This motion relates to the Mattel v. Bryant action, Case No. 04-9059 SGL (RNBx).

### Preliminary Statement

Through discovery and investigation, Mattel has uncovered facts that give rise to additional claims, including claims against defendant-in-intervention MGA Entertainment, Inc. ("MGA") and related parties. Mattel now seeks to add these claims in the proposed First Amended Complaint lodged with this motion (a copy of which is also attached hereto for the Court's convenience). These claims are based upon both newly discovered, past conduct as well as further actionable conduct that has occurred since Mattel filed its original Complaint.

The addition of these claims will not cause defendants undue prejudice. Some claims are based on the same general facts as Mattel's original claims -- including, most notably, those pertaining to the ownership of Bratz -- and defendants have been defending and will continue to defend against them regardless of Mattel's amendments. Others are based on conduct since Mattel's original Complaint was filed. The interests of judicial economy strongly favor the resolution of Mattel's claims in a single action, rather than forcing Mattel to bring a separate action against MGA and related defendants, particularly since MGA itself put such matters at issue in the action that it filed against Mattel and that since has been consolidated with the action instituted by Mattel's original Complaint.

Rule 15(a) of the Federal Rules of Civil Procedure mandates that leave to amend "shall be freely given when justice so requires," and it is well-settled that amendments to pleadings should be liberally granted. The parties are still in the early stages of discovery, no trial date has been set and no scheduling order has been

entered. Under these circumstances, the Court should permit Mattel to file its First Amended Complaint.

**Statement of Facts**

***The Consolidated Cases.*** Mattel filed its original Complaint on April 27, 2004, alleging that a former employee, Carter Bryant ("Bryant"), breached his duties to Mattel by working with and assisting a Mattel competitor, MGA, while employed by Mattel.[1] Bryant counterclaimed, seeking to invalidate all of Mattel's employment agreements with its employees as "unconscionable."[2] Bryant also filed a separate declaratory relief action against Mattel.[3] Later, in April 2005, MGA filed a broad unfair competition complaint against Mattel, targeting a number of alleged Mattel business practices worldwide.[4] This Court has consolidated all three cases.[5]

In the Mattel v. Bryant case, Mattel's original Complaint alleges that Carter Bryant, a former Mattel designer, worked with and assisted MGA, a Mattel competitor, during the term of his Mattel employment. One project that Bryant worked on while employed by Mattel was the "Bratz" project, a line of fashion dolls, that MGA purportedly acquired from Bryant and took to market. MGA intervened as a defendant in the Mattel v. Bryant case on December 7, 2004,

---

1 Mattel's Complaint in Case No. 04-9059 SGL (RNBx) dated April 27, 2004, Declaration of Jon D. Corey ("Corey Dec."), dated November 19, 2006, Exh. 1.

2 Bryant's Cross-Complaint dated August 24, 2004, Corey Dec. Exh. 2.

3 Complaint in Case No. CV 04-9049 dated November 2, 2004, Corey Dec. Exh. 3.

4 MGA's Complaint in Case No. CV 05-2727 dated April 13, 2005, Corey Dec., Exh. 4.

5 Order Consolidating Case Nos. CV 04-9049, CV-9059 and CV 05-2727, dated June 19, 2006, Corey Dec., Exh. 5.

claiming that the action put its rights in Bratz at issue.[6] Both this Court and the Ninth Circuit have recognized that the rights to the Bratz dolls are already at issue in the Mattel v. Bryant case.[7]

Bryant filed counterclaims in the Mattel v. Bryant case, alleging that his employment agreements with Mattel were invalid.[8] Bryant also filed the Bryant v. Mattel case, which sought a declaratory judgment that Bryant's "ideas, concepts, drawings and designs for, and contributions to, 'Bratz' were and are independent and original works, and were and are not copied from, derivative of or infringing any Mattel work, including, without limitation, Mattel's copyrighted 'Toon Teens.'"[9] The Court dismissed Bryant's counterclaims in the Mattel v. Bryant case on July 18, 2006.[10] The Court dismissed Bryant's declaratory relief complaint at the same time.[11] Although given leave by the Court to do so, Bryant did not attempt to amend either the declaratory relief complaint or his counterclaims.

MGA is the plaintiff in the MGA v. Mattel case, filed on April 13, 2005—after Mattel filed its initial complaint against Bryant and just before this Court entered an order stay proceedings while the Ninth Circuit considered subject matter jurisdiction issues on an interlocutory appeal. The Court vacated that stay order earlier this year, on May 16, 2006. MGA alleges in its Complaint against

---

6 Stipulation Permitting MGA to Intervene as a Party to This Action, entered by the Court on December 7, 2004, Corey Dec., Exh. 6.

7 Order Denying Plaintiff Mattel, Inc's Motion to Remand and Certifying Question for Interlocutory Review dated March 4, 2005, at 19 (stating that "the rights to the Bratz were and are in controversy" in this case), Corey Dec., Exh. 7; Mattel, Inc. v. Bryant, 446 F.3d 1011, 1012 (9th Cir. 2006) (recognizing that the "rights to Bratz dolls" are at issue in this case), Corey Dec., Exh. 8.

8 Corey Dec, Exh. 2 at 1-2.

9 Corey Dec., Exh. 3, at 14.

10 Order Granting Mattel's Motion to Dismiss Bryant's Action for Declaratory Relief and Counterclaims, dated July 18, 2006, Corey Dec., Exh. 9.

11 Id.

Mattel that Mattel engaged in "serial copycatting" of the "Bratz" dolls – which MGA claims it owns – as well as alleged themes and other attributes of the dolls and other MGA products.[12] MGA's unfair competition case is broad, encompassing claims relating to dozens of products as well as claims that Mattel's conduct with buyers, licensees, industry associations, vendors, and other third parties had a range of purportedly negative effects on MGA. The consolidation of Mattel's Complaint in the Mattel v. Bryant case with MGA's wide-ranging Complaint about Mattel's alleged worldwide business practices significantly broadened the scope of litigation.

***Proceedings to Date.*** On May 20, 2005, shortly after MGA filed its lawsuit against Mattel, the Court stayed discovery in all three consolidated cases while the Ninth Circuit considered an interlocutory appeal raising subject matter jurisdiction issues.[13] Judge Manella had, on her own accord, certified the Court's jurisdictional ruling under 28 U.S.C. § 1292(b), which the Ninth Circuit accepted.[14] Discovery resumed after May 2006, when the Ninth Circuit affirmed that the Court has subject matter jurisdiction because the rights to Bratz are at issue (and hence the amount in controversy requirement was satisfied) and ruled that the post-removal intervention of MGA, as a non-diverse defendant, did not destroy diversity jurisdiction.[15]

---

12 Corey Dec., Exh. 4 at 2.

13 Order Staying Discovery in Mattel, Inc. v. Bryant, Bryant v. Mattel, Inc., and MGA Entertainment, Inc. v. Mattel, Inc., dated May 20, 2005, Corey Dec., Exh. 10.

14 Corey Dec. Exh. 7 at 28-29.

15 Mattel initially filed this case in state court. After Bryant removed (for the second time), Mattel moved to remand the case, arguing (among other things) that the fact that MGA had intervened as a defendant destroyed any diversity jurisdiction because MGA and Mattel are not diverse. The District Court and Ninth Circuit concluded that the post-removal intervention of a non-diverse defendant does not destroy diversity jurisdiction. Corey Dec., Exhs. 7 & 8.

Because of the discovery stay, the consolidated cases have only now begun to move forward in any significant way. No trial date has been set in any of the consolidated actions. No discovery cutoff has been set in any of the cases. No scheduling conference with the Court has been held and no scheduling order has yet been set by this Court for any of the consolidated cases.

***New Information Mattel Has Discovered Since Filing Its Complaint Regarding Bryant's Work For MGA.*** Discovery Mattel has obtained to date, including in recent months, has confirmed not only that Bryant created Bratz designs, and aided MGA, during his Mattel employment and that he did so using Mattel resources. It also has shown that the nature and extent of that work was beyond what was known to Mattel at the time it filed suit and that MGA was complicit in Bryant's conduct.

Bryant worked as a Mattel product designer from September 1995 to April 1998, and then again from January 1999 to October 2000. When he started his second term of employment with Mattel, Bryant executed an Employee Confidential Information and Inventions Agreement ("Inventions Agreement").[16] In the Inventions Agreement, Bryant agreed that he would not, without Mattel's express written consent, "engage in any employment or business other than for [Mattel], or invest in or assist (in any manner) any business competitive with the business or future business plans of [Mattel]" during his Mattel employment.[17] Also in the Inventions Agreement, Bryant assigned to Mattel all rights in "inventions," including "designs," that he created during his Mattel employment to the fullest extent of the law.[18]

---

16 Inventions Agreement, Proposed Amended Complaint, Exhibit A.
17 Id. ¶ 3.
18 Id. at ¶ 2.

Bryant testified at deposition that he performed development-related work for Bratz while employed by Mattel and used Mattel employees and materials to prepare a three-dimensional doll prototype for use in a sales pitch to MGA — a pitch that he made while employed by Mattel.[19] Bryant admitted he worked on his Bratz drawings while employed by Mattel and showed them to MGA in August and September 2000, also while employed by Mattel.[20] Bryant further testified that he worked on an ostensibly separate doll called "Angel" for MGA while employed by Mattel.[21] Bryant selected Mattel vendors and engaged them to start their work on Bratz before he left Mattel, thus using Mattel resources.[22] A fax produced by Bryant bearing an April 2000 fax header date -- six months before he left Mattel -- showed that he was working on Bratz during a time period when he denied that he had been performing any such work.[23]

While Bryant sought in his deposition testimony to minimize his Bratz-related activities while he was employed by Mattel, other depositions have since then revealed that Bryant created key Bratz designs while working for Mattel and that MGA began developing Bratz with Bryant even earlier than Bryant admitted at deposition.

For example, at deposition two months ago, Steve Linker, a third-party vendor, testified that MGA asked him in or about September 2000 to put together a proposal for Bratz packaging.[24] Linker's testimony and the documents he produced — including emails and other documents that have never been produced by MGA or

---

[19] See Deposition of Carter Bryant ("Bryant Deposition"), at 88:7-89:6, 163:8-167:24, Corey Dec., Exh. 11.
[20] Bryant Deposition at 8:15-11:11, Corey Dec., Exh. 11.
[21] Id. at 178:3-18, 195:21-196:20.
[22] Id. at 132:19-136:14.
[23] April 10, 2000 Fax produced by Bryant, Corey Dec., Exh. 12.

Bryant — established that the Bratz project was much further along before Bryant left Mattel than MGA and Bryant have claimed. In particular, Bryant had testified at his deposition that he created a key design drawing for the three-dimensional Bratz dolls in November 2000, only after he had left Mattel.[25] Linker's testimony and the documents he produced approximately two months ago, however, prove that MGA gave that design drawing (as well as other Bratz development documents) to Linker at a meeting *before* Bryant left Mattel.[26] This is a highly significant fact, since Bryant had testified that this particular design drawing was the basis for sculptures of the Bratz dolls.[27] This new information thus demonstrated not only the falsity of material elements of Bryant's and MGA's story about the timing of the creation of Bratz, but indeed that Bryant created Bratz dolls designs while he was working for Mattel. As another example, Anna Rhee, a third-party vendor who painted the original Bratz doll's faces, testified that she began painting the faces of Bratz dolls as early as June 2000.[28]

***New Information Mattel Has Discovered Since Filing Its Complaint Regarding Other Unlawful Acts By MGA.*** Mattel has also uncovered a host of other unfair and unlawful business practices by MGA since filing its initial complaint against Bryant, many instances of which have occurred since Mattel first sued Bryant. MGA has engaged in an ongoing pattern of illegal conduct, consisting of aiding and encouraging Mattel employees to steal Mattel's confidential

---

24 Deposition of Steven Linker ("Linker Deposition") at 50:7-51:6, Corey Dec., Exh. 13.

25 Bryant Deposition at 350:16-350:25, 351:15-353:13, Corey Dec., Exh. 11; Bratz design drawing by Carter Bryant, Corey Dec., Exh. 14.

26 Linker Deposition at 77:6-78:23, Corey Dec., Exh. 13; Bratz design drawing by Carter Bryant produced by Steve Linker, Corey Dec. Exh. 15.

27 Bryant Deposition at 527:17-528:20, Corey Dec., Exh. 11.

28 Deposition of Anna Rhee ("Rhee Deposition") at 197:6-197:25, 199:8-199:16, Corey Dec., Exh. 16.

information and trade secrets and deliver that information to MGA, which uses that information to further MGA's business interests and to harm Mattel.

These acts, set forth in detail in the proposed First Amended Complaint, include the following: In or about 2004, MGA decided to expand into Mexico. To do so, operating from its headquarters in Southern California, MGA hired away three key Mattel employees in Mexico, who, on their way out, stole a vast array of Mattel trade secrets. This information involved virtually every category of Mattel's sensitive and trade secret business plans and information for the Mexican market, and a significant quantity of sensitive and trade secret information relating to Mattel's business in the United States and worldwide.[29] Armed with Mattel's confidential business plans and methods, MGA has claimed that it increased its market share in Mexico by 90 percent in a single year.[30] MGA's conduct in Mexico is the subject of a pending Mexican criminal case brought by the Mexican federal authorities.[31]

Ron Brawer was a Senior Vice President at Mattel.[32] On September 17, 2004, he resigned from Mattel to become the Executive Vice President of Sales and Marketing at MGA.[33] Brawer did so despite his express representations to Mattel that he had not been interviewing with MGA, and despite the fact that Brawer went out of his way just before leaving Mattel to obtain confidential Mattel information.[34] Brawer also represented during his Mattel exit interview that he had returned all proprietary information to Mattel.[35] Mattel has learned in recent months

---

29 See Amended Complaint at ¶ 38-52.
30 See id. at ¶ 50.
31 See id. at ¶ 53.
32 See id. at ¶¶ 55-69.
33 See id. at ¶ 63.
34 See id. at ¶¶ 58, 62, 68.
35 See id. at ¶ 68.

that Brawer's representation was false.[36] For example, based on its investigation, Mattel believes that Brawer did not return to Mattel information contained in his contacts file, which included contact information for Mattel customers, most notably Toys 'R Us.[37] In addition, relying on his knowledge of Mattel's operations and the roles of certain Mattel employees, Brawer has targeted certain Mattel employees who have broad access to Mattel proprietary information in an effort to induce and encourage them to join MGA and to steal or otherwise wrongfully misappropriate Mattel confidential information and trade secrets.[38]

In 2005, MGA needed help in Canada, so it hired Janine Brisbois ("Brisbois") from Mattel.[39] Brisbois was responsible for Mattel's account with Toys 'R Us and Wal-Mart.[40] MGA gave her responsibility for those same accounts, and she took from Mattel documents containing proprietary advertising, project, sales, customer and strategy information for both Canada and the United States.[41] Brisbois accessed and modified a number of such documents while employed by MGA.[42]

Mattel did not learn about this conduct, or the scope of the wrongdoing by Bryant, MGA and related entities and individuals, until after Mattel filed its original Complaint against Bryant. Indeed, much of the unlawful activity had not yet occurred when Mattel filed its complaint in April 2004.

---

36 See id. at ¶¶ 68-69.
37 See id.
38 See id.
39 See id. at ¶¶ 70-76
40 See id. at ¶ 72.
41 See id. at ¶¶ 73-74.
42 See id. at ¶ 75.

## Argument

### I. JUSTICE AND THE INTERESTS OF JUDICIAL ECONOMY REQUIRE THAT MATTEL BE PERMITTED TO MAKE ITS NON-PREJUDICIAL, TIMELY AND GOOD FAITH AMENDMENTS TO THE COMPLAINT.

#### A. Amending Pleadings Is Strongly Favored

Federal Rule of Civil Procedure 15(a) mandates that leave to amend "shall be freely given when justice so requires," Fed. R. Civ. P.15(a), as "[f]ederal policy strongly favors determination of cases on their merits." Beery v. Hitachi Home Elecs. (Am.), Inc., 157 F.R.D. 481, 482 (C.D. Cal. 1994). The Ninth Circuit has repeatedly noted the Supreme Court's instruction to lower courts to "heed carefully the command of Rule 15(a), by freely granting leave to amend where justice so requires." DCD Programs, Ltd. v. Leighton, 833 F.2d 183, 186 (9th Cir. 1987) (quoting Gabrielson v. Montgomery Ward & Co., 785 F.2d 762, 765 (9th Cir. 1986)). This policy of favoring amendments to pleadings is applied with "extreme liberality." Id. (quoting United States v. Webb, 655 F.2d 977, 979 (9th Cir. 1981)); see also Eminence Capital, LLC v. Aspeon, Inc., 316 F.3d 1048, 1051 (9th Cir. 2003) (same). "This liberality in granting leave to amend is not dependent on whether the amendment will add causes of action or parties." DCD Programs, 833 F.2d at 186 (reversing denial of leave to file a fourth amended complaint adding another defendant where the suit was still in its early stages and plaintiffs offered a satisfactory explanation for their delay of fourteen months).

"Four factors are commonly used to determine the propriety of a motion for leave to amend. These are: bad faith, undue delay, prejudice to the opposing party, and futility of amendment." Id.; see also Foman v. Davis, 371 U.S. 178, 183 (1962); Eminence Capital, 316 F.3d at 1051-52. The four factors are not, however, of equal importance. DCD Programs, 833 F.2d at 186-87. The absence of unfair prejudice is a strong factor supporting amendment. Eminence Capital, 316

F.3d at 1052. Delay, even where it exists, "is insufficient to justify denial of leave to amend." DCD Programs, 833 F.2d at 186.

Here, no unfair prejudice can be shown, and the remaining factors either support amendment or are neutral.

**B. Amendment Will Not Unfairly Prejudice Defendants**

Prejudice is the "touchstone" of the amendment analysis. Eminence Capital, 316 F.3d at 1052. Absent a showing of prejudice, there is a presumption in favor of granting leave to amend. See id. "The party opposing the amendment bears the burden of showing prejudice." Id.; SAES Getters, S.p.A. v. Aeronex, Inc., 219 F. Supp. 2d 1081, 1086 (S.D. Cal 2002); see also DCD Programs, 833 F.2d at 188 (finding no prejudice when case was still at "discovery stage with no trial date pending nor had pretrial conference been scheduled").

Defendants cannot credibly claim prejudice arising from Mattel's amendment, much less "undue" prejudice. The defendants (and presumably MGA's affiliates) named in the proposed First Amended Complaint have been on notice of this lawsuit since it was filed. In fact, on December 7, 2004, MGA intervened and has since been actively involved in this case. Additionally, on April 13, 2005, MGA filed its related unfair competition case, which was consolidated with Mattel's action. MGA's intervention and unfair competition action have transformed the original dispute between Mattel and Bryant that centered on the creation of Bratz into broad litigation over a variety of ostensible business practices -- practices that now inevitably involve MGA's theft of confidential and proprietary information from Mattel. One of Mattel's defenses to MGA's sweeping unfair competition allegations is that MGA was copying Mattel, not the other way around. And the reason that MGA was in a position to copy Mattel was its pattern of misappropriating Mattel's trade secrets — namely its anticipated future products — before Mattel brought those products to market. So, a significant portion of the allegations in the First Amended Complaint will be litigated in this dispute whether

the Court grants Mattel leave to file the First Amended Complaint or not. As such, while the present amendments add new named players and affirmative claims, the factual matters raised by the First Amended Complaint do not significantly expand the scope of the case that MGA already has staked out, and therefore does not prejudice either Bryant or MGA.

Of principal importance, the parties are still engaged in early stages of discovery, no scheduling conference has been held, no scheduling order has been entered and no trial date has been set. Defendants cannot show that Mattel's amendments would expand or delay discovery or trial in a way that would unduly prejudice them.

**C. All Other *Foman* Factors Either Support Granting Leave To Amend Or Are Neutral.**

Defendants' inability to show prejudice weighs substantially in favor of granting leave to amend. Moreover, the amendments are timely, made in good faith and meritorious.

**1. Mattel Has Timely Sought To Amend Its Complaint.**

A plaintiff has three years to timely amend a complaint to substitute in a named defendant for a Doe.[43] See Keller v. U.S., 667 F. Supp. 1351, 1356 n.8 (S.D. Cal. 1987); Cal. Civ. Proc. Code § 583.210. Mattel's First Amended Complaint is timely in its substitution of Doe defendants as it is well within the three years allotted.

---

[43] Under the Federal Rules, the California relation back standard applies because California law provides a more forgiving relation back standard. See Rumberg v. Weber Aircraft Corp., 424 F. Supp 294 (C.D. Cal. 1976) (finding that Rule 15(c) did not apply because California law extended the applicable one-year statute of limitations three years past the commencement of the cause of action as to "Doe" defendants); see also Lindley v. General Electric Company, 780 F. 2d 797, 800-01 (9th Cir. 1986) (adopting Rumberg as the law of the Circuit).

The facts that underlie the amendments now sought by Mattel were revealed only after discovery was underway in this litigation, and many were revealed only in the past few months. Because of the disputes over whether federal court had jurisdiction, the year-long discovery stay, the reassignment to this Court and the subsequent consolidation of the related actions, this action has only now begun to make any material progress. Most of the documents produced by MGA to date, including the documents suggesting its complicity with Bryant, were produced just days before the stay was ordered.[44] Mattel did not have an opportunity to depose anyone at MGA on those documents until after the stay was lifted this summer — and even after the stay was lifted, it took yet another Court order compelling his appearance and the imposition of sanctions on MGA before Isaac Larian, MGA's CEO, appeared for deposition on July 18, 2006.[45] Then, as noted above, Mattel obtained in September of this year from a third party significant information about the timing of the creation and development of Bratz -- including emails and documents that MGA and Bryant have never produced.

Having taken further discovery since the stay was lifted, Mattel now has sufficient information to support claims against additional defendants arising out of Mattel's original dispute against Bryant over Bratz. Specifically, Mattel moves to substitute MGA, Isaac Larian, and MGA Entertainment (HK) Limited as "Doe" defendants in connection with that dispute. Mattel seeks this relief because newly discovered facts show that these defendants were complicit with Bryant in his breaches of duty to Mattel and related unlawful conduct. As set forth in Mattel's First Amended Complaint, MGA was complicit in Bryant's work on Bratz, knowing

---

[44] Letter from Paula Ambrosini to Michael T. Zeller and Jon D. Corey, dated May 16, 2005, Corey Dec., Exh. 17.

[45] Order Granting Mattel's Motion to Enforce the Court's Order of March 23, 2005 and for Sanctions, dated June 16, 2006, Corey Dec., Exh. 19.

that Bryant was still employed by Mattel and in breach of his contractual, statutory and common law duties to Mattel.

Mattel also seeks to add new causes of action against MGA, Larian, Bryant, MGA Entertainment (HK) Limited, MGA de Mexico and Gustavo Machado arising out of defendants' pattern of unfair competition and related illegal conduct. This pattern of illegal conduct — most of which occurred after Mattel had filed its original Complaint — consists of aiding and abetting Mattel employees in stealing Mattel's confidential information and delivering it to MGA to further MGA's business interests. Among other things, Mattel has discovered since the filing of its original Complaint that: (1) MGA stole Mattel's trade secrets by enticing three employees of Mattel's Mexican subsidiary, including defendant Machado, to steal sensitive business planning materials, and then hired them to join MGA; (2) MGA stole Mattel trade secrets by enticing an employee of Mattel's Canadian subsidiary to steal proprietary advertising, project, sales, customer and strategy information for Canada, the United States and the rest of the world, and then hired her to join MGA; and (3) in May 2006, Isaac Larian made misrepresentations to retailers, including Target and TRU, about Mattel's products, particularly the MY SCENE MY BLING BLING product with real gems, which caused at least one retailer to cancel its order for 75,000 units of the product.

After the discovery of these facts, Mattel can now allege, and is alleging, claims for misappropriation of trade secrets against MGA, MGA de Mexico, Larian and Machado; claims for breach of fiduciary duty and breach of duty of loyalty against Machado; claims for intentional interference with contract, aiding and abetting breach of fiduciary duty, and aiding and abetting breach of duty of loyalty against MGA and Larian; and a claim for copyright infringement against MGA, MGA Entertainment (HK) Limited, Larian and Bryant. Mattel is also moving to add claims for violation of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1962(c) and 1964(c)), conspiracy to violate the

Racketeer Influenced and Corrupt Organizations Act (18 U.S.C §§ 1962(d) and 1964(c)), conversion, unfair competition (common law and Cal. Bus. & Prof. Code § 17200) and declaratory relief against MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant and Machado.

Some of these amendments — most notably, the allegations pertaining to the ownership of Bratz and Bryant's and MGA's related misconduct — are squarely related to existing allegations already pleaded in the original Complaint. Both this Court and the Ninth Circuit have recognized that the rights to the Bratz dolls are already at stake in this case.[46] Mattel has only recently learned, through the course of discovery, the true scope of what occurred and the nature and extent of MGA's involvement, which justifies the amendments sought here.

The other amendments are based on unfair and unlawful business practices by MGA and related entities and individuals consisting of aiding and encouraging Mattel employees to steal Mattel's confidential information and trade secrets and take them to MGA. Mattel had no basis to allege those claims anytime before, because much of the unlawful activity did not occur until after Mattel filed its original Complaint.

Defendants cannot legitimately complain that Mattel unfairly delayed in seeking amendment because Mattel only recently discovered information upon which to base its claims. The fact that Mattel has not previously amended its complaint also weighs in favor of leave. DCD Programs, 833 F.2d at 186 n.3.

In any case, even where (unlike here) undue delay exists, "delay, by itself, is insufficient to justify denial of leave to amend." Id. at 186.

---

[46] Corey Dec., Exh. 7 at 19 & Exh. 8 at 1012.

**2. Mattel Seeks To Amend The Complaint In Good Faith.**

The "bad faith" that courts consider in determining whether to grant leave to amend is "understood to mean such tactics as, for example, seeking to add a defendant merely to destroy diversity jurisdiction." SAES Getters, 219 F. Supp. 2d at 1086 (citing Sorosky v. Burroughs Corp., 826 F.2d 794, 805 (9th Cir. 1987)). Here, there is no question that Mattel's motion is not brought in bad faith. Because it is alleging federal claims in the proposed First Amended Complaint, including claims of copyright infringement, the proposed First Amended Complaint will not alter the Court's jurisdiction. Mattel also promptly brought this motion after investigation and discovery revealed that the proposed new claims and defendants could be added to the present action. If Mattel is not permitted to amend the complaint to add the new claims, to substitute MGA, MGA Entertainment (HK) Limited and Larian as "Doe" defendants, and to name Mattel de Mexico and Machado as new defendants, it will be forced to commence a new proceeding. That would entail needless duplication of effort and would be wasteful of Court resources.

**3. Mattel's Amendment Is Meritorious, Not Futile.**

The standard for denying a motion for leave to amend based upon futility is exceedingly high. Under the law of this Circuit, "a proposed amendment is futile only if *no* set of facts can be proved under the amendment to the pleadings that would constitute a valid and sufficient claim or defense." Miller v. Rykoff-Sexton, Inc., 845 F.2d 209, 214 (9th Cir. 1988) (reversing denial of leave to amend answer). As the Supreme Court stated in Foman, "[i]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claims on the merits." 371 U.S. at 181.

Defendants cannot demonstrate that Mattel's proposed amendment is deficient as a matter of law. To the contrary, Mattel has promptly and thoroughly

investigated its well-pleaded allegations, and will prove them at trial. There is no basis to deny leave to amend the Complaint at this time.

**Conclusion**

For the reasons set forth above, Mattel respectfully requests that the Court grant it leave to file its First Amended Complaint.

DATED: November 19, 2006

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

By [signature]
John B. Quinn
Attorneys for Plaintiff and Counter-Defendant Mattel, Inc.

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
John B. Quinn (Bar No. 90378)
(johnquinn@quinnemanuel.com)
Michael T. Zeller (Bar No. 196417)
(michaelzeller@quinnemanuel.com)
Jon D. Corey (Bar No. 185066)
(joncorey@quinnemanuel.com)
Duane R. Lyons (Bar No. 125091)
(duanelyons@quinnemanuel.com)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Attorneys for Plaintiff Mattel, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

MATTEL, INC., a Delaware corporation,

Plaintiff,

v.

MGA ENTERTAINMENT, INC., a California corporation; ISAAC LARIAN, an individual; CARTER BRYANT, an individual; MGA ENTERTAINMENT (HK) LIMITED, a Hong Kong Special Administrative Region business entity; MGAE DE MEXICO, S.R.L. DE C.V., a Mexico business entity; CARLOS GUSTAVO MACHADO GOMEZ, an individual; and DOES 4 through 10,

Defendants.

AND CONSOLIDATED CASES

CASE NO. CV 04-9049 SGL (RNBx)

Consolidated With Case No. 04-9059 and Case No. 05-2727

MATTEL, INC.'S FIRST AMENDED COMPLAINT FOR:

1. COPYRIGHT INFRINGEMENT;
2. VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT;
3. CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT;
4. MISAPPROPRIATION OF TRADE SECRETS;
5. BREACH OF CONTRACT;
6. INTENTIONAL INTERFERENCE WITH CONTRACT;
7. BREACH OF FIDUCIARY DUTY;
8. AIDING AND ABETTING BREACH OF FIDUCIARY DUTY;
9. BREACH OF DUTY OF LOYALTY;
10. AIDING AND ABETTING BREACH OF DUTY OF LOYALTY;
11. CONVERSION;
12. UNFAIR COMPETITION; AND
13. DECLARATORY RELIEF.

DEMAND FOR JURY TRIAL

**Preliminary Statement**

1. For years defendant MGA Entertainment, Inc. has engaged in a pattern of stealing and using Mattel, Inc.'s property and trade secrets. MGA's use of the stolen property and trade secrets caused and continues to cause significant harm to Mattel. MGA first stole "Bratz," a fashion doll, from Mattel, and then continued stealing Mattel's confidential and proprietary information to fuel MGA's growth.

2. Defendant Carter Bryant conceived, created and developed Bratz designs while he was employed by Mattel as a doll designer. He concealed his Bratz work from Mattel and wrongfully sold Bratz to MGA while time that he was a Mattel employee. As MGA knows, Mattel owns the Bratz designs that Bryant made. As the rightful owner of those Bratz designs, Mattel has registered copyrights for them and seeks damages arising from MGA's repeated infringement of those copyrights.

3. Emboldened by the success of its illegal conduct, MGA has repeated—and even expanded—its pattern of theft on numerous occasions. For example, in or about 2004, MGA decided to expand into Mexico. To do so, and operating from its Southern California offices, MGA hired away three key Mattel employees in Mexico, who, on their way out, stole virtually every category of Mattel's sensitive and trade secret business plans and information for the Mexican market, as well as a significant quantity of sensitive and trade secret information for Mattel's U.S. and worldwide businesses, and took them to MGA. Armed with Mattel's confidential business plans and methods, MGA claimed to have increased its market share in Mexico alone by 90% in a single year.

4. In 2005, MGA needed help in Canada. So MGA, again operating from its Southern California headquarters, hired Janine Brisbois from Mattel. At that time, Ms. Brisbois was responsible for Mattel's account with Toys 'R Us ("TRU") and Wal-Mart. MGA gave her responsibility for those same

accounts, and she took from Mattel documents containing proprietary advertising, project, sales, customer and strategy information for not only Canada, but for the United States. Eliminating any doubt that MGA then proceeded to use those stolen materials, Brisbois subsequently accessed and modified certain of those Mattel documents while employed by MGA.

5. These are not the only instances of such misconduct, which MGA orchestrated and carried out from its headquarters in this District. Defendants have engaged in an ongoing, widespread pattern of illegal acts, consisting of inducing Mattel employees to steal Mattel's confidential information or other property and take it with them to MGA to further MGA's business interests and to harm Mattel.

**Jurisdiction**

6. This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 17 U.S.C. §§ 101 *et seq.*, and 18 U.S.C. § 1964(c). This Court has supplemental jurisdiction over Mattel's state law claims pursuant to 28 U.S.C. § 1367.

**Venue**

7. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)-(d), 1391(f) and 1400(a) and 18 U.S.C. § 1965.

**Parties**

8. Mattel is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in El Segundo, California.

9. Defendant MGA Entertainment, Inc. ("MGA") is a corporation organized and existing under the laws of the State of California, with its principal place of business in Van Nuys, California. Mattel is informed and believes, and on that basis alleges, that ABC International Traders, Inc. is a predecessor corporation to MGA and that until September 16, 2002, MGA was incorporated and known as

ABC International Traders, Inc. Upon the filing of the Complaint, Mattel, being ignorant of the nature, extent and scope of MGA Entertainment, Inc.'s involvement and complicity in the conduct alleged therein and having designated MGA Entertainment, Inc. in the Complaint as Doe 1 and having discovered its involvement and complicity, Mattel hereby amends this Complaint by substituting MGA Entertainment, Inc. for the fictitious Doe name Doe 1.

10. Defendant Carter Bryant ("Bryant") is an individual who formerly was employed by Mattel and has worked for and continues to work as a contactor for MGA. Mr. Bryant currently resides in the State of Missouri.

11. Defendant MGA Entertainment (HK) Limited is a business entity organized and existing under the laws of the Hong Kong Special Administrative Region, with its principal place of business in Hong Kong. Upon the filing of the Complaint, Mattel, being ignorant of the nature, extent and scope of involvement and complicity of MGA Entertainment (HK) Limited in the conduct alleged therein and having designated MGA Entertainment (HK) Limited in the Complaint as Doe 2 and having discovered its involvement and complicity, Mattel hereby amends this Complaint by substituting MGA Entertainment (HK) Limited for the fictitious Doe name Doe 2.

12. Defendant MGAE de Mexico, S.R.L. de C.V. ("MGA de Mexico") is a business entity organized and existing under the laws of Mexico, with its principal place of business in Mexico City, Mexico.

13. Mattel is informed and believes, and on that basis alleges, that defendant Larian is the President and CEO of MGA and an individual residing in the County of Los Angeles. Upon the filing of the Complaint, Mattel, being ignorant of the nature, extent and scope of involvement and complicity of Larian in the conduct alleged therein and having designated Larian in the Complaint as Doe 3 and having discovered his involvement and complicity, Mattel hereby amends this Complaint by substituting Larian for the fictitious Doe name Doe 3.

14. Defendant Carlos Gustavo Machado Gomez is an individual who is employed by defendant MGA and who, on information and belief, currently resides in the County of Los Angeles.

15. The true names and capacities of defendants sued herein as DOES 4 through 10, inclusive, are unknown to Mattel, which therefore sues said defendants by such fictitious names. Mattel will amend this First Amended Complaint to allege their true names and capacities when the same are ascertained.

## Factual Background

### I. MATTEL

16. Mattel manufactures and markets toys, games, dolls and other consumer products. Harold Mattson and Eliot and Ruth Handler founded Mattel in 1945. The name of the company was created by incorporating the names of two of its founders, "MATT-son" and "EL-liot." Originating from the Handlers' garage in Southern California, the company greatly expanded its operations following World War II. During the next several decades, Mattel became famous for producing high-quality products at reasonable prices.

17. Critical to Mattel's success is its ability to design and develop new products. Mattel invests millions of dollars in product design and development and introduces hundreds of new products each year. Mattel maintains a 180,000 square-foot design center in El Segundo, California, that houses hundreds of designers, sculptors, painters and other artists, who work exclusively to create the products on which Mattel's business depends.

18. Mattel also has invested substantial amounts over many years to develop its business methods and practices, including, without limitation, its marketing and advertising research, plans, methods and processes; its business research and forecasts; its costs, budgets, pricing, credit terms, deal terms and finances; its manufacturing, distribution, and sales methods and processes; and its

inventory methods and processes. These represent a material part of the intellectual infrastructure of Mattel and are highly valuable.

## II. MGA ENTERTAINMENT

19. Defendant MGA is also a toy manufacturer. MGA began as a consumer electronics business, but expanded into the toy business with licenses to sell handheld electronic games. By approximately late 1999 or early 2000, MGA developed a strategy to expand its business and compete directly with Mattel by launching a fashion doll line, so it stole a fashion doll that was owned by Mattel -- "Bratz."

20. MGA intentionally stole not just specific Mattel property, such as Bratz designs, prototypes and related materials, but also a vast array of trade secrets and other confidential information that comprise Mattel's intellectual infrastructure. MGA's rapid growth was not organic, but rather was based upon its theft of Bratz. As a result, MGA lacked an appropriate intellectual infrastructure for a company of its size and it became increasingly difficult to manage. To deal with these problems, as detailed below, time and time again MGA simply stole Mattel's proprietary business methods, practices and information. This not only allowed MGA to avoid expending time, money and effort necessary to build a legitimate business, but also allowed MGA to unfairly compete against Mattel by taking Mattel's playbook.

## III. MGA STEALS A NEW LINE OF FASHION DOLLS FROM MATTEL

21. Defendant Carter Bryant is a former Mattel employee. Bryant joined Mattel in September 1995, where he worked in Mattel's Design Center as a BARBIE product designer. In or about April 1998, Bryant resigned his position with Mattel and moved to Missouri to live with his parents. Late in 1998, Bryant applied to Mattel to be rehired. On January 4, 1999, he began working at Mattel in Mattel's Design Center, again as a product designer, for Mattel's BARBIE collectibles line.

22. Upon his return to Mattel in January 1999, Bryant executed an Employee Confidential Information and Inventions Agreement (the "Employment Agreement"), a true and correct copy of which is attached hereto as Exhibit A.

23. Pursuant to his Employment Agreement and as a condition of and in consideration for his employment, Bryant agreed, among other things, that he held a position of trust with Mattel, that the designs and inventions he created during his Mattel employment (with certain exceptions not relevant here) were owned by Mattel, and that he would be loyal to the company by agreeing not to assist or work for any competitor of Mattel while he was employed by Mattel.

24. On January 4, 1999, Bryant also executed Mattel's Conflict of Interest Questionnaire (the "Conflict Questionnaire"). Among other things, Bryant certified in the Conflict Questionnaire that, other than as disclosed, he had not worked for any competitor of Mattel in the prior twelve months and had not engaged in any business venture or transaction involving a Mattel competitor that could be construed as a conflict of interest. Bryant understood what the Conflict Questionnaire required because, among other things, he disclosed on it the freelance work he had performed while in Missouri for Ashton-Drake, which is unrelated to the conduct alleged herein. A true and correct copy of the Conflict Questionnaire executed by Bryant is attached hereto as Exhibit B.

25. Pursuant to the Conflict Questionnaire, Bryant also agreed that he would immediately notify his supervisor of any change in his situation that would cause him to change any of the foregoing certifications. Despite this obligation, at no time did Bryant disclose to Mattel that he was engaging in any business venture or transaction with MGA or any other Mattel competitor.

26. More specifically, while Bryant was employed by Mattel, Bryant and other defendants misappropriated and misused Mattel property and Mattel resources for the benefit of Bryant and MGA. Such acts included, but are not limited to, the following:

a. using his exposure to Mattel development programs to create the concept, design and name of Bratz;

b. using Mattel resources, and while employed by Mattel, Bryant worked by himself and with other Mattel employees and contractors to design and develop Bratz, including without limitation by creating drawings and three-dimensional models of Bratz dolls, and fashion designs for the dolls' associated clothing and accessories; and

c. using Mattel resources, and while employed by Mattel, Bryant took steps to assist MGA to produce Bratz dolls.

27. During the time that he was employed by Mattel and thereafter, Bryant concealed these actions from Mattel, including by failing to notify his supervisor of the conflict of interest he created when he began working on MGA's behalf and when he began receiving payments from MGA. Bryant additionally enlisted other Mattel employees to perform work on Bratz during the time he was employed by Mattel and, by all indications, in at least some cases led them to believe that they were performing work on a project for Mattel.

28. Bryant also made affirmative misrepresentations to Mattel management and employees immediately before his departure from Mattel on October 20, 2000. For example, during Bryant's exit interview in October 2000, he told the Mattel Human Resources representative who conducted the interview that he was leaving Mattel to engage in non-competitive work. During his last few weeks at Mattel, Bryant told his co-workers and supervisors that he was going to leave Mattel for "non-competitive" pursuits. Bryant's representations to his supervisors and his co-workers were false. Bryant knew at the time that those representations were false and made those false statements to conceal from Mattel the fact that he was already working with MGA and that he had contracted with MGA to assign Bratz works to MGA and to provide design and development services to MGA, a Mattel competitor.

29. As a result of the efforts of Bryant and other Mattel employees working on Bratz (which were done without Mattel's knowledge), the Bratz dolls had been designed and were far along in development during the time that Bryant was employed by Mattel and prior to the time that Bryant left Mattel on October 20, 2000. Not only did Bryant create and develop designs for the dolls as well as other aspects of the products such as their fashion accessories during the time he was employed by Mattel, but MGA showed finished Bratz prototypes and/or product to both focus groups and retailers in November 2000, less than three weeks after Bryant left Mattel. Bryant, Larian and others at MGA arranged these meetings and focus groups while Bryant was still employed by Mattel.

30. Bryant and MGA employees also repeatedly and continuously communicated with employees of MGA Entertainment (HK) Limited on subjects such as design and manufacturing of Bratz. On information and belief, at all material times, MGA Entertainment (HK) Limited has maintained regular and continuous contacts with persons in the County of Los Angeles; it regularly has shipped products that it manufactures, or that are manufactured for it, to the County of Los Angeles; and such products have been distributed to retailers and sold to consumers in the County of Los Angeles.

31. Bratz also were shown to retailers at the Hong Kong Toy Fair in January 2001. By early 2001, only a few months after Bryant resigned from Mattel, MGA began having the Bratz fashion doll line and accessories manufactured and then, shortly thereafter, began selling them at retail.

32. Since 2001, MGA has distributed and sold Bratz and Bratz-related products throughout the world. Mattel is informed and believes that MGA also licenses Bratz to third parties. Mattel is also informed and believes that MGA derives annual revenue from its sales and licenses of Bratz in excess of $500 million. Mattel is further informed and believes that MGA and Bryant claim current ownership of Bratz, and all copyrights and copyright registrations attendant

thereto. MGA continues to market, sell and license Bratz and has expressed an intention to continue to do so.

33. Mattel is informed and believes that MGA and Larian encouraged, aided and financed Bryant to develop Bratz, knowing full well that Bryant was still employed by Mattel at the time and that by performing such work, including design-related work, for his own benefit and/or the benefit of MGA, Bryant would be, and was, in breach of his contractual, statutory and common law duties to Mattel. Mattel is also informed and believes that MGA proceeded to aid and encourage Bryant to develop Bratz with the goal of obtaining a valuable fashion doll line that would be commercially successful in the competitive, multi-billion dollar market for fashion dolls.

34. Pursuant to Bryant's contract with Mattel, among other things, Mattel is the true owner of Bratz designs and works, including those specifically that were conceived, created or reduced to practice during Bryant's Mattel employment as well as all designs and works that are or have been derived therefrom. Defendants' continued use, sale, distribution and licensing of Bratz thus infringes upon Mattel's rights, injures Mattel and unlawfully enriches the defendants.

35. Bryant and MGA deliberately and intentionally concealed facts sufficient for Mattel to suspect or to know that it was the true owner of Bratz. Their acts of concealment include, but are not limited to, concealing the fact that Bryant conceived, created, designed and developed Bratz while employed by Mattel, including by tampering with and defacing documents which showed that, in fact, Bryant was a Mattel employee while he was working for and with MGA; concealing the fact that Bryant worked with and assisted MGA during the time Bryant was employed by Mattel and was compensated for that assistance; concealing that Bryant was providing consulting services to MGA; concealing Bryant's role in Bratz by falsely claiming that Larian and others were the creators

of Bratz; and concealing the fact that Mattel was the true owner of Bratz by, among other things, filing fraudulent registrations and/or amendments to registrations with the United States Copyright Office claiming MGA as the author of Bratz as a work for hire and altering relevant dates on such documents to further obscure the true facts of when the works were created.

36. Because of Bryant's and MGA's acts of concealment and Bryant's misrepresentations to Mattel, Mattel had no reason to suspect that Bryant had worked with MGA, or assisted MGA, while he still employed by Mattel until approximately November 24, 2003, when Mattel received, through an unrelated legal action, a copy of Bryant's agreement with MGA which showed that the date of Bryant's agreement with MGA predated Bryant's departure from Mattel. It was then, as a result, that Mattel learned for the first time that Bryant had secretly aided, assisted and worked for and with MGA while employed at Mattel and in violation of his Mattel Employment Agreement. Specifically, Bryant's agreement with MGA obligated Bryant to provide product design services to MGA on a "top priority" basis. Bryant's agreement with MGA also provided that Bryant would receive royalties and other consideration for sales of products on which Bryant provided aid or assistance; that all works and services furnished by Bryant under the agreement, including those he purportedly provided while still a Mattel employee, purportedly would be considered "works for hire" of MGA; and that all intellectual property rights to preexisting works by Bryant, including Bratz designs, purportedly were assigned to MGA.

## IV. MGA STEALS MATTEL TRADE SECRETS IN MEXICO

37. On information and belief, in or about late 2003 or early 2004, MGA decided to open business operations in Mexico. Faced with the difficult task of developing an overall strategy for expanding into a market in which it had only a nominal presence and no operations, MGA elected to steal Mattel's plans, strategy and business information for the Mexican market and materials related to Mattel's

worldwide business strategies. As detailed below, MGA and Larian approached three employees of Mattel's Mexican subsidiary ("Mattel Mexico"), enticed them to steal Mattel's most sensitive business planning materials, and then hired them to assist in establishing and running MGA's new Mexican subsidiary.

**A. MGA Hires Three Senior Mattel Employees in Mexico**

38. Carlos Gustavo Machado Gomez ("Machado") was the Senior Marketing Manager, Boys Division, for Mattel Mexico, a position of trust and confidence. He was employed at Mattel Mexico from April 1, 1997 until April 19, 2004. His duties included short, medium and long-term marketing planning, generating product sales projections, and assisting in creation of the media plan. In his position, Machado had access to highly confidential and sensitive marketing and product development information. Machado had an employment agreement with Mattel in which he agreed to maintain the confidentiality of Mattel's protected information. Mattel's policies also required Machado to protect Mattel's proprietary information and not to disclose it to competitors.

39. Mariana Trueba Almada ("Trueba") was the Senior Marketing Manager, Girls Division, for Mattel Mexico, a position of trust and confidence. She was employed at Mattel Mexico from November 3, 1997 until April 19, 2004. Like Machado, her duties included short, medium and long-term marketing planning, generating product sales projections, and assisting in creation of the media plan. In her position, Trueba had access to highly confidential and sensitive marketing and product development information. Trueba had an employment agreement with Mattel in which she agreed to maintain the confidentiality of Mattel's protected information. Mattel's policies also required Trueba to protect Mattel's proprietary information and not to disclose it to competitors.

40. Pablo Vargas San Jose ("Vargas") was a Senior Trade Marketing Manager with Mattel Mexico, a position of trust and confidence. He was employed at Mattel Mexico from March 29, 2001 until April 19, 2004. Vargas was

responsible for ensuring that point-of-sale promotions were carried out, analyzing the results of such promotions, negotiating promotion budgets, and generally managing promotional activities. Vargas also had access to highly confidential and sensitive marketing and product development information. Vargas had an employment agreement with Mattel in which he agreed to maintain the confidentiality of Mattel's protected information. Mattel's policies also required Vargas to protect Mattel's proprietary information and not to disclose it to competitors.

41. Beginning in late 2003 or early 2004, Machado, Trueba and Vargas began planning to leave Mattel Mexico to join MGA. In connection with that plan, and with the encouragement of Larian and other MGA officers operating in the United States, they began accessing, copying and collecting proprietary Mattel documents to take with them. On April 19, 2004, Machado, Trueba and Vargas each resigned their positions with Mattel, effective immediately. They stated that they had been hired by a Mattel competitor, but refused to identify that competitor. In fact, they had been offered and accepted employment by MGA to establish and run MGA's new operation in Mexico.

**B. Machado, Trueba and Vargas Stole Dozens of Confidential Trade Secret Marketing and Sales Documents for MGA's Benefit**

42. Following these resignations, Mattel discovered that Machado, Trueba and Vargas had been in frequent telephonic and e-mail contact with MGA personnel, including Larian, for over three months prior to their resignations. The primary vehicle for these communications in furtherance of their "plot" was an America Online e-mail account with the address <plot04@aol.com>. On information and belief, during this time, Machado, Trueba and Vargas supplied Larian with certain Mattel confidential and proprietary information in order to prove their value to MGA and to improve their negotiating position vis-à-vis their respective employment contracts with MGA.

43. In March 2004, Machado, Trueba and Vargas were making plans to travel from Mexico to Los Angeles to meet with MGA personnel in person prior to resigning their positions at Mattel. Also, by at least March 3, 2004, Machado, Trueba and Vargas were discussing with MGA personnel, including Larian, specific details regarding setting up MGA offices in Mexico City. On information and belief, prior to their resignations, Larian and others at MGA directed Machado, Trueba and Vargas to steal virtually all Mattel confidential and proprietary information that they could access and bring it with them to MGA. This was reflected in, among things, e-mail messages that Mattel had discovered after Machado, Trueba and Vargas had resigned. For example, on March 22, 2006, approximately one month before they resigned, Machado, Trueba and Vargas wrote an e-mail message from the <plot04@aol.com> e-mail account addressed to Larian, MGA's General Manager Susan Kuemmerle and another MGA officer Thomas Park. In that e-mail message, Machado, Trueba and Vargas sought to prove their value in this endeavor to MGA by writing: "Attached you will find our analysis for future discussion. We will be available during the nights of the week after 16:30 Los Angeles time . . . ." In another e-mail message, showing that the participants intentionally sought to maximize the damage to Mattel from their conduct, Kuemmerle wrote to Larian and Park: "Gustavo, Mariana and Pablo want to resign (all at the same time, and you can believe my smile!) next Wednesday."

44. Beginning on April 12, 2004, a week before his resignation and after numerous communications and meetings with Larian and other MGA personnel, Machado began transferring additional Mattel confidential and proprietary information to a portable USB storage device (also know as a "thumb drive") that he connected to his Mattel computer. On Friday, April 16, 2004, the last business day before he gave notice, Machado copied at least 70 sensitive documents to the portable USB storage device.

45. Starting on April 12, 2004, Vargas also copied a host of confidential and proprietary materials to a portable USB storage device, including sales plans, sales projections and customer profiles.

46. On April 16, 2004, Trueba also copied Mattel confidential and proprietary information to a portable USB storage device connected to her Mattel computer.

47. With full knowledge that she was going to leave Mattel for a competitor, Trueba also took steps to increase further her access to Mattel's confidential information shortly before her resignation. For example, just four days before leaving, Trueba went out of her way to seek to attend a meeting at which Mattel personnel analyzed BARBIE programs for the United States, Canada and South America. Two days before her resignation, she contacted both a Mattel employee located in El Segundo, California and Mattel's advertising agency to request updated confidential information about advertising plans for BARBIE. On information and belief, Trueba acted at the direction of MGA and Larian and did so in order to obtain further information that would allow MGA to obtain unfair competitive advantage over Mattel.

48. Machado, Trueba and Vargas stole virtually every type of document a competitor would need to enter the Mexican market and to unlawfully compete with Mattel in Mexico, in the United States, and elsewhere. They stole global internal future line lists that detailed anticipated future products, production and shipping costs for Mattel products; daily sales data for Mattel products; customer data; sales estimates and projections; marketing projections; documents analyzing changes in sales performance from 2003 to 2004; budgets for advertising and promotional expenses; strategic research reflecting consumer responses to products in development; media plans; consumer comments regarding existing Mattel products customer discounts and terms of sale; customer inventory level data; assessments of promotional campaign success; market size historical data and

projections; marketing plans and strategies; merchandising plans; retail pricing and marketing strategies; and other similar materials.

49. The stolen data was not limited to the Mexican market. The information stolen would, and did, give MGA an unfair competitive advantage in the United States and around the world. Further, the stolen information was not located exclusively in Mexico, but included confidential and proprietary information that resided on Mattel computers in Phoenix, Arizona and El Segundo, California, and/or documents which were originally created by personnel in El Segundo. Included among these stolen documents was one of Mattel's earliest internal global line lists, which included information for BARBIE products for the upcoming year and included, for each product, the expected profit margin, advertising expenditures, expected volume and marketing strategy. On information and belief, Machado, Trueba or Vargas delivered that internal line list to Larian or another MGA officer during their negotiations with MGA.

50. MGA has used the information taken from Mattel to obtain an unfair advantage over Mattel, including in both the United States and Mexico. In fact, MGA later publicized its claim that, in 2005, it had increased its Mexican market share by 90 percent over the prior year. This increase came at the expense of Mattel, which lost market share during 2004 in Mexico and was forced to increase its advertising and promotional spending to offset further losses.

51. Machado, Trueba and Vargas attempted to conceal their widespread theft of Mattel's proprietary information. For example, Machado ran a software program on his Mattel personal computer in an attempt to erase information, including information that would reveal the addresses to which he had sent, or from which he had received, e-mail messages. On information and belief, for the same purpose Machado also damaged the hard drive of the personal computer that he used at Mattel.

52. On information and belief, on April 19, 2004, immediately after Machado, Trueba and Vargas simultaneously resigned, they traveled from Mexico to Los Angeles to meet with MGA personnel, including Larian, in person.

53. Mattel notified Mexican authorities about the theft of its trade secret and confidential information. On October 27, 2005, the Mexican Attorney General Office obtained a search warrant from the Mexican Federal Criminal Courts for MGA's facilities in Mexico City. In that search, the Mexican authorities found and seized from MGA's offices both electronic and paper copies of a large number of documents containing Mattel trade secrets, including those that Mattel discovered through its forensic investigations, plus many others that Mattel had not known had been stolen.

54. Based on Machado's "performance" in Mexico, Isaac Larian subsequently promoted Machado and he was transferred to MGA's main office in Van Nuys, California. On information and belief, Machado currently resides in the County of Los Angeles, California.

## V. MGA HIRES MATTEL'S SENIOR VICE PRESIDENT AND GENERAL MANAGER TO FACILITATE ITS THEFT AND USE OF MATTEL'S HIGHLY VALUABLE BUSINESS METHODS AND PRACTICES

55. On October 1, 2004, Mattel's Senior Vice President and General Manager, Ron Brawer, left Mattel and joined MGA. Tyco Toys, Inc. ("Tyco"), a predecessor to Mattel, had hired Brawer on April 22, 1996. The same day, Brawer entered into an Employee Invention & Trade Secret Agreement with Tyco. On April 9, 1997, Brawer became a Marketing Director for Mattel in Mount Laurel, New Jersey, and remained bound by his Employee Invention & Trade Secret Agreement.

56. In January 2003, while Brawer held a position of trust and confidence at Mattel, Mattel's "Code of Conduct" was circulated to all Mattel employees worldwide. Included in the Code of Conduct were statements that:

> Employees and Directors have an obligation to protect the confidentiality of Mattel's proprietary information. Proprietary information is any information not generally known to the public that is useful to Mattel, that would be useful to its competitors or other third parties or that would be harmful to Mattel or its customers if disclosed. Proprietary information includes trade secrets, revenue and profit information and projections, new product information, marketing plans, design and development efforts, manufacturing processes and any information regarding potential acquisitions, divestitures and investments.
>
> We can protect the security of Mattel's proprietary information by limiting access to it. Confidential information should not be discussed with those who are not obligated to maintain the information in confidence and in public places where the information is not likely to be kept secret, such as planes, restaurants and elevators. The obligation to preserve confidential information continues even after employment ends.

The Code of Conduct applied to Brawer and required that he meet his obligations under the Code of Conduct.

57. By 2003, Brawer had advanced within Mattel to a Senior Vice President position over customer marketing, a position of trust and confidence. In his executive position, Brawer was provided access to information that was both sensitive and confidential, including, but not limited to, detailed information related to development, manufacture, marketing, pricing, shipping, and performance of

Mattel's then-current and anticipated future product lines, and other confidential business plans between Mattel and its most significant retail customers.

58. In December 2003, Alan Kaye, Mattel's Senior Vice President of Human Resources, asked Brawer whether he was discussing potential employment with MGA. Brawer denied that he had been in contact with MGA and represented that he would not talk to MGA. Throughout 2004, Mattel reminded and stressed to its employees, including Brawer, the importance of protecting Mattel's confidential and proprietary materials and information.

59. On March 18, 2004, in response to a survey from the President of Mattel Brands, Matt Bousquette, confirming compliance with Mattel's Code of Conduct, Brawer wrote back that he "applaud[ed] the company's vigorous protection of it's [sic] intellectual property," reflecting Brawer's clear understanding that Mattel required its proprietary information to be kept confidential.

60. In April 2004, Mattel promoted Brawer to Senior Vice President/General Manager. The General Manager position also is an executive position of trust and confidence. The role of a General Manager is to lead a cross-functional "Customer Business Team." Each General Manager is accountable for a strategic partnership with a key Mattel retailer, covering all aspects of the business, including both traditional toy sales and retail development of licensed products.

61. In or about late May 2004, Brawer began performing General Manager duties, working with one of Mattel's major retail customer accounts. Thereafter, Brawer began receiving information related not only to the Senior Vice President, Customer Marketing position that he still formally held, but also began receiving detailed information related to his role as General Manager. Brawer began requesting and analyzing detailed information related to Mattel and its four key retail accounts.

62. On September 15, 2004, Brawer left work at noon for observance of Rosh Hashanah. As Brawer left, he carried a large cardboard box with binders and other materials. Several hours after his departure, Brawer instructed his assistant to print Mattel's 2004 Sales Plan for one of Mattel's significant customers and to provide it to him, falsely claiming he needed it for a meeting

63. On September 17, 2004, Brawer returned to Mattel and immediately informed his supervisor that he was leaving Mattel, effective October 1, 2004, to work for competitor MGA.

64. On September 20, 2004, Mattel hand-delivered a letter to Brawer reminding him of his continuing obligation to preserve the confidentiality of Mattel's proprietary information and trade secrets not only through October 1, 2004, but continuing beyond the termination of his employment.

65. At his exit interview on September 29, 2004, Mattel reminded Brawer that he had ongoing duties of confidentiality to Mattel, even after the termination of his employment. Brawer was given a copy of his Original Confidentiality Agreement, which he had signed on April 22, 1996, and another copy of the Code of Conduct. During the exit interview, however, Brawer noted that he had not signed the Code of Conduct, which he intended and Mattel understood to mean that Brawer believed he was not bound by Mattel's policy because he had not signed it. Brawer was unwilling to complete or sign the form that sought to confirm that Brawer understood his ongoing obligations under the Code of Conduct, which included the obligation to preserve the confidentiality of Mattel's proprietary and trade secret information.

66. On October 1, 2004, Brawer's final day of employment with Mattel, Mattel hand-delivered to Brawer a letter that, among other things, reminded Brawer of his confidentiality obligations to Mattel under the Code of Conduct.

67. Upon joining MGA, Brawer became its Executive Vice-President of Sales and Marketing. In that role he was responsible for MGA's sales

worldwide. As part of those responsibilities, Brawer had and continues to have responsibility for MGA's accounts with the same retailers that he worked with while at Mattel.

68. Brawer represented during his Mattel exit interview that he had returned all proprietary information to Mattel. That representation was false. On information and belief, Brawer removed proprietary and trade secret information from Mattel that he did not return. Mattel is informed and believes that Brawer did not return to Mattel, for example, the information contained in his contacts file. The contacts file included contact information for Mattel customers, most notably TRU, and extensive contact information for Mattel employees, including titles, e-mail addresses and telephone numbers.

69. Mattel has recently learned that Brawer has been using that contact information on a regular basis, including within recent months. Since leaving Mattel, Brawer has had contacts with Mattel employees, both by telephone and by electronic mail. Based on his knowledge of Mattel's operations and the roles of certain Mattel employees, he has targeted certain Mattel employees who have broad access to Mattel proprietary information in an effort to induce and encourage them to join MGA and to steal or otherwise wrongfully misappropriate Mattel confidential information and trade secrets. Brawer has done so by promising these Mattel employees salaries 25 percent or more higher than they earn at Mattel and stating to them that they should not be concerned by legal action taken by Mattel to protect its trade secrets and its rights because such claims are hard to prove and easy to defeat.

## VI. MGA STEALS MATTEL TRADE SECRETS IN CANADA

70. In an effort to increase its market share and sales in Canada and elsewhere, MGA stole Mattel trade secrets regarding Mattel's customers, sales, projects, advertising and strategy, not only for Canada, but the United States and the rest of the world.

71. Janine Brisbois was a Director of Sales for the Girls Division in Canada. Mattel hired her as a National Account Manager in August 1999. When she was hired as a Mattel employee, Brisbois agreed that she would preserve and would not disclose Mattel's proprietary or confidential information. For example, Brisbois agreed:

> You must keep Mattel's Proprietary Information confidential, and you may only use or disclose such information as necessary to perform your job responsibilities in accordance with Mattel policies. Your obligation to keep Mattel's Proprietary Information confidential will continue even after any termination of your employment with your employer.
>
> . . .
>
> Mattel takes steps to maintain the secrecy and confidential nature of Mattel's Proprietary Information and, if a competitor discovered Mattel's Proprietary Information, it could significantly damage Mattel and your Employer.

72. While with Mattel, Brisbois had responsibility for Mattel's account with TRU and later had responsibility for Mattel's Wal-Mart account. In her capacity as Sales Director-Wal-Mart/CTC/Girls Team, Brisbois had access to Mattel confidential and proprietary information regarding Mattel's future product lines, advertising and promotional campaigns and product profitability.

73. On September 26, 2005, Brisbois resigned from Mattel to take a position as Vice President of Sales at MGA. Mattel is informed and believes that in that position Brisbois has responsibility for MGA's accounts with both TRU and Wal-Mart. During Brisbois' exit interview she was specifically asked whether she was "taking anything." Brisbois responded, "No." Both during and after her exit interview, Brisbois was advised by Mattel of her obligations to preserve Mattel's confidential and proprietary information.

74. Mattel is informed and believes that Brisbois spoke with Isaac Larian, MGA's CEO, on September 22, 2005 at approximately 8:30 p.m., when he called Ms. Brisbois at her home. Mattel subsequently learned that on the same day that she spoke with Mr. Larian and four days before she resigned, Brisbois copied approximately 45 Mattel documents on to a USB or "thumb" drive with the volume label "BACKPACK." On information and belief, Brisbois removed the thumb drive from Mattel Canada's office by concealing it in her backpack or gym bag the last time that she left that office. These documents contained Mattel trade secret and proprietary information, and included:

- a document containing the price, cost, sales plan and quantity of every Mattel product ordered by every Mattel customer in 2005 and 2006;
- the BARBIE television advertising strategy and information concerning sales increases generated by television advertisements;
- competitive analysis of Mattel vis-à-vis its competitors in Canada;
- an analysis of Mattel's girls business sales beginning in 2003 and forecasts through 2006;
- profit and loss reviews for Mattel's products being sold in Wal-Mart, including margins and profit in not only Canada, but in the United States and Mexico; and
- a document containing the product launch dates and related advertising for all Mattel new products between Fall 2005 and Spring 2006.

75. After Mattel discovered that Brisbois had copied these sensitive documents to a thumb drive, Mattel notified Canadian law enforcement authorities. Canadian law enforcement authorities recovered from Brisbois a thumb drive with the volume label "BACKPACK" containing the documents that Brisbois had copied from Mattel's computer system. Mattel later learned that while she was working as a Vice President of Sales at MGA, Brisbois accessed and modified documents on that thumb drive.

76. After joining MGA, Brisbois repeatedly traveled to MGA's offices in Van Nuys, California and met with Larian and Brawer. In February, 2006, knowing that Mattel trade secrets had been seized from MGA's Mexico City offices and that at least three MGA employees were under criminal investigation, MGA nonetheless issued a press release trumpeting its 2005 performance, with Larian himself concluding, "Our international teams in Mexico and Canada have done a fantastic job."

## VII. MGA PERSUADES OTHER EMPLOYEES LEAVING MATTEL TO JOINT MGA TO MISAPPROPRIATE MATTEL TRADE SECRETS FOR THE BENEFIT OF MGA

77. In the past few years, MGA has hired directly from Mattel's United States operations at least 25 employees, from Senior Vice-President level to lower level employees. On information and belief, many of these employees were specifically targeted and recruited by MGA, including by Larian and Brawer, based on the Mattel confidential and proprietary information they could access. Many of these employees had access to information that Mattel considers to be highly proprietary and confidential. Mattel believes that some of those former Mattel employees may be observing their obligations not to misappropriate, disclose or use Mattel's confidential and proprietary information. Mattel is informed and believes, however, that certain additional employees accessed, copied and took from Mattel confidential and proprietary information, including Mattel's strategic plans; business operations, methods and systems; marketing and advertising strategies and plans; future product lines; product profit margins; and customer requirements. The misappropriated confidential and proprietary information included information that these Mattel employees were not authorized to access. On information and belief, the misappropriated confidential and proprietary information taken from Mattel is being disclosed to and used by MGA for the benefit of MGA and to the detriment of Mattel.

## VIII. LARIAN MAKES MISREPRESENTATIONS TO RETAILERS ABOUT MATTEL'S PRODUCTS

78. Defendants have engaged in other illegal practices in their efforts to compete unfairly with Mattel. Larian has a practice of sending e-mail messages to a "Bratz News" distribution list that Larian created or that was created for him. Mattel is informed and believes that the recipients of e-mail messages sent to the "Bratz News" distribution list include members of the media as well as representatives of many of Mattel's most significant customers.

79. On May 12, 2006, Larian sent an e-mail message to the "Bratz News" distribution list that included a reference to Mattel's updated MY SCENE MY BLING BLING product with real gems. Mattel had not publicly announced this product at the time that Larian sent his May 12, 2006 e-mail. In fact, Mattel had guarded the identification of this particular product.

80. Shortly thereafter, Larian engaged in a campaign of calling Mattel's most significant customers, including but not limited to Target and TRU, regarding the MY SCENE MY BLING BLING product with real gems. In an effort to dissuade these retailers from purchasing Mattel's MY SCENE MY BLING BLING product with real gems, Larian knowingly made false factual statements about that product to each retailer. As of the writing of this First Amended Complaint, Mattel is aware that Larian represented to each retailer that each was the only retailer to purchase the product and that Mattel would not be supporting the product with television advertising. At the time that Larian made these statements, he knew them to be false. As a result of Larian's misrepresentations, at least one retailer cancelled its order for 75,000 units of the MY SCENE MY BLING BLING product with real gems. Only after Mattel learned of Larian's misrepresentations and was able to correct them was Mattel able to assure the retailer that Larian's representations were false and to persuade the retailer to reinstate the order.

81. Such conduct is not an isolated incident. MGA and Larian, in an effort to gain an unfair competitive advantage, repeatedly issued false and misleading press releases. In these press releases, MGA and Larian have misrepresented Bratz's sales, Bratz's market share, Bratz's position vis-à-vis Mattel's BARBIE products, sales of Mattel's BARBIE products, and the market share of Mattel's BARBIE products.

**CLAIMS FOR RELIEF**

**First Claim**

**Copyright Infringement**

**(Against MGA, MGA Entertainment (HK) Limited, Larian, Bryant and Does 4 through 10)**

82. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 81, above, as though fully set forth at length.

83. Mattel is the owner of copyrights in works that are fixed in tangible media of expression and that are the subject of valid, and subsisting, copyright registrations owned by Mattel. These include, without limitation, the works that are the subject of Registrations VA 1-378-648, VA 1-378-649, VA 1-378-650, VA 1-378-651, VA 1-378-652, VA 1-378-653, VA 1-378-654, VA 1-378-655, VA 1-378-656, VA 1-378-657, VA 1-378-658, VA 1-378-659, VA 1-378-660, VAu 715-270, VAu 715-271 and VAu 715-273.

84. Defendants have reproduced, created derivative works from and otherwise infringed upon the exclusive rights of Mattel in its protected works without Mattel's authorization. Defendants' acts violate Mattel's exclusive rights under the Copyright Act, including without limitation Mattel's exclusive rights to reproduce its copyrighted works and to create derivative works from its copyrighted works, as set forth in 17 U.S.C. §§ 106 and 501.

85. Defendants' infringement (and substantial contributions to the infringement) of Mattel's copyrighted works is and has been knowingly made

without Mattel's consent and for commercial purposes and the direct financial benefit of defendants. Defendants, moreover, have deliberately failed to exercise their right and ability to supervise the infringing activities of others within their control to refrain from infringing Mattel's copyrighted works and have failed to do so in order to deliberately further their significant financial interest in the infringement of Mattel's copyrighted works. Accordingly, defendants have engaged in direct, contributory and vicarious infringement of Mattel's copyrighted works.

86. By virtue of defendants' infringing acts, Mattel is entitled to recover Mattel's actual damages plus defendants' profits, Mattel's costs of suit and attorneys' fees, and all other relief permitted under the Copyright Act.

87. Defendants' actions described above have caused and will continue to cause irreparable damage to Mattel, for which Mattel has no remedy at law. Unless defendants are restrained by this Court from continuing their infringement of Mattel's copyrights, these injuries will continue to occur in the future. Mattel is accordingly entitled to injunctive relief restraining defendants from further infringement.

## Second Claim

### Violation of the Racketeer Influenced and Corrupt Organizations Act 18 U.S.C. §§ 1962(c) and 1964(c)

### (Against All Defendants)

88. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 87, above, as though fully set forth at length.

89. Beginning at various times from approximately 1999 through the filing of this First Amended Complaint, in the Central District of California and elsewhere, defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas and Brisbois were employed by and associated-in-fact with an enterprise engaging in,

and the activities of which affect, interstate and foreign commerce (the "MGA Criminal Enterprise"). The MGA Criminal Enterprise is made up of the MGA Group (MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, certain of the Doe defendants and Brawer), the Bryant Group (Bryant and certain of the Doe defendants), the Mexican Group (Machado, Trueba and Vargas) and the Canadian Group (Brisbois).

90. MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas, Brisbois, and the Other Former Employees, and each of them, for the purpose of executing and attempting to execute the scheme to improperly defraud Mattel and steal its trade secret or otherwise confidential and proprietary information, by means of tortious, fraudulent and criminal conduct, did and do unlawfully, willfully and knowingly conduct and participate, directly and indirectly, in the conduct of the MGA Criminal Enterprise's affairs through a pattern of racketeering activity. Their actions include multiple, related acts in violation of: 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1512 (tampering with a witness victim, or informant), 18 U.S.C. § 1952 (interstate and foreign travel to aid racketeering), and 18 U.S.C. § 2319(a) and 17 U.S.C. § 506(a)(1)(A) (criminal copyright infringement).

91. MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas, Brisbois, and the Other Former Employees, and each of them, shared the common purpose of enabling MGA to obtain confidential, proprietary and otherwise valuable Mattel property through improper means in order to assist MGA in illegally competing with Mattel domestically and throughout the world.

92. The MGA Criminal Enterprise as described herein is at all relevant times a continuing enterprise because, among obvious reasons, it is designed and did unlawfully acquire the confidential business information and

property of Mattel and incorporated this information and property into MGA's ongoing business, marketing strategies and business methods, practices and processes. The conduct of the enterprise continues through the date of this First Amended Complaint and is ongoing by virtue of MGA's continuing use of Mattel's information and property, all to the detriment of Mattel.

93. The pattern of racketeering activity, as defined by 18 U.S.C. §§ 1961(1) and (5), presents both a history of criminal conduct and a distinct threat of continuing criminal activity. This activity consists of multiple acts of racketeering by each member of the MGA Criminal Enterprise, is interrelated, not isolated and is perpetrated for the same or similar purposes by the same persons. This activity extends over a substantial period of time, up to and beyond the date of this First Amended Complaint. These activities occurred after the effective date of 18 U.S.C. §§ 1961 *et seq.*, and the last such act occurred within 10 years after the commission of a prior act of racketeering activity. These racketeering activities included repeated acts of:

(a) Mail Fraud: Defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and Does 4 through 10, aided and abetted by each other and some or all of the remaining members of the MGA Criminal Enterprise, having devised a scheme or artifice to defraud Mattel of its confidential trade secret information and property by conversion, false representations, concealment and breaches of fiduciary duty, did for the purpose of furthering and executing such a scheme or artifice to defraud, deposited or caused to be deposited matters or things to be sent or delivered by the Postal Service, or any private or commercial interstate carrier, or took or received matters or things therefrom, or knowingly caused matters or things to be delivered by mail or such carrier according to the direction

thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 2, as alleged with greater particularity in the foregoing paragraphs and as set forth in Exhibit C;

(b) Wire Fraud: Defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and Does 4 through 10, aided and abetted by each other and some or all of the remaining members of the MGA Criminal Enterprise, having devised a scheme or artifice to defraud Mattel of its confidential and trade secret information and property by conversion, false representations, concealment and breaches of fiduciary duty, did for the purpose of furthering and executing such a scheme or artifice to defraud, transmit and cause to be transmitted by means of wire communications in interstate or foreign commerce, writing, signs, signals, pictures or sound, in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 2, as alleged with greater particularity in the foregoing paragraphs and as set forth in Exhibit C;

(c) Tampering With a Witness, Victim or Informant: Defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and Does 4 through 10, aided and abetted by each other and some or all of the remaining members of the MGA Criminal Enterprise, did corruptly alter, destroy, mutilate, or conceal a record, document, or other object, or attempted to do so, with the intent to impair the object's integrity or availability for use in an official proceeding. Such actions are in violation of 18 U.S.C. § 1512 and 18 U.S.C. § 2, as alleged with greater particularity in the foregoing paragraphs;

(d) Interstate and Foreign Travel in Aid of Racketeering Enterprises: Defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and Does 4 through 10, aided and abetted by each other and some or all of the remaining members of the MGA Criminal Enterprise, traveled in interstate and foreign commerce, or used the mail or any facility in interstate or foreign commerce, with the intent to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of unlawful activity, *i.e.* bribery, in violation of the laws of the State of California, *Cal. Penal Code* § 641.3, all in violation of 18 U.S.C. § 1952 and 18 U.S.C. § 2, as alleged with greater particularity in the foregoing paragraphs;

(e) Criminal Copyright Infringement: Defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and Does 4 through 10, aided and abetted by each other and some or all of the remaining members of the MGA Criminal Enterprise, willfully infringed Mattel's copyrights, including with respect to documents containing Mattel trade secret and confidential information, for purposes of commercial advantage and private financial gain, all in violation of 18 U.S.C. § 2319(a) and 17 U.S.C. § 506(a)(1)(A), as alleged with greater particularity in the foregoing paragraphs.

94. The persons alleged herein to have violated 18 U.S.C. § 1962(c) are separate from, though employed by or associated with, MGA, the MGA Group, the Bryant Group, the Mexican Group and the Canadian Group.

95. MGA had a role in the racketeering activity that was distinct from the undertaking of those acting on its behalf. MGA also attempted to benefit,

the Mexican Group and the Canadian Group, constituting a group of individuals associated-in-fact, did unlawfully, willfully, and knowingly participate in and conduct, directly and indirectly, the MGA Criminal Enterprise's affairs through a pattern of racketeering activity.

101. The pattern of racketeering activity, as defined by 18 U.S.C. §§ 1961(1) and (5), including acts of mail fraud in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 2; acts of wire fraud in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 2; acts of tampering with witnesses, victims or informants in violation of 18 U.S.C. § 1512 and 18 U.S.C. § 2; acts of interstate and foreign travel in aid of racketeering enterprises in violation of 18 U.S.C. § 1952 and 18 U.S.C. § 2; and acts of criminal copyright infringement in violation of 18 U.S.C. § 2319(a) and 17 U.S.C. § 506(a)(1)(A).

102. Defendants and the other members of the MGA Criminal Enterprise schemed to defraud Mattel and steal its property and trade secret information by means of false representation, breaches of fiduciary duty, conversation and concealment, as more fully set forth in the foregoing paragraphs.

103. In furtherance of this unlawful conspiracy, and to effect its objectives, defendants and various co-conspirators committed numerous overt acts, including but not limited to those set forth in the foregoing paragraphs.

104. Mattel has been injured in its business or property as a direct and proximate result of the defendants' and the other enterprise members' violations of 18 U.S.C. § 1962(d), including injury by reason of the predicate acts constituting the pattern of racketeering activity.

105. As a result of the conspiracies between and among all defendants and the other conspirators to violate 18 U.S.C. § 1962(c), Mattel has suffered substantial damages, in an amount to be proved at trial. Pursuant to 18 U.S.C. § 1964(c), Mattel is entitled to recover treble its general and special compensatory

damages, plus interest, costs and attorneys, fees, incurred by reason of defendants' violations of 18 U.S.C. § 1962(d).

**Fourth Claim**

**Misappropriation of Trade Secrets**

**(Against Defendants MGA, MGA de Mexico, Larian, Machado and Does 4 through 10)**

106. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 105, above, as though fully set forth at length.

107. As used herein, "Trade Secret Material" shall mean the documents, materials and information stolen by Machado, Trueba, Vargas, Brisbois, the Other Former Employees, and other persons acting for, on behalf of or at the direction of MGA and/or Larian. Prior to their theft by defendants, the Trade Secret Materials gave Mattel a significant competitive advantage over its existing and would-be competitors, including MGA. This advantage, as to MGA, has now been compromised as a result of defendants' unlawful activities.

108. Mattel made reasonable efforts under the circumstances to maintain the confidentiality of the Trade Secret Materials, including by having employees and consultants who may have access the Trade Secret Materials sign confidentiality agreements that oblige them not to disclose the Trade Secret Materials or characteristics of the Trade Secret Materials; by limiting the circulation of said materials within Mattel; by protecting and limiting access to computers with log-in identifications and passwords; by limiting each employee's access to electronic files to those that the particular employee needs to access; by educating employees on the nature of Mattel's information that is confidential and proprietary; and by reminding employees on a regular and periodic basis of their obligation to protect and maintain Mattel's confidential and proprietary information.

109. Mattel's Trade Secret Materials derive independent economic value from not being generally known to the public or to other persons who can obtain economic benefit from their disclosure.

110. Defendants have illegally obtained the trade secret materials, as set forth above, and through other means of which Mattel is presently unaware.

111. Defendants have used and disclosed Mattel's Trade Secret Materials without Mattel's consent and without regard to Mattel's rights, and without compensation, permission, or licenses for the benefit of themselves and others.

112. Defendants' conduct was, is, and remains willful and wanton, and was taken with blatant disregard for Mattel's valid and enforceable rights.

113. Defendants' wrongful conduct has caused and, unless enjoined by this Court, will continue in the future to cause irreparable injury to Mattel. Mattel has no adequate remedy at law for such wrongs and injuries. Mattel is therefore entitled to a permanent injunction restraining and enjoining defendants, and each of them, as well as their agents, servants, and employees, and all persons acting thereunder, in concert with, or on their behalf, from further using in any manner Mattel's trade secrets.

114. In addition, as a proximate result of defendants' misconduct, Mattel has suffered actual damages, and defendants have been unjustly enriched.

115. The aforementioned acts of the defendants were willful and malicious, including in that defendants misappropriated Mattel's trade secrets with the deliberate intent to injure Mattel's business and improve their own. Mattel is therefore entitled to enhanced damages. Mattel is also entitled to reasonable attorney's fees.

## Fifth Claim

**Breach of Contract**

**(Against Bryant)**

116. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 115, above, as though fully set forth at length.

117. Pursuant to his Employment Agreement, Bryant agreed that he would not, without Mattel's express written consent, engage in any employment or business other than for Mattel or assist in any manner any business competitive with the business or future business plans of Mattel during his employment with Mattel. Pursuant to his Mattel Employment Agreement, Bryant further assigned to Mattel all right, title and interest in "inventions," including without limitation "designs" and other works that he conceived, created or reduced to practice during his employment by Mattel. In addition, pursuant to the Conflict Questionnaire, Bryant certified that, other than as disclosed, he had not worked for any competitor of Mattel and had not engaged in any business venture or transaction involving a Mattel competitor that could be construed as a conflict of interest. Bryant further promised that he would notify his supervisor immediately of any change in his situation that would cause him to change any of the foregoing certifications or representations.

118. The Employment Agreement and the Conflict Questionnaire are valid, enforceable contracts, and Mattel has performed each and every term and condition of the Employment Agreement and Conflict Questionnaire required to be performed by Mattel.

119. Bryant materially breached the foregoing contracts with Mattel, in that, among other things, he secretly aided, assisted and worked for a Mattel competitor during his employment with Mattel without the express written consent of Mattel.

120. As a consequence of Bryant's breach, Mattel has suffered and will, in the future, continue to suffer damages in an amount to be proven at trial. Such damages include, without limitation, the amounts paid by the competitor to Bryant during his Mattel employment; the amounts paid by MGA to Bryant during his Mattel employment; the amount that Mattel paid Bryant during the time he wrongfully worked with MGA; the value of information and intellectual property owned by Mattel which Bryant provided to MGA; the value of the benefits that MGA obtained from Bryant during the time he was employed by Mattel; and the value of the benefits that MGA obtained from Bryant as a result of the work he performed for or with MGA during his Mattel employment.

121. Bryant's conduct has caused, and unless enjoined will continue to cause, irreparable injury to Mattel that cannot be adequately compensated by money damages and for which Mattel has no adequate remedy at law. Bryant specifically acknowledged in his Employment Agreement that his breach of the Agreement "likely will cause irreparable harm" to Mattel and that Mattel "will be entitled to injunctive relief to enforce this Agreement, in addition to damages and other available remedies." Accordingly, Mattel is entitled to orders mandating Bryant's specific performance of his contracts with Mattel and restraining Bryant from further breach.

**Sixth Claim**

**Intentional Interference with Contract**

**(Against MGA, Larian and Does 4 through 10)**

122. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 121, above, as though fully set forth at length.

123. Valid agreements existed between Mattel and Bryant, Brawer, Machado, Trueba, Vargas, Brisbois and the Other Former Employees (collectively, the "Mattel Employees")

124. At all times herein mentioned, MGA, Larian and Does 4 through 10 knew that the Mattel Employees had a duty under their agreements not to work for or assist any competitor of Mattel, such as MGA. In addition, at all times mentioned herein, MGA, Larian and Does 4 through 10 knew that Bryant had assigned to Mattel, and was obligated to disclose to Mattel all inventions, including designs and other works, created, conceived or reduced to practice during their employment with Mattel.

125. Despite such knowledge, defendants MGA, Larian and Does 4 through 10 intentionally and without justification solicited, induced and encouraged the Mattel Employees to breach their contracts with Mattel.

126. As a direct and proximate result of defendants' efforts and inducements, the Mattel Employees did breach their contracts with Mattel.

127. As a result of said breaches, Mattel has suffered damages and will imminently suffer further damages, including the loss of its competitive position and lost profits, in an amount to be proven at trial.

128. Defendants performed the aforementioned conduct with malice, fraud and oppression, and in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to recover exemplary damages from defendants in an amount to be determined at trial.

**Seventh Claim**

**Breach of Fiduciary Duty**

**(Against Bryant and Machado)**

129. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 128, above, as though fully set forth at length.

130. Bryant and Machado held positions of trust and confidence with Mattel. In their positions, Bryant and Machado had access to and were entrusted with Mattel's proprietary and confidential information, supervised the work of others, exercised discretion and worked independently in many of their job

assignments and duties. In their positions, Bryant and Machado also represented Mattel in its dealings with third parties and, in actions in the course and scope of their employment with Mattel, were agents of Mattel. They confirmed their relationship of trust with Mattel in respective employee agreements. Bryant and Machado thus owed Mattel a fiduciary duty that included, but was not limited to, an obligation not to take any action that would be contrary to Mattel's best interests or that would deprive Mattel of any opportunities, profit or advantage which Bryant or Machado might bring to Mattel.

131. Bryant breached his fiduciary duty to Mattel in that, while employed by Mattel, he secretly aided and assisted a competitor of Mattel, including without limitation by entering into an agreement with a Mattel competitor. As alleged above, Bryant also breached the aforementioned duty by using Mattel property and resources for the benefit of, and to aid and assist, himself personally and MGA.

132. Machado breached his fiduciary duty to Mattel, in that while employed by Mattel, he secretly aided and assisted a competitor of Mattel by, among other things, misappropriating Mattel trade secret and proprietary information and providing said information to officers of MGA. Machado also breached the aforementioned duty by using Mattel property and resources for the benefit of, and to aid and assist, himself personally and MGA.

133. As a direct and proximate result of defendants' wrongful conduct, Mattel has incurred damages in an amount to be determined at trial.

134. Defendants acted with malice, fraud and oppression, and in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to an award of exemplary damages against defendants in an amount to be determined at trial.

135. Furthermore, defendants' conduct has caused, and unless enjoined will continue to cause, irreparable injury to Mattel that cannot be adequately compensated by money damages and for which Mattel has no adequate

remedy at law. Accordingly, Mattel is entitled to an order restraining further breach of Bryant's fiduciary duty to Mattel and/or restraining defendants from continuing to benefit from such breach.

**Eighth Claim**

**Aiding and Abetting Breach of Fiduciary Duty**

**(Against MGA, Larian and Does 4 through 10)**

136. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 135, above, as though fully set forth at length.

137. At all times herein mentioned, MGA, Larian and Does 4 through 10 knew that Bryant held a position of trust and confidence at Mattel. At all times herein mentioned, MGA, Larian and Does 4 through 10 knew that Bryant owed a fiduciary duty to Mattel not to take any action that would be contrary to Mattel's best interests, including but not limited to secretly developing and designing Bratz while employed by Mattel and by secretly assisting Larian and MGA .

138. At all times herein mentioned, MGA, Larian and Does 4 through 10 knew that the Mattel Employees (excluding Bryant) held positions of trust and confidence at Mattel. At all times herein mentioned, MGA, Larian and Does 4 through 10 knew that the Mattel Employees (excluding Bryant) owed a fiduciary duty to Mattel not to take any action that would be contrary to Mattel's best interests, including but not limited to taking confidential trade secret information from Mattel's premises and providing that information to a competitor.

139. Despite such knowledge, defendants MGA, Larian and Does 4 through 10 intentionally and without justification solicited, encouraged, aided and abetted and gave substantial assistance to the Mattel Employees to breach their fiduciary duties to Mattel, knowing that their conduct would constitute breaches of their fiduciary duties to Mattel.

140. As a direct and proximate result of defendants' efforts, the Mattel Employees did breach their fiduciary duties to Mattel and Mattel has incurred

damages in an amount to be proven at trial. Mattel, therefore, is entitled to recover compensatory damages in an amount to be determined at trial.

141. In taking the aforesaid actions, MGA, Larian and Does 4 through 10 acted with malice, fraud and oppression, and in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to recover exemplary damages from defendants in an amount to be determined at trial.

## Ninth Claim

## Breach of Duty of Loyalty

## (Against Bryant and Machado)

142. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 141, above, as though fully set forth at length.

143. As employees of Mattel, Bryant and Machado owed a duty of undivided loyalty to Mattel. Pursuant to this duty, Bryant and Machado could not compete with Mattel or assist a competitor of Mattel during their employment with Mattel. Pursuant to this duty, Bryant and Machado were required to always give preference to Mattel's business over their own, similar interests during the course of their employment with Mattel.

144. Bryant and Machado breached their duty of loyalty to Mattel in that, while employed by Mattel, they secretly aided, assisted and worked for a competitor of Mattel, including without limitation by entering into agreements with a Mattel competitor. As alleged above, they also breached the aforementioned duty by using Mattel property and resources for the benefit of, and to aid and assist, themselves personally and the competitor of Mattel.

145. As a direct and proximate result of defendants' wrongful conduct, Mattel has incurred damages in an amount to be determined at trial.

146. Defendants acted with malice, fraud and oppression, and in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to an award of punitive damages against defendants in an amount to be determined at trial.

147. Furthermore, defendants' conduct has caused, and unless enjoined will continue to cause, irreparable injury to Mattel that cannot be adequately compensated by money damages and for which Mattel has no adequate remedy at law. Accordingly, Mattel is entitled to an order restraining further breach of defendants' duty of loyalty to Mattel and/or restraining defendants from continuing to benefit from such breach.

148. In breaching their duty of loyalty to Mattel, Bryant and Machado acted with malice, fraud and oppression, and in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to recover exemplary damages from defendants in an amount to be determined at trial.

**Tenth Claim**

**Aiding and Abetting Breach of Duty of Loyalty**

**(Against MGA, Larian and Does 4 through 10)**

149. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 148, above, as though fully set forth at length.

150. MGA, Larian and Does 4 through 10 knew that Bryant, as an employee of Mattel, owed a duty of loyalty to his employer. MGA, Larian and Does 4 through 10 knew that this duty included an obligation on the part of Bryant not to compete with Mattel or assist a competitor of Mattel during the term of his employment with Mattel. MGA, Larian and Does 4 through 10 also knew that Bryant was required to give preference to Mattel's business over his own, similar interests or those of Mattel's competitors. or those of Mattel's competitors during the course of his employment with Mattel.

151. MGA, Larian and Does 4 through 10 knew that the Mattel Employees (excluding Bryant) were employed by Mattel, and, as employees of Mattel, that they owed duties of loyalty to Mattel. MGA, Larian and Does 4 through 10 knew that these duties included an obligation on the part of the Mattel

Employees (excluding Bryant) not to compete with Mattel or assist a competitor of Mattel during their Mattel employment.

152. Despite such knowledge, defendants MGA, Larian and Does 4 through 10 intentionally and without justification solicited, encouraged, aided and abetted and gave substantial assistance to the Mattel Employees to breach their duties of loyalty to Mattel, knowing that their conduct would constitute breaches of their duties of loyalty to Mattel.

153. As a further consequence of defendants' efforts, Mattel has suffered injury and is entitled to compensatory damages in an amount to be proven at trial.

154. In taking the aforesaid actions, MGA, Larian and Does 4 through 10 acted with malice, fraud and oppression, and in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to recover exemplary damages from defendants in an amount to be determined at trial.

**Eleventh Claim**

**Conversion**

**(Against All Defendants)**

155. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 154, above, as though fully set forth at length.

156. Defendants wrongfully converted Mattel property and resources by appropriating and using them for their own benefit and gain and for the benefit and gain of others, without the permission of Mattel.

157. Mattel was entitled to, among other things, the exclusive right and enjoyment in property and tangible materials owned by Mattel, including without limitation such proper and materials that were created by Bryant while he was a Mattel product designer. Such property was taken by Bryant from Mattel to further his own interests and, in at least some instances, provided by Bryant to Larian and MGA in furtherance of the interests of Bryant, Larian and MGA.

158. In addition, defendants wrongfully converted Mattel's property by removing the Trade Secret Materials in electronic and paper form from Mattel's offices. Defendants did so without Mattel's permission and continue to possess them.

159. As a direct and proximate result of defendants' wrongful conversion of Mattel property, including those relating to Bratz and Mattel's Trade Secret Materials, Mattel has incurred damages. Mattel, therefore, is entitled to recover compensatory damages in an amount to be determined at trial.

160. As a result of defendants' acts of conversion, Mattel is entitled to damages in an amount sufficient to indemnify Mattel for the loss suffered, which is not measured by the value of the property misappropriated, but includes the lost profits that Mattel suffered as a result of the conversion or, alternatively, the profits generated by the defendants that would not have been generated but for the conversion. Only such a measure of damages would fully and fairly compensate Mattel for the injury it suffered due to defendants' acts of conversion.

161. Defendants performed the aforementioned conduct with malice, fraud and oppression, and in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to recover exemplary damages from defendants in an amount to be determined at trial.

162. Furthermore, defendants' conduct has caused, and unless enjoined will continue to cause, irreparable injury to Mattel that cannot be adequately compensated by money damages and for which Mattel has no adequate remedy at law. Accordingly, Mattel is entitled to an order restraining defendants from further conversion of Mattel property and resources and/or restraining defendants from continuing to benefit from such conversion.

**Twelfth Claim**

**Unfair Competition**

**(Common Law and *Cal. Bus. & Prof. Code* § 17200)**

**(Against All Defendants)**

163. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 162, above, as though fully set forth at length.

164. Section 17200 of the California Business and Professions Code prohibits unfair competition, including "any unlawful, unfair or fraudulent business act or practice . . . ."

165. By engaging in the foregoing conduct, defendants have, individually and in combination, engaged in unlawful, unfair and/or fraudulent acts of unfair competition in violation of both the common law of the state of California and *Cal. Bus. & Prof. Code* § 17200 *et seq*. Such conduct included, without limitation, MGA's commercial bribery of Bryant in violation of *Cal. Penal Code* § 641.3 and misappropriation of trade secrets in violation of 18 U.S.C. § 1832(a). Such conduct also included, without limitation, MGA's and Larian's disparagement of Mattel's products and misrepresentations as alleged above.

166. As a result of the aforementioned conduct, Mattel has suffered damages and will imminently suffer further damages, including but not limited to lost profits in an amount to be proven at trial. No adequate remedy at law exists for the wrongs and injuries Mattel has suffered and will continue to suffer, and Mattel is entitled to an injunction enjoining defendants' continued wrongful acts. Mattel is also entitled to recover compensatory and exemplary damages pursuant to the doctrine of common law unfair competition and *Cal. Civ. Code* § 3294.

**Thirteenth Claim**

**Declaratory Relief**

**(Against All Defendants)**

167. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 166, above, as though fully set forth at length.

168. As shown in the foregoing paragraphs above, an actual controversy exists between Mattel and defendants regarding defendants' lack of ownership interests in Bratz and Mattel's rights in the same.

169. Accordingly, Mattel seeks a declaration of the Court that defendants have no valid or protectable ownership rights or interests in Bratz, and that Mattel is the true owner of the same, and further seeks an accounting and imposition of a constructive trust over Bratz, including without limitation registrations and applications for registrations relating thereto made or filed by defendants and third parties, and over all revenues and other monies or benefits derived or obtained from MGA's and Bryant's purported ownership, use, sale, distribution and licensing of Bratz.

170. Mattel seeks a declaration of the Court that any and all agreements between Bryant, on the one hand, and MGA, on the other hand, in which Bryant purports to assign to MGA any right, title or interests in any work that he conceived, created or reduced to practice while a Mattel employee, including but not limited to the Bratz designs, is void and of no effect, including without limitation because Bryant had previously assigned said right, title or interest to Mattel and because Mattel was otherwise the owner of said right, title or interest.

**Prayer for Relief**

WHEREFORE, Mattel respectfully requests judgment:

1. For a declaration that defendants have no valid or protectable ownership interests or rights in Bratz designs and works conceived, created or

reduced to practice by Bryant during the term of his Mattel employment and/or by any others then-employed by Mattel, as well as in all derivatives prepared therefrom, and that Mattel is the true owner of the foregoing;

2. For a declaration that any agreement between Bryant, on the one hand, and MGA or any person or entity, on the other hand, in which Bryant purported to assign any right, title or interests in any work that he conceived, created or reduced to practice while a Mattel employee, including but not limited to the Bratz designs, is void and of no effect;

3. For an Order enjoining and restraining defendants, their agents, servants and employees, and all persons in active concert or participation with them, from further wrongful conduct, including without limitation from imitating, copying, distributing, importing, displaying, preparing derivatives from and otherwise infringing Mattel's copyright-protected works;

4. For an Order, pursuant to 17 U.S.C. § 503(a) and other applicable law, impounding all of defendants' products and materials that infringe Mattel's copyrights, as well as all plates, molds, matrices and other articles by which copies of the works embodied in Mattel's copyrights may be reproduced or otherwise infringed;

5. For an Order mandating that defendants return to Mattel all tangible items, documents, designs, diagrams, sketches or any other memorialization of inventions created or reduced to practice during Bryant's employment with Mattel as well as all Mattel property converted by defendants;

6. For an Order mandating specific performance by Bryant to comply with and satisfy Bryant's contractual obligations to Mattel;

7. That Mattel be awarded, and defendants be ordered to disgorge, all payments, revenues, profits, monies and royalties and any other benefits derived or obtained as a result of the conduct alleged herein, including without limitation of

all revenues and profits attributable to defendants' infringement of Mattel's copyrights under 17 U.S.C. § 504;

8. For an accounting of all profits, monies and/or royalties from the exercise of ownership, use, distribution, sales and licensing of Bratz;

9. For the imposition of a constructive trust over Bratz, including without limitation registrations and applications for registrations relating thereto made or filed by defendants and third parties, and all profits, monies, royalties and any other benefits derived or obtained from defendant's exercise of ownership, use, sale, distribution and licensing of Bratz;

10. That Mattel recover its actual damages and lost profits;

11. That defendants be ordered to pay exemplary damages in a sum sufficient to punish and to make an example of them, and deter them and others from similar wrongdoing;

12. That defendants be ordered to pay treble its general and special damages, plus interest, costs and attorney's fees incurred by reason of defendants' violations of 18 U.S.C. §§ 1962(c)-(d).

13. That defendants be ordered to pay double damages due to their willful and malicious misappropriation of Mattel's trade secrets with deliberate intent to injure Mattel's business and improve its own;

14. That defendants pay to Mattel the full cost of this action and Mattel's attorneys' and investigators' fees; and

///

///

///

///

///

///

///

15. That Mattel have such other and further relief as the Court may deem just and proper.

DATED: November 19, 2006

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

By John B Quinn /DOC

John B. Quinn
Attorneys for Plaintiff
Mattel, Inc.

**DEMAND FOR JURY TRIAL**

Plaintiff Mattel, Inc. respectfully requests a jury trial on all issues triable thereby.

DATED: November 19, 2006

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

By [signature]
John B. Quinn
Attorneys for Plaintiff
Mattel, Inc.

**Exhibit A**

4/2001691.1

-50-

FIRST AMENDED COMPLAINT

Exhibit 5 Page 169

# EMPLOYEE CONFIDENTIAL INFORMATION AND INVENTIONS AGREEMENT

I acknowledge that Mattel, Inc. (the "Company") operates in a competitive environment and that it enhances its opportunities to succeed by establishing certain policies, including those included in this Agreement. This Agreement is designed to make clear that: (i) I will maintain the confidentiality of the Company's trade secrets; (ii) I will use those trade secrets for the exclusive benefit of the Company; (iii) inventions that I create will be owned by the Company; (iv) my prior and continuing activities separate from the Company will not conflict with the Company's development of its proprietary rights; and (v) when and if my employment with the Company terminates I will not use my prior position with the Company to the detriment of the Company. In consideration of my employment with the Company and other good and valuable consideration, I agree that:

1. Provisions Related to Trade Secrets

(a) I acknowledge that the Company possesses and will continue to develop and acquire valuable Proprietary Information (as defined below), including information that I may develop or discover as a result of my employment with the Company. The value of that Proprietary Information depends on it remaining confidential. The Company depends on me to maintain that confidentiality, and I accept that position of trust.

(b) As used in the Agreement, "Proprietary Information" means any information (including formula, pattern, compilation, device, method, technique or process) that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use, and includes information on the Company, its customers, suppliers, joint ventures, licensors, licensees, distributors and other persons and entities with whom the Company does business.

(c) I will not disclose or use at any time either during or after my employment with the Company any Proprietary Information except for the exclusive benefit of the Company as required by my duties for the Company, or as the Company expressly may consent to in writing. I will cooperate with the Company and use my best efforts to prevent the unauthorized disclosure, use or reproduction of all Proprietary Information.

(d) Upon leaving employment with the Company for any reason, I immediately will deliver to the Company all tangible, written, graphical, machine readable and other materials (including all copies) in my possession or under my control containing or disclosing Proprietary Information.

2. Ownership of Inventions

(a) I agree to communicate to the Company as promptly and fully as practicable all inventions (as defined below) conceived or reduced to practice by me (alone or jointly by others) at any time during my employment by the Company. I hereby assign to the Company and/or its nominees all my right, title and interest in such inventions, and all my right, title and interest in any patents, copyrights, patent applications or copyright applications based thereon. I will assist the Company and/or its nominees (without charge but at no expense to me) at any time in every proper way to obtain for its and/or their own benefit, patents and copyrights for all such inventions anywhere in the world and to enforce its and/or their rights in legal proceedings.

(b) As used in this Agreement, the term "inventions" includes, but is not limited to, all discoveries, improvements, processes, developments, designs, know-how, data computer programs and formulae, whether patentable or unpatentable.

(c) Any provision in this agreement requiring me to assign my rights in any invention does not apply to an invention which qualifies under the provision of Section 2870 of the California Labor Code. That section provides that the requirement to assign "shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities or trade secret information except for those inventions that either (1) relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or (2) result from any work performed by the employee for the employer." I understand that I bear the burden of proving that an invention qualifies under Section 2870.

(d) I hereby irrevocably designate and appoint the Company and each of its duly authorized officers and agents as my agent and attorney-in-fact to act for and in my behalf and stead to execute and file any document and to do all other lawfully permitted acts to further the prosecution, issuance and enforcement of patents, copyrights and other proprietary rights with the same force and effect as if executed and delivered by me.

3. Conflicts with Other Activities

(a) My employment with the Company requires my undivided attention and effort. Therefore, during my employment with the Company, I will fully comply with the Company's Conflict of Interest Policy, as it may be amended from time to time. I shall not, without the Company's express written consent, engage in any employment or business other than for the Company, or invest in or assist (in any manner) any business competitive with the business or future business plans of the Company.

4. Miscellaneous

(a) My obligations under this Agreement may not be modified or terminated, in whole or in part, except in writing signed by a Vice-President of the Company. Any waiver by the Company of a breach of any provision of this Agreement will not operate or be construed as a waiver of any subsequent breach.

(b) Each provision of this Agreement will be treated as a separate and independent clause, and the unenforceability of any one provision will in no way impair the enforceability of any other provision. If any provision is held to be unenforceable, such provision will be construed by the appropriate judicial body by limiting or reducing it to the minimum extent necessary to make it legally enforceable.

(c) My obligation under this Agreement will survive the termination of my employment, regardless of the manner of such termination. This Agreement will inure to the benefit of and be binding upon the successors and assigns of the the Company.

(d) I understand that the provisions of this Agreement are a material condition to my employment with the Company. I also understand that this Agreement is not an employment contract, and nothing in this Agreement creates any right to my continuous employment by the Company, or to my employment for any particular term.

(e) Any breach of this Agreement likely will cause irreparable harm to the Company for which money damages could not reasonably or adequately compensate the Company. Accordingly, I agree that the Company will be entitled to injunctive relief to enforce this Agreement, in addition to damages and other available remedies.

(f) This agreement will be governed by and interpreted in accordance with the laws of the State of California.

(g) This Agreement contains the complete agreement between the Company and me concerning the subject matter hereof and supersedes all other agreements and understandings. This Agreement may be executed in counterparts. This Agreement will be deemed effective as of the start of Employee's employment with the Company.

CAUTION: THIS AGREEMENT CREATES IMPORTANT OBLIGATIONS OF TRUST AND AFFECTS THE EMPLOYEE'S RIGHTS TO INVENTIONS THE EMPLOYEE MAY MAKE DURING HIS OR HER EMPLOYMENT.

| | |
|---|---|
| Carter H. Bryant | MATTEL, INC. By: Teresa Newcomb |
| Employee Signature | Signature |
| CARTER H. BRYANT | TERESA NEWCOMB |
| Employee Name (print) | Name of Witness (print) |
| 01/04/99 | |
| Date | |

M 0001622

**Exhibit B**

34/2001691.1

-51-

FIRST AMENDED COMPLAINT

Exhibit 5 Page 171

# CONFLICT OF INTEREST QUESTIONNAIRE

BRYANT, CARTER H. — PROJECT DESIGNER

Name (Last, first, M.I.) — Job Title — Department

**Instructions:** The purpose of this questionnaire is to confirm the propriety of relations between our key employees and our suppliers and competitors. Please read the definitions below and Mattel's policies concerning Conflicts of Interest. Then answer the questions by checking the correct answer. Base your answers on personal knowledge. There is no need to make inquiries or seek additional information since lack of knowledge of a situation indicates that there is no conflict of interest. Your answers to questions 1 through 8 should cover the past twelve months and the term "you" should include members of your immediate family.

__Mattel Supplier__ is interpreted broadly for purposes of this questionnaire. A Mattel supplier is any person, partnership, trust, corporation, or other enterprise which during the past twelve months has done business or currently contemplates doing business with Mattel or any Mattel subsidiary.

__Mattel Competitor__ is interpreted broadly for purposes of this questionnaire. A Mattel competitor is any person, partnership, trust, corporation, or other enterprise which has done business or contemplates doing business in any field that is in competition with Mattel or any Mattel subsidiary.

__Interest__ means direct or indirect ownership of any stock, bond, option or right to purchase any security, share in profits, investment, partnership interest or other profit participation or equity interest whatsoever. Interest also means any agreement to perform services for or consult with or to deliver materials to or to receive compensation of any kind from any supplier or competitor. You may disregard mutual investment trusts and publicly-owned corporations whose securities are traded publicly, in which you own not more than $25,000 in market value, but not to exceed 10% of an individual's net worth.

__Recipient of any commission, etc.__ means receipt of anything of value, in cash or in kind, over $60 on any one occasion or over $300 total during the past twelve months.

- ○ YES ● NO 1. Have you owned, directly or indirectly, any interest in a Mattel supplier?
- ○ YES ● NO 2. Have you owned, directly or indirectly, and interest in a Mattel competitor?
- ○ YES ● NO 3. Have you been the recipient of any commission, fee, loan, trip, gift, benefit or anything else of value that is derived in any way from a Mattel supplier?
- ● YES ○ NO 4. Have you been the recipient of any commission, fee, loan, trip, gift, benefit or anything else of value that is derived in any way from a Mattel competitor?
- ● YES ○ NO 5. Have you or any relative of yours by blood or marriage been a director, officer, consultant, agent, employee, or representative of or acted for any Mattel competitor in any capacity?
- ○ YES ● NO 6. Have you or any relative of yours by blood or marriage been a director, officer, consultant, agent, employee, or representative of or acted for any Mattel supplier in any capacity?
- ○ YES ● NO 7. Have you engaged in any activity including the acquisition or ownership of any interest, for personal profit, not expressly within the scope of the foregoing with respect to any supplier or competitor?
- ○ YES ● NO 8. Excepting normal everyday transactions (purchase of toys, etc.) have you engaged in any business venture or transaction involving a Mattel supplier or competitor or engaged in any activity which could be objectively construed as being a conflict of interest or allegiance?
- ○ YES ● NO 9. Are you aware of any activity of any employee which you believe could be construed as a potential conflict of interest with Mattel?

If your answer to any of the above questions is "yes," please explain in the space below:

4, 5, freelance design & artwork in 1998, from appx. 5/98 - 11/98 for the Ashton Drake galleries.

I certify that I have read Mattel's policies concerning Conflict of Interest and the answers to the above questions are true. I understand that failure to answer this questionnaire fully and truthfully constitutes grounds for immediate termination of my employment. I agree not to divulge any company information to unauthorized recipients. I also agree to notify my superior immediately of any changes in my situation that would cause me to answer any of the above questions differently. I further certify that, to the best of my knowledge, neither I nor any member of my immediate family is or has been engaged in any capacity which creates a Conflict of Interest.

Carter H. Bryant — 01/04/98

Signature — Date

M 0001621

## EXHIBIT C

## CURRENTLY KNOWN PREDICATE ACTS BY DEFENDANTS RE MAIL AND WIRE COMMUNICATIONS

| Date | Type of Communication | Bates Reference (if applicable) |
|---|---|---|
| 4/15/2001 | Email from Isaac Larian (MGA) Aldo Horvat (GIG ITALY) | MGA000746 |
| 3/28/2001 | Email from Stephen Lee (MGA Hong Kong) to Earlylight (vendor) | MGA000747 |
| 4/15/2001 | Email from Isaac Larian Stephen Lee and Stanley Li | MGA000748-750 |
| 4/11/2001 | Email from Isaac Larian to Stephen Lee | MGA000766-767 |
| 4/10/2001 | Email from Isaac Larian to Pedro Feist (Concentra) | MGA001027-29 |
| 4/5/2001 | Email from Dave Malacrida (MGA) to Gary Cogland | MGA001030-32 |
| 4/3/2001 | Email from Isaac Larian to John Young | MGA001040-44 |
| 1/9/2000 | Email from Martin Hitch (MGA Hong Kong) to Pedro Feist | MGA001061-64 |
| 4/2/2001 | Email from Isaac Larian to Ron Stover | MGA001099-1100 |
| On or about 4/3/2001 | Fed Ex shipment from Isaac Larian to Ron Stover | MGA001099-1100 |
| 4/2/2001 | Email from Isaac Larian to Craig Cunningham (Eckerd Drugs) | MGA001105 |
| 3/28/2001 | Email from Isaac Larian to Stephen Lee | MGA001113-14 |
| On or about 3/28/2001 | Letter from Isaac Larian sent to Ron Stover | MGA001116-17 |
| 4/18/2001 | Email from Victoria O'Connor (MGA) to Avi Kreisel (Kreisel Dist.) | MGA001208-09 |
| 4/17/2001 | Email from Isaac Larian to Stephen Lee and Stanley Li | MGA001213-14 |
| On or about 4/18/2001 | Shipment from Stephen Lee to Isaac Larian | MGA001219-20 |
| 4/4/2001 | Email from Isaac Larian to John Young | MGA001278-82 |
| 3/10/2001 | Email from Isaac Larian to John Young | MGA001289-90 |
| 6/12/2003 | Facsimile transmission from MGA Entertainment to Jessie Ramirez | MGA001310 |
| 10/4/2000 | Email from David Rosenbaum (attorney for MGA) to Anne Wang (attorney for Carter Bryant) | MGA001320-29 |

| | | |
|---|---|---|
| 10/26/2000 | Email from Mercedeh Ward (MGA) to Samuel Wong, Cecilia Kwok and Franki Tsang (MGA Hong Kong) | MGA000012-13 |
| 10/25/2000 | Email from Mercedeh Ward Samuel Wong, Cecilia Kwok and Franki Tsang | MGA000015-17 |
| 10/30/2000 | Email from Mercedeh Ward to Cecilia Kwok and Paula Treantafelles | MGA000019-21 |
| 11/3/2000 | Email from Mercedeh Ward to Victor Lee and Paula Treantafelles | MGA000043-45 |
| 11/4/2000 | Email from Isaac Larian to Carter Bryant and Paula Treantafelles | MGA000046-47 |
| 11/11/2000 | Email from Judy Rich to Cecilia Kwok and Mercedeh Ward | MGA000049 |
| 11/15/2000 | Emails between Paula Treantafelles and Samuel Wong and Franki Tsang | MGA000071-74 |
| 12/8/2000 | Email from Mercedeh Ward to Cecilia Kwok and Samuel Wong | MGA000077-81 |
| On or about 12/23/2000 | Package sent from MGA Hong Kong to MGA Los Angeles per instructions from MGA Los Angeles | MGA000089-90 |
| 12/15/2000 | Email from Paula Treantafelles to Samuel Wong and Mercedeh Ward | MGA000091-92 |
| 12/16/2000 | Email from Mercedeh Ward to Samuel Wong | MGA000097-104 |
| 12/16/2000 | Email from Isaac Larian to Franki Tsang | MGA000109-112 |
| On or about 12/16/2000 | Package of fabric swatches sent from MGA Los Angeles to MGA Hong Kong | MGA000113-122 |
| On or about 12/20/2000 | Package of samples sent from MGA Los Angeles to MGA Hong Kong | MGA000124-125 |
| 12/20/2000 | Email from Mercedeh Ward to Cecilia Kwok | MGA000124-125 |
| 12/12/2000 | Fed Ex shipment from MGA Los Angeles to Cecilia Kwok | MGA000131-132 |
| 12/19/2000 | Email from Mercedeh Ward to Cecilia Kwok and Wendy Reed | MGA000131-132 |
| 12/20/2000 | Email from Paula Treantafelles to Jimmy Cheng, Samuel Wong, Cecilia Kwok | MGA000140-141 |
| 12/10/2000 | Email from Mercedeh Ward to Sarah Halpern | MGA000147-149 |
| 12/22/2000 | Email from Mercedeh Ward to Samuel Wong and Judy Rich | MGA000190 |
| 12/22/2000 | Email from Paula Treantafelles to Samuel Wong, Judy Rich and Mercedeh Ward | MGA000197-199 |
| 12/29/2000 | Email from Mercedeh Ward to Samuel Wong and Cecilia Kwok | MGA000211 |
| 12/16/2000 | Email from Isaac Larian to Franki Tsang | MGA000212-217 |

| | | |
|---|---|---|
| 12/27/2000 | Email from Paula Treantafelles to Franki Tsang et al. | MGA000212-217 |
| 12/26/2000 | Email from Paula Treantafelles to Carter Bryant | MGA000219 |
| 12/27/2000 | Email from Mercedeh Ward to Samuel Wong | MGA000234-236 |
| 12/27/2000 | Email from Mercedeh Ward to Cecilia Kwok | MGA000249-250 |
| 12/27/2000 | Email from Paula Treantafelles to Cecilia Kwok and Mercedeh Ward | MGA000253 |
| 12/27/2000 | Email from Paula Treantafelles to Samuel Wong | MGA000254, 256 |
| 12/29/2000 | Email from Mercedeh Ward to Samuel Wong | MGA000322 |
| 12/29/2000 | Email from Paula Treantafelles to Carter Bryant and Mercedeh Ward | MGA000333 |
| 1/16/2001 | Email from Paula Treantafelles to Samuel Wong et al. | MGA000366-368 |
| 1/17/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000369-370 |
| 1/18/2001 | Email from Paula Treantafelles to Cecilia Kwok, Judy Rich and Carter Bryant | MGA000371-378 |
| 1/18/2001 | Email from Paula Treantafelles to Carter Bryant, Cecilia Kwok and Samuel Wong | MGA000379-381 |
| 2/27/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000406-414 |
| 9/27/2000 | Email from Paula Treantafelles to Franki Tsang and Judy Rich | MGA000422 |
| 10/5/2000 | Email from Isaac Larian to Carter Bryant | MGA000423 |
| 10/18/2000 | Email from Mercedeh Ward to Franki Tsang and Victor Lee | MGA000425-426 |
| 12/27/2000 | Email from Mercedeh Ward to Cecilia Kwok and Paula Treantafelles | MGA000482 |
| 12/22/2000 | Email from Isaac Larian to Franki Tsang, Mercedeh Ward and Paula Treantafelles | MGA000524-528 |
| 12/20/2000 | Email from Mercedeh Ward to Samuel Wong and Cecilia Kwok | MGA000530-531 |
| 10/26/2000 | Email from Paula Treantafelles to Cecilia Kwok, Isaac Larian, and Carter Bryant | MGA000539-541 |
| 11/2/2000 | Email from Paula Treantafelles to Cecilia Kwok | MGA000539-541 |
| 11/2/2000 | Email from Paula Treantafelles to Cecilia Kwok and Isaac Larian | MGA000539-541 |
| 2/27/2001 | Email from Paula Treantafelles to Cecilia Kwok, Samuel Wong, and Judy Rich | MGA000545 |
| 2/27/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000546-547 |

| | | |
|---|---|---|
| 2/26/2001 | Email from Paula Treantafelles to Samuel Wong, Cecilia Kwok, and Carter Bryant | MGA000548 |
| 2/26/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000549 |
| 2/26/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000550 |
| 2/24/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000551 |
| 2/23/2001 | Email from Paula Treantafelles to Cecilia Kwok and Samuel Wong | MGA000554 |
| 2/21/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000556-557 |
| 2/23/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000558 |
| 2/23/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000560 |
| 2/21/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000561 |
| On or about 2/20/2001 | Fed Ex shipment from Carter Bryant to Cecilia Kwok | MGA000566 |
| 2/20/2001 | Email from Paula Treantafelles to Cecilia Kwok | MGA000566 |
| 2/19/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000568 |
| 2/19/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000569-570 |
| 2/17/2001 | Email from Paula Treantafelles to Cecilia Kwok and Carter Bryant | MGA000571-572 |
| 2/16/2001 | Emails from Paula Treantafelles to Cecilia Kwok | MGA000573, 574, 576, 582, 589-90 |
| 2/16/2001 | Emails from Paula Treantafelles to Carter Bryant | MGA000575, 579, 588 |
| 2/12/2001 | Email from Lon Ross (MGA) to Carter Bryant et al. | MGA000583-587 |
| 2/5/2001 | Email from Paula Treantafelles to Carter Bryant, Cecilia Kwok et al. | MGA000599 |
| 2/5/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000600 |
| 2/5/2001 | Email from Paula Treantafelles to Carter Bryant and Cecilia Kwok | MGA000602 |
| 2/3/2001 | Email from Paula Treantafelles to Cecilia Kwok and Judy Rich | MGA000603-05 |
| 2/2/2001 | Email from Paula Treantafelles to Carter Bryant and Cecilia Kwok | MGA000606 |

| | | |
|---|---|---|
| 1/31/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000608 |
| 1/30/2001 | Email from Paula Treantafelles to Carter Bryant and Judy Rich | MGA000609 |
| On or about 1/30/2001 | Shipment from MGA Los Angeles to Carter Bryant | MGA000609 |
| 1/26/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000610 |
| 1/24/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000611 |
| 1/22/2001 | Email from Paula Treantafelles to Carter Bryant and Samuel Wong | MGA000612 |
| 1/22/2001 | Email from Paula Treantafelles to Carter Bryant and Cecilia Kwok | MGA000613 |
| 3/26/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000617 |
| 3/11/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000618 |
| 3/11/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000620 |
| 3/6/2001 | Email from Paula Treantafelles to Carter Bryant and Cecilia Kwok | MGA000621-622 |
| 3/6/2001 | Email from Paula Treantafelles to Cecilia Kwok and Samuel Wong | MGA000625-626 |
| 3/5/2001 | Email from Paula Treantafelles to Carter Bryant and Cecilia Kwok | MGA000625-626 |
| 3/3/2001 | Email from Paula Treantafelles to Cecilia Kwok | MGA000634 |
| On or about 3/2/2001 | Fed Ex shipment from MGA Los Angeles to MGA Hong Kong | MGA000634 |
| 4/10/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000635 |
| 4/7/2001 | Email from Paula Treantafelles to Cecilia Kwok | MGA000635 |
| 4/30/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000654 |
| 5/14/2001 | Email from Paula Treantafelles to Carter Bryant and Cecilia Kwok | MGA000655 |
| 5/11/2001 | Email from Paula Treantafelles to Carter Bryant | MGA000656-664 |
| 5/9/2001 | Email from Paula Treantafelles to Cecilia Kwok and Samuel Wong | MGA000666 |
| 10/20/2000 | Email from Kerri Legg (MGA) to Steve Linker and Liz Hogan | MGA0008032 |
| | Letter from Mattel de Mexico employee to Thomas Park and Isaac Larian (MGA) | |
| 3/30/2004 | Letter to Carlos Gustavo Machado Gomez from Isaac Larian | |
| 3/30/2004 | Letter to Mariana Trueba Almada from Isaac Larian | |

| | |
|---|---|
| 3/30/2004 | Letter to Pablo Vargas San Jose from Isaac Larian |
| | Email from Pablo Vargas San Jose to Mattel de Mexico |
| 4/15/2004 | Email from Karla Papayanopulos Carvajal to Mariana Trueba Almada |
| 1/25/2004 | Email from Mariana Trueba Almada to Carlos Gustavo Machado Gomez |
| 4/15/2004 | Email from Therese Wilbur to Carlos Gustavo Machado Gomez |
| 4/15/2004 | Email from Mariana Trueba Almada to Carlos Gustavo Machado Gomez attaching confidential documents |
| 3/15/2004 | Email from Susana Kuemmerle to "plot04@aol.com" |
| 3/16/2004 | Email from Susana Kuemmerle to "plot04@aol.com" |
| 3/22/2004 | Email from "plot04@aol.com" to Isaac Larian copying Susana Kuemmerle and Thomas Park |
| 3/22/2004 | Email from Isaac Larian to "plot04@aol.com" copying Susana Kuemmerle and Thomas Park |
| 3/23/2004 | Email from Marlene Parker (MGA) to Isaac Larian and "plot04@aol.com" |
| 3/30/2004 | Email from Thomas Park to "plot04@aol.com" copying Isaac Larian |
| 4/2/2004 | Email from Maria de Carmen Mendez to Isaac Larian, Thomas Park, and Susana Kuemmerle |
| 4/4/2004 | Email from Maria de Carmen Mendez to Susana Kuemmerle |
| 4/7/2004 | Email from Maria de Carmen Mendez to Thomas Park |
| 4/12/2004 | Email from Thomas Park to "plot04@aol.com" |
| 4/14/2004 | Email from "plot04@aol.com" to Isaac Larian and Thomas Park |
| 4/14/2004 | Email from Isaac Larian to "plot04@aol.com", Thomas Park and Daphne Gronich |

| | |
|---|---|
| 4/14/2004 | Email from "plot04@aol.com" to Thomas Park copying Isaac Larian and Susana Kuemmerle |
| 4/14/2004 | Email from Susana Kuemmerle to Isaac Larian and Thomas Park copying "plot04@aol.com" |
| 4/15/2004 | Email from Jean Paul Farah to "plot04@aol.com" copying Daphne Gronich |
| 4/15/2004 | Email from "plot04@aol.com" to Thomas Park copying Jean Paul Farah and Isaac Larian |
| 4/12/2004 | Email from Susana Kuemmerle to "plot04@aol.com" |
| 4/15/2004 | Email from "plot04@aol.com" to Jean Paul Farah copying Daphne Gronich and Isaac Larian |
| 4/15/2004 | Email from Mariana Trueba Almada to Andrea Ramirez |