EXHIBIT 46

1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
     John B. Quinn (Bar No. 090378)
2    (johnquinn@quinnemanuel.com)
     Michael T. Zeller (Bar No. 196417)
3    (michaelzeller@quinnemanuel.com)
     Jon D. Corey (Bar No. 185066)
4    (joncorey@quinnemanuel.com)
   865 South Figueroa Street, 10th Floor
5  Los Angeles, California 90017-2543
   Telephone: (213) 443-3000
6  Facsimile: (213) 443-3100

7  Attorneys for Mattel, Inc.

8              UNITED STATES DISTRICT COURT

9           CENTRAL DISTRICT OF CALIFORNIA

10                 EASTERN DIVISION

11

12  CARTER BRYANT, an individual,      CASE NO. CV 04-9049 SGL (RNBx)

            Plaintiff,                  Consolidated with
13                                      Case No. CV 04-09059
                                        Case No. CV 05-02727
14       vs.
                                        THIRD NOTICE OF DEPOSITION OF
15  MATTEL, INC., a Delaware            MGA ENTERTAINMENT, INC.
    corporation,                        PURSUANT TO FEDERAL RULE OF
16                                      CIVIL PROCEDURE 30(B)(6)
            Defendant.
17                                      Discovery Cut-Off: October 22, 2007
                                        Pre-Trial Conference: January 14, 2008
18                                      Trial Date: February 12, 2008
    AND CONSOLIDATED ACTIONS
19

20

21

22

23

24

25

26

27

28

EXHIBIT    Exhibit 46 Page 865

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on June 26, 2007 beginning on 9:30 a.m. Mattel, Inc. ("Mattel") will take the deposition upon oral examination of defendant MGA Entertainment, Inc. at the offices of Quinn Emanuel Urquhart Oliver & Hedges LLP, 865 S. Figueroa Street, 10th Floor, Los Angeles, CA 90017. Pursuant to Fed. R. Civ. P. 30(b)(6), MGA Entertainment, Inc. shall designate one or more officers, directors, managing agents or other persons who consent to testify on its behalf concerning each of the topics set forth in Exhibit A hereto.

PLEASE TAKE FURTHER NOTICE that the deposition will take place before a duly authorized notary public or other officer authorized to administer oaths at depositions, and will continue from day to day, Sundays, Saturdays and legal holidays excepted, until completed.

PLEASE TAKE FURTHER NOTICE that, pursuant to Fed. R. Civ. P. 30(b)(2), the deposition will be videotaped. Mattel also reserves the right to use Livenote or other technology for real-time transcription of the testimony.

DATED: June 5, 2007          QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP


By_____
  Michael T. Zeller
  Attorneys for Mattel, Inc.

## EXHIBIT A

1.    "YOU," "YOUR" or "MGA" means MGA Entertainment, Inc., any of its current or former employees, officers, directors, agents, representatives, attorneys, parents, subsidiaries, divisions, affiliates, predecessors-in-interest and successors-in-interest, and any other PERSON acting on its behalf, pursuant to its authority or subject to its control.

2.    "BRYANT" means Carter Bryant, any of his current or former agents, representatives, attorneys, employees, partners, joint venturers, predecessors-in-interest and successors-in-interest, and any other PERSON acting on his behalf, pursuant to his authority or subject to his control.

3.    "BRATZ" means any project, product, doll or DESIGN ever known by that name (whether in whole or in part and regardless of what such project, product or doll is or has been also, previously or subsequently called) and any product, doll or DESIGN or any portion thereof that is now or has ever been known as, or sold or marketed under, the name or term "Bratz" (whether in whole or in part and regardless of what such product, doll or DESIGN or portion thereof is or has been also, previously or subsequently called) or that is now or has ever been sold or marketed as part of the "Bratz" line, and each version or iteration of such product, doll or DESIGN or any portion thereof.  As used herein, "product, doll or DESIGNS or any portion thereof" also includes without limitation any names, fashions, accessories, artwork, packaging or any other works, materials, matters or items included or associated therewith. Without limiting the generality of the foregoing, and contrary to MGA's recent assertions in connection with other Mattel discovery requests, the term "BRATZ" does not and shall not require that there be a doll existing at the time of the event, incident or occurrence that is the subject of, or otherwise relevant or responsive to, the Topics of Examination herein.

4.     "DESIGN" or "DESIGNS" means any and all representations, whether two-dimensional or three-dimensional, and whether in tangible, digital, electronic or other form, including but not limited to all works, designs, artwork, sketches, drawings, illustrations, representations, depictions, blueprints, schematics, diagrams, images, sculptures, prototypes, models, samples, rotocasts, reductions to practice, developments, inventions and/or improvements, as well as all other items, things and DOCUMENTS in which any of the foregoing are or have been expressed, embodied, contained, fixed or reflected in any manner, whether in whole or in part.

5.     "ANGEL" refers to those projects, products, dolls or DESIGNS, sometimes called "Angel Faces" and/or "Prayer Angels," that MGA has claimed are the subject of MGA000706-08, MGA000710-12, MGA000714-16, MGA000718-20, MGA000724-28 and MGA000734. Without limiting the generality of the foregoing, and contrary to MGA's recent assertions in connection with other Mattel discovery requests, the term "ANGEL" does not require that there be a doll existing at the time of the event, incident or occurrence that is the subject of, or otherwise relevant or responsive to, the Topics of Examination herein.

6.     "IDENTIFY" or "IDENTITY" means the following:

(a)     With reference to an individual, means such individual's name, current or last known business title, current or last known business affiliation, current or last known relationship to YOU, current or last known residential and business address, and current or last known telephone number.

(b)     With reference to an entity or governmental organization, means such entity's or organization's name, present or last-known address, and present or last-known telephone number and the IDENTITY of each individual who has served or participated as a contact for or on behalf of such entity or organization.

(c)     With reference to an account with a bank or financial institution, means the name and address of the bank or financial institution, the account

-3-

EXHIBIT   Exhibit 46 Page 868

number(s) for or otherwise associated with such account and the name of each holder, including without limitation each beneficial holder, of each such account.

(d)    With reference to a STORAGE DEVICE, means the manufacturer name, brand, model name and number, serial number and all other manufacturer identifiers, and the technical specifications and capacities of such STORAGE DEVICE.

7.    "ACTION" means this action now consolidated under Case No. 04-9049 before the Hon. Stephen Larson and formerly *Mattel v. Bryant, Inc.*, first filed in Los Angeles County Superior Court; *Bryant v. Mattel, Inc.*; and *MGA Entertainment, Inc. v. Mattel, Inc.*; and all counterclaims, cross-claims and defenses therein.

8.    "DIGITAL INFORMATION" means any information created or stored digitally, including but not limited to electronically, magnetically or optically.

9.    "STORAGE DEVICE" means any computer hard drive, memory, USB device, tape, storage array or any other device or medium that allows a user, whether permanently, temporarily or otherwise, to create, generate, transmit, copy, retain, store or maintain DIGITAL INFORMATION.

10.    "EMPLOYEE AGREEMENT" or "EMPLOYEE AGREEMENTS" means any agreement or contract between YOU and any of YOUR employees that purports to assign to, convey to or vest in YOU in any manner, whether in whole or in part, and whether expressly or by implication or in effect, any right, title or interest in any such employee's inventions, works, work product, ideas, concepts, discoveries, improvements, processes, developments, DESIGNS, know-how, data and/or formulae.

11.    "FAMILY MEMBER" means any PERSON who at any time is, was or has been a parent, spouse, or child of another PERSON.

12.    "REFER OR RELATE TO" means constituting, embodying, containing, referring to, commenting on, evidencing, regarding, discussing, describing,

07209/2048031.

-4-

EXHIBIT

Exhibit 46 Page 869

mentioning, reflecting, expressing, pertaining to, concerning, supporting, contradicting, negating, revoking or otherwise relating to in any manner.

13. "DOCUMENT" means all "WRITINGS" and "RECORDINGS" as those terms are defined in Rule 34 of the Federal Rules of Civil Procedure and Rule 1001 of the Federal Rules of Evidence, including, but not limited to, all writings and records of every type and description including, but not limited to, contracts, agreements, correspondence, memoranda, letters, facsimiles, electronic mail ("e-mail"), records of telephone conversations, handwritten and typewritten notes of any kind, statements, reports, minutes, recordings, transcripts and summaries of meetings, voice recordings, pictures, photographs, drawings, computer cards, tapes, discs, printouts and records of all types, studies, instruction manuals, policy manuals and statements, books, pamphlets, invoices, canceled checks and every other device or medium by which or through which information of any type is transmitted, recorded or preserved.  Without any limitation on the foregoing, the term "DOCUMENT" shall include all copies that differ in any respect from the original or other versions of the DOCUMENT, including, but not limited to, all drafts and all copies of such drafts or originals containing initials, comments, notations, insertions, corrections, marginal notes, amendments or any other variation of any kind.

14. "PERSON" or "PERSONS" means all natural persons, partnerships, corporations, joint ventures and any kind of business, legal or public entity or organization, as well as its, his or her agents, representatives, employees, officers and directors and any one else acting on its, his or her behalf, pursuant to its, his or her authority or subject to its, his or her control.

15. The singular form of a noun or pronoun includes within its meaning the plural form of the noun or pronoun so used, and *vice versa*; the use of the masculine form of a pronoun also includes within its meaning the feminine form of the pronoun so used, and *vice versa*; the use of any tense of any verb includes also within its meaning

EXHIBIT   Exhibit 46 Page 870

all other tenses of the verb so used, whenever such construction results in a broader request for information; and "and" includes "or" and *vice versa*, whenever such construction results in a broader disclosure of documents or information.

### **Topics of Examination**

1.     The IDENTITY, current or last known location, and disposition of each STORAGE DEVICE that each of the following PERSONS has used to create, generate, prepare, draft, send and/or receive any DOCUMENT or DIGITAL INFORMATION that REFERS OR RELATES TO BRATZ and/or ANGEL at any time since January 1, 1999, including without limitation the date of acquisition and the date of disposition of each such STORAGE DEVICE:

Isaac Larian

Farhad Larian

Paula Garcia

BRYANT

Kami Gillmour

Veronica Marlow

Mercedeh Ward

Margaret Hatch-Leahy

Jennifer Maurus

Judy Rich

Ninette Pembleton

Kerri Brode

Victoria O'Connor

Aileen Storer

Charles O'Connor

Helene Bartels

Colleen O'Higgins

EXHIBIT   **Exhibit 46 Page 871**

1    Vivian Matt

2    Maureen Mullen

3    Rachel Harris

4    Barbara Malcolm

5    David Dees

6    Ben Ton

7    Dave Malacrida

8         2.     The IDENTITY, current or last known location, and disposition of

9    each backup, copy or image of the STORAGE DEVICES referenced in Topic 1 of this

10   Notice, including without limitation the date of creation and the date of disposition of

11   each such backup or copy.

12        3.     YOUR search for and production of DOCUMENTS and DIGITAL

13   INFORMATION from the STORAGE DEVICES referenced in Topic 1 of this Notice.

14        4.     Each of YOUR EMPLOYEE AGREEMENTS since January 1,

15   1995, including without limitation the meaning, validity and enforcement of such

16   EMPLOYEE AGREEMENTS.

17        5.     Any requirement or practice by YOU, at any time since January 1,

18   1995, that YOUR employees sign or execute EMPLOYEE AGREEMENTS.

19        6.     YOUR statements to Christopher Palmeri in connection with the

20   *Business Week* article entitled "To Really Be A Player, Mattel Needs Hotter Toys,"

21   published on or about July 28, 2003, including without limitation in connection with the

22   statement that Isaac Larian "got the idea for Bratz after seeing his own kids run around

23   in navel-bearing tops and hip-huggers."

24        7.     YOUR statements to Denise I. O'Neal in connection with the

25   *Chicago Sun-Times* article entitled "Bratz Packers Are What's Cool in Doll World,"

26   published on or about March 5, 2004, including without limitation in connection with

27   the statements that MGA's "creative team decided the name should be catchy and not

28

1 | have more than six letters. Keeping with today's trend of making names more 'cool' by

2 | changing the spelling, MGA executives decided to replace the 's' with a 'z.'"

3 |     8.     YOUR statements to Jeff Weiss in connection with the *San*

4 | *Fernando Valley Business Journal* article entitled "Immigrant's Creative Company

5 | Shakes Up Toy Industry," published on or about March 29, 2004, including without

6 | limitation in connection with the statement that "[i]t was Jason's idea for Bratz."

7 |     9.     The IDENTITY of each PERSON who YOU had perform, or who

8 | YOU requested, asked or solicited to perform, any "test project" in advance of or in

9 | consideration of employment by YOU since January 1, 1995, including without

10 | limitation the IDENTITY of each such PERSON who was a MATTEL employee at the

11 | time.

12 |     10.     YOUR relationship with Stephen Lee since April 1, 2004, including

13 | without limitation any agreements or contracts between YOU and Stephen Lee.

14 |     11.     Payments of money or any other item of value that YOU have made

15 | to, for or on behalf of Isaac Larian or any FAMILY MEMBER of Isaac Larian since

16 | January 1, 1999, including without limitation (a) the amounts of such payment and the

17 | equivalent dollar value of each of item of value, (b) the dates of such payment, (c) the

18 | IDENTITY of each recipient of such payment, (d) the IDENTITY of each bank or

19 | financial institution account to which such payment was made and (e) the reasons for

20 | each such payment.

21 |     12.     Payments of money or any other item of value that YOU have made

22 | to, for or on behalf of Farhad Larian or any FAMILY MEMBER of Farhad Larian since

23 | January 1, 1999, including without limitation (a) the amounts of each such payment and

24 | the equivalent dollar value of each of item of value, (b) the timing of each such

25 | payment, (c) the IDENTITY of each recipient of each such payment, (d) the

26 | IDENTITY of each bank or financial institution account to which such payment was

27 | made and (e) the reasons for each such payment.

28 |

EXHIBIT   Exhibit 46 Page 873

13.    Payments of money or any other item of value that YOU have made to, for or on behalf of Morad Zarabi or any FAMILY MEMBER of Morad Zarabi since January 1, 1999, including without limitation (a) the amounts of each such payment and the equivalent dollar value of each of item of value, (b) the timing of each such payment, (c) the IDENTITY of each recipient of each such payment, (d) the IDENTITY of each bank or financial institution account to which such payment was made and (e) the reasons for each such payment.

14.    The nature, extent and timing of work and services that Veronica Marlow, Amy Myers, Sarah Halpern, Maureen Mullen and David Dees provided to, or were requested, solicited or proposed by, YOU at any time from January 1, 1999 through December 31, 2001, inclusive.

15.    Payments of money or any other item of value that YOU have made to Veronica Marlow, Amy Myers, Sarah Halpern, Maureen Mullen and David Dees since January 1, 1999, including without limitation (a) the amounts of each such payment and the equivalent dollar value of each of item of value, (b) the timing of each such payment, (c) the IDENTITY of each recipient of each such payment, (d) the IDENTITY of each bank or financial institution account to which such payment was made and (e) the reasons for each such payment.

16.    The IDENTITY of each PERSON who is not, as of June 5, 2007, an MGA employee and for whom or on behalf of whom YOU are paying, have paid or have offered, promised or agreed to pay fees or costs in connection with this ACTION, any contracts, agreements or other DOCUMENTS between YOU and such PERSON pertaining thereto, the amounts YOU have so paid or agreed to pay to such PERSON and the dates on which such payments were made.

-9-

EXHIBIT 47

# CONFORMED COPY

FILED

2001 SEP 26 PM 2:28

CLERK, U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
RIVERSIDE

1   Hon. Edward A. Infante (Ret.)
    JAMS
2   Two Embarcadero Center
    Suite 1500
3   San Francisco, California 94111
    Telephone:    (415) 774-2611
4   Facsimile:    (415) 982-5287

5

6

7               UNITED STATES DISTRICT COURT

8               CENTRAL DISTRICT OF CALIFORNIA

                      EASTERN DIVISION
9

10

11  CARTER BRYANT, an individual,              CASE NO. C 04-09049 SGL (RNBx)
                                               JAMS Reference No. 1100049530
12              Plaintiff,

13       v.                                    Consolidated with
                                               Case No. CV 04-09059
14  MATTEL, INC., a Delaware corporation,      Case No. CV 05-2727

15              Defendant.                     **ORDER GRANTING IN PART AND**
                                               **DENYING IN PART MATTEL'S**
16                                             **MOTION TO COMPEL MGA TO**
                                               **PRODUCE WITNESSES PURSUANT**
17                                             **TO THIRD NOTICE OF DEPOSITION**
                                               **UNDER RULE 30(b)(6); DENYING**
18                                             **REQUEST FOR SANCTIONS**

19  CONSOLIDATED WITH
    MATTEL, INC. v. BRYANT and
20  MGA ENTERTAINMENT, INC. v. MATTEL,
    INC.
21

22

23                      I. INTRODUCTION

24      On July 13, 2007, Mattel, Inc. ("Mattel") submitted its "Motion to Compel MGA to

25  Produce Witnesses Pursuant to Mattel's Third Notice of Deposition Under Rule 30(b)(6) and for

26  Sanctions." Specifically, Mattel seeks an order compelling MGA Entertainment, Inc. ("MGA")

27  to produce witnesses on Topics 1-3, 6-8, 9 and 11-13 of Mattel's Third Rule 30(b)(6) Notice. On

28

1  July 31, 2007, MGA submitted an opposition brief.  On August 6, 2007, Mattel submitted a reply

2  brief.  The matter was heard on September 24, 2007.  Having considered the motion papers and

3  the comments of counsel, Mattel's motion is granted in part and denied in part, and the request for

4  sanctions is denied.

5  II. BACKGROUND

6      Mattel first served a Rule 30(b)(6) Notice of Deposition of MGA in February of 2005,

7  which specified eight topics for deposition.  Mattel served a Second Notice of Deposition of

8  MGA in February of 2007, which specified forty-six topics for deposition.  On June 5, 2007,

9  Mattel served a Third Notice of Deposition of MGA (the "Third Notice"), which is the subject of

10  the present motion to compel.  The Third Notice specifies sixteen topics for deposition.  On June

11  29, 2007, MGA served objections to the Third Notice, and on July 5, 2007, the parties met and

12  conferred.  The parties were not able to resolve their disputes regarding four subject matters: hard

13  drives and other storage devices (Topics 1-3); prior inconsistent statements to the press (Topics 6-

14  8); "test projects" for MGA (Topic 9); and payments MGA made to Isaac Larian, Farhad Larian

15  and Morad Zarabi (Topic 11-13).  The topics at issue are set forth below.

16  Hard Drives and Other Storage Devices

17      1.   The IDENTITY, current or last known location, and disposition of

18  each STORAGE DEVICE that each of the following PERSONS has used to

19  create, generate, prepare, draft, send and/or receive any DOCUMENT or

20  DIGITAL INFORMATION that REFERS OR RELATES TO BRATZ and/or

21  ANGEL at any time since January 1, 1999, including without limitation the date

22  of acquisition and the date of disposition of each STORAGE DEVICE:  Isaac

23  Larian, Farhad Larian, Paula Garcia, BRYANT, Kami Gillmour, Veronica

24  Marlow, Mercedeh Ward, Margaret Hatch-Leahy, Jennifer Maurus, Judy Rich,

25  Ninette Pembleton, Kerrie Brode, Victoria O'Connor, Aileen Storer, Charles

26  O'Connor, Helene Bartels, Colleen O'Higgins, Vivian Matt, Maureen Mullen,

27  Rachel Harris, Barbara Malcolm, David Dees, Ben Ton, Dave Malacrida.

28  

2

2.      The IDENTITY, current or last known location, and disposition of each backup, copy or image of the STORAGE DEVICES referenced in Topic 1 of this Notice, including without limitation the date of creation and the date of disposition of each such backup or copy.

3.      YOUR search for and production of DOCUMENTS and DIGITAL INFORMATION from the STORAGE DEVICES referenced in Topic 1 of this Notice.

### Prior Inconsistent Statements to the Press

6.      YOUR statements to Christopher Palmeri in connection with the Business Week article entitled "To Really Be A Player, Mattel Needs Hotter Toys," published on or about July 28, 2003, including without limitation in connection with the statement that Isaac Larian "got the idea for Bratz after seeing his own kids run around in navel-bearing tops and hip-huggers."

7.      YOUR statements to Denise I. O'Neal in connection with the Chicago Sun-Times article entitled "Bratz Packers Are What's Cool in Doll World," published on or about March 5, 2004, including without limitation in connection with the statements that MGA's "creative team decided the name should be catchy and not have more than six letters. Keeping with today's trend of making names more 'cool' by changing the spelling, MGA executives decided to replace the 's' with a 'z'"

8.      YOUR statements to Jeff Weiss in connection with the San Fernando Valley Business Journal article entitled "Immigrant's Creative Company Shakes Up Toy Industry," published on or about March 29, 2004, including without limitation in connection with the statement that "[i]t was Jason's idea for Bratz."

### "Test Projects" for MGA

9.      The IDENTITY of each PERSON who YOU had perform, or who

EXHIBIT    Exhibit 47 Page 877

1   YOU requested, asked or solicited to perform, any "test project" in advance of or

2   in consideration of employment by YOU since January 1, 1995, including without

3   limitation the IDENTITY of each such PERSON who was a MATTEL employee

4   at the time.

5        Payments MGA Made to Isaac Larian, Farhad Larian and Morad Zarabi

6        11.    Payments of money or any other item of value that YOU have

7   made to, for or on behalf of Isaac Larian or any FAMILY MEMBER of Isaac

8   Larian since January 1, 1999, including without limitation (a) the amounts of such

9   payment and the equivalent dollar value of each of item of value, (b) the dates of

10  such payment, (c) the IDENTITY of each recipient of such payment, (d) the

11  IDENTITY of each bank or financial institution account to which such payment

12  was made and (e) the reasons for each such payment.

13       12.    Payments of money or any other item of value that YOU have

14  made to, for or on behalf of Farhad Larian or any FAMILY MEMBER of Farhad

15  Larian since January 1, 1999, including without limitation (a) the amounts of each

16  such payment and the equivalent dollar value of each of item of value, (b) the

17  timing of each such payment, (c) the IDENTITY of each recipient of each such

18  payment, (d) the IDENTITY of each bank or financial institution account to

19  which such payment was made and (e) the reasons for each such payment.

20       13.    Payments of money or any other item of value that YOU have

21  made to, for or on behalf of Morad Zarabi or any FAMILY MEMBER of Morad

22  Zarabi since January 1, 1999, including without limitation (a) the amounts of each

23  such payment and the equivalent dollar value of each item of value, (b) the timing

24  of each such payment, (c) the IDENTITY of each recipient of each such payment,

25  (d) the IDENTITY of each bank or financial institution account to which such

26  payment was made and (e) the reasons for each such payment.

27  Zeller Decl., Ex. 23.

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

4

EXHIBIT   Exhibit 47 Page 878

1   Mattel seeks an order compelling MGA to produce witnesses to testify on Topics 1-3, 6-8,

2 9 and 11-13, and overruling all of MGA's objections and limitations. Mattel contends that the

3 testimony it seeks is relevant, not unduly burdensome, and not otherwise objectionable as

4 cumulative or duplicative of any other deposition testimony already given in the case.

5   MGA contends that Mattel's Third Notice is invalid because Mattel failed to obtain leave

6 of court to take MGA's deposition after having previously deposed several 30(b)(6) designees.

7 MGA contends that Rule 30(a)(2)(B), Fed.R.Civ.P., requires Mattel to establish good cause for

8 examining MGA any further. MGA further contends that Mattel has not established the requisite

9 good cause, and instead improperly has attempted to shift the burden of proof to MGA to justify

10 its objections to the Third Notice. Lastly, MGA contends that Mattel has had many opportunities

11 to obtain, and in many cases has already obtained, the information it now moves to compel.

12           III. STANDARDS

13   Rule 26 of the Federal Rules of Civil Procedure provides that "[p]arties may obtain

14 discovery regarding any matter, not privileged, that is relevant to the claim or defense of any

15 party." Fed.R.Civ.P. 26(b)(1). "Relevant information need not be admissible at trial if the

16 discovery appears reasonably calculated to lead to the discovery of admissible evidence." Id.

17   Pursuant to Rule 26(b)(2)(C), Fed.R.Civ.P., the court shall limit the frequency or extent of

18 use of the discovery methods if the court determines that "(i) the discovery sought is unreasonably

19 cumulative or duplicative, or is obtainable from some other source that is more convenient, less

20 burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity by

21 discovery in the action to obtain the information sought; or (iii) the burden or expense of the

22 proposed discovery outweighs its likely benefit, taking into account the needs of the case, the

23 amount in controversy, the parties' resources, the importance of the issues at stake in the

24 litigation, and the importance of the proposed discovery in resolving the issues." Fed.R.Civ.P.

25 26(b)(2)(C).

26   Pursuant to Rule 30, Fed.R.Civ.P., a party may take the testimony of any person, including

27 a party, by deposition upon oral examination without leave of court, except as provided in Rule

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

5

1  30(a)(2), Fed.R.Civ.P.  In particular, Rule 30(a)(2) specifies that a party must obtain leave of

2  court, which shall be granted to the extent consistent with the principles stated in Rule 26(b)(2),

3  Fed.R.Civ.P., if "the person to be examined already has been deposed in the case."  Fed.R.Civ.P.

4  30(a)(2)(B).

5  IV. DISCUSSION

6      As a threshold matter, the parties dispute whether Rule 30(a)(2)(B), Fed.R.Civ.P., applies

7  to depositions taken pursuant Rule 30(b)(6), Fed.R.Civ.P.  There is caselaw to support each

8  party's position.  See e.g. Ameristar Jet Starter, Inc. v. Signal Composites, Inc., 244 F.3d 189 (1st

9  Cir. 2001) (second Rule 30(b)(6) subpoena issued without leave of court was invalid); In re

10  Sulfuric Acid Antitrust Litig., 2005 WL 1994105 (D. Ill. Aug. 19, 2005) (holding that second

11  Rule 30(b)(6) subpoena issued without leave of court was invalid); Innomed Labs, LLC v. Alza

12  Corp., 211 F.R.D. 237 (S.D. N.Y. 2002) (quashing overbroad 30(b)(6) subpoena issued without

13  leave of court); Quality Aero Tech., Inc. v. Telemetrie Elektronik, 212 F.R.D. 313, 319 (E.D.

14  N.C. 2002) (holding that Rule 30(a)(2)(B) does not apply to Rule 30(b)(6) depositions).  For

15  purposes of the present motion, however, it is unnecessary to resolve this conflict in the law

16  because the debate is purely academic and inconsequential.  As Mattel has requested, Mattel's

17  motion is treated herein as a motion for leave to serve an additional 30(b)(6) notice with

18  additional topics.  In evaluating the appropriateness of the topics, it is Mattel's burden to

19  demonstrate that there is good cause for such discovery (see e.g. Boston Scientific Corp. v. Cordis

20  Corp., 2004 WL 1945643 (N.D.Cal. 2004)), applying the principles stated in Rule 26(b)(2),

21  Fed.R.Civ.P.

22  Hard Drives and Other Storage Devices (Topics 1-3)

23      Topic 1 seeks information regarding the location and disposition of computer hard drives

24  or other storage devices used by specified MGA employees or contractors that contain or

25  contained documents related to the Bratz or Angel projects.  Topic 2 seeks the identification and

26  last known location of any backup, copy or image of the hard drives or storage devices identified

27  in Topic 1.  Topic 3 seeks information regarding MGA's search for and production of documents

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

6

EXHIBIT        Exhibit 47 Page 880

1   and digital information from the hard drives and storage devices referenced in Topic 1.

2        MGA objected to Topics 1-3 as overbroad, unduly burdensome, vague, ambiguous,

3   irrelevant, and not reasonably calculated to lead to admissible evidence.  MGA also objected to

4   Topics 1-3 to the extent that the information sought is obtainable through other more convenient,

5   less burdensome and less expensive means.  Lastly, MGA objected to Topics 1-3 as unreasonably

6   cumulative and duplicative of information already provided by Ken Lockhart, Vice President and

7   Chief Information Officer for MGA.

8        Topics 1-3 unquestionably seek information that is relevant within the meaning of Rule

9   26(b)(1), Fed.R.Civ.P., which specifically authorizes discovery regarding any matter, not

10   privileged, that is relevant to the claim or defense of any party, including "the existence,

11   description, nature, custody, condition, and location of any books, documents or other things."  A

12   portion of the discovery sought, however, is unreasonably cumulative and duplicative of

13   information already provided by Mr. Lockhart.  MGA designated Mr. Lockhart as a 30(b)(6)

14   witness to testify about MGA's retention, destruction and data back-up policies, MGA's digital

15   information systems and application software, employees' electronic messaging systems, and

16   MGA's policies regarding the use of transportable media.  Mr. Lockhart testified about the

17   location and disposition of MGA employees' hard drives and storage devices in general.

18        Mattel contends that Topics 1-3 differ from the topics in the Second Notice and the

19   testimony previously given by Mr. Lockhart in that Mattel now seeks information about the

20   locations and dispositions of hard drives used by 24 named individuals.  Mattel contends that the

21   testimony it seeks will enable it to assess MGA's production, including whether any documents

22   requested or compelled by the Court were destroyed, not collected or otherwise made unavailable

23   to Mattel.  Mattel's Reply at p.7.

24        Although Mattel's stated objective for seeking testimony regarding Topics 1-3 may be

25   legitimate, the burden and expense of a Rule 30(b)(6) deposition is not justified under the

26   circumstances of this case.  Mattel has accused MGA of obstructing discovery, and in particular

27   withholding Bryant's computer.  There is no evidence, however, to suggest that MGA has refused

28

1   or failed to search for and produce responsive documents located on the hard drives of the other

2   individuals named in Topic 1.  It is burdensome and expensive to prepare a witness to testify

3   about the locations and dispositions of hard drives used for 24 different individuals. The likely

4   benefit of undergoing such a burden and expense is doubtful.  Furthermore, there are other less

5   burdensome and less expensive means of assessing whether MGA has complied with its

6   discovery obligations, including for example, document requests and interrogatories.  Therefore,

7   Mattel's motion is denied as to Topics 1-3.

8                    Prior Inconsistent Statements to the Press (Topics 6-8)

9          Topics 6-8 seek testimony regarding three public statements made by Isaac Larian

10  regarding who conceived of Bratz.  MGA objected to Topics 6-8 as irrelevant and not reasonably

11  calculated to lead to admissible evidence.  MGA also objected to Topics 6-8 to the extent that the

12  information sought is obtainable through other more convenient, less burdensome and less

13  expensive means.  Further, MGA objected to Topics 6-8 as unreasonably cumulative and

14  duplicative of information already provided by MGA and/or Carter Bryant.  MGA also objected

15  to a deposition on these Topics "to the extent that the statements referenced above were not made

16  by MGA as a corporate actor and thus they are not the appropriate subject of a 30(b)(6)

17  designation." Zeller Decl., Ex. 24.

18         Mattel contends that Topics 6-8 are the proper subject of a Rule 30(b)(6) deposition

19  because each of the statements identified therein was made by MGA's Chief Executive Officer,

20  Isaac Larian.  Mattel acknowledges that it already deposed Isaac Larian regarding one of the

21  articles identified in Topics 6-8, but contends that it is not attempting to re-depose him.  Rather,

22  Mattel contends that it is entitled to elicit testimony that will bind the corporation so that it will

23  not be "sandbagged" at trial.  Mattel's Reply at p.6.

24         MGA accuses Mattel of misusing the 30(b)(6) procedure when Mattel knows that Isaac

25  Larian is the person who should be, and already has been, deposed about the statements identified

26  in Topics 6-8.  MGA also contends that Mattel opted to limit its examination of Isaac Larian to

27  one article, and that Mattel's failure to fully question Isaac Larian in no way justifies deposing

28
    Bryant v. Mattel, Inc.,                                                                    8
    CV-04-09049 SGL (RNBx)

1    MGA now. MGA also contends that Mattel could avail itself of other discovery methods, such as

2    interrogatories or requests for admission, to obtain further information about the publications

3    identified in Topics 6-8.

4         Topics 6-8 seek information relevant to the central issue in the case: who conceived of

5    Bratz. Mattel's use of the 30(b)(6) procedure is justified in order to obtain testimony that will

6    bind the corporation. The testimony Mattel now seeks is not unreasonably cumulative or

7    duplicative of testimony it has already sought from Isaac Larian because Mattel previously

8    questioned Isaac Larian about only one of the articles identified in Topics 6-8. Further, the likely

9    benefit to Mattel of testimony from Isaac Larian (or another corporate designee) regarding Topics

10   6-8 outweighs the burden and expense to MGA, given the importance of the testimony Mattel

11   seeks. Mattel's motion is granted as to Topics 6-8.

12                      "Test Projects" for MGA (Topic 9)

13        In Topic 9, Mattel seeks the identity of each person MGA had perform or who MGA

14   requested, asked or solicited to perform, any "test project" in advance of or in consideration of

15   employment by MGA since January 1, 1995. MGA objected to Topic 9 as irrelevant, not

16   reasonably calculated to lead to the discovery of admissible evidence, overbroad, unduly

17   burdensome, and unreasonably cumulative and duplicative. MGA also objected to Topic 9 as

18   vague and ambiguous, particularly with respect to the term "test project." MGA also objected to

19   Topic 9 to the extent that the information sought is obtainable through other, more convenient,

20   less burdensome and less expensive means. MGA also objected to Topic 9 as seeking

21   confidential, proprietary, and commercially sensitive information with no relevance to the

22   litigation.

23        When Carter Bryant was deposed by Mattel, he testified that he "did sort of a tryout kind

24   of a project for" MGA. Zeller Decl., Ex. 29 at 9:19-20. He also referred to this "tryout" project

25   as a "test assignment." Id. at 515-516. In light of Bryant's testimony, Mattel's stated purpose of

26   Topic 9 is to "obtain information that will refute MGA and Bryant's assertions that Bryant's

27   working for MGA while employed by Mattel was no different than a supposedly standard

28

EXHIBIT _                    Exhibit 47 Page 883

1  industry practice of having candidates for creative positions make artwork as part of the job

2  interview." Mattel's Motion at p.22.

3       MGA acknowledges that Mattel provided a definition for the phrase "test assignment" in

4  its motion papers. MGA's Opposition at p.10. MGA nevertheless contends that Topic 9 remains

5  objectionable as overbroad, reasoning that it would require MGA to provide information "with

6  regard to how it proceeded with hiring virtually every single employee hired since 1995."

7  MGA's Opposition at p.9. MGA also contends that it would be unduly burdensome to require

8  MGA to have a designee review and potentially memorize information about every single person

9  who has applied for a job at MGA since 1995, particularly when Bryant only began working for

10 MGA in 2000. MGA contends that a contention interrogatory is more appropriate than a 30(b)(6)

11 deposition to obtain the information called for in Topic 9.

12      Topic 9 seeks information relevant to one of MGA and Bryant's defenses, namely their

13 claim that Bryant's work for MGA while employed by Mattel was no different than a standard

14 industry practice of having candidates for creative positions make artwork as part of the job

15 interview. Topic 9, however, is objectionable because it is overbroad and burdensome. In

16 particular, Topic 9 is overbroad in terms of the specified time frame because Bryant did not begin

17 working at MGA until the year 2000. Topic 9 is also objectionable because the information

18 sought is more appropriately obtained through a contention interrogatory, which would be

19 significantly less burdensome and less expensive than a 30(b)(6) deposition. Therefore, Mattel's

20 motion is denied as to Topic 9. In lieu of taking a 30(b)(6) deposition on Topic 9, Mattel is

21 granted leave to serve a contention interrogatory regarding Topic 9 limited to the years 1998

22 through 2004.

23 <u>Payments MGA Made to Isaac Larian, Farhad Larian and Morad Zarabi (Topics 11-13)</u>

24      In Topics 11-13, Mattel seeks information regarding payments made by MGA to Isaac

25 Larian (Topic 11), Farhad Larian (Topic 12), and Morad Zarabi (Topic 13). MGA objected to

26 these Topics as irrelevant, not reasonably calculated to lead to the discovery of admissible

27 evidence, overbroad, unduly burdensome, and unreasonably cumulative and duplicative. MGA

28

EXHIBIT   Exhibit 47 Page 884

1  also objected to Topics 11-13 to the extent that the information sought is obtainable through

2  other, more convenient, less burdensome and less expensive means.  MGA also objected to

3  Topics 11-13 as seeking confidential, proprietary, and commercially sensitive information with no

4  relevance to the litigation.

5     Mattel explains that Morad Zarabi arbitrated a dispute between Isaac Larian and Farhad

6  Larian that involved the timing of the creation of Bratz.  More specifically, Farhad Larian claimed

7  that Isaac Larian concealed from him MGA's development with Carter Bryant of Bratz dolls and

8  alleged that Bryant began working with MGA during a time Bryant was employed by Mattel.

9  Mattel considers all three individuals involved in the arbitration as witnesses in this litigation, and

10  therefore seeks information that may establish their bias.  Mattel also emphasizes that Isaac

11  Larian is a party to the litigation, and that payments made by MGA to him are relevant to Mattel's

12  claim for punitive damages, and may be used as impeachment evidence.  Lastly, although Mattel

13  acknowledges that it deposed Isaac Larian regarding payments he received from MGA, Mattel

14  contends that it is entitled to testimony from MGA to corroborate or refute his testimony.

15     MGA contends that Topics 11-13 are not relevant to this lawsuit.  In particular, MGA

16  objects to Topics 12 and 13 as seeking "private financial records of persons who are neither

17  parties nor witnesses in this action, and whose only connection is knowing people involved in the

18  lawsuit."  MGA's Opposition at p. 13.  With regard to payments to Isaac Larian, MGA contends

19  that Mattel already had the opportunity to ask him about payments during his deposition.  MGA

20  also contends that Mattel is not entitled to conduct discovery regarding Isaac Larian's net worth at

21  this time.  Even if Mattel is entitled to conduct such discovery, MGA contends that payments

22  made to him would not establish his net worth because they represent only one of many sources

23  of income and do not account for his other assets and liabilities.

24     MGA's payments to Isaac Larian and Farhad Larian are relevant to the claims and

25  defenses in the case.  Payments to Isaac Larian and Farhad Larian may also show possible bias

26  and be used for impeachment purposes.  Moreover, MGA's payments to Isaac Larian may be

27  relevant to Mattel's claim for punitive damages.  Payments to Isaac Larian are a component of his

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

11

1    net worth, even if they represent one source of income. The burden of producing such information

2    does not outweigh its relevance, taking into consideration the circumstances of this case.

3    Furthermore, there is no stay on discovery pertaining to punitive damages.  Accordingly, Mattel's

4    motion is granted as to Topics 11 and 12.

5          In contrast, MGA's payments to Morad Zarabi are irrelevant.  His only connection to this

6    litigation appears to be with the arbitration proceedings.  Any potential relevance of MGA's

7    payments to Morad Zarabi is outweighed by the burden and the intrusion into his private financial

8    affairs. Mattel's motion is denied as to Topic 13.

9                              V. CONCLUSION

10         For the reasons set forth above, it is hereby ordered as follows:

11         1.     Mattel's motion to compel is granted as to Topics 6-8, 11 and 12.

12         2.     Mattel's motion to compel is denied as to Topics 1-3, 9 and 13.  In lieu of taking a

13   deposition on Topic 9, Mattel is hereby granted leave to serve a contention interrogatory

14   regarding Topic 9 that is limited to the years 1998 through 2004.

15         3. Mattel's request for sanctions is denied.

16   Pursuant to Paragraph 6 of the Stipulation and Order for Appointment of a Discovery Master,

17   Mattel shall file this Order with the Clerk of Court forthwith.

18

19

20   Dated: September _25_, 2007

21                                          HON. EDWARD A. INFANTE (Ret.)
                                            Discovery Master
22

23

24

25

26

27

28

Bryant v. Mattel, Inc.,                                              12
CV-04-09049 SGL (RNBx)

## PROOF OF SERVICE BY E-MAIL

I, Sandra Chan, not a party to the within action, hereby declare that on September 26, 2007, I served the attached ORDER GRANTING IN PART AND DENYI8NG IN PART MATTEL'S MOTION TO COMPEL MGA TO PRODUCE WITNESSES PURSUANT TO THIRD NOTICE OF DEPOSITION UNDER RULE 30(b)(6); DENYING REQUEST FOR SANCTIONS in the within action by e-mail addressed as follows:

| | | |
|---|---|---|
| John W. Kekar, Esq. | Keker & Van Nest | jkeker@kvn.com |
| Michael H. Page, Esq. | Keker & Van Nest | mhp@kvn.com |
| Christa Anderson, Esq. | Keker & Van Nest | cma@kvn.com |
| John E. Trinidad, Esq. | Keker & Van Nest | jtrinidad@kvn.com |
| John Quinn Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | johnquinn@quinnemanuel.com |
| Michael Zeller Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | michaelzeller@quinnemanuel.com |
| Jon Corey Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | joncorey@quinnemanuel.com |
| Duane Lyons Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | duanelyons@quinnemanuel.com |
| Timothy Alger Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | timalger@quinnemanuel.com |
| Dominic Surprenant Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | DominicSurprenant@QuinnEmanuel.com |
| B. Dylan Proctor Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | dylanproctor@quinnemanuel.com |
| Shane McKenzie Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | shanemckenzie@quinnemanuel.com |
| Bridget Hauler Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | bridgethauler@quinnemanuel.com |
| Tamar Buchakjian Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | tamarbuchakjian@quinnemanuel.com |
| Juan Pablo Alban, Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | juanpabloalban@quinnemanuel.com |
| Dale Cendali Esq. | O'Melveny & Myers LLP | dcendali@omm.com |
| Diana Torres Esq. | O'Melveny & Myers LLP | dtorres@omm.com |
| James Jenal Esq. | O'Melveny & Myers LLP | jjenal@omm.com |
| Alicia Meyer Esq. | O'Melveny & Myers LLP | ameyer@omm.com |
| Jennifer Glad Esq. | O'Melveny & Myers LLP | jglad@omm.com |
| David Hurwitz, Esq. | O'Melveny & Myers LLP | dhurwitz@omm.com |
| Johanna Schmitt Esq. | O'Melveny & Myers LLP | jschmitt@omm.com |
| Michael C. Keats, Esq. | O'Melveny & Myers LLP | mkeats@omm.com |
| Kendall Burr, Esq. | O'Melveny & Myers LLP | kburr@omm.com |
| Melanie Bradley, Esq. | O'Melveny & Myers LLP | mbradley@omm.com |
| Marvin Putnam, Jr., Esq. | O'Melveny & Myers LLP | mputnam@omm.com |
| William Charron, Esq. | O'Melveny & Myers LLP | wcharron@omm.com |
| Marc Feinstein, Esq. | O'Melveny & Myers LLP | mfeinstein@omm.com |
| Patricia Glaser Esq. | Christensen, Glaser, Fink, Jacobs, Weil & Shapiro, LLP | pglaser@chrisglase.com |

I declare under penalty of perjury under the laws of the Untied States of America that the above is true and correct.

Executed on September 26, 2007, at San Francisco, California.

Sandra Chan

EXHIBIT 48

FILED

DALE M. CENDALI
(of counsel, not admitted in California)
DIANA M. TORRES (S.B. #162284)
PAULA E. AMBROSINI (S.B. #193126)
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA  90071-2899
Telephone:   (213) 430-6000
Facsimile:   (213) 430-6407
email:       dtorres@omm.com

PATRICIA GLASER (S.B. # 55668)
CHRISTENSEN, MILLER, FINK,
JACOBS, GLASER, WEIL &
SHAPIRO LLP
10250 Constellation Boulevard, 19th Floor
Los Angeles, CA  90067
Telephone:   (310) 553-3000
Facsimile:   (310) 556-2920

Attorneys for Plaintiff
MGA Entertainment, Inc.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

CV 05 - 02727  CBM (RZx)

| | |
|---|---|
| MGA ENTERTAINMENT, INC., <br><br> Plaintiff, <br><br> v. <br><br> MATTEL, INC., a Delaware Corporation, and DOES 1-10, <br><br> Defendants. | Case No. <br><br> **COMPLAINT FOR FALSE DESIGNATION OF ORIGIN, AFFILIATION, ASSOCIATION OR SPONSORSHIP (15 U.S.C. § 1125 (a)); UNFAIR COMPETITION (15 U.S.C. § 1125 (a), Cal. Bus. & Prof. Code § 17200 _et seq._ and California Common Law); DILUTION (15 U.S.C. § 1125 (c), Cal. Bus. & Prof Code § 14330 and California Common Law); AND UNJUST ENRICHMENT** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff MGA Entertainment, Inc. for its complaint against Defendants Mattel, Inc. and DOES 1-10 alleges and avers as follows:

## PARTIES

1.     Plaintiff MGA Entertainment, Inc. ("MGA") is a California corporation organized and existing under the laws of the State of California, with a principal place of business in Van Nuys, California.

2.     MGA is informed and believes, and based thereon alleges, that Defendant Mattel, Inc. ("Mattel") is a Delaware corporation with a principal place of business in El Segundo, California.

3.     MGA is ignorant of the true names and capacities of the defendants sued herein under the fictitious names DOES 1 through 10 inclusive. MGA will seek leave of court to amend this complaint to allege such names and capacities when they are ascertained. MGA is informed and believes, and based thereon alleges, that each of the fictitiously named DOE defendants is responsible in some manner for the wrongful conduct alleged herein. MGA further alleges that each defendant acted in concert with, as agent or representative for, or at the request or on behalf of another or Mattel. Each charging allegation contained herein is, therefore, also hereby alleged against each fictitiously named DOE defendant.

## JURISDICTION AND VENUE

4.     Through this action MGA asserts claims against Mattel arising under the Lanham Act, 15 U.S.C. Sections 1125 (a) and (c), California Business and Professions Code Sections 17200 *et seq.*, California Business and Professions Code Section 14330 and California common law. This Court has original subject matter jurisdiction over MGA's federal claims pursuant to 15 U.S.C. Sections 1116 and 1121, 28 U.S.C. Section 1338(a), and 28 U.S.C. Section 1331, and supplemental

1

Exhibit 48 Page 889

1  subject matter jurisdiction over MGA's state law claims pursuant to 28 U.S.C.

2  Section 1367(a).

3      5.    This Court has specific personal jurisdiction over Mattel, as it has

4  purposefully committed, within the State of California, the acts from which these

5  claims arise and/or has committed tortious acts outside California, knowing and

6  intending that such acts would cause injury to MGA within the state. The Court

7  also has general personal jurisdiction over Mattel, as it conducts continuous,

8  systematic and routine business within the State of California and the County of

9  Los Angeles.

10      6.    Venue is proper in the United States District Court for the Central

11  District of California pursuant to 28 U.S.C. Sections 1391(b) and 1391(c).

12

13                  **FACTUAL BACKGROUND**

14      7.    MGA seeks by this action to halt Mattel's habitual and unfair tactics of

15  competition-by-intimidation and serial copycatting of MGA's products, which

16  Mattel has used in an unbridled effort to cause confusion in the market place and

17  eliminate MGA as a competitor in the toy and fashion doll market long dominated

18  and controlled by Mattel.

19      8.    MGA is a privately-held company in the San Fernando Valley that

20  began in 1979 as a small consumer electronics business. In 1987, the company

21  made its first foray into the toy business when it secured rights to market handheld

22  LCD games featuring licensed Nintendo® characters. Building on that small

23  success, the company began marketing products for popular licensed properties

24  such as the "Power Rangers"® and "Hello Kitty"®. This little-known but

25  successful company, however, was propelled into the limelight after its daring

26  release in June 2001 of an innovative line of fashion dolls called "BRATZ".

27  "BRATZ" are multi-ethnic fashion dolls that sport a fresh new urban and

28  contemporary look and fashion. At the time of the release of "BRATZ", "Barbie"

2

1   sales were in a slump, Mattel was in turmoil, and the market was ripe for something

2   new, exciting and inventive.  "BRATZ" fit the bill.  It is the first fashion doll that

3   has been able to seriously challenge "Barbie" for market share, and begin to loosen

4   Mattel's 50-year iron-fisted grip on the fashion doll market.

5        9.      Mattel has not taken kindly to the challenge.  Either unable or

6   unwilling to compete against "BRATZ" fairly, and on a level-playing field, Mattel

7   has, instead, taken a more expeditious approach, resorting to unfair and anti-

8   competitive business practices.  Wielding its substantial clout and influence in the

9   toy industry, Mattel has tried to muscle MGA out of business.  MGA is informed

10  and believes that Mattel has intimidated, coerced and threatened retailers, licensees,

11  suppliers and others in the industry   both in the U.S. and internationally   in order

12  to inhibit and stifle MGA's ability to compete with Mattel and to prevent MGA

13  from obtaining licensees, contracts and supplies for its products.  Mattel has also

14  serially imitated and copy-catted the look of MGA products, trade dress,

15  trademarks, themes, ideas, advertising and packaging, including for the "BRATZ"

16  line of dolls.  MGA brings this action to stop Mattel's tortious, unfair and anti-

17  competitive conduct and to recover the extensive damage that Mattel's illicit

18  behavior has caused, and continues to cause, MGA.  Mattel's own website states:

19  "As the global leader in the toy industry, we believe that how we achieve success is

20  just as important as the success itself."  It also proclaims that "unwavering integrity

21  defines our corporate culture on every level, guiding how we work and how we do

22  business."  Mattel's own corporate governance standards require it to "play by the

23  rules," complete fairly and be a good corporate citizen.  Mattel's actions, however,

24  speak louder than its words.

25

26

27

28

                                            3

## Mattel History and Performance

10.   Mattel is the world's largest toy company, but it owes its immense success chiefly to a single product: "Barbie." Since her debut in 1959, "Barbie" has been the fuel for Mattel's growth and success, turning Mattel into an international powerhouse. By the late 1990's, Mattel's annual sales of the doll approached or topped $1.8 billion and Mattel stock reached a record high of approximately $45.00 a share. At that time, the average American girl had eight "Barbie" dolls, and "Barbie" was the world's best-selling toy.

11.   Mattel's reliance on a single, 40-year old product for as much as 50% of its business turned out to be a risky business model, however. Resting on its laurels, Mattel failed to react to the shifting tastes of consumers, changing dynamics in the industry, and an increasing focus on technologically advanced and interactive toys. "Barbie's" record sales fell into a tailspin. According to one report, Adrienne Fontanella, Mattel's "Barbie" brand president, would later be quoted as saying that, "The world changed very quickly, and we missed a beat. . . Barbie wasn't talking to girls. She just wasn't hitting it."

12.   Sales began to plunge in 1997, and Mattel began posting a series of net income losses. In the first quarter of 1998, sales of the "Barbie" brand dropped 17%. This steep slide was followed by another in the second quarter, when sales fell again, down by 15%. By the end of 1998, Mattel reported an overall 14% decline in "Barbie" sales for the year and analysts were using words such as "devastating" and "a catastrophe" to describe Mattel's earnings. The company's stock fell as much as 27% in a single day. "Barbie" was having a crisis.

13.   Jill Barad, who had taken over as Mattel's chairman and chief executive in January 1997, at the height of Mattel's success, had to do something fast. Instead of focusing on and investing in new product development, however, which would obviously take time, Mattel embarked on a series of acquisitions that were seemingly aimed at quickly diversifying the company's product line and

Exhibit 48 Page 892

1   reducing its reliance on "Barbie" and on traditional retailers, such as Toys-R-Us

2   and Wal-Mart. Mattel spent a reported $881 million in March 1997 to purchase

3   Tyco Toys and acquire the "Matchbox" toy car brand. Just more than a year later,

4   it spent $700 million for the Pleasant Co., a mail-order doll company and maker of

5   the "American Girl" doll collection. And in December 1998, Mattel announced

6   plans to fork out a monumental $3.5 billion to buy the Learning Company,

7   followed quickly by Mattel's purchase, in March 1999, of a software company,

8   Purple Moon.

9       14.   Despite these acquisitions, the company continued to struggle. The

10  retail environment and buying patterns had unquestionably changed, but Mattel had

11  not kept up. Despite Mattel's feverish acquisitions, Mattel's mainstay and primary

12  profit-generator was still "Barbie." But "Barbie" had grown stale, and sales

13  languished. Posting additional losses in the first quarter of 1999, Mattel announced

14  that it would lay off 3,000 employees — 10% of its work force.

15      15.   Mattel's stock plummeted again in late 1999, dropping 30% on

16  Mattel's announcement that it would fall as much as 55% short of analysts' earning

17  estimates for the third quarter. Mattel blamed its troubles primarily on its

18  expensive, $3.5 billion acquisition of the Learning Company, which had turned out

19  to be a disaster fraught with licensing and distribution problems, bad debt, high

20  product returns and high advertising costs.

21      16.   By early 2000, Mattel's stock had crashed to as low as $8 per share,

22  and some analysts considered Mattel vulnerable to a takeover. Investors clamored

23  for Ms. Barad's resignation, and got their wish.

24      17.   Jill Barad resigned from Mattel in February 2000.

25      18.   For three months, the company was without a permanent chief

26  executive until Robert Eckert took the helm in May 2000. Mr. Eckert had spent 23

27  years at Kraft Foods, a subsidiary of Altria Group, Inc., and was widely credited

28

5

1   with reviving its ailing cheese business.  Investors looked for him to do the same

2   for Mattel.

3       19.   Upon his arrival at Mattel, Mr. Eckert's promise, according to *Wall*

4   *Street Journal* reports, was to deliver a "leaner and meaner" Mattel.

5       20.   The "leaner" Mattel came quickly.  Mr. Eckert laid off hundreds,

6   closed factories in the United States, shipped production to Mexico, and sold off the

7   Learning Company at a fraction of what Mattel had paid for it.  It helped Mattel's

8   bottom-line, but did nothing to spur sales growth.  Even under Mr. Eckert's "leaner

9   meaner" leadership, domestic "Barbie" sales remained in a slump into 2001.  In an

10  industry that had become increasingly driven by consumer whims and fads, and the

11  hot, must-have toys of the moment, Mattel remained disinterested in devoting its

12  resources to searching for or developing a new blockbuster toy.  Mr. Eckert's

13  business plan was not to diversify, but to build upon and expand sales of its existing

14  brands.  Mattel was, after all, still generating billions in revenue despite the decline

15  of "Barbie."  And so, Mattel remained committed to its age-worn icon and its two

16  other core brands, Fisher-Price and Hot Wheels, with each of the three accounting

17  for approximately a third of the company's sales.

18      21.   Then came the competition - MGA's "BRATZ".

19

20  **"BRATZ" Dolls Revolutionize The Fashion Doll Market**

21      22.   "BRATZ" challenged "Barbie's" half-century domination of the

22  fashion-doll market like nothing ever before had been able to do.

23      23.   MGA unveiled a preliminary sample of the "BRATZ" doll at the Hong

24  Kong Toy Fair in January 2001, while continuing to finalize the product throughout

25  that spring.  Finished products were first shipped in May 2001.  MGA introduced

26  the line to consumers in June 2001.

27

28

6

**Exhibit 48 Page 894**

24.     Unlike "Barbie" dolls, the "BRATZ" line of dolls and branded products sported a hip, multi-ethnic urban look that appealed to contemporary teenage and pre-teen girls.

### MGA's "BRATZ"






25.     At approximately 9.5 to 10 inches tall, the "BRATZ" dolls were intentionally shorter than "Barbie" dolls and looked like no other, with disproportionately large heads, big, dramatic eyes and lips, small, thin bodies, oversized feet (to emphasize shoe fashion and to stand on their own, unlike "Barbie," which requires a stand), and up-to-date fashions.

7

26.    Indeed, the classic "Barbie" look was nowhere to be seen in these dolls: they would never be confused with "Barbie".

**MGA's "BRATZ"**                         **Mattel's "Barbie"**



27.    Featuring and embodying the slogan "The Girls With a Passion for Fashion!", "BRATZ" dolls revitalized, transformed and expanded the fashion doll market, in particular proving popular among "tween" age girls   those between childhood and adolescence   who had been all but abandoned as a market by Mattel.

28.    The "BRATZ" line – with its unique and distinctive look - is well recognized and has been critically acclaimed and praised by consumers, retailers and toy industry analysts alike.  In 2001, the "BRATZ" line won the Toy Industry Association ("TIA") People's Choice Toy of the Year Award, the Family Fun Toy of the Year Award and Toy Wishes Hot Pick Award.  In 2002, the "BRATZ" line again won the TIA People's Choice Toy of the Year Award and the Family Fun Toy of the Year Award.  LIMA, the licensing industry's official arm, awarded MGA's "BRATZ" the best character license of the year as well as the overall best licensed property of the year for 2003.  MGA's "BRATZ" also earned the coveted TIA "Property of the Year" and "Girl Toy of the Year" for 2003, as well as the Family Fun Toy of the Year Award.  MSNBC named "BRATZ" the "Hottest Toy of the Year," and both MGA and "BRATZ" received several other accolades in

8

1    2004, including the Suppliers Performance Award by Retail Category (the
2    "SPARC" award) in the Girls' Toys category sponsored by DSN Retailing
3    Today/Apparel Merchandising.

4         29.    Although but a tiny fraction of Mattel's size, with "BRATZ", MGA
5    was able to chip away at Mattel's stranglehold on the fashion doll market, gaining
6    shelf space and market share as "Barbie" sales remained flat or, at times, declined.

7         30.    The competition that MGA (once a licensee of Mattel!) and "BRATZ"
8    posed to Mattel was unexpected and unwelcomed by Mattel.  Where "Barbie" had
9    once enjoyed a 90% share of the fashion doll market in 1997, that share had already
10   slipped to 85% or less by the time of the release of "BRATZ".  With the company
11   still struggling under Mr. Eckert to overcome prior years of declining sales and
12   mounting debt, "Barbie," Mattel   and Mr. Eckert - simply could not afford the
13   untimely competition.  Mr. Eckert's "leaner" Mattel was not enough to battle more
14   potential erosion in "Barbie's" market share.  Mattel had to combat "BRATZ" and
15   MGA, and in the process revealed Mr. Eckert's "meaner" Mattel.

16

17   **Mattel's Response to "BRATZ" and Efforts to Thwart MGA's Competition**

18        31.    Mattel was not poised to nimbly respond to "BRATZ" with a new,
19   creative product of its own -- indeed, it had been antithetical to Mattel's corporate
20   culture and mentality for Mattel to even conceive that a product might vie for shelf
21   space with "Barbie", let alone be available for sale to consumers mere months after
22   first being shown to retailers.  Mattel had to take a more expeditious route.

23        32.    Instead of fairly competing, Mattel waged war against MGA using a
24   wide-array of tortious, unfair and anti-competitive practices including systematic,
25   serial copycatting and intellectual property infringement, aided by intimidation,
26   threats and other acts of unfair competition and anti-competitive conduct, all with
27   one goal in mind - to banish MGA from the market -- or minimize its ability to
28   capture any meaningful share before it could do any real harm to Mattel.

9

**Exhibit 48 Page 897**

**Mattel's serial copycatting and intellectual property infringement**

33.    Mattel's serial copycatting of MGA's product lines began with the "BRATZ" dolls themselves, but quickly extended to MGA's packaging, themes, accessories, advertising and even other product lines.

34.    The first four "BRATZ" dolls that MGA launched in 2001, named Jade, Yasmin, Cloe and Sasha, met their wannabe "BRATZ PACK" members in October 2002 with Mattel's launch of three "My Scene" dolls named Madison, Chelsea and "Barbie." This was no ordinary "Barbie", however. Indeed, not even close. Mattel designed its "My Scene" dolls to evoke the unique and distinctive look of the "BRATZ"   also with disproportionately oversized heads, artfully made-up almond-shaped eyes, large, overly-lined and lipsticked lips, trendy, hip clothes and hair styles, and over-sized feet.

**Mattel's Traditional "Barbie"**          **Mattel's "My Scene" Doll**

circa 2002          circa 2004

  

  

10

**Exhibit 48 Page 898**

35.   These confusingly similar "BRATZ" imitators may have been originally intended to buy Mattel time while it worked to release another product the following summer, called "Flavas". MGA's founder, Isaac Larian, was quoted by the media as having predicted that the move would backfire on Mattel, and it did. Released in July 2003, Mattel's "Flavas" dolls took the urban, "hip-hop" look too far, and were widely viewed as portraying a trampy, "bad-girl" image. The dolls were not well-received, and rumor has it that Mattel had to sell them at below cost prices to get rid of inventory. Most apparently wound up in discount bins, and Mattel has seemingly abandoned the line.

36.   Realizing that "My Scene" was its best bet for riding MGA's successful coattails and capitalizing on the unique and inherently distinctive look that MGA had developed in its "BRATZ" dolls -- and MGA's substantial goodwill Mattel has systematically proceeded to modify the "My Scene" dolls since their original release, particularly their eyes, to increase their similarity to "BRATZ" more and more over time.

37.   Indeed, when Mattel found out that its initial line of "My Scene" dolls had trouble competing with "BRATZ", they simply *became* "BRATZ", in every version, whether blonde, brunette or African American. A few pictures here are worth a thousand words.

**BLONDE**

| **Mattel's Traditional "Barbie"** | **Mattel's Original "My Scene"** | **Mattel's Recent "My Scene"** |
| --- | --- | --- |
|  |  |  |

11

| Mattel's Traditional "Barbie" | Mattel's Original "My Scene" | Mattel's Recent "My Scene" |
|---|---|---|
|  |  |  |

## BRUNETTE

| Mattel's Traditional "Theresa" | Mattel's Original "My Scene" | Mattel's Recent "My Scene" |
|---|---|---|
|  |  |  |
|  |  |  |

12

## AFRICAN AMERICAN

| **Mattel's Traditional "Barbie"** | **Mattel's Original "My Scene"** | **Mattel's Recent "My Scene"** |
|:---:|:---:|:---:|
|  |  |  |
|  |  |  |

38.   The original "My Scene" eye, as shown here, for example, has recently turned into a virtual carbon-copy of the "BRATZ" eye.

### Original Mattel "My Scene" Eye

 

13

Exhibit 48 Page 901

39.   The "My Scene" eye pictured above, for instance, has lashes that radiate almost straight out, circumferentially, from the eyelids and, although the eye is more almond shaped than a "Barbie" eye, the eye is not so sleepy and heavy lidded as a "BRATZ" eye and is only lightly shadowed. The new "My Scene" eye, in contrast, is dramatically more similar to a "BRATZ" eye, as shown below in a side-by-side comparison. The doe-eyed innocent look of the "My Scene" eye shown above is gone; replaced with a sultrier look, characteristic of "BRATZ." The new "My Scene" eye, as shown below, boasts lashes that sweep out and away from the outer corner of the eye, just like the "BRATZ" eye. The new "My Scene" eye is also more heavy lidded and thickly lined, and the make-up is more markedly pronounced and dramatic.

**MGA's "BRATZ" Eye**                    **New Mattel "My Scene" Eye**

   

40.   Indeed, the progression of the "My Scene" eye, as it has departed from "Barbie" and edged closer and closer to "BRATZ", is readily apparent from virtually every angle, as shown here:

14

EXHIBIT     **Exhibit 48 Page 902**

## BLONDE

| Mattel's Traditional "Barbie" | Mattel's Original "My Scene" | Mattel's Recent "My Scene" |
| --- | --- | --- |



## BRUNETTE

| Mattel's Traditional "Theresa" | Mattel's Original "My Scene" | Mattel's Recent "My Scene" |
| --- | --- | --- |



15



**AFRICAN AMERICAN**

16

41.   Mattel has not stopped at the eyes, however.  Mattel has also incrementally but steadily modified its "My Scene" packaging, and the manner in which the dolls are displayed, to more closely mimic the packaging, trade-dress and overall look and total image of MGA's "BRATZ".

42.   To illustrate, Mattel's "My Scene" dolls were initially marketed like this:

**Mattel's Early "My Scene" Packaging**

 

43.   Little by little, however, the packaging has changed, creeping ever closer and closer to the open and transparent style of the "BRATZ" packaging. First, the panels seen running down each side of the front of the "My Scene" box shown above, framing the doll and giving the packaging a closed-in look, were changed as shown here:

**Intermediate Mattel "My Scene" Packaging**



17

44.    Mattel replaced this intermediate packaging style with another that looked even more similar to the "BRATZ" packaging, as shown here in a side-by-side comparison:

| MGA's "BRATZ" "Wintertime Wonderland" Packaging | Mattel's "My Scene" "Chillin' Out" Packaging |
|:---:|:---:|
|  |  |

45.    Then later, Mattel changed its packaging and product display yet again to look even more closely and confusingly similar to MGA's packaging and "*tout ensemble,*" as shown here

| MGA's "BRATZ" "SPORTZ" Packaging | Mattel's Recent "My Scene" "MIAMI GETAWAY" Packaging |
|:---:|:---:|
|  |  |

18

46.     In this incarnation, Mattel notably abandoned the signature figure-eight style design that had appeared on its prior "My Scene" packaging, making this recent version clearer and more transparent on the front and sides than ever before, and much more like "BRATZ", accordingly.  Mattel also discarded its traditional, rectangular shaped box and, like "BRATZ", adopted an unusual, non-rectangular shaped box.  Mattel even adopted the "flying banner" ribbon-style slogan running across the middle of the box, similar to that used on the "BRATZ" packaging.

47.     As if these pointed and deliberate efforts to confuse and mislead consumers were not enough, Mattel exacerbated the confusion, and furthered the impression that the "My Scene" line and the "BRATZ" line are related, by taking up MGA's practice of regularly releasing new dolls in connection with a theme – but not just *any* theme, often *MGA's theme.*

48.     For example, when MGA released its "Wintertime Wonderland" theme in Fall 2003, Mattel released its "Chillin Out!" theme.  Each doll in MGA's line came with winter-sports accessories, such as a snowboard or skis and ski boots.  Each doll in Mattel's line featured winter sports accessories, also including snowboards or ski and ski boots.  Even MGA's color schemes and some of the clothing styles seemed to have made their way into the Mattel products.

49.     When MGA released its "Formal Funk" theme, Mattel released its "Night on the Town" theme.  "BRATZ Formal Funk" was an elaborately themed line with its dolls in hip formalwear; so was Mattel's "Night on the Town."

50.     When MGA released its distinctive "Sun-Kissed Summer" theme, Mattel released its confusingly similar "Jammin' in Jamaica" theme.  Each line featured a bright blue-and-orange color scheme, beach accessories, such as surfboards, and beachwear clothing.  Mattel's "Jammin' in Jamaica" "Guava Gulch Tiki Lounge" playset also contained elements remarkably similar to MGA's "Sun-Kissed Summer" playset.

19

51.   Mattel also began running television commercials for its "My Scene" dolls bearing a remarkable similarity to "BRATZ" commercials, combining live action with animated sequences set to similar sounding pop music and lyrics.

52.   Mattel even stooped so low as to mimic "BRATZ" accessories and related products in order to further create consumer confusion in the marketplace.

53.   For instance, when MGA came up with its distinctive "BRATZ" "Runway Disco", Mattel came out with a "My Scene" Sound Lounge with packaging that imitated MGA's trapezoidal box.

54.   Mattel's conduct cannot be explained by sheer coincidence, nor is it merely fair competition.  It is a calculated and intentional effort unquestionably designed to trade off of MGA's hard work and goodwill, create confusion in the marketplace, steal MGA's thunder and momentum, and dilute and blur away the novelty and distinctiveness of MGA's products.  Out of the seemingly endless possibilities that Mattel could have chosen for a new line of dolls, packaging, themes, color schemes, commercials, accessories and playsets, Mattel deliberately chose *not* to come out with something unique, new or different and has, instead, focused its efforts and resources on flooding the market with something so close to "BRATZ" that the public will, can, and does, simply mistake it for "BRATZ".

55.   As yet another example of this, when MGA came out with a "BRATZ" "Funky Fashion Makeover Head," Mattel came out with a confusingly similar -- indeed, practically identical – "My Scene" styling head.

20

**Exhibit 48 Page 908**

| MGA's "BRATZ" "Funky Fashion Makeover Head" | Mattel's "My Scene" "Stylin' Head" |
|---|---|

  

   

56.  Indeed, Mattel's "My Scene" styling head is so close to the "BRATZ" styling head that even the press have mistakenly pictured and identified it as MGA's "BRATZ". The picture of Mattel's "My Scene" styling head shown below, for instance, appeared in the press with a caption indicating that the child was trying out different hairstyles "on a *Bratz* hair and makeup doll head."

Hairstyle practice

21

Exhibit 48 Page 909

57.    Creating further confusion, Mattel's television commercial for its "My Scene" styling head was like watching a re-run of MGA's commercial for its "Funky Fashion Makeover Head".

58.    At one point in time, Mattel also used a portion of the "BRATZ" dolls' now-famous trademarked tag line "The Girls With a Passion for Fashion" on Mattel's' website for its "Diva Starz" dolls, asking its website users: "Do you have a passion for fashion?"

59.    Mattel has even recently come out with a confusingly similar line of "My Scene" plush pets, which adopt the distinctive look of MGA's "BRATZ" line. The "My Scene" pets feature large, humanlike eyes and wear clothing making them remarkably and confusingly similar to "BRATZ" products, including "BRATZ PETZ", as seen in this example where the pets each wear a jacket, a cap and carry a purse:

**MGA's "BRATZ Dogz"**       **Mattel's "My Scene" dog**

     

60.    And here too, Mattel chose to package its pets the same way that MGA packaged its "BRATZ PETZ", sitting in an open box, with no top and with partial side panels that slope from a narrow front panel to a higher back panel.

61.    Indeed, the similarity of the "My Scene" pets to "BRATZ PETZ" has confused even sophisticated retailers who have mistakenly merchandised "My Scene" dogs in the middle of the "BRATZ" section of a retail display, next to and as if they were part of MGA's "BRATZ Petz" line. It comes as no surprise that

22

EXHIBIT    **Exhibit 48 Page 910**

1    customers too have been confused.

2        62.    Indeed, Mattel's television commercials and "My Scene" products

3    have become so confusingly similar to MGA's that even advertising executives

4    have expressed concern. One went so far as to say that although imitation is the

5    best form of flattery, what the individual had seen at Mattel's showroom, and how

6    its "My Scene" dolls now look so confusingly similar to "BRATZ", was

7    "shocking." This person further opined that it was clear that Mattel is intending to

8    confuse customers and capture "BRATZ" market share, and even asked MGA if it

9    was considering legal action.

10       63.    The press also has taken notice of Mattel's attempts to confuse

11   consumers. On or about February 18, 2005, a visitor to MGA's showroom from a

12   prominent news publication stated, "Oh my, I just came from Mattel's showroom

13   and their new 'My Scene' packaging is just like 'BRATZ' minus the handle."

14   Another member of the press visiting MGA's showroom offered the unsolicited

15   comment, "have you seen the new 'My Scene' dolls eyes are exactly like

16   'BRATZ'?" Yet another opined that Mattel's "My Scene" line was exactly like

17   "BRATZ", indeed, so much so that the reporter confusingly thought that Mattel had

18   bought "BRATZ", and still another has commented on Mattel's imitation of MGA.

19   On or about February 16, 2005, during an interview of a Mattel representative on

20   local network news in New York, "My Scene Barbie" was displayed by a Mattel

21   representative. During conversation about the dolls, the interviewer exclaimed that

22   they looked like "BRATZ". The Mattel representative just laughed – but this is no

23   laughing matter. This colloquy was available for replay and viewing, and was even

24   transcribed, on the internet.

25       64.    Customers too have been similarly confused. Some actually contacted

26   MGA seeking to purchase "My Scene" dolls.

27       65.    Mattel's conduct is planned, deliberate and intentional. Mattel has

28   systematically, copied, imitated and liberally borrowed many of the distinctive,

EXHIBIT **Exhibit 48 Page 911**

essential elements that identify and make "BRATZ" dolls "BRATZ" dolls, diluting the brand, creating customer confusion, and unfairly stifling competition.

66.    Ironically, Mattel sued one of its other competitors in Europe for doing much the same thing: "systematically copying and borrowing elements" from "My Scene", on grounds that "this conduct constitutes unfair competition and passing off." Indeed it does.

67.    What is more, Mattel's conduct has reached beyond "BRATZ" and "BRATZ"-related products to include other new MGA toy lines.

68.    For example, MGA's "4-Ever Best Friends" line was the obvious, and well-recognized model for Mattel's "Wee 3 Friends" line.  Mattel even adopted changes to the color scheme of its similarly-shaped packaging to create confusion with MGA's distinctive packaging.

| MGA's "4-Ever Best Friends" | Mattel's "Wee 3 Friends" |
|---|---|
|  |  |
|  |  |

24

EXHIBIT    Exhibit 48 Page 912

69.    In the second half of 2002, MGA's "Mommy's Little Patient,"
originally designed as the first in a series of "Mommy's Little . . ." dolls, was
followed by Mattel's "Little Mommy" doll.

<table>
<tr><td align="center"><b>MGA's<br>"Mommy's Little Patient"</b></td><td align="center"><b>Mattel's<br>"Little Mommy Potty Training Baby Doll"</b></td></tr>
</table>

 

70.    Sparing nothing, Mattel has also extended its monkey-see monkey-do
behavior into its boys' line.  When MGA came out with its "Alien Racers" line of
toy racing vehicles, for instance, Mattel rushed to revamp and rename one of its
"Hot Wheels" lines.  Although well-known and clearly branded for decades as "Hot
Wheels", Mattel's answer to MGA's "Alien Racers" was to re-brand and market its
Hot Wheels Highway 35 line under an "AcceleRacerS" logo.  MGA's line consists
of "extreme" radio controlled racing vehicles marketed in connection with a strong,
almost battle-like, science fiction theme.  MGA's logo accentuates the "A", "R",
and "S" in compressed block lettering.  Mattel's line also consists of extreme racing
vehicles marketed in connection with a strong, almost battle-like, theme.  Mattel's
logo too accentuates the "A", "R", and "S" in compressed block lettering.

25

EXHIBIT  Exhibit 48 Page 913    2

71.   Here, too, Mattel's mimicry has spilled over into Mattel's advertising and thematic presentation and marketing of this toy line.  In particular, Mattel has adopted MGA's "other-worldly" theme in its commercials.  For instance, in Mattel's commercials, the product, whose logo appears as "AcceleRacerS", now compete against alien-like Cyborgs engaged in a "race to save the world," mimicking MGA's alien theme and commercials in which MGA's "Alien Racers" are engaged in a "race to save the universe."

72.   None of this is coincidence.  Mattel has deliberately adopted a pattern and practice of coming out with variations of MGA's products to create confusion in the marketplace, interfere with MGA's business and divert profits away from MGA.  Mattel says, on its website, that it is in the business of creating "[t]he world's premier toy brands [of] today and tomorrow."  It seemingly does so, however, by borrowing liberally from its competitors, even when it refreshes its own existing brands and products.

73.   MGA has suffered extensive injury from Mattel's conduct.  Mattel's habitual, serial simulation of MGA's products, product lines and trade dress has allowed Mattel to take a free ride on the extensive amount of time, expense and creative development MGA expends on developing new products, product packaging and presentation, giving Mattel an unfair advantage, and making it virtually impossible for MGA to compete with Mattel on a level playing field.

**Mattel's additional unfair, manipulative, anti-competitive conduct**

74.   This already substantial injury has been exacerbated by the strong-arm tactics, and other illegitimate, unfair and anti-competitive means that Mattel has used to manipulate the market and ensure that its control and domination of the industry can continue unabated.

26

75.   For example. wielding the litigation privilege as a potential shield for intimidating conduct, Mattel has sent threatening letters to several of its former employees who now work for MGA warning them not to disclose *even publicly available information* about Mattel, including the names and positions of Mattel employees.  Mattel even went so far as to sue one of its former senior executives, after he had the temerity to resign and join MGA in October 2004.  Not only was Mattel's lawsuit dismissed for failure to state a viable claim, but Mattel thereafter seemingly could not muster up a shred of evidence sufficient to support an amended complaint.  As a result. Mattel's case against its former executive was dismissed with prejudice.

76.   Mattel has also warned a number of companies, including the biggest publishing entity in the United Kingdom, not to license MGA products, or risk retribution.  The threats are not idle.  In May 2004, Mattel terminated one of its licensees, apparently in retribution for licensing "BRATZ".  While some companies have been courageous enough to take the risk, others have not, and MGA has lost valuable licensing opportunities as a result.

77.   Mattel has used similar intimidation to pressure distributors and retailers, particularly in foreign countries, not to distribute "BRATZ", to reduce shelf and display space for "BRATZ" and to place "BRATZ" in unfavorable locations at retail outlets.

78.   When MGA faced a shortage of doll hair in October 2002, MGA is informed and believes that the reason for that shortage was that Mattel had locked MGA out by buying up the supply from the two main hair supply companies.

79.   Mattel has also manipulated the retail market.  For instance, Mattel merchandisers have been caught tampering with MGA's retail displays. replacing favorably located MGA merchandise with Mattel merchandise instead.  MGA is also informed and believes that Mattel has falsely told a major United States retailer that MGA was giving another major United States retailer below-market pricing

EXHIBIT 4   Exhibit 48 Page 915

1   and falsely told a United Kingdom retailer that MGA was discontinuing one of its

2   lines, in order to make such line less attractive to buyers and thereby attempt to

3   increase sales of the competitive Mattel product and improve its own sales, at

4   MGA's expense.

5       80.   Even supposedly unbiased and impartial industry organizations have

6   fallen prey to Mattel's abusive wield of power, to MGA's detriment.

7       81.   NPD Funworld ("NPD"), for one, is the leading supplier of sales

8   statistics in the toy industry.  Accurate NPD statistics are essential for efficient

9   product-line management.  Without these statistics, it is difficult, if not impossible,

10  for toy companies to assess and measure the relative success of their products in

11  key categories.  It is, however, a subscription service, and NPD restricts the manner

12  in which its subscribers may use the data it provides.

13      82.   Mattel has regularly ignored the restrictions – using NPD data about

14  Mattel's comparative standing relative to other companies in press releases and in

15  communications with retailers and financial investors who are not NPD subscribers.

16      83.   Mattel generates substantially more annual subscription revenue for

17  NPD than does MGA, and carries more clout.

18      84.   After MGA had subscribed to the service for more than 12 years, NPD

19  terminated MGA's subscription in 2003 theoretically on the grounds that MGA

20  misused NPD data in a press release.

21      85.   MGA is informed and believes that the termination was the result of

22  pressure from Mattel, notwithstanding Mattel's own frequent violations of NPD's

23  restrictions.

24      86.   In addition to this, the market share numbers that NPD generates are

25  heavily dependent on the category in which NPD places a particular product.  MGA

26  is informed and believes that Mattel also pressured NPD into changing certain

27  product classifications for its "BRATZ" products in order to manipulate the data

28

EXHIBIT   Exhibit 48 Page 916

1   and preserve Mattel's market share rankings in the critical fashion doll category –
2   and thereby lower MGA's.

3       87.    The Children's Advertising Review Unit ("CARU") is another
4   organization that, upon information and belief, appears to have been subject to
5   improper influence by Mattel. CARU is the toy industry's supposedly independent
6   self-regulatory body in charge of maintaining standards in advertising. CARU's
7   approval is considered critical within the toy industry to avoiding regulatory action
8   by the Federal Trade Commission.

9       88.    CARU is heavily subsidized by Mattel.

10      89.    Upon information and belief, Mattel has used its influence as a major
11  contributor to CARU's budget to induce CARU to place onerous restrictions on
12  MGA advertisements, and require MGA to amend aspects of commercials that have
13  gone unchallenged in other parties' commercials.

14      90.    As a result of CARU's restrictions, MGA has been forced to incur
15  unnecessary costs for reshooting and producing or re-editing its commercials.

16      91.    On several occasions, CARU has also either strongly suggested, if not
17  also required, that MGA respond to inquiries about its website policies and make
18  substantial changes to the "BRATZ" website notably and significantly in excess of
19  restrictions imposed on Mattel and others.

20      92.    Even TIA, the toy industry's trade association, is apparently not
21  untainted by Mattel's influence and power. Each year, TIA presents the Toy-of-
22  the-Year Awards, the most prestigious of which had been the award for Toy of the
23  Year. Winning the Toy of the Year Award is a significant achievement that not
24  only very likely increases the sales of the winning toy, but also denotes the winning
25  company as a leader in toy innovation and generates substantial goodwill with
26  retailers, distributors, licensees, and customers.

27      93.    For the years 2000 (the first year of the award), 2001 and 2002, the
28  Toy of the Year award was chosen by consumer vote. The awards ceremony was

29

then held the following year, at a dinner in New York. (For example, the awards dinner for the year 2000 award was held in February 2001). Leap Frog won the 2000 People's Choice Toy of the Year Award and MGA won the 2001 and 2002 People's Choice Toy of the Year Awards. With the 2003 Toy of the Year Award, however, the rules suddenly changed. Now, the award is selected by members of the industry.

94.    Upon information and belief, this change was orchestrated by a Fisher Price (a Mattel subsidiary) executive who, until recently, served as the Chairman of TIA.

95.    Perhaps not surprisingly given this change in the winner selection procedures, "Hokey Pokey Elmo" ("Elmo"), a Fisher Price toy, won for the year 2003 (awarded in 2004), beating out the other leading nominee, "BRATZ Formal Funk Super Stylin' Runway Disco."

96.    TIA has refused to provide MGA with the vote count procedure and totals for this award, despite repeated requests.

97.    MGA is also informed and believes that Mattel was instrumental in attempting to keep MGA from participating as a sponsor in this year's "Kids' Choice Awards."

98.    Mattel has clearly engaged in tortious, illegal and unethical behavior in its unfettered efforts to disrupt, if not destroy, MGA. Indeed, this is apparently Mattel's current *modus operandi* when it comes to "competing" in the industry. The once immensely successful "LeapFrog" interactive learning product, for example, has apparently been one of Mattel's other recent victims.

99.    Mattel may not shield its illegal, unfair and unethical business practices from the public eye. It is time for the truth to be told, and the world to know of Mattel's unfair, unethical and illegal business practices and unfair competition. "Barbie" does not "play nice" with others (particularly her competitors), and needs to be taught how "to share" (at least in the fashion doll marketplace). She cannot be

30

1   allowed to continue to be the playground bully and trample on the rights of others,

2   including MGA.

3       100.   As a result of Mattel's manipulative, illegal, unfair, unethical and anti-

4   competitive conduct, MGA has suffered and, unless abated, will continue to suffer

5   lost sales, lost licensing fees, lost contracts, lost relationships, lost business

6   opportunities and other damages and harm for which there is no adequate remedy at

7   law. Its ability to enter new markets and product lines has been hampered and

8   delayed. Its production costs have increased, its reputation and relationships with

9   important players in the industry have been negatively impacted, the value of its

10  business has been diminished, and its ability to attract, hire and retain employees

11  has been affected.

12

13              **FIRST CLAIM FOR RELIEF**

14  **(False Designation of Origin or Affiliation in Violation of 15 U.S.C. § 1125 (a))**

15      101.   MGA repeats and realleges the allegations contained in paragraphs 1

16  through 100 of this Complaint and incorporates them by reference as though fully

17  and completely set forth herein.

18      102.   MGA's "BRATZ" line has a unique and distinctive style and

19  distinctive characteristics, such as the disproportionately large head, large dramatic

20  eyes with a distinctive presentation (including the eye shape, make-up and lashes),

21  pouty, plump lips with a distinctive presentation (including the lip shape and make-

22  up), small, thin bodies, oversized feet, and up-to-date fashions. MGA's "BRATZ"

23  line is known for and recognized by the total image that is presented by its product

24  and the style and arrangement of the packaging and display. This "*tout ensemble*"

25  is representatively described and depicted herein. The characteristics of MGA's

26  "BRATZ" line, alone or in combination, have come to identify the "BRATZ" line

27  and its source, MGA, and thus serve as protectable trade dress. MGA's trade dress

28  in its "BRATZ" line is purely aesthetic and non-functional or, if any utility exists, it

31

1  is not essential to the purpose, quality or source identifying attributes of the

2  aesthetics. MGA's trade dress in its "BRATZ" line is inherently distinctive or has

3  acquired distinction within the meaning of the Lanham Act.

4       103. Similarly, MGA's "BRATZ PETZ," part of the "BRATZ" line, also

5  has its own unique and distinctive characteristics, such as the humanlike eye and

6  unusual appearance of the animals dressed in clothing. MGA's "BRATZ PETZ"

7  line has become known for and recognized by the total image that is presented by

8  the product and the style and arrangement of its packaging. This "*tout ensemble*" is

9  representatively described and depicted herein. The characteristics of MGA's

10  "BRATZ PETZ", alone or in combination, have come to identify the "BRATZ

11  PETZ" line and its source, MGA, and thus serve as protectable trade dress. MGA's

12  trade dress in its "BRATZ PETZ" line is purely aesthetic and non-functional or, if

13  any utility exists, it is not essential to the purpose, quality or source identifying

14  attributes of the aesthetics. MGA's trade dress in its "BRATZ PETZ" line is

15  inherently distinctive or has acquired distinction within the meaning of the Lanham

16  Act.

17       104. Mattel's production, sale and marketing of "My Scene" dolls,

18  including styling heads and doll heads, and "My Scene" pets that are confusingly

19  similar to MGA's "BRATZ" line (including its "BRATZ PETZ"), without MGA's

20  permission or consent, constitutes designation and use of a term, symbol, device or

21  combination thereof that is false or misleading within the meaning of 15 U.S.C.

22  Section 1125 and is likely to cause confusion, or to cause mistake, or to deceive as

23  to the affiliation, connection, or association, or as to the origin, sponsorship, or

24  approval of Mattel's goods or commercial activities, within the meaning of 15

25  U.S.C. Section 1125. MGA has been damaged by Mattel's acts.

26       105. Mattel's conduct has been intentional and willful, and is calculated

27  specifically to trade off the goodwill that MGA has developed in its successful

28  "BRATZ" line. By its aforesaid acts, particularly its imitation of the distinctive

32

features of MGA's "BRATZ" line in connection with goods sold and distributed in interstate commerce, Mattel has infringed and is likely to continue to infringe on MGA's substantial rights in and to the "BRATZ" line trade dress.  In so doing, Mattel has falsely represented and designated to the public generally and consumers of fashion doll products specifically the source and origin of Mattel's "My Scene" fashion doll products in violation of 15 U.S.C. § 1125(a).

106.  MGA has been damaged by, and Mattel has profited from, Mattel's wrongful conduct in an amount to be proven at trial.

107.  For each act of infringement, MGA is entitled to recover its actual damages as well as Mattel's profits from such infringement.

108.  Monetary relief alone, however, is not adequate to address fully the irreparable injury that Mattel's illegal actions have caused and will continue to cause MGA, if not enjoined.  MGA is therefore entitled to preliminary and permanent injunctive relief to stop Mattel's ongoing infringement of MGA's trade dress.

## SECOND CLAIM FOR RELIEF

### (Unfair Competition in Violation of 15 U.S.C. § 1125 (a) and Unfair Competition and Unfair Business Practices in Violation of Cal. Bus. & Prof. Code § 17200 *et seq.* and California Common Law)

109.  MGA repeats and realleges the allegations contained in paragraphs 1 through 108 of this Complaint and incorporates them by reference as though fully and completely set forth herein.

110.  Mattel has deliberately and, indeed, repeatedly adopted, imitated and mimicked the make-up, appearance, features, trade dress, and image of MGA's products, packaging and advertising, including its repackaging and refreshing of older Mattel toys.  Mattel's actions were and are done with the intent to deceive consumers, cause confusion and mistake, and interfere with the ability of consumers to identify the source of goods by appearance and packaging.  By this

EXHIBIT   Exhibit 48 Page 921

1  conduct, Mattel pirates and exploits, by subliminal or conscious association with

2  MGA, the goodwill and reputation of MGA and derives benefit therefrom.

3      111. Mattel has particularly and deliberately poached upon the commercial

4  magnetism of MGA's "BRATZ" and the success of "BRATZ". Mattel's conduct

5  has been intentional and willful, and is calculated specifically to trade off the

6  goodwill that MGA has developed in its successful "BRATZ" line.

7      112. By its acts, including its intentional imitation of the distinctive features

8  of MGA's "BRATZ" dolls, which has progressively become closer and closer, as

9  well as its imitation of "BRATZ" themes, packaging and the overall look, feel and

10 total image of the "BRATZ" line, imitation of other MGA products, packaging and

11 advertising, and other conduct alleged herein, Mattel has engaged in unfair

12 competition under both federal and California state law.

13      113. Mattel has also willfully and maliciously used its power, influence and

14 intimidation to threaten certain retailers, suppliers, licensees, distributors and

15 manufacturers so as to limit, if not prevent, MGA from doing business with these

16 retailers, suppliers, licensees, distributors and manufacturers, using its power and

17 influence to intimidate and manipulate industry bodies. Mattel has further used its

18 power and influence to attempt to, if not actually, intimidate and threaten MGA's

19 current and potential employees so as to cause MGA competitive injury.

20      114. Alone, in combination, or in totality, Mattel's actions discussed and

21 alleged herein constitute unfair competition and unfair business practices within the

22 meaning of federal law, California statutory law and/or California common law.

23      115. As a result of its conduct, Mattel has derived substantial monetary and

24 non-monetary benefit and business advantage. Mattel has also wrongfully diverted

25 profits away from MGA and to Mattel and, on information and belief, deprived

26 MGA of the patronage of a large number of actual and potential customers.

27      116. MGA has been damaged by, and Mattel has profited from, Mattel's

28 wrongful conduct in an amount to be proven at trial.

34

117.  Monetary relief alone, however, is not adequate to address fully the irreparable injury that Mattel's actions have caused and will continue to cause MGA, if not enjoined.  MGA is therefore entitled to preliminary and permanent injunctive relief to stop Mattel, and all persons acting in concert with Mattel, from engaging in acts of unfair competition and unfair business practices.

118.  MGA is further entitled to relief whereby Mattel is ordered to pay restitution for damages resulting from Mattel's unfair competition and unfair business practices.

## THIRD CLAIM FOR RELIEF

### (Dilution in Violation of 15 U.S.C. § 1125 (c); Cal. Bus. & Prof. Code § 14330 and California Common Law)

119.  MGA repeats and realleges the allegations contained in paragraphs 1 through 118 of this Complaint and incorporates them by reference as though fully and completely set forth herein.

120.  The look and trade dress of the MGA products referenced herein are distinctive and famous, and have been since before Mattel launched its similar versions.  By its aforesaid acts, Mattel caused and continues to cause blurring and dilution of the distinctive look of MGA's products and trade dress, which previously served as a unique source identifier for MGA, within the meaning of the Lanham Act, California Business and Professions Code § 14330 and/or California common law.

121.  Mattel's conduct has been intentional and willful, calculated specifically to trade on MGA's goodwill and reputation and to cause dilution of MGA's famous marks, particularly those connected with MGA's famous and successful "BRATZ" doll head, "BRATZ" doll product line, "BRATZ Funky Fashion Makeover Head" and "BRATZ PETZ" line.

122.  MGA has been damaged by, and Mattel has profited from, Mattel's wrongful conduct in an amount to be proven at trial.

35

123.  Monetary relief alone, however, is not adequate to address fully the irreparable injury that Mattel's actions have caused and will continue to cause MGA, if not enjoined.  MGA is therefore entitled to preliminary and permanent injunctive relief to stop Mattel's ongoing dilution.

## FOURTH CLAIM FOR RELIEF

### (Unjust Enrichment)

124.  MGA repeats and realleges the allegations contained in paragraphs 1 through 123 of this Complaint and incorporates them by reference as though fully and completely set forth herein.

125.  As a result of the conduct alleged herein, Mattel has been unjustly enriched to MGA's detriment.  MGA seeks a worldwide accounting and disgorgement of all ill-gotten gains and profits resulting from Mattel's inequitable activities.

## PRAYER FOR RELIEF

WHEREFORE, MGA prays for relief, as follows:

1.   That Mattel, its agents, servants and employees and all persons acting in concert be restrained preliminarily and permanently from directly or indirectly:

     a.   using confusingly similar trade dress;

     b.   improperly influencing, or attempting to improperly influence, standard-setting and industry organizations;

     c.   engaging in unfair competition and unfair business practices; and

     d.   diluting MGA's trade dress;

2.   For general and actual damages, according to proof at trial but believed to reach or exceed tens of millions of dollars;

3.   For the disgorgement of all profits derived by Mattel for its acts of:

     a.   false designation of origin or affiliation;

EXHIBIT ___   Exhibit 48 Page 924

1      b.      unfair competition and unfair business practices; and

2      c.      dilution;

3      4.      For costs of suit and reasonable attorneys' fees;

4      5.      For punitive and/or exemplary damages as a result of Mattel's willful

5  and malicious conduct to the extent allowable by law; and

6      6.      For such other and further relief as the Court deems just and proper.

7

8  Dated:      April 13, 2005                    PATRICIA GLASER
                                                 CHRISTENSEN, MILLER, FINK,
9                                                JACOBS, GLASER, WEIL &
                                                 SHAPIRO LLP
10

11                                               DALE M. CENDALI
                                                 DIANA M. TORRES
12                                               PAULA E. AMBROSINI
                                                 O'MELVENY & MYERS LLP
13

14

15                                               By:
                                                     Diana M. Torres
16                                               Attorneys for Plaintiff
                                                 MGA ENTERTAINMENT, INC.
17

18

19

20

21

22

23

24

25

26

27

28

37

## **DEMAND FOR JURY TRIAL**

MGA hereby demands a jury trial on all triable issues.

Dated:      April 13, 2005

PATRICIA GLASER
CHRISTENSEN, MILLER, FINK,
JACOBS, GLASER, WEIL &
SHAPIRO LLP

DALE M. CENDALI
DIANA M. TORRES
PAULA E. AMBROSINI
O'MELVENY & MYERS LLP

By:
Diana M. Torres
Attorneys for Plaintiff
MGA ENTERTAINMENT, INC.

38