**EXHIBIT 9**

**Maria Albert**

| | |
|---|---|
| **From:** | Jon Corey |
| **Sent:** | Thursday, November 16, 2006 6:09 PM |
| **To:** | Cendali, Dale; Torres, Diana; Jacoby, Keith A.; Wickham, Douglas A. |
| **Cc:** | John Quinn; Michael T Zeller |
| **Subject:** | Mattel v. MGA |
| **Attachments:** | Jon Corey.vcf; Amended Complaint.pdf |

Dear Counsel,

On October 31, 2006, we sent you our pre-filing letter under Local Rule 7-3 regarding Mattel's proposed motion for leave to file a First Amended Complaint. That letter also invited you to meet or discuss with us further on our anticipated motion. On November 9, 2006, we provided you with a summary of Mattel's anticipated First Amended Complaint, as you had requested, and again invited you to meet or discuss with us further on the motion. We have not heard from you on that subject since then, however.

In the hopes of moving forward on a possible stipulation, I am enclosing for your consideration a proposed First Amended Complaint, the substance of which we had previously provided to you. The only additional information is Mattel's election to name as defendants Isaac Larian and Carlos Gustavo Machado Gomez. While we reserve the right to make appropriate modifications before filing, we believe it is sufficiently concrete for MGA and Bryant to let us know whether they will stipulate to its filing as opposed to burdening the court with motion practice.

Also, in no way should our sharing of the First Amended Complaint be construed as or deemed a waiver of privilege or the work product doctrine. If you disagree, please advise us immediately and return to us and delete all copies of the attached.

We would appreciate hearing from you by 10:00 a.m. Monday, November 20, 2006, as to whether MGA and Bryant are willing to stipulate to the filing of the First Amended Complaint. Thanks in advance, and please let us know if you have any questions.

Best regards,

Jon Corey, Esq.
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Main Phone: (213) 443-3000
Main Fax: (213) 443-3100
E-mail: joncorey@quinnemanuel.com
Web: www.quinnemanuel.com

EXHIBIT __9__ PAGE _153_

1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
    John B. Quinn (Bar No. 90378)
2    (johnquinn@quinnemanuel.com)
    Michael T. Zeller (Bar No. 196417)
3    (michaelzeller@quinnemanuel.com)
    Jon D. Corey (Bar No. 185066)
4    (joncorey@quinnemanuel.com)
    Duane R. Lyons (Bar No. 125091)
5    (duanelyons@quinnemanuel.com)
   865 South Figueroa Street, 10th Floor
6  Los Angeles, California  90017-2543
   Telephone: (213) 443-3000
7  Facsimile: (213) 443-3100

8  Attorneys for Plaintiff Mattel, Inc.

9              UNITED STATES DISTRICT COURT

10            CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| 11 MATTEL, INC., a Delaware corporation, | CASE NO. CV 04-9049 SGL (RNBx) |
| 12 | Consolidated With Case No. 04-9059 and Case No. 05-2727 |
| 13 Plaintiff, | |
| 14 v. | MATTEL, INC.'S FIRST AMENDED COMPLAINT FOR: |
| 15 MGA ENTERTAINMENT, INC., a California corporation; ISAAC | 1.  COPYRIGHT INFRINGEMENT; |
| 16 LARIAN, an individual; CARTER BRYANT, an individual; MGA | 2.  VIOLATION OF THE RACKETEER INFLUENCED AND |
| 17 ENTERTAINMENT (HK) LIMITED, a Hong Kong Special Administrative | CORRUPT ORGANIZATIONS ACT; |
| 18 Region business entity; MGAE DE MÉXICO, S.R.L. DE C.V., a | 3.  CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED AND |
| 19 Mexico business entity; CARLOS GUSTAVO MACHADO GOMEZ, an | CORRUPT ORGANIZATIONS ACT; |
| 20 individual; and DOES 4 through 10, | 4.  MISAPPROPRIATION OF TRADE SECRETS; |
| 21 Defendants. | 5.  BREACH OF CONTRACT; 6.  INTENTIONAL INTERFERENCE WITH CONTRACT; |
| 22 AND CONSOLIDATED CASES | 7.  BREACH OF FIDUCIARY DUTY; 8.  AIDING AND ABETTING |
| 23 | BREACH OF FIDUCIARY DUTY; 9.  BREACH OF DUTY OF |
| 24 | LOYALTY; 10. AIDING AND ABETTING |
| 25 | BREACH OF DUTY OF LOYALTY; |
| 26 | 11. CONVERSION; 12. UNFAIR COMPETITION; AND |
| 27 | 13. DECLARATORY RELIEF. |
| 28 | DEMAND FOR JURY TRIAL |

07934/2000453.1

**Preliminary Statement**

1.    For years defendant MGA Entertainment, Inc. has engaged in a pattern of stealing and using Mattel, Inc.'s property and trade secrets. MGA's use of the stolen property and trade secrets caused and continues to cause significant harm to Mattel. MGA first stole "Bratz," a fashion doll, from Mattel, and then continued stealing Mattel's confidential and proprietary information to fuel MGA's growth.

2.    Defendant Carter Bryant conceived, created and developed Bratz designs while he was a Mattel doll designer. He concealed his Bratz work from Mattel and wrongfully sold Bratz to MGA during the time he was a Mattel employee. Mattel, as MGA knows, owns the Bratz designs that Bryant made. As the rightful owner of those Bratz designs, Mattel has registered copyrights for the Bratz designs and seeks damages arising from MGA's repeated infringement of those copyrights.

3.    Emboldened by the success of its illegal conduct, MGA has since repeated—and even expanded—its pattern of theft on numerous occasions. For example, in 2004, MGA decided to expand into Mexico. To do so, and operating from its Southern California offices, MGA hired away three key Mattel employees in Mexico, who, on their way out, stole virtually every category of Mattel's sensitive and trade secret business plans and information for the Mexican market, as well as a significant quantity of sensitive and trade secret information for Mattel's U.S. and worldwide businesses, and took them to MGA. Armed with Mattel's confidential business plans and methods, MGA claimed to have increased its market share in Mexico alone by 90% in a single year.

4.    In 2005, MGA needed help in Canada. So MGA, again operating from its Southern California headquarters, hired Janine Brisbois from Mattel. At that time, Ms. Brisbois was responsible for Mattel's account with Toys 'R Us ("TRU") and Wal-Mart. MGA gave her responsibility for those same

FIRST AMENDED COMPLAINT

EXHIBIT    9    PAGE   155

1   accounts, and she took from Mattel documents containing proprietary advertising,

2   project, sales, customer and strategy information for not only Canada, but for the

3   United States.  Eliminating any doubt that MGA then proceeded to use those stolen

4   materials, Brisbois subsequently accessed and modified certain of those Mattel

5   documents while employed by MGA.

6        5.    These are not the only instances of such misconduct, which

7   MGA orchestrated and carried out from its headquarters in this District.. In the

8   United States, as well as Canada and Mexico, defendants have engaged in an

9   ongoing pattern of illegal acts, consisting of inducing Mattel employees to steal

10   Mattel's confidential information and other property and take it with them to MGA

11   to further MGA's business interests and to harm Mattel.

12                  **Jurisdiction**

13        6.    This Court has federal question jurisdiction over this action

14   pursuant to 28 U.S.C. §§ 1331, 17 U.S.C. §§ 101 *et seq.*, and 18 U.S.C. § 1964(c).

15   This Court has supplemental jurisdiction over Mattel's state law claims pursuant to

16   28 U.S.C. § 1367.

17                    **Venue**

18        7.    Venue is proper in this District pursuant to 28 U.S.C.

19   §§ 1391(b)–(d), 1391(f) and 1400(a) and 18 U.S.C. § 1965.

20                    **Parties**

21        8.    Mattel is a corporation organized and existing under the laws of

22   the State of Delaware, with its principal place of business in El Segundo,

23   California.

24        9.    Defendant MGA Entertainment, Inc. ("MGA") is a corporation

25   organized and existing under the laws of the State of California, with its principal

26   place of business in Van Nuys, California.  Mattel is informed and believes, and on

27   that basis alleges, that ABC International Traders, Inc. is a predecessor corporation

28   to MGA and that until September 16, 2002, MGA was incorporated and known as

07934/2000453.1

-2-

EXHIBIT ___9___ PAGE 154

1  ABC International Traders, Inc.  Upon the filing of the Complaint, Mattel, being

2  ignorant of the nature, extent and scope of MGA Entertainment, Inc.'s involvement

3  and complicity in the conduct alleged therein and having designated MGA

4  Entertainment, Inc. in the Complaint as Doe 1 and having discovered its

5  involvement and complicity, Mattel hereby amends this Complaint by substituting

6  MGA Entertainment, Inc. for the fictitious Doe name.

7        10.   Defendant Carter Bryant ("Bryant") is an individual who

8  formerly was employed by Mattel and has worked for and continues to work as a

9  contactor for MGA.  Mr. Bryant currently resides in the State of Missouri.

10       11.   Defendant MGA Entertainment (HK) Limited is a business entity

11  organized and existing under the laws of the Hong Kong Special Administrative

12  Region, with its principal place of business in Hong Kong.  Upon the filing of the

13  Complaint, Mattel, being ignorant of the nature, extent and scope of involvement

14  and complicity of MGA Entertainment (HK) Limited in the conduct alleged therein

15  and having designated MGA Entertainment (HK) Limited in the Complaint as Doe

16  2 and having discovered its involvement and complicity, Mattel hereby amends this

17  Complaint by substituting MGA Entertainment (HK) Limited for the fictitious Doe

18  name.

19       12.   Defendant MGAE de Mexico, S.R.L. de C.V. ("MGA de

20  Mexico") is a business entity organized and existing under the laws of Mexico,

21  with its principal place of business in Mexico City, Mexico.

22       13.   Mattel is informed and believes, and on that basis alleges, that

23  defendant Larian is the President and CEO of MGA and an individual residing in

24  the County of Los Angeles.   Upon the filing of the Complaint, Mattel, being

25  ignorant of the nature, extent and scope of involvement and complicity of Larian in

26  the conduct alleged therein and having designated Larian in the Complaint as Doe 3

27  and having discovered his involvement and complicity, Mattel hereby amends this

28  Complaint by substituting Larian for the fictitious Doe name.

-3-

FIRST AMENDED COMPLAINT

EXHIBIT _____9_____ PAGE 157

14.   Defendant Carlos Gustavo Machado Gomez is an individual who is employed by defendant MGA and who, on information and belief, currently resides in the County of Los Angeles.

15.   The true names and capacities of defendants sued herein as DOES 4 through 10, inclusive, are unknown to Mattel, which therefore sues said defendants by such fictitious names.  Mattel will amend this Amended Complaint to allege their true names and capacities when the same are ascertained.

**Factual Background**

**I.   MATTEL**

16.   Mattel manufactures and markets toys, games, dolls and other consumer products.  Harold Mattson and Eliot and Ruth Handler founded Mattel in 1945.  The name of the company was created by incorporating the names of two of its founders, "MATT-son" and "EL-liot."  Originating from the Handlers' garage in Southern California, the company greatly expanded its operations following World War II.  During the next several decades, Mattel became famous for producing high-quality products at reasonable prices.

17.   Critical to Mattel's success is its ability to design and develop new products.  Mattel invests millions of dollars in product design and development and introduces hundreds of new products each year.  Mattel maintains a 180,000 square-foot design center in El Segundo that houses hundreds of designers, sculptors, painters and other artists, who work exclusively to create the products on which Mattel's business depends.

18.   Mattel also has invested substantial amounts over many years to develop its business methods and practices, including, without limitation, its marketing and advertising research, plans, methods and processes; its business research and forecasts; its costs, budgets, pricing, credit terms, deal terms and finances; its manufacturing, distribution, and sales methods and processes; and its

07934/2000453 1

-4-

FIRST AMENDED COMPLAINT

EXHIBIT __9__ PAGE _158_

1  inventory methods and processes.  These represent a material part of the intellectual

2  infrastructure of Mattel and are highly valuable.

3  **II.   MGA ENTERTAINMENT**

4        19.   Defendant MGA is also a toy manufacturer.  MGA began as a

5  consumer electronics business, but expanded into the toy business with licenses to

6  sell handheld electronic games.  By approximately late 1999 or early 2000, MGA

7  developed a strategy to expand its business and compete directly with Mattel by

8  launching a fashion doll line, so it stole a fashion doll that was owned by Mattel –

9  "Bratz."

10        20.   MGA intentionally stole not just specific Mattel property, such

11  as Bratz designs, prototypes and related materials, but also a vast array of trade

12  secrets and other confidential information that comprise Mattel's intellectual

13  infrastructure.  MGA's rapid growth was not organic, but rather based upon its theft

14  of Bratz.  As a result, MGA lacked an appropriate intellectual infrastructure for a

15  company of its size and it became increasingly difficult to manage.  To deal with

16  these problems, as detailed below, time and time again MGA simply stole Mattel's

17  proprietary business methods, practices and information.  This not only allowed

18  MGA to avoid expending time, money and effort necessary to build a legitimate

19  business, but also allowed MGA to unfairly compete against Mattel by taking

20  Mattel's playbook.

21  **III.   MGA STEALS A NEW LINE OF FASHION DOLLS FROM MATTEL**

22        21.   Defendant Carter Bryant is a former Mattel employee.  Bryant

23  joined Mattel in September 1995, where he worked in Mattel's Design Center as a

24  BARBIE product designer.  In or about April 1998, Bryant resigned his position

25  with Mattel and moved to Missouri to live with his parents.  Late in 1998, Bryant

26  applied to Mattel to be rehired.  On January 4, 1999, he began working at Mattel in

27  Mattel's Design Center, again as a product designer, for Mattel's BARBIE

28  collectibles line.

07934/2000453.1

-5-

22.    Upon his return to Mattel in January 1999, Bryant executed an Employee Confidential Information and Inventions Agreement (the "Employment Agreement"), which is attached hereto as Exhibit A.

23.    Pursuant to his Employment Agreement and as a condition of and in consideration of his employment, Bryant agreed, among other things, that he held a position of trust with Mattel, that all designs and inventions that he created would be owned by Mattel (with certain exceptions not relevant here), and that he would be loyal to the company by agreeing not to assist or work for any competitor of Mattel during the term of his Mattel employment.

24.    On January 4, 1999, Bryant also executed Mattel's Conflict of Interest Questionnaire (the "Conflict Questionnaire"). Among other things, Bryant certified in the Conflict Questionnaire that, other than as disclosed, he had not worked for any competitor of Mattel in the prior twelve months and had not engaged in any business venture or transaction involving a Mattel competitor that could be construed as a conflict of interest. Bryant understood what the Conflict Questionnaire required because, among other things, he disclosed on it the freelance work he had performed while in Missouri for Ashton-Drake, which is unrelated to the conduct alleged herein. A copy of the Conflict Questionnaire executed by Bryant is attached hereto as Exhibit B.

25.    Pursuant to the Conflict Questionnaire, Bryant also agreed that he would immediately notify his supervisor of any change in his situation that would cause him to change any of the foregoing certifications. Despite this obligation, at no time did Bryant disclose to Mattel that he was engaging in any business venture or transaction with MGA or any other Mattel competitor.

26.    More specifically, while Bryant was employed by Mattel, Bryant and the other defendants misappropriated and misused Mattel property and resources for the benefit of Bryant and MGA. Such acts included the following:

-6-

FIRST AMENDED COMPLAINT

EXHIBIT   9   PAGE 160

1              a.      Bryant used his exposure to Mattel development programs

2 to create the concept, design and name of Bratz;

3              b.      Using Mattel resources and while employed by Mattel,

4 Bryant worked by himself and with other Mattel employees and contractors to

5 design and develop Bratz, including without limitation by creating drawings and

6 three-dimensional models of Bratz dolls, and fashion designs for the dolls'

7 associated clothing and accessories; and

8              c.      Also using Mattel resources and while employed by

9 Mattel, Bryant took steps to assist MGA to produce Bratz dolls.

10         27.    During the time that he was employed by Mattel and thereafter,

11 Bryant concealed these actions from Mattel, including by failing to notify his

12 supervisor of the conflict of interest he created when he began working for and on

13 MGA's behalf and when he began receiving payments from MGA. Bryant

14 additionally enlisted other Mattel employees to perform work on Bratz during the

15 time he was employed by Mattel and, by all indications, in at least some cases

16 misled them into believing that they were performing work on a project for Mattel.

17         28.    Bryant also made affirmative misrepresentations to Mattel

18 management and employees immediately before his departure from Mattel on

19 October 20, 2000. For example, during Bryant's exit interview in October 2000, he

20 told the Mattel Human Resources representative who conducted the interview that

21 he was leaving Mattel to engage in non-competitive work. During his last few

22 weeks at Mattel, Bryant repeatedly told his co-workers and supervisors that he was

23 going to leave Mattel for "non-competitive" pursuits. Bryant's representations to

24 his supervisors and his co-workers were false. Bryant knew at the time that those

25 representations were false and made those false statements to conceal from Mattel

26 the facts that Bryant was already working with and for MGA and that he had

27 contracted with MGA to assign Bratz works to MGA and to provide design and

28 development services to MGA, a Mattel competitor.

-7-

EXHIBIT ___9___ PAGE 161

29. As a result of the efforts of Bryant and other Mattel employees working on Bratz for MGA (which were done without Mattel's knowledge), the Bratz dolls had been designed and were far along in development prior to the time that Bryant left Mattel on October 20, 2000. Not only did Bryant create and develop designs for the dolls and other aspects of the products such as their fashion accessories during the time he was employed by Mattel, but MGA showed finished Bratz prototypes and/or product to both focus groups and retailers no later than November 2000, less than three weeks after Bryant left Mattel. Bryant, Larian and others at MGA arranged these meetings and focus groups while Bryant was still employed by Mattel.

30. While Bryant assisted MGA in the development of Bratz, he and other Mattel and MGA employees working on Bratz repeatedly and continuously communicated with employees of MGA Entertainment (HK) Limited on subjects such as design and manufacturing of Bratz. On information and belief, at all material times, MGA Entertainment (HK) Limited has maintained regular and continuous contacts with persons in the County of Los Angeles; it regularly has shipped products that it manufactures, or that are manufactured for it, to the County of Los Angeles; and such products have been distributed to retailers and sold to consumers in the County of Los Angeles.

31. Bratz also were shown to retailers at the Hong Kong Toy Fair in January 2001. By early 2001, only a few months after Bryant resigned from Mattel, MGA began having the Bratz fashion doll line and accessories manufactured and then, shortly thereafter, began selling them at retail.

32. Since 2001, MGA has distributed and sold the Bratz and Bratz-related products throughout the world. Mattel is informed and believes that MGA also licenses Bratz to third parties. Mattel is also informed and believes that MGA derives annual revenue from its sales and licenses of Bratz in excess of $500 million. Mattel is further informed and believes that MGA and Bryant claim

07934/2000453.1

-8-

1  current ownership of Bratz, and all copyrights and copyright registrations attendant
2  thereto. MGA continues to market, sell and license Bratz and has expressed an
3  intention to continue to do so.

4       33.  Mattel is informed and believes that MGA and Larian
5  encouraged, aided and financed Bryant to develop Bratz, knowing full well that
6  Bryant was still employed by Mattel at the time and that by performing such work
7  and by creating designs for MGA, Bryant would be, and was, in breach of his
8  contractual, statutory and common law duties to Mattel. Mattel is also informed
9  and believes that MGA proceeded to aid and encourage Bryant to develop Bratz
10  with the goal of obtaining a valuable fashion doll line that would be commercially
11  successful in the competitive, multi-billion dollar market for fashion dolls.

12       34.  Pursuant to Bryant's contract with Mattel, among other things,
13  Mattel is the true owner of Bratz designs and works, including those specifically
14  that were conceived, created or reduced to practice during Bryant's Mattel
15  employment as well as all designs and works that are or have been derived
16  therefrom. Defendants' continued use, sale, distribution and licensing of Bratz thus
17  injures Mattel and unlawfully enriches the defendants.

18       35.  Bryant and MGA deliberately and intentionally concealed facts
19  sufficient for Mattel to know or suspect that it was the true owner of Bratz. Their
20  acts of concealment include, but are not limited to, concealing the fact that Bryant
21  conceived, created, designed and developed Bratz while employed by Mattel,
22  including by tampering with and defacing documents which showed that, in fact,
23  Bryant was a Mattel employee while he was negotiating with and working for
24  MGA's benefit; concealing the fact that Bryant worked for and assisted MGA
25  during the time Bryant was employed by Mattel and was compensated for that
26  assistance; concealing that Bryant had gone to work for MGA; concealing Bryant's
27  role in Bratz by falsely claiming that Larian and others were the creators of Bratz;
28  and concealing the fact that Mattel was the true owner of Bratz by, among other

07934/2000453.1

-9-

EXHIBIT  9  PAGE 163

1   things, filing fraudulent registrations and/or amendments to registrations with the
2   United States Copyright Office claiming MGA as the author of Bratz as a work for
3   hire and altering relevant dates on such documents to further obscure the true facts
4   of when the works were created.

5       36.   Because of Bryant's and MGA's acts of concealment and Bryant's
6   misrepresentations to Mattel, Mattel had no reason to suspect that Bryant had
7   worked for MGA while still employed by Mattel until approximately
8   November 24, 2003, when Mattel received, through an unrelated legal action, a
9   copy of Bryant's agreement with MGA which showed that the date of Bryant's
10  agreement with MGA predated Bryant's departure from Mattel.  It was then, as a
11  result, that Mattel learned for the first time that Bryant had secretly aided, assisted
12  and worked for MGA while employed at Mattel and in violation of his Mattel
13  Employment Agreement.  Specifically, Bryant's agreement with MGA obligated
14  Bryant to provide product design services to MGA on a "top priority" basis.
15  Bryant's agreement with MGA also provided that Bryant would receive royalties
16  and other consideration for sales of products on which Bryant provided aid or
17  assistance; that all works and services furnished by Bryant under the agreement
18  purportedly would be considered "works for hire"; and that all intellectual property
19  rights to preexisting works by Bryant, including Bratz designs, purportedly was
20  assigned to MGA.

21  **IV.  MGA STEALS MATTEL TRADE SECRETS IN MEXICO**

22      37.   On information and belief, in or about late 2003 or early 2004,
23  MGA decided to open business operations in Mexico.  Faced with the difficult task
24  of developing an overall strategy for expanding into a market in which it had only a
25  nominal presence and no operations, MGA elected to steal Mattel's plans, strategy
26  and business information for the Mexican market and materials related to Mattel's
27  worldwide business strategies.  As detailed below, MGA and Larian approached
28  three employees of Mattel's Mexican subsidiary ("Mattel Mexico"), enticed them to

07934/2000453.1

-10-

FIRST AMENDED COMPLAINT

EXHIBIT ___9___ PAGE __164__

1   steal Mattel's most sensitive business planning materials, and then hired them to

2   assist in establishing and running MGA's new Mexican subsidiary.

3       **A.    MGA Hires Three Senior Mattel Employees in Mexico**

4           38.   Carlos Gustavo Machado Gomez ("Machado") was the Senior

5   Marketing Manager, Boys Division for Mattel Mexico, a position of trust and

6   confidence. He was employed at Mattel Mexico from April 1, 1997 until April 19,

7   2004. His duties included short, medium and long-term marketing planning,

8   generating product sales projections, and assisting in creation of the media plan. In

9   his position, Machado had access to highly confidential and sensitive marketing

10  and product development information. Machado had an employment agreement

11  with Mattel in which he agreed to maintain the confidentiality of Mattel's protected

12  information. Mattel's policies also required Machado to protect Mattel's

13  proprietary information and not to disclose it to competitors.

14          39.   Mariana Trueba Almada ("Trueba") was the Senior Marketing

15  Manager, Girls Division for Mattel Mexico, a position of trust and confidence. She

16  was employed at Mattel Mexico from November 3, 1997 until April 19, 2004. Like

17  Machado, her duties included short, medium and long-term marketing planning,

18  generating product sales projections, and assisting in creation of the media plan. In

19  her position, Trueba had access to highly confidential and sensitive marketing and

20  product development information. Trueba had an employment agreement with

21  Mattel in which she agreed to maintain the confidentiality of Mattel's protected

22  information. Mattel's policies also required Trueba to protect Mattel's proprietary

23  information and not to disclose it to competitors.

24          40.   Pablo Vargas San Jose ("Vargas") was a Senior Trade Marketing

25  Manager with Mattel Mexico, a position of trust and confidence. He was employed

26  at Mattel Mexico from March 29, 2001 until April 19, 2004. Vargas was

27  responsible for ensuring that point-of-sale promotions were carried out, analyzing

28  the results of such promotions, negotiating promotion budgets, and generally

07934/2000453 1

-11-

EXHIBIT ___9___ PAGE | 45

1   managing promotional activities.  Vargas also had access to highly confidential and
2   sensitive marketing and product development information.  Vargas had an
3   employment agreement with Mattel in which he agreed to maintain the
4   confidentiality of Mattel's protected information.  Mattel's policies also required
5   Vargas to protect Mattel's proprietary information and not to disclose it to
6   competitors.
7          41.   Beginning in late 2003 or early 2004, Machado, Trueba and
8   Vargas began planning to leave Mattel Mexico to join MGA.  In connection with
9   that plan, and with the encouragement of Larian and other MGA officers operating
10  in the United States, they began accessing, copying and collecting proprietary
11  Mattel documents to take with them.  On April 19, 2004, Machado, Trueba and
12  Vargas each resigned their positions with Mattel, effective immediately.  They
13  stated that they had been hired by a Mattel competitor, but refused to identify that
14  competitor.  In fact, they had been offered and accepted employment by MGA to
15  establish and run MGA's new operation in Mexico.
16  **B.    Machado, Trueba and Vargas Stole Dozens of Confidential Trade**
17          **Secret Marketing and Sales Documents for MGA's Benefit**
18         42.   Following these resignations, Mattel discovered that Machado,
19  Trueba and Vargas had been in frequent telephonic and e-mail contact with MGA
20  personnel, including Larian, for over three months prior to their resignations.  The
21  primary vehicle for these communications in furtherance of their "plot" was an
22  America Online e-mail account with the address <plot04@aol.com>.  On
23  information and belief, during this time, Machado, Trueba and Vargas supplied
24  Larian with certain Mattel confidential and proprietary information in order to
25  prove their value to MGA and improve their negotiating position vis-à-vis their
26  respective employment contracts with MGA.
27         43.   In March 2004, Machado, Trueba and Vargas were making plans
28  to travel from Mexico to Los Angeles to meet with MGA personnel in person prior

FIRST AMENDED COMPLAINT

EXHIBIT ___9___ PAGE _166_

1    to resigning their positions at Mattel.  Also, by at least March 3, 2004, Machado,

2    Trueba and Vargas were discussing with MGA personnel, including Larian,

3    specific details regarding setting up MGA offices in Mexico City.  On information

4    and belief, prior to their resignations, Larian and others at MGA directed Machado,

5    Trueba and Vargas to steal virtually all Mattel confidential and proprietary

6    information that they could access and bring it with them to MGA.  This was

7    reflected in, among things, e-mail messages that Mattel had discovered after

8    Machado, Trueba and Vargas had resigned.  For example, in a March 22, 2006

9    email message from the <plot04@aol.com> addressed to Larian, MGA's General

10   Manager Susan Kuemmerle and another MGA officer Thomas Park, Machado,

11   Trueba and Vargas sought to prove their value in this endeavor to MGA by writing:

12   "Attached you will find our analysis for future discussion.  We will be available

13   during the nights of the week after 16:30 Los Angeles time . . . ."  In another email,

14   showing that the participants intentionally sought to maximize the damage to

15   Mattel from their conduct, Kuemmerle wrote to Larian and Park:  "Gustavo,

16   Mariana and Pablo want to resign (all at the same time, and you can believe my

17   smile!) next Wednesday."

18           44.    Beginning on April 12, 2004, a week before his resignation and

19   after numerous communications and meetings with Larian and other MGA

20   personnel, Machado began transferring additional Mattel confidential and

21   proprietary information to a portable USB storage device (also know as a "thumb

22   drive") that he connected to his Mattel computer.  On Friday, April 16, 2004, the

23   last business day before he gave notice, Machado copied at least 70 sensitive

24   documents to the portable USB storage device.

25           45.    Starting on April 12, 2004, Vargas copied a host of confidential

26   and proprietary materials to a portable USB storage device, including sales plans,

27   sales projections and customer profiles.

28

-13-

FIRST AMENDED COMPLAINT

EXHIBIT ___9___ PAGE __167__

46.   On April 16, 2004, Trueba copied Mattel confidential and
proprietary information to a portable USB storage device connected to her Mattel
computer.

47.   Trueba also took steps to increase further her access to Mattel's
confidential information.  For example, just four days before leaving, Trueba went
out of her way to seek to attend a meeting at which Mattel personnel analyzed
BARBIE programs for the United States, Canada and South America.  Two days
before her resignation, she contacted a Mattel employee located in El Segundo,
California and Mattel's advertising agency to request updated confidential
information about advertising plans for BARBIE.  On information and belief,
Trueba acted at the direction of MGA and Larian and did so in order to obtain
further information that would allow MGA to obtain unfair competitive advantage
over Mattel.

48.   Machado, Trueba and Vargas stole virtually every type of
document a competitor would need to enter the Mexican market and to unlawfully
compete with Mattel in Mexico, in the United States, and elsewhere.  They stole
global internal future line lists that detailed anticipated future products, production
and shipping costs for Mattel products; daily sales data for Mattel products;
customer data; sales estimates and projections; marketing projections; documents
analyzing changes in sales performance from 2003 to 2004; budgets for advertising
and promotional expenses; strategic research reflecting consumer responses to
products in development; media plans; consumer comments regarding existing
Mattel products customer discounts and terms of sale; customer inventory level
data; assessments of promotional campaign success; market size historical data and
projections; marketing plans and strategies; merchandising plans; retail pricing and
marketing strategies; and other similar materials.

49.   The stolen data was not limited to the Mexican market.  The
information stolen would, and did, give MGA an unfair competitive advantage in

-14-

FIRST AMENDED COMPLAINT

EXHIBIT __9__ PAGE __167__

1  the United States and around the world.  Further, the stolen information was not

2  located exclusively in Mexico, but included confidential and proprietary

3  information that resided on Mattel computers in Phoenix, Arizona and El Segundo,

4  California, and/or documents which were originally created by personnel in El

5  Segundo.  Included among these stolen documents was one of Mattel's earliest

6  internal global line lists, which included information for BARBIE products for the

7  upcoming year and included, for each product, the expected profit margin,

8  advertising expenditures, expected volume and marketing strategy.  On information

9  and belief, Machado, Trueba or Vargas delivered that internal line list to Larian or

10  another MGA officer during their negotiations with MGA.

11         50.    MGA has used the information taken from Mattel to obtain an

12  unfair advantage, including both the United States and Mexico.  In fact, MGA later

13  publicized its claim that, in 2005, it had increased its Mexican market share by 90

14  percent over the prior year.  This increase came at the expense of Mattel, which lost

15  market share during 2004 in Mexico and was forced to increase its advertising and

16  promotional spending to offset further losses.

17         51.    Machado, Trueba and Vargas attempted to conceal their

18  widespread theft of Mattel's proprietary information.  For example, Machado ran a

19  software program on his Mattel personal computer in an attempt to erase

20  information, including information that would reveal the addresses to which he had

21  sent, or from which he had received, e-mails.  On information and belief, Machado

22  also damaged the hard drive of his Mattel personal computer for the same purpose.

23         52.    On information and belief, on April 19, 2004, immediately after

24  Machado, Trueba and Vargas simultaneously resigned, they traveled from Mexico

25  to Los Angeles to meet with MGA personnel, including Larian, in person.

26         53.    Mattel notified Mexican authorities about the theft of its trade

27  secret and confidential information.  On October 27, 2005, the Mexican Attorney

28  General Office obtained a search warrant from the Mexican Federal Criminal

07934/2000453.1

-15-

1  Courts for MGA's facilities in Mexico City.  In that search, the Mexican authorities

2  found and seized from MGA's offices both electronic and paper copies of a large

3  number of documents with Mattel trade secrets, including those that Mattel

4  discovered through its forensic investigations, plus many others that Mattel had not

5  known had been stolen.

6        54.    Based on Machado's "performance" in Mexico, Isaac Larian

7  subsequently promoted Machado and he was transferred to MGA's main office in

8  Van Nuys, California.  On information and belief, Machado currently resides in the

9  County of Los Angeles, California.

10  **V.    MGA HIRES MATTEL'S SENIOR VICE PRESIDENT AND**

11  **GENERAL MANAGER TO FACILITATE ITS THEFT AND USE OF**

12  **MATTEL'S HIGHLY VALUABLE BUSINESS METHODS AND**

13  **PRACTICES**

14        55.    On October 1, 2004, Mattel's Senior Vice President and General

15  Manager, Ron Brawer, left Mattel and joined MGA.  Tyco Toys, Inc. ("Tyco"), a

16  predecessor to Mattel, had hired Brawer on April 22, 1996.  The same day, Brawer

17  entered into an Employee Invention & Trade Secret Agreement with Tyco.  On

18  April 9, 1997, Brawer became a Marketing Director for Mattel in Mount Laurel,

19  New Jersey, and remained bound by his Employee Invention & Trade Secret

20  Agreement.

21        56.    In January 2003, while Brawer held a position of trust and

22  confidence at Mattel, Mattel's "Code of Conduct" was circulated to all Mattel

23  employees worldwide.  Included in the Code of Conduct were statements that:

24              Employees and Directors have an obligation to protect the

25              confidentiality of Mattel's proprietary information.  Proprietary

26              information is any information not generally known to the public

27              that is useful to Mattel, that would be useful to its competitors or

28              other third parties or that would be harmful to Mattel or its

07934/2000453.1

-16-

1           customers if disclosed.  Proprietary information includes trade

2           secrets, revenue and profit information and projections, new

3           product information, marketing plans, design and development

4           efforts, manufacturing processes and any information regarding

5           potential acquisitions, divestitures and investments.

6           We can protect the security of Mattel's proprietary information

7           by limiting access to it.  Confidential information should not be

8           discussed with those who are not obligated to maintain the

9           information in confidence and in public places where the

10          information is not likely to be kept secret, such as planes,

11          restaurants and elevators.  The obligation to preserve confidential

12          information continues even after employment ends.

13 The Code of Conduct applied to Brawer and required that he meet his obligations

14 under the Code of Conduct.

15       57.   By 2003, Brawer had advanced within Mattel to a Senior Vice

16 President position over customer marketing, a position of trust and confidence.  In

17 his executive position, Brawer was provided access to information that was both

18 sensitive and confidential, including, but not limited to, detailed information related

19 to development, manufacture, marketing, pricing, shipping, and performance of

20 Mattel's then-current and anticipated future product lines, and other confidential

21 business plans between Mattel and its most significant retail customers.

22       58.   In December 2003, Alan Kaye, Mattel's Senior Vice President of

23 Human Resources, asked Brawer whether he was talking to MGA.  Brawer denied

24 that he had been in contact with MGA and promised that he would not talk to

25 MGA.  Throughout 2004, Mattel reminded and stressed to its employees, including

26 Brawer, the importance of protecting Mattel's confidential and proprietary

27 materials and information.

28

-17-

EXHIBIT __9__ PAGE _170_

59.   On March 18, 2004, in response to a survey from the President of Mattel Brands, Matt Bousquette, confirming compliance with Mattel's Code of Conduct, Brawer wrote back that he "applaud[ed] the company's vigorous protection of it's [sic] intellectual property," reflecting Brawer's clear understanding that Mattel required its proprietary information to be kept confidential.

60.   In April 2004, Mattel promoted Brawer to Senior Vice President/General Manager ("GM"). The GM position also is an executive position of trust and confidence. The role of a GM is to lead a cross—functional "Customer Business Team." Each GM is accountable for a strategic partnership with a key Mattel retailer, covering all aspects of the business, including both traditional toy sales and retail development of licensed products.

61.   In or about late May 2004, Brawer began performing GM duties, working with one of Mattel's major retail customer accounts. Thereafter, Brawer began receiving information related not only to the Senior Vice President, Customer Marketing position that he still formally held, but also began receiving detailed information related to his role as GM. Brawer began requesting and analyzing detailed information related to Mattel and its four key retail accounts.

62.   On September 15, 2004, Brawer left work at noon for observance of Rosh Hashanah. As Brawer left, he carried a large cardboard box with binders and other materials. Several hours after his departure, Brawer instructed his assistant to print Mattel's 2004 Sales Plan for one of Mattel's significant customers and to provide it to him, falsely claiming he needed it for a meeting

63.   On September 17, 2004, Brawer returned to Mattel and immediately informed his supervisor that he was leaving Mattel, effective October 1, 2004, to work for competitor MGA.

07934/2000453 1

-18-

EXHIBIT ___9___ PAGE __171__

64.   On September 20, 2004, Mattel hand-delivered a letter to Brawer reminding him of his continuing confidentiality obligations, not only through October 1, 2004, but continuing beyond the termination of his employment.

65.   At his exit interview on September 29, 2004, Mattel reminded Brawer that he had ongoing duties of confidentiality to Mattel, even after the termination of his employment.  Brawer was given a copy of his Original Confidentiality Agreement, which he had signed on April 22, 1996, and another copy of the Code of Conduct.  During the exit interview, however, Brawer noted that he had not signed the Code of Conduct, which he intended and Mattel understood to mean that Brawer believed he was not bound by Mattel's policy because he had not signed it.  Brawer was unwilling to complete or sign the form that sought to confirm that Brawer understood his ongoing obligations under the Code of Conduct, which included the obligation to preserve the confidentiality of Mattel's proprietary and trade secret information.

66.   On October 1, 2004, Brawer's final day of employment with Mattel, Mattel hand-delivered to Brawer a letter that, among other things, reminded Brawer of his confidentiality obligations to Mattel under the Code of Conduct.

67.   Upon joining MGA, Brawer became its Executive Vice-President of Sales and Marketing.  In that role he was responsibile for MGA's sales worldwide.  As part of those responsibilities, Brawer had and continues to have responsibility for MGA's accounts with the same retailers that he worked with while at Mattel.

68.   Brawer represented during his Mattel exit interview that he had returned all proprietary information to Mattel.  That representation was false.  On information and belief, Brawer removed proprietary and trade secret information from Mattel that he did not return.  Mattel is informed and believes that Brawer did not return to Mattel, for example, the information contained in his contacts file.  The contacts file included contact information for Mattel customers, most notably

07934/2000453 1

-19-

FIRST AMENDED COMPLAINT

EXHIBIT ___9___ PAGE _172_

1  TRU, and extensive contact information for Mattel employees, including titles, e-
2  mail addresses and telephone numbers.

3          69.   Mattel has recently learned that Brawer has been using that
4  contact information on a regular basis, including within recent months. Since
5  leaving Mattel, Brawer has had contacts with Mattel employees, both by telephone
6  and by electronic mail. Based on his knowledge of Mattel's operations and the
7  roles of certain Mattel employees, he has targeted certain Mattel employees who
8  have broad access to Mattel proprietary information in an effort to induce and
9  encourage them to join MGA and to steal or otherwise wrongfully misappropriate
10  Mattel confidential information and trade secrets. Brawer has done so by
11  promising these Mattel employees salaries 25 percent or more higher than they earn
12  at Mattel and stating to them that they should not be concerned by legal action
13  taken by Mattel to protect its trade secrets and its rights because such claims are
14  hard to prove and easy to defeat.

15  **VI.  MGA STEALS MATTEL TRADE SECRETS IN CANADA**

16          70.   In an effort to increase its market share and sales in Canada and
17  elsewhere, MGA stole Mattel trade secrets regarding its customers, sales, projects,
18  advertising and strategy, not only for Canada, but the United States and the rest of
19  the world.

20          71.   Janine Brisbois was a Director of Sales for the Girls Division in
21  Canada. Mattel hired her as a National Account Manager in August 1999. When
22  she was hired as a Mattel employee, Brisbois agreed that she would preserve and
23  would not disclose Mattel's proprietary or confidential information. For example,
24  Brisbois agreed:

25          You must keep Mattel's Proprietary Information confidential,
26          and you may only use or disclose such information as necessary
27          to perform your job responsibilities in accordance with Mattel
28          policies. Your obligation to keep Mattel's Proprietary

-20-

FIRST AMENDED COMPLAINT

EXHIBIT ___9___ PAGE _173_

1    Information confidential will continue even after any termination
2    of your employment with your employer.
3         . . .
4    Mattel takes steps to maintain the secrecy and confidential nature
5    of Mattel's Proprietary Information and, if a competitor
6    discovered Mattel's Proprietary Information, it could
7    significantly damage Mattel and your Employer.
8         72.   While with Mattel, Brisbois gained responsibility for Mattel's
9    account with TRU and later gained responsibility for Mattel's Wal-Mart account.
10   In her capacity as Sales Director-Wal-Mart/CTC/Girls Team, Brisbois had access
11   to Mattel confidential and proprietary information regarding Mattel's future product
12   lines, advertising and promotional campaigns and product profitability.
13        73.   On September 26, 2005, Brisbois resigned from Mattel to take a
14   position as Vice President of Sales at MGA.  Mattel is informed and believes that
15   in that position Brisbois has responsibility for MGA's accounts with both TRU and
16   Wal-Mart.  During Brisbois' exit interview she was specifically asked whether she
17   was "taking anything."  Brisbois responded, "No."  Both during and after her exit
18   interview, Brisbois was advised by Mattel of her obligations to preserve Mattel's
19   confidential and proprietary information.
20        74.   Mattel is informed and believes that Brisbois spoke with Isaac
21   Larian, MGA's CEO, on September 22, 2005 at approximately 8:30 p.m., when he
22   called Ms. Brisbois at her home.  Mattel subsequently learned that on the same day
23   that she spoke with Mr. Larian and four days before she resigned, Brisbois copied
24   approximately 45 Mattel documents on to a USB or "thumb" drive with the volume
25   label "BACKPACK."  On information and belief, Brisbois removed the thumb
26   drive from Mattel Canada's office by concealing it in her backpack or gym bag the
27   last time that she left that office.  These documents contained Mattel trade secret
28   and proprietary information, and included:

FIRST AMENDED COMPLAINT

EXHIBIT ___9___ PAGE __174__

- a document containing the price, cost, sales plan and quantity of every Mattel product ordered by every Mattel customer in 2005 and 2006;
- the BARBIE television advertising strategy and information concerning sales increases generated by television advertisements;
- competitive analysis of Mattel vis-à-vis its competitors in Canada;
- an analysis of Mattel's girls business sales beginning in 2003 and forecasts through 2006;
- profit and loss reviews for Mattel's products being sold in Wal-Mart, including margins and profit in not only Canada, but in the United States and Mexico; and
- a document containing the product launch dates and related advertising for all Mattel new products between Fall 2005 and Spring 2006.

75.    After Mattel discovered that Brisbois had copied these sensitive documents to a thumb drive, Mattel notified Canadian law enforcement authorities. Canadian law enforcement authorities recovered from Brisbois a thumb drive with the volume label "BACKPACK" containing the documents that Brisbois had copied from Mattel's computer system.  Mattel later learned that while she was working as a Vice President of Sales at MGA, she accessed and modified documents on that thumb drive.

76.    After joining MGA, Brisbois repeatedly traveled to MGA's offices in Van Nuys, California and met with Larian and Brawer.  In February, 2006, knowing that Mattel trade secrets had been seized from MGA's Mexico City offices and that at least three MGA employees were under criminal investigation, MGA nonetheless issued a press release trumpeting its 2005 performance, with Larian himself concluding, "Our international teams in Mexico and Canada have done a fantastic job."

-22-

FIRST AMENDED COMPLAINT

EXHIBIT 9 PAGE 175

**VII. MGA PERSUADES OTHER EMPLOYEES LEAVING MATTEL FOR MGA TO MISAPPROPRIATE MATTEL TRADE SECRETS FOR THE BENEFIT OF MGA**

77.     In the past few years, MGA has hired directly from Mattel's United States operations at least 25 employees, from Senior Vice-President to lower level employees.  On information and belief, a segment of these employees were specifically targeted and recruited by MGA, including Larian and Brawer, based on the Mattel confidential and proprietary information they could access. Many of these employees have had access to information that Mattel considers to be highly proprietary and confidential.  Mattel believes that some of those former Mattel employees may be observing their obligations not to misappropriate, disclose or use Mattel's confidential and proprietary information.  Mattel is informed and believes, however, that certain additional employees accessed, copied and took from Mattel confidential and proprietary information, including Mattel's strategic plans; business operations, methods and systems; marketing and advertising strategies and plans; future product lines; product profit margins; and customer requirements.  The misappropriated confidential and proprietary information included information that these Mattel employees were not authorized to access.  On information and believe, the misappropriated confidential and proprietary information taken from Mattel is being disclosed to and used by MGA for the benefit of MGA and to the detriment of Mattel.

**VIII. LARIAN MAKES MISREPRESENTATIONS TO RETAILERS ABOUT MATTEL'S PRODUCTS**

78.     Defendants have engaged in other illegal practices as well in their efforts to compete unfairly against Mattel.  Larian has a practice of sending e-mail messages to a "Bratz News" distribution list that Larian created or that was created for him.  Mattel is informed and believes that the recipients of e-mail

-23-

FIRST AMENDED COMPLAINT

EXHIBIT ___9___ PAGE _176_

1  messages sent to the "Bratz News" distribution list include members of the media
2  as well as representatives of many of Mattel's most significant customers.

3      79.   On May 12, 2006, Larian sent an e-mail message to the "Bratz
4  News" distribution list that included a reference to Mattel's updated MY SCENE
5  MY BLING BLING product with real gems. Mattel had not publicly announced
6  this product at the time that Larian sent his May 12, 2006 e-mail. In fact, Mattel
7  had guarded the identification of this particular product.

8      80.   Shortly thereafter, Larian engaged in a campaign of calling
9  Mattel's most significant customers, including but not limited to Target and TRU,
10  regarding the MY SCENE MY BLING BLING product with real gems. In an
11  effort to dissuade these retailers from purchasing Mattel's MY SCENE MY BLING
12  BLING product with real gems, Larian knowingly made false factual statements
13  about that product to each retailer. As of the writing of this Amended Complaint,
14  Mattel is aware that Larian represented to each retailer that each was the only
15  retailer to purchase the product and that Mattel would not be supporting the product
16  with television advertising. At the time that Larian made these statements, he knew
17  them to be false. As a result of Larian's misrepresentations, at least one retailer
18  cancelled its order for 75,000 units of the MY SCENE MY BLING BLING product
19  with real gems. Only after Mattel learned of Larian's misrepresentations and was
20  able to correct them was Mattel able to assure the retailer that Larian's
21  representations were false and to persuade the retailer to reinstate the order.

22      81.   Such conduct is not an isolated incident. MGA and Larian, in an
23  effort to gain an unfair competitive advantage, repeatedly issued false and
24  misleading press releases. In these press releases, MGA and Larian have
25  misrepresented Bratz's sales, Bratz's market share, Bratz's position vis-à-vis
26  Mattel's BARBIE products, sales of Mattel's BARBIE products, and the market
27  share of Mattel's BARBIE products.

28

-24-

EXHIBIT ___9___ PAGE __177__

## CLAIMS FOR RELIEF

### First Claim

### Copyright Infringement

### (Against MGA, MGA Entertainment (HK) Limited,

### Larian, Bryant and Does 4 through 10)

82.   Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through __, above, as though fully set forth at length.

83.   Mattel is the owner of copyrights in works that are fixed in tangible media of expression and that are the subject of valid, and subsisting, copyright registrations owned by Mattel.  These include, without limitation, the works that are the subject of Registrations VA 1-378-648, VA 1-378-649, VA 1-378-650, VA 1-378-651, VA 1-378-652, VA 1-378-653, VA 1-378-654, VA 1-378-655, VA 1-378-656, VA 1-378-657, VA 1-378-658, VA 1-378-659, VA 1-378-660, VAu 715-270, VAu 715-271 and VAu 715-273.

84.   Defendants have reproduced, created derivative works from and otherwise infringed upon the exclusive rights of Mattel in its protected works without Mattel's authorization.  Defendants' acts violate Mattel's exclusive rights under the Copyright Act, including without limitation Mattel's exclusive rights to reproduce its copyrighted works and to create derivative works from its copyrighted works, as set forth in 17 U.S.C. §§ 106 and 501.

85.   Defendants' infringement (and substantial contributions to the infringement) of Mattel's copyrighted works is and has been knowingly made without Mattel's consent and for commercial purposes and the direct financial benefit of defendants.  Defendants, moreover, have deliberately failed to exercise their right and ability to supervise the infringing activities of others within their control to refrain from infringing Mattel's copyrighted works and have failed to do so in order to deliberately further their significant financial interest in the infringement of Mattel's copyrighted works.  Accordingly, defendants have

07934/2000453.1

EXHIBIT ___9___ PAGE 178

1   engaged in direct, contributory and vicarious infringement of Mattel's copyrighted

2   works.

3        86.   By virtue of defendants' infringing acts, Mattel is entitled to

4   recover Mattel's actual damages plus defendants' profits, Mattel's costs of suit and

5   attorneys' fees, and all other relief permitted under the Copyright Act.

6        87.   Defendants' actions described above have caused and will

7   continue to cause irreparable damage to Mattel, for which Mattel has no remedy at

8   law.  Unless defendants are restrained by this Court from continuing their

9   infringement of Mattel's copyrights, these injuries will continue to occur in the

10  future.  Mattel is accordingly entitled to injunctive relief restraining defendants

11  from further infringement.

12                          **Second Claim**

13  **Violation of the Racketeer Influenced and Corrupt Organizations Act**

14                  **18 U.S.C. §§ 1962(c) and 1964(c)**

15                    **(Against All Defendants)**

16        88.   Mattel repeats and realleges each and every allegation set forth in

17  paragraphs 1 through __, above, as though fully set forth at length.

18        89.   Beginning at various times from approximately 1999 through the

19  filing of this Amended Complaint, in the Central District of California and

20  elsewhere, defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico

21  Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas and

22  Brisbois were employed by and associated-in-fact with an enterprise engaging in,

23  and the activities of which affect, interstate and foreign commerce.  This enterprise

24  is made up of the MGA Group (MGA, MGA Entertainment (HK) Limited, MGA

25  de Mexico, Larian, certain of the Doe defendants and Brawer), the Bryant Group

26  (Bryant and certain of the Doe defendants), the Mexican Group (Machado, Trueba

27  and Vargas) and the Canadian Group (Brisbois).

28

                              -26-

90.   MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas, Brisbois, and the Other Former Employees, and each of them, for the purpose of executing and attempting to execute the scheme to improperly defraud Mattel and steal its trade secret or otherwise confidential and proprietary information, by means of tortious, fraudulent and criminal conduct, did and do unlawfully, willfully and knowingly conduct and participate, directly and indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity.  Their actions include multiple, related acts in violation of:  18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1512 (tampering with a witness victim, or informant), and 18 U.S.C. § 1952 (interstate and foreign travel to aid racketeering), 18 U.S.C. § 2319(a) and 17 U.S.C. § 506(a)(1)(A) (criminal copyright infringement).

91.   MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas, Brisbois, and the Other Former Employees, and each of them, shared the common purpose of allowing MGA to obtain confidential, proprietary and otherwise valuable Mattel property through improper means in order to assist MGA in unfairly competing with Mattel domestically and throughout the world.

92.   The enterprise as described herein is at all relevant times a continuing enterprise because, among obvious reasons, it is designed and did unlawfully acquire the confidential business information and property of Mattel and incorporated this information and property into MGA's ongoing business, marketing strategies and business methods, practices and processes.  The conduct of the enterprise continues through the date of his Amended Complaint and is ongoing by virtue of MGA's continuing use of Mattel's information and property, all to the detriment of Mattel.

07934/2000453.1

-27-

EXHIBIT ___9___ PAGE __180__

93.    The pattern of racketeering activity, as defined by 18 U.S.C. §§ 1961(1) and (5), presents both a history of criminal conduct and a distinct threat of continuing criminal activity.  Such activity consists of multiple acts of racketeering by each member of the enterprise, is interrelated, not isolated and is perpetrated for the same or similar purposes by the same persons.  Such activity extends over a substantial period of time, up to and beyond the date of this Amended Complaint.  Such activities occurred after the effective date of 18 U.S.C. §§ 1961 *et seq.*, and the last such act occurred within 10 years after the commission of a prior act of racketeering activity.  These racketeering activities included repeated acts of:

      (a)   Mail Fraud:  Defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and Does 4 through 10, aided and abetted by each other and some or all of the remaining members of the enterprise, having devised a scheme or artifice to defraud Mattel of its confidential trade secret information and property by conversion, false representations, concealment and breaches of fiduciary duty, did for the purpose of furthering and executing such a scheme or artifice to defraud, deposited or caused to be deposited matters or things to be sent or delivered by the Postal Service, or any private or commercial interstate carrier, or took or received matters or things therefrom, or knowingly caused matters or things to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 2, as alleged with greater particularity in the foregoing paragraphs and as set forth in Exhibit C;

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(b)  Wire Fraud:  Defendants MGA, MGA Entertainment (HK)
Limited, MGA de Mexico, Larian, Bryant, Machado and Does 4
through 10, aided and abetted by each other and some or all of the
remaining members of the enterprise, having devised a scheme or
artifice to defraud Mattel of its confidential and trade secret
information and property by conversion, false representations,
concealment and breaches of fiduciary duty, did for the purpose
of furthering and executing such a scheme or artifice to defraud,
transmit and cause to be transmitted by means of wire
communications in interstate or foreign commerce, writing, signs,
signals, pictures or sound, in violation of 18 U.S.C. § 1343 and
18 U.S.C. § 2, as alleged with greater particularity in the
foregoing paragraphs and as set forth in Exhibit C;

(c)  Tampering With a Witness, Victim or Informant:  Defendants
MGA, MGA Entertainment (HK) Limited, MGA de Mexico,
Larian, Bryant, Machado and Does 4 through 10, aided and
abetted by each other and some or all of the remaining members
of the enterprise, did corruptly alter, destroy, mutilate, or conceal
a record, document, or other object, or attempted to do so, with
the intent to impair the object's integrity or availability for use in
an official proceeding.  Such actions are in violation of 18 U.S.C.
§ 1512 and 18 U.S.C. § 2, as alleged with greater particularity in
the foregoing paragraphs;

(d)  Interstate and Foreign Travel in Aid of Racketeering Enterprises:
Defendants MGA, MGA Entertainment (HK) Limited, MGA de
Mexico, Larian, Bryant, Machado and Does 4 through 10, aided
and abetted by each other and some or all of the remaining
members of the enterprise, traveled in interstate and foreign

-29-

EXHIBIT 9 PAGE 182

1    commerce, or used the mail or any facility in interstate or foreign

2    commerce, with the intent to promote, manage, establish, carry

3    on and facilitate the promotion, management, establishment and

4    carrying on of unlawful activity, *i.e.* bribery, in violation of the

5    laws of the State of California, *Cal. Penal Code* § 641.3, all in

6    violation of 18 U.S.C. § 1952 and 18 U.S.C. § 2, as alleged with

7    greater particularity in the foregoing paragraphs;

8    (e)    Criminal Copyright Infringement: Defendants MGA, MGA

9    Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant,

10    Machado and Does 4 through 10, aided and abetted by each other

11    and some or all of the remaining members of the enterprise,

12    willfully infringed Mattel's copyrights, including with respect to

13    documents containing Mattel trade secret and confidential

14    information, for purposes of commercial advantage and private

15    financial gain, all in violation of 18 U.S.C. § 2319(a) and 17

16    U.S.C. § 506(a)(1)(A), as alleged with greater particularity in the

17    foregoing paragraphs.

18    94.    The persons alleged herein to have violated 18 U.S.C. § 1962(c)

19    are separate from, though employed by or associated with, MGA, the MGA Group,

20    the Bryant Group, the Mexican Group and the Canadian Group.

21    95.    MGA had a role in the racketeering activity that was distinct

22    from the undertaking of those acting on its behalf.  MGA also attempted to benefit,

23    and did benefit, from the activity of its employees and agents alleged herein, and

24    thus was not a passive victim of racketeering activity, but an active perpetrator.

25    96.    Mattel has been injured in its business or property as a direct

26    and proximate result of the defendants' and the other enterprise members' violations

27    of 18 U.S.C. § 1962(c), including injury by reason of the predicate acts constituting

28    the pattern of racketeering activity.

-30-

1    97.    As a result of the violations of 18 U.S.C. § 1962(c), by the MGA

2    Group, the Bryant Group, the Mexican Group and the Canadian Group, Mattel has

3    suffered substantial damages, in an amount to be proved at trial.  Pursuant to 18

4    U.S.C. § 1964(c), Mattel is entitled to recover treble its general and special

5    compensatory damages, plus interest, costs and attorneys, fees, incurred by reason

6    of defendants' violations of 18 U.S.C. § 1962(c).

7                            **Third Claim**

8                **Conspiracy To Violate the Racketeer**

9             **Influenced And Corrupt Organizations Act**

10                **(18 U.S.C. §§ 1962(d) and 1964(c))**

11                     **(Against All Defendants)**

12    98.    Mattel repeats and realleges each and every allegation set forth in

13    paragraphs 1 through __, above, as though fully set forth at length.

14    99.    Beginning at various times from approximately 1999 through the

15    filing of this Amended Complaint, in the Central District of California and

16    elsewhere, defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico,

17    Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas,

18    Brisbois and the Other Former Employees willfully, knowingly and unlawfully, did

19    conspire, combine, confederate and agree together to violate 18 U.S.C. § 1962(c).

20    100.    These conspirators were employed by and associated-in-fact with

21    an enterprise engaging in, and the activities of which affect, interstate and foreign

22    commerce.  Specifically, the MGA Group, the Bryant Group, the Mexican Group

23    and the Canadian Group, constituting a group of individuals associated-in-fact, did

24    unlawfully, willfully, and knowingly participate in and conduct, directly and

25    indirectly, the enterprise's affairs through a pattern of racketeering activity.

26    101.    The pattern of racketeering activity, as defined by 18 U.S.C.

27    §§ 1961(1) and (5), including acts of mail fraud in violation of 18 U.S.C. § 1341

28    and 18 U.S.C. § 2; acts of wire fraud in violation of 18 U.S.C. § 1343 and 18

FIRST AMENDED COMPLAINT

EXHIBIT ___9___ PAGE 184

1  U.S.C. § 2; acts of tampering with witnesses, victims or informants in violation of

2  18 U.S.C. § 1512 and 18 U.S.C. § 2; acts of interstate and foreign travel in aid of

3  racketeering enterprises in violation of 18 U.S.C. § 1952 and 18 U.S.C. § 2; and

4  acts of criminal copyright infringement in violation of 18 U.S.C. § 2319(a) and 17

5  U.S.C. § 506(a)(1)(A).

6       102. Defendants and the other members of the enterprise schemed to

7  defraud Mattel and steal its property and trade secret information by means of false

8  representation, breaches of fiduciary duty, conversation and concealment, as more

9  fully set forth in the foregoing paragraphs.

10       103. In furtherance of this unlawful conspiracy, and to effect its

11  objectives, defendants and various co-conspirators committed numerous overt acts,

12  including but not limited to those set forth in the foregoing paragraphs.

13       104. Mattel has been injured in its business or property as a direct and

14  proximate result of the defendants' and the other enterprise members' violations of

15  18 U.S.C. § 1962(d), including injury by reason of the predicate acts constituting

16  the pattern of racketeering activity.

17       105. As a result of the conspiracies between and among all defendants

18  and the other conspirators to violate 18 U.S.C. § 1962(c), Mattel has suffered

19  substantial damages, in an amount to be proved at trial. Pursuant to 18 U.S.C.

20  § 1964(c), Mattel is entitled to recover treble its general and special compensatory

21  damages, plus interest, costs and attorneys' fees, incurred by reason of defendants'

22  violations of 18 U.S.C. § 1962(d).

23                      **Fourth Claim**

24            **Misappropriation of Trade Secrets**

25  **(Against Defendants MGA, Larian, Machado and Does 4 through 10)**

26       106. Mattel repeats and realleges each and every allegation set forth in

27  paragraphs 1 through __, above, as though fully set forth at length.

28

07934/2000453.1

-32-

1    107.  As used herein, "Trade Secret Material" shall mean the
2    documents, materials and information stolen by Machado, Trueba, Vargas,
3    Brisbois, the Other Former Employees, and other persons acting for, on behalf of or
4    at the direction of MGA and/or Larian.  Prior to their theft by defendants, the Trade
5    Secret Materials gave Mattel a significant competitive advantage over its existing
6    and would-be competitors, including MGA.  This advantage, as to MGA, has now
7    been compromised as a result of defendants' unlawful activities.
8          108.  Mattel made reasonable efforts under the circumstances to
9    maintain the confidentiality of the Trade Secret Materials, including by having
10   employees and consultants who may have access the Trade Secret Materials sign
11   confidentiality agreements that oblige them not to disclose the Trade Secret
12   Materials or characteristics of the Trade Secret Materials; by limiting the
13   circulation of said materials within Mattel; by protecting and limiting access to
14   computers with log-in identifications and passwords; by limiting each employee's
15   access to electronic files to those that the particular employee needs to access; by
16   educating employees on the nature of Mattel's information that is confidential and
17   proprietary; and by reminding employees on a regular and periodic basis of their
18   obligation to protect and maintain Mattel's confidential and proprietary
19   information.
20         109.  Mattel's Trade Secret Materials derive independent economic
21   value from not being generally known to the public or to other persons who can
22   obtain economic benefit from their disclosure.
23         110.  Defendants have illegally obtained the trade secret materials, as
24   set forth above, and through other means of which Mattel is presently unaware.
25         111.  Defendants have used and disclosed Mattel's Trade Secret
26   Materials without Mattel's consent and without regard to Mattel's rights, and
27   without compensation, permission, or licenses for the benefit of themselves and
28   others.

07934/2000453.1

-33-

112. Defendants' conduct was, is, and remains willful and wanton, and was taken with blatant disregard for Mattel's valid and enforceable rights.

113. Defendants' wrongful conduct has caused and, unless enjoined by this Court, will continue in the future to cause irreparable injury to Mattel. Mattel has no adequate remedy at law for such wrongs and injuries. Mattel is therefore entitled to a permanent injunction restraining and enjoining defendants, and each of them, as well as their agents, servants, and employees, and all persons acting thereunder, in concert with, or on their behalf, from further using in any manner Mattel's trade secrets.

114. In addition, as a proximate result of defendants' misconduct, Mattel has suffered actual damages, and defendants have been unjustly enriched.

115. The aforementioned acts of the defendants were willful and malicious, including in that defendants misappropriated Mattel's trade secrets with the deliberate intent to injure Mattel's business and improve their own. Mattel is therefore entitled to enhanced damages. Mattel is also entitled to reasonable attorney's fees.

### **Fifth Claim**

**Breach of Contract**

**(Against Bryant)**

116. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through ___, above, as though fully set forth at length.

117. Pursuant to his Employment Agreement, Bryant agreed that he would not, without Mattel's express written consent, engage in any employment or business other than for Mattel or assist in any manner any business competitive with the business or future business plans of Mattel during his employment with Mattel. Pursuant to his Mattel Employment Agreement, Bryant further assigned to Mattel all right, title and interest in "inventions," including without limitation "designs" and other works that he conceived, created or reduced to practice during

07934/2000453.1

-34-

EXHIBIT ___9___ PAGE __187__

1  his employment by Mattel.  In addition, pursuant to the Conflict Questionnaire,

2  Bryant certified that, other than as disclosed, he had not worked for any competitor

3  of Mattel and had not engaged in any business venture or transaction involving a

4  Mattel competitor that could be construed as a conflict of interest.  Bryant further

5  promised that he would notify his supervisor immediately of any change in his

6  situation that would cause him to change any of the foregoing certifications or

7  representations.

8        118.  The Employment Agreement and the Conflict Questionnaire are

9  valid, enforceable contracts, and Mattel has performed each and every term and

10  condition of the Employment Agreement and Conflict Questionnaire required to be

11  performed by Mattel.

12        119.  Bryant materially breached the foregoing contracts with Mattel,

13  in that, among other things, he secretly aided, assisted and worked for a Mattel

14  competitor during his employment with Mattel, without the express written consent

15  of Mattel.

16        120.  As a consequence of Bryant's breach, Mattel has suffered and

17  will in the future continue to suffer damages in an amount to be proven at trial.

18  Such damages include, without limitation, the amounts paid by the competitor to

19  Bryant during his Mattel employment; the amounts paid by MGA to Bryant during

20  his Mattel employment; the amount that Mattel paid Bryant during the time he

21  wrongfully worked for MGA; the value of information and intellectual property

22  owned by Mattel which Bryant provided to MGA; the value of the benefits that

23  MGA obtained from Bryant during the time he was employed by Mattel; and the

24  value of the benefits that MGA obtained from Bryant as a result of the work he

25  performed for MGA during his Mattel employment.

26        121.  Bryant's conduct has caused, and unless enjoined will continue to

27  cause, irreparable injury to Mattel that cannot be adequately compensated by

28  money damages and for which Mattel has no adequate remedy at law.  Bryant

1   specifically acknowledged in his Employment Agreement that his breach of the

2   Agreement "likely will cause irreparable harm" to Mattel and that Mattel "will be

3   entitled to injunctive relief to enforce this Agreement, in addition to damages and

4   other available remedies." Accordingly, Mattel is entitled to orders mandating

5   Bryant's specific performance of his contracts with Mattel and restraining Bryant

6   from further breach.

7                          **Sixth Claim**

8                **Intentional Interference with Contract**

9            **(Against MGA, Larian and Does 4 through 10)**

10           122.  Mattel repeats and realleges each and every allegation set forth in

11   paragraphs 1 through __, above, as though fully set forth at length.

12           123.  Valid agreements existed between Mattel and Bryant, Brawer,

13   Machado, Trueba, Vargas, Brisbois and the Other Former Employees (collectively,

14   the "Mattel Employees")

15           124.  At all times herein mentioned, MGA, Larian and Does 4 through

16   10 knew that the Mattel Employees had a duty under their Agreement not to work

17   for or assist any competitor of Mattel, such as MGA.  In addition, at all times

18   mentioned herein, MGA, Larian and Does 4 through 10 knew that Bryant had

19   assigned to Mattel, and was obligated to disclose to Mattel all inventions, including

20   designs and other works, created, conceived or reduced to practice during their

21   employment with Mattel.

22           125.  Despite such knowledge, defendants MGA, Larian and Does 4

23   through 10 intentionally and without justification solicited, induced and encouraged

24   the Mattel Employees to breach their contracts with Mattel.

25           126.  As a direct and proximate result of defendants' efforts and

26   inducements, the Mattel Employees did breach their contracts with Mattel.

27

28

07934/2000453 1

-36-

FIRST AMENDED COMPLAINT

EXHIBIT ___9___ PAGE 189

127. As a result of said breaches, Mattel has suffered damages and will imminently suffer further damages, including the loss of its competitive position and lost profits, in an amount to be proven at trial.

128. Defendants performed the aforementioned conduct with malice, fraud and oppression, and in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to recover exemplary damages from defendants in an amount to be determined at trial.

### Seventh Claim
### Breach of Fiduciary Duty
### (Against Bryant and Machado)

129. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through __, above, as though fully set forth at length.

130. Bryant and Machado held positions of trust and confidence with Mattel. In their positions, Bryant and Machado had access to and were entrusted with Mattel's proprietary and confidential information, supervised the work of others, exercised discretion and worked independently in many of their job assignments and duties. In their positions, Bryant and Machado also represented Mattel in its dealings with third parties and, in actions in the course and scope of their employment with Mattel, were agents of Mattel. They confirmed their relationship of trust with Mattel in respective employee agreements. Bryant and Machado thus owed Mattel a fiduciary duty that included, but was not limited to, an obligation not to take any action that would be contrary to Mattel's best interests or that would deprive Mattel of any opportunities, profit or advantage which Bryant or Machado might bring to Mattel.

131. Bryant breached his fiduciary duty to Mattel in that, while employed by Mattel, he secretly aided, assisted and worked for a competitor of Mattel, including without limitation by entering into an agreement with a Mattel competitor. As alleged above, Bryant also breached the aforementioned duty by

-37-

EXHIBIT ___9___ PAGE 190

1  using Mattel property and resources for the benefit of, and to aid and assist, himself

2  personally and MGA.

3         132.  Machado breached his fiduciary duty to Mattel, in that while

4  employed by Mattel, he secretly aided and assisted a competitor of Mattel by,

5  among other things, misappropriating Mattel trade secret and proprietary

6  information and providing said information to officers of MGA.  Machado also

7  breached the aforementioned duty by using Mattel property and resources for the

8  benefit of, and to aid and assist, himself personally and MGA.

9         133.  As a direct and proximate result of defendants' wrongful conduct,

10  Mattel has incurred damages in an amount to be determined at trial.

11         134.  Defendants acted with malice, fraud and oppression, and in

12  conscious disregard of Mattel's rights.  Accordingly, Mattel is entitled to an award

13  of exemplary damages against defendants in an amount to be determined at trial.

14         135.  Furthermore, defendants' conduct has caused, and unless

15  enjoined will continue to cause, irreparable injury to Mattel that cannot be

16  adequately compensated by money damages and for which Mattel has no adequate

17  remedy at law.  Accordingly, Mattel is entitled to an order restraining further

18  breach of Bryant's fiduciary duty to Mattel and/or restraining defendants from

19  continuing to benefit from such breach.

20                        **Eighth Claim**

21            **Aiding and Abetting Breach of Fiduciary Duty**

22            **(Against MGA, Larian and Does 4 through 10)**

23         136.  Mattel repeats and realleges each and every allegation set forth in

24  paragraphs 1 through __, above, as though fully set forth at length.

25         137.  At all times herein mentioned, MGA, Larian and Does 4 through

26  10 knew that Bryant held a position of trust and confidence at Mattel.  At all times

27  herein mentioned, MGA, Larian and Does 4 through 10 knew that Bryant owed a

28  fiduciary duty to Mattel not to take any action that would be contrary to Mattel's

FIRST AMENDED COMPLAINT

EXHIBIT ___9___ PAGE ___191___

1   best interests, including but not limited to secretly developing and designing the

2   Bratz while employed by Mattel and by secretly assisting Larian and MGA .

3          138. At all times herein mentioned, MGA, Larian and Does 4 through

4   10 knew that the Mattel Employees (excluding Bryant) held positions of trust and

5   confidence at Mattel. At all times herein mentioned, MGA, Larian and Does 4

6   through 10 knew that the Mattel Employees (excluding Bryant) owed a fiduciary

7   duty to Mattel not to take any action that would be contrary to Mattel's best

8   interests, including but not limited to taking confidential trade secret information

9   from Mattel's premises and providing that information to a competitor.

10          139.   Despite such knowledge, defendants MGA and Does 4 through

11   10 intentionally and without justification solicited, encouraged, aided and abetted

12   and gave substantial assistance to the Mattel Employees to breach their fiduciary

13   duties to Mattel, knowing that their conduct would constitute breaches of their

14   fiduciary duties to Mattel.

15          140. As a direct and proximate result of defendants' efforts, the Mattel

16   Employees did breach their fiduciary duties to Mattel and Mattel has incurred

17   damages in an amount to be proven at trial. Mattel, therefore, is entitled to recover

18   compensatory damages in an amount to be determined at trial.

19          141. In taking the aforesaid actions, MGA and Does 4 through 10

20   acted with malice, fraud and oppression, and in conscious disregard of Mattel's

21   rights. Accordingly, Mattel is entitled to recover exemplary damages from

22   defendants in an amount to be determined at trial.

23                          **Ninth Claim**

24                     **Breach of Duty of Loyalty**

25                    **(Against Bryant and Machado)**

26          142. Mattel repeats and realleges each and every allegation set forth in

27   paragraphs 1 through __, above, as though fully set forth at length.

28

-39-

FIRST AMENDED COMPLAINT

EXHIBIT ___9___ PAGE ___192___

143. As employees of Mattel, Bryant and Machado owed a duty of undivided loyalty to Mattel. Pursuant to this duty, Bryant and Machado could not compete with Mattel or assist a competitor of Mattel during their employment with Mattel. Pursuant to this duty, Bryant and Machado were required to always give preference to Mattel's business over their own, similar interests during the course of their employment with Mattel.

144. Bryant and Machado breached their duty of loyalty to Mattel in that, while employed by Mattel, they secretly aided, assisted and worked for a competitor of Mattel, including without limitation by entering into agreements with a Mattel competitor. As alleged above, they also breached the aforementioned duty by using Mattel property and resources for the benefit of, and to aid and assist, themselves personally and the competitor of Mattel.

145. As a direct and proximate result of defendants' wrongful conduct, Mattel has incurred damages in an amount to be determined at trial.

146. Defendants acted with malice, fraud and oppression, and in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to an award of punitive damages against defendants in an amount to be determined at trial.

147. Furthermore, defendants' conduct has caused, and unless enjoined will continue to cause, irreparable injury to Mattel that cannot be adequately compensated by money damages and for which Mattel has no adequate remedy at law. Accordingly, Mattel is entitled to an order restraining further breach of defendants' duty of loyalty to Mattel and/or restraining defendants from continuing to benefit from such breach.

148. In breaching their duty of loyalty to Mattel, Bryant and Machado acted with malice, fraud and oppression, and in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to recover exemplary damages from defendants in an amount to be determined at trial.

FIRST AMENDED COMPLAINT

EXHIBIT ___9___ PAGE _193_

**Tenth Claim**

**Aiding and Abetting Breach of Duty of Loyalty**

**(Against MGA, Larian and Does 4 through 10)**

149. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through __, above, as though fully set forth at length.

150. MGA, Larian and Does 4 through 10 knew that Bryant, as an employee of Mattel, owed a duty of loyalty to his employer. MGA, Larian and Does 4 through 10 knew that this duty included an obligation on the part of Bryant not to compete with Mattel or assist a competitor of Mattel during the term of his employment with Mattel. MGA, Larian and Does 4 through 10 also knew that Bryant was required to give preference to Mattel's business over his own, similar interests or those of Mattel's competitors. or those of Mattel's competitors during the course of his employment with Mattel.

151. MGA, Larian and Does 4 through 10 knew that the Mattel Employees (excluding Bryant) were employed by Mattel, and, as employees of Mattel, that they owed duties of loyalty to Mattel. MGA, Larian and Does 4 through 10 knew that these duties included an obligation on the part of the Mattel Employees (excluding Bryant) not to compete with Mattel or assist a competitor of Mattel during their Mattel employment.

152. Despite such knowledge, defendants MGA and Does 4 through 10 intentionally and without justification solicited, encouraged, aided and abetted and gave substantial assistance to the Mattel Employees to breach their duties of loyalty to Mattel, knowing that their conduct would constitute breaches of their duties of loyalty to Mattel.

153. As a further consequence of defendants' efforts, Mattel has suffered injury and is entitled to compensatory damages in an amount to be proven at trial.

07934/2000453 1

-41-

EXHIBIT ___9___ PAGE 194

154.  In taking the aforesaid actions, MGA and Does 4 through 10 acted with malice, fraud and oppression, and in conscious disregard of Mattel's rights.  Accordingly, Mattel is entitled to recover exemplary damages from defendants in an amount to be determined at trial.

**Eleventh Claim**

**Conversion**

**(Against All Defendants)**

155.  Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through ___, above, as though fully set forth at length.

156.  Defendants wrongfully converted Mattel property and resources by appropriating and using them for their own benefit and gain and for the benefit and gain of others, without the permission of Mattel.

157.  Mattel was entitled to, among other things, the exclusive right and enjoyment in property and tangible materials owned by Mattel, including without limitation of such that was created by Bryant while he was a Mattel product designer.  Such property was taken by Bryant from Mattel to further his own interests and, in at least some instances, provided by Bryant to Larian and MGA in furtherance of the interests of Bryant, Larian and MGA.

158.  In addition, defendants wrongfully converted Mattel's property by removing the Trade Secret Materials in electronic and paper form from Mattel's offices.  Defendants did so without Mattel's permission and continue to possess them.

159.  As a direct and proximate result of defendants' wrongful conversion of Mattel property, including those relating to Bratz and Mattel's Trade Secret Materials, Mattel has incurred damages.  Mattel, therefore, is entitled to recover compensatory damages in an amount to be determined at trial.

160.   As a result of defendants' acts of conversion, Mattel is entitled to damages in an amount sufficient to indemnify Mattel for the loss suffered, which

07934/2000453.1

-42-

1   is not measured by the value of the property misappropriated, but includes the lost

2   profits that Mattel suffered as a result of the conversion or, alternatively, the profits

3   generated by the defendants that would not have been generated but for the

4   conversion. Only such a measure of damages would fully and fairly compensate

5   Mattel for the injury it suffered due to defendants' acts of conversion.

6          161.  Defendants performed the aforementioned conduct with malice,

7   fraud and oppression, and in conscious disregard of Mattel's rights. Accordingly,

8   Mattel is entitled to recover exemplary damages from defendants in an amount to

9   be determined at trial.

10          162.  Furthermore, defendants' conduct has caused, and unless

11  enjoined will continue to cause, irreparable injury to Mattel that cannot be

12  adequately compensated by money damages and for which Mattel has no adequate

13  remedy at law. Accordingly, Mattel is entitled to an order restraining defendants

14  from further conversion of Mattel property and resources and/or restraining

15  defendants from continuing to benefit from such conversion.

16                          **Twelfth Claim**

17                        **Unfair Competition**

18         **(Common Law and *Cal. Bus. & Prof. Code* § 17200)**

19                      **(Against All Defendants)**

20          163.  Mattel repeats and realleges each and every allegation set forth in

21  paragraphs 1 through __, above, as though fully set forth at length.

22          164.  Section 17200 of the California Business and Professions Code

23  prohibits unfair competition, including "any unlawful, unfair or fraudulent business

24  act or practice . . . ."

25          165.  By engaging in the foregoing conduct, defendants have,

26  individually and in combination, engaged in unlawful, unfair and/or fraudulent acts

27  of unfair competition in violation of both the common law of the state of California

28  and *Cal. Bus. & Prof. Code* § 17200 *et seq.*  Such conduct included, without

07934/2000453.1

-43-

1  limitation, MGA's commercial bribery of Bryant in violation of *Cal. Penal Code*

2  § 641.3 and misappropriation of trade secrets in violation of 18 U.S.C. § 1832(a).

3  Such conduct also included, without limitation, MGA's and Larian's disparagement

4  of Mattel's products and misrepresentations as alleged above.

5       166. As a result of the aforementioned conduct, Mattel has suffered

6  damages and will imminently suffer further damages, including but not limited to

7  lost profits in an amount to be proven at trial. No adequate remedy at law exists for

8  the wrongs and injuries Mattel has suffered and will continue to suffer, and Mattel

9  is entitled to an injunction enjoining defendants' continued wrongful acts. Mattel is

10  also entitled to recover compensatory and exemplary damages pursuant to the

11  doctrine of common law unfair competition and *Cal. Civ. Code* § 3294.

12                    **Thirteenth Claim**

13                   **Declaratory Relief**

14              **(Against All Defendants)**

15       167. Mattel repeats and realleges each and every allegation set forth in

16  paragraphs 1 through __, above, as though fully set forth at length.

17       168. As shown in the foregoing paragraphs above, an actual

18  controversy exists between Mattel and defendants regarding defendants' lack of

19  ownership interests in Bratz and Mattel's rights in the same.

20       169. Accordingly, Mattel seeks a declaration of the Court that

21  defendants have no valid or protectable ownership rights or interests in Bratz, and

22  that Mattel is the true owner of the same, and further seeks an accounting and

23  imposition of a constructive trust over Bratz and over all revenues and other monies

24  or benefits derived or obtained from MGA's and Bryant's purported ownership, use,

25  sale, distribution and licensing of Bratz.

26       170. Mattel seeks a declaration of the Court that any and all

27  agreements between Bryant, on the one hand, and MGA, on the other hand, in

28  which Bryant purports to assign to MGA any right, title or interests in any work

07934/2000453.1

-44-

1  that he conceived, created or reduced to practice while a Mattel employee,

2  including but not limited to the Bratz designs, is ineffective, void and of no effect,

3  including without limitation because Bryant had previously assigned said right, title

4  or interest to Mattel and because Mattel was otherwise the owner of said right, title

5  or interest.

6                                    **Prayer for Relief**

7          WHEREFORE, Mattel respectfully requests judgment:

8          1.      For a declaration that defendants have no valid or protectable

9  ownership interests or rights in Bratz designs and works conceived, created or

10  reduced to practice by Bryant during the term of his Mattel employment and/or by

11  any others then-employed by Mattel, as well as in all derivatives prepared

12  therefrom, and that Mattel is the true owner of the foregoing;

13          2.      For a declaration that any agreement between Bryant, on the one

14  hand, and MGA or any person or entity, on the other hand, in which Bryant

15  purported to assign any right, title or interests in any work that he conceived,

16  created or reduced to practice while a Mattel employee, including but not limited to

17  the Bratz designs, is ineffective, void and of no effect;

18          3.      For an Order enjoining and restraining defendants, their agents,

19  servants and employees, and all persons in active concert or participation with

20  them, from further wrongful conduct, including without limitation from imitating,

21  copying, distributing, importing, displaying, preparing derivatives from and

22  otherwise infringing Mattel's copyright-protected works;

23          4.      For an Order, pursuant to 17 U.S.C. § 503(a) and other

24  applicable law, impounding all of defendants' products and materials that infringe

25  Mattel's copyrights, as well as all plates, molds, matrices and other articles by

26  which copies of the works embodied in Mattel's copyrights may be reproduced or

27  otherwise infringed;

28

FIRST AMENDED COMPLAINT

EXHIBIT ___9___ PAGE 198

5.    For an Order mandating that defendants return to Mattel all tangible items, documents, designs, diagrams, sketches or any other memorialization of inventions created or reduced to practice during Bryant's employment with Mattel as well as all Mattel property converted by defendants;

6.    For an Order mandating specific performance by Bryant to comply with and satisfy Bryant's contractual obligation to Mattel;

7.    That Mattel be awarded, and defendants be ordered to disgorge, all payments, revenues, profits, monies and royalties and any other benefits derived or obtained as a result of the conduct alleged herein, including without limitation of all revenues and profits attributable to defendants' infringement of Mattel's copyrights under 17 U.S.C. § 504;

8.    For an accounting of all profits, monies and/or royalties from the exercise of ownership, use, distribution, sales and licensing of Bratz;

9.    For the imposition of a constructive trust over Bratz and all profits, monies, royalties and any other benefits derived or obtained from defendant's exercise of ownership, use, sale, distribution and licensing of the Bratz;

10.   That Mattel recover its actual damages and lost profits;

11.   That defendants be ordered to pay exemplary damages in a sum sufficient to punish and to make an example of them, and deter them and others from similar wrongdoing;

12.   That defendants be ordered to pay treble its general and special damages, plus interest, costs and attorney's fees incurred by reason of defendants' violations of 18 U.S.C. §§ 1962(c)-(d).

13.   That defendants be ordered to pay double damages due to their willful and malicious misappropriation of Mattel's trade secrets with deliberate intent to injure Mattel's business and improve its own;

14.   That defendants pay to Mattel the full cost of this action and Mattel's attorneys' and investigators' fees; and

07934/2000453.1

-46-

1          15.   That Mattel have such other and further relief as the Court may

2   deem just and proper.

3

4   DATED: November ___, 2006        QUINN EMANUEL URQUHART OLIVER &
                                     HEDGES, LLP
5

6                                    By_____

7                                       John B. Quinn
                                        Attorneys for Plaintiff
8                                       Mattel, Inc.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-47-

FIRST AMENDED COMPLAINT

EXHIBIT _9___ PAGE _200_

1

## DEMAND FOR JURY TRIAL

2

3          Plaintiff Mattel, Inc. respectfully requests a jury trial on all issues

4  triable thereby.

5

6  DATED:  November __, 2006          QUINN EMANUEL URQUHART OLIVER &
                                      HEDGES, LLP
7

8                                     By_____

9                                        John B. Quinn
                                         Attorneys for Plaintiff
10                                       Mattel, Inc.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

07934/2000453.1
-48-

FIRST AMENDED COMPLAINT

EXHIBIT __9__ PAGE __201__