Exhibit 6



RECEIVED

FEB 0 7 2005

1  DIANA M. TORRES (S.B. #162284)
   PAULA E. AMBROSINI (S.B. #193126)
2  ALICIA C. MEYER (S.B. #230189)
   O'MELVENY & MYERS, LLP
3  400 South Hope Street
   Los Angeles, California 90071-2899
4  Telephone: (213) 430-6000
   Facsimile: (213) 430-6407
5
6  Attorneys for Defendant-in-Intervention,
   MGA Entertainment, Inc.
7
8              UNITED STATES DISTRICT COURT
9              CENTRAL DISTRICT OF CALIFORNIA
10 MATTEL, INC., a Delaware              Case No.  CV04-9059 NM (RNBx)
   Corporation,
11                                       MGA'S FIRST SET OF
              Plaintiff,                 INTERROGATORIES TO MATTEL,
12                                       INC.
       v.
13
   CARTER BRYANT, an individual,
14 and MGA ENTERTAINMENT,
   INC., a California Corporation
15
              Defendant and
16            Defendant-in-
              Intervention.
17
18
19 PROPOUNDING PARTY:    MGA ENTERTAINMENT, INC.
20 RESPONDING PARTY:     MATTEL, INC.
21 SET:                  ONE
22
23
24
25
26
27
28

EXHIBIT __6__ _ PAGE _|5|_

1    Defendant-In-Intervention, MGA Entertainment Inc. ("MGA"), hereby
2  requests that Plaintiff, Mattel Inc. ("Mattel") answer the following Interrogatories
3  separately, fully, and under oath, pursuant to Rule 33 of the Federal Rules of Civil
4  Procedure, within thirty (30) days of service, in accordance with the definitions and
5  instructions set forth herein.

6  ## DEFINITIONS

7      1. "BRATZ" means and refers to each image, character, logo, doll, toy,
8  accessory, product, packaging or other thing or matter that is or has ever been
9  manufactured, marketed or sold by MGA, or others under license, as part of a line of
10  goods or merchandise commonly known as, or sold and marketed under the "Bratz"
11  trademark or trade dress including but not limited to the "BRATZ CONCEPT,"
12  "FIRST BRATZ DOLLS," "BRATZ DOLLS," "BRATZ PACK", "LIL' BRATZ,"
13  "BRATZ PETZ," "BRATZ BABYZ," and "BRATZ BOYZ.

14      2. "BRATZ CONCEPT" means and refers to each "BRATZ"-related image,
15  drawing, picture, sculpt, mold, prototype and any other form of artwork predating the
16  FIRST BRATZ DOLLS, examples of which have been the subject of Mr. Bryant's
17  testimony and produced by Mr. Bryant bearing Bates serial numbers Bryant 00175-
18  177; 00179-00182; 00189-00190; 00192-00196; 00198-00216; 00218; 00341; 00972;
19  01014; and 01116-01118.

20      3. "FIRST BRATZ DOLLS" means and refers to each image, character, logo,
21  doll, toy, accessory, product, packaging or other thing or matter that is or has ever
22  been manufactured, marketed or sold by MGA, or others under license, as part of a
23  line of goods or merchandise commonly known as, or sold and marketed under the
24  "Bratz" trademark or trade dress and consisting of the following:  "Bratz Cloe", SKU
25  248521; "Bratz Cloe", SKU 248538; "Bratz Jade", SKU 248545; "Bratz Sasha, SKU
26  248552; "Bratz Yasmin", SKU 248569; "Bratz Pajama Power Fashion", SKU
27  248576; "Bratz Study Hall Fashion", SKU 248583; and "Bratz Dynamite Dance
28  Fashion", SKU 248682.

1
**EXHIBIT** _p___   **PAGE** 152

1    4. "BRATZ DOLLS" means and refers to each image, character, logo, doll,

2    toy, accessory, product, packaging or other thing or matter that is or has ever been

3    manufactured, marketed or sold by MGA, or others under license, as part of a line of

4    goods or merchandise commonly known as, or sold and marketed under the "Bratz"

5    trademark or trade dress excluding the "FIRST BRATZ DOLLS", "LIL' BRATZ,"

6    "BRATZ PETZ," and "BRATZ BABYZ" and including, without limitation, the

7    styling head commonly known as or sold and marketed as the "Bratz Funky Fashion

8    Make Over" styling head, and specifically including, without limitation, the images,

9    characters, dolls, playsets and other products and toys called or referred to as, or

10   named or marketed in association with the names "Cloe", "Jade", "Sasha", "Yasmin",

11   "Meygan", "Dana", "Fianna", "Nevra", "Cameron", "Dylan", "Eitan", "Koby",

12   "Cade", "Ailani", "Nazalia", "Talia", "Zada", "Mikko", "Colin", "Deavon", "Lakin",

13   "Flaunt It," "Beach Party", "Micro Bratz", "Xpress It", "Bratz Boyz", "Funk 'n'

14   Glow", "Funky Fashion Makeover", "Holiday Bratz – Sweetheart", "Holiday Bratz –

15   Spring Fling", "Holiday Bratz – Independence Dance", "Slumber Party", "Strut It",

16   "Spring Break", "Formal Funk", "Bratz Boyz Formal Funk", "Wintertime

17   Wonderland", "Style It!", "Funky Fashion Makeover", "Funk Out!", "Sun-Kissed

18   Summer", "Girls Nite Out!", "Wild Life Safari", and any other released, or yet to be

19   released, BRATZ named character or product theme.

20   5. "BRATZ PACK" means and refers to any collection, compilation or

21   grouping of two or more images, characters or dolls that are or have ever been

22   manufactured, marketed or sold by MGA, or others under license, as part of a line of

23   goods or merchandise commonly known as, or sold and marketed under the "Bratz"

24   trademark or trade dress including, without limitation, the collection, compilation or

25   grouping of four female images, characters or dolls individually named, called or

26   referred to as "Bratz Cloe", "Bratz Jade", "Bratz Sasha", and "Bratz Yasmin" and any

27   other similar collection, compilation or grouping of two or more images, characters or

28   dolls, male or female, and specifically including, without limitation, the images,

2

EXHIBIT __6__ PAGE __53__

1  characters and dolls called or referred to as, or named or marketed in association with

2  the names "Cloe", "Jade", "Sasha", "Yasmin", "Meygan", "Dana", "Fianna",

3  "Nevra", "Cameron", "Dylan", "Eitan", "Koby", "Cade", "Ailani", "Nazalia",

4  "Talia", "Zada", "Mikko", "Colin", "Deavon", "Lakin", and any other released, or yet

5  to be released, BRATZ character.

6       6.  "LIL' BRATZ" means and refers to each image, character, logo, doll, toy,

7  accessory, product, packaging or other thing or matter that is or has ever been

8  manufactured, marketed or sold by MGA, or others under license, as part of a line of

9  goods or merchandise commonly known as, or sold and marketed under the "Bratz"

10  trademark or trade dress and commonly labeled, called, referred to, named or

11  identified as "LIL' BRATZ", and specifically including, without limitation, the

12  images, characters, dolls, playsets and other products and toys called or referred to as,

13  or named or marketed in association with the names "Cloe", "Yasmin", "Sasha",

14  "Jade", "Ailani", "Nazalia", "Talia", "Zada", "Lil' Boyz", "Cameron", "Dylan",

15  "Eitan", "Koby", "Mikko", "Colin", "Deavon", "Lakin", "Lil' Bratz Slumber Party",

16  "Lil' Bratz Tote", "Lil' Bratz Spring Break", "Lil Bratz Dancefloor Funk", "Lil' Boyz

17  Dancefloor Funk", and any other released, or yet to be released, LIL' BRATZ

18  character or product theme.

19       7.  "BRATZ PETZ" means and refers to each image, character, logo, doll, toy,

20  accessory, product, packaging or other thing or matter that is or has ever been

21  manufactured, marketed or sold by MGA, or others under license, as part of a line of

22  goods or merchandise commonly known as, or sold and marketed under the "Bratz"

23  trademark or trade dress and commonly labeled, called, referred to, named or

24  identified as "BRATZ PETZ", and specifically including, without limitation, the

25  images, characters and toys called or referred to as, or named or marketed in

26  association with the names, "Bratz Catz", "Brigitte", "Jolie", "Kendall", "Daphne",

27  "Bratz Petz Tokyo Catz", "Kyoto", "Cho", "Nami", "Yukiko", "Bratz Petz Foxz",

28  "Carly", "Reilly", "Shayna", "Bree", "Bratz Petz Dogz", "Shae", "Kali", "Pilar",

3

EXHIBIT ___6___ PAGE __154__

1   "Abby", and any other released, or yet to be released, BRATZ PETZ character or
2   product theme.

3         8.   "BRATZ BABYZ" means and refers to each image, character, logo, doll,
4   toy, accessory, product, packaging or other thing or matter that is or has ever been
5   manufactured, marketed or sold by MGA, or others under license, as part of a line of
6   goods or merchandise commonly known as, or sold and marketed under the "Bratz"
7   trademark or trade dress and commonly labeled, called, referred to, named or
8   identified as "BRATZ BABYZ", and specifically including, without limitation, the
9   images, characters and dolls called or referred to as, or named or marketed in
10  association with the names, "Cloe", "Sasha", "Jade," "Yasmin", and any other
11  released, or yet to be released, BRATZ BABYZ character or product theme.

12        9.   "BRATZ BOYZ" means and refers to each male image, character, logo, doll,
13  toy, accessory, product, packaging or other thing or matter that is or has ever been
14  manufactured, marketed or sold by MGA, or others under license, as part of a line of
15  goods or merchandise commonly known as, or sold and marketed under the "Bratz"
16  trademark or trade dress and commonly labeled, called, referred to, named or
17  identified as "BRATZ BOYZ", and specifically including, without limitation, the
18  images characters, dolls, playsets and other products and toys called or referred to as,
19  or named or marketed in association with the names "Cameron", "Dylan", "Eitan",
20  "Koby", "Cade", "Mikko", "Colin", "Deavon", "Lakin", "Bratz Boyz Formal Funk",
21  "Boyz Funk Out!", "Boyz Sun-Kissed Summer", and any other released, or yet to be
22  released BRATZ BOYZ character or product theme.

23      10.   "BRATZ INTELLECTUAL PROPERTY" means all intellectual and
24  industrial property rights in and to BRATZ including, without limitation, all
25  copyrights, patents, trademarks, industrial designs, trade secrets, contract and
26  licensing rights, design rights, moral rights and trade dress rights, in any country of
27  the world.

28      11.   "BRYANT" means defendant Carter Bryant.

4       **EXHIBIT**  _6_   **PAGE** _155_

12. "COMMUNICATION[S]" means any transmission of information from one person or entity to another, including, without limitation, by personal meeting, conversation, letter, telephone, facsimile or electronic mail. Each request that encompasses information relating in any way to communications to, from or within a business or corporate entity is hereby designated to mean, and should be construed to include, all communications by and between representatives, employees, agents or servants of the business or corporate entity.

13. "COMPLAINT" means and refers to the Complaint filed by Mattel Inc. in this matter on April 27, 2004 and now designated as Case No. CV 04-9059 NM (RNBx) in the United States District Court for the Central District of California.

14. "DOCUMENT[S]" incorporates the full meaning of Federal Rule of Civil Procedure 24, and shall be construed in the broadest sense to mean any and all writings, tangible things and property, of any kind, that are now or that have been in YOUR actual or constructive possession, custody or control, including, but not limited to, any handwritten, typewritten, printed, drawn, charted, taped, filmed, punched, copied, recorded, transcribed, graphic or photographic matter of any kind or nature, in, through, or from which information may be embodied, translated, conveyed or stored, whether an original, a draft or copy, however produced or reproduced, whether sent or received or neither, including, but not limited to, notes, memoranda, correspondence, letters, facsimiles and facsimile transmittals, reports, inter- and intra-office COMMUNICATIONS, work papers, work sheets, work records, ledgers, graphs, indexes, advertisements, brochures, price lists, cost sheets, estimating sheets, bills, bills of lading, bids, time cards, receipts, purchase orders, telephone records, telegrams, telexes, literature, invoices, contracts, purchase orders, estimates, recordings, transcriptions of recordings, records, books, pamphlets, periodicals, publications, papers, tapes, DVDs, video CDs, video, audio and digital recordings, television commercials, story boards, website or other spot

**EXHIBIT  6   PAGE  156**

advertisements, movies, movie trailers, prototypes, products, diaries, calendars, charts, drawings, sketches, messages, photographs and data contained in or accessible through any electronic data processing system, including, but not limited to, computer databases, data sheets, data processing cards, computer files and tapes, computer disks, CD-ROMs, computer meta-data, microfilm, microfiche, electronic mail, website and web pages and transcriptions thereof and all other memorializations of any conversations, meetings and conference, by telephone or otherwise.  The term DOCUMENT also means every copy of a DOCUMENT, where such copy is not an identical duplicate of the original, whether because of deletions, underlinings, showing of blind copies, initialing, signatures, receipt stamps, comments, notations, differences in stationery or any other difference or modification of any kind.

15.    "MARKET RESEARCH" means any type of research, study, survey or analysis of consumers or potential consumers of a product or potential product including, without limitation, focus groups, consumer surveys, market analyses, behavioral analyses and consumer research.

16.    "MATTEL," "PLAINTIFF," "YOU" or "YOUR" means plaintiff MATTEL, Inc. and any of its past or present officers, directors, agents, employees, representatives, consultants, attorneys, parents, subsidiaries, divisions, affiliates, predecessors-in-interest and successors-in-interest, entities and persons acting in joint venture or partnership relationships with YOU and any others acting on YOUR behalf, pursuant to YOUR authority or subject to YOUR control.

17.    MGA" means MGA Entertainment, Inc. and any of its past or present officers, directors, agents, employees, representatives, consultants, attorneys, parents, subsidiaries, divisions, affiliates, predecessors-in-interest and successors-in-interest, entities and persons acting in joint venture or partnership relationships with MGA

6

EXHIBIT   6   PAGE   157

and any others acting on MGA's behalf, pursuant to its authority or subject to its control.

18.     "MGA PRODUCTS" means any and all products offered for sale by MGA Entertainment, Inc., other than BRATZ, including, without limitation, "4-Ever Best Friends" and "Alien Racers".

19.     "PERSON" or "PERSONS" means all natural persons, partnerships, corporations, joint ventures and any kind of business, legal or public entity or organization, as well as its, his or her agents, representatives, employees, officers and directors and any one else acting on its, his or her behalf, pursuant to its, his or her authority or subject to its, his or her control.

20.     "PROPERTY" or "PROPERTIES" means all ideas, concepts, rights, designs, proprietary and confidential information, and other intellectual and intangible property including, without limitation, copyrights, patents, trademarks, design rights and trade secrets.

21.     The singular form includes the plural, and vice versa.

22.     The terms "any" and "all" are interchangeable.

23.     The terms "and" and "or" shall be construed disjunctively and conjunctively, and each shall include the other whenever such dual construction will serve to bring within the scope of any interrogatory, information that would otherwise not be within its scope.

24.     As used herein, the terms "relating to" and "referring to" should each be construed in the broadest possible sense to mean concerning, consisting of, referring to, describing, discussing, constituting, evidencing, containing, reflecting, mentioning, pertaining to, citing, summarizing, analyzing or bearing any logical or factual connection with the matter discussed.

## INSTRUCTIONS

1.     Mattel is instructed to serve written responses to these Interrogatories

7

EXHIBIT ___6___ PAGE ___158___

1    upon MGA's counsel at O'Melveny & Myers LLP, 400 South Hope Street, Los
2    Angeles, California 90071.
3         2.    These Interrogatories are deemed to be continuing in nature. If, after
4    responding, Mattel discovers additional information responsive to any Interrogatory,
5    or part thereof, MGA requests that Mattel provide such information to MGA within
6    thirty days after acquiring knowledge of its existence or advise MGA in writing as to
7    why such additional information cannot be provided within the specified period.
8         3.    For any information withheld based on any ground, including privilege,
9    provide a written statement setting forth: (a) the identity of all person(s) from and to
10   whom the information has been communicated; (b) the names and organization
11   position, if any, of each such person; (c) a brief description of the subject matter of the
12   information; and (d) the legal ground upon which you rely in withholding the
13   information; and (e) if work product is asserted, the proceeding for or during which
14   the information was obtained or created.
15        4.    Whenever in these Interrogatories there is a request to "IDENTIFY" a
16   COMMUNICATION, the answering party shall state the date of the
17   COMMUNICATION, the places of origin and reception of the COMMUNICATION,
18   the persons present during any portion of the COMMUNICATION if oral, the type of
19   COMMUNICATION (*i.e.* letter, facsimile, face-to-face conversation, telephone, etc.),
20   the substance of the COMMUNICATION and the DOCUMENT(S), if any, that
21   constitute, record, show or refer to the COMMUNICATION.
22        5.    Whenever in these Interrogatories there is a request to state the
23   "IDENTITY" of a PERSON, the answering party shall set forth the person's name,
24   present or last known business address, residence address and telephone numbers,
25   dates of employment, job capacity, title, status, position, rank or classification or, with
26   respect to a non-natural person, the name and address of the principal office or place
27   of business, all names under which it is doing business or ever has done business, the
28   nature of the venture (*i.e.* sole proprietorship, partnership , corporation, etc.), and the

8

**EXHIBIT** _6_ **PAGE** _159_

1  identities of its officers, directors, partners or administrators.

2      6.    Whenever in these Interrogatories there is a request to state the

3  "IDENTITY" of a DOCUMENT, the answering party shall identify, by name, all

4  authors and recipients of the DOCUMENT, the date of the DOCUMENT, the person

5  or entity who currently has possession, custody and control of the DOCUMENT, and

6  describe the DOCUMENT in a manner sufficient for MGA to draft a discovery

7  demand requesting production of the DOCUMENT.

8      7.    Whenever in these Interrogatories there is a request to "IDENTIFY"

9  PROPERTY, the answering party shall describe the PROPERTY as specifically as

10  possible, state the name and current employer, if known, of the author(s), inventor(s),

11  owner(s) and any assignee(s) and licensee(s) of the PROPERTY, state any copyright

12  registration, recordation information relative to a copyright interest, trademark

13  registration and patent numbers of the PROPERTY, if any, and state the dates of

14  conception, authorship, invention and reduction to practice of the PROPERTY.

15

16                          **INTERROGATORIES**

17  **INTERROGATORY NO. 1.:**

18      State all facts, with particularity, and IDENTIFY all DOCUMENTS that

19  support YOUR contention, if YOU so contend, that YOU have suffered harm as a

20  result of any act or omission of MGA.

21  **INTERROGATORY NO. 2.:**

22      For each fact stated in response to Interrogatory No. 1, IDENTIFY all

23  PERSONS with knowledge of each fact.

24  **INTERROGATORY NO. 3.:**

25      State, with particularity, the nature, amount, cause and calculation of every item

26  of YOUR alleged damages, including, without limitation, general, actual and statutory

27  damages, restitution, disgorgement of unlawful profits, lost profits, lost payments, lost

28

EXHIBIT   b   PAGE   140

revenues, lost monies, lost royalties or license fees, reputational harm, lost relationships, lost business opportunities, interest, attorneys' fees, costs, expenses, and any other form of injury or damage or quantifiable remedy that YOU seek to recover in this lawsuit.

**INTERROGATORY NO. 4.:**

State all facts, with particularity, and IDENTIFY all DOCUMENTS that support YOUR contention, if YOU so contend, that YOU are entitled to exemplary damages, attorneys' fees and costs.

**INTERROGATORY NO. 5.:**

State all facts, with particularity, and IDENTIFY all DOCUMENTS that YOU contend prove, directly or circumstantially, that MGA copied YOUR PROPERTY, including, without limitation, "Toon Teens".

**INTERROGATORY NO. 6.:**

IDENTIFY each COMMUNICATION that YOU have ever made, received, or participated in that referred to, mentioned, or concerned this lawsuit.

**INTERROGATORY NO. 7.:**

IDENTIFY all PERSONS interviewed for the July 18, 2003 Wall Street Journal article.

**INTERROGATORY NO. 8.:**

Describe, with particularity, each error contained in the July 18, 2003 Wall Street Journal article by explaining why and in what way each fact is incorrect.

**INTERROGATORY NO. 9.:**

State, with particularity, when and how MATTEL first learned of BRATZ.

**INTERROGATORY NO. 10.:**

State, with particularity, when and how MATTEL first learned that BRYANT performed work for MGA.

10

**EXHIBIT _6_    PAGE _161_**

1  **INTERROGATORY NO. 11.:**

2       State, with particularity, when and how MATTEL first learned that BRYANT

3  conceived of the BRATZ CONCEPT.

4

5  Dated: February 4, 2005                    DIANA M. TORRES
                                              PAULA E. AMBROSINI
6                                             ALICIA C. MEYER
                                              O'MELVENY & MEYERS LLP
7

8

9                                             Paula E. Ambrosini,
                                              Attorneys for MGA Entertainment, Inc.
10

11  LA2:746290.2

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                        11

EXHIBIT  6   PAGE 162

## PROOF OF SERVICE

I, Suzanne I. Jimenez, declare:

I am a resident of the State of California and over the age of eighteen years, and not a party to the within action; my business address is 400 South Hope Street, Los Angeles, California 90071-2899. On February 4, 2005, I served the within document:

### MGA'S FIRST SET OF INTERROGATORIES TO MATTEL, INC.

☒ by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles addressed as set forth below. I am readily familiar with the firm's practice of collecting and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☒ by putting a true and correct copy thereof, together with an unsigned copy of this declaration, in a sealed envelope designated by the carrier, with delivery fees paid or provided for, for delivery the same business day to the person(s) listed above. I am readily familiar with this firm's practice for collection and processing of overnight courier correspondence. In the ordinary course of business, such correspondence collected from me would be processed on the same day, with fees thereon fully prepaid.

Michael T. Zeller                             **VIA HAND-DELIVERY & MAIL**
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Tel: (213) 443-3000
Fax: (213) 443-3100

Keith Jacoby                                  **VIA REGULAR MAIL**
Littler Mendelson
A Professional Corporation
2049 Century Park East, 5th Floor
Los Angeles, CA 90067-3107
Tel: (310) 553-0308
Fax: (310) 553-5583

I declare under penalty of perjury under the laws of the United States that the above is true and correct.

Executed on February 4, 2005, at Los Angeles, California.

_Suzanne I. Jimenez_
Suzanne I. Jimenez

**EXHIBIT** _____6_____ **PAGE** __163__

Exhibit 7

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(D).

**PRIORITY SEND**
**& ENTERED**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
<u>CIVIL MINUTES -- GENERAL</u>

Case No.   CV 04-09049 SGL(RNBx)                    Date:  July 2, 2007

Title:    CARTER BRYANT -v- MATTEL, INC.
          AND CONSOLIDATED ACTIONS

=================================================================

PRESENT:  HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

Jim Holmes                              Theresa Lanza
Courtroom Deputy Clerk                  Court Reporter

ATTORNEYS PRESENT FOR CARTER            ATTORNEYS PRESENT FOR MATTEL:
BRYANT:

John W. Keker                           John B. Quinn
                                        Brett Dylan Proctor
                                        Michael T. Zeller

ATTORNEYS PRESENT FOR MGA:

Dale M. Cendali
Patricia Glaser

PROCEEDINGS:   MINUTE ORDER

ENTERED
CLERK, U.S. DISTRICT COURT

JUL - 5 2007

CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION       BY DEPUTY



DOCKETED ON CM

JUL - 5 2007

BY _____ 164

    As set forth more fully herein, the Court hereby makes the following ruling regarding matters
heard on July 2, 2007:

(1)   The Court **GRANTS** Mattel's Motion re Trial Structure (docket #462);

(2)   The Court **GRANTS IN PART AND DENIES IN PART** MGA's Motion re Discovery Master's
      May 15, 2007, Order (docket #505);

(3)   The Court **GRANTS IN PART AND DENIES IN PART** MGA's Ex Parte Application

MINUTES FORM 90                                    Initials of Deputy Clerk _____
CIVIL -- GEN                          1            Time: 01/15

EXHIBIT ___7___  PAGE __104__   07|2|07

regarding date of production of documents (docket #545); and

(4)   The Court **DENIES** MGA's Motion re Discovery Master's May 16, 2007, Order (docket #508).

(5)   The Court **DENIES** the parties' oral request for modification of pretrial and trial dates.

(1)   Motion re Trial Structure (docket #462)

Previous orders of the Court specified that the claims and counterclaims brought in this action will be tried in two phases. The parties have agreed, in large part, to a refinement of the Court's mandate that all issues regarding the ownership of Bratz shall be tried in Phase 1. Where the parties differ is upon a proposal by Mattel that the Phase 1 be bifurcated into two sub-phases, with Mattel's copyright infringement claim (its first counterclaim in the 05-02727 case) and all Phase 1 damages being tried after all the other issues. Phase 1(a) would be limited to issues surrounding Carter Bryant's employment with Mattel, and how those issues impact the ownership of certain original Bratz drawings, while Phase 1(b) would address approximately two-hundred Bratz products that are potentially derivative of the original drawings. This approach has the appeal of limiting Phase 1(a) to discrete issue of the ownership of the original Bratz drawings. A finding that Bryant owns these original drawings in Phase 1(a) has the potential to eliminate the need for Phase 1(b).

Accordingly, **THE COURT ADOPTS MATTEL'S MODIFICATION OF DEFENDANTS' PROPOSAL**, as set forth at 8-9 of its Memorandum Regarding Trial Structure, filed June 20, 2007. Phase 1(a) and Phase 1(b) (if necessary) will be tried to the same jury.

(2)   MGA's Motion re Discovery Master's May 15, 2007, Order (docket #505), and
(3)   MGA's Ex Parte Application regarding date of production of documents (docket #545).

The Discovery Master's May 15, 2007, Order compels production of documents regarding ink, paper, and chemical analysis and documents relating to unreleased MGA products. The order required that documents be produced no later than the end of May.

The Court reviews the Discovery Master's orders under the "clearly erroneous" or "contrary to law" standard set forth in Fed. R. Civ. P. 72(a).

The Discovery Master's order compels the production of only non-privileged documents. Therefore, MGA's arguments that the Discovery Master's order requires production of documents in violation of the attorney-client privilege are misplaced. If the only responsive documents are privileged, then MGA need not produce them, but must produce a privilege log.

MGA acknowledges that it has raised an argument before the Court that was not raised

before the Discovery Master, namely, that Mattel has failed to establish that there are "exceptional circumstances" that allow Mattel to "discover facts known or opinions held by an expert . . . who is not expected to be called as a witness at trial." Fed. R. Civ. P. 26(b)(4)(B). MGA contends that the Discovery Master's order is contrary to law based on this standard, and that it was incumbent upon Mattel to raise it below. The Court disagrees. Mattel would be required to establish that exceptional circumstances existed if MGA objected to production on that grounds. A party seeking production cannot be expected to rebut all arguments that could possibly be raised by a party resisting production. MGA has not convinced the Court that the Discovery Master's failure to require Mattel to rebut an argument that was not raised by MGA is contrary to law.

MGA contends that the Discovery Master's order compelling production of documents regarding unreleased products is contrary to law. Relevant to that determination is a balancing test required to be applied by the Ninth Circuit when trade secrets are requested by a competitor in discovery. See Brown Bag Software v. Symantec Corp., 960 F.2d 1465, 1470 (9th Cir. 1992) ("Specifically, in this case we must balance the risk to [defendant] of inadvertent disclosure of trade secrets to competitors against the risk to [plaintiff] that protection of [defendant's] trade secrets [will] impair[] prosecution of [plaintiff's] claims.").

Here, the documents sought are of a particularly sensitive nature. They represent some of the most secretive documents maintained by MGA, and they are being ordered to be produced to MGA's fierce competitor. The Discovery Master recognized the sensitive nature of the documents and entered a strict protective order that severely limits access to those documents and that goes well beyond the normal "attorney eyes only" designation.

MGA argues that unreleased products are irrelevant to the issue of who owns the original Bratz drawings. That is clear. However, MGA's argument attempts to limit the discovery to issues involved in Phase 1 of the trial. There has been no bifurcation of discovery.

Mattel correctly points out that these documents are relevant to a number of its other claims. Specifically, if they show unreleased products that are similar to Mattel's unreleased products, the documents would be highly probative of Mattel's misappropriation of trade secrets claim. Moreover, these documents could be relevant to Mattel's RICO claims based on alleged acts of criminal copyright infringement.

Balancing tests are inherently subjective and particularly susceptible to varying interpretation by individual judicial officers. This Court, upon considering this issue from the outset, may very well have weighed the evidence differently and reached a contrary result. However, this Court is bound by the standard of review, and MGA's motion falls far short of convincing the Court that the Discovery Master's order is contrary to law.

The parties have a long history regarding the production of documents ordered in the May 15, 2007, Order, which is set forth in their papers and which need not be repeated here. Counsel for MGA represented that the remaining documents could be produced no later than July 31, 2007, with the exception of the documents from MGA Hong Kong, which could be produced no

later than two weeks after that date. Accordingly, the Court **ORDERS** that MGA complete the document production set forth in the Discovery Master's May 15, 2007, order no later than July 31, 2007, with the exception of the documents from MGA Hong Kong, which shall be produced no later than August 14, 2007.

Accordingly, the Court **GRANTS** in part MGA's motion re the Discovery Master's May 15, 2007, Order, extending the document production date as set forth above. The Motion is **DENIED** in all other respects.

Likewise, the Court **GRANTS** in part MGA's ex parte application re date of production of documents, extending the document production date as set forth above. The application is **DENIED** in all other respects.

(4)    MGA's Motion re Discovery Master's May 16, 2007, Order (docket #508)

The Discovery Master's May 16, 2007, Order compelled the Rule 30(b)(6) depositions of witnesses on the topics of MGA's net worth, prior sworn statements, and ink, paper, and chemical analysis performed by MGA.

> A party may in the party's notice and in a subpoena name as the deponent a public or private corporation or a partnership or association or governmental agency and describe with reasonable particularity the matters on which examination is requested. In that event, the organization so named shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. . . . The persons so designated shall testify as to matters *known or reasonably available* to the organization.

Fed. R. Civ. P. 30(b)(6) (emphasis added). "The purpose behind Rule 30(b)(6) is to create testimony that will bind the corporation." <u>Sanders v. Circle K Corp.</u>, 137 F.R.D. 292, 294 (D. Ariz. 1991) (internal citation omitted). Another purpose of Rule 30(b)(6) is aptly described by the District Court for the District of Columbia:

> [The purpose of Rule 30(b)(6) is to] prevent[] serial depositions of various witnesses without knowledge within an organization and eliminating 'bandying', which is the name given to the practice in which people are deposed in turn but each disclaims knowledge of facts that are clearly known to persons in the organization and thereby to the organization itself.

<u>Alexander v. F.B.I.</u>, 186 F.R.D. 148, 152 (D.D.C. 1999) (citing the 1970 Advisory Committee Notes to Rule 30(b)(6)).

The Discovery Master's order compelling Rule 30(b)(6) depositions in the specified

**EXHIBIT   7   PAGE   167**

categories serve both these purposes and is not contrary to law.

Although MGA's net worth may not be known to it, MGA does not contend that the information is not readily available. That net worth is generally the subject of expert testimony at trial -- a proposition disputed by neither Mattel nor the Court -- does not render it an improper subject for a Rule 30(b)(6). Therefore, the Discovery Master's ruling on this issue is not contrary to law.

MGA likewise does not contend that information regarding prior sworn statements are not readily available to it. Although contending that this is not an appropriate subject for a Rule 30(b)(6) deposition, MGA fails to cite authority in support of that contention. Therefore, the Discovery Master's ruling on this issue is not contrary to law.

The ink, paper, and chemical analysis topic is likewise a proper subject of a Rule 30(b)(6) deposition. To the extent that such a deposition has the potential to encroach upon information protected by the work-product privilege, then that objection must be made on a question-by-question basis. MGA may not make a blanket objection and justify its refusal to produce a Rule 30(b)(6) designee on this topic based on that blanket objection. Therefore, the Discovery Master's ruling on this issue is not contrary to law.

Accordingly, the Court **DENIES** MGA's motion re the Discovery Master's May 16, 2007, Order.

(5)     Oral Request for Modification of pretrial and trial dates.

Although no motion or ex parte application on the subject was pending before the Court, the parties made an oral request at the hearing to continue certain pretrial and trial dates. A discussion ensued and it became apparent that no final agreement was reached by the parties regarding extending these dates. Accordingly, the Court **DENIES** the parties' oral request for modification of pretrial and trial dates. The Court will consider counsels' stipulation regarding extensions of those dates only where all counsel unqualifiedly stipulate to those dates. Until the scheduling order is modified by the Court, the dates previously set by the Court remain in effect. In addition, the Court is unlikely to entertain a continuance of the Phase 1 trial past April, 2008.

IT IS SO ORDERED.

Initials of Deputy Clerk __jh_____
Time: 01/15

EXHIBIT _7_   PAGE _168_

Exhibit 8

Westlaw

12/23/06 ABCNIGHTLINE (No Page)

12/23/06 ABC Nightline (Pg. Unavail. Online)
2006 WLNR 22434503

ABC Nightline
Copyright 2006 American Broadcasting Company

December 23, 2006

NIGHTLINE

[SHOW: ABC Nightline]   [AIRDATE: 12/22/06]   [AIRTIME: 23:35]   [ANCHOR: MARTIN BASHIR]   [ANCHOR LOCATION: NEW YORK, NY USA]   [STORY: NIGHTLINE]

TOPIC:

CONTENT:

GRAPHICS: NIGHTLINE

GRAPHICS: BRAWL IN THE DOLLHOUSE

MARTIN BASHIR (ABC NEWS): Tonight on 'Nightline,' brawl in the dollhouse.  After almost 50 years of domination, Barbie is facing brash new competition from the Bratz dolls.  Billions of dollars are on the line.  It's a toy story where nobody is playing nice.

GRAPHICS: CHRISTMAS JOURNEY

MARTIN BASHIR (ABC NEWS): A Christmas journey.  Retracing the root historians say Joseph and Mary would have taken from Nazareth to Bethlehem.  The dangers, the difficulties, then and today.

GRAPHICS: FANTASY VS REALITY

MARTIN BASHIR (ABC NEWS): Fantasy versus reality.  It seems like the perfect gift for a romantic holiday season.  So why do so many of us get it wrong?  Tonight, we take you inside one store that thinks it has the answer.

MATT NEELY (STOCKING FELLA): The 34B should look good.

ANNOUNCER: From the global resources of ABC News, with Terry Moran in Washington, Martin Bashir and Cynthia McFadden in New York City, this is 'Nightline,' December 22nd, 2006.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

EXHIBIT __8__ PAGE __169__

12/23/06 ABCNIGHTLINE (No Page)                                          Page 2

GRAPHICS: NIGHTLINE: DECEMBER 22, 2006

REPORTER: JOHN BERMAN
REPORTER LOCATION: LOS ANGELES, CA USA

TOPIC:

CONTENT: BARBIE, BRATZ, MATTEL, MICRO GAMES OF AMERICA, CHUCK SCOTHON

MARTIN BASHIR (ABC NEWS): (Off-camera)  Good evening.  Many of us have spent at least part of today rushing around the shops looking for that perfect Christmas present particularly for our children.  Toys are now big business.  Almost $11 billion will be spent on them during the holiday season alone.  And nowhere is the business more competitive than in the world of dolls.  Yes.  Barbie has long been the biggest-selling toy doll of all, but now there's a serious challenger.  And in the fight to be number one nobody's backing down.  Here's ABC's John Berman.

JOHN BERMAN (ABC NEWS): (Voiceover)  In this corner, measuring nine inches tall with big eyes and even bigger bling, the challenger, Bratz.  And in this corner, with flowing blond hair and impossibly disproportionate bust, a 47-year undisputed, undefeated champion from Mattel, Barbie.  Now you might think the world of dolls isn't the kind of place for a knock down, drag out brawl but you'd be wrong.

ISAAC LARIAN (CEO: Ken is not gonna save Barbie.  Barbie is not gonna save Barbie.  And the leadership that they have at Mattel right now, it's not gonna save Barbie.

JOHN BERMAN (ABC NEWS): (Off-camera)  You sound like a linebacker on a football team.  You're like taunting Mattel.

ISAAC LARIAN (CEO: It's good.  It's good for the business.

JOHN BERMAN (ABC NEWS): (Off-camera)  It's good?  Trash talking in the doll business is good?

ISAAC LARIAN (CEO: I'm not trash talking.  I'm telling - I'm talking about the facts.

JOHN BERMAN (ABC NEWS): (Voiceover)  Meet Isaac Larian.  The seemingly nice man who wants to pummel Barbie.  He is the CEO of Micro Games of America, which makes the Bratz doll.  He might not strike you as the doll kind of guy.  He came to the US from Iran with nothing.

ISAAC LARIAN (CEO: I came here in 1971 with a one-way ticket and $750 in my pocket and a big American dream.  And I have lived the American dream.

JOHN BERMAN (ABC NEWS): (Voiceover)  Larian went from washing dishes to building a toy company to the American dream on steroids.  Largely due to this big-eyed, big-headed cartoonish doll.  When Larian first saw the Bratz design in 2001, he thought they looked like aliens.

JOHN BERMAN (ABC NEWS): (Off-camera)  Do you still they look like aliens?

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

EXHIBIT __8__  PAGE __170__

ISAAC LARIAN (CEO: No: I think now they look beautiful. I've grown to like them.

JOHN BERMAN (ABC NEWS): (Voiceover) Last year's $2 billion in sales can make many things beautiful. Larian now says Bratz has a 40% market share and is the number two doll in the US market. Number two for now. Larian claims his Bratz girls are breathing down the lanky plastic neck of number one. That would be Barbie.

JOHN BERMAN (ABC NEWS): (Off-camera) What's wrong with Barbie?

ISAAC LARIAN (CEO: It's time for her to retire. She's been around for too long.

JOHN BERMAN (ABC NEWS): (Voiceover) And you want to help Barbie retire?

ISAAC LARIAN (CEO: Yes, I would help her retire. I would throw a party for her.

CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION): He's welcome to throw a party for Barbie any time he wants, but it won't be a retirement party. She has been and will remain the number one fashion doll in the industry.

JOHN BERMAN (ABC NEWS): (Voiceover) Meet Chuck Scothon. A senior Mattel executive and former high school offensive lineman. His product is the long-legged goliath of the toy business. Since she was first created in 1959, Barbie has been an icon among icons with almost absurd success. One study found that 90% of American girls between 3 and 10-years-old owns a Barbie doll.

CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION): Now, we're traveling through the world of fairytopia.

JOHN BERMAN (ABC NEWS): (Voiceover) Scothon doesn't like to talk about Bratz. Let alone the fact that they might pose a challenge.

JOHN BERMAN (ABC NEWS): (Off-camera) How was it, do you think, this become a story?

CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION): I think a lot of people like to talk about the underdog and the leadership positions. I think at the end of the day it's really about making more out of something than there really is.

JOHN BERMAN (ABC NEWS): (Voiceover) But last year, Barbie might have started to show her age. Sales dropped 13% just as Bratz were getting white hot.

JOHN BERMAN (ABC NEWS): (Off-camera) Is Barbie in danger?

CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION): Not in the least. Barbie has been and will continue to be the number one fashion doll.

JOHN BERMAN (ABC NEWS): (Voiceover) Barbie has rebounded a bit this year, but Isaac Larian is not impressed. He says he has the key to cool. A multicultural doll with the edgy sassy attitude girls want these days.

© 2007 Thomson/West. Claim to Orig. U.S. Govt. Works.

EXHIBIT __8__ PAGE __171__

ISAAC LARIAN (CEO: The kids look at Bratz dolls and they think they are teenagers. And we ask them how old do you think Bratz dolls are? They say they are teenagers. And when they look at Barbie doll they think it's old mom.

JOHN BERMAN (ABC NEWS): (Off-camera)  They think mom when they look at Barbie dolls?

CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION): What I would suggest and say to that is, first of all if Barbie, for some girls, reminds them of their mothers, I would think of nothing better.  The most important job a woman can have in many ways is being a mom.

JOHN BERMAN (ABC NEWS): (Voiceover)  There is no mistaking a Bratz doll for a mom.

JOHN BERMAN (ABC NEWS): (Off-camera)  I look at that Bratz doll.  She's wearing, you know, the leopard skin top, she's got the sequins, she's got the hairs, I mean, you know, people have compared them to street walkers.  They look a little, you know, trashy.

ISAAC LARIAN (CEO: They don't look trashy to me.  And this is - I think trashy is in the eye of the adults.  When we show these to the little girls, and we have done that over and over, everybody said they're beautiful.  They never say they look like a streetwalker.

JOHN BERMAN (ABC NEWS): (Voiceover)  Barbie is clearly going for a different image. What image, you ask?

CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION): First and foremost, I would say the Barbie doll is truly based on some great values for little girls. The courage, inspiration, imaginative play.

JOHN BERMAN (ABC NEWS): (Voiceover)  Whatever that means exactly, Barbie is famous for having careers like Doctor Barbie and Astronaut Barbie.  The Bratz dolls? Well, they like...

CARTOON VOICEOVER (GROUP): Shopping.

JOHN BERMAN (ABC NEWS): (Voiceover)  This is their motto.

ISAAC LARIAN (CEO: The girls with the passion for fashion.

JOHN BERMAN (ABC NEWS): (Off-camera)  The girls with the passion for fashion.

ISAAC LARIAN (CEO: Right.

JOHN BERMAN (ABC NEWS): (Off-camera)  What's that about?

ISAAC LARIAN (CEO: They have good fashion.  It's okay to look good.  It's okay, who said that you have to, who said that girls don't have to look good?

* 2007 Thomson/West. No Claim to Orig. US Gov. Works.

EXHIBIT  8  PAGE  172

JOHN BERMAN (ABC NEWS): (Off-camera)  And Barbie doesn't look good?  I could tell you, there are a lot of people who think Barbie looks good.

ISAAC LARIAN (CEO: I don't know.  The consumers who are buying Bratz doll don't think Barbie is good.

JOHN BERMAN (ABC NEWS): (Voiceover)  If all this is true why hasn't Bratz yet overtaken Barbie as number one?  According to Larian...

ISAAC LARIAN (CEO: We would have beaten them up this year and year before if they had not engaged in, what I call, really unfair competition.

JOHN BERMAN (ABC NEWS): (Off-camera)  Really unfair competition?  Those are fighting words.

ISAAC LARIAN (CEO: They are fighting words.

JOHN BERMAN (ABC NEWS): (Voiceover)  The Barbie-Bratz battle has moved beyond the Barbie dream house to the courthouse.  Round one.  Mattel filed a lawsuit alleging that the designer of the Bratz concept came up with the idea when he was working at Mattel.  Round two, Isaac Larian sued back saying that Mattel tried to corner the market on doll hair, and more seriously that Mattel ripped off the Bratz concept for a new line of Barbie dolls.  The MyScene dolls.

JOHN BERMAN (ABC NEWS): (Off-camera) This is, the MyScene Barbies are what has, to some extent, they're in the center of a little bit of a controversy now because Bratz says these look just like their dolls.

CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION): Okay.

JOHN BERMAN (ABC NEWS): (Off-camera)  I mean, don't you see the resemblance between MyScene Barbie and the Bratz doll?

CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION): What we see is an evolution to the Barbie brand.  And again, the Barbie brand is made up of dolls that target girls of every age because it's really an evolution of where the Barbie doll has been with a little bit more animated look, but not necessarily something that's been inspired by the competition at all.

JOHN BERMAN (ABC NEWS): (Voiceover)  The cases are still pending, but both companies say they are confident they will win the legal battle, though they say it differently.

CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION): I'm not really gonna talk about the legal piece of this.  I have all the confidence in the world that the justice system and that, that our attorneys can work through those issues.

ISAAC LARIAN (CEO: When we're done with Mattel, we will get them for billions of dollars, not only for this, but for defamation.

© 2007 Thomson/West.  No Claim to Orig. US Gov. Works.

EXHIBIT ___8___ PAGE  173

12/23/06 ABCNIGHTLINE (No Page)

JOHN BERMAN (ABC NEWS): (Voiceover)  Who will prevail in this doll brawl?  It's one thing to be hot.  Bratz are hot, but another to be iconic.

ISAAC LARIAN (CEO): We're gonna become number one.  I promise you that.

CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL – GIRLS DIVISION): I can't speak to his guarantee.  What I can speak to is I believe that Barbie will continue to be the number fashion doll around the globe.

JOHN BERMAN (ABC NEWS): (Off-camera)  We're talking about dolls.  I mean, shouldn't everyone be able to play nice?

ISAAC LARIAN (CEO): They have gotten away too much with bullying everybody around.  And somebody has to stand up to them.  I will.

JOHN BERMAN (ABC NEWS): (Off-camera)  So you're gonna fight them on the schoolyard?

ISAAC LARIAN (CEO): I'm gonna fight, I'm gonna, not in the school schoolyard.  I'm gonna fight them in the courthouse.

JOHN BERMAN (ABC NEWS): (Off-camera)  And with this thing?

ISAAC LARIAN (CEO): With this thing and many other things.  But all 100% the old American fashion way.

JOHN BERMAN (ABC NEWS): (Voiceover)  Merry Christmas.  I'm John Berman for 'Nightline' in Los Angeles.

MARTIN BASHIR (ABC NEWS): (Off-camera)  The doll wars in a store near you.

GRAPHICS: ROAD TO BETHLEHEM

MARTIN BASHIR (ABC NEWS): (Voiceover)  And just ahead on 'Nightline,' retracing the journey that has inspired millions for centuries.  In the footsteps of Joseph and Mary.

GRAPHICS: STOCKING FELLAS

MARTIN BASHIR (ABC NEWS): (Voiceover)  And stocking fellas.  One store's solution to the challenge of buying lingerie.  It's a 'Sign of the times.'

ANNOUNCER: ABC News 'Nightline,' brought to you by...

COMMERCIAL BREAK

REPORTER: WILF DINNICK
REPORTER LOCATION: NAZARETH, ISRAEL

TOPIC:

* 2007 Thomson/West.  No Claim to Orig. US Gov. Works.

EXHIBIT  8   PAGE  174

CONTENT: CHRISTMAS STORY, CHURCH OF NATIVITY, JESUS, MARY, JOSEPH, ISRAEL

MARTIN BASHIR (ABC NEWS): (Off-camera)  It's easy and commonplace to sentimentalize
the Christmas story.  Mary and Joseph, traveling for days on a donkey from their
home in Nazareth to Bethlehem.  Mary eventually giving birth to Jesus in a stable
because there was no room for them at the inn.  It wasn't an easy journey back
then, but imagine making the same trek today in 2006.  Here's ABC's Wilf Dinnick.

WILF DINNICK (ABC NEWS): (Voiceover)  A heavily pregnant woman, traveling across
deserts, through ancient cities and river crossings.  The story of a trip inspiring
Christians around the world.  The gospel according to Luke says it began in
Nazareth, a city where it's believed an angel told Mary she would have a son named
Jesus.

WILF DINNICK (ABC NEWS): (Off-camera)  Today, Nazareth is a city of about 70,000
people.  But back in Joseph and Mary's day, it was only a small village of about
1,000.  Now, to get to Bethlehem, it's actually only 55 miles, as the crow flies
but Joseph and Mary, they had a complicated route.  We're gonna take the exact same
route.  Well, they had a donkey.  We've got this car.

WILF DINNICK (ABC NEWS): (Voiceover)  The Bible does not have details of the
journey.  But historians told us, Mary and Joseph probably did not take the direct
way to Bethlehem because then, like today, the Middle East was a complicated,
sometimes dangerous, place.  From Nazareth they headed east to the Jordan River to
avoid hostile territory controlled by the Samaritans who hated Jews.  They crossed
the river by foot in the ancient city of Bet She'an.  Then through the Jordan
Valley, land that was controlled by Jewish kings, back into Israel, over the Jordan
River again and through the ancient city of Jericho passed Jerusalem and then on to
Bethlehem.  Steve Pfann sees similarities between today and 2,000 years ago.

STEPHEN PFANN (PRESIDENT): There is an interesting parallel that can be drawn with
border crossings, and police at the border, soldiers at the border, questions of
taxation and other types of things put more into a modern context.

WILF DINNICK (ABC NEWS): (Voiceover)  So, we drove from Nazareth to the Jordan
River.  It was in shallow areas like this where Mary and Joseph simply walked
across the river.

ISRAELI SECURITY PERSONNEL (MALE): But you don't understand.  Hey, I'm telling you,
there is a problem.

WILF DINNICK (ABC NEWS): (Voiceover)  But today, crossing the Jordan is not so
simple.  We were greeted by Israeli security.

WILF DINNICK (ABC NEWS): (Off-camera)  The security here is so tight in fact that
they won't even let us shoot here, even though we have permission.  This is the
Jordan Valley and this as far as we can come here because this is now an
international border.

WILF DINNICK (ABC NEWS): (Voiceover)  So from here on in, it was hidden cameras
only.  Passport checks, departure tax and duty-free.

© 2007 Thomson/West.  No Claim to Orig. US Gov. Works.

EXHIBIT   8   PAGE   175

12/23/06 ABCNEWSNIGHTLINE (No Page)                                    Page 8

WILF DINNICK (ABC NEWS): (Off-camera)  And then we have to get on a bus to make the very short trip from Israel to Jordan.  This is how you have to do it in 2006.

WILF DINNICK (ABC NEWS): (Voiceover)  I did manage to sneak a few shots as we crossed the Jordan River.  On the other side, Jordanians were also nervous about our cameras.

WILF DINNICK (ABC NEWS): (Off-camera)  We face yet another delay here.  This is now on the Jordanian side and the security here says we can't actually use the camera, even though we applied for permission weeks ago, they somehow have lost our permission.  So we're trying to go down to the Jordan Valley now, as quickly as we can, and then we'll cross over to the Israeli side.

WILF DINNICK (ABC NEWS): (Voiceover)  The Jordan Valley is flat, perfect for traveling.  In Joseph and Mary's day there would have been hardly anything here.  Today, plenty of busy Arab towns.

WILF DINNICK (ABC NEWS): (Off-camera)  Okay, let's go in.  A lot has changed over the last 2,000 years but one thing that has remained the same is the type of bread made almost exactly the same way as when Joseph and Mary made their journey.

WILF DINNICK (ABC NEWS): (Voiceover)  Then back into Israel, just before the border closes.

WILF DINNICK (ABC NEWS): (Off-camera)  We're now gonna cross the Jordan River for the second time here, where Mary and Joseph would have waded across on their way to Bethlehem.

WILF DINNICK (ABC NEWS): (Voiceover)  Then on to the ancient town of Jericho, it is Palestinian and the Israeli army demands special ID to enter.

WILF DINNICK (ABC NEWS): (Off-camera)  Could I get a falafel with hummus and pita?  Pita, yeah.  Okay.

WILF DINNICK (ABC NEWS): (Voiceover)  This was a chance for Mary and Joseph to rest before the final, grueling leg of the trip, which was a treacherous road that was yet again blocked for us by the Israeli army.

WILF DINNICK (ABC NEWS): (Off-camera)  This is the part of the trip we cannot do by car.  This is the ancient route between Jericho and Bethlehem.  The silence here is amazing, the view is stunning, but it must have been a daunting part of the journey for Mary and Joseph.

WILF DINNICK (ABC NEWS): (Voiceover)  The last stretch of the journey that Mary and Joseph took into Bethlehem is now impossible.  Blocked by Israel's security wall.  Even Bethlehem itself is cut off by the wall.  We had to drive through this gate controlled by Israeli soldiers.

WILF DINNICK (ABC NEWS): (Off-camera)  We finally arrive in Bethlehem, and that's the church of the nativity behind us.  Now our trip took 15 hours, we crossed two international borders and dozens of military checkpoints.  Joseph and Mary's trip took about a week.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

EXHIBIT ___8___  PAGE |76

WILF DINNICK (ABC NEWS): (Voiceover)  But on our trip, we met at least one historian who believes Joseph and Mary's journey never happened.  The gospel according to Luke says the couple made the trip to Bethlehem for a Roman census, but historians now know there was no census at the time.

REVEREND JEROME MURPHY-O'CONNOR (ECOLE BIBLIQUE): I have no problem with the divinity of Christ.  I have no problem with his birth in Bethlehem.  It's just the colorful little bits that writers, storytellers, felt inclined to add.  Those, we can legitimately question.

WILF DINNICK (ABC NEWS): (Voiceover)  He also believes, like many other historians, the couple already lived in Bethlehem and went to Nazareth later to look for work.  But don't tell that to anyone here.  In the Church of the Nativity, in this small spot where it's believed Mary gave birth to Jesus.  For the faithful, a miracle, after such a grueling journey.

REVEREND JEROME MURPHY-O'CONNOR (ECOLE BIBLIQUE): It's an extremely good yarn, and that's why it has survived because people prefer good yarns to the truth.

WILF DINNICK (ABC NEWS): (Voiceover)  And it is a good story.  And for us, an amazing journey.  Wilf Dinnick for "Nightline" in Bethlehem.

MARTIN BASHIR (ABC NEWS): (Off-camera)  The Christmas journey then and now.  And when we come back, Santa's little helpers like you've never seen them before.  It's a "Sign of the Times."

GRAPHICS: SIGN OF THE TIMES

COMMERCIAL BREAK

ANNOUNCER: 'Nightline' continues from New York City with Martin Bashir.

REPORTER: NICK WATT
REPORTER LOCATION: LONDON, ENGLAND

TOPIC:

CONTENT: LINGERIE, STOCKING FELLA, MARKS AND SPENCER, NYLA

MARTIN BASHIR (ABC NEWS): (Off-camera)  It seems like the perfect gift, the sexy little outfit for the one we love this Christmas.  If only it were that simple.  According to experts, men are simply hopeless at choosing lingerie.  So now, a department store in Britain is employing Santa's little helpers to guide men away from any lingerie land mines and, according to ABC's Nick Watt, it's a "Sign of the Times."

WATT NEELY (STOCKING FELLA): (Inaudible) nice, actually.  You guys doing okay?  Finding everything you want?  Yeah?

CUSTOMER (MALE): Yeah, we're fine.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

EXHIBIT ___8___  PAGE ___177___

CUSTOMER (FEMALE): Yes, thank you.

CUSTOMER (MALE): Thank you, sir.

MATT NEELY (STOCKING FELLA): Give me a shout if you need any more help.

NICK WATT (ABC NEWS): (Voiceover)  Here at Marks and Spencer they noticed a lot of lingerie returned by women after Christmas.  The problem?  Men were buying it. Matt Neely is part of the solution.

MATT NEELY (STOCKING FELLA): We were given all sorts of training about the styles of bra and what function it performs in terms pushing it together or lifting up, or squashing it down.

MATT NEELY (STOCKING FELLA): There we are.

NICK WATT (ABC NEWS): (Voiceover)  Two hundred stocking fellas were sent out to help hapless husbands.

MATT NEELY (STOCKING FELLA): That's quite sweet.

CUSTOMER (MALE): Mm-hmm.

MATT NEELY (STOCKING FELLA): Okay?

CUSTOMER (MALE): No.

MATT NEELY (STOCKING FELLA): You know, if the guys are wandering around not really know what they're doing, or kind of skirting around the outside too afraid to step in.

NICK WATT (ABC NEWS): (Voiceover)  He helps the unromantic.

NICK WATT (ABC NEWS): (Off-camera)  Do you always buy underwear for Christmas?

CUSTOMER (MALE): No.

NICK WATT (ABC NEWS): (Off-camera)  So why this year?

CUSTOMER (MALE): Because I've run out of ideas.

MATT NEELY (STOCKING FELLA): Yeah.

NICK WATT (ABC NEWS): (Voiceover)  He helps the clueless.

MATT NEELY (STOCKING FELLA): What color are you looking for?

CUSTOMER (MALE): Well...

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

EXHIBIT __8__ PAGE __178__

12/23/06 ABCNIGHTLINE (No Page)                                    Page 11

NICK WATT (ABC NEWS): (Voiceover)  He even helps those who think they know better.

NICK WATT (ABC NEWS): (Off-camera)  Do you have the right size?

CUSTOMER (MALE): I have the right size, yeah.

NICK WATT (ABC NEWS): (Off-camera)  Color?

CUSTOMER (MALE): Well, color is my, my choice really, actually.

MATT NEELY (STOCKING FELLA): Hopefully, the presence of another man in the department will put them at ease.

NICK WATT (ABC NEWS): (Off-camera)  Now, this is Myla, an upmarket lingerie boutique where they have a very different philosophy.  Here, they only employ women.

TAMARA DAVIES (MANAGER): I would say 75% of my customers are men.

NICK WATT (ABC NEWS): (Off-camera)  Are men?

TAMARA DAVIES (MANAGER): Are men.  Male.

NICK WATT (ABC NEWS): (Voiceover)  Men, like Anatoly (PH).

TAMARA DAVIES (MANAGER): Do you know what she likes?  Do you know what color?

CUSTOMER (MALE): Colors, yeah, yeah.

TAMARA DAVIES (MANAGER): Size?

CUSTOMER (MALE): Size, yeah.  I think, it's a must if you - you have to know your woman.

NICK WATT (ABC NEWS): (Voiceover)  But even at Myla, some men aren't quite so sure about the size.

TAMARA DAVIES (MANAGER): So they're like this, or, I mean, as a woman, you know, female working here, we have men come in and said, 'She's your size, what size are you?'

NICK WATT (ABC NEWS): (Voiceover)  So, there's one bonus of a female assistant but it's not male bonding.

NICK WATT (ABC NEWS): (Off-camera)  And how do you put them at ease?

TAMARA DAVIES (MANAGER): Smiling, 'Hello, how are you today?'  Talk about the weather.

* 2007 Thomson/West.  No Claim to Orig. US Gov. Works.

EXHIBIT __8__  PAGE __179__

NICK WATT (ABC NEWS): (Off-camera)  Bit of humor?

TAMARA DAVIES (MANAGER: A bit of humor, yes.  We do that.

NICK WATT (ABC NEWS): (Off-camera)  Do you flirt a little bit?

TAMARA DAVIES (MANAGER: Yes, a little.

NICK WATT (ABC NEWS): (Off-camera)  Apparently a lot of men end up buying two pairs, something safe and something saucy that they're both gonna enjoy.

NICK WATT (ABC NEWS): (Voiceover)  As Bridget Jones found out in the movie, safe can also be sexy.

CLIP FROM "BRIDGET JONES'S DIARY"

HUGH GRANT (ACTOR): Oh, absolutely enormous panties.  No, no, don't apologize.  I like them.  Hello, mommy.

TAMARA DAVIES (MANAGER: Men don't wanna leave here.  I got a guy here in yesterday, and he was looking around.  He spent about half an hour, and he said to me, 'I just, I just don't wanna leave.  I wanna stay here forever."

MATT NEELY (STOCKING FELLA): It's a 34B, which will be no good.

NICK WATT (ABC NEWS): (Voiceover)  I wonder if any one's ever said that...

MATT NEELY (STOCKING FELLA): Yeah.

NICK WATT (ABC NEWS): (Voiceover)  ...to a stocking fella?  I'm Nick Watt for "Nightline" in Lingerie Land.

MARTIN BASHIR (ABC NEWS): (Off-camera)  And in case you're wondering, I bought my wife a rather fetching handbag.  And when we come back, a special look at the achievements and events of the past year.

COMMERCIAL BREAK

MARTIN BASHIR (ABC NEWS): (Off-camera)  Next week on "Nightline," a look at some memorable moments and provocative people we've covered during 2006.  The year in entertainment, power, money and love.  It's all part of our special series beginning on Christmas Day with the 'Year in Jesus.'  We hope you'll join us.  But that's our report for tonight.  I'm Martin Bashir.  For Cynthia McFadden, Terry Moran, and all of us at ABC News, good night America and have a very happy and peaceful Christmas.

FOR INFORMATION ON ORDERING A VIDEO OR TRANSCRIPT COPY OF ABC NEWS OR ABC NEWS NOW PROGRAMMING, PLEASE VISIT THE SECURE ONLINE ORDER FORM LOCATED AT WWW.TRANSCRIPTS.TV

® 2007 Thomson/West. No Claim to Orig. US Gov. Works.

EXHIBIT  3    PAGE  180

12/23/06 ABCNIGHTLINE (No Page)                                    Page 13

---- INDEX REFERENCES ----

COMPANY: MATTEL INC; ABC NEWS; BRATS F C; BEACH TRADE AND MARKETING; ABC

INDUSTRY: (TV (1TV19); Underwear (1UN06); Entertainment (1EN08); Gen Y
Entertainment (1GE14); TV Programming (1TV26); Games & Toys (1GA95); Gen Y TV
(1GE33); Apparel (1AP19); Consumer Products & Services (1CO62); Children's Apparel
(1CH40); Apparel & Textiles (1AP20))

REGION: (Americas (1AM92); North America (1NO39); Mediterranean (1ME20); Middle
East (1MI23); USA (1US73); Palestine (1PA37); New York (1NE72); Israel (1IS16);
Arab States (1AR46))

Language: EN

OTHER INDEXING: (MARTIN BASHIR (ABC NEWS); MARTIN BASHIR (ABC NEWS); MARTIN BASHIR
(ABC NEWS); MATT NEELY (STOCKING FELLA); ANNOUNCER; MARTIN BASHIR (ABC NEWS); JOHN
BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO;
JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); ISAAC LARIAN
(CEO; JOHN BERMAN (ABC NEWS); JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN
BERMAN (ABC NEWS); JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC
NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS
DIVISION); JOHN BERMAN (ABC NEWS); CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL -
GIRLS DIVISION); JOHN BERMAN (ABC NEWS); JOHN BERMAN (ABC NEWS); CHUCK SCOTHON
(SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION); JOHN BERMAN (ABC NEWS); JOHN
BERMAN (ABC NEWS); CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION);
JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); CHUCK SCOTHON
(SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION); JOHN BERMAN (ABC NEWS); JOHN
BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); CHUCK SCOTHON (SENIOR
VICE PRESIDENT MATTEL - GIRLS DIVISION); JOHN BERMAN (ABC NEWS); CARTOON VOICEOVER
(GROUP); JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); ISAAC
LARIAN (CEO; JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS);
ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC
NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); JOHN BERMAN (ABC NEWS); CHUCK
SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION); JOHN BERMAN (ABC NEWS);
CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION); JOHN BERMAN (ABC
NEWS); CHUCK SCOTHON (SENIOR VICE PRESIDENT MATTEL - GIRLS DIVISION); ISAAC LARIAN
(CEO; JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; CHUCK SCOTHON (SENIOR VICE
PRESIDENT MATTEL - GIRLS DIVISION); JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN
BERMAN (ABC NEWS); ISAAC LARIAN (CEO; JOHN BERMAN (ABC NEWS); ISAAC LARIAN (CEO;
JOHN BERMAN (ABC NEWS); MARTIN BASHIR (ABC NEWS); MARTIN BASHIR (ABC NEWS); MARTIN
BASHIR (ABC NEWS); ANNOUNCER; MARTIN BASHIR (ABC NEWS); WILF DIMMICK (ABC NEWS);
WILF DIMMICK (ABC NEWS); WILF DIMMICK (ABC NEWS); STEPHEN EVANS (PRESIDENT; WILF
DIMMICK (ABC NEWS); ISRAELI SECURITY PERSONNEL (MALE); WILF DIMMICK (ABC NEWS);
WILF DIMMICK (ABC NEWS); WILF DIMMICK (ABC NEWS); WILF DIMMICK (ABC NEWS); WILF
DIMMICK (ABC NEWS); WILF DIMMICK (ABC NEWS); WILF DIMMICK (ABC NEWS); WILF DIMMICK
(ABC NEWS); WILF DIMMICK (ABC NEWS); WILF DIMMICK (ABC NEWS); WILF DIMMICK (ABC
NEWS); WILF DIMMICK (ABC NEWS); WILF DIMMICK (ABC NEWS); WILF DIMMICK (ABC
NEWS); WILF DIMMICK (ABC NEWS); WILF DIMMICK (ABC NEWS); WILF DIMMICK (ABC NEWS);
JEROME MURPHY-O'CONNOR (NICOLA BIBLIQUE; WILF DIMMICK (ABC NEWS); REVEREND JEROME
MURPHY-O'CONNOR (NICOLA BIBLIQUE; WILF DIMMICK (ABC NEWS); MARTIN BASHIR (ABC NEWS);
ANNOUNCER; MARTIN BASHIR (ABC NEWS); MATT NEELY (STOCKING FELLA; CUSTOMER (MALE);
CUSTOMER (FEMALE); CUSTOMER (MALE); MATT NEELY (STOCKING FELLA; NICK WATT (ABC

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

EXHIBIT   8   PAGE 181

NEWS); MATT NEELY (STOCKING FELLA); MATT NEELY (STOCKING FELLA); NICK WATT (ABC
NEWS); MATT NEELY (STOCKING FELLA); CUSTOMER (MALE); MATT NEELY (STOCKING FELLA);
CUSTOMER (MALE); MATT NEELY (STOCKING FELLA); NICK WATT (ABC NEWS); NICK WATT (ABC
NEWS); CUSTOMER (MALE); NICK WATT (ABC NEWS); CUSTOMER (MALE); MATT NEELY (STOCKING
FELLA); NICK WATT (ABC NEWS); MATT NEELY (STOCKING FELLA); CUSTOMER (MALE); NICK
WATT (ABC NEWS); NICK WATT (ABC NEWS); CUSTOMER (MALE); CUSTOMER (MALE); NICK
CUSTOMER (MALE); MATT NEELY (STOCKING FELLA); NICK WATT (ABC NEWS); MARTIN
BASHIR (ABC NEWS); TAMARA DAVIES
(MANAGER; NICK WATT (ABC NEWS); TAMARA DAVIES (MANAGER; NICK WATT (ABC NEWS);
TAMARA DAVIES (MANAGER; CUSTOMER (MALE); TAMARA DAVIER (MANAGER; CUSTOMER (MALE);
NICK WATT (ABC NEWS); TAMARA DAVIES (MANAGER; NICK WATT (ABC NEWS); NICK WATT (ABC
NEWS); TAMARA DAVIES (MANAGER; NICK WATT (ABC NEWS); TAMARA DAVIES (MANAGER; NICK
WATT (ABC NEWS); TAMARA DAVIES (MANAGER; NICK WATT (ABC NEWS); NICK WATT (ABC
NEWS); HUGH GRANT (ACTOR); TAMARA DAVIES (MANAGER; MATT NEELY (STOCKING FELLA);
NICK WATT (ABC NEWS); MATT NEELY (STOCKING FELLA); NICK WATT (ABC NEWS); MARTIN
BASHIR (ABC NEWS); MARTIN BASHIR (ABC NEWS))  (ABC; ABC NEWS; BASHIR; BETHLEHEM;
BIBLE; BRATZ; BRAWL; CHRISTMAS; CHRISTMAS JOURNEY; CHUCK; CONTENT; CONTENT: BARBIE;
CONTENT: CHRISTMAS; CONTENT: LINGERIE; CYNTHIA MCFADDEN TERRY MORAN; DIARY;
DIVISION; DOLLHOUSE; FANTASY; FELLAS; GRAPHICS; GRAPHICS: BRAWL; GRAPHICS:
CHRISTMAS; GRAPHICS: FANTASY; GRAPHICS: SIGN; HUGH; ISAAC; JEWISH; JOSEPH; JOURNEY;
KEN; LUKE; MARTIN BASHIR; MANY GRAPHICS: STOCKING; MATT; MATTEL; NICK; NIGHTLINE;
NIGHTLINE: DECEMBER; PALESTINIAN; SIGN; STOCKING; TAMARA; TAMARA; TERRY MORAN; TOPIC; USA)
(Astronaut Barbie; Barbie; Barbies; BRATZ; BRATZ DOLL WARS; Cynthia McFadden;
Doctor Barbie; Finding; Hey; Isaac; Isaac Larian; JOHN BERMAN; Jordanians; Largely;
Larian; Mary; Matt Neely; MyScene Barbie; Passport; Round; Steve Pfann)

Word Count: 5025
12/23/06 ABCNIGHTLINE (No Page)
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

EXHIBIT  8  PAGE 182

Westlaw.

8/6/07 BSX-TRBREV (No Page)

NewsRoom
Page 1

8/6/07 Trib. Rev. (Greensburg Pa.) (Pg. Unavail. Online)
2007 WLNR 15082166

Pittsburgh Tribune Review
Copyright 2007 Tribune-Review Publishing Co.

August 6, 2007

'Bratz' movie renews doll debate

The Associated Press

NEW YORK -- The Bratz universe was humming along as usual last week at the Toys 'R' Us flagship store in Manhattan. Like bees to honey, little girls buzzed about shelves lined with those famous pouty dolls with huge heads, plush lips to put Angelina to shame, and bared, toned midriffs.

There was much to choose from: Bratz Babyz. Bratz Kids. Fashion Pixiex. Magic Hair. Bratz Spiderman 3. Bratz Shrek. The Bratz RC cruiser. Alarm clocks, CDs, video games. "I love it!" one girl cried, actually jumping for joy. "Look at all the makeup!"

These are the Bratz lovers -- young girls who, negative reviews aside, are the target audience for the new "Bratz" movie. What they'll see is a more wholesome look to Yasmin, Jade, Sasha and Cloe, the main characters behind the billion-dollar global franchise.

Then there are the Bratz haters, including some (but not all) parents, who say that film or no film, the Bratz doll message is troubling: friendship may be good, but what's really important is to be chic and, above all, sexy.

Few dolls seem to inspire as much opinion as the Bratz, created in 2001 by Isaac Larian of MGA Entertainment Inc. The blogosphere is littered with references to the dolls as tarts or prostitutes. The American Psychological Association got into the act earlier this year, mentioning Bratz in a broader report on the sexualization of girls: "It is worrisome when dolls designed specifically for 4- to 8-year-olds are associated with an objectified adult sexuality."

Some parents, alarmed by the sexy clothing and pouty looks, simply ban the dolls. "We don't allow them in the house," says Helene Lewis, of Moorestown, N.J. "It's the name, the look, the whole feeling about them. There are already enough negative.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

EXHIBIT   8   PAGE  183

influences out there."

But Lewis recognizes that banning something outright might lead her 5-year-old daughter to want it more. So she tempers her response: "We're going to avoid it as long as possible."

At the Toys 'R' Us display, Vera Dias-Freitas was going through the same balancing act. "It's hard to say no, now that all the kids are getting it -- it's her peer pressure," she said, as her 7-year-old daughter Emily weighed her options. "What bothers me is that they give off an aggressive attitude. And why do they have to be sexy?" said the mother from Framingham, Mass. "The heels, and the low-rise jeans -- it's too much."

Some, though, say young girls simply love to dress up their dolls -- and it doesn't mean your 5-year-old will demand stilettos and spaghetti straps next time she leaves for preschool. "I like the dolls," said Mary Ann Savage, of Fenton, Mich., as daughter Kylee, 8, exulted over the Magic Makeup kit. "At this age, they all want to dress up and wear makeup. My daughter's a total girly-girl."

Though producers of the "Bratz" movie say they expect mainly a "tween" audience -- roughly ages seven to 13 -- many fans of the dolls are as young as four and five. And perhaps younger for the babies, who wear diapers that look more like bikini bottoms, with midriff showing, and bottles stylishly attached to a chain necklace.

Psychologist Sharon Lamb, who often gives talks on the sexualization of girls, says one seventh-grade class gasped when she showed them a Bratz Baby.

"The baby looked just like a blowup sex doll in a bikini," says Lamb, co-author of "Packaging Girlhood: Rescuing Our Daughters From Marketers' Schemes." She's also concerned by some of the social scenarios Bratz dolls are placed in, which she calls "'Sex and the City' scenarios for little girl dolls -- hanging out on corners, at parties, in hot tubs."

Lamb said the "Bratz" filmmakers had no choice but to outfit the girls more modestly than the dolls, "because if they dressed real girls in those outfits they'd look sleazy." But she added that parents "need to look at the whole package. Girls will still want to buy Bratz dolls or padded Bratz bralettes. It's the whole Bratz package that they're buying and supporting."

The film's producers see it differently. Avi Arad, who co-produced the film and made a career in the toy industry, says criticism of the dolls is unjustified.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

EXHIBIT     8     PAGE   184

"I don't think parents are looking at (the whole) picture," Arad said. "In all fairness, this is a huge brand. You couldn't be that successful if most parents really hated it." MGA Entertainment says worldwide revenue for all Bratz products -- dolls, CDs, video games, DVDs, etc. -- came to $2 billion for the 13-month period straddling last holiday season.

What critics don't understand, Arad says, is the stylistic reasons behind the doll's design. "A big head allows more hair play," he says. "The lips are for styling." As for the film, he says the aim was to create a truly multiethnic group of characters who learn to value friendship over the need for social acceptance.

"If parents give it a chance, they'll walk out and say, 'I like these kids,'" says Arad. Besides, he says, what's wrong with a little passion for fashion? "I see kids today folding down their skirts because it's fashionable to have a little belly," he says. "It doesn't make them bad girls. It doesn't reflect their beliefs." (And he points out that the costume designer, Bernadene Morgan, is a grandmother.)

Nonetheless, at least one young girl has no intention of seeing the film, and has never played with the doll. "I think they're really immodest," says Hannah Brown, 13, who's entering the eighth grade in Spartansburg, S.C. "Third-graders will see these dolls wearing halter tops and spaghetti straps and really short miniskirts, and think it's OK for them, too. It's not."

But Lauren Kaufman, whose daughters own several Bratz dolls, thinks Yaghin and cohorts get a slightly bum rap.

"My kids just think they're cool dolls," said the mother of two from Scarsdale, N.Y. "As for their values, they get them from me. I really don't worry about that."

And as for the movie, she says, "yes, we'll probably go see it."

---- INDEX REFERENCES ----

COMPANY: ABC INTERNATIONAL TRADERS INC; MGA ENTERTAINMENT INC

INDUSTRY:  (Entertainment (1ENO8); Consumer Products & Services (1CO62); Games & Toys (1GA65))

REGION:  (USA (1US73); Americas (1AM92); North America (1NO39); New York (1NE72))

Language:  EN

OTHER INDEXING:  (AMERICAN PSYCHOLOGICAL ASSOCIATION; MGA ENTERTAINMENT; MGA ENTERTAINMENT INC; RC; TOYS)  (Angelina; Arad; Avi Arad; Bernadene Morgan; Bratz;

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

EXHIBIT ___8___ PAGE 185

Bratz Kidz; Bratz Shrek; Bratz Spiderman; CDs; Cloe; DVDs; Hannah Brown; Helene Lewis; Kylee; Lamb; Lauren Kaufman; Lewis; Magic Hair; Mary Ann Savage; Nonetheless; Sharon Lamb; Vera Diaz)

Word Count: 1181
8/6/07 BSX-TRBREV (No Page)
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

EXHIBIT ___8___ PAGE _180_

Westlaw.

8/6/07 NWSDAY B04

NewsRoom

Page 1

8/6/07 Newsday  B04
2007 WLNR 15040145

Newsday (USA)
Copyright 2007 Newsday, Inc.

August 6, 2007

Section: PART II

## Too dolled up?

### GEOFF BOUCHER, Los Angeles Times

Remember Tiger Beat magazine? Sean McNamara is the Tiger Beat of Hollywood, and he knows his audience. He's directed 13 films, delivered television hits such as "That's So Raven" and "Even Stevens" to Disney, and was astute enough to give youngsters named Jessica Alba, Shia LaBeouf and Hilary Duff some of the first big roles in their careers. Still, when McNamara was approached about making a live-action film based on the wildly successful dolls called Bratz, he had to admit he was out of touch.

"I have to be honest, I had never heard of these toys." McNamara trundled off to the Toys "R" Us with his 5-year-old son. "We checked out the Thomas the Train aisle, and then I went looking for Bratz. I was blown away. There were two full walls of Bratz stuff. But when I saw them I thought, 'These aren't cute dolls - they look like sluts.'"

And there you have it, the unique challenge of McNamara's new film, "Bratz: The Movie," which opened nationwide Friday. Like the filmmakers behind "Transformers," McNamara and company are looking for an instant audience by riding a hugely successful brand name from the toy stores up to the silver screen. The movie they have made is a fairly wholesome affair, but the brand they picked clearly has a checkered past. Simply put, parents pay for the movie tickets, and a lot of parents think the Bratz dolls look like 10-inch-tall hoochie mamas.

Extreme doll makeover

The dolls have dewy lips, fishnet stockings and barely-there miniskirts - a creep-out factor for a lot of moms. Earlier this year, a report from the American Psychological Association even mentioned the Bratz dolls by name and said "it is worrisome when dolls designed specifically for 4- to 8-year-olds are associated

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

EXHIBIT ___8___ PAGE _187_

with an objectified adult sexuality.*

Those young doll owners may not recognize their beloved Yasmin, Jade, Sasha and Cloe when they sit down in the theater. The film gives the Bratz a complete makeover that takes them from nightclub sexpots to flirty schoolgirls.

Like the dolls, the film characters are four BFFs (that's "best friends forever," but you knew that) who are ethnically diverse but share "a passion for fashion." Really, though, beyond that, the film has very little connection to the toys. "Bratz: The Movie" seems more indebted to "The Cheetah Girls," "High School Musical," "Clueless" and, oddly, the subversive "Heathers" than it does to its namesake source material. The name's the thing, though. The "Bratz" brand is a stunningly potent one; the dolls first caught the imagination of young girls in late 2001, and by the end of 2005, Bratz products had topped $2 billion in global sales. They are especially popular in England and Australia.

In elementary schools you are either a Bratz girl or a Barbie girl. You'll find some girls who are neither, of course, but very few who claim allegiance to both camps. They are just too different, and, besides, their accessories aren't interchangeable.

There's plenty of bad blood between Mattel Inc., the maker of the venerable Barbie collection, and MGA Entertainment Inc., too, which makes the Bratz. There have been lawsuits and a nasty feud as MGA has cut into Barbie's plasticized hegemony, and the rivals vie for the hearts of girls with Internet social sites, fashion accessories, video games, lip gloss, cartoons on DVD, pajamas and CD players.

Barbie is country-club white (although she has plenty of diverse Barbie pals), while the Bratz are the urban poly-hues of a Benetton ad. This makes it easy to assume that consumers are divided along race lines, and although that certainly is part of it, the assumption doesn't hold up all that well. There are far too many white kids playing with Bratz. One of the big determining factors may be the age of the parents or elders who are actually buying the toys; if they were born in the hip-hop era, they are more likely to consider the toys to be cute versions of the MTV images of Mariah, Missy or Fergie, music artists they play in their car on the way to work. Barbie, meanwhile, is so not hip-hop.

Losing street cred?

The problem presented by "Bratz: The Movie" is that some loyalists may wonder if their sassy and urban heroes are sliding a bit toward the white, suburban Barbie ethos.

To keep the separation line clear, the filmmakers decided early on that a Barbie-esque character pretty much had to be the villain in the movie. The heavy in the film is student-body president Meredith, who is platinum blond, affluent, haughty and in possession of both nefarious plans to rule the school and a pampered pooch named (ahem) Paris.

Avi Arad has a unique point of view on this contemporary valley of the dolls. He made his name as a toy designer and executive of note in the 1980s and '90s, and he worked on the Barbie line for a time. By the end of that decade, he was leading

# 2007 Thomson/West. No Claim to Orig. US Gov. Works.

EXHIBIT ___8___ PAGE 188

8/6/07 NWSDAY B04

Page 3

Marvel Enterprises. Now Arad has his own production company, and he has been the driving force behind "Bratz: The Movie."

"The genius in Barbie is that they made her belong to no one," Arad said. "And she had an aura of perfection about her. But then the world changed. Perfection is imperfection. Not everyone is going to look like the cover of the fashion magazine."

Arad said that "the Bratz are the X-Men for girls," an allusion to the struggle against the establishment and the outsiders' stigma that are key in the story of the mutant superheroes.

"The first thing I saw in them was diversity," Arad said. "I really liked the idea that they had a Latino girl, an Asian girl, an African-American girl and a lily-white kid. They show that your color is not going to set up your path in life. And I think that works because, among kids, it's becoming more and more of 'one world for a change.'"

The screenplay is already being written for a sequel to "Bratz: The Movie," and he is sizing up a venture that would adapt the property for a Broadway musical. Arad also said a line of Bratz dolls and tie-in products would be launched based on the film's imagery, story and less-saucy characters.

"I wanted a movie with the kind of kids I would want my daughter's friends to be like," Arad said. "They ended up being the kind of people I would want as my daughters."

---- INDEX REFERENCES ----

COMPANY: MATTEL INC; JADE; MAYOTTE TOURISME ET VOYAGES; TOYS R US INC; BRATZ F C; P AND B HOLDINGS INC; MERLIN GERIN ALPES SAS; MGA ENTERTAINMENT INC; BENETTON

INDUSTRY: (Entertainment (1EN98); Consumer Products & Services (1CO62); Games & Toys (1GA85))

Language: EN

OTHER INDEXING: (AMERICAN PSYCHOLOGICAL ASSOCIATION; BENETTON; BRATZ; CD; DVD; JADE; MATTEL INC; MGA; MGA ENTERTAINMENT INC; MTV; SASHA; TIGER BEAT; TOYS "R; YASMIN) (Arad; Avi Arad; Barbie; Cloe; Extreme; Hilary Duff; Jessica Alba; McNamara; Meredith; Remember Tiger Beat; Sean McNamara; Shia LaBeouf)

KEYWORDS: COVER.MOVIES.

EDITION: ALL EDITIONS

Word Count: 1235
8/6/07 NWSDAY B04
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

EXHIBIT __8__ PAGE _189_

Exhibit 9

1

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3              EASTERN DIVISION

4                 - - -

5     HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                 - - -

7   CARTER BRYANT, ET. AL.,          )
                                     )
8                    PLAINTIFFS,     )
                                     )
9           VS.                      )   NO. ED CV 04-09049
                                     )   (LEAD LOW NUMBER)
10  MATTEL, INC., ET. AL.,           )
                                     )
11                   DEFENDANTS.     )
                                     )   TELEPHONIC
12  AND CONSOLIDATED ACTIONS,        )   HEARING
                                     )

13

14

15           REPORTER'S TRANSCRIPT OF

16          TELEPHONIC PROCEEDINGS

17           RIVERSIDE, CALIFORNIA

18        WEDNESDAY, OCTOBER 10, 2007

19                3:02 P.M.

20

21

22

23           THERESA A. LANZA, RPR, CSR
          FEDERAL OFFICIAL COURT REPORTER
24           3470 12TH STREET, RM. 134
           RIVERSIDE, CALIFORNIA  92501
25              (951) 274-0844
            CSR11457@SBCGLOBAL.NET

**CERTIFIED COPY**

2

```
 1   APPEARANCES:

 2   ON BEHALF OF CARTER BRYANT:

 3                        KEKER & VAN NEST
                         BY:   JOHN W. KEKER
 4                        BY:   MATTHEW M. WERDEGAR
                         BY:   JOHN TRINIDAD
 5                        710 SANSOME STREET
                         SAN FRANCISCO, CALIFORNIA  94111-1704
 6                        (415) 391-5400

 7

     ON BEHALF OF MATTEL:
 8
                         QUINN EMANUEL
 9                        BY:   B. DYLAN PROCTOR
                         865 S. FIGUEROA STREET,
10                        10TH FLOOR
                         LOS ANGELES, CALIFORNIA  90017
11                        (213) 624-7707

12

     ON BEHALF OF MGA ENTERTAINMENT (OUTGOING):
13
                         O'MELVENY & MYERS LLP
14                        BY:   SCOTT DUNHAM
                         BY:   MARC F. FEINSTEIN
15                        400 SOUTH HOPE STREET
                         LOS ANGELES, CALIFORNIA 90071-2899
16                        (213) 430-6000

17                        CHRISTENSEN, GLASER, FINK,
                          JACOBS, WEIL & SHAPIRO, LLP
18                        BY:   JOEL KLEVENS
                         BY:   AMMAN KHAN
19                        BY:   ALISA MORGENTHALER
                         10250 CONSTELLATION BOULEVARD
20                        LOS ANGELES, CALIFORNIA  90067
                         (310) 553-3000
21

22   ON BEHALF OF MGA ENTERTAINMENT (INCOMING):

23                        SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                         BY:   THOMAS J. NOLAN
24                        BY:   CRAIG HOLDEN (IN-HOUSE)
                         300 SOUTH GRAND AVENUE
25                        LOS ANGELES, CALIFORNIA  90071-3144
                         213-687-5000
```

OCTOBER 10, 2007        TELEPHONIC HEARING        CV 04-9059-SGL

EXHIBIT 9 PAGE 121

1    RIVERSIDE, CALIFORNIA; FRIDAY, OCTOBER 10, 2007; 3:02 P.M.

2                              -oOo-

3         THE CLERK:  CALLING CALENDAR ITEM TWO, CV

4    04-09049-SGL, CARTER BRYANT VERSUS MATTEL, INC.

5         COUNSEL, APPEARANCES, PLEASE.                          03:11

6         MR. FEINSTEIN:  O'MELVENY & MYERS, BY SCOTT DUNHAM

7    AND MARC FEINSTEIN.

8         MR. PROCTOR:  B. DYLAN PROCTOR, QUINN EMANUEL, FOR

9    MATTEL.

10        MR. KLEVENS:  JOEL KLEVENS, AMMAN KHAN, AND ALISA      03:02

11   MORGENTHALER OF CHRISTENSEN & GLASER, FOR MGA.

12        MR. KEKER:  JOHN KEKER, MATT WERDEGAR, AND JOHN

13   TRINIDAD, FOR CARTER BRYANT.

14        MR. NOLAN:  ALSO TOM NOLAN, SKADDEN ARPS, FOR MGA.

15        MR. HOLDEN:  CRAIG HOLDEN, IN-HOUSE COUNSEL, FOR MGA.  03:02

16        THE COURT:  GOOD AFTERNOON, COUNSEL.  THIS IS

17   JUDGE LARSON.

18        WE'RE ON THE RECORD HERE, AND WE DO HAVE A COURT

19   REPORTER IN MY CHAMBERS THAT'S TAKING DOWN EVERYTHING.  I'M

20   GOING TO ASK COUNSEL BEFORE THEY SAY ANYTHING TO IDENTIFY   03:02

21   THEMSELVES, JUST TO KEEP THE RECORD AS CLEAN AS POSSIBLE.

22        I NORMALLY DON'T DO THESE TELEPHONIC CONFERENCES, BUT

23   I'VE RECEIVED AN EX-PARTE APPLICATION FROM O'MELVENY & MYERS

24   ASKING FOR A SHORTENING OF TIME FOR A HEARING ON A PROPOSED

25   MOTION TO WITHDRAW AND REQUIRING IN-CAMERA INSPECTION OF     03:03

4

1   SUPPORTING DOCUMENTS.  I'VE ALSO RECEIVED OPPOSITIONS THERETO.

2   SOME OF THE DOCUMENTS I'VE RECEIVED HAVE BEEN FILED UNDER SEAL;

3   OTHERS HAVE BEEN FILED IN-CAMERA; STILL OTHERS HAVE BEEN FILED

4   FOR PUBLIC INSPECTION.  I GUESS I WANTED TO GET A HANDLE ON

5   EXACTLY WHERE WE ARE HERE.                                      03:03

6         OBVIOUSLY, SOME COUNSEL WANT OUT; SOME COUNSEL WANT

7   IN.  ORDINARILY THIS WOULD BE HANDLED BY SIMPLE

8   SUBSTITUTION-OF-ATTORNEY FORMS, BUT APPARENTLY THIS IS NOT THE

9   NORMAL CASE.

10        WHY DON'T YOU LET ME KNOW WHERE WE ARE, AS WE STAND      03:03

11  RIGHT NOW, FROM YOUR VARIOUS PERSPECTIVES.

12        **MR. DUNHAM:**  SCOTT DUNHAM FROM O'MELVENY.

13        IF I MAY ADDRESS FIRST THE APPLICATION ITSELF.

14        AS YOU STATED, THIS IS MOST OFTEN HANDLED BY A

15  STIPULATION OF COUNSEL.  WE WERE UNABLE TO OBTAIN THAT.  WE     03:04

16  THEN FILED THIS EX-PARTE APPLICATION BECAUSE WE BELIEVE THAT

17  OUR MOTION TO WITHDRAW SHOULD BE HEARD PROMPTLY, THERE'S NO

18  REASON FOR DELAY, AND ALL WE'RE ASKING FOR AT THIS PARTICULAR

19  STAGE IS TO HAVE AN APPLICATION SO WE CAN FILE THE MOTION

20  PROMPTLY AND HAVE IT HEARD, RATHER THAN DOING IT ON A NOTICE    03:04

21  MOTION, PARTICULARLY SINCE THE COURT'S FIRST AVAILABLE DATE IS

22  NOVEMBER 19TH.

23        WE THINK THE OPPOSITIONS THAT HAVE BEEN FILED TRY TO

24  ADDRESS THE MERITS OF THE MOTION RATHER THAN THE TIMING OF THE

25  MOTION.  WE'RE SIMPLY SEEKING THE RIGHT TO FILE A MOTION AND TO 03:04

EXHIBIT 9  PAGE 93

5

1   FILE THE SUPPORTING PAPERS, WHICH HAVE NOT YET EVEN BEEN FILED,

2   SO THAT YOUR HONOR CAN DETERMINE THE ISSUE.

3         MR. KLEVENS:  THIS IS JOEL KLEVENS, CHRISTENSEN

4   GLASER.

5         IT DOES SEEM TO ME THAT YOUR HONOR'S INITIAL REMARK          03:04

6   MAKES THE MOST IMPORTANT POINT, WHICH IS THAT AT THIS STAGE,

7   THIS MOTION THAT O'MELVENY WANTS TO FILE ON SHORTENED TIME

8   SHOULD BE UNNECESSARY.

9         WE HAVE NEW COUNSEL, SKADDEN ARPS, WHO HAS BEEN

10  RETAINED AND WHO IS PREPARED TO CIRCULATE A SUBSTITUTION.  AND    03:05

11  MGA DOES NOT OPPOSE O'MELVENY'S REQUEST TO WITHDRAW; THEY

12  SIMPLY OPPOSE HAVING IT TAKE PLACE IN A PRECIPITOUS FASHION

13  WHICH WOULD BE INCONSISTENT WITH AN ORDERLY TRANSITION TO NEW

14  COUNSEL; SO IT DOES NOT SEEM TO ME THAT THERE SHOULD BE A NEED

15  FOR A MOTION OR A NEED FOR FILING PAPERS THAT INVOLVE            03:05

16  PRIVILEGED MATTERS IN-CAMERA BECAUSE THERE SHOULD BE NO NEED TO

17  DO THAT.

18        WE'RE WILLING TO HAVE O'MELVENY WITHDRAW.  MGA IS

19  PREPARED TO HAVE SKADDEN SUBSTITUTE IN FOR BOTH O'MELVENY AND

20  CHRISTENSEN GLASER, AND WHAT WE REQUIRE IS AN ORDERLY           03:06

21  TRANSITION WHICH REQUIRES THAT O'MELVENY COOPERATE WITH NEW

22  COUNSEL IN IMPARTING ALL OF THE KNOWLEDGE THAT THEY HAVE

23  ACQUIRED ABOUT HUNDREDS OF THOUSANDS OF PAGES OF DOCUMENTS AND

24  ALL KINDS OF PENDING DISCOVERY DISPUTES AND MATTERS AND

25  RESEARCH AND ANALYSIS AND SO ON.                               03:06

OCTOBER 10, 2007         TELEPHONIC HEARING         CV 04-9059-SGL

EXHIBIT _9_ PAGE _144_

1    AND THE OTHER THING THAT WOULD SEEM TO BE ESSENTIAL

2    TO ALLOW SKADDEN ARPS TO GET UP TO SPEED IS TO HAVE SOME BRIEF

3    STAY OF A MYRIAD OF PENDING DISCOVERY MATTERS THAT ARE

4    HAPPENING EVERY DAY THIS WEEK AND EVERY DAY NEXT WEEK WHERE WE

5    HAVE MEET AND CONFERS THAT O'MELVENY IS SUPPOSED TO BE INVOLVED          03:06

6    IN AND DEPOSITIONS THAT O'MELVENY IS SUPPOSED TO BE INVOLVED

7    IN, HAPPENING EVERY DAY.

8    SO WE WOULD REQUEST A BRIEF 30-DAY STAY, NOT A

9    CONTINUANCE OF ANYTHING, JUST A 30-DAY STAY TO ALLOW SKADDEN TO

10   GET INTO THE CASE WHEN THEY ARE NOT HAVING TO TRY TO FIGURE OUT         03:07

11   HOW TO TAKE AND DEFEND DEPOSITIONS BUT, RATHER, CAN FIND OUT

12   WHAT THE CASE IS ABOUT, FOR A REASONABLE TIME, WITH O'MELVENY'S

13   ASSISTANCE SO THAT O'MELVENY DOESN'T HAVE TO HANDLE THESE

14   MATTERS WHEN THEY WANT TO WITHDRAW AND WHEN MGA WANTS THEM TO

15   BE ALLOWED TO WITHDRAW.                                                 03:07

16   SO THAT'S WHAT WE WOULD REQUEST, AS OPPOSED TO A

17   MOTION TO WITHDRAW THAT'S UNNECESSARY.

18   **MR. DUNHAM:**  THE MOTIONS AREN'T UNNECESSARY, YOUR

19   HONOR.

20   THIS IS SCOTT DUNHAM AGAIN.                                            03:07

21   THE BASIS IS THAT OUR REQUEST HAS BEEN TO WITHDRAW A

22   MONTH AGO; THAT REQUEST WAS DENIED BY THE CLIENTS.  OUR MOTION

23   WOULD BE TO HAVE OUR WITHDRAWAL TAKE EFFECT IMMEDIATELY, AND

24   THAT'S WHAT WE ASK THE COURT TO CONSIDER.

25   THE MGA PARTIES DON'T DISPUTE THAT THE RELATIONSHIP                    03:07

1   IS BROKEN DOWN.  THEY DON'T DISPUTE THAT WE SHOULD BE OUT OF

2   THE RELATIONSHIP.  THE COURT CAN DECIDE THE PROPER TIMING, ONCE

3   IT'S HAD BRIEFING IN-CAMERA, SETTING FORTH THE FACTS AND

4   ISSUES, AND CERTAINLY THE MGA PARTIES AND NO ONE ELSE IS

5   PREJUDICED BY AN EXPEDITED BRIEFING AND HEARING ON OUR MOTION        03:08

6   TO WITHDRAW IMMEDIATELY.

7           **THE COURT:**  COUNSEL, IS THERE ANYTHING IN PARTICULAR

8   THAT YOU CAN SHARE AT THIS POINT THAT WOULD MAKE THIS SO

9   UNUSUAL OR SO EXTRAORDINARY AS TO TAKE THIS APPROACH?

10          AND I UNDERSTAND I MAY BE PUTTING YOU IN AN AWKWARD           03:08

11  POSITION, BECAUSE YOU'VE SUGGESTED BY INDICATING THE NEED TO

12  FILE DOCUMENTS IN-CAMERA THAT PERHAPS YOU DON'T FEEL

13  COMFORTABLE DISCUSSING THIS ON THE RECORD.  BUT IT'S KIND OF

14  PUTTING THE CART BEFORE THE HORSE HERE, WITHOUT THE COURT

15  HAVING THE BENEFIT OF KNOWING WHY IT IS THAT YOU THINK SUCH          03:08

16  URGENT ACTION IS NEEDED.

17          **MR. HOLDEN:**  THIS IS CRAIG HOLDEN, IN-HOUSE COUNSEL

18  FOR MGA.

19          IF YOU BELIEVE IT'S APPROPRIATE, I'D BE HAPPY TO

20  ANSWER THAT QUESTION, IF THAT'S DIRECTED TO MGA'S COUNSEL.          03:08

21          **THE COURT:**  ACTUALLY, IT'S DIRECTED TOWARDS O'MELVENY

22  & MYERS, BECAUSE THEY ARE THE MOVING PARTY HERE.

23          **MR. DUNHAM:**  SCOTT DUNHAM AGAIN.

24          THE REASON FOR IT AGAIN IS WE ADVISED THE CLIENTS

25  SOME TIME AGO, AND WE OFFICIALLY ADVISED THEM IN WRITING FOUR        03:09

8

1   WEEKS AGO, THAT WE WERE WITHDRAWING AS COUNSEL, AND THAT

2   REQUEST OR THAT STATEMENT THAT WE WERE WITHDRAWING AS COUNSEL

3   HAS BEEN REJECTED BY THE CLIENTS.

4        HERE WE ARE, FOUR WEEKS LATER, STILL IN THE CASE.

5   THERE'S NO REASON TO CONTINUE IN THE CASE, PARTICULARLY SINCE          03:09

6   THE CLIENT HAS NOW STATED THAT THEY HAVE REPLACED US OR WISH TO

7   REPLACE US, BUT THEY WON'T RELEASE US.

8        WE SHOULD BE RELEASED AS COUNSEL AND WE'LL DISCHARGE

9   OUR OBLIGATIONS UNDER RULE 3-700 AND PROVIDE ALL FILES TO THE

10  CLIENT; BUT THAT IS OUR EXTENT OF OUR OBLIGATION UNDER THE            03:09

11  RULES OF PROFESSIONAL CONDUCT.

12       THE CLIENT IS ASKING FOR MORE HERE.

13       **MR. KLEVENS:**  JOEL KLEVENS.

14       WHEN O'MELVENY MADE THEIR REQUEST TO WITHDRAW, NO ONE

15  REJECTED THEIR REQUEST TO WITHDRAW.  WHAT BEGAN WAS AN EFFORT         03:10

16  TO FIND SUBSTITUTE COUNSEL, WHICH HAS JUST BEEN FOUND.  THAT

17  WASN'T SOMETHING THAT COULD BE DONE IN A DAY OR A WEEK.  AND

18  O'MELVENY INSISTED ON ALL KINDS OF CONDITIONS TO A STIPULATION,

19  WHICH WERE UNACCEPTABLE AND NOT JUSTIFIED.

20       AT THIS POINT, IT'S O'MELVENY THAT'S ASKING NOW FOR              03:10

21  EXTRAORDINARY RELIEF FROM THE COURT.  THEY ARE SAYING 'WE WANT

22  TO FILE A MOTION TO WITHDRAW, BUT WE DON'T WANT TO DO IT ON

23  NORMAL NOTICE; WE WANT TO BE RELEASED IMMEDIATELY,' SO THAT

24  THERE WOULDN'T EVEN BE A REASONABLE TRANSITION PERIOD.

25       THAT DOESN'T MAKE ANY SENSE.                                    03:10

OCTOBER 10, 2007          TELEPHONIC HEARING          CV 04-9059-SGL

EXHIBIT 9  PAGE 97

9

1      WE HAVE SKADDEN HERE WHO'S SUBSTITUTING IN TOMORROW.

2      **THE COURT:**  LET ME HEAR FROM THE CLIENTS, THE

3  IN-HOUSE COUNSEL.

4      NOW THAT YOU HAVE COUNSEL, YOU HAVE LOCATED

5  REPLACEMENT COUNSEL, WHAT IS YOUR CONCERN OR WHAT IS YOUR        03:11

6  POSITION?

7      **MR. HOLDEN:**  YOUR HONOR, CRAIG HOLDEN FOR MGA.

8      AS SOON AS WE LEARNED ON SEPTEMBER 12TH OF

9  O'MELVENY'S DESIRE TO WITHDRAW, WE MOVED SWIFTLY TO FIND NEW

10  COUNSEL.  AND JUST PRECEDING RECEIVING THAT NOTICE TO           03:11

11  WITHDRAW -- AND I CONSIDER THIS TO BE NONPRIVILEGED

12  INFORMATION -- THE DISPUTE WAS 'WHO WOULD BE THE TRIAL

13  COUNSEL?'

14      O'MELVENY WANTED TO HOUSE EVERYTHING INTERNALLY UNDER

15  ONE ROOF, AND WE SAID CHRISTENSEN GLASER.  WHEN THAT DISPUTE    03:11

16  WAS RESOLVED NOT IN O'MELVENY'S FAVOR, WE LEARNED THEY WANTED

17  TO GET OUT OF THE CASE.

18      WE MOVED SWIFTLY.  WE LEARNED THERE WAS NEVER AN

19  AGREEMENT THAT WAS PUT IN PLACE THREE AND A HALF YEARS AGO WITH

20  RESPECT TO THE RETENTION OF O'MELVENY IN THIS CASE, AND THAT    03:11

21  COMPLICATED THEIR WITHDRAWAL.

22      THEY INSISTED UPON TERMS, AFTER GIVING US NOTICE OF

23  THEIR DESIRE TO WITHDRAW, THAT JUST WERE NOT ACCEPTABLE, GIVEN

24  THE FACT THAT NO RETENTION OR ENGAGEMENT AGREEMENT WAS EVER

25  EXECUTED.                                                       03:12

OCTOBER 10, 2007          TELEPHONIC HEARING          CV 04-9059-SGL

EXHIBIT 9  PAGE 198

1          WE NOTIFIED THEM LAST WEEK THAT WE WOULD IDENTIFY THE

2    NEW TRIAL COUNSEL THAT WOULD TAKE OVER FOR BOTH O'MELVENY AND

3    FOR CHRISTENSEN GLASER ON TUESDAY OF THIS WEEK; IN OTHER WORDS,

4    YESTERDAY.  THEY REJECTED THAT AND SAID THAT WAS NOT

5    SUFFICIENT; THEY WANTED TO GET OUT IMMEDIATELY.                03:12

6          TRUE TO WHAT WE PROMISED, WE DID RETAIN NEW COUNSEL

7    YESTERDAY.  TOM NOLAN HAS NOT HAD THE OPPORTUNITY TO GET NOT

8    ONLY HIS TEAM TOGETHER AND CONFER WITH O'MELVENY AS TO WHERE

9    THE CASE IS, BUT HE HAS ALSO NOT HAD THE OPPORTUNITY TO GET

10   ACCESS TO THE MATERIALS THAT ARE UNDER THE PROTECTIVE ORDER.   03:12

11         WE DON'T BELIEVE THERE ARE ANY EXIGENT CIRCUMSTANCES

12   THAT REQUIRE ANYTHING OTHER THAN AN ORDERLY TRANSITION, AND WE

13   WOULD ASK YOUR HONOR TO KEEP THE FACTS AND CIRCUMSTANCES IN

14   MIND THAT THE DIFFERENCES AND THE BACKDROP IS A SITUATION ABOUT

15   A DISPUTE RELATING TO WHO WOULD BE THE LEAD TRIAL COUNSEL IN    03:13

16   THIS CASE, AND IT'S NOT A CIRCUMSTANCE THAT NECESSITATES AN

17   IMMEDIATE EX-PARTE WITHDRAW.

18         **MR. DUNHAM:**  SCOTT DUNHAM AGAIN.

19         WITHOUT REVEALING ATTORNEY-CLIENT PRIVILEGED

20   INFORMATION, I RESPECTFULLY DISAGREE WITH MR. HOLDEN'S          03:13

21   REPRESENTATIONS ON VIRTUALLY EVERY STANCE.  AGAIN, WHAT WE SEEK

22   IS AN OPPORTUNITY TO HAVE A HEARING WHERE WE CAN EXPLAIN TO YOU

23   MORE FULLY IN-CAMERA THE CIRCUMSTANCES.

24         I CAN TELL YOU THAT THE URGENCY HERE RELATES TO THE

25   TWO POINTS THAT WE HAVE SET FORTH IN THE MEMORANDUM OF POINTS   03:13

11

1   AND AUTHORITIES THAT ARE ON FILE PUBLICLY IN CONNECTION WITH

2   OUR EX-PARTE APPLICATION; THAT THE DISAGREEMENTS THAT HAVE

3   ARISEN BETWEEN O'MELVENY AND THE MGA PARTIES HAVE MADE IT

4   UNREASONABLY DIFFICULT FOR O'MELVENY TO CONTINUE SERVING AS

5   COUNSEL, AS UNDISPUTED BY THE OPPOSITIONS THEY FILED BY THE MGA          03:14

6   PARTIES, AND IT HAS MATERIALLY INTERFERED WITH OUR ABILITY TO

7   CONTINUE TO PROVIDE EFFECTIVE REPRESENTATION TO THIS CLIENT.

8            IN ADDITION, THE CLIENT HAS NOT COMPLIED WITH THE

9   AGREEMENT TO PAY FEES, AND THAT CREATES A SIGNIFICANT PROBLEM,

10  BOTH IN THE PAST AND TODAY AND GOING FORWARD; AND IT'S URGENT          03:14

11  THAT THOSE TWO ISSUES BE ADDRESSED BY THE COURT.

12           THE COURT:  WHAT IS SKADDEN'S VIEW OF THIS WHOLE

13  THING?

14           MR. NOLAN:  TOM NOLAN FROM SKADDEN.

15           OBVIOUSLY, I'M THE NEWEST ONE ON THE TEAM HERE.               03:14

16           SETTING ASIDE FOR A MOMENT, JUDGE, WHAT SHOULD BE

17  DONE IMMEDIATELY, I WILL TELL YOU THAT WE WERE RETAINED

18  YESTERDAY.  WE WERE RETAINED WITH THE EXPECTATION THAT THERE

19  COULD BE AN ORDERLY TRANSITION WITH COUNSEL FROM O'MELVENY.

20  I'VE ENJOYED A 30-SOME-YEAR RELATIONSHIP WITH COUNSEL -- NOT ON        03:15

21  THE PHONE HERE BUT WITH OTHER COUNSEL AT O'MELVENY -- AND THESE

22  ARE THE TYPES OF THINGS THAT PROFESSIONAL FIRMS HANDLE IN THE

23  ORDINARY COURSE OF EVENTS AND GENERALLY DO NOT HAVE TO GET THE

24  COURT INVOLVED.  I WAS TAKEN BY SURPRISE THAT THE FIRST

25  PLEADING THAT I SAW AFTER WE HAD SIGNED THE RETAINER AGREEMENT         03:15

OCTOBER 10, 2007          TELEPHONIC HEARING          CV 04-9059-SGL

EXHIBIT 9  PAGE 200

12

```
 1  WAS THE EX-PARTE APPLICATION.

 2          I AM PREPARED, YOUR HONOR, TO COME IN AND SUBSTITUTE

 3  IN FOR CHRISTENSEN & GLASER AND O'MELVENY AND TO ASSUME THE

 4  RESPONSIBILITIES OF BEING THE LEAD TRIAL LAWYER.  I'M NOT

 5  ASKING FOR A CONTINUANCE OF THE TRIAL DATE.  I UNDERSTAND THAT     03:15

 6  IT'S SET FOR APRIL.

 7          WHAT I WAS HOPING THAT I COULD DO, IF THIS HAD NOT

 8  BEEN INTERRUPTED BY THE SUBSTANCE OF THE EX-PARTE APPLICATION,

 9  WOULD SIMPLY HAVE BEEN ABLE TO CALL UP JOHN QUINN, OR ANYBODY

10  ELSE ON THE QUINN EMANUEL TEAM, AND SPEAK TO JOHN KEKER, AND      03:16

11  ADVISE THEM OF THE CHANGE IN COUNSEL; ASK FOR THE PROFESSIONAL

12  COURTESY OF A COOL-DOWN PERIOD, RECOGNIZING THAT IT MAY BE A

13  LITTLE BIT OF AN INCONVENIENCE FOR SCHEDULING; THAT WE WOULD

14  APPLY A TEAM; THAT WE WOULD GET OUR HANDS AROUND AS MUCH OF THE

15  MILLION PAGES OF DOCUMENTS THAT HAVE BEEN PRODUCED; GET A        03:16

16  HANDLE ON THE 18 DEPOSITIONS THAT HAVE BEEN TAKEN SO FAR;

17  UNDERSTAND BETTER WHAT THE DEPOSITION SCHEDULES LOOK LIKE OVER

18  THE NEXT 30 DAYS; AND ASK JOHN AND HIS TEAM WHETHER OR NOT, AS

19  A PROFESSIONAL COURTESY, THEY WOULD EXTEND THAT TO SKADDEN &

20  ARPS.

21          AND THEN, IF THAT DID NOT WORK OUT, TO COME TO YOUR

22  HONOR AND SEE WHETHER OR NOT WE COULD REACH SOME KIND OF AN

23  ADJUSTMENT IN THE SCHEDULE UNDER THE CIRCUMSTANCES.

24          WHAT NOW SEEMS TO COMPLICATE ALL OF THIS -- AND I'M

25  NOT MEANING TO SOUND CRITICAL, BUT O'MELVENY'S REPRESENTATIVES    03:17
```

EXHIBIT 9  PAGE 201

13

1   HAVE NOW DECLARED THAT THERE'S A CONFLICT; THAT HE HAS NOW ON

2   THE RECORD IMPUGNED THE INTEGRITY OF IN-HOUSE COUNSEL CRAIG

3   HOLDEN WITH RESPECT TO THE REPRESENTATIONS THAT CRAIG MADE AS

4   TO THE UNDERSTANDING OF THE DISAGREEMENT WITH COUNSEL; THAT

5   THEY ARE WILLING NOW TO DISCHARGE THE RESPONSIBILITIES BY WHAT      03:17

6   APPEARS TO BE SIMPLY COMPLYING WITH THE PROFESSIONAL RULES OF

7   3-700, WHICH IS TO TRANSFER DOCUMENTS TO ME.

8        I WOULD LIKE TO IMPLORE THAT A SENSE OF

9   PROFESSIONALISM WOULD BE APPLIED HERE; THAT WE WOULD GET

10  INVOLVED; WE WON'T DELAY THE COURT; WE WON'T BOTHER YOU WITH        03:17

11  UNNECESSARY MOTIONS; WE'LL TRY TO WORK THIS OUT PROFESSIONALLY.

12  YOU HAVE MY WORD, YOUR HONOR, THAT WE WOULD TRY TO WORK AS

13  QUICKLY AND AS EFFICIENTLY AS POSSIBLE TO GET IN PLACE SO THAT

14  THE INTERESTS OF MGA ARE NOT PREJUDICED.

15       I CAN ASSURE YOU THAT FROM MY REVIEW OF THE FACTS,            03:17

16  THERE IS NOTHING INCONSISTENT WITH THE RECITATION THAT WAS MADE

17  BY MR. HOLDEN AND THAT A DECISION WAS MADE WITH RESPECT TO WHO

18  WOULD ACTUALLY STAND IN FRONT OF THE JURY REPRESENTING MGA, AND

19  THAT WAS A DISAGREEMENT THAT WAS NOT ACCEPTED BY COUNSEL.  IT'S

20  THEIR CHOICE.                                                       03:18

21       I WOULD ASK THE COURT TO ALLOW ME TO CIRCULATE A

22  SUBSTITUTION OF ATTORNEY.  I HAVE HAD PLEDGED BY COUNSEL FROM

23  CHRISTENSEN GLASER THAT THEY WILL COOPERATE IN EVERY WAY

24  POSSIBLE.  BUT FROM THE COURT'S READING OF THE PAPERS, YOU'LL

25  KNOW THAT CHRISTENSEN GLASER HAVE NOT BEEN THE ACTIVE LAWYERS       03:18

1   ON THE FILE; AND ALTHOUGH THEY HAVE PROVIDED SOME HIGH-LEVEL

2   TRIAL ADVICE AND STRATEGY ADVICE, THEY ARE NOT PREPARED AT THIS

3   MOMENT TO TAKE ON THE DEFENSE OF THESE DEPOSITIONS.

4           SO AGAIN, IN SHORT FORM, YOUR HONOR, I WOULD ASK FOR

5   JUST A MODEST AMOUNT OF TIME TO ALLOW ME AND MY TEAM TO GET IN,    03:18

6   GET OUR HANDS AROUND THE FACTS OF THE CASE AND MOVE

7   AGGRESSIVELY AND GET THE DISCOVERY COMPLETED AND HAVE THIS CASE

8   READY TO TRY ON THE DATE THAT YOU SET.

9           **MR. DUNHAM:**  SCOTT DUNHAM AGAIN, RESPONDING, IF I

10  MAY.                                                              03:19

11          FIRST OF ALL, WITH DUE RESPECT TO MR. NOLAN, NOBODY

12  IS IN A CONDITION TO STATE WHAT THE FACTS ARE OR NOT UNDER THE

13  CIRCUMSTANCES.  AND AGAIN, I'M STRAINED BY ATTORNEY-CLIENT

14  COMMUNICATIONS AND CONFIDENTIAL INFORMATION FROM RESPONDING IN

15  MORE DETAIL TO THE REPRESENTATIONS.                               03:19

16          WHAT MR. NOLAN HAS STATED IS ACCEPTABLE TO O'MELVENY

17  TO THE EXTENT THAT WHAT HE'S SAYING IS THE CLIENT EXECUTES

18  IMMEDIATE SUBSTITUTION OF COUNSEL.  IF WE ARE RELIEVED OF

19  COUNSEL OF RECORD, WE WILL THEN DISCHARGE OUR PROFESSIONAL

20  OBLIGATIONS UNDER RULE 3-700.  THAT HAS BEEN REJECTED TO DATE;    03:19

21  THAT'S WHY WE FILED OUR APPLICATION TO HAVE IT HEARD IN A

22  CIRCUMSTANCE WHERE -- THE RELATIONSHIP BETWEEN COUNSEL AND

23  CLIENT IS IRRETRIEVABLY BROKEN.

24          **THE COURT:**  ALL RIGHT.

25          DOES QUINN EMANUEL HAVE ANYTHING TO SAY ABOUT THIS?       03:20

15

1      **MR. PROCTOR:**  WE DO, YOUR HONOR.

2      B. DYLAN PROCTOR FOR MATTEL.

3          UNFORTUNATELY, THAT PROPOSAL WHICH I JUST HEARD WOULD

4      CAUSE MATTEL SIGNIFICANT PREJUDICE, IN OUR VIEW.  WE ARE ALL

5      FOUR PROFESSIONALS HERE, AND I UNDERSTAND THAT MR. NOLAN IS          03:20

6      VERY NEW TO THE CASE; TODAY IS THE FIRST DAY THAT I HAVE HEARD

7      HIS NAME.  BUT IF WHAT WE'RE TALKING ABOUT HERE IS HAVING

8      O'MELVENY AND CHRISTENSEN GLASER GET IMMEDIATELY OUT OF THE

9      CASE AND HAVING MR. NOLAN AND HIS TEAM STEP IN, AND WITH THE

10     REQUEST THAT I HEARD FOR AN EITHER FORMAL OR INFORMAL STAY OR        03:20

11     COOL-DOWN PERIOD, ALL OF THE DEPOSITIONS WHICH ARE NOW ON

12     SCHEDULE -- THERE ARE AT LEAST A DOZEN ON SCHEDULE IN THE NEXT

13     MONTH; I THINK MORE THAN THAT -- ARE GOING TO HAVE TO BE PUT

14     OFF.  ALL OF THE PENDING DISCOVERY MATTERS ARE NOT GOING TO

15     HAPPEN.  AND THERE ARE ONLY ABOUT THREE MONTHS, AS OF NOW, LEFT      03:21

16     IN THE FACT DISCOVERY PERIOD ON PHASE ONE.

17         A ONE-MONTH STAY OR COOL-DOWN PERIOD ON DISCOVERY IS

18     A MAJOR PROBLEM FOR MATTEL.  IT WOULD CAUSE MATTEL SIGNIFICANT

19     PREJUDICE TO DO THAT.

20         AND EVEN GETTING THE DEPOSITIONS WHICH HAVE BEEN                 03:21

21     SCHEDULED OVER THE NEXT MONTH ON FILE AND GETTING THOSE DATES

22     LOCKED IN TAKES INORDINATE EFFORT IN THIS CASE, AS I THINK THE

23     COURT KNOWS, BASED ON THE WAY DISCOVERY WORKS IN THIS CASE.

24         AND SO THE IDEA OF O'MELVENY STEPPING OUT OF A CASE

25     IMMEDIATELY AND SKADDEN COMING IN AND TAKING A MONTH OFF TO          03:21

EXHIBIT _9_ PAGE _207_

1   LEARN THE CASE BEFORE DISCOVERY PROCEEDS IS SOMETHING WHICH

2   MATTEL WOULD VIGOROUSLY OPPOSE.

3          **MR. DUNHAM:**  SCOTT DUNHAM AGAIN.

4          THE ISSUE BEFORE THE COURT AT THE MOMENT IS OUR

5   APPLICATION TO HAVE A HEARING ON THE MERITS OF WITHDRAWAL.  AND    03:22

6   WE SEEM TO BE MOVING INTO THE MERITS OF WITHDRAWAL -- WE'D LIKE

7   TO HAVE A MOTION; WE'D LIKE TO HAVE IT HEARD, AND WE'D LIKE TO

8   BE ABLE TO SUBMIT SUPPORTING DECLARATIONS AND INFORMATION TO

9   YOU TO SHOW THAT A WITHDRAWAL SHOULD TAKE PLACE IMMEDIATELY.

10         **THE COURT:**  MR. DUNHAM, MY SENSE IS THERE'S NO    03:22

11  QUESTION THAT YOU AND O'MELVENY & MYERS ARE GOING TO BE OUT AND

12  SKADDEN ARPS IS GOING TO BE IN.  THE ISSUE, I THINK, IS NOT AS

13  COMPLICATED, OR SHOULDN'T BE AS COMPLICATED, AS IT'S TURNING

14  INTO.

15         WHAT I'M GOING TO DIRECT IS AS FOLLOWS:    03:22

16         COUNSEL FOR SKADDEN, MR. NOLAN, I'M GOING TO ORDER

17  THAT YOU GET TOGETHER IN PERSON WITH MR. DUNHAM TOMORROW, AND

18  THE TWO OF YOU, FOR WHOM I HAVE A TREMENDOUS AMOUNT OF RESPECT,

19  ARE GOING TO SIT DOWN AND YOU'RE GOING TO FIGURE OUT A

20  TRANSITION PLAN, AND THEN YOU'RE GOING TO DRAW UP A JOINT    03:23

21  REPORT TO THIS COURT DESCRIBING THE TRANSITION PLAN AND

22  IDENTIFY ANY AREAS THAT YOU'RE NOT ABLE TO AGREE UPON.

23         AND I TRUST THAT EVERYBODY ELSE WILL GET TOGETHER AND

24  SIGN OFF ON THE SUBSTITUTION OF COUNSEL, AND WE'LL GET

25  CHRISTENSEN GLASER OUT AND O'MELVENY OUT AND SKADDEN IN, AND    03:23

17

1    WE'LL BE DONE WITH THIS.

2          AND THEN THE ISSUE OF THE STAY IS SOMETHING WHICH

3    OBVIOUSLY THE PARTIES, COUNSEL WHO ARE IN THE CASE, ARE GOING

4    TO HAVE TO WORK AND DISCUSS THEMSELVES.  I DON'T WANT TO SHORT-

5    CIRCUIT THE PROCESS OF THEM MEETING AND CONFERRING; NAMELY,          03:23

6    HAVING MR. NOLAN AND MR. QUINN, OR WHOEVER ELSE FROM THOSE

7    RESPECTIVE FIRMS, SITTING DOWN AND TRYING TO FIGURE OUT WHAT IS

8    AN APPROPRIATE APPROACH AT THIS POINT.  BUT I'M NOT GOING TO

9    LINK THESE TWO ISSUES, AT LEAST NOT TODAY.

10         WHAT NEEDS TO HAPPEN IS PROFESSIONALS FROM O'MELVENY          03:23

11   AND SKADDEN NEED TO SIT DOWN, MINDFUL OF THEIR ETHICAL

12   RESPONSIBILITIES, AND WORK OUT A TRANSITION PLAN HERE.  I

13   EXPECT THAT TO TAKE PLACE TOMORROW AND THE COURT TO RECEIVE A

14   JOINT REPORT BY NOON ON FRIDAY.

15         I WILL THEN PERHAPS CALL ANOTHER TELEPHONIC                   03:24

16   CONFERENCE ON FRIDAY AFTERNOON, IF THERE'S ANY NEED FOR COURT

17   INTERVENTION, IF THERE'S A NEED FOR MOTION PRACTICE, OR

18   ANYTHING ELSE.  BUT I REALLY BELIEVE, I HAVE A TREMENDOUS

19   AMOUNT OF CONFIDENCE, THAT IF COUNSEL SIT DOWN IN PERSON

20   TOMORROW, THAT THEY WILL BE ABLE TO WORK OUT AN APPROPRIATE        03:24

21   TRANSITION PLAN THAT MAKES THIS WORK.

22         MR. NOLAN, DO YOU UNDERSTAND WHAT THE COURT IS

23   ASKING?

24         **MR. NOLAN:**  CLEARLY, YOUR HONOR, AND I SHARE YOUR

25   CONFIDENCE.                                                        03:24

18

1      THE COURT:  MR. DUNHAM, DO YOU UNDERSTAND WHAT THE

2  COURT IS ASKING?

3      MR. DUNHAM:  I DO, YOUR HONOR, BUT I DON'T SHARE YOUR

4  CONFIDENCE.

5      THE COURT:  ALL RIGHT.  WELL, WE'LL SEE WHAT COMES      03:24

6  OUT ON FRIDAY.

7      I CAN'T THINK OF ANY NEED FOR ANYBODY ELSE TO BE

8  INVOLVED IN THIS AT THIS POINT.  THIS IS BASICALLY A HAND-OFF

9  BETWEEN THE TWO FIRMS IN QUESTION.  AS I UNDERSTAND IT, THERE'S

10  NO PROBLEM WITH CHRISTENSEN GLASER IN TERMS OF HOW YOU'RE      03:25

11  TRANSITIONING.

12      IS THAT CORRECT?

13      MR. KLEVENS:  CORRECT, YOUR HONOR.

14      THE COURT:  AND AS FAR AS QUINN EMANUEL IS CONCERNED,

15  WE'RE JUST GOING TO HAVE TO WAIT AND SEE HOW THIS TRANSITION      03:25

16  GOES DOWN IN THE NEXT DAY OR TWO, AND THEN WE CAN TALK ABOUT

17  WHERE WE'RE GOING TO GO FROM THERE.

18      ALL RIGHT, MR. PROCTOR?

19      MR. PROCTOR:  YES, SIR.  THANK YOU, YOUR HONOR.

20      THE COURT:  I'LL LOOK FORWARD TO THAT REPORT BY      03:25

21  FRIDAY BY NOON.

22      MR. DUNHAM:  IF I MAY, JUST TO CLARIFY, IN TERMS OF

23  THE DISCUSSION ABOUT TRANSITION, I'M A BIT CONCERNED -- AND I'M

24  NOT AS CLOSE TO THE CASE AS EVERYBODY ELSE ON THIS LINE; I'M

25  HERE SIMPLY FOR THE WITHDRAWAL PURPOSES -- THAT CHRISTENSEN      03:25

1    GLASER HAS QUITE A BIT OF RESPONSIBILITY ON THIS CASE THAT WILL

2    REQUIRE SOME TRANSITIONING AS WELL.

3         **THE COURT:**  I'M SURE THAT'S TRUE, BUT I'M NOT HEARING

4    ANY PROBLEM ABOUT THAT TRANSITION.  THE TRANSITION PROBLEM

5    APPEARS TO BE DIRECTED AT O'MELVENY RIGHT NOW, AND ALL I WANT          03:25

6    TO DO IS -- YOU'RE OUT; I MEAN, YOU'RE GOING TO BE OUT AS SOON

7    AS THAT SUBSTITUTION OF COUNSEL FORM IS FILLED OUT; SO YOU'RE

8    GOING TO GET THE RELIEF THAT YOU SEEK, AND I THINK YOU'RE GOING

9    TO GET IT IN QUICK ORDER.

10        THE QUESTION IS HOW IS THE TRANSITION GOING TO TAKE              03:26

11   PLACE AND HOW ARE YOU GOING TO GET THE FILES OVER TO SKADDEN

12   ARPS?

13        AND THAT'S ALL I'M ASKING FOR TOMORROW, IS FOR YOU TO

14   SIT DOWN -- AND I KNOW THAT O'MELVENY & MYERS HAS DONE THIS

15   MANY TIMES BEFORE, AS HAS SKADDEN ARPS; SO I KNOW YOU KNOW HOW         03:26

16   TO DO THIS.  JUST SIT DOWN AND DO IT.

17        **MR. DUNHAM:**  I AGREE, YOUR HONOR, THAT IF THE

18   WITHDRAWAL WAS PROVIDED TO US TOMORROW, WE'LL HAVE NO

19   DIFFICULTY TRANSITIONING THE FILES TO MR. NOLAN.

20        **THE COURT:**  AND FULFILLING ALL OF YOUR ETHICAL               03:26

21   RESPONSIBILITIES THAT ARISE IN A CIRCUMSTANCE LIKE THIS.

22        I DON'T NEED TO LECTURE ANYBODY ON THIS PHONE LINE

23   ABOUT WHAT NEEDS TO BE DONE AND WHAT DOESN'T NEED TO BE DONE.

24   YOU ALL KNOW BETTER.

25        LETS GET IT DONE.  LETS GET A REPORT TO THE COURT BY             03:26

20

1    NOON ON FRIDAY.  YOU'LL RECEIVE FURTHER DIRECTION FROM MY COURT

2    CLERK AT THAT POINT IN TIME.

3              AS FAR AS THE STAY OR THE REQUEST FOR THE STAY,

4    OBVIOUSLY SOMETHING NEEDS TO BE DONE HERE.  IT'S NOT CLEAR TO

5    ME WHAT.  WHAT I'M GOING TO DO IS ORDER COUNSEL TO COME IN ON            03:26

6    MONDAY AT OUR NORMAL HEARING TIME FOR A STATUS CONFERENCE,

7    10:00 A.M., AND WE'LL DISCUSS THE FUTURE DIRECTION OF THIS

8    CASE.

9              MR. NOLAN:  IN THE MEANTIME, BEFORE MONDAY, I WILL

10   ENDEAVOR, AFTER I MEET WITH O'MELVENY COUNSEL, I'LL ALSO REACH           03:27

11   OUT AND, IF POSSIBLE, TRY TO MEET WITH QUINN EMANUEL'S TEAM AND

12   SEE WHETHER OR NOT WE CAN'T COME INTO COURT AT LEAST WITH SOME

13   IDEA IN MIND AS TO WHAT OUR RESPECTIVE POSITIONS ARE, AND I'LL

14   ALSO MEET WITH MR. KEKER'S FIRM TO COORDINATE THAT AS WELL.

15             THE COURT:  I WOULD EXPECT YOU TO DO THAT.                     03:27

16             ANYTHING FURTHER?

17             MR. KEKER:  THIS IS JOHN KEKER.

18             ON MONDAY, I WILL BE IN SERBIA, I'M AFRAID, BUT WE'LL

19   HAVE SOMEBODY ELSE AT THE HEARING REPRESENTING MR. BRYANT.

20             THE COURT:  VERY WELL.  I APPRECIATE THAT.                     03:27

21             HAVE A SAFE JOURNEY TO SERBIA.

22             MR. KEKER:  THANK YOU.

23             THE HEARING IS AT 10:00?

24             THE COURT:  YES.

25   / / /



21

1          (WHEREUPON, THE TELEPHONIC CONFERENCE

2             WAS CONCLUDED.)

3

4    / / /

5    / / /

6    / / /

7

8

9

10

11

12

13

14

15

16

17                              CERTIFICATE

18

19   I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
     STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
20   THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE ABOVE-
     ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
21   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
     THE UNITED STATES.

22

23   _____              10-23-07
     THERESA A. LANZA, CSR, RPR)                DATE
24   FEDERAL OFFICIAL COURT REPORTER

25

OCTOBER 10, 2007          TELEPHONIC HEARING      CV 04-9059 SGL
                                          EXHIBIT 9 PAGE 210

**AO 44**
(Rev. 7/95)

## UNITED STATES DISTRICT COURT

For the CENTRAL District of CALIFORNIA

### INVOICE

NUMBER 71010 Bryant

TO: Laura Kinsey w/ Quinn Emanuel
865 S Figueroa #10th
LA        90017

PHONE: 213-624-7707

**NOTE**
**MAKE CHECK PAYABLE TO:**
Theresa A. Lanza, CSR, RPR
U.S. Federal District Court
3470 12th Street, Rm. 134
Riverside, CA 92501
PHONE: 951-274-0844

### TRANSCRIPTS

| ☐ CRIMINAL | ☒ CIVIL | DATE ORDERED 10-23-07 | DATE DELIVERED 10-23-07 |
|---|---|---|---|

IN THE MATTER OF (CASE NUMBER AND TITLE)

Bryant v. Mattel     CV 04-9049-SGL

### CHARGES

| CATEGORY | ORIGINAL | | | 1ST COPY | | | ADDITIONAL COPIES | | | TOTAL CHARGES |
|---|---|---|---|---|---|---|---|---|---|---|
| | PAGES | PRICE @ | SUB TOTAL | PAGES | PRICE @ | SUB TOTAL | PAGES | PRICE @ | SUB TOTAL | |
| Ordinary | | | | | | | | | | |
| Expedited | | | | 21 | 1.10 | 23.10 | 21 | .83 | 17.43 | 40.53 |
| Daily | | | | | | | | | | |
| Hourly | | | | | | | | | | |

| For proceedings on (Date): 10-10-07 | TOTAL | 40.53 |
|---|---|---|
| | LESS DISCOUNT FOR LATE | |
| | LESS AMOUNT OF DEPOSIT | 40.53 |
| one E-tran sent to lauriakinsey@Quinnemanel | TOTAL REFUNDED | |
| one hard copy sent USPS | TOTAL DUE | -0- |

### ADDITIONAL INFORMATION

Full price may be charged only if the transcript is delivered within the required time frame. For example, if an order for expedited transcript is not completed and delivered within (7) calendar days, payment would be at the ordinary *delivery* rate.

### CERTIFICATION

I certify that the transcript fees charged and page format used comply with the requirements of this court and the Judicial Conference of the United States.

SIGNATURE OF OFFICIAL COURT REPORTER
_Theresa A. Lanza_

DATE 10-23-07

editions of this form are
scaled and should be destroyed.)

DISTRIBUTION:   TO PARTY (2 copies - 1 to be returned with payment)

FEES CHARGED ON THIS INVOICE, LESS ANY
CIRCUIT FEE REDUCTION AND / OR DEPOSIT, ARE
IN CONFORMANCE WITH THE REGULATIONS
OF THE JUDICIAL CONFERENCE OF THE
UNITED STATES.

EXHIBIT 9 PAGE 21

Exhibit 10

1  THOMAS J. NOLAN (Bar No. 66992)
   (tnolan@skadden.com)
2  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
   300 South Grand Avenue
3  Los Angeles, CA 90071-3144
   Tel.: (213) 687-5000/Fax: (213) 687-5600
4
   RAOUL D. KENNEDY (Bar No. 40892)
5  (rkennedy@skadden.com)
   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
6  4 Embarcadero Center, 38th Floor
   San Francisco, CA 94111-5974
7  Tel.: (415) 984-6400 / Fax: (415) 984-2698

8  Attorneys for MGA Entertainment, Inc., MGA Entertainment (HK) Limited,
   MGAE de Mexico, S.R.L. de C.V., and Isaac Larian
9
   JOHN W. KEKER (Bar No. 49092)
10 (jkeker@kvn.com)
   CHRISTA M. ANDERSON (Bar No. 184325)
11 (canderson@kvn.com)
   KEKER & VAN NEST LLP
12 710 Sansome St.
   San Francisco, CA 94111-1704
13 Tel.: (415) 391-5400 / Fax: (415) 397-7188

14 Attorneys for Carter Bryant

15           UNITED STATED DISTRICT COURT

16           CENTRAL DISTRICT OF CALIFORNIA

17 CARTER BRYANT, an          ) CASE NO. CV 04-9049 SGL (RNBx)
   individual,                )
18                            ) **DISCOVERY MATTER**
       Plaintiff,             )
19                            ) MGA'S AND CARTER BRYANT'S JOINT
       v.                     ) NOTICE OF MOTION AND MOTION TO
20                            ) COMPEL AN UNREDACTED VERSION
   MATTEL, INC., a Delaware   ) OF M0074400, MATTEL'S
21 corporation,               ) INVESTIGATIVE FILE 02-299 AND THE
                              ) FURTHER DEPOSITION OF RICHARD
22                            ) DE ANDA; MEMORANDUM OF POINTS
       Defendant.             ) AND AUTHORITIES IN SUPPORT
23                            ) THEREOF

24 ─────────────────────────── ) [To be heard by Discovery Master Hon.
                              ) Edward Infante (Ret.) Pursuant to Court
25 AND CONSOLIDATED            ) Order of December 6, 2006]
   ACTIONS                    )
26                            ) Hearing Date: TBD
27                              Time: TBD

28
   ───────────────────────────────────────────────────────────────────────────
   Motion To Compel An Unredacted Version Of M0074400, Investigative File 02-299 And Further Deposition Of Richard De Anda



1  TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2       PLEASE TAKE NOTICE that, pursuant to Rules 26, 30 and 37 of the Federal

3  Rules of Civil Procedure, MGA Entertainment, Inc. ("MGA") and Carter Bryant

4  jointly move the court for an order compelling Mattel, Inc. ("Mattel") to produce an

5  unredacted version of the document bearing Bates number M0074400, Mattel's

6  Investigative File 02-299, and Richard De Anda for further deposition.  Discovery

7  Master Hon. Edward Infante (Ret.) will preside over the hearing on this motion,

8  which will occur January 10, 2008, at a time to be determined.

9       This motion is based upon this notice of motion and accompanying

10  memorandum of points and authorities, the declaration of Marcus R. Mumford filed

11  concurrently herewith, the records and files of this court, and any other matter of

12  which the court may take judicial notice.

13  DATED:  January 4, 2008

                SKADDEN, ARPS, SLATE, MEAGHER &

14                  FLOM, LLP

15

16                  By:  _____
                Raoul D. Kennedy

17                  Attorney for MGA Entertainment, Inc.

18                  KEKER & VAN NEST LLP

19                  By:  _____

20                  Christa M. Anderson
                Attorney for Carter Bryant

21

22

23

24

25

26

27

28

EXHIBIT ___ PAGE 22

## MEMORANDUM OF POINTS AND AUTHORITIES

This motion concerns three matters arising from the recent deposition of Mattel's Vice President of Global Security, Richard De Anda.

First, during his deposition, De Anda voluntarily disclosed the content of several conversations with in-house counsel, Michelle McShane, from March 2002 to August 2002 and beyond, and then admitted that the content of those conversations was reflected in redacted portions of an email bearing bates number M0074400, which he had reviewed in unredacted form in preparation for his deposition. MGA and Bryant move to compel Mattel to produce an unredacted version of that email on grounds that any attorney-client privilege was waived by De Anda's voluntary disclosure of his conversations with McShane.

Second, De Anda admitted during his deposition that there was an additional "related case" file, Investigative File 02-299, to the one his department opened in March 2002 to investigate whether MGA and Isaac Larian were hiring Mattel employees and manufacturing products based on designs that belonged to Mattel. Having established that Investigative File 02-299 is clearly relevant to this litigation, Mattel should be compelled to produce it.

Finally, Mattel should be compelled to produce De Anda for an additional day to complete his deposition. De Anda is a critical witness who headed Mattel's department of global security and has been investigating MGA, Larian and Bryant, and many of the claims at issue in this litigation, since at least March 2002. Despite its diligence in questioning De Anda, MGA was not able to cover all aspects of the investigations conducted by De Anda's department at Mattel, including over 1200 pages of investigative files that Mattel produced in incomplete form a day and a half before the deposition, many of which are in Spanish. Also, additional time is requested to allow Bryant's counsel an opportunity to question De Anda.

EXHIBIT ___ PAGE ___

## I.   FACTUAL AND PROCEDURAL BACKGROUND

Richard De Anda was deposed December 19, 2007.  He is the Vice President and Head of Global Security at Mattel, which is charged with protecting Mattel's intellectual property rights and one of the departments at Mattel with responsibility for conducting investigations into allegations, rumor or innuendo concerning the misappropriation of Mattel's intellectual property.[1]  He is a critical witness to understand the basis of the claims asserted by Mattel in this litigation, and to establish, among other things, when Mattel knew or had reason to suspect the basis of its claims for purposes of MGA's and Bryant's statute of limitations and laches defenses.

Among other things, De Anda testified concerning several conversations he had with Mattel in-house counsel, Michelle McShane, regarding legal matters arising from Mattel's March 2002 investigation of MGA and Isaac Larian for hiring Mattel employees and manufacturing products based on designs that allegedly belonged to Mattel, and the August 2002 investigation ordered by Mattel CEO Robert Eckert after he received an anonymous letter alleging that Carter Bryant helped MGA create Bratz while he was working with Mattel.[2]  De Anda voluntarily disclosed the content of conversations he had with McShane, waiving the attorney-client privilege to these discussions.[3]  In one instance, De Anda even refused to follow the instructions of Mattel counsel, stating that he "would prefer not" to answer just "yes" or "no," and in fact testified that McShane told him that Mattel's outside counsel had concluded that there was not a copyright infringement on the part of MGA, Larian and Bryant.[4]

---

[1] Declaration of Marcus R. Mumford in Support of MGA's and Bryant's Joint Motion To Compel the Deposition Testimony of Richard De Anda And The Unredacted Production of Documents ("Mumford Decl."), Ex. 1: De Anda Tr. 6:13-23, 110:11-112:19.

[2] *Id.* at Tr. 184:20-188:23; 192:2-193:17; 197:11-22; 205:22-207:17; 221:17-224:16; 227:1-17; 240:10-241:23; 258:23-259:15; 281:3-282:3; 283:1-22.

[3] *Id.*

[4] *Id.* at Tr. 224:3-16.

EXHIBIT _D_ PAGE _245_

De Anda also testified concerning an email he sent Alan Kaye, Mattel's Senior Vice-President of Human Resources, in August 2002 in response to Mattel CEO Robert Eckert's demand to pursue an investigation into whether Bryant helped MGA create Bratz "[w]hile he was working with Mattel."[5]  In the email, De Anda wrote: "I'm aware of this situation and have been working on it for several months.  My frustration in this matter was the genesis of [REDACTED] and that is now in the hands of [Mattel counsel] Robert Normile.  The truth of the matter is that Carter Bryant did work for Mattel, however, [REDACTED] according to outside attorneys.  [Mattel counsel] McShane [REDACTED]."[6]  The redactions were made by Mattel's counsel in this litigation.[7]

Despite the fact that De Anda had testified repeatedly concerning the content of his conversations with McShane, counsel for Mattel improperly instructed De Anda not to answer questions concerning the redactions of his email to Kaye.  De Anda admitted that he had reviewed the email in unredacted form in preparing for his deposition and that it may have refreshed his memory of events between March and August of 2002.[8]  He admitted further that the redacted portions of the email reflected the content of his conversations with McShane, that he testified to earlier in his deposition.[9]  De Anda admitted that he based the assertion that he was "'working on this matter for several months by participating in phone calls with Ms. McShane checking in on the status."[10]  He explained that the email referenced Robert Normile because "McShane reports to him."[11]  When asked if there was anything "in this E-

---

[5] Mumford Decl., Ex. 2: Document bates-numbered M 0074401.
[6] Mumford Decl., Ex. 3: Document bates-numbered M 0074400.
[7] Mumford Decl., Ex. 1: De Anda Tr. at 270:15-20.
[8] *Id.* at Tr. 77:4-17, 270:24-272:24, 281:18-282:17.
[9] *Id.* at Tr. 276:17-278:11; 282:18-283:7; 285:17-286:2.
[10] *Id.* at Tr. 270:4-9.
[11] *Id.* at Tr. 274:17-275:23.

EXHIBIT ___ PAGE ___

mail right after 'in this matter was the genesis of' blank, blank, blank, blank, blank, okay, that is not attributed to information that you received from Ms. McShane," De Anda explained: "[s]o what you're asking is the information here [in the redacted parts] attributed to McShane? Yes, it is."[12]  When asked whether the same series of phone conversations with McShane was the source of information redacted in the email following the phrase "[t]he truth of the Carter Bryant did work for Mattel, however," De Anda answered: "Yes, I believe it to be so, yes."[13]  De Anda later reiterated this fact: "Q: ... [I]s it accurate to say that the information that has been redacted from this E-mail is information that came to you from your communications with Ms. McShane?  A: That is correct."[14]

In his deposition, De Anda also admitted there was a "related case" file to the March 2002 investigation of MGA, Larian and Bryant that has not been produced in this matter.[15]  He explained that the "related case" was Mattel's Investigative File 02-299, which would have "some nexus," "interest or value" to the case and was "related either by location, subject matter, type of issue" to the matters raised by the March 2002 investigation, "be it by subject matter it or be it by subject be it by type of crime, location or whatever."[16]  In addition to Investigative File 02-299, there were two other "related cases" indicated by the file De Anda reviewed at the deposition, both of which have been produced by Mattel in this litigation.  De Anda admitted that he may have reviewed Investigative File 02-299 in preparing for his deposition.[17]

---

[12] *Id.* at Tr. 275:24-279:9.
[13] *Id.* at Tr. 282:22-283:7.
[14] *Id.* at Tr. 285:17-22.
[15] *Id.* at Tr. 293:12-295:18.
[16] *See id.*
[17] *Id.* at Tr. 296:8-16.

EXHIBIT    PAGE 217

Other matters covered at the deposition of De Anda – all issues relevant to this litigation – include: (1) a review of Investigative File 02-115 concerning Mattel's investigation at least as early as March 2002 that MGA and Isaac Larian allegedly hired Mattel employees and manufactured products based on designs that belonged to Mattel; (2) Mattel's August 2002 investigation of allegations raised in an anonymous letter that Carter Bryant helped MGA create Bratz while he was working with Mattel; (3) the fact that Mattel's policy on secondary employment only "discouraged," and did not prohibit it, and that De Anda, as Vice President of Global Security, disregarded the purported policy of obtaining written authorization to engage in secondary employment;[18] (4) the fact that De Anda, as Vice President of Global Security, construes Mattel's policy toward "moonlighting," i.e., secondary employment, as meaning that compensation he received for work he did at home, on weekends and even at Mattel's headquarters for the clients of his security consulting firm, Richard N. De Anda & Associates, belonged to him because it was "on Richard De Anda's time" as opposed to "Mattel's time";[19] and (5) the fact that De Anda did not disclose to Mattel a design patent for a product he invented prior to coming to work for Mattel and considers himself the "inventor" of the design patent even though he did not do the drawings or the prototypes reflected in it.[20]

Despite their best efforts, MGA and Bryant were unable to complete the deposition of De Anda in seven hours. Besides Investigative File 02-299, which Mattel has not produced, MGA and Bryant were not able to cover any of the other "related cases" Mattel had opened concerning the allegations at issue in this lawsuit. Further, they were not able to review or cover over 1200 pages of investigative files from the department of Global Security that Mattel produced a day and a half before

---

[18] *Id.* at Tr. 139:4-140:18.

[19] *Id.* at Tr. 27:13-31:22, 86:23-90:11, 97:5-100:2, 100:14-102:13, 103:19-104:18, 152:19-153:20, 157:6-19, 158:6-162:14.

[20] *Id.* at Tr. 80:18-86:21.

EXHIBIT 12 PAGE 258

1   De Anda's deposition.  As MGA pointed out in a letter in response to Mattel's effort
2   to dump these materials prior to the deposition of De Anda, Mattel's production did
3   not meet the parties' agreed-upon production protocol, and many of the documents
4   were in Spanish, meaning that MGA and Bryant could not meaningful review them
5   prior to the deposition of De Anda.[21]  Significantly, counsel for Bryant also did not
6   have any time to question De Anda.

7        MGA and Bryant raised these issues with Mattel at the deposition of De Anda
8   and in several items of follow-up correspondence.[22]  Mattel refused to produce De
9   Anda for an additional day of deposition on grounds that it viewed the matters
10  covered as "wholly irrelevant," and Mattel has had to seek leave when seeking
11  additional deposition testimony with MGA witnesses, namely Paula Garcia.[23]
12  Mattel's letter did not acknowledge that, pursuant to this court's previous orders,
13  Mattel has had over four days of deposition with Ms. Garcia.  Mattel has ignored and
14  refused to meet and confer on the matters concerning M0074400 and Investigative
15  File 02-299.[24]

16       Because of Mattel's unreasonably denial of an additional day of deposition
17  with De Anda, and its improper refusal to produce an unredacted version of the email
18  bearing Bates number M0074400 and a copy of Investigative File 02-299, MGA and
19  Bryant now move for an order compelling Mattel to do so.

20

21

22

23

24  [21] Mumford Decl., Ex. 4: December 18, 2007 Letter from Andrew Temkin to Heidi
25  Frahm.
    [22] Mumford Decl., Exs. 5 & 6: December 20, 2007 Email from Tom Nolan to Jon
26  Corey; December 21, 2007 Letter from Marcus Mumford to Jon Corey.
27  [23] Mumford Decl., Ex. 7: December 21, 2007 Letter from Jon Corey to Tom Nolan.
    [24] Mumford Decl., ¶ 9.
28

EXHIBIT *10* PAGE _219_

## II.    ARGUMENT

### A.    De Anda's Voluntary Disclosures Waived Mattel's Attorney-Client Privilege With Respect To M0074400.

The voluntary disclosure of privileged communications to a third party destroys confidentiality and the privilege asserted. *See In re Syncor ERISA Litig.*, 229 F.R.D. 636, 645 (C.D. Cal. 2005). "'As a general rule, implied waiver occurs when the party claiming the privilege has made any disclosure of a confidential communication to any individual who is not embraced by the privilege.'" *In re Grand Jury Subpoena*, 341 F.3d 331, 336 (4th Cir. 2003) (citation omitted).

Voluntary disclosures of attorney client communications during a deposition constitutes a waiver of the privilege. *See Hollins v. Powell*, 773 F.2d 191, 196 (8th Cir. 1985) ("Waiver will be implied when a client has testified concerning portions of the attorney-client communication."); *see also Adler v. Wallace Computer Servs., Inc.*, 202 F.R.D. 666, 674 (N.D. Ga. 2001) (finding that general counsel's disclosure of statements made by other corporate representatives seeking legal advice during his deposition waived the privilege). In *Hollins v. Powell*, the Eighth Circuit noted that testifying to the substance of conversations with an attorney, and failing to object to the questions eliciting the testimony waives the attorney-client privilege. *Id.* at 197.

Here, Mr. De Anda voluntarily disclosed his impressions and the content of conversations with in-house counsel, thus, waiving the attorney-client privilege. He also admitted that the information he obtained from these discussions were contained in the redacted portions of the email addressed to Mr. Alan Kaye. Thus, because Mr. De Anda voluntarily disclosed the content of his conversations with in-house counsel, any privilege with respect to the content of those conversations is waived, and Mattel must therefore produce an unredacted version of the M0074400 email.

### B.    Mattel Should Be Compelled To Produce Investigative File 02-299.

Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party. Fed. R. Civ. P. 26(b)(1). Under the

EXHIBIT 10 PAGE 220

1   liberal discovery rules of the Federal Rules of Civil Procedure, the information

2   sought "need not be admissible at the trial if the discovery appears reasonably

3   calculated to lead to the discovery of admissible evidence." *See id.*

4       Here, Mattel has failed to produce Investigative File 02-299, which De Anda

5   acknowledged at his deposition was a "related file" to the March 2002 investigation

6   and thus reasonably calculated to lead to the discovery of admissible evidence.  This

7   court will recall some history on the subject.  In compliance with Judge Infante's

8   (Ret.) January 30, 2007 Order to produce all documents relating to the 2002

9   Anonymous Letter, Mattel "produced non-privileged portions of files from Mattel's

10   Global Security department pertaining to … a file related to inquiries that Global

11   Security made in March 2002 about whether Carter Bryant had stolen a Mattel doll

12   project called Toon Teens."[25]  During the hearing regarding MGA's and Bryant's

13   joint motion to certify the completeness of Mattel's production, Mattel's counsel

14   represented that it "produced all documents related to the March 2002 investigation

15   that are responsive to MGA and Bryant's document requests."[26]  Based on that

16   representation, the court denied the motion to certify the completeness.

17       MGA and Bryant learned at the deposition of De Anda that, contrary to

18   Mattel's prior representations in connection with MGA's and Bryant's joint motion

19   for certification concerning all documents relating to the March 2002 investigation,

20   Mattel has not produced Investigative File 02-299.  In his deposition, Mr. De Anda

21   acknowledged that Investigative File 02-299 was related to the March 2002

22   investigation.[27]  He was directed to the file on the March 2002 investigation, which

23   states that it is "related," and testified that it "would be related either by location,

24

---

25   [25] Mumford Decl., Ex. 8: Order Granting MGA and Bryant's Joint Motion to Compel Production and Denying Motion to Attest Completeness dated May 15, 2007, at 2:25-3:4 ("Order").

26

27   [26] *Id.*: Order at 6:14-15.

28   [27] Mumford Decl., Ex. 1: De Anda Tr. at 293:1-294:24.

EXHIBIT *10* PAGE *221*

1  subject matter, type of issue [and] ... that there's some – there's some nexus to it."[28]

2  Therefore, based on the relevance of this file to the claims, Mattel should be

3  compelled to produce Investigative File 02-299.

4  **C.   Mattel Should Produce De Anda For An Additional Day Of**
     **Deposition.**

5

6       Additional deposition time is granted where there is good cause. *See Boston*

7  *Scientific Corp. v. Cordis Corp.*, 2004 WL 1945643, *3 (N.D. Cal. Sept. 1, 2004)

8  (defendant demonstrated "good cause" sufficient to support its request for additional

9  time to depose witness); *see also Burkett v. Hyman Lippit, P.C.*, 2007 WL 4201141,

10 * 2 (E.D. Mich. Nov. 28, 2007) (awarding defendants an extension of time to depose

11 witness); *Doe v. District of Colombia*, 2005 WL 3828731, *1 (D.D.C. Aug. 15, 2005)

12 (finding pursuant to Fed. R. Civ. P 26(b)(2) that additional deposition time was not

13 unreasonably cumulative or duplicative and burden did not outweigh benefit); *Grill v.*

14 *Costco Wholesale Corp.*, 2004 WL 2314639, *1(W.D. Wash. Oct. 7, 2004) (finding

15 good cause for an order compelling resumption of plaintiff's deposition for "an

16 amount of time necessary to complete defendant's questioning," and noting that not

17 all relevant documents were produced which defendant needed to examine plaintiff

18 about).

19       Here, it is beyond dispute that Mr. De Anda has personal knowledge regarding

20 the facts underlying the claims and defenses asserted in this matter.  MGA and

21 Bryant's request for additional time to depose Mr. De Anda is reasonable in light of

22 his role, involvement in the March 2002 investigation, and knowledge of the issues

23 being litigated in this matter.  Notably, Bryant's counsel did not get any time to

24 question De Anda.  Additionally, as indicated in a letter from MGA's counsel, dated

25 December 18, 2007 to Mattel's counsel, Mattel produced several documents,

26 appearing to be Mattel Global Security files, a day and a half before De Anda's

27

28 [28] *Id.* at Tr. 294:4-7.

EXHIBIT 10 PAGE 222

deposition.[29]  These documents should have been produced several months prior to the date, but were instead produced late and in such a manner as to prevent MGA and Bryant's counsel from having an opportunity to examine and review them.  They appeared to be from De Anda's department, but many were in Spanish.  Moreover, the documents were produced in violation of the parties' March 29, 2007 agreement, which requires documents to be produced "as single page TIFF digital files accompanied by Concordance and Opticon load files."[30]

These documents are relevant to Mr. De Anda's knowledge of the claims and defenses in this case and should have been produced earlier.  Mattel's late and faulty production denied MGA and Bryant's counsel the opportunity to examine Mr. De Anda with regards to the content of these documents.  Thus, Mattel created the need for additional time MGA and Bryant to complete their deposition of Mr. De Anda.

Therefore, in light of Mr. De Anda's role and knowledge of the facts at issue in this case, and Mattel's late production of relevant documents, MGA and Bryant are entitled to additional time to depose Mr. De Anda as provided by Rules 26 and 30 of the Federal Rules of Civil Procedure.

---

[29] Mumford Decl., Ex. 4: December 18, 2007 Letter from Andrew Temkin to Heidi Frahm.
[30] Id.

EXHIBIT 10 PAGE 223

## III.   CONCLUSION

For the foregoing reasons, MGA and Bryant respectfully request this Court to issue an order compelling Mattel to produce an unredacted version of the email bearing Bates number M0074400, a copy of the Investigative file 02-299, and Richard De Anda for an additional day of deposition.

DATED:   January 4, 2008

SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

By: _____
Raoul D. Kennedy
Attorney for MGA Entertainment, Inc.

KEKER & VAN NEST LLP

By: _____
Christa M. Anderson
Attorney for Carter Bryant

EXHIBIT _10_ PAGE _224_

Exhibit 11

**THIS EXHIBIT IS FILED UNDER SEAL
PURSUANT TO PROTECTIVE ORDER**