EXHIBIT 8

May 13, 2005

**VIA FACSIMILE**
 **AND U.S. MAIL**

Douglas A. Wickham, Esq.
Littler Mendelson
2049 Century Park East, 5th Floor
Los Angeles, California 90067

Bryant v. Mattel, Inc.

Dear Mr. Wickham:

I write in response to your April 26, 2005 letter to correct Bryant's mischaracterization that at the
March 15, 2005 meeting of counsel Mattel agreed to produce witnesses to address "topic
numbers from Mr. Bryant's Rule 30(b)(6) deposition notice 1, 2, 3, 4, 5, 6, 7, 8 (currently limited
to "Bratz"), 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 22, 23, 24, 27, 28, 29, 30, 31, 32, 33, 34,
35, 36, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 49, 50, 51, 53, 54, 55 and 56."

First, you assert that we agreed to designate witnesses to testify to the above-referenced topics
without the critical qualification that Mattel and Bryant agreed to significantly narrow the topics
designated in Bryant's 30(b)(6) notice. The agreements are documented in the 250+ page
transcript of our March 15, 2005 meeting. Mattel will, of course, designate witnesses to testify
regarding those narrowed topics on which we reached agreement. For Topics 1 and 49-51,
Mattel agreed to designate a witness to testify about the agreements that Bryant signed with
Mattel, and Mattel and Bryant agreed that would include no discussion of interpretation of those
agreements. For topics 2-6, 7, and 22-23, Mattel agreed to designate a witness to testify only
about the factual basis for Bryant's contractual and non-contractual obligations to Mattel and
Bryant's breach of those obligations, including identification of what was disclosed, converted or
misappropriated. As to topics 9, 38-40 and 42-45, Mattel agreed to designate a witness to testify

**EXHIBIT** __8__ **PAGE** __150__

about Toon Teens, including the development, the decision not to commercialize, the current status of Toon Teens, and the origination and creation of documents bates-labeled M0012567-71, M0012572-78, M0012579-86 and M0012587. As to topics 13 and 24, Mattel agreed to designate a witness to testify about the factual basis for Mattel's contention, if any, that Bratz originated from or is substantially similar to a Mattel property or work created by Bryant while employed by Mattel. As to topic 14, Mattel agreed to designate a witness to testify about Mattel's damages. As to topics 15-20, Mattel agreed to designate a witness to testify about when Mattel learned (a) that Bryant was working for MGA while employed by Mattel, and (b) of Bryant's involvement in the creation of Bratz. For topics 27-36, 47 and 53, Mattel agreed to designate a witness to testify about Electronic Information Topics, including (a) Operation of Electronic Mail System (1998-2000), Zeus (1998-2000) and P-2 System/Data (1998-2000) and (b) the Retention Policy for e-mail servers from 1998 to present, the document management system (for Designers) (1998-present) and phone logs (1999-2000). As to topic 41, Mattel agreed to designate a witness to testify about Mattel's lack of knowledge of who made the statements (other than those made by Matt Bousquette) quoted in the 2003 Wall Street Journal article. For topics 54-56, Mattel agreed to designate a witness to testify about Bryant's exit interview and misrepresentations that he made in that interview, including documents bates-labeled M0011667-68 and M001654. The transcript makes it very clear that Bryant similarly agreed to all of the above limitations. If you intend to back pedal on these agreements, please let me know as soon as possible.

Second, Mattel did not agree to designate witnesses for several of the topics identified in your letter. For example, Mattel refused to produce a witness for topics 10-12, despite your assertion to the contrary. Mr. Zeller stated: "We've discussed 10, 11 and 12, although more explicitly 10, and it's our intention to move for protective order on these other kinds of products." March 15, 2005 Tr. at 249:10-13.

Finally, Mattel should clarify its position with respect to topic 46. Topics 42-46 all request that Mattel designate a witness to testify about the creation of a series of bates-numbered documents ranging from M0012567-12617 and M0001558-81. Topics 42-45 relate to Toon Teens drawings, which Mattel has agreed to designate a witness to discuss. Topic 46, however, relates to pleadings filed by MGA in two litigations filed in the High Court of Hong Kong, MGA v. Uni-Fortune Toys, et al. and MGA v. Toys & Trends Ltd., et al. When the parties were discussing these topics, they did not have the documents before them. Mattel's agreement to designate a witness to testify to certain Toon Teens drawings does not include an agreement to designate a witness to testify about documents created by MGA or counsel for MGA and filed on its behalf in MGA's Hong Kong litigations. Mattel does not have knowledge of the creation of those documents. Accordingly, Mattel does not agree to designate a witness to testify about the MGA documents referenced in topic 46.

EXHIBIT ___8___ PAGE ___151___

If you have any questions regarding the foregoing, please do not hesitate to call.

Best regards,


Jon D. Corey

07209/#654164v1<QuinnEmanuel> -Ltr to Wickham resp to 4.26 ltr re Mattel's 30b6

cc: Paula A. Ambrosini, Esq.

3

EXHIBIT ___8___ PAGE ___152___

EXHIBIT 9

**THIS EXHIBIT IS FILED UNDER SEAL
PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 10

**THIS EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 11

**THIS EXHIBIT IS FILED UNDER SEAL
PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 12

**THIS EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 13

**THIS EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 14

CERTIFIED COPY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

MATTEL, INC., A DELAWARE )
CORPORATION, )
                 )
        PLAINTIFF, )
                 )
    VS. ) NO. CV-04 9059 (NM)
                 )
CARTER BRYANT, AN INDIVIDUAL; AND )
DOES 1 THROUGH 10, INCLUSIVE, )
                 )
        DEFENDANTS. )
                 )
_____ )
                 )
CARTER BRYANT, ON BEHALF OF )
HIMSELF, ALL PRESENT AND FORMER, )
EMPLOYEES OF MATTEL, INC., AND THE)
GENERAL PUBLIC, )
                 )
        COUNTER-COMPLAINANT, )
                 )
    VS. )
                 )
MATTEL, INC., A DELAWARE )
CORPORATION, )
                 )
        COUNTER-DEFENDANT. )
_____ )

VOLUME II

REPORTER'S TRANSCRIPT OF PROCEEDINGS

TUESDAY, MARCH 15, 2005

LOS ANGELES, CALIFORNIA

REPORTED BY:

JOHN M. TAXTER
C.S.R. NO. 3579, R.P.R.

JOB NUMBER:
41191LMF

LUDWIG KLEIN
REPORTERS & VIDEO, INC.
10868 KLING STREET
TOLUCA LAKE, CALIFORNIA 91602
800.540.0681     FAX 818.508.6326
e-mail: lois@ludwigklein.com

EXHIBIT __14__ PAGE _203_

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

1                    UNITED STATES DISTRICT COURT

2                   CENTRAL DISTRICT OF CALIFORNIA

3

4    MATTEL, INC., A DELAWARE            )
     CORPORATION,                        )
5                                        )
              PLAINTIFF,                 )
6                                        )
         VS.                             )  NO. CV-04 9059 (NM)
7                                        )
     CARTER BRYANT, AN INDIVIDUAL; AND   )
8    DOES 1 THROUGH 10, INCLUSIVE,       )
                                         )
9             DEFENDANTS.                )
     _____)
10                                       )
     CARTER BRYANT, ON BEHALF OF         )
11   HIMSELF, ALL PRESENT AND FORMER,    )
     EMPLOYEES OF MATTEL, INC., AND THE  )
12   GENERAL PUBLIC,                     )
                                         )
13            COUNTER-COMPLAINANT,       )
                                         )
14       VS.                             )
                                         )
15   MATTEL, INC., A DELAWARE            )
     CORPORATION,                        )
16                                       )
              COUNTER-DEFENDANT.         )
17   _____)

18

19           REPORTER'S TRANSCRIPT OF PROCEEDINGS, VOLUME

20       II, TAKEN AT 9:36 A.M., ON TUESDAY, MARCH 15, 2005,

21       AT 2049 CENTURY PARK EAST, FIFTH FLOOR, LOS

22       ANGELES, CALIFORNIA, BEFORE JOHN M. TAXTER,

23       C.S.R. NO. 3579, R.P.R., A CERTIFIED SHORTHAND

24       REPORTER IN AND FOR THE STATE OF CALIFORNIA.

25

                                                          139

                     VOLUME II

                     EXHIBIT __14__ PAGE __204__

1    APPEARANCES:

2    FOR PLAINTIFF AND COUNTER-DEFENDANT MATTEL, INC.:

3         QUINN EMANUEL URQUHART OLIVER & HEDGES,
              L.L.P.
4         BY:  MICHAEL ZELLER
              ATTORNEY AT LAW
5         865 SOUTH FIGUEROA STREET
          TENTH FLOOR
6         LOS ANGELES, CALIFORNIA  90017
          213.443.3180
7

8

9    FOR DEFENDANT CARTER BRYANT:

10        LITTLER MENDELSON
          BY:  DOUGLAS WICKHAM
11            ATTORNEY AT LAW
                  -AND-
12            KEITH JACOBY
              ATTORNEY AT LAW
13        2049 CENTURY PARK EAST
          FIFTH FLOOR
14        LOS ANGELES, CALIFORNIA  90067-2709
          310.553.0308

15

16   FOR INTERVENOR M.G.A. ENTERTAINMENT, INC.:

17        O'MELVENY & MYERS, L.L.P.
          BY:  ALICIA CARRASQUILLO MEYER
18            ATTORNEY AT LAW
                  -AND-
19            PAULA AMBROSINI
              ATTORNEY AT LAW
20        400 SOUTH HOPE STREET
          LOS ANGELES, CALIFORNIA  90071-2899
21        213.430.6000

22

23

24

25

                                                      140

                        VOLUME II

                   EXHIBIT __14__ PAGE __205__

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

1    OF THE LAWSUIT.  BUT, I MEAN, I CAN'T THINK OF A

2    CATEGORY THAT'S MORE FOURSQUARE ABOUT WHAT THIS LAWSUIT

3    IS ABOUT THAN THIS ONE.

4            AND SO, GIVEN THE FACT THAT YOU -- MATTEL HAS

5    NOT SPELLED OUT TO DATE PRECISELY THE DUTIES, EITHER

6    CONTRACTUAL, RELATED TO THE AGREEMENT, OR NONCONTRACTUAL

7    VIOLATIONS OF A HANDBOOK THAT HAVE BEEN VIOLATED, THE

8    ONLY WAY THAT WE CAN FLESH THAT OUT IS TO PROPOUND

9    A REQUEST SUCH AS THIS.  AND, AGAIN, WE DON'T -- WE

10   DON'T TAKE ISSUE WITH THE POSITION THAT MATTEL ISN'T

11   OBLIGATED TO SPELL OUT EXACTLY WHAT DUTIES THEY BELIEVE

12   WERE VIOLATED UNTIL SOME LATER DATE.  I SUPPOSE THAT

13   DATE WOULD BE THE PRETRIAL CONFERENCE ORDER.

14            MR. WICKHAM:  IT ALSO GOES TO LAYING THE

15   FACTUAL FOUNDATION FOR THE CLAIM OF A PARTICULAR DUTY.

16   I MEAN MATTEL HAS CLAIMED THAT BRYANT BREACHED FIDUCIARY

17   DUTIES.  WE BELIEVE THAT HE WAS NOT A FIDUCIARY; THAT HE

18   DOES NOT OWE FIDUCIARY DUTIES; THAT THE -- OH,

19   GOODNESS -- THE BANCROFT-WHITNEY CASE OUT OF THE

20   CALIFORNIA SUPREME COURT DEFINES THE NATURE AND EXTENT

21   OF FIDUCIARY DUTIES IN A CORPORATE CONTEXT, AND, FOR A

22   LINE EMPLOYEE OF MR. BRYANT'S LEVEL, THAT HE SIMPLY

23   DOESN'T RISE TO THE LEVEL OF BEING A FIDUCIARY;

24   THEREFORE, HE CAN'T BE SUED FOR BREACH OF FIDUCIARY

25   DUTY.

EXHIBIT _14_ PAGE _206_

LUDWIG KLEIN REPORTERS & VIDEO, INC.    800.540.0681

1           BUT, TO THE EXTENT THAT YOU HAVE A WITNESS WHO

2    WILL TESTIFY AS TO THE FACTUAL BASIS FOR YOUR CONTENTION

3    THAT HE OWES FIDUCIARY DUTIES -- I.E., DOES HE OCCUPY

4    A POSITION OF TRUST? DOES HE HOLD SOME HIGH CORPORATE

5    POSITION AS A MANAGING DIRECTOR, OFFICER, OR SOME OTHER

6    CAPACITY ESTABLISHING CORPORATE FIDUCIARY DUTIES? -- WE

7    NEED TO BE ABLE TO ASK THAT WITNESS THOSE QUESTIONS IN

8    ORDER TO EITHER CHALLENGE MATTEL'S ASSERTION THAT HE

9    OWED FIDUCIARY DUTIES OR TO SIMPLY ACCEPT IT BECAUSE

10   YOU'VE LAID A FOUNDATION FOR IT.

11           MR. ZELLER:   OKAY.   WELL, THERE ARE A COUPLE

12   THINGS, SOME OF WHICH HAVE POTENTIALLY THE SEEDS OF A

13   RESOLUTION ON THIS.

14           ONE CONCERN WITH RESPECT TO TOPIC 2 -- AND THE

15   WAY THAT YOU WERE TALKING ABOUT IT, KEITH, IS THAT IT

16   SOUNDS LIKE YOU WANT SOMEONE TO COME IN AND TESTIFY

17   ABOUT, YOU KNOW, LEGAL OBLIGATIONS, CONTENTIONS; THAT

18   SORT OF THING.   OBVIOUSLY, WE DON'T THINK THAT'S THE

19   APPROPRIATE VEHICLE FOR FINDING OUT THAT KIND OF

20   INFORMATION.   CERTAINLY, THE FACTUAL BASIS IS CERTAINLY

21   FAIR GAME.   THAT I DON'T HAVE AN ISSUE WITH.   SO TO THE

22   EXTENT -- I MEAN ONE THING IS, OF COURSE, THIS IS --

23   THIS IS FRAMED IN TERMS OF, YOU KNOW, WHAT WILL HAVE

24   BEEN THE ULTIMATE LEGAL CONCLUSION.   WITH RESPECT TO

25   PROVIDING A WITNESS TO TALK ABOUT THE FACTUAL

VOLUME II

EXHIBIT ___14___ PAGE _207_

1   UNDERPINNINGS FOR THOSE DUTIES, THAT'S NOT AN ISSUE.

2   THAT WE CAN DO.  BUT PART OF THE ISSUE, YOU KNOW,

3   PERTAINS TO, YOU KNOW, HOW THIS THING IS FRAMED AND SET

4   OUT.

5          WITH RESPECT TO, YOU KNOW, THE NOTION OF

6   FIDUCIARY DUTIES, YOU KNOW, I DON'T WANT TO GO TOO FAR

7   AFIELD HERE, BUT, YOU KNOW, THE BANCROFT CASE ALSO

8   STATED VERY CLEARLY, AS WELL AS OTHER CASES DEALING WITH

9   THIS SITUATION, THAT FIDUCIARY DUTY CAN ARISE NOT ONLY

10  BECAUSE OF THE NATURE OF THE PERSON'S OBLIGATIONS OR THE

11  POSITION THAT THAT PERSON HAD BUT BECAUSE THEY'RE

12  CONTRACTUALLY ACQUIRED.  AND THERE IS A PROVISION IN

13  MR. BRYANT'S CONTRACT THAT SO STATES.

14          SO, YOU KNOW, IT'S NOT -- SO THESE DO OVERLAP

15  TO SOME DEGREE.  I MEAN, OBVIOUSLY, HAVING A WITNESS

16  COME IN AND TESTIFY AND SAY, "WELL, YOU KNOW, MATTEL'S

17  POSITION IS THAT HE IS A FIDUCIARY BECAUSE IT'S SET

18  FORTH HERE IN THE CONTRACT," I MEAN, I PRESUME THAT'S

19  NOT WHAT YOU'RE LOOKING FOR.

20          MR. JACOBY:  NO.  I MEAN TO IMPOSE AN

21  OBLIGATION ON SOMEONE, EITHER CONTRACTUAL OR

22  NONCONTRACTUAL, THAT OBLIGATION HAS TO BE ARTICULATED.

23  I MEAN IT GOES -- THERE IS -- I AGREE THAT IT WOULD BE

24  IMPROPER TO SAY TO THIS P.M.K., "UNDER CALIFORNIA LAW

25  DOES THIS CONTRACT MEAN THIS?"

VOLUME II

EXHIBIT ___14___ PAGE ___208___

LUDWIG KLEIN REPORTERS & VIDEO, INC.    800.540.0681

1          AND, IF YOU'RE INTERPRETING THIS CATEGORY TO

2     CALL FOR THOSE TYPE OF QUESTIONS, WELL, THEN AGAIN YOU

3     COULD OBJECT AND SAY THAT CALLS FOR A LEGAL CONCLUSION.

4          BUT, IF I SAY, "DOES MATTEL EXPECT THAT

5     EMPLOYEES OWE A DUTY NOT TO HAND OVER, YOU KNOW, SECRET

6     PROJECTS TO COMPETITORS?" I PRESUME THE ANSWER WOULD BE,

7     "YES."

8          AND THEN I'D SAY, "WELL, WHAT IS THE SOURCE OF

9     YOUR BELIEF THAT THAT IS -- THAT MATTEL EMPLOYEES OWE

10    SUCH A DUTY?" AND THEN THEY CAN TALK ABOUT WHAT WHATEVER

11    THEY'RE GOING TO TALK ABOUT.

12         "IT'S IN THE HANDBOOK.  IT'S IN THE CONTRACT.

13    WE HAVE MEETINGS ABOUT THAT.  IT'S POSTED ON THE WALL."

14    I MEAN THAT'S HOW -- TO IMPOSE AN OBLIGATION ON AN

15    EMPLOYEE, YOU HAVE TO EXPLAIN IT TO THEM.  YOU CAN'T

16    KEEP IT -- AND, CERTAINLY, IF YOU'RE GOING TO SUE ON IT,

17    YOU HAVE TO PROVE IT AS AN ELEMENT OF YOUR CASE.

18         SO WHAT I'M TRYING TO FIND OUT BEFORE THE

19    PRETRIAL CONFERENCE ORDER IS, WHAT ARE THE DUTIES THAT

20    YOU BELIEVE -- MATTEL BELIEVES HAVE BEEN BROKEN, HAVE

21    NOT BEEN MET BY CARTER?

22         AND SO THE FIRST STEP IN MY FINDING OUT THAT

23    PROCESS AFTER READING THE CONTRACTS AND READING THE

24    HANDBOOKS IS TO GET LIVE TESTIMONY ON WHAT PEOPLE

25    BELIEVE THOSE DUTIES ARE, WHAT MATTEL ASSERTS THOSE

VOLUME II

EXHIBIT ___14___ PAGE _209_

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

1    DUTIES ARE.  AND I THINK THAT, WHILE TECHNICALLY THERE

2    IS A LEGAL ASPECT TO IT, THE DEPOSITION ISN'T DIRECTED

3    TOWARD THE LEGAL ASPECT TO IT.  SOME DAY A JUDGE WILL

4    DECIDE WHETHER MATTEL HAS COMMUNICATED THOSE DUTIES,

5    WHETHER THOSE DUTIES EXIST, WHETHER THOSE DUTIES ARE

6    UNCONSISTENT OR CONSISTENT WITH CALIFORNIA OR FEDERAL

7    LAW.

8           BUT IN DISCOVERY MATTEL IS OBLIGATED, WHEN

9    THEY SUE ON BREACH OF CONTRACT OR OR BREACH OF FIDUCIARY

10   DUTY, TO SAY WHAT THE DUTIES ARE, AND THAT'S THE

11   TESTIMONY WE'RE TRYING TO GET.

12          SO I'M WILLING TO STIPULATE THAT YOU CAN

13   RESERVE THE RIGHT ON THIS CATEGORY AND EVERY CATEGORY TO

14   ASSERT THAT A PARTICULAR QUESTION CALLS FOR A LEGAL

15   CONCLUSION, BUT, CLEARLY, THERE ARE QUESTIONS RELATED TO

16   THIS CATEGORY THAT WOULD NOT.

17          MR. ZELLER:  IF WHAT YOU'RE SAYING IS THAT

18   YOU'RE LOOKING FOR FACTUAL -- YOU KNOW, FACTUAL

19   INFORMATION PERTAINING TO THESE CATEGORIES, THEN THAT

20   WOULD BE POTENTIALLY --

21          MR. JACOBY:  EVERY SINGLE ONE OF THEM.

22          MR. ZELLER:  OKAY.

23          MR. JACOBY:  EVERY SINGLE ONE OF THEM.

24          MR. WICKHAM:  IT SO HAPPENS THAT PEOPLE IN THE

25   HUMAN RESOURCES DEPARTMENT WHO HAVE FACILITY WITH

159

EXHIBIT __14__ PAGE __210__

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

1   CONTRACTS AND ARE RESPONSIBLE FOR EMPLOYEE ORIENTATION

2   AND THINGS OF THAT NATURE WILL HAVE A LAY UNDERSTANDING

3   OF CERTAIN LEGAL TERMS.  AND SO BECAUSE -- JUST BECAUSE

4   THERE MAY BE A LEGAL ASPECT OF A PARTICULAR QUESTION, IF

5   IT'S PART AND PARCEL OF THE H.R. PERSON'S DUTIES AND

6   RESPONSIBILITIES TO UNDERSTAND THESE THINGS AND TO

7   EXPLAIN THEM TO EMPLOYEES, THEN WE ALSO WOULD BE

8   ENTITLED TO BE EXPLORING THOSE ISSUES, YOU KNOW, WITH

9   THE H.R. PEOPLE AND EXPLORING THE DEGREE TO WHICH THEY

10  COMMUNICATE THESE THINGS TO THE EMPLOYEES AND

11  SPECIFICALLY THE DEGREE TO WHICH THEY COMMUNICATED THE

12  DUTIES TO MR. BRYANT.

13          SO, I MEAN, WHILE YOU ABSOLUTELY HAVE A RIGHT

14  TO MAKE WHATEVER OBJECTIONS AS TO FORM AND ANYTHING ELSE

15  AT DEPOSITIONS THAT, YOU KNOW, ARE APPROPRIATE UNDER THE

16  RULES, THAT A PARTICULAR QUESTION IN A PARTICULAR

17  CONTEXT, YOU KNOW, MAY TECHNICALLY CALL FOR A LEGAL

18  CONCLUSION WOULDN'T BE A BASIS EITHER FOR REFUSING TO

19  PRODUCE SOMEONE IN RESPONSE TO A TOPIC OR FOR, YOU KNOW,

20  WITHHOLDING THAT, IF IT'S PART OF THAT PERSON'S

21  THEMSELVES DUTIES AND RESPONSIBILITIES AS IN THE

22  H.R. FUNCTION.

23          MR. JACOBY:  LET ME GIVE YOU AN EXAMPLE OF HOW

24  I THINK THE DISTINCTION BETWEEN THESE TWO ISSUES WOULD

25  PLAY OUT IN A LINE OF QUESTIONING.

160

VOLUME II

EXHIBIT _14_ PAGE _211_

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

1    PROVISIONS OF THE CONTRACT DOES MATTEL BELIEVE WERE

2    BREACHED, AND WHAT'S YOUR BASIS -- WHAT IS THE FACTUAL

3    BASIS FOR THAT BELIEF?"

4            "WELL, WE ALLEGE THAT HE BREACHED SUBSECTION 4

5    OF THE INVENTIONS AND ASSIGNMENT AGREEMENT."

6            "WHY DO YOU BELIEVE THAT?"

7            "WELL, BECAUSE HE WAS USING OUR FAX MACHINE

8    AND HE SHOULDN'T HAVE BEEN USING IT TO WORK WITH M.G.A."

9    I MEAN THAT'S HOW YOU DO THIS.  I CAN'T GET INSIDE

10   MATTEL'S HEAD AND GUESS WHAT THEY THINK BRYANT DID

11   WRONG.  SOMEBODY HAS TO TELL ME, "THIS IS WHAT WE THINK

12   BRYANT DID WRONG."

13           MR. WICKHAM:  AND WHAT WE DID DO IS TO SERVE

14   CONTENTION INTERROGATORIES.  WE DID ASK IN INTERROGATORY

15   NO. 3 FOR MATTEL TO STATE ALL FACTS EVIDENCING ITS

16   CONTENTION THAT BRYANT IS IN A FIDUCIARY RELATIONSHIP

17   WITH MATTEL.  MATTEL RESPONDED WITH ITS VERIFIED

18   INTERROGATORY RESPONSES, AND WE SEEK TO DEPOSE A

19   30(B)(6) WITNESS WITH REGARD TO THE FACTS THAT ARE LAID

20   OUT IN MATTEL'S INTERROGATORY RESPONSES WHICH GO TO WHAT

21   DUTIES THAT MATTEL BELIEVES THAT BRYANT OWED TO THEM.

22           SO I THINK THAT, AGAIN, THERE IS SOME CHANCE

23   THAT WE CAN RESOLVE THIS, IF WE CAN AGREE THAT, AS TO

24   THE FACTUAL BASIS FOR THE PARTICULAR TOPICS THAT WE'RE

25   TALKING ABOUT, THAT SHOULD BE FAIR GAME.  AND, AS TO ANY

168

VOLUME II

EXHIBIT __14__ PAGE __2/2__

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

1    OTHER MATTERS, I MEAN, I DON'T WANT TO -- YOU WANT TO

2    RESERVE YOUR OBJECTIONS, BUT I DON'T WANT TO

3    CHARACTERIZE THAT.  BUT THIS IS A DISCOVERABLE TOPIC.

4            MR. JACOBY:  I MEAN I AGREE THAT I ANTICIPATE

5    FULLY THAT THERE WILL BE DISAGREEMENTS ABOUT ANY GIVEN

6    QUESTION ABOUT WHETHER IT CALLS FOR A PURE LEGAL

7    CONCLUSION OR WHETHER IT CALLS FOR THE ACTUAL

8    UNDERPINNING OF A LEGAL CONTENTION.  THERE'S NO WAY I

9    COULD GUARANTEE, NOR COULD YOU, THAT I WON'T COME UP

10   WITH SOME QUESTION THAT YOU WOULD OBJECT TO ON THAT

11   BASIS, NOR COULD I GUARANTEE OR ALICIA GUARANTEE THAT

12   MATTEL WON'T COME UP WITH SOME OBJECTION OR THAT THEY

13   WON'T COME UP WITH SOME OBJECTION WHEN MATTEL ASKS THE

14   SAME KIND OF QUESTIONS TO BRYANT OR M.G.A.  BUT I THINK

15   THAT THERE'S AGREEMENT HERE THAT, IN TERMS OF FACTUAL

16   UNDERPINNINGS, THAT IS FAIR GAME FOR DISCOVERY.

17           WHAT I WOULD PROPOSE IS THAT WE AGREE, WITH

18   RESPECT TO NO. 2, THAT YOU WILL PRODUCE A WITNESS ON THE

19   FACTUAL UNDERPINNINGS OF THE DUTIES THAT BRYANT OWED TO

20   MATTEL DURING HIS EMPLOYMENT AND THAT WE WILL MEET AND

21   CONFER AFTER THAT SECTION OF THE DEPOSITION CONCLUDES ON

22   ANY AREAS WHERE YOU BELIEVE WE WERE ASKING FOR SOMETHING

23   MORE THAN THAT BECAUSE I AGREE WITH YOU IN PRINCIPLE

24   THAT WE'RE ENTITLED TO FACTS, NOT LEGAL CONCLUSIONS.

25           MR. ZELLER:  RIGHT.  AND JUST SO IT'S CLEAR,

                                                    169

VOLUME II

EXHIBIT  14  PAGE  213

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

1    THOUGH, WE APPEAR TO HAVE A FAIR AMOUNT OF COMMON GROUND

2    HERE, BUT THE ONE THING I JUST WANT TO MAKE VERY CLEAR

3    IS THAT WHEN -- IF YOU'RE GOING TO BE ASKING WITNESSES

4    LIKE, "DOES MATTEL ALLEGE," "DOES MATTEL CONTEND," THOSE

5    SORT OF QUESTIONS I DON'T THINK ARE APPROPRIATELY

6    DIRECTED TO A 30(B)(6) WITNESS.   I THINK THAT THERE IS

7    PRETTY DECENT AUTHORITY FOR THE PROPOSITION THAT ASKING

8    OR -- ASKING FOR THE DESIGNATION OF A CORPORATE

9    REPRESENTATIVE TO SAY, "WELL, OUR ALLEGATIONS IN THE

10   CASE OR OUR CONTENTIONS IN THE CASE ARE 'X,' 'Y,' AND

11   'Z,'" ISN'T A PROPER STARTING POINT FOR WITNESS

12   TESTIMONY.   AND THAT'S WHERE I THINK WE HAVE, YOU KNOW,

13   AT LEAST ONE -- PROBABLY THE ONLY THING IT APPEARS THAT

14   WE REALLY NEED TO SORT OUT ON THAT, OR, "DOES MATTEL

15   ALLEGE"; THOSE KIND OF QUESTIONS THAT YOU WERE GIVING

16   EXAMPLES OF.

17            MR. WICKHAM:   WELL, I THINK THAT THOSE ARE

18   THINGS THAT ARE THE SUBJECT OF THE INTERROGATORIES THAT

19   WE HAD SERVED AND THAT WE'VE GOT SOME ISSUES WITH THAT.

20   IN PRINCIPLE, I AGREE WITH YOU.

21            ON THE OTHER HAND, A CORPORATION, LIKE AN

22   INDIVIDUAL, HAS TO HAVE A GOOD-FAITH BASIS GROUNDED IN

23   FACTS AND LAW FOR ASSERTING ITS COMPLAINT.   A

24   CORPORATION IS SUBJECT TO NUMEROUS OBLIGATIONS.

25            MR. ZELLER:   ALL I'M ACTUALLY SAYING IS THAT

170

VOLUME II

EXHIBIT __14__ PAGE __214__

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

1    I AGREE AT SOME POINT IN SOME MANNER MATTEL DOES HAVE TO

2    SPELL OUT ITS CONTENTIONS.   I AGREE THAT, IF WHAT YOU

3    WOULD LIKE TO DO TO AVOID THAT PROBLEM AND PUSH THROUGH

4    THAT ISSUE IS REVISIT YOUR INTERROGATORY RESPONSES, NOW

5    THAT YOU HAVE HAD BRYANT'S DEPOSITION AND ABOUT FOUR

6    OTHER DEPOSITIONS AND YOU'VE GOTTEN DOCUMENTS FROM

7    M.G.A. AND YOU'RE MORE INFORMED THAN YOU MAY HAVE BEEN

8    WHEN YOU WERE FIRST ANSWERED THEM -- MAYBE YOU'VE DONE

9    MORE INTERNAL INVESTIGATION -- THEN I THINK THAT'S FINE;

10   THAT WE CAN AGREE ON A DATE THAT YOU AMEND YOUR

11   INTERROGATORY RESPONSES, AND THEN THAT WILL BE PART OF

12   THE FRAMEWORK FOR THESE 30(B)(6) DEPOSITIONS.

13        MR. WICKHAM:   RIGHT.   BUT ONE THING, JUST

14   BY -- FOR CLARITY, IS THAT JUST BECAUSE A PARTICULAR

15   ALLEGATION IS A CONTENTION IN THIS COMPLAINT DOESN'T

16   MEAN THAT IT MAY NOT BE A PROPER 30(B)(6) TOPIC.

17        I MEAN MATTEL DOES CONTEND THAT BRYANT

18   CONVERTED ITS PROPERTY.   WE WANT TO ASK THE 30(B)(6)

19   WITNESS, "TELL US ALL PROPERTY -- ALL MATTEL PROPERTY

20   THAT YOU -- THAT MATTEL BELIEVES BRYANT STOLE,

21   CONVERTED, USED."   I MEAN WE'LL TRY TO AVOID USING

22   LEGALLY CHARGED TERMINOLOGY IN ASKING THE QUESTION, BUT,

23   BASICALLY, WE WANT TO GET TO THE BOTTOM OF WHAT IT IS

24   THAT MATTEL THINKS THAT BRYANT DID.   THAT IS A FACTUAL

25   QUESTION DIRECTED TO THE WITNESS.   IT SO HAPPENS TO BE

172

VOLUME II

EXHIBIT ____14____ PAGE _215_

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

1    ONE OF MATTEL'S CONTENTIONS, BUT IT DOESN'T MEAN THAT

2    IT'S NOT OTHERWISE FAIR GAME, YOU KNOW, FOR A 30(B)(6)

3    DEPOSITION.

4            MR. JACOBY:  I MEAN IT'S -- I THINK YOU CAN

5    PROBABLY FRAME THAT TYPE OF A QUESTION IN AN IMPROPER

6    WAY AND IN A PROPER WAY.  I THINK, IF BRYANT WERE TO

7    POSE, "PLEASE STATE THE BASIS FOR MATTEL'S CONTENTION

8    THAT BRYANT CONVERTED ANYTHING," IT WOULD PROBABLY NOT

9    BE A PROPER QUESTION.

10           BUT, IF I ASKED, "ARE YOU AWARE THAT BRYANT

11   GAVE ANYTHING THAT MATTEL OWNED TO SOMEBODY ELSE OUTSIDE

12   MATTEL?" I THINK THAT IS A PROPER QUESTION AND CALLS FOR

13   A FACT.  IT CALLS FOR WHAT THIS MATTEL WITNESS KNOWS

14   ABOUT WHAT BRYANT TOOK FROM MATTEL AND HANDED TO

15   SOMEBODY ELSE.  AND WHETHER THAT CONSTITUTES CONVERSION

16   IS A MATTER OF LAW; IS SOMETHING A JUDGE WILL DECIDE OR

17   A JURY WILL DECIDE LATER.

18           MR. WICKHAM:  I MEAN WE'LL GET REALLY SIMPLE.

19           DOES MATTEL BELIEVE THAT MR. BRYANT STOLE

20   SOMETHING FROM MATTEL?  YOU KNOW, DOES MATTEL BELIEVE

21   THAT, YOU KNOW, MR. BRYANT, YOU KNOW, GAVE SOMETHING OF

22   MATTEL'S TO SOMEONE THAT HE WASN'T ALLOWED TO GIVE IT

23   TO?

24           I MEAN WE CAN HAVE IT AS SIMPLE AND

25   STRAIGHTFORWARD.  BUT, AGAIN, ALTHOUGH THOSE MAY BE

173

EXHIBIT ___14___ PAGE ___216___

LUDWIG KLEIN REPORTERS & VIDEO, INC.    800.540.0681

1    CONTENTIONS IN MATTEL'S COMPLAINT, IT DOESN'T MEAN THAT

2    THEY'RE NOT PROPER FACTUAL INQUIRIES OF A 30(B)(6)

3    DEPOSITION WITNESS.

4            MR. ZELLER:   WELL, I MEAN, WITHOUT COMMENTING

5    ON THE PARTICULAR EXAMPLES THAT YOU'RE GIVING OF THE

6    TYPES OF QUESTIONS, MY PARTICULAR CONCERN JUST GOES TO,

7    YOU KNOW, AT THIS JUNCTURE, IN TRYING TO COME UP WITH A

8    FRAMEWORK FOR DEALING WITH THESE VARIOUS ISSUES -- IS

9    THAT, YOU KNOW, WE REACH RESOLUTION -- AND I BELIEVE

10   THAT WE HAVE -- THAT IT'S NOT YOUR EXPECTATION THAT

11   WITNESSES ARE GOING TO BE PRODUCED THAT ARE GOING TO SAY

12   IN RESPONSE TO QUESTIONS, "DOES MATTEL ALLEGE 'X'?  DOES

13   MATTEL ALLEGE 'Y'?" AND THAT THESE WITNESSES --

14           MR. JACOBY:   THAT'S NOT MY ENVISIONING OF HOW

15   WE'RE DOING TO DO THIS.  I THINK THE WAY I ENVISION THAT

16   WE'RE GOING TO DO THIS IS THAT WE'RE GOING TO ASK IN

17   INTERROGATORIES, "WHAT DO YOU CONTEND BRYANT CONVERTED?"

18           AND SO LET'S SAY THE ANSWER TO THE QUESTION

19   WAS, "THE MASTER BRATZ DRAWINGS."

20           AND THEN WE GO TO THE 30(B)(6) DEPOSITION AND

21   SAY, "WHY DO YOU BELIEVE MR. BRYANT CONVERTED THE MASTER

22   BRATZ DRAWINGS?"

23           "WELL, MATTEL BELIEVES THAT BECAUSE MATTEL

24   BELIEVES THAT THEY WERE DRAWN WHILE HE WORKED AT

25   MATTEL."

174

VOLUME II

EXHIBIT __14__ PAGE _217_

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

1        "WHY DO YOU BELIEVE THAT?"

2        "WELL, BECAUSE WE SAW SOMEONE DRAWING THEM

3   WHILE HE WAS AT MATTEL."  I MEAN THAT'S PROPER QUESTIONS

4   AND ANSWERS IN A 30(B)(6) DEPOSITION.  IT'S NOT TRUE,

5   BUT THAT WOULD BE PROPER.  THE CONTENTION, APPLYING

6   FACTS TO LAW, MATTEL IS OBLIGATED TO DO IN INTERROGATORY

7   RESPONSES WITH THE ASSISTANCE OF COUNSEL.  ASCERTAINING

8   THE FACTUAL BASIS THAT UNDERPINS THAT CONTENTION, WHAT

9   HE CONVERTED, IN MY VIEW, THAT'S THE PROPER BASIS OF A

10  30(B)(6) DEPOSITION.

11       NOW, THEORETICALLY YOU COULD GIVE THOSE SAME

12  FACTS IN AN INTERROGATORY RESPONSE.  "WE BELIEVE BRYANT

13  CONVERTED THE MASTER BRATZ DRAWINGS BECAUSE WE SAW HIM

14  DOING THEM ON SEPTEMBER 20TH, 2000."  THAT COULD BE PART

15  OF AN INTERROGATORY RESPONSE.  BUT THE PURPOSE OF A

16  30(B)(6) DEPOSITION IS TO EXPLORE THOSE FACTS.

17       WHO SAW HIM DRAWING IT?  WHERE DID YOU SEE IT?

18  WHEN DID THAT HAPPEN?  WHO DID YOU TELL?

19       I MEAN THAT'S -- THOSE ARE ALL FACTS.  THEY

20  DON'T CALL FOR LEGAL CONCLUSIONS, AND I THINK THAT'S

21  WITHIN THE SCOPE OF AT LEAST, YOU KNOW, FIVE OR TEN OF

22  THESE CATEGORIES.

23       SO CAN WE AGREE, THEN, THAT THE FRAMEWORK FOR

24  THESE RESPONSES TO -- AND WE CAN SEE IF WE CAN APPLY

25  THIS TO OTHERS -- IS THAT MATTEL WILL REVISIT ITS

175

EXHIBIT ___14___ PAGE ___218___

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

1    INTERROGATORY RESPONSES AND LAY OUT ANY FURTHER

2    FACTUAL -- ANY FURTHER CONTENTIONS THAT IT BELIEVES IT

3    NEEDS TO DO TO PROPERLY FRAME IN ITS MIND THE SCOPE OF

4    THESE 30(B)(6) CATEGORIES, AND THEN AT THE DEPOSITION

5    YOU WILL HAVE THE RIGHT TO OBJECT AND INSTRUCT ON THE

6    GROUNDS THAT WE CROSSED THE LINE INTO A LEGAL

7    CONCLUSION, BUT WE WOULD HAVE THE RIGHT TO EXPLORE THE

8    FACTUAL UNDERPINNINGS OF THE CONTENTIONS THAT ARE

9    IDENTIFIED EITHER IN THE COMPLAINT OR IN THE

10   INTERROGATORY RESPONSES OR ARE SUGGESTED BY DOCUMENTS OR

11   OTHER INFORMATION THAT'S BEEN PRODUCED OR THAT WE'VE

12   LEARNED THROUGH OTHER SOURCES?

13           MR. ZELLER:  YEAH.  I THINK THAT THAT'S SORT

14   OF THE FRAMEWORK I WAS PROPOSING, AND I THINK THAT

15   THAT'S --

16           MR. JACOBY:  OKAY.

17           MR. ZELLER:  I THINK THAT GETS US A FAIR

18   DISTANCE.

19           MR. JACOBY:  OKAY.

20           MR. ZELLER:  ONE THING, JUST SO IT'S CLEAR,

21   YOU'RE RAISING, TOO, IN TERMS OF, YOU KNOW, SOME OF

22   THESE, SOME OF THESE, YOU KNOW, WILL HAVE TO BE ANOTHER

23   SET OF ISSUES WE'RE GOING TO HAVE TO ADDRESS KIND OF

24   GENERALLY SPEAKING WITH RESPECT TO PRODUCING A 30(B)(6)

25   WITNESS TO, YOU KNOW, TALK ABOUT CERTAIN THINGS THAT

176

VOLUME II

EXHIBIT 14 PAGE 219

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

1    CARTER BRYANT DID THAT WEREN'T NECESSARILY AT MATTEL'S

2    DESIGN CENTER OR, YOU KNOW, THE LIKE.

3              I MEAN THAT'S SORT OF A SEPARATE ISSUE

4    BECAUSE, OBVIOUSLY, THERE'S INFORMATION THROUGH

5    DISCOVERY AND THAT SORT OF THING IN THE LAWSUIT.  YOU

6    KNOW, WE CAN TALK ABOUT WHAT THE PARAMETERS OF THOSE

7    SORT OF THINGS WOULD BE WITH RESPECT TO OUR HAVING TO

8    EDUCATE A WITNESS TO DISCUSS THOSE SORT OF THINGS.  BUT,

9    I MEAN, I THINK GENERALLY SPEAKING WE'RE SORT OF -- I

10   THINK WE HAVE AN AGREEABLE FRAMEWORK FOR TRYING TO DEAL

11   WITH THESE THINGS.

12             MR. WICKHAM:  AND IT'S PERFECTLY APPROPRIATE

13   FOR A WITNESS TO SAY, "I DON'T KNOW WHAT HE DID AT

14   M.G.A., BUT IT SURE LOOKS BAD TO US," OR SOMETHING LIKE

15   THAT.  SO, I MEAN --

16             MR. ZELLER:  ALSO, I MEAN, PART OF THE PROBLEM

17   IS, TOO, IN TERMS OF WHAT DO WE -- WHAT ARE THE

18   PARTIES' EX -- YOU KNOW, WHAT ARE YOUR EXPECTATIONS, AND

19   WHAT CAN WE DO IN TRYING TO RESOLVE SOME OF THESE

20   ISSUES?

21             AND PARTICULARLY THE SCOPE OF SOME OF THE

22   TOPICS THAT ARE SET FORTH IN THE 30(B)(6) NOTICE IS THAT

23   OBVIOUSLY THERE ARE RESTRICTIONS ON WHAT IT IS THAT WE

24   CAN SHARE WITH, YOU KNOW, THE CORPORATE REPRESENTATIVES,

25   YOU KNOW, THE INFORMATION THAT'S IN THE CASE.  SO --

177

EXHIBIT __14__ PAGE __220__

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

1          MR. JACOBY:  I UNDERSTAND THAT.

2          MR. ZELLER:  -- THAT'S SOMETHING WE'RE GOING

3  TO HAVE TO DEAL WITH IN TERMS OF THE PARAMETERS OF SOME

4  OF THESE TOPICS.

5          MR. JACOBY:  I UNDERSTAND.  THAT'S PROBABLY

6  TRUE OF EVERY TOPIC.  BUT, AGAIN, WE'RE JUST TRYING TO

7  FIND OUT WHAT YOU'RE GOING TO TELL THE JURY ONE DAY.  AT

8  LEAST ON THE FACE OF IT, YOU KNOW, I'D BE INTERESTED IN

9  KNOWING WHAT YOU AND MICHAEL MOORE BELIEVE ON THIS

10  STUFF.  I DON'T HAVE ANY EXPECTATION THAT THAT'S WHAT

11  WE'RE GOING TO GET HERE.

12          SO I THINK WHY DON'T WE TRY TO SEE HOW MANY OF

13  THESE OTHER CATEGORIES IN GROUP 3 WE COULD APPLY THE

14  CAVEAT I BELIEVE WE'VE JUST AGREED TO THAT, 1, MATTEL

15  WILL GO BACK AND REVISIT ITS RESPONSES TO THE CONTENTION

16  INTERROGATORIES THAT HAVE BEEN PROPOUNDED AND AMEND THEM

17  BEFORE THE 30(B)(6) DEPOSITION;

18          2, THAT YOU WILL TRY AND WE'LL TRY TO IDENTIFY

19  A WITNESS TO TESTIFY TO THE FACTUAL UNDERPINNINGS OF

20  THOSE CONTENTIONS;

21          3, THAT MATTEL WILL RESERVE THE RIGHT TO

22  PRODUCE ONE OR MORE WITNESSES ON A SINGLE CATEGORY, IF

23  THE SCOPE OF THE REQUEST IS BROAD ENOUGH THAT IT WOULD

24  REQUIRE IT;

25          4, THAT MATTEL RESERVES ITS RIGHT TO OBJECT ON

                                                    178

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

1    THE GROUNDS THAT THE QUESTIONS -- THE QUESTION IS AN

2    IMPROPER CONTENTION INTERROGATORY -- IS AN IMPROPER

3    SUBJECT OF A 30(B)(6) DEPOSITION BECAUSE IT'S MORE

4    APPROPRIATE AS A CONTENTION INTERROGATORY OR IT'S

5    OUTSIDE THE SCOPE OF THE LAWSUIT, OBJECTIONS WHICH I

6    BELIEVE EVERY PARTY HAS MADE BEFORE AND CERTAINLY WE CAN

7    RESERVE HERE AND WOULD BE THE SUBJECT OF A LATER MEET

8    AND CONFER.

9              MR. WICKHAM:  WITH ALL THOSE THINGS IN MIND,

10   COULD YOU LOOK AT 2 THROUGH 8 AND SEE WHETHER OR NOT WE

11   COULD APPLY WHAT WE JUST DISCUSSED TO THESE PARTICULAR

12   CATEGORIES?

13             MR. JACOBY:  SKIP 5 BECAUSE I THINK 5 IS IN MY

14   LETTER.

15             MR. ZELLER:  YEAH.  WE'LL HAVE TO DEAL WITH 5

16   SEPARATELY.

17             MR. WICKHAM:  WE CAN NARROW THAT.

18             MR. JACOBY:  WHY DON'T WE SEE -- LET'S GO

19   THROUGH THE THIRD CATEGORIES OF STUFF AND SEE HOW MANY

20   OF THOSE WE CAN PUT UNDER OUR BELTS.  THE NEXT ONE I

21   HAVE IS 3.

22             MR. ZELLER:  RIGHT.

23             MR. WICKHAM:  DO WE HAVE AN AGREEMENT IN

24   PRINCIPLE ON 2?

25             MR. ZELLER:  WELL, I THINK, YEAH, WE HAVE AN

179

EXHIBIT ___14___ PAGE ___222___

LUDWIG KLEIN REPORTERS & VIDEO, INC.    800.540.0681

1    AGREEMENT IN TERMS OF THE FRAMEWORK THAT WE'LL SET UP TO

2    DEAL WITH THESE THINGS, YOU KNOW, SO THAT THERE'S AN

3    UNDERSTANDING AS TO, YOU KNOW, WHAT THESE PEOPLE ARE

4    GOING TO BE DEPOSED ABOUT.  I MEAN THAT'S -- YOU KNOW,

5    THAT'S PART OF MY CONCERN, TOO, IN TERMS OF, YOU KNOW,

6    THE SCOPE OF THE TOPICS.

7          I MEAN LIKE, FOR EXAMPLE, THIS -- YOU KNOW,

8    BECAUSE I THINK THAT FRAMEWORK WILL ACTUALLY RESOLVE A

9    HUGE NUMBER OF THESE, BY THE WAY, BOTH THOSE THAT WERE,

10   YOU KNOW, AGREED UPON OR AT LEAST IN PRINCIPLE APPEAR TO

11   BE HEADED TOWARDS RESOLUTION.

12         MR. JACOBY:  I'M HAPPY TO HEAR THAT.

13         MR. ZELLER:  AS, YOU KNOW -- SO -- AS WELL AS

14   POTENTIALLY SOME OTHER ONES.  I MEAN THIS GETS US A LONG

15   WAYS ALONG THE WAY.  BUT ONE CONCERN, WHEN WE'RE LOOKING

16   AT SOME OF THE INDIVIDUAL FURTHER TOPICS, IT GOES BACK

17   TO THE POINT I WAS JUST MAKING A MOMENT AGO WHICH IS,

18   FOR EXAMPLE, WHERE IT SAYS ALL OF BRYANT'S ACTS OR

19   OMISSIONS WHICH BREACHED ANY CONTRACTUAL OR

20   NONCONTRACTUAL DUTY OR OBLIGATION BRYANT OWED TO MATTEL,

21   I MEAN, THAT OBVIOUSLY HEADS US RIGHT INTO THE TERRITORY

22   OF, YOU KNOW, MATTERS THAT ARE BASED UPON -- YOU KNOW,

23   IN MATERIAL PART ON DISCOVERY, FOR EXAMPLE, THAT'S BEEN

24   OBTAINED IN THE CASE AND THAT, OBVIOUSLY, WE'RE -- YOU

25   KNOW, AS THINGS PRESENTLY STAND, WE'RE NOT EVEN AT

180

VOLUME II

EXHIBIT ___14___ PAGE __223__

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

1        MR. JACOBY:  I MEAN, AM I RIGHT, DOUG?

2        MR. ZELLER:  -- IS THAT CERTAINLY, YOU KNOW,

3   THINGS THAT ARE THE RESULT OF MATTEL'S INVESTIGATION --

4   I AM SETTING ASIDE PRIVILEGE ISSUES FOR THE MOMENT, BUT

5   THE FACTUAL UNDERPINNINGS DEALING WITH WHAT IT IS THAT

6   MATTEL HAS LEARNED THROUGH INVESTIGATION --

7        MR. JACOBY:  RIGHT.

8        MR. ZELLER:  -- OBVIOUSLY, APART FROM THE

9   DISCOVERY THAT'S ALREADY IN THE CASE IN THE SENSE OF

10  WHAT WAS PRODUCED BY BRYANT, BY M.G.A., AND BY THIRD

11  PARTIES, THAT I THINK HELPS, YOU KNOW, SET SOME

12  PARAMETERS ON A LOT OF THESE TOPICS THAT ALSO WILL

13  RESOLVE THIS, IF WE HAVE A COMMON GROUND ON THAT.

14       MR. JACOBY:  WELL, I THINK WE HAVE A COMMON

15  GROUND.  I MEAN AT THE END OF THE DAY WE'RE GOING TO

16  HAVE TO -- I MEAN, TO WHITTLE DOWN, I'M KIND OF LOOKING

17  AT THE TRIAL OF THE CASE.  IN OTHER WORDS, TO KNOW HOW

18  MANY OF THE E-MAILS ARE RELEVANT TO YOUR CLAIMS OR

19  DEFENSES, AT SOME POINT YOU'RE GOING TO HAVE TO

20  COMMUNICATE TO US, "THESE ARE THE ONES THAT WE THINK

21  ESTABLISH THE BREACHES AND DEFENSES."

22       MR. ZELLER:  RIGHT.  BUT SOME OF THOSE ARE THE

23  ONES THAT WERE, YOU KNOW, PRODUCED AND PRESUMABLY WILL

24  BE PRODUCED IN THE FUTURE BY, YOU KNOW, PARTIES, YOU

25  KNOW, BY DEFENDANTS IN THE CASE, OR BY THIRD PARTIES,

190

VOLUME II

EXHIBIT ___14___ PAGE ___224___

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

1    NOT BY MATTEL.

2              MR. JACOBY:   RIGHT.

3              MR. ZELLER:   THAT'S WHERE I GUESS I'M DRAWING

4    THE LINE.

5              MR. JACOBY:   WELL, I AGREE THAT AT LEAST

6    INITIALLY THE PURPOSE OF THESE DEPOSITIONS IS TO FIND

7    OUT WHAT MATTEL KNOWS, AND SO I'M REALLY EAGER TO FIND

8    THAT OUT.  I'M EQUALLY INTERESTED TO KNOW WHAT MATTEL

9    BELIEVES FROM WHAT IT'S HEARD AND WHAT IT HAS PRODUCED

10   SUPPORTS ITS CLAIMS, BUT PERHAPS THAT'S NOT -- I DON'T

11   THINK IT'S THE SCOPE OF A 30(B)(6) DEPOSITION FOR MATTEL

12   TO TEACH A WITNESS EVERYTHING THAT IT'S DISCOVERED AND

13   THEN KIND OF RUN THAT THROUGH THE SAUSAGE MACHINE AND

14   SAY, "HERE IS THE BREACH OF DUTY."

15             MR. ZELLER:   RIGHT.

16             MR. WICKHAM:   AND IT'S SIMPLE.  I MEAN WE'RE

17   SEEKING TO CONDUCT DEPOSITIONS TO DETERMINE THE FACTUAL

18   UNDERPINNINGS BASED ON MATTEL'S PERSONAL KNOWLEDGE OF

19   THE VARIOUS THINGS THAT ARE THE SUBJECT OF THE

20   P.M.K. NOTICES.  SO THAT'S THE PRINCIPAL OBJECTIVE HERE.

21             MR. ZELLER:   RIGHT.

22             MR. WICKHAM:   IN ADDITION, HOWEVER, TO THE

23   EXTENT THAT A PARTICULAR CORPORATE DESIGNEE IS GOING TO

24   BE TESTIFYING AT TRIAL, WE ALSO WANT TO BE TAKING A

25   FULL-AND-COMPLETE DEPOSITION CONCERNING THE SCOPE OF

EXHIBIT __14__ PAGE __225__

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

1    THAT DESIGNEE'S INFORMATION, AND, AS A CONSEQUENCE,

2    MATTEL'S INFORMATION ON THE PARTICULAR TOPIC SO THAT WE

3    WON'T BE SURPRISED AT TRIAL.  SO --

4              MR. ZELLER:  YOU SEE, THAT'S -- THE LATTER

5    PART CAUSES SOME ME SOME CONCERN BECAUSE, I MEAN, FIRST

6    OF ALL, IT'S HARD FOR ME TO ENVISION EXACTLY WHAT THAT

7    SCENARIO WOULD BE, AS TO WHY WE WOULD BE HAVING A MATTEL

8    CORPORATE REPRESENTATIVE.  I MEAN PRESUMABLY THOSE SORT

9    OF THINGS, IF THEY'RE GOING TO BE TESTIFIED TO THROUGH A

10   WITNESS, IT IS EITHER GOING TO BE A FACT WITNESS WHO IS,

11   YOU KNOW, EITHER A THIRD PARTY OR SOME STATEMENT THAT

12   WAS MADE IN BRYANT'S DEPOSITION OR SOME OTHER

13   DEPOSITION.

14             MR. JACOBY:  HERE'S AN EXAMPLE OF THAT:

15   SUPPOSE THERE WAS AN E-MAIL FROM BRYANT TO SOMEONE

16   OUTSIDE OF MATTEL WHILE HE WAS WORKING AT MATTEL SAYING,

17   "MATTEL IS WORKING ON THIS GREAT NEW GIZMO.  I THINK YOU

18   GUYS SHOULD MAKE THAT GREAT NEW GIZMO" -- OKAY? -- AND

19   YOU HAD NO IDEA THAT HE DID THAT UNTIL M.G.A. PRODUCED

20   THE E-MAIL --

21             MR. ZELLER:  UNTIL YOU JUST TOLD ME NOW.

22             MR. JACOBY:  -- THERE IS NO SUCH E-MAIL THAT

23   I'M AWARE OF --

24             MR. ZELLER:  I'M JESTING.

25             MR. JACOBY:  -- AND YOU INTEND AT TRIAL TO

192

VOLUME II

EXHIBIT __14__ PAGE __226__

LUDWIG KLEIN REPORTERS & VIDEO, INC.   800.540.0681

1                  REPORTER'S CERTIFICATE

2

3

4             I, JOHN M. TAXTER, C.S.R. NO. 3579,

5     R.P.R., A CERTIFIED SHORTHAND REPORTER IN AND FOR

6     THE STATE OF CALIFORNIA, DO HEREBY CERTIFY:

7             THAT, PRIOR TO BEING EXAMINED, THE WITNESS

8     NAMED IN THE FOREGOING PROCEEDINGS WAS BY ME DULY

9     SWORN TO TESTIFY THE TRUTH, THE WHOLE TRUTH, AND

10    NOTHING BUT THE TRUTH;

11            THAT SAID PROCEEDINGS WERE TAKEN BY ME IN

12    SHORTHAND AT THE TIME AND PLACE HEREIN NAMED AND

13    WERE THEREAFTER TRANSCRIBED INTO TYPEWRITING UNDER

14    MY DIRECTION, SAID TRANSCRIPT BEING A TRUE AND

15    CORRECT TRANSCRIPTION OF MY SHORTHAND NOTES.

16            I FURTHER CERTIFY THAT I HAVE NO INTEREST

17    IN THE OUTCOME OF THIS ACTION.

18

19                     APRIL 21, 2005

20

21                     _____

                       JOHN M. TAXTER
22                     C.S.R. NO. 3579, R.P.R.

23

24

25

413

**EXHIBIT** __14__ **PAGE** __227__

EXHIBIT 15

**THIS EXHIBIT IS FILED UNDER SEAL
PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 16

1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
      John B. Quinn (Bar No. 90378)
2     Michael T. Zeller (Bar No. 196417)
      Jon D. Corey (Bar No. 185066)
3  865 South Figueroa Street, 10th Floor
   Los Angeles, California 90017-2543
4  Telephone: (213) 443-3000
   Facsimile: (213) 443-3100
5
   Attorneys for Plaintiff and Counter-Defendant
6  Mattel, Inc.

7

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10

11 MATTEL, INC., a Delaware          )   CASE NO. CV 04-9059 NM (RNBx)
   Corporation,                      )
12                                    )   STIPULATED PROTECTIVE
                  Plaintiff,         )   ORDER; AND
13                                    )
          v.                         )   PROPOSED ORDER
14                                    )
   CARTER BRYANT, an individual; and )   [Discovery Matter]
15 DOES 1 through 10, inclusive,     )
                                      )
16                Defendants.        )

17

18 CARTER BRYANT, on behalf of
   himself, all present and former
19 employees of Mattel, Inc., and the
   general public,
20
                  Counter-Claimant,
21
          v.
22
   MATTEL, INC., a Delaware
23 Corporation,

24                Counter-Defendant.

25

26

27

28

07272/625581.2

                                            PROTECTIVE ORDER

EXHIBIT 16 PAGE 347

## GOOD CAUSE STATEMENT

Plaintiff Mattel, Inc. ("Mattel"), defendant Carter Bryant, and intervenor-defendant MGA Entertainment, Inc. ("MGA") are parties to the above-captioned litigation (hereinafter, the "Action"). (Mattel, Carter Bryant and MGA Entertainment, Inc. are each referred to herein as a "Party" and collectively are the "Parties.")

In this Action, Mattel has alleged, and defendants dispute, that Bryant worked for and otherwise aided and assisted MGA while defendant was employed by Mattel as a designer, in violation of his contractual and other legal duties to Mattel.

All parties believe that they will or may be required to produce or disclose in this Action, and that nonparties may produce or disclose, information that is trade secret, proprietary, confidential and/or is of a private or personal nature and that, if disclosed in this Action without restriction on its use or further disclosure, may cause disadvantage, harm, damage and loss to the disclosing Party or to the disclosing nonparty.

In addition, the Parties are currently in a competitive relationship in the toy industry, with Mattel and MGA operating as a manufacturers and marketers of dolls, toys and other products and Bryant working at this time as a contractor for a Mattel competitor, MGA, and further anticipate that nonparty competitor information may be produced or disclosed in this Action.

In particular, without prejudice to any Party's right to object to or resist disclosure of such categories of information on relevance or any other grounds, the Parties currently anticipate that categories of such trade secret, proprietary, confidential and/or private documents and other information that may be disclosed in discovery by the Parties and by nonparties will or may include:

(1) Personnel files and other private or confidential employment, contractor or vendor information;

PROTECTIVE ORDER
EXHIBIT _16_ PAGE _348_

(2)     The specific terms of agreements with, and information received from, third parties that a Party is required to disclose only under conditions of confidentiality;

(3)     Personal or private financial information, and confidential financial data that is not known generally to the trade or to competitors, including financial data relating to specific sales, cost and profit information for specific products and product lines; and

(4)     Business plans and product information that are not known generally to the trade or to competitors, including non-public information relating to product development and design.

WHEREFORE, believing that good cause exists, the Parties HEREBY STIPULATE that, subject to the Court's approval, the following procedures shall be followed in this Action to facilitate the orderly and efficient discovery of relevant information while minimizing the potential for unauthorized disclosure or use of confidential or proprietary information:

## SCOPE OF THIS ORDER

1.     This Protective Order shall apply to trade secret, confidential and proprietary information, documents and things that are produced or disclosed in any form during the course of the Action by any Party or any nonparty:

(a)     through discovery;

(b)     in any pleading, document or other writing; or

(c)     in testimony given at a deposition.

(The foregoing information, documents and things shall be referred to hereinafter collectively as "Litigation Materials.")

07272/625581.2

-3-

PROTECTIVE ORDER

EXHIBIT 16 PAGE 349

<u>CONFIDENTIAL AND ATTORNEYS' EYES ONLY INFORMATION</u>

2.    Any Party or nonparty producing or disclosing Litigation Materials in this Action may designate such information as "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" by designating it in the manner set forth in paragraph 3 below.   The designation of Litigation Materials as "CONFIDENTIAL" shall be limited to information which the disclosing Party or nonparty believes in good faith contains, constitutes or reveals confidential design, engineering or development information, confidential commercial information, non-public financial information, confidential or private information about current or former employees, contractors or vendors (including employee, contractor and vendor personnel records), or other information of a confidential, proprietary, private or personal nature.   The designation of information as "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" shall be limited to trade secrets or other confidential commercial information, including without limitation non-public designs and drawings, which the disclosing Party or nonparty in good faith believes will result in competitive disadvantage or harm if disclosed to another Party to this Action without restriction upon use or further disclosure.   Information designated as "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" may only be used and disclosed as provided in this Protective Order.

<u>MANNER OF DESIGNATION OF MATERIALS</u>

3.    A Party or nonparty may designate Litigation Materials as "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" in the following manner:

(a)    <u>Documents or Things</u>.   "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" treatment may be

PROTECTIVE ORDER

EXHIBIT _16_ PAGE _350_

1    obtained by typing or stamping "CONFIDENTIAL" or "CONFIDENTIAL --
2    ATTORNEYS' EYES ONLY" on the particular document or thing.

3            (b)    <u>Interrogatory Answers and Responses to Requests for</u>
4    <u>Admissions</u>.  In answering any interrogatory or request for admission, or any
5    part thereof, a Party may designate its or his answer as "CONFIDENTIAL" or
6    "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" by affixing thereto the
7    legend "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES
8    ONLY."  Such "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS'
9    EYES ONLY" answers shall be made on separate pages from any other
10   answers or portions thereof that are not designated as "CONFIDENTIAL" or
11   "CONFIDENTIAL -- ATTORNEYS' EYES ONLY."

12           (c)    <u>Deposition Testimony</u>.    Any Party or nonparty giving
13   deposition testimony in this Action may obtain "CONFIDENTIAL" or
14   "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" treatment therefor by
15   designating, during the course of that testimony, for which "CONFIDENTIAL"
16   or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" treatment is desired,
17   the testimony that is claimed to be "CONFIDENTIAL" or "CONFIDENTIAL
18   -- ATTORNEYS' EYES ONLY,"  or alternatively by designating the entire
19   testimony to be "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS'
20   EYES ONLY," subject to a good faith obligation to identify any non-
21   confidential portions of the testimony (and/or any lesser "CONFIDENTIAL"
22   portions in the event that the entire testimony is designated "CONFIDENTIAL
23   -- ATTORNEYS' EYES ONLY") within fourteen (14) calendar days after
24   receipt of the transcript of the testimony.  The reporter shall separately
25   transcribe and bind the testimony so designated as "CONFIDENTIAL" and
26   "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" and shall mark the face
27   of the separate bound transcript containing such testimony with the term
28   "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY."

A Party or nonparty also may make the above-referenced designation of confidentiality in writing and within fourteen (14) calendar days of the receipt by said Party or nonparty of the transcript of said testimony. In that event, said portion of the transcript will be treated as "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" under the provisions of this Protective Order, except that it will not be separately bound. If, during the course of deposition testimony, any Party or nonparty reasonably believes that the answer to a question will result in the disclosure of "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" information, all persons other than those persons entitled to receive such information pursuant to paragraphs 5 and 6 hereof shall be excluded from the room in which the deposition testimony is given. Unless previously designated as "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY," all transcripts of deposition testimony and any related exhibits, and all information adduced in deposition, shall, in their entirety, be treated as "CONFIDENTIAL" for a period of fourteen (14) calendar days after receipt of the transcript by counsel for the designating Party or nonparty. The Party or nonparty designating the testimony or information as "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" may, within that fourteen (14) calendar day period described above, specifically designate information contained in the transcript(s) and/or exhibit(s) as "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY," whether or not previously designated as such, by notifying all Parties in writing of the portions of the transcript or exhibit which contains such information. Each Party shall attach a copy of such written statement to the face page of the transcript or exhibit and to each copy in its or his possession, custody or control. Thereafter, these portions of the transcript or exhibits designated as "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" shall be treated in

1   accordance with the terms of this Protective Order. In addition, the provisions
2   of Paragraph 3(e) for later designating transcripts or exhibits shall apply after
3   the expiration of the fourteen (14) calendar day period described in this
4   Paragraph 3(c).

5           (d)    Typing or stamping the legend "CONFIDENTIAL" or
6   "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" upon the first page of a
7   collection of Litigation Materials which are bound together shall have the
8   effect of designating such collection in its entirety as "CONFIDENTIAL" or
9   "CONFIDENTIAL -- ATTORNEYS' EYES ONLY." In the case of disks,
10  tapes, CD-ROMs, DVDs and other tangible storage media or devices, labeling,
11  stamping or marking the outside of such disk, tape, CD-ROM, DVD or other
12  medium or device with the legend "CONFIDENTIAL" or "CONFIDENTIAL
13  -- ATTORNEYS' EYES ONLY" shall have the effect of designating the entire
14  contents of such disk, tape, CD-ROM, DVD or other medium or device, and
15  all data stored thereupon, as "CONFIDENTIAL" or "CONFIDENTIAL --
16  ATTORNEYS' EYES ONLY," as the case may be.

17          (e)    Except as otherwise provided in Paragraph 3(c) of this
18  Protective Order, the receiving Party shall not reveal any information produced
19  for a period of seven (7) calendar days following receipt. Failure to designate
20  a document, thing or other information as CONFIDENTIAL" or
21  "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" in accordance with this
22  Protective Order shall not preclude any Party or nonparty desiring to so
23  designate the document, thing or information from so designating thereafter;
24  provided that the Party or nonparty proceeds promptly after discovery of any
25  omission of marking, in good faith marks the document, thing or other
26  information and requests, in writing, that each receiving Party so mark and
27  treat the document, thing or other information in accordance with this
28  Protective Order. Thereafter, the document, thing or other information shall

07272/625581.2

-7-

be fully subject to this Protective Order.  No Party shall incur liability for any disclosures made prior to notice of such designation, except to the extent that any such disclosures occurred prior to the seven (7) day period described above or prior to such other time periods as are provided by this Protective Order, including without limitation such time periods as are provided in Paragraph 3(c) above.

## RESTRICTIONS ON DISCLOSURE OF DESIGNATED MATERIALS

4.      Any Litigation Materials produced or disclosed in this Action, whether or not designated "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY," may only be used by the receiving Party of such information for purposes of litigation and not for any other purpose, including without limitation for any business or trade purpose.  As used herein, the term "litigation" shall mean preparation for, participation in and prosecution and defense of any suit, motion, trial, appeal, hearing, review or other judicial proceeding or in connection with any mediation or other alternative dispute resolution procedure that this or any other court may order or that the Parties may agree to.

5.      Subject to Paragraph 7 herein, and unless as otherwise ordered by the Court, Litigation Materials designated as "CONFIDENTIAL" shall not be disclosed to any person other than:

(a)     the attorneys for the Parties and their partners, shareholders, associates, document clerks and paralegals who are necessary to assist such attorneys;

(b)     secretaries, stenographers and other office or clerical personnel employed by said attorneys and who are necessary to assist such attorneys;

07272/625581.2

-8-

PROTECTIVE ORDER

EXHIBIT _16_ PAGE _354_

(c)     a named Party or officers or employees of a named Party, to the extent deemed necessary by their respective attorneys for purposes assisting in litigation;

(d)     the authors, senders, addressees and designated copy recipients of any document or thing which has been designated as "CONFIDENTIAL" information;

(e)     such other persons as may be consented to by the Party or nonparty designating such information as "CONFIDENTIAL" information;

(f)     outside litigation support vendors, including commercial photocopying vendors, scanning services vendors, coders and keyboard operators;

(g)     professional court reporters engaged to transcribe deposition testimony, professional videographers engaged to videotape deposition testimony and translators;

(h)     independent outside consultants or experts retained by the attorneys to the extent deemed necessary by said attorneys for purposes of litigation; and

(i)     non-party fact witnesses in a deposition, provided, however, that such persons may not retain such "CONFIDENTIAL" information unless otherwise authorized to receive it. If the attendance of a non-party fact witness at a deposition can only be obtained through compulsory process, the witness need not execute an Assurance of Compliance in the form attached as Exhibit A, provided that: (1) the witness acknowledges his obligation to maintain the confidentiality of "CONFIDENTIAL" information under oath; and (2) such "CONFIDENTIAL" information may only be shown to the witness during the deposition.

PROTECTIVE ORDER

EXHIBIT 16 PAGE 355

6.    Subject to paragraph 7 herein, and unless as otherwise ordered by the Court, Litigation Materials designated as "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" shall not be disclosed to any person other than:

(a)    the attorneys for the Parties (but not including in-house counsel for the Parties or any attorney who is an officer, director, shareholder or employee of any Party or its corporate affiliates) and their partners, shareholders, associates, document clerks and paralegals who are assigned to and necessary to assist such attorneys.  For the purposes of this subparagraph, "affiliate" shall mean any corporate parent or subsidiary of any Party, or any other entity that is under common control with any Party or corporate parent or subsidiary of any Party, or any of their successors or predecessors in interest;

(b)    secretaries, stenographers and other office or clerical personnel employed by said attorneys and who assist them with respect to litigation;

(c)    the authors, senders, addressees and designated copy recipients of any document or thing which has been designated as "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" information;

(d)    such other persons as may be consented to by the Party designating such information as "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" information;

(e)    outside litigation support vendors, including commercial photocopying vendors, scanning services vendors, coders and keyboard operators;

(f)    independent outside consultants or experts retained by the attorneys to the extent deemed necessary by said attorneys for the purposes of litigation; and

PROTECTIVE ORDER

EXHIBIT _16_ PAGE _35_

1              (g)    professional court reporters engaged to transcribe

2    deposition testimony, professional videographers engaged to videotape

3    deposition testimony and translators.

4           7.    None of the following is bound by or obligated under this Order

5    in any respect and specifically are not bound or obligated to treat information

6    designated as "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES

7    ONLY" in any particular manner: The Court hearing this Action (including the Court

8    having jurisdiction of any appeal), Court personnel, court reporters working for the

9    Court, translators working for the Court, or any jury impaneled in this Action.

10          8.    Other than those identified in Paragraph 7 above, each person to

11    whom information designated as "CONFIDENTIAL" or "CONFIDENTIAL --

12    ATTORNEYS' EYES ONLY" is disclosed shall be informed of the terms of this

13    Protective Order and agree to be bound by it before disclosure to such persons of any

14    such information. The persons described in Paragraphs 5(f), 5(h), 6(e) and 6(f) shall

15    not have access to either "CONFIDENTIAL" or   "CONFIDENTIAL --

16    ATTORNEYS' EYES ONLY" information, as the case may be, until they have

17    certified that they have read this Protective Order and have manifested their assent

18    to be bound thereby by signing a copy of the Assurance of Compliance attached

19    hereto as Exhibit A. Once a person has executed such an Assurance of Compliance,

20    it shall not be necessary for that person to sign a separate Assurance of Compliance

21    each time that person is subsequently given access to confidential material.  Any

22    person who signed an Assurance of Compliance in connection with the Stipulation

23    for Protection of Confidential Information and Protective Order filed September 16,

24    2004 in Mattel Inc. v. Bryant, Case No. BC 314398, pending in Los Angeles County

25    Superior Court, need not re-sign the Assurance of Compliance attached hereto but

26    shall, by virtue of his or her prior signature, be deemed to have signed the attached

27    Assurance of Compliance.

28

PROTECTIVE ORDER

EXHIBIT _16_ PAGE _357_

9. The failure of any Party to object to the designation of information as "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" shall not be deemed an admission that such information qualifies for such designation.

10. If any Party wishes to have any information, document or testimony marked "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" by another Party or nonparty reclassified as non-confidential, or from "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" to "CONFIDENTIAL," the Parties and/or relevant nonparty or nonparties will confer and try to reach agreement. If the Parties and/or relevant nonparty or nonparties cannot reach agreement, either Party and/or the relevant nonparty or nonparties may apply to the Court to resolve the matter in accordance with the <u>Local Rules</u>. Unless and until this Court enters an Order changing the designation of the information, it shall be afforded the treatment prescribed in this Protective Order for its designation.

11. Nothing contained in this Protective Order shall restrict or prevent any Party or nonparty from disclosing or otherwise using its or his own Litigation Materials which that Party or nonparty produces or discloses in this action.

12. The inadvertent or unintentional disclosure by a producing Party or nonparty of "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" Litigation Materials during the course of this litigation, regardless of whether the information was so designated at the time of disclosure, shall not be deemed a waiver in whole or in part of a Party's or nonparty's claim of confidentiality, either as to the specific information disclosed or as to any other information relating thereto or on the same or related subject matter. Counsel for the Parties and/or nonparties shall in any event, to the extent possible, upon discovery of inadvertent error, cooperate to restore the confidentiality of the "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" material that was inadvertently or unintentionally disclosed.

13.     If a Party or nonparty through inadvertence produces or provides discovery that it, he or she believes is subject to a claim of attorney-client privilege or work product immunity, the producing Party or nonparty may give written notice to the receiving Party that the document is subject to a claim of attorney-client privilege or work product immunity and request that the document be returned to the producing Party or nonparty. The receiving Party shall promptly return to the producing Party or nonparty the inadvertedly disclosed document and all copies of such document. Return of the document by the receiving Party shall not constitute an admission or concession, or permit any inference, that the returned document is, in fact, properly subject to a claim of attorney-client privilege or work product immunity, nor shall it foreclose any Party from moving the Court for an Order that such document has been improperly designated or should be producible for reasons other than a waiver caused by the inadvertent production.

14.     Nothing contained in this Protective Order shall affect the right of any Party or nonparty to make any objection, claim any privilege, or otherwise contest any request for production of documents, interrogatory, request for admission, or question at a deposition or to seek further relief or protective orders from the Court in accordance with the <u>Federal Rules of Civil Procedure</u> and the <u>Local Rules</u>. Nothing in this Protective Order shall constitute an admission or waiver of any claim or defense by any Party.

## <u>FILING AND USE IN COURT OF DESIGNATED MATERIALS</u>

15.     Except when the filing under seal is otherwise authorized by statute or federal rule, the Parties shall seek the Court's prior approval for the filing under seal of pleadings and other documents containing properly designated "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" information in accordance with the procedures set forth in <u>Local Rule</u> 79-5.1, as such

-13-

PROTECTIVE ORDER

EXHIBIT _16_ PAGE 3 5 9

1  <u>Rule</u> may be amended from time to time. Prior to the time that a Party receiving the

2  "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY"

3  information from any other Party files with the Court an application and the other

4  materials required by <u>Local Rule</u> 79-5.1, as such <u>Rule</u> may be amended from time to

5  time, to seal the producing Party's confidential information, the receiving Party shall

6  consult with the producing Party's attorney to determine whether the producing Party

7  will re-designate the previously designated confidential information so as to avoid the

8  need for the request to file such information under the seal. Upon the default of a

9  Party to seek the Court's approval to file a document containing "CONFIDENTIAL"

10 or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" information under seal, any

11 Party may subsequently seek the approval of the Court to file that document under

12 seal, in accordance with the procedures set forth in <u>Local Rule</u> 79-5.1, as such <u>Rule</u>

13 may be amended from time to time.

14

15                 <u>THIRD-PARTY REQUEST FOR DESIGNATED MATERIALS</u>

16

17           16.    If any Party or nonparty receives a subpoena or document request

18 from a third party which purports to require the production of materials in that Party's

19 possession which have previously been designated as "CONFIDENTIAL" or

20 "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" by any other Party or nonparty,

21 the Party or nonparty receiving such subpoena or document request (a) shall object

22 and refuse to produce documents absent a Court Order or the consent of the Party or

23 nonparty who designated the materials as "CONFIDENTIAL" or "CONFIDENTIAL

24 -- ATTORNEYS' EYES ONLY", (b) immediately notify the Party or nonparty who

25 designated the materials as "CONFIDENTIAL" or "CONFIDENTIAL --

26 ATTORNEYS' EYES ONLY" of the receipt of said subpoena or document request,

27 and (c) shall not oppose any effort by the Party or nonparty which designated the

28 material as "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES

PROTECTIVE ORDER

EXHIBIT _16_ PAGE _360_

1 | ONLY" to quash the subpoena or obtain a protective order limiting discovery of such
2 | material.

3 |
4 | ### DISCOVERY FROM NONPARTIES
5 |

6 |          17.     Discovery of nonparties may involve receipt of information,
7 | documents, things or testimony which include or contain "CONFIDENTIAL" or
8 | "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" materials or information.  A
9 | nonparty producing such material in this case may designate as "CONFIDENTIAL"
10 | or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" some or all of the material it
11 | produces in the same manner provided for in this Protective Order with respect to
12 | material furnished by or on behalf of the Parties.  Any Party may also designate as
13 | "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" any
14 | materials or information produced by a nonparty that constitute "CONFIDENTIAL"
15 | or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" material of the designating
16 | Party under Paragraph 2 of this Protective Order, regardless of whether the producing
17 | nonparty has also so designated.  In addition, a nonparty may also designate as
18 | "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" any
19 | materials or information produced by a Party that constitute "CONFIDENTIAL" or
20 | "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" material or information of such
21 | nonparty under Paragraph 2 of this Protective Order, regardless of whether the
22 | producing Party has also so designated.  In either such an event, the designation
23 | providing for the greater level of protection for the material information shall control,
24 | subject to Paragraph 10 of this Protective Order.  Nonparty materials designated
25 | "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" by a
26 | nonparty or Party shall be governed by the terms of this Protective Order.

27 |
28 |

PROTECTIVE ORDER

EXHIBIT _16_ PAGE _361_

## CONCLUSION OF LITIGATION

18.     Within thirty (30) days of the conclusion of this Action, including any post-trial motions or appellate proceedings relating thereto, all documents, transcripts or other things or information designated as "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY," and all copies thereof, shall be returned to the attorneys for the Party or nonparty furnishing the same, or shall be destroyed by the attorneys having such documents in their possession.  In addition, all summaries or other materials containing or disclosing information contained in such documents, answers, transcripts or other things shall be destroyed; provided, however, that outside counsel for each Party may retain one complete and unredacted set of pleadings and papers filed with the Court or served on the other Parties.  Such retained copy of pleadings and papers shall be maintained in a file accessible only to outside counsel bound by this Protective Order. This Protective Order shall continue to be binding after the conclusion of this Action.

## AMENDMENT OF THIS AGREEMENT

19.     The provisions of this Stipulation and Protective Order may be  modified at any time by stipulation of the Parties as approved by Order of the Court.  In addition, a Party may at any time apply to the Court for modification of this

07272/625581.2

-16-

1 | Stipulation and Protective Order pursuant to a motion brought in accordance with the

2 | rules of the Court.

3

4 |     **IT IS SO STIPULATED.**

5

6 | DATED: December 22, 2004    QUINN EMANUEL URQUHART

    OLIVER & HEDGES, LLP

7

8 |     By _Jon Corey_____

9 |     Jon Corey

    Attorneys for Plaintiff

10 |     Mattel, Inc.

11 | DATED: December __, 2004    LITTLER MENDELSON

12

13 |     By_____

14 |     Douglas A. Wickham

    Attorneys for Defendant

    Carter Bryant

15

16 | DATED: December __, 2004    O'MELVENY & MEYERS, LLP

17

18 |     By_____

    Diana M. Torres

    Attorneys for Intervenor-Defendant

19 |     MGA Entertainment, Inc.

20

21 |     **IT IS SO ORDERED.**

22

23 | DATED: __1/4/05_____    ROBERT N. BLOCK

24 |     THE HONORABLE ROBERT N. BLOCK

    United States Magistrate Judge

25

26

27

28

07272/625581.2

-17-

PROTECTIVE ORDER

EXHIBIT _16_ PAGE _363_

1   Stipulation and Protective Order pursuant to a motion brought in accordance with the

2   rules of the Court.

3

4       **IT IS SO STIPULATED.**

5

6   DATED: December ___, 2004        QUINN EMANUEL URQUHART
                                       OLIVER & HEDGES, LLP

7

8

9                                      By _____
                                      Jon Corey
                                      Attorneys for Plaintiff

10                                     Mattel, Inc.

11  DATED: December 21, 2004         LITTLER MENDELSON

12

13                                     By _____
                                      Douglas A. Wickham

14                                     Attorneys for Defendant
                                   Carter Bryant

15

16  DATED: December ___, 2004        O'MELVENY & MEYERS, LLP

17

18                                     By _____
                                      Diana M. Torres

19                                     Attorneys for Intervenor-Defendant
                                   MGA Entertainment, Inc.

20

21      **IT IS SO ORDERED.**

22

23

24  DATED: _____             THE HONORABLE ROBERT N. BLOCK
                                   United States Magistrate Judge

25

26

27

28

07272/625581.2                         -17-
                                                   PROTECTIVE ORDER

EXHIBIT 16 PAGE 364

1  Stipulation and Protective Order pursuant to a motion brought in accordance with the

2  rules of the Court.

3

4         IT IS SO STIPULATED.

5

6  DATED: December __, 2004         QUINN EMANUEL URQUHART
                                    OLIVER & HEDGES, LLP
7

8                                   By_____
9                                   Jon Corey
                                    Attorneys for Plaintiff
10                                  Mattel, Inc.

11 DATED: December __, 2004         LITTLER MENDELSON
12

13                                  By_____
                                    Douglas A. Wickham
14                                  Attorneys for Defendant
                                    Carter Bryant
15

16 DATED: December __, 2004         O'MELVENY & MEYERS, LLP

17

18                                  By_____
                                    Diana M. Torres
19                                  Attorneys for Intervenor-Defendant
                                    MGA Entertainment, Inc.

20

21        IT IS SO ORDERED.

22

23

24 DATED: _____          _____
                                    THE HONORABLE ROBERT N. BLOCK
25                                  United States Magistrate Judge

26

27

28

07272/625581.2                      -17-

                                                    PROTECTIVE ORDER

EXHIBIT *16* PAGE 365

# EXHIBIT A

## ASSURANCE OF COMPLIANCE

I, _____, under penalty of perjury under the laws of the United States of America, declare and state as follows:

I reside at _____, in the City/County of _____ and State/Country of _____;

I have read the annexed Stipulated Protective Order, ("Protective Order") dated _____ in the action entitled *Mattel, Inc. v. Carter Bryant,* Case No. CV 04-9059 NM (RNBx), which currently is pending in the United States District Court for the Central District of California; that I am fully familiar with and agree to comply with and be bound by the provisions of that Protective Order;

I will not divulge to persons other than those specifically authorized by the Protective Order, and will not copy or use any Litigation Materials designated as "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" except solely as permitted by the Protective Order; and

I consent to the jurisdiction of the United States District Court for the Central District of California for the purpose of enforcing said Protective Order, enjoining any violation or threatened violation of the Protective Order or seeking damages for the breach of said Protective Order.

_____
(Signature)

PROTECTIVE ORDER

EXHIBIT _16_ PAGE _366_

**PROOF OF SERVICE**

1013A(3) CCP Revised 5/1/88

STATE OF CALIFORNIA     )
COUNTY OF LOS ANGELES  )

     I am employed in the county of Los Angeles  State of California.  I am over the age of 18 and not a party to the within action; my business address is 865 South Figueroa Street, 10th Floor, Los Angeles, CA 90012.

     On December 22, 2004, I served the foregoing document described as

     **STIPULATED PROTECTIVE ORDER; AND [PROPOSED] ORDER**

on  all interested parties in this action:

     **SEE ATTACHED SERVICE LIST**

[ ]    By placing [ ] the original [X] true copies thereof enclosed in sealed envelopes addressed as follows:

[ ]    **BY MAIL**

[ ]    I deposited such envelope in the mail at Los Angeles, California.  The envelope was mailed with postage thereon fully prepaid.

[ ]    As follows:  I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

[X]    **BY TELECOPIER** By transmitting the above listed document(s) to the fax number(s) set forth above on this date.

Executed on December 22, 2004, at Los Angeles, California.

[X]    (Federal) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Ivana Maiorano
Print Name

Signature

EXHIBIT _16_ PAGE _367_

1  Robert F. Millman, Esq.
   Douglas A. Wickham, Esq.
2  Keith A. Jacoby, Esq.
   Littler Mendelson
3  A Professional Corporation
   2049 Century Park East, 5th Floor
4  Los Angeles, California 90067-3107
   Phone: 310-553-0308
5  Fax: 310-553-5583

6  Diana M. Torres, Esq.
   O'Melveney & Meyers
7  400 S. Hope Street
   Los Angeles, CA 90071
8  Phone: 213-430-6000
   Fax: 213-430-6407
9

10 Daniel J. Warren, Esq.
   Sutherland, Asbill & Brennan
11 999 Peachtree Street NE
   Atlanta, GA  30309-3996
12 Phone: 404-853-8698
   Fax: 404-853-8806

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-2-

EXHIBIT 16 PAGE 368

EXHIBIT 17

1  KEKER & VAN NEST, LLP
   JOHN W. KEKER - #49092
2  jkeker@kvn.com
   MICHAEL H. PAGE - #154913
3  mpage@kvn.com
   CHRISTA M. ANDERSON - #184325
4  canderson@kvn.com
   MATTHEW M. WERDEGAR - #200470
5  mwerdegar@kvn.com
   JOHN E. TRINIDAD - #250468
6  jtrinidad@kvn.com
   AUDREY WALTON-HADLOCK- #250574
7  awaltonhadlock@kvn.com
   710 Sansome Street
8  San Francisco, CA  94111-1704
   Telephone:  (415) 391-5400
9  Facsimile:  (415) 397-7188

10  Attorneys for Plaintiff
    CARTER BRYANT

11

12

13                    UNITED STATES DISTRICT COURT

14                    CENTRAL DISTRICT OF CALIFORNIA

15                            EASTERN DIVISION

16

17  CARTER BRYANT, an individual,          Case No. CV 04-09049 SGL (RNBx)
                                           (consolidated with CV 04-9059 & 05-
18                    Plaintiff,           2727

19       v.                                [PROPOSED] ORDER GRANTING
                                           IN PART MGA ENTERTAINMENT
20  MATTEL, INC. a Delaware                INC.'S AND CARTER BRYANT'S
    Corporation,                           JOINT NOTICE OF MOTION TO
21                                         COMPEL RE: MATTEL'S
                      Defendant.           BANDYING OF 30(B)(6)
22                                         WITNESSES

23  CONSOLIDATED WITH MATTEL,
    INC., v. BRYANT and MGA
24  ENTERTAINMENT, INC. v.
    MATTEL, INC.

25

26

27

28

408784.01

EXHIBIT 17 PAGE 369

1        Having considered MGA Entertainment Inc.'s and Carter Bryant's Joint

2    Motion to Compel re: Mattel's Bandying of 30(b)(6) witnesses (the "Motion") and

3    all other papers and arguments submitted in support of or opposition to the Motion,

4    and finding good cause therefore,

5    **IT IS HEREBY ORDERED THAT:**

6        1.    The Motion is **GRANTED** as to Topics 2-8, 11-13, and 24 of

7            Carter Bryant's Rule 30(b)(6) Notice of Deposition.  Accordingly,

8            Mattel shall produce, at its own expense, properly educated and

9            adequately prepared Rule 30(b)(6) witnesses to testify competently

10            as to Mattel's knowledge on Topics $2 - 8$, $11 - 13$, and $24$.  Mattel

11            shall produce no more than one competent witness on any one

12            topic.

13        2.    The Motion is **DENIED** as to topics 41 and "Zeus."

14        3.    Failure to comply with this order may result in preclusion of

15            evidence offered by Mattel at trial, pursuant to Federal Rules of

16            Civil Procedure 37.

17        4.    All motions for monetary sanctions are **DENIED**, because the

18            Court would find it is unjust under the circumstances of this case to

19            award such monetary sanctions.    Any reporter or videographer

20            costs incurred in connection with the deposition of a witness on

21            Topics 2-8, 11-13 and 24 shall be borne by Mattel.

22        5.    Mattel shall comply with this order by January 28, 2008.

23

24

25

26

27

28

[PROPOSED] ORDER GRANTING MGA ENTERTAINMENT INC.'S AND CARTER BRYANT'S JOINT
NOTICE OF MOTION TO COMPEL RE: MATTEL'S BANDYING OF 30(B)(6) WITNESSES
CASE NO. CV 04-09049 SGL (RNBx)

408784.01

EXHIBIT 17 PAGE 370

1      Pursuant to Paragraph 6 of the Stipulation and Order for Appointment of a

2 Discovery Master, Carter Bryant shall file this Order with the Clerk of the Court

3 forthwith.

4      **IT IS SO ORDERED.**

5 Dated: January *11* , 2008

6

7      By: _____

8           HON. EDWARD A. INFANTE
          Discovery Master

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

[PROPOSED] ORDER GRANTING MGA ENTERTAINMENT INC.'S AND CARTER BRYANT'S JOINT
NOTICE OF MOTION TO COMPEL RE: MATTEL'S BANDYING OF 30(B)(6) WITNESSES
CASE NO. CV 04-09049 SGL (RNBx)

408784.01

EXHIBIT *17* PAGE *371*

## PROOF OF SERVICE BY E-MAIL

I, Sandra Chan, not a party to the within action, hereby declare that on January 11, 2008, I served the attached ORDER GRANTING IN PART MGA ENTERTAINMENT INC.'S AND CARTER BRYANT'S JOINT NOTICE OF MOTION TO COMPEL RE: MATTEL'S BANDYING OF 30(B)(6) WITNESSES in the within action by email addressed as follows:

| | | |
|---|---|---|
| John W. Keker, Esq. | Keker & Van Nest | jkeker@kvn.com |
| Michael H. Page, Esq. | Keker & Van Nest | mhp@kvn.com |
| Christa Anderson, Esq. | Keker & Van Nest | cma@kvn.com |
| Matthew M. Werdegar, Esq. | Keker & Van Nest | mwerdegar@kvn.com |
| John E. Trinidad, Esq. | Keker & Van Nest | jtrinidad@kvn.com |
| Audrey Walton-Hadlock, Esq. | Keker & Van Nest | awalton-hadlock@kvn.com |
| John Quinn Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | johnquinn@quinnemanuel.com |
| Michael Zeller Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | michaelzeller@quinnemanuel.com |
| Jon Corey Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | joncorey@quinnemanuel.com |
| Duane Lyons Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | duanelyons@quinnemanuel.com |
| Timothy Alger Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | timalger@quinnemanuel.com |
| Dominic Surprenant Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | DominicSurprenant@QuinnEmanuel.com |
| B. Dylan Proctor Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | dylanproctor@quinnemanuel.com |
| Shane McKenzie Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | shanemckenzie@quinnemanuel.com |
| Bridget Hauler Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | bridgethauler@quinnemanuel.com |
| Tamar Buchakjian Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | tamarbuchakjian@quinnemanuel.com |
| Juan Pablo Alban, Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | juanpabloalban@quinnemanuel.com |
| Thomas J. Nolan, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | tnolan@skadden.com |
| Raoul D. Kennedy, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | rkennedy@skadden.com |
| Amy S. Park, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | apark@skadden.com |
| Harriet S. Posner, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | hposner@skadden.com |
| Carl Alan Roth, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | croth@skadden.com |
| Timothy A. Miller, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | tmiller@skadden.com |
| Marcus R. Mumford, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | Mmumford@skadden.com |

I declare under penalty of perjury under the laws of the Untied States of America that the above is true and correct.

Executed on January 11, 2008, at San Francisco, California.

_____
Sandra Chan

EXHIBIT 17 PAGE 372

EXHIBIT 18

```
1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                   EASTERN DIVISION

4        ----------------------------------
```

Certified Copy

```
5   MATTEL, INC., a Delaware Corporation,  )

6                   Plaintiff,             )

7       vs.                                ) No. CV 04-9059

8   CARTER BRYANT, an individual; and      ) NM (RNBx)

9   DOES 1 through 10, Inclusive,          )

10                  Defendants.            )

11       ----------------------------------)

12  CARTER BRYANT, on behalf of himself,   )

13  All present and former employees of    )

14  Mattel, Inc., and the general public,  )

15                  Counter-Claimants,     )

16      vs.                                )

17  MATTEL, INC., a Delaware corporation,  )

18                  Counter-Defendant.     )

19       --------------------------------

20       Deposition of JULIA JENSEN, taken at

21       7 Times Square, New York, New York,

22       commencing at 10:15 a.m., Friday,

23       June 8, 2007, before Morene

24       Korenman-Bangel, Notary Public.

25  PAGES 1 - 191
```

EXHIBIT 18 PAGE 373

```
 1     APPEARANCES OF COUNSEL:

 2

 3     FOR THE PLAINTIFF:

 4

 5          QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

 6          BY: TIMOTHY L. ALGER, ESQ.

 7          865 South Figueroa Street, 10th Floor

 8          Los Angeles, California 90017

 9          (213) 443-3000

10          timalger@quinnemanuel.com

11

12     FOR THE DEFENDANT MGA ENTERTAINMENT, INC.:

13

14          O'MELVENY & MYERS LLP

15          BY: MICHAEL C. KEATS, ESQ.

16              KENDALL BURR, ESQ.

17          7 Times Square

18          New York, New York 10036

19          (212) 408-2400

20          mkeats@omm.com

21          kburr@omm.com

22

23     ALSO PRESENT:

24          MICHAEL MOORE, ESQ., MATTEL, INC.

25          ILYA TALEYSNIK, VIDEOGRAPHER
```

2

EXHIBIT _18_ PAGE _374_

1                    THE VIDEOGRAPHER:  This is Ilya Taleysnik,

2      member of the national legal video association for

3      Veritext NY.  We are on record at 10:18 a.m. on June

4      8th, 2007.  We are here for the case of Mattel, Inc.,

5      versus Carter Bryant and Carter Bryant versus Mattel,

6      Inc.

7                    The witness today is Julia Jensen.

8                    We are at the location of O'Melveny & Myers

9      at 7 Times Square in New York City.  Would the

10     attorneys please state their appearances for the

11     record.

12                   MR. KEATS:  Michael Keats of O'Melveny &

13     Myers for MGA, and with me today is Kendall Burr of our

14     office.

15                   MR. ALGER:  Timothy Alger from the law firm

16     of Quinn Emanuel in Los Angeles on behalf of the

17     witness, and Mattel, Inc.

18                   MR. MOORE:  Michael Moore, in-house counsel

19     for Mattel.

20                   THE VIDEOGRAPHER:  Thank you.  Will the

21     court reporter please swear in the witness.

22                        JULIA JENSEN,

23          having been first duly sworn by the Notary

24          Public, was examined and testified as

25          follows:

                                                                3

EXHIBIT _18_ PAGE _375_

1

2      Q.      Right.

3      A.      To the best of my memory now.

4      Q.      Do you have any reason to think that you

5   might be wrong about that?

6      A.      No, not other than memory is memory.

7      Q.      Right.

8              It's possible she could have talked about it

9   with you before that last call?

10     A.      I highly doubt that's the case.

11             (Pause.)

12             MR. KEATS:  All right.  Thank you.  I'm

13   sorry this was done when you're two and a half weeks

14   away.

15             THE WITNESS:  That's fine.

16             MR. KEATS:  But we appreciate your time.

17             MR. ALGER:  Thank you.

18             THE VIDEOGRAPHER:  End tape 4, off the

19   record 3:31 p.m.

20                 (TIME NOTED: 3:31 P.M.)

21

22             (Exhibits retained by counsel.)

23

24

25

                                                      187

EXHIBIT 18 PAGE 376

1    STATE OF NEW YORK      )

2                 SS:

3    COUNTY OF NEW YORK   }

4

5         I, MORENE KORENMAN-BANGEL, a Shorthand Reporter

6    and a Notary Public within and for the State of New

7    York, do hereby certify that the foregoing deposition of

8    JULIA JENSEN was taken before me on the 8th day of June

9    2007.

10         That the said witness was duly sworn before the

11   commencement of his testimony; that the said testimony

12   was taken stenographically by me and then transcribed.

13         I am not related by blood or marriage to any of

14   the said parties, nor interested directly or indirectly

15   in the matter in controversy, nor am I in the employ of

16   any of the counsel.

17         IN WITNESS WHEREOF, I have hereunto set my hand

18   this 21st day of June 2007.

19

20

21         _Moren Koreman-Bangel_

22         MORENE KORENMAN-BANGEL

23

24

25

                                                    189

EXHIBIT _18_ PAGE _377_

EXHIBIT 19

# CERTIFIED COPY

1

2  UNITED STATES DISTRICT COURT
   CENTRAL DISTRICT OF CALIFORNIA
3  EASTERN DIVISION
   ------------------------------------------x
4  CARTER BRYANT, an individual,

5                      Plaintiff,

6                           Case No. CV 04-9049

7           -against-

8  MATTEL, INC., a Delaware corporation,

9                      Defendant.
   ------------------------------------------
10 AND CONSOLIDATED CASES
   ------------------------------------------x
11                  180 Maiden Lane
                    New York, New York
12
                    DATE: September 28, 2007
13                  TIME: 10:32 a.m.

14

15          DEPOSITION of MAUREEN TKACIK, taken

16 pursuant to the Federal Rules of Civil Procedure,

17 and Subpoena, held at the above-mentioned time and

18 place before Karen D. Williams, a Notary Public of

19 the State of New York.

20

21

22

23 ATKINSON-BAKER, INC.
   COURT REPORTERS
24 (800) 288-3376
   www.depo.com
25 FILE NO.:  A10825B

1

EXHIBIT 19 PAGE 378

```
1

2    A P P E A R A N C E S:

3

4              KEKER & VAN NEST, LLP
                    Attorney for Plaintiff
5                   710 Sansome Street
                    San Francisco, California 94111
6         BY:       (Not present)

7

8              DOW JONES & COMPANY, INC.
                    Attorney for Defendant
                    The Wall Street Journal
9                   200 Liberty Street
                    New York, New York 10281
10        BY:       STUART D. KARLE, ESQ.

11

12             LAW OFFICES OF JAMES W. SPERTUS
                    Attorney for Defendant
                    Carlos Gustavo Machado Gomez
13                  12100 Wilshire Boulevard
                    Suite 620
14                  Los Angeles, California 90025
          BY:       (Not Present)
15

16             STROOCK & STROOCK & LAVAN, LLP
                    Attorney for Defendant
17                  Mattel, Inc.
                    2029 Century Park East
18                  Los Angeles, California 90067
          BY:       MICHAEL J. NIBORSKI
19

20

21

22

23

24

25

                                                          2
```

EXHIBIT 19 PAGE 379

```
 1

 2    A P P E A R A N C E S:

 3

 4            O'MELVENY & MYERS
                      Attorney for Defendant
 5                    MGA Entertainment, Inc.,
                      MGA Entertainment, (HK), LTD.,
 6                    Isaac Larian and
                      MGAE de Mexico, S.R.I. de C.V.
 7                    Times Square Tower
                      7 Times Square
 8                    New York, New York 10036
              BY:     DALE M. CENDALI, ESQ.
 9

10

11            O'MELVENY & MYERS
                      Attorney for Defendant
12                    MGA Entertainment, Inc.,
                      MGA Entertainment, (HK), LTD.,
13                    Isaac Larian and
                      MGAE de Mexico, S.R.I. de C.V.
14                    Times Square Tower
                      7 Times Square
15                    New York, New York 10036
              BY:     KENDALL J. BURR, ESQ.
16

17

18

19

20

21

22

23

24

25
```

3

EXHIBIT _19_ PAGE _380_

1

2

3

4

5          IT IS HEREBY STIPULATED AND AGREED, by

6    and between the attorneys for the respective

7    parties herein, that the sealing and filing of the

8    within deposition be waived.

9

10

11          IT IS FURTHER STIPULATED AND AGREED

12    that this deposition may be signed and sworn to

13    before any officer authorized to administer an oath

14    with the same force and effect as if signed and

15    sworn to before the officer before whom said

16    deposition is taken.

17

18

19          IT IS FURTHER STIPULATED AND AGREED

20    that all objections, except as to form, are

21    reserved to the time of trial.

22

23

24

25

4

EXHIBIT _19_ PAGE _381_

TKACIK

1

2    M A U R E E N    T K A C I K, having first been

3    duly sworn by a Notary Public of the State of New

4    York, was examined and testified as follows:

5    BY THE REPORTER:

6         Q        Please state your name for the record.

7         A        Maureen Tkacik.

8         Q        What is your address?

9         A        65-67 Rivington, Apartment 7, New York,

10   New York 10002.

11

12   EXAMINATION BY

13   MR. NIBORSKI:

14        Q        Good morning, Miss Tkacik.

15        A        Good morning.

16        Q        Could you tell us where you are

17   currently employed?

18        A        I am currently employed by Gawker

19   Media.

20        Q        And is that here in New York?

21        A        Yes.

22        Q        And were you previously employed by the

23   Wall Street Journal?

24        A        I was.

25        Q        And approximately what time period were

5

EXHIBIT 19 PAGE 382

TKACIK

1

2       you employed by the Journal?

3           A       May 2001 through August or September of

4       2003.

5           Q       And following your time at the Journal,

6       did you then go to Gawker Media?

7           A       I worked at Philadelphia Magazine in

8       between, and free-lanced for several publications.

9           Q       And where did you work prior to the

10      Wall Street Journal as a reporter, if anything?

11          A       I worked for Time Magazine in Asia, in

12      Hong Kong.  I worked at the Philadelphia Daily News

13      in Philadelphia and I worked at the Washington

14      Times in Washington, D.C. and I worked for a web

15      company called Asia Wise in Hong Kong.

16          Q       Can you just give us a brief background

17      about your education?

18          A       I went to University of Pennsylvania

19      for two years.  I dropped out.  I took some

20      graduate classes at George Mason's -- at George

21      Mason University School of Public Policy, and

22      that's the extent.

23          Q       And what was your job title while you

24      worked at the The Wall Street Journal?

25          A       My specific job title was reporting

6

EXHIBIT 19 PAGE 383

```
 1                          TKACIK

 2   assistant or assistant reporter, something like

 3   that.

 4        Q     And could you describe your job duties

 5   while you were there?

 6        A     I had to cover, it was somewhat -- and

 7   I had a few companies that I had to cover.  I had

 8   to cover, generally, youth oriented consumer

 9   products firms.  So, that would be toy companies

10   like Mattel and footwear, the footwear companies,

11   some youth retailers.  There was a crop of

12   companies that I had to keep track of.

13        Q     Thank you.  I am going to show you what

14   we are going to mark as Exhibit 1.  This is a July

15   18, 2003 article from The Wall Street Journal.  I

16   have copies for the witness and counsel.

17                    (Whereupon, the aforementioned

18                    article was marked as Plaintiff's

19                    Exhibit 1 for identification as of this

20                    date by the Reporter.)

21   BY MR. NIBORSKI:

22        Q     Miss Tkacik, could I have you take a

23   look at what's been marked as Exhibit 1?

24        A     Yes.

25        Q     Do you recognize this?
```

7

EXHIBIT 19 PAGE 384

```
1                            TKACIK

2        A      I do.

3        Q      And what is it?

4        A      It is a story that I wrote, that I

5   think is why I am here.

6        Q      And just for the record, this is a Wall

7   Street Journal article dated July 18, 2003

8   entitled, "To Lure Older Girls, Mattel Brings in

9   Hip-Hop Crowd."

10       A      Correct.

11       Q      And this is an article that you wrote?

12       A      Yes.

13       Q      And if I could have you turn to the

14  second page, you will see a highlighted paragraph.

15              Do you see that?

16       A      Yes.

17       Q      Could I have you read that out loud,

18  please?

19       A      "Isaac Larian, chief executive of MGA,

20  says he had never heard of a project similar to the

21  Bratz at Mattel.  He says he chose Mr. Bryant's

22  idea for the Bratz over several others after

23  holding a sort of fashion-doll design contest in

24  late 1999."

25       Q      And did you interview Isaac Larian in
```

8

EXHIBIT _19_ PAGE _385_

TKACIK

1
2    preparation for writing this article?

3        A    Yes.

4        Q    And you would agree, wouldn't you, that

5    the article attributes certain statements to

6    Mr. Larian?

7                    MS. CENDALI:   Objection.

8        A    I am not sure what -- that statement

9    that is highlighted, I would say that that is

10   attributed to Isaac Larian.

11       Q    And again, turning to the highlighted

12   paragraph, the --

13                    MR. KARLE:   And we are staying on

14                that paragraph?

15                    MR. NIBORSKI:   Yes.

16       Q    The second sentence reads, "He says he

17   chose Mr. Bryant's idea for the Bratz over several

18   others after holding a sort of fashion-doll contest

19   in late 1999."   Did I read that correctly.

20       A    You missed the word design.   It's

21   fashion-doll design contest.

22       Q    Fair enough.   Let me repeat it.   He

23   says he chose Mr. Bryant's idea for the Bratz over

24   several others after holding a sort of fashion-doll

25   design contest in late 1999; is that correct?

9

EXHIBIT 19 PAGE 386

TKACIK

1

2      A      Yes.

3      Q      And did Mr. Larian tell you that

4  statement during your interview?

5      A      Yes.

6      Q      Following the publication of your

7  article, did anybody from MGA ever contact you and

8  ask for a correction or retraction or anything from

9  the article?

10     A      No.

11     Q      Did Mr. Larian ever contact you and

12  asked for a correction or retraction or anything

13  from the article?

14     A      No.

15             MR. KARLE:   Just let him finish.

16     Q      Did you ever learn that anyone

17  contacted The Wall Street Journal and asked for a

18  correction or retraction or anything in the

19  article?

20     A      No.

21             MR. NIBORSKI:   I have only one

22             more exhibit and this is just for

23             housekeeping purposes.  This is just the

24             deposition notice which I would like to

25             make an exhibit to the deposition.

10

EXHIBIT _19_ PAGE _387_

```
 1                          TKACIK
 2              MR. KARLE:  Did you ask her if
 3        she has seen it?
 4              MR. NIBORSKI:  That's all right.
 5        This is just for the deposition.
 6        A    Miss Tkacik, this is an amended
 7   deposition notice which I am handing you.  This is
 8   just for the record, just to include this as part
 9   of the transcript.  This would be marked as Exhibit
10   2.
11                    (Whereupon, the aforementioned
12                    Notice of Deposition was marked as
13                    Plaintiff's Exhibit 2 for identification
14                    as of this date by the Reporter.)
15              MR. NIBORSKI:  And finally, I
16        would like to mark as Exhibit 3 the
17        subpoena for this deposition, which
18        again is just for the record.
19              MS. CENDALI:  The amended
20        subpoena?
21              MR. NIBORSKI:  This is the
22        original subpoena.
23                    (Whereupon, the aforementioned
24                    subpoena was marked as Plaintiff's
25                    Exhibit 3 for identification as of this
```

11

EXHIBIT _19_ PAGE _388_

```
1                        TKACIK

2              date by the Reporter.)

3                    MR. NIBORSKI:  And I have no more

4              questions.

5    EXAMINATION BY

6    MS. CENDALI:

7         Q    Ms. Tkacik, the original Exhibit 3

8    subpoena in this case asks for you to appear at the

9    office of Quinn Emanuel, a law firm representing

10   Mattel.  Have you ever had any contacts with the

11   Quinn Emanuel law firm?

12        A    I don't think so.

13        Q    Do you have any idea why Quinn Emanuel,

14   I represent to you is Mattel's normal counsel in

15   this case, is not taking your deposition today?

16        A    No.

17        Q    You say that you left University of

18   Pennsylvania, when was that?

19        A    1998.

20        Q    And did you begin work in journalism

21   after you left Pennsylvania?

22        A    Directly following that.

23        Q    And the job that you mentioned that you

24   had prior to working for The Wall Street Journal,

25   were they full-time jobs or free-lance jobs?
```

12

EXHIBIT _19_ PAGE _389_

TKACIK

1

2     A     Full time.  They were all full-time

3  jobs.

4     Q     When you were working for The Wall

5  Street Journal from May 2001 to August/September

6  2003, where were you living?

7     A     I was living in Los Angeles.

8     Q     Am I correct that prior to having

9  written the article reflected in Exhibit 1, you had

10 previously wrote several other articles about

11 Mattel for The Wall Street Journal?

12    A     True.  Yes, you are correct in saying

13 that.

14    Q     Let me show you some of these articles?

15          MS. CENDALI:  Let's mark as

16          Exhibit 4 an article dated February 1,

17          2001.

18          (Whereupon, the aforementioned

19          2/1/02 article was marked as Plaintiff's

20          Exhibit 4 for identification as of this

21          date by the Reporter.)

22 BY MS. CENDALI:

23    A     It's 2002.

24    Q     Right.  Do you recognize that?

25          MR. KARLE:  Take a look at it

13

EXHIBIT 19 PAGE 390

```
                            TKACIK
1
2              first.
3         Q    Miss Tkacik, do you recognize Exhibit 4
4    as a copy of an article you wrote for The Wall
5    Street Journal on February 1, 2002 about Mattel?
6                   MR. KARLE:  Objection.  It was
7              published.
8                   MS. CENDALI:  Published.  Thank
9              you.
10        A    When you say do you recognize, I
11   recognize my name, and it looks like a story that I
12   wrote, but I don't remember writing it.
13        Q    On the first page of Exhibit 4, there
14   is a quote from a Mr. Eckert.
15             Do you see that?
16        A    Okay.  Yes.
17        Q    Did you interview Mr. Eckert for this
18   article?
19        A    It looks as though I listened in on a
20   conference call, and, so, I imagine that I did not
21   actually interview him, that these are remarks that
22   he made in the context of an earnings call with
23   analysts.
24        Q    Did you know who Mr. Eckert was at the
25   time?
```

14

EXHIBIT 19 PAGE 391

TKACIK

1

2      A     Yes.  He was the chief executive of

3  Mattel, and still is.

4      Q     Have you ever had a conversation with

5  Mr. Eckert?

6      A     Yes.

7      Q     Under what circumstances?

8      A     I don't remember.  But covering, in the

9  context of covering Mattel for The Wall Street

10  Journal.

11      Q     Did you have a conversation with

12  Mr. Eckert in connection with Exhibit 1 to your

13  deposition, the July 2003 Wall Street Journal

14  article?

15      A     I don't remember.

16      Q     Let me show you what we will mark as

17  Exhibit 5, an article dated February 7, 2002 from

18  The Wall Street Journal by Maureen Tkacik.

19                  (Whereupon, the aforementioned

20                  2/7/02 article was marked as Plaintiff's

21                  Exhibit 5 for identification as of this

22                  date by the Reporter.)

23  BY MS. CENDALI:

24      Q     Do recognize Exhibit 5 as an article

25  you wrote about Mattel in The Wall Street Journal

EXHIBIT 15 PAGE 392

```
 1                        TKACIK
 2    that was published on February 7, 2002?
 3         A     Yes.
 4         Q     And in this article, the last
 5    paragraph, there is a quote from a Rob Hudnut of
 6    Mattel.
 7               Do you see that?
 8         A     I do.
 9         Q     Did you interview Mr. Hudnut for this
10    article?
11         A     Yes.  Well, I should rephrase that.  I
12    am partially assuming that I did because I did the
13    story, and I quoted him.  But I do recall this
14    particular person, I wouldn't remember his name is
15    Rob Hudnut, but based on the fact that I generally
16    try to report accurately, I would say yes.
17         Q     Let me show you what we will mark as
18    Exhibit 6, a Wall Street Journal article with your
19    byline dated February 8, 2002.
20                    (Whereupon, the aforementioned
21                    2/8/02 article was marked as Plaintiff's
22                    Exhibit 6 for identification as of this
23                    date by the Reporter.)
24    BY MS. CENDALI:
25         Q     Do you recognize that as a copy of an
```

16

EXHIBIT _19_ PAGE _393_

TKACIK

1

2    article you wrote for The Wall Street Journal about

3    Mattel?

4         A    Yes.

5         Q    And did you interview anyone in Mattel

6    for this article?

7         A    Yes.

8         Q    Who?

9              MR. KARLE:   Excuse me.   You mean

10             who is identified in the story or are

11             you asking --

12             MS. CENDALI:   Yes.

13        Q    Who did you interview?  From what you

14   see quoted here, who did you interview for this

15   article?

16             MR. KARLE:   Read through it.

17        A    Well, again, I do have fairly decent

18   memory of doing this story, and although, again, I

19   don't think, I would not remember her name as Amy

20   Boylan, but Amy Boylan, a designer at Mattel, she

21   was my primary interview, and now that I see her

22   name, I recall interviewing her.

23        Q    And how did it come to be, as reflected

24   in Exhibits 4, 5 and 6 you wrote three articles

25   about Mattel the same week?

17

EXHIBIT _19_ PAGE _394_

TKACIK

1

2          MR. KARLE:  You are asking about

3      the editorial judgment that led to that?

4          MS. CENDALI:  I am asking if for

5      some reason she wrote these articles

6      about Mattell in the same week.

7          MR. KARLE:  If you are asking

8      about news judgment that led to this, I

9      don't understand the relevance to the

10     article we are brought here for.  And I

11     am not going to let you inquire into

12     editorial decisions made.  If you want

13     to ask what her judgment is about these

14     things, that's fine.  But if you are

15     asking why The Wall Street Journal

16     published these, I instruct the witness

17     not to answer that question.

18  Q    Is it fair to say that because of your

19  being assigned at The Wall Street Journal you made

20  it a point to get to know Mattel well?

21         MR. KARLE:  Objection to the form

22     of the question.

23         THE WITNESS:  Should I say

24     anything?

25         MR. KARLE:  You can answer the

18

EXHIBIT 19 PAGE 395

TKACIK

2          question.

3      A      I tried to, when I had a company that I

4   needed to cover, and especially if it was a public

5   company like Mattel, that have, you know, pretty --

6   they have a lot of people working in PR and

7   investor relations and they have a constant flow of

8   news, but I had a few companies that I needed to

9   keep track of, and Mattel at the time was a pretty

10  large company, both market capital and revenue

11  wise, so I did -- yes, I did make it a point to get

12  to now know all of the companies that I was

13  assigned to cover, specifically, the public ones

14  because they were the biggest, and investors care

15  about public companies and what they are doing.

16  And you know, another thing that I would say is

17  just that, that a lot of times I would, stories

18  would run close together when they weren't

19  necessarily written close together, it was -- one

20  of these was a news story about earnings and one

21  was another news story.  And this was more of a

22  feature story that I, you know, that was kind of

23  evergreen.  So I don't imagine that -- I imagine

24  that it was simply coincidental.

25                  MR. KARLE:  When you said this,

19

EXHIBIT _19_ PAGE _396_

1                          TKACIK

2              you meant Exhibit 6?

3                    THE WITNESS:  Yes.  I didn't mean

4              Exhibit 6 was a feature.

5         Q    So is it fair to say in the course of

6    your work covering, I think you said consumer

7    products?

8         A    Youth targeted consumer products and

9    retail firms is generally how you would phrase the

10   companies that I covered.

11        Q    So is it fair to say as part of your

12   work in covering youth products and consumer

13   products, you made a point to get to know Mattel?

14        A    I would -- that's fair to say; I

15   suppose.

16        Q    Let me mark as Exhibit 7, another

17   article in The Wall Street Journal with your byline

18   about Mattel dated April 3, 2003.

19                   (Whereupon, the aforementioned

20              4/3/03 article was marked as Plaintiff's

21              Exhibit 7 for identification as of this

22              date by the Reporter.)

23   BY MS. CENDALI:

24        Q    Is that a copy of another article you

25   wrote?

20

EXHIBIT 19 PAGE 387

TKACIK

1

2      A      Yes.

3      Q      And in this article, did you report --

4   it states in the first line that Mr. Eckert's 2002

5   pay jumped to 11.9 million dollars?

6      A      Yes, that's what it states.

7      Q      And you have no reason to believe that

8   that's not true?

9      A      Yes, I don't.

10     Q      So, turning to Exhibit 1, the first

11  exhibit that we started with today.

12     A      Uh-huh.

13     Q      Is it true that prior to writing the

14  article reflected in Exhibit 1, you would have

15  various interviews with people at Mattel for other

16  articles?

17     A      Yes.

18     Q      Is it true that Mattel contacted you to

19  get you interested in writing the article that

20  became Exhibit 1?

21     A      No.   No.

22     Q      Do you know a Julie Jensen at Mattel?.

23     A      There was a PR person there by that

24  name, but I thought her name was Julia.

25     Q      Did Julia Jensen contact you to

21

EXHIBIT 19 PAGE 398

TKACIK

1

2  encourage you to write an article about Flavas for

3  Mattel, about Mattel's launch of the Flavas

4  product?

5       A     No.   There was a -- generally, the

6  initial genesis of this was they have a sort of toy

7  fair at Mattel where they show new lines, new

8  products to retailers, and so I had gone to that

9  and seen the Flavas.   But the story itself -- and I

10 was thinking about writing about the Flavas.   But

11 it was only -- but I thought, you know, it was only

12 when I learned about a more interesting story that

13 I, you know, this became a story in the journal.

14      Q     When you say you learned about a more

15 interesting story, what do you mean?

16      A     When I learned about the more

17 interesting angle of the companies, I think I would

18 say corporate culture, I don't remember the story

19 that specifically, but I would describe it more as

20 a story about a corporate culture that, you know,

21 was, had been very Barbie centric rather corporate,

22 a business model that was dependent on this one

23 kind of brand and how it was changing.   And I

24 didn't, Mattel had not provided me with any of that

25 information nor did they, you know, did they, did

22

EXHIBIT _18_ PAGE _399_

```
1                        TKACIK

2    Julia Jensen or anybody else there seek to.

3         Q      Matt Bousquette is one of the people

4    listed that you interviewed for this article; is

5    that right?

6                   MR. KARLE:  When you say listed,

7                you mean someone identified in the

8                story?

9                   MS. CENDALI:  Yes.

10        Q      Matt Bousquette is one of the people

11   that is quoted in this article as someone you spoke

12   to; is that right?

13        A      Yes.

14        Q      And he is someone you spoke to?

15        A      Yes.

16        Q      Let's turn to the third paragraph of

17   the article, where is says, "Mattel Inc. hopes that

18   the dolls are hip enough to take on the Bratz."

19   You see that?

20        A      Uh-huh.

21        Q      It says, "the Flavas (pronounced

22   Flay-vuhs like flavors) is a set of six dolls

23   brought from design to production in just three

24   months, represent a striking gamble for the giant

25   toy company."
```

23

EXHIBIT _19_ PAGE _400_

```
 1                        TKACIK
 2              Do you see that?
 3        A     Yes.
 4        Q     Did people at Mattel identified in this
 5   article tell you that the Flavas was developed in
 6   just three months?
 7        A     Yes.
 8        Q     Do you recall them saying to you that
 9   it was possible to develop a new doll line in a
10   short period of time if one wanted to?
11        A     I don't remember specifically that.
12        Q     But that was the gist of what they were
13   telling you?
14        A     That has to be assumed.
15        Q     Was Mr. Bousquette the person who told
16   you that?
17        A     I don't know.
18        Q     In your article, you state in the next
19   paragraph, But Mattel, which had become accustomed
20   to its buxom blonde dominating the market, has
21   watched in alarm as Barbie has been challenged, a
22   smaller toy maker's Bratz, a line of big-headed
23   pouty-lipped characters.  Do you see that?
24        A     Uh-huh.
25        Q     Did someone at Mattel tell you that?
```

24

EXHIBIT _19_ PAGE _401_

TKACIK

1

2     A    No.  That is the sort of background --

3  nobody ever told me on the record, you know, nobody

4  phrased it in that way.  It was a conventional

5  wisdom gleaned probably, I imagine, but I don't

6  know, from speaking with analysts, watching the,

7  you know, speaking with retailers and speaking off

8  the record with employees.

9     Q    Going to the next paragraph in Exhibit

10  1, you write, "After trying and failing to defeat

11  the Bratz with a trendier Barbie last year, Mattel

12  has come up with a radical battle plan."  Do you

13  see that?

14     A    Uh-huh.

15     Q    What were you referring to when you

16  referred, to "trying and failing to defeat the

17  Bratz with a trendier Barbie last year"?

18     A    There was a Barbie that they had put on

19  the market called My Scene Barbie.  My Scene Barbie

20  had large heads and more cartoonish features.

21     Q    Did Mattel tell you that they had

22  failed to defeat Bratz with My Scene?

23     A    No.

24     Q    Did people at Mattel tell you that the

25  My Scene doll was intended to compete with Bratz?

25

EXHIBIT 19 PAGE 402

```
                              TKACIK

 1

 2        A    No.

 3        Q    Turning to two paragraphs down in the

 4   article, you write, "Mattel now concedes Barbie has

 5   gradually lost touch with some young girls' lives,

 6   "Barbie began as a great girl who was simply a

 7   reflection of popular culture, but in the past

 8   few years, we had sort of put her on a pedestal,"

 9   says Matt Bousquette, president of the newly

10   created Mattel Brands unit."

11             Do you see that?

12        A    Yes.

13        Q    Is that an accurate quote of what he

14   said?

15        A    Yes.  I remember that conversation.

16        Q    Did that conversation take place in

17   person or on the phone?

18        A    I don't remember.

19        Q    Do you remember that you met

20   Mr. Bousquette in your life?

21        A    Yes, I met him a few times.

22        Q    You interviewed him several times for

23   articles?

24        A    You know, at least twice, three times.

25        Q    It goes on to say, "which consolidated
```

26

EXHIBIT 19 PAGE 403

```
                          TKACIK
```

1                        TKACIK

2     the boys and girls toys division, we're taking her

3     off that pedestal."  Do you see that?

4          A     Yes.

5          Q     Again, is that an accurate quote of

6     Mr. Bousquette?

7          A     Yes.

8          Q     The article also discusses in the next

9     paragraphs that Barbie had began appealing to

10    younger girls while Bratz appealed to an older

11    girl.

12              Do you see that?

13         A     I see that.

14         Q     Was that something that people at

15    Mattel told you for your interview for this

16    article?

17                    MR. KARLE:   Interviewed and

18                    attributed and identified in the

19                    article?

20                    MS. CENDALI:   That's right.

21                    MR. KARLE:   Or you are asking

22                    beyond that?

23         Q     I am asking only about sources that you

24    have attributed in the article.

25         A     This statement is attributed to an

EXHIBIT _19_ PAGE _404_

TKACIK

1

2 analyst, so, that would not be attributed to

3 Mattel.

4        Q     I am asking you, though, when you spoke

5 to Mr. Bousquette?

6        A     Whether he said that?

7        Q     Yes.

8                    MR. KARLE:  Let her ask the

9                    question.  It's much easier for the

10                   report.

11       Q     You spoke on the record to

12 Mr. Bousquette and Ivy Ross at Mattel for this

13 article; is that right?

14       A     Yes.

15       Q     Did either of them discuss the fact

16 that Bratz appealed to an older market than Barbie?

17       A     I don't know.

18       Q     It could have, may not have; you just

19 don't remember?

20       A     They might have, yes.  They might have.

21 I don't remember them addressing the issue of Bratz

22 directly very often or saying that name.

23       Q     What do you remember them saying about

24 Bratz?

25       A     I don't remember.

28

EXHIBIT 19 PAGE 405

TKACIK

1

2      Q      Were you told by Miss Ross or

3   Mr. Bousquette that Flavas was intended to appeal

4   to an older audience than Barbie?

5      A      I don't remember.

6      Q      Were you told by either of them that

7   Flavas was intended to compete with Bratz?

8      A      I don't think so.

9      Q      The article goes on to say, The history

10   of the Bratz is intertwined with Mattel."  And it

11   says, "MGA says the Bratz were designed by Carter

12   Bryant, a former member of the Barbie team."

13      A      Uh-huh.

14              MR. KARLE:  If you could say yes

15          or no.

16      A      Yes.  Sorry.

17      Q      Who at MGA told you that?

18      A      I talked to Isaac Larian at MGA, and he

19   told me that.  There were probably other people at

20   MGA who also had told me that.

21      Q      Mr. Larian, when he spoke to you, did

22   he attempt to, in any way, hide Mr. Bryant's

23   involvement with Bratz from you?

24      A      I don't remember.

25      Q      You don't remember him saying anything

29

EXHIBIT 13 PAGE 406

TKACIK

1

2    to that effect, correct?

3         A     Yes, I don't remember.

4         Q     And he told you that Bratz were

5    designed by Carter Bryant; is that right?

6         A     He did.  Yeah, he did, he did say that.

7         Q     You didn't quote Mr. Larian directly on

8    that; is that true?

9         A     Well, this highlighted paragraph is a

10   paraphrase of him, basically, you know, saying

11   that.  So, I didn't quote him -- just because I

12   didn't quote him directly does not mean that he did

13   not say that.

14        Q     Miss Tkacik, do you have any notes

15   reflected of any of the interviews that you did for

16   this article?

17        A     No.

18        Q     Do you have any e-mails reflecting any

19   communications with Mattel or MGA regarding this

20   article?

21        A     No.

22        Q     Prior to your interview with Mr. Larian

23   for this article, had you ever spoken to him

24   before?

25        A     I think so.  I know that a reporter,

30

EXHIBIT 19 PAGE 407

TKACIK

1

2  Lisa Bannon, who covered Mattel before I did had

3  interviewed him extensively.  But I am not sure if

4  I had interviewed him before this article.

5      Q    And isn't it true until this article,

6  you had never written an article about MGA?

7      A    I don't know.  I would characterize the

8  Bratz are named in at least one of those articles,

9  right, I think.

10      Q    Did you interview anyone in MGA prior

11  to this article?

12                  MR. KARLE:  Prior to the work she

13              did for this article?

14                  MS. CENDALI:  Correct.

15      A    Yes.  I am certain.

16      Q    For which article?

17      A    I don't know.  If there are -- you know

18  if you didn't find anything, then I did keep up,

19  just as you said, that I got to know Mattel, I

20  would say the same for Bratz; it was a very

21  important new toy and they had a PR person whose

22  name escapes me now, who I had regular

23  communications with.

24      Q    Can you recall a single article you

25  wrote interviewing anybody at MGA prior to this

31

EXHIBIT 19 PAGE 408

TKACIK

1

2   July 2003 Wall Street Journal article?

3      A    No.

4      Q    And you don't have any notes or

5   anything like that reflecting that you ever had any

6   such conversations?

7      A    No.

8      Q    Is it fair to say that you had had many

9   more conversations with people at Mattel prior to

10   this article than you had ever had with Bratz

11   people?

12      A    I suppose so.  Mattel is a much larger

13   company with many more divisions.  MGA was a very,

14   had, you know, one brand that was, you know, that

15   was interesting.

16      Q    Now, in this article as we talked

17   about in the portion quoting Mr. Bousquette, you

18   would quote directly from your sources, right?

19            MR. KARLE:  Objection to the form

20        of the question.

21      Q    Well, in this article when we talked

22   about Mr. Bousquette, about how Barbie began as a

23   great girl who was a simple reflection of a popular

24   culture, that was in quotes, right?

25      A    Uh-hmm.  Yes.

32

EXHIBIT 19 PAGE 409

TKACIK

1

2      Q      And that's because you were directly

3   attempting to write down exactly what was said to

4   you in the interviews; is that right?

5      A      Yes.

6      Q      And in the highlighted paragraph that

7   Mattel's counsel asked you about, the statements

8   allegedly made by Mr. Larian were not in quotes,

9   right?

10      A      No, they are not in quotes.

11      Q      And that's because you weren't

12   intending to literally write down exactly what he

13   said to you, right?

14      A      When you put together a story, you

15   sometimes choose a quote usually if it sounds good.

16   This is a very informational paragraph it has so

17   much space.  I believe that I do quote, I remember

18   at some point, you know, putting a statement by

19   Larian in quotes in this story, but not that

20   particular -- not all of that information; it's

21   incidental.

22      Q      And you were not directly quoting him

23   because you did not, these weren't, as you say

24   earlier, you were paraphrasing, you were not

25   directly quoting any of Mr. Larian's statements to

33

EXHIBIT 19 PAGE 410

TKACIK

1
2    you in this paragraph, isn't that true?

3        A    Yes, this is not a direct quote.

4        Q    Now, in here it says, you wrote, "He

5    says he chose Mr. Bryant's idea for the Bratz after

6    several others about holding a sort of fashion-doll

7    contest."

8            Do you see that?

9        A    Yes.

10       Q    Did you ask him what he meant?  Or do

11   you have any understanding of what was meant by

12   this sort of fashion-doll contest?

13       A    Right now no, I don't remember.  I

14   remember talking to him, and, I believe he was

15   overseas at the time.  And he explained it to me.

16   But, there probably just was a rumor story too.

17       Q    So sitting here today, you have no idea

18   what sort of fashion-doll contest that he was

19   referring to, that you are talking about, right?

20       A    No.  I don't remember.  I have no idea

21   who else was involved in this contest or any of the

22   specifics of it.

23       Q    So you don't know anything about the

24   nature of this sort of contest; is that right?

25       A    No.

34

EXHIBIT _19_ PAGE _41_

TKACIK

1

2      Q     And you say that Mr. Larian was

3  overseas when you spoke to him; is that right?

4      A     I vaguely recall him being overseas.

5      Q     Do you remember if he was in Asia?

6      A     I think I remember, because I used to

7  live in Hong Kong and I think I had a conversation

8  with him at the time, Oh, where are you staying,

9  you know, check out this restaurant.

10     Q     Now, when you set up the interview

11 with Mr. Larian, did you tell him in advance you

12 wanted to talk about the origins of Bratz?

13     A     I don't remember.

14     Q     What do you recall saying to MGA as to

15 why you wanted to speak to them?

16     A     I don't remember.

17     Q     Do you know whether Mr. Larian had his

18 calendar in front of him or had done any research

19 in preparation for speaking to you?

20     A     I have no idea.

21     Q     And did you receive any e-mails from

22 MGA in connection with this article?

23     A     I don't remember.

24              MS. CENDALI:  I would like to

25          mark as Exhibit 8 an e-mail exchange,

35

EXHIBIT 19 PAGE 412

TKACIK

1

2      the bottom of which is an e-mail from

3      Mr. Larian to Miss Tkacik dated July 14,

4      2003.

5          (Whereupon, the aforementioned

6      e-mail was marked as Plaintiff's Exhibit

7      8 for identification as of this date by

8      the Reporter.)

9      Q    Miss Tkacik, do you recognize the

10  oldest e-mail in the chain, the last e-mail on the

11  page as an e-mail you received on or about July 14,

12  2003 from Mr. Larian to you?

13     A    I believe that -- I don't remember it

14  specifically, but I do remember him being -- I

15  remember him specifically saying to me at some

16  point, something about Formal Funk and how Mattel

17  had copied it, but I don't recognize the e-mail.   I

18  think it was one of the talking points.

19     Q    And there is nothing in this e-mail

20  that talks about a Bratz doll contest or when it

21  occurred; is that right?

22     A    Yes.

23     Q    And you are not aware of any written

24  communication of any kind from MGA on that point,

25  correct?

TKACIK

1

2      A      I don't know.

3      Q      And the e-mail also says, "Please

4  e-mail me a copy of the article when it's out as I

5  am in the orient. "

6             Do you see that?

7      A      Yes.

8      Q      And does that refresh your recollection

9  that he was, whether he mentioned to you he was in

10  Asia when he was speaking to you?

11      A      Yes, it does refresh.

12      Q      Now, when you spoke to Mr. Larian, did

13  you notice that he had a heavy accent?

14      A      I remember him, he does have an accent.

15  It certainly didn't make him unintelligible.

16      Q      Was it your impression that English was

17  not his first language?

18      A      I didn't really think about it.  He

19  spoke it very well.

20      Q      Do you understand that he came from

21  Iran?

22      A      I understood that he was Persian, but I

23  didn't know -- I don't remember.  I think that at

24  one point I probably talked to him about, you know,

25  when he had come over or what have you, but I have

EXHIBIT _19_ PAGE _414_

TKACIK

1   

2  no recollection of that now.

3      Q    When you lived in Los Angeles, did you

4  have friends who worked for Mattel?

5      A    No.

6      Q    You say in your article after the

7  highlighted paragraph, "Mr. Larian, who emigrated

8  to the U.S. from Iran found his company in the late

9  1970."

10      Do you see that?  It's on Page 2.

11      MR. KARLE:  It's right after the

12      highlight.

13      A    Okay.

14      Q    Does that refresh your recollection

15  that you understood that he had been born in Iran

16  and only later came to the United States?

17      A    Yes.

18      Q    Now, in your article, on that same Page

19  2, in the paragraph that starts, "The history of

20  the Bratz is intertwined with Mattel."

21      You see that?

22      A    Yes.

23      Q    And it goes on to say, "Inside Mattel,

24  some are convinced the Bratz borrowed liberally

25  from a Mattel project that was scrapped at the

38

EXHIBIT 19 PAGE 415

```
 1                        TKACIK
 2    testing stage in 1998."
 3              Do you see that?
 4        A    Yes.
 5        Q    Did Mr. Bousquette give you that
 6    information?
 7        A    No.
 8        Q    Did Miss Ross give you that
 9    information?
10        A    No one at Mattel who is quoted in the
11    story gave me that information.
12        Q    Did the people at Mattel who is quoted
13    in the story encourage you to investigate this
14    issue?
15        A    They had no idea.  They were oblivious.
16    My understand was that the people that I quoted in
17    the story were oblivious to that.
18        Q    So you have no idea, the people quoted
19    in the story never told you that they had been
20    involved in an investigation of Carter Bryant the
21    year before; is that right?
22        A    No.  They never told me anything like
23    that.
24        Q    Did you speak to Mr. Bousquette or
25    Miss Ross about Carter Bryant?
```

EXHIBIT *19* PAGE *416*

TKACIK

1

2      A     I don't remember.

3      Q     Do you have any recollection of what

4    you said to Miss Ross or Mr. Bousquette, if

5    anything, about Carter Bryant?

6      A     No.  I have very little recollection.

7    And I should rephrase that, my understanding and

8    the way that I took their reactions to this story

9    led me to believe that they were not aware of any

10    of this stuff, or that they might be vaguely aware

11    of it.  But they, it was not -- they weren't very

12    familiar with the specifics.  They didn't seem to

13    be.  They depicted themselves as being unfamiliar

14    with the situation.  The genesis of this story was

15    a coincidence.  And I don't remember talking to

16    anyone who is quoted in this story about Carter

17    Bryant in any sort of way.

18      Q     You said you spoke to them after a

19    reaction to the story, what do you mean?

20      A     When I, I was introduced to the Flavas,

21    I don't remember when, but probably, probably

22    two weeks, three weeks, a month before this story

23    came out, I was flirting with writing a story about

24    them, and I learned about Carter Bryant.  I don't

25    believe that he had been in anything other than

40

EXHIBIT _19_ PAGE _417_

TKACIK

1
2    trade-type media before, as the designer of his
3    dolls.  I could be wrong.  I tried to get in touch
4    with him to find out more because I really wanted
5    to find out where the Bratz came from.  And when I
6    took the idea, then this information that I learned
7    about the, you know, the genesis of this product
8    being at Mattel, which didn't, you know -- which I
9    believed I took from confidential sources, but
10   believed, especially considering that the toy
11   design industry is very small and centralized in
12   L.A., when I took that piece of information to
13   people at Mattel very shortly before this story
14   came out, they seemed very surprised, and they
15   didn't have a story.  They didn't really say much
16   about it because they didn't seem very familiar, at
17   an executive level.  I think that Ivy Ross was
18   relatively new to Mattel, I believe she had been at
19   other places, so they didn't seem very familiar
20   with the inner workings of design.  That was just
21   my impression.
22        Q     Which people did you speak to that you
23   said were surprised?
24        A     Well, that's, I think that a lot of
25   those conversations were not for attribution.  I am

EXHIBIT 18 PAGE 418

TKACIK

1

2    having trouble, I don't really want to answer that

3    question because I believe that in order to get a

4    fair assessment, to reach that assessment, I had a

5    lot of conversations that were not for attribution.

6        Q    Did you promise people confidentiality?

7        A    I promised many people confidentiality.

8    There were people in the story --

9            MR. KARLE:  That's a yes or no

10            question.

11       A    Yes.  Sorry.

12       Q    Where did you get the information that

13   alleged that Carter Bryant got the idea from Bratz

14   from something at Mattel?

15            MR. KARLE:  If you obtained that

16            information from anyone that's

17            identified in this story you can answer

18            the question.  If it's someone else --

19       A    I can't answer that.

20       Q    Have you ever heard of a man named

21   Antonio Dianda (phonetic), Richard Dianda, the head

22   of security for Mattel?

23            MR. KARLE:  If that's not a

24            person identified in this story, I will

25            instruct the witness not to answer.

42

EXHIBIT 19 PAGE 419

                              TKACIK

1

2        A     I can't answer.

3              MS. CENDALI:  I am asking, it has

4        nothing to do -- she has been covering

5        this company for a while I want to know

6        if she ever has heard of Richard Dianda,

7        the head of security for Mattel.

8              MR. KARLE:  But whether she has

9        heard of him or not is irrelevant,

10       unless she obtained information from

11       him.  He is not identified in the story

12       and, therefore, one could infer that if

13       she identifies him he may or may not be

14       a source of hers.  I can't understand

15       why for matters remotely, unless she

16       would have received information from

17       him, therefore, I am instructing the

18       witness not to answer.

19       Q     Did anyone at Mattel ever tell you that

20  in 2002 they did an investigation as to Carter

21  Bryant and came up with nothing?

22             MR. KARLE:  Is that specifically

23       as to anyone identified in the story or

24       anyone at all?

25       Q     You have been referring to these

                                                        43

EXHIBIT 19 PAGE 420

TKACIK

1 
2  confidential sources with these people you say you

3  believe, I am asking did anybody tell you -- I am

4  not asking who -- did any of these people tell you

5  that you there was an investigation in 2002 or did

6  they keep that as a secret from you?

7             MR. KARLE:  And I instruct the

8             witness to -- I'd like to talk to her

9             first if that's okay with you.

10            MS. CENDALI:  Okay.  Off the

11            record.

12            (Whereupon, an off-the-record discussion

13            was held.)

14  BY MS. CENDALI:

15       Q    Miss Tkacik, did anyone ever tell you

16  that Mattel had done an internal investigation with

17  regard to Carter Bryant, in 2002?

18       A    No.

19       Q    Did Ivy Ross ever tell you that she was

20  part of this internal investigation?

21       A    No.

22       Q    When this article --  did Miss Ross

23  lead you to believe that she was unfamiliar until

24  you informed her of them, of these claims about

25  Carter Bryant?

44

EXHIBIT 19 PAGE 421

TKACIK

1

2      A     No.

3      Q     You said earlier that you thought that

4  she had evidenced surprise?

5                  MR. KARLE:   Objection to the form

6              of the question.

7      A     I believe that I characterized

8  surprised as being the reaction from most of the

9  people at Mattel to whom I spoke.

10     Q     The unidentified people you refuse to

11  name?

12                 MR. KARLE:   Objection to the form

13             of the question.

14     Q     You are not prepared to name any of

15  these people that you said were surprised; is that

16  right?

17                 MR. KARLE:   I am instructing the

18             witness not to identify anybody other

19             than those people who are quoted or

20             identified in the story for either

21             Mattel or MGA or anybody else.

22     Q     So there is no one that you are going

23  to name as those anonymous people?

24                 MR. KARLE:   I will instruct the

25             witness not to answer the question.   If

45

EXHIBIT 15 PAGE 422

```
 1                         TKACIK

 2              you ask if she is going to follow my

 3              instruction, then --

 4       Q     Are you going to follow your counsel's

 5  instruction?

 6       A     Yes.

 7       Q     So Miss Ross and Mr. Bousquette never

 8  said that they were surprised about the allegation

 9  about Carter Bryant that's reflected in your

10  article, right?

11       A     I don't remember.

12       Q     And, in fact, you have no information,

13  one way or the other, as to whether Miss Ross and

14  Mr. Bousquette knew all about these allegation the

15  year before and did nothing about it?

16       A     I don't know.

17       Q     You refer to the design world being a

18  close knit world, or something to that effect; is

19  that right?

20       A     I said that the toy design community

21  is, seems to me to be relatively small and that

22  there was a lot of revolving door-type action.

23       Q     Did you the impression that -- you say

24  in the article that you spoke to an ex-designer at

25  Mattel about Carter Bryant's alleged borrowing of
```

```
 1                         TKACIK
 2   Mattel's idea, right?
 3                    MR. KARLE:  Could you point to
 4               where that is in the article?
 5                    MS. CENDALI:  Sure.
 6       Q    If you look at Page 2, the bottom
 7   left-hand column, "The Mattel doll line that was
 8   scrapped wasn't exactly like the Bratz says a long
 9   time designer who worked on the project."
10               Do you see that?
11       A    Yes.
12       Q    Is that someone you interviewed for
13   this article?
14       A    Yes.
15       Q    Was that a current Mattel employee at
16   the time?
17       A    I don't think so.
18                    MR. KARLE:  In the article, and
19               the next sentence appears to say that
20               the designer left Mattel in 2001.
21       Q    Who was that person?
22                    MR. KARLE:  I can either ask the
23               question or you can, is the question,
24               Was that a source who you promised
25               confidentiality in speaking to you?
```

47

EXHIBIT _19_ PAGE _424_

1                          TKACIK

2                   MS. CENDALI:  Yes.

3                   MR. KARLE:  It was yes.  Then I

4            instruct the witness not the answer.

5       Q     Did Miss Ross and Mr. Bousquette lead

6   you to that source?

7       A     No.

8       Q     The article goes on to refer to a Lilly

9   Martinez.

10           Do you see that?

11      A     Yes.

12      Q     And did you interview Lilly Martinez

13  for this article?

14      A     No.

15      Q     Have you ever spoken to Lilly Martinez?

16      A     Yes.

17      Q     In what circumstances?

18      A     I believe when the story happened I

19  called Lilly Martinez through the switchboard -- so

20  I would rephrase that -- I spoke to her very

21  briefly and she couldn't talk to me.  So it in was

22  that context.  Later on, in 2005, I met Lilly

23  Martinez.

24      Q     This is after you had left The Wall

25  Street Journal?

48

EXHIBIT 15 PAGE 425

```
 1                        TKACIK
 2      A     Completely unrelated to this.
 3      Q     What were the circumstances that you
 4   met Lilly Martinez after this?
 5      A     I wanted to do a story on her.
 6      Q     Why?
 7                  MR. KARLE:  For whom?
 8                  THE WITNESS:  The New York Times
 9            Magazine.
10      Q     Did you do such a story?
11      A     No.
12      Q     Why not?
13      A     It just didn't work out.
14      Q     Did it have anything to do with Carter
15   Bryant?
16      A     No.
17      Q     Have you remained in touch with any of
18   the other people that you interviewed for this
19   article since the time you interviewed them?
20      A     I saw them when I was doing that story,
21   or when I was thinking about doing that story.  I
22   did speak again to some people that I had spoken to
23   before.  Other than that, I haven't kept in touch
24   with them at all.
25      Q     So when you were thinking of doing the
```

49

EXHIBIT 19 PAGE 426

TKACIK

1

2  story in 2005 about Lilly Martinez, you went back

3  and contacted the same unnamed sources that you

4  used in the 2003 article for the Journal?

5              MR. KARLE:  Objection.

6          Mischaracterizes her testimony.

7      Q    You can answer.

8              MR. KARLE:  It's a yes or no.

9      A    I don't remember.

10     Q    So, you went back to these same sources

11 again two years later and spoke to them again; is

12 that right? .

13             MR. KARLE:  Objection.

14         Mischaracterizes her testimony.

15         You can answer yes or no.

16     A    I don't remember.

17     Q    Well, the designer who left Mattel in

18 2001, you spoke to that person again in 2005,

19 right?

20     A    No.

21             MR. KARLE:  Let her finish her

22         question.

23     Q    Which of the unnamed sources you spoke

24 again to in 2005?

25             MR. KARLE:  Objection.  Instruct

EXHIBIT _19_ PAGE _427_

```
1                            TKACIK
2              the witness not answer the question.
3       Q     How many of them did you speak to in
4   2005; do you recall?
5       A     No, I don't.
6                  MR. KARLE:  Do you remember if
7              there were any?
8                  THE WITNESS:  That I went back
9              to, vaguely, although my memory is hazy,
10             I think that I spoke to one of them.
11      Q     Do you have any notes of this proposed
12  article or your communications with these sources
13  in 2005?
14      A     No.
15      Q     After your article was published, what
16  communications, if any, did you have with Mattel
17  concerning the article?
18      A     I don't remember.
19      Q     Did anyone at Mattel contact you about
20  the allegations regarding Carter Bryant?
21      A     I don't remember.
22      Q     Leaving aside communications with
23  Mattel, did you receive any other response or,
24  reaction to your article?
25      A     I don't remember.
```

51

EXHIBIT 19 PAGE 428

TKACIK

1

2    Q      Did you receive any unsolicited phone

3    calls or e-mails or queries about the article?

4    A      I really don't think so, until this,

5    until being, you know, served.

6    Q      Served with your subpoena in this case?

7    A      Yes.

8    Q      Did this unnamed project that

9    Miss Martinez had worked on that you referred to in

10   this article, did that project ever have a name?

11   A      I don't remember.

12   Q      Do you remember whether you were ever

13   told the name of it at the time?

14   A      I don't remember.

15   Q      Have you ever heard of the name Tune

16   Teens before?

17   A      I don't remember.

18   Q      Do you know whether the date that Tune

19   Teens -- you say here that there was a Mattel

20   project that was scrapped at testing stage in 1998.

21          Do you see that?

22   A      Yes.  Yes, I do.

23   Q      Where did you get that information?

24   A      I can't say.

25                 MR. KARLE:  In other words, that

52

EXHIBIT 19 PAGE 429

```
1                        TKACIK

2             information was provided via a

3             confidential source?

4                  THE WITNESS:  Provided from a

5             confidential --

6                  MR. KARLE:  Then I instruct the

7             witness not to answer.

8        Q.    And am I correct you were not provided

9   with any documents confirming that date?

10       A     I don't remember.

11       Q     So sitting here today you don't know

12  whether that date is correct or not, right?

13       A     I vaguely remember going to several

14  unnamed sources and incorporated it.

15                 MR. KARLE:  It's a yes or no.

16            Could you read back the question,

17            please.

18                 (Whereupon, the record was read

19            back by the Reporter.)

20       A     I don't know.

21       Q     And were you ever shown photos or

22  drawings of this alleged unreleased project?

23       A     I don't know.

24       Q     So, you never had a chance to form an

25  opinion in your own mind of comparing whatever this
```

53

EXHIBIT _19_ PAGE _430_

TKACIK

1

2      unreleased project was with the Bratz, this is just

3      information that was told to you, correct?

4          A      I believe that's correct.

5          Q      And the people who told you it to you

6      were friends of Miss Martinez, correct?

7          A      No.

8          Q      Former co-workers of Miss Martinez,

9      correct?

10         A      Yes.

11         Q      Do you like Miss Martinez?

12         A      Do I like her?

13         Q      Yes.

14         A      I don't know her.

15         Q      You said you spoke to her again in

16     2005, right?

17         A      I did.

18         Q      Did you speak to her in person?

19         A      Yes.

20         Q      For how long?

21         A      Half an hour, probably.  I don't

22     remember.

23         Q      How long was your interview with

24     Mr. Bousquette in relation to this article?

25         A      I don't know.

54

EXHIBIT 19 PAGE 431

```
1                          TKACIK
2          Q     Can you give me any sense, was it an
3   hour?  Was it two hours?  Was it ten minutes?
4          A     It was probably about an hour, probably
5   about an hour.
6          Q     And your interview with Miss Ross in
7   connection with this article, how long was that?
8          A     I don't know.
9          Q     Do you recall anything else that
10  Miss Ross said in relation to this article?
11         A     No.
12         Q     Do you recall anything else
13  Mr. Bousquette said in relation to this article?
14         A     No.
15         Q     How long was your conversation with
16  Mr. Larian in relation to this article?
17         A     I don't know.
18         Q     Is it fair to say it was a brief
19  conversation?
20         A     No.  I don't think so.
21         Q     You don't remember?
22         A     No.
23         Q     Could you approximate the length of
24  your conversation with Mr. Larian?
25         A     Half an hour.
```

55

EXHIBIT 19 PAGE 432

```
                              TKACIK

1

2          Q     And in that conversation, did he speak

3    about My Scene having ripped off Bratz?

4          A     Yes.

5          Q     Did he speak about how well Bratz was

6    doing in the marketplace?

7          A     I don't remember.

8          Q     Did you ever speak to Mr. Larian again

9    after this one conversation with him?

10         A     I don't remember.

11         Q     Did you ever exchange any e-mails with

12   him after this article came out?

13         A     I don't know.

14         Q     After this article came out, the

15   article of July of 2003, Exhibit 1, did you have

16   any other communication ever with anyone at MGA?

17         A     Yes.

18         Q     What?

19         A     In 2005 when I went to meet Lilly, I

20   went back, I visited MGA, and I spoke to some

21   designers there.  I don't remember any of their

22   names.  I don't remember, I think that I might have

23   met Isaac Larian at the time.  It's all very, I

24   don't really remember it well.

25         Q     That was for the article you never
```

56

EXHIBIT 19 PAGE 433

```
1                         TKACIK

2    wrote; is that right?

3         A    Yes.

4         Q    That was going to be about

5    Miss Martinez, correct?

6         A    There were many.  It was about dolls

7    and toy design, I don't even remember how it was

8    framed.

9         Q    I take it you don't have any friends

10   who work for MGA, right?

11        A    No.

12                  MR. KARLE:  Let's take a

13             five-minute break.

14             (Whereupon, a short break was taken.)

15   BY MS. CENDALI:

16        Q    Turning again back to Exhibit 1, your

17   July article of 2003, on the second page there is a

18   paragraph that says, starts with, "The Mattel dolls

19   were scrapped in testing, current and former

20   designers say, because Mattel had strict quotas

21   that allowed only one "flanker brand" that is a

22   brand that would compete with Barbie for shelf

23   space on the market at a time."

24             Do you see that?

25        A    Yes.
```

57

EXHIBIT 19 PAGE 434

TKACIK

1

2    Q    Was that something Ivy Ross told you?

3    A    I don't know.

4    Q    And it goes on to say, "At the time

5  Mattel chose a product called What's Her Face, a

6  doll with a blank face on which kids could draw

7  expressions.  That doll remains on the market.

8  Mattel declined to discuss its sales."

9        Did you ask Mattel for its sales of

10  What's Her Face?

11    A    I don't remember specifically the

12  article, judging from the article, I did.

13    Q    Did you discuss with Miss Ross or

14  Mr. Bousquette the selection of what's her face?

15    A    I don't remember.

16    Q    It's possible that you did?

17    A    It's possible.

18    Q    And someone who covers or had covered

19  the consumer products industry for youth, was it

20  your impression that Mattel did not like to

21  introduce products that it felt competed with

22  Barbie?

23    A    Yes.

24    Q    Then turning to the last page of the

25  article, from the left-hand column towards the

58

EXHIBIT 19 PAGE 435

TKACIK

1

2   bottom, it says, "Mattel no longer has quotas on

3   how many products can complete with Barbie.  After

4   sitting through a girls' design-team presentation

5   in March, Mr. Bousquette seized upon the Flavas as

6   the ideal dolls to compete for the dollars of Bratz

7   buyers."

8             Do you see that?

9      A     Uh-hmm.

10     Q     Was that something Mr. Bousquette told

11  you?

12     A     Yes -- no.  I don't remember.

13     Q     Did Mr. Bousquette tell you that Flavas

14  was intended to be the ideal dolls to complete for

15  the dollars of Bratz buyers?

16     A     I don't know.

17     Q     You wrote, "After sitting through a

18  girls design-team presentation in March,

19  Mr. Bousquette seized upon the Flavas as the ideal

20  dolls to compete for the dollars of Bratz buyers."

21            Did you get that information from

22  Miss Ross or Mr. Bousquette?

23     A     I don't remember.

24     Q     Is that information accurate?

25     A     I don't know.

59

EXHIBIT 19 PAGE 436

TKACIK

1

2     Q     Do you have any reason to believe what

3 you wrote wasn't accurate?

4     A     No.

5     Q     Did you get that information from one

6 of your confidential sources you're not revealing?

7     A     I don't know.

8           MR. KARLE:  I am going to

9           instruct the witness not to answer that

10          question.

11    Q     It goes on to say, "Ivy Ross, head of

12 girls' design, suggested bringing them to market

13 for the spring 2004 season.  Mr. Bousquette said

14 the company should aim for this July instead."

15          Do you see that?

16    A     Yes.

17    Q     Did you discuss with Miss Ross and

18 Mr. Bousquette the timing of the release of the

19 Flavas dolls?

20    A     I don't remember.  I believe I did.

21    Q     Did they make statements to you to the

22 effect that the original plan was to up launch

23 Flavas in 2004, but instead they wanted to rush

24 them to market earlier?

25    A     I don't know.

60

EXHIBIT 19 PAGE 437

TKACIK

1

2      Q      Well, the article goes on to say, "We

3   were stunned says a designer who worked on the

4   Flavas and left the company in May, another

5   surprise:  Mr Bousquette asked the team to make the

6   dolls look more hip-hop than the prototypes.  No

7   one had really believed in the concept before that

8   meeting, and it was stuck in this back and forth

9   where first they were too edgy, then they weren't

10  edgy enough," says the designer.  "Matt came

11  through and cut all of that out."

12             You see that?

13      A      Uh-huh.

14      Q      Did you discuss this with

15  Mr. Bousquette?

16      A      I don't remember.

17      Q      You go on to say, "Mr. Bousquette says

18  he told designers to make the dolls as authentic as

19  possible as quickly as possible."

20      A      Then I would presume that I did.

21      Q      So you were accurately quoting

22  Mr. Bousquette there?

23      A      I have no reason to believe I am not.

24      Q      And does that refresh your recollection

25  as to whether Mr. Bousquette and Miss Ross told you

61

EXHIBIT 19 PAGE 438

TKACIK

2    that they instructed their subordinates at Mattel

3    to rush production of Flavas in three months?

4        A    It does.  I am fairly certain now

5    reading this over again that I discussed the timing

6    with Mr. Bousquette.

7        Q    And you understood from your

8    discussions with him that he had instructed the

9    Mattel team to rush Flavas into production in

10    three months; isn't that true?

11        A    Yes.

12        Q    This next paragraph goes on to say,

13    "Flavas design team often slept in their cubicles

14    to get the dolls ready in time for summer

15    shipment."

16            You see that?

17        A    Yes.

18        Q    You remember discussing that with

19    Mr. Bousquette and Miss Ross?

20        A    No.

21        Q    I believe you testified that you left

22    the Wall Street Journal in August or September of

23    2003; is that right?

24        A    Yeah, end of August.

25        Q    Pardon?

62

EXHIBIT 19 PAGE 439

TKACIK

1

2    A    The end of August.

3    Q    So that was approximately a month after

4    that article came out, right?

5    A    Yes.

6    Q    Why did you leave the Journal?

7    A    I was really young and stressed out,

8    and I wanted to go into magazine journalism, and I

9    had a friend who had been named editor of

10   Philadelphia Magazine, and I wanted to leave L.A.

11   Q    So, you would have no way of knowing

12   one way or the other, what communications MGA may

13   have had with The Wall Street Journal about your

14   article after you left; is that true?

15   A    Yes.  I kept in touch with them.  I

16   never heard about anything.  I kept in touch with

17   The Wall Street Journal.

18   Q    When was the last time you did any work

19   for The Wall Street Journal?

20   A    When I left.

21   Q    When was the first time you heard about

22   the lawsuit Mattel filed against Carter Bryant?

23   A    I don't remember.

24   Q    I'll represent to you that lawsuit was

25   filed in or about April of 2004.  You recall

63

EXHIBIT 19 PAGE 440

```
 1                          TKACIK
 2   hearing about it approximately at that time?
 3        A     I don't recall.
 4        Q     Were you aware of the lawsuit in 2005
 5   when you were thinking of doing your article about
 6   Lilly Martinez?
 7        A     Yes.
 8        Q     How had you become aware of the
 9   lawsuit?
10        A     The Internet.  I read the paper.  I
11   don't know how I had become aware in that window of
12   time.
13        Q     Prior to your deposition today and your
14   meetings, if any, with counsel for the Wall Street
15   Journal who is representing you today, had you
16   discussed the lawsuit with anyone?
17        A     I don't know.  No.  I mean casually.
18        Q     Had you discussed the lawsuit with
19   anyone at Mattel?
20        A     I don't know.
21        Q     You might have?
22        A     It's a possibility.
23        Q     Do you know who?
24        A     It would have been Julia Jensen.  That
25   would probably be the extent of it.  I really don't
```

EXHIBIT 15 PAGE 441

```
 1                              TKACIK

 2    remember.

 3        Q    Do you recall discussing the lawsuit

 4    with any ex-Mattel employees?

 5        A    No.  I may have, I don't know.

 6                    MS. CENDALI:  I have no further

 7                questions.

 8                    MR. NIBORSKI:  Just a couple

 9                quick closing remarks.  I just wanted to

10                go over the custody of the transcript,

11                just to let you know there is going to

12                be a transcript prepared, I will receive

13                a copy and send it to your attorney.  He

14                would give you a chance to review it and

15                make any changes or corrections and then

16                you can return it to him; and we will

17                maintain custody of the original.

18

19

20

21        (Continued on next page to include jurat.)

22

23

24

25
```

65

EXHIBIT _15_ PAGE _442_

TKACIK

1

2      I also want to confirm that there was no

3      medical or other reason why you were

4      unable to give your best testimony today?

5              THE WITNESS:  No.

6              MR. NIBORSKI:  And I appreciate

7      your time.  Thank you.

8              (Whereupon, at 12:15 p.m., the

9      Examination of this Witness was

10     concluded.

11

12

13     _____

14              MAUREEN TKACIK

15

Subscribed and sworn to before me

16  this _____ day of _____, 2007.

17

18

_____

19       NOTARY PUBLIC

20

21

22

23

24

25

66

EXHIBIT 15 PAGE 443

```
 1

 2                    E X H I B I T S

 3
     PLAINTIFF'S EXHIBITS:
 4   EXHIBIT      EXHIBIT                  PAGE
     NUMBER       DESCRIPTION
 5

 6     1          7/18/03 Article           7

 7     2          Notice of Deposition     11

 8     3          Subpoena                 11

 9     4          2/1/02 Article           13

10     5          2/7/02 Article           15

11     6          2/8/02 Article           16

12     7          4/3/03 Article           20

13     8          E-mail                   36

14

15

16                    I N D E X

17

18   EXAMINATION BY                      PAGE

19   MR. NIBORSKI

20   MS. CENDALI

21

22

23

24

25
```

67

EXHIBIT 19 PAGE 444

1

2  QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER

3           PAGE      LINE

4           42        20

5           43        25

6           45        14

7           45        22

8           47        21

9           50        23

10          52        23

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

68

EXHIBIT 19 PAGE 445

```
 1
 2                    C E R T I F I C A T E
 3
 4   STATE OF NEW YORK      )
                            :   SS.:
 5   COUNTY OF KINGS        )
 6
 7
 8        I, KAREN D. WILLIAMS, a Notary Public for and
 9   within the State of New York, do hereby certify:
10        That the witness whose examination is
11   hereinbefore set forth was duly sworn and that such
12   examination is a true record of the testimony given
13   by that witness.
14        I further certify that I am not related to
15   any of the parties to this action by blood or by
16   marriage and that I am in no way interested in the
17   outcome of this matter.
18        IN WITNESS WHEREOF, I have hereunto set my
19   hand this 2nd day of October, 2007.
20
21
22                 KAREN D. WILLIAMS
23
24
25 Signature Requested
```

EXHIBIT 19 PAGE 446

EXHIBIT 20

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION

CARTER BRYANT, an
individual,

          Plaintiff,

     · vs.                              No. CV 04-9049 SGL
                                        (RNBx)

MATTEL, INC., a Delaware
corporation,

          Defendants.
                                        CERTIFIED
                                        COPY

---

Consolidated with MATTEL, INC. v.
BRYANT and MGA ENTERTAINMENT, INC.
v. MATTEL, INC.

---

HEARING BEFORE THE HONORABLE EDWARD A. INFANTE

San Francisco, California

Thursday, January 3, 2008

Reported by:
DANA M. FREED
CSR No. 10602

JOB No. 79867

EXHIBIT 20 PAGE 447

1                    UNITED STATES DISTRICT COURT
                    CENTRAL DISTRICT OF CALIFORNIA
2                         EASTERN DIVISION

3    CARTER BRYANT, an
     individual,
4
                  Plaintiff,
5
            vs.                          No. CV 04-9049 SGL
6                                            (RNBx)
     MATTEL, INC., a Delaware
7    corporation,

8                  Defendants.

9

10   _____

11   Consolidated with MATTEL, INC. v.
     BRYANT and MGA ENTERTAINMENT, INC.
     v. MATTEL, INC.
12   _____

13

14            Hearing before the Honorable EDWARD A. INFANTE,

15   at JAMS, Two Embarcadero Center, Suite 1500, San Francisco,

16   California, beginning at 1:30 p.m. and ending at 4:05 p.m.

17   on Thursday, January 3, 2008, before DANA M. FREED,

18   Certified Shorthand Reporter No. 10602.

19

20

21

22

23

24

25

                                                                    2

EXHIBIT 20 PAGE 448

**HEARING**                                                          **01/03/08**

```
 1   APPEARANCES:

 2

 3   For the Plaintiff CARTER BRYANT, an individual:

 4        KEKER & VAN NEST LLP
          BY:    MATTHEW M. WERDEGAR
 5               JOHN TRINIDAD
          Attorneys at Law
 6        710 Sansome Street
          San Francisco, California 94111-1704
 7        415.391.5400

 8   For the Defendant MATTEL, INC., a Delaware
     corporation:
 9
          QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
10        BY:    JON COREY
                 TIMOTHY L. ALGER
11               B. DYLAN PROCTOR
          Attorneys at Law
12        865 Figueroa Street, 10th Floor
          Los Angeles, California 90017
13        213.443.3000

14   For the Defendants MGA Entertainment, Inc., MGA
     Entertainment (HK) Limited, and Isaac Larian:
15
          SKADDEN ARPS SLATE MEAGHER & FLOM LLP
16        BY:    RAOUL D. KENNEDY
                 AMY S. PARK
17        Attorneys at Law
          Four Embarcadero Center, 38th Floor
18        San Francisco, California 94111-5974
          415.984.6400
19
     Also Present:
20
          MAUREEN McCUAIG
21

22

23

24

25
```

                                                                        3

EXHIBIT *20* PAGE *449*

1    55 and 56.

2              JUDGE INFANTE:  I'm not sure those are part

3    of the motion.

4              MR. COREY:  Those are the topics relating to

5    Bryant's exit interview.  If they're not part of the

6    motion, I'll be quiet.

7              JUDGE INFANTE:  Well, I thought the motion

8    was Topics 2 through 8, 11 through 13, 24, 41 and

9    Zeus.

10             MR. TRINIDAD:  Your Honor, I believe

11   that's -- that there was an additional mention of the

12   topics that Mr. Corey was about to address in the

13   briefs.  I don't believe they were --

14             JUDGE INFANTE:  It wasn't clear.

15             MR. COREY:  I don't have the notice.

16             JUDGE INFANTE:  It wasn't clear you were

17   seeking an order as to those topics.

18             MR. COREY:  With that, I will submit unless

19   the Court has any questions.

20             JUDGE INFANTE:  No.  You've covered the

21   ground very comprehensively in your papers.

22             MR. TRINIDAD:  Your Honor, briefly --

23             JUDGE INFANTE:  I'm inclined not to grant 41,

24   because it's like proving a negative.  Julie Jensen

25   I believe testified.  Is that her name?

                                                          81

EXHIBIT 20 PAGE 450

1        MR. COREY:  Yes, that's correct, Your Honor

2        MR. TRINIDAD:  Right.

3        JUDGE INFANTE:  And you know, I read that.

4   And she's the one who first contacted the reporter.

5   You know, I'm inclined not to grant your 41 or Zeus.

6   I am inclined to grant you -- now that I've heard

7   Mr. Corey's arguments, I am inclined to grant the rest

8   of the motion.

9        So here's what I'll do.  I find, reading all

10  of the testimony of Mr. Hudnut, Ms. Newquist,

11  Mr. Ong Changco, O-n-g C-h-a-n-g-c-o, Ms. Pasko,

12  Ms. Pratte, P-r-a-t-t-e, and Ms. Yamamoto, Ms. Jensen

13  and Ms. Marine.  I've taken the time to read all of

14  that, and I do not feel that you adequately prepared

15  these witnesses in the spirit of Rule 30(b)(6) on

16  behalf of the corporation.

17        For the most part, these witnesses' testimony

18  was limited to their open percipient knowledge.  You

19  were operating on the notion that that was okay,

20  because of prior agreements of the parties which they

21  deny they ever made.  I've read that entire record.

22        And my judgment is to grant the motion and

23  compel Mattel to produce, at your own expense,

24  properly educated and adequately prepared 30(b)(6)

25  witnesses to testify competently as to Mattel's

82

EXHIBIT 20 PAGE 451

1    knowledge on topics 2 through 8, 11 through 13, and

2    24.

3           Mattel shall produce no more than one

4    competent witness on any one topic.  Normally, you

5    have discretion on that point to produce one or more

6    witnesses.  But I believe there's been an abuse here,

7    de-facto not necessarily intentional.  And therefore,

8    my order says you shall produce no more than one

9    competent witness on any one topic.

10          You shall comply with this order by

11   January 28th of '08.  Failure to comply with this

12   order may result in preclusion of evidence orders at

13   trial pursuant to Rule 37.

14          MGA's motion for $32,000 in attorney time,

15   plus fees for bringing this motion, is denied.

16   Because it would be unjust, under the circumstances of

17   all the history leading up to this deposition, to

18   grant such motions.  I mean, such sanctions.  The only

19   penalty I'm putting you under is the deposition shall

20   be at your expense.  Meaning court reporter fees,

21   et cetera.

22          MR. COREY:  Correct.  That's what I understood.

23   If I may ask one question.

24          JUDGE INFANTE:  Sure.

25          MR. COREY:  The --

EXHIBIT 20 PAGE 452

1          JUDGE INFANTE:  You may prepare the order.

2    I'm denying the motion as to 41.  I find the testimony

3    is adequate.

4          MR. COREY:  But by this order, the Court is

5    not compelling Mattel to provide information subject

6    to the protective order to its witnesses to prepare

7    them?

8          JUDGE INFANTE:  I'm not speaking to that.

9          You have my order.

10         MR. COREY:  Thank you, Your Honor.

11         JUDGE INFANTE:  You may prepare the order.

12   Any questions regarding what my order was?  You want

13   me to repeat it?  I'll repeat it again.

14         MR. TRINIDAD:  Certainly, Your Honor.

15         JUDGE INFANTE:  Mattel shall produce, at its

16   own expense, properly educated and adequately prepared

17   Rule 30(b)(6) witnesses to testify competently as to

18   Mattel's knowledge on topics 2 through 8, 11 through

19   13, and 24, period.  Mattel shall produce no more than

20   one competent witness on any one topic.

21         The motion is denied as to Topics 20 -- I'm

22   sorry, 41 and Zeus, that's Z-e-u-s.  Failure to comply

23   with this order may result in preclusion of evidence

24   offered by Mattel at trial pursuant to Rule 37.

25         All motions for monetary sanctions are

EXHIBIT _20_ PAGE _453_

1    denied, because the Court would find it is unjust

2    under the circumstances of this case to award such

3    monetary sanctions.

4              Compliance by January 28th of '08.

5              MR. TRINIDAD:  Thank you, Your Honor.

6              JUDGE INFANTE:  Okay.

7              MR. ALGER:  And again, Your Honor, for

8    clarity, when you say "at Mattel's expense," we're

9    talking about costs, not attorneys' fees?

10             JUDGE INFANTE:  Correct.

11             MR. ALGER:  Thank you.

12             JUDGE INFANTE:  Okay.  One more motion to be

13   heard.  This is Motion No. 15, Mattel's Motion to

14   Enforce the Court's Discovery Orders and to Overrule

15   Improper Instructions and For Sanctions.  This

16   pertains to 30(b)(6) witnesses produced by MGA,

17   Lisa Tonnu, T-o-n-n-u, Kenneth Lockhart, Rebecca Harris,

18   Spencer Woodman on 16 noticed topics.

19             You may proceed.

20             MR. COREY:  Thank you, Your Honor.  Jon Corey.

21   There is a lot of paper associated with this motion.

22   Is there anything in particular that you would like me

23   to address?

24             JUDGE INFANTE:  No.

25             MR. COREY:  I will make this very brief,

85

EXHIBIT 20 PAGE 454

1        I, the undersigned, a Certified Shorthand

2   Reporter of the State of California, do hereby certify:

3        That the foregoing proceedings were taken

4   before me at the time and place herein set forth; that

5   any witnesses in the foregoing proceedings, prior to

6   testifying, were duly sworn; that a record of the

7   proceedings was made by me using machine shorthand

8   which was thereafter transcribed under my direction;

9   that the foregoing transcript is a true record of the

10  testimony given.

11       Further, that if the foregoing pertains to

12  the original transcript of a deposition in a Federal

13  Case, before completion of the proceedings, review of

14  the transcript [  ] was [  ] was not requested.

15       I further certify I am neither financially

16  interested in the action nor a relative or employee

17  of any attorney or party to this action.

18       IN WITNESS WHEREOF, I have this date

19  subscribed my name.

20

21  Dated:   JAN - 4 2008

22

23                    _____

24                    DANA M. FREED
                      CSR No. 10602

25

EXHIBIT 20 PAGE 455

EXHIBIT 21

1  THOMAS J. NOLAN (Bar No. 66992)
   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
2  300 South Grand Avenue
   Los Angeles, CA 90071-3144
3  Telephone: (213) 687-5000
   Facsimile: (213) 687-5600
4  E-mail: tnolan@skadden.com

5  RAOUL D. KENNEDY (Bar No. 40892)
   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
6  4 Embarcadero Center, 38th Floor
   San Francisco, California 94111-5974
7  Telephone: (415) 984-6400
   Facsimile: (415) 984-2698
8  Email: rkennedy@skadden.com

9  Attorneys for Counter-Defendants,
   MGA ENTERTAINMENT, INC., ISAAC LARIAN, MGA
10 ENTERTAINMENT (HK) LIMITED, and MGAE de MEXICO S.R.L. de C.V.

11

12              UNITED STATES DISTRICT COURT

13              CENTRAL DISTRICT OF CALIFORNIA

14

15 CARTER BRYANT, an individual          )  CASE NO. CV 04-9049 SGL (RNBx)
                                         )
16              Plaintiff,               )  Consolidated with Case No. 04-9059
                                         )  and Case No. 05-2727
17      v.                               )
                                         )  **DISCOVERY MATTER**
18 MATTEL, INC., a Delaware              )
   corporation                          )  **Discovery Master Hon. Edward A.**
19                                       )  **Infante (Ret.)**
                Defendant.               )
20                                       )  [PROPOSED] ORDER REGARDING
                                         )  MGA AND CARTER BRYANT'S
21                                       )  JOINT MOTION TO OVERRULE
                                         )  MATTEL'S RELEVANCE
22                                       )  OBJECTIONS AND COMPEL
                                         )  DISCOVERY RELEVANT TO
23                                       )  STATUE OF LIMITATIONS AND
                                         )  LACHES DEFENSES
24 ─────────────────────────────────    )
   Consolidated with MATTEL, INC. v.     )
25 BRYANT and MGA                        )
   ENTERTAINMENT, INC. v.                )
26 MATTEL, INC.                          )  **Phase I:**
                                         )  Discovery Cut-Off:   January 28, 2008
27                                       )  Pre-Trial Conference: May 5, 2008
                                         )  Trial Date:          May 27, 2008
28                                       )

07209/2345649.1              [PROPOSED] ORDER

EXHIBIT 21 PAGE 456

MGA and Carter Bryant's Joint Motion to Overrule Mattel's Relevance Objections and Compel Discovery Relevant to Statue of Limitations and Laches Defenses came on for hearing before me on January 3, 2008. MGA and Bryant having withdrawn their request that Mattel supplement its discovery responses, and the matter having otherwise been fully briefed and argued, and good cause appearing, IT IS HEREBY ORDERED THAT:

1.   The motion is GRANTED as to Topics 15, 16, 17, 18, 19, 20 and 21 in Carter Bryant's Rule 30(b)(6) Deposition Notice. All of Mattel's objections as to those topics are overruled, as the information sought is relevant, *inter alia*, to MGA's and Bryant's statute of limitations and laches defenses. Topics 19 and 21 are narrowed to the time period prior to November 24, 2003;

2.   Mattel shall produce a competent and adequately prepared Rule 30(b)(6) witness or witnesses for deposition on Topics 15, 16, 17, 18 and 20 and Topics 19 and 21 as temporally narrowed by the Discovery Master. Mattel shall have complied with this Order by January 28, 2008.

3.   A ruling on the Motion with respect to Topic 26 is deferred for consideration in connection with MGA's Motion To Compel Regarding Mattel's Privilege Waiver By Claim Assertion .

**IT IS SO ORDERED.**

DATED: _Jan 9_, 2008

_Edward Infante_
Hon. Edward A. Infante (Ret.)
Discovery Master

07209/2345649.1

1
[PROPOSED] ORDER

EXHIBIT _21_ PAGE _457_

## PROOF OF SERVICE BY E-MAIL

I, Sandra Chan, not a party to the within action, hereby declare that on January 10, 2008, I served the attached: (1) ORDER REGARDING MATTEL, INC.'S MOTION TO COMPEL PRODUCTION OF IMPROPERLY WITHHELD MGA DOCUMENT SHOWING MGA'S AND BRYANT'S MISREPRESENTATIVEIONS TO THE PATENT OFFICE IN CONNECTION WITH BRATZ AND TO COMPEL 30(B)(6) TESTIMONY; (2) ORDER REGARDING MGA AND CARTER BRYANT'S JOINT MOTION TO COMPEL THE DEPOSITION TESTIMONY OF ROBERT ECKERT; and (3) ORDER REGARDING MGA AND CARTER BRYAN'TS JOINT MOTION TO OVERRULE MATTEL'S RELEVANCE OBJECTIONS AND COMPEL DISCOVERY RELEVANT TO STATUE OF LIMITIATIONS AND LACHES DEFENSES in the within action by email addressed as follows:

| | | |
|---|---|---|
| John W. Keker, Esq. | Keker & Van Nest | jkeker@kvn.com |
| Michael H. Page, Esq. | Keker & Van Nest | mhp@kvn.com |
| Christa Anderson, Esq. | Keker & Van Nest | cma@kvn.com |
| Matthew M. Werdegar, Esq. | Keker & Van Nest | mwerdegar@kvn.com |
| John E. Trinidad, Esq. | Keker & Van Nest | jtrinidad@kvn.com |
| Audrey Walton-Hadlock, Esq. | Keker & Van Nest | awalton-hadlock@kvn.com |
| John Quinn Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | johnquinn@quinnemanuel.com |
| Michael Zeller Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | michaelzeller@quinnemanuel.com |
| Jon Corey Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | joncorey@quinnemanuel.com |
| Duane Lyons Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | duanelyons@quinnemanuel.com |
| Timothy Alger Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | timalger@quinnemanuel.com |
| Dominic Surprenant Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | DominicSurprenant@QuinnEmanuel.com |
| B. Dylan Proctor Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | dylanproctor@quinnemanuel.com |
| Shane McKenzie Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | shanemckenzie@quinnemanuel.com |
| Bridget Hauler Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | bridgethauler@quinnemanuel.com |
| Tamar Buchakjian Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | tamarbuchakjian@quinnemanuel.com |
| Juan Pablo Alban, Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | juanpabloalban@quinnemanuel.com |
| Thomas J. Nolan, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | tnolan@skadden.com |
| Raoul D. Kennedy, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | rkennedy@skadden.com |
| Amy S. Park, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | apark@skadden.com |
| Harriet S. Posner, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | hposner@skadden.com |
| Carl Alan Roth, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | croth@skadden.com |
| Timothy A. Miller, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | tmiller@skadden.com |

I declare under penalty of perjury under the laws of the Untied States of America that the above is true and correct.

Executed on January 10, 2008, at San Francisco, California.

Sandra Chan

EXHIBIT 21 PAGE 458