EXHIBIT 22

COPY

1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
     John B. Quinn (Bar No. 090378)
2    (johnquinn@quinnemanuel.com)
     Michael T. Zeller (Bar No. 196417)
3    (michaelzeller@quinnemanuel.com)
     Jon D. Corey (Bar No. 185066)
4    (joncorey@quinnemanuel.com)
     Timothy L. Alger (Bar No. 160303)
5    (timalger@quinnemanul.com)
     865 South Figueroa Street, 10th Floor
6  Los Angeles, California  90017-2543
   Telephone:  (213) 443-3000
7  Facsimile:   (213) 443-3100

8  Attorneys for Mattel, Inc.

9

10                 UNITED STATES DISTRICT COURT

11                 CENTRAL DISTRICT OF CALIFORNIA

12                        EASTERN DIVISION

13  CARTER BRYANT, an individual,        CASE NO. CV 04-9049 SGL (RNBx)
              Plaintiff,
14                                       Consolidated with
                                         Case No. CV 04-09059
15        vs.                            Case No. CV 05-02727

16  MATTEL, INC., a Delaware             **DISCOVERY MATTER**
   corporation,
17                                       **[To Be Heard By Discovery Master
              Defendant.                 Hon. Edward Infante (Ret.)]**
18
                                         MATTEL, INC.'S OPPOSITION TO
19  ───────────────────────────────     MGA AND CARTER BRYANT'S
                                         JOINT MOTION TO COMPEL RE:
20  AND CONSOLIDATED ACTIONS             MATTEL'S ALLEGED BANDYING
                                         OF 30(B)(6) WITNESSES
21
                                         [Declarations of Dylan B. Proctor, Jon
22                                       D. Corey and Michael T. Zeller filed
                                         concurrently herewith]
23
                                         Hearing Date:  TBA
24                                       Time:  TBA
                                         Place:  Telephonic
25
                                         Discovery Cut-off:  January 14, 2008
26                                       Pre-trial Conference:  April 7, 2007
                                         Trial Date:  April 29, 2007
27

28

9/2217061.2

MATTEL'S OPPOSITION TO MGA'S AND BRYANT'S JOINT MOTION TO COMPEL RE 30(B)(6) WITNESSES

EXHIBIT 22 PAGE 459

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................. 1

STATEMENT OF FACTS ...................................................................... 3

ARGUMENT ........................................................................................ 21

I.      THE MOTION SHOULD BE DENIED SUMMARILY BECAUSE
        MGA AND BRYANT AGAIN FAILED TO MEET AND CONFER
        BEFORE FILING IT ................................................................. 21

II.     MATTEL'S WITNESS PREPARATION AND DESIGNATION WAS
        ENTIRELY APPROPRIATE ...................................................... 25

        A.      Rule 30(b)(6) Does Not Require A Designee to Personally
                Interview Witnesses or Review Documents; Preparation by
                Counsel Is Sufficient ..................................................... 25

        B.      Designating Multiple Witnesses for a Topic Under Rule 30(b)(6)
                Is Entirely Acceptable .................................................... 26

III.    MATTEL'S 30(B)(6) DESIGNEES WERE PREPARED TO AND DID
        TESTIFY ON THEIR DESIGNATED TOPICS--MGA AND
        BRYANT SIMPLY DO NOT LIKE WHAT THEY HAD TO SAY ............. 27

IV.     PRECLUSION AND MONETARY SANCTIONS SHOULD BE
        SUMMARILY DENIED .............................................................. 37

CONCLUSION ..................................................................................... 38

-i-

EXHIBIT 22 PAGE 460

# TABLE OF AUTHORITIES

**Page**

## Cases

Alexander v. FBI,
  186 F.R.D. 137 (D.D.C. 1998) ................................................................. 27

Amersham Pharmacia Biotech, Inc. v. Perkin-Elmer Corp.,
  190 F.R.D. 644 (N.D. Cal. 2000) ............................................................. 39

Banks v. Office of the Senate Sergeant-at-Arms,
  241 F.R.D. 370 (D.D.C. 2007) ................................................................. 27

Qualcomm Inc. v. Broadcom Corp.,
  2007 WL 935617, *2 (S.D. Cal.) .............................................................. 38

Reichhold, Inc. v. U.S. Metal Refining Co.,
  No. CIV 03-453, 2007 WL 1428559, at *8 (D.N.J. May 10, 2007) ..................... 26

U.S. ex rel Fago v. M & T Mortgage Corp.,
  235 F.R.D. 11 (D.D.C. 2006) ................................................................... 27

Ward v. Circus Casinos, Inc.,
  473 F.3d 994 (9th Cir. 2007) ................................................................... 25

Waters v. Weyerhaeuser Mortgage Co.,
  582 F.2d 503 (9th Cir. 1978) ................................................................... 25

## Statutes

California Labor Code § 2870 ........................................................... 10, 30, 31

Federal Rule 37 ................................................................................... 39

Local Rule 37-1 .............................................................................. 2, 23, 25

Rule 30(b)(6) ............................ 1, 2, 3, 7, 12, 13, 16, 17, 22, 23, 24, 25, 26, 27, 28, 39

-ii-

EXHIBIT 22 PAGE 461

## Preliminary Statement

Defendants have ignored Judge Larson's observation that their "overzealous conviction" is "no substitute for proof." In their efforts to portray Mattel's witnesses as unknowledgeable, defendants omit important facts about the parties' prior agreements regarding their Rule 30(b)(6) topics. These topics were overbroad and improperly called for witnesses to testify as to legal conclusions, among other deficiencies, and Mattel therefore objected to them. The parties participated in lengthy meet and confers and agreed to narrow the topics significantly. Mattel also made clear, and defendants agreed, that Mattel's 30(b)(6) witnesses would testify about their knowledge of facts going to the topics as narrowed, not to all facts going to any particular topic on which a witness would be designated. Defendants also understood that Mattel could designate multiple witnesses per topic, if the topic so required, as is Mattel's right.

To read defendants' motion, it is as if none of this ever happened. Indeed, not only do defendants fail to inform the Court about these agreements, but they fail to mention that these limitations were stipulated to. Defendants' motion takes aim at Mattel's 30(b)(6) witnesses for giving the very information that the parties agreed they would give.

Ignoring (and not disclosing) the parties' prior agreements defendants highlight any "I don't know" answers they could find in the transcripts. There is nothing wrong with "I don't know" answers where, as here, the questions asked were either outside the designated subject matter, completely irrelevant, or called for a legal conclusion. Moreover, defendants have not identified any relevant, substantive information they were denied.

Nor is there anything wrong with how Mattel's witnesses were prepared. Defendants criticize Mattel for not having required the witnesses to have gone out to interview people or review the parties' document production. But, as defendants acknowledge, each witness met with counsel and prepared with counsel

1  for his or her deposition, and the <u>Federal Rules</u> require no more than that.  Further, a

2  personal investigation by Mattel's designees would be an unnecessary undertaking

3  anyhow because Mattel designated witnesses who were involved in, and thus had

4  knowledge of, the relevant facts, and the parties agreed that Mattel's witnesses

5  would testify to facts within their own personal knowledge.

6           In any event, the Court should not even consider this motion on the

7  merits.  Defendants flagrantly misrepresent that they met and conferred with Mattel

8  before filing this motion.  They did not.  Defendants claim the parties met and

9  conferred on July 10, 2007, but their own letter dated July 11, 2007 shows

10  otherwise.  In that letter, defendants complain that the parties were **unable** to meet

11  and confer on July 10 regarding Mattel's supposed "bandying" of witnesses.  And, in

12  a letter, dated July 12, 2007 -- which defendants conceal from the Court --

13  defendants themselves acknowledge that "MGA and Bryant **will send** a second

14  letter further detailing the discovery abuses for which MGA and Bryant intend to

15  seek a protective order absent resolution of these issues."  Mattel responded by

16  committing to meet and confer when it received that letter, but the letter defendants

17  promised to send listing the issues subject to dispute never came.  Instead, two

18  months later, this motion came out of the blue.[1]

19           Mattel's 30(b)(6) witnesses were properly prepared and testified on the

20  subject matter consistent with Mattel's objections and as the parties agreed.  Because

21  it lacks merit and because defendants did not comply with the requirements of the

22  <u>Local Rules</u> and the Discovery Master Stipulation, this motion should be denied.

23

24

---

25  [1]   Mattel offered to provide one of the witnesses who is the subject of this motion, Rene Pasko, for additional deposition time and even provided four possible

26  dates.  Rather than pick one of those dates, defendants opted instead to file this motion.  Similarly, with Julia Jensen, Mattel offered to meet and confer over

27  whatever issues (which had not been identified) defendants wanted to raise about her deposition, but instead of meeting and conferring, defendants filed this motion.

28

EXHIBIT _22_ PAGE _463_

1                          **Statement of Facts**

2        **MGA and Bryant Fail to Inform the Court Of The Parties' Prior**

3  **Agreements Limiting the Scope of Bryant's 30(b)(6) Topics.** MGA and Bryant fail

4  to tell the Court anything about a March 15, 2005 transcribed meet and confer on the

5  scope of defendant's 30(b)(6) deposition topics. Had they done so, they would have

6  had to come clean about the fact that the parties agreed to significant limitations on

7  many of the 30(b)(6) topics defendants now complain about--limitations which

8  show that Mattel's witnesses testified about what they were supposed to.

9         For example, topics 2-7 were grossly overbroad and were framed as

10  legal contentions.[2] Therefore, Mattel agreed to designate witnesses to testify only

11  about "the factual basis" underlying the topics, and Bryant's counsel acknowledged

12  that Mattel would designate one or more witnesses for each topic who would give

13  their personal knowledge as to "factual information pertaining to these categories."[3]

14

15

16     [2]  Those topics are as follows:

17    Topic 2: All contractual and non-contractual duties and obligations Bryant
        owed or performed for Mattel during his employment with Mattel, and

18         thereafter.

19    Topic 3: All of Bryant's acts or omissions which breached any contractual or
        non-contractual duty or obligation Bryant owed to Mattel.

20    Topic 4: All of Bryant's acts or omissions which breached any duties or
        obligations imposed by the Conflict of Interest Questionnaire and/or the
21         Employee Confidential information and Inventions Agreement.

22    Topic 5: All Mattel proprietary or confidential information Bryant had access
        to during his employment with Mattel.
23

24    Topic 6: All of Bryant's acts or omissions pursuant to which he aided,
        assisted and worked for a competitor of Mattel while employed by
25         Mattel from 1995 to the present.

26    Topic 7: The services and property belonging to Mattel that Bryant provided
        to any third party, including MGA, from 1995 to the present.
27

28

(footnote continued)

07209/2217061.2

EXHIBIT 22 PAGE 464

1  Had defendants not made these concessions, Mattel would have stood on its

2  objections and would not have produced witnesses in the first place because the

3  topics are overly broad and call for improper legal opinion.[4]

4

5  _____

6  [3]   Letter from Jon D. Corey to Douglas A. Wickham dated May 13, 2005 ("5/13/05 letter"), Declaration of Jon D. Corey, dated September 26, 2007 and filed

7  concurrently herewith ("Corey Dec."), Exh. 1; Deposition Transcript of Sandy

8  Yonemoto ("Yonemoto Depo Tr."), dated May 30, 2007, Declaration of B. Dylan Proctor, dated September 26, 2007 and filed concurrently herewith ("Proctor Dec."),

9  Exh. 22, at 37:7-9; Deposition Transcript of Kislap Ongchangco ("Ongchangco Depo Tr."), dated April 24, 2007, Proctor Dec., Exh. 23, at 159:2-160:14;

10 Deposition Transcript of Robert Hudnut, Vol. I ("Hudnut Depo Tr., Vol. I"), dated

11 July 13, 2007, Proctor Dec., Exh. 24, at 92:7-94:24; Deposition Transcript of Joni Pratte ("Pratte Depo Tr."), dated June 1, 2007, Proctor Dec., Exh. 26, at 8:16-9:6;

12 Deposition Transcript of Rene Pasko ("Pasko Depo Tr."), dated June 13, 2007,

13 Proctor Dec., Exh. 27, at 10:23-11:12; Meet and Confer Transcript dated March 15, 2005 ("3/15/05 Tr."), Declaration of Michael T. Zeller, filed concurrently herewith

14 ("Zeller Dec."), Exh. 1, at 156:11-159:23, 169:4-24, 173:4-176:19, 178:5-179:8,

15 191:10-21.

16 [4]   Mattel's Objections to Carter Bryant's 30(b)(6) Deposition Notice, dated December 29, 2004, Proctor Dec., Exh. 12; 3/15/05 Tr., Zeller Dec., Exh. 1, at

17 156:11-157:19, 164:24-166:18; Zeller Dec, ¶ 2.

18

19

20

21

22

23

24

25

26

27

28

1    For topics 8, 11, 12, 13 and 24,[5] Mattel agreed to designate a witness to

2  testify about "the factual basis" regarding aspects of two internal Mattel projects

3  during 1999 and 2000 that ended up in Bratz in some form, which tends to refute

4  Bryant's claim that he created Bratz in 1998 when he was not employed by Mattel:

5  (1) aspects of Mattel's "Toon Teens" project; (2) certain names that Mattel

6  considered using in connection with the DIVA STARZ project, such as "Brats" and

7  "Boyz"; and (3) internal Mattel designs done by Steve Linker, a Mattel contractor

8  who Paula Garcia later approached during the Summer of 2000 - before the DIVA

9

10    [5] Those topics are:

11    Topic 8:  All acts, omissions, circumstances and/or evidence showing, or
          tending to show, that any and all products of MGA, including but not
12        limited to, any and all products sold under the trade name "Bratz,"
          originated from, were derived from, are based upon, are copied or
13        incorporated from, or are substantially or confusingly similar to, any
          design, research and developmental work, work in progress, or product
14        owned at any time by Mattel or created by any Mattel employee,
          including but not limited to Bryant, or by any independent contractor
15        during the time that such Person was working for Mattel.

16    Topic 11:  All facts and circumstances showing the conception, origination,
          creation, development and/or reduction to practice of "DIVA STARZ."

17    Topic 12 reads:  All facts and circumstances showing the conception,
          origination, creation, development and/or reduction to practice of "Mini
18        DIVA STARZ."

19    Topic 13:  All acts, omissions, circumstances and/or evidence showing, or
          tending to show, that any and all products of MGA, including but not
20        limited to, any and all products sold under the trade name "Bratz,"
          originated from, were derived from, are based upon, copies,
21        incorporates, or is substantially or confusingly similar to any design or
          work product owned at any time by Mattel or created by Bryant during
22        the time Bryant was working for Mattel.

23    Topic 24:  All acts, omissions, circumstances and/or evidence showing, or
          tending to show, that prior to October 21, 2000, Mattel had any toy
24        concept or project which had not yet been offered for sale to the public,
          including without limitation, any toy concept or project in the pre-
25        production or development phase, that Bryant improperly copied,
          replicated, borrowed or otherwise used in whole, or in any part, during
26        or after Bryant's employment with Mattel.
      The parties did not come to agreement concerning the narrowing of topics 8,
27  11 or 12 during the March 15, 2005 meet and confer, but rather, during
      subsequent discussions concerning the breadth of the topics. See infra, pp. 16-
28  22.

1    STARZ dolls were on the shelf - to work for MGA because she "was fond of [his]

2    work" on DIVA STARZ.[6]

3           On topic 41,[7] Mattel agreed to designate a witness to testify about

4    "Mattel's lack of knowledge of who made the statements (other than those made by

5    Matt Bousquette) quoted in the 2003 Wall Street Journal article."[8]

6           On topics 22, 54-56,[9] Mattel agreed to designate a witness to testify on

7    the "factual basis" regarding these topics.[10] On topics 54-56, in particular, Mattel

8    agreed to designate a witness about "Bryant's exit interview and misrepresentations

---

[6]   Zeller Dec., ¶ 3; Ongchangco Depo Tr., Proctor Dec., Exh. 23, at 159:2-160:14; Hudnut Depo Tr., Vol. I, Proctor Dec., Exh. 24, at 92:7-94:24; Pratte Depo Tr., Proctor Dec., Exh. 26, at 8:16-9:6; Pasko Depo Tr., Proctor Dec., Exh. 27, at 10:23-11:12; Deposition Transcript of Steven Linker ("Linker Depo Tr."), dated September 13, 2006, at 44:3-44:22, Proctor Dec., Exh. 21.

[7]   Topic 41 reads:  All statements of Mattel or ex-Mattel employees in the July 2003 Wall Street Journal article (produced by Mattel to Bryant in the present case), including, without limitation, "Inside Mattel, some are convinced the Bratz borrow liberally from a Mattel project that was scrapped at the testing stage in 1998"; "But the Bratz' oversized heads--with their pursed lips and cartoonist eyes—are 'virtually identical' to the heads of the dolls her team created"' "Anyone who passed by [Lily Martinez's] cubicle would see the picture up on the wall'" and "The big heads, the big eyes, the big feet—they were all the same [as the Bratz]."

[8]   5/13/05 letter, Corey Dec., Exh. 1, at 2.

[9]   Those topics are:

Topic 22:  All acts, omissions, circumstances and/or evidence showing, or tending to show, that Bryant misappropriated Mattel property, including without limitation intellectual property, at any time.

Topic 54:  Bryant's "Job Summary" report, produced by Mattel as Document Control Nos. M001-667-68.

Topic 55:  All acts, omissions, circumstances and/or evidence showing, or tending to show, that Bryant made affirmative misrepresentations to any and all Mattel employees upon his departure from Mattel.

Topic 56:  Bryant's "Exit Interview Report" dated October 19, 2000, produced by Mattel as Document Control No. M0001654.

[10]   Yonemoto Depo Tr., Proctor Dec., Exh. 22, at 14:9-15:17.

07209/2217061.2

MATTEL'S OPPOSITION TO MGA'S AND BRYANT'S JOINT MOTION TO COMPEL RE 30(B)(6) WITNESSES

EXHIBIT 22 PAGE 467

1   that he made in that interview, including documents bates-labeled M0011667-68

2   and M001654."[11]

3          For each topic, Bryant's counsel expressly acknowledged that Mattel

4   could designate several witnesses for a single topic, stating:  "Mattel will reserve the

5   right to produce one or more witnesses on a single category, if the scope of the

6   request is broad enough that it would require it."[12]  Mattel confirmed this fact in

7   subsequent letters and during deposition, and neither MGA nor Bryant ever

8   objected.[13]

9          MGA and Bryant also fail to tell the Court that these on-the-record

10  limitations were formally made applicable to all depositions on these topics by way

11  of a Stipulation and Order entered by Judge Block on May 4, 2005.  That Stipulation

12  and Order, signed by all parties and the Court, expressly stated that Mattel would

13  designate witnesses pursuant to Bryant's 30(b)(6) notice "as agreed to by Bryant and

14  Mattel in the March 15, 2005 meeting of counsel and as reflected in the transcript of

15  that meeting."[14]

16  <u>Mattel's 30(b)(6) Witnesses Were Properly Prepared To And Did Give</u>

17  <u>Testimony On Their Designated Topics</u>.  Defendants fail to give any cogent

18  presentation of what Mattel's 30(b)(6) witnesses said during their depositions

19  because doing so would show that the witnesses were as advertised.  Each witness

20

21  [11]  5/13/05 letter, Corey Dec., Exh. 1, at 2; Yonemoto Depo Tr., Proctor Dec.,
    Exh. 22, at 37:7-9.

22  [12]  3/15/05 Tr., Zeller Dec., Exh. 1, at 178:5-179:8.
    [13]  Letter from Jon Corey to Diana Torres and Douglas Wickham, dated May 16,

23  2005 ("5/16/05 letter"), Corey Dec., Exh. 2, at 2; Letter from Jon Corey to Keith

24  Jacoby and James Jenal, dated April 11, 2007 ("4/11/07 letter"), Corey Dec., Exh. 3,
    at 1; Hearing: Scheduling of 30(b)(6) Depositions Transcript, dated April 4, 2007

25  ("30(b)(6) Scheduling Hearing Tr."), Proctor Dec., Exh. 33, at 11:4-11; Deposition

26  Transcript of Jill Nordquist ("Nordquist Depo Tr."), dated July 31, 2007, Proctor
    Dec., Exh. 28, at 14:24-15:10.

27  [14]  Stipulation and [Proposed Order] Re Certain Discovery Issues, dated May 4,

28  2005, Proctor Dec., Exh. 5, at 1.

1  testified to facts related to his or her designated topics, even though defendants'

2  counsel strayed beyond--and often far beyond--any reasonable interpretation of

3  relevance and/or demanded legal opinions.  The testimony of each witness is briefly

4  summarized below.

5        <u>Sandy Yonemoto</u>:  Ms. Yonemoto is a Senior Manager of Human

6  Resources Operations at Mattel and conducted Carter Bryant's exit interview in

7  2000.[15]  Mattel made clear to MGA and Bryant during the meet and confer process

8  that Ms. Yonemoto was designated to testify as to topics 2-7, 22, and 54-56,[16] but

9  only to the extent those topics were relevant to Carter Bryant's exit interview.[17]

10        The core facts surrounding that exit interview are not in dispute and

11  Ms. Yonemoto testified as to information reasonably available to her.  She had no

12  specific recollection of Mr. Bryant's exit interview; indeed, she conducted over 50

13  exit interviews during the roughly five years she conducted exit interviews at

14  Mattel.[18]  There is no one at Mattel she could ask about the interview since she and

15  Bryant were the only ones there.[19]  Ms. Yonemoto instead properly relied on her

16  knowledge of Mattel's practices in conducting exit interviews, and the notes she

17  made on Bryant's Exit Interview Report to testify on this topic.[20]  During that

18  interview, as memorialized by Mr. Bryant's Exit Interview Report, Bryant failed to

19  mention he was going to work for a competitor (MGA) and instead stated that he

20  was doing unrelated "illustration and product design."[21]

21

22    [15]  Yonemoto Depo Tr., Proctor Dec., Exh. 22, at 26:10-18, 146:17-21.
  [16]  30(b)(6) Scheduling Hearing Tr., Proctor Dec., Exh. 33, at 28:24-29:9.
23    [17]  5/16/05 letter, Corey Dec., Exh. 2, at 2; Yonemoto Depo Tr., Proctor Dec.,
24  Exh. 22., at 37:7-9 (". . . we have said that Sandy [Yonemoto] is here to talk about
the exit interview.  I mean, that's what she participated in with respect to
25  Mr. Bryant.").
  [18]  Yonemoto Depo Tr., Proctor Dec., Exh. 22, at 44:17-46:13, 57:15-18.
26    [19]  <u>Id</u>. at 60:10-17.
  [20]  <u>Id</u>. at 47:7-51:12, 59:8-12, 59:20-69:20, 77:22-78:13.
27    [21]  <u>Id</u>. at 180:23-181:2.
28

EXHIBIT 22 PAGE 469

1    MGA and Bryant spent hours questioning Ms. Yonemoto about

2   Bryant's exit interview and the exit interview process; her testimony on these topics

3   spans nearly 30 pages.[22]  She described her experience conducting exit interviews;[23]

4   the training she received in conducting exit interviews;[24] guidelines she uses when

5   conducting exit interviews;[25] the documents she explains to employees when

6   conducting exit interviews;[26] the purpose of a Proprietary Information Checkout

7   form given to exiting employees;[27] her statements to exiting employees of their

8   obligation to return any proprietary information back to Mattel and to protect Mattel

9   trade secrets;[28] the fact that if Mattel had known Bryant would be going to a

10   competitor, he would have been immediately escorted out of the building rather than

11   having been allowed to work for another two weeks;[29] and her understanding of the

12   obligations of Mattel employees to disclose work they perform outside of Mattel.[30]

13    MGA's and Bryant's frustrations with Ms. Yonemoto's deposition are

14   more appropriately directed at the inept questioning of their own counsel.  Bryant's

15   lawyer took the lead and spent her time asking about topics that were outside the

16   witness's designation, including, for example:  the circumstances under which

17   Bryant came to work at Mattel and the orientation of employees at that time;[31]

18   Mattel's "PeopleSoft" technical system used to house employee personnel

19   information;[32] whether Mattel maintains contact information for former

20

21   [22] Id. at 43:11-70:19.
22   [23] Id. at 44:17-46:17, 47:7-51:12, 59:2-7, 59:20-69:20, 88:3-93:25.
     [24] Id. at 47:7-48:7.
23   [25] Id. at 48:8-50:17, 62:24-64:6.
24   [26] Id. at 48:8-18, 49:14-50:6, 50:18-51:9, 97:5-16.
     [27] Id. at 50:18-51:9, 65:7-24, 107:1-16.
25   [28] Id. at 50:18-51:9; 65:7-24, 106:6-108:24.
26   [29] Id. at 66:16-67:19, 123:13-23, 125:2-126:16.
     [30] Id. at 114:1-126:16.
27   [31] Id. at 18:8-15.
28   [32] Id. at 80:10-84:20, 139:18-146:2.

EXHIBIT 22 PAGE 470

07209/2217061.2

MATTEL'S OPPOSITION TO MGA'S AND BRYANT'S JOINT MOTION TO COMPEL RE 30(B)(6) WITNESSES

1  employees;[33] Mattel's "practices with respect to having employees sign agreements

2  in the form that is reflected in Exhibit 25" [an "onboarding" form signed by all

3  Mattel employees upon hiring];[34] Mattel's prior reduction in force;[35] and

4  investigations by Mattel's Security Department.[36]  Bryant's lawyer also repeatedly

5  asked questions that required Ms. Yonemoto to testify about the "provisions of

6  Section 2870 of the California Labor Code."[37]

7          Julia Jensen.  Ms. Jensen is the Vice President of Public Relations for

8  the Girls' Division at Mattel and was designated to testify as to Topic 41, which has

9  to do with a July 2003 Wall Street Journal article.[38]  Ms. Jensen was very

10  knowledgeable about the article subject of topic 41, as shown by the fact that MGA

11  and Bryant's counsel questioned her on this single topic from approximately

12  10:15 a.m. until 3:30 p.m.[39]  Ms. Jensen testified that she was the person at Mattel

13  who, in June 2003, first contacted the reporter who wrote the article to initiate the

14

15  [33]  Id. at 152:22-154:15.

16  [34]  Id. at 34:20-35:25.

17  [35]  Id. at 129:17-133:6.
    [36]  Id. at 148:4-151:25.

18  [37]  Id. at 96:10-103:2.  Indeed, the questioning--all of which relied on improper

19  legal opinion--spans several pages of deposition transcript and conveys counsel's
    condescending tone:  "Let me help you out, Ms. Yonemoto.  Can you identify

20  anyplace on the Proprietary Information checkout form which is Exhibit 27 that
    talks about the rights of employees under Section 2870 of the California Labor

21  Code?"  Id. at 99:10-14.

22  [38]  Deposition Transcript of Julia Jensen ("Jensen Depo Tr."), dated June 8,

23  2007, Proctor Dec., Exh. 29, at 17:14-23, 21:6-23:12.
    [39]  Jensen Depo Tr., Proctor Dec., Exh. 29, at 3:1-7, 187:18-19.  MGA and

24  Bryant's counsel make much of the fact that Ms. Jensen was substituted for another
    witness who Mattel originally designated to testify on this topic and complain that

25  Ms. Jensen did not know the answers to all of the questions they asked.  One could

26  only get the impression that Ms. Jensen did not have much to say on the subject if,
    as MGA and Bryant did in their moving papers, one simply ignores the vast amount

27  of information she gave on the topic.  Her detailed testimony regarding her personal

28  involvement in the Wall Street Journal article speaks for itself.

MATTEL'S OPPOSITION TO MGA'S AND BRYANT'S JOINT MOTION TO COMPEL RE 30(B)(6) WITNESSES

J7209/2217061.2

EXHIBIT 22 PAGE 471

1    process;[40] she testified in detail about the number and subject matter of internal

2    discussions she had with Matt Bousquette, president of Mattel brands, and Lisa

3    Tauber, Director of Marketing, including the documents she reviewed during those

4    meetings;[41] that Mattel was interested in giving the Wall Street Journal an exclusive

5    for the launch of the Flavas brand;[42] Mattel's prior experience with the Wall Street

6    Journal reporter;[43] the substance and timing of at least six telephone conversations

7    with the Wall Street Journal reporter before the article was published;[44] her

8    arranging for the reporter to preview the Flavas dolls along with Mattel's doll line;[45]

9    the identities of individuals who spoke with the reporter at Toy Fair 2003 and the

10   substance of those discussions;[46] what she learned from the reporter regarding the

11   reporter's interviews of other individuals for the story, such as retailers, Isaac Larian,

12   and Lily Martinez, a Mattel designer;[47] Ms. Jensen's internal discussions at Mattel

13   and subsequent conversations with the reporter;[48] and a sentence-by-sentence review

14   of the article and what she knew about each sentence in terms of its source, her

15   discussions with anyone at Mattel or the reporter herself about the topic of the

16   sentence.[49]

17

18

---

19   [40]   Jensen Depo Tr., Proctor Dec., Exh. 29, at 25:21-26:9.

     [41]   Jensen Depo Tr., Proctor Dec., Exh. 29, at 26:11-36:7.

20   [42]   Jensen Depo Tr., Proctor Dec., Exh. 29, at 29:2-30:16, 33:8-16.

     [43]   Jensen Depo Tr., Proctor Dec., Exh. 29, at 31:12-32:17.

21   [44]   Jensen Depo Tr., Proctor Dec., Exh. 29, at 39:3-40:15, 50:3-52:4, 52:18-

22   56:10, 57:17-65:11, 65:12-67:5, 67:6-72:14.

     [45]   Jensen Depo Tr., Proctor Dec., Exh. 29, at 41:21-42:7, 45:7-47:23.

23   [46]   Jensen Depo Tr., Proctor Dec., Exh. 29, at 78:15-79:22, 92:12-93:18, 97:21-

24   99:15, 136:19-137:12, 138:17-140:22, 144:21-145:23.

     [47]   Jensen Depo Tr., Proctor Dec., Exh. 29, at 60:2-64:13, 67:14-72:14, 135:3-

25   16.

     [48]   Jensen Depo Tr., Proctor Dec., Exh. 29, at 72:22-73:18, 75:6-22, 94:14-95:4.

26   [49]   Jensen Depo Tr., Proctor Dec., Exh. 29, at 79:23-81:5, 81:19-25, 83:2-88:16,

27   90:3-18, 92:7-11, 96:2-101:10, 104:12-107:25, 112:4-117:8, 118:18-124:4, 125:12-

28   133:6, 136:9-141:25, 143:6-145:23, 156:7-165:5, 185:5-186:15.

EXHIBIT 22 PAGE 472

1    That article also purports to quote Mattel employees or ex-Mattel

2  employees as unnamed sources for the article.  Mattel told MGA and Bryant on

3  numerous occasions that Mattel did not know the identities of those unnamed

4  sources and so a 30(b)(6) witness would only be testifying to that lack of

5  knowledge.[50] Bryant's counsel acknowledged that fact and agreed to the production

6  of a witness by Mattel with those limitations.[51]

7    However, after Ms. Jensen's deposition, MGA's counsel sent an e-mail

8  to Mattel's counsel complaining that Ms. Jensen did not know the identities of the

9  unnamed sources and had not herself engaged in an investigation to find out the

10 information.[52] This is patently false as Ms. Jensen testified that she asked Maureen

11 Tkacik, the Wall Street Journal reporter, who her sources were.[53] Ms. Jensen also

12 had discussions with counsel preparing for her deposition, and counsel had

13 previously and repeatedly told defendants that Mattel simply did not know who the

14 sources were.[54] In response to the email, Mattel's counsel wrote back and asked for

15 MGA to identify any specific information that was "asked for and not provided by

16 Ms. Jensen," and, while not agreeing with MGA's complaint, offered to meet and

17 confer over those questions that Ms. Jensen allegedly failed to answer sufficiently.[55]

18 Mattel's counsel also offered to meet and confer regarding those questions and

19 answers pursuant to the Discovery Stipulation.[56] Rather than respond, defendants

20 simply filed this motion.  Furthermore, Ms. Tkacik herself has been noticed for

---

21  [50]   5/13/05 letter, Corey Dec., Exh. 1, at 2; 3/15/05 Tr., Zeller Dec., Exh. 1, at
22 353:9-23; 354:19-355:21.
       [51]   3/15/05 Tr., Zeller Dec., Exh. 1, at 356:12-15, 357:17-24; Jensen Depo Tr.,
23 Proctor Dec., Exh. 29, at 22:23-23:11.
       [52]   Email from James Jenal to Timothy Alger, dated August 11, 2007 ("8/11/07
24 email"), Proctor Dec., Exh. 6.
25     [53]   Jensen Depo Tr., Proctor Dec., Exh. 29, at 122:20-123:12.
       [54]   3/15/05 Tr., Zeller Dec., Exh. 1, at 354:19-355:2, 356:16-20.
26     [55]   Letter from Timothy L. Alger to James Jenal, dated August 21, 2007
27 ("8/21/07 letter"), Proctor Dec., Exh. 7.

28

EXHIBIT 22 PAGE 473

07209/2217061.2
-12-
MATTEL'S OPPOSITION TO MGA'S AND BRYANT'S JOINT MOTION TO COMPEL RE 30(B)(6) WITNESSES

1  deposition in this case (scheduled for September 28) and defendants may ask her

2  any of the questions about the article they like.[57]

3          Julia Marine:  MGA and Bryant do not have any substantive

4  complaints about Ms. Marine's testimony at all, but rather, simply repeat their now

5  tired refrain that her testimony was "flatly contradicted" by the testimony of Michael

6  Moore, Mattel's in-house counsel.[58]  MGA and Bryant argued all of this at length in

7  their motion for terminating sanctions, and Judge Larson already found that there is

8  no conflict in testimony.[59]  On September 21, 2006 and November 8, 2006,

9  Ms. Marine testified as a 30(b)(6) witness on the Zeus system between 1998 and

10  2000.[60]  She was simply **never asked** what Zeus backup tapes were available during

11  these depositions.[61]  Months later, on June 26, 2007, Ms. Marine was deposed on an

12  entirely different Rule 30(b)(6) topic - namely, the document management system

13  used by designers at Mattel's Design Center.[62]  It was not until then, seven and a half

14  months later, on a different topic, and at the very end of her deposition, that

15  Ms. Marine was asked about the Zeus backup tapes Mattel did or did not possess.[63]

16  As Judge Larson already found, Ms. Marine did not testify that Zeus backup tapes

17

18  [56]  Id.

19  [57]  Notice of Deposition of Maureen Tkacik, Denise O'Neil, Christopher Palmeri
     and Jeff Weiss, dated August 6, 2007, Proctor Dec., Exh. 35.

20  [58]  MGA Entertainment, Inc.'s and Carter Bryant's Joint Motion to Compel Re:
     Mattel's Bandying of 30(b)(6) Witnesses ("Motion"), dated September 6, 2007 at

21  17:2-12.

22  [59]  Hearing: MGA's Motion for Terminating Sanctions Transcript ("Terminating
     Sanctions Tr."), dated August 27, 2007, Proctor Dec., Exh. 34, at 66:8-22, 93:21-24.

23  [60]  Deposition Transcript of Julia Marine, Volume I ("Marine Depo Tr., Vol. I"),

24  dated September 21, 2006, Proctor Dec., Exh. 30, at 11:24-12:12; Deposition
     Transcript of Julia Marine, Volume II ("Marine Depo Tr., Vol. II"), dated

25  November 8, 2006, Proctor Dec., Exh. 31, at 81:18-21.

26  [61]  Terminating Sanctions Tr., Proctor Dec., Exh. 34, at 79:22-80:22.
     [62]  Deposition Transcript of Julia Marine, Volume III ("Marine Depo Tr., Vol.

27  III"), dated June 26, 2007, Proctor Dec., Exh. 32, at 161:16-19.

28  [63]  Marine Depo Tr., Vol. III, Proctor Dec., Exh. 32, at 243:5-244:19.

07209/2217061.2

-13-
MATTEL'S OPPOSITION TO MGA'S AND BRYANT'S JOINT MOTION TO COMPEL RE 30(B)(6) WITNESSES

EXHIBIT 22 PAGE 474

1   did not exist as MGA and Bryant claim, she simply said that she did not know.[64]   No

2   matter how often or loudly MGA and Bryant assert otherwise, it does not make it so.

3       Jill Nordquist:  Ms. Nordquist is Director of Mattel Brands Consumer

4   Products and was formerly the Marketing Manager for Barbie Collectibles, the

5   group within Mattel for which Carter Bryant worked.[65]  Ms. Nordquist was

6   designated to testify as to portions of topics 2-7 and 55, specifically, her knowledge

7   concerning misstatements Carter Bryant made about his departure from Mattel.[66]

8   She testified extensively (her deposition ran from approximately 9:45 a.m. until

9   7:00 p.m.)[67] on facts relevant to those topics, including, for example:  her work and

10   interaction with Carter Bryant while he and Ms. Nordquist worked in the Design

11   Center;[68] Bryant's design work at Mattel;[69] meetings she had with Bryant;[70] the

12   layout of the Design Center;[71] what Bryant said and failed to say about his leaving

13   Mattel;[72] her discussions with others (both before and after he left Mattel) about

14   Bryant's failure to disclose that he was going to a competitor;[73] and her

15   understanding of Mattel employees' responsibilities to disclose to Mattel any work

16   done outside of Mattel.[74]

17

---

18   [64]   Marine Depo Tr., Vol. III, Proctor Dec., Exh. 32, at 239:9-240:5; Terminating
   Sanctions Tr., Proctor Dec., Exh. 34, at 66:8-22; 93:21-24.  Mattel also offered to
19   produce Zeus backup tapes for 1998 to 2001, but defendants never responded to
20   Mattel's letter.  Corey Dec., ¶ 4.
   [65]   Nordquist Depo Tr., Proctor Dec., Exh. 28, at 29:10-20; 57:2-6.
21   [66]   30(b)(6) Scheduling Hearing Tr., Proctor Dec., Exh. 33, at 20:14-18, 27:23-
22   24, 29:15-16, 30:14-15; Nordquist Depo Tr., Proctor Dec., Exh. 28, at 14:8-23,
   144:11-145:9, 124:18-24, 180:18-181:1.
23   [67]   Nordquist Depo Tr., Proctor Dec., Exh. 28, at 5:4-6, 298:1-3.
24   [68]   See e.g., id. at 56:5-58:5, 59:5-71:9.
   [69]   Id. at 67:6-21, 110:10-111:20.
25   [70]   Id. at 63:15-67:5.
26   [71]   Id. at 145:11-148:18, 160:13-167:6.
   [72]   Id. at 122:25-130:1, 141:20-145:9, 179:18-181:11.
27   [73]   Id. at 132:20-138:15, 186:16-191:20.
28   [74]   Id. at 149:4-160:11.

EXHIBIT 22 PAGE 475

07209/2217061.2

MATTEL'S OPPOSITION TO MGA'S AND BRYANT'S JOINT MOTION TO COMPEL RE 30(B)(6) WITNESSES

1    Although Ms. Nordquist had much detail to give about the relevant

2    topics, Bryant's counsel chose to spent inordinate amounts of time on plainly

3    irrelevant matters such as whether members of the Design Team at Mattel were

4    considered to be "cute" or "not cute,"[75] and about an incident during which Carter

5    Bryant cried because a doll idea of his was not well received, focusing on issues

6    such as:  whether Bryant was "audibly sobbing;"[76] what kinds of sounds Bryant

7    made (whether he was sobbing, wailing, or making some other noise);[77] whether he

8    was "running" out of the room or "just moving quickly;"[78] how many feet long the

9    room was;[79] whether there was a big table in the room;[80] whether there was one

10   table in the room;[81] and whether the exit was "on one of the longer sides of the

11   rectangle or on one of the shorter sides."[82]

12   MGA's counsel also questioned Ms. Nordquist at length about matters

13   that had nothing to do with Ms. Nordquist's designated topics, including, for

14   example: preservation of emails and documents for this litigation;[83] matters relating

15   to Mattel's trade secrets claims;[84] and her familiarity with MY SCENE (including its

16   origins, target consumer, media brief, and marketing practices).[85]

17   <u>DIVA STARZ Witnesses and the Relevance of the DIVA STARZ</u>

18   <u>Project</u>.  Four witnesses identified in the motion, Joni Pratte, Kislap Ongchangco,

19   Rene Pasko and Robert Hudnut, were designated to testify as to two narrow aspects

20   of DIVA STARZ.  DIVA STARZ is a line of fashion dolls Mattel first released in

---

[75]  <u>Id.</u> at 115:8-116:3.
[76]  <u>Id.</u> at 83:22-25.
[77]  <u>Id.</u> at 84:3-19.
[78]  <u>Id.</u> at 85:12-14.
[79]  <u>Id.</u> at 85:16-86:13, 90:2-9.
[80]  <u>Id.</u> at 88:19.
[81]  <u>Id.</u> at 88:21, 90:14-15.
[82]  <u>Id.</u> at 90:25-91:13.
[83]  <u>Id.</u> at 197:23-210:11, 220:24-228:4.
[84]  <u>Id.</u> at 210:12-220:23.

EXHIBIT 22 PAGE 476

07209/2217061.2

-15-

MATTEL'S OPPOSITION TO MGA'S AND BRYANT'S JOINT MOTION TO COMPEL RE 30(B)(6) WITNESSES

1   2000, that included four different dolls with distinct personalities.[86]  Although DIVA
2   STARZ was a vast project, only two narrow aspects of it are relevant to this case:
3   certain DIVA STARZ drawings and certain names that were considered for the
4   project.  These included certain names such as "Chat Brats," "Brats," "Girlz,"
5   "Boyz," "Diva Girlz," "Little Brats," and "Bratty Little Sister"[87] and documents and
6   designs for the DIVA STARZ project which pre-date the release of Bratz and were
7   never publicly released, but which nonetheless share common elements with the
8   Bratz dolls.[88]

9          Mattel has never argued that MGA or Mr. Bryant had direct access to
10   electronic files relating to DIVA STARZ, but rather, that Paula Garcia (a former
11   Mattel employee who left to become MGA's Bratz project manager), Carter Bryant
12   and other former Mattel employees associated with MGA had access to DIVA
13   STARZ sketches, prototypes, and names based on the physical location of their
14   workspaces in the Design Center and on the personal involvement of Ms. Garcia and
15   other former Mattel employees in the DIVA STARZ project and their relationship
16   with others who worked on DIVA STARZ.  DIVA STARZ was in development in
17   the Mattel Design Center--the same physical location where Bryant worked in 1999
18   through October 2000.[89]  Anyone who had access to the Design Center (like
19   Mr. Bryant and Ms. Garcia) also had access to other projects being worked on in
20
21
22
_____
[85]  Id. at 228:5-239:16.
23   [86]  Pratte Depo Tr., Proctor Dec., Exh. 26, at 89:3-23; Pasko Depo Tr., Proctor
24   Dec., Exh. 27, at 180:2-12, 188:17-189:9.
25   [87]  Pratte Depo Tr., Proctor Dec., Exh. 26, at 106:24-107:7, 111:1-15;
     Ongchangco Depo Tr., Proctor Dec., Exh. 23, at 33:14-22, 201:17-202:5.
26   [88]  See, e.g., documents Bates numbered M 0016585-M 0016586.001, M
27   0016817, M 0016504, TP 0008, TP 0009 and TP 0011, Proctor Dec., Exh. 8.
     [89]  See Ongchangco Depo Tr., Proctor Dec., Exh. 23, at 15:2-18:2; see also
28   Pasko Depo Tr., Proctor Dec., Exh. 27, at 89:13-92:11.

07209/2217061.2

MATTEL'S OPPOSITION TO MGA'S AND BRYANT'S JOINT MOTION TO COMPEL RE 30(B)(6) WITNESSES

EXHIBIT 22 PAGE 477

1  that space, including DIVA STARZ.[90]  Ms. Garcia worked directly on the DIVA

2  STARZ project while she was at Mattel, and describes Maureen Mullen, the original

3  designer on DIVA STARZ, as one of her friends at Mattel.[91]  In fact, Ms. Garcia

4  hired Ms. Mullen as a contractor for MGA in 2000.[92]

5          Mattel told defendants that its 30(b)(6) witnesses would be testifying to

6  facts within their personal knowledge concerning DIVA STARZ, and defendants

7  never objected.[93]  Mattel's witnesses on DIVA STARZ testified as follows:

8          Joni Pratte: Ms. Pratte is a Product Design Manager for Mattel and has

9  previously worked as a packaging designer on DIVA STARZ, Mini DIVA STARZ,

10

11  [90]  See e.g., Hudnut Depo Tr., Vol. I, Proctor Dec., Exh. 24, at 194:15-195:7; see
    also Deposition Transcript of Ann Driskill, Volume I, dated December 15, 2004,

12  Proctor Dec., Exh. 14, at 205:3-16; Pratte Depo Tr., Proctor Dec., Exh. 26, at
    140:17-19; Nordquist Depo Tr., Proctor Dec., Exh. 28, at 179:8-17.

13  [91]  See Pasko Depo Tr., Proctor Dec., Exh. 27, at 42:13-42:20, 95:15-24; see also

14  Deposition Transcript of Paula Garcia, Volume I ("Garcia Depo Tr., Vol. I"), dated
    May 24, 2007, Proctor Dec., Exh. 15, at 193:1-16.

15  [92]  Garcia Depo Tr., Vol. I, Proctor Dec., Exh. 15, at 191:20-192:15.

16  [93]  Pasko Depo Tr., Proctor Dec., Exh. 27, at 10:23-11:12, 26:20-27:12; Pratte

17  Depo Tr., Proctor Dec., Exh. 26, at 8:16-9:6; Ongchangco Depo Tr., Proctor Dec.,
    Exh. 23, at 159:2-160:6; Hudnut Depo Tr., Vol. I, Proctor Dec., Exh. 24, at 92:7-

18  94:24.  MGA also did not contest the limited scope of Mattel's production of
    documents related to the DIVA STARZ project.  See Mattel, Inc.'s Responses to

19  MGA's First Set of Requests for the Production of Documents and Things, dated
    March 7, 2005, at Responses to Request Nos. 131, 135, 137-139, Proctor Dec.,

20  Exh. 9; see also Mattel's Supplemental Responses to MGA's First Set of Requests

21  for Production of Documents and Things, dated January 5, 2007, at Responses to
    Request Nos. 132, 134 and 136, Proctor Dec., Exh. 10.  Although MGA has filed a

22  motion to compel on this set of requests, MGA did not include any requests relating

23  to DIVA STARZ.  See Proctor Dec., ¶ 12.  To the contrary, MGA has admitted that
    it does not want all of the documents and details concerning the DIVA STARZ

24  project, telling the Discovery Master that it only seeks "documents relating to the

25  original artwork or work product that Mattel claims Bryant copied."  Reply of MGA
    Entertainment, Inc. in Support of its Motion to Compel Mattel, Inc. to Supplement

26  its Responses and Produce Documents Responsive to MGA's First Set of Requests

27  for the Production of Documents and Things, dated July 26, 2006, Proctor Dec.,
    Exh. 11, at 18:1-3.

28

07209/2217061.2

-17-

MATTEL'S OPPOSITION TO MGA'S AND BRYANT'S JOINT MOTION TO COMPEL RE 30(B)(6) WITNESSES

EXHIBIT 22 PAGE 478

1  and other Mattel products.[94]  Ms. Pratte was designated to testify on topics 2-7, 8,

2  13, and 24,[95] and Mattel repeatedly told MGA and Bryant that Ms. Pratte would be

3  testifying as to her personal knowledge about DIVA STARZ.  MGA's and Bryant's

4  counsel readily accepted this fact.[96]  She testified from 10:00 a.m. until 5:00 p.m.

5  about (among other things):  the logo design and development of the DIVA STARZ

6  product;[97] the design of DIVA STARZ packaging dating back to at least

7  September/October 1999;[98] the design of Mini DIVA STARZ packaging;[99] and the

8  different names considered for the DIVA STARZ and Mini DIVA STARZ,

9  including "Girlz," "Diva Girlz," "Chat Girls" and "Chat Brats.[100]

10          She also testified about other issues that go to the designated topics

11  including, for example:  similarities she saw between the packaging for Bratz dolls

12  and the earlier-introduced DIVA STARZ packaging;[101] and her understanding of her

13  responsibility to inform her supervisor of any work she did outside Mattel and her

14  not having used Mattel resources to do work for something outside Mattel.[102]

15          Kislap Ongchangco:  Mr. Ongchangco designs toys for Mattel and

16  worked on the DIVA STARZ project.[103]  He was also designated to testify on topics

17  2-7, 8, 12, 13, 24, with the same limitations as Ms. Pratte.[104]  Like Ms. Pratte,

18  _____

19  [94]   Pratte Depo Tr., Proctor Dec., Exh. 26, at 9:14-24, 11:20-23, 15:18-16:2, 16:12-21, 57:5-8.

20  [95]   Pratte Depo Tr., Proctor Dec., Exh. 26, at 7:20-9:6; 30(b)(6) Scheduling Hearing Tr., Proctor Dec., Exh. 33, at 9:17-20.

21  [96]   Pratte Depo Tr., Proctor Dec., Exh. 26, at 8:16-25, 9:1-6.

22  [97]   Pratte Depo Tr., Proctor Dec., Exh. 26, at 78:21-81:4.

23  [98]   Pratte Depo Tr., Proctor Dec., Exh. 26, at 18:8-14, 21:7-22:13, 26:15-35:13.
    [99]   Pratte Depo Tr., Proctor Dec., Exh. 26, at 205:22-206:19.

24  [100]  Pratte Depo Tr., Proctor Dec., Exh. 26, at 36:10-21, 68:1-8, 106:24-107:7, 111:1-15.

25  [101]  Pratte Depo Tr., Proctor Dec., Exh. 26, at 71:6-72:25, 81:5-84:4, 105:3-14.

26  [102]  Pratte Depo Tr., Proctor Dec., Exh. 26, at 122:22-132:8, 133:1-137:15.

27  [103]  Ongchangco Depo Tr., Proctor Dec., Exh. 23, at 11:3-14; 14:14-19.
    [104]  Ongchangco Depo Tr., Proctor Dec., Exh. 23, at 159:2-160:3; 200:23-201:5;

28  30(b)(6) Scheduling Hearing Tr., Proctor Dec., Exh. 33, at 12:9-16.

-18-

MATTEL'S OPPOSITION TO MGA'S AND BRYANT'S JOINT MOTION TO COMPEL RE 30(B)(6) WITNESSES

EXHIBIT 22 PAGE 479

1  Mr. Ongchangco testified from about 9:45 a.m. until 5:30 p.m.[105] about his
2  knowledge concerning the Linker drawings, namely, the circumstances under which
3  he had previously seen them at Mattel, when that occurred, and the similarities
4  between the drawings and the Bratz dolls.[106]  He also testified as to DIVA STARZ
5  having been referred to internally as "Chat Girls," and Mini DIVA STARZ having
6  been referred to as "Little Brats," and how those names were considered for the final
7  product.[107]  He testified about how the names "Brats" and "Chat Brats" were
8  considered for DIVA STARZ and Mini DIVA STARZ.[108]  He testified about his
9  work on Mini DIVA STARZ;[109] the involvement of Maureen Mullen (as
10  preliminary designer), and Rene Pasko (as the accessories designer) on DIVA
11  STARZ;[110] the development of Mini DIVA STARZ for public sale;[111] and the
12  differences between different "generations" of Mini DIVA STARZ.[112]
13      <u>Rene Pasko</u>:  Ms. Pasko was a Senior Designer when she began
14  working on DIVA STARZ, and was designated on topics 2-8, 11-13 and 24.[113]
15  Ms. Pasko gave many details about DIVA STARZ project, including, for example:
16  the nature and scope of her work on DIVA STARZ; the use of other names for the
17  DIVA STARZ project including "Chat Girls" and "Cool Talk'n Teens"; the approval
18  process and product development milestones; drawings and illustrations related to
19
20  [105]  Ongchangco Depo Tr., Proctor Dec., Exh. 23, at 5:5-7; 277:15-17.
21  [106]  Ongchangco Depo Tr., Proctor Dec., Exh. 23, at 177:12-191:9.
    [107]  Ongchangco Depo Tr., Proctor Dec., Exh. 23, at 33:14-22; 55:4-14; 201:6-
22  16.
23  [108]  Ongchangco Depo Tr., Proctor Dec., Exh. 23, at 201:17-202:5.
    [109]  Ongchangco Depo Tr., Proctor Dec., Exh. 23, at 35:10-37:2.
24  [110]  Ongchangco Depo Tr., Proctor Dec., Exh. 23, at 15:2-22; 21:10-17; 26:5-20;
    58:6-59:22.
25  [111]  Ongchangco Depo Tr., Proctor Dec., Exh. 23, at 24:24-25:16.
26  [112]  Ongchangco Depo Tr., Proctor Dec., Exh. 23, at 65:18-67:8.
27  [113]  Pasko Depo Tr., Proctor Dec., Exh. 27, at 29:13-17, 10:23-11:12; 4/11/07
    letter, Corey Dec., Exh. 3, at 1; 30(b)(6) Scheduling Hearing Tr., Proctor Dec.,
28  Exh. 33, at 13:10.

EXHIBIT 22 PAGE 480

1   DIVA STARZ; comparisons between physical DIVA STARZ dolls and illustrations
2   and Bratz dolls; and her display of DIVA STARZ illustrations on her cubicle walls
3   in Mattel's Design Center.[114]

4       MGA's counsel took so long with Ms. Pasko that Bryant's counsel did
5   not even get an opportunity to question her, despite her deposition lasting from
6   about 10:00 a.m. until after 7:00 p.m.[115]  Accordingly, Mattel's counsel offered to
7   make her available again during the deposition and offered four different and
8   definite dates for her continued deposition in writing just two days later.[116]  Instead
9   of accepting one of those offered dates or responding to the letter of Mattel's
10   counsel, MGA and Bryant instead filed this motion.[117]

11       <u>Robert Hudnut</u>:  Mr. Hudnut is Mattel's Vice President, Executive
12   Producer Mattel Entertainment, and was designated to testify as to limited aspects of
13   topics 2-7, 8, 11, 13, 24, namely, his work on the scripts and pitch for a potential
14   DIVA STARZ television show.[118]  Mr. Hudnut testified that he first became
15   involved in the DIVA STARZ Entertainment project in late 1999 or early 2000;[119]
16   gave details about a  brainstorming meeting he attended regarding the creation of
17   DIVA STARZ story content;[120] the creation of the DIVA STARZ "Character
18   Bible";[121] the preparation and results of a pitch to network television executives;

19

20   [114]   Pasko Depo Tr., Proctor Dec., Exh. 27, at 183:3-186:21.
    [115]   Pasko Depo Tr., Proctor Dec., Exh. 27, at 5:5-16, 212:25-213:18.
21   [116]   Letter from Michael Zeller to Diana Torres and John Trinidad, dated
22   June 15, 2007 ("6/15/07 letter"), Zeller Dec., Exh. 2.
    [117]   Zeller Dec., ¶ 4.
23   [118]   4/11/07 letter, Corey Dec., Exh. 3, at 1; Hudnut Depo Tr., Vol. I, Proctor
24   Dec., Exh. 24, at 92:17-25, 93:15-16, 93:13-94:2, 97:13-21.  Indeed, counsel for
     Mattel noted at the deposition that, "It's only the portions of those topics that deal
25   with his knowledge as to the scripts that might be pertinent to those topics.  So it's
26   not those entire topics." <u>Id.</u> at 93:24-94:2.
    [119]   Hudnut Depo Tr., Vol. I, Proctor Dec., Exh. 24, at 129:3-6.
27   [120]   <u>Id.</u> at 129:18-141:20.
28   [121]   <u>Id.</u> at 141:21-144:14.

EXHIBIT 22 PAGE 481

f7209/2217061.2

MATTEL'S OPPOSITION TO MGA'S AND BRYANT'S JOINT MOTION TO COMPEL RE 30(B)(6) WITNESSES

1  discussions with Maureen Mullen concerning the television show;[122] and the multi-

2  ethnic nature of the DIVA STARZ dolls, their different characters, their oversized

3  heads, feet and big eyes.[123]

4       MGA and Bryant chastise Mr. Hudnut for having "childcare issues" as

5  if he had somehow left his deposition early.[124]  But Mr. Hudnut's deposition ran

6  from 9:30 a.m. until 4:30 p.m. on the first day and then he appeared for a second day

7  of deposition, stating that he did not need to leave at any particular time.[125]  After 45

8  minutes of questioning Mr. Hudnut on the second day, none of which had to do with

9  the topic on which Mr. Hudnut was designated, counsel stated he had no further

10  questions.[126]

11                                        **Argument**

12  I.    **THE MOTION SHOULD BE DENIED SUMMARILY BECAUSE MGA**

13        **AND BRYANT AGAIN FAILED TO MEET AND CONFER BEFORE**

14        **FILING IT**

15       Defendants claim that the parties met and conferred on July 10, 2007,

16  but that is false.  On July 2, 2007, MGA and Bryant requested that Mattel meet and

17  confer regarding Mattel's Third Set of Interrogatories and its supposedly "abusive"

18

19  _____

    [122]  Id. at 151:4-152:3, 160:14-161:2.

20  [123]  Id. at 173:24-174:6.  Mr. Hudnut also testified about his having negotiated a

21  side agreement to his Confidential Information and Inventions Agreement which
    clarified what he had created prior to starting again with Mattel to ensure there were

22  no conflicts of interest.  Id. at 209:2-220:3.

    [124]  Motion at 5 n.11.

23  [125]  Deposition of Robert Hudnut, Volume II, dated August 20, 2007 ("Hudnut

24  Depo Tr., Vol. II"), Proctor Dec., Exh. 25, at 244:15-17:

    MR. PAGE:        Just to check, do you need to leave at any
25                   particular time to pick up children or

26                   ·anything?

    MR. HUDNUT:      Today, no.
27

28  [126]  Id. at 243:4-6, 269:23-24.

                                            EXHIBIT 22 PAGE 482

1  discovery practices.[127]  As to Mattel's purportedly "abusive" discovery practices,

2  defendants only stated that "Mattel has engaged in a multitude of discovery abuses,

3  including improper use of the Rule 30(b)(6) deposition notice procedure to avoid

4  noticing witnesses in their individual capacity, bandying, and exceeding the page

5  limits on motions filed before the Discovery Master, among others."[128]  Defendants

6  provided no further detail regarding their claims of Mattel's alleged "bandying" and

7  other purported discovery abuses.[129]

8          During a conference on July 10, 2007, the parties discussed defendants'

9  separate motion regarding Mattel's interrogatories, but Mattel explained that it could

10  not meet and confer on defendants' allegations regarding Mattel's "bandying"

11  because defendants failed to explain their concerns, or identify topics or witnesses at

12  issue.[130]  In response, defendants identified Kislap Ongchangco, as an allegedly

13  unprepared witness.[131]  Counsel for Mattel explained to defendants that because he

14  was not involved in Mr. Ongchangco's deposition and had no prior notice that

15  Mr. Ongchangco's deposition (or any other deposition) was at issue, he could not

16  discuss the matter at that time.[132]  Counsel for Mattel requested that defendants

17  provide a letter that complied with Local Rule 37-1 and the Discovery Master

18  Stipulation and that specified which 30(b)(6) witnesses defendants believed were

19  not sufficiently knowledgeable, what aspects of their testimony defendants found to

20  be troublesome, and how Mattel engaged in supposed bandying.[133]

21          The next day, July 11, 2007, MGA wrote to Mattel and explained that

22  "MGA is concerned about the testimony of Mattel's 30(b)(6) witnesses in general,

---

[127]  Letter from James Jenal to Dylan Proctor, dated July 2, 2007, Proctor Dec., Exh. 1.

[128]  Id.

[129]  Id.

[130]  Proctor Dec., ¶ 3.

[131]  Id.

[132]  Id.

EXHIBIT 22 PAGE 483

7209/2217061.2

1  including, but not limited to the testimony of Julia Jensen, Kislap Ongchangco,

2  Rene Pasko, Joni Pratte, and Sandy Yonemoto with respect to topics 2-8 and 41 of

3  Carter Bryant's Notice of Rule 30(b)(6) depositions. . . MGA is seeking for Mattel to

4  produce a properly educated 30(b)(6) witness who can testify competently as to

5  Mattel's knowledge on these topics."[134]  Topics 11-13, 22, 24, and 54-56 were not

6  mentioned.  Nor were witnesses Robert Hudnut, Jill Nordquist or Julia Marine.

7            On July 12, 2007, the next day,  MGA wrote another letter to Mattel,

8  promising to send a "second letter further detailing the discovery abuses for which

9  MGA and Bryant intend to seek a protective order absent resolution of these

10  issues."[135]  Mattel responded to both letters on July 15, 2007 and explained that

11  defendants had yet to provide sufficient notice of what aspects of the topics they

12  believed needed to be further addressed or what further testimony should be offered

13  by Mattel.[136]  Mattel pointed out that in its most recent letter, MGA promised to

14  send a proper meet and confer letter which would enable Mattel to prepare for the

15  meet and confer, and Mattel committed to meet and confer on these matters once

16  defendants provided the promised second meet and confer letter.[137]  MGA never

17  sent the letter it promised to send and never responded to Mattel's July 15 letter.[138]

18  Instead, nearly two months later, it filed this motion.

19            MGA and Bryant also failed to meet and confer regarding Julia

20  Jensen's deposition on topic No. 41.  On August 11, 2007, MGA demanded that

21  Mattel designate Jules Andres as a Rule 30(b)(6) witness regarding Topic No. 41 of

22  
_____

23  [133]    Id.

24  [134]    Letter from William Charron to Dylan Proctor, dated July 11, 2007, Proctor Dec., Exh. 2.

25  [135]    Letter from Jennifer Glad to Dylan Proctor, dated July 12, 2007, Proctor Dec., Exh. 3.

26  [136]    Letter from Dylan Proctor to Jennifer Glad and William Charron, dated July 15, 2007, Proctor Dec., Exh. 4.

27  [137]    Id.

28  [138]    Proctor Dec., ¶ 6.

EXHIBIT _22_ PAGE _484_

1    Carter Bryant's Rule 30(b)(6) Notice of Deposition.[139]  Counsel for Mattel replied on

2    August 21, reminding MGA that Mattel had offered Julia Jenson as its topic 41

3    witness instead of Ms. Andres, and that MGA and Bryant had accepted that offer.[140]

4    Mattel offered to meet and confer with defendants on Topic No. 41 once defendants

5    identified the specific information to which MGA and Bryant claimed they are

6    entitled that was asked for and not provided by Ms. Jensen.[141]  Rather than respond

7    to this Mattel letter,[142] defendants filed this motion.

8            Likewise, defendants failed to meet and confer regarding Rene Pasko's

9    deposition.  Defendants spent so much time questioning Ms. Pasko that they did not

10   finish her deposition the first day even though she testified from 10:00 a.m. until

11   7:00 p.m.  On June 15, 2007, two days later, Mattel offered four additional dates for

12   Ms. Pasko's continued deposition.[143]  Again, rather than respond, defendants filed

13   this motion.

14           Local Rule 37-1 and the Discovery Stipulation plainly require

15   defendants to meet and confer with Mattel before filing a motion to compel.  This

16   motion raises issues, topics, and witnesses that were never identified during any

17   meet and confer, and seeks  substantial sanctions, both monetary and evidentiary,

18   that were never mentioned either.  The Court should reject defendants' motion for

19   their false certification to the Court that they met and conferred with Mattel before

20   filing and for their failure to comply with the requirements of the Local Rules and

21   the Discovery Master Stipulation.  Ward v. Circus Casinos, Inc., 473 F.3d 994, 1000

22   (9th Cir. 2007); Waters v. Weyerhaeuser Mortgage Co., 582 F.2d 503, 507 (9th Cir.

23   1978) (upholding trial court's denial of motion to amend for violation of local rule).

24

25   _____

26   [139]   8/11/07 email, Proctor Dec., Exh. 6.
     [140]   8/21/07 letter, Proctor Dec., Exh. 7.
27   [141]   Id.
     [142]   Proctor Dec., ¶ 9.
28

EXHIBIT 22 PAGE 485

## II.   MATTEL'S WITNESS PREPARATION AND DESIGNATION WAS ENTIRELY APPROPRIATE

### A.   Rule 30(b)(6) Does Not Require A Designee to Personally Interview Witnesses or Review Documents; Preparation by Counsel Is Sufficient.

MGA and Bryant claim that Ms. Yonemoto, Mr. Hudnut, Ms. Pratte, Ms. Jensen, Ms. Pasko and Mr. Ongchangco were not properly prepared because they did not personally interview witnesses and did not review enough documents.[144] But as defendants know, each of these witnesses met with counsel, sometimes on numerous occasions, to prepare for their depositions, and that is enough under the Rules. Rule 30(b)(6) simply does not require witness to speak with anyone other than counsel, and it imposes no obligation upon a designee to personally interview witnesses or review documents. See Reichhold, Inc. v. U.S. Metal Refining Co., No. CIV 03-453, 2007 WL 1428559, at *8 (D.N.J. May 10, 2007) (rejecting argument that witness was not properly prepared because he did not personally conduct interviews (other than meeting with counsel), and instead finding that "Because Rule 30(b)(6) does not require that the corporate designee personally conduct interviews, and requires only that he 'testify as to matters known or reasonably available to the organization,' Defendant has not failed to comply with the Rule.") (quotation and internal citation omitted). That these four witnesses did not engage in a personal fact-finding mission simply has no bearing on their competence as 30(b)(6) witnesses.

Furthermore, Mattel repeatedly told MGA and Bryant that its 30(b)(6) witnesses would be testifying as to their personal knowledge relevant to the

---

[143]   6/15/07 letter, Zeller Dec., Exh. 2.
[144]   Motion at 6-8, 10, 12. MGA and Bryant make no such claim as to Ms. Nordquist or Ms. Marine.

07209/2217061.2

-25-

EXHIBIT 22 PAGE 486

1    designated topics, and nothing more.[145]  MGA and Bryant acknowledged and agreed

2    to the designations on that basis and cannot now be heard to complain that the

3    witnesses testified as agreed.[146]

4    **B.    Designating Multiple Witnesses for a Topic Under Rule 30(b)(6) Is**

5    **Entirely Acceptable.**

6

7         MGA and Bryant also accuse Mattel of acting improperly for having

      designated more than one witness on many of the 30(b)(6) topics at issue here.[147]

8
      But MGA and Bryant expressly agreed (on multiple occasions) that Mattel had the
9
      option to do so, stating:  "Mattel will reserve the right to produce one or more
10
      witnesses on a single category, if the scope of the request is broad enough that it
11
      would require it.[148]
12
           MGA and Bryant's agreement aside, the Federal Rules specifically
13
      contemplate that parties may designate multiple witnesses per topic.  The cases cited
14
      in MGA's and Bryant's own motion make this very point.  See Alexander v. FBI,
15
      186 F.R.D. 137, 141 (D.D.C. 1998) ("the designating party is under the duty to
16
      designate more than one deponent if it would be necessary to do so in order to
17
      respond to the relevant areas of inquiry that are specified with reasonable
18
      particularity by the [deposing party]") (cited by MGA and Bryant, Motion at 19, fns.
19
      73, 79, 88, 90); Banks v. Office of the Senate Sergeant-at-Arms, 241 F.R.D. 370,
20
      373 (D.D.C. 2007) ("[a] responding party must designate multiple deponents if more
21

22    _____

      [145]  Zeller Dec., ¶ 2; See e.g.,  Pratte Depo Tr., Proctor Dec., Exh. 26, at 8:16-
23    9:6; Pasko Depo Tr., Proctor Dec., Exh. 27, at 10:23-11:12, 26:20-27:12; Yonemoto
      Depo Tr., Proctor Dec., Exh. 22, at 37:7-15; Ongchangco Depo Tr., Proctor Dec.,
24    Exh. 23, at 159:2-160:6; Hudnut Depo Tr., Vol. I, Proctor Dec., Exh. 24, at 92:7-
      94:24.
25    [146]  See e.g.,  Pratte Depo Tr., Proctor Dec., Exh. 26, at 8:16-9:6; Pasko Depo Tr.,
26    Proctor Dec., Exh. 27, at 10:23-11:12; Ongchangco Depo Tr., Proctor Dec., Exh. 23,
      at 159:2-160:6; Hudnut Depo Tr., Vol. I, Proctor Dec., Exh. 24, at 92:7-94:24.
27    [147]  Motion at 4:23-5:12, 17:16-18, 22:11-24:4, 24:18-20.
      [148]  3/15/05 Tr., Zeller Dec., Exh. 1, at 178:21-24.
28

                                                                        EXHIBIT 22 PAGE 487

1   than one is necessary to respond to all designated topics") (cited by MGA and

2   Bryant, Motion at 21, fn. 80).  See also U.S. ex rel Fago v. M & T Mortgage Corp.,

3   235 F.R.D. 11, 22-23 (D.D.C. 2006) ("the responding entity must designate more

4   than one deponent if multiple deponents are necessary to respond to all of the

5   relevant areas of inquiry").  Mattel acted entirely appropriately in designating

6   multiple witnesses to cover the relevant portions of the deposition topics.

7

8   **III.   MATTEL'S 30(B)(6) DESIGNEES WERE PREPARED TO AND DID**

9   **TESTIFY ON THEIR DESIGNATED TOPICS--MGA AND BRYANT**

10  **SIMPLY DO NOT LIKE WHAT THEY HAD TO SAY.**

11          Rather than identify any relevant areas of testimony that they have been

12  denied, defendants instead simply isolate any "I don't know" answers they could

13  find in the depositions of Mattel's 30(b)(6) witnesses.  But those answers responded

14  to questions that were irrelevant, called for a legal opinion, were outside the witness'

15  designation, or were previously covered by another Mattel witness.  Mattel has done

16  its best to identify what defendants believe they have been denied (which was not an

17  easy task because defendants did not set out those issues in any organized way in

18  their motion).  Each of those issues, as best as Mattel could identify them, is

19  discussed below:

20          •   "Bryant's involvement in the creation of the Bratz dolls"

21  (Ongchangco):[149] Defendants complain that Mr. Ongchangco could not testify about

22  this topic aside from "'allegations' he heard from unnamed and unknown Mattel

23  employees that Bryant had either copied DIVA STARZ or submitted drawings to

24  MGA that were allegedly created while he was still at Mattel."[150]  But this is not

25  anything about which Mr. Ongchangco was supposed to testify.  Bryant's

26  involvement is at the center of this lawsuit, and it is hard to see why Defendants

27  _____

    [149]   Motion at 7:13-14.

28                                          EXHIBIT 22 PAGE 488

1   think Mr. Ongchangco would have facts about the very activities that Bryant and

2   MGA were trying so hard to conceal from Mattel.  Nor is that a topic Mattel had

3   ever agreed to produce a witness on, given that the facts related to that matter are

4   known to Mattel from the discovery it has received in this case.

5          In any event, numerous other witnesses have already testified about

6   Bryant's involvement, including, for example: Carter Bryant,[151] Isaac Larian,[152]

7   Paula Garcia,[153] Steven Linker[154] and Anna Rhee.[155]

8          •   "Personal knowledge about Carter Bryant" (Ongchangco,

9   Hudnut, Pratte):[156] Defendants do not specify what about Carter Bryant they believe

10  these witnesses should have known, but these witnesses were not designated to

11  testify about Carter Bryant anyhow.  They were designated to testify on one or both

12  of the two narrow topics relating to DIVA STARZ, i.e., the Steve Linker drawings

13  and the DIVA STARZ project names, and that is precisely what they did.[157]

14

15

16  [150]   Motion at 7:14-17.

17  [151]   See e.g., Deposition of Carter Bryant, Volume I, dated November 4, 2004, Proctor Dec., Exh. 16, at 8:15-9:6, 21:25-22:3, 105:19-107:1.

18  [152]   See e.g., Deposition of Isaac Larian, Proctor Dec., Exh. 17, dated July 18, 2006, at 107:23-108:8, 111:3-112:21, 114:18-119:2, 125:4-126:3.

19  [153]   See e.g., Garcia Depo Tr., Vol. 1, Proctor Dec., Exh. 15, at 232:23-233:24, 239:10-240:25, 241:25-244:10, 257:10-20, 265:7-268:25.

20

21  [154]   See e.g., Linker Depo Tr., Proctor Dec., Exh. 21, at 56:21-63:15, 76:21-83:21.

22  [155]   See e.g., Deposition of Anna Rhee, dated February 3, 2005, Proctor Dec., Exh. 18, at 107:16-108:12, 109:18-110:9, 112:5-114:15, 126:25-128:12, 141:11-142:15, 143:12-144:1.

23

24  [156]   Motion at 7:20-9:1.

25  [157]   See e.g., Ongchangco Depo Tr., Proctor Dec., Exh. 23, at 160:15-161:25, 164:3-166:8, 169:8-14, 178:10-179:23, 185:6-20, 198:3-199:22 (testimony regarding Steve Linker drawings), 201:17-210:24, 215:10-25 (testimony regarding DIVA STARZ project names); Pratte Depo Tr., Proctor Dec., Exh. 26, at 100:2-103:5 (testimony regarding Linker drawings), 35:10-39:2, 43:15-18, 45:2-16, 50:15-51:23, 67:10-68:16, 69:4-70:10 (testimony regarding DIVA STARZ project names).

26

27

28

07209/2217061.2

-28-

MATTEL'S OPPOSITION TO MGA'S AND BRYANT'S JOINT MOTION TO COMPEL RE 30(B)(6) WITNESSES

EXHIBIT 22 PAGE 489

1    • __Whether Bryant was ever exposed to the name "Bratz" (as a__
2    __name used for the DIVA STARZ project) while a Mattel employee (Pratte):__[158]
3    Mattel has never argued that Mr. Bryant had direct exposure to the name "Bratz"
4    while a Mattel employee.  Rather, Mattel contends that Bryant, Paula Garcia and
5    others had access to DIVA STARZ by virtue of their access to the Mattel Design
6    Center, by Ms. Garcia's and other former employees' direct work on the project, and
7    by Ms. Garcia's and other former employees' close relationships with other persons
8    who worked on the DIVA STARZ project.  The fact that Ms. Pratte did not talk
9    about Bryant's "exposure" to the name Bratz while a Mattel employee is a non-
10   starter.  In any event, Ms. Pratte testified about the name "Brats" having been
11   considered by Mattel.[159]

12   • __Facts about Bryant's breach of duty under Mattel's Employee__
13   __Confidential Information and Inventions Agreement (Yonemoto):__[160]  Defendants
14   complain that Ms. Yonemoto did not testify about "basic facts" on this subject
15   matter, but they simply ignore Ms. Yonemoto's designation.  She was produced to
16   talk about Bryant's exit interview--a topic that clearly pertains to his breach of duty
17   under the Inventions Agreement.[161]  Ms. Yonemoto was not supposed to testify to
18   "Bryant's breach" of the Inventions Agreement more broadly, so defendants have no
19   basis to complain.

20       The questions defendants complain that Ms. Yonemoto could not
21   answer were covered by other witnesses or were improper in any event.  For
22   example, defendants asked Ms. Yonemoto:  1) when Mattel stopped using a
23   particular form of Confidential Information and Inventions Agreement;[162] 2)

24   _____

25   [158]  Motion at 23:2-11.
     [159]  Pratte Depo Tr., Proctor Dec., Exh. 26, at 36:10-46:19, 48:20-58:10, 67:23-
26   70:10, 199:2-12.
     [160]  Motion at 8:7-8.
27   [161]  Yonemoto Depo Tr., Proctor Dec., Exh. 22, at 37:7-9.
28   [162]  Yonemoto Depo Tr., Proctor Dec., Exh. 22, at 39:1-12.

07209/2217061.2

-29-

1  whether current employees were ever asked to sign a "new and different" form of

2  Confidential Information and Inventions Agreement;[163] 3) if she ever advised

3  employees regarding the provisions of Section 2870 of the California Labor Code as

4  described in the Employee Confidential Information and Inventions Agreement;[164]

5  and 4) whether Ms. Yonemoto ever told exiting employees that there were

6  "exceptions to the kinds of things that were covered under the Employee

7  Confidential Information and Inventions Agreement as pertained to what things the

8  employee had to assign to Mattel."[165]  To the extent these questions are not

9  grounded in a legal conclusion or simply unintelligible, defendants have already

10  gotten information on them.  For example, Lissa Freed, another of Mattel's 30(b)(6)

11  designees, testified about which Confidential Information and Inventions

12  Agreements were used by Mattel from 1995 to the present, including Exhibit 25,

13  which was the particular Confidential Information and Inventions Agreement

14  defendants complain Yonemoto was not able to testify about.[166]  Freed also testified

15  about the Confidential Information and Inventions Agreement that current

16  employees were asked to sign.[167]  Similarly, Alan Kaye testified as to whether

17  Mattel advised employees as to Section 2870 of the California Labor Code.[168]

18  Mattel could have pointed all of this out to defendants had they met and conferred

19  on these questions and answers, but they did not do so.

20

21

22

---

[163]   Yonemoto Depo Tr., Proctor Dec., Exh. 22, at 39:20-24.

[164]   Yonemoto Depo Tr., Proctor Dec., Exh. 22, at 96:10-103:2.

[165]   Yonemoto Depo Tr., Proctor Dec., Exh. 22, at 101:8-103:2.

[166]   Deposition Transcript of Lissa Freed ("Freed Depo Tr."), dated May 3, 2007, Proctor Dec., Exh. 19, at 31:10-33:2, 49:5-53:15, 55:2-8, 56:13-24, 57:19-59:9, 60:13-22.

[167]   Freed Depo Tr., Proctor Dec., Exh. 19, at 27:25-29:1, 55:21-56:8.

[168]   Deposition Transcript of Alan Kaye, dated December 10, 2004, Proctor Dec., Exh. 20, at 205:4-206:16, 207:13-208:20.

07209/2217061.2

EXHIBIT 22 PAGE 491

MATTEL'S OPPOSITION TO MGA'S AND BRYANT'S JOINT MOTION TO COMPEL RE 30(B)(6) WITNESSES

1      • <u>Knowledge about the Conflict of Interest Questionnaire</u>

2   <u>(Yonemoto)</u>:[169]  The only questions defendants asked Ms. Yonemoto regarding this

3   form dealt with "Mattel's practices with respect to following up on information

4   provided in a Conflict of Interest Questionnaire,"[170] nothing more.  Just because

5   Ms. Yonemoto does not know what Mattel's "practices" were regarding "following

6   up" on this particular form is meaningless.  Bryant's counsel also did not ask

7   Ms. Yonemoto more generally about her knowledge or use of the form in her duties

8   at Mattel, so counsel would have no idea what Ms. Yonemoto knew or did not know

9   about the form.  Ms. Yonemoto tried to describe how she uses the form in her job to

10  describe to starting employees their obligations relating to the form, but counsel cut

11  her off.[171]  In any event, defendants cannot complain of being deprived of

12  information concerning the Conflict of Interest Questionnaire because Lissa Freed,

13  another Mattel witness, has already testified about it at length.[172]

14      • <u>Information regarding Bryant's exit interview "other than what</u>

15  <u>appeared on the face of Mattel's personnel records" (Yonemoto)</u>:[173]  Ms. Yonemoto

16  testified as to facts reasonably available to her since she could not remember

17  Bryant's exit interview amongst the 50 she has conducted at Mattel.[174]  There is no

18  one else at Mattel who has any knowledge about it because she and Bryant were the

19  only ones there.[175]  Ms. Yonemoto's reliance on her handwritten notes on Bryant's

20  exit interview form and her knowledge of exit interview practices was proper.  That

21  is precisely what those records are for in the first place.

22

23      [169]   Motion at 23:12-18.
24      [170]   Yonemoto Depo Tr., Proctor Dec., Exh. 22, at 109:1-113:4.
        [171]   Yonemoto Depo Tr., Proctor Dec., Exh. 22, at 118:22-119:21.
25      [172]   Freed Depo Tr., Proctor Dec., Exh. 19, at 24:24-27:23, 33:5-35:25, 73:13-
26  75:9.
        [173]   Motion at 14:13-15.
27      [174]   Yonemoto Depo. Tr., Proctor Dec., Exh. 22, at 44:17-45:11, 56:21-59:18.
28      [175]   Yonemoto Depo. Tr., Proctor Dec., Exh. 22, at 60:10-17.

-31-

EXHIBIT 22 PAGE 492

1         •    <u>When the DIVA STARZ project was first released</u>

2 <u>(Ongchangco)</u>:[176] when the <u>DIVA STARZ project began or who conceived of it</u>

3 <u>(Pasko, Ongchangco)</u>;[177] and <u>the origins and inspiration for DIVA STARZ</u>

4 <u>(Hudnut)</u>.[178] As explained above, DIVA STARZ (and Mini DIVA STARZ) are

5 relevant only because certain DIVA STARZ drawings and names that were

6 considered for the project share common elements with Bratz. Defendants complain

7 that the witnesses indicated they could not testify about the particular facts listed

8 above, but Mattel never agreed to provide a witness on those particular issues, and

9 those issues are irrelevant to the narrow DIVA STARZ issues in this case.[179]

10 Besides, Mr. Ongchangco in fact testified about the time frames within which the

11 name "Brats" was considered;[180] identified many of the key people involved with the

12 project;[181] and testified about the conception and development of the project.[182]

13 Other witnesses testified about this also, and the timing of Mattel's consideration of

14 the relevant names and the creation of the relevant designs are specifically reflected

15

16

17

---

18   [176]   Motion at 9:14-15.

19   [177]   Motion at 10:9-11.
  [178]   Motion at 11:1-2.

20   [179]   Moreover, Ms. Pasko stated that she began working on DIVA STARZ in late

21 1998 to early 1999 time frame, a time that far pre-dates the launch of Bratz, so how much earlier Mattel was working on DIVA STARZ is meaningless. Pasko Depo

22 Tr., Proctor Dec., Exh. 27, at 28:21-29:4.

23   [180]   Ongchangco Depo Tr., Proctor Dec., Exh. 23, at 54:17-56:4, 201:17-210:24, 215:10-25.

24   [181]   Ongchangco Depo Tr., Proctor Dec., Exh. 23, at 18:21-19:16, 21:13-17,

25 26:2-22, 50:24-51:24, 54:1-16. The fact that Mr. Ongchangco did not recall having a conversation with Bryant (Motion at 8:3-5) is, of course, completely irrelevant

26 since Mr. Ongchangco did not purport to work with Bryant and was not designated to testify about Bryant's work at Mattel.

27   [182]   E.g., Ongchangco Depo Tr., Proctor Dec., Exh. 23, at 58:6-62:24, 65:18-

28 68:4, 139:10-20.

EXHIBIT 22 PAGE 493

1   in documents that defendants do not contest.[183]  Indeed, virtually all of the

2   depositions of Hudnut and Pratte related to the DIVA STARZ, as did large sections

3   of the deposition of Linker

4          •   The "conception" of Mini DIVA STARZ and when the Mini

5   DIVA STARZ project ended (Ongchangco):[184]  Again, the conception and end date

6   for the Mini DIVA STARZ dolls is not relevant to this case, and Mattel did not

7   agree to provide a witness to testify about those issues.  Mr. Ongchango was

8   designated to and did testify about names Mattel considered for the project,

9   including "Brats," during the 1999 time frame.[185]  He also testified about the

10  development of Mini DIVA STARZ for public sale;[186] and the differences between

11  different "generations" of Mini DIVA STARZ.[187]

12          •   Whether DIVA STARZ was a "fashion doll concept

13  (Hudnut):"[188]  That Mr. Hudnut would not say whether DIVA STARZ was a

14  "fashion doll concept" is completely irrelevant.  He was designated to testify about

15  names that Mattel used – such as "Boyz" – in the DIVA STARZ Entertainment

16  scripts and he did just that.  Besides, when Mr. Hudnut tried to explain how DIVA

17  STARZ has fashion doll aspects, counsel cut him off and then changed the

18  subject.[189]

19

20  [183]   See, e.g., Hudnut Depo Tr., Vol. I, Proctor Dec., Exh. 24, at 167:24-171:6;

21  Pratte Depo Tr., Proctor Dec., Exh. 26, at 75:20-81:4; Linker Depo Tr., Proctor
    Dec., Exh. 21, at 14:5-16:23; Pasko Depo Tr., Proctor Dec., Exh. 27, at 89:8-99:21.

22  [184]   Motion at 14:4-10.
    [185]   Ongchangco Depo Tr., Proctor Dec., Exh. 23, at 33:10-22, 54:17-56:4,

23  201:17-210:24, 215:10-25.

24  [186]   Ongchangco Depo Tr., Proctor Dec., Exh. 23, at 24:24-25:16.
    [187]   Ongchangco Depo Tr., Proctor Dec., Exh. 23, at 65:18-67:8.

25  [188]   Motion at 10:21-22.

26  [189]   Mr. Hudnut testified that the DIVA STARZ "had lots of fashionable

27  elements to it and when I say them having plastic clothes that you can put on and
    off, that's certainly a fashion doll play pattern, long beautiful hair to comb and play

28  with, so . . . . " Hudnut Depo Tr., Vol. I, Proctor Dec., Exh. 24, at 177:7-13.  Mr.
    (footnote continued)

-33-

MATTEL'S OPPOSITION TO MGA'S AND BRYANT'S JOINT MOTION TO COMPEL RE 30(B)(6) WITNESSES

EXHIBIT 22 PAGE 494

1    •    How the Name DIVA STARZ was chosen (Hudnut); how many
2    names were considered for DIVA STARZ (Ongchangco):[190] Mr. Hudnut was not
3    designated to testify about the selection of the name for DIVA STARZ dolls, and
4    Mr. Ongchangco was not designated to testify about the particular number of names
5    considered.[191] Defendants received voluminous testimony about the relevant names
6    that Mattel considered for DIVA STARZ dolls from Mr. Ongchangco, Ms. Pratte,
7    and Ms. Pasko.[192]

8    •    The "definitive" list of individuals present at meetings at which
9    the name for the DIVA STARZ project was discussed (Ongchangco):[193]
10   Mr. Ongchangco testified thoroughly on the subject of the relevant DIVA STARZ
11   names, and described who he thought was present at meetings to the extent he could
12   recall, including, for example, Joni Pratte from Packaging, Maureen Mullen from
13   Preliminary Design, Sue Davis from Packaging and possibly Galit Reisman and
14   Noriko Sata from Marketing.[194] Ms. Pratte also testified about the individuals
15   present at those meetings, including, Steve Linker, Liz Hogan, Maureen Mullen and
16   Richard Oesterheld from Copywriting.[195] Defendants have certainly received

17

18   _____

19   Hudnut was unable to finish his answer because counsel interrupted him before he
     finished his answer, and moved on. Id. at 177:13-18.
20       [190] Motion at 11:15-16.
21       [191] 4/11/07 letter, Corey Dec., Exh. 3, at 1; Hudnut Depo Tr., Vol. I, Proctor
     Dec., Exh. 24, at 92:17-25; 93:15-16; 93:24-94:2, 97:13-21.
22       [192] See e.g., Ongchangco Depo Tr., Proctor Dec., Exh. 23, at 32:12-33:1, 33:14-
23   22, 54:17-56:4, 201:17-210:24, 215:7-25 (testimony regarding DIVA STARZ
     project names); Pratte Depo Tr., Proctor Dec., Exh. 26, at 36:10-39:2, 43:15-18,
24   45:2-16, 50:15-51:23, 67:10-68:16, 69:4-70:10 (testimony regarding DIVA STARZ
     project names); Pasko Depo Tr., Proctor Dec., Exh. 27, at 91:14-92:20, 96:14-97:12,
25   (testimony regarding DIVA STARZ project names).
26       [193] Motion at 11:18-20.
         [194] Ongchangco Depo Tr., Proctor Dec., Exh. 23, at 211:20-214:2, 215:22-
27   217:16, 232:6-234:24.
28       [195] Pratte Depo Tr., Proctor Dec., Exh. 26, at 38:16-39:22, 42:2-43:2, 61:8-62:4.

-34-

07209/2217061.2

1  testimony from Mattel on this issue, and whether the list of individuals is

2  "definitive" or not is irrelevant.

3         •   The unidentified sources of statements attributed to Mattel or ex-

4  Mattel employees in a Wall Street Journal article (Jensen):[196]  Mattel specifically

5  told defendants that it (Mattel) does not know the identities of these unidentified

6  sources and that its witness (who turned out to be Ms. Jensen) would so testify.[197]

7  Defendants acknowledged all of this on the record.[198]

8         •   Jill Nordquist:  MGA and Bryant do not specify any complaint at

9  all about Ms. Nordquist's testimony.  Her name is mentioned at page 5 of the

10  Motion, but defendants do not criticize her preparation, her testimony, and do not

11  identify any information they believe she should have testified about.  The only hint

12  of what defendants may have intended to (but did not) argue regarding

13  Ms. Nordquist is from the portions of her deposition quoted in their so-called

14  Separate Statement.[199]  But those questions and answers go to the sort of mind-

15  numbing detail that Bryant's attorney pursued during the entire deposition.  Ms.

16  Nordquist's lack of knowledge about work Bryant did before joining Mattel,[200] about

17

18  [196]   Motion at 12:16-13:2.

19  [197]   5/13/05 letter, Corey Dec., Exh. 1, at 2; 3/15/05 Tr., Zeller Dec., Exh. 1, at 353:9-23; 354:19-355:21.

20  [198]   3/15/05 Tr., Zeller Dec., Exh. 1, at 356:12-15; 357:17-24; Jensen Depo Tr.,

21  Proctor Dec., Exh. 29, at 22:23-23:12.  Ms. Jensen was very knowledgeable about the article, as she was the one who initiated contact with the Wall Street Journal and

22  had many conversations with the reporter about the article. Jensen Depo Tr., Proctor

23  Dec., Exh. 29, at 25:21-26:9, 39:3-40:15, 50:3-52:4, 52:18-56:10, 57:17-65:11, 65:12-67:5, 67:6-72:14.

24  [199]   MGA and Bryant purport to have filed a "Separate Statement," but the

25  document is nothing more than a regurgitation of the deposition testimony cited in the moving papers.  It does not lay out MGA and Bryant's arguments or the

26  particular legal issues to be decided by the Court.  Mattel files herewith its

27  Objections to the Defendants' Separate Statement and has dealt with defendants' failure to specify their arguments as best it could.

28  [200]   Separate Statement at 11:23-26; 14:9-15:7.

MATTEL'S OPPOSITION TO MGA'S AND BRYANT'S JOINT MOTION TO COMPEL RE 30(B)(6) WITNESSES

EXHIBIT 22 PAGE 496

J7209/2217061.2

1 | who chose Carter Bryant to have his name associated with the Grand Entrance

2 | Doll,[201] and about Mattel's general "practice" where an employee leaves but will not

3 | say he or she is going to a competitor,[202] is irrelevant.

4 | • **Julia Marine.** Mattel gave the best information it had available

5 | about the Zeus system during the time periods at issue given that the employees who

6 | handled the system during the relevant time period have since left the company.[203]

7 | Given the detail that Mattel has provided concerning the data available on Zeus and

8 | the backup tapes that are available, it is hard to see what information MGA and

9 | Bryant claim they are missing.[204] Indeed, MGA and Bryant fail to identify any

10 | information regarding Zeus that they want but do not have; they simply repeat their

11 | "overzealous conviction" that Ms. Marine said no backup tapes exist.[205] MGA and

12 | Bryant full well know which tapes exist for which time periods. Defendants would

13 | simply rather complain than actually do the work to analyze the tapes. On

14 | September 4, 2007, Mattel wrote to MGA and offered to produce Zeus backup tapes

15 | for 1998 to 2001.[206] Defendants did not respond to Mattel's letter.

16 |

17 |

[201] Separate Statement at 12:7-15.

18 | [202] Separate Statement at 12:17-14:7.

19 | [203] Terminating Sanctions Tr., Proctor Dec., Exh, 34, at 82:4-21.

[204] For example, during the hearing on the motion for terminating sanctions,

20 | Mattel told the Court and MGA and Bryant that Zeus backup tapes exist for April,

21 | May, August, September and December 1998; January and February 1999;

February, March, April, May, June, July, August and December 2000; and January

22 | and July 2001, and a complete backup of the Zeus system in 2002 and 2004.

23 | Terminating Sanctions Tr., Proctor Dec., Exh, 34, at 40:7-15; 100:5-107:18. Mattel

has also preserved backup tapes for 2003, 2005 and 2006. Affidavit of Michael

24 | Moore in Support of Mattel, Inc.'s Opposition to MGA Entertainment, Inc.'s Motion

25 | for Terminating Sanctions Due to Spoliation of Evidence, dated September 10,

2007, at 6:10-11, Notice of Lodging Declarations, Exh. 2; Letter from John Quinn to

26 | Patricia Glaser, dated September 4, 2007, Corey Dec., Exh. 4.

27 | [205] Order on Termination Sanctions, dated August 29, 2007, Proctor Dec.,

Exh. 13, at 4.

28 |

1  **IV.   PRECLUSION AND MONETARY SANCTIONS SHOULD BE**
2        **SUMMARILY DENIED.**

3            Defendants' request for monetary sanctions in the amount of $32,000 is
4  outrageous.  First, the motion lacks merit for all the reasons discussed above.
5  Moreover, defendants did not meet and confer over the issues raised in their motion
6  before filing.  They never identified any answers they believed were inadequate or
7  any area of relevant testimony of which they claimed they were deprived.  They did
8  not even identify the witnesses or topics at issue.  The breadth of the issues involved
9  in this motion were simply not sufficiently identified by defendants' oblique
10  reference to abusive "bandying" in their purported July 2, 2007 meet and confer
11  letter, and MGA never agreed to discuss the matter and never sent the letter it
12  promised to send after that.  The transcripts at issue in this motion alone span nearly
13  2,000 pages.[207]  Mattel offered to do the leg work and review the deposition
14  transcripts if defendants just identified what they believed the issues were.
15  Defendants filed this motion instead.  If anyone should be sanctioned, it is not
16  Mattel.

17            Nor should the Court grant any sort of preclusion sanctions.  A
18  preclusion sanction is one of the most severe sanctions a court may impose.
19  Qualcomm Inc. v. Broadcom Corp., 2007 WL 935617, *2 (S.D. Cal.) ("Of those
20  sanctions a court may select when applying Federal Rule 37, preclusion of evidence
21  is among the most severe.").  Exclusion sanctions are improper absent a showing of
22  undue prejudice.  Amersham Pharmacia Biotech, Inc. v. Perkin-Elmer Corp., 190
23

24  [206]  Corey Dec., ¶ 4.
25  [207]  Ongchangco Depo Tr., Proctor Dec., Exh. 23, at 282; Nordquist Depo Tr.,
    Proctor Dec., Exh. 28, at 303; Hudnut Depo Tr., Vol. II, Proctor Dec., Exh. 25, at
26  275; Yonemoto Depo Tr., Proctor Dec., Exh. 22, at 188; Pratte Depo Tr., Proctor
    Dec., Exh. 26, at 230; Pasko Depo Tr., Proctor Dec., Exh. 27, at 222; Jensen Depo
27  Tr., Proctor Dec., Exh. 29, at 191; Marine Depo Tr., Vol. III, Proctor Dec., Exh. 32,
28  at 259; 3/15/05 Tr., Zeller Dec., Exh. 1, at 413.

EXHIBIT 22 PAGE 498

1    F.R.D. 644, 648 (N.D. Cal. 2000) ("Exclusion sanctions based on alleged discovery

2    violations are generally improper *absent undue prejudice* to the opposing side.").

3           Such a severe sanction cannot be justified here, especially since MGA

4    and Bryant never met and conferred over this motion and have made no effort to

5    show they have been prejudiced.  Mattel believes it has provided 30(b)(6) witnesses

6    on the subject matters to which the parties agreed.  If the Court finds that Mattel

7    should offer further testimony on some relevant topic, Mattel will endeavor to find a

8    witness to testify about it.  Mattel would have told defendants just that had they

9    bothered to ask.  Because they failed to do so and because Mattel has produced and

10   prepared its witnesses in good faith, defendants' request for sanctions should be

11   denied.

12                                **Conclusion**

13           For the foregoing reasons, the Discovery Master should deny this

14   motion in its entirety.

15

16   DATED:  September 26, 2007        QUINN EMANUEL URQUHART OLIVER &

17                                    HEDGES, LLP

18                                    By _Dylan Proctor_ RS

19                                    B. Dylan Proctor
                                      Attorneys for Plaintiff Mattel, Inc.
20

21

22

23

24

25

26

27

28

EXHIBIT 22 PAGE 499

EXHIBIT 23

**THIS EXHIBIT IS FILED UNDER SEAL**
**PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 24

**THIS EXHIBIT IS FILED UNDER SEAL
PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 25

**THIS EXHIBIT IS FILED UNDER SEAL
PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 26

**THIS EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 27

**THIS EXHIBIT IS FILED UNDER SEAL
PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 28

**THIS EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 29

**THIS EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 30

**THIS EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 31

**THIS EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 32

**THIS EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 33

1  Hon. Edward A. Infante (Ret.)
   JAMS
2  Two Embarcadero Center
   Suite 1500
3  San Francisco, California 94111
   Telephone:     (415) 774-2611
4  Facsimile:     (415) 982-5287

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10                         EASTERN DIVISION

11

| | |
|---|---|
| 12 CARTER BRYANT, an individual, | CASE NO. CV 04-09049 SGL (RNBx) |
| 13              Plaintiff, | JAMS Reference No. 1100049530 |
| 14        v. | Consolidated with |
| 15 MATTEL, INC., a Delaware corporation, | Case No. CV 04-09059 |
|    | Case No. CV 05-2727 |
| 16              Defendant. | **ORDER GRANTING IN PART AND** |
| 17 | **DENYING IN PART MATTEL'S** |
|    | **MOTION TO ENFORCE COURT'S** |
| 18 | **DISCOVERY ORDERS AND TO** |
|    | **COMPEL; TO OVERRULE** |
| 19 | **PURPORTEDLY IMPROPER** |
|    | **INSTRUCTIONS; AND FOR** |
| 20 | **SANCTIONS** |
| 21 CONSOLIDATED WITH | |
|    MATTEL, INC. v. BRYANT and | |
| 22 MGA ENTERTAINMENT, INC. v. MATTEL, | |
|    INC. | |
| 23 | |

24

25

26

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

EXHIBIT 33 PAGE 839

## I. INTRODUCTION

On December 5, Mattel, Inc. ("Mattel") submitted a "Motion to (1) Enforce Court's Discovery Orders and to Compel; (2) to Overrule Improper Instructions; and (3) for Sanctions." Mattel's motion challenges the sufficiency of the testimony provided by four of MGA Entertainment Inc.'s Rule 30(b)(6) witnesses, Lisa Tonnu, Kenneth Lockhart, Rebecca Harris, and Spencer Woodman, on sixteen separate topics identified in Mattel's Second Notice of Deposition of MGA. MGA submitted an opposition on December 18, 2007. Mattel submitted a reply on December 26, 2007. The matter was heard on January 3, 2008. Having considered the motion papers and comments of counsel at the hearing, Mattel's motion to compel is granted in part and denied in part, and the request for sanctions is granted in part.

## II. BACKGROUND

On May 16, 2007, MGA was ordered to produce Rule 30(b)(6) designees for all topics identified in Mattel's Second Notice of Deposition of MGA, except Topic Nos. 25 and 26, on or before June 30, 2007. Mattel's Second Notice of Deposition includes many topics relevant to the case, including, *inter alia*, the development of Bratz before it was made available for purchase; when and whom MGA first offered Bratz for sale; who first manufactured, shipped and distributed Bratz; Bratz revenues and profits; MGA's access to Mattel's earlier DIVA STARZ project that allegedly had elements which subsequently appeared in Bratz; the identity of persons who worked on Bratz and payments made to them; fee and indemnification agreements; MGA's testing and handling of original Bratz drawings; MGA's sworn statements pertaining to Bratz's creation and development; and MGA's evidence preservation and collection. On July 2, 2007, the district court rejected MGA's objections to the May 16, 2007 Order.

MGA designated four different witnesses to testify on the topics identified in Mattel's Second Notice of Deposition of MGA. First, MGA designated Kenneth Lockhart to testify on Topic Nos. 38, 39 and 42. He testified on June 14-15, 2007.

Second, MGA designated Lisa Tonnu to testify on Topic Nos. 24-25, 31, 37, 39 (in part), 40 and 41. She testified on July 19, 2007. In the meantime, Mattel moved for an order compelling MGA to produce witnesses for deposition and sanctions because MGA did not

EXHIBIT 33 PAGE 840

1    produce witnesses on certain topics as required by the May 16, 2007 Order.  On August 14, 2007,

2    Mattel's motion was granted in part and denied in part and MGA was ordered, once again, to

3    produce witnesses to testify on several topics.  On September 24-25, 2007, Mattel deposed Ms.

4    Tonnu further on Topic Nos. 21, 24-26, 31, 39, 40 and 41.

5        Third, MGA designated Rebecca Harris to testify on Topic Nos. 11, 13, 14, 19, 22-23 and

6    27-28.  Ms. Harris' deposition was scheduled, but unilaterally cancelled by MGA, on two

7    different occasions.  MGA ultimately produced Ms. Harris on July 20, 2007.

8        Fourth, MGA designated Spencer Woodman to testify on Topic No. 34.  He testified on

9    October 9, 2007.

10       In September of 2007, the parties exchanged several meet and confer letters regarding

11   purported deficiencies in the witnesses' depositions.  In mid October, MGA notified Mattel that it

12   had retained new counsel who would be responding to Mattel's letters.  After a month-long stay

13   that MGA obtained as a result of its substitution of counsel, the parties met and conferred on

14   November 16, 2007 and again on November 21, 2007.  MGA offered to produce Ms. Tonnu

15   again, but only on some of the topics for which she had been designated previously, and only

16   during the second week of January 2008.  The parties continued to exchange letters; however,

17   they were apparently unable to resolve any issues before Mattel filed the instant motion on

     December 5, 2007.

18       Mattel essentially contends that MGA's witnesses were not sufficiently knowledgeable to

19   provide complete testimony on the 30(b)(6) topics at issue, and furthermore, that MGA's counsel

20   obstructed the depositions by making improper objections and instructing witnesses not to

21   answer.  Accordingly, Mattel seeks the following eight categories of relief:  (1) an order enforcing

22   the May 16, 2007 and August 14, 2007 Orders and compelling MGA to comply therewith by

23   designating and producing fully prepared witnesses to testify on Topic Nos. 11, 13, 14, 19, 21-25,

24   27, 28, 31, 34 and 39-41 in Mattel's Second Notice of Deposition of MGA on dates of Mattel's

25   selection; (2) an order overruling each of the purportedly improper instructions not to answer

26   questions interposed at the deposition of MGA designees Spencer Woodman and compelling

27   Woodman or other such person selected by MGA as its designee to provide complete testimony

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

3

EXHIBIT 33 PAGE 841

1   on Topic No. 34; (3) an order compelling MGA to produce documents that MGA designee

2   Kenneth Lockhart identified during his June 14, 2007 deposition as documents which he reviewed

3   and relied upon to refresh his recollection in preparation for his deposition; (4) an order

4   overruling each of the purportedly improper instructions not to answer questions interposed at the

5   deposition of MGA designee Lisa Tonnu; (5) an order reopening the deposition of MGA designee

6   Lisa Tonnu based on a purported "complete reversal of testimony" made through written

7   "changes" to her deposition transcript; (6) an order compelling Rebecca Harris to sit for the

8   completion of her deposition and/or compelling such person selected by MGA as its designee to

9   complete the testimony on topics for which Harris was previously designated; (7) an order

10   imposing monetary sanctions ($10,000) for MGA's alleged willful violations of the May 16, 2007

11   and August 14, 2007 Orders, for MGA's allegedly improper instructions not to answer deposition

12   questions and for MGA's alleged improper coaching, harassing and obstructionist conduct at the

13   September 24-25, 2007 deposition of Lisa Tonnu and at the October 9, 2007 deposition of

14   Spencer Woodman; and (8) a report and recommendation to Judge Stephen G. Larson that

15   recommends the imposition of preclusion sanctions, that certain facts related to the topics

16   compelled be deemed admitted, and/or that MGA be found in contempt for MGA's allegedly

17   willful and repeated violations of the Orders.

18         MGA opposes the motion, contending that it substantially complied with its obligation to

19   produce witnesses knowledgeable on each of the topics at issue and that Mattel has had a full and

20   fair opportunity to conduct its examinations. According to MGA's calculations, the four

21   witnesses testified intelligently for nearly 36 hours over five deposition days. MGA also explains

22   that its counsel instructed witnesses not to answer two types of questions, namely questions that

23   invaded MGA's work product protection or attorney-client privilege, and questions that exceeded

24   the scope of Topic No. 34. MGA also contends that Mattel is not entitled to additional time to

25   depose Ms. Harris in particular because Mattel's counsel wasted time and badgered the witness.

26   MGA acknowledges, however, that Ms. Tonnu did change her testimony and that there are some

27   deficiencies in its witnesses' testimony that justify additional deposition time. Indeed, MGA

28   points out that prior to the filing of the instant motion, MGA agreed to produce witnesses to

EXHIBIT  33  PAGE  842

1   provide additional testimony on Topic Nos. 21, 24, 25, 31, 34 and 40. Further, after the filing of

2   the motion, MGA agreed to produce witnesses to provide additional testimony on Topic No. 39.

3   MGA contends that Mattel's motion to compel additional testimony with respect to topics on

4   which MGA has already agreed to provide additional testimony is premature and should be

5   denied.

### III. STANDARDS

6

7   Depositions of a corporation are governed by Rule 30(b)(6) of the Federal Rules of Civil

8   Procedure, which provides in pertinent part that:

9   > In its notice or subpoena, a party may name as the deponent a public or
private corporation, a partnership, an association, a governmental agency, or other
10  entity and must describe with reasonable particularity the matters for examination.
The named organization must then designate one or more officers, directors, or
11  managing agents, or designate other persons who consent to testify on its behalf;
and it may set out the matters on which each person designated will testify. . . .
12  The persons designated must testify about information known or reasonably
available to the organization.

13

14  Fed.R.Civ.P. 30(b)(6) (effective Dec. 1, 2007). Rule 30 also provides that the examination and

15  cross-examination of a deponent proceed as they would at trial under the Federal Rules of

16  Evidence. Fed.R.Civ.P. 30(c)(1). Further, "[a]n objection at the time of the examination--

17  whether to evidence, to a party's conduct, to the officer's qualifications, to the manner of taking

18  the deposition, or to any other aspect of the deposition--must be noted on the record, but the

19  examination still proceeds; the testimony is taken subject to any objection." Fed.R.Civ.P.

20  30(c)(2). "An objection must be stated concisely in a nonargumentative and nonsuggestive

21  manner. A person may instruct a deponent not to answer only when necessary to preserve a

22  privilege, to enforce a limitation ordered by the court, or to present a motion under Rule

23  30(d)(3)." Id.

24  Rule 30(d)(1), Fed.R.Civ.P., provides that a deposition is limited to one day of seven

25  hours, unless otherwise stipulated or ordered by the court. "The court must allow additional time

    consistent with Rule 26(b)(2) if needed to fairly examine the deponent or if the deponent, another

26

27

28

5

EXHIBIT 33 PAGE 843

1   person, or any other circumstance impedes or delays the examination."[1]  Fed.R.Civ.P. 30(d)(1).

2   Furthermore, sanctions may be imposed --including the reasonable expenses and attorney's fees

3   incurred by any party--on a person who impedes, delays, or frustrates the fair examination of the

4   deponent.  Fed.R.Civ.P. 30(d)(2).

## IV. DISCUSSION

A. Mattel's Request for Relief No. 1:  Mattel seeks an order enforcing the May 16, 2007 and August 14, 2007 Orders and compelling MGA to comply therewith by designating and producing fully prepared witnesses to testify on Topic Nos. 11, 13, 14, 19, 21-25, 27, 28, 31, 34 and 39-41 in Mattel's Second Notice of Deposition of MGA on dates of Mattel's selection.

Mattel contends that MGA's witnesses were inadequately prepared and failed to provide sufficient testimony on sixteen of the topics identified in the Second Notice of Deposition of MGA.  Each of the sixteen 30(b)(6) topics at issue is addressed separately below.

Topic No. 11:  The exhibition, or proposed, offered, contemplated or requested exhibition, of BRATZ or any BRATZ DESIGN to any third party prior to June 30, 2001, including without limitation each instance in which BRATZ or any BRATZ DESIGN was marketed, offered for sale, pitched, shown or disclosed to, or otherwise discussed with or communicated to, any retailer, wholesaler or distributor and the DOCUMENTS that REFER OR RELATE thereto.

Mattel contends that Ms. Harris lacked sufficient knowledge on this topic.  In particular, Mattel contends that Ms. Harris could not confirm what form of Bratz or Bratz design ("sculpts") was first exhibited to third parties prior to June 30, 2001.

MGA contends that Ms. Harris substantially discharged MGA's obligation to testify on this topic.  More specifically, MGA contends that Ms. Harris testified about the first exhibition, sale and distribution of Bratz, including presentations to Target stores, and the first sale, distribution and shipment of Bratz under an agreement with Bandai in Spain.  MGA contends that it is not reasonable to expect MGA to have investigated specifically what type of Bratz "sculpts" were shown at particular exhibitions.

---

[1] Rule 26(b)(2), Fed.R.Civ.P., provides that the court shall limit the frequency or extent of use of the discovery methods if the court determines that "(i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues."  Fed.R.Civ.P. 26(b)(2).

EXHIBIT 33 PAGE 844

1    Furthermore, MGA points out that Mattel has taken the deposition of MGA HK on the

2    subject of the initial manufacture of Bratz.  More specifically, MGA contends that Mattel took the

3    deposition of the head of MGA's Hong Kong operations, Edmond Lee, for two full days, and

4    questioned him about the first manufacture of Bratz by Early Light.  Therefore, MGA contends

5    that Mattel has had a full and fair opportunity to examine MGA regarding the first manufacture of

6    Bratz.

7    A review of the transcript confirms that Ms. Harris was not reasonably prepared for her

8    deposition, especially in light of the importance of the timing of the creation of Bratz.  For

9    example, she could not specify what was shown to retailers during the year 2000.  She testified

10   that MGA used "boards" (i.e. sketched drawings) to show retailers Bratz during the year 2000

11   based upon a telephone conversation she had with Paula Garcia during a break.  Mattel is entitled

12   to delve into more detail about these "boards," and such information should be reasonably

13   available to MGA.  Ms. Harris testified that Julie Chemo likely attended presentations during the

14   year 2000.  Therefore, Mattel is entitled to an order compelling MGA to produce a witness to

15   provide complete testimony on Topic No. 11.

**Topic No. 13:** COMMUNICATIONS prior to June 30, 2001 between YOU and any
manufacturer, distributor, wholesaler, retailer, or any contemplated, proposed or potential
manufacturer, distributor, wholesaler or retailer, that REFER OR RELATE TO BRATZ or
any BRATZ DESIGN.

18   Mattel contends that Ms. Harris' testimony was wholly inadequate.  In particular, Mattel

19   contends that Ms. Harris had no knowledge concerning early MGA communications with Bandai,

20   which distributed Bratz in the first market in which it was allegedly sold.  Ms. Harris did not have

21   any knowledge or information as to when MGA and Bandai first had any type of contact or

22   communication regarding Bratz.  Similarly, Ms. Harris did not have any knowledge or

23   information as to when MGA first had contact with a company called J.H.N. regarding the sale of

24   Bratz in Australia.

25   MGA contends that Ms. Harris substantially discharged MGA's obligation to testify on

26   Topic No. 13, as described above in connection with Topic No. 11.  Accordingly, MGA objects to

27   any further examination on Topic No. 13.

28   A review of the deposition transcript confirms that Ms. Harris provided significant

testimony on Topic No. 13.  However, as Mattel points out, her testimony lacked many details relevant to when Bratz was developed.  For example, Ms. Harris was unable to testify as to any communications or negotiations between MGA and Bandai leading up to the execution of written agreements.  Indeed, Ms. Harris did not know when MGA and Bandia first had any contact regarding Bratz.  Furthermore, MGA did not conduct a reasonable investigation to prepare Ms. Harris for Topic No. 13.  Among other things, MGA made no effort to determine whether the former MGA HK employee known to have been directly involved in the first discussions with Bandai (Martin Hitch) had retained any documents responsive to this topic.  Nor did Ms. Harris speak to Isaac Larian and Jim Olmstead, both of whom authored emails referencing existing distributorship deals in Europe and Australia.  Therefore, Ms. Harris did not fulfill MGA's duty to produce a witness to testify on information known or reasonably available to MGA.  Mattel is entitled to an order compelling MGA to produce a witness to provide complete testimony on Topic No. 13.

> **Topic No. 14:**  When and where BRATZ was first manufactured, shipped, distributed and sold, and the IDENTITIES and roles of PERSONS involved therein.

Mattel contends that Ms. Harris did not have any knowledge regarding the identity or role of any person who was involved in the first manufacture of Bratz dolls by Early Light.  Mattel also contends that Ms. Harris had no knowledge as to the date when manufacturing began for the first Bratz dolls.  Furthermore, Mattel contends that MGA should not be permitted to rely on the testimony given by MGA HK's corporate designee to evade providing testimony on this topic because that designee's testimony was deficient.

MGA contends that Ms. Harris substantially discharged MGA's obligation to testify on Topic No. 14, as described above in connection with Topic No. 11.  Accordingly, MGA objects to any further examination on Topic No. 14.

A review of the deposition transcript confirms that Ms. Harris did not have any knowledge regarding the identity or role of any person at MGA who first had contact with Early Light, the first manufacturer of Bratz dolls.  Nor did she know the identity of any person at MGA or at Early Light who was involved in the first manufacture of Bratz dolls.  Furthermore, Ms. Harris stated that she did not undertake any investigation to uncover these facts.  Ms. Harris also had no

EXHIBIT 33 PAGE 846

1   information or knowledge regarding the date when manufacturing began for the first Bratz dolls.

2   Ms. Harris testified that personnel in MGA's Hong Kong affiliate coordinated with Early Light.

3   Thus, the information sought by Mattel is reasonably available to MGA. That Mattel also seeks

4   testimony from MGA's Hong Kong affiliate does not excuse MGA from producing a witness

5   sufficiently knowledgeable on Topic No. 14. Therefore, Mattel is entitled to an order compelling

6   MGA to produce a witness to provide complete testimony on Topic No. 14.

7       **Topic No. 21:** YOUR knowledge of, and access to, non-public MATTEL DIVA STARZ
        project information and DESIGNS prior to June 30, 2001.

8

9       Mattel contends that Ms. Tonnu was not sufficiently prepared to provide testimony, as

    evidenced by the fact that two other MGA employees, Paula Garcia and Margaret Leahy, testified

10  that they had "access" to non-public DIVA STARZ information.

11      MGA contends that Ms. Tonnu prepared for her deposition by speaking with five MGA

12  employees, including Paula Garcia. Based upon that investigation, Ms. Harris testified that the

13  five employees did not work on DIVA STARZ. MGA explains that Ms. Garcia merely testified

14  that when she was at Mattel she often spoke to co-workers at Mattel who happened to work on the

15  DIVA STARZ, that those co-workers may have mentioned the existence of the project and that

16  they told Ms. Garcia it was confidential. MGA contends that Ms. Garcia's testimony does not

17  establish "access to" DIVA STARZ information, but the opposite – that the employees did not

18  share details with Ms. Garcia and told her project was confidential. MGA acknowledges,

19  however, that Ms. Garcia testified that on one occasion she saw a sketch of a DIVA STARZ

20  character.

21      Nevertheless, MGA represents that during the meet and confer process MGA designated

22  Ms. Tonnu to provide further testimony on Topic No. 21, and that she will be deposed on January

23  9, 2008. MGA represents that Ms. Tonnu will be prepared to testify whether each former Mattel

24  employee now employed by MGA had "access to" DIVA STARZ information while employed by

25  Mattel.

26      A review of the deposition transcript confirms that Ms. Tonnu was not sufficiently

27  prepared to testify on Topic No. 21. Ms. Tonnu did not know what DIVA STARZ was.

28  Furthermore, she was not sufficiently informed of the identities of the MGA employees and

contractors who had access to or worked on DIVA STARZ. For example, Ms. Tonnu was uninformed of Ms. Garcia's and Ms. Leahy's knowledge and access to DIVA STARZ information while employed by Mattel. Such information was known or reasonably available to MGA. Therefore, Mattel is entitled to an order compelling MGA to produce a knowledgeable witness to provide complete testimony on Topic No. 21.

**Topic No. 24:** Any indemnification and fee arrangement that YOU and/or BRYANT has sought proposed, requested or obtained in connection with this ACTION.

Mattel contends that MGA's designee, Lisa Tonnu, was not sufficiently prepared to testify, despite having been produced twice to testify on this topic. For example, Mattel points out that Ms. Tonnu did not know why MGA agreed to pay Carter Bryant's attorneys' fees or how much MGA had paid or whether Littler Mendelson's fees had been paid in full. Mattel's Motion at pp. 14-15. Furthermore, Mattel points out that Ms. Tonnu did not make any effort to find out the answers to these questions.

MGA contends that Ms. Tonnu substantially discharged MGA's obligation to provide testimony in response to this topic. MGA contends that Ms. Tonnu reviewed responsive documents and was able to identify the agreements in her deposition. Further, MGA contends that Ms. Tonnu spoke to MGA's in-house counsel about the agreements and was able to identify the individuals involved in the negotiations of those agreements.

MGA acknowledges, however, that Ms. Tonnu was not able to testify regarding the specifics of those negotiations or the terms of those agreements. MGA represents that prior to the filing of this motion, it designated in-house counsel Sam Khare to provide additional testimony on this topic and that Mattel will depose him on January 8, 2008.

A review of the deposition transcript confirms that Ms. Tonnu was not prepared to testify as to information known or reasonably available to MGA. For example, Ms. Tonnu did not know why MGA agreed to pay Bryant's fees, did not know how much MGA had paid in fees, and did not know whether MGA had paid Littler Mendelson's fees in full. Accordingly, Mattel is entitled to an order compelling MGA to produce a knowledgeable witness to provide complete testimony on Topic No. 24.

1   **Topic No. 25:**  YOUR revenues and profits from BRATZ, including without limitation,
2   YOUR gross and net profits, and YOUR costs associated therewith.

3       Mattel contends that Ms. Tonnu lacked the most basic information called for by this topic.
4   For example, Mattel contends that Ms. Tonnu testified that: she did not recall nor could she
5   provide an estimate of how much distribution revenue MGA derived from the Bratz brand
6   between 2001 and the end of 2006; she did not know and could not provide a best estimate for the
7   episodic costs or production costs associated with the distribution revenue; she did not know who
8   in the company could provide this information; she did not know and could not provide a range
9   for how much licensing revenue MGA had received for licensing anything associated with the
10  Bratz brand between 2001 and the end of 2006; she did not know and could not estimate how
11  much revenue the Bratz movie generated; she did not know how much revenue MGA had earned
12  from the Bratz brand; and she did not know how much profit MGA had generated from the Bratz
    brand.

13      MGA contends that it substantially discharged its obligation to provide testimony on this
14  topic.  More specifically, MGA contends that Ms. Tonnu testified with the aid of Exhibit 660, a
15  143-page report summarizing the units sold from 2001 to 2006 organized by "stock-keeping-unit"
16  or "SKU."  MGA contends that Ms. Tonnu prepared for her deposition by speaking with MGA's
17  Director of Finance, Anisse Evans, regarding Exhibit 660.

18      In the meet and confer process, MGA's counsel offered to provide Mattel with source
19  information from which the profitability of Bratz products at the SKU level could be derived and
20  to produce Ms. Tonnu for follow-up testimony regarding that source financial information so that
21  Mattel's experts would be in a position to draw their own conclusions and opinions as to MGA's
22  profits from Bratz.  MGA represents that Mattel has agreed to depose Tonnu on this topic on
23  January 9, 2008.  MGA also represents that it has produced more than 27,700 pages of source
24  financial information that will be the "starting point" from which MGA's and Mattel's experts
25  will analyze the profitability of Bratz products.  MGA represents that Ms. Tonnu will be prepared
    to discuss the source financial information produced to Mattel at her continued deposition.

26      A review of the deposition transcript confirms that Ms. Tonnu was not sufficiently
27  prepared to provide testimony on Topic No. 25.  Ms. Tonnu could not identify, generally or by

28                                                                                        11

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

EXHIBIT _33_ PAGE _849_

1   product, Bratz revenues, costs, or gross or net profits.  Furthermore, MGA has failed to provide

2   any explanation for why Ms. Tonnu was not educated on the source financial information before

3   her deposition.  Accordingly, Mattel is entitled to an order compelling MGA to produce a

4   knowledgeable witness to provide complete testimony on Topic No. 25.

5   **Topic No. 27:**  The payment of money or anything of value that YOU have made or
    offered to make to, for or on behalf of Elise Cloonan, or that has been requested, sought or

6   received by, for or on behalf of Elise Cloonan, and the timing, manner, amount(s) and
    reasons therefore.

7

8   Ms. Cloonan was Carter Bryant's roommate at some point.  Bryant testified that he

9   showed her early drawings prior to showing them to MGA.  She is not and never has been an

10  employee of MGA.

11  Mattel contends that Ms. Harris' testimony was incomplete because she only searched for

12  evidence of payment by reviewing vendor files and MGA's electronic purchase order files, and

13  did not review the individual documents within each account payable vendor file.  Mattel also

14  contends that Ms. Harris was not sufficiently prepared because she had no knowledge or

15  information as to who was paying her legal fees in this case.

16  MGA contends that it discharged its obligation to testify on Topic No. 27, emphasizing

17  that Ms. Harris unequivocally represented on behalf of MGA that MGA made no payments to,

18  had no agreements with and had no communications with Elise Cloonan.  Furthermore, MGA

19  points out that Mattel took the deposition of Elise Cloonan on December 14, 2007, and she

20  confirmed that she had received no payments from and had no communications with MGA.

21  A review of the transcript confirms that Ms. Harris' preparation for and testimony

22  regarding Topic No. 27 was adequate.  Furthermore, the burden and expense of conducting a

23  deposition on this topic substantially outweigh the potential relevance of the testimony sought.

24  Mattel's motion is denied with respect to Topic No. 27.

25  **Topic No. 28:**  COMMUNICATIONS between YOU and Elise Cloonan that REFER OR
    RELATE TO BRYANT, MATTEL, BRATZ and/or Anna Rhee, including

26  DOCUMENTS that REFER OR RELATE TO such COMMUNICATIONS.

27  Mattel contends that Ms. Harris's testimony was insufficient because she admitted she did

28  not have any knowledge or information as to what systems or hard drives in MGA were searched

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

12

EXHIBIT 33 PAGE 850

for e-mails referencing Elise Cloonan.

MGA contends that Mattel is not entitled to further examination on Topic No. 28 because Ms. Harris substantially discharged MGA's obligation to testify on the topic, as described above in reference to Topic No. 27 above.

A review of the transcript confirms that Ms. Harris' preparation for and testimony regarding Topic No. 28 was adequate. Furthermore, the burden and expense of conducting a deposition on this topic substantially outweigh the potential relevance of the testimony sought. Mattel's motion is denied with respect to Topic No. 28.

**Topic No. 31:** The IDENTITY of each PERSON who, at any time since January 1, 1998, has performed any work or services for, by or on behalf of YOU while such PERSON was employed by MATTEL, the nature and timing of each such PERSON's work or services and the amount(s) paid by YOU to each such PERSON.

Mattel contends that the first time MGA produced Ms. Tonnu to testify, she lacked any personal knowledge regarding this topic and that MGA failed to educate her properly on the topic. Ms. Tonnu testified that she spoke to an accounts payable clerk, Ms. Brooks, who had "a list of vendors and the dates in which they were either employed or freelancing with Mattel, and she cross-referenced that in her research." Tonnu Tr. at 147:5-148:20. Mattel points out, however, that Ms. Tonnu testified that she did not know who prepared the list; did not see the criteria used to prepare the list; did not know who the vendors or freelance people were on the list; and did not know whether the list included all former Mattel employees who were working at MGA. MGA produced Ms. Tonnu for a second time regarding Topic No. 31, however, Mattel contends that she was still unprepared.

MGA contends that it has substantially discharged its obligation to provide testimony on this topic. MGA explains that Ms. Tonnu testified on this topic based on a review of MGA business records. MGA explains that to prepare for the deposition, it prepared a list of MGA employees who were former Mattel employees, including the dates each person was employed by Mattel. Next, Ms. Brooks searched MGA's accounting records reflecting payments to outside vendors for any evidence of a payment to a former Mattel employee on the list during the period of that person's Mattel employment, or with respect to work or services performed during that period. MGA contends that Ms. Tonnu testified about this search and the results of the search

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

13

EXHIBIT __33__ PAGE __85(__

1   leading to the identification of three instances of payments to former Mattel employees while the

2   employee was still at Mattel.

3        Nevertheless, MGA represents that prior to the filing of this motion, it designated Ms.

4   Tonnu to provide additional testimony on this topic.  Specifically, MGA is prepared to produce

5   Ms. Tonnu to testify regarding whether former Mattel employees may have performed work or

6   services for MGA during their employment with Mattel without being paid for those services.

7   Ms. Tonnu's  deposition is scheduled for January 9, 2008.

8        A review of the deposition transcript confirms that Ms. Tonnu was not sufficiently

9   prepared to testify on Topic No. 31.  Notably, Ms. Tonnu admitted that she did not know whether

10  any person has at any time since 1998 performed work or services for MGA while that person

11  was a Mattel employee.  Further, she testified that she did not speak with or ask any of the former

12  Mattel employees who were working at MGA whether they had provided work or services for

13  MGA while they were Mattel employees.  Instead, Ms. Tonnu only knew whether or not

14  payments were made to the former Mattel employees while they were still employees of Mattel.

15  Furthermore, the list of former Mattel employees provided by Ms. Brooks was incomplete

16  because it did not include twelve former Mattel employees.  Accordingly, Mattel is entitled to an

17  order compelling MGA to produce a witness to provide complete testimony on Topic No. 31.

18       **Topic No. 34:** Other than those previously filed and served in this ACTION or in which
        Mattel, Inc.'s counsel in this ACTION was in attendance, the testimony, transcripts,
        declarations, affidavits and other sworn written statements of any other type by or from
        YOU or made on YOUR behalf that REFER OR RELATE TO BRATZ THAT REFER
        OR RELATE TO the time period prior to June 30, 2001 (regardless of when such
        testimony or sworn statement was taken, given, signed, made or filed).

19

20

21       Mattel contends that Mr. Woodman had not been adequately prepared for his deposition

22  and lacked the most basic knowledge on the topic.  Mattel points out that Mr. Woodman had been

23  employed with MGA for less than one year and that his responsibilities had been limited to the

24  administration of licensing contracts and royalties.  Further, Mattel contends that in preparation

25  for his deposition, Mr. Woodman "did no more than review a selection of sworn statements

26  previously made by others, review transcripts of Carter Bryant's deposition testimony, and speak

27  'for a few minutes' with one other person besides counsel."  Mattel's Consolidated Separate

28  Statement, p.130.

14

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

EXHIBIT 33 PAGE 852

1    Mattel also contends that Mr. Woodman was not sufficiently prepared to testify regarding

2    "sworn statements in MGA's many submissions to the Copyright Office or Patent and Trademark

3    Office," and sworn testimony from the "Art Attacks" trial. Id. Further, Mattel contends that

4    MGA's counsel improperly instructed Mr. Woodman not to answer certain questions on the basis

5    that Topic No. 34 did not include sworn statements made in connection with the "Art Attacks"

6    matter or statements made in various submissions to the Copyright Office or Patent and

7    Trademark Office. Counsel also instructed Mr. Woodman not to answer certain questions about

8    sworn statements that related to Topic No. 33 and statements that MGA believed did not

9    sufficiently relate to conduct prior to June 30, 2001. Topic No. 33 seeks testimony on

10   applications for registration and the registrations for copyright, patent, trademark or any other

11   right that refer or relate to Bratz or Bratz designs, sought, made or obtained by, for or on behalf of

12   MGA or Bryant, including communications pertaining thereto.

13       MGA contends that Mattel is not entitled to any further testimony on this topic. MGA

14   explains that Mr. Woodman reviewed 30-50 sworn statements, read the transcript of the

15   depositions of Carter Bryant and Victoria O'Connor, MGA's former Vice President of Licensing,

16   and interviewed Leon Djiguerian in MGA's Product Development. MGA further asserts that Mr.

17   Woodman answered questions as to the completeness or incorrectness of many factual statements

18   contained in the sworn statements placed in front of him by Mattel's counsel. Thus, MGA

19   contends that Mattel obtained exactly the testimony it sought. In MGA's view, Mr. Woodman's

20   testimony regarding the correctness or incorrectness of factual statements identified from the

21   sworn statements is binding on MGA. MGA also contends that Mr. Woodman was not required

22   to investigate the preparation, review and approval of MGA's various sworn statements because

23   such information would be protected from disclosure by the attorney-client privilege and work

24   product doctrine.

25       MGA next contends that most of the documents shown to Mr. Woodman were not "sworn

26   statements," but rather (i) copyright registrations and certificates that include a statement that the

27   application is "correct to the best of my knowledge," (ii) certificates of registration issued by the

28   USPTO, and (iii) an office action summary by the USPTO. Nevertheless, MGA implicitly

1    acknowledges that Mr. Woodman did not provide sufficient testimony as to certain applications

2    for registrations containing declarations by Isaac Larian documents (Exhibits 580-584, 590), a

3    declaration by Bryant (Exhibit 502), and an application and amendment referred to in the Bryant

4    declaration (Exhibits 500, 548), and one additional declaration by Isaac Larian, by agreeing to

5    produce Sam Khare to testify regarding these documents.  Mattel is scheduled to depose Mr.

6    Khare on January 8, 2008.

7         MGA contends that prior counsel properly objected to certain questions as outside the

8    scope of Topic No. 34.  In particular, MGA contends that questions directed at statements that did

9    not refer or relate to the time period prior to June 30, 2001 are outside the scope of Topic No. 34.

10    Further, MGA contends that where a sworn statement relates in part to the time period before

11    June 30, 2001, and in part to other time periods, the scope of Topic No. 34 is limited by its own

12    terms to that portion of the statement that relates to the specified time period.  MGA also contends

13    that sworn testimony taken at the Art Attacks trial is outside the scope of Topic No. 34 because

14    Mattel's counsel was present at that trial.

15         MGA represents that its present counsel does not condone the instructions not to answer

16    made by prior counsel, and will not attempt to justify those instructions.  Nevertheless, MGA

17    contends that Mattel was not deprived of any discoverable testimony by those instructions

18    because the disputed questions sought information outside the scope of Topic No. 34.  More

19    specifically, MGA represents that each exhibit that was excluded from Mr. Woodman's testimony

20    on the grounds that it was not a "sworn statement" was the subject of examination of MGA's

21    designees on Topic No. 33, Bryan Armstrong and Sam Khare.  MGA also contends that

22    resumption of a deposition on Topic No. 34 beyond what MGA has agreed to provide is

23    unwarranted because Mattel obtained two full days of 30(b)(6) testimony on Topic No. 33.

24         A review of the deposition transcript confirms that Mr. Woodman was not sufficiently

25    prepared to provide testimony on Topic No. 34.  Mr. Woodman did no more than review the

26    sworn statements made by others and the transcripts of Carter Bryant's deposition.  For the sworn

27    statements he did review, Mr. Woodman offered little information beyond what was apparent on

28    the face of the documents.  For example, Mr. Woodman did not know who authorized submitting

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

16

EXHIBIT 33 PAGE 854

1   the sworn statement. Ultimately, Mr. Woodman only testified as to whether or not a particular

2   sworn statement was consistent with deposition testimony of Carter Bryant. Furthermore, Mr.

3   Woodman admitted that the testimony he gave had nothing to do with MGA's current beliefs, was

4   not based on any investigation, and had nothing to do with the actual correctness or incorrectness

5   of any of the sworn statements. Mr. Woodman admitted that no matter what inconsistencies

6   existed between Carter Bryant's testimony and MGA's sworn statements, Mr. Woodman always

7   presented Carter Bryant's testimony as to the facts as "true." Thus, Mr. Woodman failed to

8   testify as to information known or reasonably available to MGA. Mr. Woodman's lack of

9   preparedness alone justifies re-opening Topic No. 34. Furthermore, MGA cannot rely on blanket

10  claims of privilege to preclude testimony on Topic No. 34.

11          A further deposition on Topic No. 34 is also justified in light of the admittedly improper

12  instructions not to answer, and MGA's acknowledgement that Mr. Woodman did not provide

13  testimony as to Exhibits 500, 502, 548, 580-584, 590. MGA shall abide by its agreement to

14  produce a witness to testify on these exhibits.

15          MGA's interpretation of Topic No. 34 as excluding statements not made under oath or

16  penalty of perjury, and as excluding any portion of a statement under oath that does not refer or

17  relate to the time period prior to June 30, 2001, is overly technical. There is, however, a clear

18  overlap between Topic No. 34 and Topic No. 33, which is not at issue in this motion. When the

19  deposition on Topic No. 34 is resumed, MGA's corporate designee is not required to provide

20  further testimony on statements that were the subject of examination of MGA's designees on

21  Topic No. 33.

22          MGA's interpretation of Topic No. 34 as excluding testimony from the Art Attacks trial is

23  appropriate. Mattel does not contest that its counsel attended the Art Attacks trial. Topic No. 34

24  clearly excludes any proceeding attended by Mattel's counsel. When the deposition on Topic No.

25  34 is resumed, MGA's corporate designee is not required to provide further testimony with

26  respect to the Art Attacks trial.

27          **Topic No. 39:** The preservation, collection, destruction, removal, transfer, loss or
        impairment of YOUR DOCUMENTS and DIGITAL INFORMATION in connection with
28      the ACTION and/or any DOCUMENTS requested by MATTEL in the ACTION.

EXHIBIT _33_ PAGE _855_

1        MGA designated two individuals to testify on this topic:  Kenneth Lockhart to testify on

2  electronic evidence; and Lisa Tonnu, to testify on documentary evidence.  Mattel contends that

3  both designees were unable to provide substantive testimony.

4        Mattel points out that Mr. Lockhart did not know whether the MGA's "PST files" had

5  been searched; whether e-mails had been deleted from the exchange mailbox between late 2004

6  and the present; whether MGA's "snap servers" had been searched; whether keywords were used

7  to search "PST" files; and what user files were searched.  Further, Mattel contends that Mr.

8  Lockhart was not aware of the location of any hard drive or any image of any hard drive that had

9  been preserved for litigation purposes.

10        MGA contends that Mr. Lockhart substantially discharged MGA's obligation on Topic 39

11  with respect to electronic documents.  MGA represents that Mr. Lockhart prepared extensively for

12  his testimony by speaking with various individuals and that he testified at length about the

13  configuration of MGA's computer systems and MGA's policies, practices and procedures for the

    retention and preservation of electronic documents.

14        Nevertheless, MGA is willing to produce a witness to testify on its behalf regarding the

15  collection of electronic documents in connection with this action in order to shore up the one area

16  of Mr. Lockhart's testimony that MGA agrees was lacking.

17        As for Ms. Tonnu, Mattel contends that MGA made no discernible effort to educate her

18  concerning the topic.  Ms. Tonnu testified that she did not know whether MGA has a document

19  retention policy.  Mattel also contends that MGA's counsel instructed Ms. Tonnu not to answer

20  any questions about MGA's preservation and collection of documents based upon unfounded

21  claims of attorney-client privilege.[2]

22        MGA produced Ms. Tonnu a second time to testify on Topic No. 39, however Mattel

23  contends that her testimony remained deficient.  For example, Ms. Tonnu testified that she

24  prepared for the deposition by speaking with Rich Daniels, MGA's counsel, and by reviewing a

25  //

26

27      [2] The instructions not to answer are discussed in a separate section of this Order.

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

18

EXHIBIT 33 PAGE 857

1   declaration prepared by Daphne Gronich, MGA's General Counsel on the subject of document

2   preservation. Mattel points out, however, that Ms. Tonnu never spoke with Ms. Gronich, and

3   therefore was unable to provide any information beyond what was stated in the four corners of the

4   declaration. In particular, Mattel contends that Ms. Tonnu did not know whether any documents

5   at the MGA campus had been searched for responsive documents. Nor did Ms. Tonnu know what

6   documents were stored at MGA's three off-site facilities and could not confirm whether they had

7   been searched for documents responsive to Mattel's requests.

8       MGA contends that Ms. Tonnu testified fully and completely regarding MGA's

9   preservation of documents in connection with this action. Indeed, MGA contends that the

10  Gronich declaration, which had already been provided to Mattel, contains detailed information

11  regarding MGA's document preservation efforts. MGA also points out that Tonnu testified,

12  based on her investigation and MGA's general policy (that documents generated by employees in

13  the ordinary course of business should not be destroyed and the wide distribution of document

14  preservation notices to MGA employees), that MGA did not knowingly destroy any documents

15  potentially relevant to this action.

16      MGA acknowledges, however, that Ms. Tonnu was not able to testify regarding the actual

17  collection of documents for production in this action. MGA represents that it is willing to

18  produce an additional witness to discuss the collection of hard copy and electronic documents in

19  connection with this action.

20      A review of the deposition transcripts confirms that MGA's witnesses provided a

21  significant amount of testimony on this topic, and in particular regarding document preservation.

22  The one area where they were glaringly deficient was regarding document "collection."

23  Accordingly, MGA is ordered to abide by its agreement to produce a witness to testify further

24  with respect to the "collection" of hard copy and electronic documents. In all other respects,

25  MGA is in substantial compliance with Topic No. 39, and the burden and expense of re-opening a

26  deposition on the entirety of Topic No. 39 outweighs the likely benefit of the testimony Mattel

27  seeks.

28      **Topic No. 40:** The preservation, collection, destruction, removal, transfer, loss or

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

19

EXHIBIT 33 PAGE 85 7

1    impairment of YOUR DOCUMENTS and DIGITAL INFORMATION since January 1, 1999 that

2    REFER OR RELATE TO MATTEL (including without limitation to any MATTEL product, plan

3    or information) that YOU received in any manner from any PERSON who was at the time an

4    employee of MATTEL or who had previously been an employee of MATTEL.

5        This topic appears to be based, at least in part, upon Mattel's allegations that former

6    Mattel employee Ron Brawer, former Mattel employees in Mattel's offices in Mexico; and a

7    former Mattel employee located in Canada improperly provided MGA with documents containing

8    Mattel trade secrets.

9        Mattel contends that MGA made no discernible effort to educate Ms. Tonnu on Topic No.

10   40, and therefore she was unable to answer whether MGA has or has had in its possession any (1)

11   Mattel strategic plans, (2) any sales or profit information of Mattel, (3) any documents related to

12   Mattel's advertising strategy, (4) any documents relating to the results of Mattel's advertising, (5)

13   documents related to Mattel's pre-release line lists, and (6) documents related to Mattel's strategy

14   with respect to specific customers.  MGA produced Ms. Tonnu a second time, however, Mattel

15   contends that her testimony remained deficient.  In particular, Mattel complains that MGA spoke

16   with only two former employees about the documents described above, when there are many

17   more former Mattel employees working at MGA.

18       MGA contends that Ms. Tonnu spoke with the three individuals at MGA who would be

19   most knowledgeable about the allegations against MGA and testified as to any documents they

20   brought with them from Mattel: Ron Brawer, Susana Kuemmerle and Janine Brisbois.  MGA

21   contends that Ms. Tonnu's preparation to testify on Topic 40 was reasonable.

22       Nevertheless, MGA represents that it has agreed to provide additional testimony through

23   Ms. Tonnu to address Mattel's concerns, and that her deposition will take place on January 9,

24   2008.

25       A review of the deposition transcript indicates that Ms. Tonnu did not prepare sufficiently

26   for her testimony.  Ms. Tonnu spoke to only three individuals.  Clearly, there are far more sources

27   of information reasonably available to MGA, namely the many more former Mattel employees

28   now employed at MGA.  MGA made no effort to determine what Mattel documents, if any, these

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

EXHIBIT 33 PAGE 858

1    individuals possess.  Therefore, Mattel is entitled to an order compelling MGA to produce a

2    witness to provide complete testimony on Topic No. 40.

3        **Topic No. 41:** The testing or sampling from DOCUMENTS that REFER OR RELATE
         TO BRATZ or BRYANT, including without limitation such testing or sampling in
4        connection with any ink, paper or chemical analysis performed or attempted to be
         performed to date, any DOCUMENTS that REFER OR RELATE thereto and all results
5        and reports relating thereto.

6        Mattel deposed Ms. Tonnu on this topic on two separate occasions.  Mattel contends that

7    in each instance, she was unprepared to given any meaningful testimony regarding any ink, paper

8    or chemistry testing performed on Bratz documents.  In particular, Mattel contends that Ms.

9    Tonnu's preparation for her deposition was inadequate because she did not speak to the MGA

10   litigation consultant who performed the testing, Mr. Speckin, but merely read his declaration.

11       Furthermore, Mattel contends that MGA's counsel improperly instructed Ms. Tonnu not to

12   answer questions based upon unfounded claims of work product protection.  Mattel explains that

13   it is not seeking information concerning Mr. Speckin's opinions or the results of his test on Bratz

14   documents.  Instead, Mattel contends that it is seeking factual information concerning the

15   handling and shipment of original Bratz documents, as well as the specific documents that were

16   tested.  In Mattel's view, the factual circumstances surrounding Mr. Speckin's testing are not

17   protected from discovery by the work-product doctrine.

18       Moreover, Mattel contends that MGA provided Mattel's counsel with a list identifying the

19   documents that Mr. Speckin tested and allowed Ms. Tonnu to testify about the identification of

20   documents, thereby waiving any work product protection with respect to the identification of

21   documents.  Mattel also contends that Mr. Speckin's declaration, which was submitted in the

22   case, already discloses the types of tests conducted and therefore any privilege that may have

23   applied has been waived with respect to this subject.

24       MGA contends that it complied with this topic and that Mattel is not entitled to any further

25   examination because further questioning about the testing performed by Mr. Speckin would

26   violate MGA's attorney work product protection.  Mr. Speckin is one of MGA's non-testifying

27   experts.  MGA objects to any further questioning regarding Mr. Speckin's selection of which

28   documents to test, how the documents were handled, which tests were performed on the

EXHIBIT 33 PAGE 859

documents, how they were shipped and how they were stored. MGA contends that further questioning on these subjects would necessarily reveal the mental impressions, legal theories, and conclusions of MGA's counsel and its non-testifying experts formed in anticipation of litigation with Mattel. Further, MGA contends that Mattel has not carried its heavy burden to demonstrate the "exceptional circumstances" required to invade MGA's work product.

A review of the deposition transcript confirms that Ms. Tonnu was not reasonably prepared to testify on Topic No. 41. Ms. Tonnu did not speak with Mr. Speckin or anyone involved in the testing. She had only read Mr. Speckin's declaration. Therefore, she clearly was not in a position to testify as to information known or reasonably available to MGA. On this basis alone, Mattel is entitled to an order compelling MGA to produce a witness to testify fully on Topic No. 41.

As for MGA's claims of work production protection, Judge Larson has already indicated that questions of privilege regarding the testing of the Bratz documents must be handled on a question-by-question basis. The questions at issue are set forth in Mattel's Separate Statement No. 2, and are discussed below in connection with Mattel's Request for Relief No. 4.

B. Mattel's Request for Relief No. 2:  Mattel seeks an order overruling each of the purportedly improper instructions not to answer questions interposed at the deposition of MGA designees Spencer Woodman (Instruction Nos. 46-57) and compelling Woodman or other such person selected by MGA as its designee to provide complete testimony on Topic No. 34.

Mattel identifies each instance of allegedly improper instructions in its Separate Statement No. 2. In each instance identified by Mattel, MGA's counsel instructed the witness not to answer questions about matters that counsel believed exceeded the scope of the deposition. The instructions not to answer were not based upon a claim of privilege, and therefore were clearly improper.

Furthermore, as stated previously, MGA has acknowledged that some questions fell within the scope of Topic No. 34 and should be answered. To that end, MGA has agreed to produce a corporate designee to provide supplemental testimony as to Exhibits 500, 502, 548, 580-584, 590. MGA shall abide by its agreement to produce a witness to testify on these exhibits.

Nevertheless, many of the questions identified in the Separate Statement No. 2 for which

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

22

EXHIBIT 33 PAGE 860

1   an improper instruction not to answer was given clearly exceeded the scope of the deposition

2   notice. MGA is not required to provide further testimony as to those questions. For example, the

3   question regarding the Art Attacks trial that Mattel's counsel attended (Instruction No. 46) exceed

4   the scope of Topic No. 34, and do not require any further testimony. MGA is also not required to

5   provide further testimony as to documents that have been the subject of questioning during the

6   30(b)(6) deposition on Topic No. 33.[3]

7   C. Mattel's Request for Relief No. 3:  Mattel seeks an order compelling MGA to produce
    documents that MGA designee Kenneth Lockhart identified during his June 14, 2007 deposition

8   as documents which he reviewed and relied upon to refresh his recollection in preparation for his
    deposition.

9       Mattel seeks an order compelling MGA to produce documents that Mr. Lockhart

10  identified during his deposition as documents which he reviewed and relied upon to refresh his

11  recollection in preparation for his deposition.

12      MGA contends that the documents Mattel seeks are privileged e-mail communications

13  from MGA's General Counsel to MGA employees regarding their document preservation

14  obligations in light of the present action. MGA contends that its privilege log demonstrates that

15  the documents are protected by both the attorney-client privilege and the work product doctrine.

16  Furthermore, MGA contends that Mr. Lockhart was required to review the privileged emails

17  because they related to MGA's preservation of documents in connection with this action and they

18  were reasonably available to MGA.

19      Moreover, MGA contends that waiver of the attorney-client privilege and work product

20  doctrine is not automatic where a witness refreshes his recollection with privileged prior to a

21  deposition. In re Managed Care Litig., 415 F.Supp.2d 1378 (S.D. Fla. 2006); Medtronic Xomed,
    Inc. v. Gyrus ENT LLC, 2006 WL 786425, at *1, 3, 6-7 (M.D. Fla. March 27, 2006).

22      MGA's bare bones privilege log, unaccompanied by any supporting declarations, is

23  insufficient to establish the attorney-client privilege and the work product doctrine. Further,

24  although there appears to be a split in authority, the weight of authority supports a finding of

25

26      [3] MGA represents that virtually all of the questioning quoted in Mattel's Separate Statement No. 2 at

27  Instruction Nos. 47-57 was covered in the deposition on Topic No. 33. However, MGA's representation cannot be
    confirmed by the excerpts of the deposition transcript submitted in connection with this motion.

28
                                                                                                          23

EXHIBIT 33 PAGE 861

1   waiver.  See e.g. United States ex rel. Bagley v. TRW Inc., 212 F.R.D. 554, 565-566 (C.D. Cal.

2   2003) (requiring disclosure of documents reviewed by relator in preparing for his deposition

3   based upon waiver of work product protection); U.S. v. 22.80 Acres of Land, 107 F.R.D. 25-26

4   (N.D. Cal. 1985) (work product waived where deponents used documents to refresh recollection);

5   Ehrlich v. Howe, 848 F.Supp. 482, 493 (S.D. N.Y. 1994) ("when [c]onfronted with the conflict

6   between the command of Rule 612 to disclose materials used to refresh recollection and the

7   protection afforded by the attorney-client privilege . . . the weight of the authority holds that the

8   privilege is waived."); Marshall v. United States Postal Service, 88 F.R.D. 348, 350 (D. D.C.

9   1980) ("[I]t is apparent that once a document is used to refresh the recollection of a witness,

10   privileges as to that document have been waived.").

11       Furthermore, the interests of justice compel production of the e-mail documents used by

12   Mr. Lockhart to refresh his recollection.  MGA acknowledges that Mr. Lockhart was required to

13   review the e-mails because they related to MGA's preservation of documents.  Mr. Lockart

14   testified that the e-mails refreshed his recollection as to what MGA employees had been requested

15   to preserve.  Accordingly, MGA is ordered to produce the e-mails reference in Mr. Lockhart's

16   deposition.

D. Mattel's Request for Relief No. 4.  Mattel seeks an order overruling each of the purportedly
17   improper instructions not to answer questions interposed at the deposition of MGA designee Lisa
    Tonnu.

18       In Mattel's Separate Statement No. 2, Mattel identifies each purported instance of

19   improper objections and/or instructions not to answer for which it seeks a ruling.  Each instance

20   of allegedly improper conduct is discussed below.

21

22                                   Instruction Nos. 1-5

23       Mattel's counsel posed a series of questions regarding Mr. Larian's trusts.  In each

24   instance, MGA's counsel instructed Ms. Tonnu not to answer.  MGA's counsel objected to the

25   question on privilege and privacy grounds, and objected that the question exceeded the scope of

26   deposition.

27       The privilege objections are overruled because MGA has failed to establish the requisite

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

EXHIBIT 33 PAGE 862

1   elements of any applicable privilege.  The privacy objections are overruled since there is a

2   protective order in place to address Mr. Larian's privacy concerns regarding his personal finances.

3   The remaining objections do not justify an instruction not to answer.  See Fed.R.Civ.P. 30(c)(2)

4   (an objection must be noted on the record, but the examination still proceeds and the testimony is

5   taken subject to any objection).  Accordingly, MGA shall produce a knowledgeable 30(b)(6)

6   designee to provide complete responses to the questions identified in Mattel's Separate Statement

7   No. 2 as Instruction Nos. 1-5.

### Instruction No. 6

8   In this excerpt, the witness wanted to clarify her testimony regarding voucher payments,

9   which prompted Mattel's counsel to ask a series of questions about what prompted her make the

10  clarification, including "that's what counsel told you at the break?"; "[h]ow was your recollection

11  refreshed"; and "[d]id Mr. Jenal tell you what the dates were?"  MGA's counsel objected on

12  privilege grounds and instructed the witness not to answer.

13  The objections are overruled.  The attorney-client privilege protects an attorney's

14  communication of legal advice to his client, as well as the client's communication of information

15  to the attorney "to enable him to give sound and informed advice."  Upjohn Co. v. United States,

16  449 U.S. 383, 390 (1981).  In this instance, the question posed did not require the witness to

17  disclose the substance of an attorney-client communication.  Instead, the questions posed called

18  for the disclosure of underlying facts to which Mattel is entitled.  See Upjohn, supra at 395

19  (finding that the attorney-client privilege does not preclude disclosure of factual information and

20  that the privilege does not protect facts communicated to an attorney).

21  Accordingly, MGA shall produce a knowledgeable 30(b)(6) designee to provide complete

22  responses to the questions identified in Mattel's Separate Statement No. 2 as Instruction No. 6.

### Instruction Nos. 7-20 and 23

23  In each of these excerpts, Mattel's counsel posed questions regarding testing performed on

24  Bratz drawings.  MGA's counsel objected to the questions based upon the work product doctrine

25  and instructed the witness not to answer.

26  The work product objections are overruled.  The work product doctrine, now codified in

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SOL (RNBx)

25

EXHIBIT 33 PAGE 863

1  part in Rule 26(b)(3) of the Federal Rules of Civil Procedure, provides qualified protection for

2  materials prepared by or at the behest of counsel in anticipation of litigation or for trial.  The party

3  claiming work product immunity has the burden of establishing its elements by competent

4  evidence.  In re Kidder Peabody Securities Litigation, 168 F.R.D. 459, 462 (S.D. N.Y. 1996).

5       In the instant case, all of the questions posed to the witness take one of four forms: "do

6  you know whether" or "do you know who" or "do you know what" or "do you know why."  The

7  questions thus call for a simple "yes" or "no" response that did not require divulging any

8  information protected by the work product doctrine.

9       Even if the questions are construed to require substantive responses beyond "yes" or "no,"

10  the information sought is factual (what test was conducted, how documents were stored, whether

11  the documents were handled with cotton or latex gloves, who was with the expert when he

12  performed his tests, what precautions he took).  The questions do not require the witness to

13  divulge the mental impressions, the legal theories, or conclusions of Mr. Speckin.

14       Moreover, Rule 26(b)(4)(B), Fed.R.Civ.P., provides that a party may discover facts known

15  or opinions held by an non-testifying expert upon a showing of exceptional circumstances under

16  which it is impracticable for the party seeking discovery to obtain facts or opinions on the same

17  subject by other means.  In the instant case, there is no other practicable means for Mattel to

18  obtain information about the handling, shipping and testing of original Bratz documents while in

19  Mr. Speckin's possession.  Mr. Speckin is a non-testifying expert.  The manner in which Mr.

20  Speckin transported, analyzed, tested or otherwise used the original Bratz drawings is uniquely

21  within his knowledge and plainly relevant.  The original Bratz drawings are a key piece of

22  evidence in this case.  Mattel needs information concerning what, if any, changes, damage, or

23  other alterations were made to the original Bratz drawings.  Mattel is not seeking information

24  regarding Mr. Speckin's opinions or the results of his tests.  Rather, Mattel is seeking only

25  information regarding the handling of the original Bratz documents and more precise

26  identification information for the specific documents that were handled by Mr. Speckin.

27       MGA objects to providing information concerning Mr. Speckin's testing, the testing

28  conditions, the selection of which drawings to test and other logistics.  MGA, however, has

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

26

EXHIBIT 33 PAGE 864

1   already disclosed the types of tests performed by Mr. Speckin in a declaration submitted to the

2   court, and has provided Mattel with a list identifying the documents that Mr. Speckin tested,

3   although the list did not identify the documents by Bates numbers. Therefore, MGA has waived

4   any work product protection to which it may have been entitled with respect to the identification

5   of the original Bratz drawings that were subjected to testing and which tests were performed.

6        Accordingly, MGA shall produce a knowledgeable 30(b)(6) designee to provide complete

7   responses to the questions identified in Mattel's Separate Statement No. 2 as Instruction Nos. 7-

8   20 and 23.

9                        Instruction Nos. 21-22

10       In these excerpts, Mattel's counsel asked Ms. Tonnu whether she could identify or

11  describe any of the documents that were tested by Mr. Speckin. MGA's counsel objected to the

12  questions based upon the work product doctrine and instructed the witness not to answer

13  The objections are overruled. As discussed immediately above, the questions call for factual

14  information that is not protected by the work product doctrine. Even if the work product doctrine

15  applied, the protection has been waived. Furthermore, this case presents exceptional

16  circumstances under which it is impracticable for Mattel to obtain the information sought by other

17  means. Accordingly, MGA shall produce a knowledgeable 30(b)(6) designee to provide complete

18  responses to the questions identified in Mattel's Separate Statement No. 2 as Instruction Nos. 21-

    22.

19                       Instruction Nos. 24-26

20       In these excerpts, Mattel's counsel asked the witness (1) what Ms. Garcia told her about

21  Diva Starz and (2) whether Ms. Garcia told the witness she had access to Diva Starz information

22  while she was at Mattel. MGA's counsel objected to the questions to the extent the witness'

23  conversations with Ms. Garcia occurred in the presence of counsel and instructed the witness not

24  to answer.

25       The objections are overruled. The questions do not require the witness to divulge the

26  substance of any privileged communication. Instead, the questions call for factual information to

27  which Mattel is entitled.

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

EXHIBIT 33 PAGE 865

1   Accordingly, MGA shall produce a knowledgeable 30(b)(6) designee to provide complete

2   responses to the questions identified in Mattel's Separate Statement No. 2 as Instruction Nos. 24-

3   26.

4   Instruction No. 27

5   In this excerpt, Mattel's counsel asked the witness twice whether MGA had access to

6   Mattel internal information regarding Diva Starz prior to February 1st, 2000.  MGA's counsel

7   made a speaking objection, which clearly violated Rule 30(c)(2), Fed.R.Civ.P.  However, the

8   questions do not need to be repeated because the witness provided responses.

9   Instruction No. 28

10   In this excerpt, Mattel's counsel asked, "MGA is denying that it had access to internal

11   information about Mattel's Diva Starz project prior to September 1st, 2000?"  MGA's counsel

12   objected on the grounds that the question calls for a legal conclusion, calls for the disclosure of

13   privileged information, and exceeds the scope of the deposition.  Counsel also instructed the

14   witness not to answer.

15   The objections are overruled.  The question does not call for a legal conclusion and MGA

16   has failed to establish the elements of the attorney-client privilege.

17   Accordingly, MGA shall produce a knowledgeable 30(b)(6) designee to provide complete

18   responses to the questions identified in Mattel's Separate Statement No. 2 as Instruction Nos. 28.

19   Instruction Nos. 29-34

20   In these excerpts, Mattel's counsel asked as series of questions regarding whether MGA

21   knew Mattel was considering using the name "Brats" and "Boyz" in connection with the Diva

22   Starz project and whether MGA knew Mr. Linker worked on the project.  MGA's counsel made

23   several objections including the following:  assumes facts not in evidence; misstates the witness'

24   prior testimony; compound; outside the scope of the deposition; improper as to form; lacks

25   foundation; vague and ambiguous; calls for speculation; argumentative; and asked and answered.

26   MGA's counsel objected to one question (Instruction No. 30) on the additional ground that it may

27   call for attorney-client communications.  MGA's counsel also instructed the witness not to

28   answer.

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

EXHIBIT 33 PAGE 866

1    The repeated instructions not to answer were clearly improper. Accordingly, MGA shall

2 produce a knowledgeable 30(b)(6) designee to provide complete responses to the questions

3 identified in Mattel's Separate Statement No. 2 as Instruction Nos. 29-34.

4                                      Instruction No. 35

5        In this excerpt, the witness indicated that she did not know whether Mr. Linker worked on

6 the Bratz project. Mattel's counsel then asked, "But you don't know one way or the other?"

7 MGA's counsel objected to the question, asserting that it had been asked and answered and was

8 argumentative. MGA's counsel also instructed the witness not to answer.

9        The instruction not to answer was clearly improper. Accordingly, MGA shall produce a

10 knowledgeable 30(b)(6) designee to provide complete responses to the questions identified in

11 Mattel's Separate Statement No. 2 as Instruction No. 35.

12                                     Instruction No. 36

13       In this excerpt, Mattel's counsel asked, "Did you have a conversation with Mr. Jenal about

14 the net worth or the valuation of the company?" MGA's counsel objected on privilege grounds

15 and instructed the witness not to answer.

16       The objection is overruled. The question calls for a "yes" or "no" answer and does not

17 require the witness to divulge the substance of a privileged communication.

18       Accordingly, MGA shall produce a knowledgeable 30(b)(6) designee to provide complete

19 responses to the questions identified in Mattel's Separate Statement No. 2 as Instruction No. 36.

20                                     Instruction No. 37

21       In this excerpt, Mattel's counsel asked, "What did Mr. Daniels tell you about the net worth

22 or valuation of the company?" MGA's counsel objected on privilege grounds.

23       The objection is sustained. As phrased, the question potentially calls for the disclosure of

24 the substance of a privileged communication.

25                                    Instruction Nos. 38-40

26       In these excerpts, MGA's counsel instructed the witness not to answer. The instruction

27 was not based upon a claim of privilege, and therefore was improper. MGA's counsel also made

28 an improper speaking objection. Accordingly, MGA shall produce a knowledgeable 30(b)(6)

EXHIBIT 33 PAGE 867

1  designee to provide complete responses to the questions identified in Mattel's Separate Statement

2  No. 2 as Instruction Nos. 38-40.

<u>Instruction No. 41</u>

3

4       In this excerpt, Mattel's counsel asked the witness to identify the litigation for which

5  Exhibit 660 was prepared. MGA's counsel objected to the question as calling for work product

6  and instructed the witness not to answer.

7       The work product objection is overruled. The question calls for the disclosure of facts, not

8  work product. Accordingly, MGA shall produce a knowledgeable 30(b)(6) designee to provide

9  complete responses to the questions identified in Mattel's Separate Statement No. 2 as Instruction

10  No. 41.

<u>Instruction Nos. 42-44</u>

11

12       In these excerpts, Mattel's counsel posed more questions about the litigation for which

13  Exhibit 660 was prepared, including the identity of the parties to the litigation and whether the

14  litigation was ongoing. MGA's counsel objected on privilege and work product grounds.

15       The objections are overruled. The questions call for the disclosure of facts, not work

16  product. Further, MGA has failed to establish that the questions require the witness to disclose

17  the substance of a privileged communication. Accordingly, MGA shall produce a knowledgeable

18  30(b)(6) designee to provide complete responses to the questions identified in Mattel's Separate

    Statement No. 2 as Instruction Nos. 42-44.

19

<u>Instruction No. 45</u>

20       In this excerpt, Mattel's counsel asked whether an attorney by the name of Mr. Daniels

21  wrote a document. The work product objection by MGA's counsel is overruled. The "yes" or

22  "no" question calls for the disclosure of facts, not work product. Accordingly, MGA shall

23  produce a knowledgeable 30(b)(6) designee to provide complete responses to the questions

24  identified in Mattel's Separate Statement No. 2 as Instruction No. 45.

25  <u>E. Mattel's Request for Relief No. 5:</u> Mattel seeks an order reopening the deposition of MGA
    <u>designee Lisa Tonnu based on a purported "complete reversal of testimony" made through written</u>
26  <u>"changes" to her deposition transcript.</u>

27       Ms. Tonnu made changes to her deposition transcript after her deposition was completed.

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

EXHIBIT 33 PAGE 868

1  Counsel asked Ms. Tonnu whether any documents had been collected from MGA's Filenet

2  storage facility, to which she responded "no"; whether Mr. Daniels told her that he was going to

3  collect documents from Filenet, to which she responded "yes"; and whether the documents at

4  Filenet contained any documents responsive to Mattel's request, to which she responded "no."

5  Later, Ms. Tonnu revised her deposition transcript and reversed each of her answers.

6      Mattel contends that Ms. Tonnu's initial answers in the negative precluded a line of

7  questioning into, for example, who collected documents, which documents were collected and

8  how.

9      MGA contends that the changes Ms. Tonnu made do not justify re-opening a deposition.

10  Nevertheless, MGA has no objection to follow-up questions about Ms. Tonnu's revision when she

    is deposed again in January.

11
        In light of MGA's lack of opposition, MGA shall make Ms. Tonnu available for follow-up
12
    questioning regarding the revisions to her deposition testimony.
13
    F. Mattel's Request for Relief No. 6:  Mattel seeks an order compelling Rebecca Harris to sit for
14  the completion of her deposition and/or compelling such person selected by MGA as its designee
    to complete the testimony on topics for which Harris was previously designated.
15
        Mattel seeks an additional day to depose Ms. Harris.  Mattel contends that it needs more
16
    than the 7-hours it has already deposed Ms. Harris to complete its questioning on all topics for
17
    which she was designated.  Mattel emphasizes that Ms. Harris is designated to testify on nine
18
    separate topics, each of which pertains to issues at the heart of the litigation, including the origin,
19
    creation, design and development of Bratz prior to June 30, 2001; relevant contracts concerning
20
    Carter Bryant and Bratz; payments made to Bryant and other financial information relating to
21
    Bratz; and third parties who were involved in or otherwise have knowledge about the creation,
22
    design and development of Bratz.
23
        In addition to the topics already discussed above in Section "A" to this Order, Mattel
24
    contends that it did not have sufficient time to depose Ms. Harris on Topic Nos. 19, 22 and 23,
25
    which are set forth below:
26
        **Topic No. 19:**  Each agreement or contract between YOU and any PERSON other than
        BRYANT that REFERS OR RELATES TO BRATZ or BRATZ DESIGNS that REFERS
27      OR RELATES to the time period prior to December 31, 2001 (regardless of when such
        agreement or contract was negotiated or executed), including without limitation the timing
28      thereof, the negotiations, drafts and COMMUNICATIONS that REFER OR RELATE

                                                                                              31

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

EXHIBIT 33 PAGE 869

1   thereto, and any actual or proposed amendments thereto.

2   **Topic No. 22:** The payment of money or anything of value by or for YOU or on YOUR behalf that has been made to, for or on behalf of BRYANT (a) for work, services or
3   activities performed by BRYANT prior to January 1, 2001 (regardless of when such payment was actually made), (2) for DESIGNS CREATED by BRYANT prior to January
4   1, 2001 (regardless of when such payment was actually made) or (c) in connection with BRATZ or any BRATZ DESIGN at any time, including amount(s) thereof and the reasons
5   therefore,

6   **Topic No. 23:** The payment of royalties to, for or on behalf or BRYANT made by or for YOU or on YOUR behalf, including the timing, manner and amounts of such payments
7   and the reasons therefore.

8   MGA contends that Mattel has not made the required showing that additional time is "needed to

9   fairly examine the deponent" or that "the deponent, another person, or any other circumstance

10  impedes or delays the examination." Fed.R.Civ.P. 30(d)(1). Furthermore, MGA contends that

11  Mattel wasted much of the 7-hours with Ms. Harris by asking questions outside the topics for

12  which she was designated and badgering the witness.

13          As discussed already above, Ms. Harris was not sufficiently prepared to testify on several

14  topics and did not discharge MGA's duty to produce a witness to testify as to information known

15  or reasonably available to MGA. Her lack of preparedness alone justifies additional deposition

16  time. The relatively large number of topics for which Ms. Harris was designated (Topic Nos. 11,

17  13, 14, 19, 21, 22, 23, 27 and 28), also justifies additional deposition time to enable Mattel to

18  fairly examine the deponent. Many of the topics for which Ms. Harris was designated are highly

19  relevant to the case. Mattel has identified a few instances where Mattel was inefficient in

20  conducting her deposition; however, the deposition generally proceeded at a reasonable pace.

21  Accordingly, Mattel is granted an additional four hours to complete the deposition of Ms. Harris

22  on all of the topics for which she was designated, except Topic Nos. 27 and 28 which were

23  discussed previously.

    G. Mattel's Request for Relief No. 7: Mattel seeks an order imposing sanctions for MGA's
24  alleged willful violations of the May 16, 2007 and August 14, 2007 Orders, for MGA's allegedly
    improper instructions not to answer deposition questions and for MGA's alleged improper
25  coaching, harassing and obstructionist conduct at the September 24-25, 2007 deposition of Lisa
    Tonnu and at the October 9, 2007 deposition of Spencer Woodman in the amount of $10,000.

26          Sanctions are appropriate based upon MGA's failure to produce 30(b)(6) designees who

27  were reasonably prepared to testify on seven out of the sixteen topics at issue, namely Topic Nos.

28                                                                                              32

EXHIBIT 33 PAGE 870

21, 24, 25, 31, 34, 39 and 40.  By agreeing to provide supplemental testimony on these topics, MGA implicitly acknowledges that the witnesses provided insufficient testimony.  Further, MGA's counsel also repeatedly flouted Rule 30(c)(2), Fed.R.Civ.P., and prior orders prohibiting instructions not to answer for reasons other than privilege.  Accordingly, pursuant to Rule 30(d)(2) and 37(b), Fed.R.Civ.P., sanctions are imposed in the amount of $6,000.

**H.  Mattel's Request for Relief No. 8:  Mattel seeks a report and recommendation to Judge Stephen G. Larson that recommends the imposition of preclusion sanctions, that certain facts related to the topics compelled be deemed admitted, and/or that MGA be found in contempt for MGA's allegedly willful and repeated violations of the Orders.**

As previously stated at the December 14, 2007 hearing, it is premature to consider preclusion sanctions and contempt at this time.  If Mattel intends to pursue such sanctions, it may do so only after the close of Phase 1 discovery.

## V. CONCLUSION

For the reasons set forth above, it is hereby ordered as follows:

1.     No later than January 30, 2008, MGA shall produce witnesses who are prepared to testify about information known or reasonably available to MGA in accordance with Rule 30(b)(6), Fed.R.Civ.P., and to provide complete testimony on the following topics as specified herein:  Topic Nos. 11, 13, 14, 19, 21-25, 31, 34 (with limitations noted herein) 39 (with limitations noted herein), 40 and 41.  Mattel's motion is denied as to Topic Nos. 27 and 28.

2.     MGA's 30(b)(6) designee Spencer Woodman shall provide full and complete responses to each of the questions identified in Mattel's Separate Statement No. 2 that are identified herein as requiring a further response because the objections have been overruled and/or the instructions not to answer have been found improper, and the question seeks relevant and privileged information to which Mattel is entitled.

3.     MGA shall produce the e-mails that MGA designee Kenneth Lockhart identified during his June 14, 2007 deposition as documents which he reviewed and relied upon to refresh his recollection in preparation for his deposition.  Mattel is also permitted to conduct reasonable follow-up questioning regarding those documents.

4.     MGA's 30(b)(6) designee Lisa Tonnu shall provide full and complete responses to each of the questions identified in Mattel's Separate Statement No. 2 that are identified herein as

EXHIBIT _33_ PAGE _871_

1   requiring a further response because the objections have been overruled and/or the instructions

2   not to answer have been found improper, and the question seeks relevant information to which

3   Mattel is entitled.

4       5.    In addition to the deposition testimony authorized above, Mattel is granted leave to

5   depose Ms. Tonnu regarding the changes she made to her deposition transcript.

6       6.    Mattel is granted additional time to complete a full and fair examination of Ms.

7   Harris on all of the topics for which she was designated, except Topic Nos. 27 and 28.  The

8   deposition of Ms. Harris shall not exceed four (4) hours.

9       7.    Mattel's request for monetary sanctions is granted in part pursuant to Fed.R.Civ.P.

10  37(b).  MGA shall pay sanctions in the amount of $6,000 no later than February 11, 2008.

11      8.    Mattel's request for preclusion sanctions and/or a finding of contempt is denied

12  without prejudice.

13      Pursuant to Paragraph 6 of the Stipulation and Order for Appointment of a Discovery

14  Master, Mattel shall file this Order with the Clerk of Court forthwith.

15  Dated:  January 8, 2008

16               HON. EDWARD A. INFANTE (Ret.)
             Discovery Master

17

18

19

20

21

22

23

24

25

26

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

34

EXHIBIT _33_ PAGE _872_

## PROOF OF SERVICE BY E-MAIL

I, Sandra Chan, not a party to the within action, hereby declare that on January 9, 2008, I served the attached ORDER GRANTING IN PART AND DENYING IN PART MATTEL'S MOTION TO ENFORCE COURT'S DISCOVERY ORDERS AND TO COMPEL; TO OVERRULE PURPORTEDLY IMPROPER INSTRUCTIONS; AND FOR SANCTIONS in the within action by email addressed as follows:

| | | |
|---|---|---|
| John W. Keker, Esq. | Keker & Van Nest | jkeker@kvn.com |
| Michael H. Page, Esq. | Keker & Van Nest | mhp@kvn.com |
| Christa Anderson, Esq. | Keker & Van Nest | cma@kvn.com |
| Matthew M. Werdegar, Esq. | Keker & Van Nest | mwerdegar@kvn.com |
| John E. Trinidad, Esq. | Keker & Van Nest | jtrinidad@kvn.com |
| Audrey Walton-Hadlock, Esq. | Keker & Van Nest | awalton-hadlock@kvn.com |
| John Quinn Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | johnquinn@quinnemanuel.com |
| Michael Zeller Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | michaelzeller@quinnemanuel.com |
| Jon Corey Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | joncorey@quinnemanuel.com |
| Duane Lyons Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | duanelyons@quinnemanuel.com |
| Timothy Alger Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | timalger@quinnemanuel.com |
| Dominic Surprenant Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | DominicSurprenant@QuinnEmanuel.com |
| B. Dylan Proctor Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | dylanproctor@quinnemanuel.com |
| Shane McKenzie Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | shanemckenzie@quinnemanuel.com |
| Bridget Hauler Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | bridgethauler@quinnemanuel.com |
| Tamar Buchakjian Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | tamarbuchakjian@quinnemanuel.com |
| Juan Pablo Alban, Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | juanpabloalban@quinnemanuel.com |
| Thomas J. Nolan, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | tnolan@skadden.com |
| Raoul D. Kennedy, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | rkennedy@skadden.com |
| Amy S. Park, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | apark@skadden.com |
| Harriet S. Posner, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | hposner@skadden.com |
| Carl Alan Roth, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | croth@skadden.com |
| Timothy A. Miller, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | tmiller@skadden.com |

I declare under penalty of perjury under the laws of the Untied States of America that the above is true and correct.

Executed on January 9, 2008, at San Francisco, California.

_Sandra Chan_

Sandra Chan

EXHIBIT 33 PAGE 873

EXHIBIT 34

**CONFORMED COPY**

*FILED*

1    Hon. Edward A. Infante (Ret.)
     JAMS
2    Two Embarcadero Center
     Suite 1500
3    San Francisco, California 94111
     Telephone:   (415) 774-2611
4    Facsimile:    (415) 982-5287

2007 APR 18 PM 11: 07

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
RIVERSIDE

BY_____

5

6

7            UNITED STATES DISTRICT COURT

8          CENTRAL DISTRICT OF CALIFORNIA

9              EASTERN DIVISION

10

11    CARTER BRYANT, an individual,

12          Plaintiff,

13      v.

14    MATTEL, INC., a Delaware corporation,

15          Defendant.

16

17    CONSOLIDATED WITH
     MATTEL, INC. v. BRYANT and
18    MGA ENTERTAINMENT, INC. v. MATTEL,
     INC.
19

20

CASE NO. C 04-09049 SGL (RNBx)
JAMS Reference No.1100049530

Consolidated with
Case No. CV 04-09059
Case No. CV 05-2727

**ORDER GRANTING IN PART AND
DENYING IN PART MATTEL'S
MOTION FOR PROTECTIVE ORDER
REGARDING "POLLY POCKET"
DOCUMENTS**

21              I. INTRODUCTION

22       On March 30, 2007, Mattel, Inc. ("Mattel") submitted its Motion For Protective Order

23   Regarding "Polly Pocket" Documents. Pursuant to Rule 26(c), Fed.R.Civ.P., Mattel seeks a

24   protective order to limit the scope of MGA Entertainment, Inc.'s ("MGA") and Carter Bryant's

25   ("Bryant") subpoenas for production of documents relating to Polly Pocket to only those

26   documents that relate to a single Polly Pocket commercial identified by MGA in an interrogatory

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

1

EXHIBIT 34 PAGE 874

04/19/07

1   response.  On April 6, 2007, MGA submitted its opposition brief, and on April 11, 2007, Mattel

2   submitted a reply brief.  The matter was heard via telephonic conference on April 19, 2007.

3   Having considered the motion papers and comments of counsel at the hearing, Mattel's motion

4   for a protective order is granted in part and denied in part.[1]

5                                            II. BACKGROUND

6          This consolidated action includes MGA's claims for unfair competition against Mattel.

7   Among other things, MGA alleges that Mattel has engaged in "serial copycatting" of MGA

8   products, packaging and advertising, including Bratz dolls and other Bratz products, Bratz

9   packaging and Bratz television commercials.

10         On March 7, 2007 and March 12, 2007, MGA and Bryant issued subpoenas to three of

11  Mattel's advertising agencies:  Young & Rubicam Brands, Peterson Milla Hooks, Inc., and

12  Ogilvy & Mather Worldwide.  The subpoenas seek, among other things, documents relating to

13  Mattel's products, including the Polly Pocket line of products.  See Request Nos. 3, 4, 7, 12, 13,

14  and 14.  The subpoenas define Polly Pocket as "each image, character, logo, doll, toy, accessory,

15  product, packaging or other thing or matter that is or has ever been manufactured, marketed or

16  sold by MATTEL, or others under license by MATTEL, as part of a line of goods or merchandise

17  commonly known as, or sold and marketed under the POLLY POCKET trademark or trade

18  dress."  The requests at issue are set forth below:

19         Request No. 3:  All DOCUMENTS REFERRING OR RELATING TO any focus

20         group for "MY SCENE," "POLLY POCKET," or "ACCELERACERS" products

21         and which also REFER OR RELATE TO "BRATZ," "ALIEN RACERS," or

22         MGA.

23         Request No. 4:  All DOCUMENTS REFERRING OR RELATING TO any

24         participant comments from any focus group for "MY SCENE," "POLLY

25  ─────────────────

26     [1] Pursuant to the Order for Appointment Of A Discovery Master, dated December 6, 2006, the undersigned
    is authorized to resolve disputes regarding third party subpoenas.  See Order at 3-4, 6.

27

28
    Bryant v. Mattel, Inc.,
    CV-04-09049 SGL (RNBx)                                                                              2

EXHIBIT 34 PAGE 875

1  POCKET," or "ACCELERACERS" products and which also REFER OR

2  RELATE TO "BRATZ," "ALIEN RACERS," or MGA.

3  Request No. 7:  All DOCUMENTS REFERRING OR RELATING TO any

4  MARKET RESEARCH REFERRING OR RELATING TO "MY SCENE,"

5  "POLLY POCKET," or "ACCELERACERS" or MATTEL, and which also

6  REFER OR RELATE TO "BRATZ," "ALIEN RACERS," or MGA.

7  Request No. 12:  All DOCUMENTS REFERRING OR RELATING TO proposed

8  or actual advertisements for "MY SCENE," "POLLY POCKET," OR

9  "ACCELERACERS" products and which also REFER OR RELATE TO

10  "BRATZ," "ALIEN RACERS," or MGA.

11  Request No. 13:  All DOCUMENTS REFERRING OR RELATING TO

12  directives, suggestions, or instructions from MATTEL to create advertisements

13  for "MY SCENE," "POLLY POCKET," OR "ACCELERACERS" products using

14  elements that are similar to or the same as elements used in advertisements for

15  "BRATZ," "ALIEN RACERS," or MGA products.

16  Request No. 14:  Copies of all advertisements for "BRATZ," "ALIEN RACERS,"

17  or MGA products that YOU consulted or reviewed to create advertisements for

18  "MY SCENE," "POLLY POCKET," or "ACCELERACERS" products.

19  (collectively referred to hereinafter as the "Polly Pocket Requests").  See Decl. of B. Dylan

20  Proctor in Support of Mattel's Motion for Protective Order, Exs. 1-3.

21       Mattel served objections to the subpoenas and requested a meet and confer with MGA and

22  Bryant regarding the scope of the Polly Pocket Requests.  The parties met and conferred on

23  March 27, 2007.  MGA asserted that the Polly Pocket Requests sought information relevant to

24  MGA's claims that Mattel has serially copied and imitated MGA's commercials.  MGA pointed

25  out that it is currently aware of at least one Polly Pocket commercial that copied elements from a

26  MGA Bratz commercial.  More specifically, in response to a contention interrogatory, MGA

27  identified twenty-two separate instances of alleged serial copycatting and imitating, one of which

28  was that "Mattel filmed a 'Polly Pocket' commercial in the same mall and featuring the same

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

3

EXHIBIT 34 PAGE 876

1  escalator as appeared in a previous 'Bratz' commercial." See MGA's Second Supplemental

2  Responses to Mattel's First Set of Interrogatories re Claims of Unfair Competition, Response to

3  Interrogatory No. 6.  MGA asserted that it was entitled to discovery to determine whether

4  Mattel's advertising agencies have documents evidencing plans, strategies or intentions to

5  copycat or imitate MGA commercials for this or any other Polly Pocket commercials in the past

6  or future. Further, MGA asserted that the Polly Pocket Requests sought only those documents

7  that specifically related to MGA and its products. In contrast, Mattel asserted that the Polly

8  Pocket Requests were overbroad, seeking information far beyond the Polly Pocket commercial

9  identified in MGA's interrogatory response. The parties later exchanged meet and confer letters,

10  but were unable to resolve their dispute.

11       In this motion, Mattel contends that it is entitled to a protective order because the Polly

12  Pocket Requests are overbroad, seeking documents that have no connection or relevance to the

13  claims or defenses in the case, other than the single television commercial identified in MGA's

14  interrogatory response. Mattel also contends that MGA and Bryant should not be permitted to

15  engage in a fishing expedition for potential claims involving Polly Pocket products. Furthermore,

16  Mattel contends that its Polly Pocket line of dolls is in direct competition with MGA's doll

17  products, and that MGA and Bryant are not entitled to issue sweeping subpoenas for the improper

18  purpose of discovering Mattel's confidential focus group and market research documents relating

·18  to competing products and other matters that are not even alleged to be at issue. Accordingly,

19  Mattel seeks an order limiting the scope of the Polly Pocket Requests to only those Polly Pocket

20  documents that relate to the television commercial MGA claims that Mattel copied.

21       MGA and Bryant contend that Mattel has not demonstrated the requisite "good cause" for

22  a protective order. They contend that there has been no showing that a protective order is

23  necessary to avoid annoyance, embarrassment, oppression or undue burden or expense. Further,

24  they contend that the Stipulated Protective Order is sufficient to address Mattel's confidentiality

25  concerns. MGA and Bryant also contend that the Polly Pocket Requests are narrowly tailored to

26  seek documents relevant to the claims that Mattel has serially imitated and copycatted MGA's

27  advertising for Bratz and other products. Further, they contend that the Polly Pocket Requests

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

4

EXHIBIT 34 PAGE 877

1  target documents that specifically relate to MGA or its products.  Lastly, MGA and Bryant object

2  to limiting discovery to the one Polly Pocket commercial referenced in MGA's interrogatory

3  response.  They contend that such a limitation would prevent them from obtaining documents

4  "that reveal Mattel's plans to copy or imitate MGA commercials for other 'Polly Pocket'

5  commercials and related efforts by Mattel's ad agencies to effectuate or evaluate these plans,

6  simply because the plans are non-public and about which MGA and Bryant could not possibly

7  have any actual knowledge."  Opposition at p.7.

### III. DISCUSSION

8          Rule 26 of the Federal Rules of Civil Procedure provides that "[p]arties may obtain

9  discovery regarding any matter, not privileged, that is relevant to the claim or defense of any

10  party."  Fed.R.Civ.P. 26(b)(1).  Fishing expeditions to discover new claims, however, are not

11  permitted.  See Fed.R.Civ.P. 26(b)(1); Rivera v. NIBCO, Inc., 364 F.3d 1057, 1072 (9th Cir.

12  2004) ("District courts need not condone the use of discovery to engage in 'fishing

13  expeditions.'"); Bernstein v. Travelers Ins. Co., 447 F.Supp.2d 1100, 1102 (N.D. Cal. 2006)

14  (citing Rule 26(b), Advisory Committee's Note to Amendments Effective December 1, 2000)

15  (Congress' changes in the language of Rule 26(c), substituting the words "claim or defense" for

16  the phrase "subject matter involved in the pending action," were intended to target discovery that

17  swept far beyond the claims and defenses of the parties and that seemed designed not to fairly

18  litigate the issues presented by the pleadings but to develop new claims or defenses.).

19  Furthermore, Rule 26(c), Fed.R.Civ.P., provides, in pertinent part, that upon motion and for good

20  cause shown, "the court in which the action is pending may make any order which justice requires

21  to protect a party or person from annoyance, embarrassment, oppression, or undue burden or

22  expense, including that certain matters not be inquired into, that the scope of the disclosure or

23  discovery be limited to certain matters, or that a trade secret or other confidential research,

24  development or commercial information not be revealed or be revealed only in a designated way."

25  Fed.R.Civ.P. 26(c).

26          Polly Pocket is not mentioned in either MGA's or Bryant's complaint or any of the other

27  pleadings filed in this consolidated action.  Rather, MGA's complaint alleges that Mattel's

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

5

EXHIBIT 34 PAGE 878

1    advertising and marketing schemes for two of its products – "My Scene" and "AcceleRacers" –

2    have "serially imitated" MGA's advertising.  MGA's complaint does not even reference the Polly

3    Pocket line of dolls or other Polly Pocket products.

4         The only proffered justification for the Polly Pocket Requests is an interrogatory response

5    in which MGA claims that one of Mattel's Polly Pocket commercials was allegedly filmed in the

6    same mall using the same escalator as an MGA Bratz commercial.[2]  The bulk of the Polly Pocket

7    Requests (Nos. 3, 4, 7, 12, 14), however, are far broader than the commercial identified by MGA.

8    The definition for Polly Pocket includes not just commercials, but "each image, character, logo,

9    doll, toy, accessory, product, and packaging that is or has ever been manufactured, marketed or

10   sold by Mattel as part of a line of goods or merchandise known as, or sold and marketed under the

11   Polly Pocket trademark or trade dress.  Furthermore, MGA and Bryant seek all Polly Pocket focus

12   group documents, including participant comments which relate to Bratz, MGA or Alien Racers.

13   They seek all "market research" referring or relating to Polly Pocket and which also relate to

14   Bratz, MGA, or Alien Racers, where "market research" is defined as "any type of research, study,

15   survey or analysis of consumers or potential consumers of a product or potential product

16   including, without limitation, focus groups, consumer surveys, market analyses, behavioral

17   analyses and consumer research."  They also seek all documents relating to proposed or actual

18   advertisements for Polly Pocket dolls which also relate to Bratz, MGA or Alien Racers.  MGA

19   and Bryant also seek copies of all advertisements for Bratz, Alien Racers, or MGA products that

20   were consulted or reviewed to create any and all advertisements for Polly Pocket products.  These

21   requests are clearly overbroad, extending far beyond the single Polly Pocket commercial that

22   MGA has contended is actionable.  The Federal Rules of Civil Procedure do not permit MGA and

23

24   _____

25       [2]  Like MGA's complaint, MGA's response to Mattel's contention interrogatory regarding the alleged serial
     imitating and copycatting focus primarily on Mattel's "My Scene" and "Acceleracers" products.

26       See MGA's Second Supplemental Responses to Mattel's First Set of Interrogatories re Claims of Unfair
     Competition

27

28   Bryant v. Mattel, Inc.,                                                                          6
     CV-04-09049 SGL (RNBx)

EXHIBIT 34 PAGE 879

1   Bryant to use broad discovery requests, untethered to a claim or defense, to fish for new claims.

2   <u>Rivera v. NIBCO, Inc.</u>, <u>supra</u>. Because Request Nos. 3, 4, 7, 12, and 14 extend far beyond the

3   permissible scope of discovery under Rule 26, Fed.R.Civ.P., there is good cause to issue the

4   requested protective order limiting their scope to the Polly Pocket commercial identified in

5   MGA's interrogatory response.

6         In contrast, however, Request No. 13 is reasonably tailored to documents relevant to

7   MGA's unfair competition claim. Evidence of directives, suggestions, or instructions from Mattel

8   to its advertising agencies to create advertisements for Polly Pocket using elements that are

9   similar to or the same as elements used in advertisements for "BRATZ," "ALIEN RACERS," or

10   MGA products could establish that Mattel intentionally used the same mall and escalator to

11   produce the Polly Pocket commercial identified in MGA's interrogatory response. Therefore,

12   Mattel's motion is denied with respect to Request No. 13.

13                       IV. CONCLUSION

14         For the reasons set forth above, Mattel's motion for a protective order is granted in part

15   and denied in part. Request Numbers 3, 4, 7, 12, and 14 of MGA's and Bryant's subpoenas to

16   Young & Rubicam Brands, Peterson Milla Hooks, Inc., and Ogilvy & Mather Worldwide relating

17   to Polly Pocket are hereby limited in scope to Polly Pocket documents relating to the single Polly

18   Pocket television commercial identified in MGA's interrogatory response. Mattel's motion is

19   denied as to Request No. 13.

20         Pursuant to Paragraph 6 of the Stipulation and Order for Appointment of a Discovery

21   Master, Mattel shall file this Order with the Clerk of Court forthwith.

22   Dated: April 19, 2007

23                       HON. EDWARD A. INFANTE (Ret.)

24                         Discovery Master

25

26

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

7

EXHIBIT 34 PAGE 880

## PROOF OF SERVICE BY E-MAIL

I, Sandra Chan, not a party to the within action, hereby declare that on April 19, 2007,

I served the attached ORDER GRANTING IN PART AND DENYING IN PART

MATTEL'S MOTION FOR PROTECTIVE ORDER REGARDING "POLLY POCKET"

DOCUMENTS" in the within action by e-mail addressed as follows:

| | | |
|---|---|---|
| Robert Millman Esq. | Littler Mendelson | rfmillman@littler.com |
| Douglas Wickham Esq. | Littler Mendelson | dwickham@littler.com |
| Keith Jacoby Esq. | Littler Mendelson | kjacoby@littler.com |
| Dominic Messiha Esq | Littler Mendelson | dmessiha@littler.com |
| Diba Rastegar Esq. | Littler Mendelson | drastegar@littler.com |
| Michelle Park Esq. | Littler Mendelson | mpark@littler.com |
| Alaya B. Meyers, Esq. | Littler Mendelson | ameyers@littler.com |
| Brady Mitchell, Esq. | Littler Mendelson | bmitchell@littler.com |
| Carol Miller, Esq. | Littler Mendelson | cmiller@littler.com |
| Ryan P. Eskin, Esq. | Littler Mendelson | reskin@littler.com |
| John Quinn Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | jbq@quinnemanuel.com |
| Michael Zeller Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | michaelzeller@quinnemanuel.com |
| Jon Corey Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | joncorey@quinnemanuel.com |
| Duane Lyons Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | duanelyons@quinnemanuel.com |
| Timothy Alger Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | timalger@quinnemanuel.com |
| Dominic Surprenant Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | DominicSurprenant@QuinnEmanuel.com |
| B. Dylan Proctor Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | dylanproctor@quinnemanuel.com |
| Shane McKenzie Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | shanemckenzie@quinnemanuel.com |
| Bridget Morris Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | bridgetmorris@quinnemanuel.com |
| Tamar Buchakjian Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | tamarbuchakjian@quinnemanuel.com |
| Juan Pablo Alban, Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | juanpabloalban@quinnemanuel.com |
| Dale Cendali Esq. | O'Melveny & Myers LLP | dcendali@omm.com |
| Diana Torres Esq. | O'Melveny & Myers LLP | dtorres@omm.com |
| James Jenal Esq. | O'Melveny & Myers LLP | jjenal@omm.com |
| Alicia Meyer Esq. | O'Melveny & Myers LLP | ameyer@omm.com |
| Jennifer Glad Esq. | O'Melveny & Myers LLP | jglad@omm.com |
| Benjamin Kim Esq. | O'Melveny & Myers LLP | bjkim@omm.com |
| Hamid Jabbar Esq. | O'Melveny & Myers LLP | hjabbar@omm.com |
| Johanna Schmitt Esq. | O'Melveny & Myers LLP | jschmitt@omm.com |
| Patricia Glaser Esq. | Christensen, Glaser, Fink, Jacobs, Weil & Shapiro, LLP | pglaser@chrismill.com |

I declare under penalty of perjury under the laws of the Untied States of America that the above is true and correct.

Executed on April 19, 2007, at San Francisco, California.

_____
Sandra Chan

EXHIBIT _34_ PAGE _881_

EXHIBIT 35

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
Priority _____  Send _____
Entered _____  Closed _____
JS-5/JS-6 _____  JS-2/JS-3 _____
Scan Only _____  Docketed on CM _____
_____ THIS CONSTITUTES NOTICE OF
ENTRY AS REQUIRED BY FRCP 77(d)
JUN 27 2007
EASTERN DIVISION
BY _____  DEPUTY

FILED - EASTERN DIVISION
CLERK, U.S. DISTRICT COURT
JUN 27 2007
CENTRAL DISTRICT OF CALIFORNIA
BY  JIM HOLMES  DEPUTY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARTER BRYANT, | CASE NO. CV 04-09049 SGL |
| Plaintiff, | CONSOLIDATED WITH CV 04-09059 SGL CV 05-02727 SGL |
| v. | |
| MATTEL, INC., | ORDER RE MOTIONS HEARD ON JUNE 11, 2007 |
| Defendant, | |
| AND CONSOLIDATED ACTIONS | |

Presently before the Court is a multitude of motions filed by a number of parties in these consolidated cases. The factual allegations underlying the present actions are expansive and complex. They are set forth below only to the extent necessary for the Court's consideration of the present motions. At their essence, although involving a number of other legal and factual issues, these cases involve the rights to certain fashion dolls.

The present motions, six in total, focus on four basic issues: Two of the motions, filed by certain counter-defendants, address the sufficiency of the allegations made by Mattel, Inc. ("Mattel") in its counterclaims; most notably, these motions challenge the sufficiency of the allegations which underlie Mattel's claims based on the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.

Docket No. 577

EXHIBIT 35 PAGE 882

§§ 1961-1968 ("RICO").  Another motion challenges the Court's exercise of

personal jurisdiction over a foreign corporation, MGAE de México, S.R.L. de C.V.

("MGA Mexico").  Two additional motions seek review of a ruling, issued by a court-

appointed discovery master, overruling objections made during a party's deposition

that were based on the attorney-client and joint-defense privileges.  A final motion

heard on June 11, 2007, addresses the Court's scheduling order that divided the

issues to be tried in these consolidated cases into two phases.  This last motion will

be addressed in a separate order.

     The Court has reviewed the parties' filings regarding these motions and held

a hearing on June 11, 2007.  For the reasons and in the manner set forth more fully

herein, the Court makes the following rulings regarding these motions:

     1.    Motion of MGA Entertainment, Inc., ("MGA") and Issac Larian

("Larian") to Dismiss Mattel's Amended Answer and Counterclaims (docket # 189):[1]
**GRANTED IN PART AND DENIED IN PART.**

     2.    Motion of Carter Bryant to Dismiss Counterclaims II, III, V, VII, IX, and
XI (docket # 191):  **GRANTED IN PART AND DENIED IN PART.**

     3.    Motion of MGA Mexico to Dismiss Mattel's Amended Answer and
Counterclaims (docket # 266):  **DENIED.**

     4.    Motion of MGA Objecting to Discovery Master's March 7, 2007, Order
(docket # 308):  **GRANTED IN PART AND DENIED IN PART.**

     5.    Motion of Carter Bryant Objecting to Discovery Master's March 7,
2007, Order (docket # 306):  **GRANTED IN PART AND DENIED IN PART.**

---

[1] Joining in this Motion were MGA Entertainment (HK) Ltd. ("MGA Hong Kong"), Carter Bryant ("Bryant"), and MGA Mexico.

EXHIBIT 35 PAGE 883

### I. Factual Allegations

The following allegations appear in the Amended Answer and Counterclaims ("AAC"):

#### A.  Bryant's Employment by Mattel

Carter Bryant was hired by Mattel as a Barbie product designer in January 1999. (AAC ¶ 21.) At that time, Bryant signed an "Employee Confidential Information and Inventions Agreement," wherein he agreed not to assist or work for a Mattel competitor while employed by Mattel and that the designs and inventions he created while employed by Mattel were Mattel property. (AAC ¶¶ 22-23.) Bryant also executed a "Conflict of Interest Questionnaire" wherein he certified that, other than as disclosed, he had not worked for a Mattel competitor in the past year, had not engaged in a business transaction with a Mattel competitor that could create a conflict of interest, and that he would inform Mattel immediately if such an event occurred. (AAC ¶¶ 24-25.) While still employed by Mattel, Bryant used Mattel property and resources to develop and design the Bratz concept. (AAC ¶ 26.) Bryant also allegedly enlisted other Mattel employees to perform work on the Bratz line, in some cases, falsely informing those employees that they were working on a Mattel project. (AAC ¶ 27.)

#### B.  MGA's Involvement in Bryant's Conduct

MGA knew of and encouraged Bryant's misappropriation of Mattel property and resources. (AAC ¶ 33.) Bryant made affirmative misrepresentations to Mattel, including that he was leaving Mattel for "non-competitive" pursuits. (AAC ¶ 28.) Bryant and MGA concealed from Mattel that Bryant developed Bratz while employed by Mattel, that Bryant worked with MGA during the time he was employed by Mattel, and that Larian and others, not Bryant, were the creators of Bratz. (AAC ¶ 35.) Prior to his departure from MGA, Bryant entered into a contract with MGA to provide design services to MGA on a "top priority" basis. (AAC ¶ 36.) Bryant left Mattel's employ on October 20, 2000; three weeks later, MGA

EXHIBIT 35 PAGE 884

1  showed the Bratz prototypes to focus groups and retailers. (AAC ¶ 29.) Soon

2  thereafter, MGA showed the Bratz line to retailers at the Hong Kong Toy Fair in

3  January, 2001, and then began manufacturing and selling the dolls to retailers for

4  an annual revenue in the excess of $500 million. (AAC ¶¶ 31-32.)

5  **C.   Proprietary Information**

6      **1.   Mexico**

7        Counter-defendant Carlos Gustavo Machado Gomez ("Machado"), nonparty

8  Mariana Trueba Almada ("Trueba"), and nonparty Pablo Vargas San Jose

9  ("Vargas") were upper-level employees at Mattel Mexico. (AAC ¶¶ 38-40.) In the

10  three months before all three simultaneously resigned from Mattel Mexico on April

11  19, 2004, they were in contact with MGA via an email account with the address

12  "plot04@aol.com". (AAC ¶ 42.) The three former employees allegedly used this

13  account to supply MGA with confidential and proprietary Mattel information. (AAC

14  ¶ 42.) The three also copied various proprietary Mattel documents onto USB flash

15  drives prior to resigning. (AAC ¶ 44-46.) Shortly before her departure, Trueba

16  increased her access to Mattel's confidential information and attended a meeting at

17  which Mattel personnel analyzed Barbie programs for the United States, Canada,

18  and South America. (AAC ¶ 47.)

19        Among them, Machado, Trueba, and Vargas stole documents containing

20  information regarding Mattel's future products, production and shipping costs, sales

21  information, customer information, marketing information, and strategic research

22  information both in Mexico and worldwide. (AAC ¶ 48.) The stolen data was not

23  limited to the Mexican market; rather, the information stolen had the potential, and

24  in fact did, give MGA an unfair competitive advantage in the United States and

25  around the world. (AAC ¶ 49.)

26        In an attempt to conceal his actions, Machado ran a software program on his

27  Mattel computer in order to erase information pertaining to his contact with MGA.

28  (AAC ¶ 51.) When Mattel alerted Mexican authorities about the theft, they seized

4

EXHIBIT 35 PAGE 885

1    from MGA's Mexico City offices, pursuant to a search warrant, a large number of

2    documents containing Mattel trade secrets and confidential information. (AAC

3    ¶ 53.)

4          Shortly after the theft, Machado, Trueba, and Vargas traveled to Los

5    Angeles to meet face-to-face with MGA personnel. (AAC ¶ 52.)

6          **2.    Canada**

7          Jane Brisbois was the Director of Sales for the Girls Division in Canada.

8    (AAC ¶ 71.) When she was hired in 1999, she agreed to preserve and not disclose

9    Mattel's proprietary information. (AAC ¶ 71.)  While still employed by Mattel,

10   Brisbois spoke with Larian on September 22, 2005. (AAC ¶ 74.) That same day,

11   Brisbois copied approximately 45 Mattel documents containing Mattel trade secret

12   information into a USB flash drive that she took from the Mattel Canada office.

13   (AAC ¶ 74.) The files taken by Brisbois included documents regarding Mattel sales,

14   advertising strategies, market analyses, product launch dates, and profit margins in

15   Canada, Mexico, and the United States. (AAC ¶ 74.) Four days later, she resigned

16   from Mattel. (AAC ¶ 74.)

17         When Mattel learned of Brisbois' misappropriation of Mattel documents, it

18   notified Canadian law enforcement officials, who were able to recover the flash

19   drive and the documents from Brisbois. (AAC ¶ 75.)

20         **3.    United States**

21         Ron Brawer was Mattel's Senior Vice President and General Manager.

22   (AAC ¶ 55.) On September 17, 2004, Brawer informed Mattel that he was leaving

23   Mattel to work for MGA. (AAC ¶ 63.) During Brawer's exit interview, he falsely

24   represented that he had returned all proprietary information to Mattel; specifically,

25   Brawer took the information in his contacts file which included contact information

26   for Mattel customers and Mattel employees. (AAC ¶ 68.) Brawer has since used

27   the contact information to induce certain Mattel employees to join MGA and

28   misappropriate Mattel trade secrets. (AAC ¶ 69.)

5

EXHIBIT 35 PAGE 886

1    MGA has also allegedly hired at least 25 other Mattel employees, some of

2    whom have provided MGA with Mattel's confidential information.  (AAC ¶ 77.)

3    **D.    Larian's Communications Regarding Mattel's New Product Line**

4        On May 12, 2006, Larian sent an email message to an email distribution list

5    that included a reference to a new Mattel Barbie line ("MY SCENE MY BLING

6    BLING") which Mattel had not yet made public.  (AAC ¶ 79.)  The distribution of the

7    email included members of the media and many of Mattel's most significant

8    customers.  (AAC ¶ 78.)  Soon after sending the email, Larian began calling these

9    significant customers and making false representations about the product;

10   specifically, Larian told each that it was the only retailer to purchase the product

11   and that Mattel would not be supporting the product with television advertising.

12   (AAC ¶ 80.)

13   **E.    Exhibit C**

14       In Exhibit C to the AAC, Mattel references a number of communications,

15   numbering well over one hundred, that it contends constitutes predicate acts of mail

16   fraud or wire fraud.  Exhibit C does not describe the contents of those

17   communications.

18                              **II. Counterclaims Asserted**

19       Based on these allegations, Mattel asserts the following counterclaims:

20   (1) Copyright Infringement, including willful, vicarious, and contributory

21   infringement, asserted against MGA, MGA Hong Kong, Larian and Bryant;

22   (2) violation of RICO's substantive prohibition, 18 U.S.C. § 1962(c), asserted as

23   authorized by 18 U.S.C. § 1964(c) against all defendants, which alleges predicate

24   acts of, *inter alia*, mail fraud, wire fraud, and criminal copyright infringement; (3) a

25   violation of RICO's prohibition against conspiracies, 18 U.S.C. § 1962(d), asserted

26   against all defendants; (4) state-law misappropriation of trade secrets against MGA,

27   MGA Mexico, Larian, and Machado; (5) breach of contract, asserted against Bryant

28   only and based on certain employment agreements between Bryant and Mattel;

6

EXHIBIT 35 PAGE 887

(6) intentional interference with contract, asserted against MGA and Larian and based on Bryant's employment agreements; (7) breach of fiduciary duty, asserted against Bryant and Machado; (8) aiding and abetting breach of fiduciary duty, asserted against MGA and Larian; (9) breach of the duty of loyalty, asserted against Bryant and Machado; (10) aiding and abetting breach of the duty of loyalty, asserted against MGA and Larian; (11) conversion, asserted against all counter-defendants; (12) violation of California's unfair competition law, Cal. Bus. & Prof. Code § 17200, asserted against all counter-defendants; and finally, (13) a claim for declaratory relief.

### III. Counter-Defendants' Motions to Dismiss for Failure to State a Claim

The parties have moved to dismiss a number of Mattel's counterclaims on various grounds. The Court addresses each claim in turn, considering at all times the standard for dismissal pursuant to Fed. R. Civ. P. 12(b)(6).

### A.   Standard for Dismissal Pursuant to Fed. R. Civ. P. 12(b)(6)

In lieu of an answer, a party may, as the counter-defendants have here, file a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), which provides that such a motion may be made where the pleader has "fail[ed] to state a claim upon which relief can be granted." Id. In deciding a Rule 12(b)(6) motion, the Court must also consider the requirements of Fed. R. Civ. P. 8(a), which requires only a "short and plain statement of the claim showing that the pleader is entitled to relief" or, when the claim at issue avers fraud or mistake, the motion must be considered in conformity with Fed. R. Civ. P. 9(b), which requires fraud and mistake to be pleaded with particularity. See 5A Charles A. Wright & Arthur Miller, Federal Practice and Procedure, §1356 (1990); James Wm. Moore, Moore's Federal Practice, Vol. 2 § 12.34[1][c].

In bringing a motion pursuant to Rule 12(b)(6), the moving party has the burden of persuading the Court that the complaint has failed to state a claim upon which relief can be granted. Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406,

EXHIBIT 35 PAGE 888

1   1409 (3d Cir.), cert. denied, 501 U.S. 1222 (1991). In considering the motion,

2   "courts must consider the complaint in its entirety," and read it in the light most

3   favorable to the plaintiff, accepting as true all factual allegations in the complaint, as

4   well as reasonable inferences to be drawn therefrom. Tellabs, Inc. v. Makor Issues

5   & Rights, Ltd., __ U.S. __, No. 06-484, 2007 WL 1773208, at *9 (June 21, 2007);

6   Pareto v. F.D.I.C., 139 F.3d 696, 699 (9th Cir. 1998). However, the Court need not

7   accept any unwarranted deductions of fact, or conclusory legal statements cast in

8   the form of factual allegations. See Western Mining Council v. Watt, 643 F.2d 618,

9   624 (9th Cir.), cert. denied, 454 U.S. 1031 (1981).

10      Generally, a court cannot consider evidence in deciding a Rule 12(b)(6)

11   motion; however, a court may consider exhibits attached to the complaint as well as

12   documents that are not physically attached to the complaint but "whose contents

13   are alleged in [the] complaint and whose authenticity no party questions." Branch v.

14   Tunnell, 14 F.3d 449, 453-54 (9th Cir. 1994), cert. denied, 512 U.S. 1219 (1994).

15   Facts of which a court may take judicial notice pursuant to Fed. R. Evid. 201 are

16   also properly considered. Mir v. Little Company of Mary Hospital, 844 F.2d 646,

17   649 (9th Cir. 1988).

18   **B.    RICO Claims**

19      The counter-defendants devote most of their motions to the sufficiency of the

20   allegations regarding Mattel's RICO claims. The Court's analysis begins, as it must

21   when considering a federal statute, with the language of that statute. The

22   substantive RICO prohibition at issue is found in 18 U.S.C. § 1962(c):

23      It shall be unlawful for any person employed by or associated

24      with any enterprise engaged in, or the activities of which affect,

25      interstate or foreign commerce, to conduct or participate, directly or

26      indirectly, in the conduct of such enterprise's affairs through a pattern

27      of racketeering activity or collection of unlawful debt.

28   Id. Conspiracies to violate this substantive prohibition are themselves prohibited by

8

EXHIBIT 35 PAGE 889

§ 1962(d), which states that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." Id. Many of these terms are defined by the statutory language, including "racketeering activity," "enterprise," and "pattern of racketeering activity":

> (1) "racketeering activity" means . . . (B) any act which is indictable under any of the following provisions of title 18, United States Code: . . . section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), . . . section 1512 (relating to tampering with a witness, victim, or an informant), . . . section 1952 (relating to interstate and foreign travel or transportation in aid of racketeering enterprises]), [and] section 2319 (relating to criminal infringement of a copyright)[.]
>
> . . . .
>
> (4) "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;
>
> (5) "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity[.]

18 U.S.C. § 1961.

In considering a Rule 12(b)(6) motion seeking to dismiss a RICO claim, the Court measures the sufficiency of alleged predicate acts of wire fraud and mail fraud by the Rule 9(b) "pleading-with-particularity" standard; however, the Court measures the sufficiency of all other predicate acts by the more lenient standard set forth in Rule 8(a). Compare Fed. R. Civ. P. 9(b) ("In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with

EXHIBIT 3J PAGE 890

1  particularity. Malice, intent, knowledge, and other condition of mind of a person

2  may be averred generally.") with Fed. R. Civ. P. 8(a) ("A pleading which sets forth a

3  claim for relief, . . . shall contain . . . (2) a short and plain statement of the claim

4  showing that the pleader is entitled to relief . . . ."); see Lancaster Community Hosp.

5  v. Antelope Valley Hosp. Dist., 940 F.2d 397, 405 (9th Cir. 1991) (applying Rule

6  9(b) standard to allegations of mail fraud and noting that "[t]he Ninth Circuit has

7  repeatedly insisted that [Rule 9(b)] be followed in RICO actions alleging the

8  predicate act of mail fraud."), cert. denied, 502 U.S. 1094 (1992).

9       In order to state its claim under § 1962(c), Mattel "must allege (1) conduct

10  (2) of an enterprise (3) through a pattern (4) of racketeering activity (5) causing

11  injury to [its] business or property." Ove v. Gwinn,  264 F.3d 817, 825 (9th Cir.

12  2001) (internal quotation marks and citation omitted).  Here, counter-defendants'

13  motions challenge the first, second, fourth, and fifth elements.

14       1.     **"Conduct or Participate"**

15       Bryant contends that his role in any alleged scheme or enterprise is too

16  tenuous to constitute the "conduct" necessary to impose RICO liability.  In order to

17  have RICO liability imposed upon him, a defendant must "conduct or participate,

18  directly or indirectly, in the conduct of [an] enterprise's affairs through a pattern of

19  racketeering activity . . . ." 18 U.S.C. § 1962(c).  The United States Supreme Court

20  has elaborated on this statutory language in Reves v. Ernst & Young, 507 U.S. 170,

21  179 (1993), wherein it noted:

22            [T]he word "participate" makes clear that RICO liability is not limited to

23            those with primary responsibility for the enterprise's affairs, just as the

24            phrase "directly or indirectly" makes clear that RICO liability is not

25            limited to those with a formal position in the enterprise, but some part

26            in directing the enterprise's affairs is required.

27  Id. Here, Mattel has alleged that Bryant secretly developed Bratz while employed

28  by Mattel and using Mattel's resources and employees, that he concealed that fact

EXHIBIT 35 PAGE 891

1  when he had a duty to disclose it, and that he did these things in order to facilitate

2  the development of the Bratz concept by Mattel's direct competitor, in violation of,

3  *inter alia*, criminal copyright law. These allegations, if proven to be true, are

4  sufficient to impose RICO liability on Bryant.

5  ### 2.  Enterprise

6       Bryant's motion challenges the sufficiency of the allegations regarding a

7  RICO enterprise. That enterprise is alleged to be an "association-in-fact" enterprise

8  comprised of the counter-defendants, Brawer, Trueba, Vargas, Brisbois, and

9  others. (AAC ¶ 89.) Mattel alleges that counter-defendants participated in or

10  conducted the affairs of the association-in-fact enterprise through a pattern of

11  racketeering activities, including, as detailed in the AAC, predicate acts of mail

12  fraud, wire fraud, evidence tampering, interstate and foreign travel to aid

13  racketeering activities, and criminal copyright infringement. (AAC ¶ 90.) The

14  counter-defendants' goal is alleged to have been to "execut[e] or attempt to

15  execut[e] [a] scheme to improperly defraud Mattel and steal its trade secret or

16  otherwise confidential and proprietary Information . . . ." (AAC ¶ 90.)

17       A recent *en banc* decision of the Ninth Circuit sets forth a comprehensive

18  analysis of the sufficiency of allegations regarding a RICO enterprise necessary to

19  state a claim. See Odom v. Microsoft Corp., 486 F.3d 541, 2007 WL 1297249 (9th

20  Cir. 2007) (designated for publication). That decision provides the blueprint for the

21  Court's present analysis.

22       Odom involved an alleged scheme involving consumers who purchased

23  computers from Best Buy retail stores. Id. at 543. The computers would include a

24  Microsoft compact disc that the cashier would scan; the consumer's credit card was

25  also scanned for purchase. Id. The credit card information was transmitted to

26  Microsoft, and Microsoft would, at some point, begin making unauthorized charges

27  to the credit card used to purchase the computer, ostensibly for Microsoft's

28  provision of internet services. Id. Odom brought substantive RICO and RICO

EXHIBIT 35 PAGE 892

1   conspiracy claims based on these allegations. Id. at 544.

2       The Ninth Circuit first noted the evidenced judicial resistance to RICO in the

3   lower courts, contrasted with the Supreme Court's four reversals of such narrow

4   readings of RICO. Id. at 545-47 (citing United States v. Turkette, 452 U.S. 576

5   (1981) (rejecting notion that RICO prohibited only the infiltration of legitimate

6   businesses by organized crime); Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 481

7   (1985) (rejecting notion that RICO could be used to impose civil liability only where

8   the defendant had been criminally convicted and that such liability was limited to a

9   narrow measure of damages); National Organization for Women v. Scheidler, 510

10  U.S. 249 (1994) (rejecting the notion that RICO liability could be imposed only when

11  the acts of a RICO enterprise had an economic motive); and Cedric Kushner

12  Promotions v. King, 533 U.S. 158 (2001) (reversing lower court's ruling that no

13  RICO claim was stated where president and sole shareholder of a corporation was

14  alleged to have associated with his wholly owned corporation as a RICO

15  "enterprise," and relying on fact that person and corporation were separate legal

16  entities). In Odom, the Ninth Circuit understandably viewed these four holdings as

17  a "general instruction that we should not read the statutory terms of RICO

18  narrowly." Odom, 486 F.3d at 547 (internal citation omitted).

19      In Odom, the Ninth Circuit clarified -- and relaxed -- the standard for pleading

20  and proving an "associated-in-fact" enterprise such as the one alleged here:

21          The definition of "enterprise" in the text of RICO is fairly

22      straightforward. In its entirety, the definition is as follows: "'enterprise'

23      includes any individual, partnership, corporation, association, or other

24      legal entity, and any union or group of individuals associated in fact

25      although not a legal entity." 18 U.S.C. § 1961(4). As is evident from

26      the text, this definition is not very demanding. A single "individual" is

27      an enterprise under RICO. Similarly, a single "partnership," a single

28      "corporation," a single "association," and a single "other legal entity"

EXHIBIT 35 PAGE 893

1    are all enterprises.  At issue in this case is the last kind of enterprise

2    listed in the definition -- a "group of individuals associated in fact."  It is

3    undisputed that a corporation can be an "individual" for purposes of

4    an associated-in-fact enterprise.

5    Id. at 548.

6         The Ninth Circuit acknowledged that "enterprise" must be something greater

7    than merely a pattern of racketeering activity; however, the court rejected the notion

8    that an enterprise must have a particular ascertainable organizational structure.  Id.

9    at 551 ("We take this opportunity to join the circuits that hold that an

10   associated-in-fact enterprise under RICO does not require any particular

11   organizational structure, separate or otherwise.") (citations omitted).  A party need

12   only set forth factual allegations of "a group of persons associated together for a

13   common purpose of engaging in a course of conduct," "evidence of an ongoing

14   organization, formal or informal," and "evidence that the various associates function

15   as a continuing unit."  Id. at 552 (internal citations and quotation marks omitted).

16        As for the common purpose, it was met in Odom, where the plaintiff had

17   alleged the following:

18        [D]efendants had the common purpose of increasing the

19        number of people using Microsoft's Internet Service, and doing so by

20        fraudulent means.  Best Buy furthered this common purpose by

21        distributing Microsoft Internet Trial CD's and conveying its customers'

22        debit and credit card information to Microsoft.  Microsoft then used the

23        information to activate customer accounts.

24   Id.  Here, Mattel has alleged the common purpose of attempting to defraud Mattel

25   and steal its trade secrets.  Mattel's many factual allegations, detailed herein,

26   support this alleged common purpose.

27        As for the "ongoing organization" requirement, the Ninth Circuit in Odom

28   noted that the plaintiffs had met that element, which was met where the

13

EXHIBIT 35 PAGE 894

1 organization was alleged to be "a vehicle for the commission of two or more

2 predicate crimes." Id. (internal quotation marks and citation omitted). The Ninth

3 Circuit noted the following factual allegations:

4    Microsoft and Best Buy established mechanisms for

5    transferring plaintiffs' personal and financial information from Best Buy

6    to Microsoft. That information then allowed Microsoft to activate

7    plaintiffs' Internet accounts without their knowledge or permission.

8    These mechanisms enabled Microsoft to bill plaintiffs improperly for

9    MSN services in 2001, 2002 and 2003.

10 Id. Here, plaintiffs have alleged that the counter-defendants coordinated their many

11 efforts at depriving Mattel of its proprietary information and its intellectual property.

12 The allegations regarding common use of the "plot04@aol.com" email address to

13 transfer confidential Mattel information to MGA support the finding of an "ongoing

14 organization." So, too, do the allegations regarding the repeated communications

15 between Bryant and MGA.

16    The "continuing unit" requirement does not appear to the Court to mandate

17 that the organization continues to this day;[2] rather, the requirement is related to the

18 notion that RICO was not meant to address discrete instances of fraud or criminal

19 conduct.  "[T]he continuity requirement focuses on whether the associates'

20 behavior was 'ongoing' rather than isolated activity." Id. at 553 (internal quotation

21 marks and citation omitted).  Related to that concern, it is also clear to the Court

22 that this requirement is related to the duration of the racketeering activities. See id.

23 ("An almost two-year time span is far more than adequate to establish that Best

24 Buy and Microsoft functioned as a continuing unit.").  Here, the allegations do not

25 reveal that the conduct complained of was mere isolated activity; rather, Mattel sets

26 forth allegations of racketeering activity that spanned a period of three years.  The

27

28    [2] Nevertheless, Mattel alleges that the enterprise exists to this day by virtue
of its continued use of Mattel's information and property.

EXHIBIT 3J PAGE 895

allegations describe a scheme consisting of corporate warfare between competitors that has been waged over a long period of time and waged on a number of fronts, both foreign and domestic. The "continuing unit" requirement is therefore satisfied.

Accordingly, the Court finds that Mattel has sufficiently pleaded the existence of a RICO enterprise.

### 3. Predicate Acts of Racketeering Activity

#### a. Mail Fraud and Wire Fraud

The criminal prohibition against mail fraud is found at 18 U.S.C. § 1341:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, . . . shall be fined under this title or imprisoned not more than 20 years, or both.

Id. The Ninth Circuit has described the elements of mail fraud as "(1) proof of a scheme to defraud; (2) using or causing the use of the mails to further the fraudulent scheme; and (3) specific intent to defraud." United States v. Rogers, 321 F.3d 1226, 1229 (9th Cir. 2003) (internal citation omitted).

The criminal prohibition against wire fraud is similar:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, . . . transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

EXHIBIT 35 PAGE 896

1    18 U.S.C. § 1343. The Ninth Circuit has described the elements of wire fraud as

2    "(1) a scheme to defraud; (2) use of the wires in furtherance of the scheme; and

3    (3) a specific intent to deceive or defraud." United States v. Shipsey, 363 F.3d 962,

4    971 (9th Cir. 2004) (citations omitted).

5           As all parties acknowledge, the predicate acts of mail fraud and wire fraud

6    must be pleaded with particularity pursuant to Fed. R. Civ. P. 9(b). Specifically,

7    Mattel must detail "the time, place, and manner of each act of fraud, [and it must

8    set forth] the role of each defendant in each scheme." Lancaster Community

9    Hosp., 940 F.2d at 405. This standard applies in RICO actions alleging predicate

10   acts of mail fraud. Id.

11          Here, Mattel sets forth allegations of predicate acts of mail fraud and wire

12   fraud referenced in Exhibit C to the AAC. However, these alleged predicate acts

13   are insufficiently pleaded because they fail to adequately describe the contents of

14   the communications; specifically, they fail to detail time, place and manner of "each

15   act of fraud." The substantive RICO claim is therefore dismissed to the extent it is

16   premised on those communications. Mattel is **GRANTED** leave to amend the RICO

17   claim based on this insufficiency; Mattel must attach to the Second Amended

18   Answer and Counterclaims ("SAAC") copies of the referenced communications.

19   The contents of packages referenced in Exhibit C must be described in order to

20   meet the Rule 9(b) requirements.

21          At oral argument, counsel for MGA argued that the substance of many, if not

22   all of the communications, cannot be read to further a scheme to defraud. That

23   argument will be considered another day, after Mattel files the SAAC. However, the

24   Court takes the opportunity today to note that, given the broad scope of the alleged

25   scheme to defraud, including the criminal copyright infringement allegations,

26   otherwise innocuous and routine communications regarding day-to-day operations

27   and product development may be found to be in furtherance of that scheme. See

28   Tellabs, Inc. v. Makor Issues & Rights, Ltd., __ U.S. __, No. 06-484, 2007 WL

EXHIBIT 35 PAGE 897

1  1773208, at *9 (June 21, 2007) (noting that, in considering a Rule 12(b)(6) motion,

2  "courts must consider the complaint in its entirety").

3        Counter-defendants also argue that Mattel failed to plead each defendant's

4  role in furtherance of the scheme to defraud.  As interpreted by the Ninth Circuit,

5  the Rule 9(b) standard clearly requires that a plaintiff so plead.  Lancaster

6  Community Hosp., 940 F.2d at 405.  However, the Court will view the

7  communications alleged to constitute mail and wire fraud in conjunction with all the

8  allegations set forth regarding the alleged scheme in the counterclaims.  See Flood

9  v. Makowski, No. 3:CV-03-1803, 2004 WL 1908221, at *14 (M.D. Pa., Aug. 24,

10  2004) (applying the principle that reasonable inferences in favor of a plaintiff must

11  be made when considering a Rule 12(b)(6) motion and noting that "[a]lthough

12  Plaintiffs' Complaint does not expressly identify how each particular mail or wire

13  communication furthered the scheme, the Complaint clearly alleges facts which

14  create an unquestionable inference that the alleged communications furthered the

15  scheme.").

16        Counter-defendants also argue that, because the emails alleged to

17  constitute wire fraud were sent among individuals physically located in the same

18  state, Mattel will not be able to establish the interstate nature of the

19  communications.  See 18 U.S.C. § 1343 (setting forth the requirement that

20  communications be transmitted "in interstate or foreign commerce").  Mattel has

21  alleged that the communications were transmitted in interstate or foreign

22  commerce.  (AAC ¶ 93(b).)  This suffices at the pleadings stage; however,

23  eventually Mattel will be called upon to support these allegations with evidence.

24  See First Pacific Bancorp, Inc. v. Bro, 847 F.2d 542, 547 (9th Cir. 1988) (implicitly

25  holding that wire fraud must be supported, at the summary judgment stage, by

26  evidence of interstate wire fraud).

27        The Court dismisses the RICO claim to the extent it is based on the alleged

28  predicate acts of mail fraud and wire fraud because those acts are not pleaded with

17

1   particularity as required by Rule 9(b).  Mattel is **GRANTED** ten days' leave to file a

2   SAAC that incorporates and attaches and/or describes the communications and the

3   contents of packages referenced in Exhibit C.

4           **b.**    **Evidence Tampering**

5         Unlike the mail fraud and wire fraud allegations, the allegations regarding the

6   remaining predicate acts are governed by the more lenient pleading standards of

7   Rule 8(a).  See Slade v. Gates, No. 01-8244-RMT, 2002 WL 31387263, at *6 (C.D.

8   Cal., Oct. 11, 2002).  The Court considers the sufficiency of those remaining

9   allegations pursuant to this Rule.

10         The criminal prohibition against tampering with evidence is found at 18

11   U.S.C. § 1512:

12         Whoever corruptly . . . alters, destroys, mutilates, or conceals a

13         record, document, or other object, or attempts to do so, with the intent

14         to impair the object's integrity or availability for use in an official

15         proceeding . . . shall be fined under this title or imprisoned not more

16         than 20 years, or both.

17   Id.  Mattel's opposition makes clear that its evidence tampering allegations are

18   based upon two categories of documents:  The first category of documents,

19   perhaps composed of only one multi-page document, involves the alleged alteration

20   of Bryant's contract with MGA to remove a fax header showing that the date of its

21   execution, which predated the effective date of Bryant's resignation from Mattel.[3]

22   The second category of documents are those filed with the United States Copyright

23   Office, which are alleged to omit the disclosure that certain Bratz drawings were

24   "works for hire," and which are alleged to have had alterations made to certain

25   

26         [3]  The AAC merely alleges that counter-defendants Bryant and MGA

27   "tamper[ed] with and defac[ed] documents which showed that . . . Bryant was a
Mattel employee while he was working for and with MGA . . . ."  (AAC ¶ 35.)

28   However, it is clear from other filings by the parties that, at a minimum, this
allegation refers to MGA's contract with Bryant.

EXHIBIT 3J PAGE 899

1    relevant dates. (See AAC ¶ 35; Mattel Opp. to MGA's Motion at 9.)

2        As to the first category, a predicate act is sufficiently alleged.  Mattel has

3    alleged that a document was altered in a manner designed to conceal critical

4    evidence, highly relevant to the present official proceeding, regarding the timing of

5    the execution of the document.

6        Conversely, it is unclear whether Mattel has alleged a predicate act with

7    respect to the second category of documents.  The issue of whether submitting

8    fraudulent registrations and "altering relevant dates" on documents submitted to the

9    United States Copyright Office has not been fully briefed by the parties; the issue

10   was framed in this manner only upon the filing of the reply.[4]  Therefore, the Court

11   reserves this issue for a later date, and anticipates that it will be addressed by the

12   parties in a motion to dismiss the SAAC.

13       **c.    Travel Act Violation**

14       Federal criminal law prohibits interstate or foreign travel to aid in

15   racketeering activities.  18 U.S.C. § 1952; see also 18 U.S.C. § 1961 (defining a

16   violation of § 1962 as a RICO predicate act).  In relevant part, the criminal

17   prohibition states:

18       Whoever travels in interstate or foreign commerce or uses the

19       mail or any facility in interstate or foreign commerce, with intent to . . .

20       promote, manage, establish, carry on, or facilitate the promotion,

21       management, establishment, or carrying on, of any unlawful activity,

22       and thereafter performs or attempts to perform . . . [such an act,] shall

23       be fined under this title, imprisoned not more than 5 years, or

24       both . . . .

25                                    . . . .

26       As used in this section . . . "unlawful activity" means . . .

27    _____

28       [4] The Court does not view this failure as the fault of any party.

EXHIBIT 35 PAGE 900

1    extortion, bribery, or arson in violation of the laws of the State in which

2    committed or of the United States . . . .

3  Id.  Mattel alleges that Bryant and others traveled in interstate commerce to commit

4  commercial bribery in violation of California's prohibition against commercial

5  bribery, which in relevant part provides:

6        (a) Any employee who solicits, accepts, or agrees to accept

7        money or any thing of value from a person other than his or her

8        employer, other than in trust for the employer, corruptly and without

9        the knowledge or consent of the employer, in return for using or

10        agreeing to use his or her position for the benefit of that other person,

11        and any person who offers or gives an employee money or any thing

12        of value under those circumstances, is guilty of commercial bribery.

13  Cal. Penal Code § 641.3.  Several allegations support a violation of § 641.3(a),

14  which in turn supports a violation of 18 U.S.C. § 1952.  Mattel has alleged that

15  Bryant, while still employed by Mattel, entered into a contract with MGA to provide

16  design services to MGA on a "top priority" basis, and used Mattel property,

17  employees, and resources to develop and design the Bratz concept.

18        Counter-defendants argue that the requirement under California's

19  commercial bribery statute that a violator act "corruptly" is not met because Bryant

20  did not intend to injure Mattel.  Such an intent is not required; rather it is sufficient

21  that Bryant is alleged to have intended to defraud Mattel.  See Cal. Penal Code

22  § 341.3(d)(3) (defining "corruptly" as involving the intent "to injure or defraud")

23  (emphasis added).

24        **d.    Criminal Copyright Violations**

25        The parties dispute the relevant pleading standard that governs the

26  allegations which underlie the criminal copyright violation claim.  Counter-

27  defendants would have the Court apply the more exacting Rule 9(b) standards

28  because, in their assessment, the claim "sounds in fraud."  Mattel, however,

EXHIBIT 35 PAGE 901

1    contends that there is no reason to depart from the more lenient Rule 8(a) standard

2    generally applied to copyright claims because, in its assessment, the claims "sound

3    in copying, not fraud." (Mattel Opposition to MGA's Motion at 4.)

4        The recent Ninth Circuit case on this issue, cited by both parties, stands for

5    the unremarkable proposition that, consistent with Rule 9(b), all *averments* of fraud

6    must be pleaded with particularity, regardless of whether fraud is an essential

7    element of the claim to which the averment relates.  See Vess v. Ciba-Geigy Corp.

8    USA, 317 F.3d 1097, 1103 (9th Cir. 2003); Fed. R. Civ. P. 9(b) ("In all *averments*

9    of fraud or mistake, the circumstances constituting fraud or mistake shall be stated

10   with particularity.") (emphasis added).

11       Considering Rules 8(a), 9(b), and the teachings of Vess, a spectrum

12   emerges.  At the left end of this spectrum are claims that do not involve any

13   allegations of fraud.  Those need only satisfy Rule 8(a)'s "short and plain

14   statement" standard.  At the opposite end of the spectrum are claims based solely

15   on fraud, and the facts underlying such a claim must be alleged with particularity

16   pursuant to Rule 9(b).  Lying closer to the Rule 9(b) end of the spectrum is a

17   category of claims discussed in Vess:

18           In cases where fraud is not a necessary element of a claim, a

19       plaintiff may choose nonetheless to allege in the complaint that the

20       defendant has engaged in fraudulent conduct. In some cases, the

21       plaintiff may allege a unified course of fraudulent conduct and rely

22       entirely on that course of conduct as the basis of a claim. In that

23       event, the claim is said to be "grounded in fraud" or to "sound in

24       fraud," and the pleading of that claim as a whole must satisfy the

25       particularity requirement of Rule 9(b).

26   Vess, 317 F.3d at 1103-04 (internal citations omitted).  It is into this category MGA

27   contends that the allegations of criminal copyright claims fit, and MGA therefore

28   contends that all allegations regarding the criminal copyright claims must be

21

EXHIBIT 35 PAGE 902

1   pleaded with particularity.

2       However, Vess sets up another category, lying closer to the Rule 8(a) part of

3   the spectrum (but nevertheless requiring pleading with some particularity):

4           In other cases, however, a plaintiff may choose not to allege a

5       unified course of fraudulent conduct in support of a claim, but rather

6       to allege some fraudulent and some non-fraudulent conduct.  In such

7       cases, only the allegations of fraud are subject to Rule 9(b)'s

8       heightened pleading requirements. . . . The rule does not require that

9       allegations supporting a claim be stated with particularity when those

10      allegations describe non-fraudulent conduct.

11          [In other words,] in a case where fraud is not an essential

12      element of a claim, only allegations ("averments") of fraudulent

13      conduct must satisfy the heightened pleading requirements of Rule

14      9(b).  Allegations of non-fraudulent conduct need satisfy only the

15      ordinary notice pleading standards of Rule 8(a).

16  Id. at 1104-05.

17      Whether fraud is an essential element of criminal copyright infringement

18  must be determined by reference to the statutory language and any interpretative

19  case law.  In relevant part, the prohibition against criminal copyright infringement

20  provides: "Any person who violates section 506(a) (relating to criminal offenses) of

21  title 17 shall be punished as provided [herein] in and such penalties shall be in

22  addition to any other provisions of title 17 or any other law." 18 U.S.C. § 2319.  In

23  turn, the relevant provision in 17 U.S.C. § 506 states that "[a]ny person who willfully

24  infringes a copyright shall be punished as provided under section 2319 of title 18, if

25  the infringement was committed . . . for purposes of commercial advantage or

26  private financial gain . . . ." 17 U.S.C. § 506(a)(1)(A).  The elements of the offense

27  are easily gleaned from the straightforward statutory language: "Criminal

28  infringement of copyright has three elements: (1) infringement of a copyright

EXHIBIT 35 PAGE 903

1   (2) done wilfully (3) for purposes of commercial advantage or private financial gain."

2   United States v. Goss, 803 F.2d 638, 642 (11th Cir. 1986).

3        Clearly, fraud is not an essential element of a criminal copyright claim, taking

4   it out of the category at the far end of the spectrum described above, and

5   necessitating an inquiry into whether Mattel has chosen to incorporate a fraud

6   element into its criminal copyright claim.  The AAC at ¶ 93(e) reveals that the

7   criminal copyright claim is premised upon the "willfull[] infringe[ment of] Mattel's

8   copyrights, including with respect to documents containing Mattel trade secret and

9   confidential information . . . ."  The Opposition fills in more details regarding this

10   claim, noting that the criminal copyright claim is premised upon the Bratz-related

11   works, Bratz-derivative works, and works contained within Mattel's allegedly

12   purloined trade secrets and confidential information.  (Mattel Opposition to MGA's

13   Motion at 5).

14        These allegations do not "allege a unified course of fraudulent conduct and

15   rely entirely on that course of conduct as the basis of a claim" such that the claim

16   could be said to "sound in fraud" and therefore require pleading with particularity as

17   to the entire claim.  The allegations establish that much of the conduct complained

18   of consists of simple copying of the Bratz-related works or the creation of Bratz-

19   derivative works.  Such allegations are unrelated to allegations of fraud.  Therefore,

20   if this claim falls anywhere on the spectrum other than the Rule 8(a) category, it

21   falls in the category described by Vess as those claims in which a claimant chooses

22   to "allege some fraudulent and some non-fraudulent conduct."  Id. at 1104.

23        When one considers that the alleged predicate acts of criminal copyright

24   infringement are but a small part of a larger, and singular, claim brought pursuant to

25   RICO, it is evident that the RICO claim falls neatly into the category of claims that

26   are based partly on fraudulent and partly on non-fraudulent conduct.  The Court

27   has already found that certain fraudulent conduct -- that supporting the alleged

28   predicate acts of mail fraud and wire fraud -- is insufficiently pleaded.  The current

23

EXHIBIT 35 PAGE 204

1   focus, however, is whether the allegations supporting the predicate acts of criminal

2   copyright infringement involve fraudulent conduct.

3          Here, there are two types of works allegedly infringed.  The first type is the

4   Bratz-related and Bratz-derivative works.  The second type is Mattel's other trade

5   secrets and confidential information.  Both types are alleged -- with particularity -- to

6   have been procured by MGA through fraudulent conduct, but the criminal copyright

7   infringement predicate acts do not implicate that fraudulent conduct.  Rather, they

8   implicate only questions of whether counter-defendants wilfully infringed Mattel's

9   works for commercial advantage or private financial gain.  Here, Mattel has

10  sufficiently alleged predicate acts of criminal copyright infringement by alleging that

11  MGA and other counter-defendants willfully infringed its copyrights for purposes of

12  gaining commercial advantage and private financial gain.  As Mattel correctly

13  contends, state of mind, in this instance willfulness, may be pleaded generally.  <u>See</u>

14  <u>Ferguson Beauregard/Logic Controls v. Mega systems, LLC</u>, 350 F.3d 1327, 1343

15  (Fed. Cir. 2003).

16          **4.     <u>Injury to Business or Property</u>**

17          "Recovery under RICO is limited to those injuries flowing from predicate

18  acts . . . ."  <u>Resolution Trust Corp. v. Keating</u>, 186 F.3d 1110, 1117 (9th Cir. 1999)

19  (citing <u>Sedima, S.P.R.L. v. Imrex Co., Inc.</u>, 473 U.S. 479, 497 (1985)).  Here, Mattel

20  has alleged damages flowing from the alleged acts of racketeering activity.  (AAC

21  ¶ 96).  Damages easily flow from theft of trade secrets and confidential information

22  committed by a direct competitor and from infringement of copyrights that are

23  alleged to have been used to make millions -- if not billions -- of dollars.

24          Counter-defendants argue that Mattel lacks standing to sue on behalf of its

25  subsidiaries.  This issue arises because many of the allegations of the thefts of

26  trade secrets involve actions taken in Mexico or Canada by employees of Mattel's

27  foreign subsidiaries.  Mattel argues that it is not attempting to sue for damages

28  incurred by its subsidiaries; rather, Mattel alleges that much of the confidential

EXHIBIT 35 PAGE 9 05

1   information stolen by the employees of Mattel's subsidiaries belonged not to

2   Mattel's subsidiaries, but to Mattel itself.  Based on these allegations, Mattel may

3   sue for damages it sustained.  Mattel may not sue for damages incurred by its

4   foreign subsidiaries.

5           **5.**    <u>**Ruling on Motions to Dismiss**</u>

6         The Motions to Dismiss the RICO claims are **GRANTED** in part.  As set forth

7   herein, the alleged predicate acts of mail fraud and wire fraud are insufficiently

8   alleged, and Mattel is **GRANTED** leave to amend the AAC.

9   **C.**    <u>**Trade Secrets**</u>

10         MGA contends that Mattel has failed to plead its trade secrets with sufficient

11   particularity to comply with its duties under Cal. Code Civ. P. § 2019.210, which

12   provides:

13         In any action alleging the misappropriation of a trade secret

14         under the Uniform Trade Secrets Act . . . , before commencing

15         discovery relating to the trade secret, the party alleging the

16         misappropriation shall identify the trade secret with reasonable

17         particularity subject to any orders that may be appropriate under

18         Section 3426.5 of the Civil Code [involving in camera reviews and

19         sealing of court documents].

20   <u>Id.</u>  Based on the unambiguous language of the statute, the Court agrees with

21   Mattel's characterization of this requirement as one related to discovery rather than

22   related to pleading.

23         The Court also agrees that, by identifying documents in discovery by Bates-

24   stamp number, Mattel has complied with the dictates of § 2019.210.  <u>See</u>

25   <u>Advanced Modular Sputtering, Inc. v. Superior Court</u>, 132 Cal.App.4th 826, 835-36,

26   (2005) (internal quotation marks and citations omitted) ("[Reasonable particularity]

27   means that the plaintiff must make some showing that is reasonable, i.e., fair,

28   proper, just and rational[,] . . . under all of the circumstances to identify its alleged

EXHIBIT 35 PAGE 906

trade secret in a manner that will allow the trial court to control the scope of

subsequent discovery, protect all parties' proprietary information, and allow them a

fair opportunity to prepare and present their best case or defense at a trial on the

merits."). MGA's complaints regarding the volume of documents so identified, and

their skepticism of Mattel appropriately attaching such an identification to many of

those identified documents, are not properly addressed at this stage of the

proceedings.

The motion to dismiss the trade secrets claim on this basis is therefore

**DENIED.**

D. **Duplicative State-Law Claims**

Bryant's motion to dismiss Mattel's duplicative state-law claims is **DENIED.**

The state-law counterclaims asserted against Bryant in the AAC admittedly overlap

with the claims asserted against him in the 04-9059 case, however, the factual

allegations underlying the claims asserted in the AAC are broader in scope than

those underlying the claims asserted in the 04-9059 case.

**IV. Motion to Dismiss for Lack of Personal Jurisdiction**

MGA Mexico challenges this Court's exercise of personal jurisdiction over it.

As set forth below, the Court concludes that it may, consistent with California law

and the federal Due Process Clause, exercise specific personal jurisdiction over

this admittedly foreign corporation.

A. **The Constitutional Exercise of Personal Jurisdiction**

Where a party moves to dismiss a claim for lack of personal jurisdiction, the

party asserting the claim bears the burden of demonstrating that jurisdiction is

appropriate. Schwarzenegger v. Fred Martin Motor Co., 374 F.3d 797, 800 (9th Cir.

2004). However, in opposing a motion to dismiss for lack of personal jurisdiction,

the party asserting the claim need only make a *prima facie* showing of jurisdictional

facts. Id. Disputed facts are to be resolved in favor of the exercise of personal

jurisdiction. Id.

EXHIBIT 35 PAGE 907

1    Because there is no applicable federal statute governing personal

2    jurisdiction, the Court applies the law of the state in which the district court sits. Id.

3    (citations omitted). "Because California's long-arm jurisdictional statute is

4    coextensive with federal due process requirements, the jurisdictional analyses

5    under state law and federal due process are the same." Id. at 800-01 (citations

6    omitted). In order for a court's exercise of personal jurisdiction over a nonresident

7    defendant to be constitutionally permissible, the defendant must have "minimum

8    contacts" with the forum state "such that the exercise of jurisdiction does not offend

9    traditional notions of fair play and substantial justice." Id. at 801 (internal quotation

10   marks and citation omitted).

11      Personal jurisdiction may be either general or specific. For general personal

12   jurisdiction to apply, a defendant (or here, a counter-defendant) "must engage in

13   continuous and systematic general business contacts . . . that approximate a

14   physical presence in the forum state." Id. (internal quotation marks and citations

15   omitted).

16      To determine whether it has specific personal jurisdiction over a nonresident

17   defendant, the Court employs a three-part test:

18         (1) The non-resident defendant must purposefully direct his

19         activities or consummate some transaction with the forum or resident

20         thereof; or perform some act by which he purposefully avails himself

21         of the privilege of conducting activities in the forum, thereby invoking

22         the benefits and protections of its laws; (2) the claim must be one

23         which arises out of or relates to the defendant's forum-related

24         activities; and (3) the exercise of jurisdiction must comport with fair

25         play and substantial justice, i.e. it must be reasonable.

26   Id. at 802.

27      The party asserting the claim bears the burden of establishing the first two

28   parts of the test. Id. If that party establishes the first two parts, then the burden

EXHIBIT 35 PAGE 968

1   shifts to the party resisting the Court's exercise of personal jurisdiction "to present a

2   *compelling case* that the exercise of jurisdiction would not be reasonable." Id.

3   (emphasis added).

4          The first part of the test is satisfied by either "purposeful availment" or

5   "purposeful direction." Id. Purposeful availment is shown when a defendant avails

6   itself of the privilege of doing business in a forum state, usually met when the

7   defendant took some action in the forum, such as executing or performing a

8   contract there. Id. By virtue of such actions, a defendant "purposefully avails itself

9   of the privilege of conducting activities within the forum State, thus invoking the

10  benefits and protections of its laws." Hanson v. Denckla, 357 U.S. 235, 253 (1958).

11  When taking advantage of these "benefits and protections," a defendant must also

12  "submit to the burdens of litigation in that forum." Burger King Corp. v. Rudzewicz,

13  471 U.S. 462, 476 (1985).

14         By contrast, purposeful direction, involves actions by the defendant outside

15  of the forum state but that are directed at the forum. Schwarzenegger, 374 F.3d at

16  803. The purposeful direction analysis is derived from a three-part "effects test"

17  that finds its roots in the Supreme Court's decision in Calder v. Jones, 465 U.S. 783

18  (1984). Pursuant to this analysis, the defendant must "have (1) committed an

19  intentional act, (2) expressly aimed at the forum state, (3) causing harm that the

20  defendant knows is likely to be suffered in the forum state." Id.; Schwarzenegger,

21  374 F.3d at 803. All three parts of the test must be satisfied. The second part of

22  the effects test is described by the Ninth Circuit as the "express aiming"

23  requirement, and requires that the counter-defendants "expressly aimed" its

24  intentional act at California. See Schwarzenegger, 374 F.3d at 806. Specifically,

25  "express aiming" is found where the defendant is alleged to have engaged in

26  wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident

27  of the forum state." Bancroft & Masters, Inc. v. Augusta Nat. Inc., 223 F.3d 1082,

28

EXHIBIT 35 PAGE 907

1087 (9th Cir. 2000).[5]

Assuming that the party asserting a claim can establish that the party resisting the Court's exercise of personal jurisdiction has met either the purposeful availment or express aiming part of the three-part test regarding the exercise of specific personal jurisdiction, courts next consider whether the claim arises out of or relates to the forum-related activities. In making this determination, the Court considers whether the contacts with the forum gave rise to the claims asserted, employing a "but for" standard. See Doe v. Unocal Corp., 248 F.3d 915, 924 (9th Cir. 2001).

Once the purposeful availment/express aiming and relatedness requirements are established, the burden shifts to the party resisting the Court's exercise of jurisdiction to show that exercise of jurisdiction is unreasonable. In determining reasonableness, the Court considers seven factors:

> 1) the extent of the defendant's purposeful interjection into the forum state's affairs; 2) the burden on the defendant; 3) conflicts of law between the forum and defendant's home jurisdiction; 4) the forum's interest in adjudicating the dispute; 5) the most efficient judicial resolution of the dispute; 6) the plaintiff's interest in convenient and effective relief; and 7) the existence of an alternative forum.

---

[5] What constitutes, or doesn't constitute, "express aiming" is best illustrated by example. For instance, in Pebble Beach Co. v. Caddy, 453 F.3d 1151 (9th Cir. 2006), no express aiming was found where the owner of a bed-and-breakfast in England (overlooking a pebbly beach) used the term "pebblebeach," the name of a famous golf course located in California, on its web site. Id. at 1153, 1156-57. The Ninth Circuit acknowledged that it might be foreseeable that the defendant's use of the web site might have some effect on California, but noted that mere foreseeability of effect in a forum state is not enough to constitute express aiming. Id. at 1157. In contrast to Pebble Beach is the case of Panavision Intern., L.P. v. Toeppen,141 F.3d 1316, 1321 (9th Cir. 1998), in which the Ninth Circuit found that the express aiming requirement was met where the defendant registered plaintiff's marks as Internet domain names in order to force a California plaintiff to pay him money.

EXHIBIT 95 PAGE 910

1   Roth v. Garcia Marquez, 942 F.2d 617, 623 (9th Cir. 1991) (internal citation

2   omitted).  No factor is dispositive and the Court must balance all seven.  Id.

3   (internal citation omitted).

4   **B.    MGA Mexico's Contacts with the Forum State**

5          The AAC alleges that Issac Larian and other MGA officers, while in

6   California, executed a plot to target three high-level employees of Mattel Mexico,

7   and entice them to steal Mattel's trade secrets.  In written offers of employment to

8   these three individuals, Issac Larian held himself out to be the CEO of MGA

9   Mexico.  This plot was facilitated by a number of cross-border communications

10  among the participants as well as travel to the United States by the targeted

11  employees.

12  **C.    The Court May Exercise Personal Jurisdiction over MGA Mexico**

13         The AAC repeatedly alleges that Larian, who held himself out to be MGA

14  Mexico's CEO, and who was designated as MGA Mexico's "legal agent" in Mexican

15  registration document actively sought to induce others to access and steal Mattel's

16  trade secrets while located in the California.  See Velázquez Decl. Exs. A-C; Salem

17  Decl. Ex. B.  This constitutes purposeful availment.

18         To the extent that any of the actions taken in Mexico by the three Mexican

19  employees may be imputed to Mattel Mexico, there is also purposeful direction.

20  The alleged actions taken on behalf of MGA Mexico were specifically engineered to

21  result in the alleged illegal acquisition of trade secrets belonging to Mattel, a

22  California resident.[6]

23         The relatedness requirement is also clearly met.  The contacts with

24  California involve actions allegedly taken in order to further the illegal acquisition of

25  Mattel's trade secrets, leading to the present claims against MGA Mexico for

26  misappropriation of trade secrets and the related RICO claims.

27  _____

28         [6] The AAC alleges the theft of trade secrets belonging not only to Mattel's
Mexican subsidiary, but also to Mattel itself, which is a California corporation.

EXHIBIT 35 PAGE 911

The burden, therefore, is on MGA Mexico to show that the exercise of jurisdiction is unreasonable.[7] As noted previously, the Court considers seven factors. The first factor the Court considers is the defendant's purposeful interjection. For the reasons the Court has found purposeful availment and purposeful direction, this factor favors the exercise of personal jurisdiction.

MGA Mexico argues, without elaboration, that the burden of defending itself in California is "significant." However, the assumption underlying this argument is that the present action is more properly litigated by MGA's and Mattel's Mexican subsidiaries. This assumption misses the point of Mattel's claim against MGA Mexico; Mattel, the parent company, was itself injured by MGA's Mexico's alleged misappropriation of its own trade secrets because the alleged misappropriation was not limited to trade secrets belonging to its Mexican subsidiary. The argument based on this faulty assumption is therefore unconvincing. In order to show unreasonableness, the burden on the defendant must be great. See Panavision, 141 F.3d at 1323 ("A defendant's burden in litigating in the forum is a factor in the assessment of reasonableness, but unless the inconvenience is so great as to constitute a deprivation of due process, it will not overcome clear justifications for the exercise of jurisdiction.") (internal quotation marks and citation omitted).

As to the third and seventh factors, regarding conflicts of law and the

---

[7] In its reply, MGA Mexico declares that it "made a 'compelling case' in support of its motion to dismiss that it would be unreasonable to force it to litigate in this forum." MGA Mexico Reply at 10. However, MGA Mexico's motion papers fail to acknowledge that they bear the burden on this issue. See MGA Mexico's Memorandum of Points and Authorities at 10 ("Finally, Mattel has failed to satisfy the third element required for specific jurisdiction – that the exercise of jurisdiction over the defendant would be reasonable."). As Mattel accurately predicted in its opposition papers, MGA Mexico implicitly acknowledged its burden in the reply, and used the occasion to improperly present additional arguments for the first time. Although the Court ordinarily would not consider such arguments, it does so here because it does not change the Court's ultimate conclusion. See In re Intuit Privacy Litigation, 138 F.Supp.2d 1272, 1275 n.3 (C.D. Cal. 2001) ("this court does not consider arguments raised anew for the first time in a reply brief as to do so would unfairly deny the non-moving party an opportunity to respond.").

31

EXHIBIT 35 PAGE 912

1  existence of an alternative forum, MGA Mexico makes veiled references to the

2  criminal action in Mexico as constituting a choice of forum made by Mattel,

3  apparently implying that Mattel, having chosen to pursue criminal charges in

4  Mexico, should be precluded from invoking the power of this Court.  It appears to

5  the Court that MGA Mexico has failed to fully and clearly articulate this argument

6  because it is untenable.  Whether Mexican authorities pursue criminal charges

7  based on the same conduct underlying the claims in this action is irrelevant to

8  whether this Court may constitutionally exercise personal jurisdiction over MGA

9  Mexico.  Therefore, MGA Mexico's argument on this issue is unpersuasive.

10  The fourth factor, the interest in adjudicating the dispute, weighs in favor of

11  the exercise of personal jurisdiction, as does the sixth, the plaintiff's interest in

12  convenient and effective relief.

13  MGA Mexico argues that the fifth factor weighs in its favor when the Court

14  considers that the site of injury, which it does not believe is California, is the most

15  efficient forum.  However, this argument is premised on the rejected assumption

16  that the present action is more properly litigated between MGA's and Mattel's

17  Mexican subsidiaries.

18  On balance, a consideration of the reasonableness factors reveals that MGA

19  Mexico has fallen far short of establishing the "compelling case" necessary to

20  render the Court's exercise of personal jurisdiction unreasonable.

21  The Court concludes that Mattel has established the first two parts of the

22  specific personal jurisdiction test, and that MGA Mexico has failed to establish that

23  the Court's exercise of personal jurisdiction over it is otherwise unreasonable.

24  Accordingly, the Court **DENIES** MGA Mexico's motion to dismiss.

### V. MGA's and Bryant's Motions Regarding

### the Discovery Master's March 7, 2007, Order

27  MGA and Bryant seek review of a decision that resolved discovery disputes

28  that arose during Bryant's deposition, and that was rendered by the Court-

EXHIBIT 35 PAGE 913

1    appointed discovery master, Judge Edward A. Infante (Ret.), on March 7, 2007.

2    The Court's order appointing Judge Infante provides that his orders resolving

3    discovery disputes shall be reviewed in the same manner as those made by a

4    magistrate judge of this Court.

5    Pursuant to Fed. R. Civ. P. 72(a), when the parties object to the ruling of a

6    magistrate judge on a non-dispositive manner, such as a discovery dispute, the

7    district judge may modify or set aside only those portions of the magistrate judge's

8    order that are "clearly erroneous or contrary to law." Id.

9    The "clearly erroneous" language refers to factual findings. See e.g.,

10   Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension

11   Trust, 508 U.S. 602, 622 (1993) (discussing the clearly erroneous standard). Here,

12   there were no explicit factual findings or legal conclusions made by Judge Infante

13   regarding the relevant rulings; therefore, the Court reviews the record presented to

14   Judge Infante to determine whether his rulings are contrary to law. See March 7,

15   2007, Order.

16   Questions that do not seek the substance of attorney-client communications

17   generally do not implicate the attorney-client privilege. United States v. Carrillo, 16

18   F.3d 1046, 1050 (9th Cir. 1994) (finding no violation of the attorney-client privilege

19   where prosecutor, who asked whether a criminal defendant had consulted with his

20   attorney during a recess in order to raise an inference of attorney coaching of

21   testimony during the trial, stopped short of asking defendant the substance of

22   defendant's communications with his attorney). Therefore, questions such as the

23   one addressed by objection No. 38, asking whether Bryant talked to counsel for

24   MGA during a break from his deposition, are not subject to objection based on the

25   attorney-client privilege. This conclusion is consistent with Judge Infante's Order.

26   Mattel's question regarding who is paying Bryant's legal fees, addressed by

27   objection No. 42, is likewise not objectionable. MGA and Bryant argue that state

28   law applies; however, because the present consolidated actions involve both

EXHIBIT 35 PAGE 914

1  federal and state-law claims, the federal law of privilege applies. Agster v.

2  Maricopa County, 422 F.3d 836, 839-40 (9th Cir. 2005) ("Where there are federal

3  question claims and pendent state law claims present, the federal law of privilege

4  applies."). To that end, consistent with federal privilege law, fee-payment

5  arrangements are relevant to credibility and bias, and if asked in discovery, Bryant

6  must disclose who is paying his legal fees. See United States v. Blackman, 72 F.3d

7  1418, 1424 (9th Cir. 1995) ("As a general rule, client identity and the nature of the

8  fee arrangement between attorney and client are not protected from disclosure by

9  the attorney-client privilege."). This conclusion is also consistent with Judge

10  Infante's Order.

11  However, in this case, the joint-defense privilege protects from disclosure the

12  substance of certain statements made by Bryant and his attorneys in the presence

13  of attorneys representing MGA. "The joint defense privilege protects

14  communications between an individual and an attorney for another when the

15  communications are 'part of an on-going and joint effort to set up a common

16  defense strategy.'" United States v. Bay State Ambulance and Hosp. Rental

17  Service, Inc., 874 F.2d 20, 28 (1st Cir. 1989) (internal quotation marks and citation

18  omitted). Generally, to rely on the joint-defense privilege, a party must establish

19  three elements: "(1) [T]he communications were made in the course of a joint

20  defense effort, (2) the statements were designed to further the effort, and (3) the

21  privilege has not been waived." Id.

22  The Court finds the first element was met. The Court, based on its review of

23  the record pending before Judge Infante, is satisfied that the parties had in place at

24  the time of Bryant's deposition, and have in place today, a valid joint-defense

25  agreement. The Court also finds that the second element was met. Mattel cannot

26  seriously contend that MGA's interests are not aligned with Bryant's in this action,

27  or that counsels' thorough preparation of Bryant for his deposition was not designed

28  to further the joint defense effort. Finally, as for the third element, there is no

EXHIBIT 35 PAGE 9/5

suggestion in the record that any party has waived the attorney-client privilege.

Accordingly, the Court holds that Judge Infante's rulings on Objection Nos. 39 and 50 are contrary to law to the extent those rulings require Bryant to divulge the substance of his communications with counsel for MGA.

### VII. Conclusion

In the manner set forth more fully herein, the Court makes the following rulings:

1.     Motion of MGA Entertainment, Inc., ("MGA") and Issac Larian ("Larian") to Dismiss Mattel's Amended Answer and Counterclaims (docket # 189): **GRANTED IN PART AND DENIED IN PART.**

2.     Motion of Carter Bryant to Dismiss Counterclaims II, III, V, VII, IX, and XI (docket # 191): **GRANTED IN PART AND DENIED IN PART.**

3.     Motion of MGA Mexico to Dismiss Mattel's Amended Answer and Counterclaims (docket # 266): **DENIED.**

4.     Motion of MGA Objecting to Discovery Master's March 7, 2007, Order (docket # 308): **GRANTED IN PART AND DENIED IN PART.**

5.     Motion of Carter Bryant Objecting to Discovery Master's March 7, 2007, Order (docket # 306): **GRANTED IN PART AND DENIED IN PART.**

Mattel is **GRANTED** ten days' leave to amend the AAC in conformity with this Order.  The Counter-defendants shall answer or otherwise respond to the SAAC no later than thirty days after the filing of the SAAC.

EXHIBIT _35_ PAGE _916_

1    The Motion Re Trial Structure (docket #462) has been the subject of further

2    briefing by the parties and is set for further oral argument on July 2, 2007.  Ruling

3    on that matter is **DEFERRED** pending oral argument.

4        DATE:  June 27, 2007

5                                              _S.G. Larson_

6                                     STEPHEN G. LARSON
                                     UNITED STATES DISTRICT JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 35 PAGE 217