1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
   John B. Quinn (Bar No. 090378)
2    (johnquinn@quinnemanuel.com)
   Michael T. Zeller (Bar No. 196417)
3    (michaelzeller@quinnemanuel.com)
   Jon D. Corey (Bar No. 185066)
4    (joncorey@quinnemanuel.com)
   865 South Figueroa Street, 10th Floor
5  Los Angeles, California 90017-2543
   Telephone: (213) 443-3000
6  Facsimile: (213) 443-3100

7  Attorneys for Mattel, Inc.

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10                   EASTERN DIVISION

11  CARTER BRYANT, an individual,          CASE NO. CV 04-9049 SGL (RNBx)
                                           Consolidated with
12              Plaintiff,                 Case Nos. CV 04-09059 & CV 05-2727

13       vs.                               **DISCOVERY MATTER**

14  MATTEL, INC., a Delaware               **[To Be Heard By Hon. Edward**
    corporation,                           **Infante (Ret.) Pursuant To Order Of**
15                                         **December 6, 2006]**
                Defendant.
16                                         **[PUBLIC REDACTED]**
   ─────────────────────────────          DECLARATION OF JON D. COREY
17  AND CONSOLIDATED ACTIONS              IN SUPPORT MATTEL, INC.'S:
                                           (1) OPPOSITION TO MGA'S
18                                         MOTION TO QUASH OR, IN THE
                                           ALTERNATIVE, FOR PROTECTIVE
19                                         ORDER; AND
                                           (2) COUNTERMOTION TO COMPEL
20                                         PRODUCTION OF DOCUMENTS
                                           RESPONSIVE TO THIRD-PARTY
21                                         SUBPOENAS

22                                         Date:  February 8, 2008
                                           Time:  9:30 a.m.
23       **(VOLUME 1 OF 2:**               Place: Telephonic
         **Declaration thru Exhibit L)**
24                                         **Phase 1**
                                           Discovery Cut-Off:   January 28, 2008
25                                         Pre-Trial Conference: May 5, 2008
                                           Trial Date:          May 27, 2008
26

27

28

## DECLARATION OF JON D. COREY

I, Jon D. Corey, declare as follows:

1.     I am a member of the bars of the State of California and the District of Columbia. I am a partner at Quinn Emanuel Urquhart Oliver & Hedges, LLP, attorneys for Mattel, Inc. ("Mattel"). I make this declaration in support Mattel, Inc.'s: (1) Opposition to MGA's Motion to Quash or, in the Alternative, for Protective Order; and (2) Countermotion to Compel Production of Documents Responsive to Third-Party Subpoenas. I make this declaration of personal, firsthand knowledge, and if called and sworn as a witness, I could and would testify competently thereto.

2.     Attached as Exhibit A is a true and correct copy of MGA's Complaint in this matter, filed April 13, 2007.

3.     Attached as Exhibit B is a true and correct copy of Mattel's Second Amended Answer and Counterclaims excluding Exhibit C.

4.     Mattel served subpoenas on the trusts associated with Isaac Larian that it identified, from public sources: Isaac Larian Annuity Trust and the Isaac and Angela Larian Trust. Counsel for MGA and Larian, Amy Park, told Mattel during the December 21, 2007 meeting of counsel with me, that the names of the trusts that Mattel served were incorrect. Counsel for MGA and Isaac Larian identified two additional trusts associated with Mr. Larian that Mattel "should have served." They were the Isaac and Angela Larian Family Trust and Isaac E. Larian Qualified Annuity Trust 2004. MGA's counsel, however, refused to say (a) whether the trusts identified were the only Larian trusts, or (b) whether the trusts that Mattel subpoenaed were real or not. Counsel further refused to confirm whether either of the subpoenaed trusts or the newly identified trusts held or did not hold shares of MGA Entertainment, Inc. Since then, Mattel served subpoenas upon the newly named trusts.

-1-

5.      On January 17, 2008, I deposed MGA designee Lisa Tonnu, who was instructed at a prior deposition not to identify the Larian trusts.  At her deposition, Ms. Tonnu identified the Larian trusts that held MGA's shares on his behalf, only one of which had been previously identified.  They are Larian Family Trust, Isaac Larian Grantor Annuity Trust, and Angela Larian Grantor Annuity Trust.  Attached as Exhibit GG is a true and correct copy of excerpts from the rough transcript of the January 17, 2008 deposition of MGA designee Lisa Tonnu.

6.      No independent representative of any of the trusts related to Isaac Larian has met and conferred regarding their subpoenas.  Rather, MGA and Larian's lawyers in this action have acted on their behalf.

7.      Mattel met and conferred with counsel for Ernst & Young, John Baran.  Mr. Baran stated that since receiving Mattel's document subpoena, Ernst & Young prepared to produce documents by diligently searching for and gathering approximately 60,000 pages of documents that Ernst & Young believes to be responsive to Mattel's requests.  Mattel offered to send a paralegal and associate to Ernst & Young to review these documents in order to narrow the production and reduce copy costs.  Attached as Exhibit C is a true and correct copy of a letter from me to John Baran dated December 20, 2007.

8.      Mattel also met and conferred with Wachovia, who during that process stated that Wachovia had provided two loans to MGA; one in 1999/2000 and the other in 2006.  On December 20, 2007, counsel for Mattel met and conferred with counsel for Wachovia, Neal Potischman.  During that call, Mr. Potischman stated that Wachovia had three concerns with Mattel's requests: (1) Wachovia was opposed to producing documents regarding Wachovia's underwriting standards, policies or procedures; (2) Wachovia was opposed to producing documents regarding Wachovia's syndication standards, policies or procedures; and (3) Wachovia asserted that the timeframe set forth in Mattel's requests, 1999 to present, was too expansive and requested that it be narrowed.  In response to Wachovia's

DECLARATION OF JON COREY

1  concerns, Mattel agreed not to seek documents regarding underwriting or

2  syndication policies or practices, and Mattel further agreed to tailor the time period

3  encompassed by its document requests based on the representation by Wachovia's

4  counsel that MGA had only two loans to MGA.  Mattel also provided examples of

5  the precise documents sought by Mattel.  Attached as Exhibit D is a true and correct

6  copy of a letter from me to Neal Potischman dated December 24, 2007.

7         9.    Additionally, Request No. 3 of the Wachovia subpoena seeks the

8  three boxes of the loan documents referenced in a November 15, 2005 letter from

9  Wachovia (which was attached to the subpoena).  During Mattel's meet and confer

10  with Wachovia, Mr. Potischman stated that Wachovia had already searched for and

11  located these documents.  Mr. Potischman concluded that he would discuss Mattel's

12  requests with Wachovia and let Mattel know if this narrowing and clarification were

13  amenable to Wachovia.

14         10.    In a letter to Quinn Emanuel, counsel for Wells Fargo expressed

15  his intent to meet and confer with Mattel "in order to address" Wells Fargo's

16  concerns.  Although making its objections (which were made at the "direction" of

17  MGA and Larian), the President of Moss Adams stated that Moss Adams "was

18  prepared to produce the records as agreed by the parties, or ordered by the court."

19  These letters are attached to the Declaration of Amy Park submitted in support of

20  MGA's Motion to Quash.

21         11.    On June 13, 2007, Mattel propounded its First Set of Requests

22  for Production of Documents to Isaac Larian.  It contained requests for documents

23  related to his finances, net worth, Larian v. Larian disputes, among others.

24         12.    Despite promises to produce documents made months ago,

25  Larian produced nothing until just last week after yet another order compelling

26  production.  Attached as Exhibit E is a true and correct copy of the Discovery

27  Master's Order dated December 31, 2007.

28

DECLARATION OF JON COREY

1         13.    Of the more than three million pages that MGA produced, only

2  38,000 relate to Bratz revenues, costs, and profits.  These are the documents

3  responsive to Mattel's Second Set of Requests for Production that the Discovery

4  Master ordered produced on December 28, 2007.  A true and correct copy of the

5  Discovery Master's December 28, 2007 order is attached as Exhibit V.

6         14.    Missing from MGA's list of produced documents and MGA's

7  production are the following:

8         &bull; Documents related to a determination of Isaac Larian's net worth.

9         &bull; Any documents stating the value of MGA's intellectual property and

10  good will (other than Little Tykes intellectual property).

11         &bull; MGA's tax records and supporting documents.

12         &bull; Wells Fargo banking records for MGA.

13         &bull; Documents related to payments to third-parties by MGA, Isaac

14  Larian, or the Larian trusts (such as to Bryant and other Mattel employees and

15  vendors)

16         &bull; Consumer and marketing research regarding MGA products

17  underlying MGA's claims against Mattel, including 4-ever Best Friends and

18  Alienracers.

19         &bull; More than four documents from the Larian v. Larian disputes.

20         &bull; Documents related to the Larian trusts, including any documents

21  showing Isaac Larian's interest in, payments received, or transfers to those trusts.

22         &bull; Documents regarding the 1999-2000 and 2006 loans MGA received

23  from Wachovia, including what documents MGA and Larian gave to Wachovia to

24  justify the loans.

25         15.    The Documents showing MGA's sales, returns and costs of good

26  sold" "promotional, advertising and media expenditures" relate to Bratz.  They do

27  not relate to MGA's or Larian's net worth directly.  They do not relate to banking

28  records.  They do not relate directly to the Larian v. Larian disputes.

-4-

DECLARATION OF JON COREY

16.     The "monthly general ledger" documents do not appear to be
general ledger entries at all, but the more generic trial balances.  Moreover, there
information produced appears to relate only to selected account numbers, omitting
many others.  Further, it appears that no general ledger information has been
produced for the years 2001 and 2004.

17.     In September 2006, a third-party witness, Steven Linker,
produced Bratz design drawings and Bratz product development documents.
Linker's production included a multitude of Bratz materials he had received from or
exchanged with MGA and Bryant before Bryant left Mattel.

(a)  Attached as Exhibit F are true and correct copies of excerpts
from the deposition transcript of Steven Linker, taken on September 13, 2006.

(b)  Attached as Exhibit G are true and correct copies of email
messages dated October 12, 14, and 23, 2000 from Liz Hogan, Linker's design
partner, to MGA, which were produced by Steven Linker on September 13, 2006
pursuant to subpoena.

(c)  Attached as Exhibit H is a true and correct copy of Bratz
design drawing, Bates No. SL00044, that Linker received from MGA and Bryant on
October 19, 2000 as part of a packet of design and marketing materials on Bratz that
Linker produced on September 13, 2006 in this action.

18.     Before Linker's testimony, MGA had produced an email relating
to Bratz development that Linker's design partner, Liz Hogan, had sent to MGA on
October 23, 2000 -- a date which was conveniently after the date that Bryant left
Mattel.  MGA, however, had not produced the emails pre-dating Bryant's last day of
employment at Mattel that Hogan had exchanged with MGA on that very same
subject.  Attached as Exhibit I is a true and correct copy of Liz Hogan e-mail
message dated October 23, 2000, which had been produced by MGA on May 16,
2005.  E-mail messages on the same topic that pre-dated Bryant leaving Mattel,

DECLARATION OF JON COREY

1 | which were produced by Linker, were not produced by MGA. Mattel obtained
2 | those only after Linker produced them pursuant to subpoena in September 2006.
3 |       19.    After receiving MGA's objections to the subpoenas, counsel for
4 | Mattel entered into good-faith meet and confer efforts with MGA. By letter dated
5 | December 7, 2007, Mattel set forth the deficiencies in MGA and Larian's specific
6 | and general objections to the financial institutions' subpoenas, and requested that
7 | they meet and confer, as required by paragraph 5 of the Discovery Master's
8 | Stipulation. Attached as Exhibit J is a true and correct copy of the letter from Jon
9 | Corey to Timothy Miller and Marcus Mumford dated December 7, 2007.
10 |       20.    On December 11, 2007, MGA and Larian responded by
11 | proposing that the parties meet and confer on December 11th, 17th, or 18th. On the
12 | evening of December 11th, Mattel's counsel responded, stating that Mattel was
13 | unavailable to meet and confer on Friday, December 14th (one of the proposed
14 | times). Mattel's counsel added that he would contact MGA's counsel regarding
15 | meeting and conferring on either December 17th or 18th (the other two proposed
16 | dates). Attached as Exhibit K is a true and correct copy of a letter from Amy Park
17 | to me dated December 11, 2007.
18 |       21.    On December 18th, Mattel's counsel sent an e-mail message to
19 | MGA's counsel proposing that the parties meet and confer at three times throughout
20 | that day. Attached as Exhibit L is a true and correct copy of an email from Michael
21 | Fazio to Amy Park dated December 18, 2007.
22 |       22.    MGA's counsel did not respond. Rather, at approximately 11:30
23 | a.m., an assistant to MGA's counsel contacted Mattel's counsel to state that MGA's
24 | counsel was "very busy" in meetings. At no time did this assistant, or any other of
25 | MGA's counsel, inform Mattel's counsel that the times proposed by Mattel were
26 | unworkable or that MGA would be unable to timely fulfill its meet and confer
27 | obligations.
28 |

DECLARATION OF JON COREY

23.    At 5:55 p.m. on December 18, 2007, and notwithstanding the prior representation that MGA's counsel was very busy and, therefore, unable to meet and confer with Mattel, MGA's counsel responded with a three-page single-spaced letter attempting to explain the untimeliness in meeting and conferring and objections to Mattel's document subpoenas.  Attached as Exhibit M is a true and correct copy of a letter from Amy Park to Michael Fazio dated December 18, 2007.

24.    The parties subsequently agreed to conduct their meet and confer on December 21, 2007 at 2:00 p.m., which they did.  MGA and Larian served their Motion shortly before 3:00 p.m. that same day, moments after the parties' meet and confer concluded.

25.    Attached as Exhibit N is a true and correct copy of the Court's August 9, 2006 Order Denying Appointment of Expert Witnesses.

26.    Attached as Exhibit O is a true and correct copy of the relevant transcript pages from the depositions of MGA designee Lisa Tonnu.

27.    Attached as Exhibit P is a true and correct copy of MGA's audited financial statements that it produced in this action.

28.    Attached as Exhibit Q is a true and correct copy of the Discovery Master's Order dated May 15, 2007.

29.    Attached as Exhibit R is a true and correct copy of the Stipulated Protective Order filed January 4, 2005.

30.    Attached as Exhibit S  is a true and correct copy of the relevant pages from the transcript of the December 28, 2007 Deposition of Veronica Marlow.

31.    Attached as Exhibit T is a true and correct copy of a December 7, 2007 letter from Timothy A. Miller letter to Scott Kidman.

32.    Attached as Exhibit U is a true and correct copy of the relevant pages fro the transcript of the September 28, 2007 Deposition of Richard Irmen.

33.    Attaches as Exhibit W is a true and correct copy of the relevant pages from the transcript of the November 5, 2004 Deposition of Carter Bryant.

1    34.    Attached as Exhibit X is a true and correct copy of relevant

2 excerpts of MGA's Supp. Responses to Mattel's Revised Third Set of

3 Interrogatories.

4    35.    Attached as Exhibit Y is a true and correct copy of Isaac Larian's

5 December 15, 2005 Deposition Testimony from <u>Art Attacks Ink, LLC v. MGA</u>

6 <u>Entertainment, Inc.,</u> Central District of California Case No. 04-1035-J, which MGA

7 produced in this action.

8    36.    Attached as Exhibit Z is a true and correct copy of a Press

9 Release from Congress Financial posted on the internet.

10    37.    Attached as Exhibit AA is a true and correct copy of the July 2,

11 2007 Order of the Court in this matter.

12    38.    Attached as Exhibit BB is a true and correct copy of the January

13 7, 2007 Order of the Court in this matter.

14    39.    Attached as Exhibit CC is a true and correct copy of a December

15 24, 2007 letter from me to Amy Park.

16    40.    Attached as Exhibit DD is a true and correct copy of Mattel's

17 Notice of Motion and Motion of Mattel, Inc. for Leave to Take Additional

18 Discovery and Objections to Discovery Master Order of September 28, 2007.

19    41.    Attached as Exhibit EE is a true and correct copy of a transcript

20 of a January 17, 2008 hearing before Judge Infante.

21    42.    On June 5, 2007, Mattel served the Third Notice of Deposition of

22 MGA Entertainment, Inc., Pursuant to <u>Federal Rule of Civil Procedure</u> 30(b)(6).

23 Topic of Examination No. 16 required that MGA designate a witness to testify as to

24 the identity of persons who were not MGA employees as of June 5, 2007, but who

25

26

27

28

DECLARATION OF JON COREY

1 | MGA was paying, had paid, or had offered, promised or agreed to pay fees or costs

2 | in connection with this action.  Attached as Exhibit FF is a true and correct copy of

3 | the Third Notice of Deposition.

4 |

5 |        I declare under penalty of perjury under the laws of the United States of

6 | America that the foregoing is true and correct.

7 |        Executed on January 18, 2008, at Los Angeles, California.

8 |

9 |

10 |       Jon D. Corey

DECLARATION OF JON COREY

Exhibit A

FILED

DALE M. CENDALI
(of counsel, not admitted in California)
DIANA M. TORRES (S.B. #162284)
PAULA E. AMBROSINI (S.B. #193126)
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA  90071-2899
Telephone:  (213) 430-6000
Facsimile:   (213) 430-6407
email:      dtorres@omm.com

PATRICIA GLASER (S.B. # 55668)
CHRISTENSEN, MILLER, FINK,
JACOBS, GLASER, WEIL &
SHAPIRO LLP
10250 Constellation Boulevard, 19th Floor
Los Angeles, CA  90067
Telephone:  (310) 553-3000
Facsimile:   (310) 556-2920

Attorneys for Plaintiff
MGA Entertainment, Inc.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

CV 05-02727 CBM(RZx)

| | |
|---|---|
| MGA ENTERTAINMENT, INC., <br><br> Plaintiff, <br><br> v. <br><br> MATTEL, INC., a Delaware Corporation, and DOES 1-10, <br><br> Defendants. | Case No. <br><br> **COMPLAINT FOR FALSE DESIGNATION OF ORIGIN, AFFILIATION, ASSOCIATION OR SPONSORSHIP (15 U.S.C. § 1125 (a)); UNFAIR COMPETITION (15 U.S.C. § 1125 (a), Cal. Bus. & Prof. Code § 17200 _et seq._ and California Common Law); DILUTION (15 U.S.C. § 1125 (c), Cal. Bus. & Prof Code § 14330 and California Common Law); AND UNJUST ENRICHMENT** <br><br> <u>**DEMAND FOR JURY TRIAL**</u> |

**EXHIBIT A PAGE 10**

Plaintiff MGA Entertainment, Inc. for its complaint against Defendants Mattel, Inc. and DOES 1-10 alleges and avers as follows:

## **PARTIES**

1.     Plaintiff MGA Entertainment, Inc. ("MGA") is a California corporation organized and existing under the laws of the State of California, with a principal place of business in Van Nuys, California.

2.     MGA is informed and believes, and based thereon alleges, that Defendant Mattel, Inc. ("Mattel") is a Delaware corporation with a principal place of business in El Segundo, California.

3.     MGA is ignorant of the true names and capacities of the defendants sued herein under the fictitious names DOES 1 through 10 inclusive.  MGA will seek leave of court to amend this complaint to allege such names and capacities when they are ascertained.  MGA is informed and believes, and based thereon alleges, that each of the fictitiously named DOE defendants is responsible in some manner for the wrongful conduct alleged herein.  MGA further alleges that each defendant acted in concert with, as agent or representative for, or at the request or on behalf of another or Mattel.  Each charging allegation contained herein is, therefore, also hereby alleged against each fictitiously named DOE defendant.

## **JURISDICTION AND VENUE**

4.     Through this action MGA asserts claims against Mattel arising under the Lanham Act, 15 U.S.C. Sections 1125 (a) and (c), California Business and Professions Code Sections 17200 *et seq.*, California Business and Professions Code Section 14330 and California common law.  This Court has original subject matter jurisdiction over MGA's federal claims pursuant to 15 U.S.C. Sections 1116 and 1121, 28 U.S.C. Section 1338(a), and 28 U.S.C. Section 1331, and supplemental

1

1   subject matter jurisdiction over MGA's state law claims pursuant to 28 U.S.C.

2   Section 1367(a).

3       5.      This Court has specific personal jurisdiction over Mattel, as it has

4   purposefully committed, within the State of California, the acts from which these

5   claims arise and/or has committed tortious acts outside California, knowing and

6   intending that such acts would cause injury to MGA within the state.  The Court

7   also has general personal jurisdiction over Mattel, as it conducts continuous,

8   systematic and routine business within the State of California and the County of

9   Los Angeles.

10      6.      Venue is proper in the United States District Court for the Central

11  District of California pursuant to 28 U.S.C. Sections 1391(b) and 1391(c).

12

13                          **FACTUAL BACKGROUND**

14      7.      MGA seeks by this action to halt Mattel's habitual and unfair tactics of

15  competition-by-intimidation and serial copycatting of MGA's products, which

16  Mattel has used in an unbridled effort to cause confusion in the market place and

17  eliminate MGA as a competitor in the toy and fashion doll market long dominated

18  and controlled by Mattel.

19      8.      MGA is a privately-held company in the San Fernando Valley that

20  began in 1979 as a small consumer electronics business.  In 1987, the company

21  made its first foray into the toy business when it secured rights to market handheld

22  LCD games featuring licensed Nintendo® characters.  Building on that small

23  success, the company began marketing products for popular licensed properties

24  such as the "Power Rangers"® and "Hello Kitty"®.  This little-known but

25  successful company, however, was propelled into the limelight after its daring

26  release in June 2001 of an innovative line of fashion dolls called "BRATZ".

27  "BRATZ" are multi-ethnic fashion dolls that sport a fresh new urban and

28  contemporary look and fashion.  At the time of the release of "BRATZ", "Barbie"

2

**EXHIBIT A PAGE 12**

1    sales were in a slump, Mattel was in turmoil, and the market was ripe for something

2    new, exciting and inventive. "BRATZ" fit the bill. It is the first fashion doll that

3    has been able to seriously challenge "Barbie" for market share, and begin to loosen

4    Mattel's 50-year iron-fisted grip on the fashion doll market.

5         9.     Mattel has not taken kindly to the challenge. Either unable or

6    unwilling to compete against "BRATZ" fairly, and on a level-playing field, Mattel

7    has, instead, taken a more expeditious approach, resorting to unfair and anti-

8    competitive business practices. Wielding its substantial clout and influence in the

9    toy industry, Mattel has tried to muscle MGA out of business. MGA is informed

10   and believes that Mattel has intimidated, coerced and threatened retailers, licensees,

11   suppliers and others in the industry – both in the U.S. and internationally – in order

12   to inhibit and stifle MGA's ability to compete with Mattel and to prevent MGA

13   from obtaining licensees, contracts and supplies for its products. Mattel has also

14   serially imitated and copy-catted the look of MGA products, trade dress,

15   trademarks, themes, ideas, advertising and packaging, including for the "BRATZ"

16   line of dolls. MGA brings this action to stop Mattel's tortious, unfair and anti-

17   competitive conduct and to recover the extensive damage that Mattel's illicit

18   behavior has caused, and continues to cause, MGA. Mattel's own website states:

19   "As the global leader in the toy industry, we believe that how we achieve success is

20   just as important as the success itself." It also proclaims that "unwavering integrity

21   defines our corporate culture on every level, guiding how we work and how we do

22   business." Mattel's own corporate governance standards require it to "play by the

23   rules," complete fairly and be a good corporate citizen. Mattel's actions, however,

24   speak louder than its words.

25

26

27

28

3

## Mattel History and Performance

10.     Mattel is the world's largest toy company, but it owes its immense success chiefly to a single product: "Barbie." Since her debut in 1959, "Barbie" has been the fuel for Mattel's growth and success, turning Mattel into an international powerhouse. By the late 1990's, Mattel's annual sales of the doll approached or topped $1.8 billion and Mattel stock reached a record high of approximately $45.00 a share. At that time, the average American girl had eight "Barbie" dolls, and "Barbie" was the world's best-selling toy.

11.     Mattel's reliance on a single, 40-year old product for as much as 50% of its business turned out to be a risky business model, however. Resting on its laurels, Mattel failed to react to the shifting tastes of consumers, changing dynamics in the industry, and an increasing focus on technologically advanced and interactive toys. "Barbie's" record sales fell into a tailspin. According to one report, Adrienne Fontanella, Mattel's "Barbie" brand president, would later be quoted as saying that, "The world changed very quickly, and we missed a beat. . . Barbie wasn't talking to girls. She just wasn't hitting it."

12.     Sales began to plunge in 1997, and Mattel began posting a series of net income losses. In the first quarter of 1998, sales of the "Barbie" brand dropped 17%. This steep slide was followed by another in the second quarter, when sales fell again, down by 15%. By the end of 1998, Mattel reported an overall 14% decline in "Barbie" sales for the year and analysts were using words such as "devastating" and "a catastrophe" to describe Mattel's earnings. The company's stock fell as much as 27% in a single day. "Barbie" was having a crisis.

13.     Jill Barad, who had taken over as Mattel's chairman and chief executive in January 1997, at the height of Mattel's success, had to do something fast. Instead of focusing on and investing in new product development, however, which would obviously take time, Mattel embarked on a series of acquisitions that were seemingly aimed at quickly diversifying the company's product line and

4

1   reducing its reliance on "Barbie" and on traditional retailers, such as Toys-R-Us
2   and Wal-Mart. Mattel spent a reported $881 million in March 1997 to purchase
3   Tyco Toys and acquire the "Matchbox" toy car brand. Just more than a year later,
4   it spent $700 million for the Pleasant Co., a mail-order doll company and maker of
5   the "American Girl" doll collection. And in December 1998, Mattel announced
6   plans to fork out a monumental $3.5 billion to buy the Learning Company,
7   followed quickly by Mattel's purchase, in March 1999, of a software company,
8   Purple Moon.

9       14.   Despite these acquisitions, the company continued to struggle. The
10   retail environment and buying patterns had unquestionably changed, but Mattel had
11   not kept up. Despite Mattel's feverish acquisitions, Mattel's mainstay and primary
12   profit-generator was still "Barbie." But "Barbie" had grown stale, and sales
13   languished. Posting additional losses in the first quarter of 1999, Mattel announced
14   that it would lay off 3,000 employees – 10% of its work force.

15      15.   Mattel's stock plummeted again in late 1999, dropping 30% on
16   Mattel's announcement that it would fall as much as 55% short of analysts' earning
17   estimates for the third quarter. Mattel blamed its troubles primarily on its
18   expensive, $3.5 billion acquisition of the Learning Company, which had turned out
19   to be a disaster fraught with licensing and distribution problems, bad debt, high
20   product returns and high advertising costs.

21      16.   By early 2000, Mattel's stock had crashed to as low as $8 per share,
22   and some analysts considered Mattel vulnerable to a takeover. Investors clamored
23   for Ms. Barad's resignation, and got their wish.

24      17.   Jill Barad resigned from Mattel in February 2000.

25      18.   For three months, the company was without a permanent chief
26   executive until Robert Eckert took the helm in May 2000. Mr. Eckert had spent 23
27   years at Kraft Foods, a subsidiary of Altria Group, Inc., and was widely credited
28

5

**EXHIBIT A PAGE 15**

1  with reviving its ailing cheese business.  Investors looked for him to do the same

2  for Mattel.

3       19.    Upon his arrival at Mattel, Mr. Eckert's promise, according to *Wall*

4  *Street Journal* reports, was to deliver a "leaner and meaner" Mattel.

5       20.    The "leaner" Mattel came quickly.  Mr. Eckert laid off hundreds,

6  closed factories in the United States, shipped production to Mexico, and sold off the

7  Learning Company at a fraction of what Mattel had paid for it.  It helped Mattel's

8  bottom-line, but did nothing to spur sales growth.  Even under Mr. Eckert's "leaner

9  meaner" leadership, domestic "Barbie" sales remained in a slump into 2001.  In an

10  industry that had become increasingly driven by consumer whims and fads, and the

11  hot, must-have toys of the moment, Mattel remained disinterested in devoting its

12  resources to searching for or developing a new blockbuster toy.  Mr. Eckert's

13  business plan was not to diversify, but to build upon and expand sales of its existing

14  brands.  Mattel was, after all, still generating billions in revenue despite the decline

15  of "Barbie."  And so, Mattel remained committed to its age-worn icon and its two

16  other core brands, Fisher-Price and Hot Wheels, with each of the three accounting

17  for approximately a third of the company's sales.

18       21.    Then came the competition – MGA's "BRATZ".

19

20  **"BRATZ" Dolls Revolutionize The Fashion Doll Market**

21       22.    "BRATZ" challenged "Barbie's" half-century domination of the

22  fashion-doll market like nothing ever before had been able to do.

23       23.    MGA unveiled a preliminary sample of the "BRATZ" doll at the Hong

24  Kong Toy Fair in January 2001, while continuing to finalize the product throughout

25  that spring.  Finished products were first shipped in May 2001.  MGA introduced

26  the line to consumers in June 2001.

27

28

6

**EXHIBIT A PAGE 16**

24.   Unlike "Barbie" dolls, the "BRATZ" line of dolls and branded products sported a hip, multi-ethnic urban look that appealed to contemporary teenage and pre-teen girls.

### MGA's "BRATZ"



25.   At approximately 9.5 to 10 inches tall, the "BRATZ" dolls were intentionally shorter than "Barbie" dolls and looked like no other, with disproportionately large heads, big, dramatic eyes and lips, small, thin bodies, oversized feet (to emphasize shoe fashion and to stand on their own, unlike "Barbie," which requires a stand), and up-to-date fashions.

7

26.   Indeed, the classic "Barbie" look was nowhere to be seen in these dolls; they would never be confused with "Barbie".

**MGA's "BRATZ"**                    **Mattel's "Barbie"**

     

27.   Featuring and embodying the slogan "The Girls With a Passion for Fashion!", "BRATZ" dolls revitalized, transformed and expanded the fashion doll market, in particular proving popular among "tween" age girls -- those between childhood and adolescence -- who had been all but abandoned as a market by Mattel.

28.   The "BRATZ" line -- with its unique and distinctive look -- is well recognized and has been critically acclaimed and praised by consumers, retailers and toy industry analysts alike. In 2001, the "BRATZ" line won the Toy Industry Association ("TIA") People's Choice Toy of the Year Award, the Family Fun Toy of the Year Award and Toy Wishes Hot Pick Award. In 2002, the "BRATZ" line again won the TIA People's Choice Toy of the Year Award and the Family Fun Toy of the Year Award. LIMA, the licensing industry's official arm, awarded MGA's "BRATZ" the best character license of the year as well as the overall best licensed property of the year for 2003. MGA's "BRATZ" also earned the coveted TIA "Property of the Year" and "Girl Toy of the Year" for 2003, as well as the Family Fun Toy of the Year Award. MSNBC named "BRATZ" the "Hottest Toy of the Year," and both MGA and "BRATZ" received several other accolades in

8

1    2004, including the Suppliers Performance Award by Retail Category (the

2    "SPARC" award) in the Girls' Toys category sponsored by DSN Retailing

3    Today/Apparel Merchandising.

4         29.     Although but a tiny fraction of Mattel's size, with "BRATZ", MGA

5    was able to chip away at Mattel's stranglehold on the fashion doll market, gaining

6    shelf space and market share as "Barbie" sales remained flat or, at times, declined.

7         30.     The competition that MGA (once a licensee of Mattel!) and "BRATZ"

8    posed to Mattel was unexpected and unwelcomed by Mattel. Where "Barbie" had

9    once enjoyed a 90% share of the fashion doll market in 1997, that share had already

10    slipped to 85% or less by the time of the release of "BRATZ". With the company

11    still struggling under Mr. Eckert to overcome prior years of declining sales and

12    mounting debt, "Barbie," Mattel -- and Mr. Eckert -- simply could not afford the

13    untimely competition. Mr. Eckert's "leaner" Mattel was not enough to battle more

14    potential erosion in "Barbie's" market share. Mattel had to combat "BRATZ" and

15    MGA, and in the process revealed Mr. Eckert's "meaner" Mattel.

16

17    **Mattel's Response to "BRATZ" and Efforts to Thwart MGA's Competition**

18         31.     Mattel was not poised to nimbly respond to "BRATZ" with a new,

19    creative product of its own – indeed, it had been antithetical to Mattel's corporate

20    culture and mentality for Mattel to even conceive that a product might vie for shelf

21    space with "Barbie", let alone be available for sale to consumers mere months after

22    first being shown to retailers. Mattel had to take a more expeditious route.

23         32.     Instead of fairly competing, Mattel waged war against MGA using a

24    wide-array of tortious, unfair and anti-competitive practices including systematic,

25    serial copycatting and intellectual property infringement, aided by intimidation,

26    threats and other acts of unfair competition and anti-competitive conduct, all with

27    one goal in mind – to banish MGA from the market – or minimize its ability to

28    capture any meaningful share before it could do any real harm to Mattel.

9

**EXHIBIT A PAGE 19**

**Mattel's serial copycatting and intellectual property infringement**

33.     Mattel's serial copycatting of MGA's product lines began with the "BRATZ" dolls themselves, but quickly extended to MGA's packaging, themes, accessories, advertising and even other product lines.

34.     The first four "BRATZ" dolls that MGA launched in 2001, named Jade, Yasmin, Cloe and Sasha, met their wannabe "BRATZ PACK" members in October 2002 with Mattel's launch of three "My Scene" dolls named Madison, Chelsea and "Barbie." This was no ordinary "Barbie", however. Indeed, not even close. Mattel designed its "My Scene" dolls to evoke the unique and distinctive look of the "BRATZ" – also with disproportionately oversized heads, artfully made-up almond-shaped eyes, large, overly-lined and lipsticked lips, trendy, hip clothes and hair styles, and over-sized feet.

**Mattel's Traditional "Barbie"**          **Mattel's "My Scene" Doll**

                                        circa 2002            circa 2004

  

 

10

35.     These confusingly similar "BRATZ" imitators may have been originally intended to buy Mattel time while it worked to release another product the following summer, called "Flavas". MGA's founder, Isaac Larian, was quoted by the media as having predicted that the move would backfire on Mattel, and it did. Released in July 2003, Mattel's "Flavas" dolls took the urban, "hip-hop" look too far, and were widely viewed as portraying a trampy, "bad-girl" image. The dolls were not well-received, and rumor has it that Mattel had to sell them at below cost prices to get rid of inventory. Most apparently wound up in discount bins, and Mattel has seemingly abandoned the line.

36.     Realizing that "My Scene" was its best bet for riding MGA's successful coattails and capitalizing on the unique and inherently distinctive look that MGA had developed in its "BRATZ" dolls – and MGA's substantial goodwill -- Mattel has systematically proceeded to modify the "My Scene" dolls since their original release, particularly their eyes, to increase their similarity to "BRATZ" more and more over time.

37.     Indeed, when Mattel found out that its initial line of "My Scene" dolls had trouble competing with "BRATZ", they simply *became* "BRATZ", in every version, whether blonde, brunette or African American. A few pictures here are worth a thousand words.

**BLONDE**

| **Mattel's Traditional "Barbie"** | **Mattel's Original "My Scene"** | **Mattel's Recent "My Scene"** |
|---|---|---|
|  |  |  |

11

| Mattel's<br>Traditional "Barbie" | Mattel's<br>Original "My Scene" | Mattel's<br>Recent "My Scene" |
|---|---|---|
|  |  |  |

**BRUNETTE**

| Mattel's<br>Traditional "Theresa" | Mattel's<br>Original "My Scene" | Mattel's<br>Recent "My Scene" |
|---|---|---|
|  |  |  |
|  |  |  |

12

**EXHIBIT A PAGE 22**

1

## AFRICAN AMERICAN

| **Mattel's Traditional "Barbie"** | **Mattel's Original "My Scene"** | **Mattel's Recent "My Scene"** |
|---|---|---|

  

  

38.    The original "My Scene" eye, as shown here, for example, has recently turned into a virtual carbon-copy of the "BRATZ" eye.

## Original Mattel "My Scene" Eye



13

39.     The "My Scene" eye pictured above, for instance, has lashes that radiate almost straight out, circumferentially, from the eyelids and, although the eye is more almond shaped than a "Barbie" eye, the eye is not so sleepy and heavy lidded as a "BRATZ" eye and is only lightly shadowed.  The new "My Scene" eye, in contrast, is dramatically more similar to a "BRATZ" eye, as shown below in a side-by-side comparison.  The doe-eyed innocent look of the "My Scene" eye shown above is gone; replaced with a sultrier look, characteristic of "BRATZ."  The new "My Scene" eye, as shown below, boasts lashes that sweep out and away from the outer corner of the eye, just like the "BRATZ" eye.  The new "My Scene" eye is also more heavy lidded and thickly lined, and the make-up is more markedly pronounced and dramatic.

**MGA's "BRATZ" Eye**                    **New Mattel "My Scene" Eye**

   

40.     Indeed, the progression of the "My Scene" eye, as it has departed from "Barbie" and edged closer and closer to "BRATZ", is readily apparent from virtually every angle, as shown here:

14

## BLONDE

| Mattel's Traditional "Barbie" | Mattel's Original "My Scene" | Mattel's Recent "My Scene" |
|---|---|---|



## BRUNETTE

| Mattel's Traditional "Theresa" | Mattel's Original "My Scene" | Mattel's Recent "My Scene" |
|---|---|---|



15

**EXHIBIT A PAGE 25**

Mattel's Traditional "Theresa" — Mattel's Original "My Scene" — Mattel's Recent "My Scene"

**AFRICAN AMERICAN**

Mattel's Traditional "Barbie" — Mattel's Original "My Scene" — Mattel's Recent "My Scene"

16

41.    Mattel has not stopped at the eyes, however.  Mattel has also incrementally but steadily modified its "My Scene" packaging, and the manner in which the dolls are displayed, to more closely mimic the packaging, trade-dress and overall look and total image of MGA's "BRATZ".

42.    To illustrate, Mattel's "My Scene" dolls were initially marketed like this:

### Mattel's Early "My Scene" Packaging

 

43.    Little by little, however, the packaging has changed, creeping ever closer and closer to the open and transparent style of the "BRATZ" packaging. First, the panels seen running down each side of the front of the "My Scene" box shown above, framing the doll and giving the packaging a closed-in look, were changed as shown here:

### Intermediate Mattel "My Scene" Packaging



17

**EXHIBIT A PAGE 27**

44.   Mattel replaced this intermediate packaging style with another that looked even more similar to the "BRATZ" packaging, as shown here in a side-by-side comparison:

| MGA's "BRATZ" "Wintertime Wonderland" Packaging | Mattel's "My Scene" "Chillin' Out" Packaging |
|---|---|

 

45.   Then later, Mattel changed its packaging and product display yet again to look even more closely and confusingly similar to MGA's packaging and "*tout ensemble*," as shown here

| MGA's "BRATZ" "SPORTZ" Packaging | Mattel's Recent "My Scene" "MIAMI GETAWAY" Packaging |
|---|---|

 

18

46. In this incarnation, Mattel notably abandoned the signature figure-eight style design that had appeared on its prior "My Scene" packaging, making this recent version clearer and more transparent on the front and sides than ever before, and much more like "BRATZ", accordingly. Mattel also discarded its traditional, rectangular shaped box and, like "BRATZ", adopted an unusual, non-rectangular shaped box. Mattel even adopted the "flying banner" ribbon-style slogan running across the middle of the box, similar to that used on the "BRATZ" packaging.

47. As if these pointed and deliberate efforts to confuse and mislead consumers were not enough, Mattel exacerbated the confusion, and furthered the impression that the "My Scene" line and the "BRATZ" line are related, by taking up MGA's practice of regularly releasing new dolls in connection with a theme – but not just *any* theme, often *MGA's theme.*

48. For example, when MGA released its "Wintertime Wonderland" theme in Fall 2003, Mattel released its "Chillin Out!" theme. Each doll in MGA's line came with winter-sports accessories, such as a snowboard or skis and ski boots. Each doll in Mattel's line featured winter sports accessories, also including snowboards or ski and ski boots. Even MGA's color schemes and some of the clothing styles seemed to have made their way into the Mattel products.

49. When MGA released its "Formal Funk" theme, Mattel released its "Night on the Town" theme. "BRATZ Formal Funk" was an elaborately themed line with its dolls in hip formalwear; so was Mattel's "Night on the Town."

50. When MGA released its distinctive "Sun-Kissed Summer" theme, Mattel released its confusingly similar "Jammin' in Jamaica" theme. Each line featured a bright blue-and-orange color scheme, beach accessories, such as surfboards, and beachwear clothing. Mattel's "Jammin' in Jamaica" "Guava Gulch Tiki Lounge" playset also contained elements remarkably similar to MGA's "Sun-Kissed Summer" playset.

51.   Mattel also began running television commercials for its "My Scene" dolls bearing a remarkable similarity to "BRATZ" commercials, combining live action with animated sequences set to similar sounding pop music and lyrics.

52.   Mattel even stooped so low as to mimic "BRATZ" accessories and related products in order to further create consumer confusion in the marketplace.

53.   For instance, when MGA came up with its distinctive "BRATZ" "Runway Disco", Mattel came out with a "My Scene" Sound Lounge with packaging that imitated MGA's trapezoidal box.

54.   Mattel's conduct cannot be explained by sheer coincidence, nor is it merely fair competition.  It is a calculated and intentional effort unquestionably designed to trade off of MGA's hard work and goodwill, create confusion in the marketplace, steal MGA's thunder and momentum, and dilute and blur away the novelty and distinctiveness of MGA's products.  Out of the seemingly endless possibilities that Mattel could have chosen for a new line of dolls, packaging, themes, color schemes, commercials, accessories and playsets, Mattel deliberately chose *not* to come out with something unique, new or different and has, instead, focused its efforts and resources on flooding the market with something so close to "BRATZ" that the public will, can, and does, simply mistake it for "BRATZ".

55.   As yet another example of this, when MGA came out with a "BRATZ" "Funky Fashion Makeover Head," Mattel came out with a confusingly similar – indeed, practically identical – "My Scene" styling head.

20

| MGA's "BRATZ" "Funky Fashion Makeover Head" | Mattel's "My Scene" "Stylin' Head" |
|---|---|

   

  

56.    Indeed, Mattel's "My Scene" styling head is so close to the "BRATZ" styling head that even the press have mistakenly pictured and identified it as MGA's "BRATZ". The picture of Mattel's "My Scene" styling head shown below, for instance, appeared in the press with a caption indicating that the child was trying out different hairstyles "on a *Bratz* hair and makeup doll head."

Hairstyle practice



21

57.     Creating further confusion, Mattel's television commercial for its "My Scene" styling head was like watching a re-run of MGA's commercial for its "Funky Fashion Makeover Head".

58.     At one point in time, Mattel also used a portion of the "BRATZ" dolls' now-famous trademarked tag line "The Girls With a Passion for Fashion" on Mattel's' website for its "Diva Starz" dolls, asking its website users: "Do you have a passion for fashion?"

59.     Mattel has even recently come out with a confusingly similar line of "My Scene" plush pets, which adopt the distinctive look of MGA's "BRATZ" line. The "My Scene" pets feature large, humanlike eyes and wear clothing making them remarkably and confusingly similar to "BRATZ" products, including "BRATZ PETZ", as seen in this example where the pets each wear a jacket, a cap and carry a purse:

**MGA's "BRATZ Dogz"**                    **Mattel's "My Scene" dog**

          

60.     And here too, Mattel chose to package its pets the same way that MGA packaged its "BRATZ PETZ", sitting in an open box, with no top and with partial side panels that slope from a narrow front panel to a higher back panel.

61.     Indeed, the similarity of the "My Scene" pets to "BRATZ PETZ" has confused even sophisticated retailers who have mistakenly merchandised "My Scene" dogs in the middle of the "BRATZ" section of a retail display, next to and as if they were part of MGA's "BRATZ Petz" line.  It comes as no surprise that

22

**EXHIBIT A PAGE 32**

1   customers too have been confused.

2       62.   Indeed, Mattel's television commercials and "My Scene" products

3   have become so confusingly similar to MGA's that even advertising executives

4   have expressed concern.  One went so far as to say that although imitation is the

5   best form of flattery, what the individual had seen at Mattel's showroom, and how

6   its "My Scene" dolls now look so confusingly similar to "BRATZ", was

7   "shocking."  This person further opined that it was clear that Mattel is intending to

8   confuse customers and capture "BRATZ" market share, and even asked MGA if it

9   was considering legal action.

10      63.   The press also has taken notice of Mattel's attempts to confuse

11  consumers.  On or about February 18, 2005, a visitor to MGA's showroom from a

12  prominent news publication stated, "Oh my, I just came from Mattel's showroom

13  and their new 'My Scene' packaging is just like 'BRATZ' minus the handle."

14  Another member of the press visiting MGA's showroom offered the unsolicited

15  comment, "have you seen the new 'My Scene' dolls eyes are exactly like

16  'BRATZ'?"  Yet another opined that Mattel's "My Scene" line was exactly like

17  "BRATZ", indeed, so much so that the reporter confusingly thought that Mattel had

18  bought "BRATZ", and still another has commented on Mattel's imitation of MGA.

19  On or about February 16, 2005, during an interview of a Mattel representative on

20  local network news in New York, "My Scene Barbie" was displayed by a Mattel

21  representative.  During conversation about the dolls, the interviewer exclaimed that

22  they looked like "BRATZ".  The Mattel representative just laughed – but this is no

23  laughing matter.  This colloquy was available for replay and viewing, and was even

24  transcribed, on the internet.

25      64.   Customers too have been similarly confused.  Some actually contacted

26  MGA seeking to purchase "My Scene" dolls.

27      65.   Mattel's conduct is planned, deliberate and intentional.  Mattel has

28  systematically, copied, imitated and liberally borrowed many of the distinctive,

1   essential elements that identify and make "BRATZ" dolls "BRATZ" dolls, diluting

2   the brand, creating customer confusion, and unfairly stifling competition.

3       66.   Ironically, Mattel sued one of its other competitors in Europe for doing

4   much the same thing: "systematically copying and borrowing elements" from "My

5   Scene", on grounds that "this conduct constitutes unfair competition and passing

6   off." Indeed it does.

7       67.   What is more, Mattel's conduct has reached beyond "BRATZ" and

8   "BRATZ"-related products to include other new MGA toy lines.

9       68.   For example, MGA's "4-Ever Best Friends" line was the obvious, and

10  well-recognized model for Mattel's "Wee 3 Friends" line.  Mattel even adopted

11  changes to the color scheme of its similarly-shaped packaging to create confusion

12  with MGA's distinctive packaging.

**MGA's "4-Ever Best Friends"**          **Mattel's "Wee 3 Friends"**





24

69.   In the second half of 2002, MGA's "Mommy's Little Patient,"
originally designed as the first in a series of "Mommy's Little . . ." dolls, was
followed by Mattel's "Little Mommy" doll.

**MGA's**        **Mattel's**

**"Mommy's Little Patient"**     **"Little Mommy Potty Training Baby Doll"**

 

70.   Sparing nothing, Mattel has also extended its monkey-see monkey-do
behavior into its boys' line.  When MGA came out with its "Alien Racers" line of
toy racing vehicles, for instance, Mattel rushed to revamp and rename one of its
"Hot Wheels" lines.  Although well-known and clearly branded for decades as "Hot
Wheels", Mattel's answer to MGA's "Alien Racers" was to re-brand and market its
Hot Wheels Highway 35 line under an "AcceleRacerS" logo.  MGA's line consists
of "extreme" radio controlled racing vehicles marketed in connection with a strong,
almost battle-like, science fiction theme.  MGA's logo accentuates the "A", "R",
and "S" in compressed block lettering.  Mattel's line also consists of extreme racing
vehicles marketed in connection with a strong, almost battle-like, theme.  Mattel's
logo too accentuates the "A", "R", and "S" in compressed block lettering.

25

**EXHIBIT A PAGE 35**

71.   Here, too, Mattel's mimicry has spilled over into Mattel's advertising and thematic presentation and marketing of this toy line.  In particular, Mattel has adopted MGA's "other-worldly" theme in its commercials.  For instance, in Mattel's commercials, the product, whose logo appears as "AcceleRacerS", now compete against alien-like Cyborgs engaged in a "race to save the world," mimicking MGA's alien theme and commercials in which MGA's "Alien Racers" are engaged in a "race to save the universe."

72.   None of this is coincidence.  Mattel has deliberately adopted a pattern and practice of coming out with variations of MGA's products to create confusion in the marketplace, interfere with MGA's business and divert profits away from MGA.  Mattel says, on its website, that it is in the business of creating "[t]he world's premier toy brands [of] today and tomorrow."  It seemingly does so, however, by borrowing liberally from its competitors, even when it refreshes its own existing brands and products.

73.   MGA has suffered extensive injury from Mattel's conduct.  Mattel's habitual, serial simulation of MGA's products, product lines and trade dress has allowed Mattel to take a free ride on the extensive amount of time, expense and creative development MGA expends on developing new products, product packaging and presentation, giving Mattel an unfair advantage, and making it virtually impossible for MGA to compete with Mattel on a level playing field.

**Mattel's additional unfair, manipulative, anti-competitive conduct**

74.   This already substantial injury has been exacerbated by the strong-arm tactics, and other illegitimate, unfair and anti-competitive means that Mattel has used to manipulate the market and ensure that its control and domination of the industry can continue unabated.

26

**EXHIBIT A PAGE 36**

75.     For example, wielding the litigation privilege as a potential shield for intimidating conduct, Mattel has sent threatening letters to several of its former employees who now work for MGA warning them not to disclose *even publicly available information* about Mattel, including the names and positions of Mattel employees.  Mattel even went so far as to sue one of its former senior executives, after he had the temerity to resign and join MGA in October 2004.  Not only was Mattel's lawsuit dismissed for failure to state a viable claim, but Mattel thereafter seemingly could not muster up a shred of evidence sufficient to support an amended complaint.  As a result, Mattel's case against its former executive was dismissed with prejudice.

76.     Mattel has also warned a number of companies, including the biggest publishing entity in the United Kingdom, not to license MGA products, or risk retribution.  The threats are not idle.  In May 2004, Mattel terminated one of its licensees, apparently in retribution for licensing "BRATZ".  While some companies have been courageous enough to take the risk, others have not, and MGA has lost valuable licensing opportunities as a result.

77.     Mattel has used similar intimidation to pressure distributors and retailers, particularly in foreign countries, not to distribute "BRATZ", to reduce shelf and display space for "BRATZ" and to place "BRATZ" in unfavorable locations at retail outlets.

78.     When MGA faced a shortage of doll hair in October 2002, MGA is informed and believes that the reason for that shortage was that Mattel had locked MGA out by buying up the supply from the two main hair supply companies.

79.     Mattel has also manipulated the retail market.  For instance, Mattel merchandisers have been caught tampering with MGA's retail displays, replacing favorably located MGA merchandise with Mattel merchandise instead.  MGA is also informed and believes that Mattel has falsely told a major United States retailer that MGA was giving another major United States retailer below-market pricing

27

**EXHIBIT A PAGE 37**

1    and falsely told a United Kingdom retailer that MGA was discontinuing one of its

2    lines, in order to make such line less attractive to buyers and thereby attempt to

3    increase sales of the competitive Mattel product and improve its own sales, at

4    MGA's expense.

5         80.    Even supposedly unbiased and impartial industry organizations have

6    fallen prey to Mattel's abusive wield of power, to MGA's detriment.

7         81.    NPD Funworld ("NPD"), for one, is the leading supplier of sales

8    statistics in the toy industry.  Accurate NPD statistics are essential for efficient

9    product-line management.  Without these statistics, it is difficult, if not impossible,

10   for toy companies to assess and measure the relative success of their products in

11   key categories.  It is, however, a subscription service, and NPD restricts the manner

12   in which its subscribers may use the data it provides.

13        82.    Mattel has regularly ignored the restrictions – using NPD data about

14   Mattel's comparative standing relative to other companies in press releases and in

15   communications with retailers and financial investors who are not NPD subscribers.

16        83.    Mattel generates substantially more annual subscription revenue for

17   NPD than does MGA, and carries more clout.

18        84.    After MGA had subscribed to the service for more than 12 years, NPD

19   terminated MGA's subscription in 2003 theoretically on the grounds that MGA

20   misused NPD data in a press release.

21        85.    MGA is informed and believes that the termination was the result of

22   pressure from Mattel, notwithstanding Mattel's own frequent violations of NPD's

23   restrictions.

24        86.    In addition to this, the market share numbers that NPD generates are

25   heavily dependent on the category in which NPD places a particular product.  MGA

26   is informed and believes that Mattel also pressured NPD into changing certain

27   product classifications for its "BRATZ" products in order to manipulate the data

28

28

**EXHIBIT A PAGE 38**

1   and preserve Mattel's market share rankings in the critical fashion doll category –

2   and thereby lower MGA's.

3        87.    The Children's Advertising Review Unit ("CARU") is another

4   organization that, upon information and belief, appears to have been subject to

5   improper influence by Mattel.  CARU is the toy industry's supposedly independent

6   self-regulatory body in charge of maintaining standards in advertising.  CARU's

7   approval is considered critical within the toy industry to avoiding regulatory action

8   by the Federal Trade Commission.

9        88.    CARU is heavily subsidized by Mattel.

10       89.    Upon information and belief, Mattel has used its influence as a major

11  contributor to CARU's budget to induce CARU to place onerous restrictions on

12  MGA advertisements, and require MGA to amend aspects of commercials that have

13  gone unchallenged in other parties' commercials.

14       90.    As a result of CARU's restrictions, MGA has been forced to incur

15  unnecessary costs for reshooting and producing or re-editing its commercials.

16       91.    On several occasions, CARU has also either strongly suggested, if not

17  also required, that MGA respond to inquiries about its website policies and make

18  substantial changes to the "BRATZ" website notably and significantly in excess of

19  restrictions imposed on Mattel and others.

20       92.    Even TIA, the toy industry's trade association, is apparently not

21  untainted by Mattel's influence and power.  Each year, TIA presents the Toy-of-

22  the-Year Awards, the most prestigious of which had been the award for Toy of the

23  Year.  Winning the Toy of the Year Award is a significant achievement that not

24  only very likely increases the sales of the winning toy, but also denotes the winning

25  company as a leader in toy innovation and generates substantial goodwill with

26  retailers, distributors, licensees, and customers.

27       93.    For the years 2000 (the first year of the award), 2001 and 2002, the

28  Toy of the Year award was chosen by consumer vote.  The awards ceremony was

29

1   then held the following year, at a dinner in New York. (For example, the awards

2   dinner for the year 2000 award was held in February 2001). Leap Frog won the

3   2000 People's Choice Toy of the Year Award and MGA won the 2001 and 2002

4   People's Choice Toy of the Year Awards. With the 2003 Toy of the Year Award,

5   however, the rules suddenly changed. Now, the award is selected by members of

6   the industry.

7        94.   Upon information and belief, this change was orchestrated by a Fisher

8   Price (a Mattel subsidiary) executive who, until recently, served as the Chairman of

9   TIA.

10       95.   Perhaps not surprisingly given this change in the winner selection

11  procedures, "Hokey Pokey Elmo" ("Elmo"), a Fisher Price toy, won for the year

12  2003 (awarded in 2004), beating out the other leading nominee, "BRATZ Formal

13  Funk Super Stylin' Runway Disco."

14       96.   TIA has refused to provide MGA with the vote count procedure and

15  totals for this award, despite repeated requests.

16       97.   MGA is also informed and believes that Mattel was instrumental in

17  attempting to keep MGA from participating as a sponsor in this year's "Kids'

18  Choice Awards."

19       98.   Mattel has clearly engaged in tortious, illegal and unethical behavior in

20  its unfettered efforts to disrupt, if not destroy, MGA. Indeed, this is apparently

21  Mattel's current *modus operandi* when it comes to "competing" in the industry.

22  The once immensely successful "LeapFrog" interactive learning product, for

23  example, has apparently been one of Mattel's other recent victims.

24       99.   Mattel may not shield its illegal, unfair and unethical business practices

25  from the public eye. It is time for the truth to be told, and the world to know of

26  Mattel's unfair, unethical and illegal business practices and unfair competition.

27  "Barbie" does not "play nice" with others (particularly her competitors), and needs

28  to be taught how "to share" (at least in the fashion doll marketplace). She cannot be

1   allowed to continue to be the playground bully and trample on the rights of others,

2   including MGA.

3       100.  As a result of Mattel's manipulative, illegal, unfair, unethical and anti-

4   competitive conduct, MGA has suffered and, unless abated, will continue to suffer

5   lost sales, lost licensing fees, lost contracts, lost relationships, lost business

6   opportunities and other damages and harm for which there is no adequate remedy at

7   law.  Its ability to enter new markets and product lines has been hampered and

8   delayed.  Its production costs have increased, its reputation and relationships with

9   important players in the industry have been negatively impacted, the value of its

10  business has been diminished, and its ability to attract, hire and retain employees

11  has been affected.

12

13              **FIRST CLAIM FOR RELIEF**

14  **(False Designation of Origin or Affiliation in Violation of 15 U.S.C. § 1125 (a))**

15      101.  MGA repeats and realleges the allegations contained in paragraphs 1

16  through 100 of this Complaint and incorporates them by reference as though fully

17  and completely set forth herein.

18      102.  MGA's "BRATZ" line has a unique and distinctive style and

19  distinctive characteristics, such as the disproportionately large head, large dramatic

20  eyes with a distinctive presentation (including the eye shape, make-up and lashes),

21  pouty, plump lips with a distinctive presentation (including the lip shape and make-

22  up), small, thin bodies, oversized feet, and up-to-date fashions.  MGA's "BRATZ"

23  line is known for and recognized by the total image that is presented by its product

24  and the style and arrangement of the packaging and display.  This "*tout ensemble*"

25  is representatively described and depicted herein.  The characteristics of MGA's

26  "BRATZ" line, alone or in combination, have come to identify the "BRATZ" line

27  and its source, MGA, and thus serve as protectable trade dress.  MGA's trade dress

28  in its "BRATZ" line is purely aesthetic and non-functional or, if any utility exists, it

31

**EXHIBIT A PAGE 41**

1   is not essential to the purpose, quality or source identifying attributes of the

2   aesthetics.  MGA's trade dress in its "BRATZ" line is inherently distinctive or has

3   acquired distinction within the meaning of the Lanham Act.

4       103.  Similarly, MGA's "BRATZ PETZ," part of the "BRATZ" line, also

5   has its own unique and distinctive characteristics, such as the humanlike eye and

6   unusual appearance of the animals dressed in clothing.  MGA's "BRATZ PETZ"

7   line has become known for and recognized by the total image that is presented by

8   the product and the style and arrangement of its packaging.  This *"tout ensemble"* is

9   representatively described and depicted herein.  The characteristics of MGA's

10  "BRATZ PETZ", alone or in combination, have come to identify the "BRATZ

11  PETZ" line and its source, MGA, and thus serve as protectable trade dress.  MGA's

12  trade dress in its "BRATZ PETZ" line is purely aesthetic and non-functional or, if

13  any utility exists, it is not essential to the purpose, quality or source identifying

14  attributes of the aesthetics.  MGA's trade dress in its "BRATZ PETZ" line is

15  inherently distinctive or has acquired distinction within the meaning of the Lanham

16  Act.

17      104.  Mattel's production, sale and marketing of "My Scene" dolls,

18  including styling heads and doll heads, and "My Scene" pets that are confusingly

19  similar to MGA's "BRATZ" line (including its "BRATZ PETZ"), without MGA's

20  permission or consent, constitutes designation and use of a term, symbol, device or

21  combination thereof that is false or misleading within the meaning of 15 U.S.C.

22  Section 1125 and is likely to cause confusion, or to cause mistake, or to deceive as

23  to the affiliation, connection, or association, or as to the origin, sponsorship, or

24  approval of Mattel's goods or commercial activities, within the meaning of 15

25  U.S.C. Section 1125.  MGA has been damaged by Mattel's acts.

26      105.  Mattel's conduct has been intentional and willful, and is calculated

27  specifically to trade off the goodwill that MGA has developed in its successful

28  "BRATZ" line.  By its aforesaid acts, particularly its imitation of the distinctive

1   features of MGA's "BRATZ" line in connection with goods sold and distributed in

2   interstate commerce, Mattel has infringed and is likely to continue to infringe on

3   MGA's substantial rights in and to the "BRATZ" line trade dress.  In so doing,

4   Mattel has falsely represented and designated to the public generally and consumers

5   of fashion doll products specifically the source and origin of Mattel's "My Scene"

6   fashion doll products in violation of 15 U.S.C. § 1125(a).

7       106.  MGA has been damaged by, and Mattel has profited from, Mattel's

8   wrongful conduct in an amount to be proven at trial.

9       107.  For each act of infringement, MGA is entitled to recover its actual

10   damages as well as Mattel's profits from such infringement.

11       108.  Monetary relief alone, however, is not adequate to address fully the

12   irreparable injury that Mattel's illegal actions have caused and will continue to

13   cause MGA, if not enjoined.  MGA is therefore entitled to preliminary and

14   permanent injunctive relief to stop Mattel's ongoing infringement of MGA's trade

15   dress.

16   ## SECOND CLAIM FOR RELIEF

17   **(Unfair Competition in Violation of 15 U.S.C. § 1125 (a) and Unfair**

18   **Competition and Unfair Business Practices in Violation of Cal. Bus. & Prof.**

19   **Code § 17200 *et seq.* and California Common Law)**

20       109.  MGA repeats and realleges the allegations contained in paragraphs 1

21   through 108 of this Complaint and incorporates them by reference as though fully

22   and completely set forth herein.

23       110.  Mattel has deliberately and, indeed, repeatedly adopted, imitated and

24   mimicked the make-up, appearance, features, trade dress, and image of MGA's

25   products, packaging and advertising, including its repackaging and refreshing of

26   older Mattel toys.  Mattel's actions were and are done with the intent to deceive

27   consumers, cause confusion and mistake, and interfere with the ability of

28   consumers to identify the source of goods by appearance and packaging.  By this

33

**EXHIBIT A PAGE 43**

1  conduct, Mattel pirates and exploits, by subliminal or conscious association with

2  MGA, the goodwill and reputation of MGA and derives benefit therefrom.

3         111.  Mattel has particularly and deliberately poached upon the commercial

4  magnetism of MGA's "BRATZ" and the success of "BRATZ".  Mattel's conduct

5  has been intentional and willful, and is calculated specifically to trade off the

6  goodwill that MGA has developed in its successful "BRATZ" line.

7         112.  By its acts, including its intentional imitation of the distinctive features

8  of MGA's "BRATZ" dolls, which has progressively become closer and closer, as

9  well as its imitation of "BRATZ" themes, packaging and the overall look, feel and

10  total image of the "BRATZ" line, imitation of other MGA products, packaging and

11  advertising, and other conduct alleged herein, Mattel has engaged in unfair

12  competition under both federal and California state law.

13        113.  Mattel has also willfully and maliciously used its power, influence and

14  intimidation to threaten certain retailers, suppliers, licensees, distributors and

15  manufacturers so as to limit, if not prevent, MGA from doing business with these

16  retailers, suppliers, licensees, distributors and manufacturers, using its power and

17  influence to intimidate and manipulate industry bodies.  Mattel has further used its

18  power and influence to attempt to, if not actually, intimidate and threaten MGA's

19  current and potential employees so as to cause MGA competitive injury.

20        114.  Alone, in combination, or in totality, Mattel's actions discussed and

21  alleged herein constitute unfair competition and unfair business practices within the

22  meaning of federal law, California statutory law and/or California common law.

23        115.  As a result of its conduct, Mattel has derived substantial monetary and

24  non-monetary benefit and business advantage.  Mattel has also wrongfully diverted

25  profits away from MGA and to Mattel and, on information and belief, deprived

26  MGA of the patronage of a large number of actual and potential customers.

27        116.  MGA has been damaged by, and Mattel has profited from, Mattel's

28  wrongful conduct in an amount to be proven at trial.

34

1    117.   Monetary relief alone, however, is not adequate to address fully the

2    irreparable injury that Mattel's actions have caused and will continue to cause

3    MGA, if not enjoined.  MGA is therefore entitled to preliminary and permanent

4    injunctive relief to stop Mattel, and all persons acting in concert with Mattel, from

5    engaging in acts of unfair competition and unfair business practices.

6    118.   MGA is further entitled to relief whereby Mattel is ordered to pay

7    restitution for damages resulting from Mattel's unfair competition and unfair

8    business practices.

9    ## THIRD CLAIM FOR RELIEF

10   **(Dilution in Violation of 15 U.S.C. § 1125 (c); Cal. Bus. & Prof. Code § 14330**

11   **and California Common Law)**

12   119.   MGA repeats and realleges the allegations contained in paragraphs 1

13   through 118 of this Complaint and incorporates them by reference as though fully

14   and completely set forth herein.

15   120.   The look and trade dress of the MGA products referenced herein are

16   distinctive and famous, and have been since before Mattel launched its similar

17   versions.  By its aforesaid acts, Mattel caused and continues to cause blurring and

18   dilution of the distinctive look of MGA's products and trade dress, which

19   previously served as a unique source identifier for MGA, within the meaning of the

20   Lanham Act, California Business and Professions Code § 14330 and/or California

21   common law.

22   121.   Mattel's conduct has been intentional and willful, calculated

23   specifically to trade on MGA's goodwill and reputation and to cause dilution of

24   MGA's famous marks, particularly those connected with MGA's famous and

25   successful "BRATZ" doll head, "BRATZ" doll product line, "BRATZ Funky

26   Fashion Makeover Head" and "BRATZ PETZ" line.

27   122.   MGA has been damaged by, and Mattel has profited from, Mattel's

28   wrongful conduct in an amount to be proven at trial.

35

**EXHIBIT A PAGE 45**

123.   Monetary relief alone, however, is not adequate to address fully the irreparable injury that Mattel's actions have caused and will continue to cause MGA, if not enjoined.  MGA is therefore entitled to preliminary and permanent injunctive relief to stop Mattel's ongoing dilution.

### FOURTH CLAIM FOR RELIEF

### (Unjust Enrichment)

124.   MGA repeats and realleges the allegations contained in paragraphs 1 through 123 of this Complaint and incorporates them by reference as though fully and completely set forth herein.

125.   As a result of the conduct alleged herein, Mattel has been unjustly enriched to MGA's detriment.  MGA seeks a worldwide accounting and disgorgement of all ill-gotten gains and profits resulting from Mattel's inequitable activities.

### PRAYER FOR RELIEF

WHEREFORE, MGA prays for relief, as follows:

1.   That Mattel, its agents, servants and employees and all persons acting in concert be restrained preliminarily and permanently from directly or indirectly:

    a.   using confusingly similar trade dress;

    b.   improperly influencing, or attempting to improperly influence, standard-setting and industry organizations;

    c.   engaging in unfair competition and unfair business practices; and

    d.   diluting MGA's trade dress;

2.   For general and actual damages, according to proof at trial but believed to reach or exceed tens of millions of dollars;

3.   For the disgorgement of all profits derived by Mattel for its acts of:

    a.   false designation of origin or affiliation;

36

1    b. unfair competition and unfair business practices; and

2    c. dilution;

3  4. For costs of suit and reasonable attorneys' fees;

4  5. For punitive and/or exemplary damages as a result of Mattel's willful

5 and malicious conduct to the extent allowable by law; and

6  6. For such other and further relief as the Court deems just and proper.

7

8 Dated:  April 13, 2005     PATRICIA GLASER

9               CHRISTENSEN, MILLER, FINK, JACOBS, GLASER, WEIL &

10              SHAPIRO LLP

                DALE M. CENDALI

11              DIANA M. TORRES

                PAULA E. AMBROSINI

12              O'MELVENY & MYERS LLP

13

14

15              By:

                Diana M. Torres

16              Attorneys for Plaintiff

                MGA ENTERTAINMENT, INC.

17

18

19

20

21

22

23

24

25

26

27

28

1

## DEMAND FOR JURY TRIAL

2

3          MGA hereby demands a jury trial on all triable issues.

4

5   Dated:          April 13, 2005                PATRICIA GLASER
                                                  CHRISTENSEN, MILLER, FINK,
6                                                 JACOBS, GLASER, WEIL &
                                                  SHAPIRO LLP
7
                                                  DALE M. CENDALI
8                                                 DIANA M. TORRES
                                                  PAULA E. AMBROSINI
9                                                 O'MELVENY & MYERS LLP

10

11                                                By:
                                                     Diana M. Torres
12                                                Attorneys for Plaintiff
                                                  MGA ENTERTAINMENT, INC.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

38

EXHIBIT A PAGE 48