QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
  John B. Quinn (Bar No. 090378)
  (johnquinn@quinnemanuel.com)
  Michael T. Zeller (Bar No. 196417)
  (michaelzeller@quinnemanuel.com)
  Jon D. Corey (Bar No. 185066)
  (joncorey@quinnemanuel.com)
  865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Attorneys for Mattel, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual, | CASE NO. CV 04-9049 SGL (RNBx) |
| Plaintiff, | Consolidated with<br>Case Nos. CV 04-09059 & CV 05-2727 |
| vs. | **DISCOVERY MATTER** |
| MATTEL, INC., a Delaware corporation, | **[To Be Heard By Hon. Edward Infante (Ret.) Pursuant To Order Of December 6, 2006]** |
| Defendant. | **[PUBLIC REDACTED]**<br>DECLARATION OF JON D. COREY IN SUPPORT MATTEL, INC.'S:<br>(1) OPPOSITION TO MGA'S MOTION TO QUASH OR, IN THE ALTERNATIVE, FOR PROTECTIVE ORDER; AND<br>(2) COUNTERMOTION TO COMPEL PRODUCTION OF DOCUMENTS RESPONSIVE TO THIRD-PARTY SUBPOENAS |
| AND CONSOLIDATED ACTIONS | |
| **(VOLUME 2 OF 2:<br>Exhibit M-Exhibit BB)** | Date: February 8, 2008<br>Time: 9:30 a.m.<br>Place: Telephonic<br><br>**Phase 1**<br>Discovery Cut-Off: January 28, 2008<br>Pre-Trial Conference: May 5, 2008<br>Trial Date: May 27, 2008 |

07209/2357572.1

-1-

# Exhibit M

00029/2340430.1

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

525 UNIVERSITY AVENUE

PALO ALTO, CALIFORNIA 94301

TEL: (650) 470-4500

FAX: (650) 470-4570

www.skadden.com

DIRECT DIAL
650.470.4511
DIRECT FAX
888.329.6334
EMAIL ADDRESS
APARK@SKADDEN.COM

FIRM/AFFILIATE OFFICES
——
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
NEW YORK
SAN FRANCISCO
WASHINGTON, D.C.
WILMINGTON
——
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

December 18, 2007

**By Email and U.S. Mail**

Michael Fazio, Esq.
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017

RE:  *Carter Bryant v. Mattel, Inc.* Case No. CV 04-9049 SGL (RNBx)
    (consolidated with Cases Nos. CV 04-09059 and CV 05-02727) –
    Request to Meet and Confer re: Various Third Party Subpoenas

Dear Michael:

This letter: (i) responds to your email from this morning proposing to meet and confer today regarding MGA's objections to Mattel's subpoenas to Ernst & Young, Deloitte & Touche and Wachovia Corporation; and (ii) reiterates the request from my December 11 letter that our meet-and-confer regarding the foregoing subpoenas also include a discussion of the subpoenas to Wells Fargo, ConsumerQuest, Moss Adams, the Isaac Larian Annuity Trust and the Isaac and Angela Larian Trust.

As you know from my assistant's phone call this morning, I am unavailable today at the times you proposed. On December 11, I sent a letter to Mr. Corey (in response to his December 7 letter) stating that I would be available to meet and confer "on the afternoon of December 14, from 2 p.m. on. I am also available on the mornings of December 17 and December 18, any time after 10 a.m." On the evening of December 11, Mr. Corey sent me an email stating that he was "unavailable to meet and confer on Friday [December 14], but will let you know about next Monday or Tuesday [December 17 or 18] when I get a calendar." Neither Mr. Corey nor anyone else from your office got back to me until your email of this morning, proposing to meet and confer at various times throughout today. As I'm sure you can appreciate, in the week since your office promised to get back to me, I have scheduled a number of other commitments that render me unable to meet and confer today. I am, however, available to meet and confer on the afternoons of Friday, December 21, and Thursday, December 27, between 2 and 5 p.m.

**EXHIBIT M PAGE 201**

Michael Fazio, Esq.
December 18, 2007
Page 2

   Your email of this morning and Mr. Corey's email of December 11 failed to address the request in my December 11 letter that we also include in our meet-and-confer a discussion of Mattel's subpoenas to Wells Fargo, ConsumerQuest, Moss Adams, the Isaac Larian Annuity Trust and the Isaac and Angela Larian Trust. As I wrote in my December 11 letter, these subpoenas give rise to the very same issues that we will be discussing with respect to the subpoenas to Ernst & Young, Deloitte & Touche and Wachovia Corporation. In particular, as with the subpoenas to Ernst & Young, Deloitte & Touche and Wachovia Corporation, the subpoenas to Wells Fargo, ConsumerQuest, Moss Adams, the Isaac Larian Annuity Trust and the Isaac and Angela Larian Trust are improper and objectionable because they are overly broad in substantive and temporal scope, seek documents that are irrelevant to this litigation or are duplicative of documents and information that has been or could be obtained by Mattel through other discovery, and contain requests that are not specifically tailored to avoid unnecessarily burdening or harassing the non-parties.

   To begin with, Mattel has improperly subpoenaed the non-parties for the entirety of MGA and Isaac Larian's financial records, from tax returns to canceled checks, covering a nine-year period from 1999 to the present. There is no claim or defense at issue in this case that could possibly justify giving Mattel such unfettered access to MGA and Mr. Larian's financial histories. *See, e.g., Travelers Indem. Co. v. Metropolitan Life Ins. Co.*, 228 F.R.D. 111, 113 (D. Conn. 2005) (granting defendant's motion to quash subpoena because it covered a ten-year period and was not limited to products at issue); *In re Ashworth, Inc. Sec. Litig.*, 2002 U.S. Dist. LEXIS 27991, at *20 (S.D. Cal. May 10, 2002) (quashing subpoenas issued to defendant's financial analysts and investment companies as "overwhelmingly broad in category and content" because "[a]s they are phrased, the requests appear, in this Court's view, to seek all documents in the third party financial analysts' possession that refer to or mention Ashworth in any shape or form."); *S. Cal. Hous. Rights Ctr. v. Krug*, 2006 U.S. Dist. LEXIS 65330 (C.D. Cal. Sept. 2006) (denying request for production of tax return because plaintiff could not show there was a compelling need for the tax return where other less intrusive means could be used to establish defendant's net worth). In addition, to the extent that any of MGA or Mr. Larian's financial records are relevant and the permissible subject of discovery, Mattel has already requested, has received and continues to receive such documents from the MGA entities. *See, e.g., Moon v. SCP Pool Corp.*, 232 F.R.D. 633, 638 (C.D. Cal. 2005) (holding that a subpoena is unduly burdensome where the subpoenaing party "can more easily and inexpensively obtain the documents from [another party], rather than from [the] nonparty.").

   Further, Mattel has demanded that the non-parties produce vast amounts of financial records for a host of other non-parties, including every person who ever did any work for MGA or Isaac Larian, and every conceivable relative of Isaac Larian. The private financial records of these non-parties are not even remotely relevant to this case and Mattel's efforts to obtain such information constitute a clear abuse of the non-party discovery process.

Michael Fazio, Esq.
December 18, 2007
Page 3

In addition, Mattel has requested from the non-parties all documents relating to any litigation between Isaac Larian and his brother Farhad Larian. Mattel, however, has already requested the same documents from both Messrs. Larian, as well as MGA and other law firms. Mattel is not permitted to seek the same documents from twelve different sources. Such duplication is unreasonable and unduly burdens the non-parties.

Moreover, Mattel's subpoenas include various requests for all documents obtained from MGA or Isaac Larian relating to Bratz, other MGA products, or Carter Bryant. While some documents relating to Mr. Bryant or the MGA products at issue in this case may be relevant, Mattel's requests to the non-parties are improper because Mattel has already requested and received more than three million pages of such documents from the MGA Defendants. To the extent that Mattel is seeking relevant documents that are not duplicative, Mattel's requests are so overly broad that it is impossible to discern what specific relevant, non-duplicative documents Mattel is requesting from the non-parties. As I'm sure you know, Mattel has tried to engage in similar abusive non-party discovery tactics in other litigation and has been sanctioned for such misconduct. *See Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 813-14 (9th Cir. 2003) (affirming sanctions against Mattel and its counsel, Quinn Emanuel, for issuing "very broad" and "abusively drawn" discovery subpoena to employer of defendant's expert).

In light of the foregoing, I hereby reiterate my December 11 request that our meet-and-confer include a discussion of Mattel's subpoenas issued to Ernst & Young, Deloitte & Touche, Wachovia Corporation, Wells Fargo, ConsumerQuest, Moss Adams, the Isaac Larian Annuity Trust and the Isaac and Angela Larian Trust. If you are unwilling to meet and confer regarding these subpoenas or we are unable to resolve our differences, MGA will have no choice but to file a motion seeking to quash or modify those subpoenas or for a protective order. Please let me know your availability.

Sincerely,

Amy S. Park

Exhibit N

Priority ✓
Send ✓
Enter ___
Closed ___
JS-5/JS-6 ___
JS-2/JS-3 ___
Scan Only ___

FILED - EASTERN DIVISION
CLERK, U.S. DISTRICT COURT

AUG 1 0 2006

CENTRAL DISTRICT OF CALIFORNIA
BY ___ DEPUTY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARTER BRYANT, | |
|              Plaintiff, | CASE NO.  CV 04-9049 SGL (RNBx) |
| v. | (Consolidated with cases CV-04-9059 and CV-05-2727) |
| MATTEL, INC., | ORDER DENYING MOTION FOR APPOINTMENT OF EXPERT WITNESSES |
|              Defendant, | |
| and related actions. | |

Presently before the Court is Mattel, Inc.'s ("Mattel") motion for the appointment of expert witnesses pursuant to Federal Rule of Evidence 706, Carter Bryant and MGA Entertainment, Inc.'s ("MGA") opposition and response thereto, and Mattel's reply.  For the reasons set forth below, the Court **DENIES** the motion for the appointment of expert witnesses.

Federal Rule of Evidence 706(a) provides

> The court may . . . on the motion of any party enter an order to show cause why expert witnesses should not be appointed, and may request the parties to submit nominations.  The court may appoint any expert witnesses agreed upon by the parties, and may appoint expert witness of its own selection.  An expert witness shall not be appointed by the court unless the witness consents to act.

DOCKETED ON CM

AUG 11 2006

BY ___ /044

**EXHIBIT N PAGE 204**

A witness so appointed shall be informed of the witness'
duties by the court in writing, a copy of which shall be filed
with the clerk, or at a conference in which the parties shall
have opportunity to participate.

The appointment of an expert by a federal court is a rare occurrence.  Much of
this stems from a concept "[d]eeply ingrained" in the common law "that it is the
responsibility of the parties to produce the evidence while the court looks on to assure
that the rules are followed."  4 JOSEPH M. MCLAUGHLIN, WEINSTEIN'S FEDERAL EVIDENCE
§ 706.02[1], at 706-6 (2nd ed. 2006).  The reluctance of courts to intrude into the
evidence-gathering function normally assigned to counsel is borne out of "the fear of
ex parte communications between the court and its expert," as well as the
unseemliness of "[c]ollecting a share of the expense [for the work performed by the
court appointed expert] from a party who has been damaged by the expert's report."
Id. at 706-6, 706-7.  As a result of these institutional concerns, "experts are usually
appointed only in exceptional cases that present unwieldy, complex, or technical
issues" or where "there is a need for an impartial, independent assessment of a
disputed issue."  Id. § 706.02[3], at 706-8 706-9.

Here, Mattel seeks for the court to appoint experts in the fields of questioned
document examination, ink chemistry analysis, and paper chemistry analysis in order
to "analyze and date (1) the originals of 'BRATZ' design drawings, (2) the faxed-
version of the BRATZ-related contract between . . . Carter Bryant and MGA
Entertainment, Inc., (3) MGA's internal documents relating to work performed by Anna
Rhee on Bryant-related projects in the year 2000, and (4) a facsimile of BRATZ
drawings bearing a fax header date of April 10, 2000," as well as "(5) any other
documents that cannot be sampled or tested without destroying the sample tested or
analyzed."  (Mattel's Mot. Appt. Expert, Preface at 2).  The reason proffered for such
an appointment is two-fold:  First, a generalized concern that, because the documents
sought to be examined are "highly relevant" to the litigation, having a neutral expert
perform the testing on the same may obviate a battle of the experts that would make

2

1  the jury's function of sorting out the truth much more arduous; and second, concerns,

2  deduced during discovery, about the possible spoliation of key documents in the case

3  by MGA/Bryant and their counsel.

4  A.    AVERTING A BATTLE OF THE EXPERTS

5       Mattel's argument that the Court should appoint an expert because otherwise

6  each side will perform "separate, partisan destructive analyses of separate samples of

7  the documents" with "wide divergence" of opinion "virtually assured" is not well-

8  founded. (Mattel's Mot. Appt. Expert at 18, 20). Explicit in Mattel's argument is that

9  this feared divergence in each side's retained expert's opinions has yet to materialize.

10  This is not surprising as it appears that discovery in this case is in its nascent stage,

11  owed largely to the fact that the Court had earlier stayed the case while Mattel

12  appealed the denial of its motion to remand the case to state court.  Mattel's argument

13  instead is that the Court should appoint an expert now to avoid the <u>possibility</u> that

14  there <u>may</u> be such wide divergence in each side's privately retained expert in the

15  <u>future</u>.  Needless to say from the jabs each party took at the credibility and even

16  trustworthiness of the other side's retained expert during the oral argument on this

17  motion (one going so far as to label the competing ink chemistry experts as being the

18  modern day equivalent of one's Hatfield to the other's McCoy), such a possibility may

19  be more easier to imagine occurring here than in ordinary cases.  Nevertheless, such

20  divergence, even if likely, is still that – a possibility, not an inevitability.

21       In those cases where an expert has been appointed by a court on account of

22  the excessive partisanship in the expert opinions retained by counsel, the rationale for

23  the appointment was based on the fact that the feared wide divergence in opinion had

24  already materialized.  <u>See Students of California Sch. for the Blind v. Honig</u>, 736 F.2d

25  538, 548 (9th Cir. 1984)("the judge could not decide the merits of the students' seismic

26  safety claims on the basis of evidence presented at trial, so he reopened the case and

27  appointed a neutral expert to evaluate the adequacy of seismic testing at the Fremont

28  site"), <u>vacated on other grounds</u>, 471 U.S. 148 (1985); <u>Eastern Air Lines, Inc. v.</u>

3

1   McDonnell Douglas Corp., 532 F.2d 957 (5th Cir. 1976); 4 WEINSTEIN § 706App.100 at

2   706App.-5 (noting that legal commentators' "imprecations against the parties' 'battle of

3   experts'", not the potential for such a battle, "led to the drafting of the Uniform Expert

4   Testimony Act in 1937," the precursor to Federal Rule of Evidence 706).

5          In no instance uncovered by the Court's research (or by Mattel's citation to

6   authority) has a court appointed an expert because of a fear, even one that is well-

7   founded, that such wide divergence in privately-retained expert testimony may

8   materialize in the future.  Were the Court to adopt Mattel's analysis, appointment of

9   experts by courts would expand exponentially, limited only by a court's assessment of

10  how partisan the experts in a given case may become in the future.  Such a

11  proliferation has not occurred precisely because courts generally require that the

12  divergent "horse" be placed before the expert witness "cart."  See FED. R. EVID. 706

13  advisory committee's note ("actual appointment is a relatively infrequent occurrence").

14  Unless and until this feared divergence in opinion becomes reality, the Court finds that

15  the potential (which itself cannot be quantified at this point) for its occurrence does not

16  warrant the Court's intrusion into the adversarial process through the appointment of

17  an expert at this stage.

18  B.     SPOILATION OF EVIDENCE

19         The question is much closer with respect to Mattel's other reason for the Court

20  to appoint an expert in this case:  Concern that opposing counsel or their clients may

21  have destroyed or altered key documents in the case.  Mattel's basis for such concern

22  is predicated on three facts uncovered during discovery.

23         1.     Evidence of spoilation

24         Before being deposed Bryant was asked to bring all his original BRATZ design

25  drawings.  When he arrived at his deposition, however, Bryant only had in his

26  possession a few of the originals.  (Decl. Michael T. Zeller ¶ 13).  Among these some

27  "contained holes where plugs apparently had already been removed.  Bryant

28  acknowledged . . . that his drawings had no holes in them when he gave them to his

4

1  lawyers." (Mattel's Mot. Appt. Expert at 2; see also Decl. Michael T. Zeller ¶ 14).

2  Specifically, at Bryant's deposition the following exchange took place between Bryant

3  and counsel for Mattel:

4          Q.      (By Mr. Quinn) I wanted to ask you about one of
                   these original drawings that were produced today.
5
                   – what we're talking about here.  This is – the Post-it
6                  says that's Bryant – that's the original of Bryant
                   192, Bates number 192, which has the heads on it,
7                  and this is one of the originals that your counsel was
                   kind enough to have shipped here today for us to
8                  look at.

9          A.      Yes

10         Q.      And we were just looking at these this afternoon and
                   we notice[d] that there's a bunch of holes on the
11                 page, including in the signature, as if somebody
                   were taking ink samples.
12
           A.      Uh-huh.
13
           Q.      Do you see that?
14
           A.      Yes.
15
           Q.      Do you know anything about why those holes were
16                 made or how or when?

17         A.      I have no idea what those are.

18         Q.      I mean, when you had – when you had possession
                   of this document did it have those holes in it?
19
           A.      Not that I remember.
20
           Q.      You certainly never had anything to do with that?
21
           A.      No.  I don't know anything about those holes.
22
           Q.      And, similarly, if you wouldn't mind holding this up to
23                 the camera, this is the original of Bryant 210 and it's
                   also – if you take a look at it, I think you'll see it has
24                 some of those holes in it, although not as many as
                   the last one we looked at.  Again, you don't know
25                 anything about how or why those holes got put on
                   there?
26
           A.      I don't.
27

28  (Decl. Michael T. Zeller, Ex. 7 at 161-163).

                                    5

                          **EXHIBIT N PAGE 208**

1    Mattel has submitted the declaration of a questioned document analysis expert,

2    Lloyd Cunningham, who has opined that the holes described in the document

3    mentioned above are consistent with those that would be generated by taking

4    microplug samples to perform analysis of the ink found on a document.  (Decl. Lloyd

5    Cunningham ¶ 5).  Bryant and MGA eventually conceded (although at first refusing to

6    do so under the veil of work-product privilege) that they tested some of the original

7    BRATZ drawings by an expert they retained in the field of forensic chemistry, Erich J.

8    Speckin.  (Response to Order to Show Cause ("Response") at 1-2).

9        Mr. Speckin states that in June, 2004, he performed a series of tests "on

10   various 'Bratz' documents" at the request of MGA's counsel.[1]  (Decl. Erich J. Speckin

11   ¶ 8).  Those tests included examining the documents in question under an infrared

12   light as well as performing sidelight testing, which involves "visually inspecting a

13   document by holding a side light up to the document at an oblique angel . . . to

14   determine preliminarily whether the document contains impressions, or markings

15   impressed upon the document by drawing and writing done on a sheet of paper laid

16   on top of the document being tested."  (Decl. Erich J. Speckin ¶¶ 9, 10).  Mr. Speckin

17   also performed an electrostatic detection apparatus to see if there was indented

18   impressions on the documents.  (Decl. Erich J. Speckin ¶ 11).  Finally, Mr. Speckin

19   "performed ink identifications tests" on the documents.  (Decl. Erich Speckin ¶¶ 12-

20   13).  Such testing involved Mr. Speckin removing "very small microplug samples from

21   the document at issue and testing the microplug."  (Decl. Erich Speckin ¶13).

22   Nowhere is it averred by MGA, Bryant, or Mr. Speckin which or how many of the

23   original BRATZ drawings were subjected to this microplug sampling procedure, nor is

24   it averred from what parts of the documents that were tested was the microplug taken.

25   Instead, Mr. Speckin simply notes that in taking the microplugs he "le[ft] more than

26

27       [1] At the time the testing was done by Mr. Speckin, Bryant had already been

28   sued by Mattel for violating the terms of the invention agreement he signed when he
     worked for them from 1999 to 2000.  (Response at 1).

6

**EXHIBIT N PAGE 209**

1  sufficient material for another expert to test the exact same <u>documents</u>," but admits

2  that "another expert cannot test the very same microplug that I tested . . . ." (Decl.

3  Erich J. Speckin ¶14).

4        Another episode brought to light during discovery causing Mattel concern

5  relates to MGA's handling of the original Bryant/MGA contract before the inception of

6  the instant litigation.  At the deposition of a former MGA executive, Victoria O'Connor,

7  testimony was elicited that O'Connor, "on explicit instructions of MGA's [CEO] Isaac

8  Lariam, . . . [made] redact[ions from] the fax header . . . on the BRATZ contract

9  between Bryant and MGA for the year 2000 to conceal the fact that Bryant sent the

10 contract from Mattel's Design Center while he was still employed at Mattel." (Mattel's

11 Mot. Appt. Expert at 3).  O'Connor's deposition appears to indicate that such alteration

12 occurred before the present litigation began (indeed, perhaps even before MGA

13 marketed the BRATZ doll).

14          Q.    . . . Was there ever anything that you were asked to
                  do that you — made you feel kind of uncomfortable?
15

16          A.    Yes.
                              . . . .

17          Q.    And what was that?

18          A.    When the original contract was executed by Carter
                  Bryant, it was sent to me <u>via</u> fax, and on the top of
19                the fax listed the phone number from where it was
                  faxed, which said "Barbie Collectibles," and at one
20                point my boss, Isaac Larian, asked me to white that
                  out and send it to a lawyer, Patty Glaser.
21

22 (Decl. Michael T. Zeller, Ex. 19 at 306).  Upon further examination, however,

23 O'Connor stated that she did not participate in or have knowledge of any other

24 instances in which any other agreement between Bryant and MGA was directed to be

25 altered:

26          Q.    Were you ever asked to change the date on any
                  agreements between Mr. Bryant and MGA?
27
28          A.    No.

7

**EXHIBIT N PAGE 210**

1   Q.   Are you aware of anybody being asked to change the date on any of those agreements?

2

3   A.   No.

    Q.   I mean, do you have any reason to believe that any
4        agreement that was entered into between Mr. Bryant
         and MGA had a date altered or changed?
5

6   A.   No.

    Q.   You never heard that from — from any source?
7
    A.   No.
8

9   (Decl. Paula E. Ambrosini, Ex. 3).

10         Finally, Mattel speculates that a drawing of some BRATZ doll accessories

11  faxed on April 10, 2000, had the fax header altered, much in the same manner

12  described in O'Connor's testimony vis-à-vis the MGA/Bryant faxed contract, as the

13  fields on the fax header for the sender's name and the sender's telephone number are

14  missing. (Decl. Michael T. Zeller ¶ 23 & Ex. 24).[2]  As explained by Mattel, "Because

15  _____

16       [2] Mattel speculates that the time sheets produced by MGA for one of its
17  employees, Anna Rhee (who did doll face painting work for the BRATZ mock-up), from
    "mid-to-late 2000" were altered or recently created by MGA to show that Rhee worked
18  on projects called "Angel" or "Prayer Angel," when in fact she was working at the time
    painting faces for BRATZ dolls at the direction of Bryant. (Mattel's Mot. Appt. Expert at
19  3).  The basis for this speculation is based on the fact that the initial disclosure by MGA
20  of Rhee's time sheets comprised only 8 pages. (Decl. Michael T. Zeller ¶ 20).  Then,
    on January 7, 2005, Rhee produced 20 separate invoices of her work at MGA during
21  mid-to-late 2000, indicating that Rhee performed work for MGA prior to Bryant's
    departure from Mattel, most notably on June 12, 2000. (Decl. Michael T. Zeller ¶ 21).
22  Within a couple of weeks after Rhee's production of invoices to Mattel, MGA
23  supplemented its earlier production of Rhee's time sheets showing that during the mid-
    to-late 2000 period Rhee was working on a MGA project known as "Angel" or "Prayer
24  Angels" and was not involved in any BRATZ-related work until after Bryant's departure
    from Mattel. (Decl. Michael T. Zeller ¶ 22).  Mattel's surmise that the supplemental time
25  sheets were altered is allegedly bolstered by the fact that Rhee testified during her
    deposition that the only work she performed in mid-to-late 2000 was on BRATZ and
26  that the supplemental time sheets reference to the "Angel" and "Prayer Angel" was
27  nothing but a cover or code word for BRATZ-related work.  This argument is hard to
    accept.  First, even the invoices Rhee turned over to Mattel contain the phrase "Angel"
28  for the mid-2000 project she worked on. (Decl. Michael T. Zeller, Ex. 22 at 356-60,
    362).  It is not until December, 2000, that any of the invoices submitted by Rhee show

8

1  facsimile machines normally insert senders' names and numbers as a matter of

2  course, and indeed is required by law [to do so], it appears likely that the document

3  was altered to conceal the sender's information. See 47 U.S.C. § 227(d)(1)(B)."

4  (Mattel's Mot. Appt. Expert at 10).  The premise underlying Mattel's concern on this

5  topic is not unreasonable.  The law requires such information to be found on any

6  document, like the one in question, that has been faxed.  Additionally, the testimony

7  elicited from Ms. O'Connor that MGA altered the fax header for other documents

8  related to BRATZ from the same time period leads to an obvious inference that other

9  documents where spaces on other fax headers are absent suffered a similar fate.

10      2.    Analysis

11          a.    Microplug Ink Testing

12      Bryant and MGA begin by downplaying the significance of the spoilation issue

13  in this case.  With respect to the holes on some of the original BRATZ design

14  drawings produced at Bryant's deposition, they note that, even with these holes,

15  nothing prevents Mattel from performing its own testing on the remaining portions of

16  the drawings on the document.  "Indeed, the very fact that Mattel is asking for court-

17  appointed experts to perform ink and paper testing only underscores the fact that

18  nothing has been 'destroyed.'" (Joint Opp. at 2).  Mr. Speckin makes similar assertions

19  in his declaration, stating that the fact that the same microplug cannot be tested "is

20  entirely irrelevant because there is more than enough ink on each of the documents I

21  tested to allow numerous microplug samples to be extracted and tested by different

22  experts." (Decl. Erich J. Speckin ¶ 14 (emphasis added); see also Response at 5-6

23  ("While another expert cannot test the very same microplug that Mr. Speckin tested,

24

25

26  her doing work on the BRATZ doll, well after Bryant had left Mattel. (Decl. Michael T.
    Zeller, Ex. 21 at 367, 370, 373).  To accept Mattel's argument, not only would MGA
27  have had to alter the invoices it produced in the supplemental production, but the
    documents produced by Rhee would also have to be similarly altered.  An alternative
28  and just as plausible explanation is that Rhee is simply mistaken as to when she began
    performing work on the BRATZ project.

1  that fact is entirely irrelevant because, unlike in a situation where the entire object is

2  destroyed during the testing, there is more than enough ink on each of the <u>documents</u>

3  Mr. Speckin tested to allow numerous microplug samples to be extracted and tested"

4  (emphasis added))). This argument is not persuasive. This is not a case where

5  everyone concedes that the documents in question were created at one point in time,

6  but dispute what that date may have been. In such a circumstance all the ink

7  markings on the documents are comparable to one another as it is conceded that all

8  the marks came from one point in time.

9       Here, however, it is Mattel's theory that Bryant made drawings in 1998 and then

10  periodically touched up or made refinements/additions to those drawings, adding more

11  marks in 1999 and 2000 during the time he was employed by Mattel. An ink mark

12  from one part of the document is not necessarily comparable to another set of ink

13  markings found elsewhere on the document. One ink mark on a drawing could have

14  been made in 1998, for example, while another ink mark found on the same drawing

15  could have been put there sometime later. In taking microplug samples from one of

16  these ink markings without the ability of the other side to test <u>the same mark</u> would

17  forever foreclose a potential avenue of crucial evidence in this case. It is on that point

18  that taking microplug samples of the marks on these drawings is akin to the spoliation.

19  Therefore the fact that another expert could test other parts of the document does not

20  mean that key relevant evidence found on that document has not been destroyed. As

21  MGA and Bryant make clear spoliation of evidence occurs through the "destruction or

22  significant alteration of evidence, or the failure to preserve property for another's use

23  as evidence in pending or reasonably foreseeable litigation." <u>West v. Goodyear Tire &</u>

24  <u>Rubber Co.</u>, 167 F.3d 776, 779 (2nd Cir. 1999).[3]

25       At this point, it should not be lost that the documents in question are not

26  ————————————————

27       [3] The Court does not mean to suggest that Mattel's theory is correct. Instead, the Court simply notes this theory as refuting MGA and Bryant's argument that only the

28  complete destruction of a document would amount to spoliation under the particular circumstances in this case.

1    peripheral to the case. At its heart, this case asks the question: Who owns the rights

2    to the Bratz dolls? Bryant asserts that he came up with the idea for the Bratz dolls

3    while on a break from his employment at Mattel in 1998, and that he sold his idea to

4    MGA when he went to work for them in October, 2000. Mattel claims, among other

5    things, that Bryant "developed" or "continued to develop" his idea for Bratz dolls while

6    he was working for them from January, 1999, to October, 2000, and that pursuant to

7    an inventions agreement he signed with the Mattel when he went to work for them,

8    that idea now belongs to Mattel. As this clash of factual contentions makes clear, the

9    dating of the original BRATZ drawings and the markings contained thereon is a

10   fundamental, perhaps despositive, issue to this case. That there are serious

11   questions concerning the handling of these critical documents certainly causes the

12   Court much concern about whether the truth seeking functions of the adversarial

13   system have been fundamentally compromised in this case. As Mattel rightly notes,

14   "The adversarial process is not an end in itself; its value is in its ability to promote a

15   search for truth." (Mattel's Reply at 9).

16        Bryant and MGA concede that the sections that were holed out contained

17   markings, be they handwritten dates or other words or letters, that may be crucial to

18   the case. Indeed, one of the drawings – Bryant 192 – had a portion of the signature

19   line sampled. What is left unclear is whether, for those portions of the document

20   where ink or signatures were sampled, enough of the same part of the document in

21   question (meaning the same mark) remains to be sampled by Mattel. For instance, is

22   there enough of the signature line from Bryant 192 left to sample, or has too much of it

23   already been sampled? In that sense, MGA's and Bryant's argument that nothing has

24   been destroyed by the microplug testing procedure because other parts of the

25   document still exist is misplaced. Indeed, MGA and Bryant later admit that the

26   circumstances allowing for "multiple experts [to] remove multiple microplugs and test

27   the exact same paper and ink" is dependent upon there being the same exact paper

28   and ink there to test. (Joint Opp. at 15 ("[a]s long as there is paper and ink to test")).

11

1    The continued existence of the "exact same pen stroke" is the very issue that is now

2    left open because of the holes in some of Bryant's original BRATZ design drawings.

3    Is there anything left of that exact same pen stroke that was sampled by Mr. Speckin

4    remaining on the original drawing for Mattel to test?  None of these questions have

5    been addressed by MGA, Bryant, or Mr. Speckin in their papers.  Instead, they simply

6    make the observation that there remain other ink markings on the same drawings for

7    Mattel to test, a reason which, as explained above, is wholly insufficient to assure the

8    Court that Mattel has not been prejudiced by MGA's actions.

9              Given the absence of any representation by them on this point, the Court

10    pressed MGA's counsel about the same at oral argument:

11              THE COURT:   And part of your argument is that
       while a small portion of the small portion of the page may
12      be gone, as you in your most recent papers concede is
       gone, there are other portions of the page that can be
13      tested.  The concern I have, I guess – and maybe you can
       clear this up for me – I've seen some of the drawings and I
14      have a pretty good mental image of what the drawings look
       like.  But there is also writing on these drawings,
15      signatures, copyright registration indications; some are
       large, some are small.  As I gather from the plaintiff, from
16      Mattel, the concern is that these different drawings or
       writings were done at different times.  And I guess I can
17      understand why when those drawings or writings were
       done could be significant from an evidentiary standpoint.
18      So the concern is not so much there's another part of the
       paper that can be tested; it's whether or not the particular
19      marking in question has been so damages as to not permit
       a full further testing on that particular marking.  Does my
20      question make sense?

21              MS. CENDALI: Yes, it does, your Honor.  And I
       anticipated that.  Significant, we thought, in their papers
22      was that . . . they cited to the fact that Mr. Bryant admitted
       in his deposition that there were holes in some of the
23      documents that he didn't know how they got there
       originally.  As an example, if you look at part of Zeller,
24      Exhibit 17, Bates number Bryant 201, that's an example of
       one of the documents that's been tested.
25
              THE COURT: One second so I have that in front of
26      me. Okay.

27              MS. CENDALI: There are many many others that were
       submitted that were also submitted to this type of ink
28      testing, but this is just an example of one of them.  And if

                                            12

1  you look at the document, you would never know —
   granted, this is smaller, so the actual drawing is even larger
2  than this, so there's even more ink on the larger drawing
   than there would be available on this reproduction size.

3
        But if you look at it — and I'll represent to you that we
4  didn't test the face; the face is absent before and after the
   testing — but if you look at it, you couldn't even see that
5  there were any pin pricks to it.  If you look very, very
   carefully at the signature at the bottom, you can maybe see
6  where it says "Ramona Prints, 8-26-99"; that maybe there
   was like a little tiny hole in one of the little slash marks; that
7  was a teeny little pin prick hole that showed the testing .
   There's ample amount of ink to do the testing on all of
8  these documents.  This is the normal course of procedure
   that was done.
9

10       When asked by the Court whether it accepted MGA's representation that there

11  was "ample amount of ink" left on the same marks that the microplugs were taken

12  from for further microplug testing, Mattel, in seeming contradiction to its position in its

13  papers, said it did: "I agree with Ms. Cendali.  We do not maintain any portion of the

14  ink on a signature or an image has been so obliterated that you couldn't take a plug

15  now on any of it; that's not our point." (Emphasis added).

16       In light of this concession by Mattel, the Court finds that no colorable claim of

17  spoilation has been established at this time vis-à-vis Mr. Speckin's testing of the

18  documents to warrant the appointment of an expert by the Court to investigate the

19  same.  See Sedrati v. Allstate Life Ins. Co., 185 F.R.D. 388, 393 (M.D. Ga.

20  1998)(sanction warranted where because "defendant's expert has conducted

21  destructive tests on the original documents," plaintiff's expert "cannot duplicate the

22  conditions of the original documents").  If there was any evidence indicating that MGA,

23  Bryant, or their counsel had engaged in acts that could compromise Mattel's ability to

24  discover crucial information in this case, the Court would be sympathetic to the

25  appointment of an expert to investigate the same.  Here, no such evidence exists.

26  The tests done by Mr. Speckin have not left the marks that were micro-sampled or the

27  documents that were handled so compromised that Mattel cannot perform the exact

28  same tests on those exact same marks as performed by Mr. Speckin.

13

1       Indeed, the only basis for spoilation that Mattel has left to argue – that the

2   passage of time has left the ability to perform any meaningful ink testing at this time

3   problematic – is an argument that has nothing to do with MGA's conduct, but much

4   more with Mattel's own dereliction.  As the Court understands it, the process of dating

5   when ink was placed on a document has only a limited window of time in which it can

6   be accomplished because, eventually, the ink dries (be it in 2 years or 3 to 4 years),

7   leaving nothing capable of being sampled after that point to test (save to acknowledge

8   that the ink in question was put on the paper some time more than 3 to 4 years ago).

9   Mattel essentially argues that the impossibility of testing ink after a certain period

10   mandates that, if the other side is going to test ink while "fresh" ink remains on the

11   document, that party has an obligation to inform the other side so that they can do the

12   same before the ink "dries out"; failure to do so renders the test performed something

13   that cannot be replicated.[4]  By Mattel's own admission, they knew there had been

14   testing done on the BRATZ original drawings as far back as November, 2004, during

15   Bryant's deposition testimony when they saw some of the original BRATZ drawings

16   (drawings that had been tested by Mr. Speckin five months earlier).  Rather than

17   immediately seeking the production of those documents and having its own expert

18   perform similar tests on them, Mattel sat idly by, waiting until June of this year to do

19   anything, either by way of court-pleadings or formal requests made to MGA and

20   Braynt, related to having ink tests performed on the documents.  Nowhere has Mattel

21

22       [4]  The basic factual assumption in Mattel's argument may indeed be faulty – that

23   when MGA tested the ink there was enough "fresh" ink to test.  Mr. Speckin states that

   "[I]nk takes approximately 3 to 4 years to dry on paper.  Thus, by testing the ink to

24   determine if it is dry, it can be determined whether the document was created within the

   last [3 to] 4 years, or whether the ink, and thus the drawing, is more than [3 to] 4 years

25   old."  (Decl. Erich J. Speckin ¶ 13).  Given that Mr. Speckin performed his ink dating

   test in June, 2004, at best he could determine whether the ink had been put on the

26   paper on or after June, 2000.  Beyond that time frame his test could not tell when the

   now-dried ink was marked on the document.  Given that the relevant period in question

27   in this case is from August, 1998, to October, 2000, Mr. Speckin's test results would

28   appear to be only marginally relevant in adducing proof as to when the BRATZ

   drawings were made.

1   explained how MGA or Bryant had anything to do with it not having the ability to

2   perform such testing until now.  Mattel's allusion to the fact that a stay on discovery

3   was put in place by this Court in 2005 is misguided.  If Mattel thought that it was losing

4   valuable time on account of the stay, it could have at any time filed with this Court an

5   emergency request for relief from the stay to have such tests performed.  All it needed

6   to do was inform the Court that it had only a short period of time to perform the test on

7   account of the fact that ink dries; something which it never did in this case.

8        Mattel's citation to the case Edwardes v. Southampton Hospital Associates,

9   278 N.Y.S.2d 283 (1967) is equally unhelpful to their argument.  In that case, the court

10  was presented with an application to prevent the testing of a intramedullary pin for

11  discovery and testing.  Id. at 284.  The court held that, "[s]ince the pin is crucial to the

12  action it is not too difficult to appreciate that any change, however slight, assumes an

13  importance magnified proportionately. And undoubtedly tests which would destroy or

14  alter most or all of a particular article ought not be permitted in the first instance

15  without providing adequate safeguards to protect all concerned."  Id. at 286.  Here,

16  such an argument cannot be made because, for the reasons cited above, Mattel has

17  conceded that even in performing the tests of the original BRATZ drawings Mr.

18  Speckin left enough ink of the same pen stroke for its own experts to test.  In short,

19  there has been no alteration, however slight, made to the documents insofar as

20  Mattel's ability to replicate the exact same test is concerned.  The only change that

21  has occurred is in Mattel's ability to retrieve any relevant information from such a test

22  on account of the passage of time that has elapsed.  The test Mr. Speckin performed

23  is not responsible for this negative occurrence.  MGA is similarly not responsible for

24  the passage of time or Mattel's inability to retrieve useful information from the testing

25  process.  On that point, Mattel should look itself in the mirror for any finding of fault or

26  blame.

27        Moreover, aside from the potential for "destroying" key portions of the original

28  documents, it is alleged that MGA and Bryant's actions carry other means of

15

**EXHIBIT N PAGE 218**

1  prejudicing Mattel's ability to pursue lines of potential evidence in this case.  The

2  expert declaration submitted by Mattel notes another possible spoilation of the original

3  drawings even if there remained enough of the pertinent portion of the document in

4  question to sample: The sampling process itself may have contaminated the

5  document in question by obliterating potential crucial clues that were on the document

6  or otherwise the sampling process led to the introduction of foreign materials onto the

7  documents themselves which may complicate any future analysis.  As explained by

8  Mattel's expert:

9         [P]erforming many such types of testing, even if described
          as "non-destructive," on a particular original document
10        carries the risk that potential evidence on it, including
          indentations in the paper fiber, might be contaminated or
11        destroyed in the process.  Furthermore, the order of the
          types of testing to be performed on a given document
12        might have an impact on developing potential evidence
          during subsequent examinations. . . .
13
14        . . . . [With respect to the original BRATZ drawings
          containing holes in them,] it is possible that the destructive
15        testing performed on the document may have caused
          some form of contamination and/or alteration, which carries
16        the further prospect that subsequent examinations by
          experts may not enable them to develop potential evidence
17        or the same evidence that the other [earlier] expert
          developed.

18  (Decl. Lloyd Cunningham ¶¶ 4-5).

19         MGA has rebutted this risk of contamination argument by proffering Mr.

20  Speckin's declaration, the expert who actually performed the tests in question.  Mr.

21  Speckin states that he "exercised the utmost care in handling the documents [he]

22  tested," that a number of the tests he performed on the documents "has absolutely no

23  effect on the tested document whatsoever," and that with respect to those tests that

24  could effect the document he followed established procedures in carrying out the test

25  in question.  (Decl. Erich J. Speckin ¶¶ 8, 9, 10, 11, 12, 13).  Nowhere has Mattel

26  proffered any evidence rebutting or calling into question Mr. Speckin's

27  representations.  The Court therefore finds that, based on the evidence that is

28  currently before it, Mattel has not established a colorable claim of spoilation by way of

1    contamination in the tests MGA performed on the documents in question.

2              b.      Alteration of Fax Headers

3         Insofar as O'Connor's deposition testimony relating to the white out of the fax

4    header on the October, 2000, contract between Bryant and MGA, this too is

5    downplayed by MGA and Bryant as being irrelevant because "there is no dispute that

6    Mr. Bryant faxed his signed contract from a fax machine at Mattel and, indeed, Mr.

7    Bryant readily admitted that fact at his deposition, which took place before Ms.

8    O'Connor's deposition." (Joint Opp. at 8 (emphasis in original)).  This argument seeks

9    to compare apples to oranges.  While it may be true that now there is no dispute by

10   MGA and Bryant that he faxed his portion of the contract to MGA from his office at

11   Mattel, at the time O'Connor did the white out of the fax header such a lack of dispute

12   was not apparent.  It is from that perspective in time – the prologue to the litigation —

13   that O'Connor's deposition testimony is to be judged.  And from that perspective her

14   testimony calls into question MGA's handling of relevant documents in its possession.

15        When the contract was first executed there is no indication that MGA and/or

16   Bryant would admit to the fact that Bryant negotiated his contract with MGA while he

17   was still working at Mattel; rather, at that point, that issue appeared to be an open one.

18   Indeed, the fact that MGA's CEO would direct O'Connor to tamper with the contract's

19   fax header clearly indicates that they would not admit to the fact.  If MGA mistreated

20   this document where an open issue existed, it is not unreasonable to infer that it may

21   have been just as cavalier with its obligations to maintain the other documents in their

22   possession – say, for instance, the original BRATZ drawings – where similar open

23   issues remained.  This concern with MGA's handling of documents in its possession at

24   the prologue to this litigation is reinforced by MGA and Bryant's blasé mention in a

25   footnote to their opposition that the original to this contract, the one which they

26   describe as being irrelevant, "has not been found." (Joint Opp. at 15 n.6).  Indeed, it

27   has been suggested that MGA and Bryant or their counsel have made representations

28   that they are not sure of the exact whereabouts of a number of the original BRATZ

1  drawings.  (Decl. Shane McKenzie ¶ 3 ("Mr. Bryant's counsel[, at the December 22 to

2  23, 2004, inspection of the originals by counsel for Mattel,] claimed not to have the

3  majority of the originals of BRATZ drawings and sketches, and further claimed not to

4  know where those originals were located")).

5          All that being said, the Court does not find that the alteration of the fax header

6  on the original Bryant/MGA contract warrants the appointment of an expert at this

7  time.  Ms. O'Connor testified that, other than this one instance, she is aware of no

8  other documents that were purposefully altered by MGA.  While the evidence related

9  to the missing fax header on the April, 2000, BRATZ accessories fax may indicate that

10  more than one document had been tampered with by MGA personnel, the Court has

11  nothing at this time to basis that conclusion on other than speculation and conjecture.

12  Without any tangible, concrete proof that MGA's mishandling of documents was more

13  widespread, the Court is left with what appears simply as an isolated instance of

14  tampering.

15          Accordingly, the motion for appointment of expert witnesses is **DENIED.**

16          IT IS SO ORDERED.

17

18  DATE:  _8-9-06_ .

19

20                              STEPHEN G. LARSON

21                              STEPHEN G. LARSON
                               UNITED STATES DISTRICT JUDGE

22

23

24

25

26

27

28

18

# Exhibit O

EXHIBIT O REMOVED

PURSUANT TO PROTECTIVE ORDER

Exhibit P

EXHIBIT P REMOVED

PURSUANT TO PROTECTIVE ORDER

Exhibit Q

CONFORMED COPY
LODGED                                    FILED



2007 MAY 16  PM 1: 59    2007 MAY 16  PM 2: 00

CLERK U.S. DISTRICT COURT CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.    CENTRAL DIST. OF CALIF.
RIVERSIDE                    RIVERSIDE

BY _____        BY _____

1    Hon. Edward A. Infante (Ret.)
     JAMS
2    Two Embarcadero Center
     Suite 1500
3    San Francisco, California 94111
     Telephone:    (415) 774-2611
4    Facsimile:    (415) 982-5287

5

6

7                    UNITED STATES DISTRICT COURT

8                    CENTRAL DISTRICT OF CALIFORNIA

9                         EASTERN DIVISION

10

11   CARTER BRYANT, an individual,         CASE NO. C 04-09049 SGL (RNBx)
                                           JAMS Reference No. 1100049530
12            Plaintiff,

13        v.                               Consolidated with
                                           Case No. CV 04-09059
14   MATTEL, INC., a Delaware corporation, Case No. CV 05-2727

15            Defendant.                   ORDER GRANTING MATTEL'S
                                           MOTION TO COMPEL PRODUCTION
16                                         OF DOCUMENTS AND
                                           INTERROGATORY RESPONSES BY
17   CONSOLIDATED WITH                     MGA
     MATTEL, INC. v. BRYANT and
18   MGA ENTERTAINMENT, INC. v. MATTEL,
     INC.
19

20                                         I.  INTRODUCTION

21        On February 2, 2007, Mattel, Inc. ("Mattel") submitted its Motion To Compel Production

22   of Documents and Interrogatory Answers by MGA Entertainment, Inc. ("MGA").  On February

23   20, 2007, MGA submitted its opposition brief, and on February 26, 2007, Mattel submitted a

24   reply brief.  The matter was heard on March 5, 2007.  Thereafter the motion was taken under

25   submission pending the parties' submission of a proposed protective order, which was received

26

27

28
     Bryant v. Mattel, Inc.,                                          1
     CV-04-09049 SGL (RNBx)

1   on April 23, 2007.  Having considered the motion papers and comments of counsel at the hearing,

2   Mattel's motion to compel is granted.

3                                          II.  BACKGROUND

4        A.  Requests for Documents

5            In June of 2004, two months after Mattel filed suit against Bryant, and before MGA

6   became a party to the action, Mattel served MGA with an eight-page subpoena for twenty-one

7   categories of documents, to be produced in ten days.  MGA filed a motion to quash, which the

8   court granted because of the short amount of time provided for compliance with the subpoena.

9   The parties met and conferred in July of 2004, and reached an agreement to limit the scope of

10  some of Mattel's requests.  In particular, the parties agreed to limit production to the "first

11  generation" Bratz dolls.  On August 12, 2004, MGA produced documents.

12          In 2005, the parties stipulated to supplementing their document productions on May 16,

13  2005.  Mattel agreed to continue limiting its discovery requests to "first generation" Bratz dolls.

14          In September of 2006, MGA made a supplemental production of documents.  On February

15  5, 2007, MGA produced about 2,300 pages of documents to replace earlier produced documents

16  with legibility problems.  On February 20, 2007, MGA produced an additional 224 pages of

17  documents to replace earlier produced documents with legibility problems.

18          Mattel now moves to compel MGA to produce documents responsive to its requests.  As a

19  preliminary matter, Mattel contends that MGA's production is deficient because it contains

20  redactions and cut-off text.  Further, Mattel contends that MGA's production is incomplete with

21  respect to essentially five categories of documents.  First, Mattel contends that MGA is

22  withholding documents relating to the origins of Bratz and Bryant's work for MGA.  Mattel

23  believes that MGA's production is incomplete based upon its review of documents that have been

24  produced by third party Steven Linker.  According to Mattel, Linker's documents from October

25  of 2000 show that Bratz was much farther along before Bryant left Mattel than MGA or Bryant

26  previously represented.  Mattel also contends that MGA's responses to the document requests

27

28
    Bryant v. Mattel, Inc.,                                                                    2
    CV-04-09049 SGL (RNBx)

1   contain inappropriate limitations, such as MGA's statement that it will produce "relevant and
2   responsive non-objectionable documents" or only that it will produce documents "sufficient" to
3   show when certain dates relating to Bratz occurred. Mattel contends that these "carve outs
4   purport to allow MGA to cherry-pick what it will and will not produce to Mattel." Mattel's
5   Separate Statement at 17:11-13. Mattel also contends that the carve-outs fail to provide notice of
6   what is or is not being withheld. Mattel also contends that MGA's objections based upon its
7   confidentiality concerns or the privacy rights of third parties are unwarranted in light of the
8   protective order in place. In addition, Mattel contends that MGA's objection to producing
9   documents relating to activities or conduct in foreign countries is wholly improper because those
10  documents may contain information relevant to Mattel's claims.

11       Second, Mattel seeks documents relating to the origins of Bratz, regardless of whether
12  such documents relate to the "first generation" Bratz dolls. Mattel argues that whether the work
13  ultimately resulted in Bratz dolls that were released at a particular time does not matter for
14  discovery purposes. Mattel contends that the works created by Bryant during his Mattel
15  employment are highly relevant because Mattel owns them, regardless of whether they resulted in
16  a Bratz doll released at a particular time.[1]

17       Mattel next contends that MGA is improperly withholding documents about designs
18  Bryant created on Bratz dolls that were released after June 2001, even though such designs may
19  be derivative of work he did when employed by Mattel. Mattel contends that it is entitled to
20  explore whether such works and the profits from Bratz dolls other than the "first generation"
21  Bratz dolls were derived from works owned by Mattel both for purposes of establishing liability
22  and damages. Furthermore, Mattel asserts that the "first generation" limitation on discovery is
23  improper in light of Bryant's continuing duty not to use Mattel's confidential and proprietary
24  information as well as MGA's unfair competition claims.

25  _____

26       [1]   Mattel also reiterates many of the arguments it made previously in connection with its earlier filed motion to compel Bryant to produce documents.

27
28
Bryant v. Mattel, Inc.,                                                                           3
CV-04-09049 SGL (RNBx)

1    Mattel also asserts that MGA is improperly withholding documents relating to products,

2    services and matters other than those relating to "dolls." According to Mattel, it has evidence that

3    Bryant conceived of marketing and advertising ideas for the Bratz line while he was employed by

4    Mattel. Mattel contends that any such ideas or contributions may belong to it pursuant to the

5    Inventions Agreement.

6    Third, Mattel seeks documents relating to all of MGA's payments to Bryant, and not just

7    payments for the "first generation" Bratz dolls. Mattel asserts that such information is relevant

8    because (1) Mattel seeks all benefits Bryant received as a result of violating his duties to Mattel;

9    (2) under the Copyright Act, Mattel is entitled to all profits from infringement as well as actual

10   damages; and (3) payments may show when and what trade secret information Bryant and other

11   defendants allegedly misappropriated from Mattel.

12   Fourth, Mattel seeks documents relating to MGA's agreements with Bryant. Mattel

13   contends that all agreements between Bryant and MGA are relevant, not just the original

14   September 18, 2000 agreement. In particular, Mattel contends that it is entitled to discover all

15   documents relating to MGA and Bryant's alleged joint defense agreement because such

16   information would be relevant to demonstrate bias and lack of credibility.

17   Fifth, Mattel seeks production of all declarations, affidavits and other sworn written

18   statements from other cases that refer or relate to Bratz or Angel. Mattel contends that such

19   information may reveal relevant information about the date of creation of Bryant's Bratz

20   drawings.

21   In response, MGA denies withholding responsive documents and asserts that it has

22   produced volumes of documents responsive to Mattel's requests. In particular, MGA represents

23   that it has produced all responsive and relevant documents that it was able to locate in response to

24   request nos. 6, 7, 9, 26, 27, 32, 33, 34, 35, 36, 55, 69, and 70. Further, MGA asserts that even

25   before the motion was filed, it had agreed to address the vast majority of the issues raised in this

26   motion. In particular, MGA represents that it is diligently working to produce documents related

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

4

**EXHIBIT Q PAGE 334**

1    to Bratz other than "first generation" Bratz in response to request nos. 1, 2, 8, 10, 11, 43, 45, 46,

2    49, 50, 51, 53, 57, 59, 61, 63, 64, 66, 96, 97, 98, 99 and 100.  MGA represents that it informed

3    Mattel that it would produce documents pertaining to subsequent generations of Bratz dolls that

4    have been released on the market.  In addition, MGA represents that it has agreed to produce

5    documents relevant to Bratz or Prayer Angels that it received from Union Bank.  More

6    specifically, MGA represents that it agreed to review and produce documents provided to it by

7    Union Bank for the years 1999 – 2001 concerning payments that it could identify as being for

8    Bratz or Prayer Angels.  MGA also represents that it has agreed to produce royalty statements.

9    Therefore, MGA views the motion as unnecessary.

10          MGA next contends that Mattel's motion should be denied for the following additional

11   reasons.  First, MGA contends that Mattel is not entitled to MGA's product design documents for

12   unreleased products.  MGA asserts that its product design documents for its unreleased toy

13   concepts are among its most highly valuable trade secrets.  Furthermore, MGA contends that

14   designs and drawings for products currently under development, over six years after Bryant first

15   created his original Bratz drawings, have no relevance to any of Mattel's claims.  In the event that

16   documents relating to unreleased products are ordered produced, MGA requests a protective order

17   under Rule 26(c), Fed.R.Civ.P., that limits the dissemination of its documents more drastically

18   than the current protective order provides.  In the alternative, MGA requests that any order

19   compelling production of documents relating to unreleased products should essentially be stayed

20   until after MGA's products are publicly released.

21          Second, MGA contends that Mattel is not entitled to information concerning Bryant's

22   attorneys' fees because the information is privileged.  Furthermore, MGA contends that the

23   information is not relevant to demonstrate bias because "there is no dispute that Bryant's interests

24

25

26

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)                                                                                            5

**EXHIBIT Q PAGE 335**

1  in this case are aligned with those of MGA, and that Bryant is 'biased' in that sense." MGA's

2  Opposition at 24:9-12.[2]

3      Third, MGA asserts that Mattel is not entitled to review all non-public witness statements

4  and litigation documents concerning Bratz for a variety of reasons, including because Mattel has

5  refused to produce similar types of documents.  More significantly, MGA contends that Mattel's

6  requests for non-public witness statements are "a blatant attempt to avoid the discovery

7  limitations imposed by both the Federal Rules of Civil Procedure and those additional limitations

8  imposed by this Court." MGA's Opposition at 25:6-7.  MGA explains its position as follows.

9  MGA is involved in litigation against a number of counterfeiters and infringers in Asia.  In 2003,

10  Mattel allegedly began feeding documents concerning "Toon Teens" to those defendants in an

11  attempt to prove that Bryant created Bratz while working at Mattel, even though Mattel

12  abandoned its claims based upon "Toon Teens" in this court.  Thereafter, those defendants took

13  the position that MGA did not own, and therefore could not enforce, the rights to Bratz.  MGA

14  was thus forced to litigate the issue of ownership.  MGA contends that "[i]n effect, by prompting

15  foreign counterfeiters to espouse a theory that Mattel now admits has no merit, Mattel has created

16  a situation in which MGA has been forced to give testimony and provide evidence related to

17  issues in this case that Mattel now seeks to obtain wholesale." MGA's Opposition at 25:5-24.

18      Fourth, MGA contends that Mattel is not entitled to documents concerning a family

19  dispute between MGA's chief executive officer and his brother because such documents are in no

20  way relevant to this lawsuit.  MGA explains that the brothers were involved in an arbitration

21  proceeding relating to MGA's CEO's purchase of his brother's interest in MGA.  Moreover,

22  MGA contends that the brothers were bound by a protective order prohibiting the use of any

23  documents or testimony for any purpose other than the arbitration.

24

25  _____

26      [2]  Nevertheless, MGA represents that it has produced the only non-privileged document responsive to the
    request.

27

28
    Bryant v. Mattel, Inc.,                                                              6
    CV-04-09049 SGL (RNBx)

1    Fifth, MGA contends that Mattel is not entitled to its chief executive officer's personnel

2  files because they contain confidential information and are not relevant to the lawsuit. Sixth,

3  MGA contends that Mattel is not entitled to obtain documents from MGA that belong to, and are

4  in the possession, custody and control of, its indirect foreign subsidiary, MGA HK Ltd. Lastly,

5  MGA objects to producing documents relating to any testing performed to determine the date that

6  Bratz documents were created. MGA contends that such discovery is premature and should not

7  proceed until experts are designated.

8    B. Interrogatories

9    On April 28, 2005, Mattel served its Second Set of Interrogatories. On May 20, 2005,

10  however, the district court stayed the action. On May 17, 2006, the district court lifted the stay.

11  On May 30, 2006, MGA responded to the interrogatories.

12    Mattel contends that MGA's responses to the interrogatories were untimely. Further,

13  Mattel contends that the interrogatory responses to numbers five through eleven are deficient

14  because they lack substantive information and consist almost entirely of objections. MGA

15  responds that the motion is moot because it is prepared to provide supplemental responses to its

16  interrogatories. MGA does not otherwise assert any additional grounds for opposing Mattel's

17  motion to compel responses to interrogatories.

18    III. DISCUSSION

19    A. Rule 26 of the Federal Rules of Civil Procedure

20    Rule 26 of the Federal Rules of Civil Procedure provides that "[p]arties may obtain

21  discovery regarding any matter, not privileged, that is relevant to the claim or defense of any

22  party." Fed.R.Civ.P. 26(b)(1). "Relevant information need not be admissible at trial if the

23  discovery appears reasonably calculated to lead to the discovery of admissible evidence." Id.

24  Discovery shall, however, be limited by the court if it determines that: "(i) the discovery sought is

25  unreasonably cumulative or duplicative, or is obtainable from some other source that is more

26  convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample

27

28
Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)                                                                    7

**EXHIBIT Q PAGE 337**

1   opportunity by discovery in the action to obtain the information sought; or (iii) the burden or

2   expense of the proposed discovery outweighs its likely benefit, taking into account the needs of

3   the case, the amount in controversy, the parties' resources, the importance of the issues at stake in

4   the litigation, and the importance of the proposed discovery in resolving the issues." Fed.R.Civ.P.

5   26(b)(2).

6       B.  Document Requests

7         1.  Requests re Origins of Bratz and Bryant's Work for MGA (Nos. 6, 26, 27, 32, 33,

8            34, 35, 51, 53, 55, 64, 69, 96, 97, 98, 99, 100

9       The requests above seek discoverable information regarding the origins of Bratz and

10   Bryant's work for MGA.  MGA represents that it has produced all responsive documents in

11   response to request nos. 6, 26, 27, 32, 33, 34, 35, 55,and 69 (MGA's Opposition at 13:4-5), and is

12   "diligently working to produce documents in response to" request nos. 51, 53, 64, 96, 97, 98, 99,

13   and 100, including documents related to Bratz other than "first generation" (MGA's Opposition at

14   14:1-4 and note 39).  MGA does, however, object to producing design documents for unreleased

15   products and documents from MGA Hong Kong.

16       As a threshold matter, MGA's responses are inadequate to the extent MGA has restricted

17   its production to "relevant and responsive non-objectionable documents" or documents

18   "sufficient" to show when events relating to Bratz occurred.  These restrictions suggest that MGA

19   might be excluding documents that are responsive to the request based upon its unilateral

20   determination of what is "relevant" or "sufficient."  Mattel shall provide the responses to

21   document requests ordered herein without these restrictions.

22               Design Documents for Unreleased Products

23       MGA's design documents for unreleased products are relevant to Mattel's claims and

24   defenses and must be produced.  See Order Modifying Protective Order.  On April 23, 2007, the

25   parties submitted a stipulation to modify the existing protective order to limit the disclosure of

26   design documents for unreleased products that constitute trade secret information.  See Stipulation

27

28

1   to Modify Protective Order; And Proposed Order Thereon ("stipulation"). The parties' stipulation

2   has been approved and entered as an order of the court. MGA is ordered to produce design

3   documents for unreleased products that are responsive to Mattel's document requests in

4   accordance with the terms of the stipulation and order.

5                              Documents from MGA Hong Kong

6           Documents relating to activities or conduct in foreign countries are relevant and

7   discoverable because Mattel has evidence indicating that MGA Hong Kong was involved with

8   Bratz. Nevertheless, MGA objects to producing documents from Hong Kong unless Mattel

9   provides reciprocal discovery from its subsidiaries.

10          Whether MGA is entitled to discovery from Mattel's subsidiaries has not been briefed in

11  the context of this motion, and therefore is not addressed herein. MGA is ordered to produce

12  documents from MGA Hong Kong.

13          Mattel's motion is granted with respect to request nos. 6, 26, 27, 32, 33, 34, 35, 51, 53, 55,

14  64, 69, 96, 97, 98, 99, 100.

15              2. Additional Requests re Origins of Bratz (Nos. 7, 8, 9, 10, 11, 12, 13, 36, 46, 57, 59,

16                 61, 63, 66, 67, 70, 88, 90, 91

17          Mattel contends that MGA is improperly limiting its document production to the "first

18  generation" Bratz dolls. MGA represents, however, that it has agreed to produce subsequent

19  generations of Bratz products (MGA's Opposition at 9:20-25, 13:6-14:1), except design

20  documents for yet unreleased products.

21          As stated previously, design documents for yet unreleased products are relevant and

22  discoverable. See Order Modifying Protective Order. Accordingly, MGA is ordered to produce

23  all non-privileged documents that are responsive to request nos. 7, 8, 9, 10, 11, 12, 13, 36, 46, 57,

24  59, 61, 63, 66, 67, 70, 88, 90, and 91.

25          //

26          //

27

28
Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)                                                                                    9

1          3. <u>MGA's Payments to Bryant (Nos. 43, 45)</u>

2          MGA represents that it has already agreed to produce documents related to Bratz, without

3    limiting its production to "first generation" Bratz.  MGA's motion at 13:7-14:3.  Nevertheless,

4    Mattel is entitled to an order compelling production of such documents by a date certain.  Mattel's

5    motion is granted with respect to request nos. 43 and 45.

6          4. <u>MGA's Agreements with Bryant (Nos. 1, 2, 49, 50)</u>

7          MGA represents that it has already agreed to produce non-privileged documents

8    responsive to request nos. 1, 2, 49, and 50, even though it believes that such documents are not

9    relevant (MGA's motion at 13:7-14:3).  These requests seek documents relating to fee or

10   indemnity agreements between MGA and Bryant .

11         Fee or indemnity agreements are relevant to demonstrate bias and lack of credibility.

12   Accordingly, Mattel's motion is granted with respect to request nos. 1, 2, 49, and 50.  Any

13   responsive documents withheld on the basis of a privilege must be properly identified in a

14   privilege log.

15         5. <u>Declarations, Affidavits & Other Sworn Written Statements (Nos. 37, 38, 39, 40,</u>

16         <u>41,</u>

17         In request nos. 37, 38, 390, 40, and 41, Mattel seeks production of declarations, affidavits,

18   and other sworn written statements from cases that refer or relate to Bratz or Angel.  Mattel

19   anticipates that these documents could provide evidence relating to the conception date for Bratz.

20         Request nos. 37, 38, 39, 40, and 41 seek relevant information regarding the conception

21   date for Bratz.  MGA admits in its opposition brief that this issue was litigated in its suits against

22   alleged counterfeiters and infringers.[3]  The issue also appears to have been raised in the

23   arbitration proceedings between MGA's chief executive officer, Isaac Larian, and his brother

24   Farhad Larian.  In those proceedings, Farhad Larian alleged that Isaac Larian concealed from him

25   _____

26       [3]  Although MGA questions the propriety of Mattel providing assistance to the alleged counterfeiters and infringers in raising ownership of Bratz as a defense against MGA's claims, MGA has not cited to any legal authority

27   that prohibits Mattel's conduct.

28   <span style="font-size:small">Bryant v. Mattel, Inc.,<br>CV-04-09049 SGL (RNBx)</span>                               10

1   that MGA was developing Bratz by early 2000.  Nevertheless, MGA objects to producing

2   documents from the Larians' arbitration on the grounds that the arbitration was governed by a

3   protective order that prohibits the use of any documents or testimony for any purpose other than

4   the arbitration.  MGA, however, has not provided any evidence of the protective order.

5   Accordingly, Mattel's motion to compel is granted as to request nos. 37, 38, 39, 40 and 41.[4]

6          6. <u>Documents Regarding Date-Testing (Request No. 92)</u>

7      Mattel's request no. 92 seeks documents that refer or relate to "any testing of or sampling

8   from any documents that refer or relate to Bratz or Bryant, including without limitation any such

9   testing or sampling in connection with ink, paper or chemical analysis to date any such documents

10   and including without limitation all results and reports relating thereto."  MGA contends that the

11   request is premature, and should proceed in the course of expert discovery.

12      The request calls for relevant discovery and there is no basis for delaying production of

13   responsive documents, other than expert reports.  The timing of expert reports is governed by

14   Rule 26(a)(2)(C), Fed.R.Civ.P.  Accordingly, Mattel's motion is granted as to request no. 92.

15      C. <u>Interrogatories</u>

16      Mattel contends that MGA's responses to interrogatories were untimely, and therefore

17   MGA has waived its objections to the interrogatories.  Pursuant to Rule 33(b)(3), Fed.R.Civ.P.,

18   responses to interrogatories are due thirty days after service.  In this case, Mattel served its

19   interrogatories on April 28, 2005, and responses were initially due May 31, 2005.  The district

20   court, however, issued a stay on May 20, 2005, twenty-two days after the interrogatories were

21   served.  The district court lifted the stay on May 17, 2006.

22

23

24

25   ———————————

26       [4]  In its discussion of the arbitration proceedings, MGA raises an objection to producing Isaac Larian's personnel file based upon privacy grounds. The personnel file may have documents relevant to Bratz, and therefore

27   should be produced. The protective order is sufficient to alleviate Mr. Isaac Larian's privacy concerns.

28   Bryant v. Mattel, Inc.,
        CV-04-09049 SGL (RNBx)

                                     11

1    Neither party has cited to any caselaw governing the calculation of the 30-day period

2  when there is an intervening stay in discovery.  In the absence of any caselaw, MGA's responses

3  will be treated as timely in order to preserve any valid objections MGA may have asserted.

4    Interrogatory No. 5 seeks the identity of each and every person who was involved in the

5  conception, origin, creation, design, development, sculpting, engineering, reduction to practice,

6  tooling or painting of, or who otherwise produced or contributed to any embodiment of Bratz

7  before December 31, 2001, including a description of each person's role and the start and end

8  dates of each person's involvement.  In response, MGA asserted numerous objections, but did

9  provide the names of five individuals.

10    The interrogatory clearly seeks information relevant to the claims at issue.  MGA's

11  objections are without merit.  The interrogatory is not vague, ambiguous, compound or overbroad.

12  Nor has MGA carried its burden of establishing that the interrogatory is unduly burdensome, calls

13  for confidential, proprietary or commercially sensitive information, or seeks information

14  protected by the attorney-client privilege.  Furthermore, MGA's response is incomplete insofar as

15  it fails to provide the description of each person's role and the start and end dates of each person's

16  involvement.  Accordingly, MGA is ordered to provide a complete response to Interrogatory No.

17  5 and identify documents in compliance with Rule 33(d), Fed.R.Civ.P.

18    Interrogatory No. 6 seeks the same information as Interrogatory No. 5 with respect to any

19  embodiment of Angel.  MGA is ordered to provide a complete response to Interrogatory No. 6 for

20  the reasons previously discussed in connection with Interrogatory No. 5.

21    Interrogatory No. 7 asks MGA to identify each and every embodiment of Bratz prior to

22  December 31, 2001.  In response, MGA asserted numerous objections and did not provide any

23  substantive information.

24    MGA's objections are without merit.  The interrogatory clearly seeks information relevant

25  to establishing when Bryant first conceived Bratz.  The interrogatory is not vague, ambiguous,

26  compound or overbroad.  Nor has MGA carried its burden of establishing that the interrogatory is

27

28
Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

                                                                                            12

1  unduly burdensome, calls for confidential, proprietary or commercially sensitive information, or

2  seeks information protected by the attorney-client privilege.  Accordingly, MG is ordered to

3  provide a complete response to Interrogatory No. 7.

4      Interrogatory No.8 asks MGA to identify each and every embodiment of Angel.  MGA is

5  ordered to provide a complete response to Interrogatory No. 8 for the reasons previously

6  discussed in connection with Interrogatory No. 7.

7      Interrogatory No. 9 requires MGA to identify each and every sworn statement that refers

8  or relates to the conception, origin, creation, design, development, sculpting, engineering, tooling

9  or painting of Bratz.  In response, MGA asserted numerous objections and did not provide any

10  substantive information.

11      The interrogatory seeks information relevant to establishing when Bryant first conceived

12  Bratz.  Furthermore, MGA's boiler-plate objections are unsubstantiated.  Accordingly, MGA is

13  ordered to provide a complete response to Interrogatory No. 9.

14      Interrogatory No. 10 requires MGA to identify each and every instance in which Bratz

15  was shown, displayed, or exhibited prior to June 1, 2001, including by stating the date(s) on

16  which each such instance occurred, the location of each show or exhibit, and the identity of

17  persons with knowledge of the shows or exhibits.  In response, MGA asserted numerous

18  objections and provided the following information:  Hong Kong Toy Fair in Hong Kong in or

19  about January 2001 and New York Toy Fair, New York, in or about February 2001.

20      Once again, MGA's boiler-plate objections are unsubstantiated.  The information is

21  potentially relevant to establish when Bryant conceived Bratz.  Further, the response is

22  incomplete insofar as it fails to identify any persons with knowledge.  Therefore, MGA is ordered

23  to provide a complete response to Interrogatory No. 10.

24      Interrogatory No. 11 requires MGA to state the "number for each and every telephone,

25  including without limitation each office, home and cell phone number, in the name of, for the

26  benefit of or for the account of Isaac Larian and any other telephone that Isaac Larian used from

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

13

1  January 1, 1998 through the present, and IDENTIFY each and every carrier (including without

2  limitation any long-distance carrier) for each such number. In response, MGA asserted numerous

3  boiler-plate objections.

4        Once again, MGA has failed to substantiate any of its objections with supporting

5  declarations or legal authorities. Accordingly, all objections are overruled and MGA is ordered to

6  provide a full response to Interrogatory No. 11.

IV. CONCLUSION

8        For the reasons set forth above, Mattel's motion to compel production of documents is

9  granted. MGA shall produce all non-privileged documents that are responsive to the requests

10  identified in this Order. Further, MGA shall produce all documents in un-redacted form, except

11  for redactions that are justified by the attorney-client privilege or work product doctrine. Mattel's

12  motion to compel interrogatory answers is also granted. MGA shall produce documents and

13  provide responses to interrogatories consistent with this Order, and produce a privilege log in

14  compliance with Rule 26(b)(5), Fed.R.Civ.P., no later than May 31, 2007. Mattel's request for

15  sanctions is denied.

16        Pursuant to Paragraph 6 of the Stipulation and Order for Appointment of a Discovery

17  Master, Mattel shall file this Order with the Clerk of Court forthwith.

21  Dated: May 15, 2007

HON. EDWARD A. INFANTE (Ret.)
Discovery Master

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

14

## PROOF OF SERVICE BY E-MAIL

I, Anthony Sales, not a party to the within action, hereby declare that on May 15, 2007, I served the attached ORDER GRANTING MATTEL'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND INTERROGATORY RESPONSES BY MGA in the within action by e-mail addressed as follows:

| | | |
|---|---|---|
| Robert Millman Esq. | Littler Mendelson | rfmillman@littler.com |
| Douglas Wickham Esq. | Littler Mendelson | dwickham@littler.com |
| Keith Jacoby Esq. | Littler Mendelson | kjacoby@littler.com |
| Dominic Messiha Esq | Littler Mendelson | dmessiha@littler.com |
| Diba Rastegar Esq. | Littler Mendelson | drastegar@littler.com |
| Michelle Park Esq. | Littler Mendelson | mpark@littler.com |
| Alaya B. Meyers, Esq. | Littler Mendelson | ameyers@littler.com |
| Brady Mitchell, Esq. | Littler Mendelson | bmitchell@littler.com |
| Carol Miller, Esq. | Littler Mendelson | cmiller@littler.com |
| Ryan P. Eskin, Esq. | Littler Mendelson | reskin@littler.com |
| John Quinn Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | jbq@quinnemanuel.com |
| Michael Zeller Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | michaelzeller@quinnemanuel.com |
| Jon Corey Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | joncorey@quinnemanuel.com |
| Duane Lyons Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | duanelyons@quinnemanuel.com |
| Timothy Alger Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | timalger@quinnemanuel.com |
| Dominic Surprenant Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | DominicSurprenant@QuinnEmanuel.com |
| B. Dylan Proctor Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | dylanproctor@quinnemanuel.com |
| Shane McKenzie Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | shanemckenzie@quinnemanuel.com |
| Bridget Morris Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | bridgetmorris@quinnemanuel.com |
| Tamar Buchakjian Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | tamarbuchakjian@quinnemanuel.com |
| Juan Pablo Alban, Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | juanpabloalban@quinnemanuel.com |
| Dale Cendali Esq. | O'Melveny & Myers LLP | dcendali@omm.com |
| Diana Torres Esq. | O'Melveny & Myers LLP | dtorres@omm.com |
| James Jenal Esq. | O'Melveny & Myers LLP | jjenal@omm.com |
| Alicia Meyer Esq. | O'Melveny & Myers LLP | ameyer@omm.com |
| Jennifer Glad Esq. | O'Melveny & Myers LLP | jglad@omm.com |
| David Hurwitz, Esq. | O'Melveny & Myers LLP | dhurwitz@omm.com |
| Johanna Schmitt Esq. | O'Melveny & Myers LLP | jschmitt@omm.com |
| Patricia Glaser Esq. | Christensen, Glaser, Fink, Jacobs, Weil & Shapiro, LLP | pglaser@chrisglase.com |

I declare under penalty of perjury under the laws of the Untied States of America that the above is true and correct.

Executed on May 15, 2007, at San Francisco, California.

Anthony Sales

Exhibit R



QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
  John B. Quinn (Bar No. 90378)
  Michael T. Zeller (Bar No. 196417)
  Jon D. Corey (Bar No. 185066)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Attorneys for Plaintiff and Counter-Defendant
Mattel, Inc.

FILED
CLERK, U.S. DISTRICT COURT

JAN - 4 2005

CENTRAL DISTRICT OF CALIFORNIA
DEPUTY

Priority ___
Send ___
Enter ___
Closed ___
JS-5/JS-6 ___
JS-2/JS-3 ___
Scan Only ___

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTEL, INC., a Delaware Corporation,<br><br>                    Plaintiff,<br><br>        v.<br><br>CARTER BRYANT, an individual; and DOES 1 through 10, inclusive,<br><br>                    Defendants. | CASE NO. CV 04-9059 NM (RNBx)<br><br>STIPULATED PROTECTIVE ORDER; AND<br><br>[PROPOSED] ORDER<br><br>[Discovery Matter] |
| CARTER BRYANT, on behalf of himself, all present and former employees of Mattel, Inc., and the general public,<br><br>                    Counter-Claimant,<br><br>        v.<br><br>MATTEL, INC., a Delaware Corporation,<br><br>                    Counter-Defendant. | |

DOCKETED ON CM

JAN - 5 2005

BY ___ 006

59

SERVED ON US BY MAIL

07272/625581.2

EXHIBIT R PAGE 346

PROTECTIVE ORDER

ORIGINAL

LODGED

## GOOD CAUSE STATEMENT

Plaintiff Mattel, Inc. ("Mattel"), defendant Carter Bryant, and intervenor-defendant MGA Entertainment, Inc. ("MGA") are parties to the above-captioned litigation (hereinafter, the "Action"). (Mattel, Carter Bryant and MGA Entertainment, Inc. are each referred to herein as a "Party" and collectively are the "Parties.")

In this Action, Mattel has alleged, and defendants dispute, that Bryant worked for and otherwise aided and assisted MGA while defendant was employed by Mattel as a designer, in violation of his contractual and other legal duties to Mattel.

All parties believe that they will or may be required to produce or disclose in this Action, and that nonparties may produce or disclose, information that is trade secret, proprietary, confidential and/or is of a private or personal nature and that, if disclosed in this Action without restriction on its use or further disclosure, may cause disadvantage, harm, damage and loss to the disclosing Party or to the disclosing nonparty.

In addition, the Parties are currently in a competitive relationship in the toy industry, with Mattel and MGA operating as a manufacturers and marketers of dolls, toys and other products and Bryant working at this time as a contractor for a Mattel competitor, MGA, and further anticipate that nonparty competitor information may be produced or disclosed in this Action.

In particular, without prejudice to any Party's right to object to or resist disclosure of such categories of information on relevance or any other grounds, the Parties currently anticipate that categories of such trade secret, proprietary, confidential and/or private documents and other information that may be disclosed in discovery by the Parties and by nonparties will or may include:

(1)   Personnel files and other private or confidential employment, contractor or vendor information;

07272/625581.2

-2-

PROTECTIVE ORDER

1          (2)    The specific terms of agreements with, and information received

2    from, third parties that a Party is required to disclose only under conditions of

3    confidentiality;

4          (3)    Personal or private financial information, and confidential

5    financial data that is not known generally to the trade or to competitors, including

6    financial data relating to specific sales, cost and profit information for specific

7    products and product lines; and

8          (4)  · Business plans and product information that are not known

9    generally to the trade or to competitors, including non-public information relating to

10   product development and design.

11

12          WHEREFORE, believing that good cause exists, the Parties HEREBY

13   STIPULATE that, subject to the Court's approval, the following procedures shall be

14   followed in this Action to facilitate the orderly and efficient discovery of relevant

15   information while minimizing the potential for unauthorized disclosure or use of

16   confidential or proprietary information:

17

18                         <u>SCOPE OF THIS ORDER</u>

19

20          1.    This Protective Order shall apply to trade secret, confidential and

21   proprietary information, documents and things that are produced or disclosed in any

22   form during the course of the Action by any Party or any nonparty:

23          (a)    through discovery;

24          (b)    in any pleading, document or other writing; or

25          (c)    in testimony given at a deposition.

26   (The foregoing information, documents and things shall be referred to hereinafter

27   collectively as "Litigation Materials.")

28

07272/625581.2

-3-

PROTECTIVE ORDER

## CONFIDENTIAL AND ATTORNEYS' EYES ONLY INFORMATION

2.      Any Party or nonparty producing or disclosing Litigation Materials in this Action may designate such information as "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" by designating it in the manner set forth in paragraph 3 below.   The designation of Litigation Materials as "CONFIDENTIAL" shall be limited to information which the disclosing Party or nonparty believes in good faith contains, constitutes or reveals confidential design, engineering or development information, confidential commercial information, non-public financial information, confidential or private information about current or former employees, contractors or vendors (including employee, contractor and vendor personnel records), or other information of a confidential, proprietary, private or personal nature.    The designation of information as "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" shall be limited to trade secrets or other confidential commercial information, including without limitation non-public designs and drawings, which the disclosing Party or nonparty in good faith believes will result in competitive disadvantage or harm if disclosed to another Party to this Action without restriction upon use or further disclosure.    Information designated as "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" may only be used and disclosed as provided in this Protective Order.

## MANNER OF DESIGNATION OF MATERIALS

3.      A Party or nonparty may designate Litigation Materials as "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" in the following manner:

(a)     Documents or Things.     "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" treatment may be

obtained by typing or stamping "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" on the particular document or thing.

(b)   Interrogatory Answers and Responses to Requests for Admissions.  In answering any interrogatory or request for admission, or any part thereof, a Party may designate its or his answer as "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" by affixing thereto the legend "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY." Such "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" answers shall be made on separate pages from any other answers or portions thereof that are not designated as "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY."

(c)   Deposition Testimony.  Any Party or nonparty giving deposition testimony in this Action may obtain "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" treatment therefor by designating, during the course of that testimony, for which "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" treatment is desired, the testimony that is claimed to be "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY," or alternatively by designating the entire testimony to be "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY," subject to a good faith obligation to identify any non-confidential portions of the testimony (and/or any lesser "CONFIDENTIAL" portions in the event that the entire testimony is designated "CONFIDENTIAL -- ATTORNEYS' EYES ONLY") within fourteen (14) calendar days after receipt of the transcript of the testimony.  The reporter shall separately transcribe and bind the testimony so designated as "CONFIDENTIAL" and "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" and shall mark the face of the separate bound transcript containing such testimony with the term "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY."

-5-

PROTECTIVE ORDER

A Party or nonparty also may make the above-referenced designation of confidentiality in writing and within fourteen (14) calendar days of the receipt by said Party or nonparty of the transcript of said testimony. In that event, said portion of the transcript will be treated as "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" under the provisions of this Protective Order, except that it will not be separately bound. If, during the course of deposition testimony, any Party or nonparty reasonably believes that the answer to a question will result in the disclosure of "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" information, all persons other than those persons entitled to receive such information pursuant to paragraphs 5 and 6 hereof shall be excluded from the room in which the deposition testimony is given.    Unless previously designated as "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY," all transcripts of deposition testimony and any related exhibits, and all information adduced in deposition, shall, in their entirety, be treated as "CONFIDENTIAL" for a period of fourteen (14) calendar days after receipt of the transcript by counsel for the designating Party or nonparty. The Party or nonparty designating the testimony or information as "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" may, within that fourteen (14) calendar day period described above, specifically designate information contained in the transcript(s) and/or exhibit(s) as "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY," whether or not previously designated as such, by notifying all Parties in writing of the portions of the transcript or exhibit which contains such information. Each Party shall attach a copy of such written statement to the face page of the transcript or exhibit and to each copy in its or his possession, custody or control. Thereafter, these portions of the transcript or exhibits designated as "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" shall be treated in

accordance with the terms of this Protective Order. In addition, the provisions of Paragraph 3(e) for later designating transcripts or exhibits shall apply after the expiration of the fourteen (14) calendar day period described in this Paragraph 3(c).

(d)     Typing or stamping the legend "CONFIDENTIAL" or "CONFIDENTIAL — ATTORNEYS' EYES ONLY" upon the first page of a collection of Litigation Materials which are bound together shall have the effect of designating such collection in its entirety as "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY." In the case of disks, tapes, CD-ROMs, DVDs and other tangible storage media or devices, labeling, stamping or marking the outside of such disk, tape, CD-ROM, DVD or other medium or device with the legend "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" shall have the effect of designating the entire contents of such disk, tape, CD-ROM, DVD or other medium or device, and all data stored thereupon, as "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY," as the case may be.

(e)     Except as otherwise provided in Paragraph 3(c) of this Protective Order, the receiving Party shall not reveal any information produced for a period of seven (7) calendar days following receipt. Failure to designate a document, thing or other information as CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" in accordance with this Protective Order shall not preclude any Party or nonparty desiring to so designate the document, thing or information from so designating thereafter; provided that the Party or nonparty proceeds promptly after discovery of any omission of marking, in good faith marks the document, thing or other information and requests, in writing, that each receiving Party so mark and treat the document, thing or other information in accordance with this Protective Order. Thereafter, the document, thing or other information shall

1   be fully subject to this Protective Order.  No Party shall incur liability for any

2   disclosures made prior to notice of such designation, except to the extent that

3   any such disclosures occurred prior to the seven (7) day period described above

4   or prior to such other time periods as.are provided by this Protective Order,

5   including without limitation such time periods as are provided in Paragraph

6   3(c) above.

7

8   <u>RESTRICTIONS ON DISCLOSURE OF DESIGNATED MATERIALS</u>

9

10      4.    Any Litigation Materials produced or disclosed in this Action,

11  whether or not designated "CONFIDENTIAL" or "CONFIDENTIAL --

12  ATTORNEYS' EYES ONLY," may only be used by the receiving Party of such

13  information for purposes of litigation and not for any other purpose, including

14  without limitation for any business or trade purpose.  As used herein, the term

15  "litigation" shall mean preparation for, participation in and prosecution and defense

16  of any suit, motion, trial, appeal, hearing, review or other judicial proceeding or in

17  connection with any mediation or other alternative dispute resolution procedure that

18  this or any other court may order or that the Parties may agree to.

19      5.    Subject to Paragraph 7 herein, and unless as otherwise ordered by

20  the Court, Litigation Materials designated as "CONFIDENTIAL" shall not be

21  disclosed to any person other than:

22      (a)    the attorneys for the Parties and their partners, shareholders,

23  associates, document clerks and paralegals who are necessary to assist such

24  attorneys;

25      (b)    secretaries, stenographers and other office or clerical

26  personnel employed by said attorneys and who are necessary to assist such

27  attorneys;

28

07272/625581.2

(c)     a named Party or officers or employees of a named Party, to the extent deemed necessary by their respective attorneys for purposes assisting in litigation;

(d)    the authors, senders, addressees and designated copy recipients of any document or thing which has been designated as "CONFIDENTIAL" information;

(e)     such other persons as may be consented to by the Party or nonparty designating such information as "CONFIDENTIAL" information;

(f)     outside litigation support vendors, including commercial photocopying vendors, scanning services vendors, coders and keyboard operators;

(g)     professional court reporters engaged to transcribe deposition testimony, professional videographers engaged to videotape deposition testimony and translators;

(h)     independent outside consultants or experts retained by the attorneys to the extent deemed necessary by said attorneys for purposes of litigation; and

(i)     non-party fact witnesses in a deposition, provided, however, that such persons may not retain such "CONFIDENTIAL" information unless otherwise authorized to receive it.  If the attendance of a non-party fact witness at a deposition can only be obtained through compulsory process, the witness need not execute an Assurance of Compliance in the form attached as Exhibit A, provided that:  (1) the witness acknowledges his obligation to maintain the confidentiality of "CONFIDENTIAL" information under oath; and (2) such "CONFIDENTIAL" information may only be shown to the witness during the deposition.

**EXHIBIT R PAGE 354**

6.      Subject to paragraph 7 herein, and unless as otherwise ordered by the Court, Litigation Materials designated as "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" shall not be disclosed to any person other than:

(a)      the attorneys for the Parties (but not including in-house counsel for the Parties or any attorney who is an officer, director, shareholder or employee of any Party or its corporate affiliates) and their partners, shareholders, associates, document clerks and paralegals who are assigned to and necessary to assist such attorneys. For the purposes of this subparagraph, "affiliate" shall mean any corporate parent or subsidiary of any Party, or any other entity that is under common control with any Party or corporate parent or subsidiary of any Party, or any of their successors or predecessors in interest;

(b)      secretaries, stenographers and other office or clerical personnel employed by said attorneys and who assist them with respect to litigation;

(c)      the authors, senders, addressees and designated copy recipients of any document or thing which has been designated as "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" information;

(d)      such other persons as may be consented to by the Party designating such information as "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" information;

(e)      outside litigation support vendors, including commercial photocopying vendors, scanning services vendors, coders and keyboard operators;

(f)      independent outside consultants or experts retained by the attorneys to the extent deemed necessary by said attorneys for the purposes of litigation; and

**EXHIBIT R PAGE 355**

PROTECTIVE ORDER

1           (g)    professional court reporters engaged to transcribe

2    deposition testimony, professional videographers engaged to videotape

3    deposition testimony and translators.

4           7.    None of the following is bound by or obligated under this Order

5    in any respect and specifically are not bound or obligated to treat information

6    designated as "CONFIDENTIAL" or "CONFIDENTIAL – ATTORNEYS' EYES

7    ONLY" in any particular manner: The Court hearing this Action (including the Court

8    having jurisdiction of any appeal), Court personnel, court reporters working for the

9    Court, translators working for the Court, or any jury impaneled in this Action.

10           8.    Other than those identified in Paragraph 7 above, each person to

11    whom information designated as "CONFIDENTIAL" or "CONFIDENTIAL –

12    ATTORNEYS' EYES ONLY" is disclosed shall be informed of the terms of this

13    Protective Order and agree to be bound by it before disclosure to such persons of any

14    such information. The persons described in Paragraphs 5(f), 5(h), 6(e) and 6(f) shall

15    not have access to either "CONFIDENTIAL" or "CONFIDENTIAL –

16    ATTORNEYS' EYES ONLY" information, as the case may be, until they have

17    certified that they have read this Protective Order and have manifested their assent

18    to be bound thereby by signing a copy of the Assurance of Compliance attached

19    hereto as Exhibit A. Once a person has executed such an Assurance of Compliance,

20    it shall not be necessary for that person to sign a separate Assurance of Compliance

21    each time that person is subsequently given access to confidential material. Any

22    person who signed an Assurance of Compliance in connection with the Stipulation

23    for Protection of Confidential Information and Protective Order filed September 16,

24    2004 in <u>Mattel Inc. v. Bryant</u>, Case No. BC 314398, pending in Los Angeles County

25    Superior Court, need not re-sign the Assurance of Compliance attached hereto but

26    shall, by virtue of his or her prior signature, be deemed to have signed the attached

27    Assurance of Compliance.

28

**EXHIBIT R PAGE 356**

**PROTECTIVE ORDER**

1   9.   The failure of any Party to object to the designation **of**

2   information as "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES

3   ONLY" shall not be deemed an admission that such information qualifies for such

4   designation.

5   10.   If any Party wishes to have any information, document or

6   testimony marked "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS'

7   EYES ONLY" by another Party or nonparty reclassified as non-confidential, or from

8   "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" to "CONFIDENTIAL," the

9   Parties and/or relevant nonparty or nonparties will confer and try to reach agreement.

10  If the Parties and/or relevant nonparty or nonparties cannot reach agreement, either

11  Party and/or the relevant nonparty or nonparties may apply to the Court to resolve the

12  matter in accordance with the <u>Local Rules</u>.  Unless and until this Court enters an

13  Order changing the designation of the information, it shall be afforded the treatment

14  prescribed in this Protective Order for its designation.

15  11.   Nothing contained in this Protective Order shall restrict or prevent

16  any Party or nonparty from disclosing or otherwise using its or his own Litigation

17  Materials which that Party or nonparty produces or discloses in this action.

18  12.   The inadvertent or unintentional disclosure by a producing Party

19  or nonparty of "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES

20  ONLY" Litigation Materials during the course of this litigation, regardless of whether

21  the information was so designated at the time of disclosure, shall not be deemed a

22  waiver in whole or in part of a Party's or nonparty's claim of confidentiality, either

23  as to the specific information disclosed or as to any other information relating thereto

24  or on the same or related subject matter.  Counsel for the Parties and/or nonparties

25  shall in any event, to the extent possible, upon discovery of inadvertent error,

26  cooperate to restore the confidentiality of the "CONFIDENTIAL" or

27  "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" material that was inadvertently

28  or unintentionally disclosed.   **EXHIBIT R PAGE 357**

PROTECTIVE ORDER

13.     If a Party or nonparty through inadvertence produces or provides discovery that it, he or she believes is subject to a claim of attorney-client privilege or work product immunity, the producing Party or nonparty may give written notice to the receiving Party that the document is subject to a claim of attorney-client privilege or work product immunity and request that the document be returned to the producing Party or nonparty.  The receiving Party shall promptly return to the producing Party or nonparty the inadvertedly disclosed document and all copies of such document.  Return of the document by the receiving Party shall not constitute an admission or concession, or permit any inference, that the returned document is, in fact, properly subject to a claim of attorney-client privilege or work product immunity, nor shall it foreclose any Party from moving the Court for an Order that such document has been improperly designated or should be producible for reasons other than a waiver caused by the inadvertent production.

14.     Nothing contained in this Protective Order shall affect the right of any Party or nonparty to make any objection, claim any privilege, or otherwise contest any request for production of documents, interrogatory, request for admission, or question at a deposition or to seek further relief or protective orders from the Court in accordance with the <u>Federal Rules of Civil Procedure</u> and the <u>Local Rules</u>. Nothing in this Protective Order shall constitute an admission or waiver of any claim or defense by any Party.

## <u>FILING AND USE IN COURT OF DESIGNATED MATERIALS</u>

15.     Except when the filing under seal is otherwise authorized by statute or federal rule, the Parties shall seek the Court's prior approval for the filing under seal of pleadings and other documents containing properly designated "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" information in accordance with the procedures set forth in <u>Local Rule</u> 79-5.1, as such

1  Rule may be amended from time to time.  Prior to the time that a Party receiving the

2  "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY"

3  information from any other Party files with the Court an application and the other

4  materials required by Local Rule 79-5.1, as such Rule may be amended from time to

5  time, to seal the producing Party's confidential information, the receiving Party shall

6  consult with the producing Party's attorney to determine whether the producing Party

7  will re-designate the previously designated confidential information so as to avoid the

8  need for the request to file such information under the seal.  Upon the default of a

9  Party to seek the Court's approval to file a document containing "CONFIDENTIAL"

10  or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" information under seal, any

11  Party may subsequently seek the approval of the Court to file that document under

12  seal, in accordance with the procedures set forth in Local Rule 79-5.1, as such Rule

13  may be amended from time to time.

14

15  <u>THIRD-PARTY REQUEST FOR DESIGNATED MATERIALS</u>

16

17       16.   If any Party or nonparty receives a subpoena or document request

18  from a third party which purports to require the production of materials in that Party's

19  possession which have previously been designated as "CONFIDENTIAL" or

20  "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" by any other Party or nonparty,

21  the Party or nonparty receiving such subpoena or document request (a) shall object

22  and refuse to produce documents absent a Court Order or the consent of the Party or

23  nonparty who designated the materials as "CONFIDENTIAL" or "CONFIDENTIAL

24  -- ATTORNEYS' EYES ONLY", (b) immediately notify the Party or nonparty who

25  designated the materials as "CONFIDENTIAL" or "CONFIDENTIAL --

26  ATTORNEYS' EYES ONLY" of the receipt of said subpoena or document request,

27  and (c) shall not oppose any effort by the Party or nonparty which designated the

28  material as "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES

1  ONLY" to quash the subpoena or obtain a protective order limiting discovery of such

2  material.

3

4  <u>DISCOVERY FROM NONPARTIES</u>

5

6          17.    Discovery of nonparties may involve receipt of information,

7  documents, things or testimony which include or contain "CONFIDENTIAL" or

8  "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" materials or information.  A

9  nonparty producing such material in this case may designate as "CONFIDENTIAL"

10  or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" some or all of the material it

11  produces in the same manner provided for in this Protective Order with respect to

12  material furnished by or on behalf of the Parties.  Any Party may also designate as

13  "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" any

14  materials or information produced by a nonparty that constitute "CONFIDENTIAL"

15  or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" material of the designating

16  Party under Paragraph 2 of this Protective Order, regardless of whether the producing

17  nonparty has also so designated.  In addition, a nonparty may also designate as

18  "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" any

19  materials or information produced by a Party that constitute "CONFIDENTIAL" or

20  "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" material or information of such

21  nonparty under Paragraph 2 of this Protective Order, regardless of whether the

22  producing Party has also so designated.  In either such an event, the designation

23  providing for the greater level of protection for the material information shall control,

24  subject to Paragraph 10 of this Protective Order.  Nonparty materials designated

25  "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" by a

26  nonparty or Party shall be governed by the terms of this Protective Order.

27

28                          **EXHIBIT R PAGE 360**

**PROTECTIVE ORDER**

## CONCLUSION OF LITIGATION

18.    Within thirty (30) days of the conclusion of this Action, including any post-trial motions or appellate proceedings relating thereto, all documents, transcripts or other things or information designated as "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY," and all copies thereof, shall be returned to the attorneys for the Party or nonparty furnishing the same, or shall be destroyed by the attorneys having such documents in their possession. In addition, all summaries or other materials containing or disclosing information contained in such documents, answers, transcripts or other things shall be destroyed; provided, however, that outside counsel for each Party may retain one complete and unredacted set of pleadings and papers filed with the Court or served on the other Parties. Such retained copy of pleadings and papers shall be maintained in a file accessible only to outside counsel bound by this Protective Order. This Protective Order shall continue to be binding after the conclusion of this Action.

## AMENDMENT OF THIS AGREEMENT

19.    The provisions of this Stipulation and Protective Order may be modified at any time by stipulation of the Parties as approved by Order of the Court. In addition, a Party may at any time apply to the Court for modification of this

EXHIBIT R PAGE 361

PROTECTIVE ORDER

1  Stipulation and Protective Order pursuant to a motion brought in accordance with the

2  rules of the Court.

3

4     **IT IS SO STIPULATED.**

5

6  DATED: December 22, 2004        QUINN EMANUEL URQUHART
                                   OLIVER & HEDGES, LLP
7

8                                  By _Jon Corey_
9                                     Jon Corey
                                      Attorneys for Plaintiff
10                                    Mattel, Inc.

11

12 DATED: December ___, 2004       LITTLER MENDELSON

13                                 By_____
14                                    Douglas A. Wickham
                                      Attorneys for Defendant
15                                    Carter Bryant

16 DATED: December ___, 2004       O'MELVENY & MEYERS, LLP

17                                 By_____
18                                    Diana M. Torres
                                      Attorneys for Intervenor-Defendant
19                                    MGA Entertainment, Inc.

20

21    **IT IS SO ORDERED.**

22

23 DATED: __1/4/05__

24                                 THE HONORABLE ROBERT N. BLOCK
                                      United States Magistrate Judge
25

26

27

28              **EXHIBIT R PAGE 362**

07272/625581.2                    -17-
                                              **PROTECTIVE ORDER**

1  Stipulation and Protective Order pursuant to a motion brought in accordance with the

2  rules of the Court.

3

4      **IT IS SO STIPULATED.**

5

6  DATED: December __, 2004          QUINN EMANUEL URQUHART
                                      OLIVER & HEDGES, LLP
7

8                                     By _____
9                                        Jon Corey
                                         Attorneys for Plaintiff
10                                       Mattel, Inc.

11
   DATED: December 21, 2004          LITTLER MENDELSON
12

13                                    By _____
                                         Douglas A. Wickham
14                                       Attorneys for Defendant
                                         Carter Bryant
15

16 DATED: December __, 2004          O'MELVENY & MEYERS, LLP

17

18                                    By _____
                                         Diana M. Torres
19                                       Attorneys for Intervenor-Defendant
                                         MGA Entertainment, Inc.
20

21

22     **IT IS SO ORDERED.**

23
   DATED: _____
24                                    THE HONORABLE ROBERT N. BLOCK
                                      United States Magistrate Judge
25

26

27

28

07272/625581.2                         -17-
                                                        PROTECTIVE ORDER

**EXHIBIT R PAGE 363**

1 | Stipulation and Protective Order pursuant to a motion brought in accordance with the

2 | rules of the Court.

3

4 | IT IS SO STIPULATED.

5

6 | DATED: December ___, 2004        QUINN EMANUEL URQUHART
                                    OLIVER & HEDGES, LLP
7

8                                   By
9                                     Jon Corey
                                      Attorneys for Plaintiff
10                                    Mattel, Inc.

11 | DATED: December ___, 2004        LITTLER MENDELSON

12

13                                   By
                                       Douglas A. Wickham
14                                     Attorneys for Defendant
                                       Carter Bryant
15

16 | DATED: December ___, 2004        O'MELVENY & MEYERS, LLP

17

18                                   By
                                       Diana M. Torres
19                                     Attorneys for Intervenor-Defendant
                                       MGA Entertainment, Inc.
20

21

22 | IT IS SO ORDERED.

23

24 | DATED: _____           THE HONORABLE ROBERT N. BLOCK
                                      United States Magistrate Judge
25

26

27

28

07272/625581.2                        -17-

# EXHIBIT A

## ASSURANCE OF COMPLIANCE

I, _____, under penalty of perjury under the laws of the United States of America, declare and state as follows:

I reside at _____, in the City/County of _____ and State/Country of _____;

I have read the annexed Stipulated Protective Order, ("Protective Order") dated _____ in the action entitled *Mattel, Inc. v. Carter Bryant,* Case No. CV 04-9059 NM (RNBx), which currently is pending in the United States District Court for the Central District of California; that I am fully familiar with and agree to comply with and be bound by the provisions of that Protective Order;

I will not divulge to persons other than those specifically authorized by the Protective Order, and will not copy or use any Litigation Materials designated as "CONFIDENTIAL" or "CONFIDENTIAL -- ATTORNEYS' EYES ONLY" except solely as permitted by the Protective Order; and

I consent to the jurisdiction of the United States District Court for the Central District of California for the purpose of enforcing said Protective Order, enjoining any violation or threatened violation of the Protective Order or seeking damages for the breach of said Protective Order.

_____
(Signature)

07272/625581.2

**EXHIBIT R PAGE 365**

PROTECTIVE ORDER

**PROOF OF SERVICE**

1013A(3) CCP Revised 5/1/88

STATE OF CALIFORNIA      )
COUNTY OF LOS ANGELES    )

I am employed in the county of Los Angeles State of California.  I am over the age of 18 and not a party to the within action; my business address is 865 South Figueroa Street, 10th Floor, Los Angeles, CA 90012.

On December 22, 2004, I served the foregoing document described as

**STIPULATED PROTECTIVE ORDER; AND [PROPOSED] ORDER**

on all interested parties in this action:

**SEE ATTACHED SERVICE LIST**

[ ]    By placing [ ] the original [X] true copies thereof enclosed in sealed envelopes addressed as follows:

[ ]    **BY MAIL**

[ ]    I deposited such envelope in the mail at Los Angeles, California.  The envelope was mailed with postage thereon fully prepaid.

[ ]    As follows: I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

[X]    **BY TELECOPIER** By transmitting the above listed document(s) to the fax number(s) set forth above on this date.

Executed on December 22, 2004, at Los Angeles, California.

[X]    (Federal) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.


Ivana Maiorano                          
Print Name                              Signature

**EXHIBIT R PAGE 366**

1   Robert F. Millman, Esq.
    Douglas A. Wickham, Esq.
2   Keith A. Jacoby, Esq.
    Littler Mendelson
3   A Professional Corporation
    2049 Century Park East, 5th Floor
    Los Angeles, California 90067-3107
4   Phone: 310-553-0308
    Fax: 310-553-5583
5

6   Diana M. Torres, Esq.
    O'Melveney & Meyers
7   400 S. Hope Street
    Los Angeles, CA 90071
8   Phone: 213-430-6000
    Fax: 213-430-6407
9

10  Daniel J. Warren, Esq.
    Sutherland, Asbill & Brennan
11  999 Peachtree Street NE
    Atlanta, GA 30309-3996
12  Phone: 404-853-8698
    Fax: 404-853-8806

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-2-