QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
JOHN B. QUINN (State Bar No. 090378)
MICHAEL T. ZELLER (State Bar No. 196417)
JON D. COREY (State Bar No. 185066)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000; Facsimile: (213) 443-3100

STROOCK & STROOCK & LAVAN LLP
BARRY B. LANGBERG (State Bar No. 048158)
MICHAEL J. NIBORSKI (State Bar No. 192111)
2029 Century Park East, Suite 1600
Los Angeles, California 90067-3086
(lacalendar@stroock.com)
Telephone: (310) 556-5800; Facsimile: (310) 556-5959

Attorneys for MATTEL, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>MATTEL, INC., a Delaware corporation,<br><br>Defendant.<br><br>AND CONSOLIDATED ACTIONS | Case No. CV 04-9049 SGL (RNBx)<br>Consolidated with<br>Case No. CV 04-09059<br>Case No. CV 05-02727<br><br>DISCOVERY MATTER<br>[To Be Heard by Discovery Master Hon. Edward Infante (Ret.) Pursuant To The Court's Order Of Dec. 6, 2006]<br><br>**[PUBLIC REDACTED]**<br>DECLARATION OF MICHAEL J. NIBORSKI IN SUPPORT OF MATTEL, INC.'S NOTICE OF MOTION AND MOTION TO COMPEL THE DEPOSITION OF CHRISTOPHER PALMERI<br><br>Date:     February 8, 2008<br>Time:     9:30 a.m.<br>Place:    TBA |

07209/2363314.1

## DECLARATION OF MICHAEL J. NIBORSKI

I, Michael J. Niborski, declare as follows:

1.     I am an attorney licensed to practice before all courts of the State of California and am an attorney with the law firm of Stroock & Stroock & Lavan LLP, co-counsel for Mattel, Inc. ("Mattel") in the above-captioned action. I submit this declaration in support of Mattel, Inc.'s Notice of Motion and Motion to Compel the Deposition of Christopher Palmeri. The facts set forth in this declaration are true of my own personal knowledge, except where based on a review of the pleadings and records in this action and, if called as a witness, I could and would competently testify to such facts.

2.     Attached hereto as Exhibit 1 is a true and correct copy of an article published in BusinessWeek magazine in July 2003 entitled "To Really Be A Player, Mattel Needs Hotter Toys" (the "Article"). The by-line of the Article identifies Christopher Palmeri as the author of the Article.

3.     Attached hereto as Exhibit 2 is a true and correct copy of a deposition subpoena in this action that was served on Christopher Palmeri on July 25, 2007 (the "Subpoena").

4.     Prior to service of the Subpoena, co-counsel for Mattel in this matter, Timothy Alger of the law firm Quinn Emanuel Urquhart Oliver & Hedges, LLP, engaged in a series of meet-and-confer discussions by telephone and email with counsel for Christopher Palmeri and BusinessWeek magazine regarding the proposed deposition of Mr. Palmeri. During these discussions, Mr. Alger described the limited scope of the deposition and the importance of Mr. Palmeri's testimony. Attached hereto as Exhibit 3 is a true and correct copy of an exchange of emails between William Farley, associate general counsel of BusinessWeek, and Mr. Alger, between June 20 and 27, 2007. No agreement regarding Mr. Palmeri's deposition was reached.

- 1 -

1          5.         On or about August 8, 2007, counsel for Mr. Palmeri served a

2 document entitled Non-Party Reporter Christopher Palmeri's Objections To

3 Plaintiff's Subpoena (the "Objections"), a true and correct copy of which is attached

4 hereto as Exhibit 4.

5          6.         Following service of the Objections, Mr. Alger and counsel for Mr.

6 Palmeri, Alonzo Wickers of the law firm Davis Wright Tremaine LLP, continued

7 meet and confer efforts in an attempt to resolve this dispute informally.  Attached

8 hereto as Exhibit 5 is a true and correct copy of a letter from Timothy Alger to

9 Alonzo Wickers, dated August 17, 2007.  These discussions included telephone

10 conversations, emails, and an in-person meet-and-confer at Mr. Alger's office on

11 August 24, 2007.

12          7.         During their discussions, Mr. Wickers represented to Mr. Alger that

13 no documents exist that are responsive to the documents requests in the subpoena.

14 True and correct copies of emails between Mr. Wickers and Mr. Alger are attached

15 as Exhibit 6.

16          8.         I continued the meet and confer efforts on behalf of Mattel in

17 connection with the Subpoena in early September 2007.  Attached hereto as Exhibit

18 7 is a true and correct copy of a letter from me to Mr. Wickers, dated September 5,

19 2007.  These discussions also failed to result in agreement regarding Mr. Palmeri's

20 deposition.

21          9.         On September 28, 2007, I took the deposition of Maureen Tkacik, a

22 former reporter for the Wall Street Journal.  Attached hereto as Exhibit 8 is a true

23 and correct copy of the transcript of my examination of Ms. Tkacik, dated

24 September 28, 2007.

25         10.       On October 3, 2007, I took the deposition of Denise O'Neal, a

26 reporter for the Chicago Sun-Times.  Attached hereto as Exhibit 9 is a true and

27

28

-2-

1    correct copy of the transcript of my examination of Ms. O'Neal, dated October 3,

2    2007.

3        11.      Attached hereto as Exhibit 10 is a true and correct copy of the

4    Motion of Mattel, Inc. for Leave to Take Additional Discovery and Objections to

5    Discovery Master Order of September 28, 2007, dated November 19, 2007.  Mr.

6    Palmeri's deposition is described on pages 8 and 11.

7        12.      Attached hereto as Exhibit 11 is a true and correct copy of a

8    transcript of the January 7, 2008 hearing before Judge Larson on Mattel's Motion

9    for Leave to Take Additional Discovery, during which the reporter depositions were

10   described to the Court at page 6.

11       13.      Attached hereto as Exhibit 12 is a true and correct copy of the Order

12   Granting In Part and Denying In Part Mattel's Motion for Leave to Take Additional

13   Discovery, dated January 7, 2008, and the Court's Order amending the Order, dated

14   January 9, 2008.  In the January 7, 2008 Order, Judge Larson approved the

15   deposition of Mr. Palmeri and others at the top of page 3.

16       14.      On January 9, 2008, I spoke by telephone with Mr. Wickers in

17   another attempt to resolve this matter.  During this conversation, I informed Mr.

18   Wickers that in order to limit any burden on Mr. Palmeri and BusinessWeek, Mattel

19   would agree to conduct Mr. Palmeri's deposition at a date, time and location of Mr.

20   Palmeri's choosing.  I also informed Mr. Wickers that Mattel would agree to limit

21   the time for questioning of Mr. Palmeri and discuss the anticipated questions in

22   advance of the deposition.

23       15.      On January 11, 2008, I again spoke with Mr. Wickers at which time

24   he informed me his client would consider this matter further and that he would

25   attempt to provide me with an answer the following Monday.

26       16.      On January 14, 2008, Mr. Wickers telephoned and informed me that

27   BusinessWeek had decided not to produce Mr. Palmeri for deposition in response to

28

- 3 -

1   the Subpoena.  During this conversation, Mr. Wickers and I confirmed an agreement

2   he made with Mr. Alger that the Subpoena served on July 25, 2007 would still be

3   considered valid, notwithstanding the delay in taking the deposition.  Attached

4   hereto as Exhibit 13 is a true and correct copy of a letter from me Mr. Wickers,

5   dated January 14, 2008, memorializing this conversation.

6        17.     Attached hereto as Exhibit 14 is a true and correct copy of relevant

7   portions of the deposition transcript of Isaac Larian.

8        18.     Attached hereto as Exhibit 15 is a true and correct copy of the

9   public portion of Mattel, Inc.'s Second Amended Answer in Case No. 05-2727 and

10  Counterclaims.

11       I declare under penalty of perjury under the laws of the State of California that

12  the foregoing is true and correct.  Executed this 20th day of January 2008, at Los

13  Angeles, California.

14

15                                 Michael J. Niborski

16

17

18

19

20

21

22

23

24

25

26

27

28
                                    - 4 -

DECLARATION OF MICHAEL J. NIBORSKI IN SUPPORT OF
MOTION TO COMPEL THE DEPOSITION OF CHRISTOPHER PALMERI

**EXHIBIT 1**

The Corporation: COMMENTARY

## TO REALLY BE A PLAYER, MATTEL NEEDS HOTTER TOYS

By Christopher Palmeri

1,151 words

28 July 2003

BusinessWeek

64

Number 3843

English

(Copyright 2003 McGraw-Hill, Inc.)

The Bratz pack has invaded the Gabriele house. The line of trendy dolls burst on the scene two years ago, offering girls a hipper alternative to that old standby, Barbie: Think Jennifer Lopez to Barbie's Reese Witherspoon. Joan Gabriele, a Hollywood (Fla.) mother of two, now has eight Bratz dolls in her home. Her daughters, ages 6 and 8, rarely touch their Barbies. ``Barbie is pretty much a thing of the past," she says. ``They like Bratz better."

That's bad news for Barbie's maker, Mattel Inc. -- and for the three-year-old turnaround efforts of CEO Robert A. Eckert, the ex-president of Kraft Foods Inc. who replaced the embattled Jill E. Barad. The El Segundo (Calif.) toy giant counts on Barbie for about one-third of its revenues and more of its profits. But Mattel says U.S. Barbie sales declined 2% last year and 14% in this year's first quarter. The overall doll category, says market researcher NPD Group Inc., dropped only 3% in the quarter.

Give Eckert, 48, his due: He pulled Mattel out of its tailspin after its disastrous $3.8 billion acquisition of Learning Co. He got rid of the money-losing computer-game maker and slashed costs. His goal: to bring the stability of a consumer-products company to the hit-driven toymaker. And using such practices as computer-aided design to speed up product development and just-in-time inventory management, he succeeded.

But now it looks like Eckert is learning a valuable lesson: Mattel is selling toys, not soap or cornflakes. Good brand management goes only so far in a business that caters to children's whims. Like it or not, the key to success is launching innovative products and promoting the heck out of them. If you don't do it, your competitors will.

Eckert's strategy has been great for Mattel's bottom line. Profits last year, before special charges, were a

© 2005 Dow Jones Reuters Business Interactive LLC (trading as Factiva). All rights reserved.

EXHIBIT 8 PAGE 110

EXHIBIT 1 PAGE 5

healthy $455 million, and the stock has nearly doubled, to $20, since Eckert arrived in May, 2000. But top-line growth has sputtered. U.S. revenues, $3.4 billion in 2002, have declined marginally in the past few years. Total 2002 sales of $4.9 billion crept up from $4.6 billion in 2000 -- thanks to overseas expansion.

While Eckert continues to build on the massive Barbie franchise that Barad constructed, he now knows that he needs hot new toys. Recycling old characters like Sesame Street's Elmo just won't be enough. "We need to do a better job on the top line," he says. "The good news is, it's only spring training, and we have a long season ahead of us."

To that end, Eckert has begun an ambitious push. Between now and Christmas, he hopes to launch 250 new toys, including dozens of Hot Wheels models and Flavas, a Bratz-like hip-hop posse with baggy jeans and serious bling-bling. Originally, half of these toys weren't scheduled until 2004.

That should help boost sales. But it's even more important that Mattel prove it can respond to nimble upstarts as well as traditional big rivals like Hasbro Inc. After all, it took the company more than a year to launch a competitor to MGA Entertainment's Bratz. My Scene Barbie didn't hit stores until last October and has yet to make a dent in Bratz's success. At its Santa Monica (Calif.) store recently, Toy 'R' Us Inc. devoted just a sliver of the shelf space to My Scene that it did to Bratz. And My Scene dolls were being offered at 2 for 1. "It's not really catching ground," says Sean P. McGowan, toy industry analyst at Harris Nesbitt Gerard Inc. Mattel will start tossing in a cell phone with 300 free minutes if you buy four of the $13.99 dolls. It also plans to add accessories and boy versions -- Hudson, River, and Bryant.

Barbie isn't the only Mattel stalwart under attack. Its Fisher-Price unit, long the king of preschool, is losing sales to newcomer LeapFrog Enterprises Inc., whose electronic interactive books have captured 19% of the $2.9 billion preschool toy and electronic learning market. Eckert is counting on a successful launch in August for PowerTouch, Mattel's version of LeapFrog's popular interactive book. PowerTouch is operated by pointing a finger at an image or a word, instead of the stylus used in LeapFrog's original products. That's key for younger kids. "It's much easier for her to use," says Christopher Coye, a Los Angeles-area parent whose 4-year-old tested a PowerTouch. Still, LeapFrog releases a finger-operated system in August, too.

Over the long term, Eckert puts at risk one of the strongest toy companies around if he can't instill innovation and rapid reaction in his much-tightened organization. To his credit, he is making it crystal clear that he doesn't want ideas to linger in the pipeline. When Matchbox brand managers mentioned this year that they had designed a toy firehouse that could be shipped with no assembly required, Eckert told them to get it out by fall. "Why wait?" he says. "If you've got it, sell it." And not a moment too soon: Sales of Mattel's Hot Wheels and Matchbox cars fell 6% in the first quarter, thanks to competition for boys' attention from action figures like Hasbro's resurgent G.I. Joe and Transformers.

   © 2005 Dow Jones Reuters Business Interactive LLC (trading as Factiva). All rights reserved.   EXHIBIT 18   PAGE 111

EXHIBIT ___1___   PAGE ___6___

The question is how much Eckert needs to tweak his model. He probably cut back too much, for instance, on marketing. In 1998, Mattel's advertising and promotional spending totaled $631 million, or 13.8% of sales. By last year, it had fallen to $552 million, or 11.2% of sales. Aggressive television marketing boosted sales of Hot Wheels cars in Spain last year, and a strong new campaign could help Mattel toys here.

Mattel won't live or die on every new toy it develops. But it can't just rely on Barbies, either. "Like they say in business school -- no risk, no reward," says Isaac Larian, CEO of privately held MGA. He should know: He got the idea for Bratz after seeing his own kids run around in navel-baring tops and hip-huggers. As Eckert is finding out, sometimes the best ideas are right in front of you.

```
First Came Bratz...
MAKER      MGA Entertainment
DEBUT      2001
NAMES      Yasmin, Sasha, Cloe, Jade, and Meygan
MOTTO      The girls with a passion for fashion
HER RIDE   Late-night stretch limo
Data: MGA Entertainment, Mattel
...Then, My Scene Barbie
MAKER      Mattel
DEBUT      2002
NAMES      Barbie, Madison, Chelsea, and Nolee
MOTTO      My city. My style. My scene.
HER RIDE   Vespa motorscooter
Data: MGA Entertainment, Mattel
```

Palmeri covers toys from Los Angeles.

Document bw00000020030724dz7s0001w

 © 2005 Dow Jones Reuters Business Interactive LLC (trading as Factiva). All rights reserved.

EXHIBIT 18 PAGE 112

EXHIBIT 1 PAGE 7

**EXHIBIT 2**

AO88  (Rev. 12/06) Subpoena in a Civil Ca...

Issued by the

# UNITED STATES DISTRICT COURT

_____ Central _____ DISTRICT OF __California__

MATTEL, INC., a Delaware Corporation

V.

CARTER BRYANT, an Individual; and DOES
1 through 10, inclusive

## SUBPOENA IN A CIVIL CASE

Case Number: [1] CV 04-9059 NM  (RNBx)
Consolidated with cases
CV 04-9049 and CV 05-2727

TO:  Christopher Palmeri c/o Business Week
     3333 Wilshire Blvd., Suite 500
     Los Angeles, CA 90010

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | |
| | DATE AND TIME |
| | |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case. Testimony will be recorded stenographically and by videographer.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| Quinn Emanuel Urquhart Oliver & Hedges, LLP, 865 S. Figueroa St., 10th Floor, Los Angeles, CA 90017 | September 4. 2007 9:30 a.m. |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):
See Attachment A.

| PLACE | DATE AND TIME |
|---|---|
| Quinn Emanuel Urquhart Oliver & Hedges, LLP, 865 S. Figueroa St., 10th Floor, Los Angeles, CA 90017 | August 28, 2007 9:30 a.m. |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| Attorney for Plaintiff, Mattel, Inc. | July 25, 2007 |

ISSUING OFFICER'S NAME ADDRESS AND TELEPHONE NUMBER
Timothy L. Alger, QUINN EMANUEL URQUHART OLIVER & HEDGES LLP
865 S. Figueroa St., 10th Floor, Los Angeles, CA 90017     (213) 443-3000

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

AO-88

EXHIBIT _2_ PAGE _8_

AO88 (Rev. 12/06) Subpoena in a Civil Case

---

## PROOF OF SERVICE

| | DATE | | PLACE | |
|---|---|---|---|---|

**SERVED**

| SERVED ON (PRINT NAME) | | MANNER OF SERVICE |
|---|---|---|

| SERVED BY (PRINT NAME) | | TITLE |
|---|---|---|

---

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

---

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2006:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection, copying, testing, or sampling of designated electronically stored information, books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection, copying, testing, or sampling may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to producing any or all of the designated materials or inspection of the premises — or to producing electronically stored information in the form or forms requested. If objection is made, the party serving the subpoena shall not be entitled to inspect, copy, test, or sample the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production, inspection, copying, testing, or sampling. Such an order to compel shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection, copying, testing, or sampling commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held;

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) (A) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(B) If a subpoena does not specify the form or forms for producing electronically stored information, a person responding to a subpoena must produce the information in a form or forms in which the person ordinarily maintains it or in a form or forms that are reasonably usable.

(C) A person responding to a subpoena need not produce the same electronically stored information in more than one form.

(D) A person responding to a subpoena need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or to quash, the person from whom discovery is sought must show that the information sought is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) (A) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial-preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

(B) If information is produced in response to a subpoena that is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved. A receiving party may promptly present the information to the court under seal for a determination of the claim. If the receiving party disclosed the information before being notified, it must take reasonable steps to retrieve it. The person who produced the information must preserve the information until the claim is resolved.

e) CONTEMPT. Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued. An adequate cause for failure to obey exists when a subpoena purports to require a nonparty to attend or produce at a place not within the limits provided by clause (ii) of subparagraph (c)(3)(A).

EXHIBIT 2 PAGE 9

## ATTACHMENT A

### Documents To Be Produced

## I.   DEFINITIONS

1.   "YOU" or "YOUR" means Christopher Palmeri, and any other PERSON acting on YOUR behalf, pursuant to YOUR authority or subject to YOUR control.

2.   "LARIAN" means Isaac Larian and his representatives and agents.

3.   "ARTICLE" means the article bearing YOUR byline published in the Business Week edition dated July 28, 2003, bearing the headline, "To Really Be A Player, Mattel Needs Hotter Toys."

4.   "DOCUMENT" means any "writing" or "recording" as defined in Federal Rule of Civil Procedure 34 or Federal Rule of Evidence 1001 and includes any tangible thing upon which any expression, communication or representation has been recorded, including but not limited to correspondence, e-mails, preliminary, intermediate or final drafts, memoranda, notes, reports of telephone or other oral conversations, audio or videotape recordings, computer tape, computer disk or storage media, computer printout, optical storage disk, other electronic media, and all other writings and recordings of any kind.

5.   "REFERRING OR RELATING TO" means reflecting, identifying, describing, summarizing, evidencing, referencing, concerning, discussing, constituting, or indicating in any way.

6.   Wherever used herein, the singular shall include the plural and the plural shall include the singular.

## II.   INSTRUCTIONS

A.   YOU are to produce all DOCUMENTS requested hereby that are in YOUR possession, custody and control.

B.   If YOU contend that YOU are not required to produce certain DOCUMENTS called for by these requests on the grounds of a privilege or protection that YOU are not prepared to waive, in lieu of producing such

07975/2176044.1                                        - 1 -

DOCUMENTS identify each DOCUMENT and provide the following information:

      1.    The privilege or protection that you claim precludes disclosure;

      2.    The subject matter of the DOCUMENT;

      3.    The date, author(s), addressee(s); and

      4.    Any additional facts on which YOU would base YOUR claim of privilege or protection.

      C.    YOU are required to identify any and all DOCUMENTS sought by this document request that have been destroyed.

      D.    YOU are required to identify the source of all DOCUMENTS produced, and the person for whom, or department, division or office for which, such DOCUMENTS are maintained.

      E.    Each DOCUMENT shall be produced in its original file folder, or in lieu thereof, any writing on the file folder from which each such DOCUMENT is taken shall be copied and appended to such DOCUMENT.

III.    <u>DOCUMENTS TO BE PRODUCED.</u>

      All DOCUMENTS REFERRING OR RELATING TO statements made to YOU by LARIAN during YOUR research for the ARTICLE.

ATTACHMENT A

EXHIBIT _2_ PAGE _11_

AO88 (Rev. 12/06) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | 7/25/2007 | 3333 Wilshire Boulevard, #500 Los Angeles, CA 90010 |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| CHRISTOPHER PALMERI (Witness Fee Paid $49.02) | Personal (Served 7-25-07, 3:57 p.m.) |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| Rayn Jerez | Process Server |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on        7/26/2007
                   DATE

SIGNATURE OF SERVER

Now Legal Service, 1301 W. 2nd St., #206, Los
ADDRESS OF SERVER

Angeles, CA 90026, (213) 482-1567, L.A. Cty. #5426

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2006:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection, copying, testing, or sampling of designated electronically stored information, books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection, copying, testing, or sampling may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to producing any or all of the designated materials or inspection of the premises — or to producing electronically stored information in the form or forms requested. If objection is made, the party serving the subpoena shall not be entitled to inspect, copy, test, or sample the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production, inspection, copying, testing, or sampling. Such an order to compel shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection, copying, testing, or sampling commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held;

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject

to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) (A) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(B) If a subpoena does not specify the form or forms for producing electronically stored information, a person responding to a subpoena must produce the information in a form or forms in which the person ordinarily maintains it or in a form or forms that are reasonably usable.

(C) A person responding to a subpoena need not produce the same electronically stored information in more than one form.

(D) A person responding to a subpoena need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or to quash, the person from whom discovery is sought must show that the information sought is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) (A) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial-preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

(B) If information is produced in response to a subpoena that is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved. A receiving party may promptly present the information to the court under seal for a determination of the claim. If the receiving party disclosed the information before being notified, it must take reasonable steps to retrieve it. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT. Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued. An adequate cause for failure to obey exists when a subpoena purports to require a nonparty to attend or produce at a place not within the limits provided by clause (ii) of subparagraph (c)(3)(A).

EXHIBIT  2  PAGE  12

**EXHIBIT 3**

**Timothy Alger**

From:         Farley, William [william_farley@mcgraw-hill.com]
Sent:         Wednesday, June 27, 2007 6:02 AM
To:           Timothy Alger
Subject:      RE: Deposition subpoena


Tim:
I am in an all day meeting out of the office. I'll contact you tomorrow.
Bill

Sent from my GoodLink synchronized handheld (www.good.com)


  -----Original Message-----
From:        Timothy Alger [mailto:timalger@quinnemanuel.com]
Sent: Tuesday, June 26, 2007 06:49 PM Eastern Standard Time
To:   Farley, William
Subject:     RE: Deposition subpoena

Bill,
I just left you a voicemail.  Please call when you can.
Tim



From: Farley, William [mailto:william_farley@mcgraw-hill.com]
Sent: Tuesday, June 26, 2007 3:09 PM
To: Timothy Alger
Cc: Palmeri, Chris (MHM - chris_palmeri)
Subject: RE: Deposition subpoena


Tim:

        The article quotes Larian as saying: "Like they say in
business school - no risk, no reward."  There are no quotations or other
statements attributed to Larian ("Larian said...").  Consequently, I do
not see how you could argue that he would just be verifying a quotation
when the only quotation is the one I've reproduced above.

        As far as other sources are concerned, I am correct in
assuming then that you have already deposed Larian and anyone else he
identified as being at any interview with a BusinessWeek reporter?

        Like you, I have no interest in burdening a court or anyone
else (including ourselves) with this but this is a very serious issue
for us that we have litigated many times.  As a result, I cannot proceed
on the basis of simple assurances that everything will be OK and, so
far, I am not convinced that a deposition here would be appropriate.


Bill


William P. Farley

Associate General Counsel

The McGraw-Hill Companies, Inc.

1221 Avenue of the Americas

1

EXHIBIT __3__ PAGE __13__

New York, New York 10020

Tel: 212-512-3625

Fax: 212-512-6531

From: Timothy Alger [mailto:timalger@quinnemanuel.com]
Sent: Tuesday, June 26, 2007 5:52 PM
To: Farley, William
Cc: Palmeri, Chris (MHM - chris_palmeri)
Subject: RE: Deposition subpoena


Bill,


Put simply, we need deposition testimony verifying Isaac Larian's statements to Chris about the origins of Bratz that were published in the article. This should not be something we need to fight about or discuss at great length. Certainly you can have counsel at the deposition who will object and instruct at appropriate times. There are no alternative sources for the information we seek, unless you are aware of someone who participated in the interview of Larian other than Chris and Larian and, perhaps, Larian's employees. The area of questioning goes to the heart of our case. Also, waiver does not occur under California law if the reporter verifies published statements, and I'm not aware of any federal decision to the contrary. As I've mentioned, I represent the media, and I know the law very well. Mattel takes this very seriously and is fully aware of the sensitive issues raised by depositions of reporters. It does no one any good to burden a court with this, given the very limited scope of my questions.


If we can agree on a date in July, and if you accept service of the subpoena, I would be glad to discuss in detail the line of questioning with you and/or local counsel. Indeed, if it is more convenient for you and Chris, I will be glad to take the deposition in NY. But we need to tie this down this week; absent agreement now about service of the subpoena and a date of deposition, I will proceed to have Chris served.


Tim


From: Farley, William [mailto:william_farley@mcgraw-hill.com]
Sent: Tuesday, June 26, 2007 1:05 PM
To: Timothy Alger
Cc: Palmeri, Chris (MHM - chris_palmeri)
Subject: RE: Deposition subpoena

Tim:

      I did not realize that you were in federal court. I agree

2

EXHIBIT  3   PAGE  14

that the application of the California privilege is unclear, there is, of course, the privilege recognized in federal court under the First Amendment.

In any event, it is not accurate to claim that deposing a journalist about an article he authored does not involve unpublished information. If it were published, you would not need him to explain it for you. Further, such testimony would open up the journalist to claims of waiver and subject him to even broader questioning.

Also, I've taken a look at the article you mention, the 7/28/2003 piece about Mattel. There appear to be only a couple of statements that could be ascribed to someone at Mattel and there should be alternative sources for the information in those statements.

At this point, I am not convinced that a deposition of our reporter is necessary or permissible. You might be able to change my mind if you explained what information from the article you believe to be critical to your case, how that information fit into the claims in the law suit, and what efforts have been taken to obtain the information from an alternative source.

Bill


William P. Farley

Associate General Counsel

The McGraw-Hill Companies, Inc.

1221 Avenue of the Americas

New York, New York 10020

Tel: 212-512-3625

Fax: 212-512-6531

---

From: Timothy Alger [mailto:timalger@quinnemanuel.com]
Sent: Thursday, June 21, 2007 3:31 PM
To: Farley, William
Cc: Palmeri, Chris (MHM - chris_palmeri)
Subject: RE: Deposition subpoena


Bill,


I am very familiar with the law; I wrote my law review note on it and I have been representing media organizations and reporters for 15 years. As an initial matter, it is unclear whether the California shield law would apply here, where we are in federal court on a federal question. Further, even if it did, the shield law does not permit Chris to avoid appearance at a deposition where we will not be inquiring about unpublished information. The published statements in the article are critical to Mattel's claims and they cannot be verified through an alternative source. What I would like to do at this point is reach agreement regarding a convenient date and service of the subpoena.

3

EXHIBIT __3__ PAGE __15__

Tim

---

From: Farley, William [mailto:william_farley@mcgraw-hill.com]
Sent: Thursday, June 21, 2007 12:01 PM
To: Timothy Alger
Cc: Palmeri, Chris (MHM - chris_palmeri)
Subject: RE: Deposition subpoena

Tim:

It is our corporate policy to assert the journalist privilege in all appropriate cases. As I am sure you are aware, journalists cannot be compelled to reveal sources or to provided unpublished information pursuant to the privilege set out in the California Constitution, Article 1, Section 2(b) and Cal. Evid. Code Section 1107. As a result, we would resist any effort to compel Chris or another BusinessWeek reporter to testify.

Bill

William Farley

Associate General Counsel

The McGraw-Hill Companies, Inc.

1221 Avenue of the Americas

New York, New York 10020

Tel.: 212-512-3625

Fax: 212-512-6531

-----Original Message-----
From: Timothy Alger [mailto:timalger@quinnemanuel.com]
Sent: Wednesday, June 20, 2007 9:47 PM
To: Palmeri, Chris (MHM - chris_palmeri); Farley, William
Subject: Deposition subpoena

Chris, I understand that you spoke with Jules Andres of Mattel and she informed you that I was trying to reach you about a deposition in the Mattel-MGA litigation. She tells me that you gave her Mr. Farley's email address, so I am directing this email to you both. If Mr. Farley is representing you in this matter, please let me know and I will direct all future communications to him.

We would like to depose Chris about published statements in his July 28, 2003 article, "To Really Be A Player, Mattel Needs Hotter Toys." We will not be seeking documents. I am a former newspaper reporter and editor, and represent a number of media organizations, so I am fully aware of the sensitivity here. Be assured that Chris' testimony is critical to our case and, again, our interest only is in those statements that were published in Business Week.

4

EXHIBIT  3  PAGE 16

Please let me know what dates Chris is available in July (other than the first week, when I will be out of town), and how you would like to handle service of a subpoena.


Thanks in advance,

Tim


Timothy L. Alger, Esq.
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Direct: (213) 443-3223
Main Phone: (213) 443-3000
Main Fax:  (213) 443-3100
E-mail:  timalger@quinnemanuel.com
<mailto:timalger@quinnemanuel.com>
Web:  www.quinnemanuel.com <http://www.quinnemanuel.com/>

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above.  This message may be an attorney-client communication and/or work product and as such is privileged and confidential.  If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited.  If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

---

The information contained in this message is intended only for the recipient, and may be a confidential attorney-client communication or may otherwise be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, please be aware that any dissemination or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by replying to the message and deleting it from your computer.

Thank you,

The McGraw-Hill Companies

---

EXHIBIT 3 PAGE 17

**EXHIBIT 4**

Received:   8/ 8/07   4:18F

Aug-08-07   03:53pm   From-DAVIS WRIGHT TREMAINE LLP    +2136336899 -> QUINN   ANUEL;   Page 1

+2136336899    T-468   P.001/007   F-396

LAWYERS

# Davis Wright Tremaine LLP

ANCHORAGE  BELLEVUE  HONOLULU  LOS ANGELES  NEW YORK  PORTLAND  SAN FRANCISCO  SEATTLE  SHANGHAI  WASHINGTON, D.C.

SUITE 2400                          TEL (213) 633-6800
865 SOUTH FIGUEROA STREET           FAX (213) 633-6899
LOS ANGELES, CA  90017-2566         www.dwt.com

## FACSIMILE TRANSMITTAL

### Date:  August 8, 2007

### SEND TO:

| | | | |
|---|---|---|---|
| <u>Name:</u> | John B. Quinn | <u>Name:</u> | M. Randall Oppenheimer |
| <u>Fax Number:</u> | (213) 443-3100 | <u>Fax Number:</u> | (213) 430-6407 |
| <u>Name:</u> | Douglas A. Wickman | | |
| <u>Fax Number:</u> | (310) 553-5583 | | |

### Client and Matter Number:      50022-348

**FROM:**

| | |
|---|---|
| <u>Name:</u> | Robyn Aronson, Esq. |
| <u>Fax Number:</u> | (213) 633-6899 |
| <u>Telephone Number:</u> | (213) 633-6816 |

### NUMBER OF PAGES (INCLUDING COVER PAGE):   7

Time Sent: _____

**COMMENTS:**

THE WRITTEN MESSAGE TRANSMITTED HEREBY IS FOR THE EXCLUSIVE USE OF THE ADDRESSEE AND CONTAINS CONFIDENTIAL, PRIVILEGED AND NONDISCLOSABLE INFORMATION. IF THE RECIPIENT OF THIS MESSAGE IS NOT THE ADDRESSEE, OR A PERSON RESPONSIBLE FOR DELIVERING THE MESSAGE TO THE ADDRESSEE, SUCH RECIPIENT IS PROHIBITED FROM READING OR USING THIS MESSAGE IN ANY WAY. IF YOU HAVE RECEIVED THIS MESSAGE BY MISTAKE, PLEASE NOTIFY THE SENDER IMMEDIATELY AND DESTROY THE FACSIMILE MESSAGE.

**IF YOU DO NOT RECEIVE ALL PAGES OF THIS TRANSMISSION,
PLEASE CALL (213) 633-6800 AS SOON AS POSSIBLE**

EXHIBIT  4  PAGE  18

Received:   8/ 8/07  4:18P                  +2136936899 -> QUINN   ANUEL;  Page 2
Aug-08-07   03:54pm   From-DAVIS WRIGHT TREMAINE LLP        +2136936899        T-468   P.002/007   F-386

1  **DAVIS WRIGHT TREMAINE LLP**
   865 S. FIGUEROA ST.
2      SUITE 2400
  LOS ANGELES, CALIFORNIA 90017-2566
3     TELEPHONE (213) 633-6800
    FAX (213) 633-6899
4

5  ALONZO WICKERS IV (State Bar No. 169454)
   alonzowickers@dwt.com
6  ROBYN ARONSON (State Bar No. 228613)
   robynaronson@dwt.com
7

8  Attorneys for Non-Party Reporter
   CHRISTOPHER PALMERI

9

10            UNITED STATES DISTRICT COURT

11            CENTRAL DISTRICT OF CALIFORNIA

12

13  MATTEL, INC., a Delaware                Case No. **CV 04-9059 SGL (RNBx)**
   corporation,
14                                          **NON-PARTY REPORTER**
             Plaintiff,   **CHRISTOPHER PALMERI'S**
15                                          **OBJECTIONS TO PLAINTIFF'S**
     vs.                    **SUBPOENA**
16
   CARTER BRYANT, an Individual;
17  and DOES 1 through 10, inclusive,

18              Defendants.

19

20

21

22      Pursuant to Federal Rule of Civil Procedure 45(c), non-party reporter

23  Christopher Palmeri hereby objects to the July 25, 2007, subpoena that plaintiff

24  Mattel, Inc. purported to serve on Mr. Palmeri, seeking the production of documents

25  on August 28, 2007, and the deposition of Mr. Palmeri on September 4, 2007.

26

27

28

OBJECTIONS TO SUBPOENA
LAX 465466v1 0050022-000348

EXHIBIT 4  PAGE 19

Received:   8/ 8/07  4:18l

Aug-08-07   03:54pm   From-DAVIS WRIGHT TREMAINE LLP        +2136336899 -> QUINN    ANUEL;   Page 3
                                                           +2136336899

                                                                          T-468   P.003/007   F-386

# GENERAL OBJECTIONS AND QUALIFICATIONS

1.      Mr. Palmeri objects to the subpoena on the basis that it was improperly served. The subpoena was sent by fax on July 25, 2007. Such service is ineffective; a civil litigant must personally serve a third-party witness with a subpoena. *See, e.g., Firefighter's Institute for Racial Equality ex rel. Anderson v. City of St. Louis*, 220 F. 3d 898, 903 (8th Cir. 2000); *Barnhill v. U.S.*, 11 F.3d 1360, 1369 (7th Cir. 1993); *FTC v. Compagnie de Saint-Gobain-Pont-a-Mousson*, 636 F.2d 1300, 1312-1313 (D.C. Cir. 1980); *In re Smith*, 126 F.R.D. 461, 462 (E.D.N.Y. 1989). Absent proper service, Mr. Palmeri has no obligation to respond or to object to the subpoena or to produce responsive documents, if any exist. By serving these objections, Mr. Palmeri does not waive his right to object to the improper method by which plaintiff attempted to serve the subpoena.

2.      Mr. Palmeri objects to the subpoena on the basis that it was not accompanied by witness fees. Federal Rule of Civil Procedure 45(b)(1) requires that all subpoenas requesting in-person testimony be accompanied by a payment of witness fees and reasonable mileage as allowed by law. Service of a subpoena is invalidated if witness fees are not tendered simultaneously. *See CF&I Steel Corp. v. Mitsui & Co.*, 713 F.2d 494, 496 (9th Cir. 1983). By serving these objections, Mr. Palmeri does not waive his right to object to the improper method by which plaintiff attempted to serve the subpoena.

3.      Mr. Palmeri objects to the subpoena being addressed to him in his personal capacity, on the grounds that the documents requested, if they exist, would be possessed by Mr. Palmeri only by virtue of his employment by Business Week, and any such documents would belong to Business Week.

4.      Mr. Palmeri objects to the subpoena as unduly burdensome and oppressive to the extent it purports to impose any requirement or discovery obligation other than or beyond that set forth in the Federal Rules of Civil Procedure,

---

OBJECTIONS TO SUBPOENA                              1

LAX 465466v1 0050022-000348

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

EXHIBIT  4  PAGE  20

Received:   8/ 8/07  4:19P                          +2136336899 -> QUINN   ANUEL;   Page 4

Aug-08-07   03:54pm   From-DAVIS WRIGHT TREMAINE LLP          +2136336899          T-468  P.004/007  F-396

1  the Local Rules of the Central District of California, or other applicable rules of
2  court.

3      5.   Mr. Palmeri objects to the subpoena to the extent it seeks disclosure of
4  information, communications, and/or documents protected by the attorney-client
5  privilege, the attorney work-product doctrine, or any other applicable privilege,
6  doctrine, or immunity.  To the extent that it may be construed as seeking such
7  privileged or protected information, Mr. Palmeri hereby claims such privilege and
8  invokes such protection.  The fact that Mr. Palmeri does not specifically object to an
9  individual request on the ground that it seeks such privileged or protected
10 information or documents shall not be deemed a waiver of the protection afforded by
11 the attorney-client privilege, the attorney work-product doctrine, or other applicable
12 privilege or protection.

13     6.   Mr. Palmeri objects to this subpoena to the extent that it calls for the
14 production of information protected from compelled disclosure by the First
15 Amendment to the United States Constitution, Article I, Section 2(b) of the
16 California Constitution, California Evidence Code § 1070, and the common law.

17     7.   Mr. Palmeri objects to the subpoena to the extent that it seeks
18 documents not in his possession, custody, or control.  Mr. Palmeri further objects to
19 the subpoena to the extent that it purports to require Mr. Palmeri to produce
20 documents exclusively within the possession, custody, or control of other parties.

21     8.   Mr. Palmeri objects to the subpoena to the extent it purports to require
22 him to produce information available from other sources.  Such requests are
23 overbroad and unduly burdensome.

24     9.   Mr. Palmeri objects to the subpoena to the extent that it seeks discovery
25 regarding matters that are not relevant to the subject matter of this litigation or that
26 are not reasonably calculated to lead to the discovery of admissible evidence.

27

28

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax (213) 633-6899

EXHIBIT  4  PAGE  21

Received:   8/ 8/07   4:20'                    +2136336899 -> QUINN   ANUEL;  Page 5

Aug-08-07   03:55pm   From-DAVIS WRIGHT TREMAINE LLP          +2136336899              T-468   P.005/007   F-396

10.    Insofar as any requests in the subpoena are vague, ambiguous, and/or overbroad, Mr. Palmeri objects because such requests are unduly burdensome. Reasonable assumptions will be made, where possible, as to the intended meanings.

11.    By objecting to this subpoena, Mr. Palmeri is not acknowledging the existence of any responsive documents.

12.    The foregoing objections and qualifications apply to each and every request made in the subpoena, and are incorporated by reference to the extent applicable in each of the specific responses set forth below as though fully set forth there. The failure to mention one of the foregoing objections in any of the specific responses set forth below shall not be deemed a waiver of such objection or qualification.

## SPECIFIC OBJECTIONS

### REQUEST FOR PRODUCTION NO. 1

All DOCUMENTS REFERRING OR RELATING TO statements made to YOU by LARIAN during YOUR research for the ARTICLE.

### RESPONSE TO REQUEST FOR PRODUCTION NO. 1

Mr. Palmeri objects that this request calls for the production of information protected from compelled disclosure by the First Amendment of the United States Constitution, Article I, Section 2(b) of the California Constitution, California Evidence Code § 1070, and the common law. Mr. Palmeri further objects to the subpoena being addressed to him in his personal capacity, on the grounds that the documents requested, if they exist, would be possessed by Mr. Palmeri only by virtue of his employment by Business Week, and any such documents would belong to Business Week. Mr. Palmeri further objects to this request to the extent that it seeks information that is not relevant to the subject matter of this litigation or that is not reasonably calculated to lead to the discovery of admissible evidence. Mr. Palmeri

OBJECTIONS TO SUBPOENA
LAX 465466v1 0050022-000348

3

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

EXHIBIT 4   PAGE 22

Received:   8/ 8/07  4:20f
Aug-08-07   03:55pm   From-DAVIS WRIGHT TREMAINE LLP   +2136336899 -> QUINN - MANUEL;   Page 6
+2136336899                          T-468  P.006/007  F-396

further objects that this request is oppressive and designed to harass rather than to obtain information legitimately available under the applicable discovery rules.

DATED: August 8, 2007

DAVIS WRIGHT TREMAINE LLP
ALONZO WICKERS IV
ROBYN ARONSON

By: _____
        Robyn Aronson

Attorneys for Non-Party Reporter
CHRISTOPHER PALMERI

OBJECTIONS TO SUBPOENA
LAX 465466v1 0050022-000348

4

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

EXHIBIT __4__ PAGE __23__

## PROOF OF SERVICE BY FACSIMILE AND U.S. MAIL

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is Davis Wright Tremaine LLP, Suite 2400, 865 South Figueroa Street, Los Angeles, California 90017-2566.

On August 8, 2007, I served the foregoing document(s) described as: **NON-PARTY REPORTER CHRISTOPHER PALMERI'S OBJECTIONS TO PLAINTIFF'S SUBPOENA** on the interested parties to this action, by Facsimile and by U.S. Mail by placing a **true copy** of said document(s) enclosed in a sealed envelope(s) for each addressee named below, with the name and address of the person served shown on the envelope as follows:

John B. Quinn                                         **Plaintiff Mattel, Inc.**
Michael T. Zeller
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543
(213) 443-3100 (FAX)

Douglas A. Wickman                                    **Defendant Carter Bryant**
Keith Jacoby
Littler Mendelson
A Professional Corporation
2049 Century Park East, 5th Floor
Los Angeles, CA 90067-3107
(310) 553-5583 (FAX)

M. Randall Oppenheimer                                **Attorneys for Applicant-Intervenor MGA**
Diana M. Torres                                       **Entertainment, Inc.**
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA 90071-2899
(213) 430-6407 (FAX)

**(FROM FACSIMILE TELEPHONE NO. (213) 633-6899)** at Suite 2400, 865 South Figueroa Street, Los Angeles, California. Upon completion of the said facsimile machine transmission, the transmitting machine will issue a transmission report showing that the transmission was complete and without error.

**(U.S. MAIL)** - I placed such envelope(s) with postage thereon fully prepaid for deposit in the United States Mail in accordance with the office practice of Davis Wright Tremaine LLP for collecting and processing correspondence for mailing with the United States Postal Service. I am familiar with the office practice of Davis Wright Tremaine LLP, for collecting and processing correspondence for mailing with the United States Postal Service, which practice is that when correspondence is deposited with the Davis Wright Tremaine LLP, personnel responsible for delivering correspondence to the United States Postal Service, such correspondence is delivered to the United States Postal Service that same day in the ordinary course of business.

Executed on August 8, 2007, at Los Angeles, California.

☑   Federal      I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Frank M. Romero
_____                                    _____
Print Name                                                      Signature

LAX 466736v1 0050022-000348

EXHIBIT   4   PAGE   24

**EXHIBIT 5**

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-443-3000 FAX 213-443-3100

WRITER'S DIRECT DIAL NO.
(213) 443-3223

WRITER'S INTERNET ADDRESS
timalger@quinnemanuel.com

August 17, 2007

<u>VIA E-MAIL AND U.S. MAIL</u>

Alonzo Wickers IV, Esq.
Davis Wright Tremaine LLP
865 S. Figueroa Street
Suite 2400
Los Angeles, CA  90017

Re:    <u>Bryant v. Mattel, Inc.</u>

Dear Al:

We have spoken several times regarding the *subpoena duces tecum* served by my client, Mattel, Inc. ("Mattel") on Christopher Palmeri, and I received an email from you on August 16, 2007, stating (1) there are no documents responsive to the subpoena's request for documents, and (2) Mr. Palmeri intends to move to quash the subpoena.  It is Mattel's view that Mr. Palmeri must appear and testify pursuant to the subpoena, and the journalists' privilege does not even apply here, where Mattel seeks testimony confirming published statements by a non-confidential source.  Further, even if the privilege applies, it must yield here.  *See Shoen v. Shoen,* 48 F.3d 412 (9th Cir. 1995); *McKevitt v. Pallasch,* 339 F.3d 531 (7th Cir.); *Dillon v. City of San Francisco,* 748 F. Supp. 722 (N.D. Cal. 1990).

As we have discussed, Hon. Edward A. Infante (Ret.) has been appointed discovery master in this litigation, and I previously forwarded to you the Stipulation for Appointment of a Discovery Master ("Stipulation").  I attach another copy of the Stipulation, for your convenience.  By this letter, Mattel requests an in-person conference to resolve the dispute, pursuant to Paragraph 5 of the Stipulation.  I am available to confer with you on Wednesday, August 22, or Friday, August 24, 2007.  Please provide me with a convenient time on either of those days.

**quinn emanuel urquhart oliver & hedges, llp**

NEW YORK | 535 Madison Avenue, 17th Floor, New York, New York 10017 | TEL 212-702-8100 FAX 212-702-8200
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94111 | TEL 415-875-6600 FAX 415-875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL 650-801-5000 FAX 650-801-5100
PALM SPRINGS | 45-025 Manitou Drive, Suite 10, Indian Wells, California 92210 | TEL 760-345-4757 FAX 760-345-2414
SAN DIEGO | 4445 Eastgate Mall, Suite 200, San Diego, California 92121 | TEL 858-812-3107 FAX 858-812-3336

EXHIBIT  5  PAGE 25

Alonzo Wickers IV, Esq.
August 17, 2007
Page 2

I look forward to speaking with you next week.

Very truly yours,

Timothy L. Alger

07209/2196964.1

**EXHIBIT 6**

## Timothy Alger

**From:**   Wickers, Alonzo [alonzowickers@dwt.com]
**Sent:**   Wednesday, August 08, 2007 10:41 PM
**To:**     Timothy Alger
**Subject:** RE: Chris Palmeri

Tim:

I will reconfirm the information provided to us about service.  Obviously, if you are correct about service, then we'll have two less things to worry about...

Thanks!

Al

---

**From:** Timothy Alger [mailto:timalger@quinnemanuel.com]
**Sent:** Wednesday, August 08, 2007 5:02 PM
**To:** Wickers, Alonzo
**Subject:** Chris Palmeri

Al,

I just received your objections, which assert that Chris was purportedly served by fax and not paid his witness fees.  I have a proof of service showing that he was personally served on July 25, 2007, at 3:57 p.m., at 3333 Wilshire Blvd., Suite 500, and paid $49.02.  Is there some miscommunication here?  Let me know because I would certainly want to sort it out.

With warmest regards,

Tim

Timothy L. Alger, Esq.
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Direct: (213) 443-3223
Main Phone: (213) 443-3000
Main Fax:  (213) 443-3100
E-mail:  timalger@quinnemanuel.com
Web:  www.quinnemanuel.com

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above.  This message may be an attorney-client communication and/or work product and as such is privileged and confidential.  If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited.  If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

EXHIBIT _6_ PAGE 27

**Timothy Alger**

| | |
|---|---|
| **From:** | Wickers, Alonzo [alonzowickers@dwt.com] |
| **Sent:** | Friday, August 10, 2007 10:53 AM |
| **To:** | Timothy Alger |
| **Subject:** | RE: Stip & Order re Appointment of a Discovery Master.PDF |

Tim:

At this point, I don't know definitively.  But I should know by early next week and will call you then.  If there are not any such documents -- which I suspect is the case -- it should narrow the issues in the dispute.

Thanks.

Al

**From:** Timothy Alger [mailto:timalger@quinnemanuel.com]
**Sent:** Friday, August 10, 2007 9:37 AM
**To:** Wickers, Alonzo
**Subject:** RE: Stip & Order re Appointment of a Discovery Master.PDF

Al,

In the hope of narrowing the issues:  Do any documents exist that are called for in the subpoena?

Thanks,
Tim

**From:** Wickers, Alonzo [mailto:alonzowickers@dwt.com]
**Sent:** Thursday, August 09, 2007 4:58 PM
**To:** Timothy Alger
**Subject:** RE: Stip & Order re Appointment of a Discovery Master.PDF

Tim:

Thanks for forwarding this.  We'll take a look.

Al

**From:** Timothy Alger [mailto:timalger@quinnemanuel.com]
**Sent:** Thursday, August 09, 2007 4:31 PM
**To:** Wickers, Alonzo
**Subject:** FW: Stip & Order re Appointment of a Discovery Master.PDF

Al,
It looks like any motion will need to be presented to Judge Infante.
Tim

**From:** Albert Villamil

EXHIBIT 6 PAGE 28

1/20/2008

**Timothy Alger**

| | |
|---|---|
| **From:** | Wickers, Alonzo [alonzowickers@dwt.com] |
| **Sent:** | Thursday, August 16, 2007 5:22 PM |
| **To:** | Timothy Alger |
| **Subject:** | Business Week: Mattel Subpoena to Chris Palmeri |

Tim:

Just wanted to let you know that there are no documents responsive to your document request to Chris Palmeri. We will proceed with our motion to quash, and are preparing our pre-filing meet-and-confer letter, which we hope to send you next week.

Thanks.

Al

**Alonzo Wickers IV** | Davis Wright Tremaine LLP
865 S Figueroa Street, Suite 2400 | Los Angeles, CA 90017
Tel: (213) 633-6865 | Fax: (213) 633-6899
Email: alonzowickers@dwt.com | Website: www.dwt.com
Bio: www.dwt.com/lawdir/attorneys/WickersIVAlonzo.cfm

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Shanghai | Washington, D.C.

Disclaimer: This message may contain confidential communications protected by the attorney client privilege. If you received this message in error, please delete it and notify the sender.

EXHIBIT 6 PAGE 29

**Timothy Alger**

| | |
|---|---|
| **From:** | Wickers, Alonzo [alonzowickers@dwt.com] |
| **Sent:** | Friday, August 31, 2007 11:09 AM |
| **To:** | Timothy Alger |
| **Subject:** | RE: Palmeri |

Tim:

I'm happy to continue the matter while we meet and confer.  If we cannot resolve our disagreement, we still intend to file a motion to quash the subpoena.

Thanks and enjoy the long weekend.

Al

---

**From:** Timothy Alger [mailto:timalger@quinnemanuel.com]
**Sent:** Friday, August 31, 2007 10:02 AM
**To:** Wickers, Alonzo
**Subject:** Palmeri

Al,
I would like your agreement to continue the Palmeri deposition to a mutually convenient date in September, without the need for new service, while we continue to meet and confer.  New counsel will be taking over the matter.  Let me know.
Tim

EXHIBIT __6__ PAGE 30

**EXHIBIT 7**

# STROOCK

Via Fax & E-Mail

September 5, 2007

Michael J. Niborski
Direct Dial 310-556-5873
Direct Fax 310-556-5959
MNiborski@stroock.com

Alonzo Wickers IV, Esq.
Davis Wright Tremaine LLP
865 S. Figueroa Street, Suite 2400
Los Angeles, California 90017

Re:   *Carter Bryant v. Mattel, Inc. and Consolidated Cases*, United States District Court,
      Central District of California, Case No. CV 04-9049 (SGL) (RNBx),
      Consolidated with Case Nos. CV 04-9059 and CV 05-2727

Dear Mr. Wickers:

I am writing to introduce myself and our firm who will be representing Mattel, Inc. in
the above-referenced matters in connection with the deposition subpoena of
Christopher Palmeri. It is our understanding from Quinn Emanuel, primary counsel for
Mattel in this litigation, that you were investigating whether September 26, 2007 would
be a convenient date for the deposition of Mr. Palmeri. For scheduling purposes, I am
also available on Thursday, September 27 and Friday, September 28.

I also understand that you and Tim Alger of Quinn Emanuel were meeting and
conferring regarding whether the deposition should be held at all or, if it goes forward,
whether there would be some limitations on the questioning. I look forward to
continuing this discussion. Please let me know what time and date works for you this
week. I look forward to speaking with you soon.

Very truly yours,

Michael J. Niborski

cc:   Timothy L. Alger, Esq. (By Email)

EXHIBIT __7__ PAGE _31_

50369786

**EXHIBIT 8**

A10825B
MAUREEN TKACIK  SEPTEMBER 28, 2007

```
 1

 2    UNITED STATES DISTRICT COURT
      CENTRAL DISTRICT OF CALIFORNIA
 3    EASTERN DIVISION
      -------------------------------------------X
 4    CARTER BRYANT, an individual,

 5                        Plaintiff,

 6                             Case No. CV 04-9049

 7            -against-

 8    MATTEL, INC., a Delaware corporation,

 9                        Defendant.
      -------------------------------------------
10    AND CONSOLIDATED CASES
      -------------------------------------------X
11                        180 Maiden Lane
                          New York, New York
12
                          DATE: September 28, 2007
13                        TIME: 10:32 a.m.

14

15            DEPOSITION of MAUREEN TKACIK, taken

16    pursuant to the Federal Rules of Civil Procedure,

17    and Subpoena, held at the above-mentioned time and

18    place before Karen D. Williams, a Notary Public of

19    the State of New York.

20

21

22

23    ATKINSON-BAKER, INC.
      COURT REPORTERS
24    (800) 288-3376
      www.depo.com
25    FILE NO.:  A10825B
```

Page 1

EXHIBIT 8 PAGE 32

A10825B

## MAUREEN TKACIK   SEPTEMBER 28, 2007

**Page 2**

```
 1
 2   A P P E A R A N C E S :
 3
 4        KEKER & VAN NEST, LLP
             Attorney for Plaintiff
 5           710 Sansome Street
             San Francisco, California 94111
 6        BY:   (Not present)
 7
         DOW JONES & COMPANY, INC.
 8           Attorney for Defendant
             The Wall Street Journal
 9           200 Liberty Street
             New York, New York 10281
10        BY:   STUART D. KARLE, ESQ.
11
         LAW OFFICES OF JAMES W. SPERTUS
12           Attorney for Defendant
             Carlos Gustavo Machado Gomez
13           12100 Wilshire Boulevard
             Suite 620
14           Los Angeles, California 90025
         BY:   (Not Present)
15
16       STROOCK & STROOCK & LAVAN, LLP
             Attorney for Defendant
17           Mattel, Inc.
             2029 Century Park East
18           Los Angeles, California 90067
         BY:   MICHAEL J. NIBORSKI
19
20
21
22
23
24
25
```

**Page 3**

```
 1
 2   A P P E A R A N C E S :
 3
 4        O'MELVENY & MYERS
             Attorney for Defendant
 5           MGA Entertainment, Inc.,
             MGA Entertainment, (HK), LTD.,
 6           Isaac Larian and
             MGAE de Mexico, S.R.I. de C.V.
 7           Times Square Tower
             7 Times Square
 8           New York, New York 10036
         BY:   DALE M. CENDALI, ESQ.
 9
10
         O'MELVENY & MYERS
11           Attorney for Defendant
             MGA Entertainment, Inc.,
12           MGA Entertainment, (HK), LTD.,
             Isaac Larian and
13           MGAE de Mexico, S.R.I. de C.V.
             Times Square Tower
14           7 Times Square
             New York, New York 10036
15       BY:   KENDALL J. BURR, ESQ.
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1
 2
 3
 4
 5           IT IS HEREBY STIPULATED AND AGREED, by
 6   and between the attorneys for the respective
 7   parties herein, that the sealing and filing of the
 8   within deposition be waived.
 9
10
11           IT IS FURTHER STIPULATED AND AGREED
12   that this deposition may be signed and sworn to
13   before any officer authorized to administer an oath
14   with the same force and effect as if signed and
15   sworn to before the officer before whom said
16   deposition is taken.
17
18
19           IT IS FURTHER STIPULATED AND AGREED
20   that all objections, except as to form, are
21   reserved to the time of trial.
22
23
24
25
```

**Page 5**

```
 1                    TKACIK
 2   M A U R E E N   T K A C I K, having first been
 3   duly sworn by a Notary Public of the State of New
 4   York, was examined and testified as follows:
 5   BY THE REPORTER:
 6       Q   Please state your name for the record.
 7       A   Maureen Tkacik.
 8       Q   What is your address?
 9       A   65-67 Rivington, Apartment 7, New York,
10   New York 10002.
11
12   EXAMINATION BY
13   MR. NIBORSKI:
14       Q   Good morning, Miss Tkacik.
15       A   Good morning.
16       Q   Could you tell us where you are
17   currently employed?
18       A   I am currently employed by Gawker
19   Media.
20       Q   And is that here in New York?
21       A   Yes.
22       Q   And were you previously employed by the
23   Wall Street Journal?
24       A   I was.
25       Q   And approximately what time period were
```

2 (Pages 2 to 5)

EXHIBIT __8__ PAGE __33__

A10825B
MAUREEN TKACIK   SEPTEMBER 28, 2007

```
 1              TKACIK
 2  you employed by the Journal?
 3      A    May 2001 through August or September of
 4  2003.
 5      Q    And following your time at the Journal,
 6  did you then go to Gawker Media?
 7      A    I worked at Philadelphia Magazine in
 8  between, and free-lanced for several publications.
 9      Q    And where did you work prior to the
10  Wall Street Journal as a reporter, if anything?
11      A    I worked for Time Magazine in Asia, in
12  Hong Kong. I worked at the Philadelphia Daily News
13  in Philadelphia and I worked at the Washington
14  Times in Washington, D.C. and I worked for a web
15  company called Asia Wise in Hong Kong.
16      Q    Can you just give us a brief background
17  about your education?
18      A    I went to University of Pennsylvania
19  for two years. I dropped out. I took some
20  graduate classes at George Mason's -- at George
21  Mason University School of Public Policy, and
22  that's the extent.
23      Q    And what was your job title while you
24  worked at the The Wall Street Journal?
25      A    My specific job title was reporting
                                            Page 6
```

```
 1              TKACIK
 2      A    I do.
 3      Q    And what is it?
 4      A    It is a story that I wrote, that I
 5  think is why I am here.
 6      Q    And just for the record, this is a Wall
 7  Street Journal article dated July 18, 2003
 8  entitled, "To Lure Older Girls, Mattel Brings in
 9  Hip-Hop Crowd."
10      A    Correct.
11      Q    And this is an article that you wrote?
12      A    Yes.
13      Q    And if I could have you turn to the
14  second page, you will see a highlighted paragraph.
15      Do you see that?
16      A    Yes.
17      Q    Could I have you read that out loud,
18  please?
19      A    "Isaac Larian, chief executive of MGA,
20  says he had never heard of a project similar to the
21  Bratz at Mattel. He says he chose Mr. Bryant's
22  idea for the Bratz over several others after
23  holding a sort of fashion-doll design contest in
24  late 1999."
25      Q    And did you interview Isaac Larian in
                                            Page 8
```

```
 1              TKACIK
 2  assistant or assistant reporter, something like
 3  that.
 4      Q    And could you describe your job duties
 5  while you were there?
 6      A    I had to cover, it was somewhat -- and
 7  I had a few companies that I had to cover. I had
 8  to cover, generally, youth oriented consumer
 9  products firms. So, that would be toy companies
10  like Mattel and footwear, the footwear companies,
11  some youth retailers. There was a crop of
12  companies that I had to keep track of.
13      Q    Thank you. I am going to show you what
14  we are going to mark as Exhibit 1. This is a July
15  18, 2003 article from The Wall Street Journal. I
16  have copies for the witness and counsel.
17      (Whereupon, the aforementioned
18      article was marked as Plaintiff's
19      Exhibit 1 for identification as of this
20      date by the Reporter.)
21  BY MR. NIBORSKI:
22      Q    Miss Tkacik, could I have you take a
23  look at what's been marked as Exhibit 1?
24      A    Yes.
25      Q    Do you recognize this?
                                            Page 7
```

```
 1              TKACIK
 2  preparation for writing this article?
 3      A    Yes.
 4      Q    And you would agree, wouldn't you, that
 5  the article attributes certain statements to
 6  Mr. Larian?
 7      MS. CENDALI:  Objection.
 8      A    I am not sure what -- that statement
 9  that is highlighted, I would say that that is
10  attributed to Isaac Larian.
11      Q    And again, turning to the highlighted
12  paragraph, the --
13      MR. KARLE:  And we are staying on
14      that paragraph?
15      MR. NIBORSKI: Yes.
16      Q    The second sentence reads, "He says he
17  chose Mr. Bryant's idea for the Bratz over several
18  others after holding a sort of fashion-doll contest
19  in late 1999." Did I read that correctly.
20      A    You missed the word design. It's
21  fashion-doll design contest.
22      Q    Fair enough. Let me repeat it. He
23  says he chose Mr. Bryant's idea for the Bratz over
24  several others after holding a sort of fashion-doll
25  design contest in late 1999; is that correct?
                                            Page 9
```

3 (Pages 6 to 9)

EXHIBIT  8   PAGE  34

A10825B
MAUREEN TKACIK   SEPTEMBER 28, 2007

TKACIK

1    TKACIK
2    A    Yes.
3    Q    And did Mr. Larian tell you that
4    statement during your interview?
5    A    Yes.
6    Q    Following the publication of your
7    article, did anybody from MGA ever contact you and
8    ask for a correction or retraction or anything from
9    the article?
10   A    No.
11   Q    Did Mr. Larian ever contact you and
12   asked for a correction or retraction or anything
13   from the article?
14   A    No.
15        MR. KARLE:   Just let him finish.
16   Q    Did you ever learn that anyone
17   contacted The Wall Street Journal and asked for a
18   correction or retraction or anything in the
19   article?
20   A    No.
21        MR. NIBORSKI:   I have only one
22   more exhibit and this is just for
23   housekeeping purposes.   This is just the
24   deposition notice which I would like to
25   make an exhibit to the deposition.
                                    Page 10

1    TKACIK
2        date by the Reporter.)
3        MR. NIBORSKI:   And I have no more
4    questions.
5    EXAMINATION BY
6    MS. CENDALI:
7    Q    Ms. Tkacik, the original Exhibit 3
8    subpoena in this case asks for you to appear at the
9    office of Quinn Emanuel, a law firm representing
10   Mattel.   Have you ever had any contacts with the
11   Quinn Emanuel law firm?
12   A    I don't think so.
13   Q    Do you have any idea why Quinn Emanuel,
14   I represent to you is Mattel's normal counsel in
15   this case, is not taking your deposition today?
16   A    No.
17   Q    You say that you left University of
18   Pennsylvania, when was that?
19   A    1998.
20   Q    And did you begin work in journalism
21   after you left Pennsylvania?
22   A    Directly following that.
23   Q    And the job that you mentioned that you
24   had prior to working for The Wall Street Journal,
25   were they full-time jobs or free-lance jobs?
                                    Page 12

1    TKACIK
2        MR. KARLE:   Did you ask her if
3    she has seen it?
4        MR. NIBORSKI:   That's all right.
5    This is just for the deposition.
6    A    Miss Tkacik, this is an amended
7    deposition notice which I am handing you.   This is
8    just for the record, just to include this as part
9    of the transcript.   This would be marked as Exhibit
10   2.
11        (Whereupon, the aforementioned
12   Notice of Deposition was marked as
13   Plaintiff's Exhibit 2 for identification
14   as of this date by the Reporter.)
15        MR. NIBORSKI:   And finally, I
16   would like to mark as Exhibit 3 the
17   subpoena for this deposition, which
18   again is just for the record.
19        MS. CENDALI:   The amended
20   subpoena?
21        MR. NIBORSKI:   This is the
22   original subpoena.
23        (Whereupon, the aforementioned
24   subpoena was marked as Plaintiff's
25   Exhibit 3 for identification as of this
                                    Page 11

1    TKACIK
2    A    Full time.   They were all full-time
3    jobs.
4    Q    When you were working for The Wall
5    Street Journal from May 2001 to August/September
6    2003, where were you living?
7    A    I was living in Los Angeles.
8    Q    Am I correct that prior to having
9    written the article reflected in Exhibit 1, you had
10   previously wrote several other articles about
11   Mattel for The Wall Street Journal?
12   A    True.   Yes, you are correct in saying
13   that.
14   Q    Let me show you some of these articles?
15        MS. CENDALI:   Let's mark as
16   Exhibit 4 an article dated February 1,
17   2001.
18        (Whereupon, the aforementioned
19   2/1/02 article was marked as Plaintiff's
20   Exhibit 4 for identification as of this
21   date by the Reporter.)
22   BY MS. CENDALI:
23   A    It's 2002.
24   Q    Right.   Do you recognize that?
25        MR. KARLE:   Take a look at it
                                    Page 13

4 (Pages 10 to 13)



EXHIBIT  8  PAGE 35

A10825B
MAUREEN TKACIK  SEPTEMBER 28, 2007

**Page 62**

TKACIK

2 that they instructed their subordinates at Mattel
3 to rush production of Flavas in three months?
4    A    It does. I am fairly certain now
5 reading this over again that I discussed the timing
6 with Mr. Bousquette.
7    Q    And you understood from your
8 discussions with him that he had instructed the
9 Mattel team to rush Flavas into production in
10 three months; isn't that true?
11    A    Yes.
12    Q    This next paragraph goes on to say,
13 "Flavas design team often slept in their cubicles
14 to get the dolls ready in time for summer
15 shipment."
16        You see that?
17    A    Yes.
18    Q    You remember discussing that with
19 Mr. Bousquette and Miss Ross?
20    A    No.
21    Q    I believe you testified that you left
22 the Wall Street Journal in August or September of
23 2003; is that right?
24    A    Yeah, end of August.
25    Q    Pardon?

**Page 63**

TKACIK

2    A    The end of August.
3    Q    So that was approximately a month after
4 that article came out, right?
5    A    Yes.
6    Q    Why did you leave the Journal?
7    A    I was really young and stressed out,
8 and I wanted to go into magazine journalism, and I
9 had a friend who had been named editor of
10 Philadelphia Magazine, and I wanted to leave L.A.
11    Q    So, you would have no way of knowing
12 one way or the other, what communications MGA may
13 have had with The Wall Street Journal about your
14 article after you left; is that true?
15    A    Yes. I kept in touch with them. I
16 never heard about anything. I kept in touch with
17 The Wall Street Journal.
18    Q    When was the last time you did any work
19 for The Wall Street Journal?
20    A    When I left.
21    Q    When was the first time you heard about
22 the lawsuit Mattel filed against Carter Bryant?
23    A    I don't remember.
24    Q    I'll represent to you that lawsuit was
25 filed in or about April of 2004. You recall

**Page 64**

TKACIK

2 hearing about it approximately at that time?
3    A    I don't recall.
4    Q    Were you aware of the lawsuit in 2005
5 when you were thinking of doing your article about
6 Lilly Martinez?
7    A    Yes.
8    Q    How had you become aware of the
9 lawsuit?
10    A    The Internet. I read the paper. I
11 don't know how I had become aware in that window of
12 time.
13    Q    Prior to your deposition today and your
14 meetings, if any, with counsel for the Wall Street
15 Journal who is representing you today, had you
16 discussed the lawsuit with anyone?
17    A    I don't know. No. I mean casually.
18    Q    Had you discussed the lawsuit with
19 anyone at Mattel?
20    A    I don't know.
21    Q    You might have?
22    A    It's a possibility.
23    Q    Do you know who?
24    A    It would have been Julia Jensen. That
25 would probably be the extent of it. I really don't

**Page 65**

TKACIK

2 remember.
3    Q    Do you recall discussing the lawsuit
4 with any ex-Mattel employees?
5    A    No. I may have, I don't know.
6        MS. CENDALI: I have no further
7 questions.
8        MR. NIBORSKI: Just a couple
9 quick closing remarks. I just wanted to
10 go over the custody of the transcript,
11 just to let you know there is going to
12 be a transcript prepared, I will receive
13 a copy and send it to your attorney. He
14 would give you a chance to review it and
15 make any changes or corrections and then
16 you can return it to him; and we will
17 maintain custody of the original.

21 (Continued on next page to include jurat.)

ATKINSON-BAKER, INC. COURT REPORTERS                1 (800) 288-3376

EXHIBIT  8  PAGE 36

A10825B
MAUREEN TKACIK   SEPTEMBER 28, 2007

---

```
 1              TKACIK
 2    I also want to confirm that there was no
 3    medical or other reason why you were
 4    unable to give your best testimony today?
 5         THE WITNESS:  No.
 6         MR. NIBORSKI:  And I appreciate
 7    your time.  Thank you.
 8         (Whereupon, at 12:15 p.m., the
 9    Examination of this Witness was
10    concluded.
11
12
13    _____
                MAUREEN TKACIK
14
15
      Subscribed and sworn to before me
16    this _____ day of _____, 2007.
17
18

19    _____
                NOTARY PUBLIC
20
21
22
23
24
25
                                    Page 66
```

```
 1
 2    QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER
 3        PAGE    LINE
 4        42      20
 5        43      25
 6        45      14
 7        45      22
 8        47      21
 9        50      23
10        52      23
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                    Page 68
```

---

```
 1
 2              E X H I B I T S
 3
      PLAINTIFF'S EXHIBITS:
 4    EXHIBIT    EXHIBIT              PAGE
      NUMBER     DESCRIPTION
 5
 6      1        7/18/03 Article        7
 7      2        Notice of Deposition  11
 8      3        Subpoena              11
 9      4        2/1/02 Article        13
10      5        2/7/02 Article        15
11      6        2/8/02 Article        16
12      7        4/3/03 Article        20
13      8        E-mail                36
14
15
16              I N D E X
17
18    EXAMINATION BY            PAGE
19    MR. NIBORSKI
20    MS. CENDALI
21
22
23
24
25
                                    Page 67
```

```
 1
 2              C E R T I F I C A T E
 3
 4    STATE OF NEW YORK     )
                            : SS.:
 5    COUNTY OF KINGS       )
 6
 7
 8         I, KAREN D. WILLIAMS, a Notary Public
 9    for and within the State of New York, do hereby
10    certify:
11         That the witness whose examination is
12    hereinbefore set forth was duly sworn and that such
13    examination is a true record of the testimony given
14    by that witness.
15         I further certify that I am not related
16    to any of the parties to this action by blood or by
17    marriage and that I am in no way interested in the
18    outcome of this matter.
19         IN WITNESS WHEREOF, I have hereunto set
20    my hand this 1st day of October, 2007.
21
22
23    _____
                KAREN D. WILLIAMS
24
25
                                    Page 69
```

18 (Pages 66 to 69)

EXHIBIT _8_ PAGE 37

**EXHIBIT 9**

**A107CD0**

**DENISE O'NEAL        OCTOBER 3, 2007**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION

CARTER BRYANT, an           )
individual,                 )
                            )
                            ) Case No.
                Plaintiff,  ) CV 04-9049
                            ) SGL (RNBx)
        vs.                 ) Consolidated with
                            ) No. CV 04-09059
MATTEL, INC., a             ) No. CV 05-02727
Delaware corporation,       )
                            )
                Defendant.  )
_____)

And Consolidated Cases


DISCOVERY DEPOSITION OF

DENISE O'NEAL

CHICAGO, ILLINOIS

OCTOBER 3, 2007


Atkinson-Baker, Inc.
Court Reporters
(800) 288-3376
www.depo.com


Reported by: Janice Smith, RPR
             No. 084-001346



FILE NO: A107CD0

Page 1

EXHIBIT _9_ PAGE _38_

A107CD0

DENISE O'NEAL          OCTOBER 3, 2007

Page 2

1      UNITED STATES DISTRICT COURT
2        CENTRAL DISTRICT OF CALIFORNIA
           EASTERN DIVISION
3    CARTER BRYANT, an        )
     individual,              )
4                             )
                              )
5                             ) Case No.
              Plaintiff,  ) CV 04-9049
6                             ) SGL (RNBx)
       vs.                    ) Consolidated with
7                             ) No. CV 04-09059
     MATTEL, INC., a          ) No. CV 05-02727
     Delaware corporation,    )
8                             )
              Defendant.  )
9    _____)
     And Consolidated Cases
10
11        The deposition of DENISE O'NEAL,
12   called by Plaintiff for examination, taken
13   pursuant to the Federal Rules of Civil
14   Procedure of the United States District Courts
15   pertaining to the taking of depositions for
16   discovery, taken before Janice Smith, a Notary
17   Public within and for the County of Cook, State
18   of Illinois, and a Registered Professional
19   Reporter of said state, taken at Suite 2300,
20   55 W. Monroe St., Chicago, Illinois 60603, on
21   the 3rd day of October, A. D. 2007, at 2:07
22   p.m.
23
24
25

Page 3

1    APPEARANCES:
2
3    FUNKHOUSER VEGOSEN LIEBMAN & DUNN, LTD.,
     BY: DAMON E. DUNN, ESQ.,
       55 West Monroe St.,
4      Suite 2300,
       Chicago, Illinois 60603,
5
       Appeared on behalf of the Deponent;
6
7
     STROOCK & STROOCK & LAVAN, LLP,
8    BY: MICHAEL J. NIBORSKI, ESQ.,
       2029 Century Park East, Suite 1600
9      Los Angeles, Ca.  90067-3086,
10     Appeared on behalf of Mattel, Inc.;
11
     QUINN, EMANUEL, URQUHART OLIVER &
12   HEDGES, LLP,
     BY: MICHAEL T. ZELLER, ESQ.,
13     865 S. Figueroa St.,
       10th Floor,
14     Los Angeles, Ca.  90017,
15     Appeared on behalf of Mattel, Inc.;
16
     SIDLEY AUSTIN, LLP,
17   BY: RICHARD J. O'BRIEN, ESQ.,
       One South Dearborn St.,
18     Chicago, Il. 60603,
19     Appeared on behalf of MGA.
20
     REPORTED BY: MS. JANICE SMITH, RPR
21         License No. 084-1346
22
23
24
25

Page 4

1           INDEX
     EXAMINATION
2
     Witness Name                    Page
3    DENISE O'NEAL
       By Mr. Niborski .............................. 5
4      By Mr. O'Brien ............................... 18
       By Mr. Niborski (CONTINUED) .................. 19
5
6
7
          EXHIBITS
8
                                    Page
9    Deposition Exhibit No. 927 Marked for
       Identification                    7
10
     Deposition Exhibit No. 928 Marked for     15
11     Identification
12   Deposition Exhibit No. 929 Marked for     15
       Identification
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1           THE VIDEOGRAPHER:  We are on the
2    record at 2:07 p.m. on October 3, 2007. Here
3    begins the videotaped deposition of Denise
4    O'Neal, taking place in Chicago, Illinois.
5    This deposition is being taken in the matter of
6    Carter Bryant versus Mattel, Incorporated.
7           Will counsel please state the
8    names for the record?
9           MR. NIBORSKI:  Michael Niborski, of
10   Stroock & Stroock & Lavan, on behalf of Mattel.
11          MR. ZELLER:  Michael Zeller, Quinn
12   Emanuel, for Mattel.
13          MR. DUNN:  Damon Dunn, for the
14   witness.
15          MR. O'BRIEN:  Dick O'Brien, on behalf
16   of MGA.
17          THE VIDEOGRAPHER:  Thank you,
18   counsel. The witness will now be sworn in.
19            (Witness sworn.)
20          DENISE O'NEAL,
21   called as a witness herein, having been first
22   duly sworn, was examined and testified, as
23   follows:
24          EXAMINATION
25   BY MR. NIBORSKI:

2 (Pages 2 to 5)



EXHIBIT 9 PAGE 39

A107CD0

DENISE O'NEAL        OCTOBER 3, 2007

1   Q.   Good afternoon, Ms. O'Neal.        02:06
2   A.   Hi.
3   Q.   Could you spell your full name for   02:06
4   the record, please?
5   A.   My first name is Denise,
6   D-e-n-i-s-e. My last name is O'Neal,
7   O'-N-e-a-l.
8   Q.   And could you also state for the     02:07
9   record your current address?
10  A.   14732 South Princeton Avenue,
11  Dolton, D-o-l-t-o-n, Illinois 60419.
12  Q.   And where are you currently          02:07
13  employed?
14  A.   Chicago Sun-Times.
15  Q.   And when did you start working for   02:07
16  the Sun-Times?
17  A.   December. Yeah, December of 1990.
18  Q.   And have you worked for the          02:07
19  Sun-Times from December 1990 until now?
20  A.   Yes.
21  Q.   And did you have any -- what was     02:07
22  your employment history prior to the Sun-Times?
23  A.   Prior to the Sun-Times I worked for
24  Advertising Age Magazine.
25  Q.   Could you just give us a brief       02:07

Page 6

1   description of your educational background?
2   A.   I have a bachelor's from Roosevelt
3   University in Chicago, Illinois, in mass
4   communication, which covered broadcast and
5   print media.
6   Q.   Could you give us a brief summary of   02:08
7   your job titles while you have been at the
8   Sun-Times?
9   A.   I have been -- my current title is
10  editorial assistant, food staff writer. I have
11  worked for a food section, our weekend section,
12  and have been assistant and still assistant to
13  our features editor.
14  Q.   And do you recall what your official   02:08
15  position was in March of 2004?
16  A.   Editorial assistant and staff
17  writer.
18  Q.   Thank you. I would like to show you   02:08
19  an article and we will mark it as an exhibit
20  for the deposition, and I believe we are going
21  in order so that that will be marked as Exhibit 927.
22          (Whereupon, Deposition Exhibit
23          No. 927 was marked for I.D.
24          as of 10-3-07.)
25  BY MR. NIBORSKI:

Page 7

1   Q.   I would ask you to take a quick       02:09
2   look at that and tell me if you recognize it,
3   this document?
4   A.   It appears to be a story that I
5   wrote for the paper. It has my byline, so I am
6   assuming it is the story I wrote.
7   Q.   Do you recall this particular         02:09
8   article?
9   A.   I know that I wrote an article on
10  the Bratz, one lengthy article, and that is the
11  only I do believe. It is the one that appeared
12  in 2004, yes.
13  Q.   Okay. And would you like to take a     02:09
14  minute and review it, or are you quite
15  confident you wrote this article?
16  A.   If it has my byline, I am sure I
17  wrote it.
18  Q.   If you could turn to page 2, please?  02:09
19  You will see some highlighted portions. And if
20  I could have you focus on the first sentence. And
21  it says, "When Larian's daughter was 7, he
22  noticed she had become bored with Barbie
23  dolls."
24          Do you see that?
25  A.   Yes.

Page 8

1   Q.   Do you recall interviewing for this   02:10
2   article an individual named Isaac Larian?
3   A.   Yes.
4   Q.   You do. Do you remember               02:10
5   approximately when that interview occurred
6   compared to the publication of this article?
7   A.   It would more likely be one to two
8   weeks prior to --
9   Q.   To the publication date?              02:10
10  A.   -- to the publication date. Right.
11  Q.   So approximately between mid
12  February?
13  A.   Somewhere in February, yeah.
14  Q.   2004?                                  02:10
15  A.   Yeah. Right.
16  Q.   Thank you. Now turning back to that   02:10
17  first sentence, do you recall Mr. Larian
18  telling you that information during your
19  interview with him?
20  A.   I do.
21  Q.   And if I could have you focus on the  02:10
22  next sentence, it says, "He decided to again
23  change the focus of his company, wanting to
24  create a doll product for girls ages 7 to 13.
25  The dolls would have to be urban dolls

Page 9

3 (Pages 6 to 9)


EXHIBIT __9__ PAGE __40__

A107CD0

**DENISE O'NEAL**          **OCTOBER 3, 2007**

1  representing America's multi-ethnicity.  They
2  also had to reflect the trends and attitudes of
3  the tween generation."
4          Do you recall Mr. Larian
5  telling you that information?
6      A.  To the best of my knowledge, yes.
7      Q.  Turning to the next paragraph, you    02:11
8  will see a quote.  It says, "We were looking
9  for a new toy to challenge Barbie.  Something
10  that would span girls' interest in dolls for a
11  few more years," says Larian.
12          And you attribute that quote to
13  Mr. Isaac Larian, correct?
14      A.  Yes.
15      Q.  And to the best of your knowledge,    02:11
16  that was an exact quote from him to you,
17  correct?
18      A.  Most quotes are pretty much
19  verbatim, yes.
20      Q.  And to the best of your memory, that  02:11
21  quote was words specifically spoken by Mr.
22  Larian?
23      A.  To the best of my knowledge, yes, it
24  was.
25      Q.  Thank you.  Turning to the next       02:11

Page 10

1  paragraph it says, "Larian began shopping
2  around for interested vendors.  Getting
3  negative response because of the company name,
4  Larian once again changed the company's name,
5  shortening it to MGA Entertainment.  That done,
6  Larry needed a name for his dolls."
7          Do you recall Mr. Larian telling
8  you that information?
9      A.  To the best of my knowledge, yes, I
10  do.
11      Q.  And the next paragraph reads, "His    02:12
12  creative team decided the name should be catchy
13  and not have more than six letters."
14          Do you recall him telling you
15  that?
16      A.  To the best of my knowledge, yes.
17      Q.  It goes on to say, "When looking at   02:12
18  sketches and pitching ideas, someone said the
19  dolls looked like little brats.  Keeping with
20  today's trend of making names more cool by
21  changing the spelling, MGA executives decided
22  to replace the S with a Z."
23          And you recall Mr. Larian
24  telling you that information?
25      A.  Yes.

Page 11

1      Q.  If you could turn a few paragraphs    02:12
2  down below, you will see a highlighted quote
3  that reads, "We don't have plans laid out for
4  the Bratz.  We come up with new ideas as we go
5  along and we are having fun doing it."
6          Do you see that?
7      A.  Yes.
8      Q.  And is it your recollection that      02:13
9  that is a quote from Mr. Isaac Larian?
10     A.  It is in quotation marks.  Yes, it
11  would have been a quote from Mr. Larian.
12     Q.  Thank you.  If I could have you turn   02:13
13  back to page one of the exhibit, you will see
14  another series of paragraphs that are
15  highlighted.
16     A.  Um-hmm.
17     Q.  The first one is also a quote which    02:13
18  reads, "We wanted a respectable product that
19  reflected the lifestyle of school girls and
20  fashionable trends, but also one that
21  represented clean fun with learning values," he
22  says.
23          And is it your recollection
24  that that quote came from Mr. Larian as well?
25     A.  Yes, it did.

Page 12

1      Q.  Turning to the next paragraph, it     02:13
2  reads, "The Bratz are moving into another
3  medium this year, starring in their first
4  direct-to-DVD movie titled, "The Bratz Go
5  Hollywood."  The movie is set for a late summer
6  release.  The dolls also will star in an
7  animated feature film, which is expected to be
8  released in late 2005."
9          Do you recall Mr. Larian
10  telling you that information?
11     A.  To the best of my knowledge, yes.
12     Q.  Thank you.  And continuing with the    02:14
13  next paragraph, it reads, "Doll products new
14  for 2004 include Bratz Petz; cats Brigitte,
15  Kendall, Jolie and Daphne; Bratz Wild Life, an
16  exclusive set featuring Nevra, Meyghan and
17  Fianna; Bratz Girls Nite Out, with Cloe, Sasha,
18  Yasmin, Jade and Dana preparing for Saturday
19  night fun; Sun-kissed Summer, with Cloe,
20  Yasmin, Sasha, Jade and Dana dressed in beach
21  attire; Best Friends Beach Party, with friends
22  Calista and Noelle spending a day at the beach;
23  Best Friends Pajama Party, with Brianne and
24  Zana in a themed slumber party setting, and
25  Flower Fairies, featuring Rose, Daisy and

Page 13

4 (Pages 10 to 13)



EXHIBIT  9  PAGE  41

A107CD0

**DENISE O'NEAL          OCTOBER 3, 2007**

1  Sunflower, a trio of scented dolls."
2        Do you recall Mr. Larian
3  giving you all of that information?
4    **A.   The best of my knowledge, yes, I do.**
5    Q.   A few more quick housekeeping things   02:15
6  just for the record. Also did you -- do you
7  recall interviewing anybody else from MGA in
8  preparation for this article?
9    **A.   No, I did not.**
10   Q.   Just Mr. Larian?   02:15
11   **A.   Isaac Larian, yes.**
12   Q.   When we discuss the timing of the   02:15
13 interview, do you recall was it in person or
14 was it on the telephone?
15   **A.   It was a telephone interview.**
16   Q.   Do you recall approximately how long   02:15
17 it lasted?
18   **A.   No, I don't.**
19   Q.   Would you say more than a few   02:15
20 minutes, less than an hour?
21   **A.   I would be speculating in saying**
22 **probably 15 to 20 minutes.**
23   Q.   And was that your only conversation   02:15
24 with Mr. Larian in preparation for this
25 article?

Page 14

1    A.   No.
2    Q.   And are you aware of anybody ever   02:17
3  contacting the Chicago Sun-Times asking for a
4  correction or retraction of this article in any
5  way?
6    **A.   No.**
7    Q.   Okay. We need to take a 5 minutes   02:17
8  break. I think we can wrap up.
9        THE VIDEOGRAPHER:  Going off the
10 record. The time now is 2:18 p.m.
11       (Recess was taken.)
12       THE VIDEOGRAPHER:  We are back on the
13 record. Time now is 2:20 p.m.
14 BY MR. NIBORSKI:
15   Q.   Ms. O'Neal, just a few more   02:20
16 questions.
17       We talked briefly about the
18 timing of your interview with Mr. Larian. The
19 article again was published March 5, 2004, and
20 it is your recollection, correct, that you
21 interviewed Mr. Larian sometime in February of
22 2004, correct?
23   **A.   Correct.**
24   Q.   And to the best of your recollection   02:20
25 it would have been within one to two weeks

Page 16

1    **A.   Yes, it was. Yes.**
2    Q.   I would like to just put for the   02:15
3  record exhibits -- I guess it would be 928 and
4  929. These are just for housekeeping. These
5  are the copies of the deposition notice and the
6  subpoena. No need to ask any questions. Just
7  would like to make them part of the record. We
8  will make the notice 928 and the subpoena 929.
9        (Whereupon, Deposition
10         Exhibit Nos. 928 and 929
11         were marked for I.D. as of
12         10-3-07.)
13 BY MR. NIBORSKI:
14   Q.   Were you ever contacted by Mr.   02:16
15 Larian at any point after this article was
16 published and asked for a correction or a
17 retraction of anything in this article?
18   **A.   No.**
19   Q.   Were you ever contacted by a person   02:16
20 named Carter Bryant asking for a retraction or
21 correction?
22   **A.   No.**
23   Q.   Do you recall ever being contacted   02:16
24 by anybody from MGA asking for a correction or
25 retraction of anything in this article?

Page 15

1  before publication of the article?
2    **A.   Normally that is the time span**
3  **between interviews because we have to have**
4  **stories filed a week prior to publication.**
5    Q.   And you have a specific recollection   02:20
6  following that policy in this particular case
7  in interviewing Mr. Larian in February of '04?
8    **A.   As I said, it was sometime within**
9  **two weeks prior to the publication. I can't**
10 **give you an exact date.**
11   Q.   Sometime within two weeks before   02:20
12 publication?
13   **A.   To my best recollection.**
14   Q.   Okay. Thank you.   02:20
15       Just a couple of quick
16 admonitions in closing.
17       We will get -- I will get a copy
18 of the transcript of the deposition. I will
19 give it to your attorney. He will give you an
20 opportunity to review it and make any
21 corrections and we will retain custody of the
22 original. Just want to confirm that there is
23 no medical or other reason why you were unable
24 to give your best testimony today.
25   **A.   No.**

Page 17

5 (Pages 14 to 17)



EXHIBIT _9_ PAGE _42_

A107CD0

**DENISE O'NEAL          OCTOBER 3, 2007**

| | |
|---|---|
| 1    Q.   Okay.  And I have nothing further.     02:21 | 1   BY MR. NIBORSKI: |
| 2   I really appreciate your time.  Thank you. | 2      Q.   Let me rephrase.                         02:23 |
| 3      A.   Thank you. | 3         MR. DUNN:  Okay. |
| 4         MR. O'BRIEN:  I just have a few | 4   BY MR. NIBORSKI: |
| 5   follow-ups. | 5      Q.   Is this any reason to believe that      02:23 |
| 6         **EXAMINATION** | 6   the information that you actually published in |
| 7   BY MR. O'BRIEN: | 7   the article does not accurately reflect what |
| 8      Q.   With respect to the stuff in the      02:21 | 8   Mr. Larian told you during your interview? |
| 9   article that you just attributed to Mr. Larian | 9         MR. DUNN:  You can answer that one. |
| 10  which was not in quotes, were you | 10        THE WITNESS:  No. |
| 11  characterizing what Mr. Larian said to you? | 11        MR. NIBORSKI:  Nothing further. |
| 12        MR. DUNN:  Yes or no. | 12  Thank you so much for your time. |
| 13        THE WITNESS:  Yes. | 13        THE WITNESS:  Thank you. |
| 14  BY MR. O'BRIEN: | 14        THE VIDEOGRAPHER:  Going off the |
| 15     Q.   Are there things that Mr. Larian      02:21 | 15  record.  The time now is 2:24 p.m.  This is the |
| 16  said to you during the interview that did not | 16  end of videotape number one, |
| 17  find themselves in the article? | 17       * * FURTHER DEPONENT SAYETH NOT * * |
| 18        MR. DUNN:  You can give a yes or no | 18 |
| 19  to that one. | 19 |
| 20        THE WITNESS:  Yes, most likely. | 20 |
| 21  BY MR. O'BRIEN: | 21 |
| 22     Q.   And how did you, when you            02:22 | 22 |
| 23  interviewed him, record those things that you | 23 |
| 24  put into quotes? | 24 |
| 25        MR. DUNN:  I am going to object to | 25 |
| Page 18 | Page 20 |

| | |
|---|---|
| 1   that.  That goes into the substance of the | 1   STATE OF ILLINOIS ) |
| 2   interview and Mr. Bryant and I basically, in | 2   COUNTY OF C O O K ) ss. |
| 3   setting the ground rules for allowing this | 3        UNITED STATES DISTRICT COURT |
| 4   deposition without filing a motion to quash, | 3        CENTRAL DISTRICT OF CALIFORNIA |
| 5   limited it to the authentication of the story | 4        EASTERN DIVISION |
| 6   itself, and for that reason the witness isn't | 5   CARTER BRYANT, an         ) |
| 7   going to answer anything with respect to what | Individual,               ) |
| 8   took place at the interview other than just to | 6                          ) |
| 9   set the general foundation of the situation, | 7   Plaintiff, ) CV 04-9049 |
| 10  though she will -- I will allow her to | 7              ) SGL (RNBx) |
| 11  voluntarily testify as to what was actually in | 8   vs.        ) Consolidated with |
| 12  the story. | 8              ) No. CV 04-09059 |
| 13        MR. DUNN:  I have nothing further. | 9   MATTEL, INC., a  ) No. CV 05-02727 |
| 14        EXAMINATION (continued) | Delaware corporation,    ) |
| 15  BY MR. NIBORSKI: | 10                 ) |
| 16     Q.   Just one quick follow-up,            02:22 | Defendant. ) |
| 17  Ms. O'Neal.  Is there any reason to believe | 11        I hereby certify that I have read |
| 18  that the information Mr. Larian provided you | 12  the foregoing transcript of my deposition, pages |
| 19  was not accurately conveyed in your article? | 13  1 through 23 inclusive, given at the time and |
| 20        MR. DUNN:  I am going to object to | 14  place aforesaid, and I do again subscribe and |
| 21  that just because I think the question is too | 15  make oath that the same is a true, correct, and |
| 22  broad.  If you are asking whether or not she | 16  complete transcript of my deposition given as |
| 23  believes that she printed something in the | 17  aforesaid, with corrections, if any, appearing |
| 24  article that didn't come from that source, I | 18  on the attached correction sheet (s). |
| 25  will let her answer that question yes or no. | 19 |
| | 20        DENISE O'NEAL |
| | 21  No corrections (please initial)_____ |
| | 22  Number of errata sheets submitted_____(pgs.) |
| | 23 |
| | SUBSCRIBED AND SWORN TO |
| | 24  before me this_____ day of |
| | _____, A.D. 2007. |
| | 25  _____ |
| | Notary Public |
| Page 19 | Page 21 |

EXHIBIT _9_ PAGE _43_

A107CD0
## DENISE O'NEAL          OCTOBER 3, 2007

```
 1  STATE OF ILLINOIS )
                      ) ss.
 2  COUNTY OF C O O K )
 3
 4          I, JANICE SMITH, RPR, a
 5  Notary Public within and for the County of Cook,
 6  State of Illinois, and a Registered Professional
 7  Reporter of said state, do hereby certify:
 8          That, previous to the commencement of
 9  the examination of the witness, DENISE O'NEAL,
10  she was first duly sworn to testify the whole
11  truth concerning the matters herein;
12          That, the foregoing deposition
13  transcript was reported stenographically by me,
14  was thereafter reduced to typewriting, via
15  computer-aided transcription, under my personal
16  direction, and constitutes a true record of the
17  testimony given and the proceedings had;
18          That, the said deposition was taken
19  before me at 55 West Monroe Street, Suite 2300,
20  Chicago, Illinois 60603, on the 3rd day of
21  October, A.D. 2007;
22          That, the reading and signing by the
23  witness of the deposition transcript was not
24  waived;
25          That, I am not a relative or employee
                                            Page 22
```

```
 1  or
 2  attorney or counsel, nor a relative or employee
 3  of such attorney or counsel for any of the
 4  parties hereto; nor interested directly or
 5  indirectly in the outcome of this action.
 6          IN WITNESS WHEREOF, I do hereunto set
 7  my hand and affix my seal of office at Chicago,
 8  Illinois, this 3rd day of October, A. D. 2007.
 9
10  _____
            Janice Smith, RPR
            Cook County, Illinois
11          License No. 84-1346
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                            Page 23
```

7 (Pages 22 to 23)



EXHIBIT 9  PAGE 44

**EXHIBIT 10**

**CONFORMED**

1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
   John B. Quinn (Bar No. 090378)
2  johnquinn@quinnemanuel.com
   Michael T. Zeller (Bar No. 196417)
3  (michaelzeller@quinnemanuel.com)
   Jon D. Corey (Bar No. 185066)
4  (joncorey@quinnemanuel.com)
   Timothy L. Alger (Bar No. 160303)
5  (timalger@quinnemanuel.com)
   865 South Figueroa Street, 10th Floor
6  Los Angeles, California 90017-2543
   Telephone: (213) 443-3000
7  Facsimile: (213) 443-3100

8  Attorneys for Mattel, Inc.

9           UNITED STATES DISTRICT COURT

10         CENTRAL DISTRICT OF CALIFORNIA

11              EASTERN DIVISION

12 | CARTER BRYANT, an individual, | CASE NO. CV 04-9049 SGL (RNBx)
13 | Plaintiff, | Consolidated with
14 | vs. | Case No. CV 04-09059
   |  | Case No. CV 05-02727
15 | MATTEL, INC., a Delaware | Hon. Stephen G. Larson
   | corporation, |
16 |  | NOTICE OF MOTION AND MOTION
17 | Defendant. | OF MATTEL, INC. FOR LEAVE TO
   |  | TAKE ADDITIONAL DISCOVERY
   |  | AND OBJECTIONS TO DISCOVERY
18 | AND CONSOLIDATED ACTIONS | MASTER ORDER OF SEPTEMBER
   |  | 28, 2007; AND
19 |  | MEMORANDUM OF POINTS AND
20 |  | AUTHORITIES
21 |  | [Declaration of B. Dylan Proctor filed
   |  | concurrently]
22 |  | Hearing Date: January 7, 2008
23 |  | Time:        10:00 a.m.
   |  | Courtroom:   1
24 |  | **Phase 1:**
25 |  | Discovery Cut-off:    January 28, 2008
   |  | Pre-trial Conference: May 5, 2008
26 |  | Trial Date:          May 27, 2008
27
28

EXHIBIT 10 PAGE 45

1  TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2      PLEASE TAKE NOTICE that on January 7, 2008, at 10:00 a.m., or as soon

3  thereafter as the matter may be heard, in the courtroom of Honorable Stephen G.

4  Larson, located at 3470 Twelfth Street, Riverside, California, 92501, Mattel, Inc. will,

5  and hereby does, move the Court, pursuant to Federal Rule of Civil Procedure 26(b)

6  and the Court's February 12, 2007 Scheduling Order, for an order granting Mattel leave

7  to take additional depositions, including Rule 30(b)(6) depositions of defendants MGA

8  Entertainment, Inc., and MGAE de Mexico S.R.L. de C.V., beyond the current limit set

9  by the Court and to serve additional interrogatories on defendants.  Pursuant to 28

10  U.S.C. § 636(b)(1), Mattel also seeks an additional 12 hours to depose Carter Bryant, in

11  addition to the seven hours already permitted by Discovery Master Infante.

12      Mattel makes this Motion on the grounds that the breadth and complexity of this

13  case warrant more than the 24 depositions and 50 interrogatories permitted by the

14  Court's Scheduling Order.  Mattel further makes this Motion on the grounds that, given

15  Bryant's central role in the hundreds of products that MGA has sued upon in this case,

16  and because both the parties and third-parties have produced many millions of pages of

17  documents since Mr. Bryant's deposition in 2005, seven hours is not enough time to

18  fully depose Mr. Bryant.

19      This Motion is based on this Notice of Motion and Motion, the accompanying

20  Memorandum of Points and Authorities, the Declaration of B. Dylan Proctor filed

21  concurrently herewith, the records and files of this Court, and all other matters of which

22  the Court may take judicial notice.

23

24

25

26

27

28

07209/2299353.1

-ii-
MATTEL'S MOTION FOR ADDITIONAL INTERROGATORIES AND DEPOSITIONS

EXHIBIT 10 PAGE 44

1

**Statement of Local Rule 7-3 Compliance**

2     The parties met and conferred pursuant to Local Rule 7-3 on October 3, 2007,

3 and times thereafter, but were not able to resolve this motion.

4

5 DATED: November 19, 2007          QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

6

7                          By_____

8                            Jon Corey
                           Attorneys for Mattel, Inc.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

07209/2299353.1

-iii-

EXHIBIT 10 PAGE 47

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ..................................................................................... 3

ARGUMENT ...................................................................................................... 6

I.   THE RULES CONTEMPLATE ADDITIONAL DISCOVERY ..................... 6

    A.   Each Category of Claims Warrants More Depositions ......................... 8

        1.   The Bratz Claims Require Additional Depositions ..................... 8

        2.   Mattel's Trade Secret and RICO Claims and MGA's Unfair Competition Claims Require Additional Depositions ............... 12

    B.   Mattel Needs Additional Depositions Because the Integrity of MGA's and Bryant's Preservation of Documents Is At Issue .............. 14

    C.   Mattel Seeks Leave to Take 30(b)(6) Depositions On Non-Duplicative Topics ................................................................. 15

    D.   Mattel Meets The Requirements for Additional Discovery ................ 15

II.  THE COURT SHOULD GRANT LEAVE WITH RESPECT TO MATTEL'S INTERROGATORIES ...................................................... 16

III. THE COURT SHOULD ALLOW ADDITIONAL TIME FOR THE BRYANT DEPOSITION .......................................................................... 20

CONCLUSION ................................................................................................. 25

07209/2299353.1

1

## **TABLE OF AUTHORITIES**

2
**Page**
3

### **Cases**

4
Andamiro v. Konami Amusement of Am.,
5   2001 WL 535667 (C.D. Cal. April 26, 2001)..................................................8

6
Bahn v. NME Hosps., Inc.,
7   929 F.2d 1404 (9th Cir. 1991) ...............................................................22

8
Bromgard v. Montana,
   2007 WL 1101179 (D. Mont. April 11, 2007) ...............................11, 18

9
Collaboration Prop. v. Polycom, Inc.,
10   224 F.R.D. 473 (N.D. Cal. 2004).............................................................8

11
Fresenius Med. Care Hldgs, Inc. v. Roxane Labs., Inc.,
   2007 WL 764302  Proctor Dec., Ex. 43 ..................................................23

12
Rx USA Wholesale, Inc. v. McKesson Corp.,
13   2007 WL 1827335 (E.D.N.Y. June 25, 2007) ............................7, 11, 19

14
Whittingham  v. Amherst Coll.,
   163 F.R.D. 170 (D. Mass. 1995).............................................................7

15

### **Statutes**

16
Cal. Civ. Code § 3426.1...........................................................................20

17
Fed. R. Civ. P. 26(b)..........................................................................8, 20

18
Fed. R. Civ. P. 30(a)(2)(A) .................................................................7, 20

19
Fed. R. Civ. P. 33 ...........................................................................7, 8, 20

20
Local Rule 7-3 ........................................................................................3

21
Fed. R. Civ. P. 30(b)(6) .........................................................9, 14, 16, 17

22
Fed. R. Civ. P. 53(e) ..............................................................................21

23

24

25

26

27

28

-ii-

EXHIBIT 1 PAGE 49

## MEMORANDUM OF POINTS AND AUTHORITIES

### Preliminary Statement

In its Scheduling Order, the Court limited each side to 50 interrogatories and 24 fact depositions. The Court recognized, however, that the case's complexity could require additional depositions or interrogatories and invited motions for additional discovery, if necessary: "I don't want to say they are soft limits [on the number of depositions], but they are limits which the Court would certainly understand or would invite counsel to submit a motion to expand if there's reason to. But I just want to have some parameters placed on this at the outset." Likewise, with respect to the interrogatory limit, the Court stated: "[L]et's try and work within the confines of the 50 interrogatories, and if you need more, again, the Court is going to be forthcoming, if there's a need for it."[1] Mattel respectfully submits that time has come.

Under the Federal Rules, leave to take additional discovery "shall be granted" to the extent consistent with the principles set forth in Rule 26(b)(2). Fed. R. Civ. P. 30(a)(2)(A) & 33(a). The additional discovery Mattel seeks is appropriate under that framework. It is not duplicative of prior discovery, Mattel has not had an adequate opportunity to take discovery on these matters, and the substantial benefits of discovery on these central issues outweigh any burden. MGA has identified many dozens of witnesses with knowledge of the parties' claims or defenses. Mattel has sued MGA for inducing several Mattel employees to misappropriate many thousands of pages of documents containing Mattel trade secrets over an extended period of time. For its part, MGA has accused over 400 Mattel products of infringing the trade dress of more than 200 MGA products. As MGA has proclaimed, it will be seeking "billions" of dollars from Mattel on its claims alone. Additional depositions are warranted given the breadth and complexity of the claims and defenses in this case and the stakes involved.

---

[1]   February 12, 2007 Scheduling Conference Tr. at 22:12-15 and 24:5-7, Exhibit 7 to the Declaration of B. Dylan Proctor, dated November 19, 2007 ("Proctor Dec.").

-1-
MATTEL'S MOTION FOR ADDITIONAL INTERROGATORIES AND DEPOSITIONS

EXHIBIT 10 PAGE 50

1    To date, Mattel has taken 18 depositions, which leaves Mattel with six
2 remaining.  Mattel has been able to take only one deposition on its counterclaims or
3 defenses to MGA's unfair competition claims, and as of yet, Mattel has been unable to
4 depose any of the individuals actively involved in the theft of Mattel's trade secrets.
5 The specific individuals who Mattel seeks to depose are identified below, along with
6 the justification for each.  In addition, Mattel cannot obtain without the Court's leave
7 the corporate testimony of MGA or MGAE de Mexico on the facts related to either
8 MGA's unfair competition claims or Mattel's counterclaims.  Mattel seeks leave to
9 serve the First Notice of Deposition of MGAE de Mexico, attached as Exhibit A, and
10 an additional Notice of Deposition of MGA, attached as Exhibit B, on those subjects.

11    Mattel also seeks leave to serve defendants with additional interrogatories.
12 Mattel has served interrogatories seeking MGA's contentions with respect to the
13 creation of Bratz and MGA's unfair competition claims.   Mattel's proposed
14 interrogatories, which are attached as Exhibit C, seek information related to Mattel's
15 counterclaims and to MGA's claims against Mattel for alleged unfair competition, as
16 well as certain of defendants' defenses.[2]

17    Finally, Mattel seeks additional time to depose Mr. Bryant.  Although Bryant was
18 deposed in 2004, since that time MGA and Bryant have produced millions of pages of
19 documents that they had long withheld until compelled by the Court, and the scope of
20 the claims in these consolidated cases has increased dramatically.  Only after Bryant's
21 deposition occurred, MGA asserted its broad unfair competition claims against Mattel.
22 Only after Bryant's deposition occurred, Mattel asserted its counterclaims, including its
23 copyright infringement and RICO counterclaims, against Bryant and other defendants.
24 And, despite the fact that Mattel sought documents relating to the origins of Bratz

25
26    [2]  Because defendants refuse to answer Mattel's previously served interrogatories based
on spurious claims that they exceed the 50 limit, Mattel seeks leave as to them to avoid
27 defendants' further quarreling over the counting of interrogatories and thereby obtain
obvious information about defendants' own contentions and other critical subjects.
28

:09/2299353.1

EXHIBIT  10  PAGE  51

1  before Bryant's initial deposition, both MGA and Bryant were, unbeknownst to Mattel,

2  withholding such documents at the time of the deposition – this was discovered only

3  after multiple motions to compel brought by Mattel were granted.   Judge Infante

4  recognized that Bryant is the "most knowledge witness with respect to virtually all of

5  the factual issues" and claims in these matters.[3]  Judge Infante nevertheless gave Mattel

6  only seven additional hours for Bryant's deposition (on top of two hours previously

7  granted due to Bryant's and his counsel's improper conduct during the prior deposition).

8  That simply is not enough to depose Bryant on MGA's claims, Mattel's counterclaims

9  and all the newly produced evidence that post-dates the 2004 deposition.   Mattel

10  therefore requests that this Court grant additional time of another 12 hours for a total of

11  21 additional hours to question Bryant.

12                              **Statement of Facts**

13      Mattel's Original Complaint.  Mattel filed its initial Complaint on April 27, 2004,

14  alleging that Carter Bryant breached his duties to Mattel by working with and assisting

15  a Mattel competitor, MGA, while he was employed by Mattel.[4]   While at Mattel,

16  Bryant worked on the "Bratz" project.[5]  On December 7, 2004, MGA filed an answer in

17  intervention claiming that the action put at issue MGA's rights to Bratz.[6]

18      MGA's Complaint.  MGA filed a complaint against Mattel on April 13, 2005

19  alleging that Mattel engaged in "serial copycatting" of the Bratz dolls.[7]  Mattel's action

20  and MGA's action were later consolidated along with a declaratory relief action filed by

21  Bryant, which was later dismissed.[8]

22      Mattel's Counterclaims.  On November 19, 2006, Mattel moved for leave to

23  amend its complaint.  The Court granted Mattel's motion, allowing Mattel's new claims

24  ────────────────────
   [3] 9/27/07 Hearing Tr. at 24:24-25:2, Proctor Dec., Ex 85.
25  [4] Proctor Dec., Ex. 1.
   [5] Id. ¶¶ 12-13.
26  [6] Proctor Dec., Ex. 2.
   [7] Proctor Dec., Ex. 3.
27  [8] Minute Order Re Consolidation (June 19, 2006), Proctor Dec., Ex. 4.

28

EXHIBIT 10  PAGE 52

1  to be alleged as counterclaims to MGA's complaint.[9]  Mattel filed its Second Amended

2  Answer and Counterclaims on July 12, 2007.  Mattel's counterclaims against MGA

3  Entertainment, Inc., MGA Entertainment (HK) Limited, and MGAE de Mexico S.R.L.

4  de C.V. include claims for copyright infringement, violation of RICO, conspiracy to

5  violate RICO, misappropriation of trade secrets, intentional interference with contract,

6  aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of

7  loyalty, conversion and unfair competition.[10]  MGA's current amended answer to

8  Mattel's counterclaims asserts twenty-two affirmative defenses.[11]

9      Scheduling Conference.  At the February 12, 2007, and as reflected in a Minute

10  Order, the Court limited depositions to 24 per side and interrogatories to 50 per side.[12]

11  The Court recognized that the parties might need more depositions or interrogatories:

12          I don't want to say they are soft limits [on the number of
            depositions], but they are limits which the Court would
13          certainly understand or would invite counsel to submit a
14          motion to expand if there's reason to.  But I just want to have
            some parameters placed on this at the outset.
15              . . .
16          [L]et's try and work within the confines of the 50
            interrogatories, and if you need more, again, the Court is
17          going to be forthcoming, if there's a need for it.[13]

18

19      Mattel's Interrogatories.  To date, Mattel has propounded 50 interrogatories.[14]  In

20  June 2007, Mattel propounded 19 interrogatories on MGA, MGA Hong Kong, Larian

21

22      [9]  1/11/07 Order Re Mattel's Motion for Leave to Amend, Proctor Dec., Ex. 5.
        [10]  See Mattel's Second Amended Answer in Case No. 05-2727 and Counterclaims,
23  dated July 12, 2007 ("Mattel's Counterclaims"), Proctor Dec., Ex. 16.
        [11]  See MGA's Amended Answer and Affirmative Defenses ("MGA's Amended
24  Answer"), Proctor Dec., Ex. 46.  MGA had filed its original answer on August 13, 2007.
    Proctor Dec., Ex. 17.  After meeting and conferring, MGA acknowledged deficiencies in
25  its defenses and served its amended answer on September 19, 2007.
        [12]  2/12/07 Scheduling Order, at 1, Proctor Dec., Ex. 6.
26      [13]  2/12/07 Scheduling Conference Tr., at 22:12-15 and 24:5-7, Proctor Dec., Ex. 7.
27      [14]  See Proctor Dec., Exs. 8-12, 15, 64-68.

28

7209/2299353.1

-4-

MATTEL'S MOTION FOR ADDITIONAL INTERROGATORIES AND DEPOSITIONS

EXHIBIT 10   PAGE 53

1   and Bryant, seeking information about Bratz development, their affirmative defenses to

2   Mattel's claims, defendants' contentions regarding unfair competition claims and

3   MGA's benefit from Bratz.[15]  Defendants claimed they exceeded the interrogatory limit,

4   and on September 5, 2007, Judge Infante ruled that identical interrogatories served on

5   multiple parties, as well as interrogatories asking defendants to "state all facts"

6   supporting a particular contention, "identify all persons with knowledge of such facts,"

7   and "identify all documents" relevant to such facts, would each count as only one

8   interrogatory.[16]  However, an interrogatory asking a party to state facts supporting

9   different affirmative defenses would count as a different interrogatory per defense.[17]  In

10   accordance with that ruling, on September 21, 2007, Mattel served revised sets of

11   fifteen interrogatories.[18]  Defendants nevertheless still refuse to substantively answer

12   these interrogatories, including because they allegedly exceed the number permitted.[19]

13       Mattel Depositions.  To date, Mattel has taken 18 depositions.  Mattel has had

14   good cause for each of those depositions.  They include:

- Carter Bryant – defendant
- Victoria O'Connor – former MGA executive with knowledge of MGA's and Larian's spoliation of evidence
- Jaqueline Prince – witness allegedly supporting Bryant's Bratz creation story
- Isaac Larian – defendant
- Steve Linker – third party with knowledge of work on Bratz before Bryant left Mattel
- Paula Garcia – Bratz project manager from the start who worked on Bratz with Bryant before he left Mattel
- Brooke Gilbert – Bryant's niece with knowledge of Bryant's computer on which Bryant installed and used "Evidence Eliminator"

[15]  Proctor Dec., Ex. 13.
[16]  9/5/07 Order Re Mattel's Interrogatories, at 5-6, Proctor Dec., Ex. 14.
[17]  See id. at 7.
[18]  Proctor Dec., Ex. 45.
[19]  See Proctor Dec., Exs. 73-74.

EXHIBIT 10   PAGE 54

- Kerri Brode – MGA employee with knowledge of Bryant's work on Bratz while at Mattel

- Dave Malacrida – MGA public relations employee with knowledge regarding early Bratz design and marketing

- Janet Bryant – Bryant's mother and relied upon by Bryant to establish alleged date of Bratz creation

- Thomas Bryant – Bryant's father and relied upon by Bryant to establish alleged date of Bratz creation

- Sarah Chui – worked on Bratz in 2000 for MGA Hong Kong

- Richard Irmen – Bryant's partner and relied upon by Bryant to establish alleged date of Bratz creation

- Maureen Tkacik – *Wall Street Journal* reporter to whom Larian stated, in an interview, that he chose Mr. Bryant's idea for the Bratz over several others after holding "a sort of fashion-doll design contest in late 1999" -- a time during which Bryant was employed by Mattel and months before MGA and Bryant now say they first were introduced

- MGA Entertainment, Inc. – defendant

- MGA Entertainment (HK) Limited – defendant

- Schyler Bacon – MGA employee who recruited Mattel employees who stole trade secrets

- Denise O'Neal – *Chicago Sun Times* reporter to whom Larian made prior inconsistent statements, including that MGA's creative team decided to use the "Brats" name but to change the "s" to a "z"

## Argument

I. **THE RULES CONTEMPLATE ADDITIONAL DISCOVERY**

The Federal Rules require that a party obtain leave before serving interrogatories or taking depositions beyond the limits established by the Court. See Fed. R. Civ. P. 33(a) (interrogatories); id. 30(a)(2)(A) (depositions). The purpose of these limits is to allow the Court to "maintain a 'tighter rein' on the extent of discovery and to minimize the potential cost of [w]ide ranging discovery". Rx USA Wholesale, Inc. v. McKesson Corp., 2007 WL 1827335, at *2-3 (E.D.N.Y. June 25, 2007) (quoting Whittingham v. Amherst Coll., 163 F.R.D. 170, 171-72 (D. Mass. 1995)). The limits, however, are not intended to "prevent needed discovery," and courts have "broad[] discretion" to allow

EXHIBIT 10   PAGE 55

1  additional discovery "based on the complexity" of the case at hand.  Notes of the
2  Advisory Committee (1993) to <u>Fed. R. Civ. P.</u> 26(b) & 33.  Leave to take additional
3  discovery "shall be granted" to the extent consistent with the principles set forth in <u>Rule</u>
4  26(b)(2). <u>Fed. R. Civ. P.</u> 30(a)(2)(A), & 33(a).  Courts permit additional interrogatories
5  or depositions after considering whether:

> (1) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (2) the party seeking discovery has [had] ample opportunity obtain the information sought; or (3) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the party's resources, and the importance of the proposed discovery in resolving the issues.

12  <u>Andamiro v. Konami Amusement of Am.</u>, 2001 WL 535667, at *2 (C.D. Cal. April
13  26, 2001) (depositions); <u>see also</u> <u>Collaboration Prop. v. Polycom, Inc.</u>, 224 F.R.D.
14  473, 475 (N.D. Cal. 2004) (interrogatories).

15  **II.    MATTEL SHOULD BE GRANTED ADDITIONAL DEPOSITIONS**

16      Mattel should be permitted to take more than 24 depositions in these
17  consolidated cases.  This action contains three broad categories of significant claims,
18  each of which necessitates additional depositions:  Mattel's Bratz-related claims,
19  MGA's unfair competition claims, and Mattel's trade secret theft and RICO claims.
20  MGA's supplemental initial disclosures identified 86 witnesses with knowledge of
21  MGA's claims and defenses, 62 of whom are not Mattel employees.[20]  Mattel's
22  supplemental disclosures contain nearly double the number of witnesses with
23  knowledge, only 43 of whom are Mattel employees.[21]  Based on the million-and-a-half
24  pages that MGA has recently produced, Mattel is preparing third supplemental

---

[20]   See MGA Entertainment, Inc.'s Supplemental Disclosures and MGA Entertainment (HK) Limited, MGAE de Mexico S.R.L. de C.V. and Larian's Initial Disclosures Under Rule 26(a)(1), dated September 21, 2007, at 1-16, Proctor Dec., Ex. 18.
[21]   See Proctor Dec., Ex. 19, at 3-19.


EXHIBIT 10   PAGE 56

1  disclosures which will name additional witnesses. Mattel can rely on <u>Rule</u> 30(b)(6) to

2  obtain some information, but Mattel cannot effectively prosecute or defend these cases

3  with only 24 depositions.

4       A.    **<u>Each Category of Claims Warrants More Depositions</u>**

5            1.    **<u>The Bratz Claims Require Additional Depositions</u>**

6       The number of witnesses involved with the creation of Bratz or with knowledge

7  of Bryant's purported story about when he created – and the inconsistent stories that

8  MGA spun in the media – justify additional depositions. For example, Bryant claims

9  that he created Bratz when he was not a Mattel employee.[22] He initially identified three

10  people who he claimed could corroborate this story: Tom and Janet Bryant (his

11  parents) and Richard Irmen (his partner). Bryant's mother for the first time in this case

12  recently identified a fourth: her friend, Jeanne Galvano. Bryant will introduce their

13  testimony to vouch for his story, so Mattel obviously needs and is entitled to depose

14  them. Similarly, Isaac Larian has repeatedly made conflicting, inconsistent statements

15  about Bratz's creation to the press, among others.[23] Mattel thus far has deposed two of

16  the journalists who wrote those stories – depositions where Mattel's questioning lasted

17  far less than an hour. Bryant's "alibi" witnesses and the reporters alone use up one-third

18  of Mattel's originally allotted 24 depositions.

19       In addition, at the time of the Scheduling Order, Bryant and MGA had said only

20  a handful of people worked directly on Bratz prior to 2002: Bryant, Anna Rhee,

21  Mercedeh Ward, Margaret Leahy, Paula Garcia and unidentified people in Hong

22  Kong.[24] In a recent supplemental interrogatory response, MGA identified 11 more

23  people who worked on the first Bratz dolls, including Sarah Halpern, Veronica Marlow,

24

---

25  [22]  Bryant Dep. Tr. at 140:9-141:8, Proctor Dec., Ex. 20.

26  [23]  Proctor Dec., Ex. 21.

    [24]  <u>See</u> Bryant's Objections and Responses to Second Set of Interrogatories

27  Propounded by Mattel, Inc., at 4, Proctor Dec., Ex. 22; MGA's Response to Mattel's

    Second Set of Interrogatories, at 4:17-20, Proctor Dec., Ex. 23.

28

EXHIBIT 10 PAGE 57

1  Cecilia Kwok, David Dees, Stephen Tarmichael, Edmond Lee, Franki Tsang, Samuel

2  Wong, Stephen Lee, William Ragsdale and Wendy Ragsdale (and Mattel now knows

3  that even this list is incomplete).[25] This list does not include anyone involved in early

4  sales, marketing, product testing or advertising of Bratz.

5       When a deponent possesses unique information, courts generally grant leave for

6  additional depositions because they do not undermine the key purpose of the limits –

7  preventing duplicative discovery. See, e.g., Bromgard v. Montana, 2007 WL 1101179,

8  at *2 (D. Mont. April 11, 2007).  Courts deny additional depositions when deponents

9  are likely to have common, interchangeable information.  And, even in such instances,

10  courts may allow a limited number or sequential depositions to proceed.  See, e.g., Rx

11  USA, 2007 WL 1827335, at *3 (allowing additional deposition testimony on one but

12  not both individuals with generalized information).

13       Here, Mattel seeks depositions of witnesses who each have specific, unique

14  personal knowledge of the Bratz claims as well as about other claims in the case.  All of

15  them are third parties:

16  • Sarah Halpern – worked on the patterns for the first Bratz dolls

17  • Margaret Leahy – sculpted the first Bratz dolls and 4-Ever Best Friends

18  • Veronica Marlow – worked on the first Bratz doll fashions as well on
19     products at issue in MGA's claims

20  • Elise Cloonan – worked with Bryant on his Bratz pitch to MGA while both
   were employed by Mattel

21  • Jesse Ramirez – worked on molds for Bratz

22  • Jeanne Galvano – alleged witness Bryant's mother recently claimed can
23     verify facts relating to Bratz's creation

24  • Stephen Lee – Managing Director of MGA Hong Kong during development
   of Bratz and other products at issue

25

26  [25]  MGA's Third Supplemental Responses to Mattel's Second Set of Interrogatories, at
4:1-6:3, Proctor Dec., Ex. 24; see Linker Dep. Tr. at 59:22-64:9, Proctor Dec., Ex. 25
27  (testifying that Paula (Treantafelles) Garcia and Bryant approached him and his partner,
Liz Hogan, before Bryant left Mattel to work on Bratz).

28

EXHIBIT 10 PAGE 58

1  • Cecilia Kwok – MGA Hong Kong employee principally involved with first Bratz dolls

2  • Farhad Larian – brother of Isaac Larian, who sued Isaac Larian and alleged, inter alia, that MGA was working on Bratz by early 2000 (months before MGA and Bryant claim to have met) when he was a part owner of MGA[26]

4  • Certain as yet unidentified attorneys who represented parties to disputes between Isaac Larian and Farhad Larian in which the creation of and value of Bratz was at issue

6  • Sandra Bilotto – sculptor who worked on Prayer Angel dolls at issue[27]

7  • Anne Wang – represented Bryant in negotiations with MGA while he was a Mattel employee that led to the agreement dated "as of September 18, 2000"[28]

9  • David Rosenbaum – represented MGA in negotiations with Bryant's first agreement with MGA[29]

10 • Christensen Glaser LLP – firm to which Victoria O'Connor faxed the MGA/Bryant agreement that Isaac Larian had ordered her to alter[30]

12 • Lucy Arant – lawyer with knowledge of MGA's first use of Bratz

13 • Mitchell Kamarck – former MGA counsel who responsible for patent applications, including those in which Isaac Larian had claimed to be the inventor of Bratz features that Bryant has since testified he created[31]

15 • Carol Witschell – lawyer who worked on MGA trademark applications and other trademark matters at issue

16 • Nana Ashong – former MGA employee who stated Bratz was created during Bryant's employment by Mattel[32]

18 • Larry McFarland – wrote MGA copyright registrations that stated the Bratz dolls were created during 2000 and that, after this suit was filed, MGA claimed were incorrect

20 • Eric Yip – MGA Hong Kong Sales Administrator in 2000 and 2001, when Bratz were created and first shipped to Bandai in Spain[33]

---

26  See Larian Dep. Tr. at 159:17-160:14, Proctor Dec. Ex. 54.
27  Brode Dep. Tr. at 303:9-316:16, Proctor Dec. Ex. 55; Dep. Exhs. 607, 608, 609, Proctor Dec., Ex. 56.
28  See Bryant Tr. at 39:6-42:18, Proctor Dec. Ex. 60.
29  See O'Connor Dep. Tr. at 94:1-95:21, Proctor Dec., Ex. 61.
30  See O'Connor Dep. Tr. 17:3-19:19, Proctor Dec., Ex 75.
31  See Armstrong Dep. Tr. at 10:7-12, 26:16-23, 244:18-21, Proctor Dec. Ex. 62.
32  See Brode Tr. at 87:13-88:11, Proctor Dec., Ex. 55.
33  See Harris Dep. Tr. at 121:16-122:17, Proctor Dec. Ex. 63.

07209/2299353.1

-10-

EXHIBIT 10 PAGE 59

- Gentle Giant Studios – created relevant moldings and casts while Bryant was still employed at Mattel[34]

- Christopher Palmeri – *Business Week* reporter who wrote that Larian purportedly "got the idea for Bratz after seeing his own kids run around in navel-bearing tops and hip-huggers"[35]

- Jeff Weiss – *San Fernando Valley Business Journal* reporter who quoted another inconsistent Larian statement concerning the origin of Bratz[36]

- Kickapoo High School – where Bryant allegedly found inspiration for Bratz and author of documents refuting that claim

- LA Focus – conducted Bratz focus groups, including focus groups that MGA denies occured

- Joyce Ng – independent contractor who moderated Bratz focus groups

- Rachel Harris – former MGA employee who worked on initial Bratz packaging as well as on other packaging which MGA's claims rest on

- Peter Marlow – spouse of Veronica Marlow who negotiated millions of dollars in payments for Bratz from Bryant on her behalf

- Andreas Koch – former MGA manager who has knowledge of Bryant's initial contacts with MGA

- Kami Gillmour – former Mattel and MGA employee who has knowledge regarding Paula Garcia's employment with MGA, confidential information taken from Mattel and MGA's projects at issue

- Mercedeh Ward – engineer on initial Bratz dolls and author of emails reflecting the use of Mattel property in its creation

- Moss Adams – accounting firm with knowledge of MGA's profits and distributions thereof to Larian (who owns 90% of MGA's shares)

- Wachovia Bank – bank identified as being involved in early Bratz financing and knowledgeable about MGA's net worth or value

- Amy Myers – formerly with MGA and has knowledge of Prayer Angels project that MGA has raised as a defense

- Two or three parties MGA sued for infringement of Bratz and whose identities are not yet known to Mattel – they will have knowledge of the dolls and other properties MGA has sued on in the past, which is relevant to refuting MGA's current claims that earlier iterations of Bratz products look nothing like subsequent iteration of Bratz products

---

[34] See Proctor Dec., Ex 72.
[35] Proctor Dec. Ex. 52.
[36] Proctor Dec. Ex. 53.

07209/2299353.1

-11-

EXHIBIT 1   PAGE 60

1    Further, many of these same witnesses are also knowledgeable as to MGA's
2  claims of unfair competition and Mattel's trade secret and RICO claims, as they
3  continued to work with MGA in later years. For example, MGA has already identified
4  Halpern, Kwok, Leahy, Marlow, Lee, Ward and Yip as individuals involved with the
5  products at issue.[37]    Likewise, Ramirez continued working on molds for subsequent
6  Bratz dolls through at least 2005,[38] while   Kamarck,[39] Witschell,[40] Arant, and
7  McFarland[41] were involved in subsequent Bratz-related intellectual property matters.
8  As such, testimony from these witnesses is essential for both phases of trial.

9         2.       **Mattel's Trade Secret and RICO Claims and MGA's Unfair**
10                **Competition Claims Require Additional Depositions**

11    Mattel has sued MGA for misappropriating Mattel trade secrets and RICO
12  violations by, among other things, stealing thousands of pages of Mattel confidential
13  information in the United States, Canada and Mexico.[42] Mattel identified Ron Brawer,
14  Janine Brisbois, Gustavo Machado, Mariana Trueba Almada and Pablo Vargas as
15  individuals who misappropriated Mattel trade secrets. The only person Mattel has been
16  able to depose on its counterclaims is Ms. Bacon, who coordinated MGA's recruiting of

---

[37]    See MGA's Fourth Supp. Response to Interrogatory No. 1 of Mattel's First Set of
Interrogatories Re Claims of Unfair Competition, at 10-12, 18, 19, Proctor Dec., Ex. 27.
[38]    See, e.g., Proctor Dec., Ex. 69 (showing various Bratz-related work in 2005).
[39]    See, e.g., Armstrong Tr. 26:5-23, Proctor Dec., Ex. 62 (discussing involvement in
Bratz-related patent applications through 2004).
[40]    See, e.g., Proctor Dec., Ex. 70 (discussing involvement with Bratz registrations).
[41]    See, e.g., Proctor Dec., Ex. 71 (discussing involvement with Bratz licensing).
[42]    Mattel's Counterclaims ¶¶ 37-54, 70-76, Proctor Dec., Ex 16.

07209/2299353.1

-12-

EXHIBIT 10 PAGE 61

Mattel employees.[43]  Accordingly, Mattel seeks leave to take the depositions of the following witnesses on such claims:[44]

- Ron Brawer – has knowledge of stolen Mattel trade secrets in the U.S.
- Janine Brisbois – former Mattel employee who stole Mattel trade secrets
- Gustavo Machado – former Mattel employee who stole Mattel trade secrets
- Mariana Trueba – former Mattel employee who stole Mattel trade secrets
- Pablo Vargas – former Mattel employee who stole Mattel trade secrets
- Ricardo Abundis – has knowledge of stolen Mattel trade secrets in Mexico
- Jorge Castilla – believed to have stolen Mattel trade secrets in the U.S.
- Nic Contreras – believed to have knowledge of stolen Mattel trade secrets
- Dan Cooney – believed to have knowledge of stolen Mattel trade secrets
- Susan Kuemmerle – believed to have knowledge regarding stolen Mattel trade secrets in Mexico
- Shirin Salemnia – believed to have knowledge of stolen Mattel trade secrets
- MGAE de Mexico – defendant to trade secret theft and RICO claims
- MGA Entertainment, Inc. – defendant

Further, MGA has accused Mattel of trade dress infringement and dilution and unfair competition in connection with more than 440 products.[45]  MGA has identified

---

[43]  Bacon Dep. Tr. at 12:12-13, 51:22-52:17, 86:8-12, and 114:19-116:9, Proctor Dec., Ex. 28.  And even with respect to Ms. Bacon's deposition, MGA attempted to prevent her from testifying on the grounds that Mattel had not noticed her deposition individually, but only as a Rule 30(b)(6) designee.  See Proctor Dec., Ex. 29.

[44]  These are those who Mattel has identified to date.  Mattel anticipates that there may be more who will need to be deposed in connection with MGA's unfair competition claims and Mattel's counterclaims because (a) it continues to review the over one-and-a-half million pages of documents that MGA produced in the past month and (b) MGA, to date, has failed to identify how it anticipates defending Mattel's counterclaims or which documents or witnesses it will rely upon to do so, including by its ongoing failures to answer Mattel contention interrogatories related to its defenses to Mattel's counterclaims.

[45]  MGA's Supp. Response to Interrogatory No. 2 Of Mattel, Inc.'s First Set of Interrogatories Re Claims of Unfair Competition, at 5-19, Proctor Dec., Ex. 26.

EXHIBIT 10 PAGE 62

1   117 witnesses with knowledge of the creation or promotion of those products,[46]

2   including many of the persons listed above.  Mattel has taken the depositions of only

3   six of those 117 named individuals, and has not yet been able to depose two of them,

4   Bryant or Larian, regarding the unfair competition allegations.

5       **B.**   **Mattel Needs Additional Depositions Because the Integrity of MGA's**

6              **and Bryant's Preservation of Documents Is At Issue**

7        Mattel also is entitled to inquire about MGA's and Bryant's preservation and

8   production of evidence.  For example, as MGA's designee on document preservation

9   testified, MGA had only obtained off-site documents as of the summer of 2007 and had

10  searched none of these documents for responsive documents, even though the Court

11  had ordered MGA to produce them and MGA had previously represented that its

12  production was complete.[47]  Further, MGA's designee on MGA's electronic document

13  preservation and collection testified that MGA's only search of such information was a

14  single search of Isaac Larian's e-mails in 2005, nothing more.[48]  MGA's designee

15  repeatedly testified that Joe Tiongco, who Mattel seeks to depose, has more

16  knowledge.[49]  In the same vein, Mattel seeks to depose Daphne Gronich, who provided

17  the preservation declaration on MGA's behalf.[50]  In addition, there are serious issues

18  about Bryant's hard drives, including because of Bryant's prior counsel's conflicting

19  representations about their collection and preservation – and indeed even their

20  existence.  Mattel therefore seeks testimony on these subjects.[51]  Bryant's belated

21  revelation that he installed and used the "Evidence Eliminator" program on these drives

22

---

[46]   MGA's Fourth Supp. Resp. Unfair Comp. No. 1, at 5-16, Proctor Dec., Ex. 27.

23  [47]   9/24/07 Stip. and Order, Proctor Dec., Ex. 30; Tonnu Dep. Tr. at 612:13-612:15,

24  620:14-621:21, Proctor Dec., Ex. 31; 8/13/07 Order, at 14:18-22, Proctor Dec., Ex. 32.

[48]   See Lockhart Deposition Tr. at 265:1-11, Proctor Dec., Ex. 33.

25  [49]   Id. at 116:2-14, 150:25-151:5, 158:10-15. 258:17-259:9, 265:1-11, 266:12-267:5.

[50]   See Dec. of Daphne Gronich in Response to Court's Request for Information

26  Regarding Document Preservation, dated September 10, 2007, Proctor Dec., Ex. 34.

[51]   Notice of Deposition of Littler Mendelson Pursuant to Federal Rule of Procedure

27  30(b)(6), dated September 6, 2007, Proctor Dec., Ex. 35.

28

07209/2299353.1

-14-

EXHIBIT 10 PAGE 63

1 underscores all the more the legitimacy of full and fair discovery into the integrity of

2 his drives.

3     **C.**    <u>**Mattel Seeks Leave to Take 30(b)(6) Depositions On Non-Duplicative**</u>

4         <u>**Topics**</u>

5     MGA objected, and the Discovery Master has ruled, that a corporate party who

6 has been deposed pursuant to a <u>Rule</u> 30(b)(6) notice cannot be deposed pursuant to a

7 subsequent notice absent Court leave.[52]  Mattel has not propounded a <u>Rule</u> 30(b)(6)

8 Notice of Deposition on MGA or MGAE de Mexico related to either MGA's unfair

9 competition claims or Mattel's counterclaims.  Mattel's Notices of Deposition—

10 attached as Exhibits A and B—contain topics of testimony which relate to those

11 claims.[53]  Mattel has not previously served any <u>Rule</u> 30(b)(6) Notice on MGAE de

12 Mexico at all, and the topics in the additional Notice to MGA are not duplicative of

13 those in Mattel's prior Notices to MGA.[54]  Mattel respectfully submits that it should be

14 granted leave to proceed with those depositions.

15     **D.**    <u>**Mattel Meets The Requirements for Additional Discovery**</u>

16     When a deponent possess unique information, courts will generally allow leave

17 for additional depositions because they do not undermine the key purpose of the

18

19 [52] 9/25/07 Order Re Mattel's Motion to Compel MGA to Produce Witnesses Pursuant to Third Notice of Deposition Under 30(b)(6), Proctor Dec., Ex. 36.

20 [53] <u>See</u> Exhibits A & B. Mattel's Fourth Notice of Deposition is far less than

21 burdensome compared to MGA's recently served Notice of Deposition, which contains more than 80 topics, each of which has many sub-parts. <u>See</u> MGA Entertainment, Inc.'s

22 Notice of Deposition of Mattel, dated September 5, 2007, Proctor Dec., Ex. 40.

23 [54] Mattel's First Notice of Deposition was narrowly tailored to obtain information related to MGA's contentions that Bryant and Anna Rhee had worked on Prayer Angels,

24 not Bratz, while Bryant employed by Mattel. Proctor Dec., Ex. 37. Mattel's Second Notice sought information related to Bratz, including Bratz revenues, costs and profits, and

25 evidence preservation and collection. Proctor Dec., Ex. 38. Mattel's Third Notice sought follow-up information on matters that had arisen in discovery, including with respect to

26 specific electronic evidence, specific individuals who worked on the first Bratz dolls,

27 payments made to witnesses or parties, and statements to reporters related to Bratz's creation and inspiration. Proctor Dec., Ex. 39.

28

-15-
MATTEL'S MOTION FOR ADDITIONAL INTERROGATORIES AND DEPOSITIONS

EXHIBIT 10 PAGE 64

1   limits—preventing duplicative discovery. See, e.g., Bromgard, 2007 WL 1101179, at

2   *2 (D. Mont. April 11, 2007).   As explained above, Mattel seeks depositions of

3   individuals who each have specific, unique knowledge of the underlying events.

4        Without additional depositions, Mattel cannot discover the full extent of MGA's

5   wrongdoing or adequately prepare to defend against MGA's claims.  Mattel seeks a

6   declaration of ownership of Bratz works that Bryant created during his Mattel

7   employment and their derivatives – property that MGA and Bryant have claimed are

8   worth hundreds of millions of dollars and perhaps more.  Mattel has accused MGA of

9   stealing thousands of pages of Mattel's most valuable trade secrets, including product

10  lines, and strategic plans.  MGA has accused Mattel of infringing hundreds of MGA

11  products, alleging "billions" of dollars in damages.  In light of the magnitude of this

12  case, the burden or additional expense of these depositions pales in comparison to

13  Mattel's need to fully prepare to try this case.  As set forth above, the depositions that

14  Mattel seeks by this motion are not collateral, but go to the heart of its claims and

15  defenses.  See, e.g., Rx USA, 2007 WL 1827335, at *2-3 (additional depositions

16  warranted in a dispute between large corporations, given the complexity of the issues

17  and the parties' resources).

18  **III.   THE COURT SHOULD GRANT LEAVE WITH RESPECT TO**

19       **MATTEL'S INTERROGATORIES**

20       Two categories of interrogatories are involved here:  first, Mattel's proposed

21  additional interrogatories that it seeks leave to serve; and, second, interrogatories which

22  Mattel has already served on defendants.

23       **A.   Mattel Should Be Allowed To Propound Additional Interrogatories**

24       Mattel seeks leave to propound additional interrogatories related to MGA's unfair

25  competition claims and Mattel's counterclaims, and MGA's evidence collection and

26  preservation.  To properly prepare for trial, Mattel seeks leave to serve interrogatories

27  requiring defendants to identify the facts, documents and witnesses it will use to prove

28  its claims, defenses and damages.  Mattel's proposed interrogatories thus seek to

-16-

EXHIBIT 10  PAGE 65

1  identify which specific Mattel designs or products defendants allege infringe on

2  defendants' designs[55] and trade dress[56] and the facts supporting those legal claims.[57]

3  Additionally, Mattel seeks to determine defendants' position regarding their

4  misappropriation of Mattel documents, including whether defendants contend that no

5  such documents were obtained improperly,[58] that the information contained therein has

6  no value as a trade secret,[59] that the information had been publicly disclosed,[60] that

7  defendants did not use or disclose such information,[61] that any such disclosure neither

8  benefited defendants nor harmed Mattel,[62] and that defendants have a right to possess,

9  use or disclose any such documents in their possession.[63] These are essential elements

10 of the trade secret theft claim. See Cal. Civ. Code § 3426.1. Finally, Mattel seeks

11 information related to MGA's efforts to collect and preserve evidence relevant or

12 potentially relevant to this action.[64]

13      The proposed interrogatories are consistent with the factors set out in Rule 26(b)

14 and should be permitted. They seek disclosure of specific relevant facts regarding

15 topics which have not been the subject of prior interrogatories. The majority of Mattel's

16 prior interrogatories focused on issues related to creation and ownership of Bratz.[65]

17 Only Mattel's set of interrogatories relating to MGA's unfair competition claims could

18

19

20  [55]  See Mattel's Proposed Interrogatory No. 51.
21  [56]  See Mattel's Proposed Interrogatory No. 52.
    [57]  See Mattel's Proposed Interrogatories Nos. 53, 54, 55.
22  [58]  See Mattel's Proposed Interrogatory No. 56.
    [59]  See Mattel's Proposed Interrogatory No. 57.
23  [60]  See Mattel's Proposed Interrogatory No. 58.
    [61]  See Mattel's Proposed Interrogatory No. 59.
24  [62]  See Mattel's Proposed Interrogatory No. 60.
    [63]  See Mattel's Proposed Interrogatory No. 61.
25  [64]  See Mattel's Proposed Interrogatories Nos. 63-64.
    [65]  See First Set to Bryant, Proctor Dec., Ex 8; First Set to MGA, Proctor Dec., Ex. 9;
26  Second Set to Bryant, Proctor Dec., Ex. 11; Second Set to MGA, Proctor Dec., Ex. 10;
27  Third Set Revised, Proctor Dec., Ex. 45.

28

EXHIBIT 10 PAGE 46

1  conceivably overlap with the proposed interrogatories.[66] However, the interrogatories
2  already propounded focused on issues distinct from the proposed interrogatories—
3  specifically, facts relating to MGA employees involved with certain MGA products,[67]
4  MGA's alleged injuries,[68] MGA's allegations regarding Mattel's conduct with certain
5  third-parties in the industry[69] and MGA's allegations of product confusion.[70] These are
6  not duplicated in the interrogatories which Mattel is proposing.

7      Finally, the benefits of the proposed interrogatories outweigh any added burden,
8  as these type of facts are properly revealed through interrogatories, and the information
9  sought by the interrogatories will advance this litigation and avoid surprise at trial.

10  **B.   The Court Should Grant Leave With Respect To Mattel's**
11        **Outstanding Interrogatories That Defendants Will Not Answer**

12      To date, Mattel has served 50 interrogatories on the defendants. Yet, by
13  objecting to some of those previously served interrogatories served as being compound,
14  defendants refuse to answer on the purported ground that they exceed the Court's
15  limit.[71] Although defendants are wrong, the Court should eliminate further delay and
16  quarreling by defendants by simply granting Mattel leave to serve them regardless of
17  how they are counted.

18      Mattel has been seeking answers to these basic interrogatories for over five
19  months now. To justify their wholesale refusal to answer them, defendants claimed
20  they exceeded the Court's limit on the number of interrogatories. Mattel moved to
21  compel, defendants moved for a protective order, and in a September 5, 2007 Order
22  Judge Infante provided guidance on the counting of the interrogatories. Mattel then

23
24  [66] See First Set Re Unfair Comp., Proctor Dec., Ex. 12.
     [67] See id. No. 1.
25  [68] See id. No. 4.
     [69] See id. Nos. 5, 8, 9, and 10.
26  [70] See id. No. 7.
27  [71] See Bryant's Objections to Revised Third Set, Proctor Dec., Ex. 73; Bryant's
     Objections to Amended Fourth Set, Proctor Dec., Ex. 74.
28



EXHIBIT  1 0  PAGE  47

1   propounded revised interrogatories that were consistent with the Discovery Master's
2   Order.

3          Defendants nevertheless claim, once again, that Mattel exceeds its 50 allotted
4   interrogatories. Not only is this without merit,[72] but it is clear that defendants rehash
5   this objection for no other reason than to obstruct. Bryant refuses to answer any
6   interrogatory past No. 27 because "Mattel has propounded more than 50
7   interrogatories."[73] And, even the minimal answers he gave to others amply confirms
8   that he continues to stonewall on even basic discovery in this case. MGA makes
9   essentially the same objection.[74] Accordingly, through nothing more than creatively

10

11   [72]   The essence of the defendants' objection is that Mattel's revised interrogatories are
     compound interrogatories because they improperly require them to respond to individual
12   interrogatories with "different and distinct facts." See Bryant's Objections to Revised
     Third Set, at 18; Bryant's Objections to Amended Fourth Set, at 4. For example,
13   defendants frivolously object to having to identify both the name of a product and its
     corresponding product number. But Judge Infante ruled on this matter, explaining that
14   interrogatories "'containing subparts directed at eliciting details concerning [a] common
15   theme should be considered a single question,'" while interrogatories on "discrete issues"
     should be treated as multiple interrogatories. Order re Mattel's Interrogs., at 5 (quoting 8A
16   Wright & Miller, Federal Practice & Procedure § 2168.1 (2d ed. 1994)); see also id. at 7.
17   The scope of Mattel's revised interrogatories is no different than those which Judge Infante
     ruled were permissible, as in both instances the "subparts are related and directed to the
18   underlying details of a specifically identified" subject. See id. Judge Infante specifically
19   observed that under the Advisory Committee notes, interrogatories which required distinct
     factual answers relating to the same subject—e.g., the time, place, persons present, and
20   contents of a particular communication—should be treated as a single interrogatory. See
     id. Mattel's revised interrogatories are not compound, and defendants' arguments to the
21   contrary are groundless: the fact that an interrogatory answer requires different facts does
22   not convert it into a compound interrogatory on different issues.
     [73]   Bryant's Objections to Revised Third Set, at 7. Bryant then makes the same
23   objection to the remaining 23 interrogatories.
     [74]   See MGA's Objections to Revised Third Set, at 8, Proctor Dec., Ex. 76; MGA (HK)
24   Ltd.'s Objections to Revised Third Set, at 17, Proctor Dec., Ex. 77; MGAE de Mexico's
25   Objections to Revised Third Set, at 8, Proctor Dec., Ex. 78; Larian's Objections to Revised
     Third, at 8, Proctor Dec., Ex. 79; MGA's Objections Amended Fourth Set, at 7, Proctor
26   Dec., Ex. 80; MGA (HK) Ltd.'S Objections to Amended Fourth Set, at 7-8, Proctor Dec.,
     Ex. 81; MGAE de Mexico's Objections to Amended Fourth Set, at 8, Proctor Dec., Ex. 82;
27   Larian's Objections to Amended Fourth Set, at 7, Proctor Dec., Ex. 83.

28

EXHIBIT 10   PAGE 68

1  counting a few interrogatories as a multitude, defendants manufacture grounds to delay
2  yet more and refuse obviously appropriate discovery.  To the extent that defendants
3  have substantive objections to specific interrogatories, these issues may be properly
4  heard before the Discovery Master. But defendants should not be permitted to serially
5  raise the same objection to a few specific interrogatories in order to delay for yet more
6  months in responding to the bulk of Mattel's interrogatories.  Mattel requests that this
7  Court cut through this issue by granting Mattel leave, to the extent needed, to serve
8  each of the interrogatories that have been served to date regardless of how they are
9  counted.

10  **IV.   THE COURT SHOULD ALLOW ADDITIONAL TIME FOR THE**
11        **BRYANT DEPOSITION**

12        On September 28, 2007, the Discovery Master issued an Order Granting in Part
13  Mattel's Motion for Additional Time to Depose Carter Bryant for All Purposes,
14  granting Mattel seven additional hours to depose Bryant (in addition to 2 hours
15  previously granted based on counsel's dozens of improper instructions not to answer at
16  the Bryant deposition), but denying Mattel the 21 hours that it sought.[75]  Mattel
17  respectfully submits that the facts, as determined by the Discovery Master, justify far
18  more than seven additional hours, and the Court should grant additional time.

19        Mattel does not contest the Discovery Master's factual findings in any way.  To
20  the contrary, the underlying factual findings were plainly correct.  As Judge Infante
21  noted, Mattel's deposition of Bryant in 2004 took place before MGA even brought its
22  unfair competition claims and before Mattel filed its counterclaims, and Mattel had no
23  opportunity to depose Bryant on either.[76]  Thus, as Judge Infante justifiably found:

24        •     The new claims and defenses that were added to the case after Bryant's
             deposition justify additional deposition time. . . . Without question,
25

26  [75]   Order Granting in Part Mattel's Motion for Additional Time to Depose Carter
      Bryant for All Purposes (Sept. 28, 2007) ("Order re Additional Time"), at 8:7-13, Proctor
27  Dec., Ex. 43.
      [76]   Id. at 5:2-10.
28

EXHIBIT 10   PAGE 69

- Bryant is a critical witness regarding MGA's unfair competition claims and Mattel has not had an opportunity to depose him on such claims.[77]

- In addition, Mattel filed a counterclaim against Bryant, MGA, and other defendants in 2007, asserting thirteen different claims . . . . Bryant filed an answer asserting over twenty affirmative defenses. Mattel has not had an opportunity to depose Bryant on any of these claims or defenses.[78]

- Bryant is the central figure in this litigation and arguably the most important witness *for virtually every claim in the case*. No other witness in the case has his depth and breadth of relevant information.[79]

Bryant and MGA cannot dispute any of this. In interrogatory responses, MGA lists Bryant as a person directly involved with and knowledgeable about the allegedly infringed MGA products that MGA has put at issue.[80] MGA's responses to Mattel's interrogatories also state that the entire Bratz line is the subject of MGA's claims, and an MGA witness has declared that there are more than 200 Bratz products.[81] Moreover, Paula Garcia, MGA's Vice President of Product Design and Development, has declared that she and Bryant are "the *only* people who know what the concept is and who see the early product drawings" with respect to many Bratz products.[82] That is particularly important because many of both Mattel's *and* MGA's claims will turn on the source and timing of these products at issue. As the Court knows, Mattel's defenses to MGA's infringement claims rest, in part, on the fact that it was MGA which stole and copied Mattel products through its trade secret thefts. Testimony on the origins of those MGA products and when they were created is indispensable.

---

[77] Id. at 5:4-5.
[78] Id. at 5:6-10.
[79] Id. at 5:15-17 (emphasis added).
[80] MGA's Responses to Mattel's First Set of Interrogatories Re Claims of Unfair Competition, dated January 19, 2007, Response No. 1, at 6:9, Proctor Dec., Ex. 57.
[81] See Declaration of Patricia Perrier in Support of MGA's Opposition to Mattel's Motion to Try All Claims Related to Bratz Ownership in Phase One, dated May 25, 2007, at ¶ 2, Proctor Dec., Ex. 58; MGA Sup. Resp. Unfair Comp. No. 2, Proctor Dec., Ex. 26.
[82] Declaration of Paula Garcia in Support of MGA's Opposition to Mattel's Motion to Compel, dated February 9, 2007, ¶ 6 (emphasis in original), Proctor Dec., Ex. 59.

07209/2299353.1

-21-

EXHIBIT 10 PAGE 70

1    Bryant is also obviously a crucial witness on Mattel's copyright infringement,

2  RICO and other counterclaims, which raise a host of new issues Bryant has not been

3  deposed on. According to MGA, Mattel's copyright infringement claim against Bryant

4  alone relates to "*hundreds* of products."[83]  Bryant was also personally involved, either

5  as sender or recipient, in approximately 100 of the predicate acts of mail and wire fraud

6  alleged by Mattel. [84]  Mattel is entitled to question Bryant about these and all the other

7  issues presented for the first time by Mattel's counterclaims and Bryant's answer.

8    Moreover, as Judge Infante found, "new evidence justifies additional time to

9  depose Bryant."[85]  Judge Infante noted that Bryant's deposition took place before "98

10  percent of Bryant's and MGA's collective document production took place"[86] – and that

11  did not even reflect the more than a million-and-a-half pages, that MGA has produced

12  in recent weeks.[87]  In truth, *99.9%* of defendants' production in this case has occurred

13  only after Bryant's 2004 deposition.  Thus, Mattel has had no opportunity to examine

14  Bryant on the vast bulk of the evidence, whether relevant to new claims or the original

15  ones.  This includes, for example:

16    •    Bryant's fee agreements with MGA, which reflect that MGA is paying
        Bryant's legal fees at its discretion, and which were withheld by Bryant
17        even in the face of prior court orders;

18    •    Bratz design drawings produced by Bryant for the first time this year,
        only after being ordered, which bear handwritten dates of September
19        19, 1999, at time when Bryant was employed by Mattel;

20    •    Bryant's desktop hard drive, which reveals his use of "Evidence
        Eliminator" software, which was not produced until compelled this
21        year.

---

[83]   See MGA's Opposition to Mattel's Motion to Try All Claims Related to Bratz
Ownership in Phase One at 3:12-19.

[84]   See Mattel's Second Amended Answer & Counterclaims, Exhibit C.

[85]   Order re Additional Time at 5:20 (font altered), Proctor Dec., Ex. 43.

[86]   Id. at 5:24-27, Proctor Dec., Ex. 43.  Notably, Judge Infante calculated the 98
percent number based on MGA's production of 157,000 pages of documents as of the close
of briefing in late August.  Since that time MGA has produced over a million-and-a-half
pages of documents.  See Proctor Dec. ¶ 45.

[87]   See Proctor Dec. ¶ 45.

EXHIBIT 10 PAGE 71

1   • Original Bratz drawings, which Bryant did not make available for inspection until this summer, after being ordered to do so, notwithstanding his promise that he would produce such documents at the 2004 deposition.

3   • A fax from Bryant to David Rosenbaum, outside counsel for MGA, dated September 14, 2000, wherein Bryant stated that he could not ask Mattel's Human Resources any more questions about his contract with Mattel "without risking suspicion."

6   • October 10, 2000 e-mails between Isaac Larian, Victoria O'Connor and Paula Garcia (formerly Treantafelles), reflecting that Bryant worked on Bratz with MGA "on average about 4 hours a day," starting at least six weeks before he left Mattel.

9   • Invoices showing that Veronica Marlow, a key third party, billed MGA for 169 hours of development services on Bratz that were performed before Bryant left Mattel.

10  The list of new evidence that was requested by Mattel before Bryant's deposition but

11  first produced by defendants only later literally goes on and on. As Judge Infante

12  ruled, "a witness may be re-deposed with respect to . . . new developments" in a

13  case, including new documents such as these, as well as new claims.[88]

14

15      Despite his factual findings, Judge Infante ruled that Mattel is only entitled to an

16  additional seven hours of deposition. Previously Judge Infante had gave Mattel two

17  additional hours as a result of the improper instructions and objections by counsel at

18  Bryant's deposition.[89] So, under Judge Infante's ruling, Mattel has been limited to only

19  seven hours to depose Bryant – the "most important witness for virtually every claim in

20  the case"[90] – on MGA's claims, Mattel's counterclaims, the hundreds of MGA and

21  Mattel products now at issue about which Bryant has unique knowledge, and the vast

22  amounts of recently produced new evidence. This is unfair. The ruling that Mattel be

23

24  _____
    [88]  Order re Additional Time at 4:20-24 (quoting Fresenius Med. Care Hldgs. Inc. v.
25  Roxane Labs., Inc., 2007 WL 764302 (S.D. Ohio 2007)), Proctor Dec., Ex. 43.
    [89]  Order re Additional Time at 7:24-25, Proctor Dec., Ex. 43; see Order Granting In
26  Part And Denying In Part Mattel's Motion To Overrule Instructions Not To Answer During
27  The Deposition Of Carter Bryant (March 7, 2007), Proctor Dec., Ex. 44.
    [90]  Id. at 5:15-17.
28

-23-
MATTEL'S MOTION FOR ADDITIONAL INTERROGATORIES AND DEPOSITIONS

EXHIBIT / 0   PAGE 72

1  granted only seven additional hours is clearly erroneous given Bryant's singular

2  importance, the magnitude of this case and the tectonic shift of claims.

3      Also, based on <u>Rule</u> 30's "presumptive one day, seven-hour limitation on

4  depositions," Judge Infante awarded Mattel a total of 7 hours to depose Bryant on all of

5  MGA's claims and all of Mattel's counterclaims.[91]  It is simply impossible to conduct a

6  deposition on those claims – which had not even been filed when Bryant was first

7  deposed – in that amount of time.  Judge Infante apparently awarded Mattel no

8  additional time based on new evidence, even though 99.9% of defendants' production

9  has taken place since the 2004 deposition.  That effectively punishes Mattel for

10  defendants' discovery misconduct.  Mattel requested defendants' documents before the

11  deposition took place; defendants withheld them at their own peril, not at Mattel's.[92]

12  Mattel is entitled to a fair amount of time to depose the key witness in the case on the

13  new claims and evidence he has not been deposed on.  The Court should afford that,

14  and grant Mattel a total of 21 hours for the deposition.[93]

15

16

17     [91]  <u>Id.</u> at 8:10-13.

18     [92]  <u>See, e.g., Fresenius Medical Care Holdings, Inc. v. Roxane Laboratories, Inc.</u>, 2007 WL 764302, at *2 (S.D. Ohio 2007) (originally cited by Bryant to Judge Infante) (allowing

19  second deposition because defendant failed to produce requested documents prior to first deposition); <u>Robins v. Scholastic Book Fairs</u>, 928 F. Supp. 1027, 1036 (D. Or. 1996) ("the

20  second set of depositions of these individuals was necessary because they had to be questioned about additional documents that Defendant produced after the first set of

21  depositions"); <u>Ritchie v. U.S.</u>, 2004 WL 1161171, at *3 (N.D. Cal. 2004) ("when further

22  evidence linking [witness to the project in dispute] subsequently came to light this court permitted plaintiff to depose [the witness] a second time").

23     [93]  In the alternative, the Court should excercise its discretion to enlarge Mattel's time

24  to depose Bryant.  The Court previously extended MGA's deadlines to produce documents that it was compelled to produce even though Judge Infante had specifically *rejected*

25  MGA's request for additional time to comply and despite MGA's failure to show there was

26  any error in that ruling.  Here, there can be no dispute that the Court has the right to ensure that the parties receive fair discovery, proportionate to the magnitude and complexity of

27  the case, and that trial in this matter is conducted without undue surprises which will cause prejudice and waste the time of the Court and the jury.

28

EXHIBIT  /O  PAGE 73

1

**Conclusion**

2      For the foregoing reasons, Mattel respectfully requests that the Court grant

3  Mattel's motion for leave.

4  DATED:  November 19, 2007     QUINN EMANUEL URQUHART OLIVER &
                          HEDGES, LLP

5

6                       By Jon Corey /s/

7                         Jon Corey
                         Attorneys for Mattel, Inc.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

07209/2299353.1

-25-

EXHIBIT  10  PAGE  74