1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
   John B. Quinn (Bar No. 90378)
2  (johnquinn@quinnemanuel.com)
   Michael T. Zeller (Bar No. 196417)
3  (michaelzeller@quinnemanuel.com)
   Jon D. Corey (Bar No. 185066)
4  (joncorey@quinnemanuel.com)
   865 South Figueroa Street, 10th Floor
5  Los Angeles, California 90017-2543
   Telephone: (213) 443-3000
6  Facsimile: (213) 443-3100

7  Attorneys for Mattel, Inc.

8              UNITED STATES DISTRICT COURT

9            CENTRAL DISTRICT OF CALIFORNIA

10                    EASTERN DIVISION

11 | CARTER BRYANT, an individual,     | CASE NO. CV 04-9049 SGL (RNBx)

12 |              Plaintiff,           | Consolidated with
                                         Case No. CV 04-09059
13 |      vs.                          | Case No. CV 05-2727

14 | MATTEL, INC., a Delaware          | **DISCOVERY MATTER**
15 | corporation,                      | **[To be Heard by Discovery Master Hon. Edward Infante (Ret.) Pursuant to Court Order of December 6, 2006]**
16 |              Defendant.           |
17 |                                   | [PUBLIC REDACTED] DECLARATION OF BERNARD B. SMYTH IN SUPPORT OF MOTION OF PLAINTIFF MATTEL, INC. FOR ORDER FINDING WAIVER AND TO COMPEL PRODUCTION OF DOCUMENTS WITHHELD AS PRIVILEGED
18 | AND CONSOLIDATED ACTIONS          |
19 |                                   |
20 |                                   |
21 |                                   | Date:  February 8, 2008
                                         Time:  9:30 a.m.
22 |                                   | Place: TBA
23 |                                   | **Phase 1**
                                         Discovery Cut-Off:      January 28, 2008
24 |                                   | Pre-Trial Conference:  May 5, 2008
                                         Trial Date:            May 27, 2008

25

26

27

28

## DECLARATION OF BERNARD B. SMYTH

I, Bernard B. Smyth, declare as follows:

1.     I am a member of the bar of the State of California and an associate at Quinn Emanuel Urquhart Oliver & Hedges, LLP, attorneys for Mattel, Inc. ("Mattel"). I make this declaration of personal, firsthand knowledge, and if called and sworn as a witness, I could and would testify competently thereto.

2.     On January 16, 2008, my colleague, Dylan Proctor, wrote to counsel for MGA requesting a meet and confer regarding MGA's waiver of the attorney-client and work product privileges with respect to communications showing its lack of good faith in connection with its contracting with Carter Bryant and alleged purchase of rights to Bratz and subsequent copying, development, production and sales of Bratz. Attached as Exhibit 1 is a true and correct copy of the letter Mr. Proctor sent to Timothy Miller and Marcus Mumford, counsel for MGA. On January 21, 2008, Mr. Mumford responded to that letter stating that MGA did not waive any attorney-client or work product privilege in pleading its affirmative defenses. Attached as Exhibit 2 is a true and correct copy of the letter Mr. Mumford sent to Mr. Proctor. On January 23, 2008, I conferred with Mr. Mumford regarding Mattel's position that MGA had waived the privilege. I informed Mr. Mumford that the authorities supporting Mattel's position were, in large measure, those that MGA had relied on in its motion for implied waiver of the privilege against Mattel. The parties were unable to reach a resolution of the issue during my conference with Mr. Mumford.

3.     Attached as Exhibit 3 is a true and correct copy of Mattel's Second Amended Answer in Case No. 05-2727 and Counterclaims, dated July 12, 2007, with exhibits omitted.

4.     Attached as Exhibit 4 is a true and correct copy of the Amended Answer and Affirmative Defenses of MGA Entertainment Inc., MGA Entertainment

1   (HK) Limited, and MGAE de Mexico S.R.L. de C.V. to Mattel, Inc.'s Second

2   Amended Answer and Counterclaims, dated September 19, 2007

3           5.      Attached as Exhibit 5 is a true and correct copy of MGA

4   Entertainment Inc.'s Supplemental Responses to Mattel, Inc.'s Fifth Set of Requests

5   for Admission, dated August 21, 2007.

6           6.      Attached as Exhibit 6 is a true and correct copy of MGA's

7   Response to Mattel, Inc.'s Amended Supplemental Interrogatory Regarding

8   Defendants' Affirmative Defenses, dated January 7, 2008.

9           7.      Attached as Exhibit 7 is a true and correct copy of MGA

10  Entertainment, Inc.'s Second Supplemental Responses to Mattel, Inc.'s Revised

11  Third Set of Interrogatories, dated January 7, 2008.

12          8.      Attached as Exhibit 8 is a true and correct copy of a facsimile

13  sent from Carter Bryant to David Rosenbaum, dated September 14, 2000, produced

14  by MGA as bates-stamp numbers MGA007337-MGA007340.

15          9.      Attached as Exhibit 9 is a true and correct copy of relevant

16  excerpts of the deposition transcript of Isaac Larian, dated July 18, 2006.

17          10.     Attached as Exhibit 10 is a true and correct copy of relevant

18  excerpts of the deposition transcript of Victoria O'Connor, dated December 6, 2004.

19          11.     Attached as Exhibit 11 is a true and correct copy of the

20  Supplemental Revised Privilege and Redaction Log for MGA's 2005 Document

21  Production, dated November 16, 2007.

22          12.     Attached as Exhibit 12 is a true and correct copy of David

23  Rosenbaum's Privilege Log, dated December 3, 2007.

24          13.     Attached as Exhibit 13 is a true and correct copy of MGA's

25  Complaint in Case No. 05-2727, dated April 13, 2005.

26          14.     Attached as Exhibit 14 is a true and correct copy of an email

27  chain between Isaac Larian and David Rosenbaum, dated February 10, 2001 through

28

SMYTH DECLARATION

1  February 15, 2001, produced by MGA as bates-stamp numbers MGA3708210-
2  MGA3708211.

3        15.  Attached as Exhibit 15 is a true and correct copy of Isaac
4  Larian's Privilege Log, dated January 15, 2008.

5        16.  Attached as Exhibit 16 is a true and correct copy of MGA's
6  Supplemental Privilege Log, dated August 14, 2007.

7        17.  Attached as Exhibit 17 is a true and correct copy of MGA's
8  Notice of Motion and Motion to Compel Regarding Mattel's Privilege Waiver by
9  Claim Assertion, dated December 18, 2007.

10

11        I declare under penalty of perjury under the laws of the United States of
12  America that the foregoing is true and correct.

13        Executed on January 23, 2008, at Los Angeles, California.

14

15        Bernard B. Smyth

16

17

18

19

20

21

22

23

24

25

26

27

28

- 3 -

**EXHIBIT 1**

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-443-3000 FAX 213-443-3100

WRITER'S DIRECT DIAL NO.
**(213) 443-3112**

WRITER'S INTERNET ADDRESS
dylanproctor@quinnemanuel.com

January 16, 2008

<u>VIA FACSIMILE AND ELECTRONIC MAIL</u>
**(888) 329-1836 & (213) 687-5600**

Timothy A. Miller, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
Four Embarcadero Center, Suite 3800
San Francisco, California 94301

Marcus R. Mumford, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071

Re:    <u>Mattel, Inc. v. Bryant</u>

Dear Messrs. Miller and Mumford:

I write pursuant to section 5 of the Discovery Master Stipulation to request that the MGA Defendants, including Mr. Larian, meet and confer regarding MGA's waiver of the privilege regarding communications showing its lack of good faith in connections with its contracting with Bryant and alleged purchase of rights to Bratz and subsequent development, distribution and sales of Bratz.

A number of MGA affirmative defenses assert that MGA acted in good faith when it purchased Bratz from Bryant, and has continued to do so.  For example, MGA's Fifth and Sixth Affirmative Defenses assert that the "MGA Defendants acted with a good faith belief that Bryant owned the rights to his original Bratz drawings and that his assignment of such rights to MGA Defendants was valid and permissible."  MGA also separately asserts "good faith" as its Eighteenth Affirmative Defense.  In asserting its good faith as a defense, MGA may have waived the attorney-client and work product privileges as to communications and other withheld

**quinn emanuel urquhart oliver & hedges, llp**

NEW YORK | 51 Madison Avenue, 22nd Floor, New York, New York 10010 | TEL 212-849-7000 FAX 212-849-7100
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94111 | TEL 415-875-6600 FAX 415-875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560; Redwood Shores, California 94065 | TEL 650-801-5000 FAX 650-801-5100

EXHIBIT <u>1</u> PAGE <u>4</u>

information which could show MGA's lack of good faith, including communications regarding the purchase Bratz, MGA's contracting with Bryant and Bryant's relationship with Mattel.

Please let us know when MGA is available to meet and confer. Should the parties be unable to reach resolution on the issue, Mattel may file a motion for an order finding waiver of the attorney-client and work product privileges and to compel MGA to produce information withheld as privileged.

I look forward to hearing from you.


Very truly yours,

B. Dylan Proctor

BDP:BBS
07209/2355774.1

cc:     David Jin, Esq. (by electronic mail only)

EXHIBIT _1_ PAGE _5_

**EXHIBIT 2**

Jan-21-2008  05:45pm  From-SASMF                    2136875600         T-442  P 001/002  F-038

# SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

300 SOUTH GRAND AVENUE
LOS ANGELES, CALIFORNIA 90071-3144

TELEPHONE NO.: (213) 687-5000
FACSIMILE NO.: (213) 687-5600

EMAIL: MMUMFOAD@skadden.com

## FACSIMILE TRANSMITTAL SHEET

FROM: **Marcus Mumford**                    DATE: **January 21, 2008**

DIRECT DIAL: **(213) 687-5514**              FLOOR/OFFICE NO.: **36**

DIRECT FACSIMILE: **(213) 621-5514**

THIS FACSIMILE IS INTENDED ONLY FOR USE OF THE ADDRESSEE(S) NAMED HEREIN AND MAY CONTAIN LEGALLY PRIVILEGED AND/OR CONFIDENTIAL INFORMATION. IF YOU ARE NOT THE INTENDED RECIPIENT OF THIS FACSIMILE, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS FACSIMILE IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS FACSIMILE IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE AND RETURN THE ORIGINAL FACSIMILE TO US AT THE ADDRESS ABOVE VIA THE LOCAL POSTAL SERVICE. WE WILL REIMBURSE ANY COSTS YOU INCUR IN NOTIFYING US AND RETURNING THE FACSIMILE TO US.

IF THIS TRANSMISSION IS UNCLEAR OR INCOMPLETE, PLEASE CONTACT THE FACSIMILE DEPARTMENT AT (213) 687-5443.
WHEN TRANSMITTING TO OUR MACHINES, PLEASE INCLUDE YOUR COVER SHEET AND NUMBER ALL PAGES CONSECUTIVELY.

TOTAL NUMBER OF PAGES INCLUDING COVER(S): **2**

PLEASE DELIVER THE FOLLOWING PAGE(S) TO:

1. NAME: **Mr. B. Dylan Proctor, Esq.**          FIRM: **Quinn Emanuel Urquhart, etc.**

   CITY: **Los Angeles**                          TELEPHONE NO.: **(213) 443-3000**

   FACSIMILE NO.: **(213) 443-3100**

MESSAGE: **Please see attached letter.**

EXHIBIT **2** PAGE **6**

Jan-21-2008  05:45pm   From-SASMF                    2136875600            T-442  P.002/002  F-039

# SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

300 SOUTH GRAND AVENUE
LOS ANGELES, CALIFORNIA 90071-3144
TEL: (213) 687-5000
FAX: (213) 687-5600
www.skadden.com

FIRM/AFFILIATE OFFICES
BOSTON
CHICAGO
HOUSTON
NEW YORK
PALO ALTO
SAN FRANCISCO
WASHINGTON, D.C.
WILMINGTON
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

DIRECT DIAL
(213) 687-5514
DIRECT FAX
(213) 521-5514
EMAIL ADDRESS
MMUMFORD@SKADDEN.COM

January 21, 2008

__VIA FACSIMILE__

B. Dylan Proctor, Esq.
Quinn, Emanuel, Urquhart, Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA  90017-2543

        RE:   *Mattel, Inc. v. Bryant*

Dear Dylan:

      I write in response to your letter of January 16, 2008.  MGA did not waive any attorney-client privilege or work product immunity in stating its affirmative defenses in response to Mattel's claims and counterclaims.  In any event, your letter is unclear in stating what the scope of any purported waiver might be.  Moreover, you did not provide any authority to support your position, and we are therefore unable to respond to any specific arguments you may have.

      We are available to meet and confer to discuss these issues.  As you know, there are many events scheduled this week; please let me know what time you would propose.  We also request that you provide us, in advance of the meet and confer, the authority that your position relies upon and what specific documents or answers you believe were improperly withheld as a result of MGA's assertions of privilege.

      If I can be of any further assistance in this matter, please let me know.

                        Sincerely,

                        Marcus R. Mumford

EXHIBIT __2__ PAGE __7__

**EXHIBIT 3**

**THIS EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

**EXHIBIT 4**

1  DALE M. CENDALI (admitted pro hac vice)
   DIANA M. TORRES (S.B. #162284)
2  MARC F. FEINSTEIN (S.B. #158901)
   O'MELVENY & MYERS LLP
3  400 South Hope Street
   Los Angeles, California 90071-2899
4  Telephone: (213) 430-6000
   Facsimile: (213) 430-6407
5  Email: dtorres@omm.com

6  PATRICIA GLASER (S.B. # 55668)
   CHRISTENSEN, GLASER, FINK,
7  JACOBS, WEIL & SHAPIRO LLP
   10250 Constellation Boulevard, 19th Floor
8  Los Angeles, California  90067
   Telephone:  (310) 553-3000
9  Facsimile:   (310) 556-2920
   Email: pglaser@chrisglase.com

10
   Attorneys for Counter-defendants MGA
11 Entertainment, Inc., Isaac Larian, MGA
   Entertainment (HK) Limited, and MGAE de
12 Mexico S.R.L. de C.V.

13

14

15            UNITED STATES DISTRICT COURT

16          CENTRAL DISTRICT OF CALIFORNIA

17                 EASTERN DIVISION

| | |
|---|---|
| 18  CARTER BRYANT, an individual, | Case No. CV 05-2727 SGL (RNBx) (Consolidated with CV 04-09049 and CV 04-9059) |
| 19           Plaintiff, | |
| 20       v. | **AMENDED ANSWER AND AFFIRMATIVE DEFENSES OF MGA ENTERTAINMENT INC., MGA ENTERTAINMENT (HK) LIMITED, AND MGAE DE MEXICO S.R.L. DE C.V. TO MATTEL, INC.'S SECOND AMENDED ANSWER AND COUNTERCLAIMS** |
| 21  MATTEL, INC., a Delaware Corporation, | |
| 22           Defendant | |
| 23 | |
| 24 | |
| 25 | |
| 26  CONSOLIDATED WITH | Judge:        Hon. Stephen G. Larson Courtroom:  1 |
| 27  MATTEL, INC. v. BRYANT and MGA ENTERTAINMENT, INC. v. MATTEL, INC. | |
| 28 | |

EXHIBIT _4_ PAGE _87_

1    Counter-defendants MGA Entertainment, Inc. ("MGA"), MGA

2  Entertainment (HK) Limited, and MGAE de Mexico S.R.L. de C.V. (collectively

3  the "MGA Defendants") hereby answer, for themselves alone, the Second

4  Amended Answer and Counterclaim of Counter-claimant Mattel Inc., as follows:

5    As a preliminary matter, Mattel's use of headings throughout its

6  counterclaims is improper, and therefore no response to Mattel's headings is

7  required.  If any response is required, MGA Defendants deny all allegations

8  contained in Mattel's headings.

9                    **RESPONSES**

10    1.    MGA Defendants deny the allegations set forth in paragraph 1.

11    2.    MGA Defendants deny the allegations set forth in paragraph 2.

12    3.    MGA Defendants admit that MGA decided to expand into

13  Mexico in or about 2004, and deny the remaining allegations set forth in paragraph

14  3.

15    4.    MGA Defendants deny the allegations set forth in paragraph 4.

16    5.    MGA Defendants deny the allegations set forth in paragraph 5.

17    6.    MGA Defendants admit that the Court has federal question

18  jurisdiction over this action pursuant to 28 U.S.C. § 1331, deny that 17 U.S.C. §§

19  101 and 18 U.S.C. § 1964(c) apply to the extraterritorial conduct alleged in the

20  Counterclaims, and deny that Mattel is entitled to any relief on its Counterclaims.

21    7.    MGA Defendants admit that venue is proper in this District for

22  Mattel's claims based on conduct alleged to have occurred within this District and

23  deny that venue is proper in this District for acts alleged to have occurred in

24  Mexico, Canada, Hong Kong, or other places outside of this District.

25    8.    MGA Defendants admit the allegations set forth in paragraph 8.

26    9.    MGA Defendants admit the allegations set forth in the first and

27  second sentences of paragraph 9, and deny the remaining allegations set forth in

28  paragraph 9.

LA2:841935.2                    - 2 -

EXHIBIT _4_ PAGE _88_

10.  MGA Defendants admit the allegations set forth in paragraph 10.

11.  MGA Defendants admit the allegations set forth in the first sentence of paragraph 11, and deny the remaining allegations set forth in paragraph 11.

12.  MGA Defendants admit the allegations set forth in paragraph 12.

13.  MGA Defendants admit the allegations set forth in the first sentence of paragraph 13, and deny the remaining allegations set forth in paragraph 13.

14.  MGA Defendants admit the allegations set forth in paragraph 14.

15.  Paragraph 15 is a statement of Mattel's legal position, to which no response is necessary.  To the extent a response is required, MGA Defendants deny the allegations set forth in paragraph 15.

16.  MGA Defendants admit the allegations set forth in the first sentence of paragraph 16.  MGA Defendants are without sufficient knowledge to admit or deny the remaining allegations set forth in paragraph 16, and on that basis, deny the remaining allegations set forth in paragraph 16.

17.  MGA Defendants are without sufficient knowledge to admit or deny the allegations set forth in paragraph 17, and on that basis, deny the allegations set forth in paragraph 17.

18.  MGA Defendants are without sufficient knowledge to admit or deny the allegations set forth in paragraph 18, and on that basis, deny the allegations set forth in paragraph 18.

19.  MGA Defendants admit that MGA is a toy manufacturer, that MGA began as a consumer electronics business and expanded into the toy business with licenses to sell handheld electronic games, and later expanded its business by

EXHIBIT 4 PAGE 89

1   launching the Bratz fashion doll line, and deny the remaining allegations set forth in

2   paragraph 19.

3            20.    MGA Defendants deny the allegations set forth in paragraph 20.

4            21.    MGA Defendants admit that Carter Bryant is a former employee

5   of Mattel, and state that they are without sufficient knowledge to admit or deny the

6   remaining allegations set forth in paragraph 21, and on that basis, deny the

7   remaining allegations set forth in paragraph 21.

8            22.    MGA Defendants are without sufficient knowledge to admit or

9   deny the allegations set forth in paragraph 22, and on that basis, deny the

10  allegations set forth in paragraph 22.

11           23.    MGA Defendants are without sufficient knowledge to admit or

12  deny the allegations set forth in paragraph 23, and on that basis, deny the

13  allegations set forth in paragraph 23.

14           24.    MGA Defendants are without sufficient knowledge to admit or

15  deny the allegations set forth in paragraph 24, and on that basis, deny the

16  allegations set forth in paragraph 24.

17           25.    MGA Defendants are without sufficient knowledge to admit or

18  deny the allegations set forth in paragraph 25, and on that basis, deny the

19  allegations set forth in paragraph 25.

20           26.    MGA Defendants deny the allegations set forth in paragraph 26.

21           27.    MGA Defendants deny the allegations set forth in paragraph 27.

22           28.    MGA Defendants deny the allegations set forth in paragraph 28.

23           29.    MGA Defendants deny the allegations set forth in paragraph 29.

24           30.    MGA Defendants admit that after MGA made the decision to

25  proceed with the manufacture of the Bratz dolls, MGA employees communicated

26  with employees of MGA Entertainment (HK) Limited on subjects including the

27  manufacturing of Bratz, and deny the remaining allegations set forth in the first

28

EXHIBIT 4 PAGE 90

1  sentence of paragraph 30.  MGA Defendants admit the second sentence of

2  paragraph 30.

3          31.    MGA Defendants admit that samples of the four original Bratz

4  dolls were shown at the Hong Kong Toy Fair in January 2001, and deny the

5  remaining allegations set forth in paragraph 31.

6          32.    MGA Defendants admit that MGA and its subsidiaries have

7  distributed and sold Bratz and Bratz-related products in many countries throughout

8  the world, that MGA and its subsidiaries have licensed Bratz to third parties, that

9  MGA has derived annual revenues from its sales and licenses of Bratz in excess of

10 $500 million, that MGA and its subsidiaries continue to market, sell and license

11 Bratz and intend to continue to do so, and deny the remaining allegations set forth

12 in paragraph 32.

13         33.    MGA Defendants deny the allegations set forth in paragraph 33.

14         34.    MGA Defendants deny the allegations set forth in paragraph 34.

15         35.    MGA Defendants deny the allegations set forth in paragraph 35.

16         36.    MGA Defendants admit that Bryant had an agreement with

17 MGA, state that the terms of the agreement speak for themselves, and deny the

18 remaining allegations set forth in paragraph 36.

19         37.    MGA Defendants admit that in or about late 2003 or early 2004,

20 MGA decided to form a new corporation, MGAE de Mexico, S.R.L. de C.V., to

21 conduct business in Mexico, admit that MGAE de Mexico hired three employees of

22 Mattel's Mexican subsidiary, and deny the remaining allegations set forth in

23 paragraph 37.

24         38.    MGA Defendants admit that Carlos Gustavo Machado Gomez

25 was a Marketing Manager, Boys Division, for Mattel Mexico, admit that Machado

26 was employed at Mattel Mexico from April 1997 until April 19, 2004, admit that

27 Machado had access to some nonpublic business information of Mattel Mexico, and

28 state that they are without sufficient knowledge to admit or deny the remaining

LA2:841935.2                              - 5 -

EXHIBIT _4_ PAGE _91_

1    allegations set forth in paragraph 38, and on that basis, deny the remaining

2    allegations set forth in paragraph 38.

3          39.    MGA Defendants admit that Mariana Trueba Almada was a

4    Marketing Manager, Girls Division, for Mattel Mexico, admit that Trueba had

5    access to some nonpublic business information of Mattel Mexico, and state that

6    they are without sufficient knowledge to admit or deny the remaining allegations

7    set forth in paragraph 39, and on that basis, deny the remaining allegations set forth

8    in paragraph 39.

9          40.    MGA Defendants admit that Pablo Vargas San Jose was a Trade

10   Marketing Manager for Mattel Mexico, admit that Vargas was employed at Mattel

11   Mexico from March 2001 until April 19, 2004, admit that Vargas had access to

12   some nonpublic business information of Mattel Mexico, and state that they are

13   without sufficient knowledge to admit or deny the remaining allegations set forth in

14   paragraph 40, and on that basis, deny the remaining allegations set forth in

15   paragraph 40.

16         41.    MGA Defendants admit that in or about early 2004, Machado,

17   Trueba and Vargas discussed leaving Mattel Mexico, admit that Machado, Trueba

18   and Vargas resigned from Mattel Mexico on April 19, 2004, admit that they did not

19   identify their new employer to Mattel Mexico, admit that Machado, Trueba and

20   Vargas were offered and accepted employment with MGAE de Mexico, and deny

21   the remaining allegations set forth in paragraph 41.

22         42.    MGA Defendants admit that MGA personnel communicated by

23   telephone with Machado and Vargas prior to their Mattel resignations, admit that

24   MGA personnel, including Isaac Larian, communicated by e-mail with Machado

25   and Vargas concerning terms of employment through an America Online e-mail

26   account with the address <plot04@aol.com>, and deny the remaining allegations

27   set forth in paragraph 42.

28

LA2:841935.2

- 6 -

EXHIBIT _4_ PAGE _92_

43. MGA Defendants admit that in or about March 2004, Machado, Trueba, and Vargas made plans to travel from Mexico to Los Angeles in April 2004, admit that in or about March 2004, Machado, Trueba and Vargas discussed with MGA personnel, including Larian, employment at MGAE de Mexico, state that the quoted <plot04@aol.com> e-mails speak for themselves, and deny the remaining allegations set forth in paragraph 43.

44. MGA Defendants are without sufficient knowledge to admit or deny the allegations set forth in paragraph 44, and on that basis, deny the allegations set forth in paragraph 44.

45. MGA Defendants are without sufficient knowledge to admit or deny the allegations set forth in paragraph 45, and on that basis, deny the allegations set forth in paragraph 45.

46. MGA Defendants are without sufficient knowledge to admit or deny the allegations set forth in paragraph 46, and on that basis, deny the allegations set forth in paragraph 46.

47. MGA Defendants are without sufficient knowledge to admit or deny the allegation set forth in the third sentence of paragraph 47, and on that basis, deny these allegations, and deny the remaining allegations set forth in paragraph 47.

48. MGA Defendants deny the allegations set forth in paragraph 48.

49. MGA Defendants deny the allegations set forth in paragraph 49.

50. MGA Defendants are without sufficient knowledge to admit or deny the allegation that MGA publicized a claim that, in 2005, it had increased its Mexican market share by 90% over the prior year, and on that basis, deny this allegation, and deny the remaining allegations set forth in paragraph 50.

51. MGA Defendants deny the allegations set forth in paragraph 51.

52. MGA Defendants deny the allegations set forth in paragraph 52.

53. MGA Defendants admit that on October 27, 2005, Mexican authorities searched MGAE de Mexico and seized certain documents, and state that

EXHIBIT _4_ PAGE _93_

1  they are without sufficient knowledge to admit or deny the remaining allegations

2  set forth in paragraph 53, and on that basis, deny the remaining allegations set forth

3  in paragraph 53.

4       54.    MGA Defendants admit that Machado was transferred from

5  MGAE de Mexico to MGA's office in Van Nuys, California, admit that Machado

6  resides in the County of Los Angeles, and deny the remaining allegations set forth

7  in paragraph 54.

8       55.    MGA Defendants admit the allegations set forth in the first

9  sentence of paragraph 55. MGA Defendants admit that Tyco Toys hired Brawer on

10  April 22, 1996, and state that they are without sufficient knowledge to admit or

11  deny the remaining allegations set forth in the second sentence of paragraph 55, and

12  on that basis, deny the remaining allegations set forth in the second sentence of

13  paragraph 55. MGA Defendants admit the allegations set forth in third sentence of

14  paragraph 55. MGA Defendants admit that on April 9, 1997, Brawer became a

15  Marketing Director for Mattel in Mount Laurel, New Jersey, and state that the

16  remaining allegations in the fourth sentence of paragraph 55 are a statement of

17  Mattel's legal position, to which no response is necessary. To the extent a response

18  is required, MGA Defendants deny the remaining allegations set forth in paragraph

19  55.

20       56.    MGA Defendants are without sufficient knowledge to admit or

21  deny the allegations set forth in paragraph 56, and on that basis, deny the

22  allegations set forth in paragraph 56. The last sentence of paragraph 56 is a

23  statement of Mattel's legal position, to which no response is necessary. To the

24  extent a response is required, MGA Defendants deny the remaining allegations set

25  forth in paragraph 56.

26       57.    MGA Defendants admit that by 2003, Brawer had advanced

27  within Mattel to a Senior Vice President position over customer marketing, and

28  state that the remaining allegations in the first sentence of paragraph 57 are a

LA2:841935.2                                    - 8 -

EXHIBIT __4__ PAGE __94__

1   statement of Mattel's legal position, to which no response is necessary. To the

2   extent a response is required, MGA Defendants deny the remaining allegations set

3   forth in the first sentence of paragraph 57. MGA Defendants admit that in his

4   executive position, Brawer was provided access to certain nonpublic Mattel

5   information.

6        58.   MGA Defendants admit the allegations set forth in the first

7   sentence of paragraph 58. MGA Defendants deny the allegations set forth in the

8   second sentence of paragraph 58. MGA Defendants are without sufficient

9   knowledge to admit or deny the remaining allegations set forth in paragraph 58, and

10  on that basis, deny the remaining allegations set forth in paragraph 58.

11       59.   MGA Defendants are without sufficient knowledge to admit or

12  deny the allegations set forth in paragraph 59, and on that basis, deny the

13  allegations set forth in paragraph 59.

14       60.   MGA Defendants admit that in April 2004, Mattel made Brawer

15  a Senior Vice President/General Manager, and state that they are without sufficient

16  knowledge to admit or deny the remaining allegations set forth in paragraph 60, and

17  on that basis, deny the remaining allegations set forth in paragraph 60.

18       61.   MGA Defendants admit that in May 2004, Brawer began

19  performing General Manager duties, working with one of Mattel's major retail

20  customer accounts, and state that they are without sufficient knowledge to admit or

21  deny the remaining allegations set forth in paragraph 61, and on that basis, deny the

22  remaining allegations set forth in paragraph 61.

23       62.   MGA Defendants admit the allegations set forth in the first

24  sentence of paragraph 62. MGA Defendants admit that as Brawer left, he carried a

25  large cardboard box, and deny the remaining allegations set forth in the second

26  sentence of paragraph 62. MGA Defendants state that they are without sufficient

27  knowledge to admit or deny the remaining allegations set forth in paragraph 62, and

28  on that basis, deny the remaining allegations set forth in paragraph 62.

LA2:841935.2

- 9 -

EXHIBIT 4 PAGE 95

63.    MGA Defendants admit the allegations set forth in paragraph 63.

64.    MGA Defendants admit that on September 20, 2004, Mattel hand-delivered a letter to Brawer, state that the contents of the letter speak for themselves, and deny the remaining allegations set forth in paragraph 64.

65.    MGA Defendants admit that at his exit interview on September 29, 2004, Brawer was given a copy of an agreement with Tyco that he had signed on April 22, 1996, and a copy of Mattel's Code of Conduct, admit that Brawer stated that he had not signed the Code of Conduct, and deny the remaining allegations set forth in paragraph 65.

66.    MGA Defendants admit that on October 1, 2004, Brawer's last day of employment with Mattel, Mattel delivered a letter to Brawer, state that the contents of the letter speak for themselves, and deny the remaining allegations set forth in paragraph 66.

67.    MGA Defendants admit that Brawer became MGA's Executive Vice President of Sales and Marketing, admit that he was responsible for sales worldwide, admit that he had and continues to have responsibility for MGA's accounts with some of the same retailers that he worked with while at Mattel, and deny the remaining allegations set forth in paragraph 67.

68.    MGA Defendants admit that Brawer stated during his exit interview that he had returned all confidential proprietary information to Mattel, state that he did not provide copies of information from his personal contacts file, and deny the remaining allegations set forth in paragraph 68.

69.    MGA Defendants admit that since leaving Mattel, Brawer has had contacts with certain Mattel employees, both by telephone and electronic mail, and deny the remaining allegations set forth in paragraph 69.

70.    MGA Defendants deny the allegations set forth in paragraph 70.

EXHIBIT 4 PAGE 96

1          71.    MGA Defendants are without sufficient knowledge to admit or

2    deny the allegations set forth in paragraph 71, and on that basis, deny the

3    allegations set forth in paragraph 71.

4          72.    MGA Defendants are without sufficient knowledge to admit or

5    deny the allegations set forth in paragraph 72, and on that basis, deny the

6    allegations set forth in paragraph 72.

7          73.    MGA Defendants admit that on September 26, 2005, Brisbois

8    resigned from Mattel Canada, state that she took a position as Vice President of

9    National Accounts at MGAE Canada, and deny the remaining allegations set forth

10   in the first sentence of paragraph 73. MGA Defendants are without sufficient

11   knowledge to admit or deny the remaining allegations set forth in paragraph 73, and

12   on that basis, deny the remaining allegations set forth in paragraph 73.

13         74.    MGA Defendants admit that Brisbois spoke with Isaac Larian

14   by telephone on or about the evening of September 22, 2005, deny that Brisbois

15   copied approximately 45 Mattel documents onto a USB or thumb drive on that

16   same date, deny that Brisbois concealed the thumb drive the last time she left

17   Mattel Canada's office, and state that they are without sufficient knowledge to

18   admit or deny the remaining allegations set forth in paragraph 74, and on that basis,

19   deny the remaining allegations set forth in paragraph 74.

20         75.    MGA Defendants are without sufficient knowledge to admit or

21   deny the allegations set forth in paragraph 75, and on that basis, deny the

22   allegations set forth in paragraph 75.

23         76.    MGA Defendants admit that Brisbois traveled several times to

24   MGA's offices in Van Nuys, California and met with Larian and Brawer, that

25   MGA issued a press release, state that the press release speaks for itself, and state

26   that they are without sufficient knowledge to admit or deny the remaining

27   allegations set forth in paragraph 76 and, on that basis, deny the remaining

28   allegations set forth in paragraph 76.

EXHIBIT 4 PAGE 97

77.     MGA Defendants admit that MGA has hired at least 25 employees directly from Mattel's United States operations in the past few years, and deny the remaining allegations set forth in paragraph 77.

78.     MGA Defendants deny the allegations set forth in the first sentence of paragraph 78. MGA Defendants admit that Larian has sent email messages to a "Bratz News" distribution list, admit that the recipients of e-mail messages sent to the "Bratz News" distribution list includes members of the media as well as representatives of customers of both MGA and Mattel, and deny the remaining allegations set forth in paragraph 78.

79.     MGA Defendants admit that on May 12, 2006, Larian sent an email message to the "Bratz News" distribution list that included a reference to the new My Scene product with real gems, and state that they are without sufficient knowledge to admit or deny the remaining allegations set forth in paragraph 79, and on that basis, deny the remaining allegations set forth in paragraph 79.

80.     MGA Defendants admit that Larian told one retailer that such retailer was the only retailer with plans to purchase MY SCENE BLING BLING with real gems, at a time when Larian had a good faith belief that such retailer was the only retailer with plans to purchase MY SCENE BLING BLING with real gems, and deny the remaining allegations set forth in paragraph 80.

81.     MGA Defendants deny the allegation set forth in paragraph 81.

82.     MGA Defendants repeat their responses contained in paragraphs 1 through 81 of this Answer and incorporate them by reference as though fully and completely set forth herein.

83.     MGA Defendants deny the allegations set forth in paragraph 83.

84.     MGA Defendants deny the allegations set forth in paragraph 84.

85.     MGA Defendants deny the allegations set forth in paragraph 85.

86.     MGA Defendants deny the allegations set forth in paragraph 86.

87.     MGA Defendants deny the allegations set forth in paragraph 87.

LA2:841935.2

EXHIBIT 4 PAGE 98

1        88.    MGA Defendants repeat their responses contained in paragraphs
2    1 through 87 of this Answer and incorporate them by reference as though fully and
3    completely set forth herein.

4        89.    MGA Defendants deny the allegations set forth in paragraph 89.

5        90.    MGA Defendants deny the allegations set forth in paragraph 90.

6        91.    MGA Defendants deny the allegations set forth in paragraph 91.

7        92.    MGA Defendants deny the allegations set forth in paragraph 92.

8        93.    MGA Defendants deny the allegations set forth in paragraph 93.

9        94.    MGA Defendants deny the allegations set forth in paragraph 94.

10        95.    MGA Defendants deny the allegations set forth in paragraph 95.

11        96.    MGA Defendants deny the allegations set forth in paragraph 96.

12        97.    MGA Defendants deny the allegations set forth in paragraph 97.

13        98.    MGA Defendants repeat their responses contained in paragraphs
14    1 through 97 of this Answer and incorporate them by reference as though fully and
15    completely set forth herein.

16        99.    MGA Defendants deny the allegations set forth in paragraph 99.

17        100.    MGA Defendants deny the allegations set forth in paragraph
18    100.

19        101.    MGA Defendants deny the allegations set forth in paragraph
20    101.

21        102.    MGA Defendants deny the allegations set forth in paragraph
22    102.

23        103.    MGA Defendants deny the allegations set forth in paragraph
24    103.

25        104.    MGA Defendants deny the allegations set forth in paragraph
26    104.

27        105.    MGA Defendants deny the allegations set forth in paragraph
28    105.

LA2:841935.2

- 13 -

EXHIBIT __4__ PAGE __99__

106. MGA Defendants repeat their responses contained in paragraphs 1 through 105 of this Answer and incorporate them by reference as though fully and completely set forth herein.

107. MGA Defendants deny the allegations set forth in paragraph 107.

108. MGA Defendants deny the allegations set forth in paragraph 108.

109. MGA Defendants deny the allegations set forth in paragraph 109.

110. MGA Defendants deny the allegations set forth in paragraph 110.

111. MGA Defendants deny the allegations set forth in paragraph 111.

112. MGA Defendants deny the allegations set forth in paragraph 112.

113. MGA Defendants deny the allegations set forth in paragraph 113.

114. MGA Defendants deny the allegations set forth in paragraph 114.

115. MGA Defendants deny the allegations set forth in paragraph 115.

116. MGA Defendants repeat their responses contained in paragraphs 1 through 115 of this Answer and incorporate them by reference as though fully and completely set forth herein.

117. MGA Defendants deny the remaining allegations set forth in paragraph 117.

118. MGA Defendants deny the allegations set forth in paragraph 118.

EXHIBIT 4 PAGE 100

1      119.   MGA Defendants deny the allegations set forth in paragraph
2    119.

3      120.   MGA Defendants deny the allegations set forth in paragraph
4    120.

5      121.   MGA Defendants deny the allegations set forth in paragraph
6    121.

7      122.   MGA Defendants repeat their responses contained in paragraphs
8    1 through 121 of this Answer and incorporate them by reference as though fully and
9    completely set forth herein.

10     123.   MGA Defendants deny the allegations set forth in paragraph
11   123.

12     124.   MGA Defendants deny the allegations set forth in paragraph
13   124.

14     125.   MGA Defendants deny the allegations set forth in paragraph
15   125.

16     126.   MGA Defendants deny the allegations set forth in paragraph
17   126.

18     127.   MGA Defendants deny the allegations set forth in paragraph
19   127.

20     128.   MGA Defendants deny the allegations set forth in paragraph
21   128.

22     129.   MGA Defendants repeat their responses contained in paragraphs
23   1 through 128 of this Answer and incorporate them by reference as though fully and
24   completely set forth herein.

25     130.   The first and fifth sentences of paragraph 130 are statements of
26   Mattel's legal position, to which no response is necessary.  To the extent a response
27   is required, MGA Defendants deny the allegations set forth in the first and fifth
28   sentences of paragraph 130.  MGA Defendants are without sufficient knowledge to

EXHIBIT 4 PAGE 101

1    admit or deny the remaining allegations set forth in paragraph 130, and on that

2    basis, deny the remaining allegations set forth in paragraph 130.

3         131.    MGA Defendants deny the allegations set forth in paragraph

4    131.

5         132.    MGA Defendants deny the allegations set forth in paragraph

6    132.

7         133.    MGA Defendants deny the allegations set forth in paragraph

8    133.

9         134.    MGA Defendants deny the allegations set forth in paragraph

10   134.

11        135.    MGA Defendants deny the allegations set forth in paragraph

12   135.

13        136.    MGA Defendants repeat their responses contained in paragraphs

14   1 through 135 of this Answer and incorporate them by reference as though fully and

15   completely set forth herein.

16        137.    MGA Defendants deny the allegations set forth in paragraph

17   137.

18        138.    MGA Defendants deny the allegations set forth in paragraph

19   138.

20        139.    MGA Defendants deny the allegations set forth in paragraph

21   139.

22        140.    MGA Defendants deny the allegations set forth in paragraph

23   140.

24        141.    MGA Defendants deny the allegations set forth in paragraph

25   141.

26        142.    MGA Defendants repeat their responses contained in paragraphs

27   1 through 141 of this Answer and incorporate them by reference as though fully and

28   completely set forth herein.

EXHIBIT 4 PAGE 102

1        143.   Paragraph 143 is a statement of Mattel's legal position, to which

2  no response is necessary. To the extent a response is required, MGA Defendants

3  deny the allegations set forth in the paragraph 143.

4        144.   MGA Defendants deny the allegations set forth in paragraph

5  144.

6        145.   MGA Defendants deny the allegations set forth in paragraph

7  145.

8        146.   MGA Defendants deny the allegations set forth in paragraph

9  146.

10       147.   MGA Defendants deny the allegations set forth in paragraph

11  147.

12       148.   MGA Defendants deny the allegations set forth in paragraph

13  148.

14       149.   MGA Defendants repeat their responses contained in paragraphs

15  1 through 148 of this Answer and incorporate them by reference as though fully and

16  completely set forth herein.

17       150.   MGA Defendants deny the allegations set forth in paragraph

18  150.

19       151.   MGA Defendants deny the allegations set forth in paragraph

20  151.

21       152.   MGA Defendants deny the allegations set forth in paragraph

22  152.

23       153.   MGA Defendants deny the allegations set forth in paragraph

24  153.

25       154.   MGA Defendants deny the allegations set forth in paragraph

26  154.

27

28

LA2:841935.2

- 17 -

EXHIBIT 4 PAGE 103

1       155.   MGA Defendants repeat their responses contained in paragraphs

2   1 through 154 of this Answer and incorporate them by reference as though fully and

3   completely set forth herein.

4       156.   MGA Defendants deny the allegations set forth in paragraph

5   156.

6       157.   MGA Defendants deny the allegations set forth in paragraph

7   157.

8       158.   MGA Defendants deny the allegations set forth in paragraph

9   158.

10       159.   MGA Defendants deny the allegations set forth in paragraph

11   159.

12       160.   MGA Defendants deny the allegations set forth in paragraph

13   160.

14       161.   MGA Defendants deny the allegations set forth in paragraph

15   161.

16       162.   MGA Defendants deny the allegations set forth in paragraph

17   162.

18       163.   MGA Defendants repeat their responses contained in paragraphs

19   1 through 162 of this Answer and incorporate them by reference as though fully and

20   completely set forth herein.

21       164.   MGA Defendants deny the allegations set forth in paragraph

22   164.

23       165.   MGA Defendants deny the allegations set forth in paragraph

24   165.

25       166.   MGA Defendants deny the allegations set forth in paragraph

26   166.

27

28

LA2:841935.2                                              - 18 -

EXHIBIT __4__ PAGE __104__

1         167.   MGA Defendants repeat their responses contained in paragraphs

2    1 through 166 f this Answer and incorporate them by reference as though fully and

3    completely set forth herein.

4         168.   MGA Defendants deny the allegations set forth in paragraph

5    168.

6         169.   Paragraph 169 is a statement of Mattel's legal position, to which

7    no response is necessary.  To the extent a response is required, MGA Defendants

8    deny the allegations set forth in the paragraph 169.

9         170.   Paragraph 170 is a statement of Mattel's legal position, to which

10   no response is necessary.  To the extent a response is required, MGA Defendants

11   deny the allegations set forth in the paragraph 170.

12   ## AFFIRMATIVE DEFENSES

13       Without admitting any wrongful conduct on the part of MGA Defendants or

14   any Counter-Defendant, and without admitting that Mattel suffered any loss,

15   damage, or injury, MGA Defendants allege the following affirmative defenses to

16   the Counterclaims.  By designating the following as affirmative defenses, MGA

17   Defendants do not in any way waive or limit any defenses which are or may be

18   raised by their denials, allegations, and averments set forth herein.  MGA

19   Defendants also do not, by alleging any affirmative defense, admit that Mattel does

20   not have the burden of proof for any or all facts underlying any of those defenses.

21   These defenses are pled in the alternative, and are raised to preserve the rights of

22   MGA Defendants to assert such defenses, and are without prejudice to their ability

23   to raise other and further defenses.

24   ## FIRST AFFIRMATIVE DEFENSE

25   ### (Failure to State a Claim)

26       Mattel's counterclaims fail to state a claim against MGA Defendants upon

27   which relief can be granted.

28

LA2:841935.2                                    - 19 -

EXHIBIT 4 PAGE 105

## SECOND AFFIRMATIVE DEFENSE

### (Unclean Hands/*in Pari Delicto*)

Mattel's counterclaims are barred in whole or in part by Mattel's unclean hands and wrongful acts. This affirmative defense is based, in part, on Mattel's efforts to undermine MGA's business and to "kill" Bratz at any cost which include, but are not limited to, Mattel's efforts to infringe and dilute MGA's trade dress, copy MGA's products, packaging, themes, and advertising (including for Mattel products My Scene, Diva Starz, Wee 3 Friends, Acceleracers, Polly Pocket, and Little Mommy products, to name a few), and engage in other acts of unfair competition against MGA as alleged in MGA's complaint against Mattel; Mattel's efforts to create negative publicity or press about MGA, MGA products, Bryant, Larian, or MGA employees; Mattel's efforts to fund or commission market research or studies that portray Bratz or MGA products negatively; Mattel's efforts to interfere with MGA's acquisition of or investment in Zapf Creation AG; Mattel's efforts to include negative references to MGA or Bratz on Mattel's "We Believe in Girls" website; Mattel's efforts or intent to interfere with business dealings or contractual relations between MGA and Smoby Group; Mattel's influencing Nickelodeon to reject MGA advertisements or to limit time slots for advertisements; assisting parties in lawsuits against MGA; Mattel's monitoring, "spying on" or gaining knowledge of MGA's trade secrets, non-public information, non-public activities, unreleased products, and product development; gaining access, or attempts to gain access, to MGA showrooms, Plan-o-Grams, merchandising displays, Toy Fair displays on false pretenses; Mattel's wrongfully obtaining MGA's costs and sales information through Mattel-employed category managers at retailers; Mattel's inducing non-party customers to breach confidentiality agreements with MGA and divulge non-public information about MGA's unreleased products; Mattel's covertly investigating MGA, its officers and employees, and their family members; Mattel's contacting persons under false

EXHIBIT __4__ PAGE _106_

1   pretense in order to interrogate them about Bratz and this litigation; Mattel's

2   coercing its employees to accept restrictive covenants (right before a massive

3   layoff) and non-compete clauses and other efforts to prevent prospective MGA

4   employees from accepting offers of employment; Mattel's delay in suing Carter

5   Bryant because, *inter alia*, Mattel wanted Bryant to testify in an unrelated Mattel

6   case; Mattel's falsely inflating its Barbie sales figures in an effort to mislead the

7   public and retailers; and Mattel's taking all measures to conceal its bad acts,

8   including the willful non-retention and destruction of documents. Additionally,

9   Mattel believed from the time that Carter Bryant left Mattel's employ that he was

10   going to perform work for a Mattel competitor. Mattel began investigating Bryant

11   and MGA Defendants, including Bryant's role in the creation and development of

12   Bratz, at least as early as March 2002. Nonetheless, Mattel waited years to bring

13   suit, all the while allowing MGA Defendants to spend years developing their

14   business and invest tens of millions of dollars developing the Bratz products and

15   building the Bratz brand. These averments are made on information and belief

16   except where MGA Defendants have knowledge thereof.

17              **THIRD AFFIRMATIVE DEFENSE**

18                   (Laches)

19       Mattel's counterclaims are barred by the equitable doctrine of laches

20   because, among other things, Mattel believed from the time that Carter Bryant left

21   Mattel's employ that he was going to perform work for a Mattel competitor. Mattel

22   began investigating Bryant and MGA Defendants, including Bryant's role in the

23   creation and development of Bratz, at least as early as March 2002 and thereafter

24   continued its investigation into Bryant's role in the creation and development of

25   Bratz, as well as his work with MGA, in August 2002 after Mattel's CEO, Robert

26   Eckert, received an "anonymous letter" that claimed that Bryant stole the idea for

27   Bratz from Mattel and sold it to MGA Defendants. Nonetheless, Mattel waited

28   years to bring suit, all the while allowing MGA Defendants to spend years

EXHIBIT 4 PAGE 107

1   developing their business and invest tens of millions of dollars developing the Bratz

2   products and building the Bratz brand.

3   ### FOURTH AFFIRMATIVE DEFENSE

4   ### (Statute of Limitations)

5       Mattel's counterclaims are barred by the applicable statutes of limitations,

6   including but not limited to, 18 U.S.C. § 1961 *et seq.*, 17 U.S.C. § 507(b), and Code

7   of Civil Procedure §§ 337, 339, 343 and 338(c).

8   ### FIFTH AFFIRMATIVE DEFENSE

9   ### (*Bona Fide* Purchaser for Value)

10      Mattel cannot maintain its counterclaims against MGA Defendants because

11  MGA Defendants paid valuable consideration for Bryant's assignment of his rights

12  in the original Bratz drawings to MGA Defendants, and MGA Defendants acted

13  with a good faith belief that Bryant owned the rights to his original Bratz drawings

14  and that his assignment of such rights to MGA Defendants was valid and

15  permissible.

16  ### SIXTH AFFIRMATIVE DEFENSE

17  ### (17 U.S.C. § 205(d))

18      Mattel cannot maintain its counterclaims against MGA Defendants because,

19  among other things, MGA Defendants acted with a good faith belief that Bryant

20  owned the rights to his original Bratz drawings and that his assignment of such

21  rights to MGA Defendants was valid and permissible.

22  ### SEVENTH AFFIRMATIVE DEFENSE

23  ### (Information Readily Ascertainable)

24      MGA Defendants cannot be liable, either on their own account or by

25  association with other defendants, for misappropriation of information that was

26  readily ascertainable by proper means at the time of the alleged acquisition or use.

27  Such information includes, but is not limited to, the identity of suppliers,

28

LA2:841935.2

- 22 -

EXHIBIT 4 PAGE 108

1   manufacturers, distributors and retailers; contact information for the same; and

2   sales, marketing and media data.

### EIGHTH AFFIRMATIVE DEFENSE

#### (Acts or Omissions of Others)

5   Mattel's damages, if any, were not caused by MGA Defendants and are not

6   attributable to any acts or omissions of MGA Defendants.

### NINTH AFFIRMATIVE DEFENSE

#### (Estoppel)

9   Mattel's counterclaims are barred in whole or in part by the equitable

10   doctrine of estoppel because, among other things, Mattel believed from the time

11   that Carter Bryant left Mattel's employ that he was going to perform work for a

12   Mattel competitor.  Mattel began investigating Bryant and MGA Defendants,

13   including Bryant's role in the creation and development of Bratz, at least as early as

14   March 2002.  Nonetheless, Mattel waited years to bring suit, all the while allowing

15   MGA Defendants to spend years developing their business and invest tens of

16   millions of dollars developing the Bratz products and building the Bratz brand.

### TENTH AFFIRMATIVE DEFENSE

#### (Acquiescence)

19   Mattel's counterclaims are barred in whole or in part by acquiescence

20   because, among other things, Mattel believed from the time that Carter Bryant left

21   Mattel's employ that he was going to perform work for a Mattel competitor.  Mattel

22   began investigating Bryant and MGA Defendants, including Bryant's role in the

23   creation and development of Bratz, at least as early as March 2002.  Nonetheless,

24   Mattel waited years to bring suit, all the while allowing MGA Defendants to spend

25   years developing their business and invest tens of millions of dollars developing the

26   Bratz products and building the Bratz brand.  Additionally, Mattel tolerated and

27   condoned conduct by other employees similar to the alleged conduct by Bryant and

28   others on which Mattel bases its claims.

EXHIBIT 4 PAGE 109

## ELEVENTH AFFIRMATIVE DEFENSE

### (Failure to Mitigate)

MGA Defendants deny that Mattel suffered any damages, but even if it did, Mattel failed to take reasonable steps to mitigate those purported damages.

## TWELFTH AFFIRMATIVE DEFENSE

### (No Statutory Damages or Attorneys' Fees)

Mattel is barred from recovering statutory damages and/or attorneys' fees because it failed to register the copyrights that are purportedly at issue within the time required by 17 U.S.C. § 412.

## THIRTEENTH AFFIRMATIVE DEFENSE

### (Waiver)

Mattel's counterclaims are barred in whole or in part by waiver because, among other things, Mattel believed from the time that Carter Bryant left Mattel's employ that he was going to perform work for a Mattel competitor. Mattel began investigating Bryant and MGA Defendants, including Bryant's role in the creation and development of Bratz, at least as early as March 2002. Nonetheless, Mattel waited years to bring suit, all the while allowing MGA Defendants to spend years developing their business and invest tens of millions of dollars developing the Bratz products and building the Bratz brand.

## FOURTEENTH AFFIRMATIVE DEFENSE

### (Abandonment)

Mattel has abandoned any interest it may have had in the alleged copyrighted works.

## FIFTEENTH AFFIRMATIVE DEFENSE

### (*De Minimus* Use)

MGA Defendants deny that Mattel owns any copyright interest in the alleged works, but even if Mattel could craft a claim that the Bratz dolls incorporate an

LA2:841935.2

- 24 -

EXHIBIT 4 PAGE 110

1  aspect of a Mattel copyrighted work, such use would be *de minimus* and non-
2  infringing.

### SIXTEENTH AFFIRMATIVE DEFENSE

#### (Joint Authorship)

5  MGA Defendants deny that Mattel owns any copyright interest in the alleged
6  works, but even if it did, any liability would be eliminated or greatly diminished by
7  the doctrine of joint authorship.

### SEVENTEENTH AFFIRMATIVE DEFENSE

#### (Competition Privilege/Justification)

10  Mattel's counterclaims are barred in whole or in part on the grounds that the
11  acts of the MGA Defendants were lawful competition or justified.

### EIGHTEENTH AFFIRMATIVE DEFENSE

#### (Good Faith)

14  Mattel's counterclaims are barred in whole or in part because the MGA
15  Defendants acted in good faith.

### NINETEENTH AFFIRMATIVE DEFENSE

#### (Lack of Authority)

18  Mattel's counterclaims are barred in whole or in part on the grounds that to
19  the extent any person committed an unlawful or tortious act, the person lacked
20  authority to commit such act on behalf of the MGA Defendants.

### TWENTIETH AFFIRMATIVE DEFENSE

#### (Lack of Standing)

23  Mattel's counterclaims are barred in whole or in part by its lack of standing.

### TWENTY-FIRST AFFIRMATIVE DEFENSE

#### (Joinder in Defenses of Co-Defendants)

26  MGA Defendants hereby adopt and incorporate by reference any and all
27  other affirmative defenses that have been or will be asserted by any other defendant
28  (including Bryant) in this litigation to the extent that defendants may share in such

LA2:841935.2

EXHIBIT 4 PAGE 111

1   affirmative defenses.

2   ## TWENTY-SECOND AFFIRMATIVE DEFENSE

3   ### (Undiscovered Defenses)

4   MGA Defendants have insufficient knowledge or information upon which to

5   form a belief as to whether additional defenses are available.  MGA Defendants

6   reserve the right to assert any further or additional defenses upon receiving more

7   complete information regarding the matters alleged in the Counterclaims, through

8   discovery or otherwise.

9

10   WHEREFORE, MGA Entertainment, Inc., MGA Entertainment (HK)

11   Limited, and MGAE de Mexico S.R.L. de C.V., pray for relief as follows:

12       a.   that the Counterclaims be dismissed with prejudice;

13       b.   that judgment be entered in favor of counter-defendants and against

14   counterclaimant;

15       c.   that counter-defendants recover their costs and attorneys' fees; and

16       d.   that the Court award such other and further relief as is just and proper.

17

18   Dated:  September 19, 2007          O'MELVENY & MYERS LLP

19

20

21                           Marc F. Feinstein
                        Attorneys for Counter-defendants

22                           MGA Entertainment, Inc., Isaac Larian,
                        MGA Entertainment (HK) Limited, and

23                           MGAE de Mexico S.R.L. de C.V.

24

25

26

27

28

EXHIBIT 4 PAGE 112

1

## PROOF OF SERVICE

2

I, Karen A. Nakatsu, declare:

3

I am a resident of the State of California and over the age of eighteen years, and not a party to the within action; my business address is 400 South Hope Street, Los Angeles, California 90071-2899. On September 19, 2007, I served the within document(s):

4

5

**AMENDED ANSWER AND AFFIRMATIVE DEFENSES OF MGA ENTERTAINMENT, INC., MGA ENTERTAINMENT (HK) LIMITED, AND MGAE DE MEXICO S.R.L. DE C.V. TO MATTEL, INC.'S SECOND AMENDED ANSWER AND COUNTERCLAIMS**

6

7

8

☒   by causing to be personally served the document(s) listed above to the person(s) listed below.

9

10

John B. Quinn, Esq.
Michael T. Zeller, Esq.
B. Dylan Proctor, Esq.
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street,
10th Floor
Los Angeles, CA 90017

11

12

13

14

☒   by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California addressed as set forth below. I am readily familiar with the firm's practice of collecting and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

15

16

17

18

19

Patricia Glaser, Esq.
Christensen, Glaser, Fink, Jacobs,
Weil & Shapiro, LLP
10250 Constellation Blvd.,
19th Floor
Los Angeles, CA 90067

Michael H. Page, Esq.
Keker & Van Nest LLP
710 Sansome Street
San Francisco, CA 94111

20

21

22

23

James W. Spertus, Esq.
Law Offices of James W. Spertus
12100 Wilshire Blvd., Suite 620
Los Angeles, CA 90025

24

25

26

27

28

LA2:817525.2

EXHIBIT __4__ PAGE __113__

1   I declare under penalty of perjury under the laws of the United States that the
2   above is true and correct.

3   Executed on September 19, 2007, at Los Angeles, California.

4

5                                                      _Karen a. Nakatsu_
                                                       Karen A. Nakatsu
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LA2:817525.2

EXHIBIT 4 PAGE 114

.

**EXHIBIT 5**

# ORIGINAL

1  DIANA M. TORRES (S.B. #162284)
   JAMES P. JENAL (S.B. #180190)
2  O'MELVENY & MYERS LLP
   400 South Hope Street
3  Los Angeles, CA 90071-2899
   Telephone: (213) 430-6000
4  Facsimile: (213) 430-6407
   Email: jjenal@omm.com
5
   DALE M. CENDALI (admitted *pro hac vice*)
6  O'MELVENY & MYERS LLP
   Times Square Tower, 7 Times Square
7  New York, New York 10036
   Telephone: (212) 326-2000
8  Facsimile: (212) 326-2061

9  PATRICIA GLASER (S.B. #55668)
   CHRISTENSEN, GLASER, FINK, JACOBS,
   WEIL & SHAPIRO, LLP
10 10250 Constellation Boulevard, 19th Floor
   Los Angeles, CA 90067
11 Telephone: (310) 553-3000
   Facsimile: (310) 557-9815

12 Attorneys for MGA Entertainment, Inc.

13

14 **UNITED STATES DISTRICT COURT**

15 **CENTRAL DISTRICT OF CALIFORNIA**

16 **EASTERN DIVISION**

17

| | |
|---|---|
| 18  CARTER BRYANT, an individual, | Case No. CV 04-09049 SGL (RNBx) |
| 19          Plaintiff, | Consolidated with Case Nos. CV 04-9059 and CV 05-2727 |
| 20      v. | **MGA ENTERTAINMENT INC.'S** |
| 21  MATTEL, INC., a Delaware Corporation, | **SUPPLEMENTAL RESPONSES TO MATTEL, INC.'S FIFTH SET OF REQUESTS FOR ADMISSION** |
| 22          Defendant. | |
| 23 | |
| 24  AND CONSOLIDATED ACTIONS. | |

25

26  PROPOUNDING PARTY:   Mattel, Inc.

27  RESPONDING PARTY:    MGA Entertainment, Inc.

28  SET NO.:             Five

8/22

---

SUPPLEMENTAL RESPONSES TO MATTEL'S FIFTH SET OF RFA'S PROPOUNDED TO MGA

EXHIBIT 5 PAGE 115

## INTRODUCTORY STATEMENT

1
2          MGA Entertainment, Inc.'s ("MGA") responses and objections are
3  made solely for the purpose of this action, and are made based upon information
4  presently known and available to MGA.  MGA has not completed its investigation
5  of facts relating to this case, has not fully completed its discovery in this action, and
6  has not completed its preparation for trial.  Accordingly, the following responses
7  are based only upon such information and documents as are presently available and
8  specifically known to MGA, and disclose only those facts and contentions that
9  presently occur to MGA.  Further discovery, independent investigation, legal
10  research and analysis may supply additional facts, add meaning to known facts, and
11  establish entirely new factual conclusions and legal contentions, any of which may
12  lead to additions to, changes to, or variations from the responses set forth below.
13          The following responses are given without prejudice to MGA's right
14  to produce evidence of any subsequently discovered facts that MGA may later
15  recall or locate.  MGA, accordingly, reserves the right to supplement and/or change
16  any and all of the following responses as additional facts are ascertained, analyses
17  are made, legal research is completed, and contentions are investigated, and
18  reserves the right to rely upon and present at hearing or trial any information or
19  documents that may be subsequently discovered as a result of this ongoing
20  discovery and investigation.  The responses contained herein are made in a good
21  faith effort to supply as much factual information as is presently known, but should
22  in no way be to the prejudice of MGA in relation to further discovery, research or
23  analysis.
24          A response to any of the Requests does not constitute an admission by
25  MGA that it agrees with plaintiff's characterization or definition contained therein,
26  that the information sought is relevant to a claim or defense, or that the information
27  sought is likely to lead to admissible evidence.  Except for explicit facts admitted
28  herein, no admission of any nature whatsoever is to be implied by or inferred from

1

EXHIBIT _5_ PAGE _116_

1   any response anywhere stated in this document.  By responding to these Requests,

2   MGA does not concede the relevancy, materiality, or admissibility of any

3   information sought by the requests or any responses thereto.

4        This Introductory Statement applies to each and every response

5   contained herein.

6                    **GENERAL OBJECTIONS**

7        The following General Objections apply to the entirety of Mattel's

8   Fifth Set of Requests for Admission (the "Requests").  The assertion of same,

9   similar, or additional objections to the individual requests does not waive any of

10  MGA's General Objections as set forth below.

11       1.    To the extent these Requests request MGA to provide

12  information concerning the legal basis regarding its defense of this matter, MGA

13  objects on the grounds that the Requests impermissibly call for mental impressions,

14  conclusions, opinions and/or legal theories of MGA's attorneys.

15       2.    MGA also objects to the extent these Requests call for the

16  disclosure of information protected by the attorney-client privilege, the work-

17  product doctrine, the joint defense or common interest privilege or any other

18  applicable privilege.

19       3.    MGA further objects to the extent that these Requests seek

20  information comprising the trade secrets of MGA and/or third parties, and/or

21  otherwise constitute confidential information, protected from disclosure by

22  California and/or federal law.

23       4.    MGA objects to the Requests on the grounds that they attempt to

24  unfairly restrict the facts on which MGA may rely at trial.  Discovery has not been

25  completed and MGA is not yet necessarily in possession of all the facts and

26  documents upon which MGA intends to rely.  All of the responses submitted

27  herewith are tendered to Mattel with the reservation that the responses are

28  submitted without limiting the evidence on which MGA may rely to support the

2

SUPPLEMENTAL RESPONSES TO MATTEL'S FIFTH SET OF RFA'S PROPOUNDED TO MGA

EXHIBIT 5 PAGE 117

1   contentions that MGA may assert at the trial of this action.  Further, MGA reserves

2   the right to supplement or amend these responses at a future date if same is deemed

3   appropriate.

4          5.   MGA objects to the Requests on the grounds that they are

5   compound, vague, overbroad, unduly burdensome or oppressive, seek information

6   that is not within MGA's knowledge, or seek information that is neither relevant to

7   this litigation nor reasonably calculated to lead to the discovery of admissible

8   evidence.

9          6.   MGA objects to the defined terms "You," "MGA," "Affiliates,"

10   "Person," Design," "Bratz," "Bratz Works," "Mattel," "The Bratz Pitch Materials"

11   and "Create or Improve" on the grounds that these terms, as defined, are overbroad,

12   are vague and ambiguous, and call for legal conclusions.

13          These General Objections shall be deemed incorporated into each

14   specific response below as if they were fully set forth below.  Nevertheless, without

15   waiver of, without prejudice to, and expressly hereby reserving all of the foregoing

16   General Objections, MGA submits the following responses to the Requests.

17

18                   **SPECIFIC SUPPLEMENTAL RESPONSES**

19   **REQUEST FOR ADMISSION NO. 1:**

20          Admit that YOU CONTEND YOU believed at the time YOU entered into

21   the BRYANT/MGA AGREEMENT that it would be lawful for YOU to market

22   BRATZ.

23   **RESPONSE TO REQUEST FOR ADMISSION NO. 1:**

24          In addition to the above General Objections, each of which is incorporated by

25   reference as though fully set forth herein, MGA also objects to this request on the

26   grounds that this request calls for a legal conclusion.  MGA also objects that this

27   request calls for the disclosure of information protected by the attorney-client

28   privilege, the work-product doctrine, the joint defense privilege and/or the common

                                   3

EXHIBIT 5 PAGE 118

1  interest privilege. MGA further objects that the term "BRATZ" is vague and

2  ambiguous and, as defined by Mattel, renders the RFA nonsensical as no BRATZ

3  then existed.

4       Subject to, and without waiving, the foregoing objections, MGA responds:

5  MGA admits that it contends it believed at the time it entered into its agreement

6  with Bryant and at all times thereafter that it had the right to market products

7  developed as a result of its agreement with Bryant.

8

9  **REQUEST FOR ADMISSION NO. 2:**

10      Admit that YOU do not CONTEND YOU believed at the time YOU entered

11  into the BRYANT/MGA AGREEMENT that it would be lawful for YOU to market

12  BRATZ.

13 **RESPONSE TO REQUEST FOR ADMISSION NO. 2:**

14      In addition to the above General Objections, each of which is incorporated by

15  reference as though fully set forth herein, MGA also objects to this request on the

16  grounds that this request calls for a legal conclusion. MGA also objects that this

17  request calls for the disclosure of information protected by the attorney-client

18  privilege, the work-product doctrine, the joint defense privilege and/or the common

19  interest privilege. MGA further objects that the term "BRATZ" is vague and

20  ambiguous and, as defined by Mattel, renders the RFA nonsensical as no BRATZ

21  then existed.

22      Subject to, and without waiving, the foregoing objections, MGA responds:

23  MGA denies the request and specifically denies that it does not contend it believed

24  at the time it entered into its agreement with Bryant or at any time thereafter that it

25  had the right to market products developed as a result of its agreement with Bryant.

26

27 **REQUEST FOR ADMISSION NO. 3:**

28      Admit that YOU CONTEND YOU believed at the time YOU entered into

4

SUPPLEMENTAL RESPONSES TO MATTEL'S FIFTH SET OF RFA'S PROPOUNDED TO MGA

EXHIBIT 5 PAGE 119

1    the BRYANT/MGA AGREEMENT that it would be lawful for YOU to copy THE

2    BRATZ PITCH MATERIALS.

3    **RESPONSE TO REQUEST FOR ADMISSION NO. 3:**

4         In addition to the above General Objections, each of which is incorporated by

5    reference as though fully set forth herein, MGA also objects to this request on the

6    grounds that this request calls for a legal conclusion.  MGA also objects that this

7    request calls for the disclosure of information protected by the attorney-client

8    privilege, the work-product doctrine, the joint defense privilege and/or the common

9    interest privilege.  MGA further objects that the term "THE BRATZ PITCH

10   MATERIALS" is vague and ambiguous.

11        Subject to, and without waiving, the foregoing objections, MGA responds:

12   MGA admits that it contends it believed at the time it entered into its agreement

13   with Bryant and at all times thereafter that it would have the lawful right to fully

14   exploit the drawings drawn and presented by Bryant prior to the execution of

15   MGA's agreement with Bryant.

16

17   **REQUEST FOR ADMISSION NO. 4:**

18        Admit that YOU do not CONTEND YOU believed at the time YOU entered

19   into the BRYANT/MGA AGREEMENT that it would be lawful for YOU to copy

20   THE BRATZ PITCH MATERIALS.

21   **RESPONSE TO REQUEST FOR ADMISSION NO. 4:**

22        In addition to the above General Objections, each of which is incorporated by

23   reference as though fully set forth herein, MGA also objects to this request on the

24   grounds that this request calls for a legal conclusion.  MGA also objects that this

25   request calls for the disclosure of information protected by the attorney-client

26   privilege, the work-product doctrine, the joint defense privilege and/or the common

27   interest privilege.  MGA further objects that the term "THE BRATZ PITCH

28   MATERIALS" is vague and ambiguous.

5

EXHIBIT _5_ PAGE _120_

1    Subject to, and without waiving, the foregoing objections, MGA responds:

2    MGA denies the request and specifically denies that it does not contend it believed

3    at the time it entered into its agreement with Bryant or at any time thereafter that it

4    would have the lawful right to fully exploit the drawings drawn and presented by

5    Bryant prior to the execution of MGA's agreement with Bryant.

6

7    **REQUEST FOR ADMISSION NO. 5:**

8    Admit that YOU CONTEND YOU believed at the time YOU entered into

9    the BRYANT/MGA AGREEMENT that it would be lawful for YOU to produce

10   BRATZ.

11   **RESPONSE TO REQUEST FOR ADMISSION NO. 5:**

12   In addition to the above General Objections, each of which is incorporated by

13   reference as though fully set forth herein, MGA also objects to this request on the

14   grounds that this request calls for a legal conclusion.  MGA also objects that this

15   request calls for the disclosure of information protected by the attorney-client

16   privilege, the work-product doctrine, the joint defense privilege and/or the common

17   interest privilege.  MGA further objects that the term "THE BRATZ PITCH

18   MATERIALS" is vague and ambiguous and, as defined by Mattel, renders the RFA

19   nonsensical as no BRATZ then existed.

20   Subject to, and without waiving, the foregoing objections, MGA responds:

21   MGA admits that it contends it believed at the time it entered into its agreement

22   with Bryant (and at all times thereafter) that it had the right to fully exploit products

23   developed as a result of its agreement with Bryant.

24

25   **REQUEST FOR ADMISSION NO. 6:**

26   Admit that YOU do not CONTEND YOU believed at the time YOU entered

27   into the BRYANT/MGA AGREEMENT that it would be lawful for YOU to

28   produce BRATZ.

6

SUPPLEMENTAL RESPONSES TO MATTEL'S FIFTH SET OF RFA'S PROPOUNDED TO MGA

EXHIBIT _5_ PAGE _121_

1    **RESPONSE TO REQUEST FOR ADMISSION NO. 6:**

2        In addition to the above General Objections, each of which is incorporated by

3    reference as though fully set forth herein, MGA also objects to this request on the

4    grounds that this request calls for a legal conclusion. MGA also objects that this

5    request calls for the disclosure of information protected by the attorney-client

6    privilege, the work-product doctrine, the joint defense privilege and/or the common

7    interest privilege. MGA further objects that the term "BRATZ" is vague and

8    ambiguous and, as defined by Mattel, renders the RFA nonsensical as no BRATZ

9    then existed.

10       Subject to, and without waiving, the foregoing objections, MGA responds:

11   MGA denies the request and specifically denies that it does not contend it believed

12   at the time it entered into its agreement with Bryant (and at all times thereafter) that

13   it had the right to fully exploit products developed as a result of its agreement with

14   Bryant.

15

16   **REQUEST FOR ADMISSION NO. 7:**

17       Admit that YOU CONTEND YOU believed at the time YOU entered into

18   the BRYANT/MGA AGREEMENT that it would be lawful for YOU to prepare

19   derivative works from THE BRATZ PITCH MATERIALS.

20   **RESPONSE TO REQUEST FOR ADMISSION NO. 7:**

21       In addition to the above General Objections, each of which is incorporated by

22   reference as though fully set forth herein, MGA also objects to this request on the

23   grounds that this request, in using the phrase "prepare derivative works," calls for a

24   legal conclusion. MGA also objects that this request calls for the disclosure of

25   information protected by the attorney-client privilege, the work-product doctrine,

26   the joint defense privilege and/or the common interest privilege. MGA further

27   objects that the term "THE BRATZ PITCH MATERIALS" is vague and

28   ambiguous.

7

EXHIBIT _5_ PAGE _122_

1     Subject to, and without waiving, the foregoing objections, MGA responds:

2    MGA admits that it contends it believed at the time it entered into its agreement

3    with Bryant (and at all times thereafter) that it had the lawful right to fully exploit

4    the drawings drawn and presented by Bryant prior to the execution of its agreement

5    with Bryant.

6    **REQUEST FOR ADMISSION NO. 8:**

7    Admit that YOU do not CONTEND YOU believed at the time YOU entered

8    into the BRYANT/MGA AGREEMENT that it would be lawful for YOU to

9    prepare derivative works from THE BRATZ PITCH MATERIALS.

10    **RESPONSE TO REQUEST FOR ADMISSION NO. 8:**

11    In addition to the above General Objections, each of which is incorporated by

12    reference as though fully set forth herein, MGA also objects to this request on the

13    grounds that this request, in using the phrase "prepare derivative works," calls for a

14    legal conclusion.  MGA also objects that this request calls for the disclosure of

15    information protected by the attorney-client privilege, the work-product doctrine,

16    the joint defense privilege and/or the common interest privilege.  MGA further

17    objects that the term "THE BRATZ PITCH MATERIALS" is vague and

18    ambiguous.

19    Subject to, and without waiving, the foregoing objections, MGA responds:

20    MGA denies the request and specifically denies that it does not contend it believed

21    at the time it entered into its agreement with Bryant (and at all times thereafter) that

22    it had the lawful right to fully exploit the drawings drawn and presented by Bryant

23    prior to the execution of MGA's agreement with Bryant.

24

25    **REQUEST FOR ADMISSION NO. 9:**

26    Admit that BRYANT CREATED OR IMPROVED at least one of THE

27    BRATZ PITCH MATERIALS while employed by MATTEL.

28

SUPPLEMENTAL RESPONSES TO MATTEL'S FIFTH SET OF RFA'S PROPOUNDED TO MGA

EXHIBIT 5 PAGE 123

**RESPONSE TO REQUEST FOR ADMISSION NO. 9:**

In addition to the above General Objections, each of which is incorporated by reference as though fully set forth herein, MGA also objects that the terms "CREATED OR IMPROVED" and "THE BRATZ PITCH MATERIALS" are vague and ambiguous. MGA further objects to this Request on the grounds that, in using the phrase "created," it calls for a legal conclusion. MGA also objects to this request on the grounds that it seeks MGA to admits facts not within its percipient knowledge but based solely on the same information available to Mattel. MGA further objects that this request is compound.

Subject to, and without waiving, the foregoing objections, MGA responds: MGA denies that Bryant created "Bratz" while employed by Mattel. MGA admits that Bryant testified at deposition that he applied color to some tracings of drawings created in 1998 and drew outfits of formal wear (that were ultimately not used) in 2000 prior to his pitch.

**REQUEST FOR ADMISSION NO. 10:**

Admit that BRYANT CREATED OR IMPROVED more than one of THE BRATZ PITCH MATERIALS while employed by MATTEL.

**RESPONSE TO REQUEST FOR ADMISSION NO. 10:**

In addition to the above General Objections, each of which is incorporated by reference as though fully set forth herein, MGA also objects that the terms "CREATED OR IMPROVED" and "THE BRATZ PITCH MATERIALS" are vague and ambiguous. MGA further objects to this Request on the grounds that, in using the phrase "created," it calls for a legal conclusion. MGA also objects to this request on the grounds that it seeks MGA to admits facts not within its percipient knowledge but based solely on the same information available to Mattel. MGA further objects that this request is compound.

Subject to, and without waiving, the foregoing objections, MGA responds:

9

EXHIBIT 5 PAGE 124

1  MGA denies that Bryant created "Bratz" while employed by Mattel. MGA admits

2  that Bryant testified at deposition that he applied color to some tracings of drawings

3  created in 1998 and drew outfits of formal wear (that were ultimately not used) in

4  2000 prior to his pitch.

5

6  **REQUEST FOR ADMISSION NO. 11:**

7      Admit that YOU CONTEND that at the time YOU entered into the

8  BRYANT/MGA AGREEMENT, YOU had no reason to believe that BRYANT

9  CREATED OR IMPROVED any of THE BRATZ PITCH MATERIALS while

10  employed by MATTEL.

11  **RESPONSE TO REQUEST FOR ADMISSION NO. 11:**

12      In addition to the above General Objections, each of which is incorporated by

13  reference as though fully set forth herein, MGA also objects that the terms

14  "CREATED OR IMPROVED," "THE BRATZ PITCH MATERIALS" "no reason

15  to believe" are vague and ambiguous. MGA further objects on the grounds that the

16  Request's use of the phrase "no reason to believe" requires a statement of opinion

17  rather than an admission of fact. MGA further objects to this Request on the

18  grounds that, in using the phrase "created," it calls for a legal conclusion. MGA

19  further objects that the RFA is compound and cannot be answered by "admit" or

20  "deny."

21      Subject to, and without waiving, the foregoing objections, MGA responds:

22  MGA admits that it contends it did not believe or believe it had reason to believe

23  that BRYANT created or improved any of THE BRATZ PITCH MATERIALS

24  while employed by MATTEL.

25

26  **REQUEST FOR ADMISSION NO. 12:**

27      Admit that YOU do not CONTEND that at the time YOU entered into the

28  BRYANT/MGA AGREEMENT, YOU had no reason to believe that BRYANT

10

EXHIBIT 5 PAGE 125

1   CREATED OR IMPROVED any of THE BRATZ PITCH MATERIALS while

2   employed by MATTEL.

3   **RESPONSE TO REQUEST FOR ADMISSION NO. 12:**

4       In addition to the above General Objections, each of which is incorporated by

5   reference as though fully set forth herein, MGA also objects that the terms

6   "CREATED OR IMPROVED," "THE BRATZ PITCH MATERIALS" and "no

7   reason to believe" are vague and ambiguous.  MGA further objects on the grounds

8   that the Request's use of the phrase "no reason to believe" requires a statement of

9   opinion rather than an admission of fact.  MGA further objects to this Request on

10  the grounds that, in using the phrase "created," it calls for a legal conclusion.  MGA

11  further objects to this Request because, as phrased, it is nearly unintelligible.  MGA

12  further objects that the RFA is compound and cannot be answered by "admit" or

13  "deny."

14      Subject to, and without waiving, the foregoing objections, MGA responds:

15  MGA denies the request and specifically denies that it does not contend it did not

16  believe or believe it had reason to believe that BRYANT created or improved any

17  of THE BRATZ PITCH MATERIALS while employed by MATTEL.

18

19  **REQUEST FOR ADMISSION NO. 13:**

20      Admit that YOU did not suspect MATTEL owned any of THE BRATZ

21  PITCH MATERIALS when or before YOU executed the BRYANT/MGA

22  AGREEMENT.

23  **RESPONSE TO REQUEST FOR ADMISSION NO. 13:**

24      In addition to the above General Objections, each of which is incorporated by

25  reference as though fully set forth herein, MGA also objects to this request on the

26  grounds that this request calls for a legal conclusion.  MGA also objects that this

27  request calls for the disclosure of information protected by the attorney-client

28  privilege, the work-product doctrine, the joint defense privilege and/or the common

11

EXHIBIT 5 PAGE 126

1    interest privilege.  MGA further objects that the terms "suspect" and "THE BRATZ

2    PITCH MATERIALS" are vague and ambiguous.  MGA further objects that this

3    request is compound.  MGA further objects that this request is compound.

4         Subject to, and without waiving, the foregoing objections, MGA responds:

5    Admitted.  Based on the information provided to it, MGA did not believe that

6    Mattel owned any of the materials Carter Bryant presented to it, but nonetheless

7    took steps to confirm the timing of Mr. Bryant's work prior to executing the

8    agreement, as Mr. Larian testified to at his deposition.  Indeed, to this day, MGA

9    does not "suspect" or believe that Mattel owns any rights to "Bratz."

10

11   **REQUEST FOR ADMISSION NO. 14:**

12        Admit that YOU CONTEND that, assuming BRYANT transferred rights in

13   any or all of THE BRATZ PITCH MATERIALS to MATTEL, YOU are entitled to

14   priority over MATTEL as to such materials or YOUR rights are superior to those of

15   MATTEL as to such materials under 17 U.S.C. § 205(d) or otherwise.

16   **RESPONSE TO REQUEST FOR ADMISSION NO. 14:**

17        In addition to the above General Objections, each of which is incorporated by

18   reference as though fully set forth herein, MGA also objects that the request calls

19   for a legal conclusion.  MGA also objects that this request calls for the disclosure of

20   information protected by the attorney-client privilege, the work-product doctrine,

21   the joint defense privilege and/or the common interest privilege.  MGA further

22   objects that the term "THE BRATZ PITCH MATERIALS" is vague and

23   ambiguous.  MGA also objects to this request on the grounds that it purports to ask

24   MGA to admit a fact based on an incomplete hypothetical.

25        Subject to, and without waiving, the foregoing objections, MGA responds:

26   MGA believes that it is the sole transferee of any rights to "Bratz" and anything

27   related to "Bratz," and therefore admits that it contends that its rights to "Bratz" are

28   superior to any and all others who may claim such rights under 17 U.S.C. § 205(d)

12

EXHIBIT 5 PAGE 127

1   or otherwise.

2

3   **REQUEST FOR ADMISSION NO. 15:**

4       Admit that YOU do not CONTEND that, assuming BRYANT transferred

5   rights in any or all of THE BRATZ PITCH MATERIALS to MATTEL, YOU are

6   entitled to priority over MATTEL as to such materials or YOUR rights are superior

7   to those of MATTEL as to such materials under 17 U.S.C. § 205(d) or otherwise.

8   **RESPONSE TO REQUEST FOR ADMISSION NO. 15:**

9       In addition to the above General Objections, each of which is incorporated by

10   reference as though fully set forth herein, MGA also objects that the request calls

11   for a legal conclusion. MGA also objects that this request calls for the disclosure of

12   information protected by the attorney-client privilege, the work-product doctrine,

13   the joint defense privilege and/or the common interest privilege. MGA further

14   objects that the term "THE BRATZ PITCH MATERIALS" is vague and

15   ambiguous. MGA also objects to this request on the grounds that it purports to ask

16   MGA to admit a fact based on an incomplete hypothetical.

17       Subject to, and without waiving, the foregoing objections, MGA responds:

18   MGA believes that it is the sole transferee of any rights to "Bratz" and anything

19   related to "Bratz," and therefore admits that it contends that its rights to "Bratz" are

20   superior to any and all others who may claim such rights under 17 U.S.C. § 205(d)

21   or otherwise.

22

23   **REQUEST FOR ADMISSION NO. 16:**

24       Admit that, assuming BRYANT transferred rights in any or all of THE

25   BRATZ PITCH MATERIALS to MATTEL, YOU are not entitled to priority over

26   MATTEL as to such materials and YOUR rights are not superior to those of

27   MATTEL as to such materials under 17 U.S.C. § 205(d) or otherwise.

28

13

SUPPLEMENTAL RESPONSES TO MATTEL'S FIFTH SET OF RFA'S PROPOUNDED TO MGA

EXHIBIT 5 PAGE 128

1   **RESPONSE TO REQUEST FOR ADMISSION NO. 16:**

2       In addition to the above General Objections, each of which is incorporated by

3   reference as though fully set forth herein, MGA also objects that the request calls

4   for a legal conclusion.  MGA also objects that this request calls for the disclosure of

5   information protected by the attorney-client privilege, the work-product doctrine,

6   the joint defense privilege and/or the common interest privilege.  MGA further

7   objects that the term "THE BRATZ PITCH MATERIALS" is vague and

8   ambiguous.  MGA also objects to this request on the grounds that it purports to ask

9   MGA to admit a fact based on an incomplete hypothetical.

10      Subject to, and without waiving, the foregoing objections, MGA responds:

11  MGA believes that it is the sole transferee of any rights to "Bratz" and anything

12  related to "Bratz," and therefore admits that it contends that its rights to "Bratz" are

13  superior to any and all others who may claim such rights under 17 U.S.C. § 205(d)

14  or otherwise.

15

16  **REQUEST FOR ADMISSION NO. 17:**

17      Admit that YOU CONTEND that YOU are a transferee in good faith under

18  17 U.S.C. § 205(d) with respect to at least one of THE BRATZ PITCH

19  MATERIALS.

20  **RESPONSE TO REQUEST FOR ADMISSION NO. 17:**

21      In addition to the above General Objections, each of which is incorporated by

22  reference as though fully set forth herein, MGA also objects that the request calls

23  for a legal conclusion.  MGA also objects that this request calls for the disclosure of

24  information protected by the attorney-client privilege, the work-product doctrine,

25  the joint defense privilege and/or the common interest privilege.  MGA further

26  objects that the term "THE BRATZ PITCH MATERIALS" is vague and

27  ambiguous.

28      Subject to, and without waiving, the foregoing objections, MGA responds:

14

SUPPLEMENTAL RESPONSES TO MATTEL'S FIFTH SET OF RFA'S PROPOUNDED TO MGA

EXHIBIT ___5___ PAGE _129_

1     to the extent 17 U.S.C. § 205 (d) applies, MGA admits that it contends that MGA is

2     a transferee of some materials that were created by Bryant prior to the execution of

3     his agreement with MGA and that MGA acted at all times in good faith.  MGA

4     believes that it is the sole transferee from Bryant of any rights to "Bratz" and

5     anything related to "Bratz."

6

7     **REQUEST FOR ADMISSION NO. 18:**

8        Admit that YOU do not CONTEND that YOU are a transferee in good faith

9     under 17 U.S.C. § 205(d) with respect to at least one of THE BRATZ PITCH

10    MATERIALS.

11    **RESPONSE TO REQUEST FOR ADMISSION NO. 18:**

12        In addition to the above General Objections, each of which is incorporated by

13    reference as though fully set forth herein, MGA also objects that the request calls

14    for a legal conclusion.  MGA also objects that this request calls for the disclosure of

15    information protected by the attorney-client privilege, the work-product doctrine,

16    the joint defense privilege and/or the common interest privilege.  MGA further

17    objects that the term "THE BRATZ PITCH MATERIALS" is vague and

18    ambiguous.

19        Subject to, and without waiving, the foregoing objections, MGA responds:

20    to the extent 17 U.S.C. § 105(d) applies, MGA denies that it does not contend that

21    MGA is a transferee of some materials that were created by Bryant prior to the

22    execution of his agreement with MGA and denies that it does not contend that it

23    acted at all times in good faith.  MGA believes that it is the sole transferee from

24    Bryant of any rights to "Bratz" and anything related to "Bratz."

25

26    **REQUEST FOR ADMISSION NO. 19:**

27        Admit that YOU CONTEND that YOU may be a transferee in good faith

28    under 17 U.S.C. § 205(d) with respect to at least one of THE BRATZ PITCH

15

SUPPLEMENTAL RESPONSES TO MATTEL'S FIFTH SET OF RFA'S PROPOUNDED TO MGA

EXHIBIT 5 PAGE 130

1   MATERIALS.

2   **RESPONSE TO REQUEST FOR ADMISSION NO. 19:**

3       In addition to the above General Objections, each of which is incorporated by

4   reference as though fully set forth herein, MGA also objects that the request calls

5   for a legal conclusion. MGA also objects that this request calls for the disclosure of

6   information protected by the attorney-client privilege, the work-product doctrine,

7   the joint defense privilege and/or the common interest privilege. MGA further

8   objects that use of the phrase "may be" is vague and ambiguous. MGA further

9   objects that the term "THE BRATZ PITCH MATERIALS" is vague and

10  ambiguous.

11      Subject to, and without waiving, the foregoing objections, MGA responds:  to the

12  extent 17 U.S.C. § 105(d) applies, MGA admits that it contends that MGA is a transferee

13  of some materials that were created by Bryant prior to the execution of his agreement with

14  MGA and that MGA acted at all times in good faith.  MGA believes that it is the sole

15  transferee from Bryant of any rights to "Bratz" and anything related to "Bratz."

16

17  **REQUEST FOR ADMISSION NO. 20:**

18      Admit that YOU do not CONTEND that YOU may be a transferee in good

19  faith under 17 U.S.C. § 205(d) with respect to at least one of THE BRATZ PITCH

20  MATERIALS.

21  **RESPONSE TO REQUEST FOR ADMISSION NO. 20:**

22      In addition to the above General Objections, each of which is incorporated by

23  reference as though fully set forth herein, MGA also objects that the request calls

24  for a legal conclusion. MGA also objects that this request calls for the disclosure of

25  information protected by the attorney-client privilege, the work-product doctrine,

26  the joint defense privilege and/or the common interest privilege. MGA further

27  objects that use of the phrase "may be" is vague and ambiguous. MGA further

28  objects that the term "THE BRATZ PITCH MATERIALS" is vague and

16

EXHIBIT _5_ PAGE _131_

1  ambiguous.

2    Subject to, and without waiving, the foregoing objections, MGA responds:

3  to the extent 17 U.S.C. § 105(d) applies, MGA denies that it does not contend that

4  MGA is a transferee of some materials that were created by Bryant prior to the

5  execution of his agreement with MGA and denies that it does not contend that it

6  acted at all times in good faith.  MGA believes that it is the sole transferee from

7  Bryant of any rights to "Bratz" and anything related to "Bratz."

8

9  **REQUEST FOR ADMISSION NO. 21:**

10    Admit that YOU CONTEND that YOU are a transferee in good faith under

11  17 U.S.C. § 205(d) with respect to all of THE BRATZ PITCH MATERIALS.

12  **RESPONSE TO REQUEST FOR ADMISSION NO. 21:**

13    In addition to the above General Objections, each of which is incorporated by

14  reference as though fully set forth herein, MGA also objects that the request calls

15  for a legal conclusion.  MGA also objects that this request calls for the disclosure of

16  information protected by the attorney-client privilege, the work-product doctrine,

17  the joint defense privilege and/or the common interest privilege.  MGA further

18  objects that the term "THE BRATZ PITCH MATERIALS" is vague and

19  ambiguous.

20    Subject to, and without waiving, the foregoing objections, MGA responds:

21  to the extend 17 U.S.C. § 105(d) applies, MGA admits that it contends that MGA is

22  a transferee of some materials that were created by Bryant prior to the execution of

23  his agreement with MGA and that MGA acted at all times in good faith.  MGA

24  believes that it is the sole transferee from Bryant of any rights to "Bratz" and

25  anything related to "Bratz."

26

27  **REQUEST FOR ADMISSION NO. 22:**

28    Admit that YOU do not CONTEND that YOU are a transferee in good faith

17

SUPPLEMENTAL RESPONSES TO MATTEL'S FIFTH SET OF RFA'S PROPOUNDED TO MGA

EXHIBIT 5  PAGE 132

1  under 17 U.S.C. § 205(d) with respect to all of THE BRATZ PITCH

2  MATERIALS.

3  **RESPONSE TO REQUEST FOR ADMISSION NO. 22:**

4        In addition to the above General Objections, each of which is incorporated by

5  reference as though fully set forth herein, MGA also objects that the request calls

6  for a legal conclusion. MGA also objects that this request calls for the disclosure of

7  information protected by the attorney-client privilege, the work-product doctrine,

8  the joint defense privilege and/or the common interest privilege. MGA further

9  objects that the term "THE BRATZ PITCH MATERIALS" is vague and

10  ambiguous.

11        Subject to, and without waiving, the foregoing objections, MGA responds:

12  to the extent 17 U.S.C. § 105(d) applies, MGA denies that it does not contend that

13  MGA is a transferee of some materials that were created by Bryant prior to the

14  execution of his agreement with MGA and denies that it does not contend that it

15  acted at all times in good faith. MGA believes that it is the sole transferee from

16  Bryant of any rights to "Bratz" and anything related to "Bratz."

17

18  **REQUEST FOR ADMISSION NO. 23:**

19        Admit that YOU CONTEND that YOU may be a transferee in good faith

20  under 17 U.S.C. § 205(d) with respect to all of THE BRATZ PITCH

21  MATERIALS.

22  **RESPONSE TO REQUEST FOR ADMISSION NO. 23:**

23        In addition to the above General Objections, each of which is incorporated by

24  reference as though fully set forth herein, MGA also objects that the request calls

25  for a legal conclusion. MGA also objects that this request calls for the disclosure of

26  information protected by the attorney-client privilege, the work-product doctrine,

27  the joint defense privilege and/or the common interest privilege. MGA further

28  objects that use of the phrase "may be" is vague and ambiguous. MGA further

18

EXHIBIT 5 PAGE 133

1  objects that the term "THE BRATZ PITCH MATERIALS" is vague and

2  ambiguous.

3      Subject to, and without waiving, the foregoing objections, MGA responds:

4  to the extent 17 U.S.C. § 105(d) applies, MGA admits that it contends that MGA is

5  a transferee of some materials that were created by Bryant prior to the execution of

6  his agreement with MGA and that MGA acted at all times in good faith.  MGA

7  believes that it is the sole transferee from Bryant of any rights to "Bratz" and

8  anything related to "Bratz."

9

10  **REQUEST FOR ADMISSION NO. 24:**

11      Admit that YOU do not CONTEND that YOU may be a transferee in good

12  faith under 17 U.S.C. § 205(d) with respect to all of THE BRATZ PITCH

13  MATERIALS.

14  **RESPONSE TO REQUEST FOR ADMISSION NO. 24:**

15      In addition to the above General Objections, each of which is incorporated by

16  reference as though fully set forth herein, MGA also objects that the request calls

17  for a legal conclusion.  MGA also objects that this request calls for the disclosure of

18  information protected by the attorney-client privilege, the work-product doctrine,

19  the joint defense privilege and/or the common interest privilege.  MGA further

20  objects that the term "THE BRATZ PITCH MATERIALS" is vague and

21  ambiguous.  MGA further objects that use of the phrase "may be" is vague and

22  ambiguous.

23      Subject to, and without waiving, the foregoing objections, MGA responds:

24  to the extent 17 U.S.C. § 105(d) applies, MGA denies that it does not contend that

25  MGA is a transferee of some materials that were created by Bryant prior to the

26  execution of his agreement with MGA and denies that it does not contend that it

27  acted at all times in good faith.  MGA believes that it is the sole transferee from

28  Bryant of any rights to "Bratz" and anything related to "Bratz."

19

SUPPLEMENTAL RESPONSES TO MATTEL'S FIFTH SET OF RFA'S PROPOUNDED TO MGA

EXHIBIT 5 PAGE 134

1

2  **REQUEST FOR ADMISSION NO. 25:**

3      Admit that YOU are not a transferee in good faith under 17 U.S.C. § 205(d)

4  with respect to any of THE BRATZ PITCH MATERIALS.

5  **RESPONSE TO REQUEST FOR ADMISSION NO. 25:**

6      In addition to the above General Objections, each of which is incorporated by

7  reference as though fully set forth herein, MGA also objects that the request calls

8  for a legal conclusion.  MGA also objects that this request calls for the disclosure of

9  information protected by the attorney-client privilege, the work-product doctrine,

10  the joint defense privilege and/or the common interest privilege.  MGA further

11  objects that the term "THE BRATZ PITCH MATERIALS" is vague and

12  ambiguous.

13      Subject to, and without waiving, the foregoing objections, MGA responds:

14  to the extent 17 U.S.C. § 105(d) applies, MGA denies that it does not contend that

15  MGA is a transferee of any materials that were created by Bryant prior to the

16  execution of his agreement with MGA and denies that it does not contend that it

17  acted at all times in good faith.  MGA believes that it is the sole transferee from

18  Bryant of any rights to "Bratz" and anything related to "Bratz."

19

20  **REQUEST FOR ADMISSION NO. 26:**

21      Admit that the BRATZ dolls were first exhibited in the United States in

22  November 2000.

23  **RESPONSE TO REQUEST FOR ADMISSION NO. 26:**

24      In addition to the above General Objections, each of which is incorporated by

25  reference as though fully set forth herein, MGA also objects that the phrases

26  "BRATZ dolls" and "first exhibited" in this context are vague and ambiguous.

27      Subject to, and without waiving, the foregoing objections, MGA responds:

28  MGA denies the request, except insofar as MGA admits that boards showing

20

SUPPLEMENTAL RESPONSES TO MATTEL'S FIFTH SET OF RFA'S PROPOUNDED TO MGA

EXHIBIT _5_ PAGE _135_

1  "Bratz" character art were shown to certain retailers in November 2000.

2

3  **REQUEST FOR ADMISSION NO. 27:**

4      Admit that the BRATZ dolls were not first exhibited in the United States in

5  November 2000.

6  **RESPONSE TO REQUEST FOR ADMISSION NO. 27:**

7      In addition to the above General Objections, each of which is incorporated by

8  reference as though fully set forth herein, MGA also objects that the phrases

9  "BRATZ dolls" and "first exhibited" in this context are vague and ambiguous.

10      Subject to, and without waiving, the foregoing objections, MGA responds:

11  MGA admits the request but, for purposes of clarification, states that boards

12  showing "Bratz" character art were shown to certain retailers in November 2000.

13  **REQUEST FOR ADMISSION NO. 28:**

14      Admit that, when YOU met with BRYANT on September 1, 2000, YOU

15  knew BRYANT was employed by MATTEL at the time.

16  **RESPONSE TO REQUEST FOR ADMISSION NO. 28:**

17      MGA incorporates by reference the above General Objections as though

18  fully set forth herein.

19      Subject to, and without foregoing the General Objections, MGA responds:

20  MGA admits that MGA employees Isaac Larian and Victoria O'Connor testified at

21  their depositions that Bryant told them on or about September 1, 2000, that he was

22  employed by Mattel at that time.

23

24  **REQUEST FOR ADMISSION NO. 29:**

25      Admit that, when YOU entered into the BRYANT/MGA AGREEMENT,

26  YOU knew BRYANT was employed by MATTEL at the time.

27  **RESPONSE TO REQUEST FOR ADMISSION NO. 29:**

28      MGA incorporates by reference the above General Objections as though

21

SUPPLEMENTAL RESPONSES TO MATTEL'S FIFTH SET OF RFA'S PROPOUNDED TO MGA

EXHIBIT _5_ PAGE _136_

1   fully set forth herein.

2        Subject to, and without foregoing the General Objections, MGA responds:

3   MGA admits that certain MGA personnel knew at the time it entered into its

4   agreement with Bryant that Bryant was employed by Mattel, as MGA employees

5   Isaac Larian and Victoria O'Connor testified at their depositions that Bryant told

6   them on or about September 1, 2000, that he was employed by Mattel at that time.

7

8

    Dated:       August 21, 2007     O'MELVENY & MYERS LLP

9

10

11                  By:

12                  William J. Charron
               Attorneys for MGA Entertainment, Inc.

13

14

15   CC1:768553.3

16

17

18

19

20

21

22

23

24

25

26

27

28

                   22

SUPPLEMENTAL RESPONSES TO MATTEL'S FIFTH SET OF RFA'S PROPOUNDED TO MGA

EXHIBIT 5 PAGE 137

## PROOF OF SERVICE

I, Deborah L. Hodge, declare:

I am a resident of the State of California and over the age of eighteen years, and not a party to the within action; my business address is 1999 Avenue of the Stars, 7th Floor, Los Angeles, California 90067-6035. On August 22, 2007, I served the within documents:

**MGA ENTERTAINMENT INC.'S SUPPLEMENTAL RESPONSES TO MATTEL, INC.'S FIFTH SET OF REQUESTS FOR ADMISSION**

by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California addressed as set forth below. I am readily familiar with the firm's practice of collecting and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

Michael H. Page, Esq.
Keker & Van Nest LLP
710 Sansome Street
San Francisco, CA 94111
mpage@kvn.com
    Attorneys for Carter Bryant

Patricia Glaser, Esq.
Christensen, Glaser, Fink, Jacobs, Weil & Shapiro, LLP
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067
pglaser@chrisglase.com
    Attorneys for MGA

James W. Spertus, Esq.
Law Offices of James W. Spertus
12100 Wilshire Boulevard
Suite 620
Los Angeles, CA 90025
Jim@SpertusLaw.com
    Attorneys for Carlos Gustovo Machado Gomez

I declare under penalty of perjury under the laws of the United States that the above is true and correct.

Executed on August 22, 2007, at Los Angeles, California.

_____
Deborah L. Hodge

PROOF OF SERVICE

EXHIBIT _5_ PAGE _138_

1      **PROOF OF PERSONAL SERVICE**

2          I am a citizen of the United States and employed in the County of Los

3  Angeles, State of California, by First Legal Support Services, whose address is 1511 W.

4  Beverly Blvd., Los Angeles, CA 90026, and which has been employed by a member of

5  the bar of this Court at whose direction the service was made.  I am over the age of

6  eighteen years and not a party to the within action.  On August 22, 2007, I personally

7  served the following:

8          **MGA ENTERTAINMENT INC.'S SUPPLEMENTAL**
           **RESPONSES TO MATTEL, INC.'S FIFTH SET OF**
9          **REQUESTS FOR ADMISSION**

10  by delivering a copy thereof to the office of the following:

11          Michael T. Zeller, Esq.
            Timothy Alger, Esq.
12          Dylan Proctor, Esq.
            Scott Kidman, Esq.
13          Quinn Emanuel Urquhart Oliver & Hedges, LLP
            865 South Figueroa Street, 19th Floor
14          Los Angeles, CA 90017

15          I declare under penalty of perjury under the laws of the United States that

16  the above is true and correct.  Executed on August 22, 2007, at Los Angeles, California.

17

18          SIGNATURE:      _____

19          PRINTED NAME:   _____

20

21

22

23

24

25

26

27                                          EXHIBIT __5__ PAGE _139_

28

                                    PROOF OF PERSONAL SERVICE

**EXHIBIT 6**

**THIS EXHIBIT IS FILED UNDER SEAL
PURSUANT TO PROTECTIVE ORDER**

**EXHIBIT 7**

**THIS EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

**EXHIBIT 8**

**THIS EXHIBIT IS FILED UNDER SEAL
PURSUANT TO PROTECTIVE ORDER**

**EXHIBIT 9**

**THIS EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

**EXHIBIT 10**

**THIS EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

**EXHIBIT 11**

**THIS EXHIBIT IS FILED UNDER SEAL
PURSUANT TO PROTECTIVE ORDER**

**EXHIBIT 12**

Privilege Log of David Rosenbaum re: Mattel Inc.'s Subpoena Duces Tecum, Dated October 26, 2007
In the Action Captioned *Bryant v. Mattel Inc.*, Case No. CV 04-9049 SGL (RNBx), and Consolidated Cases

| No. | Primary Date | Item Type | From | To | Cc | Bcc | Privilege Type | Description |
|-----|-------------|-----------|------|-----|-----|-----|----------------|-------------|
| 1. | 07/02/01 | Email | Isaac Larian | Patty Glaser, Esq. | David Rosenbaum, Esq. | | Attorney-Client | Email message requesting legal advice regarding lawsuit. |
| 2. | 02/22/01 | Email Chain | David Rosenbaum, Esq. | Victoria O'Connor | | | Attorney-Client; Work Product | Email chain requesting and reflecting legal advice regarding contract. |
| 3. | 02/22/01 | Email Chain | Victoria O'Connor | David Rosenbaum, Esq. | | | Attorney-Client; Work Product | Email chain requesting and reflecting legal advice regarding contract. |
| 4. | 02/21/01 | Email Chain | David Rosenbaum, Esq. | Victoria O'Connor | | | Attorney-Client; Work Product | Email chain requesting and reflecting legal advice regarding contract. |
| 5. | 02/21/01 | Email | Victoria O'Connor | David Rosenbaum, Esq. | | | Attorney-Client | Email message requesting legal advice regarding contract. |
| 6. | 02/10/01 | Email | Isaac Larian | David Rosenbaum, Esq. | | | Attorney-Client | Email message requesting legal advice regarding contract.\n\nDR 00001-2 |
| 7. | 02/12/01 | Email | David Rosenbaum, Esq. | Isaac Larian | Victoria O'Connor | | Attorney-Client; Work Product | Email message reflecting legal advice regarding contract.\n\nDR 00003-4 |

12·3

EXHIBIT 12 PAGE 402

| No. | Primary Date | Item Type | From | To | Cc | Bcc | Privilege Type | Description |
|---|---|---|---|---|---|---|---|---|
| | 02/10/01 | Email | Isaac Larian | David Rosenbaum | | | Attorney-Client | Email message requesting legal advice regarding contract. |
| 8. | 02/10/01 | Email | Isaac Larian | David Rosenbaum, Esq. | | | Attorney-Client | Email message requesting legal advice regarding contract. DR 00005 |
| 9. | 10/04/00 | Email Chain | Victoria O'Connor | David Rosenbaum, Esq. | | | Attorney-Client; Work Product | Email chain requesting and reflecting legal advice regarding contract. |
| 10. | 10/05/00 | Email Chain | David Rosenbaum, Esq. | Victoria O'Connor | | | Attorney-Client; Work Product | Email chain requesting and reflecting legal advice regarding contract. |
| 11. | 10/05/00 | Email Chain | David Rosenbaum, Esq. | Victoria O'Connor | | | Attorney-Client; Work Product | Email chain requesting and reflecting legal advice regarding contract. |
| 12. | 10/05/00 | Email | David Rosenbaum, Esq. | Victoria O'Connor | | | Attorney-Client; Work Product | Email message reflecting legal advice regarding contract. DR 00006-7 |
| | 10/04/00 | Email | Victoria O'Connor | David Rosenbaum, Esq. | | | Attorney-Client | Email message requesting legal advice regarding contract. |

2

EXHIBIT _12_ PAGE _403_

| No. | Primary Date | Item Type | From | To | Cc | Bcc | Privilege Type | Description |
|-----|--------------|-----------|------|-----|-----|-----|----------------|-------------|
|  | 10/04/00 | Email | David Rosenbaum, Esq. | Victoria O'Connor |  |  | Attorney-Client; Work Product | Email message reflecting legal advice regarding contract. |
|  | 10/05/00 | Email | Victoria O'Connor | David Rosenbaum, Esq. |  |  | Attorney-Client | Email message requesting legal advice regarding contract. |
| 13. | 10/04/00 | Email Chain | David Rosenbaum, Esq. | Victoria O'Connor |  |  | Attorney-Client; Work Product | Email chain requesting and reflecting legal advice regarding contract. |
| 14. | 09/28/00 | Email | David Rosenbaum, Esq. | Victoria O'Connor |  |  | Attorney-Client; Work Product | Email message reflecting legal advice regarding contract.<br><br>DR 00008-9 |
| 15. | 09/28/00 | Email | David Rosenbaum, Esq. | Victoria O'Connor |  |  | Attorney-Client; Work Product | Email message reflecting legal advice regarding contract. |
| 16. | 09/25/00 | Email | Victoria O'Connor | David Rosenbaum, Esq.; Dennis Medici, Esq. |  |  | Attorney-Client | Email message requesting legal advice regarding contract. |
|  | 09/25/00 | Email | David Rosenbaum, Esq. | Victoria O'Connor; Dennis Medici, Esq. |  |  | Attorney-Client; Work Product | Email message reflecting legal advice regarding contract.<br><br>DR 00010-12 |

3

EXHIBIT 12 PAGE 404

| No. | Primary Date | Item Type | From | To | Cc | Bcc | Privilege Type | Description |
|-----|-------------|-----------|------|-----|-----|-----|----------------|-------------|
| | 09/25/00 | Email | Victoria O'Connor | Dennis Medici, Esq. | David Rosenbaum, Esq. | | Attorney-Client | Email message requesting legal advice regarding contract. |
| | 09/25/00 | Email | Dennis Medici, Esq. | Victoria O'Connor | David Rosenbaum, Esq. | | Attorney-Client; Work Product | Email message reflecting legal advice regarding contract. |
| 17. | 09/25/00 | Email Chain | Victoria O'Connor | Dennis Medici, Esq. | David Rosenbaum, Esq. | | Attorney-Client | Email message requesting legal advice regarding contract.\n\nDR 00013-14 |
| | 09/25/00 | Email Chain | Dennis Medici, Esq. | Victoria O'Connor | David Rosenbaum, Esq. | | Attorney-Client; Work Product | Email message reflecting a legal advice regarding contract. |
| 18. | 09/19/00 | Draft Contract | | | | | Work Product | Draft contract with attorney's handwritten comments. |
| 19. | 09/19/00 | Email | Victoria O'Connor | David Rosenbaum, Esq. | | | Attorney-Client; Work Product | Email message requesting legal advice regarding contract.\n\nDR 00015-16 |

4

EXHIBIT 12 PAGE 405

| No. | Primary Date | Item Type | From | To | Cc | Bcc | Privilege Type | Description |
|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| | 09/19/00 | Email | David Rosenbaum, Esq. | Victoria O'Connor | | | Attorney-Client; Work Product | Email message reflecting legal advice regarding contract. |
| 20. | 09/19/00 | Email | David Rosenbaum, Esq. | Victoria O'Connor | | | Attorney-Client; Work Product | Email message reflecting legal advice regarding contract. DR 00017-18 |
| 21. | 09/14/00 | Email Chain | Victoria O'Connor | David Rosenbaum, Esq. | | | Attorney-Client; Work Product | Email chain requesting and reflecting legal advice regarding contract. |
| 22. | 09/12/00 | Email Chain | David Rosenbaum, Esq. | Victoria O'Connor | Dennis Medici, Esq. | | Attorney-Client; Work Product | Email chain requesting and reflecting legal advice regarding contract. |
| 23. | 09/14/00 | Email Chain | Victoria O'Connor | David Rosenbaum, Esq. | | | Attorney-Client; Work Product | Email chain requesting and reflecting legal advice regarding contract. |
| 24. | 09/12/00 | Email Chain | Victoria O'Connor | David Rosenbaum, Esq. | Dennis Medici, Esq. | | Attorney-Client; Work Product | Email chain requesting and reflecting legal advice regarding contract. |
| 25. | 09/12/00 | Email Chain | David Rosenbaum, Esq. | Victoria O'Connor | Dennis Medici, Esq. | | Attorney-Client; Work Product | Email chain requesting and reflecting legal advice regarding contract. |
| 26. | 07/02/01 | Email | Isaac Larian | Patty Glaser, Esq. | David Rosenbaum, Esq. | | Attorney-Client | Email message requesting legal advice regarding insurance. |

5

EXHIBIT 12 PAGE 40 6

| No. | Primary Date | Item Type | From | To | Cc | Bcc | Privilege Type | Description |
|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| 27. | 09/23/03 | Email | David Rosenbaum, Esq. | Isaac Larian | Larry Feldman, Esq.; Robert Turner, Esq.; Mitchell Kamarck, Esq.; joelk@ffork.com | | Attorney-Client; Work Product | Email message reflecting legal advice regarding litigation. |
| 28. | 09/22/03 | Email | Isaac Larian | David Rosenbaum, Esq. | Larry Feldman, Esq.; Robert Turner, Esq.; Mitchell Kamarck, Esq.; joelk@ffork.com | | Attorney-Client; Work Product | Email message requesting legal advice regarding litigation. |
| 29. | 5/27/03 | Letter | David Rosenbaum, Esq. | Keith Jacoby, Esq. | | | Attorney-Client; Work Product | Letter reflecting legal advice regarding litigation. |
| 30. | 6/21/05-7/7/05 | Email Chain | David Rosenbaum, Esq. | Daphne Gronich, Esq. | | | Attorney-Client; Work Product | Email chain requesting and reflecting legal advice regarding litigation. |

6

EXHIBIT 12 PAGE 407

| No. | Primary Date | Item Type | From | To | Cc | Bcc | Privilege Type | Description |
|---|---|---|---|---|---|---|---|---|
| 31. | 6/21/05- 7/7/05 | Email Chain | Daphne Gronich, Esq. | David Rosenbaum, Esq. | Isaac Lariani; Larry Feldman, Esq.; Bob Turner Esq. | | Attorney-Client; Work Product | Email chain requesting and reflecting legal advice regarding litigation. |
| 32. | 6/21/05- 7/13/05 | Email Chain | David Rosenbaum, Esq. | Bernie Fischbach, Esq. | | | Attorney-Client; Work Product | Email chain requesting and reflecting legal advice regarding litigation. |
| 33. | 6/21/05 | Email | David Rosenbaum, Esq. | Daphne Gronich, Esq. | | | Attorney-Client; Work Product | Email message reflecting legal advice regarding litigation. |
| 34. | 6/21/05 | Email Chain | Daphne Gronich, Esq. | David Rosenbaum, Esq. | | | Attorney-Client; Work Product | Email chain requesting and reflecting legal advice regarding litigation. |
| 35. | 9/12/00 | Time Sheet | David Rosenbaum, Esq. | | | | Attorney-Client | Time record reflecting the nature of legal services provided. |
| 36. | 9/18/00 | Time Sheet | David Rosenbaum, Esq. | | | | Attorney-Client | Time record reflecting the nature of legal services provided. |
| 37. | 9/26/00 | Time Sheet | David Rosenbaum, Esq. | | | | Attorney-Client | Time record reflecting the nature of legal services provided. |
| 38. | 9/28/00 | Time Sheet | David Rosenbaum, Esq. | | | | Attorney-Client | Time record reflecting the nature of legal services provided. |
| 39. | 9/29/00 | Time Sheet | David Rosenbaum, Esq. | | | | Attorney-Client | Time record reflecting the nature of legal services provided. |

7

EXHIBIT 12 PAGE 408

| No. | Primary Date | Item Type | From | To | Cc | Bcc | Privilege Type | Description |
|-----|------|------|------|----|----|-----|------|------|
| 40. | 9/19/00 | Time Sheet | David Rosenbaum, Esq. | | | | Attorney-Client | Time record reflecting the nature of legal services provided. |
| 41. | 10/4/00 | Time Sheet | David Rosenbaum, Esq. | | | | Attorney-Client | Time record reflecting the nature of legal services provided. |
| 42. | 6/24/01 | Time Sheet | David Rosenbaum, Esq. | | | | Attorney-Client | Time record reflecting the nature of legal services provided. |
| 43. | 7/2/01 | Time Sheet | David Rosenbaum, Esq. | | | | Attorney-Client | Time record reflecting the nature of legal services provided. |
| 44. | 7/9/01 | Time Sheet | David Rosenbaum, Esq. | | | | Attorney-Client | Time record reflecting the nature of legal services provided. |

8

EXHIBIT _12_ PAGE _409_

`

**EXHIBIT 13**

FILED

1   DALE M. CENDALI
    (of counsel, not admitted in California)
2   DIANA M. TORRES (S.B. #162284)
    PAULA E. AMBROSINI (S.B. #193126)
3   O'MELVENY & MYERS LLP
    400 South Hope Street
4   Los Angeles, CA 90071-2899
    Telephone: (213) 430-6000
5   Facsimile: (213) 430-6407
    email:      dtorres@omm.com
6
    PATRICIA GLASER (S.B. # 55668)
7   CHRISTENSEN, MILLER, FINK,
    JACOBS, GLASER, WEIL &
8   SHAPIRO LLP
    10250 Constellation Boulevard, 19th Floor
9   Los Angeles, CA 90067
    Telephone: (310) 553-3000
10  Facsimile: (310) 556-2920

11  Attorneys for Plaintiff
    MGA Entertainment, Inc.
12

13

14                  UNITED STATES DISTRICT COURT

15                  CENTRAL DISTRICT OF CALIFORNIA

                        CV 05-02727  CBM(RZx)
16  MGA ENTERTAINMENT, INC.,         Case No.

17                 Plaintiff,        COMPLAINT FOR FALSE
                                     DESIGNATION OF ORIGIN,
18          v.                       AFFILIATION, ASSOCIATION OR
                                     SPONSORSHIP (15 U.S.C. § 1125
19  MATTEL, INC., a Delaware         (a)); UNFAIR COMPETITION (15
    Corporation, and DOES 1-10,      U.S.C. § 1125 (a), Cal. Bus. & Prof.
20                                   Code § 17200 et seq. and California
                 Defendants.         Common Law); DILUTION (15
21                                   U.S.C. § 1125 (c), Cal. Bus. & Prof
                                     Code § 14330 and California Common
22                                   Law); AND UNJUST ENRICHMENT

23                                   DEMAND FOR JURY TRIAL

24

25

26

27

28

EXHIBIT 13 PAGE 410

Plaintiff MGA Entertainment, Inc. for its complaint against Defendants Mattel, Inc. and DOES 1-10 alleges and avers as follows:

## PARTIES

1.     Plaintiff MGA Entertainment, Inc. ("MGA") is a California corporation organized and existing under the laws of the State of California, with a principal place of business in Van Nuys, California.

2.     MGA is informed and believes, and based thereon alleges, that Defendant Mattel, Inc. ("Mattel") is a Delaware corporation with a principal place of business in El Segundo, California.

3.     MGA is ignorant of the true names and capacities of the defendants sued herein under the fictitious names DOES 1 through 10 inclusive. MGA will seek leave of court to amend this complaint to allege such names and capacities when they are ascertained. MGA is informed and believes, and based thereon alleges, that each of the fictitiously named DOE defendants is responsible in some manner for the wrongful conduct alleged herein. MGA further alleges that each defendant acted in concert with, as agent or representative for, or at the request or on behalf of another or Mattel. Each charging allegation contained herein is, therefore, also hereby alleged against each fictitiously named DOE defendant.

## JURISDICTION AND VENUE

4.     Through this action MGA asserts claims against Mattel arising under the Lanham Act, 15 U.S.C. Sections 1125 (a) and (c), California Business and Professions Code Sections 17200 *et seq.*, California Business and Professions Code Section 14330 and California common law. This Court has original subject matter jurisdiction over MGA's federal claims pursuant to 15 U.S.C. Sections 1116 and 1121, 28 U.S.C. Section 1338(a), and 28 U.S.C. Section 1331, and supplemental

1

EXHIBIT 13 PAGE 411

1  subject matter jurisdiction over MGA's state law claims pursuant to 28 U.S.C.

2  Section 1367(a).

3      5.    This Court has specific personal jurisdiction over Mattel, as it has

4  purposefully committed, within the State of California, the acts from which these

5  claims arise and/or has committed tortious acts outside California, knowing and

6  intending that such acts would cause injury to MGA within the state.  The Court

7  also has general personal jurisdiction over Mattel, as it conducts continuous,

8  systematic and routine business within the State of California and the County of

9  Los Angeles.

10     6.    Venue is proper in the United States District Court for the Central

11  District of California pursuant to 28 U.S.C. Sections 1391(b) and 1391(c).

12

13                       **FACTUAL BACKGROUND**

14     7.    MGA seeks by this action to halt Mattel's habitual and unfair tactics of

15  competition-by-intimidation and serial copycatting of MGA's products, which

16  Mattel has used in an unbridled effort to cause confusion in the market place and

17  eliminate MGA as a competitor in the toy and fashion doll market long dominated

18  and controlled by Mattel.

19     8.    MGA is a privately-held company in the San Fernando Valley that

20  began in 1979 as a small consumer electronics business.  In 1987, the company

21  made its first foray into the toy business when it secured rights to market handheld

22  LCD games featuring licensed Nintendo® characters.  Building on that small

23  success, the company began marketing products for popular licensed properties

24  such as the "Power Rangers"® and "Hello Kitty"®.  This little-known but

25  successful company, however, was propelled into the limelight after its daring

26  release in June 2001 of an innovative line of fashion dolls called "BRATZ".

27  "BRATZ" are multi-ethnic fashion dolls that sport a fresh new urban and

28  contemporary look and fashion.  At the time of the release of "BRATZ", "Barbie"

                                  2

EXHIBIT _13_ PAGE _412_

sales were in a slump, Mattel was in turmoil, and the market was ripe for something new, exciting and inventive. "BRATZ" fit the bill. It is the first fashion doll that has been able to seriously challenge "Barbie" for market share, and begin to loosen Mattel's 50-year iron-fisted grip on the fashion doll market.

9.     Mattel has not taken kindly to the challenge. Either unable or unwilling to compete against "BRATZ" fairly, and on a level-playing field, Mattel has, instead, taken a more expeditious approach, resorting to unfair and anti-competitive business practices. Wielding its substantial clout and influence in the toy industry, Mattel has tried to muscle MGA out of business. MGA is informed and believes that Mattel has intimidated, coerced and threatened retailers, licensees, suppliers and others in the industry – both in the U.S. and internationally – in order to inhibit and stifle MGA's ability to compete with Mattel and to prevent MGA from obtaining licensees, contracts and supplies for its products. Mattel has also serially imitated and copy-catted the look of MGA products, trade dress, trademarks, themes, ideas, advertising and packaging, including for the "BRATZ" line of dolls. MGA brings this action to stop Mattel's tortious, unfair and anti-competitive conduct and to recover the extensive damage that Mattel's illicit behavior has caused, and continues to cause, MGA. Mattel's own website states: "As the global leader in the toy industry, we believe that how we achieve success is just as important as the success itself." It also proclaims that "unwavering integrity defines our corporate culture on every level, guiding how we work and how we do business." Mattel's own corporate governance standards require it to "play by the rules," complete fairly and be a good corporate citizen. Mattel's actions, however, speak louder than its words.

3

EXHIBIT _13_ PAGE _413_

## Mattel History and Performance

10.    Mattel is the world's largest toy company, but it owes its immense success chiefly to a single product: "Barbie." Since her debut in 1959, "Barbie" has been the fuel for Mattel's growth and success, turning Mattel into an international powerhouse. By the late 1990's, Mattel's annual sales of the doll approached or topped $1.8 billion and Mattel stock reached a record high of approximately $45.00 a share. At that time, the average American girl had eight "Barbie" dolls, and "Barbie" was the world's best-selling toy.

11.    Mattel's reliance on a single, 40-year old product for as much as 50% of its business turned out to be a risky business model, however. Resting on its laurels, Mattel failed to react to the shifting tastes of consumers, changing dynamics in the industry, and an increasing focus on technologically advanced and interactive toys. "Barbie's" record sales fell into a tailspin. According to one report, Adrienne Fontanella, Mattel's "Barbie" brand president, would later be quoted as saying that, "The world changed very quickly, and we missed a beat. . . Barbie wasn't talking to girls. She just wasn't hitting it."

12.    Sales began to plunge in 1997, and Mattel began posting a series of net income losses. In the first quarter of 1998, sales of the "Barbie" brand dropped 17%. This steep slide was followed by another in the second quarter, when sales fell again, down by 15%. By the end of 1998, Mattel reported an overall 14% decline in "Barbie" sales for the year and analysts were using words such as "devastating" and "a catastrophe" to describe Mattel's earnings. The company's stock fell as much as 27% in a single day. "Barbie" was having a crisis.

13.    Jill Barad, who had taken over as Mattel's chairman and chief executive in January 1997, at the height of Mattel's success, had to do something fast. Instead of focusing on and investing in new product development, however, which would obviously take time, Mattel embarked on a series of acquisitions that were seemingly aimed at quickly diversifying the company's product line and

4

EXHIBIT 13 PAGE 414

1  reducing its reliance on "Barbie" and on traditional retailers, such as Toys-R-Us

2  and Wal-Mart.  Mattel spent a reported $881 million in March 1997 to purchase

3  Tyco Toys and acquire the "Matchbox" toy car brand.  Just more than a year later,

4  it spent $700 million for the Pleasant Co., a mail-order doll company and maker of

5  the "American Girl" doll collection.  And in December 1998, Mattel announced

6  plans to fork out a monumental $3.5 billion to buy the Learning Company,

7  followed quickly by Mattel's purchase, in March 1999, of a software company,

8  Purple Moon.

9         14.    Despite these acquisitions, the company continued to struggle.  The

10  retail environment and buying patterns had unquestionably changed, but Mattel had

11  not kept up.  Despite Mattel's feverish acquisitions, Mattel's mainstay and primary

12  profit-generator was still "Barbie."  But "Barbie" had grown stale, and sales

13  languished.  Posting additional losses in the first quarter of 1999, Mattel announced

14  that it would lay off 3,000 employees   10% of its work force.

15         15.    Mattel's stock plummeted again in late 1999, dropping 30% on

16  Mattel's announcement that it would fall as much as 55% short of analysts' earning

17  estimates for the third quarter.  Mattel blamed its troubles primarily on its

18  expensive, $3.5 billion acquisition of the Learning Company, which had turned out

19  to be a disaster fraught with licensing and distribution problems, bad debt, high

20  product returns and high advertising costs.

21         16.    By early 2000, Mattel's stock had crashed to as low as $8 per share,

22  and some analysts considered Mattel vulnerable to a takeover.  Investors clamored

23  for Ms. Barad's resignation, and got their wish.

24         17.    Jill Barad resigned from Mattel in February 2000.

25         18.    For three months, the company was without a permanent chief

26  executive until Robert Eckert took the helm in May 2000.  Mr. Eckert had spent 23

27  years at Kraft Foods, a subsidiary of Altria Group, Inc., and was widely credited

28

5

EXHIBIT _13_ PAGE _415_

1   with reviving its ailing cheese business.  Investors looked for him to do the same

2   for Mattel.

3       19.    Upon his arrival at Mattel, Mr. Eckert's promise, according to *Wall*

4   *Street Journal* reports, was to deliver a "leaner and meaner" Mattel.

5       20.    The "leaner" Mattel came quickly.  Mr. Eckert laid off hundreds,

6   closed factories in the United States, shipped production to Mexico, and sold off the

7   Learning Company at a fraction of what Mattel had paid for it.  It helped Mattel's

8   bottom-line, but did nothing to spur sales growth.  Even under Mr. Eckert's "leaner

9   meaner" leadership, domestic "Barbie" sales remained in a slump into 2001.  In an

10  industry that had become increasingly driven by consumer whims and fads, and the

11  hot, must-have toys of the moment, Mattel remained disinterested in devoting its

12  resources to searching for or developing a new blockbuster toy.  Mr. Eckert's

13  business plan was not to diversify, but to build upon and expand sales of its existing

14  brands.  Mattel was, after all, still generating billions in revenue despite the decline

15  of "Barbie."  And so, Mattel remained committed to its age-worn icon and its two

16  other core brands, Fisher-Price and Hot Wheels, with each of the three accounting

17  for approximately a third of the company's sales.

18      21.    Then came the competition – MGA's "BRATZ".

19

20  **"BRATZ" Dolls Revolutionize The Fashion Doll Market**

21      22.    "BRATZ" challenged "Barbie's" half-century domination of the

22  fashion-doll market like nothing ever before had been able to do.

23      23.    MGA unveiled a preliminary sample of the "BRATZ" doll at the Hong

24  Kong Toy Fair in January 2001, while continuing to finalize the product throughout

25  that spring.  Finished products were first shipped in May 2001.  MGA introduced

26  the line to consumers in June 2001.

27

28

6

EXHIBIT 13 PAGE 416

24.     Unlike "Barbie" dolls, the "BRATZ" line of dolls and branded products sported a hip, multi-ethnic urban look that appealed to contemporary teenage and pre-teen girls.

## MGA's "BRATZ"









25.     At approximately 9.5 to 10 inches tall, the "BRATZ" dolls were intentionally shorter than "Barbie" dolls and looked like no other, with disproportionately large heads, big, dramatic eyes and lips, small, thin bodies, oversized feet (to emphasize shoe fashion and to stand on their own, unlike "Barbie," which requires a stand), and up-to-date fashions.

7

EXHIBIT _13_ PAGE _417_

26.   Indeed, the classic "Barbie" look was nowhere to be seen in these dolls; they would never be confused with "Barbie".

**MGA's "BRATZ"**                    **Mattel's "Barbie"**

    

27.   Featuring and embodying the slogan "The Girls With a Passion for Fashion!", "BRATZ" dolls revitalized, transformed and expanded the fashion doll market, in particular proving popular among "tween" age girls – those between childhood and adolescence – who had been all but abandoned as a market by Mattel.

28.   The "BRATZ" line – with its unique and distinctive look – is well recognized and has been critically acclaimed and praised by consumers, retailers and toy industry analysts alike.  In 2001, the "BRATZ" line won the Toy Industry Association ("TIA") People's Choice Toy of the Year Award, the Family Fun Toy of the Year Award and Toy Wishes Hot Pick Award.  In 2002, the "BRATZ" line again won the TIA People's Choice Toy of the Year Award and the Family Fun Toy of the Year Award.  LIMA, the licensing industry's official arm, awarded MGA's "BRATZ" the best character license of the year as well as the overall best licensed property of the year for 2003.  MGA's "BRATZ" also earned the coveted TIA "Property of the Year" and "Girl Toy of the Year" for 2003, as well as the Family Fun Toy of the Year Award.  MSNBC named "BRATZ" the "Hottest Toy of the Year," and both MGA and "BRATZ" received several other accolades in

8

EXHIBIT *13* PAGE *418*

2004, including the Suppliers Performance Award by Retail Category (the "SPARC" award) in the Girls' Toys category sponsored by DSN Retailing Today/Apparel Merchandising.

29. Although but a tiny fraction of Mattel's size, with "BRATZ", MGA was able to chip away at Mattel's stranglehold on the fashion doll market, gaining shelf space and market share as "Barbie" sales remained flat or, at times, declined.

30. The competition that MGA (once a licensee of Mattel!) and "BRATZ" posed to Mattel was unexpected and unwelcomed by Mattel. Where "Barbie" had once enjoyed a 90% share of the fashion doll market in 1997, that share had already slipped to 85% or less by the time of the release of "BRATZ". With the company still struggling under Mr. Eckert to overcome prior years of declining sales and mounting debt, "Barbie," Mattel – and Mr. Eckert – simply could not afford the untimely competition. Mr. Eckert's "leaner" Mattel was not enough to battle more potential erosion in "Barbie's" market share. Mattel had to combat "BRATZ" and MGA, and in the process revealed Mr. Eckert's "meaner" Mattel.

**Mattel's Response to "BRATZ" and Efforts to Thwart MGA's Competition**

31. Mattel was not poised to nimbly respond to "BRATZ" with a new, creative product of its own – indeed, it had been antithetical to Mattel's corporate culture and mentality for Mattel to even conceive that a product might vie for shelf space with "Barbie", let alone be available for sale to consumers mere months after first being shown to retailers. Mattel had to take a more expeditious route.

32. Instead of fairly competing, Mattel waged war against MGA using a wide-array of tortious, unfair and anti-competitive practices including systematic, serial copycatting and intellectual property infringement, aided by intimidation, threats and other acts of unfair competition and anti-competitive conduct, all with one goal in mind – to banish MGA from the market or minimize its ability to capture any meaningful share before it could do any real harm to Mattel.

9

EXHIBIT _13_ PAGE _419_

**Mattel's serial copycatting and intellectual property infringement**

33.    Mattel's serial copycatting of MGA's product lines began with the "BRATZ" dolls themselves, but quickly extended to MGA's packaging, themes, accessories, advertising and even other product lines.

34.    The first four "BRATZ" dolls that MGA launched in 2001, named Jade, Yasmin, Cloe and Sasha, met their wannabe "BRATZ PACK" members in October 2002 with Mattel's launch of three "My Scene" dolls named Madison, Chelsea and "Barbie." This was no ordinary "Barbie", however. Indeed, not even close. Mattel designed its "My Scene" dolls to evoke the unique and distinctive look of the "BRATZ" – also with disproportionately oversized heads, artfully made-up almond-shaped eyes, large, overly-lined and lipsticked lips, trendy, hip clothes and hair styles, and over-sized feet.

**Mattel's Traditional "Barbie"**          **Mattel's "My Scene" Doll**
                                             circa 2002          circa 2004



EXHIBIT _13_ PAGE _420_

35.     These confusingly similar "BRATZ" imitators may have been originally intended to buy Mattel time while it worked to release another product the following summer, called "Flavas". MGA's founder, Isaac Larian, was quoted by the media as having predicted that the move would backfire on Mattel, and it did.  Released in July 2003, Mattel's "Flavas" dolls took the urban, "hip-hop" look too far, and were widely viewed as portraying a trampy, "bad-girl" image.  The dolls were not well-received, and rumor has it that Mattel had to sell them at below cost prices to get rid of inventory.  Most apparently wound up in discount bins, and Mattel has seemingly abandoned the line.

36.     Realizing that "My Scene" was its best bet for riding MGA's successful coattails and capitalizing on the unique and inherently distinctive look that MGA had developed in its "BRATZ" dolls – and MGA's substantial goodwill – Mattel has systematically proceeded to modify the "My Scene" dolls since their original release, particularly their eyes, to increase their similarity to "BRATZ" more and more over time.

37.     Indeed, when Mattel found out that its initial line of "My Scene" dolls had trouble competing with "BRATZ", they simply *became* "BRATZ", in every version, whether blonde, brunette or African American.  A few pictures here are worth a thousand words.

**BLONDE**

Mattel's **Traditional "Barbie"**    Mattel's **Original "My Scene"**    Mattel's **Recent "My Scene"**

  

11

EXHIBIT _13_ PAGE _421_

**Mattel's Traditional "Barbie"**

**Mattel's Original "My Scene"**

**Mattel's Recent "My Scene"**

**BRUNETTE**

**Mattel's Traditional "Theresa"**

**Mattel's Original "My Scene"**

**Mattel's Recent "My Scene"**

12

EXHIBIT __13__ PAGE __422__



## AFRICAN AMERICAN

**Mattel's Traditional "Barbie"**   **Mattel's Original "My Scene"**   **Mattel's Recent "My Scene"**

38.   The original "My Scene" eye, as shown here, for example, has recently turned into a virtual carbon-copy of the "BRATZ" eye.

### Original Mattel "My Scene" Eye

13

EXHIBIT *13* PAGE *423*

39. The "My Scene" eye pictured above, for instance, has lashes that radiate almost straight out, circumferentially, from the eyelids and, although the eye is more almond shaped than a "Barbie" eye, the eye is not so sleepy and heavy lidded as a "BRATZ" eye and is only lightly shadowed. The new "My Scene" eye, in contrast, is dramatically more similar to a "BRATZ" eye, as shown below in a side-by-side comparison. The doe-eyed innocent look of the "My Scene" eye shown above is gone; replaced with a sultrier look, characteristic of "BRATZ." The new "My Scene" eye, as shown below, boasts lashes that sweep out and away from the outer corner of the eye, just like the "BRATZ" eye. The new "My Scene" eye is also more heavy lidded and thickly lined, and the make-up is more markedly pronounced and dramatic.

**MGA's "BRATZ" Eye**                    **New Mattel "My Scene" Eye**

       

40. Indeed, the progression of the "My Scene" eye, as it has departed from "Barbie" and edged closer and closer to "BRATZ", is readily apparent from virtually every angle, as shown here:

14

EXHIBIT 13 PAGE 424



**BLONDE**

Mattel's
Traditional "Barbie"

Mattel's
Original "My Scene"

Mattel's
Recent "My Scene"

**BRUNETTE**

Mattel's
Traditional "Theresa"

Mattel's
Original "My Scene"

Mattel's
Recent "My Scene"

15

EXHIBIT _13_ PAGE _425_



**Mattel's Traditional "Theresa"**

**Mattel's Original "My Scene"**

**Mattel's Recent "My Scene"**

**AFRICAN AMERICAN**

**Mattel's Traditional "Barbie"**

**Mattel's Original "My Scene"**

**Mattel's Recent "My Scene"**

16

EXHIBIT 13 PAGE 426

41.    Mattel has not stopped at the eyes, however.  Mattel has also incrementally but steadily modified its "My Scene" packaging, and the manner in which the dolls are displayed, to more closely mimic the packaging, trade-dress and overall look and total image of MGA's "BRATZ".

42.    To illustrate, Mattel's "My Scene" dolls were initially marketed like this:

**Mattel's Early "My Scene" Packaging**

 

43.    Little by little, however, the packaging has changed, creeping ever closer and closer to the open and transparent style of the "BRATZ" packaging. First, the panels seen running down each side of the front of the "My Scene" box shown above, framing the doll and giving the packaging a closed-in look, were changed as shown here:

**Intermediate Mattel "My Scene" Packaging**



17

EXHIBIT *13* PAGE *427*

44.   Mattel replaced this intermediate packaging style with another that looked even more similar to the "BRATZ" packaging, as shown here in a side-by-side comparison:

| MGA's "BRATZ"<br>"Wintertime Wonderland" Packaging | Mattel's "My Scene"<br>"Chillin' Out" Packaging |
|:---:|:---:|
|  |  |

45.   Then later, Mattel changed its packaging and product display yet again to look even more closely and confusingly similar to MGA's packaging and *"tout ensemble,"* as shown here

| MGA's "BRATZ"<br>"SPORTZ" Packaging | Mattel's Recent "My Scene"<br>"MIAMI GETAWAY" Packaging |
|:---:|:---:|
|  |  |

18

EXHIBIT _13_ PAGE _428_

46.   In this incarnation, Mattel notably abandoned the signature figure-eight style design that had appeared on its prior "My Scene" packaging, making this recent version clearer and more transparent on the front and sides than ever before, and much more like "BRATZ", accordingly.  Mattel also discarded its traditional, rectangular shaped box and, like "BRATZ", adopted an unusual, non-rectangular shaped box.  Mattel even adopted the "flying banner" ribbon-style slogan running across the middle of the box, similar to that used on the "BRATZ" packaging.

47.   As if these pointed and deliberate efforts to confuse and mislead consumers were not enough, Mattel exacerbated the confusion, and furthered the impression that the "My Scene" line and the "BRATZ" line are related, by taking up MGA's practice of regularly releasing new dolls in connection with a theme – but not just *any* theme, often *MGA's theme.*

48.   For example, when MGA released its "Wintertime Wonderland" theme in Fall 2003, Mattel released its "Chillin Out!" theme.  Each doll in MGA's line came with winter-sports accessories, such as a snowboard or skis and ski boots.  Each doll in Mattel's line featured winter sports accessories, also including snowboards or ski and ski boots.  Even MGA's color schemes and some of the clothing styles seemed to have made their way into the Mattel products.

49.   When MGA released its "Formal Funk" theme, Mattel released its "Night on the Town" theme.  "BRATZ Formal Funk" was an elaborately themed line with its dolls in hip formalwear; so was Mattel's "Night on the Town."

50.   When MGA released its distinctive "Sun-Kissed Summer" theme, Mattel released its confusingly similar "Jammin' in Jamaica" theme.  Each line featured a bright blue-and-orange color scheme, beach accessories, such as surfboards, and beachwear clothing.  Mattel's "Jammin' in Jamaica" "Guava Gulch Tiki Lounge" playset also contained elements remarkably similar to MGA's "Sun-Kissed Summer" playset.

19

EXHIBIT _13_ PAGE _429_

51.   Mattel also began running television commercials for its "My Scene" dolls bearing a remarkable similarity to "BRATZ" commercials, combining live action with animated sequences set to similar sounding pop music and lyrics.

52.   Mattel even stooped so low as to mimic "BRATZ" accessories and related products in order to further create consumer confusion in the marketplace.

53.   For instance, when MGA came up with its distinctive "BRATZ" "Runway Disco", Mattel came out with a "My Scene" Sound Lounge with packaging that imitated MGA's trapezoidal box.

54.   Mattel's conduct cannot be explained by sheer coincidence, nor is it merely fair competition. It is a calculated and intentional effort unquestionably designed to trade off of MGA's hard work and goodwill, create confusion in the marketplace, steal MGA's thunder and momentum, and dilute and blur away the novelty and distinctiveness of MGA's products. Out of the seemingly endless possibilities that Mattel could have chosen for a new line of dolls, packaging, themes, color schemes, commercials, accessories and playsets, Mattel deliberately chose *not* to come out with something unique, new or different and has, instead, focused its efforts and resources on flooding the market with something so close to "BRATZ" that the public will, can, and does, simply mistake it for "BRATZ".

55.   As yet another example of this, when MGA came out with a "BRATZ" "Funky Fashion Makeover Head," Mattel came out with a confusingly similar – indeed, practically identical – "My Scene" styling head.

20

EXHIBIT *13* PAGE *430*

| MGA's "BRATZ" "Funky Fashion Makeover Head" | Mattel's "My Scene" "Stylin' Head" |
|---|---|

56.   Indeed, Mattel's "My Scene" styling head is so close to the "BRATZ" styling head that even the press have mistakenly pictured and identified it as MGA's "BRATZ".  The picture of Mattel's "My Scene" styling head shown below, for instance, appeared in the press with a caption indicating that the child was trying out different hairstyles "on a *Bratz* hair and makeup doll head."



Hairstyle practice

21

EXHIBIT 13 PAGE 431

57. Creating further confusion, Mattel's television commercial for its "My Scene" styling head was like watching a re-run of MGA's commercial for its "Funky Fashion Makeover Head".

58. At one point in time, Mattel also used a portion of the "BRATZ" dolls' now-famous trademarked tag line "The Girls With a Passion for Fashion" on Mattel's' website for its "Diva Starz" dolls, asking its website users: "Do you have a passion for fashion?"

59. Mattel has even recently come out with a confusingly similar line of "My Scene" plush pets, which adopt the distinctive look of MGA's "BRATZ" line. The "My Scene" pets feature large, humanlike eyes and wear clothing making them remarkably and confusingly similar to "BRATZ" products, including "BRATZ PETZ", as seen in this example where the pets each wear a jacket, a cap and carry a purse:

**MGA's "BRATZ Dogz"**          **Mattel's "My Scene" dog**

          

60. And here too, Mattel chose to package its pets the same way that MGA packaged its "BRATZ PETZ", sitting in an open box, with no top and with partial side panels that slope from a narrow front panel to a higher back panel.

61. Indeed, the similarity of the "My Scene" pets to "BRATZ PETZ" has confused even sophisticated retailers who have mistakenly merchandised "My Scene" dogs in the middle of the "BRATZ" section of a retail display, next to and as if they were part of MGA's "BRATZ Petz" line. It comes as no surprise that

EXHIBIT _13_ PAGE _432_

1    customers too have been confused.

2         62.    Indeed, Mattel's television commercials and "My Scene" products
3    have become so confusingly similar to MGA's that even advertising executives
4    have expressed concern. One went so far as to say that although imitation is the
5    best form of flattery, what the individual had seen at Mattel's showroom, and how
6    its "My Scene" dolls now look so confusingly similar to "BRATZ", was
7    "shocking." This person further opined that it was clear that Mattel is intending to
8    confuse customers and capture "BRATZ" market share, and even asked MGA if it
9    was considering legal action.

10        63.    The press also has taken notice of Mattel's attempts to confuse
11   consumers. On or about February 18, 2005, a visitor to MGA's showroom from a
12   prominent news publication stated, "Oh my, I just came from Mattel's showroom
13   and their new 'My Scene' packaging is just like 'BRATZ' minus the handle."
14   Another member of the press visiting MGA's showroom offered the unsolicited
15   comment, "have you seen the new 'My Scene' dolls eyes are exactly like
16   'BRATZ'?" Yet another opined that Mattel's "My Scene" line was exactly like
17   "BRATZ", indeed, so much so that the reporter confusingly thought that Mattel had
18   bought "BRATZ", and still another has commented on Mattel's imitation of MGA.
19   On or about February 16, 2005, during an interview of a Mattel representative on
20   local network news in New York, "My Scene Barbie" was displayed by a Mattel
21   representative. During conversation about the dolls, the interviewer exclaimed that
22   they looked like "BRATZ". The Mattel representative just laughed – but this is no
23   laughing matter. This colloquy was available for replay and viewing, and was even
24   transcribed, on the internet.

25        64.    Customers too have been similarly confused. Some actually contacted
26   MGA seeking to purchase "My Scene" dolls.

27        65.    Mattel's conduct is planned, deliberate and intentional. Mattel has
28   systematically, copied, imitated and liberally borrowed many of the distinctive,

EXHIBIT *13* PAGE *433*

essential elements that identify and make "BRATZ" dolls "BRATZ" dolls, diluting the brand, creating customer confusion, and unfairly stifling competition.

66.   Ironically, Mattel sued one of its other competitors in Europe for doing much the same thing: "systematically copying and borrowing elements" from "My Scene", on grounds that "this conduct constitutes unfair competition and passing off." Indeed it does.

67.   What is more, Mattel's conduct has reached beyond "BRATZ" and "BRATZ"-related products to include other new MGA toy lines.

68.   For example, MGA's "4-Ever Best Friends" line was the obvious, and well-recognized model for Mattel's "Wee 3 Friends" line. Mattel even adopted changes to the color scheme of its similarly-shaped packaging to create confusion with MGA's distinctive packaging.

| MGA's "4-Ever Best Friends" | Mattel's "Wee 3 Friends" |
|---|---|






24

EXHIBIT 13 PAGE 434

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

69.   In the second half of 2002, MGA's "Mommy's Little Patient," originally designed as the first in a series of "Mommy's Little . . ." dolls, was followed by Mattel's "Little Mommy" doll.

<table>
<tr><td align="center">MGA's<br>"Mommy's Little Patient"</td><td align="center">Mattel's<br>"Little Mommy Potty Training Baby Doll"</td></tr>
</table>

  

70.   Sparing nothing, Mattel has also extended its monkey-see monkey-do behavior into its boys' line. When MGA came out with its "Alien Racers" line of toy racing vehicles, for instance, Mattel rushed to revamp and rename one of its "Hot Wheels" lines. Although well-known and clearly branded for decades as "Hot Wheels", Mattel's answer to MGA's "Alien Racers" was to re-brand and market its Hot Wheels Highway 35 line under an "AcceleRacerS" logo. MGA's line consists of "extreme" radio controlled racing vehicles marketed in connection with a strong, almost battle-like, science fiction theme. MGA's logo accentuates the "A", "R", and "S" in compressed block lettering. Mattel's line also consists of extreme racing vehicles marketed in connection with a strong, almost battle-like, theme. Mattel's logo too accentuates the "A", "R", and "S" in compressed block lettering.

25

EXHIBIT *13* PAGE *435*

71.   Here, too, Mattel's mimicry has spilled over into Mattel's advertising and thematic presentation and marketing of this toy line.  In particular, Mattel has adopted MGA's "other-worldly" theme in its commercials.  For instance, in Mattel's commercials, the product, whose logo appears as "AcceleRacerS", now compete against alien-like Cyborgs engaged in a "race to save the world," mimicking MGA's alien theme and commercials in which MGA's "Alien Racers" are engaged in a "race to save the universe."

72.   None of this is coincidence.  Mattel has deliberately adopted a pattern and practice of coming out with variations of MGA's products to create confusion in the marketplace, interfere with MGA's business and divert profits away from MGA.  Mattel says, on its website, that it is in the business of creating "[t]he world's premier toy brands [of] today and tomorrow."  It seemingly does so, however, by borrowing liberally from its competitors, even when it refreshes its own existing brands and products.

73.   MGA has suffered extensive injury from Mattel's conduct.  Mattel's habitual, serial simulation of MGA's products, product lines and trade dress has allowed Mattel to take a free ride on the extensive amount of time, expense and creative development MGA expends on developing new products, product packaging and presentation, giving Mattel an unfair advantage, and making it virtually impossible for MGA to compete with Mattel on a level playing field.

**Mattel's additional unfair, manipulative, anti-competitive conduct**

74.   This already substantial injury has been exacerbated by the strong-arm tactics, and other illegitimate, unfair and anti-competitive means that Mattel has used to manipulate the market and ensure that its control and domination of the industry can continue unabated.

26

EXHIBIT 13 PAGE 436

75.   For example, wielding the litigation privilege as a potential shield for intimidating conduct, Mattel has sent threatening letters to several of its former employees who now work for MGA warning them not to disclose ***even publicly available information*** about Mattel, including the names and positions of Mattel employees.  Mattel even went so far as to sue one of its former senior executives, after he had the temerity to resign and join MGA in October 2004.  Not only was Mattel's lawsuit dismissed for failure to state a viable claim, but Mattel thereafter seemingly could not muster up a shred of evidence sufficient to support an amended complaint.  As a result, Mattel's case against its former executive was dismissed with prejudice.

76.   Mattel has also warned a number of companies, including the biggest publishing entity in the United Kingdom, not to license MGA products, or risk retribution.  The threats are not idle.  In May 2004, Mattel terminated one of its licensees, apparently in retribution for licensing "BRATZ".  While some companies have been courageous enough to take the risk, others have not, and MGA has lost valuable licensing opportunities as a result.

77.   Mattel has used similar intimidation to pressure distributors and retailers, particularly in foreign countries, not to distribute "BRATZ", to reduce shelf and display space for "BRATZ" and to place "BRATZ" in unfavorable locations at retail outlets.

78.   When MGA faced a shortage of doll hair in October 2002, MGA is informed and believes that the reason for that shortage was that Mattel had locked MGA out by buying up the supply from the two main hair supply companies.

79.   Mattel has also manipulated the retail market.  For instance, Mattel merchandisers have been caught tampering with MGA's retail displays, replacing favorably located MGA merchandise with Mattel merchandise instead.  MGA is also informed and believes that Mattel has falsely told a major United States retailer that MGA was giving another major United States retailer below-market pricing

27

EXHIBIT *13* PAGE *437*

1   and falsely told a United Kingdom retailer that MGA was discontinuing one of its

2   lines, in order to make such line less attractive to buyers and thereby attempt to

3   increase sales of the competitive Mattel product and improve its own sales, at

4   MGA's expense.

5       80.   Even supposedly unbiased and impartial industry organizations have

6   fallen prey to Mattel's abusive wield of power, to MGA's detriment.

7       81.   NPD Funworld ("NPD"), for one, is the leading supplier of sales

8   statistics in the toy industry.  Accurate NPD statistics are essential for efficient

9   product-line management.  Without these statistics, it is difficult, if not impossible,

10  for toy companies to assess and measure the relative success of their products in

11  key categories.  It is, however, a subscription service, and NPD restricts the manner

12  in which its subscribers may use the data it provides.

13      82.   Mattel has regularly ignored the restrictions – using NPD data about

14  Mattel's comparative standing relative to other companies in press releases and in

15  communications with retailers and financial investors who are not NPD subscribers.

16      83.   Mattel generates substantially more annual subscription revenue for

17  NPD than does MGA, and carries more clout.

18      84.   After MGA had subscribed to the service for more than 12 years, NPD

19  terminated MGA's subscription in 2003 theoretically on the grounds that MGA

20  misused NPD data in a press release.

21      85.   MGA is informed and believes that the termination was the result of

22  pressure from Mattel, notwithstanding Mattel's own frequent violations of NPD's

23  restrictions.

24      86.   In addition to this, the market share numbers that NPD generates are

25  heavily dependent on the category in which NPD places a particular product.  MGA

26  is informed and believes that Mattel also pressured NPD into changing certain

27  product classifications for its "BRATZ" products in order to manipulate the data

28

EXHIBIT 13 PAGE 438

1   and preserve Mattel's market share rankings in the critical fashion doll category –

2   and thereby lower MGA's.

3       87.   The Children's Advertising Review Unit ("CARU") is another

4   organization that, upon information and belief, appears to have been subject to

5   improper influence by Mattel.  CARU is the toy industry's supposedly independent

6   self-regulatory body in charge of maintaining standards in advertising.  CARU's

7   approval is considered critical within the toy industry to avoiding regulatory action

8   by the Federal Trade Commission.

9       88.   CARU is heavily subsidized by Mattel.

10       89.   Upon information and belief, Mattel has used its influence as a major

11   contributor to CARU's budget to induce CARU to place onerous restrictions on

12   MGA advertisements, and require MGA to amend aspects of commercials that have

13   gone unchallenged in other parties' commercials.

14       90.   As a result of CARU's restrictions, MGA has been forced to incur

15   unnecessary costs for reshooting and producing or re-editing its commercials.

16       91.   On several occasions, CARU has also either strongly suggested, if not

17   also required, that MGA respond to inquiries about its website policies and make

18   substantial changes to the "BRATZ" website notably and significantly in excess of

19   restrictions imposed on Mattel and others.

20       92.   Even TIA, the toy industry's trade association, is apparently not

21   untainted by Mattel's influence and power.  Each year, TIA presents the Toy-of-

22   the-Year Awards, the most prestigious of which had been the award for Toy of the

23   Year.  Winning the Toy of the Year Award is a significant achievement that not

24   only very likely increases the sales of the winning toy, but also denotes the winning

25   company as a leader in toy innovation and generates substantial goodwill with

26   retailers, distributors, licensees, and customers.

27       93.   For the years 2000 (the first year of the award), 2001 and 2002, the

28   Toy of the Year award was chosen by consumer vote.  The awards ceremony was

EXHIBIT _13_ PAGE _439_

1  then held the following year, at a dinner in New York. (For example, the awards
2  dinner for the year 2000 award was held in February 2001). Leap Frog won the
3  2000 People's Choice Toy of the Year Award and MGA won the 2001 and 2002
4  People's Choice Toy of the Year Awards. With the 2003 Toy of the Year Award,
5  however, the rules suddenly changed. Now, the award is selected by members of
6  the industry.

7      94.   Upon information and belief, this change was orchestrated by a Fisher
8  Price (a Mattel subsidiary) executive who, until recently, served as the Chairman of
9  TIA.

10      95.   Perhaps not surprisingly given this change in the winner selection
11  procedures, "Hokey Pokey Elmo" ("Elmo"), a Fisher Price toy, won for the year
12  2003 (awarded in 2004), beating out the other leading nominee, "BRATZ Formal
13  Funk Super Stylin' Runway Disco."

14      96.   TIA has refused to provide MGA with the vote count procedure and
15  totals for this award, despite repeated requests.

16      97.   MGA is also informed and believes that Mattel was instrumental in
17  attempting to keep MGA from participating as a sponsor in this year's "Kids'
18  Choice Awards."

19      98.   Mattel has clearly engaged in tortious, illegal and unethical behavior in
20  its unfettered efforts to disrupt, if not destroy, MGA. Indeed, this is apparently
21  Mattel's current *modus operandi* when it comes to "competing" in the industry.
22  The once immensely successful "LeapFrog" interactive learning product, for
23  example, has apparently been one of Mattel's other recent victims.

24      99.   Mattel may not shield its illegal, unfair and unethical business practices
25  from the public eye. It is time for the truth to be told, and the world to know of
26  Mattel's unfair, unethical and illegal business practices and unfair competition.
27  "Barbie" does not "play nice" with others (particularly her competitors), and needs
28  to be taught how "to share" (at least in the fashion doll marketplace). She cannot be

30

EXHIBIT *13* PAGE *440*

1   allowed to continue to be the playground bully and trample on the rights of others,

2   including MGA.

3        100.   As a result of Mattel's manipulative, illegal, unfair, unethical and anti-

4   competitive conduct, MGA has suffered and, unless abated, will continue to suffer

5   lost sales, lost licensing fees, lost contracts, lost relationships, lost business

6   opportunities and other damages and harm for which there is no adequate remedy at

7   law.  Its ability to enter new markets and product lines has been hampered and

8   delayed.  Its production costs have increased, its reputation and relationships with

9   important players in the industry have been negatively impacted, the value of its

10  business has been diminished, and its ability to attract, hire and retain employees

11  has been affected.

12

13                 **FIRST CLAIM FOR RELIEF**

14  **(False Designation of Origin or Affiliation in Violation of 15 U.S.C. § 1125 (a))**

15       101.   MGA repeats and realleges the allegations contained in paragraphs 1

16  through 100 of this Complaint and incorporates them by reference as though fully

17  and completely set forth herein.

18       102.   MGA's "BRATZ" line has a unique and distinctive style and

19  distinctive characteristics, such as the disproportionately large head, large dramatic

20  eyes with a distinctive presentation (including the eye shape, make-up and lashes),

21  pouty, plump lips with a distinctive presentation (including the lip shape and make-

22  up), small, thin bodies, oversized feet, and up-to-date fashions.  MGA's "BRATZ"

23  line is known for and recognized by the total image that is presented by its product

24  and the style and arrangement of the packaging and display.  This "*tout ensemble*"

25  is representatively described and depicted herein.  The characteristics of MGA's

26  "BRATZ" line, alone or in combination, have come to identify the "BRATZ" line

27  and its source, MGA, and thus serve as protectable trade dress.  MGA's trade dress

28  in its "BRATZ" line is purely aesthetic and non-functional or, if any utility exists, it

31

EXHIBIT _13_ PAGE _441_

1    is not essential to the purpose, quality or source identifying attributes of the

2    aesthetics. MGA's trade dress in its "BRATZ" line is inherently distinctive or has

3    acquired distinction within the meaning of the Lanham Act.

4         103. Similarly, MGA's "BRATZ PETZ," part of the "BRATZ" line, also

5    has its own unique and distinctive characteristics, such as the humanlike eye and

6    unusual appearance of the animals dressed in clothing. MGA's "BRATZ PETZ"

7    line has become known for and recognized by the total image that is presented by

8    the product and the style and arrangement of its packaging. This *"tout ensemble"* is

9    representatively described and depicted herein. The characteristics of MGA's

10   "BRATZ PETZ", alone or in combination, have come to identify the "BRATZ

11   PETZ" line and its source, MGA, and thus serve as protectable trade dress. MGA's

12   trade dress in its "BRATZ PETZ" line is purely aesthetic and non-functional or, if

13   any utility exists, it is not essential to the purpose, quality or source identifying

14   attributes of the aesthetics. MGA's trade dress in its "BRATZ PETZ" line is

15   inherently distinctive or has acquired distinction within the meaning of the Lanham

16   Act.

17        104. Mattel's production, sale and marketing of "My Scene" dolls,

18   including styling heads and doll heads, and "My Scene" pets that are confusingly

19   similar to MGA's "BRATZ" line (including its "BRATZ PETZ"), without MGA's

20   permission or consent, constitutes designation and use of a term, symbol, device or

21   combination thereof that is false or misleading within the meaning of 15 U.S.C.

22   Section 1125 and is likely to cause confusion, or to cause mistake, or to deceive as

23   to the affiliation, connection, or association, or as to the origin, sponsorship, or

24   approval of Mattel's goods or commercial activities, within the meaning of 15

25   U.S.C. Section 1125. MGA has been damaged by Mattel's acts.

26        105. Mattel's conduct has been intentional and willful, and is calculated

27   specifically to trade off the goodwill that MGA has developed in its successful

28   "BRATZ" line. By its aforesaid acts, particularly its imitation of the distinctive

32

EXHIBIT *13* PAGE *442*

1    features of MGA's "BRATZ" line in connection with goods sold and distributed in

2    interstate commerce, Mattel has infringed and is likely to continue to infringe on

3    MGA's substantial rights in and to the "BRATZ" line trade dress.  In so doing,

4    Mattel has falsely represented and designated to the public generally and consumers

5    of fashion doll products specifically the source and origin of Mattel's "My Scene"

6    fashion doll products in violation of 15 U.S.C. § 1125(a).

7        106.  MGA has been damaged by, and Mattel has profited from, Mattel's

8    wrongful conduct in an amount to be proven at trial.

9        107.  For each act of infringement, MGA is entitled to recover its actual

10   damages as well as Mattel's profits from such infringement.

11       108.  Monetary relief alone, however, is not adequate to address fully the

12   irreparable injury that Mattel's illegal actions have caused and will continue to

13   cause MGA, if not enjoined.  MGA is therefore entitled to preliminary and

14   permanent injunctive relief to stop Mattel's ongoing infringement of MGA's trade

15   dress.

16   ## SECOND CLAIM FOR RELIEF

17   **(Unfair Competition in Violation of 15 U.S.C. § 1125 (a) and Unfair**

18   **Competition and Unfair Business Practices in Violation of Cal. Bus. & Prof.**

19   **Code § 17200 *et seq.* and California Common Law)**

20       109.  MGA repeats and realleges the allegations contained in paragraphs 1

21   through 108 of this Complaint and incorporates them by reference as though fully

22   and completely set forth herein.

23       110.  Mattel has deliberately and, indeed, repeatedly adopted, imitated and

24   mimicked the make-up, appearance, features, trade dress, and image of MGA's

25   products, packaging and advertising, including its repackaging and refreshing of

26   older Mattel toys.  Mattel's actions were and are done with the intent to deceive

27   consumers, cause confusion and mistake, and interfere with the ability of

28   consumers to identify the source of goods by appearance and packaging.  By this

33

EXHIBIT *13* PAGE *443*

1  conduct, Mattel pirates and exploits, by subliminal or conscious association with
2  MGA, the goodwill and reputation of MGA and derives benefit therefrom.

3       111.  Mattel has particularly and deliberately poached upon the commercial
4  magnetism of MGA's "BRATZ" and the success of "BRATZ". Mattel's conduct
5  has been intentional and willful, and is calculated specifically to trade off the
6  goodwill that MGA has developed in its successful "BRATZ" line.

7       112.  By its acts, including its intentional imitation of the distinctive features
8  of MGA's "BRATZ" dolls, which has progressively become closer and closer, as
9  well as its imitation of "BRATZ" themes, packaging and the overall look, feel and
10 total image of the "BRATZ" line, imitation of other MGA products, packaging and
11 advertising, and other conduct alleged herein, Mattel has engaged in unfair
12 competition under both federal and California state law.

13      113.  Mattel has also willfully and maliciously used its power, influence and
14 intimidation to threaten certain retailers, suppliers, licensees, distributors and
15 manufacturers so as to limit, if not prevent, MGA from doing business with these
16 retailers, suppliers, licensees, distributors and manufacturers, using its power and
17 influence to intimidate and manipulate industry bodies.  Mattel has further used its
18 power and influence to attempt to, if not actually, intimidate and threaten MGA's
19 current and potential employees so as to cause MGA competitive injury.

20      114.  Alone, in combination, or in totality, Mattel's actions discussed and
21 alleged herein constitute unfair competition and unfair business practices within the
22 meaning of federal law, California statutory law and/or California common law.

23      115.  As a result of its conduct, Mattel has derived substantial monetary and
24 non-monetary benefit and business advantage.  Mattel has also wrongfully diverted
25 profits away from MGA and to Mattel and, on information and belief, deprived
26 MGA of the patronage of a large number of actual and potential customers.

27      116.  MGA has been damaged by, and Mattel has profited from, Mattel's
28 wrongful conduct in an amount to be proven at trial.

34

EXHIBIT 13 PAGE 444

117.   Monetary relief alone, however, is not adequate to address fully the irreparable injury that Mattel's actions have caused and will continue to cause MGA, if not enjoined.  MGA is therefore entitled to preliminary and permanent injunctive relief to stop Mattel, and all persons acting in concert with Mattel, from engaging in acts of unfair competition and unfair business practices.

118.   MGA is further entitled to relief whereby Mattel is ordered to pay restitution for damages resulting from Mattel's unfair competition and unfair business practices.

### THIRD CLAIM FOR RELIEF

### (Dilution in Violation of 15 U.S.C. § 1125 (c); Cal. Bus. & Prof. Code § 14330 and California Common Law)

119.   MGA repeats and realleges the allegations contained in paragraphs 1 through 118 of this Complaint and incorporates them by reference as though fully and completely set forth herein.

120.   The look and trade dress of the MGA products referenced herein are distinctive and famous, and have been since before Mattel launched its similar versions.  By its aforesaid acts, Mattel caused and continues to cause blurring and dilution of the distinctive look of MGA's products and trade dress, which previously served as a unique source identifier for MGA, within the meaning of the Lanham Act, California Business and Professions Code § 14330 and/or California common law.

121.   Mattel's conduct has been intentional and willful, calculated specifically to trade on MGA's goodwill and reputation and to cause dilution of MGA's famous marks, particularly those connected with MGA's famous and successful "BRATZ" doll head, "BRATZ" doll product line, "BRATZ Funky Fashion Makeover Head" and "BRATZ PETZ" line.

122.   MGA has been damaged by, and Mattel has profited from, Mattel's wrongful conduct in an amount to be proven at trial.

35

EXHIBIT 13 PAGE 445

123.   Monetary relief alone, however, is not adequate to address fully the irreparable injury that Mattel's actions have caused and will continue to cause MGA, if not enjoined.  MGA is therefore entitled to preliminary and permanent injunctive relief to stop Mattel's ongoing dilution.

**FOURTH CLAIM FOR RELIEF**

**(Unjust Enrichment)**

124.   MGA repeats and realleges the allegations contained in paragraphs 1 through 123 of this Complaint and incorporates them by reference as though fully and completely set forth herein.

125.   As a result of the conduct alleged herein, Mattel has been unjustly enriched to MGA's detriment.  MGA seeks a worldwide accounting and disgorgement of all ill-gotten gains and profits resulting from Mattel's inequitable activities.

**PRAYER FOR RELIEF**

WHEREFORE, MGA prays for relief, as follows:

1.   That Mattel, its agents, servants and employees and all persons acting in concert be restrained preliminarily and permanently from directly or indirectly:

     a.   using confusingly similar trade dress;

     b.   improperly influencing, or attempting to improperly influence, standard-setting and industry organizations;

     c.   engaging in unfair competition and unfair business practices; and

     d.   diluting MGA's trade dress;

2.   For general and actual damages, according to proof at trial but believed to reach or exceed tens of millions of dollars;

3.   For the disgorgement of all profits derived by Mattel for its acts of:

     a.   false designation of origin or affiliation;

36

EXHIBIT _13_ PAGE _446_

1            b.     unfair competition and unfair business practices; and

2            c.     dilution;

3     4.    For costs of suit and reasonable attorneys' fees;

4     5.    For punitive and/or exemplary damages as a result of Mattel's willful

5 and malicious conduct to the extent allowable by law; and

6     6.    For such other and further relief as the Court deems just and proper.

7

8 Dated:     April 13, 2005        PATRICIA GLASER

9                            CHRISTENSEN, MILLER, FINK, JACOBS, GLASER, WEIL & SHAPIRO LLP

10

11                          DALE M. CENDALI
DIANA M. TORRES

12                          PAULA E. AMBROSINI
O'MELVENY & MYERS LLP

13

14

15                          By:

16                          Diana M. Torres
Attorneys for Plaintiff
MGA ENTERTAINMENT, INC.

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT _13_ PAGE _447_

1

## DEMAND FOR JURY TRIAL

2

3      MGA hereby demands a jury trial on all triable issues.

4

5  Dated:      April 13, 2005            PATRICIA GLASER
                                         CHRISTENSEN, MILLER, FINK,
6                                        JACOBS, GLASER, WEIL &
                                         SHAPIRO LLP
7
                                         DALE M. CENDALI
8                                        DIANA M. TORRES
                                         PAULA E. AMBROSINI
9                                        O'MELVENY & MYERS LLP

10

11                                       By:
                                             Diana M. Torres
12                                       Attorneys for Plaintiff
                                         MGA ENTERTAINMENT, INC.
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 13 PAGE 448

**EXHIBIT 14**

**THIS EXHIBIT IS FILED UNDER SEAL
PURSUANT TO PROTECTIVE ORDER**

**EXHIBIT 15**

**THIS EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

**EXHIBIT 16**

**THIS EXHIBIT IS FILED UNDER SEAL
PURSUANT TO PROTECTIVE ORDER**

**EXHIBIT 17**

1  THOMAS J. NOLAN (Bar No. 66992)
   (tnolan@skadden.com)
2  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
   300 South Grand Avenue, Suite 3400
3  Los Angeles, CA  90071-3144
   Tel.: (213) 687-5000/Fax: (213) 687-5600
4
   RAOUL D. KENNEDY (Bar No. 40892)
5  (rkennedy@skadden.com)
   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
6  4 Embarcadero Center, 38th Floor
   San Francisco, CA  94111-5974
7  Tel.: (415) 984-6400 / Fax: (415) 984-2698

8  Attorneys for MGA Entertainment, Inc., MGA Entertainment (HK) Limited,
   MGAE de Mexico, S.R.L. DE C.V., and Isaac Larian
9

10             UNITED STATED DISTRICT COURT

11            CENTRAL DISTRICT OF CALIFORNIA

12

13
   CARTER BRYANT, an individual,          )  CASE NO. CV 04-9049 SGL (RNBx)
14                                         )
                    Plaintiff,             )  **DISCOVERY MATTER**
15                                         )
             v.                            )  MGA'S NOTICE OF MOTION AND
16                                         )  MOTION TO COMPEL
   MATTEL, INC., a Delaware                )  REGARDING MATTEL'S
17 corporation,                            )  PRIVILEGE WAIVER BY CLAIM
                                           )  ASSERTION
18                  Defendant.             )
                                           )
19                                         )
                                           )  [To be heard by Discovery Master
20 AND CONSOLIDATED ACTIONS                )  Hon. Edward Infante (Ret.) Pursuant
                                           )  to Court Order of December 6, 2006]
21
                                              Hearing Date: January 3, 2008
22                                            Time: TBD

23

24

25

26

27

28
                          12-18
   ─────────────────────────────────────────────────────────
   MGA's Motion To Compel Regarding Mattel's Privilege Waiver By Claim Assertion

                          EXHIBIT _17_ PAGE _677_

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that MGA Entertainment, Inc. ("MGA") hereby moves the court for an order (1) concluding that Mattel has waived attorney-client privilege and work product concerning what it knew or had reason to suspect prior to November 2003 regarding (a) Carter Bryant's involvement in Bratz, (b) his alleged breach of contract, (c) his work for MGA, and/or (d) Mattel's alleged "true owner[ship] of Bratz," and (2) compelling that Mattel supplement its discovery responses and document productions accordingly.  This Motion is made on the grounds that Mattel has injected the issue of what it knew or had reason to suspect prior to November 2003 regarding these issues by claiming that it "had no reason to suspect" prior to November 2003 that it was the alleged true owner of Bratz; that Bryant conceived, created, designed and developed Bratz; Bryant's role in Bratz; that Bryant had worked with MGA, or assisted MGA, while he was employed by Mattel; or that Bryant had secretly aided, assisted and worked for and with MGA in violation of his employment agreements with Mattel -- thus making these issues relevant to the case.  The attorney-client privilege and work product immunity Mattel asserts with respect to what it knew or had reason to suspect on these issues pre-November 2003 has denied MGA access to information vital to its defense and, in fairness, has been waived.  The parties met and conferred regarding this Motion, as mandated by Local Rule 37-1 and Section 5 of the Discovery Master Stipulation, but were unable to come to a resolution of the dispute.

This Motion is based upon this notice of motion and accompanying memorandum of points and authorities, the declaration of Marcus R. Mumford filed concurrently herewith, the records and files of this court, and any other matter of which the court may take judicial notice.  Discovery Master Hon. Edward Infante (Ret.) will preside over the hearing on this Motion, which will occur on January 3, 2008, at a time and manner to be determined.

EXHIBIT _17_ PAGE _678_

1  DATED:  December 18, 2007

2                                        SKADDEN, ARPS, SLATE, MEAGHER &
                                         FLOM, LLP

3                                        By: _Raoul Kennedy MM_____

4                                            Raoul D. Kennedy
                                             Attorney for MGA Entertainment, Inc.
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

_____

EXHIBIT _17_ PAGE _679_

# TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................ 1

II.  FACTUAL AND PROCEDURAL BACKGROUND .................................. 5

     A.   Mattel's Counterclaims Affirmatively Place At Issue What It Knew Or Had Reason To Suspect Prior To November 2003 ................................................................................................ 5

     B.   Mattel Has Refused To Turn Over Information That Would Show When It First Had Reason To Suspect The Basis for Its Claims............................................................................................. 6

III. ARGUMENT ............................................................................................. 13

     A.   Fairness Requires The Disclosure Of Mattel's Protected Information................................................................................... 13

     B.   Mattel Has Waived Privilege Regarding When It Had Any Reason To Suspect Bryant's Work On Bratz, His Alleged Breach Of Contract, His Work For MGA, And/Or Mattel's Alleged "True Owner[ship] Of Bratz" .......................................... 15

IV.  CONCLUSION ......................................................................................... 22

EXHIBIT _17_ PAGE _680_

1

# TABLE OF AUTHORITIES

2

**Cases**                                                                    page(s)

3

Aloe Vera of America, Inc. v. United States,
    2003 WL 22429082 (D. Ariz. Sept. 23, 2003) ............................. 10

4

5

American Standard Inc. v. Bendix Corp.,
    80 F.R.D. 706 (W.D. Mo. 1978) ............................................... 8

6

Bittaker v. Woodford,
    331 F.3d 715 (9th Cir. 2003) .............................................. 1, 7

7

8

Bohack Corp. v. Iowa Beef Processors, Inc.,
    No. 77 C 1673, 1981 WL 2018 (E.D.N.Y. Jan. 13, 1981) ............ 8

9

Chevron Corp. v. Pennzoil Co.,
    974 F.2d 1156 (9th Cir. 1992) ............................................... 7

10

11

Conkling v. Turner,
    883 F.2d 431 (5th Cir. 1989) ............................................... 8

12

Hearn v. Rhay,
    68 F.R.D. 574 (E.D. Wash. 1975) ............................. 9, 10, 11, 13, 14

13

14

Hickman v. Taylor,
    329 U.S. 495 (1947) ......................................................... 12

15

Holmgren v. State Farm Mutual Automobile Insurance Co.,
    976 F.2d 573 (9th Cir. 1992) ............................................... 12

16

17

Home Indemnity Co. v. Lane Powell Moss & Miller,
    43 F.3d 1322 (9th Cir. 1995) ............................................... 9

18

In re Imperial Corp. of America,
    179 F.R.D. 286 (S.D. Cal. 1998) ....................................... 8, 10, 12

19

20

Rambus Inc. v. Samsung Electronics Co., Ltd.,
    2007 WL 3444376 (N.D. Cal. Nov. 13, 2007) ..................... passim

21

Russell v. Curtin Matheson Scientific, Inc.,
    493 F. Supp. 456 (D. Tex. 1980) ........................................... 8

22

23

Titan Corp. v. M/A-Com, Inc.,
    1994 WL 16001739 (S.D. Cal. June 22, 1994) ..................... 8, 12

24

United States v. Amlani,
    169 F.3d 1189 (9th Cir. 1999) ............................................. 9

25

26

United States v. St. Pierre,
    132 F.2d 837 (2d Cir. 1942) ............................................. 7, 11

27

28

EXHIBIT _17_ PAGE _681_

**Miscellaneous**                                                                          page(s)

2 Paul R. Rice, *Attorney-Client Privilege in the United States*, § 9:53 (2d ed.
1999)................................................................................... 8, 10

8 Wright, Miller & Marcus, *Federal Practice and Procedure*: Civil 2d §
2016.2 (West 2007 Update) ................................................ 7

Edna Selan Epstein, The Attorney-Client Privilege and the Work-Product
Doctrine (5th ed. 2007)............................................................ 10

EXHIBIT _17_ PAGE _682_

## I. **INTRODUCTION**

Mattel asserts that its claims are timely because, prior to November 2003, MGA and Carter Bryant "deliberately and intentionally concealed facts sufficient for Mattel *to suspect or to know* that it was the true owner of Bratz," including "the fact that Bryant conceived, created, designed and developed Bratz," and "Bryant's role in Bratz."[1]   Mattel contends that it "*learned for the first time*" in November 2003 that "Bryant had secretly aided, assisted and worked for and with MGA ... in violation of his Mattel Employment Agreement," and prior to that time, Mattel "*had no reason to suspect* that Bryant had worked with MGA, or assisted MGA, while he still [sic] employed by Mattel."[2]  Thus, Mattel has affirmatively injected into this litigation the issue of what it knew or had reason to suspect prior to November 2003 regarding Bryant's involvement in Bratz, his alleged breach of contract, his work for MGA, and Mattel's alleged "true owner[ship] of Bratz."  Any attorney communications on those issues are therefore relevant to the determination of, *inter alia*, MGA's statute of limitations and laches defenses, and fairness requires that they be given access to those communications to dispute Mattel's allegations.  *See Hearn v. Rhay*, 68 F.R.D. 574, 581 (E.D. Wash. 1975); *see also United States v. Amlani*, 169 F.3d 1189, 1195 (9th Cir. 1999) (recognizing the Ninth Circuit's adoption of the *Hearn* test); *Rambus Inc. v. Samsung Elec. Co.*, Nos. C-05-02298 RMW, C-05-00334 RMW, 2007 WL 3444376, at *3 (N.D. Cal. Nov. 13, 2007) (finding a waiver where plaintiff was "alleging a basis for avoiding a statute of limitations").

There is good reason to believe Mattel is concealing evidence behind a cloak of privilege that it *suspected or had reason to suspect* well prior to November 2003

---

[1]  Declaration of Marcus R. Mumford in Support of MGA's Motion To Compel Regarding Mattel's Privilege Waiver By Claim Assertion ("Mumford Decl."), Ex. 1: Mattel's Second Amended Answer And Counterclaims ("SAC") ¶ 35 (emphasis added).

[2]  *Id.* ¶ 36 (emphasis added).

EXHIBIT 17 PAGE 683

that Bryant was involved in Bratz and worked for MGA while a Mattel employee. Recent discovery confirms that Mattel knew Bryant's role in Bratz and was investigating possible claims *at least as early as summer 2001*, when Bratz came out. Margaret Leahy, the third-party sculptor of Bratz, recently testified that in the summer of 2001 a friend from Mattel was "grilling" her, "like somebody put her up to it," about whether "Carter [was] the designer on the doll or what was [MGA employee and former Mattel employee] Paula [Garcia's] involvement" in Bratz.[3] Leahy testified that she told the Mattel employee that "Carter initially came up with a design and Paula carried it out." (*Id.*) And Mattel recently admitted that in 2002 it investigated "rumor and innuendo that Bryant may be working with MGA on Bratz," including whether "Bryant ... plagiarized [Mattel product] 'Toon Teens' and created Bratz dolls for MGA"[4] and whether Bryant helped MGA create Bratz "[w]hile he was working with Mattel."[5] As part of an official investigation requested by Mattel CEO Robert Eckert in August 2002, Mattel's head of security, Richard De Anda, wrote that he had been "aware of this situation and ... working on it for several months" but it was in the hands of Mattel's attorneys.[6] Testimony from former Mattel employee Elise Cloonan last week confirms that by at least late 2001, Mattel's lawyers were conducting an investigation involving Bryant's work on Bratz in the design department.[7]

Mattel attempts to distinguish its investigations prior to November 2003 on the ground that the claims related to whether Bryant had plagiarized the Toon Teens

---

[3] Mumford Decl., Ex. 2: Deposition of Margaret Leahy at 187:9-13 (rough).

[4] Mumford Decl., Ex. 3: Supplemental Responses to MGA's First Set of Interrogatories to Mattel, Inc at 113; *see also id.*, Ex. 4: Mattel's Objections and Second Supplemental Responses to Defendant's First Set of Interrogatories at 21, 300.

[5] Mumford Decl., Ex. 5: Document bates-numbered M 0074401.

[6] Mumford Decl., Ex. 6: Document bates-numbered M 0074400.

[7] Mumford Decl., Ex. 7: Deposition of Elise Cloonan at 298-306 (rough).

EXHIBIT *17* PAGE *684*

concept in creating Bratz and that "[t]he potential claims investigated ... did not give Mattel any knowledge, or even reason to believe, that Bryant worked for MGA and/or conceived of Bratz while a Mattel employee."[8]  But elsewhere in the same interrogatory response, Mattel argues that the similarities between Toon Teens and Bratz "tend[] to establish that Bryant created Bratz works while he was a Mattel employee."[9]  Similarly, Mattel claims that Bryant concealed his plans when he left Mattel, but it alleges elsewhere that Bryant used several "other Mattel employees" to work on the Bratz dolls so that they "had been designed and were far along in development during the time that Bryant was employed by Mattel,"[10] and its exit interview report shows that Bryant told Mattel's human resources representative he was leaving because an "[o]pportunity arose; had to take it."[11]  Mattel recently acknowledged that employees leaving under similar circumstances to work for an unnamed competitor "caused Mattel to begin investigating their activities."[12]

In sum, Mattel actively investigated Bryant's role in creating Bratz in 2001 and 2002 and went so far as to hire "outside attorneys."  Yet, Mattel claims that it did not learn any facts that would have caused it even to suspect the basis for its counterclaims until November 2003 – and Mattel would prefer that defendants (and the Court) simply accept Mattel's representation as true.  To prevent any further discovery, Mattel has asserted the attorney-client privilege and work product doctrine and refused to provide information that would establish whether, in fact,

---

[8] Mumford Decl., Ex. 4: Mattel's Objections and Second Supplemental Responses to Defendant's First Set of Interrogatories at 21, 27, 172, 214, 300, 336, 376, 416, 456, 488.

[9] Id.

[10] Id. at 20, 62-63, 102, 134, 166, 207, 330, 370, 409, 449-50, 481.

[11] Mumford Decl., Ex. 8: Exit Interview Report (M 0001654-55).

[12] Mumford Decl., Ex. 3: Supplemental Responses to MGA's First Set of Interrogatories to Mattel, Inc. at 28.

EXHIBIT 17 PAGE 685

Mattel had *any reason to suspect* the matters raised in their counterclaims prior to November 2003.

MGA believes that Mattel was aware of the basis for its claims much earlier than November 2003, but that it made a strategic decision not to pursue them at that time because either (a) it did not believe that its employment agreement with Bryant applied to Bratz, and/or (b) it did not believe that Bratz would become as successful as it eventually did. MGA is entitled to discovery on its statute of limitations and laches defenses, including any privileged communications that may rebut Mattel's assertion that it had no reason even to suspect the basis for its claim until November 2003. Under the implied waiver doctrine, a party waives the privilege when it "assert[s] claims the opposing party cannot adequately dispute unless it has access to the privileged materials." *Bittaker v. Woodford*, 331 F.3d 715, 719 (9th Cir. 2003). Courts within the Ninth Circuit have repeatedly recognized that the doctrine applies when a party asserts a claim that ordinarily would be barred by the statute of limitations, but for an alleged exception to the doctrine, such as the discovery rule, that implicates when the party knew or should have known the basis for its claim. *Rambus*, 2007 WL 3444376, at *3 (finding a waiver where plaintiff was "alleging a basis for avoiding a statute of limitations").

By this motion, MGA seeks an order (a) holding that Mattel has waived privilege and work product on the issue of what it knew or had reason to suspect prior to November 2003 regarding its claims, including Bryant's involvement in Bratz, his alleged breach of contract, his work for MGA, and/or Mattel's alleged "true owner[ship] of Bratz" and (b) compelling Mattel, *inter alia*, to answer discovery requests and produce any and all documents in its possession, custody, or control that discuss, refer, or relate to the issue.

EXHIBIT 17 PAGE 686

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Mattel's Counterclaims Affirmatively Place At Issue What It Knew Or Had Reason To Suspect Prior To November 2003

On July 12, 2007, Mattel filed counterclaims alleging that it was the "true owner of Bratz" pursuant to agreements it had with Carter Bryant and, *inter alia*, allegations that Bryant "conceived, created or reduced to practice" Bratz designs and worked for MGA "during [his] Mattel employment."[13] Mattel asserted that its claims were timely because "Bryant and MGA deliberately and intentionally concealed facts sufficient for Mattel to suspect or to know that it was the true owner of Bratz...., includ[ing] ... the fact that Bryant conceived, created, designed and developed Bratz while employed by Mattel, ... the fact that Bryant worked with and assisted MGA during the time Bryant was employed by Mattel,... [and] concealing Bryant's role in Bratz..."[14] In particular, Mattel claimed that

> [b]ecause of Bryant's and MGA's acts of concealment ... Mattel had no reason to suspect that Bryant had worked with MGA, or assisted MGA, while he still [sic] employed by Mattel until approximately November 24, 2003, when Mattel received, through an unrelated legal action, a copy of Bryant's agreement with MGA, which showed that the date of Bryant's agreement with MGA predated Bryant's departure from Mattel. It was then, as a result, that Mattel learned for the first time that Bryant had secretly aided, assisted and worked for and with MGA ... in violation of his Mattel Employment Agreement.[15]

Based on the above, Mattel brought claims against MGA and Bryant for, *inter alia*: (1) copyright infringement, (2) civil RICO violations, (3) conspiracy to violate RICO, (4) breach of contract, (5) intentional interference with contract, (6) breach of fiduciary duty, (7) aiding and abetting breach of fiduciary duty, (8) breach of duty of loyalty, (9) aiding and abetting breach of duty of loyalty, (10) conversion, (11) unfair competition, and (12) declaratory relief.[16] Mattel seeks, among other things, "a

[13] SAC ¶¶ 23-27, 29, 34.

[14] *Id.* ¶ 35.

[15] *Id.* ¶¶ 35-36.

[16] *Id.* ¶¶ 82-105, 116-70.

EXHIBIT 17 PAGE 687

declaration that Counter-defendants have no valid or protectable ownership interests or rights in Bratz designs and works conceived, created or reduced to practice by Bryant during the term of his Mattel employment ... and that Mattel is the true owner of the foregoing," "an Order ... impounding all of Counter-defendants' products," an award of "all payments, revenues, profits, monies and royalties and any other benefits derived or obtained" from Bratz, treble damages and exemplary damages.[17]

By alleging fraudulent concealment and that it "had no reason to suspect" the facts that allegedly give rise to its counterclaims, Mattel placed at issue when it knew or had reason to suspect them prior to November 2003. In response, MGA and Bryant denied Mattel's allegations and pleaded, *inter alia*, statute of limitations and laches defenses, which remain pending.[18]

**B.      Mattel Has Refused To Turn Over Information That Would Show When It First Had Reason To Suspect The Basis for Its Claims**

Mattel's allegations have affirmatively injected into this litigation the issue of when it first knew or had reason to suspect the basis for its counterclaims against MGA and Bryant. At the same time, Mattel has blocked discovery on that issue.

In discovery, MGA and Bryant have sought interrogatory responses, documents, requests for admission and deposition testimony that would address when, in fact, Mattel first had reason to suspect Bryant's involvement in Bratz, his alleged breach of contract, his work for MGA, and Mattel's alleged "true owner[ship] of Bratz." For example, Bryant's interrogatories ask Mattel to "[s]tate all facts supporting your contention that Mattel first became aware of the alleged wrongful conduct of Bryant in November 2003."[19] MGA's interrogatories ask Mattel to

---

[17] *Id.*, Prayer for Relief ¶¶ 4, 7, 11, 12.

[18] Mumford Decl., Ex. 9: MGA Answer to Mattel's Counterclaims at 21-22; *id.*, Ex. 10: Carter Bryant's Reply to Mattel's Counterclaims at 15.

[19] Mumford Decl., Ex. 11: Defendant's First Set of Interrogatories at 3, 5 (Nos. 1, 9)

EXHIBIT *11* PAGE *688*

"[s]tate, with particularity, when and how [it] first learned of BRATZ," "that Bryant performed work for MGA," or "that Bryant conceived of the BRATZ CONCEPT."[20] And MGA has requested all documents "evidencing, mentioning, referring to, or relating to the date and manner in which [Mattel] first learned of Bryant's involvement with, work on, and connection to the conception, design, creation or development of BRATZ or BRATZ INTELLECTUAL PROPERTY" and Bryant's "involvement with, contract with, and work with or for MGA."[21]

In response to each of these requests, Mattel has (a) asserted attorney-client privilege and work product, and (b) objected on grounds that the request seeks information "that [is] not relevant to this action, nor likely to lead to the discovery of admissible evidence."[22]

There is good reason to believe that Mattel is using the attorney-client privilege and work product doctrine to conceal facts relevant to MGA's statute of limitations and laches defenses. Besides asserting privilege and irrelevance, Mattel's initial discovery responses sought to mislead MGA and Bryant on issues related to when Mattel had reason to suspect the basis for its counterclaims. For example, in response to the request to "[s]tate ... when and how MATTEL first learned that BRYANT performed work for MGA," Mattel originally responded:

> To Mattel's knowledge, Bryant was first confirmed as the Bratz designer in the July 18, 2003 *Wall Street Journal* article, in which Isaac Larian also indicated that Bryant had been involved in some manner with MGA in or about "late 1999."

---

[20] Mumford Decl., Ex. 12: MGA's First Set of Interrogatories to Mattel, Inc. at 10-11 (Nos. 9-11).

[21] Mumford Decl., Ex. 13: MGA's First Set of Requests for the Production of Documents and Things at 56 (Requests 191-92).

[22] *See, e.g.,* Mumford Decl., Ex. 14: Mattel, Inc.'s Objections and Reponses to MGA's First Set of Interrogatories at 17; *id.,* Ex. 4: Mattel's Objections and Second Supplemental Responses to Defendant's First Set of Interrogatories at 15, 161, 202-03, 299, 317, 365, 405, 445 and 477; *id.,* Ex. 15: Mattel, Inc.'s Responses to MGA's First Set of Requests for the Production of Documents and Things at 192-93.

EXHIBIT *17* PAGE *689*

1      Subsequently, in November 2003, Mattel obtained a copy of a contract
2  between defendant Carter Bryant and defendant MGA.... Through this
   agreement, Mattel concluded that Bryant ... worked as a designer for a
3  Mattel competitor, MGA.[23]

4      Only after MGA raised the issue presented in this motion, did Mattel

5  supplement its response to acknowledge that "[a]fter Bryant left Mattel, but prior to

6  the July 18, 2003 [*Wall Street Journal*] article, there was rumor and innuendo that

7  Bryant may be working with MGA on Bratz."[24]  The supplemental response

8  continues:

9      Mattel conducted an investigation in Spring 2002 based on allegations
   that Bryant may have plagiarized "Toon Teens" and created Bratz dolls
10  for MGA, and later in August 2002 based on an anonymous letter sent
   to Mattel.... The potential claims investigated in 2002 did not give
11  Mattel any knowledge, or even reason to believe, that Bryant worked
   for MGA and/or conceived of Bratz while a Mattel employee.[25]
12

13  Elsewhere in its supplemental response, Mattel states that "the similarities between

14  the Toon Teens drawings and Bryant's Bratz drawings tends to establish that Bryant

15  created Bratz works while he was a Mattel employee and not in 1998 as he claims."[26]

16      Further, the third-party sculptor of Bratz, Margaret Leahy, recently testified

17  that in the summer of 2001 a friend from Mattel was "grilling" her, and asking "very

18  poignant question[s] like somebody put her up to it," about whether "Carter [was] the

19  designer on the doll or what was [MGA employee and former Mattel employee]

20  Paula [Garcia's] involvement" in Bratz.[27]  Leahy told the Mattel employee that

21  "Carter initially came up with a design and Paula carried it out."[28]  Other recent

22  [23] Mumford Decl., Ex. 14: Mattel, Inc.'s Objections and Reponses to MGA's First Set
   of Interrogatories at 17-19.
23  [24] Mumford Decl., Ex. 3: Supplemental Responses to MGA's First Set of
   Interrogatories to Mattel, Inc at 113.
24  [25] *Id.; see also id.*, Ex. 4: Mattel's Objections and Second Supplemental Responses to
25  Defendant's First Set of Interrogatories at 21, 300.
   [26] Mumford Decl., Ex. 4: Mattel's Objections and Second Supplemental Responses to
26  Defendant's First Set of Interrogatories at 27, 172, 214, 336, 376, 416, 456, 488.
   [27] Mumford Decl., Ex. 2: Deposition of Margaret Leahy 187:9-13 (rough).
27  [28] *Id.*
28

testimony from former Mattel employee Elise Cloonan confirms that by late 2001, Mattel's lawyers were conducting an investigation involving Bryant's work on Bratz in the design department.[29]  And Mattel produced in redacted form an email from its head of security, Richard De Anda, that relates to an official investigation Mattel CEO Robert Eckert requested in 2002 as to whether Bryant helped MGA create Bratz "[w]hile he was working with Mattel."[30]  In the email, De Anda states that he had been "aware of this situation and ... working on it for several months" but it was in the hands of Mattel's attorneys.[31]

In its interrogatory responses, Mattel also asserts that Bryant used several "other Mattel employees" to work on the Bratz dolls so that they "had been designed and were far along in development during the time that Bryant was employed by Mattel."[32]  A report from Bryant's exit interview at Mattel shows that Bryant told Mattel's human resources representative he was leaving because an "[o]pportunity arose; had to take it."[33]  Mattel recently acknowledged that employees leaving under similar circumstances to work for an unnamed competitor have "caused Mattel to begin investigating their activities."[34]

In other words, the record already includes a plethora of evidence calling into question Mattel's assertion that it had *no reason to suspect*, until November 2003, Bryant's involvement in Bratz, his alleged breach of contract, his work for MGA while a Mattel employee, and Mattel's alleged "true owner[ship] of Bratz":

---

[29] Mumford Decl., Ex. 7: Deposition of Elise Cloonan at 298-306 (rough).

[30] Mumford Decl., Ex. 5: Document bates-numbered M 0074401.

[31] Mumford Decl., Ex. 6: Document bates-numbered M 0074400.

[32] Mumford Decl., Ex. 4: Mattel's Objections and Second Supplemental Responses to Defendant's First Set of Interrogatories at 20, 62-63, 102, 134, 166, 207, 330, 370, 409, 449-50, 481.

[33] Mumford Decl., Ex. 8: Exit Interview Report (M 0001654-55).

[34] Mumford Decl., Exhibit 3: Supplemental Responses to MGA's First Set of Interrogatories to Mattel, Inc. at 28.

EXHIBIT *17* PAGE *691*

- Mattel alleges that Bryant and several "Mattel employees" designed Bratz and "were far along in development" while Bryant was employed by Mattel;

- Bryant told Mattel's human resources representative in October 2000 that he was leaving because an "[o]pportunity arose; had to take it";

- At the behest of management, Mattel employees were "grilling" friends concerning Bryant's role in Bratz by the summer of 2001;

- Mattel's lawyers were investigating claims that Bryant plagiarized a Mattel product and created Bratz for MGA by late 2001;

- Mattel CEO Robert Eckert ordered an official investigation into whether Bryant helped MGA create Bratz "[w]hile he was working with Mattel" in August 2002;[35] and

- Mattel Security Head Richard De Anda wrote in response to Eckert's demand: "I'm aware of this situation and have been working on it for several months. My frustration in this matter was the genesis of [REDACTED] and that is now in the hands of [Mattel counsel] Robert Normile. The truth of the matter is that Carter Bryant did work for Mattel, however, [REDACTED] according to outside attorneys. [Mattel counsel] McShane [REDACTED]."[36]

Further, while insisting that the investigation into whether Bryant plagiarized a particular Mattel product is irrelevant to MGA's limitations defense, Mattel is simultaneously asserting that the alleged similarities between Bratz and the allegedly plagiarized product "tends to establish" that Bryant created Bratz "while he was a Mattel employee." Mattel would like to eat its cake and have it too: it intends to rely upon the purported similarities to support its claims, while at the same time

---

[35] Mumford Decl., Ex. 5: Document bates-numbered M 0074401.
[36] Mumford Decl., Ex. 6: Document bates-numbered M 0074400.

EXHIBIT 17 PAGE 692

1   claiming that its awareness of not just the similarities but also the affirmative

2   allegations of plagiarism in Spring 2002 are irrelevant.

3       In sum, even though Mattel conducted multiple investigations and consulted

4   with "outside attorneys," Mattel would like defendants (and the Court) to accept

5   without inquiry Mattel's implausible claim that these events did not give it any

6   reason to suspect the basis for its current claims.  By withholding and redacting

7   documents that contain information relating to when Mattel became aware of the

8   basis for its counterclaims, Mattel is preventing MGA and Bryant from vital

9   information that would allow them to dispute Mattel's assertions that it did not have

10  *any reason to suspect* these matters prior to November 2003.

11      On November 30, 2007, MGA advised Mattel that its assertions had injected

12  the issue of its knowledge into this litigation and made otherwise privileged

13  information on that subject relevant to, *inter alia,* the defendants' statute of

14  limitations and laches defenses, and that "'[f]airness, therefore, requires that

15  defendants be given access to attorney client communications that may impact

16  resolution of that issue.'"[37]  On December 6, 2007, the parties met and conferred over

17  these matters, and Mattel informed MGA  that it would stand by its assertion of

18  privilege over any instance in which MGA and Bryant sought attorney client

19  communications or work product that might show what, in fact, Mattel knew or had

20  reason to suspect prior to November 2003.[38]  On December 8, 2007, Mattel

21

22

23

24  [37] Mumford Decl., Ex.  16: November 30, 2007 Letter from Marcus Mumford to Jon
    Corey (quoting Paul R. Rice, *Attorney-Client Privilege in the United States* § 9:53, at
25  9-370 (2d ed. 2007) (citing authorities)).  On November 29, 2007, MGA and Bryant
    advised Mattel that its relevancy objection has no support in the record of this case or
26  the law governing discovery.  That objection is the subject of a motion MGA and
    Bryant filed December 10, 2007, to compel discovery designed to ascertain when
27  Mattel first had notice, or was on inquiry notice, of its claims.

    [38] Mumford Decl. ¶ 19.
28

EXHIBIT *17* PAGE *693*

supplemented its interrogatory responses and, in addition to the factual whipsaw illustrated above, reasserted its privilege objections.[39]

On December 10, 2007, Mattel sent a letter stating that it did not consider the parties' meet-and-confer on anything but a "blanket waiver" to have been adequate because it "may be [that] Mattel does not take and has never taken the position that facts relating to notice constitute privileged information or that the disclosure of such non-privileged fact [sic] could constitute a waiver of any claim of privilege."[40] This motion, however, is based on Mattel's assertions that it had no knowledge or reason to suspect the basis for its claims prior to November 2003. Mattel's waiver with respect to those matters was discussed at the December 6 meet and confer, and the parties were unable to come to a resolution.[41] On December 13, 2007, Mattel further supplemented its interrogatory responses and, as indicated above, reasserted privilege over attorney-client communications that would otherwise impact resolution of the issue.[42] Accordingly, MGA now moves for an order (1) concluding that Mattel has waived attorney-client privilege and work product doctrine concerning what it knew or had reason to suspect prior to November 2003 regarding Carter Bryant's involvement in Bratz, his alleged breach of contract, his work for MGA, and/or Mattel's alleged "true owner[ship] of Bratz," and (2) compelling that Mattel supplement its discovery responses and document productions accordingly.

---

[39] Mumford Decl., Ex. 3: Supplemental Responses to MGA's First Set of Interrogatories to Mattel, Inc. at 111-13.

[40] Mumford Decl., Ex. 17: December 10, 2007 Letter from Jon Corey to Marcus Mumford.

[41] Mumford Decl. ¶ 19.

[42] Mumford Decl., Ex. 4: Mattel's Objections and Second Supplemental Responses to Defendant's First Set of Interrogatories at 15, 161, 202-03, 299, 317, 365, 405, 445 and 477.

EXHIBIT 17 PAGE 694

## III. ARGUMENT

### A.   Fairness Requires The Disclosure Of Mattel's Protected Information

"When a party puts privileged matter in issue as evidence in a case, it thereby waives the privilege as to all related privileged matters on the same subject." 8 Wright, Miller & Marcus, *Federal Practice and Procedure: Civil 2d* § 2016.2 at 252 (West 2007 Update).  As Judge Learned Hand explained with regard to the Fifth Amendment, "[privilege] should not furnish one side with what may be false evidence and deprive the other of any means of detecting the imposition." *United States v. St. Pierre*, 132 F.2d 837, 840 (2d Cir. 1942).  "[T]he privilege is to suppress the truth, but that does not mean that it is a privilege to garble it[.]" *Id.*  Having affirmatively injected into the case the issue of what it knew, and when, concerning Bryant's work on Bratz, his alleged breach of contract, his work for MGA, and its alleged "true owner[ship] of Bratz," Mattel cannot conceal key evidence on the topic behind a cloak of privilege.  Under the implied waiver doctrine, MGA is entitled to all evidence that might show what Mattel knew or had any reason to suspect concerning these matters prior to November 2003.

The implied waiver doctrine holds that a party waives its privilege when it "raises a claim which in fairness requires disclosure of the protected communications." *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992) (reversing summary judgment for failure to have found a waiver of attorney client privilege).  This doctrine – which is also sometimes referred to as "waiver by claim assertion" – is intended to prevent litigants from "using the privilege as both a shield and a sword." *Bittaker v. Woodford*, 331 F.3d 715, 719 (9th Cir. 2003).  "In practical terms, this means that parties in litigation may not abuse the privilege by asserting claims the opposing party cannot adequately dispute unless it has access to the privileged materials." *Id.*  To avoid prejudicing the opposing party in this context, "[t]he party asserting the claim is said to have implicitly waived the privilege." *Id.*

EXHIBIT *17* PAGE *695*

Federal courts -- including those in California -- have routinely found implied waiver on the topic of the plaintiff's knowledge or investigation of its claims where (as here) a plaintiff seeks to evade the statute of limitations by alleging fraudulent concealment and the discovery rule. *See Rambus*, 2007 WL 3444376 at *3-5 (finding a waiver where plaintiff was "alleging a basis for avoiding a statute of limitations"); *Aloe Vera of America, Inc. v. United States*, No. CV 99-1794 PHX JAT, 2003 WL 22429082, *3 (D. Ariz. Sept. 23, 2003) (finding a waiver where "[p]laintiffs have asserted privilege as the result of an affirmative act – by filing a suit in which a statute of limitations defense is available"); *In re Imperial Corp. of Am.*, 179 F.R.D. 286, 289-90 (S.D. Cal. 1998) (finding a waiver with respect to documents that were "essential to [defendant's] examination ... regarding plaintiff's allegations of avoidance of the statute of limitations"); *Titan Corp. v. M/A-Com, Inc.*, No. CV 93-335, 1994 WL 16001739, *2-3 (S.D. Cal. June 22, 1994) (finding a waiver where, in its complaint and answers to interrogatory "plaintiff put the allegedly protected information in issue" by, *inter alia*, "claim[ing] that it did not and could not with reasonable diligence have discovered the alleged fraud" earlier); *Bohack Corp. v. Iowa Beef Processors, Inc.*, No. 1981 WL 2018, at *1-2 (E.D.N.Y. Jan. 13, 1981) ("[P]laintiff may not take advantage of the assertion of fraudulent concealment, a doctrine which derives from equity, and at the same time preclude its adversary's discovery of the very evidence which pertains to the application of that doctrine."); *Russell v. Curtin Matheson Scientific, Inc.*, 493 F. Supp. 456, 458 (D. Tex. 1980) (finding waiver where plaintiffs "assert the attorney-client privilege" and yet have "by an 'affirmative act for (their) own benefit,' the raising of the equitable tolling issue, 'placed information protected by (the privilege) in issue'"). As a leading treatise on privilege has explained, the plaintiff waives its privilege in this context because fairness dictates that the defendant must have access to vital

EXHIBIT *17* PAGE *696*

information to dispute what the plaintiff claims it knew or should have known for purposes of statute of limitations accrual:

> A plaintiff's contention that she timely filed suit from when she discovered or should have discovered the defendant's actionable conduct injects the issue of her knowledge into the suit and makes her attorney's communications on that subject *relevant* to the court's determination. Fairness, therefore, requires that the defendant be given access to attorney-client communications that may impact on resolution of that issue.

2 Paul R. Rice, *Attorney-Client Privilege in the United States* § 9:53, at 9-370 (2d ed. rev. 2007).

This is precisely the situation before the Court.  To avoid the applicable statute or limitations and laches doctrines, Mattel affirmatively alleged that it had no reason *"to suspect or to know* that it was the true owner of Bratz" prior to November 2003 because MGA and Bryant "deliberately and intentionally concealed facts," including "the fact that Bryant conceived, created, designed and developed Bratz," "Bryant's role in Bratz," and the fact that "Bryant had secretly aided, assisted and worked for and with MGA … in violation of his Mattel Employment Agreement."[43]  By withholding information that pertains to those very issues, Mattel has deprived MGA of a fair opportunity to test the truthfulness of Mattel's allegations.  Moreover, Mattel has attempted to mislead MGA concerning the extent of its knowledge on these matters.  This is precisely the "garbl[ing]" of the truth that the implied waiver doctrine is calculated to prevent.  *St. Pierre*, 132 F.2d at 840 (Learned Hand, J.).

**B.     Mattel Has Waived Privilege Regarding When It Had Any Reason To Suspect Bryant's Work On Bratz, His Alleged Breach Of Contract, His Work For MGA, And/Or Mattel's Alleged "True Owner[ship] Of Bratz"**

The three-part test for determining whether a party has impliedly waived privilege and work product as to subject matter it has placed at issue in litigation is well-established. *See Hearn v. Rhay*, 68 F.R.D. 574 (E.D. Wash. 1975).

---

[43] SAC ¶ 35-36 (emphasis added).

EXHIBIT *17* PAGE *697*

The factors common to each exception [to the rules of privilege] may be summarized as follows: (1) assertion of the privilege was a result of *some affirmative act, such as filing suit,* by the asserting party; (2) through this affirmative act, the asserting party *put the protected information at issue by making it relevant* to the case; and (3) application of the *privilege would have denied the opposing party access to information vital to his defense.*

*Id.* at 581 (emphasis added); *see also United States v. Amlani,* 169 F.3d 1189, 1195 (9th Cir. 1999) (recognizing the Ninth Circuit's adoption of the *Hearn* test).

Here, Mattel's actions easily meet this test – by asserting the privilege, it has denied MGA access to information vital to its statute of limitations and laches defenses – requiring a finding of implied waiver.

First, Mattel's assertion of the attorney-client privilege and work product doctrine results from its filing suit and alleging a basis for avoiding the statute of limitations. As stated only weeks ago by the Northern District of California, **"alleging a basis for avoiding a statute of limitations constitutes an affirmative act under the *Hearn* test."** *Rambus,* 2007 WL 3444376, at *3 (emphasis added). Mattel's Second Amended Answer and Counterclaims assert that "Bryant and MGA deliberately and intentionally concealed facts sufficient for Mattel to suspect or to know that it was the true owner of Bratz," and "[b]ecause of Bryant's and MGA's acts of concealment ... Mattel had *no reason to suspect* that Bryant had worked with MGA, or assisted MGA, while he still [sic] employed by Mattel" or violated his Mattel Employment Agreement "until approximately November 24, 2003."[44]

Because Mattel undertook the affirmative act of stating counterclaims and alleging fraudulent concealment against MGA and Bryant to avoid their statute of limitations and laches defenses, the first prong of the *Hearn* test is satisfied. *See Rambus,* 2007 WL 3444376 at *3; *accord In re Imperial Corp. of Am.,* 179 F.R.D. at 289-90; *Aloe Vera of Am.,* 2003 WL 22429082 at *3.

---

[44] *Id.* ¶¶ 35-36 (emphasis added).

EXHIBIT *17* PAGE *698*

Second and relatedly, through its pleadings and discovery responses, Mattel has repeatedly put at issue *when it knew or had reason to suspect* the facts that allegedly give rise to its counterclaims thus making it relevant to MGA's affirmative defenses, including whether Mattel had any reason to suspect prior to November 2003 Bryant's involvement in Bratz, his alleged breach of contract, his work for MGA while at Mattel, and Mattel's alleged "true owner[ship] of Bratz." Indeed, Mattel's attempt to plead around the statute of limitations issue plainly satisfies the second prong of the *Hearn* test as well. *See Rambus*, 2007 WL 3444376, at *3 ("California law clearly considers a plaintiff's subjective knowledge relevant to the fraudulent concealment inquiry. Similarly, the discovery rule can be triggered by subjective knowledge of a claim." (citations omitted)); *see also* 2 Paul R. Rice, *Attorney-Client Privilege in America* § 9:53 (2d ed. rev. 2007); Edna Selan Epstein, *The Attorney-Client Privilege and the Work-Product Doctrine*, at 544 (5th ed. 2007) ("[E]ach time a plaintiff brings a suit, he tacitly puts into issue the question of whether the statute of limitations [has] run.").

Mattel's discovery responses have placed the matter of what it knew or had reason to suspect prior to November 2003 even further at issue. *See, e.g., Titan Corp.*, 1994 WL 16001739, at *2-3 (plaintiff "put the allegedly protected information in issue" in its complaint and answers to interrogatory). After first asserting that it had no reason to suspect Bryant's involvement in Bratz or his work at MGA while a Mattel employee because his identity was not publicly reported until July 2003 and was not confirmed until November 2003, Mattel recently admitted that prior to July 2003 "there was rumor and innuendo that Bryant may be working with MGA on Bratz."[45] Mattel attempts to distinguish the investigations that it conducted in 2002 concerning whether Bryant plagiarized "Toon Teens" and the anonymous

---

[45] Mumford Decl., Ex. 3: Supplemental Responses to MGA's First Set of Interrogatories to Mattel, Inc. at 113.

EXHIBIT *17* PAGE *699*

letter, and the conclusions its attorneys and officers reached (which it does not disclose), on the grounds "[t]he potential claims investigated in 2002 did not give Mattel any knowledge, or even reason to believe, that Bryant worked for MGA and/or conceived of Bratz while a Mattel employee."[46] But its own statements allege that the similarities between Toon Teens and Bratz, which apparently were noted at least as early as the spring of 2002, "tends to establish that Bryant created Bratz works *while he was a Mattel employee* and not in 1998 as he claims."[47]

Moreover, contrary to what its responses suggest, Mattel's investigations concerned whether Bryant helped MGA create Bratz "[w]hile he was working with Mattel."[48] In response to CEO Robert Eckert's query following the anonymous letter, Mattel's head of security, Richard De Anda, wrote that he had been "aware of this situation and ... working on it for several months."[49] It further appears that Mattel was relying on the advice of counsel in resolving those matters. De Anda continued: "My frustration in this matter was the genesis of [REDACTED] and that is now in the hands of [Mattel counsel] Robert Normile. The truth of the matter is that Carter Bryant did work for Mattel, however, [REDACTED] according to outside attorneys. [Mattel counsel] McShane [REDACTED]."[50] In sum, Mattel cannot argue that its attorney communications are not relevant to these matters, including the enforcement of the employment agreements and its alleged status as the "true owner of Bratz." Mattel has attempted to evade the statute of limitations and laches by pleading fraudulent concealment and the discovery rule. Notwithstanding its attempt to

---

[46] *Id.; see also id.,* Ex. 4: Mattel's Objections and Second Supplemental Responses to Defendant's First Set of Interrogatories at 21, 300.

[47] Mumford Decl., Ex. 4: Mattel's Objections and Second Supplemental Responses to Defendant's First Set of Interrogatories at 27, 172, 214, 336, 376, 416, 456, 488 (emphasis added).

[48] Mumford Decl., Ex. 5: Document bates-numbered M 0074401.

[49] Mumford Decl., Ex. 6: Document bates-numbered M 0074400.

[50] *Id.*

EXHIBIT *17* PAGE *700*

1   distinguish the 2002 investigations into the same conduct asserted in its

2   counterclaims, Mattel has "put the protected information at issue," including what its

3   attorneys knew or had reason to suspect as a result of those investigations, and thus

4   made "it relevant to the case." *Hearn*, 68 F.R.D. at 581. In other words, Mattel is

5   "abus[ing] the privilege by asserting claims the opposing party cannot adequately

6   dispute unless it has access to the privileged materials," attempting to "us[e] the

7   privilege as both a shield and a sword," and therefore must be "said to have

8   implicitly waived the privilege." *Bittaker*, 331 F.3d at 719.

9       **Third**, application of the privilege here would prevent MGA from discovering

10  facts vital to its statute of limitations and laches defenses. Here, the Discovery

11  Master has already observed that what Mattel knew or had reason to suspect prior to

12  November 2003 is vital to the potentially "case dispositive …[statute of limitations

13  and laches] defenses" of MGA and Bryant "which are still pled and still in the

14  case."[51]  Without the opportunity to test Mattel's self-serving allegations that it could

15  not reasonably have been aware of its claims prior to November 2003 – made while

16  cloaking relevant evidence behind a claim of privilege – MGA faces the risk that

17  Mattel's privilege assertions will serve only to "furnish one side with what may be

18  false evidence and deprive the other of the means of detecting the imposition." *St.*

19  *Pierre*, 132 F.2d at 849. Thus, the third prong of *Hearn* is also satisfied.

20      Mattel has also waived any claim of work product protection it might

21  otherwise have for pre-lawsuit materials prepared by its attorneys relating to these

22  issues. The work product doctrine is a qualified privilege that, in the Ninth Circuit,

23  may be overcome by showing, first, a "substantial need" for non-opinion materials to

24  prepare the case and that the requesting party cannot, without undue hardship, obtain

25  the "substantial equivalent of the materials by other means," *Holmgren v. State Farm*

26

27  [51] Mumford Decl., Ex. 18: Reporter's Transcript of the Proceedings—January 25, 2007, at 11:1-12:9.

28

MGA's Motion To Compel Regarding Mattel's Privilege Waiver By Claim Assertion
19

EXHIBIT *17* PAGE *701*

*Mut. Auto. Ins. Co.*, 976 F.2d 573, 576 (9th Cir. 1992) (citing *Hickman v. Taylor*, 329 U.S. 495 (1947)), and second, a "compelling" need for "opinion work product ... when mental impressions are *at issue* in a case." *Id.* at 577 (emphasis in original); *accord Rambus*, 2007 WL 3444376, at *6 (allowing defendant access to plaintiff's work product because it was "vital information [defendant] is entitled to know to defend against [plaintiff's] claims."). As demonstrated above, Mattel has put its lawyer's mental impressions concerning the potential for a claim against MGA and Bryant at issue by asserting that it did not believe or have any reason to suspect the facts that allegedly give rise to its counterclaims prior to November 2003. Because Mattel has put the matter directly at issue, MGA is entitled to discover what Mattel's counsel knew or should have suspected concerning a potential lawsuit against MGA and/or Bryant prior to November 2003 and what Mattel's lawyers actually thought about such claims. *See Rambus* WL 3444376, at *6 (holding that plaintiff waived *both attorney-client privilege and work product protection* by placing both the client and the lawyer's knowledge of a potential claim at issue); *In re Imperial Corp.*, 179 F.R.D. at 289-90 (same); *Titan Corp.*, 1994 WL 16001739, at *2-3 (same).

The recent decision of the Northern District of California in *Rambus* illustrates the application of the *Hearn* test to the facts before the Court. In *Rambus*, Samsung Electronics brought counterclaims alleging its competitor, Rambus, had aided and abetted breaches of fiduciary duty by a former Samsung employee, Neil Steinberg, both before and after Steinberg left the company. 2007 WL 3444376, at *1. Specifically, Samsung claimed that Steinberg possessed confidential information from his time at Samsung that Rambus later misused. *Id.* In addition, Samsung pleaded that the statute of limitations on certain of its counterclaims was tolled because it "did not and could not investigate potential claims until 2005." *Id.* at *1-2. Rambus argued that Samsung had waived privilege by bringing suit and relying on equitable tolling and the discovery rule to overcome the statute of limitations and

1   moved to compel production of information relating to this subject matter previously

2   withheld on privilege grounds. *Id.*

3       The Special Master in the case agreed, finding that:

4
5   By affirmative [sic] asserting both the discovery rule and equitable
    tolling in its counterclaims and in its briefing and oral argument on
6   Rambus' motion to dismiss, Samsung has placed the issue of what it
    knew about Steinberg's work at Rambus at issue in this litigation.
7   Samsung has also placed the timing and scope of its investigation of
    these claims at issue by alleging that it did not and could not investigate
8   potential claims until 2005.

9   *Id.* at *2.

10      Samsung appealed the Special Master's decision to the district court, which

11  confirmed that Samsung had waived privilege under the *Hearn* test. *Id.* at *3-5.

12  Specifically, the court found by pleading equitable tolling and the discovery rule

13  Samsung had affirmatively placed its subjective knowledge into issue, satisfying

14  prongs one and two of *Hearn*. *Id.* at 3. The court also affirmed the Special Master's

15  finding that "the timing and scope of [Samsung's] investigation of [its] claims" was

16  information vital to Rambus' statute of limitations defense, satisfying the third prong

17  of *Hearn*. *Id.* at 4-5. The court also granted Rambus' motion to compel information

18  Samsung had withheld based on the work product doctrine. *Id.* at *6.

19      The facts of *Rambus* are similar to those before the Court in this litigation.

20  Here, Mattel alleges that MGA and Bryant wrongfully profited from confidential and

21  proprietary materials Mattel owns by virtue of Bryant's employment with Mattel.

22  Like Samsung, Mattel's pleadings and discovery responses in this litigation have

23  placed "the timing and scope of its investigation of [its] claims at issue," by arguing

24  that it could not have known or reasonably suspected the alleged wrongdoing until

25  November 2003. This matter concerns what Mattel and its lawyers knew or had

26  reason to suspect concerning its claims prior to November 2003, including Mattel's

27  alleged "true owner[ship] of Bratz," Bryant's involvement in Bratz, his alleged

28

---

MGA's Motion To Compel Regarding Mattel's Privilege Waiver By Claim Assertion
21

EXHIBIT _17_ PAGE _703_

breach of contract, and/or his work for MGA while at Mattel.  "[A]rtful pleading cannot overcome the record evidence that demonstrates" that a plaintiff's attorneys were involved for purposes of determining what the plaintiff knew or had reason to know concerning the accrual of its claims. *Aloe Vera of Am.*, 2003 WL 22429082, at *3.  This information, bearing on whether the claims are subject to dismissal based on the statute of limitations or laches, is equally as vital to the statute of limitations and laches defenses of MGA as it was to Rambus.  Accordingly, applying the *Hearn* test to the facts before it, the Court should find that Mattel has waived the privilege as to information bearing on when Mattel knew or had reason to suspect prior to November 2003 concerning Bryant's involvement in Bratz, his alleged breach of contract, his work for MGA while at Mattel, and Mattel's alleged "true owner[ship] of Bratz."

## IV.  CONCLUSION

For the foregoing reasons, MGA respectfully requests an order (1) concluding that Mattel has waived attorney-client privilege and work product concerning what it knew or had reason to suspect prior to November 2003 regarding Bryant's involvement in Bratz, his alleged breach of contract, his work for MGA, and/or Mattel's alleged "true owner[ship] of Bratz," and (2) compelling Mattel to supplement its discovery responses and document productions accordingly.

DATED:  December 18, 2007

SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, LLP

By: Raoul Kennedy

Raoul D. Kennedy
Attorney for MGA ENTERTAINMENT,
INC.

EXHIBIT 17 PAGE 70 4