QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
  John B. Quinn (Bar No. 090378)
  (johnquinn@quinnemanuel.com)
  Michael T. Zeller (Bar No. 196417)
  (michaelzeller@quinnemanuel.com)
  Jon D. Corey (Bar No. 185066)
  (joncorey@quinnemanuel.com)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:   (213) 443-3000
Facsimile:   (213) 443-3100

Attorneys for Mattel, Inc.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# EASTERN DIVISION

| CARTER BRYANT, an individual, | CASE NO. CV 04-9049 SGL (RNBx) |
|---|---|
| Plaintiff, | Consolidated with<br>Case Nos. CV 04-09059 & CV 05-2727 |
| vs. | Hon. Stephen G. Larson |
| MATTEL, INC., a Delaware corporation, | **MATTEL, INC.'S NOTICE OF LODGING OF FOREIGN AUTHORITIES IN SUPPORT OF MATTEL, INC.'S MOTION FOR ISSUANCE OF LETTER OF REQUEST AND REQUEST FOR JUDICIAL ASSISTANCE (LETTER OF REQUEST)** |
| Defendant. | |
| AND CONSOLIDATED ACTIONS | |

Hearing Date:   March 3, 2008
Time:           10:00 a.m.
Courtroom:      1

**Phase 1**
Discovery Cut-off:      January 28, 2008
Pre-trial Conference:   May 5, 2008
Trial Date              May 27, 2008

07209/2369020.1

1       Mattel Inc. hereby lodges copies of the following foreign authorities cited in

2 support of Mattel, Inc.'s Motion for Issuance of Letter of Request and Request for

3 Judicial Assistance (Letter of Request) by the United States District Court for the

4 Central District of California.

5

6 <u>CASES</u>                                       <u>EXHIBIT</u>

7
8 <u>Advance/Newhouse Partnership and Bright House Networks, LLC</u>
<u>v. Brighthouse, Inc.</u>,
   [2005] 38 C.P.R. (4th ) 559 ........................................................................1

9
10 <u>Campbell Estate,</u>
   B.C.J. No. 2304 ......................................................................................2

11 <u>Friction Division Products Inc. v. E.I. DuPont de Nemours & Co. (No. 2),</u>
   [1986] 56 O.R. 722 (H.C.J.).....................................................................3
12

13 <u>Ontario Public Service Employees Union Pension Trust Fund v. Clark,</u>
   2005 CanLII 51207..................................................................................4

14 <u>Presbyterian Church of Sudan v. Rybiak,</u>
   [2005] 256 D.L.R. (4th) 750......................................................................5
15

16 <u>Zingre v. The Queen et al.,</u>
   1981 CanLII 32 (S.C.C.) .........................................................................6

17

18

19 DATED:  January 28, 2008      QUINN EMANUEL URQUHART OLIVER &
20                           HEDGES, LLP

21
22                   By_____
                      Jon D. Corey
23                       Attorneys for Mattel, Inc.

24

25

26

27

28

NOTICE OF LODGING

# EXHIBIT 1

2005 CanLII 3461 (ON S.C.)

**COURT FILE NO.:** C-1036-04
**DATE:** 20050125

## SUPERIOR COURT OF JUSTICE - ONTARIO

**RE:**      Advance/Newhouse Partnership and Bright House Networks, LLC v. Brighthouse, Inc., D/B/A/ Brighthouse Branding Group

**BEFORE:**    The Honourable Mr. Justice R.D. Reilly

**COUNSEL:**   L.E. Trent Horne, for the Applicants

              John R. Weber, for the Respondent

## <u>RULING ON AN APPLICATION</u>

[1]    By this application, the applicants seek an order giving effect to letters rogatory issued by the United States District Court for the Middle District of Florida on October 25, 2004. The letters rogatory detailed to some extent the context in which the application comes before this court and merit reproduction at this time. They read as follows:

> "In the United States District Court for the Middle District of Florida
> Tampa Division
>
> Letters Rogatory
>
> To: Ontario Superior Court of Justice
> From: The United States District Court for the Middle District of Florida
>
> Whereas, Mr. Alexander R. Haag, in his capacity as President of Brighthouse, Inc. d/b/a Brighthouse Branding Group ('Brighthouse Branding'), is an important witness in the above-referenced case pending with the United States District Court for the Middle District of Florida; and
>
> Whereas, Mr. Haag has personal knowledge and information regarding the use of the name and mark Brighthouse by Brighthouse Branding, which may be relevant to defendants Advance/Newhouse Partnership and Bright House Networks,

**EXHIBIT 1 PAGE 3**

- 2 -

LLC's defense, namely, that Brighthouse Branding uses the name or mark Brighthouse or variations thereon in the United States and that plaintiff BrightHouse LLC's rights in its Brighthouse mark are therefore limited such that it does not have the exclusive right to use the name or mark Brighthouse in the United States; and

Whereas, defendants contend that Mr. Haag and Brighthouse Branding do not have any offices or physical location in the United States; and

Whereas, defendants do not have and cannot otherwise obtain admissible evidence regarding the use of the name or mark Brighthouse by Brighthouse Branding absent the deposition of Mr. Haag; and

Whereas, defendants intend to use the evidence they obtain from Mr. Haag in support of their claim and/or defenses, either at trial and/or in support of a motion for summary judgment; and

Whereas, defendants contend that justice cannot completely be done between the parties without the deposition of Mr. Haag, within your jurisdiction.

Therefore, this Court respectfully requests that the Ontario Superior Court of Justice cause, by proper and usual process, Mr. Alexander R. Haag to appear at a location within the Province of Ontario, Canada on a date to be mutually agreed upon by Mr. Haag, counsel for the defendants and counsel for plaintiff BrightHouse, LLC, for a nonparty videotaped deposition before an official examiner to be examined under oath on matters at issue in the above-referenced case.

Dated this 25th day of October, 2004."

[2]     The letters rogatory conclude with the signature of the court. By their prayer for relief,

the applicants specifically request:

1. an order that Mr. Alexander R. Haag attend on a mutually convenient date, and in any event, no later than November 30, 2004 (later amended to read January 31, 2004) (sic), for a non-party videotaped deposition before an official examiner to be examined under oath on matters in issue in the U.S. action;

2. an order that the examination be conducted by the solicitors for Advance/Newhouse Partnership and Bright House Networks, LLC, or their agents, in accordance with the Rules of Civil Procedure Applicable to proceedings in the United States District Court for the Middle District of Florida;

2005 CanLII 3461 (ON S.C.)

**EXHIBIT 1 PAGE 4**

- 3 -

3. an order that the examination may be videotaped in the manner contemplated by Rule 34.19 of the Rules of Civil Procedure;

4. in the event the application is unsuccessfully opposed, costs on a scale and in an amount to be determined by this honourable court.

[3]     Both the *Canada Evidence Act* (s. 46) and the *Evidence Act*, R.S.O. (s. 60) provide for the

recognition of letters rogatory and the authority to give effect to such a request when it is

established that a foreign court is desirous of obtaining the evidence of a witness within the

jurisdiction of the Ontario court when such evidence relates to a civil, commercial or criminal

proceeding pending before the foreign court. There are a number of factors which will impact

upon the court's decision and the exercise of its discretion to grant or refuse the request in the

letters rogatory. I am mindful of the jurisprudence cited by counsel. I need not analyze that

jurisprudence in detail for purposes of this ruling. I will, however, make brief reference to the

oft cited case of *Zingre v. R.* (1981), 127 D.L.R. (3d) 223 (S.C.C.). In that judgment, the

Supreme Court set out the justification for honouring the request of a foreign court. Dickson, J.

(as he then was) stated at p. 230:

> "As that great jurist, Chief Justice Marshall, observed in *Schooner Exchange v. McFadden et al.* (1812), 7 Cranch's Reports 116 at pp. 136-7, the jurisdiction of a nation within its own territory is necessarily exclusive and absolute, susceptible of no limitation not imposed by itself, but common interest impels Sovereigns to mutual intercourse and an interchange of good offices with each other.
>
> It is upon this comity of nations that international legal assistance rests. Thus the Courts of one jurisdiction will give effect to the laws and judicial decisions of another jurisdiction, not as a matter of obligation but out of mutual deference and respect. A foreign request is given full force and effect unless it be contrary to the public policy of the jurisdiction to which the request is directed (see Gulf Oil Corp. v. Gulf Canada Ltd. (1980), 111 D.L.R. (3d) 74, 51 C.P.R. (2d) 1, [1980] 2 S.C.R. 39) or otherwise prejudicial to the sovereignty or the citizens of the latter

2005 CanLII 3461 (ON S.C.)

**EXHIBIT 1 PAGE 5**

- 4 -

jurisdiction."

[4]     These guiding principles of mutual deference and respect have set the tone for the contemporary approach to honouring requests by letters rogatory of foreign courts. In *France (Republic) v. De Havilland Aircraft of Canada Ltd.* (1991), 3 O.R. (3d) 705 (C.A.), after discussing the legal foundation for the courts recognizing and giving effect to letters rogatory, Mr. Justice Doherty quoted a portion of the judgment of Dickson, J. in *Zingre v. R.* (cited above) and went on to say at p. 716:

> "This modern approach not only recognizes the inherent value in international judicial co-operation between friendly nations, but also reflects an enlightened self-interest. In an ever-shrinking world, Canadian courts often require the assistance of foreign courts so as to do justice between parties engaged in litigation in Canada. A receptive judicial ear to requests from foreign courts can only enhance the chances that a Canadian court will receive assistance when required."

[5]     It may be a useful exercise before turning to the factors which relate more directly to a request from a foreign court to consider whether Mr. Haag would be subject to discovery in accordance with Rule 31.10 of the Rules of Civil Procedure if the principal action was in Ontario. Rule 31.10 provides in part:

> "31.10(1)  The court may grant leave, on such terms respecting costs and other matters as are just, to examine for discovery any person who there is reason to believe has information relevant to a material issue in the action, other than an expert engaged by or on behalf of a party in preparation for contemplated or pending litigation.
>
> Test for Granting Leave
>
> (2)     An order under sub rule (1) shall not be made unless the court is satisfied that,

2005 CanLII 3461 (ON S.C.)

**EXHIBIT 1 PAGE 6**

- 5 -

> (a) the moving party has been unable to obtain the information from other persons whom the moving party is entitled to examine for discovery, or from the person the party seeks to examine;
>
> (b) it would be unfair to require the moving party to proceed to trial without having the opportunity of examining the person; and,
>
> (c) the examination will not
>
>> (i)   unduly delay the commencement of the trial of the action
>> (ii)  entail unreasonable expense for other parties or
>> (iii) result in unfairness to the person the moving party seeks to examine."

[6]     At the risk of overly summarizing the jurisprudence, I would state that leave to discover a non-party should not be given routinely. However, I feel, for reasons I will touch on presently, that leave would be granted in this case to discover Mr. Haag if the principal action was before an Ontario Court.

[7]     It is presumed that the United States District Court which granted the letters rogatory acted reasonably and responsibly in coming to the stated conclusions justifying the request. Inter alia, the United States District Court found that Mr. Haag is an important witness in the principal action, that he has personal knowledge and information which may be relevant to the issues in the case, that the evidence obtained from Mr. Haag would be used at trial or on a motion for summary judgment and that the defendants in the principal action (the applicants before this court) cannot otherwise obtain the evidence requested absent the deposition of Mr. Haag. Not only is there a presumption (potentially rebuttable) that the United States District Court acted responsibly in directing the letters rogatory but based on the material filed on this application I would concur with the reasons given by the district court justifying the letters rogatory.

2005 CanLII 3461 (ON S.C.)

**EXHIBIT 1 PAGE 7**

- 6 -

[8]     In *Re Fricton Division Products (No. 2)* (1986), 56 O.R. (2d) 722 (H.C.J.), Osborne, J.

(as he then was) set out at p. 732 some of the factors to be considered by the court in determining

whether to give effect to the letters rogatory. His Lordship stated:

> "Before an order giving effect to letters rogatory will be made, the evidence
> (including the letters rogatory) must establish that:
>
> (1)  the evidence sought is relevant;
>
> (2)  the evidence sought is necessary for trial and will be adduced at trial, if
>      admissible;
>
> (3)  the evidence is not otherwise obtainable;
>
> (4)  the order sought is not contrary to public policy;
>
> (5)  the documents sought are identified with reasonable specificity;
>
> (6)  the order sought is not unduly burdensome, having in mind what the relevant
>      witnesses would be required to do, and produce, were they action to be tried
>      here.
>
> There may well be other factors which bear upon a request for an order giving
> effect to letters rogatory."

[9]     What the applicants essentially seek from Mr. Haag is evidence of the use of the

"Brighthouse" name, particularly in the United States.  By such evidence, the applicants

(defendants in the U.S. action) hope to demonstrate that the plaintiffs in the U.S. action are not

entitled to the exclusive use of the name "Brighthouse" or any slight variation thereof. Thus, the

evidence sought from Mr. Haag is clearly relevant and, presuming admissibility, would be

adduced as important evidence at trial.

2005 CanLII 3461 (ON S.C.)

**EXHIBIT 1 PAGE 8**

- 7 -

[10]    Notwithstanding the position taken by Mr. Haag on this application, I conclude that the

evidence sought to be obtained from him is not otherwise obtainable. It may be true that there

are other corporate entities using the name "Brighthouse", or a variation thereof, but Mr. Haag is

in a rather unique position to testify as to the use of that name by his company, Brighthouse, Inc.

or Brighthouse Branding Group.

[11]    I further conclude that the order sought is not in any way contrary to public policy.

[12]    The fifth consideration set out by Mr. Justice Osborne in Fricton that "the documents

sought are identified with reasonable specificity" does not apply to the application at bar. The

letters rogatory do not require or request production or discovery of documents. The request is

limited to an oral examination of Mr. Haag. One of the principal concerns expressed by Mr.

Haag in his affidavit is that it is not clear what questions he may be asked. He has an apparent

concern that some questions may intend to elicit "confidential, personal business information".

He was unable, during the course of his cross-examination on his affidavit, to indicate with any

specificity what such confidential information might relate to. In my view, his concerns are not

justified. He will, of course, be permitted to have counsel with him at his "deposition". Based

on counsel's wise advice, he may object to answer any questions not directly relevant to the U.S.

action or which might otherwise infringe upon a valid claim of confidentiality. If necessary,

refusals may result in a subsequent determination by the court with a possibility of re-attendance,

just as in the normal discovery process.

[13]    It would be premature for me to make a specific ruling at this time as to what questions

would be permissible. As noted above, the applicant's principal area of inquiry will obviously

2005 CanLII 3461 (ON S.C.)

**EXHIBIT 1 PAGE 9**

- 8 -

relate to the use and publication of the name "Brighthouse" in the United States. It seems clear that much of the evidence sought by the applicants from Mr. Haag is already in a sense part of the "public domain" as a result of the respondent's web page, identified by Mr. Haag at his cross-examination on his affidavit. This, I believe, is the kind of evidence which the applicants hope to discover from him. I would add that any questions relating to, for instance, his pricing policy with his customers would not be permitted. Apart from directly impacting on matters of business confidentiality such questions would not seem to be relevant to the issues in the U.S. action. I suspect if I grant the relief sought by the applicants that Mr. Haag will find the experience less intrusive than he seems to anticipate.

[14]    Indeed, in my view the order I intend to direct will not be unduly burdensome, having in mind what Mr. Haag would be required to do were the U.S. action to be tried in Ontario.

[15]    I agree essentially with the response of applicants' counsel to Mr. Haag's expressed concerns in applicants' supplemental factum dated December 30, 2004. Having carefully considered his concerns, I conclude that the request of the U.S. District Court expressed in the letters rogatory should be granted, though not necessarily with the terms and conditions requested by the applicants. In the result, I direct:

1. an order will go giving effect to the letters rogatory issued by the United States District Court for the middle district of Florida on October 25, 2004;

2. I direct that Mr. Alexander R. Haag shall attend on a mutually convenient date and in any event no later than February 18, 2005 for a non-party videotaped deposition before an official examiner to be examined under oath on matters in issue in the U.S. action;

2005 CanLII 3461 (ON S.C.)

**EXHIBIT 1 PAGE 10**

- 9 -

3. the court directs that such examination shall be conducted by solicitors for Advance/Newhouse Partnership and Bright House Networks, LLC, or their agents, in accordance with the Rules of Civil Procedure applicable to proceedings in Ontario;

4. I direct that the examination may be videotaped in the manner contemplated by Rule 34.19 of the Rules of Civil Procedure;

5. I direct that Mr. Haag shall have the right to be represented by counsel at his deposition, which counsel may participate as he or she would representing a party or a non-party witness being examined for discovery. The cost to Mr. Haag of his counsel for preparation and attendance at the deposition shall be borne by the applicants up to a maximum amount of $6,000;

6. the applicants are bound by the deemed undertaking rule. I further direct that applicants shall use their best efforts in the U.S. proceedings to obtain whatever undertaking or court order may be necessary to ensure that all parties will be bound by the deemed undertaking rule with respect to any evidence given by Mr. Haag at his deposition.

[16]    The parties may address me in writing with respect to the costs of this application within 30 days of publication of this ruling.

. R.D. REILLY, J.

**DATE:**        January 25, 2005

2005 CanLII 3461 (ON S.C.)

**EXHIBIT 1 PAGE 11**

EXHIBIT 1 PAGE 12

2005 CanLII 3461 (ON S.C.)

# EXHIBIT 2

Date of Release: November 1, 1995

NO A952686
VANCOUVER REGISTRY

# IN THE SUPREME COURT OF BRITISH COLUMBIA

1995 CanLII 1931 (BC S.C.)

BETWEEN:

THE ESTATE OF JAMES CAMPBELL

PETITIONER

AND:

JAMES F. STENHOUSE, E. NIGEL DOYLE, and PETER J. NOAKES

RESPONDENTS

REASONS FOR JUDGMENT

OF THE HONOURABLE

MADAM JUSTICE SAUNDERS

(IN CHAMBERS)

| | |
|---|---|
| D. Sanderson and R. Brown | Counsel for the Petitioner |
| C.A. Donovan | Counsel for the Respondents |
| B.J. Freedman | Counsel for Cominco Limited |

**Heard at Vancouver:**                                       **September 8, 1995**

1          The petitioner seeks an order under section 59 of the *Evidence Act*, R.S.B.C. 1979, c. 116, to examine witnesses pursuant to a request made by Letters Rogatory on August 4, 1995 by the Honourable Francis I. Yamashita of the United States District Court for the District of Hawaii in proceeding No. 92-00587 ACK described as *United States of America v. Hawaiian Western Steel Limited, Inc.*

2          When the respondents Mr. Doyle and Mr. Noakes were first requested to voluntarily attend at a deposition they each refused to do so. When the respondent Mr. Stenhouse was first requested to

**EXHIBIT 2 PAGE 13**

- 2 -

attend an interview he advised counsel for the United States of America in the Hawaiian action that he would not attend or give evidence in that action.  They have since advised counsel for the petitioner, through their counsel, that they will consent to appear voluntarily at the trial in Hawaii, provided their expenses are paid.  At the hearing before me, their counsel reiterated this willingness to attend the trial, on reasonable terms as to notice and payment of expenses.

3          The Hawaiian action is described in the Letters Rogatory. The plaintiff United States of America instituted an action against the petitioner, Cominco Limited and others.  In this action the petitioner also made a complaint against Cominco Limited, as third party.  A portion of that action has settled, leaving unresolved the claims of United States of America and the petitioner against Cominco Limited.

4          The Hawaiian action is brought under United States and Hawaiian environmental laws for restitution, indemnity and damages arising from hazardous waste decisions and hazardous waste disposal in the State of Hawaii. The United States of America and the petitioner allege that Cominco Limited, through a subsidiary, owned the majority of shares of Hawaiian Western Steel Limited, Inc., and participated in hazardous waste decisions concerning Hawaiian

1995 CanLII 1931 (BC S.C.)

**EXHIBIT 2 PAGE 14**

- 3 -

Western Steel Limited, Inc. or arranged for disposal of waste at certain locations without proper permits.

5          Mr. Stenhouse is a former officer of the subsidiary company.  Mr. Doyle and Mr. Noakes are former employees of Cominco Limited.  The petitioner wishes to depose them for the purposes of obtaining trial testimony and believes all three are knowledgeable of issues in dispute in the Hawaiian action.  The Letters Rogatory reflect the court's acceptance that the evidence of the three respondents is relevant to the case and state:

> The evidence known and possessed by these witnesses is relevant to this Court's determination of the rights, responsibilities, and liabilities of the parties, and the interests of justice provide that the evidence be received by this Court for trial.
>
> ... it appears to this Court that it is necessary for the purposes of justice and for the due determination of the matters in dispute between the United States, the Estate and Cominco, that Messrs. Stenhouse, Doyle, and Noakes should be examined upon oath or affirmation and produce documents relating to the matters identified in this request.

6          The District Court of Hawaii's request is made in these terms:

> THIS COURT REQUESTS that, in the interest of justice and judicial economy and for assistance of this Court, you issue an order by your proper and usual process summoning

1995 CanLII 1931 (BC S.C.)

**EXHIBIT 2 PAGE 15**

- 4 -

each of James F. Stenhouse and Peter J. Noakes to appear before David Black, an Official Court Reporter, or his designate, or any other duly appointed official, in Vancouver, British Columbia, and E. Nigel Doyle to appear before Patti A. Kortegaard, an Official Court Reporter, or her designate, or any other duly appointed official, in Rossland, British Columbia, at a time as you shall appoint, to give testimony upon oath or affirmation by questions and answers propounded by counsel for the Estate, and produce and permit the copying of documents by counsel, such depositions to continue from day-to-day until their completion, and upon notice given by the Estate to other parties and their counsel, permit other parties and their counsel to attend and obtain testimony by questions and answers, and examine and copy documents.

THIS COURT FURTHER REQUESTS that evidence by testimony and documents be given on the following subjects:

The witnesses' positions, responsibilities, supervisors, and subordinates at Cominco, Western Steel, and HWS.

1. The organization and operation of Western Steel, Cominco, and HWS and the companies' interrelationships, financial support, and inter-company transactions.

2. The control that the directors, officers, and employees of Cominco and/or Western Steel may have exercised over HWS.

3. The handling, storage, treatment, sale, or disposal of baghouse dust at Western Steel, Cominco, and HWS.

4. The waste material survey conducted by Cominco of its subsidiaries, and any updates

1995 CanLII 1931 (BC S.C.)

**EXHIBIT 2 PAGE 16**

- 5 -

or correspondence regarding
that subject.

5.  A 1985 environmental audit by
VERSAR of Cominco's United
States operations, any
environmental insurance
policies, or applications
therefor, related to HWS,
baghouse dust, cadmium, or
lead.

6.  Remediation or cleanup of the
HWS Plant or Landfill sites, or
plans to perform projects
related to remediation or
cleanup.

7.  Cleanup of lead or cadmium
contamination at any other
Cominco or Cominco subsidiary
property.

7       The respondents ask the court to decline to make the
order sought, contending that the application is an attempt to
engage in examinations for discovery and that an order from this
court is unnecessary, given that all three respondents have agreed
to appear at trial. Further, Mr. Doyle and Mr. Noakes deny
material knowledge of the matters enumerated in the Letters
Rogatory.

8       In the circumstances of this case, the latter objection
is not a basis upon which to refuse the order sought. The
petitioner has represented that Mr. Doyle and Mr. Noakes have
knowledge of matters relevant to the Hawaiian action and this has
been accepted by the Hawaiian court in its decision to issue

1995 CanLII 1931 (BC S.C.)

**EXHIBIT 2 PAGE 17**

- 6 -

Letters Rogatory.  If the petitioner has otherwise established a basis for the order, this court will respect the request of the Hawaiian court and grant the order, leaving the deposition process to uncover the extent of knowledge of Mr. Doyle or Mr. Noakes within the rules for admissibility of evidence at the trial.

9      All three respondents contend that the request of the District Court of Hawaii should be denied because the anticipated deposition is in the nature of examination for discovery, which, they say, is a purpose British Columbia courts typically do not accept.

10      In the recent British Columbia authority, *Henry Baron Building Materials Inc. v. Royal Canadian Mounted Police* (1994), 98 B.C.L.R. (2d) 59, Mr. Justice Edwards discussed this proposition and, based upon his view that the primary concern of Canadian courts asked to enforce a request made by Letters Rogatory is "the imposition and inconvenience being required to testify in a foreign proceeding may entail for residents of Canada" (p.65), concluded that the question of whether the examination proposed is "for a discovery or trial purpose is one factor, but not necessarily the determining factor in the exercise of the court's discretion." (p.67).

11      *Henry Baron Building Materials Inc. v. Royal Canadian Mounted Police* is binding upon me.  It is not a complete answer for

**EXHIBIT 2 PAGE 18**

- 7 -

respondents to an application such as this to say the purpose of
the deposition is discovery of the deponents.  In any case, the
Letters Rogatory issued by the District Court of Hawaii make it
clear that the purpose of obtaining the depositions is to obtain
testimony for trial.  I conclude that the purposes of the request
are ones recognized by the courts of British Columbia.

12          The sole remaining question is whether the respondents'
present willingness to attend at trial makes the proposed
depositions prior to trial of such imposition and inconvenience to
the respondents that the application should be denied.  In *Zingre
v. R.*, [1981] 2 S.C.R. 392, Mr. Justice Dickson laid down the
following test at p.403:

> The Court or judge must balance the possible
> infringement of Canadian sovereignty with the
> natural desire to assist the courts of justice
> of a foreign land.

13          The phrase "Canadian sovereignty" was described by Mr.
Justice Doherty in *France (Republic) v. De Havilland Aircraft of
Canada Ltd.* (1991), 3 O.R. (3d) 705 at 718-19:

> The considerations encompassed by the phrase
> "Canadian sovereignty" ... include an
> assessment of whether ... the request would
> impose an undue burden on, or do prejudice to,
> the individual whose evidence is requested.

1995 CanLII 1931 (BC S.C.)

**EXHIBIT 2 PAGE 19**

- 8 -

1995 CanLII 1931 (BC S.C.)

14          In this case the respondents point to their present
willingness to attend at trial and the possibility of the case
settling before trial, rendering the depositions useless and their
time and effort wasted. It is true that cases cited to me are ones
in which there is evidence before the court that the witnesses may
not, or are unlikely to, attend the trial.

15          The willingness of a witness to attend the foreign trial
is certainly one factor the court should consider in reviewing the
burden placed on the witness by compelled attendance in British
Columbia. It is, however, not determinative of the exercise of
judicial discretion. Where, as here, the respondents initially
declined co-operation and the foreign court, with that knowledge,
requested co-operation by issuing the Letters Rogatory, this court
may make the order sought.

16          In these circumstances the respondents have not
established that the potential burden or prejudice to them in
attending for depositions in British Columbia outweighs the force
of international judicial good manners.

17          Cominco Limited also opposes the application, contending
the witnesses' evidence would be more helpful to the District Court
of Hawaii if it were *viva voce*, rather than by deposition. This is

**EXHIBIT 2 PAGE 20**

- 9 -

a matter of trial management of the Hawaiian action and is, in my view, a concern which is properly for the courts of Hawaii to consider.

18        For these reasons the application is granted. The respondents shall attend for deposition for the purposes of trial, as requested. This includes examination and cross-examination by the parties to the Hawaiian action as would occur at trial.

19        A question has arisen as to timing of the depositions. In my view, they should occur after the conclusion of the discovery process in the Hawaiian action. This will have the advantage of ensuring these depositions are not mistaken for discovery, and increase the likelihood that settlement, if it is to occur, will precede the date of the depositions and thereby minimize the inconvenience to the respondents.

20        Each respondent is entitled to conduct money and a reasonable fee for preparation in accordance with the *Rules of Court*. The depositions shall be conducted in accordance with the evidentiary rules of the District Court of Hawaii and of British Columbia, with the latter to prevail in cases of conflict.

1995 CanLII 1931 (BC S.C.)

**EXHIBIT 2 PAGE 21**

- 10 -

21          If the parties are unable to agree on the schedule for the examinations, the petitioner may apply to have a time set by the court.

                              "M.E. SAUNDERS, J."

November 1, 1995
Vancouver, B.C.

1995 CanLII 1931 (BC S.C.)

**EXHIBIT 2 PAGE 22**

# EXHIBIT 3

[HIGH COURT OF JUSTICE]

## Re Friction Division Products, Inc. and E. I. Du Pont de Nemours & Co. Inc. et al. (No. 2)

OSBORNE J.                                        15TH OCTOBER 1986.

Judgments and orders — Res judicata — Application to enforce letters rogatory — Application dismissed — Subsequent application based on more extensive affidavit material — Subsequent application not barred by res judicata.

Conflict of laws — Letters rogatory — Patent action — Plaintiff in foreign action seeking evidence of patent infringement — Situation such that Ontario court would not allow discovery — Order enforcing letters rogatory — Canada Evidence Act, R.S.C. 1970, c. E-10, s. 43—Evidence Act, R.S.O. 1980, c. 145, s. 60.

The plaintiff sought an order giving effect to letters rogatory issued by a U.S. District Court in a patent action. The plaintiff alleged that the defendants had induced two Canadian companies to infringe the patent and sought evidence relating to the defendants' activity in Canada with respect to the patent. A previous application to obtain the same evidence was dismissed on the ground that the evidence was unneccessary, that it was not clearly established that it was for trial rather than discovery, and that the order was more burdensome upon the respondents than if the action had been brought in Ontario. The present application was based upon new letters rogatory and upon new evidence alleged by the applicant to correct the deficiencies of the previous application.

Held, the application should be allowed. The application was based on a new request and on far more extensive evidence. It had been established that counsel acting for the applicant on the first application did not expect that the relevance of evidence sought would be challenged. This error had led to there being an absence of evidence. The applicant should not be precluded from proceeding with the fresh application based upon different evidence. Letters rogatory may be enforced even though they go beyond the circumstances in which an Ontario court would make an order for discovery.

The applicant did seek evidence rather than mere discovery and it would be unfair to require the applicant to proceed to trial without the evidence. The linkage between the defendant and the two Ontario companies had been established on the evidence and although the production sought was wide it was not unreasonable or unduly onerous.

*Re Mulroney et al. and Coates et al.; Re Southam et al. and Mulroney et al.* (1986), 54 O.R. (2d) 353, 27 D.L.R. (4th) 118, 8 C.P.C. (2d) 109, **folld**

*Zingre, Wuest and Reiser v. The Queen* (1981), 127 D.L.R. (3d) 223, 61 C.C.C. (2d) 465, [1981] 2 S.C.R. 392, 10 Man. R. (2d) 62, 38 N.R. 272, 23 C.P.C. 259; *Appeal Enterprises, Ltd. et al. v. First National Bank of Chicago* (1984), 46 O.R. (2d) 590, 10 D.L.R. (4th) 317, **apld**

### Other cases referred to

*District Court of United States, Middle District of Florida v. Royal American Shows Inc. et al.* (1982), 134 D.L.R. (3d) 32, 66 C.C.C. (2d) 125, [1982] 1 S.C.R. 414, 36 A.R. 361, 19 Alta. L.R. (2d) 97, [1982] 3 W.W.R. 481, 25 C.P.C. 287, 27

**EXHIBIT 3 PAGE 23**

C.R. (3d) 1; *Re Raychem Corp. v. Canusa Coating Systems, Inc.*, (1971) 1 C.R. 192, 14 D.L.R. (3d) 684, 64 C.P.R. 247; *Appeal Enterprises, Ltd. et al. v. First National Bank of Chicago* (1984), 46 O.R. (2d) 590, 10 D.L.R. (4th) 317; *American Express Warehousing Ltd. v. Doe et al.*, [1967] 1 Lloyd's Rep. 222; *Penn-Texas Corp. v. Murat Anstalt et al. (No. 2)*, [1964] 2 All E.R. 594

**Statutes referred to**

*Canada Evidence Act*, R.S.C. 1970, c. E-10, s. 43
*Evidence Act*, R.S.O. 1980, c. 145, s. 60 (am. 1984, c. 11, s. 176(2))

APPLICATION to enforce a request for letters rogatory.

*Donald J. Wright*, Q.C., and *P. E. J. Wells*, for applicant.
*Roger T. Hughes*, Q.C., and *Donald M. Cameron*, for respondent, E. I. Du Pont de Nemours & Company Inc.
*Arnold Somers*, Q.C., for respondent, Canparts.
*Peter Israel*, for respondent, Canadian Metallic Brake Ltd.
*D. I. Hamer*, for respondent, Du Pont Canada Inc., intervenor.

OSBORNE J.:—This is an application for an order giving effect to letters rogatory issued by the U.S. District Court for the District of Delaware in patent litigation in which the applicant, as plaintiff, has alleged that E. I. Du Pont de Nemours & Company Incorporated (Du Pont U.S.A.) induced two Canadian companies (the respondents Canparts and Canadian Metallic) to infringe the applicant's patent.

If this matter has a familiar ring to it, that is explained because Barr J., in a decision reported 6 C.P.R. (3d) 66, 51 O.R. (2d) 244, refused to give effect to letters rogatory seeking virtually the same evidence.

The applicant seeks to obtain evidence from Canparts and Canadian Metallic for use at a trial to be held in the State of Delaware in which the alleged infringement of the applicant's patent is the central issue. I do not think it is necessary to explore U.S. patent law in any detail for the purpose of dealing with this application. It seems to be common ground that under U.S. patent law anyone who makes, uses or sells a product within the scope of a patent, or any product made under a process within the scope of a patent infringes the patent. Further, U.S. law imposes liability on any person who teaches another how to manufacture a patented product, or teaches another how to use a patented process, or sells another an essential component of a patented product or process intending that it be used for a patented product or process. I take it that in the end result inducing infringement of a patent results in the inducer being guilty of patent infringement. The essence of the U.S. action, in any event, is patent infringe-

EXHIBIT 3 PAGE 24

ment. The pleadings in the U.S. action suggest that at least one route the applicant intends to follow is to establish patent infringement by Du Pont U.S.A. by establishing that in its dealings with Canparts and Canadian Metallic, Du Pont U.S.A. induced one or both of those companies to breach Friction Division Products, Inc.'s U.S. patent. To succeed, Friction must establish that Du Pont U.S.A. has induced Canparts or Canadian Metallic to infringe Friction's patent. Canparts is involved because it is in the automobile after-market brake manufacturing business. Friction's contention is that Canparts uses a material in its brake pads which results in Friction's patent being infringed. Friction alleges that Du Pont U.S.A. is the manufacturer of the product (Kevlar) which is said to infringe Friction's patent. Du Pont Canada sells the allegedly offending product to Canadian companies including Canparts and Canadian Metallic. Canparts ships its brake pads to a distributor in North Carolina and the distributor in turn sells the brake pads in the United States. Canadian Metallic's involvement is so similar to that of Canparts that it need not be separately referred to.

The letters rogatory seek evidence in these areas:

(1) When and under what circumstances Canparts first learned from Du Pont, from others, or within Canparts of the use of Kevlar pulp for the production of a preform in the manufacture of non-asbestos friction products;

(2) (a) The purchase and/or use by Du Pont of Canpart's non-asbestos friction products or mixes containing Kevlar pulp from 1981 to the present:

    (i) on Du Pont's owned, leased or employee motor vehicles,

    (ii) at Du Pont's booths at the Society of Automotive Engineers or other promotional shows, and

    (iii) for testing purposes, including at the Ohio Transportation Research Center or within Du Pont's Wilmington facility;

(3) The advertising and/or technical assistance rendered by Du Pont to Canparts, including payments to Canparts by Du Pont, and all advertisements placed in magazines, journals and/or other publications, under the Du Pont-Canparts joint advertising contract;

(4) (a) The chemical formulations of:

**EXHIBIT 3 PAGE 25**

(i) Canparts' frictional products which were advertised under the Du Pont-Canadian Metallic joint advertising contract, including the Canparts products identified in the documents attached hereto as exhibits;

(ii) Canparts' Kevlar pulp containing frictional products or mixes, including those Canparts products or mixes obtained by Du Pont for testing, promotional or other purposes;

(b) The process and/or methods used by Canparts from 1978 to the present by which Canparts made non-asbestos friction products containing Kevlar pulp;

(c) the sale of Canparts' non-asbestos friction products containing Kevlar pulp, including the sales figures attributed to the advertising under the Du Pont-Canparts contract; and

(d) the purchases by Canparts of Du Pont's Kevlar pulp and fibre from 1980 to the present.

The request for evidence from an officer of Canadian Metallic is in similar form.

As previously indicated, this is the second request for evidence from Canparts and Canadian Metallic in connection with the Delaware litigation between Friction and Du Pont U.S.A. On July 3, 1985, Barr J. dismissed Friction's application. Barr J. concluded that the evidence sought was not necessary; that it was not clearly established that the evidence was for trial not simply discovery; that as to both Canparts and Canadian Metallic the order sought was more burdensome than would be the case if the action were in Ontario in that the provisions of the Rules of Civil Procedure, rule 31.10, regarding discovery of non-parties, had not been satisfied; that the order sought with respect to documents was oppressive and burdensome because of the enormous spectrum of documents sought to be produced; and that documents need not be produced until it is demonstrated that the documents existed.

Following the release of Barr J.'s reasons, Friction returned to the Delaware court and sought new letters rogatory. Judge Longobardi of the Delaware District Court issued new letters rogatory after a review of Barr J.'s reasons. Previous evidentiary deficiencies were purportedly corrected so as to clearly establish the direct involvement of Canparts and Canadian Metallic in the U.S. market, and Du Pont U.S.A.'s relationship with both companies, including the extent to which Du Pont assisted with the promotion and marketing of the brake pads manufactured by the two Canadian companies.

EXHIBIT 3 PAGE 26

The order sought has been frontally challenged by the respondents, which include Du Pont Canada added as an intervenor by order of the master.

It seems to me that this application should be dealt with by focusing on two general questions. They are:

(1) Is there any reason to deny relief to the applicant because of matters bearing upon the previous application, including its dismissal? I will refer to this application as *Friction (No. 1)*. This gives rise to a consideration of *res judicata*, issue estoppel and abuse of process.

(2) If the applicant is not foreclosed from obtaining the order it now seeks because of the dismissal of the first application, has the applicant established an entitlement to the relief sought? The answer to this question requires resort to the evidence on this application, unencumbered by a consideration of the fact that a previous application for essentially the same relief was dismissed. It boils down to this: on this evidence, should the order sought issue?

All respondents take the position that Friction is now, and forever, foreclosed from obtaining the order it seeks because of Barr J.'s decision on Friction's first application. The respondents' position on this issue, given particular emphasis by Mr. Hamer for Du Pont Canada, breaks down this way:

(1) Barr J.'s judgment, not having been appealed, finally disposes of the very issue before me and is *res judicata*;

(2) in the alternative, the doctrine of issue estoppel applies so as to prevent Friction from resurrecting its permanently lost cause;

(3) in any event, the respondents contend I am bound by Barr J.'s findings of fact and law;

(4) reopening the issue dealt with by Barr J. amounts to an abuse of process and is unduly burdensome and onerous.

In support of their *res judicata*-estoppel position, the respondents refer to the following passage from Spencer Bower and Turner on *The Doctrine of Res Judicata*, 2nd ed. (1969), at pp. 14-5:

It is not essential, or even relevant, to prove that the decision relied upon to found an estoppel is itself correct, or well founded in law or fact; if it is pronounced as a final judicial decision, by a tribunal having jurisdiction, as to the same question, and between the same parties, it will be conclusively deemed correct, as between these parties, unless and until upset on appeal. This proposition rests on the well-known fact that a competent tribunal has jurisdiction to give a wrong judgment. It has jurisdiction to decide wrongly,

**EXHIBIT 3 PAGE 27**

as well as rightly, and if it makes a mistake that mistake is conclusive between the parties unless and until corrected by an appeal duly constituted.

**a**   In Du Pont Canada's factum the practical import of Barr J.'s *Friction* judgment is dealt with this way:

> If, contrary to the submissions advanced above, the applicant here is entitled to launch a renewed application to enforce letters rogatory at all, then it is respectfully submitted that the renewed application must be governed by the principles laid down by Mr. Justice Barr and not those espoused by Mr.
> **b**   Justice Catzman. Even if Mr. Justice Barr's findings of fact and rulings of law are wrong (and it is strenuously submitted they are not), those findings and rulings represent a conclusive and binding determination as amongst the parties to the present applications.

**c**   The reference to Mr. Justice Catzman above was occasioned by Catzman J.'s judgment in *Re Mulroney et al. and Coates et al.; Re Southam et al. and Mulroney et al.* (1986), 27 D.L.R. (4th) 118, 54 O.R. (2d) 353, in which Catzman J. differed somewhat with Barr J.'s views: see *Mulroney, supra,* at pp. 127-8 D.L.R., p. 362 O.R. In *Mulroney,* Catzman J. correctly pointed out that in
**d**   *Friction (No. 1)* the applicant did not rely on s. 60 of the Ontario *Evidence Act,* R.S.O. 1980, c. 145. Catzman J. also dealt with Barr J.'s approach to the burdensome issue of *Friction (No. 1)* where Barr J. said this at pp. 69-71 C.P.R., pp. 247-9 O.R.:

> An order should not be made if it would be more burdensome to the witness than the court could properly order in an action taken within this jurisdiction:
> **e**   *Re Radio Corp. of America v. Rauland Corp., supra* [26 C.P.R. 29, 5 D.L.R. (2d) 424, [1956] O.R. 630], at p. 638.

> .   .   .   .   .

> Rule 39.01(5) limits the use of affidavits of information and belief to facts that are not contentious. Whether the evidence is required for trial or not is contentious and the statement of Mr. Tamas cannot therefore be received to
> **f**   establish this fact.

> 3. The order sought is more burdensome to the witness than would be the case if this action had been brought in Ontario. Here, the plaintiff could only interrogate and require production of documents from the Canadian respondents upon satisfying a provision of rule 31.10. Under this rule the moving party would have to establish that he had been unable to obtain the inform-
> **g**   ation from other persons whom he was entitled to examine and that it would be unfair to require the moving party to proceed to trial without having had the examination that he seeks. The plaintiff's evidence does not satisfy these requirements. This court will not impose greater requirements on persons within its jurisdiction at the request of a foreign court than it would impose in proceedings taken within this jurisdiction.

**h**   In *Mulroney,* Catzman J. dealt with this issue and its treatment in *Friction (No. 1)* in this way, at pp. 127-8 D.L.R., pp. 361-2 O.R.:

> I make three observations with respect to the *Friction Division* case.

**EXHIBIT 3 PAGE 28**

The first is that the only basis of the application was s. 43 of the *Canada Evidence Act*. The applicant in that case did not rely on s. 60(1) of the Ontario *Evidence Act*, and no reference to that Act or to its 1985 amendment appears in the reasons for judgment.

**a**

The second relates to the authority which Barr J. cited in support of the proposition set out by him at p. 247, quoted above, namely, *Re Radio Corp. of America v. Rauland Corp.*, *supra*, at p. 638 O.R., p. 431 D.L.R. The comments of Gale J. on the page mentioned were not directed to the question whether the proposed examination should take place, for he had considered that question at an earlier stage of his judgment and had declined to set aside that part of an order which implemented letters rogatory to that effect. Rather, the comments of Gale J. at p. 638 O.R., p. 431 D.L.R., were addressed to the breadth of the proposed examination and, in particular, to the wide, vague and general description of the documents which it was sought to require strangers to the litigation to bring to their examination.

**b**

**c**

I make the third observation with considerable deference. I have the highest regard for the views of my brother Barr, but if the passage set out on p. 249 of his reasons for judgment, quoted above, is intended as an expression of a proposition of general application on the subject, I do not find that proposition compelled by the earlier authorities and I respectfully do not agree with it. While I consider that the recent changes in Ontario's Rules of Civil Procedure and *Evidence Act* have the result of effecting a relaxation of the former practice, I do not agree that, whether as a matter of legal precedent, of statutory construction or of judicial discretion, such relaxation ought to be limited to instances where the foreign court has seen fit to issue letters of request in circumstances which meet the requirements in which an Ontario court would make an order for discovery of non-parties under rule 31.10. With respect to legal precedent and to statutory construction, I find such a limitation compelled neither by the earlier authorities nor by the words of the *Canada Evidence Act* or those of the Ontario *Evidence Act*; indeed, the language of the 1985 amendment to the latter statute — which is directed not to a *situation* in which a letter of request *would* be issued in Ontario but rather to a *purpose* for which a letter of request *could* be issued here — suggests, to my mind, a contrary interpretation.

**d**

**e**

**f**

In my view Catzman J. is correct. But the respondents contend I am forbidden from so concluding, at least to the extent that such conclusion conflicts with Barr J.'s findings of fact and law in *Friction (No. 1)*.

Mr. Hamer for Du Pont Canada contends that Catzman J. relied upon "the somewhat exceptional case of *Zingre, Wuest and Reiser v. The Queen* (1981), 127 D.L.R. (3d) 223, 61 C.C.C. (2d) 465, [1981] 2 S.C.R. 392, and the later decision of the Supreme Court of Canada in *District Court of United States, Middle District of Florida v. Royal American Shows Inc. et al.* (1982), 134 D.L.R. (3d) 32, 66 C.C.C. (2d) 125, [1982] 1 S.C.R. 414, does not appear to have been drawn to his attention": see Du Pont Canada Factum, para. 19. I have these comments on this aspect of the matter. First, I agree with Catzman J. Secondly, I do not regard

**g**

**h**

EXHIBIT 3 PAGE 29

*Zingre* as an exceptional case so as to limit the application of the principles set out in it. Thirdly, I do not think anything in *Royal American Shows Inc.* dilutes those general principles set forth by Dickson J. in *Zingre*, about which I will say more later. Fourthly, it is noteworthy that in *Royal American Shows Inc.* the Supreme Court of Canada did not seem to be troubled by the prospect of there being a second request for evidence through further letters rogatory.

This application is based on another and different request from the Delaware court. The evidence is far more complete in essential areas previously mentioned than was the case on the application before Barr J. Judge Longobardi reviewed Barr J.'s decision and tried to accommodate those deficiencies which were clearly outlined by Barr J. and which led to the application being dismissed. Judge Longobardi also considered Du Pont's objections to the new letters rogatory being issued. I have no quarrel with Barr J.'s decision on the evidence before him; that evidence led to Barr J.'s conclusion that "the proposed witnesses have had no dealings with either of the parties to the U.S. action". I assume Barr J. was referring to the absence of evidence establishing that Canparts and Canadian Metallic had dealings with either or both parties to the U.S. action (Friction and Du Pont U.S.A.).

Mr. Hughes for Du Pont U.S.A. contends that Barr J.'s dismissal of the first application to give effect to the letters rogatory was not made "without prejudice". Absent these magic words, all respondents take the position that the matter is at an end, and the order sought cannot issue. Surely this kind of rigidity ought to be avoided if at all possible. I do not accede to the respondents' submissions on this point.

It is, however, appropriate that the previous application be taken into account when considering whether this, the second application, is oppressive or an abuse of process. I am satisfied that counsel acting for Friction on the first application (not counsel appearing on this application), did not expect that relevance of the evidence sought to be challenged. This point is dealt with in the affidavit of Steven Kreiss as follows:

> 26. On the first application to seek the assistance of this Court pursuant to the first set of Letters Rogatory, FDP was not aware that the relevance of the evidence sought was an issue. Consequently Exhibits A to H to the present Letters Rogatory were not part of the first Letters Rogatory. As well, FDP had been given to understand the first application would be unopposed. The cumulative effect was to omit from the first application evidence showing the Canparts' direct involvement in the United States market, DuPont's assistance to Canparts and DuPont's relationship with Canparts.

EXHIBIT 3 PAGE 30

This error led to there being an absence of persuasive evidence showing Canparts and Canadian Metallic's involvement in the U.S. market, Du Pont U.S.A.'s assistance to Canparts and Canadian Metallic and Du Pont U.S.A.'s relationship with those companies.

Neither *res judicata* nor issue estoppel apply to prevent the applicant from pursuing the relief it seeks. I can see no basis for the contention that this second application is, in the circumstances, an abuse of process or unduly burdensome. A discretion has to be exercised in this area, and I choose to exercise it in favour of the applicant. This is a fresh application based upon new letters rogatory and different evidence from that considered by Barr J. in *Friction (No. 1)*. This may be a second bite, but at a different apple.

The statutory basis upon which the order sought may issue comes from s. 43 of the *Canada Evidence Act*, R.S.C. 1970, c. E-10, and s. 60 of the Ontario *Evidence Act*. Those sections provide:

> 43. Where, upon an application for that purpose, it is made to appear to any court or judge, that any court or tribunal of competent jurisdiction, in the Commonwealth and Dependent Territories, or in any foreign country, before which any civil, commercial or criminal matter is pending, is desirous of obtaining the testimony in relation to such matter, of a party or witness within the jurisdiction of such first mentioned court, or of the court to which such judge belongs, or of such judge, the court or judge may, in its or his discretion, order the examination upon oath upon interrogatories, or otherwise, before any person or persons named in the order, of such party or witness accordingly, and by the same or any subsequent order may command the attendance of such party or witness for the purpose of being examined, and for the production of any writings or other documents mentioned in the order, and of any other writings or documents relating to the matter in question that are in the possession or power of such party or witness.

> • • • • •

> 60(1) Where it is made to appear to the Supreme Court or a judge thereof, or to a judge of a county or district court, that a court or tribunal of competent jurisdiction in a foreign country has duly authorized, by commission, order or other process, the obtaining of the testimony in or in relation to an action, suit or proceeding pending in or before such foreign court or tribunal, of a witness out of the jurisdiction thereof and within the jurisdiction of the court or judge so applied to, such court or judge may order the examination of such witness before the person appointed, and in the manner and form directed by the commission, order or other process, and may, by the same or by a subsequent order, command the attendance of a person named therein for the purpose of being examined, or the production of a writing or other document or thing mentioned in the order, and may give all such directions as to the time and place of the examination, and all other matters connected therewith as seem proper, and the order may be enforced, and any disobedience thereto punished, in like manner as in the case of an order made

**EXHIBIT 3 PAGE 31**

by the same court or judge in an action pending in such court or before such judge.

(2) A person whose attendance is so ordered is entitled to the like conduct money and payment for expenses and loss of time as upon attendance at a trial in the Supreme Court.

(3) A person examined under such commission, order or process has the like right to object to answer questions tending to criminate himself, and to refuse to answer any questions that, in an action pending in the court by which or by a judge whereof or before the judge by whom the order for examination was made, the witness would be entitled to object or to refuse to answer, and no person shall be compelled to produce at the examination any writing, document or thing that he could not be compelled to produce at the trial of such an action.

(4) Where the commission, order or other process, or the instructions of the court accompanying the same, direct that the person to be examined shall be sworn or shall affirm, the person so appointed has authority to administer the oath to him or take his affirmation.

In addition to the letters rogatory, there is affidavit evidence outlining the issues in the Delaware action, and the evidence sought from officers of Canparts and Canadian Metallic. The affidavit evidence deals at some length with the necessity of having what the applicant seeks, for trial purposes, and purports to establish that the evidence cannot otherwise be obtained.

Aside from matters which bear upon the application before Barr J., the respondents frontally challenge the applicant's right to the relief it seeks. The respondents' position, looked at generally, breaks down this way:

(1) the evidence sought must be otherwise unobtainable, and this evidence cannot be so characterized;

(2) the applicant has not established that the evidence sought is necessary, and further, the evidence on this application establishes that the evidence sought is not necessary in that such evidence is merely supplemental to evidence either obtained through pre-trial depositions, or otherwise obtainable in the U.S. action;

(3) if the letters rogatory are given effect to, the examination which would result would be more burdensome to Canparts and Canadian Metallic than would be the case were those companies involved in similar circumstances in an Ontario action;

(4) the examination sought is oppressive in that it requires Canparts and Canadian Metallic to conduct a virtual corporate scavenger hunt to unearth 38 kinds of documents and to determine which are relevant to the issues;

**EXHIBIT 3 PAGE 32**

(5) the respondents' position is that the application must, and did not, demonstrate that the evidence sought is relevant.

Before an order giving effect to letters rogatory will be made, the evidence (including the letters rogatory) must establish that:

(1) the evidence sought is relevant;

(2) the evidence sought is necessary for trial and will be adduced at trial, if admissible;

(3) the evidence is not otherwise obtainable;

(4) the order sought is not contrary to public policy;

(5) the documents sought are identified with reasonable specificity;

(6) the order sought is not unduly burdensome, having in mind what the relevant witnesses would be required to do, and produce, were the action to be tried here.

There may well be other factors which bear upon a request for an order giving effect to letters rogatory. The above listed factors apply here.

The court's policy involves a consideration of comity of nations in support of lending assistance to a foreign court, in this case a court in the United States. In *Zingre, Wuest and Reiser v. The Queen et al.* (1981), 127 D.L.R. (3d) 223 at p. 230, 61 C.C.C. (2d) 465, [1981] 2 S.C.R. 392 at pp. 400-1, Dickson J., as he then was, set forth what I regard to be this general statement of principle:

> As that great jurist, U.S. Chief Justice Marshall, observed in *Schooner Exchange v. McFaddon et al.* (1812), 7 Cranch's Reports 116, at pp. 136-7, the jurisdiction of a nation within its own territory is necessarily exclusive and absolute, susceptible of no limitation not imposed by itself, but common interest impels sovereigns to mutual intercourse and an interchange of good offices with each other.

> It is upon this comity of nations that international legal assistance rests. Thus the Courts of one jurisdiction will give effect to the laws and judicial decisions of another jurisdiction, not as a matter of obligation but out of mutual deference and respect. A foreign request is given full force and effect unless it be contrary to the public policy of the jurisdiction to which the request is directed (see *Gulf Oil Corp. v. Gulf Canada Ltd.* (1980), 111 D.L.R. (3d) 74, 51 C.P.R. (2d) 1, [1980] 2 S.C.R. 39) or otherwise prejudicial to the sovereignty or the citizens of the latter jurisdiction.

The evidence sought is relevant, as Zuber J.A. noted in *Appeal Enterprises, Ltd. et al. v. First National Bank of Chicago* (1984), 10 D.L.R. (4th) 317, 46 O.R. (2d) 590, "from this vantage point". That is the only point from which I can assess the applicant seeks. Its admissibility is for the trial judge in Delaware. I am satisfied that a link between Du Pont U.S.A. and

EXHIBIT 3 PAGE 33

Du Pont Canada and the two Ontario companies as related to
Friction's patent has been established. That link was not found to
have been demonstrated when Friction's application for an order
giving effect to the first letters rogatory was heard by Barr J.
That evidentiary deficiency seems to me to have been the crux of
Barr J.'s decision to refuse the order sought, although Barr J. had
other concerns with which I will deal later.

It seems to me that this evidence is necessary having in mind
the issues in the American litigation and the evidentiary link
developed between Du Pont U.S.A. and Du Pont Canada and the
two Ontario companies from which evidence is sought. That
evidence is not really challenged. The applicant seeks this
evidence, not as part of a discovery process, but for trial. I am
satisfied that it would be unfair to require the applicant to proceed
to trial without this evidence. Having reached that conclusion it
does not seem to me to be productive to dissect the authorities to
determine whether the evidence must be necessary, or absolutely
necessary, or really necessary. In *Re Raychem Corp. v. Canusa
Coating Systems, Inc.* (1970), 64 C.P.R. 247, 14 D.L.R. (3d) 684,
[1971] 1 O.R. 192, all three terms of reference were mentioned. At
p. 252 C.P.R., p. 688 D.L.R., p. 196 O.R., Brooke J.A. said:

> It is, however, clear from the material filed, which I have referred to as the
> second issue, the evidence sought is not *really necessary* for the determi-
> nation of the United States action. There can be no more than a mere
> suggestion that this information is *necessary*. In this regard, it was stated by
> Aylesworth, J.A., in *Re McCarthy and Menin and United States Securities
> and Exchange Comm'n*, [1963] 2 O.R. 154 at p. 160, 38 D.L.R. (2d) 660 at p.
> 666:

> > "In any event, judicial pronouncement has established the principle that
> > the order sought should not be granted under either of our statutes
> > 'unless *absolutely necessary* for the purposes of justice': *Keogh v. Brady*
> > (1905), 6 O.W.R. 552; *Quality Steels (London) Ltd. v. Atlas Steels Ltd.*,
> > [1949] O.W.N. 110; *Ehrmann v. Ehrmann*, [1896] 2 Ch. 611."

(Emphasis added.)

I agree with Catzman J.'s observation in *Mulroney* that s. 60
(as amended) of the Ontario *Evidence Act* indicates an intent to
achieve a relaxation in those circumstances in which requests of a
foreign court will be given effect to in Ontario. That relaxation
applies to productions as well as to the examination of a witness.
Apart from statute, the Supreme Court of Canada's judgment in
*Zingre, supra*, suggests requests of foreign courts for assistance
should be looked at without rigidity.

The respondents' contend that the evidence sought could be
obtained, and could have been obtained in the U.S.A. Mr.

**EXHIBIT 3 PAGE 34**

Hughes, for Du Pont U.S.A., ably pressed this point in both his submissions and his factum. All respondents share this position. Mr. Hughes argued that the applicant has already examined a number of witnesses in the United States who, if asked, could have given evidence on what I will refer to as the Canadian-Kevlar issue. Moreover, Mr. Hughes contends that representatives of Canparts and Canadian Metallic have been examined in the United States, and the kind of evidence sought here was not then explored. Lastly, Du Pont U.S.A. has offered to permit the applicant to test relevant products which allegedly infringe the Friction patent. That offer has not been accepted, as far as I know.

I do not think that examining an independent sales representative of Canparts or Canadian Metallic can come close to filling Friction's evidentiary needs. I accept Mr. Wright's submission that Friction cannot be criticized for not seeking from those independent sales representatives evidence of the sort the applicant hopes to obtain through an order giving effect to these letters rogatory. Nor do I accede to the submission that other U.S. witnesses can produce the evidence the applicant seeks to obtain. There is an insufficient evidentiary basis to permit me to reach the conclusion the respondents submit is appropriate, on that issue.

The respondents' testing argument is persuasive, but only to a limited degree. If an appropriate product is tested, it will not in my view eliminate, or substantially dilute, the applicant's need for the evidence sought. Testing would undoubtedly answer some technical questions; however, the evidence sought is far wider than evidence which would emerge from product testing. The Canparts/Canadian Metallic-Du Pont connection, in all its aspects, is crucial to the applicant's Delaware case, based as it is on infringement through inducement. That connection has both a commercial (sales marketing) and technical part.

I do not think the two proposed witnesses are being asked to do anything which can be said to be burdensome or oppressive, measured against the witnesses' obligations in Ontario were this matter to be tried here. I agree with Catzman J.'s approach to this issue in *Mulroney, supra*. In any event, the evidence sought, on the facts of this matter, does not place the proposed witnesses or the companies they represent in an unfair or burdensome position.

In *Friction (No. 1)*, Barr J. found the order sought was more burdensome to the witnesses involved than would be the case had

**EXHIBIT 3 PAGE 35**

the action been tried in Ontario. On this point Barr J. said this at
p. 70 C.P.R., p. 248 O.R.:

**a**
> 1. A Canadian court will not order a Canadian resident to submit to the
> process of a foreign court unless it is necessary. Neither the letters rogatory
> nor the affidavit material establish this. Here, the subject of the matter is the
> alleged infringement of a United States patent in the United States. The
> defendant in that action does not carry on business in Canada. The proposed
> witnesses have had no dealings with either of the parties to the U.S. action.

**b**
> The plaintiff has had discovery of the Canadian corporation with which the
> parties sought to be examined have been dealing, and have had production of
> its correspondence and documents relating to Canadian respondents. In these
> circumstances it is hard to see that the success of the plaintiff's U.S. action
> could depend upon the granting or refusing of the order sought in this case.

**c**
Barr J. found the obligation to search out 38 kinds of documents
and to determine which were relevant to the issue to be too
burdensome. At p. 71 C.P.R., p. 249 O.R., Barr J. said this:

> The time and expense required of the Canadian parties to satisfy these
> requirements is an unreasonable price to exact for the "comity of nations" in
> the circumstances of this case.

**d**
Barr J. also concluded it was not established the documents
sought existed.

As I have indicated, the evidence before Barr J. was, to put it
mildly, less complete than the evidence on this application. In
dealing with the evidentiary deficiencies, Barr J. said this at p. 67

**e**
C.P.R., p. 246 O.R.:

> Canadian Metallic Brake Ltd. is Mr. Beri's company. Canparts Automotive
> International Ltd. is Mr. Salt's. It is not suggested that they have ever dealt
> with either of the parties to the Delaware action. The questioning is sought
> because it is said that the Canadian companies have used Kevlar pulp and
> fibre in their business. The patent to these products is the subject of the

**f**
> Delaware litigation. E. I. Du Pont de Nemours & Company Incorporated is
> the defendant in that litigation. It is also the majority shareholder in Du Pont
> Canada Inc., a Canadian company with a substantial number of Canadian
> shareholders. It appears that Du Pont Canada purchased Kevlar pulp and
> fibre from E. I. Du Pont and resold it to a number of Canadian users including
> the Canadian respondents. The goods were ordered, delivered and paid for in

**g**
> Canada. These sales were entirely between three Canadian companies—Du
> Pont Canada and the two Canadian respondents.

The linkage between Du Pont U.S.A. and the two Ontario
companies has now been established and is the basis of my
conclusion that the evidence is relevant and necessary, and part of

**h**
the basis of my conclusion that it would be unfair to require the
applicant to proceed to trial without it.

While I concede that some authorities (including Barr J.'s
judgment in *Friction (No. 1)* suggest documents sought must be
proved to exist, I think the need for specificity is better served by

**EXHIBIT 3 PAGE 36**

requiring documents to be identified with reasonable precision, in the circumstances of each case. In many instances it will be impossible for a party on the outside, denied a look inside, to determine what documents are relevant to the issues and what documents may be reasonably ancillary to the evidence of a witness sought to be examined. Requiring a witness to search a number of files may in one case be burdensome, and in another quite reasonable. Because Friction is a stranger to the dealings between Du Pont U.S.A., Du Pont Canada and the two Ontario companies, Friction can do no more than to identify the documents it seeks by topics, as has been done.

In *Appeal Enterprises, Ltd. et al. v. First National Bank of Chicago* (1984), 10 D.L.R. (4th) 317 at p. 319, 46 O.R. (2d) 590 at p. 592, one of the two issues before the Ontario Court of Appeal was put this way by Zuber J.A.:

> It is argued by the appellant that the amount of material sought pursuant to the subpoena is simply too large, is described too generally and amounts to a discovery. It cannot be denied that the amount of documentary material sought is very large indeed.

*Appeal Enterprises* involved an Illinois request that an employee of Peat, Marwick, Mitchell & Co. give evidence of his firm's involvement with the plaintiff and to produce an enormous quantity of documentation in the accountant's possession. The breadth of the order appealed from can best be understood by setting out the production part of the order:

> 4. AND IT IS FURTHER ORDERED that The First National Bank of Chicago, the Defendant in the above-captioned action, be and it is hereby given leave to apply to this court and to have issued a subpoena duces tecum requiring the said David V. Bosworth to produce at the said examination all documents prepared by or for Peat, Marwick, Mitchell & Co. during their examination of the business records of the various plaintiffs which documents are now in the possession or control of Peat, Marwick, Mitchell & Co., including but not limited to all documents reflecting or otherwise pertaining to, (i) the calculation or review of the provisions and/or allowances for losses on individual loans receivable of the plaintiff companies, and (ii) the calculation or review of the values at which Real Estate Owned is reflected on the books and records of the plaintiff companies;

Zuber J.A. held that the issues in the U.S. litigation were complex and involved large sums of money. The same observation applies here. It is implicit in Zuber J.A.'s judgment that although the documentation involved was voluminous and not identified with much precision, it was relevant and at least ancillary to the evidence of the witness sought to be examined in Ontario.

In my view, the production of documents is not a discovery process, but evidence reasonably required as ancillary to the

EXHIBIT 3 PAGE 37

evidence to be given by officers of Canparts and Canadian Metallic, which evidence will in my view be relevant to the issues

*a* in the U.S. litigation. In *American Express Warehousing Ltd. v. Doe et al.*, [1967] 1 Lloyd's Rep. 222 at p. 225, Lord Denning M.R. said this:

*b*
> Where the documents are sufficiently specified, there is no objection to an order being made on a person to give his testimony and to produce supporting documents as ancillary to that testimony. That is so in the present case. This application, as I see it, is not a mere application for discovery. It is an application that the brokers should give testimony. The request to produce documents is only ancillary to their oral testimony. The documents are described as "slips" and "quote slips" and also the correspondence in their "files" relating to those particular insurances. That seems to me to be

*c* sufficient specification. It would satisfy a *subpoena duces tecum*: and satisfies a request of this kind for supporting documents.

> As to the point on "pre-trial" procedure, it seems to me to have no substance in it. The evidence is requested in this case very much on the same lines as we ask for evidence to be taken on Commission, or before an Examiner before the trial. It is taken down, and afterwards at the trial it is admitted in evidence if it is relevant. But it can be rejected if it is inadmis-

*d* sible for some special reason or other.

> I think we in this Court should do what the United States Courts ask us to do. The witnesses should be examined here to help the United States Courts to do justice. If the position were reversed, we would confidently expect the United States Courts to help us. So we should help them.

*e* The documents sought must be "sufficiently identified": see *Penn-Texas Corp. v. Murat Anstalt et al. (No. 2)*, [1964] 2 All E.R. 594 at p. 599. Documents may be specifically identified, or identified by class, to pass the threshold test for production. Although the production sought is wide, it is not unreasonable or

*f* unduly onerous.

Counsel for Canparts emphasized the fact that Canparts was a small company, unwillingly enveloped in litigation involving corporate giants in the United States, in support of his submission that it would be unduly oppressive and burdensome for this small

*g* company to undertake the document searches, and then the productions required, were the letters rogatory given effect to. The David and Goliath rhetoric is misplaced. All that Canparts will be required to do is to produce documents relating to those issues clearly spelled out in the letters rogatory. The productions,

*h* looked at generally, will relate to the anatomy of Canparts brakes and the sales-marketing connection between Du Pont U.S.A. and Canparts as related to the brakes said to contain the Du Pont product Kevlar.

Du Pont Canada had itself added as an intervenor. Some might

**EXHIBIT 3 PAGE 38**

wonder why. Du Pont Canada's position on that issue is that its basic reason for intervening is to support its customers Canparts and Canadian Metallic in "resisting their being caught up in the toils of complex and wide ranging United States patent litigation". This lofty goal, unrelated to any mundane desire to assist Du Pont Canada's parent company, brings to mind the concluding comments of Salmon L.J. in *Penn-Texas Corp. v. Murat Anstalt et al. (No. 2), supra.* There in dealing with an English company's refusal to produce documents Salmon L.J. said this at p. 602:

> If the appellants' real purpose in bringing this appeal is merely to demonstrate their zeal to their clients, the appellants should regard this appeal as a triumph in spite of its result. It must surely now be obvious to everyone, that every point that human ingenuity could devise for the purpose of keeping these documents from the light of day has been taken and pursued with skill, vigour and persistence—but to no avail.

In the end result, an order will issue giving effect to the letters rogatory. If necessary, I may be spoken to as to its forum.

I have not dealt with the confidentiality issue. That is a legitimate concern and I would ask counsel to write to me with their suggestions on that issue as soon as is reasonably possible. I am optimistic counsel will be able to agree on terms to accommodate the need for confidentiality as outlined in counsel's submissions on that issue. I would also ask counsel to write to me with their submissions on costs, although I am inclined to the view that there should be no costs because evidentiary differences on the first application made this application necessary.

It is noteworthy that the Supreme Court of Canada in *District Court of United States, Middle District of Florida v. Royal American Shows Inc. et al.* (1982), 134 D.L.R. (3d) 32, 66 C.C.C. (2d) 125, [1982] 1 S.C.R. 414, did not seem to be troubled by the potential of there being a second request for evidence through further letters rogatory.

*Application granted.*

---

[COURT OF APPEAL]

## Re Partition Holdings Ltd. et al. and Minister of Transportation & Communications

THORSON, CORY AND                    16TH OCTOBER 1986.
TARNOPOLSKY JJ.A.

Expropriation — Compensation — Interest — Ministry registering highway plan but not expropriating lands for another three years — Interest payable on

EXHIBIT 3 PAGE 39

# EXHIBIT 4

**COURT FILE NO.** 04-CV-278983 CM2
**DATE:** 20050725

## ONTARIO
## SUPERIOR COURT OF JUSTICE

2005 CanLII 51027 (ON S.C.)

| | | |
|---|---|---|
| **B E T W E E N:** | ) | |
| | ) | |
| **THE TRUSTEES OF THE ONTARIO** | ) | *Mr. Kirk M. Baert, Ms. Celeste Poltak* for |
| **PUBLIC SERVICE EMPLOYEES UNION** | ) | the Applicant |
| **PENSION TRUST FUND, individually and** | ) | |
| **on behalf of all other persons similarly** | ) | |
| **situated** | ) | |
| Applicants/Plaintiffs | ) | |
| | ) | |
| - and - | ) | |
| | ) | |
| **RICHARD CLARK, MARK WAYLAND,** | ) | *Mr. Brian Morgan, Mr. Don Hanna* for |
| **DELOITTE & TOUCHE LLP and** | ) | Richard Clark, Mark Wayland and Deloitte |
| **NORTEL NETWORKS CORP.** | ) | & Touche LLP |
| Respondents/Defendants | ) | |
| | ) | |
| | ) | **HEARD:** June 22 and 23, 2005 |

APPLICATION UNDER the *Evidence Act*, R.S.O. 1990, c. E. 23, s. 60,
the *Canada Evidence Act*, R.S.C. 1985, c. C-5, s. 46
and Rule 14.05 of the *Rules of Civil Procedure*

### M.A. SANDERSON J.

## REASONS FOR DECISION

### Introduction

[1]     This is the Plaintiffs' application requesting this Court to make an order enforcing letters rogatory [requiring: (a) production of specified documents (the "Specified Documents") and (b) the deposition of Richard Clark ("Clark") and Mark Wayland ("Wayland") (the "Specified Evidence")], issued on September 21, 2004 by Magistrate Judge Dolinger of the United States District Court for the Southern District of New York in *Re Nortel Networks Corp. Securities Litigation*, Civil Action No. 2001-CV-1855 (the "U.S. Class Action.")

**EXHIBIT 4 PAGE 40**

2

[2]     In the U.S. Class Action, the Applicants are the Plaintiffs; Nortel Networks Corporation ("Nortel") is the Defendant.

[3]     The Respondent Deloitte Canada (hereinafter "Deloittes") was at all material times and still is Nortel's independent auditor. The Respondents Clark and Wayland at the material times were employees of Deloittes with responsibility for the Nortel audit engagement. None of the Respondents is a party/defendant to the U.S. Class Action.

[4]     The Plaintiffs allege generally that Nortel made false or misleading public overstatements of its financial condition and performance between October 24, 2000 and February 15, 2001 ("the relevant period.") They allege that when they purchased Nortel shares, they relied upon those inflated statements. After Nortel made disclosure of its true financial condition, the value of their shares declined substantially and they suffered significant losses.

[5]     They also allege that Nortel violated sections 10(b) and 20(a) of the *Exchange Act of 1934* and Rule 10b-5 promulgated by the Securities Exchange Commission.

[6]     In 2000 and 2001, Deloittes audited Nortel's year-end financial statements and conducted quarterly reviews. It was involved in a restatement of Nortel's financial statements for 2000, 2001, 2002 and for certain quarters of 2003 [completed on or about December 23, 2003 (the "2002 Restatement")] and [in March 2004] in a further restatement of Nortel's financial statements for 2001, 2002 and certain fiscal quarters in 2003. In January 2005, Nortel's 2003 audited financial statements were re-filed (the "2003 Restatement.")

[7]     The Specified Documents are as follows:

(a) all Deloittes' working papers and other documents concerning its audit of Nortel's financial statements for year-ends 2000 and 2001;

(b) all its working papers and other documents concerning its reviews of Nortel's financial statements for the third and fourth quarters of 2000 and the first quarter of 2001;

(c) all its working papers and other documents concerning its review of Nortel's financial statements for the second and third quarters of 2001, related to the charge/write-down for the quarter ending June 30, 2001 [filed with the Securities Exchange Commission ("SEC") on or around August 8, 2001];

(d) all its documents relating to Nortel's analysis as to whether during the relevant period any transaction, customer, contract or arrangement [included in Nortel's 2000 consolidated financial statements as originally filed with the SEC on March 31, 2001] was considered and/or formed the basis for a restatement of Nortel's financial statements [including, but not limited to documents reflecting the methodology used by Nortel to identify each transaction selected for potential restatement, the documents supporting each adjustment, and any changes to Nortel's accounting policies, practices or procedures as a result of such restatement]; and

(e) all indices and/or inventories of working papers relating to any engagement or service performed for Nortel by Deloittes.

2005 CanLII 51027 (ON S.C.)

**EXHIBIT 4 PAGE 41**

3

### The Allegations in the Complaint

[8]      In the Complaint, the Plaintiffs allege that Nortel caused its public statements to be false
or misleading by deliberately using five improper financial reporting and accounting practices, as
follows:

1. **Vendor Financing** – inadequately reserving for vendor-financed loans and artificially
   inflating and improperly recognizing revenues (Complaint, paras. 6, 65, 92-94, 106,
   163);

2. **Inventory Valuation** –failing to take adequate charges against earnings to reflect the
   diminished value of its products recovered after defaults on vendor-financed loans
   [thereby inflating inventory value] (Complaint, paras. 11, 95-96, 163);

3. **Revenue Recognition** – inflating revenues by improperly and prematurely recognizing
   revenue (Complaint, paragraphs 9, 82, 83, 88, 94, 97-102, 163);

4. **Failing to Adequately Account for Uncollectible Receivables** – (paras. 10, 103-112,
   163); and

5. **Goodwill Impairment** – failing to recognize and report billions of dollars in goodwill
   impairment (paras. 12, 113-118, 163).

### The Specified Evidence

[9]      In their affidavit materials filed on behalf of Deloittes in opposition to the Application,
the affiants deposed that Clark and Wayland have detailed first-hand knowledge about Nortel's
conduct during the relevant period.

[10]     Clark was Deloittes' Lead Audit Partner, one of two senior executives responsible for the
planning, administration, and execution of the Nortel audit.

[11]     Wayland was Deloittes' Lead Manager (along with Mitch Szorcsik, Lead Client Service
Partner) on the Nortel engagement. He supervised staff and prepared and reviewed working
papers on a day-to-day basis.

### The Specified Documents

[12]     The Deloittes affiants deposed that the Specified Documents number at least in the
hundreds of thousands of pages and possibly exceed a million pages. They are in both hard-copy
and electronic form and are stored at numerous locations.

[13]     The Specified Documents related to the 2000 and 2001 financial statements include more
than four hundred Deloittes working paper files. Although they contain some primary documents
in hard copy form, they consist mostly of documents in electronic form [including notes prepared
during the course of the audit and review work.] Only about 10% of the 2000 working paper files
and even fewer documents in the 2001 working paper files have already been printed.

2005 CanLII 51027 (ON S.C.)

**EXHIBIT 4 PAGE 42**

4

[14]    Approximately 500 Deloittes employees worked for 11 months to complete the 2003 Restatement. The working papers with respect to it contain information about Nortel journal entries in its balance sheets for 2002 and 2003, and its income statements for 2001, 2002 and 2003.

[15]    Deloittes generates and stores documents in its working papers in electronic form using a proprietary software program known as "Audit System 2" or "AS/2." AS/2 does not allow text searching across multiple documents or records. It does not include a "Print All" function. Users must open documents individually before examining and/or printing them. To access and print documents, users must open the applicable root directory, then the applicable sub-directory, and manually repeat the process for each document. To print the many electronic documents in irregular formats [such as spreadsheets] would require manual formatting.

[16]    The Specified Documents also include more than a hundred thousand pages of personal desk files that are not organized by subject matter generated by at least ten employees.

### Relevant Procedural History of the U.S. Class Action

[17]    The Class was certified on September 5, 2003.

[18]    The Plaintiffs unsuccessfully sought to obtain the Specified Documents from Deloittes U.S., a U.S. resident.

[19]    The Plaintiffs then subpoenaed Deloittes Canada. Deloittes did not respond to the U.S. subpoena because it "did not create an obligation of any kind when served in Canada."

[20]    Clark and Wayland refused to voluntarily attend at U.S. depositions.

[21]    On July 21, 2004, Magistrate Judge Dolinger had ordered oral examinations to be completed by December 23, 2004.

[22]    Counsel for the Plaintiffs wanted to examine the Specified Documents before conducting most of the 40 depositions of parties and non-parties, which Magistrate Judge Dolinger had held would be permissible. They also wanted to examine Clark and Wayland as part of the U.S. deposition process.

[23]    On September 21, 2004, Magistrate Judge Dolinger issued the letters rogatory. The Plaintiffs brought this application in Ontario to enforce the letters rogatory [on November 9, 2004] and applied in the U.S. to extend the time to complete the depositions (to accommodate the hearing and determination of this application.) Magistrate Judge Dolinger extended the December 23, 2004 deadline and ordered instead that discoveries must be completed within ninety days of the Plaintiffs' receipt of the Specified Documents or the end of their attempts to obtain them.

2005 CanLII 51027 (ON S.C.)

**EXHIBIT 4 PAGE 43**

5

2005 CanLII 51027 (ON S.C.)

## Submissions of Counsel

### The Test

[24] All counsel agree on the criteria this Court should use in deciding whether or not the letters rogatory should be enforced. The evidence sought must be relevant, not otherwise obtainable and identified with reasonable specificity. The Canadian enforcement order must be consistent with Canadian public policy and must not be unduly burdensome. *Optimight Communications Inc. v. Innovance Inc.*, [2002] O.J. No. 577 (C.A.) at para. 22, relying on *Re Friction Division Products Inc. E.I. Du Pont de Nemours & Co. et al.* (No. 2) (1986), 56 O.R. (2d) 722 at 732.

### 1. Relevance

[25] Counsel for the Plaintiffs submits that relevance must be considered in context. Where, as here, substantial damages have been claimed and the issues in the litigation are complex, requests for production of voluminous documents are to be expected. He referred to the reasoning of Conant J. in *W.R. Grace Co. v. Brookfield Development Corp.*, [1995] O.J. No. 1483 (Gen.Div.) at paragraph 8, as follows:

> On relevancy, I am satisfied this is a thirty million dollar claim of damages of great complexity. Although, on the fact of it the thirty-four areas of documents seem extremely extensive, I am not persuaded, taken on the whole, that there is irrelevancy. It may be some areas of documents at trial may have little import in the eyes of the Court at that time, however I cannot discard any at this time from the materials and arguments this day.

[26] Counsel for the Plaintiffs submits that as Nortel's defence discloses it relied on the advice of experts [presumably including Deloittes'], they need discovery on that advice and on the information Nortel shared and discussed with Deloittes.

[27] The working papers are said to be of particular relevance and significance. They document the work performed during the audit and the facts discovered. They are relevant to their allegation that Nortel used accounting machinations to inflate its revenues and earnings during the relevant period. They will reveal how and to what extent that was done.

[28] He submits that Clark, as Lead Audit Partner, possesses essential unique and specific knowledge, directly relevant to the allegations in the Complaint.

[29] As Audit Manager, Wayland was intimately involved in the audits on a day-to-day basis.

[30] No other witnesses have more knowledge about the 2000 and 2001 audit engagements.

[31] Counsel for Deloittes submits the Plaintiffs did not cross-examine the Deloittes affiants on their assertions that the majority of the Specified Documents are irrelevant to the allegations in the Complaint.

[32] Summaries, prepared by counsel for Deloittes of information contained in the working papers outlining estimated volumes of relevant information, commingling of relevant and irrelevant documents, effort required to separate relevant from irrelevant information and to convert electronic to hard copies, are attached to these Reasons as **Appendix A**.

**EXHIBIT 4 PAGE 44**

6

**2. Availability of the Specified Documents and Evidence from Other Sources**

[33]     Letters rogatory should only be enforced if other avenues to obtain the information requested have been pursued.

[34]     Counsel for the Plaintiffs submits that has been done.

[35]     Although the Specified Documents and Evidence could have been subpoenaed by the Plaintiffs had Deloittes been subject to the jurisdiction of the New York District Court, as non-resident non-parties, they are not compellable in New York State. Deloittes did not respond to a U.S. subpoena. Clark and Wayland refused to voluntarily attend at depositions. There is no other practical means to obtain the needed information.

[36]     In any event, he submits Deloittes is the only entity having possession of the relevant working papers and desk files. It does not provide its working papers to its clients.

[37]     Counsel for Deloittes submits that much of the information in the Specified Documents and Evidence is obtainable from Nortel. This application is premature because insufficient attempts have been made to obtain it from Nortel first. In *Fecht v. Deloitte & Touche* (1996), 28 O.R. (3d) 189 (affirmed by the Ontario Court of Appeal 32 O.R. (3d) on February 13, 1997) in dismissing the application both Blair J. (as he then was), the application judge, and the Court of Appeal mentioned that senior Northern Telecom witnesses had "already been deposed" but had not been asked about information exchanged with Deloitte & Touche LLP.

[38]     He sought to illustrate that the Plaintiffs have made insufficient attempts to obtain the information from Nortel by proffering lists of references to Deloittes contained in the transcripts of Nortel witnesses who have already been deposed, Those lists are **Appendices B** and **C** to these Reasons.

[39]     He also provided the following list of scheduled deposition witnesses having knowledge and information about specific allegations in the Complaint:

   (a) Adrian Donoghue – vendor financing, inventory valuation, revenue recognition, and uncollectible receivables;

   (b) Doug Beatty (Controller) – vendor financing, inventory valuation, revenue recognition, uncollectible receivables and goodwill impairment. (Mr. Beatty is fully familiar with the facts in issue in respect of the goodwill write-down in the second quarter of 2001, and the facts underlying that write-down, which Deloittes obtained from Nortel or any other source.);

   (c) Tom Manley (Vice President, Finance) – vendor financing, inventory valuation, revenue recognition, and uncollectible receivables;

   (d) Gary Donahee (President, Service Provider Solutions, Americas) – vendor financing and uncollectible receivables;

   (e) R.B. Kaye (General Auditor, Internal Audit Services) – vendor financing, inventory valuation, revenue recognition, uncollectible receivables and goodwill impairment;

**EXHIBIT 4 PAGE 45**

2005 CanLII 51027 (ON S.C.)

7

(f) John Roth (President and Chief Executive Officer) – vendor financing, inventory valuation, revenue recognition, uncollectible receivables and goodwill impairment;

(g) Frank Dunn (Chief Financial Officer) – vendor financing, inventory valuation, revenue recognition, uncollectible receivables and goodwill impairment;

(h) Mary Anne Pahapill (Assistant Controller, Sales Operations/Stock Options, Control Div. of Global Finance) – vendor financing, inventory valuation, revenue recognition, uncollectible receivables and goodwill impairment;

(i) Chahram Bolouri (President, Global Operations) – inventory valuation;

(j) D. Greg Mumford (President, Optical Internet Division) – vendor financing, inventory valuation.

[40]    He used that list and Appendices B and C, when submitting that the Plaintiffs have had and will have ample opportunity to obtain the information sought (or substantially equivalent information), from Nortel.

[41]    Counsel for the Plaintiffs submits that to require them to depose the Nortel witnesses before obtaining the Specified Documents would be inefficient, ineffective and contrary to the procedure mandated by the U.S. District Court. The Specified Documents and Evidence are needed now to focus the upcoming depositions.

[42]    He submits that in holding that the Plaintiffs may conduct up to 40 pre-trial depositions of parties and non-parties within a four-month period, Magistrate Judge Dolinger contemplated that the Specified Documents would be made available and reviewed before further depositions would take place. While he has extended the time for conducting the depositions until after the delivery of the Specified Documents, he has not extended the overall completion time.

### 3. The Evidence Has Been Identified with Specificity

[43]    Counsel for the Plaintiffs submits the Specified Documents have been identified by subject matter and timeframe. It was impossible to be more specific, given that they remain within the power, possession and control of Deloittes and that the Plaintiffs have not yet been given any opportunity to review them.

[44]    As mentioned earlier, counsel for Deloittes submits that a majority of the Specified Documents are irrelevant to the allegations pleaded. At the same time, he agrees with counsel for the Plaintiffs that in all the circumstances here, it would not be feasible to narrow the request. His suggested solution is to altogether deny the Plaintiffs' request.

### 4. Burdensomeness

[45]    It is uncontested that admittedly relevant documents are extensively commingled with allegedly irrelevant documents.

[46]    Counsel for Deloittes cites the following excerpt from *Fecht, supra*, at 206, in submitting that foreign requests that are unduly burdensome will not be enforced:

> It is evident that from a review of the documentary production sought, as described in the letters rogatory – and recited in these reasons – that an examination into the *entire* audit procedure respecting STC (and not

2005 CanLII 51027 (ON S.C.)

**EXHIBIT 4 PAGE 46**

8

> simply that portion of it may relate to the write-down of good will) and *almost the entirety* of STC's business operations, including the sale of that business, is requested. Such a request places an unfair burden upon Deloitte & Touche LLP in the circumstances in this case in my view. In the *Zingre* sense, it constitutes an infringement upon the sovereignty of the jurisdiction to which the request in the letters rogatory is directed, Ontario, and a prejudice to a business citizen that isn't of that jurisdiction. [Emphasis in original.]

[47]    He submits it would be unduly burdensome if Deloittes' employees were required to review up to a million Specified Documents, to cull the relevant from the irrelevant, and to reproduce the relevant ones. It would require thousands of hours of work. He points out that Deloittes' detailed evidence with respect to the effort needed is uncontradicted. The Plaintiffs have adduced no evidence to the contrary.

[48]    Counsel for the Applicants submits that given the complexity and magnitude of the claim, the manner in which Deloittes maintains its audit files, and the undertakings they have provided, the enforcement of the letters rogatory by this court would not subject the Respondents to an undue burden.

[49]    Professional standards require Deloittes to compile and secure their work papers in such a manner that they can be made available to regulatory entities and successor auditors.

[50]    Counsel for the Plaintiffs submits that Deloittes can simply give them access to the Specified Documents. Employees of the Plaintiffs are prepared to do any time-consuming culling and copying.

[51]    Alternatively, if this Court requires Deloittes to do the culling or to assist in it and to print or copy the Specified Documents, the Plaintiffs are prepared to pay Deloittes reasonable professional fees of up to U.S.$100,000 for the services of its personnel and to reimburse its reasonable expenses.

[52]    Magistrate Judge Dolinger has already ordered that expenses incurred by Deloittes, the witnesses and/or the Ontario Superior Court of Justice in assisting in the enforcement of the letters rogatory "are to be reimbursed by the Class Plaintiffs."

[53]    The Plaintiffs have provided an undertaking not to disclose the Specified Evidence or the Specified Documents, "to anyone other than those classes of persons set out in the U.S. and Canadian Confidentiality Orders" and not to use any such information to join Deloittes as a party defendant in the U.S. Class Action.

[54]    Counsel for the Plaintiffs submits the examinations of Clark and Wayland, if ordered, would not be unduly lengthy or burdensome. He anticipates their examinations will take no more than one day each. The depositions are to take place in Ontario; Clark and Wayland are to be reimbursed for reasonable travel costs.

## Issues and the Law

[55]    The enforcement of letters rogatory issued by foreign courts is discretionary.

[56]    Relevant statutory provisions are as follows:

2005 CanLII 51027 (ON S.C.)

**EXHIBIT 4 PAGE 47**

*Evidence Act*, R.S.O. 1990, c. E. 23, section 60.

60.(1) Where it is made to appear to the Ontario Court (General Division) [Superior Court of Justice] or a judge thereof, that a court or tribunal of competent jurisdiction in a foreign country has duly authorized, by commission, order or other process, for a purpose for which a letter of request could be issued under the rules of court, the obtaining of the testimony in or in relation to an action, suit or proceeding pending in or before such foreign court or tribunal, of a witness out of the jurisdiction thereof and within the jurisdiction of the court or judge so applied to, such court or judge may order the examination of such witness before the person appointed, and in the manner and form directed by the commission, order or other process, and may, by the same or by a subsequent order, command the attendance of a person named therein for the purpose of being examined, or the production of a writing of other document or thing mentioned in the order, and may give all such directions as to the time and place of the examination, and all other matters connected therewith as seem proper, and the order may be enforced, and any disobedience thereto punished, in like manner as in the case of an order made by the court or judge in an action pending in the court of before a judge of the court.

*Canada Evidence Act*, R.S.C. 1985, c. C-5, section 46:

46. Where, on application for that purpose, it is made to appear to any court of judge that any court of tribunal of competent jurisdiction in the Commonwealth and Dependent Territories or in any foreign country, before which any civil, commercial or criminal matter is pending, is desirous of obtaining the testimony in relation to that matter of a party or witness within the jurisdiction of the first mentioned court, of the court to which the judge belongs or of the judge, the court or judge may, in its or his discretion, order the examination on oath on interrogatories, or otherwise, before any person or persons named in the order, of that party or witness accordingly, and by the same or any subsequent order may command the attendance of such party or witness for the purpose of being examined, and for the production of any writings or other documents mentioned in the order, and of any other writings or documents relating to the matter in question that are in the possession or power of that party or witness.

[57]     I have already mentioned the agreed criteria to be considered in the exercise of the discretion.

[58]     In *Fecht, supra*, the Ontario Court of Appeal at p. 419 held that two objectives should be considered: (1) doing what justice requires and (2) protecting Canadian sovereignty.

[59]     In *R. v. Zingre* [1981], 127 D.L.R. (3d) 223 (S.C.C.), the Supreme Court of Canada, per Dickson J. (as he then was), held at p. 230:

It is upon this comity of nations that international legal assistance rests. Thus the court of one jurisdiction will give effect to the laws and judicial decisions of another jurisdiction, not as a matter of obligation, but out of mutual deference and respect. A foreign request is given full force and effect unless it be contrary to the public policy of the jurisdiction to which the request is directed … or otherwise prejudicial to the sovereignty of the citizens of the latter jurisdiction.

He continued at p. 231:

The granting of an order for examination, being discretionary, will depend on the facts and particular circumstances of the individual case. The Court or judge must balance the possible infringement of Canadian sovereignty with the natural desire to assist the courts of justice of a foreign land.

[60]     While this Court is not bound by the conclusions of Magistrate Judge Dolinger, his observations and conclusions are entitled to deference and respect.

[61]     In *United States of America v. Levy*, [2002] O.J. No. 2298 (S.C.J.), C. Campbell J. wrote:

2005 CanLII 51027 (ON S.C.)

**EXHIBIT 4 PAGE 48**

> The principle of comity which underpins the recent pronouncements of the Supreme Court of Canada ...
> should, in my view, inform the development of this area of the law. ... In an area of law dealing with such
> obvious and significant transborder issues [environmental clean up], it is particularly appropriate for the
> foreign court to give full faith and credit to the laws and judgments of neighbouring state.

[62]     In *Vitapharm Canada Ltd. v. F. Hoffman-La Roche Ltd.*, [2001] O.J. No. 237 (S.C.J.)
Cumming J. wrote at paragraph 27:

> As a result of the inexorable forces of globalization and expanding international free trade and open markets,
> there will be an ever-increasing inter-jurisdictional presence of corporate enterprises. This is seen
> particularly in respect of American and Canadian business activity, given the extent of cross-border trade. If
> both societies are to maximize the benefits of expanding freer trade and open markets, the legal systems of
> both countries must recognize and facilitate an expeditious, fair and efficient regime for the resolution of
> litigation that arises from disputes in either one or both countries.

[63]     In issuing the letters rogatory, Magistrate Judge Dolinger held that the Specified
Evidence and Documents are "relevant and probative," necessary to "adjudicate the above stated
contentions [of the Class Plaintiffs] and allegations of the parties" and that "justice cannot be
completely achieved among the parties without such evidence." He wrote:

> The documents and testimony sought is not otherwise obtainable. It would therefore be unfair to require the
> Class Plaintiffs to proceed to trial without the documents or testimony. The Class Plaintiffs have
> demonstrated that the documents sought are of paramount evidentiary importance to the case and that each
> of the witnesses whose testimony is sought possesses unique and specific knowledge of facts which are
> directly relevant to the allegations of the Complaint. ... No other witness can come close to meeting the
> Class Plaintiffs' evidentiary needs as Deloitte-Canada, Nortel's independent auditor during the Class Period.

[64]     Based on his reasons, it is clear that he was of the view that justice requires production of
the Specified Documents in all the circumstances here.

[65]     This Court should "give full faith and credit" to the orders and judgments of a U.S. court
unless it is of the view that to do so would be contrary to the interests of justice or would infringe
Canadian sovereignty.

## Application of the Settled Criteria to the Present Facts

### (1) Relevance

[66]     Like Magistrate Judge Dolinger, I am of the view that the Specified Documents are of
paramount evidentiary importance to the U.S. Class Action.

[67]     This is significant and complex litigation and the requested production must be viewed in
context. The litigation is largely about alleged accounting irregularities. While not a party, as
Nortel's auditor, Deloittes undoubtedly has information crucial to the accounting issues.

[68]     It cannot be said the allegations are purely speculative. While the U.S. Class Action is
still at a pre-trial stage, it has been certified and has survived a motion to dismiss.

[69]     It is clear from the record before me [even apart from inadmissible statements contained
in the Mintzer affidavit as to standard U.S. legal practice], that the discovery practices mandated
by the United States District Court for the Southern District of New York differ from those
contained in the Ontario Rules of Practice. This Court gives deference and respect to the New
York procedural rules and, to use the words of Cumming J., will "recognize and facilitate an

2005 CanLII 51027 (ON S.C.)

**EXHIBIT 4 PAGE 49**

expeditious, fair and efficient regime for the resolution of litigation" so long as it does not infringe upon the two objectives set out earlier.

[70]    The Specified Documents are clearly relevant. In my view, contemporaneous documents provide the best evidence of the information Nortel provided to its independent auditors. The working papers and desk papers are clearly relevant to Nortel's state of mind and its pleaded defence of reliance upon its advisors. The Specified Documents relating to the five enumerated accounting machinations are clearly relevant.

[71]    Like Magistrate Judge Dolinger, I am of the view that Clark and Wayland possess unique and specific knowledge touching on the matters complained of, highly relevant to the issues in the action. They will be able to provide information relevant to the complaint and Nortel's defences, including information on Nortel's accounting practices, information exchanged and advice given.

[72]    I do not accept the submission of counsel for Deloittes that this is just a fishing expedition.

[73]    In my view, the reasoning of Doherty J.A. in *France (Republic) v. De Havilland* (1991), 3 O.R. (3d) 705 (C.A) is apt here:

> ... Clearly, without the order the evidence of De Havilland will not be available to the French court, as De Havilland has made it clear that it will not voluntarily attend before the French court. ... It is also apparent that the information sought by the letters rogatory is material to the inquiry into the complaint currently before the French court. It is no overstatement to describe that information as potentially central to that inquiry. It is self-evident that the denial of <u>access to highly material information</u> diminishes any court's ability to do justice. [Emphasis added.]

[74]    It would be unfair to the Plaintiffs to require them to proceed to trial without the Specified Documents and Evidence. Nortel has not objected to their production. It has not been suggested that they contain confidential information of concern to any stranger to this litigation. Nortel and Deloittes cannot be said to be strangers to each other.

### (2) Availability from Other Sources

[75]    Counsel for Deloittes submits that the Plaintiffs cannot show the evidence is unavailable from other sources unless it can prove they have already deposed Nortel witnesses about their communications with Deloittes. He relies heavily on *Fecht, supra,* dismissing an application to enforce letters rogatory. However, in that case, the Ontario Court of Appeal concluded that Blair J. had not been satisfied that production of the information covered by the letters rogatory was necessary to do justice. Rather, he had decided that there was not a sufficiently substantial link to the foreign litigation to conclude that justice required the order.

[76]    In the case at bar, I am satisfied that the necessary link exists and that justice requires the enforcement of the letters rogatory. The Specified Documents and Specified Evidence are crucial to the determination of the issues in the U.S. Class Action.

[77]    While the legal analysis and conclusions in *Fecht* are persuasive and clearly binding on me, as Blair J. said at p. 203:

2005 CanLII 51027 (ON S.C.)

**EXHIBIT 4 PAGE 50**

> The matter falls to be determined on the basis of the circumstances of each case, having in mind the principles of law which govern.

In my view, *Fecht* is distinguishable on its facts from the case at bar.

[78]    Recognizing that international assistance rests on the comity of nations, I am of the view that our Courts should not be quick to reject foreign procedural rules or to impose our own procedures on them unless they infringe on Canadian sovereignty because they are prejudicial to our country or its citizens.

[79]    Given the undertakings detailed later in these Reasons, I am of the view that the procedure mandated by the New York District Court [while different from ours], will not unduly prejudice Deloittes, and thus will not infringe upon Canadian sovereignty.

[80]    Even if I had been of the view that our procedural rules should trump those of the New York Court, I would still have agreed with Magistrate Judge Dolinger that the evidence sought is not "otherwise available."

[81]    The content of the working papers extends well beyond primary documents [which may be within the power, possession and control of Nortel.] Documents generated by Deloittes in the course of the audits and restatements touching on the issues set out in the complaint will be unique to Deloittes.

[82]    Many contemporaneous records generated by Deloittes' employees respecting communications between Deloittes and Nortel will differ from Nortel's contemporaneous records.

[83]    The reasoning of Doherty J.A. in *France v. De Havilland, supra* is applicable here:

> There is nothing to suggest that the employee who provided the affidavit in the French proceedings was privy to all information and documents in the possession of De Havilland or that he necessarily shared all of the information that he had with the French court. If the French court is entitled to the information requested in the letters rogatory, it is entitled to receive that information from the appropriate De Havilland official and by means of questions posed on behalf of the investigating magistrate. The court is not required to accept on the definitive statement of De Havilland's knowledge, the affidavit of an employee who was apparently very much involved...

[84]    By pleading that it relied on the advice of its advisors, Nortel has put the content of the Deloittes working papers in issue.

### (3) Specificity of Identification of Evidence Requested

[85]    This criterion is related to relevance.

[86]    All counsel submit that any narrowing of the request would not be feasible.

[87]    While I appreciate that it would have been open to me to narrow the request had I considered it to be appropriate, I am not inclined to do so here [especially given the position taken by the parties on the issue.]

2005 CanLII 51027 (ON S.C.)

**EXHIBIT 4 PAGE 51**

13

[88]     I accept the submission of counsel for the Applicants/Plaintiffs that in all the
circumstances here the Specified Documents have been adequately identified.

### (4) Burdensomeness

[89]     Deloittes is not being asked to have its personnel review and cull the documents or to
format and provide copies at its own expense. Rather, counsel for the Plaintiffs has said that
employees of the Plaintiffs will do the culling and formatting/printing/copying, if they can. If
they cannot, and if they need assistance from Deloittes personnel, they will pay reasonable costs
of up to $100,000 for that assistance.

[90]     To ensure the letters rogatory cannot be used to conduct a "fishing expedition" to
Deloittes' prejudice, counsel for the Plaintiffs has undertaken not to use the Specified Documents
or Evidence to join Deloittes/Wayland/Clark as parties defendant in the U.S. Class Action.

[91]     These undertakings substantially reduce the possibility of prejudice to Deloittes. The
Plaintiffs will not be allowed to circumvent the provisions of the *Private Securities Litigation
Reform Act* of 1995.

[92]     Counsel for the Plaintiffs has provided assurances that the examinations of Clark and
Wayland will be limited to one day each and will occur in Toronto on dates convenient for them.

[93]     In addition, the affidavits filed by the Plaintiffs in support of this application contain
assurances that the evidence being sought is for use in preparation for trial, and will be offered in
evidence at the trial of the U.S. Class Action [subject only to such evidentiary objections as the
parties may raise and the District Court may sustain pursuant to the *Federal Rules of Procedure*
and *Federal Rules of Evidence*.]

### Summary of Conclusions

[94]     I am of the view that justice requires the production of the Specified Documents and
Specified Evidence. I am satisfied that an order enforcing the letters rogatory in the form of
Magistrate Judge Dolinger's order of September 21, 2004 is in the interests of justice. The
evidence is indeed relevant, crucial and otherwise unavailable. Its production in the manner
ordered will not be unduly burdensome to Deloittes. Given the undertakings of the Applicants
and the pre-existing confidentiality agreements and protective orders, Deloittes' interests will not
be unduly prejudiced in a manner that would infringe Canadian sovereignty.

[95]     I appreciate that the Specified Documents and Evidence are being requested at a pre-trial
stage. Amendments to s. 60 of the *Ontario Evidence Act* have made it clear that orders enforcing
letters rogatory can be made for pre-trial discovery purposes. In that event, the threshold test
used is more rigorous.  Nordheimer J. said in *Pecarsky v. Lipton Wiseman Altbaum & Partners*
(1999), 38 C.P.C. (4th) 170 (Ont. S.C.J.) at para 13:

> . . . when the letter of request is directed to pre-trial discovery, rather than to evidence for trial, a higher
> hurdle must be overcome to satisfy the court that it is desirable that the letter of request be enforced.

[96]     Applying the more rigorous standard, I am of the view that the test for pre-trial
production has been met.

2005 CanLII 51027 (ON S.C.)

**EXHIBIT 4 PAGE 52**

14

[97]     Subject to the following undertakings being given by counsel for the Applicants/
Plaintiffs, an order will go enforcing the letters rogatory issued by Magistrate Judge Dolinger of
the United States District Court, Southern District of New York, dated September 21, 2004:

    (a) the Applicants/Plaintiffs must undertake that the Specified Documents and the Specified
    Evidence will be used only for the purpose of the U.S. Class Action, and not for the
    purpose of (i) adding Deloitte Canada and/or Clark and/or Wayland as party defendants
    to the U.S. Class Action (ii) commencing any new proceedings against Deloitte Canada
    and/or Clark and/or Wayland; or (iii) otherwise advancing any new claim against Deloitte
    Canada and/or Clark and/or Wayland; and

    (b) the Applicants/Plaintiffs will not provide the Specified Documents and the Specified
    Evidence to any other person unless that person executes an acknowledgement and
    undertaking that he/she/it agrees to the same terms.

[98]     Counsel should agree on a proposed timetable for compliance with the letters rogatory. If
they cannot, they may make written submissions to this Court on or before August 16, 2005.

[99]     If they cannot agree on costs, counsel may make submissions in writing as to costs on or
before the same date.

                                               M.A. SANDERSON

Released:

2005 CanLII 51027 (ON S.C.)

**EXHIBIT 4 PAGE 53**

**COURT FILE NO.** 04-CV-278983 CM2

**DATE:** 20050725

2005 CanLII 51027 (ON S.C.)

**ONTARIO**

**SUPERIOR COURT OF JUSTICE**

**B E T W E E N:**

**THE TRUSTEES OF THE ONTARIO PUBLIC SERVICE EMPLOYEES UNION PENSION TRUST FUND, individually and on behalf of all other persons similarly situated**

Applicant

– and –

**RICHARD CLARK, MARK WAYLAND, DELOITTE & TOUCHE LLP and NORTEL NETWORKS CORP.**

Respondents

---

**REASONS FOR DECISION**

---

M.A. SANDERSON J.

Released:

**EXHIBIT 4 PAGE 54**

# EXHIBIT 5

**COURT FILE NO.:  05-CV-284509PD1**
**DATE:** 20050729

**ONTARIO**

**SUPERIOR COURT OF JUSTICE**

IN THE MATTER OF THE *Evidence Act,* R.S.O. 1990, C. E.23, s.60

AND IN THE MATTER OF THE *Canada Evidence Act,* R.C., c. E-10, ss. 46, 47

AND IN THE MATTER OF an action now pending in the
United States District Court for the Southern District of New York

2005 CanLII 27013 (ON S.C.)

|  |  |  |
|---|---|---|
| **B E T W E E N:** | ) | |
| | ) | |
| | ) | |
| THE PRESBYTERIAN CHURCH OF | ) | *Joel P. Rochon* and *Sakie Tambakos* for |
| SUDAN, REV. MATTHEW MATHIANG | ) | Berger & Montague, P.C. and for the |
| DEANG, REV. JAMES KOUNG NINREW, | ) | Applicants |
| NUER COMMUNITY DEVELOPMENT | ) | |
| SERVICES IN U.S.A., FATUMA | ) | |
| NYAWANG GARBANG, NYOT TOT | ) | |
| RIETH, individually and on behalf of the | ) | |
| Estate of her husband Joseph Thiet Makuac, | ) | |
| STEPHEN HOTH, STEPHEN KUINA, | ) | |
| TUNGUAR KUEIGWONG RAT, LUKA | ) | |
| AYUOL YOL, THOMAS MALUAL KAP, | ) | |
| PUOK BOL MUT, CHIEF PATAI TUT, | ) | |
| CHIEF PETER RING PATAI and CHIEF | ) | |
| GATLUAK CHIEK JANG, on behalf of | ) | |
| themselves and all other similarly situated | ) | |
| | ) | |
| Applicants | ) | |
| | ) | |
| - and - | ) | |
| | ) | |
| TERRANCE TAYLOR, JENNIFER | ) | *Robert Frank* and *Erik Penz* for the |
| TAYLOR and TALISMAN ENERGY, INC. | ) | Respondent, Talisman Energy, Inc. |
| | ) | |
| Respondents | ) | |
| | ) | |
| | ) | |
| | ) | |

**EXHIBIT 5 PAGE55**

Page: 2

**COURT FILE NO. 05-CV-283553PD1**

2005 CanLII 27013 (ON S.C.)

**B E T W E E N:**

THE PRESBYTERIAN CHURCH OF
SUDAN, REV, MATTHEW MATHIANG
DEANG, REV. JAMES KOUNG NINREW,
NUER COMMUNITY DEVELOPMENT
SERVICES IN U.S.A., FATUMA
NYAWANG GARBANG, NYOT TOT
RIETH, individually and on behalf of the
Estate of her husband Joseph Thiet Makuac,
STEPHEN HOTH, STEPHEN KUINA,
TUNGUAR KUEIGWONG RAT, LUKA
AYUOL YOL, THOMAS MALUAL KAP,
PUOK BOL MUT, CHIEF PATAI TUT,
CHIEF PETER RING PATAI and CHIEF
GATLUAK CHIEK JANG, on behalf of
themselves and all other similarly situated

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

*Joel P. Rochon* and *Sakie Tambakos* for
Berger & Montague, P.C. and for the
Applicants

                                        Applicants )

- and -

RICHARD RYBIAK

                                        Respondent

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

*Burton Tait, Q.C.* and *Sara J. Erskine* for
the Respondent, Richard Rybiak

*Robert Frank* and *Erik Penz* proposed
intervenor's counsel and for Talisman
Energy Inc.

**HEARD:** June 8, 2005

<u>Pitt J.</u>

**REASONS FOR JUDGMENT**

**EXHIBIT 5 PAGE56**

Page: 3

## INTRODUCTION

[1]     Applications to grant judicial assistance in civil cases to foreign courts, especially those
with procedural regimes similar to our own, are generally routine. This application, however, is
far from routine, as it involves the assumption of jurisdiction by a United States court on the
basis of a seldom, if ever, used U.S. statute, the *Alien Tort Claims Act*, that is considered by
some in the legal community to represent a marked departure from generally accepted principles
of private international law. The Act, passed by the first Congress of the United States in 1789,
provides that:

> The district court shall have original jurisdiction of any civil action by an alien for
> a tort only, committed in violation of the law of nations or a treaty of the United
> States.

## OVERVIEW

[2]     The applicants, the Presbyterian Church of Sudan and other current and former residents
of Sudan, are engaged in a civil action against Talisman Energy Inc. and the Government of
Sudan undertaken in the United States District Court for the Southern District of New York. In
the current applications, they seek oral and documentary evidence from the respondent, Richard
Rybiak, as well as documentary evidence in the possession of the respondents Terrance and
Jennifer Taylor. The applications were brought pursuant to s. 60 of the Ontario *Evidence Act*,
R.S.O. 1990, c. E.26 and s. 46 of the *Canada Evidence Act*, R.S.C. 1985, c. C-5 for an Order
giving effect to the Requests for International Judicial Assistance issued on January 19, 2005 and
October 26, 2004 respectively, by Judge Cote of the Southern District of New York. The
defendant, Richard Rybiak, opposes the application, and Talisman Energy Inc. sought and was
granted intervenor status. Terrance and Jennifer Taylor do not oppose the application.

[3]     I shall deal with both applications in theses reasons.

## THE MAIN ACTION

[4]     The main action was commenced as a putative class action brought by the applicants on
behalf of themselves and similarly situated non-Muslim, African residents of certain areas in
southern Sudan who allege to have been damaged by acts of genocide, war crimes, extra-judicial
killing, forced displacement, military bombings and assaults on civilian targets, confiscation and
destruction of property, enslavement, torture and rape related to the oil exploration and
extraction activities of Talisman and the Government of Sudan. Talisman is said to have
collaborated with and aided and abetted the government of Sudan in respect of those acts. The
presiding judge in the US action, The Honourable Denise Cote, denied the motion by the
applicants to certify the class on March 25, 2005. The litigation continues on behalf of the
named plaintiffs.

2005 CanLII 27013 (ON S.C.)

**EXHIBIT 5 PAGE57**

Page: 4

[5]     The defendant, Talisman Energy Inc. ("Talisman"), is a Canadian company; the plaintiffs are current and former residents of the Republic of Sudan[1]; and, the alleged acts took place in Sudan. Nonetheless, Judge Schwartz of the United States District Court for the Southern District of New York held that the American court had jurisdiction over this matter pursuant to the *Alien Tort Claims Act*, 28 U.S.C. §1350.

[6]     On August 27, 2004, Judge Cote denied Talisman's motion to strike for lack of personal jurisdiction, holding that the maintenance of the U.S. action was "consistent with the traditional notions of fair play and substantial justice". (*Presbyterian Church of Sudan v. Talisman Energy Inc.*, No. 01 Civ. 9882 (DLC), 2004 WL 1920978 (S.D.N.Y. Aug. 27, 2004)) On March 15, 2005, the United States government filed with the court a *Statement of Interest* to inform the court of the U.S. Department of State and the Government of Canada's concerns over the court's exercise of jurisdiction over Talisman. On June 13, 2005, Judge Cote dismissed Talisman's motion for judgment on the pleadings.

**THE CURRENT ACTION**

[7]     Richard Rybiak is the former manager of Human Resources and Administration for Talisman (Greater Nile) B.V., in the Republic of the Sudan, which was a subsidiary of Talisman at the times material to the U.S. action. The applicants allege Rybiak, in this capacity, was uniquely positioned to observe Talisman's interaction with the Government of Sudan, as well as its operations in the Sudan.

[8]     Terrance Taylor and Jennifer Taylor are the brother and sister, respectively, of the late Ian Taylor who was formerly Talisman's Community Development Manager in Sudan. The applicants seek to obtain the documents that were in the possession of Ian Taylor prior to his death that related to Talisman's operations in Sudan. The Taylors are not opposing the application and have agreed to produce the documents in their possession in the event of a Court Order or a waiver by Talisman of a confidentiality agreement it had with Ian Taylor.

[9]     The *Rybiak* and *Taylor* applications were heard on June 8, 2005, one following the other.

**ENFORCING LETTERS ROGATORY GENERALLY**

[10]     The starting point for the enforcement of a letter of request is s. 60 of the Ontario *Evidence Act*, R.S.O. 1990, c. E.26, which states:

> Where it is made to appear to the Superior Court of Justice or a judge thereof, that a court or tribunal of competent jurisdiction in a foreign country has duly authorized, by commission, order or other process, for a purpose for which a letter of request could be issued under the rules of court, the obtaining of the

---

[1] Some have now become American citizens or resident aliens. The Nuer Community Development Services in U.S.A. ("NCDS") is a non-profit corporation that assists Nuer refugees in the United States and those who remain in Sudan. The NCDS members are refugees from Sudan who are now citizens or resident aliens of the United States. Their relatives are alleged to have been the subject of extrajudicial killings and have had their property destroyed in Sudan.

2005 CanLII 27013 (ON S.C.)

EXHIBIT 5 PAGE58

Page: 5

testimony in or in relation to an action, suit or proceeding pending in or before such foreign court or tribunal, of a witness out of the jurisdiction thereof and within the jurisdiction of the court or judge so applied to, such court or judge may order the examination of such witness before the person appointed, and in the manner and form directed by the commission, order or other process, and may, by the same or by a subsequent order, command the attendance of a person named therein for the purpose of being examined, or the production of a writing or other document or thing mentioned in the order, and may give all such directions as to the time and place of the examination, and all other matters connected therewith as seem proper, and the order may be enforced, and any disobedience thereto punished, in like manner as in the case of an order made by the court or judge in an action pending in the court or before a judge of the court.

Section 46 is the corresponding section in the *Canada Evidence Act*, R.S.C. 1985, c. C-5.

## REQUEST FOR PRE-TRIAL PURPOSES

[11]     The law is now clear that letters of request can be enforced for pre-trial discovery. (See: *R. v. Zingre*, [1981] 2 S.C.R. 392 at 403 and *Fecht v. Deloitte & Touche* (1996), 28 O.R. (3d) 188 (Gen. Div.) at 196, aff'd (1997), 32 O.R. (3d) 417 (C.A.))  However, in *Pecarsky v. Lipton Wiseman Altbaum & Partners* (1999), 38 C.P.C. (4th) 170 at 176, Nordheimer J. interpreted the case law as requiring a higher standard to be overcome to enforce the letters of request directed to pre-trial discovery, than to evidence for trial.

## TEST FOR ORDERING LETTERS ROGATORY

[12]     The granting of an order to give effect to letters rogatory is a matter of discretion of the Court.  In *Friction Division Products Inc. v. E.I. Du Pont de Nemours & Co. (No. 2)* (1986), 56 O.R. (2d) 722 (H.C.J.) at 732, cited with approval in *Fecht v. Deloitte & Touche (Gen. Div.), supra* at 194, Osborne J. (as he then was) set out some of the factors to be considered by the court when exercising its discretion:

Before an order giving effect to letters rogatory will be made, the evidence (including the letters rogatory) must establish that:

(1)     the evidence sought is relevant;

(2)     the evidence sought is necessary for trial and will be adduced at trial, if admissible;

(2)     the evidence is not otherwise obtainable;

(3)     the order sought is not contrary to public policy;

(4)     the documents sought are identified with reasonable specificity;

(5)     the order sought is not unduly burdensome, having in mind what the relevant witnesses would be required to do, and produce, were the action to be tried here.

2005 CanLII 27013 (ON S.C.)

**EXHIBIT 5 PAGE59**

Page: 6

Other factors may also be relevant to the determination in each particular case.

## GUIDING PRINCIPLES

[13]     The main principle underlying requests for international judicial assistance is that of international judicial cooperation and the comity of nations.  Justice Dickson, speaking for the court, in *R. v. Zingre, supra* at 400-01 states:

> As that great jurist, U.S. Chief Justice Marshall, observed in *The Schooner Exchange v. M'Faddon & Others* [(1812), 7 Cranch's Reports 116], at pp. 136-7, the jurisdiction of a nation within its own territory is necessarily exclusive and absolute, susceptible of no limitation not imposed by itself, but common interest impels sovereigns to mutual intercourse and an interchange of good offices with each other.

> It is upon this comity of nations that international legal assistance rests. Thus the courts of one jurisdiction will give effect to the laws and judicial decisions of another jurisdiction, not as a matter of obligation but out of mutual deference and respect. A foreign request is given full force and effect unless it be contrary to the public policy of the jurisdiction to which the request is directed (see *Gulf Oil Corporation v. Gulf Canada Ltd et al.* [[1980] 2 S.C.R. 39] or otherwise prejudicial to the sovereignty or the citizens of the latter jurisdiction. [Emphasis added.]

[14]     Thus, in considering its discretion to grant the letters rogatory, the court must consider whether the request is contrary to the public policy of Canada or is otherwise prejudicial to Canadian sovereignty or to the private interests of Canadian citizens. (See: *France (Republic) v. De Havilland Aircraft of Canada Ltd.* (1991), 3 O.R. (3d) 705 at 718 (C.A.))

[15]     The onus is on the applicant to establish the necessary elements for an affirmative exercise of judicial discretion to enforce letters rogatory. Freedman and Harney in "Obtaining Evidence from Canada" (1987) 21 U.B.C.L. Rev. 351 at 378, suggest that the evidentiary burden to establish a possible infringement of an aspect of international interest may, as a practical matter, rest with the party opposing the enforcement of the letters rogatory. Nonetheless, the final onus is on the applicant.

[16]     The Canadian government has expressed concerns about the American court's taking of jurisdiction in this matter, submitting that the U.S. action frustrates the government's policies vis-à-vis Sudan.  These concerns were included in a diplomatic letter from the Embassy of Canada in the United States to the U.S. Department of State, dated January 14, 2005.  It is helpful to set out the contents of the Canadian letter at some length. The following are excerpts:

> Canada reiterates its overriding concerns regarding the extraterritorial application of the Alien Tort Claims Act to activities of Canadian corporations that take place entirely outside the US and in particular, the current application of the Alien Tort Claims Act against a Canadian corporation, Talisman Energy brought by the Presbyterian Church of Sudan in the US District Court, Southern District of New York ("Talisman case").

EXHIBIT 5 PAGE60

Page: 7

As stated in its earlier diplomatic note, Canada is opposed, in principle, to broad assertions of extraterritorial jurisdiction over Canadian individuals and entities arising out of activities that take place entirely outside of the state asserting jurisdiction. Under international law, the limitations on the extent to which any single nation can extend its own jurisdiction are generally recognized as flowing from the sovereignty and equality of nations. Territoriality is universally recognized in international law as a primary ground for asserting jurisdiction. International law has developed a number of additional grounds for asserting jurisdiction that are based on the need for a 'substantial and genuine' connection to the nation asserting jurisdiction. In the Talisman case, there is no connection with the US either through the plaintiffs or the defendants or the location where the alleged actions took place.

... The 'Talisman case' is problematic because it involves a US court acting with respect to the foreign policy power of the executive authority of the Canadian government, an area of prerogative where courts are normally expected to defer. This assumption of extraterritorial jurisdiction by a US court constitutes an infringement in the conduct of foreign relations by the Government of Canada.

... Canada has taken the foreign policy decision to use access to trade support services as an incentive in support of the Sudan peace process. Canada has devoted considerable diplomatic and financial resources to promoting a peaceful resolution of the disputes wracking Sudan. The Prime Minister has visited Sudan, as have other ministers and senior officials with the objective of constructive engagement with the Sudanese to address short and long term problems in Sudan...

... Canada has thus taken the foreign policy decision to use trade support services as both a stick and a carrot in support of peace.

The inducement for Sudan if they achieve peaceful resolution of their internal disputes will be the reinstatement of trade support services. However, the impending US court action removes that inducement...

Through the extraterritorial application of the Alien Tort Claims Act, US courts assumption of jurisdiction creates a "chilling effect" on Canadian firms engaging in Sudan and the ability of the Canadian government to implement its foreign policy initiatives through the granting and denial of trade support services. This action infringes on Canada's conduct of foreign policy and on its relations with other states.

...

For all the reasons noted above, the Government of Canada considers the assumption of jurisdiction by US courts over Talisman, on the basis of the Alien Tort Claims Act raises serious foreign policy issues.

This letter was submitted to the New York District Court on March 15, 2005, appended to a Statement of Interest in the action of the United States government.

## THE APPLICANTS' POSITION

[17]    The applicants take the position that the order sought is not contrary to public policy because the applicants' attempt to seek compensation and justice for the alleged violations is laudable, and if the evidence is not produced, there is a genuine risk the applicants will not be able to properly prepare for trial. Regardless of the disposition of this proceeding, the U.S. action will proceed.

2005 CanLII 27013 (ON S.C.)

**EXHIBIT 5 PAGE61**

Page: 8

[18]     Secondly, the applicants submit that the *Statement of Interest* filed by the United States government and the appended Diplomatic Note from the Canadian government have little significance for the purposes of this proceeding and do not disclose proper grounds for refusing to grant the Order sought. There is nothing in the diplomatic note that suggests the Canadian government finds it objectionable for a witness such as Rybiak to provide relevant evidence concerning serious breaches of international law. Rather, these documents go to the jurisdiction of the American court to hear the case. It would be inappropriate for the Canadian court to "sit on appeal" of the decision of the US court with respect to jurisdiction. (*Factum of Applicants*, para. 33).

[19]     Finally, the policy objectives of international comity and ensuring the applicants can properly prepare for the case override any public policy concerns.

**THE RESPONDENT'S POSITION**

[20]     The respondent, Rybiak, asserts that the *Alien Tort Claims Act* should "**not** be treated as an American imperial fiat to which this Court owes deference". (*Factum of respondent (Rybiak)*, para. 23) Rather, he questions whether the court should support litigation based on "an American 'long arm' statute with respect to events occurring entirely outside the United States". (*Factum of respondent (Rybiak)*, para. 6) Rybiak notes that the applicants do not challenge the assertion that Canadian courts would be adequate alternative fora. Thus, Rybiak submits that the declarations of Canadian foreign policy should be accorded substantial deference in the court's exercise of discretion.

**THE JURISPRUDENCE**

[21]     Freedman and Harney suggest, in "Obtaining Evidence from Canada", *supra* at 371-77, that the courts should consider the following issues with respect to Canadian sovereignty:

a)     an assessment of whether the request would give extra-territorial authority to foreign laws which violate relevant Canadian or provincial laws;

b)     whether granting the request would infringe on recognized Canadian moral or legal principles; and,

c)     whether the request would impose an undue burden on, or do prejudice to, the individual whose evidence is requested.

The Ontario Court of Appeal affirmed the relevance of these factors in *France (Republic) v. De Havilland Aircraft of Canada Ltd., supra* at 718-19.

[22]     The first two points were considered in *Re Westinghouse Electric Corporation and Duquesne Light Company et al.* (1977), 16 O.R. (2d) 273 (H.C.J.), where Justice Robins denied enforcing letters rogatory because of the public policy of the Canadian government. Robins J. stated (at 291):

2005 CanLII 27013 (ON S.C.)

**EXHIBIT 5 PAGE62**

Page: 9

> The most important of these is public policy. This case constitutes a rare occasion, certainly in relations with the United States, in which, in my opinion, legal assistance should be denied on the ground that to grant it would be to run counter to a public policy of this country. The policy I refer to has been clearly and forcefully expressed; it relates specifically to the evidence and documents in issue. By affidavit and public statement a Minister of the Crown has made it plain that the Government of Canada has, as a matter of public policy, taken the position that the information and documents sought should not be disclosed. ...[Emphasis added.]

[23]   In that case, Security Regulations had been promulgated with the approval of the Governor in Council that prohibited the production of the documents sought for disclosure. Robins J. concluded (at 291):

> In these circumstances the Court, in my view, should take judicial cognizance of the stated public policy in exercising its discretionary power... and should not force the disclosure of information if to do so would, on the authority of the Government, be harmful to the public interest. To decline to lend a foreign Court assistance through the use of domestic judicial machinery in such circumstances is not to act in breach of the doctrine of comity but in accord with it.

[24]   It is important to note that in *Westinghouse, supra* and on similar facts in *Golf Oil Corporation v. Gulf Canada Limited*, [1980] 2 S.C.R. 39, two cases in which letters rogatory were denied on the basis of Canadian public policy, the Canadian government had expressed direct concerns with the production of the materials requested. In the current case, the Canadian government has expressed concern about the jurisdiction of the American court to hear the main action; the government has not taken a direct position on the production of the evidence sought.

[25]   The American court has already accepted jurisdiction in the main action; whether or not the Canadian court orders the production of the evidence, the case will proceed in the United States.   On one hand, enforcing the letters rogatory would assist the American court in its deliberations on the main action by putting before it evidence that is, arguably, not otherwise available. On the other hand, it is legitimate to ask whether enforcing the request implicitly condones the United States court in taking jurisdiction in circumstances in which the Canadian government has expressed concern, and the jurisdictional basis of the United States court is suspect in private international law. The expression "court of competent jurisdiction" in the Ontario and Canada *Evidence Act* is not used in a private international law context.   The conditions enunciated in *Zingre, supra*, for international legal assistance, and the rationale for such assistance, do not contemplate an assessment of the foreign court's "jurisdiction" in the private international law sense. Therefore, enforcing letters rogatory should not be taken as an acknowledgement of the jurisdiction of the New York court.

2005 CanLII 27013 (ON S.C.)

**EXHIBIT 5 PAGE63**

Page: 10

## INTERESTS OF CANADIAN INDIVIDUALS

[26]   Concerns with respect to sovereignty include potential prejudice to a Canadian individual. A request that is burdensome or unfair goes to the issue of sovereignty. In weighing the impact of the proposed order on a Canadian individual, the requirements under rule 30.10 of the *Rules of Civil Procedure* are relevant, though not determinative. (*Fecht (C.A.), supra*, at 420)   The factors to consider when ordering production from a non-party under rule 30.10 include:

   a)  the importance of the documents in the litigation;

   b)  whether production at the discovery stage of the process as opposed to production at trial is necessary to avoid unfairness to the party seeking production;

   c)  whether the discovery of the other party to the litigation with respect to the issues to which the documents are relevant is adequate and if not, whether responsibility for that inadequacy rests with the defendants;

   d)  the position of the non-party with respect to production;

   e)  the availability of the documents or their informational equivalent from some other source which is accessible to the moving parties;

   f)  the relationship of the non-party from whom production is sought, to the litigation and the parties to the litigation.  Non-parties who have an interest in the subject-matter of the litigation and whose interests are allied with the party opposing production should be more susceptible to a production order than a true "stranger" to the litigation.

   (*Ontario (Attorney General) v. Stavro* (1995), 26 O.R. (3d) 39 (C.A.) at 48)

[27]   These factors were considered in *Fecht (Gen. Div.), supra,* where Blair J. found the scope of the request for documentary production unjustifiably broad and therefore "constitutes an infringement upon the sovereignty of the jurisdiction to which the request in the letters rogatory is directed, Ontario, and a prejudice to a business citizen of that jurisdiction". (p. 205, aff'd on appeal at 420)

[28]   In *Fecht*, the applicants sought to enforce documentary production from an accounting firm, Deloitte & Touche ("D&T"), and the oral examination of one of the firm's representatives on issues relating to a class action pending in the United States against a company of which D&T were the independent Canadian auditors.  The U.S. action was a class action on behalf of shareholders alleging misrepresentation by the company and some of its Directors in violation of U.S. securities laws.

2005 CanLII 27013 (ON S.C.)

**EXHIBIT 5 PAGE64**

Page: 11

[29]    Justice Blair denied the request for several reasons: the request for documentary production was of such a sweeping nature that significant portions were irrelevant or at best of marginal relevance; it was not clear that the evidence or information could not be, or have been, otherwise obtained; and, it did not appear that D&T was involved in the matters at the heart of the U.S. action in any fashion other than the normal connection between independent auditor and client. Blair J. concluded that without more, he would not "sanction what is in essence the extension of the American pre-trial deposition practice to a non-party providing auditing services in Ontario in the circumstances of this case". (p.204)

[30]    Justice Blair's decision was upheld on appeal, in part, on the basis that any attempt to narrow the request would have been virtually impossible, and on the grounds that there was not a sufficiently substantial link to the foreign litigation to require such a commission of evidence. (C.A., p.420)

[31]    The applicants seek to obtain oral and documentary evidence from Richard Rybiak regarding: Talisman Energy's operations in Sudan; Talisman Energy's security strategy in Sudan; Talisman Energy's complicity in the human rights violations in Sudan; Talisman Energy's cooperation and coordination with the Government of Sudan; and Talisman Energy's knowledge of statements concerning human rights violations in Sudan as set out in the *Notice of Motion for Issuance of Request for International Judicial Assistance* of Judge Cote, issued January 19, 2005.[2] The applicants submit that the evidence sought is relevant, necessary for the trial, essential to an assessment of Talisman's liability, not otherwise obtainable, and that the documents are identified with reasonable specificity. Thus, they submit, the request is not unduly burdensome.

[32]    Counsel for Rybiak argues that there is no evidence that Rybiak has any knowledge or any material facts which have not already been disclosed to the plaintiffs. Rybiak questions why he should be subject to an oral examination of virtually unlimited content when, he submits, it is highly unlikely that he would be ordered to do so in similar circumstances in a Canadian action. He states that the discovery of a non-party would violate local laws of civil procedure and that the examination requested is a "fishing expedition". (*Factum of respondent (Rybiak)*, para. 24) Rybiak also submits that the ambit of evidence sought on oral examination is extraordinarily broad and general, and that no effort has been taken to redefine the ambit in light of the refusal of class certification. (*Factum of respondent (Rybiak)*, para. 29)

---

[2] 1. All documents relating to: (A) communications by Talisman or any of its subsidiaries with the Government of Sudan; (B) security for Talisman's oil exploration or extraction activities in Sudan; (C) alleged human rights violations in Sudan, including displacement of civilians and attacks, whether by air or land, on villages or populations; (D) dates and locations of Talisman's oil exploration and extraction activities in Sudan; (E) communications between Talisman and Talisman (Greater Nile) BV regarding operations in Sudan. 2. All documents concerning your service as Manager of Human Resources and Administration for (Greater Nile) B.V., regarding the following subjects: (A) security for Talisman's operations in Sudan; (B) the Sudan Peace Act; (C) human rights violations in Sudan; (E) Awad Al-Jazz; (F) Saeed Al-Sabawi; (G) Mark Kingley; (H) Mark Reading; (I) Mohammed Mohktar.

2005 CanLII 27013 (ON S.C.)

EXHIBIT 5 PAGE65

Page: 12

[33]    In *Fecht (C.A.), supra* at 419, it was held that the mere fact that the letter of request may
be overly broad is not necessarily, and in and of itself, a reason for not enforcing the request.
(See also: *Pecarsky v. Lipton Wiseman Altbaum & Partners, supra* at 177). Ontario courts have
the power to narrow the request contained in the letter of request to that which the court views
as relevant.

[34]    The applicants make similar arguments relating to the production of Ian Taylor's
documents. They seek to obtain documentary evidence from Ian Taylor regarding: Talisman
Energy's operations in Sudan; Talisman Energy's security strategy in Sudan; Talisman Energy's
complicity in the human rights violations in Sudan; Talisman Energy's cooperation and
coordination with the Government of Sudan; and Talisman Energy's knowledge of statements
concerning human rights violations in Sudan as set out in the *Notice of Motion for Issuance of
Request for International Judicial Assistance* of Judge Cote, dated October 26, 2004.[3]  The
applicants assert that the information sought is relevant and necessary to prepare for the U.S.
action and is not otherwise obtainable. The respondents, Jennifer and Terrance Taylor, do not
oppose the application and do not assert that the request is overly broad or unduly burdensome.

[35]    The consent of the Taylors clearly eliminates the need for concern for their personal
interests. However, it remains highly important to consider Canadian state sovereignty and the
Canadian public interest more generally. Thus, the scope of the evidence sought is relevant to
the overall balancing of the factors considered in the exercise of the court's discretion. The
confidentiality agreement struck between Ian Taylor (now deceased) and Talisman is contained
in a release that terminated a wrongful dismissal action. The terms of the release were
presumably, as is often the case, intended to be kept confidential. Needless to say, it is most
unlikely that the obligations, if any, undertaken by Talisman to obtain the release from Ian
Taylor, are material to the issues in the main action. Accordingly, at this stage, the Taylors need
not produce the release itself, but are required to produce all other relevant documents. The
Taylors shall deliver the release in a sealed envelope to the counsel for the applicants, who shall
retain it in such sealed envelope to be delivered to the trial judge, who will in due course
determine its relevance.

---

[3] 1. All documents concerning Talisman's operations in Sudan. 2. All documents concerning Talisman's Human
Rights Monitoring program in Sudan. 3. All documents concerning Talisman's use of Sudanese military and security
forces to protect operations in Sudan. 4. All documents concerning Sudan military operations in the oil concession
area of Sudan, including the use of tanks, armoured personnel carriers, helicopter gunships, and Antonov bombers.
5. All documents concerning forced displacement in the oil concession area of Sudan. 6. All documents concerning
destruction of evidence of human rights abuses in Sudan by Talisman employees. 7. All documents concerning
Talisman's Corporate Social Responsibility Reports or audit(s). 8. All documents concerning misidentification by
Talisman's military advisers in the oil concession area acting as "community development" personnel. 9. All
documents concerning GNPOC or Talisman's plans for oil exploration in southern Sudan. 10. All documents
concerning the Sudanese military's use of facilities built and maintained by Talisman, including transportation roads
and airstrips and communication facilities in Sudan. 11. All documents concerning Talisman's official meeting
minutes including deletions of references to Talisman's secret plan to finance and build helicopter gunship bases in
the oil concession area. 12. All documents describing Ian Taylor's experiences as an employee of Talisman Energy,
Inc. 13. All documents concerning Talisman's financial and logistical support of the Sudanese military and security
forces.

2005 CanLII 27013 (ON S.C.)

**EXHIBIT 5 PAGE66**

Page: 13

## WHETHER THE COURT SHOULD GO BEHIND THE ORDER

[36]    Counsel for Rybiak observes that when the Letter of Request was issued, there was no affidavit evidence before Judge Cote to justify the request.  The judge relied solely on representations of counsel.  When the request was made, many of the depositions of other witnesses had not yet occurred; thus, it was unlikely the applicants knew what evidence would be obtained from them.  The evidence since obtained has not been disclosed to the court.

[37]    Should the Canadian court take these factors into consideration?  As noted above, in *Zingre, supra,* the court held that letters of request should be given "full force and effect unless it be contrary to the public policy of the jurisdiction to which the request is directed... or otherwise prejudicial to the sovereignty or the citizens of the latter jurisdiction".  (401)  It is possible that, in a particular case, the conditions which led to the issuance of the letters rogatory are so offensive to the Canadian court that the request should not be granted.  However, it is also clear that "it is not the function of this Court to act as an appellate court in respect of the decision made in the foreign court".  (*D.G. Jewellery of Canada Ltd. v. Valentine* (2000), 11 C.P.C. (5th) 378 (Ont. S.C.J.) at para. 2)

## WHETHER JUSTICE MCWATT'S ORDER DATED MARCH 21, 2005 IS BINDING?

[38]    On March 21, 2005, Justice McWatt, of this court, granted a similar unopposed request by the applicants for an Order to enforce a letter of request regarding Dr. Sabawi.  The respondent, Talisman, notes that Justice McWatt did not have before her the statement of interest of the United States, dated March 15, 2005, and the appended Canadian diplomatic note dated January 14, 2005. (*Factum of the respondent (Talisman),* para. 39)  Since McWatt J. did not provide reasons for her Order, it is of limited precedential value.

## CONCLUSION

### The Public Policy Issue

[39]    It would no doubt have been simpler to deal with such an application if the defendant corporation were American rather than Canadian.

[40]    The concerns expressed in the diplomatic note from the Canadian Embassy in the United States were directed to the United States State Department.  They were not, as they should not have been, directed to this court, nor to the respondents.  The objective of the diplomatic note, it seems to me, was to alert the United States Government to the sensitivity of the sovereignty aspect of the issue to the Canadian Government.  That has been done.  Whether the United States Government does or does not take any action to deal with the concerns expressed by Canada, is not an issue for this court.

[41]    I noted earlier the applicants' observation that the case will proceed whatever the decision rendered by this court.  Disclosure of documents and answers to questions that are useful for a case ensure that trials are conducted fairly and efficiently.  See *Glegg v. Smith &*

2005 CanLII 27013 (ON S.C.)

**EXHIBIT 5 PAGE67**

Page: 14

*Nephew Inc.*, [2005] S.C.J. No. 29 at para. 22 (S.C.C.). Since the case is proceeding to trial in any event, this court clearly has an interest in it being conducted fairly.

[42]    As Dickson J. said in *R. v. Zingre, supra*, it is upon the comity of nations that international legal assistance rests. The Supreme Court of Canada has recently expressed that crimes against humanity are the types of issues that require a unified international approach. (*Mugesera v. Canada (Minister of Citizenship and Immigration)*, [2005] S.C.J. No. 39 at para. 178 (S.C.C.))

[43]    It is my view that, while the Canadian government's concern as to the American court's jurisdiction is well-founded and an important consideration, it is not sufficient, and was likely not intended to override the principles of comity, and the applicants' right to the evidence to conduct a fair trial. The compliance with the request for documents and answers to questions that are useful for the case is not contrary to the public policy of Canada.

[44]    The Government of Canada is clearly not pleased, and I am sure for good reasons, that the New York court is the forum chosen to prosecute this action. It would, nevertheless, be in the Canadian public interest that the New York trial judge, who obviously intends to adjudicate on the matter, have before her evidence that would enhance, at least, the fairness of trial.

### The Issue of the Interest of Private Individuals

[45]    I do not share the view of the respondent that the request is so overly broad as to unduly burden Rybiak such that it is an affront to Canadian sovereignty.

[46]    The main action is extraordinary. In many respects, it breaks new ground. The process will likely present difficulties to Mr. Rybiak. He will perhaps not be in a position to provide all the information required, whether oral or documentary. Nevertheless, I believe the factors set out by Osborne J. in *Friction Division Products Inc., supra,* and under Rule 30.10 as set out by Blair J. in *Fecht, supra,* support a granting of the request.

[47]    It does not appear from the materials before me that, for example, the applicants have deposed any other persons from the Sudanese subsidiary, Talisman (Greater Nile) B.V. In contrast to *Fecht, supra,* the documents requested are relevant and sufficiently connected to the issues in the main action. The production of documents may be inconvenient, but is not so burdensome as to outweigh the compelling reasons for permitting the examination and production to proceed. The respondent, Rybiak, had counsel for these proceedings and will undoubtedly have counsel present at the time of the discoveries.

### DISPOSITION

[48]    The letters of request are granted in both proceedings.

2005 CanLII 27013 (ON S.C.)

**EXHIBIT 5 PAGE68**

Page: 15

[49]    Talisman shall have equal participation rights with the applicants in any examination of
Richard Rybiak, and any productions of documents from Richard Rybiak or Jennifer Taylor,
pursuant to the enforcement of the letters of request.

[50]    It is also ordered that the implied undertaking rule apply to any such examinations and
productions.

**COSTS**

[51]    Subject to any agreement between the parties, brief written submissions on costs are to be
made within 20 days of the release of these reasons.

_____

Pitt J.

**Released:**      July 29, 2005

2005 CanLII 27013 (ON S.C.)

**EXHIBIT 5 PAGE69**

COURT FILE NO.: 05-CV-284509PD1
05-CV-283553PD1
DATE: 20050729

2005 CanLII 27013 (ON S.C.)

## ONTARIO

## SUPERIOR COURT OF JUSTICE

**B E T W E E N:**

THE PRESBYTARIAN CHURCH OF SUDAN et
al.

Applicants

- and -

RICHARD RYBIAK

Respondents

**A N D   B E T W E EN**

THE PRESBYTARIAN CHURCH OF SUDAN et
al.

Applicants

- and -

TAYLOR et al.

Respondents

REASONS FOR JUDGMENT

Pitt J.

Released:     July 29, 2005

**EXHIBIT 5 PAGE70**

# EXHIBIT 6



Canadian Legal Information Institute

Home > Federal > Supreme Court of Canada >
1981 CanLII 32 (S.C.C.)

Français | English

# Zingre v. The Queen et al., 1981 CanLII 32 (S.C.C.)

Date:             1981-09-28
Parallel citations:  [1981] 2 S.C.R. 392
URL:              http://www.canlii.org/en/ca/scc/doc/1981/1981canlii32/1981canlii32.html

Reflex Record (noteup and cited decisions)

**SUPREME COURT OF CANADA**
**Zingre v. The Queen et al., [1981] 2 S.C.R. 392**
**Date: 1981-09-28**

Alfred Robert Zingre (Respondent) Appellant;

and

Her Majesty The Queen (Applicant) Respondent;

and

Kurt Wuest and Oskar Reiser (Respondents). Oskar Reiser (Respondent) Appellant; and

Her Majesty The Queen (Applicant) Respondent;

and

Kurt Wuest and Alfred Robert Zingre

(Respondents).

1981: May 11; 1981: September 28.

Present: Laskin C.J. and Martland, Ritchie, Dickson, Beetz, Estey, McIntyre, Chouinard
and Lamer JJ.

ON APPEAL FROM THE COURT OF APPEAL FOR MANITOBA

*Evidence — Swiss nationals, now resident in Switzer—land and not subject to extradition,*
*charged in Canada with criminal offences committed in Canada — Proceedings*
*commenced in Swiss courts at Canada's request pursuant to treaty — Swiss examining*
*judges seeking sworn testimony for pre-trial stage necessary to Swiss judicial system —*
*Whether or not order allowing commission evidence should be made — Canada Evidence*
*Act, R.S.C. 1970, c. E- l0, ss. 40, 43, 48.*

**EXHIBIT 6 PAGE 71**

The Court in these appeals considered the right of a Manitoba court to issue a commission authorizing two Swiss "extraordinary investigating judges" to take testimony in Canada in respect of the prosecution in Switzerland of three Swiss nationals for crimes allegedly committed in Manitoba. Swiss law prevented the extradition of Swiss nationals from Switzerland but an Anglo-Swiss Treaty of 1880 provided for prosecution of a fugitive on the charge according to the laws of the fugitive's canton.

Held: The appeals should be dismissed.

[Page 393]

Section 43 of the Canada Evidence Act and the treaty must be fairly and liberally interpreted with a view to fulfilling Canada's international treaty obligation. Although generally only made for use at trial, orders for examinations for gathering evidence may be made at the pre-trial stage. No distinction is made in s. 43 between trial and pre-trial proceedings. The court should exercise its discretion and grant this order for the order would not compromise Canadian sovereignty and was necessary for the carriage of justice. Without it, the treaty would be frustrated for the Swiss authorities would be unable to continue the surrogate criminal proceedings being conducted by them at Canada's request. The requirements of s. 43 were met. The Swiss request, made through the proper diplomatic channels, complied with the treaty and satisfied that section. The charges laid in Winnipeg underlay the Swiss proceedings and met the condition that charges be before a foreign court. The testimony was sought by a foreign court.

Re Geneva v. Comtesse, [1959] O.R, 668; The Schooner Exchange v. M'Faddon & Others (1812), 7 Cranch's Reports 116; Gulf Oil Corporation v. Gulf Canada Limited et al., [1980] 2 S.C.R. 39; Re Radio Corporation of America v. The Rauland Corporation et al., [1956] O.R. 630; Radio Corporation of America v. Rauland Corporation and Another, [1956] 1 Q.B. 618; Re Request for International Judicial Assistance (1979), 49 C.C.C. (2d) 276; Re Uszinska and the Republic of France (1980), 52 C.C.C. (2d) 39; In Re Application by Letters Rogatory from United States District Court, Middle District of Florida, [1980] 1 W.W.R. 7; Re Kirchoffer v. The Imperial Loan and Investment Company (1904), 17 O.L.R. 295; Re Isler (1915), 34 O.L.R. 375; R. v. Dzambas (1973), 24 C.R.N.S. 118, referred to.

APPEALS from a judgment of the Manitoba Court of Appeal[1] allowing the Crown's appeal against an order in respect of Zingre setting aside an order against him, and dismissing Reiser's appeal with respect to the order made against him. Appeals dismissed.

[Page 394]

K. P. Regier, Q.C., and A. Stewart, for the appellant Alfred Robert Zingre.

H. Walsh, Q.C., and P. Walsh, for the appellant Oskar Reiser.

J. P. Nelligan, Q.C., J. Chapman, Q.C., and Paul Teskey, for respondent Her Majesty The Queen.

The judgment of the Court was delivered by

DICKSON J.—The Court in this appeal is called upon to consider an unusual procedural
**EXHIBIT 6 PAGE 72**

matter of some considerable importance. At issue is the right of a Manitoba court to issue a
commission authorizing two Swiss "extraordinary investigating judges" to take testimony in
Canada in respect of the prosecution in Switzerland of three Swiss nationals for crimes
allegedly committed in the Province of Manitoba.

I

The proceedings relate to the Churchill Forest Industries (Manitoba) Limited forestry
complex at the Town of The Pas in Manitoba constructed during the mid and latter 1960's.
The project, intended to stimulate industrial growth in an underdeveloped area of the
province, was basically financed by public funds through an agency of the Government of
Manitoba, namely, the Manitoba Development Fund, latterly known as the Manitoba
Development Corporation. As a result of an investigation into the construction and
financing of the project criminal charges were laid against the appellants Alfred Robert
Zingre and Oskar Reiser and others alleging fraud and conspiring to defraud. Large
amounts of money are involved. One of the charges against Zingre and Reiser and two
other named individuals alleges conspiracy to defraud the Manitoba Development
Corporation of $36,596,262.22. The investigation has been pursued in nine countries.

During the month of February 1972 members of the Royal Canadian Mounted Police and
two special prosecutors continued investigations in

[Page 395]

Europe. Prior to their attendance in Europe John N. Turner, then Attorney General and
Minister of Justice of Canada, issued a Letter of Request, directed to the Competent Legal
Authority, Switzerland, requesting the assistance of the Swiss police in the inspection of
records and documents of a number of companies and banks and in the interviewing of
persons, including the accused. In response to Mr. Turner's letter the Swiss Department of
Justice and Police provided assistance to the R.C.M.P. and the special prosecutors.

In the latter part of 1973 sworn testimony was given by some thirty-three witnesses before
the Chief Provincial Court Judge of Manitoba. The evidence was taken in four different
countries. On December 14, 1973 the judge issued warrants to arrest all the accused
persons including Zingre against whom nine warrants to arrest were issued for charges of
fraud, conspiracy to defraud and theft, and Reiser against whom twenty-three warrants to·
arrest were issued for like charges.

Prior to and following December 14, 1973 attempts were made to locate and apprehend
the various accused persons with a view to having them extradited to Canada to face the
criminal charges outstanding against them. Zingre and Reiser were, however, residents of
Switzerland and, because of their citizenship, expressly exempted by treaty from
extradition.

On August 8, 1975 Howard Pawley, then Attorney General of Manitoba wrote to the Chief
of Extradition Section, Federal Department of Justice and Police, at Berne, Switzerland
making an official request that Zingre and Reiser and one Wuest be prosecuted in
Switzerland in a court of competent jurisdiction for offences committed in the Province of
Manitoba. The request was pursuant to the treaty and convention between Switzerland and
Great Britain for the mutual surrender of fugitive criminals, signed at Berne on November

**EXHIBIT 6 PAGE 73**

26, 1880. Article 1 of the treaty reads:

> Her Majesty the Queen of the United Kingdom of Great Britain and Ireland engages to deliver up, under the circumstances and on the conditions stipulated in the

[Page 396]

> present Treaty, all persons, and the Swiss Federal Council engages to deliver up, under the like circumstances and conditions, all persons, excepting Swiss citizens, who, having been charged with or convicted by the tribunals of one of the two High Contracting Parties of the crimes or offences enumerated in Article II, committed in the territory of the one party, shall be found within the territory of the other.
>
> In the event of the Federal Council being unable, by reason of his Swiss nationality, to grant the extradition of an individual who, after having committed in the United Kingdom one of the crimes or offences enumerated in Article II, should have taken refuge in Switzerland, the Federal Council engages to give legal effect to and prosecute the charge against him according to the laws of the Canton of his origin; and the Government of the United Kingdom engages to communicate to the Federal Council all documents, depositions, and proofs relating to the case, and to cause the commissions of examination directed by the Swiss Judge, and transmitted through the proper diplomatic channel, to be executed gratuitously.

The Canadian Embassy in Berne transmitted by a note verbale under the seal of the Embassy of Canada to the Police Division of the Federal Department of Justice and Police the request of the Attorney General of Manitoba for the prosecution of the Swiss citizens Zingre, Reiser and Wuest. As the three accused were domiciled in separate Cantons of Switzerland the Swiss authorities decided that the Canton of Thurgau should be the Canton to handle the Canadian request. Extensive answers were provided by Canadian authorities to questions posed by the Swiss authorities and there was an exchange of documents.

On June 27, 1978 the Public Prosecutor's office of the Canton of Thurgau rejected the launching of criminal proceedings in that jurisdiction against the appellant Zingre, the appellant Reiser, and Kurt Wuest on the basis that: (a) 16 charges involving conspiracy to defraud were foreign to Swiss law; (b) 13 cases of theft against Oskar Reiser were covered by the Statute of Limitations; (c) 16 charges of fraud required proof of deceitful misleading which was not evident; (d) the entire matter was marked by political overtones and damages were not substantiated as at that time; (e) the doubtful outcome did not warrant the

[Page 397]

expenditure of the sum of at least 250,000 francs likely to be incurred in the investigation and prosecution.

This ruling was appealed. On March 13, 1979 the Chamber of Indictment of the Canton of Thurgau handed down its decision, ordering the Public Prosecutor to open the criminal inquiry requested by Canada and Manitoba. Reiser appealed to the Supreme Court of Switzerland. The appeal was dismissed.

**EXHIBIT 6 PAGE 74**

In accordance with the order of the Chamber of Indictment, two "extraordinary investigating judges" were appointed in Thurgau. The function of these magistrates is to examine documents and to interrogate witnesses in order to assist the authorities in determining whether the evidence justified a formal trial. At the end of the investigation a report is submitted to the State Attorney who will then make a decision as to whether or not there is sufficient evidence before him. If he thinks that a crime has been committed, he will submit the case to the competent court and the accused will have to stand trial to face the charges brought by the State Attorney.

II

As might be expected, much of the evidence relevant to the inquiry is in Canada, the situs of the alleged offence. On October 31, 1980 the Federal Office for Police Matters of the Federal Department of Justice and Police submitted to the Canadian Embassy in Berne a request for assistance addressed to the Chief Justice of the Court of Queen's Bench for the Province of Manitoba. The request aimed at Messrs. Hanspeter Hirt and August Biedermann, both extraordinary investigating judges for the Canton of Thurgau, being appointed as Commissioners to take evidence in Canada in respect of the prosecution in Switzerland of Zingre, Reiser and Wuest. The request recited the investigations taking place in the Canton of Thurgau dealing with possible criminal charges against Zingre, Reiser and Wuest for possible violations of the Criminal Laws of Canada and possible violations of the Criminal Laws of Switzerland. The charges laid in Canada against

[Page 398]

these three individuals are also recited. The following recital then appears:

> AND WHEREAS it has been represented to the Department of Justice and Police of the Country of Switzerland that it is necessary for the purposes of the proper administration of justice and for the due determination of the matter in dispute between the parties that the following named persons:

Nine persons are named. This further recital follows:

> AND WHEREAS Mr. Hanspeter Hirt, LL.M., extraordinary investigating judge for the Canton of Thurgau, Frauenfeld, and Mr. August Biedermann, Attorney, extraordinary investigating judge for the Canton of Thurgau, Frauenfeld, are the Examining Magistrates in charge of the conduct of this examination and accordingly would be responsible for the examination of, and production of all writings, records and documents by the aforesaid witnesses who are located in Canada.

The request asks Chief Justice Dewar to summon the witnesses and cause them to be examined under oath. All of the witnesses have indicated a consent to appear and give testimony as required.

On February 2, 1981 Mr. Justice Hamilton of the Manitoba Court of Queen's Bench made an order for the issuance of a commission to Messrs. Hirt and Biedermann for the examination under oath of the nine persons named in the request. Crown counsel and counsel for Reiser were present upon the motion. The appellant Zingre and Kurt Wuest were not present nor represented by counsel. Zingre filed a notice of motion for an order

**EXHIBIT 6 PAGE 75**

rescinding or reversing the order, in response to which the order issuing the commission was discharged and set aside with respect to Zingre on the ground that s. 43 of the Canada Evidence Act, R.S.C. 1970, c. E-10 had not been complied with. Section 43 provides that:

> 43. Where, upon an application for that purpose, it is made to appear to any court or judge, that any court or tribunal of competent jurisdiction, in the Commonwealth and Dependent Territories, or in any foreign country, before which any civil, commercial or criminal matter is pending, is desirous of obtaining the testimony

[Page 399]

> in relation to such matter, of a party or witness within the jurisdiction of such first mentioned court, or of the court to which such judge belongs, or of such judge, the court or judge may, in its or his discretion, order the examination upon oath upon interrogatories, or otherwise, before any person or persons named in the order, of such party or witness accordingly, and by the same or any subsequent order may command the attendance of such party or witness for the purpose of being examined, and for the production of any writings or other documents mentioned in the order, and of any other writings or documents relating to the matter in question that are in the possession or power of such party or witness.

Two other sections of the Canada Evidence Act should be noted. Section 40 reads:

> 40. This Part applies to the taking of evidence relating to proceedings in courts out of Canada.

Section 48 reads:

> 48. (1) The court may frame rules and orders in relation to procedure, to the evidence to be produced in support of the application for an order for examination of parties and witnesses under this Part, and generally for carrying this Part into effect.

> (2) In the absence of any order in relation to such evidence, letters rogatory from any court of justice in the Commonwealth and Dependent Territories, or from any foreign tribunal, in which such civil, commercial or criminal matter is pending, shall be deemed and taken to be sufficient evidence in support of such application.

Mr. Justice Hamilton held there was no "pending criminal matter" within the meaning of s. 43 of the Canada Evidence Act. Reference was made to Re Geneva v. Comtesse[2], an application by the Swiss Consulate for an order pursuant to the Canada Evidence Act.

The Crown appealed. So did Reiser. In brief reasons, Freedman C.J.M., speaking for the Court said:

> The main ground of attack by counsel for Reiser and counsel for Zingre is that an order should go only if the request for it emanates from a court or tribunal and if the evidence it seeks is to be used at a trial in respect of

[Page 400]

## EXHIBIT 6 PAGE 76

which a charge has been laid. It is contended that the investigating judges who have been authorized to take the testimony in Manitoba are not members of a court or tribunal, and are seeking the evidence, not for a trial, but rather to determine whether the evidence is of sufficient weight to support a decision that the accused be placed on trial.

The Court referred to the difference in nature and function of judicial personnel here and abroad, more specifically, the fact that judges frequently carry on an investigatory function in European jurisdictions. The Court added:

We must add that Hamilton J. erred in saying that there was no charge outstanding. The charges laid in Winnipeg qualified sufficiently for this purpose.

and concluded:

We conclude accordingly that the persons who are to take the testimony in Manitoba are indeed "judges" and are, ipso facto, members of a court. Further, the testimony they obtain here will be available for use at a trial in Switzerland.

We should not forget that the criminal proceedings originated in Manitoba, and that Manitoba has sought the assistance of the Swiss authorities in accordance with the terms of Article 1 Paragraph 2 of the Treaty. It is in furtherance of the obligations under the treaty that Switzerland is now seeking the assistance of the Manitoba courts in this matter.

The Court allowed the Crown's appeal against the order respecting Zingre and dismissed Reiser's appeal in respect of the order against him.

III

As that great jurist, U.S. Chief Justice Marshall, observed in The Schooner Exchange v. M'Faddon & Others[3] at pp. 136-37, the jurisdiction of a nation within its own territory is necessarily exclusive and absolute, susceptible of no limitation not imposed by itself, but common interest impels sovereigns to mutual intercourse and an

[Page 401]

interchange of good offices with each other.

It is upon this comity of nations that international legal assistance rests. Thus the courts of one jurisdiction will give effect to the laws and judicial decisions of another jurisdiction, not as a matter of obligation but out of mutual deference and respect. A foreign request is given full force and effect unless it be contrary to the public policy of the jurisdiction to which the request is directed (see Gulf Oil Corporation v. Gulf Canada Limited et al.[4]) or otherwise prejudicial to the sovereignty or the citizens of the latter jurisdiction.

The interests of sovereignty have come into conflict with the principle of judicial comity in a number of situations and Canadian courts have refused to order the testimony of the individual for use in the foreign proceedings: for example, (i) where a request for production of documents was vague and general (Re Radio Corporation of America v. The Rauland

**EXHIBIT 6 PAGE 77**

Corporation et al.[5]) and the court held that if the litigation were being conducted in Canada the litigants would not be required to comply with such a request; (ii) when discovery was sought against an individual not a party to the litigation, in violation of local laws of civil procedure (Radio Corporation of America v. Rauland Corporation and Another [6]); (iii) when the main purpose of the examination was to serve as a "fishing expedition", a procedure not allowed in English or Canadian courts. (See RCA case (England), supra, per Lord Goddard C.J. at p. 625); (iv) where the granting of the order would place the person sought to be examined in the position of having to commit an offence such as violation of s. 178.2 of the Criminal Code in order to comply with the order (Re Request for International Judicial Assistance[7]); (v) where the person whose attendance for examination is sought is an <u>accused</u> in pending criminal proceedings in the requesting court and the testimony sought is for

[Page 402]

the purpose of such proceedings (Re Uszinska and the Republic of France[8]).

It is sometimes said that an order for examination will never be issued if the testimony is to be used as part of a pre-trial or investigatory procedure. This rule has been applied in large part in civil proceedings in which American courts have sought the assistance of Canadian authorities in the discovery process. It should be remembered that American rules relating to discovery are much broader than those in Canada and this in part may explain the reluctance of Canadian courts to enforce letters rogatory in these instances. While the rule has its genesis in civil litigation (the first application of the rule in Canada appears in the judgment of Gale J. in Re Radio Corporation of America v. The Rauland Corporation et al., supra, at p. 635) it has also been applied in criminal proceedings. In Re Application by Letters Rogatory from United States District Court, Middle District of Florida[9], an American criminal court sought documents for use at a trial of American citizens on charges of income tax evasion. Mr. Justice Miller of the Alberta Supreme Court granted the application for an order, but he noted the following principle [at p. 18]:

> I infer from this that it must be established to the satisfaction of this court that the material requested by the Florida court in the letters rogatory is to be used at the trial of the criminal charges pending against the named persons, as set out in the letters rogatory. It also follows from this that, if the purpose of requesting the information or assistance is to provide a basis for an examination for discovery or a preliminary inquiry, the court should not accede to the request.

It may be worth noting that in the RCA litigation in England (applied by Gale J. in the Canadian litigation), Devlin J., supra, at pp. 643-44, spoke of "pre-trial procedure" and discovery of

[Page 403]

documents in these terms:

> In the United States of America it is not restricted merely to obtaining a disclosure of documents from the other party to the suit, but there is a procedure, which might be called a pre-trial procedure, in the courts of the United States which allows interrogation not merely of the parties to the suit but also of persons who may be

**EXHIBIT 6 PAGE 78**

witnesses in the suit, or whom it may be thought may be witnesses in the suit, and which requires them to answer questions and produce documents.

In general, our courts will only order an examination for the purpose of gathering evidence to be used at a trial, but that is not to say that an order will never be made at the pre-trial stage. Section 43 does not make a distinction between pre-trial and trial proceedings. It merely speaks of the foreign court or tribunal "desiring" the testimony of an individual "in relation to" a matter pending before it. I do not think it would be wise to lay down an inflexible rule that admits of no exceptions. The granting of an order for examination, being discretionary, will depend on the facts and particular circumstances of the individual case. The Court or judge must balance the possible infringement of Canadian sovereignty with the natural desire to assist the courts of justice of a foreign land. It may well be that, depending on the circumstances, a court would be prepared to order an examination even if the evidence were to be used for pre-trial proceedings. An illustration is the case of Re Kirchoffer v. The Imperial Loan and Investment Company[10]. An action had been brought in Manitoba against a corporation by a former employee. The plaintiff had sought to examine the former manager of the defendant corporation on discovery, but the individual was a resident of Ontario and he refused to comply. The plaintiff then sought an order from the Ontario Court under the provisions of The Ontario Evidence Act and Canada Evidence Act compelling the former manager to submit to discovery. It was argued that the order should be refused, as the statute did not contemplate examinations for discovery. Chancellor Boyd at p. 296] rejected the argument and ordered the examination for

[Page 404]

discovery:

> The Imperial Statute 19 & 20 Vict. ch. 113, sec. 1, relates to witnesses; ours extends to parties as well as witnesses: R.S.C. 1886, ch. 140.

> The order asked is to examine Dr. Kertland, a manager of the defendants, for discovery. As such officer he is a quasi party, or stands for the person to be examined for the corporation who is the defendant. I think the statute applies on a liberal construction to such a case, and grant the order as upon an ex parte application.

In Re Isler[11] the Ontario High Court ordered the examination of an individual based on letters rogatory from a "juge d'instruction" in France. The function of the "juge d'instruction" is described by René David in English Law and French Law (1980) at p. 65 as follows:

> The role of a juge d'instruction is not to pronounce if the accused is guilty or not guilty; it is only to direct and supervise the procedure of enquiry led by ministère public and it is to decide, at the close of such enquiry, if it is appropriate or not to remand the accused for trial before a criminal Court ... The accused will only appear before such Court if, in the mind of juge d'instruction, there is a probability that he is guilty.

It is clear that the testimony was for use at a pre-trial inquiry, yet the court ordered the examination.

In Re Geneva v. Comtesse, supra, the Ontario High Court received letters rogatory from a "juge d'instruction" in Switzerland. The Court refused to order the examination on another

**EXHIBIT 6 PAGE 79**

·ground, with no reference being made to the fact that the testimony was for use at a pretrial inquiry. Where there is no limitation or infringement of Canadian sovereignty, and where the facts are such that justice can only be done by ordering the examination, the court should not refuse to make the order solely because the testimony relates to a pre-trial proceeding.

[Page 405]

IV

Section 43 of the Canada Evidence Act has its origin in s. 1 of the English Foreign Tribunals Evidence Act, 1856 (U.K.), c. 113, s. 1, which applies to civil proceedings. This section was made to apply to evidence for foreign criminal proceedings by s. 24 of The Extradition Act, 1870, 1870 (U.K.), c. 52.

In Canada, legislation was enacted duplicating the English legislation: 1868 (Can.), c. 76, s. 1; 1870 (U.K.), c. 52, s. 24; 1877 (Can.), c. 25, s. 4; 1883 (Can.), c. 35, s. 1. The criminal and civil provisions were amalgamated in R.S.C. 1886, c. 140, in An Act respecting the taking of Evidence relating to proceedings in Courts out of Canada which subsequently in 1906 was incorporated in the Canada Evidence Act, R.S.C. 1906, c. 145, ss. 38-46. Section 41 of the 1906 Canada Evidence Act is virtually identical with the present s. 43.

Section 43 is framed in extremely broad terms. It provides, as far as relevant:

> Where, upon an application for that purpose, it is made to appear to any court or judge, that any court or tribunal of competent jurisdiction, ... in any foreign country, before which any civil, commercial or criminal matter is pending, is desirous of obtaining the testimony in relation to such matter, of a ... witness within the jurisdiction of such first mentioned court, ... the court or judge may, in its or his discretion, order the examination upon oath ... of such party or witness accordingly

The section merely requires that:

> 1. There be an application made to a Superior Court in Canada (s. 41 defines 'court' as the Supreme Court of Canada and any Superior court of a province);
>
> 2. There must be a civil, commercial or criminal matter 'pending' before a foreign court or tribunal;
>
> 3. It must be 'made to appear' to the Canadian court or judge that the foreign tribunal is 'desirous' of obtaining the testimony of a party or witness within Canadian jurisdiction in relation to the pending matter.

If these conditions are satisfied, the Canadian court or judge "may, in its or his discretion" order

[Page 406]

the examination under oath of the party or witness concerned.

### EXHIBIT 6 PAGE 80

The appellants take four points. First, it is said that the request for assistance did not emanate from a court or tribunal of competent criminal jurisdiction in Switzerland. The letters rogatory in this case emanate from a department of government, the Federal Office for Police Matters of the Federal Department of Justice and Police (Office fédéral de la police).

I do not think this objection can be sustained, having regard to the legal proceedings conducted to date in Switzerland and the terms of the Treaty and of s. 43 of the Canada Evidence Act. Section 43 simply requires that there be "an application" and on that application, it be "made to appear" that a court or tribunal is "desirous" of obtaining testimony. The section does not speak of a specific application or request from a tribunal. I would interpret s. 43 in light of Article I of the 1880 Treaty, which recites that the commissions of examination shall be transmitted through the "proper Diplomatic channel". I consider that the Federal Office for Police Matters of the Federal Department of Justice and Police is the "proper Diplomatic channel", in light of the fact that the Swiss Chief of Federal Police was one of the signatories of the 1880 Treaty. Since the request complied with the Treaty, I would consider it sufficient for the purposes of s. 43 of the Act. In any event, the primary source of the letters rogatory was a "tribunal of competent jurisdiction" desirous of obtaining the testimony of witnesses within the jurisdiction of the Court of Queen's Bench in Manitoba.

Second, it is submitted that the evidence is sought by the Swiss Department of Justice and Police not for the purpose of trial but for the purpose of carrying on an investigation which is deemed necessary in order to determine whether criminal charges should be laid against the appellants. I have already discussed the "pre-trial" issue, and it is my view that, depending on the circumstances, it may be appropriate to invoke s. 43 in a pre-trial context. In my opinion, the circumstances of the present case are such that the court should exercise its discretion in favour of the

[Page 407]

investigating magistrates. I reach this conclusion because the contrary view would result in the purpose of the 1880 Treaty being completely frustrated. Article I of that Treaty is designed to ensure that Swiss nationals who commit crimes in Great Britain, or in Canada, are prosecuted in Switzerland. There will be no evidence of the crime in Switzerland, the crime having been committed in another jurisdiction. It will be impossible for the Swiss authorities to fulfil their obligations unless they are permitted to gather evidence at the scene of the alleged offence. This is recognized in the treaty itself, which makes explicit provision for the gathering of evidence by the Swiss magistrate in Great Britain. In short, if we prohibit the Swiss authorities from gathering evidence here, we will effectively make it impossible for them to conduct the prosecution which Canadian authorities asked them to undertake. The Swiss will not hold a trial because the investigating magistrates have not gathered sufficient evidence. We will not permit the magistrates to gather evidence because a trial has not yet been commenced. The only beneficiaries from this absurdity would be the accused who would be exempted from answering for their alleged offences.

Third, it is argued that in order for a criminal matter to be "pending" before a foreign court, a criminal charge or charges must be outstanding. Counsel take issue with the holding of the Manitoba Court of Appeal that the "charges laid in Winnipeg qualified sufficiently" for the purpose of concluding there was a charge outstanding. Again, I think s. 43 must be read

**EXHIBIT 6 PAGE 81**

and construed in the light of the Treaty. The effect of Article I is this. If a Swiss national commits an Article II crime or offence in England, or in Canada, and seeks refuge in Switzerland, where he is non-extraditable, Switzerland will give legal effect to and prosecute the charge against him according to the laws of the Canton of his origin. Switzerland in effect conducts what has been referred to as a "surrogate" criminal prosecution in respect of the English or Canadian, as the case may be, charges. Also it is obvious, for the reasons given in discussing the second point raised by the appellants, that if charges had to be laid in Switzerland before the

[Page 408]

Swiss authorities had the right to investigate the alleged offence in the country of its commission, the treaty would be rendered completely ineffective. I have no difficulty in concluding that a criminal matter is pending before a court or tribunal of competent jurisdiction in Switzerland affecting the appellants.

Fourth, according to s. 43 it must be "made to appear" that a foreign court is desirous of obtaining the testimony of the witnesses in Canada. The Court of Appeal held that the "extraordinary examining judges" were judges and, ipso facto, members of a court. These judges were desirous of obtaining the testimony of the witnesses in Canada. Therefore, the Court of Appeal concluded, the requirement of s. 43 had been satisfied.

The appellants attack this argument. They suggest that the examining judges are not members of any court, but rather are impartial investigating officers similar to police investigators despite their designation as "extraordinary investigating judges" or "examining magistrates". That contention is incorrect in that it fails to have regard to the differences between the continental systems of criminal justice and our own.

One should be wary of analysing the Swiss judicial system using our model. The European approach is quite different. In continental systems of criminal justice, there are three distinct stages to criminal procedure. The first is a preliminary investigation conducted by police officials and prosecution. This is followed by a judicial phase in which there is investigation by career judges known as "examining magistrates" or "juges d'instruction". Witnesses are required to testify and documents are examined. If, following this judicial inquiry, the case is deemed by the prosecuting attorneys to be an appropriate one for trial a formal trial is held. (See generally Gerhard O. W. Mueller and Fré Le Poole-Griffiths, Comparative Criminal Procedure (1969) ch. 2).

What is now transpiring is the judicial investigating procedures of the Swiss judicial system. It amounts to a procedure similar to the preliminary

[Page 409]

inquiry in Canadian criminal procedure. It appears that this procedure was contemplated in the 1880 Treaty, Article I speaks of "commissions of examination directed by the Swiss judge". The Article speaks of a "judge" and not of a "court". We must assume that the drafters of the Treaty were familiar with the Swiss Criminal Procedure and the reference to a "Swiss judge" must have been to an examining magistrate charged with taking evidence from witnesses. Thus the interpretation suggested by the Court of Appeal of Manitoba seems to accord with the intention of the Treaty.

**EXHIBIT 6 PAGE 82**

Even if the Court of Appeal was wrong, it can be said that the Chamber of Indictment is "desirous" of receiving the testimony of the witnesses in Canada. The Chamber of Indictment has general powers of supervision over the investigation of crime. The Chamber ordered the investigation in this case, and it made specific mention of the appointment of an examining judge. The Chamber of Indictment stated:

Art. I, par. 2 of the Swiss-British Treaty of Extradition of November 26, 1880 (AS12 page 114) obligates Switzerland to "take over the criminal litigation of the applications in accordance with the law of the home Canton" as it pertains to Swiss citizens. This includes the possibility to reject the initiation of criminal investigations if the examining judge is of the opinion that the charges brought before him are not punishable and that the legal conditions for prosecution by law are not given.

V

This case is exceptional and differs in vital respects from the other cases to which the Court has been referred. The argument in favour of granting the order in the case at bar does not rest merely on the notion of "comity". It rests on treaty. In responding affirmatively to the request which has been made the Court will be recognizing and giving effect to a duty to which Canada is subject, by treaty, under international law. It is common ground that the treaty applies. None of the cases cited by the appellants involves a situation where Canada is under obligation to provide assistance to foreign authorities. It is the duty of the Court, in interpreting the 1880 Treaty and s. 43 of the Canada Evidence Act to give them a

[Page 410]

fair and liberal interpretation with a view to fulfilling Canada's international obligations. Canada forced Switzerland to undertake criminal proceedings because Canada was unable to extradite the appellants from Switzerland. Now, Switzerland is asking Canada for assistance in those proceedings. The Treaty of 1880 places Canada under a specific obligation to comply with the Swiss request. If Canada denies the Swiss request it will be in breach of its international obligations. By the terms of the Treaty, orders for commission evidence, as requested by the Swiss, are part and parcel of the surrogate criminal proceedings in Switzerland. It must be assumed in the absence of evidence to the contrary that the request has been made in compliance with the Treaty, in conformity with Swiss rules and practice, and "with a view to the better administration of justice, and to the prevention of crime", the purpose for which the Treaty, as expressly stated herein, was entered into.

As the Canadian Department of External Affairs stated in a note to the Swiss Federal Policy Department, at the time of Canada's appeal from the decision of the public prosecutor "it is a recognized principle of international customary law that a state may not invoke the provisions of its internal law as justification for its failure to perform its international obligations."

The crimes alleged against the appellants were committed in Canada and, Swiss authorities are simply responding to a Canadian request that prosecution be initiated in Switzerland. It is one thing for country A to ask country B to permit the examination of citizens of country B in respect of a transaction arising in country A. Country B has no direct interest in the proceedings and it is proper to interpret s. 43 in a fairly strict fashion. It

**EXHIBIT 6 PAGE 83**

is quite another thing for country A to ask country B to permit the examination of citizens of country B in respect of matters arising in country B. Country B, in this case Canada, has a direct interest in the proceedings, the prosecution of the appellants.

[Page 411]

To the extent that the Manitoba courts have a discretionary right to issue the order requested, I can see no basis upon which the discretion should be exercised in favour of the appellants. Warrants for the arrest of the appellants have been outstanding since 1973. As Swiss nationals, they rely on the terms of the 1880 Treaty to protect them from extradition. They invoke, from a distance, Canadian legal processes in an attempt to frustrate the very Treaty upon which they rely. We are advised that none of the witnesses sought to be interviewed objects in any way to appearing. The only objection has come from the fugitive accused. Crown counsel challenged the status of the appellants. He contended that the appellants had no right even to appear before Canadian courts considering they are fugitives from charges laid in Manitoba: R. v. Dzambas[12]. It is not necessary for the resolution of this appeal to decide whether the appellants have status. Their anomalous position is, however, relevant to the exercise of discretion.

I would dismiss the appeals. No costs should be awarded.

Appeals dismissed.

*Solicitors for Alfred Robert Zingre: Regier, Stewart, Winnipeg.*

*Solicitors for Oskar Reiser: Walsh, Micay & Company, Winnipeg.*

*Solicitors for Her Majesty the Queen: Simkin, Gallagher, Winnipeg.*

---

[1] February 13, 1981.

[2] [1959] O.R. 668.

[3] (1812), 7 Cranch's Reports 116.

[4] [1980] 2 S.C.R. 39.

[5] [1956] O.R. 630.

[6] [1956] 1 Q.B. 618.

[7] (1979), 49 C.C.C. (2d) 276.

[8] (1980), 52 C.C.C. (2d) 39.

[9] [1980] 1 W.W.R. 7.

**EXHIBIT 6 PAGE 84**

[10] (1904), 7 O.L.R. 295.

[11] (1915), 34 O.L.R. 375.

[12] (1973), 24 C.R.N.S. 118.

**EXHIBIT 6 PAGE 85**