CALENDARED

RECEIVED

JAN 16 2007

P. Send

ENTERED
CLERK, U.S. DISTRICT COURT

JAN 12 2006

CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION        BY DEPUTY

FILED

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

CARTER BRYANT,

            Plaintiff,

v.

MATTEL, INC.,

            Defendant.

and related actions.

CASE NO. CV-04-9049-SGL

(Consolidated with cases CV-04-9059 and CV-05-2727)

ORDER REGARDING MATTEL'S MOTION FOR LEAVE TO AMEND

<div style="text-align:left; writing-mode: vertical">THIS CONSTITUTES NOTICE OF ENTRY AS REQUIRED BY FRCP, RULE 77(D).</div>

    This case has, increasingly, become one of the proverbial tail wagging the proverbial dog.

    Back in April, 2004, Mattel, Inc., ("Mattel") filed a complaint in Los Angeles County Superior Court against its former employee and the reputed creator of the BRATZ dolls, Carter Bryant. The complaint pressed five separate state-law theories relating to certain agreements Bryant signed while an employee with Mattel, namely, an Employee Confidential Information and Inventions Agreement ("Inventions Agreement") and a Conflict of Interest Questionnaire ("COI Questionnaire"). Although couched in state law terms and ostensibly pled as a simple employment action, lurking beneath the allegations in the complaint was whether Bryant had either misappropriated Mattel's intellectual property or

1-12

1  resources in creating and/or developing the BRATZ dolls or whether he continued

2  to develop his BRATZ design while still working in Mattel's employ.  In either event,

3  the rights to the BRATZ dolls could become the property of Mattel, either through

4  infringement or through operation of the agreements noted above.  The case was

5  later removed to this Court and was assigned the case number CV-04-9059.  MGA

6  Entertainment, Inc. ("MGA"), the maker of the BRATZ doll line, then intervened "to

7  protect its rights to Bratz dolls" that were at stake in the action.  Mattel, Inc. v.

8  Bryant, 446 F.3d 1011, 1012 (9th Cir. 2006); see also id. at 1013 ("Mattel argues, 'a

9  significant risk of prejudice' to MGA [exists] if the ownership of rights to intellectual

10  property, i.e., the Bratz creations, were decided in the absence of MGA").

11       In the interim, Bryant filed a declaratory judgment action in this Court,

12  seeking for the Court to declare that his BRATZ doll creations did not infringe

13  Mattel's copyright in its Toon Teens products.  See Court's July 18, 2006, Order at

14  3 (noting that, although "Bryant's complaint . . . makes reference to 'other Mattel

15  products,' . . . the substance of his allegations all address the product 'Toon

16  Teens'").  The declaratory judgment action was assigned the case number CV-04-

17  9049.

18       MGA then filed an action against Mattel in this Court broadening the scope

19  of the controversy beyond that concerned with the ownership rights to the BRATZ

20  doll line.  MGA's complaint asserted various Lanham Act claims and their California

21  state law equivalent arising out of Mattel's alleged "habitual and unfair tactics of

22  competition-by-intimidation and serial copycatting of MGA's products." (Compl.

23  ¶ 7).  In essence, although the prior actions were concerned with ownership in the

24  rights to the BRATZ doll line, the allegations in 05-2727 concerned whether there

25  had been unlawful efforts to block the marketing of those rights in the BRATZ dolls.

26  MGA's complaint did make mention of other products that were affected by Mattel's

27  alleged predatory business practices, but by far the largest portion of its complaint

28  concerned Mattel's conduct in undermining (or seeking to undermine) MGA's rival

2

EXHIBIT __1__ PAGE __6__

1  line of BRATZ dolls.[1]

2      By Order dated June 19, 2006, the Court consolidated all three cases "for all

3  purposes" as they "involve[d] a number of common issues of law and fact." As the

4  Court later noted in its August 10, 2006, Order: "At its heart, this case asks the

5  question: Who owns the rights to the Bratz dolls?" Resolution of this question lies

6  at the heart of or, at the very least, affects many of the other claims set forth in

7  each of the three respective cases. For instance, even though the allegations in

8  05-2727 concern Mattel's alleged efforts at defeating the marketing of the BRATZ

9  dolls, resolution of who owned the rights to the BRATZ dolls could serve to moot

10  many of those allegations. It is hard to imagine how it is unlawful for a company to

11  thwart or otherwise undermine the marketing of a product it owns. Thus, if Mattel

12  owned the rights to the BRATZ dolls, many of the allegations in the 05-2727

13  complaint would become moot. That said, such consolidation did not do away with

14  the distinctions that do exist between the three cases. As the Court highlighted in

15  its consolidation order, when either party files a pleading in the case, "the first

16  paragraph of [that] document . . . shall inform the Court to which case(s) the

17  document relates."

18      On July 18, 2006, the Court dismissed Bryant's declaratory judgment action,

19  04-9049, finding there existed no reasonable apprehension of an imminent

20  copyright infringement claim being filed against him by Mattel based on Mattel's

21  Toon Teen intellectual property. See Court's July 18, 2006, Order at 4. The

22  Court's Order was predicated entirely upon counsel for Mattel's representation

23  during oral argument that it "will not maintain that Bratz infringes the copyright in

24  Toon Teens." Owing to this representation, the Court, in dismissing the declaratory

25  judgment action, made clear that any future "claim by Mattel of copyright

26  _____

27      [1] That the marketing of the BRATZ dolls lies at the heart of the issues
between the rival doll makers in the 05-2727 case is best illustrated by the Court's

28  discussion of those allegations in its August 26, 2005, Order, Granting in Part and
Denying Part Mattel's Motion to Strike portions of MGA's complaint.

EXHIBIT   1   PAGE   7

1    infringement based on the Toon Teens product is barred by counsel's

2    representation."  July 18, 2006, Order at 4.

3           Presently before the Court is Mattel's request for leave to file an amended

4    complaint in the 04-9059 action.  The complaint broadens considerably the nature

5    of the action from its genesis in state court.  Whereas before the complaint simply

6    sought to litigate alleged contractual and fiduciary breaches by Bryant while in the

7    employ of Mattel (no doubt geared toward procuring a legal basis for Mattel to lay

8    claim to the BRATZ doll line), the amended complaint adds five more defendants

9    and nine new legal claims, alleging a wide range of commercial disputes between

10   the rival doll makers that spans three countries.  For instance, the amended

11   complaint now contains RICO claims, a misappropriation of trade secrets claim,

12   and various aiding and abetting claims all stemming from allegations that MGA

13   cherry-picked certain high-ranking Mattel executives in foreign markets (many also

14   named as defendants in the amended complaint) or designers (namely, Bryant),

15   and then enticed or encouraged those same individuals to steal various trade and

16   proprietary secrets (be it sales plans, sales projections, customer profiles, or

17   intellectual property) from Mattel and hand them over to MGA before going to work

18   at MGA.

19          Moreover, the amended complaint expands upon the existing breaches of

20   contract and fiduciary duty claims in the original complaint by expanding the

21   universe of former employees (namely, the cherry-picked executives) to whom

22   those claims now apply.

23          Finally, Mattel now makes plain what was always lurking in its original

24   complaint — a copyright claim, but one directed not only to Bryant but also to MGA,

25   MGA's Hong Kong subsidiary, and MGA's President and CEO Isaac Larian.

26   Moreover, Mattel characterizes its copyright claim somewhat differently from that at

27   issue in Bryant's declaratory relief action: "The Amended Complaint does not

28   include a claim for infringement of copyrights in Toon Teens, but rather

4

EXHIBIT  1   PAGE  8

1   infringement of copyrights in Bratz." (Reply to MGA Opp. at 11). Toward that end,

2   Mattel has recently filed copyright registrations with the U.S. Copyright Office

3   claiming ownership in various BRATZ doll design drawings penned by Bryant.

4   A.     ANALYSIS

5          Federal Rule of Civil Procedure 15(a) provides that, once a responsive

6   pleading has been served, "a party may amend the party's pleading only by leave of

7   court or by written consent of the adverse party; and leave shall be freely given

8   when justice so requires." With no consent to Mattel's proposed filing proffered by

9   MGA and Bryant, determining whether to grant Mattel leave to file an amended

10  complaint is gauged by looking to the familiar formulation of factors set forth by the

11  Supreme Court in Forman v. Davis:

12          
13          > In the absence of any apparent or declared
            > reason—such as undue delay, bad faith or dilatory
14          > motive on the part of the movant, repeated failure to
            > cure deficiencies by amendments previously allowed,
15          > undue prejudice to the opposing party by virtue of
            > allowance of the amendment, futility of amendment,
16          > etc.—the leave sought should, as the rules require, be
            > 'freely given.' Of course, the grant or denial of an
17          > opportunity to amend is within the discretion of the
            > District Court, but outright refusal to grant the leave
18          > without any justifying reason appearing for the denial is
            > not an exercise of discretion; it is merely abuse of that
19          > discretion and inconsistent with the spirit of the Federal
            > Rules.

20  371 U.S. 178, 182 (1962).

21          MGA and Bryant offer the following reasons for denying Mattel leave to

22  amend: (1) Mattel has long known of the factual predicates underlying its copyright

23  and intentional interference claims but delayed in asserting them; (2) the proposed

24  amendment to add the copyright claim and the intentional interference claims

25  (against the new defendants) are futile because they are barred by the applicable

26  statute of limitations; (3) the copyright claim had been brought in bad faith by Mattel

27  because of its prior public disavowal of an intent to assert such a claim; and (4)

28  MGA and Bryant would incur undue prejudice were the copyright claim added to the

EXHIBIT  1  PAGE  9

1  suit because of alleged spoilation of evidence issues involving Mattel's ZEUS

2  computer system used by doll designers at Mattel and its e-mail system.  None of

3  these arguments are persuasive.

4      1.      Awareness of Factual Predicate for Copyright and Intentional

5              Interference Claims

6          MGA argues that Mattel has long known about the factual predicate for its

7  recently added copyright claim, observing that, "[o]ver four years ago, in August

8  2002, Mattel CEO Bob Eckert received an anonymous letter stating that Bryant

9  created the project that became the 'Bratz' dolls — and worked with MGA to 'steal'

10  that project — while still employed at Mattel." (MGA Opp. at 9).  Similarly, MGA

11  argues that Mattel has long known of the factual predicate for its intentional

12  interference claim with respect to Bryant's contract given that, "[b]y Mattel's own

13  admission, it learned in November 2003 — more than three years ago — that

14  Bryant had signed a contract with MGA 'dated as of' a month prior to his final day at

15  Mattel." (MGA Opp. at 11-12).

16          At the outset it must be observed that "[m]ere delay in proffering an

17  amendment does not justify denying leave to amend." Sierra Club v. Union Oil Co.

18  of California, 813 F.2d 1480, 1493 (9th Cir. 1987), vacated on other grounds by,

19  485 U.S. 931 (1988), and reinstated by, 853 F.2d 667 (9th Cir. 1988).  Seizing upon

20  this point of law, Mattel argues that "only in . . . cases" when "granting leave would

21  require discovery to be reopened after summary judgment motions have been filed"

22  has the Ninth Circuit found the denial of leave "justified" based on the passage of

23  time alone.  (Reply to MGA Opp. at 3).  That is incorrect.  There is a line of cases

24  from the Ninth Circuit finding that, if a "party seeking amendment knows or should

25  know of the facts underlying the amendment when the original complaint is filed,

26  the motion to amend may be denied." Sierra Club, 813 F.2d at 1493 (citing Jordan

27  v. County of Los Angeles, 669 F.2d 1311, 1324 (9th Cir. 1982)).  And, recently, the

28  Ninth Circuit upheld the denial of leave to amend based on the passage of time

6

1  even though the requested leave to amend was tendered <u>before</u> the time, as set

2  forth in a Rule 16(b) pre-trial scheduling order, for amending pleadings had expired.

3  <u>See AmerisourceBergen Corp. v. Dialysist West, Inc.</u>, 465 F.3d 946 (9th Cir. 2006).

4  The Ninth Circuit observed that, even when a request for leave to amend is timely

5  under a Rule 16(b) schedule for pretrial motions, the district court may nonetheless

6  still deny the request based on any of the <u>Forman</u> factors. <u>Id</u>. at 951-52. The Ninth

7  Circuit then noted that the issue of untimeliness (regardless of whether the

8  amendment is tendered "within the period of time allotted by the district court in a

9  Rule 16 scheduling order") in seeking to amend can constitute a justification for

10  denying leave to amend if "the moving party knew or should have known the facts

11  and theories raised by the amendment in the original pleading." <u>Id</u>. at 953.

12  Toward that end, the Ninth Circuit observed that "an eight month delay between the

13  time of obtaining a relevant fact and seeking a leave to amend is unreasonable."

14  <u>Id</u>. In this regard, the Ninth Circuit in <u>Dialysist</u> was unpersuaded by the fact that,

15  even though the moving party had known of the facts prompting the amendment for

16  a long period of time, there still remained eight more months of discovery for the

17  parties to marshal facts against the allegations raised by the amended pleading:

18  "Even though eight months of discovery remained, requiring the parties to scramble

19  and attempt to ascertain whether the Procrit purchased by AmerisourceBergen was

20  tainted, would have unfairly imposed potentially high, additional litigation costs on

21  Dialysist West that could have easily been avoided had AmerisourceBergen

22  pursued its 'tainted product' theory in its original complaint or reply." <u>Id</u>. Thus,

23  absent "a satisfactory explanation" for the delay in amending the complaint, the

24  Court is well within its rights to deny leave to amend. <u>Id</u>.

25      Mattel proffers the following reasons for taking the time that it did before

26  presenting its amended complaint: (1) Acting out of an abundance of caution to its

27  obligations under Rule 11 to present "factual contentions [that] have evidentiary

28  support," Mattel waited until its claims were better supported by evidence

EXHIBIT __/__ PAGE __//__

1  uncovered in discovery; and (2) the delay in the proceedings caused by "the year-

2  long stay and the parties' prior jurisdictional disputes" have left the case still in its

3  "nascent stage." (Reply to MGA Opp. at 2, 4).

4      The first reason is not well-founded.  Rule 11 specifically allows parties to

5  aver factual allegations that "are likely to have evidentiary support after a

6  reasonable opportunity for further investigation or discovery" so long as the party

7  makes clear in its pleading that its factual contentions on those points are with the

8  caveat that they are based on a good faith belief that further discovery would

9  unearth evidence to support them.  See FED. R. CIV. P. 11(b)(3).  Simply put, Rule

10  11 did not stand in the way of Mattel averring the factual contentions it now claims it

11  "merely suspected" as being the case based on the limited information before it.

12  Mattel could have gone ahead and made such suspected factual allegations so

13  long as it caveated those claims with the declaration that it reasonably believed that

14  those allegations would be borne out by further discovery.  Perhaps the time by

15  which Mattel could have reasonably believed such allegations would be borne out

16  by further discovery occurred after the dates noted by MGA, but it is hard to fathom

17  that such materialization took three or four years to occur.

18      The second reason would have some merit to it but for the fact that the

19  information that alerted (or should have alerted) Mattel to the existence of its now

20  asserted copyright and intentional interference claims was brought to Mattel's

21  attention well before the case was stayed on May 20, 2005.  The stay, therefore,

22  did not operate as an obstacle to Mattel asserting its claims; nor even if it did, the

23  stay does not explain why Mattel waited nearly six months after the stay was lifted

24  on May 16, 2006, to present those claims now.

25      All of that being said, the one thing that gives the Court pause in denying

26  leave based on the tardiness in Mattel's presentation is the lack of any evidence

27  that MGA or Bryant have been prejudiced by the delay.  Delay unconnected to

28  some showing of prejudice, be it prejudice to the parties or disruption in judicial

8

EXHIBIT _1_ PAGE _12_

1   management of the case, does not suffice to deny granting leave to amend.  The

2   Ninth Circuit has noted that, "where a defendant is on notice of the facts contained

3   in an amendment to a complaint, there is no serious prejudice to defendant in

4   allowing the amendment" even if it is made tardily.  Sierra Club, 813 F.2d at 1493.

5   Indeed, the denial of leave was proper in the Dialysist case not simply because of

6   the length of the delay, but because the delay itself was "detrimental" in that it

7   would entail the opposing party to have "unfairly" incurred "potentially high,

8   additional litigation costs" that could have been avoided if the moving party had

9   made clear its intentions earlier.  465 F.3d at 953.

10          Here, as well demonstrated in Mattel's papers, it is readily apparent from the

11   pleadings filed by MGA and Bryant in this case that both have been aware for some

12   time of the factual predicates now underlying Mattel's copyright claim and

13   intentional interference claim.  (See MGA Opp. at 5 ("As Bryant and MGA

14   suspected at the time of filing — and Mattel now concedes by conduct — those

15   deceptively-pled state-law claims [in 04-9059] were copyright infringement claims all

16   along")(emphasis added)).  The parties have engaged in meaningful discovery

17   regarding many of the facts touched upon by these new claims, be it tracking down

18   experts in various forensic fields or taking depositions of various of the key players

19   to those claims.   In point of fact, in their papers filed with this Court before this

20   present motion, both Bryant and MGA have made it abundantly clear that they have

21   long suspected that a copyright infringement claim was in the offing as evidenced

22   by Bryant's filing of the declaratory judgment action and MGA's intervention in the

23   05-9059 matter to protect its rights to the BRATZ dolls.  Similarly, MGA and Bryant

24   have been on notice to the facts comprising the interference claim concerning

25   Bryant's contract as evidenced by the identity of the individuals who have been

26   deposed by Mattel, as well as the nature of the questions posed and the testimony

27   proffered at those depositions.  MGA's argument that, with the amendments, it

28   faces the prospect of defending "against stale claims" owing to faded memories and

EXHIBIT __/__ PAGE _/3_

1    loss of documents caused by the great passage of time, (see MGA Opp. at 3, 13),

2    is diminished by the fact that (no doubt owing to the sophistication of all counsel

3    involved) discovery on these very issues have been proceeding apace by both

4    sides long before Mattel filed its proposed amendments.  This is simply not a case

5    where "additional litigation costs" will be "unfairly" visited upon Bryant and MGA by

6    allowing the proposed amendments; much of those costs have already been borne

7    by the parties for some time.

8        2.    Spoilation of Evidence

9        MGA next argues that Mattel's delay in bringing the amended complaint has

10   caused it prejudice as, in the interim, critical pieces of evidence have been or are

11   suspected of having become lost.  For instance, MGA asserts that Mattel's Rule

12   30(b)(6) witness concerning its Zeus computer system, Julia Marine, testified that,

13   "although Mattel identified and segregated its most relevant backup tapes available

14   for Zeus, Mattel allowed its tape backup system to expire the database for those

15   backup tapes, thereby eliminating all information about what was actually stored on

16   those backup tapes." (MGA Opp. at 9-10).  Information on the Zeus computer

17   system is critical because of Mattel's assertion that part of its copyright claim rests

18   on Bryant's exposure to Mattel development programs.  (First Am. Compl. ¶ 26(a)).

19   As explained by MGA: "[C]oncept data and drawings created by [Mattel] design

20   center personnel are stored on Zeus.  Thus, the electronic documents stored on

21   Zeus – which should include the metadata showing who created, edited and

22   accessed Mattel's concept drawings and designs – during the time Bryant worked

23   in the design center at Mattel is vitally important to defending against Mattel's

24   claims." (MGA Opp. at 14).  MGA's argument is neither an accurate

25   characterization of Ms. Marine's testimony nor of the nature of Mattel's exposure

26   claim.

27       Ms. Marine did not testify that the information on the backup tapes (some

28   fifty in total) was lost, but rather that Mattel no longer carried the type of hardware

EXHIBIT  1  PAGE  14

1  that could restore the information still found on those tapes:

2      Q.      So if you wanted to restore that 2002 backup
3              tape[s] then, how would you go about doing that?

        . . . .

4      A.      You need the hardware so if we don't have the
5              hardware — if [the technology used by the tape
               is] DLT we don't have the hardware and you've
6              got to buy it and — well, first you have to find a
               place to put it with adequate power which we
7              don't have in the design center. You need to
               have a tape library. You need to have the tape
8              drives that carried those tapes. You need a
               server that has the capability to — that's big
9              enough to handle all of the hardware. You need
               the software – the license for the backup
10             software[, Net Backup]. You need the disk space
               to restore it to and then you have to start reading
11             in all those tapes.

12     Q.      You said that you don't have that in the design
               center. Do you have that hardware anywhere
13             else in the company?

14     A.      DLT? No, no.

15     Q.      At what point did you get rid of the hardware?

16     A.      Once the last backups — DLT backups expired
               so it would have been a couple years ago
17             probably.

18  (Decl. Diana Torres, Ex. K at 118-119).

19      The above testimony clearly denotes the difficulty in restoring what was on

20  Mattel's Zeus computer system during the relevant time frame, but it certainly does

21  not demonstrate that the information on those backup tapes has been "eliminated"

22  or forever lost. Undoubtedly it will be a costly endeavor to recover that information

23  (not to mention to later search and sort through it); but to argue, as MGA does, that

24  the information is "unavailable" or "lost", (MGA Opp. at 9, 14), exaggerates its

25  plight. Indeed, Ms. Marine's testimony indicates that the difficulty in retrieving the

26  information on the Zeus backup tapes has been present for some time (maybe

27  since 2004 or perhaps even earlier). This is important because it undermines

28  MGA's claim that Mattel's undue delay in bringing its amended complaint will cause

11

EXHIBIT __1__ PAGE __15__

1   it to suffer prejudice it otherwise would not have faced if the amendments were

2   brought sooner.  Such prejudice has been present for years, and Mattel's failure to

3   bring its amended complaint sooner would not have changed this situation.

4        Similarly, MGA's point that access to what was on the Zeus computer

5   system is vital in demonstrating that Bryant was not exposed to or otherwise did not

6   hack the system to steal other designers work is diminshed to some extent by the

7   fact that Bryant himself testified that he did not use the Zeus computer system and

8   was "pretty much computer illiterate" while employed at Mattel.  Admittedly, the

9   ability to point to information on the Zeus system backup tapes to prove that Bryant

10  did not access other designers drawings or to prove the date those drawings were

11  created by those other designers would be useful evidence to negate Mattel's

12  factual claims.  Nonetheless, such evidence still would not discount other avenues

13  outside of the Zeus computer system by which Mattel could seek to prove that

14  Bryant was exposed to its copyrighted works, e.g., witness testimony that Bryant

15  saw drawings of the same posted on other designers' cubicles.

16       MGA next surmises that Mattel's e-mail records have disappeared, not

17  because it has any proof on that point, but simply because Mattel has postponed

18  the deposition of the individual most knowledgeable of Mattel's e-mail records until

19  after the hearing on Mattel's motion for leave to amend.  (MGA Opp. at 10).

20  Speculation of spoilation does not suffice.  That MGA's argumentation on this point

21  is nothing more than speculation is best exhibited by the evidence it has proffered

22  in support of its argument:  "[I]f the sole retained backup for Zeus is no longer

23  available, it is not hard to imagine that Mattel's electronic mail archives are similarly

24  out of reach." (MGA Opp. at 15 (emphasis added)).  MGA then makes much of a

25  deposition from a Mattel executive, Alan Kaye, who testified that e-mails in his

26  inbox would be automatically deleted if they had remained there for more than a

27  certain time period.  (Decl. Diana Torres, Ex. H at 292-93).  MGA takes from this

28  acknowledgment that Mattel has an "automatic email deletion system" that has

EXHIBIT __1__ PAGE __16__

1   compromised Mattel's "duty to preserve documents." (MGA's Opp. at 14).

2   Noticeably absent from MGA's argument is any evidence that the e-mails so

3   deleted from a Mattel employee's inbox are forever lost or, as is far more likely,

4   whether such information remains or is otherwise archived on some backup file on

5   Mattel's computer system.  Absent concrete proof that spoilation has occurred,

6   nothing in MGA's argument forms a basis for denying Mattel its requested leave to

7   amend.

8        3.    Statute of Limitations

9        MGA next argues that Mattel's copyright and intentional interference claims

10  are futile as both are barred by the applicable statute of limitations.  This argument

11  was pressed emphatically at oral argument.  With respect to the copyright claim,

12  MGA argues that the applicable statute of limitations is three years, with the

13  limitations period accruing from when a party has knowledge of a violation or when

14  a reasonably diligent person would have been put on inquiry of the infringement.

15  (MGA Opp. at 16 (citing Roley v. New World Pictures, 19 F.3d 479, 481 (9th Cir.

16  1994)).  MGA argues that Mattel was put on notice about its copyright claim in

17  August, 2002, upon the receipt of the anonymous letter to Mattel's CEO that Bryant

18  had stolen the idea for BRATZ while working at Mattel.  Thus, according to MGA,

19  the limitations period on Mattel's claim expired in August, 2005, rendering Mattel's

20  current copyright claim stale.

21       The problem with MGA's analysis is it fails to take into account the relations-

22  back principles found in Rule 15(c), which provides that "[a]n amendment of a

23  pleading relates back to the date of the original pleading when "the claim . . . in the

24  amended pleading arose out of the conduct, transaction, or occurrence set forth . . .

25  in the original pleading," or if such relation back is otherwise permissible by the

26  state "law that provides the statute of limitations applicable to the action."  By

27  MGA's own admission Mattel's copyright claim arises out of the same conduct or

28  transaction contained in the original complaint filed in April, 2004, well within the

EXHIBIT __1__ PAGE _17_

1   applicable limitations period.[2] (MGA Opp. at 12 ("These very same allegations

2   [contained in the original complaint] underlie the copyright infringement and

3   intentional interference contract claims Mattel now seeks to allege against MGA,

4   Mr. Larian and Bryant")).

5          MGA's statute of limitations argument with respect to the intentional

6   interference claims fares no better.  According to MGA, the applicable statute of

7   limitations is two years for an intentional interference with contract claim and Mattel

8   was aware of the facts alerting it to this claim (insofar as Bryant's contract is

9   concerned) on November 24, 2003, when it learned "that Bryant worked with MGA

10  to develop the 'Bratz' dolls prior to his last day of employment by Mattel and, hence,

11  prior to the expiration of his contractual relationship with Mattel."[3] (MGA Opp. at 18

12  (citing Knoell v. Petrovich, 76 Cal. App.4th 164, 168 (1999)) .  Such a time line

13  would, according to MGA, mean that the applicable limitations period expired on

14  Mattel's interference with Bryant's contract claim on November 24, 2005, well

15  before Mattel sought leave to file its amended complaint.  (Id).  The problem again

16  with MGA's argument is that it ignores that through Rule 15(c) Mattel's intentional

17  interference claim would relate back to when it filed its original complaint in April,

18

19

20         [2] The same would appear to be true — that the amendments would be timely

21  — if the amendments related back to Mattel's answer (filed on May 13, 2005) to
    MGA's complaint in the 05-2727 case.

22

23         [3] With respect to Mattel's interference with contract claim as to one of its
    former executives, Ron Brawer, MGA claims Mattel was put on notice of that claim

24  on September 17, 2004, when Brawer informed Mattel that he leaving to go to work
    for MGA.  (MGA Opp. at 19-20).  The problem with this argument is that nothing from

25  that simple event — Brawer's declaration of his intent to leave — in any way would
    apprise Mattel that MGA had encouraged Brawer to engage in nefarious conduct

26  (the stealing of proprietary information) causing Brawer to breach his contract with
    Mattel that he would not do anything to help a competitor while working for them.

27  MGA's contention that Mattel must have known of those misdeeds in mid-September
    is nothing more than speculation.  Futility cannot be founded on what might or might

28  not be the case; either a claim is futile to bring or it is not.

EXHIBIT __1__ PAGE __18__

1   2004, well before the limitations period expired.[4]

2          Accordingly, MGA's futility argument is not well-founded.

3          4.     Prior Disavowals of Asserting a Copyright Claim

4          Finally, MGA takes umbrage with the cageyness to which Mattel has taken in

5   this case as to whether or not it is asserting a copyright infringement claim against

6   it.  To MGA, such ducking and weaving on Mattel's part renders its effort to now

7   bring such a copyright claim as one done in bad faith.  No doubt the Court itself has

8   been subjected to Mattel's overly vague statements on this point, but in the end

9   nothing in those statements has ever foreclosed the possibility that such a claim

10  may be in the offing.  Indeed, during the oral argument on Mattel's motion to

11  dismiss Bryant's declaratory judgment action, the Court pressed Mattel's counsel as

12  to whether it would assert such a copyright claim against Bryant as it is currently

13  seeking to do.  The most that Mattel's counsel would proffer was that Mattel would

14  not assert a copyright claim against Bryant based on Mattel's copyright rights in

15  TOON TEENS.  At that point, the Court directed the parties to engage in a meet

16  and confer based on counsel for Mattel's representation and to provide a report to

17  the Court based on those discussions.  The report submitted to the Court made

18  clear that, although Mattel was willing to accede that it would not bring a copyright

19  claim based on TOON TEENS, it refused to accede to Bryant's broader request

20  that "Bryant 'never copied anything' and that no Mattel product has any 'relevance'

21  to any claim that Mattel has or ever will assert against Bryant."  This by itself should

22  have dispelled any illusion either Bryant or MGA was operating under that Mattel's

23  prior statements had foreclosed any potential copyright claim against them.[5]

24  _____

25      [4] Again the relations-back principle would also seem to render its claim timely
    if it were filed as an amended answer (the original having been filed in May, 2005) in
26  the 05-2727 case.

27      [5] MGA also argues that Mattel's effort to substitute MGA and its CEO, Isaac
    Larian, for the "Doe" defendants listed in its original complaint is improper because
28  Mattel knew of their identity when it filed the original complaint.  The argument is

15

EXHIBIT __1__ PAGE __19__

1    That said, Mattel's allegation in the amended complaint as to how it is

2   seeking to lay claim to the copyright in BRATZ is disconcerting.  Paragraph 26,

3   subsection a, in the amended complaint alleges that Bryant "misappropriated and

4   misused Mattel property" by "using his exposure to Mattel development programs to

5   create the concept, design and name of Bratz."  (First Am. Compl. ¶ 26(a)).  Such

6   "exposure" could include Bryant misappropriating the Mattel design concept in

7   TOON TEENS in drawing his inspiration for the BRATZ doll.  Were Mattel's

8   copyright claim so predicated it would be barred by this Court's July, 2006, Order,

9   dismissing Bryant's declaratory judgment action.  Mattel was pressed on this point

10   during oral argument and conceded that such "exposure" to Mattel "development

11   programs" did not include TOON TEENS.  With this representation, nothing in

12   Mattel's proposed copyright claim is barred under the rubric of bad faith.

13       5.    Judicial Economy Considerations

14    In his opposition, Bryant adds an additional reason for denying leave beyond

15   those contained in MGA's papers — the amendment would muddy the waters in the

16   04-9059 by adding "tangential" issues that would only serve to delay resolution of

17   the key issue lying at the heart of the complaint:  Who owns the rights to the

18   BRATZ line of dolls.  (Bryant Opp. at 2 ).  Bryant notes that the case has proceeded

19   apace in moving toward resolving that issue, and the amendment would "transform

20

21

22   misplaced.  As made clear by Mattel, California law allows a plaintiff to substitute in a
     defendant for a "Doe" if the plaintiff was ignorant of that defendant's identity or

23   ignorant of the basis for liability at the time the complaint was filed.  See Miller v.
     Thomas, 121 Cal.App.3d 440 (1981).  MGA does not dispute this legal contention

24   but at oral argument disputed that Mattel did not know the basis for liability against
     itself or Mr. Larian due to the "uncanny" similarity between the allegations averred in

25   the original complaint and those now proffered against the two in the amended
     complaint.  Specifically, MGA notes that the original complaint spoke of Bryant

26   working for one of Mattel's competitiors and of that employee's theft of Mattel's
     intellectual property before leaving to work for that competitior.  At most, all this

27   shows is that Mattel knew that Bryant went to work for MGA, not that MGA or Mr.
     Larian encouraged Bryant's alleged unlawful behavior recited in the original

28   complaint.

16

EXHIBIT  1  PAGE  20

what Mattel has always claimed was a straightforward employment action against an individual defendant into a global commercial dispute against Mattel's primary competitor, MGA," that "will last years" thereby "delay[ing]" resolution of who owns BRATZ.[6] (Bryant Opp. at 2). Mattel argues that "the law does not deny leave to amend because claims are 'tangential'" and then reiterates its point that some showing of prejudice, namely, seeking leave after expiration of discovery, is necessary. (Reply to Bryant Opp. at 3). That is not entirely correct.

As noted previously, the Ninth Circuit recently upheld a denial for leave to amend because the amendment would have "drastically changed" the litigation, even though the leave request was tendered before the time, as set forth in a Rule 16(b) pre-trial scheduling order, for filing a motion to amend had expired and well before the discovery cut-off. See AmerisourceBergen Corp. v. Dialysist West, Inc., 465 F.3d 946, 953 (9th Cir. 2006). In justifying its reasoning the Ninth Circuit cited approvingly to the following statement from a well-respected treatise: "If an amendment substantially changes the theory on which the case has been proceeding and is proposed late enough so that the opponent would be required to engage in significant new preparation, the court may deem it prejudical." Id. at 953 n.2 (quoting 6 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1487 (2nd ed. 1990)). Thus, Dialysist recognized that the introduction of "different legal theories" and/or proof of materially different facts well into the litigation can itself be a basis for finding prejudice regardless of whether the period for discovery has expired (or is even close to expiring) or the parties have already filed summary judgment motions. Id. at 953-54.

Although the parties can safely be said to be at this point well into the

---

[6] Bryant also brings intricate legal arguments about the sufficiency of the allegations Mattel has averred in building its RICO claims against him. Such considerations are best left to be resolved on a properly filed motion to dismiss.

EXHIBIT ___1___ PAGE _21_

1  litigation in this consolidated action (as evidenced by the protracted discovery

2  disputes contained in the docket sheet that the parties have had before the

3  magistrate judge and now the special master, and the litigation of motions to

4  dismiss in both the 04-9049 and 04-9059 cases), the fact remains that, as Mattel

5  has made painfully clear in its papers, no scheduling order has been entered in this

6  case.[7]  This takes away somewhat from the prejudice Dialysist found to exist when

7  a "drastic change [in a party's] litigation theory" takes place mid-stream in the

8  litigation process.  Id. at 953.  Simply put, without a schedule for the filing of pre-trial

9  motions and other matters (e.g., discovery cutoff), the parties have been given free

10  reign in how to conduct the litigation in this case.

11      That the delay in bringing the proposed amendments and the relative length

12  of time into the litigation when those amendments were brought may not neatly fold

13  into Dialysist's reasoning does not mean that leave must nonetheless be granted.

14  The 04-9059 action, as it is presently constituted, is not a complex one.  It asks a

15  rather narrow and straightforward question — Did anything from Bryant's

16  employment at Mattel during the 1999-2000 period give Mattel ownership rights to

17  the BRATZ doll line?  The proposed amendments would radically alter the litigation

18  in that case to include far ranging disputes involving multiple parties and concerning

19  events not connected with the BRATZ ownership issue.  That the original action

20  was a relatively simple and straight-forward matter raises another point beyond the

21  change in the action's litigation posture — whether entangling the rival doll makers'

22  other commercial disputes into this particular case would serve to muddy the waters

23  and make the matter that much more difficult to manage from the Court's

24  perspective.

25  _____

26      [7]  Mattel's repeated refrain that the matter is in its nascent stage as evidenced
by the fact that the parties only just recently exchanged in initial disclosures is

27  misleading.  The exchange of initial disclosures referred to by Mattel is in the 05-
2727 case.  With respect to the 04-9059 case it appears that such initial disclosures

28  were completed long ago as evidenced by the fact that discovery disputes appeared
in that case as far back as January, 2005.

EXHIBIT _/_ PAGE _22_

1    As has long been recognized, equally important in determining whether to

2  grant such leave is what impact such amendments would have on the court's ability

3  to manage the case.  See 3 JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE

4  § 15.15[1] at 15-42.1 to 15-43 (3rd ed. 2006)("A court should also consider judicial

5  economy and its ability to manage the case. . . .  The court should also temper the

6  policy favoring freely granting leave to amend with consideration of the ability of the

7  district court to manage the case adequately if amendment is allowed").  As Judge

8  Clark for the Fifth Circuit once observed: "In keeping with the purposes of the rule,

9  the court should consider judicial economy and whether the amendments would

10  lead to expeditious disposition of the merits of the litigation.  Finally, the court

11  should consider whether the amendment adds substance to the original allegations,

12  and whether it is germane to the original case of action." Chitimacha Tribe of

13  Louisiana v. Harry L. Laws Co., 690 F.2d 1157, 1163 (5th Cir. 1982); see also

14  Sierra Club v. Union Oil Co. of California, 813 F.2d 1480, 1493 (9th Cir.

15  1987)("General considerations of judicial economy also justify allowing the

16  amendments. The violations included in the proposed amendment relate to the

17  same subject matter as the original complaint.  Allowing the amendment will further

18  the federal policy of 'wrapping in one bundle all matters concerning the same

19  subject matter.'").

20    Mattel's amendments do not add substance to the claims contained in its

21  original complaint.  Rather, they would expand the universe of claims and

22  defendants stretching well-beyond the questions raised in the original complaint

23  over whether Bryant's conduct while in the employ of Mattel subjected his later

24  attributed creation of the BRATZ dolls to the provisions in Mattel's Inventions

25  Agreement or otherwise rendered his creation subject to an infringement action.

26  Nowhere does Mattel seek to reconcile the breadth of its present amendments with

27  the narrowness of the allegations contained in its original complaint.  In fact, the

28  precise opposite is true.  Mattel acknowledges that its proposed amendments bear

EXHIBIT __1__ PAGE 23

1   more congruity to the allegations leveled against it in MGA's Lanham Act case than

2   to those in the action to which it seeks to add them:

3               [M]any of the matters raised by Mattel's proposed
4               Amended Complaint are and will remain at issue
                because of MGA's Complaint, whether or not leave to
5               amend is granted. MGA's claims allege that a broad
                array of purported Mattel conduct across the globe,
6               starting at least as early as 1999, has violated the
                Lanham Act and unfair competition law. This includes
7               Mattel's alleged infringement of Bratz and other MGA
                products. As a result, issues in the proposed Amended
8               Complaint are already part and parcel of Mattel's
                defenses to MGA's unfair competition claims, including
9               because they show that MGA and Bryant, and not
                Mattel, are ones who stole the products and other
10              properties involved.

11  (Reply to Bryant Opp. at 7 (emphasis added)). Mattel apparently finds this

12  discongruity unimportant because "all of these matters have been consolidated with

13  the Bryant case." (Id. at 7). As noted earlier, the fact that the cases have been

14  consolidated does not mean that the parties can ignore the distinctions that still

15  exist between them. If, as Mattel acknowledges, the present amendments are

16  nothing more than re-formulated defenses and counterclaims it presently has to

17  MGA's complaint against it in the 05-2727 case, then such amendments should be

18  brought in the form of an amended answer and counterclaim in that case.

19          Consideration of the distinctions between the two cases is wise as it serves

20  as a useful tool in providing the Court a better means to manage the cases now

21  that they have been consolidated. The proverbial dog (ownership in BRATZ)

22  should be wagging the proverbial tail (the remaining commercial disputes), not the

23  other way around. Admittedly, the dog's tail has grown in size both by MGA's filing

24  of its complaint in the 05-2727 action and Mattel's response thereto through its

25  proposed amendments. Nonetheless, it is readily apparent to the Court that the

26  crown jewel in this action still remains the ownership rights to the BRATZ dolls. The

27  parties have engaged in extensive and undoubtedly expensive discovery on this

28  very issue (from hiring world-renowned experts to test the age of Bryant's design

20

1   drawings to technically complex discovery of what is on each other's computers).

2          Indeed the separateness of the two matters is reflected in how the cases are

3   currently structured, namely, the narrowness of the issue involved in 04-9059 and

4   the expansiveness of the facts at issue in 05-2727. In light of this fact, the Court

5   believes a two-track scheduling order wherein the 04-9059 matter's discovery cut

6   off and trial date are set well-ahead of those in 05-2727 makes the most sense. As

7   noted earlier, many of the legal claims being pressed in 05-2727 will be affected by

8   the result of the litigation in 04-9059. If, for instance, Mattel does own the rights to

9   the BRATZ dolls (either owing to Bryant's stealing his idea from one of Mattel's

10  "development programs" or by way of the Inventions Agreement because he

11  continued to work on his designs while at Mattel), then large portions of MGA's

12  Lanham Act infringement claims may become moot. By the same token, if Mattel

13  does not own rights to BRATZ, then some of the defenses and counterclaims set

14  forth as independent claims in the present amended complaint may become moot,

15  including Mattel's copyright infringement claim as well as portions of its remaining

16  RICO, misappropriation, and aiding and abetting claims. If, however, the Court

17  were to allow the amended complaint to be filed in the 04-9059 action, such case

18  management would be difficult, if not impossible as many of the issues being

19  litigated in the 05-2727 case would have been poured into the 04-9059 case by the

20  amendment. Due to this substantial overlap in claims and facts, a two-track

21  scheduling order utilizing the case number distinctions would be impossible to craft.

22  When pressed by the Court at oral argument as to which of its proposed claims it

23  believed would <u>not</u> undermine the BRATZ ownership posture of the 04-9059 case,

24  Mattel cited to its copyright and RICO claims. However, upon further questioning

25  by the Court, counsel for Mattel acknowledged that much of those claims were, like

26  the claims at issue in 05-2727, dependent upon resolution of the ownership issue.

27          In light of the burden allowing Mattel's amendment to proceed would have on

28  this Court's ability to efficiently manage these consolidated matters denial of

21

EXHIBIT __1__ PAGE _25_

1  Mattel's request to amend its complaint in the 04-9059 matter is justified.  See

2  Perrian v. O'Grady, 958 F.2d 192, 195 (7th Cir. 1992)("The burden to the judicial

3  system can justify a denial of a motion to amend 'even if the amendment would

4  cause no hardship at all to the opposing party'").  Buttressing the Court's decision is

5  the fact that, even with such a denial, Mattel may file (and the Court provides leave

6  to Mattel to so file) an amended answer and counterclaim in the 05-2727 case

7  raising all the new claims and defendants presently sought to be achieved through

8  amendment of its complaint in the 04-9059 action.  None of the substantive

9  concerns raised by MGA and Bryant to the present amended complaint, e.g.,

10  statutes of limitations, would appear to be affected if the new claims and

11  defendants were brought as defenses and counterclaims in the 05-2727 case as

12  opposed to the 04-9059 one.

13      Accordingly, the Court GRANTS Mattel's motion for leave to file its proposed

14  amendments, but only insofar as they are pled in the form of an amended answer

15  and counterclaim in the 05-2727 case.

16      Finally, the lack of a scheduling order in this case is problematic; one should

17  have been entered long ago.  See Fed. R. Civ. P. 16(b)(noting that a scheduling

18  "order shall issue as soon as practicable but in any event within 90 days after the

19  appearance of a defendant and within 120 days after the complaint has been

20  served on a defendant").  In light of the fact that entry of a scheduling order is

21  woefully overdue in this case, the Court hereby ORDERS that a Rule 16(b)

22  scheduling conference be held in this consolidated matter on February 12, 2007, at

23  1:30 p.m. in Courtroom One.  The parties are directed to file a Joint Rule 26(f)

24  report with the Court by February 5, 2007.

25      IT IS SO ORDERED.

26  DATE:  _1-11-07_

27

28  _____
    STEPHEN G. LARSON
    UNITED STATES DISTRICT JUDGE

22

EXHIBIT __1__ PAGE __26__

**SEND**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA - Eastern Division
<u>CIVIL MINUTES - GENERAL</u>

Case No.      CV 04-09059 SGL(RNBx)                                    Date:   February 12, 2007
Title:        MATTEL, INC. -v- CARTER BRYANT, DOES 1-10, INCLUSIVE
              **Consolidated Action**
              CV 05-02727 SGL(RNBx)   MGA ENTERTAINMENT v. MATTEL, INC.,
==============================================================================
PRESIDING:  HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

Jim Holmes                                  Theresa Lanza
Courtroom Deputy Clerk                      Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:           ATTORNEYS PRESENT FOR DEFENDANTS:

John B. Quinn and Michael Zeller for        Diana M. Torres for MGA
Mattel                                      Keith A. Jacoby for Carter Bryant

PROCEEDINGS:     SCHEDULING CONFERENCE PURSUANT TO FRCP 16(b)

       The Court convened a scheduling conference pursuant to FRCP 16(b).  Court and counsel
discussed case management and thereafter the court set the following schedule:  <u>See</u> attachment
"Schedule of Trial and Pretrial Dates."

       Counsel stipulated pursuant to Local Rule 16-14, to settlement procedure #3, to a retired judicial
officer or other private or non-profit dispute resolution body for mediation type settlement proceedings.
The Court approves the request and refers this case to an outside Mediator to act as the Settlement
Officer.  Counsel are directed to contact such outside Mediator to schedule a settlement conference as
soon as the parties believe such a conference would be fruitful. The cut-off to complete the mandatory
settlement procedures under Local Rule 16-14, is December 3, 2007, in Case No. CV 04-09059-SGL
(RNBx) <u>Mattel, Inc. v. Carter Bryant</u>, and the cut-off to complete the mandatory settlement procedures
under Local rule 16-14, is April 21, 2008, in Case No. CV 05-02727 SGL (RNBx) <u>MGA Entertainment v.
Mattel, Inc.</u>

       The Court further ordered that in both Case No. CV 04-09049-SGL (RNBx), <u>Mattel, Inc. v. Carter
Bryant</u>, and Case No. CV 05-02727 SGL (RNBx), <u>MGA Entertainment v. Mattel, Inc.</u>:

       1.      Non-Expert Depositions are limited to a total of 24 for each side for both cases.
       2.      Expert Depositions are limited to a total of 20 for each side for both cases.
       3.      Interrogatories are limited to 50 for each side for both cases.

       IT IS SO ORDERED.                                         EXHIBIT 2 PAGE 27

2-12-07

## SCHEDULE OF TRIAL AND PRETRIAL DATES

**CASE NAME:**     CARTER BRYANT -v- MATTEL, INC., CASE NO: CV 04-09059-SGL(RNBx)

(Consolidated Case No: CV 05-2727-SGL(RNBx), MGA Entertainment, Inc. v. Mattel, Inc., et al.)

| Matter | Time | Court Order |
|---|---|---|
| Jury Trial Date | 9:30 am | 02/12/08 |
| Estimated Length of Trial | | |
| [Hearing on Motions in Limine; Hearing on Disputed Jury Instructions | 10:00 am | 02/04/08 |
| Final Pretrial Conference, LR 16-7 Motions in Limine to be filed | 11:00 am | 01/14/08 |
| Lodge Pretrial Conference Order, LR 16-6 to 16-6.2; File Contentions of Fact and Law, LR16-2.8; Exhibit & Witness Lists, LR 16-4 to 16-5; File Status Report regarding Settlement; File Rule 26(e)(1) Supplementation File Agreed Upon Set of Jury Instructions and Verdict Forms LR 49-1 to 49-2, 51-1 to 51-5.1; File Joint Statement regarding Disputed Instructions, Verdicts, etc. | | 12/31/07 |
| Last date to conduct Settlement Conference | | 12/03/07 |
| Last date for hearing motions, LR 7.2, *et seq.* | 10:00 am | 11/19/07 |
| Discovery cut-off | | 10/22/07 |
| Last date to Amend Pleadings or Add Parties | | Closed |

### ADDITIONAL MATTERS TO BE DETERMINED AT SCHEDULING CONFERENCE

LR 16-14.4 Settlement Selection:     ☐ 1. CT/USMJ          ☑ 3. Outside ADR
to be discussed

          ☐ 2. Attorney Settlement Panel          ☐

DOE Dismissal:          Complaint Filed: 04/13/05          SET DATE

          Dismissal Date:          to be discussed

EXHIBIT __2__ PAGE __28__

 

**SEND**

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA - Eastern Division
### CIVIL MINUTES - GENERAL

Case No.   CV 04-09059 SGL(RNBx)                              Date:  February 12, 2007
Title:       MATTEL, INC. -v- CARTER BRYANT, DOES 1-10, INCLUSIVE
            **Consolidated Action**
            CV 05-02727 SGL(RNBx)    MGA ENTERTAINMENT v. MATTEL, INC.,
==================================================================
PRESIDING: HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

Jim Holmes                                    Theresa Lanza
Courtroom Deputy Clerk                         Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:        ATTORNEYS PRESENT FOR DEFENDANTS:

John B. Quinn and Michael Zeller for        Diana M. Torres for MGA
Mattel                                       Keith A. Jacoby for Carter Bryant

PROCEEDINGS:     SCHEDULING CONFERENCE PURSUANT TO FRCP 16(b)

       The Court convened a scheduling conference pursuant to FRCP 16(b).  Court and counsel
discussed case management and thereafter the court set the following schedule: See attachment
"Schedule of Trial and Pretrial Dates."

       Counsel stipulated pursuant to Local Rule 16-14, to settlement procedure #3, to a retired judicial
officer or other private or non-profit dispute resolution body for mediation type settlement proceedings.
The Court approves the request and refers this case to an outside Mediator to act as the Settlement
Officer.  Counsel are directed to contact such outside Mediator to schedule a settlement conference as
soon as the parties believe such a conference would be fruitful. The cut-off to complete the mandatory
settlement procedures under Local Rule 16-14, is December 3, 2007, in Case No. CV 04-09059-SGL
(RNBx) Mattel, Inc. v. Carter Bryant, and the cut-off to complete the mandatory settlement procedures
under Local rule 16-14, is April 21, 2008, in Case No. CV 05-02727 SGL (RNBx) MGA Entertainment v.
Mattel, Inc.

       The Court further ordered that in both Case No. CV 04-09049-SGL (RNBx), Mattel, Inc. v. Carter
Bryant, and Case No. CV 05-02727 SGL (RNBx), MGA Entertainment v. Mattel, Inc.:

       1.      Non-Expert Depositions are limited to a total of 24 for each side for both cases.
       2.      Expert Depositions are limited to a total of 20 for each side for both cases.
       3.      Interrogatories are limited to 50 for each side for both cases.

       IT IS SO ORDERED.                              EXHIBIT _2_ PAGE _29_

MINUTES FORM 90                                               Initials of Deputy Clerk: jh
CIVIL -- GEN                    Page 1      FEB 2 2 2007      00/30




## SCHEDULE OF TRIAL AND PRETRIAL DATES

**CASE NAME:**    MGA ENTERTAINMENT, INC. V. MATTEL, INC., et al.,

**CASE NO:**    CV 05-2727-SGL (RNBx)

| Matter | Time | Court Order |
|---|---|---|
| Jury Trial Date | 9:30 am | 07/01/08 |
| Estimated Length of Trial | | |
| (Hearing on Motions in Limine; Hearing on Disputed Jury Instructions | 10:00 am | 06/23/08 |
| Final Pretrial Conference, LR 16-7 Motions in Limine to be filed | 11:00 am | 06/02/08 |
| Lodge Pretrial Conference Order, LR 16-6 to 16-6.2; File Contentions of Fact and Law, LR16-2.8; Exhibit & Witness Lists, LR 16-4 to 16-5; File Status Report regarding Settlement; File Rule 26(e)(1) Supplementation File Agreed Upon Set of Jury Instructions and Verdict Forms LR 49-1 to 49-2, 51-1 to 51-5.1; File Joint Statement regarding Disputed Instructions, Verdicts, etc. | | 05/19/08 |
| Last date to conduct Settlement Conference | | 04/21/08 |
| Last date for hearing motions, LR 7.2, et seq. | 10:00 am | 04/07/08 |
| Discovery cut-off | | 03/03/08 |
| Last date to Amend Pleadings or Add Parties | | Closed |

## ADDITIONAL MATTERS TO BE DETERMINED AT SCHEDULING CONFERENCE

LR 16-14.4 Settlement Selection:     ☐ 1. CT/USMJ          ☑ 3. Outside ADR
to be discussed

☐ 2. Attorney Settlement Panel     ☐

DOE Dismissal:     Complaint Filed: 04/13/05     SET DATE

Dismissal Date:     to be discussed

EXHIBIT _2_ PAGE _30_

S:\SGL\CIVIL ORDERS\MGA 05-2727 MO 2-12-07.wpd

**From:**     Name:        United States District Court
                           312 North Spring Street
                           Los Angeles, CA  90012
              Voice Phone: (213) 894-5474

**To:**       Name:        Michael Zeller
              Company:
                           865 S Figueroa St, 10th Floor,
              City/State:  Los Angeles, CA 90017-2543
              Fax Number:  213-443-3100



### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

## Automated Document Delivery Service

*Notice pursuant to Rule 77(d) FRCiv.P*
*The attached copy is hereby served upon you pursuant to Federal Rule of Civil Procedure 77(d).*

**Fax Notes:**

Case 2:05-CV-02727 : MGA ENTERTAINMENT INC V. MATTEL INC ET AL

*Pursuant to General Order 06-07, Section F, the following documents shall be submitted in the traditional manner: Pen Registers, Search Warrants, Seizure Warrants, Wire Taps, Bond Related Documents, Under Seal and In-Camera Documents, and All Charging Documents (Complaints, Informations, Indictments, and Superseding Charging Documents). All other documents filed in cases unassigned to a judge shall be filed electronically with a copy e-mailed to the criminal intake mailbox for the appropriate division. The proper e-mail address for each division is as follows:*

*Western Division: CrimIntakeCourtDocs-LA@cacd.uscourts.gov*
*Southern Division: CrimIntakeCourtDocs-SA@cacd.uscouts.gov*
*Eastern Division: CrimIntakeCourtDocs-RS@cacd.uscourts.gov*

*For additional information and assistance, please refer to the CM/ECF page on the Court website at www.cacd.uscourts.gov.*

**Switch to e-mail delivery and get these documents sooner!**
**To switch, complete and submit**
**Optical Scanning Enrollment / Update form G-76.**
**Call 213-894-5474 for help and free technical support.**

*If you received this document in error because the attorney with whom this document is directed is no longer the attorney on the case, a Notice of Change of Attorney Information, form G-6, must be filed. If there are other cases which you've received documents for which you are no longer the attorney, separate notices must be filed for each case. Failure to do so will result in the continued sending of documents to you. Form G-6 is available on the court's website at www.cacd.uscourts.gov or at the Clerk's Office.*

Date and time of transmission:        Thursday, February 22, 2007 3:14:36 PM
Number of pages including this cover sheet:  03

EXHIBIT  2  PAGE  31

1   QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
2     John B. Quinn (Bar No. 90378)
      (johnquinn@quinnemanuel.com)
3     Michael T. Zeller (Bar No. 196417)
      (michaelzeller@quinnemanuel.com)
4     Jon D. Corey (Bar No. 185066)
      (joncorey@quinnemanuel.com)
5     Duane R. Lyons (Bar No. 125091)
      (duanelyons@quinnemanuel.com)
6   865 South Figueroa Street, 10th Floor
    Los Angeles, California 90017-2543
7   Telephone: (213) 443-3000
    Facsimile: (213) 443-3100

8   Attorneys for Mattel, Inc.

9               UNITED STATES DISTRICT COURT

10              CENTRAL DISTRICT OF CALIFORNIA

11   CARTER BRYANT, an individual,        CASE NO. CV 04-9049 SGL (RNBx)

12                      Plaintiff,         Consolidated With Case No. 04-9059 and
                                           Case No. 05-2727
13           v.
                                           MATTEL, INC.'S SECOND AMENDED
14                                         ANSWER IN CASE NO. 05-2727 AND
                                           COUNTERCLAIMS FOR:
15   MATTEL, INC., a Delaware
     corporation,                          1.  COPYRIGHT INFRINGEMENT;
16                                         2.  VIOLATION OF THE
                        Defendant.             RACKETEER INFLUENCED AND
17                                             CORRUPT ORGANIZATIONS
                                               ACT;
18   MGA ENTERTAINMENT, INC. a            3.  CONSPIRACY TO VIOLATE THE
     California corporation,                   RACKETEER INFLUENCED AND
19                                             CORRUPT ORGANIZATIONS
                        Plaintiff,             ACT;
20                                         4.  MISAPPROPRIATION OF TRADE
                                               SECRETS;
21           v.                            5.  BREACH OF CONTRACT;
                                           6.  INTENTIONAL INTERFERENCE
22   MATTEL, INC., a Delaware                  WITH CONTRACT;
     corporation, and DOES 1-10,           7.  BREACH OF FIDUCIARY DUTY;
23                                         8.  AIDING AND ABETTING
                        Defendants.            BREACH OF FIDUCIARY DUTY;
24                                         9.  BREACH OF DUTY OF
                                               LOYALTY;
25

26                                         CONFIDENTIAL FILED UNDER
                                           SEAL, PURSUANT TO
27                                         PROTECTIVE ORDER

28                                         Volume I

CLERK, U.S. DISTRICT COURT
JUL 12 2007
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION        BY DEPUTY

EXHIBIT 3 PAGE 32

c7·12·c7

07209/2154363.3

SECOND AMENDED ANSWER AND COUNTERCLAIMS

1  | MATTEL, INC., a Delaware corporation,

2  |                    Counter-claimant,

3  |        v.

4  | MGA ENTERTAINMENT, INC., a

5  | California corporation; ISAAC LARIAN, an individual; CARTER

6  | BRYANT, an individual; MGA ENTERTAINMENT (HK) LIMITED,

7  | a Hong Kong Special Administrative Region business entity; MGAE DE

8  | MEXICO, S.R.L. DE C.V., a Mexico business entity; CARLOS

9  | GUSTAVO MACHADO GOMEZ, an individual; and DOES 4 through 10,

10 |

11 |                    Counter-defendants.

12 | AND CONSOLIDATED CASES

13 |

10. AIDING AND ABETTING BREACH OF DUTY OF LOYALTY;
11. CONVERSION;
12. UNFAIR COMPETITION; AND
13. DECLARATORY RELIEF.

DEMAND FOR JURY TRIAL

EXHIBIT 3 PAGE 33

07209/2154363.3

-2-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

1    **SECOND AMENDED ANSWER**

2        Pursuant to the Court's Orders of January 12, 2007 and June 27, 2007,

3    Defendant Mattel, Inc. ("Mattel") answers the Complaint of MGA Entertainment,

4    Inc. ("Complaint") as follows:

5                        Preliminary Statement

6        The Complaint in this case contravenes <u>Rule</u> 8(a) of the <u>Federal Rules</u>

7    <u>of Civil Procedure</u> in multiple respects.  For example, in many places, the Complaint

8    improperly mixes factual averments with argumentative rhetoric.  The Complaint

9    also includes a selective recitation of alleged historical facts and "rumor," much of

10   which is both irrelevant and inflammatory in tone and content.  In addition, many of

11   the allegations of the Complaint are overly broad, vague or conclusory and include

12   terms which are undefined and which are susceptible to different meanings.

13   Accordingly, by way of a general response, all allegations are denied unless

14   specifically admitted, and any factual averment admitted is admitted only as to the

15   specific facts and not as to any conclusions, characterizations, implications or

16   speculations which are contained in the averment or in the Complaint as a whole.

17   These comments and objections are incorporated, to the extent appropriate, into

18   each numbered paragraph of this Second Amended Answer.

19       Mattel further submits that the use of the headings throughout the

20   Complaint is improper, and therefore no response to them is required.  In the event

21   that a response is required, Mattel denies those allegations.

22       The Complaint also contains many purported photographs of various

23   items, and it uses one or more headings purporting to describe, either individually or

24   in groups, these various photographs.  The images of these photographs contained in

25   the Complaint are all relatively small and some are of less than optimal quality,

26   making it difficult to evaluate the adequacy of the photographs or their fairness and

27   accuracy in depicting what they purport to represent.  The Complaint also does not

28   describe the circumstances or time frame in which these photographs were taken,

EXHIBIT _3_ PAGE _34_

-3-

2154363.2

1  and in many cases does not identify, or does not sufficiently or properly identify, the

2  item depicted in the photographs.  All of these factors, as well as the use of these

3  photographs and headings out of context, or with an insufficient context, impair the

4  ability of Mattel to fully respond to these photographs and headings, or to any

5  purported allegations involving, or relying upon, the use of such photographs and

6  accompanying headings.  By way of a general response, Mattel therefore does not

7  admit the authenticity of any photograph, or the accuracy or adequacy of any

8  heading, nor does it admit any allegation or inference that is based on, or purports to

9  be based on, any photograph or accompanying heading in the Complaint.  Mattel

10  reserves the right to challenge the authenticity of any photograph and the accuracy

11  or adequacy of any heading (either as included in the Complaint or in the context of

12  additional material not included).  Further, with reference to all photographs and

13  accompanying headings, or any averments based on the Complaint's use of such

14  photographs and headings, which might be offered into evidence, Mattel specifically

15  reserves its right to object to any use of such photographs, headings, and averments,

16  or the Complaint as a whole or in part, in evidence for any purpose whatsoever.

17          To the extent that Mattel has endeavored to answer any particular

18  allegation containing any such photographs and headings, any admission concerning

19  the item purported to be depicted in such photograph, or described in such headings,

20  shall not constitute an admission that the photograph is authentic, adequate, or

21  admissible, nor that any heading is accurate, adequate, or admissible.  All such items

22  purportedly depicted in such photographs, and described in such headings, "speak

23  for themselves".  Accordingly, to the extent that any such referenced materials are

24  deemed allegations against Mattel, they are denied.

25                                   <u>Responses</u>

26          1.      Answering paragraph 1 of the Complaint, Mattel admits that

27  plaintiff MGA Entertainment, Inc. ("plaintiff" or "MGA") is a California

28  corporation with a principal place of business in Van Nuys, California.

EXHIBIT _3_ PAGE _35_

SECOND AMENDED ANSWER AND COUNTERCLAIMS

154363.2

1           2.     Answering paragraph 2 of the Complaint, Mattel admits that

2 Mattel is a Delaware corporation with a principal place of business in El Segundo,

3 California.

4           3.     Answering paragraph 3 of the Complaint, Mattel denies that

5 there has been wrongful conduct on its part and states that it is without knowledge

6 or information sufficient to form a belief as to the truth or falsity of the remaining

7 allegations set forth therein and, on that basis, denies them.

8           4.     Answering paragraph 4 of the Complaint, Mattel admits that

9 plaintiff purports to assert claims under the Lanham Act, 15 U.S.C. §§ 1125(a) and

10 (c), California Business and Professions Code §§ 17200 *et seq.*, California Business

11 and Professions Code § 14330 and California common law, denies that plaintiff is

12 entitled to any relief thereunder and denies the truth of the remaining allegations set

13 forth in paragraph 4.

14           5.     Answering paragraph 5 of the Complaint, Mattel admits that it is

15 subject to personal jurisdiction in this District and denies the truth of the remaining

16 allegations set forth in paragraph 5.

17           6.     Answering paragraph 6 of the Complaint, Mattel admits that

18 venue is proper in this District and denies the truth of the remaining allegations set

19 forth in paragraph 6.

20           7.     Answering paragraph 7 of the Complaint, Mattel admits that

21 MGA has filed the instant lawsuit and denies the truth of the remaining allegations

22 set forth in paragraph 7.

23           8.     Answering paragraph 8 of the Complaint, Mattel states that it is

24 without knowledge or information sufficient to form a belief as to the truth or falsity

25 of the allegations regarding MGA's history set forth therein and, on that basis,

26 denies them, states that MGA has made conflicting representations, including in

27 sworn statements, that are at odds with the allegations of the Complaint and denies

28 the truth of the remaining allegations set forth in paragraph 8.

1    9.    Answering paragraph 9 of the Complaint, Mattel admits that

2  MGA filed this action, states that Mattel's web site and corporate governance

3  policies speak for themselves and denies the truth of the remaining allegations set

4  forth in paragraph 9.

5    10.    Answering paragraph 10 of the Complaint, Mattel admits that it

6  is the world's most successful toy company, states that the first doll in its BARBIE

7  line was publicly introduced in 1959 and that BARBIE-branded dolls have been the

8  world's best-selling toys, states that Mattel's sales and stock price speak for

9  themselves, and denies the truth of the remaining allegations set forth in paragraph

10  10.

11    11.    Answering paragraph 11 of the Complaint, Mattel admits that

12  Adrienne Fontanella is the former president for girls' toys at Mattel, states that it is

13  without knowledge or information sufficient to form a belief as to the truth or falsity

14  of the allegations regarding an alleged statement by Ms. Fontanella, and denies the

15  truth of the remaining allegations set forth in paragraph 11.

16    12.    Answering paragraph 12 of the Complaint, Mattel is without

17  knowledge or information sufficient to form a belief as to the truth or falsity of the

18  allegations regarding alleged statements by unidentified "analysts," states that

19  Mattel's sales and stock price speak for themselves, and denies the truth of the

20  remaining allegations set forth in paragraph 12.

21    13.    Answering paragraph 13 of the Complaint, Mattel admits that Jill

22  Barad became President and Chief Executive Officer of Mattel in January 1997, that

23  Mattel acquired Tyco Industries, Inc. ("Tyco") in March 1997, that Mattel acquired

24  Pleasant Company in 1998, Mattel acquired the Learning Company in May 1999,

25  that Mattel acquired Purple Moon in 1999, that the MATCHBOX brand was owned

26  by Tyco, that the AMERICAN GIRL line of dolls was made by Pleasant Company

27  at the time of that entity's acquisition, and denies the truth of the remaining

28  allegations set forth in paragraph 13.

2154363.2

EXHIBIT 3 PAGE 37

-6-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

14.    Answering paragraph 14 of the Complaint, Mattel states that its public announcements speak for themselves, and denies the truth of the remaining allegations set forth therein.

15.    Answering paragraph 15 of the Complaint, Mattel states that its stock price and its public announcements speak for themselves, and denies the truth of the remaining allegations set forth therein.

16.    Answering paragraph 16 of the Complaint, Mattel states that its stock price speaks for itself, states that it is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations regarding the alleged views of unnamed "analysts" and "[i]nvestors," and denies the truth of the remaining allegations set forth therein.

17.    Answering paragraph 17 of the Complaint, Mattel admits that Ms. Barad resigned in February 2000.

18.    Answering paragraph 18 of the Complaint, Mattel admits that Robert Eckert became Chairman and Chief Executive Officer of Mattel in May 2000 and that Mr. Eckert previously was employed at Kraft Foods, Inc. for 23 years, is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations regarding the views of unnamed "[i]nvestors" and others, and denies the truth of the remaining allegations set forth in paragraph 18.

19.    Answering paragraph 19 of the Complaint, Mattel admits that the *Wall Street Journal* published an article on August 10, 2000 the content of which speaks for itself, and denies the truth of the remaining allegations set forth therein.

20.    Answering paragraph 20 of the Complaint, Mattel admits that it disposed of the Learning Company in October 2000, states that its sales and revenues speak for themselves, states that the remainder of the allegations contained therein are characterizations, not factual assertions, and therefore no response is necessary under Fed. R. Civ. P. 8(b) and, to the extent any further response is required, denies the truth of any remaining allegations set forth in paragraph 20.

1    21.    Answering paragraph 21 of the Complaint, Mattel admits that

2  products in plaintiff's "Bratz" line compete with products in Mattel's BARBIE and

3  other product lines and states that the remainder of the allegation contained

4  therein—consisting of a sentence fragment—is unintelligible and on that basis

5  denies the truth of any such remaining allegation set forth therein.

6    22.    Answering paragraph 22 of the Complaint, Mattel admits that

7  products in plaintiff's "Bratz" line compete with Mattel products, states that the

8  remainder of the allegations contained therein are characterizations, not factual

9  assertions, and that therefore no response is necessary under Fed. R. Civ. P. 8(b)

10  and, to the extent any further response is required, denies the truth of any remaining

11  allegations set forth therein.

12    23.    Answering paragraph 23 of the Complaint, Mattel states that

13  MGA has made conflicting statements, including in sworn statements, that are

14  inconsistent with the allegations set forth in paragraph 23 of the Complaint and

15  states that it is therefore without knowledge or information sufficient to form a

16  belief as to the truth or falsity of the allegations set forth therein and, on that basis,

17  denies them.

18    24.    Answering paragraph 24 of the Complaint, Mattel states that the

19  "look" of the referenced dolls speak for themselves and denies the truth of the

20  remaining allegations set forth therein.  By way of further answer, Mattel states that

21  the photographs and their accompanying caption on page 7 of the Complaint are

22  false and misleading to the extent they are intended to suggest that MGA has

23  produced or used a consistent packaging shape or look or that it has protectible

24  rights in the matters depicted in the photographs.

25    25.    Answering paragraph 25 of the Complaint, Mattel admits that

26  Bratz dolls are between approximately 9.5 to 10 inches in height, states that the

27  appearances of the dolls speak for themselves, denies that "Bratz" dolls are or "were

28  intentionally shorter" than dolls in Mattel's BARBIE line, denies that the "Bratz"

EXHIBIT _3__ PAGE _39_

154363.2

-8-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

1  dolls "looked like no other" and denies the truth of the remaining allegations set

2  forth in paragraph 25.

3       26.   Answering paragraph 26 of the Complaint, Mattel states that the

4  use of the term "classic" is unintelligible, since Mattel has designed and sold

5  different dolls using different heads and with different fashions and themes over the

6  years, and denies the truth of any remaining allegations.  By way of further answer,

7  Mattel states that the image encaptioned "Mattel's 'Barbie'" on page 8 of the

8  Complaint is misleading in that it depicts one of the doll heads that have been used

9  as part of the BARBIE line for many years, and therefore ignores that Mattel has

10  long designed and sold an array of different BARBIE line dolls that use different

11  doll heads, including doll heads which depict different ethnicities, and that are

12  dressed in different clothing and fashion styles.

13       27.   Answering paragraph 27 of the Complaint, Mattel admits that

14  MGA has used the line "The Girls With a Passion for Fashion" in some contexts,

15  denies that MGA originated or otherwise has rights to that phrase, admits that one

16  audience for products in the "Bratz" line has been "tweens" and denies the truth of

17  the remaining allegations set forth in paragraph 27.

18       28.   Answering paragraph 28 of the Complaint, Mattel admits that

19  certain "Bratz" dolls have won certain awards, the terms of which speak for

20  themselves, states that it is without knowledge or information sufficient to form a

21  belief as to the truth or falsity of the allegations regarding the "awards" MGA claims

22  and, on that basis, denies them, denies that plaintiff has protectible rights and denies

23  the truth of any remaining allegations set forth in paragraph 28.

24       29.   Answering paragraph 29 of the Complaint, Mattel admits that

25  dolls in the "Bratz" line compete with dolls in Mattel product lines, denies that

26  Mattel has or has ever had a "stranglehold" on any market, states that the market

27  allegations contained in paragraph 29 are vague and ambiguous, including without

28  limitation in that the allegations fail to specify what products among the parties'

EXHIBIT 3  PAGE 40

SECOND AMENDED ANSWER AND COUNTERCLAIMS

2154363.2

1 | respective lines are being referred to and what time period is being referred to, and

2 | denies the truth of any remaining allegations set forth in paragraph 29.

3 |      30.    Answering paragraph 30 of the Complaint, Mattel admits that

4 | MGA has been a licensee of Mattel, states that the market allegations are vague and

5 | ambiguous, including without limitation in that the allegations fail to specify what

6 | products are being referred to and what time periods or points in time are being

7 | referred to, and states that the remainder of the allegations contained therein are

8 | characterizations, not factual assertions, and therefore no response is necessary

9 | under Fed. R. Civ. P. 8(b) and, to the extent any further response is required, denies

10 | the truth of any remaining allegations set forth in paragraph 30.

11 |      31.    Answering paragraph 31 of the Complaint, Mattel states that the

12 | allegations contained therein are characterizations, not factual assertions, and

13 | therefore no response is necessary under Fed. R. Civ. P. 8(b) and, to the extent any

14 | further response is required, denies the truth of the allegations set forth in paragraph

15 | 31.

16 |      32.    Answering paragraph 32 of the Complaint, Mattel denies the

17 | truth of the allegations set forth therein.

18 |      33.    Answering paragraph 33 of the Complaint, Mattel denies the

19 | truth of the allegations set forth therein.

20 |      34.    Answering paragraph 34 of the Complaint, Mattel states that it

21 | has released various MY SCENE dolls, including MY SCENE dolls named

22 | "Madison", "Chelsea" and "Barbie," states that the appearance of the Bratz and MY

23 | SCENE dolls speak for themselves, denies that Mattel designed its MY SCENE

24 | dolls to "evoke" or resemble the alleged "look" of "Bratz" dolls, denies that plaintiff

25 | has protectible rights, states that MGA has made conflicting representations that are

26 | at odds with the allegations of the Complaint and that it is therefore without

27 | knowledge or information sufficient to form a belief as to the truth or falsity of the

28 | allegations regarding the "launch" of Bratz dolls set forth therein and, on that basis,

EXHIBIT 3 PAGE 41

1  denies them, and denies the truth of the remaining allegations set forth therein.  By

2  way of further answer, Mattel states that the photographs and their accompanying

3  captions on page 10 of the Complaint are misleading and false to the extent they are

4  intended to suggest that a particular Mattel doll has been changed over time as

5  purportedly depicted.  Among other things, Mattel has long designed and sold an

6  array of different BARBIE line dolls using different doll heads, and the photographs

7  encaptioned "Mattel's Traditional 'Barbie'" is one of the doll heads that has been

8  used, and continues to be used, as part of the BARBIE line.  In addition, the

9  photographs encaptioned MY SCENE doll "circa 2002" is, in fact, a Mattel doll

10  character called BARBIE that continues to be sold and/or marketed with that head,

11  and the photographs encaptioned MY SCENE doll "circa 2004" depict a MY

12  SCENE doll character separate and apart from the one depicted in the "circa 2002"

13  image (and is not a revised character as plaintiff apparently attempts to imply).

14       35.    Answering paragraph 35 of the Complaint, Mattel admits that

15  Mattel released a product line called FLAVAS, states that the appearance of the

16  FLAVAS dolls speaks for themselves, states that it is without knowledge or

17  information sufficient to form a belief as to the truth or falsity of the allegations

18  regarding the  "rumor" relied upon by plaintiff and the undefined "media"

19  purportedly quoting Isaac Larian and, on that basis, denies them, denies that Mattel

20  has abandoned the FLAVAS line, and denies the truth of the remaining allegations

21  set forth in paragraph 35.

22       36.    Answering paragraph 36 of the Complaint, Mattel denies the

23  truth of the allegations set forth therein.

24       37.    Answering paragraph 37 of the Complaint, Mattel denies the

25  truth of the allegations set forth therein.  By way of further answer, Mattel states that

26  the unnumbered photographs and their accompanying captions on pages 11 through

27  16 of the Complaint -- which apparently were included to purportedly support the

28  allegation that MY SCENE dolls "became 'Bratz,'" which allegation Mattel

EXHIBIT _3_ PAGE _42_

-11-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

specifically denies -- are false and misleading. Among other things, the heads depicted are among an array of different doll heads that Mattel has used, and continues to use, over the course of many years. Moreover, the images purport to compare different Mattel doll lines to show alleged changes in appearance even though, in fact, each of the heads are currently sold and/or marketed to the public. The "Blonde" series of photographs encaptioned "original" and "recent" MY SCENE is further and specifically misleading in that it purports to compare two differently named and outfitted dolls in the MY SCENE doll line, both of which continue to be sold and/or marketed.

38.   Answering paragraph 38 of the Complaint, Mattel states that the phrase "the 'BRATZ' eye" is unintelligible, denies that MGA has rights therein, denies that MGA was the originator of or the first to use the eye shape or makeup depicted as purportedly constituting "the 'BRATZ' eye," denies that Mattel has copied the "the 'BRATZ' eye" and denies the truth of the remaining allegations contained in paragraph 38. By way of further answer, Mattel states that the unnumbered photographs and accompanying caption on page 13 of the Complaint are false and misleading. Among other things, the purported "Original Mattel 'My Scene' Eye" is one of the eye and makeup designs that Mattel has used over the course of many years, and Mattel continues to sell and/or market dolls using the eye and makeup design depicted therein.

39.   Answering paragraph 39 of the Complaint, Mattel states that the phrase "the 'BRATZ' eye" is unintelligible, denies that MGA has rights therein, denies that MGA was the originator of or the first to use the eye shape or makeup purportedly described as constituting "the 'BRATZ' eye," denies that Mattel has copied "the 'BRATZ' eye," states that the relevant dolls speak for themselves and denies the truth of the remaining allegations contained in paragraph 39. By way of further answer, Mattel states that the unnumbered photographs and accompanying captions on page 14 of the Complaint are false and misleading. Among other things,

EXHIBIT 3   PAGE 43

2154363.2

-12-

1    the purported "New Mattel 'My Scene' Eye" is one of the eye and makeup designs
2    that Mattel has used over the course of many years, and Mattel continues to sell
3    and/or market dolls using the eye and makeup design depicted on page 14 of the
4    Complaint.

5           40.    Answering paragraph 40 of the Complaint, Mattel denies the
6    truth of the allegations therein.  By way of further answer, Mattel states that the
7    unnumbered photographs and their accompanying captions on pages 15 to 16 are
8    false and misleading.  Among other things, the heads depicted are among an array of
9    different doll heads that Mattel has used, and continues to use, over the course of
10   many years.  Moreover, the photographs purport to compare different Mattel doll
11   lines to show alleged changes in appearance even though, in fact, each of the heads
12   are currently sold and/or marketed to the public.  The "Blonde" series of
13   photographs encaptioned "original" and "recent" MY SCENE is further and
14   specifically misleading in that it purports to compare two differently named and
15   outfitted dolls in the MY SCENE doll line, both of which continue to be sold and/or
16   marketed.

17          41.    Answering paragraph 41 of the Complaint, Mattel denies the
18   truth of the allegations set forth therein.

19          42.    Answering paragraph 42 of the Complaint, Mattel admits that the
20   photographs purport to depict two packages that were, among others, part of the MY
21   SCENE line, state that the packages speak for themselves and denies the truth of any
22   remaining allegations set forth therein.

23          43.    Answering paragraph 43 of the Complaint, Mattel admits that the
24   photograph purports to depict one of the packages that were, among others, part of
25   the MY SCENE line, states that the parties' packages speak for themselves, states
26   that MGA has failed to establish that it originated, or has protectible rights in, an
27   "open and transparent style" for packaging and denies the truth of the remaining
28   allegations set forth therein.

EXHIBIT _3_ PAGE _44_

2154363.2

SECOND AMENDED ANSWER AND COUNTERCLAIMS

44.     Answering paragraph 44 of the Complaint, Mattel admits that one photograph purports to depict one of the packages that were, among others, part of the MY SCENE line, admits that the other photograph purports to depict one of the packages that were, among others, used as part of the Bratz line, states that the parties' packages speak for themselves, denies that MGA originated, or has protectible rights in, "the 'BRATZ' packaging" or in the packaging depicted in the Complaint and denies the truth of any remaining allegations set forth therein.

45.     Answering paragraph 45 of the Complaint, Mattel admits that one photograph purports to depict one of the packages that were, among others, part of the MY SCENE line, admits that the other photograph purports to depict one of the packages that were, among others, used as part of the Bratz line, states that the parties' packages speak for themselves, denies that MGA originated, or has protectible rights in, the packaging depicted in the Complaint and denies the truth of any remaining allegations set forth therein.

46.     Answering paragraph 46 of the Complaint, Mattel states that it has utilized a wide variety of packaging styles and shapes over the years, states that the relevant packaging speaks for itself, states that MGA lacks protectible rights in "non-rectangular shaped box" packaging or in the other elements MGA claims in paragraph 46, and denies the truth of the remaining allegations set forth therein.

47.     Answering paragraph 47 of the Complaint, Mattel denies that any alleged "theme" is "MGA's theme," denies that MGA originated or has rights to any theme and denies the truth of the remaining allegations set forth therein.

48.     Answering paragraph 48 of the Complaint, Mattel admits that it released a doll called "Chillin Out!", states that it has released such themed dolls over the course of many years, admits MGA released a "Wintertime Wonderland" themed doll, denies that MGA originated or has rights to such theme, states that the relevant products speak for themselves and denies the truth of the remaining allegations set forth therein.

EXHIBIT 3 PAGE 45

-14-

2154363.2

49.     Answering paragraph 49 of the Complaint, Mattel admits that it released a doll called "Night on the Town", states that it has released such themed dolls over the course of many years, admits MGA released a "Formal Funk" themed doll, denies that MGA originated or has rights to such theme, states that the relevant products speak for themselves and denies the truth of the remaining allegations set forth therein.

50.     Answering paragraph 50 of the Complaint, Mattel admits that it released a doll called "Jammin' in Jamaica" and a playset called "Guava Gulch Tiki Lounge", states that it has released such themed dolls and products over the course of many years, admits that MGA released a "Sun-Kissed Summer" themed doll and playset, denies that MGA originated or has rights to such theme, states that the relevant products speak for themselves and denies the truth of the remaining allegations set forth therein.

51.     Answering paragraph 51 of the Complaint, Mattel admits that it has aired television commercials for its MY SCENE line, states that such commercials speak for themselves, denies the truth of the remaining allegations set forth therein and specifically denies that MGA was the originator of or has rights to commercials "combining live action with animated sequences" set to "pop music and lyrics".

52.     Answering paragraph 52 of the Complaint, Mattel denies the truth of the allegations set forth therein.

53.     Answering paragraph 53 of the Complaint, Mattel admits that it released a MY SCENE "Sound Lounge", admits that MGA released a product called "Runway Disco", states that the relevant products speak for themselves, denies that it "imitated MGA's trapezoidal box," denies that MGA has rights thereto, and denies the truth of the remaining allegations set forth therein.

54.     Answering paragraph 54 of the Complaint, Mattel denies the truth of the allegations set forth therein.

EXHIBIT 3 PAGE 46

1    55.   Answering paragraph 55 of the Complaint, Mattel admits that,

2  among the styling heads it has produced and sold over the course of many years, it

3  released a MY SCENE styling head, admits that MGA released a styling head called

4  "Funky Fashion Makeover Head", states that the relevant products speak for

5  themselves, denies that MGA has protectible rights and denies the truth of the

6  remaining allegations set forth in paragraph 55.

7    56.   Answering paragraph 56 of the Complaint, Mattel is without

8  knowledge or information sufficient to form a belief as to the truth or falsity of the

9  allegations set forth therein because plaintiff fails to identify the alleged instances of

10  confusion, including the source of the unidentified picture titled "Hairstyle practice",

11  and on that basis, denies them, and denies the truth of any remaining allegations set

12  forth in paragraph 56.

13    57.   Answering paragraph 57 of the Complaint, Mattel admits that it

14  has aired television commercials for its MY SCENE line, states that such

15  commercials speak for themselves and denies the truth of the remaining allegations

16  set forth therein.

17    58.   Answering paragraph 58 of the Complaint, Mattel admits that

18  MGA has used the line "The Girls With a Passion for Fashion" in some contexts,

19  denies that MGA originated that phrase or otherwise has rights to it, states that

20  Mattel's web site speaks for itself and denies the truth of the remaining allegations

21  set forth therein.

22    59.   Answering paragraph 59 of the Complaint, Mattel admits that,

23  among the plush products that it has produced and sold over the course of many

24  years, it has released plush dogs as part of its MY SCENE "Miami Getaway"

25  themed product line, states that Mattel has for many years sold plush pets of the type

26  used with its MY SCENE dog, admits that MGA has released various Bratz pets,

27  states that MGA was not the originator of and has no rights to the features and other

28

EXHIBIT 3  PAGE 47

1  elements described therein, states that the relevant products speak for themselves
2  and denies the truth of the remaining allegations set forth therein.

3        60.    Answering paragraph 60 of the Complaint, Mattel admits that,
4  among the plush toys that it has released over the course of many years, its MY
5  SCENE dog has been sold in packaging depicted (in part) on page 22 of the
6  Complaint, states that Mattel has for many years sold plush pets and other plush
7  products in packaging of the type used with its MY SCENE dog, admits that MGA
8  has released a "Bratz" dog, states that MGA was not the originator of and has no
9  rights to the packaging described therein, states that the relevant packages speak for
10 themselves and denies the truth of the remaining allegations set forth therein.

11       61.    Answering paragraph 61 of the Complaint, Mattel denies that it
12 has intended to cause any consumer confusion and states that it is without
13 knowledge or information sufficient to form a belief as to the truth or falsity of the
14 allegations set forth therein concerning unnamed retailers, customers and others
15 because plaintiff fails to identify any source for the matters alleged and, on that
16 basis, denies them and denies the truth of any remaining allegations set forth therein.

17       62.    Answering paragraph 62 of the Complaint, Mattel denies that it
18 has intended to cause any confusion and states that it is without knowledge or
19 information sufficient to form a belief as to the truth or falsity of the allegations set
20 forth therein concerning alleged comments and conversations because plaintiff fails
21 to identify any source for the alleged comments and conversations and, on that
22 basis, denies them, and denies the truth of any remaining allegations set forth
23 therein.

24       63.    Answering paragraph 63 of the Complaint, Mattel denies that it
25 has intended to cause any confusion and states that it is without knowledge or
26 information sufficient to form a belief as to the truth or falsity of the allegations set
27 forth therein because plaintiff fails to identify any source for the alleged comments
28

EXHIBIT 3 PAGE 48

-17-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

1 | and conversations and, on that basis, denies them, and denies the truth of any
2 | remaining allegations set forth therein.

3 |         64.    Answering paragraph 64 of the Complaint, Mattel denies that it
4 | has intended to cause any confusion and states that it is without knowledge or
5 | information sufficient to form a belief as to the truth or falsity of the allegations set
6 | forth therein because plaintiff fails to identify any source for the alleged comments
7 | and conversations and, on that basis, denies them, and denies the truth of any
8 | remaining allegations set forth therein.

9 |         65.    Answering paragraph 65 of the Complaint, Mattel denies the
10 | truth of the allegations set forth therein.

11 |         66.    Answering paragraph 66 of the Complaint, Mattel admits that it
12 | sued a competitor in the German courts for unfair competition for copying various
13 | Mattel BARBIE line products, states that such claims exclusively arose under and
14 | were the subject of German law, states that since that time the Federal Supreme
15 | Court has rejected the contention made by MGA in paragraph 66 that
16 | "systematically copying and borrowing elements" from competing dolls supports a
17 | claim for unfair competition, and denies the truth of the remaining allegations set
18 | forth therein.

19 |         67.    Answering paragraph 67 of the Complaint, Mattel denies the
20 | truth of the allegations set forth therein.

21 |         68.    Answering paragraph 68 of the Complaint, Mattel admits that it
22 | has released dolls called "Wee 3 Friends," admits that MGA has released dolls
23 | called "4-Ever Best Friends," states that the relevant products speak for themselves,
24 | denies that MGA's packaging is distinctive, denies that MGA has protectible rights
25 | thereto and denies the truth of the remaining allegations set forth in paragraph 68.

26 |         69.    Answering paragraph 69 of the Complaint, Mattel admits that its
27 | Fisher Price division has released, among other dolls called "Little Mommy," the
28 | "Little Mommy Potty Training Baby Doll," admits that MGA has released a

2154363.2

-18-

EXHIBIT __3__ PAGE __49__

1  "Mommy's Little Patient" doll and denies the truth of the remaining allegations set

2  forth therein.

3         70.    Answering paragraph 70 of the Complaint, Mattel admits that it

4  has released die-cast cars and other products called "Acceleracers" as part of its

5  HOT WHEELS line, admits that MGA has released products called "AlienRacers,"

6  denies that MGA was the originator of or has rights to the elements and matters

7  described in paragraph 70, states that the relevant products speak for themselves and

8  denies the truth of the remaining allegations set forth therein.

9         71.    Answering paragraph 71 of the Complaint, Mattel admits that it

10  has aired commercials relating to "Acceleracers," states that such commercials

11  speak for themselves, denies the truth of the remaining allegations set forth therein

12  and specifically denies that MGA originated or has rights to commercials and other

13  matters described therein.

14         72.    Answering paragraph 72 of the Complaint, Mattel states that its

15  web site speaks for itself, denies the truth of the remaining allegations contained in

16  paragraph 72 and specifically denies that Mattel intended to create confusion in the

17  marketplace.

18         73.    Answering paragraph 73 of the Complaint, Mattel denies the

19  truth of the allegations set forth therein.

20         74.    Answering paragraph 74 of the Complaint, Mattel denies the

21  truth of the allegations set forth therein.

22         75.    Answering paragraph 75 of the Complaint, Mattel admits that it

23  has reminded certain former employees who became employed by MGA by letter of

24  their contractual and fiduciary obligation to maintain the secrecy of all Mattel

25  confidential and proprietary business information, states that such letters were

26  prepared and sent to their recipients in good faith contemplation of litigation, admits

27  that it filed a complaint for declaratory relief against Ronald Brawer in Los Angeles

28  Superior Court, entitled Mattel, Inc. v. Brawer, Case No. BC323381, on October 21,

1 │ 2004, states that pursuant to the Court's Order of August 25, 2005 it need not

2 │ respond to the allegations in paragraph 75 relating to that action, and denies the truth

3 │ of the remaining allegations set forth in paragraph 75.

4 │       76.     Answering paragraph 76 of the Complaint, Mattel states that

5 │ MGA cannot establish subject matter jurisdiction regarding extra-territorial acts,

6 │ including such acts that are lawful in foreign nations, and denies the truth of

7 │ allegations set forth therein.

8 │       77.     Answering paragraph 77 of the Complaint, Mattel states that

9 │ MGA cannot establish subject matter jurisdiction regarding extra-territorial acts,

10 │ including such acts that are lawful in foreign nations, and denies the truth of the

11 │ allegations set forth therein.

12 │       78.     Answering paragraph 78 of the Complaint, Mattel states that it is

13 │ without knowledge or information sufficient to form a belief as to the truth or falsity

14 │ of the allegations regarding MGA's claimed "shortage of doll hair" and, on that

15 │ basis, denies them and denies the truth of the remaining allegations set forth therein.

16 │       79.     Answering paragraph 79 of the Complaint, Mattel states that

17 │ MGA cannot establish subject matter jurisdiction regarding extra-territorial acts,

18 │ including such acts that are lawful in foreign nations, and denies the truth of

19 │ allegations set forth therein.

20 │       80.     Answering paragraph 80 of the Complaint, Mattel denies the

21 │ truth of the allegations set forth therein.

22 │       81.     Answering paragraph 81 of the Complaint, Mattel admits that

23 │ NPD Funworld ("NPD") supplies sales statistics in *inter alia* the toy, PC games and

24 │ video games industries, admits that to Mattel's knowledge NPD restricts the use of

25 │ its subscriber information, states that MGA was sued by NPD and states that it is

26 │ without knowledge or information sufficient to form a belief as to the truth or falsity

27 │ of the allegations regarding the need of unspecified "toy companies" for NPD

28 │

EXHIBIT _3_ PAGE _5/_

SECOND AMENDED ANSWER AND COUNTERCLAIMS

2154363.2

1  statistics and, on that basis, denies them and denies the truth of any remaining

2  allegations set forth therein.

3        82.  Answering paragraph 82 of the Complaint, Mattel denies the

4  truth of the allegations set forth therein.

5        83.  Answering paragraph 83 of the Complaint, Mattel states that it is

6  without knowledge or information sufficient to form a belief as to the truth or falsity

7  of the allegations set forth therein because MGA fails to quantify its annual

8  subscription fees and, on that basis, denies them.

9        84.  Answering paragraph 84 of the Complaint, Mattel states that it is

10  without knowledge or information sufficient to form a belief as to the truth or falsity

11  of the allegations set forth therein and, on that basis, denies them.

12        85.  Answering paragraph 85 of the Complaint, Mattel states that

13  MGA was sued by NPD, states that it is without knowledge or information sufficient

14  to form a belief as to such nature and grounds for such litigation (to which Mattel

15  was not a party) and, on that basis, denies the allegations relating thereto, and denies

16  the truth of the remaining allegations set forth therein.

17        86.  Answering paragraph 86 of the Complaint, Mattel denies the

18  truth of the allegations set forth therein.

19        87.  Answering paragraph 87 of the Complaint, Mattel admits that the

20  Children's Advertising Review Unit ("CARU") is the children's arm of the

21  advertising industry's self-regulation program, states that compliance with CARU's

22  Privacy Program can provide FTC-approved Safe Harbor under the Children's

23  Online Privacy Protection Act ("COPPA"), and denies the truth of the remaining

24  allegations set forth therein.

25        88.  Answering paragraph 88 of the Complaint, Mattel admits that it

26  is one of dozens of CARU Supporters and denies the truth of the remaining

27  allegations set forth therein.

28

2154363.2

EXHIBIT __3__ PAGE __52__

-21-

1         89.    Answering paragraph 89 of the Complaint, Mattel denies the

2    truth of the allegations set forth therein.

3         90.    Answering paragraph 90 of the Complaint, Mattel states that it is

4    without knowledge or information sufficient to form a belief as to the truth or falsity

5    of the allegations as to the consequences to MGA of MGA's violations of CARU

6    standards and, on that basis, denies them.

7         91.    Answering paragraph 91 of the Complaint, Mattel states that it is

8    without knowledge or information sufficient to form a belief as to the truth or falsity

9    of the allegations as to the consequences to MGA of MGA violation of CARU

10   standards and, on that basis, denies them.

11        92.    Answering paragraph 92 of the Complaint, Mattel admits that the

12   Toy Industry Association, Inc. ("TIA") is a toy industry trade association, admits

13   that at certain times TIA has given awards called the People's Choice Toy of The

14   Year or the Toy of The Year Award, denies that Mattel wrongfully influenced TIA

15   and states that it is without knowledge or information sufficient to form a belief as

16   to the truth or falsity of the remaining allegations set forth therein and, on that basis,

17   denies them.

18        93.    Answering paragraph 93 of the Complaint, Mattel states that the

19   allegations set forth therein are vague and ambiguous, including in that they fail to

20   properly identify the years in which the referenced awards were given and/or the

21   particular product which won such awards, and accordingly lacks knowledge or

22   information sufficient to form a belief as to the truth or falsity of the allegations set

23   forth therein and, on that basis, denies them.

24        94.    Answering paragraph 94 of the Complaint, Mattel admits that

25   Neil Freidman was the chairman of TIA from approximately May 2002 to May

26   2004, states that Fischer Price is a division of Mattel and denies the truth of the

27   remaining allegations set forth therein.

28                                            EXHIBIT __3__ PAGE _53_

1         95.   Answering paragraph 95 of the Complaint, Mattel admits that
2   Hokey Pokey Elmo won the Toy of the Year Award and denies the truth of the
3   remaining allegations set forth therein.

4         96.   Answering paragraph 96 of the Complaint, Mattel states that it is
5   without knowledge or information sufficient to form a belief as to the truth or falsity
6   of the allegations set forth therein and, on that basis, denies them.

7         97.   Answering paragraph 97 of the Complaint, Mattel denies the
8   truth of the allegations set forth therein.

9         98.   Answering paragraph 98 of the Complaint, Mattel denies the
10  truth of the allegations set forth therein.

11        99.   Answering paragraph 99 of the Complaint, Mattel denies the
12  truth of the allegations set forth therein.

13        100.   Answering paragraph 100 of the Complaint, Mattel denies the
14  truth of the allegations set forth therein.

15        101.   Answering paragraph 101 of the Complaint, Mattel repeats its
16  responses contained in paragraphs 1 through 100 of this Second Amended Answer
17  and incorporates them by reference as though fully and completely set forth herein.

18        102.   Answering paragraph 102 of the Complaint, Mattel denies the
19  truth of the allegations set forth therein and specifically denies that MGA's alleged
20  trade dress is distinctive.

21        103.   Answering paragraph 103 of the Complaint, Mattel denies the
22  truth of the allegations set forth therein and specifically denies that MGA's alleged
23  trade dress is distinctive.

24        104.   Answering paragraph 104 of the Complaint, Mattel denies the
25  truth of the allegations set forth therein.

26        105.   Answering paragraph 105 of the Complaint, Mattel denies the
27  truth of the allegations set forth therein.

28  EXHIBIT _3_ PAGE _54_

-23-

1       106.   Answering paragraph 106 of the Complaint, Mattel denies the

2  truth of the allegations set forth therein.

3       107.   Answering paragraph 107 of the Complaint, Mattel denies the

4  truth of the allegations set forth therein.

5       108.   Answering paragraph 108 of the Complaint, Mattel denies the

6  truth of the allegations set forth therein and specifically denies that plaintiff is

7  entitled to injunctive relief.

8       109.   Answering paragraph 109 of the Complaint, Mattel repeats its

9  responses contained in paragraphs 1 through 108 of this Second Amended Answer

10  and incorporates them by reference as though fully and completely set forth herein.

11       110.   Answering paragraph 110 of the Complaint, Mattel denies the

12  truth of the allegations set forth therein.

13       111.   Answering paragraph 111 of the Complaint, Mattel denies the

14  truth of the allegations set forth therein.

15       112.   Answering paragraph 112 of the Complaint, Mattel denies the

16  truth of the allegations set forth therein.

17       113.   Answering paragraph 113 of the Complaint, Mattel denies the

18  truth of the allegations set forth therein.

19       114.   Answering paragraph 114 of the Complaint, Mattel denies the

20  truth of the allegations set forth therein.

21       115.   Answering paragraph 115 of the Complaint, Mattel denies the

22  truth of the allegations set forth therein.

23       116.   Answering paragraph 116 of the Complaint, Mattel denies the

24  truth of the allegations set forth therein.

25       117.   Answering paragraph 117 of the Complaint, Mattel denies the

26  truth of the allegations set forth therein and specifically denies that plaintiff is

27  entitled to injunctive relief.

28

EXHIBIT 3 PAGE 55

2154363.2

SECOND AMENDED ANSWER AND COUNTERCLAIMS

1    118.   Answering paragraph 118 of the Complaint, Mattel denies the
2    truth of the allegations set forth therein.

3    119.   Answering paragraph 119 of the Complaint, Mattel repeats its
4    responses contained in paragraphs 1 through 118 of this Second Amended Answer
5    and incorporates them by reference as though fully and completely set forth herein.

6    120.   Answering paragraph 120 of the Complaint, Mattel denies the
7    truth of the allegations set forth therein.

8    121.   Answering paragraph 121 of the Complaint, Mattel denies the
9    truth of the allegations set forth therein.

10   122.   Answering paragraph 122 of the Complaint, Mattel denies the
11   truth of the allegations set forth therein.

12   123.   Answering paragraph 123 of the Complaint, Mattel denies the
13   truth of the allegations set forth therein and specifically denies that plaintiff is
14   entitled to injunctive relief.

15   124.   Answering paragraph 124 of the Complaint, Mattel repeats its
16   responses contained in paragraphs 1 through 123 of this Second Amended Answer
17   and incorporates them by reference as though fully and completely set forth herein.

18   125.   Answering paragraph 125 of the Complaint, Mattel denies the
19   truth of the allegations set forth therein.

20

21                              General Denial

22   Unless specifically admitted herein, Mattel denies the truth of each and
23   every allegation set forth in plaintiff's Complaint and specifically denies that
24   plaintiff is entitled to any relief against Mattel.

25

26

27

28
                              EXHIBIT __3__ PAGE _56_

21154363.2
                              -25-
                              SECOND AMENDED ANSWER AND COUNTERCLAIMS

## Affirmative Defenses

By alleging the Affirmative Defenses set forth below, Mattel does not agree or concede that it bears the burden of proof or the burden of persuasion on any of these issues, whether in whole or in part.

## First Affirmative Defense

Plaintiff's Complaint fails to state a claim upon which relief can be granted.

## Second Affirmative Defense

Plaintiff has no valid, enforceable or protectible rights or interest in the alleged trade dress or other matters asserted, including without limitation in that plaintiff has failed to establish that its alleged trade dress is distinctive as to plaintiff.

## Third Affirmative Defense

Plaintiff's claims, including without limitation plaintiff's claims based upon alleged extra-territorial acts, are barred in whole or in part by lack of subject matter jurisdiction.

## Fourth Affirmative Defense

Plaintiff's claims are barred in whole or in part by plaintiff's unclean hands.

## Fifth Affirmative Defense

Plaintiff's claims are barred in whole or in part by virtue of Mattel's prior-creation of the elements and other matters asserted in the Complaint.

EXHIBIT _3_ PAGE _57_

SECOND AMENDED ANSWER AND COUNTERCLAIMS

2154363.2

## Sixth Affirmative Defense

Plaintiff's claims are barred in whole or in part by its lack of standing.

## Seventh Affirmative Defense

Plaintiff's claims are barred in whole or in part by the applicable statutes of limitation and the doctrine of laches.

## Eighth Affirmative Defense

Plaintiff's claims are barred in whole or in part by the doctrines of waiver, estoppel and acquiescence.

## Ninth Affirmative Defense

Plaintiff's claims are barred in whole or in part by Mattel's constitutional rights of free speech, petitioning and association, including without limitation by the litigation privilege as protected by and/or codified in *inter alia* Section 47(b) of the California Civil Code, the *Noerr-Pennington* doctrine, the common interest privilege and by other privileges.

## Tenth Affirmative Defense

Plaintiff's claims are barred in whole or in part by Mattel's federal and state constitutional rights of free speech, including without limitation under the First Amendment of the United States Constitution.

## Eleventh Affirmative Defense

Plaintiff's claims are barred in whole or in part by the competitor privilege.

EXHIBIT 3 PAGE 58

-27-

2154363.2

<div align="center">Twelfth Affirmative Defense</div>

Plaintiff's claims are in whole or in part preempted by the Copyright Act and barred by the *Sears-Compco* doctrine.

<div align="center">Thirteenth Affirmative Defense</div>

Plaintiff's requested relief, including plaintiff's requests for punitive and/or enhanced damages, are barred in whole or in part because all of Mattel's actions were in good faith.

<div align="center">Fourteenth Affirmative Defense</div>

Plaintiff's damages, if any, were not caused by Mattel and are not attributable to the acts or omissions of Mattel.

<div align="center">Fifteenth Affirmative Defense</div>

Plaintiff has failed to mitigate its damages, if any.

<div align="center">Additional Defenses</div>

Mattel has insufficient knowledge or information upon which to form a belief as to whether additional defenses are available. Mattel reserves the right to amend this Second Amended Answer to add, delete, or modify additional defenses based on legal theories which may or will be divulged through clarification of the Complaint, through discovery, through change or clarification of the governing law or through further legal analysis of plaintiff's positions in this litigation.

<div align="center">Prayer for Relief</div>

WHEREFORE, Mattel prays for relief as follows:

EXHIBIT __3__ PAGE __59__

2154363.2

-28-

1      1.    That the Complaint be dismissed with prejudice;

2      2.    That plaintiff take nothing by reason of the Complaint against

3  Mattel and that judgment be entered in Mattel's favor;

4      3.    That Mattel recover its costs and attorneys' fees; and

5      4.    That this Court award such other and further relief as it deems

6  just and proper.

7

8              **COUNTERCLAIMS**

9      Pursuant to the Court's Orders of January 12, 2007 and June 27, 2007,

10  and incorporating its [Proposed] Amended Complaint dated November 19, 2006,

11  Mattel, Inc. alleges as follows:

12              **Preliminary Statement**

13      1.    For years MGA Entertainment, Inc. has engaged in a pattern of

14  stealing and using Mattel, Inc.'s property and trade secrets.  MGA's use of the

15  stolen property and trade secrets caused and continues to cause significant harm to

16  Mattel.  MGA first stole "Bratz," a fashion doll, from Mattel, and then continued

17  stealing Mattel's confidential and proprietary information to fuel MGA's growth.

18      2.    Carter Bryant conceived, created and developed Bratz designs

19  while he was employed by Mattel as a doll designer.  He concealed his Bratz work

20  from Mattel and wrongfully sold Bratz to MGA while he was a Mattel employee.

21  As MGA knows, Mattel owns the Bratz designs that Bryant made.  As the rightful

22  owner of those Bratz designs, Mattel has registered copyrights for them and seeks

23  damages arising from MGA's repeated infringement of those copyrights.

24      3.    Emboldened by the success of its illegal conduct, MGA has

25  repeated—and even expanded—its pattern of theft on numerous occasions.  For

26  example, in or about 2004, MGA decided to expand into Mexico.  To do so, and

27  operating from its Southern California offices, MGA hired away three key Mattel

28  employees in Mexico, who, on their way out, stole virtually every category of

EXHIBIT 3 PAGE 60

1    Mattel's sensitive and trade secret business plans and information for the Mexican

2    market, as well as a significant quantity of sensitive and trade secret information

3    for Mattel's U.S. and worldwide businesses, and took them to MGA.  Armed with

4    Mattel's confidential business plans and methods, MGA claimed to have increased

5    its market share in Mexico alone by 90% in a single year.

6            4.    In 2005, MGA needed help in Canada.  So MGA, again

7    operating from its Southern California headquarters, hired Janine Brisbois from

8    Mattel.  At that time, Ms. Brisbois was responsible for Mattel's account with Toys

9    'R Us ("TRU") and Wal-Mart.  MGA gave her responsibility for those same

10   accounts, and she took from Mattel documents containing proprietary advertising,

11   project, sales, customer and strategy information for not only Canada, but for the

12   United States.  Eliminating any doubt that MGA then proceeded to use those stolen

13   materials, Brisbois subsequently accessed and modified certain of those Mattel

14   documents while employed by MGA.

15           5.    These are not the only instances of such misconduct, which

16   MGA orchestrated and carried out from its headquarters in this District.  Counter-

17   defendants have engaged in an ongoing, widespread pattern of illegal acts,

18   consisting of inducing Mattel employees to steal Mattel's confidential information

19   or other property and take it with them to MGA to further MGA's business interests

20   and to harm Mattel.

21                                **Jurisdiction**

22           6.    This Court has federal question jurisdiction over this action

23   pursuant to 28 U.S.C. §§ 1331, 17 U.S.C. §§ 101 *et seq.*, and 18 U.S.C. § 1964(c).

24   This Court has supplemental jurisdiction over Mattel's state law claims pursuant to

25   28 U.S.C. § 1367.

26                                **Venue**

27           7.    Venue is proper in this District pursuant to 28 U.S.C.

28   §§ 1391(b)-(d), 1391(f) and 1400(a) and 18 U.S.C. § 1965.

2154363.2

-30-

EXHIBIT 3 PAGE 61

SECOND AMENDED ANSWER AND COUNTERCLAIMS

**Parties**

8.   Mattel is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in El Segundo, California.

9.   Counter-defendant MGA Entertainment, Inc. ("MGA") is a corporation organized and existing under the laws of the State of California, with its principal place of business in Van Nuys, California.  Mattel is informed and believes, and on that basis alleges, that ABC International Traders, Inc. is a predecessor corporation to MGA and that until September 16, 2002, MGA was incorporated and known as ABC International Traders, Inc.  Upon the filing of the Complaint, Mattel, being ignorant of the nature, extent and scope of MGA Entertainment, Inc.'s involvement and complicity in the conduct alleged therein and having designated MGA Entertainment, Inc. in the Complaint as Doe 1 and having discovered its involvement and complicity, Mattel hereby amends its Complaint by substituting MGA Entertainment, Inc. for the fictitious Doe name Doe 1.

10.   Counter-defendant Carter Bryant ("Bryant") is an individual who formerly was employed by Mattel and has worked for and continues to work as a contactor for MGA.  Mr. Bryant currently resides in the State of Missouri.

11.   Counter-defendant MGA Entertainment (HK) Limited is a business entity organized and existing under the laws of the Hong Kong Special Administrative Region, with its principal place of business in Hong Kong.  Upon the filing of the Complaint, Mattel, being ignorant of the nature, extent and scope of involvement and complicity of MGA Entertainment (HK) Limited in the conduct alleged therein and having designated MGA Entertainment (HK) Limited in the Complaint as Doe 2 and having discovered its involvement and complicity, Mattel hereby amends its Complaint by substituting MGA Entertainment (HK) Limited for the fictitious Doe name Doe 2.

EXHIBIT _3_ PAGE _62_

2154363.2

-31-

12.   Counter-defendant MGAE de Mexico, S.R.L. de C.V. ("MGA de Mexico") is a business entity organized and existing under the laws of Mexico, with its principal place of business in Mexico City, Mexico.

13.   Mattel is informed and believes, and on that basis alleges, that Counter-defendant Larian is the President and CEO of MGA and an individual residing in the County of Los Angeles.   Upon the filing of the Complaint, Mattel, being ignorant of the nature, extent and scope of involvement and complicity of Larian in the conduct alleged therein and having designated Larian in the Complaint as Doe 3 and having discovered his involvement and complicity, Mattel hereby amends its Complaint by substituting Larian for the fictitious Doe name Doe 3.

14.   Counter-defendant Carlos Gustavo Machado Gomez is an individual who is employed by Counter-defendant MGA and who, on information and belief, currently resides in the County of Los Angeles.

15.   The true names and capacities of Counter-defendants sued herein as DOES 4 through 10, inclusive, are unknown to Mattel, which therefore sues said Counter-defendants by such fictitious names.  Mattel will amend its pleadings to allege their true names and capacities when the same are ascertained.

**Factual Background**

**I.    MATTEL**

16.   Mattel manufactures and markets toys, games, dolls and other consumer products.  Harold Mattson and Eliot and Ruth Handler founded Mattel in 1945.  The name of the company was created by incorporating the names of two of its founders, "MATT-son" and "EL-liot."  Originating from the Handlers' garage in Southern California, the company greatly expanded its operations following World War II.  During the next several decades, Mattel became famous for producing high-quality products at reasonable prices.

EXHIBIT 3 PAGE 63

17.     Critical to Mattel's success is its ability to design and develop new products.  Mattel invests millions of dollars in product design and development and introduces hundreds of new products each year.  Mattel maintains a 180,000 square-foot design center in El Segundo, California, that houses hundreds of designers, sculptors, painters and other artists, who work exclusively to create the products on which Mattel's business depends.

18.     Mattel also has invested substantial amounts over many years to develop its business methods and practices, including, without limitation, its marketing and advertising research, plans, methods and processes; its business research and forecasts; its costs, budgets, pricing, credit terms, deal terms and finances; its manufacturing, distribution, and sales methods and processes; and its inventory methods and processes.  These represent a material part of the intellectual infrastructure of Mattel and are highly valuable.

**II.   MGA ENTERTAINMENT**

19.     MGA is also a toy manufacturer.  MGA began as a consumer electronics business, but expanded into the toy business with licenses to sell handheld electronic games.  By approximately late 1999 or early 2000, MGA developed a strategy to expand its business and compete directly with Mattel by launching a fashion doll line, so it stole a fashion doll that was owned by Mattel – "Bratz."

20.     MGA intentionally stole not just specific Mattel property, such as Bratz designs, prototypes and related materials, but also a vast array of trade secrets and other confidential information that comprise Mattel's intellectual infrastructure.  MGA's rapid growth was not organic, but rather was based upon its theft of Bratz.  As a result, MGA lacked an appropriate intellectual infrastructure for a company of its size and it became increasingly difficult to manage.  To deal with these problems, as detailed below, time and time again MGA simply stole Mattel's proprietary business methods, practices and information.  This not only

EXHIBIT __3__ PAGE _64_

1    allowed MGA to avoid expending time, money and effort necessary to build a

2    legitimate business, but also allowed MGA to unfairly compete against Mattel by

3    taking Mattel's playbook.

4    **III.  MGA STEALS A NEW LINE OF FASHION DOLLS FROM MATTEL**

5            21.    Carter Bryant is a former Mattel employee.  Bryant joined Mattel

6    in September 1995, where he worked in Mattel's Design Center as a BARBIE

7    product designer.  In or about April 1998, Bryant resigned his position with Mattel

8    and moved to Missouri to live with his parents.  Late in 1998, Bryant applied to

9    Mattel to be rehired.  On January 4, 1999, he began working at Mattel in Mattel's

10   Design Center, again as a product designer, for Mattel's BARBIE collectibles line.

11           22.    Upon his return to Mattel in January 1999, Bryant executed an

12   Employee Confidential Information and Inventions Agreement (the "Employment

13   Agreement"), a true and correct copy of which is attached hereto as Exhibit A.

14           23.    Pursuant to his Employment Agreement and as a condition of

15   and in consideration for his employment, Bryant agreed, among other things, that

16   he held a position of trust with Mattel, that the designs and inventions he created

17   during his Mattel employment (with certain exceptions not relevant here) were

18   owned by Mattel, and that he would be loyal to the company by agreeing not to

19   assist or work for any competitor of Mattel while he was employed by Mattel.

20           24.    On January 4, 1999, Bryant also executed Mattel's Conflict of

21   Interest Questionnaire (the "Conflict Questionnaire").  Among other things, Bryant

22   certified in the Conflict Questionnaire that, other than as disclosed, he had not

23   worked for any competitor of Mattel in the prior twelve months and had not

24   engaged in any business venture or transaction involving a Mattel competitor that

25   could be construed as a conflict of interest.  Bryant understood what the Conflict

26   Questionnaire required because, among other things, he disclosed on it the

27   freelance work he had performed while in Missouri for Ashton-Drake, which is

28

EXHIBIT __3__ PAGE _65_

2154363.2

1    unrelated to the conduct alleged herein.  A true and correct copy of the Conflict

2    Questionnaire executed by Bryant is attached hereto as Exhibit B.

3         25.   Pursuant to the Conflict Questionnaire, Bryant also agreed that

4    he would immediately notify his supervisor of any change in his situation that

5    would cause him to change any of the foregoing certifications.  Despite this

6    obligation, at no time did Bryant disclose to Mattel that he was engaging in any

7    business venture or transaction with MGA or any other Mattel competitor.

8         26.   More specifically, while Bryant was employed by Mattel, Bryant

9    and other Counter-defendants misappropriated and misused Mattel property and

10   Mattel resources for the benefit of Bryant and MGA.  Such acts included, but are

11   not limited to, the following:

12        a.    using his exposure to Mattel development programs to

13   create the concept, design and name of Bratz;

14        b.    using Mattel resources, and while employed by Mattel,

15   Bryant worked by himself and with other Mattel employees and contractors to

16   design and develop Bratz, including without limitation by creating drawings and

17   three-dimensional models of Bratz dolls, and fashion designs for the dolls'

18   associated clothing and accessories; and

19        c.    using Mattel resources, and while employed by Mattel,

20   Bryant took steps to assist MGA to produce Bratz dolls.

21        27.   During the time that he was employed by Mattel and thereafter,

22   Bryant concealed these actions from Mattel, including by failing to notify his

23   supervisor of the conflict of interest he created when he began working on MGA's

24   behalf and when he began receiving payments from MGA.  Bryant additionally

25   enlisted other Mattel employees to perform work on Bratz during the time he was

26   employed by Mattel and, by all indications, in at least some cases led them to

27   believe that they were performing work on a project for Mattel.

28

EXHIBIT _3_ PAGE _66_

SECOND AMENDED ANSWER AND COUNTERCLAIMS

2154363.2

1    28.   Bryant also made affirmative misrepresentations to Mattel
2    management and employees immediately before his departure from Mattel on
3    October 20, 2000.  For example, during his last few weeks at Mattel, Bryant told
4    his co-workers and supervisors that he was going to leave Mattel for "non-
5    competitive" pursuits.  Bryant's representations to his supervisors and his co-
6    workers were false.  Bryant knew at the time that those representations were false
7    and made those false statements to conceal from Mattel the fact that he was already
8    working with MGA and that he had contracted with MGA to assign Bratz works to
9    MGA and to provide design and development services to MGA, a Mattel
10   competitor.

11   29.   As a result of the efforts of Bryant and other Mattel employees
12   working on Bratz (which were done without Mattel's knowledge), the Bratz dolls
13   had been designed and were far along in development during the time that Bryant
14   was employed by Mattel and prior to the time that Bryant left Mattel on
15   October 20, 2000.  Not only did Bryant create and develop designs for the dolls as
16   well as other aspects of the products such as their fashion accessories during the
17   time he was employed by Mattel, but MGA showed Bratz prototypes and/or
18   product to both focus groups and retailers in November 2000, less than three weeks
19   after Bryant left Mattel.  Bryant, Larian and others at MGA arranged these
20   meetings while Bryant was still employed by Mattel.

21   30.   Bryant and MGA employees also repeatedly and continuously
22   communicated with employees of MGA Entertainment (HK) Limited on subjects
23   such as design and manufacturing of Bratz.  On information and belief, at all
24   material times, MGA Entertainment (HK) Limited has maintained regular and
25   continuous contacts with persons in the County of Los Angeles; it regularly has
26   shipped products that it manufactures, or that are manufactured for it, to the County
27   of Los Angeles; and such products have been distributed to retailers and sold to
28   consumers in the County of Los Angeles.

EXHIBIT __3__ PAGE __67__

-36-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

2154363.2

31.   Bratz also were shown to retailers at the Hong Kong Toy Fair in January 2001.  By early 2001, only a few months after Bryant resigned from Mattel, MGA began having the Bratz fashion doll line and accessories manufactured and then, shortly thereafter, began selling them at retail.

32.   Since 2001, MGA has distributed and sold Bratz and Bratz-related products throughout the world.  Mattel is informed and believes that MGA also licenses Bratz to third parties.  Mattel is also informed and believes that MGA derives annual revenue from its sales and licenses of Bratz in excess of $500 million.  Mattel is further informed and believes that MGA and Bryant claim current ownership of Bratz, and all copyrights and copyright registrations attendant thereto.  MGA continues to market, sell and license Bratz and has expressed an intention to continue to do so.

33.   Mattel is informed and believes that MGA and Larian encouraged, aided and financed Bryant to develop Bratz, knowing full well that Bryant was still employed by Mattel at the time and that by performing such work, including design-related work, for his own benefit and/or the benefit of MGA, Bryant would be, and was, in breach of his contractual, statutory and common law duties to Mattel.  Mattel is also informed and believes that MGA proceeded to aid and encourage Bryant to develop Bratz with the goal of obtaining a valuable fashion doll line that would be commercially successful in the competitive, multi-billion dollar market for fashion dolls.

34.   Pursuant to Bryant's contract with Mattel, among other things, Mattel is the true owner of Bratz designs and works, including those specifically that were conceived, created or reduced to practice during Bryant's Mattel employment as well as all designs and works that are or have been derived therefrom.  Counter-defendants' continued use, sale, distribution and licensing of Bratz thus infringes upon Mattel's rights, injures Mattel and unlawfully enriches the Counter-defendants.

EXHIBIT _3_ PAGE _68_

2154363.2

35.   Bryant and MGA deliberately and intentionally concealed facts sufficient for Mattel to suspect or to know that it was the true owner of Bratz. Their acts of concealment include, but are not limited to, concealing the fact that Bryant conceived, created, designed and developed Bratz while employed by Mattel, including by tampering with and defacing documents which showed that, in fact, Bryant was a Mattel employee while he was working for and with MGA; concealing the fact that Bryant worked with and assisted MGA during the time Bryant was employed by Mattel and was compensated for that assistance; concealing that Bryant was providing consulting services to MGA; concealing Bryant's role in Bratz by falsely claiming that Larian and others were the creators of Bratz; and concealing the fact that Mattel was the true owner of Bratz by, among other things, filing fraudulent registrations and/or amendments to registrations with the United States Copyright Office claiming MGA as the author of Bratz as a work for hire and altering relevant dates on such documents to further obscure the true facts of when the works were created.

36.   Because of Bryant's and MGA's acts of concealment and Bryant's misrepresentations to Mattel, Mattel had no reason to suspect that Bryant had worked with MGA, or assisted MGA, while he still employed by Mattel until approximately November 24, 2003, when Mattel received, through an unrelated legal action, a copy of Bryant's agreement with MGA which showed that the date of Bryant's agreement with MGA predated Bryant's departure from Mattel. It was then, as a result, that Mattel learned for the first time that Bryant had secretly aided, assisted and worked for and with MGA while employed at Mattel and in violation of his Mattel Employment Agreement. Specifically, Bryant's agreement with MGA obligated Bryant to provide product design services to MGA on a "top priority" basis. Bryant's agreement with MGA also provided that Bryant would receive royalties and other consideration for sales of products on which Bryant provided aid or assistance; that all works and services furnished by Bryant under

EXHIBIT __3__ PAGE _69_

-38-

2154363.2

1    the agreement, including those he purportedly provided while still a Mattel

2    employee, purportedly would be considered "works for hire" of MGA; and that all

3    intellectual property rights to preexisting works by Bryant, including Bratz designs,

4    purportedly were assigned to MGA.

5    **IV.  MGA STEALS MATTEL TRADE SECRETS IN MEXICO**

6           37.   On information and belief, in or about late 2003 or early 2004,

7    MGA decided to open business operations in Mexico.  Faced with the difficult task

8    of developing an overall strategy for expanding into a market in which it had only a

9    nominal presence and no operations, MGA elected to steal Mattel's plans, strategy

10    and business information for the Mexican market and materials related to Mattel's

11    worldwide business strategies.  As detailed below, MGA and Larian approached

12    three employees of Mattel's Mexican subsidiary ("Mattel Mexico"), enticed them to

13    steal Mattel's most sensitive business planning materials, and then hired them to

14    assist in establishing and running MGA's new Mexican subsidiary.

15         **A.    MGA Hires Three Senior Mattel Employees in Mexico**

16           38.   Carlos Gustavo Machado Gomez ("Machado") was the Senior

17    Marketing Manager, Boys Division, for Mattel Mexico, a position of trust and

18    confidence.  He was employed at Mattel Mexico from April 1, 1997 until April 19,

19    2004.  His duties included short, medium and long-term marketing planning,

20    generating product sales projections, and assisting in creation of the media plan.  In

21    his position, Machado had access to highly confidential and sensitive marketing

22    and product development information.  Machado had an employment agreement

23    with Mattel in which he agreed to maintain the confidentiality of Mattel's protected

24    information.  Mattel's policies also required Machado to protect Mattel's

25    proprietary information and not to disclose it to competitors.

26           39.   Mariana Trueba Almada ("Trueba") was the Senior Marketing

27    Manager, Girls Division, for Mattel Mexico, a position of trust and confidence.

28    She was employed at Mattel Mexico from November 3, 1997 until April 19, 2004.

EXHIBIT _3_ PAGE _70_

-39-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

1   Like Machado, her duties included short, medium and long-term marketing
2   planning, generating product sales projections, and assisting in creation of the
3   media plan.  In her position, Trueba had access to highly confidential and sensitive
4   marketing and product development information.  Trueba had an employment
5   agreement with Mattel in which she agreed to maintain the confidentiality of
6   Mattel's protected information.  Mattel's policies also required Trueba to protect
7   Mattel's proprietary information and not to disclose it to competitors.

8        40.   Pablo Vargas San Jose ("Vargas") was a Senior Trade Marketing
9   Manager with Mattel Mexico, a position of trust and confidence.  He was employed
10  at Mattel Mexico from March 29, 2001 until April 19, 2004.  Vargas was
11  responsible for ensuring that point-of-sale promotions were carried out, analyzing
12  the results of such promotions, negotiating promotion budgets, and generally
13  managing promotional activities.  Vargas also had access to highly confidential and
14  sensitive marketing and product development information.  Vargas had an
15  employment agreement with Mattel in which he agreed to maintain the
16  confidentiality of Mattel's protected information.  Mattel's policies also required
17  Vargas to protect Mattel's proprietary information and not to disclose it to
18  competitors.

19       41.   Beginning in late 2003 or early 2004, Machado, Trueba and
20  Vargas began planning to leave Mattel Mexico to join MGA.  In connection with
21  that plan, and with the encouragement of Larian and other MGA officers operating
22  in the United States, they began accessing, copying and collecting proprietary
23  Mattel documents to take with them.  On April 19, 2004, Machado, Trueba and
24  Vargas each resigned their positions with Mattel, effective immediately.  They
25  stated that they had been hired by a Mattel competitor, but refused to identify that
26  competitor.  In fact, they had been offered and accepted employment by MGA to
27  establish and run MGA's new operation in Mexico.

28

EXHIBIT _3_ PAGE _71_

SECOND AMENDED ANSWER AND COUNTERCLAIMS

**B.**     **Machado, Trueba and Vargas Stole Dozens of Confidential Trade**
       **Secret Marketing and Sales Documents for MGA's Benefit**

42.     Following these resignations, Mattel discovered that Machado,
Trueba and Vargas had been in frequent telephonic and e-mail contact with MGA
personnel, including Larian, for over three months prior to their resignations. The
primary vehicle for these communications in furtherance of their "plot" was an
America Online e-mail account with the address <plot04@aol.com>. On
information and belief, during this time, Machado, Trueba and Vargas supplied
Larian with certain Mattel confidential and proprietary information in order to
prove their value to MGA and to improve their negotiating position vis-à-vis their
respective employment contracts with MGA.

43.     In March 2004, Machado, Trueba and Vargas were making plans
to travel from Mexico to Los Angeles to meet with MGA personnel in person prior
to resigning their positions at Mattel. Also, by at least March 3, 2004, Machado,
Trueba and Vargas were discussing with MGA personnel, including Larian,
specific details regarding setting up MGA offices in Mexico City. On information
and belief, prior to their resignations, Larian and others at MGA directed Machado,
Trueba and Vargas to steal virtually all Mattel confidential and proprietary
information that they could access and bring it with them to MGA. This was
reflected in, among things, e-mail messages that Mattel had discovered after
Machado, Trueba and Vargas had resigned. For example, on March 22, 2006,
approximately one month before they resigned, Machado, Trueba and Vargas wrote
an e-mail message from the <plot04@aol.com> e-mail account addressed to
Larian, MGA's General Manager Susan Kuemmerle and another MGA officer
Thomas Park. In that e-mail message, Machado, Trueba and Vargas sought to
prove their value in this endeavor to MGA by writing: "Attached you will find our
analysis for future discussion. We will be available during the nights of the week
after 16:30 Los Angeles time . . . ." In another e-mail message, showing that the

EXHIBIT 3 PAGE 72

SECOND AMENDED ANSWER AND COUNTERCLAIMS

2154363.2

1 | participants intentionally sought to maximize the damage to Mattel from their

2 | conduct, Kuemmerle wrote to Larian and Park: "Gustavo, Mariana and Pablo want

3 | to resign (all at the same time, and you can believe my smile!) next Wednesday."

4 |     44.   Beginning on April 12, 2004, a week before his resignation and

5 | after numerous communications and meetings with Larian and other MGA

6 | personnel, Machado began transferring additional Mattel confidential and

7 | proprietary information to a portable USB storage device (also know as a "thumb

8 | drive") that he connected to his Mattel computer. On Friday, April 16, 2004, the

9 | last business day before he gave notice, Machado copied at least 70 sensitive

10 | documents to the portable USB storage device.

11 |     45.   Starting on April 12, 2004, Vargas also copied a host of

12 | confidential and proprietary materials to a portable USB storage device, including

13 | sales plans, sales projections and customer profiles.

14 |     46.   On April 16, 2004, Trueba also copied Mattel confidential and

15 | proprietary information to a portable USB storage device connected to her Mattel

16 | computer.

17 |     47.   With full knowledge that she was going to leave Mattel for a

18 | competitor, Trueba also took steps to increase further her access to Mattel's

19 | confidential information shortly before her resignation. For example, just four days

20 | before leaving, Trueba went out of her way to seek to attend a meeting at which

21 | Mattel personnel analyzed BARBIE programs for the United States, Canada and

22 | South America. Two days before her resignation, she contacted both a Mattel

23 | employee located in El Segundo, California and Mattel's advertising agency to

24 | request updated confidential information about advertising plans for BARBIE. On

25 | information and belief, Trueba acted at the direction of MGA and Larian and did so

26 | in order to obtain further information that would allow MGA to obtain unfair

27 | competitive advantage over Mattel.

28 |

EXHIBIT _3_ PAGE _73_

48.   Machado, Trueba and Vargas stole virtually every type of document a competitor would need to enter the Mexican market and to unlawfully compete with Mattel in Mexico, in the United States, and elsewhere.  They stole global internal future line lists that detailed anticipated future products, production and shipping costs for Mattel products; daily sales data for Mattel products; customer data; sales estimates and projections; marketing projections; documents analyzing changes in sales performance from 2003 to 2004; budgets for advertising and promotional expenses; strategic research reflecting consumer responses to products in development; media plans; consumer comments regarding existing Mattel products customer discounts and terms of sale; customer inventory level data; assessments of promotional campaign success; market size historical data and projections; marketing plans and strategies; merchandising plans; retail pricing and marketing strategies; and other similar materials.

49.   The stolen data was not limited to the Mexican market.  The information stolen would, and did, give MGA an unfair competitive advantage in the United States and around the world.  Further, the stolen information was not located exclusively in Mexico, but included confidential and proprietary information that resided on Mattel computers in Phoenix, Arizona and El Segundo, California, and/or documents which were originally created by personnel in El Segundo.  Included among these stolen documents was one of Mattel's earliest internal global line lists, which included information for BARBIE products for the upcoming year and included, for each product, the expected profit margin, advertising expenditures, expected volume and marketing strategy.  On information and belief, Machado, Trueba or Vargas delivered that internal line list to Larian or another MGA officer during their negotiations with MGA.

50.   MGA has used the information taken from Mattel to obtain an unfair advantage over Mattel, including in both the United States and Mexico.  In fact, MGA later publicized its claim that, in 2005, it had increased its Mexican

EXHIBIT 3 PAGE 74

-43-

2154363.2

1    market share by 90 percent over the prior year. This increase came at the expense

2    of Mattel, which lost market share during 2004 in Mexico and was forced to

3    increase its advertising and promotional spending to offset further losses.

4         51.   Machado, Trueba and Vargas attempted to conceal their

5    widespread theft of Mattel's proprietary information. For example, Machado ran a

6    software program on his Mattel personal computer in an attempt to erase

7    information, including information that would reveal the addresses to which he had

8    sent, or from which he had received, e-mail messages. On information and belief,

9    for the same purpose Machado also damaged the hard drive of the personal

10    computer that he used at Mattel.

11         52.   On information and belief, on April 19, 2004, immediately after

12    Machado, Trueba and Vargas simultaneously resigned, they traveled from Mexico

13    to Los Angeles to meet with MGA personnel, including Larian, in person.

14         53.   Mattel notified Mexican authorities about the theft of its trade

15    secret and confidential information. On October 27, 2005, the Mexican Attorney

16    General Office obtained a search warrant from the Mexican Federal Criminal

17    Courts for MGA's facilities in Mexico City. In that search, the Mexican authorities

18    found and seized from MGA's offices both electronic and paper copies of a large

19    number of documents containing Mattel trade secrets, including those that Mattel

20    discovered through its forensic investigations, plus many others that Mattel had not

21    known had been stolen.

22         54.   Based on Machado's "performance" in Mexico, Isaac Larian

23    subsequently promoted Machado and he was transferred to MGA's main office in

24    Van Nuys, California. On information and belief, Machado currently resides in the

25    County of Los Angeles, California.

26

27

28

EXHIBIT __3__ PAGE __75__

**V.    MGA HIRES MATTEL'S SENIOR VICE PRESIDENT AND GENERAL MANAGER TO FACILITATE ITS THEFT AND USE OF MATTEL'S HIGHLY VALUABLE BUSINESS METHODS AND PRACTICES**

55.    On October 1, 2004, Mattel's Senior Vice President and General Manager, Ron Brawer, left Mattel and joined MGA.  Tyco Toys, Inc. ("Tyco"), a predecessor to Mattel, had hired Brawer on April 22, 1996.  The same day, Brawer entered into an Employee Invention & Trade Secret Agreement with Tyco.  On April 9, 1997, Brawer became a Marketing Director for Mattel in Mount Laurel, New Jersey, and remained bound by his Employee Invention & Trade Secret Agreement.

56.    In January 2003, while Brawer held a position of trust and confidence at Mattel, Mattel's "Code of Conduct" was circulated to all Mattel employees worldwide.  Included in the Code of Conduct were statements that:

Employees and Directors have an obligation to protect the confidentiality of Mattel's proprietary information.  Proprietary information is any information not generally known to the public that is useful to Mattel, that would be useful to its competitors or other third parties or that would be harmful to Mattel or its customers if disclosed.  Proprietary information includes trade secrets, revenue and profit information and projections, new product information, marketing plans, design and development efforts, manufacturing processes and any information regarding potential acquisitions, divestitures and investments.

We can protect the security of Mattel's proprietary information by limiting access to it.  Confidential information should not be discussed with those who are not obligated to maintain the information in confidence and in public places where the

EXHIBIT 3  PAGE 76

2154363.2

-45-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

1  information is not likely to be kept secret, such as planes,

2  restaurants and elevators.  The obligation to preserve confidential

3  information continues even after employment ends.

4  The Code of Conduct applied to Brawer and required that he meet his obligations

5  under the Code of Conduct.

6       57.   By 2003, Brawer had advanced within Mattel to a Senior Vice

7  President position over customer marketing, a position of trust and confidence.  In

8  his executive position, Brawer was provided access to information that was both

9  sensitive and confidential, including, but not limited to, detailed information related

10  to development, manufacture, marketing, pricing, shipping, and performance of

11  Mattel's then-current and anticipated future product lines, and other confidential

12  business plans between Mattel and its most significant retail customers.

13       58.   In December 2003, Alan Kaye, Mattel's Senior Vice President of

14  Human Resources, asked Brawer whether he was discussing potential employment

15  with MGA.  Brawer denied that he had been in contact with MGA and represented

16  that he would not talk to MGA.  Throughout 2004, Mattel reminded and stressed to

17  its employees, including Brawer, the importance of protecting Mattel's confidential

18  and proprietary materials and information.

19       59.   On March 18, 2004, in response to a survey from the President of

20  Mattel Brands, Matt Bousquette, confirming compliance with Mattel's Code of

21  Conduct, Brawer wrote back that he "applaud[ed] the company's vigorous

22  protection of it's [sic] intellectual property," reflecting Brawer's clear

23  understanding that Mattel required its proprietary information to be kept

24  confidential.

25       60.   In April 2004, Mattel promoted Brawer to Senior Vice

26  President/General Manager.  The General Manager position also is an executive

27  position of trust and confidence.  The role of a General Manager is to lead a cross-

28  functional "Customer Business Team."  Each General Manager is accountable for a

1  strategic partnership with a key Mattel retailer, covering all aspects of the business,

2  including both traditional toy sales and retail development of licensed products.

3      61.   In or about late May 2004, Brawer began performing General

4  Manager duties, working with one of Mattel's major retail customer accounts.

5  Thereafter, Brawer began receiving information related not only to the Senior Vice

6  President, Customer Marketing position that he still formally held, but also began

7  receiving detailed information related to his role as General Manager.  Brawer

8  began requesting and analyzing detailed information related to Mattel and its four

9  key retail accounts.

10      62.   On September 15, 2004, Brawer left work at noon for observance

11  of Rosh Hashanah.  As Brawer left, he carried a large cardboard box with binders

12  and other materials.  Several hours after his departure, Brawer instructed his

13  assistant to print Mattel's 2004 Sales Plan for one of Mattel's significant customers

14  and to provide it to him, falsely claiming he needed it for a meeting

15      63.   On September 17, 2004, Brawer returned to Mattel and

16  immediately informed his supervisor that he was leaving Mattel, effective October

17  1, 2004, to work for competitor MGA.

18      64.   On September 20, 2004, Mattel hand-delivered a letter to Brawer

19  reminding him of his continuing obligation to preserve the confidentiality of

20  Mattel's proprietary information and trade secrets not only through October 1,

21  2004, but continuing beyond the termination of his employment.

22      65.   At his exit interview on September 29, 2004, Mattel reminded

23  Brawer that he had ongoing duties of confidentiality to Mattel, even after the

24  termination of his employment.  Brawer was given a copy of his Original

25  Confidentiality Agreement, which he had signed on April 22, 1996, and another

26  copy of the Code of Conduct.  During the exit interview, however, Brawer noted

27  that he had not signed the Code of Conduct, which he intended and Mattel

28  understood to mean that Brawer believed he was not bound by Mattel's policy

-47-

EXHIBIT __3__ PAGE __78__

SECOND AMENDED ANSWER AND COUNTERCLAIMS

1  because he had not signed it.  Brawer was unwilling to complete or sign the form

2  that sought to confirm that Brawer understood his ongoing obligations under the

3  Code of Conduct, which included the obligation to preserve the confidentiality of

4  Mattel's proprietary and trade secret information.

5      66.  On October 1, 2004, Brawer's final day of employment with

6  Mattel, Mattel hand-delivered to Brawer a letter that, among other things, reminded

7  Brawer of his confidentiality obligations to Mattel under the Code of Conduct.

8      67.  Upon joining MGA, Brawer became its Executive Vice-

9  President of Sales and Marketing.  In that role he was responsible for MGA's sales

10  worldwide.  As part of those responsibilities, Brawer had and continues to have

11  responsibility for MGA's accounts with the same retailers that he worked with

12  while at Mattel.

13      68.  Brawer represented during his Mattel exit interview that he had

14  returned all proprietary information to Mattel.  That representation was false.   On

15  information and belief, Brawer removed proprietary and trade secret information

16  from Mattel that he did not return.  Mattel is informed and believes that Brawer did

17  not return to Mattel, for example, the information contained in his contacts file.

18  The contacts file included contact information for Mattel customers, most notably

19  TRU, and extensive contact information for Mattel employees, including titles, e-

20  mail addresses and telephone numbers.

21      69.  Mattel has recently learned that Brawer has been using that

22  contact information on a regular basis, including within recent months.  Since

23  leaving Mattel, Brawer has had contacts with Mattel employees, both by telephone

24  and by electronic mail.  Based on his knowledge of Mattel's operations and the

25  roles of certain Mattel employees, he has targeted certain Mattel employees who

26  have broad access to Mattel proprietary information in an effort to induce and

27  encourage them to join MGA and to steal or otherwise wrongfully misappropriate

28  Mattel confidential information and trade secrets.  Brawer has done so by

EXHIBIT __3__ PAGE __79__

-48-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

2154363.2

1  promising these Mattel employees salaries 25 percent or more higher than they earn

2  at Mattel and stating to them that they should not be concerned by legal action

3  taken by Mattel to protect its trade secrets and its rights because such claims are

4  hard to prove and easy to defeat.

5  **VI.  MGA STEALS MATTEL TRADE SECRETS IN CANADA**

6       70.   In an effort to increase its market share and sales in Canada and

7  elsewhere, MGA stole Mattel trade secrets regarding Mattel's customers, sales,

8  projects, advertising and strategy, not only for Canada, but the United States and

9  the rest of the world.

10       71.   Janine Brisbois was a Director of Sales for the Girls Division in

11  Canada.  Mattel hired her as a National Account Manager in August 1999.  When

12  she was hired as a Mattel employee, Brisbois agreed that she would preserve and

13  would not disclose Mattel's proprietary or confidential information.  For example,

14  Brisbois agreed:

15       You must keep Mattel's Proprietary Information confidential,

16       and you may only use or disclose such information as necessary

17       to perform your job responsibilities in accordance with Mattel

18       policies.  Your obligation to keep Mattel's Proprietary

19       Information confidential will continue even after any termination

20       of your employment with your employer.

21       . . .

22       Mattel takes steps to maintain the secrecy and confidential nature

23       of Mattel's Proprietary Information and, if a competitor

24       discovered Mattel's Proprietary Information, it could

25       significantly damage Mattel and your Employer.

26       72.   While with Mattel, Brisbois had responsibility for Mattel's

27  account with TRU and later had responsibility for Mattel's Wal-Mart account.  In

28  her capacity as Sales Director-Wal-Mart/CTC/Girls Team, Brisbois had access to

EXHIBIT 3 PAGE 80

SECOND AMENDED ANSWER AND COUNTERCLAIMS

2154363.2

1  Mattel confidential and proprietary information regarding Mattel's future product
2  lines, advertising and promotional campaigns and product profitability.

3        73.   On September 26, 2005, Brisbois resigned from Mattel to take a
4  position as Vice President of Sales at MGA.  Mattel is informed and believes that
5  in that position Brisbois has responsibility for MGA's accounts with both TRU and
6  Wal-Mart.  During Brisbois' exit interview she was specifically asked whether she
7  was "taking anything."  Brisbois responded, "No."  Both during and after her exit
8  interview, Brisbois was advised by Mattel of her obligations to preserve Mattel's
9  confidential and proprietary information.

10        74.   Mattel is informed and believes that Brisbois spoke with Isaac
11  Larian, MGA's CEO, on September 22, 2005 at approximately 8:30 p.m., when he
12  called Ms. Brisbois at her home.  Mattel subsequently learned that on the same day
13  that she spoke with Mr. Larian and four days before she resigned, Brisbois copied
14  approximately 45 Mattel documents on to a USB or "thumb" drive with the volume
15  label "BACKPACK."  On information and belief, Brisbois removed the thumb
16  drive from Mattel Canada's office by concealing it in her backpack or gym bag the
17  last time that she left that office.  These documents contained Mattel trade secret
18  and proprietary information, and included:

19      • a document containing the price, cost, sales plan and quantity of every
20        Mattel product ordered by every Mattel customer in 2005 and 2006;

21      • the BARBIE television advertising strategy and information concerning
22        sales increases generated by television advertisements;

23      • competitive analysis of Mattel vis-à-vis its competitors in Canada;

24      • an analysis of Mattel's girls business sales beginning in 2003 and
25        forecasts through 2006;

26      • profit and loss reviews for Mattel's products being sold in Wal-Mart,
27        including margins and profit in not only Canada, but in the United
28        States and Mexico; and     EXHIBIT _3_ PAGE _81_

-50-