1 | QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
John B. Quinn (Bar No. 090378)
2 | johnquinn@quinnemanuel.com
Michael T. Zeller (Bar No. 196417)
3 | (michaelzeller@quinnemanuel.com)
Jon D. Corey (Bar No. 185066)
4 | (joncorey@quinnemanuel.com)
865 South Figueroa Street, 10th Floor
5 | Los Angeles, California 90017-2543
Telephone: (213) 443-3000
6 | Facsimile: (213) 443-3100

7 | Attorneys for Mattel, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| CARTER BRYANT, an individual, | CASE NO. CV 04-9049 SGL (RNBx) |
|---|---|
| Plaintiff, | Consolidated with Case No. CV 04-09059 Case No. CV 05-02727 |
| vs. | |
| MATTEL, INC., a Delaware corporation, | Hon. Stephen G. Larson |
| Defendant. | **[PUBLIC VERSION]** SUPPLEMENTAL DECLARATION OF JON D. COREY IN SUPPORT OF MATTEL, INC.'S *EX PARTE* APPLICATION; (1) TO COMPEL DEPOSITIONS OF DAPHNE GRONICH, JOE TIONGCO, MARIANA TRUEBA, PABLO VARGAS, MGA ENTERTAINMENT, INC. (PURSUANT TO RULE 30(B)(6), AND MGAE DE MEXICO (PURSUANT TO 30(B)(6) AND (2) FOR LEAVE TO TAKE DEPOSITIONS IN FEBRUARY 2008; OR, IN THE ALTERNATIVE, FOR AN ORDER SHORTENING TIME TO HEAR A MOTION SEEKING THE FOREGOING RELIEF |
| AND CONSOLIDATED ACTIONS | |

Hearing Date: February 4, 2008
Time: 10:00 a.m.
Courtroom: Hon. Stephen G. Larson

**Phase 1:**
Discovery Cut-off:     January 28, 2008
Pre-trial Conference:  May 5, 2008
Trial Date:            May 27, 2008

1    ## SUPPLEMENTAL DECLARATION OF JON D. COREY

2    I, Jon D. Corey, declare as follows:

3        1.    I am a member of the bar of the State of California and a partner
4    with Quinn Emanuel Urquhart Oliver & Hedges, LLP, attorneys for Mattel, Inc. I
5    make this declaration of personal, firsthand knowledge, and if called and sworn as a
6    witness, I could and would testify competently hereto.

7        2.    On January 29, 2008, Walter Weiss spoke with my colleague
8    Timothy Alger about the deposition of Walter Weiss' client, Jeff Weiss. Walter
9    Weiss stated that Jeff Weiss would appear for deposition and that he would provide
10   convenient dates on which the deposition could proceed.

11       3.    On January 28, 2008, I deposed Susan Kuemmerle, the Vice
12   President of MGAE de Mexico. A true and correct copy of the relevant excerpts of
13   the rough transcript of Ms. Kuemmerle's deposition is attached as Exhibit 24.

14       4.    A true and correct copy of the Court's August 27, 2007 Order is
15   attached as Exhibit 25.

16       5.    A true and correct copy of the Declaration of Daphne Gronich in
17   Response to Court's Request for Information Regarding Document Preservation is
18   attached as Exhibit 26.

19       6.    A true and correct copy of the Supplemental Declaration of
20   Daphne Gronich in Response to Court's Request for Information Regarding
21   Document Preservation is attached as Exhibit 27.

22       7.    A true and correct copy of the relevant excerpts of the
23   Deposition Transcript of Kenneth Lockhart is attached as Exhibit 28.

24
25
26
27
28

1     8.     A true and correct copy of an MGAE de Mexico Human

2  Resources List prepared at the request of Susan Kuemmerle is attached as Exhibit

3  29.  This document was produced by MGA in this matter and was authenticated by

4  Ms. Kuemmerle at her January 28, 2008 deposition.

5

6          I declare under penalty of perjury under the laws of the United States of

7  America that the foregoing is true and correct.

8          Executed on February 1, 2008, at Los Angeles, California.

9

10                                          _____

11                                          Jon D. Corey

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit 24

1

ROUGH DRAFT DISCLAIMER

THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN
FINAL FORM. VARIOUS CORRECTIONS AND/OR CHANGES MAY BE
MADE BEFORE THE FINAL VERSION IS COMPLETE. THIS ASCII
IS BEING PROVIDED AS A SPECIAL SERVICE TO BE USED FOR
LIMITED PURPOSES; HOWEVER, THIS REPORTER, AS WELL AS ANY
COURT REPORTING AGENCY AFFILIATED WITH THIS REPORTER,
WILL NOT BE RESPONSIBLE FOR THE CONTENT OF SUCH ROUGH
DRAFT AND/OR ANY VARIANCE THEREOF FROM THE FINAL
TRANSCRIPT.

///
///
///

THE VIDEOGRAPHER: GOOD MORNING. WE ARE ON
THE RECORD. THE TIME IS 9:06 A.M. MY NAME IS SERGIO
ESPARZA. TODAY'S DATE IS MONDAY JANUARY 28TH, 2008. I
AM THE VIDEO TECHNICIAN EMPLOYED BY JTV LITIGATION
SERVICES LOCATED IN LOS ANGELES, CALIFORNIA. WE ARE
TAPING THESE PROCEEDINGS AT 865 SOUTH FIGUEROA STREET
SECOND FLOOR IN LOS ANGELES, CALIFORNIA. THIS IS TAPE
NUMBER 1 FOR THE VIDEOTAPED DEPOSITION OF MS. SUSAN
KUEMMERLE IN THE ACTION CARTER BRYANT VERSUS MATTEL,
INC. THIS DEPOSITION IS BEING TAKEN ON BEHALF OF THE
DEFENDANTS. THE CASE NUMBER IS C.V. 049049SOL. MAY I
PLEASE HAVE INTRODUCTIONS FOR THE RECORD.

2

MR. COREY: JON COREY ON BEHALF OF MATTEL.
AND I THINK THE NAME IS SUSANA.
THE DEPONENT: THAT IS CORRECT.
THE VIDEOGRAPHER: THANK YOU, SIR.
MR. ALLEN: JOSE ALLEN, SKADDEN ARPS ON BEHALF
OF MGA, ET AL., AND THE WITNESS.
THE DEPONENT: SUSANA KUEMMERLE ON BEHALF OF
MGA DE MEXICO.
MR. AAMID: FARHAD AAMID FROM SKADDEN ARPS ON
BEHALF OF MGA AND THE WITNESS.
MR. COTE: ALEXANDER COTE ON BEHALF OF GUSTAVO
MACHADO.
THE VIDEOGRAPHER: MS. REPORTER, PLEASE
ADMINISTER THE OATHS.
---
INTERPRETER  .
THE INTERPRETER HEREIN,
WAS DULY SWORN BY THE DEPOSITION OFFICER TO CORRECTLY
INTERPRET THE ENGLISH LANGUAGE INTO LANGUAGE  ,
AND THE LANGUAGE    LANGUAGE INTO ENGLISH AND
TRANSLATE AS FOLLOWS:
---
WITNESS  ,
HAVING BEEN FIRST DULY AFFIRMED
BY THE REPORTER, WAS EXAMINED

3

AND TESTIFIED AS FOLLOWS:
- - -
DEPOSITION OFFICER: PLEASE RAISE YOUR RIGHT
HAND.
DO YOU SOLEMNLY SWEAR OR AFFIRM THAT THE
TESTIMONY YOU ARE ABOUT TO GIVE IN THIS MATTER SHALL BE
THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH?
THE DEPONENT: I DO.
MR. ALLEN: LET ME JUST SAY ON THE RECORD THAT
AS FAR AS THE INTERPRETER IS CONCERNED WE'LL ONLY NEED
HER IF WE HIT A PHRASE OR A WORD THAT MS. KUEMMERLE
DOESN'T UNDERSTAND. OTHERWISE YOU CAN ASSUME THAT
MS. KUEMMERLE WILL BE PREPARED TO ANSWER YOU'RE
QUESTIONS IN ENGLISH.
MR. COREY: OKAY. PERFECT. SHOULD MAKE
THINGS A LITTLE BIT MORE QUICKLY.
- - -
EXAMINATION
BY MR. COREY:
Q. MS. KUEMMERLE, HAVE YOU AND I MET BEFORE?
A. NO.
Q. HAVE YOU EVER HAD YOUR DEPOSITION TAKEN
BEFORE?
A. NO.
Q. I'M SURE YOU'VE SPOKEN TO YOUR COUNSEL ABOUT

4

THIS, BUT JUST TO MAKE SURE THAT WE'RE ON THE SAME PAGE
I'M GOING TO GO OVER SOME OF THE GROUND RULES. DO YOU
UNDERSTAND THAT THE OATH THAT YOU JUST TOOK IS THE SAME
OATH THAT YOU WOULD TAKE IF YOU WERE TESTIFYING IN A
COURT OF LAW?
A. YES.
Q. AND THAT YOU HAVE SWORN TO TELL THE TRUTH?
A. YES.
Q. AND DO YOU UNDERSTAND THAT THE COURT REPORTER
WHO IS SEATED AT YOUR RIGHT WILL BE TAKING DOWN
EVERYTHING THAT EVERYONE -- EVERYTHING THAT EVERYONE IN
THIS ROOM SAYS?
A. YES.
Q. AND DO YOU UNDERSTAND THAT SHE WILL BE
PREPARING A TRANSCRIPT THAT YOU WILL HAVE THE
OPPORTUNITY TO LOOK AT AND TO MAKE ANY CHANGES TO?
A. YES.
Q. DO YOU UNDERSTAND THAT IF YOU MAKE ANY CHANGES
TO THAT TRANSCRIPT, THEN I WILL HAVE THE OPPORTUNITY TO
COMMENT ON THOSE CHANGES AT TRIAL WHICH MAY AFFECT
YOU'RE CREDIBILITY?
A. YES.
Q. OKAY. ARE YOU UNDER THE INFLUENCE OF ANY
MEDICATION OR SUBSTANCE THAT AFFECTS YOU'RE MEMORY OR
ABILITY TO TESTIFY?

**Exhibit 24, Page 3**

5

1       A. NO.

2       Q. OKAY. AND MR. ALLEN -- MR. ALLEN JUST GAVE US

3   A PREAMBLE, AN EXPLANATION OF WHY THE INTERPRETER IS

4   HERE AND HOW WE'LL USE THE INTERPRETER. SO I UNDERSTAND

5   THAT IF YOU DON'T UNDERSTAND A WORD THAT I USE OR A

6   PHRASE THAT I USE, YOU WILL BE ASKING THE INTERPRETER TO

7   PROVIDE CLARIFICATION?

8       A. YES.

9       Q. OKAY. AND IF YOU DON'T ASK THE INTERPRETER TO

10   PROVIDE A CLARIFICATION, I'LL ASSUME THAT YOU UNDERSTOOD

11   WHAT I WAS SAYING IS THAT FAIR?

12      A. THAT'S CORRECT.

13      Q. OKAY. BY WHOM ARE YOU CURRENTLY EMPLOYED?

14      A. MGA DE MEXICO.

15      Q. AND HOW LONG HAVE YOU BEEN SO EMPLOYED?

16      A. SINCE 2004.

17      Q. WHAT'S YOUR CURRENT TITLE?

18      A. VICE PRESIDENT MGA DE MEXICO AND

19   LATIN-AMERICAN SALES.

20      Q. WHO DO YOU REPORT TO?

21      A. LARRY FALCON.

22      Q. WHAT'S HIS POSITION?

23      A. I BELIEVE IT'S EXECUTIVE VICE PRESIDENT SALES.

24      Q. HOW LONG HAVE YOU BEEN THE VICE PRESIDENT OF

25   MGA MEXICO AND LATIN-AMERICAN SALES?

Exhibit 24, Page 4

Kuemmerle, Susana - Vol 1 [ROUGH] 1/28/2008 10:54:00 AM

54

1 GIVEN NOTICE TO MATTEL?

2 A. BECAUSE I KNOW THAT THEY RESIGNED.

3 Q. AND WHAT WAS THAT DATE?

4 A. I BELIEVE IT WAS APRIL 16TH OR 15TH.

5 Q. AND DID THEY TRAVEL TO LOS ANGELES TO REVIEW

6 THE MGA LINE BEFORE OR AFTER THEY RESIGNED FROM MATTEL?

7 A. I BELIEVE IT WAS BEFORE.

8 Q. DID ANY OF THE OTHER PEOPLE WITH WHOM YOU HAD

9 SPOKEN KNOW THAT THE CANDIDATES TRAVELED FROM MEXICO TO

10 LOS ANGELES TO REVIEW THE LINE?

11 A. NOT THAT I RECALL.

12 Q. BUT YOU RECALL THOSE -- BUT YOU RECALL THOSE

13 THREE GOING THERE?

14 A. YES.

15 Q. HOW LONG WERE THEY IN LOS ANGELES?

16 A. TWO DAYS, ONE DAY AND A HALF. I DON'T RECALL.

17 Q. WHEN WAS -- STRIKE THAT.

18 WERE YOU INVOLVED IN THE DECISION TO EXTEND

19 OFFERS OF EMPLOYMENT TO MR. MACHADO, MR. VARGAS AND

20 MS. TRUEBA?

21 A. NO.

22 Q. WHO MADE THAT DECISION?

23 A. I DON'T KNOW.

24 Q. DID MS. MENDEZ RECEIVE AN OFFER OF EMPLOYMENT?

25 A. I BELIEVE SHE DID NOT.

55

1 Q. AND DO YOU KNOW WHY?

2 A. BECAUSE I THINK THEY DIDN'T BELIEVE THAT THERE

3 WAS A NEED FOR AN H.R. PERSON AT THAT TIME.

4 Q. OKAY. HOW DID YOU FIRST LEARN THAT OFFERS OF

5 EMPLOYMENT WERE GOING TO BE EXTENDED TO MR. MACHADO,

6 MR. VARGAS OR MS. TRUEBA?

7 A. I DON'T RECALL.

8 Q. WAS IT YOUR UNDERSTANDING AT THE TIME THAT

9 THE -- THAT MR. LARIAN AND MR. PARK LEFT MEXICO CITY

10 THAT THEY WERE GOING TO ESTABLISH AN MGA SUBSIDIARY

11 THERE FOR SURE?

12 A. THAT'S MY UNDERSTANDING, YES.

13 Q. DO YOU KNOW WHO EXTENDED OFFERS OF EMPLOYMENT

14 TO MR. MACHADO, MS. TRUEBA AND MR. VARGAS?

15 A. I BELIEVE IT WAS ISAAC LARIAN.

16 Q. DID YOU HAVE A CONVERSATION WITH MR. MACHADO

17 AFTER THE TRIP IN MEXICO CITY?

18 A. I DON'T RECALL.

19 Q. DID YOU HAVE ANY DISCUSSIONS WITH HIM ABOUT

20 THE TIMING OF GIVING NOTICE AND WHEN HE WOULD LEAVE

21 MATTEL?

22 A. I DON'T RECALL.

23 Q. BETWEEN THE TIME THAT THE INTERVIEWS OCCURRED

24 AND THE TIME IN MID-APRIL WHEN THEY GAVE NOTICE, DO YOU

25 KNOW WHETHER MR. LARIAN AND MR. MACHADO HAD ANY

56

1 CONVERSATIONS?

2 A. I DON'T KNOW.

3 Q. DID YOU HAVE ANY CONVERSATIONS WITH

4 MR. MACHADO BETWEEN THE TIME THAT HE -- THE TIME OF HIS

5 INTERVIEW AND THE TIME THAT HE GAVE NOTICE?

6 A. I DON'T RECALL.

7 Q. YOU DON'T RECALL ONE WAY OR THE OTHER?

8 A. NO.

9 Q. DO YOU KNOW WHETHER DURING THAT TIME PERIOD

10 YOU HAD ANY PHONE CONVERSATIONS WITH MS. TRUEBA?

11 A. I DON'T RECALL.

12 Q. WHAT ABOUT WITH MR. VARGAS?

13 A. I DON'T RECALL.

14 Q. WHEN DID YOU START COMMUNICATING WITH THESE

15 THREE BY E-MAIL?

16 A. I DON'T RECALL THE SPECIFIC DATE.

17 Q. WAS IT AFTER THE INTERVIEW OR BEFORE THE

18 INTERVIEW?

19 A. I DON'T RECALL.

20 Q. DO YOU RECALL HOW YOU RECEIVED MR. MACHADO'S,

21 MR. VARGAS' OR MS. TRUEBA'S RÉSUMÉS BEFORE THE

22 INTERVIEWS?

23 A. THE RÉSUMÉS WERE GIVEN IN PRESENCE TO

24 MR. LARIAN.

25 Q. THEY BROUGHT THEM WITH THEM?

**Exhibit 24, Page 5**

Kuemmerle, Susana - Vol 1 [ROUGH]  1/28/2008  10:54:00 AM

78

```
1   2004?
2       A.  I DON'T RECALL.
3       Q.  DO YOU RECALL WHAT THE PROCESS WAS OF COMING
4   UP WITH THAT SALES NUMBER?
5       A.  THEY ARE THE SAME PROCESS WE APPLY ALWAYS.
6   REVISION OF THE LINE, APPLICABILITY TO OUR MARKET,
7   SELECTION OF QUANTITIES, MATH.
8       Q.  AND THAT'S THE PROCESS THAT'S FOLLOWED EVERY
9   YEAR TO COME UP WITH A REVENUE NUMBER?
10      A.  MAYBE MORE SOPHISTICATED NOW BUT YES.
11      Q.  WHAT MAKES YOU SAY THAT IT WAS MORE
12  SOPHISTICATED NOW?
13      A.  THERE ARE MORE APPLICATIONS, COMPUTER
14  APPLICATIONS.
15      Q.  WHAT IS THE COURT OF LAW REPORT CALLED?
16      A.  QUARTERLY REPORT.
17      Q.  JUST A QUARTERLY REPORT THAT SHOWS YOUR
18  PROJECTED -- YOUR BUDGET AND THEN YOUR PERFORMANCE
19  AGAINST THE BUDGET?
20      A.  THAT IS CORRECT.
21      Q.  DO YOU HAVE THOSE?  ARE THEY IN YOUR OFFICE?
22      A.  YES.
23      Q.  DO YOU HAVE THEM GOING BACK TO 2004?
24      A.  OF THAT PARTICULAR TIME IT WAS NOT SENT OUT
25  PRINTED, SO NO, I DON'T HAVE THOSE.
```

79

```
1       Q.  HOW WAS IT SENT OUT?
2       A.  VIA E-MAIL.
3       Q.  ELECTRONICALLY?
4       A.  (NODS HEAD).
5       Q.  AND YOU DON'T HAVE YOUR E-MAIL GOING BACK THAT
6   FAR?
7       A.  I DON'T THINK SO.
8       Q.  BEFORE YOU STARTED GOING OUT AND TALKING TO
9   RETAILERS, I EXPECT THAT YOU HAD -- STRIKE THAT.
10          HOW DID YOU DETERMINE WHAT PRICE PRODUCTS WERE
11  GOING TO BE OFFERED TO THE RETAILERS IN MEXICO?
12      A.  CAN YOU REPEAT?
13      Q.  SURE HOW DID YOU DETERMINE WHAT PRICE THE MGA
14  PRODUCTS WERE GOING TO BE OFFERED TO THE RETAILERS IN
15  MEXICO?
16      A.  IT WAS DETERMINED GENERATING PRICE BRACKETS OF
17  MARKETING NICHE AND HOW WE ARE GOING TO REACH ZERO TO
18  100, TO 199 TO 200 AND FROM THE LINE WE'VE GENERATED A
19  STRATEGY THERE.
20      Q.  WHO DOES THAT?
21      A.  IT'S USUALLY --
22      Q.  LET ME STRIKE THAT.
23          IN 2004 WHO DID THAT?
24      A.  AT THAT PARTICULAR TIME WE ALL DID IT.  RIGHT
25  NOW IT'S A FUNCTION OF MARKETING.
```

80

```
1       Q.  AND AGAIN WHEN YOU SAY YOU ALL, IT'S THE FOUR
2   OF YOU?
3       A.  YES.
4       Q.  OKAY.  HAD YOU -- DID YOU GET ANY INFORMATION
5   FROM HASBRO AS TO HOW IT HAD BEEN PRICING THE PRODUCTS?
6       A.  NO.
7       Q.  DID YOU GET ANY RECOMMENDATIONS FROM MR. MARK
8   OR ANYONE ELSE AT MGA U.S.A. AS TO HOW TO PRICE THOSE
9   PRODUCTS?
10      A.  NO.
11      Q.  SO IT WAS JUST THE FOUR OF YOU SITTING IN A
12  ROOM GOING DOWN A LIST SAYING THIS IS WHAT WE THINK A
13  FAIR PRICE WOULD BE?
14      A.  AND -- YES.
15      Q.  AND HOW LONG WAS IT -- HOW LONG -- WAS IT THE
16  FOUR OF YOU DOING THE SAME THING IN 2005 TO DO THE 2005
17  PRICING?
18      A.  IN 2005?
19      Q.  YES.
20      A.  AND WE CONTINUE TO DO IT NOW.  IT'S A COMBINED
21  TEAM EFFORT.
22      Q.  I APOLOGIZE.  I WAS NOT PRECISE.  IN 2005 WAS
23  IT JUST THE FOUR OF YOU WHO ALSO DID THE 2005 PRICE
24  LISTS?
25      A.  PART OF THE TEAM, YES.
```

81

```
1       Q.  OKAY.  DID ANYONE ELSE PARTICIPATE?
2       A.  THE FINANCE PERSON.
3       Q.  WHAT'S THE NAME OF THE FINANCE PERSON?
4       A.  AT THAT PARTICULAR TIME, PEDRO ARENAS <SP?>
5       Q.  IS HE NO LONGER WITH THE COMPANY?
6       A.  NO.
7       Q.  DO YOU KNOW WHY HE LEFT?
8       A.  I FIRED HIM.
9       Q.  WHY DID YOU FIRE HIM?
10      A.  IT WAS SUPER BOWL 2005.
11      Q.  WHY DID YOU FIRE HIM?
12      A.  WHY?
13      Q.  YEAH.
14      A.  BECAUSE HE WAS INCOMPETENT.
15      Q.  DO YOU KNOW IF HE GOT ANOTHER JOB?
16      A.  I DON'T KNOW.
17      Q.  WAS HE DRIVING YOU CRAZY?
18          MR. ALLEN:  OBJECTION.
19  BY MR. COREY:
20      Q.  I JUST SEE SOME THINGS COMING TO THE SURFACE.
21          MR. ALLEN:  LET'S ASK A PROPER QUESTION.
22  BY MR. COREY:
23      Q.  LET'S TAKE A BREAK AND SWITCH THE TAPE?
24          MR. ALLEN:  YOU KNOW IN ITS -- WE'RE GOING
25  ABOUT AN HOUR ARE WE AT A GOOD.
```

Exhibit 24, Page 6

85

```
1    A. THREE.
2    Q. AND DOES HE KIND OF ACT AS THE FACE OF THE
3    COMPANY FROM A MARKETING PERSPECTIVE?
4    A. YES.
5       MR. COTE: OBJECTION. VAGUE.
6       MR. ALLEN: OBJECTION. VAGUE.
7       THE DEPONENT: SAY IT AGAIN.
8    BY MR. COREY:
9    Q. DID YOU FINISH YOUR ANSWER?
10   A. NO I DIDN'T. HE IS THE MARKETING DIRECTOR.
11   Q. DOES HE REPORT DIRECTLY TO YOU?
12   A. YES.
13   Q. AND DO YOU HAVE -- YOU HAVE PROFIT AND LOSS
14   RESPONSIBILITY FOR THE SUBSIDIARY, RIGHT?
15   A. YES.
16   Q. DO YOU HAVE MARKETING RESPONSIBILITY AS WELL
17   OR IS THAT MR. -- FOR THE SUBSIDIARY OR IS THAT
18   MR. MACHADO?
19   A. I AM FULLY RESPONSIBLE FOR THE ENTIRE
20   SUBSIDIARY.
21   Q. BUT THE MARKETING ASPECT OF THAT YOU'VE
22   DELEGATED TO HIM?
23   A. BUT IT IS ULTIMATELY MY RESPONSIBILITY.
24   Q. RIGHT. RIGHT. AND I UNDERSTAND THAT. I MEAN,
25   YOU'RE THE ONE WHOSE PHONES GOING TO RING IF THINGS
```

86

```
1    START GOING SIDEWAYS?
2    A. MM-HMM.
3    Q. AND THEN YOU CAN YELL DOWN THE LINE BUT THE
4    MARKETING FUNCTION IS -- THE DAY-TO-DAY MARKETING
5    FUNCTION IS CARRIED OUT BY MR. MACHADO?
6       MR. ALLEN: OBJECTION. ASKED AND ANSWERED.
7       THE DEPONENT: YES.
8    BY MR. COREY:
9    Q. AND WHAT ARE MR. VARGAS' RESPONSIBILITIES AS
10   DIRECTOR OF SALES?
11   A. SALES.
12   Q. DOES HE HAVE PEOPLE WHO REPORT TO HIM?
13   A. YES.
14   Q. DO YOU KNOW HOW MANY?
15   A. APPROXIMATELY EIGHT, NINE.
16   Q. AND HE REPORTS DIRECTLY TO YOU?
17   A. THAT IS CORRECT.
18   Q. WHAT ARE MS. TRUEBA'S JOB RESPONSIBILITIES?
19   A. SHE HANDLES MEDIA, PUBLIC RELATIONS.
20   Q. DOES SHE HAVE PEOPLE WHO REPORT TO HER?
21   A. NO.
22   Q. WHO DOES SHE REPORT TO?
23   A. GUSTAVO MACHADO.
24   Q. AND I MAY HAVE ASKED YOU THIS. WERE YOU
25   INVOLVED IN THE NEGOTIATION OF THEIR SALARIES WHEN THEY
```

87

```
1    CAME OVER?
2    A. YES, YOU --
3       MR. ALLEN: OBJECTION. ASKED AND ANSWERED.
4       THE DEPONENT: YES, YOU ASKED AND NO.
5    BY MR. COREY:
6    Q. WHAT WERE THE CIRCUMSTANCES THAT LED -- STRIKE
7    THAT.
8       DO YOU KNOW WHAT THE CIRCUMSTANCES WERE THAT
9    LED TO MR. MACHADO BECOMING THE VICE PRESIDENT OF
10   MARKETING FOR WORLDWIDE MARKETING?
11   A. YES.
12   Q. WHAT HAPPENED THERE?
13   A. ONE OF THE SENIOR V.P.S -- EXECUTIVE V.P.S OF
14   THE COMPANY IN LOS ANGELES OFFERED HIM THE POSSIBILITY
15   TO COME AND WORK IN L.A.
16   Q. WHICH EXECUTIVE VICE PRESIDENT WAS THAT?
17   A. MR. BRAWER.
18   Q. AND MR. MACHADO ACCEPTED THAT POSITION?
19   A. THAT IS CORRECT.
20   Q. DID YOU HAVE A CONVERSATION WITH HIM ABOUT --
21   WITH MR. MACHADO ABOUT ACCEPTING THAT POSITION BEFORE HE
22   DID SO?
23   A. YES.
24   Q. AND WHAT DID YOU TWO DISCUSS?
25   A. HE WANTED MY OPINION.
```

98

1  MY RECORD.
2      MR. ALLEN: LET'S NOT WASTE TIME WITH OUR
3  COLLOQUY AND JUST ASK YOUR QUESTION.
4      MR. COREY: JUST TRYING TO MAKE IT SO THE
5  WITNESS DOESN'T HAVE TO COME BACK.
6      Q. DO YOU KNOW WHETHER MGA DE MEXICO IS PAYING
7  MS. TRUEBA'S ATTORNEYS' FEES IN CONNECTION WITH THE
8  CRIMINAL CASE IN MEXICO?
9      MR. ALLEN: SAME OBJECTION.
10  BY MR. COREY:
11      Q. DO YOU KNOW WHETHER MGA DE MEXICO IS PAYING
12  MR. VARGAS' ATTORNEYS' FEES IN CONNECTION WITH THE
13  CRIMINAL CASE IN MEXICO?
14      MR. ALLEN: SAME OBJECTION.
15  BY MR. COREY:
16      Q. ARE YOU GOING TO FOLLOW YOUR COUNSEL'S
17  INSTRUCTION?
18      MR. ALLEN: THE ANSWER TO THAT WOULD BE YES.
19  BY MR. COREY:
20      Q. BUT YOU NEED TO SAY IT.
21      A. YES.
22      Q. AND IF YOU'D LIKE TO ENTER INTO A STIPULATION
23  THAT SHE'LL FOLLOW YOUR INSTRUCTION WHENEVER YOU
24  INSTRUCT IS THAT ACCEPTABLE?
25      MR. ALLEN: CERTAINLY.

99

1  BY MR. COREY:
2      Q. DO YOU KNOW WHETHER MGA MEXICO OR MGA
3  ENTERTAINMENT IS PAYING MR. MACHADO'S ATTORNEYS' FEES IN
4  CONNECTION THIS CASE?
5      MR. ALLEN: OBJECTION. SAME INSTRUCTION.
6  BY MR. COREY:
7      Q. DO YOU KNOW WHETHER MGA DE MEXICO OR MGA
8  ENTERTAINMENT IS PAYING MR. VARGAS' ATTORNEYS' FEES IN
9  CONNECTION WITH THIS CASE?
10      MR. ALLEN: SAME INSTRUCTION.
11  BY MR. COREY:
12      Q. DO YOU KNOW WHETHER MGA MEXICO OR MGA
13  ENTERTAINMENT IS PAYING MS. TRUEBA'S ATTORNEYS' FEES IN
14  CONNECTION WITH THIS CASE?
15      MR. ALLEN: SAME INSTRUCTION.
16  BY MR. COREY:
17      Q. DO YOU KNOW WHETHER MR. VARGAS OR MS. TRUEBA
18  HAVE RETAINED COUNSEL IN CONNECTION WITH THIS CASE?
19      A. YES, THEY DID.
20      Q. AND DO YOU KNOW WHO THAT COUNSEL IS?
21      A. YES, I KNOW.
22      Q. WHO IS IT?
23      A. IT'S THE FRANCO GUZMAN LAW FIRM.
24      Q. NOT IN CONNECTION WITH THE CRIMINAL MATTER, IN
25  CONNECTION WITH THE CASE IN THE UNITED STATES.

100

1      A. OH. NO, THEY HAVE NOT RETAINED COUNSEL.
2      Q. AND HOW DO YOU KNOW THAT?
3      A. I KNOW.
4      Q. HAVE THEY TALKED TO YOU ABOUT RETAINING
5  COUNSEL, MR. VARGAS OR MS. TRUEBA?
6      A. IN REGARDS TO WHAT?
7      Q. IN REGARDS TO THE CASE IN THE UNITED STATES.
8      A. WE HAVEN'T DISCUSSED THAT.
9      Q. DID YOU HAVE A DISCUSSION WITH THEM ABOUT
10  RETAINING COUNSEL IN THE CRIMINAL CASE IN MEXICO?
11      A. YES.
12      Q. AND WHEN DID THAT CONVERSATION OCCUR?
13      A. I DON'T RECALL.
14      Q. WHAT DID THEY SAY?
15      A. THEY WANTED COUNSEL.
16      Q. AND WHO MADE THE DECISION THAT THAT SHOULD BE
17  PROVIDED TO THEM?
18      A. IT WAS COMPANY DECISION.
19      Q. DO YOU KNOW WHO MADE THAT DECISION -- STRIKE
20  THAT.
21      WHEN YOU SAY COMPANY DO YOU MEAN MGA
22  ENTERTAINMENT OR MGA DE MEXICO?
23      A. I DON'T RECALL.
24      Q. WHO MADE THE DECISION?
25      A. AS TO WHAT LAW FIRM HIRED?

101

1      Q. AS TO WHETHER THEY SHOULD GET COUNSEL AND WHAT
2  LAW FIRM WOULD BE HIRED.
3      A. I DON'T RECALL.
4      Q. WAS IT YOU?
5      A. NO.
6      Q. AND WHAT DO YOU UNDERSTAND THAT THEIR -- THAT
7  MR. MACHADO, MR. VARGAS AND MS. TRUEBA ARE ACCUSED OF IN
8  MEXICO?
9      MR. ALLEN: I'M GOING TO INSTRUCT THE WITNESS.
10  YOU CAN ANSWER TO THE EXTENT YOU'RE NOT, IT'S NOT BASED
11  ON INFORMATION THAT'S BEEN RELAYED TO YOU BY COUNSEL.
12      THE DEPONENT: SO I CANNOT ANSWER.
13  BY MR. COREY:
14      Q. LET ME ASK YOU A DIFFERENT QUESTION. DO YOU
15  KNOW -- DO YOU CURRENTLY HAVE KNOWLEDGE OF WHAT
16  MR. MACHADO, MR. VARGAS AND MS. TRUEBA HAVE BEEN ACCUSED
17  OF IN MEXICO?
18      A. I SAID I WAS INFORMED BY THEIR COUNSEL.
19      Q. BUT YOU CAN ANSWER THAT YES OR NO?
20      MR. ALLEN: YOU CAN SIMPLY SAY YES OR NO IF
21  YOU'VE GOT KNOWLEDGE.
22      THE DEPONENT: YES.
23  BY MR. COREY:
24      Q. OKAY. BUT -- SO YOU HAVE KNOWLEDGE BUT
25  EVERYTHING THAT YOU KNOW ABOUT THAT YOU'VE LEARNED FROM

Kuemmerle, Susana - Vol 1 [ROUGH]  1/28/2008  10:54:00 AM

122

1   Q. AT THE SAME TIME?
2   A. YES.
3   Q. WHEN DID THAT OCCUR?
4   A. I DON'T RECALL.
5   Q. SHORTLY AFTER THE SEARCH?
6   A. PROBABLY, YES.
7   Q. AND WHAT DID YOU TELL THEM WHAT DID YOU ASK
8 THEM?
9   A. STUPID ANTIQUATED STUFF THAT WAS NEVER USED
10 THAT ENDED UP THERE LIKE MY ROLODEX FOLLOWS ME WHEREVER
11 I GO.
12   Q. DID THEY TELL YOU WHY THEY HAD TAKEN IT WITH
13 THEM?
14   A. IT JUST ENDED UP THERE AND IT WAS COLLECTING
15 DUST.
16   Q. WHO TOLD YOU THAT?
17   A. LIKE I SAID, GUSTAVO.
18   Q. DID GUSTAVO KNOW VARGAS AND TRUEBA ALSO HAD
19 INFORMATION FROM MATTEL?
20   A. I DON'T KNOW.
21   Q. DID YOU ASK HIM THAT?
22   A. I DIDN'T.
23   Q. WHERE DID YOUR CONVERSATION WITH THEM TAKE
24 PLACE?
25   A. I DON'T RECALL.  IN THE OFFICE.

123

1   Q. WAS IT IN THE OFFICE?
2   A. YEAH.
3   Q. DID YOU ASK THEM IF THEY HAD ANYTHING ELSE?
4   A. I WAS -- NO, I DIDN'T HAVE TO ASK THAT.  IT
5 WAS OBVIOUS THERE'S NOTHING ELSE.
6   Q. AND WHY DO YOU SAY IT WAS OBVIOUS?
7   A. BECAUSE THERE WAS NOTHING ELSE.
8   Q. DID YOU SEARCH THEIR OFFICES OR HAVE THEIR
9 OFFICES SEARCHED?
10   A. NO.
11   Q. DID YOU ASK MR. MACHADO WHETHER HE HAD USED
12 THE INFORMATION ON THE CD WHILE HE WAS AN MGA DE MEXICO
13 EMPLOYEE?
14   A. NO.
15   Q. DID YOU ASK MS. VARGAS?
16   A. NO.
17   Q. DID YOU ASK MR. ?
18   A. MS. TRUEBA.
19   Q. EXCUSE ME DID YOU ASK MS. TRUEBA?
20   A. NO.
21   Q. DID YOU ASK MR. VARGAS?
22   A. NO.
23   Q. WHY DIDN'T YOU ASK THEM THAT?
24   A. THE SECRECY OF OUR BUSINESS AND THE WAY THAT
25 WE MOVE IS SO FAST THAT ANY INFORMATION THAT YOU HAVE IT

124

1 BECOMES OUTDATED AUTOMATICALLY AND WE HAVE -- WE WERE S
2 TIGHT OF A GROUP, NOT ENOUGH EMPLOYEES THAT WE WERE ALL
3 FORCED TO MULTITASK, SO ANY INFORMATION THAT I HIRE THEM
4 FOR IS POSE WHATEVER THEY HAVE IN THEIR MIND AND I KNOW
5 THAT'S -- THAT'S OUTDATED STUFF.  IT'S NOTHING THAT IT
6 IS IMPORTANT THAT IT BENEFITED WHAT WE PROVIDE TO DO AS
7 A SUBSIDIARY.
8   Q. DID THEY TELL YOU THAT IT WAS OUTDATED?
9   A. I KNOW HOW THINGS BECOME OUTDATED IN OUR
10 INDUSTRY.
11   Q. BUT YOU SAID THAT YOU DON'T -- YOU ONLY
12 GLANCED AT THE THING SO I'M TRYING TO FIND OUT HOW, YOU
13 KNOW, THAT IT WAS OUTDATED.
14   A. ANYTHING THAT IT IS OLDER THAN THREE OR
15 FOUR MONTHS IT'S OUTDATED INFORMATION.
16   Q. WERE YOU ABLE TO DETERMINE WHETHER THAT WAS
17 MORE THAN THREE OR FOUR MONTHS OLD?
18   A. I REMEMBER SEEING THE SORIANA STUDY AND I
19 REMEMBER SEEING 2002 AND I REMEMBER LAUGHING.
20   Q. DID MR. VARGAS HAVE RESPONSIBILITY FOR SELLING
21 TO SORIANA?
22   A. IN 2002?
23   Q. NO WHILE HE WAS AN MGA DE MEXICO EMPLOYEE.
24   A. YES.
25   Q. HAVE YOU EVER HAD A CONVERSATION WITH

125

1 MR. MACHADO ABOUT -- STRIKE THAT.
2   DID YOU EVER ASK MR. MACHADO WHETHER HE HAD
3 MATTEL DOCUMENTS AT HIS HOME OR APARTMENT?
4   A. I DON'T REMEMBER.
5   Q. DID YOU EVER ASK MR. VARGAS THAT QUESTION?
6   A. I DON'T REMEMBER.
7   Q. DID YOU ASK MS. TRUEBA THAT QUESTION?
8   A. I DON'T REMEMBER.
9   Q. DID YOU DO ANYTHING INDEPENDENT OF ASKING
10 MR. MACHADO WHETHER HE HAD USED THE DOCUMENTS ON THE
11 CD -- STRIKE THAT THAT WAS A POOR QUESTION.
12   YOU SAID THAT MR. MACHADO TOLD YOU THAT HE HAD
13 NEVER USED THE DOCUMENTS ON THE CD.  WHAT DO YOU BASE
14 THAT ON?
15   MR. ALLEN: OBJECTION.
16   YOU CAN ANSWER THE QUESTION.
17   THE DEPONENT: I CAN ANSWER?
18   MR. ALLEN: YEAH, YOU CAN ANSWER.
19   THE DEPONENT: I HIRED MACHADO BECAUSE OF HIS
20 BRAIN AND I WORKED WITH MACHADO TWO TIMES BEFORE.
21 NOTHING THAT ANY OTHER COMPANY COULD HAVE IS WHAT WE
22 COULD APPLY ON OUR SUBSIDIARY.
23 BY MR. COREY:
24   Q. DID YOU DO ANYTHING TO DETERMINE WHETHER HE
25 HAD ACCESS TO THE DOCUMENTS ON THE CD ON HIS COMPUTER?

**Exhibit 24, Page 9**

237

1    Q.  DO YOU HAVE ANY IDEA WHO PREPARED IT?

2    A.  NO.

3    Q.  ALL RIGHT.  YOU CAN SET THAT ASIDE.

4        LET'S TAKE A BREAK.  HE NEEDS TO CHANGE THE

5    TAPE I THINK I'M ACTUALLY PRETTY CLOSE I'LL LOOK AT MY

6    NOTES AND SEE WHAT ELSE I HAVE?

7        THE VIDEOGRAPHER:  THIS IS THE END OF DISC

8    NUMBER 3.  OFF THE RECORD THE TIME IS 5:14 P.M.

9        (RECESS TAKEN.)

10       THE VIDEOGRAPHER:  THIS IS THE BEGINNING OF

11   DISC NUMBER 4, ON THE RECORD THE TIME IS 5:28 P.M. --

12   EXCUSE ME 5:29 P.M.

13       MR. COREY:  WHY HAVE ANY MORE QUESTIONS FOR

14   MS. KUEMMERLE I DO RESERVE THE RIGHT TO SEE TO RULES ON

15   THE INSTRUCTIONS WE TALKED ABOUT I DON'T BELIEVE IN THE

16   PROPER CONTEXT OF JUDGE INFANTE'S RULING BUT WITH THAT I

17   DON'T HAVE ANY QUESTIONS.

18       MR. COTE:  NO QUESTIONS.

19       MR. ALLEN:  WE HAVE NO QUESTIONS THANK YOU,

20   SIR.

21       MR. COREY:  OKAY.  DO YOU JUST WANT TO PUT ON

22   THE STIPULATION THAT WE DID AT TONNU'S LAST ONE DO YOU

23   WANT ME TO PUT A STIPULATION ON THE RECORD?  IT'S

24   30 DAYS WITH -- SHE HAS 30 DAYS TO SIGN, SIGN UNDER

25   PENALTY OF PERJURY AND YOU'LL SHE DOESN'T HAVE CUSTODIAL

238

1    RESPONSIBILITIES IT WILL BE SENT TO YOU.

2        MR. ALLEN: FINE THAT'S FINE.

3        MR. COREY:  JUST PUT THAT ONE ON.

4        THE DEPONENT:  WHAT HAPPENED?

5        MR. ALLEN:  DON'T WORRY ABOUT IT.

6        MR. COREY:  IT'S LAWYER STUFF WE'RE OFF THE

7    RECORD.

8        THE VIDEOGRAPHER:  OFF THE THE TIME IS

9    5:29 P.M. THIS IS THE END OF TAPE NUMBER 2, DISK

10   NUMBER 4.

11       (WHEREUPON, THE PROCEEDING WAS

12       ADJOURNED AT TIME   )

13       -o0o-

14   [[CHECK TIMECODES

15   [[CHECK EXAM LINES

16   CHECK [[

17

18

19

20

21

22

23

24

25

Exhibit 24, Page 10

Exhibit 25

00029/2369479.1

RightFax                    8/30/2007 2:34    PAGE 002/006    Fax Server

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
Priority ____    Send ____
Entered ____    Closed ____
JS-5/JS-6 ____   JS-2/JS-3 ____
Scan Only____   Docketed on CM ____
____THIS CONSTITUTES NOTICE OF
ENTRY AS REQUIRED BY FRCP 77(d)

8/29/07

EASTERN DIVISION
BY ____ DEPUTY

# PRIORITY SEND
## & ENTERED

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
CIVIL MINUTES – GENERAL

Case No.    CV 04-09049 SGL (RNBx)                    Date: August 27, 2007

Title:    CARTER BRYANT -v- MATTEL, INC.
          AND CONSOLIDATED ACTIONS
==================================================================================
PRESENT:  HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

          Gina L. Guzman                      Theresa Lanza
          Courtroom Deputy Clerk              Court Reporter

ATTORNEYS PRESENT FOR CARTER          ATTORNEYS PRESENT FOR MATTEL:
BRYANT:

John W. Keker, Esq.                    John B. Quinn, Esq.
(morning session only)                 Michael T. Zeller, Esq.
                                       Jon D. Corey, Esq.

ATTORNEYS PRESENT FOR MGA:

Patricia Glaser, Esq.
Diana M. Torres, Esq.

PROCEEDINGS:    **ORDER DENYING MOTION FOR TERMINATING SANCTIONS;
                ORDER DENYING REQUEST FOR INTERLOCUTORY
                APPEAL; ORDER REQUIRING FILING OF AFFIDAVITS RE
                EVIDENCE PRESERVATION**

     This matter is before the Court on MGA's and Carter Bryant's Motion for Terminating
Sanctions, filed on July 24, 2007 (docket #689). This matter was heard on August 27, 2007, at
which time it was taken under submission. The Court has considered the moving, opposition, and
reply briefs, as well as the many declarations and other evidence presented by the parties. The

MINUTES FORM 90                                    Initials of Deputy Clerk __glg__
CIVIL -- GEN                                        Time: 02/52
                              1                    Docket No. 895

Court has also considered the arguments presented at the August 27 hearing and the sworn testimony given by Michael C. Moore, in-house counsel for Mattel. Although at the hearing the Court indicated it would defer ruling on the present motion pending further filings by all parties regarding their efforts to preserve evidence, upon further reflection the Court sees no reason to delay ruling on the current motion.[1]  As set forth below, the Court **DENIES** the motion.

Based on their inherent power to sanction for "abusive litigation practices," district courts may impose sanctions against a party who destroys evidence, including the ultimate sanction of dismissal. Leon v. IDX Systems Corp., 464 F.3d 951, 958 (9th Cir. 2006). Dismissal is a harsh sanction, which may nonetheless be imposed upon those parties who have "engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings." Anheuser-Busch, Inc. v. Natural Beverage Distributors, 69 F.3d 337, 348 (9th Cir. 1995). However, before imposing the ultimate sanction of dismissal, district courts should consider five factors: "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions." Id. Nevertheless, district courts need not make explicit findings regarding each of these factors and, in any event, "a finding of willfulness, fault, or bad faith is required for dismissal to be proper." Leon, 464 F.3d 951, 958 (9th Cir. 2006) (internal quotation marks and citation omitted).

"A party's destruction of evidence qualifies as willful spoliation if the party has 'some notice that the documents were potentially relevant to the litigation before they were destroyed.'" Id. at 959 (quoting United States v. Kitsap Physicians Serv., 314 F.3d 995, 1001 (9th Cir. 2002) (finding no willful spoliation where documents were destroyed in the routine course of business)). Neither Leon nor Kitsap elaborate on when a party has the "notice" necessary to trigger the duty to preserve evidence. However, in In re Napster, Inc. Copyright Litigation, 462 F.Supp.2d 1060, 1068 (N.D. Cal. 2006), the district court presented a persuasive discussion of the standard, first rejecting an argument that the duty to preserve evidence arises only when litigation is "imminent," and then setting forth a lesser standard. Specifically, the Napster court noted that the duty arose "when a party should have known that the evidence may be relevant to future litigation," and that any such "future litigation" must be "probable," and not merely "possibl[e]." (internal quotation marks and citation omitted).

Keeping in mind these standards, the Court turns to the categories of evidence MGA and Bryant allege that Mattel has despoiled. As articulated by the Court at the hearing on this matter, those categories are (1) Mattel employees' emails, (2) documents maintained on the Zeus document storage system, (3) the delay in producing certain Rule 30(b)(6) witnesses, (4) Carter

---

[1] By the same token, upon further reflection, the Court sees no reason to delay ruling on MGA's request for interlocutory appeal of the present order. See 28 U.S.C. § 1292(b) (stating that certifications for interlocutory appeal should be set forth in the order to be appealed). The Court's ruling on that matter appears infra.

Bryant's missing phone records, and (5) Carter Bryant's missing time records.

In considering the arguments of the parties regarding when Mattel's duty to begin to preserve evidence arose, the Court determines that November 24, 2003, marks the date when litigation between Mattel and Bryant became more than merely speculative and in fact became probable. On this date, in-house counsel for Mattel received in discovery in an unrelated action a copy of a contract between MGA and Bryant that pre-dated Bryant's resignation from Mattel. This contract appeared to Mattel to violate certain employment agreements executed by Bryant and Mattel, thus giving rise to one of the current consolidated actions. Although prior to this date an internal investigation may have raised a suspicion on Mattel's part that litigation might arise, there was no evidence presented to the Court that Mattel should have known it had a viable claim against Bryant before November 2003. Cf. Fed. R. Civ. P. 11(b)(3) ("By presenting to the court . . . a pleading . . . , an attorney . . . is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, . . . the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery . . . .").

The Court heard testimony from Michael C. Moore, in-house counsel for Mattel, regarding the efforts to preserve email communications and other evidence. Counsel for MGA and Bryant cross-examined Mr. Moore at the hearing on this matter. The Court credits his testimony. The efforts Mr. Moore described regarding the preservation of emails is reasonable, and certainly does not amount to spoliation. Moore described communications with specific individuals identified by Mattel as those most likely to have information relevant to the litigation and efforts made to preserve any evidence those individuals had in their custody or control. Emails not otherwise archived from the relevant time period – mostly September and October, 2000 – had already been deleted from Mattel's email servers in accordance with its email retention policies. Mattel cannot be faulted for deleting these emails in the regular course of business before it had notice of its claims against Bryant.

In April, 2005, the current litigation took a dramatic turn, when MGA filed suit against Mattel. At that time, all Mattel employees were instructed to maintain any evidence potentially relevant to the litigation. When that suit was filed, Mattel took action to preserve all of its emails, capturing emails that date back to December, 2004. They retain these backup tapes to this day. MGA and Bryant make much of Mattel's failure to suspend its 90-day auto-delete policy regarding emails, but fail to address two key points: First, Mattel altered only the storage mechanism for its emails, it did not actually delete any emails; and second, Mattel, a number of years ago, informed MGA that it was not planning on suspending its 90-day auto-delete policy, and MGA did not at that time object.

As for the Zeus tapes, there is simply no evidence of spoliation. First and foremost, as the system has been described to the Court, the system is a cumulative file system that continues to accumulate. The system is still in operation, does not have an auto-delete function, and

MINUTES FORM 90
CIVIL -- GEN

                                        Initials of Deputy Clerk __glg_____
                                        Time: 02/52
                        3               Docket No. 895

information dating back to all relevant time period in this case may be accessed from it.
Additionally, Mattel's in-house counsel testified as to the existence of several backup tapes that it
can make available to MGA and Bryant. Finally, outside of pure speculation, there is no evidence
that anyone has deleted anything from the Zeus system. Although production issues may still
remain with respect to these data, preservation of this data, in the Court's view, is simply not an
issue based on the record before the Court.

The delay in producing certain Rule 30(b)(6) witnesses is not a proper basis for terminating
sanctions in this case. No motions to compel were brought to compel these witnesses's
depositions at earlier times, and MGA and Bryant's accusations that the delay in producing them
for deposition is part of a cover-up of the destruction of evidence is mere unfounded speculation.
Moreover, the Court is mindful that MGA has been found by the discovery master to be guilty of
the very same unexcused delay of which it accuses Mattel. See August 14, 2007, J. Infante
Order, at 8 and 9 (attached to the Supplemental Proctor Decl. as Ex. 1).

Although Mattel is at a loss to explain the missing phone records from the critical month of
October, 2000, there is no evidence that the records were destroyed. Moreover, other evidence
presented by Mattel, especially phone records produced by Bryant that show he was in contact
with MGA during that time period, suggest that the missing records would not assist Bryant.

The "missing" time records were either never created or were deleted. There is no
evidence that the latter occurred. In fact, the only evidence on this point, from Mattel's Rule
30(b)(6) witness, is that although deletion of time records is possible, he was unaware of any
instances of that occurring. Artavia Depo. 116, 170-71.

In sum, MGA and Bryant have failed to present any evidence regarding the "willfulness,
fault, or bad faith" required to justify the imposition of terminating sanctions. Leon, 464 F.3d at
958. Many of MGA and Bryant's allegations, especially those raised in connection with Mattel's
failure to suspend its auto-delete policy (portrayed as a wholesale failure to preserve emails less
than 90-days old) and the availability of data from the Zeus system, are nothing more than rhetoric
laced with hyperbole. Other allegations, such as Mattel's motive for delaying certain Rule 30(b)(6)
depositions, and the destruction of Bryant's October, 2000, phone records and time records, are
nothing more than sheer speculation, unsupported by evidence. Although counsel impressed
upon the Court MGA's conviction of the righteousness of its cause, such overzealous conviction as
witnessed by the Court at the hearing is no substitute for proof.

Accordingly, the Court **DENIES** MGA's and Bryant's Motion for Terminating Sanctions.

At the hearing, counsel for MGA and Bryant requested the Court certify the present order
for interlocutory appeal. That request is **DENIED**. Permissive interlocutory appeals are governed
by 28 U.S.C. § 1292(b):

When a district judge, in making in a civil action an order not otherwise

MINUTES FORM 90                                        Initials of Deputy Clerk __glg_____
CIVIL -- GEN                                           Time: 02/52
                            4                          Docket No. 895

RightFAX                    8/30/2007 2:34    PAGE 006/006    Fax Server

appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order.

Id. Here, there is no "controlling question of law" in controversy. The law is quite settled. Accordingly, certification for interlocutory appeal of the present order is unwarranted.

As stated at the hearing, the Court **ORDERS** all parties to set forth, in affidavit form, their preservation efforts and policies with respect to the present litigation on or before September 10, 2007.

**IT IS SO ORDERED.**

MINUTES FORM 90                                  Initials of Deputy Clerk __glg_____
CIVIL -- GEN                                     Time: 02/52
                          5                      Docket No. 895

'RightFAX                    8/30/2007 2:34      PAGE 001/006      Fax Server

**From:**     Name:         United States District Court
                            312 North Spring Street
                            Los Angeles, CA 90012
              Voice Phone:  (213) 894-5474

**To:**       Name:         Michael Zeller
              Company:

                            865 S Figueroa St, 10th Fl,
              City/State:   Los Angeles, CA 90017-2543
              Fax Number:   213-624-0643



## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

## Automated Document Delivery Service
*Notice pursuant to Rule 77(d) FRCiv.P*
*The attached copy is hereby served upon you pursuant to Federal Rule of Civil Procedure 77(d).*

**Fax Notes:**

Case 2:04-CV-09049 : CARTER BRYANT V. MATTEL INC

*Pursuant to General Order 06-07, Section F, the following documents shall be submitted in the traditional manner: Pen Registers, Search Warrants, Seizure Warrants, Wire Taps, Bond Related Documents, Under Seal and In-Camera Documents, and All Charging Documents (Complaints, Informations, Indictments, and Superseding Charging Documents). All other documents filed in cases unassigned to a judge shall be filed electronically with a copy e-mailed to the criminal intake mailbox for the appropriate division. The proper e-mail address for each division is as follows:*

*Western Division: CrimIntakeCourtDocs-LA@cacd.uscourts.gov*
*Southern Division: CrimIntakeCourtDocs-SA@cacd.uscourts.gov*
*Eastern Division: CrimIntakeCourtDocs-RS@cacd.uscourts.gov*

*For additional information and assistance, please refer to the CM/ECF page on the Court website at www.cacd.uscourts.gov.*

**Switch to e-mail delivery and get these documents sooner!**
**To switch, complete and submit**
**Optical Scanning Enrollment / Update form G-76.**
**Call 213-894-5474 for help and free technical support.**

*If you received this document in error because the attorney with whom this document is directed is no longer the attorney on the case, a Notice of Change of Attorney Information, form G-6, must be filed. If there are other cases which you've received documents for which you are no longer the attorney, separate notices must be filed for each case. Failure to do so will result in the continued sending of documents to you. Form G-6 is available on the court's website at www.cacd.uscourts.gov or at the Clerk's Office.*

Date and time of transmission:        Thursday, August 30, 2007 2:34:04 PM
Number of pages including this cover sheet:  06

8|29

Exhibit 26

RECEIVED

SEP 1 0 2007

1   DALE M. CENDALI (admitted *pro hac vice*)
    dcendali@omm.com
2   DIANA M. TORRES (S.B. #162284)
    dtorres@omm.com
3   JAMES P. JENAL (S.B. # 180190)
    jjenal@omm.com
4   O'MELVENY & MYERS LLP
    400 South Hope Street
5   Los Angeles, CA 90071-2899
    Telephone: (213) 430-6000
6   Facsimile: (213) 430-6407

7   PATRICIA GLASER (S.B. #55668)
    CHRISTENSEN, GLASER, FINK,
8   JACOBS, WEIL & SHAPIRO, LLP
    10250 Constellation Boulevard, 19th Floor
9   Los Angeles, CA 90067
    Telephone: (310) 553-3000
10  Facsimile: (310) 557-9815

11  Attorneys for MGA Entertainment, Inc.

12              UNITED STATES DISTRICT COURT

13              CENTRAL DISTRICT OF CALIFORNIA

14

15  CARTER BRYANT, an individual,      Case No. CV 04-09049 SGL (RNBx)
                                        (consolidated with CV 04-9059 & 05-
16              Plaintiff,              2727)

17       v.

18  MATTEL, INC., a Delaware           DECLARATION OF DAPHNE
    Corporation,                       GRONICH IN RESPONSE TO
19                                      COURT'S REQUEST FOR
                Defendant.             INFORMATION REGARDING
20                                      DOCUMENT PRESERVATION

21

22                                      Discovery Cut-off: March 3, 2008
                                        Pre-trial Conference: June 2, 2008
23                                      Trial Date: July 1, 2008

24                                      Judge: Hon. Stephen G. Larson

25

26

27

28

LA2:841480.1                                      GRONICH DECL
                                          CV 04-09049 SGL (RNBX)

Exhibit 26, Page 17

I, Daphne Gronich, declare and state as follows:

1. I am General Counsel for MGA Entertainment, Inc. ("MGA") and a resident of the state of California. All of the facts set forth herein are known to me personally, except for those stated on information and belief and if called as a witness, I could and would testify competently thereto.

**Document Preservation Communications**

2. I have been MGA's General Counsel since December, 2003, and have had oversight responsibility for MGA's legal response to this litigation since its inception. Shortly after Mattel sued Carter Bryant in April 2004, even though MGA had not been named as a defendant in that suit, I communicated to MGA employees that Mattel had filed suit against Carter Bryant alleging that he had breached his employment agreement with Mattel. I advised MGA's employees that MGA might at some point become involved in the litigation, and that it would be prudent for MGA to preserve all documents that might be potentially relevant to the claims at issue in the litigation. In addition to these initial communications, both I and my colleague, Rich Daniels, one of MGA's other in-house attorneys, repeated that advisement at numerous one-on-one and group meetings (including those held in Isaac Larian's office at MGA's former location on Schoenborn Avenue in North Hills) involving senior executives, creative staff members, sales and administration staff and others including IT personnel. These communications took place throughout the late-Spring and Summer of 2004.

3. In addition to those communications, the legal department began locating and collecting documents and materials that might be relevant to the lawsuit against Mr. Bryant. In that regard we were aided by the company's previous efforts to collect certain documents and materials related to the origin and initial development of "Bratz," due to MGA's involvement in prior, unrelated litigation (that did not challenge MGA's ownership of "Bratz"). As a result, we

1    were able to preserve potentially relevant documents and materials from MGA's

2    employees in California and its related company in Hong Kong, including Isaac

3    Larian, Paula Treantafelles (now Garcia), Dave Malacrida, Victoria O'Connor,

4    Becky Harris, Charles O'Connor, Aileen Storer, Mercedeh Ward, Marcy George,

5    Shirin Salemnia, Edmond Lee, Dennis Soai, Stephen Lee, Samuel Wong, Cecilia

6    Kwok and Franki Tsang.

7         4.    In addition to the communications described above, in the weeks

8    following the filing of Mattel's lawsuit against Carter Bryant, both I and Rich

9    Daniels and/or our outside counsel, spoke with and/or confirmed that MGA had the

10   documents of key potential witnesses, including Isaac Larian, Paula Garcia,

11   Victoria O'Connor, Charles O'Connor, Aileen Storer, Mercedeh Ward, Marcy

12   George, Dennis Soai, Shirin Salemnia, and Dave Malacrida.   During those

13   conversations, we again personally directed MGA's potential witnesses to preserve

14   their potentially relevant documents.

15        5.    As a result of those discussions, MGA's potential witnesses

16   were given express direction by myself, Mr. Daniels, or MGA's outside counsel to

17   preserve their relevant paper documents and to assist, as necessary, MGA's IT

18   department in preserving their emails and electronic documents.  We also directed

19   the IT department to segregate and preserve emails from MGA employees who had

20   since left the company, which former employees included some who had also been

21   previously employed by Mattel prior to working for MGA.

22        6.    In the years since the litigation began, I have sent out reminder

23   emails to MGA's employees reminding them of their continuing obligation to

24   preserve documents potentially relevant to this litigation, including reminder emails

25   that I sent to all MGA employees on April 14, 2005, December 5, 2006, and July 5,

26   2007.  In addition, other members of the legal department routinely advise the staff

27   members with whom they work to retain relevant documents.  For example, Sam

28   Khare, an MGA in-house lawyer who works closely with the product design teams,

LA2:841480.1                          -2-                          GRONICH DECL
                                                                   CV 04-09049 SGL (RNBX)

1   routinely reminds people in the design groups to retain documents.

2        7.   After we became aware of Mattel's claims against MGA, on
3   December 5, 2006 I sent an email to all MGA employees reminding them of their
4   ongoing obligations regarding Mattel's suit against Carter Bryant and informing
5   them of the nature of the new claims against MGA, including the allegation of trade
6   secret theft. I reminded MGA's employees of MGA's policy that its employees
7   must not bring with them to MGA the property or confidential or proprietary
8   information of their former employers, and instructed them to preserve all
9   documents and materials relevant to these new claims as well.

10       8.   In addition to that communication, we also began collecting and
11  segregating the documents of all former Mattel employees, including those who
12  were no longer employed by MGA.

13       9.   While MGA is ready and willing to produce its communications
14  for the Court's review, I have been informed by MGA's outside counsel that Mattel
15  has taken the position that "it cannot agree" that MGA's production of those
16  communications would not constitute a waiver of the attorney-client privilege.
17  Attached hereto as **Exhibit 1** is a true and correct copy of a letter from Mattel's
18  counsel, Jon Corey, to MGA's outside counsel, Bill Charron, asserting that
19  position. If the Court wishes to see such communications and agrees with MGA
20  that such production would not constitute a waiver of the attorney-client privilege,
21  MGA will produce its communications within 24 hours of receiving the Court's
22  guidance.

23

**Paper Document Preservation**

24       10.   MGA does not now, and never has had a policy to routinely
25
26  destroy paper documents. In particular, since this litigation began, MGA has
27  expressly retained paper files in the Creative Departments, character art files,
28  vendor files, executive files and others.

LA2:841480.1               - 3 -                      GRONICH DECL
                                                    CV 04-09049 SGL (RNBX)

**Email Preservation**

11.     Since before 2004, MGA has used Microsoft's Exchange email system and the Outlook email client to provide email support to the company. MGA does not have, and never has had, a policy to auto-delete emails; to the contrary, employees are advised to retain work-related emails. I am informed by our IT staff that employees may, and often do, create email storage files (known as "pst" files) to which they can move emails from their mailbox on the Exchange server. MGA's practice is to preserve those pst files, and it has done so.

12.     MGA's process for preserving those emails has become more automated over time as our IT department has grown in its sophistication to meet the needs of the company, particularly as MGA itself has grown and expanded. I am informed that in January of 2000, MGA only had around eighty employees, whereas by January of 2004 that number had grown to 196 and by January of 2007 it was approximately 900 domestically and 670 internationally, including subsidiaries.

13.     In 2004, when an employee would leave the company, the IT department copied the pst files from the employee's computer and burned them onto CDs that were then retained by the IT department. I am informed that in September 2005, the system was improved so that instead of having to copy those pst files onto CDs, the IT department was then able to preserve those pst files on a network server.

14.     Emails in the departing employee's mailbox on our Exchange server are retained on the Exchange server. The IT department's network administrators change the access permissions on that employee's mailbox so that only the administrators can access it. In that way, those emails are retained and can be accessed when necessary with proper authorization.

15.     In the past year, an even more automated process was put in place to preserve and manage email. In January 2007, the IT department began

1   using a system known as "Archive One" which I am informed automatically

2   archives emails older than 90 days once a user's mailbox exceeds a set size

3.  threshold. In this way, access to older emails is retained, but the size of the user's

4   mailbox files on our Exchange server is controlled.

5       16.   MGA's Exchange email server is also backed up on a nightly

6   basis as a means of disaster recovery. Historically those backup tapes had been

7   rotated on a 90-day cycle. However, because we have no policy of auto-deleting

8   emails and because we preserve the mailboxes (and pst files) of former employees,

9   unless an employee violates MGA's policies, and the legal department's express

10  and repeated directives to preserve email, no email would be lost by recycling those

11  backup tapes.

12

13  **Other Electronic Document Preservation**

14      17.   Employees are encouraged to store other electronic documents

15  (such as Word documents or Excel spreadsheets) on a shared network file server.

16  Some employees may also save electronic documents in the "My Documents"

17  folder on their computer. As was the case for emails saved to local pst files, going

18  back to 2004, if an employee left the company the contents of the My Documents

19  folder was also copied onto CDs and preserved. Again, when the system evolved in

20  September of 2005, the My Documents folder was preserved onto a network server.

21  Since March of this year, the entire hard drive itself is preserved by the IT

22  department.

23      18.   In addition to those preservation methods when an employee

24  would leave the company, files saved to the shared network file server would be

25  retained indefinitely and protected by nightly backups. I am informed that since

26  this litigation began in April 2004, MGA has not suffered any server failures that

27  resulted in the loss of data.

28      19.   In April of this year, another automated capability was brought

LA2:841480.1                        - 5 -                    GRONICH DECL
                                                            CV 04-09049 SGL (RNBX)

1   online.  MGA has now installed an automated process that daily copies the
2   contents of the My Documents folder and any pst files that are saved in the user's
3   "Exchange" folder to a network file server.
4        20.     Within days of learning of Mattel's intent to bring claims
5   against MGA, MGA made, and retains to this day, a complete backup of all of its
6   servers.
7
8   **Preservation of Data from Isaac Larian's Computer**
9        21.     I am informed by our IT department that there are always two
10  laptop computers assigned to Mr. Larian – the computer that he is actively using,
11  and a second, "mirrored" spare computer.  Whenever Mr. Larian docks his
12  computer into the MGA network, any changes that have been made to the files on
13  his computer are automatically "mirrored" or copied to the spare.  In that way, any
14  potential data loss is minimized.
15       22.     I am also informed by our IT department that when Mr. Larian
16  needs to replace his laptop, the IT department starts with the mirrored spare.  If the
17  hard drive on Mr. Larian's old laptop is still operable, they make sure that the files
18  on the mirrored spare contain the most up-to-date information that can be read from
19  the old hard drive.  When all of that data has been copied onto the spare, it is
20  provided to Mr. Larian and a new laptop becomes the mirrored spare.
21       23.     Personal computers at MGA frequently contain a great deal of
22  MGA's confidential and trade secret information – and this is especially true for
23  Mr. Larian's laptop.  I am informed by our IT department that prior to instituting
24  the present policy of retaining computer hard drives, whenever a computer that Mr.
25  Larian had been using was to be retired from his use – whether due to damage or
26  simply the need to provide newer technology – the hard drive was backed up to one
27  of the IT department's archive servers so as to preserve the data that was on the
28  hard drive in a secure location.  Once the data had been safely preserved, the IT

1   department then reformatted the hard drive in such a way that the confidential and

2   trade secret data was no longer present on the hard drive. Thus, although the hard

3   drive had been "wiped" before being put back into service or disposed of, none of

4   the data had been lost to MGA as it remained preserved on one of the IT

5   department's archive servers. Today, we would simply retain the hard drive from

6   Mr. Larian.

7

8   **Other Corporate Data Preservation**

9        24.    In 2004, MGA used an enterprise accounting package known as

10  Great Plains. In January 2006, MGA converted to a newer system known as

11  Axapta and after that time, all new business transactions were processed on the

12  Axapta system. However, MGA has retained the Great Plains system and I am

13  informed that no data was lost in the conversion. Accordingly, MGA is able to

14  retrieve transaction data as needed going back to at least 1998.

15

16        I declare under penalty of perjury under the laws of the United States

17  that the foregoing is true and correct.

18        Executed this 10th day of September, 2007, at Van Nuys, California.

19

20                                         Daphne Gronich

21

22

23

24

25

26

27

28

LA2:841480.1                    - 7 -                    GRONICH DECL.
                                                   CV 04-09049 SGL (RNBX)

Exhibit 26, Page 24

Exhibit 27

1  THOMAS J. NOLAN (Bar No. 66992)
   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
2  300 South Grand Avenue
   Los Angeles, CA 90071-3144
3  Telephone: (213) 687-5000
   Facsimile: (213) 687-5600
4  Email: tnolan@skadden.com

5  RAOUL D. KENNEDY (Bar No. 40892)
   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
6  4 Embarcadero Center, 38th Floor
   San Francisco, CA 94111-5974
7  Telephone: (415) 984-6400
   Facsimile: (415) 984-2698
8  Email: rkennedy@skadden.com

9

10 Attorneys for MGA Entertainment, Inc., MGA Entertainment
   (HK) Limited, MGAE de Mexico, S. de R.L. de C.V., and
11 Isaac Larian

12

13              UNITED STATES DISTRICT COURT

14              CENTRAL DISTRICT OF CALIFORNIA

15

16 CARTER BRYANT, an individual,        )  CASE NO. CV 04-9049 SGL (RNBx)

17            Plaintiff,                 )  Consolidated with Case No. 04-9059
                                         )  and Case No. 05-2727
18       v.                             )
                                         )  **SUPPLEMENTAL**
19 MATTEL, INC., a Delaware             )  **DECLARATION OF DAPHNE**
   corporation,                          )  **GRONICH IN RESPONSE TO**
20                                       )  **COURT'S REQUEST FOR**
                                         )  **INFORMATION REGARDING**
21            Defendant.                 )  **DOCUMENT PRESERVATION**
                                         )
22 Consolidated with                    )
   MATTEL, INC. v. BRYANT and           )  Judge: Hon. Stephen G. Larson
23 MGA ENTERTAINMENT, INC. v.           )
   MATTEL, INC.                          )
24                                       )

25

26

27

28                        12-05

SUPPLEMENTAL DECLARATION OF DAPHNE GRONICH IN RESPONSE TO COURT'S REQUEST FOR
INFORMATION REGARDING DOCUMENT PRESERVATION

Exhibit 27, Page 25

1    I, Daphne Gronich, declare and state as follows:

2    1.    This declaration will supplement the September 10, 2007 Declaration of
3 Daphne Gronich in Response to Court's Request for Information Regarding
4 Document Preservation ("the September 10 Declaration") attached hereto as Exhibit
5 A. All of the facts set forth herein are known to me personally, except for those
6 stated on information and belief and, if called as a witness, I could and would testify
7 competently thereto.

8    2.    I was the General Counsel of MGA Entertainment, Inc. ("MGA") and
9 its subsidiaries, including MGA Entertainment (HK) Limited ("MGA HK") and
10 MGAE de Mexico, S. de R.L. de C.V. ("MGA Mexico") from December 2003
11 through early November 2007. To clarify Paragraph 2 of the September 10
12 Declaration, I had oversight responsibility for the legal response of MGA, MGA HK
13 and MGA Mexico to this litigation since its inception. To further clarify Paragraph 2
14 of the September 10 Declaration, the reference to communications with MGA
15 employees after Mattel sued Carter Bryant in April 2004, includes employees of
16 MGA, MGA HK and MGA Mexico, as well as Mr. Isaac Larian.

17    3.    To clarify Paragraphs 4 and 5 of the September 10 Declaration, the
18 references to Rich Daniels, outside counsel and/or myself confirming that MGA had
19 the documents of key potential witnesses and directing such witnesses to preserve
20 potentially relevant documents include MGA and MGA HK. Although employees
21 of MGA Mexico were advised of the filing of the litigation, as a brand new entity
22 with new employees, MGA Mexico would not have had any documents potentially
23 relevant to the allegations set forth in the initial complaint.

24    4.    To clarify Paragraphs 6 and 7 of the September 10 Declaration, the
25 reminder emails that were sent to all employees of MGA on April 14, 2005,
26 December 5, 2006, and July 5, 2007 (reminding employees of their continuing
27 obligation to preserve documents potentially relevant to this litigation, including the
28

- 2 -

1   new claims) included as recipients Mr. Larian, MGA HK and MGA Mexico
2   personnel.

3       5.      To clarify Paragraph 8 of the September 10 Declaration, the reference to
4   the collection of documents includes documents at MGA and MGA HK with regard
5   to the initial complaint and, later, MGA Mexico.

6       6.      To clarify Paragraph 10 of the September 10 Declaration, the reference
7   to the policy not to routinely destroy paper documents and the retention of certain
8   files includes MGA, MGA HK and MGA Mexico.

9       7.      To clarify Paragraph 11 of the September 10 Declaration, the reference
10  to the use of Microsoft's Exchange server by MGA includes MGA and MGA HK
11  with respect to the time period before 2004.  I am informed that since its
12  establishment in the spring of 2004, MGA Mexico also uses Microsoft's Exchange
13  email system and the Outlook email client.  To further clarify Paragraph 11 of the
14  September 10 Declaration, the reference to the policies regarding auto-deletion of
15  emails and creation of pst files, applies to MGA, MGA HK, MGA Mexico and Mr.
16  Larian.

17      8.      To clarify Paragraph 12 of the September 10 Declaration, the reference
18  to MGA's automation of the process for preserving emails applies to MGA and
19  MGA Mexico.

20      9.      To clarify Paragraph 13 of the September 10 Declaration, the reference
21  to the procedure whereby the IT department copied departing employees' pst files on
22  to CDs applies to MGA and MGA HK as well as MGA Mexico in 2004.  I am
23  informed that the improvement in the system used to preserve such pst files of
24  departing employees in September 2005 applies to MGA and MGA Mexico.  I am
25  also informed that during this time, MGA HK continued its practice of copying
26  departing employees' hard drives, including pst files, on to CDs or DVDs.

27

28

- 3 -
SUPPLEMENTAL DECLARATION OF DAPHNE GRONICH IN RESPONSE TO COURT'S REQUEST FOR
INFORMATION REGARDING DOCUMENT PRESERVATION

1    10.    To clarify Paragraph 14 of the September 10 Declaration, the reference
2  to the change in access permissions applies to MGA and MGA Mexico. With
3  respect to MGA HK, I am informed that from September 2004 through July 2007,
4  the emails in a departing employee's mailbox were maintained for three months,
5  during which time the mailbox was backed up by MGA HK's disaster recovery
6  system. I am further informed that since July 2007, in addition to being backed up,
7  departing MGA HK employees' mailboxes have been preserved on the server.

8    11.    To clarify Paragraph 15 of the September 10 Declaration, the reference
9  to "an even more automated process [which] was put in place to preserve and
10  manage email" applies to MGA and MGA Mexico.

11    12.    To clarify Paragraph 16 of the September 10 Declaration, the reference
12  to the nightly back up of the Exchange email server includes MGA, MGA HK and
13  MGA Mexico. To further clarify, the reference to the 90-day rotation cycle of back-
14  up tapes used for the nightly back-up of the Exchange email server applies to MGA
15  and MGA Mexico. With respect to MGA HK, I am informed that historically
16  backup tapes used for the nightly back-up of the Exchange email server had been
17  rotated on a 7-day cycle, with the back up tapes for the last day of the month being
18  preserved. I am informed that since September 2007, all backup tapes used for the
19  nightly back-up of the Exchange email server at MGA HK have been preserved.

20    13.    To clarify Paragraph 17 of the September 10 Declaration, the reference
21  to employees being encouraged to store electronic documents on shared network file
22  servers, saving documents to "My Documents," and the copying onto CDs of
23  documents saved by departing employees on their computer's "My Documents"
24  folder includes MGA, MGA HK and MGA Mexico. I am informed that the
25  evolution of the system in September of 2005 applies to MGA and MGA Mexico.
26  With respect to MGA HK, I am informed that when an employee leaves MGA HK,
27
28

- 4 -

1  the IT department copies the contents of the My Documents folder onto CDs or
2  DVDs and, more recently, preserves the hard-drive as well.

3        14.    To clarify Paragraph 18 of the September 10 Declaration, the reference
4  to files saved on the shared network file server (drive) includes MGA, MGA HK and
5  MGA Mexico.  I am informed that MGA and MGA Mexico have suffered no server
6  failures since this litigation begin April 2004.  With respect to MGA HK in 2006,
7  MGA HK suffered a server failure, which may have resulted in the loss of some
8  electronically stored data relating to purchasing and shipping information.  I am
9  further informed that paper copies of this information have been maintained.

10       15.    To clarify Paragraph 19 of the September 10 Declaration, the reference
11 to the automated process whereby the contents of the My Documents folders and pst
12 folders saved in users' Exchange folders are copied to a network file server includes
13 MGA and MGA Mexico.

14       16.    To clarify Paragraph 20 of the September 10 Declaration, the reference
15 to the server back ups includes MGA, MGA HK, and MGA Mexico.

16       17.    To clarify Paragraph 21 of the September 10 Declaration,  I am
17 informed that Mr. Larian's My Documents and pst files are regularly backed up by
18 MGA's IT department to the file server, rather than the spare computer.  In addition,
19 when Mr. Larian docks his computer into the MGA network, the email files on his
20 computer are automatically synchronized to the exchange server, rather than the
21 spare computer.

22       18.    To clarify Paragraph 22 of the September 10 Declaration, I am informed
23 that when Mr. Larian needs to replace his computer, the IT department transfers any
24 readable data from the old laptop on to the spare computer before it is provided to
25 Mr. Larian.

26       19.    To clarify Paragraph 23 of the September 10 Declaration, the reference
27 to the personal computers at MGA containing confidential and trade secret

28
                                    - 5 -
SUPPLEMENTAL DECLARATION OF DAPHNE GRONICH IN RESPONSE TO COURT'S REQUEST FOR
INFORMATION REGARDING DOCUMENT PRESERVATION

1  information includes the personal computers of MGA, MGA HK and MGA Mexico,

2  in addition to the computers used by Mr. Larian.

3      20.    To clarify Paragraph 24 of the September 10 Declaration, the references

4  to the use of the Great Plains and Axapta enterprise accounting packages by MGA

5  includes MGA, MGA HK and MGA Mexico.

6      I declare under penalty of perjury under the laws of the United States that the

7  foregoing is true and correct.

8

9      Executed this 4th day of December, 2007, at Van Nuys, California.

10

11

12                             _____
                               Daphne Gronich

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

- 6 -

28  SUPPLEMENTAL DECLARATION OF DAPHNE GRONICH IN RESPONSE TO COURT'S REQUEST FOR
    INFORMATION REGARDING DOCUMENT PRESERVATION

# EXHIBIT A

FILED

2007 SEP 10 PM 4: 00

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF COURT
RIVERSIDE CALIF.

BY _____

1   DALE M. CENDALI (admitted *pro hac vice*)
    dcendali@omm.com
2   DIANA M. TORRES (S.B. #162284)
    dtorres@omm.com
3   JAMES P. JENAL (S.B. # 180190)
    jjenal@omm.com
4   O'MELVENY & MYERS LLP
    400 South Hope Street
5   Los Angeles, CA 90071-2899
    Telephone: (213) 430-6000
6   Facsimile: (213) 430-6407

7   PATRICIA GLASER (S.B. #55668)
    CHRISTENSEN, GLASER, FINK,
8   JACOBS, WEIL & SHAPIRO, LLP
    10250 Constellation Boulevard, 19th Floor
9   Los Angeles, CA 90067
    Telephone: (310) 553-3000
10  Facsimile: (310) 557-9815

11  Attorneys for MGA Entertainment, Inc.

12              UNITED STATES DISTRICT COURT

13             CENTRAL DISTRICT OF CALIFORNIA

14

15  CARTER BRYANT, an individual,          Case No. CV 04-09049 SGL (RNBx)
                                           (consolidated with CV 04-9059 & 05-
16              Plaintiff,                 2727)

17       v.

18  MATTEL, INC., a Delaware              **DECLARATION OF DAPHNE**
    Corporation,                          **GRONICH IN RESPONSE TO**
19                                        **COURT'S REQUEST FOR**
                Defendant.                **INFORMATION REGARDING**
20                                        **DOCUMENT PRESERVATION**

21

22                                        Discovery Cut-off: March 3, 2008
                                          Pre-trial Conference: June 2, 2008
23                                        Trial Date: July 1, 2008

24                                        Judge: Hon. Stephen G. Larson

25
                                          **BY FAX**
26

27

28

Los Angeles Court Services
COPY SENT TO A2:841480.1
CALENDAR DEPT.

7

GRONICH DECL
CV 04-09049 SGL (RNBX)

1        I, Daphne Gronich, declare and state as follows:

2        1.    I am General Counsel for MGA Entertainment, Inc. ("MGA")

3 and a resident of the state of California. All of the facts set forth herein are known

4 to me personally, except for those stated on information and belief and if called as a

5 witness, I could and would testify competently thereto.

6

7 **Document Preservation Communications**

8        2.    I have been MGA's General Counsel since December, 2003, and

9 have had oversight responsibility for MGA's legal response to this litigation since

10 its inception.  Shortly after Mattel sued Carter Bryant in April 2004, even though

11 MGA had not been named as a defendant in that suit, I communicated to MGA

12 employees that Mattel had filed suit against Carter Bryant alleging that he had

13 breached his employment agreement with Mattel. I advised MGA's employees that

14 MGA might at some point become involved in the litigation, and that it would be

15 prudent for MGA to preserve all documents that might be potentially relevant to the

16 claims at issue in the litigation. In addition to these initial communications, both I

17 and my colleague, Rich Daniels, one of MGA's other in-house attorneys, repeated

18 that advisement at numerous one-on-one and group meetings (including those held

19 in Isaac Larian's office at MGA's former location on Schoenborn Avenue in North

20 Hills) involving senior executives, creative staff members, sales and administration

21 staff and others including IT personnel. These communications took place

22 throughout the late-Spring and Summer of 2004.

23        3.    In addition to those communications, the legal department began

24 locating and collecting documents and materials that might be relevant to the

25 lawsuit against Mr. Bryant. In that regard we were aided by the company's

26 previous efforts to collect certain documents and materials related to the origin and

27 initial development of "Bratz," due to MGA's involvement in prior, unrelated

28 litigation (that did not challenge MGA's ownership of "Bratz"). As a result, we

LA2:841480.1                   - 1 -                 GRONICH DECL
                                                CV 04-09049 SGL (RNBX)

8

1 were able to preserve potentially relevant documents and materials from MGA's

2 employees in California and its related company in Hong Kong, including Isaac

3 Larian, Paula Treantafelles (now Garcia), Dave Malacrida, Victoria O'Connor,

4 Becky Harris, Charles O'Connor, Aileen Storer, Mercedeh Ward, Marcy George,

5 Shirin Salemnia, Edmond Lee, Dennis Soai, Stephen Lee, Samuel Wong, Cecilia

6 Kwok and Franki Tsang.

7   4. In addition to the communications described above, in the weeks

8 following the filing of Mattel's lawsuit against Carter Bryant, both I and Rich

9 Daniels and/or our outside counsel, spoke with and/or confirmed that MGA had the

10 documents of key potential witnesses, including Isaac Larian, Paula Garcia,

11 Victoria O'Connor, Charles O'Connor, Aileen Storer, Mercedeh Ward, Marcy

12 George, Dennis Soai, Shirin Salemnia, and Dave Malacrida.  During those

13 conversations, we again personally directed MGA's potential witnesses to preserve

14 their potentially relevant documents.

15   5. As a result of those discussions, MGA's potential witnesses

16 were given express direction by myself, Mr. Daniels, or MGA's outside counsel to

17 preserve their relevant paper documents and to assist, as necessary, MGA's IT

18 department in preserving their emails and electronic documents.  We also directed

19 the IT department to segregate and preserve emails from MGA employees who had

20 since left the company, which former employees included some who had also been

21 previously employed by Mattel prior to working for MGA.

22   6. In the years since the litigation began, I have sent out reminder

23 emails to MGA's employees reminding them of their continuing obligation to

24 preserve documents potentially relevant to this litigation, including reminder emails

25 that I sent to all MGA employees on April 14, 2005, December 5, 2006, and July 5,

26 2007.  In addition, other members of the legal department routinely advise the staff

27 members with whom they work to retain relevant documents.  For example, Sam

28 Khare, an MGA in-house lawyer who works closely with the product design teams,

LA2:841480.1       - 2 -      GRONICH DECL
               CV 04-09049 SGL (RNBX)

**9**

Exhibit 27, Page 34

1  routinely reminds people in the design groups to retain documents.

2        7.    After we became aware of Mattel's claims against MGA, on

3  December 5, 2006 I sent an email to all MGA employees reminding them of their

4  ongoing obligations regarding Mattel's suit against Carter Bryant and informing

5  them of the nature of the new claims against MGA, including the allegation of trade

6  secret theft. I reminded MGA's employees of MGA's policy that its employees

7  must not bring with them to MGA the property or confidential or proprietary

8  information of their former employers, and instructed them to preserve all

9  documents and materials relevant to these new claims as well.

10        8.    In addition to that communication, we also began collecting and

11  segregating the documents of all former Mattel employees, including those who

12  were no longer employed by MGA.

13        9.    While MGA is ready and willing to produce its communications

14  for the Court's review, I have been informed by MGA's outside counsel that Mattel

15  has taken the position that "it cannot agree" that MGA's production of those

16  communications would not constitute a waiver of the attorney-client privilege.

17  Attached hereto as **Exhibit 1** is a true and correct copy of a letter from Mattel's

18  counsel, Jon Corey, to MGA's outside counsel, Bill Charron, asserting that

19  position. If the Court wishes to see such communications and agrees with MGA

20  that such production would not constitute a waiver of the attorney-client privilege,

21  MGA will produce its communications within 24 hours of receiving the Court's

22  guidance.

23

24  **Paper Document Preservation**

25        10.    MGA does not now, and never has had a policy to routinely

26  destroy paper documents. In particular, since this litigation began, MGA has

27  expressly retained paper files in the Creative Departments, character art files,

28  vendor files, executive files and others.

LA2:841480.1           - 3 -           GRONICH DECL
                                CV 04-09049 SGL (RNBX)

**Email Preservation**

      11.    Since before 2004, MGA has used Microsoft's Exchange email
system and the Outlook email client to provide email support to the company.
MGA does not have, and never has had, a policy to auto-delete emails; to the
contrary, employees are advised to retain work-related emails. I am informed by
our IT staff that employees may, and often do, create email storage files (known as
"pst" files) to which they can move emails from their mailbox on the Exchange
server. MGA's practice is to preserve those pst files, and it has done so.

      12.    MGA's process for preserving those emails has become more
automated over time as our IT department has grown in its sophistication to meet
the needs of the company, particularly as MGA itself has grown and expanded. I
am informed that in January of 2000, MGA only had around eighty employees,
whereas by January of 2004 that number had grown to 196 and by January of 2007
it was approximately 900 domestically and 670 internationally, including
subsidiaries.

      13.    In 2004, when an employee would leave the company, the IT
department copied the pst files from the employee's computer and burned them
onto CDs that were then retained by the IT department. I am informed that in
September 2005, the system was improved so that instead of having to copy those
pst files onto CDs, the IT department was then able to preserve those pst files on a
network server.

      14.    Emails in the departing employee's mailbox on our Exchange
server are retained on the Exchange server. The IT department's network
administrators change the access permissions on that employee's mailbox so that
only the administrators can access it. In that way, those emails are retained and can
be accessed when necessary with proper authorization.

      15.    In the past year, an even more automated process was put in
place to preserve and manage email. In January 2007, the IT department began

LA2:841480.1

- 4 -

GRONICH DECL
CV 04-09049 SGL (RNBX)

11

Exhibit 27, Page 36

1   using a system known as "Archive One" which I am informed automatically

2   archives emails older than 90 days once a user's mailbox exceeds a set size

3   threshold. In this way, access to older emails is retained, but the size of the user's

4   mailbox files on our Exchange server is controlled.

5        16.   MGA's Exchange email server is also backed up on a nightly

6   basis as a means of disaster recovery. Historically those backup tapes had been

7   rotated on a 90-day cycle. However, because we have no policy of auto-deleting

8   emails and because we preserve the mailboxes (and pst files) of former employees,

9   unless an employee violates MGA's policies, and the legal department's express

10   and repeated directives to preserve email, no email would be lost by recycling those

11   backup tapes.

12

13   **Other Electronic Document Preservation**

14        17.   Employees are encouraged to store other electronic documents

15   (such as Word documents or Excel spreadsheets) on a shared network file server.

16   Some employees may also save electronic documents in the "My Documents"

17   folder on their computer. As was the case for emails saved to local pst files, going

18   back to 2004, if an employee left the company the contents of the My Documents

19   folder was also copied onto CDs and preserved. Again, when the system evolved in

20   September of 2005, the My Documents folder was preserved onto a network server.

21   Since March of this year, the entire hard drive itself is preserved by the IT

22   department.

23        18.   In addition to those preservation methods when an employee

24   would leave the company, files saved to the shared network file server would be

25   retained indefinitely and protected by nightly backups. I am informed that since

26   this litigation began in April 2004, MGA has not suffered any server failures that

27   resulted in the loss of data.

28        19.   In April of this year, another automated capability was brought

Exhibit 27, Page 37

1  online.  MGA has now installed an automated process that daily copies the
2  contents of the My Documents folder and any pst files that are saved in the user's
3  "Exchange" folder to a network file server.

4       20.    Within days of learning of Mattel's intent to bring claims
5  against MGA, MGA made, and retains to this day, a complete backup of all of its
6  servers.

7
8  **Preservation of Data from Isaac-Larian's Computer**

9       21.    I am informed by our IT department that there are always two
10  laptop computers assigned to Mr. Larian – the computer that he is actively using,
11  and a second, "mirrored" spare computer.  Whenever Mr. Larian docks his
12  computer into the MGA network, any changes that have been made to the files on
13  his computer are automatically "mirrored" or copied to the spare.  In that way, any
14  potential data loss is minimized.

15       22.    I am also informed by our IT department that when Mr. Larian
16  needs to replace his laptop, the IT department starts with the mirrored spare.  If the
17  hard drive on Mr. Larian's old laptop is still operable, they make sure that the files
18  on the mirrored spare contain the most up-to-date information that can be read from
19  the old hard drive.  When all of that data has been copied onto the spare, it is
20  provided to Mr. Larian and a new laptop becomes the mirrored spare.

21       23.    Personal computers at MGA frequently contain a great deal of
22  MGA's confidential and trade secret information – and this is especially true for
23  Mr. Larian's laptop.  I am informed by our IT department that prior to instituting
24  the present policy of retaining computer hard drives, whenever a computer that Mr.
25  Larian had been using was to be retired from his use – whether due to damage or
26  simply the need to provide newer technology – the hard drive was backed up to one
27  of the IT department's archive servers so as to preserve the data that was on the
28  hard drive in a secure location.  Once the data had been safely preserved, the IT

1   department then reformatted the hard drive in such a way that the confidential and
2   trade secret data was no longer present on the hard drive. Thus, although the hard
3   drive had been "wiped" before being put back into service or disposed of, none of
4   the data had been lost to MGA as it remained preserved on one of the IT
5   department's archive servers. Today, we would simply retain the hard drive from
6   Mr. Larian.

7
8   **Other Corporate Data Preservation**
9       24.    In 2004, MGA used an enterprise accounting package known as
10  Great Plains. In January 2006, MGA converted to a newer system known as
11  Axapta and after that time, all new business transactions were processed on the
12  Axapta system. However, MGA has retained the Great Plains system and I am
13  informed that no data was lost in the conversion. Accordingly, MGA is able to
14  retrieve transaction data as needed going back to at least 1998.

15
16      I declare under penalty of perjury under the laws of the United States
17  that the foregoing is true and correct.
18      Executed this 10th day of September, 2007, at Van Nuys, California.
19
20                                          Daphne Gronich
21
22
23
24
25
26
27
28

LA2:841480.1                    - 7 -                    GRONICH DECL.
                                                        CV 04-09049 SGL (RNBX)

14

Exhibit 1

09/07/2007 18:11 FAX  12134433100          QEUOH-LAO-2                          ☒002/003

**QUINN EMANUEL** trial lawyers | los angeles
865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-443-3000 FAX 213-443-3100

September 7, 2007

VIA FACSIMILE AND U.S. MAIL

William Charron, Esq.
O'Melveny & Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067-6035

Re:    Mattel, Inc. v. Bryant

Dear Bill:

I write to follow up on the conversation that we had earlier today.

First, you reviewed the questions which MGA instructed Ms. Tonnu not to answer regarding Mr. Speckin's testing and handling of documents, and agreed that MGA would not instruct Ms. Tonnu not to answer such questions when she returns for deposition.

Second, you did not agree to produce to Mattel the documents that refreshed Mr. Lockhart's memory for his deposition, but inquired as to whether Mattel would agree that the content of the preservation affidavits requested by the Court would not constitute a waiver of any privilege. Mattel cannot agree to that. You indicated, however, that MGA may nevertheless include those documents with its affidavit. If MGA elects not to do so, or otherwise fails to produce the documents, then Mattel will ask Judge Infante to rule on MGA's assertion of privilege.

Finally, you agreed to provide, on September 17, 2007, initial disclosures for MGAE de Mexico, MGA Hong Kong and Isaac Larian. You also agreed to provide supplemental initial disclosures for MGA on that date.

quinn emanuel urquhart oliver & hedges, llp

NEW YORK | 335 Madison Avenue, 17th Floor, New York, New York 10017 | TEL 212-702-8100 FAX 212-702-8200
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94104 | TEL 415-875-6600 FAX 415-875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL 650-801-5000 FAX 650-801-5100
PALM SPRINGS | 45-025 Manitou Drive, Suite 10, Indian Wells, California 92210 | TEL 760-345-4757 FAX 760-345-2424
SAN DIEGO | 4445 Eastgate Mall, Suite 200, San Diego, California 92121 | TEL 858-812-5107 FAX 858-812-5338

8

15

09/07/2007 16:11 FAX  12134433100          QEUOE-LA0-2                                  ☑003/003

William Charron, Esq.
September 7, 2007

If the foregoing is inconsistent with your recollection of our conversation, please let me know at
your earliest convenience.

Best regards,

Jon D. Corey

JDC:jcl
07209/2214875.1

9

16

SEP-10-2007  16:40       DMM COURT SVCS                      213 430 8136      P.02/02

**PROOF OF SERVICE**

I, Karen A. Nakatsu, declare:

I am a resident of the State of California and over the age of eighteen years, and not a party to the within action; my business address is 400 South Hope Street, Los Angeles, California 90071-2899.  On September 10, 2007, I served the within document(s):

**DECLARATION OF DAPHNE GRONICH IN RESPONSE TO COURT'S REQUEST FOR INFORMATION REGARDING DOCUMENT PRESERVATION**

☒   by causing to be personally served the document(s) listed above to the person(s) listed below.

John B. Quinn, Esq.
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street,
10ᵗʰ Floor
Los Angeles, CA 90017

☒   by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California addressed as set forth below.  I am readily familiar with the firm's practice of collecting and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

Patricia Glaser, Esq.                 Michael H. Page, Esq.
Christensen, Glaser, Fink, Jacobs,    Kekor & Van Nest LLP
Weil & Shapiro, LLP                   710 Sansome Street
10250 Constellation Blvd.,            San Francisco, CA 94111
19ᵗʰ Floor
Los Angeles, CA 90067

James W. Spertus, Esq.
Law Offices of James W. Spertus
12100 Wilshire Blvd., Suite 620
Los Angeles, CA 90025

I declare under penalty of perjury under the laws of the United States that the above is true and correct.

Executed on September 10, 2007, at Los Angeles, California.

*Karen A. Nakatsu*
Karen A. Nakatsu

LA2:817525.3

17

TOTAL P.02

EXHIBIT 28 REMOVED

PURSUANT TO PROTECTIVE ORDER

# EXHIBIT 29 REMOVED

# PURSUANT TO PROTECTIVE ORDER

00029/2369510.1