QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
  John B. Quinn (Bar No. 090378)
  johnquinn@quinnemanuel.com
  Michael T. Zeller (Bar No. 196417)
  (michaelzeller@quinnemanuel.com)
  Jon D. Corey (Bar No. 185066)
  (joncorey@quinnemanuel.com)
  Timothy L. Alger (Bar No. 160303)
  (timalger@quinnemanuel.com)
865 South Figueroa Street, 10th Floor
Los Angeles, California  90017-2543
Telephone:  (213) 443-3000
Facsimile:   (213) 443-3100

Attorneys for Mattel, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual,<br><br>           Plaintiff,<br><br>      vs.<br><br>MATTEL, INC., a Delaware corporation,<br><br>           Defendant.<br><br>AND CONSOLIDATED ACTIONS | CASE NO. CV 04-9049 SGL (RNBx)<br><br>Consolidated with<br>Case No. CV 04-09059<br>Case No. CV 05-02727<br><br>**[PUBLIC REDACTED] DECLARATION OF MELISSA GRANT IN SUPPORT OF MATTEL, INC.'S OPPOSITION TO CARTER BRYANT'S MOTION TO QUASH MATTEL, INC.'S SUBPOENA ISSUED TO PEOPLE'S BANK OF THE OZARKS OR, IN THE ALTERNATIVE, FOR A PROTECTIVE ORDER**<br><br>**DISCOVERY MATTER**<br><br>**[To Be Heard By Discovery Master Hon. Edward Infante (Ret.) Pursuant To The Court's Order Of December 6, 2006]**<br><br>Hearing Date:  TBA<br>Time:             TBA<br>Courtroom:    TBA<br><br>**Phase 1:**<br>Discovery Cut-off:          January 28, 2008<br>Pre-trial Conference:      May 5, 2008<br>Trial Date:                      May 27, 2008 |

07209/2380763.1

## DECLARATION OF MELISSA GRANT

I, Melissa Grant, declare as follows:

1.      I am a member of the bar of the State of California and an associate at Quinn Emanuel Urquhart Oliver & Hedges, LLP, attorneys for plaintiff and counter-defendant, Mattel, Inc. ("Mattel").  I make this declaration of personal, firsthand knowledge and, if called and sworn as a witness, I could and would testify competently thereto.

2.      Attached as Exhibit A is a true and correct copy of MGA's Complaint in this matter, filed April 13, 2007.

3.      Attached as Exhibit B is a true and correct copy of Mattel's Second Amended Answer and Counterclaims excluding Exhibit C.

4.      Attached as Exhibit C is a true and correct copy of Mattel's subpoena *duces tecum* served on People's Bank of the Ozarks (the "Bank") on January 21, 2008 and the notice thereof.

### The Bank's Statement of Compliance Without Objection and Request for Additional Time

5.      On Friday, January 25, 2008, I received a telephone call from Alison Holmes of the Bank advising me that the Bank will comply with Mattel's subpoena.  Ms. Holmes said that the Bank had already collected almost all the responsive documents (consisting of a stack of paper two feet high) but that some of the older records had to be retrieved from microfilm.  Ms. Holmes also said that because of technical problems the Bank needed additional time to retrieve and produce the records on microfilm.  Later that day, I received two e-mails from James Bowles, the attorney for the Bank reiterating what Ms. Holmes had told me regarding their difficulty in retrieving the microfilm documents, and requesting 14 additional days from January 28, 2008 (the return date on the subpoena) to produce those documents.  Attached as Exhibit D are true and correct copies of the e-mail messages from James Bowles.  Subsequently, Ms. Holmes and Mr.

07209/2380763.1

Bowles advised me that the documents the Bank had assembled and was ready to produce on January 28, 2008 (the return date of the subpoena) consisted of responsive documents spanning from October 2002 to the present.  They also advised that the documents to be retrieved from microfilm consisted of records from February 2002 through September 2002.

6.      Later that day, I sent an e-mail message to opposing counsel for MGA, Carter Bryant ("Bryant"), Isaac Larian ("Larian"), and Carlos Gustavo Machado Gomez ("Machado") requesting that they stipulate to extend the deadline for the Bank to produce documents responsive to Mattel's subpoena from January 28, 2008 to February 11, 2008, without prejudice as to Mattel's right to move to compel after the Phase 1 discovery cut-off in the event that the bank's responses were insufficient.  Mattel advised opposing counsel that if they would not agree to the stipulation, Mattel would file a motion seeking leave for additional time.  Attached as Exhibit E is a true and correct copy of my January 25, 2008 e-mail message.

7.      In the evening of January 25, 2008, I sent a e-mail message to Mr. Bowles advising him that Mattel had no objection to the Bank's request for 14 additional days to produce all documents responsive to the subpoena, but requested that the Bank produce the documents it had already assembled on the subpoena return date of Monday, January 20, 2008.  To facilitate production, I offered to arrange for Federal Express to pick the documents from the Bank.  I asked Mr. Bowles to let me know whether that was acceptable.  Attached as Exhibit F is a true and correct copy of my e-mail message to Mr. Bowles.

8.      As of January 27, 2008, neither Bryant's counsel nor MGA's counsel had responded to my January 25, 2008 e-mail message requested that the parties stipulate to additional time for the Bank's production.  Because opposing counsel had agreed to stipulate to a similar extension proposed by Mattel on January 27, 2008 regarding a subpoena *duces tecum* served on Wachovia Bank, I

1  sent a second e-mail message to Bryant's counsel and other opposing counsel

2  asking them if they would agree to the proposed stipulation regarding People's

3  Bank of the Ozarks.  Attached as Exhibit G is a true and correct copy of my e-

4  mail message dated January 27, 2008.  Less than five minutes later, I received an

5  e-mail message from Bryant's counsel, Michael Page, stating in full: "No, we will

6  not agree."  Bryant's counsel gave no reason for their refusal to so stipulate.

7  Attached as Exhibit H is a true and correct copy of the e-mail message from Mr.

8  Page.

9       9.    By e-mail message dated January 26, 2008, Mr. Bowles advised

10  me that he would check with the Bank president and let me know Monday morning

11  whether Mattel could pick-up the responsive documents already assembled by the

12  Bank on the return date of January 28, 2008.  Attached as Exhibit I is a true and

13  correct copy of Mr. Bowles' e-mail message.

14       10.   On Monday, January 28, 2008 at 8:18 a.m., I received another e-

15  mail message from Mr. Bowles stating that Mattel could arrange with Ms. Holmes

16  to pick up the responsive documents already assembled later that day.  Less than

17  two hours later, before any pick-up arrangements were made, I received an e-mail

18  message from Mr. Bowles, advising that the Bank had received notification of an

19  unspecified "attempt to quash the subpoena" and that therefore production was "on

20  hold."  Approximately three hours later, I received another e-mail from Mr.

21  Bowles, which read: "We now have a threatening letter from John Trinidad

22  regarding the subpoena.  He is moving to quash, accordingly, we are going to hold

23  off until we get a court order or the parties come to an agreement."  As a result, no

24  documents responsive to the subpoena have been produced to Mattel by People's

25  Bank of the Ozarks.  Attached collectively as Exhibit J are true and correct copies of

26  Mr. Bowles' three e-mail messages to me dated January 28, 2008.

27       11.   At 9:08 a.m. on January 28, 2008, I received by e-mail a letter

28  from John Trinidad, Bryant's counsel, asserting that the subpoena was invalid and

-4-
GRANT DECLARATION IN OPPOSITION TO BRYANT'S MOTION
TO QUASH PEOPLE'S BANK OF OZARKS SUBPOENA

1    advising that Bryant would file a motion to quash or for a protective order "should

2    Mattel not withdraw its subpoena."  Attached as Exhibit K is a true and correct

3    copy of Mr. Trinidad's January 28, 2008 e-mail message and letter.  Mattel would

4    not agree to do so because the subpoena is valid and seeks relevant and

5    discoverable documents that Bryant has failed to produce despite promises and his

6    agreement to do so.

7           12.     Notwithstanding Bryant's argument to the contrary, Bryant has

8    not been prejudiced in any way by the lack of "prior notice" of the subpoena.  To

9    the contrary, Bryant improperly advised the Bank that the subpoena was invalid

10   and threatened that Bank if it produced documents responsive to Mattel.  As a

11   result of that action and the Motion to Quash, the Bank has not produced <u>any</u>

12   documents to Mattel in response to the subpoena despite its ability to do so.

13

14              **Foothill Business Services Document Production**

15          13.     On December 11, 2007, Mattel issued a subpoena to Foothill

16   Business Services ("Foothill"), Bryant's accountants, seeking relevant financial

17   information relating to Bryant and Carter Bryant Enterprises, which it amended on

18   December 18, 2007 ("Foothill Subpoena").  Attached as Exhibit L is a true and

19   correct copy of the Foothill Subpoena.

20          14.     Bryant's counsel objected to the Subpoena and advised Mattel

21   that Bryant intended to file a motion to quash or for a protective order if Mattel did

22   not withdraw it.  Over the course of the next month, counsel met and conferred by

23   telephone, e-mail message, and letter regarding Bryant's objections to the Foothill

24   Subpoena.  Attached collectively as Exhibit  M are true and correct copies of the

25   meet and confer communications.

26          15.     By later dated January 11, 2008, to my colleague Jon D. Corey

27   from Mathew Werdegar, counsel for Bryant, Bryant agreed to gather from Foothill

28   and produce to Mattel the following documents:

1          a.     All available profit and loss income statements for Carter Bryant

2   Enterprises ("CBE");

3          b.     Documents sufficient to show all payments to Bryant from MGA

4   and/or Isaac Larian;

5          c.     Documents sufficient to show all payments to Veronica Marlow

6   from Bryant or CBE;

7          d.     Documents sufficient to show Bryant's net worth;

8          e.     Documents sufficient to identify any witness or witnesses'

9   counsel to whom Bryant has made any payments for fees, costs, or expenses

10  incurred by that witness in connection with the present litigation and the amount

11  paid, if any, to or on behalf of such witness;

12         f.     Foothill's document retention policy, if it has one; and

13         g.     Documents constituting communications between Bryant and

14  Foothill substantively related Bratz.

15  Attached as Exhibit N is a true and correct copy of Mr. Werdegar's January 11,

16  2008 letter.

17         16.    On January 23, 2008—five days before the Phase 1 discovery

18  cut-off—Bryant purported to produce by e-mail "documents in accordance with our

19  stipulation regarding Mattel's subpoena of Foothill Business Services."  However,

20  the Foothill production consisted of only 10 documents:  two CBE income

21  statements from 2003, four CBE quarterly income statements from 2006, four CBE

22  quarterly incomes statements from 2007, and ledger of payments to Veronica

23  Marlow in 2006 and 2007 only.  Attached collectively as Exhibit O are true and

24  correct copies of Bryant's January 23, 2008 Foothill production.

25

26

27

28

07209/2380763.1

GRANT DECLARATION IN OPPOSITION TO BRYANT'S MOTION
TO QUASH PEOPLE'S BANK OF OZARKS SUBPOENA

## Bryant Has Not Provided Mattel with "Prior Notice" of Subpoenas Before Serving Them to Third Parties

17.   Bryant has served at least six subpoenas on third parties in this action.  They include subpoenas to Anna Rhee, Verizon California, SBC, Pacific Bell Telephone Co., Steven Linker, and Ogilvy and Mather Worldwide.  A review of the documents served on Mattel related to those subpoenas shows that Bryant never provided Mattel with "prior notice" of those subpoenas before serving them on the third parties.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 7th day of February, 2008, at Los Angeles, California.

Melissa Grant

GRANT DECLARATION IN OPPOSITION TO BRYANT'S MOTION TO QUASH PEOPLE'S BANK OF OZARKS SUBPOENA

07209/2380763.1

**Exhibit A**

FILED

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DALE M. CENDALI
(of counsel, not admitted in California)
DIANA M. TORRES (S.B. #162284)
PAULA E. AMBROSINI (S.B. #193126)
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071-2899
Telephone: (213) 430-6000
Facsimile: (213) 430-6407
email:      dtorres@omm.com

PATRICIA GLASER (S.B. # 55668)
CHRISTENSEN, MILLER, FINK,
JACOBS, GLASER, WEIL &
SHAPIRO LLP
10250 Constellation Boulevard, 19th Floor
Los Angeles, CA 90067
Telephone: (310) 553-3000
Facsimile: (310) 556-2920

Attorneys for Plaintiff
MGA Entertainment, Inc.

2007 APR 13 PM 3:04

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY:_____

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

CV 05 - 02727 CBM (RZx)

MGA ENTERTAINMENT, INC.,

    Plaintiff,

    v.

MATTEL, INC., a Delaware
Corporation, and DOES 1-10,

    Defendants.

Case No.

**COMPLAINT FOR FALSE
DESIGNATION OF ORIGIN,
AFFILIATION, ASSOCIATION OR
SPONSORSHIP (15 U.S.C. § 1125
(a)); UNFAIR COMPETITION (15
U.S.C. § 1125 (a), Cal. Bus. & Prof.
Code § 17200 et seq. and California
Common Law); DILUTION (15
U.S.C. § 1125 (c), Cal. Bus. & Prof
Code § 14330 and California Common
Law); AND UNJUST ENRICHMENT**

**DEMAND FOR JURY TRIAL**

EXHIBIT A   PAGE 8

1    Plaintiff MGA Entertainment, Inc. for its complaint against

2    Defendants Mattel, Inc. and DOES 1-10 alleges and avers as follows:

3

4                              **PARTIES**

5          1.      Plaintiff MGA Entertainment, Inc. ("MGA") is a California

6    corporation organized and existing under the laws of the State of California, with a

7    principal place of business in Van Nuys, California.

8          2.      MGA is informed and believes, and based thereon alleges, that

9    Defendant Mattel, Inc. ("Mattel") is a Delaware corporation with a principal place

10   of business in El Segundo, California.

11         3.      MGA is ignorant of the true names and capacities of the defendants

12   sued herein under the fictitious names DOES 1 through 10 inclusive. MGA will

13   seek leave of court to amend this complaint to allege such names and capacities

14   when they are ascertained. MGA is informed and believes, and based thereon

15   alleges, that each of the fictitiously named DOE defendants is responsible in some

16   manner for the wrongful conduct alleged herein. MGA further alleges that each

17   defendant acted in concert with, as agent or representative for, or at the request or

18   on behalf of another or Mattel. Each charging allegation contained herein is,

19   therefore, also hereby alleged against each fictitiously named DOE defendant.

20

21                      **JURISDICTION AND VENUE**

22         4.      Through this action MGA asserts claims against Mattel arising under

23   the Lanham Act, 15 U.S.C. Sections 1125 (a) and (c), California Business and

24   Professions Code Sections 17200 *et seq.*, California Business and Professions Code

25   Section 14330 and California common law. This Court has original subject matter

26   jurisdiction over MGA's federal claims pursuant to 15 U.S.C. Sections 1116 and

27   1121, 28 U.S.C. Section 1338(a), and 28 U.S.C. Section 1331, and supplemental

28

1

**EXHIBIT A   PAGE 9**

1  subject matter jurisdiction over MGA's state law claims pursuant to 28 U.S.C.
2  Section 1367(a).

3      5.     This Court has specific personal jurisdiction over Mattel, as it has
4  purposefully committed, within the State of California, the acts from which these
5  claims arise and/or has committed tortious acts outside California, knowing and
6  intending that such acts would cause injury to MGA within the state.  The Court
7  also has general personal jurisdiction over Mattel, as it conducts continuous,
8  systematic and routine business within the State of California and the County of
9  Los Angeles.

10      6.     Venue is proper in the United States District Court for the Central
11  District of California pursuant to 28 U.S.C. Sections 1391(b) and 1391(c).

12

13              **FACTUAL BACKGROUND**

14      7.     MGA seeks by this action to halt Mattel's habitual and unfair tactics of
15  competition-by-intimidation and serial copycatting of MGA's products, which
16  Mattel has used in an unbridled effort to cause confusion in the market place and
17  eliminate MGA as a competitor in the toy and fashion doll market long dominated
18  and controlled by Mattel.

19      8.     MGA is a privately-held company in the San Fernando Valley that
20  began in 1979 as a small consumer electronics business.  In 1987, the company
21  made its first foray into the toy business when it secured rights to market handheld
22  LCD games featuring licensed Nintendo® characters.  Building on that small
23  success, the company began marketing products for popular licensed properties
24  such as the "Power Rangers"® and "Hello Kitty"®.  This little-known but
25  successful company, however, was propelled into the limelight after its daring
26  release in June 2001 of an innovative line of fashion dolls called "BRATZ".
27  "BRATZ" are multi-ethnic fashion dolls that sport a fresh new urban and
28  contemporary look and fashion.  At the time of the release of "BRATZ", "Barbie"

2

1   sales were in a slump, Mattel was in turmoil, and the market was ripe for something
2   new, exciting and inventive.  "BRATZ" fit the bill.  It is the first fashion doll that
3   has been able to seriously challenge "Barbie" for market share, and begin to loosen
4   Mattel's 50-year iron-fisted grip on the fashion doll market.

5       9.      Mattel has not taken kindly to the challenge.  Either unable or
6   unwilling to compete against "BRATZ" fairly, and on a level-playing field, Mattel
7   has, instead, taken a more expeditious approach, resorting to unfair and anti-
8   competitive business practices.  Wielding its substantial clout and influence in the
9   toy industry, Mattel has tried to muscle MGA out of business.  MGA is informed
10  and believes that Mattel has intimidated, coerced and threatened retailers, licensees,
11  suppliers and others in the industry – both in the U.S. and internationally – in order
12  to inhibit and stifle MGA's ability to compete with Mattel and to prevent MGA
13  from obtaining licensees, contracts and supplies for its products.  Mattel has also
14  serially imitated and copy-catted the look of MGA products, trade dress,
15  trademarks, themes, ideas, advertising and packaging, including for the "BRATZ"
16  line of dolls.  MGA brings this action to stop Mattel's tortious, unfair and anti-
17  competitive conduct and to recover the extensive damage that Mattel's illicit
18  behavior has caused, and continues to cause, MGA.  Mattel's own website states:
19  "As the global leader in the toy industry, we believe that how we achieve success is
20  just as important as the success itself."  It also proclaims that "unwavering integrity
21  defines our corporate culture on every level, guiding how we work and how we do
22  business."  Mattel's own corporate governance standards require it to "play by the
23  rules," complete fairly and be a good corporate citizen.  Mattel's actions, however,
24  speak louder than its words.

25
26
27
28

3

EXHIBIT ___A___ PAGE __11__

## Mattel History and Performance

10.     Mattel is the world's largest toy company, but it owes its immense success chiefly to a single product: "Barbie." Since her debut in 1959, "Barbie" has been the fuel for Mattel's growth and success, turning Mattel into an international powerhouse. By the late 1990's, Mattel's annual sales of the doll approached or topped $1.8 billion and Mattel stock reached a record high of approximately $45.00 a share. At that time, the average American girl had eight "Barbie" dolls, and "Barbie" was the world's best-selling toy.

11.     Mattel's reliance on a single, 40-year old product for as much as 50% of its business turned out to be a risky business model, however. Resting on its laurels, Mattel failed to react to the shifting tastes of consumers, changing dynamics in the industry, and an increasing focus on technologically advanced and interactive toys. "Barbie's" record sales fell into a tailspin. According to one report, Adrienne Fontanella, Mattel's "Barbie" brand president, would later be quoted as saying that, "The world changed very quickly, and we missed a beat... Barbie wasn't talking to girls. She just wasn't hitting it."

12.     Sales began to plunge in 1997, and Mattel began posting a series of net income losses. In the first quarter of 1998, sales of the "Barbie" brand dropped 17%. This steep slide was followed by another in the second quarter, when sales fell again, down by 15%. By the end of 1998, Mattel reported an overall 14% decline in "Barbie" sales for the year and analysts were using words such as "devastating" and "a catastrophe" to describe Mattel's earnings. The company's stock fell as much as 27% in a single day. "Barbie" was having a crisis.

13.     Jill Barad, who had taken over as Mattel's chairman and chief executive in January 1997, at the height of Mattel's success, had to do something fast. Instead of focusing on and investing in new product development, however, which would obviously take time, Mattel embarked on a series of acquisitions that were seemingly aimed at quickly diversifying the company's product line and

4

EXHIBIT __A__ PAGE __12__

reducing its reliance on "Barbie" and on traditional retailers, such as Toys-R-Us and Wal-Mart. Mattel spent a reported $881 million in March 1997 to purchase Tyco Toys and acquire the "Matchbox" toy car brand. Just more than a year later, it spent $700 million for the Pleasant Co., a mail-order doll company and maker of the "American Girl" doll collection. And in December 1998, Mattel announced plans to fork out a monumental $3.5 billion to buy the Learning Company, followed quickly by Mattel's purchase, in March 1999, of a software company, Purple Moon.

14.     Despite these acquisitions, the company continued to struggle. The retail environment and buying patterns had unquestionably changed, but Mattel had not kept up. Despite Mattel's feverish acquisitions, Mattel's mainstay and primary profit-generator was still "Barbie." But "Barbie" had grown stale, and sales languished. Posting additional losses in the first quarter of 1999, Mattel announced that it would lay off 3,000 employees – 10% of its work force.

15.     Mattel's stock plummeted again in late 1999, dropping 30% on Mattel's announcement that it would fall as much as 55% short of analysts' earning estimates for the third quarter. Mattel blamed its troubles primarily on its expensive, $3.5 billion acquisition of the Learning Company, which had turned out to be a disaster fraught with licensing and distribution problems, bad debt, high product returns and high advertising costs.

16.     By early 2000, Mattel's stock had crashed to as low as $8 per share, and some analysts considered Mattel vulnerable to a takeover. Investors clamored for Ms. Barad's resignation, and got their wish.

17.     Jill Barad resigned from Mattel in February 2000.

18.     For three months, the company was without a permanent chief executive until Robert Eckert took the helm in May 2000. Mr. Eckert had spent 23 years at Kraft Foods, a subsidiary of Altria Group, Inc., and was widely credited

5

EXHIBIT __A__ PAGE __13__

1   with reviving its ailing cheese business. Investors looked for him to do the same

2   for Mattel.

3       19.   Upon his arrival at Mattel, Mr. Eckert's promise, according to *Wall*

4   *Street Journal* reports, was to deliver a "leaner and meaner" Mattel.

5       20.   The "leaner" Mattel came quickly. Mr. Eckert laid off hundreds,

6   closed factories in the United States, shipped production to Mexico, and sold off the

7   Learning Company at a fraction of what Mattel had paid for it. It helped Mattel's

8   bottom-line, but did nothing to spur sales growth. Even under Mr. Eckert's "leaner

9   meaner" leadership, domestic "Barbie" sales remained in a slump into 2001. In an

10   industry that had become increasingly driven by consumer whims and fads, and the

11   hot, must-have toys of the moment, Mattel remained disinterested in devoting its

12   resources to searching for or developing a new blockbuster toy. Mr. Eckert's

13   business plan was not to diversify, but to build upon and expand sales of its existing

14   brands. Mattel was, after all, still generating billions in revenue despite the decline

15   of "Barbie." And so, Mattel remained committed to its age-worn icon and its two

16   other core brands, Fisher-Price and Hot Wheels, with each of the three accounting

17   for approximately a third of the company's sales.

18       21.   Then came the competition – MGA's "BRATZ".

19

20   **"BRATZ" Dolls Revolutionize The Fashion Doll Market**

21       22.   "BRATZ" challenged "Barbie's" half-century domination of the

22   fashion-doll market like nothing ever before had been able to do.

23       23.   MGA unveiled a preliminary sample of the "BRATZ" doll at the Hong

24   Kong Toy Fair in January 2001, while continuing to finalize the product throughout

25   that spring. Finished products were first shipped in May 2001. MGA introduced

26   the line to consumers in June 2001.

27

28

EXHIBIT _A_ PAGE _14_