71. Here, too, Mattel's mimicry has spilled over into Mattel's advertising and thematic presentation and marketing of this toy line. In particular, Mattel has adopted MGA's "other-worldly" theme in its commercials. For instance, in Mattel's commercials, the product, whose logo appears as "AcceleRacerS", now compete against alien-like Cyborgs engaged in a "race to save the world," mimicking MGA's alien theme and commercials in which MGA's "Alien Racers" are engaged in a "race to save the universe."

72. None of this is coincidence. Mattel has deliberately adopted a pattern and practice of coming out with variations of MGA's products to create confusion in the marketplace, interfere with MGA's business and divert profits away from MGA. Mattel says, on its website, that it is in the business of creating "[t]he world's premier toy brands [of] today and tomorrow." It seemingly does so, however, by borrowing liberally from its competitors, even when it refreshes its own existing brands and products.

73. MGA has suffered extensive injury from Mattel's conduct. Mattel's habitual, serial simulation of MGA's products, product lines and trade dress has allowed Mattel to take a free ride on the extensive amount of time, expense and creative development MGA expends on developing new products, product packaging and presentation, giving Mattel an unfair advantage, and making it virtually impossible for MGA to compete with Mattel on a level playing field.

**Mattel's additional unfair, manipulative, anti-competitive conduct**

74. This already substantial injury has been exacerbated by the strong-arm tactics, and other illegitimate, unfair and anti-competitive means that Mattel has used to manipulate the market and ensure that its control and domination of the industry can continue unabated.

26

EXHIBIT A PAGE 34

75. For example, wielding the litigation privilege as a potential shield for intimidating conduct, Mattel has sent threatening letters to several of its former employees who now work for MGA warning them not to disclose *even publicly available information* about Mattel, including the names and positions of Mattel employees. Mattel even went so far as to sue one of its former senior executives, after he had the temerity to resign and join MGA in October 2004. Not only was Mattel's lawsuit dismissed for failure to state a viable claim, but Mattel thereafter seemingly could not muster up a shred of evidence sufficient to support an amended complaint. As a result, Mattel's case against its former executive was dismissed with prejudice.

76. Mattel has also warned a number of companies, including the biggest publishing entity in the United Kingdom, not to license MGA products, or risk retribution. The threats are not idle. In May 2004, Mattel terminated one of its licensees, apparently in retribution for licensing "BRATZ". While some companies have been courageous enough to take the risk, others have not, and MGA has lost valuable licensing opportunities as a result.

77. Mattel has used similar intimidation to pressure distributors and retailers, particularly in foreign countries, not to distribute "BRATZ", to reduce shelf and display space for "BRATZ" and to place "BRATZ" in unfavorable locations at retail outlets.

78. When MGA faced a shortage of doll hair in October 2002, MGA is informed and believes that the reason for that shortage was that Mattel had locked MGA out by buying up the supply from the two main hair supply companies.

79. Mattel has also manipulated the retail market. For instance, Mattel merchandisers have been caught tampering with MGA's retail displays, replacing favorably located MGA merchandise with Mattel merchandise instead. MGA is also informed and believes that Mattel has falsely told a major United States retailer that MGA was giving another major United States retailer below-market pricing

and falsely told a United Kingdom retailer that MGA was discontinuing one of its lines, in order to make such line less attractive to buyers and thereby attempt to increase sales of the competitive Mattel product and improve its own sales, at MGA's expense.

80. Even supposedly unbiased and impartial industry organizations have fallen prey to Mattel's abusive wield of power, to MGA's detriment.

81. NPD Funworld ("NPD"), for one, is the leading supplier of sales statistics in the toy industry. Accurate NPD statistics are essential for efficient product-line management. Without these statistics, it is difficult, if not impossible, for toy companies to assess and measure the relative success of their products in key categories. It is, however, a subscription service, and NPD restricts the manner in which its subscribers may use the data it provides.

82. Mattel has regularly ignored the restrictions – using NPD data about Mattel's comparative standing relative to other companies in press releases and in communications with retailers and financial investors who are not NPD subscribers.

83. Mattel generates substantially more annual subscription revenue for NPD than does MGA, and carries more clout.

84. After MGA had subscribed to the service for more than 12 years, NPD terminated MGA's subscription in 2003 theoretically on the grounds that MGA misused NPD data in a press release.

85. MGA is informed and believes that the termination was the result of pressure from Mattel, notwithstanding Mattel's own frequent violations of NPD's restrictions.

86. In addition to this, the market share numbers that NPD generates are heavily dependent on the category in which NPD places a particular product. MGA is informed and believes that Mattel also pressured NPD into changing certain product classifications for its "BRATZ" products in order to manipulate the data

28

EXHIBIT A PAGE 36

and preserve Mattel's market share rankings in the critical fashion doll category – and thereby lower MGA's.

87. The Children's Advertising Review Unit ("CARU") is another organization that, upon information and belief, appears to have been subject to improper influence by Mattel. CARU is the toy industry's supposedly independent self-regulatory body in charge of maintaining standards in advertising. CARU's approval is considered critical within the toy industry to avoiding regulatory action by the Federal Trade Commission.

88. CARU is heavily subsidized by Mattel.

89. Upon information and belief, Mattel has used its influence as a major contributor to CARU's budget to induce CARU to place onerous restrictions on MGA advertisements, and require MGA to amend aspects of commercials that have gone unchallenged in other parties' commercials.

90. As a result of CARU's restrictions, MGA has been forced to incur unnecessary costs for reshooting and producing or re-editing its commercials.

91. On several occasions, CARU has also either strongly suggested, if not also required, that MGA respond to inquiries about its website policies and make substantial changes to the "BRATZ" website notably and significantly in excess of restrictions imposed on Mattel and others.

92. Even TIA, the toy industry's trade association, is apparently not untainted by Mattel's influence and power. Each year, TIA presents the Toy-of-the-Year Awards, the most prestigious of which had been the award for Toy of the Year. Winning the Toy of the Year Award is a significant achievement that not only very likely increases the sales of the winning toy, but also denotes the winning company as a leader in toy innovation and generates substantial goodwill with retailers, distributors, licensees, and customers.

93. For the years 2000 (the first year of the award), 2001 and 2002, the Toy of the Year award was chosen by consumer vote. The awards ceremony was

EXHIBIT A PAGE 37

then held the following year, at a dinner in New York. (For example, the awards dinner for the year 2000 award was held in February 2001). Leap Frog won the 2000 People's Choice Toy of the Year Award and MGA won the 2001 and 2002 People's Choice Toy of the Year Awards. With the 2003 Toy of the Year Award, however, the rules suddenly changed. Now, the award is selected by members of the industry.

94. Upon information and belief, this change was orchestrated by a Fisher Price (a Mattel subsidiary) executive who, until recently, served as the Chairman of TIA.

95. Perhaps not surprisingly given this change in the winner selection procedures, "Hokey Pokey Elmo" ("Elmo"), a Fisher Price toy, won for the year 2003 (awarded in 2004), beating out the other leading nominee, "BRATZ Formal Funk Super Stylin' Runway Disco."

96. TIA has refused to provide MGA with the vote count procedure and totals for this award, despite repeated requests.

97. MGA is also informed and believes that Mattel was instrumental in attempting to keep MGA from participating as a sponsor in this year's "Kids' Choice Awards."

98. Mattel has clearly engaged in tortious, illegal and unethical behavior in its unfettered efforts to disrupt, if not destroy, MGA. Indeed, this is apparently Mattel's current *modus operandi* when it comes to "competing" in the industry. The once immensely successful "LeapFrog" interactive learning product, for example, has apparently been one of Mattel's other recent victims.

99. Mattel may not shield its illegal, unfair and unethical business practices from the public eye. It is time for the truth to be told, and the world to know of Mattel's unfair, unethical and illegal business practices and unfair competition. "Barbie" does not "play nice" with others (particularly her competitors), and needs to be taught how "to share" (at least in the fashion doll marketplace). She cannot be

EXHIBIT __A__ PAGE __38__

allowed to continue to be the playground bully and trample on the rights of others, including MGA.

100. As a result of Mattel's manipulative, illegal, unfair, unethical and anti-competitive conduct, MGA has suffered and, unless abated, will continue to suffer lost sales, lost licensing fees, lost contracts, lost relationships, lost business opportunities and other damages and harm for which there is no adequate remedy at law. Its ability to enter new markets and product lines has been hampered and delayed. Its production costs have increased, its reputation and relationships with important players in the industry have been negatively impacted, the value of its business has been diminished, and its ability to attract, hire and retain employees has been affected.

### FIRST CLAIM FOR RELIEF

**(False Designation of Origin or Affiliation in Violation of 15 U.S.C. § 1125 (a))**

101. MGA repeats and realleges the allegations contained in paragraphs 1 through 100 of this Complaint and incorporates them by reference as though fully and completely set forth herein.

102. MGA's "BRATZ" line has a unique and distinctive style and distinctive characteristics, such as the disproportionately large head, large dramatic eyes with a distinctive presentation (including the eye shape, make-up and lashes), pouty, plump lips with a distinctive presentation (including the lip shape and make-up), small, thin bodies, oversized feet, and up-to-date fashions. MGA's "BRATZ" line is known for and recognized by the total image that is presented by its product and the style and arrangement of the packaging and display. This *"tout ensemble"* is representatively described and depicted herein. The characteristics of MGA's "BRATZ" line, alone or in combination, have come to identify the "BRATZ" line and its source, MGA, and thus serve as protectable trade dress. MGA's trade dress in its "BRATZ" line is purely aesthetic and non-functional or, if any utility exists, it

is not essential to the purpose, quality or source identifying attributes of the aesthetics. MGA's trade dress in its "BRATZ" line is inherently distinctive or has acquired distinction within the meaning of the Lanham Act.

103. Similarly, MGA's "BRATZ PETZ," part of the "BRATZ" line, also has its own unique and distinctive characteristics, such as the humanlike eye and unusual appearance of the animals dressed in clothing. MGA's "BRATZ PETZ" line has become known for and recognized by the total image that is presented by the product and the style and arrangement of its packaging. This *"tout ensemble"* is representatively described and depicted herein. The characteristics of MGA's "BRATZ PETZ", alone or in combination, have come to identify the "BRATZ PETZ" line and its source, MGA, and thus serve as protectable trade dress. MGA's trade dress in its "BRATZ PETZ" line is purely aesthetic and non-functional or, if any utility exists, it is not essential to the purpose, quality or source identifying attributes of the aesthetics. MGA's trade dress in its "BRATZ PETZ" line is inherently distinctive or has acquired distinction within the meaning of the Lanham Act.

104. Mattel's production, sale and marketing of "My Scene" dolls, including styling heads and doll heads, and "My Scene" pets that are confusingly similar to MGA's "BRATZ" line (including its "BRATZ PETZ"), without MGA's permission or consent, constitutes designation and use of a term, symbol, device or combination thereof that is false or misleading within the meaning of 15 U.S.C. Section 1125 and is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association, or as to the origin, sponsorship, or approval of Mattel's goods or commercial activities, within the meaning of 15 U.S.C. Section 1125. MGA has been damaged by Mattel's acts.

105. Mattel's conduct has been intentional and willful, and is calculated specifically to trade off the goodwill that MGA has developed in its successful "BRATZ" line. By its aforesaid acts, particularly its imitation of the distinctive

features of MGA's "BRATZ" line in connection with goods sold and distributed in interstate commerce, Mattel has infringed and is likely to continue to infringe on MGA's substantial rights in and to the "BRATZ" line trade dress. In so doing, Mattel has falsely represented and designated to the public generally and consumers of fashion doll products specifically the source and origin of Mattel's "My Scene" fashion doll products in violation of 15 U.S.C. § 1125(a).

106. MGA has been damaged by, and Mattel has profited from, Mattel's wrongful conduct in an amount to be proven at trial.

107. For each act of infringement, MGA is entitled to recover its actual damages as well as Mattel's profits from such infringement.

108. Monetary relief alone, however, is not adequate to address fully the irreparable injury that Mattel's illegal actions have caused and will continue to cause MGA, if not enjoined. MGA is therefore entitled to preliminary and permanent injunctive relief to stop Mattel's ongoing infringement of MGA's trade dress.

### SECOND CLAIM FOR RELIEF

**(Unfair Competition in Violation of 15 U.S.C. § 1125 (a) and Unfair Competition and Unfair Business Practices in Violation of Cal. Bus. & Prof. Code § 17200 *et seq.* and California Common Law)**

109. MGA repeats and realleges the allegations contained in paragraphs 1 through 108 of this Complaint and incorporates them by reference as though fully and completely set forth herein.

110. Mattel has deliberately and, indeed, repeatedly adopted, imitated and mimicked the make-up, appearance, features, trade dress, and image of MGA's products, packaging and advertising, including its repackaging and refreshing of older Mattel toys. Mattel's actions were and are done with the intent to deceive consumers, cause confusion and mistake, and interfere with the ability of consumers to identify the source of goods by appearance and packaging. By this

-33-

EXHIBIT A PAGE 41

conduct, Mattel pirates and exploits, by subliminal or conscious association with MGA, the goodwill and reputation of MGA and derives benefit therefrom.

111. Mattel has particularly and deliberately poached upon the commercial magnetism of MGA's "BRATZ" and the success of "BRATZ". Mattel's conduct has been intentional and willful, and is calculated specifically to trade off the goodwill that MGA has developed in its successful "BRATZ" line.

112. By its acts, including its intentional imitation of the distinctive features of MGA's "BRATZ" dolls, which has progressively become closer and closer, as well as its imitation of "BRATZ" themes, packaging and the overall look, feel and total image of the "BRATZ" line, imitation of other MGA products, packaging and advertising, and other conduct alleged herein, Mattel has engaged in unfair competition under both federal and California state law.

113. Mattel has also willfully and maliciously used its power, influence and intimidation to threaten certain retailers, suppliers, licensees, distributors and manufacturers so as to limit, if not prevent, MGA from doing business with these retailers, suppliers, licensees, distributors and manufacturers, using its power and influence to intimidate and manipulate industry bodies. Mattel has further used its power and influence to attempt to, if not actually, intimidate and threaten MGA's current and potential employees so as to cause MGA competitive injury.

114. Alone, in combination, or in totality, Mattel's actions discussed and alleged herein constitute unfair competition and unfair business practices within the meaning of federal law, California statutory law and/or California common law.

115. As a result of its conduct, Mattel has derived substantial monetary and non-monetary benefit and business advantage. Mattel has also wrongfully diverted profits away from MGA and to Mattel and, on information and belief, deprived MGA of the patronage of a large number of actual and potential customers.

116. MGA has been damaged by, and Mattel has profited from, Mattel's wrongful conduct in an amount to be proven at trial.

EXHIBIT A PAGE 42

117. Monetary relief alone, however, is not adequate to address fully the irreparable injury that Mattel's actions have caused and will continue to cause MGA, if not enjoined. MGA is therefore entitled to preliminary and permanent injunctive relief to stop Mattel, and all persons acting in concert with Mattel, from engaging in acts of unfair competition and unfair business practices.

118. MGA is further entitled to relief whereby Mattel is ordered to pay restitution for damages resulting from Mattel's unfair competition and unfair business practices.

### THIRD CLAIM FOR RELIEF
### (Dilution in Violation of 15 U.S.C. § 1125 (c); Cal. Bus. & Prof. Code § 14330 and California Common Law)

119. MGA repeats and realleges the allegations contained in paragraphs 1 through 118 of this Complaint and incorporates them by reference as though fully and completely set forth herein.

120. The look and trade dress of the MGA products referenced herein are distinctive and famous, and have been since before Mattel launched its similar versions. By its aforesaid acts, Mattel caused and continues to cause blurring and dilution of the distinctive look of MGA's products and trade dress, which previously served as a unique source identifier for MGA, within the meaning of the Lanham Act, California Business and Professions Code § 14330 and/or California common law.

121. Mattel's conduct has been intentional and willful, calculated specifically to trade on MGA's goodwill and reputation and to cause dilution of MGA's famous marks, particularly those connected with MGA's famous and successful "BRATZ" doll head, "BRATZ" doll product line, "BRATZ Funky Fashion Makeover Head" and "BRATZ PETZ" line.

122. MGA has been damaged by, and Mattel has profited from, Mattel's wrongful conduct in an amount to be proven at trial.

35

123. Monetary relief alone, however, is not adequate to address fully the irreparable injury that Mattel's actions have caused and will continue to cause MGA, if not enjoined. MGA is therefore entitled to preliminary and permanent injunctive relief to stop Mattel's ongoing dilution.

## FOURTH CLAIM FOR RELIEF
### (Unjust Enrichment)

124. MGA repeats and realleges the allegations contained in paragraphs 1 through 123 of this Complaint and incorporates them by reference as though fully and completely set forth herein.

125. As a result of the conduct alleged herein, Mattel has been unjustly enriched to MGA's detriment. MGA seeks a worldwide accounting and disgorgement of all ill-gotten gains and profits resulting from Mattel's inequitable activities.

## PRAYER FOR RELIEF

WHEREFORE, MGA prays for relief, as follows:

1. That Mattel, its agents, servants and employees and all persons acting in concert be restrained preliminarily and permanently from directly or indirectly:
   a. using confusingly similar trade dress;
   b. improperly influencing, or attempting to improperly influence, standard-setting and industry organizations;
   c. engaging in unfair competition and unfair business practices; and
   d. diluting MGA's trade dress;

2. For general and actual damages, according to proof at trial but believed to reach or exceed tens of millions of dollars;

3. For the disgorgement of all profits derived by Mattel for its acts of:
   a. false designation of origin or affiliation;

      b.    unfair competition and unfair business practices; and

      c.    dilution;

4. For costs of suit and reasonable attorneys' fees;

5. For punitive and/or exemplary damages as a result of Mattel's willful and malicious conduct to the extent allowable by law; and

6. For such other and further relief as the Court deems just and proper.

Dated: April 13, 2005

PATRICIA GLASER
CHRISTENSEN, MILLER, FINK, JACOBS, GLASER, WEIL & SHAPIRO LLP

DALE M. CENDALI
DIANA M. TORRES
PAULA E. AMBROSINI
O'MELVENY & MYERS LLP

By: _____
Diana M. Torres
Attorneys for Plaintiff
MGA ENTERTAINMENT, INC.

EXHIBIT A PAGE 45

## DEMAND FOR JURY TRIAL

MGA hereby demands a jury trial on all triable issues.

Dated: April 13, 2005

PATRICIA GLASER
CHRISTENSEN, MILLER, FINK,
JACOBS, GLASER, WEIL &
SHAPIRO LLP

DALE M. CENDALI
DIANA M. TORRES
PAULA E. AMBROSINI
O'MELVENY & MYERS LLP

By: /s/ Diana M. Torres
Diana M. Torres
Attorneys for Plaintiff
MGA ENTERTAINMENT, INC.

EXHIBIT A PAGE 46