1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
     John B. Quinn (Bar No. 090378)
2    johnquinn@quinnemanuel.com
     Michael T. Zeller (Bar No. 196417)
3    (michaelzeller@quinnemanuel.com)
     Jon D. Corey (Bar No. 185066)
4    (joncorey@quinnemanuel.com)
     Timothy L. Alger (Bar No. 160303)
5    (timalger@quinnemanuel.com)
   865 South Figueroa Street, 10th Floor
6  Los Angeles, California 90017-2543
   Telephone: (213) 443-3000
7  Facsimile: (213) 443-3100

8  Attorneys for Mattel, Inc.

9              UNITED STATES DISTRICT COURT

10            CENTRAL DISTRICT OF CALIFORNIA

11                   EASTERN DIVISION

| | |
|---|---|
| 12  CARTER BRYANT, an individual, | CASE NO. CV 04-9049 SGL (RNBx) |
| 13                Plaintiff, | Consolidated with Case No. CV 04-09059 Case No. CV 05-02727 |
| 14        vs. | |
| 15  MATTEL, INC., a Delaware | |
| 16  corporation, | **[PUBLIC REDACTED] DECLARATION OF MELISSA GRANT IN SUPPORT OF MATTEL, INC.'S OPPOSITION TO MGA'S MOTION TO QUASH SUBPOENA TO BANK OF AMERICA OR, IN THE ALTERNATIVE, FOR A PROTECTIVE ORDER** |
| 17                Defendant. | |
| 18  AND CONSOLIDATED ACTIONS | |
| 19 | **DISCOVERY MATTER** |
| 20 | **[To Be Heard By Discovery Master Hon. Edward Infante (Ret.) Pursuant To The Court's Order Of December 6, 2006]** |
| 21 | |
| 22 | |
| 23 | Hearing Date:  TBA Time:  TBA Courtroom:  TBA |
| 24 | |
| 25 | **Phase 1:** Discovery Cut-off:     January 28, 2008 |
| 26 | Pre-trial Conference:  May 5, 2008 Trial Date:              May 27, 2008 |
| 27 | |
| 28 | |

07209/2380594.1

GRANT DECLARATION IN SUPPORT OF MATTEL'S OPPOSITION TO MGA'S MOTION TO QUASH

# DECLARATION OF MELISSA GRANT

I, Melissa Grant, declare as follows:

1.      I am a member of the bars of the State of California and an associate at Quinn Emanuel Urquhart Oliver & Hedges, LLP, attorneys for plaintiff and counter-defendant, Mattel, Inc. ("Mattel").  I make this declaration of personal, firsthand knowledge and, if called and sworn as a witness, I could and would testify competently thereto.

2.      Attached as Exhibit A is a true and correct copy of MGA's Complaint in this matter, filed April 13, 2007.

3.      Attached as Exhibit B is a true and correct copy of Mattel's Second Amended Answer and Counterclaims, excluding Exhibit C thereto.

4.      Attached as Exhibit C is a true and correct copy of the subpoena *duces tecum* served on Bank of America by Mattel on January 17, 2008 and the notice thereof served on opposing parties.

5.      On January 24, 2008, Mattel deposed MGA designee Lisa Tonnu.  Ms. Tonnu was MGA's designee on certain compelled topics, including Topic of Examination No. 11 of Mattel's Third Notice of Deposition of MGA Entertainment, Inc., Pursuant to <u>Federal Rule of Civil </u>Procedure 30(b)(6).  Topic of Examination No. 11 required MGA to designate a witness to testify as to "Payments of money or any other item of value that [MGA defendants] have made to, for or on behalf of Isaac Larian or any Family Member of Isaac Larian since January 1, 1999, including without limitation (a) the amounts of such payment and the equivalent dollar value of each item of value, (b) the dates of such payment, (c) the Identify of each recipient of such payment, (d) the Identify of each bank of financial institution account to which such payment was made and (e) the reasons for each payment."  Attached as Exhibit D is a true and correct copy of the Third Notice of Deposition.  Ms. Tonnu, however, testified that she could not quantify the total amount of money transferred from MGA to Larian,

GRANT DECLARATION IN SUPPORT OF MATTEL'S OPPOSITION TO MGA'S MOTION TO QUASH

nor could she provide specific information regarding each aspect of Topic 11. Attached as Exhibit E is a true and correct copy of excerpts from the rough transcript of the January 24, 2008 deposition of MGA designee Lisa Tonnu.

6.    By letter dated January 28, 2008, the Bank of America advised me that it had received the January 17, 2008 subpoena and would produce the requested documents without objection.  Attached as Exhibit F is a true and correct copy of that letter.

7.    On January 28, 2008, Timothy A. Miller, counsel for MGA and Isaac Larian, sent a e-mail message to my colleague, B. Dylan Proctor, advising Mattel of MGA would file a motion to quash the Bank of America the next day because the Bank of America purportedly told MGA's counsel that the bank would process the subpoena and produce responsive documents "unless we file a motion to quash." Mr. Miller also stated that MGA's counsel "ha[d] no choice but to file the motion to quash as soon as possible," although he "remained willing to meet and confer regarding the issues raised in [MGA's] written objections." Attached as Exhibit G is a true and correct of Mr. Miller's e-mail message.

8.    On January 29, 2008, I called the Bank of America to ascertain the status of the bank's production.  Jermaine in the Bank of America Subpoena Processing Department told me that in accordance with bank policy, Bank of America had suspended processing the subpoena and would not produce responsive documents until it received a court order advising the bank that MGA's objections had been overruled.   The Bank has produced no documents in response to the subpoena.

9.    On January 29, 2008, I called Timothy A. Miller in response to the e-mail he sent to B. Dylan Proctor the previous day.  I proposed the parties stipulate to extend the return date of the subpoena to February 11, 2008 and advise the bank that it should not produce documents until that date to permit the parties time to meet and confer over MGA's objections.  Mr. Miller stated that he would

1  discuss my proposal with his colleague, Amy Park, and either Ms. Park or Mr.

2  Miller would call me back.  Minutes later, MGA's counsel filed the instant

3  Motion to quash the Bank of America subpoena.  Thereafter, Ms. Park called me

4  and stated that because MGA had already filed its motion to quash Mattel's

5  proposed stipulation was moot.

6       10.    I, along with others in my office, began reviewing the documents

7  produced by MGA defendants in January 2008 soon after received, and although

8  MGA argues that the subpoena should be quashed because the information sought

9  is available from and/or was purportedly produced by the parties, MGA neglects

10  to mention in its moving papers that Larian **failed to produce any documents**

11  **showing transfers of value between him and any MGA entity or any other**

12  **defendant or transfers of value between him and Mattel employees** —

13  notwithstanding the Court's December 31, 2007 Order to do so.   Attached as

14  Exhibit H  is a true and correct copy of the Discovery Master's December 31,

15  2007 Order granting Mattel's motion to compel.

16       11.    The inconsistency in what MGA claims to have produced and

17  what it actually produced is epitomized by its assertion in its Separate Statement

18  regarding the Bank of America Subpoena at 6:3-6 that Larian recently produced

19  "13,000 pages of documents showing his net worth, his income from multiple

20  sources, as well as information regarding his banks and bank accounts," and the

21  statement in Larian's counsel's—Timothy A. Miller's Declaration in support of

22  the motion, at ¶ 10, that "in mid–January Mr. Larian produced to Mattel nearly

23  50,000 pages" of such documents.  Because MGA document productions do not

24  distinguish "Larian" documents from MGA documents, Mattel has not been able

25  to determine how many of the hundreds of thousands of pages that MGA

26  defendants have produced in the past three weeks are in fact "Larian" documents.

27  To date, Mattel has been able to identify only a fraction those documents as being

28  even arguably Larian "financial" records. **And none of them include monthly**

-4-

)7209/2380594.1

1  statements of his personal Bank of America account or accounts, Bank of

2  America cancelled checks or wire transfers reflecting transfer of value to or

3  from Larian, or any other document sought by Mattel's subpoena to Bank of

4  America. The only documents that Larian appears to have produced related to his

5  personal Bank of America account(s)—as opposed to accounts of MGA entities—

6  are those relating to payments he made to his brother Farhad Larian.

7         12.    Even the description of documents that MGA claims Larian

8  produced is notable for its lack of specificity. Indeed, conspicuously missing

9  from that description—and Larian's production to date—are documents from

10  1999 to the present that the Discovery Master ordered him to produce, including:

11        • Documents sufficient to determine Larian's net worth.

12        • Bank of America banking records for Larian.

13        • Documents related to payments to third–parties or other defendants

14  by Larian, or the Larian trusts (such as to Bryant and other Mattel employees and

15  vendors).

16        • Documents related to the Larian trusts, including any documents

17  showing Isaac Larian's interest in, payments received, or transfers to those trusts.

18         13.    In short, Larian has refused to produce relevant and discoverable

19  documents for months and now seeks to prevent Mattel from obtaining those

20  documents from third parties. As the Phase 1 discovery cut–off approached,

21  Mattel had no choice but to seek documents essential to its claims and defenses

22  from third parties, including the Bank of America.

23         14.    Attached as Exhibit I is a true and correct copy of excerpts from

24  Isaac Larian's December 15, 2005 Deposition Testimony in <u>Art Attacks Ink, LLC</u>

25  <u>v. MGA Entertainment, Inc.</u>, Central District of California Case No. 04-1035-J, in

26  which he testified that he personally banks with Bank of America.

27         15.    As made clear by in the Discovery Master's December 31, 2007

28  Order, even if Larian had documents that were requested by the Bank of America

subpoena, his track record of obstruction of discovery, even to the point of violating his own promises to produce, means that Mattel should not be forced to rely exclusively on his production.  At the time the subpoena was served, Isaac Larian had not produced financial records—including his personal banking records—reflecting his income, the source of his income, his net worth, or transfers of value from any MGA entity to him or transfers of value from him to any other defendant or any Mattel employee—notwithstanding the Discovery Master's December 31, 2007 Order.   In fact, Larian's failure to produce a single document in discovery in 2007 convinced the Discovery Master to grant Mattel's motion to compel and to order Larian to produce documents in response to 71 document requests; 52 of which Larian had already promised to respond.

16.     Attached as Exhibit J is a true and correct copy of Objections of MGA Entertainment, Inc., Isaac Larian, MGA Entertainment (HK) Limited, and MGAE De Mexico S.R.L. De C.V. to Mattel Inc.'s Subpoena to Bank of America, dated January 25, 2008.

17.     Attached as Exhibit K is a true and correct copy of the Court's August 9, 2006 Order Denying Appointment of Expert Witnesses.

18.     Notwithstanding MGA's claims to the contrary, it has not been prejudiced by lack of "prior notice" of the subpoena served on Bank of America. MGA was able to intervene, assert its objections, and stop any production by the Bank pending the Court's decision on the Motion to Quash.

19.     Attached as Exhibit L is a true and correct copy of the July 2, 2007 Order of the Court in this matter.

20.     Attached as Exhibit M is a true and correct copy of excerpts from Lisa Tonnu's September 24,2007 Deposition Testimony in <u>Carter Bryant v. Mattel Inc</u>, Central District of California Case No. 04-9040.

21.     Attached as Exhibit N is a true and correct copy of excerpts from Veronica Marlow's December 28, 2007 Deposition Testimony in <u>Carter Bryant v. Mattel Inc.,</u> Central District of California Case No. CV-9040.

22.     Attached as Exhibit O is a true and correct copy of excerpts from Carter Bryant's November 5, 2005 Deposition Testimony in <u>Carter Bryant v. Mattel Inc.,</u> Central District of California Case No. CV-9059.

23.     Attached as Exhibit P is a true and correct copy of MGA Entertainment (HK) Limited's Supplemental Responses to Mattel, Inc's Revised Third Set of Interrogatories, dated November 11, 2007.

24.     Attached as Exhibit Q is a true and correct copy of excerpts from Richard Irmen's September 28, 2007 Deposition Testimony in <u>Carter Bryant v. Mattel Inc.,</u> Central District of California Case No. CV-9059.

25.     Attached as Exhibit R is a true and correct copy of excerpts from Stephen Linker September 13, 2006 Deposition Testimony in <u>Carter Bryant v. Mattel Inc.,</u> Central District of California Case No. CV 04-09049.

26.     Attached as Exhibit S is a true and correct copy of the January 28, 2008 Order of the Court in this matter.

27.     Attached as Exhibit T is a true and correct copy of the May 15, 2007 Order of the Court in this matter.


I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 7th day of February, 2008, at Los Angeles, California.


Melissa Grant

07209/2380594.1

GRANT DECLARATION IN SUPPORT OF MATTEL'S OPPOSITION TO MGA'S MOTION TO QUASH

**Exhibit A**

DALE M. CENDALI
(of counsel, not admitted in California)
DIANA M. TORRES (S.B. #162284)
PAULA E. AMBROSINI (S.B. #193126)
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071-2899
Telephone: (213) 430-6000
Facsimile: (213) 430-6407
email:     dtorres@omm.com

PATRICIA GLASER (S.B. # 55668)
CHRISTENSEN, MILLER, FINK,
JACOBS, GLASER, WEIL &
SHAPIRO LLP
10250 Constellation Boulevard, 19th Floor
Los Angeles, CA 90067
Telephone: (310) 553-3000
Facsimile: (310) 556-2920

Attorneys for Plaintiff
MGA Entertainment, Inc.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

CV 05-02727 CBM (RZx)

| | |
|---|---|
| MGA ENTERTAINMENT, INC., | Case No. |
| Plaintiff, | COMPLAINT FOR FALSE DESIGNATION OF ORIGIN, AFFILIATION, ASSOCIATION OR SPONSORSHIP (15 U.S.C. § 1125 (a)); UNFAIR COMPETITION (15 U.S.C. § 1125 (a), Cal. Bus. & Prof. Code § 17200 *et seq.* and California Common Law); DILUTION (15 U.S.C. § 1125 (c), Cal. Bus. & Prof Code § 14330 and California Common Law); AND UNJUST ENRICHMENT |
| v. | |
| MATTEL, INC., a Delaware Corporation, and DOES 1-10, | |
| Defendants. | |
| | <u>DEMAND FOR JURY TRIAL</u> |

Plaintiff MGA Entertainment, Inc. for its complaint against Defendants Mattel, Inc. and DOES 1-10 alleges and avers as follows:

## PARTIES

1. Plaintiff MGA Entertainment, Inc. ("MGA") is a California corporation organized and existing under the laws of the State of California, with a principal place of business in Van Nuys, California.

2. MGA is informed and believes, and based thereon alleges, that Defendant Mattel, Inc. ("Mattel") is a Delaware corporation with a principal place of business in El Segundo, California.

3. MGA is ignorant of the true names and capacities of the defendants sued herein under the fictitious names DOES 1 through 10 inclusive. MGA will seek leave of court to amend this complaint to allege such names and capacities when they are ascertained. MGA is informed and believes, and based thereon alleges, that each of the fictitiously named DOE defendants is responsible in some manner for the wrongful conduct alleged herein. MGA further alleges that each defendant acted in concert with, as agent or representative for, or at the request or on behalf of another or Mattel. Each charging allegation contained herein is, therefore, also hereby alleged against each fictitiously named DOE defendant.

## JURISDICTION AND VENUE

4. Through this action MGA asserts claims against Mattel arising under the Lanham Act, 15 U.S.C. Sections 1125 (a) and (c), California Business and Professions Code Sections 17200 *et seq.*, California Business and Professions Code Section 14330 and California common law. This Court has original subject matter jurisdiction over MGA's federal claims pursuant to 15 U.S.C. Sections 1116 and 1121, 28 U.S.C. Section 1338(a), and 28 U.S.C. Section 1331, and supplemental

1

EXHIBIT __A__ PAGE __9__

1    subject matter jurisdiction over MGA's state law claims pursuant to 28 U.S.C.

2    Section 1367(a).

3         5.    This Court has specific personal jurisdiction over Mattel, as it has

4    purposefully committed, within the State of California, the acts from which these

5    claims arise and/or has committed tortious acts outside California, knowing and

6    intending that such acts would cause injury to MGA within the state.  The Court

7    also has general personal jurisdiction over Mattel, as it conducts continuous,

8    systematic and routine business within the State of California and the County of

9    Los Angeles.

10        6.    Venue is proper in the United States District Court for the Central

11   District of California pursuant to 28 U.S.C. Sections 1391(b) and 1391(c).

12

13                        **FACTUAL BACKGROUND**

14        7.    MGA seeks by this action to halt Mattel's habitual and unfair tactics of

15   competition-by-intimidation and serial copycatting of MGA's products, which

16   Mattel has used in an unbridled effort to cause confusion in the market place and

17   eliminate MGA as a competitor in the toy and fashion doll market long dominated

18   and controlled by Mattel.

19        8.    MGA is a privately-held company in the San Fernando Valley that

20   began in 1979 as a small consumer electronics business.  In 1987, the company

21   made its first foray into the toy business when it secured rights to market handheld

22   LCD games featuring licensed Nintendo® characters.  Building on that small

23   success, the company began marketing products for popular licensed properties

24   such as the "Power Rangers"® and "Hello Kitty"®.  This little-known but

25   successful company, however, was propelled into the limelight after its daring

26   release in June 2001 of an innovative line of fashion dolls called "BRATZ".

27   "BRATZ" are multi-ethnic fashion dolls that sport a fresh new urban and

28   contemporary look and fashion.  At the time of the release of "BRATZ", "Barbie"

2

EXHIBIT ___A___ PAGE __10__

 1   sales were on a slump, Mattel was in turmoil, and the market was ripe for something

 2   new, exciting and inventive. "BRATZ" fit the bill. It is the first fashion doll that

 3   has been able to seriously challenge "Barbie" for market share, and begin to loosen

 4   Mattel's 50-year iron-fisted grip on the fashion doll market.

 5       9.    Mattel has not taken kindly to the challenge. Either unable or

 6   unwilling to compete against "BRATZ" fairly, and on a level-playing field, Mattel

 7   has, instead, taken a more expeditious approach, resorting to unfair and anti-

 8   competitive business practices. Wielding its substantial clout and influence in the

 9   toy industry, Mattel has tried to muscle MGA out of business. MGA is informed

10   and believes that Mattel has intimidated, coerced and threatened retailers, licensees,

11   suppliers and others in the industry – both in the U.S. and internationally – in order

12   to inhibit and stifle MGA's ability to compete with Mattel and to prevent MGA

13   from obtaining licensees, contracts and supplies for its products. Mattel has also

14   serially imitated and copy-catted the look of MGA products, trade dress,

15   trademarks, themes, ideas, advertising and packaging, including for the "BRATZ"

16   line of dolls. MGA brings this action to stop Mattel's tortious, unfair and anti-

17   competitive conduct and to recover the extensive damage that Mattel's illicit

18   behavior has caused, and continues to cause, MGA. Mattel's own website states:

19   "As the global leader in the toy industry, we believe that how we achieve success is

20   just as important as the success itself." It also proclaims that "unwavering integrity

21   defines our corporate culture on every level, guiding how we work and how we do

22   business." Mattel's own corporate governance standards require it to "play by the

23   rules," complete fairly and be a good corporate citizen. Mattel's actions, however,

24   speak louder than its words.

25

26

27

28

3

EXHIBIT __A__ PAGE __11__

**Mattel History and Performance**

2    10.    Mattel is the world's largest toy company, but it owes its immense

3    success chiefly to a single product: "Barbie." Since her debut in 1959, "Barbie"

4    has been the fuel for Mattel's growth and success, turning Mattel into an

5    international powerhouse. By the late 1990's, Mattel's annual sales of the doll

6    approached or topped $1.8 billion and Mattel stock reached a record high of

7    approximately $45.00 a share. At that time, the average American girl had eight

8    "Barbie" dolls, and "Barbie" was the world's best-selling toy.

9    11.    Mattel's reliance on a single, 40-year old product for as much as 50%

10   of its business turned out to be a risky business model, however. Resting on its

11   laurels, Mattel failed to react to the shifting tastes of consumers, changing dynamics

12   in the industry, and an increasing focus on technologically advanced and interactive

13   toys. "Barbie's" record sales fell into a tailspin. According to one report, Adrienne

14   Fontanella, Mattel's "Barbie" brand president, would later be quoted as saying that,

15   "The world changed very quickly, and we missed a beat. . . Barbie wasn't talking

16   to girls. She just wasn't hitting it."

17   12.    Sales began to plunge in 1997, and Mattel began posting a series of net

18   income losses. In the first quarter of 1998, sales of the "Barbie" brand dropped

19   17%. This steep slide was followed by another in the second quarter, when sales

20   fell again, down by 15%. By the end of 1998, Mattel reported an overall 14%

21   decline in "Barbie" sales for the year and analysts were using words such as

22   "devastating" and "a catastrophe" to describe Mattel's earnings. The company's

23   stock fell as much as 27% in a single day. "Barbie" was having a crisis.

24   13.    Jill Barad, who had taken over as Mattel's chairman and chief

25   executive in January 1997, at the height of Mattel's success, had to do something

26   fast. Instead of focusing on and investing in new product development, however,

27   which would obviously take time, Mattel embarked on a series of acquisitions that

28   were seemingly aimed at quickly diversifying the company's product line and

4

EXHIBIT ___A___ PAGE __12__

1   reducing its reliance on "Barbie" and on traditional retailers, such as Toys-R-Us
2   and Wal-Mart. Mattel spent a reported $881 million in March 1997 to purchase
3   Tyco Toys and acquire the "Matchbox" toy car brand. Just more than a year later,
4   it spent $700 million for the Pleasant Co., a mail-order doll company and maker of
5   the "American Girl" doll collection. And in December 1998, Mattel announced
6   plans to fork out a monumental $3.5 billion to buy the Learning Company,
7   followed quickly by Mattel's purchase, in March 1999, of a software company,
8   Purple Moon.

9       14.   Despite these acquisitions, the company continued to struggle. The
10  retail environment and buying patterns had unquestionably changed, but Mattel had
11  not kept up. Despite Mattel's feverish acquisitions, Mattel's mainstay and primary
12  profit-generator was still "Barbie." But "Barbie" had grown stale, and sales
13  languished. Posting additional losses in the first quarter of 1999, Mattel announced
14  that it would lay off 3,000 employees – 10% of its work force.

15      15.   Mattel's stock plummeted again in late 1999, dropping 30% on
16  Mattel's announcement that it would fall as much as 55% short of analysts' earning
17  estimates for the third quarter. Mattel blamed its troubles primarily on its
18  expensive, $3.5 billion acquisition of the Learning Company, which had turned out
19  to be a disaster fraught with licensing and distribution problems, bad debt, high
20  product returns and high advertising costs.

21      16.   By early 2000, Mattel's stock had crashed to as low as $8 per share,
22  and some analysts considered Mattel vulnerable to a takeover. Investors clamored
23  for Ms. Barad's resignation, and got their wish.

24      17.   Jill Barad resigned from Mattel in February 2000.

25      18.   For three months, the company was without a permanent chief
26  executive until Robert Eckert took the helm in May 2000. Mr. Eckert had spent 23
27  years at Kraft Foods, a subsidiary of Altria Group, Inc., and was widely credited

28

5

EXHIBIT ___A___  PAGE ___13___

2 | for Mattel.

3 |      19.    Upon his arrival at Mattel, Mr. Eckert's promise, according to *Wall*

4 | *Street Journal* reports, was to deliver a "leaner and meaner" Mattel.

5 |      20.    The "leaner" Mattel came quickly. Mr. Eckert laid off hundreds,

6 | closed factories in the United States, shipped production to Mexico, and sold off the

7 | Learning Company at a fraction of what Mattel had paid for it. It helped Mattel's

8 | bottom-line, but did nothing to spur sales growth. Even under Mr. Eckert's "leaner

9 | meaner" leadership, domestic "Barbie" sales remained in a slump into 2001. In an

10 | industry that had become increasingly driven by consumer whims and fads, and the

11 | hot, must-have toys of the moment, Mattel remained disinterested in devoting its

12 | resources to searching for or developing a new blockbuster toy. Mr. Eckert's

13 | business plan was not to diversify, but to build upon and expand sales of its existing

14 | brands. Mattel was, after all, still generating billions in revenue despite the decline

15 | of "Barbie." And so, Mattel remained committed to its age-worn icon and its two

16 | other core brands, Fisher-Price and Hot Wheels, with each of the three accounting

17 | for approximately a third of the company's sales.

18 |      21.    Then came the competition – MGA's "BRATZ".

19 |

20 | **"BRATZ" Dolls Revolutionize The Fashion Doll Market**

21 |      22.    "BRATZ" challenged "Barbie's" half-century domination of the

22 | fashion-doll market like nothing ever before had been able to do.

23 |      23.    MGA unveiled a preliminary sample of the "BRATZ" doll at the Hong

24 | Kong Toy Fair in January 2001, while continuing to finalize the product throughout

25 | that spring. Finished products were first shipped in May 2001. MGA introduced

26 | the line to consumers in June 2001.

27 |

28 |

EXHIBIT <u>A</u> PAGE <u>14</u>

2      Unlike "Barbie" dolls, the "BRATZ" line of dolls and branded
3  products sported a hip, multi-ethnic urban look that appealed to contemporary
   teenage and pre-teen girls.

### MGA's "BRATZ"



23      25.     At approximately 9.5 to 10 inches tall, the "BRATZ" dolls were
24  intentionally shorter than "Barbie" dolls and looked like no other, with
25  disproportionately large heads, big, dramatic eyes and lips, small, thin bodies,
26  oversized feet (to emphasize shoe fashion and to stand on their own, unlike
27  "Barbie," which requires a stand), and up-to-date fashions.
28

7

26. Indeed, the classic "Barbie" look was nowhere to be seen in these dolls; they would never be confused with "Barbie".

**MGA's "BRATZ"**        **Mattel's "Barbie"**



27. Featuring and embodying the slogan "The Girls With a Passion for Fashion!", "BRATZ" dolls revitalized, transformed and expanded the fashion doll market, in particular proving popular among "tween" age girls – those between childhood and adolescence – who had been all but abandoned as a market by Mattel.

28. The "BRATZ" line – with its unique and distinctive look – is well recognized and has been critically acclaimed and praised by consumers, retailers and toy industry analysts alike. In 2001, the "BRATZ" line won the Toy Industry Association ("TIA") People's Choice Toy of the Year Award, the Family Fun Toy of the Year Award and Toy Wishes Hot Pick Award. In 2002, the "BRATZ" line again won the TIA People's Choice Toy of the Year Award and the Family Fun Toy of the Year Award. LIMA, the licensing industry's official arm, awarded MGA's "BRATZ" the best character license of the year as well as the overall best licensed property of the year for 2003. MGA's "BRATZ" also earned the coveted TIA "Property of the Year" and "Girl Toy of the Year" for 2003, as well as the Family Fun Toy of the Year Award. MSNBC named "BRATZ" the "Hottest Toy of the Year," and both MGA and "BRATZ" received several other accolades in

8

2   2004, including the Suppliers Performance Award by Retail Category (the
    "SPARC" award) in the Girls' Toys category sponsored by DSN Retailing
3   Today/Apparel Merchandising.

4       29.    Although but a tiny fraction of Mattel's size, with "BRATZ", MGA
5   was able to chip away at Mattel's stranglehold on the fashion doll market, gaining
6   shelf space and market share as "Barbie" sales remained flat or, at times, declined.

7       30.    The competition that MGA (once a licensee of Mattel!) and "BRATZ"
8   posed to Mattel was unexpected and unwelcomed by Mattel.  Where "Barbie" had
9   once enjoyed a 90% share of the fashion doll market in 1997, that share had already
10  slipped to 85% or less by the time of the release of "BRATZ".  With the company
11  still struggling under Mr. Eckert to overcome prior years of declining sales and
12  mounting debt, "Barbie," Mattel – and Mr. Eckert – simply could not afford the
13  untimely competition.  Mr. Eckert's "leaner" Mattel was not enough to battle more
14  potential erosion in "Barbie's" market share.  Mattel had to combat "BRATZ" and
15  MGA, and in the process revealed Mr. Eckert's "meaner" Mattel.

16

17  **Mattel's Response to "BRATZ" and Efforts to Thwart MGA's Competition**

18      31.    Mattel was not poised to nimbly respond to "BRATZ" with a new,
19  creative product of its own – indeed, it had been antithetical to Mattel's corporate
20  culture and mentality for Mattel to even conceive that a product might vie for shelf
21  space with "Barbie", let alone be available for sale to consumers mere months after
22  first being shown to retailers.  Mattel had to take a more expeditious route.

23      32.    Instead of fairly competing, Mattel waged war against MGA using a
24  wide-array of tortious, unfair and anti-competitive practices including systematic,
25  serial copycatting and intellectual property infringement, aided by intimidation,
26  threats and other acts of unfair competition and anti-competitive conduct, all with
27  one goal in mind – to banish MGA from the market – or minimize its ability to
28  capture any meaningful share before it could do any real harm to Mattel.

9

EXHIBIT ___A___ PAGE ___17___

**Mattel's serial copycatting and intellectual property infringement**

33.    Mattel's serial copycatting of MGA's product lines began with the "BRATZ" dolls themselves, but quickly extended to MGA's packaging, themes, accessories, advertising and even other product lines.

34.    The first four "BRATZ" dolls that MGA launched in 2001, named Jade, Yasmin, Cloe and Sasha, met their wannabe "BRATZ PACK" members in October 2002 with Mattel's launch of three "My Scene" dolls named Madison, Chelsea and "Barbie." This was no ordinary "Barbie", however. Indeed, not even close. Mattel designed its "My Scene" dolls to evoke the unique and distinctive look of the "BRATZ" – also with disproportionately oversized heads, artfully made-up almond-shaped eyes, large, overly-lined and lipsticked lips, trendy, hip clothes and hair styles, and over-sized feet.

**Mattel's Traditional "Barbie"**          **Mattel's "My Scene" Doll**

circa 2002          circa 2004








10

35.   These confusingly similar "BRATZ" imitators may have been originally intended to buy Mattel time while it worked to release another product the following summer, called "Flavas". MGA's founder, Isaac Larian, was quoted by the media as having predicted that the move would backfire on Mattel, and it did. Released in July 2003, Mattel's "Flavas" dolls took the urban, "hip-hop" look too far, and were widely viewed as portraying a trampy, "bad-girl" image. The dolls were not well-received, and rumor has it that Mattel had to sell them at below cost prices to get rid of inventory. Most apparently wound up in discount bins, and Mattel has seemingly abandoned the line.

36.   Realizing that "My Scene" was its best bet for riding MGA's successful coattails and capitalizing on the unique and inherently distinctive look that MGA had developed in its "BRATZ" dolls – and MGA's substantial goodwill – Mattel has systematically proceeded to modify the "My Scene" dolls since their original release, particularly their eyes, to increase their similarity to "BRATZ" more and more over time.

37.   Indeed, when Mattel found out that its initial line of "My Scene" dolls had trouble competing with "BRATZ", they simply *became* "BRATZ", in every version, whether blonde, brunette or African American. A few pictures here are worth a thousand words.

### BLONDE

| Mattel's Traditional "Barbie" | Mattel's Original "My Scene" | Mattel's Recent "My Scene" |

  

11

EXHIBIT ___A___ PAGE __19__



Mattel's
Traditional "Barbie"

Mattel's
Original "My Scene"

Mattel's
Recent "My Scene"

**BRUNETTE**

Mattel's
Traditional "Theresa"

Mattel's
Original "My Scene"

Mattel's
Recent "My Scene"

12

EXHIBIT ___A___ PAGE ___20___



**Mattel's Traditional "Barbie"**     **Mattel's Original "My Scene"**     **Mattel's Recent "My Scene"**

38.   The original "My Scene" eye, as shown here, for example, has recently turned into a virtual carbon-copy of the "BRATZ" eye.

**Original Mattel "My Scene" Eye**

13

39.     The "My Scene" eye pictured above, for instance, has lashes that radiate almost straight out, circumferentially, from the eyelids and, although the eye is more almond shaped than a "Barbie" eye, the eye is not so sleepy and heavy lidded as a "BRATZ" eye and is only lightly shadowed.  The new "My Scene" eye, in contrast, is dramatically more similar to a "BRATZ" eye, as shown below in a side-by-side comparison.  The doe-eyed innocent look of the "My Scene" eye shown above is gone; replaced with a sultrier look, characteristic of "BRATZ."  The new "My Scene" eye, as shown below, boasts lashes that sweep out and away from the outer corner of the eye, just like the "BRATZ" eye.  The new "My Scene" eye is also more heavy lidded and thickly lined, and the make-up is more markedly pronounced and dramatic.

**MGA's "BRATZ" Eye**                    **New Mattel "My Scene" Eye**

          

40.     Indeed, the progression of the "My Scene" eye, as it has departed from "Barbie" and edged closer and closer to "BRATZ", is readily apparent from virtually every angle, as shown here:

14

EXHIBIT ___A___ PAGE _22_



**BLONDE**

Mattel's
Traditional "Barbie"

Mattel's
Original "My Scene"

Mattel's
Recent "My Scene"

**BRUNETTE**

Mattel's
Traditional "Theresa"

Mattel's
Original "My Scene"

Mattel's
Recent "My Scene"

15

EXHIBIT ___A___ PAGE __23__



**Mattel's Traditional "Theresa"**

**Mattel's Original "My Scene"**

**Mattel's Recent "My Scene"**

**AFRICAN AMERICAN**

**Mattel's Traditional "Barbie"**

**Mattel's Original "My Scene"**

**Mattel's Recent "My Scene"**

16

EXHIBIT __A__ PAGE __24__

incrementally but steadily modified its "My Scene" packaging, and the manner in

which the dolls are displayed, to more closely mimic the packaging, trade-dress and

overall look and total image of MGA's "BRATZ".

42.    To illustrate, Mattel's "My Scene" dolls were initially marketed like

this:

### Mattel's Early "My Scene" Packaging



43.    Little by little, however, the packaging has changed, creeping ever

closer and closer to the open and transparent style of the "BRATZ" packaging.

First, the panels seen running down each side of the front of the "My Scene" box

shown above, framing the doll and giving the packaging a closed-in look, were

changed as shown here:

### Intermediate Mattel "My Scene" Packaging



17

EXHIBIT __A__ PAGE _25_

44.    Mattel replaced this intermediate packaging style with another that looked even more similar to the "BRATZ" packaging, as shown here in a side-by-side comparison:

MGA's "BRATZ"                     Mattel's "My Scene"
"Wintertime Wonderland" Packaging      "Chillin' Out" Packaging

        

45.    Then later, Mattel changed its packaging and product display yet again to look even more closely and confusingly similar to MGA's packaging and *tout ensemble*," as shown here

MGA's "BRATZ"              Mattel's Recent "My Scene"
"SPORTZ" Packaging        "MIAMI GETAWAY" Packaging

        

18

EXHIBIT __A__ PAGE __26__

46.   In this incarnation, Mattel notably abandoned the signature figure-eight style design that had appeared on its prior "My Scene" packaging, making this recent version clearer and more transparent on the front and sides than ever before, and much more like "BRATZ", accordingly.  Mattel also discarded its traditional, rectangular shaped box and, like "BRATZ", adopted an unusual, non-rectangular shaped box.  Mattel even adopted the "flying banner" ribbon-style slogan running across the middle of the box, similar to that used on the "BRATZ" packaging.

47.   As if these pointed and deliberate efforts to confuse and mislead consumers were not enough, Mattel exacerbated the confusion, and furthered the impression that the "My Scene" line and the "BRATZ" line are related, by taking up MGA's practice of regularly releasing new dolls in connection with a theme – but not just *any* theme, often *MGA's theme.*

48.   For example, when MGA released its "Wintertime Wonderland" theme in Fall 2003, Mattel released its "Chillin Out!" theme.  Each doll in MGA's line came with winter-sports accessories, such as a snowboard or skis and ski boots.  Each doll in Mattel's line featured winter sports accessories, also including snowboards or ski and ski boots.  Even MGA's color schemes and some of the clothing styles seemed to have made their way into the Mattel products.

49.   When MGA released its "Formal Funk" theme, Mattel released its "Night on the Town" theme.  "BRATZ Formal Funk" was an elaborately themed line with its dolls in hip formalwear; so was Mattel's "Night on the Town."

50.   When MGA released its distinctive "Sun-Kissed Summer" theme, Mattel released its confusingly similar "Jammin' in Jamaica" theme.  Each line featured a bright blue-and-orange color scheme, beach accessories, such as surfboards, and beachwear clothing.  Mattel's "Jammin' in Jamaica" "Guava Gulch Tiki Lounge" playset also contained elements remarkably similar to MGA's "Sun-Kissed Summer" playset.

19

51. Mattel also began running television commercials for its "My Scene" dolls bearing a remarkable similarity to "BRATZ" commercials, combining live action with animated sequences set to similar sounding pop music and lyrics.

52. Mattel even stooped so low as to mimic "BRATZ" accessories and related products in order to further create consumer confusion in the marketplace.

53. For instance, when MGA came up with its distinctive "BRATZ" "Runway Disco", Mattel came out with a "My Scene" Sound Lounge with packaging that imitated MGA's trapezoidal box.

54. Mattel's conduct cannot be explained by sheer coincidence, nor is it merely fair competition. It is a calculated and intentional effort unquestionably designed to trade off of MGA's hard work and goodwill, create confusion in the marketplace, steal MGA's thunder and momentum, and dilute and blur away the novelty and distinctiveness of MGA's products. Out of the seemingly endless possibilities that Mattel could have chosen for a new line of dolls, packaging, themes, color schemes, commercials, accessories and playsets, Mattel deliberately chose *not* to come out with something unique, new or different and has, instead, focused its efforts and resources on flooding the market with something so close to "BRATZ" that the public will, can, and does, simply mistake it for "BRATZ".

55. As yet another example of this, when MGA came out with a "BRATZ" "Funky Fashion Makeover Head," Mattel came out with a confusingly similar – indeed, practically identical – "My Scene" styling head.

20

EXHIBIT __A__ PAGE __28__

| MGA's "BRATZ" "Funky Fashion Makeover Head" | Mattel's "My Scene" "Stylin' Head" |

56.   Indeed, Mattel's "My Scene" styling head is so close to the "BRATZ" styling head that even the press have mistakenly pictured and identified it as MGA's "BRATZ".  The picture of Mattel's "My Scene" styling head shown below, for instance, appeared in the press with a caption indicating that the child was trying out different hairstyles "on a *Bratz* hair and makeup doll head."

Hairstyle practice



21

57.   Creating further confusion, Mattel's television commercial for its "My Scene" styling head was like watching a re-run of MGA's commercial for its "Funky Fashion Makeover Head".

58.   At one point in time, Mattel also used a portion of the "BRATZ" dolls' now-famous trademarked tag line "The Girls With a Passion for Fashion" on Mattel's' website for its "Diva Starz" dolls, asking its website users: "Do you have a passion for fashion?"

59.   Mattel has even recently come out with a confusingly similar line of "My Scene" plush pets, which adopt the distinctive look of MGA's "BRATZ" line. The "My Scene" pets feature large, humanlike eyes and wear clothing making them remarkably and confusingly similar to "BRATZ" products, including "BRATZ PETZ", as seen in this example where the pets each wear a jacket, a cap and carry a purse:

**MGA's "BRATZ Dogz"**                **Mattel's "My Scene" dog**

   

60.   And here too, Mattel chose to package its pets the same way that MGA packaged its "BRATZ PETZ", sitting in an open box, with no top and with partial side panels that slope from a narrow front panel to a higher back panel.

61.   Indeed, the similarity of the "My Scene" pets to "BRATZ PETZ" has confused even sophisticated retailers who have mistakenly merchandised "My Scene" dogs in the middle of the "BRATZ" section of a retail display, next to and as if they were part of MGA's "BRATZ Petz" line.  It comes as no surprise that

22

62.   Indeed, Mattel's television commercials and "My Scene" products have become so confusingly similar to MGA's that even advertising executives have expressed concern. One went so far as to say that although imitation is the best form of flattery, what the individual had seen at Mattel's showroom, and how its "My Scene" dolls now look so confusingly similar to "BRATZ", was "shocking." This person further opined that it was clear that Mattel is intending to confuse customers and capture "BRATZ" market share, and even asked MGA if it was considering legal action.

63.   The press also has taken notice of Mattel's attempts to confuse consumers. On or about February 18, 2005, a visitor to MGA's showroom from a prominent news publication stated, "Oh my, I just came from Mattel's showroom and their new 'My Scene' packaging is just like 'BRATZ' minus the handle." Another member of the press visiting MGA's showroom offered the unsolicited comment, "have you seen the new 'My Scene' dolls eyes are exactly like 'BRATZ'?" Yet another opined that Mattel's "My Scene" line was exactly like "BRATZ", indeed, so much so that the reporter confusingly thought that Mattel had bought "BRATZ", and still another has commented on Mattel's imitation of MGA. On or about February 16, 2005, during an interview of a Mattel representative on local network news in New York, "My Scene Barbie" was displayed by a Mattel representative. During conversation about the dolls, the interviewer exclaimed that they looked like "BRATZ". The Mattel representative just laughed – but this is no laughing matter. This colloquy was available for replay and viewing, and was even transcribed, on the internet.

64.   Customers too have been similarly confused. Some actually contacted MGA seeking to purchase "My Scene" dolls.

65.   Mattel's conduct is planned, deliberate and intentional. Mattel has systematically, copied, imitated and liberally borrowed many of the distinctive,

23

EXHIBIT __A__ PAGE __31__

essential elements that identify and make "BRATZ" dolls "BRATZ" dolls, diluting the brand, creating customer confusion, and unfairly stifling competition.

66.    Ironically, Mattel sued one of its other competitors in Europe for doing much the same thing: "systematically copying and borrowing elements" from "My Scene", on grounds that "this conduct constitutes unfair competition and passing off." Indeed it does.

67.    What is more, Mattel's conduct has reached beyond "BRATZ" and "BRATZ"-related products to include other new MGA toy lines.

68.    For example, MGA's "4-Ever Best Friends" line was the obvious, and well-recognized model for Mattel's "Wee 3 Friends" line. Mattel even adopted changes to the color scheme of its similarly-shaped packaging to create confusion with MGA's distinctive packaging.

| MGA's "4-Ever Best Friends" | Mattel's "Wee 3 Friends" |
|---|---|
|  |  |
|  |  |

24

EXHIBIT ___A___ PAGE _32_

69.   In the second half of 2002, MGA's "Mommy's Little Patient,"
originally designed as the first in a series of "Mommy's Little . . ." dolls, was
followed by Mattel's "Little Mommy" doll.

<table>
<tr><td align="center">MGA's<br>"<u>Mommy's Little Patient</u>"</td><td align="center">Mattel's<br>"<u>Little Mommy Potty Training Baby Doll</u>"</td></tr>
</table>

 

70.   Sparing nothing, Mattel has also extended its monkey-see monkey-do
behavior into its boys' line.  When MGA came out with its "Alien Racers" line of
toy racing vehicles, for instance, Mattel rushed to revamp and rename one of its
"Hot Wheels" lines.  Although well-known and clearly branded for decades as "Hot
Wheels", Mattel's answer to MGA's "Alien Racers" was to re-brand and market its
Hot Wheels Highway 35 line under an "AcceleRacerS" logo.  MGA's line consists
of "extreme" radio controlled racing vehicles marketed in connection with a strong,
almost battle-like, science fiction theme.  MGA's logo accentuates the "A", "R",
and "S" in compressed block lettering.  Mattel's line also consists of extreme racing
vehicles marketed in connection with a strong, almost battle-like, theme.  Mattel's
logo too accentuates the "A", "R", and "S" in compressed block lettering.

25

EXHIBIT __A__ PAGE __33__

71.  Here, too, Mattel's mimicry has spilled over into Mattel's advertising and thematic presentation and marketing of this toy line.  In particular, Mattel has adopted MGA's "other-worldly" theme in its commercials.  For instance, in Mattel's commercials, the product, whose logo appears as "AcceleRacerS", now compete against alien-like Cyborgs engaged in a "race to save the world," mimicking MGA's alien theme and commercials in which MGA's "AlienRacers" are engaged in a "race to save the universe."

72.  None of this is coincidence.  Mattel has deliberately adopted a pattern and practice of coming out with variations of MGA's products to create confusion in the marketplace, interfere with MGA's business and divert profits away from MGA.  Mattel says, on its website, that it is in the business of creating "[t]he world's premier toy brands [of] today and tomorrow."  It seemingly does so, however, by borrowing liberally from its competitors, even when it refreshes its own existing brands and products.

73.  MGA has suffered extensive injury from Mattel's conduct.  Mattel's habitual, serial simulation of MGA's products, product lines and trade dress has allowed Mattel to take a free ride on the extensive amount of time, expense and creative development MGA expends on developing new products, product packaging and presentation, giving Mattel an unfair advantage, and making it virtually impossible for MGA to compete with Mattel on a level playing field.

**Mattel's additional unfair, manipulative, anti-competitive conduct**

74.  This already substantial injury has been exacerbated by the strong-arm tactics, and other illegitimate, unfair and anti-competitive means that Mattel has used to manipulate the market and ensure that its control and domination of the industry can continue unabated.

26

EXHIBIT ___A___ PAGE 34

75. For example, wielding the litigation privilege as a potential shield for intimidating conduct, Mattel has sent threatening letters to several of its former employees who now work for MGA warning them not to disclose *even publicly available information* about Mattel, including the names and positions of Mattel employees. Mattel even went so far as to sue one of its former senior executives, after he had the temerity to resign and join MGA in October 2004. Not only was Mattel's lawsuit dismissed for failure to state a viable claim, but Mattel thereafter seemingly could not muster up a shred of evidence sufficient to support an amended complaint. As a result, Mattel's case against its former executive was dismissed with prejudice.

76. Mattel has also warned a number of companies, including the biggest publishing entity in the United Kingdom, not to license MGA products, or risk retribution. The threats are not idle. In May 2004, Mattel terminated one of its licensees, apparently in retribution for licensing "BRATZ". While some companies have been courageous enough to take the risk, others have not, and MGA has lost valuable licensing opportunities as a result.

77. Mattel has used similar intimidation to pressure distributors and retailers, particularly in foreign countries, not to distribute "BRATZ", to reduce shelf and display space for "BRATZ" and to place "BRATZ" in unfavorable locations at retail outlets.

78. When MGA faced a shortage of doll hair in October 2002, MGA is informed and believes that the reason for that shortage was that Mattel had locked MGA out by buying up the supply from the two main hair supply companies.

79. Mattel has also manipulated the retail market. For instance, Mattel merchandisers have been caught tampering with MGA's retail displays, replacing favorably located MGA merchandise with Mattel merchandise instead. MGA is also informed and believes that Mattel has falsely told a major United States retailer that MGA was giving another major United States retailer below-market pricing

27

EXHIBIT __A__ PAGE __35__

1    and falsely told a United Kingdom retailer that MGA was discontinuing one of its

2    lines, in order to make such line less attractive to buyers and thereby attempt to

3    increase sales of the competitive Mattel product and improve its own sales, at

4    MGA's expense.

5        80.    Even supposedly unbiased and impartial industry organizations have

6    fallen prey to Mattel's abusive wield of power, to MGA's detriment.

7        81.    NPD Funworld ("NPD"), for one, is the leading supplier of sales

8    statistics in the toy industry.  Accurate NPD statistics are essential for efficient

9    product-line management.  Without these statistics, it is difficult, if not impossible,

10   for toy companies to assess and measure the relative success of their products in

11   key categories.  It is, however, a subscription service, and NPD restricts the manner

12   in which its subscribers may use the data it provides.

13       82.    Mattel has regularly ignored the restrictions – using NPD data about

14   Mattel's comparative standing relative to other companies in press releases and in

15   communications with retailers and financial investors who are not NPD subscribers.

16       83.    Mattel generates substantially more annual subscription revenue for

17   NPD than does MGA, and carries more clout.

18       84.    After MGA had subscribed to the service for more than 12 years, NPD

19   terminated MGA's subscription in 2003 theoretically on the grounds that MGA

20   misused NPD data in a press release.

21       85.    MGA is informed and believes that the termination was the result of

22   pressure from Mattel, notwithstanding Mattel's own frequent violations of NPD's

23   restrictions.

24       86.    In addition to this, the market share numbers that NPD generates are

25   heavily dependent on the category in which NPD places a particular product.  MGA

26   is informed and believes that Mattel also pressured NPD into changing certain

27   product classifications for its "BRATZ" products in order to manipulate the data

28

28

EXHIBIT ___A___ PAGE __36__

and preserve Mattel's market share rankings in the critical fashion doll category —
and thereby lower MGA's.

87.    The Children's Advertising Review Unit ("CARU") is another
organization that, upon information and belief, appears to have been subject to
improper influence by Mattel.  CARU is the toy industry's supposedly independent
self-regulatory body in charge of maintaining standards in advertising.  CARU's
approval is considered critical within the toy industry to avoiding regulatory action
by the Federal Trade Commission.

88.    CARU is heavily subsidized by Mattel.

89.    Upon information and belief, Mattel has used its influence as a major
contributor to CARU's budget to induce CARU to place onerous restrictions on
MGA advertisements, and require MGA to amend aspects of commercials that have
gone unchallenged in other parties' commercials.

90.    As a result of CARU's restrictions, MGA has been forced to incur
unnecessary costs for reshooting and producing or re-editing its commercials.

91.    On several occasions, CARU has also either strongly suggested, if not
also required, that MGA respond to inquiries about its website policies and make
substantial changes to the "BRATZ" website notably and significantly in excess of
restrictions imposed on Mattel and others.

92.    Even TIA, the toy industry's trade association, is apparently not
untainted by Mattel's influence and power.  Each year, TIA presents the Toy-of-
the-Year Awards, the most prestigious of which had been the award for Toy of the
Year.  Winning the Toy of the Year Award is a significant achievement that not
only very likely increases the sales of the winning toy, but also denotes the winning
company as a leader in toy innovation and generates substantial goodwill with
retailers, distributors, licensees, and customers.

93.    For the years 2000 (the first year of the award), 2001 and 2002, the
Toy of the Year award was chosen by consumer vote.  The awards ceremony was

29

EXHIBIT __A__ PAGE __37__

1   then held the following year, at a dinner in New York.  (For example, the awards

2   dinner for the year 2000 award was held in February 2001).  Leap Frog won the

3   2000 People's Choice Toy of the Year Award and MGA won the 2001 and 2002

4   People's Choice Toy of the Year Awards.  With the 2003 Toy of the Year Award,

5   however, the rules suddenly changed.  Now, the award is selected by members of

6   the industry.

7        94.    Upon information and belief, this change was orchestrated by a Fisher

8   Price (a Mattel subsidiary) executive who, until recently, served as the Chairman of

9   TIA.

10       95.    Perhaps not surprisingly given this change in the winner selection

11  procedures, "Hokey Pokey Elmo" ("Elmo"), a Fisher Price toy, won for the year

12  2003 (awarded in 2004), beating out the other leading nominee, "BRATZ Formal

13  Funk Super Stylin' Runway Disco."

14       96.    TIA has refused to provide MGA with the vote count procedure and

15  totals for this award, despite repeated requests.

16       97.    MGA is also informed and believes that Mattel was instrumental in

17  attempting to keep MGA from participating as a sponsor in this year's "Kids'

18  Choice Awards."

19       98.    Mattel has clearly engaged in tortious, illegal and unethical behavior in

20  its unfettered efforts to disrupt, if not destroy, MGA.  Indeed, this is apparently

21  Mattel's current *modus operandi* when it comes to "competing" in the industry.

22  The once immensely successful "LeapFrog" interactive learning product, for

23  example, has apparently been one of Mattel's other recent victims.

24       99.    Mattel may not shield its illegal, unfair and unethical business practices

25  from the public eye.  It is time for the truth to be told, and the world to know of

26  Mattel's unfair, unethical and illegal business practices and unfair competition.

27  "Barbie" does not "play nice" with others (particularly her competitors), and needs

28  to be taught how "to share" (at least in the fashion doll marketplace).  She cannot be

30

EXHIBIT __A__ PAGE __38__

1    allowed to continue to be the playground bully and trample on the rights of others,

2    including MGA.

3         100.   As a result of Mattel's manipulative, illegal, unfair, unethical and anti-

4    competitive conduct, MGA has suffered and, unless abated, will continue to suffer

5    lost sales, lost licensing fees, lost contracts, lost relationships, lost business

6    opportunities and other damages and harm for which there is no adequate remedy at

7    law. Its ability to enter new markets and product lines has been hampered and

8    delayed. Its production costs have increased, its reputation and relationships with

9    important players in the industry have been negatively impacted, the value of its

10   business has been diminished, and its ability to attract, hire and retain employees

11   has been affected.

12

13                          **FIRST CLAIM FOR RELIEF**

14   **(False Designation of Origin or Affiliation in Violation of 15 U.S.C. § 1125 (a))**

15        101.   MGA repeats and realleges the allegations contained in paragraphs 1

16   through 100 of this Complaint and incorporates them by reference as though fully

17   and completely set forth herein.

18        102.   MGA's "BRATZ" line has a unique and distinctive style and

19   distinctive characteristics, such as the disproportionately large head, large dramatic

20   eyes with a distinctive presentation (including the eye shape, make-up and lashes),

21   pouty, plump lips with a distinctive presentation (including the lip shape and make-

22   up), small, thin bodies, oversized feet, and up-to-date fashions. MGA's "BRATZ"

23   line is known for and recognized by the total image that is presented by its product

24   and the style and arrangement of the packaging and display. This *"tout ensemble"*

25   is representatively described and depicted herein. The characteristics of MGA's

26   "BRATZ" line, alone or in combination, have come to identify the "BRATZ" line

27   and its source, MGA, and thus serve as protectable trade dress. MGA's trade dress

28   in its "BRATZ" line is purely aesthetic and non-functional or, if any utility exists, it

                                    31

                         EXHIBIT ___A___ PAGE ___39___

1   is not essential to the purpose, quality or source identifying attributes of the

2   aesthetics. MGA's trade dress in its "BRATZ" line is inherently distinctive or has

3   acquired distinction within the meaning of the Lanham Act.

4        103. Similarly, MGA's "BRATZ PETZ," part of the "BRATZ" line, also

5   has its own unique and distinctive characteristics, such as the humanlike eye and

6   unusual appearance of the animals dressed in clothing. MGA's "BRATZ PETZ"

7   line has become known for and recognized by the total image that is presented by

8   the product and the style and arrangement of its packaging. This *tout ensemble* is

9   representatively described and depicted herein. The characteristics of MGA's

10  "BRATZ PETZ", alone or in combination, have come to identify the "BRATZ

11  PETZ" line and its source, MGA, and thus serve as protectable trade dress. MGA's

12  trade dress in its "BRATZ PETZ" line is purely aesthetic and non-functional or, if

13  any utility exists, it is not essential to the purpose, quality or source identifying

14  attributes of the aesthetics. MGA's trade dress in its "BRATZ PETZ" line is

15  inherently distinctive or has acquired distinction within the meaning of the Lanham

16  Act.

17       104. Mattel's production, sale and marketing of "My Scene" dolls,

18  including styling heads and doll heads, and "My Scene" pets that are confusingly

19  similar to MGA's "BRATZ" line (including its "BRATZ PETZ"), without MGA's

20  permission or consent, constitutes designation and use of a term, symbol, device or

21  combination thereof that is false or misleading within the meaning of 15 U.S.C.

22  Section 1125 and is likely to cause confusion, or to cause mistake, or to deceive as

23  to the affiliation, connection, or association, or as to the origin, sponsorship, or

24  approval of Mattel's goods or commercial activities, within the meaning of 15

25  U.S.C. Section 1125. MGA has been damaged by Mattel's acts.

26       105. Mattel's conduct has been intentional and willful, and is calculated

27  specifically to trade off the goodwill that MGA has developed in its successful

28  "BRATZ" line. By its aforesaid acts, particularly its imitation of the distinctive

32

EXHIBIT __A__ PAGE __40__

1   features of MGA's "BRATZ" line in connection with goods sold and distributed in

2   interstate commerce, Mattel has infringed and is likely to continue to infringe on

3   MGA's substantial rights in and to the "BRATZ" line trade dress.  In so doing,

4   Mattel has falsely represented and designated to the public generally and consumers

5   of fashion doll products specifically the source and origin of Mattel's "My Scene"

6   fashion doll products in violation of 15 U.S.C. § 1125(a).

7       106.  MGA has been damaged by, and Mattel has profited from, Mattel's

8   wrongful conduct in an amount to be proven at trial.

9       107.  For each act of infringement, MGA is entitled to recover its actual

10  damages as well as Mattel's profits from such infringement.

11      108.  Monetary relief alone, however, is not adequate to address fully the

12  irreparable injury that Mattel's illegal actions have caused and will continue to

13  cause MGA, if not enjoined.  MGA is therefore entitled to preliminary and

14  permanent injunctive relief to stop Mattel's ongoing infringement of MGA's trade

15  dress.

16              **SECOND CLAIM FOR RELIEF**

17      **(Unfair Competition in Violation of 15 U.S.C. § 1125 (a) and Unfair**

18  **Competition and Unfair Business Practices in Violation of Cal. Bus. & Prof.**

19          **Code § 17200 *et seq*. and California Common Law)**

20      109.  MGA repeats and realleges the allegations contained in paragraphs 1

21  through 108 of this Complaint and incorporates them by reference as though fully

22  and completely set forth herein.

23      110.  Mattel has deliberately and, indeed, repeatedly adopted, imitated and

24  mimicked the make-up, appearance, features, trade dress, and image of MGA's

25  products, packaging and advertising, including its repackaging and refreshing of

26  older Mattel toys.  Mattel's actions were and are done with the intent to deceive

27  consumers, cause confusion and mistake, and interfere with the ability of

28  consumers to identify the source of goods by appearance and packaging.  By this

33

EXHIBIT ___A___ PAGE ___41___

1  conduct, Mattel pirates and exploits by subliminal or conscious association with

2  MGA, the goodwill and reputation of MGA and derives benefit therefrom.

3       111.  Mattel has particularly and deliberately poached upon the commercial

4  magnetism of MGA's "BRATZ" and the success of "BRATZ".  Mattel's conduct

5  has been intentional and willful, and is calculated specifically to trade off the

6  goodwill that MGA has developed in its successful "BRATZ" line.

7       112.  By its acts, including its intentional imitation of the distinctive features

8  of MGA's "BRATZ" dolls, which has progressively become closer and closer, as

9  well as its imitation of "BRATZ" themes, packaging and the overall look, feel and

10  total image of the "BRATZ" line, imitation of other MGA products, packaging and

11  advertising, and other conduct alleged herein, Mattel has engaged in unfair

12  competition under both federal and California state law.

13       113.  Mattel has also willfully and maliciously used its power, influence and

14  intimidation to threaten certain retailers, suppliers, licensees, distributors and

15  manufacturers so as to limit, if not prevent, MGA from doing business with these

16  retailers, suppliers, licensees, distributors and manufacturers, using its power and

17  influence to intimidate and manipulate industry bodies.  Mattel has further used its

18  power and influence to attempt to, if not actually, intimidate and threaten MGA's

19  current and potential employees so as to cause MGA competitive injury.

20       114.  Alone, in combination, or in totality, Mattel's actions discussed and

21  alleged herein constitute unfair competition and unfair business practices within the

22  meaning of federal law, California statutory law and/or California common law.

23       115.  As a result of its conduct, Mattel has derived substantial monetary and

24  non-monetary benefit and business advantage.  Mattel has also wrongfully diverted

25  profits away from MGA and to Mattel and, on information and belief, deprived

26  MGA of the patronage of a large number of actual and potential customers.

27       116.  MGA has been damaged by, and Mattel has profited from, Mattel's

28  wrongful conduct in an amount to be proven at trial.

EXHIBIT __A__ PAGE _42_

117.   Monetary relief alone, however, is not adequate to address fully the irreparable injury that Mattel's actions have caused and will continue to cause MGA, if not enjoined.  MGA is therefore entitled to preliminary and permanent injunctive relief to stop Mattel, and all persons acting in concert with Mattel, from engaging in acts of unfair competition and unfair business practices.

118.   MGA is further entitled to relief whereby Mattel is ordered to pay restitution for damages resulting from Mattel's unfair competition and unfair business practices.

### THIRD CLAIM FOR RELIEF

### (Dilution in Violation of 15 U.S.C. § 1125 (c); Cal. Bus. & Prof. Code § 14330 and California Common Law)

119.   MGA repeats and realleges the allegations contained in paragraphs 1 through 118 of this Complaint and incorporates them by reference as though fully and completely set forth herein.

120.   The look and trade dress of the MGA products referenced herein are distinctive and famous, and have been since before Mattel launched its similar versions.  By its aforesaid acts, Mattel caused and continues to cause blurring and dilution of the distinctive look of MGA's products and trade dress, which previously served as a unique source identifier for MGA, within the meaning of the Lanham Act, California Business and Professions Code § 14330 and/or California common law.

121.   Mattel's conduct has been intentional and willful, calculated specifically to trade on MGA's goodwill and reputation and to cause dilution of MGA's famous marks, particularly those connected with MGA's famous and successful "BRATZ" doll head, "BRATZ" doll product line, "BRATZ Funky Fashion Makeover Head" and "BRATZ PETZ" line.

122.   MGA has been damaged by, and Mattel has profited from, Mattel's wrongful conduct in an amount to be proven at trial.

35

EXHIBIT __A__ PAGE __43__

123. Monetary relief alone, however, is not adequate to address fully the irreparable injury that Mattel's actions have caused and will continue to cause MGA, if not enjoined. MGA is therefore entitled to preliminary and permanent injunctive relief to stop Mattel's ongoing dilution.

## FOURTH CLAIM FOR RELIEF

### (Unjust Enrichment)

124. MGA repeats and realleges the allegations contained in paragraphs 1 through 123 of this Complaint and incorporates them by reference as though fully and completely set forth herein.

125. As a result of the conduct alleged herein, Mattel has been unjustly enriched to MGA's detriment. MGA seeks a worldwide accounting and disgorgement of all ill-gotten gains and profits resulting from Mattel's inequitable activities.

## PRAYER FOR RELIEF

WHEREFORE, MGA prays for relief, as follows:

1. That Mattel, its agents, servants and employees and all persons acting in concert be restrained preliminarily and permanently from directly or indirectly:

    a.    using confusingly similar trade dress;

    b.    improperly influencing, or attempting to improperly influence, standard-setting and industry organizations;

    c.    engaging in unfair competition and unfair business practices; and

    d.    diluting MGA's trade dress;

2. For general and actual damages, according to proof at trial but believed to reach or exceed tens of millions of dollars;

3. For the disgorgement of all profits derived by Mattel for its acts of:

    a.    false designation of origin or affiliation;

36

EXHIBIT __A__ PAGE __44__

1      b.     unfair competition and unfair business practices; and

2      c.     dilution;

3     4.     For costs of suit and reasonable attorneys' fees;

4     5.     For punitive and/or exemplary damages as a result of Mattel's willful

5 and malicious conduct to the extent allowable by law; and

6     6.     For such other and further relief as the Court deems just and proper.

7

8 Dated:      April 13, 2005         PATRICIA GLASER
9                                     CHRISTENSEN, MILLER, FINK, JACOBS, GLASER, WEIL & SHAPIRO LLP
10

11                                   DALE M. CENDALI
                                  DIANA M. TORRES
12                                   PAULA E. AMBROSINI
                                  O'MELVENY & MYERS LLP
13

14

15                           By: _____
                                  Diana M. Torres
16                                   Attorneys for Plaintiff
                                  MGA ENTERTAINMENT, INC.

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT __A__ PAGE __45__

## DEMAND FOR JURY TRIAL

MGA hereby demands a jury trial on all triable issues.

Dated:          April 13, 2005

PATRICIA GLASER
CHRISTENSEN, MILLER, FINK,
JACOBS, GLASER, WEIL &
SHAPIRO LLP

DALE M. CENDALI
DIANA M. TORRES
PAULA E. AMBROSINI
O'MELVENY & MYERS LLP

By: _____
Diana M. Torres
Attorneys for Plaintiff
MGA ENTERTAINMENT, INC.

38

EXHIBIT ___A___ PAGE _46_