**Exhibit K**

Priority
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

FILED - EASTERN DIVISION
CLERK, U.S. DISTRICT COURT

AUG 10 2006

CENTRAL DISTRICT OF CALIFORNIA
BY                           DEPUTY

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARTER BRYANT, | CASE NO. CV 04-9049 SGL (RNBx) |
| Plaintiff, | (Consolidated with cases CV-04-9059 and CV-05-2727) |
| v. | |
| MATTEL, INC., | ORDER DENYING MOTION FOR APPOINTMENT OF EXPERT WITNESSES |
| Defendant, | |
| and related actions. | |

Presently before the Court is Mattel, Inc.'s ("Mattel") motion for the appointment of expert witnesses pursuant to Federal Rule of Evidence 706, Carter Bryant and MGA Entertainment, Inc.'s ("MGA") opposition and response thereto, and Mattel's reply. For the reasons set forth below, the Court **DENIES** the motion for the appointment of expert witnesses.

Federal Rule of Evidence 706(a) provides

> The court may . . . on the motion of any party enter an order to show cause why expert witnesses should not be appointed, and may request the parties to submit nominations. The court may appoint any expert witnesses agreed upon by the parties, and may appoint expert witness of its own selection. An expert witness shall not be appointed by the court unless the witness consents to act

DOCKETED ON CM

AUG 11 2006

BY                    044

1          A witness so appointed shall be informed of the witness'
2          duties by the court in writing, a copy of which shall be filed
        with the clerk, or at a conference in which the parties shall
3          have opportunity to participate.

4        The appointment of an expert by a federal court is a rare occurrence.  Much of

5   this stems from a concept "[d]eeply ingrained" in the common law "that it is the

6   responsibility of the parties to produce the evidence while the court looks on to assure

7   that the rules are followed." 4 JOSEPH M. MCLAUGHLIN, WEINSTEIN'S FEDERAL EVIDENCE

8   § 706.02[1], at 706-6 (2nd ed. 2006).  The reluctance of courts to intrude into the

9   evidence-gathering function normally assigned to counsel is borne out of "the fear of

ex parte communications between the court and its expert," as well as the
10
unseemliness of "[c]ollecting a share of the expense [for the work performed by the
11
court appointed expert] from a party who has been damaged by the expert's report."
12
Id. at 706-6, 706-7.  As a result of these institutional concerns, "experts are usually
13
appointed only in exceptional cases that present unwieldy, complex, or technical
14
issues" or where "there is a need for an impartial, independent assessment of a
15
disputed issue." Id. § 706.02[3], at 706-8 706-9.
16
     Here, Mattel seeks for the court to appoint experts in the fields of questioned
17
document examination, ink chemistry analysis, and paper chemistry analysis in order
18
to "analyze and date (1) the originals of 'BRATZ' design drawings, (2) the faxed-
19
version of the BRATZ-related contract between . . . Carter Bryant and MGA
20
Entertainment, Inc., (3) MGA's internal documents relating to work performed by Anna
21
Rhee on Bryant-related projects in the year 2000, and (4) a facsimile of BRATZ
22
drawings bearing a fax header date of April 10, 2000," as well as "(5) any other
23
documents that cannot be sampled or tested without destroying the sample tested or
24
analyzed." (Mattel's Mot. Appt. Expert, Preface at 2).  The reason proffered for such
25
an appointment is two-fold:  First, a generalized concern that, because the documents
26
sought to be examined are "highly relevant" to the litigation, having a neutral expert
27
perform the testing on the same may obviate a battle of the experts that would make
28

EXHIBIT N PAGE 205

EXHIBIT __K__ PAGE 203

1   the jury's function of sorting out the truth much more arduous; and second, concerns,

2   deduced during discovery, about the possible spoilation of key documents in the case

3   by MGA/Bryant and their counsel.

4   A.      AVERTING A BATTLE OF THE EXPERTS

5           Mattel's argument that the Court should appoint an expert because otherwise

6   each side will perform "separate, partisan destructive analyses of separate samples of

7   the documents" with "wide divergence" of opinion "virtually assured" is not well-

8   founded.  (Mattel's Mot. Appt. Expert at 18, 20).  Explicit in Mattel's argument is that

9   this feared divergence in each side's retained expert's opinions has yet to materialize.

10  This is not surprising as it appears that discovery in this case is in its nascent stage,

11  owed largely to the fact that the Court had earlier stayed the case while Mattel

12  appealed the denial of its motion to remand the case to state court.  Mattel's argument

13  instead is that the Court should appoint an expert now to avoid the possibility that

14  there may be such wide divergence in each side's privately retained expert in the

15  future.  Needless to say from the jabs each party took at the credibility and even

16  trustworthiness of the other side's retained expert during the oral argument on this

17  motion (one going so far as to label the competing ink chemistry experts as being the

18  modern day equivalent of one's Hatfield to the other's McCoy), such a possibility may

19  be more easier to imagine occurring here than in ordinary cases.  Nevertheless, such

20  divergence, even if likely, is still that -- a possibility, not an inevitability.

21          In those cases where an expert has been appointed by a court on account of

22  the excessive partisanship in the expert opinions retained by counsel, the rationale for

23  the appointment was based on the fact that the feared wide divergence in opinion had

24  already materialized.  See Students of California Sch. for the Blind v. Honig, 736 F.2d

25  538, 548 (9th Cir. 1984)("the judge could not decide the merits of the students' seismic

26  safety claims on the basis of evidence presented at trial, so he reopened the case and

27  appointed a neutral expert to evaluate the adequacy of seismic testing at the Fremont

28  site"), vacated on other grounds, 471 U.S. 148 (1985); Eastern Air Lines, Inc. v.

3

**EXHIBIT N PAGE 206**

EXHIBIT  K  PAGE 204

1 McDonnell Douglas Corp., 532 F.2d 957 (5th Cir. 1976); 4 WEINSTEIN § 706App.100 at

2 706App.-5 (noting that legal commentators' "imprecations against the parties' 'battle of

3 experts'", not the potential for such a battle, "led to the drafting of the Uniform Expert

4 Testimony Act in 1937," the precursor to Federal Rule of Evidence 706).

5        In no instance uncovered by the Court's research (or by Mattel's citation to

6 authority) has a court appointed an expert because of a fear, even one that is well-

7 founded, that such wide divergence in privately-retained expert testimony _may_

8 materialize in the future.  Were the Court to adopt Mattel's analysis, appointment of

9 experts by courts would expand exponentially, limited only by a court's assessment of

10 how partisan the experts in a given case may become in the future.  Such a

11 proliferation has not occurred precisely because courts generally require that the

12 divergent "horse" be placed before the expert witness "cart."  _See_ FED. R. EVID. 706

13 advisory committee's note ("actual appointment is a relatively infrequent occurrence").

14 Unless and until this feared divergence in opinion becomes reality, the Court finds that

15 the potential (which itself cannot be quantified at this point) for its occurrence does not

16 warrant the Court's intrusion into the adversarial process through the appointment of

17 an expert at this stage.

18 B.      SPOILATION OF EVIDENCE

19        The question is much closer with respect to Mattel's other reason for the Court

20 to appoint an expert in this case:  Concern that opposing counsel or their clients may

21 have destroyed or altered key documents in the case.  Mattel's basis for such concern

22 is predicated on three facts uncovered during discovery.

23        1.      Evidence of spoilation

24        Before being deposed Bryant was asked to bring all his original BRATZ design

25 drawings.  When he arrived at his deposition, however, Bryant only had in his

26 possession a few of the originals.  (Decl. Michael T. Zeller ¶ 13).  Among these some

27 "contained holes where plugs apparently had already been removed.  Bryant

28 acknowledged . . . that his drawings had no holes in them when he gave them to his

4

**EXHIBIT N PAGE 207**

EXHIBIT  K  PAGE 205

1  lawyers." (Mattel's Mot. Appt. Expert at 2; see also Decl. Michael T. Zeller ¶ 14).

2  Specifically, at Bryant's deposition the following exchange took place between Bryant

3  and counsel for Mattel:

4          Q.    (By Mr. Quinn) I wanted to ask you about one of
                  these original drawings that were produced today.

5                 -- what we're talking about here. This is -- the Post-it
6                 says that's Bryant -- that's the original of Bryant
                  192, Bates number 192, which has the heads on it,
7                 and this is one of the originals that your counsel was
                  kind enough to have shipped here today for us to
8                 look at.

9          A.    Yes

10         Q.    And we were just looking at these this afternoon and
                  we notice[d] that there's a bunch of holes on the
11                page, including in the signature, as if somebody
                  were taking ink samples.

12         A.    Uh-huh.

13         Q.    Do you see that?

14         A.    Yes.

15         Q.    Do you know anything about why those holes were
16                made or how or when?

17         A.    I have no idea what those are.

18         Q.    I mean, when you had -- when you had possession
                  of this document did it have those holes in it?
19
           A.    Not that I remember.
20
           Q.    You certainly never had anything to do with that?
21
           A.    No. I don't know anything about those holes.
22
           Q.    And, similarly, if you wouldn't mind holding this up to
23                the camera, this is the original of Bryant 210 and it's
                  also -- if you take a look at it, I think you'll see it has
24                some of those holes in it, although not as many as
                  the last one we looked at. Again, you don't know
25                anything about how or why those holes got put on
                  there?
26
           A.    I don't.
27

28 (Decl. Michael T. Zeller, Ex. 7 at 161-163).

5

EXHIBIT N PAGE 208

EXHIBIT K PAGE 206

1    Mattel has submitted the declaration of a questioned document analysis expert,

2  Lloyd Cunningham, who has opined that the holes described in the document

3  mentioned above are consistent with those that would be generated by taking

4  microplug samples to perform analysis of the ink found on a document.  (Decl. Lloyd

5  Cunningham ¶ 5).  Bryant and MGA eventually conceded (although at first refusing to

6  do so under the veil of work-product privilege) that they tested some of the original

7  BRATZ drawings by an expert they retained in the field of forensic chemistry, Erich J.

8  Speckin.  (Response to Order to Show Cause ("Response") at 1-2).

9    Mr. Speckin states that in June, 2004, he performed a series of tests "on

10 various 'Bratz' documents" at the request of MGA's counsel.[1]  (Decl. Erich J. Speckin

11 ¶ 8).  Those tests included examining the documents in question under an infrared

12 light as well as performing sidelight testing, which involves "visually inspecting a

13 document by holding a side light up to the document at an oblique angel . . . to

14 determine preliminarily whether the document contains impressions, or markings

15 impressed upon the document by drawing and writing done on a sheet of paper laid

16 on top of the document being tested."  (Decl. Erich J. Speckin ¶¶ 9, 10).  Mr. Speckin

17 also performed an electrostatic detection apparatus to see if there was indented

18 impressions on the documents.  (Decl. Erich J. Speckin ¶ 11).  Finally, Mr. Speckin

19 "performed ink identifications tests" on the documents.  (Decl. Erich Speckin ¶¶ 12-

20 13).  Such testing involved Mr. Speckin removing "very small microplug samples from

21 the document at issue and testing the microplug."  (Decl. Erich Speckin ¶13).

22 Nowhere is it averred by MGA, Bryant, or Mr. Speckin which or how many of the

23 original BRATZ drawings were subjected to this microplug sampling procedure, nor is

24 it averred from what parts of the documents that were tested was the microplug taken.

25 Instead, Mr. Speckin simply notes that in taking the microplugs he "le[ft] more than

26

27    [1] At the time the testing was done by Mr. Speckin, Bryant had already been

28 sued by Mattel for violating the terms of the invention agreement he signed when he
worked for them from 1999 to 2000.  (Response at 1).

6

**EXHIBIT N PAGE 209**

EXHIBIT  K  PAGE 207

1   sufficient material for another expert to test the exact same <u>documents</u>," but admits

2   that "another expert cannot test the very same microplug that I tested . . . ." (Decl.

3   Erich J. Speckin ¶14).

4            Another episode brought to light during discovery causing Mattel concern

5   relates to MGA's handling of the original Bryant/MGA contract before the inception of

6   the instant litigation.  At the deposition of a former MGA executive, Victoria O'Connor,

7   testimony was elicited that O'Connor, "on explicit instructions of MGA's [CEO] Isaac

8   Larian, . . . [made] redact[ions from] the fax header . . . on the BRATZ contract

9   between Bryant and MGA for the year 2000 to conceal the fact that Bryant sent the

10  contract from Mattel's Design Center while he was still employed at Mattel." (Mattel's

11  Mot. Appt. Expert at 3).  O'Connor's deposition appears to indicate that such alteration

12  occurred before the present litigation began (indeed, perhaps even before MGA

13  marketed the BRATZ doll).

14           Q.    . . . Was there ever anything that you were asked to
                   do that you — made you feel kind of uncomfortable?
15
16           A.    Yes.
                               . . . .
17           Q.    And what was that?

18           A.    When the original contract was executed by Carter
                   Bryant, it was sent to me <u>via</u> fax, and on the top of
19                 the fax listed the phone number from where it was
                   faxed, which said "Barbie Collectibles," and at one
20                 point my boss, Isaac Larian, asked me to white that
                   out and send it to a lawyer, Patty Glaser.
21
22  (Decl. Michael T. Zeller, Ex. 19 at 306).  Upon further examination, however,

23  O'Connor stated that she did not participate in or have knowledge of any other

24  instances in which any other agreement between Bryant and MGA was directed to be

25  altered:

26           Q.    Were you ever asked to change the date on any
                   agreements between Mr. Bryant and MGA?
27
28           A.    No.

                                        7

                          **EXHIBIT N PAGE 210**

                          EXHIBIT  K  PAGE 208

Q.   Are you aware of anybody being asked to change
     the date on any of those agreements?

A.   No.

Q.   I mean, do you have any reason to believe that any
     agreement that was entered into between Mr. Bryant
     and MGA had a date altered or changed?

A.   No.

Q.   You never heard that from — from any source?

A.   No.

(Decl. Paula E. Ambrosini, Ex. 3).

     Finally, Mattel speculates that a drawing of some BRATZ doll accessories

faxed on April 10, 2000, had the fax header altered, much in the same manner

described in O'Connor's testimony vis-à-vis the MGA/Bryant faxed contract, as the

fields on the fax header for the sender's name and the sender's telephone number are

missing. (Decl. Michael T. Zeller ¶ 23 & Ex. 24).[2]  As explained by Mattel, "Because

---

[2]  Mattel speculates that the time sheets produced by MGA for one of its
employees, Anna Rhee (who did doll face painting work for the BRATZ mock-up), from
"mid-to-late 2000" were altered or recently created by MGA to show that Rhee worked
on projects called "Angel" or "Prayer Angel," when in fact she was working at the time
painting faces for BRATZ dolls at the direction of Bryant.  (Mattel's Mot. Appt. Expert at
3).  The basis for this speculation is based on the fact that the initial disclosure by MGA
of Rhee's time sheets comprised only 8 pages. (Decl. Michael T. Zeller ¶ 20).  Then,
on January 7, 2005, Rhee produced 20 separate invoices of her work at MGA during
mid-to-late 2000, indicating that Rhee performed work for MGA prior to Bryant's
departure from Mattel, most notably on June 12, 2000.  (Decl. Michael T. Zeller ¶ 21).
Within a couple of weeks after Rhee's production of invoices to Mattel, MGA
supplemented its earlier production of Rhee's time sheets showing that during the mid-
to-late 2000 period Rhee was working on a MGA project known as "Angel" or "Prayer
Angels" and was not involved in any BRATZ-related work until after Bryant's departure
from Mattel.  (Decl. Michael T. Zeller ¶ 22).  Mattel's surmise that the supplemental time
sheets were altered is allegedly bolstered by the fact that Rhee testified during her
deposition that the only work she performed in mid-to-late 2000 was on BRATZ and
that the supplemental time sheets reference to the "Angel" and "Prayer Angel" was
nothing but a cover or code word for BRATZ-related work.  This argument is hard to
accept.  First, even the invoices Rhee turned over to Mattel contain the phrase "Angel"
for the mid-2000 project she worked on.  (Decl. Michael T. Zeller, Ex. 22 at 356-60,
362).  It is not until December, 2000, that any of the invoices submitted by Rhee show

8

**EXHIBIT N PAGE 211**

EXHIBIT  K  PAGE 209

1   facsimile machines normally insert senders' names and numbers as a matter of

2   course, and indeed is required by law [to do so], it appears likely that the document

3   was altered to conceal the sender's information. See 47 U.S.C. § 227(d)(1)(B)."

4   (Mattel's Mot. Appt. Expert at 10). The premise underlying Mattel's concern on this

5   topic is not unreasonable. The law requires such information to be found on any

6   document, like the one in question, that has been faxed. Additionally, the testimony

7   elicited from Ms. O'Connor that MGA altered the fax header for other documents

8   related to BRATZ from the same time period leads to an obvious inference that other

9   documents where spaces on other fax headers are absent suffered a similar fate.

10      2.      Analysis

11            a.      Microplug Ink Testing

12            Bryant and MGA begin by downplaying the significance of the spoliation issue

13   in this case. With respect to the holes on some of the original BRATZ design

14   drawings produced at Bryant's deposition, they note that, even with these holes,

15   nothing prevents Mattel from performing its own testing on the remaining portions of

16   the drawings on the document. "Indeed, the very fact that Mattel is asking for court-

17   appointed experts to perform ink and paper testing only underscores the fact that

18   nothing has been 'destroyed.'" (Joint Opp. at 2). Mr. Speckin makes similar assertions

19   in his declaration, stating that the fact that the same microplug cannot be tested "is

20   entirely irrelevant because there is more than enough ink on each of the documents I

21   tested to allow numerous microplug samples to be extracted and tested by different

22   experts." (Decl. Erich J. Speckin ¶ 14 (emphasis added); see also Response at 5-6

23   ("While another expert cannot test the very same microplug that Mr. Speckin tested,

24

25   ────────────────────

26   her doing work on the BRATZ doll, well after Bryant had left Mattel. (Decl. Michael T.
    Zeller, Ex. 21 at 367, 370, 373). To accept Mattel's argument, not only would MGA

27   have had to alter the invoices it produced in the supplemental production, but the
    documents produced by Rhee would also have to be similarly altered. An alternative

28   and just as plausible explanation is that Rhee is simply mistaken as to when she began
    performing work on the BRATZ project.

9

EXHIBIT N PAGE 212

EXHIBIT __K__ PAGE 210

1   that fact is entirely irrelevant because, unlike in a situation where the entire object is

2   destroyed during the testing, there is more than enough ink on each of the documents

3   Mr. Speckin tested to allow numerous microplug samples to be extracted and tested"

4   (emphasis added))). This argument is not persuasive. This is not a case where

5   everyone concedes that the documents in question were created at one point in time,

6   but dispute what that date may have been. In such a circumstance all the ink

7   markings on the documents are comparable to one another as it is conceded that all

8   the marks came from one point in time.

9        Here, however, it is Mattel's theory that Bryant made drawings in 1998 and then

10  periodically touched up or made refinements/additions to those drawings, adding more

11  marks in 1999 and 2000 during the time he was employed by Mattel. An ink mark

12  from one part of the document is not necessarily comparable to another set of ink

13  markings found elsewhere on the document. One ink mark on a drawing could have

14  been made in 1998, for example, while another ink mark found on the same drawing

15  could have been put there sometime later. In taking microplug samples from one of

16  these ink markings without the ability of the other side to test the same mark would

17  forever foreclose a potential avenue of crucial evidence in this case. It is on that point

18  that taking microplug samples of the marks on these drawings is akin to the spoilation.

19  Therefore the fact that another expert could test other parts of the document does not

20  mean that key relevant evidence found on that document has not been destroyed. As

21  MGA and Bryant make clear spoilation of evidence occurs through the "destruction or

22  significant alteration of evidence, or the failure to preserve property for another's use

23  as evidence in pending or reasonably foreseeable litigation." West v. Goodyear Tire &

24  Rubber Co., 167 F.3d 776, 779 (2nd Cir. 1999).[3]

25        At this point, it should not be lost that the documents in question are not

27        [3] The Court does not mean to suggest that Mattel's theory is correct. Instead,
28  the Court simply notes this theory as refuting MGA and Bryant's argument that only the
    complete destruction of a document would amount to spoilation under the particular
    circumstances in this case.

EXHIBIT N PAGE 213

EXHIBIT __K__ PAGE _211_

1   peripheral to the case.  At its heart, this case asks the question:  Who owns the rights

2   to the Bratz dolls?  Bryant asserts that he came up with the idea for the Bratz dolls

3   while on a break from his employment at Mattel in 1998, and that he sold his idea to

4   MGA when he went to work for them in October, 2000.  Mattel claims, among other

5   things, that Bryant "developed" or "continued to develop" his idea for Bratz dolls while

6   he was working for them from January, 1999, to October, 2000, and that pursuant to

7   an inventions agreement he signed with the Mattel when he went to work for them,

8   that idea now belongs to Mattel.  As this clash of factual contentions makes clear, the

9   dating of the original BRATZ drawings and the markings contained thereon is a

10  fundamental, perhaps despositive, issue to this case.  That there are serious

11  questions concerning the handling of these critical documents certainly causes the

12  Court much concern about whether the truth seeking functions of the adversarial

13  system have been fundamentally compromised in this case.  As Mattel rightly notes,

14  "The adversarial process is not an end in itself; its value is in its ability to promote a

15  search for truth."  (Mattel's Reply at 9).

16       Bryant and MGA concede that the sections that were holed out contained

17  markings, be they handwritten dates or other words or letters, that may be crucial to

18  the case.  Indeed, one of the drawings – Bryant 192 – had a portion of the signature

19  line sampled.  What is left unclear is whether, for those portions of the document

20  where ink or signatures were sampled, enough of the same part of the document in

21  question (meaning the same mark) remains to be sampled by Mattel.  For instance, is

22  there enough of the signature line from Bryant 192 left to sample, or has too much of it

23  already been sampled?  In that sense, MGA's and Bryant's argument that nothing has

24  been destroyed by the microplug testing procedure because other parts of the

25  document still exist is misplaced.  Indeed, MGA and Bryant later admit that the

26  circumstances allowing for "multiple experts [to] remove multiple microplugs and test

27  the exact same paper and ink" is dependent upon there being the same exact paper

28  and ink there to test.  (Joint Opp. at 15 ("[a]s long as there is paper and ink to test")).

11

EXHIBIT N PAGE 214

EXHIBIT ___K___ PAGE _212_

1   The continued existence of the "exact same pen stroke" is the very issue that is now

2   left open because of the holes in some of Bryant's original BRATZ design drawings.

3   Is there anything left of that exact same pen stroke that was sampled by Mr. Speckin

4   remaining on the original drawing for Mattel to test?  None of these questions have

5   been addressed by MGA, Bryant, or Mr. Speckin in their papers.  Instead, they simply

6   make the observation that there remain other ink markings on the same drawings for

7   Mattel to test, a reason which, as explained above, is wholly insufficient to assure the

8   Court that Mattel has not been prejudiced by MGA's actions.

9          Given the absence of any representation by them on this point, the Court

10  pressed MGA's counsel about the same at oral argument:

11              THE COURT:  And part of your argument is that
                while a small portion of the small portion of the page may
12              be gone, as you in your most recent papers concede is
                gone, there are other portions of the page that can be
13              tested.  The concern I have, I guess – and maybe you can
                clear this up for me – I've seen some of the drawings and I
14              have a pretty good mental image of what the drawings look
                like.  But there is also writing on these drawings,
15              signatures, copyright registration indications; some are
                large, some are small.  As I gather from the plaintiff, from
16              Mattel, the concern is that these different drawings or
                writings were done at different times.  And I guess I can
17              understand why when those drawings or writings were
                done could be significant from an evidentiary standpoint.
18              So the concern is not so much there's another part of the
                paper that can be tested; it's whether or not the particular
19              marking in question has been so damaged as to not permit
                a full further testing on that particular marking.  Does my
20              question make sense?

21              MS. CENDALI:  Yes, it does, your Honor.  And I
                anticipated that.  Significant, we thought, in their papers
22              was that . . . they cited to the fact that Mr. Bryant admitted
                in his deposition that there were holes in some of the
23              documents that he didn't know how they got there
                originally.  As an example, if you look at part of Zeller,
24              Exhibit 17, Bates number Bryant 201, that's an example of
                one of the documents that's been tested.

25              THE COURT:  One second so I have that in front of
26              me.  Okay.

27              MS. CENDALI:  There are many many others that were
                submitted that were also submitted to this type of ink
28              testing, but this is just an example of one of them.  And if

                                    12

EXHIBIT ___K___ PAGE 213

1    you look at the document, you would never know —
     granted, this is smaller, so the actual drawing is even larger
2    than this, so there's even more ink on the larger drawing
     than there would be available on this reproduction size.

3            But if you look at it — and I'll represent to you that we
4    didn't test the face; the face is absent before and after the
     testing — but if you look at it, you couldn't even see that
5    there were any pin pricks to it.  If you look very, very
     carefully at the signature at the bottom, you can maybe see
6    where it says "Ramona Prints; 8-26-99"; that maybe there
     was like a little tiny hole in one of the little slash marks; that
7    was a teeny little pin prick hole that showed the testing .
     There's ample amount of ink to do the testing on all of
8    these documents.  This is the normal course of procedure
     that was done.

9

10          When asked by the Court whether it accepted MGA's representation that there

11   was "ample amount of ink" left on the same marks that the microplugs were taken

12   from for further microplug testing, Mattel, in seeming contradiction to its position in its

13   papers, said it did: "I agree with Ms. Cendali.  We do not maintain any portion of the

14   ink on a signature or an image has been so obliterated that you couldn't take a plug

15   now on any of it; that's not our point." (Emphasis added).

16          In light of this concession by Mattel, the Court finds that no colorable claim of

17   spoliation has been established at this time vis-à-vis Mr. Speckin's testing of the

18   documents to warrant the appointment of an expert by the Court to investigate the

19   same.  See Sedrati v. Allstate Life Ins. Co., 185 F.R.D. 388, 393 (M.D. Ga.

20   1998)(sanction warranted where because "defendant's expert has conducted

21   destructive tests on the original documents," plaintiff's expert "cannot duplicate the

22   conditions of the original documents").  If there was any evidence indicating that MGA,

23   Bryant, or their counsel had engaged in acts that could compromise Mattel's ability to

24   discover crucial information in this case, the Court would be sympathetic to the

25   appointment of an expert to investigate the same.  Here, no such evidence exists.

26   The tests done by Mr. Speckin have not left the marks that were micro-sampled or the

27   documents that were handled so compromised that Mattel cannot perform the exact

28   same tests on those exact same marks as performed by Mr. Speckin.

13

**EXHIBIT N PAGE 216**

EXHIBIT ___K___ PAGE _214_

1    Indeed, the only basis for spoliation that Mattel has left to argue — that the

2    passage of time has left the ability to perform any meaningful ink testing at this time

3    problematic — is an argument that has nothing to do with MGA's conduct, but much

4    more with Mattel's own dereliction.  As the Court understands it, the process of dating

5    when ink was placed on a document has only a limited window of time in which it can

6    be accomplished because, eventually, the ink dries (be it in 2 years or 3 to 4 years),

7    leaving nothing capable of being sampled after that point to test (save to acknowledge

8    that the ink in question was put on the paper some time more than 3 to 4 years ago).

9    Mattel essentially argues that the impossibility of testing ink after a certain period

10   mandates that, if the other side is going to test ink while "fresh" ink remains on the

11   document, that party has an obligation to inform the other side so that they can do the

12   same before the ink "dries out"; failure to do so renders the test performed something

13   that cannot be replicated.[4]  By Mattel's own admission, they knew there had been

14   testing done on the BRATZ original drawings as far back as November, 2004, during

15   Bryant's deposition testimony when they saw some of the original BRATZ drawings

16   (drawings that had been tested by Mr. Speckin five months earlier).  Rather than

17   immediately seeking the production of those documents and having its own expert

18   perform similar tests on them, Mattel sat idly by, waiting until June of this year to do

19   anything, either by way of court pleadings or formal requests made to MGA and

20   Braynt, related to having ink tests performed on the documents.  Nowhere has Mattel

21

22   _____
         [4]  The basic factual assumption in Mattel's argument may indeed be faulty — that
23   when MGA tested the ink there was enough "fresh" ink to test.  Mr. Speckin states that
     "[I]nk takes approximately 3 to 4 years to dry on paper.  Thus, by testing the ink to
24   determine if it is dry, it can be determined whether the document was created within the
     last [3 to] 4 years, or whether the ink, and thus the drawing, is more than [3 to] 4 years
25   old."  (Decl. Erich J. Speckin ¶ 13).  Given that Mr. Speckin performed his ink dating
     test in June, 2004, at best he could determine whether the ink had been put on the
26   paper on or after June, 2000.  Beyond that time frame his test could not tell when the
     now-dried ink was marked on the document.  Given that the relevant period in question
27   in this case is from August, 1998, to October, 2000, Mr. Speckin's test results would
     appear to be only marginally relevant in adducing proof as to when the BRATZ
28   drawings were made.

14

EXHIBIT N PAGE 217

EXHIBIT  K  PAGE 215

1   explained how MGA or Bryant had anything to do with it not having the ability to

2   perform such testing until now.  Mattel's allusion to the fact that a stay on discovery

3   was put in place by this Court in 2005 is misguided.  If Mattel thought that it was losing

4   valuable time on account of the stay, it could have at any time filed with this Court an

5   emergency request for relief from the stay to have such tests performed.  All it needed

6   to do was inform the Court that it had only a short period of time to perform the test on

7   account of the fact that ink dries; something which it never did in this case.

8         Mattel's citation to the case Edwardes v. Southampton Hospital Associates,

9   278 N.Y.S.2d 283 (1967) is equally unhelpful to their argument.  In that case, the court

10  was presented with an application to prevent the testing of a intramedullary pin for

11  discovery and testing.  Id. at 284.  The court held that, "[s]ince the pin is crucial to the

12  action it is not too difficult to appreciate that any change, however slight, assumes an

13  importance magnified proportionately. And undoubtedly tests which would destroy or

14  alter most or all of a particular article ought not be permitted in the first instance

15  without providing adequate safeguards to protect all concerned."  Id. at 286.  Here,

16  such an argument cannot be made because, for the reasons cited above, Mattel has

17  conceded that even in performing the tests of the original BRATZ drawings Mr.

18  Speckin left enough ink of the same pen stroke for its own experts to test.  In short,

19  there has been no alteration, however slight, made to the documents insofar as

20  Mattel's ability to replicate the exact same test is concerned.  The only change that

21  has occurred is in Mattel's ability to retrieve any relevant information from such a test

22  on account of the passage of time that has elapsed.  The test Mr. Speckin performed

23  is not responsible for this negative occurrence.  MGA is similarly not responsible for

24  the passage of time or Mattel's inability to retrieve useful information from the testing

25  process.  On that point, Mattel should look itself in the mirror for any finding of fault or

26  blame.

27        Moreover, aside from the potential for "destroying" key portions of the original

28  documents, it is alleged that MGA and Bryant's actions carry other means of

15

**EXHIBIT N PAGE 218**

EXHIBIT K PAGE 216

1   prejudicing Mattel's ability to pursue lines of potential evidence in this case.  The

2   expert declaration submitted by Mattel notes another possible spoliation of the original

3   drawings even if there remained enough of the pertinent portion of the document in

4   question to sample: The sampling process itself may have contaminated the

5   document in question by obliterating potential crucial clues that were on the document

6   or otherwise the sampling process led to the introduction of foreign materials onto the

7   documents themselves which may complicate any future analysis.  As explained by

8   Mattel's expert:

9            [P]erforming many such types of testing, even if described
             as "non-destructive," on a particular original document
10           carries the risk that potential evidence on it, including
             indentations in the paper fiber, might be contaminated or
11           destroyed in the process.  Furthermore, the order of the
             types of testing to be performed on a given document
12           might have an impact on developing potential evidence
             during subsequent examinations. . . .
13
             . . . . [With respect to the original BRATZ drawings
14           containing holes in them,] it is possible that the destructive
             testing performed on the document may have caused
15           some form of contamination and/or alteration, which carries
             the further prospect that subsequent examinations by
16           experts may not enable them to develop potential evidence
             or the same evidence that the other [earlier] expert
17           developed.

18   (Decl. Lloyd Cunningham ¶¶ 4-5).

19        MGA has rebutted this risk of contamination argument by proffering Mr.

20   Speckin's declaration, the expert who actually performed the tests in question.  Mr.

21   Speckin states that he "exercised the utmost care in handling the documents [he]

22   tested," that a number of the tests he performed on the documents "has absolutely no

23   effect on the tested document whatsoever," and that with respect to those tests that

24   could effect the document he followed established procedures in carrying out the test

25   in question.  (Decl. Erich J. Speckin ¶¶ 8, 9, 10, 11, 12, 13).  Nowhere has Mattel

26   proffered any evidence rebutting or calling into question Mr. Speckin's

27   representations.  The Court therefore finds that, based on the evidence that is

28   currently before it, Mattel has not established a colorable claim of spoliation by way of

16

**EXHIBIT N PAGE 219**

EXHIBIT __K__ PAGE 217

1    contamination in the tests MGA performed on the documents in question.

2              b.    Alteration of Fax Headers

3              Insofar as O'Connor's deposition testimony relating to the white out of the fax

4    header on the October, 2000, contract between Bryant and MGA, this too is

5    downplayed by MGA and Bryant as being irrelevant because "there is no dispute that

6    Mr. Bryant faxed his signed contract from a fax machine at Mattel and, indeed, Mr.

7    Bryant readily admitted that fact at his deposition, which took place before Ms.

8    O'Connor's deposition." (Joint Opp. at 8 (emphasis in original)).  This argument seeks

9    to compare apples to oranges.  While it may be true that now there is no dispute by

10   MGA and Bryant that he faxed his portion of the contract to MGA from his office at

11   Mattel, at the time O'Connor did the white out of the fax header such a lack of dispute

12   was not apparent.  It is from that perspective in time – the prologue to the litigation —

13   that O'Connor's deposition testimony is to be judged.  And from that perspective her

14   testimony calls into question MGA's handling of relevant documents in its possession.

15             When the contract was first executed there is no indication that MGA and/or

16   Bryant would admit to the fact that Bryant negotiated his contract with MGA while he

17   was still working at Mattel; rather, at that point, that issue appeared to be an open one.

18   Indeed, the fact that MGA's CEO would direct O'Connor to tamper with the contract's

19   fax header clearly indicates that they would not admit to the fact.  If MGA mistreated

20   this document where an open issue existed, it is not unreasonable to infer that it may

21   have been just as cavalier with its obligations to maintain the other documents in their

22   possession – say, for instance, the original BRATZ drawings – where similar open

23   issues remained.  This concern with MGA's handling of documents in its possession at

24   the prologue to this litigation is reinforced by MGA and Bryant's blasé mention in a

25   footnote to their opposition that the original to this contract, the one which they

26   describe as being irrelevant, "has not been found." (Joint Opp. at 15 n.6).  Indeed, it

27   has been suggested that MGA and Bryant or their counsel have made representations

28   that they are not sure of the exact whereabouts of a number of the original BRATZ

17

EXHIBIT __K__ PAGE _218_

1   drawings.  (Decl. Shane McKenzie ¶ 3 ("Mr. Bryant's counsel[, at the December 22 to

2   23, 2004, inspection of the originals by counsel for Mattel,] claimed not to have the

3   majority of the originals of BRATZ drawings and sketches, and further claimed not to

4   know where those originals were located")).

5          All that being said, the Court does not find that the alteration of the fax header

6   on the original Bryant/MGA contract warrants the appointment of an expert at this

7   time.  Ms. O'Connor testified that, other than this one instance, she is aware of no

8   other documents that were purposefully altered by MGA.  While the evidence related

9   to the missing fax header on the April, 2000, BRATZ accessories fax may indicate that

10  more than one document had been tampered with by MGA personnel, the Court has

11  nothing at this time to basis that conclusion on other than speculation and conjecture.

12  Without any tangible, concrete proof that MGA's mishandling of documents was more

13  widespread, the Court is left with what appears simply as an isolated instance of

14  tampering.

15         Accordingly, the motion for appointment of expert witnesses is **DENIED**.

16         IT IS SO ORDERED.

17

18  DATE:  8-9-06

19

20

21  STEPHEN G. LARSON
    UNITED STATES DISTRICT JUDGE

22

23

24

25

26

27

28

18

EXHIBIT N PAGE 221

EXHIBIT __K__ PAGE 219

**Exhibit  L**

THIS CONSTITUTES NOTICE OF ENTRY AS REQUIRED BY FRCP, RULE 77(D).

**PRIORITY SEND**
**& ENTERED**

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
<u>CIVIL MINUTES – GENERAL</u>

Case No.    CV 04-09049 SGL(RNBx)                    Date:  July 2, 2007

Title:      CARTER BRYANT -v- MATTEL, INC.
            AND CONSOLIDATED ACTIONS
=================================================================

PRESENT:   HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

      Jim Holmes                              Theresa Lanza
      Courtroom Deputy Clerk                  Court Reporter

ATTORNEYS PRESENT FOR CARTER          ATTORNEYS PRESENT FOR MATTEL:
BRYANT:

John W. Keker                         John B. Quinn
                                      Brett Dylan Proctor
                                      Michael T. Zeller

ATTORNEYS PRESENT FOR MGA:

Dale M. Cendali
Patricia Glaser



ENTERED
CLERK, U.S. DISTRICT COURT

JUL - 5 2007

CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION      BY DEPUTY

DOCKETED ON CM

JUL - 5 2007

BY _____ 164

PROCEEDINGS:   MINUTE ORDER

      As set forth more fully herein, the Court hereby makes the following ruling regarding matters heard on July 2, 2007:

(1)   The Court **GRANTS** Mattel's Motion re Trial Structure (docket #462);

(2)   The Court **GRANTS IN PART AND DENIES IN PART** MGA's Motion re Discovery Master's May 15, 2007, Order (docket #505);

(3)   The Court **GRANTS IN PART AND DENIES IN PART** MGA's Ex Parte Application

MINUTES FORM 90                                          Initials of Deputy Clerk _jh_
CIVIL – GEN                          1                   Time: 01/15

(608)

EXHIBIT _6_ PAGE _220_

regarding date of production of documents (docket #545); and

(4)   The Court **DENIES** MGA's Motion re Discovery Master's May 16, 2007, Order (docket #508).

(5)   The Court **DENIES** the parties' oral request for modification of pretrial and trial dates.


(1)   Motion re Trial Structure (docket #462)

Previous orders of the Court specified that the claims and counterclaims brought in this action will be tried in two phases.  The parties have agreed, in large part, to a refinement of the Court's mandate that all issues regarding the ownership of Bratz shall be tried in Phase 1.  Where the parties differ is upon a proposal by Mattel that the Phase 1 be bifurcated into two sub-phases, with Mattel's copyright infringement claim (its first counterclaim in the 05-02727 case) and all Phase 1 damages being tried after all the other issues.  Phase 1(a) would be limited to issues surrounding Carter Bryant's employment with Mattel, and how those issues impact the ownership of certain original Bratz drawings, while Phase 1(b) would address approximately two-hundred Bratz products that are potentially derivative of the original drawings.  This approach has the appeal of limiting Phase 1(a) to discrete issue of the ownership of the original Bratz drawings.  A finding that Bryant owns these original drawings in Phase 1(a) has the potential to eliminate the need for Phase 1(b).

Accordingly, **THE COURT ADOPTS MATTEL'S MODIFICATION OF DEFENDANTS' PROPOSAL**, as set forth at 8-9 of its Memorandum Regarding Trial Structure, filed June 20, 2007.  Phase 1(a) and Phase 1(b) (if necessary) will be tried to the same jury.

(2)   MGA's Motion re Discovery Master's May 15, 2007, Order (docket #505), and
(3)   MGA's Ex Parte Application regarding date of production of documents (docket #545).

The Discovery Master's May 15, 2007, Order compels production of documents regarding ink, paper, and chemical analysis and documents relating to unreleased MGA products.  The order required that documents be produced no later than the end of May.

The Court reviews the Discovery Master's orders under the "clearly erroneous" or "contrary to law" standard set forth in Fed. R. Civ. P. 72(a).

The Discovery Master's order compels the production of only non-privileged documents.  Therefore, MGA's arguments that the Discovery Master's order requires production of documents in violation of the attorney-client privilege are misplaced.  If the only responsive documents are privileged, then MGA need not produce them, but must produce a privilege log.

MGA acknowledges that it has raised an argument before the Court that was not raised

EXHIBIT  L  PAGE  221

before the Discovery Master, namely, that Mattel has failed to establish that there are "exceptional circumstances" that allow Mattel to "discover facts known or opinions held by an expert . . . who is not expected to be called as a witness at trial." Fed. R. Civ. P. 26(b)(4)(B). MGA contends that the Discovery Master's order is contrary to law based on this standard, and that it was incumbent upon Mattel to raise it below. The Court disagrees. Mattel would be required to establish that exceptional circumstances existed if MGA objected to production on that grounds. A party seeking production cannot be expected to rebut all arguments that could possibly be raised by a party resisting production. MGA has not convinced the Court that the Discovery Master's failure to require Mattel to rebut an argument that was not raised by MGA is contrary to law.

MGA contends that the Discovery Master's order compelling production of documents regarding unreleased products is contrary to law. Relevant to that determination is a balancing test required to be applied by the Ninth Circuit when trade secrets are requested by a competitor in discovery. See Brown Bag Software v. Symantec Corp., 960 F.2d 1465, 1470 (9th Cir. 1992) ("Specifically, in this case we must balance the risk to [defendant] of inadvertent disclosure of trade secrets to competitors against the risk to [plaintiff] that protection of [defendant's] trade secrets [will] impair[] prosecution of [plaintiff's] claims.").

Here, the documents sought are of a particularly sensitive nature. They represent some of the most secretive documents maintained by MGA, and they are being ordered to be produced to MGA's fierce competitor. The Discovery Master recognized the sensitive nature of the documents and entered a strict protective order that severely limits access to those documents and that goes well beyond the normal "attorney eyes only" designation.

MGA argues that unreleased products are irrelevant to the issue of who owns the original Bratz drawings. That is clear. However, MGA's argument attempts to limit the discovery to issues involved in Phase 1 of the trial. There has been no bifurcation of discovery.

Mattel correctly points out that these documents are relevant to a number of its other claims. Specifically, if they show unreleased products that are similar to Mattel's unreleased products, the documents would be highly probative of Mattel's misappropriation of trade secrets claim. Moreover, these documents could be relevant to Mattel's RICO claims based on alleged acts of criminal copyright infringement.

Balancing tests are inherently subjective and particularly susceptible to varying interpretation by individual judicial officers. This Court, upon considering this issue from the outset, may very well have weighed the evidence differently and reached a contrary result. However, this Court is bound by the standard of review, and MGA's motion falls far short of convincing the Court that the Discovery Master's order is contrary to law.

The parties have a long history regarding the production of documents ordered in the May 15, 2007, Order, which is set forth in their papers and which need not be repeated here. Counsel for MGA represented that the remaining documents could be produced no later than July 31, 2007, with the exception of the documents from MGA Hong Kong, which could be produced no

EXHIBIT ___ PAGE 222

later than two weeks after that date. Accordingly, the Court **ORDERS** that MGA complete the document production set forth in the Discovery Master's May 15, 2007, order no later than July 31, 2007, with the exception of the documents from MGA Hong Kong, which shall be produced no later than August 14, 2007.

Accordingly, the Court **GRANTS** in part MGA's motion re the Discovery Master's May 15, 2007, Order, extending the document production date as set forth above. The Motion is **DENIED** in all other respects.

Likewise, the Court **GRANTS** in part MGA's ex parte application re date of production of documents, extending the document production date as set forth above. The application is **DENIED** in all other respects.

(4)   MGA's Motion re Discovery Master's May 16, 2007, Order (docket #508)

The Discovery Master's May 16, 2007, Order compelled the Rule 30(b)(6) depositions of witnesses on the topics of MGA's net worth, prior sworn statements, and ink, paper, and chemical analysis performed by MGA.

> A party may in the party's notice and in a subpoena name as the deponent a public or private corporation or a partnership or association or governmental agency and describe with reasonable particularity the matters on which examination is requested. In that event, the organization so named shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. . . . The persons so designated shall testify as to matters *known or reasonably available* to the organization.

Fed. R. Civ. P. 30(b)(6) (emphasis added). "The purpose behind Rule 30(b)(6) is to create testimony that will bind the corporation." Sanders v. Circle K Corp., 137 F.R.D. 292, 294 (D. Ariz. 1991) (internal citation omitted). Another purpose of Rule 30(b)(6) is aptly described by the District Court for the District of Columbia:

> [The purpose of Rule 30(b)(6) is to] prevent[] serial depositions of various witnesses without knowledge within an organization and eliminating 'bandying', which is the name given to the practice in which people are deposed in turn but each disclaims knowledge of facts that are clearly known to persons in the organization and thereby to the organization itself.

Alexander v. F.B.I., 186 F.R.D. 148, 152 (D.D.C. 1999) (citing the 1970 Advisory Committee Notes to Rule 30(b)(6)).

The Discovery Master's order compelling Rule 30(b)(6) depositions in the specified

EXHIBIT __L__ PAGE 223

categories serve both these purposes and is not contrary to law.

Although MGA's net worth may not be known to it, MGA does not contend that the information is not readily available. That net worth is generally the subject of expert testimony at trial -- a proposition disputed by neither Mattel nor the Court -- does not render it an improper subject for a Rule 30(b)(6). Therefore, the Discovery Master's ruling on this issue is not contrary to law.

MGA likewise does not contend that information regarding prior sworn statements are not readily available to it. Although contending that this is not an appropriate subject for a Rule 30(b)(6) deposition, MGA fails to cite authority in support of that contention. Therefore, the Discovery Master's ruling on this issue is not contrary to law.

The ink, paper, and chemical analysis topic is likewise a proper subject of a Rule 30(b)(6) deposition. To the extent that such a deposition has the potential to encroach upon information protected by the work-product privilege, then that objection must be made on a question-by-question basis. MGA may not make a blanket objection and justify its refusal to produce a Rule 30(b)(6) designee on this topic based on that blanket objection. Therefore, the Discovery Master's ruling on this issue is not contrary to law.

Accordingly, the Court **DENIES** MGA's motion re the Discovery Master's May 16, 2007, Order.

(5)     Oral Request for Modification of pretrial and trial dates.

Although no motion or ex parte application on the subject was pending before the Court, the parties made an oral request at the hearing to continue certain pretrial and trial dates. A discussion ensued and it became apparent that no final agreement was reached by the parties regarding extending these dates. Accordingly, the Court **DENIES** the parties' oral request for modification of pretrial and trial dates. The Court will consider counsels' stipulation regarding extensions of those dates only where all counsel unqualifiedly stipulate to those dates. Until the scheduling order is modified by the Court, the dates previously set by the Court remain in effect. In addition, the Court is unlikely to entertain a continuance of the Phase 1 trial past April, 2008.

IT IS SO ORDERED.

EXHIBIT ___✓___ PAGE 224

**Exhibit  M**

# THIS DOCUMENT HAS BEEN MARKED <u>CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER</u> AND IS THEREFORE SUBMITTED HEREWITH SEPARATELY UNDER SEAL.

**Exhibit  N**

# THIS DOCUMENT HAS BEEN MARKED <u>CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER</u> AND IS THEREFORE SUBMITTED HEREWITH SEPARATELY UNDER SEAL.

# THIS DOCUMENT HAS BEEN MARKED <u>CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER</u> AND IS THEREFORE SUBMITTED HEREWITH SEPARATELY UNDER SEAL.

**Exhibit P**

1 | THOMAS J. NOLAN (Bar No. 066992)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
2 | 300 South Grand Avenue
Los Angeles, CA  90071-3144
3 | Telephone:  (213) 687-5000
Facsimile:  (213) 687-5600
4 | E-mail:      tnolan@skadden.com

5 | RAOUL D. KENNEDY (Bar No. 40892)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
6 | Four Embarcadero Center, Suite 3800
San Francisco, CA  94111
7 | Telephone:  (415) 984-6400
Facsimile:  (415) 984-2698
8 | E-mail:      rkennedy@skadden.com

9 | Attorneys for Counter-Defendants,
MGA ENTERTAINMENT, INC., ISAAC LARIAN, MGA ENTERTAINMENT
10 | (HK) LIMITED, AND MGAE de MEXICO S.R.L. de C.V.

11

12                    **UNITED STATES DISTRICT COURT**

13                    **CENTRAL DISTRICT OF CALIFORNIA**

                            **EASTERN DIVISION**

14 | CARTER BRYANT, an individual              )   CASE NO. CV 04-9049 SGL (RNBx)
                                              )
15 |                 Plaintiff,               )   Consolidated with Case No. 04-9059
                                              )   and Case No. 05-2727
16 |      v.                                   )
                                              )   **MGA ENTERTAINMENT (HK)**
17 | MATTEL, INC., a Delaware                  )   **LTD.'S SUPPLEMENTAL**
corporation                                   )   **RESPONSES TO MATTEL,**
18 |                                           )   **INC.'S REVISED THIRD SET**
                 Defendant.                    )   **OF INTERROGATORIES**
19 |                                           )
                                              )   Honorable Stephen G. Larson
20 |                                           )   Courtroom 1
                                              )
21 |                                           )
                                              )
22 | Consolidated with MATTEL, INC. v.         )   Discovery Cut-Off:  March 3, 2008
BRYANT and MGA                                )
23 | ENTERTAINMENT, INC. v.                    )
MATTEL, INC.                                   )
                                              )
24 |                                           )

25 | **PROPOUNDING PARTY:**      **MATTEL, INC.  ("MATTEL")**

26 | **RESPONDING PARTY:**       **MGA ENTERTAINMENT (HK) LTD.**

27 | **SET NUMBER:**             **REVISED THIRD**

28

_11-30_

## PRELIMINARY STATEMENT

The General Response set forth herein applies to all responses that MGA Entertainment (HK) Ltd. ("MGA (HK)") is providing in response to these interrogatories (the "Interrogatories") or may in the future provide in response to any discovery request in this action.  The Response is made without waiving, or intending to waive but, on the contrary, expressly reserving:  (a) the right to object, on the grounds of competency, privilege, relevancy or materiality, or any other proper grounds, to the use of the Response, for any purpose in whole or in part, in any subsequent step or proceeding in this action or any other action; (b) the right to object on any and all grounds, at any time, to other interrogatories or other discovery procedures; and (c) the right at any time to revise, correct, add to, or clarify any of the responses propounded herein.

The Response reflects only the present state of MGA (HK)'s discovery regarding the information that Mattel seeks.  Discovery and other investigation or research concerning this litigation are continuing.  Mattel has produced almost no documents to date and has produced no documents from its Zeus computer system, and has not provided other discovery responses, including without limitation supplemental responses to its March 7, 2005, responses to MGA's First Set of Interrogatories (which responses were comprised almost entirely of objections).  It is anticipated that further discovery, independent investigation, and legal research and analysis will supply additional facts and meaning to the known facts, as well as establish entirely new factual conclusions, all of which may lead MGA (HK) to discover other information responsive to these Interrogatories.  MGA (HK) therefore reserves the right to amend or supplement this Response at any time in light of future investigation, research or analysis, and also expressly reserves the right to rely on, at any time, including trial, subsequently discovered information omitted from this Response as a result of mistake, error, oversight or inadvertence.  MGA (HK) does not hereby admit, adopt or acquiesce in any factual or legal contention, assertion or

1

EXHIBIT P   PAGE 269

1   characterization contained in the Interrogatories or any particular request therein,

2   even where MGA (HK) has not otherwise objected to a particular interrogatory, or

3   has agreed to provide information responsive to a particular interrogatory.

4           No incidental or implied admissions are intended by this Response.

5   These responses should not be taken as an admission that MGA (HK) accepts or

6   admits the existence of any facts set forth or assumed by any instruction, definition

7   or interrogatory.

8                   **GENERAL OBJECTIONS**

9           MGA (HK) responds to these Interrogatories subject to the following

10  general objections and limitations, each of which is incorporated into each and every

11  response as though fully set forth therein:

12          1.      MGA (HK) objects to these Interrogatories to the extent they

13  seek information that is not subject to disclosure under any applicable privilege,

14  doctrine or immunity, including without limitation the attorney-client privilege, the

15  work product doctrine, the right of privacy, and all other privileges recognized under

16  the constitutional, statutory or decisional law of the United States of America, the

17  State of California or any other applicable jurisdiction.

18          2.      MGA (HK) objects to these Interrogatories to the extent they

19  seek information not relevant to the claims or defenses of any party to this action and

20  not reasonably calculated to lead to the discovery of admissible evidence.

21          3.      MGA (HK) objects to these Interrogatories to the extent they

22  seek information which by reason of public filing or otherwise is already in Mattel's

23  possession or is readily accessible to Mattel.

24          4.      MGA (HK) objects to these Interrogatories to the extent they

25  seek the disclosure of information (1) not currently within its possession, custody or

26  control; (2) that MGA (HK) cannot locate after a reasonably diligent search; or (3)

27  that refer to persons, entities, or events not known to MGA (HK).

28          5.      MGA (HK) objects to these Interrogatories to the extent they are

2

EXHIBIT P   PAGE 270

1 | overbroad and unduly burdensome.

2 |       6.    MGA (HK) objects to the definitions and instructions to the

3 | extent such definitions and instructions purport to enlarge, expand, or alter in any

4 | way the plain meaning and scope of any specific term or specific interrogatories on

5 | the ground that such enlargement, expansion, or alteration renders such a term or

6 | request vague, ambiguous, unintelligible, overly broad, unduly burdensome or

7 | uncertain.

8 |       7.    MGA (HK) objects to the following definitions in these

9 | Interrogatories:

10 |       (a)    MGA (HK) objects to the definition of the term "BRATZ"

11 | (Definitions ¶ 9) as vague, ambiguous, overly broad and unduly burdensome, and

12 | designed to mislead and confuse the trier of fact.  The definition includes "any

13 | project, product, doll or DESIGN ever known by [the Bratz] name (whether in whole

14 | or in part and regardless of what such project, product or doll is or has been also,

15 | previously or subsequently called) and any product, doll or DESIGN or any portion

16 | thereof that is now or has ever been known as, or sold or marketed under, the name

17 | or term 'Bratz' (whether in whole or in part and regardless of what such product, doll

18 | or DESIGN or portion thereof is or has been also, previously or subsequently called)

19 | or that is now or has ever been marketed as part of the 'Bratz' line, and each version

20 | or iteration of such product, doll or DESIGN or any portion thereof," and it goes on.

21 | By incorporating the definition of DESIGN, the overly broad definition of BRATZ

22 | includes two-dimensional and three-dimensional representations, including "works,

23 | designs, artwork, sketches, drawings, illustrations, representations, depictions,

24 | blueprints, schematics, diagrams, images, sculptures, prototypes, models, samples,

25 | rotocasts, reductions to practice, developments, inventions and/or improvements . . .

26 | ."  (Definitions ¶ 8.)  These convoluted and multi-part definitions combine to render

27 | the interrogatories vague, ambiguous and overly broad, and to include within the

28 | term BRATZ things that do not fairly represent the Bratz line of dolls, accessories

EXHIBIT P PAGE 271

1  and related products that are the subject of this case.  In responding to these
2  interrogatories, MGA (HK) will interpret the term BRATZ to mean the line of dolls
3  introduced by MGA (HK) to the market for sale in May or June of 2001 and
4  subsequent dolls, accessories and other products known as Bratz or associated by
5  MGA (HK) with the Bratz line of dolls;

6          (b)     MGA (HK) objects to the definition of the term "BRATZ
7  DOLL" (Definitions ¶ 12) as vague, ambiguous, overly broad and unduly
8  burdensome, and designed to mislead and confuse the trier of fact.  The definition
9  includes any doll that "REFERS OR RELATES TO BRATZ."  Mattel's definition of
10  the terms "BRATZ" and "REFERS OR RELATES" renders the definition of
11  "BRATZ DOLL" unintelligible because MGA (HK) cannot know, by way of
12  example, what dolls may "deal with, comment on, respond to, . . . or in any way
13  pertain" (Definitions ¶ 20) to "BRATZ."  In responding to these interrogatories,
14  MGA (HK) will interpret the term "BRATZ DOLL" to mean the line of dolls
15  introduced by MGA (HK) to the market for sale in May or June of 2001 and
16  subsequent dolls known as Bratz;

17          (c)     MGA (HK) objects to the definition of the term
18  "CREATED" (Definitions ¶ 21) as vague, ambiguous, overly broad and unduly
19  burdensome, and designed to mislead and confuse the trier of fact.  The definition
20  strays far from the English meaning of the term "created" by including concepts such
21  as "improved," "altered," "conceived of" and "reduced to practice."  Thus, by way of
22  example, under Mattel's definition of "CREATED," the jury could be misled into
23  believing that a person "CREATED" a particular thing when that person did not, but
24  only slightly altered or improved the thing.  In responding to these interrogatories,
25  MGA (HK) will not interpret the term "CREATED," but rather will respond using
26  words contained within the Mattel definition in their normal, accepted meaning;

27          (d)     MGA (HK) objects to the definition of the term
28  "INVENTIONS AGREEMENT" (Definitions ¶ 23) as vague, ambiguous, overly

EXHIBIT  P  PAGE  272

1   broad and unduly burdensome, and designed to mislead and confuse the trier of fact.

2   The definition includes "any other version of such January 4, 1999 agreement."  In

3   responding to these interrogatories, MGA (HK) will interpret the term

4   "INVENTIONS AGREEMENT" to refer to the document Bates numbered

5   M0001596;

6           (e)    MGA (HK) objects to the definition of the term "BRATZ

7   INVENTION" (Definitions ¶ 10) as vague, ambiguous, overly broad and unduly

8   burdensome, and designed to mislead and confuse the trier of fact.  The definition

9   strays far from the English meaning of the term "invention" by including concepts

10  such as representation, idea, concept, work, process, procedure, plan, improvement,

11  design and development, none of which necessarily equate to an invention.  In

12  responding to these interrogatories, MGA (HK) will not interpret the term "BRATZ

13  INVENTION," but rather will respond using words contained within the Mattel

14  definition in their normal, accepted meaning.

15          (f)    MGA (HK) objects to the terms "IDENTIFY" or

16  "IDENTITY"  (Definitions ¶ 28)  as overbroad, unduly burdensome, vague,

17  ambiguous, and oppressive.  Mattel's definition of these terms inherently call for

18  answers to multiple discrete questions or subparts to questions.  For example, when

19  those terms are used to reference any BRATZ INVENTION, the use of those terms

20  requests at least 10 different and distinct facts: (a) the Bates number of any document

21  that "REFERS OR RELATES TO the BRATZ INVENTION"; (b) the IDENTITY of

22  the individual author or creator of the BRATZ INVENTIONS; (c) the IDENTITY of

23  each other individual who contributed in any manner to the BRATZ INVENTION;

24  (d) the form, material and medium of the BRATZ INVENTION; (e) the title or name

25  of the BRATZ INVENTION; (f) the version, modification, revision or iteration

26  number of the BRATZ INVENTION; (g) the current location of the original of the

27  BRATZ INVENTION; (h) the first day on which the BRATZ INVENTION was

28  created; (i) the last day on which the BRATZ INVENTION was CREATED; (j)

1 whether the entire invention was CREATED during the period of time listed in the
2 Interrogatory (and if not, which portions were created during, earlier, or later than
3 the period of time listed in the Interrogatory.) Therefore, any interrogatory that
4 includes or incorporates the terms "IDENTIFY" or "IDENTITY" are necessarily
5 compound and should be posed as separate interrogatories.

6         (g)    MGA (HK) objects to the terms "any" and "REFER OR
7 RELATE TO" on the grounds and to the extent that they are overbroad, unduly
8 burdensome or are vague and ambiguous in the context of the interrogatories as
9 written and as those interrogatories would be plainly understood absent Mattel's
10 definitions.

11        8.    MGA (HK) objects to these interrogatories to the extent that they
12 may unfairly seek to restrict the facts on which MGA (HK) may rely at trial.
13 Discovery has not been completed and MGA (HK) is not yet necessarily in
14 possession of all the facts and documents upon which MGA (HK) intends to rely.
15 All of the responses submitted herewith are tendered to Mattel with the reservation
16 that the responses are submitted without limiting the evidence on which MGA (HK)
17 may rely to support the contentions and defenses that MGA (HK) may assert at the
18 trial of this action and to rebut or impeach the contentions, assertions and evidence
19 that Mattel may present.  MGA (HK) reserves the right to supplement or amend
20 these responses at a future date.

21        9.    MGA (HK) objects to each interrogatory to the extent that it
22 seeks information that will be the subject of expert witness testimony and that is
23 therefore premature.

24       10.    MGA (HK) objects to each interrogatory to the extent that it
25 seeks the disclosure of confidential, proprietary, or trade-secret information.

26       11.    MGA (HK) objects to each interrogatory to the extent that it
27 calls for a legal conclusion.

28       12.    MGA (HK) reserves the right to object on any ground at any

EXHIBIT P PAGE 274

1  time to such other and supplemental discovery requests as Mattel may propound

2  involving or relating to the same subject matter of these interrogatories.

3       13.    The responses below shall not be construed as an admission as to

4  the relevance or admissibility of any statement or characterization contained in any

5  interrogatory.  MGA (HK) reserves all objections, including without limitation

6  objections as to competency, relevance, materiality, privilege, authenticity, or

7  admissibility.

8       14.    Consistent with Rule 33(d) of the Federal Rules of Civil

9  Procedure, MGA (HK) objects to providing responses to interrogatories that can be

10  derived from documents that have or will be produced (when requested in

11  compliance with Rule 26) and where the burden to derive such information is

12  substantially the same for Mattel as it is for MGA (HK).

13       15.    In responding to these Interrogatories, MGA (HK) has not and

14  will not comply with any instructions or definitions that seek to impose requirements

15  in addition to those imposed by the Federal Rules of Civil Procedure and any

16  applicable local rule.

17       16.    To the extent MGA (HK) responds to an interrogatory, it does so

18  without waiving or intending to waive but rather, on the contrary, preserving and

19  intending to preserve, its contention that anything Mr. Bryant did on weekends,

20  evenings, vacation and any other time outside ordinary business hours was not done

21  while he was working for Mattel.  MGA (HK)'s response may not be taken as an

22  admission that the information it provides in its response in any way reflects or

23  evidences work performed by Mr. Bryant while he was working for Mattel or that

24  MGA (HK) adopts or agrees with any fact or legal conclusion assumed, presumed or

25  contained in Mattel's interrogatory.

26       17.    MGA (HK) objects to each of Mattel's interrogatories because

27  Mattel has propounded more than 50 interrogatories, including discrete subparts.

28  Under Judge Larson's order of February 22, 2007, "Interrogatories are limited to 50

MGA HK'S SUPPL. RESPONSES TO MATTEL'S REVISED 3RD SET OF INTERROGATORIESNO. CV 04-9049 SGL (RNBx)

EXHIBIT  P   PAGE  275

1  for each side for both [Case Nos. CV 04-04049-SGL and CV 05-02727]."

2  ## SPECIFIC OBJECTIONS AND RESPONSES

3  Without waiving or departing from its General Response and General

4  Objections, and specifically incorporating them in its response to each Interrogatory

5  below, MGA (HK) makes the following additional objections and responses to

6  specific Interrogatories:

7  **INTERROGATORY NO. 27:**

8  IDENTIFY each and every BRATZ INVENTION YOU contend was

9  CREATED, in whole or in part, prior to January 4, 1999, and for each BRATZ

10  INVENTION so identified state all facts that support YOUR contention that such

11  BRATZ INVENTION (or aspects or portions thereof) was CREATED prior to

12  January 4, 1999, and IDENTIFY all PERSONS with knowledge of such facts and all

13  DOCUMENTS which REFER OR RELATE TO such facts.

14  **RESPONSE TO INTERROGATORY NO. 27:**

15  MGA (HK) incorporates by reference its General Response and General

16  Objections above, as though fully set forth herein and specifically incorporates

17  General Objection No. 7 (regarding the Definitions), including but not limited to its

18  objections to the definitions of the terms BRATZ INVENTION, CREATED,

19  IDENTIFY and REFER OR RELATES TO.  MGA (HK) further objects to this

20  interrogatory as compound because it contains discrete subparts that require separate,

21  distinct and multiple responses.  Specifically, MGA (HK) objects to the term

22  IDENTIFY as overbroad and unduly burdensome, as Mattel's definition of this term

23  calls for responses to multiple discrete subparts.  For example, Mattel's definition of

24  the term IDENTIFY in the context of this interrogatory would require MGA (HK) to

25  provide a multitude of discrete responses for each BRATZ INVENTION, including:

26  (a)    the Bates number of any document that "REFERS OR RELATES

27  TO the BRATZ INVENTION;"

28  (b)    the IDENTITY of the individual author or creator of the BRATZ

8

EXHIBIT P   PAGE 276

1  INVENTION;

2       (c)    the IDENTITY of each other individual who contributed in any

3  manner to the BRATZ INVENTION;

4       (d)    the form, material and medium of the BRATZ INVENTION;

5       (e)    the title or name of the BRATZ INVENTION;

6       (f)    the version, modification, revision or iteration number of the

7  BRATZ INVENTION;

8       (g)    the current location of the original of the BRATZ INVENTION;

9       (h)    the first day on which the BRATZ INVENTION was CREATED;

10       (i)    the last day on which the BRATZ INVENTION was CREATED;

11       (j)    whether the entire invention was CREATED during the period of

12  time listed in the Interrogatory (and if not, which portions were created during,

13  earlier, or later than the period of time listed in the Interrogatory).

14       This interrogatory is further compounded by Mattel's definition of

15  IDENTITY, which purports to require MGA (HK) to provide the following

16  information for each of the individuals Mattel is requesting that MGA (HK) identify

17  with respect to each BRATZ INVENTION:  (a) the individual's name; (b) any

18  known business title; (c) the current or last known business affiliation; (d) current or

19  last known residential address; (e) current or last known business address; (f) current

20  or last known relationship to MGA (HK); and (g) current or last known telephone

21  number.

22       MGA (HK) further objects to this interrogatory on the grounds that it is

23  overbroad, unduly burdensome, vague and ambiguous both generally and

24  specifically with respect to the terms BRATZ INVENTION, BRATZ, CREATED,

25  DESIGN and REFER OR RELATES TO.  In particular, the term BRATZ

26  INVENTION, which incorporates the terms BRATZ, DESIGN and REFER OR

27  RELATES TO, is so broad and over-inclusive that it could be read to include each

28  and every thought, idea and conversation that anyone may have had about BRATZ

9

EXHIBIT P   PAGE 277

1  during the time period at issue.

2       MGA (HK) further objects to the extent that this interrogatory seeks

3  information that is outside of MGA (HK)'s knowledge and is not in MGA (HK)'s

4  possession, custody or control.  In particular, MGA (HK) objects to this interrogatory

5  to the extent that it requests that MGA (HK) "state *all* facts . . . and IDENTIFY *all*

6  PERSONS ... and *all* DOCUMENTS" (emphasis added).

7       MGA (HK) also objects to this interrogatory to the extent it seeks

8  information that is not subject to disclosure under any applicable privilege, doctrine

9  or immunity, including without limitation the attorney-client privilege, the work

10  product doctrine, the right of privacy, and all other privileges recognized under the

11  constitutional, statutory or decisional law of the United States of America, the State

12  of California or any other applicable jurisdiction.  MGA (HK) further objects to the

13  interrogatory on the ground that it is premature because the invention, creation,

14  conception, or reduction to practice of Bratz (and related issues) will be the subject

15  of expert testimony at trial.  MGA (HK) objects to this interrogatory to the extent it

16  seeks to limit the expert testimony that MGA (HK) may seek to introduce at trial.

17  MGA (HK) will identify its experts and make related disclosures in accordance with

18  the Court's orders and applicable rules.

19       MGA (HK) further objects to this interrogatory because Mattel has

20  propounded more than 50 interrogatories.  Under Judge Larson's order of February

21  22, 2007, "Interrogatories are limited to 50 for each side for both [Case Nos. CV 04-

22  04049-SGL and CV 05-02727]."

23       Subject to and without waiving the foregoing objections, MGA (HK)

24  responds as follows:  MGA (HK) is willing to meet and confer with Mattel regarding

25  this interrogatory and the obligation of Mattel to supplement its responses to MGA's

26  First Set of Interrogatories.

27  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 27:**

28       MGA (HK) incorporates by reference its General Response and General

EXHIBIT __P__ PAGE __278__

1 Objections above, as though fully set forth herein and specifically incorporates

2 General Objection No. 7 (regarding the Definitions), including but not limited to its

3 objections to the definitions of the terms BRATZ INVENTION, CREATED,

4 IDENTIFY and REFER OR RELATES TO.  MGA (HK) further objects to this

5 interrogatory as compound because it contains discrete subparts that require separate,

6 distinct and multiple responses.  Specifically, MGA (HK) objects to the term

7 IDENTIFY as overbroad and unduly burdensome, as Mattel's definition of this term

8 calls for responses to multiple discrete subparts.  For example, Mattel's definition of

9 the term IDENTIFY in the context of this interrogatory would require MGA (HK) to

10 provide a multitude of discrete responses for each BRATZ INVENTION, including:

11        (a)    the Bates number of any document that "REFERS OR RELATES

12 TO the BRATZ INVENTION;"

13        (b)    the IDENTITY of the individual author or creator of the BRATZ

14 INVENTION;

15        (c)    the IDENTITY of each other individual who contributed in any

16 manner to the BRATZ INVENTION;

17        (d)    the form, material and medium of the BRATZ INVENTION;

18        (e)    the title or name of the BRATZ INVENTION;

19        (f)    the version, modification, revision or iteration number of the

20 BRATZ INVENTION;

21        (g)    the current location of the original of the BRATZ INVENTION;

22        (h)    the first day on which the BRATZ INVENTION was CREATED;

23        (i)    the last day on which the BRATZ INVENTION was CREATED;

24        (j)    whether the entire invention was CREATED during the period of

25 time listed in the Interrogatory (and if not, which portions were created during,

26 earlier, or later than the period of time listed in the Interrogatory).

27        This interrogatory is further compounded by Mattel's definition of

28 IDENTITY, which purports to require MGA (HK) to provide the following

1    information for each of the individuals Mattel is requesting that MGA (HK) identify
2    with respect to each BRATZ INVENTION:  (a) the individual's name; (b) any
3    known business title; (c) the current or last known business affiliation; (d) current or
4    last known residential address; (e) current or last known business address; (f) current
5    or last known relationship to MGA (HK); and (g) current or last known telephone
6    number.

7           MGA (HK) further objects to this interrogatory on the grounds that it is
8    overbroad, unduly burdensome, vague and ambiguous both generally and
9    specifically with respect to the terms BRATZ INVENTION, BRATZ, CREATED,
10   DESIGN and REFER OR RELATES TO.  In particular, the term BRATZ
11   INVENTION, which incorporates the terms BRATZ, DESIGN and REFER OR
12   RELATES TO, is so broad and over-inclusive that it could be read to include each
13   and every thought, idea and conversation that anyone may have had about BRATZ
14   during the time period at issue.

15          MGA (HK) further objects to the extent that this interrogatory seeks
16   information that is outside of MGA (HK)'s knowledge and is not in MGA (HK)'s
17   possession, custody or control.  In particular, MGA (HK) objects to this interrogatory
18   to the extent that it requests that MGA (HK) "state *all* facts . . . and IDENTIFY *all*
19   PERSONS ... and *all* DOCUMENTS" (emphasis added).

20          MGA (HK) also objects to this interrogatory to the extent it seeks
21   information that is not subject to disclosure under any applicable privilege, doctrine
22   or immunity, including without limitation the attorney-client privilege, the work
23   product doctrine, the right of privacy, and all other privileges recognized under the
24   constitutional, statutory or decisional law of the United States of America, the State
25   of California or any other applicable jurisdiction.  MGA (HK) further objects to the
26   interrogatory on the ground that it is premature because the invention, creation,
27   conception, or reduction to practice of Bratz (and related issues) will be the subject
28   of expert testimony at trial.  MGA (HK) objects to this interrogatory to the extent it

EXHIBIT  P    PAGE  280

1  seeks to limit the expert testimony that MGA (HK) may seek to introduce at trial.

2  MGA (HK) will identify its experts and make related disclosures in accordance with

3  the Court's orders and applicable rules.

4          Subject to and without waiving the foregoing objections, MGA (HK)

5  responds as follows:

6          With respect to "inventions" as that term is used in utility patent law,

7  MGA (HK) does not make any affirmative contentions as to whether there were any

8  such inventions, except that MGA (HK) contends that the conception and/or

9  reduction to practice of any such invention occurred before January 1999 and/or after

10 October 20, 2000.  With respect to design patents, in August or September of 1998,

11 Carter Bryant, inspired by images he was exposed to, including in the August 1998

12 issue of *Seventeen Magazine*, the appearance of teenagers, as well as other images in

13 the public domain, conceived of an idea for a line of dolls he named Bratz.  At the

14 same time, Bryant sketched a series of drawings to illustrate his idea.  To the extent

15 said idea contained elements covered by design patent law, no such invention was

16 "reduced to practice" until after October 20, 2000.  Nor did it fall within the scope of

17 the term "inventions" as used in the "INVENTIONS AGREEMENT."

18         The following persons have knowledge of the facts and circumstances

19 surrounding Bryant's conception and his illustrative drawings that he named Bratz:

20 Carter Bryant; Bryant's mother, Janet Bryant; Bryant's father, Thomas Bryant;

21 Jeanne Galvano; Richard Irmen; Elise Cloonan; Ramona Prince.

22         The following documents may be relevant to these facts:  the sketches

23 drawn by Bryant in August or September of 1998; publicly available materials that

24 Bryant identified in his deposition testimony as inspiring his conception of a line of

25 dolls in August or September of 1998, including but not limited to the August 1998

26 issue of *Seventeen Magazine*; and other documents shown to Bryant at his November

27 2004 deposition.

28

13

EXHIBIT   P   PAGE   28

**INTERROGATORY NO. 28:**

IDENTIFY each and every BRATZ INVENTION YOU contend was CREATED, in whole or in part, after October 19, 2000 and before June 1, 2001, and for each BRATZ INVENTION so identified state all FACTS that support YOUR contention that such BRATZ INVENTION (or aspects or portions thereof) was CREATED after October 19, 2000 and before June 1, 2001, and IDENTIFY all PERSONS with knowledge of such facts and all DOCUMENTS which REFER OR RELATE TO such facts.

**RESPONSE TO INTERROGATORY NO. 28:**

MGA (HK) incorporates by reference its General Response and General Objections above, as though fully set forth herein and specifically incorporates General Objection No. 7 (regarding the Definitions), including but not limited to its objections to the definitions of the terms BRATZ INVENTION, CREATED, IDENTIFY, and REFER OR RELATED TO.  MGA (HK) further objects to this interrogatory on the grounds that it is overbroad, unduly burdensome, vague and ambiguous both generally and specifically with respect to the term BRATZ INVENTION, which incorporates the terms BRATZ, DESIGN and REFER OR RELATES TO, is so broad and over-inclusive that it could be read to include each and every thought, idea and conversation that anyone may have had about BRATZ during the time period at issue.

MGA (HK) further objects to this interrogatory as compound because it contains discrete subparts that require separate, distinct and multiple responses. Specifically, MGA (HK) objects to the term IDENTIFY as overbroad and unduly burdensome, as Mattel's definition of this term calls for responses to multiple discrete subparts.  For example, Mattel's definition of the term IDENTIFY in the context of this interrogatory would require MGA (HK) to provide a multitude of discrete responses for each BRATZ INVENTION, including:

(a)  the Bates number of any document that "REFERS OR RELATES

14

EXHIBIT P  PAGE 282

1  TO the BRATZ INVENTION;"

2          (b)    the IDENTITY of the individual author or creator of the BRATZ

3  INVENTION;

4          (c)    the IDENTITY of each other individual who contributed in any

5  manner to the BRATZ INVENTION;

6          (d)    the form, material and medium of the BRATZ INVENTION;

7          (e)    the title or name of the BRATZ INVENTION;

8          (f)    the version, modification, revision or iteration number of the

9  BRATZ INVENTION;

10         (g)    the current location of the original of the BRATZ INVENTION;

11         (h)    the first day on which the BRATZ INVENTION was CREATED;

12         (i)    the last day on which the BRATZ INVENTION was CREATED;

13         (j)    whether the entire invention was CREATED during the period of

14  time listed in the Interrogatory (and if not, which portions were created during,

15  earlier, or later than the period of time listed in the Interrogatory).

16          This interrogatory is further compounded by Mattel's definition of

17  IDENTITY, which purports to require MGA (HK) to provide the following

18  information for each of the individuals Mattel is requesting that MGA (HK) identify

19  with respect to each BRATZ INVENTION:  (a) the individual's name; (b) any

20  known business title; (c) the current or last known business affiliation; (d) current or

21  last known residential address; (e) current or last known business address; (f) current

22  or last known relationship to MGA (HK); and (g) current or last known telephone

23  number.

24          MGA (HK) further objects to the extent that this interrogatory seeks

25  information that is outside of MGA (HK)'s knowledge and is not in MGA (HK)'s

26  possession, custody or control.  In particular, MGA (HK) objects to this interrogatory

27  to the extent that it requests that MGA (HK) "state *all* facts . . . and IDENTIFY *all*

28  PERSONS ... and *all* DOCUMENTS" (emphasis added).

15

EXHIBIT  P   PAGE  283

1    MGA (HK) also objects to this interrogatory to the extent it seeks

2  information that is not subject to disclosure under any applicable privilege, doctrine

3  or immunity, including without limitation the attorney-client privilege, the work

4  product doctrine, the right of privacy, and all other privileges recognized under the

5  constitutional, statutory or decisional law of the United States of America, the State

6  of California or any other applicable jurisdiction.

7    MGA (HK) further objects to the interrogatory on the ground that it is

8  premature because the invention, creation, conception, or reduction to practice of

9  Bratz (and related issues) will be the subject of expert testimony at trial.  MGA (HK)

10  objects to this interrogatory to the extent it seeks to limit the expert testimony that

11  MGA (HK) may seek to introduce at trial.  MGA (HK) will identify its experts and

12  make related disclosures in accordance with the Court's orders and applicable rules.

13  MGA (HK) further objects to the interrogatory as unduly burdensome, on the

14  grounds that it would require MGA (HK) to identify numerous documents that have

15  already been produced and are readily available to Mattel.

16    MGA (HK) further objects to this interrogatory because Mattel has

17  propounded more than 50 interrogatories.  Under Judge Larson's order of February

18  22, 2007, "Interrogatories are limited to 50 for each side for both [Case Nos. CV 04-

19  04049-SGL and CV 05-02727]."

20    Subject to and without waiving the foregoing objections, MGA (HK)

21  responds as follows:  MGA (HK) is willing to meet and confer with Mattel regarding

22  this interrogatory and the obligation of Mattel to supplement its responses to MGA's

23  First Set of Interrogatories.

24  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 28:**

25    MGA (HK) incorporates by reference its General Response and General

26  Objections above, as though fully set forth herein and specifically incorporates

27  General Objection No. 7 (regarding the Definitions), including but not limited to its

28  objections to the definitions of the terms BRATZ INVENTION, CREATED,

16

EXHIBIT _P_ PAGE _284_

1 IDENTIFY, and REFER OR RELATED TO.  MGA (HK) further objects to this
2 interrogatory on the grounds that it is overbroad, unduly burdensome, vague and
3 ambiguous both generally and specifically with respect to the term BRATZ
4 INVENTION, which incorporates the terms BRATZ, DESIGN and REFER OR
5 RELATES TO, is so broad and over-inclusive that it could be read to include each
6 and every thought, idea and conversation that anyone may have had about BRATZ
7 during the time period at issue.

8          MGA (HK) further objects to this interrogatory as compound because it
9 contains discrete subparts that require separate, distinct and multiple responses.
10 Specifically, MGA (HK) objects to the term IDENTIFY as overbroad and unduly
11 burdensome, as Mattel's definition of this term calls for responses to multiple
12 discrete subparts.  For example, Mattel's definition of the term IDENTIFY in the
13 context of this interrogatory would require MGA (HK) to provide a multitude of
14 discrete responses for each BRATZ INVENTION, including:

15          (a)     the Bates number of any document that "REFERS OR RELATES
16 TO the BRATZ INVENTION;"

17          (b)     the IDENTITY of the individual author or creator of the BRATZ
18 INVENTION;

19          (c)     the IDENTITY of each other individual who contributed in any
20 manner to the BRATZ INVENTION;

21          (d)     the form, material and medium of the BRATZ INVENTION;

22          (e)     the title or name of the BRATZ INVENTION;

23          (f)     the version, modification, revision or iteration number of the
24 BRATZ INVENTION;

25          (g)     the current location of the original of the BRATZ INVENTION;

26          (h)     the first day on which the BRATZ INVENTION was CREATED;

27          (i)     the last day on which the BRATZ INVENTION was CREATED;

28          (j)     whether the entire invention was CREATED during the period of

EXHIBIT P PAGE 285

1  time listed in the Interrogatory (and if not, which portions were created during,
2  earlier, or later than the period of time listed in the Interrogatory).

3        This interrogatory is further compounded by Mattel's definition of
4  IDENTITY, which purports to require MGA (HK) to provide the following
5  information for each of the individuals Mattel is requesting that MGA (HK) identify
6  with respect to each BRATZ INVENTION:  (a) the individual's name; (b) any
7  known business title; (c) the current or last known business affiliation; (d) current or
8  last known residential address; (e) current or last known business address; (f) current
9  or last known relationship to MGA (HK); and (g) current or last known telephone
10  number.

11        MGA (HK) further objects to the extent that this interrogatory seeks
12  information that is outside of MGA (HK)'s knowledge and is not in MGA (HK)'s
13  possession, custody or control.  In particular, MGA (HK) objects to this interrogatory
14  to the extent that it requests that MGA (HK) "state *all* facts . . . and IDENTIFY *all*
15  PERSONS ... and *all* DOCUMENTS" (emphasis added).

16        MGA (HK) also objects to this interrogatory to the extent it seeks
17  information that is not subject to disclosure under any applicable privilege, doctrine
18  or immunity, including without limitation the attorney-client privilege, the work
19  product doctrine, the right of privacy, and all other privileges recognized under the
20  constitutional, statutory or decisional law of the United States of America, the State
21  of California or any other applicable jurisdiction.

22        MGA (HK) further objects to the interrogatory on the ground that it is
23  premature because the invention, creation, conception, or reduction to practice of
24  Bratz (and related issues) will be the subject of expert testimony at trial.  MGA (HK)
25  objects to this interrogatory to the extent it seeks to limit the expert testimony that
26  MGA (HK) may seek to introduce at trial.  MGA (HK) will identify its experts and
27  make related disclosures in accordance with the Court's orders and applicable rules.
28  MGA (HK) further objects to the interrogatory as unduly burdensome, on the

EXHIBIT P   PAGE 286

1   grounds that it would require MGA (HK) to identify numerous documents that have

2   already been produced and are readily available to Mattel.

3           Subject to and without waiving the foregoing objections, MGA (HK)

4   responds as follows:

5           With respect to Bratz dolls and accessories, as concerns the term

6   "inventions" as that is used in utility patent law, and/or in the "INVENTIONS

7   AGREEMENT," MGA (HK) does not make any affirmative contentions as to

8   whether there were any such inventions, except that MGA (HK) contends the

9   conception and/or reduction to practice of any such invention occurred before

10  January 1999 and/or after October 20, 2000.  With respect to package design for

11  Bratz products, MGA (HK) contends that certain aspects of said designs qualified as

12  design patents.  With respect to design patents, to the extent that the Bratz line of

13  dolls, first marketed by MGA in 2001, contained features covered by design patent

14  law, said inventions were "reduced to practice" by MGA after October 20, 2000 and

15  before June 1, 2001.

16          The following persons have knowledge of the facts and circumstances

17  regarding the foregoing:  Isaac Larian; Carter Bryant; Margaret Leahy; Veronica

18  Marlow; Anna Rhee; Mercedeh Ward; Sarah Halpern; Paula Treantafelles (Garcia);

19  Steve Tarmichael; Rebecca Harris; Cecilia Kwok; David Dees; Jesse Ramirez; Sam

20  Wong; Edmond Lee; Steven Lee; Aileen Storer; Eric Yip; Leon Djiguerian; Rachel

21  Harris; Maggie Siu; Ben Ton; Samuel Wong; Ray Wong; Steffan Smith; and Samir

22  Khare.

23          The following documents may be relevant to these facts:  all

24  "DOCUMENTS" that refer to or evidence the work performed by MGA employees

25  and freelancers toward the reduction to practice of the first generation of Bratz dolls

26  during the period after October 19, 2000 through June 1, 2001, including but not

27  limited to:  (i) documents showing the development of the first generation of Bratz

28  dolls; (ii) documents showing exchanges with the Hong Kong factory regarding the

EXHIBIT  P   PAGE  287

1  development of the first generation of Bratz dolls; (iii) documents showing the

2  timing of the development of packaging, fashion, and accessories for the first

3  generation of Bratz dolls; (iv) documents related to the January 2001 Hong Kong toy

4  fair; (v) documents related to the February 2001 New York toy fair; (vi)

5  polyurethane samples of prototypes; (vii) rotocasts and sculpts in Hong Kong; and

6  (viii) invoices submitted from Carter Bryant, Veronica Marlow, Anna Rhee, Victoria

7  O'Connor, and other invoices submitted by freelancers for work performed on the

8  Bratz project. The documents evidencing this work are too numerous to identify

9  individually.

10 **INTERROGATORY NO. 29:**

11        IDENTIFY each and every BRATZ INVENTION that was CREATED,

12 in whole or in part, after January 3, 1999 and before October 21, 2000, and for each

13 BRATZ INVENTION so identified state all FACTS that REFER OR RELATE TO

14 the timing of the creation of such BRATZ INVENTION and IDENTIFY all

15 PERSONS with knowledge of such facts and all DOCUMENTS which REFER OR

16 RELATE TO such facts.

17 **RESPONSE TO INTERROGATORY NO. 29:**

18        MGA (HK) incorporates by reference its General Response and General

19 Objections above, as though fully set forth herein and specifically incorporates

20 General Objection No. 7 (regarding Definitions), including but not limited to its

21 objections to the definitions of the terms BRATZ INVENTION, CREATED, REFER

22 OR RELATE TO, and IDENTIFY. MGA (HK) further objects to this interrogatory

23 as compound because it contains discrete subparts that require separate, distinct and

24 multiple responses. Specifically, MGA (HK) objects to the term IDENTIFY as

25 overbroad and unduly burdensome, as Mattel's definition of this term calls for

26 responses to multiple discrete subparts. For example, Mattel's definition of the term

27 IDENTIFY in the context of this interrogatory would require MGA (HK) to provide

28 a multitude of discrete responses for each BRATZ INVENTION, including:

EXHIBIT __P__ PAGE __288__

1        (a)      the Bates number of any document that "REFERS OR RELATES

2   TO the BRATZ INVENTION;"

3        (b)      the IDENTITY of the individual author or creator of the BRATZ

4   INVENTION;

5        (c)      the IDENTITY of each other individual who contributed in any

6   manner to the BRATZ INVENTION;

7        (d)      the form, material and medium of the BRATZ INVENTION;

8        (e)      the title or name of the BRATZ INVENTION;

9        (f)      the version, modification, revision or iteration number of the

10   BRATZ INVENTION;

11       (g)      the current location of the original of the BRATZ INVENTION;

12       (h)      the first day on which the BRATZ INVENTION was CREATED;

13       (i)      the last day on which the BRATZ INVENTION was CREATED;

14       (j)      whether the entire invention was CREATED during the period of

15   time listed in the Interrogatory (and if not, which portions were created during,

16   earlier, or later than the period of time listed in the Interrogatory).

17       This interrogatory is further compounded by Mattel's definition of

18   IDENTITY, which purports to require MGA (HK) to provide the following

19   information for each of the individuals Mattel is requesting that MGA (HK) identify

20   with respect to each BRATZ INVENTION:  (a) the individual's name; (b) any

21   known business title; (c) the current or last known business affiliation; (d) current or

22   last known residential address; (e) current or last known business address; (f) current

23   or last known relationship to MGA (HK); and (g) current or last known telephone

24   number.

25       MGA (HK) further objects to this interrogatory on the grounds that it is

26   overbroad, unduly burdensome, vague and ambiguous both generally and

27   specifically with respect to the terms BRATZ INVENTION, BRATZ, CREATED,

28   DESIGN and REFER OR RELATES TO.  In particular, the term BRATZ

EXHIBIT P   PAGE 289

1 INVENTION, which incorporates the terms BRATZ, DESIGN and REFER OR

2 RELATES TO, is so broad and over-inclusive that it could be read to include each

3 and every thought, idea and conversation that anyone may have had about BRATZ

4 during the time period at issue.

5          MGA (HK) further objects to the extent that this interrogatory seeks

6 information that is outside of MGA (HK)'s knowledge and is not in MGA (HK)'s

7 possession, custody or control.  In particular, MGA (HK) objects to this interrogatory

8 to the extent that it requests that MGA (HK) "state *all* facts . . . and IDENTIFY *all*

9 PERSONS ... and *all* DOCUMENTS" (emphasis added).

10          MGA (HK) also objects to this interrogatory to the extent it seeks

11 information that is not subject to disclosure under any applicable privilege, doctrine

12 or immunity, including without limitation the attorney-client privilege, the work

13 product doctrine, the right of privacy, and all other privileges recognized under the

14 constitutional, statutory or decisional law of the United States of America, the State

15 of California or any other applicable jurisdiction.

16          MGA (HK) further objects to the interrogatory on the ground that it is

17 premature because the invention, creation, conception, or reduction to practice of

18 Bratz (and related issues) will be the subject of expert testimony at trial.  MGA (HK)

19 objects to this interrogatory to the extent it seeks to limit the expert testimony that

20 MGA (HK) may seek to introduce at trial.  MGA (HK) will identify its experts and

21 make related disclosures in accordance with the Court's orders and applicable rules.

22 MGA (HK) further objects to the interrogatory as unduly burdensome, on the

23 grounds that it would require MGA (HK) to identify numerous documents that have

24 already been produced and are readily available to Mattel.

25          MGA (HK) further objects to this interrogatory because Mattel has

26 propounded more than 50 interrogatories.  Under Judge Larson's order of February

27 22, 2007, "Interrogatories are limited to 50 for each side for both [Case Nos. CV 04-

28 04049-SGL and CV 05-02727]."

MGA HK'S SUPPL. RESPONSES TO MATTEL'S REVISED 3RD SET OF INTERROGATORIES NO. CV 04-9049 SGL (RNBx)

EXHIBIT P   PAGE 290

1   Subject to and without waiving the foregoing objections, MGA (HK)

2   responds as follows:  MGA (HK) is willing to meet and confer with Mattel regarding

3   this interrogatory and the obligation of Mattel to supplement its responses to MGA's

4   First Set of Interrogatories.

5   **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 29:**

6   MGA (HK) incorporates by reference its General Response and General

7   Objections above, as though fully set forth herein and specifically incorporates

8   General Objection No. 7 (regarding Definitions), including but not limited to its

9   objections to the definitions of the terms BRATZ INVENTION, CREATED, REFER

10  OR RELATE TO, and IDENTIFY.  MGA (HK) further objects to this interrogatory

11  as compound because it contains discrete subparts that require separate, distinct and

12  multiple responses.  Specifically, MGA (HK) objects to the term IDENTIFY as

13  overbroad and unduly burdensome, as Mattel's definition of this term calls for

14  responses to multiple discrete subparts.  For example, Mattel's definition of the term

15  IDENTIFY in the context of this interrogatory would require MGA (HK) to provide

16  a multitude of discrete responses for each BRATZ INVENTION, including:

17  (a)   the Bates number of any document that "REFERS OR RELATES

18  TO the BRATZ INVENTION;"

19  (b)   the IDENTITY of the individual author or creator of the BRATZ

20  INVENTION;

21  (c)   the IDENTITY of each other individual who contributed in any

22  manner to the BRATZ INVENTION;

23  (d)   the form, material and medium of the BRATZ INVENTION;

24  (e)   the title or name of the BRATZ INVENTION;

25  (f)   the version, modification, revision or iteration number of the

26  BRATZ INVENTION;

27  (g)   the current location of the original of the BRATZ INVENTION;

28  (h)   the first day on which the BRATZ INVENTION was CREATED;

23

EXHIBIT   P   PAGE   291

1        (i)     the last day on which the BRATZ INVENTION was CREATED;

2        (j)     whether the entire invention was CREATED during the period of

3 time listed in the Interrogatory (and if not, which portions were created during,

4 earlier, or later than the period of time listed in the Interrogatory).

5        This interrogatory is further compounded by Mattel's definition of

6 IDENTITY, which purports to require MGA (HK) to provide the following

7 information for each of the individuals Mattel is requesting that MGA (HK) identify

8 with respect to each BRATZ INVENTION: (a) the individual's name; (b) any

9 known business title; (c) the current or last known business affiliation; (d) current or

10 last known residential address; (e) current or last known business address; (f) current

11 or last known relationship to MGA (HK); and (g) current or last known telephone

12 number.

13        MGA (HK) further objects to this interrogatory on the grounds that it is

14 overbroad, unduly burdensome, vague and ambiguous both generally and

15 specifically with respect to the terms BRATZ INVENTION, BRATZ, CREATED,

16 DESIGN and REFER OR RELATES TO. In particular, the term BRATZ

17 INVENTION, which incorporates the terms BRATZ, DESIGN and REFER OR

18 RELATES TO, is so broad and over-inclusive that it could be read to include each

19 and every thought, idea and conversation that anyone may have had about BRATZ

20 during the time period at issue.

21        MGA (HK) further objects to the extent that this interrogatory seeks

22 information that is outside of MGA (HK)'s knowledge and is not in MGA (HK)'s

23 possession, custody or control. In particular, MGA (HK) objects to this interrogatory

24 to the extent that it requests that MGA (HK) "state *all* facts . . . and IDENTIFY *all*

25 PERSONS ... and *all* DOCUMENTS" (emphasis added).

26        MGA (HK) also objects to this interrogatory to the extent it seeks

27 information that is not subject to disclosure under any applicable privilege, doctrine

28 or immunity, including without limitation the attorney-client privilege, the work

EXHIBIT __P__ PAGE __292__

product doctrine, the right of privacy, and all other privileges recognized under the constitutional, statutory or decisional law of the United States of America, the State of California or any other applicable jurisdiction.

MGA (HK) further objects to the interrogatory on the ground that it is premature because the invention, creation, conception, or reduction to practice of Bratz (and related issues) will be the subject of expert testimony at trial. MGA (HK) objects to this interrogatory to the extent it seeks to limit the expert testimony that MGA (HK) may seek to introduce at trial. MGA (HK) will identify its experts and make related disclosures in accordance with the Court's orders and applicable rules. MGA (HK) further objects to the interrogatory as unduly burdensome, on the grounds that it would require MGA (HK) to identify numerous documents that have already been produced and are readily available to Mattel.

Subject to and without waiving the foregoing objections, MGA (HK) responds as follows:

There were no inventions related to Bratz after January 3, 1999 and before October 21, 2000.

**INTERROGATORY NO. 30:**

State all facts that support YOUR contention, if YOU so contend, that, assuming BRYANT assigned rights in any BRATZ INVENTION to MATTEL pursuant to the INVENTIONS AGREEMENT, MGA is entitled to priority over and/or has superior rights to MATTEL as to such BRATZ INVENTION, and IDENTIFY all PERSONS with knowledge of such facts and all DOCUMENTS that REFER OR RELATE TO such facts.

**RESPONSE TO INTERROGATORY NO. 30:**

MGA (HK) incorporates by reference its General Response and General Objections above, as though fully set forth herein and specifically incorporates General Objection No. 7 (regarding Definitions), including but not limited to its objections to the definitions of the terms BRATZ INVENTION, INVENTIONS

MGA HK'S SUPPL. RESPONSES TO MATTEL'S REVISED 3RD SET OF INTERROGATORIESNO. CV 04-9049 SGL (RNBx)

EXHIBIT _P_ PAGE _293_

1  AGREEMENT, IDENTIFY and REFER OR RELATE TO.  MGA (HK) also objects

2  to this interrogatory to the extent it seeks information that is not subject to disclosure

3  under any applicable privilege, doctrine or immunity, including without limitation

4  the attorney-client privilege, the work product doctrine, the right of privacy, and all

5  other privileges recognized under the constitutional, statutory or decisional law of

6  the United States of America, the State of California or any other applicable

7  jurisdiction.  MGA (HK) further objects to this interrogatory to the extent it calls for

8  a legal conclusion.  MGA (HK) further objects to the extent that this interrogatory

9  seeks information that is outside MGA (HK)'s knowledge and is not in MGA (HK)'s

10  possession, custody, or control.  In particular, MGA (HK) objects to this

11  interrogatory to the extent that it requests MGA (HK) to "state *all facts . . . and*

12  IDENTIFY all PERSONS . . . and *all* DOCUMENTS" (emphasis added).

13      MGA (HK) further objects to the interrogatory on the grounds that it is

14  vague, ambiguous and threatens to mislead the trier of fact in that it is stated in the

15  hypothetical and therefore proceeds from the false premise that Bryant assigned

16  rights in the Bratz line of dolls to Mattel and that all terms of the INVENTIONS

17  AGREEMENT are binding and enforceable.  *See e.g., Kendrick v. Sullivan*, 125

18  F.R.D. 1, 3 (D. D.C. 1989) (holding that Rule 33 does not permit contention

19  interrogatories directed at hypothetical scenarios).  Any response to this interrogatory

20  depends on, among other factual and legal factors, specifically which BRATZ

21  INVENTION it is hypothetically assumed that Bryant assigned rights in to MGA and

22  which rights he assigned, which information is not provided in the incomplete

23  hypothetical scenario posited in this interrogatory.

24      MGA (HK) further objects to the interrogatory on the ground that it is

25  premature because the invention, creation, conception, or reduction to practice of

26  Bratz (and related issues) will be the subject of expert testimony at trial.  MGA (HK)

27  objects to this interrogatory to the extent it seeks to limit the expert testimony that

28  MGA (HK) may seek to introduce at trial.  MGA (HK) further objects on the

EXHIBIT  P   PAGE  294

1  grounds that the interrogatory seeks information not relevant to any claim or defense

2  in the action and is not reasonably calculated to the discovery of admissible evidence

3  because MGA (HK) denies that Bryant assigned any such rights to Mattel.

4          MGA (HK) objects to this interrogatory because Mattel has propounded

5  more than 50 interrogatories.  Under Judge Larson's order of February 22, 2007,

6  "Interrogatories are to be limited to 50 for each side for both [Case Nos. CV 04-

7  04049-SGL and CV 05-02727]."

8  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 30:**

9          MGA (HK) incorporates by reference its General Response and General

10  Objections above, as though fully set forth herein and specifically incorporates

11  General Objection No. 7 (regarding Definitions), including but not limited to its

12  objections to the definitions of the terms BRATZ INVENTION, INVENTIONS

13  AGREEMENT, IDENTIFY and REFER OR RELATE TO.  MGA (HK) also objects

14  to this interrogatory to the extent it seeks information that is not subject to disclosure

15  under any applicable privilege, doctrine or immunity, including without limitation

16  the attorney-client privilege, the work product doctrine, the right of privacy, and all

17  other privileges recognized under the constitutional, statutory or decisional law of

18  the United States of America, the State of California or any other applicable

19  jurisdiction.  MGA (HK) further objects to this interrogatory to the extent it calls for

20  a legal conclusion.  MGA (HK) further objects to the extent that this interrogatory

21  seeks information that is outside MGA (HK)'s knowledge and is not in MGA (HK)'s

22  possession, custody, or control.  In particular, MGA (HK) objects to this

23  interrogatory to the extent that it requests MGA (HK) to "state *all facts . . . and*

24  IDENTIFY all PERSONS . . . and *all* DOCUMENTS" (emphasis added).

25          MGA (HK) further objects to the interrogatory on the grounds that it is

26  vague, ambiguous and threatens to mislead the trier of fact in that it is stated in the

27  hypothetical and therefore proceeds from the false premise that Bryant assigned

28  rights in the Bratz line of dolls to Mattel and that all terms of the INVENTIONS

EXHIBIT  P  PAGE  295

1   AGREEMENT are binding and enforceable. *See e.g., Kendrick v. Sullivan*, 125

2   F.R.D. 1, 3 (D. D.C. 1989) (holding that Rule 33 does not permit contention

3   interrogatories directed at hypothetical scenarios). Any response to this interrogatory

4   depends on, among other factual and legal factors, specifically which BRATZ

5   INVENTION it is hypothetically assumed that Bryant assigned rights in to MGA and

6   which rights he assigned, which information is not provided in the incomplete

7   hypothetical scenario posited in this interrogatory.

8          MGA (HK) further objects to the interrogatory on the ground that it is

9   premature because the invention, creation, conception, or reduction to practice of

10   Bratz (and related issues) will be the subject of expert testimony at trial. MGA (HK)

11   objects to this interrogatory to the extent it seeks to limit the expert testimony that

12   MGA (HK) may seek to introduce at trial. MGA (HK) further objects on the

13   grounds that the interrogatory seeks information not relevant to any claim or defense

14   in the action and is not reasonably calculated to the discovery of admissible evidence

15   because MGA (HK) denies that Bryant assigned any such rights to Mattel.

16          Subject to and without waiving the foregoing objections, MGA (HK)

17   responds as follows:

18          MGA (HK) incorporates by reference its supplemental responses to

19   Interrogatory Nos. 27, 28, 29 and 31 as though fully set forth herein, and responds

20   further that, assuming Bryant assigned rights to inventions related to Bratz pursuant

21   to the "INVENTIONS AGREEMENT," (i.e. under the terms of said Agreement and

22   for inventions conceived of and/or reduced to practice during the period of Bryant's

23   employment with Mattel to which said Agreement relates), MGA would have

24   superior rights in the Bratz dolls because: (i) there were no "inventions" related to

25   Bratz covered by the "INVENTIONS AGREEMENT;" (ii) the Bratz dolls were

26   neither substantially similar to, nor a copy of, nor derivative of, Mattel's hypothetical

27   rights; and (iii) Mattel waived any rights it may have had due to laches and the

28   statute of limitations.

EXHIBIT P   PAGE 296