1   QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
      John B. Quinn (Bar No. 90378)
2     Michael T. Zeller (Bar No. 196417)
      Jon D. Corey (Bar No. 185066)
3   865 South Figueroa Street, 10th Floor
    Los Angeles, California 90017-2543
4   Telephone: (213) 443-3000
    Facsimile: (213) 443-3100
5
    Attorneys for Plaintiff
6   Mattel, Inc.

7

8                   UNITED STATES DISTRICT COURT

9            FOR THE CENTRAL DISTRICT OF CALIFORNIA

10

11  MATTEL, INC., a Delaware           )   CASE NO. CV 04-9059 NM (RNBx)
    corporation,                       )
12                   Plaintiff,        )
                                       )   PLAINTIFF MATTEL, INC.'S
13          v.                         )   OBJECTIONS AND
                                       )   SUPPLEMENTAL RESPONSES TO
14  CARTER BRYANT, an individual, and  )   DEFENDANT'S FIRST SET OF
    DOES 1 through 10, inclusive,      )   INTERROGATORIES
15                   Defendants.       )   (INTERROGATORY NOS. 1-3, 6,
                                       )   10-13 AND 16)
16  ─────────────────────────────────  )
    CARTER BRYANT, on behalf of        )
17  himself, all present and former    )
    employees of Mattel, Inc., and the )
18  general public,                    )
                                       )
19                   Counter-Claimant, )
                                       )
20          v.                         )
                                       )
21  MATTEL, INC., a Delaware           )
    corporation,                       )
22                                     )
                     Counter-Defendant.)
23  ─────────────────────────────────

24

25

26

27

28

PLAINTIFF MATTEL, INC.'S SUPPLEMENTAL RESPONSE TO INTERROGATORIES

EXHIBIT  I
PAGE  91

Preliminary Statement

Mattel has not yet completed its investigation of the facts relating to this action, has not yet reviewed all documents relating to this action, has not yet interviewed all witnesses in this action, and has not completed discovery from defendants Carter Bryant or MGA Entertainment, Inc. or any third parties with regard to this action. Consequently, Mattel reserves the right to amend and/or supplement these responses if and when additional facts or documents are discovered. Additionally, because Mattel's responses are based on facts and documents that Mattel has identified to date, they do not preclude Mattel from later relying on facts or documents discovered or generated pursuant to subsequent investigation or discovery. Mattel's partial supplemental response to any of Defendant's First Set of Interrogatories (the "Interrogatories") is not to be construed as a waiver of any of its objections or its right to object to any other discovery request.

General Objections

Mattel generally objects to each of the Interrogatories on each and every one of the following grounds, which are incorporated into and made a part of Mattel's response to each and every individual Interrogatory:

1.    Mattel objects to the Interrogatories on the grounds that they seek to impose obligations upon Mattel beyond those imposed by the <u>Federal Rules of Civil Procedure</u>.

2.    Mattel objects to the Interrogatories on the grounds that they call for the disclosure of information subject to the attorney-client privilege, the attorney work-product doctrine, or any other applicable privilege, including the privilege against disclosure of the identities and work product of consulting experts. Such information and documents will not be produced.

07209/655298.1

-2-
PLAINTIFF MATTEL, INC.'S SUPPLEMENTAL RESPONSE TO INTERROGATORIES

EXHIBIT I<br>PAGE 92

1        3.    Mattel objects to the Interrogatories on the grounds that they

2  call for production or disclosure of confidential, proprietary and/or private

3  information.  Such information and documents will not be disclosed or produced

4  except pursuant to and in reliance upon the operative protective order.

5        4.    Mattel objects to the Interrogatories on the grounds that they

6  seek the disclosure of information or documents that are in the possession, custody

7  and control of independent parties over whom Mattel has no control, and seek the

8  disclosure of information or documents that are in the possession, custody and

9  control of defendant Bryant or are publicly available and hence equally available

10  to all parties to this litigation.

11        5.    Mattel objects to the Interrogatories on the grounds that they

12  call for information that is neither relevant to the claims or defenses in the pending

13  action nor reasonably calculated to lead to the discovery of admissible evidence.

14        6.    Mattel objects to the Interrogatories on the grounds that they

15  are unduly burdensome and oppressive.  To the extent the Interrogatories call for

16  the identification of, or Mattel's responses state that Mattel will produce, any

17  documents or tangible items, at a mutually convenient time and place Mattel will

18  make available for inspection and copying those documents or tangible items that

19  it is able to locate after a reasonable, good-faith search for and review of non-

20  privileged files that are reasonably likely to contain responsive documents and

21  tangible things.

22        7.    Mattel objects to the Interrogatories on the grounds that they

23  seek the disclosure of information or documents in violation of the terms of

24  agreements or protective orders entered into with third parties, or in violation of

25  the privacy, contractual, or other rights of third parties.

26        8.    Mattel objects to the Interrogatories on the grounds that the

27  definition of "Mattel" is overbroad, vague and ambiguous and unduly burdensome.

28

1    A statement by Mattel that it will produce documents in response to

2   an Interrogatory is not intended to suggest, nor should it be construed to mean,

3   that any such documents exist, or that they are in Mattel's possession, custody or

4   control.

5

6                          Specific and General Responses

7    Each of the following objections and responses to the Interrogatories

8   is expressly made subject to the above Preliminary Statement and General

9   Objections, all of which are incorporated in each of the following objections and

10   responses to specific Interrogatories.

11

12  INTERROGATORY NO. 1:

13    State all facts supporting YOUR contention, if YOU so contend, that

14  Bryant performed services or did any work for a third party or for himself while in

15  the employ of MATTEL.

16

17  SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1:

18    In addition to the general objections stated above, Mattel specifically

19  objects to this Interrogatory on the grounds that it calls for the disclosure of

20  information subject to the attorney-client privilege, the attorney work-product

21  doctrine and other applicable privileges. Mattel further objects to this

22  Interrogatory on the ground that it calls for the disclosure of confidential and/or

23  proprietary information, which Mattel will disclose only subject to and in reliance

24  upon a suitable protective order. Mattel further objects to this Interrogatory as

25  unreasonably burdensome and overbroad in that it purports to require Mattel to

26  summarize all facts on this subject, including without limitation, facts that are

27  known to or in the possession, custody and control of defendant Bryant,

28  defendant-in-intervention MGA Entertainment, Inc. and nonparties, including

07209/655298.1

SUPPLEMENTAL INTERROGATORY RESPONSES

EXHIBIT _I_
PAGE _94_

1   nonparties associated with Bryant and/or MGA. Mattel only undertakes to make a

2   good-faith, reasonable effort to summarize facts currently known to it in

3   responding to this Interrogatory. Mattel further objects to this Interrogatory on the

4   grounds that it is premature in that it purports to seek to all facts relating to this

5   subject at the outset of discovery in this action and also seeks to circumvent the

6   expert disclosure provisions of the <u>Federal Rules of Civil Procedure</u> and the <u>Local</u>

7   <u>Rules</u>.

8           Subject to and without waiving the foregoing general and specific

9   objections, Mattel responds as follows:

10          On January 4, 1999, upon starting his second term of Mattel

11  employment, and as a condition of and in consideration for his employment,

12  defendant Bryant entered into an Employee Confidential Information and

13  Inventions Agreement (the "Employee Agreement"). Among other things, Bryant

14  agreed that he would not, without Mattel's express written consent, "engage in any

15  employment or business other than for [Mattel], or invest in or assist (in any

16  manner) any business competitive with the business or future business plans of

17  [Mattel]." Bryant further acknowledged that he held a position of trust with

18  Mattel. In addition, Bryant assigned to Mattel all right, title and interest in

19  "inventions," including without limitation "designs," that he created, conceived or

20  reduced to practice, whether alone or jointly with others, during his employment

21  by Mattel under the terms set forth in his Employee Agreement. A copy of

22  defendant's Employee Agreement with Mattel, dated January 4, 1999, is attached

23  to the Complaint as Exhibit A and is hereby incorporated into this response by this

24  reference. Before his departure from Mattel, Bryant confirmed his obligations in a

25  Proprietary Information Checkout form, which Bryant agreed to and signed. A

26  copy of this additional agreement has been produced in this action and is hereby

27  incorporated into this response by this reference.

28

-5-

SUPPLEMENTAL INTERROGATORY RESPONSES

EXHIBIT _I_
PAGE _95_

1          Also on January 4, 1999, Bryant executed a Conflict of Interest

2  Questionnaire (the "Conflict Questionnaire"). Among other things, Bryant

3  certified in the Conflict Questionnaire that, other than as disclosed, he had not

4  worked for any competitor of Mattel in the prior twelve months and had not

5  engaged in any business venture or transaction involving a Mattel competitor that

6  could be construed as a conflict of interest. Bryant specifically agreed that he

7  would immediately notify his supervisor of any change in his situation that would

8  cause him to change any of the foregoing certifications. The only conflict

9  disclosure that Bryant made on the Conflict Questionnaire concerned what

10  defendant stated was "freelance" work for Ashton-Drake that is unrelated to the

11  conduct alleged herein. At no time did Bryant disclose to Mattel that he was

12  working with MGA, a known competitor, while employed by Mattel, or that he

13  was paid by MGA for services rendered to MGA while he was a Mattel employee.

14  A copy of the Conflict Questionnaire executed by Bryant is attached as Exhibit B

15  to the Complaint and is hereby incorporated into this response by this reference.

16          In late November 2003, Mattel obtained a copy of a contract

17  evidencing that Bryant had aided and assisted, and worked as a designer with,

18  MGA, a Mattel competitor, while he was employed by Mattel and was being paid

19  by Mattel for his exclusive services as a designer. Bryant's agreement with MGA

20  obligated him to provide design services to MGA on a "top priority" basis. In

21  addition, his agreement with MGA purported to assign to MGA rights to

22  preexisting works by Bryant and to deem work and services furnished by Bryant to

23  MGA under the agreement as "works for hire." Furthermore, Bryant's agreement

24  with MGA provided that he would be paid for such services and receive royalties

25  and other consideration for products on which he provided aid or assistance. A

26  copy of defendant's agreement with MGA, in the form obtained by Mattel, has

27  been produced in this case and is hereby incorporated into this response by this

28  reference.

-6-

SUPPLEMENTAL INTERROGATORY RESPONSES

EXHIBIT ___I___
PAGE __96__

1    Although discovery and Mattel's investigation are on-going,

2  additional documents, testimony and other evidence thus far obtained have

3  confirmed that Bryant worked with and aided MGA, and advanced his own

4  personal interests over Mattel's, during the term of his Mattel employment without

5  Mattel's express written permission.  First, Bryant admitted at deposition that he

6  did so, although he sought to minimize and conceal the time period and extent of

7  his aid to and work with MGA.  Among other things, Bryant testified that (1) he

8  made pitches to MGA concerning the Bratz project during the term of his

9  employment; (2) he used Mattel personnel and other Mattel resources to assist him

10  in such pitches, including without limitation by using Mattel personnel and

11  resources to make what he called a "dummy" and others have called a three-

12  dimensional prototype; (3) he used Mattel personnel and other Mattel resources to

13  work on the Bratz project during his Mattel employment, including without

14  limitation by (a) obtaining information about a Mattel hair vendor, which Bryant

15  then contacted for his own and MGA's benefit and which Bryant told he was

16  working with MGA; and (b) identifying others who Bryant knew as a consequence

17  of his Mattel employment to work on the project and enlisting them to work on the

18  Bratz project during the term of his Mattel employment; (4) he worked on what

19  Bryant characterized as a "test project" to aid and assist MGA and benefit himself,

20  at Mattel's expense, during the term of his Mattel employment;  (5) he entered into

21  his agreement with MGA during the term of his Mattel employment and used

22  Mattel resources in connection with the negotiation and execution of that

23  agreement; and (6) he received monetary payments and other benefits from MGA

24  during the term of his Mattel employment, and both Bryant and MGA benefitted

25  further as a consequence of his aid and assistance to and work with MGA during

26  the term of his Mattel employment.

27    Second, MGA and those associated with MGA have made statements,

28  including under oath, that confirm Bryant assisted and worked with MGA during

-7-

SUPPLEMENTAL INTERROGATORY RESPONSES

EXHIBIT  _I_
PAGE  _97_

1    his Mattel employment.  Among his many statements to the press, for example,

2    MGA's CEO, Isaac Larian, told the *Wall Street Journal* that "he chose

3    Mr. Bryant's idea for the Bratz over several others after holding a sort of

4    fashion-doll design contest in late 1999"--a time when Bryant was employed by

5    Mattel.  In a sworn affidavit filed in a Hong Kong lawsuit brought by MGA,

6    Isaac Larian stated that "[t]he Bratz dolls were first exhibited in the USA in

7    November 2000," which further confirms that Bryant was working with and aiding

8    MGA on the project prior to his departure from Mattel on or about October 20,

9    2000.  Additionally, Isaac Larian has been sued for fraud and other claims by his

10    brother and one-time partner in MGA, Farhad Larian.  Farhad Larian's verified

11    Complaint alleges, among other things, that "in or about late 1999 and early 2000,

12    Isaac became aware of a potential new product line that had tremendous potential

13    for [MGA].  The new product line involved the 'Bratz' dolls and related products."

14    The verified Complaint further alleges:  "In or about early 2000, Isaac called a

15    meeting to discuss the new Bratz product line with selected individuals" at MGA,

16    and took affirmative steps "to conceal" from Farhad Larian MGA's "plans for the

17    Bratz line" in February, March and May 2000.  Bryant was working for Mattel

18    during each of these time periods.

19         Third, although discovery is still in its early stages, other witnesses

20    who have testified thus far in the case have provided testimony revealing that

21    Bryant aided and worked with MGA during his Mattel employment.  Bryant

22    testified that he pitched the Bratz project to MGA in late August and September

23    2000.  Bryant also testified that he had no contact with MGA until August 2000

24    and had never even heard of MGA before July 2000. Bryant claims that he

25    discussed the Bratz project with Anna Rhee--and introduced Ms. Rhee to MGA--

26    only after he stopped working for Mattel in late October 2000.  After Bryant

27    introduced Ms. Rhee to MGA (which is undisputed--Bryant and Ms. Rhee agree

28

-8-

EXHIBIT I
PAGE 98

1 that she had no involvement with MGA prior to Bryant's introduction), Ms. Rhee

2 painted Bratz doll heads.

3       During the six months from August 2004 (when MGA made its initial

4 document production in this case) to January 2005, MGA produced a mere eight

5 pages of payment records relating to work that Ms. Rhee performed on Bryant-

6 related projects in the year 2000.  These pages relate exclusively to work that

7 Ms. Rhee did on Bryant-related projects in December 2000, after Bryant left

8 Mattel, which would be consistent with Bryant's testimony.

9       After Bryant testified and after MGA made its initial production of

10 Anna Rhee documents, however, Anna Rhee produced documents pursuant to

11 subpoena in mid-January 2005.  Included in Ms. Rhee's production were

12 approximately twenty invoices for work that she performed on Bryant-related

13 MGA projects in the year 2000, none of which MGA or Bryant had disclosed.

14 These invoices also revealed that Ms. Rhee performed work with Bryant and

15 MGA on at least seven separate occasions before Bryant's departure from Mattel--

16 including one invoice that dates to June 12, 2000, when Bryant purportedly had

17 never even heard of MGA.

18       After Ms. Rhee produced these documents, MGA then made a

19 supplemental production of certain internal documents relating to work performed

20 by Ms. Rhee during the June-October 2000 time period.  These belatedly produced

21 MGA records purport to show that Ms. Rhee's work during that time period

22 related to a project known as "Angel" and/or "Prayer Angels."

23       At her deposition, however, Ms. Rhee testified that her work during

24 that time period was for Bratz and that "Angel" was MGA's and Bryant's code

25 name for Bratz.  Thus, Ms. Rhee testified that her June 12, 2000 work was for face

26 painting on two Bratz doll heads; her late August 2000 work was for face painting

27 on four Bratz doll heads; and her work as of September 8, 2000 was for face

28

SUPPLEMENTAL INTERROGATORY RESPONSES

EXHIBIT  I
PAGE  99

1 painting on additional Bratz doll heads.  All of these are times when Bryant was
2 employed by Mattel.

3        At the deposition, defendants' counsel repeatedly tried--and failed--to
4 persuade Ms. Rhee to agree with their claim that "Angel" and/or "Prayer Angels"
5 was a different doll project than Bratz and that she worked on that project in the
6 June 2000, not Bratz.  For example, defendants' counsel asked whether the
7 June 12, 2000 invoice--which Ms. Rhee had testified was for work on Bratz--
8 "could" instead relate to the doll "that ultimately came to market as Prayer
9 Angels."  Ms. Rhee responded:  "There's no way."

10        Ms. Rhee further testified that during a time when Bryant was
11 necessarily employed by Mattel, he had contacted her about the "big" and "secret"
12 project that he was working on.  Bryant instructed Anna Rhee not to tell anyone
13 about the "secret" project, including Mattel employees.  He discussed this project
14 with Ms. Rhee while she was visiting the Mattel Design Center where Bryant was
15 working and informed her that he had engaged a "corporate attorney" to help him
16 with the "secret" project.

17        Fourth, while working for Mattel, Bryant concealed and affirmatively
18 misrepresented his aid and assistance to MGA in other ways.  In particular, despite
19 his obligations to do so, Bryant failed to notify his Mattel supervisor of his
20 conflict of interest in working with MGA.  Prior to and upon his departure, Bryant
21 further misrepresented to Mattel, including to Ivy Ross and Sandy Yamamoto, his
22 future plans by stating that he was not going to work with a competitor.

23        Finally, both Bryant and MGA have spoliated evidence relating to the
24 timing and extent of Bryant's aid to and work with MGA during his Mattel
25 employment.  One example was revealed by the testimony of Victoria O'Connor, a
26 former MGA executive.  According to Ms. O'Connor, Bryant faxed a signed copy
27 of a Bryant/MGA contract to MGA from Mattel.  Upon receipt, each page of the
28 contract included a fax header that read "Barbie Collectibles" and bore the number

-10-
SUPPLEMENTAL INTERROGATORY RESPONSES

EXHIBIT  I
PAGE  100

1  of the Mattel fax machine that it came from, revealing that it came from Mattel's

2  Designer Center where Bryant worked.  When Ms. O'Connor brought this to the

3  attention of Isaac Larian, Mr. Larian instructed her to "white-out" the fax header

4  information on all pages of the contract and send the contract, as altered, to an

5  outside MGA attorney.  At Mr. Larian's direction, Ms. O'Connor proceeded to

6  alter each page of the contract in order to conceal, as Ms. O'Connor testified, the

7  fact that Bryant "was still employed at Mattel at the time the contract [between

8  MGA and Bryant] was executed."

9        As further examples, Bryant has produced documents that appear to

10  have been altered to conceal information.  These include, most notably, a fax of

11  Bratz drawings that has a fax header date of April 10, 2000--six months before

12  Bryant left Mattel's employ. Although the fax header information on the page

13  produced by Bryant states that it was the third page of a fax transmission, neither

14  preceding nor subsequent pages, nor any cover sheet, has been produced.  Further,

15  even though the fax header on the produced page has fields for both the sender's

16  name and the sender's telephone number, neither the name of the sender nor the

17  sender's telephone number appears in the fax header.

18        Both MGA and Bryant also have failed and refused to provide Mattel

19  with access to original documents, despite the fact that one or both apparently

20  have already performed destructive ink chemistry analyses on Bryant's original

21  drawings and despite their agreement to provide those originals.  Bryant's counsel

22  agreed to produce all of Bryant's original Bratz drawings at his deposition.

23  Despite these promises, Bryant brought only a few of his original drawings to the

24  deposition.  Some of these drawings--including the originals of documents

25  BRYANT 192 and BRYANT 210--had holes in them, indicating that samples had

26  been extracted for ink chemical dating analysis.  Bryant testified that his drawings

27  did not have holes in them when he turned them over to defendants' counsel and

28  that he was unaware of the origin of the holes.  Appearances notwithstanding,

EXHIBIT __T__
PAGE __/O/__

1   defendants' counsel has denied that anyone engaged in destructive sampling or
2   analysis of Bryant's original drawings.  Defendants have not, however, explained
3   the origin of the holes in the original drawings.

4           Ramona Prince, a third-party witness, has raised other questions
5   about the integrity of Bryant's documents.  According to both Ms. Prince and
6   Bryant, Bryant showed Ms. Prince his Bratz drawings in August 1999, when he
7   was employed by Mattel.  Ms. Prince, however, has testified that markings which
8   now appear on the copy of a Bratz drawing produced by defendants did *not* appear
9   on the original drawing that Bryant showed her in 1999.  This conflicts with
10  Bryant's testimony about the drawing.  He claims that he created the drawing in its
11  entirety in August 1998, before he showed it to Ms. Prince.

12          By way of further answer, pursuant to <u>Federal Rule of Civil</u>
13  <u>Procedure</u> 33(d), Mattel will produce responsive, non-privileged documents and
14  tangible items in its possession, custody or control from which the answer to this
15  Interrogatory may be derived.

16          By way of further answer, Mattel currently has not yet received
17  discovery from defendant or MGA, has not yet obtained any deposition testimony
18  and has not yet had the opportunity to obtain information from other third parties
19  who may possess relevant information.  Mattel therefore reserves the right to
20  supplement this response after Mattel receives more information about defendant's
21  activities.  By way of further answer, this topic may be the subject of expert
22  testimony, which will be disclosed in the manner, and at the time, required for
23  expert disclosures pursuant to the <u>Federal</u> and <u>Local Rules</u>.

24

25  <u>INTERROGATORY NO. 2</u>:

26          State all facts supporting YOUR contention, if YOU so contend, that
27  Bryant for his own gain, or the gain of any third party, at any time converted,

28

EXHIBIT ___I___
PAGE ___102___

1  improperly used, sold, assigned or otherwise transferred any work product of his

2  creation which YOU believe was owned by MATTEL.

3

4  SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2:

5            In addition to the general objections stated above, Mattel specifically

6  objects to this Interrogatory on the grounds that it calls for the disclosure of

7  information subject to the attorney-client privilege, the attorney work-product

8  doctrine and other applicable privileges.  Mattel further objects to this

9  Interrogatory on the ground that it calls for the disclosure of confidential and/or

10 proprietary information, which Mattel will disclose only subject to and in reliance

11 upon a suitable protective order.  Mattel further objects to this Interrogatory as

12 unreasonably burdensome and overbroad in that it purports to require Mattel to

13 summarize all facts on this subject, including without limitation, facts that are

14 known to or in the possession, custody and control of defendant Bryant,

15 defendant-in-intervention MGA Entertainment, Inc. and nonparties, including

16 nonparties associated with Bryant and/or MGA.  Mattel only undertakes to make a

17 good-faith, reasonable effort to summarize facts currently known to it in

18 responding to this Interrogatory.  Mattel further objects to this Interrogatory on the

19 grounds that it is premature in that it purports to seek to all facts relating to this

20 subject at the outset of discovery in this action and also seeks to circumvent the

21 expert disclosure provisions of the Federal Rules of Civil Procedure and the Local

22 Rules.

23            Subject to and without waiving the foregoing general and specific

24 objections, Mattel responds as follows:

25            On January 4, 1999, upon starting his second term of Mattel

26 employment, and as a condition of and in consideration for his employment,

27 defendant Bryant entered into an Employee Confidential Information and

28 Inventions Agreement (the "Employee Agreement").  Among other things, Bryant

SUPPLEMENTAL INTERROGATORY RESPONSES

EXHIBIT ___I___
PAGE __103__

1  agreed that he would not, without Mattel's express written consent, "engage in any
2  employment or business other than for [Mattel], or invest in or assist (in any
3  manner) any business competitive with the business or future business plans of
4  [Mattel]." Bryant further acknowledged that he held a position of trust with
5  Mattel. In addition, Bryant assigned to Mattel all right, title and interest in
6  "inventions," including without limitation "designs," that he created, conceived or
7  reduced to practice, whether alone or jointly with others, during his employment
8  by Mattel under the terms set forth in his Employee Agreement. A copy of
9  defendant's Employee Agreement with Mattel, dated January 4, 1999, is attached
10 to the Complaint as Exhibit A and is hereby incorporated into this response by this
11 reference. Before his departure from Mattel, Bryant confirmed his obligations in a
12 Proprietary Information Checkout form, which Bryant agreed to and signed. A
13 copy of this additional agreement has been produced in this action and is hereby
14 incorporated into this response by this reference.

15         Also on January 4, 1999, Bryant executed a Conflict of Interest
16 Questionnaire (the "Conflict Questionnaire"). Among other things, Bryant
17 certified in the Conflict Questionnaire that, other than as disclosed, he had not
18 worked for any competitor of Mattel in the prior twelve months and had not
19 engaged in any business venture or transaction involving a Mattel competitor that
20 could be construed as a conflict of interest. Bryant specifically agreed that he
21 would immediately notify his supervisor of any change in his situation that would
22 cause him to change any of the foregoing certifications. The only conflict
23 disclosure that Bryant made on the Conflict Questionnaire concerned what
24 defendant stated was "freelance" work for Ashton-Drake that is unrelated to the
25 conduct alleged herein. At no time did Bryant disclose to Mattel that he was
26 working with MGA, a known competitor, while employed by Mattel, or that he
27 was paid by MGA for services rendered to MGA while he was a Mattel employee.
28

-14-
SUPPLEMENTAL INTERROGATORY RESPONSES

EXHIBIT ⊥
PAGE 104

1   A copy of the Conflict Questionnaire executed by Bryant is attached as Exhibit B

2   to the Complaint and is hereby incorporated into this response by this reference.

3         In late November 2003, Mattel obtained a copy of a contract

4   evidencing that Bryant had aided and assisted, and worked as a designer with,

5   MGA, a Mattel competitor, while he was employed by Mattel and was being paid

6   by Mattel for his exclusive services as a designer. Bryant's agreement with MGA

7   obligated him to provide design services to MGA on a "top priority" basis. In

8   addition, his agreement with MGA purported to assign to MGA rights to

9   preexisting works by Bryant and to deem work and services furnished by Bryant to

10   MGA under the agreement as "works for hire." Furthermore, Bryant's agreement

11   with MGA provided that he would be paid for such services and receive royalties

12   and other consideration for products on which he provided aid or assistance. A

13   copy of defendant's agreement with MGA, in the form obtained by Mattel, has

14   been produced in this case and is hereby incorporated into this response by this

15   reference.

16         Although discovery and Mattel's investigation are on-going,

17   additional documents, testimony and other evidence thus far obtained have

18   confirmed that Bryant worked with and aided MGA, and advanced his own

19   personal interests over Mattel's, during the term of his Mattel employment without

20   Mattel's express written permission. First, Bryant admitted at deposition that he

21   did so, although he sought to minimize and conceal the time period and extent of

22   his aid to and work with MGA. Among other things, Bryant testified that (1) he

23   made pitches to MGA concerning the Bratz project during the term of his

24   employment; (2) he used Mattel personnel and other Mattel resources to assist him

25   in such pitches, including without limitation by using Mattel personnel and

26   resources to make what he called a "dummy" and others have called a three-

27   dimensional prototype; (3) he used Mattel personnel and other Mattel resources to

28   work on the Bratz project during his Mattel employment, including without

-15-

SUPPLEMENTAL INTERROGATORY RESPONSES

EXHIBIT   I

PAGE   105

1  limitation by (a) obtaining information about a Mattel hair vendor, which Bryant

2  then contacted for his own and MGA's benefit and which Bryant told he was

3  working with MGA; and (b) identifying others who Bryant knew as a consequence

4  of his Mattel employment to work on the project and enlisting them to work on the

5  Bratz project during the term of his Mattel employment; (4) he worked on what

6  Bryant characterized as a "test project" to aid and assist MGA and benefit himself,

7  at Mattel's expense, during the term of his Mattel employment;  (5) he entered into

8  his agreement with MGA during the term of his Mattel employment and used

9  Mattel resources in connection with the negotiation and execution of that

10  agreement; and (6) he received monetary payments and other benefits from MGA

11  during the term of his Mattel employment, and both Bryant and MGA benefitted

12  further as a consequence of his aid and assistance to and work with MGA during

13  the term of his Mattel employment.

14      Second, MGA and those associated with MGA have made statements,

15  including under oath, that confirm Bryant assisted and worked with MGA during

16  his Mattel employment.  Among his many statements to the press, for example,

17  MGA's CEO, Isaac Larian, told the *Wall Street Journal* that "he chose

18  Mr. Bryant's idea for the Bratz over several others after holding a sort of

19  fashion-doll design contest in late 1999"--a time when Bryant was employed by

20  Mattel.  In a sworn affidavit filed in a Hong Kong lawsuit brought by MGA,

21  Isaac Larian stated that "[t]he Bratz dolls were first exhibited in the USA in

22  November 2000," which further confirms that Bryant was working with and aiding

23  MGA on the project prior to his departure from Mattel on or about October 20,

24  2000.  Additionally, Isaac Larian has been sued for fraud and other claims by his

25  brother and one-time partner in MGA, Farhad Larian.  Farhad Larian's verified

26  Complaint alleges, among other things, that "in or about late 1999 and early 2000,

27  Isaac became aware of a potential new product line that had tremendous potential

28  for [MGA].  The new product line involved the 'Bratz' dolls and related products."

07209/655298.1

-16-

SUPPLEMENTAL INTERROGATORY RESPONSES

EXHIBIT  I

PAGE  106

1  The verified Complaint further alleges: "In or about early 2000, Isaac called a
2  meeting to discuss the new Bratz product line with selected individuals" at MGA,
3  and took affirmative steps "to conceal" from Farhad Larian MGA's "plans for the
4  Bratz line" in February, March and May 2000.  Bryant was working for Mattel
5  during each of these time periods.

6          Third, although discovery is still in its early stages, other witnesses
7  who have testified thus far in the case have provided testimony revealing that
8  Bryant aided and worked with MGA during his Mattel employment.  Bryant
9  testified that he pitched the Bratz project to MGA in late August and September
10  2000.  Bryant also testified that he had no contact with MGA until August 2000
11  and had never even heard of MGA before July 2000. Bryant claims that he
12  discussed the Bratz project with Anna Rhee--and introduced Ms. Rhee to MGA--
13  only after he stopped working for Mattel in late October 2000.  After Bryant
14  introduced Ms. Rhee to MGA (which is undisputed--Bryant and Ms. Rhee agree
15  that she had no involvement with MGA prior to Bryant's introduction), Ms. Rhee
16  painted Bratz doll heads.

17          During the six months from August 2004 (when MGA made its initial
18  document production in this case) to January 2005, MGA produced a mere eight
19  pages of payment records relating to work that Ms. Rhee performed on Bryant-
20  related projects in the year 2000.  These pages relate exclusively to work that
21  Ms. Rhee did on Bryant-related projects in December 2000, after Bryant left
22  Mattel, which would be consistent with Bryant's testimony.

23          After Bryant testified and after MGA made its initial production of
24  Anna Rhee documents, however, Anna Rhee produced documents pursuant to
25  subpoena in mid-January 2005.  Included in Ms. Rhee's production were
26  approximately twenty invoices for work that she performed on Bryant-related
27  MGA projects in the year 2000, none of which MGA or Bryant had disclosed.
28  These invoices also revealed that Ms. Rhee performed work with Bryant and

-17-
SUPPLEMENTAL INTERROGATORY RESPONSES

EXHIBIT ___I___
PAGE __107__

1  MGA on at least seven separate occasions before Bryant's departure from Mattel--

2  including one invoice that dates to June 12, 2000, when Bryant purportedly had

3  never even heard of MGA.

4       After Ms. Rhee produced these documents, MGA then made a

5  supplemental production of certain internal documents relating to work performed

6  by Ms. Rhee during the June-October 2000 time period.  These belatedly produced

7  MGA records purport to show that Ms. Rhee's work during that time period

8  related to a project known as "Angel" and/or "Prayer Angels."

9       At her deposition, however, Ms. Rhee testified that her work during

10  that time period was for Bratz and that "Angel" was MGA's and Bryant's code

11  name for Bratz.  Thus, Ms. Rhee testified that her June 12, 2000 work was for face

12  painting on two Bratz doll heads; her late August 2000 work was for face painting

13  on four Bratz doll heads; and her work as of September 8, 2000 was for face

14  painting on additional Bratz doll heads.  All of these are times when Bryant was

15  employed by Mattel.

16       At the deposition, defendants' counsel repeatedly tried--and failed--to

17  persuade Ms. Rhee to agree with their claim that "Angel" and/or "Prayer Angels"

18  was a different doll project than Bratz and that she worked on that project in the

19  June 2000, not Bratz.  For example, defendants' counsel asked whether the

20  June 12, 2000 invoice--which Ms. Rhee had testified was for work on Bratz--

21  "could" instead relate to the doll "that ultimately came to market as Prayer

22  Angels."  Ms. Rhee responded:  "There's no way."

23       Ms. Rhee further testified that during a time when Bryant was

24  necessarily employed by Mattel, he had contacted her about the "big" and "secret"

25  project that he was working on.  Bryant instructed Anna Rhee not to tell anyone

26  about the "secret" project, including Mattel employees.  He discussed this project

27  with Ms. Rhee while she was visiting the Mattel Design Center where Bryant was

28

-18-

SUPPLEMENTAL INTERROGATORY RESPONSES

EXHIBIT  I
PAGE  108

1  working and informed her that he had engaged a "corporate attorney" to help him
2  with the "secret" project.

3         Fourth, while working for Mattel, Bryant concealed and affirmatively
4  misrepresented his aid and assistance to MGA in other ways.  In particular, despite
5  his obligations to do so, Bryant failed to notify his Mattel supervisor of his
6  conflict of interest in working with MGA.  Prior to and upon his departure, Bryant
7  further misrepresented to Mattel, including to Ivy Ross and Sandy Yamamoto, his
8  future plans by stating that he was not going to work with a competitor.

9         Finally, both Bryant and MGA have spoliated evidence relating to the
10  timing and extent of Bryant's aid to and work with MGA during his Mattel
11  employment.  One example was revealed by the testimony of Victoria O'Connor, a
12  former MGA executive.  According to Ms. O'Connor, Bryant faxed a signed copy
13  of a Bryant/MGA contract to MGA from Mattel.  Upon receipt, each page of the
14  contract included a fax header that read "Barbie Collectibles" and bore the number
15  of the Mattel fax machine that it came from, revealing that it came from Mattel's
16  Designer Center where Bryant worked.  When Ms. O'Connor brought this to the
17  attention of Isaac Larian, Mr. Larian instructed her to "white-out" the fax header
18  information on all pages of the contract and send the contract, as altered, to an
19  outside MGA attorney.  At Mr. Larian's direction, Ms. O'Connor proceeded to
20  alter each page of the contract in order to conceal, as Ms. O'Connor testified, the
21  fact that Bryant "was still employed at Mattel at the time the contract [between
22  MGA and Bryant] was executed."

23         As further examples, Bryant has produced documents that appear to
24  have been altered to conceal information.  These include, most notably, a fax of
25  Bratz drawings that has a fax header date of April 10, 2000--six months before
26  Bryant left Mattel's employ. Although the fax header information on the page
27  produced by Bryant states that it was the third page of a fax transmission, neither
28  preceding nor subsequent pages, nor any cover sheet, has been produced.  Further,

07209/655298.1

-19-

SUPPLEMENTAL INTERROGATORY RESPONSES

EXHIBIT ___
PAGE ___

1  even though the fax header on the produced page has fields for both the sender's

2  name and the sender's telephone number, neither the name of the sender nor the

3  sender's telephone number appears in the fax header.

4        Both MGA and Bryant also have failed and refused to provide Mattel

5  with access to original documents, despite the fact that one or both apparently

6  have already performed destructive ink chemistry analyses on Bryant's original

7  drawings and despite their agreement to provide those originals.  Bryant's counsel

8  agreed to produce all of Bryant's original Bratz drawings at his deposition.

9  Despite these promises, Bryant brought only a few of his original drawings to the

10  deposition.  Some of these drawings--including the originals of documents

11  BRYANT 192 and BRYANT 210--had holes in them, indicating that samples had

12  been extracted for ink chemical dating analysis.  Bryant testified that his drawings

13  did not have holes in them when he turned them over to defendants' counsel and

14  that he was unaware of the origin of the holes.  Appearances notwithstanding,

15  defendants' counsel has denied that anyone engaged in destructive sampling or

16  analysis of Bryant's original drawings.  Defendants have not, however, explained

17  the origin of the holes in the original drawings.

18        Ramona Prince, a third-party witness, has raised other questions

19  about the integrity of Bryant's documents.  According to both Ms. Prince and

20  Bryant, Bryant showed Ms. Prince his Bratz drawings in August 1999, when he

21  was employed by Mattel.  Ms. Prince, however, has testified that markings which

22  now appear on the copy of a Bratz drawing produced by defendants did *not* appear

23  on the original drawing that Bryant showed her in 1999.  This conflicts with

24  Bryant's testimony about the drawing.  He claims that he created the drawing in its

25  entirety in August 1998, before he showed it to Ms. Prince.

26        By way of further answer, pursuant to Federal Rule of Civil

27  Procedure 33(d), Mattel will produce responsive, non-privileged documents and

28

07209/655298.1

-20-

EXHIBIT  I
PAGE  110

1 | tangible items in its possession, custody or control from which the answer to this
2 | Interrogatory may be derived.

3 |      By way of further answer, Mattel currently has not yet received
4 | discovery from defendant or MGA, has not yet obtained any deposition testimony
5 | and has not yet had the opportunity to obtain information from other third parties
6 | who may possess relevant information. Mattel therefore reserves the right to
7 | supplement this response after Mattel receives more information about defendant's
8 | activities. By way of further answer, this topic may be the subject of expert
9 | testimony, which will be disclosed in the manner, and at the time, required for
10 | expert disclosures pursuant to the Federal and Local Rules.

11 |

12 | **INTERROGATORY NO. 3:**

13 |      State all facts supporting YOUR contention, if YOU so contend, that
14 | Bryant for his own gain, or the gain of any third party, at any time converted, used,
15 | sold, assigned or otherwise transferred any MATTEL work product owned at any
16 | time by MATTEL or created by any MATTEL employee other than Bryant, or by
17 | any independent contractor, during the time that such PERSON was working for
18 | MATTEL.

19 |

20 | **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3:**

21 |      In addition to the general objections stated above, Mattel specifically
22 | objects to this Interrogatory on the grounds that it calls for the disclosure of
23 | information subject to the attorney-client privilege, the attorney work-product
24 | doctrine and other applicable privileges. Mattel further objects to this
25 | Interrogatory on the ground that it calls for the disclosure of confidential and/or
26 | proprietary information, which Mattel will disclose only subject to and in reliance
27 | upon a suitable protective order. Mattel further objects to this Interrogatory as
28 | unreasonably burdensome and overbroad in that it purports to require Mattel to

SUPPLEMENTAL INTERROGATORY RESPONSES

EXHIBIT  I
PAGE  III

1   summarize all facts on this subject, including without limitation, facts that are

2   known to or in the possession, custody and control of defendant Bryant,

3   defendant-in-intervention MGA Entertainment, Inc. and nonparties, including

4   nonparties associated with Bryant and/or MGA. Mattel only undertakes to make a

5   good-faith, reasonable effort to summarize facts currently known to it in

6   responding to this Interrogatory. Mattel further objects to this Interrogatory on the

7   grounds that it is premature in that it purports to seek to all facts relating to this

8   subject at the outset of discovery in this action and also seeks to circumvent the

9   expert disclosure provisions of the Federal Rules of Civil Procedure and the Local

10  Rules.

11          Subject to and without waiving the foregoing general and specific

12  objections, Mattel responds as follows:

13          On January 4, 1999, upon starting his second term of Mattel

14  employment, and as a condition of and in consideration for his employment,

15  defendant Bryant entered into an Employee Confidential Information and

16  Inventions Agreement (the "Employee Agreement"). Among other things, Bryant

17  agreed that he would not, without Mattel's express written consent, "engage in any

18  employment or business other than for [Mattel], or invest in or assist (in any

19  manner) any business competitive with the business or future business plans of

20  [Mattel]." Bryant further acknowledged that he held a position of trust with

21  Mattel. In addition, Bryant assigned to Mattel all right, title and interest in

22  "inventions," including without limitation "designs," that he created, conceived or

23  reduced to practice, whether alone or jointly with others, during his employment

24  by Mattel under the terms set forth in his Employee Agreement. A copy of

25  defendant's Employee Agreement with Mattel, dated January 4, 1999, is attached

26  to the Complaint as Exhibit A and is hereby incorporated into this response by this

27  reference. Before his departure from Mattel, Bryant confirmed his obligations in a

28  Proprietary Information Checkout form, which Bryant agreed to and signed. A

-22-

SUPPLEMENTAL INTERROGATORY RESPONSES

EXHIBIT  I
PAGE  112

1  copy of this additional agreement has been produced in this action and is hereby

2  incorporated into this response by this reference.

3       Also on January 4, 1999, Bryant executed a Conflict of Interest

4  Questionnaire (the "Conflict Questionnaire").  Among other things, Bryant

5  certified in the Conflict Questionnaire that, other than as disclosed, he had not

6  worked for any competitor of Mattel in the prior twelve months and had not

7  engaged in any business venture or transaction involving a Mattel competitor that

8  could be construed as a conflict of interest.  Bryant specifically agreed that he

9  would immediately notify his supervisor of any change in his situation that would

10  cause him to change any of the foregoing certifications.  The only conflict

11  disclosure that Bryant made on the Conflict Questionnaire concerned what

12  defendant stated was "freelance" work for Ashton-Drake that is unrelated to the

13  conduct alleged herein.  At no time did Bryant disclose to Mattel that he was

14  working with MGA, a known competitor, while employed by Mattel, or that he

15  was paid by MGA for services rendered to MGA while he was a Mattel employee.

16  A copy of the Conflict Questionnaire executed by Bryant is attached as Exhibit B

17  to the Complaint and is hereby incorporated into this response by this reference.

18       In late November 2003, Mattel obtained a copy of a contract

19  evidencing that Bryant had aided and assisted, and worked as a designer with,

20  MGA, a Mattel competitor, while he was employed by Mattel and was being paid

21  by Mattel for his exclusive services as a designer.  Bryant's agreement with MGA

22  obligated him to provide design services to MGA on a "top priority" basis.  In

23  addition, his agreement with MGA purported to assign to MGA rights to

24  preexisting works by Bryant and to deem work and services furnished by Bryant to

25  MGA under the agreement as "works for hire."  Furthermore, Bryant's agreement

26  with MGA provided that he would be paid for such services and receive royalties

27  and other consideration for products on which he provided aid or assistance.  A

28  copy of defendant's agreement with MGA, in the form obtained by Mattel, has

-23-
SUPPLEMENTAL INTERROGATORY RESPONSES

EXHIBIT  I
PAGE  113

1  been produced in this case and is hereby incorporated into this response by this

2  reference.

3           Although discovery and Mattel's investigation are on-going,

4  additional documents, testimony and other evidence thus far obtained have

5  confirmed that Bryant worked with and aided MGA, and advanced his own

6  personal interests over Mattel's, during the term of his Mattel employment without

7  Mattel's express written permission.  First, Bryant admitted at deposition that he

8  did so, although he sought to minimize and conceal the time period and extent of

9  his aid to and work with MGA.  Among other things, Bryant testified that (1) he

10  made pitches to MGA concerning the Bratz project during the term of his

11  employment; (2) he used Mattel personnel and other Mattel resources to assist him

12  in such pitches, including without limitation by using Mattel personnel and

13  resources to make what he called a "dummy" and others have called a three-

14  dimensional prototype; (3) he used Mattel personnel and other Mattel resources to

15  work on the Bratz project during his Mattel employment, including without

16  limitation by (a) obtaining information about a Mattel hair vendor, which Bryant

17  then contacted for his own and MGA's benefit and which Bryant told he was

18  working with MGA; and (b) identifying others who Bryant knew as a consequence

19  of his Mattel employment to work on the project and enlisting them to work on the

20  Bratz project during the term of his Mattel employment; (4) he worked on what

21  Bryant characterized as a "test project" to aid and assist MGA and benefit himself,

22  at Mattel's expense, during the term of his Mattel employment;  (5) he entered into

23  his agreement with MGA during the term of his Mattel employment and used

24  Mattel resources in connection with the negotiation and execution of that

25  agreement; and (6) he received monetary payments and other benefits from MGA

26  during the term of his Mattel employment, and both Bryant and MGA benefitted

27  further as a consequence of his aid and assistance to and work with MGA during

28  the term of his Mattel employment.

1    Second, MGA and those associated with MGA have made statements,
2    including under oath, that confirm Bryant assisted and worked with MGA during
3    his Mattel employment. Among his many statements to the press, for example,
4    MGA's CEO, Isaac Larian, told the *Wall Street Journal* that "he chose
5    Mr. Bryant's idea for the Bratz over several others after holding a sort of
6    fashion-doll design contest in late 1999"--a time when Bryant was employed by
7    Mattel. In a sworn affidavit filed in a Hong Kong lawsuit brought by MGA,
8    Isaac Larian stated that "[t]he Bratz dolls were first exhibited in the USA in
9    November 2000," which further confirms that Bryant was working with and aiding
10   MGA on the project prior to his departure from Mattel on or about October 20,
11   2000. Additionally, Isaac Larian has been sued for fraud and other claims by his
12   brother and one-time partner in MGA, Farhad Larian. Farhad Larian's verified
13   Complaint alleges, among other things, that "in or about late 1999 and early 2000,
14   Isaac became aware of a potential new product line that had tremendous potential
15   for [MGA]. The new product line involved the 'Bratz' dolls and related products."
16   The verified Complaint further alleges: "In or about early 2000, Isaac called a
17   meeting to discuss the new Bratz product line with selected individuals" at MGA,
18   and took affirmative steps "to conceal" from Farhad Larian MGA's "plans for the
19   Bratz line" in February, March and May 2000. Bryant was working for Mattel
20   during each of these time periods.
21   Third, although discovery is still in its early stages, other witnesses
22   who have testified thus far in the case have provided testimony revealing that
23   Bryant aided and worked with MGA during his Mattel employment. Bryant
24   testified that he pitched the Bratz project to MGA in late August and September
25   2000. Bryant also testified that he had no contact with MGA until August 2000
26   and had never even heard of MGA before July 2000. Bryant claims that he
27   discussed the Bratz project with Anna Rhee--and introduced Ms. Rhee to MGA--
28   only after he stopped working for Mattel in late October 2000. After Bryant

-25-
SUPPLEMENTAL INTERROGATORY RESPONSES

EXHIBIT __I__
PAGE __115__

1   introduced Ms. Rhee to MGA (which is undisputed--Bryant and Ms. Rhee agree

2   that she had no involvement with MGA prior to Bryant's introduction), Ms. Rhee

3   painted Bratz doll heads.

4          During the six months from August 2004 (when MGA made its initial

5   document production in this case) to January 2005, MGA produced a mere eight

6   pages of payment records relating to work that Ms. Rhee performed on Bryant-

7   related projects in the year 2000. These pages relate exclusively to work that

8   Ms. Rhee did on Bryant-related projects in December 2000, after Bryant left

9   Mattel, which would be consistent with Bryant's testimony.

10         After Bryant testified and after MGA made its initial production of

11   Anna Rhee documents, however, Anna Rhee produced documents pursuant to

12   subpoena in mid-January 2005. Included in Ms. Rhee's production were

13   approximately twenty invoices for work that she performed on Bryant-related

14   MGA projects in the year 2000, none of which MGA or Bryant had disclosed.

15   These invoices also revealed that Ms. Rhee performed work with Bryant and

16   MGA on at least seven separate occasions before Bryant's departure from Mattel--

17   including one invoice that dates to June 12, 2000, when Bryant purportedly had

18   never even heard of MGA.

19         After Ms. Rhee produced these documents, MGA then made a

20   supplemental production of certain internal documents relating to work performed

21   by Ms. Rhee during the June-October 2000 time period. These belatedly produced

22   MGA records purport to show that Ms. Rhee's work during that time period

23   related to a project known as "Angel" and/or "Prayer Angels."

24         At her deposition, however, Ms. Rhee testified that her work during

25   that time period was for Bratz and that "Angel" was MGA's and Bryant's code

26   name for Bratz. Thus, Ms. Rhee testified that her June 12, 2000 work was for face

27   painting on two Bratz doll heads; her late August 2000 work was for face painting

28   on four Bratz doll heads; and her work as of September 8, 2000 was for face

SUPPLEMENTAL INTERROGATORY RESPONSES

EXHIBIT _I_
PAGE _116_

1  painting on additional Bratz doll heads.  All of these are times when Bryant was
2  employed by Mattel.

3        At the deposition, defendants' counsel repeatedly tried--and failed--to
4  persuade Ms. Rhee to agree with their claim that "Angel" and/or "Prayer Angels"
5  was a different doll project than Bratz and that she worked on that project in the
6  June 2000, not Bratz.  For example, defendants' counsel asked whether the
7  June 12, 2000 invoice--which Ms. Rhee had testified was for work on Bratz--
8  "could" instead relate to the doll "that ultimately came to market as Prayer
9  Angels."  Ms. Rhee responded:  "There's no way."

10        Ms. Rhee further testified that during a time when Bryant was
11  necessarily employed by Mattel, he had contacted her about the "big" and "secret"
12  project that he was working on.  Bryant instructed Anna Rhee not to tell anyone
13  about the "secret" project, including Mattel employees.  He discussed this project
14  with Ms. Rhee while she was visiting the Mattel Design Center where Bryant was
15  working and informed her that he had engaged a "corporate attorney" to help him
16  with the "secret" project.

17        Fourth, while working for Mattel, Bryant concealed and affirmatively
18  misrepresented his aid and assistance to MGA in other ways.  In particular, despite
19  his obligations to do so, Bryant failed to notify his Mattel supervisor of his
20  conflict of interest in working with MGA.  Prior to and upon his departure, Bryant
21  further misrepresented to Mattel, including to Ivy Ross and Sandy Yamamoto, his
22  future plans by stating that he was not going to work with a competitor.

23        Finally, both Bryant and MGA have spoliated evidence relating to the
24  timing and extent of Bryant's aid to and work with MGA during his Mattel
25  employment.  One example was revealed by the testimony of Victoria O'Connor, a
26  former MGA executive.  According to Ms. O'Connor, Bryant faxed a signed copy
27  of a Bryant/MGA contract to MGA from Mattel.  Upon receipt, each page of the
28  contract included a fax header that read "Barbie Collectibles" and bore the number

-27-

SUPPLEMENTAL INTERROGATORY RESPONSES

EXHIBIT _I_
PAGE _117_

1  of the Mattel fax machine that it came from, revealing that it came from Mattel's

2  Designer Center where Bryant worked.  When Ms. O'Connor brought this to the

3  attention of Isaac Larian, Mr. Larian instructed her to "white-out" the fax header

4  information on all pages of the contract and send the contract, as altered, to an

5  outside MGA attorney.  At Mr. Larian's direction, Ms. O'Connor proceeded to

6  alter each page of the contract in order to conceal, as Ms. O'Connor testified, the

7  fact that Bryant "was still employed at Mattel at the time the contract [between

8  MGA and Bryant] was executed."

9          As further examples, Bryant has produced documents that appear to

10 have been altered to conceal information.  These include, most notably, a fax of

11 Bratz drawings that has a fax header date of April 10, 2000--six months before

12 Bryant left Mattel's employ. Although the fax header information on the page

13 produced by Bryant states that it was the third page of a fax transmission, neither

14 preceding nor subsequent pages, nor any cover sheet, has been produced.  Further,

15 even though the fax header on the produced page has fields for both the sender's

16 name and the sender's telephone number, neither the name of the sender nor the

17 sender's telephone number appears in the fax header.

18         Both MGA and Bryant also have failed and refused to provide Mattel

19 with access to original documents, despite the fact that one or both apparently

20 have already performed destructive ink chemistry analyses on Bryant's original

21 drawings and despite their agreement to provide those originals.  Bryant's counsel

22 agreed to produce all of Bryant's original Bratz drawings at his deposition.

23 Despite these promises, Bryant brought only a few of his original drawings to the

24 deposition.  Some of these drawings--including the originals of documents

25 BRYANT 192 and BRYANT 210--had holes in them, indicating that samples had

26 been extracted for ink chemical dating analysis.  Bryant testified that his drawings

27 did not have holes in them when he turned them over to defendants' counsel and

28 that he was unaware of the origin of the holes.  Appearances notwithstanding,

EXHIBIT    I
PAGE    118

1  defendants' counsel has denied that anyone engaged in destructive sampling or
2  analysis of Bryant's original drawings.  Defendants have not, however, explained
3  the origin of the holes in the original drawings.
4      Ramona Prince, a third-party witness, has raised other questions
5  about the integrity of Bryant's documents.  According to both Ms. Prince and
6  Bryant, Bryant showed Ms. Prince his Bratz drawings in August 1999, when he
7  was employed by Mattel.  Ms. Prince, however, has testified that markings which
8  now appear on the copy of a Bratz drawing produced by defendants did *not* appear
9  on the original drawing that Bryant showed her in 1999.  This conflicts with
10 Bryant's testimony about the drawing.  He claims that he created the drawing in its
11 entirety in August 1998, before he showed it to Ms. Prince.
12     By way of further answer, pursuant to Federal Rule of Civil
13 Procedure 33(d), Mattel will produce responsive, non-privileged documents and
14 tangible items in its possession, custody or control from which the answer to this
15 Interrogatory may be derived.
16     By way of further answer, Mattel currently has not yet received
17 discovery from defendant or MGA, has not yet obtained any deposition testimony
18 and has not yet had the opportunity to obtain information from other third parties
19 who may possess relevant information.  Mattel therefore reserves the right to
20 supplement this response after Mattel receives more information about defendant's
21 activities.  By way of further answer, this topic may be the subject of expert
22 testimony, which will be disclosed in the manner, and at the time, required for
23 expert disclosures pursuant to the Federal and Local Rules.
24
25 INTERROGATORY NO. 6:
26     State all facts supporting YOUR claim that YOU have been damaged
27 by any act or omission of Bryant.
28

EXHIBIT _I_
PAGE _119_

## SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 6:

In addition to the general objections stated above, Mattel specifically objects to this Interrogatory on the grounds that it calls for the disclosure of information subject to the attorney-client privilege, the attorney work-product doctrine and other applicable privileges.  Mattel further objects to this Interrogatory on the ground that it calls for the disclosure of confidential and/or proprietary information, which Mattel will disclose only subject to and in reliance upon a suitable protective order.  Mattel further objects to this Interrogatory as unreasonably burdensome and overbroad in that it purports to require Mattel to summarize all facts on this subject, including without limitation, facts that are known to or in the possession, custody and control of defendant Bryant, defendant-in-intervention MGA Entertainment, Inc. and nonparties, including nonparties associated with Bryant and/or MGA.  Mattel only undertakes to make a good-faith, reasonable effort to summarize facts currently known to it in responding to this Interrogatory.  Mattel further objects to this Interrogatory on the grounds that it is premature in that it purports to seek to all facts relating to this subject at the outset of discovery in this action and also seeks to circumvent the expert disclosure provisions of the Federal Rules of Civil Procedure and the Local Rules.

Subject to and without waiving the foregoing general and specific objections, Mattel responds as follows:

On January 4, 1999, upon starting his second term of Mattel employment, and as a condition of and in consideration for his employment, defendant Bryant entered into an Employee Confidential Information and Inventions Agreement (the "Employee Agreement").  Among other things, Bryant agreed that he would not, without Mattel's express written consent, "engage in any employment or business other than for [Mattel], or invest in or assist (in any manner) any business competitive with the business or future business plans of

SUPPLEMENTAL INTERROGATORY RESPONSES

EXHIBIT ___I___
PAGE __120__

1  [Mattel]."  Bryant further acknowledged that he held a position of trust with

2  Mattel.  In addition, Bryant assigned to Mattel all right, title and interest in

3  "inventions," including without limitation "designs," that he created, conceived or

4  reduced to practice, whether alone or jointly with others, during his employment

5  by Mattel under the terms set forth in his Employee Agreement.  A copy of

6  defendant's Employee Agreement with Mattel, dated January 4, 1999, is attached

7  to the Complaint as Exhibit A and is hereby incorporated into this response by this

8  reference.  Before his departure from Mattel, Bryant confirmed his obligations in a

9  Proprietary Information Checkout form, which Bryant agreed to and signed.  A

10  copy of this additional agreement has been produced in this action and is hereby

11  incorporated into this response by this reference.

12        Also on January 4, 1999, Bryant executed a Conflict of Interest

13  Questionnaire (the "Conflict Questionnaire").  Among other things, Bryant

14  certified in the Conflict Questionnaire that, other than as disclosed, he had not

15  worked for any competitor of Mattel in the prior twelve months and had not

16  engaged in any business venture or transaction involving a Mattel competitor that

17  could be construed as a conflict of interest.  Bryant specifically agreed that he

18  would immediately notify his supervisor of any change in his situation that would

19  cause him to change any of the foregoing certifications.  The only conflict

20  disclosure that Bryant made on the Conflict Questionnaire concerned what

21  defendant stated was "freelance" work for Ashton-Drake that is unrelated to the

22  conduct alleged herein.  At no time did Bryant disclose to Mattel that he was

23  working with MGA, a known competitor, while employed by Mattel, or that he

24  was paid by MGA for services rendered to MGA while he was a Mattel employee.

25  A copy of the Conflict Questionnaire executed by Bryant is attached as Exhibit B

26  to the Complaint and is hereby incorporated into this response by this reference.

27        In late November 2003, Mattel obtained a copy of a contract

28  evidencing that Bryant had aided and assisted, and worked as a designer with,

EXHIBIT  I
PAGE  121

1   MGA, a Mattel competitor, while he was employed by Mattel and was being paid
2   by Mattel for his exclusive services as a designer.  Bryant's agreement with MGA
3   obligated him to provide design services to MGA on a "top priority" basis.  In
4   addition, his agreement with MGA purported to assign to MGA rights to
5   preexisting works by Bryant and to deem work and services furnished by Bryant to
6   MGA under the agreement as "works for hire."  Furthermore, Bryant's agreement
7   with MGA provided that he would be paid for such services and receive royalties
8   and other consideration for products on which he provided aid or assistance.  A
9   copy of defendant's agreement with MGA, in the form obtained by Mattel, has
10  been produced in this case and is hereby incorporated into this response by this
11  reference.
12          Although discovery and Mattel's investigation are on-going,
13  additional documents, testimony and other evidence thus far obtained have
14  confirmed that Bryant worked with and aided MGA, and advanced his own
15  personal interests over Mattel's, during the term of his Mattel employment without
16  Mattel's express written permission.  First, Bryant admitted at deposition that he
17  did so, although he sought to minimize and conceal the time period and extent of
18  his aid to and work with MGA.  Among other things, Bryant testified that (1) he
19  made pitches to MGA concerning the Bratz project during the term of his
20  employment; (2) he used Mattel personnel and other Mattel resources to assist him
21  in such pitches, including without limitation by using Mattel personnel and
22  resources to make what he called a "dummy" and others have called a three-
23  dimensional prototype; (3) he used Mattel personnel and other Mattel resources to
24  work on the Bratz project during his Mattel employment, including without
25  limitation by (a) obtaining information about a Mattel hair vendor, which Bryant
26  then contacted for his own and MGA's benefit and which Bryant told he was
27  working with MGA; and (b) identifying others who Bryant knew as a consequence
28  of his Mattel employment to work on the project and enlisting them to work on the

07209/655298.1

-32-

SUPPLEMENTAL INTERROGATORY RESPONSES

EXHIBIT __I__
PAGE __122__

1 Bratz project during the term of his Mattel employment; (4) he worked on what
2 Bryant characterized as a "test project" to aid and assist MGA and benefit himself,
3 at Mattel's expense, during the term of his Mattel employment;  (5) he entered into
4 his agreement with MGA during the term of his Mattel employment and used
5 Mattel resources in connection with the negotiation and execution of that
6 agreement; and (6) he received monetary payments and other benefits from MGA
7 during the term of his Mattel employment, and both Bryant and MGA benefitted
8 further as a consequence of his aid and assistance to and work with MGA during
9 the term of his Mattel employment.

10          Second, MGA and those associated with MGA have made statements,
11 including under oath, that confirm Bryant assisted and worked with MGA during
12 his Mattel employment.  Among his many statements to the press, for example,
13 MGA's CEO, Isaac Larian, told the *Wall Street Journal* that "he chose
14 Mr. Bryant's idea for the Bratz over several others after holding a sort of
15 fashion-doll design contest in late 1999"--a time when Bryant was employed by
16 Mattel.  In a sworn affidavit filed in a Hong Kong lawsuit brought by MGA,
17 Isaac Larian stated that "[t]he Bratz dolls were first exhibited in the USA in
18 November 2000," which further confirms that Bryant was working with and aiding
19 MGA on the project prior to his departure from Mattel on or about October 20,
20 2000.  Additionally, Isaac Larian has been sued for fraud and other claims by his
21 brother and one-time partner in MGA, Farhad Larian.  Farhad Larian's verified
22 Complaint alleges, among other things, that "in or about late 1999 and early 2000,
23 Isaac became aware of a potential new product line that had tremendous potential
24 for [MGA].  The new product line involved the 'Bratz' dolls and related products."
25 The verified Complaint further alleges: "In or about early 2000, Isaac called a
26 meeting to discuss the new Bratz product line with selected individuals" *at MGA*,
27 and took affirmative steps "to conceal" from Farhad Larian MGA's "plans for the
28

-33-
SUPPLEMENTAL INTERROGATORY RESPONSES

EXHIBIT  I
PAGE  123

1  Bratz line" in February, March and May 2000.  Bryant was working for Mattel

2  during each of these time periods.

3          Third, although discovery is still in its early stages, other witnesses

4  who have testified thus far in the case have provided testimony revealing that

5  Bryant aided and worked with MGA during his Mattel employment.  Bryant

6  testified that he pitched the Bratz project to MGA in late August and September

7  2000.  Bryant also testified that he had no contact with MGA until August 2000

8  and had never even heard of MGA before July 2000. Bryant claims that he

9  discussed the Bratz project with Anna Rhee--and introduced Ms. Rhee to MGA--

10  only after he stopped working for Mattel in late October 2000.  After Bryant

11  introduced Ms. Rhee to MGA (which is undisputed--Bryant and Ms. Rhee agree

12  that she had no involvement with MGA prior to Bryant's introduction), Ms. Rhee

13  painted Bratz doll heads.

14          During the six months from August 2004 (when MGA made its initial

15  document production in this case) to January 2005, MGA produced a mere eight

16  pages of payment records relating to work that Ms. Rhee performed on Bryant-

17  related projects in the year 2000.  These pages relate exclusively to work that

18  Ms. Rhee did on Bryant-related projects in December 2000, after Bryant left

19  Mattel, which would be consistent with Bryant's testimony.

20          After Bryant testified and after MGA made its initial production of

21  Anna Rhee documents, however, Anna Rhee produced documents pursuant to

22  subpoena in mid-January 2005.  Included in Ms. Rhee's production were

23  approximately twenty invoices for work that she performed on Bryant-related

24  MGA projects in the year 2000, none of which MGA or Bryant had disclosed.

25  These invoices also revealed that Ms. Rhee performed work with Bryant and

26  MGA on at least seven separate occasions before Bryant's departure from Mattel--

27  including one invoice that dates to June 12, 2000, when Bryant purportedly had

28  never even heard of MGA.

07209/655298.1

-34-

SUPPLEMENTAL INTERROGATORY RESPONSES

EXHIBIT _I_
PAGE _124_

1    After Ms. Rhee produced these documents, MGA then made a

2  supplemental production of certain internal documents relating to work performed

3  by Ms. Rhee during the June-October 2000 time period.  These belatedly produced

4  MGA records purport to show that Ms. Rhee's work during that time period

5  related to a project known as "Angel" and/or "Prayer Angels."

6    At her deposition, however, Ms. Rhee testified that her work during

7  that time period was for Bratz and that "Angel" was MGA's and Bryant's code

8  name for Bratz.  Thus, Ms. Rhee testified that her June 12, 2000 work was for face

9  painting on two Bratz doll heads; her late August 2000 work was for face painting

10  on four Bratz doll heads; and her work as of September 8, 2000 was for face

11  painting on additional Bratz doll heads.  All of these are times when Bryant was

12  employed by Mattel.

13    At the deposition, defendants' counsel repeatedly tried--and failed--to

14  persuade Ms. Rhee to agree with their claim that "Angel" and/or "Prayer Angels"

15  was a different doll project than Bratz and that she worked on that project in the

16  June 2000, not Bratz.  For example, defendants' counsel asked whether the

17  June 12, 2000 invoice--which Ms. Rhee had testified was for work on Bratz--

18  "could" instead relate to the doll "that ultimately came to market as Prayer

19  Angels."  Ms. Rhee responded:  "There's no way."

20    Ms. Rhee further testified that during a time when Bryant was

21  necessarily employed by Mattel, he had contacted her about the "big" and "secret"

22  project that he was working on.  Bryant instructed Anna Rhee not to tell anyone

23  about the "secret" project, including Mattel employees.  He discussed this project

24  with Ms. Rhee while she was visiting the Mattel Design Center where Bryant was

25  working and informed her that he had engaged a "corporate attorney" to help him

26  with the "secret" project.

27    Fourth, while working for Mattel, Bryant concealed and affirmatively

28  misrepresented his aid and assistance to MGA in other ways.  In particular, despite

EXHIBIT  I
PAGE  125

1  his obligations to do so, Bryant failed to notify his Mattel supervisor of his

2  conflict of interest in working with MGA. Prior to and upon his departure, Bryant

3  further misrepresented to Mattel, including to Ivy Ross and Sandy Yamamoto, his

4  future plans by stating that he was not going to work with a competitor.

5      Finally, both Bryant and MGA have spoliated evidence relating to the

6  timing and extent of Bryant's aid to and work with MGA during his Mattel

7  employment. One example was revealed by the testimony of Victoria O'Connor, a

8  former MGA executive. According to Ms. O'Connor, Bryant faxed a signed copy

9  of a Bryant/MGA contract to MGA from Mattel. Upon receipt, each page of the

10 contract included a fax header that read "Barbie Collectibles" and bore the number

11 of the Mattel fax machine that it came from, revealing that it came from Mattel's

12 Designer Center where Bryant worked. When Ms. O'Connor brought this to the

13 attention of Isaac Larian, Mr. Larian instructed her to "white-out" the fax header

14 information on all pages of the contract and send the contract, as altered, to an

15 outside MGA attorney. At Mr. Larian's direction, Ms. O'Connor proceeded to

16 alter each page of the contract in order to conceal, as Ms. O'Connor testified, the

17 fact that Bryant "was still employed at Mattel at the time the contract [between

18 MGA and Bryant] was executed."

19      As further examples, Bryant has produced documents that appear to

20 have been altered to conceal information. These include, most notably, a fax of

21 Bratz drawings that has a fax header date of April 10, 2000--six months before

22 Bryant left Mattel's employ. Although the fax header information on the page

23 produced by Bryant states that it was the third page of a fax transmission, neither

24 preceding nor subsequent pages, nor any cover sheet, has been produced. Further,

25 even though the fax header on the produced page has fields for both the sender's

26 name and the sender's telephone number, neither the name of the sender nor the

27 sender's telephone number appears in the fax header.

28

EXHIBIT ___I___
PAGE ___126___

1        Both MGA and Bryant also have failed and refused to provide Mattel

2  with access to original documents, despite the fact that one or both apparently

3  have already performed destructive ink chemistry analyses on Bryant's original

4  drawings and despite their agreement to provide those originals. Bryant's counsel

5  agreed to produce all of Bryant's original Bratz drawings at his deposition.

6  Despite these promises, Bryant brought only a few of his original drawings to the

7  deposition. Some of these drawings--including the originals of documents

8  BRYANT 192 and BRYANT 210--had holes in them, indicating that samples had

9  been extracted for ink chemical dating analysis. Bryant testified that his drawings

10  did not have holes in them when he turned them over to defendants' counsel and

11  that he was unaware of the origin of the holes. Appearances notwithstanding,

12  defendants' counsel has denied that anyone engaged in destructive sampling or

13  analysis of Bryant's original drawings. Defendants have not, however, explained

14  the origin of the holes in the original drawings.

15        Ramona Prince, a third-party witness, has raised other questions

16  about the integrity of Bryant's documents. According to both Ms. Prince and

17  Bryant, Bryant showed Ms. Prince his Bratz drawings in August 1999, when he

18  was employed by Mattel. Ms. Prince, however, has testified that markings which

19  now appear on the copy of a Bratz drawing produced by defendants did *not* appear

20  on the original drawing that Bryant showed her in 1999. This conflicts with

21  Bryant's testimony about the drawing. He claims that he created the drawing in its

22  entirety in August 1998, before he showed it to Ms. Prince.

23        Mattel has not yet computed damages because no discovery has yet

24  been obtained, including in particular discovery necessary to compute damages

25  that is uniquely in the possession of defendant and third parties. At a minimum,

26  Mattel's damages computation will include without limitation the following:

27  monies paid to defendant by any Mattel competitor, including without limitation

28  MGA, during his period of disloyalty and/or as a result of defendant's misconduct;

EXHIBIT __I__
PAGE __127__