1   disgorgement of any other benefit, or its value, or its proceeds, derived or obtained

2   by defendant as a result of his disloyalty, his breach of contract and other

3   misconduct and/or as a result of work that he performed for any Mattel competitor,

4   including without limitation MGA, during his Mattel employment; any profits and

5   the value of any other benefits that defendant's co-conspirators' derived or

6   obtained as a result of defendant's disloyalty and other misconduct; the value of

7   Mattel assets, resources, opportunities and/or property, including intellectual

8   property, that defendant and his co-conspirators converted, diverted from Mattel

9   and/or otherwise improperly used or usurped; the value of information and

10   intellectual property owned by Mattel which defendant provided to any Mattel

11   competitor in violation of his obligations to Mattel; compensation paid by Mattel

12   to defendant during defendant's period of disloyalty; and all other damages and

13   relief sought in Mattel's Complaint.

14        By way of further answer, pursuant to Federal Rule of Civil

15   Procedure 33(d), Mattel will produce responsive, non-privileged documents and

16   tangible items in its possession, custody or control from which the answer to this

17   Interrogatory may be derived.

18        By way of further answer, Mattel currently has not yet received

19   discovery from defendant or MGA, has not yet obtained any deposition testimony

20   and has not yet had the opportunity to obtain information from other third parties

21   who may possess relevant information. Mattel therefore reserves the right to

22   supplement this response after Mattel receives more information about defendant's

23   activities. By way of further answer, this topic may be the subject of expert

24   testimony, which will be disclosed in the manner, and at the time, required for

25   expert disclosures pursuant to the Federal and Local Rules.

26

27

28

-38-

SUPPLEMENTAL INTERROGATORY RESPONSES

EXHIBIT _I_
PAGE _128_

1    <u>INTERROGATORY NO. 10</u>:

2        State all facts supporting YOUR contention that Bryant failed to meet

3    his obligations under the MATTEL "Employee Confidential Information and

4    Inventions Agreement" attached to the Complaint as Exhibit "A".

5

6    <u>SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 10</u>:

7        In addition to the general objections stated above, Mattel specifically

8    objects to this Interrogatory on the grounds that it calls for the disclosure of

9    information subject to the attorney-client privilege, the attorney work-product

10    doctrine and other applicable privileges.  Mattel further objects to this

11    Interrogatory on the ground that it calls for the disclosure of confidential and/or

12    proprietary information, which Mattel will disclose only subject to and in reliance

13    upon a suitable protective order.  Mattel further objects to this Interrogatory as

14    unreasonably burdensome and overbroad in that it purports to require Mattel to

15    summarize all facts on this subject, including without limitation, facts that are

16    known to or in the possession, custody and control of defendant Bryant,

17    defendant-in-intervention MGA Entertainment, Inc. and nonparties, including

18    nonparties associated with Bryant and/or MGA.  Mattel only undertakes to make a

19    good-faith, reasonable effort to summarize facts currently known to it in

20    responding to this Interrogatory.  Mattel further objects to this Interrogatory on the

21    grounds that it is premature in that it purports to seek to all facts relating to this

22    subject at the outset of discovery in this action and also seeks to circumvent the

23    expert disclosure provisions of the <u>Federal Rules of Civil Procedure</u> and the <u>Local</u>

24    <u>Rules</u>.

25        Subject to and without waiving the foregoing general and specific

26    objections, Mattel responds as follows:

27        On January 4, 1999, upon starting his second term of Mattel

28    employment, and as a condition of and in consideration for his employment,

07209/655298.1

SUPPLEMENTAL INTERROGATORY RESPONSES

EXHIBIT   <u>I</u>
PAGE   <u>129</u>

1   defendant Bryant entered into an Employee Confidential Information and

2   Inventions Agreement (the "Employee Agreement").  Among other things, Bryant

3   agreed that he would not, without Mattel's express written consent, "engage in any

4   employment or business other than for [Mattel], or invest in or assist (in any

5   manner) any business competitive with the business or future business plans of

6   [Mattel]."  Bryant further acknowledged that he held a position of trust with

7   Mattel.  In addition, Bryant assigned to Mattel all right, title and interest in

8   "inventions," including without limitation "designs," that he created, conceived or

9   reduced to practice, whether alone or jointly with others, during his employment

10  by Mattel under the terms set forth in his Employee Agreement.  A copy of

11  defendant's Employee Agreement with Mattel, dated January 4, 1999, is attached

12  to the Complaint as Exhibit A and is hereby incorporated into this response by this

13  reference.  Before his departure from Mattel, Bryant confirmed his obligations in a

14  Proprietary Information Checkout form, which Bryant agreed to and signed.  A

15  copy of this additional agreement has been produced in this action and is hereby

16  incorporated into this response by this reference.

17          Also on January 4, 1999, Bryant executed a Conflict of Interest

18  Questionnaire (the "Conflict Questionnaire").  Among other things, Bryant

19  certified in the Conflict Questionnaire that, other than as disclosed, he had not

20  worked for any competitor of Mattel in the prior twelve months and had not

21  engaged in any business venture or transaction involving a Mattel competitor that

22  could be construed as a conflict of interest.  Bryant specifically agreed that he

23  would immediately notify his supervisor of any change in his situation that would

24  cause him to change any of the foregoing certifications.  The only conflict

25  disclosure that Bryant made on the Conflict Questionnaire concerned what

26  defendant stated was "freelance" work for Ashton-Drake that is unrelated to the

27  conduct alleged herein.  At no time did Bryant disclose to Mattel that he was

28  working with MGA, a known competitor, while employed by Mattel, or that he

-40-

SUPPLEMENTAL INTERROGATORY RESPONSES

EXHIBIT _I_
PAGE _130_

1  was paid by MGA for services rendered to MGA while he was a Mattel employee.

2  A copy of the Conflict Questionnaire executed by Bryant is attached as Exhibit B

3  to the Complaint and is hereby incorporated into this response by this reference.

4         In late November 2003, Mattel obtained a copy of a contract

5  evidencing that Bryant had aided and assisted, and worked as a designer with,

6  MGA, a Mattel competitor, while he was employed by Mattel and was being paid

7  by Mattel for his exclusive services as a designer.  Bryant's agreement with MGA

8  obligated him to provide design services to MGA on a "top priority" basis.  In

9  addition, his agreement with MGA purported to assign to MGA rights to

10 preexisting works by Bryant and to deem work and services furnished by Bryant to

11 MGA under the agreement as "works for hire."  Furthermore, Bryant's agreement

12 with MGA provided that he would be paid for such services and receive royalties

13 and other consideration for products on which he provided aid or assistance.  A

14 copy of defendant's agreement with MGA, in the form obtained by Mattel, has

15 been produced in this case and is hereby incorporated into this response by this

16 reference.

17        Although discovery and Mattel's investigation are on-going,

18 additional documents, testimony and other evidence thus far obtained have

19 confirmed that Bryant worked with and aided MGA, and advanced his own

20 personal interests over Mattel's, during the term of his Mattel employment without

21 Mattel's express written permission.  First, Bryant admitted at deposition that he

22 did so, although he sought to minimize and conceal the time period and extent of

23 his aid to and work with MGA.  Among other things, Bryant testified that (1) he

24 made pitches to MGA concerning the Bratz project during the term of his

25 employment; (2) he used Mattel personnel and other Mattel resources to assist him

26 in such pitches, including without limitation by using Mattel personnel and

27 resources to make what he called a "dummy" and others have called a three-

28 dimensional prototype; (3) he used Mattel personnel and other Mattel resources to

SUPPLEMENTAL INTERROGATORY RESPONSES

EXHIBIT  I
PAGE  13

1  work on the Bratz project during his Mattel employment, including without
2  limitation by (a) obtaining information about a Mattel hair vendor, which Bryant
3  then contacted for his own and MGA's benefit and which Bryant told he was
4  working with MGA; and (b) identifying others who Bryant knew as a consequence
5  of his Mattel employment to work on the project and enlisting them to work on the
6  Bratz project during the term of his Mattel employment; (4) he worked on what
7  Bryant characterized as a "test project" to aid and assist MGA and benefit himself,
8  at Mattel's expense, during the term of his Mattel employment;  (5) he entered into
9  his agreement with MGA during the term of his Mattel employment and used
10 Mattel resources in connection with the negotiation and execution of that
11 agreement; and (6) he received monetary payments and other benefits from MGA
12 during the term of his Mattel employment, and both Bryant and MGA benefitted
13 further as a consequence of his aid and assistance to and work with MGA during
14 the term of his Mattel employment.
15        Second, MGA and those associated with MGA have made statements,
16 including under oath, that confirm Bryant assisted and worked with MGA during
17 his Mattel employment.  Among his many statements to the press, for example,
18 MGA's CEO, Isaac Larian, told the *Wall Street Journal* that "he chose
19 Mr. Bryant's idea for the Bratz over several others after holding a sort of
20 fashion-doll design contest in late 1999"--a time when Bryant was employed by
21 Mattel.  In a sworn affidavit filed in a Hong Kong lawsuit brought by MGA,
22 Isaac Larian stated that "[t]he Bratz dolls were first exhibited in the USA in
23 November 2000," which further confirms that Bryant was working with and aiding
24 MGA on the project prior to his departure from Mattel on or about October 20,
25 2000.  Additionally, Isaac Larian has been sued for fraud and other claims by his
26 brother and one-time partner in MGA, Farhad Larian.  Farhad Larian's verified
27 Complaint alleges, among other things, that "in or about late 1999 and early 2000,
28 Isaac became aware of a potential new product line that had tremendous potential

07209/655298.1
-42-
SUPPLEMENTAL INTERROGATORY RESPONSES

EXHIBIT _I_
PAGE _132_

1  for [MGA]. The new product line involved the 'Bratz' dolls and related products."

2  The verified Complaint further alleges: "In or about early 2000, Isaac called a

3  meeting to discuss the new Bratz product line with selected individuals" at MGA,

4  and took affirmative steps "to conceal" from Farhad Larian MGA's "plans for the

5  Bratz line" in February, March and May 2000. Bryant was working for Mattel

6  during each of these time periods.

7        Third, although discovery is still in its early stages, other witnesses

8  who have testified thus far in the case have provided testimony revealing that

9  Bryant aided and worked with MGA during his Mattel employment. Bryant

10  testified that he pitched the Bratz project to MGA in late August and September

11  2000. Bryant also testified that he had no contact with MGA until August 2000

12  and had never even heard of MGA before July 2000. Bryant claims that he

13  discussed the Bratz project with Anna Rhee--and introduced Ms. Rhee to MGA--

14  only after he stopped working for Mattel in late October 2000. After Bryant

15  introduced Ms. Rhee to MGA (which is undisputed--Bryant and Ms. Rhee agree

16  that she had no involvement with MGA prior to Bryant's introduction), Ms. Rhee

17  painted Bratz doll heads.

18        During the six months from August 2004 (when MGA made its initial

19  document production in this case) to January 2005, MGA produced a mere eight

20  pages of payment records relating to work that Ms. Rhee performed on Bryant-

21  related projects in the year 2000. These pages relate exclusively to work that

22  Ms. Rhee did on Bryant-related projects in December 2000, after Bryant left

23  Mattel, which would be consistent with Bryant's testimony.

24        After Bryant testified and after MGA made its initial production of

25  Anna Rhee documents, however, Anna Rhee produced documents pursuant to

26  subpoena in mid-January 2005. Included in Ms. Rhee's production were

27  approximately twenty invoices for work that she performed on Bryant-related

28  MGA projects in the year 2000, none of which MGA or Bryant had disclosed.

EXHIBIT  I
PAGE  133

1   These invoices also revealed that Ms. Rhee performed work with Bryant and

2   MGA on at least seven separate occasions before Bryant's departure from Mattel--

3   including one invoice that dates to June 12, 2000, when Bryant purportedly had

4   never even heard of MGA.

5           After Ms. Rhee produced these documents, MGA then made a

6   supplemental production of certain internal documents relating to work performed

7   by Ms. Rhee during the June-October 2000 time period.  These belatedly produced

8   MGA records purport to show that Ms. Rhee's work during that time period

9   related to a project known as "Angel" and/or "Prayer Angels."

10          At her deposition, however, Ms. Rhee testified that her work during

11  that time period was for Bratz and that "Angel" was MGA's and Bryant's code

12  name for Bratz.  Thus, Ms. Rhee testified that her June 12, 2000 work was for face

13  painting on two Bratz doll heads; her late August 2000 work was for face painting

14  on four Bratz doll heads; and her work as of September 8, 2000 was for face

15  painting on additional Bratz doll heads.  All of these are times when Bryant was

16  employed by Mattel.

17          At the deposition, defendants' counsel repeatedly tried--and failed--to

18  persuade Ms. Rhee to agree with their claim that "Angel" and/or "Prayer Angels"

19  was a different doll project than Bratz and that she worked on that project in the

20  June 2000, not Bratz.  For example, defendants' counsel asked whether the

21  June 12, 2000 invoice--which Ms. Rhee had testified was for work on Bratz--

22  "could" instead relate to the doll "that ultimately came to market as Prayer

23  Angels."  Ms. Rhee responded:  "There's no way."

24          Ms. Rhee further testified that during a time when Bryant was

25  necessarily employed by Mattel, he had contacted her about the "big" and "secret"

26  project that he was working on.  Bryant instructed Anna Rhee not to tell anyone

27  about the "secret" project, including Mattel employees.  He discussed this project

28  with Ms. Rhee while she was visiting the Mattel Design Center where Bryant was

SUPPLEMENTAL INTERROGATORY RESPONSES

EXHIBIT I
PAGE 134

1   working and informed her that he had engaged a "corporate attorney" to help him
2   with the "secret" project.

3        Fourth, while working for Mattel, Bryant concealed and affirmatively
4   misrepresented his aid and assistance to MGA in other ways.  In particular, despite
5   his obligations to do so, Bryant failed to notify his Mattel supervisor of his
6   conflict of interest in working with MGA.  Prior to and upon his departure, Bryant
7   further misrepresented to Mattel, including to Ivy Ross and Sandy Yamamoto, his
8   future plans by stating that he was not going to work with a competitor.

9        Finally, both Bryant and MGA have spoliated evidence relating to the
10  timing and extent of Bryant's aid to and work with MGA during his Mattel
11  employment.  One example was revealed by the testimony of Victoria O'Connor, a
12  former MGA executive.  According to Ms. O'Connor, Bryant faxed a signed copy
13  of a Bryant/MGA contract to MGA from Mattel.  Upon receipt, each page of the
14  contract included a fax header that read "Barbie Collectibles" and bore the number
15  of the Mattel fax machine that it came from, revealing that it came from Mattel's
16  Designer Center where Bryant worked.  When Ms. O'Connor brought this to the
17  attention of Isaac Larian, Mr. Larian instructed her to "white-out" the fax header
18  information on all pages of the contract and send the contract, as altered, to an
19  outside MGA attorney.  At Mr. Larian's direction, Ms. O'Connor proceeded to
20  alter each page of the contract in order to conceal, as Ms. O'Connor testified, the
21  fact that Bryant "was still employed at Mattel at the time the contract [between
22  MGA and Bryant] was executed."

23       As further examples, Bryant has produced documents that appear to
24  have been altered to conceal information.  These include, most notably, a fax of
25  Bratz drawings that has a fax header date of April 10, 2000--six months before
26  Bryant left Mattel's employ. Although the fax header information on the page
27  produced by Bryant states that it was the third page of a fax transmission, neither
28  preceding nor subsequent pages, nor any cover sheet, has been produced.  Further,

07209/655298.1

-45-

SUPPLEMENTAL INTERROGATORY RESPONSES

EXHIBIT   I
PAGE   135

1   even though the fax header on the produced page has fields for both the sender's

2   name and the sender's telephone number, neither the name of the sender nor the

3   sender's telephone number appears in the fax header.

4          Both MGA and Bryant also have failed and refused to provide Mattel

5   with access to original documents, despite the fact that one or both apparently

6   have already performed destructive ink chemistry analyses on Bryant's original

7   drawings and despite their agreement to provide those originals.  Bryant's counsel

8   agreed to produce all of Bryant's original Bratz drawings at his deposition.

9   Despite these promises, Bryant brought only a few of his original drawings to the

10  deposition.  Some of these drawings--including the originals of documents

11  BRYANT 192 and BRYANT 210--had holes in them, indicating that samples had

12  been extracted for ink chemical dating analysis.  Bryant testified that his drawings

13  did not have holes in them when he turned them over to defendants' counsel and

14  that he was unaware of the origin of the holes.  Appearances notwithstanding,

15  defendants' counsel has denied that anyone engaged in destructive sampling or

16  analysis of Bryant's original drawings.  Defendants have not, however, explained

17  the origin of the holes in the original drawings.

18         Ramona Prince, a third-party witness, has raised other questions

19  about the integrity of Bryant's documents.  According to both Ms. Prince and

20  Bryant, Bryant showed Ms. Prince his Bratz drawings in August 1999, when he

21  was employed by Mattel.  Ms. Prince, however, has testified that markings which

22  now appear on the copy of a Bratz drawing produced by defendants did *not* appear

23  on the original drawing that Bryant showed her in 1999.  This conflicts with

24  Bryant's testimony about the drawing.  He claims that he created the drawing in its

25  entirety in August 1998, before he showed it to Ms. Prince.

26         By way of further answer, pursuant to Federal Rule of Civil

27  Procedure 33(d), Mattel will produce responsive, non-privileged documents and

28

07209/655298.1

-46-

SUPPLEMENTAL INTERROGATORY RESPONSES

EXHIBIT ___I___
PAGE __136__

1  tangible items in its possession, custody or control from which the answer to this
2  Interrogatory may be derived.
3           By way of further answer, Mattel currently has not yet received
4  discovery from defendant or MGA, has not yet obtained any deposition testimony
5  and has not yet had the opportunity to obtain information from other third parties
6  who may possess relevant information.  Mattel therefore reserves the right to
7  supplement this response after Mattel receives more information about defendant's
8  activities.  By way of further answer, this topic may be the subject of expert
9  testimony, which will be disclosed in the manner, and at the time, required for
10  expert disclosures pursuant to the <u>Federal</u> and <u>Local Rules</u>.
11

12  <u>INTERROGATORY NO. 11</u>:
13           State all facts supporting YOUR contention that Bryant failed to meet
14  his obligations under the MATTEL Conflict of Interest Questionnaire," attached to
15  the Complaint as Exhibit "B".
16

17  <u>SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 11</u>:
18           In addition to the general objections stated above, Mattel specifically
19  objects to this Interrogatory on the grounds that it calls for the disclosure of
20  information subject to the attorney-client privilege, the attorney work-product
21  doctrine and other applicable privileges.  Mattel further objects to this
22  Interrogatory on the ground that it calls for the disclosure of confidential and/or
23  proprietary information, which Mattel will disclose only subject to and in reliance
24  upon a suitable protective order.  Mattel further objects to this Interrogatory as
25  unreasonably burdensome and overbroad in that it purports to require Mattel to
26  summarize all facts on this subject, including without limitation, facts that are
27  known to or in the possession, custody and control of defendant Bryant,
28  defendant-in-intervention MGA Entertainment, Inc. and nonparties, including

07209/655298.1

SUPPLEMENTAL INTERROGATORY RESPONSES

EXHIBIT   I
PAGE   137

1  nonparties associated with Bryant and/or MGA.  Mattel only undertakes to make a
2  good-faith, reasonable effort to summarize facts currently known to it in
3  responding to this Interrogatory.  Mattel further objects to this Interrogatory on the
4  grounds that it is premature in that it purports to seek to all facts relating to this
5  subject at the outset of discovery in this action and also seeks to circumvent the
6  expert disclosure provisions of the <u>Federal Rules of Civil Procedure</u> and the <u>Local</u>
7  <u>Rules</u>.

8              Subject to and without waiving the foregoing general and specific
9  objections, Mattel responds as follows:

10              On January 4, 1999, upon starting his second term of Mattel
11  employment, and as a condition of and in consideration for his employment,
12  defendant Bryant entered into an Employee Confidential Information and
13  Inventions Agreement (the "Employee Agreement").  Among other things, Bryant
14  agreed that he would not, without Mattel's express written consent, "engage in any
15  employment or business other than for [Mattel], or invest in or assist (in any
16  manner) any business competitive with the business or future business plans of
17  [Mattel]."  Bryant further acknowledged that he held a position of trust with
18  Mattel.  In addition, Bryant assigned to Mattel all right, title and interest in
19  "inventions," including without limitation "designs," that he created, conceived or
20  reduced to practice, whether alone or jointly with others, during his employment
21  by Mattel under the terms set forth in his Employee Agreement.  A copy of
22  defendant's Employee Agreement with Mattel, dated January 4, 1999, is attached
23  to the Complaint as Exhibit A and is hereby incorporated into this response by this
24  reference.  Before his departure from Mattel, Bryant confirmed his obligations in a
25  Proprietary Information Checkout form, which Bryant agreed to and signed.  A
26  copy of this additional agreement has been produced in this action and is hereby
27  incorporated into this response by this reference.

28

1    Also on January 4, 1999, Bryant executed a Conflict of Interest

2  Questionnaire (the "Conflict Questionnaire").  Among other things, Bryant

3  certified in the Conflict Questionnaire that, other than as disclosed, he had not

4  worked for any competitor of Mattel in the prior twelve months and had not

5  engaged in any business venture or transaction involving a Mattel competitor that

6  could be construed as a conflict of interest.  Bryant specifically agreed that he

7  would immediately notify his supervisor of any change in his situation that would

8  cause him to change any of the foregoing certifications.  The only conflict

9  disclosure that Bryant made on the Conflict Questionnaire concerned what

10  defendant stated was "freelance" work for Ashton-Drake that is unrelated to the

11  conduct alleged herein.  At no time did Bryant disclose to Mattel that he was

12  working with MGA, a known competitor, while employed by Mattel, or that he

13  was paid by MGA for services rendered to MGA while he was a Mattel employee.

14  A copy of the Conflict Questionnaire executed by Bryant is attached as Exhibit B

15  to the Complaint and is hereby incorporated into this response by this reference.

16    In late November 2003, Mattel obtained a copy of a contract

17  evidencing that Bryant had aided and assisted, and worked as a designer with,

18  MGA, a Mattel competitor, while he was employed by Mattel and was being paid

19  by Mattel for his exclusive services as a designer.  Bryant's agreement with MGA

20  obligated him to provide design services to MGA on a "top priority" basis.  In

21  addition, his agreement with MGA purported to assign to MGA rights to

22  preexisting works by Bryant and to deem work and services furnished by Bryant to

23  MGA under the agreement as "works for hire."  Furthermore, Bryant's agreement

24  with MGA provided that he would be paid for such services and receive royalties

25  and other consideration for products on which he provided aid or assistance.  A

26  copy of defendant's agreement with MGA, in the form obtained by Mattel, has

27  been produced in this case and is hereby incorporated into this response by this

28  reference.

07209/655298.1

-49-

SUPPLEMENTAL INTERROGATORY RESPONSES

EXHIBIT I
PAGE 139

1   Although discovery and Mattel's investigation are on-going,
2   additional documents, testimony and other evidence thus far obtained have
3   confirmed that Bryant worked with and aided MGA, and advanced his own
4   personal interests over Mattel's, during the term of his Mattel employment without
5   Mattel's express written permission.  First, Bryant admitted at deposition that he
6   did so, although he sought to minimize and conceal the time period and extent of
7   his aid to and work with MGA.  Among other things, Bryant testified that (1) he
8   made pitches to MGA concerning the Bratz project during the term of his
9   employment; (2) he used Mattel personnel and other Mattel resources to assist him
10  in such pitches, including without limitation by using Mattel personnel and
11  resources to make what he called a "dummy" and others have called a three-
12  dimensional prototype; (3) he used Mattel personnel and other Mattel resources to
13  work on the Bratz project during his Mattel employment, including without
14  limitation by (a) obtaining information about a Mattel hair vendor, which Bryant
15  then contacted for his own and MGA's benefit and which Bryant told he was
16  working with MGA; and (b) identifying others who Bryant knew as a consequence
17  of his Mattel employment to work on the project and enlisting them to work on the
18  Bratz project during the term of his Mattel employment; (4) he worked on what
19  Bryant characterized as a "test project" to aid and assist MGA and benefit himself,
20  at Mattel's expense, during the term of his Mattel employment;  (5) he entered into
21  his agreement with MGA during the term of his Mattel employment and used
22  Mattel resources in connection with the negotiation and execution of that
23  agreement; and (6) he received monetary payments and other benefits from MGA
24  during the term of his Mattel employment, and both Bryant and MGA benefitted
25  further as a consequence of his aid and assistance to and work with MGA during
26  the term of his Mattel employment.
27          Second, MGA and those associated with MGA have made statements,
28  including under oath, that confirm Bryant assisted and worked with MGA during

07209/655298.1

-50-

SUPPLEMENTAL INTERROGATORY RESPONSES

EXHIBIT _I_
PAGE _140_

1   his Mattel employment.  Among his many statements to the press, for example,

2   MGA's CEO, Isaac Larian, told the *Wall Street Journal* that "he chose

3   Mr. Bryant's idea for the Bratz over several others after holding a sort of

4   fashion-doll design contest in late 1999"--a time when Bryant was employed by

5   Mattel.  In a sworn affidavit filed in a Hong Kong lawsuit brought by MGA,

6   Isaac Larian stated that "[t]he Bratz dolls were first exhibited in the USA in

7   November 2000," which further confirms that Bryant was working with and aiding

8   MGA on the project prior to his departure from Mattel on or about October 20,

9   2000.  Additionally, Isaac Larian has been sued for fraud and other claims by his

10  brother and one-time partner in MGA, Farhad Larian.  Farhad Larian's verified

11  Complaint alleges, among other things, that "in or about late 1999 and early 2000,

12  Isaac became aware of a potential new product line that had tremendous potential

13  for [MGA].  The new product line involved the 'Bratz' dolls and related products."

14  The verified Complaint further alleges:  "In or about early 2000, Isaac called a

15  meeting to discuss the new Bratz product line with selected individuals" at MGA,

16  and took affirmative steps "to conceal" from Farhad Larian MGA's "plans for the

17  Bratz line" in February, March and May 2000.  Bryant was working for Mattel

18  during each of these time periods.

19          Third, although discovery is still in its early stages, other witnesses

20  who have testified thus far in the case have provided testimony revealing that

21  Bryant aided and worked with MGA during his Mattel employment.  Bryant

22  testified that he pitched the Bratz project to MGA in late August and September

23  2000.  Bryant also testified that he had no contact with MGA until August 2000

24  and had never even heard of MGA before July 2000. Bryant claims that he

25  discussed the Bratz project with Anna Rhee--and introduced Ms. Rhee to MGA--

26  only after he stopped working for Mattel in late October 2000.  After Bryant

27  introduced Ms. Rhee to MGA (which is undisputed--Bryant and Ms. Rhee agree

28

-51-

SUPPLEMENTAL INTERROGATORY RESPONSES

EXHIBIT   I
PAGE   141

1    that she had no involvement with MGA prior to Bryant's introduction), Ms. Rhee

2    painted Bratz doll heads.

3              During the six months from August 2004 (when MGA made its initial

4    document production in this case) to January 2005, MGA produced a mere eight

5    pages of payment records relating to work that Ms. Rhee performed on Bryant-

6    related projects in the year 2000.  These pages relate exclusively to work that

7    Ms. Rhee did on Bryant-related projects in December 2000, after Bryant left

8    Mattel, which would be consistent with Bryant's testimony.

9              After Bryant testified and after MGA made its initial production of

10   Anna Rhee documents, however, Anna Rhee produced documents pursuant to

11   subpoena in mid-January 2005.  Included in Ms. Rhee's production were

12   approximately twenty invoices for work that she performed on Bryant-related

13   MGA projects in the year 2000, none of which MGA or Bryant had disclosed.

14   These invoices also revealed that Ms. Rhee performed work with Bryant and

15   MGA on at least seven separate occasions before Bryant's departure from Mattel--

16   including one invoice that dates to June 12, 2000, when Bryant purportedly had

17   never even heard of MGA.

18             After Ms. Rhee produced these documents, MGA then made a

19   supplemental production of certain internal documents relating to work performed

20   by Ms. Rhee during the June-October 2000 time period.  These belatedly produced

21   MGA records purport to show that Ms. Rhee's work during that time period

22   related to a project known as "Angel" and/or "Prayer Angels."

23             At her deposition, however, Ms. Rhee testified that her work during

24   that time period was for Bratz and that "Angel" was MGA's and Bryant's code

25   name for Bratz.  Thus, Ms. Rhee testified that her June 12, 2000 work was for face

26   painting on two Bratz doll heads; her late August 2000 work was for face painting

27   on four Bratz doll heads; and her work as of September 8, 2000 was for face

28

-52-

SUPPLEMENTAL INTERROGATORY RESPONSES

EXHIBIT __I__
PAGE __142__

1  painting on additional Bratz doll heads.  All of these are times when Bryant was employed by Mattel.

2  employed by Mattel.

3  At the deposition, defendants' counsel repeatedly tried--and failed--to

4  persuade Ms. Rhee to agree with their claim that "Angel" and/or "Prayer Angels"

5  was a different doll project than Bratz and that she worked on that project in the

6  June 2000, not Bratz.  For example, defendants' counsel asked whether the

7  June 12, 2000 invoice--which Ms. Rhee had testified was for work on Bratz--

8  "could" instead relate to the doll "that ultimately came to market as Prayer

9  Angels."  Ms. Rhee responded:  "There's no way."

10  Ms. Rhee further testified that during a time when Bryant was

11  necessarily employed by Mattel, he had contacted her about the "big" and "secret"

12  project that he was working on.  Bryant instructed Anna Rhee not to tell anyone

13  about the "secret" project, including Mattel employees.  He discussed this project

14  with Ms. Rhee while she was visiting the Mattel Design Center where Bryant was

15  working and informed her that he had engaged a "corporate attorney" to help him

16  with the "secret" project.

17  Fourth, while working for Mattel, Bryant concealed and affirmatively

18  misrepresented his aid and assistance to MGA in other ways.  In particular, despite

19  his obligations to do so, Bryant failed to notify his Mattel supervisor of his

20  conflict of interest in working with MGA.  Prior to and upon his departure, Bryant

21  further misrepresented to Mattel, including to Ivy Ross and Sandy Yamamoto, his

22  future plans by stating that he was not going to work with a competitor.

23  Finally, both Bryant and MGA have spoliated evidence relating to the

24  timing and extent of Bryant's aid to and work with MGA during his Mattel

25  employment.  One example was revealed by the testimony of Victoria O'Connor, a

26  former MGA executive.  According to Ms. O'Connor, Bryant faxed a signed copy

27  of a Bryant/MGA contract to MGA from Mattel.  Upon receipt, each page of the

28  contract included a fax header that read "Barbie Collectibles" and bore the number

-53-

SUPPLEMENTAL INTERROGATORY RESPONSES

EXHIBIT  I

PAGE  143

1  of the Mattel fax machine that it came from, revealing that it came from Mattel's

2  Designer Center where Bryant worked.  When Ms. O'Connor brought this to the

3  attention of Isaac Larian, Mr. Larian instructed her to "white-out" the fax header

4  information on all pages of the contract and send the contract, as altered, to an

5  outside MGA attorney.  At Mr. Larian's direction, Ms. O'Connor proceeded to

6  alter each page of the contract in order to conceal, as Ms. O'Connor testified, the

7  fact that Bryant "was still employed at Mattel at the time the contract [between

8  MGA and Bryant] was executed."

9          As further examples, Bryant has produced documents that appear to

10  have been altered to conceal information.  These include, most notably, a fax of

11  Bratz drawings that has a fax header date of April 10, 2000--six months before

12  Bryant left Mattel's employ. Although the fax header information on the page

13  produced by Bryant states that it was the third page of a fax transmission, neither

14  preceding nor subsequent pages, nor any cover sheet, has been produced.  Further,

15  even though the fax header on the produced page has fields for both the sender's

16  name and the sender's telephone number, neither the name of the sender nor the

17  sender's telephone number appears in the fax header.

18          Both MGA and Bryant also have failed and refused to provide Mattel

19  with access to original documents, despite the fact that one or both apparently

20  have already performed destructive ink chemistry analyses on Bryant's original

21  drawings and despite their agreement to provide those originals.  Bryant's counsel

22  agreed to produce all of Bryant's original Bratz drawings at his deposition.

23  Despite these promises, Bryant brought only a few of his original drawings to the

24  deposition.  Some of these drawings--including the originals of documents

25  BRYANT 192 and BRYANT 210--had holes in them, indicating that samples had

26  been extracted for ink chemical dating analysis.  Bryant testified that his drawings

27  did not have holes in them when he turned them over to defendants' counsel and

28  that he was unaware of the origin of the holes.  Appearances notwithstanding,

07209/655298.1

-54-
SUPPLEMENTAL INTERROGATORY RESPONSES

EXHIBIT __I__
PAGE __144__

1     defendants' counsel has denied that anyone engaged in destructive sampling or

2     analysis of Bryant's original drawings.  Defendants have not, however, explained

3     the origin of the holes in the original drawings.

4          Ramona Prince, a third-party witness, has raised other questions

5     about the integrity of Bryant's documents.  According to both Ms. Prince and

6     Bryant, Bryant showed Ms. Prince his Bratz drawings in August 1999, when he

7     was employed by Mattel.  Ms. Prince, however, has testified that markings which

8     now appear on the copy of a Bratz drawing produced by defendants did *not* appear

9     on the original drawing that Bryant showed her in 1999.  This conflicts with

10     Bryant's testimony about the drawing.  He claims that he created the drawing in its

11     entirety in August 1998, before he showed it to Ms. Prince.

12          By way of further answer, pursuant to Federal Rule of Civil

13     Procedure 33(d), Mattel will produce responsive, non-privileged documents and

14     tangible items in its possession, custody or control from which the answer to this

15     Interrogatory may be derived.

16          By way of further answer, Mattel currently has not yet received

17     discovery from defendant or MGA, has not yet obtained any deposition testimony

18     and has not yet had the opportunity to obtain information from other third parties

19     who may possess relevant information.  Mattel therefore reserves the right to

20     supplement this response after Mattel receives more information about defendant's

21     activities.  By way of further answer, this topic may be the subject of expert

22     testimony, which will be disclosed in the manner, and at the time, required for

23     expert disclosures pursuant to the Federal and Local Rules.

24

25

26

27

28

INTERROGATORY NO. 12:

State all facts supporting YOUR contention that Bryant misappropriated MATTEL property, including without limitation intellectual property, at any time.

SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 12:

In addition to the general objections stated above, Mattel specifically objects to this Interrogatory on the grounds that it calls for the disclosure of information subject to the attorney-client privilege, the attorney work-product doctrine and other applicable privileges. Mattel further objects to this Interrogatory on the ground that it calls for the disclosure of confidential and/or proprietary information, which Mattel will disclose only subject to and in reliance upon a suitable protective order. Mattel further objects to this Interrogatory as unreasonably burdensome and overbroad in that it purports to require Mattel to summarize all facts on this subject, including without limitation, facts that are known to or in the possession, custody and control of defendant Bryant, defendant-in-intervention MGA Entertainment, Inc. and nonparties, including nonparties associated with Bryant and/or MGA. Mattel only undertakes to make a good-faith, reasonable effort to summarize facts currently known to it in responding to this Interrogatory. Mattel further objects to this Interrogatory on the grounds that it is premature in that it purports to seek to all facts relating to this subject at the outset of discovery in this action and also seeks to circumvent the expert disclosure provisions of the Federal Rules of Civil Procedure and the Local Rules.

Subject to and without waiving the foregoing general and specific objections, Mattel responds as follows:

On January 4, 1999, upon starting his second term of Mattel employment, and as a condition of and in consideration for his employment,

07209/655298.1

SUPPLEMENTAL INTERROGATORY RESPONSES

EXHIBIT $\underline{I}$
PAGE $\underline{146}$

1  defendant Bryant entered into an Employee Confidential Information and

2  Inventions Agreement (the "Employee Agreement").  Among other things, Bryant

3  agreed that he would not, without Mattel's express written consent, "engage in any

4  employment or business other than for [Mattel], or invest in or assist (in any

5  manner) any business competitive with the business or future business plans of

6  [Mattel]."  Bryant further acknowledged that he held a position of trust with

7  Mattel.  In addition, Bryant assigned to Mattel all right, title and interest in

8  "inventions," including without limitation "designs," that he created, conceived or

9  reduced to practice, whether alone or jointly with others, during his employment

10  by Mattel under the terms set forth in his Employee Agreement.  A copy of

11  defendant's Employee Agreement with Mattel, dated January 4, 1999, is attached

12  to the Complaint as Exhibit A and is hereby incorporated into this response by this

13  reference.  Before his departure from Mattel, Bryant confirmed his obligations in a

14  Proprietary Information Checkout form, which Bryant agreed to and signed.  A

15  copy of this additional agreement has been produced in this action and is hereby

16  incorporated into this response by this reference.

17          Also on January 4, 1999, Bryant executed a Conflict of Interest

18  Questionnaire (the "Conflict Questionnaire").  Among other things, Bryant

19  certified in the Conflict Questionnaire that, other than as disclosed, he had not

20  worked for any competitor of Mattel in the prior twelve months and had not

21  engaged in any business venture or transaction involving a Mattel competitor that

22  could be construed as a conflict of interest.  Bryant specifically agreed that he

23  would immediately notify his supervisor of any change in his situation that would

24  cause him to change any of the foregoing certifications.  The only conflict

25  disclosure that Bryant made on the Conflict Questionnaire concerned what

26  defendant stated was "freelance" work for Ashton-Drake that is unrelated to the

27  conduct alleged herein.  At no time did Bryant disclose to Mattel that he was

28  working with MGA, a known competitor, while employed by Mattel, or that he

07209/655298.1

-57-

SUPPLEMENTAL INTERROGATORY RESPONSES

EXHIBIT  I
PAGE  147

1   was paid by MGA for services rendered to MGA while he was a Mattel employee.

2   A copy of the Conflict Questionnaire executed by Bryant is attached as Exhibit B

3   to the Complaint and is hereby incorporated into this response by this reference.

4          In late November 2003, Mattel obtained a copy of a contract

5   evidencing that Bryant had aided and assisted, and worked as a designer with,

6   MGA, a Mattel competitor, while he was employed by Mattel and was being paid

7   by Mattel for his exclusive services as a designer.  Bryant's agreement with MGA

8   obligated him to provide design services to MGA on a "top priority" basis.  In

9   addition, his agreement with MGA purported to assign to MGA rights to

10  preexisting works by Bryant and to deem work and services furnished by Bryant to

11  MGA under the agreement as "works for hire."  Furthermore, Bryant's agreement

12  with MGA provided that he would be paid for such services and receive royalties

13  and other consideration for products on which he provided aid or assistance.  A

14  copy of defendant's agreement with MGA, in the form obtained by Mattel, has

15  been produced in this case and is hereby incorporated into this response by this

16  reference.

17         Although discovery and Mattel's investigation are on-going,

18  additional documents, testimony and other evidence thus far obtained have

19  confirmed that Bryant worked with and aided MGA, and advanced his own

20  personal interests over Mattel's, during the term of his Mattel employment without

21  Mattel's express written permission.  First, Bryant admitted at deposition that he

22  did so, although he sought to minimize and conceal the time period and extent of

23  his aid to and work with MGA.  Among other things, Bryant testified that (1) he

24  made pitches to MGA concerning the Bratz project during the term of his

25  employment; (2) he used Mattel personnel and other Mattel resources to assist him

26  in such pitches, including without limitation by using Mattel personnel and

27  resources to make what he called a "dummy" and others have called a three-

28  dimensional prototype; (3) he used Mattel personnel and other Mattel resources to

-58-

SUPPLEMENTAL INTERROGATORY RESPONSES

EXHIBIT $\mathcal{I}$
PAGE 148

1    work on the Bratz project during his Mattel employment, including without

2    limitation by (a) obtaining information about a Mattel hair vendor, which Bryant

3    then contacted for his own and MGA's benefit and which Bryant told he was

4    working with MGA; and (b) identifying others who Bryant knew as a consequence

5    of his Mattel employment to work on the project and enlisting them to work on the

6    Bratz project during the term of his Mattel employment; (4) he worked on what

7    Bryant characterized as a "test project" to aid and assist MGA and benefit himself,

8    at Mattel's expense, during the term of his Mattel employment;  (5) he entered into

9    his agreement with MGA during the term of his Mattel employment and used

10   Mattel resources in connection with the negotiation and execution of that

11   agreement; and (6) he received monetary payments and other benefits from MGA

12   during the term of his Mattel employment, and both Bryant and MGA benefitted

13   further as a consequence of his aid and assistance to and work with MGA during

14   the term of his Mattel employment.

15           Second, MGA and those associated with MGA have made statements,

16   including under oath, that confirm Bryant assisted and worked with MGA during

17   his Mattel employment.  Among his many statements to the press, for example,

18   MGA's CEO, Isaac Larian, told the *Wall Street Journal* that "he chose

19   Mr. Bryant's idea for the Bratz over several others after holding a sort of

20   fashion-doll design contest in late 1999"--a time when Bryant was employed by

21   Mattel.  In a sworn affidavit filed in a Hong Kong lawsuit brought by MGA,

22   Isaac Larian stated that "[t]he Bratz dolls were first exhibited in the USA in

23   November 2000," which further confirms that Bryant was working with and aiding

24   MGA on the project prior to his departure from Mattel on or about October 20,

25   2000.  Additionally, Isaac Larian has been sued for fraud and other claims by his

26   brother and one-time partner in MGA, Farhad Larian.  Farhad Larian's verified

27   Complaint alleges, among other things, that "in or about late 1999 and early 2000,

28   Isaac became aware of a potential new product line that had tremendous potential

EXHIBIT   I
PAGE   149

1  for [MGA]. The new product line involved the 'Bratz' dolls and related products."

2  The verified Complaint further alleges: "In or about early 2000, Isaac called a

3  meeting to discuss the new Bratz product line with selected individuals" at MGA,

4  and took affirmative steps "to conceal" from Farhad Larian MGA's "plans for the

5  Bratz line" in February, March and May 2000. Bryant was working for Mattel

6  during each of these time periods.

7       Third, although discovery is still in its early stages, other witnesses

8  who have testified thus far in the case have provided testimony revealing that

9  Bryant aided and worked with MGA during his Mattel employment. Bryant

10  testified that he pitched the Bratz project to MGA in late August and September

11  2000. Bryant also testified that he had no contact with MGA until August 2000

12  and had never even heard of MGA before July 2000. Bryant claims that he

13  discussed the Bratz project with Anna Rhee--and introduced Ms. Rhee to MGA--

14  only after he stopped working for Mattel in late October 2000. After Bryant

15  introduced Ms. Rhee to MGA (which is undisputed--Bryant and Ms. Rhee agree

16  that she had no involvement with MGA prior to Bryant's introduction), Ms. Rhee

17  painted Bratz doll heads.

18       During the six months from August 2004 (when MGA made its initial

19  document production in this case) to January 2005, MGA produced a mere eight

20  pages of payment records relating to work that Ms. Rhee performed on Bryant-

21  related projects in the year 2000. These pages relate exclusively to work that

22  Ms. Rhee did on Bryant-related projects in December 2000, after Bryant left

23  Mattel, which would be consistent with Bryant's testimony.

24       After Bryant testified and after MGA made its initial production of

25  Anna Rhee documents, however, Anna Rhee produced documents pursuant to

26  subpoena in mid-January 2005. Included in Ms. Rhee's production were

27  approximately twenty invoices for work that she performed on Bryant-related

28  MGA projects in the year 2000, none of which MGA or Bryant had disclosed.

07209/655298.1

SUPPLEMENTAL INTERROGATORY RESPONSES

EXHIBIT  I
PAGE  150

1  These invoices also revealed that Ms. Rhee performed work with Bryant and

2  MGA on at least seven separate occasions before Bryant's departure from Mattel--

3  including one invoice that dates to June 12, 2000, when Bryant purportedly had

4  never even heard of MGA.

5      After Ms. Rhee produced these documents, MGA then made a

6  supplemental production of certain internal documents relating to work performed

7  by Ms. Rhee during the June-October 2000 time period.  These belatedly produced

8  MGA records purport to show that Ms. Rhee's work during that time period

9  related to a project known as "Angel" and/or "Prayer Angels."

10      At her deposition, however, Ms. Rhee testified that her work during

11  that time period was for Bratz and that "Angel" was MGA's and Bryant's code

12  name for Bratz.  Thus, Ms. Rhee testified that her June 12, 2000 work was for face

13  painting on two Bratz doll heads; her late August 2000 work was for face painting

14  on four Bratz doll heads; and her work as of September 8, 2000 was for face

15  painting on additional Bratz doll heads.  All of these are times when Bryant was

16  employed by Mattel.

17      At the deposition, defendants' counsel repeatedly tried--and failed--to

18  persuade Ms. Rhee to agree with their claim that "Angel" and/or "Prayer Angels"

19  was a different doll project than Bratz and that she worked on that project in the

20  June 2000, not Bratz.  For example, defendants' counsel asked whether the

21  June 12, 2000 invoice--which Ms. Rhee had testified was for work on Bratz--

22  "could" instead relate to the doll "that ultimately came to market as Prayer

23  Angels."  Ms. Rhee responded:  "There's no way."

24      Ms. Rhee further testified that during a time when Bryant was

25  necessarily employed by Mattel, he had contacted her about the "big" and "secret"

26  project that he was working on.  Bryant instructed Anna Rhee not to tell anyone

27  about the "secret" project, including Mattel employees.  He discussed this project

28  with Ms. Rhee while she was visiting the Mattel Design Center where Bryant was

-61-

SUPPLEMENTAL INTERROGATORY RESPONSES

EXHIBIT _I_
PAGE _151_

1  working and informed her that he had engaged a "corporate attorney" to help him
2  with the "secret" project.

3        Fourth, while working for Mattel, Bryant concealed and affirmatively
4  misrepresented his aid and assistance to MGA in other ways.  In particular, despite
5  his obligations to do so, Bryant failed to notify his Mattel supervisor of his
6  conflict of interest in working with MGA.  Prior to and upon his departure, Bryant
7  further misrepresented to Mattel, including to Ivy Ross and Sandy Yamamoto, his
8  future plans by stating that he was not going to work with a competitor.

9        Finally, both Bryant and MGA have spoliated evidence relating to the
10  timing and extent of Bryant's aid to and work with MGA during his Mattel
11  employment.  One example was revealed by the testimony of Victoria O'Connor, a
12  former MGA executive.  According to Ms. O'Connor, Bryant faxed a signed copy
13  of a Bryant/MGA contract to MGA from Mattel.  Upon receipt, each page of the
14  contract included a fax header that read "Barbie Collectibles" and bore the number
15  of the Mattel fax machine that it came from, revealing that it came from Mattel's
16  Designer Center where Bryant worked.  When Ms. O'Connor brought this to the
17  attention of Isaac Larian, Mr. Larian instructed her to "white-out" the fax header
18  information on all pages of the contract and send the contract, as altered, to an
19  outside MGA attorney.  At Mr. Larian's direction, Ms. O'Connor proceeded to
20  alter each page of the contract in order to conceal, as Ms. O'Connor testified, the
21  fact that Bryant "was still employed at Mattel at the time the contract [between
22  MGA and Bryant] was executed."

23        As further examples, Bryant has produced documents that appear to
24  have been altered to conceal information.  These include, most notably, a fax of
25  Bratz drawings that has a fax header date of April 10, 2000--six months before
26  Bryant left Mattel's employ. Although the fax header information on the page
27  produced by Bryant states that it was the third page of a fax transmission, neither
28  preceding nor subsequent pages, nor any cover sheet, has been produced.  Further,

07209/655298.1

-62-
SUPPLEMENTAL INTERROGATORY RESPONSES

EXHIBIT I
PAGE 152

1   even though the fax header on the produced page has fields for both the sender's

2   name and the sender's telephone number, neither the name of the sender nor the

3   sender's telephone number appears in the fax header.

4         Both MGA and Bryant also have failed and refused to provide Mattel

5   with access to original documents, despite the fact that one or both apparently

6   have already performed destructive ink chemistry analyses on Bryant's original

7   drawings and despite their agreement to provide those originals.  Bryant's counsel

8   agreed to produce all of Bryant's original Bratz drawings at his deposition.

9   Despite these promises, Bryant brought only a few of his original drawings to the

10  deposition.  Some of these drawings--including the originals of documents

11  BRYANT 192 and BRYANT 210--had holes in them, indicating that samples had

12  been extracted for ink chemical dating analysis.  Bryant testified that his drawings

13  did not have holes in them when he turned them over to defendants' counsel and

14  that he was unaware of the origin of the holes.  Appearances notwithstanding,

15  defendants' counsel has denied that anyone engaged in destructive sampling or

16  analysis of Bryant's original drawings.  Defendants have not, however, explained

17  the origin of the holes in the original drawings.

18        Ramona Prince, a third-party witness, has raised other questions

19  about the integrity of Bryant's documents.  According to both Ms. Prince and

20  Bryant, Bryant showed Ms. Prince his Bratz drawings in August 1999, when he

21  was employed by Mattel.  Ms. Prince, however, has testified that markings which

22  now appear on the copy of a Bratz drawing produced by defendants did *not* appear

23  on the original drawing that Bryant showed her in 1999.  This conflicts with

24  Bryant's testimony about the drawing.  He claims that he created the drawing in its

25  entirety in August 1998, before he showed it to Ms. Prince.

26        By way of further answer, pursuant to Federal Rule of Civil

27  Procedure 33(d), Mattel will produce responsive, non-privileged documents and

28

EXHIBIT _I_

PAGE _153_

1  tangible items in its possession, custody or control from which the answer to this

2  Interrogatory may be derived.

3          By way of further answer, Mattel currently has not yet received

4  discovery from defendant or MGA, has not yet obtained any deposition testimony

5  and has not yet had the opportunity to obtain information from other third parties

6  who may possess relevant information.  Mattel therefore reserves the right to

7  supplement this response after Mattel receives more information about defendant's

8  activities.  By way of further answer, this topic may be the subject of expert

9  testimony, which will be disclosed in the manner, and at the time, required for

10  expert disclosures pursuant to the <u>Federal</u> and <u>Local Rules</u>.

11

12  <u>INTERROGATORY NO. 13</u>:

13          State all facts supporting YOUR contention that Bryant was in a

14  fiduciary relationship with MATTEL.

15

16  <u>SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 13</u>:

17          In addition to the general objections stated above, Mattel specifically

18  objects to this Interrogatory on the grounds that it calls for the disclosure of

19  information subject to the attorney-client privilege, the attorney work-product

20  doctrine and other applicable privileges.  Mattel further objects to this

21  Interrogatory on the ground that it calls for the disclosure of confidential and/or

22  proprietary information, which Mattel will disclose only subject to and in reliance

23  upon a suitable protective order.  Mattel further objects to this Interrogatory as

24  unreasonably burdensome and overbroad in that it purports to require Mattel to

25  summarize all facts on this subject, including without limitation, facts that are

26  known to or in the possession, custody and control of defendant Bryant,

27  defendant-in-intervention MGA Entertainment, Inc. and nonparties, including

28  nonparties associated with Bryant and/or MGA.  Mattel only undertakes to make a

07209/655298.1

1  good-faith, reasonable effort to summarize facts currently known to it in

2  responding to this Interrogatory.  Mattel further objects to this Interrogatory on the

3  grounds that it is premature in that it purports to seek to all facts relating to this

4  subject at the outset of discovery in this action and also seeks to circumvent the

5  expert disclosure provisions of the <u>Federal Rules of Civil Procedure</u> and the <u>Local</u>

6  <u>Rules</u>.

7        Subject to and without waiving the foregoing general and specific

8  objections, Mattel responds as follows:

9        On January 4, 1999, upon starting his second term of Mattel

10  employment, and as a condition of and in consideration for his employment,

11  defendant Bryant entered into an Employee Confidential Information and

12  Inventions Agreement (the "Employee Agreement").  Among other things, Bryant

13  agreed that he would not, without Mattel's express written consent, "engage in any

14  employment or business other than for [Mattel], or invest in or assist (in any

15  manner) any business competitive with the business or future business plans of

16  [Mattel]."  Bryant further acknowledged that he held a position of trust with

17  Mattel.  In addition, Bryant assigned to Mattel all right, title and interest in

18  "inventions," including without limitation "designs," that he created, conceived or

19  reduced to practice, whether alone or jointly with others, during his employment

20  by Mattel under the terms set forth in his Employee Agreement.  A copy of

21  defendant's Employee Agreement with Mattel, dated January 4, 1999, is attached

22  to the Complaint as Exhibit A and is hereby incorporated into this response by this

23  reference.  Before his departure from Mattel, Bryant confirmed his obligations in a

24  Proprietary Information Checkout form, which Bryant agreed to and signed.  A

25  copy of this additional agreement has been produced in this action and is hereby

26  incorporated into this response by this reference.

27        Also on January 4, 1999, Bryant executed a Conflict of Interest

28  Questionnaire (the "Conflict Questionnaire").  Among other things, Bryant

EXHIBIT __I__
PAGE __155__

1 | certified in the Conflict Questionnaire that, other than as disclosed, he had not
2 | worked for any competitor of Mattel in the prior twelve months and had not
3 | engaged in any business venture or transaction involving a Mattel competitor that
4 | could be construed as a conflict of interest.  Bryant specifically agreed that he
5 | would immediately notify his supervisor of any change in his situation that would
6 | cause him to change any of the foregoing certifications.  The only conflict
7 | disclosure that Bryant made on the Conflict Questionnaire concerned what
8 | defendant stated was "freelance" work for Ashton-Drake that is unrelated to the
9 | conduct alleged herein.  At no time did Bryant disclose to Mattel that he was
10 | working with MGA, a known competitor, while employed by Mattel, or that he
11 | was paid by MGA for services rendered to MGA while he was a Mattel employee.
12 | A copy of the Conflict Questionnaire executed by Bryant is attached as Exhibit B
13 | to the Complaint and is hereby incorporated into this response by this reference.
14 | In late November 2003, Mattel obtained a copy of a contract
15 | evidencing that Bryant had aided and assisted, and worked as a designer with,
16 | MGA, a Mattel competitor, while he was employed by Mattel and was being paid
17 | by Mattel for his exclusive services as a designer.  Bryant's agreement with MGA
18 | obligated him to provide design services to MGA on a "top priority" basis.  In
19 | addition, his agreement with MGA purported to assign to MGA rights to
20 | preexisting works by Bryant and to deem work and services furnished by Bryant to
21 | MGA under the agreement as "works for hire."  Furthermore, Bryant's agreement
22 | with MGA provided that he would be paid for such services and receive royalties
23 | and other consideration for products on which he provided aid or assistance.  A
24 | copy of defendant's agreement with MGA, in the form obtained by Mattel, has
25 | been produced in this case and is hereby incorporated into this response by this
26 | reference.
27 | Although discovery and Mattel's investigation are on-going,
28 | additional documents, testimony and other evidence thus far obtained have

07209/655298.1

-66-

EXHIBIT _I_
PAGE _156_

1  confirmed that Bryant worked with and aided MGA, and advanced his own

2  personal interests over Mattel's, during the term of his Mattel employment without

3  Mattel's express written permission. First, Bryant admitted at deposition that he

4  did so, although he sought to minimize and conceal the time period and extent of

5  his aid to and work with MGA. Among other things, Bryant testified that (1) he

6  made pitches to MGA concerning the Bratz project during the term of his

7  employment; (2) he used Mattel personnel and other Mattel resources to assist him

8  in such pitches, including without limitation by using Mattel personnel and

9  resources to make what he called a "dummy" and others have called a three-

10  dimensional prototype; (3) he used Mattel personnel and other Mattel resources to

11  work on the Bratz project during his Mattel employment, including without

12  limitation by (a) obtaining information about a Mattel hair vendor, which Bryant

13  then contacted for his own and MGA's benefit and which Bryant told he was

14  working with MGA; and (b) identifying others who Bryant knew as a consequence

15  of his Mattel employment to work on the project and enlisting them to work on the

16  Bratz project during the term of his Mattel employment; (4) he worked on what

17  Bryant characterized as a "test project" to aid and assist MGA and benefit himself,

18  at Mattel's expense, during the term of his Mattel employment;  (5) he entered into

19  his agreement with MGA during the term of his Mattel employment and used

20  Mattel resources in connection with the negotiation and execution of that

21  agreement; and (6) he received monetary payments and other benefits from MGA

22  during the term of his Mattel employment, and both Bryant and MGA benefitted

23  further as a consequence of his aid and assistance to and work with MGA during

24  the term of his Mattel employment.

25          Second, MGA and those associated with MGA have made statements,

26  including under oath, that confirm Bryant assisted and worked with MGA during

27  his Mattel employment. Among his many statements to the press, for example,

28  MGA's CEO, Isaac Larian, told the *Wall Street Journal* that "he chose

-67-

Mattel, Inc.'s Supplemental Responses to Bryant's First Set of Interrogatories

EXHIBIT   I

PAGE   157

1  Mr. Bryant's idea for the Bratz over several others after holding a sort of

2  fashion-doll design contest in late 1999"--a time when Bryant was employed by

3  Mattel.  In a sworn affidavit filed in a Hong Kong lawsuit brought by MGA,

4  Isaac Larian stated that "[t]he Bratz dolls were first exhibited in the USA in

5  November 2000," which further confirms that Bryant was working with and aiding

6  MGA on the project prior to his departure from Mattel on or about October 20,

7  2000.  Additionally, Isaac Larian has been sued for fraud and other claims by his

8  brother and one-time partner in MGA, Farhad Larian.  Farhad Larian's verified

9  Complaint alleges, among other things, that "in or about late 1999 and early 2000,

10  Isaac became aware of a potential new product line that had tremendous potential

11  for [MGA].  The new product line involved the 'Bratz' dolls and related products."

12  The verified Complaint further alleges: "In or about early 2000, Isaac called a

13  meeting to discuss the new Bratz product line with selected individuals" at MGA,

14  and took affirmative steps "to conceal" from Farhad Larian MGA's "plans for the

15  Bratz line" in February, March and May 2000.  Bryant was working for Mattel

16  during each of these time periods.

17          Third, although discovery is still in its early stages, other witnesses

18  who have testified thus far in the case have provided testimony revealing that

19  Bryant aided and worked with MGA during his Mattel employment.  Bryant

20  testified that he pitched the Bratz project to MGA in late August and September

21  2000.  Bryant also testified that he had no contact with MGA until August 2000

22  and had never even heard of MGA before July 2000. Bryant claims that he

23  discussed the Bratz project with Anna Rhee--and introduced Ms. Rhee to MGA--

24  only after he stopped working for Mattel in late October 2000.  After Bryant

25  introduced Ms. Rhee to MGA (which is undisputed--Bryant and Ms. Rhee agree

26  that she had no involvement with MGA prior to Bryant's introduction), Ms. Rhee

27  painted Bratz doll heads.

28

1      During the six months from August 2004 (when MGA made its initial
2   document production in this case) to January 2005, MGA produced a mere eight
3   pages of payment records relating to work that Ms. Rhee performed on Bryant-
4   related projects in the year 2000.  These pages relate exclusively to work that
5   Ms. Rhee did on Bryant-related projects in December 2000, after Bryant left
6   Mattel, which would be consistent with Bryant's testimony.
7      After Bryant testified and after MGA made its initial production of
8   Anna Rhee documents, however, Anna Rhee produced documents pursuant to
9   subpoena in mid-January 2005.  Included in Ms. Rhee's production were
10  approximately twenty invoices for work that she performed on Bryant-related
11  MGA projects in the year 2000, none of which MGA or Bryant had disclosed.
12  These invoices also revealed that Ms. Rhee performed work with Bryant and
13  MGA on at least seven separate occasions before Bryant's departure from Mattel--
14  including one invoice that dates to June 12, 2000, when Bryant purportedly had
15  never even heard of MGA.
16     After Ms. Rhee produced these documents, MGA then made a
17  supplemental production of certain internal documents relating to work performed
18  by Ms. Rhee during the June-October 2000 time period.  These belatedly produced
19  MGA records purport to show that Ms. Rhee's work during that time period
20  related to a project known as "Angel" and/or "Prayer Angels."
21     At her deposition, however, Ms. Rhee testified that her work during
22  that time period was for Bratz and that "Angel" was MGA's and Bryant's code
23  name for Bratz.  Thus, Ms. Rhee testified that her June 12, 2000 work was for face
24  painting on two Bratz doll heads; her late August 2000 work was for face painting
25  on four Bratz doll heads; and her work as of September 8, 2000 was for face
26  painting on additional Bratz doll heads.  All of these are times when Bryant was
27  employed by Mattel.
28

Mattel, Inc.'s Supplemental Responses to Bryant's First Set of Interrogatories

EXHIBIT _I_
PAGE _159_

1    At the deposition, defendants' counsel repeatedly tried--and failed--to

2  persuade Ms. Rhee to agree with their claim that "Angel" and/or "Prayer Angels"

3  was a different doll project than Bratz and that she worked on that project in the

4  June 2000, not Bratz. For example, defendants' counsel asked whether the

5  June 12, 2000 invoice--which Ms. Rhee had testified was for work on Bratz--

6  "could" instead relate to the doll "that ultimately came to market as Prayer

7  Angels." Ms. Rhee responded: "There's no way."

8    Ms. Rhee further testified that during a time when Bryant was

9  necessarily employed by Mattel, he had contacted her about the "big" and "secret"

10  project that he was working on. Bryant instructed Anna Rhee not to tell anyone

11  about the "secret" project, including Mattel employees. He discussed this project

12  with Ms. Rhee while she was visiting the Mattel Design Center where Bryant was

13  working and informed her that he had engaged a "corporate attorney" to help him

14  with the "secret" project.

15    Fourth, while working for Mattel, Bryant concealed and affirmatively

16  misrepresented his aid and assistance to MGA in other ways. In particular, despite

17  his obligations to do so, Bryant failed to notify his Mattel supervisor of his

18  conflict of interest in working with MGA. Prior to and upon his departure, Bryant

19  further misrepresented to Mattel, including to Ivy Ross and Sandy Yamamoto, his

20  future plans by stating that he was not going to work with a competitor.

21    Finally, both Bryant and MGA have spoliated evidence relating to the

22  timing and extent of Bryant's aid to and work with MGA during his Mattel

23  employment. One example was revealed by the testimony of Victoria O'Connor, a

24  former MGA executive. According to Ms. O'Connor, Bryant faxed a signed copy

25  of a Bryant/MGA contract to MGA from Mattel. Upon receipt, each page of the

26  contract included a fax header that read "Barbie Collectibles" and bore the number

27  of the Mattel fax machine that it came from, revealing that it came from Mattel's

28  Designer Center where Bryant worked. When Ms. O'Connor brought this to the

EXHIBIT _I_
PAGE _160_

1   attention of Isaac Larian, Mr. Larian instructed her to "white-out" the fax header

2   information on all pages of the contract and send the contract, as altered, to an

3   outside MGA attorney.  At Mr. Larian's direction, Ms. O'Connor proceeded to

4   alter each page of the contract in order to conceal, as Ms. O'Connor testified, the

5   fact that Bryant "was still employed at Mattel at the time the contract [between

6   MGA and Bryant] was executed."

7           As further examples, Bryant has produced documents that appear to

8   have been altered to conceal information.  These include, most notably, a fax of

9   Bratz drawings that has a fax header date of April 10, 2000--six months before

10  Bryant left Mattel's employ. Although the fax header information on the page

11  produced by Bryant states that it was the third page of a fax transmission, neither

12  preceding nor subsequent pages, nor any cover sheet, has been produced.  Further,

13  even though the fax header on the produced page has fields for both the sender's

14  name and the sender's telephone number, neither the name of the sender nor the

15  sender's telephone number appears in the fax header.

16          Both MGA and Bryant also have failed and refused to provide Mattel

17  with access to original documents, despite the fact that one or both apparently

18  have already performed destructive ink chemistry analyses on Bryant's original

19  drawings and despite their agreement to provide those originals.  Bryant's counsel

20  agreed to produce all of Bryant's original Bratz drawings at his deposition.

21  Despite these promises, Bryant brought only a few of his original drawings to the

22  deposition.  Some of these drawings--including the originals of documents

23  BRYANT 192 and BRYANT 210--had holes in them, indicating that samples had

24  been extracted for ink chemical dating analysis.  Bryant testified that his drawings

25  did not have holes in them when he turned them over to defendants' counsel and

26  that he was unaware of the origin of the holes.  Appearances notwithstanding,

27  defendants' counsel has denied that anyone engaged in destructive sampling or

28

1   analysis of Bryant's original drawings.  Defendants have not, however, explained

2   the origin of the holes in the original drawings.

3           Ramona Prince, a third-party witness, has raised other questions

4   about the integrity of Bryant's documents.  According to both Ms. Prince and

5   Bryant, Bryant showed Ms. Prince his Bratz drawings in August 1999, when he

6   was employed by Mattel.  Ms. Prince, however, has testified that markings which

7   now appear on the copy of a Bratz drawing produced by defendants did *not* appear

8   on the original drawing that Bryant showed her in 1999.  This conflicts with

9   Bryant's testimony about the drawing.  He claims that he created the drawing in its

10  entirety in August 1998, before he showed it to Ms. Prince.

11          By way of further answer, pursuant to <u>Federal Rule of Civil</u>

12  <u>Procedure</u> 33(d), Mattel will produce responsive, non-privileged documents and

13  tangible items in its possession, custody or control from which the answer to this

14  Interrogatory may be derived.

15          By way of further answer, Mattel currently has not yet received

16  discovery from defendant or MGA, has not yet obtained any deposition testimony

17  and has not yet had the opportunity to obtain information from other third parties

18  who may possess relevant information.  Mattel therefore reserves the right to

19  supplement this response after Mattel receives more information about defendant's

20  activities.  By way of further answer, this topic may be the subject of expert

21  testimony, which will be disclosed in the manner, and at the time, required for

22  expert disclosures pursuant to the <u>Federal</u> and <u>Local Rules</u>.

23

24  <u>INTERROGATORY NO. 16</u>:

25          IDENTIFY each and every MATTEL employee or independent

26  contractor that worked with Bryant on any project he worked on for MATTEL,

27  from 1996 to October 2000.

28

EXHIBIT __I__
PAGE __162__

1    <u>RESPONSE TO INTERROGATORY NO. 16</u>:

2          In addition to the general objections stated above, Mattel objects to

3    this Interrogatory as overbroad and unduly burdensome on the grounds that it

4    seeks the identification of <u>all</u> employees or independent contractors who worked

5    with Bryant on "any project he worked on for MATTEL" for a period of several

6    years. For the same reasons, Mattel further objects to this Interrogatory on the

7    grounds that it seeks information that is not relevant to this action or reasonably

8    calculated to lead to the discovery of admissible evidence. Mattel further objects

9    to this Interrogatory on the grounds that this information is equally available to

10    defendant, as defendant necessarily possesses superior firsthand knowledge of the

11    people with whom he personally interacted at Mattel.

12          Subject to and without waiving the foregoing general and specific

13    objections, Mattel responds as follows:

14          Please see response to Interrogatory No. 15, which identifies Mattel

15    personnel who directly supervised Carter Bryant during his employment at Mattel.

16          By way of further answer, pursuant to <u>Federal Rule of Civil</u>

17    <u>Procedure</u> 33(d), Mattel will produce responsive, non-privileged documents and

18    tangible items in its possession, custody or control from which the answer to this

19    Interrogatory may be derived.

20

21    DATED: May 16, 2005

22                      QUINN EMANUEL URQUHART
23                      OLIVER & HEDGES, LLP

24                      By

25                         Jon D. Corey
                          Attorneys for Plaintiff
26                         Mattel, Inc.

27

28

07209/655298.1

-73-

Mattel, Inc.'s Supplemental Responses to Bryant's First Set of Interrogatories

EXHIBIT  I<br>PAGE  163

1       CONFIDENTIAL
4              IN THE UNITED STATES DISTRICT COURT
5           FOR THE CENTRAL DISTRICT OF CALIFORNIA
7    MATTEL, INC., a Delaware corporation, )  CASE NO.
8                                    )  CV 04-9059 DDP (AJWx)
9              Plaintiff,            )
10                                   )
11         vs.                       )
12                                   )
13    CARTER BRYANT, an individual, and   )
14    DOES 1 through 10, inclusive,       )
15                                   )
16              Defendants.          )
17         _____
18    CARTER BRYANT, on behalf of himself,  )
19    all present and former employees of  )
20    Mattel, Inc., and the general public, )
21                                   )
22              Cross-Complainant,   )
24         vs.                       )
26    MATTEL, INC., a Delaware corporation, )
27                                   )
28              Cross-Defendant.     )
29
30                 VOLUME II
31         THE VIDEOTAPED DEPOSITION OF CARTER BRYANT,
32    produced, sworn, and examined on Friday, November 5, 2004,
33    at 9:10 a.m. of that day, pursuant to Notice to Take
34    Deposition at the University Plaza, Executive Boardroom,
35    333 South John Q. Hammons Parkway, in the City of Springfield,
36    County of Greene, State of Missouri, before Sherrie L. Hunt,
37    Certified Court Reporter, and Notary Public, in a certain
38    cause now pending in the United States District Court for the
39    Central District of California, wherein the parties are as
40    above set forth; taken on behalf of the Plaintiff Mattell,
41    Inc.
42              . COURT REPORTERS OF THE MIDWEST, INC.
43                   P.O. Box 4282
44         Springfield, MO 65808 (417) 889-2079
45



EXHIBIT    J
PAGE    164

1   Q   Was it between the meeting with Paula and the six-person

2       meeting with Mr. Larian?

3   A   I don't recall.  I think it could have been.

4   Q   Who gave you that assignment to do this?

5   A   To the best of my recollection Paula asked me to do it.

6   Q   Is the best of your recollection that that's an assignment

7       she gave you over the phone?

8   A   It could have been.  I don't remember.

9   Q   When she gave you the assignment, how did she describe it

10      to you?

11  A   I don't really remember exactly other than she said that

12      it was -- they were doing some baby angels, baby prayer

13      angels and they needed some sweet faces.

14  Q   Okay.  And they asked you to come up with some?

15  A   Yes.

16  Q   And what was your understanding of -- you say this was --

17      in your understanding this was a tryout project?

18  A   Yes.

19  Q   Was it your understanding that this was -- was clearly

20      something that they weren't actually interested in using

21      your work product?

22  A   No.  I didn't understand that one way or another whether

23      they had intended to use it or not.

24  Q   So, I mean, you took it seriously as something that -- to

25      create something that they might end up using?

EXHIBIT   J
PAGE   165

1   A   Yes.

2   Q   But you also -- you've told us you also saw it as a tryout

3       project?

4   A   Yes.

5   Q   And what made you believe that there was that aspect to

6       this assignment, that they were sort of checking out your

7       skills?

8   A   Well, Mattel had done sort of a similar thing.  Before I

9       ever went to work with them they gave me kind of a tryout

10      project just to see what I could come up with, you know,

11      on assignment.

12  Q   Uh-huh.  Well, what was it that led you to believe that

13      this -- this was a tryout project?

14          MS. CENDALI:  Asked and answered.

15  A   Same thing.  I just -- I just assumed that, you know,

16      since this was not related to the Bratz, it was just

17      something that they were asking me to do to see what I

18      could do on assignment.

19  Q   (By Mr. Quinn)  Did anybody from MGA tell you it was a

20      tryout project?

21  A   I don't know if they used those exact words, no.

22  Q   Well, whether or not they used those exact words, did they

23      say some words that communicated to you that we're giving

24      you this assignment as a -- as a tryout project?

25  A   They may have.  I don't remember.

---

MGA v. Mattel-OMM Depo Transcripts                Unsigned                         Page 325

EXHIBIT   J
PAGE   166

1   Q  Just don't remember one way or the other?

2   A  No.

3   Q  Did they end up -- did MGA end up doing that angel doll

4      project?

5   A  They did.

6   Q  And did they end up using any of your work product?

7   A  I don't think they did, no.

8   Q  Do you know for sure one way or the other?

9   A  Well, from the look of these drawings and from what I can

10     recall of that project and the way it came out, I would

11     say no.

12  Q  Did you create any work product other than what we're

13     looking at here on this page for MGA relating to this

14     angel assignment?

15  A  I created some hairstyle ideas for them.

16  Q  That are not reflected here?

17  A  Right.

18          (Pause in proceedings.)

19  Q  (By Mr. Quinn)  Oh, okay.  Anything else other than the

20     hairstyle ideas and what's on page 173?

21          MR. WICKHAM:  Objection, ambiguous, vague.

22  A  No.  No.

23  Q  (By Mr. Quinn)  Do we have the hairstyle ideas somewhere?

24     Do you know?  Have you seen those?

25  A  I don't know.

EXHIBIT  J
PAGE  167