QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
  John B. Quinn (Bar No. 090378)
  (johnquinn@quinnemanuel.com)
  Michael T. Zeller (Bar No. 196417)
  (michaelzeller@quinnemanuel.com)
  Jon D. Corey (Bar No. 185066)
  (joncorey@quinnemanuel.com)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100

Attorneys for Mattel, Inc.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual, | CASE NO. CV 04-9049 SGL (RNBx) |
| Plaintiff, | Consolidated with<br>Case No. CV 04-09059<br>Case No. CV 05-02727 |
| vs. | |
| MATTEL, INC., a Delaware corporation, | **DISCOVERY MATTER** |
| Defendant. | **[To Be Heard By Hon. Edward Infante (Ret.) Pursuant To Order Of December 6, 2006]** |
| AND CONSOLIDATED ACTIONS | REPLY IN SUPPORT OF MATTEL, INC.'S COUNTER-MOTION TO COMPEL PRODUCTION OF DOCUMENTS RESPONSIVE TO THIRD-PARTY SUBPOENAS |
| | [Supplemental Declaration of Jon D. Corey] |
| | Hearing Date:     TBA<br>Time:                 TBA<br>Place:                TBA |
| | **Phase 1**:<br>Discovery Cut-off:         January 28, 2008<br>Pre-trial Conference:      May 5, 2008<br>Trial Date:                    May 27, 2008 |

07209/2387192.2

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

I.    THE MGA DEFENDANTS' OBJECTIONS TO THE LARIAN
      TRUSTS ARE MERITLESS ........................................................................ 3

      A.    The Objections to the Subpoenas to the Larian Trusts Are Moot .......... 3

      B.    The Larian Trusts Possess Highly Relevant Documents ........................ 3

II.   THE MGA DEFENDANTS DO NOT DISPUTE THAT
      CONSUMERQUEST HAS HIGHLY RELEVANT, UNPRODUCED
      DOCUMENTS .............................................................................................. 5

III.  THE MGA DEFENDANTS HAVE FAILED TO DEMONSTRATE
      THAT THE DOCUMENTS SOUGHT FROM THE THIRD PARTIES
      IS IN THEIR POSSESSION OR HAS BEEN PRODUCED ........................... 6

      A.    The MGA Defendants' Production is Deficient ....................................... 7

      B.    The MGA Defendants Have Failed to Produce Relevant
            Documents Until After Produced by a Third Party ................................ 8

      C.    The MGA Defendants' Treatment of Evidence Has Raised Issues
            Regarding Tampering and Spoliation ..................................................... 9

IV.   LARIAN AND MGA FAIL TO OFFER ANY EVIDENCE OF
      UNDUE BURDEN ...................................................................................... 10

V.    THE SUPPOSEDLY "DUPLICATIVE" REQUESTS ARE NOT
      UNREASONABLE ..................................................................................... 12

VI.   LARIAN AND MGA SEEK TO QUASH REQUESTS THEY
      CONCEDE ARE RELEVANT ................................................................... 13

      A.    Larian and MGA Seek Improperly to Quash Requests for
            Documents Explicitly Related to Bratz .................................................. 13

      B.    Mattel is Entitled to Documents Relevant to the Development of
            Bratz ...................................................................................................... 14

            1.    Payments to Mattel Employees .................................................... 14

            2.    The MGA Defendants' Funding of the Development of
                  Bratz ............................................................................................ 15

VII.  MATTEL IS ENTITLED TO DOCUMENTS RELATED TO NET
      WORTH AND DISGORGEMENT ............................................................. 16

      A.    Documents Relevant to Net Worth Are Not Limited to "the
            Present" ................................................................................................. 16

1

**B.**    Mattel's Disgorgement Claim Justifies the Requests for the MGA
Defendants' Financial Documents .......................................................... 19

2

VIII.   THE REQUESTS SEEK DOCUMENTS RELEVANT TO PHASE 1
DISCOVERY ................................................................................................. 22

3

4

CONCLUSION............................................................................................................ 23

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

## Cases

A. Farber and Partners, Inc. v. Garber,
234 F.R.D. 186 (C.D. Cal. 2006) ........................................................ 10

Fieldturf International, Inc. v. Trieze Management Group, Inc.,
2004 WL. 866494 (N.D. Ill. Apr. 16, 2004) ........................................ 17

Fletcher v. Security Pacific Nat'l Bank,
23 Cal. 3d 442 (1979).......................................................................... 22

Floyd-Mayers v. American Cab Co.,
1990 WL. 116855 (D.D.C. July 30, 1990)................................ 7, 17, 18

Frank Music Corp., v. Metro-Goldwyn-Mayer, Inc.,
886 F.2d 1545 (9th Cir. 1989)...................................................... 19, 20

Goodman v. U.S.,
369 F.2d 166 (9th Cir. 1966)................................................................. 9

Janigan v. Taylor,
344 F.2d 781 (1st Cir. 1965) .......................................................... 20, 21

JZ Buckingham Investments, LLC v. United States,
78 Fed. Cl. 15 (Fed. Cl. Ct. 2007)................................................. 10, 16

Klein v. AIG Trading Group, Inc.,
228 F.R.D. 418 (D. Conn. 2005)......................................................... 12

Korea Supply Co. v. Lockheed Martin Corp.,
29 Cal. 4th 1134 (2003)....................................................................... 20

Kraus v. Trinity Management Services, Inc.,
23 Cal. 4th 116 (2000)......................................................................... 21

Lectroalarm Custom Systems, Inc. v. Pelco Sales, Inc.,
213 F.R.D. 567 (2002)......................................................................... 12

In re Lloyd's American Trust Fund Litigation,
1998 WL. 50211 (S.D.N.Y. Feb. 6, 1998) ......................................... 13

Mason v. Sybron Corp.,
955 F.2d 48 (Table) (9th Cir. 1992)..................................................... 20

Paluch v. Dawson,
2007 WL. 4375937 (M.D. Pa. Dec. 12, 2007) .................................... 13

07209/2387192.2

*Panola Land Buyers Ass'n v. Shuman,*
762 F.2d 1550 (11th Cir. 1985)............................................................. 10

*S.E.C. v. Cavanagh,*
445 F.3d 105 (2d Cir. 2006)............................................................ 21, 22

*SEC v. Commonwealth Chem. Sec., Inc.,*
574 F.2d 90 (2d Cir. 1978)..................................................................... 21

*SEC v. MacDonald,*
699 F.2d 47 (1st Cir. 1983) ................................................................... 20

*SEC v. Manor Nursing Centers, Inc.,*
458 F.2d 1082 (2d Cir. 1972).................................................................. 20

*Southern Cal. Housing Rights Center v. Krug,*
2006 WL. 4122148 (C.D. Cal. Sept. 5, 2006)....................................... 17

*State Farm Mutual Auto Ins. Co. v. Accurate Medical, P.C.,*
2007 WL. 2993840 (E.D.N.Y. Oct. 10, 2007) ........................................ 6

*Tequila Centinela, S.A. v. Bacardi & Co., Ltd.,*
__ F.R.D. __, 2008 WL. 162937 (D.D.C. Jan. 18, 2008) ....................... 6

*Travelers Rental Co., Inc. v. Ford Motor Co.,*
116 F.R.D. 140 (D. Mass. 1987) ........................................................... 13

*United States v. Abel,*
469 U.S. 45 (1984) ................................................................................ 15

*United States v. Rice,*
38 F.3d 1536 (9th Cir. 1994)................................................................. 21

## **Rules**

Fed. R. Civ. Pro. 26(b)(2)(C)(i)........................................................ 12, 16

Ninth Circuit Rule 36-3 ......................................................................... 20

## **Other Authorities**

Dan B. Dobbs, Law of Remedies § 4.3(1), 589 (2d ed. 1993).................. 21

Wright & Miller, Federal Practice & Procedure: Federal Rules of Evidence
§ 6095 .................................................................................................... 15

1
2

## **Preliminary Statement**

3
4
5
6
7
8
9
10
11
12
13
14
15

The MGA defendants' objections to the Larian trust subpoenas are moot. Mattel has learned that Isaac Larian is the trustee for them. Larian has a duty pursuant to the Discovery Master's December 31, 2007 order to produce relevant documents, which includes documents in possession of the trusts. Yet Larian has produced no trust documents. Having failed to do so, the trusts must produce them. The importance of the trust documents to establishing Larian's net worth (and disgorgement) cannot be overstated. It is undisputed that MGA paid hundreds of millions of dollars to Larian through those trusts. But the exact amount of those payments is unknown. So is the amount of distributions Larian has actually received from the Larian trusts. Thus, Mattel is entitled to review the Larian trusts' financial documents to learn how much they received from MGA, how much they paid to Larian, how much they have transferred to others, and how much they may still be holding for later distribution.

16
17
18
19
20

Also, the MGA defendants make no effort to justify the motion to quash Mattel's subpoena of ConsumerQuest. MGA put ConsumerQuest at issue when it accused Mattel of interfering with the relationship between MGA and ConsumerQuest. MGA cannot deprive Mattel of evidence from ConsumerQuest that exonerates Mattel or that relates to Bratz focus groups.

21
22
23
24
25

The MGA defendants' Reply and Opposition offers little in the way of new argument and simply ignores important points made by Mattel in earlier briefing. Most notably, the MGA defendants fail to present any evidence that the third-party subpoenas impose an undue burden on themselves or the third parties. Without such evidence, their undue burden arguments must fail.

26
27
28

The notion that all of the requests should be quashed because they are duplicative is similarly baseless. Discovery requests are not improper simply because they are similar or even identical to previous requests. They are only improper if they are "unreasonably" duplicative or cumulative.

-1-

1    Here, the MGA defendants have failed to carry their burden in showing
2  that Mattel's third party subpoenas are *unreasonably* duplicative. The MGA
3  defendants still have not demonstrated that they possess, much less have produced,
4  all of the documents in the possession of third parties. Further, Mattel had no choice
5  but to serve the third party subpoenas because of deficiencies in the MGA
6  defendants' production, the tendency of the MGA defendants to produce certain
7  relevant documents only when first produced by a third party, and the legitimate
8  concerns -- shared by the Court -- Mattel has about document tampering and
9  spoliation. In short, Mattel is not required to take the MGA defendants' word for it
10 that the third parties have nothing relevant to produce.

11   The MGA defendants seek to quash document requests they concede
12 seek highly relevant documents, including requests that seek documents explicitly
13 related to Bratz and the development of Bratz. There is no valid objection to these
14 requests and the documents should be produced forthwith.

15   The MGA defendants also argue that the third-party subpoenas are
16 overbroad and seek irrelevant financial information. But their argument is based on
17 an improperly constrained understanding of net worth and Mattel's disgorgement
18 theory. In order to obtain an accurate understanding of the MGA defendants' true
19 net worth, Mattel needs to explore the underlying basis of their net worth for a
20 number of years. Mattel is not required to rely solely on the MGA defendants' own,
21 cursory statements. They have known of this lawsuit for years and have had every
22 incentive to artificially minimize their net worth.

23   Much the same is true of Mattel's disgorgement remedy. The MGA
24 defendants concede that this remedy stretches back in time to the early years of
25 MGA when Bratz was first developed. But Mattel is entitled not only to profits
26 from the "direct sale" of Bratz, but to all of the unjust enrichment obtained by the
27 MGA defendants through their misdeeds, including the increase of MGA's good will
28 and overall value.

## I.   THE MGA DEFENDANTS' OBJECTIONS TO THE LARIAN TRUSTS ARE MERITLESS

### A.   The Objections to the Subpoenas to the Larian Trusts Are Moot

Since serving the deposition subpoenas, Mattel has learned that Isaac Larian is the Trustee of the Larian trusts identified by MGA's designee (his wife, Angela, is trustee of one as well).[1]  As trustee, the documents requested from these trusts are in Larian's possession, custody, and control and are subject to the Discovery Master's December 31, 2007 Order compelling Larian to produce responsive documents.[2]  As a result, Larian had a duty to search the documents held by the trusts when finally making his own production.  He apparently has not done so.  No trust documents have been included in his production to date.  Because these documents should already have been produced by Larian, but have not, there is no basis to object to their production by the trust's themselves.  Separately, this omission calls into question Larian's compliance with the December 31, 2007 order.

### B.   The Larian Trusts Possess Highly Relevant Documents

The MGA defendants' claim that the Larian trusts "have no involvement in this litigation" is belied by Isaac Larian's own actions.  (Opp. 15:19-21).  Larian chose to hold his ownership in MGA and to receive dividends from MGA through various trusts.[3]  Further, contrary to the MGA defendants' representations, they have not explained how much money was transferred to those trusts.  Mattel knows that MGA transferred approximately $500 million in dividends to MGA shareholders, but neither the MGA defendants' financial documents or the

---

[1]   Exh. 5, at 1288:8-1289:14 [January 24, 2008 Deposition Transcript of Lisa Tonnu], to the Supplemental Declaration of Jon D. Corey ("Supp. Corey Dec.").
[2]   Exh. E [December 31, 2007 Discovery Master Order] to the Declaration of Jon D. Corey in Support of Opposition and Counter-Motion to Compel ("Corey Dec.").
[3]   Exh. O, at 49:3-51:24; 54:17-55:8 [Tonnu Tr.] to the Corey Dec.; Corey Dec., ¶ 4.

1  MGA designee can identify the amounts paid to particular shareholders.[4]  Thus, the
2  Larian trust documents are of vital importance in establishing just how much Larian
3  received in payments and distributions from MGA.

4           The same is true for the other side of the coin.  Even if Larian had
5  produced all relevant financial documents -- which he has not -- Mattel would still
6  need the information held by the Larian trusts in order to determine his net worth as
7  well as obtain evidence relevant to its disgorgement remedy.  MGA's payments and
8  distributions to the Larian trusts are part of Larian's net worth (and also subject to
9  disgorgement), whether or not they were distributed directly to him.  For example,
10  to the extent MGA payments and distributions are retained in the Larian trusts for
11  possible later distribution, or were redirected to others beneficiaries such as
12  members of Larian's family, Mattel is entitled to account for those amounts.  And
13  Larian has been compelled to produce them.

14           If the documents held by the Larian trusts are withheld, then Mattel's
15  ability to discovery of Larian's true net worth will be impaired; as will its efforts to
16  disgorge all profits that Larian received from his misdeeds.

17           The complaint that Mattel did not meet and confer with the Larian
18  trusts is particularly puzzling because, as discussed above, the Larian trusts are
19  represented by the MGA defendants' attorneys.  Counsel for Mattel contacted
20  counsel for the MGA defendants in order to identify the appropriate trusts and
21  determine whether they held shares of MGA Entertainment, Inc.  Counsel for the
22  MGA defendants were uncooperative.[5]  Indeed, they apparently played a shell game
23  with the Larian trusts; providing Mattel inaccurate information and omitting relevant
24  facts about the Trust's identities.[6]  Moreover, counsel for the MGA defendants
25  accepted service on behalf of the Larian trusts and counsel for Mattel understood

26

_____

27  [4]  Exh. O, at 49:3-51:24; 54:17-55:8 [Tonnu Tr.]; Exh. P [Audited Financial
     Statements].  Both exhibits are to the Corey Dec.
28  [5]  Corey Dec., ¶¶ 4-5.
     [6]  Id.

1   that its discussions with them was meeting and conferring.  At no point did counsel

2   for the MGA defendants suggest otherwise.

3   **II.     THE MGA DEFENDANTS DO NOT DISPUTE THAT**

4   **CONSUMERQUEST HAS HIGHLY RELEVANT, UNPRODUCED**

5   **DOCUMENTS AND RELEVANT TO MATTEL'S DEFENSE AND TO**

6   **BRATZ DEVELOPMENT**

7            The MGA defendants' silence about the subpoena Mattel served on

8   ConsumerQuest is deafening.  As Mattel explained in its Cross-Motion, MGA put

9   ConsumerQuest at issue by accusing Mattel of interfering with the relationship

10  between MGA and ConsumerQuest.  MGA cannot deny (nor do they) Mattel's right

11  to seek documents from ConsumerQuest that disprove that accusation.  Nor do they

12  deny that ConsumerQuest has performed market testing and research for Bratz prior

13  to its release and at times thereafter.  The value of such documents goes to the heart

14  of Phase 1, the timing, development, and worth of Bratz.  There is no basis upon

15  which the MGA defendants can question their relevance; nor do they.

16           These documents are exactly what Mattel's subpoena served on

17  ConsumerQuest seeks.

18        •       ALL DOCUMENTS REFERRING OR
          RELATING TO BRATZ.  [Request No. 1].

19
20        • All DOCUMENTS REFERRING OR RELATING TO
          any study, survey, focus group, research group or other
          work or services for MGA relating to BRATZ, including
21        without limitation all tangible items relating thereto and all
          photographs, videos or other images depicting any such
22        tangible items and all viability reports relating thereto.
          [Request No. 3].

23
          • All DOCUMENTS, including without limitation
24        COMMUNICATIONS, and all tangible things
          REFERRING OR RELATING TO BRATZ prior to
25        December 31, 2002. [Request No. 5].

26        • All COMMUNICATIONS with MGA, ISAAC
          LARIAN, FARHAD LARIAN or BRYANT
27        REFERRING OR RELATING TO BRYANT.  [Request
          No. 11].

28

1

2

3

• All contracts or agreements or proposed or requested contracts or agreements with MGA, ISAAC LARIAN, FARHAD LARIAN or BRYANT since January 1, 1998. [Request No. 12].[7]

Significantly, the MGA defendants do not dispute that ConsumerQuest has documents reflecting *pre-release* Bratz testing or market research by ConsumerQuest that they have not produced.[8]  Accordingly, these documents are of vital importance to this action and should be produced forthwith

## III.    THE MGA DEFENDANTS HAVE FAILED TO DEMONSTRATE THAT THE DOCUMENTS SOUGHT FROM THE THIRD PARTIES IS IN THEIR POSSESSION OR HAS BEEN PRODUCED

The third-party subpoenas are not duplicative or cumulative.  To show duplication, the MGA defendants must show that they possess and have produced all of the documents that Mattel has requested from the third parties.  State Farm Mutual Auto Ins. Co. v. Accurate Medical, P.C., 2007 W.L. 2993840 (E.D.N.Y. Oct. 10, 2007) (denying motion to quash document subpoena seeking documents from third-parties because it was "unlikely that the moving defendants would, in fact, possess all the documents sought by plaintiff in the subpoenas).  See also Tequila Centinela, S.A. v. Bacardi & Co., Ltd., __ F.R.D. __, 2008 WL 162937 (D.D.C. Jan. 18, 2008) (granting motion to compel because of opposing party's failure to "make a specific showing" that requests were unreasonably duplicative or cumulative).  The MGA defendants proclaim that they have produced a lot of financial documents (supported solely by a four line paragraph in counsel's declaration).  They scrupulously avoid stating that they possess, much less that they have produced, all documents that Mattel has subpoenaed.  Nowhere do they suggest that the third parties possess no unique, relevant documents.  Indeed, for all of the bluster, the MGA defendants do not identify a single documents that they

[7]  Exh. 10 [ConsumerQuest Subpoena] to the Declaration of Amy Park in Support of Motion to Quash ("Park Dec.").
[8]  Opposition and Motion to Compel, 27:2-3.

07209/2387192.2

1 have produced that they claim is responsive to Mattel's subpoenas. Absent a
2 showing that the subpoenas will lead to the production of no unique documents, the
3 objection should be overruled to the extent asserted, the motion to quash denied, and
4 the cross-motion to compel granted.

5       **A.**     **The MGA Defendants' Production is Deficient**

6       The MGA defendants concede that they have not produced all of the
7 documents sought by Mattel. To the extent they claim their production of
8 documents renders the third-party subpoenas duplicative, they ignore the fact that
9 their production is deficient in many respects.

10       The MGA designee on its net worth testified that she could not
11 determine MGA's net worth based on the documents it has produced. She also
12 testified that MGA simply did not have any documents showing net worth.[9] Having
13 so testified, MGA cannot now claim that it has produced all relevant documents
14 demonstrating net worth and that the documents held by third parties with
15 knowledge of MGA's net worth should be precluded from producing them. Floyd-
16 Mayers v. American Cab Co., 1990 WL 116855 (D.D.C. July 30, 1990) (granting
17 motion to compel broad discovery into defendant's finances were defendant's own
18 conduct had placed accuracy of information in doubt).

19       Despite counsel for the MGA defendants' attempt to inflate which
20 documents they have produced,[10] several categories of documents have not been
21 produced. These include but are not limited to the following: (1) documents related
22 to the Larian trusts; (2) documents regarding the 1999-2000 and 2006 loans MGA
23 received from Wachovia, including funding sources for the development of Bratz;
24 (3) MGA's "monthly general ledgers," which would contain specific information for
25 general ledger entries; and (4) valuations of MGA's good will or net worth by its
26 auditors Ernst and Young and Deloitte Touche or its bank Wells Fargo.

27

28    [9] Exh. O, at 350:9-351:14 [Tonnu Tr.] to the Corey Dec.
   [10] Declaration of Amy Park in Support of Reply and Opposition, ¶ 5.

1       Although Isaac Larian recently produced some documents pursuant to
2  the Discovery Master's order, important documents -- such as any statements for
3  checking or money market accounts -- were not included.[11]

4       **B.    The MGA Defendants Have Failed to Produce Relevant Documents**
5              **Until After Produced by a Third Party**

6       Mattel should not be forced to rely on the MGA defendants to timely
7  and fully produce responsive documents.  Several times in this litigation the MGA
8  defendants have produced responsive documents only after a third party produced
9  the same documents.  For example, as discussed in Mattel's Opposition and Motion
10  to Compel, MGA failed to produce many documents related to Bratz, including
11  Bratz related emails *predating* Carter Bryant's last day at Mattel, until after third-
12  party Steve Linker produced them at his September 2006 deposition.[12]

13      As another example, third party and doll face painter Anna Rhee
14  testified that several months before Bryant left Mattel, Bryant told her he had a
15  "secret" project that he wanted her to work on.  According to her testimony, in June
16  2000, Bryant introduced Ms. Rhee to MGA and had her paint the faces of "Bratz"
17  doll heads.[13]  She submitted an invoice dated June 12, 2000 for that work for
18  payment by MGA.  Ms. Rhee further testified that when she first began working on
19  this "secret" project, she did not know the project by the name "Bratz," but that
20  Mr. Bryant initially instead had called it "Angel," which is what she wrote on her
21  invoice to MGA as well as on other invoices for her work on Bratz in September
22  2000.[14]  *After* Ms. Rhee testified at her February 3, 2005 deposition, MGA produced
23  over 100 pages of documents related to Ms. Rhee's work on Bratz, including
24  documents that predate Mr. Bryant's leaving Mattel by two months.[15]

25

26  [11]  Supp. Corey Decl., ¶ 5.
      [12]  Id.
27  [13]  Suppl. Corey Dec., ¶ 2; Exh. 1 [Deposition Transcript of Anna Rhee, dated
      February 3, 2005], as well as exhibits 201 through 204 thereto
28  [14]  Id.
      [15]  Supp. Corey Dec., ¶ 3; Exh. 2.

C.    **The MGA Defendants' Treatment of Evidence Has Raised Issues Regarding Tampering and Spoliation**

The MGA defendants silence on the issue of document tampering and spoliation, despite Mattel's discussing it at length in its Opposition and Motion to Compel, is also deafening. It is undisputed that Mattel has legitimate concerns over document tampering and spoliation. The Court has previously found that there are "serious questions" over MGA's "handling of [] critical documents."[16] Since the filing of the motion to quash, the Court has reiterated its concern over MGA's handling of important documents. On January 7, 2008, the Court granted Mattel leave to take additional depositions on the grounds that "Mattel has shown good cause to grant additional discovery given . . . the concerns regarding retention and spoliation of evidence."[17] Despite the Court's order, the MGA defendants refused to produce witnesses on topics related to document preservation and spoliation. As a result, Mattel moved ex parte to compel the depositions. The Court granted Mattel's ex parte on February 4, 2008, again reiterating its concern over MGA's handling of documents in this matter and ordering the depositions of two of their witnesses on this issue to proceed.[18]

Obtaining relevant documents from the MGA defendants has been a hard fought, protracted process. There have been over 20 discovery orders against MGA or its co-defendants, as well as three orders that have found MGA to be in deliberate violation of Court orders, including orders on discovery related to the origins and creation of Bratz that defendants refused to produce.[19] Given this record, including the very real concern about document preservation and spoliation, Mattel's third-party subpoenas are not unreasonably duplicative.

---

[16]  Exh. N, at 9:4-18:14 [Court's August 9, 2006 Order] to the Corey Dec.
[17]  Exh. 3 [January 7, 2008 Order], to the Corey Dec.
[18]  Exh. 3 at 3-4 [February 4, 2008], to the Supp. Corey Dec.
[19]  Supp. Corey Dec., ¶ 4.

07209/2387192.2

1  ## IV.  LARIAN AND MGA FAIL TO OFFER ANY EVIDENCE OF UNDUE
2  ## BURDEN

3      Despite arguing over a dozen times that Mattel's document subpoenas
4  are unduly burdensome, the MGA defendants offer no evidence that the subpoenas
5  in fact impose such a burden.[20] Nor could they.  The burden of showing that a
6  subpoena is unduly burdensome is "upon the party to whom it is directed."
7  Goodman v. U.S., 369 F.2d 166, 169 (9th Cir. 1966).  The subpoenas were
8  obviously directed to third parties, not the MGA defendants.

9      The MGA defendants attempt to circumvent this fatal defect in their
10  opposition by arguing that the third parties have also objected to the subpoenas.  At
11  some point, the third parties must provide an evidentiary basis for the burden
12  objection.  None of the third parties moved to quash the subpoena or for a protective
13  order.  Nor did any of them join the MGA defendants' motion.  Most significantly,
14  although served, none of the third parties opposed Mattel's cross-motion to compel
15  production, much less submitted any "specific and compelling proof," that the
16  requests impose an undue burden.  JZ Buckingham Investments, LLC v. United
17  States, 78 Fed. Cl. 15, 25 (Fed. Cl. Ct. 2007) (denying motion to quash because
18  moving party failed to provide "specific and compelling proof that the burden is
19  undue").  The fact that some of the third parties also objected to the subpoenas as
20  overbroad and unduly burdensome, but did not support those objections with
21  evidence as required, is therefore irrelevant.  Absent evidence, the objections are
22  improper boilerplate and must be overruled.  See A. Farber and Partners, Inc. v.
23  Garber, 234 F.R.D. 186, 188 (C.D. Cal. 2006) (overruling defendant's boilerplate
24  objections as improper and ordering production of documents).  See Panola Land
25  Buyers Ass'n v. Shuman, 762 F.2d 1550, 1559 (11th Cir. 1985) (holding that court
26  did not have discretion to limit discovery on basis of boilerplate objections).

27

28  [20]  Reply and Opposition, at 1:16; 3:16; 4:15; 5:4, 20; 9:5, 9; 10:20; 16:22;
17:15; and 18:25.

1    The MGA defendants mischaracterize the posture of the third parties
2 regarding compliance with the subpoenas. Whatever boilerplate objections they
3 have made, most of the third parties not represented by counsel for the MGA
4 defendants have informed Mattel that they are ready and able to produce responsive
5 documents.

6    • Ernst & Young has already gathered responsive documents and
7 stands ready to produce.[21]

8    • Wachovia has already identified three boxes of potentially responsive
9 documents that include documents related to the loan MGA used to develop Bratz.
10 These documents were identified by Farhad Larian as being relevant to the dispute
11 between him and his brother Isaac, about the creation and worth of Bratz.[22]
12 Additionally, Mattel has met and conferred with Wachovia and addressed its
13 concerns regarding overbreadth and burden before the MGA defendants filed their
14 motion to quash.[23]

15    • Moss Adams stated in a letter to Mattel that they are "prepared to
16 produce" as soon as the parties reach an agreement or the Court issues an order.[24]

17    • Wells Fargo informed Mattel that they are ready to start pulling
18 responsive documents.[25]

19    Similarly, the MGA defendants' complaint that Mattel did not "meet
20 and confer" with all of the third parties is disingenuous. Mattel was in the process
21 of meeting and conferring with the third parties when the MGA defendants cut those
22 discussions short by filing their motion to quash. As the above facts demonstrate,
23 Mattel was having productive discussions with third parties, including addressing
24

25    [21] Corey Dec., ¶ 7 and Exh. C [letter from Jon Corey to John Baran dated
26 December 20, 2007], thereto.
    [22] Exh. 4 [Deposition Transcript of Farhad Larian], to the Supp. Corey Dec.
27    [23] Corey Dec., ¶ 8 and Exh. D [letter from Jon Corey to Neal Potischman dated
December 24, 2007], thereto.
28    [24] Exh. 20 [Moss Adams Objection to Subpoena] to the Park Dec.
    [25] Declaration of Dylan Proctor, ¶ 2.

1   concerns over copying costs -- which Mattel will cover -- and the scope of the
2   requests. The motion to quash interfered with Mattel's meet and confer efforts.

3          There is no evidence that the third-party subpoenas impose an undue
4   burden on the MGA defendants or any third party. Moreover, Ernst & Young,
5   Wachovia, Moss Adams, and Wells Fargo have all either identified responsive
6   documents or stand ready to do so. Notably, the MGA defendants have failed to
7   dispute that these third-party financial institutions do not have "boxes and boxes" of
8   documents responsive to the requests. Accordingly, the third-party subpoenas do
9   not impose an undue burden.

10  **V.   THE SUPPOSEDLY "DUPLICATIVE" REQUESTS ARE NOT**
11  **UNREASONABLE**

12          Despite the absence of any evidence of undue burden, the MGA
13  defendants continue to object to the production of even admittedly relevant
14  documents on the basis that they are duplicative. Their argument is oversimplistic.
15  Discovery requests are not improper because they are similar to other requests.
16  Rather, cumulative or duplicative discovery is improper only if it is "*unreasonable*."
17  Fed. R. Civ. Pro. 26(b)(2)(C)(i).[26] See also Klein v. AIG Trading Group, Inc., 228
18  F.R.D. 418 (D. Conn. 2005) ("That ample discovery has been produced does not
19  mean that the production of more is not required. That extensive reserve data has
20  been produced does not mean that the product of more is not required. The court
21  finds that the discovery sought is not 'unreasonably cumulative or duplicative."); In
22  re Lloyd's American Trust Fund Litigation, 1998 WL 50211 (S.D.N.Y. Feb. 6,
23  1998) (finding production of additional documents on an issue of a parties'

24  _____
25  [26]   In their Consolidated Separate Statement but not their Reply and Opposition,
    the MGA defendants cite Lectroalarm Custom Systems, Inc. v. Pelco Sales, Inc.,
    213 F.R.D 567 (2002) in support of its argument that the third party subpoenas are
26  unreasonably duplicative. In Lectroalarm, however, the court found that most if not
    all of the documents requested from a plaintiffs' insurer were "protected as attorney
27  work product." To the extent some of the information may not have been
    privileged, the Court expressed its "confidence" that it had already been discovered.
28  (footnote continued)

1 knowledge was not unreasonably cumulative or duplicative because previous
2 production "might not reveal full extent of [the parties'] knowledge") (emphasis
3 added); Travelers Rental Co., Inc. v. Ford Motor Co., 116 F.R.D. 140, 145-47 (D.
4 Mass. 1987) (granting motion to compel production of four executives for
5 deposition despite previous five executive depositions). Thus, even if there is some
6 question as to the duplicativeness of the requests, given the relevance of the
7 documents requested, production should still be compelled. See Paluch v. Dawson,
8 2007 WL 4375937 (M.D. Pa. Dec. 12, 2007) (despite objection on grounds that
9 discovery was unreasonably cumulative or duplicative, "where there is no doubt
10 about relevance, a court should tend toward permitting discovery").

11 The third-party subpoenas are not unreasonably duplicative or
12 cumulative. Mattel articulated these reasons in its Opposition and Motion to
13 Compel, but the MGA defendants--realizing how tenuous is their argument--simply
14 ignored them.[27]

15 **VI. LARIAN AND MGA SEEK TO QUASH REQUESTS THEY**
16 **CONCEDE ARE RELEVANT**

17 **A. Larian and MGA Seek Improperly to Quash Requests for**
18 **Documents Explicitly Related to Bratz**

19 The MGA defendants seek to quash document requests that explicitly
20 seek documents related to Bratz. As discussed above, Mattel served
21 ConsumerQuest with a subpoena seeking documents related to consumer research
22 they have done for MGA relating to Bratz.[28] The subpoenas Mattel served on Ernst
23 & Young, Deloitte & Touche, and Wachovia also seek documents explicitly related

24
25
26

27 Here, there is no work produce privilege and the MGA defendants have not proved that all of the documents sought are in its possession and have been produced.
[27] Opposition and Counter-Motion to Compel, Section IV.
28 [28] Request Nos. 1, 3, 5, 11, and 12.

1   to Bratz.[29]  The relevance of these documents in uncontested.  Indeed, the court has

2   described the issue of Bratz creation is at "the heart" of the case.[30]

### B.     Mattel is Entitled to Documents Relevant to the Development of Bratz

#### 1.     Payments to Mattel Employees

6   The MGA defendants' argument that Mattel's requests are improper

7   because they "are not directed to documents showing payments to particular

8   individuals during particular time periods" (Opp. 6:8-10), is inaccurate and

9   misleading.  It is because MGA has not been forthcoming that Mattel does not know

10  the identities of all of the "specific individuals" who may have been paid by the

11  MGA defendants while working for Mattel.  Without third party discovery, Mattel

12  would be forced to rely entirely on MGA's version of events to determine who they

13  were paying and how much.  Certainly Mattel is not required to take the MGA

14  defendants' word that they did not make payments to any other Mattel employees.

15  Furthermore, Mattel's requests do seek payment information regarding

16  "specific individuals," such as Carter Bryant, Paula Garcia, and Veronica Marlow.[31]

17  Also, the subpoena to Moss Adams seeks payments to any "FORMER MATTEL

18  EMPLOYEES."  Although the MGA defendants' contend that "Moss Adams has no

19  way of knowing whether the people who received money from MGA or Isaac

20  Larian are former Mattel employees" (Opp. 6:25-7:2), they again fail to provide any

21  supporting evidence.  Such information may be in the possession of Moss Adams or

22  reflected on the documents themselves.  If Moss Adams does not have this

23  information, they simply will not produce it.  That a witness may not have all

24  requested documents, however, is not grounds to quash.

25  Finally, the MGA defendants claim that documents reflecting payments

26  to Mattel employees is irrelevant because payments to Mattel employees is

27

28

---

[29]  Exhs. 7, 8, and 9 to the Park Dec.
[30]  Declaration of Michael Zeller, ¶ 2.

-14-

1 exclusively a Phase 2 issue. This argument ignores the relationship between the
2 MGA defendants' payments made to Mattel employees and the timing of the
3 development of Bratz. Such payments will show that Bratz was developed during
4 time periods when Bryant was an employee of Mattel; a crucial Phase 1 issue.
5 Furthermore, the issue of bias is clearly Phase 1. Payments to potential trial
6 witnesses, for example, are highly relevant to showing their bias, whether testifying
7 in Phase 1 or Phase 2. See United States v. Abel, 469 U.S. 45, 50-51 (1984); see
8 also Wright & Miller, Federal Practice & Procedure: Federal Rules of Evidence §
9 6095 (bias is a "particularly favored basis for attacking credibility," and
10 "circumstantial evidence of bias" may include evidence of the "payment of bribes or
11 fees"). Thus, Mattel is entitled to financial information from third parties which
12 would show any payments by the MGA defendants to third parties involved in this
13 action, including current and former Mattel employees.

14 **2.   The MGA Defendants' Funding of the Development of Bratz**

15        The MGA defendants concede that Wachovia possesses documents
16 directly related to the early funding of Bratz and that Wachovia has located these
17 documents and stands ready to produce them. They nevertheless claim that the
18 requests seeking those documents should be quashed because the requests may
19 encompass some documents unrelated to Bratz.[32] This is pure speculation. The loan
20 at issue was used to fund Bratz. Thus, the documents related to that loan are related
21 to the creation of Bratz. This is an issue of much dispute and Mattel is not required
22 to take the MGA defendants' word as to how and when Bratz was developed.

23        Further, the MGA defendants' argument that the requests will
24 encompass documents unrelated to Bratz is unsupported. The MGA defendants
25 have failed to offer any evidence that Wachovia's documents other relate to anything
26 other than Bratz. Wachovia represented to Mattel that it had documents relating two

27

28   [31] Moss Adams Subpoena Requests Nos. 13 - 15.
     [32] See The MGA defendants' Consolidated Separate Statement.

1  loans to MGA, the first in 1999-2000 and the second in 2006.[33]  As for the 2006

2  loan, Mattel does not argue that it was used for the development of Bratz.  Rather, it

3  is relevant to the MGA Defendants' net worth and Mattel disgorgement remedy.[34]

4          Finally, it is significant that the court recently found that there was

5  good cause to take Wachovia's deposition.  The MGA defendants try to dismiss the

6  court's order granting Mattel leave to take the deposition of Wachovia (as well as

7  the deposition of Moss Adams).  (Opp. 9:10-17).  They cannot avoid the fact that,

8  over MGA's protests, the Court found "good cause" to take the deposition of

9  Wachovia because of its role in financing the development of Bratz.[35]  In other

10  words, Judge Larson has ruled that, Wachovia possesses documents and information

11  that "appears reasonably calculated to lead to the discovery of admissible evidence."

12  Fed.R.Civ.Pro. 26(b).  Accordingly, the Court's finding of good cause to depose

13  Wachovia regarding its provision of funding to MGA adds weight to Mattel's

14  position that the Wachovia subpoena should not be quashed.

15  **VII.  MATTEL IS ENTITLED TO DOCUMENTS RELATED TO NET**

16       **WORTH AND DISGORGEMENT**

17       **A.  Documents Relevant to Net Worth Are Not Limited to "the**

18            **Present"**

19          Although the MGA defendants concede that Mattel is entitled to

20  information related to their net worth, it nevertheless seeks to quash document

21  requests seeking exactly that information.[36]  MGA contends that only "current net-

22

23  [33]  Corey Dec., ¶ 7.
     [34]  Mattel's Opposition and Motion to Compel, at 15, n. 47.
24  [35]  The MGA defendants also argue that Mattel has refused to limit the scope of
     their requests therefore cannot obtain even relevant documents encompassed by the
25  requests.  This is nonsense.  Mattel was working with the third parties including
     addressing issues related to the scope of the requests, when the MGA defendants
26  moved to quash.  Moreover, to the extent the Discovery Master finds that there are
     appropriate limitations to be placed on the subpoena, he has the discretion to compel
27  production in part and quash in part.  JZ Buckingham Investments, LLC, 78 Fed. Cl.
     15 at 26 ("Modification of a subpoena is preferred to quashing it.").
28  [36]  Mattel is aware that after the third-party subpoenas were served, Judge
     Infante ruled that Isaac Larian's tax returns were not discoverable.  However, Mattel
     (footnote continued)

1  worth" is relevant. Even if true, it does not follow that the only documents relevant
2  to a defendants' current net worth are its present financial documents. See Southern
3  Cal. Housing Rights Center v. Krug, 2006 WL 4122148 (C.D. Cal. Sept. 5, 2006)
4  (ordering production of financial documents related to defendants' net worth and
5  current assets going back three years). In order to assess the MGA defendants'
6  current net worth, Mattel should be permitted to review financial information from
7  prior years. This is especially true in light of the fact that MGA's designee on net
8  worth testified that its net worth could not be determined by the financial documents
9  MGA had produced and that MGA did not maintain such documents.[37] Obviously,
10  by MGA's own testimony, more complete information is required.

11          In Fieldturf International, Inc. v. Trieze Management Group, Inc.,
12  relied on by the MGA defendants, the plaintiffs sought information going back to
13  the inception of the defendant's corporation. 2004 WL 866494 (N.D. Ill. Apr. 16,
14  2004). Here, Mattel seeks information going back not to the inception of MGA
15  Entertainment, but to the development of Bratz, the linchpin of the MGA
16  defendants' net worth. Furthermore, this case has been pending for four years. The
17  MGA defendants have had a strong incentive to use accounting procedures and the
18  transfer of assets and proceeds to artificially reduce their "current net worth." Thus,
19  in order to verify the MGA defendants' representations regarding their "current net
20  worth," Mattel should be permitted to obtain documents regarding their financial
21  condition prior to the filing of this action.[38] See Floyd-Mayers v. American Cab

22

23  will request review of that decision from the Court and is not required to concede
    the argument regarding the Motion to Quash. This is not an attempt to "circumvent
24  the Discovery Master's prior order" but the exercise of Mattel's rights to seek review
    of discovery rulings.
25     [37]  Exh. O, at 350:9-351:14 [Tonnu Tr.] to the Corey Dec.
       [38]  The MGA defendants assert without explanation that internal audit papers
26  and draft documents prepared by MGA's auditors are irrelevant to MGA's net worth.
    (Opp. 12:4-9). Because such documents would provide a candid evaluation of
27  MGA's accounting of its profits and value by persons hired for that purpose, their
    relevance is clear. As discussed many times, Mattel should not be limited to the
28  MGA defendants' claims about their net worth. To extent that third parties informed
    about the MGA defendants' financial condition formed their own opinions or asked
    (footnote continued)

1   Co., 1990 WL 116855 (D.D.C. July 30, 1990). In Floyd-Mayers, the court granted a
2   motion to compel broad discovery into a defendant's finances because of the
3   importance of obtaining "an *accurate* picture of [the defendant's] *true* net worth."
4   Id. (emphasis added). The court found that the extensive discovery was justified, in
5   part, because the defendant's own witnesses could not provide sufficient financial
6   information about its net worth; just as MGA has testified in this matter.

7         As for Larian, his claim to have "produced substantial documents
8   showing his net worth for a few years" (Opp. 11:9-15) is vague and misleading.
9   Larian had produced nothing in this action until a few weeks ago, after months of
10  delay and pursuant to a Court order granting Mattel's motion to compel. Given that
11  the documents have only recently been produced, Mattel is in the process of
12  reviewing them. However, as discussed above, it is already clear that there are
13  significant omissions. For example, Larian has not any statements from his
14  checking or money market accounts.[39] Further, in light of the MGA defendants'
15  tendency to withhold relevant documents until produced by third parties and the
16  Court's concern with document tampering and spoliation, Mattel should not be
17  limited to Larian's assessment of his net worth.

18        Finally, the MGA defendants' net worth is not the only justification for
19  the production of their financial documents held by the third parties. As discussed
20  above and below, they are highly relevant to the timing of the creation of Bratz, the
21  MGA defendants' payments to potential witnesses and current and former
22  employees, Mattel's disgorgement remedy, and its defense to MGA's claims against
23  Mattel for unfair competition. To the extent the Court places a time limit on
24  documents relevant to the MGA defendants' net worth, it does not render the
25  document requests improper.

26

27  questions regarding the MGA defendants' net worth, such documents are highly
28  relevant.
    [39] Supp. Corey Dec., ¶ 5.

-18-

**B.**   **Mattel's Disgorgement Claim Justifies the Requests for the MGA Defendants' Financial Documents**

The MGA defendants attempt to limit the scope of Mattel's disgorgement remedy by arguing that it only encompasses profits from the "direct sales" of Bratz. (Opp. 13:3-14:28). California and federal cases, however, recognize that plaintiffs are entitled to *all* profits that are causally connected to a defendant's misdeeds. Bryant's breach of his duty of loyalty and fiduciary duty to Mattel, with MGA's inducement, allow Mattel to seek from Bryant and the MGA defendants, jointly and severally, the full benefit that they received as a result of their misdeeds. Section 403 of the Restatement (Second) of Agency states: "If an agent receives anything as a result of his violation of a duty of loyalty to the principal, he is subject to a liability to deliver it, its value, or its proceeds, to the principal." Comment a to that same section, similarly states, "[A]n agent who makes a profit from the business conducted by him on account of the principal has a duty to the principal to account for such profit."

Furthermore, the Ninth Circuit has made it clear that disgorgement of a defendant's ill-gotten gains includes all "direct profits" and "indirect profits" resulting from the misconduct. <u>Frank Music Corp., v. Metro-Goldwyn-Mayer, Inc.</u>, 886 F.2d 1545, 1550 (9th Cir. 1989). In <u>Frank Music Corp.</u>, the defendant casino presented an infringing musical production as an attraction. Due to the infringement, the plaintiff was entitled not only to the profits made from the musical production, but to the indirect profits that the use of the musical production had caused, such as from guest accommodations, restaurants, cocktail lounges, the movie theater, and the casino itself. <u>Id</u>. The Ninth Circuit recognized that the popularity of the musical production played a role in the casino's "advertising and general promotional activities in bringing customers to the hotel" and spending their money on services other than the musical itself. <u>Id</u>. The disgorgement remedy encompassed all such indirect profits.

1         The cases cited by the MGA defendants reinforce this point or are

2 inapposite. For example, in <u>Korea Supply Co. v. Lockheed Martin Corp.</u>, the

3 California Supreme Court simply found that disgorgement was not a remedy for a

4 representative unfair competition claim. 29 Cal. 4th 1134, 1145 (2003). In doing

5 so, it noted that the disgorgement remedy requires that the defendant surrender "*all*

6 money obtained through an unfair business practice" and the "surrender of all profits

7 earned as a result of an unfair business practice." <u>Id</u>. (emphasis added). The

8 Supreme Court did not limit those profits and monies to "direct sales."

9         The MGA defendants also rely on an unpublished Ninth Circuit case.

10 <u>Mason v. Sybron Corp.</u>, 955 F.2d 48 (Table) (9th Cir. 1992).[40] <u>Mason</u> held that the

11 plaintiffs pursing a disgorgement remedy are entitled to "not less than the monetary

12 gain which the defendant reaped from his improper acts." <u>Id</u>. at 2. In <u>SEC v.</u>

13 <u>MacDonald</u>, the First Circuit did not limit disgorgement to "direct sales," but

14 resolved the issue of determining ill-gotten gains in a securities transaction based on

15 insider information. 699 F.2d 47 (1st Cir. 1983). The question, irrelevant to this

16 action, was how to determine a reasonable time period after the disclosure of the

17 insider information to the general public in order to assess the profit made on the

18 fraudulent transaction.

19         In <u>SEC v. Manor Nursing Centers, Inc.</u>, 458 F.2d 1082 (2d Cir. 1972),

20 the Second Circuit held that a trial court had erred in ordering defendants to transfer

21 "all the profits and income earned on" fraudulently obtained proceeds related to

22 securities transactions. <u>Id</u>. at 1104. The record is sparse about the nature of the

23 profits and income earned from the ill-gotten gains, but in reaching its decision the

24 court relied on dicta in <u>Janigan v. Taylor</u>, which stated that "if an artist acquired

25 paints by fraud and used them in producing a valuable portrait we would not suggest

26 that the defrauded party would be entitled to the portrait, or to the proceeds of its

27

28

1  sale." 344 F.2d 781, 787 (1st Cir. 1965). Moreover, the Second Circuit has more
2  recently held that disgorgement should provide the "plaintiff the gain a defendant
3  makes from the sale of the plaintiff's property *and any reinvestment of the funds*."
4  S.E.C. v. Cavanagh, 445 F.3d 105, 117 (2d Cir. 2006) (citing 1 Dan B. Dobbs, Law
5  of Remedies § 4.3(1), at 589 (2d ed. 1993) (emphasis added).

6       In any event, the question is not only what profits were made on "direct
7  sales," but whether there is a "causal connection" between the wrongfully acquired
8  gains and the profits sought to be disgorged. See Kraus v. Trinity Management
9  Services, Inc., 23 Cal. 4th 116, 127 (2000) (defining "disgorgement" as a means to
10  force defendant "to surrender all profits earned as a result of an unfair business
11  practice regardless of whether those profits represent money taken directly from
12  persons who were victims of the unfair practice") (emphasis added); SEC v.
13  Commonwealth Chem. Sec., Inc., 574 F.2d 90, 102 (2d Cir. 1978) (accord). There
14  is no law or case that limits causation to "direct sales." To the extent that the sale of
15  Bratz increased the MGA defendants' good will, it is causally connected to their
16  misdeeds. So too with the effect the sale of Bratz on the value of MGA.

17       At the very least, it would be premature to artificially limit discovery
18  into Mattel's disgorgement remedy. To specify the exact scope of Mattel's
19  disgorgement remedy *before* it has had the opportunity to take discovery on the
20  issue would be improper. The purpose of discovery is to enable the parties to make
21  informed arguments to the Court on the issue so that it can make an informed
22  decision based on all relevant facts.[41]

23

24  [40] Ninth Circuit Rule 36-3, however, states that "Unpublished dispositions and orders of this Court issued before January 1, 2007 may not be cited to the courts of
25  this circuit."
    [41] The MGA defendants' argument that the disgorgement remedy is not a
26  punitive measure misconstrues Mattel's argument and the law. Mattel does not argue that disgorgement is a punitive remedy. But neither is it a simple
27  compensatory remedy. Rather, disgorgement is intended to 1) prevent wrongdoers from unjustly enriching themselves through misdeeds, and 2) to discourage others
28  from engaging in wrongdoing. Cavanaugh, 445 F.3d at 117. The importance of the deterrent function has been recognized by the California Supreme Court. Fletcher v.
(footnote continued)

## VIII.  **THE REQUESTS SEEK DOCUMENTS RELEVANT TO PHASE 1 DISCOVERY**

The MGA defendants concede that many of Mattel's requests are relevant, but nevertheless argues that they should be quashed because they relate to Phase 2.  All of the information sought relates to Phase 1.

• The MGA defendants' financial documents are relevant to Phase 1 issues, such as the development of Bratz, the bias of potential witnesses, and MGA's punitive damages and disgorgement remedies.

• The MGA defendants' payments to third parties related to this action, including present and former Mattel employees, are relevant to the issue of bias of potential Phase 1 witnesses, and to show MGA's knowledge or intent associated with its impropriety.

• Information related to non-Bratz products, such as Scooter Samantha, are relevant to the credibility of Paul Garcia; one of the primary witnesses in Phase 1.

In light of the relevance of such documents to both phases, the Discovery Master should avoid attempting to draw a bright line distinction between the two phases and order all relevant documents produced.

---

Security Pacific Nat'l Bank, 23 Cal. 3d 442, 451 (1979).  Here, both policies support Mattel's argument that it should be entitled to discovery so that it can determine the full scope of the MGA defendants' unjust enrichment.  Also, if a defendant were able to commit misdeeds and retain profits earned therefrom, the deterrent effect of the disgorgement remedy would be greatly reduced.

## Conclusion

For the reasons set forth above, Mattel respectfully requests that the Discovery Master enter an order directing Wachovia, Ernst & Young, Deloitte & Touche, Moss Adams, Wells Fargo, ConsumerQuest and the Larian trusts to produce all documents set forth in Mattel's subpoenas to these entities as well as a privilege log for any documents withheld on the basis of privilege.

DATED:  February 15, 2008          QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP


                                   By s/ Jon D. Corey
                                      Jon D. Corey
                                      Attorney for Mattel, Inc.