1 | QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
2 | John B. Quinn (Bar No. 090378)
(johnquinn@quinnemanuel.com)
Michael T. Zeller (Bar No. 196417)
3 | (michaelzeller@quinnemanuel.com)
Jon D. Corey (Bar No. 185066)
4 | (joncorey@quinnemanuel.com)
865 South Figueroa Street, 10th Floor
5 | Los Angeles, California 90017-2543
Telephone:   (213) 443-3000
6 | Facsimile:   (213) 443-3100

7 | Attorneys for Mattel, Inc.

9 | UNITED STATES DISTRICT COURT

10 | CENTRAL DISTRICT OF CALIFORNIA

11 | EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual, | CASE NO. CV 04-9049 SGL (RNBx) |
| Plaintiff, | Consolidated with Case Nos. CV 04-09059 and CV 05-02727 |
| vs. | **DISCOVERY MATTER**<br>**[To Be Heard By Discovery Master Hon. Edward Infante (Ret.)]** |
| MATTEL, INC., a Delaware corporation, | |
| Defendant. | DECLARATION OF JUAN PABLO ALBÁN IN SUPPORT OF MATTEL, INC.'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS BY MGA IN RESPONSE TO MATTEL'S FIFTH SET OF REQUESTS FOR DOCUMENTS AND THINGS |
| AND CONSOLIDATED ACTIONS | |
| | Hearing Date:   TBA<br>Time:   TBA<br>Place:   Telephonic Hearing |
| | **Phase 1**<br>Discovery Cut-Off:   January 28, 2008<br>Pre-Trial Conference: May 5, 2008<br>Trial Date:   May 27, 2008 |

27 | **[PUBLIC REDACTED]**

## DECLARATION OF JUAN PABLO ALBÁN

I, Juan Pablo Albán, declare as follows:

1.     I am a member of the bar of the State of California and an associate with Quinn Emanuel Urquhart Oliver & Hedges, LLP, attorneys for Mattel, Inc.  I make this declaration of personal, firsthand knowledge, and if called and sworn as a witness, I could and would testify competently thereto.

2.     Since October 1, 2007, MGA Entertainment, Inc. ("MGA") and/or Isaac Larian have produced to Mattel, Inc. approximately 2,786,642 pages of documents, including over 490,000 pages since January 1, 2008.

3.     Based on Mattel's current review and searches of the documents MGA and Mr. Larian have produced, it appears that neither MGA nor Mr. Larian have produced MGA's general ledger from the year 2000.  It also appears that neither MGA nor Mr. Larian have produced Mr. Larian's checking or money market account statements, cancelled checks from Mr. Larian's personal accounts, income tax returns, MGA check registries for 2000 and most of 2001, or any check registries from after March 2003.

4.     Attached as Exhibit 1 is a true and correct copy of the Verified Complaint in <u>Larian v. Larian</u>, Los Angeles Sup. Ct. Case no. BC301371, bearing Bates number FL 6465 - 6524.

5.     Attached as Exhibit 2 are true and correct copies of relevant portions of MGA's Account Records, bearing Bates numbers MGA 3787372 - 3787375.

6.     Attached as Exhibit 3 are true and correct copies of MGA's audited consolidated financial statements for the years ended 2001 through 2006 bearing Bates numbers MGA 0863860 – 086391 and MGA 0868693 - 0868722.

7.     Attached as Exhibit 4 is a true and correct copy of a document produced by MGA titled "Isaac Larian Total Income per Tax Returns" for the years 1999-2006, bearing Bates number MGA 3787278.

1    8.    Attached as Exhibit 5 is a true and correct copy of a letter dated
2  April 6, 2004 from Don Howarth, Esq. to Larry R. Feldman, Esq., regarding <u>Larian</u>
3  <u>v. Larian</u> and bearing Bates numbers FL 0224 – 0235.

4    9.    Attached as Exhibit 6 is a true and correct copy of a letter dated
5  July 5, 2007 from Patricia L. Glaser, Esq. to John B. Quinn, Esq.

6    10.    Attached as Exhibit 7 is a true and correct copy of a transcript of
7  the hearing the parties held before the Discovery Master on February 11, 2008.

8    11.    Attached as Exhibit 8 is a true and correct copy of an email
9  exchange between Marcus Mumford, Esq. and Timothy Alger, Esq., dated  January
10  25, 2008 to January 30, 2008.

11

12    I declare under penalty of perjury under the laws of the United States of
13  America that the foregoing is true and correct.

14    Executed on February 15, 2008, at Los Angeles, California.

15

16    _____
17    Juan Pablo Albán

18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 1

COPY

1  HOWARTH & SMITH
   DON HOWARTH (State Bar No. 53783)
2  SUZELLE M. SMITH (State Bar No. 113992)
   BRIAN D. BUBB (State Bar No. 137408)
3  ROBERT D. BRAIN (State Bar No. 98815)
   800 Wilshire Blvd., Suite 750
4  Los Angeles, California 90017

5  (213) 955-9400

6  Attorneys for Plaintiff
   FARHAD LARIAN

7

ORIGINAL FILED

AUG 2 5 2003

LOS ANGELES
SUPERIOR COURT

8           SUPERIOR COURT OF THE STATE OF CALIFORNIA

9               FOR THE COUNTY OF LOS ANGELES

10

11  FARHAD LARIAN,                        CASE NO.    BC301371

12        Plaintiff,                      VERIFIED COMPLAINT FOR:

13     vs.                                1)  FRAUD & DECEIT IN THE
                                              INDUCEMENT OF
14  ISAAC LARIAN and DOES 1 through           ARBITRATION
    50, inclusive,                            AGREEMENT;
15
          Defendants.                     2)  BREACH OF FIDUCIARY
16                                            DUTIES;

17                                        3)  FRAUD & DECEIT IN THE
                                              CONDUCT OF
18                                            ARBITRATION PROCESS;

19                                        4)  BREACH OF IMPLIED
                                              COVENANT OF GOOD
20                                            FAITH AND FAIR DEALING;

21                                        5)  VIOLATION OF
                                              CALIFORNIA
22                                            CORPORATIONS CODE §§
                                              25401 AND 25501;
23
                                          6)  VIOLATION OF
24                                            CALIFORNIA
                                              CORPORATIONS CODE §§
25                                            25402 AND 25502;

26                                        7)  FRAUD & DECEIT RE
                                              DECEMBER 2000
27                                            AGREEMENT;

28

EXHIBIT 1
PAGE 4

03:P391001.618                            FL 6465              VERIFIED COMPLAINT

| | |
|---|---|
| 1 | ) 8) NEGLIGENT MISREPRESENTATION; |
| 2 | ) |
| 3 | ) 9) UNFAIR COMPETITION, IN VIOLATION OF |
| 4 | ) CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200; and |
| 5 | ) |
| 6 | ) 10) RESCISSION BASED ON MISTAKE |

DEMAND FOR JURY TRIAL

Plaintiff, FARHAD LARIAN ("Plaintiff" or "Fred") alleges as follows:

## COMMON ALLEGATIONS

**Parties and Venue**

1.   Plaintiff Farhad Larian, also known as "Fred" Larian, is now, and at all times herein mentioned was, a resident of the State of California.  He is currently residing in Los Angeles County, California.

2.   Defendant Isaac Larian ("Isaac") is now, and at all time herein mentioned was, a resident of Los Angeles County, California.

3.   Plaintiff is unaware of the true names and capacities of Defendant DOES 1 through 50, inclusive, and therefore sues such Defendants by fictitious names.  Plaintiff will amend this complaint to show the true names and capacities of, and to make specific allegations against, these Defendants if and when additional information against them is ascertained.  Plaintiff is informed and believes and thereon alleges that each of the Defendants, including each fictitiously named Defendant, is liable in some manner for the events referred to in this complaint.

4.   At all times mentioned herein, each Defendant was the agent of each of the other Defendants, and was acting within the course and scope of said agency in performing the acts described herein.

5.   Venue is proper in Los Angeles County under California Code of Civil Procedure § 395 because Defendant Isaac Larian resides in Los Angeles County.

EXHIBIT 1
PAGE 5
2
FL 6466
VERIFIED COMPLAINT

General Background

6.    In or about 1979, two brothers, Plaintiff Fred Larian and Defendant Isaac Larian formed an equal partnership to import and distribute name brand consumer products, splitting the profits and losses 50/50.

7.    In or about 1982 the partnership was incorporated as ABC International Traders, Inc. ("ABC"), a closely-held, not publicly traded company, with each brother owning an equal 50 percent of the corporation. Upon incorporation, the brothers continued as before to divide the work and to split equally the profits in running the business. In or about 2002, the name of ABC was changed to MGA Entertainment, Inc. ("MGA).

8.    In or about 1985 or 1986, Fred's and Isaac's shares were diluted when ABC sold stock to their brother-in-law, Jahangir "Eli" Makabi. Such sale left Fred and Isaac each with an equal 45 percent share of the ownership of ABC. After the sale of the stock to Mr. Makabi, the brothers continued as partners and joint venturers in operating the Company, both continued to divide the work at ABC, and each sharing equally 45 percent of its profits.

9.    In or about 1994, Fred and Isaac also became equal 45 percent shareholders (with 10 percent going to Mr. Makabi) in MGA Hong Kong, Limited (together with MGA and ABC, "the Company"), and operated part of their business through such entity. At all times referenced herein, Isaac has served as the President of the Company. More recently, Isaac also acquired the additional title of CEO.

10.    Starting as far back as 1993, disputes arose between the brothers over the operation of the Company. In part, this was because, as Isaac put it, they were "equal partners in the Company" yet had different ideas on how best to make the Company prosper. Over the years, Fred and Isaac discussed various ways to resolve these disputes.

///
///
///

EXHIBIT ___1___

PAGE __6__

FL 6467

3

VERIFIED COMPLAINT

1        11.    One method the brothers' discussed was having one brother buy out the

2  other's equity interest.  Over the years, various such purchases were discussed and on one

3  occasion an outside appraisal of the Company, performed at the specific request of Isaac,

4  valued the Company at $35 million to $40 million.

5        12.    By 1999, Isaac, as President, had assumed control of sales, product

6  development and financial matters.  At Isaac's direction, Fred assumed responsibility for

7  major projects such as customs regulations, facilities management and warehouse

8  distribution control, and was not as involved in the day-to-day sales or financial control

9  of the Company.  For his role, Isaac took a significantly greater salary.

10

11  <u>Defendant's Concealment of the Bratz Doll Line</u>

12        13.    Plaintiff is informed and believes that beginning in or about late 1999 and

13  early 2000, Isaac became aware of a potential new product line that had tremendous

14  potential for the Company.  The new product line involved the "Bratz" dolls and related

15  products.  Bratz dolls are "hipper" and more "edgy" than Barbie and Barbie-type dolls,

16  and are aimed at the post-adolescent, pre-teen and early teen market, i.e., a market where

17  the allure of playing with Barbie-type dolls wanes.

18        14.    Plaintiff is informed and believes that during this same time period, Isaac

19  devised a plan to keep this business opportunity secret from Fred and to gain control of

20  the Company by buying Fred's shares at a value which did not include this new business

21  opportunity.  Isaac concealed from Plaintiff, his brother and partner and stockholder,

22  knowledge he had, as well as his intentions and actions undertaken, regarding the Bratz

23  product line.

24        15.    In or about early 2000, Isaac called a meeting to discuss the new Bratz

25  product line with selected individuals in the Company.  Plaintiff is informed and believes

26  that those present at the meeting spoke enthusiastically of the tremendous opportunity the

27  Bratz line presented for the Company as, *inter alia*, it captured a vacant market niche.

28  ///

**EXHIBIT** 1

**PAGE** 7    4    FL 6468

VERIFIED COMPLAINT

1  Fred was not present for this meeting. Upon information and belief, Isaac took steps to
2  conceal the results of the meeting from Fred.

3      16.    Also in or about February 2000, Isaac tried to dissuade Fred from attending
4  the New York Toy Fair, even though Fred had routinely and regularly attended such toy
5  fairs in the past. The New York Toy Fair is an important venue for discussing and
6  researching the market potential of new product lines. Isaac was furious when he
7  discovered that Plaintiff was traveling to New York for the fair. Plaintiff was expelled by
8  Isaac from meetings he tried to attend and was excluded from any discussions Isaac may
9  have had relating to the Bratz line of products at the fair.

10      17. .  In early March 2000, while continuing to conceal from Fred the Company's
11  plans for the Bratz line, Isaac offered to purchase all of Plaintiff's 45 percent interest in
12  the Company for $9 million. The offer was based on a total value of the Company of $20
13  million. Upon information and belief, Isaac knew at the time he made the offer of the
14  Company's plans already in place, and actions already undertaken, regarding the Bratz
15  line, and that such plans made the Company worth well in excess of $20 million.

16      18.    As set forth herein, the two brothers divided responsibilities with Isaac,
17  assuming control of sales, product development and financial matters, and Fred assuming
18  responsibility for major projects. Financial information was handled by Isaac and the
19  Controller, Dennis Medici. Throughout 2000 Isaac repeatedly and routinely shared with
20  Fred any financial information that showed the Company was performing poorly, while
21  withholding any positive financial information about the Company, including the plans
22  for the Bratz line. Indeed, in May 2000 Isaac told the Company's the Controller, Dennis
23  Medici, that he was to no longer give Fred any information regarding the financial
24  operation of the Company. During this period, Isaac gave Fred only bleak financial news
25  about the Company and continued to conceal the Company's plans and actions
26  undertaken regarding Bratz.

27      19.  On or about September 18, 2000, Isaac caused the Company to enter into a
28  worldwide licensing agreement for the Bratz dolls and related items. The existence of

1   this license was concealed from Fred. Upon information and belief, these important and

2   valuable rights are already generating revenues of in excess of $500 million a year and

3   are expected to exceed $3 billion in the next few years.

4

5   <u>Fraud Regarding the Arbitration Agreement</u>

6       20.   In or about September 2000, Isaac resumed his efforts to buy Fred's interest

7   in the Company. Isaac kept the Bratz opportunity and other information about the true

8   financial condition of the Company hidden from Fred in an effort to secure Fred's

9   agreement to a proposed arbitration process with their Uncle Morad Zarabi. Isaac agreed,

10   and induced Fred to agree, to the arbitration process without disclosing that during the

11   arbitration he would conceal the Company's plans and actions undertaken regarding the

12   Bratz line, and other financial information about the Company so that such information

13   would not be included in Mr. Zarabi's valuation of the Company. In or about September

14   2000, Isaac and Fred executed the "Agreement to Arbitrate and Selection of Arbitrator"

15   ("Arbitration Agreement") attached hereto as Exhibit A.

16       21.   At all times before and up through his execution of the Arbitration

17   Agreement and for some considerable time thereafter, Fred was unaware of the true facts

18   regarding the new business opportunities and Bratz line of products, was unaware of the

19   true financial condition of the Company, and was unaware of the intention of Isaac to

20   conceal such material facts from the arbitrator and from him during the arbitration

21   process. Had Fred been aware of the new business opportunities, the Bratz line of

22   products, the true financial condition of the Company, and/or the plans of Isaac to

23   conceal such material information from him and from the arbitrator, he would not have

24   agreed to enter into the arbitration process for the sale of his interest in the Company;

25   would not have agreed to the Arbitration Agreement; would not have agreed to have Mr.

26   Zarabi serve as arbitrator; and, would have placed greater restrictions and obligations on

27   the powers of any arbitrator, including without limitation a written requirement that the

28   Company be valued by an independent appraiser outside the family and that such

EXHIBIT

1  appraisal be distributed to the parties for comment before any decision in the arbitration
2  was reached.

3      22.    In or about, December 2000, as a result of the Arbitration Agreement, Fred
4  and Isaac entered into a settlement and resolution of their differences with Fred agreeing
5  to sell his shares to Isaac.  Fred and Isaac executed a written "Agreement for Sale of
6  Stock," dated as of December 4, 2000, ("December 2000 Agreement") attached hereto as
7  Exhibit B.  One of the factors in causing Fred to enter into the Agreement for Sale of
8  Stock was the fact that he had been fraudulently induced into entering into the Arbitration
9  Agreement.

10     23.    At the time Isaac agreed to have Mr. Zarabi arbitrate the value of the
11  Company and other issues, and at all relevant times thereafter, Isaac knew that he would
12  continue to conceal the existence of his and the Company's plans for the Bratz line from
13  Mr. Zarabi and Fred during the arbitration, and other financial information about the
14  Company, the result of which, Isaac knew and intended, would be a fraudulently
15  diminished value of Fred's shares from what they would be worth if all pertinent
16  financial information about the Company and its plans for the Bratz product line were
17  disclosed.  Isaac entered into the arbitration with the intent to induce Fred to rely on his
18  presenting Mr. Zarabi with all material information about the Company and its finances
19  so as to allow Mr. Zarabi to determine a fair value for the Company.  Fred did, in fact,
20  actually and reasonably rely on Isaac disclosing such material information in agreeing to
21  have Mr. Zarabi decide the value of the shares and other matters, and in executing the
22  "Arbitration Agreement".

23

24  <u>Fraud in the Conduct of the Ongoing Arbitration</u>

25     24.    Mr. Zarabi held various hearings and received financial and other
26  information about the Company in his role as arbitrator beginning in the Fall of 2000.
27  Isaac did not disclose to Fred the license the Company had obtained in September 2000
28  for the Bratz line, the plans the Company had to develop and distribute, or any other

03:P391001.618                    **PAGE** 10   7        FL 6471        VERIFIED COMPLAINT

1 | actions the Company had already undertaken regarding, the Bratz product line and other

2 | business opportunities, the true financial condition of the Company, or the other matters

3 | alleged heretofore. Upon information and belief, during this period, Isaac did not

4 | disclose to Mr. Zarabi the license the Company had obtained in September 2000 for the

5 | Bratz line, the plans the Company had to develop and distribute, or any other actions the

6 | Company had already undertaken regarding, the Bratz product line and other business

7 | opportunities, the true financial condition of the Company, or the other matters alleged

8 | heretofore.

9 |      25.     At the time Isaac agreed to have Mr. Zarabi arbitrate the value of the

10 | Company and other issues, and at all relevant times thereafter, Isaac knew that he would

11 | continue to conceal the existence of his and the Company's plans for the Bratz line from

12 | Mr. Zarabi and Fred during the arbitration, and other financial information about the

13 | Company, the result of which, Isaac knew and intended, would be a fraudulently

14 | diminished value of Fred's shares from what they would be worth if all pertinent

15 | financial information about the Company and its plans for the Bratz product line were

16 | disclosed. Isaac entered into the arbitration with the intent to induce Fred to rely on his

17 | presenting Mr. Zarabi with all material information about the Company and its finances

18 | so as to allow Mr. Zarabi to determine a fair value for the Company. Fred did, in fact,

19 | actually and reasonably rely on Isaac disclosing such material information in agreeing to

20 | have Mr. Zarabi decide the value of the shares and other matters, and in agreeing to the

21 | arbitration process.

22 |      26.     In or about, December 2000, as a result of the arbitration process,

23 | Fred and Isaac entered into a settlement and resolution of their differences with Fred

24 | agreeing to sell his shares to Isaac. Fred and Isaac executed a written "Agreement for

25 | Sale of Stock," dated as of December 4, 2000, ("December 2000 Agreement") attached

26 | hereto as Exhibit B. One of the factors in causing Fred to enter into the Agreement for

27 | Sale of Stock was the fraud and facts set forth heretofore.

28 | / / /

**EXHIBI**    \_\_\_\_\_    ~~FL 6473~~

                                    VERIFIED COMPLAINT

1 | Fraud In the Agreement for Sale of Stock

2      27.    At all relevant times herein and during the negotiation of the December

3 | 2000 Agreement, Isaac continued his fraudulent concealment and nondisclosure as set

4 | forth herein of the Company's plans, assets and steps undertaken, regarding the Bratz

5 | product line as well as other financial information regarding the Company.  But for the

6 | fraud, and had Plaintiff known of the true facts regarding the Company's plans, assets

7 | and steps undertaken regarding the Bratz product line, the true financial information

8 | about the Company and the other matters alleged heretofore, he would not have agreed to

9 | sell his shares to Isaac under the terms of the December 2000 Agreement.

10

11 | Discovery of Fraud

12      28.    In or about late spring and summer 2002, Plaintiff first became aware of

13 | the true scope of the Company's extraordinary plans, efforts and history regarding the

14 | Bratz product line and other financial information about the Company that had been

15 | concealed from him by Isaac, as the license had been concealed from him.  In or about

16 | the spring and summer 2002, Isaac asked Fred to audit payments that were due to the

17 | Company.  In that audit, Fred discovered information, for the first time, that the Company

18 | had been receiving or was expecting significant revenues based on the Bratz product line.

19      29.    Fred then asked Mr. Zarabi whether Isaac had disclosed that information to

20 | Mr. Zarabi and/or any appraiser involved with the arbitration.  Plaintiff was told by Mr.

21 | Zarabi that Isaac had not provided him with such information.  Plaintiff made a demand

22 | that Mr. Zarabi rectify the situation, but to date nothing has been done.  Thereafter,

23 | Plaintiff made a demand that Isaac pay the fair market value of Plaintiff's share of the

24 | company, but Isaac has failed and refused to do so.

25 | ///

26 | ///

27 | ///

28 | ///

**EXHIBIT** 1

**PAGE** 12

9

FL 6473

VERIFIED COMPLAINT

03:P391001.618

# FIRST CAUSE OF ACTION

## (Fraud & Deceit in the Inducement of Arbitration Agreement)

30.    Plaintiff hereby reasserts and realleges Paragraphs 1 through 29 inclusive, as though set forth in full herein.

31.    In entering into the Arbitration Agreement, agreeing to participate in the arbitration process contemplated thereby, and offering to purchase Plaintiff's shares in the Company, Defendant knowingly made false representations of material fact to Plaintiff and/or concealed and/or failed to disclose material facts known to Defendant which he was under a duty to disclose to Plaintiff.  Such facts specifically include, without limitation, his intentions regarding the information he was planning to conceal from the arbitrator, otherwise fail to disclose during the course of the arbitration process, and/or had already concealed from Plaintiff, concerning the true and accurate financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line.

32.    Plaintiff actually, reasonably, and justifiably relied upon the false statements, concealments, and omissions of Defendant described above in agreeing to execute the Arbitration Agreement, participate in the arbitration process contemplated thereby, and sell his shares in the Company.  Had Plaintiff known of the true facts, specifically including the true facts concerning Defendant's intentions regarding, without limitation, the information he was planning to conceal from arbitrator, otherwise fail to disclose during the arbitration process and/or already had concealed from Plaintiff concerning the true and accurate financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line, Plaintiff would not have entered into the Arbitration Agreement, would not have agreed to participate in the arbitration process contemplated thereby, and would not have agreed to sell his shares of the Company.

33.    Defendant made the false representations, concealments and omissions alleged above with the intent to defraud Plaintiff and/or in reckless disregard of the truth

**EXHIBIT** I

1  for purposes of inducing Plaintiff to execute the Arbitration Agreement, agree to

2  participate in the arbitration process contemplated thereby, and sell his shares in the

3  Company at a below fair market price.

4       34.    At all material times, Plaintiff was unaware of the falsity of the

5  representations and disclosures of Defendant as alleged above and believed them to be

6  true. At all material times, Plaintiff was unaware of the material omissions, concealments

7  and misstatements of material facts by Defendant, and could not, in the exercise of

8  reasonable care, made himself aware of the falsity of such misrepresentations and

9  nondisclosures, or the existence of such omissions or concealments.

10       35.    As a direct and proximate result of the fraudulent conduct alleged above,

11  Plaintiff has been damaged, without limitation, in that he was fraudulently induced to

12  enter the Arbitration Agreement, participate in the arbitration process contemplated

13  thereby, sell his shares of the Company to Defendant at a below fair market price of less

14  than $9 million, and enter into the December 2000 sale agreement. Plaintiff is entitled to

15  rescission of the September agreement to arbitrate, rescission of the December 2000 stock

16  sale agreement and restitution of his shares in the Company. In the alternative, Plaintiff

17  is entitled to damages, the amount of such damage is not presently ascertainable, but will

18  be proven at trial.

19       36.    The conduct of Defendant as alleged above, was fraudulent, malicious,

20  oppressive, and despicable; has subjected Plaintiff to unjust hardship in conscious

21  disregard of his rights; and was done to vex, annoy, and harass Plaintiff so as to justify an

22  award of punitive damages against Defendant.

23

24                 **SECOND CAUSE OF ACTION**

25                 **(Breach of Fiduciary Duties)**

26       37.    Plaintiff hereby reasserts and realleges Paragraphs 1 through 36 inclusive,

27  as though set forth in full herein.    **EXHIBIT** ___1___

28  ///                     **PAGE** ___14___

·11·

1    38.    As alleged herein, as an officer, manager and major shareholder of the

2    Company in which Plaintiff was a shareholder, and as Plaintiff's partner and joint

3    venturer in the management and operation of the Company, and otherwise due to their

4    family relationship, Defendant owed Plaintiff fiduciary duties of loyalty, honesty, care

5    and fair dealing in all matters concerning the Company.

6    39.    At all times alleged herein, Plaintiff actually and reasonably reposed the

7    highest trust and confidence in Defendant's loyalty, honesty, care, and fair dealing in all

8    matters concerning the Company.

9    40.    Defendant repeatedly breached and violated such fiduciary duties owed

10   Plaintiff by, among other things, failing to inform Plaintiff, without limitation, of the true

11   and accurate financial condition of the Company, its financial prospects, its business

12   opportunities, the Company's plans and actions already undertaken concerning the Bratz

13   product line, and/or his intentions regarding the information he was planning to conceal

14   from the arbitrator and others in the course of the arbitration process stemming from the

15   Arbitration Agreement.

16   41.    Said breaches of fiduciary duties by Defendant have caused Plaintiff

17   damage, including but not limited to damages resulting from the sale of his shares of the

18   Company to Defendant at a below fair market price, in an amount not presently

19   ascertainable, but which will be proven at the time of trial.

20   42.    The conduct of Defendant, as alleged above, was fraudulent, malicious,

21   oppressive, and despicable; has subjected Plaintiff to unjust hardship in conscious

22   disregard of his rights; and was done to vex, annoy, and harass Plaintiff so as to justify an

23   award of punitive damages against Defendant.

24

25                        **THIRD CAUSE OF ACTION**

26          (Fraud & Deceit in the Conduct of the Arbitration Process)

27   43.    Plaintiff hereby reasserts and realleges paragraphs 1 through 42, inclusive,

28   as though set forth in full herein.

**EXHIBIT** _____
12
**PAGE** __15__

03:P391001.618                                                    FL 6476                    VERIFIED COMPLAINT

1      44.   In participating in the arbitration process contemplated by the Arbitration

2 Agreement, Defendant knowingly made false representations of material fact and/or

3 concealed and/or failed to disclose material facts known to Defendant which he was

4 under a duty to disclose to the arbitrator and otherwise during the arbitration. Such facts

5 specifically included, without limitation, information as to the true and accurate financial

6 condition of the Company, its financial prospects, its business opportunities, and/or the

7 Company's plans and actions already undertaken concerning the Bratz product line.

8      45.   Plaintiff actually, reasonably, and justifiably relied upon the false

9 statements, concealments, and omissions of Defendant described above in participating in

10 the arbitration process contemplated by the Arbitration Agreement. Had Plaintiff known

11 of the true facts, specifically including, without limitation, the scope of the information

12 Defendant concealed from the arbitrator and otherwise not disclosed in the course of the

13 arbitration process regarding the true and accurate financial condition of the Company, its

14 financial prospects, its business opportunities, and/or the Company's plans and actions

15 already undertaken concerning the Bratz product line, Plaintiff would not have

16 participated in the arbitration process or agreed to sell his shares of the Company.

17      46.   Defendant made the false representations, concealments and omissions

18 alleged above with the intent to defraud Plaintiff and/or in reckless disregard of the truth

19 for purposes of inducing Plaintiff to participate in the arbitration process contemplated by

20 the Arbitration Agreement and to sell his shares of the Company to Defendant at a below

21 market price.

22      47.   At all material times, Plaintiff was unaware of the falsity of the

23 representations and disclosures of Defendant as alleged above and believed them to be

24 true. At all material times, Plaintiff was also unaware of the material omissions,

25 concealments and misstatements of material facts by Defendant, and could not, in the

26 exercise of reasonable care, made himself aware of the falsity of such misrepresentations

27 and nondisclosures, or the existence of such omissions or concealments.

28 ///

EXHIBIT    <u>1</u>

13

PAGE   <u>16</u>

03:P391001.618

FL 6477

VERIFIED COMPLAINT

48.     As a direct and proximate result of the fraudulent conduct alleged above, Plaintiff has been damaged in that he was fraudulently induced to participate in the arbitration contemplated by the Arbitration Agreement and sell his shares of the Company to Defendant at a below fair market price.  Plaintiff is entitled to rescission of the December 2000 stock sale agreement and restitution of his shares in the Company.  In the alternative, Plaintiff is entitled to damages, the amount of such damage is not presently ascertainable, but will be proven at trial.

49.     The conduct of Defendant, as alleged above was fraudulent, malicious, oppressive, and despicable; has subjected Plaintiff to unjust hardship in conscious disregard of his rights; and was done to vex, annoy, and harass Plaintiff so as to justify an award of punitive damages against Defendant.

## FOURTH CAUSE OF ACTION

### (Breach of Implied Covenant of Good Faith and Fair Dealing in the Arbitration Agreement)

50.     Plaintiff hereby reasserts and realleges paragraphs 1 through 49, inclusive, as though set forth in full herein.

51.     The Arbitration Agreement contract executed by Plaintiff and Defendant contained an implied covenant of good faith and fair dealing which imposed the following, among others duties on Defendant: (a) a duty to act with honesty in fact in his performance under the agreement; (b) a duty of fair, open and honest disclosure to Plaintiff; (c) a duty to refrain from realizing secret gains at the expense of Plaintiff by connivance, deceit, suppression of facts, or other improper means; and (d) a duty to refrain from taking any action which would unfairly injure the rights of the Plaintiff or interfere in his ability to recognize his reasonable expectations under, and benefits of, the Agreement.

52.     By engaging in the conduct described above, specifically including, without limitation, concealing from the arbitrator and otherwise failing to disclose material facts

EXHIBIT _____

14

PAGE _____

03:P391001.618

FL 6478

VERIFIED COMPLAINT

1  in the course of the arbitration process information regarding the true and accurate

2  financial condition of the Company, its financial prospects, its business opportunities,

3  and/or the Company's plans and actions already undertaken concerning the Bratz product

4  line, Defendant has breached his duties of good faith and fair dealing set forth above.

5      53.    At all times herein relevant, Plaintiff has performed and discharged all

6  covenants, conditions, and duties required of him under the Arbitration Agreement,

7  including all duties imposed by the covenant of good faith and fair dealing, except those

8  obligations, if any, which have been prevented by Defendant, those obligations Defendant

9  has waived by his words and/or conduct, or those obligations which Defendant is

10  estopped from asserting that Plaintiff has not performed as a result of Defendant's

11  conduct alleged herein.

12      54.    As a direct and proximate result of Defendant's actions and breaches as

13  alleged herein, Plaintiff has suffered, and continues to suffer damages in an amount as yet

14  unascertained but which will be established at trial.

15      55.    The conduct of Defendant, as alleged above, was fraudulent, malicious,

16  oppressive, and despicable; has subjected Plaintiff to unjust hardship in conscious

17  disregard of his rights; and was done to vex, annoy, and harass Plaintiff so as to justify an

18  award of punitive damages against Defendant.

19

20              **FIFTH CAUSE OF ACTION**

21      (Violation of California Corporations Code §§ 25401 and 25501)

22      56.    Plaintiff hereby reasserts and realleges paragraphs 1 through 55, inclusive,

23  as though set forth in full herein.

24      57.    In committing the acts, omissions, and concealments alleged herein,

25  Defendant has violated California Corporations Code, Section 25401 by, among other

26  things, offering to purchase a security in this State: (a) by means of written and/or oral

27  communications containing untrue statements of material facts, specifically including

28  untrue facts regarding the true and accurate financial condition of the Company, its

EXHIBIT ____I____

15

1 | financial prospects, its business opportunities, and/or the Company's plans and actions

2 | already undertaken concerning the Bratz product line; and/or (b) omitting to state material

3 | facts necessary in order to make statements made, in light of the circumstances when they

4 | were first made, not misleading, specifically regarding the true and accurate financial

5 | condition of the Company, its financial prospects, its business opportunities, and/or the

6 | Company's plans and actions already undertaken concerning the Bratz product line.

7 |      58.    As a direct and proximate result of the acts and conduct of Defendant,

8 | Plaintiff is entitled to rescission of the sale and restitution of his shares of the Company

9 | or damages under California Corporations Code § 25501, in an amount as yet

10 | unascertained but which will be established at trial, plus such other relief as pled herein.

11 |

12 |               **SIXTH CAUSE OF ACTION**

13 |      (Violation of California Corporations Code §§ 25402 and 25502)

14 |      59.    Plaintiff hereby reasserts and realleges paragraphs 1 through 58 inclusive,

15 | as though set forth in full herein.

16 |      60.    At all times alleged herein, Defendant was an officer of the Company, a

17 | director of the Company, a controlling person of the Company, and/or a person whose

18 | relationship with the Company provided him access, directly and indirectly, to material

19 | information about the Company, within the meaning of California Corporations Code §

20 | 25402.

21 |      61.    At all times alleged, Defendant had access to, and had information about,

22 | the Company not generally available to the public or to Plaintiff, which would

23 | significantly affect the value, and fair market price of the shares, of the Company,

24 | specifically including, without limitation, information regarding the true and accurate

25 | financial condition of the Company, its financial prospects, its business opportunities,

26 | and/or the Company's plans and actions already undertaken concerning the Bratz product

27 | line.    EXHIBIT _____ I

28 | ///     PAGE _____ 19

03:P391001.618                             FL 6480           VERIFIED COMPLAINT

1      62.   At all times herein alleged, Defendant knew such information regarding,

2  without limitation, the true and accurate financial condition of the Company, its financial

3  prospects, its business opportunities, and/or the Company's plans and actions already

4  undertaken concerning the Bratz product line, was not generally available to the public or

5  to Plaintiff, and was not intended to be available to the public or to Plaintiff.

6      63.   In committing the acts, omissions, and concealments alleged herein,

7  Defendant has violated California Corporations Code, Section 25402 by, among other

8  things, purchasing and offering to purchase from Plaintiff his shares of the Company at a

9  time when he knew of material, non-public, undisclosed information about the Company

10  gained from his status as an officer, director, controlling person, and individual with

11  access to such information regarding, without limitation, the true and accurate financial

12  condition of the Company, its financial prospects, its business opportunities, and/or the

13  Company's plans and actions already undertaken concerning the Bratz product line.

14      64.   As a direct and proximate result of the acts and conduct of Defendant,

15  Plaintiff is entitled to rescission of the sale and restitution of his shares of the Company

16  or damages pursuant to California Corporations Code § 25502 in an amount as yet

17  unascertained but which will be established at trial, plus such other relief as pled herein.

18

19                    **SEVENTH CAUSE OF ACTION**

20           **(Fraud & Deceit Regarding the December 2000 Agreement)**

21      65.   Plaintiff hereby reasserts and realleges paragraphs 1 through 64 inclusive,

22  as though set forth in full herein.

23      66.   Prior to Plaintiff's entering into the December 2000 Agreement to sell

24  Plaintiff's stock in the Company to Defendant, Defendant knowingly made false

25  representations of material fact and/or concealed and/or failed to disclose material facts

26  known to Defendant which he was under a duty to disclose to Plaintiff. Such facts

27  specifically included, without limitation, the true and accurate financial condition of the

28  ///    **EXHIBIT** _____

          **PAGE** _20_       17

1   Company, its financial prospects, its business opportunities, and/or the Company's plans

2   and actions already undertaken concerning the Bratz product line.

3       67.    Plaintiff actually, reasonably, and justifiably relied upon the false

4   statements, concealments, and omissions of Defendant described above in executing the

5   December 2000 Agreement and agreeing to sell his shares to Defendant. Had Plaintiff

6   known of the true facts, specifically including, without limitation, the facts concerning

7   true and accurate financial condition of the Company, its financial prospects, its business

8   opportunities, and/or the Company's plans and actions already undertaken concerning the

9   Bratz product line, Plaintiff would not have entered into the December 2000 Agreement,

10  or otherwise agreed to sell his shares in the Company at that time.

11      68.    Defendant made the false representations, concealments and omissions

12  alleged above with the intent to defraud Plaintiff and/or in reckless disregard of the truth

13  for purposes of inducing Plaintiff to execute the December 2000 Agreement and to sell

14  his shares in the Company to the Defendant at a below fair market price.

15      69.    At all material times, Plaintiff was unaware of the falsity of the

16  representations and disclosures of Defendant as alleged above and believed them to be

17  true. At all material times, Plaintiff was also unaware of the material omissions,

18  concealments and misstatements of material facts by Defendant, and could not, in the

19  exercise of reasonable care, made himself aware of the falsity of such misrepresentations

20  and nondisclosures, or the existence of such omissions or concealments.

21      70.    As a direct and proximate result of the fraudulent conduct alleged above,

22  Plaintiff has been damaged in that he was fraudulently induced to enter the December

23  2000 Agreement calling for the sale of his shares of the Company at a below fair market

24  price. The amount of such damage is not presently ascertainable, but will be proven at

25  trial.

26  ///

27  ///

28  ///

EXHIBIT ____1____

PAGE ___21___

18

FL 6462

VERIFIED COMPLAINT

1    71.    The conduct of Defendant, as alleged above, was fraudulent, malicious,

2  oppressive, and despicable; has subjected Plaintiff to unjust hardship in conscious

3  disregard of his rights; and was done to vex, annoy, and harass Plaintiff so as to justify an

4  award of punitive damages against Defendant.

5

6                          **EIGHTH CAUSE OF ACTION**

7                            (Negligent Misrepresentation)

8    72.    Plaintiff hereby reasserts and realleges paragraphs 1 through 70 inclusive,

9  as though set forth in full herein.

10    73.    Prior to Plaintiff's entering into the December 2000 Agreement to sell

11  Plaintiff's stock in the Company, Defendant owed Plaintiff a duty of reasonable care

12  regarding, without limitation, the accuracy and honesty of the statements made regarding

13  the true and accurate financial condition of the Company, its financial prospects, its

14  business opportunities, and/or the Company's plans and actions already undertaken

15  concerning the Bratz product line.

16    74.    Defendant breached his duty to Plaintiff by making misrepresentations of

17  material facts, and by omitting and failing to disclose material facts, which he knew, or in

18  the exercise of reasonable care, should have known were inaccurate and which he was

19  under a duty to disclose to Plaintiff, specifically including, without limitation,

20  information concerning the true and accurate financial condition of the Company, its

21  financial prospects, its business opportunities, and/or the Company's plans and actions

22  already undertaken concerning the Bratz product line.

23    75.    Defendant made such misrepresentations and omissions concerning,

24  without limitation, the true and accurate financial condition of the Company, its financial

25  prospects, its business opportunities, and/or the Company's plans and actions already

26  undertaken concerning the Bratz product line with the intent to induce Plaintiff into

27  executing the December 2000 Agreement and selling his shares to Defendant at below

28  fair market value price.   **EXHIBIT** _____

76.   Plaintiff actually, reasonably, and justifiably relied upon the false statements and omissions of Defendant described above in deciding to execute the December 2000 Agreement and sell his shares in the Company to Defendant.  Had Plaintiff known of the true facts, specifically including, without limitation, the true and accurate financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line, Plaintiff would not have entered into the December 2000 Agreement, or otherwise agreed to sell his shares in the Company at that time.

77.   As a direct and proximate result of the negligent conduct alleged above, Plaintiff has been damaged in that he was improperly induced to enter the December 2000 Agreement and sold his shares of the Company at a below fair market price.  The amount of such damage is not presently ascertainable, but will be proven at trial.

## NINTH CAUSE OF ACTION

(Unfair Competition in Violation of California
Business & Professions Code §§ 17200 et seq.)

78.   Plaintiff hereby reasserts and realleges paragraphs 1 through 77 inclusive, as though set forth in full herein.

79.   California Business and Professions Code §§ 17200 et seq. proscribes, in part, "any unlawful, unfair, or fraudulent business practice."

80.   By virtue of the conduct alleged above, Defendant has committed unlawful, unfair, and/or fraudulent business practices with regard to his dealings with Plaintiff.

81.   As a direct and proximate result of Defendant's violations Business and Professions Code §17200 et seq. alleged above, Plaintiff has been harmed and is entitled to restitution of the amounts to which he has been unjustly harmed, and Defendant unjustly enriched, and other relief as pled herein.

///   EXHIBIT _____1_____

///   PAGE _23_

20

03:P391001.618                                    FL 6484              VERIFIED COMPLAINT

1

## TENTH CAUSE OF ACTION

2

### (Rescission Based on Mistake)

3 82. Plaintiff hereby reasserts and realleges paragraphs 1 through 81, inclusive,

4 as though set forth in full herein.

5 83. In entering into both the Arbitration Agreement and the December 2000

6 Agreement, Plaintiff was mistaken in his belief that Defendant planned to inform the

7 arbitrator, and otherwise to disclose during the course of the arbitration proceeding,

8 and/or had already had disclosed to Plaintiff, without limitation true and accurate

9 information concerning the financial condition of the Company, its financial prospects, its

10 business opportunities, and/or the Company's plans and actions already undertaken

11 concerning the Bratz product line.

12 84. The disclosure of true and accurate information to Plaintiff and to the

13 arbitrator concerning, without limitation, the financial condition of the Company, its

14 financial prospects, its business opportunities, and/or the Company's plans and actions

15 already undertaken concerning the Bratz product line was a basic assumption on which

16 the Arbitration Agreement and/or the December 2000 Agreement rested.

17 85. Defendant's failure to accurately disclose true and accurate information to

18 Plaintiff and to the arbitrator regarding, without limitation, the financial condition of the

19 Company, its financial prospects, its business opportunities, and/or the Company's plans

20 and actions already undertaken concerning the Bratz product line had a such material

21 effect on the Arbitration Agreement and/or the December 2000 Agreement that

22 enforcement of either agreement against Plaintiff would be unfair and unconscionable.

23 86. Defendant both knew about, and was the cause of, Plaintiff's mistake in

24 believing Defendant would accurately disclose to Plaintiff and to the arbitrator, without

25 limitation, true and accurate information regarding the financial condition of the

26 Company, its financial prospects, its business opportunities, and/or the Company's plans

27 and actions already undertaken concerning the Bratz product line at the time Plaintiff

28 executed those agreements. **EXHIBIT** 1

21

PAGE 24

FL 6485

VERIFIED COMPLAINT

1       87.     Plaintiff did not bear the risk of Defendant's entering into the Arbitration

2 Agreement and/or the December 2000 Agreement without disclosing to Plaintiff and to

3 the arbitrator, without limitation, true and accurate information regarding the financial

4 condition of the Company, its financial prospects, its business opportunities, and/or the

5 Company's plans and actions already undertaken concerning the Bratz product line.

6

7                      **PRAYER FOR RELIEF**

8      WHEREFORE, Plaintiff prays for judgment as follows:

9              **ON THE FIRST AND SECOND CAUSES OF ACTION**

10      1.      For rescission of the Arbitration Agreement;

11      2.      For rescission of Plaintiff's sale of his shares in the Company;

12      3.      For restitution of Plaintiff's shares in the Company;

13      4.      In the alternative of rescission of the sale of shares and restitution, for

14 damages according to proof;

15      5.      For punitive damages in an amount necessary to punish the Defendant, to

16 the extent permitted by law.

17      6.      For attorneys fees and cost of suit.

18      7.      For interest at the maximum rate allowed by law.

19      8.      For such other and further relief the Court may deem just, equitable, and/or

20 proper.

21

22              **ON THE THIRD AND SEVENTH CAUSES OF ACTION**

23      1.      For rescission of Plaintiff's sale of his shares in the Company;

24      2.      For restitution of Plaintiff's shares in the Company;

25      3.      In the alternative of rescission of the sale of shares and restitution, for

26 damages according to proof;

27      4.      For punitive damages in an amount necessary to punish the Defendant, to

28 the extent permitted by law.

EXHIBIT _____ 1_____

PAGE ___25___

03:P391001.618

22

FL 6486

VERIFIED COMPLAINT

1    5.    For attorneys fees and cost of suit.

2    6.    For interest at the maximum rate allowed by law.

3    7.    For such other and further relief the Court may deem just, equitable, and/or

4    proper.

5

6             ON THE FOURTH AND EIGHTH CAUSES OF ACTION

7    1.    For damages according to proof;

8    2.    For attorneys fees and cost of suit.

9    3.    For interest at the maximum rate allowed by law.

10    4.    For such other and further relief the Court may deem just, equitable, and/or

11    proper.

12

13             ON THE FIFTH AND SIXTH CAUSES OF ACTION

14    1.    For rescission of Plaintiff's sale of his shares in the Company;

15    2.    For restitution of Plaintiff's shares in the Company;

16    3.    In the alternative of rescission of the sale of shares and restitution, for

17    damages according to proof;

18    4.    For attorneys fees and cost of suit.

19    5.    For interest at the maximum rate allowed by law.

20    6.    For such other and further relief the Court may deem just, equitable, and/or

21    proper.

22

23             ON THE NINTH CAUSE OF ACTION

24    1.    For restitution in an amount necessary to restore to Plaintiff the amount by

25    which Defendant has been unjustly enriched by means of the unlawful, unfair, and

26    fraudulent acts alleged above.

27    2.    For attorneys fees and cost of suit.

28    3.    For interest at the maximum rate allowed by law.

EXHIBIT 1

PAGE 26

23

1    4.    For such other and further relief the Court may deem just, equitable, and/or

2    proper.

3

4                     ON THE TENTH CAUSE OF ACTION

5    1.    For rescission of Plaintiff's sale of his shares in the Company;

6    2.    For restitution of Plaintiff's shares in the Company;

7    3.    For attorneys fees and cost of suit.

8    4.    For interest at the maximum rate allowed by law.

9    5.    For such other and further relief the Court may deem just, equitable, and/or

10   proper.

11

12                       DEMAND FOR JURY TRIAL

13   Plaintiff hereby demands a trial by jury herein on all causes of action so triable.

14

15   DATED: August _25_, 2003                HOWARTH & SMITH
                                             DON HOWARTH
16                                           SUZELLE M. SMITH
                                             BRIAN D. BUBB
17                                           ROBERT D. BRAIN

18

19                                    By: _Don Howarth_
                                              Don Howarth
20
                                      Attorneys for Plaintiff
21                                    Farhad Larian

22

23

24

25

26                  EXHIBIT ___1___

27                  PAGE __27__

28

                              24
03:P391001.618                        FL 6488      VERIFIED COMPLAINT

## VERIFICATION

I, Farhad Larian, declare:

I am a party to this action, and I certify and declare that I have read the foregoing VERIFIED COMPLAINT and know its contents thereof. The same is true of my own knowledge, except as to those matters which are therein alleged on information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the State of California that this Verification was executed on August 22, 2003, at Los Angeles, California and that the foregoing is true and correct.

_____
Farhad Larian

EXHIBIT ___1___

PAGE ___28___

03:P390001.618                                                          VERIFICATION

FL 6489

EXHIBIT A

EXHIBIT \_\_\_1\_\_\_

PAGE \_\_\_29\_\_\_

FL 6490

## AGREEMENT TO ARBITRATE AND SELECTION OF ARBITRATOR

This Agreement is made between Isaac Larian ("Isaac"), Farhad Larian ("Farhad") and Morad Zarabi ("Morad") pursuant to the following recitals, terms and conditions.

A.   Isaac and Farhad each own a 45% shareholder interest in ABC Int'l Traders Inc., a California corporation ("Corporation").

B.   Disputes have arisen between Isaac and Farhad concerning the continuing operation of the Corporation and other matters such as partnerships. Isaac and Farhad have been unable to resolve their disputes and desire to conclude their disputes in an economical and timely manner, outside of the formal judicial process.

C.   Both Isaac and Farhad have great confidence in the business and personal judgment of Morad and desire to utilize the services of Morad as a binding arbitrator of the disputes between Isaac and Farhad.

D.   As an accommodation to Isaac and Farhad, Morad agrees to undertake the position as arbitrator.

Now Therefore, the parties agree as follows:

1.   Isaac and Farhad irrevocably appoint Morad to arbitrate their disputes with respect to the Corporation, its operation and their shareholder interests in the Corporation, and other disputes.

2.   Upon execution of this Agreement, Isaac and Farhad shall deliver their irrevocable shareholder proxy and share certificates to Morad so that Morad may vote their shares of Corporation as Morad so determines, including the voting for positions on the Board of Directors.

3.   Upon execution of this Agreement, Isaac and Farhad shall each deliver to Morad their personal check in the amount of $500,000.00 payable to the other, to be utilized as a down payment of the purchase price as determined in Section 5 of this Agreement for the Sale of either Isaac's or Farhad's shares of the Corporation to the other.

4.   Isaac and Farhad shall present their arguments and concerns to Morad in a manner as determined by Morad. Evidence may be admitted or excluded in the sole discretion of Morad. Morad shall then render his decisions with respect to the disputes and said decisions shall be binding and conclusive upon Isaac and Farhad.

5.   In rendering his decisions, Morad has the right and power to determine, among other issues, whether either Isaac or Farhad will have to sell his shares of Corporation to the other and the purchase price and terms of payment for said shares; setting the salaries of Isaac and Farhad; and the continuation of employment by the Corporation of either Isaac or Farhad.

EXHIBIT ___1___

PAGE ___30___

FL 6491

6.     Isaac and Farhad agree to be bound by the terms of Morad's decisions and to implement the terms of Morad's decisions in the time parameters as established by Morad.

7.     Isaac and Farhad acknowledge that Morad has agreed to perform such services as arbitrator as an accommodation to Isaac and Farhad. Isaac and Farhad agree to hold Morad harmless and to indemnify Morad from any cost, liability, suit, claim, damage or judgment, including court costs and reasonable attorneys' fees arising out of or relating to this Agreement and the decisions made by Morad pursuant to the terms of this Agreement.

8.     Isaac and Farhad agree to pay equally the costs and expenses of Morad incurred by him, including his attorneys' fees, in drafting and implementing the terms of this Agreement and performing his responsibilities herein.

9.     Isaac and Farhad agree and intend hereby that Morad's decisions will constitute a full and final resolution of all disputes, past or present, between Isaac and Farhad concerning the Corporation, its operation their shareholder interests in Corporation, and other disputes.

10.    Any judgment or award rendered by Morad may be entered in any Court having jurisdiction over the disputes between Isaac and Farhad.

11.    To the extent not otherwise provided by this Agreement or determined by Morad, the rules governing the arbitration and enforcement of the arbitration award shall be governed by the California Arbitration Act, California Code of Civil Procedure, Section 1280 et seq.

Dated:_____, 2000


_____          _____          _____

ISAAC LARIAN                              FARHAD LARIAN                              MORAD ZARABI


EXHIBIT ___1___

PAGE ___31___

FL 6492

**EXHIBIT  B**

EXHIBIT 1

PAGE 32

FL 6493

AGREEMENT FOR SALE OF STOCK

This Agreement, made this 4TH day of December, 2000, by and between Farhad Larian ("SELLER"), and Isaac Larian ("BUYER").

Whereas, the SELLER is the owner of 10,000,000 shares of common stock of ABC International Traders Inc., a California corporation and 450 shares of MGA Entertainment Hong Kong Limited, a Hong Kong Corporation (collectively "CORPORATION"), with offices at 16730 Schoenborn Street, North Hills, California 91343-6122, and desires to sell to the BUYER, and the BUYER desires to purchase from the SELLER, these 10,000,000 and 450 shares of common stock of CORPORATION.

Now, therefore, in consideration of the promises and of the mutual covenants and agreements herein contained, the parties hereto hereby agree as follows:

1.  At Closing, as defined hereinafter, SELLER shall sell, transfer and convey to BUYER and BUYER shall purchase from SELLER, SELLER'S 10,000,000 and 450 shares of common stock of CORPORATION.

2.  The purchase price for said shares shall be the sum of Eight Million Seven Hundred Seventy Five Thousand Dollars ($8,775,000.00), payable as follows:

a.  The sum of $500,000.00 at Closing, as defined hereinafter; plus

b.  The sum of $8,275,000.00 evidenced by BUYER'S promissory note made payable to SELLER, in the form as attached hereto as Exhibit "A" and incorporated herein by reference. Said promissory note shall provide for a principal payment in the amount of $2,000,000.00, with interest at nine and one-half percent on or before April 15, 2001 and the remainder of the principal balance amortized in equal monthly payments of principal and interest over 120 months at an annual interest rate of nine and one-half percent commencing June

1

EXHIBIT ____

PAGE 33 ____

FL 6494

1, 2001.  The promissory note shall also provide that, in the event of default, BUYER· agrees that SELLER'S personal residence located at 237 North Carolwood Drive, Los Angeles, CA shall be exempt from lien or attachment.

3.  BUYER agrees to secure his promissory note obligation to SELLER as follows:

BUYER shall execute a Pledge Agreement in favor of SELLER in the form as attached hereto as Exhibit "B" and incorporated herein by reference.  Said Pledge Agreement shall be for the purposes of securing BUYER'S total shareholder interest in CORPORATION in favor of SELLER until such time as BUYER'S obligations pursuant to his promissory note in favor of SELLER has been paid in full.  Said Pledge Agreement shall have restrictions imposed upon BUYER with respect to the amount of compensation paid to BUYER from CORPORATION during the period of time that BUYER'S promissory note in favor of SELLER remains outstanding.

4.  In addition to the purchase price as above stated, BUYER shall cause ABC International Traders Inc. to enter into a Consultation Agreement with BUYER in the form as attached hereto as Exhibit "C" and incorporated herein by reference.

5.  SELLER warrants and represents to the BUYER the following:

a.  That CORPORATION is a corporation duly organized, validly existing,. and in good standing under the laws of California or Hong Kong, respectively, has all necessary corporate powers to own its properties and carry on its business as now owned and operated by it.

b.  That SELLER is the owner of and has the good and marketable title to the 10,000,000 shares and 450 shares, respectively, of stock agreed to be sold herein, representing 45% of the issued and outstanding shares of CORPORATION, and each of them, free of all encumbrances, liens and security interests.

2

EXHIBIT 1

PAGE 34

FL 6495

c. That the authorized capital stock of CORPORATION consists of 100,000,000 shares and 1,000 shares respectively of common stock no or nominal par value, of which 22,200,000 shares of ABC International Traders Inc. are presently issued and outstanding and 1,000 shares of MGA Entertainment Hong Kong Limited are presently issued and outstanding.

d. That any right of first refusal, stock option or any other agreement wherein SELLER has the right to purchase shares of CORPORATION is hereby terminated.

6. BUYER acknowledges that he is a current shareholder of CORPORATION, has been the President and a Director of CORPORATION; and an employee of CORPORATION for at least 18 years for ABC International Traders Inc. and at least 7 years for MGA Entertainment Hong Kong Limited, since the inception of CORPORATION. BUYER is thoroughly familiar with the operations of CORPORATION and purchases the shares of CORPORATION from SELLER with full knowledge of the business, prospects, liabilities, obligations, nature and salability of inventory, collectability of accounts receivable, condition of furniture, fixtures and equipment, and financial condition of CORPORATION. SELLER makes no warranty, either express or implied as to the business of CORPORATION, its prospects, liabilities, obligations, nature and salability of inventory, collectability of accounts receivable, condition of furniture, fixtures and equipment, or financial condition.

7. The consummation of the transaction contemplated by this Agreement ("Closing") shall take place at the offices of the CORPORATION on the 2nd day of January 2001, at 10:00 a.m., or such other time and place as the parties may agree. The sale shall be effective as of the close of business on December 31, 2000, the end of the calendar and fiscal year of CORPORATION. At the Closing the

3

EXHIBIT ___I___

PAGE ___35___

following documents and instruments shall be exchanged between the parties:

        a.   SELLER shall deliver to BUYER:

        (i).  CORPORATION'S share certificate number 3 issued in favor of SELLER representing 10,000,000 shares of ABC International Traders Inc.; and share certificated number 2 issued in favor of SELLER representing 450 shares of MGA Entertainment Hong Kong Limited, duly endorsed by SELLER in favor of BUYER.

        (ii).  The resignation of SELLER as a Director and employee of CORPORATION.

        (iii).  Any and all records of CORPORATION in the possession of SELLER.

        (iv).  A Pledge Agreement executed by SELLER as the secured party in the form as attached hereto as Exhibit "B".

        (v).  A Consultation Agreement executed by SELLER in the form as attached hereto as Exhibit "C".

        (vi).  A Mutual Release executed by SELLER in the form as attached hereto as Exhibit "D".

        b.  BUYER shall deliver to SELLER:

        (i).  Cash in the sum of $500,000.00 in the form of a cashier's check, certified check or wired funds.

        (ii).  BUYER'S Promissory Note in the amount of $8,275,000.00 made payable to SELLER in the form as attached hereto as Exhibit "A".

        (iii).  A Pledge Agreement executed by BUYER as the securing party in the form as attached hereto as Exhibit "B".

        (iv).  A Consultation Agreement executed by ABC International Traders Inc. in the form as attached hereto as Exhibit "C".

        (vi).  A Mutual Release executed by BUYER in the form as attached

4

EXHIBIT __1__

PAGE __36__

FL 6497

hereto as Exhibit "D".

8.    The parties acknowledge that differences have arisen between them concerning the continued management and operation of CORPORATION, to the extent that the continued successful operation of CORPORATION is threatened unless one of the parties purchases the other party's shareholder interest.    The parties have each sought the assistance of Morad Zarabi ("Morad") as an "arbitrator" to determine the seller and buyer between the parties, the purchase price and the terms of the purchase.  The parties previously executed an Agreement To Arbitrate And Selection of Arbitrator setting forth their agreement in this regard.  Morad has determined the purchase price and terms of payment from consultations with each of the parties and by undertaking his own outside independent research as to the value of CORPORATION.  Morad shall not charge a fee for his services rendered herein.  The costs and expenses of Morad, including appraisal costs and attorneys' fees incurred by Morad in drafting this Agreement, the various Exhibits attached hereto and the Agreement To Arbitrate And Selection of Arbitrator shall be paid by the CORPORATION at time of closing.  The parties acknowledge that Morad agreed to undertake his duties as arbitrator as an accommodation to the parties.  Each of the parties agrees to indemnify Morad, his associates, employees, consultants, lawyers, family members and all other persons employed or consulted by Morad in connection with the consummation of this Agreement or the Agreements or other documents attached as Exhibits hereto, and hold him and them harmless from any suit, claim, liability, loss, expense or damage, including court costs and reasonable attorneys' fees, as a result Morad's actions as arbitrator or any other actions concerning the drafting or implementation of this Agreement or the Agreements or other documents attached as Exhibits hereto.

EXHIBIT ___1___

PAGE ___37___

FL 6498

9. Except as otherwise provided in this Agreement, any controversy between the parties arising out of this Agreement or the Agreements contained in the Exhibits attached hereto shall be submitted to Morad who shall serve as sole arbitrator with respect to said disputes. The decision of Morad shall be final and binding upon both parties. In the event Morad is unavailable to so act, then Kambiz Zarabi shall serve as arbitrator. Any arbitrator may appoint another person or entity to arbitrate, either currently or prospectively, in the event that both named arbitrators herein are unable to so act.

10. The parties acknowledge that this Agreement, the Agreements attached hereto as Exhibits, and the Agreement To Arbitrate And Selection Of Arbitrator were drafted at the request of and on behalf of Morad by his attorneys, Stern & Goldberg. The parties each acknowledge that Stern & Goldberg does not represent either party to this Agreement. The parties have each been advised to seek legal counsel of their choice to represent their respective interests prior to entering into this Agreement and the Agreements attached hereto as Exhibits. Each party shall have three business days from the date of signing this Agreement to consult with legal counsel of his choice concerning the terms and conditions of this Agreement. Either party may terminate this Agreement without any further liability thereon, except to the extent such liability arises under the Agreement To Arbitrate And Selection of Arbitrator previously signed by the parties, in the event he notifies Morad and the other party in writing of his intent to do so within three business days from the signing of this Agreement. In the event no such written notification has been given, it shall be assumed that each party has chosen either to have this Agreement reviewed by legal counsel of his choice and no objections to the form and content of this Agreement has been made; or said party has decided, in its unilateral discretion despite repeated warnings by

6

EXHIBIT 1

PAGE 38

FL 6499

Morad and his attorney to seek such independent legal review, not to seek such legal advice. The parties have initialed this section hereinafter indicating their knowledge of the provisions of this Section.

11. The parties agree that, to the extent required, the transfer of shares as contemplated by this Agreement will have been qualified with the California Commissioner of Corporations in accordance with the California Corporate Securities Law and the Commissioner's Rules and Regulations; and the appropriate Hong Kong governmental authorities, respectively. The parties agree to utilize their best efforts and timely file any applications, consents or notices to secure the Commissioner's and/or Hong Kong authorities consent to the transfer of shares as contemplated herein.

12. Each party represents and warrants that it has dealt with no broker or finder in connection with any transaction contemplated by this Agreement, and as far as it knows, no broker or other person is entitled to any commission or finder's fee in connection with any of these transactions. Each party will indemnify and hold one another harmless against any loss, liability, damage, cost, claim, or expense incurred by reason of any brokerage commission or finder's fee alleged to be payable because of any act, omission, or statement of the indemnifying party.

13. The parties intend that this Agreement and the parties timely compliance with the terms hereof shall resolve and settle all of the claims of either party against the other, including any claim one party may have against the other or CORPORATION for any prior monetary discrepancy whatsoever. The parties shall execute a Mutual Release in the form as attached hereto as Exhibit

7

EXHIBIT ____1____

PAGE __39__

"D".

14.  BUYER agrees that, during the time that any portion of the promissory note from BUYER payable to SELLER as provided herein remains outstanding, BUYER shall cause CORPORATION to name Morad as a member of the Board of Directors of CORPORATION.

15.  This Agreement constitutes the entire agreement between the parties pertaining to the subject matter contained herein and supersedes all prior and contemporaneous agreements, representations, and understandings of the parties. No supplement, modification, or amendment to this Agreement shall be binding unless executed in writing by the parties.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provisions, whether or not similar, nor shall any waiver constitute a continuing waiver.  No waiver shall be binding unless executed in writing by the party making the waiver.

16.  This Agreement may be executed simultaneously in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

17.  This Agreement shall be binding on and shall inure to the benefit of the parties to it, and their respective heirs, legal representatives, successors and assigns; provided, however, no assignment by BUYER shall relieve BUYER of any of his obligations or duties under this Agreement.

18.  If any action or other proceeding is commenced to enforce the terms of this Agreement, the prevailing party, in addition to all other relief as appropriate under California law, shall be entitled to the recovery of court costs and reasonable attorneys fees.

19.  This Agreement shall be construed in accordance with and be governed

8

EXHIBIT ___1___

PAGE ___40___

FL 6501

by the laws of the State of California.

IN WITNESS WHEREOF, the parties to this Agreement have duly executed it effective the day and year first above written.

BUYER:                              SELLER:

_____          _____
ISAAC LARIAN                       FARHAD LARIAN

EXHIBIT ___1___

PAGE ___41___                      FL 6502

SPOUSAL CONSENT


The undersigned is the spouse of Farhad Larian.  To the extent that the undersigned now has a community property interest in the shares of ABC International Traders Inc. registered in the name of her husband, the undersigned hereby acknowledges that she has read this Agreement For Sale Of Stock, understands its contents and agrees that her community property interest in the shares of said corporation registered in the name of her husband shall be bound by and subject to the terms of this Agreement.


Dated:  _____, 2000      _____

10

EXHIBIT __1_____

PAGE __42_____                FL 6503

PROMISSORY NOTE

$8,275,000.00    Los Angeles, California,   January __ 2001

In installments as herein stated, for value received, the undersigned promises to pay to Farhad Larian, or order, at Los Angeles, California, the sum of Eight Million Two Hundred Seventy Five Thousand Dollars, with interest from date of making on unpaid principal, at the rate of nine and one-half percent per annum, payable in installments of principal and interest (amortized on $6,275,000.00 portion of note) of $83,798.90 or more on the first day of each successive month, commencing June 1, 2001. Principal and accrued interest on the above portion of the note shall be all due and payable on June 1, 2004. The undersigned shall have a ten (10) day grace period from and after the due date of any payment prior to being in default of his obligation herein. In addition thereto, the undersigned shall make a principal payment of $2,000,000.00, with interest thereon, on or before April 15, 2001.

Should default be made in payment of any installment of principal or interest when due the whole sum of principal and interest shall become immediately due at the option of the holder of this note. Principal and interest payable in lawful money of the United States. If action be instituted on this note the undersigned promises to pay such sum as the Court may fix as attorney's fees.

This Promissory Note is secured by a Pledge Agreement of even date executed by the undersigned and beneficiary herein.

In the event of default, the principal residence of the undersigned, located at 237 North Carolwood Drive, Los Angeles, California 90077 shall not be subject to lien, attachment or seizure.


ISAAC LARIAN


EXHIBIT___1___

PAGE __43___

FL 6504

'01-21-01   17:13   From-Stern & Goluberg          · +310 278 9621          .-756   P.003/007   F-722

## AMENDMENT TO PROMISSORY NOTE

On December 4, 2000, Farhad Larian ("Farhad"), Isaac Larian ("Isaac"), ABC International Traders Inc., a California corporation ("ABC") and/or Morad Zarabi ("Morad") entered into an Agreement For Sale of Stock, which included an $8,275,000.00 Promissory Note ("Note") executed by Isaac in favor of Farhad.  The Note provided, in part, for a principal payment of $2,000,000.00 with interest thereon, on or before April 15, 2001.

Isaac and Farhad agree that the payment date for said $2,000,000.00 installment, plus interest, at the request of Isaac, be and is hereby extended to "on or before June 3, 2001".

All other terms of the Note shall remain in full force and effect.

Dated:  1/1/2001

Farhad Larian
_____
Farhad Larian

_____
Isaac Larian

1

EXHIBIT _____1_____

PAGE ___44___

FL 6505

```
------------------------------------------------------------------------
                                            12-04-2000  17:59:53 Pg   1
------------------------------------------------------------------------
```

Compounding interval:   Monthly

Annual percentage rate......:   9.500%
Effective annual rate.......:   9.925%
Rate per compounding period.:   0.7917%
Equivalent daily rate........:   0.02603%

Valuation date: 01-01-2001      Value:  $  6,275,000.00

CASH FLOW DATA
```
------------------------------------------------------------------------
First date   Payment amount  -#- Interval   Last date
------------------------------------------------------------------------
06-01-2001  $    83,798.90   35 Monthly     04-01-2004
05-01-2004  $ 5,211,001.13    1
```

AMORTIZATION SCHEDULE   -   Normal amortization

| Pmt | Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|---|
| | | | Balance at 01-01-2001 | | 6,275,000.00 |
| 1 | 06-01-2001 | 83,798.90 | 252,349.44 | 168,550.54- | 6,443,550.54 |
| 2 | 07-01-2001 | 83,798.90 | 51,011.44 | 32,787.46 | 6,410,763.08 |
| 3 | 08-01-2001 | 83,798.90 | 50,751.87 | 33,047.03 | 6,377,716.05 |
| 4 | 09-01-2001 | 83,798.90 | 50,490.25 | 33,308.65 | 6,344,407.40 |
| 5 | 10-01-2001 | 83,798.90 | 50,226.56 | 33,572.34 | 6,310,835.06 |
| 6 | 11-01-2001 | 83,798.90 | 49,960.78 | 33,838.12 | 6,276,996.94 |
| 7 | 12-01-2001 | 83,798.90 | 49,692.89 | 34,106.01 | 6,242,890.93 |
| 2001 totals | | 586,592.30 | 554,483.23 | 32,109.07 | |
| 8 | 01-01-2002 | 83,798.90 | 49,422.89 | 34,376.01 | 6,208,514.92 |
| 9 | 02-01-2002 | 83,798.90 | 49,150.74 | 34,648.16 | 6,173,866.76 |
| 10 | 03-01-2002 | 83,798.90 | 48,876.45 | 34,922.45 | 6,138,944.31 |
| 11 | 04-01-2002 | 83,798.90 | 48,599.98 | 35,198.92 | 6,103,745.39 |
| 12 | 05-01-2002 | 83,798.90 | 48,321.32 | 35,477.58 | 6,068,267.81 |
| 13 | 06-01-2002 | 83,798.90 | 48,040.45 | 35,758.45 | 6,032,509.36 |
| 14 | 07-01-2002 | 83,798.90 | 47,757.37 | 36,041.53 | 5,996,467.83 |
| 15 | 08-01-2002 | 83,798.90 | 47,472.04 | 36,326.86 | 5,960,140.97 |
| 16 | 09-01-2002 | 83,798.90 | 47,184.45 | 36,614.45 | 5,923,526.52 |
| 17 | 10-01-2002 | 83,798.90 | 46,894.58 | 36,904.32 | 5,886,622.20 |
| 18 | 11-01-2002 | 83,798.90 | 46,602.43 | 37,196.47 | 5,849,425.73 |
| 19 | 12-01-2002 | 83,798.90 | 46,307.95 | 37,490.95 | 5,811,934.78 |
| 2002 totals | | 1,005,586.80 | 574,630.65 | 430,956.15 | |
| 20 | 01-01-2003 | 83,798.90 | 46,011.15 | 37,787.75 | 5,774,147.03 |
| 21 | 02-01-2003 | 83,798.90 | 45,712.00 | 38,086.90 | 5,736,060.13 |

```
                                            12-04-2000   17:59:53 Pg  2
```

| Pmt | Date | Payment | Interest | Principal | Balance |
|-----|------|---------|----------|-----------|---------|
| 22 | 03-01-2003 | 83,798.90 | 45,410.48 | 38,388.42 | 5,697,671.71 |
| 23 | 04-01-2003 | 83,798.90 | 45,106.57 | 38,692.33 | 5,658,979.38 |
| 24 | 05-01-2003 | 83,798.90 | 44,800.25 | 38,998.65 | 5,619,980.73 |
| 25 | 06-01-2003 | 83,798.90 | 44,491.51 | 39,307.39 | 5,580,673.34 |
| 26 | 07-01-2003 | 83,798.90 | 44,180.33 | 39,618.57 | 5,541,054.77 |
| 27 | 08-01-2003 | 83,798.90 | 43,866.68 | 39,932.22 | 5,501,122.55 |
| 28 | 09-01-2003 | 83,798.90 | 43,550.55 | 40,248.35 | 5,460,874.20 |
| 29 | 10-01-2003 | 83,798.90 | 43,231.92 | 40,566.98 | 5,420,307.22 |
| 30 | 11-01-2003 | 83,798.90 | 42,910.77 | 40,888.13 | 5,379,419.09 |
| 31 | 12-01-2003 | 83,798.90 | 42,587.07 | 41,211.83 | 5,338,207.26 |
| 2003 totals | | 1,005,586.80 | 531,859.28 | 473,727.52 | |
| | | | | | |
| 32 | 01-01-2004 | 83,798.90 | 42,260.81 | 41,538.09 | 5,296,669.17 |
| 33 | 02-01-2004 | 83,798.90 | 41,931.96 | 41,866.94 | 5,254,802.23 |
| 34 | 03-01-2004 | 83,798.90 | 41,600.52 | 42,198.38 | 5,212,603.85 |
| 35 | 04-01-2004 | 83,798.90 | 41,266.45 | 42,532.45 | 5,170,071.40 |
| 36 | 05-01-2004 | 5,211,001.13 | 40,929.73 | 5,170,071.40 | 0.00 |
| 2004 totals | | 5,546,196.73 | 207,989.47 | 5,338,207.26 | |
| | | | | | |
| Grand totals | | 8,143,962.63 | 1,868,962.63 | 6,275,000.00 | |

EXHIBIT ____1____

PAGE __4 6__

FL 6507

## PLEDGE AGREEMENT

THIS PLEDGE AGREEMENT made this <u>4TH</u> day of <u>DEC.</u>, 2001, by and between Isaac Larian hereinafter referred to as "Pledgor"; and Farhad Larian hereinafter referred to as "Pledgee"; and Morad Zarabi hereinafter referred to as "Trustee".

## W I T N E S S E T H

Pledgor, as security for the performance of his obligations under and pursuant to a promissory note payable to Pledgee of even date herewith in the principal amount of $8,275,000.00, as well as the performance of all other obligations contemplated hereby and pursuant to the terms of the Agreement For Sale Of Stock dated December __, 2000 between Pledgor and Pledgee, pledges, assigns and delivers to Trustee for the benefit of Pledgee the hereinafter described shares of stock of ABC International Traders Inc., a California corporation, and MGA Entertainment Hong Kong Limited, a Hong Kong corporation, hereinafter collectively referred to as "Company", subject to the terms and conditions hereinafter set forth.

NOW, THEREFORE, it is mutually agreed by the parties as follows:

1)    PLEDGE

(a)   Pledgor hereby delivers to Trustee certificates of stock in ABC International Traders Inc. numbered 1 and 3 representing a total of 20,000,000 shares of common stock of ABC International Traders Inc.; and certificates of stock in MGA Entertainment Hong Kong Limited numbered 1 and 2 representing a total of 900 shares of common stock of MGA Entertainment Hong

1

EXHIBIT _____1_____

PAGE _____47_____                    FL 6508

Kong Limited issued in the name of Pledgor, together with an assignment separate from certificate executed by Pledgor in favor of Pledgee assigning said shares of common stock in Company to Pledgee, said stock certificates and assignment to be held by Trustee as security for the payment of Pledgor's promissory note and other obligations referred to above.

(b)  Pledgor warrants and represents that he owns said stock free and clear of any liens or encumbrances except this Pledge Agreement; and agrees not to encumber, transfer or otherwise hypothecate said stock during the term of the Pledge Agreement.

(c)  In the event that during the term of this Pledge Agreement any stock dividend, reclassification, readjustment, or other change is declared or made in the capital stock of the Company which affects the pledged shares, or any subscription, warrant, or other option is exercised with reference to the pledged stock, all the new, substituted or additional shares, or other securities issued pursuant to any such change or option shall be delivered to Trustee by Pledgor and shall be held by Trustee under the terms of this Pledge Agreement in the same manner as the stock originally pledged hereunder.  Trustee shall have no duty or obligation to compel Pledgor to deliver such new, substituted or additional shares, or other securities so issued to Trustee.

2)  <u>VOTING RIGHTS. DIVIDENDS AND OTHER RESTRICTIONS ON DISTRIBUTIONS</u>:

(a)  Pledgor shall have the right to vote the stock pledged as herein and to receive all cash dividends, as limited hereinafter, if any, declared on said stock, so long as the Pledgor is not in default in the performance of any of the terms of this Pledge Agreement, the Agreement For Sale Of Stock or in the payment of the promissory note secured hereby during

2



EXHIBIT 1

PAGE 48

FL 6509

the term of this Pledge Agreement. In the event Pledgee notifies the Trustee that Pledgor is in default hereunder, Pledgee shall be entitled to vote the shares for which payment is in default. For voting purposes, Trustee shall be entitled to rely upon the written representations of Pledgee concerning a default relative to shares held by Trustee, and Trustee shall have no obligation to make any such determination unless Pledgee sends to Trustee a letter by certified mail specifying a default as set forth in Paragraph 4 below.

(b)  During the term of this Pledge Agreement, Pledgor and his immediate family members shall be limited in the aggregate annual amount of distributions from ABC International Traders Inc., whether as salary, dividends, perquisites or any other form to an amount no greater than the sum of the annual principal and interest payments payable to Pledgee under the promissory note plus the sum of $500,000.00 plus the amount of any federal and state taxes payable by Pledgor on said amounts. Notwithstanding the above, this distribution limitation shall not apply with respect to any distributions to family members of Pledgor who are presently employed at Company.

3)    RETURN OF COLLATERAL:  At such time as Pledgor has presented to Trustee evidence satisfactory to Trustee of full payment of Pledgor's promissory note to Pledgee, and the complete performance of any other obligation imposed on Pledgor pursuant to the terms of the Agreement For Sale Of Stock above mentioned, Trustee shall deliver to Pledgor all of the stock held hereunder together with the assignment executed by Pledgor.

4)    DEFAULT:  An event of default by Pledgor as used in this Pledge Agreement shall be any and all of the following, provided, however, that the default shall not be deemed to occur until the Pledgee shall have notified the

3

EXHIBIT __1__

PAGE __49__

FL 6510

Pledgor in writing specifying the nature of the default, and until the time for curing the same, if any, following Pledgor's receipt of notice from Pledgee, has expired:

(a) The failure of Pledgor to pay the indebtedness evidenced by the promissory note in favor of Pledgee in accordance with the terms thereof, should Pledgor fail to make such payment within thirty (30) days from the due date of any payment thereunder.

(b) The failure of Pledgor to observe, keep or perform within ninety (90) days any covenant, agreement or condition required in this instrument or the Agreement For Sale Of Stock or the Promissory Note in favor of Pledgee herewith to be observed, kept or performed for the benefit of Pledgee.

(c) If Pledgor is adjudicated a bankrupt, or requests, either by way of petition or answer, that Pledgor be adjudicated a bankrupt, or if any involuntary petition in bankruptcy be filed against Pledgor and the same shall not have been determined in favor of Pledgor or dismissed within ninety (90) days from the date thereof.

5) RIGHTS ON DEFAULT:

(a) Upon the happening of any of the events specified in Paragraph 4, Pledgee may, at Pledgee's election and upon proper notice and after the appropriate curative periods set forth in Paragraph 4, declare any and all obligations of the Pledgor in default secured hereby immediately all due and payable, and Pledgee is given the full power and authority to take possession of all stock pledged hereunder by the Pledgor in default from Trustee, and, at Pledgee's option, to sell and deliver the whole or any part of the herein described stock held by Trustee, or any substitutions or

4

EXHIBIT ___1___

PAGE ___50___

FL 6511

additions thereto, at one or more private or public sales, with notice, as Pledgee shall determine.

(b)  Upon any such sale, Pledgee may become the purchaser of the whole, or any part, of such stock, discharged from any right of redemption, and after deducting all costs and expenses of collection, sale and delivery, including reasonable attorney's fees, may apply the residue of the proceeds of such collection, sale or sales, to the payment of the obligations secured hereby.  Any overage of the residue of the proceeds of such sales shall be forthwith returned to Pledgor.

(c)  In the event of any public sale of the stock hereunder, if any law or regulation of the Securities and Exchange Commission or the California Commissioner of Corporations, or any other Federal or state body having jurisdiction, shall require that the Company whose stock is pledged hereunder or Pledgee or Pledgor should take any action prior to the sale of said stock, each of the parties hereto shall use his or its respective best efforts to comply with all of the said requirements.  Pledgee agrees to indemnify and hold Pledgor and Company harmless against any liabilities incurred by either of them by virtue of Pledgee's sale of the stock in violation of any such law or regulation.

6)  LIENS:  Pledgor agrees to pay prior to delinquency all taxes, charges, liens and assessments against the stock pledged hereunder.

7)  CAPTIONS:  The paragraph captions are inserted in this Pledge Agreement merely for convenience and are not to be construed as a part of this Pledge Agreement, or in any way limiting or affecting the language of any paragraph in this Pledge Agreement.

8)  PLEDGE CONSENT:  Where the consent of the Pledgee is required in

5

EXHIBIT _____|_____

PAGE ___51___

FL 6512

this Agreement, in connection with actions proposed to be taken by Pledgor, such consent shall not be withheld or delayed unreasonably. Consent shall be deemed to have been given to any specific action by Pledgor if Pledgee has not responded to written request for such consent within fifteen (15) days after receipt of notice in accordance with paragraph 12 of this Agreement.

9)    GENDER:  In this Agreement, whenever the context so requires, the masculine gender herein written shall include the feminine or the neuter and the singular number shall include the plural.

10)    TRUSTEE:

(a)  Trustee, by its signature hereto, consents to act as Trustee hereunder upon the express understanding that it shall be solely responsible for the physical holding of the shares described herein, and shall deliver said shares of stock to Pledgee in the event of default as hereinabove provided, together with the attached assignment; or to Pledgor upon full satisfaction of the promissory note and obligations pursuant to the Agreement For Sale Of Stock, both above described.

(b)  It is expressly understood that the duties and obligations of the Trustee are to be strictly limited to the foregoing, and the parties acknowledge that they do hereby hold Trustee free and harmless from any and all liability, costs, and expenses, including attorney's fees, by reason hereof, and that said parties shall and do hereby indemnify Trustee therefrom. Pledgor does hereby acknowledge that the stock being deposited with Trustee hereunder is deposited upon the joint risk of Pledgor and Pledgee.  Any fees of Trustee for acting as Trustee shall be paid by Pledgor.

(c)  Trustee shall have the power to appoint, currently or prospectively, a successor Trustee to so serve under the terms of this Pledge

6

EXHIBIT ___1___

PAGE ___52___

Agreement in the event Trustee is unable or unavailable to so act.

11)     SUCCESSORS AND ASSIGNS:  This Pledge Agreement shall be binding upon the parties hereto, and upon their respective heirs, personal representatives, successors and assigns.

12)     NOTICES:  Any and all notices to be served on or given to either Pledgor or Pledgee hereto, shall be in writing and shall be deemed duly served and given when personally delivered to either of the parties or in lieu of such personal service, when deposited in the United States mail, first-class, postage prepaid, addressed to Pledgor at 237 North Carolwood Drive, Los Angeles, California 90077, or to Pledgee at 2142 Century Park Lane, #6108, Los Angeles, CA 90067.  Any and all notices to be served on or given to Trustee shall be in writing and shall be deemed duly served and given upon receipt by Trustee.

13)     GOVERNING LAW:  This Agreement shall be governed and interpreted in accordance with the laws of the State of California.


IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and year first above written.


PLEDGEE:                              PLEDGOR:


_____               _____
FARHAD LARIAN                         ISAAC LARIAN


                    TRUSTEE:

                    _____
                    MORAD ZARABI

                              7

                    EXHIBIT __1__

                    PAGE __53__

                                        FL 6514

<u>CONSULTING AGREEMENT</u>

This Consulting Agreement is entered into this __1__ day of $\overline{JDN}$ ____,

2001, by and between ABC International Traders Inc., a California corporation

("Company") and Farhad Larian ("Consultant").

WHEREAS, CONSULTANT was a former shareholder, Director and employee of COMPANY.

WHEREAS, COMPANY desires to have CONSULTANT perform certain services on behalf of COMPANY as an Independent Contractor.

NOW, THEREFORE, for valuable consideration, it is hereby agreed by the parties hereto as follows:

    1.    <u>TERM</u>

The term of this Agreement shall be for a period of five years, commencing January 1, 2001 and terminating December 31, 2005, unless earlier terminated as provided hereinafter.

    2.    <u>SERVICES</u>

    (a)   CONSULTANT agrees to provide and make himself available to perform general administrative services, at the request of COMPANY, and/or otherwise make himself available to COMPANY for consultation by telephone, for a total period of time not more than ten hours per month, during the normal

1.



EXHIBIT ____1____

PAGE ___54___

business hours of COMPANY.

      (b)   COMPANY hereby acknowledges that during the term of this Agreement, CONSULTANT may engage in any other business or professional activity provided that such activity does not directly compete with the business of COMPANY within Los Angeles County, California, and the performance of such activity does not interfere with his present work as a consultant for COMPANY.

      (c)   CONSULTANT hereby acknowledges that he is being employed as an Independent Contractor to render the services described herein and that CONSULTANT shall be solely responsible for any Federal and State Income Tax withholding or Estimated Tax Payments that CONSULTANT may be required to file and/or pay.

      3.    COMPENSATION

For all services rendered by CONSULTANT under this Agreement, COMPANY shall pay to CONSULTANT the sum of $7,500.00 per month payable on the first day of each month of the term hereof.

      4.    TERMINATION

This Agreement may be terminated by either party for cause or for breach by the other party of any provision contained in this Agreement. COMPANY may not terminate CONSULTANT for a breach of this Agreement until COMPANY has furnished CONSULTANT with written notice of the breach contended by COMPANY and CONSULTANT fails to cure said breach within ten (10) days of receipt of said notice.

After five years from the date hereof but not before, this Agreement may be terminated by COMPANY upon payment in full of the promissory note given by Isaac Larian to CONSULTANT as part of the purchase of CONSULTANT'S shares of COMPANY.

2.

EXHIBIT ___1___

PAGE ___55___

This Agreement may be terminated by CONSULTANT, at any time, without cause, upon giving COMPANY thirty (30) days prior written notice.

5.   TRADE SECRETS

CONSULTANT acknowledges and represents that the sources of COMPANY's services, techniques, methods, products, manufacturing techniques, manufacturing requirements, pricing, customer lists and vendor lists are a trade secret and the property of COMPANY.   It is agreed that all such data is confidential and that it shall not be disclosed, directly or indirectly, or used by CONSULTANT in any way, except on behalf of COMPANY, either during the term of this Agreement or at any time thereafter.

6.   NOTICES

Any notice required or permitted to be given under this Agreement shall be sufficient if in writing and if sent by registered mail to the principal office of COMPANY or personal residence of CONSULTANT.

7.   COUNTERPARTS

The within Agreement may be executed in duplicate counterparts and each such signed duplicate counterpart shall be deemed to be an original.

8.   TITLES AND CONSTRUCTION

The titles of the paragraphs in this Agreement are set forth for convenience only.  This Agreement shall not be construed or interpreted for or against either of the parties hereto by reason of its draftsmanship by either party.

9.   ASSIGNMENT

The rights, benefits, duties and obligations of COMPANY and CONSULTANT under this Agreement may not be assigned without the express written permission of the other.

3

EXHIBIT ___1____

PAGE ___56____

### 10. ARBITRATION

Any controversy between the parties arising out of this Agreement shall be submitted to Morad Zarabi who shall serve as sole arbitrator with respect to said disputes. If Morad Zarabi is unable to so act, Kambiz Zarabi is appointed arbitrator. Either arbitrator can select another person or entity to serve as arbitrator, either currently or prospectively, if neither of the above two named arbitrators are available to so serve. The decision of the arbitrator shall be final and binding upon both parties.

### 11. ATTORNEYS' FEES

If any action or any other proceeding is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default, or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party or parties shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action or proceeding, in addition to any other relief to which they may be entitled.

### 12. ENTIRE AGREEMENT

(a)  This Agreement constitutes the entire Agreement between the parties and contains all of the agreement between the parties with respect to the subject matter hereof; this Agreement supersedes any and all other agreements, either oral or in writing, between parties hereto with respect to the subject matter hereof.

(b)  No change or modification of this Agreement shall be valid unless the same be in writing and signed by the person or party to be charged.

### 13. GOVERNING LAW

This Agreement shall be subject to and governed by the laws of the State of California.

4

EXHIBIT ____1____

PAGE ___57___

DATED: _JON  1_____, 2001

COMPANY:                          CONSULTANT:

ABC INTERNATIONAL TRADERS INC.

Farhad Lers

FARHAD LARIAN

By: _____

Isaac Larian, President

5

EXHIBIT ___1_____

PAGE ___58_____

FL 6519

## MUTUAL RELEASE

For valuable consideration, receipt of which is hereby acknowledged:

1.   Isaac Larian, an individual, and ABC International Traders Inc., a California corporation, and each of them, on behalf of themselves, their associates, owners, stockholders, predecessors, successors, heirs, assigns, directors, officers, partners, employees, representatives, and all other persons acting by, through, under, or in concert with them, or any of them, do hereby acquit, release and forever discharge Farhad Larian, an individual, and his spouse, associates, successors, heirs, assigns, agents, representatives, and all other persons acting by, through, under, or in concert with him or any of them, of and from any and all cause or causes of action, suits, claims, demands, obligations, liabilities, damages, liens, contracts, agreements, promises, losses, costs, or expenses of any nature whatsoever, known or unknown, fixed or in equity, from the beginning of time to the date hereof with the exception of those obligations imposed under the terms of the Agreement For Sale Of Stock between Isaac Larian and Farhad Larian for the sale by Farhad Larian of his shareholder interest in ABC International Traders Inc. to Isaac Larian and the agreements attached as Exhibits to the Agreement For Sale Of Stock.

2.   Farhad Larian, an individual, on behalf of himself, his spouse, associates, successors, heirs, assigns, agents, representatives, and all other persons acting by, through, under, or in concert with him or any of. them, do hereby acquit, release and forever discharge Isaac Larian, an individual, and ABC International Traders Inc., a California corporation, and each of them, their respective associates, owners, stockholders, predecessors, successors, heirs, assigns, directors, officers, partners, employees, representatives, and all other persons acting by, through, under, or in concert with them, or any of them, of and from any and all cause or causes of action, suits, claims, demands, obligations, liabilities, damages, liens, contracts, agreements, promises, losses, costs, or expenses of any nature whatsoever, known or unknown, fixed or in equity, from the beginning of time to the date hereof with the exception of those obligations imposed under the terms of the Agreement For Sale Of Stock between Isaac Larian and Farhad Larian for the dale by Farhad Larian of his shareholder interest in ABC International Traders Inc. to Isaac Larian and the agreements attached as Exhibits to the Agreement For Sale Of Stock.

3.   The foregoing release is and shall be a release of all claims, whether known or unknown, and each of the undersigned parties waives all rights reserved to him, it or them, by Section 1542 of the Civil Code of the State of California, which provided, as follows:

"A general release does not extend to claims
which the creditor does not know or suspect to exist in
his favor at the time of executing the Release which if
known by him must have materially affected his
settlement with the debtor."

4.   This Release shall be binding on, and shall inure to the benefit of, the parties to it and their respective heirs, legal representatives, successors and assigns.

EXHIBIT ___1___

PAGE ___59___

Exhibit "D"

FL 6520

5.   Each of the undersigned individuals represents that he signs this Release with the express authority of the party on whose behalf he signs.

IN WITNESS WHEREOF, the parties hereto have executed this Release on the 4Th day of DECEMBER , 2009

_____          _____
ISAAC LARIAN                       FARHAD LARIAN

ABC INTERNATIONAL TRADERS INC.

By:  _____
     Isaac Larian, President

EXHIBIT _____1_____

PAGE _____60_____

## AMENDMENT TO AGREEMENTS

On December 4, 2000, Farhad Larian ("Farhad"), Isaac Larian ("Isaac"), ABC International Traders Inc., a California corporation ("ABC") and/or Morad Zarabi ("Morad") entered into one or more of the following agreements concerning or relating to the sale by Farhad to Isaac of Farhad's shareholder interest in ABC and MGA Entertainment Hong Kong Limited, a Hong Kong corporation:

      A. Agreement For Sale of Stock.

      B. Promissory Note.

      C. Pledge Agreement.

      D. Consulting Agreement.

      E. Mutual Release.

The parties desire to amend the agreements as specifically provided herein, and in all other respects, ratify and confirm said agreements.

1. Agreement For Sale of Stock.

      a. There should be inserted as a second paragraph at section 12 on page 7 to read as follows:

"BUYER shall, and shall additionally cause CORPORATION to, indemnify and hold SELLER harmless from and against any claim, suit, liability, cause of action or damages arising from or related to SELLER's employment by CORPORATION, ownership of the stock in CORPORATION and/or any personal guarantees given by SELLER in his capacity as a shareholder, officer or employee of CORPORATION, to the greatest extent permitted by law. The provisions of this paragraph shall survive any termination of this Agreement. In addition thereto, BUYER shall, and shall additionally cause CORPORATION to, utilize all commercially reasonable efforts to have SELLER removed as a guarantor of any of the obligations of CORPORATION. Notwithstanding the above, SELLER shall remain personally liable on the SBA guarantee concerning the real property located at 16730 Schoenborn Street, North Hills, CA 91343".

      b. There should be inserted at the end of section 14 on page 8 the following additional sentence:

"BUYER shall execute in favor of Morad or any successor pledgeholder under the Pledge Agreement a limited proxy to vote his shares of CORPORATION for the purpose of electing Morad or any successor pledgeholder as a member of the board of directors of CORPORATION, so that Morad or the successor pledgeholder will serve in such capacity until such time as the promissory note issued by BUYER in favor of SELLER has been paid in full."

1

EXHIBIT    |

PAGE   6 |

FL 6522

2. Promissory Note.

    a. The date of making for purposes of interest accruals shall be January 1, 2001.

    b. There shall be added as Exhibit "1" to the Promissory Note the amortization schedule for the $6,275,000.00 principal as attached hereto.

    c. There shall be inserted the following additional paragraph between the first and second paragraphs:

"In the case of a sale of at least a majority of the shares of ABC International Traders Inc. ("ABC") by the maker hereof in a single transaction or in a series of related transactions; or the sale of at least a majority of ABC's assets in a single transaction or a series of related transactions, then, in any such case and notwithstanding anything to the contrary contained in this promissory note, all or a portion of the remaining unpaid principal and then accrued interest thereon shall then become due and payable in the same fractional proportion as determined by a fraction the numerator of which is the sale proceeds received and the denominator of which is the total value of ABC shares or assets, as the case may be. In the event of an exchange by the maker of shares of ABC for shares in another corporation, Morad Zarabi, designated arbitrator under the Agreement For Sale Of Stock between maker and beneficiary herein, shall determine, in his sole discretion, whether some or all of the newly acquired shares shall be transferred to beneficiary herein in payment of a portion of the promissory note; or whether said newly acquired shares shall instead be substituted for ABC shares under the Pledge Agreement executed between the maker, beneficiary and Morad Zarabi."

    d. There shall be added the following additional paragraph to the Promissory Note:

"Notwithstanding any other provision of this Promissory Note, any controversy between the parties concerning or arising from the Promissory Note shall be submitted to Morad Zarabi who shall serve as sole arbitrator with respect to said disputes. The decision of Morad shall be final and binding upon both parties. In the event Morad is unavailable to so act, then Kambiz Zarabi shall serve as arbitrator. Any arbitrator may appoint another person or entity to arbitrate, either currently or prospectively, in the event that both named arbitrators herein are unable to so act."

3. Pledge Agreement.

    a. There shall be added an additional section 14, as follows:

"14) <u>ARBITRATION:</u>  Any controversy between the parties concerning or

2

EXHIBIT ____1_____

PAGE ___62____

arising from this Pledge Agreement shall be submitted to Morad Zarabi who shall serve as sole arbitrator with respect to said disputes. The decision of Morad shall be final and binding upon all parties. In the event Morad is unavailable to so act, then Kambiz Zarabi shall serve as arbitrator. Any arbitrator may appoint another person or entity to arbitrate, either currently or prospectively, in the event that both named arbitrators herein are unable to so act."

    4. Consulting Agreement.

        a. There shall be added an additional section 14, as follows:
        "14. INDEMNIFICATION

            To the maximum extent provided by law, COMPANY shall indemnify and hold CONSULTANT harmless from and against any claim, suit, liability, cause of action or damages arising from or related to CONSULTANT's services under the terms of this agreement or the past services of CONSULTANT as an employee of COMPANY. The provisions of this paragraph shall survive any termination of this Agreement."

    In Witness Whereof, the parties execute this Amendment To Agreements on the $\underline{31}$ day of December, 2000.


Farhad Larian                           Isaac Larian
_____                _____


ABC International Traders Inc.

By: _____               _____
    Isaac Larian, President                Morad Zarabi

3

EXHIBIT ____1____

PAGE ____63____

FL 6524

**EXHIBIT 2**

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

**EXHIBIT 3**

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

**EXHIBIT 4**

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# EXHIBIT 5

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

**EXHIBIT 6**

RECEIVED

JUL 1 0 2007

LAW OFFICES

### CHRISTENSEN, GLASER, FINK, JACOBS, WEIL & SHAPIRO, LLP

10250 CONSTELLATION BOULEVARD
NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90067
(310) 553-3000
FAX (310) 556-2920

DIRECT DIAL NUMBER
310-282.6217
EMAIL: PGLASER@CHRISGLASE.COM

July 5, 2007

TIT MERITAS LAW FIRMS WORLDWIDE

**VIA FACSIMILE AND U.S. MAIL**

John B. Quinn
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017

     Re:   MGA Entertainment v. Mattel

Dear John:

     This is in response to your letter of May 29, 2007 concerning your law firm's improper and unethical communications with Fred Larian and Fred Larian's counsel in 2005, the circumstances of which have only recently come to our client's attention.

     Our client has determined that in the fall of 2005, members of your law firm met with Fred Larian and/or his attorney, Robert Wilson, and spent **two days** reviewing numerous confidential and privileged documents of MGA Entertainment, Inc. ("MGA") which were in Fred Larian's possession, including documents which are relevant to the pending litigation between MGA and Mattel, and documents which are covered by the protective order in this litigation. As you know, Fred Larian is the brother of Isaac Larian, MGA's Chairman and Chief Executive Officer, and was Isaac Larian's business colleague for over 20 years. The business relationship of the Larian brothers encompassed the ownership and operation of various ventures and businesses over many years, including ABC International Traders, Inc. (now called MGA and MGA Entertainment (HK), Ltd.). The Larian brothers each owned 45% of the stock in MGA until 2000; another family member owned the remaining 10% of the company's shares. Fred Larian served as MGA's Executive Vice President and Treasurer until 2000, served on the company's Board of Directors until 2002 (including during the time period which is relevant to this litigation) and acted as a paid consultant for the company until December 31, 2005 (including during the time period in which members of your law firm engaged in communications with him).

     In these capacities, Fred Larian was involved in numerous privileged and confidential matters at the company, including providing litigation consulting services for the company and being privy to an extensive amount of privileged attorney-client communications, as well as high level, confidential business matters. Further, Fred Larian was provided with or had access to an

500006 v2

**EXHIBIT** _6_

**PAGE** _153_

John B. Quinn, Esq.
July 5, 2007
Page 2

extensive number of privileged and confidential company documents, including documents
which are relevant to this litigation. In this regard, Fred Larian was copied on numerous
privileged and confidential communications which are uniquely relevant to this litigation, such
as numerous communications related to the development and initial sales of the "Bratz"
products. As you know, in 2005, Fred Larian was in possession of numerous confidential MGA
documents, including privileged documents, and was precluded from disclosing MGA's trade
secrets and confidential information pursuant to a confidentiality agreement which he had
previously entered into with the company.

During your communications with Fred Larian and his counsel, members of your law
firm requested and reviewed privileged and confidential information of MGA which is relevant
to this action, including documents which are subject to the protective order herein, a copy of
which is attached. Your letter dated November 28, 2005 to Robert Wilson, Fred Larian's then
counsel ("November 28, 2005 Letter"), demonstrates this. In particular, the November 28, 2005
Letter states that your firm was aware (e.g., apparently from your discussions with Fred Larian
and/or his counsel) that Fred Larian was in possession of certain general categories of documents
from MGA, some of which necessarily included privileged communications, and requested that
Fred Larian provide you with such documents as well as 18 other specific categories of
documents which were described as "relevant to Mattel's litigation." A copy of your firm's
November 28, 2005 Letter also is attached.

Your actions apparently were designed to induce Fred Larian to breach his fiduciary
duties to MGA, including inducing a breach of his confidentiality agreement with MGA, *and to
improperly obtain documents subject to the protective order herein without complying with such
order*. You also violated your ethical obligations, including but not limited to, Rule 4.2 of the
ABA Model Rules of Professional Conduct ("Rule 4.2") ("...[A] lawyer shall not communicate
about the subject of the representation with a party the lawyer knows to be represented by
another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is
authorized by law to do so") and Canon 9 of the ABA Code of Professional Responsibility
("Canon 9") ("A lawyer should avoid even the appearance of professional impropriety").

Case law prohibits counsel from seeking privileged information from former employees
of an adverse party and specifies the imposition of serious remedies for engaging in such
conduct. E.g., American Protection Insurance Co. v. MGM Grand Hotel-Las Vegas, Inc., 1986
WL 57464, *1, 6, 7 (D. Nev. 1986) (a violation of ethical rules and disqualification resulted
where attorney had ex parte contact with a former officer of adverse party who remained a
consultant for the adverse party and was privy to confidential information related to the
litigation); In re Data General Corp. Antitrust Litigation, 1986 U.S. Dist. LEXIS 21923, *10
(N.D. Cal. 1986) (counsel precluded from interviewing and hiring former employees of adverse
party because employees' knowledge of privileged information of adverse party was
intermingled with knowledge that might have been unprotected); Butler v. Biocore Medical
Technologies, Inc., 348 F.3d 1163, 1169-72 (10th Cir. 2003) (counsel violated Canon 9 and other
ethical rules by contacting former employee of adverse party who possessed confidential

EXHIBIT _6_

PAGE _154_

John B. Quinn, Esq.
July 5, 2007
Page 3

information; court stated that access to privileged information of adverse party may be grounds
to disqualify an attorney); Rentclub, Inc. v. Transamerica Rental Finance Corp., 811 F. Supp.
651, 657-58 (M.D. Fl. 1992) (court disqualified counsel who hired as consultant former officer
of adverse party who was privy to adverse party's confidential and proprietary information,
noting ex parte contact with former employees of adverse party should be barred to prevent
disclosure of any inadvertent confidential communications).

For example, in Kaiser v. American Telephone & Telegraph, 2002 U.S. Dist. LEXIS
25758, *30-32 (D. Ariz. 2002), the court disqualified and imposed sanctions on plaintiff's
counsel for seeking information relevant to plaintiff's lawsuit from a former employee of
defendant after holding that counsel violated Rule 4.2. Recognizing that the majority of cases
prohibit inquiry into any confidential or privileged information possessed by an adverse party's
former employee, the court concluded that "[i]f a former employee occupie[s] a high ranking
position such that his or her exposure to confidential or privileged information may be
assumed, or occupie[s] a position giving rise to a plaintiff's claims, then no *ex parte* contact
should be permitted absent notice to the former employer." Id. at *19-20 (emphasis in
original). The court in Kaiser further explained as follows: "The interest of the corporation in
protecting information - especially privileged information - acquired by an employee during
the course of employment from disclosure to an opponent in litigation remains after the
employee leaves the corporation....[A]t least with respect to former highly-placed former
employees, such as former officers and directors of the corporation, the potential for the release
of such information makes the corporation's interest paramount to the plaintiff's interest in ex
parte contact." Id. at *20-21.

Fred Larian is the very type of highly-placed former employee with whom ex parte
contact is disallowed, as instructed by the Kaiser court, as it can be assumed that he was privy
to confidential and privileged information of MGA. Indeed, Fred Larian was a paid consultant
for MGA at the time of the subject communications, and in this capacity, he had been involved
with high-level issues at the company, including certain litigation matters. Thus, the holding in
Kaiser provides that your conduct in contacting Fred Larian and seeking confidential and
privileged information of MGA from him violates your ethical duties and entitles MGA to
appropriate relief, including your disqualification and sanctions.

Given the egregious nature of your misconduct and the prejudice to MGA, we intend to
bring your actions to the attention of the Court and seek all appropriate remedies. In the interim,
we demand that you stipulate to (1) return all documents which you obtained from Fred Larian
and/or his counsel and all notes from your meetings with Fred Larian and/or his counsel; (2)
refrain from introducing or using in any fashion any documents or information obtained from
Fred Larian or his counsel or derived from information or documents obtained from Fred Larian;
(3) cease any further contact with Fred Larian or any of his counsel; and (4) compensate MGA
for its attorneys' fees and costs in investigating this matter. We will give you until July 19, 2007
to respond to our requested stipulation before we bring your actions to the attention of the Court
and seek all appropriate remedies. Some of the remedies we shall seek will include the

EXHIBIT ____6____

PAGE ____155____

John B. Quinn, Esq.
July 5, 2007
Page 4

following, among others: an order seeking to disqualify your law firm as counsel for Mattel
herein; an order excluding any evidence you obtained from Fred Larian; an adverse inference
instruction to the jury based on your misconduct; an order precluding you from further
communication with Fred Larian; an order prohibiting you from filing documents containing or
referring to any information or documents obtained from Fred Larian or derived from
information or documents obtained from Fred Larian; and an order for monetary sanctions
against your law firm for the costs incurred by MGA in investigating this matter and seeking
such remedies.

Nothing contained herein shall be deemed as a waiver of any of our client's rights and
remedies, at law or in equity, all of which are hereby expressly reserved and preserved.

Very truly yours,

Patricia L. Glaser
of CHRISTENSEN, GLASER, FINK, JACOBS,
WEIL & SHAPIRO, LLP

PLG/eb
cc:    Daphne Gronich, Esq.
       Craig Holden, Esq.
       Dale Cendali, Esq.

EXHIBIT 6
PAGE 156

**EXHIBIT 7**

2

```
1           UNITED STATES DISTRICT COURT
2           CENTRAL DISTRICT OF CALIFORNIA
3               EASTERN DIVISION
4
5    CARTER BRYANT, AN INDIVIDUAL, )
                                   )
6           PLAINTIFF,    )
                          )
7    VS.            ) CASE NO.
                          )
8    MATTEL, INC., A DELAWARE    ) CV 04-9049 SGL (RNBX)
     CORPORATION,        ) CONSOLIDATED WITH
9                 ) CASE NO. 04-9059 AND
            DEFENDANT.    ) CASE NO. 05-2727]
10                )
     _____)
11                )
     AND CONSOLIDATED ACTION(S). )
12   _____)
13
14
15       TELEPHONIC TRANSCRIPT OF
16   PROCEEDINGS, TAKEN BEFORE HON.
17   EDWARD A. INFANTE, AT 865 SOUTH
18   FIGUEROA STREET, THIRD FLOOR, LOS
19   ANGELES, CALIFORNIA, COMMENCING
20   AT 8:30 A.M., MONDAY, FEBRUARY 11,
21   2008, BEFORE ANGELA DUPRE, CSR 7804.
22
23
24
25
```

3

```
1    APPEARANCES OF COUNSEL:
2
     FOR CARTER BRYANT:
3
     KEKER & VAN NEST, LLP
4    BY: MICHAEL PAGE, ESQ.
         MATTHEW WERDEGAR, ESQ.
5    710 SANSOME STREET
     SAN FRANCISCO, CALIFORNIA 94111
6    (415) 391-5400
     (TELEPHONICALLY)
7
8
     FOR MATTEL, INC.:
9
     QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
10   BY: TIMOTHY ALGER, ESQ.
         HARRY OLIVAR, ESQ.
11       CHRISTOPHER TAYBACK, ESQ.
         B. DYLAN PROCTOR, ESQ.
12   865 SOUTH FIGUEROA STREET
     TENTH FLOOR
13   LOS ANGELES, CALIFORNIA 90017-2543
     (213) 443-3000
14
15
     FOR MGA ENTERTAINMENT, INC.:
16
     SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
17   BY: RAOUL D. KENNEDY, ESQ.
     FOUR EMBARCADERO CENTER
18   SUITE 3800
     SAN FRANCISCO, CALIFORNIA 94111
19   (415) 984-6400
20
21   ALSO PRESENT:
22   HON. EDWARD A. INFANTE (TELEPHONICALLY)
23
24
25
```

4

```
1         LOS ANGELES, CALIFORNIA; MONDAY
2              FEBRUARY 11, 2008
3                 8:30 A.M.
4
5       MR. WERDEGAR:  GOOD MORNING, YOUR HONOR.  THIS
6    IS MATT WERDEGAR AND MIKE PAGE, OF KEKER &
7    VAN NEST, ON BEHALF OF CARTER BRYANT.
8       JUDGE INFANTE:  GOOD MORNING.
9       I HAVE A LETTER DATED FEBRUARY 6TH IN
10   WHICH YOU INDICATE THE PRIORITY OF MOTIONS THAT YOU
11   WOULD LIKE TO BE HEARD FIRST, AND SO I AM PREPARED
12   TO HEAR THOSE MOTIONS.
13      THE FIRST ONE ON THE LIST IS MGA'S MOTION
14   TO COMPEL DISCOVERY AS TO ISSUES AS TO WHICH MATTEL
15   HAS WAIVED THE PRIVILEGE BY -- BY CLIENT ASSERTION
16   THAT MOTION, I BELIEVE, WAS FILED JANUARY 18TH.
17   IM PREPARED TO HEAR THAT MOTION.
18      MR. KENNEDY:  GOOD MORNING.  RAOUL KENNEDY, ON
19   BEHALF OF MGA.
20      I REALIZE WE HAVE LIMITED TIME THIS
21   MORNING.  IF THE COURT HAS QUESTIONS, I'D BE
22   PLEASED TO TRY TO ADDRESS THEM.  OTHERWISE, I THINK
23   THE MEMOS MAKE CLEAR THE ISSUE THAT HAS BEEN PLACED
24   IN ISSUE BY MATTEL, AND IT'S ONE OF THE CLASSIC
25   ISSUES THAT IN ORDER TO FULLY LITIGATE IT, WE NEED
```

5

```
1    TO KNOW WHAT ADVICE MATTEL WAS RECEIVING FROM ITS
2    LAWYERS ON THIS SUBJECT.
3       JUDGE INFANTE:  OKAY.  WELL, I'VE READ YOUR
4    MATERIALS.  YOU'VE BRIEFED IT TO -- YOU'VE CITED
5    THE RAMBUS CASE AND OTHER CASES, WHICH YOU FEEL
6    SUPPORT YOUR POSITION.
7       THE THREE-PART TEST THAT IS CITED IN THE
8    AUTHORITIES FROM HEARN, ET CETERA, I UNDERSTAND
9    YOUR POSITION.  I THINK IT'S A VERY DIFFICULT --
10   VERY DIFFICULT ISSUE.
11      I'LL BE GLAD TO HEAR FROM MATTEL.
12      MR. OLIVAR:  YES, YOUR HONOR.  HARRY OLIVAR
13   SPEAKING FOR MATTEL.
14      MR. KENNEDY, AS HE SAID, THE ISSUE HAS
15   BEEN PLACED AT ISSUE, WHAT IT SEEMS MGA IS
16   ADVOCATING IS THAT WHENEVER A PARTY RAISES
17   CONCEALMENT OF FACTS OR, FRANKLY, THE DISCOVERY
18   RULE, AS A BASIS FOR TOLLING THE STATUTE OF
19   LIMITATIONS, THE POSITION SEEMS TO BE THAT THAT
20   OPERATES AS A BLANKET PRIVILEGE WAIVER, AND THAT'S
21   NOT THE NINTH CIRCUIT TEST IN THE HEARN V. RAY; AND
22   THAT'S NOT EVEN WHAT HAPPENED IN THE RAMBUS CASE
23      HERE, WE HAVE A SITUATION WHERE MATTEL
24   HAS SIMPLY SAID IT DID NOT LEARN CERTAIN FACTS
25   UNTIL NOVEMBER OF 2003, AND MATTEL HAS PROVIDED
```

EXHIBIT 7

PAGE 157

6

1 DISCOVERY AS TO WHEN IT LEARNED THOSE FACTS. YOU
2 KNOW, THE FACTS WE'RE TALKING ABOUT WERE WHEN
3 CARTER BRYANT – THE FACT THAT CARTER BRYANT WAS
4 DOING WORK FOR MGA WHILE HE WAS STILL AT MATTEL.
5 AND MATTEL HAS BEEN FORTHCOMING IN ALL OF ITS
6 DISCOVERY RESPONSES AND DECLARATIONS AND
7 SUBMISSIONS BEFORE YOUR HONOR; SHOWED THOSE ANSWERS
8 AND THEIR AFFIRMATIONS THAT THERE WEREN'T
9 PRIVILEGES ASSERTED WITH CERTAIN OF THOSE ANSWERS
10 AS TO WHEN MATTEL LEARNED FACTS, BECAUSE FACTS ARE
11 NOT PRIVILEGED.
12 BUT THERE IS AN EFFORT NOW ON THIS MOTION
13 TO GO BEYOND THE FACTS, AND SAY, WELL, WE – IN
14 ADDITION TO FINDING OUT WHEN MATTEL LEARNED FACTS,
15 WE GET TO KNOW WHAT THE LEGAL ADVICE WAS ABOUT
16 THOSE FACTS. AND WE WOULD SUBMIT, YOUR HONOR,
17 THAT'S JUST SIMPLY NOT THE LAW.
18 UNDER THE HEARN V. RAY TEST, THEY HAVE TO
19 SHOW ON PRONG 2, THAT MATTEL PUT PRIVILEGED
20 INFORMATION AT ISSUE. AND IN THE CASES THEY RELY
21 ON, THAT'S WHAT OCCURRED. THAT'S WHAT OCCURRED IN
22 HEARN V. RAY. THERE WAS A GOOD FAITH DEFENSE,
23 WHERE THE PRISON OFFICIAL SAID THAT WE HAD A GOOD
24 FAITH BELIEF, BASED ON WHAT WE WERE BEING TOLD AND
25 KNEW, THAT WE WEREN'T VIOLATING THE INMATES'

7

1 RIGHTS. THE COURT FOUND PROPERLY THAT GOOD FAITH
2 BELIEF IMPLICATES WHAT YOU'RE BEING TOLD BY YOUR
3 LAWYERS.
4 AND THE SAME THING ON THE MATTEL MOTION
5 THAT CITED AGAINST MGA, THAT WAS ALSO A GOOD FAITH
6 BELIEF DEFENSE.
7 MGA SAID, IN 2000, WE HAD A GOOD FAITH
8 BELIEF THAT WE WOULD PROPERLY CONTACT BRYANT, AND
9 ADVICE OF COUNSEL WAS IMPLICATED THERE. THAT'S NOT
10 WHAT WE'RE TALKING ABOUT WITH RESPECT TO MATTEL.
11 WE'RE TALKING ABOUT WHEN MATTEL LEARNED FACTS, AND
12 THAT DOES NOT PUT LEGAL ADVICE AT ISSUE.
13 THE SECOND POINT ABOUT HEARN V. RAY IS –
14 THE THIRD POINT IS THEY WOULD HAVE TO SHOW THAT
15 PRIVILEGED INFORMATION IS VITAL, AND NOTHING MGA
16 SUBMITTED SHOWS THAT THE LEGAL ADVICE THAT MATTEL
17 WAS RECEIVING IS VITAL TO MGA'S DEFENSE AGAINST THE
18 FRAUDULENT CONCEALMENT ALLEGATION.
19 I'M SURE MGA WOULD LIKE TO KNOW WHAT THE
20 LAWYERS WERE SAYING, BUT THE ONLY VITAL INFORMATION
21 IS WHEN MATTEL LEARNED FACTS, AND THAT'S AVAILABLE
22 FROM MULTIPLE OTHER SOURCES, INCLUDING THE WRITTEN
23 DISCOVERY RESPONSES THAT WE HAVE IDENTIFIED, AND
24 INCLUDING THE SIX DIFFERENT 30(B)(6) TOPICS THAT
25 ALL RELATE TO THESE ISSUES THAT YOUR HONOR ORDERED

8

1 ON JANUARY 11, AND, IN ONE FORM OR ANOTHER, MATTEL
2 WILL BE PRODUCING WITNESSES TO TESTIFY TO.
3 MR. KENNEDY: YOUR HONOR, RAOUL KENNEDY. IF I
4 MIGHT RESPOND BRIEFLY.
5 MATTEL TOOK THE POSITION BOTH IN
6 OBTAINING LEAVE TO AMEND ITS PLEADINGS, AND IN
7 RESISTING THE MOTION FOR TERMINATING SANCTIONS,
8 BASED ON SPOLIATION OF EVIDENCE, THAT IT WAS NOT
9 UNTIL NOVEMBER OF 2003 THAT IT FIRST HAD ANY REASON
10 TO SUSPECT BRYANT'S INVOLVEMENT WITH BRATZ.
11 IN DECEMBER OF 2007, AFTER BOTH OF THOSE
12 RULINGS HAD BEEN MADE, MATTEL DISCLOSES FOR THE
13 FIRST TIME THAT WELL, YEAH, BACK IN 2001 AND 2002,
14 THERE WAS RUMOR AND INNUENDO THAT THAT MIGHT BE
15 GOING ON.
16 AND ABOUT THAT SAME TIME, MR. NOLAN
17 DEPOSED MR. DIANDA, MATTEL'S CHIEF OF WORLDWIDE
18 SECURITY, AND WE FIND OUT THAT HE, BACK IN AUGUST
19 OF 2002, WAS TOLD THAT BRYANT WAS HELPING MGA. AND
20 MR. DIANDA WROTE THAT HE WAS AWARE OF THIS
21 SITUATION AND HAD BEEN WORKING ON IT FOR SEVERAL
22 MONTHS. THIS IS AS OF AUGUST OF 2002, BUT THAT IT
23 WAS IN THE HANDS OF MATTEL'S ATTORNEYS.
24 SO THIS IS NOT A CASE WHERE WE JUST
25 DECIDED TO GO OUT ON A FISHING EXPEDITION AND SEE

9

1 IF MAYBE THERE'S SOME INVOLVEMENT THERE.
2 THIS IS A CASE WHERE MATTEL HAS BELATEDLY
3 DISCLOSED THAT THERE WAS AT LEAST RUMOR AND
4 INNUENDO -- AND OF COURSE WE'RE TALKING HERE NOT
5 ABOUT ADMISSIBILITY, BUT JUST ABOUT
6 DISCOVERABILITY.
7 AND WHEN WE ATTEMPT TO LEARN MORE ABOUT
8 THAT INNUENDO, THE ATTORNEY-CLIENT PRIVILEGE GETS
9 DROPPED ON US. BUT WE HAVE DOCUMENTARY EVIDENCE
10 THAT IN AUGUST OF 2002 THE HEAD OF SECURITY SAYS
11 THE LAWYERS ARE WORKING ON IT.
12 NOW, THAT'S ABOUT AS OVERWHELMING A
13 SUGGESTION OF INVOLVEMENT. AND AS RAMBUS AND OTHER
14 CASES MAKE CLEAR THE OBVIOUS, PEOPLE DON'T DECIDE
15 WHEN TO FILE AND WHEN TO TRY TO GET AROUND THE
16 STATUTE OF LIMITATIONS WITHOUT HEAVY INVOLVEMENT ON
17 THE PART OF THEIR LAWYERS.
18 SO I -- I APOLOGIZE, YOUR HONOR, FOR
19 REPEATING WHAT'S IN THE PAPERS. AGAIN, IF THE
20 COURT HAS QUESTIONS, I'M PREPARED TO TRY TO DEAL
21 WITH THEM. OTHERWISE, I'M PREPARED TO SUBMIT.
22 JUDGE INFANTE: WELL, ONE OF THE FACTORS OF THE
23 THREE-PART TEST UNDER HEARN IS WHETHER OR NOT THE
24 PRIVILEGED INFORMATION WOULD BE VITAL TO YOUR CASE.
25 AND THAT REALLY HAS WITHIN IT A QUESTION OF WHAT

EXHIBIT 7

PAGE 158

10

1 OTHER EVIDENCE IS AVAILABLE TO YOU.
2 I NOTE THAT YOU ARE GOING TO BE TAKING
3 THE DEPOSITION, IF YOU HAVEN'T ALREADY, WITH
4 RESPECT TO TOPICS NUMBERS 15 THROUGH 21 OF THE
5 30(B)(6), WHICH PRECISELY ADDRESSES THE UNDERLYING
6 ISSUES AS TO WHEN MATTEL KNEW SUFFICIENT FACTS TO
7 BRING ITS CLAIMS.
8 HAS THAT DEPOSITION TAKEN PLACE YET?
9 MR. KENNEDY: IT HAS NOT, YOUR HONOR.
10 WE HAVE BEEN ATTEMPTING TO MEET AND
11 CONFER CONCERNING GETTING OTHER FORMS OF DISCOVERY,
12 AS WELL AS THE 30(B)(6) DEPOS.
13 WE HAVE THE BENEFIT OF DOCUMENTS THAT IS
14 EXPLAINED IN OUR PENDING MOTION THAT OVERRULED THE
15 RELEVANCY OBJECTIONS REGARDING OTHER FORMS OF
16 DISCOVERY. MATTEL HAS NEVER EVEN GOTTEN BACK TO US
17 ON THE MEET AND CONFER.
18 SO THE SHORT ANSWER IS NO, THOSE
19 DEPOSITIONS HAVE NOT YET BEEN TAKEN.
20 JUDGE INFANTE: MY PROBLEM IS I CAN'T REALLY
21 FULLY ASSESS THAT MOST CRITICAL ELEMENT STATED IN
22 HEARN VERSUS RAY CASE; NAMELY, JUST HOW VITAL IS
23 THE PRIVILEGED INFORMATION IN THE CONTEXT OF ALL
24 THE EVIDENCE.
25 I'D LIKE TO QUOTE FROM MATTEL'S

11

1 OPPOSITION ON PAGE 17. IF YOU WOULD FOLLOW ME,
2 THIS IS AT LINE 9, ON PAGE 17:
3 "PURSUANT TO THE DISCOVERY
4 MASTER'S JANUARY 9TH, 2008 ORDER,
5 MATTEL WILL BE PRODUCING A DEPONENT
6 ON TOPIC NUMBERS 15 THROUGH 21.
7 MATTEL HAS NOT AND WILL NOT TAKE THE
8 POSITION THAT ITS UNDERLYING
9 KNOWLEDGE OR ANY UNDERLYING FACTS ARE
10 PRIVILEGED. MGA WILL THUS OBTAIN
11 TESTIMONY REGARDING MATTEL'S
12 KNOWLEDGE ON THE SUBJECTS OF THOSE
13 TOPICS." UNQUOTE.
14 I DON'T KNOW HOW THAT'S GOING TO PLAY
15 OUT. IF MATTEL KEEPS THAT PROMISE AND ALLOWS YOU
16 TO CONDUCT THE DEPOSITIONS AS TO TOPICS 15 AND 21,
17 WITH THE SPIRIT OF THAT STATEMENT, IT MAY VERY WELL
18 BE THAT THE PRIVILEGED INFORMATION WHICH YOU ARE
19 SEEKING WAIVER OF IS NOT VITAL TO PROVE YOUR
20 CONTENTIONS WITH RESPECT TO MATTEL'S KNOWLEDGE IN
21 THE APPLICATION OF THE STATUTE OF LIMITATIONS OR
22 LACHES DEFENSES.
23 THAT'S MY QUESTION TO YOU, MY STATEMENT
24 TO YOU -- TO BOTH OF YOU, ACTUALLY -- WHICH I THINK
25 SORT OF GOES TO THE CRUX OF THIS MOTION.

12

1 IF ANYONE WISHES TO COMMENT, YOU MAY.
2 MR. KENNEDY: YOUR HONOR, RAOUL KENNEDY
3 UNDER THOSE CIRCUMSTANCES, I WOULD
4 SUGGEST THAT THE COURT DENY THE MOTION WITHOUT
5 PREJUDICE OR RENEWING IT -- OR TO PERHAPS SAVE
6 PAPER, TAKE IT UNDER SUBMISSION, AND NOT RULE ONE
7 WAY OR THE OTHER TODAY; THAT WE WILL CONTINUE TO
8 MEET AND CONFER ON TRYING TO GET DEPOSITION DATES
9 AND TAKE THOSE DEPOSITIONS.
10 AND ALSO IF THE COURT COULD PUT MGA'S
11 NOTICE OF MOTION TO OVERRULE RELEVANCY OBJECTIONS
12 CONCERNING OTHER FORMS OF DISCOVERY TOWARDS THE TOP
13 OF ITS STACK SO THAT WE HAVE A RULING ON THAT AS
14 WELL.
15 JUDGE INFANTE: YES.
16 MR. KENNEDY: WE CAN THEN PROCEED AND LET'S SEE
17 WHAT'S IN THE PAPER DISCOVERY INTERROGATORIES, AND
18 IN THOSE DEPOSITIONS, AND THEN WITHOUT EITHER
19 PARTIES' PREJUDICE COME BACK AND PURSUE THE MATTER.
20 THAT WOULD BE MY PROPOSAL.
21 JUDGE INFANTE: THAT'S -- THAT'S PERHAPS A GOOD
22 PROPOSAL.
23 I WOULD LIKE TO ASK MATTEL'S COUNSEL.
24 MR. OLIVAR: YOUR HONOR, I THINK A DENIAL
25 WITHOUT PREJUDICE WOULD BE APPROPRIATE. IT'S BEEN

13

1 VERY CLEAR THAT IT IS NOT MATTEL'S INTENTION TO
2 DEPRIVE MGA OF THE UNDERLYING FACTS REGARDING ITS
3 KNOWLEDGE AS IT RELATES TO THE ALLEGATION IN THE
4 COMPLAINT, AND WE JUST DON'T GET THERE WITH RESPECT
5 TO LEGAL ADVICE, GIVEN THAT POSITION.
6 I THINK YOUR HONOR HIT THE NAIL ON THE
7 HEAD; WE HAVE PROVIDED UNDERLYING FACTS AND
8 CONTINUE TO DO SO IN RESPONSE TO THESE DEPOSITION
9 TOPICS.
10 IF MGA BELIEVES THERE IS ANY ISSUE ABOUT
11 UNDERLYING FACTS AFTER THESE DEPOSITIONS, COMING
12 BACK TO YOUR HONOR MIGHT BE APPROPRIATE. BUT I
13 THINK DENIAL WITHOUT PREJUDICE IS THE APPROPRIATE
14 RESULT AT THIS TIME.
15 JUDGE INFANTE: LET ME GIVE YOU A LITTLE BIT OF
16 GUIDANCE.
17 I THINK IT'S POSSIBLE TO WAIVE AN
18 ATTORNEY-CLIENT PRIVILEGE AND WORK PRODUCT
19 PRIVILEGE BY CHEATING AROUND THE STATUTE OF
20 LIMITATIONS WHERE YOU BRING A CLAIM THAT ON ITS
21 FACE MAY BE UNTIMELY. IT'S POSSIBLE.
22 THERE IS SOME CASE LAW THERE; IT'S
23 POSSIBLE. THE RULE OF WAIVER, AS APPLIED TO THESE
24 SITUATIONS, IS TRULY A RULE OF FAIRNESS. AND I
25 THINK YOU NEED TO MAKE SOME VERY CAREFUL DECISIONS

EXHIBIT ___7___

PAGE __159__

14

1   AS TO HOW YOU ALLOW THESE DEPOSITIONS TO BE
2   CONDUCTED, BECAUSE IT IS POSSIBLE THAT A COURT OR
3   SPECIAL MASTER COULD COME TO THE CONCLUSION THAT
4   THERE'S INADEQUATE INFORMATION TO YOUR ADVERSARY IN
5   A MATTER OF FAIRNESS, IN ORDER TO MEET WHAT YOU
6   HAVE PLED. AND SO YOU NEED TO KEEP THAT IN MIND.
7       AND I THINK THAT THE QUESTIONS THAT ARE
8   FRAMED AND PUT TO THE DEPONENTS NEED TO BE PROPERLY
9   PHRASED SO THAT BY ANSWERING THE QUESTION, THE
10  DEPONENT AND THE ATTORNEY FOR THE DEPONENT IS NOT
11  PERMITTING A WAIVER OF THE ATTORNEY-CLIENT
12  PRIVILEGE OR WORK PRODUCT PRIVILEGE BY ANSWERING
13  THE QUESTION.
14      I DON'T KNOW IF I'M MAKING ANY SENSE TO
15  YOU, BUT I THINK THAT THE CONDUCT OF THIS
16  DEPOSITION IS CRITICAL TO A FINAL DETERMINATION OF
17  THIS MOTION OF WHETHER OR NOT PRIVILEGE IS
18  IMPLIEDLY WAIVED.
19      AND SO WITH THAT, I'M GOING TO SIMPLY
20  TAKE THE MOTION UNDER SUBMISSION AND NOT DECIDE IT
21  AT THIS TIME.
22      AND I THINK YOU BOTH HAVE TO WORK VERY
23  HARD IN HAVING AN EFFECTIVE DEPOSITION. AND BOTH
24  OF YOU HAVE SOME RESPONSIBILITY IN THAT REGARD,
25  BOTH AS TO THE APPROPRIATE PHRASING OF THE

15

1   QUESTIONS, AND ALLOWING THE WITNESS TO ANSWER.
2       ANY OTHER COMMENTS?
3       MR. OLIVAR: JUST THANK YOU, YOUR HONOR. I
4   THINK THAT GUIDANCE IS HELPFUL.
5       JUDGE INFANTE: OKAY. SO WE'LL PASS THIS
6   MOTION.
7       WE COULD -- WHAT IS MOTION NUMBER 4?
8   THAT'S -- MGA HAS A MOTION, WHICH IS LISTED NUMBER
9   4 IN THE LETTER.
10      DO YOU WANT TO HEAR THAT NEXT?
11  MR. KENNEDY: CERTAINLY, YOUR HONOR.
12  JUDGE INFANTE: OKAY.
13  MR. KENNEDY: RAOUL KENNEDY.
14      WE BELIEVE THIS OVERLAPS, TO SOME EXTENT,
15  WITH MATTEL'S RENEWED MOTION FOR RECONSIDERATION
16  REGARDING SEARCHING OTHER EMPLOYEES' FILES,
17  VERIFICATIONS OF EFFORTS TO FORCED AND UNFORCED
18  COMPLIANCE WITH NONCONFIDENTIALITY AGREEMENTS.
19      YOUR HONOR WILL RECALL THAT RELATED TO
20  THE TOPIC 25 AND TOPIC 52, MEASURES TAKEN TO
21  ENFORCE AND FORMS OF SUCH DOCUMENTS.
22      AND THIS IS, AS I SAID, THE COROLLARY TO
23  THAT. AGAIN, IT'S BEEN BRIEFED. I DON'T WANT TO
24  WASTE VALUABLE TIME THIS MORNING REPEATING WHAT'S
25  IN THE -- THE PAPERS. BUT IF WE'RE TALKING ABOUT

16

1   DISCOVERABILITY. NONADMISSIBILITY. IT'S ABUNDANTLY
2   CLEAR UNDER CALIFORNIA LAW HOW A PARTY HAS
3   INTERPRETED THE SAME OR EVEN SIMILAR LANGUAGE AS
4   THE MOVING CASE, JUDGE BURNS DEALT WITH THAT ISSUE.
5   HE'S PARTICULARLY INSTRUCTIVE ON THAT POINT.
6       AS FAR AS THE BURDEN ARGUMENT, IT SEEMS
7   TO BE A SELF-DEFEATING AGREEMENT FOR MATTEL, WHICH
8   ONE WOULD HOPE THAT THERE WOULD HAVE BEEN
9   COMPARATIVELY FEW INSTANCES OVER THE YEARS WHERE
10  MATTEL HAS ACTUALLY GOTTEN INTO A DISPUTE OVER WHAT
11  THE NONDISCLOSURE LANGUAGE MEANT.
12      HOWEVER, THOUGH, TO THE EXTENT THAT'S NOT
13  CORRECT, AND THE MORE OTHER DISPUTES AND EPISODES
14  THERE'S BEEN, SEEMS TO ME THE GREATER IT SUGGESTS
15  THAT THERE IS UNCERTAINTY IN THE LANGUAGE -- OR
16  MATTEL CERTAINLY CREATED UNCERTAINTY AMONG ITS
17  EMPLOYEES AS WE GET INTO HYPOTHETICALLY LARGER AND
18  LARGER NUMBERS OF THEM THAT CAN'T COMPLY.
19      SO I SUBMIT ON THE BURDEN SCALE, SHOW ME
20  ADDITIONAL BURDEN AND I'LL SHOW YOU ADDITIONAL
21  REASONS FOR RELEVANCY. IT'S SIMPLY FOR INCREASED
22  DISCOVERABILITY.
23      AGAIN, IF THE COURT HAS QUESTIONS, I
24  WOULD BE PLEASED TO TRY TO ADDRESS THEM, BUT I
25  DON'T NEED TO REPEAT WHAT'S ALREADY EXHAUSTIVELY

17

1   BEEN BRIEFED.
2       JUDGE INFANTE: THIS MOTION HAS A COUSIN TO IT;
3   NAMELY, MATTEL'S MOTION FOR RECONSIDERATION OF THE
4   SPECIAL MASTER'S SEPTEMBER ORDER WITH DOCUMENT
5   DISCOVERY ON THIS VERY TOPIC, AND THAT MOTION HAS
6   NOT BEEN FULLY RESOLVED.
7       MR. KENNEDY: THAT'S CORRECT. THERE IS A
8   MOTION FOR RECONSIDERATION, AND THE COURT -- I
9   BELIEVE IT WAS THE JANUARY 3 HEARING -- GRANTED
10  MATTEL PERMISSION TO FILE THE RENEWED MOTION FOR
11  RECONSIDERATION. AND THAT'S AMONG THE MOTIONS
12  THAT'S NOW FULLY BRIEFED AND BEFORE THE COURT.
13      JUDGE INFANTE: I THINK WE NEED TO DECIDE THAT
14  MOTION AS WELL AS THIS ONE TOGETHER.
15      I'LL HEAR FROM MATTEL NOW.
16      MR. ALGER: GOOD MORNING, YOUR HONOR. THIS IS
17  TIM ALGER, FOR MATTEL.
18      JUST TO CORRECT THE RECORD A LITTLE BIT,
19  THE COURT GRANTED MATTEL THE RIGHT TO RENEW THE
20  MOTION, AND TO -- TO RESULT IN A FULL BRIEFING ON
21  THE ISSUE OF WHETHER MGA AND BRYANT WERE ENTITLED
22  TO DISCOVERY ABOUT OTHER EMPLOYMENT AGREEMENTS,
23  BECAUSE THE UNCONSCIONABILITY DEFENSE HAD BEEN
24  WITHDRAWN. AND THAT WAS A DECISION THAT THE -- THE
25  DISCOVERY MASTER MADE LATE LAST YEAR.

EXHIBIT ___7___

18

1	THEN IN JANUARY -- WE HAD A HEARING ON
2	JANUARY 3RD THAT WAS SET FOR BOTH OF THESE MOTIONS,
3	AND -- AND AT THE DATE -- AT THE HEARING, MATTEL
4	WAS SERVED WITH A REPLY BRIEF WITH NEW ARGUMENTS
5	AND NEW AUTHORITIES.  AND, AT THAT POINT, THE
6	DISCOVERY MASTER OPTED, WITH THE AGREEMENT OF THE
7	PARTIES, TO KICK IT OVER TO FEBRUARY.  THAT'S WHERE
8	WE ARE WITH THAT.
9	    THE MOTION ON -- THE OTHER MOTION FOR
10	RECONSIDERATION HAS BEEN FULLY BRIEFED, AND I THINK
11	THE BRIEFING IS QUITE GOOD ON THAT, AND MATTEL
12	CERTAINLY CAN RELY -- IS WILLING TO RELY ON THAT
13	BRIEFING.
14	    AS TO THE OTHER MOTION, MGA'S MOTION
15	WHICH IS ON THE CALENDAR FOR TODAY, I DID WANT TO
16	ADDRESS SOME THINGS THAT WERE RAISED IN THE REPLY,
17	SOME OF WHICH HAD CAME UP LATE.
18	    WHAT'S HAPPENED HERE, I THINK THE
19	DISCOVERY MASTER HAS RECOGNIZED THIS, GIVEN THAT
20	MGA AND BRYANT DON'T HAVE THE UNCONSCIONABILITY
21	DEFENSE ANYMORE -- OR CLAIM ANYMORE, THEY'VE NOW
22	SHIFTED OVER TO AN AMBIGUITY ARGUMENT.  AND THEY'VE
23	TRUMPED UP THIS AMBIGUITY CONTENDING THAT THERE IS
24	AN EXCLUSION OR A LOOPHOLE FOR COPYRIGHTED SUBJECT
25	MATTER IN THE INVENTIONS AGREEMENT, AND THAT --

19

1	THAT AMBIGUITY, THEY CLAIM, ALLOWS BROAD DISCOVERY.
2	    AND THE FACT OF THE MATTER IS THAT IF
3	THIS DISCOVERY WAS ALLOWED, IT WOULD BE A RADICAL
4	EXPANSION OF THE LAWSUIT, RESULTING IN MANY TRIALS
5	INVOLVING PERHAPS HUNDREDS OF EMPLOYEES.
6	    BUT THE MOST IMPORTANT THING I WANT TO
7	EMPHASIZE TODAY IS THE AMBIGUITY THAT THEY CONTEND
8	EXISTS, DOES NOT EXIST.  IT DOESN'T EXIST AT ALL.
9	    AND I DIRECT THE DISCOVERY MASTER TO
10	THE INVENTIONS AGREEMENT ITSELF, WHICH IS ATTACHED
11	TO MR. MUMFORD'S DECLARATION, EXHIBIT 8.  AND
12	THERE, IN PARAGRAPH -- IN SECTION 2(A), MR. BRYANT
13	DID THE FOLLOWING:
14	    "I HEREBY ASSIGN TO THE COMPANY
15	    AND/OR ITS NOMINEES ALL MY RIGHT,
16	    TITLE, AND INTEREST IN SUCH
17	    INVENTIONS, DEFINED BELOW, AND ALL MY
18	    RIGHT, TITLE, AND INTEREST IN ANY
19	    PATENTS, COPYRIGHTS, PATENT
20	    APPLICATIONS, OR COPYRIGHT
21	    APPLICATIONS BASED THEREON."
22	    AND IT GOES ON TO DEFINE INVENTIONS AS
23	INCLUDING, BUT NOT LIMITED TO, DISCOVERIES,
24	IMPROVEMENTS, PROCESSES, DEVELOPMENTS, DESIGNS,
25	KNOW-HOW, DATA COMPUTER PROGRAMS, AND SO FORTH.

20

1	AND THE FACT OF THE MATTER IS THERE'S NO
2	AMBIGUITY HERE.  AND THE WARNERS BROS. CASE DOESN'T
3	COME TO CLOSE TO THIS CASE, AND THEIRS WASN'T A
4	DISCOVERY DISPUTE AT ALL.  IT WAS A BENCH TRIAL,
5	AND OTHER AGREEMENTS THAT WERE SIMILAR AGREEMENTS
6	WERE PRESENTED DURING THE BENCH TRIAL.  IT WASN'T
7	AN ISSUE OF BURDEN ADDRESSED BY JUDGE BURNS IN THAT
8	CASE AT ALL.  BUT THE AMBIGUITY WAS QUITE CLEAR IN
9	THAT DISPUTE.
10	    THEY WERE -- THEY WERE ARGUING IN THAT
11	CASE ABOUT A 1954 AGREEMENT THAT USED THE WORD --
12	OR THE PHRASE "OR OTHERWISE" AND WHETHER "OR
13	OTHERWISE," INCLUDED PUBLICITY RIGHTS.
14	    WE DON'T HAVE ANYTHING LIKE THAT HERE.
15	WE'VE GOT A QUITE CLEAR AGREEMENT THAT COVERS
16	COPYRIGHTS.  SO TO GO OFF AND TRY TO FIND SOME --
17	DEAL WITH OTHER PEOPLE'S AGREEMENTS THAT DEAL WITH
18	MATTEL IS A WILD GOOSE CHASE.
19	    SECOND, THE CASES THAT ARE CITED BY MGA
20	AND BRYANT IN THIS DISPUTE ARE ALL GAP FILLER
21	CASES, AND WE DON'T HAVE A GAP FILLING PROBLEM
22	HERE.  WE'VE GOT AN INTERPRETATION ISSUE.  AND TO
23	THE EXTENT MGA CAN ARGUE INTERPRETATION, THEY'VE
24	GOT WHAT THEY NEED ON INTERPRETATION.
25	    WE HAVE -- MATTEL HAS PRODUCED TO MGA AND

21

1	BRYANT ALL FORM AGREEMENTS FOR THE INVENTORSHIP AND
2	FOR THE DISCLOSURES SINCE 1995.  THEY HAVE ALL
3	THOSE FORMS.
4	    SO TO THE EXTENT THAT THEY WANT TO ARGUE
5	THAT THERE WAS SOME MATERIAL CHANGE OR SOME
6	LOOPHOLE THAT WAS CREATED BY THE CHANGE IN THE
7	AGREEMENT, REVISIONS OF THE AGREEMENTS OVER THE
8	COURSE OF YEARS, THEY HAVE THE EVIDENCE THAT THEY
9	NEED FOR THAT.
10	    SO THEN WE MOVE ON TO THE QUESTION OF --
11	WHICH MR. KENNEDY KIND OF GLOSSED OVER -- AND THAT
12	IS BURDEN.  THE BURDEN HERE IS NOT THE DISCLOSURE
13	OF DOCUMENTS.  THE BURDEN IS THE SEARCH.  AND WE
14	POINTED THAT OUT, BOTH IN THIS OPPOSITION TO THIS
15	MOTION, AND ALSO IN OUR MOTION FOR RECONSIDERATION.
16	THE SEARCH ISSUE, THE THOUSANDS OF EMPLOYEES THAT
17	HAVE GONE THROUGH MATTEL'S EL SEGUNDO HEADQUARTERS
18	OVER THE YEARS.  MANY HAVE GONE, MANY ARE STILL
19	THERE, AND THE BREADTH OF THE REQUESTS THAT THEY'VE
20	MADE, INCLUDING ALL EFFORTS TO ENFORCE COMPLIANCE,
21	ALL FORMS THAT ALL THESE EMPLOYEES HAVE SIGNED.
22	THAT WOULD INCLUDE, OBVIOUSLY, VIRTUALLY EVERYTHING
23	IN THEIR EMPLOYMENT FILES, RANGING FROM MEDICAL
24	AGREEMENTS, TO 401(K)'S, PERFORMANCE RESULTS THAT
25	THEY HAVE TO SIGN, A WHOLE BROAD SWATH OF

EXHIBIT 7

22

1  AGREEMENTS THEY HAVE TO SIGN; COMMUNICATIONS WITH
2  EMPLOYEES DURING THE COURSE OF THEIR EMPLOYMENT, AS
3  TO WHETHER THEY HAD -- IF THEIR ISSUE CAME UP
4  REGARDING MOONLIGHTING OR OTHER SPECIAL SITUATIONS
5  THAT THEY MADE REQUESTS ABOUT; COMMUNICATIONS WITH
6  THEIR SUPERVISORS.
7      THE THOUSANDS AND THOUSANDS OF HOURS THAT
8  IT WOULD TAKE TO TRACK THIS DOWN, ALL FOR
9  INFORMATION THAT HAS NO RELEVANCE, WHERE WE'VE GOT
10 NO AMBIGUITY IN THE CONTRACT, AND WE HAVE NO GAP
11 THAT NEEDS TO BE FILLED. THAT WE SUBMIT, YOUR
12 HONOR.
13     JUDGE INFANTE: ALL RIGHT. LET ME DEAL WITH
14 THE MOTION, WITH RESPECT TO TOPICS 25 AND 52, THE
15 30(B)(6) DEPOSITION NOTICE WHICH ORIGINALLY WAS
16 SERVED ON DECEMBER '04.
17     THE MOTION TO OVERRULE MATTEL'S RELEVANCY
18 OBJECTIONS AND COMPEL DISCOVERY ON THOSE TOPICS IS
19 DENIED. I FIND THAT BOTH TOPICS BETWEEN THE 25 AND
20 52 ARE GROSSLY OVERBROAD, SEEK IRRELEVANT
21 INFORMATION, AND CREATE UNDUE BURDEN.
22     TO THE EXTENT THAT PORTIONS OF WHAT IS
23 SOUGHT IN THOSE TOPICS IS RELEVANT, THAT RELEVANCY
24 IS SUBSTANTIALLY OUTWEIGHED BY THE ENORMOUS BURDEN
25 IT WOULD TAKE TO PREPARE WITNESSES TO DEAL WITH THE

23

1  SCOPE OF THESE TOPICS. IN MY VIEW, ALSO, IT'S NOT
2  LIKELY TO LEAD TO ADMISSIBLE EVIDENCE. AND FOR ALL
3  THOSE REASONS, I WOULD DENY THAT MOTION.
4      NOW, I'D LOOK LIKE TO GO BACK TO THE
5  UNDERLYING MOTION FOR RECONSIDERATION. WITH
6  RESPECT TO THE DOCUMENT REQUESTS THAT WERE AT ISSUE
7  BACK IN SEPTEMBER, WHICH I ORDERED PRODUCED, WITH
8  RESPECT TO THOSE, MY JUDGMENT IS TO ONLY PARTIALLY
9  GRANT THE MOTION FOR RECONSIDERATION, BY LIMITING
10 MY ORDER TO THE FEW HUNDRED PEOPLE THAT WERE
11 EMPLOYED IN THE DESIGN CENTER -- THE DESIGN CENTER
12 WHERE BRYANT WORKED.
13     ESSENTIALLY, THAT'S THE ONLY CHANGE TO MY
14 ORDER.
15     ARE THERE ANY QUESTIONS WITH RESPECT TO
16 THAT?
17     MR. ALGER: YOUR HONOR, I DO HAVE A QUESTION AS
18 TO THE LAST PART OF YOUR ORDER. AND THAT IS: THE
19 PEOPLE IN THE DESIGN CENTER. IS THAT LIMITED AS TO
20 TIME? BECAUSE OVER THE COURSE OF YEARS IT WOULD BE
21 QUITE A LARGE NUMBER OF PEOPLE.
22     JUDGE INFANTE: WELL, I DON'T HAVE THE REQUEST
23 DIRECTLY IN FRONT OF ME, BUT I BELIEVE THE
24 REQUEST -- I DON'T RECALL WHETHER THE REQUEST WAS
25 LIMITED IN TIME.

24

1  COULD YOU HELP ME ON THAT.
2      IF NOT, I WOULD ASK MR. KENNEDY: WHAT'S
3  YOUR PROPOSAL WITH RESPECT TO SCOPE?
4      I THINK, ROUGHLY, WE WERE TALKING 1995 TO
5  EITHER THE PRESENT OR TO SOMETHING WITHIN A YEAR
6  AFTER THE LAWSUIT WAS FIRST FILED. I DON'T RECALL
7  OUR DISCUSSION ON THAT PARTICULAR POINT.
8      DO YOU HAVE ANY COMMENTS?
9      MR. KENNEDY: I DON'T RECALL OUR DISCUSSING
10 SPECIFIC TIME LIMITS IN THE PAST. BUT WE WOULD
11 CERTAINLY LIVE WITH, SAY, 1998 TO A YEAR AFTER THE
12 FILING OF THE LAWSUIT.
13     JUDGE INFANTE: ALL RIGHT. THAT'S ACCEPTABLE.
14 I MEAN, YES, TO THE EXTENT YOU FEEL THESE DOCUMENTS
15 COULD LEAD TO ADMISSIBLE EVIDENCE, TO SHOW MATTEL'S
16 PRACTICES IN CONDUCT, WITH RESPECT TO EMPLOYEE
17 CONFIDENTIAL INFORMATION AND INVENTION AGREEMENTS
18 AND CONFLICT OF INTEREST QUESTIONNAIRES, I'M TRYING
19 TO GIVE YOU SOME OF THAT DOCUMENT DISCOVERY, AND SO
20 1998 TO ONE YEAR AFTER THE FIRST LAWSUIT WAS FILED.
21     MR. ALGER: AND THAT WOULD -- YOUR HONOR, THAT
22 WOULD BE DESIGNERS; CORRECT?
23     JUDGE INFANTE: THAT WOULD BE -- WELL, I THINK
24 IT'S DESIGNERS -- IT'S THE PEOPLE THAT WERE
25 EMPLOYED IN THE DESIGN CENTER WHERE BRYANT WORKED.

25

1  OBVIOUSLY, I DON'T KNOW HOW MANY PEOPLE
2  THAT IS. BUT, AS I RECALL IN THE BRIEFING, IT WAS
3  SUGGESTED THAT THERE WERE APPROXIMATELY 700 PEOPLE,
4  AS OPPOSED TO WHAT WOULD HAVE BEEN THOUSANDS OF
5  PEOPLE, AS THE ORDER ORIGINALLY ADDRESSED.
6      MR. ALGER: THE REASON WHY I'M ASKING ABOUT
7  DESIGNERS IS THAT I THINK THAT PEOPLE ARE
8  CATEGORIZED IN THE -- IN MATTEL BY THEIR JOB ROLES,
9  SUCH AS DESIGNER, RATHER THAN THEIR PHYSICAL
10 LOCATION.
11     AND, FOR EXAMPLE, RIGHT NOW, MANY OF THE
12 MARKETING PEOPLE AT MATTEL ARE NOW IN THE DESIGN
13 CENTER. THERE IS A SIGNIFICANT NUMBER OF PEOPLE IN
14 THE DESIGN CENTER THAT ARE NOT DESIGNERS THAT HAVE
15 OTHER TASKS.
16     JUDGE INFANTE: BUT THE RELEVANCE MAY APPLY,
17 BECAUSE MARKETING PEOPLE SIGNED THESE CRITICAL
18 DOCUMENTS. THAT COULD BE THE SUBJECT
19 OF VIOLATIONS. OBVIOUSLY, WE DON'T WANT TO SWEEP
20 IN JANITORS, BUT I DON'T THINK IT SHOULD BE LIMITED
21 TO DESIGNERS.
22     MR. ALGER: OKAY. YOUR HONOR. OKAY. WE'LL DO
23 OUR BEST ON THAT. IT IS DIFFICULT TO -- GIVEN THE
24 THOUSANDS OF FILES THAT WE HAVE TO --
25     JUDGE INFANTE: WELL, I THINK THE ESTIMATE WAS

26

1 700 PEOPLE OR -- WERE EMPLOYED IN THE DESIGN
2 CENTER, THAT'S WHAT THE PAPERS SAID.
3     IN FACT, IF YOU -- IF YOU GO TO PAGE 4 OF
4 YOUR REPLY BRIEF ON THE MOTION FOR RECONSIDERATION,
5 AT LINE 25, FOR EXAMPLE, DISCOVERY IN THE CASE
6 INDICATES THAT APPROXIMATELY 700 PEOPLE ARE
7 EMPLOYED IN THE DESIGN CENTER WHERE BRYANT WORKED.
8     MGA WOULD BE WILLING TO EXPLORE A PHASED
9 PRODUCTION, UNDER WHICH FILES FOR EMPLOYEES, WHILE
10 SIMILARLY SITUATED TO BRYANT, ARE TO BE PRODUCED,
11 AFTER WHICH THE PARTIES CAN EVALUATE ON THAT.
12     WHILE I'M NOT GIVING YOU EXACTLY WHAT YOU
13 ALLUDED TO THERE, I'D LIKE YOU TO PRODUCE THE
14 DOCUMENTS THAT ARE RESPONSIVE TO THOSE REQUESTS
15 THAT I ORDERED, BUT LIMITED TO EMPLOYEES IN THE
16 DESIGN CENTER THAT BASICALLY CAME IN CONTACT WITH
17 CONFIDENTIAL INFORMATION.
18     MR. ALGER: OKAY, YOUR HONOR.
19     JUDGE INFANTE: I WOULD LIKE YOU TO PREPARE AN
20 ORDER GRANTING THE MOTION FOR RECONSIDERATION TO
21 THAT EXTENT. AND YOU CAN MEET AND CONFER REGARDING
22 THE EXACT LANGUAGE OF THAT ORDER.
23     YOU ARE BOTH POSITIONED BETTER THAN I
24 WITH RESPECT TO WHO WOULD FIT WITHIN THAT ORDER.
25     MR. ALGER: THANK YOU, YOUR HONOR.

27

1     JUDGE INFANTE: SO THE MOTION FOR
2 RECONSIDERATION IS GRANTED IN PART. AND PLEASE
3 PREPARE AN ORDER, AND THAT WILL CLOSE THE DOOR ON
4 THAT.
5     YOU MAY ALSO PREPARE AN ORDER THAT IS
6 DENYING MGA'S MOTION TO OVERRULE MATTEL'S RELEVANCY
7 OBJECTIONS AND TO COMPEL DISCOVERY RELEVANT TO
8 MATTEL'S TOPIC 25 AND 52 OF THE 30(B)(6)
9 DEPOSITION.
10     MR. ALGER: THANK YOU, YOUR HONOR.
11     JUDGE INFANTE: OKAY. ANY QUESTIONS?
12     MR. KENNEDY: YOUR HONOR, I JUST WANT TO MAKE
13 SURE THAT WE HAVE CLOSURE. IT'S PEOPLE IN THE
14 DESIGN CENTER. BECAUSE WE HAVE SCULPTORS, FOR
15 EXAMPLE, THAT MIGHT BE DIFFERENT THAN DESIGNERS, SO
16 IT'S NOT BEING LIMITED JUST TO DESIGNERS.
17     JUDGE INFANTE: NO, IT'S NOT. IT'S BASICALLY
18 ANYONE WHO CAME IN CONTACT WITH CONFIDENTIAL
19 INFORMATION, THAT WAS REQUIRED TO -- BASICALLY
20 WOULD BE REQUIRED TO SIGN THE EMPLOYEE CONFIDENTIAL
21 INFORMATION AND INVENTIONS AGREEMENT OR VARIOUS
22 VERSES OF IT.
23     MR. KENNEDY: I'M SORRY, YOUR HONOR. IN
24 LOOKING AT MY NOTES, I REALIZE MR. BRYANT FIRST
25 WENT TO WORK BACK IN 1995.

28

1     JUDGE INFANTE: THAT'S WHY I USED '95.
2     MR. KENNEDY: I PICKED UP ON THAT SUGGESTION.
3     MAY I ASK IT BE -- A MODIFICATION BE MADE
4 FOR 1995 THROUGH A YEAR AFTER THE FILING?
5     JUDGE INFANTE: THAT'S WHAT I WAS INCLINED TO
6 GIVE YOU UNTIL YOU INSERTED 1998.
7     MR. KENNEDY: IF WE CAN GO BACK TO THAT
8 PROPOSAL, I WOULD SUGGEST '95.
9     JUDGE INFANTE: '95 WOULD BE THE RELEVANT DATE.
10     MR. ALGER: YOUR HONOR, I'M SORRY TO BELABOR
11 THIS. I KNOW TIME IS WASTING HERE.
12     THE PROBLEM NOW IS THE ORDER KEEPS
13 EXPANDING OUT, AND NOT ONLY DO WE HAVE --
14     JUDGE INFANTE: NO, IT'S NOT. MY ORIGINAL
15 ORDER IN SEPTEMBER WAS A LOT WORSE THAN WHAT I JUST
16 ORDERED.
17     THE ARGUMENT IS CEASED ON THIS POINT.
18 THAT IS THE DECISION.
19     SHALL WE MOVE ON.
20     MR. ALGER: THANK YOU, YOUR HONOR.
21     JUDGE INFANTE: I WILL HEAR THE NEXT MOTION,
22 WHICH IS ON THE FEBRUARY 6TH LETTER.
23     MATTEL'S MOTION TO COMPEL RESPONSES TO
24 INTERROGATORIES NUMBERS 27 TO 44, 46 TO 50, BY MGA.
25 THIS WAS FILED DECEMBER 21 OF '07. AND THERE IS A

29

1 RELATED MOTION, MATTEL'S MOTION TO COMPEL RESPONSES
2 TO INTERROGATORIES SERVED ON CARTER BRYANT. THAT
3 MOTION, I BELIEVE, WAS FILED DECEMBER 13TH OF '07.
4     THOSE MOTIONS MAY BE HEARD.
5     MR. ALGER: GOOD MORNING, YOUR HONOR. TIM
6 ALGER AGAIN, STILL ON DECK HERE -- OR THE BATTER'S
7 PLATE.
8     THESE RESPONSES, I'D LIKE TO GO THROUGH
9 AND PROBABLY START OUT BY JUST DEALING WITH THEM IN
10 TOTAL. AND THAT IS THAT THE FACT OF THE MATTER IS
11 THE RESPONSES ARE SO HEDGED AS TO BE USELESS. THE
12 OTHER PARTIES -- MGA AND BRYANT, IN THEIR
13 RESPECTIVE RESPONSES, HAVE QUALIFIED THEIR
14 RESPONSES BY REFERENCE TO PATENT LAW, NONE OF WHICH
15 IS IN OUR REQUEST.
16     WE ASK -- WE GIVE VERY CLEAR DEFINITIONS
17 THAT ARE COMPREHENSIVE, AND WE ATTEMPT TO MAKE THEM
18 COMPREHENSIVE BY USING A VARIETY OF WORDS THAT MAKE
19 SURE THAT THEY CAN'T BE AVOIDED, TO AVOID WIGGLE
20 ROOM ON THE OTHER SIDE, SO THEY HAVE TO RESPOND AND
21 GIVE US THE INFORMATION WE SEEK.
22     WHAT THE OTHER SIDE HAS DONE IS AVOID
23 RESPONDING. THEY TRIED TO PARSE THE -- THESE
24 DEFINITIONS UP, AND TRY TO MAKE OUT THAT WE'RE
25 ASKING A MULTITUDE OF QUESTIONS, WHEN, IN FACT,

EXHIBIT 7

PAGE 163

30

1  WE'RE SIMPLY TRYING TO BE COMPREHENSIVE.
2     THIS IS NOT A PATENT CASE. THE REQUESTS
3  ARE NOT GEARED FOR PATENT INFORMATION. WE'RE
4  ASKING ABOUT THE INVENTION OF THE PRODUCTS, AND
5  IT'S QUITE CLEAR.
6     SECOND, WE HAVE -- AS SHOWN IN OUR PAPERS
7  AND IN THE PAPER TRAIL -- WE'RE SORRY THERE'S SO
8  MUCH PAPER, BECAUSE I SPENT ALL OF YESTERDAY GOING
9  THROUGH IT ALSO, I KNOW HOW VOLUMINOUS IT IS.
10  MGA AND BRYANT HAVE SAID THAT THEY'RE
11  ONLY GOING TO DISCLOSE PRINCIPAL FACTS. AND THAT'S
12  CONTRARY TO THE LAW. THE CONTENTION
13  INTERROGATORIES ARE ALLOWED TO ELICIT ALL THE
14  FACTS, AND PARTIES ARE -- CAN BE COMPELLED TO
15  DISCLOSE THEIR POSITIONS, BASED ON THOSE FACTS.
16  SUCH THAT THERE'S NO GUESSING GAME GOING INTO
17  TRIAL. THEY HAVE TO COMMIT TO A POSITION AND GIVE
18  THE FACTUAL SUPPORT.
19     AT THE END OF THE DAY, WE NEED AN ORDER
20  THAT REQUIRES MGA AND BRYANT TO GIVE COMPLETE AND
21  FULL RESPONSES WITHOUT CONDITION, AND -- TO THESE
22  INTERROGATORIES, AND OVERRULING ANY OBJECTION SO WE
23  GET STRAIGHT ANSWERS TO THE REQUESTS.
24     THERE ARE SOME SPECIFIC CATEGORIES THAT
25  WE SHOULD ALSO TOUCH ON THAT -- MY ARGUMENT THUS

31

1  FAR HAS DEALT MOSTLY WITH THE CONTENTION-TYPE
2  INTERROGATORIES AND THE 'ROGS INVOLVING THE TIMING
3  OF INVENTIONS. BUT ALSO JUST TO TOUCH ON THE OTHER
4  ISSUES. WE -- THE FORMER MATTEL EMPLOYEES REQUEST,
5  WHICH IS 'ROG 41 IN THE MGA REQUEST, AND I THINK
6  BRYANT HAS A SIMILAR -- HAVE SIMILAR NUMBERING --
7  THEY REFUSE TO GIVE US FIRST CONTACT INFORMATION
8  AND INTERVIEW INFORMATION FOR THESE PEOPLE, WHICH
9  IS RELEVANT TO OUR CLAIMS REGARDING THE FACT THAT
10  MGA INDUCED PEOPLE TO COME TO THEM, AND INDUCED
11  PEOPLE TO TAKE INFORMATION WITH THEM -- CONTINUE TO
12  WORK AT MATTEL AND TAKE INFORMATION WITH THEM AS
13  THEY DEPARTED.
14     WE ALSO -- WE'VE ALSO FOUND THAT THERE IS
15  A LACK OF INFORMATION ABOUT DOCUMENTS THROUGHOUT
16  ALL THESE INTERROGATORIES, AND I THINK THAT'S QUITE
17  CLEAR. VIRTUALLY EVERY INTERROGATORY LACKS ANY
18  SPECIFICATION OF DOCUMENTS.
19     MATTEL IN ITS INTERROGATORY RESPONSES HAS
20  PROVIDED IDENTIFICATION OF DOCUMENTS BY BATES
21  NUMBER. WE FULLY RESPONDED TO THE INTERROGATORY --
22  CONTENTION INTERROGATORIES.
23     WE ALSO -- THE INTERROGATORIES 48 AND 49,
24  ASKING ABOUT TRADE DRESS ARE GROSSLY INADEQUATE.
25  THERE'S VIRTUALLY NO INFORMATION ABOUT THE TRADE

32

1  DRESS CLAIMS IN 48 AND 49.
2     THERE'S VIRTUALLY NO INFORMATION ABOUT
3  THE COPYING OF PRODUCTS AND PACKAGING, 43 AND 44.
4  AND THEN ON 39, WHICH ASKED FOR BANK ACCOUNT
5  INFORMATION, THERE'S NO RESPONSE AT ALL. AND THE
6  ARGUMENT MADE THERE, WHICH I'M SURE WE'LL HEAR, IS
7  THAT THIS IS GOING TO BURDEN OTHER PARTIES WITH
8  SUBPOENAS. AND THAT'S -- THAT'S AN IMPROPER
9  OBJECTION.
10     THIS IS BASIC INFORMATION THAT'S READILY
11  AVAILABLE TO THE DEFENDANTS AND THEY SHOULD BE ABLE
12  TO PROVIDE IT TO US. AND, AS TO THE BURDEN, THE
13  PROPRIETY AND THE BURDEN THAT'S IMPOSED BY ANY
14  SUBPOENAS THAT MIGHT OR MIGHT NOT COME, THAT SHOULD
15  BE ADDRESSED AT THE APPROPRIATE TIME.
16     FINALLY, SOURCES OF DOCUMENTS. WE'RE
17  GOING TO HAVE A DISCUSSION ABOUT THAT IN A FEW
18  MOMENTS. IT'S INTERESTING THAT THEY -- MGA IS
19  SEEKING INFORMATION ABOUT OUR SOURCES OF DOCUMENTS
20  IN 40 -- IN THEIR INTERROGATORIES AND IN THEIR
21  MOTION ON E-MAILS, BUT ON 40 AND 47, THEY REFUSE TO
22  GIVE US A RESPONSE.
23     AND THEN, FINALLY, 46, INVOLVING THE
24  DISPUTES BETWEEN MGA'S PRIOR COUNSEL AND MGA, WE'VE
25  EXPRESSLY EXCLUDED -- WE'VE EXPRESSLY EXCLUDED

33

1  PRIVILEGED DOCUMENTS AND INFORMATION FROM THAT
2  REQUEST, AND THEY SHOULD BE COMPELLED TO ANSWER
3  THAT QUESTION AS WELL.
4     WE'VE MADE QUITE CLEAR THAT -- THAT
5  THEY -- THEY MADE PUBLIC STATEMENTS ABOUT THE
6  DEPARTURE OF FORMER COUNSEL, AND THERE'S REASONS TO
7  BELIEVE THAT THERE MAY HAVE BEEN AN EFFORT TO
8  PURSUE AN ILLEGAL COURSE OF CONDUCT, WHICH IS NOT
9  PRIVILEGED, IN ANY EVENT. SO WE -- THEY SHOULD BE
10  ABLE TO GIVE US AN ANSWER TO 46 WITHOUT A PROBLEM.
11     THANK YOU, YOUR HONOR.
12     JUDGE INFANTE: THANK YOU, MR. ALGER.
13     I'LL HEAR FROM MGA.
14     MR. KENNEDY: THANK YOU, YOUR HONOR.
15     FIRST, BEFORE THIS MOTION WAS FILED ON
16  DECEMBER 20, WE TOLD MATTEL THAT WE WERE GOING TO
17  BE FILING SUBSTANTIAL SUPPLEMENTAL RESPONSES, AND
18  WE WENT AHEAD AND DID SO ON JANUARY 7.
19     WE ALSO FILED FURTHER, NOT QUITE AS
20  SUBSTANTIAL, BUT CLARIFYING OUR SUPPLEMENTAL
21  RESPONSES ON JANUARY 28. AND WE NEVER HEARD ONE
22  WORD OR COMPLAINT ABOUT THE ADEQUACY OF THOSE
23  SUPPLEMENTAL RESPONSES.
24     SO WE'RE REALLY HERE TODAY WORKING ON
25  YESTERDAY'S NEWS, BUT THIS IS WHAT'S BEFORE THE

EXHIBIT ___7___

34

1    COURT.

2        THE SITUATION IS THE SAME FOR MR. BRYANT.

3    HE ALSO FILED VERY SUBSTANTIAL ADDITIONAL

4    RESPONSES, SO I QUESTION WHETHER WE REALLY EVEN

5    HAVE A TIMELY MOTION BEFORE US.

6        ON A PROCEDURAL FRONT ALSO, ON

7    FEBRUARY 4, JUDGE LARSON CLARIFIED, AND THAT

8    CLARIFICATION WAS NEEDED, THAT PHASE II DISCOVERY

9    IS BIFURCATED.  AND I SUBMIT, AT LEAST AS TO

10   QUESTIONS 43, 44, 48, 49, 50, ARE CLEARLY ALL

11   PHASE II, AND THERE MAY BE PORTIONS OF SOME OF THE

12   OTHERS THAT ARE AS WELL.

13       TO THE EXTENT THE COURT WILL ADDRESS THE

14   SUBSTANTIVE COMPLAINTS, I THINK THEY CAN BE

15   GROUPED.  THE BIGGEST ONE IS THE CONTENTION

16   INTERROGATORIES, IF I CAN CALL THEM THAT, ASKED FOR

17   ALL FACTS, EVIDENCE, ET CETERA, THAT YOU'RE GOING

18   TO RELY UPON AT THE TIME OF TRIAL.

19       I THINK IF THE COURT LOOKS PARTICULARLY

20   AT THE SUPPLEMENTAL RESPONSES THAT HAVE BEEN FILED

21   SINCE THIS MOTION WAS FILED, THE NAMES OF ALL

22   WITNESSES, THE CATEGORIES OF DOCUMENTS, THEORIES,

23   THEMES, ET CETERA, ARE SET FORTH, FULLY COMPLYING

24   WITH THE CASE.

25       MATTEL KEEPS COMPLAINING THAT THEY'RE

35

1    GOING TO SOMEHOW BE SANDBAGGED.  WELL, I SUSPECT

2    THAT'S THE REASON WE'VE GOT RULE 16, AND WHY

3    PARTIES ARE REQUIRED TO MEET AND CONFER IN ADVANCE

4    OF THE FINAL C.M.C., WHICH IS COMING UP.

5        IN SOME WAYS MATTEL IS ASKING FOR EVEN

6    MORE THAN THE RULE 16 PROCEDURE FULFILLS, AND THERE

7    IS NEITHER CASE SUPPORT NOR LOGIC FOR THAT.  WE

8    WOULDN'T HAVE ALL OF THESE FINAL CASE MANAGEMENT

9    CONFERENCE PROCEDURES IF THEY WEREN'T INTENDED TO

10   SOMEHOW SUPPLEMENT WHAT'S COME BEFORE, RATHER THAN

11   BEING A LESSER INCLUDED WITHIN.

12       THE NEXT BIG CATEGORY IS THE BRATZ

13   INVENTION.  AND I WAS WORKING ON THIS MOTION OVER

14   THE WEEKEND, AND THIS IS THE EQUIVALENT TO THE

15   KIND OF PERSONAL INJURY CASES I USED TO HANDLE.

16   SOMEBODY SENDS A REQUEST FOR ADMISSION SAYING, "I

17   WANT YOU TO ADMIT THAT YOUR CLIENT CAUSED THE

18   INTERSECTION ACCIDENT.  OH, BY THE WAY, WE DEFINE

19   'CAUSE' AS MEANING THAT YOU OPERATED YOUR CAR IN

20   SUCH A WAY THAT YOU HAPPENED TO ARRIVE AT THE

21   INTERSECTION AT THE SAME TIME MY CLIENT DID."  AND

22   THEN PLAY THAT SOUND BITE FOR THE JURY, THE

23   DEFENDANT ADMITS HE CAUSED THE ACCIDENT.  NO COURT

24   WOULD LET THAT KIND OF CONFUSION IN, THAT'S WHY 403

25   EXISTS.  THAT'S EXACTLY WHAT WE'VE GOT HERE.

36

1    WE'VE ADMITTED AND TOLD THEM WHAT

2    DOCUMENTS WE BELIEVE WERE GENERATED BACK AT THAT

3    PERIOD OF TIME, WHAT IDEAS WERE CONCEIVED.  BUT

4    THEY'VE GOT THIS CONVOLUTED DEFINITION, WHICH IS

5    THE HIGH TECH EQUIVALENT OF ADMITTING YOU CAUSED AN

6    ACCIDENT BECAUSE YOU HAPPENED TO BE THERE.

7        THE FORMER EMPLOYEE CATEGORY, WE'VE

8    PROVIDED THEM WITH NAMES, HIRING DATES, INCLUSIVE

9    DATES OF EMPLOYMENT FOR 188 PEOPLE, WHO AT ONE TIME

10   OR ANOTHER WORKED FOR MATTEL.

11       THEY NOW WANT THE DATE OF FIRST CONTACT,

12   WHEN CONCEIVABLY SOMEBODY FROM MGA RAN INTO ONE OF

13   THESE PEOPLE DOWN AT THE BOWLING ALLEY, AND THEY

14   SAID THEY WERE UNHAPPY AT MATTEL, AND WE SAID,

15   "GEE, YOU SHOULD REALLY CONSIDER COMING TO MGA, IF

16   YOU'RE THAT UNHAPPY," EVEN IF THAT OCCURRED A YEAR

17   BEFORE.  THAT IS MERELY A MAKE WORK FILLER.

18       IF THEY'VE GOT PARTICULAR PEOPLE ON THAT

19   LIST OF 188, THAT THERE'S REALLY A REASON TO HAVE

20   TO KNOW THE FIRST CONTACT, I CAN UNDERSTAND WHERE

21   THAT MIGHT BE A LEGITIMATE SOURCE.  BUT JUST MAKING

22   US SPIN OUR WHEELS TO TRY TO FIGURE OUT WHEN EACH

23   OF THE -- EACH OF THOSE 188 FIRST HAD CONTACT, IS

24   JUST INTENDED TO DIVERT US FROM TRIAL PREPARATION.

25       40 AND 47, EARLY WORK ON BRATZ, BOTH HAVE

37

1    BEEN SUBSTANTIALLY SUPPLEMENTED, BEYOND WHAT'S

2    BEING COMPLAINED ABOUT.

3        BANK ACCOUNTS, WE HAVE GIVEN THEM 37,000

4    PAGES OF FINANCIAL INFORMATION ALREADY.

5        AND FINALLY, ON NUMBER 46, THE DISPUTE

6    WITH FORMER COUNSEL, THE REASONS -- THE

7    NONPRIVILEGED REASONS HAVE BEEN SAID IN THE PRESS,

8    I'M NOT QUITE SURE WHERE THEY WANT TO GO.

9    MR. NOLAN EVEN MADE SOME OF THOSE COMMENTS IN HIS

10   DEPOSITION.

11       BEYOND THAT, THEY SAY WE MAY HAVE A

12   COVERUP OF A FRAUD, WHICH IS 100 PERCENT THE

13   PRODUCT OF MATTEL'S FERTILE IMAGINATION.  AND IF

14   THEY DID THINK THEY HAVE THAT, SEEMINGLY THEY COULD

15   INVOKE THE CRIME FRAUD EXCEPTION, AND THEY WOULDN'T

16   BE LIMITING IT TO NONPRIVILEGED MATERIALS.

17       IF THE COURT HAS QUESTIONS ON THAT ONE,

18   FINE.  I THINK THAT WAS PURELY A HAIL MARY TASK

19   THROWN UP TO SEE IF THEY MIGHT GET LUCKY.

20       BEYOND THAT, OBVIOUSLY, THERE ARE

21   NUMEROUS NUANCES THAT WE'VE TRIED TO COVER IN THE

22   PAPERS.  I DON'T WANT TO REPEAT ALL OF THOSE.  IT

23   IS BEFORE -- IF THE COURT HAS QUESTIONS, I WOULD BE

24   PLEASED TO TRY TO RESPOND.

25       JUDGE INFANTE:  I JUST WANT TO CLARIFY, THE

EXHIBIT ___7___

38

1 DATES OF YOUR SUPPLEMENTAL RESPONSES WERE DUE IN
2 JANUARY; CORRECT?
3 MR. KENNEDY: JANUARY 7 AND JANUARY 28, YOUR
4 HONOR.
5 MR. ALGER: YOUR HONOR, IT'S TIM ALGER. MAY I
6 BE HEARD FOR JUST A MOMENT?
7 JUDGE INFANTE: YES.
8 MR. ALGER: ALL MY ARGUMENTS ARE RELATED TO THE
9 MOST RECENT SET OF INTERROGATORY RESPONSES.
10 THE REQUESTS THAT -- THE RESPONSES THAT
11 WERE PROVIDED TO US IN JANUARY ARE JUST AS
12 INADEQUATE AS THE PREVIOUS SET. THEY'VE ADDED A
13 FEW THINGS. THEY'VE ADDED AN ADDITIONAL CONTENTION
14 ABOUT THE -- THE INVENTORSHIP AGREEMENT NOT
15 REACHING COPYRIGHT. THE SUBJECT MATTER WAS NOT IN
16 THEIR EARLIER ONES. BUT OTHER THAN THAT, IT'S
17 PRETTY MUCH THE SAME STUFF. AND I WENT THROUGH
18 THEM IN GREAT DETAIL YESTERDAY FOR HOURS. AND IT'S
19 THE SAME INADEQUACIES AS THE EARLIER ONES.
20 SO I DON'T -- I DON'T WANT THERE TO BE
21 ANY CONFUSION THAT I'M ARGUING BASED ON EARLIER
22 RESPONSES. THE SUPPLEMENTALS ARE STILL INADEQUATE.
23 AND AS MR. KENNEDY TOUCHED ON, YOU KNOW, THE
24 CONTENTION INTERROGATORIES THEY HAVE GIVEN US -- IN
25 MR. KENNEDY'S WORDS, I WROTE IT DOWN -- CATEGORIES

39

1 OF DOCUMENTS. THAT'S NOT WHAT THE INTERROGATORIES
2 ASK FOR. THEY ASK FOR THE ACTUAL -- THE DOCUMENTS
3 THAT SUPPORT THEIR CONTENTIONS. AND THE --
4 MR. KENNEDY ALSO USED THE WORD "VARIOUS THEMES."
5 IF YOU LOOK AT THEIR RESPONSES -- AND THE SAME GOES
6 FOR THE BRYANT RESPONSE, THEY'RE CONCLUSORY IN
7 NATURE. THEY'RE JUST CONTENTIONS, AND THEY DON'T
8 GIVE US ANY FACTS.
9 THE EXAMPLE IS THEY REPEATEDLY TALK ABOUT
10 OTHER EMPLOYEES MOONLIGHTING. WELL, THEY DON'T
11 IDENTIFY OTHER EMPLOYEES THAT ARE MOONLIGHTING.
12 THEY DON'T GIVE US ANY FACTS TO SUPPORT THE IDEA
13 THAT THERE WAS PREVALENT MOONLIGHTING GOING ON AT
14 MATTEL. IT'S JUST CONTENTIONS.
15 AND, AT THIS POINT, WITH DISCOVERY ON
16 PHASE I CLOSED, THERE'S NO REASON WHY THEY CAN'T
17 GIVE US THE ANSWERS TO THESE INTERROGATORIES.
18 JUDGE INFANTE: DOES CARTER BRYANT'S COUNSEL
19 WISH TO ADDRESS THE ISSUES?
20 MR. PAGE: YOUR HONOR, I'LL KEEP IT SHORT.
21 JUST SO THE RECORD IS CLEAR, A COUPLE OF THE
22 INTERROGATORIES MR. ALGER SPOKE ABOUT ARE NOT
23 ASSERTED AGAINST CARTER BRYANT: THAT'S NUMBERS 41
24 AND 46. THOSE ARE INCLUDED IN THE MOTION AGAINST
25 CARTER BRYANT. SO I JUST WANT TO MAKE SURE THAT

40

1 WAS -- THAT'S CLEAR TO THE COURT.
2 I JUST WANT TO REITERATE WHAT MR. KENNEDY
3 SAID ABOUT THE RECEIPT OF THIS MOTION. CARTER
4 BRYANT HAS -- CARTER BRYANT HAS SUPPLEMENTED HIS
5 RESPONSES TO THE INTERROGATORY AT ISSUE TWICE EVER
6 SINCE THIS MOTION WAS FILED. MATTEL KNEW THE FIRST
7 ROUND WAS COMING; THEY NEVER MET AND CONFERRED
8 ABOUT THAT WITH REGARD TO THE SUPPLEMENTATION ON
9 DECEMBER 17. NONETHELESS, WENT AHEAD AND SET THE
10 SECOND SUPPLEMENTATION ON JANUARY 28. THEY NEVER
11 SOUGHT TO MEET AND CONFER ABOUT THAT.
12 SO MR. ALGER'S COMMENTS TODAY ABOUT THE
13 SUPPLEMENTAL RESPONSE IS THE FIRST WE EVER HEARD
14 FROM MATTEL THAT THEY HAVE SUBSTANTIVE ISSUES WITH
15 THOSE RESPONSES.
16 BRIEFLY ON THE CONTENTION 'ROGS -- THE
17 CONTENTION INTERROGATORIES, YOUR HONOR -- THESE
18 INTERROGATORIES ARE FRAMED -- IF YOU LOOK AT THEM,
19 YOU CAN SEE THAT THEY'RE FRAMED SO BROADLY THAT
20 THEY'RE BASICALLY ASKING FOR CARTER BRYANT'S ENTIRE
21 DEFENSE IN THE CASE. THEY WANT ALL FACTS, ALL
22 DOCUMENTS, RELATED TO CARTER BRYANT'S ENTIRE
23 DEFENSE IN THE CASE. THIS IS A CASE WITH MILLIONS
24 OF DOCUMENTS, HUNDREDS OF HOURS OF DEPOSITION
25 TESTIMONY, AND DECIDED CASE AFTER CASE MATTEL HAS

41

1 ARGUED THAT ALL FACTS, CONTENTION INTERROGATORIES,
2 IS ABUSIVE -- AND, YOU KNOW, WHAT IS APPROPRIATE TO
3 SEEK MATERIAL OR PRINCIPLE FACTS, NOT TO SUMMARIZE
4 THE ENTIRE CASE IN ONE INTERROGATORY RESPONSE. AND
5 I BELIEVE CARTER BRYANT HAS DONE THAT. HE PROVIDED
6 A DETAILED ROAD MAP OF WHAT HE BELIEVES SUPPORTS
7 HIS CONTENTIONS. AND I THINK IF THE COURT TAKES A
8 CLOSER LOOK AT THE SUPPLEMENTAL RESPONSES,
9 HOPEFULLY IT WILL AGREE.
10 BRIEFLY, YOUR HONOR, ON INTERROGATORY
11 NUMBER 39, WHICH ASKS FOR THE IDENTITY OF ALL OF
12 CARTER BRYANT'S BANK ACCOUNTS AND OTHER FINANCIAL
13 ACCOUNTS, IT WOULD -- WITH THE EXPRESSED UNDERLYING
14 THOUGHT THAT MATTEL WOULD THEN SEEK TO GO AFTER ALL
15 THOSE OTHER RECORDS.
16 CARTER BRYANT HAS PRODUCED COPIOUS
17 AMOUNTS OF FINANCIAL DISCOVERY ALREADY, AND
18 INCLUDED IN ALL THE INFORMATION THAT MATTEL SHOULD
19 NEED, FOR THE REASONS WHY THEY CLAIM THEY NEED THIS
20 INTERROGATORY, AND CARTER BRYANT PRODUCED RECORDS
21 SHOWING ALL THE PAYMENTS HE RECEIVED FROM MGA OR
22 ISAAC LARIAN; HE PRODUCED DOCUMENTS SHOWING HIS NET
23 WORTH; HE PRODUCED ALL THE EXISTING PROFIT AND LOSS
24 STATEMENTS FOR CARTER BRYANT ENTERPRISES, WHICH IS
25 HIS COMPANY THROUGH WHICH HE WORKS. AND LOTS AND

EXHIBIT _____7_____

42

1   LOTS OF OTHER DOCUMENTS, WHICH IS ADDRESSED IN MY
2   SUPPLEMENTAL DECLARATION SERVED, THAT WE HAVE ALL
3   OF THE DISCOVERY ON THESE TOPICS THEY LEGITIMATELY
4   NEED.
5        IT'S WORTH NOTING WE HAVE A PARTICULAR
6   AGREEMENT WITH COUNSEL FOR MATTEL, AS TO THE
7   CATEGORY OF DOCUMENTS THAT WE WOULD -- THIS IS IN
8   CONNECTION WITH THE SUBPOENA SERVED ON CARTER
9   BRYANT'S ACCOUNTS. WE'VE LIMITED THE SCOPE OF THE
10  SUBPOENA TO CATEGORIES THAT MATTEL'S SAID, OKAY,
11  THIS IS WHAT WE NEED, THIS IS FINE, AND WE PRODUCED
12  THOSE DOCUMENTS.
13       BUT NOW THEY'RE CONTINUING TO SEEK ABOVE
14  AND BEYOND WHAT THEY AGREED IS WHAT THEY NEEDED,
15  AND ALSO SECRETLY SUBPOENAED CARTER BRYANT'S BANK,
16  WHICH OBVIOUSLY THEY HAVE THE IDENTITY OF, AND
17  THAT'S SUBJECT TO A -- SEPARATE PENDING MOTION TO
18  QUASH THAT SUBPOENA, YOUR HONOR.
19       UNLESS THE COURT HAS ANY QUESTIONS, I'M
20  OTHERWISE READY TO SUBMIT THE PAPERS.
21       JUDGE INFANTE: THANK YOU.
22       I'LL TAKE BOTH OF THESE MOTIONS UNDER
23  SUBMISSION AND I'LL ISSUE AN ORDER WITHIN THE NEXT
24  FEW DAYS.
25       MR. ALGER: THANK YOU, YOUR HONOR.

43

1        MR. PAGE: THANK YOU, YOUR HONOR.
2        MR. KENNEDY: THANK YOU.
3        JUDGE INFANTE: LET ME SEE. I WANT TO CHECK
4   ONE THING. GIVE ME A MOMENT.
5        OKAY. MGA'S MOTION TO COMPEL MATTEL TO
6   PRODUCE E-MAIL.
7        YOU MAY PROCEED.
8        MR. KENNEDY: THANK YOU. RAOUL KENNEDY AGAIN.
9        AS I UNDERSTAND IT, MATTEL'S POSITION
10  COMES DOWN TO A REASONABLE SEARCH FOR ALL
11  POTENTIALLY RESPONSIVE DOCUMENTS, WHICH ALLOWS
12  MATTEL TO SIMPLY DECIDE BOTH LIVE E-MAIL AND E-MAIL
13  BACKUP TAPES NEED TO BE SAMPLED, EXAMINED, OR
14  CONSIDERED, BECAUSE IF YOU TRY TO CONSIDER THEM
15  COMPLETELY AND IN THEIR ENTIRETY, THAT WOULD BE
16  BURDENSOME.
17       AND MATTEL JUST GRANTED ITSELF LIMITED
18  DISPENSATION OR PROTECTIVE ORDER, WITHOUT BOTHERING
19  TO TELL US OR THE COURT ABOUT IT. AND WE SUBMIT A
20  REASONABLE SEARCH INCLUDE SOME EFFORT TO LOCATE
21  RESPONSIVE DOCS FROM ALL SOURCES.
22       AND AGAIN WITH THAT BACKGROUND, I PROPOSE
23  THE FOLLOWING: THAT, FIRST, MATTEL -- LET ME BACK
24  UP.
25       AS I UNDERSTAND IT, THE TAPES ONLY GO

44

1   BACK TO 2004 OR 2005. MATTEL CAN GIVE US THE EXACT
2   DATE. BUT I WOULD PROPOSE MATTEL BE REQUIRED TO
3   SEARCH FOR THE KEY WITNESSES THAT ARE IDENTIFIED IN
4   EXHIBITS 14 AND 15 TO THE SUPPLEMENTAL DECLARATION
5   OF ROB HARRINGTON THAT WAS FILED IN SUPPORT OF THE
6   PRESENT MOTION. THAT'S 68 PEOPLE WHO WERE EITHER
7   ON MGA'S, BRYANT'S, OR I BELIEVE IN SOME CASES
8   MATTEL'S INITIAL DISCLOSURE LISTS, AND FOR WHOM NO
9   CHECK OR INSPECTION APPARENTLY WHATSOEVER HAS BEEN
10  DONE.
11       IN ADDITION, THE KEYWORDS MGA HAD BEEN --
12  I'M SURE YOUR HONOR KNOWS BY NOW, IT'S MATTEL'S
13  CODE FOR MGA -- BRATZ, LARIAN, AND BRYANT, BE
14  CHECKED. THEY TELL US THEY HAVE A 90-DAY DELETE
15  POLICY, SO THEY REALLY ONLY OUGHT TO HAVE TO REVIEW
16  TAPES, 80-, 75-, OR 80-DAY INTERVALS. THEY
17  SHOULDN'T HAVE TO CHECK EVERY DAY FOR EACH OF THOSE
18  PARTICULAR CATEGORIES.
19       AS I SAID, WE WOULD BE TALKING FROM
20  FEBRUARY 2004, AT 90-DAY INTERVALS, FOR A VERY
21  LIMITED SEARCH.
22       IN ADDITION, MATTEL PUT IN A DECLARATION
23  SAYING IN CONNECTION WITH THE MY SCENE, M-Y
24  S-C-E-N-E, AND DIVA STARZ LITIGATION, BACK IN 2002
25  AND 2003, MATTEL PRESERVED SOME UNKNOWN NUMBER OF

45

1   E-MAILS AND TAPES, NO INDICATION EXACTLY WHAT THAT
2   WAS.
3        I URGE THAT THE SAME SEARCH OF LIMITED
4   NATURE THAT I JUST DESCRIBED BE ORDERED FOR THOSE
5   TAPES AS WELL. AND, FINALLY, WE'RE TALKING ABOUT
6   4,000 TAPES. I COULD SEE THERE WOULD BE A WHOLE
7   LOT OF THEM THAT COULD BE TOTALLY IRRELEVANT, BUT
8   WE NEED AN INDEX. AND I WOULD URGE THAT MATTEL BE
9   GIVEN THE OPTION, NOT THE REQUIREMENT, BUT THE
10  OPTION TO, IF THEY WANT TO PROVIDE US AN INDEX BY
11  TAPE, SHOWING THE INDIVIDUALS WHOSE E-MAIL ACCOUNTS
12  WERE KEPT ON THAT TAPE, WE MIGHT VERY WELL BE ABLE
13  TO REACH A SIGNIFICANT LIMITATION, BUT THAT ISN'T
14  RELIEF WE SPECIFICALLY REQUESTED IN THE MOTION, SO
15  I DON'T THINK IT'S SOMETHING I COULD ASK FOR IN
16  THIS ORDER.
17       I SUBMIT, AGAIN, WITH THAT KIND OF
18  PROPOSAL, THAT PARES THIS DOWN TO STUFF THAT'S
19  REALLY ESSENTIAL, BUT TO THE CASE AND WOULD
20  CONSTITUTE A REASONABLE SEARCH THAT MATTEL HAS YET
21  TO UNDERTAKE.
22       ONCE AGAIN, UNLESS THERE ARE ANY
23  QUESTIONS, I DON'T WANT TO REPEAT WHAT'S IN THE
24  PAPERS.
25       JUDGE INFANTE: THANK YOU, VERY MUCH.

EXHIBIT ___7___

PAGE _167_

46

1    MR. TAYBACK: IT'S CHRISTOPHER TAYBACK
2    ADDRESSING THIS PARTICULAR MOTION.
3        GOOD MORNING, YOUR HONOR.
4    JUDGE INFANTE: GOOD MORNING.
5    MR. TAYBACK: IT'S ACTUALLY MY FIRST APPEARANCE
6    IN THIS PARTICULAR CASE.
7        BUT I GUESS I WANT TO START WITH THE
8    PREMISE THAT, ACTUALLY, NONE OF THE THINGS THAT
9    MR. KENNEDY JUST ASKED FOR ARE ASKED FOR IN THE
10   MOTION. THE MOTION SAYS MATTEL HAS TO GO OUT AND
11   SEARCH -- AND THIS IS FROM PAGE 2, LINE 1 AND 2 OF
12   ITS MOTION -- SEARCH ITS E-MAIL, INCLUDING ARCHIVED
13   E-MAIL AND E-MAIL BACKUP TAPES FOR RESPONSIVE
14   DOCUMENTS.
15       OUR POSITION HAS BEEN ALL ALONG, AS I
16   THINK WAS REPRESENTED TO THE COURT, YOUR HONOR,
17   WITH RESPECT TO THE -- IN THE COTTAGE (PHONETIC) OF
18   THE MAY HEARING ON VARIOUS MOTIONS, AND ALSO IN THE
19   SEPTEMBER HEARING OF VARIOUS MOTIONS, THAT THERE
20   ARE OODLES, TO USE A TECHNICAL TERM, OF ELECTRONIC
21   DATA COMPILATIONS, INCLUDING E-MAIL BACKUP TAPES.
22   AND IT WOULD COST -- TO DO A WHOLESALE RESTORATION
23   OF THESE WOULD COST TENS OF MILLIONS OF DOLLARS.
24       AND WE HAVE SAID THAT UP FRONT, IN
25   CONNECTION WITH THE EARLY HEARING, THE ONE THAT

47

1    RESULTED IN THE MAY ORDER BY YOUR HONOR. YOUR
2    HONOR CONSTRUED THE REQUEST TO WHICH WE HAD
3    OBJECTED AS BEING UNDULY BURDENSOME IN A
4    SUFFICIENTLY NARROW MANNER AS TO SAY, LOOK, YOU
5    DON'T NEED TO SEARCH ALL YOUR TAPES. LOOK, YOU
6    DON'T NEED TO SEARCH E-MAILS FOR EVERY EMPLOYEE.
7    YOU NEED TO SEARCH ONLY CERTAIN OF THESE SPECIFIC
8    PEOPLE THAT -- YOU NEED TO DO A REASONABLE SEARCH
9    TO FIND RESPONSIVE DOCUMENTS WITH RESPECT TO THESE
10   SPECIFIC PEOPLE ENGAGED IN THESE SPECIFIC KINDS OF
11   COMMUNICATIONS.
12   JUDGE INFANTE: I DID NOT DEFINE A REASONABLE
13   SEARCH.
14   MR. TAYBACK: NO, YOU DID NOT.
15       AND IT'S OUR CONTENTION WHAT WE HAVE
16   DONE -- AND WE RECITE IN SOME DETAIL IN OUR MOTION
17   AT PAGES -- IN OUR OPPOSITION, RATHER, AT PAGES 7
18   AND 8, ALL OF THE VAST, VERY SIGNIFICANT ELECTRONIC
19   DATA COMPILATIONS THAT WE HAVE SEARCHED, MANY OF
20   WHICH INCLUDE ARCHIVED E-MAILS OR E-MAILS CONTAINED
21   IN WHAT'S CALLED SHARED SPACE, TO GATHER RESPONSIVE
22   DOCUMENTS.
23       WHAT THIS MOTION IS THE RESULT OF IS
24   ESSENTIALLY AN -- A QUESTION BY MGA FOR US TO
25   DESCRIBE SPECIFICALLY, WHAT DID WE SEARCH, WHAT

48

1    HAVEN'T WE SEARCHED, WHOSE E-MAILS HAVE WE CHECKED,
2    HOW HAVE WE CHECKED THEM. AND, ESSENTIALLY, THAT'S
3    A QUESTION THAT'S PENDING AS AN INTERROGATORY.
4        BOTH PARTIES HAVE PROPOUNDED AN
5    INTERROGATORY ALONG THOSE LINES. THAT'S THE
6    SUBJECT OF ANOTHER MOTION, BECAUSE MGA
7    CATEGORICALLY REFUSED TO PROVIDE US WITH THAT
8    INFORMATION; INFORMATION AIMED AT FINDING OUT WHAT
9    DID YOU DO, HOW DID YOU SEARCH, WHAT DIDN'T YOU
10   SEARCH.
11       AT THE END OF THE DAY, THOUGH, AND A
12   POINT MR. KENNEDY MADE, I THINK THIS PARTICULAR
13   ISSUE IS MUCH ADO ABOUT NOTHING, FOR THE FOLLOWING
14   REASON, WHICH IS NOT ADDRESSED IN ANYBODY'S PAPERS
15   BECAUSE IT JUST HAPPENED, JUDGE LARSON STAYED
16   DISCOVERY, NOT JUST BIFURCATED IT, STAYED IT, WITH
17   RESPECT TO PHASE II.
18       AND AS MR. KENNEDY JUST ALLUDED TO, THE
19   E-MAIL BACKUP TAPES ONLY GO BACK TO APRIL OF 2005.
20   THERE IS, I SUBMIT, VIRTUALLY NOTHING THAT COULD BE
21   ON THE E-MAIL BACKUP TAPES FROM APRIL 2005 TO THE
22   PRESENT THAT RELATES TO PHASE I. SIMILARLY, AND
23   EVEN MORE POINTEDLY, THE IDEA OF SEARCHING A LIVE
24   E-MAIL SERVER THAT ONLY HAS A 90-DAY WINDOW OF
25   TIME, IS NOT LIKELY AT ALL TO LEAD TO RESPONSIVE --

49

1    TO DISCOVERABLE OR ADMISSIBLE EVIDENCE. AND I
2    THINK EITHER ONE IS JUST NOT A FRUITFUL WAY OF
3    CONDUCTING A REASONABLE SEARCH, ESPECIALLY GIVEN
4    THE COST CONCERNS.
5        NOW, I'VE HEARD FOR THE FIRST TIME A
6    PROPOSAL THAT TALKED ABOUT CERTAIN SPECIFIC PEOPLE;
7    ALTHOUGH, THEY HAVEN'T EXACTLY BEEN ITEMIZED ON A
8    NAME-BY-NAME BASIS, SO I CAN'T REALLY RESPOND TO
9    WHETHER THEY ARE REALLY GOING TO HAVE RESPONSIVE
10   EVIDENCE OR WHETHER THEY WERE AROUND AT MATTEL FOR
11   CERTAIN PERIODS OF TIME. THIS IS REALLY THE FIRST
12   TIME I'M HEARING SOME OF THE SPECIFIC PROPOSALS
13   BEING OFFERED.
14       WHAT I WOULD SAY IS THAT, TO THE EXTENT
15   YOUR HONOR IS GOING TO ORDER ANY SEARCH OF ANY
16   BACKUP E-MAIL TAPE, THAT ESSENTIALLY THE PARTIES
17   WOULD NEED TO MEET AND CONFER, AS YOUR HONOR
18   ORDERED WITH RESPECT TO ZEUSS.
19   JUDGE INFANTE: WOULD YOU STOP FOR A MOMENT.
20   MR. TAYBACK: YES.
21   JUDGE INFANTE: I AGREE WITH YOU, IN A SENSE
22   THAT I DON'T THINK THE PARTIES HAVE MET AND
23   CONFERRED. I FIND MYSELF RIGHT NOW PRESIDING OVER
24   A MEET AND CONFER MEETING, RATHER THAN A MOTION
25   HEARING. AND I'M NOT GOING TO DECIDE THIS MOTION,

EXHIBIT ___7___

50

1    BECAUSE I BELIEVE YOU SHOULD MEET AND CONFER.
2    MR. KENNEDY, YOU RAISED A PROPOSAL TODAY
3    FOR THE FIRST TIME.
4       I BELIEVE THAT AN ADEQUATE MEET AND
5    CONFER SESSION BETWEEN YOU, IN GOOD FAITH, AS
6    REQUIRED BY THE RULES, WOULD LEAD TO A RESOLUTION
7    OF THIS QUESTION.
8       RULE 34 AND RULE 26 HAVE BEEN AMENDED
9    SINCE THIS LAWSUIT WAS FIRST FILED, WHICH GIVE YOU
10   CLARITY AS TO THE STANDARDS THAT ARE TO BE
11   EMPLOYED.  AND, IN MY VIEW, THERE HASN'T BEEN AN
12   ADEQUATE MEET AND CONFER.  I'M NOT GOING TO DECIDE
13   THE MOTION UNTIL THERE IS.
14      SO AS FAR AS I'M CONCERNED, THERE'S NO
15   FURTHER HEARING ON THIS MATTER AND YOU ARE ORDERED
16   TO MEET AND CONFER.  AND I WOULD LIKE YOU TO
17   PREPARE A JOINT REPORT OR A STIPULATED ORDER, IF
18   YOU WILL, AS TO WHAT CONSTITUTES A REASONABLE
19   SEARCH FOR ELECTRONIC DISCOVERY.
20      WE CAN MOVE ON TO THE NEXT MOTION NOW.
21   MR. KENNEDY:  THANK YOU, YOUR HONOR.
22   MR. TAYBACK:  THANK YOU, YOUR HONOR.
23   JUDGE INFANTE:  THE MOTION TO COMPEL PRODUCTION
24   OF DOCUMENTS OF ISAAC LARIAN AND FOR SANCTIONS
25   REGARDING MATTEL'S FIRST SET OF REQUESTS FOR

51

1    PRODUCTION.  THAT IS LISTED NUMBER 6 ON THE
2    FEBRUARY 6 LETTER.
3       YOU MAY PROCEED IF YOU WISH.
4    MR. TAYBACK:  GOOD MORNING, AGAIN.  IT'S
5    CHRISTOPHER TAYBACK.  I'M NOW MAKING MY SECOND
6    APPEARANCE IN THIS CASE.
7       THE GIST OF OUR MOTION IS WE DON'T WANT
8    TO BE CAUGHT BETWIXT AND BETWEEN.  THERE ARE
9    DOCUMENTS THAT MAY BE MR. LARIAN'S, QUOTE, UNQUOTE,
10   PERSONAL FILES; THERE ARE DOCUMENTS THAT MAY BE IN
11   HIS POSSESSION AS C.E.O. OF MGA.
12      WE'RE NOT LOOKING -- AND I BELIEVE THEIR
13   SOLE REAL BASIS TO OPPOSE THIS MOTION IS THAT IT
14   WOULD REQUIRE THEM TO PRODUCE DUPLICATIVE
15   DOCUMENTS; THAT IS, DOCUMENTS PRODUCED BY MGA ARE
16   ARGUABLY ALSO IN THE POSSESSION OF MR. LARIAN.
17      THAT'S NOT WHAT WE'RE ASKING FOR.  AND TO
18   THE EXTENT -- WHAT WE REALLY WANT IS AN ORDER THAT
19   SAYS, AS THEY'VE ACKNOWLEDGED IN THE DECLARATION
20   THAT MR. MARSH SUBMITTED AT PARAGRAPHS 24 AND 25,
21   THEY HAVE DOCUMENTS THAT HAVE NOT BEEN PRODUCED
22   THAT ARE EITHER MR. LARIAN'S PERSONAL FILES OR
23   DOCUMENTS IN HIS POSSESSION, THAT ARE IN HIS
24   POSSESSION AS C.E.O. OF MGA, THAT ARE RESPONSIVE,
25   THAT HAVE NOT OTHERWISE BEEN PRODUCED.  AND THAT'S

52

1    WHAT WE ARE ESSENTIALLY LOOKING FOR, AND AN ORDER
2    ON THAT SUBJECT.
3       AND I ACTUALLY DON'T KNOW WHAT -- WHAT
4    MORE THERE IS TO SAY ON IT AT THIS POINT.  I THINK
5    WE'RE ENTITLED TO THAT.  THERE'S NO REAL OBJECTION,
6    OTHER THAN THEIR OBJECTION TO PRODUCING ARGUABLY
7    DUPLICATIVE FILES.
8    JUDGE INFANTE:  THANK YOU, VERY MUCH.
9    MR. KENNEDY?
10   MR. KENNEDY:  YES, YOUR HONOR.
11      I HAVE MR. MARSH ON THE PHONE THIS
12   MORNING, WHO CAN RESPOND IF THERE ARE SPECIFIC
13   QUESTIONS CONCERNING HIS WORKS IN THE CASE.
14      AS YOU POINT OUT IN OUR OPPOSITION, AT
15   THE TIME THIS MOTION WAS FILED, THERE WAS A MOTION
16   UNDER SUBMISSION BEFORE YOUR HONOR DEALING WITH
17   VERY MUCH THE SAME SUBJECT MATTER.  THAT MOTION WAS
18   RULED ON, AND SINCE WE FILED OUR REPLY, MR. LARIAN
19   HAS PRODUCED NOW A GRAND TOTAL OF 51,118 PAGES.
20   THOSE CAME IN ON A ROLLING BASIS IN JANUARY, ON THE
21   11TH, THE 15TH, THE 18TH, AND THE 25TH.  AND THOSE
22   ARE IN ADDITION TO ALL OF THE DOCUMENTS THAT
23   O'MELVENY PRODUCED BEFORE.
24      AND THEN MR. MARSH COMES IN; HE HAS
25   SPOKEN WITH O'MELVENY.  AND WE HAVE BEEN ADVISED

53

1    THAT O'MELVENY PRODUCED FOR MGA AND MR. LARIAN ON
2    AN UNDIFFERENTIATED BASIS.  OF COURSE, CONSISTENT
3    WITH MATTEL'S EXPANSIVE DEFINITION THAT MGA,
4    MR. LARIAN, ESSENTIALLY, ARE COEXTENSIVE.  BUT, IN
5    ANY EVENT, O'MELVENY ASSURED US THEY PRODUCED ON AN
6    UNDIFFERENTIATED FORM, EVERY DOCUMENT THAT
7    MR. LARIAN HAD THAT WAS RESPONSIVE TO THE
8    CATEGORIES AS TO WHICH O'MELVENY AGREED TO MAKE
9    PRODUCTION.
10      IF YOUR HONOR MAY RECALL, AFTER WE GOT IN
11   THE CASE, WE AGREED TO MAKE A PRODUCTION AS TO AN
12   ADDITIONAL 55 CATEGORIES VOLUNTARILY.  AND THEN
13   YOUR HONOR TOLD US THERE WAS SOME OTHERS WE WERE
14   GOING TO BE RESPONDING TO INVOLUNTARILY; AND THAT'S
15   THE SOURCE OF THE ADDITIONAL 51,000 DOCUMENTS
16   THAT -- THAT'S RESPONSIVE TO CATEGORIES WHICH
17   O'MELVENY PRODUCED NOTHING.
18      ALSO, IN OUR DUE DILIGENCE, WE FOUND
19   ADDITIONAL DOCUMENTS PERTAINING TO EARLIER
20   PRODUCTIONS.  AND THOSE GOT INCLUDED AS WELL.  IT'S
21   A LONG WAY FROM SAYING EVERYTHING THAT WE'RE AWARE
22   OF THAT'S RESPONSIVE TO THESE REQUESTS HAS NOW BEEN
23   PRODUCED.
24   MR. TAYBACK:  THIS IS CHRISTOPHER TAYBACK.
25      I WOULD JUST ASK THAT -- IT SOUNDS LIKE

EXHIBIT ___7___

54

1  IF EVERYTHING RESPONSIVE HAS BEEN PRODUCED, THEY
2  SIMPLY MEMORIALIZE THAT AND SAY WE PRODUCED ALL
3  RESPONSIVE DOCUMENTS RESPONSIVE TO THIS REQUEST ON
4  BEHALF OF MR. LARIAN.
5      I WOULD ALSO ASK, THOUGH, THAT THEY DO,
6  AS IT SOUNDS LIKE THEY'RE PREPARED TO DO, BECAUSE
7  THEY JUST RATTLED IT OUT FAIRLY QUICKLY THERE, JUST
8  IDENTIFY FOR US BY DATES, THOSE PRODUCTIONS THAT
9  WERE FROM OR ON BEHALF OF MR. LARIAN, EITHER BY
10  MR. LARIAN, OR MR. LARIAN, YOU KNOW, IN CONJUNCTION
11  WITH MGA -- BY BATES NUMBERS, PREFERABLY. IT
12  SOUNDS LIKE THEY'RE ABLE TO DO THAT.
13      MR. KENNEDY: YOUR HONOR, WE CERTAINLY ARE ABLE
14  TO DO THAT FOR THE DOCUMENTS THAT WE'VE PRODUCED,
15  AND I CAN GET THE LIST RIGHT AWAY OF THE DATES AND
16  THE BATES NUMBERS.
17      HOWEVER, BEFORE WE GOT IN THE CASE, FOR
18  THIS PROTRACTED PERIOD OF TIME, O'MELVENY PRODUCED
19  ON THE BASIS THAT LARIAN WAS DEFINED TO BE ANYBODY
20  AFFILIATED WITH AND INCLUDING MGA; MGA WAS DEFINED
21  TO INCLUDE ALL OF ITS OFFICERS AND DIRECTORS,
22  INCLUDING LARIAN. SO THE TWO ARE -- THEY'RE
23  SELF-CONSUMING, AND O'MELVENY PRODUCED BOTH. AND I
24  DON'T KNOW ANY WAY AT THIS POINT TO GO BACK AND
25  UNTIE THAT KNOT.

55

1      JUDGE INFANTE: YEAH, THAT'S FINE. IF YOU
2  COULD SIMPLY PRODUCE THE PRODUCTION BATES THAT
3  DATED YOUR PRESENCE IN THE CASE AND SINCE YOUR
4  PRESENCE IN THE CASE, INDICATE THE PRODUCTION AND
5  DATES BY BATES NUMBERS, AND MAKE IT PERFECTLY CLEAR
6  THAT DOCUMENTS RESPONSIVE TO ALL THESE REQUESTS
7  HAVE BEEN PRODUCED -- IF YOU COULD DO THAT, I THINK
8  THAT WOULD BE APPROPRIATE, AND I WOULD DENY THE
9  MOTION ON THAT CONDITION.
10      MR. KENNEDY: THANK YOU, YOUR HONOR.
11      JUDGE INFANTE: MOTION IS DENIED ON THE
12  CONDITION THAT YOU -- YOU PREPARE THAT SUBMISSION
13  AND SERVE MATTEL WITH IT. AND IF YOU WOULD PREPARE
14  THIS ORDER FOR ME, WHICH I JUST MEMORIALIZED, I
15  WOULD APPRECIATE IT.
16      MR. KENNEDY: YES, YOUR HONOR. WE'LL DO THAT.
17      MR. TAYBACK: THANK YOU, YOUR HONOR.
18      JUDGE INFANTE: LET'S SEE. ON THE FEBRUARY 6
19  LETTER, ARE THERE ANY OTHER MOTIONS REMAINING THAT
20  I HAVE NOT HEARD?
21      I BELIEVE THAT'S IT. I HAVE TO MOVE ON
22  TO ANOTHER PIECE OF BUSINESS IN A FEW MINUTES, SO
23  THAT'S ALL I HAVE TIME TO HEAR THIS MORNING.
24      I BELIEVE THERE ARE ABOUT 20 MOTIONS
25  PENDING. IT MAY BE MORE THAN THAT. WE'VE DECIDED

56

1  A FEW THIS MORNING. I'VE TAKEN A COUPLE UNDER
2  SUBMISSION.
3      I REALLY THINK THAT THERE NEEDS TO BE A
4  BETTER EFFORT WITH RESPECT TO MEETING AND
5  CONFERRING. I AM HEREBY ORDERING THE PARTIES, IN
6  PERSON, AN IN-PERSON MEETING, TO MEET AND CONFER
7  WITH RESPECT TO ALL PENDING MOTIONS.
8      A LOT OF THESE MOTIONS GOT FILED ON THE
9  VERY LAST DAY OF DISCOVERY IN JANUARY. THERE ARE A
10  NUMBER OF THINGS THAT ARE MOVING TARGETS, BECAUSE
11  AS WE SAW THIS MORNING, JUDGE LARSON HAS STAYED THE
12  DISCOVERY AS TO PHASE II, AND I BELIEVE THAT I'M
13  HEREBY ORDERING YOU, PURSUANT TO RULE 37, FEDERAL
14  RULES OF CIVIL PROCEDURE AND LOCAL RULES OF THE
15  MUNICIPAL OF CALIFORNIA, TO CONDUCT AN IN-DEPTH
16  MEET AND CONFER SESSION, IN PERSON, REMAINING ALL
17  PENDING MOTIONS, AND REPORT BACK TO ME EITHER BY
18  JOINT LETTERS OR INDIVIDUAL LETTERS, THE
19  DISPOSITION OF ANY MOTION.
20      WHEN I RECEIVE THAT, I'LL BE GLAD TO GIVE
21  YOU A HEARING. AND I'D LIKE TO KNOW CLEARLY WHAT
22  REMAINS IN ISSUE AT THAT POINT.
23      ARE THERE ANY QUESTIONS REGARDING THAT?
24      MR. KENNEDY: NOT HERE, YOUR HONOR.
25      MR. ALGER: YOUR HONOR, TIM ALGER, FOR MATTEL.

57

1      I JUST HAVE ONE LITTLE BOOKKEEPING
2  MATTER. THE MOTION BY MATTEL TO COMPEL THE
3  DEPOSITION OF CHRISTOPHER PALMERI, THE
4  "BUSINESSWEEK" REPORTER. WE'VE HAD EXTENSIVE MEET
5  AND CONFERS ON THAT, THAT'S BEEN OUT THERE FOR
6  QUITE SOME TIME, AND I WOULD REQUEST THAT THAT BE
7  EXCEPTED FROM THE ORDER.
8      JUDGE INFANTE: OKAY. EXCEPTED FROM THE ORDER.
9      MR. ALGER: THEN, YOUR HONOR, DO YOU HAVE A
10  DEADLINE FOR THE MEET AND CONFER PROCESS, AND THE
11  REPORT BY THE PARTIES?
12      JUDGE INFANTE: WELL, I'D LIKE TO MAKE IT
13  WITHIN 10 DAYS.
14      OKAY. WITHIN 10 DAYS OF TODAY.
15      MR. ALGER: THANK YOU, YOUR HONOR.
16      JUDGE INFANTE: OKAY. THANK YOU.
17      MR. KENNEDY: ONE QUICK -- IS THAT 10 FEDERAL
18  COURT DAYS OR 10 CALENDAR DAYS?
19      JUDGE INFANTE: CALENDAR DAYS.
20      MR. TAYBACK: THANK YOU, YOUR HONOR.
21      JUDGE INFANTE: I'D LIKE A TRANSCRIPT OF
22  TODAY'S HEARING. COULD YOU SEND IT TO ME IN THE
23  NEXT FEW DAYS?
24      MR. ALGER: WE'LL SEND IT TO YOU.
25      MR. PAGE: I WOULD LIKE TO REQUEST A TRANSCRIPT

58

1    AS WELL.  THANK YOU.

2

3              (WHEREUPON, AT THE HOUR OF

4         9:46 A.M., THE PROCEEDINGS

5            WERE CONCLUDED.)

6                -OOO-

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

59

1    STATE OF CALIFORNIA    )

              ) SS.

2    COUNTY OF LOS ANGELES   )

3

4         I,  ANGELA DUPRE  , CERTIFIED

5    SHORTHAND REPORTER, CERTIFICATE NUMBER 7604, FOR

6    THE STATE OF CALIFORNIA, HEREBY CERTIFY:

7         THE PROCEEDINGS WERE RECORDED

8    STENOGRAPHICALLY BY ME AND WERE TRANSCRIBED TO THE

9    BEST OF MY ABILITY;

10        THE FOREGOING TRANSCRIPT IS A TRUE AND

11   CORRECT TRANSCRIPT OF MY SHORTHAND NOTES SO TAKEN;

12        I FURTHER CERTIFY THAT I AM NEITHER

13   COUNSEL FOR NOR RELATED TO ANY PARTY TO SAID ACTION

14   NOR IN ANY WAY INTERESTED IN THE OUTCOME THEREOF.

15        IN WITNESS WHEREOF, I HAVE HEREUNTO

16   SUBSCRIBED MY NAME THIS_____DAY OF

17   _____, 2008.

18

19

20

21        _____

22

23

24

25

EXHIBIT ___7___

PAGE __171__

Mattel v. MGA II                    Unsigned                    Page 58 - 59

**EXHIBIT 8**

**From:** Mumford, Marcus R [mailto:Marcus.Mumford@skadden.com]
**Sent:** Wednesday, January 30, 2008 4:52 PM
**To:** Timothy Alger
**Subject:** RE: Meet and confer -- NHB documents

I dont' have the dates in front of me, but I understand it was among those rescheduled today. I'll take your word for it. And yes, 11 is fine. My apologies again.
-Marcus

**From:** Timothy Alger [mailto:timalger@quinnemanuel.com]
**Sent:** Wednesday, January 30, 2008 4:50 PM
**To:** Mumford, Marcus R (LAC)
**Subject:** RE: Meet and confer -- NHB documents

marcus,
tomorrow is fine. how about 11 a.m.?

this motion does not have a hearing date (and the parties have not put it on the feb 11 hearing list that was in my letter of monday to judge infante), so i'm working on the assumption, agreed this afternoon, that our opposition will not be due until feb 7, with reply due feb 15. let me know if you disagree.

tim

**From:** Mumford, Marcus R [mailto:Marcus.Mumford@skadden.com]
**Sent:** Wednesday, January 30, 2008 4:44 PM
**To:** Timothy Alger
**Subject:** RE: Meet and confer -- NHB documents

I'm afraid I won't be off in time. Tomorrow morning? I can do it as early as you want.

**From:** Timothy Alger [mailto:timalger@quinnemanuel.com]
**Sent:** Wednesday, January 30, 2008 4:43 PM

2/14/2008

EXHIBIT _____ 8 _____

PAGE _____ 172 _____

**To:** Mumford, Marcus R (LAC)
**Subject:** RE: Meet and confer -- NHB documents

i have to leave the office early this evening because of family commitments. can we agree to 5:00?

---

**From:** Mumford, Marcus R [mailto:Marcus.Mumford@skadden.com]
**Sent:** Wednesday, January 30, 2008 4:39 PM
**To:** Timothy Alger
**Subject:** RE: Meet and confer -- NHB documents

Tim, my apologies. I'm stuck on another call. Can I ring you in 1/2 hour?

---

**From:** Timothy Alger [mailto:timalger@quinnemanuel.com]
**Sent:** Wednesday, January 30, 2008 4:35 PM
**To:** Mumford, Marcus R (LAC)
**Cc:** Herrington, Robert J (LAC); Miller, Timothy A (SFC); Michael T Zeller; Jon Corey; Dylan Proctor
**Subject:** RE: Meet and confer -- NHB documents

Marcus, are we on? can you call me at 213 443 3042?

---

**From:** Mumford, Marcus R [mailto:Marcus.Mumford@skadden.com]
**Sent:** Wednesday, January 30, 2008 1:43 PM
**To:** Timothy Alger
**Cc:** Herrington, Robert J (LAC); Miller, Timothy A (SFC); Michael T Zeller; Jon Corey; Dylan Proctor
**Subject:** RE: Meet and confer -- NHB documents

Can we make it today at 4:30 instead?

---

**From:** Timothy Alger [mailto:timalger@quinnemanuel.com]
**Sent:** Tuesday, January 29, 2008 10:23 PM
**To:** Mumford, Marcus R (LAC)
**Cc:** Herrington, Robert J (LAC); Miller, Timothy A (SFC); Michael T Zeller; Jon Corey; Dylan Proctor
**Subject:** Re: Meet and confer -- NHB documents

How about weds at 3?

Sent from BlackBerry handheld

Timothy L. Alger
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017

Direct: (213) 443-3223
Main Phone: (213) 443-3000
Main Fax: (213) 443-3100

E-mail: timalger@quinnemanuel.com
Web: www.quinnemanuel.com

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you received this communication in error, please notify us immediately by e-mail, and delete the original message.

EXHIBIT ___8___

2/14/2008

PAGE __173__

----- Original Message -----
From: Mumford, Marcus R <Marcus.Mumford@skadden.com>
To: Timothy Alger
Cc: Herrington, Robert J (LAC) <Robert.Herrington@skadden.com>; Miller, Timothy A (SFC) <Timothy.Miller@skadden.com>; Michael T
Zeller; Jon Corey; Dylan Proctor
Sent: Tue Jan 29 21:18:20 2008
Subject: RE: Meet and confer -- NHB documents

Tim,
As you know, I was in deposition all day yesterday, and I did not receive your message until we had sent our motion to be filed on this issue.
Of course, you know that we were, and remain, very interested in meeting and conferring on this issue. If we are able to reach a resolution, we'd
be willing to withdraw the motion. I'm available tomorrow after noon. Please let me know when you are available.
-Marcus

---

From: Timothy Alger [mailto:timalger@quinnemanuel.com]
Sent: Monday, January 28, 2008 10:30 AM
To: Mumford, Marcus R (LAC)
Cc: Herrington, Robert J (LAC); Miller, Timothy A (SFC); Michael T Zeller; Jon Corey; Dylan Proctor
Subject: RE: Meet and confer -- NHB documents


Marcus,

I am in the office and can meet and confer with you or anyone representing MGA at anytime today. Call me at your convenience.

MGA should be prepared to support the following assertion, in your email below: "[W]e have good grounds to believe there are similarly
responsive documents or files that have not been produced and that are not listed on Mattel's privilege log."

Tim

Timothy L. Alger, Esq.
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Direct: (213) 443-3223
Main Phone: (213) 443-3000
Main Fax: (213) 443-3100
E-mail: timalger@quinnemanuel.com <mailto:timalger@quinnemanuel.com>
Web: www.quinnemanuel.com <http://www.quinnemanuel.com/>

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This
message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message
is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this
document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this
communication in error, please notify us immediately by e-mail, and delete the original message.

---

From: Mumford, Marcus R [mailto:Marcus.Mumford@skadden.com]
Sent: Friday, January 25, 2008 3:46 PM
To: Timothy Alger
Subject: Meet and confer -- NHB documents

EXHIBIT ___8___

PAGE ___174___

Tim,
I just received your response to my January 18 letter regarding the documents you clawed back on January 17, requesting that we put off any
meet and confer on the issue until January 28, 2008, the discovery cut-off and over 10 days after you received my letter.

We cannot allow you to delay a resolution of this issue until the discovery cut-off, and there is good cause why we are prejudiced absent a
prompt response on your part. It has already been seven days since my letter and, notably, your response does not address the issue raised in
any substance: (1) it does not substantiate your assertion of privilege with respect to the documents you improperly clawed back and (2) it does

2/14/2008

not indicate whether your document collection, review and production in this matter contemplated the fact that Mattel has been referring to MGA under codename "NHB" since well before the date Mattel represented to the court it was first on notice of a "probable claim." As I stated, we have good grounds to believe there are similarly responsive documents or files that have not been produced and that are not listed on Mattel's privilege log. Finally, given the number of depositions that your firm put off or noticed until Monday, I am unavailable to meet and confer that date.

Your assistant informed me that you are at our offices today. I am as well. If you are unwilling to meet and confer today or this evening, we will seek the assistance of the Discovery Master on this matter.
-Marcus

Marcus R. Mumford
Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue | Los Angeles | California | 90071-3144
T: 213.687.5514 | F: 213.621.5514
mmumford@skadden.com <mailto:tmmumford@skadden.com>

---------------------------------------------------------------------- ***************************************************** To ensure compliance with Treasury Department regulations, we advise you that, unless otherwise expressly indicated, any federal tax advice contained in this message was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or applicable state or local tax law provisions or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein. ***************************************************
************************************************** This email and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified any dissemination, distribution or copying of this email, and any attachments thereto, is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original copy and any copy of any email, and any printout thereof. Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request. **************************************************
=================================================================

---------------------------------------------------------------------- ***************************************************** To ensure compliance with Treasury Department regulations, we advise you that, unless otherwise expressly indicated, any federal tax advice contained in this message was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or applicable state or local tax law provisions or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein. ***************************************************
************************************************** This email and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified any dissemination, distribution or copying of this email, and any attachments thereto, is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original copy and any copy of any email, and any printout thereof. Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request. **************************************************
=================================================================

--------------------------------------------------------------------------
***************************************************** To ensure compliance with Treasury Department regulations, we advise you that, unless otherwise expressly indicated, any federal tax advice contained in this message was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or applicable state or local tax law provisions or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein.
*****************************************************

***************************************************** This email and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified any dissemination, distribution or copying of this email, and any attachments thereto, is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original copy and any copy of any email, and any printout thereof. Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.
*****************************************************
=================================================================

EXHIBIT __8__

PAGE __175__

--------------------------------------------------------------------------
***************************************************** To ensure compliance with Treasury Department regulations, we advise you that, unless otherwise expressly indicated, any federal tax advice contained in this message