# EXHIBIT A

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
<u>CIVIL MINUTES -- GENERAL</u>

Case No.   CV 04-09049 SGL(RNBx)                        Date: February 4, 2008
Title:     CARTER BRYANT -v- MATTEL, INC.
           AND CONSOLIDATED ACTIONS
=========================================================================
PRESENT:   HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

        Jim Holmes                              Theresa Lanza
        Courtroom Deputy Clerk                  Court Reporter

ATTORNEYS PRESENT FOR CARTER         ATTORNEYS PRESENT FOR MATTEL:
BRYANT:

Michael Page                         John Quinn
                                     Jon D. Corey

                                     ATTORNEY PRESENT FOR CARLOS
ATTORNEYS PRESENT FOR MGA:           GUSTAVO MACHADO GOMEZ:

Thomas J. Nolan
Carl A. Roth
Robert J. Harrington

ATTORNEYS PRESENT FOR THIRD-
PARTY WITNESSES

Larry W. McFarland
Scott Gizer
Ramit Mizrahi
Henry H. Gonzalez
Neal A. Potischman
John Patrick Petrullo

Alexander H. Cote

MINUTES FORM 90                                Initials of Deputy Clerk __jh_
CIVIL -- GEN                    1              Time: 1/45

EXHIBIT  *A*
PAGE  *5*

PROCEEDINGS:

HEARING ON EX PARTE APPLICATIONS:

**1722 EX PARTE APPLICATION to Compel Deposition of Ana Cabrera, Beatriz Morales, and Maria Salazar and Mel Woods**

**1724 EX PARTE APPLICATION to Compel Depositions of Daphne Gronich, Joe Tiongco, Mariana Trueba, Pablo Vargas, MGA Entertainment, Inc.**

**1538 EX PARTE APPLICATION for Relief from 01-07-2008 Order re Motion Hearing**

**1583 EX PARTE APPLICATION to Compel Production of Electronic Media from Third Parties Elise Cloonan, Margaret Hatch-Leahy, and Veronica Marlow**

**1624 EX PARTE APPLICATION to Enforce Court's Orders Compelling Production of Tangible Items**

**1628 EX PARTE APPLICATION to Stay pending Review of Discovery Master's January 11, 2008 Order Granting MGA's and Bryant's Motion to Compel**

**ORDER TO SHOW CAUSE DIRECTED TO COUNSEL LARRY McFARLAND**

Having considered the documents submitted in support of and opposition to the applications set forth above, and having heard oral argument, the Court issues its rulings on these matters as stated on the record and as follows:

**EX PARTE APPLICATIONS REGARDING DEPOSITIONS**
**(DOCKET #1722 AND #1724) AND ORDER TO SHOW CAUSE**

These applications are DENIED IN PART, subject to the following rulings:

(1)     The Court's January 7, 2008, Order was intended to grant certain specified relief from the numerical limitations on discovery requests; it was not meant to make definitive rulings on burdensomeness, relevance, privilege, or service of discovery requests.

(2)     The Phase 1 discovery deadline has expired. Any Phase 1 discovery not properly served on or before this deadline may not now be pursued. Based on the representation of counsel that process for the letters rogatory on the Hong Kong witnesses has not been initiated, these witnesses may not be deposed on Phase 1 issues. Notwithstanding this ruling, however, the Court is concerned with the allegations by Mattel in its ex parte application regarding certain actions of Larry

MINUTES FORM 90
CIVIL -- GEN                                    2

Initials of Deputy Clerk __jh_____
Time: 1/45

EXHIBIT ___A___
PAGE ___6___

McFarland, who represents certain third-party witnesses. Mattel submits that Mr. McFarland has been deliberately evading service of a notice of deposition on him and his clients – serious allegations when made by an officer of the Court against another officer of the Court.   Accordingly, Mr. McFarland is **ORDERED TO SHOW CAUSE** why he and his clients should not be ordered to appear for deposition. A written response to this OSC must be filed no later than February 11, 2008.  Other parties may file written replies no later than February 19, 2008.  The Court will hear the matter at 10:00 a.m., February 25, 2008, in Courtroom One of the above-referenced Court.

(3)     Phase 1 depositions that have been scheduled past the discovery deadline for the convenience of the witnesses or pursuant to the stipulation of the parties and/or witnesses may proceed as scheduled.

(4)     All discovery related to Phase 2, other than certain individual depositions that may be related to both Phase 1 and Phase 2, is STAYED until further order of the Court.

(5)     As previously ordered and reaffirmed by this Court, all discovery matters shall be presented in the first instance to the Discovery Master.  The fact that the Discovery Master's ruling might impact upon the Court's scheduling order does not relieve the parties of following this procedure.  For instance, motions to compel, motions to quash, or motions challenging service as to existing discovery requests shall be brought before the Discovery Master.  So, too, must objections based on burdensomeness, relevancy, or privilege.  In general, and on the matters touched upon herein, the Court expresses no opinion as to these issues, and instead leaves those issues to the Discovery Master to decide in the first instance.

(6)     To the extent that certain challenged depositions are within the scope of the Court's January 7, 2008, Order, and are related to Phase 1 (or to the extent that a given deposition (other than a Rule 30(b)(6) deposition) is related to both Phase 1 and Phase 2), said deposition may proceed subject to the challenges set forth in the previous paragraph.  To the extent that the depositions are related to Phase 2, they are STAYED, as set forth above, notwithstanding the January 7, 2008, Order.

(7)     The parties' arguments require the Court to resolve an internal inconsistency in the Court's January 7, 2008, Order.  The Court's Order was meant to grant all parts of Mattel's Motion for Leave to Take Additional Discovery (docket #1134) except the relief sought as to the deposition of Carter Bryant.  The Court amends its 01.07.08 Order as follows:

Delete: <Specifically, the Court grants Mattel's request to take the individual depositions relating to the Bratz claims (set forth in the moving papers at 9-11) and relating to the trade secret and RICO

MINUTES FORM 90
CIVIL -- GEN                                      3

Initials of Deputy Clerk __jh__ ___
Time: 1/45

claims (set forth in the moving papers at 13).>

Replace with: <Specifically, the Court grants Mattel's request to take the individual depositions relating to the Bratz claims (set forth in the moving papers at 9-11), relating to the trade secret and RICO claims (set forth in the moving papers at 13), and relating to document preservation (set forth in the moving papers at 14 (Joe Tiongco and Daphne Gronich)).>

(8)     The Court's January 7, 2008, Order granted leave to take additional discovery over and above the previously allocated 24 depositions per side. Nevertheless, as to all other depositions, how to "count" the previously allocated depositions is left to the discretion of the Discovery Master.

(9)     At the hearing, counsel for Christensen, Glaser requested that the Court clarify that its January 7, 2008, ruling granted leave to depose it on only one issue. That is not the case, and the request is DENIED. Mattel has been granted relief from the numerical limitations that previously restricted its ability to depose those individuals and entities addressed by the Court's January 7, 2008, Order, including its ability to depose Christensen, Glaser. Unless otherwise restricted by the Discovery Master upon proper presentation of the issue to him, Mattel may depose Christensen, Glaser on any relevant, non-privileged matter.

### MACHADO GOMEZ'S EX PARTE APPLICATION RE
### JANUARY 7, 2008, ORDER (DOCKET # 1504)

This application is GRANTED. As noted above, Phase 2 discovery is STAYED until further order of the Court. The Court will address Phase 2 discovery, motions, pretrial, and trial dates after the conclusion of Phase 1 of the trial.

### MATTEL'S EX PARTE APPLICATION RE MOTION TO COMPEL PRODUCTION OF
### ELECTRONIC MEDIA FROM THIRD PARTIES (DOCKET #1538)

This application is DENIED. This matter must be addressed in the first instance by the Discovery Master.

### MATTEL'S EX PARTE APPLICATION TO ENFORCE COURT'S ORDERS
### COMPELLING PRODUCTION OF TANGIBLE ITEMS (#1624)

This application is GRANTED IN PART. Counsel for MGA shall employ its best efforts to arrange for shipment of those tangible things located in the Peoples' Republic of China ("PRC") to Hong Kong Special Administrative Region ("Hong Kong") for examination in conjunction with those tangible things already located in Hong Kong. Otherwise, counsel for MGA shall cooperate in the

arrangements for inspection in both Hong Kong and the PRC.   Mattel's request for costs is denied
without prejudice.

Counsel are encouraged to meet and confer with the intent of reaching a stipulation
regarding the supplementation of expert reports.  Absent such stipulation, at the appropriate time,
the Court will entertain an ex parte application from any party regarding this issue.

### MATTEL'S EX PARTE APPLICATION TO STAY PENDING REVIEW OF DISCOVERY MASTER'S JANUARY 11, 2008 ORDER (DOCKET # 1628)

This application is GRANTED IN PART.  The Court sets the motion for hearing on February
11, 2008.  Opposition shall be filed no later than February 6, 2008; any reply shall be filed no later
than February 8, 2008.  The Discovery Master's January 11, 2008, Order is stayed until the
issuance of the Court's minute order regarding the February 11, 2008, hearing.

**IT IS SO ORDERED.**

MINUTES FORM 90
CIVIL -- GEN                                                    5

Initials of Deputy Clerk __jh_____
Time: 1/45

EXHIBIT   A
PAGE   9

## NOTICE PARTY SERVICE LIST

**Case No.** CV 04-09049 SGL(RNBx)  **Case Title** Carter Bryant v. Mattel, Inc.

**Title of Document** Minute Order of February 4, 2008

| |
|---|
| Atty Sttlmnt Officer Panel Coordinator |
| BAP (Bankruptcy Appellate Panel) |
| Beck, Michael J (Clerk, MDL Panel) |
| BOP (Bureau of Prisons) |
| CA St Pub Defender (Calif. State PD) |
| CAAG (California Attorney General's Office - Keith H. Borjon, L.A. Death Penalty Coordinator) |
| Case Asgmt Admin (Case Assignment Administrator) |
| Catterson, Cathy (9th Circuit Court of Appeal) |
| Chief Deputy Admin |
| Chief Deputy Ops |
| Clerk of Court |
| Death Penalty H/C (Law Clerks) |
| Dep In Chg E Div |
| Dep In Chg So Div |
| Federal Public Defender |
| Fiscal Section |
| Intake Section, Criminal LA |
| Intake Section, Criminal SA |
| Intake Supervisor, Civil |
| PIA Clerk - Los Angeles (PIALA) |
| PIA Clerk - Riverside (PIAED) |
| PIA Clerk - Santa Ana (PIASA) |
| PSA - Los Angeles (PSALA) |
| PSA - Riverside (PSAED) |
| PSA - Santa Ana (PSASA) |
| Schnack, Randall (CJA Supervising Attorney) |
| Statistics Clerk |

| |
|---|
| US Attorneys Office - Civil Division -L.A. |
| US Attorneys Office - Civil Division - S.A. |
| US Attorneys Office - Criminal Division -L.A. |
| US Attorneys Office - Criminal Division -S.A. |
| US Bankruptcy Court |
| US Marshal Service - Los Angeles (USMLA) |
| US Marshal Service - Riverside (USMED) |
| US Marshal Service -Santa Ana (USMSA) |
| US Probation Office (USPO) |
| US Trustee's Office |
| Warden, San Quentin State Prison, CA |

| ✓ | ADD NEW NOTICE PARTY (if sending by fax, mailing address must also be provided) |
|---|---|

Name: Ambassador Pierre-Richard Prosper

Firm:

Address *(include suite or floor)*:  P.O. Box 581103

Salt Lake City,  UT   84158

*E-mail: Prosper.Pierre@Arentfox.com

*Fax No.:

* For CIVIL cases only

| JUDGE / MAGISTRATE JUDGE (list below): |
|---|
| |
| |
| |
| |

**Initials of Deputy Clerk** jh

EXHIBIT  A

PAGE  10

Case 2:04-cv-09049-SGL-RNB     Document 1931     Filed 02/04/2008     Page 7 of 7

## NOTICE PARTY SERVICE LIST

**Case No.**   CV 04-09049 SGL(RNBx)     **Case Title**  Carter Bryant v. Mattel, Inc.

**Title of Document**   Minute Order of February 4, 2008

| | |
|---|---|
| Atty Sttlmnt Officer Panel Coordinator | US Attorneys Office - Civil Division -L.A. |
| BAP (Bankruptcy Appellate Panel) | US Attorneys Office - Civil Division - S.A. |
| Beck, Michael J (Clerk, MDL Panel) | US Attorneys Office - Criminal Division -L.A. |
| BOP (Bureau of Prisons) | US Attorneys Office - Criminal Division -S.A. |
| CA St Pub Defender (Calif. State PD) | US Bankruptcy Court |
| CAAG (Califonia Attorney General's Office - Keith H. Borjon, L.A. Death Penalty Coordinator) | US Marshal Service - Los Angeles (USMLA) |
| Case Asgmt Admin (Case Assignment Administrator) | US Marshal Service -  Riverside (USMED) |
| | US Marshal Service -Santa Ana (USMSA) |
| Catterson, Cathy (9th Circuit Court of Appeal) | US Probation Office (USPO) |
| Chief Deputy Admin | US Trustee's Office |
| Chief Deputy Ops | Warden, San Quentin State Prison, CA |
| Clerk of Court | |
| Death Penalty H/C (Law Clerks) | |
| Dep In Chg E Div | |
| Dep In Chg So  Div | |
| Federal Public Defender | |
| Fiscal Section | |
| Intake Section, Criminal LA | |
| Intake Section, Criminal SA | |
| Intake Supervisor, Civil | |
| PIA Clerk - Los Angeles (PIALA) | |
| PIA Clerk - Riverside (PIAED) | |
| PIA Clerk - Santa Ana (PIASA) | |
| PSA - Los Angeles (PSALA) | |
| PSA - Riverside (PSAED) | |
| PSA - Santa Ana (PSASA) | |
| Schnack, Randall (CJA Supervising Attorney) | |
| Statistics Clerk | |

| ✓ | **ADD NEW NOTICE PARTY**  (if sending by fax, mailing address must also be provided) |
|---|---|

Name: Hon. Edward A. Infante (Ret.)

Firm:

Address *(include suite or floor)*:  Two Embarcadero

Center, Suite 1500, San Francisco,  CA  94111

*E-mail:

*Fax No.:

* For CIVIL cases only

| *JUDGE / MAGISTRATE JUDGE (list below):* |
|---|
| |
| |
| |
| |

**Initials of Deputy Clerk** jh

EXHIBIT    A
PAGE      11

G-75  (03/07)                    NOTICE PARTY SERVICE LIST

# EXHIBIT B

Transcript of Proceedings [Infante- Telephonic] 2/11/2008 8:30:00 AM

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3              EASTERN DIVISION

4

5   CARTER BRYANT, AN INDIVIDUAL, )

                      )

6          PLAINTIFF,   )

                    )

7   VS.            ) CASE NO.

                  )

8   MATTEL, INC., A DELAWARE    ) CV 04-9049 SGL (RNBX)

    CORPORATION,         ) [CONSOLIDATED WITH

9                ) CASE NO. 04-9059 AND

          DEFENDANT.   ) CASE NO. 05-2727]

10              )

    _____).

11              )

    AND CONSOLIDATED ACTION(S).  )

12   _____)

13

14

15   TELEPHONIC TRANSCRIPT OF

16   PROCEEDINGS, TAKEN BEFORE HON.

17   EDWARD A. INFANTE, AT 865 SOUTH

18   FIGUEROA STREET, THIRD FLOOR, LOS

19   ANGELES, CALIFORNIA, COMMENCING

20   AT 8:30 A.M., MONDAY, FEBRUARY 11,

21   2008, BEFORE ANGELA DUPRE, CSR 7804.

22

23

24

25

**EXHIBIT** $\mathcal{B}$
**PAGE** 12

```
 1    APPEARANCES OF COUNSEL:
 2
      FOR CARTER BRYANT:
 3
      KEKER & VAN NEST, LLP
 4    BY:  MICHAEL PAGE, ESQ.
           MATTHEW WERDEGAR, ESQ.
 5    710 SANSOME STREET
      SAN FRANCISCO, CALIFORNIA 94111
 6    (415) 391-5400
      (TELEPHONICALLY)
 7
 8
      FOR MATTEL, INC.:
 9
      QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
10    BY:  TIMOTHY ALGER, ESQ.
           HARRY OLIVAR, ESQ.
11         CHRISTOPHER TAYBACK, ESQ.
           B. DYLAN PROCTOR, ESQ.
12    865 SOUTH FIGUEROA STREET
      TENTH FLOOR
13    LOS ANGELES, CALIFORNIA 90017-2543
      (213) 443-3000
14
15
      FOR MGA ENTERTAINMENT, INC.:
16
      SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
17    BY:  RAOUL D. KENNEDY, ESQ.
      FOUR EMBARCADERO CENTER
18    SUITE 3800
      SAN FRANCISCO, CALIFORNIA 94111
19    (415) 984-6400
20
21    ALSO PRESENT:
22    HON. EDWARD A. INFANTE (TELEPHONICALLY)
23
24
25
```

EXHIBIT $B$
PAGE $13$

1       LOS ANGELES, CALIFORNIA; MONDAY

2              FEBRUARY 11, 2008

3                8:30 A.M.

4

5       MR. WERDEGAR: GOOD MORNING, YOUR HONOR. THIS

6    IS MATT WERDEGAR AND MIKE PAGE, OF KEKER &

7    VAN NEST, ON BEHALF OF CARTER BRYANT.

8       JUDGE INFANTE: GOOD MORNING.

9          I HAVE A LETTER DATED FEBRUARY 6TH IN

10   WHICH YOU INDICATE THE PRIORITY OF MOTIONS THAT YOU

11   WOULD LIKE TO BE HEARD FIRST, AND SO I AM PREPARED

12   TO HEAR THOSE MOTIONS.

13         THE FIRST ONE ON THE LIST IS MGA'S MOTION

14   TO COMPEL DISCOVERY AS TO ISSUES AS TO WHICH MATTEL

15   HAS WAIVED THE PRIVILEGE BY -- BY CLIENT ASSERTION.

16   THAT MOTION, I BELIEVE, WAS FILED JANUARY 18TH.

17   I'M PREPARED TO HEAR THAT MOTION.

18      MR. KENNEDY: GOOD MORNING. RAOUL KENNEDY, ON

19   BEHALF OF MGA.

20         I REALIZE WE HAVE LIMITED TIME THIS

21   MORNING. IF THE COURT HAS QUESTIONS, I'D BE

22   PLEASED TO TRY TO ADDRESS THEM. OTHERWISE, I THINK

23   THE MEMOS MAKE CLEAR THE ISSUE THAT HAS BEEN PLACED

24   IN ISSUE BY MATTEL, AND IT'S ONE OF THE CLASSIC

25   ISSUES THAT IN ORDER TO FULLY LITIGATE IT, WE NEED

1    COURT.

2        THE SITUATION IS THE SAME FOR MR. BRYANT.

3    HE ALSO FILED VERY SUBSTANTIAL ADDITIONAL

4    RESPONSES, SO I QUESTION WHETHER WE REALLY EVEN

5    HAVE A TIMELY MOTION BEFORE US.

6        ON A PROCEDURAL FRONT ALSO, ON

7    FEBRUARY 4, JUDGE LARSON CLARIFIED, AND THAT

8    CLARIFICATION WAS NEEDED, THAT PHASE II DISCOVERY

9    IS BIFURCATED. AND I SUBMIT, AT LEAST AS TO

10   QUESTIONS 43, 44, 48, 49, 50, ARE CLEARLY ALL

11   PHASE II, AND THERE MAY BE PORTIONS OF SOME OF THE

12   OTHERS THAT ARE AS WELL.

13       TO THE EXTENT THE COURT WILL ADDRESS THE

14   SUBSTANTIVE COMPLAINTS, I THINK THEY CAN BE

15   GROUPED. THE BIGGEST ONE IS THE CONTENTION

16   INTERROGATORIES, IF I CAN CALL THEM THAT, ASKED FOR

17   ALL FACTS, EVIDENCE, ET CETERA, THAT YOU'RE GOING

18   TO RELY UPON AT THE TIME OF TRIAL.

19       I THINK IF THE COURT LOOKS PARTICULARLY

20   AT THE SUPPLEMENTAL RESPONSES THAT HAVE BEEN FILED

21   SINCE THIS MOTION WAS FILED, THE NAMES OF ALL

22   WITNESSES, THE CATEGORIES OF DOCUMENTS, THEORIES,

23   THEMES, ET CETERA, ARE SET FORTH, FULLY COMPLYING

24   WITH THE CASE.

25       MATTEL KEEPS COMPLAINING THAT THEY'RE

# EXHIBIT C

1  Hon. Edward A. Infante (Ret.)
   JAMS
2  Two Embarcadero Center
   Suite 1500
3  San Francisco, California 94111
   Telephone:    (415) 774-2611
4  Facsimile:    (415) 982-5287

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10                          EASTERN DIVISION

11

12                                              CASE NO. CV 04-09049 SGL (RNBx)
                                                JAMS Reference No. 1100049530
13   CARTER BRYANT, an individual,

14          Plaintiff,
                                                Consolidated with
15      v.                                      Case No. CV 04-09059
                                                Case No. CV 05-2727
16   MATTEL, INC., a Delaware corporation,
                                                **ORDER GRANTING IN PART AND**
17          Defendant.                          **DENYING IN PART MATTEL'S**
                                                **MOTION TO COMPEL RESPONSES**
18                                              **TO INTERROGATORY NOS. 27-44**
                                                **AND 46-50 BY THE MGA PARTIES**
19
     CONSOLIDATED WITH
20   MATTEL, INC. v. BRYANT and
     MGA ENTERTAINMENT, INC. v. MATTEL,
21   INC.

22                          I. INTRODUCTION

23          On December 20, 2007, Mattel, Inc. ("Mattel") submitted a Motion to Compel Responses

24   to Interrogatory Nos. 27-44 and 46-50 by the MGA Parties. MGA Entertainment, Inc., MGA

25   Entertainment (HK) Limited, MGAE De Mexico, S.R.L. De C.V., and Isaac Larian (collectively

26   referred to as "MGA parties") submitted an opposition on December 31, 2007. Mattel submitted

27   a reply on January 7, 2008. On February 8, 2008, the MGA parties submitted their second

28   Bryant v. Mattel, Inc.,                                                          1
     CV-04-09049 SGL (RNBx)
                                    EXHIBIT _C_
                                    PAGE _16_

1  supplemental responses and third supplemental responses to the interrogatories at issue. The

2  matter was heard on February 11, 2008.

3  II. BACKGROUND

4      Mattel served its Revised Third Set of Interrogatories on the MGA parties on September

5  21, 2007, asking each of them the same fifteen questions (Nos. 27-41). Mattel served its Fourth

6  Set of Interrogatories on the MGA parties on October 12, 2007, propounding four additional

7  interrogatories (Nos. 42-45). Mattel served an Amended Fourth Set on October 23, 2007,

8  removing No. 45, but retaining Nos. 42-44. Mattel served its Fifth Set of Interrogatories on

9  October 19, 2007, which consisted of two additional questions (Nos. 46-47). On October 23,

10  2007, Mattel served its Sixth Set of Interrogatories, which consisted of Interrogatory No. 45 to

11  replace the previously withdrawn interrogatory. On October 25, 2007, Mattel served its Seventh

12  Set of Interrogatories, which consisted of Nos. 48-50.

13      In November of 2007, the MGA parties served responses and objections to Mattel's

14  interrogatories, and in some instances supplemental responses. For the most part, the answers of

15  each of the MGA parties are substantially similar. However, in several instances where MGA

16  Entertainment, Inc. provides a response, either MGA Entertainment (HK), MGAE de Mexico

17  S.R.L. de C.V. and/or Larian do not, asserting that the interrogatory "appears directed at another

18  party."

19      The parties met and conferred on December 10 and 12, 2007 regarding the supplemental

20  responses. The MGA parties offered to provide supplemental responses by January 7, 2008.

21  Mattel contends, however, that the scope of the MGA parties' proposed supplemental responses

22  was inadequate. Therefore, Mattel filed the instant motion on December 20, 2007.[1]

23      Mattel contends that the interrogatories at issue seek information relevant to central issues

24  in the case, such as: MGA's contentions regarding which Bratz inventions were created before,

25

26      [1] One of the issues raised in the motions papers –whether the interrogatories exceed the 50 interrogatory

27  per side limit -- has been rendered moot by Judge Larson's Order Granting in Part and Denying in Part Mattel's Motion for Leave to Take Additional Discovery, dated January 7, 2008.

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

2

EXHIBIT _C_
PAGE __17__

1  during and after Carter Bryant's ("Bryant") employment with Mattel; the identity of electronic
2  storage devices MGA used prior to 2002 for digital information related to Bratz; the identity of
3  the sources of information from which MGA has collected documents in this litigation which
4  relate to Bratz and the time period prior to February 28, 2001; the facts allegedly supporting
5  MGA's contention that the Bratz dolls are not based on designs Bryant created while employed
6  by Mattel; MGA's contentions regarding Mattel's claims against MGA, Bryant and others,
7  including how Bryant's Inventions Agreement with Mattel and his assignment of rights to Bratz
8  inventions to MGA and services with or for MGA while employed by Mattel affect who owns the
9  rights to Bratz inventions, and the alleged basis for MGA's claims that it purportedly acted with
10  innocent intent; the identity of MGA's bank or financial accounts; the identity of former Mattel
11  employees that have been employed by MGA; non-privileged facts concerning the dispute
12  leading to the withdrawal of MGA's prior counsel that relate to MGA's handling of discovery in
13  this case; the facts supporting MGA's claims against Mattel, including MGA's contentions that
14  Mattel has copied, infringed or diluted MGA's trade dress; and the relevant dates regarding the
15  products MGA asserts MGA has copied or infringed. Mattel's Motion at pp. 2-3.

16  Mattel contends that although it has received responses to all of the interrogatories except
17  Nos. 39, 46 and 47, all of the responses are deficient. As an initial matter, Mattel contends that
18  the MGA parties' "boilerplate" objections – that the interrogatories are vague and ambiguous,
19  overbroad, unduly burdensome and oppressive, seek information not in the possession, custody or
20  control of MGA, seek information protected by the attorney-client privilege, work product or joint
21  defense privileges, and call for a legal conclusion – are without merit. Mattel contends that the
22  MGA parties fail to specify how the questions are overbroad, unduly burdensome or oppressive.
23  Mattel also contends that its interrogatories do not require the disclosure of privileged information
24  or work product, but rather require the MGA parties to state their contentions about facts or the
25  application of law to facts.

26  Mattel further contends that some of the MGA parties' responses are deficient in that they
27  merely lay out the "basic facts" (instead of "all facts") on which they intend to rely, without any

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

EXHIBIT  _C_
PAGE  _18_

3

1    details. Mattel contends that its contention interrogatories, including the purportedly "negative"

2    interrogatories asking for every fact which supports the denial of a statement or allegation, are

3    commonly used and well accepted to elucidate facts regarding a party's contentions, absent a

4    showing of undue burden. Indeed, Mattel points to decisions by the district judge which it

5    contends supports its use of the contention interrogatories at issue. Mattel also points out that it

6    provided the MGA parties with the details supporting its contentions in a one hundred-ten page

7    supplemental interrogatory response, and contends that the MGA parties ought to provide

8    comparable details to Mattel.

9        Mattel also contends that the MGA parties have unilaterally limited many of their

10    responses by disregarding Mattel's definitions of terms and phrases used in the interrogatories.

11    Further, Mattel contends that the MGA parties have failed to identify with specificity documents

12    they intend to rely upon, as requested by some of the interrogatories.

13        Mattel acknowledges that fully responding to the interrogatories will require some effort.

14    However, Mattel contends that the interrogatories are not unduly burdensome in this high stakes

15    litigation. Mattel contends that its need to discover MGA's key contentions outweighs any effort

16    the MGA parties will be required to undertake to disclose the requested information.

17    Accordingly, Mattel seeks an order overruling all of the MGA parties' objections and compelling

18    the MGA parties to provide complete responses to Interrogatory Nos. 27-44 and 46-50.

19        The MGA parties contend that their current responses comply with Rule 33 of the Federal

20    Rules of Civil Procedure and that Mattel is not entitled to any additional information for a number

21    of reasons. The MGA parties raise four main arguments in opposition to Mattel's motion. First,

22    the MGA parties contend that Mattel is not entitled to information about MGA's substitution of

23    counsel because such information is protected by the attorney-client privilege or the work product

24    doctrine. Second, the MGA parties contend that Mattel is not entitled to the sweeping financial

25    data that has been requested. Third, the MGA parties contend that Mattel's contention

26    interrogatories contain misleading and unfair definitions and are unduly burdensome in that they

27    require a recitation of all facts supporting the MGA parties' contentions. Fourth, the MGA parties

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

**EXHIBIT** _C_
**PAGE** _19_

4

1  contend that Rule 33 does not require a response to a contention interrogatory to set forth more

2  than the principal factual and legal bases for the response.

3  III. STANDARDS

4       Rule 26 of the Federal Rules of Civil Procedure provides that "[p]arties may obtain

5  discovery regarding any matter, not privileged, that is relevant to the claim or defense of any

6  party." Fed.R.Civ.P. 26(b)(1). Fishing expeditions to discover new claims, however, are not

7  permitted. See Fed.R.Civ.P. 26(b)(1); Rivera v. NIBCO, Inc., 364 F.3d 1057, 1072 (9th Cir.

8  2004) ("District courts need not condone the use of discovery to engage in 'fishing

9  expeditions.'"); Bernstein v. Travelers Ins. Co., 447 F.Supp.2d 1100, 1102 (N.D. Cal. 2006)

10  (citing Rule 26(b), Advisory Committee's Note to Amendments Effective December 1, 2000)

11  (Congress' changes in the language of Rule 26(c), substituting the words "claim or defense" for

12  the phrase "subject matter involved in the pending action," were intended to prevent discovery

13  that swept far beyond the claims and defenses of the parties and that seemed designed not to fairly

14  litigate the issues presented by the pleadings but to develop new claims or defenses.).

15       Further, pursuant to Rule 26(b)(2), Fed.R.Civ.P., the court shall limit the frequency or

16  extent of use of the discovery methods if the court determines that (i) the discovery sought is

17  unreasonably cumulative or duplicative, or is obtainable from some other source that is more

18  convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample

19  opportunity by discovery in the action to obtain the information sought; or (iii) the burden or

20  expense of the proposed discovery outweighs its likely benefit, taking into account the needs of

21  the case, the amount in controversy, the parties' resources, the importance of the issues at stake in

22  the litigation, and the importance of the proposed discovery in resolving the issues. Fed.R.Civ.P.

23  26(b)(2)(C).

24       Rule 33 of the Federal Rules of Civil Procedure allows a party to propound

25  interrogatories, for which the responding party is required to furnish such information as is

26  available to the party after conducting a reasonable inquiry. "Each interrogatory must, to the

27  extent it is not objected to, be answered separately and fully in writing under oath." Fed.R.Civ.P.

28

EXHIBIT _C_
PAGE _20_

5

1   33(b)(3). "The grounds for objecting to an interrogatory must be stated with specificity."

2   Fed.R.Civ.P. 33(b)(4).

3   ### IV. DISCUSSION

4   A. Interrogatories About the Identity of Bratz Inventions (Nos. 27, 28 and 29)

5        Interrogatory Nos. 27-29 request information relating to Bratz inventions created during

6   three different time periods, namely before, during and after Bryant's employment with Mattel:

7       **Interrogatory No. 27**: IDENTIFY each and every BRATZ INVENTION YOU
contend was CREATED, in whole or in part, prior to January 4, 1999, and for
8   each BRATZ INVENTION so identified state all FACTS that support YOUR
contention that such BRATZ INVENTION (or aspects or portions thereof) was
9   CREATED prior to January 4, 1999, and IDENTIFY all PERSONS with
10   knowledge of such facts and all DOCUMENTS which REFER OR RELATE TO
such facts.

11

12       **Interrogatory No. 28**: IDENTIFY each and every BRATZ INVENTION YOU
contend was CREATED, in whole or in part, after October 19, 2000 and before
13   June 1, 2001, and for each BRATZ INVENTION so identified state all FACTS
that support YOUR contention that such BRATZ INVENTION (or aspects or
14   portions thereof) was CREATED after October 19, 2000 and before June 1, 2001,
and IDENTIFY all PERSONS with knowledge of such facts and all
15   DOCUMENTS which REFER OR RELATE TO such facts.

16

17       **Interrogatory No. 29**: IDENTIFY each and every BRATZ INVENTION that
was CREATED, in whole or in part, after January 3, 1999 and before October 21,
18   2000, and for each BRATZ INVENTION so identified state all FACTS that
REFER OR RELATE TO the timing of the creating of such BRATZ
19   INVENTION and IDENTIFY all PERSONS with knowledge of such facts and all
DOCUMENTS which REFER OR RELATE TO such facts.

20

21   Mattel contends that these interrogatories seek information that is plainly relevant and

22   discoverable, and that the MGA parties do not contend otherwise. Mattel further contends that

23   the partial response given using the MGA parties' definition, not Mattel's definition, of BRATZ

24   INVENTION is inadequate. Mattel also contends that the MGA parties have failed to carry their

25   burden of showing that the interrogatories are burdensome or oppressive, particularly given the

26   importance of the information sought. Mattel emphasizes that the information sought will prove

27   liability as to a number of its claims. Moreover, Mattel contends that knowing which inventions

28

1   MGA claims were created before and just after Bryant's second period of employment at Mattel

2   is essential so that Mattel can avoid unfair surprise at trial and impeach the defendants'

3   chronology of Bratz design and development.

4          The MGA parties contend that Mattel is using misleading and unfair definitions to create

5   jury confusion. In particular, the MGA parties object to Mattel's definition of "BRATZ

6   INVENTION," which they contend contains separate component parts ("representation, idea,

7   concept, work, process, procedure, plan, improvement, DESIGN or other development"), and

8   Mattel's definition of "DESIGN," which they contend adds at least another 21 elements ("all

9   works, designs, artwork, sketches, drawings, illustrations, representations, depictions, blueprints,

10  schematics, diagrams, images, sculptures, prototypes, models, samples, rotocasts, reductions to

11  practice, developments, inventions and/or improvements"). The MGA parties contend that

12  including all of these concepts in the definition "improperly conflates distinct issues of patent law,

13  copyright protection, trade secret law and the common law protecting original ideas, many of

14  which have no place in the ordinary usage of the term 'invention.'" MGA Parties' Opposition at

15  2:11-13. The MGA parties emphasize that these distinctions are important because Mattel lays

16  claim to Bratz under a January 4, 1999 "Employee Confidential Information and Inventions

17  Agreement." Further, the MGA parties accuse Mattel of using the contention interrogatories to

18  elicit a misleading "sound bite" it can read to the jury to argue that the MGA parties concede that

19  Bryant "invented" Bratz while employed by Mattel. The MGA parties contend that they have

20  provided adequate responses to the interrogatories using the common and ordinary meaning of the

21  term "invention," and should not be required to provide anything further.

22          Next, the MGA parties contend that they have given Mattel the principal factual and legal

23  bases for their contentions, and Rule 33 does not require them to provide anything further. The

24  MGA parties contend that requiring a narrative response setting forth all evidence in support of

25  their contentions would render the interrogatories unduly burdensome and "inherently improper."

26  See e.g. Clean Earth Remediation & Constr. Servs. v. Am. Int'l Group, 245 F.R.D. 137, 141 (S.D.

27  N.Y. 2007) ("[A] number of cases have held that interrogatories seeking identification of all facts

28

EXHIBIT   C
PAGE   22

7

1   supporting a particular allegation are *inherently improper*.").

2       Mattel's motion to compel further responses to Interrogatory Nos. 27-29 is denied because

3   the interrogatories are overbroad and unduly burdensome. The definition of "Bratz Invention" is

4   extremely broad, encompassing numerous intellectual property concepts. Mattel has not shown

5   how each and every concept embedded in its multi-faceted definition of "Bratz Invention" is

6   relevant to interpreting the term "invention" for purposes of enforcing the "Employee

7   Confidential Information and Inventions Agreement," signed by Bryant. The breadth and undue

8   burden of Interrogatory Nos. 27-29 are also compounded by the fact that Mattel is employing an

9   extremely broad definition of "Bratz Invention" in a contention interrogatory seeking all facts

10   supporting the MGA parties' contentions, the identities of all persons knowledgeable, and all

11   supporting documents. Not all contention interrogatories requiring a recitation of all facts,

12   documents and witness are objectionable. See e.g. Tatum v. Schwartz, 2007 WL 2220977 at *1

13   (E.D. Cal. Aug. 2, 2007) (noting that contention interrogatories can impose undue burdens, but

14   that "courts have otherwise approved of them when they are limited to discrete, narrow factual

15   events"); Roberts v. Heim, 130 F.R.D. 424, 427 (N.D. Cal. 1989) (recognizing a broad spectrum

16   of contention interrogatories, and noting that it is not possible to announce a hard and fast rule as

17   to the exact amount of detail a party has to supply in response to a contention interrogatory). In

18   the instant case, however, Mattel's contention interrogatories would force the MGA parties to

19   review the nearly 4 million pages of documents produced in this action and more than 50 days of

20   deposition testimony in search of information relating to "any representation, idea, concept, work,

21   process, procedure, plan, improvement, design or other development" that refers or relates to

22   Bratz, including "all works, designs, artwork, sketches, drawings, illustrations, representations,

23   depictions, blueprints, schematics, diagrams, images, sculptures, prototypes, models, samples,

24   rotocasts, reductions to practice, developments, inventions and/or improvements" that refer or

25   relate to Bratz. It is not the MGA parties' responsibility to re-write the interrogatories in a

26   manner that will yield Mattel the most amount of information to support Mattel's claims and

27   defenses. On balance, the burden of responding further to Interrogatory Nos. 27-29, as written,

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

8

1   outweighs the likely benefit of the interrogatories, taking into account the needs of the case, the

2   amount in controversy, the parties' resources, the importance of the issues at stake in the

3   litigation, and the importance of the proposed discovery in resolving the issues.

4          In any event, the MGA parties' responses are adequate under the circumstances.  Faced

5   with overbroad and unduly burdensome interrogatories, the MGA parties provide facts supporting

6   the contentions identified in the interrogatories, identify persons with knowledge of those facts,

7   and identify the principal documents or categories of documents that support each contention.

8   See e.g. Moses v. Halstead, 236 F.R.D. 667, 674 (D. Kan. 2006).  For example, in response to

9   Interrogatory No. 27, the MGA parties set forth their contention that the concept for a new line of

10  fashion dolls envisioned by Bryant in August and/or September of 1998 could not have been

11  patented as a utility patent because fashion dolls were in the public domain for the purposes of

12  utility patent protection.  However, the MGA parties contend that Bryant's idea of a line of

13  fashion dolls he called Bratz was sufficiently novel and original to be protected under California

14  law as a confidential novel idea under Desny v. Wilder, 46 Cal.2d 715 (1956) and its progeny.

15         The MGA parties' supplemental responses to Interrogatory No. 27 also include the MGA

16  parties' contention that Bryant's pre-1999 drawings were never reduced to practice; that design

17  patents are not available for drawings or two-dimensional flat art of the sort that Bryant sketched

18  in 1998; that Bryant was not a sculptor and any effort to translate his pre-1999 two-dimensional

19  flat art into a three-dimensional form for use as a fashion doll sculpt would have produced shapes

20  that were different from the actual shape of the final three-dimensional Bratz sculpt used in

21  manufacturing the first generation of Bratz dolls released on the market by MGA in or about June

22  2001; that the final physical shape of the first generation of Bratz dolls released on the market by

23  MGA in or about June 2001 was conceived by Margaret Leahy; and that Bryant's drawings used

24  standard fashion model poses, and thus were not novel or original.  Further, the MGA parties'

25  supplemental responses to Interrogatory No. 27 include the MGA parties' contention that the

26  drawings Bryant completed in August and September of 1998 contained original expression

27  covered by copyright, but that subsequent modifications and versions of the drawings made by

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

9

EXHIBIT  C
PAGE  24

1  Bryant in 1999 and 2000 did not contain original expression. The MGA parties also identify

2  numerous individuals having knowledge of the facts supporting their contentions, and identify

3  documents that are relevant to the MGA parties' contentions.

4  B. Interrogatory About the Identity of Former Mattel Employees Hired by MGA (No. 41)

5        Interrogatory No. 41 asks the MGA parties to "IDENTIFY" all former Mattel employees

6  "who are now or have been employed" by MGA since January 1, 1999. More specifically,

7  Interrogatory No. 41 asks the MGA parties to:

8        IDENTIFY all PERSONS who at any time have been employed by or under
         contract with MATTEL who are now or have been employed by or under contract
9        with YOU since January 1, 1999, and, for each such PERSON, state his or her
         name, date of hire or effective date of contract, the date on which YOU first had
10       contact with such PERSON regarding potential employment or contracting, the
         date(s) on which such PERSON was interviewed for possible employment or
11       contracting, each title (if any) such PERSON has held while employed by or
         under contract with YOU, and the date of termination (if applicable).
12

13 In their supplemental response, the MGA parties assert numerous objections, but also provide a

14 list of well over a hundred individuals with their position title and employment dates.

15       Mattel contends that the MGA parties' response is incomplete because it does not contain

16 the date of first contact regarding potential employment or contracting, as well as the interview

17 date for potential employment or contracting.

18       The MGA parties contend that during the meet and confer process, they agreed to

19 investigate whether the additional requested information was reasonably available. The MGA

20 parties represent that they are in the process of looking for the requested information, and that

21 they will supplement their response if the information is reasonably available without undue

22 burden.

23       Mattel's motion to compel a further response to Interrogatory No. 41 is granted in part.

24 The requested information is clearly relevant to Mattel's claims, and the MGA parties do not

25 contend otherwise. In particular, the date of first contact, interview date, start date and end date

26 for Bryant's employment are highly relevant, but are conspicuously absent from the MGA

27 parties' response. The MGA parties shall provide the missing information for Bryant. In

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

EXHIBIT  C
PAGE  25

10

1    addition, the MGA parties shall provide the interview dates for each of the individuals identified

2    in their supplemental responses. The interview dates are potentially relevant to Mattel's claim

3    that the MGA parties induced former Mattel employees to abscond with Mattel's trade secrets.

4    However, the MGA parties are not required to provide the date of first contact for each individual

5    because the burden of producing such information outweighs its likely benefit, taking into

6    account the factors set forth in Rule 26(b)(2)(C), Fed.R.Civ.P.

7    C. Interrogatories re Allegedly Copied or Infringed Products (Nos. 43-44)

8        Interrogatory Nos. 43 and 44 request dates on which each "concept, design, product,

9    product packaging or other matter that YOU contend Mattel copied or infringed" was (1)

10   "conceived" and (2) "first fixed in any tangible medium of expression," and the identity of

11   persons with knowledge and documents that refer or relate to the foregoing. In the responses, the

12   MGA parties state numerous objections, but also refer Mattel to MGA's response to Interrogatory

13   No. 3 of Mattel's First Set of Interrogatories re Claims of Unfair Competition. The MGA parties

14   also respond that, in general, at MGA, product development is completed 7-8 months before the

15   first invoice date, although that time period could be reduced in certain situations to 5-6 months.

16       Mattel contends that the information it seeks is relevant to its defense against MGA's

17   claims that Mattel copied or infringed MGA's products. One of Mattel's defenses is that "Mattel

18   was the one who came up with relevant matters first – before MGA – and that MGA was the one

19   who copied or stole from Mattel." Mattel's Motion at p.23. Mattel contends that the MGA

20   parties' responses to Interrogatory Nos. 43 and 44 are inadequate because the referenced

21   Interrogatory No. 3 requested different information, namely the dates on which the products were

22   first "disclosed to any PERSON not employed by MGA" and first "made available for sale."

23       In response to the instant motion to compel, the MGA parties represent that they are

24   assessing whether they can provide more specific information without undue hardship, and will

25   supplement their responses if such information is available. MGA's Opposition at p.29.

26       Mattel's motion to compel further responses to Interrogatory Nos. 43 and 44 is granted.

27   The requested information is relevant to Mattel's defense against the MGA parties' claims that

28

1    their products have been copied or infringed by certain Mattel products. Although the MGA

2    parties served supplemental responses after filing their opposition brief, the supplemental

3    responses do not include the requested information. The MGA parties have failed to establish

4    that the interrogatories are unduly burdensome.

5    D. Interrogatories About the Trade Dress MGA Claims Mattel Products Infringe (Nos. 48-50)

6         Interrogatory Nos. 48-50 are directed to the MGA parties' trade dress claims:

7         **Interrogatory No. 48**: Separately IDENTIFY each trade dress that YOU
          contend MATTEL has copied, infringed or diluted or that is otherwise the
8         subject of YOUR claims, defenses or allegations in THIS ACTION.

9         **Interrogatory No. 49**: For each trade dress identified in response to
          Interrogatory No. 48, separately and fully IDENTIFY each and every MATTEL
10        product, packaging or other matter that YOU contend copies, infringes or dilutes
          such trade dress, including without limitation by describing fully and separately,
11        for each such MATTEL product, packaging or other matter, each and every
          element of the claimed trade dress that YOU contend MATTEL has copied,
12        infringed or diluted.

13        **Interrogatory No. 50**: For each trade dress identified in response to
          Interrogatory No. 48, separately and completely IDENTIFY all facts that support
14        YOUR contention that such trade dress is protectible, all DOCUMENTS that
          REFER OR RELATE to the foregoing and all PERSONS with knowledge of the
15        foregoing.

16        Mattel contends that these interrogatories seek core contentions underlying the MGA

17   parties' trade dress infringement claims and that the partial responses provided are inadequate

18   because they set forth only the "basic facts" without identifying a single product that MGA

19   alleges was infringed or any other details. Mattel also contends that the responses are improper

20   insofar as the MGA parties state that their responses "may be incomplete" as the subject matter of

21   this interrogatory will be the source of expert testimony and an expert may identify additional

22   facts that support MGA's contentions. Mattel contends that such a limitation would allow MGA

23   to sandbag Mattel by introducing new products into the litigation after fact discovery has closed.

24        As a preliminary matter, the MGA parties contend that Interrogatory Nos. 48-50 are

25   directed to a Phase 2 issue, and therefore, they reserve their right to supplement the responses in

26   Phase 2. Nevertheless, the MGA parties contend that their responses provide Mattel with the

27   principal facts supporting their contentions in compliance with Rule 33.

28

EXHIBIT _C_

PAGE _27_

1    Mattel's motion to compel further responses to Interrogatory Nos. 48-50 is denied. The

2    MGA parties are in substantial compliance with Rule 33, having identified numerous elements of

3    trade dress they contend Mattel has infringed. More specifically, the MGA parties' responses

4    identify Mattel's "My Scene" fashion dolls and pet dolls as the Mattel products that infringe their

5    trade dress. The MGA parties also set forth the principal facts supporting their contention that

6    their trade dress is protectible under the applicable trade dress legal principles, including that the

7    trade dress is aesthetic and non-functional, inherently distinctive, and has acquired secondary

8    meaning. That the interrogatory responses include a reservation of rights to supplement during

9    expert discovery does not render the responses inherently improper or inadequate. Mattel does

10   not contest that the identification of the elements and products subject to trade dress infringement

11   will be a subject of expert testimony.

12   E. Interrogatory About the Identity of MGA's Bank Accounts (No. 39)

13   Interrogatory No. 39 asks MGA to "IDENTIFY each and every bank or financial

14   institution account that REFERS OR RELATES TO YOU, including accounts in YOUR name or

15   for YOUR benefit, since January 1, 1999." The MGA parties objected to this interrogatory as

16   seeking information "not relevant to the claims or defenses of any party to the action and not

17   reasonably calculated to lead to the discovery of admissible evidence.

18   Mattel contends that the information sought is discoverable because it may lead to direct

19   evidence of liability regarding Mattel's allegations of commercial bribery against MGA and

20   Larian. More specifically, Mattel contends that the timing and amounts of payments made to

21   Bryant and to other then-Mattel employees from MGA's bank accounts would establish

22   commercial bribery and other tortious conduct. Mattel also contends that the timing of such

23   payments would also be indicative of the timing of Bryant's first involvement with MGA.

24   Further, Mattel contends that the requested information is relevant to establish net worth for

25   purposes of calculating punitive damages. Mattel also contends that the MGA parties' objection

26   based upon Rule 69(a), Fed.R.Civ.P., is without merit because the requested information is

27   independently relevant to many issues in the liability phase of trial, and is not just directed at

28

1 │ seeking discovery in aid of a judgment or execution.

2 │     The MGA parties contend that Mattel is not entitled to the sweeping financial data sought

3 │ in Interrogatory No. 39. The MGA parties are particularly concerned that Mattel will use the

4 │ information it obtains pursuant to Interrogatory No. 39 to launch abusive third-party discovery for

5 │ even more private financial information. Further, the MGA parties contend that Mattel has

6 │ already received substantial financial information from MGA Entertainment, Inc. directly, and

7 │ has not shown how that information is insufficient. More specifically, the MGA parties point out

8 │ that Mattel already audited and unaudited quarterly and annual profit and loss statements;

9 │ audited and unaudited quarterly and annual statements; annual reports; various MGA financial

10 │ reports; various financial documents relating to Veronica Marlow; documents showing royalty

11 │ payments to Bryant; documents showing MGA's sales, returns and costs of good sold for each

12 │ month, by SKU, since 2001; documents showing MGA's promotional advertising and media

13 │ expenditures, including MGA's internal allocation of those expenditures by brand and/or product;

14 │ documents showing MGA's amortization and depreciation of certain capital assets and

15 │ expenditures; documents showing MGA's monthly general ledger entries aggregated by account,

16 │ including income and expense accounts, reserves and liabilities; and documents sufficient to

17 │ explain MGA's various accounts as presently and historically maintained in MGA's books and

18 │ records, as well as various nomenclature assigned to items, products, brands, sub-brands, and

19 │ profit centers. MGA's Opposition at pp. 10-11. Further, the MGA parties contend that MGA's

20 │ witness, Lisa Tonnu, has testified regarding payments to Mr. Bryant.

21 │     Mattel's motion to compel a further response to Interrogatory No. 39 is denied on the

22 │ grounds that the financial information sought is cumulative of other discovery already sought and

23 │ obtained by Mattel, as outlined above by the MGA parties. Mattel has also sought and obtained

24 │ documents sufficient to identify each of Mr. Larian's bank accounts or financial institutions and

25 │ other banking relationships since January 1, 1999. See Order Granting in Part and Denying in

26 │ Part Mattel's Motion to Compel Production of Documents by Isaac Larian; Denying Request for

27 │ Sanctions (Document Request No. 207). Further, as Mattel acknowledges, Mattel has sought and

28 │

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

14

**EXHIBIT** _C_
**PAGE** _29_

1   obtained deposition testimony regarding payments to Mr. Larian, including the account to which

2   such payments were made.  See Order Granting in Part and Denying in Part Mattel's Motion to

3   Compel MGA to Produce Witnesses Pursuant to Third Notice of Deposition Under Rule 30(b)(6).

4   In light of the financial information discovery Mattel has already obtained, Interrogatory No. 39 is

5   unjustified, taking into consideration all of the factors set forth in Rule 26(b)(2)(C), Fed.R.Civ.P.

6   F. Contention Interrogatories (Nos. 30-38 and 42)

7        Mattel served several contention interrogatories on several additional topics.  The

8   remaining contention interrogatories at issue are set forth below.

9        **Interrogatory No. 30**: State all facts that support YOUR contention, if YOU so
        contend, that, assuming BRYANT assigned rights in any BRATZ INVENTION
10       to MATTEL pursuant to the INVENTIONS AGREEMENT, MGA is entitled to
        priority over and/or has superior rights to MATTEL as to such BRATZ
11       INVENTION, and IDENTIFY all PERSONS with knowledge of such facts and
        all DOCUMENTS that REFER OR RELATE TO such facts.

12

13       **Interrogatory No. 31**: State all facts that support YOUR contention, if YOU so
        contend, that the INVENTIONS AGREEMENT is not valid and enforceable, and
        IDENTIFY all PERSONS with knowledge of such facts and all DOCUMENTS
14       that REFER OR RELATE TO such facts.

15       **Interrogatory No. 32**: State all facts that support YOUR contention, if YOU so
        contend, that MATTEL is not or would not be entitled to injunctive relief as
16       requested in its COMPLAINT and/or COUNTERCLAIMS if it is not ultimately
        determined that MATTEL owns one or more BRATZ INVENTIONS, and
17       IDENTIFY all PERSONS with knowledge of such facts and all DOCUMENTS
        that REFER OR RELATE TO such facts.

18

19       **Interrogatory No. 33**: State all facts that support YOUR contention, if YOU so
        contend, that MATTEL is not entitled to an award of punitive or exemplary
        damages against YOU, and IDENTIFY all PERSONS with knowledge of such
20       facts and all DOCUMENTS that REFER OR RELATE TO such facts.

21       **Interrogatory No. 34**: State all facts that support YOUR contention, if YOU so
        contend, that YOU did not intentionally interfere with the INVENTIONS
22       AGREEMENT when BRYANT purported to TRANSFER and MGA purported
        to ACQUIRE rights to BRATZ, and IDENTIFY all PERSONS with knowledge
23       of such facts and all DOCUMENTS that REFER OR RELATE TO such facts.

24       **Interrogatory No. 35**: State all facts that support YOUR contention, if YOU so
        contend, that YOU did not aid or abet any breach of fiduciary duty or duty of
25       loyalty owed by BRYANT to MATTEL when BRYANT performed work or
        services with or for MGA while BRYANT was employed by MATTEL, and
26       IDENTIFY all PERSONS with knowledge of such facts and all DOCUMENTS
        that REFER OR RELATE TO such facts.

27

28       **Interrogatory No. 36**: State all facts that support YOUR contention, if YOU so

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

EXHIBIT  C
PAGE  30

15

1    contend, that YOU acted with an innocent state of mind or reasonably believed
that MATTEL did not own any rights in any BRATZ INVENTION when Bryant
2    purported to TRANSFER and MGA purported to ACQUIRE rights to BRATZ,
and IDENTIFY all PERSONS with knowledge of such facts and all
3    DOCUMENTS that REFER OR RELATE TO such facts.

4    **Interrogatory No. 37:** State all facts that support YOUR contention, if YOU so
contend, that BRYANT did not breach the INVENTIONS AGREEMENT when
5    BRYANT purported to TRANSFER right to BRATZ to MGA, and IDENTIFY
all PERSONS with knowledge of such facts and all DOCUMENTS that REFER
6    OR RELATE TO such facts.

7    **Interrogatory No. 38:** State all facts that support YOUR contention, if YOU so
contend, that BRYANT did not breach BRYANT's duty of loyalty or fiduciary
8    duties to MATTEL when BRYANT performed work or services with or for
MGA while BRYANT was employed by MATTEL, and IDENTIFY all
9    PERSONS with knowledge of such facts and all DOCUMENTS that REFER OR
RELATE TO such facts.

10

11    **Interrogatory No. 42:** State all facts that support YOUR contention, if YOU so
contend, that any BRATZ DOLLS are not BASED ON BRATZ DESIGNS
   created by BRYANT on or before October 19, 2000, and IDENTIFY all
12    PERSONS with knowledge of such facts and all DOCUMENTS that REFER OR
RELATE TO such facts.

13

14

15 Mattel contends that each of these interrogatories seeks facts relating to key issues in this case,

16 including MGA's contentions, if any, regarding the priority of Mattel's rights in Bratz vis-à-vis

17 MGA; how Bryant's Inventions Agreement with Mattel, Bryant's assignment of rights to Bratz

18 inventions to MGA, and Bryant's services with or for MGA while employed by Mattel affect who

19 owns the rights to Bratz inventions; Mattel's alleged entitlement to punitive damages and other

20 relief; MGA's purported innocent state of mind; MGA's alleged intentional interference with the

21 Inventions Agreement; MGA's alleged aiding and abetting of Bryant's breach of fiduciary duty

22 and duty of loyalty to Mattel; why the Bratz dolls purportedly are not based on designs Bryant

23 created during his Mattel employment; and why the trade dress MGA contends Mattel infringed is

24 protectible.  Mattel contends that the MGA parties cannot show burden sufficient to outweigh

25 Mattel's need for the information sought.

26       In addition to the objections discussed in connection with Interrogatory Nos. 27-29, the

27 MGA parties contend that they have given sufficient responses to Interrogatory Nos. 30 and 42.

28

EXHIBIT _C_
PAGE _31_

16

1    As for Interrogatory Nos. 31-38, the MGA parties contend that the interrogatories improperly

2    assume that Mattel owns Bryant's original idea for Bratz and ask the MGA parties to explain why

3    they should not be punished for developing Bryant's ideas.  Nevertheless, the MGA parties

4    represent that they responded to the interrogatories in good faith by providing the principal facts

5    supporting their contentions, and therefore are in compliance with Rule 33.

6         Mattel's motion to compel a further response to Interrogatory No. 30 is denied.  Like

7    Interrogatory Nos. 27-29, the definition of "Bratz Invention" in No. 30, combined with the

8    request for all facts, the identity of all persons and all supporting documents, render the

9    interrogatory overbroad and unduly burdensome.  In any event, the MGA parties have provided a

10   reasonably sufficient response.  The MGA parties' supplemental response includes their

11   contention that the "Inventions Agreement" did not apply to design patent rights.  Further, the

12   MGA parties contend that (a) the pre-October 21, 2000 drawings of characters that Bryant named

13   Bratz were never reduced to practice; (b) under 35 U.S.C. §171, design patents are available for

14   three-dimensional objections, not drawings or two-dimensional flat art of the sort that Bryant

15   sketched in 1998; (c) Bryant was not a sculptor, and any direct translation of his pre-October 21,

16   2000 two-dimensional flat art into a three-dimensional form for use as a fashion doll sculpt would

17   have produced shapes that were different from the actual shape of the final three-dimensional

18   Bratz sculpt used in manufacturing the first generation of Bratz dolls released on the market by

19   MGA in or about June 2001; (d) the final physical shape of the first generation of Bratz dolls,

20   released on the market by MGA in or about June 2001 was "conceived of" and "reduced to

21   practice" by Margaret Leahy, working on behalf of MGA, after October 20, 2000 and before June

22   1, 2001, along with other MGA agents and employees; (e) Bryant's drawings used standard

23   fashion model poses, and thus were not novel or original; and (f) the "dummy" brought by Bryant

24   to his meeting with MGA on September 1, 2000, was merely an assemblage of random pre-

25   existing doll parts that was never intended to, and did not, provide an accurate representation of

26   what became the Bratz sculpt.  Based on the foregoing, the MGA parties contend that, assuming

27   arguendo that both Bryant assigned his 1998 drawings to Mattel and that such drawings were the

28

1  conception of what could have been developed into a tangible item that would have qualified for

2  protection under a design patent, such conception would not have covered the shape of the final

3  Bratz sculpt utilized in the first generation of Bratz dolls released to market in or about June 2001,

4  nor any subsequent three-dimensional Bratz shape. The MGA parties' supplemental responses to

5  Interrogatory No. 30 also address copyright protection and trademark protection, and identify

6  persons with knowledge and documents relevant to the MGA parties' contentions.

7    Mattel's motion to compel further responses to Interrogatory Nos. 31-37 and 42 is denied.

8  The MGA parties are in substantial compliance with Rule 33, having set forth sufficient facts,

9  identified persons with knowledge, and identified documents to support their contentions. To

10  require any further information would be unduly burdensome, taking into consideration all of the

11  factors set forth in Rule 26(b)(2)(C), Fed.R.Civ.P.

12    Mattel's motion to compel a further response to Interrogatory No. 38 is granted, however,

13  because the supplemental response does not identify supporting documents.

14  G. Interrogatories About MGA's Searches for Documents (40 and 47)

15    Mattel has propounded two interrogatories to the MGA parties about their searches for

16  documents and storage devices containing evidence of early work on Bratz:

17    **Interrogatory No. 40**: IDENTIFY each and every STORAGE DEVICE that
  YOU have used for any purpose which contains or contained DIGITAL

18    INFORMATION that REFERS OR RELATES TO BRATZ and/or ANGEL prior
  to January 1, 2002.

19

  **Interrogatory No. 47**: IDENTIFY each and every SOURCE OF

20    INFORMATION from which YOU have COLLECTED DOCUMENTS in THIS
  ACTION that REFER OR RELATE TO BRATZ and that also REFER OR

21    RELATE TO the time period prior to February 28, 2001 (regardless of when such
  DOCUMENT was, in whole or part, created, drafted, generated, sent, received or

22    transmitted).

23  In response to Interrogatory No. 40, the MGA parties described the computer systems that existed

24  worldwide at MGA prior to January 1, 2002. The MGA parties did not provide any substantive

25  response to No. 47.

26    Mattel contends that the interrogatories are designed to test MGA's productions in this

27  litigation and obtain additional responsive documents and information. Further, Mattel contends

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

18

EXHIBIT __C__
PAGE __33__

1    that there is legal precedent allowing access to a party's information storage systems where the

2    party is shown to have improperly withheld relevant documents or information. Mattel contends

3    that Interrogatory No. 40 seeks legitimate discovery regarding the identification of MGA's

4    storage devices because Mattel may have a right to access such storage devices. In particular,

5    Mattel contends that it is entitled to, but the MGA parties have failed to provide, an identification

6    of specific storage devices, the individuals who have used them, the persons who currently

7    possess them, and the dates on which they were destroyed or copied, if any. Mattel contends that

8    the information requested in Interrogatory No. 40 is necessary to determine whether MGA has

9    withheld responsive documents and to enable Mattel to obtain such documents.

10       Similarly, Mattel contends that Interrogatory No. 47 seeks relevant information regarding

11   the sources of information – i.e. the media – from which the MGA parties have collected

12   documents relating to Bratz and the period prior to February 28, 2001. Mattel contends that the

13   information it seeks will enable it to determine what sources the MGA parties have examined and

14   have not examined to produce documents in the case.

15       During the meet and confer process, the MGA parties proposed that the parties exchange

16   "source logs" regarding the entirety of their productions in lieu of MGA's responses to Nos. 40

17   and 47. The "source logs" would provide each document's Bates number, the identity of the

18   individual associated with or who maintained the document and the location where the document

19   was found. Mattel contends that the "source log" proposal is unnecessary because Mattel is only

20   seeking information about key early Bratz documents, not every document produced in the case.

21   Mattel also contends that the "source log" proposal is unacceptable because the "source log,"

22   would not reveal sources that contain early Bratz documents that MGA has not produced

23   documents from, or where MGA looked for documents, as well as where MGA failed to look.

24       The MGA parties contend that the interrogatories assume, without any factual support,

25   that the MGA parties are aware of the existence of Bratz documents on their computer systems

26   that relate to the time period prior to January 1, 2002, and have not produced those documents.

27   The MGA parties contend that Mattel's speculation is not a basis to compel further responses to

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

EXHIBIT _C_
PAGE __34__

19

1   Interrogatory Nos. 40 and 47. The MGA parties emphasize that they have already produced more

2   than 3.7 million pages of documents, whereas Mattel has only produced a few hundred thousand

3   pages of documents. Furthermore, the MGA parties contend that these interrogatories are

4   cumulative of deposition testimony Mattel has previously sought and obtained regarding the

5   collection of documents produced in this action. The MGA parties also represent that they have

6   agreed to provide additional testimony on this topic.

7       Mattel's motion to compel further responses to Interrogatory Nos. 40 and 47 is granted.

8   The interrogatories seek relevant information about the identity of each storage device that

9   contains or contained information referring or relating to Bratz prior to January 1, 2002, and other

10  sources of information from which the MGA parties collected documents in this action that refer

11  or relate to Bratz and the time period prior to February 28, 2001. The "source log" information is

12  not a reasonable substitute for the information requested in the interrogatories because it would

13  not necessarily identify all storage devices used by the MGA parties during the relevant period.

14  The interrogatories are narrowly tailored to a key subject, namely early Bratz documents and

15  other information. The MGA parties have failed to establish that the interrogatories are unduly

16  burdensome. Nor are the interrogatories cumulative of other discovery propounded by Mattel.

17  Interrogatory Nos. 40 and 47 have the potential of imparting more detailed information than a

18  witness might be able to recall in the course of a deposition. Furthermore, the information sought

19  in Interrogatory Nos. 40 and 47 will enable Mattel to question MGA's witnesses more effectively.

20  H. Interrogatory Regarding MGA's Substitution of Counsel (No. 46)

21      Interrogatory No. 46 seeks facts regarding MGA's substitution of counsel as follows:

22      **Interrogatory No. 46:** Without disclosing the content of communications which
        are protected by the attorney-client privilege, state fully and in detail all facts
23      which REFER OR RELATE TO any dispute regarding THIS ACTION, between,
        on the one hand, MGA, LARIAN, BRYANT and/or MACHADO and, on the
24      other hand, O'MELVENY and/or CHRISTENSEN, including but not limited to
        any and all disputes which were or have been asserted as a basis for, or which
25      underlie, contributed to or were a factor in, the withdrawal, termination and/or
        substitution of O'MELVENY and/or CHRISTENSEN as counsel of record in this
26      ACTION, and IDENTIFY all PERSONS with knowledge of such facts and all
        DOCUMENTS that REFER OR RELATE TO such facts.

27

28
    Bryant v. Mattel, Inc.,
    CV-04-09049 SGL (RNBx)

EXHIBIT C
PAGE 35

- 20 -

1    Mattel contends that the interrogatory is limited to facts, and does not require the disclosure of

2    information protected by either the attorney-client privilege or the work product doctrine.

3    Further, Mattel contends that the requested facts are relevant and discoverable. Mattel reasons

4    that O'Melveny cited to California Rule of Professional Conduct 3-700(c) as the basis for its

5    motion to withdraw, and that Rule 3-700(c) sets forth several grounds for withdrawal that could

6    be relevant to the case. For example, Mattel contends that O'Melveny may have withdrawn

7    because MGA sought to provide false testimony, or was seeking "to pursue an illegal course of

8    conduct" or "insist[ed] that counsel pursue a course of conduct that is illegal or prohibited under

9    the State Bar Act." Mattel's Motion at p. 38.

10          The MGA parties contend that Interrogatory No. 46 is predicated upon an imagined

11   "dispute" with former counsel, and moreover, that the information sought is protected by the

12   work product doctrine and/or attorney-client privilege. The MGA parties reason that even if

13   Mattel is correct that there was some sort of dispute, either (1) the dispute does not relate to the

14   claims and defenses in this action, and therefore the requested information is irrelevant and

15   outside the proper scope of discovery, or (2) the dispute does relate to the claims or defenses in

16   this action, such that revelation of the substance of the dispute would necessarily reveal the

17   thought processes of trial counsel and the communication of those thought processes to the MGA

18   parties.

19          Mattel's motion to compel is denied as to Request No. 46. The interrogatory is not

20   tethered to any particular claim or defense. Nor is the interrogatory directed at uncovering the

21   factual events giving rise to any claim or defense. Instead, the interrogatory assumes that there

22   was a "dispute" with former counsel involving false testimony, illegal conduct, or attorney

23   misconduct; that this "dispute" led to the withdrawal, termination and/or substitution of counsel;

24   and that this "dispute" potentially relates to a claim or defense in this suit. There is no evidence,

25   however, to substantiate such a series of assumptions. Although the publicly available

26   information suggests that there was a breakdown of the attorney-client relationship, this evidence,

27   without more, is insufficient to justify Interrogatory No. 46 because the burden or expense of the

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

EXHIBIT __C__
PAGE __36__

21

1   proposed discovery outweighs its likely benefit under Rule 26(b)(2)(C), Fed.R.Civ.P.

2   Furthermore, the interrogatory is grossly overbroad in seeking information about "any and all

3   disputes" with former counsel, regardless of whether such disputes relate to a claim or defense in

4   the case.

5         The interrogatory is also objectionable because it intrudes upon MGA's relationship with

6   former counsel, and thus necessarily intrudes upon the protections afforded by the attorney-client

7   privilege and work product doctrine. Mattel's rank speculation that there were attorney-client

8   discussions of wrongdoing is insufficient to vitiate the attorney-client privilege. See e.g. In re

9   Napster, Inc. Copyright Litig., 479 F.3d 1078, 1090 (9th Cir. 2007). Nor have the MGA parties

10  waived the attorney-client privilege. Although the MGA parties discussed the reasons for their

11  substitution of counsel with the press, there has been no showing that the information they

12  disclosed revealed the substance of an attorney-client privileged communication.

13                          V. CONCLUSION

14        For the reasons set forth above, it is hereby ordered as follows:

15        1. Mattel's motion to compel is granted as to Interrogatory Nos. 38, 40, 41 (as narrowed),

16  43-44 and 47. The MGA parties shall serve supplemental responses to said interrogatories no

17  later than February 26, 2008.

18        2. Mattel's motion to compel is denied as to Interrogatory Nos. 27-37, 39, 42, 46 and 48-

19  50.

20  Pursuant to Paragraph 6 of the Stipulation and Order for Appointment of a Discovery Master,

21  Mattel shall file this Order with the Clerk of Court forthwith.

22

23  Dated: February 15, 2008

24                                          HON. EDWARD A. INFANTE (Ret.)
25                                               Discovery Master
26

27

28

EXHIBIT ___C___
PAGE ___37___

22

## PROOF OF SERVICE BY E-MAIL

I, Sandra Chan, not a party to the within action, hereby declare that on February 15, 2008, I
served the attached ORDER GRANTING IN PART AND DENYING IN PART MATTEL'S MOTION
TO COMPEL RESPONSES TO INTERROGATORY NOS. 27-44 AND 46-50 BY THE MGA
PARTIES in the within action by email addressed as follows:

| | | |
|---|---|---|
| John W. Keker, Esq. | Keker & Van Nest | jkeker@kvn.com |
| Michael H. Page, Esq. | Keker & Van Nest | mhp@kvn.com |
| Christa Anderson, Esq. | Keker & Van Nest | cma@kvn.com |
| Matthew M. Werdegar, Esq. | Keker & Van Nest | mwerdegar@kvn.com |
| John E. Trinidad, Esq. | Keker & Van Nest | jtrinidad@kvn.com |
| Audrey Walton-Hadlock, Esq. | Keker & Van Nest | awalton-hadlock@kvn.com |
| John Quinn Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | johnquinn@quinnemanuel.com |
| Michael Zeller Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | michaelzeller@quinnemanuel.com |
| Jon Corey Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | joncorey@quinnemanuel.com |
| Duane Lyons Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | duanelyons@quinnemanuel.com |
| Timothy Alger Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | timalger@quinnemanuel.com |
| Dominic Surprenant Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | DominicSurprenant@QuinnEmanuel.com |
| B. Dylan Proctor Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | dylanproctor@quinnemanuel.com |
| Shane McKenzie Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | shanemckenzie@quinnemanuel.com |
| Bridget Hauler Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | bridgethauler@quinnemanuel.com |
| Tamar Buchakjian Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | tamarbuchakjian@quinnemanuel.com |
| Juan Pablo Alban, Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | juanpabloalban@quinnemanuel.com |
| Thomas J. Nolan, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | tnolan@skadden.com |
| Raoul D. Kennedy, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | rkennedy@skadden.com |
| Amy S. Park, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | apark@skadden.com |
| Harriet S. Posner, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | hposner@skadden.com |
| Carl Alan Roth, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | croth@skadden.com |
| Timothy A. Miller, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | tmiller@skadden.com |
| Marcus R. Mumford, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | Mmumford@skadden.com |
| Paul M. Eckles, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | Paul.eckles@skadden.com |
| Robert J. Herrington, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | Robert.herrington@skadden.com |

I declare under penalty of perjury under the laws of the Untied States of America that the above
is true and correct.

Executed on February 15, 2008, at San Francisco, California.

Sandra Chan

EXHIBIT C
PAGE 38

# EXHIBIT D

1           UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3               EASTERN DIVISION

4                  - - -

5      HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                  - - -

7    CARTER BRYANT, ET. AL.,      )

                          )

8              PLAINTIFFS, )

                     )

9         VS.         ) NO. ED CV 04-09049

                    ) (LEAD LOW NUMBER)

10   MATTEL, INC., ET. AL.,      )

                     )

11            DEFENDANTS. ) MOTION; OSC HEARING

     _____)

12   AND CONSOLIDATED ACTIONS,      )

                    )

13

14

15        REPORTER'S TRANSCRIPT OF PROCEEDINGS

16             RIVERSIDE, CALIFORNIA

17           MONDAY, FEBRUARY 25, 2008

18               11:24 A.M.

19

20

21

22

23        THERESA A. LANZA, RPR, CSR

       FEDERAL OFFICIAL COURT REPORTER

24        3470 12TH STREET, RM. 134

       RIVERSIDE, CALIFORNIA  92501

25            951-274-0844

          WWW.THERESALANZA.COM

1   APPEARANCES:
2
3
    ON BEHALF OF MATTEL:
4
            QUINN EMANUEL
5           BY: JOHN QUINN
            BY: JON COREY
6           865 S. FIGUEROA STREET,
            10TH FLOOR
7           LOS ANGELES, CALIFORNIA 90017
            213-624-7707
8
9
    ON BEHALF OF MGA ENTERTAINMENT:
10
            SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
11          BY: THOMAS J. NOLAN
            BY: CARL ALAN ROTH
12          300 SOUTH GRAND AVENUE
            LOS ANGELES, CALIFORNIA 90071-3144
13          213-687-5000
14
15  ON BEHALF OF MCFARLAND, CLOONAN, MARLOW & LEAHY:
16          KEATS MCFARLAND & WILSON LLP
            BY: LARRY W. MCFARLAND
17          9720 WILSHIRE BOULEVARD
            BEVERLY HILLS, CA 90212
18          310-777-3750
19
20
21
22
23
24
25

1    FRANKLY, MATTEL DOESN'T CARE WHAT THE CHOICE IS. IF

2    PHASE TWO IS GOING TO BE STAYED, THEN IT NEEDS TO BE STAYED.

3    BUT IF THESE THEORIES ARE GOING TO BE FLOATED IN PHASE ONE.

4    THEN PHASE TWO DISCOVERY SHOULD NOT BE STAYED; IT SHOULD BE

5    ALLOWED TO PROCEED. AND THEN IF THE STAY ON PHASE TWO IS

6    LIFTED, THEN THERE'S NOT AN ISSUE WITH RESPECT TO --

7    THE COURT: MR. COREY, IF I LIFT THE STAY ON PHASE

8    TWO DISCOVERY, I CAN'T IMAGINE WHAT THAT WOULD DO. I MEAN,

9    POOR JUDGE INFANTE. I JUST COULDN'T DO THAT TO HIM. I JUST

10   COULDN'T. THAT WOULD DERAIL THIS LITIGATION.

11   BASED ON HOW -- AND I'M NOT POINTING ANY FINGERS

12   HERE, THIS IS JUST ACROSS THE BOARD -- HOW DISCOVERY HAS BEEN

13   CONDUCTED, THE MILLIONS OF DOCUMENTS; THE, I DON'T KNOW, UNTOLD

14   NUMBER OF DEPOSITIONS AND THE INTERROGATORIES AND RFA'S; TO

15   LIFT STAY TWO DISCOVERY DURING THIS CRITICAL PERIOD AS WE'RE

16   TRYING TO DO THE MOTIONS, THE PRETRIAL ORDERS, AND GET READY

17   FOR THE FIRST TRIAL IN MAY, WHICH IS GOING FORWARD IN MAY, TO

18   START IN ON FULL SCALE PHASE TWO DISCOVERY, THAT'S

19   UNFATHOMABLE.

20   MR. COREY: THAT'S NOT WHAT I THINK THE COURT SHOULD

21   DO.

22   THE COURT: SO WE'RE ALL IN AGREEMENT ON THAT.

23   MR. COREY: I THINK THE COURT SHOULD LIMIT THE ISSUES

24   TO PHASE ONE AS THE COURT HAS ARTICULATED THEM; THE CREATION OF

25   BRATZ AND CARTER BRYANT'S EMPLOYMENT WITH MATTEL. THAT'S

# EXHIBIT E

1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
      John B. Quinn (Bar No. 90378)
2     (johnquinn@quinnemanuel.com)
      Michael T. Zeller (Bar No. 196417)
3     (michaelzeller@quinnemanuel.com)
      Jon D. Corey (Bar No. 185066)
4     (joncorey@quinnemanuel.com)
      865 South Figueroa Street, 10th Floor
5  Los Angeles, California 90017-2543
   Telephone: (213) 443-3000
6  Facsimile: (213) 443-3100

7  Attorneys for Mattel, Inc.

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10                    EASTERN DIVISION

11  CARTER BRYANT, an individual,        CASE NO. CV 04-9049 SGL (RNBx)
                                         Consolidated with
12                                       Case Nos. CV 04-09059 & CV 05-2727
                Plaintiff,
13      vs.                               Hon. Stephen G. Larson

14  MATTEL, INC., a Delaware            MATTEL, INC.'S OPPOSITION TO
                                        MGA DEFENDANTS' *EX PARTE*
15  corporation,                        APPLICATION TO COMPEL THE
                                        DEPOSITIONS OF MATTHEW
16              Defendant.              BOUSQUETTE AND TINA PATEL

17  _____    [Declarations of B. Dylan Proctor and Jon
                                        D. Corey filed concurrently herewith]
18  AND CONSOLIDATED ACTIONS
                                        Hearing Date:      TBD
19                                      Time:              TBD
                                        Place:             Courtroom 1
20
                                        **Phase 1**
21                                      Discovery Cut-Off:     January 28, 2008
                                        Pre-Trial Conference:  May 5, 2008
22                                      Trial Date:            May 27, 2008

23

24

25

26

27

28              EXHIBIT ___E___
                PAGE ___42___

07209/2387995.2

MATTEL'S OPPOSITION TO DEFENDANTS' *EX PARTE* APPLICATION TO COMPEL DEPOSITIONS

1  claims), then MGA owed Mattel "a bunch of discovery."[31]  MGA's efforts to depose

2  Mr. Bousquette prior to the substantial completion of its document production

3  contravenes the Discovery Master's direction and should be rejected.

**III.  BOUSQUETTE AND PATEL ARE NOT PROPERLY PHASE 1 WITNESSES**

    **A.  Phase 1 Relates Solely to Ownership of Bratz**

7          The Court clarified what was in Phase 1 and Phase 2 in its July 2, 2007

8  Minute Order.

> Phase 1(a) should be limited to issues surrounding Carter
> Bryant's employment with Mattel, and how those issues
> would impact the ownership of certain original Bratz
> drawings, while Phase 1(b) would address approximately
> two-hundred Bratz products that are potentially derivative
> of the drawings.  This approach has the appeal of limiting
> Phase 1(a) to discrete issue of the ownership to the
> original Bratz drawings.  A finding that Bryant owns these
> drawings in Phase 1(a) has the potential to eliminate the
> need for Phase 1(b).[32]

19          MGA has made no suggestion that either Bousquette or Patel have

20  knowledge that fall within the scope of the claims to be tried in Phase 1 as the Court

21  has defined them.

---

[30]  Corey Dec., ¶ 6.

[31]  Proctor Dec., ¶ 3.

[32]  July 2, 2007 Minute Order at p. 2, Proctor Dec., Exh. 7.

EXHIBIT  _E_
PAGE  _43_

# EXHIBIT F

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP RULE 77(D).

**PRIORITY SEND**
**& ENTERED**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
<u>CIVIL MINUTES -- GENERAL</u>

Case No.    CV 04-09049 SGL(RNBx)                    Date: July 2, 2007

Title:    CARTER BRYANT -v- MATTEL, INC.
          AND CONSOLIDATED ACTIONS
=================================================================
PRESENT:   HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

              Jim Holmes                          Theresa Lanza
              Courtroom Deputy Clerk              Court Reporter

ATTORNEYS PRESENT FOR CARTER          ATTORNEYS PRESENT FOR MATTEL:
BRYANT:

John W. Keker                              John B. Quinn
                                           Brett Dylan Proctor
                                           Michael T. Zeller

ATTORNEYS PRESENT FOR MGA:

Dale M. Cendali
Patricia Glaser

PROCEEDINGS:    MINUTE ORDER

ENTERED
CLERK, U.S. DISTRICT COURT

JUL - 5 2007

CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION    BY DEPUTY

DOCKETED ON CM

JUL - 5 2007

BY _____ 164

        As set forth more fully herein, the Court hereby makes the following ruling regarding matters heard on July 2, 2007:

(1)    The Court **GRANTS** Mattel's Motion re Trial Structure (docket #482);

(2)    The Court **GRANTS IN PART AND DENIES IN PART** MGA's Motion re Discovery Master's May 15, 2007, Order (docket #505);

(3)    The Court **GRANTS IN PART AND DENIES IN PART** MGA's Ex Parte Application

MINUTES FORM 90                                      Initials of Deputy Clerk jh
CIVIL -- GEN                          1              Time: 01/15

07/c2/c7

EXHIBIT    F
PAGE    44

regarding date of production of documents (docket #545); and

(4)   The Court **DENIES** MGA's Motion re Discovery Master's May 16, 2007, Order (docket #508).

(5)   The Court **DENIES** the parties' oral request for modification of pretrial and trial dates.

(1)   Motion re Trial Structure (docket #482)

Previous orders of the Court specified that the claims and counterclaims brought in this action will be tried in two phases. The parties have agreed, in large part, to a refinement of the Court's mandate that all issues regarding the ownership of Bratz shall be tried in Phase 1. Where the parties differ is upon a proposal by Mattel that the Phase 1 be bifurcated into two sub-phases, with Mattel's copyright infringement claim (its first counterclaim in the 05-02727 case) and all Phase 1 damages being tried after all the other issues. Phase 1(a) would be limited to issues surrounding Carter Bryant's employment with Mattel, and how those issues impact the ownership of certain original Bratz drawings, while Phase 1(b) would address approximately two-hundred Bratz products that are potentially derivative of the original drawings. This approach has the appeal of limiting Phase 1(a) to discrete issue of the ownership of the original Bratz drawings. A finding that Bryant owns these original drawings in Phase 1(a) has the potential to eliminate the need for Phase 1(b).

Accordingly, **THE COURT ADOPTS MATTEL'S MODIFICATION OF DEFENDANTS' PROPOSAL,** as set forth at 8-9 of its Memorandum Regarding Trial Structure, filed June 20, 2007. Phase 1(a) and Phase 1(b) (if necessary) will be tried to the same jury.

(2)   MGA's Motion re Discovery Master's May 15, 2007, Order (docket #505), and
(3)   MGA's Ex Parte Application regarding date of production of documents (docket #545).

The Discovery Master's May 15, 2007, Order compels production of documents regarding ink, paper, and chemical analysis and documents relating to unreleased MGA products. The order required that documents be produced no later than the end of May.

The Court reviews the Discovery Master's orders under the "clearly erroneous" or "contrary to law" standard set forth in Fed. R. Civ. P. 72(a).

The Discovery Master's order compels the production of only non-privileged documents. Therefore, MGA's arguments that the Discovery Master's order requires production of documents in violation of the attorney-client privilege are misplaced. If the only responsive documents are privileged, then MGA need not produce them, but must produce a privilege log.

MGA acknowledges that it has raised an argument before the Court that was not raised

MINUTES FORM 90                                                    Initials of Deputy Clerk __jh_____
CIVIL -- GEN                                    2                   Time: 01/15

EXHIBIT ___F___
PAGE ___45___

before the Discovery Master, namely, that Mattel has failed to establish that there are "exceptional circumstances" that allow Mattel to "discover facts known or opinions held by an expert . . . who is not expected to be called as a witness at trial." Fed. R. Civ. P. 26(b)(4)(B). MGA contends that the Discovery Master's order is contrary to law based on this standard, and that it was incumbent upon Mattel to raise it below. The Court disagrees. Mattel would be required to establish that exceptional circumstances existed if MGA objected to production on that grounds. A party seeking production cannot be expected to rebut all arguments that could possibly be raised by a party resisting production. MGA has not convinced the Court that the Discovery Master's failure to require Mattel to rebut an argument that was not raised by MGA is contrary to law.

MGA contends that the Discovery Master's order compelling production of documents regarding unreleased products is contrary to law. Relevant to that determination is a balancing test required to be applied by the Ninth Circuit when trade secrets are requested by a competitor in discovery. See Brown Bag Software v. Symantec Corp., 960 F.2d 1465, 1470 (9th Cir. 1992) ("Specifically, in this case we must balance the risk to [defendant] of inadvertent disclosure of trade secrets to competitors against the risk to [plaintiff] that protection of [defendant's] trade secrets [will] impair[] prosecution of [plaintiff's] claims.").

Here, the documents sought are of a particularly sensitive nature. They represent some of the most secretive documents maintained by MGA, and they are being ordered to be produced to MGA's fierce competitor. The Discovery Master recognized the sensitive nature of the documents and entered a strict protective order that severely limits access to those documents and that goes well beyond the normal "attorney eyes only" designation.

MGA argues that unreleased products are irrelevant to the issue of who owns the original Bratz drawings. That is clear. However, MGA's argument attempts to limit the discovery to issues involved in Phase 1 of the trial. There has been no bifurcation of discovery.

Mattel correctly points out that these documents are relevant to a number of its other claims. Specifically, if they show unreleased products that are similar to Mattel's unreleased products, the documents would be highly probative of Mattel's misappropriation of trade secrets claim. Moreover, these documents could be relevant to Mattel's RICO claims based on alleged acts of criminal copyright infringement.

Balancing tests are inherently subjective and particularly susceptible to varying interpretation by individual judicial officers. This Court, upon considering this issue from the outset, may very well have weighed the evidence differently and reached a contrary result. However, this Court is bound by the standard of review, and MGA's motion fails far short of convincing the Court that the Discovery Master's order is contrary to law.

The parties have a long history regarding the production of documents ordered in the May 15, 2007, Order, which is set forth in their papers and which need not be repeated here. Counsel for MGA represented that the remaining documents could be produced no later than July 31, 2007, with the exception of the documents from MGA Hong Kong, which could be produced no

EXHIBIT F  
PAGE 46

later than two weeks after that date. Accordingly, the Court **ORDERS** that MGA complete the document production set forth in the Discovery Master's May 15, 2007, order no later than July 31, 2007, with the exception of the documents from MGA Hong Kong, which shall be produced no later than August 14, 2007.

Accordingly, the Court **GRANTS** in part MGA's motion re the Discovery Master's May 15, 2007, Order, extending the document production date as set forth above. The Motion is **DENIED** in all other respects.

Likewise, the Court **GRANTS** in part MGA's ex parte application re date of production of documents, extending the document production date as set forth above. The application is **DENIED** in all other respects.

(4)     MGA's Motion re Discovery Master's May 16, 2007, Order (docket #508)

The Discovery Master's May 16, 2007, Order compelled the Rule 30(b)(6) depositions of witnesses on the topics of MGA's net worth, prior sworn statements, and ink, paper, and chemical analysis performed by MGA.

> A party may in the party's notice and in a subpoena name as the deponent a public or private corporation or a partnership or association or governmental agency and describe with reasonable particularity the matters on which examination is requested. In that event, the organization so named shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. . . . The persons so designated shall testify as to matters *known or reasonably available* to the organization.

Fed. R. Civ. P. 30(b)(6) (emphasis added). "The purpose behind Rule 30(b)(6) is to create testimony that will bind the corporation." Sanders v. Circle K Corp., 137 F.R.D. 292, 294 (D. Ariz. 1991) (internal citation omitted). Another purpose of Rule 30(b)(6) is aptly described by the District Court for the District of Columbia:

> [The purpose of Rule 30(b)(6) is to] prevent[] serial depositions of various witnesses without knowledge within an organization and eliminating 'bandying', which is the name given to the practice in which people are deposed in turn but each disclaims knowledge of facts that are clearly known to persons in the organization and thereby to the organization itself.

Alexander v. F.B.I., 186 F.R.D. 148, 152 (D.D.C. 1999) (citing the 1970 Advisory Committee Notes to Rule 30(b)(6)).

The Discovery Master's order compelling Rule 30(b)(6) depositions in the specified

Initials of Deputy Clerk ___jh_____
Time: 01/15

EXHIBIT    F
PAGE     47

categories serve both these purposes and is not contrary to law.

Although MGA's net worth may not be known to it, MGA does not contend that the information is not readily available. That net worth is generally the subject of expert testimony at trial -- a proposition disputed by neither Mattel nor the Court -- does not render it an improper subject for a Rule 30(b)(6). Therefore, the Discovery Master's ruling on this issue is not contrary to law.

MGA likewise does not contend that information regarding prior sworn statements are not readily available to it. Although contending that this is not an appropriate subject for a Rule 30(b)(6) deposition, MGA fails to cite authority in support of that contention. Therefore, the Discovery Master's ruling on this issue is not contrary to law.

The ink, paper, and chemical analysis topic is likewise a proper subject of a Rule 30(b)(6) deposition. To the extent that such a deposition has the potential to encroach upon information protected by the work-product privilege, then that objection must be made on a question-by-question basis. MGA may not make a blanket objection and justify its refusal to produce a Rule 30(b)(6) designee on this topic based on that blanket objection. Therefore, the Discovery Master's ruling on this issue is not contrary to law.

Accordingly, the Court **DENIES** MGA's motion re the Discovery Master's May 16, 2007, Order.

(5)     Oral Request for Modification of pretrial and trial dates.

Although no motion or ex parte application on the subject was pending before the Court, the parties made an oral request at the hearing to continue certain pretrial and trial dates. A discussion ensued and it became apparent that no final agreement was reached by the parties regarding extending these dates. Accordingly, the Court **DENIES** the parties' oral request for modification of pretrial and trial dates. The Court will consider counsels' stipulation regarding extensions of those dates only where all counsel unqualifiedly stipulate to those dates. Until the scheduling order is modified by the Court, the dates previously set by the Court remain in effect. In addition, the Court is unlikely to entertain a continuance of the Phase 1 trial past April, 2008.

IT IS SO ORDERED.

Initials of Deputy Clerk __jh_____
Time: 01/15

EXHIBIT  F
PAGE  48

# EXHIBIT G

1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
     John B. Quinn (Bar No. 090378)
2    johnquinn@quinnemanuel.com
     Michael T. Zeller (Bar No. 196417)
3    (michaelzeller@quinnemanuel.com)
     Jon D. Corey (Bar No. 185066)
4    (joncorey@quinnemanuel.com)
     Timothy L. Alger (Bar No. 160303)
5    (timalger@quinnemanuel.com)
     865 South Figueroa Street, 10th Floor
6    Los Angeles, California 90017-2543
     Telephone:  (213) 443-3000
7    Facsimile:  (213) 443-3100

8  Attorneys for Plaintiff
   Mattel, Inc.

9

10            UNITED STATES DISTRICT COURT

11            CENTRAL DISTRICT OF CALIFORNIA

12                   EASTERN DIVISION

13

14  CARTER BRYANT, an individual,          CASE NO. CV 04-9049 SGL (RNBx)
                                            Consolidated with
15            Plaintiff,                    Case No. CV 04-09059
                                            Case No. CV 05-02727
16       vs.
                                            Honorable Stephen G. Larson
17  MATTEL, INC., a Delaware
    corporation,                            MATTEL'S MEMORANDUM
18                                          REGARDING TRIAL STRUCTURE
              Defendant.
19                                          Date:   TBA
                                            Time:   TBA
20  AND CONSOLIDATED ACTIONS                Place:  TBA

21                                          **Phase 1**
                                            Discovery Cut-Off:   October 22, 2007
22                                          Pre-Trial Conference: January 14, 2008
                                            Trial Date:          February 12, 2008

23                                          **Phase 2**
                                            Discovery Cut-Off:   March 3, 2008
24                                          Pre-Trial Conference: June 2, 2008
                                            Trial Date:          July 1, 2008

25

26

27

28
                    PERSONALLY
                    SERVED 4:10PM

**EXHIBIT** G
**PAGE** 45

MATTEL'S MEMORANDUM RE: TRIAL STRUCTURE

## Appendix

### CURRENT STRUCTURE

| Phase 1 Trial | Phase 2 Trial |
|---|---|
| • Breach of Contract against Bryant (MC 1)[5] | • Copyright Infringement (AC 1) |
| • Breach of Fiduciary Duty against Bryant (MC 2) | • RICO (AC 2) |
| • Breach of Duty of Loyalty against Bryant (MC 3) | • Conspiracy to Violate RICO (AC 3) |
| • Unjust Enrichment against Bryant (MC 4) | • Misappropriation of Trade Secrets (AC 4) |
| • Conversion against Bryant (MC 5) | • Breach of Contract (AC 5) |
| | • Intentional Interference with Contract (AC 6) |
| | • Breach of Fiduciary Duty (AC 7) |
| | • Aiding and Abetting Breach of Fiduciary Duty (AC 8) |
| | • Breach of Duty of Loyalty (AC 9) |
| | • Aiding and Abetting Breach of Duty of Loyalty (AC 10) |
| | • Conversion (AC 11) |
| | • Unfair Competition (AC 12) |
| | • Declaratory Relief (AC 13) |
| | • False Designation of Origin (UC 1) |
| | • Unfair Competition (UC 2) |
| | • Dilution (UC 3) |
| | • Unjust Enrichment (UC 4) |

---

[5]  MC = Mattel's Claims in *Mattel v. Bryant*
AC = Mattel's Counterclaims in *MGA v. Mattel*
UC = MGA's Claims in *MGA v. Mattel*

EXHIBIT __G__
PAGE __50__

MATTEL'S MEMORANDUM RE: TRIAL STRUCTURE

1/2147647.5

## MATTEL'S MODIFICATION OF DEFENDANTS' PROPOSAL

| **Phase 1(a) Trial** | **Phase 1(b) Trial** | **Phase 2 Trial** |
|---|---|---|
| • Breach of Contract against Bryant (MC 1, AC 5) (liability only) | • Copyright Infringement (AC 1) | • False Designation of Origin (UC 1) |
| • Breach of Fiduciary Duty against Bryant (MC 2, AC 7) (liability only) | • Damages (re: all Phase 1 claims) | • Unfair Competition (UC 2) |
| • Breach of Duty of Loyalty against Bryant (MC 3, AC 9) (liability only) | | • Dilution (UC 3) |
| | | • Unjust Enrichment (UC 4) |
| • Unjust Enrichment against Bryant (MC 4) (liability only) | | • RICO (AC 2) |
| • Conversion against Bryant (MC 5; AC 11) (liability only) | | • Conspiracy to Violate Rico (AC 3) |
| • Conversion against MGA and Larian (re: Bratz; AC 11) (liability only) | | • Misappropriation of Trade Secrets (AC 4) |
| • Intentional Interference with Contract (re: Bryant; AC 6) (liability only) | | • Intentional Interference with Contract (re: Brawer, Machado, Trueba, Vargas, Brisbois, and other former Mattel employees; AC 6) |
| • Aiding and Abetting Breach of Fiduciary Duty (re: Bryant; AC 8) (liability only) | | • Breach of Fiduciary Duty (re: Machado; AC 7) |
| • Aiding and Abetting Breach of Duty of Loyalty (re: Bryant; AC 10) (liability only) | | • Aiding and Abetting Breach of Fiduciary Duty (re: Brawer, Machado, Trueba, Vargas, Brisbois, and other former Mattel employees; AC 8) |
| | | • Breach of Duty of Loyalty (re: Machado; AC 9) |
| | | • Aiding and Abetting Breach of |

EXHIBIT ___G___
PAGE ___5 1___

-8-

3/2147647.5

| Phase 1(a) Trial | Phase 1(b) Trial | Phase 2 Trial |
|---|---|---|
| • Unfair Competition (re: bribery of Bryant; AC 12) (liability only))<br><br>• Declaratory Relief (re: ownership of original Bratz works allegedly created by Bryant while employed by Mattel; AC 13) | | Duty of Loyalty (re: Brawer, Machado, Trueba, Vargas, Brisbois, and other former Mattel employees; AC 10)<br><br>• Conversion (non-Bratz; AC 11)<br><br>• Unfair Competition (except bribery of Bryant) (AC 12)<br><br>• Damages (re: all Phase Two claims) |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT ___G___
PAGE __5ᴅ__

-9-

)/2147647.5

# EXHIBIT H

FILED

2008 APR 13 PM 3:04

CLERK U.S. DISTRICT COURT
CENTRAL DIST OF CALIF
LOS ANGELES

BY: _____

1   DALE M. CENDALI
    (of counsel, not admitted in California)
2   DIANA M. TORRES (S.B. #162284)
    PAULA E. AMBROSINI (S.B. #193126)
3   O'MELVENY & MYERS LLP
    400 South Hope Street
4   Los Angeles, CA  90071-2899
    Telephone:   (213) 430-6000
5   Facsimile:    (213) 430-6407
    email:      dtorres@omm.com
6
    PATRICIA GLASER (S.B. # 55668)
7   CHRISTENSEN, MILLER, FINK,
    JACOBS, GLASER, WEIL &
8   SHAPIRO LLP
    10250 Constellation Boulevard, 19th Floor
9   Los Angeles, CA  90067
    Telephone:   (310) 553-3000
10  Facsimile:    (310) 556-2920
11  Attorneys for Plaintiff
    MGA Entertainment, Inc.

12

13              **UNITED STATES DISTRICT COURT**

14              **CENTRAL DISTRICT OF CALIFORNIA**

15                  CV 05-02727 CBM (RZx)

16  MGA ENTERTAINMENT, INC.,          Case No.

17              Plaintiff,            **COMPLAINT FOR FALSE
                                      DESIGNATION OF ORIGIN,**
18      v.                            **AFFILIATION, ASSOCIATION OR
                                      SPONSORSHIP (15 U.S.C. § 1125**
19  MATTEL, INC., a Delaware          **(a)); UNFAIR COMPETITION (15
    Corporation, and DOES 1-10,       U.S.C. § 1125 (a), Cal. Bus. & Prof.**
20                                    **Code § 17200 et seq. and California
                Defendants.          Common Law); DILUTION (15**
21                                    **U.S.C. § 1125 (c), Cal. Bus. & Prof
                                      Code § 14330 and California Common**
22                                    **Law); AND UNJUST ENRICHMENT**

23                                    **DEMAND FOR JURY TRIAL**

24

25

26

27

28

                        EXHIBIT  H
                        PAGE  53

1      Plaintiff MGA Entertainment, Inc. for its complaint against

2  Defendants Mattel, Inc. and DOES 1-10 alleges and avers as follows:

3

4                        **PARTIES**

5      1.    Plaintiff MGA Entertainment, Inc. ("MGA") is a California

6  corporation organized and existing under the laws of the State of California, with a

7  principal place of business in Van Nuys, California.

8      2.    MGA is informed and believes, and based thereon alleges, that

9  Defendant Mattel, Inc. ("Mattel") is a Delaware corporation with a principal place

10  of business in El Segundo, California.

11      3.    MGA is ignorant of the true names and capacities of the defendants

12  sued herein under the fictitious names DOES 1 through 10 inclusive. MGA will

13  seek leave of court to amend this complaint to allege such names and capacities

14  when they are ascertained. MGA is informed and believes, and based thereon

15  alleges, that each of the fictitiously named DOE defendants is responsible in some

16  manner for the wrongful conduct alleged herein. MGA further alleges that each

17  defendant acted in concert with, as agent or representative for, or at the request or

18  on behalf of another or Mattel. Each charging allegation contained herein is,

19  therefore, also hereby alleged against each fictitiously named DOE defendant.

20

21                    **JURISDICTION AND VENUE**

22      4.    Through this action MGA asserts claims against Mattel arising under

23  the Lanham Act, 15 U.S.C. Sections 1125 (a) and (c), California Business and

24  Professions Code Sections 17200 *et seq.*, California Business and Professions Code

25  Section 14330 and California common law. This Court has original subject matter

26  jurisdiction over MGA's federal claims pursuant to 15 U.S.C. Sections 1116 and

27  1121, 28 U.S.C. Section 1338(a), and 28 U.S.C. Section 1331, and supplemental

28

1 subject matter jurisdiction over MGA's state law claims pursuant to 28 U.S.C.

2 Section 1367(a).

3      5.   This Court has specific personal jurisdiction over Mattel, as it has

4 purposefully committed, within the State of California, the acts from which these

5 claims arise and/or has committed tortious acts outside California, knowing and

6 intending that such acts would cause injury to MGA within the state. The Court

7 also has general personal jurisdiction over Mattel, as it conducts continuous,

8 systematic and routine business within the State of California and the County of

9 Los Angeles.

10      6.   Venue is proper in the United States District Court for the Central

11 District of California pursuant to 28 U.S.C. Sections 1391(b) and 1391(c).

12

13                           **FACTUAL BACKGROUND**

14      7.   MGA seeks by this action to halt Mattel's habitual and unfair tactics of

15 competition-by-intimidation and serial copycatting of MGA's products, which

16 Mattel has used in an unbridled effort to cause confusion in the market place and

17 eliminate MGA as a competitor in the toy and fashion doll market long dominated

18 and controlled by Mattel.

19      8.   MGA is a privately-held company in the San Fernando Valley that

20 began in 1979 as a small consumer electronics business. In 1987, the company

21 made its first foray into the toy business when it secured rights to market handheld

22 LCD games featuring licensed Nintendo® characters. Building on that small

23 success, the company began marketing products for popular licensed properties

24 such as the "Power Rangers"® and "Hello Kitty"®. This little-known but

25 successful company, however, was propelled into the limelight after its daring

26 release in June 2001 of an innovative line of fashion dolls called "BRATZ".

27 "BRATZ" are multi-ethnic fashion dolls that sport a fresh new urban and

28 contemporary look and fashion. At the time of the release of "BRATZ", "Barbie"

2

1   sales were in a slump, Mattel was in turmoil, and the market was ripe for something

2   new, exciting and inventive. "BRATZ" fit the bill. It is the first fashion doll that

3   has been able to seriously challenge "Barbie" for market share, and begin to loosen

4   Mattel's 50-year iron-fisted grip on the fashion doll market.

5       9.    Mattel has not taken kindly to the challenge. Either unable or

6   unwilling to compete against "BRATZ" fairly, and on a level-playing field, Mattel

7   has, instead, taken a more expeditious approach, resorting to unfair and anti-

8   competitive business practices. Wielding its substantial clout and influence in the

9   toy industry, Mattel has tried to muscle MGA out of business. MGA is informed

10   and believes that Mattel has intimidated, coerced and threatened retailers, licensees,

11   suppliers and others in the industry – both in the U.S. and internationally – in order

12   to inhibit and stifle MGA's ability to compete with Mattel and to prevent MGA

13   from obtaining licensees, contracts and supplies for its products. Mattel has also

14   serially imitated and copy-catted the look of MGA products, trade dress,

15   trademarks, themes, ideas, advertising and packaging, including for the "BRATZ"

16   line of dolls. MGA brings this action to stop Mattel's tortious, unfair and anti-

17   competitive conduct and to recover the extensive damage that Mattel's illicit

18   behavior has caused, and continues to cause, MGA. Mattel's own website states:

19   "As the global leader in the toy industry, we believe that how we achieve success is

20   just as important as the success itself." It also proclaims that "unwavering integrity

21   defines our corporate culture on every level, guiding how we work and how we do

22   business." Mattel's own corporate governance standards require it to "play by the

23   rules," complete fairly and be a good corporate citizen. Mattel's actions, however,

24   speak louder than its words.

25

26

27

28

3

## Mattel History and Performance

10.    Mattel is the world's largest toy company, but it owes its immense success chiefly to a single product: "Barbie." Since her debut in 1959, "Barbie" has been the fuel for Mattel's growth and success, turning Mattel into an international powerhouse. By the late 1990's, Mattel's annual sales of the doll approached or topped $1.8 billion and Mattel stock reached a record high of approximately $45.00 a share. At that time, the average American girl had eight "Barbie" dolls, and "Barbie" was the world's best-selling toy.

11.    Mattel's reliance on a single, 40-year old product for as much as 50% of its business turned out to be a risky business model, however. Resting on its laurels, Mattel failed to react to the shifting tastes of consumers, changing dynamics in the industry, and an increasing focus on technologically advanced and interactive toys. "Barbie's" record sales fell into a tailspin. According to one report, Adrienne Fontanella, Mattel's "Barbie" brand president, would later be quoted as saying that, "The world changed very quickly, and we missed a beat. . . Barbie wasn't talking to girls. She just wasn't hitting it."

12.    Sales began to plunge in 1997, and Mattel began posting a series of net income losses. In the first quarter of 1998, sales of the "Barbie" brand dropped 17%. This steep slide was followed by another in the second quarter, when sales fell again, down by 15%. By the end of 1998, Mattel reported an overall 14% decline in "Barbie" sales for the year and analysts were using words such as "devastating" and "a catastrophe" to describe Mattel's earnings. The company's stock fell as much as 27% in a single day. "Barbie" was having a crisis.

13.    Jill Barad, who had taken over as Mattel's chairman and chief executive in January 1997, at the height of Mattel's success, had to do something fast. Instead of focusing on and investing in new product development, however, which would obviously take time, Mattel embarked on a series of acquisitions that were seemingly aimed at quickly diversifying the company's product line and

4

EXHIBIT __H__

PAGE __57__

1   reducing its reliance on "Barbie" and on traditional retailers, such as Toys-R-Us

2   and Wal-Mart. Mattel spent a reported $881 million in March 1997 to purchase

3   Tyco Toys and acquire the "Matchbox" toy car brand. Just more than a year later,

4   it spent $700 million for the Pleasant Co., a mail-order doll company and maker of

5   the "American Girl" doll collection. And in December 1998, Mattel announced

6   plans to fork out a monumental $3.5 billion to buy the Learning Company,

7   followed quickly by Mattel's purchase, in March 1999, of a software company,

8   Purple Moon.

9       14.   Despite these acquisitions, the company continued to struggle. The

10   retail environment and buying patterns had unquestionably changed, but Mattel had

11   not kept up. Despite Mattel's feverish acquisitions, Mattel's mainstay and primary

12   profit-generator was still "Barbie." But "Barbie" had grown stale, and sales

13   languished. Posting additional losses in the first quarter of 1999, Mattel announced

14   that it would lay off 3,000 employees – 10% of its work force.

15       15.   Mattel's stock plummeted again in late 1999, dropping 30% on

16   Mattel's announcement that it would fall as much as 55% short of analysts' earning

17   estimates for the third quarter. Mattel blamed its troubles primarily on its

18   expensive, $3.5 billion acquisition of the Learning Company, which had turned out

19   to be a disaster fraught with licensing and distribution problems, bad debt, high

20   product returns and high advertising costs.

21       16.   By early 2000, Mattel's stock had crashed to as low as $8 per share,

22   and some analysts considered Mattel vulnerable to a takeover. Investors clamored

23   for Ms. Barad's resignation, and got their wish.

24       17.   Jill Barad resigned from Mattel in February 2000.

25       18.   For three months, the company was without a permanent chief

26   executive until Robert Eckert took the helm in May 2000. Mr. Eckert had spent 23

27   years at Kraft Foods, a subsidiary of Altria Group, Inc., and was widely credited

28

5

EXHIBIT __H__
PAGE __58__

1 with reviving its ailing cheese business. Investors looked for him to do the same
2 for Mattel.

3     19.    Upon his arrival at Mattel, Mr. Eckert's promise, according to *Wall*
4 *Street Journal* reports, was to deliver a "leaner and meaner" Mattel.

5     20.    The "leaner" Mattel came quickly. Mr. Eckert laid off hundreds,
6 closed factories in the United States, shipped production to Mexico, and sold off the
7 Learning Company at a fraction of what Mattel had paid for it. It helped Mattel's
8 bottom-line, but did nothing to spur sales growth. Even under Mr. Eckert's "leaner
9 meaner" leadership, domestic "Barbie" sales remained in a slump into 2001. In an
10 industry that had become increasingly driven by consumer whims and fads, and the
11 hot, must-have toys of the moment, Mattel remained disinterested in devoting its
12 resources to searching for or developing a new blockbuster toy. Mr. Eckert's
13 business plan was not to diversify, but to build upon and expand sales of its existing
14 brands. Mattel was, after all, still generating billions in revenue despite the decline
15 of "Barbie." And so, Mattel remained committed to its age-worn icon and its two
16 other core brands, Fisher-Price and Hot Wheels, with each of the three accounting
17 for approximately a third of the company's sales.

18     21.    Then came the competition – MGA's "BRATZ".

19

20 **"BRATZ" Dolls Revolutionize The Fashion Doll Market**

21     22.    "BRATZ" challenged "Barbie's" half-century domination of the
22 fashion-doll market like nothing ever before had been able to do.

23     23.    MGA unveiled a preliminary sample of the "BRATZ" doll at the Hong
24 Kong Toy Fair in January 2001, while continuing to finalize the product throughout
25 that spring. Finished products were first shipped in May 2001. MGA introduced
26 the line to consumers in June 2001.

27

28

6

24.    Unlike "Barbie" dolls, the "BRATZ" line of dolls and branded products sported a hip, multi-ethnic urban look that appealed to contemporary teenage and pre-teen girls.

### MGA's "BRATZ"









25.    At approximately 9.5 to 10 inches tall, the "BRATZ" dolls were intentionally shorter than "Barbie" dolls and looked like no other, with disproportionately large heads, big, dramatic eyes and lips, small, thin bodies, oversized feet (to emphasize shoe fashion and to stand on their own, unlike "Barbie," which requires a stand), and up-to-date fashions.

7

1    26.    Indeed, the classic "Barbie" look was nowhere to be seen in these
2    dolls; they would never be confused with "Barbie".

3    **MGA's "BRATZ"**                    **Mattel's "Barbie"**




12    27.    Featuring and embodying the slogan "The Girls With a Passion for
13    Fashion!", "BRATZ" dolls revitalized, transformed and expanded the fashion doll
14    market, in particular proving popular among "tween" age girls – those between
15    childhood and adolescence – who had been all but abandoned as a market by
16    Mattel.

17    28.    The "BRATZ" line – with its unique and distinctive look - is well
18    recognized and has been critically acclaimed and praised by consumers, retailers
19    and toy industry analysts alike. In 2001, the "BRATZ" line won the Toy Industry
20    Association ("TIA") People's Choice Toy of the Year Award, the Family Fun Toy
21    of the Year Award and Toy Wishes Hot Pick Award. In 2002, the "BRATZ" line
22    again won the TIA People's Choice Toy of the Year Award and the Family Fun
23    Toy of the Year Award. LIMA, the licensing industry's official arm, awarded
24    MGA's "BRATZ" the best character license of the year as well as the overall best
25    licensed property of the year for 2003. MGA's "BRATZ" also earned the coveted
26    TIA "Property of the Year" and "Girl Toy of the Year" for 2003, as well as the
27    Family Fun Toy of the Year Award. MSNBC named "BRATZ" the "Hottest Toy
28    of the Year," and both MGA and "BRATZ" received several other accolades in

8

EXHIBIT  H
PAGE  61

1   2004, including the Suppliers Performance Award by Retail Category (the
2   "SPARC" award) in the Girls' Toys category sponsored by DSN Retailing
3   Today/Apparel Merchandising.

4       29.    Although but a tiny fraction of Mattel's size, with "BRATZ", MGA
5   was able to chip away at Mattel's stranglehold on the fashion doll market, gaining
6   shelf space and market share as "Barbie" sales remained flat or, at times, declined.

7       30.    The competition that MGA (once a licensee of Mattel!) and "BRATZ"
8   posed to Mattel was unexpected and unwelcomed by Mattel. Where "Barbie" had
9   once enjoyed a 90% share of the fashion doll market in 1997, that share had already
10  slipped to 85% or less by the time of the release of "BRATZ". With the company
11  still struggling under Mr. Eckert to overcome prior years of declining sales and
12  mounting debt, "Barbie," Mattel – and Mr. Eckert – simply could not afford the
13  untimely competition. Mr. Eckert's "leaner" Mattel was not enough to battle more
14  potential erosion in "Barbie's" market share. Mattel had to combat "BRATZ" and
15  MGA, and in the process revealed Mr. Eckert's "meaner" Mattel.

16

17  **Mattel's Response to "BRATZ" and Efforts to Thwart MGA's Competition**

18      31.    Mattel was not poised to nimbly respond to "BRATZ" with a new,
19  creative product of its own – indeed, it had been antithetical to Mattel's corporate
20  culture and mentality for Mattel to even conceive that a product might vie for shelf
21  space with "Barbie", let alone be available for sale to consumers mere months after
22  first being shown to retailers. Mattel had to take a more expeditious route.

23      32.    Instead of fairly competing, Mattel waged war against MGA using a
24  wide-array of tortious, unfair and anti-competitive practices including systematic,
25  serial copycatting and intellectual property infringement, aided by intimidation,
26  threats and other acts of unfair competition and anti-competitive conduct, all with
27  one goal in mind – to banish MGA from the market – or minimize its ability to
28  capture any meaningful share before it could do any real harm to Mattel.

9

**Mattel's serial copycatting and intellectual property infringement**

33. Mattel's serial copycatting of MGA's product lines began with the "BRATZ" dolls themselves, but quickly extended to MGA's packaging, themes, accessories, advertising and even other product lines.

34. The first four "BRATZ" dolls that MGA launched in 2001, named Jade, Yasmin, Cloe and Sasha, met their wannabe "BRATZ PACK" members in October 2002 with Mattel's launch of three "My Scene" dolls named Madison, Chelsea and "Barbie." This was no ordinary "Barbie", however. Indeed, not even close. Mattel designed its "My Scene" dolls to evoke the unique and distinctive look of the "BRATZ" – also with disproportionately oversized heads, artfully made-up almond-shaped eyes, large, overly-lined and lipsticked lips, trendy, hip clothes and hair styles, and over-sized feet.

| **Mattel's Traditional "Barbie"** | **Mattel's "My Scene" Doll** | |
| --- | --- | --- |
| | circa 2002 | circa 2004 |





10

EXHIBIT H
PAGE 63

35.    These confusingly similar "BRATZ" imitators may have been originally intended to buy Mattel time while it worked to release another product the following summer, called "Flavas". MGA's founder, Isaac Larian, was quoted by the media as having predicted that the move would backfire on Mattel, and it did. Released in July 2003, Mattel's "Flavas" dolls took the urban, "hip-hop" look too far, and were widely viewed as portraying a trampy, "bad-girl" image. The dolls were not well-received, and rumor has it that Mattel had to sell them at below cost prices to get rid of inventory. Most apparently wound up in discount bins, and Mattel has seemingly abandoned the line.

36.    Realizing that "My Scene" was its best bet for riding MGA's successful coattails and capitalizing on the unique and inherently distinctive look that MGA had developed in its "BRATZ" dolls – and MGA's substantial goodwill – Mattel has systematically proceeded to modify the "My Scene" dolls since their original release, particularly their eyes, to increase their similarity to "BRATZ" more and more over time.

37.    Indeed, when Mattel found out that its initial line of "My Scene" dolls had trouble competing with "BRATZ", they simply *became* "BRATZ", in every version, whether blonde, brunette or African American. A few pictures here are worth a thousand words.

**BLONDE**

**Mattel's Traditional "Barbie"**     **Mattel's Original "My Scene"**     **Mattel's Recent "My Scene"**

    

11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| Mattel's Traditional "Barbie" | Mattel's Original "My Scene" | Mattel's Recent "My Scene" |
|---|---|---|



**BRUNETTE**

| Mattel's Traditional "Theresa" | Mattel's Original "My Scene" | Mattel's Recent "My Scene" |
|---|---|---|

EXHIBIT H
PAGE 65

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## AFRICAN AMERICAN

| Mattel's Traditional "Barbie" | Mattel's Original "My Scene" | Mattel's Recent "My Scene" |

38.    The original "My Scene" eye, as shown here, for example, has recently turned into a virtual carbon-copy of the "BRATZ" eye.

### Original Mattel "My Scene" Eye




13

EXHIBIT  H
PAGE  66

39.     The "My Scene" eye pictured above, for instance, has lashes that radiate almost straight out, circumferentially, from the eyelids and, although the eye is more almond shaped than a "Barbie" eye, the eye is not so sleepy and heavy lidded as a "BRATZ" eye and is only lightly shadowed. The new "My Scene" eye, in contrast, is dramatically more similar to a "BRATZ" eye, as shown below in a side-by-side comparison. The doe-eyed innocent look of the "My Scene" eye shown above is gone; replaced with a sultrier look, characteristic of "BRATZ." The new "My Scene" eye, as shown below, boasts lashes that sweep out and away from the outer corner of the eye, just like the "BRATZ" eye. The new "My Scene" eye is also more heavy lidded and thickly lined, and the make-up is more markedly pronounced and dramatic.

**MGA's "BRATZ" Eye**                          **New Mattel "My Scene" Eye**



40.     Indeed, the progression of the "My Scene" eye, as it has departed from "Barbie" and edged closer and closer to "BRATZ", is readily apparent from virtually every angle, as shown here:

14

EXHIBIT  H
PAGE  67

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**BLONDE**

| Mattel's Traditional "Barbie" | Mattel's Original "My Scene" | Mattel's Recent "My Scene" |
|---|---|---|



**BRUNETTE**

| Mattel's Traditional "Theresa" | Mattel's Original "My Scene" | Mattel's Recent "My Scene" |
|---|---|---|



15

EXHIBIT H
PAGE 68

Mattel's Traditional "Theresa"

Mattel's Original "My Scene"

Mattel's Recent "My Scene"

## AFRICAN AMERICAN

Mattel's Traditional "Barbie"

Mattel's Original "My Scene"

Mattel's Recent "My Scene"

16

EXHIBIT   H
PAGE   69

41.    Mattel has not stopped at the eyes, however.  Mattel has also incrementally but steadily modified its "My Scene" packaging, and the manner in which the dolls are displayed, to more closely mimic the packaging, trade-dress and overall look and total image of MGA's "BRATZ".

42.    To illustrate, Mattel's "My Scene" dolls were initially marketed like this:

**Mattel's Early "My Scene" Packaging**

 

43.    Little by little, however, the packaging has changed, creeping ever closer and closer to the open and transparent style of the "BRATZ" packaging. First, the panels seen running down each side of the front of the "My Scene" box shown above, framing the doll and giving the packaging a closed-in look, were changed as shown here:

**Intermediate Mattel "My Scene" Packaging**



17

44.    Mattel replaced this intermediate packaging style with another that looked even more similar to the "BRATZ" packaging, as shown here in a side-by-side comparison:

|  |  |
|---|---|
| **MGA's "BRATZ"** <br> **"Wintertime Wonderland" Packaging** | **Mattel's "My Scene"** <br> **"Chillin' Out" Packaging** |

  

45.    Then later, Mattel changed its packaging and product display yet again to look even more closely and confusingly similar to MGA's packaging and "*tout ensemble,*" as shown here

|  |  |
|---|---|
| **MGA's "BRATZ"** <br> **"SPORTZ" Packaging** | **Mattel's Recent "My Scene"** <br> **"MIAMI GETAWAY" Packaging** |

  

18

46.     In this incarnation, Mattel notably abandoned the signature figure-eight style design that had appeared on its prior "My Scene" packaging, making this recent version clearer and more transparent on the front and sides than ever before, and much more like "BRATZ", accordingly.  Mattel also discarded its traditional, rectangular shaped box and, like "BRATZ", adopted an unusual, non-rectangular shaped box.  Mattel even adopted the "flying banner" ribbon-style slogan running across the middle of the box, similar to that used on the "BRATZ" packaging.

47.     As if these pointed and deliberate efforts to confuse and mislead consumers were not enough, Mattel exacerbated the confusion, and furthered the impression that the "My Scene" line and the "BRATZ" line are related, by taking up MGA's practice of regularly releasing new dolls in connection with a theme –
but not just *any* theme, often *MGA's theme.*

48.     For example, when MGA released its "Wintertime Wonderland" theme in Fall 2003, Mattel released its "Chillin Out!" theme.  Each doll in MGA's line came with winter-sports accessories, such as a snowboard or skis and ski boots. Each doll in Mattel's line featured winter sports accessories, also including snowboards or ski and ski boots.  Even MGA's color schemes and some of the clothing styles seemed to have made their way into the Mattel products.

49.     When MGA released its "Formal Funk" theme, Mattel released its "Night on the Town" theme.  "BRATZ Formal Funk" was an elaborately themed line with its dolls in hip formalwear; so was Mattel's "Night on the Town."

50.     When MGA released its distinctive "Sun-Kissed Summer" theme, Mattel released its confusingly similar "Jammin' in Jamaica" theme.  Each line featured a bright blue-and-orange color scheme, beach accessories, such as surfboards, and beachwear clothing.  Mattel's "Jammin' in Jamaica" "Guava Gulch Tiki Lounge" playset also contained elements remarkably similar to MGA's "Sun-Kissed Summer" playset.

19

EXHIBIT ___H___
PAGE ___72___

1    51.    Mattel also began running television commercials for its "My Scene"

2    dolls bearing a remarkable similarity to "BRATZ" commercials, combining live

3    action with animated sequences set to similar sounding pop music and lyrics.

4    52.    Mattel even stooped so low as to mimic "BRATZ" accessories and

5    related products in order to further create consumer confusion in the marketplace.

6    53.    For instance, when MGA came up with its distinctive "BRATZ"

7    "Runway Disco", Mattel came out with a "My Scene" Sound Lounge with

8    packaging that imitated MGA's trapezoidal box.

9    54.    Mattel's conduct cannot be explained by sheer coincidence, nor is it

10    merely fair competition. It is a calculated and intentional effort unquestionably

11    designed to trade off of MGA's hard work and goodwill, create confusion in the

12    marketplace, steal MGA's thunder and momentum, and dilute and blur away the

13    novelty and distinctiveness of MGA's products. Out of the seemingly endless

14    possibilities that Mattel could have chosen for a new line of dolls, packaging,

15    themes, color schemes, commercials, accessories and playsets, Mattel deliberately

16    chose *not* to come out with something unique, new or different and has, instead,

17    focused its efforts and resources on flooding the market with something so close to

18    "BRATZ" that the public will, can, and does, simply mistake it for "BRATZ".

19    55.    As yet another example of this, when MGA came out with a "BRATZ"

20    "Funky Fashion Makeover Head," Mattel came out with a confusingly similar –

21    indeed, practically identical – "My Scene" styling head.

22

23

24

25

26

27

28

20        EXHIBIT __H__
          PAGE __73__

1

| MGA's "BRATZ" "Funky Fashion Makeover Head" | Mattel's "My Scene" "Stylin' Head" |

2

3

4

5

6

7

8

9

   

10

11

12

13

14

15

16

   

17    56.    Indeed, Mattel's "My Scene" styling head is so close to the "BRATZ"

18   styling head that even the press have mistakenly pictured and identified it as

19   MGA's "BRATZ". The picture of Mattel's "My Scene" styling head shown below,

20   for instance, appeared in the press with a caption indicating that the child was trying

21   out different hairstyles "on a *Bratz* hair and makeup doll head."

22

23

24   

25

26

27

28

21

EXHIBIT  H
PAGE  74

1    57.    Creating further confusion, Mattel's television commercial for its "My

2    Scene" styling head was like watching a re-run of MGA's commercial for its

3    "Funky Fashion Makeover Head".

4    58.    At one point in time, Mattel also used a portion of the "BRATZ" dolls'

5    now-famous trademarked tag line "The Girls With a Passion for Fashion" on

6    Mattel's' website for its "Diva Starz" dolls, asking its website users:  "Do you have

7    a passion for fashion?"

8    59.    Mattel has even recently come out with a confusingly similar line of

9    "My Scene" plush pets, which adopt the distinctive look of MGA's "BRATZ" line.

10   The "My Scene" pets feature large, humanlike eyes and wear clothing making them

11   remarkably and confusingly similar to "BRATZ" products, including "BRATZ

12   PETZ", as seen in this example where the pets each wear a jacket, a cap and carry a

13   purse:

**MGA's "BRATZ Dogz"**            **Mattel's "My Scene" dog**

          

21   60.    And here too, Mattel chose to package its pets the same way that MGA

22   packaged its "BRATZ PETZ", sitting in an open box, with no top and with partial

23   side panels that slope from a narrow front panel to a higher back panel.

24   61.    Indeed, the similarity of the "My Scene" pets to "BRATZ PETZ" has

25   confused even sophisticated retailers who have mistakenly merchandised "My

26   Scene" dogs in the middle of the "BRATZ" section of a retail display, next to and

27   as if they were part of MGA's "BRATZ Petz" line.  It comes as no surprise that

28

22    **EXHIBIT** __H__
     **PAGE** __75__

1   customers too have been confused.

2       62.   Indeed, Mattel's television commercials and "My Scene" products
3   have become so confusingly similar to MGA's that even advertising executives
4   have expressed concern. One went so far as to say that although imitation is the
5   best form of flattery, what the individual had seen at Mattel's showroom, and how
6   its "My Scene" dolls now look so confusingly similar to "BRATZ", was
7   "shocking." This person further opined that it was clear that Mattel is intending to
8   confuse customers and capture "BRATZ" market share, and even asked MGA if it
9   was considering legal action.

10      63.   The press also has taken notice of Mattel's attempts to confuse
11  consumers. On or about February 18, 2005, a visitor to MGA's showroom from a
12  prominent news publication stated, "Oh my, I just came from Mattel's showroom
13  and their new 'My Scene' packaging is just like 'BRATZ' minus the handle."
14  Another member of the press visiting MGA's showroom offered the unsolicited
15  comment, "have you seen the new 'My Scene' dolls eyes are exactly like
16  'BRATZ'?" Yet another opined that Mattel's "My Scene" line was exactly like
17  "BRATZ", indeed, so much so that the reporter confusingly thought that Mattel had
18  bought "BRATZ", and still another has commented on Mattel's imitation of MGA.
19  On or about February 16, 2005, during an interview of a Mattel representative on
20  local network news in New York, "My Scene Barbie" was displayed by a Mattel
21  representative. During conversation about the dolls, the interviewer exclaimed that
22  they looked like "BRATZ". The Mattel representative just laughed – but this is no
23  laughing matter. This colloquy was available for replay and viewing, and was even
24  transcribed, on the internet.

25      64.   Customers too have been similarly confused. Some actually contacted
26  MGA seeking to purchase "My Scene" dolls.

27      65.   Mattel's conduct is planned, deliberate and intentional. Mattel has
28  systematically, copied, imitated and liberally borrowed many of the distinctive,

23

EXHIBIT ___H___
PAGE ___76___

1    essential elements that identify and make "BRATZ" dolls "BRATZ" dolls, diluting
2    the brand, creating customer confusion, and unfairly stifling competition.

3         66.    Ironically, Mattel sued one of its other competitors in Europe for doing
4    much the same thing: "systematically copying and borrowing elements" from "My
5    Scene", on grounds that "this conduct constitutes unfair competition and passing
6    off." Indeed it does.

7         67.    What is more, Mattel's conduct has reached beyond "BRATZ" and
8    "BRATZ"-related products to include other new MGA toy lines.

9         68.    For example, MGA's "4-Ever Best Friends" line was the obvious, and
10   well-recognized model for Mattel's "Wee 3 Friends" line. Mattel even adopted
11   changes to the color scheme of its similarly-shaped packaging to create confusion
12   with MGA's distinctive packaging.

13   **MGA's "4-Ever Best Friends"**          **Mattel's "Wee 3 Friends"**

     

     

24

69.    In the second half of 2002, MGA's "Mommy's Little Patient," originally designed as the first in a series of "Mommy's Little . . ." dolls, was followed by Mattel's "Little Mommy" doll.

| MGA's<br>**"Mommy's Little Patient"** | Mattel's<br>**"Little Mommy Potty Training Baby Doll"** |
|:---:|:---:|
|  |  |

70.    Sparing nothing, Mattel has also extended its monkey-see monkey-do behavior into its boys' line. When MGA came out with its "Alien Racers" line of toy racing vehicles, for instance, Mattel rushed to revamp and rename one of its "Hot Wheels" lines. Although well-known and clearly branded for decades as "Hot Wheels", Mattel's answer to MGA's "Alien Racers" was to re-brand and market its Hot Wheels Highway 35 line under an "AcceleRacerS" logo. MGA's line consists of "extreme" radio controlled racing vehicles marketed in connection with a strong, almost battle-like, science fiction theme. MGA's logo accentuates the "A", "R", and "S" in compressed block lettering. Mattel's line also consists of extreme racing vehicles marketed in connection with a strong, almost battle-like, theme. Mattel's logo too accentuates the "A", "R", and "S" in compressed block lettering.

EXHIBIT  H
PAGE  78

71.   Here, too, Mattel's mimicry has spilled over into Mattel's advertising and thematic presentation and marketing of this toy line.  In particular, Mattel has adopted MGA's "other-worldly" theme in its commercials.  For instance, in Mattel's commercials, the product, whose logo appears as "AcceleRacerS", now compete against alien-like Cyborgs engaged in a "race to save the world," mimicking MGA's alien theme and commercials in which MGA's "Alien Racers" are engaged in a "race to save the universe."

72.   None of this is coincidence.  Mattel has deliberately adopted a pattern and practice of coming out with variations of MGA's products to create confusion in the marketplace, interfere with MGA's business and divert profits away from MGA.  Mattel says, on its website, that it is in the business of creating "[t]he world's premier toy brands [of] today and tomorrow."  It seemingly does so, however, by borrowing liberally from its competitors, even when it refreshes its own existing brands and products.

73.   MGA has suffered extensive injury from Mattel's conduct.  Mattel's habitual, serial simulation of MGA's products, product lines and trade dress has allowed Mattel to take a free ride on the extensive amount of time, expense and creative development MGA expends on developing new products, product packaging and presentation, giving Mattel an unfair advantage, and making it virtually impossible for MGA to compete with Mattel on a level playing field.

**Mattel's additional unfair, manipulative, anti-competitive conduct**

74.   This already substantial injury has been exacerbated by the strong-arm tactics, and other illegitimate, unfair and anti-competitive means that Mattel has used to manipulate the market and ensure that its control and domination of the industry can continue unabated.

EXHIBIT   H
PAGE   79

1    75.    For example, wielding the litigation privilege as a potential shield for
2    intimidating conduct, Mattel has sent threatening letters to several of its former
3    employees who now work for MGA warning them not to disclose *even publicly*
4    *available information* about Mattel, including the names and positions of Mattel
5    employees. Mattel even went so far as to sue one of its former senior executives,
6    after he had the temerity to resign and join MGA in October 2004. Not only was
7    Mattel's lawsuit dismissed for failure to state a viable claim, but Mattel thereafter
8    seemingly could not muster up a shred of evidence sufficient to support an amended
9    complaint. As a result, Mattel's case against its former executive was dismissed
10   with prejudice.

11   76.    Mattel has also warned a number of companies, including the biggest
12   publishing entity in the United Kingdom, not to license MGA products, or risk
13   retribution. The threats are not idle. In May 2004, Mattel terminated one of its
14   licensees, apparently in retribution for licensing "BRATZ". While some companies
15   have been courageous enough to take the risk, others have not, and MGA has lost
16   valuable licensing opportunities as a result.

17   77.    Mattel has used similar intimidation to pressure distributors and
18   retailers, particularly in foreign countries, not to distribute "BRATZ", to reduce
19   shelf and display space for "BRATZ" and to place "BRATZ" in unfavorable
20   locations at retail outlets.

21   78.    When MGA faced a shortage of doll hair in October 2002, MGA is
22   informed and believes that the reason for that shortage was that Mattel had locked
23   MGA out by buying up the supply from the two main hair supply companies.

24   79.    Mattel has also manipulated the retail market. For instance, Mattel
25   merchandisers have been caught tampering with MGA's retail displays, replacing
26   favorably located MGA merchandise with Mattel merchandise instead. MGA is
27   also informed and believes that Mattel has falsely told a major United States retailer
28   that MGA was giving another major United States retailer below-market pricing

27     EXHIBIT $\underline{H}$
       PAGE $\underline{80}$

1  and falsely told a United Kingdom retailer that MGA was discontinuing one of its

2  lines, in order to make such line less attractive to buyers and thereby attempt to

3  increase sales of the competitive Mattel product and improve its own sales, at

4  MGA's expense.

5    80.   Even supposedly unbiased and impartial industry organizations have

6  fallen prey to Mattel's abusive wield of power, to MGA's detriment.

7    81.   NPD Funworld ("NPD"), for one, is the leading supplier of sales

8  statistics in the toy industry. Accurate NPD statistics are essential for efficient

9  product-line management. Without these statistics, it is difficult, if not impossible,

10  for toy companies to assess and measure the relative success of their products in

11  key categories. It is, however, a subscription service, and NPD restricts the manner

12  in which its subscribers may use the data it provides.

13    82.   Mattel has regularly ignored the restrictions – using NPD data about

14  Mattel's comparative standing relative to other companies in press releases and in

15  communications with retailers and financial investors who are not NPD subscribers.

16    83.   Mattel generates substantially more annual subscription revenue for

17  NPD than does MGA, and carries more clout.

18    84.   After MGA had subscribed to the service for more than 12 years, NPD

19  terminated MGA's subscription in 2003 theoretically on the grounds that MGA

20  misused NPD data in a press release.

21    85.   MGA is informed and believes that the termination was the result of

22  pressure from Mattel, notwithstanding Mattel's own frequent violations of NPD's

23  restrictions.

24    86.   In addition to this, the market share numbers that NPD generates are

25  heavily dependent on the category in which NPD places a particular product. MGA

26  is informed and believes that Mattel also pressured NPD into changing certain

27  product classifications for its "BRATZ" products in order to manipulate the data

28

28

1 and preserve Mattel's market share rankings in the critical fashion doll category –
2 and thereby lower MGA's.

3     87.    The Children's Advertising Review Unit ("CARU") is another
4 organization that, upon information and belief, appears to have been subject to
5 improper influence by Mattel. CARU is the toy industry's supposedly independent
6 self-regulatory body in charge of maintaining standards in advertising. CARU's
7 approval is considered critical within the toy industry to avoiding regulatory action
8 by the Federal Trade Commission.

9     88.    CARU is heavily subsidized by Mattel.

10     89.    Upon information and belief, Mattel has used its influence as a major
11 contributor to CARU's budget to induce CARU to place onerous restrictions on
12 MGA advertisements, and require MGA to amend aspects of commercials that have
13 gone unchallenged in other parties' commercials.

14     90.    As a result of CARU's restrictions, MGA has been forced to incur
15 unnecessary costs for reshooting and producing or re-editing its commercials.

16     91.    On several occasions, CARU has also either strongly suggested, if not
17 also required, that MGA respond to inquiries about its website policies and make
18 substantial changes to the "BRATZ" website notably and significantly in excess of
19 restrictions imposed on Mattel and others.

20     92.    Even TIA, the toy industry's trade association, is apparently not
21 untainted by Mattel's influence and power. Each year, TIA presents the Toy-of-
22 the-Year Awards, the most prestigious of which had been the award for Toy of the
23 Year. Winning the Toy of the Year Award is a significant achievement that not
24 only very likely increases the sales of the winning toy, but also denotes the winning
25 company as a leader in toy innovation and generates substantial goodwill with
26 retailers, distributors, licensees, and customers.

27     93.    For the years 2000 (the first year of the award), 2001 and 2002, the
28 Toy of the Year award was chosen by consumer vote. The awards ceremony was

29    **EXHIBIT** H
           **PAGE** 82

1    then held the following year, at a dinner in New York. (For example, the awards
2    dinner for the year 2000 award was held in February 2001). Leap Frog won the
3    2000 People's Choice Toy of the Year Award and MGA won the 2001 and 2002
4    People's Choice Toy of the Year Awards. With the 2003 Toy of the Year Award,
5    however, the rules suddenly changed. Now, the award is selected by members of
6    the industry.

7        94.    Upon information and belief, this change was orchestrated by a Fisher
8    Price (a Mattel subsidiary) executive who, until recently, served as the Chairman of
9    TIA.

10       95.    Perhaps not surprisingly given this change in the winner selection
11   procedures, "Hokey Pokey Elmo" ("Elmo"), a Fisher Price toy, won for the year
12   2003 (awarded in 2004), beating out the other leading nominee, "BRATZ Formal
13   Funk Super Stylin' Runway Disco."

14       96.    TIA has refused to provide MGA with the vote count procedure and
15   totals for this award, despite repeated requests.

16       97.    MGA is also informed and believes that Mattel was instrumental in
17   attempting to keep MGA from participating as a sponsor in this year's "Kids'
18   Choice Awards."

19       98.    Mattel has clearly engaged in tortious, illegal and unethical behavior in
20   its unfettered efforts to disrupt, if not destroy, MGA. Indeed, this is apparently
21   Mattel's current *modus operandi* when it comes to "competing" in the industry.
22   The once immensely successful "LeapFrog" interactive learning product, for
23   example, has apparently been one of Mattel's other recent victims.

24       99.    Mattel may not shield its illegal, unfair and unethical business practices
25   from the public eye. It is time for the truth to be told, and the world to know of
26   Mattel's unfair, unethical and illegal business practices and unfair competition.
27   "Barbie" does not "play nice" with others (particularly her competitors), and needs
28   to be taught how "to share" (at least in the fashion doll marketplace). She cannot be

1   allowed to continue to be the playground bully and trample on the rights of others,

2   including MGA.

3       100.  As a result of Mattel's manipulative, illegal, unfair, unethical and anti-

4   competitive conduct, MGA has suffered and, unless abated, will continue to suffer

5   lost sales, lost licensing fees, lost contracts, lost relationships, lost business

6   opportunities and other damages and harm for which there is no adequate remedy at

7   law.  Its ability to enter new markets and product lines has been hampered and

8   delayed.  Its production costs have increased, its reputation and relationships with

9   important players in the industry have been negatively impacted, the value of its

10  business has been diminished, and its ability to attract, hire and retain employees

11  has been affected.

12

13              **FIRST CLAIM FOR RELIEF**

14  **(False Designation of Origin or Affiliation in Violation of 15 U.S.C. § 1125 (a))**

15      101.  MGA repeats and realleges the allegations contained in paragraphs 1

16  through 100 of this Complaint and incorporates them by reference as though fully

17  and completely set forth herein.

18      102.  MGA's "BRATZ" line has a unique and distinctive style and

19  distinctive characteristics, such as the disproportionately large head, large dramatic

20  eyes with a distinctive presentation (including the eye shape, make-up and lashes),

21  pouty, plump lips with a distinctive presentation (including the lip shape and make-

22  up), small, thin bodies, oversized feet, and up-to-date fashions.  MGA's "BRATZ"

23  line is known for and recognized by the total image that is presented by its product

24  and the style and arrangement of the packaging and display.  This "*tout ensemble*"

25  is representatively described and depicted herein.  The characteristics of MGA's

26  "BRATZ" line, alone or in combination, have come to identify the "BRATZ" line

27  and its source, MGA, and thus serve as protectable trade dress.  MGA's trade dress

28  in its "BRATZ" line is purely aesthetic and non-functional or, if any utility exists, it

31   EXHIBIT __H__
     PAGE __84__

1   is not essential to the purpose, quality or source identifying attributes of the

2   aesthetics. MGA's trade dress in its "BRATZ" line is inherently distinctive or has

3   acquired distinction within the meaning of the Lanham Act.

4       103. Similarly, MGA's "BRATZ PETZ," part of the "BRATZ" line, also

5   has its own unique and distinctive characteristics, such as the humanlike eye and

6   unusual appearance of the animals dressed in clothing. MGA's "BRATZ PETZ"

7   line has become known for and recognized by the total image that is presented by

8   the product and the style and arrangement of its packaging. This *"tout ensemble"* is

9   representatively described and depicted herein. The characteristics of MGA's

10  "BRATZ PETZ", alone or in combination, have come to identify the "BRATZ

11  PETZ" line and its source, MGA, and thus serve as protectable trade dress. MGA's

12  trade dress in its "BRATZ PETZ" line is purely aesthetic and non-functional or, if

13  any utility exists, it is not essential to the purpose, quality or source identifying

14  attributes of the aesthetics. MGA's trade dress in its "BRATZ PETZ" line is

15  inherently distinctive or has acquired distinction within the meaning of the Lanham

16  Act.

17      104. Mattel's production, sale and marketing of "My Scene" dolls,

18  including styling heads and doll heads, and "My Scene" pets that are confusingly

19  similar to MGA's "BRATZ" line (including its "BRATZ PETZ"), without MGA's

20  permission or consent, constitutes designation and use of a term, symbol, device or

21  combination thereof that is false or misleading within the meaning of 15 U.S.C.

22  Section 1125 and is likely to cause confusion, or to cause mistake, or to deceive as

23  to the affiliation, connection, or association, or as to the origin, sponsorship, or

24  approval of Mattel's goods or commercial activities, within the meaning of 15

25  U.S.C. Section 1125. MGA has been damaged by Mattel's acts.

26      105. Mattel's conduct has been intentional and willful, and is calculated

27  specifically to trade off the goodwill that MGA has developed in its successful

28  "BRATZ" line. By its aforesaid acts, particularly its imitation of the distinctive

1   features of MGA's "BRATZ" line in connection with goods sold and distributed in

2   interstate commerce, Mattel has infringed and is likely to continue to infringe on

3   MGA's substantial rights in and to the "BRATZ" line trade dress. In so doing,

4   Mattel has falsely represented and designated to the public generally and consumers

5   of fashion doll products specifically the source and origin of Mattel's "My Scene"

6   fashion doll products in violation of 15 U.S.C. § 1125(a).

7       106. MGA has been damaged by, and Mattel has profited from, Mattel's

8   wrongful conduct in an amount to be proven at trial.

9       107. For each act of infringement, MGA is entitled to recover its actual

10  damages as well as Mattel's profits from such infringement.

11      108. Monetary relief alone, however, is not adequate to address fully the

12  irreparable injury that Mattel's illegal actions have caused and will continue to

13  cause MGA, if not enjoined. MGA is therefore entitled to preliminary and

14  permanent injunctive relief to stop Mattel's ongoing infringement of MGA's trade

15  dress.

16                    **SECOND CLAIM FOR RELIEF**

17      **(Unfair Competition in Violation of 15 U.S.C. § 1125 (a) and Unfair**

18  **Competition and Unfair Business Practices in Violation of Cal. Bus. & Prof.**

19              **Code § 17200 *et seq.* and California Common Law)**

20      109. MGA repeats and realleges the allegations contained in paragraphs 1

21  through 108 of this Complaint and incorporates them by reference as though fully

22  and completely set forth herein.

23      110. Mattel has deliberately and, indeed, repeatedly adopted, imitated and

24  mimicked the make-up, appearance, features, trade dress, and image of MGA's

25  products, packaging and advertising, including its repackaging and refreshing of

26  older Mattel toys. Mattel's actions were and are done with the intent to deceive

27  consumers, cause confusion and mistake, and interfere with the ability of

28  consumers to identify the source of goods by appearance and packaging. By this

                          33    EXHIBIT  H
                                PAGE  86

1 conduct, Mattel pirates and exploits, by subliminal or conscious association with

2 MGA, the goodwill and reputation of MGA and derives benefit therefrom.

3 111. Mattel has particularly and deliberately poached upon the commercial

4 magnetism of MGA's "BRATZ" and the success of "BRATZ". Mattel's conduct

5 has been intentional and willful, and is calculated specifically to trade off the

6 goodwill that MGA has developed in its successful "BRATZ" line.

7 112. By its acts, including its intentional imitation of the distinctive features

8 of MGA's "BRATZ" dolls, which has progressively become closer and closer, as

9 well as its imitation of "BRATZ" themes, packaging and the overall look, feel and

10 total image of the "BRATZ" line, imitation of other MGA products, packaging and

11 advertising, and other conduct alleged herein, Mattel has engaged in unfair

12 competition under both federal and California state law.

13 113. Mattel has also willfully and maliciously used its power, influence and

14 intimidation to threaten certain retailers, suppliers, licensees, distributors and

15 manufacturers so as to limit, if not prevent, MGA from doing business with these

16 retailers, suppliers, licensees, distributors and manufacturers, using its power and

17 influence to intimidate and manipulate industry bodies. Mattel has further used its

18 power and influence to attempt to, if not actually, intimidate and threaten MGA's

19 current and potential employees so as to cause MGA competitive injury.

20 114. Alone, in combination, or in totality, Mattel's actions discussed and

21 alleged herein constitute unfair competition and unfair business practices within the

22 meaning of federal law, California statutory law and/or California common law.

23 115. As a result of its conduct, Mattel has derived substantial monetary and

24 non-monetary benefit and business advantage. Mattel has also wrongfully diverted

25 profits away from MGA and to Mattel and, on information and belief, deprived

26 MGA of the patronage of a large number of actual and potential customers.

27 116. MGA has been damaged by, and Mattel has profited from, Mattel's

28 wrongful conduct in an amount to be proven at trial.

1    117.  Monetary relief alone, however, is not adequate to address fully the
2    irreparable injury that Mattel's actions have caused and will continue to cause
3    MGA, if not enjoined.  MGA is therefore entitled to preliminary and permanent
4    injunctive relief to stop Mattel, and all persons acting in concert with Mattel, from
5    engaging in acts of unfair competition and unfair business practices.

6    118.  MGA is further entitled to relief whereby Mattel is ordered to pay
7    restitution for damages resulting from Mattel's unfair competition and unfair
8    business practices.

9                          **THIRD CLAIM FOR RELIEF**

10   **(Dilution in Violation of 15 U.S.C. § 1125 (c); Cal. Bus. & Prof. Code § 14330**
11                       **and California Common Law)**

12   119.  MGA repeats and realleges the allegations contained in paragraphs 1
13   through 118 of this Complaint and incorporates them by reference as though fully
14   and completely set forth herein.

15   120.  The look and trade dress of the MGA products referenced herein are
16   distinctive and famous, and have been since before Mattel launched its similar
17   versions.  By its aforesaid acts, Mattel caused and continues to cause blurring and
18   dilution of the distinctive look of MGA's products and trade dress, which
19   previously served as a unique source identifier for MGA, within the meaning of the
20   Lanham Act, California Business and Professions Code § 14330 and/or California
21   common law.

22   121.  Mattel's conduct has been intentional and willful, calculated
23   specifically to trade on MGA's goodwill and reputation and to cause dilution of
24   MGA's famous marks, particularly those connected with MGA's famous and
25   successful "BRATZ" doll head, "BRATZ" doll product line, "BRATZ Funky
26   Fashion Makeover Head" and "BRATZ PETZ" line.

27   122.  MGA has been damaged by, and Mattel has profited from, Mattel's
28   wrongful conduct in an amount to be proven at trial.

1    123. Monetary relief alone, however, is not adequate to address fully the
2  irreparable injury that Mattel's actions have caused and will continue to cause
3  MGA, if not enjoined. MGA is therefore entitled to preliminary and permanent
4  injunctive relief to stop Mattel's ongoing dilution.

5                              **FOURTH CLAIM FOR RELIEF**

6                                    **(Unjust Enrichment)**

7    124. MGA repeats and realleges the allegations contained in paragraphs 1
8  through 123 of this Complaint and incorporates them by reference as though fully
9  and completely set forth herein.

10    125. As a result of the conduct alleged herein, Mattel has been unjustly
11 enriched to MGA's detriment. MGA seeks a worldwide accounting and
12 disgorgement of all ill-gotten gains and profits resulting from Mattel's inequitable
13 activities.

14

15                                **PRAYER FOR RELIEF**

16    WHEREFORE, MGA prays for relief, as follows:

17    1.    That Mattel, its agents, servants and employees and all persons acting
18 in concert be restrained preliminarily and permanently from directly or indirectly:

19         a.    using confusingly similar trade dress;

20         b.    improperly influencing, or attempting to improperly influence,
21               standard-setting and industry organizations;

22         c.    engaging in unfair competition and unfair business practices;
23               and

24         d.    diluting MGA's trade dress;

25    2.    For general and actual damages, according to proof at trial but
26 believed to reach or exceed tens of millions of dollars;

27    3.    For the disgorgement of all profits derived by Mattel for its acts of:

28         a.    false designation of origin or affiliation;

                                36    **EXHIBIT** __H__
                                      **PAGE** __89__

1            b.     unfair competition and unfair business practices; and

2            c.     dilution;

3      4.     For costs of suit and reasonable attorneys' fees;

4      5.     For punitive and/or exemplary damages as a result of Mattel's willful

5 and malicious conduct to the extent allowable by law; and

6      6.     For such other and further relief as the Court deems just and proper.

7

8 Dated:      April 13, 2005          PATRICIA GLASER
9                                CHRISTENSEN, MILLER, FINK,
                                JACOBS, GLASER, WEIL &
10                                SHAPIRO LLP

11                                DALE M. CENDALI
                                DIANA M. TORRES
12                                PAULA E. AMBROSINI
                                O'MELVENY & MYERS LLP

13

14

15                         By:
                                Diana M. Torres
16                                Attorneys for Plaintiff
                                MGA ENTERTAINMENT, INC.

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT   H
PAGE   90

1

## DEMAND FOR JURY TRIAL

2

3    MGA hereby demands a jury trial on all triable issues.

4

5    Dated:        April 13, 2005              PATRICIA GLASER
                                              CHRISTENSEN, MILLER, FINK,
6                                             JACOBS, GLASER, WEIL &
                                              SHAPIRO LLP
7
                                              DALE M. CENDALI
8                                             DIANA M. TORRES
                                              PAULA E. AMBROSINI
9                                             O'MELVENY & MYERS LLP

10

11                                            By: _____
                                                  Diana M. Torres
12                                            Attorneys for Plaintiff
                                              MGA ENTERTAINMENT, INC.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

38      EXHIBIT __H__
        PAGE __91__

# EXHIBIT I

1   QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
2     John B. Quinn (Bar No. 90378)
      (johnquinn@quinnemanuel.com)
3     Michael T. Zeller (Bar No. 196417)
      (michaelzeller@quinnemanuel.com)
4     Jon D. Corey (Bar No. 185066)
      (joncorey@quinnemanuel.com)
5     Duane R. Lyons (Bar No. 125091)
      (duanelyons@quinnemanuel.com)
6   865 South Figueroa Street, 10th Floor
    Los Angeles, California  90017-2543
7   Telephone:  (213) 443-3000
    Facsimile:  (213) 443-3100

8   Attorneys for Mattel, Inc.

9              UNITED STATES DISTRICT COURT

10             CENTRAL DISTRICT OF CALIFORNIA

11  CARTER BRYANT, an individual,       CASE NO. CV 04-9049 SGL (RNBx)

12            Plaintiff,                 Consolidated With Case No. 04-9059 and
                                         Case No. 05-2727
13       v.
                                         MATTEL, INC.'S SECOND AMENDED
14                                       ANSWER IN CASE NO. 05-2727 AND
                                         COUNTERCLAIMS FOR:
15  MATTEL, INC., a Delaware
    corporation,                         1.   COPYRIGHT INFRINGEMENT;
16                                       2.   VIOLATION OF THE
            Defendant.                        RACKETEER INFLUENCED AND
17                                            CORRUPT ORGANIZATIONS
                                              ACT;
18  MGA ENTERTAINMENT, INC. a           3.   CONSPIRACY TO VIOLATE THE
    California corporation,                   RACKETEER INFLUENCED AND
19                                            CORRUPT ORGANIZATIONS
            Plaintiff,                        ACT;
20                                       4.   MISAPPROPRIATION OF TRADE
         v.                                   SECRETS;
21                                       5.   BREACH OF CONTRACT;
    MATTEL, INC., a Delaware            6.   INTENTIONAL INTERFERENCE
22  corporation, and DOES 1-10,              WITH CONTRACT;
                                         7.   BREACH OF FIDUCIARY DUTY;
23          Defendants.                  8.   AIDING AND ABETTING
                                              BREACH OF FIDUCIARY DUTY;
24                                       9.   BREACH OF DUTY OF
                                              LOYALTY;
25

26                                       PUBLIC REDACTED VERSION

27                                              Volume I

28

    EXHIBIT ___
    PAGE ___

2154363.2

SECOND AMENDED ANSWER AND COUNTERCLAIMS

| | | |
|---|---|---|
| 1 | MATTEL, INC., a Delaware corporation, | 10. AIDING AND ABETTING BREACH OF DUTY OF LOYALTY; |
| 2 | Counter-claimant, | 11. CONVERSION; |
| 3 | | 12. UNFAIR COMPETITION; AND 13. DECLARATORY RELIEF |
| 4 | v. | |

1    MATTEL, INC., a Delaware
     corporation,

2                    Counter-claimant,

3

4              v.

5    MGA ENTERTAINMENT, INC., a
     California corporation; ISAAC
     LARIAN, an individual; CARTER
6    BRYANT, an individual; MGA
     ENTERTAINMENT (HK) LIMITED,
7    a Hong Kong Special Administrative
     Region business entity; MGAE DE
8    MEXICO, S.R.L. DE C.V., a
     Mexico business entity; CARLOS
9    GUSTAVO MACHADO GOMEZ, an
     individual; and DOES 4 through 10,

10

11                Counter-defendants.

12   AND CONSOLIDATED CASES

10. AIDING AND ABETTING
    BREACH OF DUTY OF
    LOYALTY;
11. CONVERSION;
12. UNFAIR COMPETITION; AND
13. DECLARATORY RELIEF

DEMAND FOR JURY TRIAL

EXHIBIT  I
PAGE  93

:154363.2

-2-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

## SECOND AMENDED ANSWER

1

2       Pursuant to the Court's Orders of January 12, 2007 and June 27, 2007,

3 Defendant Mattel, Inc. ("Mattel") answers the Complaint of MGA Entertainment,

4 Inc. ("Complaint") as follows:

5                Preliminary Statement

6       The Complaint in this case contravenes Rule 8(a) of the Federal Rules

7 of Civil Procedure in multiple respects. For example, in many places, the Complaint

8 improperly mixes factual averments with argumentative rhetoric. The Complaint

9 also includes a selective recitation of alleged historical facts and "rumor," much of

10 which is both irrelevant and inflammatory in tone and content. In addition, many of

11 the allegations of the Complaint are overly broad, vague or conclusory and include

12 terms which are undefined and which are susceptible to different meanings.

13 Accordingly, by way of a general response, all allegations are denied unless

14 specifically admitted, and any factual averment admitted is admitted only as to the

15 specific facts and not as to any conclusions, characterizations, implications or

16 speculations which are contained in the averment or in the Complaint as a whole.

17 These comments and objections are incorporated, to the extent appropriate, into

18 each numbered paragraph of this Second Amended Answer.

19       Mattel further submits that the use of the headings throughout the

20 Complaint is improper, and therefore no response to them is required. In the event

21 that a response is required, Mattel denies those allegations.

22       The Complaint also contains many purported photographs of various

23 items, and it uses one or more headings purporting to describe, either individually or

24 in groups, these various photographs. The images of these photographs contained in

25 the Complaint are all relatively small and some are of less than optimal quality,

26 making it difficult to evaluate the adequacy of the photographs or their fairness and

27 accuracy in depicting what they purport to represent. The Complaint also does not

28 describe the circumstances or time frame in which these photographs were taken,

EXHIBIT I
PAGE 94

-3-

1 and in many cases does not identify, or does not sufficiently or properly identify, the
2 item depicted in the photographs. All of these factors, as well as the use of these
3 photographs and headings out of context, or with an insufficient context, impair the
4 ability of Mattel to fully respond to these photographs and headings, or to any
5 purported allegations involving, or relying upon, the use of such photographs and
6 accompanying headings. By way of a general response, Mattel therefore does not
7 admit the authenticity of any photograph, or the accuracy or adequacy of any
8 heading, nor does it admit any allegation or inference that is based on, or purports to
9 be based on, any photograph or accompanying heading in the Complaint. Mattel
10 reserves the right to challenge the authenticity of any photograph and the accuracy
11 or adequacy of any heading (either as included in the Complaint or in the context of
12 additional material not included). Further, with reference to all photographs and
13 accompanying headings, or any averments based on the Complaint's use of such
14 photographs and headings, which might be offered into evidence, Mattel specifically
15 reserves its right to object to any use of such photographs, headings, and averments,
16 or the Complaint as a whole or in part, in evidence for any purpose whatsoever.

17 To the extent that Mattel has endeavored to answer any particular
18 allegation containing any such photographs and headings, any admission concerning
19 the item purported to be depicted in such photograph, or described in such headings,
20 shall not constitute an admission that the photograph is authentic, adequate, or
21 admissible, nor that any heading is accurate, adequate, or admissible. All such items
22 purportedly depicted in such photographs, and described in such headings, "speak
23 for themselves". Accordingly, to the extent that any such referenced materials are
24 deemed allegations against Mattel, they are denied.

25                                     Responses

26          1.     Answering paragraph 1 of the Complaint, Mattel admits that
27 plaintiff MGA Entertainment, Inc. ("plaintiff" or "MGA") is a California
28 corporation with a principal place of business in Van Nuys, California.

EXHIBIT __I__     -4-
PAGE __94 A__     SECOND AMENDED ANSWER AND COUNTERCLAIMS

1     2.    Answering paragraph 2 of the Complaint, Mattel admits that

2  Mattel is a Delaware corporation with a principal place of business in El Segundo,

3  California.

4     3.    Answering paragraph 3 of the Complaint, Mattel denies that

5  there has been wrongful conduct on its part and states that it is without knowledge

6  or information sufficient to form a belief as to the truth or falsity of the remaining

7  allegations set forth therein and, on that basis, denies them.

8     4.    Answering paragraph 4 of the Complaint, Mattel admits that

9  plaintiff purports to assert claims under the Lanham Act, 15 U.S.C. §§ 1125(a) and

10  (c), California Business and Professions Code §§ 17200 *et seq.*, California Business

11  and Professions Code § 14330 and California common law, denies that plaintiff is

12  entitled to any relief thereunder and denies the truth of the remaining allegations set

13  forth in paragraph 4.

14     5.    Answering paragraph 5 of the Complaint, Mattel admits that it is

15  subject to personal jurisdiction in this District and denies the truth of the remaining

16  allegations set forth in paragraph 5.

17     6.    Answering paragraph 6 of the Complaint, Mattel admits that

18  venue is proper in this District and denies the truth of the remaining allegations set

19  forth in paragraph 6.

20     7.    Answering paragraph 7 of the Complaint, Mattel admits that

21  MGA has filed the instant lawsuit and denies the truth of the remaining allegations

22  set forth in paragraph 7.

23     8.    Answering paragraph 8 of the Complaint, Mattel states that it is

24  without knowledge or information sufficient to form a belief as to the truth or falsity

25  of the allegations regarding MGA's history set forth therein and, on that basis,

26  denies them, states that MGA has made conflicting representations, including in

27  sworn statements, that are at odds with the allegations of the Complaint and denies

28  the truth of the remaining allegations set forth in paragraph 8.

2154363.2

**EXHIBIT** _I_
**PAGE** _95_

-5-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

1       9.       Answering paragraph 9 of the Complaint, Mattel admits that
2   MGA filed this action, states that Mattel's web site and corporate governance
3   policies speak for themselves and denies the truth of the remaining allegations set
4   forth in paragraph 9.

5       10.      Answering paragraph 10 of the Complaint, Mattel admits that it
6   is the world's most successful toy company, states that the first doll in its BARBIE
7   line was publicly introduced in 1959 and that BARBIE-branded dolls have been the
8   world's best-selling toys, states that Mattel's sales and stock price speak for
9   themselves, and denies the truth of the remaining allegations set forth in paragraph
10  10.

11      11.      Answering paragraph 11 of the Complaint, Mattel admits that
12  Adrienne Fontanella is the former president for girls' toys at Mattel, states that it is
13  without knowledge or information sufficient to form a belief as to the truth or falsity
14  of the allegations regarding an alleged statement by Ms. Fontanella, and denies the
15  truth of the remaining allegations set forth in paragraph 11.

16      12.      Answering paragraph 12 of the Complaint, Mattel is without
17  knowledge or information sufficient to form a belief as to the truth or falsity of the
18  allegations regarding alleged statements by unidentified "analysts," states that
19  Mattel's sales and stock price speak for themselves, and denies the truth of the
20  remaining allegations set forth in paragraph 12.

21      13.      Answering paragraph 13 of the Complaint, Mattel admits that Jill
22  Barad became President and Chief Executive Officer of Mattel in January 1997, that
23  Mattel acquired Tyco Industries, Inc. ("Tyco") in March 1997, that Mattel acquired
24  Pleasant Company in 1998, Mattel acquired the Learning Company in May 1999,
25  that Mattel acquired Purple Moon in 1999, that the MATCHBOX brand was owned
26  by Tyco, that the AMERICAN GIRL line of dolls was made by Pleasant Company
27  at the time of that entity's acquisition, and denies the truth of the remaining
28  allegations set forth in paragraph 13.

2154363.2

EXHIBIT __I__
PAGE __96__

-6-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

1        14.   Answering paragraph 14 of the Complaint, Mattel states that its
2    public announcements speak for themselves, and denies the truth of the remaining
3    allegations set forth therein.

4        15.   Answering paragraph 15 of the Complaint, Mattel states that its
5    stock price and its public announcements speak for themselves, and denies the truth
6    of the remaining allegations set forth therein.

7        16.   Answering paragraph 16 of the Complaint, Mattel states that its
8    stock price speaks for itself, states that it is without knowledge or information
9    sufficient to form a belief as to the truth or falsity of the allegations regarding the
10   alleged views of unnamed "analysts" and "[i]nvestors," and denies the truth of the
11   remaining allegations set forth therein.

12       17.   Answering paragraph 17 of the Complaint, Mattel admits that
13   Ms. Barad resigned in February 2000.

14       18.   Answering paragraph 18 of the Complaint, Mattel admits that
15   Robert Eckert became Chairman and Chief Executive Officer of Mattel in May 2000
16   and that Mr. Eckert previously was employed at Kraft Foods, Inc. for 23 years, is
17   without knowledge or information sufficient to form a belief as to the truth or falsity
18   of the allegations regarding the views of unnamed "[i]nvestors" and others, and
19   denies the truth of the remaining allegations set forth in paragraph 18.

20       19.   Answering paragraph 19 of the Complaint, Mattel admits that the
21   *Wall Street Journal* published an article on August 10, 2000 the content of which
22   speaks for itself, and denies the truth of the remaining allegations set forth therein.

23       20.   Answering paragraph 20 of the Complaint, Mattel admits that it
24   disposed of the Learning Company in October 2000, states that its sales and
25   revenues speak for themselves, states that the remainder of the allegations contained
26   therein are characterizations, not factual assertions, and therefore no response is
27   necessary under Fed. R. Civ. P. 8(b) and, to the extent any further response is
28   required, denies the truth of any remaining allegations set forth in paragraph 20.

1363.2

EXHIBIT __I__

PAGE __97__

-7-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

1         21.    Answering paragraph 21 of the Complaint, Mattel admits that

2 products in plaintiff's "Bratz" line compete with products in Mattel's BARBIE and

3 other product lines and states that the remainder of the allegation contained

4 therein—consisting of a sentence fragment—is unintelligible and on that basis

5 denies the truth of any such remaining allegation set forth therein.

6         22.    Answering paragraph 22 of the Complaint, Mattel admits that

7 products in plaintiff's "Bratz" line compete with Mattel products, states that the

8 remainder of the allegations contained therein are characterizations, not factual

9 assertions, and that therefore no response is necessary under Fed. R. Civ. P. 8(b)

10 and, to the extent any further response is required, denies the truth of any remaining

11 allegations set forth therein.

12        23.    Answering paragraph 23 of the Complaint, Mattel states that

13 MGA has made conflicting statements, including in sworn statements, that are

14 inconsistent with the allegations set forth in paragraph 23 of the Complaint and

15 states that it is therefore without knowledge or information sufficient to form a

16 belief as to the truth or falsity of the allegations set forth therein and, on that basis,

17 denies them.

18        24.    Answering paragraph 24 of the Complaint, Mattel states that the

19 "look" of the referenced dolls speak for themselves and denies the truth of the

20 remaining allegations set forth therein. By way of further answer, Mattel states that

21 the photographs and their accompanying caption on page 7 of the Complaint are

22 false and misleading to the extent they are intended to suggest that MGA has

23 produced or used a consistent packaging shape or look or that it has protectible

24 rights in the matters depicted in the photographs.

25        25.    Answering paragraph 25 of the Complaint, Mattel admits that

26 Bratz dolls are between approximately 9.5 to 10 inches in height, states that the

27 appearances of the dolls speak for themselves, denies that "Bratz" dolls are or "were

28 intentionally shorter" than dolls in Mattel's BARBIE line, denies that the "Bratz"



EXHIBIT ____

PAGE _____

-8-

1 | dolls "looked like no other" and denies the truth of the remaining allegations set
2 | forth in paragraph 25.

3 |       26.    Answering paragraph 26 of the Complaint, Mattel states that the
4 | use of the term "classic" is unintelligible, since Mattel has designed and sold
5 | different dolls using different heads and with different fashions and themes over the
6 | years, and denies the truth of any remaining allegations. By way of further answer,
7 | Mattel states that the image encaptioned "Mattel's 'Barbie'" on page 8 of the
8 | Complaint is misleading in that it depicts one of the doll heads that have been used
9 | as part of the BARBIE line for many years, and therefore ignores that Mattel has
10 | long designed and sold an array of different BARBIE line dolls that use different
11 | doll heads, including doll heads which depict different ethnicities, and that are
12 | dressed in different clothing and fashion styles.

13 |       27.    Answering paragraph 27 of the Complaint, Mattel admits that
14 | MGA has used the line "The Girls With a Passion for Fashion" in some contexts,
15 | denies that MGA originated or otherwise has rights to that phrase, admits that one
16 | audience for products in the "Bratz" line has been "tweens" and denies the truth of
17 | the remaining allegations set forth in paragraph 27.

18 |       28.    Answering paragraph 28 of the Complaint, Mattel admits that
19 | certain "Bratz" dolls have won certain awards, the terms of which speak for
20 | themselves, states that it is without knowledge or information sufficient to form a
21 | belief as to the truth or falsity of the allegations regarding the "awards" MGA claims
22 | and, on that basis, denies them, denies that plaintiff has protectible rights and denies
23 | the truth of any remaining allegations set forth in paragraph 28.

24 |       29.    Answering paragraph 29 of the Complaint, Mattel admits that
25 | dolls in the "Bratz" line compete with dolls in Mattel product lines, denies that
26 | Mattel has or has ever had a "stranglehold" on any market, states that the market
27 | allegations contained in paragraph 29 are vague and ambiguous, including without
28 | limitation in that the allegations fail to specify what products among the parties'

1 | respective lines are being referred to and what time period is being referred to, and
2 | denies the truth of any remaining allegations set forth in paragraph 29.

3 |       30.   Answering paragraph 30 of the Complaint, Mattel admits that
4 | MGA has been a licensee of Mattel, states that the market allegations are vague and
5 | ambiguous, including without limitation in that the allegations fail to specify what
6 | products are being referred to and what time periods or points in time are being
7 | referred to, and states that the remainder of the allegations contained therein are
8 | characterizations, not factual assertions, and therefore no response is necessary
9 | under Fed. R. Civ. P. 8(b) and, to the extent any further response is required, denies
10 | the truth of any remaining allegations set forth in paragraph 30.

11 |       31.   Answering paragraph 31 of the Complaint, Mattel states that the
12 | allegations contained therein are characterizations, not factual assertions, and
13 | therefore no response is necessary under Fed. R. Civ. P. 8(b) and, to the extent any
14 | further response is required, denies the truth of the allegations set forth in paragraph
15 | 31.

16 |       32.   Answering paragraph 32 of the Complaint, Mattel denies the
17 | truth of the allegations set forth therein.

18 |       33.   Answering paragraph 33 of the Complaint, Mattel denies the
19 | truth of the allegations set forth therein.

20 |       34.   Answering paragraph 34 of the Complaint, Mattel states that it
21 | has released various MY SCENE dolls, including MY SCENE dolls named
22 | "Madison", "Chelsea" and "Barbie," states that the appearance of the Bratz and MY
23 | SCENE dolls speak for themselves, denies that Mattel designed its MY SCENE
24 | dolls to "evoke" or resemble the alleged "look" of "Bratz" dolls, denies that plaintiff
25 | has protectible rights, states that MGA has made conflicting representations that are
26 | at odds with the allegations of the Complaint and that it is therefore without
27 | knowledge or information sufficient to form a belief as to the truth or falsity of the
28 | allegations regarding the "launch" of Bratz dolls set forth therein and, on that basis,

EXHIBIT __I__
PAGE __100__

-10-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

1   denies them, and denies the truth of the remaining allegations set forth therein.  By
2   way of further answer, Mattel states that the photographs and their accompanying
3   captions on page 10 of the Complaint are misleading and false to the extent they are
4   intended to suggest that a particular Mattel doll has been changed over time as
5   purportedly depicted.  Among other things, Mattel has long designed and sold an
6   array of different BARBIE line dolls using different doll heads, and the photographs
7   encaptioned "Mattel's Traditional 'Barbie'" is one of the doll heads that has been
8   used, and continues to be used, as part of the BARBIE line.  In addition, the
9   photographs encaptioned MY SCENE doll "circa 2002" is, in fact, a Mattel doll
10  character called BARBIE that continues to be sold and/or marketed with that head,
11  and the photographs encaptioned MY SCENE doll "circa 2004" depict a MY
12  SCENE doll character separate and apart from the one depicted in the "circa 2002"
13  image (and is not a revised character as plaintiff apparently attempts to imply).

14      35.    Answering paragraph 35 of the Complaint, Mattel admits that
15  Mattel released a product line called FLAVAS; states that the appearance of the
16  FLAVAS dolls speaks for themselves, states that it is without knowledge or
17  information sufficient to form a belief as to the truth or falsity of the allegations
18  regarding the "rumor" relied upon by plaintiff and the undefined "media"
19  purportedly quoting Isaac Larian and, on that basis, denies them, denies that Mattel
20  has abandoned the FLAVAS line, and denies the truth of the remaining allegations
21  set forth in paragraph 35.

22      36.    Answering paragraph 36 of the Complaint, Mattel denies the
23  truth of the allegations set forth therein.

24      37.    Answering paragraph 37 of the Complaint, Mattel denies the
25  truth of the allegations set forth therein.  By way of further answer, Mattel states that
26  the unnumbered photographs and their accompanying captions on pages 11 through
27  16 of the Complaint -- which apparently were included to purportedly support the
28  allegation that MY SCENE dolls "became 'Bratz,'" which allegation Mattel

21543632.

**EXHIBIT** ___T___
**PAGE** ___101___

-11-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

1 | specifically denies -- are false and misleading. Among other things, the heads
2 | depicted are among an array of different doll heads that Mattel has used, and
3 | continues to use, over the course of many years. Moreover, the images purport to
4 | compare different Mattel doll lines to show alleged changes in appearance even
5 | though, in fact, each of the heads are currently sold and/or marketed to the public.
6 | The "Blonde" series of photographs encaptioned "original" and "recent" MY
7 | SCENE is further and specifically misleading in that it purports to compare two
8 | differently named and outfitted dolls in the MY SCENE doll line, both of which
9 | continue to be sold and/or marketed.

10 | 38. Answering paragraph 38 of the Complaint, Mattel states that the
11 | phrase "the 'BRATZ' eye" is unintelligible, denies that MGA has rights therein,
12 | denies that MGA was the originator of or the first to use the eye shape or makeup
13 | depicted as purportedly constituting "the 'BRATZ' eye," denies that Mattel has
14 | copied the "the 'BRATZ' eye" and denies the truth of the remaining allegations
15 | contained in paragraph 38. By way of further answer, Mattel states that the
16 | unnumbered photographs and accompanying caption on page 13 of the Complaint
17 | are false and misleading. Among other things, the purported "Original Mattel 'My
18 | Scene' Eye" is one of the eye and makeup designs that Mattel has used over the
19 | course of many years, and Mattel continues to sell and/or market dolls using the eye
20 | and makeup design depicted therein.

21 | 39. Answering paragraph 39 of the Complaint, Mattel states that the
22 | phrase "the 'BRATZ' eye" is unintelligible, denies that MGA has rights therein,
23 | denies that MGA was the originator of or the first to use the eye shape or makeup
24 | purportedly described as constituting "the 'BRATZ' eye," denies that Mattel has
25 | copied "the 'BRATZ' eye," states that the relevant dolls speak for themselves and
26 | denies the truth of the remaining allegations contained in paragraph 39. By way of
27 | further answer, Mattel states that the unnumbered photographs and accompanying
28 | captions on page 14 of the Complaint are false and misleading. Among other things,

EXHIBIT I
PAGE 102
-12-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

1 the purported "New Mattel 'My Scene' Eye" is one of the eye and makeup designs

2 that Mattel has used over the course of many years, and Mattel continues to sell

3 and/or market dolls using the eye and makeup design depicted on page 14 of the

4 Complaint.

5        40.    Answering paragraph 40 of the Complaint, Mattel denies the

6 truth of the allegations therein. By way of further answer, Mattel states that the

7 unnumbered photographs and their accompanying captions on pages 15 to 16 are

8 false and misleading. Among other things, the heads depicted are among an array of

9 different doll heads that Mattel has used, and continues to use, over the course of

10 many years. Moreover, the photographs purport to compare different Mattel doll

11 lines to show alleged changes in appearance even though, in fact, each of the heads

12 are currently sold and/or marketed to the public. The "Blonde" series of

13 photographs encaptioned "original" and "recent" MY SCENE is further and

14 specifically misleading in that it purports to compare two differently named and

15 outfitted dolls in the MY SCENE doll line, both of which continue to be sold and/or

16 marketed.

17        41.    Answering paragraph 41 of the Complaint, Mattel denies the

18 truth of the allegations set forth therein.

19        42.    Answering paragraph 42 of the Complaint, Mattel admits that the

20 photographs purport to depict two packages that were, among others, part of the MY

21 SCENE line, state that the packages speak for themselves and denies the truth of any

22 remaining allegations set forth therein.

23        43.    Answering paragraph 43 of the Complaint, Mattel admits that the

24 photograph purports to depict one of the packages that were, among others, part of

25 the MY SCENE line, states that the parties' packages speak for themselves, states

26 that MGA has failed to establish that it originated, or has protectible rights in, an

27 "open and transparent style" for packaging and denies the truth of the remaining

28 allegations set forth therein.

1         44.   Answering paragraph 44 of the Complaint, Mattel admits that

2 one photograph purports to depict one of the packages that were, among others, part

3 of the MY SCENE line, admits that the other photograph purports to depict one of

4 the packages that were, among others, used as part of the Bratz line, states that the

5 parties' packages speak for themselves, denies that MGA originated, or has

6 protectible rights in, "the 'BRATZ' packaging" or in the packaging depicted in the

7 Complaint and denies the truth of any remaining allegations set forth therein.

8         45.   Answering paragraph 45 of the Complaint, Mattel admits that

9 one photograph purports to depict one of the packages that were, among others, part

10 of the MY SCENE line, admits that the other photograph purports to depict one of

11 the packages that were, among others, used as part of the Bratz line, states that the

12 parties' packages speak for themselves, denies that MGA originated, or has

13 protectible rights in, the packaging depicted in the Complaint and denies the truth of

14 any remaining allegations set forth therein.

15        46.   Answering paragraph 46 of the Complaint, Mattel states that it

16 has utilized a wide variety of packaging styles and shapes over the years, states that

17 the relevant packaging speaks for itself, states that MGA lacks protectible rights in

18 "non-rectangular shaped box" packaging or in the other elements MGA claims in

19 paragraph 46, and denies the truth of the remaining allegations set forth therein.

20        47.   Answering paragraph 47 of the Complaint, Mattel denies that

21 any alleged "theme" is "MGA's theme," denies that MGA originated or has rights to

22 any theme and denies the truth of the remaining allegations set forth therein.

23        48.   Answering paragraph 48 of the Complaint, Mattel admits that it

24 released a doll called "Chillin Out!", states that it has released such themed dolls

25 over the course of many years, admits MGA released a "Wintertime Wonderland"

26 themed doll, denies that MGA originated or has rights to such theme, states that the

27 relevant products speak for themselves and denies the truth of the remaining

28 allegations set forth therein.

EXHIBIT  _I_

PAGE  _104_

-14-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

1       49.     Answering paragraph 49 of the Complaint, Mattel admits that it
2   released a doll called "Night on the Town", states that it has released such themed
3   dolls over the course of many years, admits MGA released a "Formal Funk" themed
4   doll, denies that MGA originated or has rights to such theme, states that the relevant
5   products speak for themselves and denies the truth of the remaining allegations set
6   forth therein.

7       50.     Answering paragraph 50 of the Complaint, Mattel admits that it
8   released a doll called "Jammin' in Jamaica" and a playset called "Guava Gulch Tiki
9   Lounge", states that it has released such themed dolls and products over the course
10  of many years, admits that MGA released a "Sun-Kissed Summer" themed doll and
11  playset, denies that MGA originated or has rights to such theme, states that the
12  relevant products speak for themselves and denies the truth of the remaining
13  allegations set forth therein.

14      51.     Answering paragraph 51 of the Complaint, Mattel admits that it
15  has aired television commercials for its MY SCENE line, states that such
16  commercials speak for themselves, denies the truth of the remaining allegations set
17  forth therein and specifically denies that MGA was the originator of or has rights to
18  commercials "combining live action with animated sequences" set to "pop music
19  and lyrics".

20      52.     Answering paragraph 52 of the Complaint, Mattel denies the
21  truth of the allegations set forth therein.

22      53.     Answering paragraph 53 of the Complaint, Mattel admits that it
23  released a MY SCENE "Sound Lounge", admits that MGA released a product called
24  "Runway Disco", states that the relevant products speak for themselves, denies that
25  it "imitated MGA's trapezoidal box," denies that MGA has rights thereto, and
26  denies the truth of the remaining allegations set forth therein.

27      54.     Answering paragraph 54 of the Complaint, Mattel denies the
28  truth of the allegations set forth therein.

2154363.2

EXHIBIT __T__
PAGE __105__

-15-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

1    55.   Answering paragraph 55 of the Complaint, Mattel admits that,
2  among the styling heads it has produced and sold over the course of many years, it
3  released a MY SCENE styling head, admits that MGA released a styling head called
4  "Funky Fashion Makeover Head", states that the relevant products speak for
5  themselves, denies that MGA has protectible rights and denies the truth of the
6  remaining allegations set forth in paragraph 55.

7    56.   Answering paragraph 56 of the Complaint, Mattel is without
8  knowledge or information sufficient to form a belief as to the truth or falsity of the
9  allegations set forth therein because plaintiff fails to identify the alleged instances of
10  confusion, including the source of the unidentified picture titled "Hairstyle practice",
11  and on that basis, denies them, and denies the truth of any remaining allegations set
12  forth in paragraph 56.

13    57.   Answering paragraph 57 of the Complaint, Mattel admits that it
14  has aired television commercials for its MY SCENE line, states that such
15  commercials speak for themselves and denies the truth of the remaining allegations
16  set forth therein.

17    58.   Answering paragraph 58 of the Complaint, Mattel admits that
18  MGA has used the line "The Girls With a Passion for Fashion" in some contexts,
19  denies that MGA originated that phrase or otherwise has rights to it, states that
20  Mattel's web site speaks for itself and denies the truth of the remaining allegations
21  set forth therein.

22    59.   Answering paragraph 59 of the Complaint, Mattel admits that,
23  among the plush products that it has produced and sold over the course of many
24  years, it has released plush dogs as part of its MY SCENE "Miami Getaway"
25  themed product line, states that Mattel has for many years sold plush pets of the type
26  used with its MY SCENE dog, admits that MGA has released various Bratz pets,
27  states that MGA was not the originator of and has no rights to the features and other

28

**EXHIBIT** _ I _
**PAGE** _ 106 _

-16-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

1   elements described therein, states that the relevant products speak for themselves
2   and denies the truth of the remaining allegations set forth therein.

3          60.    Answering paragraph 60 of the Complaint, Mattel admits that,
4   among the plush toys that it has released over the course of many years, its MY
5   SCENE dog has been sold in packaging depicted (in part) on page 22 of the
6   Complaint, states that Mattel has for many years sold plush pets and other plush
7   products in packaging of the type used with its MY SCENE dog, admits that MGA
8   has released a "Bratz" dog, states that MGA was not the originator of and has no
9   rights to the packaging described therein, states that the relevant packages speak for
10  themselves and denies the truth of the remaining allegations set forth therein.

11         61.    Answering paragraph 61 of the Complaint, Mattel denies that it
12  has intended to cause any consumer confusion and states that it is without
13  knowledge or information sufficient to form a belief as to the truth or falsity of the
14  allegations set forth therein concerning unnamed retailers, customers and others
15  because plaintiff fails to identify any source for the matters alleged and, on that
16  basis, denies them and denies the truth of any remaining allegations set forth therein.

17         62.    Answering paragraph 62 of the Complaint, Mattel denies that it
18  has intended to cause any confusion and states that it is without knowledge or
19  information sufficient to form a belief as to the truth or falsity of the allegations set
20  forth therein concerning alleged comments and conversations because plaintiff fails
21  to identify any source for the alleged comments and conversations and, on that
22  basis, denies them, and denies the truth of any remaining allegations set forth
23  therein.

24         63.    Answering paragraph 63 of the Complaint, Mattel denies that it
25  has intended to cause any confusion and states that it is without knowledge or
26  information sufficient to form a belief as to the truth or falsity of the allegations set
27  forth therein because plaintiff fails to identify any source for the alleged comments

28

EXHIBIT __I__
PAGE __107__

-17-

2154363.2

SECOND AMENDED ANSWER AND COUNTERCLAIMS

1 and conversations and, on that basis, denies them, and denies the truth of any
2 remaining allegations set forth therein.

3        64.   Answering paragraph 64 of the Complaint, Mattel denies that it
4 has intended to cause any confusion and states that it is without knowledge or
5 information sufficient to form a belief as to the truth or falsity of the allegations set
6 forth therein because plaintiff fails to identify any source for the alleged comments
7 and conversations and, on that basis, denies them, and denies the truth of any
8 remaining allegations set forth therein.

9        65.   Answering paragraph 65 of the Complaint, Mattel denies the
10 truth of the allegations set forth therein.

11        66.   Answering paragraph 66 of the Complaint, Mattel admits that it
12 sued a competitor in the German courts for unfair competition for copying various
13 Mattel BARBIE line products, states that such claims exclusively arose under and
14 were the subject of German law, states that since that time the Federal Supreme
15 Court has rejected the contention made by MGA in paragraph 66 that
16 "systematically copying and borrowing elements" from competing dolls supports a
17 claim for unfair competition, and denies the truth of the remaining allegations set
18 forth therein.

19        67.   Answering paragraph 67 of the Complaint, Mattel denies the
20 truth of the allegations set forth therein.

21        68.   Answering paragraph 68 of the Complaint, Mattel admits that it
22 has released dolls called "Wee 3 Friends," admits that MGA has released dolls
23 called "4-Ever Best Friends," states that the relevant products speak for themselves,
24 denies that MGA's packaging is distinctive, denies that MGA has protectible rights
25 thereto and denies the truth of the remaining allegations set forth in paragraph 68.

26        69.   Answering paragraph 69 of the Complaint, Mattel admits that its
27 Fisher Price division has released, among other dolls called "Little Mommy," the
28 "Little Mommy Potty Training Baby Doll," admits that MGA has released a

1   "Mommy's Little Patient" doll and denies the truth of the remaining allegations set

2   forth therein.

3          70.    Answering paragraph 70 of the Complaint, Mattel admits that it

4   has released die-cast cars and other products called "Acceleracers" as part of its

5   HOT WHEELS line, admits that MGA has released products called "AlienRacers,"

6   denies that MGA was the originator of or has rights to the elements and matters

7   described in paragraph 70, states that the relevant products speak for themselves and

8   denies the truth of the remaining allegations set forth therein.

9          71.    Answering paragraph 71 of the Complaint, Mattel admits that it

10   has aired commercials relating to "Acceleracers," states that such commercials

11   speak for themselves, denies the truth of the remaining allegations set forth therein

12   and specifically denies that MGA originated or has rights to commercials and other

13   matters described therein.

14          72.    Answering paragraph 72 of the Complaint, Mattel states that its

15   web site speaks for itself, denies the truth of the remaining allegations contained in

16   paragraph 72 and specifically denies that Mattel intended to create confusion in the

17   marketplace.

18          73.    Answering paragraph 73 of the Complaint, Mattel denies the

19   truth of the allegations set forth therein.

20          74.    Answering paragraph 74 of the Complaint, Mattel denies the

21   truth of the allegations set forth therein.

22          75.    Answering paragraph 75 of the Complaint, Mattel admits that it

23   has reminded certain former employees who became employed by MGA by letter of

24   their contractual and fiduciary obligation to maintain the secrecy of all Mattel

25   confidential and proprietary business information, states that such letters were

26   prepared and sent to their recipients in good faith contemplation of litigation, admits

27   that it filed a complaint for declaratory relief against Ronald Brawer in Los Angeles

28   Superior Court, entitled <u>Mattel, Inc. v. Brawer</u>, Case No. BC323381, on October 21,

EXHIBIT  <u>T</u>

PAGE  <u>109</u>

-19-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

1  2004, states that pursuant to the Court's Order of August 25, 2005 it need not

2  respond to the allegations in paragraph 75 relating to that action, and denies the truth

3  of the remaining allegations set forth in paragraph 75.

4         76.  Answering paragraph 76 of the Complaint, Mattel states that

5  MGA cannot establish subject matter jurisdiction regarding extra-territorial acts,

6  including such acts that are lawful in foreign nations, and denies the truth of

7  allegations set forth therein.

8         77.  Answering paragraph 77 of the Complaint, Mattel states that

9  MGA cannot establish subject matter jurisdiction regarding extra-territorial acts,

10  including such acts that are lawful in foreign nations, and denies the truth of the

11  allegations set forth therein.

12         78.  Answering paragraph 78 of the Complaint, Mattel states that it is

13  without knowledge or information sufficient to form a belief as to the truth or falsity

14  of the allegations regarding MGA's claimed "shortage of doll hair" and, on that

15  basis, denies them and denies the truth of the remaining allegations set forth therein.

16         79.  Answering paragraph 79 of the Complaint, Mattel states that

17  MGA cannot establish subject matter jurisdiction regarding extra-territorial acts,

18  including such acts that are lawful in foreign nations, and denies the truth of

19  allegations set forth therein.

20         80.  Answering paragraph 80 of the Complaint, Mattel denies the

21  truth of the allegations set forth therein.

22         81.  Answering paragraph 81 of the Complaint, Mattel admits that

23  NPD Funworld ("NPD") supplies sales statistics in *inter alia* the toy, PC games and

24  video games industries, admits that to Mattel's knowledge NPD restricts the use of

25  its subscriber information, states that MGA was sued by NPD and states that it is

26  without knowledge or information sufficient to form a belief as to the truth or falsity

27  of the allegations regarding the need of unspecified "toy companies" for NPD

28  

       **EXHIBIT   T**

       **PAGE  110**

SECOND AMENDED ANSWER AND COUNTERCLAIMS

1  statistics and, on that basis, denies them and denies the truth of any remaining
2  allegations set forth therein.

3      82.    Answering paragraph 82 of the Complaint, Mattel denies the
4  truth of the allegations set forth therein.

5      83.    Answering paragraph 83 of the Complaint, Mattel states that it is
6  without knowledge or information sufficient to form a belief as to the truth or falsity
7  of the allegations set forth therein because MGA fails to quantify its annual
8  subscription fees and, on that basis, denies them.

9      84.    Answering paragraph 84 of the Complaint, Mattel states that it is
10 without knowledge or information sufficient to form a belief as to the truth or falsity
11 of the allegations set forth therein and, on that basis, denies them.

12      85.    Answering paragraph 85 of the Complaint, Mattel states that
13 MGA was sued by NPD, states that it is without knowledge or information sufficient
14 to form a belief as to such nature and grounds for such litigation (to which Mattel
15 was not a party) and, on that basis, denies the allegations relating thereto, and denies
16 the truth of the remaining allegations set forth therein.

17      86.    Answering paragraph 86 of the Complaint, Mattel denies the
18 truth of the allegations set forth therein.

19      87.    Answering paragraph 87 of the Complaint, Mattel admits that the
20 Children's Advertising Review Unit ("CARU") is the children's arm of the
21 advertising industry's self-regulation program, states that compliance with CARU's
22 Privacy Program can provide FTC-approved Safe Harbor under the Children's
23 Online Privacy Protection Act ("COPPA"), and denies the truth of the remaining
24 allegations set forth therein.

25      88.    Answering paragraph 88 of the Complaint, Mattel admits that it
26 is one of dozens of CARU Supporters and denies the truth of the remaining
27 allegations set forth therein.

28

EXHIBIT __I__
PAGE __II__

-21-

1363.2

1          89.   Answering paragraph 89 of the Complaint, Mattel denies the
2    truth of the allegations set forth therein.

3          90.   Answering paragraph 90 of the Complaint, Mattel states that it is
4    without knowledge or information sufficient to form a belief as to the truth or falsity
5    of the allegations as to the consequences to MGA of MGA's violations of CARU
6    standards and, on that basis, denies them.

7          91.   Answering paragraph 91 of the Complaint, Mattel states that it is
8    without knowledge or information sufficient to form a belief as to the truth or falsity
9    of the allegations as to the consequences to MGA of MGA violation of CARU
10   standards and, on that basis, denies them.

11         92.   Answering paragraph 92 of the Complaint, Mattel admits that the
12   Toy Industry Association, Inc. ("TIA") is a toy industry trade association, admits
13   that at certain times TIA has given awards called the People's Choice Toy of The
14   Year or the Toy of The Year Award, denies that Mattel wrongfully influenced TIA
15   and states that it is without knowledge or information sufficient to form a belief as
16   to the truth or falsity of the remaining allegations set forth therein and, on that basis,
17   denies them.

18         93.   Answering paragraph 93 of the Complaint, Mattel states that the
19   allegations set forth therein are vague and ambiguous, including in that they fail to
20   properly identify the years in which the referenced awards were given and/or the
21   particular product which won such awards, and accordingly lacks knowledge or
22   information sufficient to form a belief as to the truth or falsity of the allegations set
23   forth therein and, on that basis, denies them.

24         94.   Answering paragraph 94 of the Complaint, Mattel admits that
25   Neil Freidman was the chairman of TIA from approximately May 2002 to May
26   2004, states that Fischer Price is a division of Mattel and denies the truth of the
27   remaining allegations set forth therein.

28

EXHIBIT ___I___
PAGE ___112___

54363.2

-22-

1    95.    Answering paragraph 95 of the Complaint, Mattel admits that

2    Hokey Pokey Elmo won the Toy of the Year Award and denies the truth of the

3    remaining allegations set forth therein.

4    96.    Answering paragraph 96 of the Complaint, Mattel states that it is

5    without knowledge or information sufficient to form a belief as to the truth or falsity

6    of the allegations set forth therein and, on that basis, denies them.

7    97.    Answering paragraph 97 of the Complaint, Mattel denies the

8    truth of the allegations set forth therein.

9    98.    Answering paragraph 98 of the Complaint, Mattel denies the

10   truth of the allegations set forth therein.

11   99.    Answering paragraph 99 of the Complaint, Mattel denies the

12   truth of the allegations set forth therein.

13   100.   Answering paragraph 100 of the Complaint, Mattel denies the

14   truth of the allegations set forth therein.

15   101.   Answering paragraph 101 of the Complaint, Mattel repeats its

16   responses contained in paragraphs 1 through 100 of this Second Amended Answer

17   and incorporates them by reference as though fully and completely set forth herein.

18   102.   Answering paragraph 102 of the Complaint, Mattel denies the

19   truth of the allegations set forth therein and specifically denies that MGA's alleged

20   trade dress is distinctive.

21   103.   Answering paragraph 103 of the Complaint, Mattel denies the

22   truth of the allegations set forth therein and specifically denies that MGA's alleged

23   trade dress is distinctive.

24   104.   Answering paragraph 104 of the Complaint, Mattel denies the

25   truth of the allegations set forth therein.

26   105.   Answering paragraph 105 of the Complaint, Mattel denies the

27   truth of the allegations set forth therein.

28

EXHIBIT    エ
PAGE    113

2154363.2

-23-

1          106.  Answering paragraph 106 of the Complaint, Mattel denies the

2  truth of the allegations set forth therein.

3          107.  Answering paragraph 107 of the Complaint, Mattel denies the

4  truth of the allegations set forth therein.

5          108.  Answering paragraph 108 of the Complaint, Mattel denies the

6  truth of the allegations set forth therein and specifically denies that plaintiff is

7  entitled to injunctive relief.

8          109.  Answering paragraph 109 of the Complaint, Mattel repeats its

9  responses contained in paragraphs 1 through 108 of this Second Amended Answer

10  and incorporates them by reference as though fully and completely set forth herein.

11          110.  Answering paragraph 110 of the Complaint, Mattel denies the

12  truth of the allegations set forth therein.

13          111.  Answering paragraph 111 of the Complaint, Mattel denies the

14  truth of the allegations set forth therein.

15          112.  Answering paragraph 112 of the Complaint, Mattel denies the

16  truth of the allegations set forth therein.

17          113.  Answering paragraph 113 of the Complaint, Mattel denies the

18  truth of the allegations set forth therein.

19          114.  Answering paragraph 114 of the Complaint, Mattel denies the

20  truth of the allegations set forth therein.

21          115.  Answering paragraph 115 of the Complaint, Mattel denies the

22  truth of the allegations set forth therein.

23          116.  Answering paragraph 116 of the Complaint, Mattel denies the

24  truth of the allegations set forth therein.

25          117.  Answering paragraph 117 of the Complaint, Mattel denies the

26  truth of the allegations set forth therein and specifically denies that plaintiff is

27  entitled to injunctive relief.

28

EXHIBIT   I  

PAGE   114

1    118.   Answering paragraph 118 of the Complaint, Mattel denies the

2   truth of the allegations set forth therein.

3    119.   Answering paragraph 119 of the Complaint, Mattel repeats its

4   responses contained in paragraphs 1 through 118 of this Second Amended Answer

5   and incorporates them by reference as though fully and completely set forth herein.

6    120.   Answering paragraph 120 of the Complaint, Mattel denies the

7   truth of the allegations set forth therein.

8    121.   Answering paragraph 121 of the Complaint, Mattel denies the

9   truth of the allegations set forth therein.

10    122.   Answering paragraph 122 of the Complaint, Mattel denies the

11   truth of the allegations set forth therein.

12    123.   Answering paragraph 123 of the Complaint, Mattel denies the

13   truth of the allegations set forth therein and specifically denies that plaintiff is

14   entitled to injunctive relief.

15    124.   Answering paragraph 124 of the Complaint, Mattel repeats its

16   responses contained in paragraphs 1 through 123 of this Second Amended Answer

17   and incorporates them by reference as though fully and completely set forth herein.

18    125.   Answering paragraph 125 of the Complaint, Mattel denies the

19   truth of the allegations set forth therein.

20

21                    General Denial

22    Unless specifically admitted herein, Mattel denies the truth of each and

23   every allegation set forth in plaintiff's Complaint and specifically denies that

24   plaintiff is entitled to any relief against Mattel.

25

26

27

28

EXHIBIT __T__
PAGE __115__

-25-

54363.2

SECOND AMENDED ANSWER AND COUNTERCLAIMS

1                        Affirmative Defenses

2                By alleging the Affirmative Defenses set forth below, Mattel does not

3 agree or concede that it bears the burden of proof or the burden of persuasion on any

4 of these issues, whether in whole or in part.

5

6                        First Affirmative Defense

7               Plaintiff's Complaint fails to state a claim upon which relief can be

8 granted.

9

10                       Second Affirmative Defense

11              Plaintiff has no valid, enforceable or protectible rights or interest in the

12 alleged trade dress or other matters asserted, including without limitation in that

13 plaintiff has failed to establish that its alleged trade dress is distinctive as to plaintiff.

14

15                       Third Affirmative Defense

16              Plaintiff's claims, including without limitation plaintiff's claims based

17 upon alleged extra-territorial acts, are barred in whole or in part by lack of subject

18 matter jurisdiction.

19

20                       Fourth Affirmative Defense

21              Plaintiff's claims are barred in whole or in part by plaintiff's unclean

22 hands.

23

24                       Fifth Affirmative Defense

25              Plaintiff's claims are barred in whole or in part by virtue of Mattel's

26 prior-creation of the elements and other matters asserted in the Complaint.

27

28          **EXHIBIT**   $\underline{T}$
             **PAGE**   $\underline{116}$

-26-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

Sixth Affirmative Defense

Plaintiff's claims are barred in whole or in part by its lack of standing.

Seventh Affirmative Defense

Plaintiff's claims are barred in whole or in part by the applicable statutes of limitation and the doctrine of laches.

Eighth Affirmative Defense

Plaintiff's claims are barred in whole or in part by the doctrines of waiver, estoppel and acquiescence.

Ninth Affirmative Defense

Plaintiff's claims are barred in whole or in part by Mattel's constitutional rights of free speech, petitioning and association, including without limitation by the litigation privilege as protected by and/or codified in *inter alia* Section 47(b) of the California Civil Code, the *Noerr-Pennington* doctrine, the common interest privilege and by other privileges.

Tenth Affirmative Defense

Plaintiff's claims are barred in whole or in part by Mattel's federal and state constitutional rights of free speech, including without limitation under the First Amendment of the United States Constitution.

Eleventh Affirmative Defense

Plaintiff's claims are barred in whole or in part by the competitor privilege.

EXHIBIT __T__
PAGE __117__

2154363.2

-27-

1          Twelfth Affirmative Defense

2               Plaintiff's claims are in whole or in part preempted by the Copyright

3     Act and barred by the *Sears-Compco* doctrine.

4

5          Thirteenth Affirmative Defense

6               Plaintiff's requested relief, including plaintiff's requests for punitive

7     and/or enhanced damages, are barred in whole or in part because all of Mattel's

8     actions were in good faith.

9

10          Fourteenth Affirmative Defense

11               Plaintiff's damages, if any, were not caused by Mattel and are not

12     attributable to the acts or omissions of Mattel.

13

14          Fifteenth Affirmative Defense

15               Plaintiff has failed to mitigate its damages, if any.

16

17          Additional Defenses

18               Mattel has insufficient knowledge or information upon which to form a

19     belief as to whether additional defenses are available. Mattel reserves the right to

20     amend this Second Amended Answer to add, delete, or modify additional defenses

21     based on legal theories which may or will be divulged through clarification of the

22     Complaint, through discovery, through change or clarification of the governing law

23     or through further legal analysis of plaintiff's positions in this litigation.

24

25          Prayer for Relief

26

27               WHEREFORE, Mattel prays for relief as follows:

28

EXHIBIT __T__
PAGE __116__

2154363.2

-28-

1     1.     That the Complaint be dismissed with prejudice;

2     2.     That plaintiff take nothing by reason of the Complaint against

3 Mattel and that judgment be entered in Mattel's favor;

4     3.     That Mattel recover its costs and attorneys' fees; and

5     4.     That this Court award such other and further relief as it deems

6 just and proper.

7

8                          **COUNTERCLAIMS**

9           Pursuant to the Court's Orders of January 12, 2007 and June 27, 2007,

10 and incorporating its [Proposed] Amended Complaint dated November 19, 2006,

11 Mattel, Inc. alleges as follows:

12                          **Preliminary Statement**

13     1.     For years MGA Entertainment, Inc. has engaged in a pattern of

14 stealing and using Mattel, Inc.'s property and trade secrets. MGA's use of the

15 stolen property and trade secrets caused and continues to cause significant harm to

16 Mattel. MGA first stole "Bratz," a fashion doll, from Mattel, and then continued

17 stealing Mattel's confidential and proprietary information to fuel MGA's growth.

18     2.     Carter Bryant conceived, created and developed Bratz designs

19 while he was employed by Mattel as a doll designer. He concealed his Bratz work

20 from Mattel and wrongfully sold Bratz to MGA while he was a Mattel employee.

21 As MGA knows, Mattel owns the Bratz designs that Bryant made. As the rightful

22 owner of those Bratz designs, Mattel has registered copyrights for them and seeks

23 damages arising from MGA's repeated infringement of those copyrights.

24     3.     Emboldened by the success of its illegal conduct, MGA has

25 repeated—and even expanded—its pattern of theft on numerous occasions. For

26 example, in or about 2004, MGA decided to expand into Mexico. To do so, and

27 operating from its Southern California offices, MGA hired away three key Mattel

28 employees in Mexico, who, on their way out, stole virtually every category of

2154363.2

**EXHIBIT** _I_    -29-
**PAGE** _119_    SECOND AMENDED ANSWER AND COUNTERCLAIMS

1    Mattel's sensitive and trade secret business plans and information for the Mexican
2    market, as well as a significant quantity of sensitive and trade secret information
3    for Mattel's U.S. and worldwide businesses, and took them to MGA. Armed with
4    Mattel's confidential business plans and methods, MGA claimed to have increased
5    its market share in Mexico alone by 90% in a single year.

6              4.    In 2005, MGA needed help in Canada. So MGA, again
7    operating from its Southern California headquarters, hired Janine Brisbois from
8    Mattel. At that time, Ms. Brisbois was responsible for Mattel's account with Toys
9    'R Us ("TRU") and Wal-Mart. MGA gave her responsibility for those same
10   accounts, and she took from Mattel documents containing proprietary advertising,
11   project, sales, customer and strategy information for not only Canada, but for the
12   United States. Eliminating any doubt that MGA then proceeded to use those stolen
13   materials, Brisbois subsequently accessed and modified certain of those Mattel
14   documents while employed by MGA.

15             5.    These are not the only instances of such misconduct, which
16   MGA orchestrated and carried out from its headquarters in this District. Counter-
17   defendants have engaged in an ongoing, widespread pattern of illegal acts,
18   consisting of inducing Mattel employees to steal Mattel's confidential information
19   or other property and take it with them to MGA to further MGA's business interests
20   and to harm Mattel.

21                                   **Jurisdiction**

22             6.    This Court has federal question jurisdiction over this action
23   pursuant to 28 U.S.C. §§ 1331, 17 U.S.C. §§ 101 *et seq.*, and 18 U.S.C. § 1964(c).
24   This Court has supplemental jurisdiction over Mattel's state law claims pursuant to
25   28 U.S.C. § 1367.

26                                      **Venue**

27             7.    Venue is proper in this District pursuant to 28 U.S.C.
28   §§ 1391(b)-(d), 1391(f) and 1400(a) and 18 U.S.C. § 1965.

**Parties**

1

2       8.    Mattel is a corporation organized and existing under the laws of

3   the State of Delaware, with its principal place of business in El Segundo,

4   California.

5       9.    Counter-defendant MGA Entertainment, Inc. ("MGA") is a

6   corporation organized and existing under the laws of the State of California, with

7   its principal place of business in Van Nuys, California. Mattel is informed and

8   believes, and on that basis alleges, that ABC International Traders, Inc. is a

9   predecessor corporation to MGA and that until September 16, 2002, MGA was

10  incorporated and known as ABC International Traders, Inc. Upon the filing of the

11  Complaint, Mattel, being ignorant of the nature, extent and scope of MGA

12  Entertainment, Inc.'s involvement and complicity in the conduct alleged therein and

13  having designated MGA Entertainment, Inc. in the Complaint as Doe 1 and having

14  discovered its involvement and complicity, Mattel hereby amends its Complaint by

15  substituting MGA Entertainment, Inc. for the fictitious Doe name Doe 1.

16      10.   Counter-defendant Carter Bryant ("Bryant") is an individual who

17  formerly was employed by Mattel and has worked for and continues to work as a

18  contactor for MGA. Mr. Bryant currently resides in the State of Missouri.

19      11.   Counter-defendant MGA Entertainment (HK) Limited is a

20  business entity organized and existing under the laws of the Hong Kong Special

21  Administrative Region, with its principal place of business in Hong Kong. Upon

22  the filing of the Complaint, Mattel, being ignorant of the nature, extent and scope

23  of involvement and complicity of MGA Entertainment (HK) Limited in the conduct

24  alleged therein and having designated MGA Entertainment (HK) Limited in the

25  Complaint as Doe 2 and having discovered its involvement and complicity, Mattel

26  hereby amends its Complaint by substituting MGA Entertainment (HK) Limited for

27  the fictitious Doe name Doe 2.

28

EXHIBIT ___I___
PAGE ___121___

-31-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

1       12.   Counter-defendant MGAE de Mexico, S.R.L. de C.V. ("MGA

2   de Mexico") is a business entity organized and existing under the laws of Mexico,

3   with its principal place of business in Mexico City, Mexico.

4       13.   Mattel is informed and believes, and on that basis alleges, that

5   Counter-defendant Larian is the President and CEO of MGA and an individual

6   residing in the County of Los Angeles.  Upon the filing of the Complaint, Mattel,

7   being ignorant of the nature, extent and scope of involvement and complicity of

8   Larian in the conduct alleged therein and having designated Larian in the

9   Complaint as Doe 3 and having discovered his involvement and complicity, Mattel

10  hereby amends its Complaint by substituting Larian for the fictitious Doe name

11  Doe 3.

12      14.   Counter-defendant Carlos Gustavo Machado Gomez is an

13  individual who is employed by Counter-defendant MGA and who, on information

14  and belief, currently resides in the County of Los Angeles.

15      15.   The true names and capacities of Counter-defendants sued herein

16  as DOES 4 through 10, inclusive, are unknown to Mattel, which therefore sues said

17  Counter-defendants by such fictitious names.  Mattel will amend its pleadings to

18  allege their true names and capacities when the same are ascertained.

19                          **Factual Background**

20  **I.   MATTEL**

21      16.   Mattel manufactures and markets toys, games, dolls and other

22  consumer products. Harold Mattson and Eliot and Ruth Handler founded Mattel in

23  1945.  The name of the company was created by incorporating the names of two of

24  its founders, "MATT-son" and "EL-liot." Originating from the Handlers' garage in

25  Southern California, the company greatly expanded its operations following World

26  War II.  During the next several decades, Mattel became famous for producing

27  high-quality products at reasonable prices.

28

                    EXHIBIT ___I___
                    PAGE ___122___

1    17.   Critical to Mattel's success is its ability to design and develop

2  new products.  Mattel invests millions of dollars in product design and

3  development and introduces hundreds of new products each year.  Mattel maintains

4  a 180,000 square-foot design center in El Segundo, California, that houses

5  hundreds of designers, sculptors, painters and other artists, who work exclusively to

6  create the products on which Mattel's business depends.

7    18.   Mattel also has invested substantial amounts over many years to

8  develop its business methods and practices, including, without limitation, its

9  marketing and advertising research, plans, methods and processes; its business

10  research and forecasts; its costs, budgets, pricing, credit terms, deal terms and

11  finances; its manufacturing, distribution, and sales methods and processes; and its

12  inventory methods and processes.  These represent a material part of the intellectual

13  infrastructure of Mattel and are highly valuable.

14  **II.   MGA ENTERTAINMENT**

15    19.   MGA is also a toy manufacturer.  MGA began as a consumer

16  electronics business, but expanded into the toy business with licenses to sell

17  handheld electronic games.  By approximately late 1999 or early 2000, MGA

18  developed a strategy to expand its business and compete directly with Mattel by

19  launching a fashion doll line, so it stole a fashion doll that was owned by Mattel –

20  "Bratz."

21    20.   MGA intentionally stole not just specific Mattel property, such

22  as Bratz designs, prototypes and related materials, but also a vast array of trade

23  secrets and other confidential information that comprise Mattel's intellectual

24  infrastructure.  MGA's rapid growth was not organic, but rather was based upon its

25  theft of Bratz.  As a result, MGA lacked an appropriate intellectual infrastructure

26  for a company of its size and it became increasingly difficult to manage.  To deal

27  with these problems, as detailed below, time and time again MGA simply stole

28  Mattel's proprietary business methods, practices and information.  This not only

**EXHIBIT** _I_
**PAGE** _123_   -33-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

1 allowed MGA to avoid expending time, money and effort necessary to build a
2 legitimate business, but also allowed MGA to unfairly compete against Mattel by
3 taking Mattel's playbook.

4 **III. MGA STEALS A NEW LINE OF FASHION DOLLS FROM MATTEL**

5       21. Carter Bryant is a former Mattel employee. Bryant joined Mattel
6 in September 1995, where he worked in Mattel's Design Center as a BARBIE
7 product designer. In or about April 1998, Bryant resigned his position with Mattel
8 and moved to Missouri to live with his parents. Late in 1998, Bryant applied to
9 Mattel to be rehired. On January 4, 1999, he began working at Mattel in Mattel's
10 Design Center, again as a product designer, for Mattel's BARBIE collectibles line.

11       22. Upon his return to Mattel in January 1999, Bryant executed an
12 Employee Confidential Information and Inventions Agreement (the "Employment
13 Agreement"), a true and correct copy of which is attached hereto as Exhibit A.

14       23. Pursuant to his Employment Agreement and as a condition of
15 and in consideration for his employment, Bryant agreed, among other things, that
16 he held a position of trust with Mattel, that the designs and inventions he created
17 during his Mattel employment (with certain exceptions not relevant here) were
18 owned by Mattel, and that he would be loyal to the company by agreeing not to
19 assist or work for any competitor of Mattel while he was employed by Mattel.

20       24. On January 4, 1999, Bryant also executed Mattel's Conflict of
21 Interest Questionnaire (the "Conflict Questionnaire"). Among other things, Bryant
22 certified in the Conflict Questionnaire that, other than as disclosed, he had not
23 worked for any competitor of Mattel in the prior twelve months and had not
24 engaged in any business venture or transaction involving a Mattel competitor that
25 could be construed as a conflict of interest. Bryant understood what the Conflict
26 Questionnaire required because, among other things, he disclosed on it the
27 freelance work he had performed while in Missouri for Ashton-Drake, which is

28

EXHIBIT   T
PAGE   124

-34-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

1   unrelated to the conduct alleged herein. A true and correct copy of the Conflict
2   Questionnaire executed by Bryant is attached hereto as Exhibit B.

3          25.   Pursuant to the Conflict Questionnaire, Bryant also agreed that
4   he would immediately notify his supervisor of any change in his situation that
5   would cause him to change any of the foregoing certifications. Despite this
6   obligation, at no time did Bryant disclose to Mattel that he was engaging in any
7   business venture or transaction with MGA or any other Mattel competitor.

8          26.   More specifically, while Bryant was employed by Mattel, Bryant
9   and other Counter-defendants misappropriated and misused Mattel property and
10  Mattel resources for the benefit of Bryant and MGA. Such acts included, but are
11  not limited to, the following:

12              a.   using his exposure to Mattel development programs to
13  create the concept, design and name of Bratz;

14              b.   using Mattel resources, and while employed by Mattel,
15  Bryant worked by himself and with other Mattel employees and contractors to
16  design and develop Bratz, including without limitation by creating drawings and
17  three-dimensional models of Bratz dolls, and fashion designs for the dolls'
18  associated clothing and accessories; and

19              c.   using Mattel resources, and while employed by Mattel,
20  Bryant took steps to assist MGA to produce Bratz dolls.

21          27.   During the time that he was employed by Mattel and thereafter,
22  Bryant concealed these actions from Mattel, including by failing to notify his
23  supervisor of the conflict of interest he created when he began working on MGA's
24  behalf and when he began receiving payments from MGA. Bryant additionally
25  enlisted other Mattel employees to perform work on Bratz during the time he was
26  employed by Mattel and, by all indications, in at least some cases led them to
27  believe that they were performing work on a project for Mattel.

28

EXHIBIT  I
PAGE  125

4363.2

-35-

1         28.  Bryant also made affirmative misrepresentations to Mattel
2  management and employees immediately before his departure from Mattel on
3  October 20, 2000. For example, during his last few weeks at Mattel, Bryant told
4  his co-workers and supervisors that he was going to leave Mattel for "non-
5  competitive" pursuits. Bryant's representations to his supervisors and his co-
6  workers were false. Bryant knew at the time that those representations were false
7  and made those false statements to conceal from Mattel the fact that he was already
8  working with MGA and that he had contracted with MGA to assign Bratz works to
9  MGA and to provide design and development services to MGA, a Mattel
10  competitor.

11        29.  As a result of the efforts of Bryant and other Mattel employees
12  working on Bratz (which were done without Mattel's knowledge), the Bratz dolls
13  had been designed and were far along in development during the time that Bryant
14  was employed by Mattel and prior to the time that Bryant left Mattel on
15  October 20, 2000. Not only did Bryant create and develop designs for the dolls as
16  well as other aspects of the products such as their fashion accessories during the
17  time he was employed by Mattel, but MGA showed Bratz prototypes and/or
18  product to both focus groups and retailers in November 2000, less than three weeks
19  after Bryant left Mattel. Bryant, Larian and others at MGA arranged these
20  meetings while Bryant was still employed by Mattel.

21        30.  Bryant and MGA employees also repeatedly and continuously
22  communicated with employees of MGA Entertainment (HK) Limited on subjects
23  such as design and manufacturing of Bratz. On information and belief, at all
24  material times, MGA Entertainment (HK) Limited has maintained regular and
25  continuous contacts with persons in the County of Los Angeles; it regularly has
26  shipped products that it manufactures, or that are manufactured for it, to the County
27  of Los Angeles; and such products have been distributed to retailers and sold to
28  consumers in the County of Los Angeles.

EXHIBIT __I__
PAGE __126__

-36-

1        31.   Bratz also were shown to retailers at the Hong Kong Toy Fair in

2  January 2001. By early 2001, only a few months after Bryant resigned from

3  Mattel, MGA began having the Bratz fashion doll line and accessories

4  manufactured and then, shortly thereafter, began selling them at retail.

5        32.   Since 2001, MGA has distributed and sold Bratz and Bratz-

6  related products throughout the world. Mattel is informed and believes that MGA

7  also licenses Bratz to third parties. Mattel is also informed and believes that MGA

8  derives annual revenue from its sales and licenses of Bratz in excess of $500

9  million. Mattel is further informed and believes that MGA and Bryant claim

10  current ownership of Bratz, and all copyrights and copyright registrations attendant

11  thereto. MGA continues to market, sell and license Bratz and has expressed an

12  intention to continue to do so.

13        33.   Mattel is informed and believes that MGA and Larian

14  encouraged, aided and financed Bryant to develop Bratz, knowing full well that

15  Bryant was still employed by Mattel at the time and that by performing such work,

16  including design-related work, for his own benefit and/or the benefit of MGA,

17  Bryant would be, and was, in breach of his contractual, statutory and common law

18  duties to Mattel. Mattel is also informed and believes that MGA proceeded to aid

19  and encourage Bryant to develop Bratz with the goal of obtaining a valuable

20  fashion doll line that would be commercially successful in the competitive, multi-

21  billion dollar market for fashion dolls.

22        34.   Pursuant to Bryant's contract with Mattel, among other things,

23  Mattel is the true owner of Bratz designs and works, including those specifically

24  that were conceived, created or reduced to practice during Bryant's Mattel

25  employment as well as all designs and works that are or have been derived

26  therefrom. Counter-defendants' continued use, sale, distribution and licensing of

27  Bratz thus infringes upon Mattel's rights, injures Mattel and unlawfully enriches the

28  Counter-defendants.

EXHIBIT __I__

PAGE __127__

-37-

35.  Bryant and MGA deliberately and intentionally concealed facts sufficient for Mattel to suspect or to know that it was the true owner of Bratz. Their acts of concealment include, but are not limited to, concealing the fact that Bryant conceived, created, designed and developed Bratz while employed by Mattel, including by tampering with and defacing documents which showed that, in fact, Bryant was a Mattel employee while he was working for and with MGA; concealing the fact that Bryant worked with and assisted MGA during the time Bryant was employed by Mattel and was compensated for that assistance; concealing that Bryant was providing consulting services to MGA; concealing Bryant's role in Bratz by falsely claiming that Larian and others were the creators of Bratz; and concealing the fact that Mattel was the true owner of Bratz by, among other things, filing fraudulent registrations and/or amendments to registrations with the United States Copyright Office claiming MGA as the author of Bratz as a work for hire and altering relevant dates on such documents to further obscure the true facts of when the works were created.

36.  Because of Bryant's and MGA's acts of concealment and Bryant's misrepresentations to Mattel, Mattel had no reason to suspect that Bryant had worked with MGA, or assisted MGA, while he still employed by Mattel until approximately November 24, 2003, when Mattel received, through an unrelated legal action, a copy of Bryant's agreement with MGA which showed that the date of Bryant's agreement with MGA predated Bryant's departure from Mattel. It was then, as a result, that Mattel learned for the first time that Bryant had secretly aided, assisted and worked for and with MGA while employed at Mattel and in violation of his Mattel Employment Agreement. Specifically, Bryant's agreement with MGA obligated Bryant to provide product design services to MGA on a "top priority" basis. Bryant's agreement with MGA also provided that Bryant would receive royalties and other consideration for sales of products on which Bryant provided aid or assistance; that all works and services furnished by Bryant under

EXHIBIT     T
PAGE     128
-38-

1    the agreement, including those he purportedly provided while still a Mattel

2    employee, purportedly would be considered "works for hire" of MGA; and that all

3    intellectual property rights to preexisting works by Bryant, including Bratz designs,

4    purportedly were assigned to MGA.

5    **IV.   MGA STEALS MATTEL TRADE SECRETS IN MEXICO**

6              37.   On information and belief, in or about late 2003 or early 2004,

7    MGA decided to open business operations in Mexico. Faced with the difficult task

8    of developing an overall strategy for expanding into a market in which it had only a

9    nominal presence and no operations, MGA elected to steal Mattel's plans, strategy

10   and business information for the Mexican market and materials related to Mattel's

11   worldwide business strategies. As detailed below, MGA and Larian approached

12   three employees of Mattel's Mexican subsidiary ("Mattel Mexico"), enticed them to

13   steal Mattel's most sensitive business planning materials, and then hired them to

14   assist in establishing and running MGA's new Mexican subsidiary.

15        **A.    MGA Hires Three Senior Mattel Employees in Mexico**

16             38.   Carlos Gustavo Machado Gomez ("Machado") was the Senior

17   Marketing Manager, Boys Division, for Mattel Mexico, a position of trust and

18   confidence. He was employed at Mattel Mexico from April 1, 1997 until April 19,

19   2004. His duties included short, medium and long-term marketing planning,

20   generating product sales projections, and assisting in creation of the media plan. In

21   his position, Machado had access to highly confidential and sensitive marketing

22   and product development information. Machado had an employment agreement

23   with Mattel in which he agreed to maintain the confidentiality of Mattel's protected

24   information. Mattel's policies also required Machado to protect Mattel's

25   proprietary information and not to disclose it to competitors.

26             39.   Mariana Trueba Almada ("Trueba") was the Senior Marketing

27   Manager, Girls Division, for Mattel Mexico, a position of trust and confidence.

28   She was employed at Mattel Mexico from November 3, 1997 until April 19, 2004.

1  Like Machado, her duties included short, medium and long-term marketing
2  planning, generating product sales projections, and assisting in creation of the
3  media plan. In her position, Trueba had access to highly confidential and sensitive
4  marketing and product development information. Trueba had an employment
5  agreement with Mattel in which she agreed to maintain the confidentiality of
6  Mattel's protected information. Mattel's policies also required Trueba to protect
7  Mattel's proprietary information and not to disclose it to competitors.

8      40.   Pablo Vargas San Jose ("Vargas") was a Senior Trade Marketing
9  Manager with Mattel Mexico, a position of trust and confidence. He was employed
10 at Mattel Mexico from March 29, 2001 until April 19, 2004. Vargas was
11 responsible for ensuring that point-of-sale promotions were carried out, analyzing
12 the results of such promotions, negotiating promotion budgets, and generally
13 managing promotional activities. Vargas also had access to highly confidential and
14 sensitive marketing and product development information. Vargas had an
15 employment agreement with Mattel in which he agreed to maintain the
16 confidentiality of Mattel's protected information. Mattel's policies also required
17 Vargas to protect Mattel's proprietary information and not to disclose it to
18 competitors.

19     41.   Beginning in late 2003 or early 2004, Machado, Trueba and
20 Vargas began planning to leave Mattel Mexico to join MGA. In connection with
21 that plan, and with the encouragement of Larian and other MGA officers operating
22 in the United States, they began accessing, copying and collecting proprietary
23 Mattel documents to take with them. On April 19, 2004, Machado, Trueba and
24 Vargas each resigned their positions with Mattel, effective immediately. They
25 stated that they had been hired by a Mattel competitor, but refused to identify that
26 competitor. In fact, they had been offered and accepted employment by MGA to
27 establish and run MGA's new operation in Mexico.

28

EXHIBIT __I__
PAGE __130__

**B.      Machado, Trueba and Vargas Stole Dozens of Confidential Trade Secret Marketing and Sales Documents for MGA's Benefit**

42.      Following these resignations, Mattel discovered that Machado, Trueba and Vargas had been in frequent telephonic and e-mail contact with MGA personnel, including Larian, for over three months prior to their resignations. The primary vehicle for these communications in furtherance of their "plot" was an America Online e-mail account with the address <plot04@aol.com>. On information and belief, during this time, Machado, Trueba and Vargas supplied Larian with certain Mattel confidential and proprietary information in order to prove their value to MGA and to improve their negotiating position vis-à-vis their respective employment contracts with MGA.

43.      In March 2004, Machado, Trueba and Vargas were making plans to travel from Mexico to Los Angeles to meet with MGA personnel in person prior to resigning their positions at Mattel. Also, by at least March 3, 2004, Machado, Trueba and Vargas were discussing with MGA personnel, including Larian, specific details regarding setting up MGA offices in Mexico City. On information and belief, prior to their resignations, Larian and others at MGA directed Machado, Trueba and Vargas to steal virtually all Mattel confidential and proprietary information that they could access and bring it with them to MGA. This was reflected in, among things, e-mail messages that Mattel had discovered after Machado, Trueba and Vargas had resigned. For example, on March 22, 2006, approximately one month before they resigned, Machado, Trueba and Vargas wrote an e-mail message from the <plot04@aol.com> e-mail account addressed to Larian, MGA's General Manager Susan Kuemmerle and another MGA officer Thomas Park. In that e-mail message, Machado, Trueba and Vargas sought to prove their value in this endeavor to MGA by writing: "Attached you will find our analysis for future discussion. We will be available during the nights of the week after 16:30 Los Angeles time . . . ." In another e-mail message, showing that the

**EXHIBIT** ___T___
**PAGE** _131_

-41-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

1   participants intentionally sought to maximize the damage to Mattel from their

2   conduct, Kuemmerle wrote to Larian and Park: "Gustavo, Mariana and Pablo want

3   to resign (all at the same time, and you can believe my smile!) next Wednesday."

4           44.   Beginning on April 12, 2004, a week before his resignation and

5   after numerous communications and meetings with Larian and other MGA

6   personnel, Machado began transferring additional Mattel confidential and

7   proprietary information to a portable USB storage device (also know as a "thumb

8   drive") that he connected to his Mattel computer. On Friday, April 16, 2004, the

9   last business day before he gave notice, Machado copied at least 70 sensitive

10   documents to the portable USB storage device.

11          45.   Starting on April 12, 2004, Vargas also copied a host of

12   confidential and proprietary materials to a portable USB storage device, including

13   sales plans, sales projections and customer profiles.

14          46.   On April 16, 2004, Trueba also copied Mattel confidential and

15   proprietary information to a portable USB storage device connected to her Mattel

16   computer.

17          47.   With full knowledge that she was going to leave Mattel for a

18   competitor, Trueba also took steps to increase further her access to Mattel's

19   confidential information shortly before her resignation. For example, just four days

20   before leaving, Trueba went out of her way to seek to attend a meeting at which

21   Mattel personnel analyzed BARBIE programs for the United States, Canada and

22   South America. Two days before her resignation, she contacted both a Mattel

23   employee located in El Segundo, California and Mattel's advertising agency to

24   request updated confidential information about advertising plans for BARBIE. On

25   information and belief, Trueba acted at the direction of MGA and Larian and did so

26   in order to obtain further information that would allow MGA to obtain unfair

27   competitive advantage over Mattel.

28

EXHIBIT __I__
PAGE _132_

-42-

2154363.2

1    48.   Machado, Trueba and Vargas stole virtually every type of

2  document a competitor would need to enter the Mexican market and to unlawfully

3  compete with Mattel in Mexico, in the United States, and elsewhere. They stole

4  global internal future line lists that detailed anticipated future products, production

5  and shipping costs for Mattel products; daily sales data for Mattel products;

6  customer data; sales estimates and projections; marketing projections; documents

7  analyzing changes in sales performance from 2003 to 2004; budgets for advertising

8  and promotional expenses; strategic research reflecting consumer responses to

9  products in development; media plans; consumer comments regarding existing

10  Mattel products customer discounts and terms of sale; customer inventory level

11  data; assessments of promotional campaign success; market size historical data and

12  projections; marketing plans and strategies; merchandising plans; retail pricing and

13  marketing strategies; and other similar materials.

14    49.   The stolen data was not limited to the Mexican market. The

15  information stolen would, and did, give MGA an unfair competitive advantage in

16  the United States and around the world. Further, the stolen information was not

17  located exclusively in Mexico, but included confidential and proprietary

18  information that resided on Mattel computers in Phoenix, Arizona and El Segundo,

19  California, and/or documents which were originally created by personnel in El

20  Segundo. Included among these stolen documents was one of Mattel's earliest

21  internal global line lists, which included information for BARBIE products for the

22  upcoming year and included, for each product, the expected profit margin,

23  advertising expenditures, expected volume and marketing strategy. On information

24  and belief, Machado, Trueba or Vargas delivered that internal line list to Larian or

25  another MGA officer during their negotiations with MGA.

26    50.   MGA has used the information taken from Mattel to obtain an

27  unfair advantage over Mattel, including in both the United States and Mexico. In

28  fact, MGA later publicized its claim that, in 2005, it had increased its Mexican

EXHIBIT ___I___
PAGE  133

-43-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

1 | market share by 90 percent over the prior year. This increase came at the expense
2 | of Mattel, which lost market share during 2004 in Mexico and was forced to
3 | increase its advertising and promotional spending to offset further losses.

4 | 51. Machado, Trueba and Vargas attempted to conceal their
5 | widespread theft of Mattel's proprietary information. For example, Machado ran a
6 | software program on his Mattel personal computer in an attempt to erase
7 | information, including information that would reveal the addresses to which he had
8 | sent, or from which he had received, e-mail messages. On information and belief,
9 | for the same purpose Machado also damaged the hard drive of the personal
10 | computer that he used at Mattel.

11 | 52. On information and belief, on April 19, 2004, immediately after
12 | Machado, Trueba and Vargas simultaneously resigned, they traveled from Mexico
13 | to Los Angeles to meet with MGA personnel, including Larian, in person.

14 | 53. Mattel notified Mexican authorities about the theft of its trade
15 | secret and confidential information. On October 27, 2005, the Mexican Attorney
16 | General Office obtained a search warrant from the Mexican Federal Criminal
17 | Courts for MGA's facilities in Mexico City. In that search, the Mexican authorities
18 | found and seized from MGA's offices both electronic and paper copies of a large
19 | number of documents containing Mattel trade secrets, including those that Mattel
20 | discovered through its forensic investigations, plus many others that Mattel had not
21 | known had been stolen.

22 | 54. Based on Machado's "performance" in Mexico, Isaac Larian
23 | subsequently promoted Machado and he was transferred to MGA's main office in
24 | Van Nuys, California. On information and belief, Machado currently resides in the
25 | County of Los Angeles, California.

26
27
28 |

**EXHIBIT** I
**PAGE** 134

-44-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

V.   **MGA HIRES MATTEL'S SENIOR VICE PRESIDENT AND GENERAL MANAGER TO FACILITATE ITS THEFT AND USE OF MATTEL'S HIGHLY VALUABLE BUSINESS METHODS AND PRACTICES**

55.   On October 1, 2004, Mattel's Senior Vice President and General Manager, Ron Brawer, left Mattel and joined MGA. Tyco Toys, Inc. ("Tyco"), a predecessor to Mattel, had hired Brawer on April 22, 1996. The same day, Brawer entered into an Employee Invention & Trade Secret Agreement with Tyco. On April 9, 1997, Brawer became a Marketing Director for Mattel in Mount Laurel, New Jersey, and remained bound by his Employee Invention & Trade Secret Agreement.

56.   In January 2003, while Brawer held a position of trust and confidence at Mattel, Mattel's "Code of Conduct" was circulated to all Mattel employees worldwide. Included in the Code of Conduct were statements that:

> Employees and Directors have an obligation to protect the confidentiality of Mattel's proprietary information. Proprietary information is any information not generally known to the public that is useful to Mattel, that would be useful to its competitors or other third parties or that would be harmful to Mattel or its customers if disclosed. Proprietary information includes trade secrets, revenue and profit information and projections, new product information, marketing plans, design and development efforts, manufacturing processes and any information regarding potential acquisitions, divestitures and investments.
>
> We can protect the security of Mattel's proprietary information by limiting access to it. Confidential information should not be discussed with those who are not obligated to maintain the information in confidence and in public places where the

1          information is not likely to be kept secret, such as planes,

2          restaurants and elevators. The obligation to preserve confidential

3          information continues even after employment ends.

4    The Code of Conduct applied to Brawer and required that he meet his obligations

5    under the Code of Conduct.

6          57.   By 2003, Brawer had advanced within Mattel to a Senior Vice

7    President position over customer marketing, a position of trust and confidence. In

8    his executive position, Brawer was provided access to information that was both

9    sensitive and confidential, including, but not limited to, detailed information related

10   to development, manufacture, marketing, pricing, shipping, and performance of

11   Mattel's then-current and anticipated future product lines, and other confidential

12   business plans between Mattel and its most significant retail customers.

13         58.   In December 2003, Alan Kaye, Mattel's Senior Vice President of

14   Human Resources, asked Brawer whether he was discussing potential employment

15   with MGA. Brawer denied that he had been in contact with MGA and represented

16   that he would not talk to MGA. Throughout 2004, Mattel reminded and stressed to

17   its employees, including Brawer, the importance of protecting Mattel's confidential

18   and proprietary materials and information.

19         59.   On March 18, 2004, in response to a survey from the President of

20   Mattel Brands, Matt Bousquette, confirming compliance with Mattel's Code of

21   Conduct, Brawer wrote back that he "applaud[ed] the company's vigorous

22   protection of it's [sic] intellectual property," reflecting Brawer's clear

23   understanding that Mattel required its proprietary information to be kept

24   confidential.

25         60.   In April 2004, Mattel promoted Brawer to Senior Vice

26   President/General Manager. The General Manager position also is an executive

27   position of trust and confidence. The role of a General Manager is to lead a cross-

28   functional "Customer Business Team." Each General Manager is accountable for a

2154363.2

EXHIBIT ___I___
PAGE __136__

-46-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

1   strategic partnership with a key Mattel retailer, covering all aspects of the business,

2   including both traditional toy sales and retail development of licensed products.

3         61.   In or about late May 2004, Brawer began performing General

4   Manager duties, working with one of Mattel's major retail customer accounts.

5   Thereafter, Brawer began receiving information related not only to the Senior Vice

6   President, Customer Marketing position that he still formally held, but also began

7   receiving detailed information related to his role as General Manager. Brawer

8   began requesting and analyzing detailed information related to Mattel and its four

9   key retail accounts.

10         62.   On September 15, 2004, Brawer left work at noon for observance

11   of Rosh Hashanah. As Brawer left, he carried a large cardboard box with binders

12   and other materials. Several hours after his departure, Brawer instructed his

13   assistant to print Mattel's 2004 Sales Plan for one of Mattel's significant customers

14   and to provide it to him, falsely claiming he needed it for a meeting

15         63.   On September 17, 2004, Brawer returned to Mattel and

16   immediately informed his supervisor that he was leaving Mattel, effective October

17   1, 2004, to work for competitor MGA.

18         64.   On September 20, 2004, Mattel hand-delivered a letter to Brawer

19   reminding him of his continuing obligation to preserve the confidentiality of

20   Mattel's proprietary information and trade secrets not only through October 1,

21   2004, but continuing beyond the termination of his employment.

22         65.   At his exit interview on September 29, 2004, Mattel reminded

23   Brawer that he had ongoing duties of confidentiality to Mattel, even after the

24   termination of his employment. Brawer was given a copy of his Original

25   Confidentiality Agreement, which he had signed on April 22, 1996, and another

26   copy of the Code of Conduct. During the exit interview, however, Brawer noted

27   that he had not signed the Code of Conduct, which he intended and Mattel

28   understood to mean that Brawer believed he was not bound by Mattel's policy.

4363.2

**EXHIBIT** ___T___   -47-

**PAGE** _137_   SECOND AMENDED ANSWER AND COUNTERCLAIMS

1 | because he had not signed it. Brawer was unwilling to complete or sign the form
2 | that sought to confirm that Brawer understood his ongoing obligations under the
3 | Code of Conduct, which included the obligation to preserve the confidentiality of
4 | Mattel's proprietary and trade secret information.

5 |   66. On October 1, 2004, Brawer's final day of employment with
6 | Mattel, Mattel hand-delivered to Brawer a letter that, among other things, reminded
7 | Brawer of his confidentiality obligations to Mattel under the Code of Conduct.

8 |   67. Upon joining MGA, Brawer became its Executive Vice-
9 | President of Sales and Marketing. In that role he was responsible for MGA's sales
10 | worldwide. As part of those responsibilities, Brawer had and continues to have
11 | responsibility for MGA's accounts with the same retailers that he worked with
12 | while at Mattel.

13 |   68. Brawer represented during his Mattel exit interview that he had
14 | returned all proprietary information to Mattel. That representation was false. On
15 | information and belief, Brawer removed proprietary and trade secret information
16 | from Mattel that he did not return. Mattel is informed and believes that Brawer did
17 | not return to Mattel, for example, the information contained in his contacts file.
18 | The contacts file included contact information for Mattel customers, most notably
19 | TRU, and extensive contact information for Mattel employees, including titles, e-
20 | mail addresses and telephone numbers.

21 |   69. Mattel has recently learned that Brawer has been using that
22 | contact information on a regular basis, including within recent months. Since
23 | leaving Mattel, Brawer has had contacts with Mattel employees, both by telephone
24 | and by electronic mail. Based on his knowledge of Mattel's operations and the
25 | roles of certain Mattel employees, he has targeted certain Mattel employees who
26 | have broad access to Mattel proprietary information in an effort to induce and
27 | encourage them to join MGA and to steal or otherwise wrongfully misappropriate
28 | Mattel confidential information and trade secrets. Brawer has done so by

EXHIBIT   I
PAGE   138   -48-
  SECOND AMENDED ANSWER AND COUNTERCLAIMS

1  promising these Mattel employees salaries 25 percent or more higher than they earn

2  at Mattel and stating to them that they should not be concerned by legal action

3  taken by Mattel to protect its trade secrets and its rights because such claims are

4  hard to prove and easy to defeat.

5  **VI.  MGA STEALS MATTEL TRADE SECRETS IN CANADA**

6         70.    In an effort to increase its market share and sales in Canada and

7  elsewhere, MGA stole Mattel trade secrets regarding Mattel's customers, sales,

8  projects, advertising and strategy, not only for Canada, but the United States and

9  the rest of the world.

10         71.    Janine Brisbois was a Director of Sales for the Girls Division in

11  Canada.  Mattel hired her as a National Account Manager in August 1999.  When

12  she was hired as a Mattel employee, Brisbois agreed that she would preserve and

13  would not disclose Mattel's proprietary or confidential information.  For example,

14  Brisbois agreed:

15         You must keep Mattel's Proprietary Information confidential,

16         and you may only use or disclose such information as necessary

17         to perform your job responsibilities in accordance with Mattel

18         policies.  Your obligation to keep Mattel's Proprietary

19         Information confidential will continue even after any termination

20         of your employment with your employer.

21         . . .

22         Mattel takes steps to maintain the secrecy and confidential nature

23         of Mattel's Proprietary Information and, if a competitor

24         discovered Mattel's Proprietary Information, it could

25         significantly damage Mattel and your Employer.

26         72.    While with Mattel, Brisbois had responsibility for Mattel's

27  account with TRU and later had responsibility for Mattel's Wal-Mart account.  In

28  her capacity as Sales Director-Wal-Mart/CTC/Girls Team, Brisbois had access to

EXHIBIT  I
PAGE  139

-49-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

1　Mattel confidential and proprietary information regarding Mattel's future product

2　lines, advertising and promotional campaigns and product profitability.

3　　　　　　　73.　On September 26, 2005, Brisbois resigned from Mattel to take a

4　position as Vice President of Sales at MGA. Mattel is informed and believes that

5　in that position Brisbois has responsibility for MGA's accounts with both TRU and

6　Wal-Mart. During Brisbois' exit interview she was specifically asked whether she

7　was "taking anything." Brisbois responded, "No." Both during and after her exit

8　interview, Brisbois was advised by Mattel of her obligations to preserve Mattel's

9　confidential and proprietary information.

10　　　　　　74.　Mattel is informed and believes that Brisbois spoke with Isaac

11　Larian, MGA's CEO, on September 22, 2005 at approximately 8:30 p.m., when he

12　called Ms. Brisbois at her home. Mattel subsequently learned that on the same day

13　that she spoke with Mr. Larian and four days before she resigned, Brisbois copied

14　approximately 45 Mattel documents on to a USB or "thumb" drive with the volume

15　label "BACKPACK." On information and belief, Brisbois removed the thumb

16　drive from Mattel Canada's office by concealing it in her backpack or gym bag the

17　last time that she left that office. These documents contained Mattel trade secret

18　and proprietary information, and included:

19　　　　　　• a document containing the price, cost, sales plan and quantity of every

20　　　　　　　Mattel product ordered by every Mattel customer in 2005 and 2006;

21　　　　　　• the BARBIE television advertising strategy and information concerning

22　　　　　　　sales increases generated by television advertisements;

23　　　　　　• competitive analysis of Mattel vis-à-vis its competitors in Canada;

24　　　　　　• an analysis of Mattel's girls business sales beginning in 2003 and

25　　　　　　　forecasts through 2006;

26　　　　　　• profit and loss reviews for Mattel's products being sold in Wal-Mart,

27　　　　　　　including margins and profit in not only Canada, but in the United

28　　　　　　　States and Mexico; and

1
2
- a document containing the product launch dates and related advertising for all Mattel new products between Fall 2005 and Spring 2006.

3
4
5
6
7
8
9
75.   After Mattel discovered that Brisbois had copied these sensitive documents to a thumb drive, Mattel notified Canadian law enforcement authorities. Canadian law enforcement authorities recovered from Brisbois a thumb drive with the volume label "BACKPACK" containing the documents that Brisbois had copied from Mattel's computer system. Mattel later learned that while she was working as a Vice President of Sales at MGA, Brisbois accessed and modified documents on that thumb drive.

10
11
12
13
14
15
16
76.   After joining MGA, Brisbois repeatedly traveled to MGA's offices in Van Nuys, California and met with Larian and Brawer. In February, 2006, knowing that Mattel trade secrets had been seized from MGA's Mexico City offices and that at least three MGA employees were under criminal investigation, MGA nonetheless issued a press release trumpeting its 2005 performance, with Larian himself concluding, "Our international teams in Mexico and Canada have done a fantastic job."

17
18
19
**VII. MGA PERSUADES OTHER EMPLOYEES LEAVING MATTEL TO JOIN MGA TO MISAPPROPRIATE MATTEL TRADE SECRETS FOR THE BENEFIT OF MGA**

20
21
22
23
24
25
26
27
28
77.   In the past few years, MGA has hired directly from Mattel's United States operations at least 25 employees, from Senior Vice-President level to lower level employees. On information and belief, many of these employees were specifically targeted and recruited by MGA, including by Larian and Brawer, based on the Mattel confidential and proprietary information they could access. Many of these employees had access to information that Mattel considers to be highly proprietary and confidential. Mattel believes that some of those former Mattel employees may be observing their obligations not to misappropriate, disclose or use Mattel's confidential and proprietary information. Mattel is informed and

2154363.2

**EXHIBIT** ___I___
**PAGE** __141__

-51-

1    believes, however, that certain additional employees accessed, copied and took

2    from Mattel confidential and proprietary information, including Mattel's strategic

3    plans; business operations, methods and systems; marketing and advertising

4    strategies and plans; future product lines; product profit margins; and customer

5    requirements.  The misappropriated confidential and proprietary information

6    included information that these Mattel employees were not authorized to access.

7    On information and belief, the misappropriated confidential and proprietary

8    information taken from Mattel is being disclosed to and used by MGA for the

9    benefit of MGA and to the detriment of Mattel.

10   **VIII.  LARIAN MAKES MISREPRESENTATIONS TO RETAILERS**

11   **ABOUT MATTEL'S PRODUCTS**

12           78.   Counter-defendants have engaged in other illegal practices in

13   their efforts to compete unfairly with Mattel.  Larian has a practice of sending e-

14   mail messages to a "Bratz News" distribution list that Larian created or that was

15   created for him.  Mattel is informed and believes that the recipients of e-mail

16   messages sent to the "Bratz News" distribution list include members of the media

17   as well as representatives of many of Mattel's most significant customers.

18           79.   On May 12, 2006, Larian sent an e-mail message to the "Bratz

19   News" distribution list that included a reference to Mattel's updated MY SCENE

20   MY BLING BLING product with real gems.  Mattel had not publicly announced

21   this product at the time that Larian sent his May 12, 2006 e-mail.  In fact, Mattel

22   had guarded the identification of this particular product.

23           80.   Shortly thereafter, Larian engaged in a campaign of calling

24   Mattel's most significant customers, including but not limited to Target and TRU,

25   regarding the MY SCENE MY BLING BLING product with real gems.  In an

26   effort to dissuade these retailers from purchasing Mattel's MY SCENE MY BLING

27   BLING product with real gems, Larian knowingly made false factual statements

28   about that product to each retailer.  As of the writing of this Second Amended

EXHIBIT  I

PAGE  142

-52-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

1   Answer and Counterclaims, Mattel is aware that Larian represented to each retailer

2   that each was the only retailer to purchase the product and that Mattel would not be

3   supporting the product with television advertising.  At the time that Larian made

4   these statements, he knew them to be false.  As a result of Larian's

5   misrepresentations, at least one retailer cancelled its order for 75,000 units of the

6   MY SCENE MY BLING BLING product with real gems.  Only after Mattel

7   learned of Larian's misrepresentations and was able to correct them was Mattel able

8   to assure the retailer that Larian's representations were false and to persuade the

9   retailer to reinstate the order.

10          81.   Such conduct is not an isolated incident.  MGA and Larian, in an

11  effort to gain an unfair competitive advantage, repeatedly issued false and

12  misleading press releases.  In these press releases, MGA and Larian have

13  misrepresented Bratz's sales, Bratz's market share, Bratz's position vis-à-vis

14  Mattel's BARBIE products, sales of Mattel's BARBIE products, and the market

15  share of Mattel's BARBIE products.

16                        **CLAIMS FOR RELIEF**

17                        <u>First Counterclaim</u>

18                        Copyright Infringement

19          (Against MGA, MGA Entertainment (HK) Limited,

20              Larian, Bryant and Does 4 through 10)

21          82.   Mattel repeats and realleges each and every allegation set forth in

22  paragraphs 1 through 81, above, as though fully set forth at length.

23          83.   Mattel is the owner of copyrights in works that are fixed in

24  tangible media of expression and that are the subject of valid, and subsisting,

25  copyright registrations owned by Mattel.  These include, without limitation, the

26  works that are the subject of Registrations VA 1-378-648, VA 1-378-649, VA 1-

27  378-650, VA 1-378-651, VA 1-378-652, VA 1-378-653, VA 1-378-654, VA 1-

28

**EXHIBIT    I**
**PAGE   143**

1   378-655, VA 1-378-656, VA 1-378-657, VA 1-378-658, VA 1-378-659, VA 1-
2   378-660, VAu 715-270, VAu 715-271 and VAu 715-273.

3           84.   Counter-defendants have reproduced, created derivative works
4   from and otherwise infringed upon the exclusive rights of Mattel in its protected
5   works without Mattel's authorization.  Counter-defendants' acts violate Mattel's
6   exclusive rights under the Copyright Act, including without limitation Mattel's
7   exclusive rights to reproduce its copyrighted works and to create derivative works
8   from its copyrighted works, as set forth in 17 U.S.C. §§ 106 and 501.

9           85.   Counter-defendants' infringement (and substantial contributions
10  to the infringement) of Mattel's copyrighted works is and has been knowingly made
11  without Mattel's consent and for commercial purposes and the direct financial
12  benefit of Counter-defendants.  Counter-defendants, moreover, have deliberately
13  failed to exercise their right and ability to supervise the infringing activities of
14  others within their control to refrain from infringing Mattel's copyrighted works
15  and have failed to do so in order to deliberately further their significant financial
16  interest in the infringement of Mattel's copyrighted works.  Accordingly, Counter-
17  defendants have engaged in direct, contributory and vicarious infringement of
18  Mattel's copyrighted works.

19          86.   By virtue of defendants' infringing acts, Mattel is entitled to
20  recover Mattel's actual damages plus Counter-defendants' profits, Mattel's costs of
21  suit and attorneys' fees, and all other relief permitted under the Copyright Act.

22          87.   Counter-defendants' actions described above have caused and
23  will continue to cause irreparable damage to Mattel, for which Mattel has no
24  remedy at law.  Unless Counter-defendants are restrained by this Court from
25  continuing their infringement of Mattel's copyrights, these injuries will continue to
26  occur in the future.  Mattel is accordingly entitled to injunctive relief restraining
27  Counter-defendants from further infringement.

28

**EXHIBIT** _I_
**PAGE** _144_

SECOND AMENDED ANSWER AND COUNTERCLAIMS

4363.2

1       ## Second Counterclaim

2       ## Violation of the Racketeer Influenced and Corrupt Organizations Act

3       ## 18 U.S.C. §§ 1962(c) and 1964(c)

4       ## (Against All Counter-defendants)

5       88.    Mattel repeats and realleges each and every allegation set forth in

6       paragraphs 1 through 87, above, as though fully set forth at length.

7       89.    Beginning at various times from approximately 1999 through the

8       filing of this Second Amended Answer and Counterclaims, in the Central District

9       of California and elsewhere, Counter-defendants MGA, MGA Entertainment (HK)

10      Limited, MGA de Mexico, Larian, Bryant, Machado, Does 4 through 10, and

11      Brawer, Trueba, Vargas and Brisbois were employed by and associated-in-fact with

12      an enterprise engaging in, and the activities of which affect, interstate and foreign

13      commerce (the "MGA Criminal Enterprise"). The MGA Criminal Enterprise is

14      made up of the MGA Group (MGA, MGA Entertainment (HK) Limited, MGA de

15      Mexico, Larian, certain of the Doe Counter-defendants and Brawer), the Bryant

16      Group (Bryant and certain of the Doe Counter-defendants), the Mexican Group

17      (Machado, Trueba and Vargas) and the Canadian Group (Brisbois). In addition,

18      beginning at various times from approximately 1999 through the filing of this

19      Second Amended Answer and Counterclaims, in the Central District of California

20      and elsewhere, Counter-defendants MGA, MGA Entertainment (HK) Limited,

21      Larian and Bryant, and certain of the Doe Counter-defendants, were employed by

22      and associated-in-fact with a second enterprise engaging in, and the activities of

23      which affect, interstate and foreign commerce (the "Bratz Criminal Enterprise").

24      90.    MGA, MGA Entertainment (HK) Limited, MGA de Mexico,

25      Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas,

26      Brisbois, and the Other Former Employees, and each of them, for the purpose of

27      executing and attempting to execute the scheme to improperly defraud Mattel and

28      steal its trade secret or otherwise confidential and proprietary information, by

**EXHIBIT** $\underline{\mathcal{I}}$
**PAGE** $\underline{145}$

-55-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

1    means of tortious, fraudulent and criminal conduct, did and do unlawfully, willfully

2    and knowingly conduct and participate, directly and indirectly, in the conduct of

3    the MGA Criminal Enterprise's affairs and, in the case of MGA, MGA

4    Entertainment (HK) Limited, Larian, Bryant, and certain of the Doe Counter-

5    defendants, the Bratz Criminal Enterprise's affairs, through a pattern of

6    racketeering activity. Their actions include multiple, related acts in violation of:

7    18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1512

8    (tampering with a witness victim, or informant), 18 U.S.C. § 1952 (interstate and

9    foreign travel to aid racketeering), and 18 U.S.C. § 2319(a) and 17 U.S.C. §

10   506(a)(1)(A) (criminal copyright infringement).

11        91.   MGA, MGA Entertainment (HK) Limited, MGA de Mexico,

12   Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas,

13   Brisbois, and the Other Former Employees, and each of them, shared the common

14   purpose of enabling MGA to obtain confidential, proprietary and otherwise

15   valuable Mattel property through improper means in order to assist MGA in

16   illegally competing with Mattel domestically and throughout the world.

17        92.   The MGA Criminal Enterprise and Bratz Criminal Enterprise as

18   described herein are and have been at all relevant times continuing enterprises

19   because, among other reasons, each is designed to and did unlawfully acquire the

20   confidential business information and property of Mattel and incorporated this

21   information and property into MGA's ongoing business, marketing strategies and

22   business methods, practices and processes. The conduct of each enterprise

23   continues through the date of this Second Amended Answer and Counterclaims and

24   is ongoing by virtue of MGA's continuing use of Mattel's information and property,

25   all to the detriment of Mattel.

26        93.   The pattern of racketeering activity, as defined by 18 U.S.C.

27   §§ 1961(1) and (5), presents both a history of criminal conduct and a distinct threat

28   of continuing criminal activity. This activity consists of multiple acts of

EXHIBIT __I__
PAGE _146_

-56-

4363.2

1     racketeering by each member of the MGA Criminal Enterprise and Bratz Criminal

2     Enterprise, is interrelated, not isolated and is perpetrated for the same or similar

3     purposes by the same persons. This activity extends over a substantial period of

4     time, up to and beyond the date of this Second Amended Answer and

5     Counterclaims. These activities occurred after the effective date of 18 U.S.C.

6     §§ 1961 *et seq.*, and the last such act occurred within 10 years after the commission

7     of a prior act of racketeering activity. These racketeering activities included

8     repeated acts of:

9            (a)    Mail Fraud: Counter-defendants MGA, MGA Entertainment

10                 (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and

11                 Does 4 through 10, aided and abetted by each other and some or

12                 all of the remaining members of the MGA Criminal Enterprise,

13                 having devised a scheme or artifice to defraud Mattel of its

14                 confidential trade secret information and property by conversion,

15                 false representations, concealment and breaches of fiduciary duty,

16                 did for the purpose of furthering and executing such a scheme or

17                 artifice to defraud, deposited or caused to be deposited matters or

18                 things to be sent or delivered by the Postal Service, or any private

19                 or commercial interstate carrier, or took or received matters or

20                 things therefrom, or knowingly caused matters or things to be

21                 delivered by mail or such carrier according to the direction

22                 thereon, or at the place at which it is directed to be delivered by

23                 the person to whom it is addressed, in violation of 18 U.S.C.

24                 § 1341 and 18 U.S.C. § 2, as alleged with greater particularity in

25                 the foregoing paragraphs and as evidenced by, among other

26                 things, the true and correct copies of communications and other

27                 evidence included in Exhibit C;

28

EXHIBIT I
PAGE 147

-57-

(b) <u>Wire Fraud</u>: Counter-defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and Does 4 through 10, aided and abetted by each other and some or all of the remaining members of the MGA Criminal Enterprise, having devised a scheme or artifice to defraud Mattel of its confidential and trade secret information and property by conversion, false representations, concealment and breaches of fiduciary duty, did for the purpose of furthering and executing such a scheme or artifice to defraud, transmit and cause to be transmitted by means of wire communications in interstate or foreign commerce, writing, signs, signals, pictures or sound, in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 2, as alleged with greater particularity in the foregoing paragraphs and as evidenced by, among other things, the true and correct copies of communications and other evidence included in Exhibit C;

(c) <u>Tampering With a Witness, Victim or Informant</u>:  Counter-defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and Does 4 through 10, aided and abetted by each other and some or all of the remaining members of the MGA Criminal Enterprise, did corruptly alter, destroy, mutilate, or conceal more than one record, document, or other object, or attempted to do so, with the intent to impair the object's integrity or availability for use in an official proceeding, including this action, including without limitation by:

   i.   altering Bryant's contract with MGA relating to Bratz to conceal evidence that Bryant faxed the contract from the BARBIE COLLECTIBLES department of Mattel, using a fax

**EXHIBIT** ___I___
**PAGE** __148__

SECOND AMENDED ANSWER AND COUNTERCLAIMS

154363.2

machine owned by Mattel and while Bryant was employed by Mattel;

     ii.    altering numerous original Bratz drawings created by Bryant by adding false and misleading date notations of "8/1998" and "© 8/1998" to the drawings even though the drawings were not created in August 1998; and

     iii.   destroying electronic and other evidence, including by destroying evidence previously contained on Carter Bryant's and Isaac Larian's computer hard drives.

Such actions are in violation of 18 U.S.C. § 1512 and 18 U.S.C. § 2, as alleged with greater particularity in the foregoing paragraphs;

(d)  Interstate and Foreign Travel in Aid of Racketeering Enterprises: Counter-defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and Does 4 through 10, aided and abetted by each other and some or all of the remaining members of the MGA Criminal Enterprise, traveled in interstate and foreign commerce, or used the mail or any facility in interstate or foreign commerce, with the intent to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of unlawful activity, *i.e.* bribery, in violation of the laws of the State of California, *Cal. Penal Code* § 641.3, all in violation of 18 U.S.C. § 1952 and 18 U.S.C. § 2, as alleged with greater particularity in the foregoing paragraphs;

(e)  Criminal Copyright Infringement: Counter-defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and Does 4 through 10, aided and abetted by

EXHIBIT __I__
PAGE __149__

-59-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

1          each other and some or all of the remaining members of the MGA

2          Criminal Enterprise, willfully infringed Mattel's copyrights,

3          including with respect to documents containing Mattel trade

4          secret and confidential information, for purposes of commercial

5          advantage and private financial gain, all in violation of 18 U.S.C.

6          § 2319(a) and 17 U.S.C. § 506(a)(1)(A), as alleged with greater

7          particularity in the foregoing paragraphs.

8          94.    The persons alleged herein to have violated 18 U.S.C. § 1962(c)

9    are separate from, though employed by or associated with, MGA, the MGA Group,

10   the Bryant Group, the Mexican Group and the Canadian Group.

11         95.    MGA had a role in the racketeering activity that was distinct

12   from the undertaking of those acting on its behalf. MGA also attempted to benefit,

13   and did benefit, from the activity of its employees and agents alleged herein, and

14   thus was not a passive victim of racketeering activity, but an active perpetrator.

15         96.    Mattel has been injured in its business or property as a direct

16   and proximate result of the Counter-defendants' and the other enterprise members'

17   violations of 18 U.S.C. § 1962(c), including injury by reason of the predicate acts

18   constituting the pattern of racketeering activity.

19         97.    As a result of the violations of 18 U.S.C. § 1962(c), by MGA,

20   MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado,

21   Does 4 through 10, Brawer, Trueba, Vargas, Brisbois and the Other Former

22   Employees, Mattel has suffered substantial damages, in an amount to be proved at

23   trial. Pursuant to 18 U.S.C. § 1964(c), Mattel is entitled to recover treble its

24   general and special compensatory damages, plus interest, costs and attorneys, fees,

25   incurred by reason of Counter-defendants' violations of 18 U.S.C. § 1962(c).

26

27

28

EXHIBIT __I__

PAGE __150__

2154363.2

-60-

### Third Counterclaim

#### Conspiracy To Violate the Racketeer Influenced And Corrupt Organizations Act

#### (18 U.S.C. §§ 1962(d) and 1964(c))

#### (Against All Counter-defendants)

98. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 97, above, as though fully set forth at length.

99. Beginning at various times from approximately 1999 through the filing of this Second Amended Answer and Counterclaims, in the Central District of California and elsewhere, Counter-defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas, Brisbois and the Other Former Employees willfully, knowingly and unlawfully, did conspire, combine, confederate and agree together to violate 18 U.S.C. § 1962(c).

100. These conspirators were employed by and associated-in-fact with the MGA Criminal Enterprise engaging in, and the activities of which affect, interstate and foreign commerce. Specifically, the MGA Group, the Bryant Group, the Mexican Group and the Canadian Group, constituting a group of individuals associated-in-fact, did unlawfully, willfully, and knowingly participate in and conduct, directly and indirectly, the MGA Criminal Enterprise's affairs through a pattern of racketeering activity. In addition, MGA, MGA Entertainment (HK) Limited, Larian and Bryant, and certain of the Doe Counter-defendants, constituting a group of individuals associated-in-fact, did unlawfully, willfully, and knowingly participate in and conduct, directly and indirectly, the Bratz Criminal Enterprise's affairs through a pattern of racketeering activity.

101. The pattern of racketeering activity, as defined by 18 U.S.C. §§ 1961(1) and (5), including acts of mail fraud in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 2; acts of wire fraud in violation of 18 U.S.C. § 1343 and 18

1  U.S.C. § 2; acts of tampering with witnesses, victims or informants in violation of

2  18 U.S.C. § 1512 and 18 U.S.C. § 2; acts of interstate and foreign travel in aid of

3  racketeering enterprises in violation of 18 U.S.C. § 1952 and 18 U.S.C. § 2; and

4  acts of criminal copyright infringement in violation of 18 U.S.C. § 2319(a) and 17

5  U.S.C. § 506(a)(1)(A).

6        102. Counter-defendants and the other members of the MGA Criminal

7  Enterprise schemed to defraud Mattel and steal its property and trade secret

8  information by means of false representation, breaches of fiduciary duty,

9  conversation and concealment, as more fully set forth in the foregoing paragraphs.

10        103. In furtherance of this unlawful conspiracy, and to effect its

11  objectives, Counter-defendants and various co-conspirators committed numerous

12  overt acts, including but not limited to those set forth in the foregoing paragraphs.

13        104. Mattel has been injured in its business or property as a direct and

14  proximate result of the Counter-defendants' and the other enterprise members'

15  violations of 18 U.S.C. § 1962(d), including injury by reason of the predicate acts

16  constituting the pattern of racketeering activity.

17        105. As a result of the conspiracies between and among all Counter-

18  defendants and the other conspirators to violate 18 U.S.C. § 1962(c), Mattel has

19  suffered substantial damages, in an amount to be proved at trial. Pursuant to 18

20  U.S.C. § 1964(c), Mattel is entitled to recover treble its general and special

21  compensatory damages, plus interest, costs and attorneys, fees, incurred by reason

22  of Counter-defendants' violations of 18 U.S.C. § 1962(d).

23                    **Fourth Counterclaim**

24                  **Misappropriation of Trade Secrets**

25           (Against Counter-defendants MGA, MGA de Mexico,

26              **Larian, Machado and Does 4 through 10)**

27        106. Mattel repeats and realleges each and every allegation set forth in

28  paragraphs 1 through 105, above, as though fully set forth at length.

1    107. As used herein, "Trade Secret Material" shall mean the
2    documents, materials and information stolen by Machado, Trueba, Vargas,
3    Brisbois, the Other Former Employees, and other persons acting for, on behalf of or
4    at the direction of MGA and/or Larian. Prior to their theft by Counter-defendants,
5    the Trade Secret Materials gave Mattel a significant competitive advantage over its
6    existing and would-be competitors, including MGA. This advantage, as to MGA,
7    has now been compromised as a result of Counter-defendants' unlawful activities.

8    108. Mattel made reasonable efforts under the circumstances to
9    maintain the confidentiality of the Trade Secret Materials, including by having
10   employees and consultants who may have access the Trade Secret Materials sign
11   confidentiality agreements that oblige them not to disclose the Trade Secret
12   Materials or characteristics of the Trade Secret Materials; by limiting the
13   circulation of said materials within Mattel; by protecting and limiting access to
14   computers with log-in identifications and passwords; by limiting each employee's
15   access to electronic files to those that the particular employee needs to access; by
16   educating employees on the nature of Mattel's information that is confidential and
17   proprietary; and by reminding employees on a regular and periodic basis of their
18   obligation to protect and maintain Mattel's confidential and proprietary
19   information.

20   109. Mattel's Trade Secret Materials derive independent economic
21   value from not being generally known to the public or to other persons who can
22   obtain economic benefit from their disclosure.

23   110. Counter-defendants have illegally obtained the trade secret
24   materials, as set forth above, and through other means of which Mattel is presently
25   unaware.

26   111. Counter-defendants have used and disclosed Mattel's Trade
27   Secret Materials without Mattel's consent and without regard to Mattel's rights, and

28   
**EXHIBIT** _I_
**PAGE** _153_

154363.2

-63-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

1  without compensation, permission, or licenses for the benefit of themselves and
2  others.

3      112. Counter-defendants' conduct was, is, and remains willful and
4  wanton, and was taken with blatant disregard for Mattel's valid and enforceable
5  rights.

6      113. Counter-defendants' wrongful conduct has caused and, unless
7  enjoined by this Court, will continue in the future to cause irreparable injury to
8  Mattel. Mattel has no adequate remedy at law for such wrongs and injuries. Mattel
9  is therefore entitled to a permanent injunction restraining and enjoining Counter-
10  defendants, and each of them, as well as their agents, servants, and employees, and
11  all persons acting thereunder, in concert with, or on their behalf, from further using
12  in any manner Mattel's trade secrets.

13      114. In addition, as a proximate result of Counter-defendants'
14  misconduct, Mattel has suffered actual damages, and Counter-defendants have been
15  unjustly enriched.

16      115. The aforementioned acts of the Counter-defendants were willful
17  and malicious, including in that Counter-defendants misappropriated Mattel's trade
18  secrets with the deliberate intent to injure Mattel's business and improve their own.
19  Mattel is therefore entitled to enhanced damages. Mattel is also entitled to
20  reasonable attorney's fees.

21                          **Fifth Counterclaim**
22                          **Breach of Contract**
23                          **(Against Bryant)**

24      116. Mattel repeats and realleges each and every allegation set forth in
25  paragraphs 1 through 115, above, as though fully set forth at length.

26      117. Pursuant to his Employment Agreement, Bryant agreed that he
27  would not, without Mattel's express written consent, engage in any employment or
28  business other than for Mattel or assist in any manner any business competitive

EXHIBIT __I__
PAGE __154__
-64-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

4363.2

1 with the business or future business plans of Mattel during his employment with
2 Mattel. Pursuant to his Mattel Employment Agreement, Bryant further assigned to
3 Mattel all right, title and interest in "inventions," including without limitation
4 "designs" and other works that he conceived, created or reduced to practice during
5 his employment by Mattel. In addition, pursuant to the Conflict Questionnaire,
6 Bryant certified that, other than as disclosed, he had not worked for any competitor
7 of Mattel and had not engaged in any business venture or transaction involving a
8 Mattel competitor that could be construed as a conflict of interest. Bryant further
9 promised that he would notify his supervisor immediately of any change in his
10 situation that would cause him to change any of the foregoing certifications or
11 representations.

12       118. The Employment Agreement and the Conflict Questionnaire are
13 valid, enforceable contracts, and Mattel has performed each and every term and
14 condition of the Employment Agreement and Conflict Questionnaire required to be
15 performed by Mattel.

16       119. Bryant materially breached the foregoing contracts with Mattel,
17 in that, among other things, he secretly aided, assisted and worked for a Mattel
18 competitor during his employment with Mattel without the express written consent
19 of Mattel.

20       120. As a consequence of Bryant's breach, Mattel has suffered and
21 will, in the future, continue to suffer damages in an amount to be proven at trial.
22 Such damages include, without limitation, the amounts paid by the competitor to
23 Bryant during his Mattel employment; the amounts paid by MGA to Bryant during
24 his Mattel employment; the amount that Mattel paid Bryant during the time he
25 wrongfully worked with MGA; the value of information and intellectual property
26 owned by Mattel which Bryant provided to MGA; the value of the benefits that
27 MGA obtained from Bryant during the time he was employed by Mattel; and the

28

**EXHIBIT**  _I_
**PAGE** _155_

1   value of the benefits that MGA obtained from Bryant as a result of the work he

2   performed for or with MGA during his Mattel employment.

3           121. Bryant's conduct has caused, and unless enjoined will continue to

4   cause, irreparable injury to Mattel that cannot be adequately compensated by

5   money damages and for which Mattel has no adequate remedy at law. Bryant

6   specifically acknowledged in his Employment Agreement that his breach of the

7   Agreement "likely will cause irreparable harm" to Mattel and that Mattel "will be

8   entitled to injunctive relief to enforce this Agreement, in addition to damages and

9   other available remedies." Accordingly, Mattel is entitled to orders mandating

10  Bryant's specific performance of his contracts with Mattel and restraining Bryant

11  from further breach.

12  **Sixth Counterclaim**

13  **Intentional Interference with Contract**

14  **(Against MGA, Larian and Does 4 through 10)**

15          122. Mattel repeats and realleges each and every allegation set forth in

16  paragraphs 1 through 121, above, as though fully set forth at length.

17          123. Valid agreements existed between Mattel and Bryant, Brawer,

18  Machado, Trueba, Vargas, Brisbois and the Other Former Employees (collectively,

19  the "Mattel Employees")

20          124. At all times herein mentioned, MGA, Larian and Does 4 through

21  10 knew that the Mattel Employees had a duty under their agreements not to work

22  for or assist any competitor of Mattel, such as MGA. In addition, at all times

23  mentioned herein, MGA, Larian and Does 4 through 10 knew that Bryant had

24  assigned to Mattel, and was obligated to disclose to Mattel all inventions, including

25  designs and other works, created, conceived or reduced to practice during their

26  employment with Mattel.

27

28  EXHIBIT ___T___
    PAGE __156__

2154363.2

-66-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

1       125. Despite such knowledge, Counter-defendants MGA, Larian and

2  Does 4 through 10 intentionally and without justification solicited, induced and

3  encouraged the Mattel Employees to breach their contracts with Mattel.

4       126. As a direct and proximate result of Counter-defendants' efforts

5  and inducements, the Mattel Employees did breach their contracts with Mattel.

6       127. As a result of said breaches, Mattel has suffered damages and

7  will imminently suffer further damages, including the loss of its competitive

8  position and lost profits, in an amount to be proven at trial.

9       128. Counter-defendants performed the aforementioned conduct with

10  malice, fraud and oppression, and in conscious disregard of Mattel's rights.

11  Accordingly, Mattel is entitled to recover exemplary damages from Counter-

12  defendants in an amount to be determined at trial.

13                      **Seventh Counterclaim**

14                      **Breach of Fiduciary Duty**

15                  **(Against Bryant and Machado)**

16       129. Mattel repeats and realleges each and every allegation set forth in

17  paragraphs 1 through 128, above, as though fully set forth at length.

18       130. Bryant and Machado held positions of trust and confidence with

19  Mattel. In their positions, Bryant and Machado had access to and were entrusted

20  with Mattel's proprietary and confidential information, supervised the work of

21  others, exercised discretion and worked independently in many of their job

22  assignments and duties. In their positions, Bryant and Machado also represented

23  Mattel in its dealings with third parties and, in actions in the course and scope of

24  their employment with Mattel, were agents of Mattel. They confirmed their

25  relationship of trust with Mattel in respective employee agreements. Bryant and

26  Machado thus owed Mattel a fiduciary duty that included, but was not limited to,

27  an obligation not to take any action that would be contrary to Mattel's best interests

28                   **EXHIBIT**   I

                   **PAGE**   157

1   or that would deprive Mattel of any opportunities, profit or advantage which Bryant
2   or Machado might bring to Mattel.

3          131.  Bryant breached his fiduciary duty to Mattel in that, while
4   employed by Mattel, he secretly aided and assisted a competitor of Mattel,
5   including without limitation by entering into an agreement with a Mattel
6   competitor.  As alleged above, Bryant also breached the aforementioned duty by
7   using Mattel property and resources for the benefit of, and to aid and assist, himself
8   personally and MGA.

9          132.  Machado breached his fiduciary duty to Mattel, in that while
10  employed by Mattel, he secretly aided and assisted a competitor of Mattel by,
11  among other things, misappropriating Mattel trade secret and proprietary
12  information and providing said information to officers of MGA.  Machado also
13  breached the aforementioned duty by using Mattel property and resources for the
14  benefit of, and to aid and assist, himself personally and MGA.

15         133.  As a direct and proximate result of Counter-defendants' wrongful
16  conduct, Mattel has incurred damages in an amount to be determined at trial.

17         134.  Counter-defendants acted with malice, fraud and oppression, and
18  in conscious disregard of Mattel's rights.  Accordingly, Mattel is entitled to an
19  award of exemplary damages against Counter-defendants in an amount to be
20  determined at trial.

21         135.  Furthermore, Counter-defendants' conduct has caused, and unless
22  enjoined will continue to cause, irreparable injury to Mattel that cannot be
23  adequately compensated by money damages and for which Mattel has no adequate
24  remedy at law.  Accordingly, Mattel is entitled to an order restraining further
25  breach of Bryant's fiduciary duty to Mattel and/or restraining Counter-defendants
26  from continuing to benefit from such breach.

27

28          EXHIBIT ___I___
            PAGE  158

2154363.2                                    -68-

## Eighth Counterclaim

### Aiding and Abetting Breach of Fiduciary Duty

### (Against MGA, Larian and Does 4 through 10)

136.  Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 135, above, as though fully set forth at length.

137.  At all times herein mentioned, MGA, Larian and Does 4 through 10 knew that Bryant held a position of trust and confidence at Mattel.  At all times herein mentioned, MGA, Larian and Does 4 through 10 knew that Bryant owed a fiduciary duty to Mattel not to take any action that would be contrary to Mattel's best interests, including but not limited to secretly developing and designing Bratz while employed by Mattel and by secretly assisting Larian and MGA .

138.  At all times herein mentioned, MGA, Larian and Does 4 through 10 knew that the Mattel Employees (excluding Bryant) held positions of trust and confidence at Mattel.  At all times herein mentioned, MGA, Larian and Does 4 through 10 knew that the Mattel Employees (excluding Bryant) owed a fiduciary duty to Mattel not to take any action that would be contrary to Mattel's best interests, including but not limited to taking confidential trade secret information from Mattel's premises and providing that information to a competitor.

139.  Despite such knowledge, Counter-defendants MGA, Larian and Does 4 through 10 intentionally and without justification solicited, encouraged, aided and abetted and gave substantial assistance to the Mattel Employees to breach their fiduciary duties to Mattel, knowing that their conduct would constitute breaches of their fiduciary duties to Mattel.

140.  As a direct and proximate result of Counter-defendants' efforts, the Mattel Employees did breach their fiduciary duties to Mattel and Mattel has incurred damages in an amount to be proven at trial.  Mattel, therefore, is entitled to recover compensatory damages in an amount to be determined at trial.

**EXHIBIT** $\underline{\mathcal{I}}$
**PAGE** $\underline{159}$

-69-

4363.2

1      141. In taking the aforesaid actions, MGA, Larian and Does 4 through

2  10 acted with malice, fraud and oppression, and in conscious disregard of Mattel's

3  rights. Accordingly, Mattel is entitled to recover exemplary damages from

4  Counter-defendants in an amount to be determined at trial.

5               **Ninth Counterclaim**

6             **Breach of Duty of Loyalty**

7           **(Against Bryant and Machado)**

8      142. Mattel repeats and realleges each and every allegation set forth in

9  paragraphs 1 through 141, above, as though fully set forth at length.

10      143. As employees of Mattel, Bryant and Machado owed a duty of

11  undivided loyalty to Mattel. Pursuant to this duty, Bryant and Machado could not

12  compete with Mattel or assist a competitor of Mattel during their employment with

13  Mattel. Pursuant to this duty, Bryant and Machado were required to always give

14  preference to Mattel's business over their own, similar interests during the course of

15  their employment with Mattel.

16      144. Bryant and Machado breached their duty of loyalty to Mattel in

17  that, while employed by Mattel, they secretly aided, assisted and worked for a

18  competitor of Mattel, including without limitation by entering into agreements with

19  a Mattel competitor. As alleged above, they also breached the aforementioned duty

20  by using Mattel property and resources for the benefit of, and to aid and assist,

21  themselves personally and the competitor of Mattel.

22      145. As a direct and proximate result of Counter-defendants' wrongful

23  conduct, Mattel has incurred damages in an amount to be determined at trial.

24      146. Counter-defendants acted with malice, fraud and oppression, and

25  in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to an

26  award of punitive damages against Counter-defendants in an amount to be

27  determined at trial.

28

EXHIBIT   _T_
PAGE   _160_

-70-

1    147. Furthermore, Counter-defendants' conduct has caused, and unless

2  enjoined will continue to cause, irreparable injury to Mattel that cannot be

3  adequately compensated by money damages and for which Mattel has no adequate

4  remedy at law. Accordingly, Mattel is entitled to an order restraining further

5  breach of Counter-defendants' duty of loyalty to Mattel and/or restraining Counter-

6  defendants from continuing to benefit from such breach.

7    148. In breaching their duty of loyalty to Mattel, Bryant and Machado

8  acted with malice, fraud and oppression, and in conscious disregard of Mattel's

9  rights. Accordingly, Mattel is entitled to recover exemplary damages from

10  Counter-defendants in an amount to be determined at trial.

11    **Tenth Counterclaim**

12    **Aiding and Abetting Breach of Duty of Loyalty**

13    **(Against MGA, Larian and Does 4 through 10)**

14    149. Mattel repeats and realleges each and every allegation set forth in

15  paragraphs 1 through 148, above, as though fully set forth at length.

16    150. MGA, Larian and Does 4 through 10 knew that Bryant, as an

17  employee of Mattel, owed a duty of loyalty to his employer. MGA, Larian and

18  Does 4 through 10 knew that this duty included an obligation on the part of Bryant

19  not to compete with Mattel or assist a competitor of Mattel during the term of his

20  employment with Mattel. MGA, Larian and Does 4 through 10 also knew that

21  Bryant was required to give preference to Mattel's business over his own, similar

22  interests or those of Mattel's competitors. or those of Mattel's competitors during

23  the course of his employment with Mattel.

24    151. MGA, Larian and Does 4 through 10 knew that the Mattel

25  Employees (excluding Bryant) were employed by Mattel, and, as employees of

26  Mattel, that they owed duties of loyalty to Mattel. MGA, Larian and Does 4

27  through 10 knew that these duties included an obligation on the part of the Mattel

28

**EXHIBIT** I
**PAGE** 161

1 │ Employees (excluding Bryant) not to compete with Mattel or assist a competitor of

2 │ Mattel during their Mattel employment.

3 │ 152. Despite such knowledge, Counter-defendants MGA, Larian and

4 │ Does 4 through 10 intentionally and without justification solicited, encouraged,

5 │ aided and abetted and gave substantial assistance to the Mattel Employees to

6 │ breach their duties of loyalty to Mattel, knowing that their conduct would constitute

7 │ breaches of their duties of loyalty to Mattel.

8 │ 153. As a further consequence of Counter-defendants' efforts, Mattel

9 │ has suffered injury and is entitled to compensatory damages in an amount to be

10 │ proven at trial.

11 │ 154. In taking the aforesaid actions, MGA, Larian and Does 4 through

12 │ 10 acted with malice, fraud and oppression, and in conscious disregard of Mattel's

13 │ rights. Accordingly, Mattel is entitled to recover exemplary damages from

14 │ Counter-defendants in an amount to be determined at trial.

15 │ **Eleventh Counterclaim**

16 │ **Conversion**

17 │ **(Against All Counter-defendants)**

18 │ 155. Mattel repeats and realleges each and every allegation set forth in

19 │ paragraphs 1 through 154, above, as though fully set forth at length.

20 │ 156. Counter-defendants wrongfully converted Mattel property and

21 │ resources by appropriating and using them for their own benefit and gain and for

22 │ the benefit and gain of others, without the permission of Mattel.

23 │ 157. Mattel was entitled to, among other things, the exclusive right

24 │ and enjoyment in property and tangible materials owned by Mattel, including

25 │ without limitation such proper and materials that were created by Bryant while he

26 │ was a Mattel product designer. Such property was taken by Bryant from Mattel to

27 │ further his own interests and, in at least some instances, provided by Bryant to

28 │ Larian and MGA in furtherance of the interests of Bryant, Larian and MGA.

2154363.2

EXHIBIT __I__<br>PAGE __162__

-72-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

1    158. In addition, Counter-defendants wrongfully converted Mattel's

2   property by removing the Trade Secret Materials in electronic and paper form from

3   Mattel's offices. Counter-defendants did so without Mattel's permission and

4   continue to possess them.

5    159. As a direct and proximate result of Counter-defendants' wrongful

6   conversion of Mattel property, including those relating to Bratz and Mattel's Trade

7   Secret Materials, Mattel has incurred damages. Mattel, therefore, is entitled to

8   recover compensatory damages in an amount to be determined at trial.

9    160. As a result of Counter-defendants' acts of conversion, Mattel is

10   entitled to damages in an amount sufficient to indemnify Mattel for the loss

11   suffered, which is not measured by the value of the property misappropriated, but

12   includes the lost profits that Mattel suffered as a result of the conversion or,

13   alternatively, the profits generated by the Counter-defendants that would not have

14   been generated but for the conversion. Only such a measure of damages would

15   fully and fairly compensate Mattel for the injury it suffered due to Counter-

16   defendants' acts of conversion.

17    161. Counter-defendants performed the aforementioned conduct with

18   malice, fraud and oppression, and in conscious disregard of Mattel's rights.

19   Accordingly, Mattel is entitled to recover exemplary damages from Counter-

20   defendants in an amount to be determined at trial.

21    162. Furthermore, Counter-defendants' conduct has caused, and unless

22   enjoined will continue to cause, irreparable injury to Mattel that cannot be

23   adequately compensated by money damages and for which Mattel has no adequate

24   remedy at law. Accordingly, Mattel is entitled to an order restraining Counter-

25   defendants from further conversion of Mattel property and resources and/or

26   restraining Counter-defendants from continuing to benefit from such conversion.

27

28   EXHIBIT ___I___
    PAGE __163__

j4363.2

1

2

3

4

**Twelfth Counterclaim**

**Unfair Competition**

**(Common Law and *Cal. Bus. & Prof. Code* § 17200)**

**(Against All Counter-defendants)**

5      163. Mattel repeats and realleges each and every allegation set forth in

6   paragraphs 1 through 162, above, as though fully set forth at length.

7      164. Section 17200 of the California Business and Professions Code

8   prohibits unfair competition, including "any unlawful, unfair or fraudulent business

9   act or practice . . . ."

10      165. By engaging in the foregoing conduct, Counter-defendants have,

11   individually and in combination, engaged in unlawful, unfair and/or fraudulent acts

12   of unfair competition in violation of both the common law of the state of California

13   and *Cal. Bus. & Prof. Code* § 17200 *et seq.* Such conduct included, without

14   limitation, MGA's commercial bribery of Bryant in violation of *Cal. Penal Code*

15   § 641.3 and misappropriation of trade secrets in violation of 18 U.S.C. § 1832(a).

16   Such conduct also included, without limitation, MGA's and Larian's disparagement

17   of Mattel's products and misrepresentations as alleged above.

18      166. As a result of the aforementioned conduct, Mattel has suffered

19   damages and will imminently suffer further damages, including but not limited to

20   lost profits in an amount to be proven at trial. No adequate remedy at law exists for

21   the wrongs and injuries Mattel has suffered and will continue to suffer, and Mattel

22   is entitled to an injunction enjoining Counter-defendants' continued wrongful acts.

23   Mattel is also entitled to recover compensatory and exemplary damages pursuant to

24   the doctrine of common law unfair competition and *Cal. Civ. Code* § 3294.

25

26

27

28

EXHIBIT __I__
PAGE __164__

2154363.2

-74-

### Thirteenth Counterclaim

### Declaratory Relief

### (Against All Counter-defendants)

167. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 166, above, as though fully set forth at length.

168. As shown in the foregoing paragraphs above, an actual controversy exists between Mattel and Counter-defendants regarding Counter-defendants' lack of ownership interests in Bratz and Mattel's rights in the same.

169. Accordingly, Mattel seeks a declaration of the Court that Counter-defendants have no valid or protectable ownership rights or interests in Bratz, and that Mattel is the true owner of the same, and further seeks an accounting and imposition of a constructive trust over Bratz, including without limitation registrations and applications for registrations relating thereto made or filed by Counter-defendants and third parties, and over all revenues and other monies or benefits derived or obtained from MGA's and Bryant's purported ownership, use, sale, distribution and licensing of Bratz.

170. Mattel seeks a declaration of the Court that any and all agreements between Bryant, on the one hand, and MGA, on the other hand, in which Bryant purports to assign to MGA any right, title or interests in any work that he conceived, created or reduced to practice while a Mattel employee, including but not limited to the Bratz designs, is void and of no effect, including without limitation because Bryant had previously assigned said right, title or interest to Mattel and because Mattel was otherwise the owner of said right, title or interest.

### Prayer for Relief

WHEREFORE, Mattel respectfully requests judgment:

1.     For a declaration that Counter-defendants have no valid or protectable ownership interests or rights in Bratz designs and works conceived,

2154363.2

EXHIBIT __I__
PAGE __165__

-75-
SECOND AMENDED ANSWER AND COUNTER

1  created or reduced to practice by Bryant during the term of his Mattel employment

2  and/or by any others then-employed by Mattel, as well as in all derivatives

3  prepared therefrom, and that Mattel is the true owner of the foregoing;

4        2.   For a declaration that any agreement between Bryant, on the one

5  hand, and MGA or any person or entity, on the other hand, in which Bryant

6  purported to assign any right, title or interests in any work that he conceived,

7  created or reduced to practice while a Mattel employee, including but not limited to

8  the Bratz designs, is void and of no effect;

9        3.   For an Order enjoining and restraining Counter-defendants, their

10  agents, servants and employees, and all persons in active concert or participation

11  with them, from further wrongful conduct, including without limitation from

12  imitating, copying, distributing, importing, displaying, preparing derivatives from

13  and otherwise infringing Mattel's copyright-protected works;

14        4.   For an Order, pursuant to 17 U.S.C. § 503(a) and other

15  applicable law, impounding all of Counter-defendants' products and materials that

16  infringe Mattel's copyrights, as well as all plates, molds, matrices and other articles

17  by which copies of the works embodied in Mattel's copyrights may be reproduced

18  or otherwise infringed;

19        5.   For an Order mandating that Counter-defendants return to Mattel

20  all tangible items, documents, designs, diagrams, sketches or any other

21  memorialization of inventions created or reduced to practice during Bryant's

22  employment with Mattel as well as all Mattel property converted by Counter-

23  defendants;

24        6.   For an Order mandating specific performance by Bryant to

25  comply with and satisfy Bryant's contractual obligations to Mattel;

26        7.   That Mattel be awarded, and Counter-defendants be ordered to

27  disgorge, all payments, revenues, profits, monies and royalties and any other

28  benefits derived or obtained as a result of the conduct alleged herein, including

EXHIBIT   T
PAGE   166

-76-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

1    without limitation of all revenues and profits attributable to Counter-defendants'

2    infringement of Mattel's copyrights under 17 U.S.C. § 504;

3         8.    For an accounting of all profits, monies and/or royalties from the

4    exercise of ownership, use, distribution, sales and licensing of Bratz;

5         9.    For the imposition of a constructive trust over Bratz, including

6    without limitation registrations and applications for registrations relating thereto

7    made or filed by Counter-defendants and third parties, and all profits, monies,

8    royalties and any other benefits derived or obtained from Counter-defendant's

9    exercise of ownership, use, sale, distribution and licensing of Bratz;

10        10.   That Mattel recover its actual damages and lost profits;

11        11.   That Counter-defendants be ordered to pay exemplary damages

12   in a sum sufficient to punish and to make an example of them, and deter them and

13   others from similar wrongdoing;

14        12.   That Counter-defendants be ordered to pay treble its general and

15   special damages, plus interest, costs and attorney's fees incurred by reason of

16   Counter-defendants' violations of 18 U.S.C. §§ 1962(c)-(d).

17        13.   That Counter-defendants be ordered to pay double damages due

18   to their willful and malicious misappropriation of Mattel's trade secrets with

19   deliberate intent to injure Mattel's business and improve its own;

20        14.   That Counter-defendants pay to Mattel the full cost of this action

21   and Mattel's attorneys' and investigators' fees; and

22

23

24

25

26

27

28

**EXHIBIT** __I__
**PAGE** __167__

-77-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

1       15.  That Mattel have such other and further relief as the Court may

2  deem just and proper.

3

4  DATED:  July 12, 2007         QUINN EMANUEL URQUHART OLIVER &
                         HEDGES, LLP

5

6                        By

7                          John B. Quinn
                          Attorneys for Defendant and Counter-

8                          claimant Mattel, Inc.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28              **EXHIBIT**   T
                  **PAGE**  168

1363.2

1

## DEMAND FOR JURY TRIAL

2

3        Mattel, Inc. respectfully requests a jury trial on all issues triable

4   thereby.

5

6   DATED: July 12, 2007              QUINN EMANUEL URQUHART OLIVER &
                                      HEDGES, LLP
7

8                                     By _____
                                          John B. Quinn
9                                         Attorneys for Defendant and Counter-
                                          claimant Mattel, Inc.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28           **EXHIBIT     T**
             **PAGE    169**

-79-.

SECOND AMENDED ANSWER AND COUNTERCLAIMS

# EXHIBIT J

1   THOMAS J. NOLAN (Bar No. 66992)
    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
2   300 South Grand Avenue
    Los Angeles, California 90071-3144
3   Telephone: (213) 687-5000
    Facsimile: (213) 687-5600
4   E-mail:     tnolan@skadden.com

5   RAOUL D. KENNEDY (Bar No. 40892)
    TIMOTHY A. MILLER (Bar No. 154744)
6   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
    Four Embarcadero Center, 38th Floor
7   San Francisco, California 94111-5974
    Telephone: (415) 984-6400
8   Facsimile: (415) 984-2698
    E-mail:     rkennedy@skadden.com
9

10  Attorneys for Cross-Defendants
    MGA Entertainment, Inc., MGA Entertainment (HK) Limited,
11  MGAE De Mexico, S.R.L. De C.V., and ISAAC LARIAN

12                  UNITED STATES DISTRICT COURT

13                 CENTRAL DISTRICT OF CALIFORNIA

14                        EASTERN DIVISION

15  CARTER BRYANT, an individual        )  CASE NO. CV 04-9049 SGL (RNBx)
                                        )
16              Plaintiff,              )  Consolidated with Case No. 04-9059
                                        )  and Case No. 05-2727
17       v.                             )
                                        )  STIPULATION REGARDING
18  MATTEL, INC., a Delaware            )  FEBRUARY 15, 2008, ORDER
    corporation                         )  GRANTING IN PART AND
19                                      )  DENYING IN PART MATTEL'S
              Defendant.                )  MOTION TO COMPEL RESPONSES
20                                      )  TO INTERROGATORY NOS. 27-44
                                        )  AND 46-50 BY THE MGA PARTIES
21  Consolidated with MATTEL, INC. v.   )
    BRYANT and MGA                      )
22  ENTERTAINMENT, INC. v.              )  **Phase 1:**
    MATTEL, INC.                        )  Discovery Cut-Off:    January 28, 2008
23                                      )  Pre-Trial Conference: May 5, 2008
                                        )  Trial Date:           May 27, 2008
24

25

26

27

28

─────────────────────────────────────────────────────────
       STIPULATION RE FEBRUARY 15, 2008, ORDER RE INTERROGATORY RESPONSES

                    EXHIBIT   J
                    PAGE   170

1    WHEREAS, on February 15, 2008, the Court issued its Order Granting
2  in Part and Denying in Part Mattel's Motion to Compel Responses to Interrogatory
3  Nos. 27-44 and 46-50 by the MGA Parties (the "February 15, 2008 Order"); and

4    WHEREAS, in the February 15, 2008, Order, the Court ordered MGA
5  Entertainment, Inc. ("MGA"), Isaac Larian, MGA Entertainment (HK) Limited
6  ("MGA HK") and MGAE de Mexico S.R.L. de C.V. (together, the "MGA Parties")
7  to serve supplemental responses to Interrogatory Nos. 38, 40, 41 (as narrowed), 43-
8  44 and 47 on or before February 26, 2008; and

9    WHEREAS, the MGA Parties believe that the obligation to respond to
10  certain of those interrogatories has been stayed pursuant to Judge Larson's February
11  4, 2008 Minute Order, and further believe that the scope of Interrogatory No. 47
12  should be limited; and

13    WHEREAS, on February 25, 2008, counsel for the MGA Parties
14  conferred with counsel for Mattel regarding the issues raised by the MGA Parties
15  with respect to the February 15, 2008, Order; and

16    WHEREAS, Mattel and the MGA Parties have agreed to extend the
17  time for the MGA Parties to comply with the February 15, 2008, Order, to and
18  including March 3, 2008, and to extend the time for bringing a motion directed to
19  that order as set forth below;

20    THEREFORE, the undersigned parties, through their undersigned
21  counsel, stipulate and agree as follows:

22    1.    Any obligation of the MGA Parties to provide supplemental
23  responses to interrogatories under the February 15, 2008, Order is extended to and
24  including March 3, 2008.

25    2.    The time for the MGA Parties to move for reconsideration of that
26  portion of the February 15, 2008, Order compelling further responses to
27  Interrogatory No. 47 is extended to and including March 3, 2008.

28

-1-

**EXHIBIT** _J_
**PAGE** 171

1    3.    The time for the MGA Parties to move for clarification of or

2  relief from that portion of the February 15, 2008, Order that the MGA Parties believe

3  has been stayed by operation of Judge Larson's February 4, 2008, Minute Order is

4  extended to and including Thursday, February 28, 2008.

5

6    IT IS SO STIPULATED.

7

8  DATED: February 26, 2008    SKADDEN, ARPS, SLATE, MEAGHER & FLOM,
9    LLP

10

11    By: _Timothy A. Miller /sw_
    Timothy A. Miller

12

13    Attorney for Counter-Defendants
    MGA ENTERTAINMENT, INC.,
    ISAAC LARIAN, MGA
14    ENTERTAINMENT (HK) LIMITED, and
    MGAE de MEXICO S.R.L. de C.V.

15

16

17

18  DATED: February 26, 2008    QUINN EMANUEL URQUHART OLIVER &
19    HEDGES, LLP

20    By: _Dylan Proctor /sw_
21    Dylan Proctor
    Attorneys for Mattel, Inc.

22

23

24

    Pursuant to stipulation, IT IS SO ORDERED.
25

26  DATED: 2-26-08

27    HON. EDWARD A. INFANTE (Ret.)
    DISCOVERY MASTER

28

-2-
STIPULATION RE FEBRUARY 15, 2008, ORDER RE INTERROGATORY RESPONSES
204391-San Francisco Server 1A - MSW

## PROOF OF SERVICE BY E-MAIL

I, Sandra Chan, not a party to the within action, hereby declare that on February 26, 2008, I
served the attached STIPULATION REGARDING FEBRUARY 15, 2008 ORDER GRANTING IN
PART AND DENYING IN PART MATTEL'S MOTION TO COMPEL RESPONSES TO
INTERROGATORY NOS. 27-44 AND 46-50 BY THE MGA PARTIES in the within action by email
addressed as follows:

| | | |
|---|---|---|
| John W. Keker, Esq. | Keker & Van Nest | jkeker@kvn.com |
| Michael H. Page, Esq. | Keker & Van Nest | mhp@kvn.com |
| Christa Anderson, Esq. | Keker & Van Nest | cma@kvn.com |
| Matthew M. Werdegar, Esq. | Keker & Van Nest | mwerdegar@kvn.com |
| John E. Trinidad, Esq. | Keker & Van Nest | jtrinidad@kvn.com |
| Audrey Walton-Hadlock, Esq. | Keker & Van Nest | awalton-hadlock@kvn.com |
| John Quinn Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | johnquinn@quinnemanuel.com |
| Michael Zeller Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | michaelzeller@quinnemanuel.com |
| Jon Corey Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | joncorey@quinnemanuel.com |
| Duane Lyons Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | duanelyons@quinnemanuel.com |
| Timothy Alger Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | timalger@quinnemanuel.com |
| Dominic Surprenant Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | DominicSurprenant@QuinnEmanuel.com |
| B. Dylan Proctor Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | dylanproctor@quinnemanuel.com |
| Shane McKenzie Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | shanemckenzie@quinnemanuel.com |
| Bridget Hauler Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | bridgethauler@quinnemanuel.com |
| Tamar Buchakjian Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | tamarbuchakjian@quinnemanuel.com |
| Juan Pablo Alban, Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | juanpabloalban@quinnemanuel.com |
| John Gordon | Quinn, Emanuel, Urquhart, Oliver & Hedges | johngordon@quinnemanuel.com |
| Thomas J. Nolan, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | tnolan@skadden.com |
| Raoul D. Kennedy, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | rkennedy@skadden.com |
| Amy S. Park, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | apark@skadden.com |
| Harriet S. Posner, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | hposner@skadden.com |
| Carl Alan Roth, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | croth@skadden.com |
| Timothy A. Miller, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | tmiller@skadden.com |
| Marcus R. Mumford, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | Mmumford@skadden.com |
| Paul M. Eckles, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | Paul.eckles@skadden.com |
| Lance A. Etcheverry, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | Lance.etcheverry@skadden.com |
| Robert J. Herrington, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | Robert.herrington@skadden.com |

I declare under penalty of perjury under the laws of the Untied States of America that the above
is true and correct.

Executed on February 26, 2008, at San Francisco, California.

Sandra Chan

**EXHIBIT  J**
**PAGE  173**

# EXHIBIT K

1   THOMAS J. NOLAN (Bar No. 66992)
    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
2   300 South Grand Avenue
    Los Angeles, California  90071-3144
3   Telephone:  (213) 687-5000
    Facsimile:  (213) 687-5600
4   E-mail:     tnolan@skadden.com

5   RAOUL D. KENNEDY (Bar No. 40892)
    TIMOTHY A. MILLER (Bar No. 154744)
6   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
    Four Embarcadero Center, 38th Floor
7   San Francisco, California  94111-5974
    Telephone:  (415) 984-6400
8   Facsimile:  (415) 984-2698
    E-mail:     rkennedy@skadden.com
9

10  Attorneys for Cross-Defendants
    MGA Entertainment, Inc., MGA Entertainment (HK) Limited,
11  MGAE De Mexico, S.R.L. De C.V., and ISAAC LARIAN

12              UNITED STATES DISTRICT COURT

13              CENTRAL DISTRICT OF CALIFORNIA

14                    EASTERN DIVISION

| | |
|---|---|
| 15  CARTER BRYANT, an individual | ) CASE NO. CV 04-9049 SGL (RNBx) |
| 16            Plaintiff, | ) Consolidated with Case No. 04-9059 |
| 17       v. | ) and Case No. 05-2727 |
| 18  MATTEL, INC., a Delaware | ) SECOND STIPULATION |
|     corporation | ) REGARDING FEBRUARY 15, 2008, |
| 19 | ) ORDER GRANTING IN PART AND |
|             Defendant. | ) DENYING IN PART MATTEL'S |
| 20 | ) MOTION TO COMPEL RESPONSES |
|     | ) TO INTERROGATORY NOS. 27-44 |
| 21  Consolidated with MATTEL, INC. v. | ) AND 46-50 BY THE MGA PARTIES; |
|     BRYANT and MGA | ) [PROPOSED] ORDER |
| 22  ENTERTAINMENT, INC. v. | ) |
|     MATTEL, INC. | ) |
| 23 | ) **Phase 1:** |
|     | ) Discovery Cut-Off:    January 28, 2008 |
| 24 | ) Pre-Trial Conference: May 5, 2008 |
|     | ) Trial Date:           May 27, 2008 |

25

26

27

28

SECOND STIP. RE FEB. 15, 2008, ORDER RE INTERROGATORY RESPONSES; [PROP] ORDER

EXHIBIT __K__
PAGE __174__

1  WHEREAS, on February 15, 2008, the Court issued its Order Granting
2 in Part and Denying in Part Mattel's Motion to Compel Responses to Interrogatory
3 Nos. 27-44 and 46-50 by the MGA Parties (the "February 15, 2008 Order"); and

4  WHEREAS, on February 26, 2008, the MGA Parties[1] and Mattel
5 entered into a stipulation extending the time for the MGA Parties to comply with the
6 February 15, 2008, Order, to and including March 3, 2008, and to extend the time for
7 bringing a motion directed to that order as set forth in that stipulation, including an
8 extension of time to Thursday, February 28, 2008, for the MGA Parties to move for
9 clarification of or relief from that portion of the February 15, 2008, Order that the
10 MGA Parties believe has been stayed by operation of Judge Larson's February 4,
11 2008, Minute Order; and

12  WHEREAS, on February 26, 2008, the Court approved the stipulation
13 between Mattel and the MGA Parties; and

14  WHEREAS, counsel for the MGA Parties and counsel for Mattel
15 continue to confer regarding issues related to the February 15, 2008, Order; and

16  WHEREAS, Mattel and the MGA Parties have agreed to a further
17 extension of the time for the MGA Parties to move for clarification of or relief from
18 that portion of the February 15, 2008, Order that the MGA Parties believe has been
19 stayed by operation of Judge Larson's February 4, 2008, Minute Order;

20  THEREFORE, the undersigned parties, through their undersigned
21 counsel, stipulate and agree as follows:

22  1. The time for the MGA Parties to move for clarification of or
23 relief from that portion of the February 15, 2008, Order that the MGA Parties believe
24 has been stayed by operation of Judge Larson's February 4, 2008, Minute Order is
25 extended to and including Monday, March 3, 2008.

26

27 [1] The term "MGA Parties" refers to MGA Entertainment, Inc. ("MGA"), Isaac
28 Larian, MGA Entertainment (HK) Limited ("MGA HK") and MGAE de
  Mexico S.R.L. de C.V.

-1-

SECOND STIP. RE FEB. 15, 2008, ORDER RE INTERROGATORY RESPONSES; [PROP] ORDER

**EXHIBIT** K

**PAGE** 175

1      2.      All other terms of the February 26, 2008, stipulation between

2 Mattel and the MGA Parties, as approved by the Court on February 26, 2008, shall

3 remain in full force and effect.

4

5              IT IS SO STIPULATED.

6

7 DATED: February 27, 2008      SKADDEN, ARPS, SLATE, MEAGHER & FLOM,
                                LLP
8

9
                                By:
10                                   Timothy A. Miller

11                                   Attorney for Counter-Defendants
12                                   MGA ENTERTAINMENT, INC.,
                                     ISAAC LARIAN, MGA
13                                   ENTERTAINMENT (HK) LIMITED, and
                                     MGAE de MEXICO S.R.L. de C.V.
14

15

16

17 DATED: February 27 2008      QUINN EMANUEL URQUHART OLIVER &
                                HEDGES, LLP
18

19                              By:
20                                   Dylan Proctor
                                     Attorneys for Mattel, Inc.
21

22

23         Pursuant to stipulation, IT IS SO ORDERED.
24

25 DATED:
26                                   HON. EDWARD A. INFANTE (Ret.)
                                     DISCOVERY MASTER
27

28

                                -2-
SECOND STIP. RE FEB. 15, 2008, ORDER RE INTERROGATORY RESPONSES; [PROP] ORDER
204391-San Francisco Server 1A - MSW

EXHIBIT __K__
PAGE __176__

# EXHIBIT L



1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
     John B. Quinn (Bar No. 090378)
2    johnquinn@quinnemanuel.com
     Michael T. Zeller (Bar No. 196417)
3    (michaelzeller@quinnemanuel.com)
     Jon D. Corey (Bar No. 185066)
4    (joncorey@quinnemanuel.com)
     Timothy L. Alger (Bar No. 160303)
5    (timalger@quinnemanuel.com)
   865 South Figueroa Street, 10th Floor
6  Los Angeles, California 90017-2543
   Telephone:  (213) 443-3000
7  Facsimile:  (213) 443-3100

8  Attorneys for Plaintiff Mattel, Inc.

9              UNITED STATES DISTRICT COURT

10             CENTRAL DISTRICT OF CALIFORNIA

11                  EASTERN DIVISION

| | |
|---|---|
| 12  CARTER BRYANT, an individual, | CASE NO. CV 04-09049 SGL (RNBx) |
| 13         Plaintiff, | Consolidated with Case Nos. CV 04-9059 and CV 05-2727 |
| 14      vs. | |
| 15  MATTEL, INC., a Delaware corporation, | MATTEL, INC.'S AMENDED FOURTH SET OF INTERROGATORIES |
| 16         Defendant. | [Amended Only to Delete Former Interrogatory No. 45] |
| 17 | |
| 18  AND CONSOLIDATED ACTIONS | Discovery Cut-off: January 14, 2008 Pre-trial Conference: April 7, 2008 Trial Date:  April 29, 2008 |
| 19 | |
| 20 | Discovery Cutoff:  March 3, 2008 Final Pretrial Conf.:  June 2, 2008 Trial Date:  July 1, 2008 |
| 21 | |
| 22 | |

23  PROPOUNDING PARTY:      Mattel, Inc.

24  RESPONDING PARTIES:     MGA Entertainment, Inc., Isaac Larian, Carter

25                          Bryant, MGA Entertainment (HK) Limited, MGAE

26                          de Mexico S.R.L. de C.V., and Carlos Gustavo

27                          Machado Gomez

28  SET NO.:                FOUR

07209/2254170.1

                                    MATTEL'S FOURTH SET OF INTERROGATORIES

EXHIBIT  L
PAGE  177

1        Pursuant to <u>Federal Rule of Civil Procedure</u> 33, plaintiff Mattel, Inc.

2  ("Mattel") hereby requests that MGA Entertainment, Inc., Isaac Larian, Carter

3  Bryant, MGA Entertainment (HK) Limited, MGAE de Mexico S.R.L. de C.V., and

4  Carlos Gustavo Machado Gomez (collectively, "the Responding Parties")

5  individually answer the following Interrogatories separately and fully, in writing and

6  under oath, within 30 days after service hereof.  The Responding Parties shall be

7  obligated to supplement their responses to the Interrogatories at such times and to

8  the extent required by the <u>Federal Rules of Civil Procedure</u>.

9

10                  **Definitions**

11       1.    "YOU" and "YOUR" mean each of the Responding Parties.

12       2.    "BRYANT" means Carter Bryant individually.

13       3.    "LARIAN" means Isaac Larian individually.

14       4.    "MGA" means MGA Entertainment, Inc., any of its current or

15  former employees, officers, directors, agents, representatives, attorneys, experts,

16  divisions, AFFILIATES, predecessors-in-interest and successors-in-interest, and any

17  other PERSON acting on its behalf, pursuant to its authority or subject to its control.

18  Without limiting the foregoing, "MGA" includes the entities known as ABC

19  International Traders or ABC International Traders, Inc.  For purposes of the these

20  Interrogatories, "MGA" does not include BRYANT.

21       5.    "MATTEL" means Mattel, Inc., its current employees, officers,

22  directors, agents, representatives, attorneys, parents, subsidiaries, divisions,

23  AFFILIATES, predecessors-in-interest and successors-in-interest, and any other

24  PERSON acting on its behalf, pursuant to its authority or subject to its control.

25       6.    "AFFILIATES" means any and all corporations, proprietorships,

26  d/b/a's, partnerships, joint ventures and business entities of any kind that, directly or

27  indirectly, in whole or in part, own or control, are under common ownership or

28  control with, or are owned or controlled by a PERSON, party or entity, including

07209/2254170.1

-2-

MATTEL'S FOURTH SET OF INTERROGATORIES

EXHIBIT _L_
PAGE _178_

1   without limitation each parent, subsidiary and joint venture of such PERSON, party
2   or entity.

3          7.    "PERSON" or "PERSONS" means all natural persons,
4   partnerships, corporations, joint ventures and any kind of business, legal or public
5   entity or organization, as well as its, his or her agents, representatives, employees,
6   officers and directors and any one else acting on its, his or her behalf, pursuant to
7   its, his or her authority or subject to its, his or her control.

8          8.    "DESIGN" or "DESIGNS" means any and all representations,
9   whether two-dimensional or three-dimensional, and whether in tangible, digital,
10  electronic or other form, including but not limited to all works, designs, artwork,
11  sketches, drawings, illustrations, representations, depictions, blueprints, schematics,
12  diagrams, images, sculptures, prototypes, models, samples, rotocasts, reductions to
13  practice, developments, inventions and/or improvements, as well as all other items,
14  things and DOCUMENTS in which any of the foregoing are or have been
15  expressed, embodied, contained, fixed or reflected in any manner, whether in whole
16  or in part.

17         9.    "BRATZ" means any project, product, doll or DESIGN ever
18  known by that name (whether in whole or in part and regardless of what such
19  project, product or doll is or has been also, previously or subsequently called) and
20  any product, doll or DESIGN or any portion thereof that is now or has ever been
21  known as, or sold or marketed under, the name or term "Bratz" (whether in whole or
22  in part and regardless of what such product, doll or DESIGN or portion thereof is or
23  has been also, previously or subsequently called) or that is now or has ever been
24  sold or marketed as part of the "Bratz" line, and each version or iteration of such
25  product, doll or DESIGN or any portion thereof. As used herein, "product, doll or
26  DESIGN or any portion thereof" also includes without limitation any names,
27  fashions, accessories, artwork, packaging or any other works, materials, matters or
28  items included or associated therewith. Without limiting the generality of the

-3-

EXHIBIT   L
PAGE   179

1   foregoing, and contrary to MGA's recent assertions in connection with other Mattel
2   discovery requests, the term "BRATZ" does not and shall not require that there be a
3   doll existing at the time of the event, incident or occurrence that is the subject of, or
4   otherwise relevant or responsive to, the Interrogatories.

5          10.    "SOLD," "SELL" or "SALE" means to distribute, market,
6   license, sell, offer to sell, or convey or transfer in any way for compensation.

7          11.    "BRATZ DOLL" means any doll that is or has ever been SOLD
8   that REFERS OR RELATES TO BRATZ.

9          12.    "BRATZ PRODUCT" means any product, whether two-
10   dimensional or three-dimensional, and whether in tangible, digital, electronic or
11   other form, that is or has ever been SOLD that, in whole or in part, REFERS OR
12   RELATES TO BRATZ, including but not limited to any BRATZ DOLL, BRATZ
13   MOVIE, or BRATZ TELEVISION SHOW, and including but not limited to any
14   product that is or has ever been SOLD in any packaging that includes the name
15   "Bratz" or REFERS OR RELATES TO BRATZ.

16          13.    "BRATZ MOVIE" means any motion picture or film that is or
17   has ever been SOLD that REFERS OR RELATES TO BRATZ.

18          14.    "BRATZ TELEVISION SHOW" means any production
19   exhibited on television that is or has ever been SOLD that REFERS OR RELATES
20   TO BRATZ.

21          15.    "BASED ON" means substantially similar to, a copy of or a
22   derivative of.

23          16.    "DOCUMENT" or "DOCUMENTS" means all "writings" and
24   "recordings" as those terms are defined in Rule 34 of the Federal Rules of Civil
25   Procedure and Rule 1001 of the Federal Rules of Evidence, including, but not
26   limited to, all writings and records of every type and description including, but not
27   limited to, contracts, agreements, correspondence, memoranda, letters, facsimiles,
28   electronic mail ("e-mail"), records of telephone conversations, handwritten and

EXHIBIT   L
PAGE   180

1  typewritten notes of any kind, statements, reports, minutes, recordings, transcripts
2  and summaries of meetings, voice recordings, pictures, photographs, drawings,
3  computer cards, tapes, discs, printouts and records of all types, studies, instruction
4  manuals, policy manuals and statements, books, pamphlets, invoices, canceled
5  checks and every other device or medium by which or through which information of
6  any type is transmitted, recorded or preserved.  Without any limitation on the
7  foregoing, the term "DOCUMENT" shall include all copies that differ in any respect
8  from the original or other versions of the DOCUMENT, including, but not limited
9  to, all drafts and all copies of such drafts or originals containing initials, comments,
10 notations, insertions, corrections, marginal notes, amendments or any other variation
11 of any kind.

12         17.    "REFER OR RELATE TO" a given subject matter means relate
13 to, refer to, constitute, contain, embody, depict, incorporate, reflect, evidence,
14 identify, state, deal with, comment on, respond to, describe, analyze, support, refute,
15 contradict, or in any way pertain to that subject matter, either directly or indirectly.

16         18.    "IDENTIFY" or "IDENTITY" means the following:

17             (a)    with reference to an individual or individuals, means to
18 state, fully and separately as to each, such individual's full name, any known
19 business title, current or last known business affiliation, current or last known
20 residential address, current or last known business address, current or last known
21 relationship to MGA, and current or last known telephone number.

22             (b)    with reference to an entity or entities, means to state, fully
23 and separately as to each, such entity's full name, state (or country) of incorporation
24 or organization, present or last known address, and present or last known telephone
25 number.

26             (c)    with reference to a BRATZ PRODUCT, means to state,
27 fully and separately as to each, the full name of the product; the number of the
28 product; the SKU of the product; any other applicable designation of the product

07209/2254170.1

-5-

EXHIBIT  L
PAGE  181

1 useful for identification; the period of time during which the product was, has been
2 or will be SOLD; and the IDENTITY of each PERSON who has licensed from
3 YOU the right to SELL such BRATZ PRODUCT.

4            (d)    with reference to any other DOCUMENT or
5 DOCUMENTS, means to describe each DOCUMENT by Bates number. In the
6 event that a DOCUMENT does not have a Bates number, IDENTIFY means, with
7 respect to each such DOCUMENT, to provide a complete description of it such that
8 it may be the subject of a request for the production of documents, including by
9 stating the date, identity of the author, addressee(s), signatories, parties, or other
10 PERSONS identified therein, its present location or custodian and a description of
11 its contents.

12            19.    "Any" as used in these interrogatories includes the word "all,"
13 and the word "all" as used in these interrogatories includes the word "any."

14            20.    The singular form of a noun or pronoun includes within its
15 meaning the plural form of the noun or pronoun so used, and vice versa; the use of
16 the masculine form of a pronoun also includes within its meaning the feminine form
17 of the pronoun so used, and vice versa; the use of any tense of any verb includes
18 also within its meaning all other tenses of the verb so used, whenever such
19 construction results in a broader request for information; and "and" includes "or"
20 and vice versa, whenever such construction results in a broader disclosure of
21 documents or information.

22

23                              **Instructions**

24            A.    When an interrogatory requests that YOU provide information,
25 YOU are required to supply all information known by or available to YOU or
26 YOUR employees, officers, directors, agents, representatives, attorneys and experts.
27 If YOU cannot completely answer the interrogatory after making diligent efforts to
28 do so, please so state. Then describe in detail all efforts made to answer the

07209/2254170.1

-6-

MATTEL'S FOURTH SET OF INTERROGATORIES

EXHIBIT  L
PAGE  182

1 | interrogatory; identify every PERSON involved in such efforts; and state the
2 | additional information YOU need, if any, to respond completely to the interrogatory.

3

4 | **Interrogatories**

5

6 | INTERROGATORY NO. 42:

7 | State all facts that support YOUR contention, if YOU so contend, that
8 | any BRATZ DOLLS are not BASED ON BRATZ DESIGNS created by BRYANT
9 | on or before October 19, 2000, and IDENTIFY all PERSONS with knowledge of
10 | such facts and all DOCUMENTS that REFER OR RELATE TO such facts.

11

12 | INTERROGATORY NO. 43:

13 | For each concept, design, product, product packaging or other matter
14 | that YOU contend MATTEL copied or infringed, including but not limited to those
15 | identified in MGA's Responses To Mattel, Inc.'s First Set Of Interrogatories Re
16 | Claims Of Unfair Competition, Response To Interrogatory No. 2 (and any
17 | Supplemental Responses to such Interrogatory), state the date that each such
18 | concept, design, product, product packaging or other matter was conceived, and
19 | IDENTIFY all PERSONS with knowledge of, and all DOCUMENTS that REFER
20 | OR RELATE TO, the foregoing.

21

22 | INTERROGATORY NO. 44:

23 | For each concept, design, product, product packaging or other matter
24 | that YOU contend MATTEL copied or infringed, including but not limited to those
25 | identified in MGA's Responses To Mattel, Inc.'s First Set Of Interrogatories Re
26 | Claims Of Unfair Competition, Response To Interrogatory No. 2 (and any
27 | Supplemental Responses to such Interrogatory), state the date that each such
28 | concept, design, product, product packaging or other matter was first fixed in any

EXHIBIT __L__
PAGE __183__

1  tangible medium of expression (if ever), and IDENTIFY all PERSONS with

2  knowledge of, and all DOCUMENTS that REFER OR RELATE TO, the foregoing.

3

4

5  DATED:  October 23, 2007          QUINN EMANUEL URQUHART OLIVER &
                                     HEDGES, LLP

6

7                                    By B. Dylan Proctor

8                                    B. Dylan Proctor
                                     Attorneys for Plaintiff
9                                    Mattel, Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

07209/2254170.1

-8-

MATTEL'S FOURTH SET OF INTERROGATORIES

EXHIBIT __L__
PAGE _184_

1  **PROOF OF SERVICE**

2    I am employed in the County of Los Angeles, State of California. I am over the age of
   eighteen years and not a party to the within action; my business address is Now Legal Service,
3  1301 W. 2nd Street, Suite 206, Los Angeles, CA 90026.

4    On October 23, 2007, I served true copies of the following document(s) described as

5  1.   **MATTEL, INC.'S AMENDED FOURTH SET OF INTERROGATORIES
        [Amended Only to Delete Former Interrogatory No. 45]**
6
     on the parties in this action as follows:
7
     Thomas Nolan, Esq.                          Mark E. Overland, Esq.
8    **SKADDEN ARPS SLATE MEAGHER**             David C. Scheper, Esq.
     **& FLOM, LLP**                             Alexander H. Cote
9    300 South Grand Avenue, Suite 3400          **OVERLAND BORENSTEIN**
     Los Angeles, CA 90071                       **SCHEPER & KIM LLP**
10                                               300 South Grand Avenue, Suite 2750
                                                 Los Angeles, CA 90071-3144
11

12

13
     **BY PERSONAL SERVICE:**  I delivered such envelope(s) by hand to the office of the person(s)
14   being served.

15     I declare that I am employed in the office of a member of the bar of this Court at whose
     direction the service was made.
16
       Executed on October 23, 2007, at Los Angeles, California.
17

18

19                                    NOW LEGAL -- Dave Quintana

20

21

22

23

24

25

26

27

28

07209/2263102.1                              -1-

EXHIBIT   L
PAGE  185

1    **PROOF OF SERVICE**

2        I am employed in the County of Los Angeles, State of California.  I am over the age of
     eighteen years and not a party to the within action; my business address is 865 South Figueroa
3    Street, 10th Floor, Los Angeles, California 90017-2543.

4        On October 23, 2007, I served true copies of the following document(s) described as

5    **1.    MATTEL, INC.'S AMENDED FOURTH SET OF INTERROGATORIES**
        **[Amended Only to Delete Former Interrogatory No. 45]**
6
        on the parties in this action as follows:
7
        John W. Keker, Esq.
8        Michael H. Page, Esq.
        Christina M. Anderson, Esq.
9        **KEKER & VAN NEST, LLP**
        710 Sansome Street
10       San Francisco, CA 94111

11   **BY FEDEX:** I deposited such document(s) in a box or other facility regularly maintained by
     FedEx, or delivered such document(s) to a courier or driver authorized by FedEx to receive
12   documents, in sealed envelope(s) or package(s) designated by FedEx with delivery fees paid or
     provided for, addressed to the person(s) being served.
13
        I declare that I am employed in the office of a member of the bar of this Court at whose
14   direction the service was made.

15       Executed on October 23, 2007, at Los Angeles, California.

16

17                                              Charlene Ho

18

19

20

21

22

23

24

25

26

27

28

07209/2241940.1                        -1-

**EXHIBIT** _L_
**PAGE** _186_