1    95.   Answering paragraph 95 of the Complaint, Mattel admits that
2  Hokey Pokey Elmo won the Toy of the Year Award and denies the truth of the
3  remaining allegations set forth therein.

4    96.   Answering paragraph 96 of the Complaint, Mattel states that it is
5  without knowledge or information sufficient to form a belief as to the truth or falsity
6  of the allegations set forth therein and, on that basis, denies them.

7    97.   Answering paragraph 97 of the Complaint, Mattel denies the
8  truth of the allegations set forth therein.

9    98.   Answering paragraph 98 of the Complaint, Mattel denies the
10  truth of the allegations set forth therein.

11    99.   Answering paragraph 99 of the Complaint, Mattel denies the
12  truth of the allegations set forth therein.

13    100.   Answering paragraph 100 of the Complaint, Mattel denies the
14  truth of the allegations set forth therein.

15    101.   Answering paragraph 101 of the Complaint, Mattel repeats its
16  responses contained in paragraphs 1 through 100 of this Second Amended Answer
17  and incorporates them by reference as though fully and completely set forth herein.

18    102.   Answering paragraph 102 of the Complaint, Mattel denies the
19  truth of the allegations set forth therein and specifically denies that MGA's alleged
20  trade dress is distinctive.

21    103.   Answering paragraph 103 of the Complaint, Mattel denies the
22  truth of the allegations set forth therein and specifically denies that MGA's alleged
23  trade dress is distinctive.

24    104.   Answering paragraph 104 of the Complaint, Mattel denies the
25  truth of the allegations set forth therein.

26    105.   Answering paragraph 105 of the Complaint, Mattel denies the
27  truth of the allegations set forth therein.

28

EXHIBIT _____ _10_

PAGE _____ _128_

-23-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

2154363.2

1    106.   Answering paragraph 106 of the Complaint, Mattel denies the
2  truth of the allegations set forth therein.

3    107.   Answering paragraph 107 of the Complaint, Mattel denies the
4  truth of the allegations set forth therein.

5    108.   Answering paragraph 108 of the Complaint, Mattel denies the
6  truth of the allegations set forth therein and specifically denies that plaintiff is
7  entitled to injunctive relief.

8    109.   Answering paragraph 109 of the Complaint, Mattel repeats its
9  responses contained in paragraphs 1 through 108 of this Second Amended Answer
10  and incorporates them by reference as though fully and completely set forth herein.

11    110.   Answering paragraph 110 of the Complaint, Mattel denies the
12  truth of the allegations set forth therein.

13    111.   Answering paragraph 111 of the Complaint, Mattel denies the
14  truth of the allegations set forth therein.

15    112.   Answering paragraph 112 of the Complaint, Mattel denies the
16  truth of the allegations set forth therein.

17    113.   Answering paragraph 113 of the Complaint, Mattel denies the
18  truth of the allegations set forth therein.

19    114.   Answering paragraph 114 of the Complaint, Mattel denies the
20  truth of the allegations set forth therein.

21    115.   Answering paragraph 115 of the Complaint, Mattel denies the
22  truth of the allegations set forth therein.

23    116.   Answering paragraph 116 of the Complaint, Mattel denies the
24  truth of the allegations set forth therein.

25    117.   Answering paragraph 117 of the Complaint, Mattel denies the
26  truth of the allegations set forth therein and specifically denies that plaintiff is
27  entitled to injunctive relief.

28

EXHIBIT _____ _10_

PAGE _____ _129_

1    118. Answering paragraph 118 of the Complaint, Mattel denies the
2  truth of the allegations set forth therein.

3    119. Answering paragraph 119 of the Complaint, Mattel repeats its
4  responses contained in paragraphs 1 through 118 of this Second Amended Answer
5  and incorporates them by reference as though fully and completely set forth herein.

6    120. Answering paragraph 120 of the Complaint, Mattel denies the
7  truth of the allegations set forth therein.

8    121. Answering paragraph 121 of the Complaint, Mattel denies the
9  truth of the allegations set forth therein.

10    122. Answering paragraph 122 of the Complaint, Mattel denies the
11  truth of the allegations set forth therein.

12    123. Answering paragraph 123 of the Complaint, Mattel denies the
13  truth of the allegations set forth therein and specifically denies that plaintiff is
14  entitled to injunctive relief.

15    124. Answering paragraph 124 of the Complaint, Mattel repeats its
16  responses contained in paragraphs 1 through 123 of this Second Amended Answer
17  and incorporates them by reference as though fully and completely set forth herein.

18    125. Answering paragraph 125 of the Complaint, Mattel denies the
19  truth of the allegations set forth therein.

20

21                          General Denial

22    Unless specifically admitted herein, Mattel denies the truth of each and
23  every allegation set forth in plaintiff's Complaint and specifically denies that
24  plaintiff is entitled to any relief against Mattel.

25

26

27                          EXHIBIT _____ /0 _____

28                          PAGE _____ /30

21543363.2                -25-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

Affirmative Defenses

By alleging the Affirmative Defenses set forth below, Mattel does not agree or concede that it bears the burden of proof or the burden of persuasion on any of these issues, whether in whole or in part.

First Affirmative Defense

Plaintiff's Complaint fails to state a claim upon which relief can be granted.

Second Affirmative Defense

Plaintiff has no valid, enforceable or protectible rights or interest in the alleged trade dress or other matters asserted, including without limitation in that plaintiff has failed to establish that its alleged trade dress is distinctive as to plaintiff.

Third Affirmative Defense

Plaintiff's claims, including without limitation plaintiff's claims based upon alleged extra-territorial acts, are barred in whole or in part by lack of subject matter jurisdiction.

Fourth Affirmative Defense

Plaintiff's claims are barred in whole or in part by plaintiff's unclean hands.

Fifth Affirmative Defense

Plaintiff's claims are barred in whole or in part by virtue of Mattel's prior-creation of the elements and other matters asserted in the Complaint.

EXHIBIT _____ *10*

PAGE _____ *131*

SECOND AMENDED ANSWER AND COUNTERCLAIMS

2154363.2

1
2
3
4
5
6
7
8
9
10
11
12
13
·14
·15
16
17
18
19
20
21
22
23
24
25
26
27
28

### Sixth Affirmative Defense

Plaintiff's claims are barred in whole or in part by its lack of standing.

### Seventh Affirmative Defense

Plaintiff's claims are barred in whole or in part by the applicable statutes of limitation and the doctrine of laches.

### Eighth Affirmative Defense

Plaintiff's claims are barred in whole or in part by the doctrines of waiver, estoppel and acquiescence.

### Ninth Affirmative Defense

Plaintiff's claims are barred in whole or in part by Mattel's constitutional rights of free speech, petitioning and association, including without limitation by the litigation privilege as protected by and/or codified in *inter alia* Section 47(b) of the California Civil Code, the *Noerr-Pennington* doctrine, the common interest privilege and by other privileges.

### Tenth Affirmative Defense

Plaintiff's claims are barred in whole or in part by Mattel's federal and state constitutional rights of free speech, including without limitation under the First Amendment of the United States Constitution.

### Eleventh Affirmative Defense

Plaintiff's claims are barred in whole or in part by the competitor privilege.

EXHIBIT _____ _/0_

PAGE _____ _/32_

SECOND AMENDED ANSWER AND COUNTERCLAIMS

2154363.2

## Twelfth Affirmative Defense

Plaintiff's claims are in whole or in part preempted by the Copyright Act and barred by the *Sears-Compco* doctrine.

## Thirteenth Affirmative Defense

Plaintiff's requested relief, including plaintiff's requests for punitive and/or enhanced damages, are barred in whole or in part because all of Mattel's actions were in good faith.

## Fourteenth Affirmative Defense

Plaintiff's damages, if any, were not caused by Mattel and are not attributable to the acts or omissions of Mattel.

## Fifteenth Affirmative Defense

Plaintiff has failed to mitigate its damages, if any.

## Additional Defenses

Mattel has insufficient knowledge or information upon which to form a belief as to whether additional defenses are available. Mattel reserves the right to amend this Second Amended Answer to add, delete, or modify additional defenses based on legal theories which may or will be divulged through clarification of the Complaint, through discovery, through change or clarification of the governing law or through further legal analysis of plaintiff's positions in this litigation.

## Prayer for Relief

WHEREFORE, Mattel prays for relief as follows:

EXHIBIT _/0_

PAGE _/33_

SECOND AMENDED ANSWER AND COUNTERCLAIMS

1        1.    That the Complaint be dismissed with prejudice;

2        2.    That plaintiff take nothing by reason of the Complaint against

3  Mattel and that judgment be entered in Mattel's favor;

4        3.    That Mattel recover its costs and attorneys' fees; and

5        4.    That this Court award such other and further relief as it deems

6  just and proper.

7

8                     **COUNTERCLAIMS**

9        Pursuant to the Court's Orders of January 12, 2007 and June 27, 2007,

10  and incorporating its [Proposed] Amended Complaint dated November 19, 2006,

11  Mattel, Inc. alleges as follows:

12                    **Preliminary Statement**

13        1.    For years MGA Entertainment, Inc. has engaged in a pattern of

14  stealing and using Mattel, Inc.'s property and trade secrets. MGA's use of the

15  stolen property and trade secrets caused and continues to cause significant harm to

16  Mattel. MGA first stole "Bratz," a fashion doll, from Mattel, and then continued

17  stealing Mattel's confidential and proprietary information to fuel MGA's growth.

18        2.    Carter Bryant conceived, created and developed Bratz designs

19  while he was employed by Mattel as a doll designer. He concealed his Bratz work

20  from Mattel and wrongfully sold Bratz to MGA while he was a Mattel employee.

21  As MGA knows, Mattel owns the Bratz designs that Bryant made. As the rightful

22  owner of those Bratz designs, Mattel has registered copyrights for them and seeks

23  damages arising from MGA's repeated infringement of those copyrights.

24        3.    Emboldened by the success of its illegal conduct, MGA has

25  repeated—and even expanded—its pattern of theft on numerous occasions. For

26  example, in or about 2004, MGA decided to expand into Mexico. To do so, and

27  operating from its Southern California offices, MGA hired away three key Mattel

28  employees in Mexico, who, on their way out, stole virtually every category of

EXHIBIT _____ /0

PAGE _____ /34

-29-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

1    Mattel's sensitive and trade secret business plans and information for the Mexican

2    market, as well as a significant quantity of sensitive and trade secret information

3    for Mattel's U.S. and worldwide businesses, and took them to MGA.  Armed with

4    Mattel's confidential business plans and methods, MGA claimed to have increased

5    its market share in Mexico alone by 90% in a single year.

6        4.    In 2005, MGA needed help in Canada.  So MGA, again

7    operating from its Southern California headquarters, hired Janine Brisbois from

8    Mattel.  At that time, Ms. Brisbois was responsible for Mattel's account with Toys

9    'R Us ("TRU") and Wal-Mart.  MGA gave her responsibility for those same

10   accounts, and she took from Mattel documents containing proprietary advertising,

11   project, sales, customer and strategy information for not only Canada, but for the

12   United States.  Eliminating any doubt that MGA then proceeded to use those stolen

13   materials, Brisbois subsequently accessed and modified certain of those Mattel

14   documents while employed by MGA.

15       5.    These are not the only instances of such misconduct, which

16   MGA orchestrated and carried out from its headquarters in this District.  Counter-

17   defendants have engaged in an ongoing, widespread pattern of illegal acts,

18   consisting of inducing Mattel employees to steal Mattel's confidential information

19   or other property and take it with them to MGA to further MGA's business interests

20   and to harm Mattel.

21                          **Jurisdiction**

22       6.    This Court has federal question jurisdiction over this action

23   pursuant to 28 U.S.C. §§ 1331, 17 U.S.C. §§ 101 *et seq.*, and 18 U.S.C. § 1964(c).

24   This Court has supplemental jurisdiction over Mattel's state law claims pursuant to

25   28 U.S.C. § 1367.

26                            **Venue**

27       7.    Venue is proper in this District pursuant to 28 U.S.C.

28   §§ 1391(b)-(d), 1391(f) and 1400(a) and 18 U.S.C. § 1965.

2154363.2

**EXHIBIT** _____ *10*

**PAGE** _____ *135*

-30-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

**Parties**

8.    Mattel is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in El Segundo, California.

9.    Counter-defendant MGA Entertainment, Inc. ("MGA") is a corporation organized and existing under the laws of the State of California, with its principal place of business in Van Nuys, California. Mattel is informed and believes, and on that basis alleges, that ABC International Traders, Inc. is a predecessor corporation to MGA and that until September 16, 2002, MGA was incorporated and known as ABC International Traders, Inc. Upon the filing of the Complaint, Mattel, being ignorant of the nature, extent and scope of MGA Entertainment, Inc.'s involvement and complicity in the conduct alleged therein and having designated MGA Entertainment, Inc. in the Complaint as Doe 1 and having discovered its involvement and complicity, Mattel hereby amends its Complaint by substituting MGA Entertainment, Inc. for the fictitious Doe name Doe 1.

10.    Counter-defendant Carter Bryant ("Bryant") is an individual who formerly was employed by Mattel and has worked for and continues to work as a contactor for MGA. Mr. Bryant currently resides in the State of Missouri.

11.    Counter-defendant MGA Entertainment (HK) Limited is a business entity organized and existing under the laws of the Hong Kong Special Administrative Region, with its principal place of business in Hong Kong. Upon the filing of the Complaint, Mattel, being ignorant of the nature, extent and scope of involvement and complicity of MGA Entertainment (HK) Limited in the conduct alleged therein and having designated MGA Entertainment (HK) Limited in the Complaint as Doe 2 and having discovered its involvement and complicity, Mattel hereby amends its Complaint by substituting MGA Entertainment (HK) Limited for the fictitious Doe name Doe 2.

EXHIBIT _____ *10*

PAGE _____ *136*

1    12.   Counter-defendant MGAE de Mexico, S.R.L. de C.V. ("MGA
2  de Mexico") is a business entity organized and existing under the laws of Mexico,
3  with its principal place of business in Mexico City, Mexico.

4    13.   Mattel is informed and believes, and on that basis alleges, that
5  Counter-defendant Larian is the President and CEO of MGA and an individual
6  residing in the County of Los Angeles.  Upon the filing of the Complaint, Mattel,
7  being ignorant of the nature, extent and scope of involvement and complicity of
8  Larian in the conduct alleged therein and having designated Larian in the
9  Complaint as Doe 3 and having discovered his involvement and complicity, Mattel
10 hereby amends its Complaint by substituting Larian for the fictitious Doe name
11 Doe 3.

12    14.   Counter-defendant Carlos Gustavo Machado Gomez is an
13 individual who is employed by Counter-defendant MGA and who, on information
14 and belief, currently resides in the County of Los Angeles.

15    15.   The true names and capacities of Counter-defendants sued herein
16 as DOES 4 through 10, inclusive, are unknown to Mattel, which therefore sues said
17 Counter-defendants by such fictitious names.  Mattel will amend its pleadings to
18 allege their true names and capacities when the same are ascertained.

19                              **Factual Background**

20 **I.    MATTEL**

21    16.   Mattel manufactures and markets toys, games, dolls and other
22 consumer products.  Harold Mattson and Eliot and Ruth Handler founded Mattel in
23 1945.  The name of the company was created by incorporating the names of two of
24 its founders, "MATT-son" and "EL-liot."  Originating from the Handlers' garage in
25 Southern California, the company greatly expanded its operations following World
26 War II.  During the next several decades, Mattel became famous for producing
27 high-quality products at reasonable prices.

28

EXHIBIT _____ _10_

PAGE _____ _137_

2154363.2

SECOND AMENDED ANSWER AND COUNTERCLAIMS

17. Critical to Mattel's success is its ability to design and develop new products. Mattel invests millions of dollars in product design and development and introduces hundreds of new products each year. Mattel maintains a 180,000 square-foot design center in El Segundo, California, that houses hundreds of designers, sculptors, painters and other artists, who work exclusively to create the products on which Mattel's business depends.

18. Mattel also has invested substantial amounts over many years to develop its business methods and practices, including, without limitation, its marketing and advertising research, plans, methods and processes; its business research and forecasts; its costs, budgets, pricing, credit terms, deal terms and finances; its manufacturing, distribution, and sales methods and processes; and its inventory methods and processes. These represent a material part of the intellectual infrastructure of Mattel and are highly valuable.

## II. MGA ENTERTAINMENT

19. MGA is also a toy manufacturer. MGA began as a consumer electronics business, but expanded into the toy business with licenses to sell handheld electronic games. By approximately late 1999 or early 2000, MGA developed a strategy to expand its business and compete directly with Mattel by launching a fashion doll line, so it stole a fashion doll that was owned by Mattel – "Bratz."

20. MGA intentionally stole not just specific Mattel property, such as Bratz designs, prototypes and related materials, but also a vast array of trade secrets and other confidential information that comprise Mattel's intellectual infrastructure. MGA's rapid growth was not organic, but rather was based upon its theft of Bratz. As a result, MGA lacked an appropriate intellectual infrastructure for a company of its size and it became increasingly difficult to manage. To deal with these problems, as detailed below, time and time again MGA simply stole Mattel's proprietary business methods, practices and information. This not only

EXHIBIT _____ 10

PAGE _____ 138

-33-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

1 allowed MGA to avoid expending time, money and effort necessary to build a

2 legitimate business, but also allowed MGA to unfairly compete against Mattel by

3 taking Mattel's playbook.

4 **III. MGA STEALS A NEW LINE OF FASHION DOLLS FROM MATTEL**

5       21.  Carter Bryant is a former Mattel employee. Bryant joined Mattel

6 in September 1995, where he worked in Mattel's Design Center as a BARBIE

7 product designer. In or about April 1998, Bryant resigned his position with Mattel

8 and moved to Missouri to live with his parents. Late in 1998, Bryant applied to

9 Mattel to be rehired. On January 4, 1999, he began working at Mattel in Mattel's

10 Design Center, again as a product designer, for Mattel's BARBIE collectibles line.

11       22.  Upon his return to Mattel in January 1999, Bryant executed an

12 Employee Confidential Information and Inventions Agreement (the "Employment

13 Agreement"), a true and correct copy of which is attached hereto as Exhibit A.

14       23.  Pursuant to his Employment Agreement and as a condition of

15 and in consideration for his employment, Bryant agreed, among other things, that

16 he held a position of trust with Mattel, that the designs and inventions he created

17 during his Mattel employment (with certain exceptions not relevant here) were

18 owned by Mattel, and that he would be loyal to the company by agreeing not to

19 assist or work for any competitor of Mattel while he was employed by Mattel.

20       24.  On January 4, 1999, Bryant also executed Mattel's Conflict of

21 Interest Questionnaire (the "Conflict Questionnaire"). Among other things, Bryant

22 certified in the Conflict Questionnaire that, other than as disclosed, he had not

23 worked for any competitor of Mattel in the prior twelve months and had not

24 engaged in any business venture or transaction involving a Mattel competitor that

25 could be construed as a conflict of interest. Bryant understood what the Conflict

26 Questionnaire required because, among other things, he disclosed on it the

27 freelance work he had performed while in Missouri for Ashton-Drake, which is

28

EXHIBIT _____ _10_

2154363.2

1   unrelated to the conduct alleged herein.  A true and correct copy of the Conflict

2   Questionnaire executed by Bryant is attached hereto as Exhibit B.

3        25.   Pursuant to the Conflict Questionnaire, Bryant also agreed that

4   he would immediately notify his supervisor of any change in his situation that

5   would cause him to change any of the foregoing certifications.  Despite this

6   obligation, at no time did Bryant disclose to Mattel that he was engaging in any

7   business venture or transaction with MGA or any other Mattel competitor.

8        26.   More specifically, while Bryant was employed by Mattel, Bryant

9   and other Counter-defendants misappropriated and misused Mattel property and

10  Mattel resources for the benefit of Bryant and MGA.  Such acts included, but are

11  not limited to, the following:

12             a.    using his exposure to Mattel development programs to

13  create the concept, design and name of Bratz;

14             b.    using Mattel resources, and while employed by Mattel,

15  Bryant worked by himself and with other Mattel employees and contractors to

16  design and develop Bratz, including without limitation by creating drawings and

17  three-dimensional models of Bratz dolls, and fashion designs for the dolls'

18  associated clothing and accessories; and

19             c.    using Mattel resources, and while employed by Mattel,

20  Bryant took steps to assist MGA to produce Bratz dolls.

21        27.   During the time that he was employed by Mattel and thereafter,

22  Bryant concealed these actions from Mattel, including by failing to notify his

23  supervisor of the conflict of interest he created when he began working on MGA's

24  behalf and when he began receiving payments from MGA.  Bryant additionally

25  enlisted other Mattel employees to perform work on Bratz during the time he was

26  employed by Mattel and, by all indications, in at least some cases led them to

27  believe that they were performing work on a project for Mattel.

28

EXHIBIT _____ _10_

28. Bryant also made affirmative misrepresentations to Mattel management and employees immediately before his departure from Mattel on October 20, 2000. For example, during his last few weeks at Mattel, Bryant told his co-workers and supervisors that he was going to leave Mattel for "non-competitive" pursuits. Bryant's representations to his supervisors and his co-workers were false. Bryant knew at the time that those representations were false and made those false statements to conceal from Mattel the fact that he was already working with MGA and that he had contracted with MGA to assign Bratz works to MGA and to provide design and development services to MGA, a Mattel competitor.

29. As a result of the efforts of Bryant and other Mattel employees working on Bratz (which were done without Mattel's knowledge), the Bratz dolls had been designed and were far along in development during the time that Bryant was employed by Mattel and prior to the time that Bryant left Mattel on October 20, 2000. Not only did Bryant create and develop designs for the dolls as well as other aspects of the products such as their fashion accessories during the time he was employed by Mattel, but MGA showed Bratz prototypes and/or product to both focus groups and retailers in November 2000, less than three weeks after Bryant left Mattel. Bryant, Larian and others at MGA arranged these meetings while Bryant was still employed by Mattel.

30. Bryant and MGA employees also repeatedly and continuously communicated with employees of MGA Entertainment (HK) Limited on subjects such as design and manufacturing of Bratz. On information and belief, at all material times, MGA Entertainment (HK) Limited has maintained regular and continuous contacts with persons in the County of Los Angeles; it regularly has shipped products that it manufactures, or that are manufactured for it, to the County of Los Angeles; and such products have been distributed to retailers and sold to consumers in the County of Los Angeles.

EXHIBIT _____ _10_

1          31.   Bratz also were shown to retailers at the Hong Kong Toy Fair in

2  January 2001. By early 2001, only a few months after Bryant resigned from

3  Mattel, MGA began having the Bratz fashion doll line and accessories

4  manufactured and then, shortly thereafter, began selling them at retail.

5          32.   Since 2001, MGA has distributed and sold Bratz and Bratz-

6  related products throughout the world. Mattel is informed and believes that MGA

7  also licenses Bratz to third parties. Mattel is also informed and believes that MGA

8  derives annual revenue from its sales and licenses of Bratz in excess of $500

9  million. Mattel is further informed and believes that MGA and Bryant claim

10  current ownership of Bratz, and all copyrights and copyright registrations attendant

11  thereto. MGA continues to market, sell and license Bratz and has expressed an

12  intention to continue to do so.

13          33.   Mattel is informed and believes that MGA and Larian

14  encouraged, aided and financed Bryant to develop Bratz, knowing full well that

15  Bryant was still employed by Mattel at the time and that by performing such work,

16  including design-related work, for his own benefit and/or the benefit of MGA,

17  Bryant would be, and was, in breach of his contractual, statutory and common law

18  duties to Mattel. Mattel is also informed and believes that MGA proceeded to aid

19  and encourage Bryant to develop Bratz with the goal of obtaining a valuable

20  fashion doll line that would be commercially successful in the competitive, multi-

21  billion dollar market for fashion dolls.

22          34.   Pursuant to Bryant's contract with Mattel, among other things,

23  Mattel is the true owner of Bratz designs and works, including those specifically

24  that were conceived, created or reduced to practice during Bryant's Mattel

25  employment as well as all designs and works that are or have been derived

26  therefrom. Counter-defendants' continued use, sale, distribution and licensing of

27  Bratz thus infringes upon Mattel's rights, injures Mattel and unlawfully enriches the

28  Counter-defendants.              EXHIBIT _____ _/0_____

2154363.2

35.   Bryant and MGA deliberately and intentionally concealed facts sufficient for Mattel to suspect or to know that it was the true owner of Bratz. Their acts of concealment include, but are not limited to, concealing the fact that Bryant conceived, created, designed and developed Bratz while employed by Mattel, including by tampering with and defacing documents which showed that, in fact, Bryant was a Mattel employee while he was working for and with MGA; concealing the fact that Bryant worked with and assisted MGA during the time Bryant was employed by Mattel and was compensated for that assistance; concealing that Bryant was providing consulting services to MGA; concealing Bryant's role in Bratz by falsely claiming that Larian and others were the creators of Bratz; and concealing the fact that Mattel was the true owner of Bratz by, among other things, filing fraudulent registrations and/or amendments to registrations with the United States Copyright Office claiming MGA as the author of Bratz as a work for hire and altering relevant dates on such documents to further obscure the true facts of when the works were created.

36.   Because of Bryant's and MGA's acts of concealment and Bryant's misrepresentations to Mattel, Mattel had no reason to suspect that Bryant had worked with MGA, or assisted MGA, while he still employed by Mattel until approximately November 24, 2003, when Mattel received, through an unrelated legal action, a copy of Bryant's agreement with MGA which showed that the date of Bryant's agreement with MGA predated Bryant's departure from Mattel. It was then, as a result, that Mattel learned for the first time that Bryant had secretly aided, assisted and worked for and with MGA while employed at Mattel and in violation of his Mattel Employment Agreement. Specifically, Bryant's agreement with MGA obligated Bryant to provide product design services to MGA on a "top priority" basis. Bryant's agreement with MGA also provided that Bryant would receive royalties and other consideration for sales of products on which Bryant provided aid or assistance; that all works and services furnished by Bryant under

EXHIBIT _____ /0
PAGE _____ /43

2154363.2

-38-

1 the agreement, including those he purportedly provided while still a Mattel
2 employee, purportedly would be considered "works for hire" of MGA; and that all
3 intellectual property rights to preexisting works by Bryant, including Bratz designs,
4 purportedly were assigned to MGA.

5 **IV.  MGA STEALS MATTEL TRADE SECRETS IN MEXICO**

6           37.    On information and belief, in or about late 2003 or early 2004,
7 MGA decided to open business operations in Mexico.  Faced with the difficult task
8 of developing an overall strategy for expanding into a market in which it had only a
9 nominal presence and no operations, MGA elected to steal Mattel's plans, strategy
10 and business information for the Mexican market and materials related to Mattel's
11 worldwide business strategies.  As detailed below, MGA and Larian approached
12 three employees of Mattel's Mexican subsidiary ("Mattel Mexico"), enticed them to
13 steal Mattel's most sensitive business planning materials, and then hired them to
14 assist in establishing and running MGA's new Mexican subsidiary.

15           **A.    MGA Hires Three Senior Mattel Employees in Mexico**

16           38.    Carlos Gustavo Machado Gomez ("Machado") was the Senior
17 Marketing Manager, Boys Division, for Mattel Mexico, a position of trust and
18 confidence.  He was employed at Mattel Mexico from April 1, 1997 until April 19,
19 2004.  His duties included short, medium and long-term marketing planning,
20 generating product sales projections, and assisting in creation of the media plan.  In
21 his position, Machado had access to highly confidential and sensitive marketing
22 and product development information.  Machado had an employment agreement
23 with Mattel in which he agreed to maintain the confidentiality of Mattel's protected
24 information.  Mattel's policies also required Machado to protect Mattel's
25 proprietary information and not to disclose it to competitors.

26           39.    Mariana Trueba Almada ("Trueba") was the Senior Marketing
27 Manager, Girls Division, for Mattel Mexico, a position of trust and confidence.
28 She was employed at Mattel Mexico from November 3, 1997 until April 19, 2004.

EXHIBIT _____ _10_

PAGE _____ _144_

-39-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

2154363.2

1  Like Machado, her duties included short, medium and long-term marketing
2  planning, generating product sales projections, and assisting in creation of the
3  media plan.  In her position, Trueba had access to highly confidential and sensitive
4  marketing and product development information.  Trueba had an employment
5  agreement with Mattel in which she agreed to maintain the confidentiality of
6  Mattel's protected information.  Mattel's policies also required Trueba to protect
7  Mattel's proprietary information and not to disclose it to competitors.

8      40.  Pablo Vargas San Jose ("Vargas") was a Senior Trade Marketing
9  Manager with Mattel Mexico, a position of trust and confidence.  He was employed
10  at Mattel Mexico from March 29, 2001 until April 19, 2004.  Vargas was
11  responsible for ensuring that point-of-sale promotions were carried out, analyzing
12  the results of such promotions, negotiating promotion budgets, and generally
13  managing promotional activities.  Vargas also had access to highly confidential and
14  sensitive marketing and product development information.  Vargas had an
15  employment agreement with Mattel in which he agreed to maintain the
16  confidentiality of Mattel's protected information.  Mattel's policies also required
17  Vargas to protect Mattel's proprietary information and not to disclose it to
18  competitors.

19      41.  Beginning in late 2003 or early 2004, Machado, Trueba and
20  Vargas began planning to leave Mattel Mexico to join MGA.  In connection with
21  that plan, and with the encouragement of Larian and other MGA officers operating
22  in the United States, they began accessing, copying and collecting proprietary
23  Mattel documents to take with them.  On April 19, 2004, Machado, Trueba and
24  Vargas each resigned their positions with Mattel, effective immediately.  They
25  stated that they had been hired by a Mattel competitor, but refused to identify that
26  competitor.  In fact, they had been offered and accepted employment by MGA to
27  establish and run MGA's new operation in Mexico.  EXHIBIT _____ 10
28

PAGE _____ 145

21543632

SECOND AMENDED ANSWER AND COUNTERCLAIMS

**B.     Machado, Trueba and Vargas Stole Dozens of Confidential Trade Secret Marketing and Sales Documents for MGA's Benefit**

42.     Following these resignations, Mattel discovered that Machado, Trueba and Vargas had been in frequent telephonic and e-mail contact with MGA personnel, including Larian, for over three months prior to their resignations. The primary vehicle for these communications in furtherance of their "plot" was an America Online e-mail account with the address <plot04@aol.com>. On information and belief, during this time, Machado, Trueba and Vargas supplied Larian with certain Mattel confidential and proprietary information in order to prove their value to MGA and to improve their negotiating position vis-à-vis their respective employment contracts with MGA.

43.     In March 2004, Machado, Trueba and Vargas were making plans to travel from Mexico to Los Angeles to meet with MGA personnel in person prior to resigning their positions at Mattel. Also, by at least March 3, 2004, Machado, Trueba and Vargas were discussing with MGA personnel, including Larian, specific details regarding setting up MGA offices in Mexico City. On information and belief, prior to their resignations, Larian and others at MGA directed Machado, Trueba and Vargas to steal virtually all Mattel confidential and proprietary information that they could access and bring it with them to MGA. This was reflected in, among things, e-mail messages that Mattel had discovered after Machado, Trueba and Vargas had resigned. For example, on March 22, 2006, approximately one month before they resigned, Machado, Trueba and Vargas wrote an e-mail message from the <plot04@aol.com> e-mail account addressed to Larian, MGA's General Manager Susan Kuemmerle and another MGA officer Thomas Park. In that e-mail message, Machado, Trueba and Vargas sought to prove their value in this endeavor to MGA by writing: "Attached you will find our analysis for future discussion. We will be available during the nights of the week after 16:30 Los Angeles time . . . ." In another e-mail message, showing that the

EXHIBIT _____ _10_

PAGE _____ _146_

-41-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

21543632

1    participants intentionally sought to maximize the damage to Mattel from their

2    conduct, Kuemmerle wrote to Larian and Park: "Gustavo, Mariana and Pablo want

3    to resign (all at the same time, and you can believe my smile!) next Wednesday."

4         44.    Beginning on April 12, 2004, a week before his resignation and

5    after numerous communications and meetings with Larian and other MGA

6    personnel, Machado began transferring additional Mattel confidential and

7    proprietary information to a portable USB storage device (also know as a "thumb

8    drive") that connected to his Mattel computer.  On Friday, April 16, 2004, the

9    last business day before he gave notice, Machado copied at least 70 sensitive

10   documents to the portable USB storage device.

11        45.    Starting on April 12, 2004, Vargas also copied a host of

12   confidential and proprietary materials to a portable USB storage device, including

13   sales plans, sales projections and customer profiles.

14        46.    On April 16, 2004, Trueba also copied Mattel confidential and

15   proprietary information to a portable USB storage device connected to her Mattel

16   computer.

17        47.    With full knowledge that she was going to leave Mattel for a

18   competitor, Trueba also took steps to increase further her access to Mattel's

19   confidential information shortly before her resignation.  For example, just four days

20   before leaving, Trueba went out of her way to seek to attend a meeting at which

21   Mattel personnel analyzed BARBIE programs for the United States, Canada and

22   South America.  Two days before her resignation, she contacted both a Mattel

23   employee located in El Segundo, California and Mattel's advertising agency to

24   request updated confidential information about advertising plans for BARBIE.  On

25   information and belief, Trueba acted at the direction of MGA and Larian and did so

26   in order to obtain further information that would allow MGA to obtain unfair

27   competitive advantage over Mattel.

EXHIBIT _____ 10

28

PAGE _____ 147

2154363.2

-42-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

1        48.   Machado, Trueba and Vargas stole virtually every type of

2   document a competitor would need to enter the Mexican market and to unlawfully

3   compete with Mattel in Mexico, in the United States, and elsewhere.  They stole

4   global internal future line lists that detailed anticipated future products, production

5   and shipping costs for Mattel products; daily sales data for Mattel products;

6   customer data; sales estimates and projections; marketing projections; documents

7   analyzing changes in sales performance from 2003 to 2004; budgets for advertising

8   and promotional expenses; strategic research reflecting consumer responses to

9   products in development; media plans; consumer comments regarding existing

10   Mattel products customer discounts and terms of sale; customer inventory level

11   data; assessments of promotional campaign success; market size historical data and

12   projections; marketing plans and strategies; merchandising plans; retail pricing and

13   marketing strategies; and other similar materials.

14        49.   The stolen data was not limited to the Mexican market.  The

15   information stolen would, and did, give MGA an unfair competitive advantage in

16   the United States and around the world.  Further, the stolen information was not

17   located exclusively in Mexico, but included confidential and proprietary

18   information that resided on Mattel computers in Phoenix, Arizona and El Segundo,

19   California, and/or documents which were originally created by personnel in El

20   Segundo.  Included among these stolen documents was one of Mattel's earliest

21   internal global line lists, which included information for BARBIE products for the

22   upcoming year and included, for each product, the expected profit margin,

23   advertising expenditures, expected volume and marketing strategy.  On information

24   and belief, Machado, Trueba or Vargas delivered that internal line list to Larian or

25   another MGA officer during their negotiations with MGA.

26        50.   MGA has used the information taken from Mattel to obtain an

27   unfair advantage over Mattel, including in both the United States and Mexico.  In

28   fact, MGA later publicized its claim that, in 2005, it had increased its Mexican

**EXHIBIT** _____ _10_

**PAGE** _____ _148_

-43-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

1   market share by 90 percent over the prior year. This increase came at the expense

2   of Mattel, which lost market share during 2004 in Mexico and was forced to

3   increase its advertising and promotional spending to offset further losses.

4        51.   Machado, Trueba and Vargas attempted to conceal their

5   widespread theft of Mattel's proprietary information. For example, Machado ran a

6   software program on his Mattel personal computer in an attempt to erase

7   information, including information that would reveal the addresses to which he had

8   sent, or from which he had received, e-mail messages. On information and belief,

9   for the same purpose Machado also damaged the hard drive of the personal

10   computer that he used at Mattel.

11        52.   On information and belief, on April 19, 2004, immediately after

12   Machado, Trueba and Vargas simultaneously resigned, they traveled from Mexico

13   to Los Angeles to meet with MGA personnel, including Larian, in person.

14        53.   Mattel notified Mexican authorities about the theft of its trade

15   secret and confidential information. On October 27, 2005, the Mexican Attorney

16   General Office obtained a search warrant from the Mexican Federal Criminal

17   Courts for MGA's facilities in Mexico City. In that search, the Mexican authorities

18   found and seized from MGA's offices both electronic and paper copies of a large

19   number of documents containing Mattel trade secrets, including those that Mattel

20   discovered through its forensic investigations, plus many others that Mattel had not

21   known had been stolen.

22        54.   Based on Machado's "performance" in Mexico, Isaac Larian

23   subsequently promoted Machado and he was transferred to MGA's main office in

24   Van Nuys, California. On information and belief, Machado currently resides in the

25   County of Los Angeles, California.

26

27

28

EXHIBIT _____ /0

PAGE _____ /49

2154363.2

-44-

V.   **MGA HIRES MATTEL'S SENIOR VICE PRESIDENT AND GENERAL MANAGER TO FACILITATE ITS THEFT AND USE OF MATTEL'S HIGHLY VALUABLE BUSINESS METHODS AND PRACTICES**

55.   On October 1, 2004, Mattel's Senior Vice President and General Manager, Ron Brawer, left Mattel and joined MGA. Tyco Toys, Inc. ("Tyco"), a predecessor to Mattel, had hired Brawer on April 22, 1996. The same day, Brawer entered into an Employee Invention & Trade Secret Agreement with Tyco. On April 9, 1997, Brawer became a Marketing Director for Mattel in Mount Laurel, New Jersey, and remained bound by his Employee Invention & Trade Secret Agreement.

56.   In January 2003, while Brawer held a position of trust and confidence at Mattel, Mattel's "Code of Conduct" was circulated to all Mattel employees worldwide. Included in the Code of Conduct were statements that:

> Employees and Directors have an obligation to protect the confidentiality of Mattel's proprietary information. Proprietary information is any information not generally known to the public that is useful to Mattel, that would be useful to its competitors or other third parties or that would be harmful to Mattel or its customers if disclosed. Proprietary information includes trade secrets, revenue and profit information and projections, new product information, marketing plans, design and development efforts, manufacturing processes and any information regarding potential acquisitions, divestitures and investments.
>
> We can protect the security of Mattel's proprietary information by limiting access to it. Confidential information should not be discussed with those who are not obligated to maintain the information in confidence and in public places where the

EXHIBIT _____ 10

PAGE _____ 150

-45-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

2154363.2

1    information is not likely to be kept secret, such as planes,

2    restaurants and elevators. The obligation to preserve confidential

3    information continues even after employment ends.

4 The Code of Conduct applied to Brawer and required that he meet his obligations

5 under the Code of Conduct.

6    57. By 2003, Brawer had advanced within Mattel to a Senior Vice

7 President position over customer marketing, a position of trust and confidence. In

8 his executive position, Brawer was provided access to information that was both

9 sensitive and confidential, including, but not limited to, detailed information related

10 to development, manufacture, marketing, pricing, shipping, and performance of

11 Mattel's then-current and anticipated future product lines, and other confidential

12 business plans between Mattel and its most significant retail customers.

13    58. In December 2003, Alan Kaye, Mattel's Senior Vice President of

14 Human Resources, asked Brawer whether he was discussing potential employment

15 with MGA. Brawer denied that he had been in contact with MGA and represented

16 that he would not talk to MGA. Throughout 2004, Mattel reminded and stressed to

17 its employees, including Brawer, the importance of protecting Mattel's confidential

18 and proprietary materials and information.

19    59. On March 18, 2004, in response to a survey from the President of

20 Mattel Brands, Matt Bousquette, confirming compliance with Mattel's Code of

21 Conduct, Brawer wrote back that he "applaud[ed] the company's vigorous

22 protection of it's [sic] intellectual property," reflecting Brawer's clear

23 understanding that Mattel required its proprietary information to be kept

24 confidential.

25    60. In April 2004, Mattel promoted Brawer to Senior Vice

26 President/General Manager. The General Manager position also is an executive

27 position of trust and confidence. The role of a General Manager is to lead a cross-

28 functional "Customer Business Team." Each General Manager is accountable for a

1  strategic partnership with a key Mattel retailer, covering all aspects of the business,

2  including both traditional toy sales and retail development of licensed products.

3       61.  In or about late May 2004, Brawer began performing General

4  Manager duties, working with one of Mattel's major retail customer accounts.

5  Thereafter, Brawer began receiving information related not only to the Senior Vice

6  President, Customer Marketing position that he still formally held, but also began

7  receiving detailed information related to his role as General Manager.  Brawer

8  began requesting and analyzing detailed information related to Mattel and its four

9  key retail accounts.

10       62.  On September 15, 2004, Brawer left work at noon for observance

11  of Rosh Hashanah.  As Brawer left, he carried a large cardboard box with binders

12  and other materials.  Several hours after his departure, Brawer instructed his

13  assistant to print Mattel's 2004 Sales Plan for one of Mattel's significant customers

14  and to provide it to him, falsely claiming he needed it for a meeting

15       63.  On September 17, 2004, Brawer returned to Mattel and

16  immediately informed his supervisor that he was leaving Mattel, effective October

17  1, 2004, to work for competitor MGA.

18       64.  On September 20, 2004, Mattel hand-delivered a letter to Brawer

19  reminding him of his continuing obligation to preserve the confidentiality of

20  Mattel's proprietary information and trade secrets not only through October 1,

21  2004, but continuing beyond the termination of his employment.

22       65.  At his exit interview on September 29, 2004, Mattel reminded

23  Brawer that he had ongoing duties of confidentiality to Mattel, even after the

24  termination of his employment.  Brawer was given a copy of his Original

25  Confidentiality Agreement, which he had signed on April 22, 1996, and another

26  copy of the Code of Conduct.  During the exit interview, however, Brawer noted

27  that he had not signed the Code of Conduct, which he intended and Mattel

28  understood to mean that Brawer believed he was not bound by Mattel's policy

EXHIBIT _____ *10*

PAGE _____ *152*

-47-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

2154363.2

1  because he had not signed it.  Brawer was unwilling to complete or sign the form

2  that sought to confirm that Brawer understood his ongoing obligations under the

3  Code of Conduct, which included the obligation to preserve the confidentiality of

4  Mattel's proprietary and trade secret information.

5        66.   On October 1, 2004, Brawer's final day of employment with

6  Mattel, Mattel hand-delivered to Brawer a letter that, among other things, reminded

7  Brawer of his confidentiality obligations to Mattel under the Code of Conduct.

8        67.   Upon joining MGA, Brawer became its Executive Vice-

9  President of Sales and Marketing.  In that role he was responsible for MGA's sales

10  worldwide.  As part of those responsibilities, Brawer had and continues to have

11  responsibility for MGA's accounts with the same retailers that he worked with

12  while at Mattel.

13        68.   Brawer represented during his Mattel exit interview that he had

14  returned all proprietary information to Mattel.  That representation was false.  On

15  information and belief, Brawer removed proprietary and trade secret information

16  from Mattel that he did not return.  Mattel is informed and believes that Brawer did

17  not return to Mattel, for example, the information contained in his contacts file.

18  The contacts file included contact information for Mattel customers, most notably

19  TRU, and extensive contact information for Mattel employees, including titles, e-

20  mail addresses and telephone numbers.

21        69.   Mattel has recently learned that Brawer has been using that

22  contact information on a regular basis, including within recent months.  Since

23  leaving Mattel, Brawer has had contacts with Mattel employees, both by telephone

24  and by electronic mail.  Based on his knowledge of Mattel's operations and the

25  roles of certain Mattel employees, he has targeted certain Mattel employees who

26  have broad access to Mattel proprietary information in an effort to induce and

27  encourage them to join MGA and to steal or otherwise wrongfully misappropriate

28  Mattel confidential information and trade secrets.  Brawer has done so by

EXHIBIT ___10___

PAGE ___153___

-48-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

2154363.2

1   promising these Mattel employees salaries 25 percent or more higher than they earn
2   at Mattel and stating to them that they should not be concerned by legal action
3   taken by Mattel to protect its trade secrets and its rights because such claims are
4   hard to prove and easy to defeat.

5   **VI. MGA STEALS MATTEL TRADE SECRETS IN CANADA**

6         70.   In an effort to increase its market share and sales in Canada and
7   elsewhere, MGA stole Mattel trade secrets regarding Mattel's customers, sales,
8   projects, advertising and strategy, not only for Canada, but the United States and
9   the rest of the world.

10         71.   Janine Brisbois was a Director of Sales for the Girls Division in
11   Canada. Mattel hired her as a National Account Manager in August 1999. When
12   she was hired as a Mattel employee, Brisbois agreed that she would preserve and
13   would not disclose Mattel's proprietary or confidential information. For example,
14   Brisbois agreed:

15         You must keep Mattel's Proprietary Information confidential,
16         and you may only use or disclose such information as necessary
17         to perform your job responsibilities in accordance with Mattel
18         policies. Your obligation to keep Mattel's Proprietary
19         Information confidential will continue even after any termination
20         of your employment with your employer.

21         . . .

22         Mattel takes steps to maintain the secrecy and confidential nature
23         of Mattel's Proprietary Information and, if a competitor
24         discovered Mattel's Proprietary Information, it could
25         significantly damage Mattel and your Employer.

26         72.   While with Mattel, Brisbois had responsibility for Mattel's
27   account with TRU and later had responsibility for Mattel's Wal-Mart account. In
28   her capacity as Sales Director-Wal-Mart/CTC/Girls Team, Brisbois had access to

EXHIBIT _____ /_/O_

-49-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

21543632

1 | Mattel confidential and proprietary information regarding Mattel's future product
2 | lines, advertising and promotional campaigns and product profitability.

3 |     73.   On September 26, 2005, Brisbois resigned from Mattel to take a
4 | position as Vice President of Sales at MGA. Mattel is informed and believes that
5 | in that position Brisbois has responsibility for MGA's accounts with both TRU and
6 | Wal-Mart. During Brisbois' exit interview she was specifically asked whether she
7 | was "taking anything." Brisbois responded, "No." Both during and after her exit
8 | interview, Brisbois was advised by Mattel of her obligations to preserve Mattel's
9 | confidential and proprietary information.

10 |     74.   Mattel is informed and believes that Brisbois spoke with Isaac
11 | Larian, MGA's CEO, on September 22, 2005 at approximately 8:30 p.m., when he
12 | called Ms. Brisbois at her home. Mattel subsequently learned that on the same day
13 | that she spoke with Mr. Larian and four days before she resigned, Brisbois copied
14 | approximately 45 Mattel documents on to a USB or "thumb" drive with the volume
15 | label "BACKPACK." On information and belief, Brisbois removed the thumb
16 | drive from Mattel Canada's office by concealing it in her backpack or gym bag the
17 | last time that she left that office. These documents contained Mattel trade secret
18 | and proprietary information, and included:

19 |      •  a document containing the price, cost, sales plan and quantity of every
20 |        Mattel product ordered by every Mattel customer in 2005 and 2006;
21 |      •  the BARBIE television advertising strategy and information concerning
22 |        sales increases generated by television advertisements;
23 |      •  competitive analysis of Mattel vis-à-vis its competitors in Canada;
24 |      •  an analysis of Mattel's girls business sales beginning in 2003 and
25 |        forecasts through 2006;
26 |      •  profit and loss reviews for Mattel's products being sold in Wal-Mart,
27 |        including margins and profit in not only Canada, but in the United
28 |        States and Mexico; and

EXHIBIT _____ _10._

2154363.2

SECOND AMENDED ANSWER AND COUNTERCLAIMS

1        • a document containing the product launch dates and related advertising
2            for all Mattel new products between Fall 2005 and Spring 2006.

3        75.    After Mattel discovered that Brisbois had copied these sensitive
4    documents to a thumb drive, Mattel notified Canadian law enforcement authorities.
5    Canadian law enforcement authorities recovered from Brisbois a thumb drive with
6    the volume label "BACKPACK" containing the documents that Brisbois had
7    copied from Mattel's computer system. Mattel later learned that while she was
8    working as a Vice President of Sales at MGA, Brisbois accessed and modified
9    documents on that thumb drive.

10       76.    After joining MGA, Brisbois repeatedly traveled to MGA's
11   offices in Van Nuys, California and met with Larian and Brawer. In February,
12   2006, knowing that Mattel trade secrets had been seized from MGA's Mexico City
13   offices and that at least three MGA employees were under criminal investigation,
14   MGA nonetheless issued a press release trumpeting its 2005 performance, with
15   Larian himself concluding, "Our international teams in Mexico and Canada have
16   done a fantastic job."

17   **VII. MGA PERSUADES OTHER EMPLOYEES LEAVING MATTEL TO**
18   **JOIN MGA TO MISAPPROPRIATE MATTEL TRADE SECRETS**
19   **FOR THE BENEFIT OF MGA**

20       77.    In the past few years, MGA has hired directly from Mattel's
21   United States operations at least 25 employees, from Senior Vice-President level to
22   lower level employees. On information and belief, many of these employees were
23   specifically targeted and recruited by MGA, including by Larian and Brawer, based
24   on the Mattel confidential and proprietary information they could access. Many of
25   these employees had access to information that Mattel considers to be highly
26   proprietary and confidential. Mattel believes that some of those former Mattel
27   employees may be observing their obligations not to misappropriate, disclose or
28   use Mattel's confidential and proprietary information. Mattel is informed and

EXHIBIT _____ *10* _____

PAGE _____ *156* _____

-51-

1    believes, however, that certain additional employees accessed, copied and took

2    from Mattel confidential and proprietary information, including Mattel's strategic

3    plans; business operations, methods and systems; marketing and advertising

4    strategies and plans; future product lines; product profit margins; and customer

5    requirements.  The misappropriated confidential and proprietary information

6    included information that these Mattel employees were not authorized to access.

7    On information and belief, the misappropriated confidential and proprietary

8    information taken from Mattel is being disclosed to and used by MGA for the

9    benefit of MGA and to the detriment of Mattel.

10    **VIII. LARIAN MAKES MISREPRESENTATIONS TO RETAILERS**

11    **ABOUT MATTEL'S PRODUCTS**

12        78.   Counter-defendants have engaged in other illegal practices in

13    their efforts to compete unfairly with Mattel.  Larian has a practice of sending e-

14    mail messages to a "Bratz News" distribution list that Larian created or that was

15    created for him.  Mattel is informed and believes that the recipients of e-mail

16    messages sent to the "Bratz News" distribution list include members of the media

17    as well as representatives of many of Mattel's most significant customers.

18        79.   On May 12, 2006, Larian sent an e-mail message to the "Bratz

19    News" distribution list that included a reference to Mattel's updated MY SCENE

20    MY BLING BLING product with real gems.  Mattel had not publicly announced

21    this product at the time that Larian sent his May 12, 2006 e-mail.  In fact, Mattel

22    had guarded the identification of this particular product.

23        80.   Shortly thereafter, Larian engaged in a campaign of calling

24    Mattel's most significant customers, including but not limited to Target and TRU,

25    regarding the MY SCENE MY BLING BLING product with real gems.  In an

26    effort to dissuade these retailers from purchasing Mattel's MY SCENE MY BLING

27    BLING product with real gems, Larian knowingly made false factual statements

28    about that product to each retailer.  As of the writing of this Second Amended

EXHIBIT _____ 10

21543632

-52-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

1   Answer and Counterclaims, Mattel is aware that Larian represented to each retailer
2   that each was the only retailer to purchase the product and that Mattel would not be
3   supporting the product with television advertising.  At the time that Larian made
4   these statements, he knew them to be false.  As a result of Larian's
5   misrepresentations, at least one retailer cancelled its order for 75,000 units of the
6   MY SCENE MY BLING BLING product with real gems.  Only after Mattel
7   learned of Larian's misrepresentations and was able to correct them was Mattel able
8   to assure the retailer that Larian's representations were false and to persuade the
9   retailer to reinstate the order.

10          81.   Such conduct is not an isolated incident.  MGA and Larian, in an
11  effort to gain an unfair competitive advantage, repeatedly issued false and
12  misleading press releases.  In these press releases, MGA and Larian have
13  misrepresented Bratz's sales, Bratz's market share, Bratz's position vis-à-vis
14  Mattel's BARBIE products, sales of Mattel's BARBIE products, and the market
15  share of Mattel's BARBIE products.

16                            **CLAIMS FOR RELIEF**
17                             <u>**First Counterclaim**</u>
18                            **Copyright Infringement**
19          **(Against MGA, MGA Entertainment (HK) Limited,**
20              **Larian, Bryant and Does 4 through 10)**
21          82.   Mattel repeats and realleges each and every allegation set forth in
22  paragraphs 1 through 81, above, as though fully set forth at length.
23          83.   Mattel is the owner of copyrights in works that are fixed in
24  tangible media of expression and that are the subject of valid, and subsisting,
25  copyright registrations owned by Mattel.  These include, without limitation, the
26  works that are the subject of Registrations VA 1-378-648, VA 1-378-649, VA 1-
27  378-650, VA 1-378-651, VA 1-378-652, VA 1-378-653, VA 1-378-654, VA 1-
28  

EXHIBIT _____10_____

PAGE _____158_____

-53-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

2154363.2

1 | 378-655, VA 1-378-656, VA 1-378-657, VA 1-378-658, VA 1-378-659, VA 1-
2 | 378-660, VAu 715-270, VAu 715-271 and VAu 715-273.

3 |     84.    Counter-defendants have reproduced, created derivative works
4 | from and otherwise infringed upon the exclusive rights of Mattel in its protected
5 | works without Mattel's authorization. Counter-defendants' acts violate Mattel's
6 | exclusive rights under the Copyright Act, including without limitation Mattel's
7 | exclusive rights to reproduce its copyrighted works and to create derivative works
8 | from its copyrighted works, as set forth in 17 U.S.C. §§ 106 and 501.

9 |     85.    Counter-defendants' infringement (and substantial contributions
10 | to the infringement) of Mattel's copyrighted works is and has been knowingly made
11 | without Mattel's consent and for commercial purposes and the direct financial
12 | benefit of Counter-defendants. Counter-defendants, moreover, have deliberately
13 | failed to exercise their right and ability to supervise the infringing activities of
14 | others within their control to refrain from infringing Mattel's copyrighted works
15 | and have failed to do so in order to deliberately further their significant financial
16 | interest in the infringement of Mattel's copyrighted works. Accordingly, Counter-
17 | defendants have engaged in direct, contributory and vicarious infringement of
18 | Mattel's copyrighted works.

19 |     86.    By virtue of defendants' infringing acts, Mattel is entitled to
20 | recover Mattel's actual damages plus Counter-defendants' profits, Mattel's costs of
21 | suit and attorneys' fees, and all other relief permitted under the Copyright Act.

22 |     87.    Counter-defendants' actions described above have caused and
23 | will continue to cause irreparable damage to Mattel, for which Mattel has no
24 | remedy at law. Unless Counter-defendants are restrained by this Court from
25 | continuing their infringement of Mattel's copyrights, these injuries will continue to
26 | occur in the future. Mattel is accordingly entitled to injunctive relief restraining
27 | Counter-defendants from further infringement.

EXHIBIT _____ /0

28 |

PAGE _____ /59

2154363.2

-54-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

## Second Counterclaim

### Violation of the Racketeer Influenced and Corrupt Organizations Act

### 18 U.S.C. §§ 1962(c) and 1964(c)

### (Against All Counter-defendants)

88.  Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 87, above, as though fully set forth at length.

89.  Beginning at various times from approximately 1999 through the filing of this Second Amended Answer and Counterclaims, in the Central District of California and elsewhere, Counter-defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas and Brisbois were employed by and associated-in-fact with an enterprise engaging in, and the activities of which affect, interstate and foreign commerce (the "MGA Criminal Enterprise"). The MGA Criminal Enterprise is made up of the MGA Group (MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, certain of the Doe Counter-defendants and Brawer), the Bryant Group (Bryant and certain of the Doe Counter-defendants), the Mexican Group (Machado, Trueba and Vargas) and the Canadian Group (Brisbois). In addition, beginning at various times from approximately 1999 through the filing of this Second Amended Answer and Counterclaims, in the Central District of California and elsewhere, Counter-defendants MGA, MGA Entertainment (HK) Limited, Larian and Bryant, and certain of the Doe Counter-defendants, were employed by and associated-in-fact with a second enterprise engaging in, and the activities of which affect, interstate and foreign commerce (the "Bratz Criminal Enterprise").

90.  MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas, Brisbois, and the Other Former Employees, and each of them, for the purpose of executing and attempting to execute the scheme to improperly defraud Mattel and steal its trade secret or otherwise confidential and proprietary information, by

EXHIBIT _____ 10

PAGE _____ 160

21543632

-55-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

means of tortious, fraudulent and criminal conduct, did and do unlawfully, willfully and knowingly conduct and participate, directly and indirectly, in the conduct of the MGA Criminal Enterprise's affairs and, in the case of MGA, MGA Entertainment (HK) Limited, Larian, Bryant, and certain of the Doe Counter-defendants, the Bratz Criminal Enterprise's affairs, through a pattern of racketeering activity. Their actions include multiple, related acts in violation of: 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1512 (tampering with a witness victim, or informant), 18 U.S.C. § 1952 (interstate and foreign travel to aid racketeering), and 18 U.S.C. § 2319(a) and 17 U.S.C. § 506(a)(1)(A) (criminal copyright infringement).

91. MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas, Brisbois, and the Other Former Employees, and each of them, shared the common purpose of enabling MGA to obtain confidential, proprietary and otherwise valuable Mattel property through improper means in order to assist MGA in illegally competing with Mattel domestically and throughout the world.

92. The MGA Criminal Enterprise and Bratz Criminal Enterprise as described herein are and have been at all relevant times continuing enterprises because, among other reasons, each is designed to and did unlawfully acquire the confidential business information and property of Mattel and incorporated this information and property into MGA's ongoing business, marketing strategies and business methods, practices and processes. The conduct of each enterprise continues through the date of this Second Amended Answer and Counterclaims and is ongoing by virtue of MGA's continuing use of Mattel's information and property, all to the detriment of Mattel.

93. The pattern of racketeering activity, as defined by 18 U.S.C. §§ 1961(1) and (5), presents both a history of criminal conduct and a distinct threat of continuing criminal activity. This activity consists of multiple acts of

EXHIBIT _____ 10

PAGE _____ 161

2154363.2

1   racketeering by each member of the MGA Criminal Enterprise and Bratz Criminal

2   Enterprise, is interrelated, not isolated and is perpetrated for the same or similar

3   purposes by the same persons. This activity extends over a substantial period of

4   time, up to and beyond the date of this Second Amended Answer and

5   Counterclaims. These activities occurred after the effective date of 18 U.S.C.

6   §§ 1961 *et seq.,* and the last such act occurred within 10 years after the commission

7   of a prior act of racketeering activity. These racketeering activities included

8   repeated acts of:

9         (a)   Mail Fraud:  Counter-defendants MGA, MGA Entertainment

10              (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and

11              Does 4 through 10, aided and abetted by each other and some or

12              all of the remaining members of the MGA Criminal Enterprise,

13              having devised a scheme or artifice to defraud Mattel of its

14              confidential trade secret information and property by conversion,

15              false representations, concealment and breaches of fiduciary duty,

16              did for the purpose of furthering and executing such a scheme or

17              artifice to defraud, deposited or caused to be deposited matters or

18              things to be sent or delivered by the Postal Service, or any private

19              or commercial interstate carrier, or took or received matters or

20              things therefrom, or knowingly caused matters or things to be

21              delivered by mail or such carrier according to the direction

22              thereon, or at the place at which it is directed to be delivered by

23              the person to whom it is addressed, in violation of 18 U.S.C.

24              § 1341 and 18 U.S.C. § 2, as alleged with greater particularity in

25              the foregoing paragraphs and as evidenced by, among other

26              things, the true and correct copies of communications and other

27              evidence included in Exhibit C;

28

EXHIBIT _____ *10*

2154363.2

(b) <u>Wire Fraud</u>: Counter-defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and Does 4 through 10, aided and abetted by each other and some or all of the remaining members of the MGA Criminal Enterprise, having devised a scheme or artifice to defraud Mattel of its confidential and trade secret information and property by conversion, false representations, concealment and breaches of fiduciary duty, did for the purpose of furthering and executing such a scheme or artifice to defraud, transmit and cause to be transmitted by means of wire communications in interstate or foreign commerce, writing, signs, signals, pictures or sound, in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 2, as alleged with greater particularity in the foregoing paragraphs and as evidenced by, among other things, the true and correct copies of communications and other evidence included in Exhibit C;

(c) <u>Tampering With a Witness, Victim or Informant</u>: Counter-defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and Does 4 through 10, aided and abetted by each other and some or all of the remaining members of the MGA Criminal Enterprise, did corruptly alter, destroy, mutilate, or conceal more than one record, document, or other object, or attempted to do so, with the intent to impair the object's integrity or availability for use in an official proceeding, including this action, including without limitation by:

i. altering Bryant's contract with MGA relating to Bratz to conceal evidence that Bryant faxed the contract from the BARBIE COLLECTIBLES department of Mattel, using a fax

EXHIBIT _____ 10 _____

PAGE _____ 163 _____   -58-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

2154363.2

1   machine owned by Mattel and while Bryant was employed by

2   Mattel;

3          ii.     altering numerous original Bratz drawings created

4   by Bryant by adding false and misleading date notations of

5   "8/1998" and "© 8/1998" to the drawings even though the

6   drawings were not created in August 1998; and

7          iii.   destroying electronic and other evidence, including

8   by destroying evidence previously contained on Carter Bryant's

9   and Isaac Larian's computer hard drives.

10        Such actions are in violation of 18 U.S.C. § 1512 and 18

11   U.S.C. § 2, as alleged with greater particularity in the foregoing

12   paragraphs;

13      (d)   <u>Interstate and Foreign Travel in Aid of Racketeering Enterprises</u>:

14   Counter-defendants MGA, MGA Entertainment (HK) Limited,

15   MGA de Mexico, Larian, Bryant, Machado and Does 4 through

16   10, aided and abetted by each other and some or all of the

17   remaining members of the MGA Criminal Enterprise, traveled in

18   interstate and foreign commerce, or used the mail or any facility

19   in interstate or foreign commerce, with the intent to promote,

20   manage, establish, carry on and facilitate the promotion,

21   management, establishment and carrying on of unlawful activity,

22   *i.e.* bribery, in violation of the laws of the State of California,

23   *Cal. Penal Code* § 641.3, all in violation of 18 U.S.C. § 1952 and

24   18 U.S.C. § 2, as alleged with greater particularity in the

25   foregoing paragraphs;

26      (e)   <u>Criminal Copyright Infringement</u>: Counter-defendants MGA,

27   MGA Entertainment (HK) Limited, MGA de Mexico, Larian,

28   Bryant, Machado and Does 4 through 10, aided and abetted by

2154363.2

EXHIBIT _____ 10 _____

PAGE _____ 164 _____

-59-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

1     each other and some or all of the remaining members of the MGA

2     Criminal Enterprise, willfully infringed Mattel's copyrights,

3     including with respect to documents containing Mattel trade

4     secret and confidential information, for purposes of commercial

5     advantage and private financial gain, all in violation of 18 U.S.C.

6     § 2319(a) and 17 U.S.C. § 506(a)(1)(A), as alleged with greater

7     particularity in the foregoing paragraphs.

8     94.   The persons alleged herein to have violated 18 U.S.C. § 1962(c)

9     are separate from, though employed by or associated with, MGA, the MGA Group,

10     the Bryant Group, the Mexican Group and the Canadian Group.

11     95.   MGA had a role in the racketeering activity that was distinct

12     from the undertaking of those acting on its behalf.  MGA also attempted to benefit,

13     and did benefit, from the activity of its employees and agents alleged herein, and

14     thus was not a passive victim of racketeering activity, but an active perpetrator.

15     96.   Mattel has been injured in its business or property as a direct

16     and proximate result of the Counter-defendants' and the other enterprise members'

17     violations of 18 U.S.C. § 1962(c), including injury by reason of the predicate acts

18     constituting the pattern of racketeering activity.

19     97.   As a result of the violations of 18 U.S.C. § 1962(c), by MGA,

20     MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado,

21     Does 4 through 10, Brawer, Trueba, Vargas, Brisbois and the Other Former

22     Employees, Mattel has suffered substantial damages, in an amount to be proved at

23     trial. Pursuant to 18 U.S.C. § 1964(c), Mattel is entitled to recover treble its

24     general and special compensatory damages, plus interest, costs and attorneys, fees,

25     incurred by reason of Counter-defendants' violations of 18 U.S.C. § 1962(c).

26

27     EXHIBIT _____ *10*

28     PAGE _____ *165*

### Third Counterclaim

**Conspiracy To Violate the Racketeer**

**Influenced And Corrupt Organizations Act**

**(18 U.S.C. §§ 1962(d) and 1964(c))**

**(Against All Counter-defendants)**

98.   Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 97, above, as though fully set forth at length.

99.   Beginning at various times from approximately 1999 through the filing of this Second Amended Answer and Counterclaims, in the Central District of California and elsewhere, Counter-defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas, Brisbois and the Other Former Employees willfully, knowingly and unlawfully, did conspire, combine, confederate and agree together to violate 18 U.S.C. § 1962(c).

100.   These conspirators were employed by and associated-in-fact with the MGA Criminal Enterprise engaging in, and the activities of which affect, interstate and foreign commerce.   Specifically, the MGA Group, the Bryant Group, the Mexican Group and the Canadian Group, constituting a group of individuals associated-in-fact, did unlawfully, willfully, and knowingly participate in and conduct, directly and indirectly, the MGA Criminal Enterprise's affairs through a pattern of racketeering activity.   In addition, MGA, MGA Entertainment (HK) Limited, Larian and Bryant, and certain of the Doe Counter-defendants, constituting a group of individuals associated-in-fact, did unlawfully, willfully, and knowingly participate in and conduct, directly and indirectly, the Bratz Criminal Enterprise's affairs through a pattern of racketeering activity.

101.   The pattern of racketeering activity, as defined by 18 U.S.C. §§ 1961(1) and (5), including acts of mail fraud in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 2; acts of wire fraud in violation of 18 U.S.C. § 1343 and 18

EXHIBIT _____ _10_

PAGE _____ _104_

-61-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

21543632

1    U.S.C. § 2; acts of tampering with witnesses, victims or informants in violation of

2    18 U.S.C. § 1512 and 18 U.S.C. § 2; acts of interstate and foreign travel in aid of

3    racketeering enterprises in violation of 18 U.S.C. § 1952 and 18 U.S.C. § 2; and

4    acts of criminal copyright infringement in violation of 18 U.S.C. § 2319(a) and 17

5    U.S.C. § 506(a)(1)(A).

6           102.  Counter-defendants and the other members of the MGA Criminal

7    Enterprise schemed to defraud Mattel and steal its property and trade secret

8    information by means of false representation, breaches of fiduciary duty,

9    conversation and concealment, as more fully set forth in the foregoing paragraphs.

10          103.  In furtherance of this unlawful conspiracy, and to effect its

11   objectives, Counter-defendants and various co-conspirators committed numerous

12   overt acts, including but not limited to those set forth in the foregoing paragraphs.

13          104.  Mattel has been injured in its business or property as a direct and

14   proximate result of the Counter-defendants' and the other enterprise members'

15   violations of 18 U.S.C. § 1962(d), including injury by reason of the predicate acts

16   constituting the pattern of racketeering activity.

17          105.  As a result of the conspiracies between and among all Counter-

18   defendants and the other conspirators to violate 18 U.S.C. § 1962(c), Mattel has

19   suffered substantial damages, in an amount to be proved at trial.  Pursuant to 18

20   U.S.C. § 1964(c), Mattel is entitled to recover treble its general and special

21   compensatory damages, plus interest, costs and attorneys, fees, incurred by reason

22   of Counter-defendants' violations of 18 U.S.C. § 1962(d).

23                          **Fourth Counterclaim**

24                    **Misappropriation of Trade Secrets**

25            **(Against Counter-defendants MGA, MGA de Mexico,**

26                 **Larian, Machado and Does 4 through 10)**

27          106.  Mattel repeats and realleges each and every allegation set forth in

28   paragraphs 1 through 105, above, as though fully set forth at length.  EXHIBIT _____ _10_

2154363.2
                                        -62-                    PAGE _____ _167_
                          SECOND AMENDED ANSWER AND COUNTERCLAIMS

1   107. As used herein, "Trade Secret Material" shall mean the

2   documents, materials and information stolen by Machado, Trueba, Vargas,

3   Brisbois, the Other Former Employees, and other persons acting for, on behalf of or

4   at the direction of MGA and/or Larian. Prior to their theft by Counter-defendants,

5   the Trade Secret Materials gave Mattel a significant competitive advantage over its

6   existing and would-be competitors, including MGA. This advantage, as to MGA,

7   has now been compromised as a result of Counter-defendants' unlawful activities.

8   108. Mattel made reasonable efforts under the circumstances to

9   maintain the confidentiality of the Trade Secret Materials, including by having

10   employees and consultants who may have access the Trade Secret Materials sign

11   confidentiality agreements that oblige them not to disclose the Trade Secret

12   Materials or characteristics of the Trade Secret Materials; by limiting the

13   circulation of said materials within Mattel; by protecting and limiting access to

14   computers with log-in identifications and passwords; by limiting each employee's

15   access to electronic files to those that the particular employee needs to access; by

16   educating employees on the nature of Mattel's information that is confidential and

17   proprietary; and by reminding employees on a regular and periodic basis of their

18   obligation to protect and maintain Mattel's confidential and proprietary

19   information.

20   109. Mattel's Trade Secret Materials derive independent economic

21   value from not being generally known to the public or to other persons who can

22   obtain economic benefit from their disclosure.

23   110. Counter-defendants have illegally obtained the trade secret

24   materials, as set forth above, and through other means of which Mattel is presently

25   unaware.

26   111. Counter-defendants have used and disclosed Mattel's Trade

27   Secret Materials without Mattel's consent and without regard to Mattel's rights; and

28

EXHIBIT _____ *10*

PAGE _____ *168*

4363.2

SECOND AMENDED ANSWER AND COUNTERCLAIMS

1 without compensation, permission, or licenses for the benefit of themselves and
2 others.

3     112. Counter-defendants' conduct was, is, and remains willful and
4 wanton, and was taken with blatant disregard for Mattel's valid and enforceable
5 rights.

6     113. Counter-defendants' wrongful conduct has caused and, unless
7 enjoined by this Court, will continue in the future to cause irreparable injury to
8 Mattel. Mattel has no adequate remedy at law for such wrongs and injuries. Mattel
9 is therefore entitled to a permanent injunction restraining and enjoining Counter-
10 defendants, and each of them, as well as their agents, servants, and employees, and
11 all persons acting thereunder, in concert with, or on their behalf, from further using
12 in any manner Mattel's trade secrets.

13     114. In addition, as a proximate result of Counter-defendants'
14 misconduct, Mattel has suffered actual damages, and Counter-defendants have been
15 unjustly enriched.

16     115. The aforementioned acts of the Counter-defendants were willful
17 and malicious, including in that Counter-defendants misappropriated Mattel's trade
18 secrets with the deliberate intent to injure Mattel's business and improve their own.
19 Mattel is therefore entitled to enhanced damages. Mattel is also entitled to
20 reasonable attorney's fees.

**Fifth Counterclaim**

**Breach of Contract**

**(Against Bryant)**

24     116. Mattel repeats and realleges each and every allegation set forth in
25 paragraphs 1 through 115, above, as though fully set forth at length.

26     117. Pursuant to his Employment Agreement, Bryant agreed that he
27 would not, without Mattel's express written consent, engage in any employment or
28 business other than for Mattel or assist in any manner any business competitive

1   with the business or future business plans of Mattel during his employment with

2   Mattel. Pursuant to his Mattel Employment Agreement, Bryant further assigned to

3   Mattel all right, title and interest in "inventions," including without limitation

4   "designs" and other works that he conceived, created or reduced to practice during

5   his employment by Mattel. In addition, pursuant to the Conflict Questionnaire,

6   Bryant certified that, other than as disclosed, he had not worked for any competitor

7   of Mattel and had not engaged in any business venture or transaction involving a

8   Mattel competitor that could be construed as a conflict of interest. Bryant further

9   promised that he would notify his supervisor immediately of any change in his

10  situation that would cause him to change any of the foregoing certifications or

11  representations.

12          118. The Employment Agreement and the Conflict Questionnaire are

13  valid, enforceable contracts, and Mattel has performed each and every term and

14  condition of the Employment Agreement and Conflict Questionnaire required to be

15  performed by Mattel.

16          119. Bryant materially breached the foregoing contracts with Mattel,

17  in that, among other things, he secretly aided, assisted and worked for a Mattel

18  competitor during his employment with Mattel without the express written consent

19  of Mattel.

20          120. As a consequence of Bryant's breach, Mattel has suffered and

21  will, in the future, continue to suffer damages in an amount to be proven at trial.

22  Such damages include, without limitation, the amounts paid by the competitor to

23  Bryant during his Mattel employment; the amounts paid by MGA to Bryant during

24  his Mattel employment; the amount that Mattel paid Bryant during the time he

25  wrongfully worked with MGA; the value of information and intellectual property

26  owned by Mattel which Bryant provided to MGA; the value of the benefits that

27  MGA obtained from Bryant during the time he was employed by Mattel; and the

28

EXHIBIT _____ 10

PAGE _____ 170

2154363.2

SECOND AMENDED ANSWER AND COUNTERCLAIMS

1 | value of the benefits that MGA obtained from Bryant as a result of the work he
2 | performed for or with MGA during his Mattel employment.

3      121. Bryant's conduct has caused, and unless enjoined will continue to
4 | cause, irreparable injury to Mattel that cannot be adequately compensated by
5 | money damages and for which Mattel has no adequate remedy at law. Bryant
6 | specifically acknowledged in his Employment Agreement that his breach of the
7 | Agreement "likely will cause irreparable harm" to Mattel and that Mattel "will be
8 | entitled to injunctive relief to enforce this Agreement, in addition to damages and
9 | other available remedies." Accordingly, Mattel is entitled to orders mandating
10 | Bryant's specific performance of his contracts with Mattel and restraining Bryant
11 | from further breach.

### Sixth Counterclaim
### Intentional Interference with Contract
### (Against MGA, Larian and Does 4 through 10)

15      122. Mattel repeats and realleges each and every allegation set forth in
16 | paragraphs 1 through 121, above, as though fully set forth at length.

17      123. Valid agreements existed between Mattel and Bryant, Brawer,
18 | Machado, Trueba, Vargas, Brisbois and the Other Former Employees (collectively,
19 | the "Mattel Employees")

20      124. At all times herein mentioned, MGA, Larian and Does 4 through
21 | 10 knew that the Mattel Employees had a duty under their agreements not to work
22 | for or assist any competitor of Mattel, such as MGA. In addition, at all times
23 | mentioned herein, MGA, Larian and Does 4 through 10 knew that Bryant had
24 | assigned to Mattel, and was obligated to disclose to Mattel all inventions, including
25 | designs and other works, created, conceived or reduced to practice during their
26 | employment with Mattel.

EXHIBIT _____ *10*

PAGE _____ *171*

SECOND AMENDED ANSWER AND COUNTERCLAIMS

2154363.2

1      125. Despite such knowledge, Counter-defendants MGA, Larian and

2 Does 4 through 10 intentionally and without justification solicited, induced and

3 encouraged the Mattel Employees to breach their contracts with Mattel.

4      126. As a direct and proximate result of Counter-defendants' efforts

5 and inducements, the Mattel Employees did breach their contracts with Mattel.

6      127. As a result of said breaches, Mattel has suffered damages and

7 will imminently suffer further damages, including the loss of its competitive

8 position and lost profits, in an amount to be proven at trial.

9      128. Counter-defendants performed the aforementioned conduct with

10 malice, fraud and oppression, and in conscious disregard of Mattel's rights.

11 Accordingly, Mattel is entitled to recover exemplary damages from Counter-

12 defendants in an amount to be determined at trial.

13                         **Seventh Counterclaim**

14                         **Breach of Fiduciary Duty**

15                         **(Against Bryant and Machado)**

16      129. Mattel repeats and realleges each and every allegation set forth in

17 paragraphs 1 through 128, above, as though fully set forth at length.

18      130. Bryant and Machado held positions of trust and confidence with

19 Mattel. In their positions, Bryant and Machado had access to and were entrusted

20 with Mattel's proprietary and confidential information, supervised the work of

21 others, exercised discretion and worked independently in many of their job

22 assignments and duties. In their positions, Bryant and Machado also represented

23 Mattel in its dealings with third parties and, in actions in the course and scope of

24 their employment with Mattel, were agents of Mattel. They confirmed their

25 relationship of trust with Mattel in respective employee agreements. Bryant and

26 Machado thus owed Mattel a fiduciary duty that included, but was not limited to,

27 an obligation not to take any action that would be contrary to Mattel's best interests

28                                              EXHIBIT ___ _/0_

-67-                    PAGE ___ _/72_

SECOND AMENDED ANSWER AND COUNTERCLAIMS

21 54l63.2

1  or that would deprive Mattel of any opportunities, profit or advantage which Bryant
2  or Machado might bring to Mattel.

3      131. Bryant breached his fiduciary duty to Mattel in that, while
4  employed by Mattel, he secretly aided and assisted a competitor of Mattel,
5  including without limitation by entering into an agreement with a Mattel
6  competitor. As alleged above, Bryant also breached the aforementioned duty by
7  using Mattel property and resources for the benefit of, and to aid and assist, himself
8  personally and MGA.

9      132. Machado breached his fiduciary duty to Mattel, in that while
10 employed by Mattel, he secretly aided and assisted a competitor of Mattel by,
11 among other things, misappropriating Mattel trade secret and proprietary
12 information and providing said information to officers of MGA. Machado also
13 breached the aforementioned duty by using Mattel property and resources for the
14 benefit of, and to aid and assist, himself personally and MGA.

15     133. As a direct and proximate result of Counter-defendants' wrongful
16 conduct, Mattel has incurred damages in an amount to be determined at trial.

17     134. Counter-defendants acted with malice, fraud and oppression, and
18 in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to an
19 award of exemplary damages against Counter-defendants in an amount to be
20 determined at trial.

21     135. Furthermore, Counter-defendants' conduct has caused, and unless
22 enjoined will continue to cause, irreparable injury to Mattel that cannot be
23 adequately compensated by money damages and for which Mattel has no adequate
24 remedy at law. Accordingly, Mattel is entitled to an order restraining further
25 breach of Bryant's fiduciary duty to Mattel and/or restraining Counter-defendants
26 from continuing to benefit from such breach.

27

28

EXHIBIT _____ /0

PAGE _____ /73

21543632

-68-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

### Eighth Counterclaim

### Aiding and Abetting Breach of Fiduciary Duty

### (Against MGA, Larian and Does 4 through 10)

136.  Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 135, above, as though fully set forth at length.

137.  At all times herein mentioned, MGA, Larian and Does 4 through 10 knew that Bryant held a position of trust and confidence at Mattel.  At all times herein mentioned, MGA, Larian and Does 4 through 10 knew that Bryant owed a fiduciary duty to Mattel not to take any action that would be contrary to Mattel's best interests, including but not limited to secretly developing and designing Bratz while employed by Mattel and by secretly assisting Larian and MGA .

138.  At all times herein mentioned, MGA, Larian and Does 4 through 10 knew that the Mattel Employees (excluding Bryant) held positions of trust and confidence at Mattel.  At all times herein mentioned, MGA, Larian and Does 4 through 10 knew that the Mattel Employees (excluding Bryant) owed a fiduciary duty to Mattel not to take any action that would be contrary to Mattel's best interests, including but not limited to taking confidential trade secret information from Mattel's premises and providing that information to a competitor.

139.  Despite such knowledge, Counter-defendants MGA, Larian and Does 4 through 10 intentionally and without justification solicited, encouraged, aided and abetted and gave substantial assistance to the Mattel Employees to breach their fiduciary duties to Mattel, knowing that their conduct would constitute breaches of their fiduciary duties to Mattel.

140.  As a direct and proximate result of Counter-defendants' efforts, the Mattel Employees did breach their fiduciary duties to Mattel and Mattel has incurred damages in an amount to be proven at trial.  Mattel, therefore, is entitled to recover compensatory damages in an amount to be determined at trial.

EXHIBIT _____ /O

PAGE _____ /7⁴

-69-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

21543632

1     141. In taking the aforesaid actions, MGA, Larian and Does 4 through

2 10 acted with malice, fraud and oppression, and in conscious disregard of Mattel's

3 rights. Accordingly, Mattel is entitled to recover exemplary damages from

4 Counter-defendants in an amount to be determined at trial.

5 **Ninth Counterclaim**

6 **Breach of Duty of Loyalty**

7 **(Against Bryant and Machado)**

8     142. Mattel repeats and realleges each and every allegation set forth in

9 paragraphs 1 through 141, above, as though fully set forth at length.

10     143. As employees of Mattel, Bryant and Machado owed a duty of

11 undivided loyalty to Mattel. Pursuant to this duty, Bryant and Machado could not

12 compete with Mattel or assist a competitor of Mattel during their employment with

13 Mattel. Pursuant to this duty, Bryant and Machado were required to always give

14 preference to Mattel's business over their own, similar interests during the course of

15 their employment with Mattel.

16     144. Bryant and Machado breached their duty of loyalty to Mattel in

17 that, while employed by Mattel, they secretly aided, assisted and worked for a

18 competitor of Mattel, including without limitation by entering into agreements with

19 a Mattel competitor. As alleged above, they also breached the aforementioned duty

20 by using Mattel property and resources for the benefit of, and to aid and assist,

21 themselves personally and the competitor of Mattel.

22     145. As a direct and proximate result of Counter-defendants' wrongful

23 conduct, Mattel has incurred damages in an amount to be determined at trial.

24     146. Counter-defendants acted with malice, fraud and oppression, and

25 in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to an

26 award of punitive damages against Counter-defendants in an amount to be

27 determined at trial.

28

EXHIBIT _____ 10

-70-      PAGE _____ 175

SECOND AMENDED ANSWER AND COUNTERCLAIMS

154363.2

1       147. Furthermore, Counter-defendants' conduct has caused, and unless

2  enjoined will continue to cause, irreparable injury to Mattel that cannot be

3  adequately compensated by money damages and for which Mattel has no adequate

4  remedy at law. Accordingly, Mattel is entitled to an order restraining further

5  breach of Counter-defendants' duty of loyalty to Mattel and/or restraining Counter-

6  defendants from continuing to benefit from such breach.

7       148. In breaching their duty of loyalty to Mattel, Bryant and Machado

8  acted with malice, fraud and oppression, and in conscious disregard of Mattel's

9  rights. Accordingly, Mattel is entitled to recover exemplary damages from

10  Counter-defendants in an amount to be determined at trial.

11              **Tenth Counterclaim**

12        **Aiding and Abetting Breach of Duty of Loyalty**

13       **(Against MGA, Larian and Does 4 through 10)**

14       149. Mattel repeats and realleges each and every allegation set forth in

15  paragraphs 1 through 148, above, as though fully set forth at length.

16       150. MGA, Larian and Does 4 through 10 knew that Bryant, as an

17  employee of Mattel, owed a duty of loyalty to his employer. MGA, Larian and

18  Does 4 through 10 knew that this duty included an obligation on the part of Bryant

19  not to compete with Mattel or assist a competitor of Mattel during the term of his

20  employment with Mattel. MGA, Larian and Does 4 through 10 also knew that

21  Bryant was required to give preference to Mattel's business over his own, similar

22  interests or those of Mattel's competitors. or those of Mattel's competitors during

23  the course of his employment with Mattel.

24       151. MGA, Larian and Does 4 through 10 knew that the Mattel

25  Employees (excluding Bryant) were employed by Mattel, and, as employees of

26  Mattel, that they owed duties of loyalty to Mattel. MGA, Larian and Does 4

27  through 10 knew that these duties included an obligation on the part of the Mattel

28

EXHIBIT _____ *10*

1 | Employees (excluding Bryant) not to compete with Mattel or assist a competitor of

2 | Mattel during their Mattel employment.

3 |       152. Despite such knowledge, Counter-defendants MGA, Larian and

4 | Does 4 through 10 intentionally and without justification solicited, encouraged,

5 | aided and abetted and gave substantial assistance to the Mattel Employees to

6 | breach their duties of loyalty to Mattel, knowing that their conduct would constitute

7 | breaches of their duties of loyalty to Mattel.

8 |       153. As a further consequence of Counter-defendants' efforts, Mattel

9 | has suffered injury and is entitled to compensatory damages in an amount to be

10 | proven at trial.

11 |       154. In taking the aforesaid actions, MGA, Larian and Does 4 through

12 | 10 acted with malice, fraud and oppression, and in conscious disregard of Mattel's

13 | rights. Accordingly, Mattel is entitled to recover exemplary damages from

14 | Counter-defendants in an amount to be determined at trial.

15 | **Eleventh Counterclaim**

16 | **Conversion**

17 | **(Against All Counter-defendants)**

18 |       155. Mattel repeats and realleges each and every allegation set forth in

19 | paragraphs 1 through 154, above, as though fully set forth at length.

20 |       156. Counter-defendants wrongfully converted Mattel property and

21 | resources by appropriating and using them for their own benefit and gain and for

22 | the benefit and gain of others, without the permission of Mattel.

23 |       157. Mattel was entitled to, among other things, the exclusive right

24 | and enjoyment in property and tangible materials owned by Mattel, including

25 | without limitation such proper and materials that were created by Bryant while he

26 | was a Mattel product designer. Such property was taken by Bryant from Mattel to

27 | further his own interests and, in at least some instances, provided by Bryant to

28 | Larian and MGA in furtherance of the interests of Bryant, Larian and MGA.

EXHIBIT _____ _10_

PAGE _____ _177_

-72-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

1         158. In addition, Counter-defendants wrongfully converted Mattel's

2  property by removing the Trade Secret Materials in electronic and paper form from

3  Mattel's offices. Counter-defendants did so without Mattel's permission and

4  continue to possess them.

5         159. As a direct and proximate result of Counter-defendants' wrongful

6  conversion of Mattel property, including those relating to Bratz and Mattel's Trade

7  Secret Materials, Mattel has incurred damages. Mattel, therefore, is entitled to

8  recover compensatory damages in an amount to be determined at trial.

9        160. As a result of Counter-defendants' acts of conversion, Mattel is

10  entitled to damages in an amount sufficient to indemnify Mattel for the loss

11  suffered, which is not measured by the value of the property misappropriated, but

12  includes the lost profits that Mattel suffered as a result of the conversion or,

13  alternatively, the profits generated by the Counter-defendants that would not have

14  been generated but for the conversion. Only such a measure of damages would

15  fully and fairly compensate Mattel for the injury it suffered due to Counter-

16  defendants' acts of conversion.

17        161. Counter-defendants performed the aforementioned conduct with

18  malice, fraud and oppression, and in conscious disregard of Mattel's rights.

19  Accordingly, Mattel is entitled to recover exemplary damages from Counter-

20  defendants in an amount to be determined at trial.

21        162. Furthermore, Counter-defendants' conduct has caused, and unless

22  enjoined will continue to cause, irreparable injury to Mattel that cannot be

23  adequately compensated by money damages and for which Mattel has no adequate

24  remedy at law. Accordingly, Mattel is entitled to an order restraining Counter-

25  defendants from further conversion of Mattel property and resources and/or

26  restraining Counter-defendants from continuing to benefit from such conversion.

27

28

EXHIBIT _____ 10

PAGE _____ 178

2154363.2

SECOND AMENDED ANSWER AND COUNTERCLAIMS

**Twelfth Counterclaim**

**Unfair Competition**

(Common Law and *Cal. Bus. & Prof. Code* § 17200)

(Against All Counter-defendants)

163. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 162, above, as though fully set forth at length.

164. Section 17200 of the California Business and Professions Code prohibits unfair competition, including "any unlawful, unfair or fraudulent business act or practice . . . ."

165. By engaging in the foregoing conduct, Counter-defendants have, individually and in combination, engaged in unlawful, unfair and/or fraudulent acts of unfair competition in violation of both the common law of the state of California and *Cal. Bus. & Prof. Code* § 17200 *et seq.* Such conduct included, without limitation, MGA's commercial bribery of Bryant in violation of *Cal. Penal Code* § 641.3 and misappropriation of trade secrets in violation of 18 U.S.C. § 1832(a). Such conduct also included, without limitation, MGA's and Larian's disparagement of Mattel's products and misrepresentations as alleged above.

166. As a result of the aforementioned conduct, Mattel has suffered damages and will imminently suffer further damages, including but not limited to lost profits in an amount to be proven at trial. No adequate remedy at law exists for the wrongs and injuries Mattel has suffered and will continue to suffer, and Mattel is entitled to an injunction enjoining Counter-defendants' continued wrongful acts. Mattel is also entitled to recover compensatory and exemplary damages pursuant to the doctrine of common law unfair competition and *Cal. Civ. Code* § 3294.

EXHIBIT _____ 10

PAGE _____ 179

2154363.2

SECOND AMENDED ANSWER AND COUNTERCLAIMS

## **Thirteenth Counterclaim**

### **Declaratory Relief**

### **(Against All Counter-defendants)**

167. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 166, above, as though fully set forth at length.

168. As shown in the foregoing paragraphs above, an actual controversy exists between Mattel and Counter-defendants regarding Counter-defendants' lack of ownership interests in Bratz and Mattel's rights in the same.

169. Accordingly, Mattel seeks a declaration of the Court that Counter-defendants have no valid or protectable ownership rights or interests in Bratz, and that Mattel is the true owner of the same, and further seeks an accounting and imposition of a constructive trust over Bratz, including without limitation registrations and applications for registrations relating thereto made or filed by Counter-defendants and third parties, and over all revenues and other monies or benefits derived or obtained from MGA's and Bryant's purported ownership, use, sale, distribution and licensing of Bratz.

170. Mattel seeks a declaration of the Court that any and all agreements between Bryant, on the one hand, and MGA, on the other hand, in which Bryant purports to assign to MGA any right, title or interests in any work that he conceived, created or reduced to practice while a Mattel employee, including but not limited to the Bratz designs, is void and of no effect, including without limitation because Bryant had previously assigned said right, title or interest to Mattel and because Mattel was otherwise the owner of said right, title or interest.

### **Prayer for Relief**

WHEREFORE, Mattel respectfully requests judgment:

1. For a declaration that Counter-defendants have no valid or protectable ownership interests or rights in Bratz designs and works conceived,

EXHIBIT _____ /0 _____

PAGE _____ /80

-75-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

1    created or reduced to practice by Bryant during the term of his Mattel employment

2    and/or by any others then-employed by Mattel, as well as in all derivatives

3    prepared therefrom, and that Mattel is the true owner of the foregoing;

4            2.    For a declaration that any agreement between Bryant, on the one

5    hand, and MGA or any person or entity, on the other hand, in which Bryant

6    purported to assign any right, title or interests in any work that he conceived,

7    created or reduced to practice while a Mattel employee, including but not limited to

8    the Bratz designs, is void and of no effect;

9            3.    For an Order enjoining and restraining Counter-defendants, their

10    agents, servants and employees, and all persons in active concert or participation

11    with them, from further wrongful conduct, including without limitation from

12    imitating, copying, distributing, importing, displaying, preparing derivatives from

13    and otherwise infringing Mattel's copyright-protected works;

14            4.    For an Order, pursuant to 17 U.S.C. § 503(a) and other

15    applicable law, impounding all of Counter-defendants' products and materials that

16    infringe Mattel's copyrights, as well as all plates, molds, matrices and other articles

17    by which copies of the works embodied in Mattel's copyrights may be reproduced

18    or otherwise infringed;

19            5.    For an Order mandating that Counter-defendants return to Mattel

20    all tangible items, documents, designs, diagrams, sketches or any other

21    memorialization of inventions created or reduced to practice during Bryant's

22    employment with Mattel as well as all Mattel property converted by Counter-

23    defendants;

24            6.    For an Order mandating specific performance by Bryant to

25    comply with and satisfy Bryant's contractual obligations to Mattel;

26            7.    That Mattel be awarded, and Counter-defendants be ordered to

27    disgorge, all payments, revenues, profits, monies and royalties and any other

28    benefits derived or obtained as a result of the conduct alleged herein, including

EXHIBIT _____ _10_

PAGE _____ _181_

-76-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

1 | without limitation of all revenues and profits attributable to Counter-defendants'
2 | infringement of Mattel's copyrights under 17 U.S.C. § 504;

3 |     8.    For an accounting of all profits, monies and/or royalties from the
4 | exercise of ownership, use, distribution, sales and licensing of Bratz;

5 |     9.    For the imposition of a constructive trust over Bratz, including
6 | without limitation registrations and applications for registrations relating thereto
7 | made or filed by Counter-defendants and third parties, and all profits, monies,
8 | royalties and any other benefits derived or obtained from Counter-defendant's
9 | exercise of ownership, use, sale, distribution and licensing of Bratz;

10 |     10.    That Mattel recover its actual damages and lost profits;

11 |     11.    That Counter-defendants be ordered to pay exemplary damages
12 | in a sum sufficient to punish and to make an example of them, and deter them and
13 | others from similar wrongdoing;

14 |     12.    That Counter-defendants be ordered to pay treble its general and
15 | special damages, plus interest, costs and attorney's fees incurred by reason of
16 | Counter-defendants' violations of 18 U.S.C. §§ 1962(c)-(d).

17 |     13.    That Counter-defendants be ordered to pay double damages due
18 | to their willful and malicious misappropriation of Mattel's trade secrets with
19 | deliberate intent to injure Mattel's business and improve its own;

20 |     14.    That Counter-defendants pay to Mattel the full cost of this action
21 | and Mattel's attorneys' and investigators' fees; and

22
23
24
25
26
27
28

**EXHIBIT** ___*10*___

**PAGE** ___*182*___

SECOND AMENDED ANSWER AND COUNTERCLAIMS

2154363.2

1          15.   That Mattel have such other and further relief as the Court may

2  deem just and proper.

3

4  DATED:  July 12, 2007         QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

5

6                 By _____

7                    John B. Quinn

8                    Attorneys for Defendant and Counter-claimant Mattel, Inc.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                                  EXHIBIT _____ 10

28                                  PAGE _____ 183

# DEMAND FOR JURY TRIAL

Mattel, Inc. respectfully requests a jury trial on all issues triable thereby.

DATED:  July 12, 2007

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

By _John Quinn / BD_

John B. Quinn
Attorneys for Defendant and Counter-
claimant Mattel, Inc.

EXHIBIT _____ 10 _____

**Exhibit A**

EXHIBIT _____ 10 _____

PAGE _____ 185 _____

# EMPLOYEE CONFIDENTIAL INFORMATION AND INVENTIONS AGREEMENT

I acknowledge that Mattel, Inc. (the "Company") operates in a competitive environment and that it enhances its opportunities to succeed by establishing certain policies, including those included in this Agreement. This Agreement is designed to make clear that: (i) I will maintain the confidentiality of the Company's trade secrets; (ii) I will use those trade secrets for the exclusive benefit of the Company; (iii) inventions that I create will be owned by the Company; (iv) my prior and continuing activities separate from the Company will not conflict with the Company's development of its proprietary rights; and (v) when and if my employment with the Company terminates I will not use my prior position with the Company to the detriment of the Company. In consideration of my employment with the Company and other good and valuable consideration, I agree that:

## 1. Provisions Related to Trade Secrets

(a) I acknowledge that the Company possesses and will continue to develop and acquire valuable Proprietary Information [as defined below], including Information that I may develop or discover as a result of my employment with the Company. The value of that Proprietary Information depends on it remaining confidential. The Company depends on me to maintain that confidentiality, and I accept that position of trust.

(b) As used in this Agreement, "Proprietary Information" means any information [including formula, pattern, compilation, device, method, technique or process] that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use, and includes information on the Company, its customers, suppliers, joint ventures, licensors, licensees, distributors and other persons and entities with whom the Company does business.

(c) I will not disclose or use at any time either during or after my employment with the Company, any Proprietary Information except for the exclusive benefit of the Company as required by my duties for the Company, or as the Company expressly may consent to in writing. I will cooperate with the Company and use my best efforts to prevent the unauthorized disclosure, use or reproduction of all Proprietary Information.

(d) Upon leaving employment with the Company for any reason, I immediately will deliver to the Company all tangible, written, graphical, machine readable and other materials [including all copies] in my possession or under my control containing or disclosing Proprietary Information.

## 2. Ownership of Inventions

(a) I agree to communicate to the Company as promptly and fully as practicable all Inventions [as defined below] conceived or reduced to practice by me [alone or jointly by others] at any time during my employment by the Company. I hereby assign to the Company and/or its nominees all my right, title and interest in such Inventions, and all my right, title and interest in any patents, copyrights, patent applications or copyright applications based thereon. I will assist the Company and/or its nominees [without charge but at no expense to me] at any time in every proper way to vest in me and/or their own benefit, patents and copyrights for all such inventions anywhere in the world and to enforce its and/or their rights in legal proceedings.

(b) As used in this Agreement, the term "Inventions" includes, but is not limited to, all discoveries, improvements, processes, developments, designs, know-how, data computer programs and formulae, whether patentable or unpatentable.

(c) Any provision in this agreement requiring me to assign my rights in any Invention does not apply to an Invention which qualifies under the exclusive under the exclusive benefit of Section 2870 of the California Labor Code. That section provides that the requirement to assign "shall not apply to an Invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities or trade secret information except for those Inventions that either [1] relate at the time of conception or reduction to practice of the Invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or [2] result from any work performed by the employee for the employee." I understand that I bear the burden of proving that an Invention qualifies under Section 2870.

(d) I hereby irrevocably designate and appoint the Company and each of its duly authorized officers and agents as my agents and attorney-in-fact to act for and in my behalf and stead to execute and file any document and to do all other lawfully permitted acts to further the prosecution, issuance and enforcement of patents, copyrights and other proprietary rights with the same force and effect as if executed and delivered by me.

## 3. Conflicts with Other Activities

(a) My employment with the Company requires my undivided attention and effort. Therefore, during my employment with the Company, I will fully comply with the Company's Conflict of Interest Policy, as it may be amended from time to time. I shall not, without the Company's express written consent, engage in any employment or business other than for the Company, or invest in or assist [in any manner] any business competitive with the business or future business plans of the Company.

## 4. Miscellaneous

(a) My obligations under this Agreement may not be modified or terminated, in whole or in part, except in writing signed by a Vice-President of the Company. Any waiver by the Company of a breach on any provision of this Agreement will not operate or be construed as a waiver of any subsequent breach.

(b) Each provision of this Agreement will be treated as a separate and independent clause, and the unenforceability of any one provision will in no way impair the enforceability of any other provision. If any provision is held to be unenforceable, such provision will be construed by the appropriate judicial body by limiting or reducing it to the minimum extent necessary to make it legally enforceable.

(c) My obligation under this Agreement will survive the termination of my employment, regardless of the manner of such termination. This Agreement will insure to the benefit of and be binding upon the successors and assigns of the the Company.

(d) I understand that the provisions of this Agreement are a material condition to my employment with the Company. I also understand that this Agreement is not an employment contract, and nothing in this Agreement creates any right to my continuous employment by the Company, or to my employment for any particular term. ` .

(e) Any breach of this Agreement likely will cause irreparable harm to the Company for which money damages could not reasonably or adequately compensate the Company. Accordingly, I agree that the Company will be entitled to injunctive relief to enforce this Agreement, in addition to damages and other available remedies.

(f) This agreement will be governed by and interpreted in accordance with the laws of the State of California.

(g) This Agreement contains the complete agreement between the Company and me concerning the subject matter hereof and supersedes all other agreements and understandings. This Agreement may be executed in counterparts. This Agreement will be deemed effective as of the start of Employee's employment with the Company.

**CAUTION: THIS AGREEMENT CREATES IMPORTANT OBLIGATIONS OF TRUST AND AFFECTS
THE EMPLOYEE'S RIGHTS TO INVENTIONS THE EMPLOYEE MAY MAKE DURING HIS OR HER EMPLOYMENT.**

Employee Signature _____

Employee Name [print]   CARTER H. BRYANT

Date   01/04/99

MATTEL, INC.

By _____
Signature

Name of Witness [print]   TERESA NEWCOMB

EXHIBIT _____ 10

PAGE _____ 186

EXHIBIT ___ PAGE 80

M 0001622

**Exhibit B**

EXHIBIT _____ 10 _____

PAGE _____ 187 _____

## CONFLICT OF INTEREST QUESTIONNAIRE

BRYANT, CARTER H.     PROJECT DESIGNER
Name (Last, First, M.I.)          Job Title                    Department

**Instructions:** The purpose of this questionnaire is to confirm the propriety of relations between our key employees and our suppliers and competitors. Please read the definitions below and Mattel's policies concerning Conflicts of Interest. Then answer the questions by checking the correct answer. Base your answers on personal knowledge. There is no need to make inquiries or seek additional information since lack of knowledge of a situation indicates that there is no conflict of interest. Your answers to questions 1 through 8 should cover the past twelve months and the term "you" should include members of your immediate family.

**Mattel Supplier** is interpreted broadly for purposes of this questionnaire. A Mattel supplier is any person, partnership, trust, corporation, or other enterprise which during the past twelve months has done business or currently contemplates doing business with Mattel or any Mattel subsidiary.

**Mattel Competitor** is interpreted broadly for purposes of this questionnaire. A Mattel competitor is any person, partnership, trust, corporation, or other enterprise which has done business or contemplates doing business in any field that is in competition with Mattel or any Mattel subsidiary.

**Interest** means direct or indirect ownership of any stock, bond, option or right to purchase any security, share in profits, investment, partnership interest or other profit participation or equity interest whatsoever. Interest also means any agreement to perform services for or consult with or to deliver materials to or to receive compensation of any kind from any supplier or competitor. You may disregard mutual investment trusts and publicly-owned corporations whose securities are traded publicly, in which you own not more than $25,000 in market value, but not to exceed 10% of an individual's net worth.

**Recipient of any commission, etc.,** means receipt of anything of value, in cash or in kind, over $60 on any one occasion or over $300 total during the past twelve months.

○ YES ● NO  1. Have you owned, directly or indirectly, any interest in a Mattel supplier?

○ YES ● NO  2. Have you owned, directly or indirectly, and interest in a Mattel competitor?

○ YES ● NO  3. Have you been the recipient of any commission, fee, loan, trip, gift, benefit or anything else of value that is derived in any way from a Mattel supplier?

● YES ○ NO  4. Have you been the recipient of any commission, fee, loan, trip, gift, benefit or anything else of value that is derived in any way from a Mattel competitor?

● YES ○ NO  5. Have you or any relative of yours by blood or marriage been a director, officer, consultant, agent, employee, or representative of or acted for any Mattel competitor in any capacity?

○ YES ● NO  6. Have you or any relative of yours by blood or marriage been a director, officer, consultant, agent, employee, or representative of or acted for any Mattel supplier in any capacity?

○ YES ● NO  7. Have you engaged in any activity including the acquisition or ownership of any interest, for personal profit, not expressly within the scope of the foregoing with respect to any supplier or competitor?

○ YES ● NO  8. Excepting normal everyday transactions (purchase of toys, etc.) have you engaged in any business venture or transaction involving a Mattel supplier or competitor or engaged in any activity which could be objectively construed as being a conflict of interest or allegiance?

○ YES ● NO  9. Are you aware of any activity of any employee which you believe could be construed as a potential conflict of interest with Mattel?

If your answer to any of the above questions is "yes," please explain in the space below:

4, 5; Freelance design & artwork in 1998,
from apprx. 5/98 - 11/98 for the Ashton Drake
galleries.

I certify that I have read Mattel's policies concerning Conflict of Interest and the answers to the above questions are true. I understand that failure to answer this questionnaire fully and truthfully constitutes grounds for immediate termination of my employment. I agree not to divulge any company information to unauthorized reopened. I also agree to notify my superior immediately of any changes in my situation that would cause me to answer any of the above questions differently. I further certify that, to the best of my knowledge, neither I nor any member of my immediate family is or has been engaged in any capacity which creates a Conflict of Interest.

Signature _Carter Bryant_                          01/04/98
                                                    Date

EXHIBIT ___10___

PAGE ___188___

EXHIBIT _B_  PAGE _21_          M 0001621

RECEIVED

DEC 2 1 2007

1  KEKER & VAN NEST, LLP
   JOHN W. KEKER - #49092
2  jkeker@kvn.com
   MICHAEL H. PAGE - #154913
3  mpage@kvn.com
   CHRISTA M. ANDERSON - #184325
4  canderson@kvn.com
   MATTHEW M. WERDEGAR - #200470
5  mwerdegar@kvn.com
   JOHN E. TRINIDAD - #250468
6  jtrinidad@kvn.com
   AUDREY WALTON-HADLOCK - #250574
7  awaltonhadlock@kvn.com
   710 Sansome Street
8  San Francisco, CA  94111-1704
   Telephone: (415) 391-5400
9  Facsimile: (415) 397-7188

10 Attorneys for Plaintiff
   CARTER BRYANT
11

12              UNITED STATES DISTRICT COURT

13             CENTRAL DISTRICT OF CALIFORNIA

14                    EASTERN DIVISION

15

16 CARTER BRYANT, an individual,          Case No. CV 04-09049 SGL (RNBx)
                                          (consolidated with CV 04-9059 & 05-
17             Plaintiff,                 2727

18     v.                                 DISCOVERY MATTER
                                          [To Be Heard By Discovery Master
19 MATTEL, INC. a Delaware                Hon. Edward Infante (Ret.) Pursuant
   Corporation,                           To The Court's Order of December 6,
20                                        2006]
             Defendant.
21                                        CARTER BRYANT'S OPPOSITION
                                          TO MATTEL, INC.'S MOTION TO
22 CONSOLIDATED WITH MATTEL,              COMPEL RESPONSES TO
   INC., v. BRYANT and MGA               INTERROGATORIES (NOS. 27-33,
23 ENTERTAINMENT, INC. v.                 36-40, 42, 45, AND 47)
   MATTEL, INC.
24                                        Date:    January 3, 2008
                                          Time:    1:30 p.m.
25
                                          Phase I:
26                                        Date Comp. Filed: April 13, 2005
                                          Discovery Cut-Off: Jan. 28, 2008
27                                        Trial Date: May 27, 2008

28                                        EXHIBIT _____ 11 _____

                                          PAGE _____ 189 _____

                        12-30

# TABLE OF CONTENTS

Page

I.      INTRODUCTION...................................................................................1

II.     PROCEDURAL BACKGROUND ..........................................................2

III.    ARGUMENT ........................................................................................6

        A.    Mattel's motion to compel should be denied as untimely. ..................6

        B.    If the Court considers the substance of Mattel's motion, despite Mattel's failure to meet and confer, it should uphold Bryant's objections. ..........................................................11

              1.    Bryant's objections to Mattel's contention interrogatories (Nos. 30-33, 36-38, 42-44, 48-50). ..................12

                    a.    Mattel's contention interrogatories, as drafted, are overbroad and abusive.........................................12

                    b.    Bryant's other objections to Mattel's contention interrogatories are also appropriate. ..............................16

              2.    Bryant's objections to Mattel's interrogatories regarding BRATZ INVENTIONS (Nos. 27-29). .....................17

              3.    Bryant accurately answered Mattel's Interrogatory No. 45, as written.........................................................20

              4.    Bryant's objections to Interrogatory Nos. 40 and 47. .............21

        C.    Mattel's motion to compel a response to Interrogatory No. 39, which requests that Bryant identify his bank and other financial institution accounts, should be denied. ..................................23

        D.    Mattel's request for sanctions should be denied, and the Court should instead impose sanctions against Mattel. ......................25

IV.     CONCLUSION .................................................................................27

EXHIBIT _____ _11_

PAGE _____ _190_

# TABLE OF AUTHORITIES

## FEDERAL CASES

Page

*Birdine v. City of Coatesville,*
No. 08172004, 2004 WL 2786153 (E.D. Pa. Aug. 17, 2004) .............................. 7

*Cable & Computer Tech, Inc. v. Lockheed Saunders, Inc.,*
175 F.R.D. 646 (C.D. Cal. 1997) ............................................................... 10, 26

*Catalano v. GWD Management Corp.,*
No. CV-403-167, 2005 WL 5519861
(S.D. Ga. Mar. 30 2005) ................................................................................. 7

*Clean Earth Remediation and Const. Services, Inc. v.*
*American Intern. Group, Inc.,*
245 F.R.D. 137 (S.D.N.Y. 2007) ................................................................... 13

*Does I-VI v. Yogi,*
110 F.R.D. 629 (D.D.C. 1986) ...................................................................... 24

*E.E.O.C. v. V & J Foods, Inc.,*
No. 05-C-194, 2006 WL 2947474 (E.D. Wis. Oct. 16, 2006) ............................. 7

*Epling v. UCB Films, Inc.,*
Nos. 98-4226-RDR, 98-4227-RDR, 00-4062-RDR, 00-4186-
RDR, 2001 WL 1249362 (D. Kan. Sep. 27, 2001) .......................................... 7

*Excess Insurance Co., Ltd. v. Rochdale Insurance Co.,*
05 Civ. 10174, 2007 WL 2900217 (S.D.N.Y. Oct. 4, 2007) ......................... 9, 10

*Garland v. Interlake, Inc.,*
CIV A No. 28-9096, 1989 WL 71467 (E.D. Pa. Jun. 28,
1989) ............................................................................................................... 7

*Geico Casualty Co. v. Beauford,*
No. 8:05-CV-697-T24-EAS, 2007 WL 1192446 (M.D. Fla.
Apr. 23, 2007) ............................................................................................... 7

*Grynberg v. Total S.A.,*
No. 03-cv-01280-WYD-BNB, 2006 WL 1186836
(D. Colo. May 3, 2006) .................................................................................. 13

EXHIBIT _____ *11*

PAGE _____ *191*

*Hiskett v. Wal-Mart Stores, Inc.*,
  180 F.R.D. 403 (D. Kan. 1998)..................................................16

*Hoelzel v. First Select Corp.*,
  214 F.R.D. 634 (N.D. Colo. 2003)...........................................10

*Ippolito v. Goord,*
  No. 05-CV-6683L, 2007 WL. 2769503
  (W.D.N.Y. Sep. 21, 2007).........................................................7

*Johnson v. Kraft Foods N. America, Inc.*,
  238 F.R.D. 648 (D. Kan. 2006)..........................................20, 22

*Kendrick v. Sullivan,*
  125 F.R.D. 1 (D. D.C. 1989)....................................................17

*Lawrence v. First Kansas Bank & Trust Co.*,
  169 F.R.D. 657 (D. Kan. 1996).........................................13, 14

*Lucero v. Valdez,*
  240 F.R.D. 591 (D. N.M. 2007)..............................................13

*Luna v. Del Monte Fresh Produce (Southeast), Inc.*,
  No. 1-06-CV-2000-JEC, 2007 WL. 1500269
  (N.D. Ga. May 18, 2007) .........................................................13

*Majdalani v. Legacy Bank,*
  No. 06-1317-MLB, 2007 WL. 2694043
  (D. Kan. Sep. 11, 2007)..........................................................8, 9

*Morris v. McGrath,*
  No. C 04-3142 SI, 2006 WL. 870965
  (N.D. Cal. April 3, 2006) ..........................................................10

*Peskoff v. Faber,*
  230 F.R.D. 25 (D.D.C. 2005)...............................................24, 25

*Pierce v. Underwood,*
  487 U.S. 552 (1988) ..................................................................26

*Premium Service Corp. v. Sperry & Hitchinson Co.*
  511 F.2d 225 (9th Cir. 1975)....................................................24

iii

EXHIBIT _____ *11*

PAGE _____ *192*

*Rhea v. Uhry,*
  No. 3:05CV189 (RNC), 2007 WL. 926908
  (D. Conn. Mar. 26, 2007)..................................................................7

*Reygo Pacific Corp. v. Johnston Pump Co.*
  680 F.2d 647 (9th Cir. 1982)..........................................................26

*Robinson v. Potter,*
  453 F.3d 990 (8th Cir. 2006)..........................................................10

*Safeco of America v. Rawstron,*
  181 F.R.D. 441 (C.D. Cal. 1998) ................................................2, 14

*Samuels v. Huff,*
  No. 04-0859-P, 2007 WL. 1237961 (W.D. La. Apr. 27, 2007).........7

*Sherman v. City of Davis,*
  No. CIV S-04-2320 LKK EFB PS, 2007 WL. 1454278
  (E.D. Cal. May 17, 2007).................................................................10

*Sommers v. West,*
  No. 97 Civ. 4902 (JSM), 1997 WL. 772783
  (S.D.N.Y. Dec. 12, 1997).................................................................23

*Tatum v. Schwartz,*
  No. CIV S-06-1440 RRB EFB, 2007 WL. 2220977
  (E.D. Cal. Aug. 2, 2007) ..................................................................14

*Tuggle v. Kamara,*
  No. C 05-4142 MHP, 2007 WL. 760596
  (N.D. Cal. March 9, 2007) ...............................................................10

*Walt Disney Co. v. DeFabiis,*
  168 F.R.D. 281 (C.D. Cal. 1996) .................................................11, 26

**STATE CASES**

*Hooser v. Superior Court,*
  84 Cal. App. 4th 997 (2000) .............................................................24

*Valley Bank v. Superior Court,*
  15 Cal. 3d 652 (1975).......................................................................23

EXHIBIT _____11_____

PAGE _____193_____

BRYANT'S OPPOSITION TO MATTEL'S MOTION TO COMPEL RESPONSES TO INTERROGATORIES
CASE NO. CV 04-09049 SGL (RNBx)

## DOCKETED CASES

*Chapman v. Cal. Department of Education,*
No. C-01-1780, 2002 WL 32854376 (N.D. Cal. Feb. 6, 2002) ........................... 14

*Sotelo-Camacho v. Morales,*
CIVA No. 1:05CV1349 WSD, 2006 WL 3709613 (ND. Ga.
Nov. 7, 2000) ................................................................................................................. 7

*Use Techno Corp. v. Kenko USA, Inc.,*
No. C-06-02754 (N.D. Cal. Oct. 18, 2007) ............................................ 8, 10

## FEDERAL STATUTES

Fed. R. Civ. P. 37 ......................................................................................... 1, 2,

Fed. R. Civ. P. 69(a) ......................................................................................... 23

## STATE STATUTES

Cal. Code Civ.Proc. § 708.110 ......................................................................... 23

Cal. Const., Art. I, § 1 ......................................................................................... 23

Cal. Penal Code § 641.3 ......................................................................................... 24

EXHIBIT _____ *11*

PAGE _____ *194*

v

BRYANT'S OPPOSITION TO MATTEL'S MOTION TO COMPEL RESPONSES TO INTERROGATORIES
CASE NO. CV 04-09049 SGL (RNBx)

408135.03

# I.   INTRODUCTION

With one lone exception, Mattel's Motion to Compel Responses to Interrogatories by Carter Bryant is either moot or it is premature and filed in violation of the meet and confer requirements of Federal Rule of Civil Procedure 37 and Central District Local Rule 37-1.  Whichever way it is viewed, Mattel's motion is neither timely nor appropriate.  Mattel seeks to compel further interrogatory responses by Bryant to fifteen interrogatories contained within Mattel's Revised Third, Amended Fourth, Fifth, Sixth, and Seventh Sets of Interrogatories.  But Bryant promised to provide supplemental responses to all but one of these interrogatories days before Mattel served its motion to compel, as Mattel itself admits in its motion.[1]  *See* Mattel's Mot. to Compel Resps. to Interrogs. ("Mattel Mot."), at 1.  And Bryant has since provided those supplemental responses to Mattel, exactly as promised.  *See* Decl. of Matthew M. Werdegar in Support of Bryant's Opp'n to Mattel's Mot. To Compel Resps. to Interrogs, filed herewith, ("Werdegar Decl."), Exs. 4-8.

Consequently, to the extent Mattel's motion is directed against Bryant's original responses to Interrogatory Nos. 27-33, 36-38, 40, 42, 45, and 47, Mattel's motion is now moot, as those responses have been superceded by Bryant's supplemental responses, served on December 17, 2007.  And to the extent that Mattel's motion is directed against Bryant's supplemental responses, it is plainly premature, as it was filed before Mattel ever received, much less analyzed or sought to meet and confer regarding, those responses.  The Discovery Master therefore should deny Mattel's motion as untimely and should sanction Mattel for its failure to meet and confer regarding Bryant's supplemental responses, as

---

[1] The only interrogatory that Bryant has declined to supplement is Mattel's Interrogatory No. 39, seeking the identity of each and every bank or financial institution account that in any way refers or relates to Bryant since January 1, 1999.  *See* Decl. of B. Dylan in Support of Mattel's Mot. To Compel Resps. to Interrogs,  ("Proctor Decl."), Ex. 1, at 11, 14, 19.  As discussed below, this interrogatory is entirely improper and Bryant's objections to it should be sustained.

408135.03

EXHIBIT _____ *11*

PAGE _____ *195*

1   required by the Federal Rules and the Local Rules of the Central District of

2   California. *See* Fed. R. Civ. P. 37(a)(2); Cent. Dist. Local Rule 37-1.

3          Because Mattel has failed to meet and confer regarding Bryant's

4   supplemental responses, the Discovery Master need not, should not, pass judgment

5   on the substance of Mattel's motion at this time. But if the Discovery Master

6   nonetheless elects to consider the merits of Mattel's motion, it should uphold

7   Bryant's objections and should not overrule them *en masse*, as requested by

8   Mattel. Mattel's interrogatories are defective in many respects, and Bryant's

9   objections to them are specific and proper.

10         For example, Bryant has objected to several interrogatories that purport to

11  require him to "state all facts" supporting his denial of a particular allegation (such

12  as that he breached his employment agreement with Mattel and that he breached

13  his fiduciary duties to Mattel) as overbroad and unduly burdensome. *See* Proctor

14  Decl., Ex. 5, at 62-71. This objection is supported by numerous federal district

15  court decisions, including published decisions from the Central District of

16  California, and Mattel itself has asserted the identical objection in response to

17  interrogatories propounded by MGA and Bryant in this litigation. *See, e.g., Safeco*

18  *of Am. v. Rawstron*, 181 F.R.D. 441, 447-48 (C.D. Cal. 1998); Werdegar Decl., Ex.

19  10. Bryant also has objected to certain interrogatories as improperly seeking

20  Bryant's contentions regarding incomplete hypothetical scenarios. *Id.*, Ex. 5, at

21  65-67. Mattel does not address these objections, which are well-supported by law,

22  in its motion.

23         Accordingly, whether or not the Discovery Master considers the merits of

24  Mattel's motion, the Discovery Master should deny the motion in its entirety.

25                    **II.    PROCEDURAL BACKGROUND**

26         Mattel served its Third Set of Interrogatories on Bryant and the other

27  defendants on June 7, 2007. Because many of Mattel's interrogatories were

28  compound, in violation of Federal Rule of Civil Procedure 33(a) and the Court's

2

EXHIBIT _____ 11

PAGE _____ 196

1    limit of 50 interrogatories per side, Bryant and the other defendants objected to

2    Mattel's Third Set and filed a motion for a protective order. *See* Proctor Decl., Ex.

3    16 (Defs.' Joint Mot. for Protective Order Re. Mattel's Third Set of Interrogs.). On

4    September 5, 2007, the Discovery Master granted defendants' motion for a

5    protective order, holding that "many of Mattel's interrogatories are compound

6    because they address discrete issues." Proctor Decl., Ex. 13 (Order Granting Joint

7    Mot. for Protective Order ("Sept. 5 Order")), at 135. The Discovery Master

8    permitted Mattel to serve a Revised Third Set of Interrogatories that, unlike

9    Mattel's original Third Set, did not exceed the 50 interrogatory limit. *Id.* at 137.

10        In his September 5 Order, the Discovery Master also held that an

11    interrogatory that contains subparts seeking "facts supporting a contention, the

12    identity of persons with knowledge, and documents" are not counted separately for

13    purposes of applying the 50 interrogatory limit. *Id.* at 134-35. However, the

14    Discovery Master was not asked to decide, and Bryant believes he did not decide,

15    whether a party propounding an interrogatory may specially define the term

16    "IDENTIFY" to require the responding party to provide multiple, discrete facts

17    regarding each person or document to be identified.

18        On September 21, 2007, Mattel served a Revised Third Set of Interrogatories

19    on each defendant. Proctor Decl., Ex. 1. Mattel subsequently served a Fourth Set

20    of Interrogatories on October 12, 2007, a Fifth Set of Interrogatories on October

21    19, 2007, and an Amended Fourth and Sixth Set on October 23, 2007. *Id.*, Exs. 2,

22    3, 4. Finally, Mattel served a Seventh Set of Interrogatories on October 25, 2007.

23    Werdegar Decl., Ex. 10 (Mattel's Seventh Set of Interrogatories).

24        In an effort to expand its interrogatories, while still appearing to comply

25    with the Discovery Master's September 5 Order, each of these sets of

26    interrogatories include numerous specially-defined terms, including multiple

27    special definitions of the term "IDENTIFY," which purport to require the

28    defendants to provide numerous, discrete facts with respect to each and every

3

EXHIBIT _____ //

PAGE _____ /97

1  document and witness identified in their interrogatory responses. *See, e.g.*, Proctor

2  Decl., Ex. 1, at 12-13.  Taking into consideration Mattel's specially defined terms,

3  Mattel's Revised Third through Sixth Sets of Interrogatories more than exhaust

4  Mattel's 50 interrogatory allotment.

5        Bryant served Responses and Objections to Mattel's Revised Third Set and

6  Amended Fourth Set of Interrogatories on November 15, 2007, the day the

7  temporary stay on discovery imposed by the Court ended.  Proctor Decl., Exs. 5, 6.

8  Bryant thereafter served Responses and Objections to Mattel's Fifth Set of

9  Interrogatories on November 21, 2007, and to Mattel's Sixth Set and Seventh Set

10  on November 26, 2007.  *Id*, Exs. 7, 8; Werdegar Decl., Ex. 8 (Bryant's Rsps. to

11  Mattel's 7th Set of Interrogatories).

12        The parties met and conferred telephonically regarding Bryant's original

13  responses to Mattel's Revised Third Set and Amended Fourth Set of

14  Interrogatories on November 27 and on December 4 and 5, 2007.  Werdegar Decl.,

15  ¶ 2; Proctor Decl., ¶ 8; Ex. 12.  The parties also met and conferred regarding

16  Bryant's original responses to Mattel's Fifth, Sixth, and Seventh Sets of

17  Interrogatories on December 5, 2007.  Werdegar Decl., ¶ 2; Proctor Decl., ¶ 8, Ex.

18  12.  During these meet and confer sessions, Bryant explained to Mattel the bases

19  for his objections to Mattel's interrogatories and sought to reach a mutually-

20  acceptable agreement regarding the scope of a number of the interrogatories.

21  Werdegar Decl., ¶ 3; Proctor Decl., Ex. 12.

22        For example, Bryant explained that Mattel's Interrogatory Nos. 27-29,

23  which seek to require Bryant to identify seventeen separate pieces of factual

24  information regarding each and every email, conversation, thought or idea,

25  however fleeting, that Bryant may have had that in any way whatsoever related to

26  Bratz, broadly defined, at any point during a specified multi-month period, were

27  over broad and unduly burdensome.  Proctor Decl., Ex. 12.  Bryant asked whether

28  Mattel would consider limiting the scope of these requests in any way, and offered,

408135.03

EXHIBIT _____ //

PAGE _____ 198

1 as one possible compromise, to identify every tangible Bratz-related drawing or

2 design that he had done during each time period. *Id.*; Werdegar Decl., ¶ 3. Mattel,

3 however, refused to accept this compromise or to offer any of its own. Proctor

4 Decl., Ex. 12; Werdegar Decl., ¶ 3.

5 　　　Although Mattel refused to compromise as to any of its interrogatories,

6 Bryant nonetheless agreed to supplement his responses to numerous

7 interrogatories, including fourteen of the fifteen interrogatories at issue in Mattel's

8 motion – Interrogatory Nos. 27-33, 36-38, 40, 43, 45 and 47—in an effort to avoid

9 needless motion practice. Proctor Decl., Ex. 12; Werdegar Decl., ¶ 3. The only

10 interrogatory that Bryant declined to supplement is Interrogatory No. 39, which, as

11 discussed below, is inappropriate. Proctor Decl., Ex. 12  Bryant stated that he

12 would serve these supplemental responses on Friday, December 14, 2007 (which

13 he later postponed to Monday, December 17, 2007, in order to gather certain

14 additional responsive information). *Id.*; Werdegar Decl., Ex. 1. Bryant's

15 agreement to supplement his responses to these interrogatories was communicated

16 both during the parties teleconference on December 6, and in writing on December

17 11, 2007. Proctor Decl., Ex. 12.

18 　　　However, despite Mattel's knowledge that Bryant was in the process of

19 preparing supplemental responses, Mattel filed the present Motion to Compel on

20 December 13, 2007, without having waited to receive Bryant's supplemental

21 responses, much less review or discuss them with Bryant. On December 14, 2007,

22 Bryant wrote to Mattel's counsel asking that Mattel withdraw the present motion

23 as premature and that Mattel meet and confer regarding Bryant's supplemental

24 responses as required by Rule 37 and Local Rule 37-1. Werdegar Decl., Ex. 1.

25 　　　At approximately 10:45 p.m. on December 19, nearly a week after Mattel

26 filed the present motion, and five days after Bryant had requested that Mattel

27 withdraw the motion as premature, Mattel finally contacted Bryant in writing to

28 discuss his supplemental interrogatory responses. Werdegar Decl., ¶ 9, Ex. 2.

BRYANT'S OPPOSITION TO MATTEL'S MOTION TO COMPEL RESPONSES TO INTERROGATORIES
CASE NO. CV 04-09049 SGL (RNBx)

EXHIBIT _____ *11*

PAGE _____ *199*

1   Although Mattel continued to argue that certain of Bryant's supplemental

2   responses remained deficient, the scope of Mattel's concerns, as reflected in its

3   counsel's correspondence, was much narrower than those expressed by Mattel in

4   the parties' previous conferences of counsel and in its motion to compel. *See*

5   *generally id.*, Ex. 2.

6          In his letter of December 19, 2007, Mattel's counsel requested that the

7   parties immediately meet and confer regarding Bryant's supplemental responses.

8   Mattel did not, however, offer to withdraw the present motion. Rather, it only

9   offered to give Bryant one additional day to prepare and file his opposition. *Id.* In

10  response, Bryant agreed to meet and confer, but informed Mattel that he could not

11  both meet and confer and finalize his opposition to Mattel's 32-page motion at the

12  same time. Werdegar Decl., Ex. 3. Bryant again requested that Mattel withdraw

13  the present motion as moot and explained that if Mattel did so, Bryant could meet

14  and confer immediately. *Id.* If Mattel insisted on pursuing this motion, Bryant

15  explained that he would not be available to meet and confer until December 21,

16  2007, the day after this opposition was due. *Id.*

17                    **III.   ARGUMENT**

18  **A.     Mattel's motion to compel should be denied as untimely.**

19         Mattel's motion to compel can be viewed one of two ways: Either it is a

20  motion to compel directed against Bryant's allegedly inadequate original responses

21  to Mattel's interrogatories, or it is a motion to compel further supplemental

22  responses from Bryant. Viewed either way, Mattel's motion is untimely and

23  inappropriate.

24         To the extent Mattel's motion is directed at Bryant's original interrogatory

25  responses—which are the only responses it properly could be directed at, as those

26  are the only responses Mattel had received, or met and conferred about, prior to

27  filing its motion—the motion is moot, except as to Interrogatory No. 39. As courts

28  across the country repeatedly have held, motions to compel are rendered moot by

6

408135.03

EXHIBIT ___11___

PAGE ___200___

1   the service of responses or supplemental responses to the discovery requests at

2   issue. *See, e.g., Ippolito v. Goord*, No. 05-CV-6683L, 2007 WL 2769503, *1-2

3   (W.D.N.Y. Sep. 21, 2007) (denying motion to compel responses to interrogatories

4   as moot where opposing party had served responses after the motion was filed);

5   *Samuels v. Huff*, No. 04-0859-P, 2007 WL 1237961, *1 (W.D. La. Apr. 27, 2007)

6   (same); *Geico Cas. Co. v. Beauford*, No. 8:05-CV-697-T24-EAS, 2007 WL

7   1192446, *2 (M.D. Fla. Apr. 23, 2007) (denying as moot motion to compel Rule

8   26 disclosures because defendant served amended and supplemental disclosures

9   after motion to compel was filed); *Rhea v. Uhry*, No. 3:05CV189 (RNC), 2007 WL

10  926908, *2 (D. Conn. Mar. 26, 2007) (denying motion to compel responses to

11  interrogatories as moot where opposing party had served responses after the

12  motion was filed); *Sotelo-Camacho v. Morales*, CIVA No. 1:05CV1349 WSD,

13  2006 WL 3709613, *1 (N.D. Ga. Nov. 7, 2006) (same); *E.E.O.C. v. V & J Foods,*

14  *Inc.*, No. 05-C-194,2006 WL 2947474, *1 (E.D. Wis. Oct. 16, 2006) (same);

15  *Catalano v. GWD Management Corp.*, No. CV-403-167, 2005 WL 5519861, *15

16  (S.D. Ga. Mar. 30 2005) (same); *Birdine v. City of Coatesville*, No. 08172004,

17  2004 WL 2786153, *2 (E.D. Pa. Aug. 17, 2004) (same); *Epling v. UCB Films,*

18  *Inc.*, Nos. 98-4226-RDR, 98-4227-RDR, 00-4062-RDR, 00-4186-RDR, 2001 WL

19  1249362, *3 (D. Kan. Sep. 27, 2001) (same); *Garland v. Interlake, Inc.*, CIV A

20  No. 28-9096, 1989 WL 71467, *1 (E.D. Pa. Jun. 28, 1989) (denying motion to

21  compel interrogatories as moot because defendants had filed supplemental

22  responses to the interrogatories at issue).

23        On the other hand, to the extent Mattel's motion is directed at Bryant's

24  supplemental responses, the motion is premature and was filed in violation of

25  Federal Rule of Civil Procedure 37(a)(2) and Local Rule 37-1. It is undisputed that

26  Mattel filed the motion without ever having received Bryant's supplemental

27  responses, much less having met and conferred with Bryant about those responses.

28  Thus, Mattel has not satisfied its obligation under Rule 37(a)(2) to meet and confer

7

408135.03

EXHIBIT _____ 11

PAGE _____ 201

1  in good faith regarding those responses and to certify in its moving papers that it
2  has done so.  *See Use Techno Corp. v. Kenko USA, Inc.*, No. C-06-02754 EDL,
3  2007 WL 3045996, at *1 (N.D. Cal. Oct. 18, 2007) ("Counsel are required to meet
4  and confer, or attempt to meet and confer, in good faith prior to filing a discovery
5  motion.").

6      To cite one of many possible examples, during the parties' telephonic meet
7  and confer, Bryant offered to provide a complete supplemental responses to
8  Mattel's Interrogatory No. 40, which asks for information about Bryant's computer
9  ownership and use, and Interrogatory No. 47, which requests a variety of
10  information about Bryant's search for responsive documents in this case.  Proctor
11  Decl., Ex. 12.  Mattel indicated that it appreciated Bryant's offer to supplement and
12  never suggested that it would move to compel with respect to these interrogatories.
13  Proctor Decl., Ex. 11, at 4.  Indeed, in his December 6, 2007 meet and confer
14  letter, Mattel's counsel wrote:

15      You agreed to supplement Mr. Bryant's response to Interrogatory No.
   47, and stated that you were inclined to provide a complete response
16      but were not committing to do so.  Thank you for agreeing to provide
   a supplemental response.
17

18  *Id.*[2]  This was Mattel's last word on this interrogatory, which is nonetheless
19  included in the present motion.  Mattel did not wait to see Bryant's supplemental
20  responses to this, or any other interrogatory, and it never bothered to inquire
21  whether Bryant's response was limited in any material way by his stated
22  objections.

23      Mattel's actions with respect to the present motion are analogous to those
24  recently litigated in *Majdalani v. Legacy Bank*, No. 06-1317-MLB, 2007 WL
25  2694043 (D. Kan. Sep. 11, 2007).  In that case, the parties met and conferred

26  _____

27  [2] Counsel for Bryant's only hesitation with respect to his agreement to supplement
   Bryant's response to this interrogatory was that , given Mattel's broad definition of
   "COLLECTED" and other terms, certain of the requested information could
28  implicate the attorney-client privilege and the attorney work product doctrine.

8

408135.03

EXHIBIT _____ //

PAGE _____ 202

1   regarding plaintiff Majdalani's First Set of Interrogatories, during which defendant

2   Legacy Bank agreed to supplement its responses to the interrogatories at issue. *Id.*

3   at *4-5. Yet despite Legacy Bank's agreement to supplement, Majdalani went

4   ahead and filed a motion to compel regarding the very same interrogatories. *Id.* at

5   5. The court denied the motion as premature on grounds that "[t]here is no

6   indication or evidence in the record that plaintiff conferred with defendant after

7   receipt of the supplemental responses" as is required. *Id.* The court explained that

8   "[i]nherent in both [Rule 37 and the equivalent local rule] *is the principle that a*

9   *motion to compel is inappropriate when, during the meet and confer process, the*

10   *party opposing discovery agrees to supplement its discovery responses.*" *Id.*

11   (emphasis added).

12      The same principle applies here. There is no excuse for Mattel's failure to

13   abstain from filing the present motion until it had received Bryant's promised

14   supplemental responses and met and conferred with Bryant regarding any

15   remaining concerns it may have had regarding those responses. Doing so would

16   have taken, at most, an additional few days (Bryant's supplemental responses were

17   served two court days after Mattel's motion). Werdegar Decl., ¶ 8. And by

18   forbearing for those few days, Mattel could have substantially reduced, if not

19   eliminated altogether, the number of interrogatories in dispute and, thus, the

20   burden on the Court and the parties of litigating yet another discovery matter. *Cf.*

21   *Excess Ins. Co., Ltd. v. Rochdale Ins. Co.*, 05 Civ. 10174, 2007 WL 2900217, at *1

22   (S.D.N.Y. Oct. 4, 2007) ("The requirement that parties meet and confer is designed

23   to "resolve discovery matters without the court's intervention to the greatest extent

24   possible. Only those matters that remain unresolved after serious attempts to reach

25   agreement should be the subject of a motion to compel.").

26      That Mattel properly should have waited to receive Bryant's supplemental

27   responses is further demonstrated by Mattel's post hoc meet and confer letter

28

Werdegar Decl., ¶ 4.

9

BRYANT'S OPPOSITION TO MATTEL'S MOTION TO COMPEL RESPONSES TO INTERROGATORIES
CASE NO. CV 04-09049 SGL (RNB EXHIBIT _____ 11

PAGE _____ 203

1   regarding those responses. Werdegar Decl., Ex. 2. Although Mattel still finds
2   fault with many of Bryant's answers, a close reading of Mattel's letter reveals that
3   the dispute between the parties is now much narrower, and could be narrowed
4   further still by additional conferences of counsel. For example, Mattel's only
5   stated complaint regarding Bryant's supplemental response to Interrogatory No. 40
6   (regarding his computer ownership and use) is that his response does not provide
7   enough information about his parents' and former roommate Elise Cloonan's
8   computers (*i.e.*, computers that are not within Bryant's possession custody or
9   control). *Id.* Any confusion regarding this narrow aspect of Bryant's response
10  should be easily resolvable through the meet and confer process. The same is true
11  with respect to Bryant's supplemental responses to Interrogatory Nos. 45 and 47,
12  for which Mattel has stated only narrow remaining concerns, and likely several
13  others.

14          Mattel's decision "to shoot first and ask questions later" should not be
15  condoned. As already discussed, Central District Local Rule 37-1 and Federal
16  Rule of Civil Procedure 37(a)(2) both require that a party meet and confer in good
17  faith before filing a motion to compel as to any discovery response. Courts
18  routinely deny motions to compel where the moving party has failed to comply
19  with its meet and confer obligations. *See, e.g., Use Techno*, 2007 WL 3045996, at
20  *1; *Sherman v. City of Davis*, No. CIV S-04-2320 LKK EFB PS, 2007 WL
21  1454278, at *2-3 (E.D. Cal. May 17, 2007); *Tuggle v. Kamara*, No. C 05-4142
22  MHP, 2007 WL 760596, at *4 (N.D. Cal. March 9, 2007); *Morris v. McGrath*, No.
23  C 04-3142 SI, 2006 WL 870965, at *1 (N.D. Cal. April 3, 2006); *Hoelzel v. First
24  Select Corp.*, 214 F.R.D. 634, 636 (N.D. Colo. 2003); *Robinson v. Potter*, 453 F.3d
25  990, 995 (8th Cir. 2006). Furthermore, Local Rule 37-4 specifically authorizes
26  sanctions where a party fails to comply with its meet and confer obligations. And
27  courts in the Central District have imposed sanctions for failing adequately to meet
28  and confer on numerous occasions. *See, e g, Cable & Computer Tech, Inc. v.*

BRYANT'S OPPOSITION TO MATTEL'S MOTION TO COMPEL RESPONSES TO INTERROGATORIES
CASE NO. CV 04-09049 SGL (RNBx)

EXHIBIT _____ 11

PAGE _____ 204

1   *Lockheed Saunders, Inc.*, 175 F.R.D. 646, 649-650 (C.D. Cal. 1997); *Walt Disney*

2   *Co. v. DeFabiis*, 168 F.R.D. 281, 285 (C.D. Cal. 1996). The Discovery Master

3   should follow these courts' lead.

4       In sum, given Mattel's failure to meet and confer with Bryant regarding any

5   of Bryant's supplemental responses, the Discovery Master should deny Mattel's

6   motion to compel with respect to those interrogatories and should order Mattel to

7   confer in good faith with Bryant regarding any legitimate concerns Mattel has with

8   respect to Bryant's supplemental responses. If the parties cannot resolve all of

9   Mattel's remaining concerns after conferring, then, and only then, should Mattel be

10   permitted bring a motion to compel, and that motion should be narrowly-tailored to

11   address only the specific portions of Bryant's supplemental interrogatory responses

12   that Mattel believes remain deficient. Additionally, as discussed below, Mattel

13   should be sanctioned for its violation of Federal Rule of Procedure 37(a)(2) and

14   Local Rule 37-1.

15   **B.**     **If the Court considers the substance of Mattel's motion, despite Mattel's**
16         **failure to meet and confer, it should uphold Bryant's objections.**

17       For all the foregoing reasons, the Discovery Master need not, and should

18   not, consider the merits of Mattel's motion until after the parties have had the

19   opportunity to meet and confer regarding Bryant's supplemental responses. Mattel

20   first communicated any concerns regarding those responses to Bryant after the

21   close of business on December 19—the day before this opposition brief was due to

22   be filed—and, consequently, Bryant has not had any meaningful opportunity to

23   evaluate and respond to Mattel's alleged concerns. Werdegar Decl., ¶ 9. Thus,

24   any issues with respect to Bryant's supplemental responses simply are not ripe at

25   this time, and the record before the Discovery Master is not complete.

26       The premise of Mattel's motion—and the basis upon which it will likely

27   argue the motion remains relevant—appears to be that because Bryant declined to

28   withdraw each and every one of his stated objections to Mattel's interrogatories,

408135.03

EXHIBIT _____11_____

1   any supplemental response he provides will necessarily be deficient.  But this

2   premise lacks any support in law or logic.  It simply is not true that a response, or a

3   supplemental response, to an interrogatory is incomplete or inappropriate simply

4   because the responding party has interposed an objection to an interrogatory.

5   Mattel has not cited any cases so holding, and Bryant has not been able to identify

6   any such authority.  Moreover, if Mattel's novel argument were accepted, then

7   each and everyone of Mattel's interrogatory responses would be similarly

8   deficient, as each is prefaced by a host of similar, if not identical, objections.

9   Interrogatory responses must be evaluated, on a response by response basis, based

10  upon their substance.  And that evaluation should only take place after the meet

11  and confer process has run its course.  However, if the Discovery Master

12  nonetheless elects to consider the substance of Mattel's motion, the Discovery

13  Master should deny it on the merits.

14      1.      **Bryant's objections to Mattel's contention interrogatories (Nos. 30-33, 36-38, 42-44, 48-50).**

15

16      Mattel contends that Bryant's objections to its contention interrogatories are

17  unfounded.  Mattel is wrong.  These interrogatories are inappropriate in numerous

18  respects, as explained in Bryant's objections.

19          a.      **Mattel's contention interrogatories, as drafted, are overbroad and abusive.**

20

21      Most fundamentally, Mattel's contention interrogatories are overbroad and

22  unduly burdensome.[3]  These interrogatories all ask Bryant to "state *all* facts" and

23  "IDENTIFY *all* PERSONS … and *all* DOCUMENTS that REFER OR RELATE

24  to such facts" supporting his contentions on such broad topics as whether Mattel is

25  entitled to injunctive relief (Interrogatory No. 32) or whether Mattel is entitled to

26

27  [3] On page 8 of its Motion, Mattel argues that Bryant failed to specify how these interrogatories are overbroad, burdensome or oppressive.  However, later in its Motion, Mattel acknowledges that Bryant provided specific authority to support

28  these objections.  *See* Mattel's Mot., at 12 n.39.

408135.03

EXHIBIT _____ 11

PAGE _____ 206

1  punitive damages in this action (Interrogatory No. 33).  Proctor Decl., Ex. 1, at 17.

2  "Blunderbuss" interrogatories of this type have repeatedly been condemned by

3  federal courts across the country as unduly burdensome and abusive.  *See, e.g.,*

4  *Lawrence v. First Kansas Bank & Trust Co.,* 169 F.R.D. 657, 663-664 (D. Kan.

5  1996) ("Some lawyers attempt to use contention interrogatories to require the

6  opponent to state every fact, identify every witness, and specify each document

7  supporting each allegation of the complaint or answer.  *Such blunderbuss*

8  *interrogatories are likely to be found objectionable and should not be used.*"

9  (emphasis added)); *see also Lucero v. Valdez,* 240 F.R.D. 591, 594 (D. N.M. 2007)

10  ("Contention interrogatories that systematically track all of the allegations in an

11  opposing party's pleadings, and that ask for "each and every fact" and application

12  of law to fact that supports the party's allegations, are an abuse of the discovery

13  process because they are overly broad and unduly burdensome."); *Clean Earth*

14  *Remediation and Const. Services, Inc. v. American Intern. Group, Inc.,* 245 F.R.D.

15  137, *141 (S.D.N.Y. 2007) (rejecting as improper interrogatories seeking

16  "identification of each fact supporting an allegation"); *Luna v. Del Monte Fresh*

17  *Produce (Southeast), Inc.,* No. 1-06-CV-2000-JEC, 2007 WL 1500269, *8 (N.D.

18  Ga. May 18, 2007) (holding that "Plaintiffs' interrogatories are overly broad to the

19  extent they request 'all' facts in support of defendants' assertions"); *Grynberg v.*

20  *Total S.A.,* No. 03-cv-01280-WYD-BNB, 2006 WL 1186836, *6 (D. Colo. May 3,

21  2006) (ruling that interrogatory that asks defendant to "state all material facts

22  supporting the denial or affirmative defense, identify all witnesses with knowledge

23  of those facts, and identify all material documents supporting the denial or

24  affirmative defense is unduly burdensome as a matter of law and an abuse of the

25  discovery system.").

26      This objection applies with particular force with respect to Mattel's

27  interrogatories that seek "all facts" supporting Bryant's denial of certain claims by

28  Mattel, such as his denial of Mattel's claim that he breached his employment

BRYANT'S OPPOSITION TO MATTEL'S MOTION TO COMPEL RESPONSES TO INTERROGATORIES
CASE NO. CV 04-09049 SGL (RNBx)

EXHIBIT _____ *11*

PAGE *207*

1   agreement and that he breached his alleged fiduciary duties to Mattel. Proctor

2   Decl., Ex. 1, at 18. As one court in the Central District has explained, such

3   interrogatories are inherently overbroad and unduly burdensome, because the

4   "universe of potentially responsive information [to prove a negative proposition] is

5   almost endless." *Safeco*, 181 F.R.D. at 447-448 (rejecting discovery requests

6   seeking "all facts, documents, and witnesses that support the denial of a statement

7   or allegation of fact").

8      Mattel admits in its motion that "interrogatories seeking all facts supporting

9   the denial of an assertion may, in some circumstances and in some cases, impose

10   an undue burden." Mattel Mot., at 12. But Mattel then goes on to rely upon

11   decades-old case law from outside the Ninth Circuit to argue that the test for

12   determining when such interrogatories become unduly burdensome is a strict

13   balancing test, which Mattel claims tips in its favor. *See* Mattel Mot., at 13. What

14   Mattel fails to mention is that current authority from *within* the Ninth Circuit and

15   elsewhere holds that "all facts" contention interrogatories are only appropriate

16   when directed toward "discrete, narrow" issues, not broad allegations effectively

17   implicating all the evidence in the case. *See Tatum v. Schwartz*, No. CIV S-06-

18   1440 RRB EFB, 2007 WL 2220977, *1 (E.D. Cal. Aug. 2, 2007) (explaining that

19   courts have approved of "state all facts supporting" a particular contention

20   interrogatories "when they are limited to discrete, narrow factual events."); *see*

21   *also Chapman v. Cal. Dept. of Educ.*, No. C-01-1780 CRB, 2002 WL 32854376,

22   *3 (N.D. Cal. Feb. 6, 2002) (distinguishing the interrogatories before the court

23   "from the problem of interrogatories seeking 'all facts' supporting denials of wide

24   ranging allegations pled by the plaintiff discussed in *Safeco, supra*." because "the

25   interrogatories here directed at specific factual questions."); *see also Grynberg*,

26   2006 WL 1186836, *6 ("It is proper, of course, to inquire about the material facts

27   supporting specific factual matters raised in the pleadings."); *Lawrence*, 169

28   F.R.D. at 664 ("It is altogether different for interrogatories to inquire about specific

EXHIBIT _____ 11

208

1    issues[.]"). Mattel's interrogatories unquestionably cross this line. None of

2    Mattel's contention interrogatories are directed at "discrete, narrow" issues, but

3    rather at Bryant's contentions on the broadest possible topics.

4         Mattel's argument that Bryant's objections are inappropriate is also

5    disingenuous in light of Mattel's own discovery responses in this litigation. In

6    Mattel's supplemental responses to MGA's First Set of Interrogatories, which

7    Mattel served just days before Mattel filed the present motion, Mattel asserts that

8    MGA's almost identically worded "state all facts" interrogatories are

9    "unreasonably burdensome and overbroad in that it purports to require Mattel to

10   summarize all facts and identify all documents on this subject, including without

11   limitation facts that are known to or in the possession, custody and control of the

12   defendants and non-parties, including non-parties associated with defendants."

13   Werdegar Decl., Ex. 6, at 4, 101, 115. Mattel did not explain during the parties'

14   meet and confer conferences—and does not explain in its memorandum of points

15   and authorities—how its continued assertion of this objection can be squared with

16   its request that the Court overrule Bryant's similar objections as inappropriate with

17   respect to its own interrogatories. Rather, it appears that Mattel is once again

18   seeking to apply a double standard when it comes to the parties' discovery

19   obligations.

20        Finally, Mattel argues that Judge Larson rejected similar over breadth and

21   burden objections when it granted Mattel's motion for leave to serve a

22   supplemental interrogatory. *See* Mattel Mot., at 14-15. What Mattel neglects to

23   explain, however, is that Judge Larson significantly narrowed the scope of Mattel's

24   requested supplemental interrogatory. Specifically, Judge Larson changed the

25   wording of the supplemental interrogatory from the open-ended "state all facts

26   which support YOUR affirmative defenses" language requested by Mattel to the

27   much more limited "state all facts upon *which YOU intend to rely at trial* to

28   support YOUR affirmative defenses." Proctor Decl., Ex. 20 at 225-26 (emphasis

BRYANT'S OPPOSITION TO MATTEL'S MOTION TO COMPEL RESPONSES TO INTERROGATORIES
CASE NO. CV 04-09049 SGL (RNBx)

EXHIBIT _____ *11*

PAGE _____ *209*

1  added).  In doing so, Judge Larson implicitly recognized that interrogatories asking

2  for "all facts," as opposed to a parties' "principle facts" or the facts it intends to

3  "rely upon at trial," are overbroad and inappropriate.  *Cf. Hiskett v. Wal-Mart*

4  *Stores, Inc.*, 180 F.R.D. 403, 405 (D. Kan. 1998) ("Interrogatories may ... properly

5  ask for the 'principal or material' facts which support an allegation or defense").

### b.  Bryant's other objections to Mattel's contention interrogatories are also appropriate.

8      Bryant's overbreadth and burden objections are not his only objections to

9  Mattel's contention interrogatories.  Bryant has also objected to Mattel's

10  contention interrogatories as seeking information outside Bryant's possession,

11  custody, or control.  Mattel claims that this objection is merely boilerplate and

12  without merit.  But Mattel's interrogatories in no way limit their demand that

13  Bryant's "state all facts" and "IDENTIFY" all witnesses and "DOCUMENTS"

14  supporting his contentions to facts, witnesses and documents within Bryant's

15  possession, custody or control.  Consequently, on their face, these interrogatories

16  ask for information that is beyond the scope of Bryant's discovery obligations

17  under the Federal Rules and are objectionable.

18      Bryant also has additional objections to certain of these interrogatories,

19  many of which Mattel fails to dispute in its motion.  For example, Mattel's

20  Interrogatory No. 32 asks Bryant to:

21      State all facts that support YOUR contention, if YOU so contend, that
       MATTEL is not or would not be entitled to injunctive relief as
22      requested in its COMPLAINT and/or COUNTERCLAIMS if it is
       ultimately determined that MATTEL owns one or more BRATZ
23      INVENTIONS, and IDENTIFY all PERSONS with knowledge of
       such facts and all DOCUMENTS that REFER OR RELATE TO such
24      facts.

25  Proctor Decl., Ex. 1, at 17.  Bryant objected to this interrogatory on grounds that it

26  asks Bryant to assume facts not in (and contrary to) evidence, and further asks him

27  to base any response on an incomplete hypothetical scenario.  Proctor Decl., Ex. 5,

28  65-67.  This objection is well-taken, and apparently undisputed by Mattel.

16

EXHIBIT ____11____

PAGE ____210____

1    Hypothetical contention interrogatories are inappropriate as a general matter. *See,*

2    *e.g., Kendrick v. Sullivan*, 125 F.R.D. 1, 3 (D. D.C. 1989) (holding that Rule 33

3    does not permit contention interrogatories directed at hypothetical scenarios).  And

4    this particular hypothetical contention interrogatory is especially defective because

5    the hypothetical it poses is incomplete in critical ways.  Specifically, whether

6    Mattel would or would not be "entitled to injunctive relief" depends on, among

7.   other factual and legal factors, which specific "BRATZ INVENTION" Mattel is

8    hypothetically found to own, and whether and / or to what extent it is determined

9    that any Bratz products that have been produced and sold are derivative works of

10   any such BRATZ INVENTIONS—all information that is not provided in the

11   incomplete hypothetical scenario posited in this interrogatory.

12        In sum, Mattel's contention interrogatories, seeking "all facts" supporting

13   certain broad contentions, are overbroad and unduly burdensome, and Bryant's

14   objections to them are appropriate.  Nonetheless, in an effort to avoid the present

15   motion, Bryant agreed to supplement his responses to these contentions, and he has

16   now done so.

17        2.    **Bryant's objections to Mattel's interrogatories regarding BRATZ INVENTIONS (Nos. 27-29).**

18

19        Mattel's Interrogatories 27 through 29 regarding the "BRATZ

20   INVETIONS" are wildly overbroad, yet Mattel has steadfastly refused to agree to

21   any limitation on these interrogatories.

22        These interrogatories asks Bryant to "IDENTIFY" (*i.e.*, provide (a) the bates

23   number of any document that "REFERS OR RELATES TO the BRATZ

24   INVENTION"; (b) the IDENTITY of the individual author or creator of the

25   BRATZ INVENTION; (c) the IDENTITY of each other individual who

26   contributed in any manner to the BRATZ INVENTION; (d) the form, material and

27   medium of the BRATZ INVENTION; (e) the title or name of the BRATZ

28   INVENTION; (f) the version, modification, revision or iteration number of the

17

408135.03

EXHIBIT _____ //

PAGE _____ 2//

1   BRATZ INVENTION; (g) the current location of the original of the BRATZ

2   INVENTION; (h) the first day on which the BRATZ INVENTION was created; (i)

3   the last day on which the BRATZ INVENTION was CREATED; and (j) whether

4   the entire invention was CREATED during the period of time listed in the

5   Interrogatory (and if not, which portions were created during, earlier, or later than

6   the period of time listed in the Interrogatory))—over a period of timing spanning

7   several years—every "BRATZ INVENTION", defined by Mattel as every

8   "representation, idea, concept, work, process, procedure, plan, improvement,

9   design or other development, whether fixed in tangible form or not" that "refer[s]

10  to, constitute[s], contain[s], embod[ies], depict[s], incorporate[s], reflect[s],

11  evidence[s], identif[ies], state[s], deal[s] with, comment[s] on, respond[s] to,

12  describe[s], analyze[s], support[s], refute[s], contradict[s], or in any way

13  pertain[s]" to "any project, doll or [representations, whether two-dimensional or

14  three dimensional, and whether in tangible, digital, electronic or other form,

15  including but not limited to all works, designs, blueprints, schematics, diagrams,

16  images, sculptures, prototypes, models, samples, rotocasts, reductions to practice,

17  developments, inventions and/or improvements, as well as other items, things and

18  DOCUMENTS [broadly defined] in which any of the foregoing are or have been

19  expressed embodied, contained fixed, or reflected in any manner, whether in whole

20  or in part"] ever known by [the name Bratz] (whether in whole or in part and

21  regardless of what such product, doll or DESIGN or portion thereof is or has also,

22  previously or subsequently called) or that is now or has ever been sold or marketed

23  as part of the 'Bratz line,' and each version or iteration of such product, doll or

24  DESIGN or any portion thereof … includ[ing] without limitation any names,

25  fashions, accessories, artwork, packaging or any other works, materials, matters or

26  items included or associated therewith." Proctor Decl., Ex. 1, at 9-16.[4]

27

28  [4] Notably, Mattel makes no mention of the absurdly sweeping nature of its definition of BRATZ INVENTION in its motion, choosing instead to use the term

408135.03

EXHIBIT _____ 11

PAGE _____ 212

1    The burden imposed by these interrogatories is not only undue, it is

2    insurmountable.  Literally interpreted, these interrogatories ask Bryant to catalogue

3    every idea, thought, conversation, musing, doodle, etc., however fleeting or

4    insignificant, that he has had having anything to do with anything in any way

5    related to Bratz from time he came up with the idea in 1998 through June 2001, a

6    nearly three year period.  There is no justification for such sweeping

7    interrogatories.  Mattel has made no effort whatsoever in drafting these

8    interrogatories to tailor them to seek information that is genuinely likely to be

9    useful.[5]  And despite Bryant's repeated attempts to find a workable compromise so

10   that discovery could proceed without further motion practice, Mattel has refused to

11   consider any limitation on the scope of these interrogatories, including Bryant's

12   offer to provide the requested information with respect to all the tangible drawings

13   and designs he created during each of the relevant time periods.  Mattel's

14   uncompromising stance is unreasonable and should not be condoned.  As one court

15   recently explained:

16       The nature of the federal discovery rules themselves suggests they are
         intended to facilitate reasonable discovery, not unduly burdensome,
17       but selected by each party to fit the needs of the particular case. The
         discovery rules provide no absolute, unharnessed right to find out
18       every conceivable, relevant fact that opposing litigants know.... This
         requires counsel in any given case to exercise professional judgment
19       and determine the priorities of discovery.

20   *Grynberg*, 2006 WL 1186836, *6 -7.  This admonition could not be more

21   applicable to Mattel's "BRATZ INVENTION" interrogatories, or to Mattel's

22   discovery conduct more generally.

23

24   _____
     "Bratz invention" in the lower case in its brief, as if it were not seeking to impose
25   any special definition on the term.  *See, e.g.*, Mattel Mot. at 16-17.  The Discovery
     Master should not be deceived.
26   [5] Mattel claims that these interrogatories "seek an identification of Bratz inventions
27   [lower case] that .... *constitute Mattel property*" *Id.* at 19 (emphasis in original).
     But Mattel cannot be seriously contending that it owns everything that falls within
28   the scope of its definition of Bratz invention, including Bryant's every thought or
     passing comment that touched upon Bratz.

19

EXHIBIT _____ 11

PAGE _____ 213

### 3. Bryant accurately answered Mattel's Interrogatory No. 45, as written.

Mattel's Interrogatory No. 45 asks Bryant to:

IDENTIFY each BRATZ PRODUCT that has been SOLD by YOU or YOUR licensees and, for each such BRATZ PRODUCT, state fully and separately (a) the number of units of each such BRATZ PRODUCT SOLD by YOU or YOUR licensees, (b) the gross and net revenue received by YOU from such SALES of each such BRATZ PRODUCT, (c) all costs YOU have incurred in connection with each such BRATZ PRODUCT, including but not limited to YOUR cost of goods sold, and (d) YOUR gross and net profits from each such BRATZ PRODUCT.

Proctor Decl., Ex. 4, at 48. Bryant answered this interrogatory accurately and completely: he has not sold any "BRATZ PRODUCT." *Id.*, Ex. 8 at 109. Mattel nonetheless complains about Bryant's response, arguing that it is "not plausible." Mattel Mot., at 25. But as Bryant explained to Mattel in meet confer, this interrogatory, as written by Mattel, does not apply to Bryant's transfer of rights to his Bratz idea to MGA in October 2000. Specifically, BRATZ PRODUCT is defined by Mattel for purposes of this interrogatory as "any product . . . ." Proctor Decl., Ex. 4, at 45. A "product," particularly as used in this interrogatory (which asks for number of units sold, costs of goods sold, product and SKU numbers, etc.) is not ordinarily understood to mean a unique, abstract idea, such as Bryant's Bratz idea. Rather a "product" ordinarily is defined and understood to mean "an article or substance manufactured for sale." Concise Oxford Dictionary of Current English (8th ed. 1990); *cf. Johnson v. Kraft Foods N. Am., Inc.*, 238 F.R.D. 648, 655 (D. Kan. 2006) (explaining that a party responding to discovery requests should "attribute ordinary definitions to terms and phrases used in interrogatories"). Bryant's Bratz idea quite clearly does not fit this ordinary definition.

Nonetheless, although he believes that his original response was complete and accurate, Bryant agreed to supplement his response to this interrogatory.

20

408135.03

EXHIBIT _____ 11

PAGE _____ 214

**4.      Bryant's objections to Interrogatory Nos. 40 and 47.**

Bryant's objections to Interrogatory Nos. 40 and 47 were entirely appropriate.  Pursuant to the special definitions of "IDENTIFY" used by Mattel, each of these interrogatories requested that Bryant provide separate, distinct, and multiple responses.  For example, Interrogatory No. 40 would have require Bryant to provide numerous discrete facts for each storage device, including:

(a) the individuals that use or have used the storage device;

(b) the current location of the storage device;

(c) the identity of the person who possesses the storage device or if it no longer exists, the date on which it was destroyed or disposed of;

(d) the type of storage device;

(e) whether the storage device has ever been copied or imaged (and if so, the current location of each copy or image (and the identity of the persons who possess such copies or image);

(f) the date(s) on which such copies or images were made;

(g) the manufacturer name, brand, model name, model number, and serial number of the storage device;

(h) the technical specifications and capacities of such storage device;

(i) any known business title of any person who possesses the storage device;

(j) any known business title of any person who possesses a copy of the storage device

(i) the current or last known business affiliation of any person who possesses the storage device;

(j) the current or last known business affiliation of any known business title of any person who possesses a copy of the storage device;

(k) the current or last known residential address of any person who possesses the storage device;

(l) the current or last known residential address of any person who possesses a copy of the storage device;

(m) the current or last known business address of any person who possesses the storage device;

(n) the current or last known business address of any person who

21

408135.03

EXHIBIT 11
PAGE 215

1      possesses a copy of the storage device;

2      (o) the current or last known relationship to MGA of any person who possesses the storage device;

3

4      (p) the current or last known relationship to MGA of any person who possesses a copy of the storage device;

5      (q) the current or last known telephone number of any person who possesses the storage device;

6

7      (r) the current or last known telephone number of any person who possesses a copy of the storage device.

8   Proctor Decl., Ex. 1, at 12-14, 19.  Interrogatory No. 47 required a similarly

9   lengthy laundry list of discrete facts with respect to the sources of information

10   from which Bryant has collected documents in this action.  *Id.,* Ex. 3, at 35-37, 39.

11      Mattel attempts to squeeze these interrogatories into the scope of the

12   Discovery Master's September 5 Order, which found that a single interrogatory

13   could request the following three pieces of information from a recipient: (1) facts

14   supporting a contention; (2) persons with knowledge of the contention, and; (3)

15   documents referring or relating to the contention.  *See* Proctor Decl., Ex. 13, at

16   134-35.  The reality, however, is that these interrogatories extend far beyond the

17   scope of what the Discovery Master found was permissible.  Through its multiple

18   specialized definitions of the term "IDENTIFY," Mattel attempts to shoehorn a

19   request for twenty discrete pieces of information into a single interrogatory.

20   Bryant does not believe that Mattel's tactics are within either the letter or the spirit

21   of the Discovery Master's September 5 Order.

22      In spite of Bryant's reasonable objections to Interrogatory Nos. 40 and 47,

23   Bryant offered to provide as complete as possible a supplemental response to each

24   of these interrogatories.  Werdegar Decl., ¶ 4.  In fact, Mattel indicated it was

25   satisfied with Bryant's offer.  *Id.*  Yet rather than waiting to receive and review

26   Bryant's supplemental responses, Mattel chose to rush ahead with a motion to

27   compel regarding these interrogatories.

28

BRYANT'S OPPOSITION TO MATTEL'S MOTION TO COMPEL RESPONSES TO INTERROGATORIES
CASE NO. CV 04-09049 SGL (RNBx)

EXHIBIT _____ 11

PAGE _____ 216

1    **C.    Mattel's motion to compel a response to Interrogatory No. 39, which requests that Bryant identify his bank and other financial institution accounts, should be denied.**

2

3        The only one of Bryant's interrogatory responses that is properly before the

4    Discovery Master relates to Interrogatory No. 39, which asks Bryant to:

5            IDENTIFY [i.e., "to state, fully and separately as to each account, the
             name of the bank or financial institution, the location and/or branch of
6            the bank or financial institution, the account number, the name in
             which the account is or was held, and the time period during which
7            the account is or was open"] each and every bank or financial
             institution account that REFERS OR RELATES TO [broadly defined
8            to mean to "relate to, refer to, constitute, contain, embody, depict,
             incorporate, reflect, evidence, identify, state, deal with, comment on,
9            respond to, describe, analyze, support, refute, contradict, or in any
             way pertain to"] YOU, including accounts in YOUR name or for
10           YOUR benefit.

11   As noted above, this is the only interrogatory response that Bryant did not agree to

12   supplement and has not supplemented. He has not done so because this

13   interrogatory is a premature attempt by Mattel to obtain sensitive personal financial

14   information not only of Bryant himself, but also of Carter Bryant Enterprises,

15   which is not a defendant in this case, that goes far beyond what is relevant or

16   necessary at this state of the proceedings. Discovery into the identity and location

17   of all of a defendant's personal assets is only appropriate under the Federal Rules

18   and California law *after* entry of a judgment. *See* Fed. R. Civ. P. 69(a); Cal. Code

19   Civ.Proc. § 708.110; *see also Sommers v. West*, No. 97 Civ. 4902 (JSM), 1997 WL

20   772783, *1 (S.D.N.Y. Dec. 12, 1997) ("the amount and location of a defendant's

21   assets are generally irrelevant unless and until a judgment against the defendant is

22   recovered) (citing 8 C. Wright, A. Miller & R. Marcus, Federal Practice &

23   Procedure § 2010 at 184 (2d ed. 1994)). Before entry of judgment, as is the case

24   here, this information is considered private and protected under the California

25   Constitution.

26        Under the California constitution, the right to privacy is an "'inalienable

27   right' expressly protected by force of constitutional mandate." *Valley Bank v.*

28   *Superior Court*, 15 Cal. 3d 652, 656 (1975) (quoting Cal. Const., art. I, § 1). It

408135.03

EXHIBIT _____ *11*

PAGE _____ *217*

1   provides protection against the "unwarranted, compelled disclosure of various

2   private or sensitive information regarding one's personal life . . . including his or

3   her financial affairs." *Hooser v. Superior Court*, 84 Cal. App. 4th 997, 1004

4   (2000). Federal courts have also recognized the need to protect private financial

5   and corporate information from unwarranted discovery, such as Mattel's

6   Interrogatory No. 39. *See, e.g., Premium Service Corp. v. Sperry & Hitchinson*

7   *Co.*, 511 F.2d 225, 229 (9th Cir. 1975) (quashing subpoena because plaintiff's need

8   for documents "was not sufficient to outweigh the burden and invasion of

9   corporate privacy . . ."); *Peskoff v. Faber*, 230 F.R.D. 25, 28-30 (D.D.C. 2005);

10   *Does I-VI v. Yogi*, 110 F.R.D. 629, 633 (D.D.C. 1986).

11       Mattel attempts to justify Interrogatory No. 39 by spending several pages

12   arguing why certain specific financial information of Bryant's is relevant to its

13   claims in this case. In particular, Mattel asserts that payments made by MGA to

14   Bryant and Bryant's net worth are relevant to its claims under Cal. Penal Code §

15   641.3, for punitive damages, and to establish bias. Mattel Mot., 20-22. But

16   Interrogatory No. 39 goes far beyond materials related to those discrete issues.

17   Rather, Interrogatory No. 39 seeks information concerning the entire universe of

18   Bryant's financial information and the financial information of other entities to the

19   extent it is even peripherally related to Bryant. Given the extraordinarily broad

20   definition of the term "REFERS OR RELATES TO," Interrogatory No. 39 requires

21   detailed account information for *any* account, no matter under whose name or for

22   whose benefit, that in any way mentions Bryant or reflects his existence. The

23   interrogatory therefore not only implicates Bryant's privacy interest in his personal

24   financial information, but also the privacy interests of nonparties, including Carter

25   Bryant Enterprises and, potentially, Bryant's friends and family.

26       To the extent that Interrogatory No. 39 seeks relevant information, that

27   information is readily available through alternative, less intrusive sources. Bryant

28   has produced, and will continue to produce his royalty statements from MGA. *See*

408135.03

EXHIBIT ___11___

PAGE ___218___

1   Werdegar Decl., Ex. 7, at 8-9. And Mattel can obtain additional information

2   concerning payments from MGA to Bryant via MGA's financial records or at the

3   continuation of Bryant's deposition. There is no need for the sweeping pre-

4   judgment financial discovery Mattel is seeking through this Interrogatory, much

5   less a compelling need sufficient to overcome Bryant's privacy rights.

6       The circumstances of this case mirror those presented in *Peskoff* where the

7   court found that the defendant's financial records should be protected from

8   discovery because any relevant information sought in those records was available

9   through other sources. *See Peskoff*, 230 F.R.D. at 29. In that case, the court noted

10  that "the plaintiff has failed to explain why any such transactions [from the

11  company to the defendant] could not be exposed via the financial records of the

12  [company]." *Id.* The *Peskoff* court thus held that "[u]ntil a persuasive argument is

13  made based on a review of the [company's] financial records, this Court will not

14  order the production of the defendant's personal account information. To do

15  otherwise, in this Court's view, would allow an unwarranted fishing expedition."

16  *Id.* The outcome here should be no different.

17  **D.   Mattel's request for sanctions should be denied, and the Court should
18       instead impose sanctions against Mattel.**

19      Bryant has engaged in no sanctionable conduct. Where the parties have

20  disagreed about discovery, Bryant has tried to resolve disputes through the meet

21  and confer process. Where Mattel has made reasonable and relevant discovery

22  requests, Bryant has endeavored to comply fully with them. Even where Mattel

23  has made overbroad and burdensome discovery requests, Bryant has attempted to

24  comply with them to the extent possible. Yet despite Bryant's good faith attempts

25  to meet and confer with Mattel regarding these objections, Mattel refused to even

26  wait to review Bryant's supplemental responses before filing a motion to compel

27  and for sanctions.

28      Attorney's fees are not warranted in the context of discovery when there is a

25

EXHIBIT _____ *11*

PAGE _____ *219*

1  "genuine dispute" of fact or law, *Pierce v. Underwood*, 487 U.S. 552, 565 (1988),

2  or "if reasonable people could differ as to [the appropriateness of the contested

3  action]," *Id.* (*quoting Reygo Pacific Corp. v. Johnston Pump Co.*, 680 F.2d 647,

4  649 (9th Cir. 1982) (alteration in original). In the sections above, Bryant has

5  articulated how Mattel's interrogatories are overbroad, unduly burdensome,

6  compound, and intrude unnecessarily upon Bryant's privacy interests. And Bryant

7  has provided citations to persuasive and/or controlling authority directly supporting

8  his positions.   Under such circumstances, sanctions against Bryant are

9  unwarranted.

10      Rather, it is Mattel that should be sanctioned for its failure to comply with its

11  meet and confer obligations. Under Local Rule 37-4, "[t]he failure of any counsel

12  to comply with or cooperate in the [meet and confer] procedures may result in the

13  imposition of sanctions." Central Dist. Local Rule 37-4; *see also Cable &*

14  *Computer Tech.*, 175 F.R.D. at 649-50; *Walt Disney*, 168 F.R.D. at 285. The

15  requirement that parties meet and confer is designed to "resolve discovery matters

16  without the court's intervention to the greatest extent possible. Only those matters

17  that remain unresolved after serious attempts to reach agreement should be the

18  subject of a motion to compel." *Excess Ins. Co.*, 2007 WL 2900217, at *1. Local

19  Rule 37 thus attempts to lessen the burden on the court and the unnecessary

20  expenditure of resources by litigants by promoting informal, extrajudicial

21  resolution of discovery disputes.

22      Here, as discussed at length above, Mattel filed a motion to compel before

23  even reviewing Bryant's supplemental responses. Mattel's single-minded focus on

24  filing a motion to compel no matter what the meet and confer process achieved by

25  definition cannot constitute a "good faith effort" at informal resolution. *See*

26  Central Dist. Local Rule 37-1. The purpose of a meet and confer is to force the

27  parties to resolve their discovery disputes informally and to only trouble the Court

28  on whatever issues they cannot resolve on their own. That process actually worked

408135.03

EXHIBIT _____ *11*

PAGE _____ *220*

1   as it should have here—Mattel complained about perceived deficiencies in

2   Bryant's responses, the parties met and conferred, and Bryant agreed to

3   supplement all but one of his responses. The problem is that Mattel, animated by

4   its desire to paint Bryant as obstructing discovery, insisted on filing the motion

5   anyway. The Discovery Master cannot condone this misconduct.

6       Bryant therefore requests that the Discovery Master deny Mattel's motion

7   for sanctions and impose $3,000 in sanctions on Mattel.

8                   IV.   CONCLUSION

9       For all the foregoing reasons, Bryant respectfully requests that the Court

10  deny Mattel's motion in its entirety and that it award Bryant sanctions in the

11  amount of $3,000.

12

13  Dated:  December 20, 2007                KEKER & VAN NEST, LLP

14

15

16                          By: /s/ Michael H. Page
                                Michael H. Page
17                              Attorneys for Plaintiff
                                CARTER BRYANT
18

19

20

21

22

23

24

25

26

27

28

BRYANT'S OPPOSITION TO MATTEL'S MOTION TO COMPEL RESPONSES TO INTERROGATORIES
CASE NO. CV 04-09049 SGL (RNBx)

408135.03

EXHIBIT ____ _11_

PAGE ____ _221_

Mattel v. Bryant et al.

**From:** Matthew Werdegar [mailto:MWerdegar@kvn.com]
**Sent:** Wednesday, February 06, 2008 6:12 PM
**To:** Dylan Proctor
**Cc:** Herrington, Robert J
**Subject:** Mattel v. Bryant et al.

Dear Dylan:

I am writing to confirm our telephonic conference of counsel today regarding Mattel's refusal to respond substantively to Bryant's First and Second Sets of Requests for Admission, Second Set of Interrogatories, and Fourth Set of Requests for Production.

You confirmed that the sole basis for Mattel's objection that the requests were not properly served on Mattel is that the requests were served by email and Federal Express, and not by U.S. Mail or hand. I asked you whether Mattel had actually received the requests, and you confirmed that Mattel had received the requests for admission and the interrogatories, but you were not sure about the requests for production. Please confirm whether or not Mattel received the requests for production on our about December 27, 2008.

I also asked you whether Mattel was contending that it was prejudiced in any way by the fact that Bryant had served these requests by email and Federal Express. You were unable to articulate any prejudice during our conversation and stated that "you would have to think about it." Please let me know if, upon further thought, Mattel contends that it was prejudiced, and if so, precisely how.

2/7/2008

EXHIBIT _____ 12

PAGE _____ 222

We also discussed Bryant's Interrogatory No. 20. You confirmed that Mattel had agreed to respond to this interrogatory as one of seven to which it would agree to respond between those served by Bryant and MGA. You stated that Mattel would provide this response, which would be substantive, possibly by February 18th, but by February 22nd at the latest, provided that Bryant would not argue that Mattel had waived its service objections to Bryant's other discovery requests by agreeing to respond this interrogatory. I hereby confirm that Bryant will not assert that Mattel's has waived its service objection as to Bryant's other discovery requests based on Mattel's agreement to respond to Bryant's interrogatory.

Additionally, I asked you whether Mattel would stipulate to extend the deadline for Bryant to bring a motion to compel regarding Mattel's response to Bryant's Interrogatory No. 20, if one proves necessary, to a date reasonably after the response is served, as Bryant agreed to in connection with obtaining an extension of time to respond to Mattel's most recent requests for admission. You said that you would consider this, and that I should provide you with a proposed stipulation. Pursuant to your request, a draft stipulation is attached.

Next, we discussed Bryant's requests for admission. I explained that Bryant was willing to offer Mattel a reasonable extension of time to respond to these requests, and to work with Mattel to limit the burden Mattel claims responding to some of them will impose (during our conferences in January, you stated that you believed Request Nos. 26-41 were unduly burdensome). You said you would consider whether Mattel would agree to respond to these requests under any circumstances. You promised to get back to me tomorrow with Mattel's position.

Finally, you stated that it was Mattel's position that any motion to compel relating to Phase I discovery filed after January 28, 2008 would be untimely, unless there was a stipulation to extend the time to bring a motion or the motion to pertained to a deposition that had not yet occurred.

I look forward to speaking further with you tomorrow regarding these issues. I am generally available all day. Please also be prepared to discuss Mattel's objections, other than on the basis of service, to Bryant's discovery requests. As I stated during our call, we believe all of Mattel's other objections are boilerplate and without merit. Also, please note that unless we are able to resolve these issues by the close of business Friday, February 7, 2008, Bryant will be bringing a motion to compel.

<<KVNDOC1-410883-v1-bratz-p-proposed stipulation to extend time to bring motion to compel.DOC¤>>

Regards,

Matthew M. Werdegar

710 Sansome Street
San Francisco, CA 94111-1704
tel: (415) 391-5400
fax: (415) 397-7188
www.kvn.com

EXHIBIT _____ 12

PAGE _____ 223

# EXHIBIT 13

## CONFIDENTIAL
## THIS EXHIBIT FILED UNDER SEAL PURSUANT TO
## PROTECTIVE ORDER OF 1- 4 -2005

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-443-3000 FAX 213-443-3100

January 10, 2007

**VIA FACSIMILE AND U.S. MAIL**

Hon. Edward Infante (Ret.)
Discovery Master
c/o Sandra Chan
JAMS
Two Embarcadero Center, Suite 1500
San Francisco, CA  94111

Re:   Mattel, Inc. v. Bryant

Dear Judge Infante:

Mattel regrets having to raise this issue, but MGA has taken the position that its failure serve a complete copy of the Joint Motion to Compel the Production of Documents and the Deposition of 30(b)(6) Witnesses in the manner required by the Federal Rules of Civil Procedure nonetheless constitutes proper service.  Mattel therefore writes to advise that because the motion was not served on Mattel until after 2:00 p.m. on Saturday, January 6, 2007, Mattel will be filing and serving its opposition to that motion on Tuesday, January 16, 2007 (which is five court days after service was effected as required by paragraph 5 of the Discovery Master Order, attached as Exhibit 1).

On Friday, January 5, 2007, counsel for MGA emailed Mattel's counsel an incomplete copy of the referenced motion.  As MGA has conceded, the email did not include a complete set of the motion papers because it failed to provide the Torres Declaration.  As is also uncontested by MGA, MGA did not personally serve the motion (or the Torres Declaration) on that day, but instead effected personal service shortly after 2:00 p.m. on Saturday, January 6, 2007, rendering it effective the next business day on January 8, 2007.

**EXHIBIT** _____ _14_

**PAGE** _____ _225_

**quinn emanuel urquhart oliver & hedges, llp**

NEW YORK | 335 Madison Avenue, 17th Floor, New York, New York 10017 | TEL 212-702-8100 FAX 212-702-8200
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94104 | TEL 415-875-6600 FAX 415-875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL 650-801-5000 FAX 650-801-5100
PALM SPRINGS | 45-025 Manitou Drive, Suite 10, Indian Wells, California 92210 | TEL 760-345-4757 FAX 760-345-2414
SAN DIEGO | 4445 Eastgate Mall, Suite 200, San Diego, California 92121 | TEL 858-812-3107 FAX 858-812-3336

Mattel made repeated efforts to informally resolve this issue with MGA, but MGA declined to cooperate as reflected in the parties' correspondence (attached as Exhibit 2). Instead, MGA has claimed that an agreement for the e-mail service of motions exists in paragraph 5 of the Discovery Master Order. It does not. By its terms, the stipulation permits only meet and confer letters to be sent by email or fax. Discovery Master Order ¶ 5 ("The moving party shall first identify each dispute, state the relief sought, and identify the authority supporting the requested relief *in a meet and confer letter* that shall be served on all parties *by facsimile or electronic mail*." (emphasis added)).[1] As a result, the service of *motions* -- which is not altered by the Discovery Master Order -- must be accomplished in compliance with Rule 5. See Fed. R. Civ. P. 5(b)(2)(D) (e-mail service not permissible unless parties have agreed in writing to accept service by electronic mail).

Further, MGA's admitted failure to include with its email a complete copy of its motion papers rendered service ineffective until a complete copy was provided. MGA itself previously argued and prevailed on a position that service of a draft discovery joint stipulation pursuant to the Local Rules was not complete unless the declarations were included. See Order of March 23, 2006, at page 3 (attached as Exhibit 3). If a mere draft discovery joint stipulation must be accompanied by service of the declarations as MGA insisted, then a motion itself clearly must as well.[2]

It is regrettable that MGA has chosen to approach an issue of service in a manner that is inconsistent with routine professional courtesy and instead required Mattel to raise it here. We, in fact, reminded MGA that when Bryant's counsel had claimed last week that they had received

---

[1]  MGA's argument otherwise relies entirely on the following sentence in paragraph 5: "Service of any document by fax or electronic mail prior to 6:00 p.m. shall constitute service on that day." That sentence, however, does not itself constitute authorization to serve by e-mail or fax, but rather governs *when* the materials that are *elsewhere* permitted to be served by e-mail or fax are deemed to be served. It is also implausible that this lone sentence could permit email service of motions and pleadings, since a stipulation for such service would have to have further terms, such as the size limits for emails because Mattel's counsel's email system does not accept emails that have attachments over a certain megabyte size. Nor until now had MGA ever interpreted this sentence as blanket authorization to serve motions by email or fax. To the contrary, Mattel has been proposing for weeks a stipulation that would permit facsimile service of motions and other pleadings, which MGA rejected. MGA did not do so, however, on the grounds that fax service of any motions was already authorized by the Discovery Master Order.

[2]  As a fallback, MGA also has claimed that Mattel was not prejudiced by MGA's failure to send a complete set of its motion papers in the email. MGA refused Mattel's request for authority to support its position that its delivery of an incomplete set of moving papers in a manner inconsistent with the Federal Rules is nonetheless effective service because Mattel, MGA claims, does not articulate prejudice to it.

2

EXHIBIT ___14___

PAGE ___226___

service of Mattel's motion to compel a few minutes after 6:00 p.m., Mattel simply agreed that service would be deemed effective the next day, as your case assistant was advised.[3]

Unless otherwise instructed by you, Mattel will be submitting its opposition papers to Bryant's and MGA's referenced motion on Tuesday, January 16, 2007. Thank you for your continuing attention to this matter.


Best regards,

*Jon Corey (BJP)*

Jon D. Corey

JDC:jcl

cc:     Jim Jenal, Esq.
        Keith A. Jacoby, Esq.

---

[3]   This also is unfortunately not the first time MGA has been uncooperative in matters that should be resolved through routine courtesies. As the Discovery Master will recall, MGA's counsel unsuccessfully insisted during the December 19, 2006 telephone conference that a motion be scheduled over the holidays and at a time when Mattel was due to file its reply on a substantive motion pending before Judge Larson.

EXHIBIT _____14_____

PAGE _____227_____

# QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

**NEW YORK**
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
Facsimile: (212) 849-7100

**LOS ANGELES**
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000
Facsimile: (213) 443-3100

**SAN FRANCISCO**
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600
Facsimile: (415) 875-6700

**SAN DIEGO**
4445 Eastgate Mall, Suite 200
San Diego, CA 92121
(858) 812-3107
Facsimile: (858) 812-3336

**SILICON VALLEY**
555 Twin Dolphin Drive, Suite 560
Redwood Shores, CA 94065
(650) 801-5000
Facsimile: (650) 801-5100

## LOS ANGELES OFFICE
## FACSIMILE TRANSMISSION

**DATE:**  January 12, 2007                    **NUMBER OF PAGES, INCLUDING COVER: 3**

| NAME/COMPANY | PHONE NO. | FAX NO. |
|---|---|---|
| Diba Rastegar, Esq. **Littler Mendelson** | (310) 553-0308 | (310) 553-5583 |
| Keith A. Jacoby, Esq. **Littler Mendelson** | (310) 553-0308 | (310) 553-5583 |
| Douglas Wickham, Esq. **Littler Mendelson** | (310) 553.0308 | (310) 553.5583 |

**FROM:**   Jon Corey

**RE:**    *Mattel, Inc. v. Bryant*

**MESSAGE:**

EXHIBIT _____ 15 _____

PAGE _____ 228 _____

07209/2034563.1

| CLIENT # | 07209 | ROUTE/ RETURN TO: | Mia Albert/3rd Floor | ☒ CONFIRM FAX ☒ INCLUDE CONF. REPORT |
|---|---|---|---|---|
| OPERATOR: | *Willa* | | CONFIRMED?  ☐ NO  ☐ YES: | |

The information contained in this facsimile is confidential and may also contain privileged attorney-client information or work product. The information is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this communication is strictly prohibited. If you have received the facsimile in error, please immediately notify us by telephone, and return the original message to us at the address above via the U.S. Postal Service. Thank you.

IF YOU DO NOT RECEIVE ALL OF THE PAGES, PLEASE PHONE (213) 443-3000 AS SOON AS POSSIBLE.

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-443-3000 FAX 213-443-3100

January 12, 2007

**VIA FACSIMILE AND U.S. MAIL**

Diba Rastegar, Esq.
Littler Mendelson
2049 Century Park East, 5th Floor
Los Angeles, California 90067

Re:   Mattel, Inc. v. Bryant

Dear Ms. Rastegar:

My office is in receipt of Bryant's purported e-mail service of Bryant's Opposition to Mattel's Motion to Compel the Production of Documents. Please be advised that there is no agreement or written consent among the parties to service of oppositions (or motions or replies) by electronic mail, which Fed. R. Civ. P. 5(b)(2)(D) requires. It also appears that Bryant elected to serve its opposition papers by facsimile and FedEx, again other manners of service to which the parties have not agreed as required by Rule 5. Indeed, counsel for MGA has specifically rejected Mattel's proposed facsimile service stipulation. Bryant's purported service of its opposition papers is therefore ineffective until Bryant serves said papers consistent with the Federal Rules, which Mattel awaits. If you have any questions regarding the foregoing, please do not hesitate to call.

Best regards,

Jon D. Corey

JDC:jcl

EXHIBIT _____ 15

PAGE _____ 229

**quinn emanuel urquhart oliver & hedges, llp**

NEW YORK | 335 Madison Avenue, 17th Floor, New York, New York 10017 | TEL 212-702-8100 FAX 212-702-8200
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94104 | TEL 415-875-6600 FAX 415-875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL 650-801-5000 FAX 650-801-5100
PALM SPRINGS | 45-025 Manitou Drive, Suite 10, Indian Wells, California 92210 | TEL 760-345-4757 FAX 760-345-2414
SAN DIEGO | 4445 Eastgate Mall, Suite 200, San Diego, California 92121 | TEL 858-812-3107 FAX 858-812-3336

07209/2032360.1

cc:    Douglas Wickham, Esq.
       Keith Jacoby, Esq.

EXHIBIT _____ 15

PAGE _____ 230

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3               EASTERN DIVISION

4                  - - -

5    HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                  - - -

7    CARTER BRYANT, ET. AL.,           )
                                       )
8                    PLAINTIFFS,       )
                                       )
9         VS.                          )  NO. ED CV 04-09049
                                       )  (LEAD LOW NUMBER)
10   MATTEL, INC., ET. AL.,            )
                                       )
11                   DEFENDANTS.       )  EX-PARTE APPLICATIONS
     _____)  RE:  DISCOVERY
12   AND CONSOLIDATED ACTIONS,         )
                                       )
13

14

15        REPORTER'S TRANSCRIPT OF PROCEEDINGS

16              RIVERSIDE, CALIFORNIA

17             MONDAY, FEBRUARY 4, 2008

18                  10:15 A.M.

19

20

21

22

23           THERESA A. LANZA, RPR, CSR

         FEDERAL OFFICIAL COURT REPORTER

24          3470 12TH STREET, RM. 134

          RIVERSIDE, CALIFORNIA  92501

25             951-274-0844

           CSR11457@SBCGLOBAL.NET

EXHIBIT _____ 16

PAGE _____ 231

```
1    APPEARANCES:
2    ON BEHALF OF CARTER BRYANT:
3                         KEKER & VAN NEST
                          BY:  MICHAEL PAGE
4                         710 SANSOME STREET
                          SAN FRANCISCO, CALIFORNIA  94111-1704
5                         415-391-5400
6
     ON BEHALF OF MATTEL:
7
                          QUINN EMANUEL
8                         BY:  JOHN QUINN
                          BY:  JON COREY
9                         865 S. FIGUEROA STREET,
                          10TH FLOOR
10                        LOS ANGELES, CALIFORNIA  90017
                          213-624-7707
11
12   ON BEHALF OF MGA ENTERTAINMENT:
13                        SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                          BY:  THOMAS J. NOLAN
14                        BY:  CARL ALAN ROTH
                          BY:  ROBERT JAMES HERRINGTON
15                        300 SOUTH GRAND AVENUE
                          LOS ANGELES, CALIFORNIA  90071-3144
16                        213-687-5000
17
     ON BEHALF OF GUSTAVO MACHADO:
18
                          OVERLAND BORENSTEIN SCHEPER & KIM LLP
19                        BY:  ALEXANDER H. COTE
                          300 SOUTH GRAND AVENUE
20                        SUITE 2750
                          LOS ANGELES, CALIFORNIA  90071
21                        213-613-4660
22
     ON BEHALF OF CLOONAN, MARLOW & LEAHY:
23
                          KEATS MCFARLAND & WILSON LLP
24                        BY:  LARRY W. MCFARLAND
                          9720 WILSHIRE BOULEVARD
25                        BEVERLY HILLS, CA  90212
                          310-777-3750
```

EXHIBIT ____16____

PAGE ____232____

```
 1    APPEARANCES CONTINUED:
 2
      ON BEHALF OF NON-PARTY CHRISTENSEN GLASER:
 3
                          CHRISTENSEN, GLASER, FINK, JACOBS,
 4                          WEIL & SHAPIRO, LLP
                          BY:   SCOTT E. GIZER
 5                          10250 CONSTELLATION BOULEVARD
                          LOS ANGELES, CA   90067
 6                          310-553-3000
 7
      ON BEHALF OF THIRD PARTIES ANA CABRERA & BEATRIZ MORALES:
 8
                          ALLRED, MAROKO & GOLDBERG
 9                          BY:   RAMIT MIZRAHI
                          6300 WILSHIRE BOULEVARD,
10                          SUITE 1500
                          LOS ANGELES, CA   90048
11                          323-653-6530
12
      ON BEHALF OF THIRD PARTY WITNESS GENTLE GIANT STUDIOS:
13
                          BAUTE & TIDUS LLP
14                          BY:   HENRY H. GONZALEZ
                          777 S. FIGUEROA STREET,
15                          SUITE 4900
                          LOS ANGELES, CA   90017
16                          213-630-5000
17
      ON BEHALF OF WACHOVIA:
18
                          DAVIS POLK & WARDWELL
19                          BY:   NEAL A. POTISCHMAN
                          1600 EL CAMINO REAL
20                          MENLO PARK, CA   94025
                          650-752-2000
21
22    ON BEHALF OF KAMI GILMOR:
23                          BUCHALTER NEMER
                          BY:   JOHN PATRICK PETRULLO
24                          1000 WILSHIRE BOULEVARD,
                          SUITE 1500
25                          LOS ANGELES, CA   90017-2457
                          213-891-0700
```

EXHIBIT ____16____

PAGE ____233____

1                              I N D E X

2                                                         PAGE

3        HEARING.........................................    5

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT _____ 16 _____

PAGE _____ 234 _____

1    THE OUTCOME OF IT, THAT IT'S UNDERSTOOD, AS WE WALK OUT OF

2    HERE, THAT THAT MOTION IS IN FRONT OF JUDGE INFANTE.  HE CAN

3    RULE ON IT HOWEVER HE MAY WISH.  WE MAY COME BACK TO YOU.  BUT

4    THAT WE'RE NOT WALKING OUT OF HERE COMMITTED AND ORDERED TO SIT

5    FOR A 30(B)(6) ON 161 TOPICS.  THAT'S THE POINT.

6           AND MY ONLY LAST COMMENT, YOUR HONOR, WAS WITH

7    RESPECT TO THIS --

8           THE COURT:  COUNSEL, LET ME STOP YOU RIGHT THERE.

9           I DID ORDER THE 30(B)(6) DEPOSITION TO GO FORWARD.

10   THERE WAS NO CHALLENGE AT THE TIME TO THE TOPICS.  I UNDERSTAND

11   YOU NOW HAVE A CHALLENGE BEFORE JUDGE INFANTE; AND HE'LL

12   RESOLVE THAT.  THAT'S WHERE WE'RE AT.

13          MR. NOLAN:  RIGHT.  EXACTLY, YOUR HONOR, BECAUSE THE

14   HEARING THAT WE HAD ON MOTIONS JUST TO EXTEND WAS NOT -- WE DID

15   NOT -- AND NOBODY DISCUSSED IT AT THE TIME, NOR WAS IT FRAMED

16   THAT WAY.  TO NOW START ATTACKING THE VARIOUS SUBTOPICS --

17          THE COURT:  FAIR ENOUGH.  THAT'S BEFORE JUDGE INFANTE

18   RIGHT NOW, AND I'M NOT GOING TO OPINE ON THAT.

19          MR. NOLAN:  YOUR HONOR, THE LAST CATEGORY THAT I WANT

20   TO MAKE CERTAIN I'VE MADE MY POINT CLEAR ON; AND THAT IS THAT

21   CATEGORY THAT WAS ORDERED BUT NOT SERVED WITHIN THE PROPER

22   TIME, FOR WHATEVER REASON.

23          THE COURT:  RIGHT.

24          MR. NOLAN:  SINCE WE ALL WATCHED THE GAME YESTERDAY,

25   HERE'S THE ANALOGY THAT I WOULD USE:

EXHIBIT ____16____

PAGE ____235____

Mattel v. MGA II                                                Page 43

1           I BET YOU THAT TOM BRADY AND THE PATRIOTS WOULD HAVE

2    LOVED TO HAVE HAD ONE MORE SHOT.  BUT, YOU KNOW, THE RULES WERE

3    THAT THE TIME ENDED IN THE FOURTH QUARTER.

4           YOU SET A VERY CLEAR RULING ON JANUARY 28TH; IF THESE

5    PEOPLE WERE NOT SERVED -- AND WE COOPERATED.  WE SAID WHENEVER

6    -- AND IF YOU CAN SERVE THEM, WE'LL MAKE OURSELVES AVAILABLE.

7    WE HAD 12 TRACKS OF DEPOSITIONS ON THE 28TH, YOUR HONOR.  FOR

8    WHATEVER REASON, MATTEL CHOSE NOT TO TRY TO GET THOSE PEOPLE

9    SERVED QUICKER.  WE THINK IT'S BECAUSE THEY DECIDED THAT MAYBE,

10   IN THE GRAND SCHEME OF THINGS, IT WASN'T RELEVANT.

11          SO I SUBMIT ON THAT, YOUR HONOR.

12          THE COURT:  THANK YOU, COUNSEL.

13          MR. QUINN?

14          MR. QUINN:  YOUR HONOR, WE SET FORTH IN OUR PAPERS

15   THE EFFORTS THAT WE MADE TO SERVE THOSE PEOPLE.  THE COURT WILL

16   EITHER FIND THOSE ADEQUATE AND THAT WE SHOULD GET A CHANCE TO

17   TRY FURTHER, OR THE COURT WON'T.  BUT IT WASN'T LIKE WE SAT

18   ON -- THOSE PEOPLE WERE LISTED IN THE ORDER, AND WE DID TRY,

19   AND WE PUT BEFORE THE COURT --

20          THE COURT:  I RECOGNIZE THAT YOU TRIED.  I DID READ

21   THOSE.  BY RULING THAT THE JANUARY 28TH CUTOFF DATE IS A CUTOFF

22   DATE, I'M NOT SUGGESTING THAT YOU DIDN'T TRY.

23          MR. QUINN:  RIGHT.

24          THE COURT:  IT IS WHAT IT IS.

25          I SUSPECT, AS WE GO FORWARD IN THE NEXT MONTH AND A

EXHIBIT _____ 16 _____

PAGE _____ 236 _____

1   HALF, I'M SURE THERE'S ALL KINDS OF ADDITIONAL DISCOVERY THAT A

2   NUMBER OF PARTIES WOULD LIKE TO BE ABLE TO TAKE.  IT'S GOING TO

3   BE THE WAY IT IS IN THIS CASE.  GIVEN ITS NATURE, GIVEN THE

4   BREADTH OF IT, WE COULD PROBABLY DO DISCOVERY FOR YEARS AND

5   STILL WANT MORE.

6           MR. QUINN:  ALL GOOD THINGS HAVE TO COME TO AN END.

7   WE UNDERSTAND THAT, YOUR HONOR.

8           THE COURT:  AND EVEN NOT SO GOOD THINGS.

9           MR. QUINN:  EVEN NOT SO GOOD THINGS.

10          BUT THESE ARE INDIVIDUALS WHERE -- YOU KNOW, WE MADE

11  A SHOWING, THE COURT SAID, 'OKAY, THERE'S GOOD CAUSE.'

12          THE COURT:  I DID.  AND I GAVE YOU A DEADLINE,

13  THOUGH; THAT DEADLINE HAS COME AND GONE.

14          MR. QUINN:  IN THE CASE OF MR. MCFARLAND, YOUR HONOR,

15  WE HAVE A LAWYER WHO -- YOU KNOW, I WAS ALWAYS BROUGHT UP THAT

16  LAWYERS SHOULD NOT EVADE SERVICE, AND IF SOMEBODY CONTACTS YOU

17  AND SAYS, 'I HAVE A' -- WE SENT THE MAN AN E-MAIL, AND HE

18  OPENED IT.  I THINK A LAWYER IS IN A DIFFERENT CATEGORY.  AND

19  HE'S GOT THREE CLIENTS WHO SOMEHOW WE COULDN'T TRACK DOWN

20  EITHER.  I DON'T KNOW, MAYBE THAT SHOULD BE TREATED

21  DIFFERENTLY.

22          THE COURT:  I UNDERSTAND YOUR FRUSTRATION, COUNSEL.

23          MR. QUINN:  YOUR HONOR, JUST TO RESPOND TO

24  MR. NOLAN'S COMMENTS ABOUT HOW WE WOULDN'T ACCEPT SERVICE AND

25  APPLY THE SAME RULE.  REMEMBER THAT MOMENT AT THE END OF THE

EXHIBIT _____ *16*

PAGE _____ *237*

1    FOUND.

2              MR. NOLAN:   YOUR HONOR, I THINK IT'S PRETTY CLEAR.

3              BOTH SIDES HAVE BEEN ENGAGED IN ROLLING PRODUCTIONS

4    AS THEY HAVE FOUND NEW MATERIAL.   AND WE CERTAINLY, COMING INTO

5    THIS, HAVE DONE THAT, YOUR HONOR; AND I THINK THE RECORD IS

6    CLEAR THAT WE HAVE PRODUCED -- I THINK IT'S SOMEWHERE AROUND

7    800 TO 900 INTANGIBLE OBJECTS AS WE'VE LOCATED THEM

8    DOMESTICALLY.   WE THEN CAME UP AND IDENTIFIED, IN -- I BELIEVE

9    IT WAS EARLY DECEMBER, THE LOCATION IN CHINA AND IN HONG KONG,

10   THESE ADDITIONAL ITEMS.   ALL IN GOOD FAITH, YOUR HONOR.

11             WE'RE TRYING TO DO WHAT WE CAN.

12             MATTEL PRODUCED 73 PERCENT OF THEIR DOCUMENTS IN

13   JANUARY, IN OUR PRODUCTION, YOUR HONOR.

14             THE COURT:   I UNDERSTAND THAT ARGUMENT THAT YOU MADE.

15             MR. NOLAN:   ALL I'M SAYING IS, YOUR HONOR, WITH

16   RESPECT TO THIS, WE IMMEDIATELY NOTIFIED THEM WHEN THEY WERE

17   IDENTIFIED AS MOLDS RELATED TO BRATZ.   THERE'S A LOT OF MOLDS

18   OUT THERE, YOUR HONOR, AND SCULPTS AND PRODUCTS AND STUFF LIKE

19   THAT.   IT IS SIMPLY THAT, YOUR HONOR; WE IDENTIFIED IT, WE

20   FOUND IT, WE IMMEDIATELY TURNED IT OVER.

21             I CAN'T ADDRESS WHAT O'MELVENY --

22             THE COURT:   I'M NOT ASKING YOU TO.

23             MR. NOLAN:   NO, NO, NO.  BUT WHAT I MEANT BY THAT IS

24   THAT I CAN REPRESENT TO THE COURT THAT I HAVE SEEN NOTHING

25   WHICH WOULD SUGGEST, 'OH, DON'T PRODUCE THAT.'  THAT'S NOT THE

**EXHIBIT** _____*11*_____

**PAGE** _____*238*_____

1   ISSUE HERE.

2               THE COURT:  I'LL TELL YOU THE ONE THING, THE ONLY

3   THING THAT SEEMS TO SUGGEST THAT, ARE THESE LETTERS AND

4   CORRESPONDENCE WHICH SUGGESTS AN INTERPRETATION OF THE REQUEST

5   AS NOT CALLING FOR THAT.

6               MR. NOLAN:  ON THE MOLDS?

7               THE COURT:  YES.

8               HOW CAN YOU BE SUGGESTING THAT ON THE ONE HAND,

9   YOU'RE IN GOOD FAITH, LOOKING FOR THESE, BUT ON THE OTHER HAND,

10  COUNSEL IS SAYING, 'NO, THIS IS NOT COVERED'?

11              MR. NOLAN:  WELL, IF I MIGHT ADDRESS THAT REAL

12  QUICKLY, YOUR HONOR.

13              DESPITE THAT CORRESPONDENCE, AT THE SAME TIME, WE ARE

14  ALSO TELLING THEM ABOUT IT AND ALSO PROVIDING DIGITAL

15  PHOTOGRAPHS OF IT SO THEY CAN START PROCESSING IT IMMEDIATELY.

16              YOUR HONOR, ALL I CAN SAY IS THAT IN THIS CASE, MORE

17  THAN ANY CASE I'VE EVER SEEN, EVERY POSSIBLE ARGUMENT IS

18  RESERVED; AND IF WE'RE GUILTY OF THAT, I OWN UP TO IT; I'M

19  RESPONSIBLE AS THE LEAD LAWYER ON THIS CASE.  BUT IT WAS NOT

20  INTENDED AT ALL TO EVER SAY, 'YOU CAN'T HAVE ACCESS TO THIS

21  MATERIAL.'

22              NOW, I COULD MAKE AN INTERESTING ARGUMENT THAT ON ONE

23  PRODUCTION, THEY DID ASK FOR MOLDS SPECIFICALLY.  ON THE ONE

24  THAT WE WERE RESPONDING TO, THAT DIDN'T RELATE TO THESE, IT

25  DIDN'T RELATE TO THAT LOCATION, BUT --

EXHIBIT _____ *16*_____

1          THE COURT:  I DON'T FIND THAT A CONVINCING ARGUMENT.

2          MR. NOLAN:  BUT WE'RE NOT ADVANCING THAT ARGUMENT.

3          THE COURT:  FAIR ENOUGH.

4          MR. NOLAN:  AND WE DIDN'T ARGUE THAT.

5          YOUR HONOR, WHAT I'M ADVANCING IS OUR POSITION, IS

6   THAT WE DID A DILIGENT SEARCH.  WE WENT AND WE LOCATED THIS.

7   WE IMMEDIATELY NOTIFIED MATTEL.  WE PROVIDED THEM DATES FOR

8   THEM TO LOOK AT THIS STUFF.

9          WE CAN'T GET IT OUT OF CHINA.

10         THE COURT:  WHAT ABOUT THAT?  I KNOW THERE'S THIS

11  UNDERTAKING.  WHAT EFFORTS HAVE BEEN MADE TO GET RELIEF FROM

12  THAT AND GET THEM OVER HERE?

13         MR. NOLAN:  REAL QUICKLY, YOUR HONOR -- AND I WAS

14  HANDLING THIS, SO I CAN SPEAK TO THIS FIRST HAND -- I WAS

15  ADVISED AS TO THE LOCATION OF THIS MATERIAL IN HONG KONG.  I

16  WAS TOLD THAT THEY WERE SUBJECT TO AN UNDERTAKING BECAUSE

17  THERE'S LITIGATION GOING ON.  IT'S LIKE REMOVING EVIDENCE FROM

18  THE COURTROOM.

19         WE THEN IMMEDIATELY CALLED MATTEL, ADVISED THEM OF

20  THE SITUATION, AND TOLD THEM, 'LISTEN, WE HAVE TWO CHOICES.

21  ONE IS THAT WE CAN MAKE IT AVAILABLE IN HONG KONG.  THAT'S NOT

22  AN ISSUE.  BY THE WAY, WE NOTE THAT YOU HAVE AN OFFICE RIGHT

23  ACROSS FROM OUR OFFICES IN HONG KONG' -- THIS IS MATTEL AND MGA

24  -- 'SO THAT SHOULDN'T BE AN ISSUE.  BUT WE'LL GO THE EXTRA

25  MILE, AND WE WILL TALK TO COUNSEL IN HONG KONG TO TRY TO GET A

EXHIBIT _____ 16

PAGE _____ 240

# EXHIBIT 17

## CONFIDENTIAL
## THIS EXHIBIT FILED UNDER SEAL PURSUANT TO
## PROTECTIVE ORDER OF 1- 4 -2005