QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
John B. Quinn (Bar No. 90378)
(johnquinn@quinnemanuel.com)
Michael T. Zeller (Bar No. 196417)
(michaelzeller@quinnemanuel.com)
Jon D. Corey (Bar No. 185066)
(joncorey@quinnemanuel.com)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Attorneys for Mattel, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual, | CASE NO. CV 04-9049 SGL (RNBx) |
| Plaintiff, | Consolidated with<br>Case No. CV 04-09059<br>Case No. CV 05-02727 |
| vs. | |
| MATTEL, INC., a Delaware corporation, | [PUBLIC REDACTED] MATTEL, INC.'S SEPARATE STATEMENT OF UNCONTESTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF MATTEL, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT |
| Defendant. | |
| AND CONSOLIDATED ACTIONS | Date: April 23, 2008<br>Time: 10:00 a.m.<br>Place: Courtroom 1 |
| | **Phase 1**<br>Discovery Cut-Off: Jan. 28, 2008<br>Pre-Trial Conference: May 5, 2008<br>Trial Date: May 27, 2008 |

07209/2427591.1

Pursuant to Rule 56 of the <u>Federal Rules of Civil Procedure</u> and <u>Local Rule</u> 56-1, defendant Mattel, Inc. ("Mattel") submits the following Separate Statement of Uncontested Facts and Conclusions of Law in support of its Motion for Partial Summary Judgment in Mattel's favor on the following issues:

**(1)** the Employee Confidential Information and Inventions Agreement ("Inventions Agreement") executed by Bryant and Mattel on January 4, 1999 is enforceable;

**(2)** under the Inventions Agreement (a) Mattel owns all Bratz-related "inventions" Bryant conceived, created, made, or reduced to practice while he was employed by Mattel, (b) the term "inventions" covers designs, improvements, ideas, concepts, and copyrightable subject matter, such that if Mattel proves at trial that any such items were conceived, created, made, or reduced to practice by Bryant during his Mattel tenure, Mattel will be entitled to a judgment that it owns those inventions, and (c) there is no factual dispute that certain such inventions, including several drawings (Exs. 716-19, 721-22, 724-25, drawing Bates-numbered SL00044) and a dummy model, were conceived, created, made, or reduced to practice during Bryant's Mattel tenure, and hence are owned by Mattel;

**(3)** the first-generation Bratz dolls released to the public in the summer of 2001, Copyright Registration Nos. VA 1-218-487, VA 1-218-488, VA 1-218-489, VA 1-218-490 and VA 1-218-491, are substantially similar to seventeen drawings (Ex. 10) and a doll sculpt drawing or blueprint (SL00044) created by Bryant, which are original, protectable works of expression;

**(4)** Although damages and the full scope of Bryant's wrongdoing may involve disputed facts which need to be decided by the jury, on the undisputed facts Bryant is liable for breach of both the Inventions Agreement and the Conflict of Interest Questionnaire, breach of the duty of loyalty, and breach of fiduciary duty;

**(5)** Although damages and the full scope of their wrongdoing may involve disputed facts which need to be decided by the jury, on the undisputed facts

1  MGA and Larian are liable for aiding and abetting Bryant's breaches of the duty of

2  loyalty and fiduciary duty; and

3           **(6)** The affirmative defenses of MGA, Larian and MGA Hong Kong of

4  (a) 17 U.S.C. § 205, (b) bona fide purchaser for value, (c) good faith, (d)

5  acquiescence, (e) abandonment, (f) acts and omissions of others; and the affirmative

6  defenses of MGA, Larian, MGA Hong Kong and Bryant of (a) statute of limitations,

7  (b) laches, (c) waiver, (d) failure to mitigate damages, and (e) estoppel; and the

8  affirmative defense of Bryant of (a) unclean hands and (b) consent, all fail as to

9  Mattel's Phase 1 claims.

10

11                    **STATEMENT OF UNCONTESTED FACTS**

| **Uncontroverted Facts:** | **Evidentiary Support** |
|---|---|
| 1.      Mattel's business as of 2000 was to "desig[n], manufactur[e], and marke[t] a broad vareity of toy products on a worldwide basis through both sales to retailers [i.e. "customers"] and direct to consumers...[and] to create new brands..." | 1.      Mattel Inc. 2000 Annual Report at 18, attached as Exhibit 1 to the Declaration of B. Dylan Proctor ("Proctor. Dec."), dated March 7, 2008 and filed concurrently herewith. |
| 2.      Bryant withdrew "his Ninth, Tenth, and Eleventh affirmative defenses of 'failure of contract,' 'duress/ unconscionability' and 'alleged duties contrary to law[.]'" | 2.      Stipulation and Order Regarding Carter Bryant's Amended Reply to Mattel's Counterclaims, dated October 5, 2007, at 1:18-22, Proctor Dec., Exh. 3. |
| 3.      The Court has already ruled that that Mattel's Confidential Information and Inventions Agreement signed by Bryant (1) is not an unlawful restraint of | 3.      Court's Order Granting Motions to Dismiss, dated July 18, 2006 at 13, 14, 15-16, Proctor Dec., Exh. 2. |

28

| | Uncontroverted Facts: | Evidentiary Support |
|---|---|---|
| 2 | trade in violation of Section 16600 of the | |
| 3 | Business and Professions Code (July 17, | |
| 4 | 2006 Order at 10-11),[1] (2) does not | |
| 5 | violate Sections 96(k), 98.6 or 2699 of | |
| 6 | the Labor Code (id. at 11-12), (3) does | |
| 7 | not violate Section 2870 of the Labor | |
| 8 | Code (id. at 12-13), (4) is not | |
| 9 | substantively unconscionable (Order at | |
| 10 | 13-14), (5) does not violate Sections 232 | |
| 11 | or 232.5 of the Labor Code (id. at 14), (6) | |
| 12 | was not obtained through fraud or | |
| 13 | fraudulently concealed facts (id. at 14- | |
| 14 | 15), and (7) was not obtained through | |
| 15 | duress (id. at 16-17). | |
| 16 | 4.  ▮▮▮▮▮▮▮▮ | 4.      Deposition Transcript of Carter |
| 17 | ▮▮▮▮▮▮▮▮ | Bryant, Vol. 3 ("Bryant Tr. Vol. 3"), |
| 18 | ▮▮▮▮▮▮▮ | dated November 8, 2004, at 545:24-25, |
| 19 | ▮▮ | attached as Exhibit 3 to the Declaration of |
| 20 | | Jon D. Corey ("Corey Dec."), dated |
| 21 | | March 7, 2008 and filed concurrently |
| 22 | | herewith. |
| 23 | 5.      Toy design involves ▮▮▮ | 5.      Deposition Transcript of Ana Elise |
| 24 | ▮▮▮▮▮ | Cloonan, Vol. 1 ("Cloonan Tr. Vol. 1") |
| 25 | | dated December 14, 2007, at 98:23-24, |
| 26 | | Corey Dec., Exh. 6; see also Deposition |
| 27 | | |

---

[1]  UF 3 (July 17, 2006 Order at 10-11).

-3-

MATTEL INC.'S SEPARATE STATEMENT OF UNCONTESTED FACTS AND CONLUSIONS OF LAW

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
|  | Transcript of Christina Tomiyama, Vol. 1 ("Tomiyama Tr. Vol. 1"), dated February 27, 2008, at 38:3-39:8 (noting that the role of a designer like Bryant was to design products), Corey Dec., Exh. 7. |
| 6.     Bryant admitted creating a Bratz "dummy" or model using Mattel resources and that he paid at least one Mattel employee for her work on Bratz. | 6.     Bryant Tr. Vol. 3 at 666:5-667:9, Corey Dec., Exh. 3; Deposition Transcript of Carter Bryant, Vol. 1 ("Bryant Tr. Vol. 1"), dated November 4, 2004, at 166:10-170:15 (describing his recruitment of two Mattel employees to make his "dummy"), Corey Dec., Exh. 1; Id. at 165:6-8 ("███████████ ███████████████████████ ██████████████████"); Deposition Transcript of Carter Bryant, Vol. 4 ("Bryant Tr. Vol. 4"), dated January 23, 2008, at 817:8-19 (where Bryant admits paying Sheila Kyaw for her work on the dummy), Corey Dec., Exh. 4; see also Deposition Transcript of Sheila Kyaw ("Kyaw Tr."), dated January 24, 2008, at 169:23-170:21, 173:24-176:8, 251:3-4, 251:24-252:1, Corey Dec., Exh. 8. |
| 7.     Bryant acknowledged that he "███████████" | 7.     Bryant Tr. Vol. 1 at 133:9-15, Corey Dec., Exh. 1;  see also id. at |

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| ██████████████████████ | 135:25-136:1 (███████████ |
| ████████████ | ███████████████████ |
| | ███████████████████ |
| | ███████ ). |
| 8.    Bryant placed dozens of phone calls to MGA from his extension at Mattel. | 8.    M 0001820-24 (Mattel phone records showing that Bryant called MGA's main line on 9/11/00, 9/12/00, 9/13/00, 9/14/00, 9/15/00, 9/18/00, 9/19/00, 9/20/00, 9/21/00, 9/25/00, 9/26/00, and 9/27/00, and that he called Isaac Larian on 9/27/00), attached as Exhibit 1 to the Declaration of Rodney Palmer, Jr. ("Palmer Dec."), dated March 6, 2008 and filed concurrently herewith. |
| 9.    The Inventions Agreement reads, "the term 'inventions' includes, but is not limited to, all discoveries, improvements, processes, designs, know-how, data computer programs and formulae, whether patentable or unpatentable." | 9.    Mattel's Employee Confidential Information and Inventions Agreement ("Inventions Agreement") at ¶ 2(b), Proctor Dec., Exh. 5. |
| 10.    The Inventions Agreement assigns to Mattel "all [Bryant's] right, title and interest" in Bryant's inventions to the extent they were "conceived or reduced to practice by [Bryant] (alone or jointly by others) at any time during [Bryant's] employment by the Company." and also | 10.    Inventions Agreement at ¶ 2(a), Proctor Dec., Exh. 5. |

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| his "right title and interest in any patents, copyrights, patent applications or copyright applications based thereon." The Inventions Agreement further states that even if no copyright application has yet been filed, Bryant must assist Mattel "at any time" "to obtain for [Mattel's] own benefit, patents and <u>copyrights</u> for all such inventions anywhere in the world..." | |
| 11.   Bryant admitted that ███ ████████ is equivalent to ████████ ██ | 11.   Deposition Transcript of Carter Bryant, Vol. 4 ("Bryant Tr. Vol. 4"), dated January 23, 2008, at 861:4-13, Corey Dec., Exh. 4. |
| 12.   "[I]mprovement" is "an alteration or addition to an existing subject of invention or discovery that does not destroy its identity or essential character but accomplishes greater efficiency or economy[.]" | 12.   See WEBSTER'S THIRD NEW INT'L DICTIONARY (1993) at 1138, Proctor Dec., Exh. 6. |
| 13.   "[D]esign" is "a preliminary sketch or outline (as a drawing on paper or a modeling in clay) showing the main features of something to be executed[.]" | 13.   See WEBSTER'S THIRD NEW INT'L DICTIONARY (1993) at 611, Proctor Dec., Exh. 6. |
| 14.   The Proprietary Information Check Out form that Bryant signed at the end of | 14.   Proprietary Information Checkout, Proctor Dec., Exh. 7. |

MATTEL INC.'S SEPARATE STATEMENT OF UNCONTESTED FACTS AND CONLUSIONS OF LAW

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| his Mattel tenure describes the Inventions Agreement as covering "any and all inventions, improvements and ideas (whether or not patentable) which I have made or conceived … during the period of my employment with the Company."<br><br>The Check Out form also certified that "[a]ll documents … and other items including, but not limited to, … sketches … relating to the business of the Company, made or obtained by me while employed by the Company shall be the exclusive property of the Company and shall be delivered by me to the Company on termination of my employment or at any time as requested by the Company." | |
| 15.    Bryant's counsel represented to the Court with respect to the Inventions Agreement that, "The nature of the assignment here is that it is a broad based assignment of all inventions during their employment; all things that were conceived and practiced." | 15.    Transcript of Hearing Regarding Mattel's Motion to Dismiss Bryant's Counter-claims, dated June 26, 2006, at 12:23-25, Proctor Dec., Exh. 8. |
| 16.    Defendants' expert D. Jan Duffy described Mattel's and other employers' ███████████████ | 16.    Expert Report of D. Jan Duffy, dated February 11, 2008, at 7, Proctor Dec., Exh. 9. |

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| ████████████████████<br>██████ | |
| 17.     Bryant has sharply restricted his defense of unclean hands. | 17.     Werdeger letter to Proctor, dated February 27, 2008, Proctor Dec., Exh. 120. |
| 18.     MGA, MGA Entertainment (HK) Limited, and Isaac Larian have withdrawn enitrely their defense of unclean hands to Mattel's Phase I claims. | 18.     MGA's Notice of Withdrawal of Unclean Hands Affirmative Defense as it Pertains to Phase 1, dated February 15, 2008, Proctor Dec., Exh. 121. |
| 19.     Bryant admitted creating drawings of the Bratz characters wearing evening fashion designs in or about July 2000. | 19.     See Drawing Bates-numbered BRYANT 00273 and a photograph of BRYANT 00273 marked as Exhibit 717 in this action, Proctor Dec., Exh. 12; Bryant Tr. Vol. 2 at 340:21-23, Corey Dec., Exh. 2; BRYANT 00228 and a photograph of BRYANT 00228 marked as Exhibit 719 in this action, Proctor Dec., Exh. 12; Bryant Tr. Vol. 2 at 301:25-302:3, Corey Dec., Exh. 2; BRYANT 00221 and a photograph of BRYANT 00221 marked as Exhibit 722 in this action, Proctor Dec., Exh. 12; Bryant Tr. Vol. 2 at 340:2-4, Corey Dec., Exh. 2; BRYANT 00297 and a photograph of BRYANT 00297 marked as Exhibit 725 in this action, Proctor Dec., Exh. 12; Bryant Tr. Vol. 2 at 358:2- |

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
|  | 358:4, Corey Dec., Exh. 2; see also Bryant Tr. Vol. 1 at 229:14-230:5, Corey Dec., Exh. 1; Bryant Tr. Vol. 2 at 302:4-19, Corey Dec., Exh. 2; Bryant's Responses to Mattel, Inc.'s Third Set of Requests for Admission Propounded to All Defendants at Response Nos. 9-12; Proctor Dec., Exh. 88. |
| 20.    When MGA and MGA Hong Kong sought to enforce MGA's copyrights in the courts of Hong Kong, the former director of MGA Hong Kong swore in an affirmation that Bryant created 17 drawings as the "initial concept and design drawings of the Bratz dolls" "in the year 2000 pursuant to the [Bryant-MGA] Agreement." | 20.    Affirmation of Lee Shiu Cheung, dated June 18, 2002, at ¶ 7, Proctor Dec., Exh. 13; Exhibit LSC-3 to the Affirmation of Lee Shiu Cheung, Proctor Dec., Exh. 14. |
| 21.    Bryant testified that he drew a key sculptural drawing to give to the sculptor of Bratz to " ▮▮▮▮ " her sculpt.  Bratz program manager Paula Garcia testified that the same drawing was completed between October 4, 2000 and October 19, 2000. | 21.    Bryant Tr. Vol. 2 at 350:16-25, Corey Dec., Exh. 2.  Sculptural drawing Bates-numbered BRYANT 00278, Proctor Dec., Exh. 15;  Deposition Transcript of Paula Garcia, Vol. 2, dated May 25, 2007, at 589:25-592:7 (Garcia testifies that she thinks the drawing was created in between October 4, 2000 and October 19, 2000, and that it was given to Margaret Leahy), Corey Dec., Exh. 20. |

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| 22.    A third-party vendor testified that he received the same key sculptural drawing that Bryant created for the sculptor as part of a packet of materials from Bryant and MGA while Bryant was still employed by Mattel.  The witness decribed the drawing as "████ ████████ ████████ ██.█. ████████ ████████ █████" | 22.    See Collection of drawings marked as Exhibit 323 in this action at SL00044, Proctor Dec., Exh. 16; see also Deposition Transcript of Steven Linker ("Linker Tr."), dated September 13, 2006 at 77:11-13 (describing Ex. 323, Bates-numbered SL00013-63, as ████ ████████ ████████ ██████), Corey Dec., Exh. 9; id. at 89:11-21 ("████████ ████████ ████████ ████████ ████████ ██████ ████████ █████").  |
| 23.    MGA has registered Bratz drawings created by Bryant with the U.S. Copyright Office. | 23.    See the copyright registration marked as Exhibit 505 in this action, Proctor Dec., Exh. 17; the copyright registration marked as Exhibit 507 in this action, Proctor Dec., Exh. 18; the copyright registration marked as Exhibit 509 in this action, Proctor Dec., Exh. 19; the copyright registration marked as Exhibit 511 in this action, Proctor Dec., |

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| | Exh. 20; the copyright registration marked as Exhibit 513 in this action, Proctor Dec., Exh. 21. |
| 24.    Mattel has registered the same Bratz drawings with the U.S. Copyright Office that MGA has registered as well as other Bratz drawings created by Bryant during Bryant's Mattel employment. | 24.    See the copyright registration Bates-numbered M 0059601-2, Proctor Dec., Exh. 22; the copyright application Bates-numbered M 0059734-7, Proctor Dec., Exh. 23; the copyright registration Bates-numbered M 0059585-6, Proctor Dec., Exh. 24; the copyright application Bates-numbered M 0059702-5, Proctor Dec., Exh. 25; the copyright registration Bates-numbered M 0059589-90, Proctor Dec., Exh. 26; the copyright application Bates-numbered M 0059710-3, Proctor Dec., Exh. 27; the copyright registration Bates-numbered M 0059591-2, Proctor Dec., Exh. 28; the copyright application Bates-numbered M 0059714-7, Proctor Dec., Exh. 29; the copyright registration Bates-numbered M 0059587-8, Proctor Dec., Exh. 30; the copyright application Bates-numbered M 0059706-9, Proctor Dec., Exh. 31; the copyright registration Bates-numbered M 0059609-10, Proctor Dec., Exh. 32; the copyright application Bates-numbered M 0059750-3, Proctor |

-11-

MATTEL INC.'S SEPARATE STATEMENT OF UNCONTESTED FACTS AND CONLUSIONS OF LAW

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| | Dec., Exh. 33; the copyright registration |
| | Bates-numbered M 0059583-4, Proctor |
| | Dec., Exh. 34; the copyright application |
| | Bates-numbered M 0059698-701, Proctor |
| | Dec., Exh. 35; the copyright registration |
| | Bates-numbered M 0059593-4, Proctor |
| | Dec., Exh. 36; the copyright application |
| | Bates-numbered M 0059718-21, Proctor |
| | Dec., Exh. 37; the copyright registration |
| | Bates-numbered M 0059595-6, Proctor |
| | Dec., Exh. 38; the copyright application |
| | Bates-numbered M 0059722-5, Proctor |
| | Dec., Exh. 39; the copyright registration |
| | Bates-numbered M 0059597-8, Proctor |
| | Dec., Exh. 40; the copyright application |
| | Bates-numbered M 0059726-9, Proctor |
| | Dec., Exh. 41; the copyright registration |
| | Bates-numbered M 0059599-600, Proctor |
| | Dec., Exh. 42; the copyright application |
| | Bates-numbered M 0059730-3, Proctor |
| | Dec., Exh. 43; the copyright registration |
| | Bates-numbered M 0059603-4, Proctor |
| | Dec., Exh. 44; the copyright application |
| | Bates-numbered M 0059738-41, Proctor |
| | Dec., Exh. 45; the copyright registration |
| | Bates-numbered M 0059605-6, Proctor |
| | Dec., Exh. 46; the copyright application |

MATTEL INC.'S SEPARATE STATEMENT OF UNCONTESTED FACTS AND CONLUSIONS OF LAW

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| | Bates-numbered M 0059742-5, Proctor Dec., Exh. 47; the copyright registration Bates-numbered M 0059607-8, Proctor Dec., Exh. 48; the copyright application Bates-numbered M 0059746-9, Proctor Dec., Exh. 49; the copyright registration Bates-numbered M 0059581-2, Proctor Dec., Exh. 50; the copyright application Bates-numbered M 0059758-61, Proctor Dec., Exh. 51; the copyright registration Bates-numbered M 0059579-80, Proctor Dec., Exh. 52; the copyright application Bates-numbered M 0059754-7, Proctor Dec., Exh. 53. |
| 25.    Bryant testified that he intended his Bratz drawings to serve as guides for creation of the Bratz dolls. | 25.    Bryant Tr. Vol. 2 at 387:17-25, Corey Dec., Exh. 2; Bryant Tr. Vol. 3 at 528:3-20, Corey Dec., Exh. 3;  Bryant Tr. Vol. 5 at 901:7-902:3, Corey Dec., Exh. 5. |
| 26.    Defendant Larian testified in another matter that the first Bratz dolls were exhibited in November 2000.  MGA Rule 30(b)(6) designee Rebecca Harris confirmed that Larian was referring to the exhibition of Bryant's drawings. | 26.    See Affidavit of Isaac Larian in Cityworld at ¶13, ("Larian's Cityworld Affidavit") Bates-numbered M 0883396-407 (Larian stating "███████ ███████████████ █████), Proctor Dec., Exh. 54; Deposition Transcript of Spencer Woodman ("Woodman Tr."), dated |

-13-

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| | October 9, 2007, at 170:22, Corey Dec., Exh. 17; see also Deposition Transcript of Rebecca Harris, Vol. 2 ("Rebecca Harris Tr. Vol. 2"), dated January 22, 2008, at 476:18-25, Corey Dec., Exh. 10 (when asked about Larian's statement at ¶13 in Larian's Cityworld Affidavit, Harris responds, "███████████████ ████████████████."); see also Bryant sketches marked as Exhibits 1107-10 in this action, Proctor Dec., Exh. 55; Deposition Transcript of Paula Garcia, Vol. 4 ("Garcia Tr. Vol. 4"), at 1021:14, 1024:21, 1025:19 & 1026:12, Corey Dec., Exh. 18; see also Rebecca Harris Tr. Vol. 2 at 367:2-6, Corey Dec., Exh. 10 (confirming "████████ ████████████████ ████████████████ ███████████████ ██████████"); id. at 376:25-377:15 (noting that MGA presented character art boards to the retailers previously listed "████████████████ ████████."); id. at 485:20-489:19 (describing pictures of boards attached to an e-mail as some of the boards presented |

-14-

MATTEL INC.'S SEPARATE STATEMENT OF UNCONTESTED FACTS AND CONLUSIONS OF LAW

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| | to the retailers); e-mail and attachments Bates-numbered MGA 0050733-36, Proctor Dec., Exh. 56; Deposition Transcript of Sarah Chui ("Chui Tr."), dated September 28, 2007, at 94:4, Corey Dec., Exh. 19; Rebecca Harris Tr. Vol. 2 at 497:23-500:3 (describing Bryant's sketches as some of the figures which were on the boards presented to the retailers), Corey Dec., Exh. 10; Collection of drawings marked as Exhibit 302 in this action, Proctor Dec., Exh. 57; Deposition Transcript of Paula Garcia, Vol. 2, ("Garcia Tr. Vol. 2"), dated May 25, 2007, at 622:9-11, Corey Dec., Exh. 20. |
| 27.    In a side-by-side comparison of a picture of a first wave Bratz doll unclothed next to a sculpt drawing done by Bryant, all the major anatomical landmarks -- including chins, shoulders, waists, crotch, knees, and ankles -- line up on a horizontal plane.  The alignments are too numerous to be coincidental. | 27.    See Exhibit 37 and Paragraph 12 to the Declaration of Lee Loetz ("Loetz Dec."), dated March 7, 2008 and filed concurrently herewith. |
| 28.    A side-by-side comparison of a picture of a first wave Bratz doll unclothed next to a sculpt drawing done | 28.    Loetz Dec., Exh. 2 & ¶ 13. |

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| by Bryant from a three quarter view shows that the dolls and drawings are highly similar, and demonstrates that the doll closely followed the curves of the drawing. | |
| 29.    In Bryant's drawings, the characters have an angular waist pose with knock-knees, pigeon toes, and hands upturned at the wrist.  The final dolls match to a remarkable degree the poses in Carter Bryant's concept sketches. Similarly, the upturned hands at the wrists evident in Bryant's drawings were faithfully executed in the three dimensional Bratz dolls. | 29.    Loetz Dec., Exhs. 4, 5, 7, 9 & 16 & ¶ 15. |
| 30.    The proportional placement of the eyes, hair and lips, which define the signature "sultry look" of the Bratz dolls, match nearly identically as between the drawings and the dolls.  From a three quarter view, the eyes are a similar distance apart, as are the eyebrows.  The cheek color application is in the same place.  The faces have a similar shape, from the brow down to indenture of the eye socket, to the outward curve of the cheek.  Even the moles are in the same | 30.    Loetz Dec., Exhs. 6, 17, 19, 21 & 24 & ¶¶ 16-18. |

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| location on the face. | |
| 31.    Bryant's drawings include oversized almond shaped-eyes, with heavy lids, outlined with makeup lines. The Bratz dolls' eyes share this almond shape, which is angled upward at its outside edge.  The pupils are also placed in a similar location on the horizontal as well as vertical plane.  And the eyebrows share the same distance from the eye, the same angular shape, and cover fifty percent of the pupils; Loetz deems this fact especially notable. | 31.    Loetz Dec., Exhs. 18, 20, 22 & ¶¶ 19-20. |
| 32.    The makeup on the eyes in Bryant's drawings was meticulously executed on the doll.  In the dolls and in the drawings, the characters' eyes have three eyelashes.  There are similarities in placement and design of the eye makeup. The eyeliner design is similar in its painterly thickness and sweeping upward curves.  The eye makeup style and design is exceptional in correlation from drawing to doll.  The various colors of makeup and the placement, size and shape of the makeup applications gives the look of a girl who has on too much | 32.    Loetz Dec., Exhs. 20, 22, 24 & ¶ 21. |

MATTEL INC.'S SEPARATE STATEMENT OF UNCONTESTED FACTS AND CONLUSIONS OF LAW

07209/2427591.1

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| eye makeup . | |
| 33.    The lips are essentially the same in Bryant's drawings and the dolls.  Both have large over-inflated lips with the widest portion being in the middle of the lips.  There is also a correlation in makeup style on the lips.  The glossy lips with a dark distinctive outline are apparent on both doll and drawing. | 33.    Loetz Dec., Exhs. 8, 18, 20, 22, 24 & ¶ 22. |
| 34.    The dolls and the drawings share similar braided hairstyles on a dark-haired character, and pig-tailed hairstyles with the same length bangs on a dark haired character. | 34.    Loetz Dec., Exhs. 17, 19, 23 & ¶ 23. |
| 35.    The dolls and drawings share similar urban fashions of short skirts, layered tops, and high heeled shoes.  Where pants are worn, both doll and drawing share the same flared style with wide cuffs and striped details.  The denim skirts are also similar.  The dolls and drawings feature a similar floral pattern shirt, with similar style and length denim skirt.   The dolls and drawings also share a similar knit hat style, similar striped shirts, and similarly layered and cropped shirts. | 35.    Loetz Dec., Exhs. 4, 5, 10, 25, 26, 28, 29, 30 & ¶ 26. |

MATTEL INC.'S SEPARATE STATEMENT OF UNCONTESTED FACTS AND CONLUSIONS OF LAW

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| 36.    The Bratz accessories are youthful and funky in style, especially in the use of colorful backpacks and bags.  Both dolls and drawings share the same graphic motif, such as a kitten on a cropped t-shirt, and a bunny on a backpack. | 36.    Loetz Dec., Exhs. 7, 13, 16, 27 & ¶¶ 27-28. |
| 37.    There are extensive similarities in the shoe design, including in the execution of sneaker style and design, high heels, open toes, and belt straps. Shoes in both the drawings and on the dolls are oversized. | 37.    Loetz Dec., Exhs. 3, 9-12, 14, 15 & ¶¶ 29-30. |
| 38.    There is a visual consistency from Bryant's sketches, to the first wave of dolls, up through the later waves of Bratz dolls. | 38.    Loetz Dec., ¶ 31. |
| 39.    MGA registered with the U.S. Copyright Office the original four Bratz dolls released to market in or about June 2001 and registered the Bratz sculpt in or about March 2002.  MGA's initial copyright registrations for those dolls and the Bratz sculpt list their dates of creation as 2000. | 39.    See MGA copyright registration produced in this action and Bates-numbered M 0110155-9, Proctor Dec., Exh. 58; MGA copyright registration produced in this action and Bates-numbered M 0110160-4, Proctor Dec., Exh. 59; MGA copyright registration produced in this action and Bates-numbered M 0110165-9, Proctor Dec., Exh. 60; MGA copyright registration |

-19-

MATTEL INC.'S SEPARATE STATEMENT OF UNCONTESTED FACTS AND CONLUSIONS OF LAW

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
|  | produced in this action and Bates-numbered M 0110639-42, Proctor Dec., Exh. 61; MGA copyright registration produced in this action and Bates-numbered M 0110174-8, Proctor Dec., Exh. 62. |
| 40.    After Mattel filed this lawsuit, MGA "corrected" the registrations for the original dolls and the sculpt to state that the dolls were created in 2001. | 40.    See Form CA produced in this action and Bates-numbered M 0110217-8, Proctor Dec., Exh. 63; Form CA produced in this action and Bates-numbered M 0110219-20, Proctor Dec., Exh. 64; Form CA produced in this action and Bates-numbered M 0110221-2, Proctor Dec., Exh. 65; Form CA produced in this action and Bates-numbered M 0110223-4, Proctor Dec., Exh. 66; Form CA produced in this action and Bates-numbered M 0110225-6, Proctor Dec., Exh. 67. |
| 41.    When defendant Isaac Larian sought to enforce MGA's copyrights in the courts of Hong Kong, he swore in an affidavit that the defendant's dolls " ███████ ████████████████ ██████████████ ██████████ " | 41.    Larian CityWorld Affidavit at ¶ 12, Proctor Dec., Exh. 54. |
| 42.    Daphne Gronich, MGA's former | 42.    See, e.g., Affidavit of Daphne |

MATTEL INC.'S SEPARATE STATEMENT OF UNCONTESTED FACTS AND CONLUSIONS OF LAW

07209/2427591.1

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| general counsel, repeatedly identified fifteen Bryant drawings as the "████ ████" upon which the three dimensional Bratz dolls are modeled. | Gronich at ¶¶ 5-6 in Hunglam Toys Company Limited et al., Proctor Dec., Exh. 68; Woodman Tr. Vol. 1 at 235:6-7, Corey Dec., Exh. 17; see also Affidavit of Daphne Gronich in MGA Entertainment, Inc. v. Double Grand Corp. Ltd., at ¶¶ 6-7, Proctor Dec., Exh. 122. |
| 43.   Both MGA Hong Kong's Lee Shiu Cheung and MGA Hong Kong's outside counsel have separately declared under oath that ████████████ ████████████ ████████████ ████████ | 43.   Affirmation of Lee Shiu Cheung in MGA Entertainment, Inc. v. Double Grand Corp. Ltd. at ¶ 8, Proctor Dec., Exh. 69; Woodman Tr. Vol. 1 at 281:7-14, Corey Dec., Exh. 17; see also Affirmation of Wai Lim Fan at ¶ 5(2) in MGA Entertainment, Inc. v. Hunglam Toys Co. Ltd., dated July 24, 2003, Proctor Dec., Exh. 123. |
| 44.   Bryant admitted in this action that the drawings at issue are original works of authorship within the meaning of the Copyright Act. | 44.   Carter Bryant's Responses to Mattel's Sixth Set of Requests for Admission at Response Nos. 18, 19, 92, 93, 145, 146, 177, 178, 262, 263, 644, 645, 655, 656, 666, 667, 677, 678, Proctor Dec., Exh. 70. |
| 45.   Bryant admitted that he failed to disclose his Bratz inventions to Mattel. | 45.   Bryant Tr. Vol. 4 at 885:3-18, Corey Dec., Exh. 4. |
| 46.   Bryant signed a contract dated as of September 18, 2000 assigning to MGA all "████████," which | 46.   Agreement between Carter Bryant and MGA ("Bryant-MGA Agreement") at ¶3(a), Bates-numbered BRYANT 00794- |

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| included copyrights to "████████ ██████████████ ███████ ." | 799, Proctor Dec., Exh. 71. |
| 47.    The Bryant-MGA Agreement obligated Bryant to provide his services to MGA on a "████████" while Bryant was still a Mattel employee. | 47.    Bryant-MGA Agreement at ¶ 1, Proctor Dec., Exh. 71. |
| 48.    In 2004, Bryant signed a "████████████ ████████████ ████████ ██████ ████████ ████████████ ████████ █████" | 48.    2004 Modification and Clarification of 2000 Agreement ("Modification of 2000 Agreement") at § 2, Bates-numbered MGA000429-434, Proctor Dec., Exh. 72. |
| 49.    The Modification of the 2000 Agreement defines "██████" to include "████████████ █████████ ████████ ██████ ██████ ██████". | 49.    Modification of 2000 Agreement at §§ 1.1, 1.4, Proctor Dec., Exh. 72. |
| 50.    The Inventions Agreement prohibits Bryant from "without the | 50.    Inventions Agreement at ¶ 3(a), Proctor Dec., Exh. 5. |

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| Company's express written consent, engag[ing] in any employment or business other than for the Company, or invest[ing] in or assist[ing] (in any manner) any business competitive with the business or future business plans of the Company." | |
| 51.    In the Inventions Agreement, Bryant specifically acknowledged: "The Company depends on me to maintain that confidentiality, and I accept that position of trust." | 51.    Inventions Agreement at ¶ 1(a), Proctor Dec., Exh. 5. |
| 52.    The Inventions Agreement also required Bryant to maintain Mattel's proprietary information in strict confidence. | 52.    See Inventions Agreement at ¶ 1(a)-(d), Proctor Dec., Exh. 5. |
| 53.    Bryant testified that, while at Mattel, he had extensive access to and exposure to confidential and proprietary information, including not only the designs for the Barbie line, but other proposed lines of dolls and toys; that he had confidential knowledge relating to design, marketing, production, sales; that his access to the creative resources and concepts at the core of Mattel's business put him in a position where he was | 53.    Bryant Tr. Vol. 1 at 17:5-6, Corey Dec., Exh. 1 ("███████ ████████████████ ████████████"); id. at 14:20-16:8 (admitting that he had access to confidential information and stating ██████████████ ████████████████ ████"); Bryant Tr. Vol. 4 at 822:1-826:20, Corey Dec., Exh. 4 (discussing his attendance at meetings regarding |

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| clearly in a position of trust within the company. | products and products in development); id. at 828:11-830:15 (acknowledging the openness of the Mattel design center and the possibility that " ███████████ ███████████ ███████████ "); Bryant Tr. Vol. 5 at 1095:15- 1097:4, Corey Dec., Exh. 5 (admitting that he attended brainstorming sessions and that he "███████."). |
| 54.    Bryant worked on his Bratz drawings while employed by Mattel. | 54.    See, e.g., UF 17-19; see also collection of Bratz drawings marked as Exhibit 2 in this action, Proctor Dec., Exh. 73; Bryant Tr. Vol. 2 at 296:4-297:12 (Bryant admits to coloring the drawings collectively marked as Exhibit 2 in this action in 1999, and that, to his best recollection, he put them together to form a packet in 1999), Corey Dec., Exh. 2. |
| 55.    Bryant showed his Bratz drawings to MGA while employed by Mattel. | 55.    E-mail reminder regarding meeting in Larian's office with attendees Paula Treantafelles & Victoria O'Connor re Carter Bryant on 9/1/00 ("E-mail Reminder"), Bates-numbered MGA001473, Proctor Dec., Exh. 74; Deposition Transcript of Isaac Larian ("Larian Tr. Vol. 1"), dated July 18, 2006, at 198:19-198:24, Corey Dec., Exh. 13; |

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| | collection of Bryant drawings marked as Exhibit 302 in this action, Proctor Dec., Exh. 57; Bryant Tr. Vol. 1 at 9:25-11:17, Corey Dec., Exh. 1 (Bryant discusses his first meeting with MGA that took place at the end of August 2000 and in which he showed his drawings); Deposition Transcript of Veronica Marlow ("Marlow Tr. Vol. 1"), dated December 28, 2007, at 135:20-136:9, Corey Dec., Exh. 11 (Marlow testifies that Ex. 302 contains the drawings Bryant showed Garcia at the first meeting); id. at 206:18-211:17 (Marlow discusses  the September 1, 2000 meeting and mentions the fact that Larian and his daughter commented on Bryant's drawings); Deposition Transcript of Paula Garcia, Vol. 1 ("Garcia Tr. Vol. 1"), dated May 24, 2007, at 265:11-268:20 (Garcia testifies to the prototype and drawings that Bryant presented), Corey Dec., Exh. 12; Larian Tr. Vol. 1 at 77:14-78:10 (Larian comments on his first encounter with Bryant and how Bryant showed him some drawings), Corey Dec., Exh. 13 ; Deposition Transcript of Victoria O'Connor |

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| | Confidential ("O'Connor Tr. Conf."), dated December 6, 2004, at 55:12-56:2, Corey Dec., Exh. 14 (O'Connor states that Bryant presented a prototype and a drawing at the first meeting with MGA at which she was present); Id. at 56:20- 59:12 (O'Connor describes in more detail the prototype and the drawings that Bryant brought with him); Deposition Transcript of Samir Khare, Vol. 3 ("Khare Tr. Vol. 3"), dated January 25, 2008, at 752:24- 753:12, Corey Dec., Exh. 15 (Khare discusses the first meeting where Bryant showed his sketches to Garcia and Marlow); id. at 766:17- 767:11 (Khare testifies about Bryant showing his drawings at the first meeting with MGA); Deposition Transcript of Rachel Harris ("Rachel Harris Tr."), dated February 26, 2008, at 17:11-19, 30:24-32:17, Corey Dec., Exh. 16 (Harris testified that MGA set up a meeting for Bryant to present his drawings to MGA in October of 2000). |
| 56.    Bryant has admitted working for MGA on a "████" doll called "████" while employed by Mattel and was paid | 56.    See Bryant Tr. Vol. 1 at 178:3 - 178:18, Corey Dec., Exh. 1; see also Bryant's Angel sketches, Bates-numbered |

07209/2427591.1

MATTEL INC.'S SEPARATE STATEMENT OF UNCONTESTED FACTS AND CONLUSIONS OF LAW

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| by MGA for that work. | BRYANT 00173-174, Proctor Dec., Exh. 75; Garcia Tr. Vol. 2 at 321:22-322:6, Corey Dec., Exh. 20; Bryant invoice, Bates-numbered MGA 001294-96, Proctor Dec., Exh. 76; Deposition Transcript of Kerri Brode, Percipient, ("Brode Percipient Tr."), dated August 15, 2007, at 117:18-24, Corey Dec., Exh. 21. |
| 57.     Bryant targeted Mattel vendors and engaged them to start their work on Bratz before he left Mattel. | 57.     Facsimile from Bryant to Universal Commerce Corp., Bates-numbered BRYANT 01200-03, Proctor Dec., Exh. 77; Bryant Tr. Vol. 3 at 680:13-21, Corey Dec., Exh. 3; Marlow's invoices for 169 hours of work on Bratz beginning as early as September 29, 2000, Bates-numbered MGA 0072161-167, Proctor Dec., Exh. 78; Garcia Tr. Vol. 4 at 1276:16-21, Corey Dec., Exh. 18;  Bryant Tr. Vol. 2 at 341:18-342:11, Corey Dec., Exh. 2 (testifying about the drawing he gave to Margaret Leahy while he was still at Mattel for her to begin her sculpting work on Bratz); October 12, 2000 e-mail from Liz Hogan to Paula Treantafelles and Carter Bryant, copy to Steve Linker, Bates-numbered SL00001, Proctor Dec., |

07209/2427591.1

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| | Exh. 79; Linker Tr. Vol. 1 at 57:7-21, Corey Dec. Exh. 9; October 14, 2000 e-mail from Hogan to Treantafelles copying Linker, Bates-numbered SL00005-7, Proctor Dec., Exh. 80; Linker Tr. Vol. 1 at 66:16-67:9, Corey Dec., Exh. 9; Bryant Tr. Vol. 1 at 221:21-222:11, Corey Dec., Exh. 1 (noting that before he signed his contract with MGA, he and Garcia met with Steve Linker regarding packaging designs for Bratz). |
| 58.   Bryant created Bratz designs that bore March and April 2000 fax header dates -- six to seven months before his last day at Mattel. | 58.   Bratz designs with March and April 2000 fax headers, Bates-numbered KMW-M 01647-8, MGA HK 0001928, MGA HK 0001935, KMW-M 007726, KMW-M 007729, KMW-M 007734 & BRYANT 00167, Proctor Dec., Exh. 81; see also Bryant Tr. Vol. 2 at 317:17-23, Corey Dec., Exh. 2. |
| 59.   Paula Treantafelles, the project manager on Bratz, stated in an e-mail dated October 10, 2000 that Bryant worked for MGA for at least 4 hours per day starting weeks before he left Mattel. | 59.   E-mail correspondence between Larian, O'Connor, Dennis Medici and Treantafelles, dated October 10, 2000, Bates-numbered MGA 004717, Proctor Dec., Exh. 82; Deposition Transcript of Paula Garcia, Vol. 3 ("Garcia Tr. Vol. 3"), dated October 9, 2007 at 873:25-875:4, Corey Dec., Exh. 22. |

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| 60.    MGA produced an internal MGA e-mail message stating that the first Bratz dolls were created in September 2000. | 60.    E-mail from Nana Ashong to O'Connor, Treantafelles and Martin Hitch, copy to Jackie Bielke, dated September 6, 2001, Bates-numbered MGA0069426-7, Proctor Dec., Exh. 83; Deposition Transcript of Nana Ashong Vol. 1 ("Ashong Tr. Vol. 1"), dated January 28, 2008, at 215:23-216:16, Corey Dec., Exh. 23. |
| 61.    Anna Rhee, the face painter of Bratz, testified that invoices dated as early as June 12, 2000 were for work she performed on Bratz for MGA under the "███████" of "█████." | 61.    Rhee's 2000-2001 invoices to MGA, Bates-numbered AR 0001-0058, Proctor Dec., Exh. 84; Deposition Transcript of Anna Rhee Non-Confidential ("Rhee Non-Conf. Tr."), dated February 3, 2005 at 23:13-24:8, Corey Dec., Exh. 24; Deposition Transcript of Anna Rhee Confidential ("Rhee Conf. Tr."), dated February 3, 2005, at 107:16-110:6 (Rhee testifies about AR 0001 and says that the invoice reflects Bratz work she performed for Bryant), Corey Dec., Exh. 25. |
| 62.    Bryant testified that he informed Isaac Larian and Paula Garcia, MGA's CEO and Product Managaer respectively, that he was a Mattel employee at his initial meeting with MGA.  Larian, | 62.    Bryant Tr. Vol. 1 at 88:12-13, Corey Dec., Exh. 1 ("████████ ████████████████████████ ████████████████████"); Id. at 88:21-89:1 (Bryant testifying that he told Larian |

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| O'Connor and Rachel Harris have each confirmed that they knew he was a Mattel employee when each first met with him. | he was an employee of Mattel at the September 1, 2000 meeting);  Larian Tr. Vol. 1 at 77:17-18, Corey Dec., Exh. 13 (Larian testifies that ▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇ );  Isaac Larian's testimony in Art Attacks at MGA 0868922, Proctor Dec., Exh. 85; O'Connor Tr. at 71:8-17, Corey Dec., Exh. 14 (O'Connor testifies that Bryant mentioned he was employed by Mattel and that he was a designer for Barbie Collectibles). |
| 63.    Bryant testified that he told Larian that he was a Mattel employee the first time that he met Larian.  In addition, MGA's Rachel Harris testified that MGA knew Bryant was a Mattel employee at the time Bryant presented his drawings to MGA. | 63.    Bryant Tr. Vol. 1 at 88:21-89:3, Corey Dec., Exh. 1; Rachel Harris Tr. Vol. 1 at 41:10-42:10, 166:1-168:8, Corey Dec., Exh. 16. |
| 64.    Bryant told MGA's counsel that he had signed a confidentiality agreement with Mattel. | 64.    Facsimile from Bryant to David Rosenbaum, Bates-numbered MGA007337-40, Proctor Dec., Exh. 86; Bryant Tr. Vol. 4 at 772:18-773:15, Corey Dec., Exh. 4; Bryant Tr. Vol. 3 at 585:17 - 587:17 (Bryant testifying that he had informed MGA that he had signed a confidentiality agreement), Corey Dec., |

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| | Exh. 3. |
| 65.    MGA specifically paid Bryant for work performed and expenses that he incurred on behalf of MGA while Bryant was still working for Mattel. | 65.    See, e.g., Bryant's invoice dated August 31, 2000 and marked as Exhibit 593 in this action, Proctor Dec., Exh. 76; Brode Percipient Tr. at 117:10-118:6, Corey Dec., Exh. 21; internal MGA e-mail regarding setting Bryant up as a vendor, Bates-numbered MGA 001291, Proctor Dec., Exh 89; Deposition Transcript of MGA Designee Kerri Brode ("Brode Designee Tr.") dated January 19, 2007, at 53:6-14, Corey Dec., Exh. 26; Bryant's actual expense report, receipts, and MGA's payment to Bryant for his Bratz expenses, Bates-numbered MGA 3786749-60, Proctor Dec., Exh. 111. |
| 66.    Bratz has been a very successful product for MGA and Larian. | 66.    Deposition Transcript of Lisa Tonnu, Vol. 2 ("Tonnu Vol. 2"), dated September 24, 2007, at 380:21-381:19, Corey Dec., Exh. 27; Bratz Sales from 2001-2006 spreadsheet, Bates-numbered MGA 0868723-865, marked as Exhibit 660 in this action, Proctor Dec., Exh. 4. |
| 67.    The Inventions Agreement states at the outset that the agreement "is designed to make clear that … inventions that I create will be owned by the Company," | 67.    Inventions Agreement, Proctor Dec., Exh. 5. |

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| and concluding with the capitalized, bold-faced statement that **"THIS AGREEMENT CREATES IMPORTANT OBLIGATIONS OF TRUST AND AFFECTS THE EMPLOYEE'S RIGHT TO INVENTIONS THE EMPLOYEE MAY MAKE DURING HIS OR HER EMPLOYMENT."** | |
| 68.    The Bratz project manager at MGA admitted that the Bratz dolls are based on Bryant's drawings.  An MGA Rule 30(b)(6) designee likewise admitted that the drawing started the "████" from which the dolls "█████" | 68.    See E-mail interview of Paula Treantafelles for "Dolls Magazine", dated April 25, 2001 and May 1, 2001, Bates-numbered MGA 0051255-7, at MGA 0051256 ("████████ ██████████ ███████ ██████████████ ████████ █████"), Proctor Dec., Exh. 110; see also Rebecca Harris Vol. 2 at 490:15-17 ("██ ██████████ ██████████ ██████"), Corey Dec., Exh. 10. |
| 69.    Bryant departed from Mattel on October 19, 2000. | 69.    Proprietary Information Checkout, Proctor Dec., Exh. 7; Mattel Exit Interview Form, Proctor Dec., Exh. 90. |
| 70.    On April 27, 2004, Mattel filed its | 70.    Mattel's Complaint in Mattel, Inc. |

-32-

MATTEL INC.'S SEPARATE STATEMENT OF UNCONTESTED FACTS AND CONLUSIONS OF LAW

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| original complaint in California state court against Bryant in <u>Mattel, Inc. v. Bryant</u>, Case No. BC314398.  Mattel brought claims for breach of contract and breach of duty of loyalty. | <u>v. Bryant</u>, Case No. BC314398 at 5-9, Proctor Dec., Exh. 91. |
| 71.     On May 13, 2005, Mattel filed its answer to MGA's complaint in <u>MGA Entertainment, Inc. v. Mattel, Inc.</u>, Case No. CV 05-2727 SGL (RNBx). | 71.     Mattel's answer to MGA's complaint in <u>MGA Entertainment, Inc. v. Mattel, Inc.</u>, Case No. CV 05-2727 SGL (RNBx), dated May 13, 2005, Proctor Dec., Exh. 92. |
| 72.     On November 20, 2006, Mattel moved to amend its complaint against MGA and Bryant.  Mattel added a claim for copyright infringement against Bryant when it moved to amend. | 72.     Mattel's Notice of Motion and Motion for Leave to File Amended Complaint at 1-3, 14, filed November 20, 2006, Proctor Dec., Exh. 93. |
| 73.     The Court has previously ruled that, "November 24, 2003[] marks the date when litigation between Mattel and Bryant became more than merely speculative and in fact became probable. On this date, in-house counsel for Mattel received in discovery in an unrelated action a copy of a contract between MGA and Bryant that pre-dated Bryant's resignation from Mattel.  This contract appeared to Mattel to violate certain employment agreements executed by | 73.     Court's Order Denying MGA's Motion for Terminating Sanctions, dated August 27, 2007, at 3, Proctor Dec., Exh. 94. |

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| Bryant and Mattel, thus giving rise to one of the current consolidated actions. Although prior to this date an internal investigation may have raised a <u>suspicion</u> on Mattel's part that litigation might arise, there was no evidence presented to the Court that Mattel should have known it had a viable claim against Bryant before November 2003." | |
| 74.   The Court ruled that Mattel could file its Amended Complaint in Case No. 04-9059 as an Amended Answer in Case No. 05-2727 instead. | 74.   <u>See</u> Court's Order Regarding Mattel's Motion for Leave to Amend, dated January 11, 2007, at 22:13-15, Proctor Dec., Exh. 95. |
| 75.   The Court previously found that, "By MGA's own admission Mattel's copyright claim arises out of the same conduct or transaction contained in the original complaint filed in April, 2004 …." | 75.   <u>Id.</u> at 13. |
| 76.   Bryant alleged in an Interrogatory Response that Mattel knew "he was going to perform work for a Mattel competitor," but "waited and said nothing while the [Bratz] dolls were successfully (and at great cost) developed, manufactured and sold, and only filed suit years later." | 76.   Carter Bryant's Responses to Mattel, Inc's Amended Supplemental Interrogatory Regarding Defendants' Affirmative Defenses ("Bryant's Responses") at §§ B, E, Proctor Dec., Exh. 96. |

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| 77. In the Inventions Agreement, Bryant acknowledged that his "obligations under this Agreement may not be modified or terminated, in whole or in part, except in writing signed by a Vice-President of the Company." | 77. Inventions Agreement at ¶ 4(a), Proctor Dec., Exh. 5. |
| 78. During his exit interview, Bryant claimed that he was leaving to start his own freelancing business and work for himself doing design and development. | 78. Bryant Tr. Vol. 1. at 208:22-24, Corey Dec., Exh. 1. |
| 79. Had Mattel been aware that Bryant was going to a competitor, it would have followed its policy of expelling that employee the same day of his announced resignation. | 79. Deposition Transcript of Sandra Yonemoto, Confidential ("Yonemoto Conf. Tr. Vol. 1"), dated May 30, 2007, at 67:16-19, Corey Dec., Exh. 28. |
| 80. On January 4, 1999, Bryant executed a Conflict of Interest Questionnaire ("Conflict Questionnaire"), in which he certified that, other than as disclosed, he had not worked for any competitor of Mattel in the prior twelve months and had not engaged in any business venture or transaction involving a Mattel competitor that could be construed as a conflict of interest. | 80. Mattel's Complaint at Exh. B, Proctor Dec., Exh. 91. |
| 81. Bryant did not notify Mattel that he was working on Bratz. | 81. Bryant Tr. Vol. 4 at 885:3-18, Corey Dec., Exh. 4. |

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| 82.    In an e-mail dated March 12, 2002, from Isaac Larian to MGA personnel, regarding inquiries about Bratz, Larian stated that:" ███████████ ██████████ ████████. " | 82.    E-mail from Isaac Larian dated March 12, 2002 instructing MGA personnel, Bates-numbered MGA 3801819-22, Proctor Dec., Exh. 97. |
| 83.    In response to an e-mail from Larian proposing development of a collectible Bratz doll, Dee Dee Valencia proposed creating a limited edition model that would create a marketing "████." However, she raised the question: "███████████ ███████." | 83.    E-mail from Isaac Larian to Dee Dee Valencia dated February 6, 2003, Bates-numbered MGA 3801558-9, Proctor Dec., Exh. 98. |
| 84.    Lee Loetz is a toy designer with more than ten years of experience in the toy industry.  He has worked with companies throughout the industry and has prepared artwork and designs that have been implemented in numerous toys and children's products. | 84.    Loetz Dec., Exh. 1.¶ |
| 85.    In public statements, Larian identified himself, not Bryant, as the creator of Bratz. | 85.    See Affidavit of Isaac Larian in MGA v. Metson at p. 2, ¶ 8, Bates-numbered MGA 0868039-91 (Larian claiming he "████████████ ██████."), Proctor Dec., Exh. 99; Woodman Tr. Vol. 1 at 218:1-21, Corey |

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| | Dec., Exh. 17; Business Week article discussing Mattel and Bratz, Bates-numbered M 0074054-6, ("[Larian] got the idea for Bratz after seeing his own kids run around in navel-baring tops and hip-huggers."), Proctor Dec., Exh. 100; San Fernando Valley Business Journal article discussing Larian, (Larian states "It was Jason's idea for Bratz."), Proctor Dec., Exh. 100.  Similarly, Larian represented to the U.S. Patent and Trademark Office that he had created the Bratz feet and packaging:  U.S. patent application for Bratz feet marked as Exhibit 500 in this action, Proctor Dec., Exh. 101; Amendment to U.S. patent application for Bratz feet marked as Exhibit 548 in this action, Proctor Dec., Exh. 102; Patent for trapezoidal packaging marked as Exhibit 552 in this action, Proctor Dec., Exh. 103; Patent application for trapezoidal packaging marked as Exhibit 615 in this action, Proctor Dec., Exh. 104.  See also e-mail from Isaac Larian dated March 12, 2002 instructing MGA personnel, Bates-numbered MGA 3801819-22 (Larian |

MATTEL INC.'S SEPARATE STATEMENT OF UNCONTESTED FACTS AND CONLUSIONS OF LAW

07209/2427591.1

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| | demanded that a Bratz website make no reference to Mattel), Proctor Dec., Exh. 97. |
| 86.   The Inventions Agreement provides "Any waiver by the Company of a breach on any provision of this Agreement will not operate or be construed as a waiver of any subsequent breach." | 86.   Inventions Agreement at ¶ 4(a), Proctor Dec., Exh. 5. |
| 87.   Paragraph 1(c) of the Inventions Agreement required Bryant to "not disclose or use at any time either during or after my employment with the Company any Proprietary information except for the exclusive benefit of the Company." | 87.   Inventions Agreement at 1(c), Proctor Dec., Exh. 5. |
| 88.   Paragraph 3(a) of the Inventions Agreement states "I shall not, without the Company's express written consent, engage in any employment or business other than for the Company, or invest in or assist (in any manner) any business competitive with the business or future business plans of the Company." | 88.   Inventions Agreement at 3(a), Proctor Dec., Exh. 5. |
| 89.   Assuming Mattel employees were moonlighting as defendants suggest, such work, based on defendants' own | 89.   See, e.g., Bryant's Responses at 35 (Joni Pratte's volleyball and basketball books; Lori Sipos' puppets; Veronica |

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| description, was completely unrelated to Mattel's core line of business. | Marlow's handbags; other employees' weekend nail and hair salon work), Proctor Dec., Exh. 96. |
| 90. The MGA Defendants' Answer and Affirmative Defenses state simply, "Mattel has abandoned any interest it may have had in the alleged copyrighted works." | 90. Amended Answer and Affirmative Defenses of MGA Entertainment, Inc. MGA Entertainment (HK) Limited, and MGAE De Mexico S.R.L. De C.V. To Mattel, Inc's Second Amended Answer and Counterclaims ("MGA's Answer"), dated September 19, 2007 at 24, Proctor Dec., Exh. 105. |
| 91. MGA's Answer argues that MGA allegedly "acted with a good faith belief that Bryant owned the rights to his original Bratz drawings and that his assignment of such rights to MGA Defendants was valid and permissible." | 91. MGA's Answer at 22:12-15, Proctor Dec., Exh. 105. |
| 92. MGA admitted that it did not record its copyright assignment. | 92. See MGA's Responses to Mattel's Third Set of Requests for Admission Nos. 241-44, 249-52, Proctor Dec., Exh. 106. |
| 93. MGA's complaint in MGA Entertainment, Inc. v. Mattel, Inc., Case No. CV 05-2727 SGL (RNBx), emphasizes the uniqueness of Bratz: "At approximately 9.5 to 10 inches tall, the 'BRATZ' dolls were intentionally shorter than 'Barbie' dolls and looked like no | 93. MGA's complaint in MGA Entertainment, Inc. v. Mattel, Inc., Case No. CV 05-2727 SGL (RNBx), Proctor Dec., Exh. 107. |

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| other, with disproportionately large heads, big, dramatic eyes and lips, small, thin bodies, oversized feet (to emphasize shoe fashion and to stand on their own, unlike 'Barbie' which requires a stand), and up-to-date fashions." | |
| 94.    The sum total of MGA's attorney David Rosenbaum's investigation of Mattel's preexisting rights to Bratz was a brief telephone conversation with Bryant's attorney, Anne Wang.  Wang purportedly said that Bryant created Bratz before commencing employment at Mattel.  Rosenbaum asked no questions about what investigation Wang had done to reach that conclusion.  He did not ask any specific questions about the time, manner or place Bryant allegedly developed the concept, whether it was expressed then in any tangible form, or whether Bryant could otherwise document ownership. | 94.    Deposition Transcript of David Rosenbaum ("Rosenbaum Tr."), dated January 25, 2008, at 78:21-88:18 & 218:18-220:3, Corey Dec., Exh. 29. |
| 95.    On September 14, 2000, Rosenbaum received a fax from Bryant, from the fax machine at Barbie Collectibles -- stating that Bryant could not look into his agreements with Mattel | 95.    Facsimile from Bryant to David Rosenbaum, Bates-numbered MGA007337-40, Proctor Dec., Exh. 86. |

| | Uncontroverted Facts: | Evidentiary Support |
|---|---|---|
| 1 | | |
| 2 | further without risking suspicion. | |
| 3 | 96.     Rosenbaum testified based on his | 96.     Rosenbaum Tr. at 88:19-90:24, |
| 4 | knowledge of "███████████" in the | Corey Dec., Exh. 29; see also Mercedeh |
| 5 | industry, "████████████ | Ward's Inventions Agreement with MGA, |
| 6 | ███████████ | Bates-numbered MGA001470-2, Proctor |
| 7 | ███████████████ | Dec., Exh. 87. |
| 8 | ████████." | |
| 9 | MGA itself used Inventions Agreement | |
| 10 | substantially similar to Mattel's. | |
| 11 | 97.     The Bryant-MGA Agreement | 97.     Bryant-MGA Agreement at ¶ 2, |
| 12 | drafted by MGA prohibits Bryant from | Proctor Dec., Exh. 71. |
| 13 | providing services "██████████ | |
| 14 | █████████ | |
| 15 | ███████████ | |
| 16 | ██████████" during the term | |
| 17 | of the Agreement. | |
| 18 | 98.     The Bryant-MGA Agreement | 98.     Bryant-MGA Agreement at ¶ 3(a), |
| 19 | drafted by MGA assigns ████████ | Proctor Dec., Exh. 71. |
| 20 | ██████████ | |
| 21 | ██████████ | |
| 22 | █████████ | |
| 23 | █████████ | |
| 24 | █████████ | |
| 25 | █████████ | |
| 26 | ███████ | |
| 27 | 99.     Paragraph 3.2 of Bryant and | 99.     Modification of 2000 Agreement at |
| 28 | MGA's Modification of 2000 Agreement | § 3.2, Bates-numbered MGA000429-434, |



| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| "▮▮▮▮" assignment of "▮▮▮▮" ▮▮▮▮ | Proctor Dec., Exh. 72. |
| 100.  Bryant testified that he had seen only the Steve Madden and Paris Blues ads before creating the Bratz drawings. | 100.  Bryant Tr. Vol. 1 at 140:21-141:6, Corey Dec., Exh. 1. Compare Expert Report of Peter S. Menell, dated February 11, 2008, at 17-20, Proctor Dec., Exh. 108; (Spice Girls dolls, Japanese anime-style cartoons, the "Blythe" line of dolls, Margaret Keene's "Ladies in Waiting" illustrations, the Lara Croft character, print advertisements by Steve Madden, Cover Girl, Paris Blue and Coca Cola). |
| 101.  When Bryant left Mattel's employ in October 2000, he lied about where he was going, telling Mattel employees that he was not going to work for a freelancer. | 101.  Bryant Tr. Vol. 1 at 209:16-17, Corey Dec., Exh. 1 ("▮▮▮▮ ▮▮▮▮ ▮▮▮▮."); Deposition Transcript of Jill Nordquist ("Nordquist |

MATTEL INC.'S SEPARATE STATEMENT OF UNCONTESTED FACTS AND CONLUSIONS OF LAW

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| | Tr."), dated July 31, 2007, at 145:1-9 (Nordquist testified that " ███████████ ███████████████ ███████████████ ████████ "), Corey Dec., Exh. 30; id. at 127:22-128:9 (when asked whether Bryant was going to a competitive doll company, Bryant responded " ██████ ██████ "); Deposition Transcript of Ivy Ross ("Ross Tr."), dated January 17, 2008, at 87:5-23 (" ████████ ██████████████████ ████████████████████ ████████████████ ███████████ █████████████████ ████████████████ ██████████████████████ ████████ "), Corey Dec., Exh. 31; id. at 88:17-19 (noting what Bryant described " █████████████ █████████████ ██████ "); id. at 220:5-12 (Ross explains that Ron Longsdorf suggested ██████ █████████████████ ████████████ ███████████████████ |

MATTEL INC.'S SEPARATE STATEMENT OF UNCONTESTED FACTS AND CONLUSIONS OF LAW

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| | ████████████████████ |
| | ██████████████ "). |
| 102.   Larian directed a subordinate to conceal a fax header from Bryant's signed contract signature page before sending the page to Particia Glaser, Larian's attorney.  The concealed fax header would have shown that the page was faxed from "████████████." | 102.   O'Connor Conf. Tr. at 18:13-18, Corey Dec., Exh. 14. |
| 103.   Farhad Larian, a former MGA executive and Isaac Larian's brother, has stated in court pleadings that Bryant brought Bratz to MGA by February 2000 -- and that they attempted to conceal it. | 103.   [Proposed] First Amended VerifiedComplaint in _Larian v. Larian_ at ¶16, Bates-numbered FL 10569-621, Proctor Dec., Exh. 109. |
| 104.   Both MGA and Larian admitted they knew Bryant was a Mattel employee at the time Bryant presented his drawings to MGA. | 104.   Response to Request for Admission No. 140 in MGA's Responses to Mattel's Third Set of Requests for Admission to MGA; Proctor Dec., Exh. 106; Rachel Harris Tr. Vol. 1 at 41:10-42:10, 166:1-168:8, Corey Dec., Exh. 16. |
| 105.   Bryant told MGA that he had signed a confidentiality agreement with Mattel. | 105.   Bryant Tr. Vol. 3 at 585:17 - 587:17, Corey Dec., Exh. 3; facsimile from Bryant to David Rosenbaum, Bates-numbered MGA007337-40, Proctor Dec., Exh. 86. |
| 106.   MGA itself requires strict | 106.   Mercedeh Ward's Inventions |

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| confidentiality from its own employees in jobs such as Bryant's. | Agreement with MGA, Bates-number MGA 001470-2, Proctor Dec., Exh. 87. |
| 107.   MGA has produced a document that shows Bryant's end date at Mattel and start date at MGA as " ███ ." | 107.   MGA spreadsheet listing former Mattel employees, Bates-numbered MGA 1134723-30, at 26, Proctor Dec., Exh. 112. |
| 108.   MGA admits that no public statement even recognizing Bryant as Bratz's creator was issued until July 18, 2003, when the <u>Wall Street Journal</u> published an article with that information. | 108.   MGA Entertainment, Inc.'s Supplemental and Amended Responses to Mattel, Inc.'s Third Set of Requests for Admission to MGA Entertainment, Inc., Proctor Dec., Exh. 113. |
| 109.   Defendants have not and cannot present any evidence that Mattel had notice of its claims against Bryant before April 27, 2001. | 109.   Defendants have no evidence genuinely disputing this fact. |
| 110.   Defendants can proffer no evidence that Mattel consented to their employees' moonlighting activity. | 110.   Defendants have no evidence genuinely disputing this fact. |
| 111.   Defendants cannot present any evidence that suggests Mattel intended or acted in a manner that would allow its employees to believe they could violate their legal obligations with impunity. | 111.   Defendants have no evidence genuinely disputing this fact. |
| 112.   Defendants have not presented any evidence to show that they would have behaved differently had Mattel filed suit | 112.   Defendants have no evidence genuinely disputing this fact. |

MATTEL INC.'S SEPARATE STATEMENT OF UNCONTESTED FACTS AND CONLUSIONS OF LAW

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| earlier, as they have continued manufacturing the infringing dolls both before and after Mattel's filing of this action. | |
| 113.   In its Eighth Affirmative Defense, MGA contends that "Mattel's damages, if any, were not caused by MGA Defendants and are not attributable to any acts or omissions of MGA defendants." | 113.   MGA's Answer at 23:5-6, Proctor Dec., Exh. 105. |
| 114.   MGA defendants have asserted the following affirmative defenses that fall under the rubric of good faith: bona fide purchaser for value, 17 U.S.C. § 205(d), lawful competition, and good faith. | 114.   MGA's Answer at 22, 25, Proctor Dec., Exh. 105. |
| 115.   Bryant initially asserted a good faith defense, but withdrew it in his amended answer. | 115.   Bryant's Amended Reply to Mattel's Counterclaims, dated September 12, 2007, Proctor Dec., Exh. 114. |
| 116.   Bryant did not seek reconsideration of the August 27, 2007 Court's Order Denying MGA's Motion for Terminating Sanctions. | 116.   There is no evidence genuinely disputing this fact. |
| 117.   The Court ruled in the January 11, 2007 Order that the relation back principle applies to MGA even though it was not named a defendant in Mattel's complaint. | 117.   Court's Order Regarding Mattel's Motion for Leave to Amend, dated January 11, 2007, at 12-15, Proctor Dec., Exh. 95. |
| 118.   The Court noted, "Again, the | 118.   Court's Order Regarding Mattel's |

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| relations back principle would seem to render [Mattel's] claim timely if it were filed as an amended answer . . . in the 05-2727 case.") | Motion for Leave to Amend, dated January 11, 2007, at 15, 22, Proctor Dec., Exh. 95. |
| 119.   The nature of the underlying claim is to establish that Defendants have no interest in Bratz. | 119.   Mattel's Second Amended Answer in Case No. 05-2727, dated July 12, 2007, at ¶ 169 , Proctor Dec., Exh. 115. |
| 120.   Defendants were not prejudiced because they did not rely on Mattel's alleged delay; rather, they proceeded with developing and producing Bratz dolls both before and after Mattel brought suit. | 120.   Tonnu Vol. 2 at 380:21-381:19, Corey Dec., Exh. 27; Bratz Sales from 2001-2006 spreadsheet, Bates-numbered MGA 0868723-865, marked as Exhibit 660 in this action, Proctor Dec., Exh. 4. |
| 121.   No authorized Mattel executive ever provided Bryant with written consent to this assignment of Bratz to MGA, or permitted him to work for MGA while in Mattel's employ. | 121.   Defendants have no evidence genuinely disputing this fact. |
| 122.   Bryant asserts that "Mattel believed from the time that Bryant left Mattel's employ that he was going to perform work for a Mattel competitor." | 122.   Bryant's Responses at 32, Proctor Dec., Exh. 96. |
| 123.   Defendants assert that waiver applies because Mattel "tolerated conduct by other employees similar to the alleged conduct by Bryant." | 123.   Bryant's Responses at 32, Proctor Dec., Exh. 96. |
| 124.   As shown, Mattel did not "know the facts" regarding defendants' waiver | 124.   Defendants have no evidence genuinely disputing this fact. |

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| and consent defenses. | |
| 125.  "Designs," as that term is well understood in the toy industry, undoubtedly include drawings. | 125.   Rebecca Harris Vol. 2 at 490:15-17 ("███████████████ ███████████████ ███████"), Corey Dec., Exh. 10; Paula Garcia Vol. 2 at 318:19-320:13 (discussing need for "I-designs" for Prayer Angels and receiving drawings from Bryant), Corey Dec., Exh. 20. |
| 126.   Mattel's in-house counsel learned on November 24, 2003 through discovery in another action that Bryant had entered a contract with MGA while still employed by Mattel. | 126.   Deposition Transcript of Michael Moore, dated March 7, 2008, at ¶ 3, Exh. 1. |
| 127.   The Court has previously held "None of the substantive concerns raised by MGA and Bryant to the present amended complaint, e.g., statutes of limitations, would appear to be affected if the new claims and defendants were brought as defenses and counterclaims in the 05-2727 case as opposed to the 04-9059 one." | 127.   Court's Order Regarding Mattel's Motion for Leave to Amend at 22, Proctor Dec., Exh. 95. |
| 128.   Mattel recorded Bryant's Inventions Agreement with the U.S. Copyright Office on November 6, 2006. | 128.   Certificates of Recordation recorded by Mattel with the Copyright Office, Proctor Dec., Exhs. 116-118. |
| 129.   A Hong Kong court found on | 129.   Judgment of Deputy High Court of |

| Uncontroverted Facts: | Evidentiary Support |
|---|---|
| summary judgment that three-dimensional dolls and products infringed MGA's copyright in Bryant's initial concept drawings. "The substantial similarity between the plaintiff's drawings and the dolls produced from them, and the defendant's dolls are obvious on inspection." | the Hong Kong Special Administrative Region in <u>MGA Entertainment, Inc. v. Double Grand Corp. Ltd.</u>, Action No. 1883 of 2003, dated February 24, 2006 at ¶ 11, attached as Exhibit A to Request for Judicial Notice, dated March 7, 2008 and filed concurrently herewith. |
| 130. The Questionnaire required Bryant to notify Mattel if he became engaged in any business venture with a Mattel competitor that could be construed as a conflict of interest. | 130. Mattel's Complaint in <u>Mattel, Inc. v. Bryant</u>, Case No. BC314398 at Exh. B, Proctor Dec., Exh. 91. |

## STATEMENT OF UNCONTESTED CONCLUSIONS OF LAW

1.    Partial summary adjudication enables a district court to make rulings on individual issues even where summary judgment is not appropriate as to all of the claims advanced by the complaint. <u>See</u> <u>Fed. R. Civ. P.</u> 56(d) (district court "shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted"); <u>First Nat'l Ins. Co. v. Federal Deposit Ins. Co.</u>, 977 F. Supp. 1051, 1055 (S.D. Cal. 1997) ("Even if First National will not prevail on one of its causes of action, the Court may still grant summary adjudication as to specific issues if it will narrow the issues for trial.").

2.    The standard for granting partial summary adjudication echoes that for granting summary judgment. <u>See</u> <u>Humanitarian Law Project v. Mukasey</u>, 509 F.3d 1122, 1130 (9th Cir. 2007). The Court must determine "what material facts are not genuinely" disputed and whether the moving party is entitled to a ruling on the issue as

1   a matter of law.  Fed. R. Civ. P. 56(d).  In making that determination, the Court

2   "view[s] the evidence in the light most favorable to the nonmoving party."

3   Humanitarian Law Project, 509 F.3d at 1130.

4        3.     Among the issues susceptible to partial summary adjudication are liability

5   on a cause of action where a factual dispute remains only on damages, see Fed. R. Civ.

6   P. 56(d)(2), and the availability of an affirmative defense, see Vernon v. Heckler, 811

7   F.2d 1274, 1278 (9th Cir. 1987) ("The affirmative defense of statute of limitations …

8   may be tested on summary judgment ….").

9        4.     Section 2870 of the Labor Code prohibits contractual provisions that

10  assign the employee's "rights in an invention … that the employee developed entirely

11  on his or her own time without using the employer's equipment, supplies, facilities, or

12  trade secret information …." Cal. Labor Code § 2870.  The statute's prohibition does

13  not apply if the invention (1) relates to the employer's business "at the time of

14  conception or reduction to practice" or (2) if the invention results from any work

15  performed by the employee for the employer. Id.  Thus, an invention lawfully may be

16  assigned in three independent circumstances: "(1) The invention was developed using

17  the employer's time *or* resources; *or* (2) The invention relates to the employer's

18  business or actual or demonstrably anticipated research or development; *or* (3) The

19  invention resulted from work performed by the employee for the employer." Cadence

20  Design Sys., Inc. v. Bhandari, 2007 WL 3343085, at *5 n.4 (N.D. Cal. Nov. 8, 2007).

21       5.     Bryant bears the burden of establishing his inventions are within Section

22  2870's scope. See Cal. Labor Code § 2872 ("In any suit or action arising thereunder,

23  the burden of proof shall be on the employee claiming the benefits of its provisions.")

24       6.     "Courts interpreting employee assignment agreements in the context of

25  section 2870 have construed the 'related to' phrase broadly." Cadence, 2007 WL

26  3343085, at *5.  Thus, in Cadence, the court granted summary judgment to an

27  employer, finding that the employee's invention "related to" the employer's business

28  even though the employer did not yet have the invention in its product line and the

1  invention merely improved the employer's existing products. <u>Id.</u>; <u>see also</u> <u>Cubic Corp.</u>

2  <u>v. Marty</u>, 229 Cal. Rptr. 828, 834-36 (1986) (finding that employee's invention fell

3  within the scope of company's actual or demonstrated research and development

4  because it would enhance the company's product capabilities).

5      7.      The Court can determine the scope of the Inventions Agreement on partial

6  summary judgment because interpretation of the plain language of the agreement is a

7  pure legal question. <u>See</u>, <u>e.g.</u>, <u>Cal. Civ. Code</u> § 1639 ("When a contract is reduced to

8  writing, the intention of the parties is to be ascertained from the writing alone, if

9  possible ...."); <u>In re Bennett</u>, 298 F.3d 1059, 1064 (9th Cir. 2002) ("'If contractual

10  language is clear and explicit, it governs.'") (quoting <u>Bank of the West v. Superior</u>

11  <u>Court</u>, 2 Cal.4th 1254, 1264 (1992)); <u>Am. President Lines, Ltd. v. Zolin</u>, 38 Cal. App.

12  4th 910, 923 (1995) (interpretation of a written instrument is essentially a judicial

13  function); <u>Sheet Metal Workers, Int'l Ass'n Local Union No. 24 v. Architectural Metal</u>

14  <u>Works, Inc.</u>, 259 F.3d 418, 426 (6th Cir. 2001) (interpretation of a contract is an issue

15  of law and may be resolved by summary adjudication).

16      8.      To prove copyright infringement, a plaintiff must show (1) ownership of a

17  valid copyright, (2) access to the original, and (3) substantial similarity of the works.

18  <u>Brown Bag Software Corp. v. Symantec</u>, 960 F.2d 1465,1472 (9th Cir. 1992).

19      9.      "Access is proven when the plaintiff shows that the defendant had an

20  opportunity to view or to copy the plaintiff's work.." <u>Meta-Film Assoc., Inc. v. MCA,</u>

21  <u>Inc.</u>, 586 F. Supp. 1346, 1355 (C.D. Cal. 1984) (quoting <u>Sid & Marty Krofft Television</u>

22  <u>Prods., Inc. v. McDonalds Corp.</u>, 562 F.2d 1157, 1172 (9th Cir. 1977)).

23      10.      Substantial similarity is often resolved at the summary-judgment stage.

24  <u>See</u>, <u>e.g.</u>, <u>JCW Invs., Inc. v. Novelty, Inc.</u>, 289 F.Supp.2d 1023 (N.D. Ill. 2003)

25  (granting summary judgment to plaintiff on copyright infringement claim involving

26  copying of toys), <u>aff'd</u> 482 F.3d 910 (7th Cir. 2007); <u>Educ. Testing Serv. v. Simon</u>, 95

27  F. Supp. 2d 1081 (C.D. Cal. 1999) (testing materials).

28

1    11.    Access lowers the plaintiff's quantum of proof with respect to substantial

2  similarity.  See, e.g., Three Boys Music Corp. v. Bolton, 212 F.3d 477, 485 (9th Cir.

3  2000) ("Under our case law, substantial similarity is inextricably linked to the issue of

4  access.  In what is known as the 'inverse ratio rule,' we require a lower standard of

5  proof of substantial similarity when a high degree of access is shown.") (quotation

6  marks and citation omitted); Krofft, 562 F.2d at 1172 (high "degree of access justifies a

7  lower standard of proof to show substantial similarity").

8          The Ninth Circuit uses the extrinsic test and the intrinsic test to

9  determine substantial similarity.  Under the extrinsic test, the plaintiff must establish

10  that specific expressive elements of the works at issue are similar.  The intrinsic test,

11  on the other hand, looks at the overall similarity of expression in the two works from

12  the perspective of an ordinary observer.  The plaintiff must satisfy both tests to

13  prevail on a claim of copyright infringement.  See, e.g., Krofft, 562 F.2d at 1164

14  (9th Cir. 1977); Litchfield v. Spielberg, 736 F.2d 1352, 1356 (9th Cir. 1984).  The

15  works at issue satisfy both tests.

16    12.    As part of the extrinsic test, the court engages in "analytic dissection" to

17  determine what is protected and what is not.  See, e.g., Dr. Seuss Enters., L.P. v.

18  Penguin Books USA, Inc., 109 F.3d 1394, 1398 (9th Cir. 1997).  This involves

19  breaking works into their components to determine whether similarities between the

20  works are attributable to unprotected elements, if any.  Id.  The unprotected similarities

21  are filtered out.  Id.

22    13.    Because the intrinsic test focuses on a reasonable observer's overall

23  impression, analytic dissection is not employed.  See Olson v. Nat'l Broad. Co., 855

24  F.2d 1446, 1449 (9th Cir. 1988).  The intrinsic test ascertains the visceral reaction of

25  the lay observer, and as such is "virtually devoid of analysis."  Shaw v. Lindheim, 919

26  F.2d 1353, 1357 (9th Cir. 1990).

27    14.    "As Judge Learned Hand cogently remarked, 'no plagiarist can excuse the

28  wrong by showing how much of his work he did not pirate.'"  Harper & Row

1 | Publishers, Inc. v. Nation Enters., 471 U.S. 539, 565 (1985) (quoting Sheldon v. Metro-
2 | Goldwyn Pictures Corp., 81 F.2d 49, 56 (2d Cir. 1936)).

3 |    15. In the context of toys, courts often find similarities substantial. For
4 | example, in Fisher-Price Toys v. My-Toy Co., 385 F. Supp. 218 (S.D.N.Y. 1974), the
5 | court entered judgment for the plaintiff-copyright owner where the accused dolls and
6 | the copyrighted dolls had similar shapes, facial features and proportion, eye shape and
7 | color, and clothes. Likewise, in Gund v. Russ Berrie & Co., 701 F. Supp. 1013, 1019
8 | (S.D.N.Y. 1988), the court issued an injunction because the infringing baby ostrich
9 | dolls and the copyrighted dolls had similarly curved necks, beaks, colored bodies, and
10 | "stubby" tails.

11 |    16. Courts uniformly hold that a two-dimensional drawing may be infringed
12 | by a three-dimensional toy. See King Features Syndicate v. Fleisher, 299 F. 533 (2d
13 | Cir. 1924) (copyrighted comic book character infringed by dolls); Fleisher Studios v.
14 | Ralph A. Freundlich, Inc., 73 F.2d 276, 278 (2d Cir. 1934) (drawing of Betty Boop
15 | character infringed by a substantially similar doll).

16 |    17. "[A] taking is considered de minimis only if it is so meager and
17 | fragmentary that the average audience would not recognize the appropriation." Fisher
18 | v. Dees, 794 F.2d 432, 434 n.2 (9th Cir. 1986).

19 |    18. The Copyright Act protects "original works of authorship." 17 U.S.C. §
20 | 102.

21 |    19. A copyright registration obtained within five years of the work's
22 | publication "shall constitute prima facie evidence of the validity of the copyright and of
23 | the facts stated in the certificate." 17 U.S.C. § 410(c); see also Transgo, Inc. v. Ajac
24 | Transmission Parts Corp., 768 F.2d 1001, 1019 (9th Cir. 1985) ("[R]egistration by the
25 | Copyright Office is prima facie evidence of copyrightability. This presumption shifts
26 | the burden of proof to the challenging party to demonstrate why the item in question is
27 | not copyrightable."); NIMMER ON COPYRIGHT §12.11[B][1] at 12-201 (same).

28 |

20.   Courts consistently "invoke[] judicial estoppel not only to prevent a party from gaining an advantage by taking inconsistent positions, but also because of 'general consideration[s] of the orderly administration of justice and regard for the dignity of judicial proceedings,' and to 'protect against a litigant playing fast and loose with the courts.'" Hamilton v. State Farm Fire & Cas. Co., 270 F.3d 778, 782 (9th Cir. 2001) (quoting Russell v. Rolfs, 893 F.2d 1033, 1037 (9th Cir. 1990)). "Inconsistency is the basic element that runs through both judicial reliance and more open-ended 'fast-and-loose' theories of judicial estoppel." CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE, § 4477 at 587 (3d ed. 2002). With the latter theory, "[t]he focus is not so much on a court's reliance as on the perceived unseemliness of a litigant's conduct." Id.

21.   In Feist Publications, Inc. v. Rural Telephone Service Co., 499 U.S. 340 (1991), the Supreme Court held that the originality requirement in copyright law requires "only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." Id. at 345. Distinguishing the originality requirement of copyright law from the novelty requirement of patent law, the Court emphasized that "the requisite level of creativity is extremely low; even a slight amount will suffice," and "[t]he vast majority of works make the grade quite easily." Id. (quotation and citation omitted). The Ninth Circuit similarly has explained that originality means "little more than a prohibition of actual copying" and requires only that the author contribute "something more than a 'merely trivial' variation." Three Boys, 212 F.3d at 489 (quoting North Coast Indus. v. Jason Maxwell, Inc., 972 F.2d 1031, 1033 (9th Cir. 1992)).

22.   The existence of prior similar works is irrelevant to the issue of originality without "evidence that [the work's author] copied from such works." NIMMER § 12.11[B][1] at 12-202; R. Dakin & Co. v. A & L Novelty Co., Inc., 444 F. Supp. 1080, 1084 (E.D.N.Y. 1978). "Absent such evidence, works such as these, having copyright registration certificates, are entitled to a presumption of originality." Id.

23.   Given the low bar of originality, courts have uniformly rejected arguments that a work that purportedly draws on pre-existing material is not entitled to full protection under the Copyright Act. In <u>Kamar International</u>, the Ninth Circuit rejected the defendant's argument that the plaintiff's toys were not sufficiently original "because stuffed toy animals are widely available to manufacturers ..., and that because [the plaintiff's] concepts of toy animals were taken from the public domain, [its] stuffed animals are not copyrightable." 657 F.2d at 1061. The court held that "[a]nyone can copyright anything [including realistic depictions of animals], if he <u>adds</u> something original to its expression." <u>Id</u>. (emphasis added).

24.   In <u>Mattel, Inc. v. Goldberger Doll Mfg. Co.</u>, 365 F.3d 133 (2d Cir. 2004), the district court had held that copyright protection did not extend to such purportedly common features of a BARBIE doll as the widely spaced eyes, pert nose, and slim figure.  The Second Circuit reversed, holding:

> Mattel's copyright in a doll visage with an upturned nose,
> bow lips, and widely spaced eyes will not prevent a
> competitor from making dolls with upturned noses, bow
> lips, and widely spaced eyes, even if the competitor has
> taken the idea from Mattel's example, so long as the
> competitor has not copied Mattel's particularized
> expression.

<u>Id</u>. at 135-36.  The court emphasized that virtually imperceptible variations on common facial features may be extremely valuable.  "One artist's version of a doll face with upturned nose, bow lips, and widely spaced eyes will be irresistible to an eight-year-old collector.  Another artist's version, which to a grownup may look very like the first, will be a dud to the eight-year-old. . . . We can surmise that <u>in the highly competitive, billion-dollar doll industry, getting the doll's face and expression exactly right is crucial to success</u>." <u>Id</u>. at 136 (emphasis added).  <u>See also</u>, e.g., <u>JCW Investments, Inc. v. Novelty, Inc.</u>, 482 F.3d 910 (7th Cir. 2007) (a

1    doll that "represent[ed] a combination of elements that were in the public domain or

2    were *scènes à faire*" was sufficiently original because "the very combination of

3    these elements as well as the expression that is [the doll] himself are creative")

4         25.    Every California employee owes a duty of undivided loyalty to his

5    employer and may not take any action that is adverse to his employer. See Stokes v.

6    Dole Nut Co., 41 Cal. App. 4th 285, 295 (1995); Fowler v. Varian Assocs. Inc., 196

7    Cal. App. 3d 34, 41 (1987); J. C. Peacock, Inc. v. Hasko, 196 Cal. App. 2d 353, 357

8    (1961); 4 KIRBY WILCOX AND ERICA GRUBB, CALIFORNIA EMPLOYMENT LAW § 70.04

9    (2003). The duty of loyalty is also codified in the Labor Code, which obligates every

10   employee to comply with his employer's directions, to assign to the employer

11   everything (except compensation) the employee acquires by virtue of his employment,

12   and to give preference to the business of the employer over his own similar interests.

13   Cal. Labor Code §§ 2856, 2860, 2863.

14        26.    Thus, "[w]here a person is employed to design improvements to the

15   product of his employer, or to design new products for his employer, and he does so, he

16   may not use the results of such work for his own use and benefit and particularly not to

17   the detriment of his employer." Daniel Orifice Fitting Co. v. Whalen, 198 Cal. App. 2d

18   791, 797-98 (1962) (stating that such a job does not contemplate a right to pitch designs

19   to competitors) (citations omitted). The Restatement (Second) of Agency explains an

20   employee who breaches his duty of loyalty is entitled to no compensation and indeed

21   provides that the employee must disgorge anything received as a result of his violation

22   of the duty. See Restatement (Second) of Agency §§ 393, 403, 429, 469 (1958).

23        27.    Confidentiality provisions may create a fiduciary duty under California

24   law. See GAB Bus. Svcs, Inc. v. Lindsey & Newsom Claim Servs., Inc., 83 Cal. App.

25   4th 409, 417 (2000), overruled on other grounds, Reeves v. Hanlon, 33 Cal. 4th 1140

26   (2004).

27        28.    An employee owes his employer a fiduciary duty if the employer entrusts

28   him with highly confidential information. See Stevens v. Marco, 147 Cal. App. 2d 357

1 (1956) (fiduciary relationship existed because one party confidentially entrusted
2 another with "a new and valuable idea"); Michelson v. Hamada, 29 Cal. App. 4th 1566,
3 1581 (1994) ("Confidential and fiduciary relations are, in law, synonymous, and may
4 be said to exist whenever trust and confidence is reposed by one person in the integrity
5 and fidelity of another.") (citations and quotation omitted).

6      29.   A broad variety of conduct can breach an employee's duty of loyalty and
7 fiduciary duty. As the Court recognized in Bancroft-Whitney Co. v. Glen, 64 Cal. 2d
8 327, 346 (1966), "No ironclad rules as to the type of conduct which is permissible can
9 be stated, since the spectrum of activities in this regard is as broad as the ingenuity of
10 man itself."

11      30.   "[I]n the absence of authority, express or implied, [an agent] cannot
12 transfer his principal's property, and such authority will not be presumed." Palo Alto
13 Mut. Bldg. & Loan Ass'n v. First Nat'l Bank, 33 Cal. App. 214, 221 (1917) (quotation
14 and citation omitted).

15      31.   For a "preparation to compete" defense to apply, the employee must
16 disclose his plans to his employer. See Daniel Orifice Fitting Co., 198 Cal. App. 2d at
17 800-01 (employee liable where he did not make a "full disclosure of acts undertaken in
18 preparation for entering into competition" with the employer) (quotation and citation
19 omitted); Sequoia Vacuum Sys. v. Stransky, 229 Cal. App. 2d 281, 287 (1964)
20 ("Appellant argues that all his activities were within the permissible scope of seeking
21 other employment . . . But the protection of the principal's interest requires a full
22 disclosure of acts undertaken in preparation of entering into competition").

23      32.   Courts have consistently recognized that employers have a right to expect
24 loyalty from their employees, and that employees have a legally enforceable duty to
25 provide it. "There can be no doubt that [the defendant] breached his duties.... He was
26 an officer in charge of an important part of the respondent's business and at the same
27 time he was creating improvements to the respondent's product, he was concealing
28 such improvements and stealthily doing all that was necessary to set up a competing

business." <u>Daniel Orifice Fitting Company</u>, 198 Cal. App. 2d at 800; <u>see also</u> <u>Stokes</u>, 41 Cal. App. 4th at 296 (employees breached the duty of loyalty by working toward establishing a competing business); <u>Fowler</u>, 196 Cal. App. 3d at 37, 42 (marketing manager's communications with third parties about a new competing business venture were a breach of his duty of loyalty); <u>J. C. Peacock, Inc.</u>, 196 Cal. App. 2d at 358-59 (finding breach of the duty of loyalty where employees entered into business transactions that presented a conflict of interest).

33.    A defendant aids and abets the commission of an intentional tort if he (1) knows the other's conduct constitutes a breach of duty, and (2) gives substantial assistance or encouragement to the other so to act. <u>See, e.g.</u>, <u>Neilson v. Union Bank of Calif.</u>, 290 F. Supp. 2d 1101, 1119 (C.D. Cal. 2003); <u>River Colony Estates Gen. P'ship v. Bayview Fin. Trading Group, Inc.</u>, 287 F. Supp. 2d 1213, 1225-26 (S.D.Cal. 2003); <u>Casey v. U.S. Bank Nat'l Assoc.</u>, 127 Cal. App. 4th 1138, 1144 (2005).

34.    Aiding and abetting requires actual knowledge of the underlying breach, <u>Neilson</u>, 290 F. Supp. 2d at 1118-19, but does not require a defendant to agree to join the wrongful conduct in the way one joins a conspiracy. <u>Berg & Berg Enters., LLC v. Sherwood Partners, Inc.</u>, 131 Cal. App. 4th 802, 823 n. 10 (2005). For instance, even "ordinary business transactions" that a bank performs for a customer can satisfy the substantial assistance element. <u>Casey</u>, 127 Cal. App. 4th at 1145.

35.    Although financial gain and self-interested profit are not elements of an aiding and abetting claim, they corroborate the two elements of the claim. <u>Neilson v. Union Bank of Calif.</u>, 290 F. Supp. 2d 1101, 1127-28 (C.D. Cal. 2003). In other words, if the aider/abetter is an active participant in the breach of a fiduciary duty and reaped the benefit, he cannot disclaim the burden of liability for the breach. <u>Id.</u> (citing <u>Heckmann v. Ahmanson</u>, 168 Cal. App. 3d 119, 127 (1985); <u>Bancroft-Whitney Co.</u>, 64 Cal.2d at 353.

36.    Good faith is not a valid defense to copyright infringement. "[E]ven where the defendant believes in good faith that he is not infringing a copyright, he may

1   be found liable." <u>Pye v. Mitchell</u>, 574 F.2d 476, 481 (9th Cir. 1978) (<u>citing</u> <u>County of</u>

2   <u>Ventura v. Blackburn</u>, 362 F.2d 515 (9th Cir. 1966)); <u>see also</u> <u>L.A. News Serv. v.</u>

3   <u>Conus Commc'n Co.</u>, 969 F. Supp. 579, 584 (C.D. Cal. 1997) ("Direct infringement

4   does not require intent or any particular state of mind").

5        37.   17 U.S.C. § 205(d) states that where there are competing transfers of

6   copyright, a prior transferee prevails unless the later purported transferee took in good

7   faith without notice of the earlier transfer <u>and</u> recorded first. <u>See</u> 17 U.S.C. § 205(d)

8   ("[T]he later transfer prevails <u>if recorded first</u> . . . and if taken in good faith . . . and

9   without notice of the earlier transfer") (emphasis added).

10       38.   Good faith is not a viable defense to claims for unfair competition and

11  conversion because these are strict-liability offenses for which intent is not even an

12  element. <u>See, e.g.</u>, <u>Community Assisting Recovery, Inc. v. Aegis Ins. Co.</u>, 92 Cal. App.

13  4th 886, 891 (2001) ("The [unfair competition] statute imposes strict liability. It is not

14  necessary to show that the defendant intended to injure anyone."); <u>Virtanen v.</u>

15  <u>O'Connell</u>, 140 Cal. App. 4th 688, 707 (2006) ("Conversion is a species of strict

16  liability in which questions of good faith, lack of knowledge and motive are ordinarily

17  immaterial.") (quotation and citation omitted).

18       39.   "A defense which demonstrates that plaintiff has not met its burden of

19  proof [as to an element] is not an affirmative defense." <u>Zivkovic v. Southern California</u>

20  <u>Edison Co.</u>, 302 F.3d 1080, 1088 (9th Cir. 2002); <u>see also</u> <u>Bank of the Sierra v. Kallis</u>,

21  2006 WL 3513568, *10 (E.D. Cal. Dec. 6 2006) (granting summary judgment on an

22  affirmative defense where defendant was merely "challenging an element of the

23  [plaintiff's] cause of action" because "mere negation of a required element of a cause

24  of action is not an affirmative defense.").

25       40.   Claims for aiding and abetting a breach of loyalty or a breach of fiduciary

26  duty and for interference with contract clearly fall within this category. <u>See, e.g.</u>,

27  <u>CRST Van Expedited, Inc. v. Werner Enters., Inc.</u>, 479 F.3d 1099, 1105 (9th Cir. 2007)

28  (interference with contract); <u>PMC, Inc. v. Kadisha</u>, 78 Cal. App. 4th 1368, 1382 (2000)

(misappropriation of trade secrets); <u>Casey v. U.S. Bank Nat'l Ass'n</u>, 127 Cal. App. 4th 1138, 1144 (2005) (aiding and abetting).

41.    The applicable limitations periods and accrual rules are:

We begin by identifying each claim's limitations period.

| Claim | Statute of Limitations | Accrual |
|---|---|---|
| Copyright Infringement (MGA and Bryant) | rolling 3 years (17 U.S.C. § 507(b)) | upon discovery (see <u>Roley v. New World Pictures, Ltd.</u>, 19 F.3d 479, 481 (9th Cir. 1994)) |
| Misappropriation of Trade Secrets (MGA and Bryant) | 3 years (Cal. Code Civ. Pro. § 3426.6) | upon discovery (see Cal. Code Civ. Pro. § 3426.6) |
| Breach of Contract (Bryant) | 4 years (Cal. Code Civ. Pro. § 337(1)) | upon discovery where there is concealment (see <u>April Enters., Inc. v. KTTV</u>, 147 Cal. App. 3d 805, 831 (1983)) |
| Interference with Contract (MGA) | 2 years (Cal. Code Civ. Pro. § 339(1)) | upon discovery (see <u>Korea Supply Co. v. Lockheed Martin Corp.</u>, 109 Cal.Rptr. 2d 417, 428-9 (2001), <u>rev'd on other grounds</u>, 29 Cal.4th 1134 (2003)) |
| Breach of Fiduciary Duty (Bryant) | 4 years if gravamen of claim is not fraud (Cal. Code Civ. Pro. § 343) | upon discovery (see <u>April Enters.</u>, 147 Cal. App. 3d at 827) |
| Aiding and Abetting Breach of Fiduciary Duty (MGA) | 2 years (see <u>Rambus Inc. v. Samsung Electronics Co.</u>, 2007 WL 39374, at *3 n.4 (N.D. Cal. 2007)) | upon discovery (see <u>April Enters.</u>, 147 Cal. App. 3d at 827) |
| Breach of Duty of Loyalty (Bryant) | 3 year (by analogy to breach of fiduciary duty) | upon discovery (by analogy to breach of fiduciary duty) |
| Aiding and Abetting Breach of Duty of Loyalty (MGA) | 2 years (by analogy to aiding and abetting breach of fiduciary duty) | upon discovery (by analogy to aiding and abetting breach of fiduciary duty) |
| Conversion | 3 years (Cal. Code Civ. Pro. § 338(c)) | upon act of wrongfully taking property (see <u>Bono v. Clark</u>, 103 Cal. App. 4th 1409, 1433 (2003)), but the discovery rule applies in cases where "a fiduciary has concealed the material facts giving rise to the cause of action." <u>Id</u>. |
| Unfair Competition | 2 years if based on common law (Cal. Code Civ. Pro. | upon discovery (see, e.g., <u>Mass. Mutual Life Ins. Co. v.</u> |

| | | |
|---|---|---|
| | § 339(1)); 4 years if based on statute (Cal. Bus. & Prof. Code § 17208) | Superior Court, 97 Cal. App.4th 1282, 1295 (2002)) |
| Declaratory Relief | period applicable to underlying claim (see Howard Jarvis Taxpayers Ass'n v. City of La Habra, 25 Cal.4th 809, 821 (2001)) | accrual applicable to underlying claim (see Howard Jarvis Taxpayers Ass'n, 25 Cal.4th at 821) |

42.    It is well-established that a claim accrues when the plaintiff could have discovered the specific wrongful acts alleged in the complaint, not when the plaintiff merely had cause to suspect some wrongdoing.  See, e.g., Fox v. Ethicon Endo-Surgery, Inc., 35 Cal. 4th 797 (2005).  In Fox, a patient filed a medical malpractice action against her surgeon.  After learning in discovery about a potential surgical equipment malfunction, she amended her complaint to include a product liability claim against the equipment manufacturer.  The California Supreme Court held that the plaintiff's product liability claim was timely because "if a plaintiff's reasonable and diligent investigation discloses only one kind of wrongdoing when the injury was actually caused by tortious conduct of a wholly different sort, the discovery rule postpones accrual of the statute of limitations on the newly discovered claim."  Id. at 813 (emphasis added).  See also Snow v. A.H. Robins Co., 165 Cal. App. 3d 120, 124 (1985) (plaintiff's fraud claim based upon the manufacturer's concealment of product defect rates accrued upon her discovery of the misrepresentation, not when she learned that the product failed); Westinghouse Elec. Corp. v. General Circuit Breaker & Elec. Supply Inc., 106 F.3d 894, 899 (9th Cir. 1997) (citing Hobson v. Wilson, 737 F.2d 1, 35 (D.C. Cir. 1984), cert. denied, 470 U.S. 1084 (1985)) (the party asserting the time bar must prove that the opposing party knew of facts giving it notice of the specific cause of action at issue, not just any cause of action).  Thus, the pertinent question for accrual is when the plaintiff discovered the specific misconduct for which it has sued.

43.    A plaintiff is "on notice" of a claim only when he has "an awareness of sufficient facts to identify a particular cause of action, be it a tort, a constitutional

MATTEL INC.'S SEPARATE STATEMENT OF UNCONTESTED FACTS AND CONLUSIONS OF LAW

1   violation or a claim of fraud.  [It does] not mean the kind of notice—based on hints,

2   suspicions, hunches or rumors—that requires a plaintiff to make inquiries in the

3   exercise of due diligence, but not to file suit." Garamendi v. SDI Vendome S.A., 276

4   F. Supp. 2d 1030, 1043 (C.D. Cal. 2003) (quoting Hobson, 737 F.2d at 35).

5       44.   "[A] claim relates back if it "arose out of the conduct, transaction, or

6   occurrence set out — or attempted to be set out — in the original pleading." Fed. R.

7   Civ. P. 15(c)(1)(B); see also Martel v. Trilogy Ltd., 872 F.2d 322, 327 (9th Cir. 1989)

8   (new claim related back because it arose from the same transaction and occurrence as

9   original claim); Grudt v. City of Los Angeles, 2 Cal. 3d 575, 583-84 (1970) (holding

10  that amended complaint related back to filing of original complaint where new claim

11  added new theory of recovery based on same acts and same injury alleged in original

12  pleading); cf. Cummings v. U.S., 704 F.2d 437 (9th Cir. 1983) (claimant's insurer's

13  complaint in intervention seeking to enforce its right of subrogation related back to

14  filing of claimant's original complaint); DePinto v. Provident Sec. Life Ins. Co., 323

15  F.2d 826, 831-32 (9th Cir. 1963) (intervention of a party plaintiff that shared interests

16  with the original plaintiff related back for statute of limitations purposes)

17      45.   Under Rule 15(c), the state relation back rules apply if state law provides

18  "the applicable statute of limitations." See also Wm. Moore, MOORE'S FEDERAL

19  PRACTICE 3d, § 15.20[3] at 15-126.   ("When a state relation-back rule is more

20  generous than the federal relation-back rule, the more generous state rule should

21  apply.").  California favors "liberality in the amendment of pleadings to encourage

22  litigating causes on their merits." Myers v. Phillip Morris, Inc., 2003 WL 21756086 at

23  *4 (E.D. Cal. 2003) (quoting Marasco v. Wadsworth, 21 Cal. 3d 82, 89 (1978)). Under

24  California relation-back doctrine, the claims against new defendants, who were

25  previously sued as Does, relate back to the date of the original complaint, as long as

26  they are based on the same general set of facts. See, e.g., Smeltzley v. Nicholson Mfg.

27  Co., 18 Cal. 3d 932 (1977); Austin v. Mass. Bonding & Ins. Co., 56 Cal. 2d 596, 600

28  (1961).

46. "Laches is not available as a defense to an action at law." <u>Abbott v. City of Los Angeles</u>, 50 Cal.2d 438, 462 (1958); <u>see also</u> 11 B.E. WITKIN, SUMMARY OF CALIFORNIA LAW, EQUITY § 14(a)(2) (9th ed. 1987) ("Laches can be asserted only in a suit in equity; an action at law may be brought at any time within the period of the statute of limitations."). "The equitable doctrine of laches has a legal equivalent in the statute of limitations. To allow a laches defense in a legal action would be to override a time limit mandated by the Legislature." <u>Unilogic, Inc. v. Burroughs Corp.</u>, 10 Cal. App. 4th 612, 619 (1992).

47. The declaratory relief claim is considered a claim at law (not equity) because the nature of the underlying claim resembles an action at law for money damages. <u>See</u> <u>Wells Fargo Bank v. Bank of America</u>, 32 Cal. App. 4th 424, 439 (1995) ("Although declaratory relief is an equitable proceeding, whether laches is available in a declaratory relief proceeding depends upon the nature of the underlying claim."). Thus, in <u>Wells Fargo</u>, the court held that laches was inapplicable to a declaratory relief claim because it was "essentially also a dispute regarding money." <u>Id.</u>; <u>see also</u> <u>Mandracio v. Bartenders Union, Local 41</u>, 41 Cal.2d 81, 84-85 (1953) (laches inapplicable to declaratory relief action that amounted to an action for money damages).

48. Only in the rarest of circumstances can a claim that satisfies the statute of limitations be barred as untimely by laches. <u>See, e.g.</u>, <u>Jarrow Formulas, Inc. v. Nutrition Now, Inc.</u>, 304 F.3d 829, 835-36 (9th Cir. 2002) ("[A] laches determination is made with reference to the limitations period for the analogous action at law. If the plaintiff filed suit within the analogous limitations period, the strong presumption is that laches is inapplicable."); <u>Kling v. Hallmark Cards Inc.</u>, 225 F.3d 1030, 1041, n.8 (9th Cir. 2000) ("When a limitation on the period for bringing suit has been set by statute, laches will generally not be invoked to shorten the statutory period.") (quoting <u>Advanced Cardiovascular Sys., Inc. v. SciMed Life Sys., Inc.</u>, 988 F.2d 1157, 1161 (Fed. Cir. 1993));

49.    To establish laches, defendant must show "both an unreasonable delay . . . and prejudice to itself" Kling, 225 F.3d at 1036 (quotation omitted).  Continuing the same challenged conduct militates against a finding of laches.  See, e.g, Russell v. Price, 612 F.2d 1123, 1125-2f6 (9th Cir. 1979) ("Defendants at no time changed their film distribution activities in reliance on [plaintiff's] conduct."); Danjaq, LLC v. Sony Corp., 263 F.3d 942, 955 (9th Cir. 2001) ("A defendant may also demonstrate prejudice by showing that it took actions or suffered consequences that it would not have, had the plaintiff brought suit promptly.").

50.    Existence of nonwaiver clauses is "important fact[]" militating against finding of waiver.  Securities and Exchange Commission v. Lincoln Thrift Ass'n, 557 F.2d 1274, 1278 (9th Cir. 1977).

51.    "Waiver is the intentional relinquishment of a known right with knowledge of its existence and the intent to relinquish it." U. S. v. King Features Entm't, Inc., 843 F.2d 394, 399 (9th Cir. 1988) (citation omitted).  Waiver of copyright "occurs only if there is an intent by the copyright proprietor to surrender rights in his work."  A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1026  (9th Cir. 2001) (quoting 4 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT  ¶ 13.06 (2000)). Because the burden is on the party claiming a waiver of a right to prove it by clear and convincing evidence, doubtful cases will be decided against a waiver.  See City of Ukiah v. Fones, 64 Cal. 2d 104, 107-08 (1966).

52.    Inaction by itself is not an intentional relinquishment.  Novell Inv. v. Weird Stuff, Inc., No. C92-20467 JW/EAI, 1994 WL 16458729 (N.D. Cal. 1993), is on point.  In Novell, plaintiffs brought an action for copyright infringement, trademark infringement, and false designation of origin against defendants as a result of the unauthorized sale of approximately 1700 Novell NetWare 3.11 serialized "system" disks which were retrieved from a dumpster by defendants and sold to another party. Defendants argued that Novell had waived its right to claim infringement because it had knowledge of "dumpster divers" -- persons who comb through dumpsters for material -

1  - for several years and failed to take action to deter such activity.  The court rejected

2  this claim, and held that "there was no evidence that Novell was aware of 'dumpster

3  divers' for years and failed to take action to deter such activity."  Id. at *13.

4  "Moreover, even if Novell failed to take preventive measures to stop "dumpster

5  diving," a failure to act, without more, is insufficient evidence" to support a waiver

6  claim.  Id.  Accordingly, the court denied defendants' waiver defense and granted

7  summary judgment to Novell. See also id. at *17 (applying same analysis to copyright

8  claim).

9        53.    The law is clear that litigants need not choose between pursuing all

10  offenders or none. See Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd., 518 F.

11  Supp. 2d 1197, 1225 (9th Cir. 2007) ("The Court knows of no rule in copyright, and

12  StreamCast has cited no authority for the proposition, that a copyright holder is bound

13  to pursue either all infringers or none at all."); Emerson Electric Co. v. Rogers, 418

14  F.3d 841, 845 (8th Cir. 2005) ("While [employer] may not have exercised its rights

15  under the covenant on every occasion, there is no credible evidence that [its] failure to

16  do so rose to a waiver of its right to enforce the agreement as to [the defendant

17  employee] or that its failure to enforce the agreement as to other employees makes it

18  any less likely that [defendant] could use information gained during his relationship

19  with [the employer] to unfairly compete against it."); Deal v. Consumer Programs, Inc.,

20  458 F. Supp. 2d 970, 978 n 5 (E.D. Mo. 2005) (employer's alleged non-enforcement of

21  a contractual provision against one executive does not operate as a waiver of that

22  provision against another); Pochopien v. Marshall, O'Toole, Gerstein, Murray &

23  Borun, 315 Ill. App. 3d 329, 339 (Ill. App. 2000) ("The non-enforcement of a provision

24  as to previous employees in different situations is insufficient to constitute waiver as to

25  a subsequent employee.").

26        54.    To establish the defense of consent, there cannot be fraud or mistake on

27  the part of the plaintiff.  2 SCHWING § 32:3 at 197 ("To be a defense, the consent given

28  must have been to the very act or circumstances that caused the harm giving rise to the

1 | action.") (citation omitted); <u>Greenawalt v. Rogers</u>, 151 Cal. 630, 635 (1907) ("An
2 | apparent consent is not real or free when obtained through ... fraud [or] mistake.").

3 |     55.    Like waiver, "[a]bandonment also requires intent to surrender rights." <u>Bell</u>
4 | <u>Atlantic Business Systems Services, Inc. v. Hitachi Data Systems Corp.</u>, 1995 WL
5 | 836331 * 11 (1995) (<u>citing</u> <u>Hampton v. Paramount Pictures Corp.</u>, 279 F.2d 100, 103
6 | (9th Cir.), and <u>Lopez v. Electrical Rebuilders, Inc.</u>, 416 F. Supp. 1133, 1135 (C.D. Cal.
7 | 1976)).  Thus, abandonment "must be manifested by some overt act indicative of a
8 | purpose to surrender the rights and allow the public to copy." <u>Hampton</u>, 279 F.2d at
9 | 104; <u>see also</u> <u>Micro Star v. Formgen Inc.</u>, 154 F.3d 1107, 1114 (9th Cir. 1998).

10 |     56.    A vague and conclusory allegation cannot sustain an abandonment claim.
11 | <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986) ("a party opposing a
12 | properly supported motion for summary judgment `may not rest upon the mere
13 | allegations or denials of his pleading but ... must set forth specific facts showing there
14 | is a genuine issue for trial'" (<u>quoting</u> <u>Fed. R. Civ. P.</u> 56(e)).

15 |     57.    For estoppel to apply, the party sought to be estopped (1) "must know the
16 | facts; (2) he must intend that his conduct shall be acted on or must so act that the party
17 | asserting the estoppel has a right to believe it is so intended; (3) the latter must be
18 | ignorant of the true facts; and (4) he must rely on the former's conduct to his injury."
19 | <u>Metro-Goldwyn-Mayer</u>, 518 F. Supp. 2d at 1225; <u>see also</u> <u>Bell Atlantic Bus. Sys.</u>
20 | <u>Servs., Inc. v. Hitachi Data Sys. Corp</u>, 1995 WL 836331 (1995) (<u>citing</u> <u>U. S. v. King</u>
21 | <u>Features Entm't</u>, 843 F.2d 394, 399 (9th Cir. 1988)). "'Where any one of the elements
22 | of equitable estoppel is absent, the claim must fail.'" <u>Am. Cas. Co. of Reading Pa. v.</u>
23 | <u>Baker</u>, 22 F.3d 880, 891, 892 (9th Cir. 1994) (citation omitted).  Where, as here, only
24 | one inference can be drawn from the evidence, the question of estoppel is one of law.
25 | <u>See</u> <u>Sawyer v. Sonoma County</u>, 719 F.2d 1001, 1006 n.12 (9th Cir. 1983) (<u>citing</u>
26 | <u>Driscoll v. City of L.A.</u>, 67 Cal.2d 297, 305 (1967)).

27 |     58.    "Acquiescence constitutes a ground for denial of relief only upon a finding
28 | of conduct on the plaintiff's part that amounted to an assurance to the defendant,

1  express or implied, that plaintiff would not assert ..." his rights against the defendant.

2  Novell, 1994 WL 16458729 at * 13; see id. at *17 (applying standard to copyright

3  infringement).

4      59.    "The doctrine of unclean hands demands that a plaintiff act fairly in the

5  matter for which he seeks a remedy.... The determination of the unclean hands defense

6  cannot be distorted into a proceeding to try the general morals of the parties." Kendall-

7  Jackson Winery Ltd v. Superior Court, 76 Cal. App.4th 970, 978 (1999). "It is

8  fundamental to the operation of the doctrine that the alleged misconduct by the plaintiff

9  related directly to the transactions concerning which the complaint is made." Dollar

10 Systems, Inv. v. Avcar Leasing Systems, Inc., 890 F.2d 165, 173 (9th Cir. 1989)

11 (quoting Arthur v. Davis, 126 Cal. App. 3d 684, 693-94 (1981). See also

12 Magnesystems, Inc.v. Nikken, Inc., 933 F. Supp. 944, 953 (C.D.Cal. 1996) (rejecting

13 unclean hand defense based on plaintiffs' alleged patent infringement in a patent

14 infringement case against defendants, finding that "[p]laintiff's alleged misconduct

15 ha[d] no direct relationship to the [patent-in-suit] or [p]laintiff's conduct in obtaining

16 the patent-in-suit.").

17     60.    Courts routinely dispose of the affirmative defense of failure to mitigate on

18 summary judgment. See, e.g., U.S. v. Union Pacific R. Co., 2008 WL 413765

19 (E.D.Cal. 2008). Lack of such evidence is fatal to a mitigation of damages defense.

20 See, e.g., Classic Concepts, Inc. v. Linen Source, Inc., 2006 WL 4756377, *8 (C.D.

21 Cal. Apr. 27 2006) (granting summary judgment on a defense of mitigation of damages

22 where defendant failed to introduce any evidence supporting the defense).

23

24 DATED: March 7, 2008          QUINN EMANUEL URQUHART OLIVER &

25                              HEDGES, LLP

26

27                          By _____

                               John B. Quinn
28                             Attorneys for Mattel, Inc.