# EXHIBIT 1

**Diane Hutnyan**

| | |
|---|---|
| From: | Diane Hutnyan |
| Sent: | Sunday, March 09, 2008 7:54 PM |
| To: | 'Sloan, Matthew E'; Michael T Zeller |
| Cc: | 'Weinstein, Ryan (LAC)'; Chris Grohman |
| Subject: | RE: Notice of Intent To Move Ex Parte |

Matt,

There would be no reason for motion practice if you had even tried to come up with a properly limited protocol for the testing of these materials. Your last stipulation had an unlimited number of unnamed experts, 35 days of time, no access by Mattel to test your results, and a potentially unlimited number of plugs that would be taken. As you are the cause of the motion practice, we see absolutely no reason why under these circumstances you should be given unlimited extra time for your rebuttal report at Mattel's expense. You have wasted almost two weeks already for no reason.

Destructive sampling and testing of documents cannot be performed without prior approval of the Court or agreement by other parties; and, if it is done without prior approval or agreement, such conduct is sanctionable. E.g., Marrocco v. General Motors Corp., 966 F.2d 220, 221 (7th Cir. 1992) (ex parte destructive testing warranted dismissal sanction); Sedrati v. Allstate Life Ins. Co., 185 F.R.D. 388, 390-94 (M.D. Ga. 1998) (excluding results of document testing performed by defendant ex parte).

Failing to obtain prior Court approval or agreement among the parties before engaging in destructive testing is a serious offense that subjects the offending party to sanctions. For example, in Mirchandani v. Home Depot, U.S.A., Inc., 235 F.R.D. 611 (D. Md. May 31, 2006), plaintiffs in a products liability case sought permission from the court to perform destructive testing on a ladder central to the complaint. The court noted:

Had plaintiffs proceeded to destructively test components of the ladder without first seeking guidance from the court, they would have risked the consequences that may befall a litigant deemed to have engaged in spoliation of evidence, such as an adverse inference instruction to the jury, Vodusek v. Bayliner Marine Corp., 71 F.3d 148, 155-57 (4th Cir. 1995), or even outright dismissal of their case, Silvestri v. General Motors Corp., 271 F.3d 583 (4th Cir. 2001).

Id. at *1; see also Sedrati v. Allstate Life Ins. Co., 185 F.R.D. 388, 390-94 (M.D. Ga. 1998) (imposing sanctions where one party's unilateral testing of documents without leave of the court precluded subsequent testing); Cameron v. District Court, 193 Colo. 286, 290 (1977) (plaintiff "correctly brought the matter before the trial court for a judicial determination prior to the administration of the destructive test," and noting that although plaintiff had custody of tire at issue, "[o]wnership is, of course, not a license to alter evidence which may be crucial to both sides in the dispute.").

"The district court . . . retains discretion to impose reasonable conditions surrounding a request to test tangible objects, especially to protect against damage by destructive testing." Diepenhorst v. City of Battle Creek, 2006 WL 1851243, at *1 (W.D. Mich. June 30, 2006; see also Dabney v. Montgomery Ward & Co., Inc., 761 F.2d 494, 498 (8th Cir. 1985) (same); see also 23 Am. Jur. 2d Depositions and Discovery § 166 (". . . Destructive testing may be permitted in the court's discretion, [] if the rights of opposing litigants are protected, such as by assuring that the object is not totally consumed[] or by giving the parties adequate opportunity to photograph and inspect the object before destructive testing and an opportunity to view the tests with their experts or representatives.[] Protective arrangements are necessary if the test would so alter the exhibit that it would be difficult for the [other party] to present his or her claim") (citations omitted); see also Cameron v. Priest, 565 P.2d 925, 929 (Colo. 1977) ("plaintiff correctly brought the matter before the trial court for a judicial determination prior to administration of the destructive test").

So you have three choices. You can work with Mattel on a stipulation that can be jointly presented to the Court; you can present a protocol to the Court over Mattel's objection and see if you can win; or you can present nothing to the Court, spoliate the documents

EXHIBIT ____

PAGE ___ 10

and suffer the consequences.  If your planned testing is legitimate, there is no reason why you would not opt for Court approval pursuant to one of the first two options, and ask for more time from the Court.  The fact that you are going for Option 3 speaks volumes about your purported "testing" plan.

Every bit of non-destructive and destructive testing that has ever been done by Mattel on this case has been done by Court-approved experts and pursuant to either a protocol that was approved by the Court over MGA's objection, or a protocol that was agreed upon by MGA. In contrast, MGA has a record of punching holes in documents without any protocol, and without any notice to, or approval of, the Court.  You appear bent on adding to that record.

When Mattel has negotiated a stipulation with the other parties on destructive testing and presented it to Judge Infante, it has been approved right away.  It is by far the fastest way to achieve what you want to do, if you can agree to something reasonable.  Since your purported "notice" stated that the testing could be done on the 10th, 11th or 12th, you certainly have no reason to be doing anything tomorrow except focusing your efforts on working with Mattel to arrive at an appropriate, stipulated protocol to present to the Discovery Master.

-----Original Message-----
From: Sloan, Matthew E [mailto:Matthew.Sloan@skadden.com]
Sent: Sunday, March 09, 2008 6:38 PM
To: Michael T Zeller
Cc: Diane Hutnyan; Weinstein, Ryan (LAC)
Subject: RE: Notice of Intent To Move Ex Parte

Mike  -- With all due respect, I am unaware of any basis for your claim that "destructive sampling is permitted only with the Court's approval or [Mattel's] agreement" and that it would be "a violation of law" for MGA to engage in the proposed sampling of the notary book.  If you are referring to the sampling protocol set forth in Judge Infante's August 30 Order, as you well know that Order applied only to Mattel's request to perform destructive testing on Bryant's drawings; it does not reference and does not apply to the testing of Ms. Prince's notary book by MGA or anyone else.  Moreover, as you also know -- and as my colleague Ryan Weinstein and I have repeatedly reminded your partner, Diane Hutnyan -- the protocol in that Order requiring court approval of your experts prior to any sampling was only required because you refused to reveal the identity of your experts to Bryant (or MGA) before the testing.  Here, by contrast, we revealed the identity of the expert who will be performing the sampling (Dr. Albert Lyter) and his CV over ten days ago, and we take it from your silence that you have no basis to contest his credentials or contend that he would mishandle the relevant documents.

Very simply, we are only asking for the same opportunity to take samples from the notary book which we provided you and your expert, Dr. Aginsky, without objection.  Nothing more, nothing less.  We have provided you with a detailed description of the amount and size of microplug samples to be taken, and offered to allow your expert the opportunity to observe the taking of any samples.    We are simply at a loss as to what
additional procedure you need to protect your interests, and must sadly conclude that your real purpose is to thwart MGA's right to replicate Dr. Aginsky's testing so that we can check the accuracy of his findings.
Your claim that MGA is somehow at fault because we have "had years" to conduct the requested testing is specious, as you must know.  MGA had no reason to conduct the testing of the notary book until we received Dr.
Aginsky's report in February, and we have been diligently trying to perform the testing since that time.  The whole reason the the courts allow expert rebuttal is to rebut the opposing party's experts; your tactics appear transparently designed to deny us this opportunity.

That having been said, I realize we are not going to resolve this dispute through emails. Therefore, I am simply writing to repeat the request I made to Ms. Hutnyan this morning that Mattel agree to enter a stipulation to extend the deadline for MGA to submit the expert rebuttal report of Dr. Lyter until after the court's resolution of your ex parte motion.  If your intent in filing this ex parte motion is merely to preserve the integrity of the notary book, you should have no reason to object to this request.  If you refuse, we will be left to conclude that your real intent is to thwart our right to perform any testing at all under any circumstances.

EXHIBIT  1

PAGE  11

Please inform me immediately whether you will agree to such a stipulation so that we can inform Judge Infante of your position at the telephonic status conference with Judge Infante tomorrow morning.

Very truly yours,

Matt


Matthew E. Sloan
Skadden, Arps, Slate, Meagher & Flom LLP

Los Angeles Office
300 South Grand Ave., Suite 3400
Los Angeles, CA 90071
T: (213) 687-5276 | F: (213) 687-5600
Main: (213) 687-5000
E: matthew.sloan@skadden.com



-----Original Message-----
From: Michael T Zeller [mailto:michaelzeller@quinnemanuel.com]
Sent: Sunday, March 09, 2008 1:05 PM
To: Sloan, Matthew E (LAC); Diane Hutnyan
Cc: Chris Grohman; Andrea Hoeven; Weinstein, Ryan (LAC)
Subject: Re: Notice of Intent to Move Ex Parte

As you know, destructive sampling is permitted only with the Court's approval or our agreement. You have neither. As a result, should you proceed with such a violation of law, we will seek sanctions that will include, among other things, the entry of orders barring defendants from contesting the testing that was done with Court authorization. Your threatened violation of law is particularly egregious given that you are apparently planning to proceed with destructive sampling for the purpose of thwarting the ex parte and the Court's ruling on it.

Nor does your latest unilateral demand for a stipulation excuse your threatened misconduct. Defendants have had years to conduct any and all testing they wished by simply following the rules. They also could have conducted sampling by now had they abided by the requirements that defendants insisted Mattel comply with but now insist they are free to ignore. Defendants' recourse as far as any rebuttal report goes is to comply with the Rules and, if a pre-filing conference fails to reach agreement, is bring a motion as Judge Larson already instructed. What defendants are not entitled to do is to unilaterally destructively sample documents.

Michael Zeller
Quinn, Emanuel, Urquhart, Oliver & Hedges, LLP
865 South Figueroa Street, 3rd Floor
Los Angeles, CA   90017

Direct:  (213) 443-3180
Main Phone:  (213) 443-3000
Main Fax:  (213) 443-3100

E-mail:  michaelzeller@quinnemanuel.com
Web:   www.quinnemanuel.com

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above.  This message may be an attorney-client communication and/or work product and as such is privileged and confidential.  If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited.  If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

EXHIBIT ____1____

PAGE ____12____

----- Original Message -----
From: Sloan, Matthew E <Matthew.Sloan@skadden.com>
To: Diane Hutnyan
Cc: Michael T Zeller; Chris Grohman; Andrea Hoeven; Weinstein, Ryan
(LAC) <Ryan.Weinstein@skadden.com>
Sent: Sun Mar 09 12:16:07 2008
Subject: RE: Notice of Intent To Move Ex Parte

Diane -- MGA strongly opposes your proposed motion.   In the interim,
please let me know whether you will agree to file a Stipulation with Judge Larson agreeing
to extend the deadline for MGA to file the rebuttal report of our ink chemist until after
the court has resolved your ex parte motion.  Without such a commitment on your part, we
have little choice but to proceed with the sampling immediately in order to meet the
Court's expert discovery deadline.


- Matt


_____

From: Diane Hutnyan [mailto:dianehutnyan@quinnemanuel.com]
Sent: Saturday, March 08, 2008 4:21 PM
To: Weinstein, Ryan (LAC); Sloan, Matthew E (LAC)
Cc: Michael T Zeller; Chris Grohman; Andrea Hoeven
Subject: Notice of Intent To Move Ex Parte


Dear Ryan and Matthew:

This email is intended to provide notice of Mattel's intention to move before Judge
Infante on an ex parte basis to enjoin MGA and its experts from handling or performing
destructive tests on Jacqueline Prince's notary book without an agreement with Mattel
and/or Court oversight and approval.

We plan to file the motion on Monday, March 10, 2008, for a hearing time and date TBA.
Please instruct your experts not to handle or take samples from the notary book until the
court has resolved our motion.

Please let me know at your earliest convenience whether MGA opposes the motion, or if you
have any questions.

I have left this message on your voicemail as well.

--------------------------------------------------------------------
----- ****************************************** To ensure compliance with
Treasury Department regulations, we advise you that, unless otherwise expressly indicated,
any federal tax advice contained in this message was not intended or written to be used,
and cannot be used, for the purpose of (i) avoiding tax-related penalties under the
Internal Revenue Code or applicable state or local tax law provisions or
(ii) promoting, marketing or recommending to another party any tax-related matters
addressed herein.
**********************************************
********************************************** This email and any attachments
thereto, is intended only for use by the addressee(s) named herein and may contain legally
privileged and/or confidential information. If you are not the intended recipient of this
email, you are hereby notified any dissemination, distribution or copying of this email,
and any attachments thereto, is strictly prohibited. If you receive this email in error
please immediately notify me at (212) 735-3000 and permanently delete the original copy
and any copy of any email, and any printout thereof. Further information about the firm, a
list of the Partners and their professional qualifications will be provided upon request.
**********************************************

EXHIBIT   1

PAGE   13

---------------------------------------------------------------------------
*****************************************************

To ensure compliance with Treasury Department regulations, we advise you that, unless
otherwise expressly indicated, any federal tax advice contained in this message was not
intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-
related penalties under the Internal Revenue Code or applicable state or local tax law
provisions or (ii) promoting, marketing or recommending to another party any tax-related
matters addressed herein.
*****************************************************
*****************************************************

This email and any attachments thereto, is intended only for use by the addressee(s) named
herein and may contain legally privileged and/or confidential information. If you are not
the intended recipient of this email, you are hereby notified any dissemination,
distribution or copying of this email, and any attachments thereto, is strictly
prohibited. If you receive this email in error please immediately notify me at (212)
735-3000 and permanently delete the original copy and any copy of any email, and any
printout thereof.

Further information about the firm, a list of the Partners and their professional
qualifications will be provided upon request.
*****************************************************
=====================================================================

EXHIBIT __1__

PAGE __14__

# EXHIBIT 2

1 | QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
 John B. Quinn (Bar No. 090378)
2 | johnquinn@quinnemanuel.com
 Michael T. Zeller (Bar No. 196417)
3 | (michaelzeller@quinnemanuel.com)
 Jon D. Corey (Bar No. 185066)
4 | (joncorey@quinnemanuel.com)
 Timothy L. Alger (Bar No. 160303)
5 | (timalger@quinnemanuel.com)
 865 South Figueroa Street, 10th Floor
6 | Los Angeles, California 90017-2543
 Telephone: (213) 443-3000
7 | Facsimile: (213) 443-3100

8 | Attorneys for Mattel, Inc.

9

10 | UNITED STATES DISTRICT COURT

11 | CENTRAL DISTRICT OF CALIFORNIA

12 | EASTERN DIVISION

| | |
|---|---|
| 13  CARTER BRYANT, an individual, | Case No. CV 04-09049 SGL (RNBx) |
| 14      Plaintiff, | Consolidated with |
| 15   vs. | Case No. CV 04-09059 Case No. CV 05-02727 |
| 16  MATTEL, INC., a Delaware corporation, | **DISCOVERY MATTER** |
| 17      Defendant. | Hon. Edward A. Infante (Ret.) Discovery Master |
| 18 | [~~PROPOSED~~] ORDER GRANTING |
| 19  AND CONSOLIDATED CASES | MATTEL, INC.'S MOTION TO COMPEL BRYANT TO MAKE ORIGINAL DOCUMENTS |
| 20 | AVAILABLE FOR EXPERT EXAMINATION AND TESTING |
| 21 | |
| 22 | Date: August 23, 2007 Time: 9:00 a.m. |
| 23 | Place: Telephonic |
| 24 | Discovery Cut-Off: October 22, 2007 Pre-Trial Conference: January 14, 2008 |
| 25 | Trial Date: February 12, 2008 |

26

27

28

07209/2201994.1

8-30

[PROPOSED] ORDER

EXHIBIT 2

PAGE 15

Having considered Mattel, Inc.'s Motion To Compel Bryant To Make Original Documents Available For Expert Examination and Testing (the "Motion"), and all other papers and argument submitted in support of or opposition to the Motion, and finding good cause therefore,

IT IS HEREBY ORDERED that:

1.   Mattel's Motion IS GRANTED IN PART, as follows:

2.   The following materials were provided to the Discovery Master, at his request, for *in camera* review:   the C.V. of the four experts who will be conducting examination, inspection and testing of the documents, and statements from each of them as to the location and nature of their laboratory facilities, as to their individual practices with regard to the preservation of evidence, and as to their understanding that they are fully accountable for Bryant's original documents while those documents are in their custody.   The Discovery Master has found Mattel's showing with respect to the experts satisfactory.

3.   Accordingly, Bryant shall produce to Mattel, within ten (10) Court days of entry of this Order, on the day that Mattel specifies, the original documents listed below for Mattel's experts' examination, testing and/or analysis:

- the originals of boxes 1 through 8 inclusive;

- from box 9: folders "Sugar Planet Spring 2003 Tropical" and "Sugar Planet General 2001-2002?";

- from box 10: folders "Baby Bratz," "F 04 Retro Funk General," "Sugar Planet Butterfly Purse & Character S 04," "Lipstixx 2003," Sugar Planet Candyland Purse:  Character S 04" and "Sugar Planet Tropical 2001"

- from box 11: folders entitled "Bratz Dollpack Fall 2003," "S04 Girls Night Out," "Bratz New Accessories Etc. 2002," "Bratz Petz S04," "Winter Wonderland F03 Dolls," "Bratz Spring 2002 7.99 molded pieces," "S04 Sweetheart," "Jade Dollpack Spring 2003," "Jade Fall 2002," "Sasha Fall 2002," "Yasmin Fall 2002," "Cloe Fall 2002," "New

EXHIBIT _2_

PAGE _\6_

1    Girl 2002 Fall," "Bratz $7.99 2002 Spring Break," and "Bratz Spring
2    2002 14.99 segment."

3    ~~If Mattel's experts determine that their analysis would potentially benefit~~
4    ~~from access to other original documents not listed above, Bryant will make those~~
5    ~~originals available to Mattel's counsel or Mattel's expert(s) at Mattel's counsel's~~
6    ~~direction upon five (5) Court days' notice.~~

7        4.    On the day specified, Mattel will pick up the documents listed
8    above from Keker & Van Nest's San Francisco office during normal business hours.
9    The next day after the documents are removed from Keker & Van Nest shall be the
10   first of 35 days that Mattel will have for the expert examination and testing of the
11   materials requested for preparation of its initial expert reports, which time period may
12   be extended upon a showing by Mattel of good cause by further Order of the
13   Discovery Master.   The documents shall be returned to Keker & Van Nest's San
14   Francisco office on the 35th day during normal business hours.

15       5.    The experts' examination, testing and analysis may take place at
16   the experts' laboratories.   Any shipping of the originals will be done by overnight
17   mail, for earliest delivery possible to the destination area, using Federal Express or
18   UPS or a similar service that Bryant selects.

19       6.    If any of Mattel's experts recommends that a form of destructive
20   testing (that is, any testing that would alter the documents' inherent physical status) be
21   conducted, the following procedure shall be used.   First, Mattel will send a request in
22   writing to Bryant and MGA explaining what would be tested and what test or tests
23   would be conducted.   Then Bryant and MGA will have five (5) Court days to object,
24   in which case the parties must meet and confer and, within three (3) more Court days,
25   file a joint statement with Judge Infante to seek resolution of the dispute.   Bryant and
26   MGA may also elect to have their own experts attend for any destructive testing
27   being done, so long as they make this election in writing to Mattel within the five-
28   Court-day objection period, and so long as the testing can take place within ten (10)

-2-

PROPOSED ORDER

EXHIBIT   2

PAGE   17

1 | Court days of the original request.  If Bryant's or MGA's expert, while he or she is
2 | observing the examination or destructive testing, raises any issues about sampling or
3 | testing being done or any other aspects of the expert's or experts' process, the parties
4 | will seek immediate resolution from this Court so that the sampling, testing or other
5 | activity will not be delayed.  If Bryant's counsel or MGA's counsel does not object or
6 | seek attendance by its expert within five days of the request, the proposed destructive
7 | testing shall be deemed as unobjectionable and may be carried out without further
8 | delay.

9 |          7.     With the exception of alterations resulting from any destructive
10 | testing, which would be conducted in accordance with the protocol above, all the
11 | Bryant documents that are provided for inspection, examination and testing shall be
12 | returned in the same condition, sequence and order in which they were received.

13 |          **IT IS SO ORDERED.**

15 | DATED: _Aug 30_, 2007

18 | Hon. Edward Infante (Ret.)
19 | Discovery Master

-3-

PROPOSED ORDER

07209/2201994.1

EXHIBIT ___2___

PAGE ___18___

1  Prepared and respectfully submitted by:
2  QUINN EMANUEL URQUHART
   OLIVER & HEDGES, LLP
3

4

5  Diane C. Hutnyan
6  Attorneys for Mattel, Inc.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

07209/2201994.1

-4-

PROPOSED ORDER

EXHIBIT  2
PAGE  19

## PROOF OF SERVICE BY E-MAIL

I, Sandra Chan, not a party to the within action, hereby declare that on August 30, 2007, I served the attached ORDER GRANTING MATTEL, INC'S MOTION TO COMPEL BRYANT TO MAKE ORIGINAL DOCUMENTS AVAILABLE FOR EXPERT EXAMINATION AND TESTING in the within action by e-mail addressed as follows:

| | | |
|---|---|---|
| John W. Keker, Esq. | Keker & Van Nest | jkeker@kvn.com |
| Michael H. Page, Esq. | Keker & Van Nest | mhp@kvn.com |
| Christa Anderson, Esq. | Keker & Van Nest | cma@kvn.com |
| John E. Trinidad, Esq. | Keker & Van Nest | jtrinidad@kvn.com |
| John Quinn Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | johnquinn@quinnemanuel.com |
| Michael Zeller Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | michaelzeller@quinnemanuel.com |
| Jon Corey Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | joncorey@quinnemanuel.com |
| Duane Lyons Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | duanelyons@quinnemanuel.com |
| Timothy Alger Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | timalger@quinnemanuel.com |
| Dominic Surprenant Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | DominicSurprenant@QuinnEmanuel.com |
| B. Dylan Proctor Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | dylanproctor@quinnemanuel.com |
| Shane McKenzie Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | shanemckenzie@quinnemanuel.com |
| Bridget Hauler Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | bridgethauler@quinnemanuel.com |
| Tamar Buchakjian Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | tamarbuchakjian@quinnemanuel.com |
| Juan Pablo Alban, Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | juanpabloalban@quinnemanuel.com |
| Dale Cendali Esq. | O'Melveny & Myers LLP | dcendali@omm.com |
| Diana Torres Esq. | O'Melveny & Myers LLP | dtorres@omm.com |
| James Jenal Esq. | O'Melveny & Myers LLP | jjenal@omm.com |
| Alicia Meyer Esq. | O'Melveny & Myers LLP | ameyer@omm.com |
| Jennifer Glad Esq. | O'Melveny & Myers LLP | jglad@omm.com |
| David Hurwitz, Esq. | O'Melveny & Myers LLP | dhurwitz@omm.com |
| Johanna Schmitt Esq. | O'Melveny & Myers LLP | jschmitt@omm.com |
| Michael C. Keats, Esq. | O'Melveny & Myers LLP | mkeats@omm.com |
| Kendall Burr, Esq. | O'Melveny & Myers LLP | kburr@omm.com |
| Melanie Bradley, Esq. | O'Melveny & Myers LLP | mbradley@omm.com |
| Marvin Putnam, Jr., Esq. | O'Melveny & Myers LLP | mputnam@omm.com |
| William Charron, Esq. | O'Melveny & Myers LLP | wcharron@omm.com |
| Marc Feinstein, Esq. | O'Melveny & Myers LLP | mfeinstein@omm.com |
| Patricia Glaser Esq. | Christensen, Glaser, Fink, Jacobs, Weil & Shapiro, LLP | pglaser@chrisglase.com |

I declare under penalty of perjury under the laws of the Untied States of America that the above is true and correct.

Executed on August 30, 2007, at San Francisco, California.

Sandra Chan

EXHIBIT __2__

PAGE __20__

# EXHIBIT 3

# SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

300 SOUTH GRAND AVENUE

LOS ANGELES, CALIFORNIA 90071-3144

———

TEL: (213) 687-5000

FAX: (213) 687-5600

www.skadden.com

DIRECT DIAL
213-687-5276
DIRECT FAX
213-621-5276
EMAIL ADDRESS
MATTHEW.SLOAN@SKADDEN.COM

FIRM/AFFILIATE OFFICES
BOSTON
CHICAGO
HOUSTON
NEWARK
NEW YORK
PALO ALTO
SAN FRANCISCO
WASHINGTON, D.C.
WILMINGTON
—
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
PARIS
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

March 3, 2008

<u>VIA E-MAIL AND U.S. MAIL</u>

Diane C. Hutnyan, Esq.
Quinn Emanuel Urquhart Oliver &
Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017

RE:    <u>Bryant v. Mattel:  Stipulation Re Proposed Testing of Prince's Log Book</u>

Dear Diane:

I am writing in response to your letter to Ryan Weinstein, dated March 3, 2008, which you transmitted to us earlier today.  As we feared, rather than respond in good faith to our proposed stipulation regarding the testing of Ms. Prince's notary book, you have raised largely frivolous objections in a transparent attempt to delay MGA's testing of the notary book and obstruct our ability to challenge the findings reached by your expert, Dr. Aginsky.  In the spirit of compromise, we are willing to make certain minor amendments to the stipulation to accommodate your alleged concerns.  (A copy of the amended stipulation (the "amended Stipulation") is attached hereto).  The overwhelming majority of your objections, however, are frivolous and clearly designed primarily, if not solely, for the purpose of obtaining an unfair litigation advantage by obstructing MGA's ability to conduct the very same testing, under the very same conditions, that MGA allowed your expert to conduct without objection or court intervention.  I discuss your objections and our responses to them below.

First, you object that the stipulation "appears to contemplate the idea of a future protocol, rather than contain an actual protocol."  We do not know what you

EXHIBIT  3

PAGE  21

Diane C. Hutnyan, Esq.
March 3, 2008
Page 2

mean by this and you have failed to specify precisely how you would revise the stipulation or why any additional procedures are necessary.  Notwithstanding these shortcomings in your letter, we will slightly modify the testifying protocol as set forth below and in the amended Stipulation to provide further procedure. We believe this should cover any reasonable concerns you may have.

Second, you object that the "stipulation does not reflect any plan to obtain the Court's approval of Mr. Lyter and his credentials." This is not accurate.  The Stipulation specifically provides that MGA must provide Mattel with notice of the expert we plan to use to perform the sampling and provide Mattel the expert's curriculum vitae.  *See* Stipulation, ¶ 7.  Mattel then has three days to object to the expert's credentials or the proposed testing, during which time Mr. Warren will not transmit the notary book to MGA.  Accordingly, if Mattel has any objections to Mr. Lyter's credentials, then the Court will have to approve Dr. Lyter and his proposed testing.  If Mattel has no such objection,  there is no reason for MGA to have to obtain court approval – unless Mattel is trying to delay the testing to obtain an unfair litigation advantage.[1]

Third, you complain that you are "concerned about having the notary book in anyone's hands or possession but the (by then Court-approved) expert in the presence of [Mattel's] expert."  To the extent you are concerned about the custody of the notary book, we will amend the stipulation to provide that the notary book must be maintained in the custody of Dr. Lyter or one of his employees or assistants at all times from the time Dr. Lyter's lab receives the notary book from Mr. Warren until it is transmitted back to Mr. Warren.  *See* Amended Stipulation, ¶ 10.

The rest of your concerns are unfounded, and designed primarily to obstruct.  As explained above, if you object to the delivery of the notary book to Dr. Lyter, you will have a full opportunity to litigate this matter before Judge Infante *before* the

---

[1]    As you know, the only reason that Judge Infante required Mattel to submit its experts' curriculum vitae to the court and obtain advance court approval before Mattel could perform any sampling on Bryant's drawings *is because Mattel refused to reveal the identity of its experts to Mr. Bryant's counsel*.  Given that MGA has disclosed the identity and curriculum vitae of our expert already, there is no need for the added step of obtaining court approval of MGA's experts – unless, of course, Mattel has some good faith basis to object to Dr. Lyter's credentials.  We assume by your silence that you recognize that Dr. Lyter is a highly-respected expert, and that any such objections would therefore be unfounded.

It is worth noting, moreover, that Mattel failed to give MGA *any* advance notice of the identity of Mattel's expert until just before Dr. Aginsky took his samples from the notary book.  We simply fail to comprehend how you can claim the procedure we have proposed is insufficient compared to the paltry notice and procedure you provided MGA in connection with the testing of the notary book.

EXHIBIT  3

PAGE  22

Diane C. Hutnyan, Esq.
March 3, 2008
Page 3

notary book is delivered to Dr. Lyter. Thus, under the Stipulation, Dr. Lyter will not obtain possession unless he is either approved by the Court (over Mattel's objections) or you decide not to object to his performing the sampling.  As for your request that "the notary book should not be handled by either expert outside the presence of the other," this is absurd.  Mattel's expert, Dr. Aginsky, had possession of the notary book for at least 27 days[2] without any oversight.  Mattel's expert is entitled to observe our expert's destructive sampling procedure; he is not entitled to be present at all times while Dr. Lyter visually inspects the notary book or engages in other non-destructive testing.  You have provided no basis for such an invasive request to monitor our expert's examination and, as you well know, no such basis exists.  If you want more information about Dr. Lyter's non-destructive examination of the notary book, you will have to do what any litigant must do (and what MGA will have to do with respect to Dr. Aginsky): ask him in his deposition.

Fourth,  you complain that the stipulation must be "more specific in setting forth the exact method or delivery, time of delivery, location of delivery, and return date" and must set forth the "specific conditions" under which the book will be stored.  Although MGA thinks that these objections are largely irrelevant, at your suggestion we have revised the stipulation to conform more closely with Judge Infante's August 30, 2007 Order.  *See* Amended Stipulation, ¶¶ 9, 10, 14.

As for the storage conditions, the Stipulation specifies that the notary book will be maintained in "normal environmental conditions." *See* Stipulation, ¶ 5. We think this is more than sufficient to ensure the integrity of the notary book, but in the spirit of compromise, we will amend Paragraph 5 by providing that "normal environment conditions," means "generally accepted laboratory conditions that will preserve the integrity of the notary book from any damage caused by heat, cold, humidity, or other conditions."

Fifth, you have asked for a provision that all the samples must be taken in one-day. We think this is reasonable and will amend the Stipulation accordingly.

Sixth, you have asked that MGA limit the number of "microplug" samples which Dr. Lyter can take in any one "set" of samples.  We believe this is also a reasonable request, and are prepared to stipulate that each "set" will be limited to 15-20 microplugs, subject to MGA's right to apply to the court for the right to increase the amount of "microplugs" allowed.  We will amend the Stipulation accordingly. *See* Amended Stipulation, ¶ 3.

---

[2]   Per Mr. Aginsky's report, he removed the "microplug" samples from the notary book on January 4, 2008, and did not return the notary book to Ms. Prince's counsel, Mr. Warren, until January 31, 2008.

EXHIBIT 3
PAGE 23

Diane C. Hutnyan, Esq.
March 3, 2008
Page 4

Seventh, you object to the "Whereas" section of the Stipulation as unnecessary and argumentative. We disagree. It is appropriate and necessary for the Court to know the history of testing that has been performed on the notary book, and to be informed that Mattel performed the very same testing, in order to render a decision. We see no valid reason that you should object to presenting the whole story unless you have something to hide. Accordingly, we will not revise the "Whereas" provisions in the Stipulation.

Eighth, you remarkably reject our reasonable and necessary request for an agreement that the deadline for submitting our rebuttal report should be extended during the pendency of any court proceedings regarding Dr. Lyter's right to obtain samples from the notary book. Your refusal to agree to such a provision reveals your true intentions. Failing to include such a provision would render the whole stipulation futile from MGA's perspective because you would undoubtedly use it as an opportunity to tie us up in litigation until the March 17 deadline for rebuttal reports had passed, and thereby prevent us from engaging in any expert testing.

Finally, you request that Mattel be guaranteed access to the notary book to perform additional tests after MGA has served its rebuttal report and/or Mr. Lyter has been deposed. Given that Dr. Aginsky has already had free and unfettered access to the notary book for almost a month, and no constraints were placed on his ability to test the book, we see no reason to address such a request at this juncture. If you can present grounds for such additional testing later, we will consider them, but we think that any request at this juncture is premature and we will not incorporate it in the amended Stipulation.

Please review the attached Amended Stipulation and let us know by 4:00 pm PST tomorrow, Tuesday, March 4, 2008, whether you are willing to sign the Amended Stipulation as is. In the event you reject this reasonable proposal, we will proceed to subpoena the notary book from Mr. Warren so that Mr. Lyter can perform his sampling in time to meet the March 17, 2008 deadline for submitting MGA's expert rebuttal reports. In the event Mattel seeks to delay our legitimate testing

EXHIBIT 3
PAGE 24

Diane C. Hutnyan, Esq.
March 3, 2008
Page 5

further by improper obstructionist tactics, and interferes with our ability to perform the necessary sampling before the March 17 deadline, we will seek preclusionary sanctions to prevent Mattel from introducing Dr. Aginsky's testimony or expert report at trial.

Very truly yours,

Matthew E. Sloan

Enclosures

cc:   Ryan Weinstein, Esq.
      Carl Roth, Esq.

EXHIBIT 3

PAGE 25

1 | THOMAS J. NOLAN (Bar No. 66992)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
2 | 300 South Grand Avenue
Los Angeles, CA 90071-3144
3 | Telephone: (213) 687-5000
Facsimile: (213) 687-5600
4 | E-mail: tnolan@skadden.com

5 | KENNETH A. PLEVAN
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
6 | Four Times Square
New York, New York, 10036-6522
7 | Telephone: (212) 735-3000
Facsimile: (212) 735-2000
8 | Email: kplevan@skadden.com

9 | Attorneys for Counter-Defendants
MGA ENTERTAINMENT, INC., ISAAC LARIAN,
10 | MGA ENTERTAINMENT (HK) LIMITED, and
MGAE de MEXICO S.R.L. de C.V.

11

12 | **UNITED STATES DISTRICT COURT**

13 | **CENTRAL DISTRICT OF CALIFORNIA**

14 | **EASTERN DIVISION**

15

16 | CARTER BRYANT, an individual,

17 |      Plaintiff,

18 | v.

19 | MATTEL, INC., a Delaware corporation,

20 |      Defendant.

21 |

22 | Consolidated with MATTEL, INC. v.
BRYANT and MGA
23 | ENTERTAINMENT, INC. v.
MATTEL, INC.
24 |

25 |

26 |

27 |

28 |

CASE NO. CV 04-9049 SGL (RNBx)

Consolidated with:
Case No. CV 04-9059
Case No. CV 05-2727

**DISCOVERY MATTER**

Hon. Edward A. Infante (Ret.)
Discovery Master

**STIPULATION RE MGA'S PROPOSED TESTING OF JACQUELINE PRINCE'S NOTARY BOOK; [PROPOSED] ORDER**

**Phase 1**

| | |
|---|---|
| Discovery Cut-Off: | Jan. 28, 2008 |
| Expert Rebuttal Reports Due: | March 17, 2008 |
| Expert Discovery Cut-Off: | March 31, 2008 |
| Pre-Trial Conference: | May 5, 2008 |
| Trial Date: | May 27, 2008 |

STIPULATION RE MGA'S PROPOSED TESTING OF PRINCE'S NOTARY LOG BOOK AND [PROPOSED] ORDER

EXHIBIT _3_

PAGE _26_

## STIPULATION

This Stipulation is entered into by and between Mattel, Inc. ("Mattel") on the one hand, and MGA Entertainment, Inc., Isaac Larian, MGA Entertainment (HK) Limited, and MGAE de Mexico S.R.L. de C.V. (collectively referred to herein as "MGA"), on the other hand, with reference to the following:

WHEREAS, Jacqueline Prince, a notary public, made notations in a log book entitled "Official Journal of Notarial Acts" (the "log book") which relate to the date on which certain of plaintiff and counter-defendant Carter Bryant's ("Bryant") drawings were created;

WHEREAS, on page 11 of the notary book, there is an entry, dated 8/26/99, which identifies 6 sketches of dolls made by Bryant;

WHEREAS, the same entry includes the notation "From 1998 Missouri";

WHEREAS, on or about December 25, 2007, counsel for Mattel sent a letter to Daniel J. Warren, counsel for Ms. Prince, requesting production of the notary book for purposes of conducting a forensic analysis on the ink used on the above-referenced entry;

WHEREAS, in response, Mr. Warren produced said log book to Mattel, and MGA did not object;

WHEREAS, on January 4, 2008, Mattel's expert, Valery N. Aginsky, extracted 17 sets of hypodermic needle-sized samples or "microplugs" from written lines appearing on pages 11 and 12 of the notary book and two sets of blank paper "microplug" samples from page 11 of the notary book;

WHEREAS, Mr. Aginsky subsequently subjected the "microplug" samples to various chemical analyses, including chromatography, thin-layer chromatography ("TLC"), and gas chromatography-mass spectrometry ("GC-MS");

WHEREAS, on January 31, 2008, Mr. Aginsky returned Ms. Prince's log book to Mr. Warren;

-1-

STIPULATION RE MGA'S PROPOSED TESTING OF PRINCE'S NOTARY LOG BOOK AND [PROPOSED] ORDER

EXHIBIT _3_

PAGE _27_

1    WHEREAS, on February 11, 2008, Mattel transmitted to MGA a copy of

2    Mr. Aginsky's expert report, wherein Mr. Aginsky set forth the results of ink tests

3    that he performed on samples extracted from the notary book;

4        WHEREAS, on the basis of his tests, Mr. Aginsky concluded that the notation

5    "From 1998 Missouri" on page 11 of the notary book was written in different ink

6    than the remainder of the 8/26/99 entry;

7        WHEREAS, MGA now seeks to test the accuracy of Mr. Aginsky's findings

8    by having its own expert replicate Mr. Aginsky's ink testing;

9        WHEREAS, the current deadline for submitting expert rebuttal reports is

10   March 17, 2008;

11       THEREFORE, the undersigned parties, through their undersigned counsel,

12   stipulate and agree as follows:

13       1.    MGA will be allowed to take samples and conduct testing on the notary

14   book to test the accuracy of Mr. Aginsky's findings, pursuant to the following

15   protocol.

16       2.    MGA's testing of Ms. Prince's log book will be limited to analysis of

17   "microplug" samples extracted from pages 11 and 12 of the notary book.

18       3.    MGA's expert (or experts) will remove no more than 17 sets of

19   "microplug" samples from the written portions of the entries on pages 11 and 12 of

20   the notary book, and no more than two sets of blank paper "microplug" samples from

21   the areas of pages 11 and 12 which do not contain writing.  (Although this

22   Stipulation refers to MGA's "expert," MGA reserves the right to employ more than

23   one expert for the proposed sampling and testing of the notary book).  MGA's

24   expert will take no more than 15 to 20 "microplugs" from any set of "microplug"

25   samples.  However, MGA retains the right to apply to the Court for the right to

26   increase the number of "microplugs" from each set of samples if necessary.

27

28

-2-

EXHIBIT  3

PAGE  28

4.      MGA's expert will extract all "microplug" samples using a hypodermic-needle-sized hole punch, which removes holes of less than one millimeter in diameter.

5.      Before subjecting the samples to ink analysis, MGA's expert will maintain the samples at his or her laboratory in normal environmental conditions, which means generally accepted laboratory conditions that will preserve the integrity of the notary book from any damage that could be caused by heat, cold, humidity or other conditions.

6.      All sampling and testing will occur at the laboratory of MGA's expert.

7.      Before Mr. Warren sends the notary book to MGA's expert, MGA will send a letter to Mattel's counsel by facsimile (and U.S. Mail) setting forth: (a) the name of MGA's expert (or experts) who will conduct the sampling; (b) the expert's curriculum vitae; (c) the location of the expert's laboratory; and (d) samples of "microplugs" similar to those that would be extracted from the notary book.

8.      Mattel will have three days from its receipt of the above-referenced letter by facsimile to object to the contemplated testing.  During this three-day period, Mr. Warren will maintain custody of the notary book, and no testing will be performed.  If Mattel raises no objection, then Mr. Warren will be directed to transmit the notary book to MGA's expert and MGA's expert will be authorized to conduct testing pursuant to the protocol set forth herein.

9.      Mr. Warren will transmit the notary book to MGA's expert by overnight mail, using Federal Express or UPS or a similar service that Mr. Warren selects.

10.      Upon receipt of the notary book, MGA's expert and/or his employees and assistants will maintain custody of the notary book in a safe place at all times, and will not release the notary book to any unauthorized third parties.

11.      In the event Mattel objects to the proposed testing, Mattel's counsel must notify MGA by letter and/or a telephone call within the 3-day period set forth

-3-

STIPULATION RE MGA'S PROPOSED TESTING OF PRINCE'S NOTARY LOG BOOK AND [PROPOSED] ORDER

EXHIBIT 3

PAGE 29

1  above. The parties must then meet and confer and, within two more Court days, file

2  a joint statement to Judge Infante seeking resolution of the dispute.

3      12.    Mattel may elect to have its own expert attend the extraction of

4  "microplug" samples provided that (1) Mattel makes the election in writing within

5  the three-day objection period; (2) Mattel provides counsel for MGA with the

6  credentials of any observing expert; and (3) the testing can take place within ten (10)

7  calendar days of the execution of this Stipulation. At this time, MGA's expert is

8  available to conduct the sampling on March 10, 11, or 12, 2008.

9      13.    If Mattel's expert raises any issues about the sampling being performed

10  while he or she is observing the sampling, the parties will seek immediate resolution

11  from the Court so that the sampling will not be delayed. If Mattel's counsel does not

12  object or seek attendance by its expert within the three-day objection period, the

13  proposed destructive testing shall be deemed unobjectionable and may be carried out

14  by MGA's expert without further delay.

15      14.    With the exception of alterations resulting from any destructive testing,

16  which would be conducted in accordance with the protocol set forth above, the

17  notary book will be returned promptly to Mr. Warren in the same condition it was

18  received. MGA's expert will return the notary book to Mr. Warren by overnight

19  mail, using Federal Express or UPS or a similar service, on the 35th day after

20  receiving such notary book from Mr. Warren, providing MGA's expert's testing is

21  not delayed by any court proceedings. In the event MGA's expert's testing is

22  delayed by such proceedings, MGA's expert will have an additional 15 days after the

23  resolution of such proceedings to perform testing on the notary book before having

24  to return it to Mr. Warren.

25      15.    The parties agree that, should Mattel raise any objections to the

26  proposed sampling, testing, or credentials of Mattel's expert, or to any other aspects

27  of the testing process, MGA will be granted an extension of time within which to

28  submit a rebuttal report in response to Mr. Aginsky's initial expert report.

-4-

EXHIBIT 3
PAGE 80

1  Specifically, in the event that Mattel objects to MGA's proposed expert sampling,

2  the current March 17, 2008 deadline for submitting MGA's rebuttal expert report

3  will be extended by one calendar day for each day from the date Mattel raises its

4  objection to the date upon which any such objection is resolved by Judge Infante or

5  by the agreement of the parties.

6        IT IS SO STIPULATED.

7  DATED: February __, 2008     SKADDEN, ARPS, SLATE, MEAGHER

8                         & FLOM, LLP

9

10                         By: _____

11                              Matthew E. Sloan
                         Attorneys for Counter-Defendants

12            MGA ENTERTAINMENT, INC., ISAAC LARIAN,
           MGA ENTERTAINMENT (HK) LIMITED, and
              MGAE de MEXICO S.R.L. de C.V.

13

14  DATED: February __, 2008     QUINN EMANUEL URQUHART OLIVER

15                         & HEDGES, LLP

16

17                         By: _____

18                             Diane C. Hutnyan
                         Attorneys for Mattel, Inc.

19

20

21

22

23

24

25

26

27

28

EXHIBIT __3__

PAGE __31__

## **ORDER**

The Court, having reviewed MGA and Mattel's Stipulation Re MGA's Proposed Testing Of Jacqueline Prince's Notary Book (the "Stipulation") and for good cause shown, hereby approves the procedure for MGA's proposed expert testing of the notary book set forth in the Stipulation.

IT IS SO ORDERED.

DATED: _____

                       _____
                            Hon. Edward A. Infante (Ret.)
                            Discovery Master

STIPULATION RE MGA'S PROPOSED TESTING OF PRINCE'S NOTARY LOG BOOK AND [PROPOSED] ORDER
495716.05-Los Angeles Server 1A - MSW

EXHIBIT 3

PAGE 32

THOMAS J. NOLAN (Bar No. 066992)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue
Los Angeles, California 90071-3144
Telephone:  (213) 687-5000
Facsimile:   (213) 687-5600
E-mail:  tnolan@skadden.com

RAOUL D. KENNEDY (Bar No.  40892)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
4 Embarcadero Center, 38th Floor
San Francisco, CA  94111-5974
Telephone: (415) 984-6400
Facsimile:  (415) 984-2698
Email:  rkennedy@skadden.com

Attorneys for Counter-Defendants,
MGA ENTERTAINMENT, INC., ISAAC LARIAN, MGA ENTERTAINMENT
(HK) LIMITED, AND MGAE de MEXICO S.R.L. de C.V.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual<br><br>Plaintiff,<br><br>v.<br><br>MATTEL, INC., a Delaware corporation<br><br>Defendant.<br><br>Consolidated with MATTEL, INC. v. BRYANT and MGA ENTERTAINMENT, INC. v. MATTEL, INC. | CASE NO. CV 04-9049 SGL (RNBx)<br><br>Consolidated with Case No. 04-9059 and Case No. 05-2727<br><br>**NOTICE OF THIRD-PARTY SUBPOENA TO JACQUELINE RAMONA PRINCE** |

EXHIBIT ___3___

PAGE ___33___

3·5·08

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that, pursuant to Rule 45 of the Federal Rules of Civil Procedure, MGA Entertainment, Inc., by its attorneys, Skadden, Arps, Slate, Meagher & Flom LLP, has demanded that Jacqueline Ramona Prince is to produce her notary log book, entitled "Official Journal of Notarial Acts", which contains, inter alia, an entry dated 8/26/99 relating to certain original sketches of Carter Bryant.

PLEASE TAKE FURTHER NOTICE that, on or before March 7, 2008 at 10:00 a.m., Jacqueline Ramona Prince, is to produce to Federal Forensic Associates, Inc. c/o Albert H. Lyter III, 7425 Capstone Dr., Raleigh, N.C. 27615, the notary log book described above and in the attached Subpoena in a Civil Case.

DATED:  March 5, 2008

SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

By: _Ryan Weinstein /ak_

Ryan Weinstein
Attorneys for Counter-Defendants, MGA ENTERTAINMENT, INC., ISAAC LARIAN, MGA ENTERTAINMENT (HK) LIMITED, AND MGAE de MEXICO S.R.L. de C.

2

EXHIBIT __3__

PAGE __34__

AO88 (Rev. 12/07) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT

### Northern District of Georgia

CARTER BRYANT, an individual, Plaintiff,

V.

**SUBPOENA IN A CIVIL CASE**

MATTEL, INC., a Delaware corporation, Defendant

Case Number:[1] CV 04-09049 SGL (RNBx)
Central District of CA

TO:   JACQUELINE RAMONA PRINCE
c/o Daniel J. Warren, Esq.
Sutherland Asbill & Brennan LLP, 999 Peachtree Street, Suite 2300, Atlanta, GA 30309

☐   YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☐   YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
|  |  |

☒   YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

Ms. Prince's notary log book, entitled "Official Journal of Notarial Acts", which contains, inter alia, an entry dated 8/26/99 relating to certain original sketches of Carter Bryant.

| PLACE | DATE AND TIME |
|---|---|
| Federal Forensic Assoc., c/o Albert H. Lyter III, 7425 Capstone Dr., Raleigh, N.C. 27615 | March 7, 2008  10:00 AM |

☐   YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
|  |  |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rule of Civil Procedure 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| _Ryan Weinstein_   Atty for Counter Defendant MGA Ent. et al. | March 5, 2008 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Ryan Weinstein, Skadden, Arps, Slate, Meagher & Flom LLP, 300 S. Grand Ave., Los Angeles, CA 90071-3144 (213) 687-5000

(See Federal Rule of Civil Procedure 45 (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

EXHIBIT ___3___

PAGE ___35___

American LegalNet, Inc.
www.FormsWorkflow.com

AO88 (Rev. 12/07) Subpoena in a Civil Case (Page 2)

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
                   DATE

_____
SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

---

Federal Rule of Civil Procedure 45 (c), (d), and (e), as amended on December 1, 2007:

(c) PROTECTING A PERSON SUBJECT TO A SUBPOENA.
(1) Avoiding Undue Burden or Expense; Sanctions. A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.
(2) Command to Produce Materials or Permit Inspection.
(A) Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
(B) Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.
(3) Quashing or Modifying a Subpoena.
(A) When Required. On timely motion, the issuing court must quash or modify a subpoena that:
(i) fails to allow a reasonable time to comply;
(ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
(B) When Permitted. To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:
(i) disclosing a trade secret or other confidential research, development, or commercial information;
(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or
(iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial
(C) Specifying Conditions as an Alternative. In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

(d) DUTIES IN RESPONDING TO A SUBPOENA.
(1) Producing Documents or Electronically Stored Information. These procedures apply to producing documents or electronically stored information:
(A) Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
(B) Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
(C) Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.
(D) Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.
(2) Claiming Privilege or Protection.
(A) Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
(B) Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT.
The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

EXHIBIT ___3___

PAGE ___36___

American LegalNet, Inc.
www.FormsWorkflow.com

# PROOF OF SERVICE

## STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the county of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 300 South Grand Avenue, 34th Floor, Los Angeles, CA 90071.

On **March 5, 2008**, I served the foregoing document described as:

## NOTICE OF THIRD-PARTY SUBPOENA TO JACQUELINE RAMONA PRINCE

on the interested parties in this action addressed as follows:

## SEE ATTACHED SERVICE LIST

[X]    **(BY PERSONAL SERVICE)** ☐     By personally delivering copies to the person served. (FEDERAL) (As Noted.)

[X]     I caused such documents to be hand delivered to the office of the addressee. (FEDERAL) (As Noted.)

[X]    **(BY FEDERAL EXPRESS)** I am readily familiar with the firm's practice for the collection and processing of correspondence for mailing with Federal Express and the fact that the correspondence would be deposited with Federal Express that same day in the ordinary course of business; on this date, the above-referenced correspondence was placed for deposit at Los Angeles, California and placed for collection and mailing following ordinary business practices. (As Noted.)

I declare under penalty of perjury under the laws of the State of California and the United States of America that the above is true and correct.

Executed on **March 5, 2008** at Los Angeles, California.

Cecilia Reyes
PRINT NAME                          SIGNATURE

PROOF OF SERVICE                                    NO. CV 04-9049 SGL (RNBx)

EXHIBIT 3

PAGE 37

# EXHIBIT 4

## SERVICE LIST

John B. Quinn, Esq.
Michael T. Zeller, Esq.
Jon D. Corey, Esq.
Timothy L. Alger, Esq.
Quinn Emanuel Urquhart Oliver &
Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543
(213) 443-3000
(213) 443-3100 (Fax)

Attorneys for Mattel, Inc.
[Personal Service]

John W. Keker, Esq.
Michael H. Page, Esq.
Keker & Van Nest, LLP
710 Sansome Street
San Francisco, CA 94111
(415) 391-5400
(415) 397-7188 (Fax)

Attorneys for Carter Bryant
[Federal Express]

Mark E. Overland, Esq.
Alexander H. Cote, Esq.
David C. Scheper, Esq.
Overland Borenstein Scheper & Kim
300 South Grand Avenue, Suite 2750
Los Angeles, CA 90071
(213) 613-4655
(213) 613-4656 (Fax)

Attorneys for Carlos Gustavo Machado
Gomez
[Federal Express]

PROOF OF SERVICE

EXHIBIT ____4____

PAGE ____38____

NO. CV 04-9049 SGL (RNBx)

NOTE: SERVICE OF
PROCESS WAS REFUSED,
LATER, MESSENGER
RETURNED AND DROPPED
ENVELOPE WITH RECEPTION.

EXHIBIT ___4___
PAGE ___39___

# EXHIBIT 5

# Sutherland
## ■ Asbill & ■
# Brennan LLP
ATTORNEYS AT LAW

999 Peachtree Street, NE
Atlanta, GA 30309-3996
404.853.8000
fax 404.853.8806
www.sablaw.com

Daniel J. Warren
DIRECT LINE:  404.853.8028
E-Mail: daniel.warren@sablaw.com

March 6, 2008

## VIA FEDERAL EXPRESS

Federal Forensic Associates, LLP
c/o Albert H. Lyter, III
7425 Capstone Dr.
Raleigh, NC 27615

RE:   Carter Bryant v. Mattel
       Our Ref. No. 22897.0001

Dear Mr. Lyter:

Pursuant to the Subpoena issued in the above-referenced case on March 5, 2008 by MGA, please find enclosed the notary book of Jacqueline R. Prince.

Please return the notary book to my attention when your evaluation is complete.

Very truly yours,

SUTHERLAND ASBILL & BRENNAN LLP

Daniel J. Warren

DJW/tlc
Encl.

cc:  Ryan Weinstein, Esq.
      Diane Hutnyan, Esq.
      Matthew W. Werdegar, Esq.

EXHIBIT 5

PAGE 40

7844345.1

Atlanta    ■    Austin    ■    Houston    ■    New York    ■    Tallahassee    ■    Washington, DC

# EXHIBIT 6

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California  90017 | TEL: (213) 443-3000 FAX: (213) 443-3100

WRITER'S INTERNET ADDRESS
dianehutnyan@quinnemanuel.com

February 18, 2008

<u>VIA EMAIL</u>

Daniel Warren, Esq.
Sutherland Asbil & Brennan, LLP
999 Peachtree Street
Suite 2300
Atlanta, GA 30309

Re:   <u>Mattel v. Carter Bryant</u>

Dear Dan:

The arrangement outlined in Mr. Weinstein's letter of today is unacceptable to Mattel and we request that you do not release the notary book to MGA or Bryant or MGA's or Bryant's counsel absent a Court Order.

When Mattel received certain production documents in this case from Bryant, it noticed that microplugs appeared to have already been taken from them.  Mattel's 2004 inspections of the originals showed that to be the case.  Since then, although a Mr. Speckin produced a declaration saying he had handled "various" unidentified Bryant original documents, MGA has never unable to explain or account for all of the microplugs that were taken, and in particular has never explained or accounted for any of the microplugs that were taken from certain documents that Ms. Prince testified she had notarized for Mr. Bryant.  This is the case even despite MGA having been ordered to provide a Rule 30(b)(6) witness to testify as to the handling and testing of all such documents.  Mr. Bryant has been similarly unwilling or unable to provide any information about those microplugs and what caused them.

The Court has been understandably quite concerned with this earlier incident of tampering by MGA and its expert(s), and (upon MGA's and Bryant's insistence) required a showing as to our experts' qualifications and methods of preserving evidence before even letting them examine the

quinn emanuel urquhart oliver & hedges, llp

NEW YORK | 51 Madison Avenue, 22nd Floor, New York, NY  10010  | TEL (212) 849-7000 FAX (212) 849-7100
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, CA  94111  | TEL (415) 875-6600 FAX (415) 875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, CA  94065  | TEL (650) 801-5000 FAX (650) 801-5100
TOKYO | Akasaka Twin Tower Main Building, 6th Floor, 17-22 Akasaka 2-Chome, Minato-ku, Tokyo 107-0052, Japan  | TEL +81 3 5561-1711
FAX +81 3 5561-1712

07209/2392406.1

EXHIBIT ___

PAGE ___ 41

Dan Warren, Esq.
February 18, 2008

documents non-destructively, much less letting them put microplugs in them.  We worked with the other parties to come up with a specific protocol for the testing we did, that included attendance by their own consultant, and all that was approved by our Judge.  Here, Mattel objects to your or your client's turning over the original notary book or any originals to MGA or Bryant (or their counsel or experts), given their history of tampering and given that there is neither any approval from the Court nor any agreement by us.  Please be advised that should you or your client nevertheless turn over the notary book or any originals to MGA or Bryant (or their counsel or experts), we would consider such an action to constitute improper spoliation and will seek relief from the Court as such.  We expect that you and your client will not provide the notary book or any other originals absent the Court's Order directing it or pursuant to a written agreement among the parties.

Please be so kind as to confirm that your office will maintain and preserve the notary book in its current condition and location until entry of a Court Order releasing it or written agreement among all of the parties.

Sincerely,


/s/


Diane C. Hutnyan


cc:    Ryan Weinstein, Esq.
       Matthew Werdegar, Esq.

07209/2392406.1                                    2

EXHIBIT 6
PAGE 42

# EXHIBIT 7

**Diane Hutnyan**

| | |
|---|---|
| **From:** | Camp, Theresa L. [Theresa.Camp@sablaw.com] |
| **Sent:** | Wednesday, February 20, 2008 8:13 AM |
| **To:** | Ryan.Weinstein@skadden.com; Diane Hutnyan |
| **Subject:** | Mattel v Carter Bryant |
| **Attachments:** | Letter.pdf |

Dear Mr. Weinstein & Ms. Hutnyan:

Please find attached a letter from Daniel Warren regarding the above-referenced matter.

Very truly yours,

*Theresa L. Camp*
Patent Legal Secretary
SUTHERLAND ASBILL & BRENNAN LLP
404.853.8698
theresa.camp@sablaw.com

---

CIRCULAR 230 DISCLOSURE:   To comply with Treasury
Department regulations, we inform you that, unless
otherwise expressly indicated, any tax advice contained in
this communication (including any attachments) is not
intended or written to be used, and cannot be used, for the
purpose of (i)avoiding penalties that may be imposed under
the Internal Revenue Code or any other applicable tax law,
or (ii) promoting, marketing or recommending to another
party any transaction, arrangement, or other matter.

---

The information contained in this message from Sutherland
Asbill & Brennan LLP and any attachments are confidential
and intended only for the named recipient(s). If you have
received this message in error, you are prohibited from
copying, distributing or using the information. Please
contact the sender immediately by return email and delete
the original message.

EXHIBIT 7

PAGE 43

3/10/2008



**Sutherland**
**■ Asbill & ■**
**Brennan LLP**
ATTORNEYS AT LAW

999 Peachtree Street, NE
Atlanta, GA 30309-3996
404.853.8000
fax 404.853.8806
www.sablaw.com

Daniel J. Warren
DIRECT LINE: 404.853.8028
E-Mail: daniel.warren@sablaw.com

February 20, 2008

<u>**VIA E-MAIL & CONFIRMATION BY MAIL**</u>

Ryan Weinstein, Esq.
Skaden, Arps, Slate, Meagher & Flom, LLP
300 South Grand Ave.
Los Angeles, CA 90071-3144

Diane C. Hutnyan, Esq.
Quinn Emanuel
865 South Figueroa St., 10th Fl
Los Angeles, CA 90017

        RE:    Ms. Prince's Notary Book
               Our Ref. No. 22897.0001

Dear Ryan and Diane:

      We have received your letters of February 18, 2008 concerning Ms. Prince's notary book. As you know, Ms. Prince has cooperated with both of your clients to date. We also understand that you have upcoming discovery deadlines. Ms. Prince obviously has no comment on Mattel's allegations of tampering.

      Our intent is to forward the notary book to MGA on Monday, February 25, 2008. We trust that this date gives the parties enough time to work out an agreement or seek the intervention of the court.

                    Very truly yours,

                    SUTHERLAND ASBILL & BRENNAN LLP

                    Daniel J. Warren

DJW/tlc
7830591.1

Atlanta  ■  Austin  ■  Houston  ■  New York  ■  Tallahassee  ■  Washington, DC

EXHIBIT   7

PAGE   44

# EXHIBIT 8

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

300 SOUTH GRAND AVENUE

LOS ANGELES, CALIFORNIA 90071-3144
—
TEL: (213) 687-5000
FAX: (213) 687-5600
www.skadden.com

DIRECT DIAL
213687-5276
DIRECT FAX
213621-5276
EMAIL ADDRESS
MATTHEW.SLOAN@SKADDEN.COM

FIRM/AFFILIATE OFFICES
—
BOSTON
CHICAGO
HOUSTON
NEW YORK
PALO ALTO
SAN FRANCISCO
WASHINGTON, D.C.
WILMINGTON
—
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

March 6, 2008

<u>VIA E-MAIL AND U.S. MAIL</u>

Diane C. Hutnyan, Esq.
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017

RE:   <u>Bryant v. Mattel:  Notice of MGA's Intent to Perform Sampling on Jacqueline Prince's Notary Book</u>

Dear Diane:

As Ryan Weinstein and I indicated in our phone call with you on February 25, 2008 and in our numerous letters and emails, MGA intends to have its expert, Dr. Albert Lyter III, take "microplug" samples from Jacqueline Prince's notary log book in order to test the ink from the notary book in preparation for MGA's rebuttal expert report. Dr. Lyter will also perform various non-destructive, visual examinations of the notary book.   I write to inform you that, pursuant to the notice already provided by the proposed stipulation we sent you last Wednesday, February 27, Dr. Lyter plans to perform this testing on Monday, March 10 or Tuesday, March 11, 2008. *See* Stipulation, ¶ 10.  The testing will be performed at Dr. Lyter's laboratory located at the following address:

Federal Forensic Associates
7425 Capstone Drive
Raleigh, NC 27615

Please inform us in writing if Mattel would like to have its expert attend and observe the extraction of the "microplug" samples.  If you elect to do so, please also provide us with the credentials of your observing expert.  We will make all

EXHIBIT 8

PAGE 45

Diane C. Hutnyan, Esq.
March 6, 2008
Page 2


reasonable efforts to accommodate your expert's schedule, but due to the impending March 17 deadline for submitting MGA's rebuttal expert report, and Dr. Lyter's own schedule, the sampling must be conducted by no later than Tuesday, March 11.

      I received your letter yesterday in which you state your objection to our proposed stipulation and request a meet and confer, pursuant to the stipulation appointing Judge Infante as the discovery master. I note, however, that you have not specifically set forth "the relief sought" -- unless you seek to preclude us from taking samples under any circumstances -- nor identified "the authority supporting [your] requested relief," as required by that stipulation. *See* Stipulation for Appointment of a Discovery Master, ¶ 5. Upon your provision of the specific relief sought and the supporting authorities for such relief, I am ready to have a telephonic meet and confer today or any time tomorrow.

      Very truly yours,

Matthew E. Sloan


Enclosures

cc:  Ryan Weinstein, Esq.
     Carl Roth, Esq.


508223.01-Los Angeles Server 2A - MSW

EXHIBIT __8__
PAGE __46__

# EXHIBIT 9

## Diane Hutnyan

| | |
|---|---|
| **From:** | Diane Hutnyan |
| **Sent:** | Friday, February 22, 2008 4:10 PM |
| **To:** | 'Warren, Daniel J.'; 'Lopez, Alejandra' |
| **Cc:** | 'mwerdegar@kvn.com'; 'Weinstein, Ryan (LAC)'; Michael T Zeller |
| **Subject:** | RE: Bryant v. Mattel |

Dan,

No, I'm afraid it does not.

We are certainly willing to work with MGA when there is something to work out.  But we believe MGA's record of tampering in this case is more than enough reason for it not to have this original third-party evidence outside of the parties' agreement or the Court's specific approval.  We further believe that if MGA's ultimate plan is legitimate, it should simply pursue an appropriate agreement and/or a Court order governing its actions, the way that Mattel did.  It is well developed in the case law that destructive testing is supposed to be done with the agreement of the parties and/or the approval of the Court.

MGA has made no move to do any of this.  When it develops a protocol, we will be happy to consider it and work something out with MGA that is appropriate.  And if we cannot work it out, MGA still has the right to try to convince the Court of its position.

We expect you to maintain the notary book in its current condition until the parties can agree or the Court orders it.

Thank you.

---

**From:** Warren, Daniel J. [mailto:Daniel.Warren@sablaw.com]
**Sent:** Friday, February 22, 2008 2:32 PM
**To:** Lopez, Alejandra
**Cc:** Diane Hutnyan; mwerdegar@kvn.com; Weinstein, Ryan (LAC)
**Subject:** RE: Bryant v. Mattel

Dear Ms. Hutnyan. Does this resolve your concerns?  If not, I would ask both of you to work this out.  Thank you.
Dan Warren

---

**From:** Lopez, Alejandra [mailto:Alejandra.Lopez@skadden.com]
**Sent:** Friday, February 22, 2008 1:28 PM
**To:** Warren, Daniel J.
**Cc:** dianehutnyan@quinnemanuel.com; mwerdegar@kvn.com; Weinstein, Ryan (LAC)
**Subject:** Bryant v. Mattel

Dear Counsel, please see attached correspondence from Ryan Weinstein.

**Alejandra Lopez**
**Legal Secretary**
**Skadden, Arps, Slate, Meagher & Flom LLP**
**300 South Grand Avenue | Los Angeles | California | 90071-3144**
**T: 213.687.5604 | F: 213.687.5600**
alejandra.lopez@skadden.com

Skadden

🐸 please consider the environment before printing this email

EXHIBIT 9
PAGE 47

3/10/2008

-----------------------------------------------------------------
************************************************* This email and any attachments
thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged
and/or confidential information. If you are not the intended recipient of this email, you are hereby
notified any dissemination, distribution or copying of this email, and any attachments thereto, is strictly
prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and
permanently delete the original copy and any copy of any email, and any printout thereof. Further
information about the firm, a list of the Partners and their professional qualifications will be provided
upon request. *************************************************
=================================================================

CIRCULAR 230 DISCLOSURE:   To comply with Treasury
Department regulations, we inform you that, unless
otherwise expressly indicated, any tax advice contained in
this communication (including any attachments) is not
intended or written to be used, and cannot be used, for the
purpose of (i)avoiding penalties that may be imposed under
the Internal Revenue Code or any other applicable tax law,
or (ii) promoting, marketing or recommending to another
party any transaction, arrangement, or other matter.

The information contained in this message from Sutherland
Asbill & Brennan LLP and any attachments are confidential
and intended only for the named recipient(s). If you have
received this message in error, you are prohibited from
copying, distributing or using the information. Please
contact the sender immediately by return email and delete
the original message.

EXHIBIT 9

PAGE 48

3/10/2008

# EXHIBIT 10

**Diane Hutnyan**

| | |
|---|---|
| **From:** | Weinstein, Ryan [Ryan.Weinstein@skadden.com] |
| **Sent:** | Wednesday, February 27, 2008 11:00 AM |
| **To:** | Diane Hutnyan |
| **Cc:** | Sloan, Matthew E (LAC) |
| **Subject:** | Stipulation re Testing of Prince's Log Book |
| **Attachments:** | lac1-495716-3.doc |

Diane,

Per your request, please find our proposed stipulation attached.

As we would like to finalize this tomorrow, please provide us with your comments as soon as possible.

Thanks,
Ryan

Ryan Weinstein
Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue
Los Angeles, CA 90071
Phone:  (213) 687-5526
Fax:  (213) 621-5526
E-mail:  ryan.weinstein@skadden.com

------------------------------------------------------------------
*************************************************** To ensure compliance with Treasury Department regulations, we advise you that, unless otherwise expressly indicated, any federal tax advice contained in this message was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or applicable state or local tax law provisions or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein. *************************************************** This email and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified any dissemination, distribution or copying of this email, and any attachments thereto, is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original copy and any copy of any email, and any printout thereof. Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request. ***************************************************

EXHIBIT 10

PAGE 49

1 | THOMAS J. NOLAN (Bar No. 66992)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
2 | 300 South Grand Avenue
Los Angeles, CA 90071-3144
3 | Telephone: (213) 687-5000
Facsimile: (213) 687-5600
4 | E-mail: tnolan@skadden.com

5 | KENNETH A. PLEVAN
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
6 | Four Times Square
New York, New York, 10036-6522
7 | Telephone: (212) 735-3000
Facsimile: (212) 735-2000
8 | Email: kplevan@skadden.com

9 | Attorneys for Counter-Defendants
MGA ENTERTAINMENT, INC., ISAAC LARIAN,
10 | MGA ENTERTAINMENT (HK) LIMITED, and
MGAE de MEXICO S.R.L. de C.V.

11

12 | UNITED STATES DISTRICT COURT

13 | CENTRAL DISTRICT OF CALIFORNIA

14 | EASTERN DIVISION

15

16 | CARTER BRYANT, an individual,        ) CASE NO. CV 04-9049 SGL (RNBx)
17 |                 Plaintiff,           ) Consolidated with:
18 |      v.                             ) Case No. CV 04-9059
                                        ) Case No. CV 05-2727
19 | MATTEL, INC., a Delaware            )
corporation,                            ) **DISCOVERY MATTER**
20 |                                     )
                Defendant.              ) Hon. Edward A. Infante (Ret.)
21 |                                     ) Discovery Master
                                        )
22 |                                     ) **STIPULATION RE MGA'S**
Consolidated with MATTEL, INC. v.       ) **PROPOSED TESTING OF**
23 | BRYANT and MGA                      ) **JACQUELINE PRINCE'S**
ENTERTAINMENT, INC. v.                  ) **NOTARY BOOK; [PROPOSED]**
24 | MATTEL, INC.                        ) **ORDER**
                                        )
25 |                                     ) **Phase 1**
                                         Discovery Cut-Off:      Jan. 28, 2008
26 |                                      Expert Rebuttal
                                         Reports Due:           March 17, 2008
27 |                                      Expert Discovery
                                         Cut-Off:               March 31, 2008
28 |                                      Pre-Trial Conference:  May 5, 2008
                                         Trial Date:            May 27, 2008

STIPULATION RE MGA'S PROPOSED TESTING OF PRINCE'S NOTARY LOG BOOK AND [PROPOSED] ORDER
495716.03-Los Angeles Server 1A                    MSW - Draft February 27, 2008 - 10:23 AM

EXHIBIT 10
PAGE 50

## STIPULATION

This Stipulation is entered into by and between Mattel, Inc. ("Mattel") on the one hand, and MGA Entertainment, Inc., Isaac Larian, MGA Entertainment (HK) Limited, and MGAE de Mexico S.R.L. de C.V. (collectively referred to herein as "MGA"), on the other hand, with reference to the following:

WHEREAS, Jacqueline Prince, a notary public, made notations in a log book entitled "Official Journal of Notarial Acts" (the "log book") which relate to the date on which certain of plaintiff and counter-defendant Carter Bryant's ("Bryant") drawings were created;

WHEREAS, on page 11 of the notary book, there is an entry, dated 8/26/99, which identifies 6 sketches of dolls made by Bryant;

WHEREAS, the same entry includes the notation "From 1998 Missouri";

WHEREAS, on or about December 25, 2007, counsel for Mattel sent a letter to Daniel J. Warren, counsel for Ms. Prince, requesting production of the notary book for purposes of conducting a forensic analysis on the ink used on the above-referenced entry;

WHEREAS, in response, Mr. Warren produced said log book to Mattel, and MGA did not object;

WHEREAS, on January 4, 2008, Mattel's expert, Valery N. Aginsky, extracted 17 sets of hypodermic needle-sized samples or "microplugs" from written lines appearing on pages 11 and 12 of the notary book and two sets of blank paper "microplug" samples from page 11 of the notary book;

WHEREAS, Mr. Aginsky subsequently subjected the "microplug" samples to various chemical analyses, including chromatography, thin-layer chromatography ("TLC"), and gas chromatography-mass spectrometry ("GC-MS");

WHEREAS, on January 31, 2008, Mr. Aginsky returned Ms. Prince's log book to Mr. Warren;

-1-

STIPULATION RE MGA'S PROPOSED TESTING OF PRINCE'S NOTARY LOG BOOK AND [PROPOSED] ORDER
495716.03-Los Angeles Server 1A                                                                MSW - Draft February 27, 2008 - 10.23 AM

EXHIBIT

PAGE _____ 51

1    WHEREAS, on February 11, 2008, Mattel transmitted to MGA a copy of Mr.

2   Aginsky's expert report, wherein Mr. Aginsky set forth the results of ink tests that he

3   performed on samples extracted from the notary book;

4    WHEREAS, on the basis of his tests, Mr. Aginsky concluded that the notation

5   "From 1998 Missouri" on page 11 of the notary book was written in different ink

6   than the remainder of the 8/26/99 entry;

7    WHEREAS, MGA now seeks to test the accuracy of Mr. Aginsky's findings

8   by having its own expert replicate Mr. Aginsky's ink testing;

9    WHEREAS, the current deadline for submitting expert rebuttal reports is

10   March 17, 2008;

11    THEREFORE, the undersigned parties, through their undersigned counsel,

12   stipulate and agree as follows:

13    1.    MGA will be allowed to take samples and conduct testing on the notary

14   book to test the accuracy of Mr. Aginsky's findings, pursuant to the following

15   protocol.

16    2.    MGA's testing of Ms. Prince's log book will be limited to analysis of

17   "microplug" samples extracted from pages 11 and 12 of the notary book.

18    3.    MGA's expert (or experts) will remove no more than 17 sets of

19   "microplug" samples from the written portions of the entries on pages 11 and 12 of

20   the notary book, and no more than two sets of blank paper "microplug" samples from

21   the areas of pages 11 and 12 which do not contain writing.   (Although this

22   Stipulation refers to MGA's "expert," MGA reserves the right to employ more than

23   one expert for the proposed sampling and testing of the notary book).

24    4.    MGA's expert will extract all "microplug" samples using a hypodermic-

25   needle-sized hole punch, which removes holes of less than one millimeter in

26   diameter.

27    5.    Before subjecting the samples to ink analysis, MGA's expert will

28   maintain the samples at his or her laboratory in normal environmental conditions.

-2-

STIPULATION RE MGA'S PROPOSED TESTING OF PRINCE'S NOTARY LOG BOOK AND [PROPOSED] ORDER
495716.03-Los Angeles Server 1A                                 MSW - Draft February 07, 2008 - 10:27 AM

PAGE 52

6.   All sampling and testing will occur at the laboratory of MGA's expert.

7.   Before Mr. Warren sends the notary book to MGA's expert, MGA will send a letter to Mattel's counsel by facsimile (and U.S. Mail) setting forth: (a) the name of MGA's expert (or experts) who will conduct the sampling; (b) the expert's curriculum vitae; (c) the location of the expert's laboratory; and (d) samples of "microplugs" similar to those that would be extracted from the notary book.

8.   Mattel will have three days from its receipt of the above-referenced letter by facsimile to object to the contemplated testing.  During this three-day period, Mr. Warren will maintain custody of the notary book, and no testing will be performed.  If Mattel raises no objection, then Mr. Warren will be directed to transmit the notary book to MGA's expert and MGA's expert will be authorized to conduct testing pursuant to the protocol set forth herein.

9.   In the event Mattel objects to the proposed testing, Mattel's counsel must notify MGA by letter and/or a telephone call within the 3-day period set forth above.  The parties must then meet and confer and, within two more Court days, file a joint statement to Judge Infante seeking resolution of the dispute.

10.   Mattel may elect to have its own expert attend the extraction of "microplug" samples provided that (1) Mattel makes the election in writing within the three-day objection period; (2) Mattel provides counsel for MGA with the credentials of any observing expert; and (3) the testing can take place within ten (10) calendar days of the execution of this Stipulation.  At this time, MGA's expert is available to conduct the sampling on March 10, 11, or 12, 2008.

11.   If Mattel's expert raises any issues about the sampling being performed while he or she is observing the sampling, the parties will seek immediate resolution from the Court so that the sampling will not be delayed.  If Mattel's counsel does not object or seek attendance by its expert within the three-day objection period, the proposed destructive testing shall be deemed unobjectionable and may be carried out by MGA's expert without further delay.

-3-

STIPULATION RE MGA'S PROPOSED TESTING OF PRINCE'S NOTARY LOG BOOK AND [PROPOSED] ORDER
495716.03-Los Angeles Server 1A                                   MSW - Draft February 8 - 10:25 AM
EXHIBIT

PAGE    53

12.     With the exception of alterations resulting from any destructive testing, which would be conducted in accordance with the protocol set forth above, the notary book will be returned promptly to Mr. Warren in the same condition it was received.

13.     The parties agree that, should Mattel raise any objections to the proposed sampling, testing, or credentials of Mattel's expert, or to any other aspects of the testing process, MGA will be granted an extension of time within which to submit a rebuttal report in response to Mr. Aginsky's initial expert report. Specifically, in the event that Mattel objects to MGA's proposed expert sampling, the current March 17, 2008 deadline for submitting MGA's rebuttal expert report will be extended by one calendar day for each day from the date Mattel raises its objection to the date upon which any such objection is resolved by Judge Infante or by the agreement of the parties.

IT IS SO STIPULATED.

DATED:  February __, 2008      SKADDEN, ARPS, SLATE, MEAGHER
                               & FLOM, LLP


                               By: _____
                                    Matthew E. Sloan
                               Attorneys for Counter-Defendants
                               MGA ENTERTAINMENT, INC., ISAAC LARIAN,
                               MGA ENTERTAINMENT (HK) LIMITED, and
                               MGAE de MEXICO S.R.L. de C.V.

DATED:  February __, 2008      QUINN EMANUEL URQUHART OLIVER
                               & HEDGES, LLP


                               By: _____
                                    Diane C. Hutnyan
                               Attorneys for Mattel, Inc.

-4-

STIPULATION RE MGA'S PROPOSED TESTING OF PRINCE'S NOTARY LOG BOOK AND PROPOSED ORDER
495716.03-Los Angeles Server 1A                          MSW - Draft February 27, 2008 - 10:23 AM

PAGE___54

1
2
3

## ORDER

4      The Court, having reviewed MGA and Mattel's Stipulation Re MGA's

5  Proposed Testing Of Jacqueline Prince's Notary Book (the "Stipulation") and for

6

7  good cause shown, hereby approves the procedure for MGA's proposed expert

8  testing of the notary book set forth in the Stipulation.

9

10      IT IS SO ORDERED.

11

12  DATED: _____      _____

13                              Hon. Edward A. Infante (Ret.)
                                Discovery Master

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT 10

PAGE 55

# EXHIBIT 11

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-443-3000 FAX 213-443-3100

WRITER'S DIRECT DIAL NO.
**(213) 443-3666**

WRITER'S INTERNET ADDRESS
dianehutryan@quinnemanuel.com

March 3, 2008

<u>VIA EMAIL AND FACSIMILE</u>

Ryan Weinstein, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue
Los Angeles, CA 90071

Re:    Carter Bryant v. Mattel

Dear Ryan:

We have reviewed the proposal you sent and found that there are a number of issues with the proposal you sent that still need to be resolved.

The proposed stipulation appears to contemplate the idea of a future potential protocol, rather than contain an actual protocol, for the delivery, handling and sampling of the materials. You seem to have obtained the idea from paragraph 6 of Judge Infante's August 30, 2007 Order. Paragraph 6 contemplated the development of a future protocol for the potential destructive testing that we didn't even know would be needed at that time. That is not the case here. Here, you already know what destructive testing you expect to do. So the stipulation should be more consistent with paragraphs 3, 4, 5, and 7 of that Order in terms of outlining what will be, or will not be, done with the documents.

Another issue is that the stipulation does not reflect any plan to obtain the Court's approval of Mr. Lyter and his credentials. As is set forth in the transcript of the hearing last summer on Mattel's contemplated non-destructive testing, Judge Infante required that specific information be submitted with respect to the experts that Mattel was going to use for non-destructive testing. That information was submitted in camera at the time because the only testing contemplated was all non-destructive, and thus such information was privileged in nature. But since you are

**quinn emanuel urquhart oliver & hedges, llp**

NEW YORK | 51 Madison Avenue, 22nd Floor, New York, New York 10010 | TEL 212-849-7000 FAX 212-849-7100

SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94111 | TEL 415-875-6600 FAX 415-875-6700

SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL 650-801-5000 FAX 650-801-5100

TOKYO | Akasaka Twin Tower Main Building, 6th Floor, 17-22 Akasaka 2-Chome, Minato-ku, Tokyo 107-0052, Japan | TEL +81-3-5561-1711 FAX +81-3-5561-1712

PAGE  50

Ryan Weinstein
March 3, 2008

planning destructive testing with our expert present, the submission that we made for each of our experts, along the lines of what was set forth in the transcript, should be made both to us (with an opportunity for us to object) and then should be made to the Court for approval.

As I have explained to you previously at length, we are quite concerned about having the notary book in anyone's hands or possession but the (by then Court-approved) expert in the presence of our expert. So the protocol for delivery and handling of the notary book should be designed to prevent access by anyone besides those two people. And the notary book should not be handled by either expert outside the presence of the other.

We are also concerned about the custody of the notary book generally. The delivery plan should be specific in setting forth the exact method of delivery, time of delivery, location of delivery, and return date, and be done in a way that all parties can track the package. What are the specific conditions the book will be stored in, if at all, while it is at Mr. Lyter's lab?

While we will insist upon our expert, Dr. Aginsky, attending, we do not want him to have to take time out of his schedule waiting around. So all of the samples must be taken in one day. Bryant and MGA afforded Mattel four days to find and punch samples from within eight boxes of original documents, so one day is certainly more than enough to take the microplugs in question from the two pages you have contemplated.

The number of microplugs in the proposed stipulation also seems open-ended. A "set" should be limited to some reasonably small number that is agreed upon in advance.

We view the "Whereas" section of the stipulation as unnecessary and improper argument. Whether Mattel did destructive testing on the document does not give MGA a right to do any destructive testing it wants; MGA must show the appropriateness of the destructive testing it plans to do, independent of what Mattel obtained Court approval to do and did. Please remove this section.

In paragraph 13, MGA appears to request an extension of time to file its rebuttal reports if Mattel's expert raises any objections to the procedures he is observing. Mattel might be willing to toll the time that Mr. Lyter has with the book, but it should have no bearing on the rebuttal report deadline. Further, as to any objections made prior to the sampling, those should all be resolved through agreement or by Judge Infante before Mr. Lyter even takes possession of the notary book.

The stipulation also must include a provision whereby Mattel would be guaranteed additional access to the notary book and the right to take further samples after MGA has served its rebuttal reports and/or after Mr. Lyter has been deposed. Also, thus, the stipulation should be expressly approved by Mr. Warren and the other parties to the case so that no one can later object to try to

2

EXHIBIT ___11___

PAGE ___57___

Ryan Weinstein
March 3, 2008

block Mattel's expert's access.  Similarly, all the parties and Ms. Prince must agree that the
notary book will be made available in California during the trial if Mattel so requests.

I look forward to your response.

Very truly yours,

Diane Hutnya /str

Diane C. Hutnyan

3

EXHIBIT __11__
PAGE __58__

# EXHIBIT 12

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL: (213) 443-3000 FAX: (213) 443-3100

WRITER'S DIRECT DIAL NO.
**(213) 443-3666**

WRITER'S INTERNET ADDRESS
dianehutnyan@quinnemanuel.com

March 5, 2008

<u>VIA EMAIL AND FACSIMILE</u>

Ryan Weinstein, Esq.                          Matthew Sloan, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP      Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue                        300 South Grand Avenue
Los Angeles, CA 90071                         Los Angeles, CA 90071

Re:     Carter Bryant v. Mattel

Dear Ryan and Matthew:

We were disappointed by your letter.  Contrary to your view, our intent in our March 3 letter was to let you know, point by point, specifically what our concerns were and specific ways that you might meet them.  It appeared to us that we were moving closer to each other on some key issues up until you sent your latest proposal and letter.

Since you seem bent on proceeding with a subpoena today, I do not have time to address all of the points in your letter fully, but I will try to address a few quickly, in the hopes that you will reconsider and try to work out an agreement with us.

You had said you did not understand my comment about the future protocol, and what I meant by that is that you seem to have an artificially short period of time between official disclosure and resolution of any objection, rather than officially disclosing the expert now and having us work out any objections right away.  We do not see any reason why you would set it up this way, other than to try to prevent us from being able to meaningfully object.  And it seems that if you are in a hurry to do the testing, you would want to officially disclose the expert now anyway.  I note that although you had previously represented Mr. Lyter as being the expert, the latest stipulation seems to contemplate multiple unnamed experts again.

**quinn emanuel urquhart oliver & hedges, llp**

NEW YORK | 51 Madison Avenue, 22nd Floor, New York, NY 10010 | TEL (212) 849-7000 FAX (212) 849-7100
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, CA 94111 | TEL (415) 875-6600 FAX (415) 875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, CA 94065 | TEL (650) 801-5000 FAX (650) 801-5100
TOKYO | Akasaka Twin Tower Main Building, 6th Floor, 17-22 Akasaka 2-Chome, Minato-ku, Tokyo 107-0052, Japan | TEL +81 3 5561-1711 FAX +81 3 5561-1712

PAGE 54

EXHIBIT 12

Also, you have pointed out that the rebuttal expert report date is March 17 and stated that the proposed microplugging is limited to two pages. Yet the latest stipulation seeks thirty-five days' custody of the notary book. Thirty-five days was the length of time the Court allotted for the non-destructive examination of eight boxes of original documents by four different experts in four different parts of the country. MGA and Bryant had insisted on no more than four days for the paper plugging of 190 individual sheets of paper that needed to be located within eight boxes of original documents. So I cannot imagine any reason why your expert would need them for longer than one day. Could you tell me why you need thirty-five days?

Also, you point out that Dr. Aginsky had the notary book at his lab for longer than one day, but there was no need to return it immediately then, whereas here it should be made available to us or our expert witness during that timeframe. For all the same reasons that you would like to review Dr. Aginsky's work, we should have the right to review your expert's work. Yet it appears that you will not even consider that, which seems inconsistent with your many statements about how unobjectionable your testing plans are. Further, after MGA's refusal to provide the Court-ordered Topic 41 deposition testimony on MGA's handling and destructive sampling of the other original documents, we believe that we are entitled to more explanation than just a deposition. If you seek to do this by agreement, I would ask you to reconsider the reasonableness of our request for access to the notary book and help us figure out a way that we can both do what we need to do.

Also, please explain your basis for modification of the scheduling order. It, too, seems designed to keep us from being able to appropriately respond to your expert's findings.

I am certainly happy to discuss a reasonable proposal, but as these few examples show, much of what you have proposed does not seem to have a reasonable basis. If it does, and I am missing it, I would appreciate you letting me know what that basis is so that maybe we can work something out. If you are interested, let me know; I am available to discuss by telephone tonight or tomorrow.

Your alternate plan, to issue a subpoena and take possession of the notary book, with neither Court approval nor an agreement in place, is problematic for all the reasons I have set forth in my prior correspondence. If you do that, we will move to quash the subpoena and/or move for a protective order. So, to the extent MGA is unwilling to proceed by seeking Court approval or our agreement, please also consider this letter a request to meet and confer pursuant to paragraph 5 of the Discovery Master Stipulation in advance of such motion(s).

I look forward to hearing from you.

Very truly yours,

Diane C. Hutnyan
07209/2424163.1

2

EXHIBIT ___12___

PAGE ___60___

# EXHIBIT 13

THIS EXHIBIT IS FILED UNDER SEAL

PURSUANT TO PROTECTIVE ORDER

# EXHIBIT 14

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

# EXHIBIT 15

1   UNITED STATES DISTRICT COURT

2   CENTRAL DISTRICT OF CALIFORNIA

3   EASTERN DIVISION

4

5   CARTER BRYANT, AN INDIVIDUAL,)
                                )
6   PLAINTIFF,                  )
                                )
7   VS.                         ) CASE NO.
                                )
8   MATTEL, INC., A DELAWARE    ) CV 04-9049 SGL (RNBX)
    CORPORATION,                ) [CONSOLIDATED WITH
9                               ) CASE NO. 04-9059 AND
                DEFENDANT.      ) CASE NO. 05-2727]
10                              )
    _____)
11                              )
    AND CONSOLIDATED ACTION(S). )
12  _____)

13

14

15   TELEPHONIC TRANSCRIPT OF

16   PROCEEDINGS, TAKEN BEFORE HON.

17   EDWARD A. INFANTE, AT 865 SOUTH

18   FIGUEROA STREET, TENTH FLOOR, LOS

19   ANGELES, CALIFORNIA, COMMENCING

20   AT 9:00 A.M., THURSDAY, AUGUST 23,

21   2007, BEFORE ANGELA DUPRE, CSR 7804.

22

23

24   EXHIBIT 15

25   PAGE 157

1    APPEARANCES OF COUNSEL:

2

3    FOR CARTER BRYANT:

4        KEKER & VAN NEST, LLP
         BY:  MICHAEL PAGE, ESQ.

5        710 SANSOME STREET
         SAN FRANCISCO, CALIFORNIA 94111

6        (415) 391-5400
         (TELEPHONICALLY)

7

8

     FOR MATTEL, INC.:

9

         QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

10       BY:  DIANE HUNTYAN, ESQ.

         865 SOUTH FIGUEROA STREET

11       TENTH FLOOR

         LOS ANGELES, CALIFORNIA 90017-2543

12       (213) 443-3000

13

14

15   ALSO PRESENT:

16       HON. EDWARD A. INFANTE
         (TELEPHONICALLY)

17

18

19

20

21

22

23

24

25

1   YOU KNOW, WITH A QUINN EMANUEL EMPLOYEE ON BOARD, I

2   DON'T THINK REALLY MITIGATES THE RISK THAT MIGHT BE

3   ASSOCIATED WITH FED-EX.  I DON'T SEE THERE'S REALLY

4   A DIFFERENCE THERE.

5           WHAT WE REALLY OBJECT TO IS THE IDEA THAT

6   WE NEED TO BABY-SIT THESE DOCUMENTS FROM THE MOMENT

7   WE GET THEM, I MEAN, PHYSICALLY HAVE THEM IN

8   MATTEL'S COUNSEL'S CUSTODY, ALMOST LIKE THE GUY WHO

9   SPENT TIME WITH THE PRESIDENT AND HOLDS THAT

10  BRIEFCASE THAT IS CHAINED TO HIS ARM.  THAT DOES

11  NOT SEEM TO BE WARRANTED HERE.

12          AS I MENTIONED, BRYANT HAS NOT BEEN

13  PARTICULARLY CAREFUL WITH HIS OWN DOCUMENTS, AND I

14  THINK, YOU KNOW, WE OBVIOUSLY WOULD BE VERY CAREFUL

15  WITH THEM AND MAKE SURE THAT WE COMMUNICATED

16  EFFECTIVELY SUCH THAT, YOU KNOW, THE FEDERAL

17  EXPRESS GETS TO WHERE IT'S SUPPOSED TO GO, AND IT'S

18  RECEIVED ON THE RIGHT END, AND THEN PRESERVED

19  WITHIN THE EXPERT'S LAB THE WAY THAT IT SHOULD BE.

20          JUDGE INFANTE:  WELL, I THINK IT'S IMPORTANT TO

21  KNOW WHO YOUR EXPERTS ARE TO DETERMINE THAT THEY'RE

22  REPUTABLE AND HAVE SYSTEMS IN PLACE AND UNDERSTAND

23  THEIR IMPORTANT DUTY.

24          THE ONLY WAY THAT COULD BE DEMONSTRATED

25  AND STILL PROTECT YOUR WORK PRODUCT WOULD BE FOR

1  YOU TO SUBMIT TO ME IN CAMERA A LIST OF WHO THE

2  EXPERTS ARE, WITH ANY RESUME OR STATEMENT OF THEIR

3  QUALIFICATIONS AND PRACTICES AND THEIR LOCATIONS.

4      THAT COULD BE SUBMITTED TO ME IN CAMERA,

5  SO THAT I WOULD FEEL MORE COMFORTABLE IN FOLLOWING

6  YOUR RECOMMENDATIONS HERE REGARDING PROTOCOL.

7  MS. HUNTYAN:  OKAY.  THAT SOUNDS FINE.  WE'LL

8  BE ABLE TO FURNISH THAT.

9  JUDGE INFANTE:  I THINK THAT'S PROBABLY THE

10  BEST WAY TO HANDLE IT.

11      I ASSUME YOU'RE USING REPUTABLE EXPERTS

12  AND ARE USED TO HANDLING MATTERS OF THIS NATURE,

13  AND ARE ACCOUNTABLE.

14  MS. HUNTYAN:  YES, YOUR HONOR.

15  JUDGE INFANTE:  OKAY.  THOSE ARE MY ONLY

16  QUESTIONS.

17      I THINK WE'LL TURN IT OVER TO MR. PAGE.

18  MR. PAGE:  THANK YOU, YOUR HONOR.

19      MY PROBLEM WITH THIS IS, THIS SEEMS TO BE

20  AN ONGOING PATTERN IN THIS CASE, WHERE MR. BRYANT,

21  WHO'S AN INDIVIDUAL DEFENDANT, IS GETTING GROUND

22  DOWN WITH DEMAND AFTER DEMAND AFTER DEMAND, YOU

23  KNOW, MULTIPLE MEET AND CONFER LETTERS EVERY WEEK.

24      AND IT'S EITHER, YOU KNOW, ACCEDE TO

25  RIDICULOUS DEMANDS OR HAVE TO GO THROUGH MOTION

# EXHIBIT 16

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-443-3000 FAX 213-443-3100

WRITER'S INTERNET ADDRESS
dianehutnyan@quinnemanuel.com

December 13, 2007

**VIA FACSIMILE AND EMAIL**

Michael H. Page, Esq.
Keker & Van Nest LLP
710 Sansome Street
San Francisco, CA 94111-1704

Timothy Miller, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
Four Embarcadero Center
Suite 3800
San Francisco, CA 94111

Re:   Mattel v. Carter Bryant

Pursuant to paragraph 6 of the Order Granting Mattel, Inc.'s Motion to Compel Bryant To Make Original Documents Available for Expert Examination and Testing, dated August 31, 2007, we request that the following Bryant originals (identified by Bates Numbers or BORIG control numbers) be produced so that samples may be taken for fiber composition analysis, chemical spot tests and/or elemental analysis:

Bryant 00139-00140, 00154, 00157-00162, 00171-00172, 00175-00183, 00186, 00189-00190, 00192-00218, 00220-00246, 00277-00278, 00291-00297, 00300-00303, 00310-00351, 00358-00361, 00688, 00690-00691, 00699-00701, 00829-00831, 00859, 00911, 00954, 00960-00970, 01003, 01014, 01094, 01111-01118, 01121-01126, 01243, and the notebooks that are numbered Bryant 01589-01665 and BORIG 1632, 1633 and 1729.

These tests would involve obtaining a small sample or samples of the paper from the document. This is done by taking a small punch or punches from the document and/or a snippet from the corner of the document. The punches or samples would be taken from a portion or portions of the document that do(es) not have any markings or ink and thus would not be destructive of the drawings or writing on the document. As you know, some of the documents listed above are stuck to a posterboard. In those cases, the paper may have to be gently lifted from the posterboard so as to allow a sample to be taken; also samples may need to be taken from the posterboard attached to certain documents.

**quinn emanuel urquhart oliver & hedges, llp**

20078/2319892.1

NEW YORK | 51 Madison Avenue, 22nd Floor, New York, New York 10010 | TEL 212-849-7000 FAX 212-849-7100

SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94111 | TEL 415-875-6600 FAX 415-875-6700

SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL 650-801-5000 FAX 650-801-5100

EXHIBIT 6

PAGE 101

Michael H. Page, Esq. and Timothy A. Miller, Esq.
December 13, 2007

In addition, we are alerting you to our request of Ms. Prince's counsel, Dan Warren, for our expert to take small ink samples from entries in Ms. Prince's notary book, including but not limited to parts of the 8/26/99 ink entry on the originals of Bryant 00928 and 00929 so that ink identification testing may conducted.

I look forward to hearing from you on these matters.

Sincerely,

Diane C. Hutnyan

20078/2319892.1
cc:     Timothy Miller, Esq.
        Larry W. McFarland, Esq.

EXHIBIT ___16___

PAGE ___162___

# EXHIBIT 17



1   QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
      John B. Quinn (Bar No. 090378)
2     johnquinn@quinnemanuel.com
      Michael T. Zeller (Bar No. 196417)
3     (michaelzeller@quinnemanuel.com)
      Jon D. Corey (Bar No. 185066)
4     (joncorey@quinnemanuel.com)
      Timothy L. Alger (Bar No. 160303)
5     (timalger@quinnemanuel.com)
      865 South Figueroa Street, 10th Floor
6     Los Angeles, California  90017-2543
      Telephone:  (213) 443-3000
7     Facsimile:  (213) 443-3100

8   Attorneys for Plaintiff and Cross-Defendant Mattel, Inc.

9                   UNITED STATES DISTRICT COURT

10                 CENTRAL DISTRICT OF CALIFORNIA

11                         EASTERN DIVISION

12  CARTER BRYANT, an individual,        Case No. CV 04-09049 SGL (RNBx)

13           Plaintiff,                  Consolidated with
                                         Case No. CV 04-09059
14       vs.                             Case No. CV 05-02727

15  MATTEL, INC., a Delaware             **DISCOVERY MATTER**
    corporation,
16                                       Hon. Edward A. Infante (Ret.)
             Defendant.                  Discovery Master
17
                                         STIPULATION RE: MATTEL'S
18  ─────────────────────────           DESTRUCTIVE TESTING OF
                                         BRYANT ORIGINAL
19  AND CONSOLIDATED CASES               DOCUMENTS; AND

20                                       [PROPOSED] ORDER

21

22

23

24

25

26

27

28

07209/2348296.2

STIPULATION RE DESTRUCTIVE TESTING OF BRYANT ORIGINALS; PROPOSED ORDER

EXHIBIT   17

PAGE   163

## STIPULATION

WHEREAS, Mattel has, pursuant to paragraph 6 of the Court's August 30, 2007 Order Granting Mattel, Inc.'s Motion to Compel Bryant to Make Original Documents Available for Expert Examination and Testing, requested limited destructive testing of certain of Carter Bryant's ("Bryant") original documents;

WHEREAS, Bryant originally objected to the request as untimely, but now has agreed to allow the requested destructive testing;

NOW, THEREFORE, the parties will adhere to the following protocol with respect to the destructive testing of the Bryant originals:

1.      On January 11, 2008, during normal business hours, Mattel's counsel will pick up, by messenger, from Keker & Van Nest, LLP, 710 Sansome Street, San Francisco, California, the documents that were previously provided by Bryant to Mattel for examination by Mattel's experts on Wednesday, September 12, 2007, in the seven mailing cartons in which they were returned to Keker by Mattel's counsel on October 17, 2007 ("the seven cartons").[1]

2.      The seven cartons will be shipped, using Federal Express or UPS, to Mattel's expert's laboratory, Integrated Paper Services, Inc., c/o Walter Rantanen, 3211 E. Capitol Drive, Appleton, WI 54911, for delivery on Monday morning, January 14, 2008.  January 14 shall be the first of four business days that Mattel shall have for the sampling of the documents.  Subject to Paragraph 7 below, when the sampling is complete or on the fourth business day, whichever comes first, the documents shall be sent from Mattel's expert's laboratory, and will be delivered

---

[1] The documents were provided to Mattel by Bryant on September 12, 2007 in eight boxes.  However, to give the documents additional protection, Mattel repackaged the original eight boxes into seven cartons.  The original eight boxes, and the documents they originally contained, all are now contained within the seven cartons.

STIPULATION RE DESTRUCTIVE TESTING OF BRYANT ORIGINALS; PROPOSED ORDER

07209/2348296.2

EXHIBIT ___17___

PAGE ___104___

1   to Keker & Van Nest's San Francisco office, to, the attention of Matthew Werdegar,

2   during normal business hours the next business day.

3       4.      The documents as to which sampling is permitted are the

4   originals of those documents produced by Bryant in this action that correspond with

5   bates-numbered documents:  Bryant 00139-00140, Bryant 00154, Bryant 00157-

6   00162, Bryant 00171-00172, Bryant 00175-00183, Bryant 00186, Bryant 00189-

7   00190, Bryant 00192-00218, Bryant 00220-00246, Bryant 00277-00278, Bryant

8   00291-00297, Bryant 00300-00303, Bryant 00310-00351, Bryant 00358-00361,

9   Bryant 00688, Bryant 00690-00691, Bryant 00699-00701, Bryant 00829-00831,

10  Bryant 00859, Bryant 00911, Bryant 00954, Bryant 00960-00970, Bryant 01003,

11  Bryant 01014, Bryant 01094, Bryant 01111-01118, Bryant 01121-01126, Bryant

12  01243; and the notebooks that are numbered Bryant 01589-01665; and BORIG

13  1632, 1633 and 1729.

14      5.      The sampling of the documents listed in paragraph 4 above shall

15  consist of the following:  Samples of the documents listed will be obtained by taking

16  a small punch or punches from the document and/or a snippet from the corner of the

17  document.  The samples shall be taken from a portion or portions of the document

18  that do(es) not have any markings or ink and thus shall not be destructive of the

19  drawings or writing on the document.  Examples of punches and snippets of the type

20  that will be taken during the sampling have been received by Bryant's counsel and

21  deemed unobjectionable.  The expert extracting the samples will be one of the

22  experts approved by Judge Infante during his *in camera* inspection of their

23  credentials.  The samples shall be used for fiber composition analysis, chemical spot

24  tests and/or elemental analysis.

25      6.      Except as set forth in paragraph 5, above, all the Bryant

26  documents shall be returned in the same condition, sequence and order in which

27  they were received.

28

                                    3
STIPULATION RE DESTRUCTIVE TESTING OF BRYANT ORIGINALS; PROPOSED ORDER

EXHIBIT  17

PAGE  105

1        7.     MGA has elected to have Mr. Erich Speckin observe the

2  sampling procedure. Counsel for Mattel hereby represents that Mattel has conferred

3  with MGA and that Mr. Speckin is available to observe the destructive testing

4  procedure during the four business day period described in paragraph 2. If Mr.

5  Speckin, while he is observing the procedure, raises any issues about the sampling

6  or testing being done or any other aspects of the process, the parties will seek

7  immediate resolution from this Court so that the sampling, and any subsequent

8  activities, will not be delayed. In the event that there is a dispute or objection, the

9  four business day period described in paragraph 2 is extended for the length of time

10  that was needed to resolve the dispute or objection.

11

12          IT IS SO STIPULATED.

13  DATED:  January 11, 2008     QUINN EMANUEL URQUHART OLIVER &

14                       HEDGES, LLP

15

16                    By _____

                              Diane C. Hutnyan

17                       Attorneys for Mattel, Inc.

18  DATED:  January 11, 2008     KEKER & VAN NEST, LLP

19

20                    By _____

21                       Matthew M. Werdegar

22                       Attorneys for Carter Bryant

23

24

25

26

27

28

STIPULATION RE DESTRUCTIVE TESTING OF BRYANT ORIGINALS; PROPOSED ORDER

EXHIBIT  17

PAGE  166

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[PROPOSED] ORDER

Pursuant to the foregoing stipulation of the parties, IT IS SO ORDERED.

DATED: January _11_, 2008

_Edward Infante_

Hon. Edward Infante (Ret.)

5

STIPULATION RE DESTRUCTIVE TESTING OF BRYANT ORIGINALS; PROPOSED ORDER

07209/2348296.2

EXHIBIT 17

PAGE 107

## PROOF OF SERVICE BY E-MAIL

I, Sandra Chan, not a party to the within action, hereby declare that on January 11, 2008, I served the attached STIPULATION AND ORDER RE: MATTEL'S DESTRUCTIVE TESTING OF BRYANT ORIGINAL DOCUMENTS in the within action by email addressed as follows:

| | | |
|---|---|---|
| John W. Keker, Esq. | Keker & Van Nest | jkeker@kvn.com |
| Michael H. Page, Esq. | Keker & Van Nest | mhp@kvn.com |
| Christa Anderson, Esq. | Keker & Van Nest | cma@kvn.com |
| Matthew M. Werdegar, Esq. | Keker & Van Nest | mwerdegar@kvn.com |
| John E. Trinidad, Esq. | Keker & Van Nest | jtrinidad@kvn.com |
| Audrey Walton-Hadlock, Esq. | Keker & Van Nest | awalton-hadlock@kvn.com |
| John Quinn Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | johnquinn@quinnemanuel.com |
| Michael Zeller Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | michaelzeller@quinnemanuel.com |
| Jon Corey Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | joncorey@quinnemanuel.com |
| Duane Lyons Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | duanelyons@quinnemanuel.com |
| Timothy Alger Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | timalger@quinnemanuel.com |
| Dominic Surprenant Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | DominicSurprenant@QuinnEmanuel.com |
| B. Dylan Proctor Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | dylanproctor@quinnemanuel.com |
| Shane McKenzie Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | shanemckenzie@quinnemanuel.com |
| Bridget Hauler Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | bridgethauler@quinnemanuel.com |
| Tamar Buchakjian Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | tamarbuchakjian@quinnemanuel.com |
| Juan Pablo Alban, Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | juanpabloalban@quinnemanuel.com |
| Thomas J. Nolan, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | tnolan@skadden.com |
| Raoul D. Kennedy, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | rkennedy@skadden.com |
| Amy S. Park, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | apark@skadden.com |
| Harriet S. Posner, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | hposner@skadden.com |
| Carl Alan Roth, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | croth@skadden.com |
| Timothy A. Miller, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | tmiller@skadden.com |
| Marcus R. Mumford, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | Mmumford@skadden.com |

I declare under penalty of perjury under the laws of the Untied States of America that the above is true and correct.

Executed on January 11, 2008, at San Francisco, California.

_____
Sandra Chan

EXHIBIT ___17___

PAGE ___168___

# EXHIBIT 18

## Diane Hutnyan

| | |
|---|---|
| **From:** | Diane Hutnyan |
| **Sent:** | Tuesday, December 25, 2007 1:18 PM |
| **To:.** | 'Warren, Daniel J.' |
| **Cc:** | 'tmiller@skadden.com'; 'Michael Page'; Michael T Zeller; Andrea Hoeven |
| **Subject:** | Letter to Dan Warren re Destructive Testing |
| **Attachments:** | 2335468_Letter to Dan Warren re Destructive Testing (2).pdf |

Counsel,

Happy Holidays!  Please see attached correspondence.

Diane

EXHIBIT __18__

PAGE __169__

3/10/2008

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL: (213) 443-3000 FAX: (213) 443-3100

WRITER'S INTERNET ADDRESS
dianehutnyan@quinnemanuel.com

December 25, 2007

**VIA EMAIL**

Daniel Warren, Esq.
Sutherland Asbil & Brennan, LLP
999 Peachtree Street
Suite 2300
Atlanta, GA 30309

Re:    Mattel v. Carter Bryant

Dear Dan:

Pursuant to your request, I am writing to inform you, in greater detail, of the procedure our expert plans to use when extracting samples from entries in Ms. Prince's notary book. As we have discussed, Mattel's expert plans to take small ink samples from entries in Ms. Prince's notary book, including but not limited to parts of the 8/26/99 ink entry on the originals of Bryant 00928 and 00929, so that ink identification testing may conducted.

To obtain the samples, our expert (whose qualifications were carefully reviewed and approved as satisfactory by Judge Infante) would punch small holes, better known as "microplugs," from the text of Ms. Prince's notary book. With the exception of the removal of the microplugs, the notary book will remain intact; also our expert will take care to leave a significant portion of each text entry intact such that future samples may be taken from the same entries. As previously discussed, you or your designated expert are welcome to attend the taking of these samples. Once the microplugs have been taken, we are happy to return the notary book to your custody right away.

quinn emanuel urquhart oliver & hedges, llp

NEW YORK | 51 Madison Avenue, 22nd Floor, New York, New York 10010 | TEL (212) 849-7000 FAX (212) 849-7100
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94111 | TEL (415) 875-6600 FAX (415) 875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL (650) 801-5000 FAX (650) 801-5100

07209/2335468.1

EXHIBIT 18

PAGE 170

Dan Warren, Esq.
December 25, 2007

Please let me know if you have any further questions; or if not, that you will approve the sampling requested.

Thank you for your cooperation in this matter.

Sincerely,


/s/

Diane C. Hutnyan

07209/2335468.1
cc:     Timothy Miller, Esq.
        Michael H. Page, Esq.

07209/2335468.1                              2

EXHIBIT  18
PAGE  171

# EXHIBIT 19

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

# EXHIBIT 20

Priority
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

FILED - EASTERN DIVISION
CLERK, U.S. DISTRICT COURT

AUG 1 0 2006

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

CARTER BRYANT,

               Plaintiff,

v.

MATTEL, INC.,

               Defendant,

and related actions.

CASE NO.  CV 04-9049 SGL (RNBx)

(Consolidated with cases CV-04-9059 and CV-05-2727)

ORDER DENYING MOTION FOR APPOINTMENT OF EXPERT WITNESSES

Presently before the Court is Mattel, Inc.'s ("Mattel") motion for the appointment of expert witnesses pursuant to Federal Rule of Evidence 706, Carter Bryant and MGA Entertainment, Inc.'s ("MGA") opposition and response thereto, and Mattel's reply. For the reasons set forth below, the Court **DENIES** the motion for the appointment of expert witnesses.

    Federal Rule of Evidence 706(a) provides

>     The court may . . . on the motion of any party enter an order to show cause why expert witnesses should not be appointed, and may request the parties to submit nominations. The court may appoint any expert witnesses agreed upon by the parties, and may appoint expert witness of its own selection. An expert witness shall not be appointed by the court unless the witness consents to act

DOCKETED ON CM

AUG 1 1 2006

BY                          044

EXHIBIT ___20___

PAGE ___182___

A witness so appointed shall be informed of the witness' duties by the court in writing, a copy of which shall be filed with the clerk, or at a conference in which the parties shall have opportunity to participate.

The appointment of an expert by a federal court is a rare occurrence. Much of this stems from a concept "[d]eeply ingrained" in the common law "that it is the responsibility of the parties to produce the evidence while the court looks on to assure that the rules are followed." 4 JOSEPH M. MCLAUGHLIN, WEINSTEIN'S FEDERAL EVIDENCE § 706.02[1], at 706-6 (2nd ed. 2006). The reluctance of courts to intrude into the evidence-gathering function normally assigned to counsel is borne out of "the fear of ex parte communications between the court and its expert," as well as the unseemliness of "[c]ollecting a share of the expense [for the work performed by the court appointed expert] from a party who has been damaged by the expert's report." Id. at 706-6, 706-7. As a result of these institutional concerns, "experts are usually appointed only in exceptional cases that present unwieldy, complex, or technical issues" or where "there is a need for an impartial, independent assessment of a disputed issue." Id. § 706.02[3], at 706-8 706-9.

Here, Mattel seeks for the court to appoint experts in the fields of questioned document examination, ink chemistry analysis, and paper chemistry analysis in order to "analyze and date (1) the originals of 'BRATZ' design drawings, (2) the faxed-version of the BRATZ-related contract between . . . Carter Bryant and MGA Entertainment, Inc., (3) MGA's internal documents relating to work performed by Anna Rhee on Bryant-related projects in the year 2000, and (4) a facsimile of BRATZ drawings bearing a fax header date of April 10, 2000," as well as "(5) any other documents that cannot be sampled or tested without destroying the sample tested or analyzed." (Mattel's Mot. Appt. Expert, Preface at 2). The reason proffered for such an appointment is two-fold: First, a generalized concern that, because the documents sought to be examined are "highly relevant" to the litigation, having a neutral expert perform the testing on the same may obviate a battle of the experts that would make

EXHIBIT 20

PAGE 183

1   the jury's function of sorting out the truth much more arduous; and second, concerns,

2   deduced during discovery, about the possible spoliation of key documents in the case

3   by MGA/Bryant and their counsel.

4   A.     <u>AVERTING A BATTLE OF THE EXPERTS</u>

5         Mattel's argument that the Court should appoint an expert because otherwise

6   each side will perform "separate, partisan destructive analyses of separate samples of

7   the documents" with "wide divergence" of opinion "virtually assured" is not well-

8   founded. (Mattel's Mot. Appt. Expert at 18, 20). Explicit in Mattel's argument is that

9   this feared divergence in each side's retained expert's opinions has yet to materialize.

10   This is not surprising as it appears that discovery in this case is in its nascent stage,

11   owed largely to the fact that the Court had earlier stayed the case while Mattel

12   appealed the denial of its motion to remand the case to state court. Mattel's argument

13   instead is that the Court should appoint an expert now to avoid the <u>possibility</u> that

14   there <u>may</u> be such wide divergence in each side's privately retained expert in the

15   <u>future</u>. Needless to say from the jabs each party took at the credibility and even

16   trustworthiness of the other side's retained expert during the oral argument on this

17   motion (one going so far as to label the competing ink chemistry experts as being the

18   modern day equivalent of one's Hatfield to the other's McCoy), such a possibility may

19   be more easier to imagine occurring here than in ordinary cases. Nevertheless, such

20   divergence, even if likely, is still that – a possibility, not an inevitability.

21         In those cases where an expert has been appointed by a court on account of

22   the excessive partisanship in the expert opinions retained by counsel, the rationale for

23   the appointment was based on the fact that the feared wide divergence in opinion had

24   already materialized. <u>See Students of California Sch. for the Blind v. Honig</u>, 736 F.2d

25   538, 548 (9th Cir. 1984)("the judge could not decide the merits of the students' seismic

26   safety claims on the basis of evidence presented at trial, so he reopened the case and

27   appointed a neutral expert to evaluate the adequacy of seismic testing at the Fremont

28   site"), <u>vacated on other grounds</u>, 471 U.S. 148 (1985); <u>Eastern Air Lines, Inc. v.</u>

3

EXHIBIT   <u>20</u>

PAGE   <u>184</u>

1   McDonnell Douglas Corp., 532 F.2d 957 (5th Cir. 1976); 4 WEINSTEIN § 706App.100 at

2   706App.-5 (noting that legal commentators' "imprecations against the parties' 'battle of

3   experts'", not the potential for such a battle, "led to the drafting of the Uniform Expert

4   Testimony Act in 1937," the precursor to Federal Rule of Evidence 706).

5          In no instance uncovered by the Court's research (or by Mattel's citation to

6   authority) has a court appointed an expert because of a fear, even one that is well-

7   founded, that such wide divergence in privately-retained expert testimony may

8   materialize in the future.  Were the Court to adopt Mattel's analysis, appointment of

9   experts by courts would expand exponentially, limited only by a court's assessment of

10  how partisan the experts in a given case may become in the future.  Such a

11  proliferation has not occurred precisely because courts generally require that the

12  divergent "horse" be placed before the expert witness "cart."  See FED. R. EVID. 706

13  advisory committee's note ("actual appointment is a relatively infrequent occurrence").

14  Unless and until this feared divergence in opinion becomes reality, the Court finds that

15  the potential (which itself cannot be quantified at this point) for its occurrence does not

16  warrant the Court's intrusion into the adversarial process through the appointment of

17  an expert at this stage.

18  B.     SPOILATION OF EVIDENCE

19         The question is much closer with respect to Mattel's other reason for the Court

20  to appoint an expert in this case:  Concern that opposing counsel or their clients may

21  have destroyed or altered key documents in the case.  Mattel's basis for such concern

22  is predicated on three facts uncovered during discovery.

23         1.     Evidence of spoilation

24         Before being deposed Bryant was asked to bring all his original BRATZ design

25  drawings.  When he arrived at his deposition, however, Bryant only had in his

26  possession a few of the originals.  (Decl. Michael T. Zeller ¶ 13).  Among these some

27  "contained holes where plugs apparently had already been removed.  Bryant

28  acknowledged . . . that his drawings had no holes in them when he gave them to his

4

EXHIBIT _20_

PAGE _185_

1  lawyers." (Mattel's Mot. Appt. Expert at 2; see also Decl. Michael T. Zeller ¶ 14).

2  Specifically, at Bryant's deposition the following exchange took place between Bryant

3  and counsel for Mattel:

4  Q.   (By Mr. Quinn) I wanted to ask you about one of these original drawings that were produced today.

5       — what we're talking about here. This is — the Post-it

6       says that's Bryant — that's the original of Bryant 192, Bates number 192, which has the heads on it,

7       and this is one of the originals that your counsel was kind enough to have shipped here today for us to

8       look at.

9  A.   Yes

10  Q.  And we were just looking at these this afternoon and we notice[d] that there's a bunch of holes on the

11      page, including in the signature, as if somebody were taking ink samples.

12  A.  Uh-huh.

13  Q.  Do you see that?

14  A.  Yes.

15  Q.  Do you know anything about why those holes were

16      made or how or when?

17  A.  I have no idea what those are.

18  Q.  I mean, when you had — when you had possession

19      of this document did it have those holes in it?

20  A.  Not that I remember.

21  Q.  You certainly never had anything to do with that?

22  A.  No. I don't know anything about those holes.

23  Q.  And, similarly, if you wouldn't mind holding this up to the camera, this is the original of Bryant 210 and it's

24      also — if you take a look at it, I think you'll see it has some of those holes in it, although not as many as

25      the last one we looked at. Again, you don't know anything about how or why those holes got put on

26      there?

27  A.  I don't.

28  (Decl. Michael T. Zeller, Ex. 7 at 161-163).

5

EXHIBIT ___80___

PAGE ___186___

1       Mattel has submitted the declaration of a questioned document analysis expert,

2  Lloyd Cunningham, who has opined that the holes described in the document

3  mentioned above are consistent with those that would be generated by taking

4  microplug samples to perform analysis of the ink found on a document. (Decl. Lloyd

5  Cunningham ¶ 5). Bryant and MGA eventually conceded (although at first refusing to

6  do so under the veil of work-product privilege) that they tested some of the original

7  BRATZ drawings by an expert they retained in the field of forensic chemistry, Erich J.

8  Speckin. (Response to Order to Show Cause ("Response") at 1-2).

9       Mr. Speckin states that in June, 2004, he performed a series of tests "on

10  various 'Bratz' documents" at the request of MGA's counsel.[1] (Decl. Erich J. Speckin

11  ¶ 8). Those tests included examining the documents in question under an infrared

12  light as well as performing sidelight testing, which involves "visually inspecting a

13  document by holding a side light up to the document at an oblique angel . . . to

14  determine preliminarily whether the document contains impressions, or markings

15  impressed upon the document by drawing and writing done on a sheet of paper laid

16  on top of the document being tested." (Decl. Erich J. Speckin ¶¶ 9, 10). Mr. Speckin

17  also performed an electrostatic detection apparatus to see if there was indented

18  impressions on the documents. (Decl. Erich J. Speckin ¶ 11). Finally, Mr. Speckin

19  "performed ink identifications tests" on the documents. (Decl. Erich Speckin ¶¶ 12-

20  13). Such testing involved Mr. Speckin removing "very small microplug samples from

21  the document at issue and testing the microplug." (Decl. Erich Speckin ¶13).

22  Nowhere is it averred by MGA, Bryant, or Mr. Speckin which or how many of the

23  original BRATZ drawings were subjected to this microplug sampling procedure, nor is

24  it averred from what parts of the documents that were tested was the microplug taken.

25  Instead, Mr. Speckin simply notes that in taking the microplugs he "le[ft] more than

26

27    ————————————————

[1] At the time the testing was done by Mr. Speckin, Bryant had already been

28  sued by Mattel for violating the terms of the invention agreement he signed when he

worked for them from 1999 to 2000. (Response at 1).

EXHIBIT 20

PAGE 197

1  sufficient material for another expert to test the exact same documents," but admits

2  that "another expert cannot test the very same microplug that I tested . . . ." (Decl.

3  Erich J. Speckin ¶14).

4        Another episode brought to light during discovery causing Mattel concern

5  relates to MGA's handling of the original Bryant/MGA contract before the inception of

6  the instant litigation.  At the deposition of a former MGA executive, Victoria O'Connor,

7  testimony was elicited that O'Connor, "on explicit instructions of MGA's [CEO] Isaac

8  Lariam, . . . [made] redact[ions from] the fax header . . . on the BRATZ contract

9  between Bryant and MGA for the year 2000 to conceal the fact that Bryant sent the

10  contract from Mattel's Design Center while he was still employed at Mattel." (Mattel's

11  Mot. Appt. Expert at 3).  O'Connor's deposition appears to indicate that such alteration

12  occurred before the present litigation began (indeed, perhaps even before MGA

13  marketed the BRATZ doll).

14        Q.    . . . Was there ever anything that you were asked to
            do that you – made you feel kind of uncomfortable?
15

16        A.    Yes.

                    . . . .

17        Q.    And what was that?

18        A.    When the original contract was executed by Carter
            Bryant, it was sent to me via fax, and on the top of
19          the fax listed the phone number from where it was
            faxed, which said "Barbie Collectibles," and at one
20          point my boss, Isaac Larian, asked me to white that
            out and send it to a lawyer, Patty Glaser.
21

22  (Decl. Michael T. Zeller, Ex. 19 at 306).  Upon further examination, however,

23  O'Connor stated that she did not participate in or have knowledge of any other

24  instances in which any other agreement between Bryant and MGA was directed to be

25  altered:

26        Q.    Were you ever asked to change the date on any
            agreements between Mr. Bryant and MGA?
27

28        A.    No.

7

EXHIBIT 20

PAGE 188

1   Q.   Are you aware of anybody being asked to change
         the date on any of those agreements?
2
3   A.   No.

4   Q.   I mean, do you have any reason to believe that any
         agreement that was entered into between Mr. Bryant
5        and MGA had a date altered or changed?

6   A.   No.

7   Q.   You never heard that from – from any source?

8   A.   No.

9   (Decl. Paula E. Ambrosini, Ex. 3).

10      Finally, Mattel speculates that a drawing of some BRATZ doll accessories

11  faxed on April 10, 2000, had the fax header altered, much in the same manner

12  described in O'Connor's testimony vis-à-vis the MGA/Bryant faxed contract, as the

13  fields on the fax header for the sender's name and the sender's telephone number are

14  missing. (Decl. Michael T. Zeller ¶ 23 & Ex. 24).[2] As explained by Mattel, "Because

15

16      [2] Mattel speculates that the time sheets produced by MGA for one of its

17  employees, Anna Rhee (who did doll face painting work for the BRATZ mock-up), from
    "mid-late 2000" were altered or recently created by MGA to show that Rhee worked
18  on projects called "Angel" or "Prayer Angel," when in fact she was working at the time
    painting faces for BRATZ dolls at the direction of Bryant. (Mattel's Mot. Appt. Expert at
19  3). The basis for this speculation is based on the fact that the initial disclosure by MGA
    of Rhee's time sheets comprised only 8 pages. (Decl. Michael T. Zeller ¶ 20). Then,
20  on January 7, 2005, Rhee produced 20 separate invoices of her work at MGA during
    mid-late 2000, indicating that Rhee performed work for MGA prior to Bryant's
21  departure from Mattel, most notably on June 12, 2000. (Decl. Michael T. Zeller ¶ 21).
    Within a couple of weeks after Rhee's production of invoices to Mattel, MGA
22  supplemented its earlier production of Rhee's time sheets showing that during the mid-
    to-late 2000 period Rhee was working on a MGA project known as "Angel" or "Prayer
23  Angels" and was not involved in any BRATZ-related work until after Bryant's departure
24  from Mattel. (Decl. Michael T. Zeller ¶ 22). Mattel's surmise that the supplemental time
    sheets were altered is allegedly bolstered by the fact that Rhee testified during her
25  deposition that the only work she performed in mid-late 2000 was on BRATZ and
    that the supplemental time sheets reference to the "Angel" and "Prayer Angel" was
26  nothing but a cover or code word for BRATZ-related work. This argument is hard to
27  accept. First, even the invoices Rhee turned over to Mattel contain the phrase "Angel"
    for the mid-2000 project she worked on. (Decl. Michael T. Zeller, Ex. 22 at 356-60,
28  362). It is not until December, 2000, that any of the invoices submitted by Rhee show

8

EXHIBIT _∞_

PAGE _189_

1   facsimile machines normally insert senders' names and numbers as a matter of

2   course, and indeed is required by law [to do so], it appears likely that the document

3   was altered to conceal the sender's information.  See 47 U.S.C. § 227(d)(1)(B)."

4   (Mattel's Mot. Appt. Expert at 10).  The premise underlying Mattel's concern on this

5   topic is not unreasonable.  The law requires such information to be found on any

6   document, like the one in question, that has been faxed.  Additionally, the testimony

7   elicited from Ms. O'Connor that MGA altered the fax header for other documents

8   related to BRATZ from the same time period leads to an obvious inference that other

9   documents where spaces on other fax headers are absent suffered a similar fate.

10      2.    Analysis

11          a.    Microplug Ink Testing

12      Bryant and MGA begin by downplaying the significance of the spoliation issue

13   in this case.  With respect to the holes on some of the original BRATZ design

14   drawings produced at Bryant's deposition, they note that, even with these holes,

15   nothing prevents Mattel from performing its own testing on the remaining portions of

16   the drawings on the document.  "Indeed, the very fact that Mattel is asking for court-

17   appointed experts to perform ink and paper testing only underscores the fact that

18   nothing has been 'destroyed.'" (Joint Opp. at 2).  Mr. Speckin makes similar assertions

19   in his declaration, stating that the fact that the same microplug cannot be tested "is

20   entirely irrelevant because there is more than enough ink on each of the documents I

21   tested to allow numerous microplug samples to be extracted and tested by different

22   experts."  (Decl. Erich J. Speckin ¶ 14 (emphasis added); see also Response at 5-6

23   ("While another expert cannot test the very same microplug that Mr. Speckin tested,

24

25   _____

26   her doing work on the BRATZ doll, well after Bryant had left Mattel.  (Decl. Michael T. Zeller, Ex. 21 at 367, 370, 373).  To accept Mattel's argument, not only would MGA

27   have had to alter the invoices it produced in the supplemental production, but the documents produced by Rhee would also have to be similarly altered.  An alternative

28   and just as plausible explanation is that Rhee is simply mistaken as to when she began performing work on the BRATZ project.

EXHIBIT  20

PAGE  190

1   that fact is entirely irrelevant because, unlike in a situation where the entire object is

2   destroyed during the testing, there is more than enough ink on each of the <u>documents</u>

3   Mr. Speckin tested to allow numerous microplug samples to be extracted and tested"

4   (emphasis added))). This argument is not persuasive. This is not a case where

5   everyone concedes that the documents in question were created at one point in time,

6   but dispute what that date may have been. In such a circumstance all the ink

7   markings on the documents are comparable to one another as it is conceded that all

8   the marks came from one point in time.

9        Here, however, it is Mattel's theory that Bryant made drawings in 1998 and then

10  periodically touched up or made refinements/additions to those drawings, adding more

11  marks in 1999 and 2000 during the time he was employed by Mattel.   An ink mark

12  from one part of the document is not necessarily comparable to another set of ink

13  markings found elsewhere on the document.  One ink mark on a drawing could have

14  been made in 1998, for example, while another ink mark found on the same drawing

15  could have been put there sometime later.  In taking microplug samples from one of

16  these ink markings without the ability of the other side to test <u>the same mark</u> would

17  forever foreclose a potential avenue of crucial evidence in this case.  It is on that point

18  that taking microplug samples of the marks on these drawings is akin to the spoilation.

19  Therefore the fact that another expert could test other parts of the document does not

20  mean that key relevant evidence found on that document has not been destroyed.  As

21  MGA and Bryant make clear spoilation of evidence occurs through the "destruction or

22  significant alteration of evidence, or the failure to preserve property for another's use

23  as evidence in pending or reasonably foreseeable litigation." <u>West v. Goodyear Tire &</u>

24  <u>Rubber Co.</u>, 167 F.3d 776, 779 (2nd Cir. 1999).[3]

25        At this point, it should not be lost that the documents in question are not

26  _____

27        [3] The Court does not mean to suggest that Mattel's theory is correct.  Instead,
    the Court simply notes this theory as refuting MGA and Bryant's argument that only the

28  <u>complete</u> destruction of a document would amount to spoilation under the particular
    circumstances in this case.

EXHIBIT __80__

PAGE __191__

1   peripheral to the case.  At its heart, this case asks the question:  Who owns the rights

2   to the Bratz dolls?  Bryant asserts that he came up with the idea for the Bratz dolls

3   while on a break from his employment at Mattel in 1998, and that he sold his idea to

4   MGA when he went to work for them in October, 2000.  Mattel claims, among other

5   things, that Bryant "developed" or "continued to develop" his idea for Bratz dolls while

6   he was working for them from January, 1999, to October, 2000, and that pursuant to

7   an inventions agreement he signed with the Mattel when he went to work for them,

8   that idea now belongs to Mattel.  As this clash of factual contentions makes clear, the

9   dating of the original BRATZ drawings and the markings contained thereon is a

10  fundamental, perhaps despositive, issue to this case.  That there are serious

11  questions concerning the handling of these critical documents certainly causes the

12  Court much concern about whether the truth seeking functions of the adversarial

13  system have been fundamentally compromised in this case.  As Mattel rightly notes,

14  "The adversarial process is not an end in itself; its value is in its ability to promote a

15  search for truth."  (Mattel's Reply at 9).

16         Bryant and MGA concede that the sections that were holed out contained

17  markings, be they handwritten dates or other words or letters, that may be crucial to

18  the case.  Indeed, one of the drawings – Bryant 192 – had a portion of the signature

19  line sampled.  What is left unclear is whether, for those portions of the document

20  where ink or signatures were sampled, enough of the same part of the document in

21  question (meaning the same mark) remains to be sampled by Mattel.  For instance, is

22  there enough of the signature line from Bryant 192 left to sample, or has too much of it

23  already been sampled?  In that sense, MGA's and Bryant's argument that nothing has

24  been destroyed by the microplug testing procedure because other parts of the

25  document still exist is misplaced.  Indeed, MGA and Bryant later admit that the

26  circumstances allowing for "multiple experts [to] remove multiple microplugs and test

27  the exact same paper and ink" is dependent upon there being the same exact paper

28  and ink there to test.  (Joint Opp. at 15 ("[a]s long as there is paper and ink to test")).

11

EXHIBIT _20_

PAGE _192_

1  The continued existence of the "exact same pen stroke" is the very issue that is now

2  left open because of the holes in some of Bryant's original BRATZ design drawings.

3  Is there anything left of that exact same pen stroke that was sampled by Mr. Speckin

4  remaining on the original drawing for Mattel to test?  None of these questions have

5  been addressed by MGA, Bryant, or Mr. Speckin in their papers.  Instead, they simply

6  make the observation that there remain other ink markings on the same drawings for

7  Mattel to test, a reason which, as explained above, is wholly insufficient to assure the

8  Court that Mattel has not been prejudiced by MGA's actions.

9       Given the absence of any representation by them on this point, the Court

10  pressed MGA's counsel about the same at oral argument:

11       THE COURT:  And part of your argument is that
      while a small portion of the small portion of the page may
12      be gone, as you in your most recent papers concede is
      gone, there are other portions of the page that can be
13      tested.  The concern I have, I guess -- and maybe you can
      clear this up for me -- I've seen some of the drawings and I
14      have a pretty good mental image of what the drawings look
      like.  But there is also writing on these drawings,
15      signatures, copyright registration indications; some are
      large, some are small.  As I gather from the plaintiff, from
16      Mattel, the concern is that these different drawings or
      writings were done at different times.  And I guess I can
17      understand why when those drawings or writings were
      done could be significant from an evidentiary standpoint.
18      So the concern is not so much there's another part of the
      paper that can be tested; it's whether or not the particular
19      marking in question has been so damaged as to not permit
      a full further testing on that particular marking.  Does my
20      question make sense?

21       MS. CENDALI: Yes, it does, your Honor.  And I
      anticipated that.  Significant, we thought, in their papers
22      was that . . . they cited to the fact that Mr. Bryant admitted
      in his deposition that there were holes in some of the
23      documents that he didn't know how they got there
      originally.  As an example, if you look at part of Zeller,
24      Exhibit 17, Bates number Bryant 201, that's an example of
      one of the documents that's been tested.
25
      THE COURT: One second so I have that in front of
26  me.  Okay.

27       MS. CENDALI: There are many many others that were
      submitted that were also submitted to this type of ink
28      testing, but this is just an example of one of them.  And if

12

EXHIBIT ___70___

PAGE ___193___

1   you look at the document, you would never know --
2   granted, this is smaller, so the actual drawing is even larger
    than this, so there's even more ink on the larger drawing
3   than there would be available on this reproduction size.

4        But if you look at it -- and I'll represent to you that we
    didn't test the face; the face is absent before and after the
5   testing -- but if you look at it, you couldn't even see that
    there were any pin pricks to it. If you look very, very
6   carefully at the signature at the bottom, you can maybe see
    where it says "Ramona Prints, 8-26-99": that maybe there
7   was like a little tiny hole in one of the little slash marks; that
    was a teeny little pin prick hole that showed the testing .
8   There's ample amount of ink to do the testing on all of
    these documents. This is the normal course of procedure
9   that was done.

10      When asked by the Court whether it accepted MGA's representation that there

11  was "ample amount of ink" left on the same marks that the microplugs were taken

12  from for further microplug testing, Mattel, in seeming contradiction to its position in its

13  papers, said it did: "I agree with Ms. Cendali. <u>We do not maintain any portion of the</u>

14  <u>ink on a signature or an image has been so obliterated that you couldn't take a plug</u>

15  <u>now on any of it; that's not our point</u>." (Emphasis added).

16      In light of this concession by Mattel, the Court finds that no colorable claim of

17  spoliation has been established at this time <u>vis-à-vis</u> Mr. Speckin's testing of the

18  documents to warrant the appointment of an expert by the Court to investigate the

19  same. <u>See Sedrati v. Allstate Life Ins. Co.</u>, 185 F.R.D. 388, 393 (M.D. Ga.

20  1998)(sanction warranted where because "defendant's expert has conducted

21  destructive tests on the original documents," plaintiff's expert "cannot duplicate the

22  conditions of the original documents"). If there was any evidence indicating that MGA,

23  Bryant, or their counsel had engaged in acts that could compromise Mattel's ability to

24  discover crucial information in this case, the Court would be sympathetic to the

25  appointment of an expert to investigate the same. Here, no such evidence exists.

26  The tests done by Mr. Speckin have not left the marks that were micro-sampled or the

27  documents that were handled so compromised that Mattel cannot perform the exact

28  same tests on those exact same marks as performed by Mr. Speckin.

13

EXHIBIT __20__

PAGE __194__

1    Indeed, the only basis for spoliation that Mattel has left to argue – that the

2    passage of time has left the ability to perform any meaningful ink testing at this time

3    problematic – is an argument that has nothing to do with MGA's conduct, but much

4    more with Mattel's own dereliction.  As the Court understands it, the process of dating

5    when ink was placed on a document has only a limited window of time in which it can

6    be accomplished because, eventually, the ink dries (be it in 2 years or 3 to 4 years),

7    leaving nothing capable of being sampled after that point to test (save to acknowledge

8    that the ink in question was put on the paper some time more than 3 to 4 years ago).

9    Mattel essentially argues that the impossibility of testing ink after a certain period

10   mandates that, if the other side is going to test ink while "fresh" ink remains on the

11   document, that party has an obligation to inform the other side so that they can do the

12   same before the ink "dries out"; failure to do so renders the test performed something

13   that cannot be replicated.[4]  By Mattel's own admission, they knew there had been

14   testing done on the BRATZ original drawings as far back as November, 2004, during

15   Bryant's deposition testimony when they saw some of the original BRATZ drawings

16   (drawings that had been tested by Mr. Speckin five months earlier).  Rather than

17   immediately seeking the production of those documents and having its own expert

18   perform similar tests on them, Mattel sat idly by, waiting until June of this year to do

19   anything, either by way of court-pleadings or formal requests made to MGA and

20   Braynt, related to having ink tests performed on the documents.  Nowhere has Mattel

21   _____

22        [4] The basic factual assumption in Mattel's argument may indeed be faulty – that
     when MGA tested the ink there was enough "fresh" ink to test.  Mr. Speckin states that
23   "[i]nk takes approximately 3 to 4 years to dry on paper.  Thus, by testing the ink to
     determine if it is dry, it can be determined whether the document was created within the
24   last [3 to] 4 years, or whether the ink, and thus the drawing, is more than [3 to] 4 years
     old." (Decl. Erich J. Speckin ¶ 13).  Given that Mr. Speckin performed his ink dating
25   test in June, 2004, at best he could determine whether the ink had been put on the
     paper on or after June, 2000.  Beyond that time frame his test could not tell when the
26   now-dried ink was marked on the document.  Given that the relevant period in question
     in this case is from August, 1998, to October, 2000, Mr. Speckin's test results would
27   appear to be only marginally relevant in adducing proof as to when the BRATZ
28   drawings were made.

                                          14

EXHIBIT _____ 20

PAGE _____ 195

1   explained how MGA or Bryant had anything to do with it not having the ability to

2   perform such testing until now.  Mattel's allusion to the fact that a stay on discovery

3   was put in place by this Court in 2005 is misguided.  If Mattel thought that it was losing

4   valuable time on account of the stay, it could have at any time filed with this Court an

5   emergency request for relief from the stay to have such tests performed.  All it needed

6   to do was inform the Court that it had only a short period of time to perform the test on

7   account of the fact that ink dries; something which it never did in this case.

8        Mattel's citation to the case Edwardes v. Southampton Hospital Associates,

9   278 N.Y.S.2d 283 (1967) is equally unhelpful to their argument.  In that case, the court

10  was presented with an application to prevent the testing of a intramedullary pin for

11  discovery and testing.  Id. at 284.  The court held that, "[s]ince the pin is crucial to the

12  action it is not too difficult to appreciate that any change, however slight, assumes an

13  importance magnified proportionately. And undoubtedly tests which would destroy or

14  alter most or all of a particular article ought not be permitted in the first instance

15  without providing adequate safeguards to protect all concerned." Id. at 286.  Here,

16  such an argument cannot be made because, for the reasons cited above, Mattel has

17  conceded that even in performing the tests of the original BRATZ drawings Mr.

18  Speckin left enough ink of the same pen stroke for its own experts to test.  In short,

19  there has been no alteration, however slight, made to the documents insofar as

20  Mattel's ability to replicate the exact same test is concerned.  The only change that

21  has occurred is in Mattel's ability to retrieve any relevant information from such a test

22  on account of the passage of time that has elapsed.  The test Mr. Speckin performed

23  is not responsible for this negative occurrence.  MGA is similarly not responsible for

24  the passage of time or Mattel's inability to retrieve useful information from the testing

25  process.  On that point, Mattel should look itself in the mirror for any finding of fault or

26  blame.

27       Moreover, aside from the potential for "destroying" key portions of the original

28  documents, it is alleged that MGA and Bryant's actions carry other means of

15

EXHIBIT __20__

PAGE __196__

1  prejudicing Mattel's ability to pursue lines of potential evidence in this case.  The

2  expert declaration submitted by Mattel notes another possible spoliation of the original

3  drawings even if there remained enough of the pertinent portion of the document in

4  question to sample: The sampling process itself may have contaminated the

5  document in question by obliterating potential crucial clues that were on the document

6  or otherwise the sampling process led to the introduction of foreign materials onto the

7  documents themselves which may complicate any future analysis.  As explained by

8  Mattel's expert:

9           [P]erforming many such types of testing, even if described
          as "non-destructive," on a particular original document
10         carries the risk that potential evidence on it, including
          indentations in the paper fiber, might be contaminated or
11         destroyed in the process.  Furthermore, the order of the
          types of testing to be performed on a given document
12         might have an impact on developing potential evidence
          during subsequent examinations. . . .
13
              . . . . [With respect to the original BRATZ drawings
14         containing holes in them,] it is possible that the destructive
          testing performed on the document may have caused
15         some form of contamination and/or alteration, which carries
          the further prospect that subsequent examinations by
16         experts may not enable them to develop potential evidence
          or the same evidence that the other [earlier] expert
17         developed.

18  (Decl. Lloyd Cunningham ¶¶ 4-5).

19         MGA has rebutted this risk of contamination argument by proffering Mr.

20  Speckin's declaration, the expert who actually performed the tests in question.  Mr.

21  Speckin states that he "exercised the utmost care in handling the documents [he]

22  tested," that a number of the tests he performed on the documents "has absolutely no

23  effect on the tested document whatsoever," and that with respect to those tests that

24  could effect the document he followed established procedures in carrying out the test

25  in question.  (Decl. Erich J. Speckin ¶¶ 8, 9, 10, 11, 12, 13).  Nowhere has Mattel

26  proffered any evidence rebutting or calling into question Mr. Speckin's

27  representations.  The Court therefore finds that, based on the evidence that is

28  currently before it, Mattel has not established a colorable claim of spoliation by way of

EXHIBIT 20

PAGE 197

1   contamination in the tests MGA performed on the documents in question.

2           b.   <u>Alteration of Fax Headers</u>

3        Insofar as O'Connor's deposition testimony relating to the white out of the fax

4   header on the October, 2000, contract between Bryant and MGA, this too is

5   downplayed by MGA and Bryant as being irrelevant because "there is no dispute that

6   Mr. Bryant faxed his signed contract from a fax machine at Mattel and, indeed, Mr.

7   Bryant readily admitted that fact at his deposition, which took place <u>before</u> Ms.

8   O'Connor's deposition." (Joint Opp. at 8 (emphasis in original)).  This argument seeks

9   to compare apples to oranges.  While it may be true that <u>now</u> there is no dispute by

10  MGA and Bryant that he faxed his portion of the contract to MGA from his office at

11  Mattel, at the time O'Connor did the white out of the fax header such a lack of dispute

12  was not apparent.  It is from that perspective in time – the prologue to the litigation —

13  that O'Connor's deposition testimony is to be judged.  And from that perspective her

14  testimony calls into question MGA's handling of relevant documents in its possession.

15       When the contract was first executed there is no indication that MGA and/or

16  Bryant would admit to the fact that Bryant negotiated his contract with MGA while he

17  was still working at Mattel; rather, at that point, that issue appeared to be an open one.

18  Indeed, the fact that MGA's CEO would direct O'Connor to tamper with the contract's

19  fax header clearly indicates that they would not admit to the fact.  If MGA mistreated

20  this document where an open issue existed, it is not unreasonable to infer that it may

21  have been just as cavalier with its obligations to maintain the other documents in their

22  possession – say, for instance, the original BRATZ drawings – where similar open

23  issues remained.  This concern with MGA's handling of documents in its possession at

24  the prologue to this litigation is reinforced by MGA and Bryant's blasé mention in a

25  footnote to their opposition that the original to this contract, the one which they

26  describe as being irrelevant, "has not been found." (Joint Opp. at 15 n.6).  Indeed, it

27  has been suggested that MGA and Bryant or their counsel have made representations

28  that they are not sure of the exact whereabouts of a number of the original BRATZ

EXHIBIT _20_

PAGE _198_

1   drawings.  (Decl. Shane McKenzie ¶ 3 ("Mr. Bryant's counsel[, at the December 22 to

2   23, 2004, inspection of the originals by counsel for Mattel,] claimed not to have the

3   majority of the originals of BRATZ drawings and sketches, and further claimed not to

4   know where those originals were located")).

5          All that being said, the Court does not find that the alteration of the fax header

6   on the original Bryant/MGA contract warrants the appointment of an expert at this

7   time.  Ms. O'Connor testified that, other than this one instance, she is aware of no

8   other documents that were purposefully altered by MGA.  While the evidence related

9   to the missing fax header on the April, 2000, BRATZ accessories fax may indicate that

10  more than one document had been tampered with by MGA personnel, the Court has

11  nothing at this time to basis that conclusion on other than speculation and conjecture.

12  Without any tangible, concrete proof that MGA's mishandling of documents was more

13  widespread, the Court is left with what appears simply as an isolated instance of

14  tampering.

15         Accordingly, the motion for appointment of expert witnesses is **DENIED**.

16         IT IS SO ORDERED.

17

18  DATE: _8-9-06_ .

19

20                          _S G Larson_

21                          STEPHEN G. LARSON
                            UNITED STATES DISTRICT JUDGE

22

23

24

25

26

27

28

                                18

EXHIBIT __20__

PAGE __199__