1   QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
2   JOHN B. QUINN (State Bar No. 090378)
    MICHAEL T. ZELLER (State Bar No. 196417)
3   JON D. COREY (State Bar No. 185066)
4   865 South Figueroa Street, 10th Floor
    Los Angeles, California  90017-2543
5   Telephone: (213) 443-3000; Facsimile: (213) 443-3100

6
    STROOCK & STROOCK & LAVAN LLP
7   BARRY B. LANGBERG (State Bar No. 048158)
8   MICHAEL J. NIBORSKI (State Bar No. 192111)
    2029 Century Park East, Suite 1600
9   Los Angeles, California  90067-3086
10  (lacalendar@stroock.com)
    Telephone: (310) 556-5800; Facsimile: (310) 556-5959
11
12  Attorneys for MATTEL, INC.

13              UNITED STATES DISTRICT COURT
14            CENTRAL DISTRICT OF CALIFORNIA
15                   EASTERN DIVISION

16  CARTER BRYANT, an individual,      )  Case No. CV 04-9049 SGL (RNBx)
                                        )  Consolidated with
17              Plaintiff,              )  Case No. CV 04-09059
                                        )  Case No. CV 05-02727
18      vs.                             )
                                        )  [PUBLIC REDACTED]
19  MATTEL, INC., a Delaware            )  SUPPLEMENTAL DECLARATION
    corporation,                        )  OF MICHAEL J. NIBORSKI IN
20                                      )  SUPPORT OF MATTEL, INC.'S
                                        )  NOTICE OF MOTION AND MOTION
21              Defendant.              )  OBJECTING TO DISCOVERY
                                        )  MASTER'S FEBRUARY 26, 2008
22                                      )  ORDER DENYING MATTEL'S
                                        )  MOTION TO COMPEL DEPOSITION
23                                      )  OF CHRISTOPHER PALMERI
                                        )
24                                      )
                                        )
25  AND CONSOLIDATED ACTIONS           )  Date:    April 7, 2008
                                        )  Time:    10:00 a.m.
26                                      )  Place:   Courtroom 1
                                        )
27                                      )
                                        )
28

# DECLARATION OF MICHAEL J. NIBORSKI

I, Michael J. Niborski, declare as follows:

1. I am an attorney licensed to practice before all courts of the State of California and am an attorney with the law firm of Stroock & Stroock & Lavan LLP, co-counsel for Mattel, Inc. ("Mattel") in the above-captioned action. I submit this supplemental declaration in support of Mattel, Inc.'s Notice of Motion and Motion Objecting to Discovery Master's February 26, 2008 Order Denying Mattel's Motion to Compel the Deposition of Christopher Palmeri. The facts set forth in this declaration are true of my own personal knowledge, except where based on a review of the pleadings and records in this action and, if called as a witness, I could and would competently testify to such facts.

2. Attached hereto as Exhibit 1 is a true and correct copy of the Order Denying Mattel's Motion to Compel Deposition of Christopher Palmeri, dated February 26, 2008.

3. Attached hereto as Exhibit 2 is a true and correct copy of a letter from Paula Ambrosini, counsel for MGA, to Michael T. Zeller, counsel for Mattel, dated May 17, 2006.

4. Attached hereto as Exhibit 3 is a true and correct copy of Defendant Carter Bryant's Opposition to Plaintiff Mattel, Inc.'s Motion to Remand, dated December 22, 2004. Attached hereto as Exhibit 4 is a true and correct copy of MGA's joinder in that motion.

5. Attached hereto as Exhibit 5 is a true and correct copy of MGA Entertainment, Inc.'s and Carter Bryant's Joint Motion to Compel Re: Mattel's Bandying of 30(b)(6) Witnesses, dated September 6, 2007. Attached as Exhibit 6 is a true and correct copy of an article published in The Wall Street Journal, dated July 18, 2003 entitled "Dolled Up: To Lure Older Girls, Mattel Brings in Hip-Hop Crowd." The by-line of the article identifies Maureen Tkacik as the author.

1

SUPPLEMENTAL DECLARATION OF MICHAEL J. NIBORSKI IN SUPPORT OF MOTION OBJECTING TO DISCOVERY MASTER'S FEBRUARY 26, 2008 ORDER

1        6.     On March 10, 2008, I conducted a telephonic meet and confer

2  session with counsel for Mr. Palmeri and BusinessWeek Magazine, Alonzo Wickers

3  of the law firm Davis Wright Tremaine LLP.  We were unable to informally resolve

4  this matter.

5        I declare under penalty of perjury under the laws of the State of

6  California that the foregoing is true and correct.  Executed this 10th day of March

7  2008, at Los Angeles, California.

Michael J. Niborski

SUPPLEMENTAL DECLARATION OF MICHAEL J. NIBORSKI IN SUPPORT OF
MOTION OBJECTING TO DISCOVERY MASTER'S FEBRUARY 26, 2008 ORDER

**EXHIBIT 1**

1   Hon. Edward A. Infante (Ret.)
    JAMS
2   Two Embarcadero Center
    Suite 1500
3   San Francisco, California 94111
    Telephone:    (415) 774-2611
4   Facsimile:    (415) 982-5287

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10                         EASTERN DIVISION

11

12  | CARTER BRYANT, an individual, | CASE NO. CV 04-09049 SGL (RNBx) |
    |                               | JAMS Reference No. 1100049530   |
13  |        Plaintiff,             |                                 |
14  |                               |                                 |
    |        v.                     | Consolidated with               |
    |                               | Case No. CV 04-09059            |
15  | MATTEL, INC., a Delaware corporation, | Case No. CV 05-2727     |
16  |                               | **ORDER DENYING MATTEL'S**      |
    |        Defendant.             | **MOTION TO COMPEL DEPOSITION** |
17  |                               | **OF CHRISTOPHER PALMERI**      |

18  CONSOLIDATED WITH
    MATTEL, INC. v. BRYANT and
19  MGA ENTERTAINMENT, INC. v. MATTEL,
    INC.
20

21

22                        I. INTRODUCTION

23       On January 22, 2008, Mattel, Inc. ("Mattel") submitted a motion to compel the deposition

24  of Christopher Palmeri ("Palmeri"), a non-party reporter who authored an article for Business

25  Week that refers to Isaac Larian ("Larian"), MGA and Bratz.  On January 29, 2008, Palmeri

26  submitted an opposition and on February 15, 2008, Mattel submitted a reply.  At issue is whether

27  the testimony Mattel seeks from Palmeri is protected by the federal journalist's privilege.

28

Bryant v. Mattel, Inc.,                                              1
CV-04-09049 SGL (RNBx)

EXHIBIT __1__

PAGE __3__

## II. BACKGROUND

In July 2003, Business Week published an article authored by Palmeri entitled "To Really Be A Player, Mattel Needs Hotter Toys." Of particular interest to Mattel is the portion of the article referring to MGA, Larian and Bratz as follows:

> Mattel won't live or die on every new toy it develops. But it can't just rely on
> Barbies, either. "Like they say in business school – no risk, no reward," says
> Isaac Larian, CEO of privately held MGA. He should know: He got the idea for
> Bratz after seeing his own kids run around in navel-baring tops and hip-huggers.

Niborski Decl., Ex. 1 (Article). In Mattel's view, the Article conveys that Larian told Palmeri that the Bratz dolls were Larian's idea and that the source of that idea was Larian's observation of "his own kids run[ning] around in navel-baring tops and hip huggers." Mattel seeks testimony from Palmeri to confirm what Mattel characterizes as Larian's "published" statements about the origins of Bratz.[1]

Mattel contends that the federal journalist's privilege does not apply because Mattel is seeking only "published" information, not "unpublished" information. Moreover, Mattel contends that even if the privilege applies, the privilege is qualified and yields when the litigant's need for the information sought outweighs any public interest in non-disclosure. Mattel contends that there is no public policy rationale for Palmeri's refusal to confirm under oath that Larian made the statements about the origins in Bratz that appear in the Article. In contrast, Mattel contends that it needs Palmeri's testimony to develop what it considers crucial evidence to establish that Carter Bryant ("Bryant") and Larian, among others at MGA, made inconsistent statements concerning the origins of Bratz and engaged in a scheme to conceal the product's true origins. More specifically, Mattel contends that Palmeri's anticipated testimony will provide direct proof that Larian –who has since acknowledged under oath that Bryant brought him the Bratz idea – falsely

---

[1] During the meet and confer process, Mattel offered to limit the time of questioning and to conduct the deposition at a time and place of Palmeri's choosing. Mattel also offered to discuss the prospective line of questioning in advance of the deposition with Palmeri's counsel.

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

EXHIBIT ___1___

PAGE ___4___

2

1  claimed that he was the creator of Bratz. Mattel contends that Larian's false claim was part of a

2  scheme to conceal the truth about the origins of Bratz from the public and Mattel.

3       Mattel further contends that the evidence of concealment it seeks will show "guilty

4  knowledge by Larian and MGA that Bryant developed Bratz while an employee of Mattel, in

5  violation of his employment agreement with Mattel, and an awareness by Larian and MGA that

6  Bryant's inventions during his employment at Mattel belong to Mattel." Mattel's Motion at p.3.

7  Mattel contends that the evidence it seeks is also relevant to rebut MGA's statute of limitations

8  defense.

9       Palmeri raises four main arguments in opposition to Mattel's motion. First, Palmeri

10  contends that Mattel relies on decisions from circuits that are inconsistent with the journalist's

11  privilege recognized by the Ninth Circuit in Shoen v. Shoen, 5 F.3d 1289 (9th Cir. 1993), and

12  Shoen v. Shoen, 48 F.3d 412 (9th Cir. 1995) . Second, Palmeri contends that the information

13  Mattel seeks is "unpublished," and therefore the journalist's privilege applies. Palmeri reasons

14  that nothing within the four corners of the Article reveals the source of the information about the

15  origins of Bratz dolls. Even assuming for the sake of argument that the information Mattel seeks

16  is "published," Palmeri contends that the journalist's privilege applies to preclude compelled

17  disclosure of a journalist's professional news gathering efforts and results, whether published or

18  not. Third, Palmeri contends that Mattel has failed to make the requisite showing to overcome the

19  privilege, namely that the information Mattel seeks is "clearly relevant to an important issue in the

20  case," that it is "non-cumulative," and that it is "unavailable despite exhaustion of all reasonable

21  alternative sources." Shoen, 48 F.3d at 416. Fourth, Palmeri contends that Mattel ignores his

22  rights under California's state constitutional shield law.

23                      III. DISCUSSION

24       Rooted in the First Amendment, the journalist's privilege protects non-party reporters

25  against being compelled to disclose information that they acquire in the course of their

26  newsgathering. Shoen v. Shoen, 48 F.3d 412 (9th Cir. 1995) ("Shoen II"); Shoen v. Shoen, 5 F.3d

27  1289, 1293 (9th Cir. 1993) ("Shoen I"). "[T]he journalist's privilege applies to a journalist's

28

1   resource materials even in the absence of the element of confidentiality." Shoen I, 5 F.3d at 1295-

2   196.

3          The journalist's privilege is a qualified one.  "[T]he process of deciding whether the

4   privilege is overcome requires that 'the claimed First Amendment privilege and the opposing need

5   for disclosure be judicially weighed in light of the surrounding facts, and a balance struck to

6   determine where lies the paramount interest.'" Shoen I, 5 F.3d at 1292-1293 (quoting Farr v.

7   Pitchess, 522 F.2d 464, 468 (9th Cir. 1975).  To overcome the privilege when the information

8   sought is not confidential, a litigant must demonstrate that the requested evidence is:  "(1)

9   unavailable despite the exhaustion of all reasonable alternative sources; (2) non-cumulative; and

10  (3) clearly relevant to an important issue in the case." Shoen II, 48 F.3d at 416.  This test is

11  intended to "ensure that compelled disclosure is the exception, not the rule." Id.

12         Because Mattel cannot satisfy any, let alone all, of these three factors, Mattel is not

13  entitled to depose Palmeri.

14                 1. The Information Sought is Not Clearly Relevant to an Important Issue

15         The information sought by Mattel is not clearly relevant to an important issue in the case.

16  Mattel's claims are predicated upon an allegation that Carter Bryant created Bratz while still

17  employed by Mattel.  Whether or not Larian made any statements to Palmeri about Larian's

18  children "run[ning] around in navel-baring tops and hip huggers" is not relevant to that central

19  issue.

20         Nor is the requested information "clearly relevant" to determine when Mattel was put on

21  notice of its claims for purposes of the statute of limitations.  As to this issue, the requested

22  information would be superfluous.  What is relevant is that the Article was published and that as

23  of the date of its publication, this public account of the dolls' origin did not mention, much less

24  credit Carter Bryant as the creator of the dolls.  For purposes of the statute of limitations, the

25  information published within the four corners of the Article is relevant, regardless of who was the

26  source of the information.

27         Nor can Mattel satisfy the "clearly relevant" standard by claiming that the information it

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)                                                                          4

EXHIBIT __1__

PAGE __6__

1    seeks will demonstrate that Larian "made inconsistent statements concerning the origins of

2    Bratz." The Ninth Circuit's <u>Shoen II</u> decision is on point. There, the plaintiffs argued that the

3    journalist's tapes and notes of an interview with the defendant might provide valuable

4    impeachment material. <u>Shoen</u>, 48 F.3d at 418. The Ninth Circuit concluded that "to the extent

5    the requested materials would demonstrate that [defendant] was less than candid during his

6    deposition, they do not relate to an important issue in the case." <u>Id</u>. Although the requested

7    information is relevant to Larian's credibility, a greater showing is required under <u>Shoen I</u>, <u>supra</u>,

8    to tip the balance of competing interests in favor of compelling disclosure of information

9    protected by the journalist's privilege.

10                    <u>2. The Information Mattel Seeks is Cumulative</u>

11        Mattel contends that the information it seeks from Palmeri is not cumulative because no

12   one else has testified about any communications between Palmeri and Larian. Mattel's focus,

13   however, is unreasonably narrow. The issue is not whether other witnesses have testified

14   specifically about the substance of the communications between Palmeri and Larian, but whether

15   the information Mattel seeks is cumulative.

16        As discussed previously, Mattel is essentially seeking evidence of Larian's allegedly

17   inconsistent statements regarding the origins of Bratz. In its motion papers, Mattel acknowledges

18   that it obtained testimony from two other reporters (Ms.Tkacik and Ms. O'Neal) who "wrote

19   articles for their respective publications that contain statements attributed to Larian regarding the

20   origins of Bratz which were inconsistent with Larian's, MGA's and Bryant's subsequent claims in

21   this case." Mattel's Motion at p.4. Any testimony that Palmeri might provide on the same subject

22   would be cumulative impeachment evidence.

23                    <u>3. Information Sought is Available From Another Source</u>

24        Finally, the information Mattel seeks from Palmeri is clearly available from another

25   source. In <u>Shoen I</u>, <u>supra</u>, the Ninth Circuit refused to compel disclosure of a non-party reporter's

26   tapes and notes of his communications with the defendant unless and until plaintiffs deposed

27   defendant and specifically questioned him about those communications. The Ninth Circuit

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

**EXHIBIT** <u>1</u>

**PAGE** <u>7</u>

1    described the defendant as "an obvious alternative source for discovering what he said to [the

2    reporter] in their communications." <u>Shoen I</u>, 5 F.3d at 1296.  Even though the plaintiffs served

3    the defendant with interrogatories asking about his communications with the reporter and the

4    defendant responded that he could not recall the specific content of his meetings or conversations

5    with the reporter, the court found that the plaintiffs could not claim to have exhausted alternative

6    sources until they "plumb[ed] the depths" of the defendant's recollection in deposition.  <u>Id.</u> at

7    1297.  Like the plaintiffs in <u>Shoen I</u>, Mattel cannot claim to have exhausted alternative sources

8    unless and until Mattel deposes Larian and exhausts Larian's recollection of his communications

9    with Palmeri.  Moreover, Larian is not the only alternative source of information that must be

10   exhausted before Mattel can overcome the journalist's privilege.  There may be other witnesses

11   with whom Larian may have discussed the origins of Bratz dolls, such as co-workers, publicists or

12   industry analysts.  Yet, Mattel does not claim to have questioned or deposed those witnesses

13   about any such statements.

### V. CONCLUSION

15        Because Mattel has not satisfied any of the three factors set forth in <u>Shoen II</u>, Mattel's

16   motion to compel the deposition of Christopher Palmeri is denied.[2]  Pursuant to Paragraph 6 of

17   the Stipulation and Order for Appointment of a Discovery Master, Mattel shall file this Order

18   with the Clerk of Court forthwith.

20   Dated: February 26, 2008

                            *Edward A. Infante*

21                           HON. EDWARD A. INFANTE (Ret.)

                               Discovery Master

---

27      [2] Because the federal journalist's privilege is dispositive of the motion, it is unnecessary to address Palmeri's alternative argument under the California shield law.

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

6

EXHIBIT 1

PAGE 8

## PROOF OF SERVICE BY E-MAIL

I, Sandra Chan, not a party to the within action, hereby declare that on February 26, 2008, I served the attached ORDER DENYING MATTEL'S MOTION TO COMPEL DEPOSITION OF CHRISTOPHER PALMERI in the within action by email addressed as follows:

| | | |
|---|---|---|
| John W. Keker, Esq. | Keker & Van Nest | jkeker@kvn.com |
| Michael H. Page, Esq. | Keker & Van Nest | mhp@kvn.com |
| Christa Anderson, Esq. | Keker & Van Nest | cma@kvn.com |
| Matthew M. Werdegar, Esq. | Keker & Van Nest | mwerdegar@kvn.com |
| John E. Trinidad, Esq. | Keker & Van Nest | jtrinidad@kvn.com |
| Audrey Walton-Hadlock, Esq. | Keker & Van Nest | awalton-hadlock@kvn.com |
| John Quinn Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | johnquinn@quinnemanuel.com |
| Michael Zeller Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | michaelzeller@quinnemanuel.com |
| Jon Corey Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | joncorey@quinnemanuel.com |
| Duane Lyons Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | duanelyons@quinnemanuel.com |
| Timothy Alger Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | timalger@quinnemanuel.com |
| Dominic Surprenant Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | DominicSurprenant@QuinnEmanuel.com |
| B. Dylan Proctor Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | dylanproctor@quinnemanuel.com |
| Shane McKenzie Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | shanemckenzie@quinnemanuel.com |
| Bridget Hauler Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | bridgethauler@quinnemanuel.com |
| Tamar Buchakjian Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | tamarbuchakjian@quinnemanuel.com |
| Juan Pablo Alban, Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | juanpabloalban@quinnemanuel.com |
| John Gordon | Quinn, Emanuel, Urquhart, Oliver & Hedges | johngordon@quinnemanuel.com |
| Thomas J. Nolan, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | tnolan@skadden.com |
| Raoul D. Kennedy, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | rkennedy@skadden.com |
| Amy S. Park, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | apark@skadden.com |
| Harriet S. Posner, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | hposner@skadden.com |
| Carl Alan Roth, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | croth@skadden.com |
| Timothy A. Miller, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | tmiller@skadden.com |
| Marcus R. Mumford, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | Mmumford@skadden.com |
| Paul M. Eckles, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | Paul.eckles@skadden.com |
| Lance A. Etcheverry, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | Lance.etcheverry@skadden.com |
| Robert J. Herrington, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | Robert.herrington@skadden.com |
| Alonzo Wickers IV, Esq. | Davis Wright Tremaine LLP | alonzowickers@dwt.com |
| Robyn Aronson, Esq. | Davis Wright Tremaine LLP | robynaronson@dwt.com |

I declare under penalty of perjury under the laws of the Untied States of America that the above is true and correct.

Executed on February 26, 2008, at San Francisco, California.

*Sandra Chan*

Sandra Chan

**EXHIBIT** 1

**PAGE** 9

**EXHIBIT 2**

O

## O'MELVENY & MYERS LLP

BEIJING
BRUSSELS
CENTURY CITY
HONG KONG
LONDON
NEWPORT BEACH

400 South Hope Street
Los Angeles, California 90071-2899

TELEPHONE (213) 430-6000
FACSIMILE (213) 430-6407
www.omm.com

NEW YORK
SAN FRANCISCO
SHANGHAI
SILICON VALLEY
TOKYO
WASHINGTON, D.C.

May 17, 2006

OUR FILE NUMBER
527436-04

### VIA FACSIMILE

WRITER'S DIRECT DIAL
(213) 430-7466

Michael T. Zeller, Esq.
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 Figueroa Street, 10th Floor
Los Angeles, California 90017

WRITER'S E-MAIL ADDRESS
pambrosini@omm.com

Dear Mr. Zeller:

Pursuant to Local Rule 37-1, MGA requests to meet and confer with Mattel regarding Mattel's Objections and Responses to MGA's First Set of Interrogatories. To facilitate discussion, this letter is broken into two parts. The first concerns Mattel's "General Objections." The second concerns Mattel's objections and responses to individual interrogatories.

### I.    Mattel's General Objections

**Mattel's Preliminary Statement**

Mattel initially qualifies its responses to MGA's Interrogatories by stating that Mattel has not yet interviewed all witnesses in this action, and contends that it has yet to receive requested discovery from defendants. This, however, does not excuse Mattel from undertaking a reasonable inquiry and responding to the Interrogatories to the best of its present ability. Mattel must supplement its responses immediately to the extent that Mattel has failed to respond to any Interrogatory, or withheld information, because it is waiting until after it has interviewed all witnesses in the action and received all discovery from the defendants.

**General Objection No. 2.**

Mattel objects generally to the Interrogatories on the grounds that they call for the disclosure of information subject to the attorney-client privilege, work-product doctrine of "other applicable privilege" but has not indicated, specifically, what, if any, information has been withheld based on any asserted privilege. MGA insists that Mattel (1) state whether it has refused to respond fully and completely to any particular interrogatory, or qualified any particular response, to protect privileged information from disclosure; (2) if it has, identify which interrogatory(ies) and response(s) are implicated; and (3) provide information, in the nature of a

EXHIBIT   2

PAGE   10

O'MELVENY & MYERS LLP
Michael T. Zeller, Esq., May 17, 2006 - Page 2

privilege log, sufficient for MGA to evaluate the claim of privilege.  Please confirm that Mattel
will do so.

**General Objection No. 3:**

Mattel also generally objects to the Interrogatories on the grounds that "they seek the
disclosure of information or documents that are "in the possession, custody and control of
independent parties," and information or documents that are "in the possession, custody and
control of defendants" or are " publicly available and hence equally available to all parties to this
litigation." Mattel, however, must respond to the Interrogatories based on the information
known to Mattel, irrespective of whether the source of the information was a third party, the
defendants themselves, or a publicly available source.[1]  Please confirm that Mattel has not
withheld any responsive information because the source of the information was a third party,
defendants, or a publicly available source.

**General Objection Number 4:**

Mattel generally objects to MGA's Interrogatories on the grounds that they call for
information that is not relevant.  Nowhere, however, does Mattel justify this blanket objection.
Please confirm that Mattel has not withheld or qualified any response based on this objection or,
if it has, please identify, with particularity, the specific interrogatory(ies) that Mattel has not
answered, in full or in part, based on this objection.

**General Objection Number 5:**

Mattel also objects to MGA's requests on the grounds that they are "unduly burdensome
and oppressive."  A party asserting an objection such as this, however, bears the burden of
justifying the objection by showing how and why any particular Interrogatory is unduly
burdensome.  Mattel has not done so.  To the extent that Mattel has refused to respond to any
Interrogatory or withheld information based on burden, MGA requests that Mattel identify, with
specificity, each Interrogatory implicated and explain precisely why and in what way responding
to the Interrogatory would impose an undue burden upon Mattel.

---

[1]*Orleman v. Jumpking, Inc.*, No. Civ. A. 99-2522-CM, 2000 WL 1114849, at *6 (D. Kan. July 11, 2000)
("The court counsels defendant that where responsive information is in its possession, it is obligated to
produce the information, *whether or not plaintiff has obtained the information from an alternate source.*
The rules of discovery *do not permit* parties to withhold material *because the opponent either has or
could discover it on their own.*  Accordingly, to the extent defendant has not produced all responsive
information within its possession, it shall do so.") (citation omitted) (emphasis added); *St. Paul
Reinsurance Co., Ltd. v. Commercial Financial Corp.*, 198 F.R.D. 508, 513 (N.D. Iowa 2000) ("The
plaintiffs' fifth objection to CFC's request is based on the ground that it seeks information and documents
equally available to the propounding parties from their own records or from records which are equally
available to the propounding parties.  However, with respect to this objection, courts have unambiguously
stated that this exact objection is insufficient to resist a discovery request.").

EXHIBIT ___2___

PAGE ___11___

O'MELVENY & MYERS LLP
Michael T. Zeller, Esq., May 17, 2006 – Page 3

**General Objection No. 6:**

MGA also requests that Mattel provide further and more specific information to support its general objection that MGA's Interrogatories seek the disclosure of information or documents "in violation of the terms of agreements or protective orders entered into with third parties, or in violation of the privacy, contractual, or other rights of third parties." Specifically, MGA requests that Mattel (1) identify each Interrogatory to which Mattel claims it cannot fully respond without violating the rights of third parties; (2) with respect to each such Interrogatory, identify who the third party is and the nature of the right implicated (i.e. right of privacy, contractual rights, etc.); and (3) in each instance in which Mattel has withheld information based on a third party contract or protective order, produce each such contract or protective order, or such documents as may be necessary and sufficient for MGA to evaluate Mattel's assertion, and to challenge the protection, as appropriate.

**General Objection No. 7:**

Mattel's general objection that the definition of "Mattel" is vague, ambiguous and unduly burdensome is meritless. Mattel is obligated to use common sense and reason in responding to discovery.[2]  Please confirm that Mattel has not refused to respond or qualified its response to any of MGA's Interrogatories based on this general objection.

A.    **Specific Interrogatories**

**Interrogatories 1 and 2:** Facts supporting Mattel's contention, if Mattel so contends, that Mattel has suffered harm as a result of any act or omission of MGA; identify all persons with knowledge of each such facts.

Mattel's objections to these interrogatories lack merit.  Each of these interrogatories seeks information simply requiring Mattel to prove its own contentions; MGA is clearly entitled to discovery on regarding Mattel's own contentions.  Unless Mattel agrees to disavow any contention that it has suffered harm as a result of any alleged act or omission of MGA, the subject matter of these interrogatories is relevant and MGA is entitled to Mattel's responses.

**Interrogatory 3 and 4:** Damages; proof of Mattel's contention that it is entitled to punitive damages.

In response to these interrogatories, Mattel asserts that it has produced documents from which the answers to these interrogatories may be ascertained.  MGA is entitled to know specifically the documents to which Mattel refers.  In addition, the parties have already

---

[2] *Swackhammer v. Sprint Corp. PCS*, 225 F.R.D. 658, 662 (D. Kan. 2004) ("The party objecting to discovery as vague or ambiguous has the burden to show such vagueness or ambiguity. *A party responding to discovery requests 'should exercise reason and common sense to attribute ordinary definitions to terms and phrases* utilized in interrogatories.'") (emphasis added).

EXHIBIT _2_

PAGE _12_

O'MELVENY & MYERS LLP
Michael T. Zeller, Esq., May 17, 2006 - Page 4

conducted substantial discovery and MGA is entitled to the information presently in Mattel's
possession, including "the value of Mattel assets, resources, opportunities and/or property,
including intellectual property" that Mattel contends "Bryant converted, diverted from Mattel or
otherwise improperly used or usurped." Finally, in connection with Mattel's response to
Interrogatory No. 4, MGA is entitled to more specificity, particularly regarding Mattel's
statement that "Bryant and MGA have concealed and intentionally spoliated evidence in an
effort to conceal the true nature, timing and extent of their unlawful behavior."

**Interrogatory 5**: Facts to prove Mattel's contention that MGA copied Mattel's property,
including, without limitation, "Toon Teens."

Mattel's objection that this subject matter has no bearing on this suit is baseless. Mattel
contends that Bryant converted/copied/stole Mattel property. 2005 U.S. Dist. LEXIS 3568, at
*26. Indeed, there is an abundance of evidence suggesting that Mattel contends that Bryant
converted Mattel's scrapped "Toon Teens" idea. Moreover, the Court has concluded that "the
rights to the Bratz were and are in controversy" and that Mattel is assisting another party in
asserting that "the Bratz are knock-offs of the Toon Teens." *Id.* at *28-*29. Mattel must either
disavow its contention or cooperate in discovery concerning this subject. Mattel simply cannot
have it both ways.

Mattel's objection that this interrogatory is vague and ambiguous is not credible, as
MGA's definitions of "your" and "property" cannot plausibly be said to render the phrase "your
property" vague and ambiguous. Indeed, the referenced property is limited by Mattel's own
contentions. The term "copied" is also perfectly comprehensible, as it has an ordinary, plain-
language meaning. Mattel's objection to the term "some element" is a non-sequitur, as the
interrogatory does not use that phrase. MGA's reference to "Toon Teens" must also be
understandable to Mattel, as MGA's use of that phrase, by its own terms, is coterminous with
Mattel's contention regarding them. It is not MGA's burden to discern, at this point, whether
Mattel's contention about "Toon Teens," about which Mattel has refused to provide information,
concerns drawings, prototypes, photographs, or the like.

In any case, to the extent Mattel contends that MGA has copied Mattel property in any
way and seeks any remedies for such alleged copying, this interrogatory seeks relevant
information regardless of whether Mattel's Complaint sounds in state tort law or in federal
intellectual copyright law.

**Interrogatory 6**: Identify all communications that refer to this lawsuit.

Mattel has raised privilege objections to this interrogatory, and MGA offers to limit the
interrogatory to "each non-public, non-privileged COMMUNICATION" Mattel has had about
the suit, including, but not limited to, internal communications, communications with current or
former employees, or with one or more of its investors. Excluded from this would be press
releases or other statements to the press or in an open forum. Responsive communications, for
example, might include non-privileged discussions between or among Mattel executives and/or

EXHIBIT ___2___

PAGE ___13___

O'MELVENY & MYERS LLP
Michael T. Zeller, Esq., May 17, 2006 - Page 5

officers, at non-privileged strategy or informational meetings with Mattel personnel, or at Board of Directors' meetings. How Mattel has described the suit, what it has said about the factual or legal basis of the suit, its damages, and its prospects is discoverable information relevant to Mattel's claims and prayer for relief.

**Interrogatory 7:** Identify all persons interviewed for the July 18, 2003, *Wall Street Journal* article.

Mattel's objection that this interrogatory is unreasonably burdensome and overbroad is baseless. Contrary to Mattel's assertion, interrogatory 7 does not require it to "gather and summarize all facts on the subject, including without limitation facts that are known to or in the possession, custody or control of defendants and non-parties, including the Wall Street Journal staff." Rather, this interrogatory simply requires Mattel to "identify" all persons interviewed for the article.

Mattel's relevance objections to these interrogatories are also insupportable. As Mattel knows, the article, which it produced, liberally quotes both named and unnamed Mattel employees foreshadowing Mattel's belief with regard to its core contention in this case – that Bryant copied one of its ideas, referring to "Toon Teens." MGA is clearly entitled to discovery concerning who was interviewed for the article. Indeed, the Court has already noted the importance of the article to the case. 2005 U.S. Dist. LEXIS 3568, at *7 n.4. Moreover, the discovery rules provides that parties should seek to obtain information from a party to the suit before attempting to obtain it from a non-party such as the Wall Street Journal or former Mattel employees. To the extent Mattel has any information concerning the identity of those who provided information for this article, Mattel is obligated to provide it, regardless of whether those people are identified in the article itself. Indeed, MGA is entitled to have Mattel's confirmation of the accuracy of the information provided therein with respect to the sources for the article so that MGA can pursue further discovery on its defense of laches, among other things.

**Interrogatory 8:** Identify each error in the *Wall Street Journal* article and explain why and in what way each fact is incorrect.

As with its objections to Interrogatory No. 7, Mattel's objections to interrogatory 8 are not well founded. The interrogatory does not require Mattel to "summarize all facts on this subject," but rather merely requires Mattel to "describe, with particularity, each error contained in [the article] by explaining why and in what way each fact is incorrect." The interrogatory as phrased is not overbroad or unduly burdensome, let alone "harassing." To the extent Mattel contends that the article contains misstatements that pertain to the issues in this lawsuit, Mattel is obligated to identify those misstatements and explain why it believes the statements are wrong.

**Interrogatories 10 and 11:** State when and how Mattel first learned that Bryant performed work for MGA; and when and how Mattel first learned that Bryant conceived of the Bratz concept.

EXHIBIT ___2___

PAGE ___14___

O'MELVENY & MYERS LLP
Michael T. Zeller, Esq., May 17, 2006 – Page 6

These requests seek the information Mattel had, and when it learned that information, regarding Bryant's involvement with MGA's "Bratz" property and his creation of the original "Bratz" concept. Such information is pertinent to the affirmative defenses asserted in this case. In response to Interrogatory No. 10, Mattel asserts that it was first "confirmed" that Bryant was the Bratz designer by the Wall Street Journal's July 200 article. Mattel appears to be equating MGA's confirmation with Mattel's knowledge. In fact, the interrogatory seeks to learn when Mattel first obtained this information, regardless of whether it had been confirmed by MGA or anyone else. Indeed, Mattel produced a document indicating that it was told in August 2002 that Bryant had supposedly created the "Bratz" dolls. Thus, it appears that Mattel first had information concerning Bratz and Bryant's work for MGA before the July 2003 Wall Street Journal article, and MGA is entitled to know when.

Mattel's objection that the phrase "first learned that Bryant conceived of the Bratz Concept" is "vague and ambiguous" is meritless, as the phrase "first learned of" has a readily ascertainable, ordinary meaning, and Mattel does not object to MGA's definition of the term "Bratz Concept." In combination, these words are not somehow rendered mysterious. For purposes of these interrogatories only, MGA will define "Mattel" to include only persons who were employed by Mattel at the time they acquired the knowledge at issue.

In conclusion, counsel for MGA seek to meet and confer in person with you in the next ten days concerning the aforementioned discovery and issues. In addition, as stated above, we urge you to give serious consideration to the appointment of a Discovery Special Master, the use of which would substantially reduce the burden on the Court and the costs to the parties, and would facilitate and expedite the resolution of discovery disputes (or perhaps avoid them in the first instance).

We look forward to your response.

Very truly yours,

Paula E. Ambrosini
for O'MELVENY & MYERS LLP

cc:     Keith Jacoby, Esq.

EXHIBIT ___2___

PAGE ___15___

**EXHIBIT 3**

**THIS EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

**EXHIBIT 4**

**THIS EXHIBIT IS FILED UNDER SEAL
PURSUANT TO PROTECTIVE ORDER**

**EXHIBIT 5**

**THIS EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

**EXHIBIT 6**

7/18/03 WSJ A1
7/18/03 Wall St. J: A1
2003 WL-WSJ 3974434
(Publication page references are not available for this document.)

The Wall Street Journal
(Copyright (c) 2003, Dow Jones & Company, Inc.)

Page 2

Friday, July 18, 2003

### Dolled Up: To Lure Older Girls, Mattel Brings In Hip-Hop Crowd

---

### It Sees Stalwart Barbie Lose Market Share, So 'Flavas' Will Take on the 'Bratz'

---

### Battle of the Big Heads
### By Maureen Tkacik

LOS ANGELES -- Tika, 10 inches tall with two-toned hair, is of ambiguous ethnic origin -- maybe she's Asian, maybe Latina -- but her "platinum" medallion, airbrushed jean jacket, shell-toe sneakers and graffiti-streaked packaging make one thing clear.

"She's like . . . hip-hop," said Crystal Audigier, 10 years old, as she rifled through the first crate of "Flavas" dolls to arrive at a Los Angeles FAO Schwarz store last week.

Mattel Inc. hopes the dolls are hip enough to take on the "Bratz." The Flavas (pronounced "Flay-vuhs," like "flavors"), a set of six dolls brought from design to production in just three months, represent a striking gamble for the giant toy company. In the 44 years since it introduced its bombshell Barbie, Mattel has rarely brought out a doll line to compete with her.

But Mattel, which had become accustomed to its buxom blonde dominating the market, has watched in alarm as Barbie has been challenged by a smaller toy maker's Bratz -- a line of big-headed, pouty-lipped characters. While Barbie, which posted about $1.7 billion in sales for Mattel last year, is still queen, her share of the so-called fashion-doll market has fallen, almost entirely due to the Bratz.

After trying -- and failing -- to defeat the Bratz with a trendier Barbie last year, Mattel has come up with a radical battle plan. Among other things, that means curtailing its reliance on, and near-reverence toward, its cash cow. While Barbie is still a plaything of choice for girls 3 to 7 years old, it's been years since she managed to hold the attention of the tweens, or 8-

to 12- year-olds. With the Flavas, Mattel is trying to get back into that market -- even if it risks cannibalizing its biggest product.

Mattel has tweaked Barbie many times since she was introduced in 1959: bronzing her skin during the 1970s, introducing black and Hispanic counterparts and giving her a band (the fuchsia-clad "Rockers") during the 1980s. Mattel even shrunk her chest and widened her hips in 1998.

But Mattel now concedes Barbie has gradually lost touch with some young girls' lives. "Barbie began as a great girl who was simply a reflection of popular culture, but in the past few years we had sort of put her on a pedestal," says Matt Bousquette, president of the newly created Mattel Brands unit, which consolidated the boys' and girls' toys divisions. "We're taking her off that pedestal."

While Mr. Bousquette and his team overhaul Barbie, he is also enlisting the Flavas, who wear sweats and heavy chains and have names like "Tre" and "P. Bo," as a second force with which to fight the Bratz. Mattel says hip-hop -- which it defines as "a cultural phenomenon . . . dimensionalized through freestyle dance, street sports, music and fashion" -- has gained sufficient ground in the mainstream to have its own toy line.

"Mattel is recognizing that there are other trends besides Barbie that girls want to play with," says Manny Francione, divisional merchandise manager for Toys "R" Us Inc., Paramus, N.J. "Hip-hop is one of those trends."

The Bratz, developed by a toy maker called MGA Entertainment Inc., North Hills, Calif., were introduced in the summer of 2001. They became a hit with tweens, an age group of girls that the toy industry had almost written off.

For the past decade, toy makers have been grappling with a phenomenon analysts call "age compression," in which media-saturated youngsters are outgrowing dolls and other toys at an earlier age. NPD Group Inc., a market-research firm, says toy spending on children peaks at age 3 and steadily declines after

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

M 0012536

EXHIBIT ___6___

PAGE ___92___

that, with spending on 12-year-olds at about a quarter of the peak level. By attracting tweens, the Bratz bucked that trend.

Bratz "appealed to an older girl . . . who is not necessarily still a Barbie customer," says Sean McGowan, a longtime industry analyst with Gerard Klauer Mattison. "Nothing's ever challenged Barbie like the Bratz." At Barbie's 1997 peak, a year in which Mattel posted $1.9 billion in sales of the doll, her clothing and accessories, she boasted more than a 90% share of the fashion-doll market, Mr. McGowan says. Barbie held at least 85% of the market right before the Bratz were introduced, he says, but her share has now dropped to about 70%.

The history of the Bratz is intertwined with Mattel. MGA says the Bratz were designed by Carter Bryant, a former member of the Barbie team. Inside Mattel, some are convinced the Bratz borrow liberally from a Mattel project that was scrapped at the testing stage in 1998. Mattel declined to comment.

Mr. Bryant didn't work on the line that Mattel scrapped, according to former and current Mattel designers. But most Barbie designers had seen the prototypes, his former colleagues say. Mr. Bryant, through MGA, declined to be interviewed.

The Mattel doll line that was scrapped wasn't exactly like the Bratz, says a longtime Mattel designer who worked on the project. But the Bratz's oversized heads -- with their pursed lips and cartoonish eyes -- are "virtually identical" to the heads of the dolls her team created, says the designer, who left Mattel in 2001.

Lily Martinez, a designer who still works at Mattel, came up with the idea for the big doll heads for Mattel, colleagues say. Mattel declined to comment. She even posted her sketch on her cubicle, colleagues say. "Anyone who passed by her cubicle would see the picture up on the wall," says another designer who also left Mattel in 2001. "The big heads, the big eyes, the big feet -- they were all the same" as the Bratz. Ms. Martinez declined to comment.

The Mattel dolls were scrapped in testing, current and

former designers say, because Mattel had strict quotas that allowed only one "flanker brand" -- that is, a brand that would compete with Barbie for shelf space -- on the market at a time. At the time, Mattel chose a product called "What's Her Face" -- a doll with a blank face on which kids could draw expressions. That doll remains on the market; Mattel declined to discuss its sales.

Designers say they often faced a higher bar for non-Barbie projects. And Barbie's image was carefully protected. Bruce Stein, who was president of Mattel until 1998, says that former Chief Executive Jill Barad nixed an idea for "Barbie as Xena" dolls in 1998.

Ms. Barad was replaced in 2000, after Mattel's disastrous $3.5 billion acquisition of a software maker called The Learning Company. Under her successor, Robert Eckert, a former Kraft Foods president, the company has returned to profitability by cutting its work force 10%, streamlining its supply chain and developing international sales, among other things. Mattel, which reported a net loss of $431 million in 2000, reported net income of $230 million last year. Its stock has risen about 76% since Mr. Eckert arrived.

Isaac Larian, chief executive of MGA, says he had never heard of a project similar to the Bratz at Mattel. He says he chose Mr. Bryant's idea for the Bratz over several others after holding a sort of fashion-doll design contest in late 1999.

Mr. Larian, who emigrated to the U.S. from Iran, founded his company in the late 1970s, making a name by picking up the license for hand-held Pac-Man games. Though his company had made baby dolls before, it had never made fashion dolls. He says he was motivated by a challenge from a Wal-Mart Stores Inc. buyer to "give me something that can compete with Barbie."

This year, closely held MGA expects revenue of about $800 million -- with 65% of that coming from the Bratz. The company says it's profitable, but won't discuss specifics. Mr. Bryant still does design work for MGA, Mr. Larian says, and collects royalties on the Bratz line.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

M 0012537

EXHIBIT __6__

PAGE __93__

7/18/03 WSJ A1
7/18/03 Wall St. J. A1
2003 WL-WSJ 3974434
(Publication page references are not available for this document.)

Page 4

Mattel began worrying about the Bratz's momentum during the 2001 holiday season. Barbie sales fell 12% in the U.S. that year, despite a marketing campaign featuring an animated video, "Barbie in the Nutcracker."

By spring of 2002, Adrienne Fontanella, then president of the girls' division, decided to launch what the company termed a more "reality based" Barbie line. Like the Bratz, the "My Scene" Barbies boasted bigger heads and feet and fuller lips, as well as trendier clothes.

Mr. Larian, the head of MGA, calls the My Scene dolls a "cheap imitation" of the Bratz. Mattel declined to comment. Introduced in October 2002, the My Scene Barbies helped Mattel's sales, but still ranked behind the Bratz during the 2002 holiday season, according to NPD. "My Scene has been just OK for us," says Fred Hurley, a longtime girls'-toys buyer for KB Toys Inc., Pittsfield, Mass.

In February, Ms. Fontanella's job, along with others, was eliminated in what Mr. Eckert called a "restructuring" of Mattel's executive ranks aimed at "increasing efficiency."

Mr. Bousquette, the then-head of Mattel's boys' toy division, became the first man to take control of Barbie in more than a decade. "It used to be that whoever ran Barbie ran the company, not the other way around," says Mr. Stein, the former president. "For Matt to be in charge is a major shift."

Mattel no longer has quotas on how many products can compete with Barbie. After sitting through a girls'-design-team presentation in March, Mr. Bousquette seized upon the Flavas as the ideal dolls to compete for the dollars of Bratz buyers. Ivy Ross, head of girls' design, suggested bringing them to market for the spring 2004 season. Mr. Bousquette said the company should aim for this July instead.

"We were stunned," says a designer who worked on the Flavas and left the company in May. Another surprise: Mr. Bousquette asked the team to make the dolls look more hip-hop than the prototypes. "No one had really believed in the concept before that meeting, and it was stuck in this back-and-forth where first they were too edgy, then they weren't edgy enough," says the designer. "Matt came through and cut all of that out." Mr. Bousquette says he told designers to make the dolls "as authentic as possible, as quickly as possible."

Flavas are more complicated to manufacture than most fashion dolls. They are all different heights -- meaning separate molds -- and they have 10 points at which they can move, allowing them to strike a variety of poses. The Flavas design team often slept in their cubicles to get the dolls ready in time for summer shipment. Two designers each clocked 53 hours during Memorial Day weekend to prepare the line for the company's annual toy fair held in the first week of June.

Some buyers have been impressed. Mattel's girls' division "has never been a particularly forward-thinking group, but the Flavas are right on trend," says KB's Mr. Hurley. The six dolls in the Flavas line are certainly edgier than anyone in Barbie's clique. The Flavas girls have highlighted hair, flashier jewelry and wear midriff-baring tops with low-slung pants. Unlike Barbie, they have flat feet and wear sneakers. The two boy Flavas dolls sport earrings and serious expressions. Boxer underwear appears to show from the top of their cargo pants.

The Flavas come in boxes splashed with black-and-white photos of urban scenes shot around Venice Beach. When arranged together, the boxes create a "graffiti" mural that reads: "FA SIZZLE." It is a play on the hip-hop expression "Fa' shizzle," which means "For sure." Marketing director Lisa Tauber explains that it is also an acronym that stands for "Fashion, Attitude and Sizzlin' Style." The dolls, aimed at 9- to 11-year-olds, are "all about fearless self- expression," she says.

MGA's Mr. Larian says he isn't scared by the Flavas. "The only thing that's missing is a cocaine vial," he says. "You think of Mattel, you think of Barbie and you think of sweetness. . . . This is like 'gangster' Barbie, and I think it's going to backfire."

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

M 0012538

EXHIBIT _6_

PAGE _94_

7/18/03 WSJ A1
7/18/03 Wall St. J. A1
2003 WL-WSJ 3974434
(Publication page references are not available for this document.)

Page 5

Telejah Dean, a nine-year-old from West Los Angeles noticed the Flavas last week, as she was admiring Mattel's Mary-Kate and Ashley dolls. The Flavas are "not as pretty as Barbie," she said. But her older sister, Tiffany, 22, seemed impressed by the blond Happy D. doll. "Look, she's got black [hair] extensions like Christina," she exclaimed, referring to pop singer Christina Aguilera.

In fact, Mattel has hired people to give out Flavas hats, wristbands and decals during Ms. Aguilera's concert tour this summer. Ms. Aguilera, who got her start on the Disney Channel, is now probably as well known for her 11 body piercings and her mud wrestling-themed MTV video called "Dirrty."It's a sign of the changing times, says Mattel spokeswoman Julia Jensen. "The old Mattel probably wouldn't try to tie up with someone like Christina Aguilera."

---- INDEX REFERENCES ----

COMPANY:        KB Holdings LLC (KBTY); Mattel Inc (MATL)

NEWS SUBJECT:        (Marketing (C31); Market Share (C313); Corporate/Industrial News (CCAT); Content Types (NCAT); Page-One Story (NPAG); Editor's Choice - Consumer Products (REQRCP); Editor's Choice - Industry Trends/Analysis (REQR))

INDUSTRY:        (Dolls/Toys/Games (I4941); Retail (I64); Specialty Stores (I654); Hobby/Toy/Game Stores (I6540030); Consumer Products (ICNP); Media (IMED))

REGION:        (North American Countries (NAMZ); United States (USA); United States - California (USCA); Northeast U.S. (USE); United States - Massachusetts (USMA); Western U.S. (USW))

OTHER INDEXING:    Marketing; Market Share; Page-One Story; Content Types; Corporate/Industrial News; United States - California; United States - Massachusetts; United States; Northeast U.S.; Western U.S.; North American Countries; Dolls/Toys/Games; Retail; Specialty Stores; Hobby/Toy/Game Stores; Consumer Products;

Media; Consumer Cyclical; Newswire More Code; Newswire End Code; All Entertainment & Leisure; Limited Product Specialty Retailers; Recreational Products & Services; All Specialty Retailers; Toys; Islamic Index; S&P 500 Index component; Newspapers' Section Fronts; Marketing; Market

Word Count: 2217

7/18/03 WSJ A1

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

M 0012539

EXHIBIT __6__

PAGE __95__