1  THOMAS J. NOLAN (Bar No. 66992)
   (tnolan@skadden.com)
2  JASON D. RUSSELL (Bar No. 169219)
   (jrussell@skadden.com)
3  MARINA V. BOGORAD (Bar No. 217524)
   (mbogorad@skadden.com)
4  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
   300 South Grand Avenue
5  Los Angeles, CA  90071-3144
   Tel.: (213) 687-5000 / Fax: (213) 687-5600
6
7  KENNETH PLEVAN (admitted *pro hac vice*)
   (kplevan@skadden.com)
8  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
   Four Times Square, New York, NY 10046
9  Tel.: (212) 735-3000 / Fax: (212) 735-2000

10 Attorneys for MGA Entertainment, Inc., MGA Entertainment (HK) Limited,
   MGAE de Mexico, S.R.L. de C.V., and Isaac Larian

11            UNITED STATES DISTRICT COURT

12            CENTRAL DISTRICT OF CALIFORNIA

13                  EASTERN DIVISION

14 CARTER BRYANT, an individual,      )  CASE NO. CV 04-9049 SGL (RNBx)
                                      )  Consolidated with Case No. 04-9059
15                       Plaintiff,   )  and Case No. 05-2727
                                      )
16            v.                      )  Honorable Stephen G. Larson
                                      )
17 MATTEL,   INC.,   a   Delaware )  **[PUBLIC REDACTED]**
   corporation,                       )  MGA PARTIES' CORRECTED
18                                    )  NOTICE OF MOTION FOR PARTIAL
                       Defendant.     )  SUMMARY JUDGMENT, MOTION
19                                    )  AND MEMORANDUM OF POINTS
                                      )  AND AUTHORITIES IN SUPPORT
20 AND CONSOLIDATED ACTIONS )  THEREOF
                                      )
21                                    )

22                                       Hearing Date: April 23, 2008
                                         Time: 10:00 a.m.
23

24

25

26

27

28

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on April 23, 2008 at 10 a.m., or as soon thereafter as the matter may be heard by the Honorable Stephen G. Larson in the above-referenced court located at 3470 Twelfth St., Riverside, California 92501, Defendants MGA Entertainment, Inc., MGA Entertainment (HK) Limited, MGAE de Mexico, S.R.L. de C.V. (collectively, "MGA"), and Isaac Larian (together with MGA, the "MGA Parties"), will and hereby do move pursuant to Federal Rule of Civil Procedure 56 for partial summary judgment of plaintiff Mattel's First, Sixth, Eighth, Tenth, Eleventh, Twelfth, and Thirteenth counterclaims in its Second Amended Answer and Counterclaims dated July 12, 2007 on the following grounds:

First, all Mattel's counterclaims are time-barred because Mattel brought them more than five and a half years after it was placed on notice of its potential claims;

Second, Mattel's interference with contract, conversion and unfair competition claims (its Sixth, Eleventh, and Twelfth counterclaims, respectively) are preempted by the Copyright Act, as a matter of law;

Third, Mattel's statutory and common law unfair competition claims (the Twelfth counterclaim) fail as a matter of law because Mattel cannot establish that MGA's or Larian's conduct was unfair, fraudulent, or unlawful;

Fourth, Mattel's claim for intentional interference with contract (its Sixth Counterclaim) fails because there is no evidence of breach, intent, or inducement;

Fifth, Mattel's claim for aiding and abetting a breach of fiduciary duty allegedly owed by defendant Carter Bryant to Mattel (its Eighth Counterclaim) fails because Bryant, as a matter of law, did not owe such a duty to Mattel.

This Motion is made on the ground that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that [the MGA Parties are] entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

1       This Motion is based upon this Notice of Motion and accompanying Memorandum of

2   Points and Authorities, the Statement of Uncontroverted Facts and Conclusions of Law filed

3   concurrently under separate cover, the Declarations of Jason D. Russell and Isaac Larian

4   filed concurrently under separate cover, the MGA Parties' Request for Judicial Notice filed

5   concurrently under separate cover, the records and files of this court, and any other matter

6   of which the court may take judicial notice.

7       This Motion is made following the conference of counsel pursuant to Local Rule 7-3,

8   which took place on February 15, 2008.

9       DATED:  March 7, 2008

10                       SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

11

12                       By: _____

                                Thomas J. Nolan

13                       Attorneys for MGA Entertainment, Inc.,

                     MGA Entertainment (HK) Limited, MGAE

14                       de Mexico, S.R.L. de C.V., and Isaac Larian

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES..................................................................................vi

PRELIMINARY STATEMENT ......................................................................... 1

FACTUAL BACKGROUND .............................................................................. 4

1.   Bryant's Initial Meetings with MGA And His Contract With MGA ................... 4

2.   Mattel Becomes Aware of MGA's Ownership of BRATZ in February 2001 and Suspects Bryant's Involvement In BRATZ Design ............................. 6

    (a)   February 2001 – Mattel sees the BRATZ at the Toy Fair ............................ 6

    (b)   June 2001 – BRATZ release in Spain piques Mattel's interest................... 7

    (c)   BRATZ are introduced to the American market ......................................... 7

    (d)   Mattel immediately concludes that BRATZ was copied from Mattel dolls.................................................................. 8

    (e)   It was "common knowledge" within Mattel in 2001 that Bryant created BRATZ ................................................................. 8

3.   In March 2002, Mattel Launches An Internal Campaign To Investigate Its Alleged Rights In the BRATZ, Bryant's Creation Of The BRATZ Concept And MGA's Role In Its Development ........... 9

4.   Mattel Continues To Be Bombarded With Public Information About MGA, Larian And BRATZ Until It Sued Bryant in April 2004 ..................................... 11

5.   Barbie's ▮▮▮▮▮▮▮▮ Due to Brisk Sales of BRATZ................................ 12

6.   The History of the Litigation at Hand .................................................................. 13

ARGUMENT.......................................................................................................... 15

I.   ALL CLAIMS AGAINST MGA AND LARIAN ARE TIME-BARRED.......... 15

    A.   Mattel Was On Notice Of Its Claims For Statute Of Limitations Purposes As Early As February 2001 And No Later Than March 2002 ... 17

    B.   As Mattel Was On Notice Of Its Claims By March 2002, Its Claims Are Time-Barred, Unless They Relate Back To An Earlier Pleading....... 20

        1.   Mattel's Sixth, Eighth, and Tenth Counterclaims are time-barred by their respective two-year statutes of limitations and cannot be saved by any "relation-back" rules ............................................. 20

            (a)   Mattel's Sixth Counterclaim for Intentional Interference with Contract is time-barred .............................. 20

            (b)   Mattel's Aiding and Abetting claims are time-barred .......... 21

2. Mattel's First, Eleventh, and Thirteenth Counterclaims, as well as a portion of its Twelfth Counterclaim, are time-barred by their respective three-year statutes of limitations ........................... 22

 (a) Mattel's claim for copyright "infringement" is time-barred ............................................................. 22

 (b) Mattel's claim for conversion is time-barred and cannot be saved by any "relation-back" rules ............... 25

 (c) Mattel's common law unfair competition claim is time-barred ............................................. 26

3. Mattel's remaining portion of its Twelfth Counterclaim for statutory unfair competition is time-barred by a four-year statute of limitation ....................................... 27

4. Mattel's claim for declaratory relief is time-barred ........................ 28

C. As MGA And Larian Are New Parties In The '04 Action, And Were Not Omitted by "Mistake", The '04 Complaint Cannot Save Mattel's Claims ........................... 29

D. The '05 Action Cannot Revive Mattel's Claims Against Larian .............. 33

II. MATTEL'S CONVERSION, INTENTIONAL INTERFERENCE WITH CONTRACT, AND UNFAIR COMPETITION CLAIMS ARE PREEMPTED BY THE COPYRIGHT ACT ............................................. 34

A. The BRATZ concept falls within Copyright Act's scope ......................... 35

B. Mattel's conversion, intentional interference with contract, and unfair competition claims fail to meet the "extra element" test ............................ 35

1. Mattel's conversion claim ................................................. 35

2. Mattel's intentional interference with contract claim ..................... 37

3. Mattel's unfair competition claims ...................................... 38

III. MATTEL'S UNFAIR COMPETITION CLAIMS FAIL ..................................... 40

A. MGA's and Larian's Conduct Was Not Unfair ...................................... 40

B. MGA and Larian's Conduct Was Not Fraudulent ................................... 41

C. MGA's and Larian's Conduct Was Not Unlawful ................................... 42

D. Mattel's Common Law Unfair Competition Claims Also Fail ................ 44

IV. MATTEL CANNOT ESTABLISH THAT LARIAN AND MGA INTENTIONALLY INTERFERED WITH BRYANT'S AT-WILL CONTRACT WITH MATTEL ........................................ 44

A.   Bryant did not breach or disrupt his contract with Mattel ......................... 46

B.   MGA and Larian lacked the intent to induce Bryant to breach his contract ................................................................. 46

C.   MGA and Larian did not induce Bryant to leave Mattel and therefore could not be the cause of his alleged breach ...................... 48

V.   AS BRYANT DID NOT OWE A FIDUCIARY DUTY TO MATTEL, THERE CAN BE NO AIDING AND ABETTING LIABILITY .............................................................. 49

CONCLUSION ................................................................................. 50

# TABLE OF AUTHORITIES

**CASES**                                                                     **PAGE(S)**

1-800 Contacts, Inc. v. Steinberg,
  107 Cal. App. 4th 568 (2003) .......................................................... 47, 49

40235 Washington Street Corp. v. Lusardi,
  No. Cir. 90-1472-R,
  1999 WL 33633157 (S.D. Cal. Jan. 19, 1999).......................................... 16

In re Adbox, Inc.,
  488 F.3d 836 (9th Cir. 2007)................................................................ 33

AmerUS Life Insurance Co. v. Bank of America, N.A.,
  143 Cal. App. 4th 631 (2006) .............................................................. 25

American Mortgage Network v. LoanCity.com,
  No. D044550,
  2006 WL 3199291 (Cal. Ct. App. Nov. 7, 2006) ................................... 49

Ananda Church of Self-Realization v. Massachusetts Bay Insurance Co.,
  95 Cal. App. 4th 1273 (2002) .............................................................. 36

Ashlar Inc. v. Structural Dynamics Research Corp.,
  C-94-4344 WHO, 1995 WL 639599,
  36 U.S.P.Q. 2d 1402 (N.D. Cal. 1995) ................................................. 25

Bank of the West v. Superior Court,
  2 Cal. 4th 1254 (1992) .................................................................. 26, 44

Barksdale v. Robinson,
  211 F.R.D. 240 (S.D.N.Y. 2002) ......................................................... 24

Barrington v. A.H. Robins Co.,
  39 Cal. 3d 146 (1985) ........................................................................ 30

Bauer v. Interpublic Group of Companies, Inc.,
  255 F. Supp. 2d 1086 (N.D. Cal. 2003)................................................. 49

Big East Entertainment, Inc. v. Zomba Enterprises, Inc.,
  453 F. Supp. 2d 788 (S.D.N.Y. 2006)................................................... 24

Bono v. Clark,
  103 Cal. App. 4th 1409 (2002) ............................................................ 25

Booth v. Quantum3D, Inc.,
  No. C. 04-5376 EMC,
  2005 WL 1512138 (N.D. Cal. June 15, 2005)........................................ 28

Boyer v. Jensen,
  129 Cal. App. 4th 62 (2005) ................................................................ 34

Brewer-Giorgio v. Producers Video, Inc.,
  216 F.3d 1281 (11th Cir. 2000) ................................................................. 25

Brink v. First Credit Resources,
  57 F. Supp. 2d 848 (D. Ariz. 1999) ..................................................... 31, 32

Brush Creek Media, Inc. v. Boujaklian,
  No. C-02-3491 EDL,
  2002 WL 1906620 (N.D. Cal. Aug. 19, 2002) ......................................... 25

Butler v. Robar Enterprises, Inc.,
  208 F.R.D. 621 (C.D. Cal. 2002) ............................................................. 31

Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.,
  20 Cal. 4th 163 (1999) ....................................................................... 26, 40

Charles Lowe Co. v. Xomox Corp.,
  No. C95-0498 SI,
  1999 WL 1293362 (N.D. Cal, Dec. 27, 1999) ......................................... 21

Charter Oak Fire Insurance Co. v. Bokharian Jewish Community Centers, Inc.,
  No. 01 CIV 4162,
  2002 WL 59420 (S.D.N.Y. Jan. 16, 2002) .............................................. 33

In re Conseco Insurance Co. Annuity Marketing & Sales Practices Litigation,
  No. C-05-04726 RMW, C-06-00537 RMW,
  2007 WL 486367 (N.D. Cal. Feb. 12, 2007) ........................................... 27

Continental Car-Na-Var Corp. v. Moseley,
  24 Cal. 2d 104 (1944) .............................................................................. 46

Cortez v. Purolator Air Filtration Products Co.,
  23 Cal. 4th 163 (2000) ............................................................................ 27

Country Road Music, Inc. v. MP3.com, Inc.,
  279 F. Supp. 2d 325 (S.D.N.Y. 2003) ..................................................... 25

CrossTalk Productions v. Jacobson,
  65 Cal. App. 4th 631 (1998) .................................................................... 43

Davaloo v. State Farm Insurance Co.,
  135 Cal. App. 4th 409 (2005) .................................................................. 29

Del Madera Properties v. Rhodes & Gardner, Inc.,
  820 F.2d 973 (9th Cir. 1987) ........................................................ 35, 39, 40

Della Penna v. Toyota Motor Sales, U.S.A., Inc.,
  11 Cal. 4th 376 (1995) ............................................................................ 38

DeVoto v. Pacific Fidelity Life Insurance Co.,
  618 F.2d 1340 (9th Cir. 1980) ................................................................. 48

Dielsi v. Falk,
  916 F. Supp. 985 (C.D. Cal. 1996) ..................................................... 36, 37

Diodes, Inc. v. Franzen,
  260 Cal. App. 2d 244 (1968)..................................................45, 46

Dover v. Sadowinski,
  147 Cal. App. 3d 113 (1983).........................................................32

Engstrom v. Kallins,
  49 Cal. App. 4th 773 (1996) .........................................................28

Family Home & Finance Center, Inc. v. Federal Home Loan Mortgage Corp.,
  461 F. Supp. 2d 1188 (C.D. Cal. 2006) .........................................45

Fisher v. Dees,
  794 F.2d 432 (9th Cir. 1986)..........................................................39

Fogerty v. Fantasy, Inc.,
  510 U.S. 517 (1994)........................................................................35

Fogel v. UNUM Corp.,
  No. B146857,
  2001 WL 1359112 (Cal. Ct. App. Nov. 6, 2001) ..........................49

Forcier v. Microsoft Corp.,
  123 F. Supp. 2d 520 (N.D. Cal. 2000) ...........................................21

Fox v. Ethicon Endo-Surgery, Inc.,
  35 Cal. 4th 797 (2005) ............................................................17, 20

Gemcraft Homes, Inc. v. Sumurdy,
  688 F. Supp. 289 (E.D. Tex. 1988)................................................38

Gilmore v. State of California,
  No. 93-20788SW,
  1995 WL 492625 (N.D. Cal. Aug. 10, 1995) ................................31

Harper & Row Publishers v. Nation Enterprises,
  723 F.2d 195 (2d Cir. 1983), rev'd on other grounds by,
  471 U.S. 539 (1985)..................................................................37, 38

Henderson v. Bolanda,
  253 F.3d 928 (7th Cir. 2001)..........................................................29

Idema v. Dreamworks, Inc.,
  162 F. Supp. 2d 1129 (C.D. Cal. 2001) ....................................36, 38

Interloc Solutions, Inc. v. Technology Associates International Corp.,
  No. CV071534 LEW GGHX,
  2007 WL 2429715 (E.D. Cal. Aug. 24, 2007)...............................46

International Trade Management, Inc. v. United States,
  553 F. Supp. 402 (Cl. Ct. 1982)....................................................25

Jolly v. Eli Lilly & Co.,
44 Cal. 3d 1103 (1988) ............................................................. 17, 20

Kasparian v. County of Los Angeles,
38 Cal. App. 4th 242 (1995) ............................................................. 38

Kilkenny v. Arco Marine Inc.,
800 F.2d 853 (9th Cir. 1986) ....................................................... 30, 31

Knoell v. Petrovich,
76 Cal. App. 4th 164 (1999) ............................................................. 21

Kodadek v. MTV Networks, Inc.,
152 F.3d 1209 (9th Cir. 1998) ........................................................ 39

Lanard Toys, Ltd. v. Novelty, Inc.,
511 F. Supp. 2d 1020 (C.D. Cal. 2007) ............................................. 39

Levald, Inc. v. City of Palm Desert,
998 F.2d 680 (9th Cir. 1993) ............................................................. 28

Liberty Mutual Insurance Co. v. Fales,
8 Cal. 3d 712 (1973) ...................................................................... 15

In re Literary Works in Electronic Databases Copyright Litigation,
509 F.3d 116 (2d Cir. 2007) ............................................................. 24

Loree Rodkin Management Corp. v. Ross-Simons, Inc.,
315 F. Supp. 2d 1053 (C.D. Cal. 2004) ............................................. 24

Louisiana-Pacific Corp. v. ASARCO, Inc.,
5 F.3d 431 (9th Cir. 1993) .......................................................... 30, 31

MJT Securities, LLC v. Toronto-Dominion Bank,
No. C 03-3815 CW,
2007 WL 1725421 (N.D. Cal. Jun. 14, 2007) ..................................... 50

Mattel, Inc. v. Bryant,
441 F. Supp. 2d 1081 (C.D. Cal. 2005),
aff'd, 446 F.3d 1011 (9th Cir. 2006) ............................................. 14, 37

Mattel, Inc. v. Luce, Forward, Hamilton & Scripps,
No. B143260,
2001 WL 1589175 (Cal. Ct. App. Dec. 13, 2001) ................................ 2

McGee Street Productions v. Workers' Compensation Appeals Board,
108 Cal. App. 4th 717 (2003) ...................................................... 30, 32

Melchior v. New Line Productions, Inc.,
106 Cal. App. 4th 779 (2003) ................................................... 34, 35- 36

Menefee v. Ostawari,
228 Cal. App. 3d 239 (1991) ............................................................. 21

Meridian Project Systems, Inc. v. Hardin Construction Co.,
No. Civ. S-04-2728 FCD DAD, 2006 WL 1062070,
79 U.S.P.Q. 2d 1691 (E.D. Cal. 2006)......................................36

Metro Traffic Control, Inc. v. Shadow Traffic Network,
22 Cal. App. 4th 853 (1994) .............................................45, 46

Miguel v. Country Funding Corp.,
309 F.3d 1161 (9th Cir. 2002) ...............................................24

Minder Music Ltd. v. Mellow Smoke Music Co.,
No. 98 Civ. 4496 (AGS), 1999 WL 820575,
52 U.S.P.Q. 2d 1700 (S.D.N.Y. 1999)...............................23, 24

Motown Record Corp. v. George A. Hormel & Co.,
657 F. Supp. 1236 (C.D. Cal. 1987) ...........................35, 38, 40

National Rural Telecommunications Co-op. v. DIRECTV, Inc.,
319 F. Supp. 2d 1059 (C.D. Cal. 2003) ...........................41, 42

In re Network Assocs., Inc. II Sec. Litig.,
No. C00-CV-4849,
2003 WL 24051280 (N.D. Cal. Mar 25, 2003)....................30-31

Netzer v. Continuity Graphic Associates, Inc.,
963 F. Supp. 1308 (S.D.N.Y. 1997)..........................................23

Norgart v. Upjohn Co.,
21 Cal. 4th 383 (1999) .............................................................30

Papenthien v. Papenthien,
16 F. Supp. 2d 1235 (S.D. Cal. 1998)......................................29

Pembroke, By and Through Pembroke v. City of San Rafael,
No. C 92 1869 BAC,
1994 WL 443683 (N.D. Cal. Aug. 2, 1994) .............................31

People v. Hood,
1 Cal. 3d 444 (1969)  ...............................................................42

Percy v. San Francisco General Hospital,
841 F.2d 975 (9th Cir. 1988)....................................................29

Polar Bear Productions, Inc. v. Timex Corp .,
384 F.3d 700 (9th Cir. 2004)......................................17, 19, 22

Rambus Inc. v. Samsung Electronics Co., Ltd.,
No. C05-02298 RMW, C05-00334 RMW,
2007 WL 39374, (N.D. Cal. Jan. 4, 2007)................................21

Reeves v. Hanlon,
33 Cal. 4th 1140 (2004) ......................................................45, 46

Richard B. LeVine, Inc. v. Higashi,
131 Cal. App. 4th 566 (2005) ..................................................50

Roger Miller Music, Inc. v. Sony/ATV Publishing, LLC,
   477 F.3d 383 (6th Cir. 2007)...................................................... 23

Roley v. New World Pictures, Ltd.,
   19 F.3d 479 (9th Cir. 1994)................................................ 17, 22

Ryan v. Carl Corp.,
   No. C97-3873 FMS,
   1998 WL 320817 (N.D. Cal. June 15, 1998)........................... 25

Scherer v. Mark,
   64 Cal. App. 3d 834 (1976)...................................................... 32

Selby v. Newline Cinema Corp.,
   96 F. Supp. 2d 1053 (C. D. Cal. 2000) .................................... 39

Sidney v. Superior Court,
   198 Cal. App. 3d 710 (1988)..................................................... 34

Smith & Hawken, Ltd. v. Gardendance, Inc,
   No. C04-1664 SBA,
   2004 WL 2496163 (N.D. Cal. Nov. 5, 2004) .................... 42, 44

Snapp & Associates Insurance Services, Inc. v. Robertson,
   96 Cal. App. 4th 884 (2002) ............................................. 25, 27

Sony Pictures Entertainment, Inc. v. Fireworks Entertainment Group, Inc.,
   156 F. Supp. 2d 1148 (C.D. Cal. 2001) .................................... 39

South Carolina v. Catawba Indian Tribe, Inc.,
   476 U.S. 498 (1986)................................................................. 16

Strasberg v. Odyssey Group, Inc.,
   51 Cal. App. 4th 906 (1996) .................................................... 25

Stutz Motor Car of America, Inc. v. Reebok International, Ltd.,
   909 F. Supp. 1353 (C.D. Cal. 1995),
   aff'd, 113 F.3d 1258 (Fed. Cir. 1997) ..................................... 27

Sybersound Records, Inc. v. UAV Corp.,
   No. 06-55221,
   2008 WL 509245 (9th Cir. Feb. 27, 2008) ............................... 41

In re Syntex Corp. Securities Litigation,
   855 F. Supp. 1086 (N.D. Cal. 1994),
   aff'd, 95 F. 3d 922 (9th Cir. 1996) .......................................... 30

Trembath v. Digardi,
   43 Cal. App. 3d 834 (1974)...................................................... 21

Triangle Film Corp. v. Artcraft Pictures Corp.,
   250 F. 981 (2d Cir. 1918)......................................................... 45

Trindade v. Superior Court,
   29 Cal. App. 3d 857 (1973)...................................................... 34

Trovan, Ltd. v. Pfizer, Inc.,
   No. CV-98-0094 LGB MCX,
   2000 WL 709149 (C.D. Cal. May 24, 2000) ............................................ 26

Tu-Vu Drive-In Corp. v. Davies,
   66 Cal. 2d 435 (1967) ................................................................................ 21

Tuchscher Development Enterprises, Inc. v. San Diego Unified Port District,
   106 Cal. App. 4th 1219 (2003) .................................................................. 47

United States v. Kubrick,
   444 U.S. 111 (1979) ................................................................................... 15

Union Pacific Railroad Co. v. Nevada Power Co.,
   950 F.2d 1429 (9th Cir. 1991) ................................................................... 29

Universal City Studios, Inc. v. J.A.R. Sales, Inc.,
   No. 82-4892-AHH(BX), 1982 WL 1279,
   216 U.S.P.Q. 679 (C.D. Cal. 1982) ........................................................... 35

VL Systems, Inc. v. Unisen, Inc.,
   152 Cal. App. 4th 708 (2007) .................................................................... 46

Watermark Publishers. v. High Technology Systems, Inc.
   No. 95-3839 IEG (CGA), 1997 WL 717677,
   44 U.S.P.Q. 2d 1578 (S.D. Cal. 1997) ............................................... 22-23, 39

Watson Laboratories, Inc. v. Rhone-Poulenc Rorer, Inc.,
   178 F. Supp. 2d 1099 (C.D. Cal. 2001) ................................................. 40, 41

Weinstock, Lubin & Co. v. Marks,
   109 Cal. 529 (1895) ................................................................................... 26

Weissmann v. Freeman,
   868 F.2d 1313 (2d Cir. 1989) .................................................................... 24

Welles v. Turner Entertainment Co.,
   503 F.3d 728 (9th Cir. 2007) ..................................................................... 23

Woo v. Superior Court,
   75 Cal. App. 4th 169 (1999) ...................................................................... 32

Worth v. Universal Pictures, Inc.,
   5 F. Supp. 2d 816 (C.D. Cal. 1997) ........................................................... 37

Xtracash ATM, Inc. v. Karsh,
   No. D037905,
   2002 WL 31053855 (Cal. Ct. App. Sept. 16, 2002) ................................. 49

Zuill v. Shanahan,
   80 F.3d 1366 (9th Cir. 1996) ..................................................................... 23

## STATUTES

Cal. Bus. & Prof. Code § 17200 ............................................................. 26, 27

Cal. Bus. & Prof. Code § 17208.................................................................27

Cal Civ. Proc. Code § 338...............................................................25, 26

Cal. Civ. Proc. Code § 339..............................................................21, 22

Cal. Penal Code § 641.3 .....................................................................42

Fed. R. Civ. P. 13(a) & (b)...................................................................33

Fed. R. Civ. P. 15(c) (3) ......................................................................16

17 U.S.C. §§ 101, et seq........................................................................22, 35

17 U.S.C. § 102 ...................................................................................35

17 U.S.C. § 301(a)................................................................................34

17 U.S.C. § 507(b) ...............................................................................22

**MISCELLANEOUS**

3 B.E. Witkin, California Procedure:  Actions (3d. 1985)............................28

3 B.E. Witkin, California Procedure:  Actions (4th ed. 1996)..........21, 28, 34

Black's Law Dictionary 1399 (6th ed. 1997)...............................................42

M. Nimmer & D. Nimmer, Nimmer on Copyright ¶ 1.01[B][1] (2007) ......34

Restatement (Second) of Torts § 766, cmt. n..........................................48, 49

## **PRELIMINARY STATEMENT**

1

2    For 50 years, Barbie has dominated the fashion doll market, and Mattel has enjoyed a

3    monopoly.  In early 2001, that monopoly became threatened when MGA released the

4    BRATZ, an innovative take on the fashion doll concept.[1]  Sales of the BRATZ were a

5    phenomenon and quickly eroded Barbie's long-settled and dominant market position.  By

6    the end of 2003 and early 2004, the reality of Mattel's inability to compete had set in.

7    According to internal Mattel documents, its executives were in a full-blown panic,

8    concluding that ███████████████ and the ████████████ These concerns were

9    based on the fact that Barbie's market share had plummeted at a ████████████, while the

10   BRATZ share was skyrocketing.  (Ex. 35.)[2]  Mattel made some feeble efforts to restore

11   Barbie's luster, but all the cosmetic surgery in the world could not make this 50 year old

12   grand dame competitive with the hip and fresh BRATZ designs, marketing, and packaging.

13   As Mattel's senior executives lamented in early 2004, ██████████████████████

14   ███████ (Ex. 33.)

15   Having been, by its own admission, ███████████████████ in the market by

16   MGA and with Barbie losing market share ██████████ to the BRATZ, Mattel

17   decided to turn to the courts for relief.  According to Mattel's own employees, ████████

18   ████████████████████████████████████████████████████████████

19   ████████████████████████████████████ (Ex. 21 (Brawer) at

20   232:19-233:22.)  This is far from the first time that Mattel has tried litigation instead of

21   competition; Mattel and its counsel have a well-earned reputation for overzealously suing

22   anyone who had the temerity to enter the fashion doll market.  Indeed, a California court

23   found it to be "substantially true" that "Mattel aggressively defends against any entries in

24   the fashion doll business and 'anyone who makes an 11 1/2 inch fashion doll paints a target

25

26   [1]    "MGA" hereafter refers to MGA Enter., Inc., MGA Enter. (HK) Limited, MGAE de Mexico, S.R.L. de C.V., and the "MGA Parties" refers to Larian and MGA.

27   [2]    All "Ex." cites herein refer to documents attached as exhibits to the concurrently filed Declaration of Jason D. Russell in Support of the MGA Parties' Motion for Partial Summary

28   Judgment, unless otherwise noted.

1  on their back.'" Mattel, Inc. v. Luce, Forward, Hamilton & Scripps, 2001 WL 1589175, at
2  *9 (Cal. Ct. App. Dec. 13, 2001). Given that Mattel's claims were devised to force MGA
3  out of business, it comes as no surprise that such claims are factually and legally untenable,
4  and the MGA Parties are entitled to partial summary judgment on all Phase I claims asserted
5  against them.

6      The claims ultimately filed by Mattel present a classic case of overreaching. The
7  issue in this case can be simply stated as follows: did Bryant "conceive" or "reduce to
8  practice" his idea for the BRATZ dolls while employed at Mattel and in such a manner that
9  Mattel has a legitimate claim of ownership over the idea. Despite the simple nature of the
10 issue here, Mattel, consistent with its strategy of litigation by attrition, has mushroomed this
11 simple question into an unwieldy and complicated action by asserting a slew of state law
12 and time-barred claims that lack merit and then trying to bury MGA under thousands of
13 discovery requests and countless hours of expense. But an analysis of the relevant facts and
14 applicable law makes clear that Mattel's claims have no merit. By this motion, the MGA
15 Parties ask this Court to pare the case back to its essence, streamlining issues for the parties,
16 the Court, and most importantly, the jury if one is needed. As shown below, all of Mattel's
17 Phase I claims fail as a matter of law and should be dismissed on summary judgment with
18 respect to the MGA Parties.

19     In the concurrently filed summary judgment motion of Carter Bryant ("Bryant Br."),
20 Bryant establishes as a matter of law that Mattel has no legal right to ownership of the
21 BRATZ concept under his agreements with Mattel. (Bryant Br. at III.B.1.) The MGA
22 Parties join and incorporate those arguments herein by reference. If, as the MGA Parties
23 conclude it should, the Court accepts Bryant's arguments, then there is no need to even
24 review this brief, as there is no basis on which Mattel could prevail on any of its claims
25 against any party. Assuming, for argument's sake, that the Court finds a genuine issue on
26 the arguments in Bryant's motion for summary judgment, then all of Mattel's claims still
27 fail for the reasons stated herein under settled law and undisputed facts.

28     First, assuming Mattel had any right to the BRATZ concept, Mattel's tactical decision

1 to wait over *five and a half years* from when it was placed on notice of its potential claims
2 renders all of its claims time-barred on their face.  Mattel doubtless will argue that the
3 "relation-back" doctrine saves their claims, and will point to this Court's earlier decisions
4 that were made before any discovery had occurred.  As shown below, Mattel's claims
5 against MGA and Larian do not "relate back" to any earlier pleadings as a matter of law
6 because MGA and Larian were new parties, and Mattel has no cause to argue any mistake
7 or lack of knowledge about their identity.  Quite the contrary, Mattel concedes it knew of all
8 the facts needed to assert its claims long before it filed any action and yet chose not to assert
9 claims against MGA or Larian until November of 2006.  Under settled Ninth Circuit and
10 California law precedent, there is no basis to permit relation back in these circumstances
11 and, thus, all of Mattel's claims are time-barred.  (See Section I, infra.)

12       Second, Mattel's interference with contract, conversion and unfair competition claims
13 (its Sixth, Eleventh and Twelfth Counterclaims, respectively) are preempted by the
14 Copyright Act as a matter of law because the gravamen of these claims is for ownership of
15 the BRATZ concept, an issue that falls squarely within the exclusive protections of the
16 Copyright Act.  (See Section II, infra.)

17       Third, Mattel's statutory and common law unfair competition claims (the Twelfth
18 Counterclaim) fail as a matter of law because Mattel cannot establish that MGA's or
19 Larian's conduct was unlawful, fraudulent, or unfair.  (See Section III, infra.)

20       Fourth, Mattel's claim for intentional interference with contract (its Sixth
21 Counterclaim) fails because: (a) Bryant did not breach his contract with Mattel; (b) there is
22 no evidence that MGA intended to cause Bryant to breach his contract given his
23 representations (and the representations of his patent counsel) that his actions did not breach
24 any contractual obligations to Mattel and that he owned the rights to the BRATZ concept
25 free of claims by any party; and (c) there is no evidence that MGA induced Bryant to breach
26 his contract with Mattel, as it is undisputed that Bryant approached MGA of his own accord.
27 (See Section IV, infra.)

28       Finally, Mattel's claim for aiding and abetting a supposed breach of fiduciary duty

1  allegedly owed by Bryant to Mattel (its Eighth Counterclaim) fails because Bryant, as a
2  matter of law, did not owe such a duty to Mattel. (See Section V, infra.)

3      In sum, however viewed, all of Mattel's claims fail, and MGA and Larian are entitled
4  to partial summary judgment of all of Mattel's Phase I claims.

## FACTUAL BACKGROUND[3]

### 1.  Bryant's Initial Meetings with MGA And His Contract With MGA

7      In early 2000, Bryant showed the BRATZ drawings he created prior to returning to
8  Mattel to Veronica Marlow, who he had met while she worked at Mattel. (UF ¶ 2.)[4]
9  Marlow was then a freelance designer who was not working for MGA. (UF ¶¶ 2-3.)
10  Nothing came of that conversation. Some months later, in July of 2000, while Bryant was
11  cleaning out some stored boxes in his studio, he came across his BRATZ drawings, and
12  realized that he ████████████████████████████████ (UF ¶ 4.)

13      The first person he called was Marlow, asking if ████████████████
14  ████████████████████████ (UF ¶ 5.) Marlow suggested MGA, the first time
15  Bryant had heard of it. (UF ¶¶ 6-7.) Bryant had had no contact with MGA personnel until
16  he arrived at MGA headquarters in late August 2000 for the pitch meeting Marlow had
17  arranged with Paula Garcia and Victoria O'Connor. (UF ¶¶ 8-9.)[5] At the meeting, Garcia
18  and O'Connor received Bryant's drawings enthusiastically and asked him to meet MGA's
19  owner Isaac Larian. (UF ¶ 11.)

20      At a second meeting, on September 1, 2000, Bryant showed his drawings to Garcia,
21  Marlow, O'Connor, and Larian. (UF ¶ 12.) MGA asked whether the BRATZ concept was
22  something Mattel had the rights to. (UF ¶ 14.) Specifically, Larian asked Bryant if the
23  drawings were of ████████████████████████████████████████

---

25  [3]    Rather than repeat the facts set forth in Bryant's brief, the MGA Parties incorporate them by reference and add additional facts that are pertinent to consideration of the arguments herein.
26  [4]    Citations to "UF" refer to undisputed facts set forth in the MGA Parties' [Proposed] Statement of Uncontroverted Facts and Conclusions of Law filed concurrently herewith.
27
28  [5]    For introducing him to MGA, Bryant pays Marlow ten percent of his BRATZ royalties. (UF ¶ 10.)

1  ███████ (UF ¶ 14.)  As Larian explained, ███████████████████████

2  ████████████████████████████████████████████████████████ (Id.)

3  For his part, Bryant was aware he had signed a confidentiality agreement when he returned

4  to Mattel in January of 1999, but considered the BRATZ to be ████████████████

5  ██████████████████████████████████████████████████ (UF ¶

6  15.) ████████████████████████████

7  ██████████████████████ (Ex. 1 (Bryant) at 184:22-24.)

8       Negotiations ensued between the parties.  MGA requested copies of Bryant's

9  employment contract with Mattel because MGA ████████████████████

10 ████████████████████████ (UF ¶ 16.)  Specifically,

11 MGA's attorney David Rosenbaum wanted to see the document because he wanted to

12 insure ██████████████████████████████████

13 ██████████████████ (UF ¶¶ 17-18.)  But Bryant was unable to provide a copy of the

14 document in response to that request because he did not have a copy in his possession.  (UF

15 ¶ 19.)

16      Unable to review a copy of Bryant's Inventions Agreement, Rosenbaum sought

17 assurances from Bryant's attorney, Anne Wang, that Bryant's development of the BRATZ

18 concept fell outside the scope of Bryant's employment with Mattel.  (UF ¶ 20.)  In response,

19 Bryant and Wang, an experienced patent attorney, assured MGA that Bryant ████████

20 ████████████████████████████████████████████████████████

21 ████████ (UF ¶¶ 15, 20-22.)[6]  In the contract between MGA and Bryant, Bryant warranted

22 [6] ████████████████████████

23 ████████████████████████████████████████████████████████

24 ████████████████████████████████████████████████████████

25 ████████████████████████████████████████████████████████

26 ████████████████████████████████████████████████████████

27 ████████████████████████████████████████████████████████

28 ████████████████████████████████████████████████████████

1   that his contracting with MGA did not violate or breach any existing contract with a third

2   party, that the concept and drawings were ███████ did not infringe on any third party's

3   contractual or intellectual property rights, were the exclusive property of MGA, and

4   indemnified MGA should a third party claim ownership of the BRATZ concept or drawings.

5   (UF ¶¶ 14, 23.)  Bryant signed the MGA contract on October 4, 2000.  (UF ¶ 23.)

6         MGA and Larian expected that on signing a contract with MGA, Bryant would

7   immediately resign from Mattel and begin working ███████ on BRATZ.  (UF ¶¶ 24-26.)

8   Indeed, Larian instructed Bryant to quit his job at Mattel immediately because Bryant

9   needed to work ██████████████████████ (UF ¶¶

10   24- 25.)

11     **2.   Mattel Becomes Aware of MGA's Ownership of BRATZ in February 2001 and Suspects Bryant's Involvement In BRATZ Design**

12         **(a)   February 2001 – Mattel sees the BRATZ at the Toy Fair**

13         When he left Mattel in October 2000, Bryant told Mattel, and Mattel understood, that

14   he was leaving to work on a line of dolls.  (UF ¶¶ 27-28.)  His supervisors suspected he was

15   going to work for a competitor (UF ¶ 29), and the rumor within Mattel was that the

16   competitor was MGA.  (UF ¶ 30.)  Soon thereafter, beginning in early 2001, MGA unveiled

17   BRATZ prototypes at a series of toy fairs, first in Hong Kong in January 2001 and then in

18   New York in February 2001.   (UF ¶¶ 31-32.)   Immediately following these initial

19   exhibitions, MGA and the BRATZ received considerable publicity, appearing on a

20   nationally syndicated clip of Toy Fair highlights hosted by "Toy Guy" Chris Byrne (Ex. 67),

21   and in several public media sources (UF ¶ 35).  Larian began speaking publicly on behalf of

22   MGA and BRATZ as early as February 2001.  (UF ¶ 36.)

23         Mattel attended the New York Toy Fair.  (UF ¶ 34.)  While there, MGA offered

24   Mattel the opportunity to license and distribute the BRATZ.  (UF ¶ 37.)  Although Mattel

25   apparently initially jumped at the chance to sell BRATZ, in March of 2001 Mattel wrote to

26

27   ██████████████████████████████

28   ██████████████████████████████

1  MGA and stated that it would not license and distribute BRATZ because ██████████

2  ████████████████████████████████████████████████████████████████

3  ████████████████████ (Id.)  Despite declining to distribute the BRATZ, Mattel

4  nonetheless (unbeknownst to MGA) placed the BRATZ line into the Mattel product system,

5  which came to light in April 2001, when MGA ████████████████████████████████

6  ████████████████████████████████████████████████████████████████

7  ████████████████████████████████████████████  (UF ¶ 38.)

8  **(b)  June 2001 – BRATZ release in Spain piques Mattel's interest**

9  MGA spent the spring of 2001 finalizing the BRATZ, and released the first dolls to

10  the consumers in Spain in June 2001.  (UF ¶ 39.)  This initial release caught the eye of a key

11  Mattel employee, Adrienne Fontanella, who was the head of Mattel's Girls' Division.  (UF

12  ¶ 40.)  By July 2001, although BRATZ had not yet been launched in the United States,

13  Mattel's Marketing Division was well aware of its existence, and had begun monitoring

14  BRATZ as a competitor of Barbie.  (UF ¶ 41.)  Fontanella's deposition testimony confirms

15  Mattel's very early interest in BRATZ.[7]  While the precise substance of Mattel's internal

16  meetings regarding MGA and BRATZ in the summer of 2001 is unknown because Mattel

17  did not produce its files, Mattel was closely watching MGA and BRATZ.  Indeed, even

18  Mattel's Chairman and CEO, Robert Eckert, knew about BRATZ ██████████████ (UF

19  ¶ 42) and even knew that BRATZ had gained market share on Barbie ██████ (UF ¶ 44.)

**(c)  BRATZ are introduced to the American market**

20  In the fall of 2001, BRATZ were released in the United States to widespread acclaim,

21  with toy analysts predicting that the dolls would be a top-seller during the 2001 holiday

22  season.  Indeed, upon MGA's initial release of BRATZ in the U.S., the American media

23

24  [7]  Id. ████████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████████████████

26  ████████████████████████████████████████████████████████████████

27  ████████████████████████████████████████████████████████████████

28  ████████████████████████████████████████████████████████████████

placed the dolls on the short list of hit toys for 2001.  (UF ¶ 45.)    Moreover, MGA's BRATZ dolls were named as one of the "Hot 1's To Watch" by an American news source in October 2001.  (Id.)  BRATZ rounded out 2001 with strong holiday sales and earned a coveted Toy of the Year nomination from the Toy Industry Association.   (UF ¶ 45 ("'There's no rest in this business,' says MGA Head Elf, er, President Isaac Larian.  'We've had a fantastic year (in 2001), and we expect to double our business next year.'").)  The ████████ at Mattel about BRATZ were widespread by this time. (Ex. 18 (Simpson-Taylor) at 102:12-23, 103:3-19.)

### (d)   Mattel immediately concludes that BRATZ was copied from Mattel dolls

Mattel's immediate reaction upon seeing the first BRATZ dolls in 2001 was that they had been copied from Mattel's line of "Diva Starz" or "Toon Teens" dolls.  (UF      ¶ 47.)  Ivy Ross, a former VP of Product and Visual Design at Mattel, believed it had been copied by BRATZ (UF ¶ 48), as did Lilly Martinez, Mattel's Design Manager and creator of Mattel's "Toon Teens."  (UF ¶ 49.)  On August 14, 2001, Debbie Hastie, a senior manager of the Mattel Product Design in the Design Center, wrote to Elise Cloonan, a Mattel designer that she believed BRATZ resembled Lilly Martinez's Toon Teens dolls.  (UF ¶ 50.)[8]  Even a reporter noted, "[w]hen I first saw BRATZ dolls at the Toy Fair this year, they reminded me of Mattel, Inc.'s electronic talking Diva Starz dolls."  (UF ¶ 51.)

### (e)   It was ██████████████ within Mattel in 2001 that Bryant created BRATZ

Shortly after Mattel's marketing department became aware of the BRATZ, word spread throughout Mattel that Carter Bryant was the creator of the BRATZ:

• Elise Cloonan testified that in 2001 it was ████████████ at the Mattel Design Center that Bryant was behind BRATZ, and that ████████████ ████ about BRATZ as a result.  (UF ¶ 53.)  The ████████ as Cloonan put it, did

---

[8]   See Ex. 28 (e-mail dated August 14, 2001 from Debbie Hastie to Elise Cloonan).
████████████████████████████████████████████████████
████████████████████████████████████████████████████

1 | not consist of simply ████████████████████████████

2 | and ██████████████████████████████████████ (UF ¶

3 | 53.)

4 | • It was widely rumored within Mattel between Bryant's departure in

5 | October 2000 and the release of BRATZ in 2001 that Bryant was involved with MGA

6 | on the BRATZ, because when Mattel employees ██████████████████████

7 | ███████████████████████████████████████████████████

8 | ████████████████████████ (UF ¶ 54.)

9 | • Ann Driskill, Mattel's Senior Director in Collectibles Division, testified

10 | that ███████████████████████████████████████████

11 | ████████████ (UF ¶ 52.)

12 | • Margaret Leahy, a former Mattel designer, testified that ███████████

13 | ███████████████████████████████████████████████████

14 | ███████████████████████████████████████████████████

15 | ███████████████████████████████████████████████████

16 | ███████████████████████████████████████████████████

17 | ███████████████████████████████████████████████ (Id.)

18 | • Mattel was ██████ about MGA's success with the BRATZ line and the

19 | competitive implications of that success, but once numerous Mattel employees

20 | confirmed that Bryant was indeed the creator of BRATZ, Mattel's interest in MGA

21 | and the genesis of BRATZ grew from a rumble to a full blown investigation.

22 | **3.  In March 2002, Mattel Launches An Internal Campaign To Investigate Its Alleged Rights In the BRATZ, Bryant's Creation Of The BRATZ ConceptAnd MGA's Role In Its Development**

23 | Toward the end of 2001 and continuing into early 2002, Mattel's Legal and

24 | Investigations Departments became involved in Mattel's ongoing inquiry into MGA's

25 |

26 | 9 ████████████████████████████████████████████

27 | ███████████████████████████████████████████████████

28 | ███████████████████████████████████████████████████



creation of BRATZ.  (UF ¶ 56.)

(UF ¶ 57.)[10]

(UF ¶ 58.)          (UF ¶ 59.)

[10]    Mattel has steadfastly refused to produce all the details concerning its investigation, and a motion to compel production of the withheld materials is scheduled to be heard after the filing of this motion.  Once MGA has gained access to these materials, it will supplement its presentation to the Court with the newly obtained evidence.

[11]    UF ¶¶ 60-61

[12]

(UF ¶ 65.)



**4. Mattel Continues To Be Bombarded With Public Information About MGA, Larian And BRATZ Until It Sued Bryant in April 2004**

From August 2002, [redacted] to April 2004, when Mattel filed suit against Bryant,[13] Mattel was already familiar with MGA and BRATZ. (UF ¶ 78 (collecting articles).) By 2003, Mattel's flagship – the Barbie doll – had begun to lose market share to BRATZ. (UF ¶ 74.) In October 2003, Mattel re-hired Tim Kilpin to head up its Girls' Division to help revive the Barbie brand. (UF ¶ 75.) Kilpin, who had known Larian was involved with BRATZ from December 2001, was acutely aware of BRATZ' new-found dominance, having personally congratulated Larian on the success of BRATZ vis-à-vis Barbie in a December 12, 2001 e-mail. (UF ¶ 76.) [redacted]

---

[13]   Mattel admits in its 2004 Complaint, filed on April 27, 2004 as Case No. 04-9059 SGL (RNBx) (the "'04 Action") in California state court (hereinafter, the "'04 Complaint") against Bryant only, that it understood Bryant to have worked with a "competitor" in developing a concept while under agreement with Mattel. See '04 Compl. ¶ 12. This is clearly a reference to MGA who, as described above, Mattel had known since early 2001 was involved with BRATZ and Bryant.

1 ██████████████████████████████████████ (Ex. 40 (Mattel's Supp. Resps. to

2 MGA's First Set of Interrogs., Supp. Resp. No. 10.)[14]

### 5. **Barbie's** ████████████████ **Due to Brisk Sales of BRATZ**

4     Although Mattel had known all along about MGA and Bryant's success with BRATZ,

5 when Kilpin took over the Girls Division, he quickly impressed upon everyone how

6 BRATZ was destroying Barbie's market share. (UF ¶ 77.) In the months after Mr. Kilpin

7 joined Mattel, Barbie's sales plummeted, giving Mr. Kilpin cause to up the ante and scream

8 ████ in a crowded, and battered, doll house. (UF ¶ 77 ███████████

9 ████████████████████████████████████████████

10 ████████████████████████████████████████████

11 ████████████████████████████████████████████

12 ██████████████████████████████████████)); see also UF ¶ 79.) By

13 April 2004, then, Mattel was digging in for a full scale ████████████ to save its

14 ██████████ (Ex. 70.)

15     In April 2004, internal Mattel reports noted in panic that, ████████████████

16 ██████████████ (Ex. 35.) These same reports made clear how dire the competition Barbie

17 faced was to Mattel's survival: a ████████████████████, and so Mattel

18 concluded that its response to this competition ████████████████

19 ██████████████ (Id.) Unfortunately for Mattel, given the tremendous success of BRATZ,

20 and the uniformly held view that MGA's genius in marketing, packaging, and fashion

21 accessories for the line were the best in the business, even Mattel's own executives

22 concluded that ████████████████████████████ (Ex. 33.) So Mattel did

23 what it always does when competition looms: it filed a lawsuit to drive its competitor out of

24 business. Indeed, discovery in this case revealed that Mattel expressly considered litigation

25 as a means of driving MGA and BRATZ out of the market so that Barbie could reclaim her

---

14     Despite everything Mattel knew of MGA and Bryant, it failed to register its alleged copyrights in Bryant's drawings until October 30, 2006. (UF ¶ 80.)

1 lost luster.[15]

2 ### 6.   **The History of the Litigation at Hand**

3 The earliest pleading in these consolidated proceedings is Mattel's '04 Complaint,
4 filed on April 27, 2004 against a single defendant – Bryant – and ten "Doe" defendants.
5 Mattel's claims in that action focused on Bryant's involvement with an unnamed
6 "competitor", which allegedly received from Bryant Mattel's intellectual property; this
7 Complaint further alleged that Bryant used "Mattel's property and resources" for the benefit
8 of himself and the aforementioned "competitor", and that Bryant "converted" Mattel's
9 "intellectual property and intangible property" by "asserting ownership" of that property
10 and providing it to "others." ('04 Compl. ¶¶ 12, 18, 23, 24, 30, 31, 36, 41 & 42.)

11 The '04 Complaint specified that no later than November 2003 Mattel already knew
12 that "Bryant had secretly aided, assisted and worked for a Mattel competitor . . . by entering
13 into an agreement with the competitor, during the time [he] was employed by Mattel." (Id.
14 ¶ 12.)  Mattel also knew that "Bryant's agreement with the competitor obligated Bryant to
15 provide product design services to the competitor on a 'top priority' basis." (Id.)  Mattel
16 also knew that Bryant's agreement with that competitor "provided . . . that Bryant would
17 receive royalties and other consideration for sales of products on which [he] provided aid or
18 assistance; that all work and services furnished by Bryant to the competitor under the
19 agreement would be considered 'works for hire'; and that all intellectual property rights to
20 preexisting work by Bryant purportedly would be assigned to the competitor." (Id.)  Mattel
21 sought damages for the alleged misappropriation of its property and an injunction against
22 Bryant and "those acting in concert and participation: with him, prohibiting them from
23 "continuing to benefit from" Bryant's alleged misappropriation. (Id. ¶¶ 19, 27, 29, 34 & 45.)

24 Mattel thus was clearly on notice of the facts underlying its current claims against

25 ────────────
15 ████████████████████████████████████
26 █████████████████████████████████████████
27 █████████████████████████████████████████
28 █████████████████████████████████████████

1  MGA and Larian by the time it filed the '04 Action; given that knowledge, Mattel's refusal

2  to identify the alleged competitor it knew so much about could only be viewed as a strategic

3  choice.  Mattel candidly admitted in its motion for leave to assert the claims at issue here

4  that the discovery obtained by Mattel after it filed the '04 Complaint only "confirmed" what

5  it had already suspected; namely, that "Bryant created BRATZ designs, and aided MGA,

6  during his Mattel employment and that he did so using Mattel resources." (Memorandum of

7  Points and Authorities in Support of Mattel, Inc.'s Motion for Leave to File Amended

8  Complaint, at 5:7-10 (emphasis added).)

9      On May 14, 2004, Bryant filed its first notice of removal to this Court.  On August 20,

10  2004, the action was remanded back to state court.  Upon remand, Bryant counterclaimed

11  against Mattel, asserting that the employment agreements at issue were invalid.[16]  After an

12  initial round of preliminary discovery, Bryant filed his second notice of removal on

13  November 2, 2004.[17]  Soon thereafter, the parties agreed that MGA would intervene "as a

14  procedural matter" only.[18]  On December 1, 2004, Mattel again moved to remand; that

15  motion was denied by Judge Manella on March 4, 2005, whose decision was affirmed by

16  the Ninth Circuit on May 2, 2006.  See Mattel, Inc. v. Bryant, 441 F. Supp. 2d 1081 (C.D.

17  Cal. 2005), aff'd, 446 F.3d 1011 (9th Cir. 2006).

18      On April 13, 2005, MGA filed its complaint against Mattel, alleging that Mattel had

19  engaged in copycatting of MGA's BRATZ line of dolls and other wrongful behavior

20  designed to stifle MGA as a competitor. (See MGA's Complaint in Case No. 05-2727 SGL

21  (RNBx) (the "'05 Action").)  MGA is the sole plaintiff in the '05 Action. On May 13, 2005,

22

---

[16]      See Bryant's Cross-Complaint dated August 24, 2004, Case No. 04-9059 SGL (RNBx).
23  These counterclaims were dismissed along with Bryant's declaratory action on July 18, 2006. See
    Order Granting Mattel's Motion to Dismiss Bryant's Action for Declaratory Relief and
24  Counterclaims, dated July 18, 2006.

[17]      On the same day, Bryant filed a complaint in federal court seeking a declaratory judgment
25  that BRATZ do not violate Mattel's copyright. See Bryant's Complaint in Case No. in Case No.
    CV 04-9040, dated November 2, 2004.
26
[18]      See Stipulation and Order dated December 7, 2004, at 1:10-11, 1:14-15. Mattel was on
27  notice that MGA did not consider Mattel's claims to be asserted against it via this procedural
    maneuver.  See Mattel, Inc., 446 F.3d at 1013 (on appeal taken after MGA's procedural
28  intervention, noting MGA's argument that "Mattel seeks no relief from MGA").

1  Mattel filed its original answer in the '05 Action (the "'05 Answer"). The litigation was
2  thereafter stayed on May 20, 2005, while the appeal before the Ninth Circuit was pending.
3  Notwithstanding the stay, on September 19, 2005, Mattel filed an amended answer in the
4  '05 Action.  The stay was lifted after the Ninth Circuit's opinion came down on May 2,
5  2006, and the Court consolidated the three cases filed to date on June 19, 2006.  (Order
6  Consolidating Case Nos. CV 04-9049, CV 04-9059, and CV 05-2727, dated June 19, 2006.)

On November 20, 2006, Mattel – for the first time in the *two and a half years* since
8  the inception of this litigation – moved to assert claims against MGA and Larian. These
9  claims focus on Mattel's claim of ownership of the BRATZ and allegations of infringement
10  thereon by MGA and Larian.  Mattel also claims that MGA and Larian induced Bryant's
11  breach of contract, fiduciary duty and duty of loyalty by collaborating with him on the
12  BRATZ's development while Bryant was still in Mattel's employ; and engaged in
13  conversion and unfair competition based on their role in Bryant's development of the
14  BRATZ. (Mattel, Inc.'s Second Amended Answer in Case No. 05-2727 and Counterclaims
15  ("SAA") ¶¶ 82-170.)  On January 12, 2007, this Court granted Mattel leave to assert these
16  claims as counterclaims in the '05 Action.

## ARGUMENT

## I.   ALL CLAIMS AGAINST MGA AND LARIAN ARE TIME-BARRED

The policies behind the statute of limitations considerations are well-known in their
design to protect defendants and courts from dealing with stale claims.[19] Mattel's claims are
all, on their face, time-barred.  The longest statute of limitation applicable here is four years,
but it was not until November 20, 2006 – i.e., over *five and a half* years after Mattel was on

---

[19]    See U. S. v. Kubrick, 444 U.S. 111, 117 (1979) ("Statutes of limitations, which 'are found and approved in all systems of enlightened jurisprudence,' represent a pervasive legislative judgment that it is unjust to fail to put the adversary on notice to defend within a specified period of time and that 'the right to be free of stale claims in time comes to prevail over the right to prosecute them.' ... [A]lthough affording plaintiffs what the legislature deems a reasonable time to present their claims, ... [these statutes] protect defendants and the courts from having to deal with cases in which the search for truth may be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents, or otherwise."); Liberty Mut. Ins. Co. v. Fales, 8 Cal. 3d 712, 718 (1973) (statutes of limitations "are designed to promote justice by preventing the revival of hoary claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared").

notice of its claims and more than *two and a half* years after Mattel first ventured into the litigation fray on its all-or-nothing war to eliminate BRATZ from its path on the way to world-wide doll hegemony, that Mattel first asserted its claims against MGA or Larian. As shown herein, Mattel was on notice of its claims as early as February 2001 and no later than March 2002.  Thus, the <u>only</u> way Mattel's claims can survive is if they relate back to Mattel's complaint in the '04 Action or its original answer filed in the '05 Action.[20]

However, neither of these pleadings saves Mattel's claims. <u>First</u>, most of Mattel's claims expired before the '04 Complaint, the earliest pleading filed in this litigation. <u>Second</u>, Mattel's claims cannot relate back to the '04 Complaint because both MGA and Larian are new parties to that action, and Mattel cannot prove that they were omitted from its '04 Complaint due to a mistake in identity, as is required for "relation-back" of claims against new parties asserted under federal law or for substitution of "Doe" defendants under California law.[21] <u>Third</u>, as for the '05 Action, wherein Mattel's claims are designated as counterclaims, Mattel's claims against Larian cannot relate back as a matter of law because

---

[20]    In its January 12, 2007 Order, the Court acknowledged the possibility of "relation back" to either of the pleadings, but denied Mattel's request to amend the '04 Complaint based on the judicial economy considerations.  <u>See</u> January 12, 2007 Order at 13-15, 21-22.  The Court suggested, however, that Mattel's claims against MGA and Larian could relate back to the '04 Complaint under Rule 15(c) of the Federal Rules of Civil Procedure as arising "out of the same conduct or transaction" contained in the '04 Complaint. <u>Id.</u> at 13-15.  At the same time, the Court did not reach the issue of whether Rule 15(c)'s additional requirements for "relation back" of claims against new parties were satisfied.  While the Court did touch on this issue under California law when dealing with addition of MGA and Larian as "Doe" defendants, <u>see id.</u> at 15-16 n.5, the Court did not have the benefit of the evidence set forth herein, establishing that Mattel was on notice of both the identity of MGA and Larian, as well as their involvement with Bryant in developing the BRATZ line of dolls, which alters the Court's prior analysis.

[21]    The timeliness of Mattel's first counterclaim for copyright infringement asserted under the Copyright Act is governed by federal law. <u>See</u> <u>40235 Washington Street Corp. v. Lusardi</u>, 1999 WL 33633157, at *5 (S.D. Cal. Jan. 19, 1999) ("With federal question cases, federal common law determines whether a counterclaim 'relates back' to the date the action was commenced for statute of limitation purposes."); <u>accord.</u> <u>South Carolina v. Catawba Indian Tribe</u>, 476 U.S. 498, 518 (1986) (for federal claims, "the statute of limitations is ... a matter of federal law"); <u>cf.</u> Mattel's SAA ¶ 6 ("This Court has federal question jurisdiction over this action pursuant to . . . 17 U.S.C. §§ 101 *et seq.* . . . This Court has supplemental jurisdiction over Mattel's state law claims"); <u>see also</u> <u>StreamCast Networks, Inc. v. Skype Techs., S.A.</u>, No. CV 06-391 FMC (ex), Mem. Op. at 10-11 (C.D. Cal. Sept. 14, 2006) (Ex. 69) (where plaintiff asserts both federal and California law claims, "relation-back" of the federal claims is governed by F.R.C.P. 15).  However, as Mattel's other Phase I counterclaims are governed by California law, it is California law that determines their timeliness. <u>See</u> Fed. R. Civ. P. 15(c)(3), advisory committee notes (1991 Amendments).

Larian is not a plaintiff in that action and not an "opposing party" within the meaning of Rule 13 of the Federal Rules of Civil Procedure. [22]

### A.  Mattel Was On Notice Of Its Claims For Statute Of Limitations Purposes As Early As February 2001 And No Later Than March 2002

Mattel has known or, at least, should have known of the facts underlying its claims against MGA and Larian as early as February of 2001, but in no event later than March 2002. Under the "discovery rule," which is applicable to most California causes of action, a claim accrues when the party asserting it "has, or should have, inquiry notice of the cause of action." Fox v. Ethicon Endo-Surgery, Inc., 35 Cal. 4th 797, 807 (2005).[23] Inquiry notice is triggered by a *mere suspicion* or any reason to *suspect* that wrongdoing has taken place. See Jolly v. Eli Lilly & Co., 44 Cal. 3d 1103, 1111 (1988) ("[o]nce the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights") (emphasis added); see also Fox, 35 Cal. 4th at 803 ("a cause of action accrues and the statute of limitations begins to run when the plaintiff has reason to suspect an injury and some wrongful cause, unless the plaintiff pleads and proves that a reasonable investigation at that time would not have revealed a factual basis for that particular cause of action") (emphasis added). [24]

Here, the undisputed record shows that Bryant told Mattel in October 2000 that he was leaving to design a line of dolls. (UF ¶ 27.) The personnel supervising Bryant had no

---

[22]    Although in its January 12, 2007 Order (at p. 22) the Court noted that "[n]one of the substantive concerns raised by MGA and Bryant" such as the statute of limitations issue "would appear to be affected" if Mattel's claims were filed as counterclaims in the '05 Action, the Court did not appear to reach the issue of such concerns as applicable to Larian (as opposed to MGA), who was an entirely new party for purposes of the '05 Action.

[23]    The "discovery" rule does not apply to Mattel's claims for intentional interference with contract, conversion and statutory unfair competition, as these claims accrue upon the alleged wrongful act. (See infra Section I.B.)

[24]    Under federal law, which governs Mattel's copyright claim, the general standard is similar in that the statute of limitations is triggered when a plaintiff discovers, or reasonably could have discovered, the infringement. See Polar Bear Prods., Inc. v. Timex Corp., 384 F.3d 700, 706 (9th Cir. 2004); see also Roley v. New World Pictures, Ltd., 19 F.3d 479, 481 (9th Cir. 1994) (copyright infringement claims accrue "when one has knowledge of a violation or is chargeable with such knowledge"). However, because, as shown below, Mattel's copyright infringement claim is essentially a claim for copyright ownership, here the claim of copyright infringement accrued upon MGA's repudiation of Mattel's ownership in BRATZ, which occurred as soon as the dolls entered the market (see infra at pp. 23-24).

---

1  doubt that he was going to a competitor (UF ¶¶ 28-29) and believed it to be MGA (UF ¶ 30).

2  A little over two months after Bryant left to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ prototypes of

3  the BRATZ dolls were exhibited by MGA at the Hong Kong and New York Toy Fairs in

4  January and February 2001, respectively.  (UF ¶¶ 31-32.)  The New York Toy Fair is where

5  speculation in the media started about alleged similarities between the BRATZ and Mattel's

6  internal projects. (UF ¶ 51 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

7  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).)  At the same time, in February of 2001,

8  Larian began generating publicity as the man behind MGA's BRATZ dolls. (UF ¶ 36.)

9  　　Mattel not only attended the New York Toy Fair (UF ¶ 34), it actually saw the

10  BRATZ and discussed with MGA that Mattel might carry and sell BRATZ (UF ¶ 37).  In

11  March 2001, shortly after the fair, Mattel wrote MGA saying that Mattel would not carry

12  BRATZ, noting that BRATZ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

13  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Id.)  Despite not wanting to distribute BRATZ

14  because of supposed similarities to Mattel's own products, Mattel apparently surreptitiously

15  placed the BRATZ line into Mattel's computer systems, a fact that MGA confronted Mattel

16  about in early April 2001.  (UF ¶ 38 (expressing to Mattel that MGA ▮▮▮▮▮▮

17  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

18  ▮▮▮▮▮▮▮▮▮▮▮).)

19  　　The undisputed record shows that Mattel's designers and executives (including the

20  head of its Girls' Division) believed as soon as the BRATZ was first publicly unveiled (i.e.,

21  at the Toy Fairs) that the BRATZ was copied from Mattel products.  (UF ¶¶ 47-50.)[25]  That

22  Mattel was concerned in early 2001 that the BRATZ supposedly was based on Mattel

23  designs is confirmed by the fact that Mattel was writing to MGA as early as March 2001

24  ───────────
25  [25] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

26  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

27  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

28  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1  expressing that the BRATZ was ██████████ to Mattel's own products.  The undisputed
2  record also shows that as of the time in 2001 of the first release of the BRATZ (i.e., the Toy
3  Fairs), it was ██████████████ within Mattel that Bryant was working at MGA and
4  was the designer of the BRATZ.  (UF ¶¶ 52-54.)

5     The undisputed record reveals other facts that should have made Mattel "suspicious"
6  about potential BRATZ-related claims against MGA, Larian, and Bryant as soon as BRATZ
7  was unveiled in early 2001.  For instance, Mattel certainly understood how long it takes to
8  make a line of dolls (from 3 to 9 months Mattel has stated).  Mattel understood that a line of
9  dolls emanates from a sketch (Declaration of C.M. Anderson in support of Bryant's Motion
10 for Partial Summary Judgment, dated March 7, 2008, Ex. 19 (Hoffman-Briggs Depo. at
11 56:25-57:7 (██████████████████████████████).)  Mattel
12 knew that Bryant was a designer who made sketches of doll lines (Bryant UF ¶ 31) and that
13 BRATZ came on the market less than three months after Bryant left Mattel, where he had
14 worked for a year and a half before BRATZ came on the market (id. ¶ 27).  Mattel is a
15 hands-down leader in suing potential infringers.  (Ex. 70.)  Thus, Mattel certainly had
16 reason to suspect, upon seeing a new line of fashion dolls at the New York Toy Fair, that
17 Bryant might have been the creator and that he potentially had done sketches on this line
18 while at Mattel that he then gave to MGA.  (See generally UF ¶¶ 27-41.)  Consequently,
19 Mattel's attendance at the New York Toy Fair was sufficient to place it on notice of its
20 potential infringement claims as early as February 2001.  Polar Bear Prods., 384 F.3d at 707
21 (attendance at trade show sufficient "discovery" to start statute of limitations on copyright
22 infringement claim).

23    Mattel's knowledge or, at the very least, reasons to suspect MGA and Larian in the
24 alleged wrongdoings continued to accumulate thereafter.  By March 15, 2002, the facts
25 known to Mattel materialized into its launch of a formal investigation into MGA and
26 Larian's involvement in Bryant's creation and development of the BRATZ.  (UF ¶¶ 56-58.)
27 This launch of Mattel's formal investigation begs the following question: what more could
28 one ask for to satisfy the "inquiry" notice standard, when the plaintiff, as Mattel did here,

1   *actually inquired* into the circumstances surrounding the claims at issue? Indeed, at the

2   time Mattel launched this formal investigation, Mattel found itself well beyond the required

3   suspicion about the activities of MGA and Larian – as, by that time, it did not merely

4   suspect the facts underlying its claims here, but took the matter even further and actually

5   inquired into the circumstances surrounding the creation of BRATZ, as well as the role

6   MGA and Larian played in their development and release.[26] It is possible that Mattel's

7   investigation turned out to be extraordinarily inept (they were, after all, ██████████

8   █████████ by MGA) – so much so that it did not discover the facts until four and a half

9   years later, when it finally moved to assert its claims against MGA and Larian on November

10   20, 2006. That, however, does not stop the clock on Mattel's claims. Cf. Fox, 35 Cal. 4th at

11   803 (requiring a "reasonable" investigation). Thus, there is no genuine issue that Mattel's

12   claims accrued by March 15, 2002.

13     **B.   As Mattel Was On Notice Of Its Claims By March 2002, Its Claims Are Time-Barred, Unless They Relate Back To An Earlier Pleading**

14     As Mattel did not assert its claims against MGA and Larian until November 20, 2006,

15   those claims are time-barred, insofar as the statutes of limitations governing these claims

16   range from two-years to four-years. Thus, Mattel's longest surviving claim went stale no

17   later than March 2006, more than *half a year before* Mattel first raised its claims here. Thus,

18   unless these claims relate back relate back to an earlier pleading – and, as shown below,

19   they do not – they must be dismissed.

20     **1.   Mattel's Sixth, Eighth, and Tenth Counterclaims are time-barred by their respective two-year statutes of limitations**

21     **and cannot be saved by any "relation-back" rules**

22     **(a)   Mattel's Sixth Counterclaim for Intentional Interference with Contract is time-barred**

23     Mattel's Sixth Counterclaim asserts a cause of action for intentional interference with

24   contract under California law. (SAA ¶¶ 122-128.) As such, it is governed by a two-year

25

26   [26]   Compare Order Denying Defendants' Motion for Termination Sanctions, dated August 29,

27   2007 (observing that the internal investigation "may have raised suspicion on Mattel's part" concerning its claims) (emphasis added), with Jolly, 44 Cal. 3d at 1111 (inquiry notice is triggered by suspicion: "[o]nce the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue,

28   she must decide whether to file suit or sit on her rights").

1 | statute of limitations.  See Cal. Civ. Proc. Code § 339(1); Tu-Vu Drive-In Corp. v. Davies,
2 | 66 Cal. 2d 435, 437 (1967); Knoell v. Petrovich, 76 Cal. App. 4th 164, 168 (1999);
3 | Trembath v. Digardi, 43 Cal. App. 3d 834, 836 (1974).   A cause of action for intentional
4 | interference with a contract accrues no later than the date of the contract's breach.   See
5 | Forcier v. Microsoft Corp., 123 F. Supp. 2d 520, 530 (N.D. Cal. 2000); Charles Lowe Co. v.
6 | Xomox Corp., 1999 WL 1293362, at *9 (N.D. Cal. Dec. 27, 1999); Menefee v. Ostawari,
7 | 228 Cal. App. 3d 239, 245 (1991), and 3 B.E. Witkin, Cal. Procedure: Actions, § 575, at
8 | 728 (4th ed. 1996).   Here, Mattel alleges that Bryant breached the contracts at issue
9 | sometime before his October 2000 departure from Mattel by developing the BRATZ line of
10 | dolls for MGA while still employed by Mattel and taking his creation to MGA upon his
11 | departure. (SAA ¶¶ 117, 119.)  Mattel suspected when Bryant left that he was going to a
12 | competitor to design dolls.  (UF ¶¶ 27-30.)   Consequently, Mattel's Sixth Counterclaim
13 | expired by October 2002, *a year and a half before* Mattel filed its earliest action to date in
14 | April 2004.[27]  Therefore, there is no pleading that could allow Mattel to save its Sixth
15 | Counterclaim via the "relation-back" rules, even if these rules applied here.  Consequently,
16 | the Sixth Counterclaim against MGA and Larian is time-barred.

17 | **(b)   Mattel's Aiding and Abetting claims are time-barred**

18 | Mattel's Eighth and Tenth Counterclaims are for aiding and abetting Bryant's breach
19 | of fiduciary duty and duty of loyalty under California law, respectively.  (SAA ¶¶ 136, 141.)
20 | These claims are governed by a two-year statute of limitations.  See Rambus Inc. v.
21 | Samsung Elecs. Co., Ltd., 2007 WL 39374, at *3 n.4 (N.D. Cal. Jan. 4, 2007) ("The statute
22 | of limitations applicable to the claim[] of aiding and abetting breach of fiduciary duty … is
23 | two years."), citing Cal. Civ. Proc. Code § 339. Section 339 of the California Code of Civil
24 | Procedure mandates a two-year limitations period for actions "upon a contract, obligation or

25 |

26 | [27]  If the Court applied the discovery rule to determine when Mattel's Sixth Counterclaim
accrued, the result is the same.  Mattel was on notice of MGA and Larian's alleged role in Bryant's
27 | departure from Mattel and his development of the BRATZ line of dolls by no later than March
2002. (UF ¶¶ 27-30, 52-54.)  Thus, even under the discovery rule, Mattel's claim would expire by
28 | March 2004 – i.e., prior to Mattel's filing of the '04 Complaint in April 2004.

1  liability not founded upon an instrument of writing". Id.

2      Mattel's underlying claim for breach of duty of loyalty against Bryant is not pled as

3  contractually based. (SAA ¶ 143 (alleging that duty of loyalty arose out of the employment

4  relationship between Mattel and Bryant).)  And, to the extent a duty exists, it arises without

5  regard to the existence of a contract because all employees owe such a duty to their

6  employer.  As for Mattel's claim against Bryant for breach of fiduciary duty, although

7  Mattel attempted to plead around the statute of limitations by alleging the claim as arising

8  from Mr. Bryant's employment contracts, these contracts did not impose on him a position

9  of trust, such that a fiduciary duty was created. (Bryant Br. at A.2.)

10      Because, as shown above, Mattel was on notice of the facts underlying its adding and

11  abetting claims, such as MGA and Larian's role in Bryant's departure from Mattel and his

12  development of the BRATZ line of dolls, by no later than March 2002 (supra Section I.A.),

13  Mattel's Eighth and Tenth Counterclaims expired by March 2004. Since these claims were

14  already time-barred by the time Mattel filed its earliest pleading in this action, which is

15  Mattel's complaint dated April 2004, the "relation-back" rules cannot revive Mattel's aiding

16  and abetting claims. Therefore, the Eighth and Tenth Counterclaims asserted against MGA

17  and Larian must be dismissed.

       2.    **Mattel's First, Eleventh, and Thirteenth Counterclaims, as well as a portion of its Twelfth Counterclaim, are time-barred by their respective three-year statutes of limitations**

       (a)  **Mattel's claim for copyright "infringement" is time-barred**

20      Mattel's First Counterclaim asserts a claim for copyright infringement under the

21  Copyright Act, 17. U.S.C. §§ 101, et seq.  (SAA ¶¶ 82-87.) This claim is governed by a

22  three-year statute of limitations. 17 U.S.C. § 507(b); see also Roley, 19 F.3d at 481.

23  Because Mattel was on notice of its copyright claim as early as February 2001 (UF ¶¶ 32-

24  36), its copyright claim expired by February 2004 and was time-barred before Mattel filed

25  the '04 Complaint in April 2004, the earliest pleading in this litigation. See Polar Bear Prod.,

26  384 F.3d at 707 (attendance at a trade show is sufficient "discovery" to start the statute of

27  limitations on a claim of copyright infringement); cf. Watermark Publrs. v. High Tech. Sys.,

28

1   Inc., 1997 WL 717677, 44 U.S.P.Q.2d 1578, 1582-83 (S.D. Cal. 1997) (copyright statute of
2   limitations started running once plaintiff's sole proprietor saw the allegedly infringing map
3   and made a mental note that the map infringed plaintiff's copyright).

4          Mattel has represented to the Court that the statute of limitations on its copyright
5   infringement claim is not an absolute bar, but rather a "rolling statute" that allows recovery
6   for infringing acts occurring within three years of filing suit "even if a plaintiff knew of the
7   infringement more than three years before suit was filed." (Reply of Plaintiff Mattel, Inc. to
8   Opposition of MGA to Motion for Leave to File Amended Complaint, dated December 28,
9   2006, at 10.) However, the "rolling" statute concept is inapplicable for infringement claims
10  that, at their core, are actually claims for copyright ownership, as "[a] claim for copyright
11  ownership is barred three years from the 'plain and express repudiation' of copyright
12  ownership" by another. Welles v. Turner Enter. Co., 503 F.3d 728, 734 (9th Cir. 2007).

13         "[I]t has been established that the statute of limitations cannot be defeated by
14  portraying an action as one for infringement when copyright ownership rights are the true
15  matter at issue." Minder Music Ltd. v. Mellow Smoke Music Co., 1999 WL 820575, 52
16  U.S.P.Q. 2d 1700, 1701 (S.D.N.Y. 1999) (rejecting "plaintiff['s] attempts to portray its
17  [ownership] claim as one for an ongoing infringement"), citing Netzer v. Continuity
18  Graphic Assocs., Inc., 963 F. Supp. 1308, 1315 (S.D.N.Y. 1997). The principle underlying
19  this rule is the fact that where the gravamen of a claim is the creation and ownership, rather
20  than the defendant's use of the disputed property, then the ownership claim accrues when
21  defendant repudiates plaintiff's ownership rights, rather than accruing repeatedly with each
22  of defendant's uses. See Zuill v. Shanahan, 80 F.3d 1366, 1371 (9th Cir. 1996).

23         Here, as the central issue is whether Bryant's creation of the BRATZ dolls belongs to
24  Mattel – as opposed to MGA, Mattel's claim for copyright infringement is simply a claim
25  for copyright ownership in a not-so-clever disguise.[28] To wit, should MGA prove to be the

26  [28] Even if Mattel is viewed as asserting both a copyright ownership claim and a copyright
    infringement claim, the timeliness of the infringement claim is dependent on the timeliness of the
27  ownership claim: "When claims for both infringement and ownership are alleged, the infringement
    claim is timely only if the corresponding ownership claim is also timely." Roger Miller Music, Inc.
28  v. Sony/ATV Publ'g, LLC, 477 F.3d 383, 389-90 (6th Cir. 2007).

1  rightful owner of the copyright in question, Mattel's infringement claim would disappear.

2  See Weissmann v. Freeman, 868 F.2d 1313, 1318 (2d Cir. 1989). Indeed, even where a

3  plaintiff pleads his claim as one for infringement, where, as here, the plaintiff would have to

4  "unseat" the defendant from its position as apparent owner of the copyright, the courts

5  recognize that the gravamen of such a claim is really ownership, and not infringement, and

6  apply the statute of limitations to bar and not just limit the claim. See, e.g., Minder Music,

7  1999 WL 820575, 52 U.S.P.Q. 2d at 1702-3; Barksdale v. Robinson, 211 F.R.D. 240, 245-

8  46 (S.D.N.Y. 2002). Notably, Mattel's claims here are substantively similar to the claims

9  asserted in Big East Entm't, Inc. v. Zomba Enters., Inc., 453 F. Supp. 2d 788 (S.D.N.Y.

10  2006), wherein plaintiff argued that it owned rights to certain musical compositions, which

11  were allegedly created under a broad "Artist Agreement" between the plaintiff's

12  predecessor and the compositions' authors; at the same time, defendant claimed that it

13  received the rights from the authors themselves. The Big East court held that the

14  infringement claim before it was nothing but a claim for sole ownership and dismissed it as

15  time-barred, since it was brought more than three years after defendant's assertion of the

16  sole ownership in the compositions at issue. See id. at 795-96. Since the core of this action

17  is Mattel's claim for ownership of BRATZ, the "rolling" statute theory cannot apply.

18  Additionally, aside from the reasons for non-application of the "relation-back" rules

19  set forth below (infra Sections I.C.-D.), Mattel's First Counterclaim is unique in that it may

20  not relate back to any pleading filed prior to October 30, 2006, when Mattel obtained

21  registrations of its alleged copyright in BRATZ. (UF ¶ 80.)  This is because a copyright

22  registration is a jurisdictional prerequisite for Mattel to maintain its copyright claims, and

23  "relation-back" rules cannot supplant jurisdictional standing.   See Miguel v. Country

24  Funding Corp., 309 F.3d 1161, 1165 (9th Cir. 2002) (rules governing "relation-back" of

25  claims "may not be used to extend federal jurisdiction").[29]  Because Mattel's copyright

26  ────────────
[29]    Cf. In re Literary Works in Elec. Databases Copyright Litig., 509 F.3d 116, 125 n.5 (2nd Cir.

27  2007) ("a copyright claim does not exist absent registration or preregistration-and the law is clear that courts lack subject matter jurisdiction over claims that Congress has specified do not yet

28  exist"). See also Loree Rodkin Mgmt. Corp. v. Ross-Simons, Inc., 315 F. Supp. 2d 1053, 1055 (C.D. Cal. 2004) (there is no federal jurisdiction for a copyright claim prior to registration), citing,

1   infringement claim thus may not relate back to any pleadings filed in either of the '04 or the

2   '05 Actions, it must be dismissed as time-barred. Cf. Brewer-Giorgio v. Producers Video,

3   Inc., 216 F.3d 1281, 1285 (11th Cir. 2000) (plaintiff cannot amend its complaint to add

4   copyright claims where plaintiff failed to register its copyrights prior to filing of the original

5   complaint, and the statute of limitation expired before the registration); Country Road

6   Music, Inc. v. MP3.com, Inc., 279 F. Supp. 2d 325, 332-33 (S.D.N.Y. 2003) (copyright

7   infringement claim does not relate back to original complaint where plaintiff failed to

8   register copyright within the limitations period).

9   **(b)  Mattel's claim for conversion is time-barred and cannot be saved by any "relation-back" rules**

10   Mattel's Eleventh Counterclaim asserts a cause of action for conversion under

11   California law. (SAA ¶¶ 155-162.) This claim is governed by a three-year statute of

12   limitations. Cal. Civ. Proc. Code § 338(c); AmerUS Life Ins. Co. v. Bank of Am., N.A., 143

13   Cal. App. 4th 631, 639 (2006); Strasberg v. Odyssey Group, Inc., 51 Cal. App. 4th 906, 916

14   (1996). The California discovery rule does not apply to a claim for conversion; rather, "the

15   statute of limitations for conversion is triggered by the act of wrongfully taking property."

16   AmerUS Life, 143 Cal. App. 4th at 639, quoting Bono v. Clark, 103 Cal. App. 4th 1409,

17   1433 (2002).[30]  Here, the statute of limitations for the portion of Mattel's conversion claim

18   _____

19   inter alia, Ryan v. Carl Corp., 1998 WL 320817, at *2 (N.D. Cal. Jun. 15, 1998); Brush Creek Media, Inc. v. Boujaklian, 2002 WL 1906620, at *4 (N.D. Cal. Aug. 19, 2002); Ashlar Inc. v.

20   Structural Dynamics Research Corp., 1995 WL 639599, 36 U.S.P.Q.2d 1402, 1405-06 (N.D. Cal. 1995) (defendant's counterclaim for copyright infringement must be dismissed, since registration

21   of copyright was not effected before counterclaim's filing), citing Int'l Trade Mgmt., Inc. v. United States, 553 F. Supp. 402, 402-03 (Cl. Ct. 1982) (Kozinski, J.).

22   [30]   While Mattel may argue that the facts of conversion were fraudulently concealed from it and, therefore, the statute of limitations could not start until it was on notice of these facts, cf. AmerUS

23   Life, 143 Cal. App. 4th at 639, this would not help Mattel, since, as shown above, Mattel was on notice of the facts at issue as early as February 2001. (UF ¶¶ 32-36); see also StreamCast, Mem.

24   Op. at 18 (the fraudulent concealment doctrine does not apply to plaintiff's claim for conversion where plaintiff was on notice of its potential claim), citing Snapp & Assocs. Ins. Servs., Inc. v.

25   Robertson, 96 Cal. App. 4th 884, 891 (2002). Under this scenario then, the claim expired as early as February 2004 – before Mattel filed its '04 Complaint in April 2004; therefore, "relation-back"

26   rules would not revive Mattel's claim, even if these rules applied here (and, as shown below, they do not, see infra Sections I.C.-D.). Alternatively, even if Mattel was on notice of the claim as late

27   as March 2002, the conversion claim would have expired no later than March 2005 – before MGA filed its '05 Action. Then, Mattel's conversion claim could be saved only by "relation-back" to the

28   '04 Complaint, which, as shown below, is not available to Mattel here. (See infra Section I.C.)

1  to be adjudicated in Phase I – i.e., Mattel's conversion claim based on Bryant's purported

2  theft of Mattel's proprietary drawings – was thus triggered no later than October 2000,

3  when Bryant left Mattel.  (Bryant Br. at II.C.)  Consequently, Mattel's conversion claim

4  expired no later than October 2003, six months before Mattel's filing of the '04 Complaint.

5  Since there is no pleading filed within the limitations period that could revive Mattel's

6  conversion claim via "relation-back" rules, Mattel's conversion claim is time-barred.

7  **(c)  Mattel's common law unfair competition claim is time-barred**

8  Mattel's Twelfth Counterclaim asserts two different causes of action: a claim for

9  common law unfair competition under California law and a claim for statutory unfair

10  competition under Cal. Bus. & Prof. Code § 17200, *et seq.* (SAA ¶ 165.) Mattel's claim for

11  common law unfair competition is a tort that sounds in fraud. See Cel-Tech Commc'ns, Inc.

12  v. Los Angeles Cellular Tel. Co., 20 Cal. 4th 163, 192-93 (1999) (Kennard, J., concurring in

13  part and dissenting in part), citing, inter alia, Weinstock, Lubin & Co. v. Marks, 109 Cal.

14  529, 541 (1895) (principles of unfair competition "apply to all cases where fraud is

15  practiced by one in securing the trade of a rival dealer; and these ways are as many and as

16  various as the ingenuity of the dishonest schemer can invent"); see also Trovan, Ltd. v.

17  Pfizer, Inc., 2000 WL 709149, at *6 (C.D. Cal. May 24, 2000) ("At present, 'the common

18  law tort of unfair competition is generally thought to be synonymous with the act of passing

19  off one's goods as those of another.'"), citing Bank of the West v. Sup. Ct., 2 Cal. 4th 1254,

20  1263 (1992).

21  Claims sounding in fraud are governed by a three-year limitations period. See Cal.

22  Civ. Proc. Code § 338(d). Since, as shown above, Mattel was on notice of the facts

23  underlying its common law unfair competition claim to the extent it relates to the issue of

24  ownership of BRATZ as early as February 2001,[31] this claim expired by February 2004 –

25

26  [31]   (UF ¶¶ 32-36.)  The only alleged link between Mattel's unfair competition claim and Phase I is Mattel's allegations concerning MGA's commercial bribery of Bryant, which arises from MGA's role in Bryant's departure from Mattel and his development of BRATZ. It is, however, unclear whether there are any unfair competition claims in Phase I as against Larian. (See SAA ¶ 165 (asserting "MGA's commercial bribery of Bryant" as the only ownership-related issue underlying its unfair competition claims) (emphasis added).)

27

28

1  before Mattel filed its '04 Complaint in April 2004, which makes any revival by "relation-

2  back" rules simply impossible. Alternatively, even if the claim accrued as late as March

3  2002, it would have expired by March 2005 – before MGA initiated its '05 Action in April

4  2005. In this case, the claim could only be revived by "relation-back" to the '04 Complaint,

5  which, as shown below, does not apply here. (See infra Section I.C.) Therefore, Mattel's

6  common law unfair competition claim is time-barred.[32]

### 3. Mattel's remaining portion of its Twelfth Counterclaim for statutory unfair competition is time-barred by a four-year statute of limitation

Mattel's remaining portion of the Twelfth Counterclaim is for statutory unfair competition under California Business and Professions Code Section 17200, et seq. (SAA ¶¶ 163-66), and is governed by a four-year statute of limitations. Cal. Bus. & Prof. Code § 17208; Cortez v. Purolator Air Filtration Prods. Co., 23 Cal. 4th 163, 178-79 (2000). The discovery rule does not apply to this claim; therefore, the statute begins to run when the cause of action accrues.[33] Since the crux of the underlying violations alleged in support of Mattel's statutory unfair competition claims occurred by October 2000, when Bryant left Mattel's employ and took the BRATZ concept to MGA, Mattel's statutory competition

[32]  Even if the Court were to apply the same statute of limitations here as is applicable to a claim for statutory unfair competition, Cal. Bus. & Prof. Code § 17208, which is a four-year statute, its common law unfair competition claim would still be time-barred. Assuming ▮▮▮▮▮▮ rule would apply (it does not apply to claims for statutory unfair competition, as shown below), Mattel was on notice of its claims as early as February 2001, (UF ¶¶ 32-36); therefore, its common law unfair competition claim would then have expired as early as February 2005 – i.e., before MGA initiated the '05 Action in April 2005. This claim could thus be saved only by "relation back" to the '04 Complaint, which, as shown below, does not apply here. (See infra Section I.C.) Alternatively, even if the Court were to find that the claim accrued no later than March 2002 (UF ¶¶ 57-64), Mattel's unfair competition claim against Larian (to the extent asserted in Phase I, see supra n.31) would still be subject to dismissal, as it would have expired no later than March 2006 – i.e., more than half a year before it was asserted on November 20, 2006. Because, as shown below (see infra Sections I.C.-D.), Mattel's claims against Larian cannot relate back to either the '04 Complaint or the '05 Answer, its common law unfair competition claim would thus be time-barred.

[33]  See In re Conseco Ins. Co. Annuity Marketing & Sales Practices Litig., 2007 WL 486367, at *6 (N.D. Cal. Feb. 12, 2007) ("The 'discovery rule,' which delays accrual of certain causes of action until the plaintiff has actual or constructive knowledge of facts giving rise to the claim, does not apply to unfair competition actions."), citing Snapp & Assocs., 96 Cal. App. 4th at 891 (discovery rule does not apply to unfair competition claims); Stutz Motor Car of Am., Inc. v. Reebok Int'l, Ltd., 909 F. Supp. 1353, 1363 (C.D. Cal. 1995) ("[T]he 'discovery rule' ... is inapplicable on this count [for statutory unfair competition]; thus, the statute begins to run when cause of action accrues, irrespective of whether plaintiff knew of its accrual"), aff'd, 113 F.3d 1258 (Fed. Cir. 1997).

claim expired no later than October 2004 – i.e., half a year before MGA filed its '05 Action. Thus, this claim is also time-barred and subject to dismissal, unless it relates back to the '04 Complaint (which it does not[34]).

### 4. Mattel's claim for declaratory relief is time-barred

Mattel's Thirteenth Counterclaim is for declaratory relief. (SAA ¶¶ 167-170.) By this claim, Mattel seeks a declaration that MGA and Larian have no valid ownership rights in BRATZ, that Mattel is the true owner of the same, and any agreements between Bryant and MGA assigning the rights in BRATZ are void. (Id. ¶¶ 169-170.)

"[D]eclaratory relief is available as a remedy in cases involving various rights and obligations, and the governing statute will be the one applicable to an ordinary legal or equitable action based on the same claim." Engstrom v. Kallins, 49 Cal. App. 4th 773, 784 (1996), citing 3 B.E. Witkin, California Procedure: Actions § 475, pp. 506-507 (3d ed. 1985). See also Booth v. Quantum3D, Inc., No. C. 04-5376 EMC, 2005 WL 1512138, at *9 (N.D. Cal. June 15, 2005) (on declaratory judgment action, "suit is time-barred if the applicable limitations period has run on a direct claim to obtain such relief."); accord Levald, Inc. v. City of Palm Desert, 998 F.2d 680, 688 (9th Cir. 1993). The time of accrual similarly coincides: "If a breach has occurred, and the appropriate statute has begun to run on an ordinary suit for 'coercive relief' either in contract or tort, or legal or equitable, the same statute begins to run at the same time on the declaratory remedy, and both causes of action are extinguished at the same time." 3 B.E. Witkin, California Procedure: Actions, § 625, at 804 (4th ed. 1996). Here, Mattel essentially seeks a declaration along the lines of its copyright infringement and conversion claims. As shown above, these claims are time-barred. Thus, Mattel's declaratory relief claim is also time-barred.

---

[34]    See infra Section I.C. Should the Court apply the ▮▮▮▮▮▮▮ rule here, such application would result in either of the following two scenarios: (1) if Mattel was on notice of its claim by February 2001 (UF ¶¶ 32-36), then the claim would have expired by February 2005; in that case, the claim could be saved only by "relation-back" to the '04 Complaint, which, as shown below (see infra Section I.C.), does not apply here; or (2) if the accrual date was no later than March 2002 (UF ¶¶ 57-64), then Mattel's statutory unfair competition claim as asserted against Larian, to the extent such is asserted in Phase I, see supra n.31, would still fail, because it would have accrued no later than March 2006 and, as shown below, would not be saved by relating back to either the '04 Complaint or the '05 Answer (see infra Sections I.C.-D.).

**C.    As MGA And Larian Are New Parties In The '04 Action, And Were Not Omitted by "Mistake", The '04 Complaint Cannot Save Mattel's Claims**

As Mattel's claims are time-barred, they survive only if they relate back to the '04 Complaint.[35] See generally Percy v. San Francisco Gen. Hosp., 841 F.2d 975, 979 (9th Cir. 1988); Davaloo v. State Farm Ins. Co., 135 Cal. App. 4th 409, 415 (2005). At the same time, the '04 Complaint could provide no relief for Mattel's claims governed by their respective two- or three-year statutes of limitations, since, as shown above, these claims had expired before Mattel filed the '04 Complaint in April 2004.   (Supra at pp. 20-28.) Mattel's copyright infringement claim similarly expired before the '04 Complaint was filed and, in any event, cannot relate back to any pleading filed before Mattel registered its copyrights in October 2006. (UF ¶ 80.)  Therefore, only Mattel's claims governed by a four-year statute of limitations and accrued under the delayed "discovery" rule, if any, conceivably could be saved by the '04 Complaint.

As the procedural summary set forth above demonstrates (supra at pp. 13-15), neither MGA nor Larian were named as defendants in the '04 Complaint. See Union Pacific R.R. Co. v. Nevada Power Co., 950 F.2d 1429, 1432 (9th Cir. 1991) (for purposes of the "relation-back" doctrine, "[w]e differentiate between pleadings attempting to amend *claims* from those seeking to amend *parties*. Amendments seeking to add claims are to be granted more freely than amendments adding parties."). Thus, for Mattel's time-barred claims to survive, they must satisfy the "relation-back" rules for new or additional parties – i.e., the

---

[35]    As shown above, all of Mattel's claims against MGA and Larian expired prior to the filing of the '05 Action; therefore, the '04 Complaint is the only pleading that could conceivably revive Mattel's claims. (See supra Section I.B.) Consequently, even though MGA was not a new party to the '05 Action, Mattel's claims against it are still subject to dismissal as time-barred. See Papenthien v. Papenthien, 16 F. Supp. 2d 1235, 1240-41 (S.D. Cal. 1998) (amended complaint did not relate back to filing of original complaint, where the original complaint was "dead on arrival" because it was untimely); see also Henderson v. Bolanda, 253 F. 3d 928, 932 (7th Cir. 2001) ("[E]ven though it was based on the same conduct as that set forth in the original complaint, ... [plaintiff]'s amended complaint may not relate back to the date the original complaint was filed. The prior complaint, having been itself filed after the expiration of the one-year statute of limitations for the claims which it contained, was a nullity. That complaint cannot then act as a life-line for a later complaint."). Moreover, as for Larian, as shown below, the '05 Action is of no help to Mattel for yet another reason: Larian was not a plaintiff in that action at the time Mattel asserted its counterclaims against him. (See infra Section I.D.)

1  requirements of Rule 15(c) of the Federal Rules of Civil Procedure for Mattel's copyright

2  claim and the "Doe" defendant procedure under California law for Mattel's state law claims.

3  See Kilkenny v. Arco Marine Inc., 800 F.2d 853, 856 (9th Cir. 1986) ("Because the statute

4  of limitations period expired prior to [plaintiff]'s filing of the amended complaint, rule 15(c),

5  Fed.R.Civ.P., is the only procedural avenue by which [plaintiff]'s original complaint may be

6  amended to add additional parties.") (emphasis added); McGee St. Prods. v. Workers'

7  Comp. Appeals Bd., 108 Cal. App. 4th 717, 724-25 (2003) ("[T]he amendment here

8  involves new party defendants. ... [W]e refer to the familiar rule that under the Code of

9  Civil Procedure, a complaint may not be amended to add a new defendant after the statute

10  of limitations has run. The only exception to this rule is when the original complaint states a

11  cause of action against a Doe defendant and the plaintiff is unaware of the true identity of

12  that party at the inception of the suit.") (emphasis added).[36]

13      Under Rule 15(c) of the Federal Rules of Civil Procedure, an amendment adding

14  claims against a new defendant may not relate back to an earlier pleading unless that

15  defendant "should have known that, but for a mistake concerning identity, the action would

16  have been brought against it." In re Syntex Corp. Sec. Litig., 855 F. Supp. 1086, 1099 (N.D.

17  Cal. 1994) ("[s]ince Plaintiffs do not contend that they made a mistake concerning

18  [defendants]'s identity, they are not entitled to take advantage of Rule 15(c)"), citing

19  Louisiana-Pacific Corp. v. ASARCO, Inc., 5 F.3d 431, 434 (9th Cir. 1993) (denial of

20  "relation-back" was proper where plaintiff "knew perfectly well" the identity of the

21  potential defendant and "[t]here was no mistake of identity, but rather a conscious choice of

22  whom to sue"). The relevant inquiry focuses on when the plaintiff first had notice of

23  defendant's correct identity, not on when the plaintiff first had notice of the defendant's

24  culpability. See Syntex Corp., 855 F. Supp. at 1099; see also In re Network Assocs., Inc. II

25  ─────────

[36]  The necessity of utilizing the "Doe" defendant procedure under California law is further
26  underscored by the fact that California generally does not allow "relation-back" of claims against
    new defendants. See Barrington v. A.H. Robins Co., 39 Cal. 3d 146, 150 (1985) (under California
27  law, for an amended complaint to "relate back" to the original complaint, it must, inter alia, "[s]eek
    recovery against the same defendants"), receded from on other grounds by, Norgart v. Upjohn Co.,
28  21 Cal. 4th 383 (1999).

1 | Sec. Litig., 2003 WL 24051280, at *8 (N.D. Cal. Mar. 25, 2003) ("Relation back is only
2 | allowed for a mistake in identity, not liability."), citing Louisiana-Pacific Corp., 5 F.3d at
3 | 434. Furthermore, plaintiff's "lack of knowledge regarding the identity of a proper party
4 | does not constitute mistake" for purposes of "relation-back" under Rule 15(c). Butler v.
5 | Robar Enterprises, Inc., 208 F.R.D. 621, 623 (C.D. Cal. 2002) (collecting authority).

6 |      Consequently, where a plaintiff is aware of the potential defendant's identity at the
7 | time the original complaint is filed but is uncertain whether the potential defendant may be
8 | found liable, the amendment to add that defendant – i.e., the defendant that plaintiff had
9 | known of from the outset – is never allowed. See Gilmore v. State of Cal., 1995 WL 492625,
10 | at *2 (N.D. Cal. Aug. 10, 1995); see also Brink v. First Credit Resources, 57 F. Supp. 2d
11 | 848, 856 (D. Ariz. 1999); cf. Pembroke, By and Through Pembroke v. City of San Rafael,
12 | 1994 WL 443683, at *3 (N.D. Cal. Aug. 2, 1994) (no "relation-back" of claims asserted
13 | against new defendants where the defendants' identities were publicly available before
14 | plaintiff filed her original complaint).

15 |      Similarly, where plaintiff is unaware of a potential defendant or its identity at the
16 | time the complaint is filed, learns of the potential defendant within the time established in
17 | the statute of limitations, but seeks to add that defendant only after the statute of limitations
18 | has expired, relation back also fails. See Kilkenny, 800 F.2d at 857 (plaintiff was not
19 | allowed to amend after the statute of limitations had run when she was notified of potential
20 | defendants in the named defendant's answer to the complaint and the answer was filed
21 | within the limitations period). As the Ninth Circuit explains, Rule 15(c) is not served by
22 | allowing the plaintiff to amend the complaint in these situations, explaining:

23 |      Rule 15(c) was intended to protect a plaintiff who mistakenly names a party
24 |      and then discovers, after the relevant statute of limitations has run, the identity
25 |      of the proper party. Rule 15(c) was never intended to assist a plaintiff who
26 |      ignores or fails to respond in a reasonable fashion to notice of a potential party,
27 |      nor was it intended to permit a plaintiff to engage in piecemeal litigation.
28 | Id. at 857-8 (emphasis added). In other words, Rule 15(c) gives no relief to a plaintiff who

1   tactically decides to omit a party from the original pleading – the same party that plaintiff

2   later seeks to add by amendment. See Brink, 57 F. Supp. 2d at 856.

3        California procedure for "relation-back" of claims against parties substituted as

4   "Doe" defendants is similar in that it precludes such a substitution where plaintiff was

5   aware of the proposed "Doe" defendant identity and was on notice of the facts underlying

6   his alleged liability at the time the original pleading was filed. See Scherer v. Mark, 64 Cal.

7   App. 3d 834, 840-841 (1976) (when it appears that plaintiff knew both the person's identity

8   and the facts giving rise to liability when the complaint was filed, but did not name him, that

9   person cannot be served as a "Doe" defendant after the statute of limitations has run); see

10   also McGee St. Prods., 108 Cal. App. 4th at 725-26; cf. Dover v. Sadowinski, 147 Cal. App.

11   3d 113 (1983) (no "relation-back" where plaintiff knew all along that the defendant in

12   question was involved in the underlying controversy, albeit he did not know "how deeply"

13   the defendant was involved). Plaintiff cannot feign ignorance to avail itself of the "Doe"

14   procedure: where the information concerning the additional defendants is readily available

15   to plaintiff, "there [is] no good faith, bona fide ignorance as required" underlying plaintiff's

16   failure to name the defendants. Woo v. Superior Court, 75 Cal. App. 4th 169, 180 (1999).

17        Here, there was no mistake in identity of either MGA or Larian at the time Mattel

18   filed its '04 Complaint nor was there lack of notice as to their involvement in the

19   development of the BRATZ, starting with their retention of Bryant in October 2000. Indeed,

20   Mattel freely admits that it had specific knowledge of Bryant's October 2000 agreement

21   *half a year* before it filed the '04 Complaint and thus was well aware of the key facts

22   underlying its current claims. (SAA ¶ 36 (admitting that as of November 24, 2003, Mattel

23   had in its possession "a copy of Bryant's agreement with MGA which showed that the date

24   of Bryant's agreement with MGA predated Bryant's departure from Mattel").) Thus, Mattel

25   knew only too well about MGA and its involvement with Bryant months before it filed the

26   '04 Action. Even aside from Mattel's November 2003 receipt of Bryant's agreement with

27   MGA, the success of MGA's BRATZ concept and Larian's role as the leading man behind

28   that success was so widely publicized ever since the BRATZ came out in the summer of

1   2001 that Mattel could escape that knowledge only if it turned a deaf ear and a blind eye to
2   all that press. (UF ¶¶ 33, 35-36, 40 & 45-46.)

3       In any event, Mattel was on notice of MGA and Larian's involvement with Bryant
4   and their role in Bryant's development of BRATZ by March 2002 – i.e., **more than two**
5   **years** prior to Mattel's filing of the '04 Action.[37] This also proves that Mattel was not in any
6   way "mistaken" in MGA or Larian's identity or lacked sufficient facts to suspect them of
7   the alleged wrongdoings that now form the basis for Mattel's claims. Rather, for the reasons
8   known only to Mattel, it made a strategic choice to omit these defendants from the '04
9   Complaint.   Therefore, to the extent "relation-back" to the '04 Complaint could save
10  Mattel's time-barred claims, it cannot apply.

11      **D.    The '05 Action Cannot Revive Mattel's Claims Against Larian**

12      As shown above, all of Mattel's claims expired by the time the '05 Action was filed
13  (supra Section I.B.), and thus relation back to Mattel's '05 Answer is irrelevant.  For the
14  sake of argument, however, if any of the claims asserted by Mattel could be saved if they
15  related back to the '05 Answer, all of the claims against Larian still would fail because
16  Larian was not a party to that action at the time Mattel asserted counterclaims against him.
17  (See MGA's Complaint in the '05 Action (MGA is the sole plaintiff).)

18      Since, for purposes of Mattel's counterclaims as maintained against Larian in the '05
19  Action, Larian is an entirely new party, the claims against him cannot stand because they are
20  improper under federal law and do not relate back under California law.  Under Rule 13 of
21  the Federal Rules of Civil Procedure, a counterclaim "must be against an 'opposing party.'"
22  In re Adbox, Inc., 488 F.3d 836, 840 (9th Cir. 2007), citing Fed.R.Civ.P. 13(a) & (b).  A
23  stranger to litigation is not an opposing party under Rule 13. See, e.g., Charter Oak Fire Ins.
24  Co. v. Bokharian Jewish Cmty. Ctrs., Inc., 2002 WL 59420, at *3 (S.D.N.Y. Jan. 16, 2002)
25  (counterclaims asserted against a third party "are not against an opposing party as required

26  _____
    [37]    Supra Section I.A. Notably, the Incident Report that started the March 15, 2002
27  investigation mentions Larian by name. ███████████████
28  ██████████████████████████████████████████████████

1  by Rule 13.... Simply put, [the third party at issue] is not a party to this action and, therefore,

2  cannot possibly be an opposing party."). In turn, California law precludes "relation-back" of

3  counterclaims filed against a new party. See Boyer v. Jensen, 129 Cal. App. 4th 62, 70

4  (2005); 3 B.E. Witkin, California Procedure: Actions § 421, 529-31 (4th ed. 1996) ("where

5  the cross-complaint is against … new parties, the statute is not tolled by the commencement

6  of the plaintiff's action").[38] Therefore, because Larian is not a plaintiff in the '05 Action,

7  Mattel's time-barred counterclaims against him cannot be revived by relating back to that

8  action.

9  **II.   MATTEL'S CONVERSION, INTENTIONAL INTERFERENCE WITH CONTRACT, AND UNFAIR COMPETITION CLAIMS ARE PREEMPTED BY THE COPYRIGHT ACT**

10

11         Mattel's conversion, intentional interference with Bryant's contract with Mattel, and

12  unfair competition with respect to MGA and Larian's alleged infringement of copyrightable

13  material claims against MGA and Larian are preempted by the Copyright Act.  Section 301

14  of the Copyright Act establishes a two-part test for preemption.  First, the subject work must

15  fall within the subject matter of copyright, as defined in Sections 102 and 103 of the

16  Copyright Act.  17 U.S.C. § 301(a).  Second, the rights granted under state law must be

17  "equivalent to any of the exclusive rights within the general scope of copyright as specified

18  by section 106 [of the Copyright Act]."  Id.; see generally Melchior v. New Line Prods.,

19  Inc., 106 Cal. App. 4th 779, 792 (2003) (reciting preemption test); 1 M. Nimmer & D.

20  Nimmer, Nimmer on Copyright § 1.01[B][1] (2007) (hereafter, "Nimmer").  Mattel's

21  conversion, intentional interference with contract, and unfair competition claims against

22  MGA and Larian implicate material within and rights equivalent to the Copyright Act's

---

[38]    As one California court explained, "[t]he principle underlying the rule that a statute of limitations is suspended by the filing of the original complaint is that the plaintiff has thereby waived the claim and permitted the defendant to make all proper defenses to the cause of action pleaded. But, where the controversy is limited to cross-defendants [which are equivalent to counter-defendants in federal court], none of whom has done any act in the nature of a waiver the reason for the rule does not exist." Trindade v. Super. Ct., 29 Cal. App. 3d 857, 859-60 (1973). The rule is the same as applied to "relation-back" to Mattel's original answer, as opposed to MGA's original complaint. Cf. 3 B.E. Witkin, California Procedure: Actions, § 426, at 535 (4th ed. 1996) ("The relation back doctrine should apply to an amended compulsory cross-complaint in the same manner as to an initial cross-complaint."), discussing Sidney v. Super. Court, 198 Cal. App. 3d 710 (1988).

1  exclusive protective grasp.

2  **A.   The BRATZ concept falls within Copyright Act's scope**

3  The expressions of the BRATZ concept, in both its drawn and sculptural forms, falls
4  within the Copyright Act's exclusive purview.  Section 102 of the Copyright Act provides
5  protection for "original works of authorship fixed in any tangible medium of expression."
6  17 U.S.C. § 102.  This includes "pictorial, graphic and sculptural works," such as "two-
7  dimensional works of fine, graphics, and applied art … technical drawings, diagrams, [and]
8  models." 17 U.S.C. § 101.  It is the effort expended to create drawings – tangible works of
9  authorship – that is within the scope of copyright protection. See Del Madera Props. v.
10  Rhodes & Gardner, Inc., 820 F.2d 973, 976-77 (9th Cir. 1987), overruled on other grounds
11  by, Fogerty v. Fantasy, Inc., 510 U.S. 517 (1994); Universal City Studios, Inc. v. J.A.R.
12  Sales, Inc., 1982 WL 1279, 216 U.S.P.Q. 679, 680 (C.D. Cal. 1982) ("dolls are protected
13  both as derivative works and as copyrightable subject matter in their own right").
14  Ownership of Bryant's original works of authorship (i.e., the BRATZ drawings) is at the
15  heart of Mattel's counterclaims and, therefore, such claims clearly implicate subject matter
16  within the Copyright Act's protective scope.

17  **B.   Mattel's conversion, intentional interference with contract, and unfair competition claims fail to meet the "extra element" test**

18  State law claims that contain different elements from their copyright counterparts are
19  preempted unless they contain an "extra element" that is qualitatively different from a
20  copyright infringement claim, and that changes not just the scope of the right, but its nature
21  as well. See Motown Record Corp. v. Hormel & Co., 657 F. Supp. 1236, 1240 (C.D. Cal.
22  1987). As the gravamen of Mattel's suit is the alleged infringement of copyrightable
23  material, Mattel's claims for conversion, intentional interference with contract, and unfair
24  competition are preempted by the Copyright Act.

25  **1.   Mattel's conversion claim**

26  California courts consistently hold that conversion claims are preempted by the
27  Copyright Act when they arise from the reproduction, copying and misuse of material
28  falling within the general subject matter scope of the Act. See, e.g., Melchior, 106 Cal. App.

1   4th at 794 ("The tort of conversion does not apply to ideas."). For instance, in Meridian

2   Project Sys., Inc. v. Hardin Constr. Co., 2006 WL 1062070, 79 U.S.P.Q.2d 1691, 1693 (E.D.

3   Cal. Apr. 21, 2006), plaintiff asserted a claim for conversion of the non-copyrightable

4   aspects of its project management software. In granting defendant's motion to dismiss the

5   conversion claim as preempted, the court reasoned that, as the subject matter of copyright is

6   broader than the scope of copyright protection, plaintiff's conversion claim sought to

7   enforce rights equivalent to those asserted in plaintiff's copyright claim. Id. at 1694.

8       This rule applies whether the conversion claim is based on the deprivation of an idea

9   itself or the tangible medium in which it is expressed. In Dielsi v. Falk, 916 F. Supp. 985,

10  992 (C.D. Cal. 1996), plaintiff's conversion claim was based on the use and distribution of

11  ideas expressed in a manuscript which plaintiff had given to defendant.   In finding

12  plaintiff's conversion claim was preempted, the court held that the conversion allegation

13  "d[id] not add any additional element to the essential claim that Plaintiff's ideas were

14  misappropriated by Defendants ... [because s]uch a claim is 'part and parcel' of a copyright

15  claim." Id.

16      Although Mattel casts its conversion claim as seeking recovery of "tangible

17  materials" (SAA ¶ 157 and at 76 ¶ 5), the focus of its claim is on the disgorgement of profits

18  resulting from the alleged infringement of its copyrights (id. at 76-77).  Plaintiff's semantic

19  masquerade cannot save its claim – this action is not about tangible items Bryant allegedly

20  converted[39] from Mattel, but about the BRATZ concept. Indeed, in Idema v. Dreamworks,

21  Inc., 162 F. Supp. 2d 1129, 1192-93 (C.D. Cal. 2001), the court held that, although plaintiffs

22  alleged that there had been a conversion of tangible documents by defendants, "[p]laintiffs

23  claim[ed] that Defendants somehow profited from information in those documents, and/or

24

25  [39]   Indeed, the items Bryant is alleged to have used in assembling the early BRATZ sculpts had been discarded by Mattel. ███████████████

26  Discarded material cannot be the subject of a conversion claim.  Ananda Church of Self-

27  Realization v. Mass. Bay Ins. Co., 95 Cal. App. 4th 1273, 1282 (2002) ("no claim for conversion or other interference with personal property rights may be based on the taking of documents placed in

28  a trash can").

1 that this information was instrumental in the [alleged infringement]. It is therefore not the

2 documents *themselves* which Plaintiffs claim as their 'property' which was wrongfully

3 converted, but the *information* contained therein."

4      Mattel cannot save a claim for conversion of copyrightable material with language

5 indicating that it instead seeks the restoration of the documents containing the genesis of the

6 copyrightable concept. Where (1) the "crucial" allegation in the complaint involves the use

7 and distribution of copyrighted work, as opposed to the deprivation of its tangible

8 embodiment (Dielsi, 916 F. Supp. at 992; Harper & Row Publrs. v. Nation Enters., 723 F.2d

9 195, 201 (2d Cir. 1983) ("If unauthorized publication is the gravamen of their claim, then it

10 is clear that the right they seek to protect is coextensive with an exclusive right already

11 safeguarded by the [Copyright] Act"), rev'd on other grounds by, 471 U.S. 539 (1985)), and

12 (2) the primary measure of damages is disgorgement of profits from the unauthorized use,

13 reproduction or distribution of copyrighted works, the allegation is equivalent to a copyright

14 claim. See Worth v. Universal Pictures, Inc., 5 F. Supp. 2d 816, 822 (C.D. Cal. 1997). As

15 Mattel's "crucial" claim seeks the disgorgement of profits of MGA and Larian's use and

16 reproduction of the BRATZ concept, Mattel's conversion claim is equivalent to its

17 copyright infringement claim and is preempted.[40]

18      **2.   Mattel's intentional interference with contract claim**

19      The elements of awareness and intent in a claim of intentional interference with

20 contract only alter the action's scope, not its nature, and, therefore, any such claims are

21 preempted by the Copyright Act. See Harper, 723 F.2d at 201. In claims alleging intentional

22 interference with a contract involving copyright, the enjoyment of the allegedly infringing

23

[40]   Mattel may argue that because Judge Manella refused to find preemption of its conversion
24 claims in connection with the briefing on remand, this Court should likewise reject MGA's
preemption arguments. However, Judge Manella rejected defendant's conversion preemption
25 argument because the complaint was "vague and generalized ... never mention[ed] what items or
works Bryant allegedly converted." Mattel, Inc. v. Bryant, 441 F. Supp. 2d at 1093. Here, Mattel's
26 Counterclaims specifically allege that Bryant converted "such proper[ty] [sic] and materials that
were created by Bryant while he was a Mattel product designer." (See SAA ¶ 157.) Furthermore,
27 Mattel's lynchpin counterclaim is for copyright infringement against MGA, Larian and Bryant.
(See id. ¶¶ 82-87.) Thus, this Court's consideration of MGA and Larian's preemption argument
28 would be based on entirely new allegations.

1  use is "so intimately bound up with the right itself that it could not possibly be deemed a

2  separate element." Id. Although Mattel pled an element resembling awareness, intent, or

3  inducement apart from its copyright infringement claim, this "additional" element "goes

4  merely to the scope of the right; it does not establish qualitatively different conduct on the

5  part of the [allegedly] infringing party, nor a fundamental nonequivalence between the state

6  and federal rights implicated." Id.

7       Mattel's Sixth Counterclaim for Intentional Interference with Contract offers all the

8  same flavor as its copyright infringement claim in that it alleges (1) "MGA, Larian ... knew

9  that Bryant had assigned to Mattel, and was obligated to disclose to Mattel all inventions,

10  including designs and other works, created, conceived, or reduced to practice during their

11  employment with Mattel," and that (2) "[d]espite such knowledge, Counter-defendants

12  MGA, Larian ... intentionally and without justification solicited, induced and encouraged

13  the Mattel employees to breach their contracts with Mattel." (SAA ¶¶ 124-125.)   This

14  allegation does not add anything to Mattel's copyright claim, which similarly seeks to place

15  liability on MGA and Larian for MGA's role in the alleged infringement.   The addition of

16  "elements such as awareness or intent may alter the scope of the action but not its nature."

17  Motown Record, 657 F. Supp. at 1240 (intentional interference claim preempted by

18  Copyright Act); see also Idema, 162 F. Supp. 2d at 1193; cf. Gemcraft Homes, Inc. v.

19  Sumurdy, 688 F. Supp. 289, 295-6 (E.D. Tex. 1988) (claim for interference with contract

20  preempted on allegations that defendants used copyrightable material).[41]   As Mattel's

21  lawsuit revolves around issues of infringement, its claim for intentional interference with

22  contract is preempted.

23       **3.**   **Mattel's unfair competition claims**

24       Mattel's unfair competition claims are preempted because, to the extent they are not

25  _____

[41]   Although Motown Record and Idema deal with interference with economic relations, they

26  apply here as such claims undergo the same preemption analysis – focusing on the elements of intent and awareness – as interference with contract. See Kasparian v. County of Los Angeles, 38

27  Cal. App. 4th 242, 260 (1995) (interference with contract has been referred to as a species of the broader tort of interference with prospective economic relations); accord Della Penna v. Toyota

28  Motor Sales, U.S.A., Inc., 11 Cal. 4th 376, 381-391 (1995).

1  qualitatively different from a copyright claim, they are subsumed by federal copyright law.
2  See Lanard Toys, Ltd. v. Novelty, Inc., 511 F. Supp. 2d 1020, 1030-31 (C.D. Cal. 2007),
3  citing Fisher v. Dees, 794 F.2d 432 (9th Cir. 1986).[42]   This principle applies whether
4  Mattel's claim under the Copyright Act ultimately fails. See Selby v. New Line Cinema
5  Corp., 96 F. Supp. 2d 1053, 1058 (C.D. Cal. 2000) ("[T]he shadow actually cast by the
6  Act's preemption is notably broader than the wing of its protection").   Thus, an unfair
7  competition argument constructed upon the premises that copyrightable material was (1)
8  owned by plaintiff, and (2) was misappropriated defendants, will be considered "part and
9  parcel of the copyright claim." Del Madera, 820 F.2d at 977.

10  A recent decision of this District, Lanard Toys, Ltd. v. Novelty, Inc., 511 F. Supp. 2d
11  at 1030-31, which involved a defendant supplier's allegedly infringing "knock-off" toys,
12  granted defendants' summary judgment motion, holding that "plaintiffs may not allege a
13  claim for unfair competition based on defendants' alleged infringement of its copyright."
14  Furthermore, where a plaintiff specifically incorporates allegations made earlier in its
15  complaint, such repetition is a sufficient basis for preemption.  For instance, in Kodadek v.
16  MTV Networks, Inc., the Ninth Circuit preempted plaintiff's unfair competition claim on
17  the ground that its complaint "expressly base[d] his unfair competition claim on rights
18  granted by the Copyright Act," because "the unfair competition claim incorporates by
19  reference paragraphs from the copyright infringement claim." 152 F.3d 1209, 1212-13 (9th
20  Cir. 1998) (emphasis added); see also Watermark Publrs., 1997 WL 717677, 44 U.S.P.Q.2d
21  at 1582 (statutory unfair competition claim predicated on "the conduct alleged above"
22  preempted).

23  Mattel also incorporated its infringement allegations into its unfair competition claim.
24  Mattel's unfair competition claim specifically "repeats and realleges each and every
25  allegation set forth in paragraphs 1 through 162, above, as though fully set forth at length."

26

27  [42]   Mattel's common law unfair competition claim also is preempted. See Sony Pictures Ent.
Inc. v. Fireworks Ent. Group, Inc., 156 F. Supp. 2d 1148, 1164 (C.D. Cal. 2001) (statutory and
28  common law unfair competition claims treated the same for copyright preemption analysis).

1  (SAA ¶ 163.)  Furthermore, Mattel bases its unfair competition claim on MGA's "foregoing

2  conduct."  (Id. ¶ 165.)  Naturally, this includes allegations of Bryant's purported copyright

3  infringement (id. ¶¶ 21-36), which precede Mattel's unfair competition allegations. Claims

4  of unfair competition predicated on ownership, misappropriation, and infringement of a

5  copyright add no "extra element" to distinguish it from a copyright infringement claim. Del

6  Madera, 820 F.2d at 977 ("[Plaintiff's] ownership of the material, and the alleged

7  misappropriation by the defendants, are part and parcel of the copyright claim").  As the

8  essence of Mattel's complaint is derived from MGA, Larian and Bryant's alleged

9  unauthorized use of a copyrighted work, Mattel's unfair competition claim is preempted.

10 See Motown Record, 657 F. Supp. at 1240 (statutory unfair competition claim preempted by

11 Copyright Act).

12 **III.   MATTEL'S UNFAIR COMPETITION CLAIMS FAIL**

13      Mattel's statutory and common law unfair competition claims fail as to MGA and

14 Larian because, as a matter of law, MGA and Larian: (1) did not engage in anticompetitive

15 practice that would justify a finding of unfairness, (2) did not engage in any deceptive

16 practices that would justify a finding of fraudulent conduct; and (3) did not commit

17 "commercial bribery" that would support a finding of unlawful conduct.

18      **A.   MGA's and Larian's Conduct Was Not Unfair**

19      Mattel's claim that MGA and Larian engaged in unfair conduct is inadequately pled

20 and fails as a matter of law.  In California, when a party sues an ostensible competitor, a

21 defendant's business practice is only "unfair" to the extent it implicates "conduct that

22 threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of

23 those laws because its effects are comparable to or the same as a violation of the law, or

24 otherwise significantly threatens or harms competition." Cel-Tech Commc'ns, 20 Cal. 4th at

25 186-87.  As between direct competitors, like Mattel and MGA, "unfairness" must be

26 "tethered to some legislatively declared policy or proof of some actual or threatened impact

27 on competition." Id. at 186. "Unfairness" cannot be established where a plaintiff alleges

28 harm to *commercial interests*, as opposed to *competition*. See Watson Labs. Inc. v. Rhone-

1  Poulenc Rorer, Inc., 178 F. Supp. 2d 1099, 1118-19 (C.D. Cal. 2001) (no "unfairness"

2  where no impact on competition shown).

3      Mattel alleges no harm to competition, relying instead on allegations pertaining to its

4  alleged ownership of Bryant's drawings throughout its Second Amended Answer. (SAA ¶

5  21-36, 82-87). Indeed, Mattel's claim, if accepted, actually reduces competition because

6  Mattel indisputably had a monopoly position and is seeking to eliminate a competitor from

7  the market. Furthermore, Mattel's claim also fails because mere allegations of copyright

8  ownership are not sufficient to sustain a claim of unfairness under section 17200. See

9  Sybersound Records, Inc. v. UAV Corp., __ F.3d __, 2008 WL 509245, at *13 (9th Cir. Feb.

10  27, 2008) (in action brought under Lanham and Copyright Acts, plaintiff's failure to plead

11  that "unfair" act would be an "incipient violation of antitrust law" defeats its claim unfair

12  competition claim).

13      **B.   MGA and Larian's Conduct Was Not Fraudulent**

14      Mattel did not make any allegations of conduct constituting fraud or deception,

15  basing its entire claim of "fraudulent" conduct under section 17200 on "the foregoing

16  conduct" and "misrepresentations as alleged above" – i.e., claims of copyright ownership

17  and infringement.   (SAA ¶ 165.)   As demonstrated above, because Mattel's unfair

18  competition claim is based entirely on conduct pertaining to the ownership of Bryant's

19  drawings, the claim is preempted by the Copyright Act. (Supra at pp. 23-24.)

20      Mattel's claim that MGA and Larian's conduct was fraudulent also fails because

21  Mattel has not alleged that the public was deceived in any manner. A business practice is

22  "fraudulent" if "members of the public are likely deceived." Nat'l Rural Telecommc'ns Co-

23  op. v. DIRECTV, Inc., 319 F. Supp. 2d 1059, 1078 (C.D. Cal. 2003) (granting defendant

24  summary judgment on, inter alia, "fraudulent" prong of unfair competition claim).   Fairly

25  read, Mattel's allegations show more concern for MGA and Larian's alleged

26  misrepresentations to Mattel concerning Bryant's involvement with BRATZ. However,

27  Mattel may not sustain a claim for "fraudulent" conduct when the only allegedly "deceived"

28  party is itself. See, e.g., Watson Labs., 178 F. Supp. 2d at 1117 ("it is necessary under the

1  fraudulent prong [of the UCL] to show deception to some members of the public, or harm to

2  the public interest, and not merely to the direct competitor or other non-consumer party to a

3  contract").

4  ## C.   MGA's and Larian's Conduct Was Not Unlawful

5  "Commercial bribery" is the only express predicate in Phase One that would support

6  the "unlawful" prong of Mattel's unfair competition claims.[43] Specifically, Mattel argues

7  that MGA and Larian engaged in "commercial bribery" in violation of California Penal

8  Code section 641.3(a), which punishes individuals who "[s]olicit[], accept[], or agree[] to

9  accept money or any thing of value from a person other than his or her employer, other than

10 in trust for the employer, <u>corruptly</u> and without the knowledge or consent of the employer,

11 <u>in return for using or agreeing to use his or her position for the benefit of that other person</u>,

12 and any person who offers or gives an employee money or any thing of value under those

13 circumstances, is guilty of commercial bribery." Cal. Penal Code § 641.3(a) (emphasis

14 added).  As a matter of law, Mattel cannot establish a violation of Section 641.3 for several

15 reasons.

16 <u>First</u>, there is no evidence that Bryant had the specific intent to injure or defraud

17 Mattel.  "Corruptly," as defined in section 641.3, requires the employee to evince a

18 "specific" intent to injure or defraud his employer.  <u>Id.</u> § 641.3(c)(3).  "Specific intent"

19 requires more than the performance of the proscribed act – it requires the intent to do some

20 further or achieve a particular consequence.[44]  When Bryant contracted with MGA he knew

---

21 [43]   Mattel's citation to the Economic Espionage Act of 1996, 18 U.S.C. §§ 1831, <u>et seq.</u>, in its
22 counterclaims implicates issues to be decided in Phase Two. <u>See</u> Mattel's Memorandum Regarding
    Trial Structure, dated June 20, 2007, at 8-9, adopted by the Order dated July 2, 2007. Although not
23 alleged, and thus not properly a basis for the claim, Mattel might argue that its claims under the
    Copyright Act form the basis for the unlawful prong.  If permitted, such a claim still would fail
24 because, as discussed above, the crux of Mattel's claim is for copyright <u>ownership</u> based on an
    alleged contractual right, not <u>infringement</u>.  (<u>Supra</u> at pp. 23-24.)  A dispute over copyright
25 ownership in not an "unlawful" practice "prohibited by law, whether 'civil or criminal, federal,
    state, or municipal, statutory, regulatory, or court-made.'" <u>Smith & Hawken, Ltd. v. Gardendance,</u>
26 <u>Inc.</u>, 2004 WL 2496163, at **6-7 (N.D. Cal. Nov. 5, 2004).
   [44]   <u>See</u> <u>People v. Hood</u>, 1 Cal. 3d 444, 456-57 (1969) ("When the definition [of a crime] refers
27 to defendant's intent to do some further act or achieve some additional consequence, the crime is
    deemed to be one of specific intent"); see also Black's Law Dictionary 1399 (6th ed. 1997) ("[t]he
28 subjective desire or knowledge that the prohibited result will occur.").

---

that he had created the BRATZ concept in August 1998, before entering Mattel's employ, and he subjectively believed that Mattel could lay no claim to his drawings. (UF ¶ 15.) Indeed, Bryant, expressly represented to MGA, and his patent attorney confirmed, that Bryant owned the BRATZ concept. (UF ¶¶ 20-22.)

Second, Mattel cannot establish that MGA "asked" Bryant to use his position with Mattel for MGA's benefit. To the contrary, MGA and Larian asked for and received a warranty from Bryant and his attorney that his contract with MGA did not breach any existing contract with Mattel. (UF ¶ 23.) Moreover, MGA and Larian expected and instructed Bryant to resign from Mattel immediately upon entering a contract with MGA, and believed that he had done so. (UF ¶¶ 24-26.) Bryant's offer from MGA was thus not elicited by a demand for payment from MGA for his drawings, but was presented to him by MGA based on his merit as an artist after receiving a warranty from Bryant that his drawings were not covered by his Mattel agreement. See CrossTalk Prods. v. Jacobson, 65 Cal. App. 4th 631, 644 (1998) (affirming dismissal of commercial bribery claim where facts failed to alleged that a contract that was the subject to the alleged bribery was obtained improperly). Far from wanting Bryant to misuse his position at Mattel or otherwise obtain his employment by improper means, MGA wanted to insure that Bryant did not do any such thing.[45] Were Mattel's theory of commercial bribery to prevail, nearly all job offers under similar circumstances would constitute commercial bribery.

Lastly, there is no evidence that Bryant actually "used" his position with Mattel to benefit MGA. Mattel does not allege, nor is there any evidence to prove, that Bryant used his position at Mattel to benefit MGA. Rather, the allegation is that Bryant assigned to MGA rights that he had previously assigned to Mattel under the Inventions Agreement. On its face, this allegation has nothing to do with Bryant's position at Mattel or using

---

[45]    MGA and Larian wanted nothing to do with any work that would be subject to a Mattel claim of ownership. ████████████████████████████████████████

████████████████████████████████████████████████████████████████

1   information at Mattel to benefit MGA. Indeed, it is undisputed that Bryant's creation of the

2   BRATZ concept was something that was <u>not</u> done during the normal course and scope of

3   his employment at Mattel or at the direction of Mattel.

4       **D.**   **Mattel's Common Law Unfair Competition Claims Also Fail**

5       "The common law tort of unfair competition is generally thought to be synonymous

6   with the act of 'passing off' one's goods as those of another." <u>Bank of the W.</u>, 2 Cal. 4th at

7   1263.  Here, Mattel's claim does not allege a claim resembling one for "passing off."

8   Mattel never alleges that MGA or Larian sold Mattel's products as their own.  Mattel's

9   claims also fail to satisfy the basic elements of such a claim, which requires that: "(1) the

10   [counterclaimant] has invested substantial time and money in development of its ...

11   'property'; (2) the [counterclaim] defendant has appropriated the [property] at little or no

12   cost; and (3) the [counterclaimant] has been injured by the [counterclaim] defendant's

13   conduct." <u>Smith & Hawken, Ltd. v. Gardendance, Inc.</u>, 2004 WL 2496163, at **6-7 (N.D.

14   Cal. Nov. 5, 2004).

15       First, Mattel does not allege that it invested ███████████████████

16   ██████████████████  Mattel seeks to destroy BRATZ, not take possession of it,

17   indicating that Mattel does not value the BRATZ because of some prior effort or pecuniary

18   investment. (Ex. 21 █████████████████and SAA p. 76, ¶ 4 (Mattel seeks an order

19   impounding BRATZ).)  Moreover, it is undisputed that Mattel neither knew about nor put

20   effort into developing BRATZ on its own.  Furthermore, MGA and Larian have not

21   appropriated the drawings, let alone "at little or not cost." <u>Smith & Hawken</u>, 2004 WL

22   2496163, at **6-7.  MGA and Larian were repeatedly assured that Bryant's title to his

23   drawings was free and clear of Mattel's grasp, and indeed MGA poured literally millions of

24   dollars into developing BRATZ in reliance on Bryant's representations. (UF ¶¶ 15, 20-23.)

25   **IV.   MATTEL CANNOT ESTABLISH THAT LARIAN**

26         **AND MGA INTENTIONALLY INTERFERED WITH**
      **BRYANT'S AT-WILL CONTRACT WITH MATTEL**

27       In its Sixth Counterclaim, Mattel alleges that Larian and MGA intentionally

28   "encouraged, aided and financed Bryant to develop BRATZ, knowing full well that Bryant

1  was still employed by Mattel" in order to "obtain[] a valuable fashion doll line" even though
2  in developing the line for MGA, Bryant would be in breach of his contractual obligations to
3  Mattel. (SAA ¶ 33.) While it is unclear which "contract" Mattel is referring to, Larian and
4  MGA assume for this motion that Mattel is referring to the Inventions Agreement Bryant
5  signed with Mattel in January 1999. (Id. ¶ 22.)  Here, Bryant's offer letter from Mattel
6  states ███████████████████ (UF ¶ 1.)

7      To establish a claim for intentional interference with contractual relations, Mattel
8  must show: (1) a valid contract between Mattel and Carter Bryant; (2) MGA and Larian's
9  knowledge of the contract; (3) MGA and Larian's intentional acts designed to induce a
10  breach or disruption of the contractual relationship; (4) actual breach or disruption of the
11  contractual relationship; and (5) resulting damage.  See Family Home & Fin. Ctr., Inc. v.
12  Fed. Home Loan Mortg. Corp., 461 F. Supp. 2d 1188, 1193 (C.D. Cal. 2006) (summary
13  judgment granted where plaintiff failed to show defendant induced breach).  Even if Mattel
14  could establish breach or disruption of a contract, it must also prove that MGA and Larian
15  caused that disruption.  See id.  As shown below, Mattel cannot establish any of these
16  elements on the undisputed record.

17      "California courts have consistently declared ... an expression of public policy to
18  ensure that every citizen shall retain the right to pursue any lawful employment and
19  enterprise of their choice." Metro Traffic Control, Inc. v. Shadow Traffic Network, 22 Cal.
20  App. 4th 853, 859 (1994).  This policy dictates that "[t]he interests of the employee in his
21  own mobility and betterment are deemed paramount to the competitive business interests of
22  the employers[.]"  Diodes, Inc. v. Franzen, 260 Cal. App. 2d 244, 255 (1968).  Thus,
23  California "public policy generally supports a competitor's right to offer more pay or better
24  terms to another's employee, so long as the employee is free to leave.... [I]f the law were to
25  the contrary, the result 'would be intolerable, both to such employers as could use the
26  employe[e] more effectively and to such employe[e]s as might receive added pay. It would
27  put an end to any kind of competition.'"  Reeves, 33 Cal. 4th at 1151 (quoting Judge
28  Learned Hand in Triangle Film Corp. v. Artcraft Pictures Corp., 250 F. 981, 982 (2d Cir.

1  1918)).[46]

2       These policy concerns spawned the principle that where, as here, the contract at issue

3  is an at-will employment contract, "no actionable wrong is committed by a competitor who

4  solicits his competitor's employees or who hires away one or more of his competitor's

5  employees who are not under contract, so long as the inducement to leave is not

6  accompanied by unlawful action." Diodes, 260 Cal. App. 2d at 255. Later courts interpreted

7  "the qualification of Diodes regarding 'employees who are not under contract' to mean an

8  employment contract other than employment at will."[47]

9       **A.   Bryant did not breach or disrupt his contract with Mattel**

10      As shown in Bryant's summary judgment brief, Bryant did not breach his

11 Employment Agreement with Mattel because any BRATZ-related drawings or models

12 allegedly created by Bryant before his departure from Mattel do not fall within the scope of

13 the Inventions Agreement.  (Bryant Br. at III.B.)

14      **B.   MGA and Larian lacked the intent to induce Bryant to breach his contract**

15      To prove that MGA and Larian intended to interfere with Bryant's Employment

16 Agreement by contracting with Bryant for the ownership rights to the BRATZ concept and

17 drawings, Mattel must show that MGA and Larian knew that "the interference is certain or

18 [46]   See also VL Sys., Inc. v. Unisen, Inc., 152 Cal. App. 4th 708, 713, 715 (2007) (quoting
19 Diodes, finding no unlawful solicitation of employee where the employee initiated the new
   agreement with the defendant and "chose to seek the job with" the defendant); Reeves v. Hanlon,
20 33 Cal. 4th 1140, 1145 (2004) (requiring a demonstration of an unlawful act on the part of
   competitor employer "will promote the public policies supporting the right of at-will employees to
21 pursue opportunities for economic betterment and the right of employers to compete for talented
   workers"); Continental Car-Na-Var Corp. v. Moseley, 24 Cal. 2d 104, 110 (1944) ("A former
22 employee has the right to engage in a competitive business for himself and to enter into
   competition with his former employer, even for the business of ... his former employer, provided
23 such competition is fairly and legally conducted."); accord Interloc Solutions, Inc. v. Technology
   Assocs. Int'l Corp.  2007 WL 2429715, at *2 (E.D. Cal. Aug. 24, 2007) ("employees are not
24 precluded from seeking new employment on their own initiative").
   [47]   Metro Traffic,  22 Cal. App. 4th at 860; Reeves, 33 Cal. 4th at 1145 ("defendant is not
25 subject to liability for intentional interference if the interference consists merely of extending a job
   offer that induces an employee to terminate his or her at-will employment"). The California
26 Supreme Court refined this standard, holding that "to recover for a defendant's interference with an
   at-will employment relation, a plaintiff must plead and prove that the defendant engaged in an
27 independently wrongful act – i.e., an act 'proscribed by some constitutional, statutory, regulatory,
   common law, or other determinable legal standard' that induced an at-will employee to leave the
28 plaintiff." Reeves, 33 Cal. 4th at 1152-53.

1  substantially certain to occur as a result of his action. The rule applies, in other words, to an
2  interference that is incidental to the actor's independent purpose and desire but known to
3  him to be a necessary consequence of his action." Tuchscher Dev. Enters., Inc. v. San
4  Diego Unified Port Dist., 106 Cal. App. 4th 1219, 1239 (2003) (emphasis added).  There is
5  no intent to interfere where the defendant knows or believes its agreement with a third party
6  will not infringe the rights of the plaintiff.

7       1-800 Contacts, Inc. v. Steinberg, 107 Cal. App. 4th 568 (2003), although arising in
8  an anti-SLAPP motion, is instructive.  The court found plaintiff (a discount contact lens
9  seller) would be unlikely to prevail on its intentional interference with contract claims
10 against defendant (a representative of optometrist associations) where plaintiff's former
11 legal counsel contacted defendant and offered his services to groups of optometrists, which
12 were direct competitors of plaintiff's as contact lens sellers and were seeking laws
13 regulating the activities of businesses like plaintiff's. Id. at 573.  Because the former
14 employee repeatedly reiterated to defendant that he would not disclose confidential
15 information learned from his previous employer, "stated and restated his contractual
16 obligation not to work for a defined class of competitors, and obtained assurances that
17 neither [defendant] Steinberg nor the optometric associations were within that class[,]" the
18 court concluded that, regardless of whether the former employee actually breached the
19 contract, "the evidence did not show or substantiate that Steinberg – either in agreeing to
20 work with [the former employee] on a subject of mutual concern or in inviting or arranging
21 for others interested to meet with them – acted with knowledge that any such breach would
22 thereby be caused." Id. at 586 (emphasis added).  The undisputed facts here show that
23 Larian and MGA took steps to verify that by contracting with Bryant for the ownership of
24 BRATZ, they would not infringe any potential rights of Mattel, and thus the intent element
25 cannot be met. MGA and Larian indisputably did not know the specific requirements of
26 Bryant's Employment Agreement; Bryant was unable to provide a copy at their request,
27 because he did not have one in his possession. (UF ¶ 19.)  MGA and Larian specifically
28 sought assurances from Bryant and his patent attorney that Bryant's developing of the

1  BRATZ concept fell outside the scope of Bryant's employment with Mattel (UF ¶¶ 14, 20),

2  and were told by Bryant and his attorney that he ████████████████████████████

3  ████████████████████████████████ (UF ¶¶ 15, 21.)

4  MGA and Larian had no reason to doubt these assurances, especially as a patent attorney

5  familiar with the precise ownership issues in question represented that she was ████████

6  the Employment Agreement was not implicated. (UF ¶¶ 20-22.)

7       Finally, and most importantly, MGA and Larian asked for and received a warranty

8  from Bryant that, <u>inter alia</u>, his signing of the agreement with MGA did not breach any

9  existing contract with a third party, that the BRATZ concept and drawings were ████████

10  and were the exclusive property of MGA, and indemnifying MGA from third party claims

11  to ownership of the BRATZ concept or drawings. (UF ¶ 23.) Given this evidence, there is

12  no question that MGA and Larian were far from ████████ that any interference with

13  Mattel's rights was likely to occur—indeed, the opposite is true, as the undisputed facts

14  show that, as a result of repeated inquiries by MGA and Larian and assurances from Bryant

15  and his attorney, MGA and Larian were rightfully secure in the knowledge that they were

16  <u>not</u> interfering with <u>any</u> party's contractual rights.  Thus, there is no triable issue of fact as

17  to MGA and Larian's lack of intent to interfere with Bryant's Employment Agreement.

18      **C.    MGA and Larian did not induce Bryant to leave Mattel**
           **<u>and therefore could not be the cause of his alleged breach</u>**

19       It is settled that a contracting party is not liable for intentional interference with

20  contract where the breaching party initiates the contact with him. <u>See</u> Restatement (Second)

21  of Torts § 766, cmt. n (2007).[48] <u>See also</u> <u>DeVoto v. Pacific Fidelity Life Ins. Co.</u>, 618 F.2d

22  1340, 1348 (9th Cir. 1980) (noting that "where a contract has been abrogated, competitors

23  may thereafter offer to deal with the party who repudiated the contract without incurring

24  liability in tort: there is no act of inducement, and once the contract is abrogated there is no

25  _____

[48]    "One does not induce another to commit a breach of contract with a third person under the
26  rule stated in this Section when he merely enters into an agreement with the other with knowledge
that the other cannot perform both it and his contract with the third person. .... For instance, B is
27  under contract to sell certain goods to C. He offers to sell them to A, who knows of the contract. A
accepts the offer and receives the goods. A has not induced the breach and is not subject to liability
28  under the rule stated in this Section."

1  advantage to appropriate") (citing Restatement (Second) of Torts § 766, cmt. n); Bauer v.

2  Interpublic Group of Companies, Inc.,   255 F. Supp. 2d 1086, 1093, 1095 (N.D. Cal.

3  2003).[49]

4       Assuming Bryant somehow breached his Employment Agreement with Mattel in

5  selling the BRATZ concept to MGA, the undisputed evidence shows that there was no

6  inducement on the part of MGA and Larian for him to do so.  Here, the record is undisputed

7  that Bryant was the one searching for a company to develop his BRATZ line and he was the

8  initiating party.[50]  It is undisputed that Bryant had no contact with MGA until he arrived at

9  MGA headquarters for his first pitch meeting – arranged by Marlow, who was not an MGA

10  employee – in August of 2000.  (UF ¶¶ 3, 7-10.)  Mattel has no evidence to suggest that

11  MGA approached or solicited Bryant to leave his position at Mattel.   Given these

12  undisputed facts, MGA and Larian did not intentionally induce or cause Bryant to breach

13  his Employment Agreement.

14  **V.   AS BRYANT DID NOT OWE A FIDUCIARY DUTY TO MATTEL, THERE CAN BE NO AIDING AND ABETTING LIABILITY**

15       Mattel's 8th Counterclaim alleges that MGA and Larian are liable for aiding and

16  abetting Bryant's breach of fiduciary duty owed to Mattel because they "encouraged, aided

17  _____

18  [49]   1-800 Contacts, Inc., 107 Cal. App. 4th at 586 (where breaching party approached defendant, defendant agreed to work with and set up meetings for others to work with breaching party not

19  enough to show inducement); American Mortg. Network v. LoanCity.com, 2006 WL 3199291, at *17 (Cal. C24t. App. Nov. 7, 2006) (judgment notwithstanding a verdict granted where

20  "dissatisfied" employee "putting himself on the market" contacted and was hired by competitor after receiving competitor's name as recommendation from third party"); Xtracash ATM, Inc. v.

21  Karsh, 2002 WL 31053855, at *9 (Cal. Ct. App. Sept. 16, 2002) (granting summary judgment on intentional interference with contract claims against provider of ATM services, finding no

22  inducement where "very dissatisfied" merchants contacted and contracted with defendant to provide alternate service and undisputed facts showed defendant "did not approach merchants to

23  change their service and did not induce them to breach their contracts with [plaintiff]"); Fogel v. UNUM Corp., 2001 WL 1359112, at *4 (Cal. Ct. App. Nov. 6, 2001) (no inducement where, inter

24  alia, alleged inducing party did not approach breaching party but instead was solicited by breaching party).

25  [50]   UF ¶ 5; Ex. 1

26

27

28

1  and financed Bryant to develop BRATZ," knowing Bryant was employed by Mattel and

2  that Mattel is the "true owner of BRATZ designs and works." (SAA ¶¶ 33, 34; see also id.

3  ¶¶ 26-27, 136-37, 139-41.) Bryant's concurrently filed summary judgment motion, in which

4  MGA and Larian join, demonstrates that, as a matter of law, Bryant did not owe a fiduciary

5  duty. (Bryant Br. at III.A.)  Absent such a duty, a claim for aiding and abetting necessarily

6  fails. See Richard B. LeVine, Inc. v. Higashi, 131 Cal. App. 4th 566, 574 (2005) (granting

7  summary judgment on aiding and abetting breach of fiduciary duty where plaintiff failed to

8  establish breach); see also MJT Securities v. Toronto Dominion Bank, 2007 WL 1725421,

9  at **7-8 (N.D. Cal. June 14, 2007). As Bryant owed no fiduciary duty to Mattel, Mattel's

10  claim against MGA and Larian likewise fails as a matter of law.

## CONCLUSION

11
12     For the foregoing reasons, MGA and Isaac Larian respectfully request an order

13  granting partial summary judgment and dismissing Mattel's Phase I claims against them.

14  DATED: March 7, 2008              SKADDEN,   ARPS,   SLATE,   MEAGHER   &
                                      FLOM, LLP
15
                                      By:
16                                           Thomas L. Nolan
                                      Attorneys for MGA Entertainment, Inc., MGA
17                                    Entertainment (HK) Limited, MGAE de Mexico,
                                      S.R.L. de C.V., and Isaac Larian
18
19
20
21
22
23
24
25
26
27
28