# Exhibit 16

## Diane Hutnyan

| | |
|---|---|
| **From:** | Weinstein, Ryan [Ryan.Weinstein@skadden.com] |
| **Sent:** | Wednesday, February 27, 2008 11:00 AM |
| **To:** | Diane Hutnyan |
| **Cc:** | Sloan, Matthew E (LAC) |
| **Subject:** | Stipulation re Testing of Prince's Log Book |
| **Attachments:** | lac1-495716-3.doc |

Diane,

Per your request, please find our proposed stipulation attached.

As we would like to finalize this tomorrow, please provide us with your comments as soon as possible.

Thanks,
Ryan

Ryan Weinstein
Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue
Los Angeles, CA 90071
Phone: (213) 687-5526
Fax: (213) 621-5526
E-mail: ryan.weinstein@skadden.com

----------------------------------------------------------------
******************************************** To ensure compliance with Treasury Department regulations, we advise you that, unless otherwise expressly indicated, any federal tax advice contained in this message was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or applicable state or local tax law provisions or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein. ********************************************
******************************************** This email and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified any dissemination, distribution or copying of this email, and any attachments thereto, is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original copy and any copy of any email, and any printout thereof. Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request. ********************************************

Exhibit 16
P. 94

1 | THOMAS J. NOLAN (Bar No. 66992)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
2 | 300 South Grand Avenue
Los Angeles, CA  90071-3144
3 | Telephone:  (213) 687-5000
Facsimile:   (213) 687-5600
4 | E-mail:   tnolan@skadden.com

5 | KENNETH A. PLEVAN
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
6 | Four Times Square
New York, New York, 10036-6522
7 | Telephone:  (212) 735-3000
Facsimile:   (212) 735-2000
8 | Email:      kplevan@skadden.com

9 | Attorneys for Counter-Defendants
MGA ENTERTAINMENT, INC., ISAAC LARIAN,
10 | MGA ENTERTAINMENT (HK) LIMITED, and
MGAE de MEXICO S.R.L. de C.V.

11

12 | **UNITED STATES DISTRICT COURT**

13 | **CENTRAL DISTRICT OF CALIFORNIA**

14 | **EASTERN DIVISION**

15

16 | CARTER BRYANT, an individual,

17 | Plaintiff,

18 | v.

19 | MATTEL, INC., a Delaware
corporation,

20 | Defendant.

21 |

22 | Consolidated with MATTEL, INC. v.
23 | BRYANT and MGA
ENTERTAINMENT, INC. v.
24 | MATTEL, INC.

25

26

27

28

| CASE NO. CV 04-9049 SGL (RNBx) |
| --- |
| Consolidated with:<br>Case No. CV 04-9059<br>Case No. CV 05-2727 |
| **DISCOVERY MATTER** |
| Hon. Edward A. Infante (Ret.)<br>Discovery Master |
| **STIPULATION RE MGA'S PROPOSED TESTING OF JACQUELINE PRINCE'S NOTARY BOOK; [PROPOSED] ORDER** |

| **Phase 1** | |
| --- | --- |
| Discovery Cut-Off: | Jan. 28, 2008 |
| Expert Rebuttal Reports Due: | March 17, 2008 |
| Expert Discovery Cut-Off: | March 31, 2008 |
| Pre-Trial Conference: | May 5, 2008 |
| Trial Date: | May 27, 2008 |

STIPULATION RE MGA'S PROPOSED TESTING OF PRINCE'S NOTARY LOG BOOK AND [PROPOSED] ORDER
495716.03-Los Angeles Server 1A                                    MSW - Draft February 27, 2008 - 10:23 AM

Exhibit _16_,
P. _95_

1  **STIPULATION**

2      This Stipulation is entered into by and between Mattel, Inc. ("Mattel") on the

3  one hand, and MGA Entertainment, Inc., Isaac Larian, MGA Entertainment (HK)

4  Limited, and MGAE de Mexico S.R.L. de C.V. (collectively referred to herein as

5  "MGA"), on the other hand, with reference to the following:

6      WHEREAS, Jacqueline Prince, a notary public, made notations in a log book

7  entitled "Official Journal of Notarial Acts" (the "log book") which relate to the date

8  on which certain of plaintiff and counter-defendant Carter Bryant's ("Bryant")

9  drawings were created;

10      WHEREAS, on page 11 of the notary book, there is an entry, dated 8/26/99,

11  which identifies 6 sketches of dolls made by Bryant;

12      WHEREAS, the same entry includes the notation "From 1998 Missouri";

13      WHEREAS, on or about December 25, 2007, counsel for Mattel sent a letter

14  to Daniel J. Warren, counsel for Ms. Prince, requesting production of the notary

15  book for purposes of conducting a forensic analysis on the ink used on the above-

16  referenced entry;

17      WHEREAS, in response, Mr. Warren produced said log book to Mattel, and

18  MGA did not object;

19      WHEREAS, on January 4, 2008, Mattel's expert, Valery N. Aginsky,

20  extracted 17 sets of hypodermic needle-sized samples or "microplugs" from written

21  lines appearing on pages 11 and 12 of the notary book and two sets of blank paper

22  "microplug" samples from page 11 of the notary book;

23      WHEREAS, Mr. Aginsky subsequently subjected the "microplug" samples to

24  various chemical analyses, including chromatography, thin-layer chromatography

25  ("TLC"), and gas chromatography-mass spectrometry ("GC-MS");

26      WHEREAS, on January 31, 2008, Mr. Aginsky returned Ms. Prince's log

27  book to Mr. Warren;

28

-1-

Exhibit 16 ,
P. 96

1    WHEREAS, on February 11, 2008, Mattel transmitted to MGA a copy of Mr.
2  Aginsky's expert report, wherein Mr. Aginsky set forth the results of ink tests that he
3  performed on samples extracted from the notary book;

4    WHEREAS, on the basis of his tests, Mr. Aginsky concluded that the notation
5  "From 1998 Missouri" on page 11 of the notary book was written in different ink
6  than the remainder of the 8/26/99 entry;

7    WHEREAS, MGA now seeks to test the accuracy of Mr. Aginsky's findings
8  by having its own expert replicate Mr. Aginsky's ink testing;

9    WHEREAS, the current deadline for submitting expert rebuttal reports is
10 March 17, 2008;

11    THEREFORE, the undersigned parties, through their undersigned counsel,
12 stipulate and agree as follows:

13    1.    MGA will be allowed to take samples and conduct testing on the notary
14 book to test the accuracy of Mr. Aginsky's findings, pursuant to the following
15 protocol.

16    2.    MGA's testing of Ms. Prince's log book will be limited to analysis of
17 "microplug" samples extracted from pages 11 and 12 of the notary book.

18    3.    MGA's expert (or experts) will remove no more than 17 sets of
19 "microplug" samples from the written portions of the entries on pages 11 and 12 of
20 the notary book, and no more than two sets of blank paper "microplug" samples from
21 the areas of pages 11 and 12 which do not contain writing.  (Although this
22 Stipulation refers to MGA's "expert," MGA reserves the right to employ more than
23 one expert for the proposed sampling and testing of the notary book).

24    4.    MGA's expert will extract all "microplug" samples using a hypodermic-
25 needle-sized hole punch, which removes holes of less than one millimeter in
26 diameter.

27    5.    Before subjecting the samples to ink analysis, MGA's expert will
28 maintain the samples at his or her laboratory in normal environmental conditions.

-2-

1    6.    All sampling and testing will occur at the laboratory of MGA's expert.

2    7.    Before Mr. Warren sends the notary book to MGA's expert, MGA will
3  send a letter to Mattel's counsel by facsimile (and U.S. Mail) setting forth: (a) the
4  name of MGA's expert (or experts) who will conduct the sampling; (b) the expert's
5  curriculum vitae; (c) the location of the expert's laboratory; and (d) samples of
6  "microplugs" similar to those that would be extracted from the notary book.

7    8.    Mattel will have three days from its receipt of the above-referenced
8  letter by facsimile to object to the contemplated testing. During this three-day period,
9  Mr. Warren will maintain custody of the notary book, and no testing will be
10 performed. If Mattel raises no objection, then Mr. Warren will be directed to
11 transmit the notary book to MGA's expert and MGA's expert will be authorized to
12 conduct testing pursuant to the protocol set forth herein.

13   9.    In the event Mattel objects to the proposed testing, Mattel's counsel
14 must notify MGA by letter and/or a telephone call within the 3-day period set forth
15 above. The parties must then meet and confer and, within two more Court days, file
16 a joint statement to Judge Infante seeking resolution of the dispute.

17   10.   Mattel may elect to have its own expert attend the extraction of
18 "microplug" samples provided that (1) Mattel makes the election in writing within
19 the three-day objection period; (2) Mattel provides counsel for MGA with the
20 credentials of any observing expert; and (3) the testing can take place within ten (10)
21 calendar days of the execution of this Stipulation. At this time, MGA's expert is
22 available to conduct the sampling on March 10, 11, or 12, 2008.

23   11.   If Mattel's expert raises any issues about the sampling being performed
24 while he or she is observing the sampling, the parties will seek immediate resolution
25 from the Court so that the sampling will not be delayed. If Mattel's counsel does not
26 object or seek attendance by its expert within the three-day objection period, the
27 proposed destructive testing shall be deemed unobjectionable and may be carried out
28 by MGA's expert without further delay.

-3-

12.     With the exception of alterations resulting from any destructive testing, which would be conducted in accordance with the protocol set forth above, the notary book will be returned promptly to Mr. Warren in the same condition it was received.

13.     The parties agree that, should Mattel raise any objections to the proposed sampling, testing, or credentials of Mattel's expert, or to any other aspects of the testing process, MGA will be granted an extension of time within which to submit a rebuttal report in response to Mr. Aginsky's initial expert report. Specifically, in the event that Mattel objects to MGA's proposed expert sampling, the current March 17, 2008 deadline for submitting MGA's rebuttal expert report will be extended by one calendar day for each day from the date Mattel raises its objection to the date upon which any such objection is resolved by Judge Infante or by the agreement of the parties.

IT IS SO STIPULATED.

DATED: February ___, 2008         SKADDEN, ARPS, SLATE, MEAGHER
                                                          & FLOM, LLP


                                          By: _____
                                                  Matthew E. Sloan
                                                  Attorneys for Counter-Defendants
                                                  MGA ENTERTAINMENT, INC., ISAAC LARIAN,
                                                  MGA ENTERTAINMENT (HK) LIMITED, and
                                                  MGAE de MEXICO S.R.L. de C.V.


DATED: February ___, 2008         QUINN EMANUEL URQUHART OLIVER
                                                          & HEDGES, LLP


                                          By: _____
                                                  Diane C. Hutnyan
                                                  Attorneys for Mattel, Inc.

-4-

STIPULATION RE MGA'S PROPOSED TESTING OF PRINCE'S NOTARY LOG BOOK AND [PROPOSED] ORDER
495716.03-Los Angeles Server 1A                                               MSW - Draft February 27, 2008 - 10:23 AM

Exhibit __16__,
P. __99__

1

2

3 **<u>ORDER</u>**

4  The Court, having reviewed MGA and Mattel's Stipulation Re MGA's

5 Proposed Testing Of Jacqueline Prince's Notary Book (the "Stipulation") and for

6

7 good cause shown, hereby approves the procedure for MGA's proposed expert

8 testing of the notary book set forth in the Stipulation.

9

10     IT IS SO ORDERED.

11

12 DATED: _____

13                            Hon. Edward A. Infante (Ret.)
                               Discovery Master

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-5-

Exhibit <u>16</u>,
P. <u>100</u>

# Exhibit 17

**From:** Diane Hutnyan [mailto:dianehutnyan@quinnemanuel.com]
**Sent:** Thursday, February 28, 2008 4:03 PM
**To:** Sloan, Matthew E (LAC)
**Cc:** Weinstein, Ryan (LAC); Michael T Zeller; Chris Grohman
**Subject:** RE: Stipulation re Testing of Prince's Log Book

Hi, Matt,

We are working on it.

One thing that troubles us a lot, frankly, is MGA's continuing refusal to identify the expert (actually, now expertS).  MGA has no Court-approved experts, as we did.  And the stip suggests that you know already who the candidates are, but do not want to share that information with us now, but then prefer to disclose it at a point later when Mattel has a very narrow window in which to resolve and/or brief the issue.  That is clearly unfair.  MGA should disclose that person or persons to us know so that we can assess the situation fairly.

We are reviewing and preparing comments on the rest of the stipulation, but if you could rethink your decision to conceal this information, that would probably move things along significantly.

Diane

---

**From:** Sloan, Matthew E [mailto:Matthew.Sloan@skadden.com]
**Sent:** Thursday, February 28, 2008 3:21 PM
**To:** Diane Hutnyan
**Cc:** Weinstein, Ryan (LAC)
**Subject:** FW: Stipulation re Testing of Prince's Log Book

Diane -- Per Ryan's email from yesterday, please give us your comments on the attached stipulation as soon as possible.  We would like to submit this to Judge Infante tomorrow given the quickly approaching deadline for submitting our expert rebuttal report(s).

Thank you for your prompt consideration of the stipulation.

-- Matt

***Matthew E. Sloan***
***Skadden, Arps, Slate, Meagher & Flom LLP***

**Los Angeles Office**
*300 South Grand Ave., Suite 3400*
*Los Angeles, CA 90071*
*T: (213) 687-5276 | F: (213) 687-5600*
*Main: (213) 687-5000*
*E: matthew.sloan@skadden.com*

Exhibit 17,
P. 101

3/9/2008

# Exhibit 18

## Weinstein, Ryan (LAC)

| | |
|---|---|
| **From:** | Sloan, Matthew E (LAC) |
| **Sent:** | Friday, February 29, 2008 12:21 PM |
| **To:** | 'Diane Hutnyan' |
| **Cc:** | Weinstein, Ryan (LAC) |
| **Subject:** | FW: Stipulation re Testing of Prince's Log Book |
| **Attachments:** | 2-28 Ltr to D Hutnyan.pdf; Lyter CV.pdf |

Diane -- You have now had the stipulation for two days and, per your request, we have identified the expert whom
MGA will employ to take the samples. As you will see, Dr. Lyter is well-trained, highly-qualified, and respected in
the field, so we cannot imagine that you could have any reasonable objections to having him perform the identical
testing procedures employed by your own expert, Valery Aginsky. Please get back to us immediately with any
comments you may have on the stipulation so that we may submit it for Judge Infante's consideration
immediately.

Thanks for your consideration of this matter,

Matt

**Matthew E. Sloan**
**Skadden, Arps, Slate, Meagher & Flom LLP**

**Los Angeles Office**
*300 South Grand Ave., Suite 3400*
*Los Angeles, CA 90071*
*T: (213) 687-5276 | F: (213) 687-5600*
*Main: (213) 687-5000*
*E: matthew.sloan@skadden.com*

---

**From:** Weinstein, Ryan (LAC)
**Sent:** Thursday, February 28, 2008 7:24 PM
**To:** 'Diane Hutnyan'
**Cc:** Sloan, Matthew E (LAC)
**Subject:** RE: Stipulation re Testing of Prince's Log Book

Diane,

Please see the attached in response to your e-mail.

Ryan

Ryan Weinstein
Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue
Los Angeles, CA 90071
Phone: (213) 687-5526
Fax: (213) 621-5526
E-mail: ryan.weinstein@skadden.com

Exhibit 18 ,
P. 102

3/9/2008

# Exhibit 19

## Weinstein, Ryan (LAC)

**From:**    Sloan, Matthew E (LAC)
**Sent:**    Sunday, March 02, 2008 5:24 PM
**To:**      'Diane Hutnyan'
**Cc:**      Weinstein, Ryan (LAC); Sloan, Matthew E (LAC)
**Subject:** RE: Stipulation re Testing of Prince's Log Book

Diane -- Per my emails from last week, please respond to us immediately with any comments you have on our proposed Stipulation re the Testing of Ms. Prince's notary book. We believe that the proposed stipulation is reasonable and fair, and have now disclosed the identity and CV of the expert we will employ to take the samples, thus eliminating the concerns you raised in our phone call last Monday. We await your comments and will consider any reasonable suggestions you have with an open mind. In the event we have not heard back from you by tomorrow morning, however, we will have no choice but to assume you are refusing to enter into a reasonable agreement and will have to consider our next steps. As you know, our rebuttal expert report is now due on March 17, so time is of the essence. We have no futher time to wait for your response.

Respectfully,

- Matt

**Matthew E. Sloan**
**Skadden, Arps, Slate, Meagher & Flom LLP**

**Los Angeles Office**
*300 South Grand Ave., Suite 3400*
*Los Angeles, CA 90071*
*T: (213) 687-5276 | F: (213) 687-5600*
*Main: (213) 687-5000*
*E: matthew.sloan@skadden.com*

---

**From:** Sloan, Matthew E (LAC)
**Sent:** Friday, February 29, 2008 12:21 PM
**To:** 'Diane Hutnyan'
**Cc:** Weinstein, Ryan (LAC)
**Subject:** FW: Stipulation re Testing of Prince's Log Book

Diane -- You have now had the stipulation for two days and, per your request, we have identified the expert whom MGA will employ to take the samples. As you will see, Dr. Lyter is well-trained, highly-qualified, and respected in the field, so we cannot imagine that you could have any reasonable objections to having him perform the identical testing procedures employed by your own expert, Valery Aginsky. Please get back to us immediately with any comments you may have on the stipulation so that we may submit it for Judge Infante's consideration immediately.

Thanks for your consideration of this matter,

Matt

**Matthew E. Sloan**
**Skadden, Arps, Slate, Meagher & Flom LLP**

3/9/2008

Exhibit 19 ,
P. 103

# Exhibit 20

## Sloan, Matthew E (LAC)

| | |
|---|---|
| **From:** | dianehutnyan@quinnemanuel.com |
| **Sent:** | Thursday, February 28, 2008 4:03 PM |
| **To:** | Sloan, Matthew E (LAC) |
| **Cc:** | Weinstein, Ryan (LAC); Michael T Zeller; Chris Grohman |
| **Subject:** | RE: Stipulation re Testing of Prince's Log Book |

Hi, Matt,

We are working on it.

One thing that troubles us a lot, frankly, is MGA's continuing refusal to identify the expert
(actually, now expertS). MGA has no Court-approved experts, as we did. And the stip
suggests that you know already who the candidates are, but do not want to share that
information with us now, but then prefer to disclose it at a point later when Mattel has a very
narrow window in which to resolve and/or brief the issue. That is clearly unfair. MGA should
disclose that person or persons to us know so that we can assess the situation fairly.

We are reviewing and preparing comments on the rest of the stipulation, but if you could
rethink your decision to conceal this information, that would probably move things along
significantly.

Diane

---

**From:** Sloan, Matthew E [mailto:Matthew.Sloan@skadden.com]
**Sent:** Thursday, February 28, 2008 3:21 PM
**To:** Diane Hutnyan
**Cc:** Weinstein, Ryan (LAC)
**Subject:** FW: Stipulation re Testing of Prince's Log Book

Diane -- Per Ryan's email from yesterday, please give us your comments on the attached stipulation as soon as
possible. We would like to submit this to Judge Infante tomorrow given the quickly approaching deadline for
submitting our expert rebuttal report(s).

Thank you for your prompt consideration of the stipulation.

-- Matt

**Matthew E. Sloan**
**Skadden, Arps, Slate, Meagher & Flom LLP**

**Los Angeles Office**
300 South Grand Ave., Suite 3400
Los Angeles, CA 90071
T: (213) 687-5276 / F: (213) 687-5600
Main: (213) 687-5000
E: matthew.sloan@skadden.com

Exhibit 20 ,
P. 104

3/10/2008

**From:** Weinstein, Ryan (LAC)
**Sent:** Wednesday, February 27, 2008 11:00 AM
**To:** 'Diane Hutnyan'
**Cc:** Sloan, Matthew E (LAC)
**Subject:** Stipulation re Testing of Prince's Log Book

Diane,

Per your request, please find our proposed stipulation attached.

As we would like to finalize this tomorrow, please provide us with your comments as soon as possible.

Thanks,
Ryan

Ryan Weinstein
Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue
Los Angeles, CA 90071
Phone:  (213) 687-5526
Fax:  (213) 621-5526
E-mail:  ryan.weinstein@skadden.com

------------------------------------------------------------------------------
*************************************************** To ensure compliance with Treasury Department regulations, we advise you that, unless otherwise expressly indicated, any federal tax advice contained in this message was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or applicable state or local tax law provisions or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein. *************************************************** This email and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified any dissemination, distribution or copying of this email, and any attachments thereto, is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original copy and any copy of any email, and any printout thereof. Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request. ***************************************************

Exhibit 20 ,
P. 105

**Los Angeles Office**
*300 South Grand Ave., Suite 3400*
*Los Angeles, CA 90071*
*T: (213) 687-5276 | F: (213) 687-5600*
*Main: (213) 687-5000*
*E: matthew.sloan@skadden.com*

---

**From:** Weinstein, Ryan (LAC)
**Sent:** Thursday, February 28, 2008 7:24 PM
**To:** 'Diane Hutnyan'
**Cc:** Sloan, Matthew E (LAC)
**Subject:** RE: Stipulation re Testing of Prince's Log Book

Diane,

Please see the attached in response to your e-mail.

Ryan

Ryan Weinstein
Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue
Los Angeles, CA 90071
Phone:  (213) 687-5526
Fax:  (213) 621-5526
E-mail:  ryan.weinstein@skadden.com

---

**From:** Diane Hutnyan [mailto:dianehutnyan@quinnemanuel.com]
**Sent:** Thursday, February 28, 2008 4:03 PM
**To:** Sloan, Matthew E (LAC)
**Cc:** Weinstein, Ryan (LAC); Michael T. Zeller; Chris Grohman
**Subject:** RE: Stipulation re Testing of Prince's Log Book

Hi, Matt,

We are working on it.

One thing that troubles us a lot, frankly, is MGA's continuing refusal to identify the expert (actually, now expertS). MGA has no Court-approved experts, as we did. And the stip suggests that you know already who the candidates are, but do not want to share that information with us now, but then prefer to disclose it at a point later when Mattel has a very narrow window in which to resolve and/or brief the issue. That is clearly unfair. MGA should disclose that person or persons to us know so that we can assess the situation fairly.

We are reviewing and preparing comments on the rest of the stipulation, but if you could rethink your decision to conceal this information, that would probably move things along significantly.

Exhibit _20_ ,
P. _106_

3/9/2008

Diane

---

**From:** Sloan, Matthew E [mailto:Matthew.Sloan@skadden.com]
**Sent:** Thursday, February 28, 2008 3:21 PM
**To:** Diane Hutnyan
**Cc:** Weinstein, Ryan (LAC)
**Subject:** FW: Stipulation re Testing of Prince's Log Book

Diane -- Per Ryan's email from yesterday, please give us your comments on the attached stipulation as soon as possible. We would like to submit this to Judge Infante tomorrow given the quickly approaching deadline for submitting our expert rebuttal report(s).

Thank you for your prompt consideration of the stipulation.

-- Matt

*Matthew E. Sloan*
*Skadden, Arps, Slate, Meagher & Flom LLP*

**Los Angeles Office**
*300 South Grand Ave., Suite 3400*
*Los Angeles, CA 90071*
*T: (213) 687-5276 | F: (213) 687-5600*
*Main: (213) 687-5000*
*E: matthew.sloan@skadden.com*

---

**From:** Weinstein, Ryan (LAC)
**Sent:** Wednesday, February 27, 2008 11:00 AM
**To:** 'Diane Hutnyan'
**Cc:** Sloan, Matthew E (LAC)
**Subject:** Stipulation re Testing of Prince's Log Book

Diane,

Per your request, please find our proposed stipulation attached.

As we would like to finalize this tomorrow, please provide us with your comments as soon as possible.

Thanks,
Ryan

Ryan Weinstein
Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue
Los Angeles, CA 90071
Phone: (213) 687-5526
Fax: (213) 621-5526
E-mail: ryan.weinstein@skadden.com

Exhibit 20 ,
P. 107

3/9/2008

*************************************************** To ensure compliance with Treasury Department regulations, we advise you that, unless otherwise expressly indicated, any federal tax advice contained in this message was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or applicable state or local tax law provisions or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein. *************************************************** This email and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified any dissemination, distribution or copying of this email, and any attachments thereto, is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original copy and any copy of any email, and any printout thereof. Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request. ***************************************************

Exhibit _20_ ,
P. _108_

# Exhibit 21

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

300 SOUTH GRAND AVENUE

LOS ANGELES, CALIFORNIA 90071-3144

TEL: (213) 687-5000
FAX: (213) 687-5600
www.skadden.com

FIRM/AFFILIATE OFFICES
————
BOSTON
CHICAGO
HOUSTON
NEW YORK
PALO ALTO
SAN FRANCISCO
WASHINGTON, D.C.
WILMINGTON
————
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
PARIS
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

DIRECT DIAL
213-687-5526
DIRECT FAX
213-621-5526
EMAIL ADDRESS
RYAN.WEINSTEIN@SKADDEN.COM

February 28, 2008

**BY E-MAIL**

Diane C. Hutnyan, Esq.
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017

RE:   Bryant v. Mattel:  Stipulation Re Proposed Testing of Prince's Log Book

Dear Diane:

I write in response to your e-mail of today in which you indicate that it would expedite Mattel's likely approval of MGA's proposed stipulation re the testing of Ms. Prince's notary log book if MGA provided you with the name of the expert who would be performing the testing and extracting of "microplug" samples from the notary book.

Per your request, and in the interests of expediting agreement on a testing protocol, I enclose herewith a copy of the curriculum vitae of Albert H. Lyter III.  MGA intends to have Mr. Lyter extract the "microplug" samples described in the stipulation we have submitted for your review.

Exhibit _24_ ,
P. _109_

Diane C. Hutnyan, Esq.
February 28, 2008
Page 2


        Please call me if you should have any questions about the above.  I trust that this will obviate any concerns you may have and that you will get back to us soon with any comments on the proposed stipulation.


                Very truly yours,

                Ryan H. Weinstein


Enclosures


Exhibit 21 ,
P. 118

# Exhibit 22

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-443-3000 FAX 213-443-3100

WRITER'S DIRECT DIAL NO.
(213) 443-3666

WRITER'S INTERNET ADDRESS
dianehutnyan@quinnemanuel.com

March 3, 2008

VIA EMAIL AND FACSIMILE

Ryan Weinstein, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue
Los Angeles, CA 90071

Re:    Carter Bryant v. Mattel

Dear Ryan:

We have reviewed the proposal you sent and found that there are a number of issues with the proposal you sent that still need to be resolved.

The proposed stipulation appears to contemplate the idea of a future potential protocol, rather than contain an actual protocol, for the delivery, handling and sampling of the materials. You seem to have obtained the idea from paragraph 6 of Judge Infante's August 30, 2007 Order. Paragraph 6 contemplated the development of a future protocol for the potential destructive testing that we didn't even know would be needed at that time. That is not the case here. Here, you already know what destructive testing you expect to do. So the stipulation should be more consistent with paragraphs 3, 4, 5, and 7 of that Order in terms of outlining what will be, or will not be, done with the documents.

Another issue is that the stipulation does not reflect any plan to obtain the Court's approval of Mr. Lyter and his credentials. As is set forth in the transcript of the hearing last summer on Mattel's contemplated non-destructive testing, Judge Infante required that specific information be submitted with respect to the experts that Mattel was going to use for non-destructive testing. That information was submitted in camera at the time because the only testing contemplated was all non-destructive, and thus such information was privileged in nature. But since you are

**quinn emanuel urquhart oliver & hedges, llp**

NEW YORK | 51 Madison Avenue, 22nd Floor, New York, New York 10010 | TEL 212-849-7000 FAX 212-849-7100

SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94111 | TEL 415-875-6600 FAX 415-875-6700

SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL 650-801-5000 FAX 650-801-5100

TOKYO | Akasaka Twin Tower Main Building, 6th Floor, 17-22 Akasaka 2-Chome, Minato-ku, Tokyo 107-0052, Japan | TEL +81-3-5561-1711 FAX +81-3-5561-1712

Exhibit _22_,
P. _111_

Ryan Weinstein
March 3, 2008

planning destructive testing with our expert present, the submission that we made for each of our experts, along the lines of what was set forth in the transcript, should be made both to us (with an opportunity for us to object) and then should be made to the Court for approval.

As I have explained to you previously at length, we are quite concerned about having the notary book in anyone's hands or possession but the (by then Court-approved) expert in the presence of our expert. So the protocol for delivery and handling of the notary book should be designed to prevent access by anyone besides those two people. And the notary book should not be handled by either expert outside the presence of the other.

We are also concerned about the custody of the notary book generally. The delivery plan should be specific in setting forth the exact method of delivery, time of delivery, location of delivery, and return date, and be done in a way that all parties can track the package. What are the specific conditions the book will be stored in, if at all, while it is at Mr. Lyter's lab?

While we will insist upon our expert, Dr. Aginsky, attending, we do not want him to have to take time out of his schedule waiting around. So all of the samples must be taken in one day. Bryant and MGA afforded Mattel four days to find and punch samples from within eight boxes of original documents, so one day is certainly more than enough to take the microplugs in question from the two pages you have contemplated.

The number of microplugs in the proposed stipulation also seems open-ended. A "set" should be limited to some reasonably small number that is agreed upon in advance.

We view the "Whereas" section of the stipulation as unnecessary and improper argument. Whether Mattel did destructive testing on the document does not give MGA a right to do any destructive testing it wants; MGA must show the appropriateness of the destructive testing it plans to do, independent of what Mattel obtained Court approval to do and did. Please remove this section.

In paragraph 13, MGA appears to request an extension of time to file its rebuttal reports if Mattel's expert raises any objections to the procedures he is observing. Mattel might be willing to toll the time that Mr. Lyter has with the book, but it should have no bearing on the rebuttal report deadline. Further, as to any objections made prior to the sampling, those should all be resolved through agreement or by Judge Infante before Mr. Lyter even takes possession of the notary book.

The stipulation also must include a provision whereby Mattel would be guaranteed additional access to the notary book and the right to take further samples after MGA has served its rebuttal reports and/or after Mr. Lyter has been deposed. Also, thus, the stipulation should be expressly approved by Mr. Warren and the other parties to the case so that no one can later object to try to

2

Exhibit 22,<br>P. 112

Ryan Weinstein
March 3, 2008

block Mattel's expert's access. Similarly, all the parties and Ms. Prince must agree that the notary book will be made available in California during the trial if Mattel so requests.

I look forward to your response.

Very truly yours,

Diane C. Hutnyan

3

Exhibit 22,
P. 113

# Exhibit 23

# SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

300 SOUTH GRAND AVENUE

LOS ANGELES, CALIFORNIA 90071-3144
———
TEL: (213) 687-5000
FAX: (213) 687-5600
www.skadden.com

FIRM/AFFILIATE OFFICES
———
BOSTON
CHICAGO
HOUSTON
NEWARK
NEW YORK
PALO ALTO
SAN FRANCISCO
WASHINGTON, D.C.
WILMINGTON
———
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
PARIS
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

DIRECT DIAL
213-687-5276
DIRECT FAX
213-621-5276
EMAIL ADDRESS
MATTHEW.SLOAN@SKADDEN.COM

March 3, 2008

<u>VIA E-MAIL AND U.S. MAIL</u>

Diane C. Hutnyan, Esq.
Quinn Emanuel Urquhart Oliver &
Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017

RE:   <u>Bryant v. Mattel:  Stipulation Re Proposed Testing of
Prince's Log Book</u>

Dear Diane:

I am writing in response to your letter to Ryan Weinstein, dated March 3, 2008, which you transmitted to us earlier today.  As we feared, rather than respond in good faith to our proposed stipulation regarding the testing of Ms. Prince's notary book, you have raised largely frivolous objections in a transparent attempt to delay MGA's testing of the notary book and obstruct our ability to challenge the findings reached by your expert, Dr. Aginsky.  In the spirit of compromise, we are willing to make certain minor amendments to the stipulation to accommodate your alleged concerns.  (A copy of the amended stipulation (the "amended Stipulation") is attached hereto).  The overwhelming majority of your objections, however, are frivolous and clearly designed primarily, if not solely, for the purpose of obtaining an unfair litigation advantage by obstructing MGA's ability to conduct the very same testing, under the very same conditions, that MGA allowed your expert to conduct without objection or court intervention.  I discuss your objections and our responses to them below.

First, you object that the stipulation "appears to contemplate the idea of a future protocol, rather than contain an actual protocol."  We do not know what you

Exhibit _23_,
P. _114_

Diane C. Hutnyan, Esq.
March 3, 2008
Page 2

mean by this and you have failed to specify precisely how you would revise the
stipulation or why any additional procedures are necessary.  Notwithstanding these
shortcomings in your letter, we will slightly modify the testifying protocol as set
forth below and in the amended Stipulation to provide further procedure. We believe
this should cover any reasonable concerns you may have.

      Second, you object that the "stipulation does not reflect any plan to obtain the
Court's approval of Mr. Lyter and his credentials." This is not accurate.  The
Stipulation specifically provides that MGA must provide Mattel with notice of the
expert we plan to use to perform the sampling and provide Mattel the expert's
curriculum vitae.  *See* Stipulation, ¶ 7.  Mattel then has three days to object to the
expert's credentials or the proposed testing, during which time Mr. Warren will not
transmit the notary book to MGA. Accordingly, if Mattel has any objections to Mr.
Lyter's credentials, then the Court will have to approve Dr. Lyter and his proposed
testing. If Mattel has no such objection,  there is no reason for MGA to have to
obtain court approval – unless Mattel is trying to delay the testing to obtain an unfair
litigation advantage.[1]

      Third, you complain that you are "concerned about having the notary book in
anyone's hands or possession but the (by then Court-approved) expert in the presence
of [Mattel's] expert."  To the extent you are concerned about the custody of the
notary book, we will amend the stipulation to provide that the notary book must be
maintained in the custody of Dr. Lyter or one of his employees or assistants at all
times from the time Dr. Lyter's lab receives the notary book from Mr. Warren until it
is transmitted back to Mr. Warren. *See* Amended Stipulation, ¶ 10.

      The rest of your concerns are unfounded, and designed primarily to obstruct.
As explained above, if you object to the delivery of the notary book to Dr. Lyter, you
will have a full opportunity to litigate this matter before Judge Infante *before* the

---

[1]  As you know, the only reason that Judge Infante required Mattel to submit its experts' curriculum
vitae to the court and obtain advance court approval before Mattel could perform any sampling on
Bryant's drawings *is because Mattel refused to reveal the identity of its experts to Mr. Bryant's
counsel.*  Given that MGA has disclosed the identity and curriculum vitae of our expert already, there
is no need for the added step of obtaining court approval of MGA's experts – unless, of course, Mattel
has some good faith basis to object to Dr. Lyter's credentials.  We assume by your silence that you
recognize that Dr. Lyter is a highly-respected expert, and that any such objections would therefore be
unfounded.

    It is worth noting, moreover, that Mattel failed to give MGA *any* advance notice of the identity of
Mattel's expert until just before Dr. Aginsky took his samples from the notary book.  We simply fail
to comprehend how you can claim the procedure we have proposed is insufficient compared to the
paltry notice and procedure you provided MGA in connection with the testing of the notary book.

Diane C. Hutnyan, Esq.
March 3, 2008
Page 3

notary book is delivered to Dr. Lyter. Thus, under the Stipulation, Dr. Lyter will not
obtain possession unless he is either approved by the Court (over Mattel's objections)
or you decide not to object to his performing the sampling. As for your request that
"the notary book should not be handled by either expert outside the presence of the
other," this is absurd. Mattel's expert, Dr. Aginsky, had possession of the notary
book for at least 27 days[2] without any oversight. Mattel's expert is entitled to
observe our expert's destructive sampling procedure; he is not entitled to be present
at all times while Dr. Lyter visually inspects the notary book or engages in other
non-destructive testing. You have provided no basis for such an invasive request to
monitor our expert's examination and, as you well know, no such basis exists. If you
want more information about Dr. Lyter's non-destructive examination of the notary
book, you will have to do what any litigant must do (and what MGA will have to do
with respect to Dr. Aginsky): ask him in his deposition.

Fourth, you complain that the stipulation must be "more specific in setting
forth the exact method or delivery, time of delivery, location of delivery, and return
date" and must set forth the "specific conditions" under which the book will be
stored. Although MGA thinks that these objections are largely irrelevant, at your
suggestion we have revised the stipulation to conform more closely with Judge
Infante's August 30, 2007 Order. *See* Amended Stipulation, ¶¶ 9, 10, 14.

As for the storage conditions, the Stipulation specifies that the notary book
will be maintained in "normal environmental conditions." *See* Stipulation, ¶ 5. We
think this is more than sufficient to ensure the integrity of the notary book, but in the
spirit of compromise, we will amend Paragraph 5 by providing that "normal
environment conditions," means "generally accepted laboratory conditions that will
preserve the integrity of the notary book from any damage caused by heat, cold,
humidity, or other conditions."

Fifth, you have asked for a provision that all the samples must be taken in
one-day. We think this is reasonable and will amend the Stipulation accordingly.

Sixth, you have asked that MGA limit the number of "microplug" samples
which Dr. Lyter can take in any one "set" of samples. We believe this is also a
reasonable request, and are prepared to stipulate that each "set" will be limited to 15-
20 microplugs, subject to MGA's right to apply to the court for the right to increase
the amount of "microplugs" allowed. We will amend the Stipulation accordingly.
*See* Amended Stipulation, ¶ 3.

---

[2]  Per Mr. Aginsky's report, he removed the "microplug" samples from the notary book on January
4, 2008, and did not return the notary book to Ms. Prince's counsel, Mr. Warren, until January 31,
2008.

Exhibit 23,
P. 116

Diane C. Hutnyan, Esq.
March 3, 2008
Page 4

Seventh, you object to the "Whereas" section of the Stipulation as unnecessary and argumentative. We disagree. It is appropriate and necessary for the Court to know the history of testing that has been performed on the notary book, and to be informed that Mattel performed the very same testing, in order to render a decision. We see no valid reason that you should object to presenting the whole story unless you have something to hide. Accordingly, we will not revise the "Whereas" provisions in the Stipulation.

Eighth, you remarkably reject our reasonable and necessary request for an agreement that the deadline for submitting our rebuttal report should be extended during the pendency of any court proceedings regarding Dr. Lyter's right to obtain samples from the notary book. Your refusal to agree to such a provision reveals your true intentions. Failing to include such a provision would render the whole stipulation futile from MGA's perspective because you would undoubtedly use it as an opportunity to tie us up in litigation until the March 17 deadline for rebuttal reports had passed, and thereby prevent us from engaging in any expert testing.

Finally, you request that Mattel be guaranteed access to the notary book to perform additional tests after MGA has served its rebuttal report and/or Mr. Lyter has been deposed. Given that Dr. Aginsky has already had free and unfettered access to the notary book for almost a month, and no constraints were placed on his ability to test the book, we see no reason to address such a request at this juncture. If you can present grounds for such additional testing later, we will consider them, but we think that any request at this juncture is premature and we will not incorporate it in the amended Stipulation.

Please review the attached Amended Stipulation and let us know by 4:00 pm PST tomorrow, Tuesday, March 4, 2008, whether you are willing to sign the Amended Stipulation as is. In the event you reject this reasonable proposal, we will proceed to subpoena the notary book from Mr. Warren so that Mr. Lyter can perform his sampling in time to meet the March 17, 2008 deadline for submitting MGA's expert rebuttal reports. In the event Mattel seeks to delay our legitimate testing

Exhibit 23
P. 117

Diane C. Hutnyan, Esq.
March 3, 2008
Page 5

further by improper obstructionist tactics, and interferes with our ability to perform the necessary sampling before the March 17 deadline, we will seek preclusionary sanctions to prevent Mattel from introducing Dr. Aginsky's testimony or expert report at trial.

Very truly yours,

Matthew E. Sloan

Enclosures

cc:  Ryan Weinstein, Esq.
     Carl Roth, Esq.

Exhibit 23,
P. 118

# Exhibit 24



THOMAS J. NOLAN (Bar No. 66992)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue
Los Angeles, CA 90071-3144
Telephone: (213) 687-5000
Facsimile: (213) 687-5600
E-mail: tnolan@skadden.com

KENNETH A. PLEVAN
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York, 10036-6522
Telephone: (212) 735-3000
Facsimile: (212) 735-2000
Email: kplevan@skadden.com

Attorneys for Counter-Defendants
MGA ENTERTAINMENT, INC., ISAAC LARIAN,
MGA ENTERTAINMENT (HK) LIMITED, and
MGAE de MEXICO S.R.L. de C.V.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual,<br><br>    Plaintiff,<br><br>  v.<br><br>MATTEL, INC., a Delaware corporation,<br><br>    Defendant.<br><br>Consolidated with MATTEL, INC. v. BRYANT and MGA ENTERTAINMENT, INC. v. MATTEL, INC. | CASE NO. CV 04-9049 SGL (RNBx)<br><br>Consolidated with:<br>Case No. CV 04-9059<br>Case No. CV 05-2727<br><br>**DISCOVERY MATTER**<br><br>Hon. Edward A. Infante (Ret.)<br>Discovery Master<br><br>**STIPULATION RE MGA'S PROPOSED TESTING OF JACQUELINE PRINCE'S NOTARY BOOK; [PROPOSED] ORDER**<br><br>**Phase 1**<br>Discovery Cut-Off: Jan. 28, 2008<br>Expert Rebuttal<br>Reports Due: March 17, 2008<br>Expert Discovery<br>Cut-Off: March 31, 2008<br>Pre-Trial Conference: May 5, 2008<br>Trial Date: May 27, 2008 |

STIPULATION RE MGA'S PROPOSED TESTING OF PRINCE'S NOTARY LOG BOOK AND [PROPOSED] ORDER

Exhibit 24,
P. 119

## STIPULATION

1
2     This Stipulation is entered into by and between Mattel, Inc. ("Mattel") on the
3 one hand, and MGA Entertainment, Inc., Isaac Larian, MGA Entertainment (HK)
4 Limited, and MGAE de Mexico S.R.L. de C.V. (collectively referred to herein as
5 "MGA"), on the other hand, with reference to the following:
6     WHEREAS, Jacqueline Prince, a notary public, made notations in a log book
7 entitled "Official Journal of Notarial Acts" (the "log book") which relate to the date
8 on which certain of plaintiff and counter-defendant Carter Bryant's ("Bryant")
9 drawings were created;
10     WHEREAS, on page 11 of the notary book, there is an entry, dated 8/26/99,
11 which identifies 6 sketches of dolls made by Bryant;
12     WHEREAS, the same entry includes the notation "From 1998 Missouri";
13     WHEREAS, on or about December 25, 2007, counsel for Mattel sent a letter
14 to Daniel J. Warren, counsel for Ms. Prince, requesting production of the notary
15 book for purposes of conducting a forensic analysis on the ink used on the above-
16 referenced entry;
17     WHEREAS, in response, Mr. Warren produced said log book to Mattel, and
18 MGA did not object;
19     WHEREAS, on January 4, 2008, Mattel's expert, Valery N. Aginsky,
20 extracted 17 sets of hypodermic needle-sized samples or "microplugs" from written
21 lines appearing on pages 11 and 12 of the notary book and two sets of blank paper
22 "microplug" samples from page 11 of the notary book;
23     WHEREAS, Mr. Aginsky subsequently subjected the "microplug" samples to
24 various chemical analyses, including chromatography, thin-layer chromatography
25 ("TLC"), and gas chromatography-mass spectrometry ("GC-MS");
26     WHEREAS, on January 31, 2008, Mr. Aginsky returned Ms. Prince's log
27 book to Mr. Warren;
28

-1-

Exhibit 24,
P. 120

1    WHEREAS, on February 11, 2008, Mattel transmitted to MGA a copy of
2  Mr. Aginsky's expert report, wherein Mr. Aginsky set forth the results of ink tests
3  that he performed on samples extracted from the notary book;
4    WHEREAS, on the basis of his tests, Mr. Aginsky concluded that the notation
5  "From 1998 Missouri" on page 11 of the notary book was written in different ink
6  than the remainder of the 8/26/99 entry;
7    WHEREAS, MGA now seeks to test the accuracy of Mr. Aginsky's findings
8  by having its own expert replicate Mr. Aginsky's ink testing;
9    WHEREAS, the current deadline for submitting expert rebuttal reports is
10  March 17, 2008;
11    THEREFORE, the undersigned parties, through their undersigned counsel,
12  stipulate and agree as follows:
13    1.    MGA will be allowed to take samples and conduct testing on the notary
14  book to test the accuracy of Mr. Aginsky's findings, pursuant to the following
15  protocol.
16    2.    MGA's testing of Ms. Prince's log book will be limited to analysis of
17  "microplug" samples extracted from pages 11 and 12 of the notary book.
18    3.    MGA's expert (or experts) will remove no more than 17 sets of
19  "microplug" samples from the written portions of the entries on pages 11 and 12 of
20  the notary book, and no more than two sets of blank paper "microplug" samples from
21  the areas of pages 11 and 12 which do not contain writing.  (Although this
22  Stipulation refers to MGA's "expert," MGA reserves the right to employ more than
23  one expert for the proposed sampling and testing of the notary book).  MGA's
24  expert will take no more than 15 to 20 "microplugs" from any set of "microplug"
25  samples.  However, MGA retains the right to apply to the Court for the right to
26  increase the number of "microplugs" from each set of samples if necessary.
27
28

STIPULATION RE MGA'S PROPOSED TESTING OF PRINCE'S NOTARY LOG BOOK AND [PROPOSED] ORDER

Exhibit 24 ,
P. 121

1    4.    MGA's expert will extract all "microplug" samples using a hypodermic-
2  needle-sized hole punch, which removes holes of less than one millimeter in
3  diameter.

4    5.    Before subjecting the samples to ink analysis, MGA's expert will
5  maintain the samples at his or her laboratory in normal environmental conditions,
6  which means generally accepted laboratory conditions that will preserve the integrity
7  of the notary book from any damage that could be caused by heat, cold, humidity or
8  other conditions.

9    6.    All sampling and testing will occur at the laboratory of MGA's expert.

10    7.    Before Mr. Warren sends the notary book to MGA's expert, MGA will
11  send a letter to Mattel's counsel by facsimile (and U.S. Mail) setting forth: (a) the
12  name of MGA's expert (or experts) who will conduct the sampling; (b) the expert's
13  curriculum vitae; (c) the location of the expert's laboratory; and (d) samples of
14  "microplugs" similar to those that would be extracted from the notary book.

15    8.    Mattel will have three days from its receipt of the above-referenced
16  letter by facsimile to object to the contemplated testing.  During this three-day period,
17  Mr. Warren will maintain custody of the notary book, and no testing will be
18  performed.  If Mattel raises no objection, then Mr. Warren will be directed to
19  transmit the notary book to MGA's expert and MGA's expert will be authorized to
20  conduct testing pursuant to the protocol set forth herein.

21    9.    Mr. Warren will transmit the notary book to MGA's expert by overnight
22  mail, using Federal Express or UPS or a similar service that Mr. Warren selects.

23    10.    Upon receipt of the notary book, MGA's expert and/or his employees
24  and assistants will maintain custody of the notary book in a safe place at all times,
25  and will not release the notary book to any unauthorized third parties.

26    11.    In the event Mattel objects to the proposed testing, Mattel's counsel
27  must notify MGA by letter and/or a telephone call within the 3-day period set forth
28

STIPULATION RE MGA'S PROPOSED TESTING OF PRINCE'S NOTARY LOG BOOK AND [PROPOSED] ORDER

Exhibit _24_ ,
P. _122_

1  above.  The parties must then meet and confer and, within two more Court days, file
2  a joint statement to Judge Infante seeking resolution of the dispute.

3      12.   Mattel may elect to have its own expert attend the extraction of
4  "microplug" samples provided that (1) Mattel makes the election in writing within
5  the three-day objection period; (2) Mattel provides counsel for MGA with the
6  credentials of any observing expert; and (3) the testing can take place within ten (10)
7  calendar days of the execution of this Stipulation.  At this time, MGA's expert is
8  available to conduct the sampling on March 10, 11, or 12, 2008.

9      13.   If Mattel's expert raises any issues about the sampling being performed
10 while he or she is observing the sampling, the parties will seek immediate resolution
11 from the Court so that the sampling will not be delayed.  If Mattel's counsel does not
12 object or seek attendance by its expert within the three-day objection period, the
13 proposed destructive testing shall be deemed unobjectionable and may be carried out
14 by MGA's expert without further delay.

15     14.   With the exception of alterations resulting from any destructive testing,
16 which would be conducted in accordance with the protocol set forth above, the
17 notary book will be returned promptly to Mr. Warren in the same condition it was
18 received.  MGA's expert will return the notary book to Mr. Warren by overnight
19 mail, using Federal Express or UPS or a similar service, on the 35th day after
20 receiving such notary book from Mr. Warren, providing MGA's expert's testing is
21 not delayed by any court proceedings.  In the event MGA's expert's testing is
22 delayed by such proceedings, MGA's expert will have an additional 15 days after the
23 resolution of such proceedings to perform testing on the notary book before having
24 to return it to Mr. Warren.

25     15.   The parties agree that, should Mattel raise any objections to the
26 proposed sampling, testing, or credentials of Mattel's expert, or to any other aspects
27 of the testing process, MGA will be granted an extension of time within which to
28 submit a rebuttal report in response to Mr. Aginsky's initial expert report.

-4-

STIPULATION RE MGA'S PROPOSED TESTING OF PRINCE'S NOTARY LOG BOOK AND [PROPOSED] ORDER

Exhibit 24 ,
P. 123

1 | Specifically, in the event that Mattel objects to MGA's proposed expert sampling,

2 | the current March 17, 2008 deadline for submitting MGA's rebuttal expert report

3 | will be extended by one calendar day for each day from the date Mattel raises its

4 | objection to the date upon which any such objection is resolved by Judge Infante or

5 | by the agreement of the parties.

6 |     IT IS SO STIPULATED.

7 | DATED: February __, 2008     SKADDEN, ARPS, SLATE, MEAGHER
                                     & FLOM, LLP
8 |

9 |

10 |                              By: _____
                                              Matthew E. Sloan
11 |                                   Attorneys for Counter-Defendants
                                  MGA ENTERTAINMENT, INC., ISAAC LARIAN,
12 |                               MGA ENTERTAINMENT (HK) LIMITED, and
                                     MGAE de MEXICO S.R.L. de C.V.
13 |

14 | DATED: February __, 2008     QUINN EMANUEL URQUHART OLIVER
                                     & HEDGES, LLP
15 |

16 |

17 |                              By: _____
                                              Diane C. Hutnyan
18 |                                   Attorneys for Mattel, Inc.

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

-5-

STIPULATION RE MGA'S PROPOSED TESTING OF PRINCE'S NOTARY LOG BOOK AND [PROPOSED] ORDER

Exhibit 24,
P. 124

## ORDER

The Court, having reviewed MGA and Mattel's Stipulation Re MGA's Proposed Testing Of Jacqueline Prince's Notary Book (the "Stipulation") and for good cause shown, hereby approves the procedure for MGA's proposed expert testing of the notary book set forth in the Stipulation.

IT IS SO ORDERED.

DATED: _____        _____
                                 Hon. Edward A. Infante (Ret.)
                                 Discovery Master

STIPULATION RE MGA'S PROPOSED TESTING OF PRINCE'S NOTARY LOG BOOK AND [PROPOSED] ORDER
495716.05-Los Angeles Server 1A - MSW

Exhibit 24 ,
P. 125

# Exhibit 25

**Weinstein, Ryan (LAC)**

| | |
|---|---|
| **From:** | Sloan, Matthew E (LAC) |
| **Sent:** | Monday, March 03, 2008 10:51 PM |
| **To:** | 'Diane Hutnyan' |
| **Cc:** | Weinstein, Ryan (LAC); Roth, Carl A (LAC) |
| **Subject:** | Letter and Revised Stipulation re MGA Proposed Testing of Notary Book |
| **Attachments:** | lac2-507894-1.pdf |

Diane -- Attached please find our response to the letter you sent Ryan this morning about MGA's proposed stipulation re testing of Ms. Prince's notary book. I have also attached a slightly revised version of the Stipulation. As set forth in the letter, please let us know by 4:00 p.m. tomorrow whether you will agree to the proposed stipulation.

-- Matt

**Matthew E. Sloan**
**Skadden, Arps, Slate, Meagher & Flom LLP**

**Los Angeles Office**
300 South Grand Ave., Suite 3400
Los Angeles, CA 90071
T: (213) 687-5276 | F: (213) 687-5600
Main: (213) 687-5000
E: matthew.sloan@skadden.com

Exhibit 25 ,
P. 126

3/9/2008

# Exhibit 26

**Sloan, Matthew E (LAC)**

| | |
|---|---|
| **From:** | Weinstein, Ryan (LAC) |
| **Sent:** | Monday, March 03, 2008 11:43 AM |
| **To:** | Sloan, Matthew E (LAC) |
| **Subject:** | FW: Carter Bryant v. Mattel - correspondence |
| **Attachments:** | 3-3-08 Weinstein ltr.pdf |

---

**From:** Andrea Hoeven [mailto:andreahoeven@quinnemanuel.com]
**Sent:** Monday, March 03, 2008 11:39 AM
**To:** Weinstein, Ryan (LAC); Sloan, Matthew E (LAC)
**Cc:** Diane Hutnyan; Michael T Zeller; Chris Grohman
**Subject:** Carter Bryant v. Mattel - correspondence

Ryan,

Please see attached correspondence from Diane Hutnyan, also to follow via facsimile.

Thanks.

Andrea Hoeven
Assistant to Diane Hutnyan, Bridget Hauler and Jerry Chow
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Direct Phone: (213) 443-3316
Main Phone: (213) 443-3000
Main Fax: (213) 443-3100
Email: AndreaHoeven@quinnemanuel.com
Web: www.quinnemanuel.com

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

Exhibit 20,
P. 127

3/11/2008

# Exhibit 27

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL: (213) 443-3000 FAX: (213) 443-3100

WRITER'S DIRECT DIAL NO.
(213) 443-3666

WRITER'S INTERNET ADDRESS
dianehutnyan@quinnemanuel.com

March 5, 2008

VIA EMAIL AND FACSIMILE

Ryan Weinstein, Esq.                        Matthew Sloan, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP    Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue                      300 South Grand Avenue
Los Angeles, CA 90071                       Los Angeles, CA 90071

Re:    Carter Bryant v. Mattel

Dear Ryan and Matthew:

We were disappointed by your letter. Contrary to your view, our intent in our March 3 letter was
to let you know, point by point, specifically what our concerns were and specific ways that you
might meet them. It appeared to us that we were moving closer to each other on some key issues
up until you sent your latest proposal and letter.

Since you seem bent on proceeding with a subpoena today, I do not have time to address all of
the points in your letter fully, but I will try to address a few quickly, in the hopes that you will
reconsider and try to work out an agreement with us.

You had said you did not understand my comment about the future protocol, and what I meant
by that is that you seem to have an artificially short period of time between official disclosure
and resolution of any objection, rather than officially disclosing the expert now and having us
work out any objections right away. We do not see any reason why you would set it up this way,
other than to try to prevent us from being able to meaningfully object. And it seems that if you
are in a hurry to do the testing, you would want to officially disclose the expert now anyway. I
note that although you had previously represented Mr. Lyter as being the expert, the latest
stipulation seems to contemplate multiple unnamed experts again.

**quinn emanuel urquhart oliver & hedges, llp**

NEW YORK | 51 Madison Avenue, 22nd Floor, New York, NY 10010 | TEL (212) 849-7000 FAX (212) 849-7100
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, CA 94111 | TEL (415) 875-6600 FAX (415) 875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, CA 94065 | TEL (650) 801-5000 FAX (650) 801-5100
TOKYO | Akasaka Twin Tower Main Building, 6th Floor, 17-22 Akasaka 2-Chome, Minato-ku, Tokyo 107-0052, Japan | TEL +81 3 5561-1711 FAX +81 3 5561-1712

Exhibit 22,
P. 125

Also, you have pointed out that the rebuttal expert report date is March 17 and stated that the proposed microplugging is limited to two pages. Yet the latest stipulation seeks thirty-five days' custody of the notary book. Thirty-five days was the length of time the Court allotted for the non-destructive examination of eight boxes of original documents by four different experts in four different parts of the country. MGA and Bryant had insisted on no more than four days for the paper plugging of 190 individual sheets of paper that needed to be located within eight boxes of original documents. So I cannot imagine any reason why your expert would need them for longer than one day. Could you tell me why you need thirty-five days?

Also, you point out that Dr. Aginsky had the notary book at his lab for longer than one day, but there was no need to return it immediately then, whereas here it should be made available to us or our expert witness during that timeframe. For all the same reasons that you would like to review Dr. Aginsky's work, we should have the right to review your expert's work. Yet it appears that you will not even consider that, which seems inconsistent with your many statements about how unobjectionable your testing plans are. Further, after MGA's refusal to provide the Court-ordered Topic 41 deposition testimony on MGA's handling and destructive sampling of the other original documents, we believe that we are entitled to more explanation than just a deposition. If you seek to do this by agreement, I would ask you to reconsider the reasonableness of our request for access to the notary book and help us figure out a way that we can both do what we need to do.

Also, please explain your basis for modification of the scheduling order. It, too, seems designed to keep us from being able to appropriately respond to your expert's findings.

I am certainly happy to discuss a reasonable proposal, but as these few examples show, much of what you have proposed does not seem to have a reasonable basis. If it does, and I am missing it, I would appreciate you letting me know what that basis is so that maybe we can work something out. If you are interested, let me know; I am available to discuss by telephone tonight or tomorrow.

Your alternate plan, to issue a subpoena and take possession of the notary book, with neither Court approval nor an agreement in place, is problematic for all the reasons I have set forth in my prior correspondence. If you do that, we will move to quash the subpoena and/or move for a protective order. So, to the extent MGA is unwilling to proceed by seeking Court approval or our agreement, please also consider this letter a request to meet and confer pursuant to paragraph 5 of the Discovery Master Stipulation in advance of such motion(s).

I look forward to hearing from you.

Very truly yours,

*[signature]*

Diane C. Hutnyan
07209/2424163.1

2

Exhibit ___,
P. ___

# Exhibit 28

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

300 SOUTH GRAND AVENUE

LOS ANGELES, CALIFORNIA 90071-3144
———
TEL: (213) 687-5000
FAX: (213) 687-5600
www.skadden.com

FIRM/AFFILIATE OFFICES
BOSTON
CHICAGO
HOUSTON
NEWARK
NEW YORK
PALO ALTO
SAN FRANCISCO
WASHINGTON, D.C.
WILMINGTON

BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
PARIS
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

March 5, 2008

BY FACSIMILE AND FEDERAL EXPRESS

Daniel Warren, Esq.
Sutherland Asbil & Brennan LLP
999 Peachtree Street
Suite 2300
Atlanta, GA 30309

RE:   Bryant v. Mattel

Dear Dan:

Per your request, attached please find a subpoena calling for the production of Ms. Prince's notary log book to the laboratory of MGA's forensic document examiner, Dr. Albert Lyter III. As further specified in the subpoena, we ask that you send the log book for delivery on Friday, March 7, 2008.

Thanks very much for agreeing to accept service of the subpoena and for agreeing to comply therewith. Of course, should you have any questions or concerns, please do not hesitate to contact me.

Very Truly Yours,

Ryan Weinstein /op

Ryan Weinstein

Enclosure

Exhibit 28 ,
P. 130

AO88 (Rev. 12/07) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT
### Northern District of Georgia

CARTER BRYANT, an individual, Plaintiff,

V.

MATTEL, INC., a Delaware corporation, Defendant

**SUBPOENA IN A CIVIL CASE**

Case Number:[1] CV 04-09049 SGL (RNBx)
Central District of CA

TO:  JACQUELINE RAMONA PRINCE
c/o Daniel J. Warren, Esq.
Sutherland Asbill & Brennan LLP, 999 Peachtree Street, Suite 2300, Atlanta, GA 30309

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

Ms. Prince's notary log book, entitled "Official Journal of Notarial Acts", which contains, inter alia, an entry dated 8/26/99 relating to certain original sketches of Carter Bryant.

| PLACE | DATE AND TIME |
|---|---|
| Federal Forensic Assoc., c/o Albert H. Lyter III, 7425 Capstone Dr., Raleigh, N.C. 27615 | March 7, 2008  10:00 AM |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rule of Civil Procedure 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| _Ryan Weinstein_   Atty for Counter Defendant MGA Ent. et al. | March 5, 2008 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Ryan Weinstein, Skadden, Arps, Slate, Meagher & Flom LLP, 300 S. Grand Ave., Los Angeles, CA 90071-3144 (213) 687-5000

(See Federal Rule of Civil Procedure 45 (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

American LegalNet, Inc.
www.FormsWorkflow.com

Exhibit 28,
P. 131

AO88 (Rev. 12/07) Subpoena in a Civil Case (Page 2)

---

## PROOF OF SERVICE

|  | DATE | PLACE |
|---|---|---|
| SERVED |  |  |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

---

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

---

Federal Rule of Civil Procedure 45 (c), (d), and (e), as amended on December 1, 2007:

(c) PROTECTING A PERSON SUBJECT TO A SUBPOENA.
(1) Avoiding Undue Burden or Expense; Sanctions. A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.
(2) Command to Produce Materials or Permit Inspection.
(A) Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
(B) Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.
(3) Quashing or Modifying a Subpoena.
(A) When Required. On timely motion, the issuing court must quash or modify a subpoena that:
(i) fails to allow a reasonable time to comply;
(ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
(B) When Permitted. To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:
(i) disclosing a trade secret or other confidential research, development, or commercial information;
(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or
(iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial
(C) Specifying Conditions as an Alternative. In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

(d) DUTIES IN RESPONDING TO A SUBPOENA.
(1) Producing Documents or Electronically Stored Information. These procedures apply to producing documents or electronically stored information:
(A) Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
(B) Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
(C) Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.
(D) Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.
(2) Claiming Privilege or Protection.
(A) Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
(B) Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT.
The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

American LegalNet, Inc.
www.FormsWorkflow.com

Exhibit _28_ ,
P. _132_

Confirmation Report—Memory Send

```
                                    Time     : 03-05-2008   12:43pm
                                    Tel line 1 : +
                                    Tel line 2 :
                                    Name     :        #
```

| | | |
|---|---|---|
| Job number | : | 777 |
| Date | : | 03-05  12:41pm |
| To | : | 914048538806 |
| Document Pages | : | 004 |
| Start time | : | 03-05  12:41pm |
| End time | : | 03-05  12:43pm |
| Pages sent | : | 004 |
| Status | : | OK |
| Job number | : 777 | *** SEND SUCCESSFUL *** |

---

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 SOUTH GRAND AVENUE
LOS ANGELES, CALIFORNIA 90071-3144
TELEPHONE NO.: (213) 687-5000
FACSIMILE NO.: (213) 687-5600
DIRECT FACSIMILE NO: 404-853-8806
Email:

FACSIMILE TRANSMITTAL SHEET

PLEASE DELIVER THE FOLLOWING PAGE(S) TO:

| | | | |
|---|---|---|---|
| NAME: | Daniel Warren | | |
| FIRM: | Sutherland Asbil & Brennan LLP | | |
| CITY: | Atlanta, GA | DATE: | March 5, 2008 |
| TELEPHONE NO.: | 404-853-8000 | | |
| FACSIMILE NO.: | 404-853-8806 | | |
| FROM: | Ryan Weinstein | FLOOR: | 36 |
| REFERENCE NO.: | 112040-0001 | DIRECT DIAL: | 213-687-5000 |

TOTAL NUMBER OF PAGES INCLUDING COVER(S): 4

THIS FACSIMILE IS INTENDED ONLY FOR USE OF THE ADDRESSEE(S) NAMED HEREIN AND MAY CONTAIN LEGALLY PRIVILEGED AND/OR CONFIDENTIAL INFORMATION. IF YOU ARE NOT THE INTENDED RECIPIENT OF THIS FACSIMILE, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS FACSIMILE IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS FACSIMILE IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE AND RETURN THE ORIGINAL FACSIMILE TO US AT THE ADDRESS ABOVE VIA THE U.S. POSTAL SERVICE. WE WILL REIMBURSE ANY COSTS YOU INCUR IN NOTIFYING US AND RETURNING THE FACSIMILE TO US.

IF THIS TRANSMISSION IS UNCLEAR OR INCOMPLETE, PLEASE CONTACT THE FACSIMILE DEPARTMENT AT 404-853-8000. WHEN TRANSMITTING TO OUR MACHINES, PLEASE INCLUDE YOUR COVER SHEET AND NUMBER ALL PAGES CONSECUTIVELY.

MESSAGE: Please see attached.

Exhibit 28,
P. 133

# Exhibit 29

# SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

### 300 SOUTH GRAND AVENUE
### LOS ANGELES, CALIFORNIA 90071-3144

TEL: (213) 687-5000
FAX: (213) 687-5600
www.skadden.com

DIRECT DIAL
213-687-5276
DIRECT FAX
213-621-8276
EMAIL ADDRESS
MATTHEW.SLOAN@SKADDEN.COM

FIRM/AFFILIATE OFFICES
———
BOSTON
CHICAGO
HOUSTON
NEW YORK
PALO ALTO
SAN FRANCISCO
WASHINGTON, D.C.
WILMINGTON
———
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

March 6, 2008

## VIA E-MAIL AND U.S. MAIL

Diane C. Hutnyan, Esq.
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017

RE:   <u>Bryant v. Mattel: Notice of MGA's Intent to Perform Sampling on Jacqueline Prince's Notary Book</u>

Dear Diane:

As Ryan Weinstein and I indicated in our phone call with you on February 25, 2008 and in our numerous letters and emails, MGA intends to have its expert, Dr. Albert Lyter III, take "microplug" samples from Jacqueline Prince's notary log book in order to test the ink from the notary book in preparation for MGA's rebuttal expert report. Dr. Lyter will also perform various non-destructive, visual examinations of the notary book. I write to inform you that, pursuant to the notice already provided by the proposed stipulation we sent you last Wednesday, February 27, Dr. Lyter plans to perform this testing on Monday, March 10 or Tuesday, March 11, 2008. *See* Stipulation, ¶ 10. The testing will be performed at Dr. Lyter's laboratory located at the following address:

Federal Forensic Associates
7425 Capstone Drive
Raleigh, NC 27615

Please inform us in writing if Mattel would like to have its expert attend and observe the extraction of the "microplug" samples. If you elect to do so, please also provide us with the credentials of your observing expert. We will make all

Exhibit 29 ,
P. 134

Diane C. Hutnyan, Esq.
March 6, 2008
Page 2


reasonable efforts to accommodate your expert's schedule, but due to the impending March 17 deadline for submitting MGA's rebuttal expert report, and Dr. Lyter's own schedule, the sampling must be conducted by no later than Tuesday, March 11.

I received your letter yesterday in which you state your objection to our proposed stipulation and request a meet and confer, pursuant to the stipulation appointing Judge Infante as the discovery master. I note, however, that you have not specifically set forth "the relief sought" -- unless you seek to preclude us from taking samples under any circumstances -- nor identified "the authority supporting [your] requested relief," as required by that stipulation. *See* Stipulation for Appointment of a Discovery Master, ¶ 5. Upon your provision of the specific relief sought and the supporting authorities for such relief, I am ready to have a telephonic meet and confer today or any time tomorrow.

Very truly yours,

Matthew E. Sloan


Enclosures

cc:  Ryan Weinstein, Esq.
     Carl Roth, Esq.

Exhibit _29_ ,
P. _135_

# Exhibit 30

Diane -- MGA strongly opposes your proposed motion.   In the interim, please let me know whether you will agree to file a Stipulation with Judge Larson agreeing to extend the deadline for MGA to file the rebuttal report of our ink chemist until after the court has resolved your ex parte motion.  Without such a commitment on your part, we have little choice but to proceed with the sampling immediately in order to meet the Court's expert discovery deadline.


- Matt


From: Diane Hutnyan [mailto:dianehutnyan@quinnemanuel.com]
Sent: Saturday, March 08, 2008 4:21 PM
To: Weinstein, Ryan (LAC); Sloan, Matthew E (LAC)
Cc: Michael T Zeller; Chris Grohman; Andrea Hoeven
Subject: Notice of Intent To Move Ex Parte


Dear Ryan and Matthew:

This email is intended to provide notice of Mattel's intention to move before Judge Infante on an ex parte basis to enjoin MGA and its experts from handling or performing destructive tests on Jacqueline Prince's notary book without an agreement with Mattel and/or Court oversight and approval.

We plan to file the motion on Monday, March 10, 2008, for a hearing time and date TBA. Please instruct your experts not to handle or take samples from the notary book until the court has resolved our motion.

Please let me know at your earliest convenience whether MGA opposes the motion, or if you have any questions.

I have left this message on your voicemail as well.


--------------------------------------------------------------------------
------ ***************************************************** To ensure compliance with
Treasury Department regulations, we advise you that, unless otherwise expressly
indicated, any federal tax advice contained in this message was not intended or written
to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties
under the Internal Revenue Code or applicable state or local tax law provisions or
(ii) promoting, marketing or recommending to another party any tax-related matters
addressed herein.
*****************************************************
***************************************************** This email and any attachments
thereto, is intended only for use by the addressee(s) named herein and may contain
legally privileged and/or confidential information. If you are not the intended
recipient of this email, you are hereby notified any dissemination, distribution or
copying of this email, and any attachments thereto, is strictly prohibited. If you
receive this email in error please immediately notify me at (212) 735-3000 and
permanently delete the original copy and any copy of any email, and any printout
thereof. Further information about the firm, a list of the Partners and their
professional qualifications will be provided upon request.
*****************************************************
=====================================================================================
======

Exhibit 30 ,
P. 136

-----------------------------------------------------------
*****************************************************

To ensure compliance with Treasury Department regulations, we advise you that, unless
otherwise expressly indicated, any federal tax advice contained in this message was not
intended or written to be used, and cannot be used, for the purpose of (i) avoiding
tax-related penalties under the Internal Revenue Code or applicable state or local tax
law provisions or (ii) promoting, marketing or recommending to another party any tax-
related matters addressed herein.

# Exhibit 31

**From:** Sloan, Matthew E (LAC)
**Sent:** Sunday, March 09, 2008 12:16 PM
**To:** 'Diane Hutnyan'
**Cc:** Michael T Zeller; Chris Grohman; Andrea Hoeven; Weinstein, Ryan (LAC)
**Subject:** RE: Notice of Intent To Move Ex Parte

Diane -- MGA strongly opposes your proposed motion.  In the interim, please let me know whether you will agree to file a Stipulation with Judge Larson agreeing to extend the deadline for MGA to file the rebuttal report of our ink chemist until after the court has resolved your ex parte motion. Without such a commitment on your part, we have little choice but to proceed with the sampling immediately in order to meet the Court's expert discovery deadline.

- Matt

**From:** Diane Hutnyan [mailto:dianehutnyan@quinnemanuel.com]
**Sent:** Saturday, March 08, 2008 4:21 PM
**To:** Weinstein, Ryan (LAC); Sloan, Matthew E (LAC)
**Cc:** Michael T Zeller; Chris Grohman; Andrea Hoeven
**Subject:** Notice of Intent To Move Ex Parte

Dear Ryan and Matthew:

This email is intended to provide notice of Mattel's intention to move before Judge Infante on an ex parte basis to enjoin MGA and its experts from handling or performing destructive tests on Jacqueline Prince's notary book without an agreement with Mattel and/or Court oversight and approval.

We plan to file the motion on Monday, March 10, 2008, for a hearing time and date TBA. Please instruct your experts not to handle or take samples from the notary book until the court has resolved our motion.

Please let me know at your earliest convenience whether MGA opposes the motion, or if you have any questions.

I have left this message on your voicemail as well.

Exhibit _31_,
P. _137_

3/14/2008

# Exhibit 32

Matt

Matthew E. Sloan
Skadden, Arps, Slate, Meagher & Flom LLP

Los Angeles Office
300 South Grand Ave., Suite 3400
Los Angeles, CA 90071
T: (213) 687-5276 | F: (213) 687-5600
Main: (213) 687-5000
E: matthew.sloan@skadden.com


-----Original Message-----
From: Michael T Zeller [mailto:michaelzeller@quinnemanuel.com]
Sent: Sunday, March 09, 2008 1:05 PM
To: Sloan, Matthew E (LAC); Diane Hutnyan
Cc: Chris Grohman; Andrea Hoeven; Weinstein, Ryan (LAC)
Subject: Re: Notice of Intent To Move Ex Parte

As you know, destructive sampling is permitted only with the Court's approval or our
agreement. You have neither. As a result, should you proceed with such a violation of
law, we will seek sanctions that will include, among other things, the entry of orders
barring defendants from contesting the testing that was done with Court authorization.
Your threatened violation of law is particularly egregious given that you are
apparently planning to proceed with destructive sampling for the purpose of thwarting
the ex parte and the Court's ruling on it.

Nor does your latest unilateral demand for a stipulation excuse your threatened
misconduct.  Defendants have had years to conduct any and all testing they wished by
simply following the rules.  They also could have conducted sampling by now had they
abided by the requirements that defendants insisted Mattel comply with but now insist
they are free to ignore.  Defendants' recourse as far as any rebuttal report goes is to
comply with the Rules and, if a pre-filing conference fails to reach agreement, is
bring a motion as Judge Larson already instructed.  What defendants are not entitled to
do is to unilaterally destructively sample documents.

Michael Zeller
Quinn, Emanuel, Urquhart, Oliver & Hedges, LLP
865 South Figueroa Street, 3rd Floor
Los Angeles, CA   90017

Direct:  (213) 443-3180
Main Phone:  (213) 443-3000
Main Fax:  (213) 443-3100

E-mail:  michaelzeller@quinnemanuel.com
Web:  www.quinnemanuel.com

The information contained in this e-mail message is intended only for the personal and
confidential use of the recipient(s) named above.  This message may be an attorney-
client communication and/or work product and as such is privileged and confidential.
If the reader of this message is not the intended recipient or agent responsible for
delivering it to the intended recipient, you are hereby notified that you have received
this document in error and that any review, dissemination, distribution, or copying of
this message is strictly prohibited.  If you have received this communication in error,
please notify us immediately by e-mail, and delete the original message.


----- Original Message -----
From: Sloan, Matthew E <Matthew.Sloan@skadden.com>
To: Diane Hutnyan
Cc: Michael T Zeller; Chris Grohman; Andrea Hoeven; Weinstein, Ryan
(LAC) <Ryan.Weinstein@skadden.com>
Sent: Sun Mar 09 12:16:07 2008
Subject: RE: Notice of Intent To Move Ex Parte

Exhibit 32,
P. 138

# EXHIBIT 33

**Sloan, Matthew E (LAC)**
_____

| | |
|---|---|
| From: | Diane Hutnyan [dianehutnyan@quinnemanuel.com] |
| Sent: | Sunday, March 09, 2008 7:54 PM |
| To: | Sloan, Matthew E (LAC); Michael T Zeller |
| Cc: | Weinstein, Ryan (LAC); Chris Grohman |
| Subject: | RE: Notice of Intent To Move Ex Parte |

Matt,

There would be no reason for motion practice if you had even tried to come up with a
properly limited protocol for the testing of these materials.  Your last stipulation
had an unlimited number of unnamed experts, 35 days of time, no access by Mattel to
test your results, and a potentially unlimited number of plugs that would be taken.  As
you are the cause of the motion practice, we see absolutely no reason why under these
circumstances you should be given unlimited extra time for your rebuttal report at
Mattel's expense.  You have wasted almost two weeks already for no reason.

Destructive sampling and testing of documents cannot be performed without prior
approval of the Court or agreement by other parties; and, if it is done without prior
approval or agreement, such conduct is sanctionable.  E.g., Marrocco v. General Motors
Corp., 966 F.2d 220, 221 (7th Cir. 1992) (ex parte destructive testing warranted
dismissal sanction); Sedrati v. Allstate Life Ins. Co., 185 F.R.D. 388, 390-94 (M.D.
Ga. 1998) (excluding results of document testing performed by defendant ex parte).

Failing to obtain prior Court approval or agreement among the parties before engaging
in destructive testing is a serious offense that subjects the offending party to
sanctions.  For example, in Mirchandani v. Home Depot, U.S.A., Inc., 235 F.R.D. 611 (D.
Md. May 31, 2006), plaintiffs in a products liability case sought permission from the
court to perform destructive testing on a ladder central to the complaint.  The court
noted:

>        Had plaintiffs proceeded to destructively test components of the ladder
> without first seeking guidance from the court, they would have risked the consequences
> that may befall a litigant deemed to have engaged in spoliation of evidence, such as an
> adverse inference instruction to the jury, Vodusek v. Bayliner Marine Corp., 71 F.3d
> 148, 155-57 (4th Cir. 1995), or even outright dismissal of their case, Silvestri v.
> General Motors Corp., 271 F.3d 583 (4th Cir. 2001).

Id. at *1; see also Sedrati v. Allstate Life Ins. Co., 185 F.R.D. 388, 390-94 (M.D. Ga.
1998) (imposing sanctions where one party's unilateral testing of documents without
leave of the court precluded subsequent testing); Cameron v. District Court, 193 Colo.
286, 290 (1977) (plaintiff "correctly brought the matter before the trial court for a
judicial determination prior to the administration of the destructive test," and noting
that although plaintiff had custody of tire at issue, "[o]wnership is, of course, not a
license to alter evidence which may be crucial to both sides in the dispute.").

"The district court . . . retains discretion to impose reasonable conditions
surrounding a request to test tangible objects, especially to protect against damage by
destructive testing." Diepenhorst v. City of Battle Creek, 2006 WL 1851243, at *1
(W.D. Mich. June 30, 2006; see also Dabney v. Montgomery Ward & Co., Inc., 761 F.2d
494, 498 (8th Cir. 1985) (same); see also 23 Am. Jur. 2d Depositions and Discovery §
166 (". . . Destructive testing may be permitted in the court's discretion, [] if the
rights of opposing litigants are protected, such as by assuring that the object is not
totally consumed[] or by giving the parties adequate opportunity to photograph and
inspect the object before destructive testing and an opportunity to view the tests with
their experts or representatives.[]  Protective arrangements are necessary if the test
would so alter the exhibit that it would be difficult for the [other party] to present
his or her claim") (citations omitted); see also Cameron v. Priest, 565 P.2d 925, 929
(Colo. 1977) ("plaintiff correctly brought the matter before the trial court for a
judicial determination prior to administration of the destructive test").

So you have three choices.  You can work with Mattel on a stipulation that can be
jointly presented to the Court; you can present a protocol to the Court over Mattel's
objection and see if you can win; or you can present nothing to the Court, spoliate the
documents and suffer the consequences.  If your planned testing is legitimate, there is
no reason why you would not opt for Court approval pursuant to one of the first two
options, and ask for more time from the Court.  The fact that you are going for Option

Exhibit 32
P. 137

3 speaks volumes about your purported "testing" plan.

Every bit of non-destructive and destructive testing that has ever been done by Mattel on this case has been done by Court-approved experts and pursuant to either a protocol that was approved by the Court over MGA's objection, or a protocol that was agreed upon by MGA. In contrast, MGA has a record of punching holes in documents without any protocol, and without any notice to, or approval of, the Court. You appear bent on adding to that record.

When Mattel has negotiated a stipulation with the other parties on destructive testing and presented it to Judge Infante, it has been approved right away. It is by far the fastest way to achieve what you want to do, if you can agree to something reasonable. Since your purported "notice" stated that the testing could be done on the 10th, 11th or 12th, you certainly have no reason to be doing anything tomorrow except focusing your efforts on working with Mattel to arrive at an appropriate, stipulated protocol to present to the Discovery Master.

-----Original Message-----
From: Sloan, Matthew E [mailto:Matthew.Sloan@skadden.com]
Sent: Sunday, March 09, 2008 6:38 PM
To: Michael T Zeller
Cc: Diane Hutnyan; Weinstein, Ryan (LAC)
Subject: RE: Notice of Intent To Move Ex Parte

Mike -- With all due respect, I am unaware of any basis for your claim that "destructive sampling is permitted only with the Court's approval or [Mattel's] agreement" and that it would be "a violation of law" for MGA to engage in the proposed sampling of the notary book. If you are referring to the sampling protocol set forth in Judge Infante's August 30 Order, as you well know that Order applied only to Mattel's request to perform destructive testing on Bryant's drawings; it does not reference and does not apply to the testing of Ms. Prince's notary book by MGA or anyone else. Moreover, as you also know -- and as my colleague Ryan Weinstein and I have repeatedly reminded your partner, Diane Hutnyan -- the protocol in that Order requiring court approval of your experts prior to any sampling was only required because you refused to reveal the identity of your experts to Bryant (or MGA) before the testing. Here, by contrast, we revealed the identity of the expert who will be performing the sampling (Dr. Albert Lyter) and his CV over ten days ago, and we take it from your silence that you have no basis to contest his credentials or contend that he would mishandle the relevant documents.

Very simply, we are only asking for the same opportunity to take samples from the notary book which we provided you and your expert, Dr. Aginsky, without objection. Nothing more, nothing less. We have provided you with a detailed description of the amount and size of microplug samples to be taken, and offered to allow your expert the opportunity to observe
the taking of any samples. We are simply at a loss as to what additional procedure you need to protect your interests, and must sadly conclude that your real purpose is to thwart MGA's right to replicate Dr. Aginsky's testing so that we can check the accuracy of his findings.
Your claim that MGA is somehow at fault because we have "had years" to conduct the requested testing is specious, as you must know. MGA had no reason to conduct the testing of the notary book until we received Dr. Aginsky's report in February, and we have been diligently trying to perform the testing since that time. The whole reason the courts allow expert rebuttal is to rebut the opposing party's experts; your tactics appear transparently designed to deny us this opportunity.

That having been said, I realize we are not going to resolve this dispute through emails. Therefore, I am simply writing to repeat the request I made to Ms. Hutnyan this morning that Mattel agree to enter a stipulation to extend the deadline for MGA to submit the expert rebuttal report of Dr. Lyter until after the court's resolution of your ex parte motion. If your intent in filing this ex parte motion is merely to preserve the integrity of the notary book, you should have no reason to object to this request. If you refuse, we will be left to conclude that your real intent is to thwart our right to perform any testing at all under any circumstances.

Please inform me immediately whether you will agree to such a stipulation so that we can inform Judge Infante of your position at the telephonic status conference with Judge Infante tomorrow morning.

Exhibit 33
P. 140

Very truly yours,

# EXHIBIT 34



Prince, Jacqueline Ramona - (Highly Confidential – AEO)  12/21/2004  9:40:00 AM

1

```
1       IN THE UNITED STATES DISTRICT COURT
2       FOR THE CENTRAL DISTRICT OF CALIFORNIA
4   MATTEL, INC., a Delaware Corporation,
5           Plaintiff,
6       vs.         CASE NO. CV 04-9059 NM
                        (RJBx)
7   CARTER BRYANT, an individual, and
    DOES 1 through 10, inclusive,
8
            Defendants.
9
    CARTER BRYANT, on behalf of himself,
10  all present and former employees of
    Mattel, Inc., and the general public,
11
            Cross-Complaint.
12
        vs.
13
    MATTEL, INC.,
14  a Delaware corporation,
15          Cross-Defendant.

16      HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY
17  VIDEOTAPED DEPOSITION OF JACQUELINE RAMONA PRINCE
18      Tuesday, December 21, 2004
19      Atlanta, Georgia
20
21  Reported by:
    Kendra R. Bridges
22  B-2194 Court Reporter
    Court Reporter/Notary Public
23  JOB NO. 26654
24
25
```

2

```
1       IN THE UNITED STATES DISTRICT COURT
2       FOR THE CENTRAL DISTRICT OF CALIFORNIA
4   MATTEL, INC., a Delaware Corporation,
5           Plaintiff,
6       vs.         CASE NO. CV 04-9059 NM
                        (RJBx)
7   CARTER BRYANT, an individual, and
    DOES 1 through 10, inclusive,
8
            Defendants.
9
    CARTER BRYANT, on behalf of himself,
10  all present and former employees of
    Mattel, Inc., and the general public,
11
            Cross-Complaint.
12
        vs.
13
    MATTEL, INC.,
14  a Delaware corporation,
15          Cross-Defendant.

16
17
18      Deposition of JACQUELINE PRINCE, taken by the
19  Defendant, at 999 Peachtree Street, Suite 2300, Atlanta,
20  Georgia, on the 21st day of December, 2004, at 9:40 a.m.,
21  before Kendra R. Bridges, Registered Professional
22  Reporter and Notary Public.
23
24
25
```

3

```
1   APPEARANCES OF COUNSEL:
2
3   For the Plaintiff and Cross-Defendant:
4   MR. MICHAEL T. ZELLER, Esq.
5   Quinn, Emanuel, Urquhart, Oliver & Hedges, LLP
6   865 South Figueroa Street
7   Tenth Floor
8   Los Angeles, California  90017
9   213-624-7707
10  213-624-0643
11  mtz@quinnemanuel.com
12
13  MICHAEL MOORE, Esq.
14  Mattel, Inc.
15  333 Continental Boulevard
16  El Segundo, California  90245
17  310-252-2000
18  310-252-3861
19  michael.moore@mattel.com
20
21
22
23
24
25
```

4

```
1   APPEARANCES OF COUNSEL: (CONTINUED)
2
3   For the Defendants:
4   LARRY W. McFARLAND, Esq.
5   KEATS McFARLAND & WILSON
6   8720 Wilshire Boulevard
7   Penthouse Suite
8   Beverly Hills, California  90212
9   310-777-3750
10  310-860-0363
11  lmcfarland@kmwlaw.com
12
13  DONALD W. BENSON, Esq.
14  LITTLER MEDELSON
15  3348 Peachtree Road, NE
16  Suite 1100
17  Atlanta, Georgia  30326
18  404-233-0330
19  404-233-2361
20  dbenson@littler.com
21
22
23
24
25
```

Prince, Jacqueline Ramona - (Highly Confidential - AEO)  12/21/2004  9:40:00 AM

5

APPEARANCES OF COUNSEL: (CONTINUED)

For Ms. Prince:

DANIEL J. WARREN, Esc.
Sutherland Asbill & Brennan, LLP
999 Peachtree Street
Suite 2300
Atlanta, Georgia 30309
404-853-8028
404-853-8806
djwarren@sablaw.com

6

                         Page

THE WITNESS:  JACQUELINE PRINCE

EXAMINATION

    BY MR. ZELLER:                  8, 199
    BY MR. MCFARLAND:                  197

                INDEX TO EXHIBITS

For the Plaintiff                   Page

60    Notary Journal                91

61    7/21/04 Letter                142

62    Drawings                      170

63    Color Drawings                183

(Original Exhibit 60 through 63 have been attached to the
                original transcript.)

7

1    THE VIDEOGRAPHER:  Good morning, ladies and
2    gentlemen.  It's December 21st, 2004; 9:39 --
3    9:40 a.m.  We're in Atlanta, Georgia.
4        This is the deposition of Jacqueline Ramona
5    Prince.  The case is Mattel, Inc., a Delaware
6    corporation, Plaintiffs, versus Carter Bryant, an
7    individual and Does 1 through 10 includes the
8    defendant in Case No. CV 04-9059 NM (RJBx).  Also,
9    Carter Bryant on behalf of himself, all present and
10   former employees of Mattel, Inc., and the general
11   public versus Mattel, Inc., a Delaware corporation,
12   cross-defendant.
13       Would the attorneys please introduce
14   themselves?
15       MR. ZELLER:  Mike Zeller on behalf of the
16   plaintiff, Mattel, Inc.
17       MR. MOORE:  Michael Moore, in-house counsel
18   with Mattel, Inc.
19       MR. WARREN:  Dan Warren for Ms. Prince.
20       MR. MCFARLAND:  Larry McFarland on behalf of
21   defendant, Carter Bryant.
22       MR. BENSON:  Don Benson with Littler Medelson
23   for Carter Bryant.
24       JACQUELINE RAMONA PRINCE,
25       Having been first duly sworn,

8

1    was examined and testified as follows:
2                EXAMINATION
3    BY MR. ZELLER:
4        Q.  Good morning, Ms. Prince.
5        A.  Good morning.
6        Q.  If you could, please tell us your full name for
7    the record.
8        A.  Jacqueline Ramona Prince.
9        Q.  And have you ever had any other legal name?
10       A.  My first marriage I changed my name to Chan,
11   C-h-a-n; but I changed it after that divorce.
12       Q.  And so at that time, you were going by the name
13   Jacqueline Ramona Chan?
14       A.  When I was at Mattel, no.
15       Q.  No, I'm saying --
16       A.  Oh, yes.
17       Q.  -- when you had that name?
18       A.  Uh-huh.
19       Q.  I'm sorry.  That's a yes?
20       A.  Yes.
21       Q.  There's one thing, you know, and I'll talk a
22   little bit about depositions and the like, but you want
23   to give a response.
24       A.  Okay.
25       Q.  It's a yes or no or something that's -- a word

105

```
1    second call. I haven't -- I think it was the second call
2    when she said we actually need, you know -- can you -- do
3    you still have that. We'll need to look at it. I was
4    like okay, I'll go dig it out. That's when I pulled it
5    out.
6       Q. And did you -- did you remember right off that
7    the container that had the notary journal was up in the
8    attic?
9       A. No. I had to look a little bit, but I
10   finally -- I remembered where it was after I started
11   looking around. It's not something that was in my mind.
12
13      Q. That's why I asked.
14         Did you look in other places for it first?
15      A. No, I looked in the attic.
16      Q. But you weren't sure about what container it was
17   in?
18      A. Right.
19      Q. But you have a recollection that you went in
20   and looked for the journal as a result of the
21   conversations that you had with Dale?
22      A. Yes.
23      Q. And then did you actually go and locate the
24   original of the journal prior to the time that the
25   attorney came and visited you?
```

106

```
1       A. Yes.
2       Q. So you had that already out by the time that the
3    attorney came?
4       A. That's right.
5       Q. Now, once you located the original journal there
6    in your attic in that container, what did you do with it
7    in your house?
8       A. I kept it in my bedroom.
9       Q. And where in the bedroom?
10      A. By my computer.
11      Q. Was that on a desk?
12      A. Under the desk.
13      Q. And how it was under the desk?
14      A. Just sitting on the floor.
15      Q. And that was -- and that was -- it was kept
16   there from the time that you located it in the attic --
17      A. Yes.
18      Q. -- until the time that the attorney came and
19   visited you?
20      A. Yes.
21      Q. Was it kept anywhere else?
22      A. No.
23      Q. And then I take it then when she came and she
24   had the visit with you is when you turned over the
25   journal to her?
```

107

```
1       A. Exactly.
2       Q. Now, other than the places that we've talked
3    about so far --
4       A. Uh-huh.
5       Q. -- in your deposition, has the original of the
6    journal been anywhere else that you're aware of, and I'm
7    talking about from the time, you know, say, the start of
8    1999, up until the time that you gave it to the attorney
9    who came to visit you?
10      A. No.
11      Q. There are no other locations that you could
12   think of?
13      A. No.
14      Q. Now, you mentioned that you were told to always
15   keep the original of the notary journal?
16      A. Right.
17      Q. Where did you hear that?
18      A. I don't remember. I either read it or I was
19   told that. Maybe I read it; I really don't remember.
20      Q. Then you can't tell me what the source of that
21   information was?
22      A. No.
23      Q. Had you ever heard that when your commission
24   expired, that you were supposed to turn over the original
25   of your journal to the California Secretary of State?
```

108

```
1       A. No.
2       Q. No one ever told you that?
3       A. No.
4       Q. You never read that anywhere?
5       A. Not that I recall or I would have.
6       Q. Well, at the time that your commission expired,
7    did you make any inquiries of anyone as to what you were
8    supposed to do with your journal?
9       A. No.
10      Q. Did you do anything to investigate or research
11   what you're supposed to do with the original of your
12   notary journal once your commission expired back in 1999?
13      A. No. I didn't think about it.
14      Q. Would you please turn to the page of Exhibit 60
15   that pertains to the notarization that you did for Carter
16   Bryant.
17         You'll see that those are basically the last two
18   pages of this document that have written entries in your
19   journal.
20      A. Yes.
21      Q. Let me ask first with respect to the entries
22   pertaining to Carter Bryant's drawings that you
23   notarized, is all of that your handwriting?
24      A. Yes.
25      Q. And I'm talking about on both of those pages,
```

109

1  excluding of course Mr. Bryant's signature.
2  A. Yes.
3  Q. And so the record is clear, it's your
4  handwriting in the following boxes where it's the first
5  one on the far left: Month, day, year, time of
6  notarization; is that correct?
7  A. Yes.
8  Q. The same is true of kind or type of
9  notarization?
10  A. Yes.
11  Q. The same is true of document date?
12  A. Yes.
13  Q. The same is true of document kind or type?
14  A. Right.
15  Q. The same is true of name and address?
16  A. Yes.
17  Q. Although it's a little hard to tell from this
18  photocopy, we could perhaps get the original out if it
19  needs to be, you'll see that there's the certification of
20  signer box?
21  A. I see it.
22  Q. And it looks like personally known by the notary
23  is the one that was checked off?
24  A. Yes. Well, that would be what I would check
25  off.

110

1  Q. And that -- you made that mark in that box?
2  A. Yes.
3  Q. And then you also made the entry in the
4  additional information?
5  A. Yes.
6  Q. And that's Mr. Bryant's signature under
7  signature of signer?
8  A. Yes.
9  Q. And then did you write all of these words that
10  are on these boxes that we've just talked about with
11  respect to the Carter Bryant entry --
12  A. Yes.
13  Q. -- at the same time?
14  A. Right. The same time.
15  MR. WARREN: You have to let him finish his
16  question before you answer.
17  THE WITNESS: Okay.
18  MR. ZELLER: Yeah. Particularly for one like
19  that where I'm talking about specific times --
20  THE WITNESS: Okay.
21  MR. ZELLER: -- because it can certainly change
22  the meaning.
23  Q. (By Mr. Zeller)  And did Mr. Bryant sign the
24  book before or after you wrote those entries into the
25  other boxes?

111

1  A. After.
2  Q. So you wrote the entries in first and then
3  Mr. Bryant signed it?
4  A. Yes.
5  Q. And did you write these entries into your
6  journal before or after you actually stamped any
7  drawings?
8  A. After I stamped the drawings.
9  Q. And then so if I understand it correctly, the
10  first thing you did was -- with respect to the
11  notarization itself, we'll talk about the other
12  circumstances in a bit of course. But with respect to
13  the notarization itself, the first thing you did was
14  notarize all of the drawings?
15  A. Right.
16  Q. And so with that notarization on the drawings,
17  you signed them and Mr. Carter Bryant signed them as
18  well?
19  A. Yes.
20  Q. And that was -- and then the next thing that
21  happened was, is that you wrote the entries into your
22  journal?
23  A. Right.
24  Q. And then Mr. Carter Bryant signed the journal?
25  A. Right. That's how I remember it.

112

1  Q. Directing your attention to the box where it
2  says document kind or type?
3  A. Yes.
4  Q. And for the record, we're referring to Exhibit
5  60, and specifically the entries that pertain to the
6  notarization of Carter Bryant's drawings. And you'll see
7  the words here: Original sketches of doll idea hyphen
8  characters, six total, equal sign, names are colon, Zoe,
9  Lupe, L-u-p-e, Hallidae, H-a-l-l-l-d-a-e, Jay, two males,
10  and then there's an additional notation: From 1998,
11  Missouri.
12  Do you see that?
13  A. Yes.
14  Q. And you wrote all those words in there?
15  A. Yes.
16  Q. Did you choose to put this particular
17  information down?
18  A. This is information he gave me that he thought
19  would be helpful, so I wrote it -- tried to squeeze it
20  in.
21  Q. My question is a little bit different. In terms
22  of the information that's -- I understand that
23  Mr. Bryant's the source of the information --
24  A. Yes.
25  Q. -- but were you the one who chose to put that

Prince, Jacqueline Ramona - (Highly Confidential - AEO)  12/21/2004  9:40:00 AM

113

1  information down?  The particular information that's
2  reflected here?
3      A. Yes.
4      Q. Now, the names that are listed here, did you get
5  those names from the drawings?
6      A. He told me the names and I believe the names
7  were on the drawings as well, but I remember he told me
8  the names.
9      Q. Did you look at the drawings --
10     A. Yes.
11     Q. -- in order to get the names?
12     A. I must have.
13     Q. It's your best recollection that you got the
14 names from the drawings; right?
15     A. Yes.
16     Q. And let me try it this way.  How is it that you
17 knew how to spell the particular character's name?  Like
18 for example Zoe, you have Z-o-e.  How do you know it
19 wasn't Z-o-e-y?
20     A. Right.  It --
21     Q. Did you get that from the drawings?
22     A. Yes, from the drawings.
23     Q. Did Carter Bryant actually tell you the names
24 of any of these characters?
25     A. I remember him talking about them.

114

1      Q. Do you remember him using the names?
2      A. Yes.
3      Q. Do you remember him talking about Hallidae?
4      A. I thought he pronounced it Hallyday.
5      Q. Hallyday?
6      A. I think so.
7      Q. Did Mr. Bryant tell you to spell Hallidae this
8  way?
9      A. Yes.
10     Q. He did?
11     A. Yes.
12     Q. You didn't get that from the drawing?
13     A. Oh.  I don't remember.
14     Q. Let me ask this.  Was Hallidae a name that you
15 were familiar with or had ever heard prior to the time
16 that you had this conversation with Carter Bryant?
17     A. No.
18     Q. It's not -- it wasn't a name that you'd ever
19 heard of before?
20     A. No.
21     Q. And it's fair to say that the name -- the
22 spelling of this name was known to you only because of
23 this conversation with Mr. Bryant or from the drawings;
24 right?
25     A. Right.

115

1      Q. Did you take down the names of the characters
2  exactly as they appeared in the drawings?
3      MR. MCFARLAND:  Objection asked and answered.
4      THE WITNESS:  Do what?
5      MR. MCFARLAND:  The objection means that he's
6  asked that question --
7      THE WITNESS:  Oh.
8      MR. MCFARLAND:  -- a couple of times.
9      THE WITNESS:  Well, I would have had to --
10 someone either tell me or look at it because I
11 wouldn't know how to spell those names, obviously.
12     Q. (By Mr. Zeller)  Well, that's part of the --
13 that's part of what I'm trying to -- trying to get at.
14     Do you have a recollection one way or the other
15 of taking the drawings and then writing the names down in
16 your journal?  In other words, looking at the names on
17 the drawings and writing them down in the journal?
18     A. I don't remember.
19     Q. What I would like to do is ask a little bit
20 about the circumstances under which you came to notarize
21 the drawings that are reflected here.
22     What's your understanding as to how Carter
23 Bryant was aware that you were a notary?
24     A. I don't remember.
25     Q. Is that something that you mentioned, you know,

116

1  in the course of conversations at Mattel?
2      A. I don't think I ever mentioned it to him.  I
3  think somebody else may have told him that I was notary,
4  but I didn't particularly mention it to him.  I don't
5  remember that.
6      Q. It's fair to say you don't recall telling
7  Mr. Bryant --
8      A. Right.
9      Q. -- at any time that you were a notary?
10     A. Exactly.
11     Q. In fact, you don't think that you ever did?
12     A. I don't think I ever did.
13     Q. Do you have any understanding as to how
14 Mr. Bryant came to learn that you were a notary?
15     A. No, I don't remember.
16     Q. Do you have any expectation or understanding
17 based on circumstances there in the design center?
18     A. No.
19     Q. At the time when you were working at Mattel
20 there in the design center, there were -- there were
21 other notaries around; right?
22     A. I don't know.
23     Q. You didn't -- you didn't know of any?
24     A. No.
25     Q. The only person who was a notary there that you

MGA v. Mattel-OMM Depo Transcripts        None        Exhibit 34, P. 145        Page 113 - 116

117

1  knew of was yourself?
2  A  That's the only one I knew of.
3  Q.  How is it that Mr. Bryant came to your apartment
4  and had these drawings notarized?  And what I'm
5  asking about is, what were the circumstances that led
6  to it?  Was it something that he asked in advance you to
7  do and scheduled an appointment or did he drop by?  If
8  you could please just explain for us the circumstances.
9  A.  He asked if he could have my phone number, he
10  wanted to call me at home and talk to me about something
11  and I said, Sure.  Then when I was at home, I don't
12  remember if it was the same day or the next day he called
13  me and asked if he could come by and I said, Sure.  He
14  said are you -- and asked if I was a notary and if I
15  could notarize some documents for him.  And I said, Sure,
16  come on over.
17  Q.  Is there anything else you can recall about that
18  conversation?
19  A.  That was it.
20  Q.  And the -- when he asked for your home phone or
21  excuse me -- I take it when you said that he asked for
22  your phone number, it was your home phone number?
23  A.  Yes.
24  Q.  And did he -- you mentioned that he called a day
25  or so after you gave him the number?

118

1  A.  I don't remember if it was the next day.
2  Q.  But it was soon after?
3  A.  Yeah, soon after.
4  Q.  And then was it soon after that that he actually
5  came by and did -- and had the drawings notarized?
6  A.  Yes.
7  Q.  So it's fair to say that when you had this
8  conversation with him first, when he asked for your phone
9  number and then when he called you, that was within a
10  couple of days of August 26th, 1999?
11  A.  I would say yes.
12  Q.  When Mr. Bryant asked for your home phone
13  number, was that there in the Mattel design center that
14  he asked you?
15  A.  Yes.
16  Q.  Did he come by your cubicle to do that?
17  A.  Yes.
18  Q.  And were -- were you sitting in your cubicle
19  when he came by to ask for it?
20  A.  Yes.
21  Q.  What else did you discuss with Mr. Bryant on
22  that occasion when he came up and asked you for your home
23  phone number?
24  A.  Nothing.
25  Q.  At that time, did he ask you if you were a

119

1  notary?
2  A.  No.
3  Q.  So he just asked for your home phone number?
4  A.  Right.
5  Q.  Did you -- did you have an understanding as to
6  why?
7  A.  No.  I recall asking him, Well, what's this
8  about?  He said, Oh, I'll just -- can I talk to you about
9  it later.  I said, Sure.
10  Q.  And so I take it that this conversation you had
11  with him was very brief?
12  A.  Very brief.
13  Q.  And you gave him your phone number and then he
14  went back to the -- some other place in the design
15  center?
16  A.  Right.
17  Q.  Do you remember what time of day this happened?
18  A.  No.
19  Q.  Do you remember if it was during the --
20  A.  It was during the day.
21  Q.  During the day?
22  (Whereupon, the witness nods head
23  affirmatively.)
24  Q.  And then you said that he called you at home?
25  A.  Right.

120

1  Q.  Was that -- did you hear from Mr. Bryant or did
2  you see him or talk to him at any time between when he
3  asked you for your home phone number and then when he
4  called you at home?
5  A.  No.
6  Q.  Did he call you at home during the course of an
7  evening or was it something that was over a weekend?
8  A.  I don't remember.
9  Q.  You mentioned that during the phone call he
10  asked to come by and he also asked you at that point
11  that -- whether you were a notary?
12  A.  I don't really remember for sure if he asked me
13  then or when he came by.
14  Q.  Okay.  So let just be clear then about this.  Is
15  that the next thing you remember is having the
16  conversation over the phone with Mr. Bryant where he
17  asked to come by?
18  A.  Yeah, that for sure he asked me.
19  Q.  And is there anything else that you can remember
20  for sure Mr. Bryant saying during that conversation?
21  A.  No.
22  Q.  And what is it that you said in that
23  conversation?
24  A.  I just said, Come on by.
25  Q.  Did you wonder why he was coming by?

Prince, Jacqueline Ramona - (Highly Confidential - AEO)  12/21/2004  9:40:00 AM

137

```
1   at least your viewpoint that there wasn't a way of
2   documenting through the notary process --
3       A. No.
4       Q. -- the creation date or the idea date?
5       MR. MCFARLAND: Objection; calls for
6   speculation.
7       THE WITNESS: He didn't seem disappointed.
8       Q. (By Mr. Zeller) Didn't seem surprised either,
9   to your mind?
10      MR. MCFARLAND: Objection; calls for
11  speculation.
12      THE WITNESS: No.
13      Q. (By Mr. Zeller) And who was it -- well, I'll
14  ask it this way: It's your recollection that then you
15  were the one who suggested that one way of doing -- of
16  documenting the -- that at least the date as of the time
17  you were doing the notarization was you?
18      A. Yes.
19      Q. That wasn't something that Mr. Bryant came up
20  with that you recall?
21      A. No.
22      Q. Or that Mr. Bryant brought up I should say?
23      A. No.
24      Q. And did Mr. Bryant comment on that idea at all?
25      A. No.
```

138

```
1       Q. He just said --
2       A. He just said, Well, let's do that.
3       Q. Had Mr. Bryant pulled out the drawings prior to
4   the time that you had that discussion or any part of that
5   discussion?
6       A. Yes.
7       Q. Okay. Maybe you could tell me the first that
8   you can recall happening during the conversation you had
9   with Mr. Bryant?
10      A. I just remember that the -- I just remember
11  looking at the drawings.
12      Q. He came in and he sat down in your living room;
13  right? Is that correct?
14      A. Would you repeat that?
15      Q. Yeah. Mr. Bryant came into your house --
16      A. Uh-huh.
17      Q. -- or excuse me, your apartment, and sat down in
18  your living room; right?
19      A. Right.
20      Q. And did he pull out the drawings at that time or
21  did you -- did you chat first?
22      A. We chatted first.
23      Q. Was it about the drawings or about the dolls?
24      A. He was explaining what he wanted, which was
25  to -- that he had worked on some drawings while he was in
```

139

```
1   Minnesota I think it was, and that he was trying to
2   figure out a way to document that they had been done
3   before he came from Minnesota.
4       And I said, Well, I don't know what to do except
5   we -- I mean, the only thing I can do as far as being a
6   notary is just acknowledge your signature, this date and
7   time. If you want to do that, put those on there. He
8   said, Okay, let's do that, and that was that.
9       Q. Was it actually Missouri instead of Minnesota?
10      A. I don't know if it was Missouri or Minnesota. I
11  always forget which one.
12      Q. If you take a look back at Exhibit 60 in your
13  journal entry, you'll see it has the word Missouri.
14      A. Oh, okay. I'm sure it's Missouri.
15      Q. Does that help your recollection?
16      A. Yeah. Oh, yeah. I'll be -- I still don't
17  remember.
18      Q. But based on your journal entry, you think
19  it's more likely it was Missouri?
20      A. Well, yes, that's obviously what he told me at
21  the time.
22      Q. Well -- but my question is a little bit
23  different in this sense: Did Mr. Bryant pull out the
24  drawings before he started explaining what they were and
25  what he wanted or did he start explaining first and then
```

140

```
1   show you the drawings?
2       A. I don't remember exactly.
3       THE VIDEOGRAPHER: 12:48. We're off the
4   record.
5       (Whereupon, a recess was taken.)
6       THE VIDEOGRAPHER: 1:17. We're back on the
7   record.
8       MR. ZELLER: Let's please mark as Exhibit 61 a
9   one-page document which consists of a letter from
10  Charlotte McCluskey to Jacqueline Ramona Prince,
11  dated July 21st, 2004.
12      (Whereupon, Exhibit 61 was marked for
13  Identification.)
14      Q. (By Mr. Zeller) For the record this is a letter
15  that was just produced today?
16      A. Yeah.
17      Q. And you recognize that as the letter that you
18  were referring to earlier in your testimony --
19      A. Yes.
20      Q. -- relating to the original of your notary
21  journal?
22      A. Yes.
23      Q. And the stamp as well?
24      A. Yes.
25      Q. Now, unfortunately there's only -- why don't you
```

Exhibit 34,
P. 147

Prince, Jacqueline Ramona - (Highly Confidential - AEO)  12/21/2004  9:40:00 AM

141

1   hang on to that.

2   A. Okay.

3   Q. There's only one copy so I apologize for

4   standing a bit. I would just take a -- ask you a few

5   questions about it.

6   You'll see that this letter is July 21st, 2004?

7   A. Yes.

8   Q. And the letter references that the attorney,

9   Charlotte McCluskey, took possession of the original

10  notary book and the stamp on that day?

11  A. Right.

12  Q. Was that the same day that she met with you?

13  A. Yes.

14  Q. And seeing this letter, does that refresh your .

15  recollection that it was Charlotte McCluskey who visited

16  you at your home?

17  A. Yes. It was Charlotte McCluskey.

18  Q. Now, are your initials somewhere on this

19  document?

20  A. Yes. The top set of initials and date are mine.

21  Q. And the date there is 7/21/04?

22  A. Right.

23  Q. And who are the initials of the person below?

24  A. Charlotte McCluskey, 7/21/04.

25  Q. Now, you'll see it says by hand-delivery. Did

142

1   she actually bring the letter with her to the meeting or

2   did she send it by messenger later on?

3   A. I believe she brought this with her. And I

4   handed it to her, yes.

5   Q. And so you both initialed the letter at the same

6   time while you were there in the house?

7   A. Yes.

8   Q. And then there's some handwritten notation

9   there. It says to the effect, and stamp enclosed in

10  case?

11  A. Yes, that's my handwriting because she had just

12  put regarding notary book and I said, Well, the stamp is

13  in there, too, so I wrote that on there.

14  Q. Now, other than the notary book and the stamp as

15  reflected in this letter, did you give anything else to

16  Ms. McCluskey on that day?

17  A. No.

18  Q. No documents or any other tangible things?

19  A. No. Just -- I handed her that entire packet,

20  whatever's in that little case.

21  Q. And then did you make a copy of the letter at

22  the time or was one sent to you later?

23  A. One was sent to me later.

24  Q. It was a photocopy?

25  A. Yes.

143

1   Q. And how was that sent to you?

2   A. In the mail.

3   Q. And then have you had any communications with

4   Ms. McCluskey in any way since the letter was signed?

5   A. Not exactly. I called and left her a voice mail

6   when I got a request to come to a deposition.

7   Q. And so you learned about the possibility of

8   there -- a deposition would be taken in the case from

9   that voice mail?

10  A. No. I got -- received something in the mail.

11  Q. Oh, I see. You left it for her?

12  A. Yes. So, I called her and said, Hey, what do I

13  need to do?

14  Q. And did you hear back from her?

15  A. No, I heard back from Dan Warren.

16  Q. And did you have any other communications with

17  attorneys in between the time that you signed this letter

18  that's dated -- or initialed I should say, this letter

19  dated July 24th, 2004 and the time you spoke with

20  Mr. Warren?

21  A. No. July 21st, no. 21st.

22  Q. Oh, I'm sorry I misspoke --

23  A. That's okay.

24  Q. -- 21st.

25  Returning to the time when Mr. Bryant came to

144

1   your apartment when you notarized the drawings, we were

2   talking about when Mr. Bryant showed you the drawings.

3   Do you recall how many drawings there were?

4   A. No. Several, but I don't recall exactly how

5   many sheets of paper. I wrote it in my notary book at

6   the time.

7   Q. Were all the drawings on the same kind of paper

8   or were they on different kinds of paper?

9   A. I don't remember.

10  Q. Do you remember some of the drawings being on

11  tracing paper?

12  A. I don't remember.

13  Q. Do you recall the drawings being on kind of

14  over-sized translucent paper that had to be unfolded?

15  A. I remember big paper, but I don't remember what

16  kind of paper.

17  Q. Were all the drawings that you saw on the same

18  kind of paper?

19  A. I don't remember that.

20  Q. Did you eventually notarize all of the drawings

21  that Mr. Bryant brought with him?

22  A. Yes. I notarized every sheet of paper he had.

23  Q. So there were no other additional drawings that

24  Mr. Bryant brought with him that you did not notarize?

25  A. No.

Exhibit _34_

P. _148_

Prince, Jacqueline Ramona - (Highly Confidential - AEO)  12/21/2004  9:40:00 AM

145

1    Q. My statement is correct?

2    A. Your statement's correct.

3    Q. Do you recall drawings having to be unfolded

4 .  when you were in the process of notarizing them?

5    A. Unfolded, no.

6    Q. Do you remember any of the drawings being folded

7    up?

8    A. No. I don't remember anything being folded.

9    Q. Were all the drawings that you were shown in

10   black and white?

11   A. Yes.

12   Q. You weren't shown any big color drawings --

13   A. No.

14   Q. -- is that correct?

15   A. No. I don't remember seeing color.

16   Q. My statement's correct?

17   A. Your statement's correct.

18   Q. Just to follow up on that point, you put in your

19   notary journal that you notarized 13 drawings in total?

20   A. Yes. Yes.

21   Q. Those were the total number of drawings, these

22   13 drawings, that Mr. Bryant brought with him and that

23   you notarized; is that correct?

24   A. Yes.

25   Q. And did you count them yourself? The number of

146

1    them?

2    A. I don't remember counting them.

3    Q. Do you have any recollection as to where you got

4    the number 13 from in particular?

5    A. I just don't remember counting them. I'm sure I

6    did, but I don't remember actually going one, two, three,

7    four.

8    Q. It is your expectation that you were the one who

9    identified that there were 13 of these drawings?

10       MR. MCFARLAND: Objection --

11       THE WITNESS: Yes.

12       MR. MCFARLAND: -- calls for speculation.

13   Q. (By Mr. Zeller) That would be in accordance

14   with your normal practice as a notary --

15   A. Right.

16   Q. -- is that correct?

17   A. Well, yes.

18   Q. By the way, was that the first time you had ever

19   notarized any kind of drawings?

20   A. Yes.

21   Q. Did you ever subsequently notarize any kind of

22   drawings?

23   A. No.

24   Q. That was the first and only occasion?

25   A. Right.

147

1    Q. Had anyone ever asked to -- you to notarize

2    drawings other than this instance with Mr. Bryant?

3    A. No.

4    Q. I'm talking about before or after?

5    A. Right, no.

6    Q. Now, other than the content of the conversation

7    that you had with Mr. Bryant that you've told me so far

8    about in this deposition, is there anything else that you

9    said or that he said in the course of the conversation?

10   A. No.

11   Q. You've told me your complete testimony as to the

12   contents of these conversations or that conversation?

13   A. Yes.

14   Q. Prior to the time that Mr. Bryant came to your

15   apartment and had the drawings notarized, did you have

16   any understanding or belief that Mr. Bryant was working

17   on this project?

18   A. No.

19   Q. So this was the first time that you had learned

20   about it?

21   A. Yes.

22   Q. Did Mr. Bryant say at any point during that

23   conversation or at any other time as to whether or not he

24   was working with anyone else on this project?

25   A. No.

148

1    Q. Did you ever obtain an understanding from any

2    source as to whether or not Mr. Bryant was working on

3    this project with anyone?

4    A. No.

5    Q. If you could return to your journal entry for a

6    moment where it says document kind or type, the Carter

7    Bryant entry?

8    A. Yes.

9    Q. It says original sketches of doll idea.

10       Do you see that part of it?

11   A. Yes.

12   Q. And then later on it says from 1998, Missouri?

13   A. Right.

14   Q. Was it your understanding that Mr. Bryant was

15   telling you that the doll ideas were from 1998, Missouri,

16   or that the sketches were?

17   A. The sketches. That was my understanding.

18   Q. Do you have an understanding as to why you wrote

19   down doll idea?

20   A. No. I don't remember why I wrote doll idea.

21   Q. Are those words that Mr. Bryant used?

22   A. I don't remember.

23   Q. Other than in conversations that you had with

24   Mr. Warren, have you ever discussed with anyone the fact

25   that Mr. Bryant had these drawings notarized?

Exhibit 34 ,
P. 149

Prince, Jacqueline Ramona ~ (Highly Confidential - AEO)  12/21/2004  9:40:00 AM

149

```
1      A. No.
2      Q. So it's fair to say that in between the time
3   that Mr. Bryant came to your apartment and had the
4   drawings notarized all the way up until your first
5   conversation with Mr. Warren, you never discussed the
6   subject with anyone?
7      A. No.
8      Q. And no one had ever asked about it?
9      THE WITNESS: No.
10     MR. MCFARLAND: Objection. Misstates her
11  testimony. She already testified about the Cendali
12  conversation.
13     MR. ZELLER: I'm sorry.
14     MR. MCFARLAND: She already testified about the
15  conversation with Ms. Cendali which predated the
16  conversation with Mr. Warren. You just said, isn't
17  it fair to say that there were no conversations
18  about these notarizations from the time of Carter
19  Bryant to Mr. Warren and Ms. Cendali was before
20  Mr. Warren.
21     MR. ZELLER: I'll clarify that then.
22     Q. (By Mr. Zeller) Let me restate it just so the
23  record is clear on that point.
24     Other than your first contact with Ms. Cendali,
25  did you discuss with anyone the fact that Mr. Bryant had
```

150

```
1   these drawings notarized after you had notarized them?
2      A. No.
3      Q. So it's fair to say that you didn't discuss with
4   anyone the fact that these drawings were notarized from
5   the time that you notarized them up until the time that
6   you had the discussion with Ms. Cendali?
7      A. Right. Correct.
8      Q. And so the record is clear, the first time that
9   you discussed with anyone ever, the fact that
10  Mr. Bryant -- the fact of this notarization of
11  Mr. Bryant's drawings, was when you received the call
12  from Ms. Cendali?
13     A. Correct.
14     Q. And that's the call that you had testified about
15  before?
16     A. Right.
17     Q. Did you have any reaction when Mr. Bryant showed
18  you the drawings?
19     A. Yes.
20     Q. What was your reaction?
21     A. I thought they were great.
22     Q. Did you tell him that?
23     A. Yeah.
24     Q. Did you say anything else to Mr. Bryant about
25  the drawings?
```

151

```
1      A. The only thing I really said is I thought they
2   were really hip looking and I thought it was a great idea
3   but other than that, no. Just that he's really talented.
4   I always told him he was really talented when he
5   sketches.
6      Q. Did you tell Mr. Bryant that you thought that
7   they were original or very original?
8      A. Yeah, I told him what a great idea.
9      Q. Well, let me break this down a little bit. Do
10  you ever recall using the word original?
11     A. I don't recall.
12     Q. At that time, would you consider yourself to be
13  somebody who could detmen whether or not drawings were
14  original or not?
15     MR. MCFARLAND: Object again to the use of the
16  word original, which is, of course, a copyright term
17  and therefore calls for a legal conclusion.
18     MR. WARREN: Join the objection.
19     THE WITNESS: They looked original to me.
20     Q. (By Mr. Zeller) That's not quite what I'm
21  driving at, but, first of all just so the record is
22  clear --
23     A. I guess I don't understand.
24     Q. Just so the record is clear, you don't recall
25  using the word original to Mr. Bryant; correct?
```

152

```
1      A. I don't recall.
2      Q. And so my next question is: Did you consider
3   yourself at that time someone who had sufficient
4   experience in the area to detmen whether or not
5   something was original such that you said that to
6   Mr. Bryant?
7      MR. MCFARLAND: Objection to the use of the
8   word original. It calls for a legal conclusion.
9      MR. WARREN: Join the objection.
10     THE WITNESS: What do you mean when you say
11  consider myself -- did you say an expert?
12     Q. (By Mr. Zeller) Or someone who was in a
13  position to comment on whether or not Mr. Bryant's
14  drawings were quote original unquote?
15     MR. MCFARLAND: Same objection.
16     THE WITNESS: Well, it looked like there were
17  pencil marks on it, if that's what you mean. They
18  didn't look like copies.
19     Q. (By Mr. Zeller) Other than the drawings, did
20  Mr. Bryant bring anything with him?
21     A. No.
22     Q. Did you ever see any 3-dimensional
23  representations or prototypes or models or anything like
24  that of Mr. Bryant's dolls?
25     A. No.
```

Prince, Jacqueline Ramona - (Highly Confidential - AEO)  12/21/2004  9:40:00 AM

153

1    Q. And I'm asking in any context?
2    A. No.
3    Q. At the time that the notarization of
4    Mr. Bryant's signature was done on the drawings, did you
5    notarize anything else for Mr. Bryant such as an
6    affidavit of any kind?
7    A. I don't think so. I think I just notarized
8    drawings for him.
9    Q. Did Mr. Bryant tell you anything about the
10   circumstances under which he claimed to have come up with
11   the doll idea?
12   A. All he told me is that while he was home, back
13   home, he came up with this concept for some dolls and
14   that's it.
15   Q. You'll see in the notary journal which we marked
16   as Exhibit 60 --
17   A. Uh-huh.
18   Q. -- that there's a reference to 1998?
19   A. Yes.
20   Q. Did Mr. Bryant use the word 1998 to describe
21   when he came up with it?
22   A. Yes.
23   Q. So he --
24   A. Pertaining to last year.
25   Q. -- he specifically referred to the year?

154

1    A. Yes.
2    Q. Did he say what month in the year?
3    A. I don't remember.
4    Q. You don't have a recollection of him saying
5    that?
6    A. I don't have a recollection, no.
7    Q. Is it your expectation that if Mr. Bryant told
8    you the month in 1998, that he said that he came up with
9    this, that you would have written it down in the notary
10   journal?
11       MR. MCFARLAND: Objection.
12       THE WITNESS: I don't remember.
13       MR. MCFARLAND: Objection. Calls again as
14   before, you ask these questions, is it your
15   expectation; it calls for speculation.
16       MR. ZELLER: It's completely proper.
17       MR. MCFARLAND: Calls for speculation.
18       MR. ZELLER: You can go ahead and answer.
19       THE WITNESS: I don't remember.
20   Q. (By Mr. Zeller) I'm not asking about
21   your memory at this point. What I -- what I'm trying to
22   find out is, is based upon your experience as a notary,
23   and what it is that you did in connection with notarizing
24   Mr. Bryant's signature on these drawings, is it your
25   expectation or belief that if Mr. Bryant said to you that

155

1    he came up with this idea in a particular month in 1998,
2    that you would have reported that to the journal?
3        MR. MCFARLAND: Object to the -- object to the
4    question as phrased. Calls for speculation.
5        MR. WARREN: Join the objection.
6        THE WITNESS: I don't know what to say.
7    Q. (By Mr. Zeller) It's fair to say that it's
8    your best testimony based on your understanding and based
9    upon your recollection, that you didn't receive any
10   information about what month in 1998 that Mr. Bryant
11   claimed to have come up with the idea; right?
12       MR. MCFARLAND: Objection, mischaracterizing
13   her testimony. She says she doesn't recall whether
14   he told her or not. That is her testimony.
15       MR. ZELLER: You can go ahead and answer.
16       THE WITNESS: I don't recall.
17   Q. (By Mr. Zeller) I'm not asking about
18   recollection only.
19       (Whereupon, the record was read by the
20   reporter.)
21       MR. WARREN: I'll join the objection; that is
22   it your best testimony seems to be is it your best
23   guess, which calls for speculation.
24       THE WITNESS: Since we're -- okay, I would
25   assume that if he told me the month while I was

156

1    writing this down that I would have written it down,
2    but it's an assumption.
3    Q. (By Mr. Zeller) It is your expectation,
4    correct?
5        MR. MCFARLAND: Objection to the use of
6    expectation; it calls for speculation. She's
7    already said she doesn't remember. Now you're
8    asking her to guess.
9    Q. (By Mr. Zeller) My question is when you use the
10   word assume, you're saying that's your expectation;
11   correct?
12       MR. WARREN: Objection.
13       MR. MCFARLAND: Object to the use of the word
14   expect. Expect is a guess.
15       THE WITNESS: That's my guess.
16       MR. ZELLER: Your expectation?
17       MR. MCFARLAND: She's already answered the
18   question.
19       MR. WARREN: Objection.
20       THE WITNESS: It's my guess. Really that's --
21   I mean, I don't know what else to say.
22   Q. (By Mr. Zeller) Well, let me try it this way.
23   If Mr. Bryant told you a particular month in 1998 that he
24   claims to have come up with the doll idea -- I'm sorry,
25   I've actually -- can you read back what I said?

Exhibit 34,
P. 151

Prince, Jacqueline Ramona - (Highly Confidential - AEO)  12/21/2004  9:40:00 AM

197

199



1    MR. WARREN:  We can talk about that.

2    We'll read and sign.  Okay.

3    (Whereupon, the deposition concluded at 2:46

4    p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

1

2    STATE OF GEORGIA:

3    COUNTY OF FULTON:

4    I hereby certify that the foregoing

5    deposition was stenographically recorded by me, as

6    stated in the caption.  The deponent was duly sworn

7    to tell the truth, the whole truth, and nothing but

8    the truth.  The colloquies, statements, questions,

9    and answers thereto were reduced to typewriting

10   under my direction and supervision; that the

11   deposition is a true and correct record of the

12   testimony/evidence given by the deponent.

13   I further certify that I am not a relative,

14   an employee of attorney or counsel of the parties,

15   nor am I financially interested in the action.

16       This, the 21st day of December, 2004

17

18   _____

19       KENDRA R. BRIDGES

20       Certified Court Reporter

21       (B-2194) and Notary Public

22       My commission expires on the

23       5th day of August 2008.

24

25

198

1

2

3

4

5

6

7

8

9    I, JACQUELINE RAMONA PRINCE, do hereby declare under

10   penalty of perjury that I have read the foregoing

11   transcript; that I have made any corrections as appear

12   noted, in ink, initialed by me, or attached hereto; that

13   my testimony as contained herein, as corrected, is true

14   and correct.

15       EXECUTED this _____ day of _____

16   20_____, at _____, _____

         (City)          (State)

17

18

19

20   _____

         JACQUELINE RAMONA PRINCE

21

22

23

24

25