QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
  John B. Quinn (Bar No. 090378)
  johnquinn@quinnemanuel.com
  Michael T. Zeller (Bar No. 196417)
  (michaelzeller@quinnemanuel.com)
  Jon D. Corey (Bar No. 185066)
  (joncorey@quinnemanuel.com)
  Timothy L. Alger (Bar No. 160303)
  (timalger@quinnemanuel.com)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100

Attorneys for Mattel, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual,<br><br>            Plaintiff,<br><br>vs.<br><br>MATTEL, INC., a Delaware corporation,<br><br>            Defendant.<br><br>AND CONSOLIDATED ACTIONS | CASE NO. CV 04-9049 SGL (RNBx)<br><br>Consolidated with Case Nos. CV 04-09059 and CV 05-02727<br><br>**DISCOVERY MATTER**<br><br>**[To Be Heard By Discovery Master Hon. Edward Infante (Ret.) Pursuant To The Court's Order Of December 6, 2006]**<br><br>MATTEL, INC.'S REPLY IN SUPPORT OF *EX PARTE* APPLICATION FOR PROTECTIVE ORDER PREVENTING MGA'S UNAUTHORIZED DESTRUCTIVE SAMPLING OF THE PRINCE NOTARY BOOK<br><br>[Supplemental Declaration of Diane C. Hutnyan filed concurrently herewith]<br><br>Date: TBA<br>Time: TBA<br>Place: TBA<br><br>Phase 1:<br>Discovery Cut-off:        January 28, 2008<br>Pre-trial Conference:     May 5, 2008<br>Trial Date:               May 27, 2008 |

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

I.     MGA'S PROTOCOL LACKS REASONABLE LIMITATIONS ................... 3

II.    THERE IS NO CONSPIRACY; MGA NEEDS TO DEVELOP A
       REASONABLE PROTOCOL, JUST AS MATTEL DID ............................... 7

CONCLUSION.................................................................................................... 11

07209/2434617.17209/24
3408.407209/2433408.3

# TABLE OF AUTHORITIES

**Page**

## Cases

E.E.O.C. v. Ethan Allen, Inc.,
  259 F. Supp. 2d 625 (N.D. Ohio 2003)................................................................. 6, 7

In re Estate of Wang The Huei,
  2002 WL. 1341762 (2002) ........................................................................................ 6

Mirchandani v. Home Depot, U.S.A., Inc.,
  235 F.R.D. 611 (D. Md. 2006) .............................................................................. 11

Ostrander by Ostrander v. Cone Mills, Inc.,
  199 F.R.D. 417 (D. Minn. 1988) ..................................................................... 10, 11

07209/2434617.17209/243
3408.407209/2433408.3

-ii-

### **Preliminary Statement**

In its opposition brief, MGA asks the Court to exercise "simple fairness"[1] in deciding whether to allow MGA to unilaterally proceed with its destructive testing plan. Mattel agrees. The Court should exercise fairness and require MGA to follow the same procedures and protocol that Mattel did before the Court allowed Mattel's experts to perform testing. This protocol included submitting the CVs -- as well as statements regarding the experts' facilities and practices concerning the preservation of evidence, and a sworn statement as to their being fully accountable for original documents in this case while in their custody -- to the Discovery Master for *all* of its proposed experts prior to Mattel obtaining access to the requested documents. The Discovery Master also required a detailed protocol for the delivery, timing, and handling of the evidence to be tested.

Having strong safeguards to protect the notary book is imperative because MGA has already performed undisclosed destructive testing on 16 key documents in this case. In its opposition brief, MGA admits to performing unilateral unauthorized destructive testing on Bryant original documents without notice to the Court or Mattel but excuses it by stating that the testing was performed "by a different expert, on different documents, under the watch of different counsel."[2] But it is still MGA, the documents are still evidence in this case, and it is far from clear that the expert is different. MGA's proposal deliberately leaves open the possibility that the same "expert," Mr. Speckin, could handle the documents as well as the disclosed expert, Dr. Lyter. Or that another person, Jason Harner, who is an assistant to Mr. Speckin and graduated from college just last year, but who MGA has claimed is an "expert," could handle them. That is why MGA insists on an

---

[1]   MGA's Opposition Brief ("Opp.") at 1.
[2]   Opp. at 17.

1  extremely short objection period for any of the unnamed "other" experts it might
2  use.[3]

3        Nor is there any merit to the "different counsel" argument. MGA's
4  current counsel is bound by the same requirements of Court approval or agreement
5  by the parties before proceeding with destructive sampling. Furthermore, the lawyer
6  who prepared the proposed stipulation MGA is now urging on the Court is one of
7  the same lawyers who prepared Ms. Tonnu for, and defended her at, her January
8  2008 depositions on Topic No. 41.[4] That lawyer, despite a Court Order ordering full
9  testimony on the handling of all the plugged documents, prevented Mattel from
10 getting any testimony about 11 of them by ensuring that the designee knew nothing
11 about them.

12       There is no "double standard" being applied. Mattel's approach and
13 MGA's approach are night and day. MGA devotes ten pages of its brief to an
14 irrelevant argument it labels "Factual Background" to try to hide that fact. But the
15 focus here is what MGA actually plans to do, and it undeniably contemplates an
16 unlimited number of samples taken by an unlimited number of experts. MGA
17 knows its "first" expert, Dr. Lyter, is likely to draw the same conclusion as
18 Dr. Aginsky -- that the phrase "From 1998 Missouri" was added to the notary book
19 at a later date to support Bryant's claims in this case. So Paragraphs 3 and 7 of
20 MGA's proposed stipulation[5] specifically contemplate multiple unnamed experts.
21 And the 15-20 plugholes for each of the 19 sets that MGA contemplates in

22

23   [3] Actually, MGA still proposes no Court review or approval with respect to Dr.
24 Lyter. Opp. at 21 (discussing the objection provision "[a]s to any *other* experts that may be used").
25   [4] Supplemental Declaration of Diane C. Hutnyan, dated March 14, 2008 ("Supp. Hutnyan Dec."), Exhs. 1 and 2 (Excerpts from transcripts of depositions of Ms.
26 Tonnu dated January 17 and January 24, 2008, showing Mr. Weinstein in attendance), at 734:1-7 and 988:1-7, respectively.
27   [5] See Hutnyan Dec., dated March 10, 2008, Exh. 3, at 2-3.

28

1 | Paragraph 3 appears to apply to each of its experts, as the stipulation is currently
2 | written.

3 |       MGA, not Mattel, is the reason why MGA has no agreed-upon protocol
4 | to present to the Court, because it wants to leave open the possibility of using Mr.
5 | Speckin, or Harner, or others, or of punching enough holes in the notary book so
6 | that it is effectively destroyed as a trial exhibit. All MGA had to do is develop a
7 | protocol that was sensibly limited. The Court should grant Mattel's application for a
8 | protective order barring MGA from handling, sampling or testing the Prince notary
9 | book until and unless there is an agreement among the parties or MGA obtains the
10 | Court's approval of a proper protocol with approved experts and appropriate limits
11 | on its activities.

12 |

13 | **ARGUMENT**

14 | **I.   MGA'S PROTOCOL LACKS REASONABLE LIMITATIONS**

15 |       MGA argues that Mattel is being unreasonable in refusing to allow
16 | MGA to perform the "same" testing on the notary book that Mattel has already
17 | completed. Yet, as a comparison of MGA's proposed stipulation versus Mattel's
18 | actual protocol indicates, there is no similarity between the two on the critical
19 | issues.

| Mattel's Actual Protocol | MGA's Proposed Stipulation |
|---|---|
| Mattel had <u>one</u> expert, Dr. Valery Aginsky, take samples from the notary book. | MGA's proposed stipulation allows the use of multiple experts taking multiple samples. ¶ 3 and ¶ 7. |
| Mattel disclosed the names of its expert. | MGA refuses to disclose the names of all of its proposed experts. ¶ 3 and ¶ 7, and generally. |

| Mattel's Actual Protocol | MGA's Proposed Stipulation |
|---|---|
| Mattel's expert, his credentials, his facility, and his evidence preservation methodology, were approved by the Discovery Master prior to testing. | MGA refuses to allow Court oversight or prior Court approval of its experts and fails to provide information regarding the facilities and evidence preservation methodology. |
| Dr. Aginsky took up to 5 "microplug" samples from 19 areas of the notary book. | MGA contemplates taking as many as 20 microplugs from each area *per expert.* ¶ 3. |
| Mattel set forth a protocol for how the book would be shipped, stored, and handled, that was agreed upon by the parties and that mirrored the Court-approved handling of the Bryant original documents. | MGA argues that it needs neither Mattel's agreement, nor Court approval, of its protocol.  Hutnyan Dec., Exh. 3 (Letter). |
| Mattel has not previously performed unilateral, unapproved destructive testing. | MGA admits to performing destructive testing without prior notice to Mattel or the authorization of this Court.  Opp. at 17. |

In its opposition, MGA focuses repeatedly on its disclosure of one "expert," Dr. Lyter.  However, no requirement that Dr. Lyter's credentials be submitted to or approved by the Court appears in either of MGA's proposed stipulations.  More importantly, MGA has not, and will not, even disclose the names of the other experts its stipulation "reserves the right" to use in addition to Dr. Lyter, and offers Mattel just three days to try to research any name MGA puts up, rather than allowing Mattel and the Court to assess these options now.

-4-

1    Nor does MGA deny that its plan would allow each expert to take up to
2    20 microplugs from 19 "sets" on the two pages of the notary book, with 17 of those
3    sets being taken just from the writing on the handwritten entries.[6]  Basic math shows
4    that plan could easily riddle the text on the two key pages with plugs, obliterating it.
5    And MGA insists that it be allowed to retain possession of the notary book for 35
6    days -- a period which notably extends more than 2 weeks past the deadline for
7    submission of expert rebuttal reports -- to supposedly "replicate" Mattel's sampling.
8    Given that Dr. Aginsky's sampling in fact only took one day and given MGA's
9    failure to provide any cogent reason for the time period, it is evident that MGA
10   plans to give the notary book to as yet unnamed experts.

11   MGA will not concede on these key points because it needs to be able
12   to shop around for an "expert" who will give it the right answer, and it is likely that
13   Dr. Lyter is not that expert.  This is not just speculation.  Up until Mattel pointed out
14   that MGA had to disclose which expert it would use if it hoped to gain any possible
15   agreement, MGA's two "experts" were Mr. Speckin and Mr. Harner.  When Mattel
16   sought to paper test certain Bryant originals and to ink test the notary book, MGA
17   elected to have its "expert" observe and object if necessary.[7]  Mattel could find no
18   information on Mr. Harner, and asked MGA for his credentials, only to find that he
19   is a trainee for Mr. Speckin.[8]  Mr. Harner graduated, without distinction, from the
20   Michigan State University less than a year ago.[9]  Mattel agreed to allow Mr. Harner
21

22   [6]  See id., Exh. 3 (Stipulation), at ¶ 3 ("MGA's expert (or experts) will remove
23   no more than 17 sets of micro plugs . . . .  Although this stipulation refers to MGA's
     'expert,' MGA reserves the right to employ more than one expert . . . MGA's expert
24   will take no more than 15 to 20 microplugs from any set . . .").
25   [7]  Supp. Hutnyan Dec., Exh. 3 (Letter from Carl Roth to Diane Hutnyan, dated
     December 20, 2007).
26   [8]  Id., ¶ 2.
27   [9]  Id., Exh. 4 (Email from Ryan Weinstein to Diane Hutnyan dated December
     28, 2007 at 12:30 PM) (enclosing Harner's C.V.).
28

1   to attend the sampling, and he did attend it with respect to the sampling from the
2   notary book.[10]

3              As for the paper testing, MGA elected to send Mr. Erich Speckin
4   instead.[11]  Even MGA refuses to call Mr. Speckin an "expert," calling him instead an
5   "ink testing consultant."[12]   As MGA knows, Mr. Speckin has a sordid history as a
6   expert.  For example, in E.E.O.C. v. Ethan Allen, Inc., 259 F. Supp. 2d 625 (N.D.
7   Ohio 2003), the Court found that Mr. Speckin's testimony was inadmissible at trial
8   because Mr. Speckin "could give no clear explanation of how or why [his] results
9   occurred."  Id. at 628.  Similarly, in In re Estate of Wang The Huei, 2002 WL
10  1341762, [2002] HKEC 1424 (Hong Kong Special Administrative Region Ct. of
11  First Instance) (Nov. 21, 2002), the Court found that Mr. Speckin did not perform
12  his tests correctly and offered no scientific basis for his results.[13]  The Court also
13  found that Mr. Speckin had a "penchant for exaggeration" regarding his own
14  background.  Id. at ¶ 29.7.  In toto, the Wang court: (1) found that Speckin was not
15  credible, (2) rejected Speckin's evidence and expert opinion entirely, and (3) was
16  left with the "lingering suspicion" that Speckin "tailored his results to suit his client's
17

18  _____

    [10]  Id., Exh. 5  (Email from Ryan Weinstein to Diane Hutnyan dated January 3,
19  2008 at 9:44 A.M.).
    [11]  Id., Exh. 6  (Email from Ryan Weinstein to Diane Hutnyan dated January 10,
20  2008 at 4:21 P.M.).
    [12]  Id., Exh. 7 (See, e.g., MGA's Opposition to Mattel's Motion re 30(b0(6)
21  orders at 16).
    [13]  Among other things, "Counsel for Mrs. Wang decided to secretly test
22  Speckin's methods by instructing a third party to have Speckin test 12 documents of
23  known origin- a sort of 'set-up' made by the defense in order to find out whether or
    not the method used by [Speckin] for ink-dating is valid, reliable and accurate.  Of
24  the 12 documents he tested, Speckin was wrong on 4 of them, concluding
25  incorrectly that: (a) three writings that were actually less than 3 years old were more
    than 3 1/2 years old; and (b) one writing that was actually 10 years old was less than
26  3 1/2 years old."  E.E.O.C., 259 F. Supp. 2d at 631 (internal citations and quotations
27  omitted.)

28

1  requirements." Id. at ¶ 29.31(f).[14]  And in this very case, Mr. Speckin has already
2  performed destructive testing on original documents with no notice to Mattel or to
3  the Court and MGA has actively concealed what he did from view by refusing to
4  provide Court-ordered testimony explaining it.[15]

5  　　　　Mattel is quite reasonably concerned that the notary book, a vital piece
6  of evidence in this case, could be subjected to testing by unqualified and
7  unscrupulous experts.  Mattel's concern is not compounded by the fact that MGA
8  refuses to agree to allow Mattel to have further access to the notary book to rebut the
9  findings of MGA's "experts."[16]  Thus, any purported expert MGA seeks to use
10  should be approved by this Court after Mattel has had reasonable opportunity to
11  research and object to the expert, if necessary, so that the Court can make an
12  informed decision, before such "expert" handles the notary book.  The Court also
13  should place reasonable limitations on MGA's destructive testing of this evidence to
14  protect it for use at trial.

15  **II.    THERE IS NO CONSPIRACY; MGA NEEDS TO DEVELOP A**
16  **REASONABLE PROTOCOL, JUST AS MATTEL DID**

17  　　　　The actual correspondence between the parties, rather than MGA's
18  argument made out of select and misleading snippets, is a record of the actual facts
19  pertaining to the attorney examination, the expert examination, and the sampling of
20  the Bryant originals and the Prince notebook.  And while the real issue here is not

21

---

22  [14]  The E.E.O.C. Court also noted that the Hong Kong Court found that "Speckin
23  had a "penchant for exaggeration" regarding his own background. Id. at ¶ 29.7. For
    example, the American Board of Forensic Document Examiners accused Speckin of
24  engaging in a "fraudulent misrepresentation" by stating he was eligible for their
25  certification, and Speckin falsely testified that he was "a member of the Questioned
    Document Section of the Mid-Western Association of Forensic Scientists," when he
26  was not. Id. at ¶¶ 29.52, 29.29.  E.E.O.C., 259 F. Supp. 2d at 632.
    [15]  Mattel's Application, Section II.
27  [16]  Hutnyan Dec., Exh. 3 (Letter), at 4.
28

1   whether MGA's protocol matches Mattel's, but whether it is reasonable in and of
2   itself, Mattel feels compelled to address some of the misleading argument being
3   presented by MGA as "fact."

4        First, MGA tries to create the false impression that Mattel did not seek
5   the Court's approval or MGA's participation as to its handling, sampling and testing
6   of the notary book. On page 4 of its Opposition, MGA suggests that Mattel failed to
7   give notice to MGA of its desire to inspect and photograph the book at Keker & Van
8   Nest. But the inspection in question was just an attorney examination of the orignal
9   evidence, which was governed by the June 20, 2006 on-the-record stipulation before
10   Judge Block, requiring the parties to allow such examination and photographing
11   upon 15 days' notice. MGA did not need to be notified for such an inspection, just
12   as MGA has never notified Bryant of its decision to inspect any of Mattel's original
13   documents in this case.[17]

14        MGA's then asserts that its only notice of Mattel's intent to test the
15   notary book came by way of a "cc" on a letter between Mattel and Dan Warren.
16   But in fact, on the exact same day, Mattel had addressed a specific letter to MGA's
17   counsel, Timothy Miller, that directly informed him that it planned to have its
18   experts test the notary book: "We are alerting you to our request of Ms. Prince's
19   counsel, Dan Warren, for our expert to take small ink samples from entries in Ms.
20   Prince's notary book . . . I look forward to hearing from you on these mattersMGA
21   and Mattel then engaged in a lengthy correspondence with regard to this testing,
22   after which MGA assented to all the sampling and testing without objection and had
23   its purported expert, Mr. Harner, attend the sampling.[18]

24

25     [17]  Supp. Hutnyan Dec., Exh. 8 (Letter from R. Herrington to Dylan Proctor,
26   dated December 24, 2007).
27     [18]  Id., Exhs. 9 (Letter from Carl Roth to Diane Hutnyan dated December 26,
    2007) and 10 (email chain).
28

1    The fact is that MGA had every opportunity to object to Mattel's testing
2 during the three-week period from December 13, 2007 to mid-January when the
3 notary book was tested, but chose not to do so.  In contrast, the three-day period that
4 MGA proposes for Mattel to lodge its objections does not give it adequate time to
5 meaningfully access any expert's credentials and prepare a response.
6    MGA repeatedly complains that Dr. Aginsky retained possession of the
7 notary book for four months (ostensibly to show that MGA's keeping the notary
8 book for 35 days and through the expert discovery period makes sense because there
9 is no actual evidence that it does).  But the two situations are completely different.
10 Dr. Aginsky had conducted non-destructive examination of this book and
11 contemplated eventually doing potential destructive sampling as well.  Pending a
12 final decision on that, this expert, whose credentials and practices had previously
13 been reviewed and approved by the Discovery Master and numerous Courts, stored
14 the book safely in his laboratory, using the Court-approved protocol for doing so,[19]
15 securely in locked laboratory facilities with no one else having access to the
16 materials.[20]  Dr. Aginsky had submitted a sworn statement to the Court that "I
17 certainly understand the critical nature of each of Mr. Bryant's original documents
18 and will be fully accountable for them while they are in my custody."[21]  Obviously,
19 the notary book, which up until Mattel's attorney examination last year had been in
20 Bryant's, not Prince's custody, was to be treated as any other Bryant original (or any
21 other original in this case, for that matter).  Such storage was much safer than
22 needlessly shipping it to Georgia and then back if the destructive testing was
23 needed, and Bryant and MGA, as well as the Discovery Master, had been concerned

24

25    [19] Hutnyan Dec., Exh. 2, at ¶ 2.
     [20] Supp. Hutnyan Dec., Exh. 11 (*In Camera* Declaration #1 As To Expert
26 Examination And Testing Of Bryant's Original Documents, dated August 28, 2007),
   at ¶ 7.
27    [21] Id., Exh. 11 at ¶ 7.

28

1    about shipping with respect to all the Bryant originals.[22]  During that period, all

2    parties' counsel knew that the notary book was there but no one objected or even

3    asked for it.[23]

4             Further, MGA's claim that "the only reason that Mattel was forced to

5    obtain Court approval of its experts prior to performing any testing was because

6    Mattel refused to provide its experts' names or qualifications to Bryant" and  its

7    insinuation that the Court required a showing just from Mattel's experts because of

8    particular concern about them[24] could not be further from the truth.  The only

9    significant document-altering event known by the Court at that point was the

10   admitted, unauthorized sampling by MGA's alleged expert, Mr. Speckin, with no

11   prior notice to the parties of the Court.  The Court wanted to ensure that such

12   excesses could not occur again; this was and is Mattel's position as well, and Mattel

13   was happy to provide all relevant information so that the Court could make an

14   informed decision.[25]

15            MGA's legal analysis is faulty as well.  MGA relies on Ostrander by

16   Ostrander v. Cone Mills, Inc., 199 F.R.D. 417 (D. Minn. 1988), to support the

17   erroneous proposition that MGA is free to proceed without Court oversight in the

18   destructive testing process.  But immediately after the paragraph MGA cited in its

19

20   [22]   Id., Exh. 12 (Hearing Transcript dated August 23, 2007), at 11:5-12:23; and
21   Exh. 13 (Bryant's Opposition to Mattel's Motion to Make Original Documents
     Available for Expert Inspection dated July 16, 2007), at 10 (arguing for requiring "a
22   responsible Quinn Emanuel employee [to] personally transport them to any location
23   necessary for testing [and] maintain physical custody of the originals at all times").
     [23]   Id., ¶ 13.
24   [24]   Opp. at 2.
25   [25]   Further, that Mattel "refused" to provide MGA about its experts at that point
     in time was appropriate, as their identity was still attorney work product that had not
26   been waived.  In contrast, MGA had submitted the declaration from Mr. Speckin
27   and thus waived its privilege, as Judge Larson later found, but even to this day,
     MGA refuses to tell Mattel or the Court what he did.

28

1  brief, the <u>Ostrander</u> court states that "the decision whether to allow destructive tests
2  rests within the sound discretion of the court." <u>Id.</u> at 419.  If the Court has the
3  authority to decide whether a party may even undertake destructive testing, it
4  certainly has the authority to require reasonable limits on such testing.

5          The four-part balancing test proposed by MGA is instructive, and MGA
6  would do well to try to meet it.  Under this test, the Court should examine whether
7  there is a less prejudicial alternative and whether there are adequate safeguards in
8  place.  <u>See</u> <u>Mirchandani v. Home Depot, U.S.A., Inc.</u>, 235 F.R.D. 611, 614 (D. Md.
9  2006).  Here, there are many alternatives that would allow MGA to replicate
10  Mattel's tests and prevent undue damage to the evidence, but MGA refuses to
11  contemplate any of them, preferring its open-ended plan, allowing unlimited
12  destruction of this key evidence by anyone it chooses to label an "expert."  MGA's
13  ultimately arrogant position that it and its counsel should not be accountable to the
14  Court should be rejected.

15                            **<u>Conclusion</u>**

16          For all of the foregoing reasons, Mattel respectfully requests that its
17  application for a protective order be granted.

18

19  DATED:  March 14, 2008        QUINN EMANUEL URQUHART OLIVER &
20                                     HEDGES, LLP

21                               By _____
22                                 Diane C. Hutnyan
23                                 Attorneys for Plaintiff and Cross-Defendant
                               Mattel, Inc.

24
25
26
27
28