QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
  John B. Quinn (Bar No. 090378)
  johnquinn@quinnemanuel.com
  Michael T. Zeller (Bar No. 196417)
  (michaelzeller@quinnemanuel.com)
  Jon D. Corey (Bar No. 185066)
  (joncorey@quinnemanuel.com)
  Timothy L. Alger (Bar No. 160303)
  (timalger@quinnemanuel.com)
865 South Figueroa Street, 10th Floor
Los Angeles, California  90017-2543
Telephone:   (213) 443-3000
Facsimile:    (213) 443-3100

Attorneys for Mattel, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual, | CASE NO. CV 04-9049 SGL (RNBx) |
| Plaintiff, | Consolidated with Case Nos. CV 04-09059 and CV 05-02727 |
| vs. | |
| MATTEL, INC., a Delaware corporation, | [PUBLIC REDACTED] MATTEL, INC.'S OPPOSITION TO MGA DEFENDANTS' *EX PARTE* APPLICATION FOR AN ORDER EXTENDING THE MARCH 17 DEADLINE FOR MGA TO SERVE ITS REBUTTAL EXPERT REPORT CONCERNING MS. PRINCE'S NOTARY BOOK OR, IN THE ALTERNATIVE, PRECLUDING MATTEL FROM INTRODUCING ANY EXPERT EVIDENCE REGARDING ITS EXAMINATION OF THE NOTARY BOOK |
| Defendant. | |
| AND CONSOLIDATED ACTIONS | |
| | [Declaration of Diane C. Hutnyan filed concurrently herewith] |
| | Date:         TBA<br>Time:         TBA<br>Place:        TBA |
| | Phase 1:<br>Discovery Cut-off:       January 28, 2008<br>Pre-trial Conference:     May 5, 2008<br>Trial Date:               May 27, 2008 |

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................1

APPLICABLE LAW ..............................................................................................4

STATEMENT OF FACTS ......................................................................................5

ARGUMENT ........................................................................................................17

I.   THERE IS NO GOOD CAUSE TO EXCUSE MGA FROM MISSING THE REBUTTAL REPORT DEADLINE ................................................17

   A.   MGA Had Every Opportunity To Negotiate, Or Litigate, A Sensible Protocol For The Rebuttal Testing But Failed To Do So ......17

   B.   There Is No Reason To Extend MGA's Time To Do A Rebuttal Report It Has No Right To Do ............................................................20

II.  THERE IS NO BASIS TO PRECLUDE DR. AGINSKY'S TESTIMONY ..................................................................................................21

CONCLUSION ....................................................................................................22

# TABLE OF AUTHORITIES

**Page**

## Cases

Cameron v. Priest,
565 P.2d 925 (Colo. 1977) .................................................................................. 4

Congressional Air, Ltd. v. Beech Aircraft Corp.,
176 F.R.D. 513 (D. Md. 1997) .......................................................................... 22

Dabney v. Montgomery Ward & Co., Inc.,
761 F.2d 494 (8th Cir. 1985) ............................................................................... 5

Diepenhorst v. City of Battle Creek,
2006 WL 1851243 ................................................................................................ 5

E.E.O.C. v. Ethan Allen, Inc.,
259 F. Supp. 2d 625 (N.D. Ohio 2003) ...................................................... 11, 12

In re Estate of Wang The Huei,
2002 WL 1341762, [2002] HKEC 1424
(Hong Kong Special Administrative Region Ct. of First Instance)
(Nov. 21, 2002) ............................................................................................ 11, 12

Marrocco v. General Motors Corp.,
966 F.2d 220 (7th Cir. 1992) ............................................................................... 4

Mirchandani v. Home Depot,
235 F.R.D. 611 (D. Md. 2006) ............................................................................. 4

Sedrati v. Allstate Life Ins. Co.,
185 F.R.D. 388 (M.D. Ga. 1998) ......................................................................... 4

Unigard Security Ins. Co. v. Lakewood Engineering & Manufacturing Corp.,
982 F.2d 363 (9th Cir. 1992) ............................................................................. 22

Von Brimer v. Whirlpool Corp.,
536 F.2d 838 (9th Cir. 1976) ...................................................................... 21, 22

## Statutes

Federal Rule of Civil Procedure 30(b)(6) .............................................. 12, 13, 16

## Other Authorities

Am. Jur. 2d Depositions and Discovery § 166 ........................................................ 5

**<u>Preliminary Statement</u>**

No one is to blame for MGA's situation but MGA.  The law requires that a party, prior to performing irreversible destructive sampling or testing on evidence, obtain the Court's approval and allow the Court to have oversight of the testing process.  In fact, in this case, at defendants' insistence the Discovery Master required Mattel to obtain approval of its experts and to follow a detailed protocol before its experts could even examine, <u>*non*</u>-*destructively,* any Bryant original documents.  MGA knew more than three months ago that Mattel's world-renowned, Discovery Master-approved ink expert, Dr. Valery Aginsky, would be taking microplugs from the 8/26/99 ink entry in Ms. Prince's notary book for forensic ink analysis.  More than two months ago, on January 4, 2008, MGA's chosen consultant -- a Speckin trainee, Jason Harner -- watched the microplugs being taken.  And more than *three years ago* -- not in the last month as MGA falsely represents to the Court -- MGA hired Dr. Lyter as an ink expert.  So all along, MGA knew what Mattel was testing, and it had the resources, and plenty of time, to develop a reasonable protocol that the Discovery Master could approve or that Mattel could agree to.

But what MGA has sought to do with the notary book would never get past Mattel or the Discovery Master.  So MGA decided to proceed, for the second time in this litigation, to start punching holes in key documents with neither the Court's approval nor Mattel's agreement.  Mattel objected, and encouraged MGA to try to work out a sensible protocol, pointing out that the Discovery Master had swiftly approved an earlier stipulated protocol on destructive sampling.  MGA refused.

MGA claims it proposed to "perform the exact same sampling pursuant to the exact same protocol used by Mattel," but there was no similarity between the two in critical areas:

- While Mattel had <u>one</u> expert, Dr. Valery Aginsky, take samples from the notary book, MGA's proposed stipulation allowed the use of multiple experts taking multiple samples.

1   •   While Mattel disclosed the name of its expert, MGA refuses to disclose the
2       names of all of its proposed experts.

3   •   While Mattel's expert, his credentials, his facility, and his evidence preservation
4       methodology, were all approved by the Discovery Master prior to his even
5       looking at the book, MGA subpoenaed the book directly to the first of its experts
6       without Court oversight or prior Court approval of its experts and refused to
7       provide information regarding the facilities and evidence preservation
8       methodology of any of the experts.

9   •   While Dr. Aginsky took up to 5 microplug samples from 19 areas of the notary
10      book, MGA will not agree to less than 20 microplugs from each of the 19 areas,
11      *per" expert*," leaving open the possibility that MGA will punch hundreds of
12      holes in the book and thus leave it unrecognizable to the jury and interfere with
13      replication of any testing.

14  •   While Mattel set forth a protocol for how the book would be shipped, stored, and
15      handled that was agreed upon by the parties and that conformed with the Court-
16      approved handling of the Bryant original documents, MGA argues that it needs
17      neither Mattel's agreement, nor Court approval, of its protocol.

18  •   While Mattel has never performed unilateral, unapproved destructive testing in
19      this case, MGA admittedly has performed destructive testing on key documents
20      in this case without any prior notice to Mattel and without authorization from the
21      Court.

22  •   While Mattel's sampling took one day, MGA demanded 35 days' control over the
23      notary book, not because more time was needed, but to deny Mattel any
24      opportunity to examine or retest the notary book.

25      MGA takes offense at the notion that Mattel might object to its lawyers or
26  "experts" taking custody of the notary book, but events have shown that objection was
27  right on the mark.  As soon as MGA and Dr. Lyter had their hands on the notary book,
28  they planned to alter it -- without notice to the Court, Court approval, or agreement by

the other parties.  It was only when Mattel brought an *ex parte* application for a protective order would MGA even tell Dr. Lyter to hold off.  Parties that will not recognize the Court's authority to review and approve destructive testing of evidence should not be allowed access to such evidence, especially when it is as important as the notary book.

Also, parties, like MGA, who engage in secret acts of destructive sampling and testing and continue to conceal these acts from the Court and from other parties even after being ordered to disclose them, should not be allowed access to key evidence without Court oversight.  Inexplicable holes were found in at least 16 of Bryant's original documents earlier in this case.  Eventually, a Mr. Speckin -- an individual with a demonstrably sordid history as a forensic document expert -- admitted to having removed and destroyed parts of some documents.  This Court found MGA had waived its privilege as to MGA's handling of these materials, and ordered it to "testify fully" on Topic No. 41, "the testing of or sampling from documents that refer or relate to Bratz."  But MGA's current counsel, including the very same individual who crafted the proposed stipulation as to MGA's proposed sampling of the notary book, obstructed Mattel's efforts to learn about what Mr. Speckin did to the documents.  After MGA's current counsel prepared Ms. Tonnu for her Court-ordered Rule 30(b)(6) deposition, Ms. Tonnu still had no information about most of the Bryant original documents that had been plugged and denied even knowing who took some of those plugs.

Mattel has never sought to prevent MGA from performing reasonable testing on the notary book.  But given the importance of this piece of evidence; the specific requirements the Discovery Master has placed on non-destructive and destructive testing in this case, and MGA's refusal to meet those requirements; MGA's refusal to limit its testing protocol in any way; the unlimited number of unnamed "experts" it plans to use and microplugs it plans to take; and MGA's undisputed record of document-tampering in this case, it is not asking too much to have it establish an appropriate protocol and obtain approval for it and for its expert.

1   MGA has no right to test the notary book, and its failure to meet the rebuttal

2   report deadline is entirely its own.  Until and unless it can gain the Discovery Master's

3   approval for an appropriate protocol according to the standards that have been

4   previously set in this case by the Discovery Master -- and that is a question currently

5   pending before him -- it is premature and groundless for MGA to seek an extension of

6   the rebuttal report deadline, as there is nothing to test.

7   As for MGA's *ex parte* request for the extraordinary relief of striking

8   Dr. Aginsky's report, there is simply no legitimate basis at all, much less "good cause."

9   If MGA believed it could achieve a good result with one, legitimate, Court-approved

10   expert and a reasonably limited protocol, it would have done that, and it didn't.  It chose

11   to rely on cross examination of Dr. Aginsky and the testimony of Carter Bryant instead

12   and that is a decision it must live with.

13   ## Applicable Law

14   "Destructive" sampling or testing means any sampling or testing that would alter

15   the documents' inherent physical status.  Because of the permanent nature of destructive

16   sampling or testing, it cannot be performed without prior approval of the Court

17   or agreement by other parties; and, if it is done without prior approval or agreement,

18   such conduct is sanctionable.  E.g., Marrocco v. General Motors Corp., 966 F.2d 220,

19   221 (7th Cir. 1992) (*ex parte* destructive testing warranted dismissal sanction);

20   Sedrati v. Allstate Life Ins. Co., 185 F.R.D. 388, 390-94 (M.D. Ga. 1998) (excluding

21   results of document testing performed by defendant *ex parte*; "The Court neither

22   condones nor approves of Defendant's conduct in handling the subject documents or

23   performing the analyses upon them without providing sufficient prior notice to the

24   Plaintiff and the Court."); Mirchandani v. Home Depot, 235 F.R.D. 611, 613 (D. Md.

25   2006) ("[h]ad plaintiffs proceeded to destructively test components of the ladder

26   without first seeking guidance from the court, they would have risked the consequences

27   that may befall a litigant deemed to have engaged in spoliation of evidence, such as an

28   adverse inference instruction to the jury . . . or even outright dismissal of their case");

Cameron v. Priest, 565 P.2d 925, 929 (Colo. 1977) ("plaintiff correctly brought the matter before the trial court for a judicial determination prior to administration of the destructive test").

"The district court . . . retains discretion to impose reasonable conditions surrounding a request to test tangible objects, especially to protect against damage by destructive testing." Diepenhorst v. City of Battle Creek, 2006 WL 1851243, at *1 (W.D. Mich. June 30, 2006; see also Dabney v. Montgomery Ward & Co., Inc., 761 F.2d 494, 498 (8th Cir. 1985) (same); see also 23 Am. Jur. 2d Depositions and Discovery § 166 (". . . Destructive testing may be permitted in the court's discretion, [] if the rights of opposing litigants are protected, such as by assuring that the object is not totally consumed[] or by giving the parties adequate opportunity to photograph and inspect the object before destructive testing and an opportunity to view the tests with their experts or representatives.[]  Protective arrangements are necessary if the test would so alter the exhibit that it would be difficult for the [other party] to present his or her claim") (citations omitted).

## Statement of Facts

**The Discovery Master's Required Showing.**  Recognizing this body of law, and perhaps also in light of the stated concerns of the District Court with regard to the earlier unauthorized destructive testing that MGA conducted on at least 16 of Mr. Bryant's supposedly original Bratz drawings before Mattel's counsel ever was permitted to see the drawings,[1] the Discovery Master in this case has required that a specific protocol be established before experts could perform any testing, *even non-destructive testing,* on original documents.

---

[1] Hutnyan Declaration In Support of Mattel's Opposition To MGA's *Ex Parte* Application For An Order Extending The March 17 Deadline For MGA To Serve Its Rebuttal Expert Report ("Hutnyan Decl."), Exh. 1 (photocopies and photographs of plugged documents).  *See also* id., Exh. 2 (Mattel's Inc's Motion and Notice of Motion for Appointment of Expert Witnesses; and Memorandum of Points and Authorities dated June 19, 2006) at 20.

With the admitted, unauthorized sampling by MGA's alleged expert, Mr. Speckin, fresh in his mind, and with MGA and Bryant at that time arguing for severe restrictions on Mattel's experts' ability to even *see* the Bryant original documents,[2] Judge Infante required a specific showing be made with respect to forensic document examination experts.  At the August 23, 2007 hearing on Mattel's Motion to Compel Production of the Bryant Original Documents for expert non-destructive examination, Judge Infante commented:

> WELL, I THINK IT'S IMPORTANT TO KNOW WHO
> YOUR EXPERTS ARE TO DETERMINE THAT
> THEY'RE REPUTABLE AND HAVE SYSTEMS IN
> PLACE AND UNDERSTAND THEIR IMPORTANT
> DUTY.
>
> THE ONLY WAY THAT COULD BE
> DEMONSTRATED AND STILL PROTECT YOUR
> WORK PRODUCT WOULD BE FOR YOU TO
> SUBMIT TO ME IN CAMERA A LIST OF WHO THE
> EXPERTS ARE, WITH ANY RESUME OR
> STATEMENT OF THEIR QUALIFICATIONS AND
> PRACTICES AND THEIR LOCATIONS.
>
> THAT COULD BE SUBMITTED TO ME IN CAMERA,
> SO THAT I WOULD FEEL MORE COMFORTABLE IN

---

[2]   Hutnyan Dec., Exh. 3 (Bryant's Opposition To Mattel, Inc.'s Motion To Compel Bryant To Make Original Documents Available For Expert Examination And Testing And For Sanctions, dated July 13, 2007), at 9-11; Exh. 4 (Order dated August 30, 2007) (end of paragraph 3 was removed at insistence of defendants).

1  FOLLOWING YOUR RECOMMENDATIONS HERE

2  REGARDING PROTOCOL.[3]

3  Mattel complied in full, as reflected in the Discovery Master's Order of

4  August 30, 2007:

5  The following materials were provided to the Discovery

6  Master, at his request, for *in camera* review:  the C.V. of

7  the four experts who will be conducting examination,

8  inspection and testing of the documents; and statements

9  from each of them as to the location and nature of their

10  laboratory facilities, as to their individual practices with

11  regard to the preservation of evidence, and as to their

12  understanding that they are fully accountable for Bryant's

13  original documents while those documents are in their

14  custody.  The Discovery Master has found Mattel's

15  showing with respect to the experts satisfactory.[4]

16  In this Order, the Discovery Master also required that Mattel abide by a detailed

17  protocol that set forth the exact manner, time, location, storage, and handling of the

18  documents.[5]  Thirty-five days was the total time that was given to Mattel for

19  examination of eight large boxes of Bryant original documents by four different Court-

20  approved experts in four different parts of the country.[6]  The non-destructive

21

22

---

23  [3]  Id., Exh. 5 (Hearing Transcript dated August 23, 2007), at 12:20-13:6.  The

24  Discovery Master recognized at that time that the identity of Mattel's experts was still attorney work product that had not been waived.

25  [4]  Id., Exh. 4 at ¶ 2.  *See also* id., Exh. 6 (*In Camera* Declaration #1 [of

26  Dr. Valery Aginsky] As To Expert Examination And Testing Of Bryant's Original

27  Documents, dated August 28, 2007), at ¶ 7.

     [5]  Id., Exh. 4 at ¶¶ 4-7.

28  [6]  Id., Exh. 4 at ¶ 4.

examination proceeded according to the August 30, 2007 Order and without any objection by Bryant or MGA.[7]

**Paper Testing On The Bryant Originals.**   After the non-destructive examination was complete, Mattel sought to conduct destructive testing on certain Bryant originals and on Ms. Prince's notary book.  With respect to the Bryant originals, which were governed by the August 30, 2007 Order, Mattel selected approximately 200 pages from among the eight boxes to conduct paper testing on and pursuant to its obligations in paragraph 6 of that Order, notified all the parties, including MGA, of its intention to take samples of the documents for such testing.[8]  The parties were then able to agree upon a specific protocol for the sampling procedure, which included the name of the expert doing the sampling (who had previously been approved by the Discovery Master), set forth a total period of four business days for the sampling, and gave MGA's consultant, Dr. Erich Speckin, the right to attend the sampling (which he did) and to object (which he did not).[9]  This stipulation was presented to the Discovery Master, who approved it.[10]

**Ink Testing of The Notary Book.**   The testing of Ms. Prince's notary book -- which amounted to less than 60 hypodermic-needle-sized microplugs from two pages -- was accomplished by agreement.   In advance of the sampling, Mattel notified Mr. Warren and the parties of its intent to have its Court-approved expert, Dr. Aginsky, take the samples.  As MGA concedes, it did not object or request Mattel to obtain a Court order.  MGA agreed with it, so long as its ink testing consultant was permitted to attend and object.[11]  MGA sent a trainee of Mr. Speckin, Jason Harner, to attend the

---

[7]  Id., ¶ 8.

[8]  Id., Exh. 7 (Letter from Diane Hutnyan to Michael Page and Timothy Miller, dated December 13, 2007).

[9]  Id., Exh. 8 (Stipulation and Order, dated January 11, 2008).

[10]  Id., Exh. 8.

[11]  Id., Exh. 9 (Letter from Diane Hutnyan to Daniel Warren, dated December 13, 2007); Exh. 10 (Letter from Carl Alan Roth to Diane Hutnyan to December 20, (footnote continued)

1  sampling.[12]   Mr. Harner raised no objection to the sampling; it was otherwise

2  completely uneventful, and the notary book was returned to Mr. Warren in the same

3  condition it had arrived in with the exception of the agreed-upon microplugs that had

4  been taken.[13]

5     On page 4 of its Application, MGA emphasizes that Dr. Aginsky had had

6  possession of the notary book for some three months  before conducting the destructive

7  sampling (ostensibly to legitimize MGA's current effort to maintain control over the

8  notary book for 35 days and through the expert discovery period).  But there was an

9  important reason for this.  Dr. Aginsky had conducted a non-destructive examination of

10  this book in September, and he contemplated eventually doing potential destructive

11  sampling as well.  Pending a final decision on that, the book could either be retained at

12  his laboratory or shipped back and forth to Georgia.  Dr. Aginsky, whose credentials

13  and practices and laboratory facilities had previously been reviewed and approved by

14  the Discovery Master and numerous Courts, stored the book safely in his laboratory,

15  using the Court-approved protocol for doing so,[14] securely in locked laboratory

16  _____

17  2007); Exh. 11 (Letter from Diane Hutnyan to Daniel Warren, dated December 25, 2007); Exh. 12 (Email from Daniel Warren to Diane Hutnyan, dated December 26,

18  2007).  It is not true that MGA's only notice of Mattel's intent to test the notary book came by way of a "cc" on a letter between Mattel and Dan Warren.  *See*

19  Memorandum at 4-5 and n. 9.  In fact, on the exact same day as its letter to

20  Mr. Warren, Mattel had addressed another specific letter to MGA's counsel,

21  Timothy Miller, that directly informed him that it planned to have its experts test the notary book:  "We are alerting you to our request of Ms. Prince's counsel, Dan

22  Warren, for our expert to take small ink samples from entries in Ms. Prince's notary book . . . I look forward to hearing from you on these matters."  Exh. 7 at 2.  MGA

23  and Mattel then engaged in a lengthy correspondence with regard to this testing,

24  after which MGA assented to all the sampling and testing without objection and had

25  its purported expert, Mr. Harner, attend the sampling.  Id., Exhs. 13 (Letter from Carl Roth to Diane Hutnyan dated December 26, 2007) and 14 (email chain).

26  [12]  Id., Exh. 15  (Email from Ryan Weinstein to Diane Hutnyan dated January 3, 2008 at 9:44 A.M.).

27  [13]  Id., ¶ 18.

28  [14]  Id., Exh. 4 at ¶ 2.

MATTEL'S OPPOSITION TO MGA'S EX PARTE APPLICATION ISO EXTENSION OF REB. REPORT DATE

1   facilities with no one else having access to the materials.[15]  Such storage was much

2   safer than needlessly shipping it to Georgia and then back if the destructive testing was

3   needed, and Bryant and MGA, as well as the Discovery Master, had been concerned

4   about shipping with respect to all the Bryant originals.[16]  During that period, all parties'

5   counsel knew that the notary book was there but no one objected or even asked for it.[17]

6       **MGA's Previous Destructive Testing On Bryant's Original Drawings.**  As the

7   Court is aware, the originals of at least 16 of Bryant's drawings have unexplained plug

8   holes in them.  Every one of these documents was, according to Bryant's testimony, a

9   Bratz-related sketch that he purportedly created in 1998.[18]  Mr. Bryant testified in

10  November 2004 that he did not know where the plugholes in his original documents

11

12      [15]  Id., Exh. 6 at ¶ 7.  In this declaration, Dr. Aginsky had stated that "I certainly
13  understand the critical nature of each of Mr. Bryant's original documents and will be
14  fully accountable for them while they are in my custody." Id., Exh. 6 at ¶ 7.

    [16]  Id., Exh. 5 (Hearing Transcript dated August 23, 2007), at 11:5-12:23; and
15  Exh. 3 at 10 (arguing for requiring "a responsible Quinn Emanuel employee [to]
16  personally transport them to any location necessary for testing [and] maintain
    physical custody of the originals at all times").

17      In contrast, Bryant, MGA and Prince have throughout this litigation had little to
18  no concern for the safekeeping or integrity of their own documents.  As described
    below, MGA and Bryant allowed for destructive samples to be taken from
19  documents supposedly leaving little record of what was done.  In July 2004, Prince
20  had handed over the notary book to Bryant's lawyers, who presented it as a Bryant
    original.  By the time of her deposition in December, 2004, Ms. Prince still had not
21  seen the notary book, although it was apparently returned to her counsel sometime
22  before May 2007.  Id., Exh. 16 (Excerpts of Prince Deposition Transcript, at 76-80
    and 140-142); Exh. 17 (Deposition Exh. 61); Exh. 18 (Bates-numbered Bryant
23  documents 00928 and 00929).

24      [17]  Id., ¶ 19.

    [18]  Id., Exh. 19 (Excerpts from Deposition Transcript of Carter Bryant
25  Deposition, dated November 5, 2004, at 328:1-6 (re Bryant 00179); at 328:18-20 (re
26  Bryant 00180); at 328:22-329:7 (re Bryant 00181-00183); at 329:17-19 (re Bryant
    00186);at 332:121-333:6 (re Bryant 00194-00195); at 334:14-21 (re Bryant 00201-
27  00202; 00204); at 335:12-21 (re Bryant 00207-00208; 00210); and at 336:2-6 (re
28  Bryant 00211)).

came from.[19]  After refusing to disclose where the holes came from, Erich Speckin, in his July 21, 2006 declaration to the Court, admitted that he performed tests on "various" original documents that included "extracting small microplugs" from an unspecified number of unidentified documents.[20]  Judge Larson stated in his August 2006 Order with respect to these materials:  "That there are serious questions concerning the handling of these critical documents certainly causes the Court much concern about whether the truth seeking functions of the adversarial system have been fundamentally compromised in this case."[21]

As MGA knows, Mr. Speckin has a sordid history as a expert.  For example, in E.E.O.C. v. Ethan Allen, Inc., 259 F. Supp. 2d 625 (N.D. Ohio 2003), the Court found that Mr. Speckin's testimony was inadmissible at trial because Mr. Speckin "could give no clear explanation of how or why [his] results occurred." Id. at 628.  Similarly, in In re Estate of Wang The Huei, 2002 WL 1341762, [2002] HKEC 1424 (Hong Kong Special Administrative Region Ct. of First Instance) (Nov. 21, 2002), the Court found that Mr. Speckin did not perform his tests correctly and offered no scientific basis for his results.[22]  The Court also found that Mr. Speckin had a "penchant for exaggeration" regarding his own background. Id. at ¶ 29.7.  In toto, the Wang court:  (1) found that Speckin was not credible, (2) rejected Speckin's evidence and expert opinion entirely,

---

[19]  Id., Exh. 20 (Court Order dated August 9, 2006) at 4-5.

[20]  Id., Exh. 21 (Declaration of Erich J Speckin, dated July 21, 2006), at ¶¶ 8 and 13; Exh. 20, at 6-7.

[21]  Id., Exh. 20 at 11.

[22]  Among other things, "Counsel for Mrs. Wang decided to secretly test Speckin's methods by instructing a third party to have Speckin test 12 documents of known origin- a sort of 'set-up' made by the defense in order to find out whether or not the method used by [Speckin] for ink-dating is valid, reliable and accurate.  Of the 12 documents he tested, Speckin was wrong on 4 of them, concluding incorrectly that:  (a) three writings that were actually less than 3 years old were more than 3 1/2 years old; and (b) one writing that was actually 10 years old was less than 3 1/2 years old." E.E.O.C., 259 F. Supp. 2d at 631 (internal citations and quotations omitted.)

and (3) was left with the "lingering suspicion" that Speckin "tailored his results to suit his client's requirements." Id. at ¶ 29.31(f).[23]

In an effort to discern which documents Mr. Speckin tested, how many holes he removed from them, and what other damage he may have caused, Mattel sought Rule 30(b)(6) testimony from MGA.  Topic No. 41 of Mattel's Notice requested that MGA provide a Rule 30(b)(6) witness with knowledge of  "the testing of or sampling from documents that refer or relate to Bratz."[24]  After MGA flatly refused to provide that testimony, Mattel moved to compel, and both the Discovery Master and this Court ordered MGA to provide it.

MGA then presented Lisa Tonnu on this topic twice, but her testimony was found to be inadequate, and the Discovery Master found MGA had waived its privilege as to the handling of the documents and ordered MGA to "produce a witness to testify fully on Topic No. 41."[25]

Again, MGA designated Ms. Tonnu.  In her first session of the continued deposition in January 2008, Ms. Tonnu could not identify a single document that had been tested.[26]  In her last session of deposition, taken January 24, 2008, Ms. Tonnu identified exactly six pages that Mr. Speckin had taken plugs from for ink aging and ink

---

[23]   The E.E.O.C. Court also noted that the Hong Kong Court found that "Speckin had a "penchant for exaggeration" regarding his own background. Id. at ¶ 29.7. For example, the American Board of Forensic Document Examiners accused Speckin of engaging in a "fraudulent misrepresentation" by stating he was eligible for their certification, and Speckin falsely testified that he was "a member of the Questioned Document Section of the Mid-Western Association of Forensic Scientists," when he was not. Id. at ¶¶ 29.52, 29.29.  E.E.O.C., 259 F. Supp. 2d at 632.

[24]   Id., Exh. 22 (Second Notice of Deposition of MGA Entertainment, Inc. Pursuant to Federal Rule of Civil Procedure 30(b)(6), dated February 1, 2007), at 11.

[25]   Id., Exh. 23 (Court Order, dated January 8, 2008), at 22.

[26]   Id., Exh. 24 (Tonnu Deposition, dated January 17, 2008), at 921:8-13 and 929:17-22 (███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████).

07209/2437838.1
MATTEL'S OPPOSITION TO MGA'S EX PARTE APPLICATION ISO EXTENSION OF REB. REPORT DATE

comparison testing, but could not identify any of the other 10 pages with inexplicable holes in them.[27]   Counsel for Mattel then showed Ms. Tonnu several drawings that Mr. Bryant testified were purportedly created in 1998 and notarized by Ms. Prince in August of 1999.[28]  Each of these documents had had microplugs taken from them.[29]  In each case, Ms. Tonnu testified that Mr. Speckin did not make those microplug holes.[30] With respect to another Prince-notarized microplugged Bratz drawing, original Bryant document 00211, Ms. Tonnu testified that the document was plugged at the time of Mr. Speckin's examination in 2004, but that he had not done the microplugging.[31]  As a result, Mattel still does not have the evidence that the Court compelled as to MGA's handling of the documents.

**MGA's Procurement Of The Notary Book.**  MGA's counsel called Mr. Warren sometime before February 18, 2008, asking Warren to send the notary book to them for forensic ink tests.[32]  When Mattel first found out about it, after having been copied on a letter to Mr. Warren,[33] Mattel immediately objected, explaining to Mr. Warren and Mr. Weinstein that such testing was inappropriate in that MGA had neither Court

---

[27]   Id., Exh. 25 (Tonnu Deposition, dated January 24, 2008), at 1267:22-1268:5; Exh. 26 (Deposition Exhibit 1723).  The six documents in Exhibit 1723 are photocopies of Bryant original documents 00179, 00180, 00181, 00182, 00183 and one that has not been identified by Bates number.  No explanation has ever been given for the microplugs taken from Bryant original documents 00186, 00192, 00194, 00195, 00201, 00202, 00204, 00207, 00208, 00210, 00211.  Id., ¶ 1.

[28]   Id., Exh. 25, at 1268:12-23 and Exhs. 27-30 (Deposition Exhibits 1747, 1748, 1750, 1751, respectively). Exh. 19 (Deposition Transcript of Carter Bryant, dated November 5, 2004), at 335:12-21.

[29]   Id., Exhs. 27-30.

[30]   Id., Exh. 25, at 1269:13-19; 1270:19-1271:8; 1272:4-1273:21; 1273:22-1275:1.

[31]   Id., Exh. 25, at 1277:20-1280:7, and Exh. 31 (Deposition Exhibit 1752).

[32]   Id., Exh. 32 (Letter from Ryan Weinstein to Daniel Warren, dated February 18, 2008).

[33]   Id., Exh. 32.

1  approval nor an agreement with Mattel.[34]   When   MGA attempted to proceed

2  nonetheless, Mattel objected again.[35]

3       Mattel expressed its willingness to agree that MGA's experts could perform

4  destructive testing on the notary book if the parties could arrive a stipulation containing

5  a protocol similar to that in the Discovery Master's August 30, 2007 order that the

6  Discovery Master could approve.[36]  Nine days after Mattel had objected that there was

7  no agreement among the parties, and after several vituperative accusations by MGA

8  that *Mattel* was trying to delay, MGA finally sent a draft stipulation to Mattel.[37]

9       The next day, rather than waiting until all the problems with MGA's proposal

10  could be fully addressed, Mattel's counsel sent an email noting that a threshold issue

11  was the identification of the expert to be used.[38]  MGA's counsel responded with the

12  name and curriculum vitae of one purported expert it planned to use, Dr. Lyter.[39]  The

13  letter did not disclose that MGA was still intending to use multiple other, unnamed

14  experts.[40]

---

18  [34]  Id., Exh. 33 (Letter from Diane Hutnyan to Daniel Warren, dated
19  February 18, 2008) ("Here, Mattel objects to your or your client's turning over the
   original notary book or any originals to MGA or Bryant (or their counsel or
20  experts), given their history of tampering and given that there is neither any
   approval from the Court nor any agreement by us").
21  [35]  Exh. 34 (Letter from Diane Hutnyan to Ryan Weinstein and Daniel Warren,
22  dated February 21, 2008).
23  [36]  Id., Exhs. 33 and 36 (Email to Daniel Warren from Diane Hutnyan dated
   February 22, 2008).
24  [37]  Id., Exh. 37 (Email from Ryan Weinstein to Diane Hutnyan, dated
   February 27, 2008, enclosing MGA's proposed stipulation).
25  [38]  Id., Exh. 38 (Email from Diane C. Hutnyan to Ryan Weinstein, dated
26  February 28, 2008).
27  [39]  Id., Exh. 39 (Letter from Ryan Weinstein to Diane Hutnyan, dated
   February 28, 2008).
28  [40]  Id., Exh. 39.

On March 3, Mattel responded with a detailed letter pointing out specific deficiencies in the stipulation.[41]  Among other things, MGA's proposal did not (1) name any of the "experts" who would perform the destructive sampling and testing; (2) limit the number of "experts" who would handle and subject the notary book to sampling and testing; (3) contemplate the submission of the experts' CVs, or any of the other specific information the Discovery Master had required of Mattel's experts, for Court approval in advance of receiving the notary book from Mr. Warren; (4) set forth any protocol regarding how, when, and where the notary book would be shipped and stored; (5) limit the time period of the handling, sampling and/or testing so that Mattel's expert could reasonably attend the sampling procedure; (6) allow any such attendance by Mattel's already Court-approved expert without his credentials being presented to MGA for approval; or (7) limit the number of holes that would be punched into the notary book's pages.[42]

MGA refused to cure any of these defects,[43] flatly rejected Mattel's request that it have an opportunity to rebut MGA's experts' findings through further examination or testing of the notary book, should that be necessary,[44] and ignored Mattel's request for agreement that the notary book be made available at trial.[45]  MGA also sent over a new

[41]  Id., Exh. 40 (Letter from Diane Hutnyan to Ryan Weinstein dated March 3, 2008).

[42]  Id., Exh. 37, cf. id., Exh. 40.

[43]  Id., Exh. 41 (Letter from Matthew Sloan to Diane Hutnyan dated March 3, 2008, enclosing Stipulation).

[44]  Id., Exh. 41 (Letter), at 4.  MGA's counsel told Mattel that if it wanted more information about what its consultant-expert did with the notary book, it could "ask him in his deposition."  See id., Exh. 41 (Letter) at 3.  But MGA has not presented any consultant for deposition, there is no guarantee that any of the "experts" MGA subjects the notary book to will be testifying experts or otherwise subject to deposition, and as further described above, even when this Court found that MGA had waived its privilege and ordered MGA to provide a Rule 30(b)(6) witness on the subject of MGA's consultant's earlier plugging of key documents in this case, MGA refused to educate its witness, depriving Mattel of this information.

[45]  Id., Exh. 41 (Letter), cf. id., Exh. 40, at 3.

1   version of the stipulation that was not only as defective as the first, in which it now

2   reserved a 35-day period for MGA to keep custody of the notary book.[46]  No reason

3   was provided for this change, which apparently was designed either to keep Mattel

4   from having access to the book for any rebuttal-related examination, or to subject the

5   notary book to sampling and/or testing by other unnamed "experts," or both.[47]  MGA

6   also stated that if Mattel would not agree to the new stipulation "as is" within 18 hours,

7   MGA would subpoena the notary book directly and initiate the sampling and testing

8   despite MGA's lack of Court authorization.[48]

9        Mattel responded that it thought that the parties still could arrive at a mutually

10  satisfactory stipulation, and, in any event, MGA must have prior Court approval before

11  performing destructive testing.[49]  Instead of continuing the negotiations, on March 5,

12  MGA subpoenaed Mr. Warren, who sent the notary book to the first of MGA's

13  "experts" the next day.[50]  Also on March 6, MGA announced for the first time that the

14  sampling would begin on March 10 or March 11 and that Mattel's expert could only

15  attend if he could attend on one of those two unilaterally dictated days.[51]  To date,

16  MGA refuses to acknowledge the need for Court approval prior to any destructive

17  sampling or testing.[52]  Only after Mattel gave notice that it was filing an *ex parte*

18  application for a protective order with Judge Infante did MGA tell Dr. Lyter not to take

19

20   [46]   Id., Exh. 41 (Stipulation), at ¶ 14.

     [47]   Hutnyan Decl. ¶ 46.

21   [48]   Id., Exh. 41 (Letter), at 4.

22   [49]   Id., Exh. 42 (Letter from Diane Hutnyan to Ryan Weinstein and Matthew Sloan dated March 5, 2008 ), at 2.

23   [50]   Id., Exhs. 43 (Subpoena, dated March 5, 2008, that was issued by MGA to

24   Jacqueline Prince c/o Daniel Warren) and 44 (Letter from Matthew Sloan to Diane Hutnyan dated March 6, 2008).

25   [51]   Id., Exh. 44 at 1-2.

26   [52]   Id., Exh. 45 (Email from Matt Sloan to Michael Zeller dated March 9, 2008),

27   at 2.  MGA has argued that its stipulation allows for objection and Court approval of the non-Lyter "experts" it might use, but the three-day period that MGA proposes

28   for Mattel to lodge its objections does not give it adequate time to meaningfully access any expert's credentials and prepare a response.

1   the plugs.[53]   Mattel then filed its *Ex Parte* Application for a Protective Order with the

2   Discovery Master on March 10, 2008.

**Argument**

4

5   I.     **THERE IS NO GOOD CAUSE TO EXCUSE MGA FROM MISSING**

6          **THE REBUTTAL REPORT DEADLINE**

7          A.     **MGA Had Every Opportunity To Negotiate, Or Litigate, A**

8                 **Sensible Protocol For The Rebuttal Testing But Failed To Do So**

9          MGA tells this Court that it "had no cause to test the ink on the notary book until

10  Mattel served the Aginsky report on February 11, 2008."[54]   That does not explain why

11  MGA failed to work out a reasonable testing protocol well in advance of such testing.

12  MGA knew last August that the Discovery Master required a specific showing as to

13  forensic experts; in fact, it had argued for such a showing from Mattel even for <u>non</u>-

14  destructive forensic examination.[55]   MGA knew last December that Dr. Aginsky would

15  be taking microplugs from the 8/26/99 ink entry in Ms. Prince's notary book for ink

16  identification testing.[56]   And by January 4, 2008, MGA's consultant, Jason Harner, had

17  observed the microplugs being taken from the exact two pages in question.[57]   Had

18  MGA really been interested in just replicating Dr. Aginsky's tests, it could have devised

19  a reasonable protocol for doing so in December, or even as late as January, when the

---

20      [53]   <u>Id.</u>, ¶ 50; *see also* Memorandum at 12, n. 61 (only in response to Mattel's

21  *ex parte* application would MGA stop the extraction).

22      [54]   Memorandum at 19, n. 84.

        [55]   <u>Id.</u>, Exh. 3, at 9-11.

23      [56]   "[W]e are alerting you to our request of Ms. Prince's counsel, Dan Warren,

24  for our expert to take small ink samples from entries in Ms. Prince's notary book,
    including but not limited to parts of the 8/26/99 ink entry on the originals of Bryant

25  00928 and 00929 so that ink identification testing may be conducted."  Hutnyan

26  Dec., Exh. 7 (Letter from D. Hutnyan to M. Page and T. Miller, dated December 13,
    2007).

27      [57]   Hutnyan Dec., ¶ 51 and Exh. 46 (Email from Ryan Weinstein to Diane

28  Hutnyan, dated January 3, 2008).

plugs were taken.  Even had Mattel been unreasonable, MGA could have moved *ex parte* then.  Either way, the rebuttal testing would easily have been done on time.

MGA has no explanation as to why such steps were not taken in the three months before February 18.  But what is even worse is its fabrication that "[a]fter receiving the Aginsky report, MGA moved expeditiously to find an expert" and that "only one week later, MGA had digested the report, [and] located an expert to review and test the accuracy of Aginsky's findings. . . . "[58]  In reality, more than <u>three years</u> ago, MGA had already hired Dr. Lyter as an ink expert.[59]  So there is no reason why MGA could not have put a reasonable protocol into place well before Dr. Aginsky's report was served.

Even were MGA telling the truth -- and it was totally surprised by Dr. Aginsky's report and had to scramble to find an expert to counter it -- it has no excuse for failing to negotiate a simple protocol in time to complete the sampling and testing by March 17, especially in light of its position that all it sought to do was "replicate" Mattel's tests.[60]  It did not do this, of course, because it wanted to go far beyond replication.

Even now, MGA refuses:

(1) to name any of the "experts" who would perform the destructive sampling and testing (besides Dr. Lyter);

---

[58]   *Ex Parte* Application, at 1 and Memorandum at 15.

[59]   Hutnyan Dec., Exh. 47 (Letter from Albert H. Lyter, III to Tania Krebs, dated January 20, 2005), at 1 ("we had [before Mattel's offer to retain Lyter as a consultant in November 2004] previously accepted a similar assignment with the firm of O'Melveny and Myers of Los Angeles. . . "). *See also* Exh. 48 (Letter from Tania Krebs to Albert H. Lyter, III dated November 22, 2004).  The Court will note that Dr. Lyter's declaration in support of MGA's *ex parte* application bears no mention of when he was retained.

[60]   See Memorandum at 15 (claiming MGA's desire to "replicate Mattel's testing of the same notary book" and "employ the same sampling methodology that Mattel's expert has used"); and at 17 ("to perform the exact same testing pursuant to the exact same protocol").

(2) to limit the number of "experts" who would handle and subject the notary book to sampling and testing;

(3) to submit the experts' CVs, and the other specific information the Discovery Master had required of Mattel's experts, for Court approval in advance of receiving the notary book from Mr. Warren;[61]

(4) to set forth any protocol regarding how, when, and where the notary book would be shipped and stored;

(5) to limit the time period of the handling, sampling and/or testing so that Mattel's expert could reasonably attend the sampling procedure;

(6) to allow any such attendance by Mattel's already Court-approved expert without his credentials being presented to MGA for approval;

(7) to limit the number of holes that would be punched into the notary book's pages in any way;

(8) to limit the number of holes even Dr. Lyter alone would take to less than 380;

(9) to limit the time period MGA controls the notary book to less than 35 days; and

(10) to allow Mattel the same opportunity to replicate testing that it claims it is entitled to.[62]

Mattel's objections are legitimate and real.  MGA knows its "first" expert, Dr. Lyter, is likely to draw the same conclusion as Dr. Aginsky -- that the phrase "From 1998 Missouri" was added to the notary book at a later date to support Bryant's claims

---

[61]   On 11 of its Memorandum, MGA contends that its stipulation provided "the Court *would have to approve* Dr. Lyter's credentials before any testing could proceed," but this is contradictory to MGA's statement on page 21 of its Opposition to Mattel's Ex Parte Application for a Protective Order currently pending before Judge Infante that the objection provision only applies to "any *other* experts that may be used."  *See* Hutnyan Dec., Exh. 49.

[62]   Id., Exh. 41 (Letter), *cf.* id., Exh. 40, at 3.

in this case.  So Paragraphs 3 and 7 of MGA's proposed stipulation[63] specifically contemplate multiple unnamed experts in case so that MGA can shop the notary book around to Mr. Speckin, or Mr. Harner, or others,[64] allowing 380 plugs (20 plugs times 19 sets) from the text on those two pages for each of these supposed "experts" until MGA receives the results it is looking for or until the book is effectively destroyed as a trial exhibit.  And this is a party that previously engaged in unilateral, unapproved destruction of evidence and then refused to provide Court-ordered testimony as to what was done.  While Mattel would be within its rights to resist any handling by MGA whatsoever, it has repeatedly invited MGA to come up with a reasonable testing protocol, but MGA let the deadline lapse without doing so.

### B.     There Is No Reason To Extend MGA's Time To Do A Rebuttal Report It Has No Right To Do

Currently pending before the Discovery Master is Mattel's *Ex Parte* Application for a Protective Order seeking an order barring MGA from handling, sampling or destructively testing the Prince notary book until and unless MGA seeks and obtains Mattel's agreement to or the Court's approval of a proper protocol with approved experts and appropriate limits on its activities, and including Mattel's participation. Until the resolution of that motion, MGA has said that it will not do any destructive sampling or testing.  Thus, there is no reason to extend the deadline for a rebuttal report on that destructive testing at least until the application is decided.  Unless and until

---

[63]  See id., Exh. 41, at 2-3.

[64]  When there is not sufficient time for objection and Court review, anyone could become an "expert."  When Mattel sought to paper test certain Bryant originals and to ink test the notary book, MGA elected to have its "consultant" observe and object if necessary.  Hutnyan Dec., Exh. 10 (Letter from Carl Roth to Diane Hutnyan, dated December 20, 2007, identifying Jason Harner).  Mattel could find no information on Mr. Harner, and asked MGA for his credentials, only to find that he is a trainee for Mr. Speckin.  Id., ¶ 2.  Mr. Harner graduated, without distinction, from the Michigan State University less than a year ago.  Id., Exh. 50 (Email from Ryan Weinstein to Diane Hutnyan dated December 28, 2007 at 12:30 PM) (enclosing Harner's C.V.).

07209/2437838.1

1  MGA has a protocol that receives Court approval or Mattel's agreement, the request to
2  submit a belated rebuttal report is premature and indeed may become moot.

3

4  ## II.   THERE IS NO BASIS TO PRECLUDE DR. AGINSKY'S TESTIMONY

5        The supposed premise of MGA's application for a preclusion order is that Mattel
6  has been obstructionist in refusing to allow MGA to proceed with further unauthorized
7  destructive sampling of key evidence.  But the evidence does not support that.

8        Instead, the evidence shows that Mattel's objections were well taken.  The
9  evidence also shows not only that it was MGA itself that prevented MGA from having
10  an appropriate destructive testing protocol in place by February 11, 2008 (in case it was
11  needed) but that even had Mattel been completely unreasonable, MGA had plenty of
12  time to set up such a protocol that could pass the Court's muster.

13        Dr. Aginsky's test results showed (1) that the ink for the notation "from 1998
14  Missouri" was a different ink than the rest of the August 26, 1999 entry it appears in,
15  and than the rest of the ink on those two pages; (2) that the notation "from 1998
16  Missouri" was written at a later time than the rest of the August 26, 1999 entry; and
17  (3) that the notation that the notation "from 1998 Missouri" was likely written after both
18  the rest of the August 26, 1999 entry and the entry dated September 14, 1999.[65]  These
19  three findings are each compelling evidence that Bryant's story of how he created
20  drawings in 1998 that he notarized in August 1999 is false.

21        If MGA thought it was likely to overcome this evidence through simple
22  replication of Mattel's tests, it would have done so long ago.  That it didn't is good
23  evidence that it could not.

24        None of MGA's cited cases even remotely supports its argument for preclusion of
25  Dr. Aginsky's report.  <u>Von Brimer v. Whirlpool Corp.</u>, 536 F.2d 838 (9th Cir. 1976),
26  did not even involve an expert report.  Plaintiff's evidence was stricken because it had

27

28  [65]  <u>Id.</u>, Exh. 51 (Expert Report of Dr. Valery Aginsky (without exhibits)).

1   willfully failed to produce previously compelled information until the eve of trial. <u>Von</u>
2   <u>Brimer</u>, 536 F.2d at 844. <u>Congressional Air, Ltd. v. Beech Aircraft Corp.</u>, 176 F.R.D.
3   513 (D. Md. 1997), involved a situation where an expert report was stricken due to the
4   proponent's having served it five months after its due date. 176 F.R.D. 513, at 516.
5   And in <u>Unigard Security Ins. Co. v. Lakewood Engineering & Manufacturing Corp.</u>,
6   982 F.2d 363 (9th Cir. 1992), the party had destroyed evidence without the opposing
7   party having an opportunity to inspect. "In this case, Unigard's destruction of evidence
8   was not in dispute; it precluded Lakewood from any opportunity to inspect the
9   evidence; and it rendered unreliable virtually all of the evidence that a finder of fact
10  could potentially consider." <u>Id</u>. at 369. There is simply no basis for precluding
11  Dr. Aginsky's expert report, now or in the future.

12                                          **<u>Conclusion</u>**

13           For all of the foregoing reasons, Mattel respectfully requests that
14  MGA's *ex parte* application be denied in its entirety.
15

16  DATED:  March 18, 2008          QUINN EMANUEL URQUHART OLIVER &
17                                  HEDGES, LLP
18

19                                  By /s/ Diane C. Hutnyan
20                                     Diane C. Hutnyan
                                       Attorneys for Plaintiff and Cross-Defendant
21                                     Mattel, Inc.

22

23

24

25

26

27

28