# EXHIBIT 1

**THIS EXHIBIT IS FILED UNDER SEAL
PURSUANT TO PROTECTIVE ORDER**

# EXHIBIT 2

**THIS EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

# EXHIBIT 3

RECEIVED

JUL 1 6 2007
CALENDARED

1  KEKER & VAN NEST, LLP
   JOHN W. KEKER - #49092
2  jkeker@kvn.com
   MICHAEL H. PAGE - #154913
3  mpage@kvn.com
   CHRISTA M. ANDERSON - #184325
4  canderson@kvn.com
   710 Sansome Street
5  San Francisco, CA  94111-1704
   Telephone:  (415) 391-5400
6  Facsimile:  (415) 397-7188

7  Attorneys for Plaintiff
   CARTER BRYANT
8

9

10              UNITED STATES DISTRICT COURT

11             CENTRAL DISTRICT OF CALIFORNIA

12                    EASTERN DIVISION

13

14  CARTER BRYANT, an individual,        Case No. CV 04-09049 SGL (RNBx)
                                         (consolidated with CV 04-9059 & 05-
15                        Plaintiff,     2727

16        v.                             DISCOVERY MOTION

17  MATTEL, INC. a Delaware
    Corporation,                         CARTER BRYANT'S OPPOSITION
18                                       TO MATTEL, INC.'S MOTION TO
                          Defendant.     COMPEL BRYANT TO MAKE
19                                       ORIGINAL DOCUMENTS
    CONSOLIDATED WITH MATTEL,            AVAILABLE FOR EXPERT
20  INC. v. BRYANT and MGA               EXAMINATION AND TESTING
    ENTERTAINMENT, INC. v.               AND FOR SANCTIONS
21  MATTEL, INC.
                                         [To be heard by Discovery Master Hon.
22                                       Edward Infante (Ret.) Pursuant to the
                                         Court's Order of December 6, 2006]
23
                                         Date:    TBA
24                                       Time:    TBA
                                         Place:   TBA
25
                                         Discovery Cut-Off: Oct. 22, 2007
26                                       Pre-Trial Conference: Jan. 14, 2008
                                         Trial Date:  Feb. 12, 2008
27                                       EXHIBIT _____ 3

28                                       PAGE _____ 103

OPPOSITION TO MATTEL, INC.'S MOTION TO COMPEL BRYANT TO MAKE ORIGINAL DOCUMENTS
AVAILABLE FOR EXPERT EXAMINATION AND TESTING AND FOR SANCTIONS
CASE NO. CV 04-09049 SGL (RNBx)           C7 10 C7

# TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................1

II.   BACKGROUND ..............................................................................................2

      A.   In February 2007, Mattel reviewed and inspected Bryant's
           original drawings over the course of two days to determine
           which drawings are potential candidates for expert analysis.................2

      B.   Over two months later, Mattel demanded additional
           inspections of Bryant's original drawings. ...........................................2

      C.   Mattel conducted three additional days of inspection in May
           and June, and declined an additional day of inspection that
           Bryant had made available. ....................................................................4

      D.   Mattel requests possession of nearly all of Bryant's
           drawings for expert inspection. .............................................................5

III.  ARGUMENT.....................................................................................................7

      A.   Mattel's proposed inspection procedures are patently
           unreasonable............................................................................................7

      B.   Bryant has proposed a reasonable and fair process for expert
           examination. ............................................................................................9

      C.   Sanctions are not warranted .................................................................11

IV.   CONCLUSION ...............................................................................................11

EXHIBIT _____ 3

PAGE _____ 104

i

# TABLE OF AUTHORITIES

Page

## FEDERAL CASES

*Pierce v. Underwood*
487 U.S. 552 (1988) .................................................................................. 11

*Reygo Pacific Corp. v. Johnston Pump Co.*
680 F.2d 647 (9th Cir. 1982) ..................................................................... 11

## FEDERAL STATUTES

Fed. R. Civ. P. 34(b) ................................................................................... 7

EXHIBIT ____3____

PAGE ___105___

ii

# I.   INTRODUCTION

Despite Mattel's strident rhetoric, there is no dispute between the parties regarding the central issue raised by Mattel's motion.  No one disputes that Mattel's experts may subject key documents to forensic testing on a reasonable schedule, subject to reasonable safeguards.  We have never disputed that, and we do not dispute it now.

What we **do** dispute is Mattel's unilateral announcement that it can simply appropriate massive quantities of Mr. Bryant's personal property for however long, and in whatever manner, it chooses.  Mattel's nonnegotiable demand is (1) that Mr. Bryant deliver more than **two thousand** separate original drawings (all of which have already been subject to three days of inspections, and many to four), (2) that Mattel then be allowed to redistribute them to unnamed experts in undisclosed locations for unspecified testing, and (3) that Mattel be allowed to keep all of those drawing for **two full months**, returning them to Bryant in time to allow Bryant's and MGA's own experts only **seven days** to conduct rebuttal testing and prepare rebuttal reports.[1]

We have accommodated Mattel's steadily escalating inspection demands, which began with a request for a single-day inspection of about thirty drawings, but then morphed quickly to three days of attorney and photographic inspection of thousands of drawings.  We then repeated the process with Mattel's demands for a separate expert examination of those same documents.  We have tried to negotiate a reasonable accommodation, only to be repeatedly rebuffed.  Once it became clear that Mattel's goal was motion practice rather than cooperation, we suggested a streamlined means of bringing the issue before the Discovery Master, only to be rebuffed yet again.  Enough is enough.  Bryant is fully prepared to make a reasonable universe of his original drawings available for expert testing under

---

[1] As noted in Mattel's papers, the parties are continuing to negotiate modifications to the trial schedule; that schedule may have changed by the time this motion is heard.

OPPOSITION TO MATTEL, INC.'S MOTION TO COMPEL BRYANT TO MAKE ORIGINAL DOCUMENTS
AVAILABLE FOR EXPERT EXAMINATION AND TESTING AND FOR SANCTIONS
CASE NO. CV 04-09049 SGL (RNBx)

EXHIBIT

PAGE

106

1 │ reasonable protocols for a reasonable time.  Unfortunately, it must once again fall

2 │ to the Discovery Master to impose that reason.

3 │ **II.   BACKGROUND**

4 │ **A.   In February 2007, Mattel reviewed and inspected Bryant's original**

5 │ **drawings over the course of two days to determine which drawings are potential candidates for expert analysis.**

6 │ In order to resolve this motion, it is regrettably necessary to review the

7 │ recent history of inspection demands by Mattel, and Bryant's response to those

8 │ demands.[2]  On February 27 and 28, 2007, Bryant made original documents

9 │ available for inspection and photographing pursuant to the Discovery Master's

10 │ February 14, 2007 order.  Mattel requested this inspection, arguing that it needed

11 │ to inspect and photograph Bryant's originals "to determine which of the originals

12 │ are potentially appropriate candidates for expert analysis."[3]  Mattel did not raise

13 │ any concerns regarding the February inspection, and Bryant considered its

14 │ obligations under the Discovery Master's order satisfied and the matter closed.

15 │ **B.   Over two months later, Mattel demanded additional inspections of**

16 │ **Bryant's original drawings.**

17 │ More than two months later, Mattel demanded a meet-and-confer concerning

18 │ Bryant's alleged failure to have produced for inspection three items in response to

19 │ this Court's prior orders.[4]  In fact, Bryant does not have two of them (a pad of

20 │ drawing paper apparently discarded nearly 10 years ago, and two notarized

21 │ drawings which were lost sometime between 1999 and the filing of this suit in

22 │ 2004), and did not own the other (the notary book owned by Jacqueline Ramona

23 │ Prince, that Mattel now seeks to inspect for a **third** time).

24 │

25 │ [2] Mattel would have the Court believe that this motion is the culmination of a multi-year refusal to respond to discovery.  It is nothing of the sort.  Most of Mattel's motion rehashes a long-

26 │ resolved dispute that has nothing to do with the instant motion, while eliding the fact that the order in that previous motion was complied with long ago.

27 │ [3] *See* Hutnyan Decl. In Support Of Mattel's Motion to Compel, Exh. 1 at 15.

28 │ [4] *See* Page Dec., Exh. 1.

2

EXHIBIT ___

PAGE ___ 107

1    Also in mid-May, Keker & Van Nest replaced Mr. Bryant's prior counsel,[5]
2   and was in the process of having all of the litigation files in this case, including
3   thousands of Mr. Bryant's original drawings, transferred from Los Angeles to San
4   Francisco. Nevertheless, we informed Mattel that we would be happy to make
5   available any of Bryant's original drawings as soon as we received them from
6   predecessor counsel.[6] We asked that Mattel wait until we had an opportunity to
7   inventory and index the materials upon receiving them.[7]

8    Mattel refused that request. In a letter dated May 22, 2007, Mattel's counsel
9   Diane Hutnyan insisted that the drawings and notary book be produced for
10   inspection immediately, writing that "any indexing Bryant cares to carry out for his
11   own purposes has nothing to do with Mattel and could be done after Bryant abides
12   by the Court's Orders to provide the documents for the inspection and
13   photographing."[8]

14    We acceded to Mattel's demands and agreed to make Mr. Bryant's originals
15   available for inspection immediately, scheduling that inspection for May 30, 2007.[9]
16   We also volunteered to arrange for Ms. Prince's counsel to ship her notary book
17   and notary stamp[10] to us from Atlanta, so that they would be available for
18   inspection without the need for a trip to Georgia.[11] Finally, we asked Mattel to let
19   us know if there were any other originals they wished to inspect at the same time.

20    Near midnight on the Friday of Memorial Day weekend, Mattel sent us an
21   email listing more than **two thousand** additional pages of original drawings and

22

23   [5] *See* Page Dec., Exh. 2.
24   [6] *See* Page Dec., Exh. 3.
25   [7] *Id.*
     [8] *See* Page Dec., Exh. 4.
26   [9] *See* Page Dec., Exh. 5. At the request of Mattel's counsel, the inspection was moved to May 31. *See* Page Dec., Exh. 6.
27   [10] Mattel requested the notary stamp for the first time on May 22, 2007. *See* Page Dec., Exh. 7.
28   [11] *See* Page Dec., Exh. 5.

EXHIBIT

PAGE

3

1   other documents it wished to inspect, multiplying the scope of the inspection by a

2   factor of one hundred with only two business days' notice. Mattel also requested

3   to "inspect/photograph anything on sketch paper, anything on tracing paper,

4   anything on notebook paper, [and] any books."[12] Not only was this request

5   onerous, but it basically encompassed all of Mr. Bryant's drawings. Nonetheless,

6   we set about gathering all the originals we had not yet had the opportunity to index

7   and made them available for Mattel's inspection.[13]

8        Next, on the day before the scheduled inspection, Mattel asked for a second

9   day of inspection. Despite the short notice, we again complied, rearranging

10  schedules to provide coverage for an additional half-day of inspection.

11  **C.   Mattel conducted three additional days of inspection in May and June,
12       and declined an additional day of inspection that Bryant had made
         available.**

13       On May 31 and June 1, Mattel's counsel, accompanied by a photographer

14  and videographer and under the supervision of a Keker & Van Nest attorney,

15  painstakingly reviewed, inventoried, catalogued, and photographed approximately

16  two thirds of Bryant's originals. At the end of those two days, Bryant's counsel

17  expressed their willingness to schedule an additional day of inspection.

18       Instead of accepting Bryant's offer, Mattel sent an incendiary letter claiming

19  that the inspection had been "sabotaged." By letter of June 6, Ms. Hutnyan—

20  having insisted that the first inspection occur before Keker & Van Nest had been

21  able to index any of the drawings—complained that the documents had not been

22  indexed, and complained that Bryant had not produced documents he simply does

23  not have.[14] We explained to Ms. Hutnyan that we had produced every original

24  drawing in our possession, and reiterated our offer to schedule yet another day of

---

[12] See Page Dec., Exh. 8.

[13] Bryant's counsel also made clear that they had only recently received this material from
Littler, and were "conducting the inspection -- at your request -- prior to having the opportunity
to properly index the originals." See Page Dec., Exh 9.

[14] See Page Dec., Exh 10.

OPPOSITION TO MATTEL, INC.'S MOTION TO COMPEL BRYANT TO MAKE ORIGINAL DOCUMENTS
AVAILABLE FOR EXPERT EXAMINATION AND TESTING AND FOR SANCTIONS
CASE NO. CV 04-09049 SGL (RNBx)

1   inspection.[15]  Bryant agreed to set aside two days, June 20 and 21, in order to allow

2   Mattel to complete its inspection.[16]

3        Mattel conducted only one additional day of photographing and inspection,

4   on June 20, apparently conceding that another day of inspection was not necessary.

5   **D.    Mattel requests possession of nearly all of Bryant's drawings for expert**
        **inspection.**

6

7        Just prior to its fifth day of inspection of the originals, Mattel asked to meet

8   and confer concerning its request that some unspecified set of drawings be

9   submitted to forensic testing by Mattel's experts.[17]  On June 22, Bryant's counsel

10  participated in a telephonic conference with Ms. Hutnyan, in which Ms. Hutnyan

11  proposed the following:

12      • that Bryant ship all of his original drawings (11 oversized boxes,

13         totaling about 2,500 drawings) to Quinn Emanuel within six days,

14      • that Mattel's counsel and experts would keep those originals for two

15         months,

16      • that the documents would be returned only a week before Bryant's

17         and MGA's rebuttal expert reports would be due.

18       We told Mattel that this was unacceptable, but that if they could identify

19  particular documents they wished to test, and could propose a reasonable protocol

20  for the handling and timing of testing, we would be happy to comply.[18]  In

21  response, Ms. Hutnyan could not identify any particular documents for testing

22  other than the 11 notarized drawings, and would not identify the experts to whom

23  she proposed giving the documents.[19]  We concluded the call by asking that Mattel

24  [15] *See* Page Dec., Exh. 11.

25  [16] *See* Page Dec., Exh 12.

26  [17] *See* Page Dec., Exh. 13.

    [18] *See* Page Dec., ¶ 16.

27  [19] Mattel previously argued that it needed to inspect and photograph Bryant's originals "to
    determine which of the originals are potentially appropriate candidates for expert analysis."

28  Hutnyan Dec. In Support Of Mattel's Motion to Compel, Exh. 1 at 15.  It is incomprehensible

                                    5

EXHIBIT

PAGE

110

1   send us a letter identifying the drawings they wished to test and the protocols they

2   proposed.

3          On June 26, Ms. Hutnyan wrote to us, refusing to make any particular

4   identification of drawings to be subjected to testing, but instead demanding that we

5   ship to her the entirety of eight large boxes of originals and significant portions of

6   another three boxes.[20]  Mattel also again demanded that its unidentified experts

7   have two months of unsupervised possession of the originals, leaving Bryant's and

8   MGA's experts seven days to conduct their own rebuttal testing and prepare

9   rebuttal reports.  Mattel made no effort to narrow its demands to any reasonable set

10  of documents, instead including in its demands hundreds of drawings that were

11  created years after the relevant events in this case.

12         The next day we responded, again stating that we were willing to subject a

13  reasonable universe of documents to reasonable testing, and asking Mattel to select

14  "scores rather than thousands" of documents.[21]  We also noted that, having just put

15  us through the expense and effort of three days of inspection and photographing –

16  in addition to the two days of inspection that took place in February – Mattel

17  should have been in a position to make a more specific identification than simply

18  "all of them."

19         On June 30, Mattel again wrote to us, and refused to modify its original

20  demands in any way, threatening motion practice if we did not simply turn over

21  virtually all of Mr. Bryant's original works to them for two months and allow them

22  to ship them off to whomever they elect without restriction.[22]

23

24  why after five days of inspection Mattel refuses to identify the originals they would like to
    present to their experts.

25  [20] *See* Page Dec., Exh. 14.  Those eight boxes contain virtually all of the drawings from Bryant's
    2004 and March 2, 2007 production, including non-responsive drawings that were collected.

26  [21] *See* Page Dec., Exh. 15.

27  [22] The June 30, 2007 letter also objects to a requirement we never proposed:  that Mattel not be
    allowed to take the originals to its experts' laboratories.  We proposed no such limitation:  rather,

28  we asked that the documents remain in the custody of Mattel's counsel.  If they choose to take
    the documents to a laboratory, we have no objection, provided that custody of the documents—

OPPOSITION TO MATTEL, INC.'S MOTION TO COMPEL BRYANT TO MAKE ORIGINAL DOCUMENTS
AVAILABLE FOR EXPERT EXAMINATION AND TESTING AND FOR SANCTIONS
CASE NO. CV 04-09049 SGL (RNBx)

PAGE ___  EXHIBIT ___

1    At this point, it was apparent that Mattel had no intention of reaching any

2   agreement, instead preferring to bring yet another discovery motion. Accordingly,

3   on July 5, we wrote to Mattel to propose a simple solution: that we provide Your

4   Honor with copies of our correspondence to date, ask you to sit down with counsel

5   for both sides at our offices in a room with the original drawings in front of us.

6   After each side presented their positions, we would submit whatever originals

7   Your Honor ordered to be tested, and subject those originals to testing under a

8   protocol determined by you.[23]

9    By letter of July 6, Mattel rejected that proposal out of hand. That same day,

10   the instant motion was filed.

11   ### III.   ARGUMENT

12    Mattel's brief is dedicated to making a point that no one disputes: that

13   inspection requests under the Federal Rules of Civil Procedure include requests for

14   scientific testing. Of course they do. Bryant has never argued otherwise. But

15   those Rules do not authorize one party in a lawsuit to demand that the other turn

16   over massive amounts of his personal property to months of unsupervised custody

17   by his opponent. Instead, Fed. R. Civ. P. 34(b) clearly states that any request must

18   specify a "reasonable time, place, and manner" for the inspection. Mattel's

19   demands in this regard are patently unreasonable, and no amount of repeating the

20   mantra that its demands are "reasonable by any measure" can make them so.

21   **A.   Mattel's proposed inspection procedures are patently unreasonable.**

22    Mattel's proposed procedure is unreasonable for a number of reasons. <u>First</u>,

23   the universe of drawings to be tested is wildly over-inclusive. Mattel has to date

24   identified only the eleven original notarized drawings as testing targets.[24] Mattel

25

26   and responsibility for their preservation—remains with counsel. *See* Page Dec., Exh. 16.

     [23] *See* Page Dec., Exh. 17.

27   [24] Mattel has also identified Ms. Prince's notary book for testing. Mr. Bryant doesn't own it, and

28   has no objection to it being tested as long as equal access is afforded to MGA's and Bryant's experts.

PAGE ___   EXHIBIT ___

1   hopes to dispute Mr. Bryant's testimony that those drawings were created in

2   August 1998, and to argue that they were instead created in the first half of 1999.

3   When pressed, Mattel says that its experts may also wish to examine other

4   drawings on identical paper, in hopes of finding impressions that would indicate

5   they were created at the same time. Mattel has had multiple days of inspection to

6   determine which originals they believe are on paper that matches the eleven

7   notarized drawings. Mattel also turned down an additional day of inspection that

8   Bryant made available.

9           Instead, Mattel has asked that it be handed more than two thousand separate

10  drawings, without any rhyme or reason to the demand. For the vast majority, there

11  can be no good reason for testing. For example, Mattel has requested boxes 1

12  through 8, which include: (1) hundreds of pages of torn magazine pages; (2)

13  fashion designs drawn by Bryant from as far back as 1985, when he was 17 years

14  old, and (3) a cartoon drawing by Bryant of his family given to his dad on Father's

15  Day 1982. Even Mattel's more detailed requests for specific folders in boxes 9,

16  10, 11 are overbroad. One folder labeled "Bratz Petz S04" contains over 60

17  drawings of animals that were designed for potential release in Spring 2004.

18          Furthermore, it is frustrating that after conducting five days of inspection

19  and photographing of Mr. Bryant's originals, Mattel is still not able to identify a

20  reasonable subset of documents that are proper subjects of expert inspection.

21  Presumably, Mattel photographed the originals they wish to inspect, and should be

22  able to provide Bryant with those photographs. Yet, to date, Mattel has refused to

23  do so, instead asking for an unreasonable number of Bryant's originals.

24          Second, Mattel's assertion that it is entitled to lock up virtually all of Mr.

25  Bryant's drawings for two months is just as unreasonable. Mattel has not

26  presented any explanation why all the drawings need to be retained for the full two

27  month period. More baffling is why Mattel believes it needs two months to inspect

28  the documents when under its plan, yet Bryant and MGA would only receive seven

OPPOSITION TO MATTEL, INC.'S MOTION TO COMPEL BRYANT TO MAKE ORIGINAL DOCUMENTS
AVAILABLE FOR EXPERT EXAMINATION AND TESTING AND FOR SANCTIONS
CASE NO. CV 04-09049 SGL (RNBx)

PAGE _____   EXHIBIT _____   (13   3

1    days of inspection prior to the expert discovery cut-off date.

2         Third, Mattel has not responded to Bryant's request that Mattel take

3    responsibility for the integrity of the original drawings when they are provided for

4    expert inspection. Mattel has stated its intention to send Bryant's originals to

5    "multiple experts at their laboratories which are in various locations throughout the

6    country."[25] Bryant cannot be expected to hand over his valuable property to a party

7    that refuses to take responsibility for its maintenance and safekeeping.[26]

8         Finally, Mattel's proposed protocol forces Bryant to waive his right to have

9    an expert present during any destructive testing if he initially objects to such

10   testing. While Mattel's protocol requires that Bryant receive notice before any

11   destructive testing is conducted and grants him five court days to object, the

12   protocol then states that "[i]n lieu of objection, Bryant could elect to have his own

13   expert attend for a any destructive testing being done...."[27] Bryant cannot be

14   expected to waive his right to have his own expert be present simply by voicing an

15   initial objection to such testing. Nor can Bryant be expected to waive his right to

16   object to certain testing simply by choosing to have his expert attend the testing.[28]

17   Such restrictions are unreasonable, and make Mattel's protocol unacceptable.

18   **B.   Bryant has proposed a reasonable and fair process for expert
          examination.**

19

20        For each of these reasons, Mattel's demands are patently unreasonable. We

21   propose that the Court instead issue the following order:

22        1.   That Mattel identify no more than 50 particular drawings for testing.

23   That identification may be made either by Bates number or by providing Bryant

24   [25] Mattel's Mot. to Compel, at 19.

25   [26] Contrary to Mattel's argument in its brief, Bryant has never blanketly refused to allow Mattel's
     experts to perform tests in their laboratories. Mattel can of course test documents in a laboratory,
26   but its counsel must maintain custody of—and responsibility for—those documents.

     [27] See Page Dec., Exh. 14 at 2.
27
     [28] In fact, Mattel's proposed protocol seems to concede this point, by stating that Bryant's expert
28   can "raise[] any issues tests in their laboratories. Mattel can of course test documents in a laboratory
     Infante to resolve the dispute so tha thte testing will not be delayed." Id.

1  with photographs of the requested documents.

2      2.     That those drawings be turned over to Quinn Emanuel or its agent at

3  the offices of Keker & Van Nest within 5 days of receipt of the aforementioned

4  identification.

5      3.     That the originals be maintained in the personal custody and control

6  of Quinn Emanuel, with the understanding that a responsible Quinn Emanuel

7  employee may personally transport them to any location necessary for testing but

8  must maintain physical custody of the originals at all times, and must keep the

9  originals in a secure, locked location when not in use.

10      4.     That the drawings be returned to Keker & Van Nest within 21 days.

11      5.     That any request for destructive testing[29] be governed by the following

12  protocol:

13          i)      Mattel will provide a written request to Bryant explaining what

14  document would be tested and what test or tests would be conducted prior to any

15  destructive testing;

16          ii)     Bryant will have 5 court days to object, in which case the

17  parties must meet and confer and, within 3 more court days, file a joint statement

18  with Judge Infante to seek resolution of the dispute;

19          iii)    Bryant will have the opportunity to have his own expert attend

20  any destructive testing being done, provided such election is made in writing to

21  Mattel within the 5-court-day objection period, and provided the testing can take

22  place within ten court days of the original request;

23          iv)     Bryant's expert may raise any issues about the testing being

24  done, and the parties agree to go immediately to Judge Infante to resolve the

25  dispute;

26

27  [29] "Destructive testing" is defined as any testing that would chemically or physically alter the document, and includes ink dating, paper fiber and chemical analysis, treating the document with
28  chemicals, or taking plugs from the document.

10

1        v)     In addition, MGA will be given notice of any destructive

2   testing, and will be given an opportunity to attend and observe any such testing.

3

4   **C.   Sanctions are not warranted**

5       Attorney's fees are not warranted in the context of discovery when there is a

6   "genuine dispute" of fact or law or "if reasonable people could differ as to [the

7   appropriateness of the contested action]."[30]  There is a valid and legitimate dispute

8   between the parties as to Mattel's proposed protocol for expert inspection of

9   Bryant's original documents.  Bryant has raised concerns as to the fairness of

10  Mattel's protocol and Mattel's unwillingness to accept responsibility for the care

11  and maintenance of those documents while they are inspected by their own experts.

12  Sanctions, therefore, are not warranted.

13  **IV.   CONCLUSION**

14       For the above-mentioned reasons, Bryant respectfully requests that the

15  Discovery Master deny Mattel's motion and instead adopt the terms and procedure

16  proposed by Bryant above.

17

18  Dated:  July 13, 2007                 Respectfully submitted,
                                              KEKER & VAN NEST, LLP

19

20

21                                  By:

22                                       MICHAEL PAGE
                                       Attorneys for Plaintiff
                                       CARTER BRYANT

23

24

25

26  [30] *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Reygo Pacific Corp. v. Johnston Pump Co.*, 680 F.2d 647, 649 (9th Cir. 1982) (alteration in original).

27

28

11

1                   PROOF OF SERVICE

2          I am employed in the City and County of San Francisco, State of California in the office

3 of a member of the bar of this court at whose direction the following service was made. I am over the age of eighteen years and not a party to the within action. My business address is

4 Keker & Van Nest, LLP, 710 Sansome Street, San Francisco, California 94111.

5 On July 13, 2007, I served the following document(s):

6 **CARTER BRYANT'S OPPOSITION TO MATTEL, INC.'S MOTION TO COMPEL**

7 **BRYANT TO MAKE ORIGINAL DOCUMENTS AVAILABLE FOR EXPERT EXAMINATION AND TESTING AND FOR SANCTIONS**

8 by **FEDERAL EXPRESS**, by placing a true and correct copy in a sealed envelope addressed as

9 shown below. I am readily familiar with the practice of Keker & Van Nest, LLP for correspondence for delivery by FedEx Corporation. According to that practice, items are

10 retrieved daily by a FedEx Corporation employee for overnight delivery;

11 *AND*

12 by **E-MAIL VIA PDF FILE**, by transmitting on this date via e-mail a true and correct copy

13 scanned into an electronic file in Adobe "pdf" format. The transmission was reported as complete and without error.

14

15 Hon. Edward A. Infante                 John B. Quinn

JAMS                             Michael T. Zeller

16 Two Embarcadero Center, Suite 1500     Quinn Emanuel Urquhart Oliver & Hedges,

San Francisco, CA 94111                 LLP

17 Tel:    415/774-2649                865 South Figueroa Street, 10th Floor

Fax:    415/982-5287                Los Angeles, CA 90017-2543

18 Email: schan@jamsadr.com           Tel:    213/443-3000

Fax:    213/443-3100

19                                   Email: johnquinn@quinnemanuel.com

20                                   Email: michaelzeller@quinnemanuel.com

21 Diana M. Torres                      Patricia L. Glaser

22 O'Melveny & Myers, LLP           Christensen Glaser Fink Jacobs Weil & Shapiro

400 S. Hope Street                 10250 Constellation Blvd., 19th Floor

23 Los Angeles, CA 90071           Los Angeles, CA 90067

Tel:    213/430-6000                Tel:    310/553-3000

24 Fax:    213/430-6407                Fax:    310/556-2920

Email: dtorres@omm.com          Email: pglaser@chrisglase.com

25

26

27 EXHIBIT _____ 2

28 PAGE _____ 117

1       Executed on July 13, 2007, at San Francisco, California.

2       I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

3

4

5                                  JULIE A. SELBY

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26                               EXHIBIT _____ 3

27                               PAGE _____ 118

28

# EXHIBIT 4



1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
     John B. Quinn (Bar No. 090378)
2    johnquinn@quinnemanuel.com
     Michael T. Zeller (Bar No. 196417)
3    (michaelzeller@quinnemanuel.com)
     Jon D. Corey (Bar No. 185066)
4    (joncorey@quinnemanuel.com)
     Timothy L. Alger (Bar No. 160303)
5    (timalger@quinnemanuel.com)
   865 South Figueroa Street, 10th Floor
6  Los Angeles, California 90017-2543
   Telephone:  (213) 443-3000
7  Facsimile:   (213) 443-3100

8  Attorneys for Mattel, Inc.

9                UNITED STATES DISTRICT COURT

10             CENTRAL DISTRICT OF CALIFORNIA

11                     EASTERN DIVISION

12

13  CARTER BRYANT, an individual,          Case No. CV 04-09049 SGL (RNBx)

14              Plaintiff,                  Consolidated with
                                           Case No. CV 04-09059
15        vs.                               Case No. CV 05-02727

16  MATTEL, INC., a Delaware corporation,  **DISCOVERY MATTER**

17              Defendant.                  Hon. Edward A. Infante (Ret.)
                                           Discovery Master
18
                                           [PROPOSED] ORDER GRANTING
19  AND CONSOLIDATED CASES                 MATTEL, INC.'S MOTION TO
                                           COMPEL BRYANT TO MAKE
20                                          ORIGINAL DOCUMENTS
                                           AVAILABLE FOR EXPERT
21                                          EXAMINATION AND TESTING

22                                          Date:  August 23, 2007
                                           Time:  9:00 a.m.
23                                          Place:  Telephonic

24                                          Discovery Cut-Off:  October 22, 2007
                                           Pre-Trial Conference: January 14, 2008
25                                          Trial Date: February 12, 2008

26

27

28

07209/2201994.1

                        8-30

                                           [PROPOSED] ORDER

EXHIBIT 4

PAGE 119

1    Having considered Mattel, Inc.'s Motion To Compel Bryant To Make
2  Original Documents Available For Expert Examination and Testing (the "Motion"),
3  and all other papers and argument submitted in support of or opposition to the
4  Motion, and finding good cause therefore,
5       IT IS HEREBY ORDERED that:
6       1.    Mattel's Motion is GRANTED IN PART, as follows:
7       2.    The following materials were provided to the Discovery Master, at
8  his request, for *in camera* review:   the C.V. of the four experts who will be
9  conducting examination, inspection and testing of the documents, and statements
10  from each of them as to the location and nature of their laboratory facilities, as to
11  their individual practices with regard to the preservation of evidence, and as to their
12  understanding that they are fully accountable for Bryant's original documents while
13  those documents are in their custody.   The Discovery Master has found Mattel's
14  showing with respect to the experts satisfactory.
15       3.    Accordingly, Bryant shall produce to Mattel, within ten (10) Court
16  days of entry of this Order, on the day that Mattel specifies, the original documents
17  listed below for Mattel's experts' examination, testing and/or analysis:
18   • the originals of boxes 1 through 8 inclusive;
19
20   • from box 9:  folders "Sugar Planet Spring 2003 Tropical" and "Sugar
         Planet General 2001-2002?";
21
22   • from box 10: folders "Baby Bratz," "F 04 Retro Funk General," "Sugar
         Planet Butterfly Purse & Character S 04," "Lipstixx 2003," Sugar Planet
23       Candyland Purse:  Character S 04" and "Sugar Planet Tropical 2001"
24
25   • from box 11:  folders entitled "Bratz Dollpack Fall 2003," "S04 Girls
         Night Out," "Bratz New Accessories Etc. 2002," "Bratz Petz S04,"
26       "Winter Wonderland F03 Dolls," "Bratz Spring 2002 7.99 molded
         pieces," "S04 Sweetheart," "Jade Dollpack Spring 2003," "Jade Fall
27       2002," "Sasha Fall 2002," "Yasmin Fall 2002," "Cloe Fall 2002," "New
28

07209/2201994.1

-1-

PROPOSED ORDER

EXHIBIT ___4___

PAGE ___120___

1    Girl 2002 Fall," "Bratz $7.99 2002 Spring Break," and "Bratz Spring
2    2002 14.99 segment."

3    ~~If Mattel's experts determine that their analysis would potentially benefit~~
4    ~~from access to other original documents not listed above, Bryant will make those~~
5    ~~originals available to Mattel's counsel or Mattel's expert(s) at Mattel's counsel's~~
6    ~~direction upon five (5) Court days' notice.~~

7          4.    On the day specified, Mattel will pick up the documents listed
8    above from Keker & Van Nest's San Francisco office during normal business hours.
9    The next day after the documents are removed from Keker & Van Nest shall be the
10   first of 35 days that Mattel will have for the expert examination and testing of the
11   materials requested for preparation of its initial expert reports, which time period may
12   be extended upon a showing by Mattel of good cause by further Order of the
13   Discovery Master.   The documents shall be returned to Keker & Van Nest's San
14   Francisco office on the 35th day during normal business hours.

15         5.    The experts' examination, testing and analysis may take place at
16   the experts' laboratories.  Any shipping of the originals will be done by overnight
17   mail, for earliest delivery possible to the destination area, using Federal Express or
18   UPS or a similar service that Bryant selects.

19         6.    If any of Mattel's experts recommends that a form of destructive
20   testing (that is, any testing that would alter the documents' inherent physical status) be
21   conducted, the following procedure shall be used. First, Mattel will send a request in
22   writing to Bryant and MGA explaining what would be tested and what test or tests
23   would be conducted.  Then Bryant and MGA will have five (5) Court days to object,
24   in which case the parties must meet and confer and, within three (3) more Court days,
25   file a joint statement with Judge Infante to seek resolution of the dispute.  Bryant and
26   MGA may also elect to have their own experts attend for any destructive testing
27   being done, so long as they make this election in writing to Mattel within the five-
28   Court-day objection period, and so long as the testing can take place within ten (10)

PROPOSED ORDER

EXHIBIT ___4___

PAGE ___121___

1 | Court days of the original request. If Bryant's or MGA's expert, while he or she is
2 | observing the examination or destructive testing, raises any issues about sampling or
3 | testing being done or any other aspects of the expert's or experts' process, the parties
4 | will seek immediate resolution from this Court so that the sampling, testing or other
5 | activity will not be delayed. If Bryant's counsel or MGA's counsel does not object or
6 | seek attendance by its expert within five days of the request, the proposed destructive
7 | testing shall be deemed as unobjectionable and may be carried out without further
8 | delay.

9 |      7.     With the exception of alterations resulting from any destructive
10 | testing, which would be conducted in accordance with the protocol above, all the
11 | Bryant documents that are provided for inspection, examination and testing shall be
12 | returned in the same condition, sequence and order in which they were received.

13 | **IT IS SO ORDERED.**

15 | DATED: _Aug 30_ , 2007

18 | Hon. Edward Infante (Ret.)
19 | Discovery Master

-3-

PROPOSED ORDER

EXHIBIT _____ 4 _____

PAGE _____ 122 _____

1   Prepared and respectfully submitted by:
2   QUINN EMANUEL URQUHART
    OLIVER & HEDGES, LLP
3
4
5   _Dane C. Holman /SBK_
    Diane C. Hutnyan
6   Attorneys for Mattel, Inc.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

07209/2201994.1

-4-

PROPOSED ORDER

EXHIBIT _____4_____

PAGE _____123_____

## PROOF OF SERVICE BY E-MAIL

I, Sandra Chan, not a party to the within action, hereby declare that on August 30, 2007, I served the attached ORDER GRANTING MATTEL, INC'S MOTION TO COMPEL BRYANT TO MAKE ORIGINAL DOCUMENTS AVAILABLE FOR EXPERT EXAMINATION AND TESTING in the within action by e-mail addressed as follows:

| | | |
|---|---|---|
| John W. Keker, Esq. | Keker & Van Nest | jkeker@kvn.com |
| Michael H. Page, Esq. | Keker & Van Nest | mhp@kvn.com |
| Christa Anderson, Esq. | Keker & Van Nest | cma@kvn.com |
| John E. Trinidad, Esq. | Keker & Van Nest | jtrinidad@kvn.com |
| John Quinn Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | johnquinn@quinnemanuel.com |
| Michael Zeller Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | michaelzeller@quinnemanuel.com |
| Jon Corey Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | joncorey@quinnemanuel.com |
| Duane Lyons Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | duanelyons@quinnemanuel.com |
| Timothy Alger Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | timalger@quinnemanuel.com |
| Dominic Surprenant Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | DominicSurprenant@QuinnEmanuel.com |
| B. Dylan Proctor Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | dylanproctor@quinnemanuel.com |
| Shane McKenzie Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | shanemckenzie@quinnemanuel.com |
| Bridget Hauler Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | bridgethauler@quinnemanuel.com |
| Tamar Buchakjian Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | tamarbuchakjian@quinnemanuel.com |
| Juan Pablo Alban, Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | juanpabloalban@quinnemanuel.com |
| Dale Cendali Esq. | O'Melveny & Myers LLP | dcendali@omm.com |
| Diana Torres Esq. | O'Melveny & Myers LLP | dtorres@omm.com |
| James Jenal Esq. | O'Melveny & Myers LLP | jjenal@omm.com |
| Alicia Meyer Esq. | O'Melveny & Myers LLP | ameyer@omm.com |
| Jennifer Glad Esq. | O'Melveny & Myers LLP | jglad@omm.com |
| David Hurwitz, Esq. | O'Melveny & Myers LLP | dhurwitz@omm.com |
| Johanna Schmitt Esq. | O'Melveny & Myers LLP | jschmitt@omm.com |
| Michael C. Keats, Esq. | O'Melveny & Myers LLP | mkeats@omm.com |
| Kendall Burr, Esq. | O'Melveny & Myers LLP | kburr@omm.com |
| Melanie Bradley, Esq. | O'Melveny & Myers LLP | mbradley@omm.com |
| Marvin Putnam, Jr., Esq. | O'Melveny & Myers LLP | mputnam@omm.com |
| William Charron, Esq. | O'Melveny & Myers LLP | wcharron@omm.com |
| Marc Feinstein, Esq. | O'Melveny & Myers LLP | mfeinstein@omm.com |
| Patricia Glaser Esq. | Christensen, Glaser, Fink, Jacobs, Weil & Shapiro, LLP | pglaser@chrisglase.com |

I declare under penalty of perjury under the laws of the Untied States of America that the above is true and correct.

Executed on August 30, 2007, at San Francisco, California.

_____
Sandra Chan

EXHIBIT _____ 4 _____

PAGE _____ 124 _____

# EXHIBIT 5

**CERTIFIED COPY**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, AN INDIVIDUAL, ) | |
| ) | |
| PLAINTIFF, ) | |
| ) | NO. CV 04-9040 SGL (RNBX) |
| V. ) | |
| ) | |
| MATTEL, INC., A DELAWARE ) | |
| CORPORATION, ) | |
| ) | |
| DEFENDANTS. ) | |
| ———————————————) | |
| ) | |
| AND CONSOLIDATED ACTION (S). ) | |
| ———————————————) | |

# TELEPHONIC TRANSCRIPT OF PROCEEDINGS

# AUGUST 23, 2007



COURT REPORTERS
700 S. Flower Street
Suite 1100
Los Angeles, California 90017
Office: (213) 955-0070
Fax: (213) 955-0077

REPORTED BY:
ANGELA DUPRE
CSR NO. 7804
JOB NO. 07AD067

EXHIBIT _5_

PAGE _125_

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

CARTER BRYANT, AN INDIVIDUAL,)
                                   )

       PLAINTIFF,        )

                                   )

   VS.                      ) CASE NO.

                                 )

MATTEL, INC., A DELAWARE   ) CV 04-9049 SGL (RNBX)

CORPORATION,            ) [CONSOLIDATED WITH

                               ) CASE NO. 04-9059 AND

          DEFENDANT.  ) CASE NO. 05-2727]

                               )

                               )

                               )

AND CONSOLIDATED ACTION(S).  )

TELEPHONIC TRANSCRIPT OF

PROCEEDINGS, TAKEN BEFORE HON.

EDWARD A. INFANTE, AT 865 SOUTH

FIGUEROA STREET, TENTH FLOOR, LOS

ANGELES, CALIFORNIA, COMMENCING

AT 9:00 A.M., THURSDAY, AUGUST 23,

2007, BEFORE ANGELA DUPRE, CSR 7804.

EXHIBIT 5

PAGE 126

2

```
 1   APPEARANCES OF COUNSEL:
 2
 3   FOR CARTER BRYANT:
 4       KEKER & VAN NEST, LLP
         BY:  MICHAEL PAGE, ESQ.
 5       710 SANSOME STREET
         SAN FRANCISCO, CALIFORNIA 94111
 6       (415) 391-5400
         (TELEPHONICALLY)
 7
 8
     FOR MATTEL, INC.:
 9
         QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
10       BY:  DIANE HUNTYAN, ESQ.
         865 SOUTH FIGUEROA STREET
11       TENTH FLOOR
         LOS ANGELES, CALIFORNIA 90017-2543
12       (213) 443-3000
13
14
15   ALSO PRESENT:
16       HON. EDWARD A. INFANTE
         (TELEPHONICALLY)
17
18
19
20
21
22
23
24                                   EXHIBIT ____5____
25
                                     PAGE ___127___
```

```
1              LOS ANGELES, CALIFORNIA; THURSDAY

2                      AUGUST 23, 2007

3                        9:00 A.M.

4

5

6        JUDGE INFANTE:   I'D LIKE TO GO ON THE RECORD

7    NOW.   THIS IS JUDGE INFANTE.

8              THIS IS A HEARING ON A MATTEL'S MOTION TO

9    COMPEL BRYANT TO MAKE ORIGINAL DOCUMENTS AVAILABLE

10   FOR EXPERT EXAMINATION AND TESTING, AND A MOTION

11   FOR SANCTIONS.

12             I'D LIKE TO ACKNOWLEDGE THAT I'VE READ

13   THE MOTION, ALONG WITH ALL EXHIBITS, DECLARATIONS.

14   I'VE ALSO READ THE OPPOSITION PAPERS, AND THE REPLY

15   PAPERS.   I'M PREPARED TO HEAR YOUR ARGUMENTS.

16             I WOULD ALLOW MATTEL, AS THE MOVING PARTY

17   TO GO FIRST, BUT I WOULD LIKE TO INDICATE TO YOU

18   THAT I DON'T NEED TO HEAR ARGUMENT THAT YOU'RE

19   ENTITLED TO HAVE THE EXHIBITS EXAMINED BY YOUR

20   EXPERT, THAT'S UNDISPUTED, IN MY VIEW.

21             THE ONLY QUESTION IS:   WHAT WOULD BE

22   EXAMINED BY THE EXPERT, UNDER WHAT PROCEDURES AND

23   WHAT SAFEGUARDS, AND WHAT WOULD BE THE PROTOCOL FOR

24   DESTRUCTIVE TESTING, IF THAT SHOULD BECOME

25   NECESSARY.
```

EXHIBIT _____ 5

PAGE _____ 128

4

1           SO I REALLY DON'T NEED ARGUMENT ON YOUR

2   ENTITLEMENT, BUT SIMPLY HOW TO GET THIS

3   ACCOMPLISHED.

4           YOU MAY PROCEED.

5       MS. HUNTYAN:  THANK YOU, YOUR HONOR.  THE

6   DOCUMENTS THAT WE WOULD NEED TO EXAMINE AND INSPECT

7   ARE THE ONES THAT WE HAVE REQUESTED IN THE EIGHT

8   BOXES, PLUS SOME INDIVIDUAL FOLDERS THAT RESIDE IN

9   OTHER BOXES.  AND THE REASON WE'VE ASKED FOR THAT

10  MANY DOCUMENTS IS BECAUSE OF THE WAY THAT THE

11  DOCUMENTS HAVE BEEN KEPT.  THEY'RE NOT BATES

12  NUMBERED, THEY DON'T EXIST IN AN ORDER THAT

13  CORRESPONDS WITH THE BATES NUMBERED VERSION, AND

14  THE ORDER THAT THEY'RE IN IS POTENTIALLY PROBATIVE

15  IN AND OF ITSELF.

16          SO THE ONLY WAY -- AND ALSO TO AVOID

17  TELEGRAPHING OUR WORK PRODUCT TO BRYANT'S COUNSEL

18  IN THE PROCESS, THE ONLY WAY TO GO AHEAD AND

19  INSPECT THESE DOCUMENTS IN THEIR CURRENT STATE IS

20  TO HAVE THE BOXES SENT OVER TO THE INDIVIDUAL LABS

21  IN A SERIAL FASHION, SUCH THAT ONE EXPERT CAN BUILD

22  ON THE ANALYSIS OF THE PREVIOUS EXPERT,

23  POTENTIALLY, OF THINGS THAT HE OR SHE SHOULD LOOK

24  AT, AND HAVE ALL OF THOSE SENT AT ONCE, SO THAT IF

25  THINGS BECOME SIGNIFICANT IN THE PROCESS, THEY CAN

EXHIBIT ___5___

1   BE LOOKED AT AT THE SAME TIME, AND THE WHOLE

2   PROCESS CAN BE TAKEN CARE OF IN AN EXPEDITIOUS

3   FASHION THAT DOES NOT RESULT IN THE CHAOS THAT

4   WOULD ENSUE IF BRYANT WERE PULLING INDIVIDUAL

5   DOCUMENTS OUT OF THEIR PLACES, LOSING THE EVIDENCE

6   THAT -- THAT EXISTS, JUST BECAUSE OF WHERE THE

7   DOCUMENTS ARE, AND TRYING TO UNNECESSARILY LIMIT

8   THE DOCUMENTS THAT WE ARE ALLOWED TO EXAMINE BY

9   HAVING A 50 -- A 50 EXHIBIT REVIEW.

10              ANY RELEVANT EVIDENCE WE ARE ENTITLED TO

11  REVIEW AND EXAMINE, AND THAT MEANS THAT EIGHT BOXES

12  AND THE ADDITIONAL FOLDERS THAT WE'VE REQUESTED.

13  OF COURSE, MATTEL'S COUNSEL IS SUBJECT TO AN

14  ETHICAL DUTY TO MAINTAIN THESE DOCUMENTS.  THE

15  EXPERTS THAT WE ARE WORKING WITH ARE WORLD CLASS

16  EXPERTS, VERY GOOD AT WHAT THEY DO, AND USED TO

17  DEALING WITH DOCUMENTS LIKE THIS, THAT ARE VERY

18  IMPORTANT.

19              OBVIOUSLY, THEY WOULD BE MAINTAINED IN A

20  FASHION THAT IS PROBABLY BETTER THAN THE WAY THAT

21  THEY'VE BEEN MAINTAINED WITH BRYANT WHO, IN

22  NOVEMBER 2004, DIDN'T KNOW WHERE THE DOCUMENTS

23  WERE, DIDN'T KNOW WHO HAD POKED HOLES IN THEM,

24  ET CETERA.

25              SO WHAT WE'VE DONE IS TRIED TO BE VERY

EXHIBIT _____ 5

1    FORTHCOMING ABOUT SPECIFICALLY WHAT WE WANT,

2    WITHOUT DIVULGING OUR WORK PRODUCT, AND COMING UP

3    WITH A REASONABLE PROTOCOL TO GET THAT DONE IN ONE

4    FAIL SWOOP, WITHOUT HAVING TO GO BACK TO BRYANT AND

5    SAY THIS EXPERT HAS DETERMINED THAT THIS PARTICULAR

6    DOCUMENT IS NOW OF INTEREST, CAN YOU DIG THROUGH

7    AND FIND THE 50TH DOCUMENT ON THE LEFT, YOU KNOW,

8    THEY'RE ALL UNNUMBERED, AND THEN HAVE BRYANT SEND

9    THAT OVER AND DELAY THE WHOLE PROCESS.  IT JUST

10   DOESN'T MAKE ANY SENSE ANY OTHER WAY.

11       JUDGE INFANTE:  LET ME ASK YOU A COUPLE

12   QUESTIONS.

13           I'M NOT -- MY INTENTION IS NOT TO INVADE

14   YOUR WORK PRODUCT, BUT TO THE EXTENT YOU WANT TO

15   VOLUNTARILY DISCLOSE ANY INFORMATION WHICH MAY BE

16   WORK PRODUCT, YOU MAY DO SO, IF YOU FEEL IT WOULD

17   BENEFIT YOUR ARGUMENTS.

18           YOU HAVE NOT IDENTIFIED WHO THE EXPERTS

19   ARE.  AT THIS POINT, THEY WOULD BE CONSULTANTS.

20           DO YOU WISH TO IDENTIFY WHO THE EXPERTS

21   ARE THAT WOULD BE DOING THE TESTING?

22       MS. HUNTYAN:  NO, WE DON'T, YOUR HONOR.  WE

23   BELIEVE THAT THAT IS WORK PRODUCT.  AND UNDER

24   AUTHORITY THAT BRYANT HIMSELF HAS CITED, WHICH IS

25   PIZZA TIME, WHICH YOU PROBABLY READ, THIS IS PART

EXHIBIT _____ 5

1   OF COUNSEL'S MENTAL IMPRESSIONS AND THEORIES AND

2   STRATEGY OF THE CASE, AND I'M -- IN BRYANT'S OWN

3   WORDS, UNTIL -- ON PAGE 2 OF EXHIBIT 19, THEY ARGUE

4   THAT UNLESS AND UNTIL AN EXPERT IS DESIGNATED, ANY

5   EXPERT WORK PERFORMED IS PROTECTED WORK PRODUCT,

6   AND THERE'S NO OBLIGATION TO TELL MATTEL WHAT, IF

7   ANY, TESTING THAT THE EXPERT HAD PERFORMED; AND

8   THAT HAS INCLUDED, AS YOU KNOW, FROM OTHER MOTIONS,

9   EVEN THE IDENTITY OF EXPERTS THAT MGA HAS OR THAT

10  BRYANT HAS.

11      JUDGE INFANTE:  THERE'S NO DISPUTE OVER WHAT

12  YOU JUST SAID.  IT'S A QUESTION OF INVITING YOU, IF

13  WISH, TO DISCLOSE A CONSULTANT OR CONSULTANTS, YOU

14  MAY DO SO FOR THE RECORD, AND THAT WOULD BE ANOTHER

15  FACTOR THAT I WOULD CONSIDER IN DETERMINING THIS

16  MOTION.

17      THE SECOND QUESTION IS:  ARE YOU PREPARED

18  TO DISCLOSE HOW MANY EXPERTS OR CONSULTANTS WOULD

19  BE CONDUCTING THIS TESTING?  BECAUSE THE EXTENT OF

20  WHO AND AT WHAT LOCATIONS THE TESTING WOULD TAKE

21  PLACE WOULD ADD RISK TO THE PROCESS.

22      DO YOU WANT TO TELL ME LOCATIONS, GENERAL

23  LOCATIONS, AND HOW MANY?

24      MS. HUNTYAN:  OKAY.  I'M CONCERNED ABOUT WAIVER

25  ISSUES HERE, SPECIFICALLY BECAUSE THE ISSUE HAS

EXHIBIT    5

1    COME UP, AND BRYANT HAS TAKEN THE POSITION THAT HE

2    HAS -- AND ALSO BECAUSE I DO BELIEVE THAT A GREAT

3    DEAL OF THIS IS WORK PRODUCT, SO I WANT TO BE

4    CAREFUL HERE.

5         BUT I CAN TELL YOU THAT WE ARE

6    CONTEMPLATING EXAMINATION AND TESTING BY THREE TO

7    FOUR EXPERTS, DEPENDING ON WHAT EACH EXPERT FINDS.

8         THERE ARE THINGS IN THESE DOCUMENTS THAT

9    WE MAY NOT BE ABLE TO SEE WITH A NAKED EYE, AND

10   ONLY AFTER THE FIRST OR THE SECOND EXPERT LOOKS AT

11   THE DOCUMENTS WITH A MICROSCOPE, OR WHAT HAVE YOU,

12   WILL WE KNOW WHETHER OTHER EXPERTS ACTUALLY COME

13   INTO PLAY.

14        AS FAR AS THE LOCATIONS, THEY'RE -- EACH

15   ONE HAS THEIR OWN SEPARATE LABORATORY.  THE

16   EXPERTS -- I CAN TELL YOU THERE'S A QUESTIONED

17   DOCUMENTS EXAMINER IS ONE OF THEM, WHO LOOKS AT A

18   NUMBER OF DIFFERENT ISSUES RELATING TO QUESTIONED

19   DOCUMENTS, BUT DOESN'T NECESSARILY PERFORM ALL OF

20   THE DIFFERENT TYPES OF TESTING HIMSELF.

21        THERE IS A PAPER PERSON, WHO SPECIALIZES

22   IN LOOKING AT DIFFERENT TYPES OF PAPER AND THE

23   EVIDENCE THAT MIGHT BE YIELDED IN PAPER.

24        JUDGE INFANTE:  RIGHT.

25        MS. HUNTYAN:  THERE IS AN INK ANALYSIS EXPERT,

EXHIBIT ___5

1    WHO CAN CONSIDER THE QUESTIONS OF DATING OF INK OR

2    MATCHING OF INKS AND THE LIKE, AND THEN THERE IS

3    A -- HE'S AN EXPERT IN BASICALLY MACHINE PRODUCED

4    DOCUMENTS, SO DOCUMENTS THAT COME OUT OF PRINTERS,

5    OUT OF COLOR COPIERS, OUT OF COPIERS, TYPEWRITTEN

6    DOCUMENTS, RUBBER STAMP DOCUMENTS, ANYTHING WHERE A

7    MECHANISM HAS BEEN USED TO CREATE THAT DOCUMENT, IN

8    WHOLE OR IN PART.

9              SO THERE ARE DIFFERENT EXPERTS.  IT'S NOT

10   THAT WE'RE SHOPPING THEM AROUND, SEEING WHAT KIND

11   OF OPINION WE CAN GET FROM EACH ONE ON THE SAME

12   TOPIC, AND THAT'S WHY WE'RE BEING CAGY.  IT'S JUST

13   SIMPLY THAT WE WANT DIFFERENT EXPERTS WHO ARE

14   EXPERTS IN SPECIFIC SUBSPECIALTIES TO BE ABLE TO

15   LOOK AT THESE AND TELL US WHAT EACH OF THEM SEE IN

16   THEIR OWN NARROW SPECIALTY IN THESE DOCUMENTS, AND

17   SO, I DON'T -- I DON'T KNOW IF THAT HELPS.

18        JUDGE INFANTE:  THAT DOES HELP.  THAT'S

19   UNDERSTANDABLE, AND NOT SURPRISING.

20             MY NEXT QUESTION WOULD BE:  YOU INDICATED

21   THAT THESE EXPERTS HAVE PROFESSIONAL WORKPLACES AND

22   LABORATORIES TO DO THE WORK; IS THAT CORRECT?

23        MS. HUNTYAN:  YES.

24        JUDGE INFANTE:  OKAY.  ARE THEY LOCATED IN THE

25   SAME CITY OR REGION?

EXHIBIT _____ 5

PAGE _____ 134

10

1    MS. HUNTYAN:  NO.  WHICH MEANS THAT A CERTAIN

2    AMOUNT OF TIME NEEDS TO BE FACTORED IN, IN ORDER

3    JUST TO TRANSPORT THE MATERIALS FROM ONE TO THE

4    OTHER.

5    JUDGE INFANTE:  YES.  AND WHAT -- WHETHER --

6    WHETHER SOMEONE SHOULD BE RESPONSIBLE FOR

7    TRANSFERRING MATERIALS, WHETHER THERE SHOULD BE AN

8    INDIVIDUAL SPECIFICALLY RESPONSIBLE FOR

9    TRANSFERRING MATERIALS.  SO IT DEPENDS ON THE

10   LOGISTICS AS TO WHETHER THAT'S NECESSARY.

11   MS. HUNTYAN:  RIGHT.  I THINK -- I MEAN, WHAT

12   WE HAD PROPOSED TO BRYANT'S COUNSEL WAS THAT THEY

13   COULD SELECT THE PARTICULAR SERVICE THAT WAS USED

14   TO TRANSPORT THE DOCUMENTS; FOR EXAMPLE, IF THEY

15   WANTED FEDERAL EXPRESS TO BE USED, WE WOULD AGREE

16   THEY COULD BE SENT IN THE SHORTEST POSSIBLE

17   FASHION, WHATEVER WORKS FOR THAT PARTICULAR REGION,

18   SO THAT THEY WERE BASICALLY IN LIMBO FOR THE

19   SHORTEST AMOUNT OF TIME.  AND IF THEY WOULD AGREE

20   TO THAT, THAT WOULD BE FINE.

21   ALTERNATIVELY, I THINK WE WOULD BE FINE

22   IF SOMEBODY WANTED US TO, YOU KNOW, BASICALLY

23   TRANSPORT THEM, WE COULD HAVE SOMEBODY DO THAT.  I

24   THINK THAT'S PROBABLY NOT NECESSARY.  AND, FRANKLY,

25   PUTTING THE BOXES IN THE CARGO HOLD OF AN AIRCRAFT,

EXHIBIT          5

PAGE      135

11

1   YOU KNOW, WITH A QUINN EMANUEL EMPLOYEE ON BOARD, I

2   DON'T THINK REALLY MITIGATES THE RISK THAT MIGHT BE

3   ASSOCIATED WITH FED-EX.  I DON'T SEE THERE'S REALLY

4   A DIFFERENCE THERE.

5        WHAT WE REALLY OBJECT TO IS THE IDEA THAT

6   WE NEED TO BABY-SIT THESE DOCUMENTS FROM THE MOMENT

7   WE GET THEM, I MEAN, PHYSICALLY HAVE THEM IN

8   MATTEL'S COUNSEL'S CUSTODY, ALMOST LIKE THE GUY WHO

9   SPENT TIME WITH THE PRESIDENT AND HOLDS THAT

10  BRIEFCASE THAT IS CHAINED TO HIS ARM.  THAT DOES

11  NOT SEEM TO BE WARRANTED HERE.

12       AS I MENTIONED, BRYANT HAS NOT BEEN

13  PARTICULARLY CAREFUL WITH HIS OWN DOCUMENTS, AND I

14  THINK, YOU KNOW, WE OBVIOUSLY WOULD BE VERY CAREFUL

15  WITH THEM AND MAKE SURE THAT WE COMMUNICATED

16  EFFECTIVELY SUCH THAT, YOU KNOW, THE FEDERAL

17  EXPRESS GETS TO WHERE IT'S SUPPOSED TO GO, AND IT'S

18  RECEIVED ON THE RIGHT END, AND THEN PRESERVED

19  WITHIN THE EXPERT'S LAB THE WAY THAT IT SHOULD BE.

20       JUDGE INFANTE:  WELL, I THINK IT'S IMPORTANT TO

21  KNOW WHO YOUR EXPERTS ARE TO DETERMINE THAT THEY'RE

22  REPUTABLE AND HAVE SYSTEMS IN PLACE AND UNDERSTAND

23  THEIR IMPORTANT DUTY.

24       THE ONLY WAY THAT COULD BE DEMONSTRATED

25  AND STILL PROTECT YOUR WORK PRODUCT WOULD BE FOR

EXHIBIT _____ 5

PAGE _____ 136

12

1    YOU TO SUBMIT TO ME IN CAMERA A LIST OF WHO THE

2    EXPERTS ARE, WITH ANY RESUME OR STATEMENT OF THEIR

3    QUALIFICATIONS AND PRACTICES AND THEIR LOCATIONS.

4            THAT COULD BE SUBMITTED TO ME IN CAMERA,

5    SO THAT I WOULD FEEL MORE COMFORTABLE IN FOLLOWING

6    YOUR RECOMMENDATIONS HERE REGARDING PROTOCOL.

7        MS. HUNTYAN:  OKAY.  THAT SOUNDS FINE.  WE'LL

8    BE ABLE TO FURNISH THAT.

9        JUDGE INFANTE:  I THINK THAT'S PROBABLY THE

10   BEST WAY TO HANDLE IT.

11           I ASSUME YOU'RE USING REPUTABLE EXPERTS

12   AND ARE USED TO HANDLING MATTERS OF THIS NATURE,

13   AND ARE ACCOUNTABLE.

14       MS. HUNTYAN:  YES, YOUR HONOR.

15       JUDGE INFANTE:  OKAY.  THOSE ARE MY ONLY

16   QUESTIONS.

17           I THINK WE'LL TURN IT OVER TO MR. PAGE.

18       MR. PAGE:  THANK YOU, YOUR HONOR.

19           MY PROBLEM WITH THIS IS, THIS SEEMS TO BE

20   AN ONGOING PATTERN IN THIS CASE, WHERE MR. BRYANT,

21   WHO'S AN INDIVIDUAL DEFENDANT, IS GETTING GROUND

22   DOWN WITH DEMAND AFTER DEMAND AFTER DEMAND, YOU

23   KNOW, MULTIPLE MEET AND CONFER LETTERS EVERY WEEK.

24           AND IT'S EITHER, YOU KNOW, ACCEDE TO

25   RIDICULOUS DEMANDS OR HAVE TO GO THROUGH MOTION

EXHIBIT _____ 5

13

```
 1   PRACTICE OVER AND OVER AGAIN.
 2          AS WE SET FORTH IN OUR BRIEF, WHEN WE
 3   WERE FIRST CONTACTED, RIGHT AFTER SUBSTITUTING IN
 4   FOR THIS CASE, MS. HUNTYAN ASKED US TO MAKE
 5   AVAILABLE A COUPLE OF DOZEN DOCUMENTS FOR
 6   INSPECTION.  WE SAID THAT THEY WERE IN TRANSIT, WE
 7   WOULD LIKE A CHANCE TO INDEX WHAT WE GOT FIRST.
 8   THE RESPONSE WAS, QUOTE, ANY INDEXING BRYANT CARES
 9   TO CARRY OUT FOR ITS OWN PURPOSES HAS NOTHING TO DO
10   WITH MATTEL AND CAN BE DONE AFTER BRYANT ABIDES BY
11   THE COURT'S ORDER, ET CETERA.
12      JUDGE INFANTE:  I'VE READ ALL OF THE
13   CORRESPONDENCE BETWEEN COUNSEL GOING BACK FOR
14   SEVERAL MONTHS, SO YOU DON'T NEED TO RECOUNT IT.  I
15   AM FULLY AWARE OF IT.
16      MR. PAGE:  OKAY.  THANK YOU, YOUR HONOR.
17          SO, YOU KNOW, AS WE SAY IN OUR PAPERS, WE
18   DON'T DISPUTE THAT THEY'RE ENTITLED TO DO
19   REASONABLE TESTING OF A RANGE OF DOCUMENTS.
20          WE HAVE GONE THROUGH NOW FIVE DAYS OF
21   INSPECTIONS.  SINCE WE TOOK OVER AS COUNSEL, WE'VE
22   HAD THREE DAYS OF LABORIOUS ON-SITE INSPECTION OF
23   EVERY ONE OF THESE DOCUMENTS THAT WERE INDEXED,
24   PHOTOGRAPHED, VIDEOED, PURPORTEDLY FOR THE REASON
25   OF BEING ABLE TO IDENTIFY WHICH DOCUMENTS NEEDED TO
```

EXHIBIT _____ 5

PAGE _____ 138

14

1    BE TESTED.  AND THEN WE'RE TOLD THAT, ACTUALLY, WE

2    JUST WANT ALL 2,000 OF THE 2,500 DRAWINGS, AND WE

3    WANT THEM FOR TWO MONTHS, AND WE WON'T TELL YOU

4    WHERE THEY'RE GOING.

5            I DON'T UNDERSTAND WHY WE WERE PUT TO THE

6    EXPENSE OF THREE DAYS OF INSPECTION, IF AT THE END

7    OF IT THEY CAN'T IDENTIFY WHICH DOCUMENTS THEY WANT

8    TO TEST.  BUT YOU KNOW, WHAT WE PROPOSED WHEN WE

9    HIT THIS CONTRETEMPS WAS A SIMPLE SOLUTION WHERE WE

10   WOULD SIMPLY SIT DOWN WITH YOUR HONOR, WITH THE

11   DOCUMENTS AND/OR CORRESPONDENCE, AND JUST DO

12   WHATEVER YOU SAID.  AND THE RESPONSE WAS, NO, WE'RE

13   DOING MOTION PRACTICE.

14           WE'RE PREPARED TO PRODUCE WHATEVER

15   DOCUMENTS YOUR HONOR THINKS ARE LEGITIMATELY NEEDED

16   FOR EXPERT TESTING, UNDER WHATEVER PROTOCOL YOUR

17   HONOR THINKS IS APPROPRIATE.

18       JUDGE INFANTE:  OKAY.  WELL, I -- MY

19   IMPRESSIONS ARE THAT A SMALLER UNIVERSE OF

20   DOCUMENTS WOULD PROBABLY BE ADEQUATE FOR TESTING,

21   BUT I BELIEVE YOUR OPPONENT HAS A RIGHT UNDER RULE

22   34 TO EXAMINE ANY DOCUMENTS THAT HAVE BEEN PRODUCED

23   IN DISCOVERY UNDER RULE 34, AND ALTHOUGH I THINK

24   THE SCOPE OF THE REQUEST IS EXCESSIVE AND THAT

25   EXPERTS PROBABLY WON'T EXAMINE EACH AND EVERY

EXHIBIT _____ 5

1   DOCUMENT, FOR THE REASONS STATED BY COUNSEL, I WILL

2   GRANT THE MOTION TO PERMIT TESTING OF THE ORIGINAL

3   DOCUMENTS IN BOXES 1 THROUGH 8, THE BOXES ITEMIZED

4   IN BOX 9, WHICH IS STATED IN THE PROPOSED ORDER,

5   THE FOLDERS FROM BOX 10 THAT IS ITEMIZED IN THE

6   PROPOSED ORDER, AND THE FOLDERS ITEMIZED IN BOX 11,

7   WHICH IS SPECIFIED IN THE PROPOSED ORDER.

8            THE QUESTION OF PROTOCOL, I AGREE THAT

9   THE TESTING AND ANALYSIS MAY TAKE PLACE AT THE

10   EXPERT'S LABORATORIES.  THE SHIPPING OF THE

11   ORIGINALS MUST BE DONE BY OVERNIGHT MAIL, USING A

12   REPUTABLE TRANSPORTER OF BRYANT'S SELECTION,

13   WHETHER IT BE UPS OR FEDERAL EXPRESS.

14            THE SPECIAL MASTER NEEDS TO BE ADVISED OF

15   THE IDENTITY AND LOCATION AND QUALIFICATIONS OF

16   EACH EXPERT WHO WILL HAVE POSSESSION OR CUSTODY OF

17   THE DOCUMENTS, AND I WOULD LIKE YOU TO DO THAT

18   PRIOR TO TAKING POSSESSION OF THE DOCUMENTS, SAY,

19   WITHIN THE NEXT THREE DAYS.

20            IN THAT SHOWING, I WANT YOU TO SATISFY ME

21   THAT THE PROPOSED EXPERTS OR CONSULTANTS ARE FULLY

22   ACCOUNTABLE AND UNDERSTAND THEIR RESPONSIBILITY

23   WITH THESE IMPORTANT DOCUMENTS.  SO, AGAIN, I'D

24   LIKE THAT SUBMISSION WITHIN THREE DAYS IN CAMERA.

25            WITH THAT UNDERSTANDING, YOUR PROPOSED

EXHIBIT _____ 5

1   ORDER IS SATISFACTORY, AND I'M REFERRING TO YOUR

2   PROPOSED ORDER, PARAGRAPHS 2, PARAGRAPHS 3,

3   PARAGRAPH 4, WHICH I'D LIKE TO SPEAK TO NOW.

4           YOU HAVE SET FORTH A PROCESS IF

5   DESTRUCTIVE TESTING NEEDS TO BE CONDUCTED ON ONE OR

6   MORE DOCUMENTS.  I BELIEVE THAT PROCESS IS

7   ADEQUATE, AND IT GIVES NOTICE TO CARTER BRYANT'S

8   COUNSEL.

9           LOOKING AT CARTER BRYANT'S OPPOSITION AND

10  LOOKING AT YOUR PROPOSED ORDER, WITH RESPECT TO THE

11  PROTOCOL ON DESTRUCTIVE TESTING, I SEE REALLY NO

12  ESSENTIAL DIFFERENCES.

13          THE ONLY LANGUAGE I WOULD STRIKE IN YOUR

14  PROPOSED ORDER ARE THE WORDS, "IN LIEU OF

15  OBJECTION," WHICH IS ON PAGE 2, LINE 9, WHERE YOU

16  PROVIDE THAT, QUOTE:  "IN LIEU OF OBJECTION, BRYANT

17  MAY ELECT TO HAVE HIS OWN EXPERT ATTEND FOR ANY

18  DESTRUCTIVE TESTING BEING DONE," ET CETERA.

19          I WANT TO MAKE IT PERFECTLY CLEAR THAT

20  BRYANT HAS THAT RIGHT, AND DOES NOT WAIVE ANY

21  OBJECTION, IF HE ELECTS THAT RIGHT.  SO THAT'S THE

22  ONLY CLARIFICATION.

23          OTHERWISE, I BELIEVE THAT YOU BOTH ARE IN

24  AGREEMENT ON THE APPROPRIATE PROTOCOL FOR

25  DESTRUCTIVE TESTING AND, THEREFORE, I WOULD APPROVE

EXHIBIT _____ 5

PAGE _____ 141                    17

1    YOUR PROPOSED ORDER PARAGRAPH 4 WITH THAT ONE

2    MODIFICATION.

3         I DO NOT AGREE WITH YOUR PROPOSAL AS TO

4    THE LENGTH OF TIME THAT YOU WOULD HAVE TO EXAMINE

5    AND TEST THE MATERIALS.  YOU'VE ASKED FOR TWO

6    MONTHS.  I DO UNDERSTAND THAT THE DISCOVERY PERIOD

7    HAS BEEN SOMEWHAT EXTENDED, BUT, NEVERTHELESS, I

8    BELIEVE TWO MONTHS IS EXCESSIVE.

9         HAVING READ YOUR PAPERS AND LISTENED TO

10   YOUR ARGUMENTS AND UNDERSTANDING THAT THESE

11   DOCUMENTS MAY BE DESTINED FOR EXAMINATION AT MORE

12   THAN ONE LOCATION AND BY MORE THAN ONE EXPERT, AT

13   THIS TIME, I BELIEVE YOU SHOULD HAVE CUSTODY OF THE

14   DOCUMENTS FOR A TOTAL OF 35 DAYS.  THAT IS FROM THE

15   TIME OF PICKUP TO THE TIME OF RETURN, 35 DAYS.

16        WHERE ARE THE DOCUMENTS CURRENTLY

17   LOCATED?  ARE THEY LOCATED AT YOUR LAW FIRM,

18   MR. PAGE?

19      MR. PAGE:  YES, THEY ARE ALL AT OUR OFFICE.

20      JUDGE INFANTE:  SO THAT WILL BE THE PLACE OF

21   PICKUP AND THE PLACE OF RETURN.

22        I'D ALSO LIKE TO PUT IN THE ORDER THAT

23   THE DOCUMENTS SHALL BE RETURNED IN THE SAME

24   CONDITION, SEQUENCE AND ORDER THAT THEY ARE

25   RECEIVED IN, OR WORDS TO THAT EFFECT.  I THINK THAT

EXHIBIT _____ 5

1   SHOULD BE INSTITUTED IN THE ORDER.

2         WITH THAT -- WITH THOSE CHANGES, I HEREBY

3   GRANT MATTEL'S MOTION, AND I ADOPT YOUR PROPOSED

4   ORDER, AND I WOULD ASK YOU TO MODIFY YOUR PROPOSED

5   ORDER CONSISTENT WITH MY COMMENTS.

6         WITH RESPECT TO YOUR MOTION FOR

7   SANCTIONS, THE MOTION IS DENIED.

8         ARE THERE ANY QUESTIONS?

9     MS. HUNTYAN:  YES, I HAVE A COUPLE, YOUR HONOR.

10         ONE, WITH RESPECT TO THE TIME PERIOD, I

11   AM WONDERING IF WHEN WE DO OUR SUBMISSION TO YOU ON

12   THE ISSUE OF THE QUALIFICATIONS, ET CETERA, OF THE

13   EXPERTS, IF THAT 35-DAY WINDOW IS GOING TO PRESENT

14   A SCHEDULING PROBLEM VIS-A-VIS THE EXPERTS SUCH

15   THAT WE WOULD NOT MAKE THAT 35 DAYS, IF WE COULD

16   PRESENT THAT INFORMATION TO YOU, SUCH THAT PERHAPS

17   AN ADJUSTMENT COULD BE MADE.

18         I'M REALLY CONCERNED JUST WITH THE

19   SHUTTLING BACK AND FORTH, THE ORDER THAT EVERYTHING

20   HAS TO BE DONE IN, AND THE FACT THAT THESE PEOPLE

21   ARE VERY BUSY EXPERTS AND HAVE OTHER CASES ON THEIR

22   PLATE, THAT I JUST WON'T BE ABLE TO MAKE IT IN

23   35 DAYS.

24         I'M HAPPY TO DO IT, IF I CAN POSSIBLY DO

25   IT, BUT I DON'T ACTUALLY HAVE THE INFORMATION ON --

EXHIBIT _____ 5

PAGE _____ 143

19

1    I DIDN'T KNOW, YOU KNOW, HOW FAST WE WOULD BE ABLE

2    TO GET THE DOCUMENTS, SO I DON'T KNOW THEIR

3    SCHEDULES, AND I WOULD JUST NEED TO --

4        JUDGE INFANTE:  I THINK 35 DAYS IS REASONABLE,

5    AND YOU WOULD HAVE TO MAKE A SHOWING OF GOOD CAUSE

6    TO EXTEND THAT TIME, AND YOU'RE NOT IN A POSITION

7    TO MAKE THAT SHOWING, AND I DON'T THINK THAT A

8    SHOWING SHOULD BE MADE UNTIL THE EXPERTS HAVE BEGUN

9    THEIR -- THEIR WORK.

10            SO, NO; I'M NOT GOING TO ALLOW YOU TO

11    MAKE THAT SHOWING NOW, AND I'M NOT SURE YOU CAN

12    MAKE THAT SHOWING.  BUT YOU WOULD HAVE THE

13    OPPORTUNITY TO MAKE THAT SHOWING AT SOME POINT IN

14    THE PROCESS, IF THE TASKS CANNOT BE COMPLETED

15    WITHIN THE TIME ALLOTTED.

16            NOW, AS FAR AS THE PICKUP DATE GOES, I

17    THINK THE -- I DID NOT SPECIFY WHEN THE DOCUMENTS

18    SHOULD BE PICKED UP.  I WOULD GIVE YOU SOME LEEWAY

19    THERE, AND I DIDN'T ORDER THAT YOU PICK THEM UP

20    TOMORROW.

21            I WOULD GIVE YOU -- THE DOCUMENTS SHALL

22    BE PICKED UP AT ANY TIME WITHIN THE NEXT TEN DAYS,

23    SO THAT GIVES YOU A LITTLE BIT OF PLANNING WITH

24    RESPECT TO YOUR EXPERTS, AND THEN THE CLOCK WILL

25    START TO RUN FROM THE DAY OF PICKUP, AND THE NEXT

EXHIBIT ____5____

PAGE ____144____

20

1    DAY WILL COUNT AS DAY ONE, AND THEY MUST BE

2    RETURNED ON THE 35TH DAY.  SO THEY MUST BE PICKED

3    UP WITHIN THE NEXT TEN DAYS DURING NORMAL BUSINESS

4    HOURS.

5         MS. HUNTYAN:  THANK YOU, YOUR HONOR.

6         JUDGE INFANTE:  OKAY.

7         MR. PAGE:  YOUR HONOR, MICHAEL PAGE, ONE

8    PROCEDURAL QUESTION.

9              SINCE THEY'RE DOING AN IN CAMERA

10   SUBMISSION, WILL THE COURT LET US KNOW ONCE YOU'VE

11   BEEN SATISFIED WITH THAT SUBMISSION, ASSUMING YOU

12   ARE.  OTHERWISE, WE WON'T KNOW THAT WE'RE -- THE

13   CLOCK IS STARTING.

14        JUDGE INFANTE:  YEAH.  I THINK THE SUBMISSION

15   SHOULD BE MADE WITHIN THE NEXT THREE DAYS.  AND

16   PICKUP CANNOT OCCUR BEFORE THE SUBMISSION OCCURS.

17             SO YOU'RE QUITE CORRECT, THAT I WOULD

18   LIKE TO REVIEW THAT.  AND ONCE I HAVE THE

19   SUBMISSION, I WILL ISSUE THE ORDER.

20             SO I THINK THAT'S THE BEST WAY TO DO IT.

21   I'D LIKE YOU TO PREPARE THE ORDER, SEND IT TO ME,

22   ALONG WITH THE MODIFICATIONS I'VE MADE TODAY, SEND

23   ME THE IN CAMERA MATERIAL, AND I THINK YOU SHOULD

24   RECITE IN THE ORDER THAT THE FOLLOWING MATERIAL HAS

25   BEEN SUBMITTED TO THE SPECIAL MASTER IN CAMERA AT

EXHIBIT _____ 5

```
1    HIS REQUEST FOR REVIEW, AND THE SPECIAL MASTER HAS
2    FOUND THE SHOWING WITH RESPECT TO THE EXPERTS
3    SATISFACTORY.
4              SO JUST PUT THAT RECITAL IN THE ORDER,
5    AND IF I'M NOT SATISFIED, I WON'T ISSUE THE ORDER.
6    I WILL INSTEAD CONTACT YOU.  IF I AM SATISFIED, THE
7    ORDER WILL SO SAY THAT I'VE HAD AN IN CAMERA REVIEW
8    OF THE QUALIFICATIONS, ET CETERA, ET CETERA, IN
9    ORDER TO MAKE A DETERMINATION THAT THE EXPERTS ARE
10   ACCOUNTABLE AND THAT SORT OF THING.
11             SO I THINK YOU SHOULD PUT THAT IN THE
12   ORDER.  I THINK THAT'S THE BEST WAY TO HANDLE IT.
13        MS. HUNTYAN:  AND THEN SHOULD I ALSO PUT IN THE
14   ORDER THAT WE HAVE THE TEN DAYS BEFORE -- FOR THE
15   PICKUP DATE, THAT WE HAVE TEN DAYS FROM THE ENTRY
16   OF THE ORDER?
17        MR. PAGE:  WE WOULD HAVE NO OBJECTION TO THAT.
18        JUDGE INFANTE:  YEAH, THAT'S FINE.  THAT'S
19   FINE.  I'D LIKE THE ORDER WITHIN THREE DAYS.
20        MS. HUNTYAN:  YES, YOUR HONOR.
21             THANK YOU.
22        JUDGE INFANTE:  I THINK THAT'S THE BEST WAY TO
23   HANDLE IT, AND I'LL LOOK FORWARD TO RECEIVING YOUR
24   ORDER.
25             AND IF YOU WANT TO SUBMIT THE ORDER ALONG
```

EXHIBIT _____ 5

A&E COURT REPORTERS (213) 955-0070 FAX: (213) 955-0077

1    WITH THE IN CAMERA INFORMATION, THAT'S FINE; OR IF

2    YOU WANT TO SUBMIT THE ORDER QUICKLY, AND THEN I'LL

3    WAIT FOR THE IN CAMERA MATERIAL, EITHER WAY IS

4    FINE.

5              I'D LIKE YOU TO SERVE MR. PAGE,

6    OBVIOUSLY, WITH THE ORDER, AND YOU CAN SERVE HIM

7    WITH A -- WITH A COPY OF THE TRANSMITTAL LETTER

8    OF -- BUT NOT THE IN CAMERA MATERIAL.

9       MS. HUNTYAN:  ALL RIGHT.

10      JUDGE INFANTE:  VERY GOOD.

11      MS. HUNTYAN:  THANK YOU.

12      JUDGE INFANTE:  THANK YOU, COUNSEL.

13      MR. PAGE:  THANK YOU.

14

15              (WHEREUPON, AT THE HOUR OF

16              10:22 A.M., THE PROCEEDINGS

17                 WERE CONCLUDED.)

18                    -OOO-

19

20

21

22

23

24

25

EXHIBIT _____ 5

PAGE _____ 147     23

1   STATE OF CALIFORNIA   )

                            )   SS.

2   COUNTY OF LOS ANGELES   )

3

4     .I, ANGELA DUPRE, CERTIFIED SHORTHAND REPORTER,

5   CERTIFICATE NUMBER 7804, FOR THE STATE OF

6   CALIFORNIA, HEREBY CERTIFY:

7           THE FOREGOING PROCEEDINGS WERE TAKEN

8   BEFORE ME AT THE TIME AND PLACE THEREIN SET FORTH,

9   AT WHICH TIME THE WITNESSES WERE PLACED UNDER OATH

10   BY ME;

11           THE FOREGOING TRANSCRIPT IS A TRUE AND

12   CORRECT TRANSCRIPT OF MY SHORTHAND NOTES SO TAKEN;

13           I FURTHER CERTIFY THAT I AM NEITHER

14   COUNSEL FOR NOR RELATED TO ANY PARTY TO SAID ACTION

15   NOR IN ANY WAY INTERESTED IN THE OUTCOME THEREOF.

16           IN WITNESS WHEREOF, I HAVE HEREUNTO

17   SUBSCRIBED MY NAME THIS__24____ DAY OF

18   _August_____, 2007.

19

20

21                   _Angela Dupre_____

22

23

24

25                   EXHIBIT _____ 5

                        PAGE ___148

                                          24

# EXHIBIT 6



1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
   John B. Quinn (Bar No. 090378)
2  johnquinn@quinnemanuel.com
   Michael T. Zeller (Bar No. 196417)
3  (michaelzeller@quinnemanuel.com)
   Jon D. Corey (Bar No. 185066)
4  (joncorey@quinnemanuel.com)
   Timothy L. Alger (Bar No. 160303)
5  (timalger@quinnemanuel.com)
   865 South Figueroa Street, 10th Floor
6  Los Angeles, California 90017-2543
   Telephone:  (213) 443-3000
7  Facsimile:  (213) 443-3100

8  Attorneys for Mattel, Inc.

9

10              UNITED STATES DISTRICT COURT

11              CENTRAL DISTRICT OF CALIFORNIA

12                    EASTERN DIVISION

13  CARTER BRYANT, an individual,        | Case No. CV 04-09049 SGL (RNBx)
                                         |
14              Plaintiff,               | Consolidated with
                                         | Case No. CV 04-09059
15        vs.                            | Case No. CV 05-02727
                                         |
16  MATTEL, INC., a Delaware corporation,| **DISCOVERY MATTER**
                                         |
17              Defendant.               | Hon. Edward A. Infante (Ret.)
                                         | Discovery Master
18  ───────────────────────────────     |
                                         | *IN CAMERA* DECLARATION # 1 AS
19  AND CONSOLIDATED CASES               | TO EXPERT EXAMINATION AND
                                         | TESTING OF BRYANT'S ORIGINAL
20                                       | DOCUMENTS
                                         |
21                                       | Date:  August 23, 2007
                                         | Time:  9:00 a.m.
22                                       | Place:  Telephonic
                                         |
23                                       | Discovery Cut-Off:  October 22, 2007
                                         | Pre-Trial Conference: January 14, 2008
24                                       | Trial Date:  February 12, 2008

25  ┌──────────────────────────────────────────────────┐
26  │   **SUBMITTED PER JUDGE INFANTE'S REQUEST ON AN**  │
    │                                                    │
27  │              ***IN CAMERA* BASIS**         8/28    │
    │                                                    │
28  │  ~ **Not For Dissemination To Defendants/Counterclaimants** ~ │
    └──────────────────────────────────────────────────┘

07209/2205386.1

                                    IN CAMERA DECLARATION NO. 1

EXHIBIT _____ 6
PAGE _____ 149

## DECLARATION OF VALERY N. AGINSKY, PhD

I, Valery N. Aginsky, Ph.D., declare as follows:

1.    I am a forensic chemist specializing in the field of forensic document examination. I am submitting this declaration *in camera* in response to a request from the Discovery Master in connection with Mattel's Motion to Compel Bryant To Make Original Documents Available For Expert Examination and Testing. I am more than twenty-one (21) years of age; I make this declaration of personal, firsthand knowledge; and if called and sworn as a witness, I could and would testify competently thereto.

2.    I have been a forensic chemist for 27 years. I am currently employed with Riley, Welch & Aginsky Forensic Document Examinations, Inc. (formerly known as Riley, Welch & Associates Forensic Document Examinations, Inc.) I received my Ph.D. in Analytical Chemistry in 1980. Prior to joining Riley, Welch & Associates I worked as a senior research chemist with the Forensic Science Center, Ministry of the Interior, Russia. I am experienced in a wide range of examination techniques, but my particular specialty is the analysis and dating of ink on documents by Thin-Layer Chromatography and Gas Chromatography-Mass Spectrometry. I am the author of more than 20 peer-reviewed articles on ink analysis and dating, including chapters in three books and two encyclopedias. A true and correct copy of my curriculum vitae showing further details of my professional history and a list of my professional publications is attached hereto as Exhibit 1.

3.    Attached hereto as Exhibit 2 is a true and correct copy of a list of the cases in which I have testified for the last five years. One of the famous cases I was involved in was the multi-billion-dollar will contest of Chinachem magnate Teddy Wang, "In The Matter of Wang Teh Huei," in The High Court of the Hong Kong Special Administrative Region. Attached hereto as Exhibit 3 is a true and

-1-

IN CAMERA DECLARATION NO. 1

EXHIBIT 6

PAGE 150

1  correct copy of excerpts of the Hong Kong Court's ruling assessing my work in that
2  case.

3       4.    I understand that the parties have stipulated to, and the Court has
4  tentatively approved, a special protocol for any destructive testing that might be
5  advisable.  I have been informed of this protocol and, to the extent that destructive
6  testing is authorized in accordance with the protocol and appropriate in this case, will
7  follow it with regard to any destructive testing that might need to be done.

8       5.    To properly examine and test documents, as well as to ensure that
9  they are properly handled and preserved, I conduct my analysis and testing in my
10 laboratory in Lansing, Michigan.  The laboratory contains specialized scientific
11 equipment that I use to conduct the examination and testing of documents.  Some of
12 this equipment includes: a gas chromatograph equipped with a mass selective
13 detector (GC-MS), a kit for conducting thin-layer chromatographic (TLC) analysis of
14 ink, and necessary laboratory instruments and chemicals, such as organic solvents
15 used to extract ink from ink-on-paper samples taken from documents.  I may perform
16 the chemical analysis of ink by GC-MS and TLC on one or more of the original
17 documents from Mr. Bryant.  GC-MS and TLC are separation techniques ideally
18 suited to the characterization and dating of writing ink, printing ink, and other colored
19 materials on documents.  Most important parts of the above scientific equipment are
20 not portable, meaning that it is practically impossible to transport this equipment to
21 California for me to perform the chemical analysis of the original documents from
22 Mr. Bryant there.  As an option, I can conduct some preliminary analysis and testing
23 of Mr. Bryant's original documents in Mr. Cunningham's office in California,
24 including taking ink samples from the documents.  I would then bring these ink
25 samples to my laboratory in Lansing, Michigan for their chemical analysis by GC-
26 MS and TLC.

27      6.    In the event that any destructive testing is authorized in
28 accordance with the protocol and is appropriate, the sampling procedure that I

07209/2205386.1

-2-

IN CAMERA DECLARATION NO. 1

EXHIBIT _____ 6

PAGE _____ 151

1   conduct as an expert involves removing portions of the written lines from the entries
2   to be examined.  This is accomplished with a hypodermic needle-sized hole punch,
3   which removes hole punches about the size of a typewriter period (less than 1 mm in
4   diameter).  Approximately 10 tiny plugs of ink-on-paper will be punched out from
5   each questioned entry on the document.  The method of removing ink samples from
6   documents that I use has been accepted by courts in the United States for over 30
7   years.  While tiny holes will be visible in the writing, the writing remains completely
8   legible.  Therefore, as I perform such sampling, the documents will be nearly intact.
9   Each document will be photographed at varying high resolutions before and after any
10  samples of ink are removed.  These images provide a permanent record of the
11  condition of the document before and after ink testing was conducted.

12          7.      As an expert in the field of forensic document examination, I
13  recognize the extreme importance of preserving the integrity of the evidence I am
14  sent for review and analysis.  When materials arrive at my laboratory, they will
15  remain securely stored (when not being examined) while they are in my custody.  The
16  laboratory facilities are locked and no one else has access to the materials that are
17  sent to me for examination and testing.  My laboratory is located in my house at 2511
18  Lafayette Avenue, Lansing, Michigan 48906.  I certainly understand the critical
19  nature of each of Mr. Bryant's original documents and will be fully accountable for
20  them while they are in my custody.  The ink comparison and age determination
21  procedures I use will not affect the documents in any way so as to be prejudicial to
22  the owner of the documents' interest.

23          8.      With the exception of alterations resulting from any destructive
24  testing, which would be conducted in accordance with the protocol above, all the
25  Bryant documents that are provided for inspection, examination and testing shall be
26  returned by me in the same condition, sequence and order in which they were
27  received.

28

07209/2205386.1

-3-

EXHIBIT _____6_____

PAGE _____152_____

1       I declare under penalty of perjury under the laws of the State of
2  California and the United States of America that the foregoing is true and correct.
3  Executed this 28th day of August, 2007, at Lansing, Michigan.
4
5
6
7
8           Valery N. Aginsky, Ph.D.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

07209/2205386.1

-4-

IN CAMERA DECLARATION NO. 1

EXHIBIT _____ 6

PAGE _____ 153

# Exhibit 1

EXHIBIT ____6____

PAGE ____154____

# VALERY N. AGINSKY, Ph.D.

## Curriculum Vitae

**Position:** *Forensic Chemist / Document Dating Specialist*
Riley, Welch & Aginsky Forensic Document Examinations, Inc.
Lansing, Michigan

**Education:** *Ph.D. Analytical Chemistry - 1980*
Military Academy of Chemical Defense (formerly known as the Chemical Faculty of the Institute of Mechanical Engineering prior to 1940), Moscow, USSR

*M.S. Analytical Chemistry - 1977*
Military Academy of Chemical Defense, Moscow, USSR

**Professional Experience:** Riley, Welch & Associates Forensic Document Examinations, Inc., Lansing, Michigan
*Forensic Chemist* (1998 to April 2005)

Riley, Welch & Aginsky Forensic Document Examinations, Inc.,
Lansing, Michigan
*Forensic Chemist* (April 2005 to present)

Responsible for chemical analysis of ink on documents (ink comparison and dating). Uses ink dating methods developed as a result of many years of research of the methodology developed and published by Dr. Antonio Cantu. These methods measure certain parameters of ink that decrease as ink ages on paper. They analyze *ink volatile components* (their residues are always present in ink lines, no matter the ink age) and enable *absolute* ink age determination: one determines a time frame within which a questioned entry has been written, not relative to other known dated entries, as *relative* ink age determination technology requires.

Forensic Science Center of the Ministry of the Interior, Moscow, Russia
*Senior Research Chemist* (1980 to 2000)

Exhibit **I** Page **5**

EXHIBIT _____ 6

PAGE _____ 155

Involved in methods development, technical assistance to investigative personnel, including training and presentations to legal proceedings and routine examination of evidence. Developed several techniques for examining questioned documents, drugs of abuse, explosives and gunshot residues.

About ten years of professional research and practical experience as a questioned document examiner: the dating of writing, stamp pad and printing inks, alteration of records, indented writings, erasures/eradications/obliterations, sequence of strokes, paper/ink/toners, computer printers and documents generated, counterfeit currency, currency exposed to an exploding dye-pack.

*Methods:* microscopy, microspectrophotometry, electrostatic imaging analysis, video enhancement techniques, infrared spectroscopy, ultraviolet/visual spectrophotometry, thin-layer chromatography, and gas chromatography-mass spectrometry.

**Honors/Awards:**    *Diploma and the First Prize for new techniques on Dating Inks*
Ministry of the Interior, 1993

*Award for excellence in service (Best Forensic Chemist)*
Ministry of the Interior, 1982

*Silver medal in chemistry at the 1976 All-Union Contest of Scientific Works,*
*Ministry of Defense*

*Co-Chair of the Questioned Documents Sections at the First International*
*Forensic Science Symposium, Moscow, Russia, 1994, the 13th and 14th*
*Meetings of the International Association of Forensic Sciences, Dusseldorf,*
*Germany, 1993, and Tokyo, Japan, 1996.*

**Teaching**
**Experience:**    Conducted numerous training seminars for the personnel of forensic laboratories in Russia and the former Soviet Union in the framework of the Ministry of the Interior's training programs:

*Technical and Chemical Examination of Counterfeit Currency*

*Detecting and Dating Alterations Made to Documents*

*Ink/Paper Comparison by Thin-Layer Chromatography and Other Analytical Methods*

*Detection and Characterization of Explosive Residues*

Exhibit 1 Page 6

EXHIBIT _____ 6

PAGE _____ 156

Served as visiting examiner to the Division of Identification and Forensic Science, Israel Police Headquarters, 1996 & 1997.

Conducted seminars on ink analysis and dating for the Division of Identification and Forensic Science, Israel Police Headquarters, Jerusalem, Israel, 1995; Ministry of Justice and Ministry of the Interior Combined Scientific Council for Forensic Science and Criminalistics, Moscow, Russia, 1997; the Forensic Sciences Division of the Canada Customs and Revenue Agency, Ottawa, Canada, 1998; Istanbul University, Institute of Forensic Sciences, Istanbul, Turkey 2000.

Conducted a seminar on Quantitative Thin-Layer Chromatography (Internal Standard Method) at the Russian-German Summer School on Thin-Layer Chromatography, Moscow, Russia, 1993.

**Court Testimony:** Testified regarding ink analysis and ink and document dating in criminal and civil matters and in arbitrations.

**Professional Affiliations:**

International Association for Identification, Questioned Documents Section (1992 - present)

International Association of Forensic Sciences, Questioned Documents Section (1993 - present)

Ministry of Justice and Ministry of the Interior Combined Scientific Council for Forensic Science and Criminalistics (Russia, 1995-1999)

Regional Representative for the Russian Charted Division of the International Association for Identification (1998 - 2000)

American Society for Testing & Materials (2003 - present)

Exhibit 1 Page 7

EXHIBIT 6
PAGE 157

## Professional Publications

### Books

1. Document Analysis / Analytical Methods. *Encyclopedia of Forensic Sciences*, J.A. Siegel (Ed.), Academic Press, Harcourt Publishers Ltd., 2000.

2. Writing Media and Documents. Chapter 19. *Handbook of Analytical Separations*. Vol. 2 – Forensic Science, M.J. Bogucz (Ed.), ELSEVIER, Amsterdam – New York – Oxford – Shannon – Singapore – Tokyo, 2000.

3. Writing Media and Documents. Chapter 28. *Handbook of Analytical Separations (2nd Edition)*. Vol. II – Forensic Science (publication pending).

4. An Application of Chromatographic Methods for Dating Questioned Documents. *Chromatography (Celebrating the 125th Birthday of the Inventor of Chromatography, Dr. Michael Tswett)*, O. Kaiser, R.E. Kaiser, H. Gunz, and W. Gunther (Eds.), InCOM, Duesseldorf, Germany, 1997.

5. A New Version of the Internal Standard Method in Quantitative Thin-Layer Chromatography. Chapter 4.6. *Handbook of Modern Thin-Layer Chromatography*, O.G. Larionov (Ed.), Russian Academy of Science, Chromatography Council, Moscow, Russia, 1994 (in Russian).

6. Aginsky, V.N. and Dildin, Yr. M., *Forensic Examination of Explosives*, VNII MVD SSSR, Moscow, USSR, 1982 (in Russian).

7. Aginsky, V.N., Safronenko, T.I., and Sorokina, G.I., *Forensic Examination of Questioned Documents*, VNII MVD SSSR, Moscow, USSR, 1987 (in Russian).

8. Aginsky, V.N., Safronenko, T.I., and Sorokina, G.I., *Detecting and Dating Alterations Made to Documents*, VNII MVD SSSR, Moscow, USSR, 1989 (in Russian).

9. Aginsky, V.N., Zibrov, G.S., and Sorokina, G.I., *Analysis of Drugs, Inks, Petroleum Products, and Explosives by Reversed Phase Thin-Layer Chromatography*, Forensic Science Center of the Russia's Ministry of the Interior, Moscow, 1993 (in Russian).

### Peer-Reviewed Articles and Presentations at Scientific Conferences

10. A New Application of Instrumental Planar Chromatography in Forensic Analysis, *Journal of Planar Chromatography*, Vol. 4, 1991, pp. 167-169.

11. Some New Ideas for Dating Ballpoint Inks – A Feasibility Study, *Journal of Forensic Sciences*, 1993, No. 5.

12. Comparative Examination of Inks by Using Instrumental Thin-Layer Chromatography and Microspectrophotometry, *Journal of Forensic Sciences*, Vol. 38, No. 5, Sept. 1993, pp. 1111-1130.

13. Forensic Examination of "Slightly Soluble" Inks Pigments Using Thin-Layer Chromatography, *Journal of Forensic Sciences*, Vol. 38, No. 5, Sept. 1993, pp. 1131-1133.

Exhibit _1_ Page _8_

EXHIBIT _____ 6

PAGE _____ 158

14. Mechanism and Kinetics of the Aging of Some Ink Dyes. *Advances in Forensic Sciences.*
    Vol. 3 - Forensic Criminalistics, Proceedings of the 13th Meeting of the International
    Association of Forensic Sciences, Dusseldorf 1993, B. Jacob and W. Bonte, Eds., Verlag Dr.
    Koster, Berlin, 1995.

15. Discrimination between Naturally and Artificially Aged Ballpoint Inks, ibid.

16. Determination of the Age of Ballpoint Pen Ink by Gas and Densitometric Thin-Layer
    Chromatography, *J. Chromatography*, 1994, Vol. 678.

17. A New Version of the Internal Standard Method in Quantitative Thin-Layer Chromatography,
    *Journal of Planar Chromatography*, July/August 1994, Vol. 7, pp. 309-314.

18. A Microspectrophotometric Method for Dating Ballpoint Inks - A Feasibility Study, *Journal
    of Forensic Sciences*, Vol. 40, No. 3, May 1995, pp. 475-478.

19. Dating and Characterizing Writing, Stamp Pad and Jet Printer Inks by Gas
    Chromatography/Mass Spectrometry, *International J. Forensic Document Examiners*, 1996,
    No. 2, pp.103-115.

20. Accelerated Aging – Its Use in Methods for Dating Ink (Letter to the Editor), *International J.
    Forensic Document Examiners*, 1996, No. 3.

21. Ink Dating – The State of the Art in 1996, Proceedings of the 14th Meeting of the
    International Association of Forensic Sciences, Tokyo 1996, Shunderson Communications,
    1997, Vol. 4.

22. Current Methods for Dating Inks – Which is the Best? Presented at the 49th Annual Meeting
    of the American Academy of Forensic Sciences, New York, NY, 1997.

23. Dating Ink on Questioned Documents – The State of the Art in 1997, presented at the First
    European Meeting of Forensic Science, Lausanne, Switzerland, 1997.

24. Measuring Ink Extractability as a Function of Age – Why the Relative Aging Approach is
    Unreliable and why it is More Correct to Measure Ink Volatile Components than Dyes,
    *International J. Forensic Document Examiners*, 1998, No. 3.

25. Ink Dating – The State of the Art, presented at the 50th Annual Meeting of the American
    Academy of Forensic Sciences, San Francisco, CA, 1998.

26. Ink Dating – The State of the Art, presented at the First Regional Symposium on
    Criminalistics, April 20-22, 2000, Istanbul University, Institute of Forensic Sciences, Turkey.

27. Determining the Sequence of Non-Intersecting Media on Documents: Ballpoint Pen Ink and
    Laser Toner Entries, *Journal of the American Society of Questioned Document Examiners*,
    2002.

28. Current Methods for Dating Ink on Documents, presented at the 60th Annual Conference of
    the American Society of Questioned Document Examiners, San Diego, California, August
    14-19, 2002, and at the Midwestern Association of Forensic Scientists Fall 2002 Meeting,
    Milwaukee, Wisconsin, September 15-20, 2002.

29. Using TLC and GC-MS to Determine whether Inks Came from the Same Manufacturing

Exhibit 1 Page 9

EXHIBIT _____ 6

PAGE _____ 15-9

Batch, presented at the 63rd Annual Conference of the American Society of Questioned Document Examiners, Montreal, Canada, August 11-16, 2005.

30. Using TLC and GC-MS to Determine whether Inks Came from the Same Manufacturing Batch, *Journal of the American Society of Questioned Document Examiners*, Vol. 9, No. 1, 2006, pp. 19-27.

31. Current Methods for Dating Ink on Documents, presented at the 65th Annual Conference of the American Society of Questioned Document Examiners, Boulder, Colorado, August 11-16, 2007.

## Other Professional Publications

32. Aginsky, V.N. and Sorokina, G.I., "Detecting Explosives in Post Explosion Debris Contaminated by Petroleum Products", *Expertnaya Praktika [Expert Practice]*, Vol. 19, 1982, pp. 73-75 (in Russian).

33. Aginsky, V.N. and Sorokina, G.I., "Detection of Explosive Residues Intruded into Asphalt", *Expertnaya Praktika [Expert Practice]*, Vol. 20, 1983, pp. 109, 110 (in Russian).

34. Aginsky, V.N. and Sorokina, G.I., *Detection and Quantitative Determination of Clonidine and Other Psychotropic Drugs in Beverages*, VNII MVD SSSR, Moscow, USSR, 1990 (in Russian).

35. Aginsky, V.N., "A New Application of Instrumental Planar Chromatography in Forensic Analysis," presented at the 6th International Symposium on Instrumental Planar Chromatography, Interlaken, Switzerland, April 23-26, 1991.

36. Aginsky, V.N., Sorokina, G.I., and Zibrov, G.S., "Detection, Identification and Comparative Examination of Narcotics and Drugs of Abuse," Proceedings of the Forensic Science Symposium, Linkoping, June 1992, Report 27, National Laboratory of Forensic Science, Linköping, Sweden, 1993.

37. Aginsky, V.N., Savilov, A.P., and Sorokina, G.I., "Chromatographic Screening of Drugs of Abuse," Proceedings of the Forensic Science Symposium, Moscow, March 1994, Forensic Science Center of the Ministry of the Interior, Moscow, Russia, 1994.

38. Aginsky, V.N., "Increasing the Reliability of the Identification of Separated Substances in Densitometric Thin-Layer Chromatography", *Advances in Forensic Sciences*, Vol. 3 - Forensic Criminalistics, Proceedings of the 13th Meeting of the International Association of Forensic Sciences, Dusseldorf 1993, B. Jacob and W. Bonte, Eds., Verlag Dr. Koster, Berlin, 1995.

39. Aginsky, V.N., "A New Approach in Determining the Age of Inks Using Densitometric Thin-Layer Chromatography," ibid.

40. Aginsky, V.N., "Instrumental Techniques for Comparing Similarly Colored Inks," ibid.

41. Aginsky, V.N., Lesnikov, V.A. and Sorokina, G.I., "Time of Shooting - Feasibility of Discriminating "Fresh" and "Old" Organic Gunshot Residues," Proceedings of the 14th Meeting of the International Association of Forensic Sciences, Tokyo 1996, Shunderson Communications, 1997, Vol. 4.

42. Aginsky, V.N., "Application of GC/MS in Some Areas of Forensic Analysis," presented at the Hewlett-Packard Analytical Forum, Moscow, Russia, April 1998.

43. Aginsky, V.N., "Determining the Sequence of Non-Intersecting Media on Documents – Ballpoint pen ink and laser toner entries," presented at the 49th Annual Conference of the American Society of Questioned Document Examiners, Des Moines, Iowa, August 2001.

Exhibit 1 Page 10

EXHIBIT _____ 6

PAGE _____ 160

# Exhibit 2

EXHIBIT _____ 6

PAGE _____ 161

Valery N. Aginsky, Ph.D.                                                     - 1 -
COURT CASES AND DEPOSITIONS

| Date | Location | Type of Proceeding | Case |
|---|---|---|---|
| 10-22-01 through 10-31-01 | Hong Kong | Trial | Wang Din Shin  vs  Nina Kung alias Nina T.H. Wang<br>High Court,  Case No. HCAP8/1999 |
| 01-15-02 | Pennsylvania | Arbitration Hearing | Labor's Union International of North America  - vs - Prudencio Martinez, Jr. |
| 05-06-02 | Cayman Islands | Trial | CVC/Opportunity Equity Partners Limited  - vs - Luis Roberto Demarco Almeida<br>The Grand Court of the Cayman Islands Case No. 389 of 1999 . |
| 8-21-02 8-22-02 | Chicago, IL | Trial | MULTIUT CORPORATION  - vs -  DRAIMAN, et al<br>Circuit Court of Cook County, Illinois Case No. 01 CH 9989 |
| 10-16-02 | Farmington Hills MI | Deposition | Robert J. Petz |
| 03-12-03 | Los Angeles, CA | Trial | Estate of Yvette Smith<br>Superior Court of the State of California Case No. 069111 |
| 09-26-03 | Toronto, Canada | Arbitration Hearing | FCLG Enterprises, Ltd.  - vs - 668152 ONTARIO, Ltd., et al |
| 11-05-03 | Chicago, IL | Deposition | Rempala  - vs -  Ebner, et al<br>Circuit Court of Cook County, Illinois Case No. 00 CH 01783 |
| 02-11-04 | Okemos, MI | Deposition | JJK Industries, L.P.  - vs -  KPlus, et al<br>District Court for the Southern District of Taxes, Houston,  Case No. H-02-2252 |
| 05-06-04 | East Lansing, MI | Deposition | Digital Control, Inc.  - vs -  Charles Machine Works,  Arbitration Hearing, Seattle, Washington |
| 01-26-05 12-05-05 | Okemos, MI West Palm Beach, FL | Deposition Hearing | Jupiter Medical Center  - vs -  Orlon Carr, III, MD<br>Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida, Case No. CL-00-9971-AD |
| 03-14-05 04-06-05 | Glendale, CA Van Nuys, CA | Deposition Trial | SP22, Inc. et al v. Yurdumyan, et al<br>Superior Court of the State of California County of Los Angeles, Northwest District Case No. LC067829 |

Exhibit 2 Page 11

EXHIBIT _____ 6 _____

PAGE _____ 162 _____

**Valery N. Aginsky, Ph.D.**                                                                                  - 2 -

**COURT CASES AND DEPOSITIONS**

| Date | Location | Type of Proceeding | Case |
|---|---|---|---|
| 10-27-05 | Washington, DC | Deposition | LG. Phillips LCD Co., Ltd. v. Tatung Co. of America, Tatung Company, and Chunghwa Picture Tubes, Ltd.<br>District Court, Central District of California<br>Case No. CV-02-6775 CBM (JTLx) |
| 04-14-06<br>06-20-06<br>06-20-06 | Los Angeles, CA | Deposition<br>Court Hearing<br>Trial | 1124 Marilyn Drive Development LLC v. Shahram Elyaszadeh<br>Superior Court of California, County of Los Angeles, Case No. SC 085 437 |
| 05-29-06 | Lansing, MI | Deposition | Van Cleave v. Newbrough, M.D., et al<br>Superior Court of California, County of Kern<br>Case No. S-1500-CV-255754-AEW |
| 09-07-06 | Wichita, KS | Deposition | Bolton v. Coombs, et al<br>District Court, Sedgwick County, Kansas<br>Case No. 05 CV 2332 |
| 02-06-06<br>03-09-07 | Laguna Hills, CA<br>Los Angeles, CA | Deposition<br>Arbitration Hearing | Angeline Hebert v. Bank of America, et al<br>Superior Court of California, County of Orange<br>Case No. 04CC10405 |
| 05-07-07 | Vancouver, Canada | Trial | Osooli-Talesh v. Emami<br>Supreme Court of British Columbia<br>Vancouver Registry No. S026800 |
| 07-07-06<br><br>06-29-07 | Lansing, MI<br><br>Clearwater, FL | Deposition<br><br>Trial | Estate of Paul R. Smith et al v. William P. Gregory, et al<br>Circuit Court of the 6th Judicial Circuit in and for Pinellas County, Florida, Probate Division<br>Case No. 02-4488-ES-003 |
| 04-26-07<br>07-18-07 | Okemos, MI<br>Troy, MI | Deposition<br>Trial | Quality Manufacturing, Inc. v. Brian D. Mann, et al<br>Genesee County Circuit Court<br>Case No. 04-79512-CZ |
| 08-03-07 | Lansing, MI | Deposition | Hypoxico v. Colorado Altitude Training, et al<br>District Court, Southern District of New York<br>Case No. 02 Civ 6191 (JGK) |

**Exhibit 2 Page 12**

EXHIBIT _____ 6

PAGE _____ 163

# Exhibit 3

EXHIBIT _____ 6

PAGE _____ 164

18.13        EJS submitted a Second Report ("EJS 2") dated 19 February 2001 and a further Third Report ("EJS 3") dated 3 August 2001. I shall consider them hereinbelow when the validity of EJS's method and results are considered.

18.14        EJS contended that his conclusion was drawn upon results he obtained from the Dye-ratio method, which he claimed to be a well-established method having been in use worldwide (including law enforcement agencies in the United States) for many years, and accepted universally by the scientific community at large and numerous courts at various levels in the United States and in other countries.[10] He said that the research has already been done to show the reliability of the relative ink-dating procedures using the Dye-ratio method of analysis,[11] and that the data collection in this case was performed on accepted standards in the field of forensic ink analysis and in a manner that has been tested and proven reliable on many occasions in the past.[12]

18.15        He claimed that there are many publications that show the method utilized by him in this case is valid, reproducible, and reliable.[13]

18.16        He contended that he has personal knowledge of at least two cases in which the United States Secret Service has performed testing in the same manner as he performed in this case and it has used this technique between 1995 and today.

18.17        In the end, EJS also contended that his testing is based upon sound objective scientific testing and his opinion is based upon sound scientific principles.

*THE DEFENCE*

18.18        The defence contended otherwise. They said that the contrary is true, EJS was cross-examined in depth and the defence called two experts, Dr Valery N. Aginsky ("VNA") and one Mr Peter Tytell ("PVT"). They did not perform any tests on the documents but they have put in reports in contradiction to EJS's reports with their critical analysis.

18.19        Before I consider the validity of the methods and findings of EJS and their scientific theory and validity, I would like to approach the problem from a layman's point of view first which I think ordinary people would understand. This is what the defence called "the true proficiency or blind test".

---

*Footnote:*

1 p.409, E4-E5
2 p.409, E4-E5 and T35:62:9
3 p.409, E4-E5
4 T35:54-55
5 p.923, E13
6 T35:58-61
7 T35:61:17-62:10
8 T35:62:18
9 p.413, EJS 1, E4-E5
10 para.5, p.909, EJS 3, E13
11 para.15, p.885, EJS 3, E13
12 para.42, p.897, EJS 3, E13
13 para.47, p.898, EJS 3, E13

Exhibit **3** Page 13

⊂▣❐█▓▄❄◣◢⊃

EXHIBIT _____ 6

PAGE _____ 165

36 Decision dated 2 January 2001, pp.967-977, F5 and Submissions at pp.1464-1491, F6
37 p.1483, F6
38 14 May, 1996, pp.340-343, G2
39 See Memorandum Opinion and Order 31 March 2000, pp.2085-2087, G8
40 p.1776, F7
41 pp.3154-3195, G11
42 p.3191, G11
43 T48:129:15-130:2

ᴰ

ᵈ

## Chapter 24 - Arbitrary Separation Of Fused/Overlapped Chromatographic Peaks

ᴰ

24.1        The chromatographic peaks shown on EJS's densitochromatograms were not smooth and bell-shaped but they were like a "range of mountains". EJS did not know why they were so overlapped.[1] Thus they required him to manipulate the integration marks between the poor separation of the dye components or chromatographic zones on the TLC plates he developed. VNA has the strongest objection in this kind of manipulation. He considered that in no circumstances should EJS have manipulated with the raw data provided by the video densitometer by arbitrarily separating almost completely fused/overlapped peaks on the densitochromatograms. As a consequence of him doing so, the data upon which he conducted statistical analysis are subjective, possibly pre-determined and therefore utterly unreliable.

24.2        VNA is an acknowledged world expert in chromatography. He explained that the prerequisite of obtaining reliable data/results was that the chromatographic peaks have to be properly resolved to the baseline, if the purpose of their analysis is to obtain *quantitative* data. The very basis of chromatographic technique is to separate one substance from another. The dye components on the TLC plates should be well separated and the peaks on the densitochromatograms should be resolved to the baseline. VNA said his contention is borne out by all the articles and textbooks on chromatography, some of which were exhibited.[2] The problem of analysing fused chromatographic peaks is summarised as follows[3] :

> "The experimental errors in the determination of the area of fused non-Gaussian peaks are so large as to shed doubt on the usefulness of such methods for quantitative purposes."

24.3        Contrary to what EJS had argued, VNA said the same principles of evaluating the peaks would apply to both thin-layer and gas or liquid chromatography.[4] Since EJS's densitochromatograms have the poor quality of fused/overlapped peaks, he had to manipulate the integration marks to "help" the computer to separate the unseparated peaks. This manipulation is subjective and are prone to produce erroneous results. The most important ones are those from the densitochromatograms of Vial 2 at the 30 seconds time frame. These are the worst resolved chromatograms.[5] These are important chromatograms, because according to EJS, they gave a "significant statistical difference" upon which EJS relied heavily.

Exhibit 3 Page 14

©EDID0b366@©

EXHIBIT                    6

PAGE _____    166

24.4        EJS's manipulation and subjective marking of the demarcation line would have the four following pitfalls. *First*, EJS claimed that the ink dye components separated on the TLC plate were "... *scanned using white light and the amount of absorption was measured using a computer driven video densitometer with automatic integration*".[6] This was misleading and untrue. On the contrary, the integration marks were manipulated and arbitrarily placed by EJS. The data were used to calculate dye ratios and they were subjective, possibly pre-determined, and are therefore unreliable.

24.5        According to VNA, usually, the dye components applied closer to the sides of a TLC plate would travel somewhat further than the same dye components applied closer to the middle of the TLC plate. They would also have different shapes.[7] This is because the solvent, an eluent used to do chromatographic separation, evaporates faster from the side than the middle of the TLC plate.[8] When the chromatographic peaks are fused, it is impossible to know how each of them behaved within the area where they fused.[9]

24.6        EJS claimed that it does not matter where you put the vertical line as long as it is in the same on both the heated and unheated chromatograms,[10] however, VNA's measurements (combined in Slide 29) show that the integration marks placed by EJS were not in the same place in both densitochromatograms. Consequently, EJS had to admit that the integration marks could only be placed at "... *the same relative position with the peak*" but not at identical position.[11] He said he could only "... *chose where the peaks were separated as best [he] could tell.*"[12]

24.7        *Secondly*, EJS claimed that he was comparing one peak to another. As considered hereinbefore, the area under each of the chromatographic peaks could not be ascertained. Any comparison of these peaks is, at best, guesswork. Thus it cannot be ascertained whether he was comparing one dye component to another dye component or a group of components to another dye components or a group of dye components to another group.

24.8        But more importantly, the concept of measuring a composition of dye components has never been published, or ever referred to or raised in any published paper. EJS himself was unable to refer to any support for his own method. The scientific basis of such a comparison is also unclear.

24.9        EJS further claimed that if Mr Brunelle were faced with the same problem of fused chromatographic peaks, he would also *"lump them together"*.[13] In fact, Mr Brunelle suggested the contrary. He considered that if the dye components were not separated adequately for accurate densitometer readings, the test should be repeated using another solvent.[14] This is in line with the suggestion of VNA.

24.10       *Thirdly*, EJS claimed that if the integration marks were moved as he did in this case, no significant change occurs in the data or the results.[15] This must be mathematically incorrect since he was comparing the values of each of the peaks by dividing them against each other. His manipulation would obviously affect the values of the area under the peaks, which were values used as numerators and denominators in his analysis.

24.11       *Fourthly*, EJS claimed that "... *you could move it [i.e. the integration mark] one click one way or the other and it is not going to affect the data or the results.*"[16] This, too, is untrue.

24.12       VNA demonstrated with the aid of Slides 27 to 29, G8A, that one click would drastically change the results of the Dye-ratio method. He demonstrated further the sensitivity of the placing of integration marks at 30 seconds for dye 2/dye 3 of Vial 2. In such circumstances, the ratio

Exhibit 3 Page 15

☐BIEDI目☐0161☐40☐

EXHIBIT                6

PAGE                167

would overlap and therefore, show no statistically significant difference.[17] Thus, the slightest shift of the integration marks will give a completely opposite conclusion.

24.13       Further, EJS took no account of the small peaks in the chromatograms which contained dirt and impurities collected from the solvent front, for example, the peak for dye 1 in Vial 2.[18]

*HIGHER RESOLUTION SHOULD BE USED*

24.14       In light of the poor quality of the chromatography, VNA considered that EJS should have, at least, scanned the TLC plates at the highest optical resolution possible. The difference of using high and low resolution can be found at p.3228, G11.[19] However, EJS inexplicably only used the standard resolution of his video densitometer even when scanning at a higher resolution was available. Consequently, the amount of pixels inside each chromatographic zone was too low for the video densitometer to give good images. Although this point was not specifically and satisfactorily put to EJS, yet again VNA's contention could be refuted in cross-examination of VNA upon EJS's instructions. Similar incidents occurred in a few points raised by counsel for the plaintiff. Whilst this court is not encouraging the other party for not putting certain points to a witness, yet the special circumstances of this long case when each party is trying to improve his case in this kind of complicated matter, the other party's failure of putting certain matters have been carefully assessed in the scale before accepting the other party's contention. (This same point would not be repeated in similar situations hereinbelow). In the end, it was demonstrated that EJS was actually unfamiliar even with his own video densitometer by his ignorance as to the meaning of "Max" and "Wide" which appeared on the monitor next to "Area".[20] He later admitted that he had no idea what their functions were or what they were used for.[21]

24.15       VNA suggested that EJS should re-do the chromatographic separation with another solvent and re-scan the TLC plates at high resolution until he obtained satisfactorily resolved chromatographic peaks by his video densitometer, subject to such video densitometer being properly calibrated. This view is actually shared by Mr Brunelle who developed the Dye-ratio method.[22]

*CONCLUSION*

24.16       In the circumstances, the data obtained from the video densitometer after EJS's admitted manipulation were subjective and unreliable. Any conclusion drawn on the basis of the dye-ratios calculated using these unreliable data cannot be accepted.

---

Footnote:

1 T42:29:10-32:9; T42:46:7-12
2 pp.2209-2241, G8
3 Quantitative Analysis using Chromatographic Techniques, E. Katz (Ed.) John Wiley & Sons, New York, 1987 - Slide 19, G8A
4 T51:66:1-8
5 Slides 26-I and 27-I, G8A
6 p.412, EJS I
7 T51:40:3-5
8 T51:40:6-41:24, Plates V and VI
9 T51:70:16-22, Slide 18, G8A
10 T42:25:16-19
11 T42:89:22-23
12 T44:124:5-6; T44:147:19-24

Exhibit 3 Page 16

EXHIBIT   6

PAGE   168

13 T44:29:6-17
14 p.526, F2-3
15 p.896, EJS 3, para.41, as illustrated in VNA-12 on p.755, E7-E10
16 T42:16:13-14
17 Slide 51, G8A
18 VNA's Slide 22-1, G8A and his contention at T51:60:15-61:24
19 See also VNA's explanation at T55:92:21-94:11
20 T40:38:4-12
21 T42:14:11-21
22 p.526, F2-3

## Chapter 25 – Illogical Results Of Dye-ratio Method

25.1      The validity of the Dye-ratio method depends, inter alia, on obtaining reliable raw data after each of the ink dye components separated on the TLC plates were evaluated using the video densitometer. According to EJS, he would be measuring the extractability or the decomposition of the dye components of the ink samples obtained from Documents A and C, or both. It is just remarkable that the dye components extracted in the weak solvent (n-butanol) exhibited illogical behaviour, which is inexplicable.

25.2 I      accept VNA's contention that half of the results EJS obtained from his examination conducted upon the heated and unheated samples of each of Documents A and C behaved illogically and unpredictably.[1] There are three major criticism listed hereinbelow.

*CRITICISM 1*

25.3      If the tests were performed correctly, logic dictates that the values of measurements would increase with time, as the concentration of the substance being extracted in the solvent increases with time. It is analogous to one putting a teabag in a glass of hot water. It is just common sense and logic that the longer the teabag was left in the hot water, the darker the water would become as more tea was zipped into the hot water. Visual examinations on the TLC plates, Plates V and VI, would show that the intensity of the dye components increased logically from 30 seconds, 90 seconds to 180 seconds. However, contrary to what is shown on the TLC plates, the data EJS obtained from the video densitometers were illogical.

25.4      The measurements of the following dyes at 90 seconds/ 180 seconds are lower than those at 30 seconds, bearing in mind that, for each ink sample (heated, unheated) being extracted, the aliquots were taken successively from the same vial :

| (a) | Vial 2 - unheated 1 | | |
|---|---|---|---|
| | Dye | 90 Seconds | 30 Seconds |
| | 2 | 783 | 917 |
| (b) | Vial 2 - unheated | | |

Exhibit 3 Page 17

EXHIBIT 6
PAGE 169

| | Dye | 90 Seconds | 30 Seconds |
|---|---|---|---|
| | 1 | 1156 | 1324 |
| | 2 | 757 | 1043 |
| | 3 | 452 | 569 |
| (c) | Vial 2 - heated 1 | | |
| | Dye | 90 Seconds | 30 Seconds |
| | 2 | 689 | 976 |
| | 3 | 345 | 375 |
| (d) | Vial 6 - heated 2 | | |
| | Dye | 90 Seconds | 30 Seconds |
| | 1 | 667 | 1324 |
| | 2 | 935 | 1158 |
| | 3 | 1430 | 1437 |
| (e) | Vial 6 - unheated 2 | | |
| | Dye | 90 Seconds | 30 Seconds |
| | 1 | 652 | 701 |

25.5     VNA explained such illogical behaviour of the dye components extracted in the weak solvent with the aid of two sketch drawings.[2] They borrowed from the example of fertilizer offered by EJS. VNA explained that it was only logical that the tree grows bigger after 90 days than 30 days. It would be illogical if, however, by using fertilizer, the tree shrunk from 30 days to 90 days, but after 180 days, it became taller than it was even after 30 days.

25.6     According to EJS's evidence, he did not know what to expect of his results :

| (a) | On one day, he said such illogical behaviour of his results was not what he would expect to typically see;[3] yet |
|---|---|
| (b) | on another, he said, "It is well recognised that from one sample to another, it can go down slightly".[4] |

25.7     The results of dye 1 in unheated 2, Vial 6 (Document C) were as follows :

| Dye | 30 Seconds | 90 Seconds | 30 Seconds |
|---|---|---|---|
| 1 | 701 (108%) | 590 (90%) | 652 (100%) |

In terms of percentages, we would have 108% at 30 seconds, 90% at 90 seconds and 100% at 180 seconds.[5] A graphical representation of such results can be found in Slide 12, Bundle G8A (the dotted red line). These results are clearly illogical. There should be most concentration at 180 seconds, followed by that at 90 seconds, and least at 30 seconds, and not vice versa and certainly not the most at 30 seconds, followed by 180 seconds and the least at 90 seconds. These results are inexplicable.

Exhibit 3 Page 18

EXHIBIT _____ 6

PAGE _____ 170

## CRITICISM 2

25.8        EJS said the Dye-ratio method could be measuring the extractability, or decomposition of
dyes, or both. He said he did not know what parameters the R-ratio method, the Percent Extraction
method and the Dye-ratio method were measuring.[6] As considered hereinbefore, we can deduce from the
experimental results published by Brunelle and Lee that the Dye-ratio method could only be measuring
the decomposition of dye components, and not their respective extractability.

25.9        If the Dye-ratio method measures the extractability of the dye components, which was
found otherwise hereinbefore, the rate of extraction is slower with old ink than with new ink. Then one
would expect to see that the values of the measurements obtained from the heated sample (old) are less
or lower than those from the unheated sample (new). Again, this is not what we see from EJS's data.

*Vial 6 - 180 Seconds*

| Dye | Heated | Unheated 1 | Heated 2 | Unheated 2 |
|-----|--------|------------|----------|------------|
| 1 | 878 | 624 | 941 | 652 |
| 2 | 1221 | 1170 | 1361 | 1070 |
| 3 | 1653 | 1627 | 1934 | 1474 |

In the 180 seconds extraction for Vial 6 (which produced two allegedly "positive" results), all the value
of the measurements of dyes 1, 2 and 3 in the heated samples are higher than those in the unheated
samples.

25.10        Further at the same time frame, one dye shows higher value for the heated samples than
for the unheated ones, whilst another dye has a lower value for the heated samples than the unheated
samples, as follows :

*Vial 2 - 180 Seconds*

| Dye | Heated 2 | Unheated 2 |
|-----|----------|------------|
| 1 | 2014 | 1790 |
| 2 | 1319 | 1117 |
| 3 | 690 | 725 |

25.11        In this case dyes 1 and 2 of heated 2 have higher values than those with unheated 2,
whereas dye 3 shows the opposite circumstance, that is, the value of dye 3 of heated 2 is lower than that
of unheated 2.

25.12        Still further what we see in these two samples is not, however, what we can expect to
see in the *other* two samples taken from the *same* Vial 2, i.e. heated/unheated 1. All values at the same
time frame of heated 1 are lower than those of unheated 1, which appears to be logical :

*Vial 2 - 180 seconds*

| Dye | Heated 1 | Unheated 1 |
|-----|----------|------------|
| 1 | 1722 | 2026 |
| 2 | 1005 | 1190 |
| 3 | 516 | 623 |

25.13        What also causes concern is the inconsistent behaviour of the dyes being extracted from
the same sample, as well as the inconsistent behaviour of the dyes being extracted from the two samples

Exhibit __3__ Page __19__            ⊙🖽🏳🏴🏁⊙

EXHIBIT _____ 6

PAGE _____ 171

of the same ink. As the examination was conducted in duplicates, in the absence of a scientifically sound explanation to these illogical data, there is no means of knowing which of these sets of data is correct, if at all. If one of them is wrong, then the Court would be left with a conclusion based on one sample only and of course, in that case, no statistical analysis could be conducted.

## CRITICISM 3

25.14　　　There is the additional situation that there is very large difference in measurements obtained between duplicates samples taken from the same handwritten entry on Documents A and C, as follows :

(a) *Vial 2 - 90 seconds, dye 1*

The difference between heated 1 and heated 2 is 30%;[7] and,

(b) *Vial 6 - 30 seconds, dye 2*

The difference between heated 1 and heated 2 is 31%.[8]

Sketches of graphical representations on such percentages can be found at pp.2270-1, and 2270-2, G8.

25.15　　　It is not clear from the evidence of EJS whether he claimed that such a large difference was acceptable or not.[9] He classified this huge difference as a "variation". Whilst VNA agreed that variation exists in any analytical procedure, he stressed that it should be within a few percent, say 1% to 3%, certainly not 20% or 30%.[10] Even in the case of *Calloway v. Richter*,[11] EJS gave evidence that there should be about 1% to 2% error between duplicated samples, not a difference of up to 31% as we have in this case. Indeed, EJS did not use the Dye-ratio method in that case.[12]

## EJS'S DEFENCES

25.16　　　When EJS was challenged with the above criticisms, he claimed that one cannot compare raw data against each other, as they are mass-dependant.[13] The ratio of these raw data should be calculated and could then be compared against each other, as the ratios are mass independant.[14] Further, he claimed that the behaviour of these ratios were predictable.

25.17 However, it is difficult to appreciate why the raw data could not be considered and compared, but only their ratios, given that the ratios were calculated from the raw data. EJS was unable to offer explanation to what appears to be an unreasonable and illogical claim.[15]

25.18　　　In any event, the *ratios* behaved unpredictably too and did not, therefore, assist EJS. VNA gave two examples on the unpredictably behaved ratios in VNA-5 and VNA-6[16] as follows :

(a) *The ratios of dye 2/dye 3 in Vial 2 (VNA-5) :*

*Vial 2 - Dye 2/Dye 3*

|          | 30 Seconds | 90 Seconds | 180 Seconds |
|----------|------------|------------|-------------|
| Heated 1 | 2.6        | 2.0        | 1.95        |
| Heated 2 | 2.55       | 1.69       | 1.91        |

Exhibit **3** Page **20**

EXHIBIT _____ 6

PAGE _____ 172

It is apparent that the two heated samples behaved in the opposite manner to each other, contrary to EJS's claim that the ratios are predictable. In heated 1, the ratios decreased with time whereas the ratio in heated 2 decreased from 30 seconds to 90 seconds only but it increased again at 180 seconds.

*Vial 2 – Dye 2/Dye 3*

| | 30 Seconds | 90 Seconds | 180 Seconds |
|---|---|---|---|
| Unheated 1 | 1.83 | 1.49 | 1.91 |
| Unheated 2 | 1.83 | 1.67 | 1.54 |

In relation to the two unheated samples, they behaved just as unpredictable as the heated samples.

25.19    The ratios of dye 1 to dye 3 in Vial 6, as illustrated in VNA-6, behaved as unpredictably as those of dye 2/dye 3 in Vial 2 (VNA-5) as pointed out hereinbefore.

25.20    Therefore, even if we were to restrict ourselves and consider only the *ratios* of the dyes as EJS suggested, they are also illogical and unpredictable. Again, if there were errors in only one of the two samples, in the absence of any scientifically sound explanation to these illogical data, there is no means of knowing which of the two samples is correct, if at all. Again, no statistical analysis could be conducted with one sample only.

25.21    When VNA was cross-examined,[17] various graphs[18] (presumably prepared by EJS) using different scale in the x-axis and y-axis were shown to him, in an attempt to show that the ratios given in EJS 2 behaved uniformly to each other or at least, not as drastically as they appear in VNA-5 and VNA-6.[19] The difference between these graphs and VNA's illustrations are no more than difference in graphical presentations. However the graphs were misleading. As VNA explained,[20] the graphs were plotted with one curve representing the average of the two ratios of the two sample runs. It is therefore impossible to tell by these graphs how each of the samples behaved. The two readings may be miles apart but because an average was taken, they would only be represented by one point on the graph. Indeed, it was never suggested by EJS, nor in any publication, that the average of duplicate runs should (or could) be considered.

25.22    The range of possible explanations offered by EJS were :

(a)    It was as a consequence of "some interaction once the dye is extracting with the solvent to reduce the optical density of the dye".[21]

(b)    "It could have some leaching back into the paper, or something like that".[22]

(c)    "...depending on the size of the difference, could just be a variation in the measurements".[23]

(d)    This "variation" within samples had been "factored" into the calculations by applying 1 STD.[24]

25.23    In the end, none of the possible reasons offered by EJS were acceptable as pointed out by VNA. EJS should have at least investigated into the reasons of his examinations which gave him the illogical data or as VNA suggested, simply re-do the examination. As EJS did not conduct any scientific research with the view to evaluating the capabilities and limitations of the Dye-ratio method, he was therefore unable to offer any scientifically sound explanation as to why the method he used in this case produced such illogical results. For example, if he suggested boldly that there could have been some leaching back into the paper or something like that, there is no reason why, after the decease in the 90 seconds reading because the colour somehow leach back into the paper, the concentration increased again after 180 seconds. Even if that is so, how can any measurement be accurate if there is such a "leaching back" factor.

Exhibit 3 Page 21

EXHIBIT _____ 6

PAGE _____ 173

25.24       By reason of the aforesaid matters, I accept VNA's contention that the illogical data primarily attributed to EJS arbitrarily separating the badly resolved chromatographic peaks into dyes 1, 2 and 3. This is supported by the fact that before they were separated by thin-layer chromatography, the dyes behaved logically according to the visual examination of the TLC plates and the data obtained from the Percent Extraction and R-ratio methods.[25]

## CONCLUSION

25.25       By reason of the aforesaid matters, the Court cannot and should not place any reliance whatsoever on the illogical and unreliable results obtained by EJS using the Dye-ratio method in this case. The conclusion drawn by him from these results cannot be accepted.

Footnote:

1 Slides 1 to 13, G8A, pp.2270-1 and 2270-2, G8, and in VNA-5 and VNA-6 of VNA 2
2 pp.2207-2208, G8
3 T40:88:17
4 T44:76:1-2
5 Slide 13, Bundle G8A
6 T38:20:24-22:1; T22:22-23:5
7 Slide 6, G8A
8 Slide 13, G8A
9 T44:77:2-11
10 T51:32:16-25
11 p.1073 (lines 4-8) and p.1089 (lines 3-14), F5
12 T44:57:1-12
13 T44:79:24-25
14 T44:77:8-19
15 T44:100:23-101:23
16 pp.699 and 701, E7-E10 (VNA 2) and T51:27:18-29:4
17 T56:12;10-18:5
18 pp.1929-1934, F7
19 pp.699 and 701, E7-E10 (VNA 2)
20 T56:17:9-17
21 T41:70:6-9; T48:71:21-23
22 T41:70:14-15
23 T41:70:15-17
24 T40:85:12-16
25 See illustrations at pp.2270-1 and 2, G8

0

0

0

## Chapter 26 - Mass Independence

0

26.1       Both VNA and EJS agreed that to obtain Dye-ratios that would be independant of the amount of ink on the samples of microplugs taken from Documents A and C, (i.e. the mass of the ink) the data (optical signals) received by the video densitometer must be *directly proportional* to the

Exhibit 3 Page 22

EXHIBIT _____ 6

PAGE _____ 14

# EXHIBIT 7

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-443-3000 FAX 213-443-3100

WRITER'S INTERNET ADDRESS
dianehutnyan@quinnemanuel.com

December 13, 2007

<u>VIA FACSIMILE AND EMAIL</u>

Michael H. Page, Esq.                          Timothy Miller, Esq.
Keker & Van Nest LLP                           Skadden, Arps, Slate, Meagher & Flom LLP
710 Sansome Street                             Four Embarcadero Center
San Francisco, CA 94111-1704                   Suite 3800
                                               San Francisco, CA 94111

Re:    <u>Mattel v. Carter Bryant</u>

Pursuant to paragraph 6 of the Order Granting Mattel, Inc.'s Motion to Compel Bryant To Make
Original Documents Available for Expert Examination and Testing, dated August 31, 2007, we
request that the following Bryant originals (identified by Bates Numbers or BORIG control
numbers) be produced so that samples may be taken for fiber composition analysis, chemical
spot tests and/or elemental analysis:

Bryant 00139-00140, 00154, 00157-00162, 00171-00172, 00175-00183, 00186, 00189-00190,
00192-00218, 00220-00246, 00277-00278, 00291-00297, 00300-00303, 00310-00351, 00358-
00361, 00688, 00690-00691, 00699-00701, 00829-00831, 00859, 00911, 00954, 00960-00970,
01003, 01014, 01094, 01111-01118, 01121-01126, 01243, and the notebooks that are numbered
Bryant 01589-01665 and BORIG 1632, 1633 and 1729.

These tests would involve obtaining a small sample or samples of the paper from the document.
This is done by taking a small punch or punches from the document and/or a snippet from the
corner of the document. The punches or samples would be taken from a portion or portions of
the document that do(es) not have any markings or ink and thus would not be destructive of the
drawings or writing on the document. As you know, some of the documents listed above are
stuck to a posterboard. In those cases, the paper may have to be gently lifted from the
posterboard so as to allow a sample to be taken; also samples may need to be taken from the
posterboard attached to certain documents.

EXHIBIT _____ 7 _____

PAGE _____ 175 _____

**quinn emanuel urquhart oliver & hedges, llp**

NEW YORK | 51 Madison Avenue, 22nd Floor, New York, New York 10010 | TEL 212-849-7000 FAX 212-849-7100
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94111 | TEL 415-875-6600 FAX 415-875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL 650-801-5000 FAX 650-801-5100

20078/2319892.1

Michael H. Page, Esq. and Timothy A. Miller, Esq.
December 13, 2007

In addition, we are alerting you to our request of Ms. Prince's counsel, Dan Warren, for our expert to take small ink samples from entries in Ms. Prince's notary book, including but not limited to parts of the 8/26/99 ink entry on the originals of Bryant 00928 and 00929 so that ink identification testing may conducted.

I look forward to hearing from you on these matters.

Sincerely,

Diane C. Hutnyan

20078/2319892.1
cc:    Timothy Miller, Esq.
       Larry W. McFarland, Esq.

EXHIBIT _____ 7 _____

PAGE _____ 176 _____

# EXHIBIT 8



QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
  John B. Quinn (Bar No. 090378)
  (johnquinn@quinnemanuel.com)
  Michael T. Zeller (Bar No. 196417)
  (michaelzeller@quinnemanuel.com)
  Jon D. Corey (Bar No. 185066)
  (joncorey@quinnemanuel.com)
  Timothy L. Alger (Bar No. 160303)
  (timalger@quinnemanuel.com)
865 South Figueroa Street, 10th Floor
Los Angeles, California  90017-2543
Telephone:   (213) 443-3000
Facsimile:   (213) 443-3100

Attorneys for Plaintiff and Cross-Defendant Mattel, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual,<br><br>　　　　Plaintiff,<br><br>　　vs.<br><br>MATTEL, INC., a Delaware corporation,<br><br>　　　　Defendant.<br><br><br>AND CONSOLIDATED CASES | Case No. CV 04-09049 SGL (RNBx)<br><br>Consolidated with<br>Case No. CV 04-09059<br>Case No. CV 05-02727<br><br>**DISCOVERY MATTER**<br><br>Hon. Edward A. Infante (Ret.)<br>Discovery Master<br><br>STIPULATION RE: MATTEL'S DESTRUCTIVE TESTING OF BRYANT ORIGINAL DOCUMENTS; AND<br><br>~~[PROPOSED]~~ ORDER |

07209/2348296.2

STIPULATION RE DESTRUCTIVE TESTING OF BRYANT ORIGINALS; PROPOSED ORDER

EXHIBIT _____ 8

PAGE _____ 177

## STIPULATION

WHEREAS, Mattel has, pursuant to paragraph 6 of the Court's August 30, 2007 Order Granting Mattel, Inc.'s Motion to Compel Bryant to Make Original Documents Available for Expert Examination and Testing, requested limited destructive testing of certain of Carter Bryant's ("Bryant") original documents;

WHEREAS, Bryant originally objected to the request as untimely, but now has agreed to allow the requested destructive testing;

NOW, THEREFORE, the parties will adhere to the following protocol with respect to the destructive testing of the Bryant originals:

1.      On January 11, 2008, during normal business hours, Mattel's counsel will pick up, by messenger, from Keker & Van Nest, LLP, 710 Sansome Street, San Francisco, California, the documents that were previously provided by Bryant to Mattel for examination by Mattel's experts on Wednesday, September 12, 2007, in the seven mailing cartons in which they were returned to Keker by Mattel's counsel on October 17, 2007 ("the seven cartons").[1]

2.      The seven cartons will be shipped, using Federal Express or UPS, to Mattel's expert's laboratory, Integrated Paper Services, Inc., c/o Walter Rantanen, 3211 E. Capitol Drive, Appleton, WI 54911, for delivery on Monday morning, January 14, 2008.  January 14 shall be the first of four business days that Mattel shall have for the sampling of the documents.  Subject to Paragraph 7 below, when the sampling is complete or on the fourth business day, whichever comes first, the documents shall be sent from Mattel's expert's laboratory, and will be delivered

---

[1] The documents were provided to Mattel by Bryant on September 12, 2007 in eight boxes.  However, to give the documents additional protection, Mattel repackaged the original eight boxes into seven cartons.  The original eight boxes, and the documents they originally contained, all are now contained within the seven cartons.

EXHIBIT ___ 8

PAGE ___ 178

1 | to Keker & Van Nest's San Francisco office, to the attention of Matthew Werdegar,
2 | during normal business hours the next business day.

3     4.   The documents as to which sampling is permitted are the
4 | originals of those documents produced by Bryant in this action that correspond with
5 | bates-numbered documents:  Bryant 00139-00140, Bryant 00154, Bryant 00157-
6 | 00162, Bryant 00171-00172, Bryant 00175-00183, Bryant 00186, Bryant 00189-
7 | 00190, Bryant 00192-00218, Bryant 00220-00246, Bryant 00277-00278, Bryant
8 | 00291-00297, Bryant 00300-00303, Bryant 00310-00351, Bryant 00358-00361,
9 | Bryant 00688, Bryant 00690-00691, Bryant 00699-00701, Bryant 00829-00831,
10 | Bryant 00859, Bryant 00911, Bryant 00954, Bryant 00960-00970, Bryant 01003,
11 | Bryant 01014, Bryant 01094, Bryant 01111-01118, Bryant 01121-01126, Bryant
12 | 01243; and the notebooks that are numbered Bryant 01589-01665; and BORIG
13 | 1632, 1633 and 1729.

14     5.   The sampling of the documents listed in paragraph 4 above shall
15 | consist of the following:  Samples of the documents listed will be obtained by taking
16 | a small punch or punches from the document and/or a snippet from the corner of the
17 | document.  The samples shall be taken from a portion or portions of the document
18 | that do(es) not have any markings or ink and thus shall not be destructive of the
19 | drawings or writing on the document.  Examples of punches and snippets of the type
20 | that will be taken during the sampling have been received by Bryant's counsel and
21 | deemed unobjectionable.  The expert extracting the samples will be one of the
22 | experts approved by Judge Infante during his *in camera* inspection of their
23 | credentials.  The samples shall be used for fiber composition analysis, chemical spot
24 | tests and/or elemental analysis.

25     6.   Except as set forth in paragraph 5, above, all the Bryant
26 | documents shall be returned in the same condition, sequence and order in which
27 | they were received.

28 |

EXHIBIT 8
PAGE 179

1       7.    MGA has elected to have Mr. Erich Speckin observe the

2 sampling procedure.  Counsel for Mattel hereby represents that Mattel has conferred

3 with MGA and that Mr. Speckin is available to observe the destructive testing

4 procedure during the four business day period described in paragraph 2.  If Mr.

5 Speckin, while he is observing the procedure, raises any issues about the sampling

6 or testing being done or any other aspects of the process, the parties will seek

7 immediate resolution from this Court so that the sampling, and any subsequent

8 activities, will not be delayed.  In the event that there is a dispute or objection, the

9 four business day period described in paragraph 2 is extended for the length of time

10 that was needed to resolve the dispute or objection.

11

12        IT IS SO STIPULATED.

13 DATED: January 11, 2008       QUINN EMANUEL URQUHART OLIVER &

14                       HEDGES, LLP

15

16                     By _____

17                       Diane C. Hutnyan
                         Attorneys for Mattel, Inc.

18 DATED: January 11, 2008       KEKER & VAN NEST, LLP

19

20

21                     By _____

22                       Matthew M. Werdegar
                         Attorneys for Carter Bryant

23

24

25

26

27

28

07209/2348196.2

EXHIBIT _____ 9

PAGE _____ 180

1                ~~[PROPOSED]~~ ORDER

2      Pursuant to the foregoing stipulation of the parties, IT IS SO ORDERED.

3

4 DATED: January _11_, 2008

5

6

7                      Hon. Edward Infante (Ret.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

07209/2348296.2

                                5
STIPULATION RE DESTRUCTIVE TESTING OF BRYANT ORIGINALS; PROPOSED ORDER

EXHIBIT _____ 8

PAGE _____ 191

## PROOF OF SERVICE BY E-MAIL

I, Sandra Chan, not a party to the within action, hereby declare that on January 11, 2008, I served the attached STIPULATION AND ORDER RE: MATTEL'S DESTRUCTIVE TESTING OF BRYANT ORIGINAL DOCUMENTS in the within action by email addressed as follows:

| | | |
|---|---|---|
| John W. Keker, Esq. | Keker & Van Nest | jkeker@kvn.com |
| Michael H. Page, Esq. | Keker & Van Nest | mhp@kvn.com |
| Christa Anderson, Esq. | Keker & Van Nest | cma@kvn.com |
| Matthew M. Werdegar, Esq. | Keker & Van Nest | mwerdegar@kvn.com |
| John E. Trinidad, Esq. | Keker & Van Nest | jtrinidad@kvn.com |
| Audrey Walton-Hadlock, Esq. | Keker & Van Nest | awalton-hadlock@kvn.com |
| John Quinn Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | johnquinn@quinnemanuel.com |
| Michael Zeller Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | michaelzeller@quinnemanuel.com |
| Jon Corey Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | joncorey@quinnemanuel.com |
| Duane Lyons Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | duanelyons@quinnemanuel.com |
| Timothy Alger Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | timalger@quinnemanuel.com |
| Dominic Surprenant Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | DominicSurprenant@QuinnEmanuel.com |
| B. Dylan Proctor Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | dylanproctor@quinnemanuel.com |
| Shane McKenzie Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | shanemckenzie@quinnemanuel.com |
| Bridget Hauler Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | bridgethauler@quinnemanuel.com |
| Tamar Buchakjian Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | tamarbuchakjian@quinnemanuel.com |
| Juan Pablo Alban, Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | juanpabloalban@quinnemanuel.com |
| Thomas J. Nolan, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | tnolan@skadden.com |
| Raoul D. Kennedy, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | rkennedy@skadden.com |
| Amy S. Park, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | apark@skadden.com |
| Harriet S. Posner, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | hposner@skadden.com |
| Carl Alan Roth, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | croth@skadden.com |
| Timothy A. Miller, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | tmiller@skadden.com |
| Marcus R. Mumford, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | Mmumford@skadden.com |

I declare under penalty of perjury under the laws of the Untied States of America that the above is true and correct.

Executed on January 11, 2008, at San Francisco, California.

Sandra Chan

EXHIBIT _____ 8 _____

PAGE _____ 182 _____

# EXHIBIT 9

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-443-3000 FAX 213-443-3100

WRITER'S INTERNET ADDRESS
dianehutnyan@quinnemanuel.com

December 13, 2007

**VIA FACSIMILE AND EMAIL**

Daniel Warren, Esq.
Sutherland Asbil & Brennan, LLP
999 Peachtree Street
Suite 2300
Atlanta, GA 30309

Re:    Carter Bryant v. Mattel

Dear Mr. Warren:

Thank you again for providing our experts access to Ms. Prince's notary book. Our experts have not conducted any destructive testing on it to date. However, one of our experts recommends our taking some small plug samples from various handwritten ink lines of the notary book, including those in the 8/26/99 Carter Bryant entry, so that ink identification testing can be done. Could you please let me know whether you have any objection to that? If you have any questions, please call me at 213-443-3666.

Sincerely,

Diane C. Hutnyan

DH
07209/2321947.1
cc:    Timothy Miller, Esq.

EXHIBIT _____ 9 _____

PAGE ___ 183 ___

**quinn emanuel urquhart oliver & hedges, llp**

07209/2321947.1

NEW YORK | 51 Madison Avenue, 22nd Floor, New York, New York 10010 | TEL 212-849-7000 FAX 212-849-7100
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94111 | TEL 415-875-6600 FAX 415-875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL 650-801-5000 FAX 650-801-5100

# EXHIBIT 10

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

300 SOUTH GRAND AVENUE

LOS ANGELES, CALIFORNIA 90071-3144
———
TEL: (213) 687-5000
FAX: (213) 687-5600
www.skadden.com

FIRM/AFFILIATE OFFICES
BOSTON
CHICAGO
HOUSTON
NEWARK
NEW YORK
PALO ALTO
SAN FRANCISCO
WASHINGTON, D.C.
WILMINGTON
———
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
PARIS
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

December 20, 2007

Via Email and Facsimile

Diane C. Hutnyan
Quinn Emanuel
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017

    RE: Bryant vs. Mattel, Inc. (and Consolidated Cases)
       Case No. CV04-9049 SGL(RNBx) (Consolidated with
       Case Nos. CV04-09059 and CV05-02727)

Dear Ms. Hutnyan:

    I am in receipt of your December 13, 2007 letter to Daniel Warren,
cc'd to Tim Miller, concerning Mattel's request to conduct certain testing on Ramona
Prince's notary book. As I have advised Mr. Warren, MGA requests that its ink
testing consultant be present when any so-called "destructive testing" of that notary
book is conducted. Please propose a date and location for that testing so that I can
arrange for our consultant to be present.

       Very truly yours,

       Carl Alan Roth

cc: Daniel Warren (via email and facsimile)
CAR:pp

487122.01-Los Angeles Server 1A - MSW

EXHIBIT _____ 10 _____

PAGE _____ 184 _____

# EXHIBIT 11

**Diane Hutnyan**

| | |
|---|---|
| **From:** | Diane Hutnyan |
| **Sent:** | Tuesday, December 25, 2007 1:18 PM |
| **To:** | 'Warren, Daniel J.' |
| **Cc:** | 'tmiller@skadden.com'; 'Michael Page'; Michael T Zeller; Andrea Hoeven |
| **Subject:** | Letter to Dan Warren re Destructive Testing |
| **Attachments:** | 2335468_Letter to Dan Warren re Destructive Testing (2).pdf |

Counsel,

Happy Holidays! Please see attached correspondence.

Diane

EXHIBIT ___11___

PAGE ___185___

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL: (213) 443-3000  FAX: (213) 443-3100

WRITER'S INTERNET ADDRESS
dianehutnyan@quinnemanuel.com

December 25, 2007

VIA EMAIL

Daniel Warren, Esq.
Sutherland Asbil & Brennan, LLP
999 Peachtree Street
Suite 2300
Atlanta, GA 30309

Re:   Mattel v. Carter Bryant

Dear Dan:

Pursuant to your request, I am writing to inform you, in greater detail, of the procedure our expert plans to use when extracting samples from entries in Ms. Prince's notary book. As we have discussed, Mattel's expert plans to take small ink samples from entries in Ms. Prince's notary book, including but not limited to parts of the 8/26/99 ink entry on the originals of Bryant 00928 and 00929, so that ink identification testing may conducted.

To obtain the samples, our expert (whose qualifications were carefully reviewed and approved as satisfactory by Judge Infante) would punch small holes, better known as "microplugs," from the text of Ms. Prince's notary book. With the exception of the removal of the microplugs, the notary book will remain intact; also our expert will take care to leave a significant portion of each text entry intact such that future samples may be taken from the same entries. As previously discussed, you or your designated expert are welcome to attend the taking of these samples. Once the microplugs have been taken, we are happy to return the notary book to your custody right away.

EXHIBIT _____ 11

PAGE _____ 186

**quinn emanuel urquhart oliver & hedges, llp**

07209/2335468.1

NEW YORK | 51 Madison Avenue, 22nd Floor, New York, New York 10010 | TEL (212) 849-7000  FAX (212) 849-7100
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94111 | TEL (415) 875-6600  FAX (415) 875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL (650) 801-5000  FAX (650) 801-5100

Dan Warren, Esq.
December 25, 2007


Please let me know if you have any further questions; or if not, that you will approve the sampling requested.

Thank you for your cooperation in this matter.

Sincerely,


/s/


Diane C. Hutnyan

07209/2335468.1
cc:     Timothy Miller, Esq.
        Michael H. Page, Esq.

EXHIBIT _____ 11

PAGE _____ 187

# EXHIBIT 12

## Diane Hutnyan

| | |
|---|---|
| **From:** | Warren, Daniel J. [Daniel.Warren@sablaw.com] |
| **Sent:** | Wednesday, December 26, 2007 7:56 AM |
| **To:** | Diane Hutnyan |
| **Cc:** | tmiller@skadden.com; Michael Page; Michael T Zeller; Andrea Hoeven; JTrinidad@kvn.com; Carl.Roth@skadden.com |

**Subject:** RE: Letter to Dan Warren re Destructive Testing

Dear Ms. Hutnyan,

Subject to coordinating your efforts with counsel for Mr. Bryant and MGA, you may proceed as outlined. Please copy me on your correspondence with counsel.

Regards. Dan Warren

---

**From:** Diane Hutnyan [mailto:dianehutnyan@quinnemanuel.com]
**Sent:** Tuesday, December 25, 2007 4:18 PM
**To:** Warren, Daniel J.
**Cc:** tmiller@skadden.com; Michael Page; Michael T Zeller; Andrea Hoeven
**Subject:** Letter to Dan Warren re Destructive Testing

Counsel,

Happy Holidays!  Please see attached correspondence.

Diane

---

CIRCULAR 230 DISCLOSURE:   To comply with Treasury
Department regulations, we inform you that, unless
otherwise expressly indicated, any tax advice contained in
this communication (including any attachments) is not
intended or written to be used, and cannot be used, for the
purpose of (i) avoiding penalties that may be imposed under
the Internal Revenue Code or any other applicable tax law,
or (ii) promoting, marketing or recommending to another
party any transaction, arrangement, or other matter.

---

The information contained in this message from Sutherland
Asbill & Brennan LLP and any attachments are confidential
and intended only for the named recipient(s). If you have
received this message in error, you are prohibited from
copying, distributing or using the information. Please
contact the sender immediately by return email and delete
the original message.

EXHIBIT ___12___

PAGE ___188___

# EXHIBIT 13

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

300 SOUTH GRAND AVENUE

LOS ANGELES, CALIFORNIA 90071-3144
———
TEL: (213) 687-5000
FAX: (213) 687-5600
www.skadden.com

FIRM/AFFILIATE OFFICES
———
BOSTON
CHICAGO
HOUSTON
NEWARK
NEW YORK
PALO ALTO
SAN FRANCISCO
WASHINGTON, D.C.
WILMINGTON
———
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
PARIS
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

December 26, 2007

Via Email and Facsimile

Diane C. Hutnyan
Quinn Emanuel
865 South Figueroa Street, 10th Floor
Los Angeles, CA  90017

RE:     Bryant vs. Mattel, Inc. (and Consolidated Cases)
        Case No. CV04-9049 SGL(RNBx) (Consolidated with
        Case Nos. CV04-09059 and CV05-02727)

Dear Ms. Hutnyan:

        I am in receipt of your December 25, 2007 letter to Daniel Warren, cc'd to Tim Miller, concerning Mattel's request to conduct certain testing on Ramona Prince's notary book.  As I stated in my letter of December 20, 2007 letter to you, MGA requests that its ink testing consultant be present when any so-called "destructive testing" of that notary book is conducted.  Such a procedure is, of course, consistent with Judge Infante's August 30, 2007 Order (providing that Bryant and MGA may "also elect to have their own experts attend for any destructive testing").  It is evident from Mr. Warren's e-mail to you of earlier today that he expects you to work out a schedule with MGA as well.  MGA's consultant is available on January 4, 5, 6 and 11, and the entire week of January 14.

EXHIBIT _____ 13

PAGE _____ 184

Daniel Warren, Esq.
December 26, 2007
Page 2


        Accordingly, I ask again (as I did in my December 20 letter): please
propose a date and location for that testing so that I can arrange for our consultant to
be present.

                       Very truly yours,

                       Carl Alan Roth

cc:  Daniel Warren (via email and facsimile)
CAR:pp

EXHIBIT _____ 13 _____

PAGE _____ 190 _____

1   QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
2     John B. Quinn (Bar No. 090378)
      johnquinn@quinnemanuel.com
3     Michael T. Zeller (Bar No. 196417)
      (michaelzeller@quinnemanuel.com)
4     Jon D. Corey (Bar No. 185066)
      (joncorey@quinnemanuel.com)
5     Timothy L. Alger (Bar No. 160303)
      (timalger@quinnemanuel.com)
6   865 South Figueroa Street, 10th Floor
    Los Angeles, California 90017-2543
7   Telephone:  (213) 443-3000
    Facsimile:  (213) 443-3100
8
9   Attorneys for Plaintiff and Cross-Defendant Mattel, Inc.

10              UNITED STATES DISTRICT COURT

11              CENTRAL DISTRICT OF CALIFORNIA

12                  EASTERN DIVISION

| | |
|---|---|
| 13  CARTER BRYANT, an individual, | Case No. CV 04-09049 SGL (RNBx) |
| 14              Plaintiff, | Consolidated with |
| 15     vs. | Case No. CV 04-09059 |
| 16 | Case No. CV 05-02727 |
| 17  MATTEL, INC., a Delaware | **DISCOVERY MATTER** |
|     corporation, | Hon. Edward A. Infante (Ret.) |
| 18 | Discovery Master |
| 19              Defendant. | STIPULATION RE: MATTEL'S DESTRUCTIVE TESTING OF BRYANT ORIGINAL DOCUMENTS; AND |
| 20 | |
| 21  AND CONSOLIDATED CASES | [PROPOSED] ORDER |
| 22 | |

23
24
25
26
27                         EXHIBIT _____13_____
28                         PAGE _____191_____

07209/2338290.1

STIPULATION RE DESTRUCTIVE TESTING OF BRYANT ORIGINALS; PROPOSED ORDER

## STIPULATION

WHEREAS, Mattel has, pursuant to paragraph 6 of the Court's August 30, 2007 Order Granting Mattel, Inc.'s Motion to Compel Bryant to Make Original Documents Available for Expert Examination and Testing, requested limited destructive testing of certain of Carter Bryant's ("Bryant") original documents;

WHEREAS, Bryant originally objected but now has agreed to allow the requested destructive testing;

NOW, THEREFORE, the parties will adhere to the following protocol with respect to the destructive testing of the Bryant originals:

1.      On January 11, 2008, during normal business hours, Mattel's counsel will pick up, by messenger, from Keker and Van Nest, LLP, 710 Sansome Street, San Francisco, California, the eight boxes of materials that were provided for examination by Mattel's experts on Wednesday, September 12, in the mailing cartons they were returned to Keker in on October 17, 2007 ("the eight boxes").

2.      The eight boxes will be shipped, using Federal Express or UPS, to the laboratory, [address to be filled in] on Monday morning, January 14, 2008. When they are received in the laboratory ("reception time"), the clock will start running as to Mattel's time for the sampling. The sampling procedure will begin on the morning of January 14, and continue on consecutive days until the "completion time." Subject to paragraph 7 below, the completion time is when the sampling is complete, or 96 hours from the reception time, whichever comes first.

4.      The documents as to which sampling is permitted are the originals of those documents produced by Bryant in this action that correspond with bates-numbered documents:  Bryant 00139-00140, Bryant 00154, Bryant 00157-00162, Bryant 00171-00172, Bryant 00175-00183, Bryant 00186, Bryant 00189-00190, Bryant 00192-00218, Bryant 00220-00246, Bryant 00277-00278, Bryant 00291-00297, Bryant 00300-00303, Bryant 00310-00351, Bryant 00358-00361,

STIPULATION RE DESTRUCTIVE TESTING OF BRYANT ORIGINALS; PROPOSED ORDER

07209/2338290.1

1   Bryant 00688, Bryant 00690-00691, Bryant 00699-00701, Bryant 00829-00831,

2   Bryant 00859, Bryant 00911, Bryant 00954, Bryant 00960-00970, Bryant 01003,

3   Bryant 01014, Bryant 01094, Bryant 01111-01118, Bryant 01121-01126, Bryant

4   01243; and the notebooks that are numbered Bryant 01589-01665; and BORIG

5   1632, 1633 and 1729.

6          5.      Samples of the documents listed will be obtained by taking a

7   small punch or punches from the document and/or a snippet from the corner of the

8   document.  The samples would be taken from a portion or portions of the document

9   that do(es) not have any markings or ink and thus would not be destructive of the

10  drawings or writing on the document.  Examples of punches and snippets of the type

11  that would be taken during the sampling have been received by Bryant's counsel and

12  deemed unobjectionable.  The expert extracting the samples will be one of the

13  experts approved by Judge Infante during his *in camera* inspection of their

14  credentials.

15         6.      Except as set forth above, all the Bryant documents shall be

16  returned in the same condition, sequence and order in which they were received.

17         7.      MGA has elected to have its ink testing consultant, Jason Harner,

18  observe the sampling procedure.  If Mr. Harner, while he is observing the procedure,

19  raises any issues about the sampling or testing being done or any other aspects of the

20  process, the parties will seek immediate resolution from this Court so that the

21  sampling, and any subsequent activities, will not be delayed.  In the event that there

22  is a dispute or objection, the 96-hour period described in paragraph 2 is extended for

23  the length of time that was needed to resolve the dispute or objection.

24         8.      Upon reaching the completion time, Mattel's expert will ship the

25  eight boxes directly back to Keker & Van Nest, LLP, by Federal Express or UPS,

26  for receipt by Matthew Werdegar the following business morning.

27

28

-3-

STIPULATION RE DESTRUCTIVE TESTING OF BRYANT ORIGINALS; PROPOSED ORDER

PAGE ___   EXHIBIT ___

1    IT IS SO STIPULATED.

2

3    DATED:  January 4, 2008         QUINN EMANUEL URQUHART OLIVER &
                                     HEDGES, LLP
4

5

6                                    By_____
                                        Diane C. Hutnyan
7                                       Attorneys for Mattel, Inc.

8

9    DATED:  January 4, 2008         KEKER & VAN NEST, LLP

10

11

12                                   By_____
                                        Matthew M. Werdegar
13                                      Attorneys for Carter Bryant

14

15

16                            **[PROPOSED] ORDER**

17

18       IT IS SO ORDERED.

19

20   DATED:  January __, 2008

21

22

23                                   _____
                                     Hon. Edward Infante (Ret.)
24

25

26

27

28

STIPULATION RE DESTRUCTIVE TESTING OF BRYANT ORIGINALS; PROPOSED ORDER

07209/2338290.1

# EXHIBIT 14

I'm sorry but Mr. Huh cannot attend, especially on one day's notice. You have never asked for a lawyer to attend, and none of the parties contemplated that when reaching agreement on the protocol for destructive testing in this case. Why do you want a lawyer to attend?

---

**From:** Weinstein, Ryan [mailto:Ryan.Weinstein@skadden.com]
**Sent:** Thursday, January 03, 2008 9:44 AM
**To:** Diane Hutnyan
**Cc:** Roth, Carl A (LAC); mwerdegar@kvn.com; daniel.warren@sablaw.com; Andrea Hoeven; Michael T Zeller; Chris Grohman; Huh, Peter J (CHI)
**Subject:** RE: Mattel v. Bryant

Diane,

Jason Harner is the ink testing consultant who will be observing the micro-plug sampling for MGA. Additionally, Peter Huh from our Chicago office will also attend.

Ryan

---

**From:** Diane Hutnyan [mailto:dianehutnyan@quinnemanuel.com]
**Sent:** Wednesday, January 02, 2008 10:48 AM
**To:** Weinstein, Ryan (LAC)
**Cc:** Roth, Carl A (LAC); 'mwerdegar@kvn.com'; 'daniel.warren@sablaw.com'; Andrea Hoeven; Michael T Zeller; Chris Grohman
**Subject:** RE: Mattel v. Bryant

Ryan,

We are all set for January 4. The procedure should take about an hour. It can be done between 11:00 a.m. and 4:00 p.m. EST. Please let me know what times your consultant is available within that range. Also, please let me know who your consultant is.

I also have confirmed the location for the microplugging. It is not, as I reported earlier, in Grand Ledge. It is in Lansing. The address is: 2511 Lafayette Avenue, Lansing, Michigan. That should be good news for your consultant traveler.

Please confirm that you have received this and everything is in order.

I am still confirming arrangements for the sampling of the Bryant originals. I hope to get back to you on that later today.

Thanks,

Diane

---

**From:** Weinstein, Ryan [mailto:Ryan.Weinstein@skadden.com]
**Sent:** Friday, December 28, 2007 2:42 PM
**To:** Diane Hutnyan

EXHIBIT _____ 14 _____

PAGE _____ 145 _____

3/13/2008

**Cc:** Roth, Carl A (LAC); mwerdegar@kvn.com; daniel.warren@sablaw.com; Andrea Hoeven; Michael T Zeller; Chris Grohman
**Subject:** RE: Mattel v. Bryant

Diane,

We're confirmed for January 4.

As for the following week, our consultant is available January 10 and 11.  Please let us know how you'd like to proceed.

Ryan

---

**From:** Diane Hutnyan [mailto:dianehutnyan@quinnemanuel.com]
**Sent:** Friday, December 28, 2007 12:30 PM
**To:** Weinstein, Ryan (LAC)
**Cc:** Roth, Carl A (LAC); 'mwerdegar@kvn.com'; 'daniel.warren@sablaw.com'; Andrea Hoeven; Michael T Zeller; Chris Grohman
**Subject:** RE: Mattel v. Bryant

Ryan,

Of the dates you gave me, the only day I have available for the ink micro-plugging on the notary book is January 4.  We should go ahead and schedule that, as our expert is completely unavailable all around those dates (except for the 2nd and 3rd but your consultant is not available then).  The plugs would be taken in Grand Ledge, Michigan, which is very close to Lansing.  Please confirm.

As for the paper plugging, your consultant has no availability at all on the week of the 7th?  I am trying to check the following week for you but may not get an answer today.  Please have your consultant hold open the week of the 14th if he can, okay?  Also, he should try to hold the 11th in the event that we need that extra day to get a four-day spread into the next week.

Thanks.

---

**From:** Weinstein, Ryan [mailto:Ryan.Weinstein@skadden.com]
**Sent:** Friday, December 28, 2007 12:02 PM
**To:** Diane Hutnyan
**Cc:** Roth, Carl A (LAC); mwerdegar@kvn.com; daniel.warren@sablaw.com; Andrea Hoeven
**Subject:** RE: Mattel v. Bryant

Great - thank you.

Ryan

---

**From:** Diane Hutnyan [mailto:dianehutnyan@quinnemanuel.com]
**Sent:** Friday, December 28, 2007 11:58 AM
**To:** Weinstein, Ryan (LAC)
**Cc:** Roth, Carl A (LAC); 'mwerdegar@kvn.com'; 'daniel.warren@sablaw.com'; Andrea Hoeven
**Subject:** RE: Mattel v. Bryant

EXHIBIT _____ 14

PAGE _____ 14.6

3/13/2008

Hi, Ryan,

Thanks for your email and clarification.

I was just about to send over a note saying I was checking those dates and would hopefully have some answers shortly.  I will let you know as soon as I can confirm our experts' availability (I hope today but cannot promise).

Thanks

**From:** Weinstein, Ryan [mailto:Ryan.Weinstein@skadden.com]
**Sent:** Friday, December 28, 2007 11:00 AM
**To:** Diane Hutnyan
**Cc:** Roth, Carl A (LAC); mwerdegar@kvn.com; daniel.warren@sablaw.com
**Subject:** Mattel v. Bryant

Diane,

I write to follow up on Carl Roth's letters to you, dated December 20 and December 26, 2007.  In those letters, MGA requested that its ink testing consultant observe Mattel's "destructive testing" of Ramona Prince's log books, and proposed dates for that testing.  Please confirm that one or more of the proposed dates work for the testing of both Ms. Prince's log books and Carter Bryant's original drawings.  As set forth in Carl's December 26 letter, MGA proposes January 4, 5, 6 and 11, and the entire week of January 14.  Additionally, we again request that Mattel propose a location for the testing.

Regards,
Ryan

Ryan Weinstein
Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue
Los Angeles, CA 90071
Phone: (213) 687-5526
Fax: (213) 621-5526
E-mail: rweinste@skadden.com

---
To ensure compliance with Treasury Department regulations, we advise you that, unles

*********************************************
This email and any attachments thereto, is intended only for use by the addressee(s)

Further information about the firm, a list of the Partners and their professional qu
*********************************************
=================================================================================

---
*********************************************
This e-mail and any attachments thereto, is intended only for use by the addressee(s

EXHIBIT _____ 19

PAGE _____ 197

3/13/2008

# EXHIBIT 15

**From:** Diane Hutnyan [mailto:dianehutnyan@quinnemanuel.com]
**Sent:** Thursday, January 03, 2008 10:28 AM
**To:** Weinstein, Ryan (LAC)
**Cc:** Roth, Carl A (LAC); 'mwerdegar@kvn.com'; 'daniel.warren@sablaw.com'; Andrea Hoeven; Michael T Zeller; Chris Grohman; Huh, Peter J (CHI)
**Subject:** RE: Mattel v. Bryant

Ryan,

I'm sorry but Mr. Huh cannot attend, especially on one day's notice.  You have never asked for a lawyer to attend, and none of the parties contemplated that when reaching agreement on the protocol for destructive testing in this case.  Why do you want a lawyer to attend?

**From:** Weinstein, Ryan [mailto:Ryan.Weinstein@skadden.com]
**Sent:** Thursday, January 03, 2008 9:44 AM
**To:** Diane Hutnyan
**Cc:** Roth, Carl A (LAC); mwerdegar@kvn.com; daniel.warren@sablaw.com; Andrea Hoeven; Michael T Zeller; Chris Grohman; Huh, Peter J (CHI)
**Subject:** RE: Mattel v. Bryant

Diane,

Jason Harner is the ink testing consultant who will be observing the micro-plug sampling for MGA.  Additionally, Peter Huh from our Chicago office will also attend.

Ryan

**From:** Diane Hutnyan [mailto:dianehutnyan@quinnemanuel.com]
**Sent:** Wednesday, January 02, 2008 10:48 AM
**To:** Weinstein, Ryan (LAC)
**Cc:** Roth, Carl A (LAC); 'mwerdegar@kvn.com'; 'daniel.warren@sablaw.com'; Andrea Hoeven; Michael T Zeller; Chris Grohman
**Subject:** RE: Mattel v. Bryant

Ryan,

We are all set for January 4.  The procedure should take about an hour.  It can be done between 11:00 a.m. and 4:00 p.m. EST.  Please let me know what times your consultant is available within that range.  Also, please let me know who your consultant is.

I also have confirmed the location for the microplugging.  It is not, as I reported earlier, in Grand Ledge.  It is in Lansing.  The address is: 2511 Lafayette Avenue, Lansing, Michigan.  That should be good news for your consultant traveler.

Please confirm that you have received this and everything is in order.

I am still confirming arrangements for the sampling of the Bryant originals.  I hope to get back to you on that later today.

Thanks,

EXHIBIT _____ 15
PAGE _____ 198

3/13/2008

# EXHIBIT 16

**THIS EXHIBIT IS FILED UNDER SEAL
PURSUANT TO PROTECTIVE ORDER**

# EXHIBIT 17

**LITTLER MENDELSON®**

A PROFESSIONAL CORPORATION

ARIZONA

CALIFORNIA

July 21, 2004

Charlotte K. McClusky
Direct: 404.760.3917
Direct Fax: 404.233.2361
cmcclusky@littler.com

COLORADO

DISTRICT OF
COLUMBIA

**BY HAND DELIVERY**

Jaqueline Ramona Prince
300 Timber Laurel Lane
Lawrenceville, Georgia 30042

GEORGIA

Re:    *Notary Book & Stamp enclosed in case.* ~~7-21-04~~ 7-21-04 ~~9-21-04~~

ILLINOIS

Dear Ms. Prince:

This letter will confirm that I have this day personally taken receipt of your notary book. We appreciate your cooperation in this matter. Should you have any questions or concerns, please do not hesitate to contact me.

MINNESOTA

Thank you.

Very truly yours,

NEVADA

Charlotte K. McClusky

NEW JERSEY

CKM/jc
cc:    Dale Cendali, Esq.
       Robert Millman, Esq.

NEW YORK

Atlanta:159909.1 028307.1010

OHIO

PENNSYLVANIA

EXHIBIT    17    ~~PAGE~~

PAGE    211    ~~EXHIBIT~~

EXHIBIT
(o)
12/21/04   KRB

TEXAS

WASHINGTON

THE NATIONAL EMPLOYMENT & LABOR LAW FIRM℠

3348 Peachtree Road, N.E., Suite 1100, Atlanta, Georgia 30326.1008  Tel: 404.233.0330  Fax: 404.233.2361  www.littler.com