# EXHIBIT 18

**THIS EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

# EXHIBIT 19

**THIS EXHIBIT IS FILED UNDER SEAL
PURSUANT TO PROTECTIVE ORDER**

# EXHIBIT 20

RightFAX                    8/  /2006 3:02    PAGE 002/019   Fax Server

Priority ✓
Send     ✓
Enter    ____
Closed   ____
JS-5/JS-6 ____
JS-2/JS-3 ____
Scan Only ____

FILED - EASTERN DIVISION
CLERK, U.S. DISTRICT COURT

AUG 1 0 2006

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

CARTER BRYANT,

                    Plaintiff,

v.

MATTEL, INC.,

                    Defendant,

and related actions.

CASE NO.  CV 04-9049 SGL (RNBx)

(Consolidated with cases CV-04-9059 and CV-05-2727)

ORDER DENYING MOTION FOR APPOINTMENT OF EXPERT WITNESSES

Presently before the Court is Mattel, Inc.'s ("Mattel") motion for the appointment of expert witnesses pursuant to Federal Rule of Evidence 706, Carter Bryant and MGA Entertainment, Inc.'s ("MGA") opposition and response thereto, and Mattel's reply.  For the reasons set forth below, the Court **DENIES** the motion for the appointment of expert witnesses.

Federal Rule of Evidence 706(a) provides

> The court may . . . on the motion of any party enter an order to show cause why expert witnesses should not be appointed, and may request the parties to submit nominations.  The court may appoint any expert witnesses agreed upon by the parties, and may appoint expert witness of its own selection.  An expert witness shall not be appointed by the court unless the witness consents to act.

DOCKETED ON CM

AUG 1 1 2006

BY _____ 044

EXHIBIT ____20____

PAGE ____224____

1
2
3

    A witness so appointed shall be informed of the witness' duties by the court in writing, a copy of which shall be filed with the clerk, or at a conference in which the parties shall have opportunity to participate.

4
5
6
7
8
9
10
11
12
13
14
15
16

    The appointment of an expert by a federal court is a rare occurrence. Much of this stems from a concept "[d]eeply ingrained" in the common law "that it is the responsibility of the parties to produce the evidence while the court looks on to assure that the rules are followed." 4 JOSEPH M. MCLAUGHLIN, WEINSTEIN'S FEDERAL EVIDENCE § 706.02[1], at 706-6 (2nd ed. 2006). The reluctance of courts to intrude into the evidence-gathering function normally assigned to counsel is borne out of "the fear of ex parte communications between the court and its expert," as well as the unseemliness of "[c]ollecting a share of the expense [for the work performed by the court appointed expert] from a party who has been damaged by the expert's report." Id. at 706-6, 706-7. As a result of these institutional concerns, "experts are usually appointed only in exceptional cases that present unwieldy, complex, or technical issues" or where "there is a need for an impartial, independent assessment of a disputed issue." Id. § 706.02[3], at 706-8 706-9.

17
18
19
20
21
22
23
24
25
26
27
28

    Here, Mattel seeks for the court to appoint experts in the fields of questioned document examination, ink chemistry analysis, and paper chemistry analysis in order to "analyze and date (1) the originals of 'BRATZ' design drawings, (2) the faxed-version of the BRATZ-related contract between . . . Carter Bryant and MGA Entertainment, Inc., (3) MGA's internal documents relating to work performed by Anna Rhee on Bryant-related projects in the year 2000, and (4) a facsimile of BRATZ drawings bearing a fax header date of April 10, 2000," as well as "(5) any other documents that cannot be sampled or tested without destroying the sample tested or analyzed." (Mattel's Mot. Appt. Expert, Preface at 2). The reason proffered for such an appointment is two-fold: First, a generalized concern that, because the documents sought to be examined are "highly relevant" to the litigation, having a neutral expert perform the testing on the same may obviate a battle of the experts that would make

EXHIBIT _____ 20

PAGE _____ 225

1  the jury's function of sorting out the truth much more arduous; and second, concerns,

2  deduced during discovery, about the possible spoliation of key documents in the case

3  by MGA/Bryant and their counsel.

4  A.      AVERTING A BATTLE OF THE EXPERTS

5        Mattel's argument that the Court should appoint an expert because otherwise

6  each side will perform "separate, partisan destructive analyses of separate samples of

7  the documents" with "wide divergence" of opinion "virtually assured" is not well-

8  founded. (Mattel's Mot. Appt. Expert at 18, 20). Explicit in Mattel's argument is that

9  this feared divergence in each side's retained expert's opinions has yet to materialize.

10 This is not surprising as it appears that discovery in this case is in its nascent stage,

11 owed largely to the fact that the Court had earlier stayed the case while Mattel

12 appealed the denial of its motion to remand the case to state court.  Mattel's argument

13 instead is that the Court should appoint an expert now to avoid the <u>possibility</u> that

14 there <u>may</u> be such wide divergence in each side's privately retained expert in the

15 <u>future</u>.  Needless to say from the jabs each party took at the credibility and even

16 trustworthiness of the other side's retained expert during the oral argument on this

17 motion (one going so far as to label the competing ink chemistry experts as being the

18 modern day equivalent of one's Hatfield to the other's McCoy), such a possibility may

19 be more easier to imagine occurring here than in ordinary cases.  Nevertheless, such

20 divergence, even if likely, is still that – a possibility, not an inevitability.

21        In those cases where an expert has been appointed by a court on account of

22 the excessive partisanship in the expert opinions retained by counsel, the rationale for

23 the appointment was based on the fact that the feared wide divergence in opinion had

24 already materialized.  <u>See</u> <u>Students of California Sch. for the Blind v. Honig</u>, 736 F.2d

25 538, 548 (9th Cir. 1984)("the judge could not decide the merits of the students' seismic

26 safety claims on the basis of evidence presented at trial, so he reopened the case and

27 appointed a neutral expert to evaluate the adequacy of seismic testing at the Fremont

28 site"), <u>vacated on other grounds</u>, 471 U.S. 148 (1985); <u>Eastern Air Lines, Inc. v.</u>

3

EXHIBIT ___20

PAGE ___226

1   McDonnell Douglas Corp., 532 F.2d 957 (5th Cir. 1976); 4 WEINSTEIN § 706App.100 at

2   706App.-5 (noting that legal commentators' "imprecations against the parties' 'battle of

3   experts'", not the potential for such a battle, "led to the drafting of the Uniform Expert

4   Testimony Act in 1937," the precursor to Federal Rule of Evidence 706).

5       In no instance uncovered by the Court's research (or by Mattel's citation to

6   authority) has a court appointed an expert because of a fear, even one that is well-

7   founded, that such wide divergence in privately-retained expert testimony may

8   materialize in the future.  Were the Court to adopt Mattel's analysis, appointment of

9   experts by courts would expand exponentially, limited only by a court's assessment of

10  how partisan the experts in a given case may become in the future.  Such a

11  proliferation has not occurred precisely because courts generally require that the

12  divergent "horse" be placed before the expert witness "cart."  See FED. R. EVID. 706

13  advisory committee's note ("actual appointment is a relatively infrequent occurrence").

14  Unless and until this feared divergence in opinion becomes reality, the Court finds that

15  the potential (which itself cannot be quantified at this point) for its occurrence does not

16  warrant the Court's intrusion into the adversarial process through the appointment of

17  an expert at this stage.

18  B.    SPOILATION OF EVIDENCE

19      The question is much closer with respect to Mattel's other reason for the Court

20  to appoint an expert in this case:  Concern that opposing counsel or their clients may

21  have destroyed or altered key documents in the case.  Mattel's basis for such concern

22  is predicated on three facts uncovered during discovery.

23      1.    Evidence of spoilation

24      Before being deposed Bryant was asked to bring all his original BRATZ design

25  drawings.  When he arrived at his deposition, however, Bryant only had in his

26  possession a few of the originals.  (Decl. Michael T. Zeller ¶ 13).  Among these some

27  "contained holes where plugs apparently had already been removed.  Bryant

28  acknowledged . . . that his drawings had no holes in them when he gave them to his

4

EXHIBIT ___20___

PAGE __227__

1   lawyers." (Mattel's Mot. Appt. Expert at 2; <u>see also</u> Decl. Michael T. Zeller ¶ 14).

2   Specifically, at Bryant's deposition the following exchange took place between Bryant

3   and counsel for Mattel:

4          Q.    (By Mr. Quinn) I wanted to ask you about one of
5                 these original drawings that were produced today.

6                 — what we're talking about here. This is — the Post-it
                 says that's Bryant — that's the original of Bryant
7                 192, Bates number 192, which has the heads on it,
                 and this is one of the originals that your counsel was
8                 kind enough to have shipped here today for us to
                 look at.

9          A.    Yes

10         Q.    And we were just looking at these this afternoon and
11                we notice[d] that there's a bunch of holes on the
               page, including in the signature, as if somebody
12                were taking ink samples.

13        A.    Uh-huh.

14        Q.    Do you see that?

         A.    Yes.
15

16        Q.    Do you know anything about why those holes were
               made or how or when?

17        A.    I have no idea what those are.

18        Q.    I mean, when you had — when you had possession
19                of this document did it have those holes in it?

20        A.    Not that I remember.

21        Q.    You certainly never had anything to do with that?

22        A.    No.  I don't know anything about those holes.

23        Q.    And, similarly, if you wouldn't mind holding this up to
               the camera, this is the original of Bryant 210 and it's
24                also — if you take a look at it, I think you'll see it has
               some of those holes in it, although not as many as
25                the last one we looked at.  Again, you don't know
               anything about how or why those holes got put on
26                there?

27        A.    I don't.

28   (Decl. Michael T. Zeller, Ex. 7 at 161-163).

5

EXHIBIT ____20____

PAGE _228_

1       Mattel has submitted the declaration of a questioned document analysis expert,

2 Lloyd Cunningham, who has opined that the holes described in the document

3 mentioned above are consistent with those that would be generated by taking

4 microplug samples to perform analysis of the ink found on a document.  (Decl. Lloyd

5 Cunningham ¶ 5).  Bryant and MGA eventually conceded (although at first refusing to

6 do so under the veil of work-product privilege) that they tested some of the original

7 BRATZ drawings by an expert they retained in the field of forensic chemistry, Erich J.

8 Speckin.  (Response to Order to Show Cause ("Response") at 1-2).

9       Mr. Speckin states that in June, 2004, he performed a series of tests "on

10 various 'Bratz' documents" at the request of MGA's counsel.[1]  (Decl. Erich J. Speckin

11 ¶ 8).  Those tests included examining the documents in question under an infrared

12 light as well as performing sidelight testing, which involves "visually inspecting a

13 document by holding a side light up to the document at an oblique angel . . . to

14 determine preliminarily whether the document contains impressions, or markings

15 impressed upon the document by drawing and writing done on a sheet of paper laid

16 on top of the document being tested."  (Decl. Erich J. Speckin ¶¶ 9, 10).  Mr. Speckin

17 also performed an electrostatic detection apparatus to see if there was indented

18 impressions on the documents.  (Decl. Erich J. Speckin ¶ 11).  Finally, Mr. Speckin

19 "performed ink identifications tests" on the documents.  (Decl. Erich Speckin ¶¶ 12-

20 13).  Such testing involved Mr. Speckin removing "very small microplug samples from

21 the document at issue and testing the microplug."  (Decl. Erich Speckin ¶13).

22 Nowhere is it averred by MGA, Bryant, or Mr. Speckin which or how many of the

23 original BRATZ drawings were subjected to this microplug sampling procedure, nor is

24 it averred from what parts of the documents that were tested was the microplug taken.

25 Instead, Mr. Speckin simply notes that in taking the microplugs he "le[ft] more than

26

27     [1] At the time the testing was done by Mr. Speckin, Bryant had already been

28 sued by Mattel for violating the terms of the invention agreement he signed when he
worked for them from 1999 to 2000.  (Response at 1).

EXHIBIT _____ 20

PAGE _____ 229

1    sufficient material for another expert to test the exact same <u>documents,</u>" but admits

2    that "another expert cannot test the very same microplug that I tested . . . ." (Decl.

3    Erich J. Specklin ¶14).

4          Another episode brought to light during discovery causing Mattel concern

5    relates to MGA's handling of the original Bryant/MGA contract before the inception of

6    the instant litigation.  At the deposition of a former MGA executive, Victoria O'Connor,

7    testimony was elicited that O'Connor, "on explicit instructions of MGA's [CEO] Isaac

8    Larian, . . . [made] redact[ions from] the fax header . . . on the BRATZ contract

9    between Bryant and MGA for the year 2000 to conceal the fact that Bryant sent the

10   contract from Mattel's Design Center while he was still employed at Mattel." (Mattel's

11   Mot. Appt. Expert at 3).  O'Connor's deposition appears to indicate that such alteration

12   occurred before the present litigation began (indeed, perhaps even before MGA

13   marketed the BRATZ doll).

14          Q.      . . . Was there ever anything that you were asked to
15                  do that you -- made you feel kind of uncomfortable?

16          A.      Yes.

                            . . . .

17          Q.      And what was that?

18          A.      When the original contract was executed by Carter
19                  Bryant, it was sent to me <u>via</u> fax, and on the top of
                    the fax listed the phone number from where it was
20                  faxed, which said "Barbie Collectibles," and at one
                    point my boss, Isaac Larian, asked me to white that
21                  out and send it to a lawyer, Patty Glaser.

22   (Decl. Michael T. Zeller, Ex. 19 at 306).  Upon further examination, however,

23   O'Connor stated that she did not participate in or have knowledge of any other

24   instances in which any other agreement between Bryant and MGA was directed to be

25   altered:

26          Q.      Were you ever asked to change the date on any
27                  agreements between Mr. Bryant and MGA?

28          A.      No.

                                    7

EXHIBIT  20

PAGE  230

1    Q.    Are you aware of anybody being asked to change
2         the date on any of those agreements?

     A.    No.
3
     Q.    I mean, do you have any reason to believe that any
4         agreement that was entered into between Mr. Bryant
         and MGA had a date altered or changed?
5
     A.    No.
6
     Q.    You never heard that from – from any source?
7
     A.    No.
8

9    (Decl. Paula E. Ambrosini, Ex. 3).

10       Finally, Mattel speculates that a drawing of some BRATZ doll accessories

11   faxed on April 10, 2000, had the fax header altered, much in the same manner

12   described in O'Connor's testimony vis-à-vis the MGA/Bryant faxed contract, as the

13   fields on the fax header for the sender's name and the sender's telephone number are

14   missing. (Decl. Michael T. Zeller ¶ 23 & Ex. 24).[2] As explained by Mattel, "Because

15

16      [2] Mattel speculates that the time sheets produced by MGA for one of its

17   employees, Anna Rhee (who did doll face painting work for the BRATZ mock-up), from
"mid-to-late 2000" were altered or recently created by MGA to show that Rhee worked

18   on projects called "Angel" or "Prayer Angel," when in fact she was working at the time
painting faces for BRATZ dolls at the direction of Bryant. (Mattel's Mot. Appt. Expert at

19   3). The basis for this speculation is based on the fact that the initial disclosure by MGA

20   of Rhee's time sheets comprised only 8 pages. (Decl. Michael T. Zeller ¶ 20). Then,
on January 7, 2005, Rhee produced 20 separate invoices of her work at MGA during

21   mid-to-late 2000, indicating that Rhee performed work for MGA prior to Bryant's
departure from Mattel, most notably on June 12, 2000. (Decl. Michael T. Zeller ¶ 21).

22   Within a couple of weeks after Rhee's production of invoices to Mattel, MGA
supplemented its earlier production of Rhee's time sheets showing that during the mid-

23   to-late 2000 period Rhee was working on a MGA project known as "Angel" or "Prayer

24   Angels" and was not involved in any BRATZ-related work until after Bryant's departure
from Mattel. (Decl. Michael T. Zeller ¶ 22). Mattel's surmise that the supplemental time

25   sheets were altered is allegedly bolstered by the fact that Rhee testified during her
deposition that the only work she performed in mid-to-late 2000 was on BRATZ and

26   that the supplemental time sheets reference to the "Angel" and "Prayer Angel" was

27   nothing but a cover or code word for BRATZ-related work. This argument is hard to
accept. First, even the invoices Rhee turned over to Mattel contain the phrase "Angel"

28   for the mid-2000 project she worked on. (Decl. Michael T. Zeller, Ex. 22 at 356-60,
362). It is not until December, 2000, that any of the invoices submitted by Rhee show

8

EXHIBIT _____ 20

PAGE _____ 231

1  facsimile machines normally insert senders' names and numbers as a matter of

2  course, and indeed is required by law [to do so], it appears likely that the document

3  was altered to conceal the sender's information. See 47 U.S.C. § 227(d)(1)(B)."

4  (Mattel's Mot. Appt. Expert at 10). The premise underlying Mattel's concern on this

5  topic is not unreasonable. The law requires such information to be found on any

6  document, like the one in question, that has been faxed. Additionally, the testimony

7  elicited from Ms. O'Connor that MGA altered the fax header for other documents

8  related to BRATZ from the same time period leads to an obvious inference that other

9  documents where spaces on other fax headers are absent suffered a similar fate.

10          2.       Analysis

11                  a.       Microplug Ink Testing

12          Bryant and MGA begin by downplaying the significance of the spoliation issue

13  in this case. With respect to the holes on some of the original BRATZ design

14  drawings produced at Bryant's deposition, they note that, even with these holes,

15  nothing prevents Mattel from performing its own testing on the remaining portions of

16  the drawings on the document. "Indeed, the very fact that Mattel is asking for court-

17  appointed experts to perform ink and paper testing only underscores the fact that

18  nothing has been 'destroyed.'" (Joint Opp. at 2). Mr. Speckin makes similar assertions

19  in his declaration, stating that the fact that the same microplug cannot be tested "is

20  entirely irrelevant because there is more than enough ink on each of the documents I

21  tested to allow numerous microplug samples to be extracted and tested by different

22  experts." (Decl. Erich J. Speckin ¶ 14 (emphasis added); see also Response at 5-6

23  ("While another expert cannot test the very same microplug that Mr. Speckin tested,

24

25  ────────────────────

26  her doing work on the BRATZ doll, well after Bryant had left Mattel. (Decl. Michael T. Zeller, Ex. 21 at 367, 370, 373). To accept Mattel's argument, not only would MGA
27  have had to alter the invoices it produced in the supplemental production, but the documents produced by Rhee would also have to be similarly altered. An alternative
28  and just as plausible explanation is that Rhee is simply mistaken as to when she began performing work on the BRATZ project.

9

EXHIBIT ____20____

PAGE ____232____

RightFAX                    8/ /2006 3:02    PAGE 011/019 __Fax Server

1  that fact is entirely irrelevant because, unlike in a situation where the entire object is

2  destroyed during the testing, there is more than enough ink on each of the <u>documents</u>

3  Mr. Speckin tested to allow numerous microplug samples to be extracted and tested"

4  (emphasis added))).  This argument is not persuasive.  This is not a case where

5  everyone concedes that the documents in question were created at one point in time,

6  but dispute what that date may have been.  In such a circumstance all the ink

7  markings on the documents are comparable to one another as it is conceded that all

8  the marks came from one point in time.

9          Here, however, it is Mattel's theory that Bryant made drawings in 1998 and then

10  periodically touched up or made refinements/additions to those drawings, adding more

11  marks in 1999 and 2000 during the time he was employed by Mattel.  An ink mark

12  from one part of the document is not necessarily comparable to another set of ink

13  markings found elsewhere on the document.  One ink mark on a drawing could have

14  been made in 1998, for example, while another ink mark found on the same drawing

15  could have been put there sometime later.  In taking microplug samples from one of

16  these ink markings without the ability of the other side to test <u>the same mark</u> would

17  forever foreclose a potential avenue of crucial evidence in this case.  It is on that point

18  that taking microplug samples of the marks on these drawings is akin to the spoilation.

19  Therefore the fact that another expert could test other parts of the document does not

20  mean that key relevant evidence found on that document has not been destroyed.  As

21  MGA and Bryant make clear spoilation of evidence occurs through the "destruction or

22  significant alteration of evidence, or the failure to preserve property for another's use

23  as evidence in pending or reasonably foreseeable litigation." <u>West v. Goodyear Tire &</u>

24  <u>Rubber Co.</u>, 167 F.3d 776, 779 (2nd Cir. 1999).[3]

25          At this point, it should not be lost that the documents in question are not

26  _____

27    [3] The Court does not mean to suggest that Mattel's theory is correct.  Instead, the Court simply notes this theory as refuting MGA and Bryant's argument that only the

28  <u>complete</u> destruction of a document would amount to spoilation under the particular circumstances in this case.

10

EXHIBIT ___ 20

PAGE ___ 232

RightFAX          8/  /2008 3:02     PAGE 012/019 __Fax Server

1   peripheral to the case.  At its heart, this case asks the question:  Who owns the rights

2   to the Bratz dolls?  Bryant asserts that he came up with the idea for the Bratz dolls

3   while on a break from his employment at Mattel in 1998, and that he sold his idea to

4   MGA when he went to work for them in October, 2000.  Mattel claims, among other

5   things, that Bryant "developed" or "continued to develop" his idea for Bratz dolls while

6   he was working for them from January, 1999, to October, 2000, and that pursuant to

7   an inventions agreement he signed with the Mattel when he went to work for them,

8   that idea now belongs to Mattel.  As this clash of factual contentions makes clear, the

9   dating of the original BRATZ drawings and the markings contained thereon is a

10  fundamental, perhaps despositive, issue to this case.  That there are serious

11  questions concerning the handling of these critical documents certainly causes the

12  Court much concern about whether the truth seeking functions of the adversarial

13  system have been fundamentally compromised in this case.  As Mattel rightly notes,

14  "The adversarial process is not an end in itself; its value is in its ability to promote a

15  search for truth."  (Mattel's Reply at 9).

16         Bryant and MGA concede that the sections that were holed out contained

17  markings, be they handwritten dates or other words or letters, that may be crucial to

18  the case.  Indeed, one of the drawings – Bryant 192 – had a portion of the signature

19  line sampled.  What is left unclear is whether, for those portions of the document

20  where ink or signatures were sampled, enough of the same part of the document in

21  question (meaning the same mark) remains to be sampled by Mattel.  For instance, is

22  there enough of the signature line from Bryant 192 left to sample, or has too much of it

23  already been sampled?  In that sense, MGA's and Bryant's argument that nothing has

24  been destroyed by the microplug testing procedure because other parts of the

25  document still exist is misplaced.  Indeed, MGA and Bryant later admit that the

26  circumstances allowing for "multiple experts [to] remove multiple microplugs and test

27  the exact same paper and ink" is dependent upon there being the same exact paper

28  and ink there to test.  (Joint Opp. at 15 ("[a]s long as there is paper and ink to test")).

EXHIBIT          20

PAGE          234

1    The continued existence of the "exact same pen stroke" is the very issue that is now

2    left open because of the holes in some of Bryant's original BRATZ design drawings.

3    Is there anything left of that exact same pen stroke that was sampled by Mr. Speckin

4    remaining on the original drawing for Mattel to test? None of these questions have

5    been addressed by MGA, Bryant, or Mr. Speckin in their papers. Instead, they simply

6    make the observation that there remain other ink markings on the same drawings for

7    Mattel to test, a reason which, as explained above, is wholly insufficient to assure the

8    Court that Mattel has not been prejudiced by MGA's actions.

9        Given the absence of any representation by them on this point, the Court

10   pressed MGA's counsel about the same at oral argument:

11           THE COURT:   And part of your argument is that
12       while a small portion of the small portion of the page may
         be gone, as you in your most recent papers concede is
13       gone, there are other portions of the page that can be
         tested. The concern I have, I guess – and maybe you can
14       clear this up for me – I've seen some of the drawings and I
         have a pretty good mental image of what the drawings look
15       like. But there is also writing on these drawings,
         signatures, copyright registration indications; some are
16       large, some are small. As I gather from the plaintiff, from
         Mattel, the concern is that these different drawings or
17       writings were done at different times. And I guess I can
         understand why when those drawings or writings were
18       done could be significant from an evidentiary standpoint.
         So the concern is not so much there's another part of the
19       paper that can be tested; it's whether or not the particular
         marking in question has been so damages as to not permit
20       a full further testing on that particular marking. Does my
         question make sense?

21           MS. CENDALI: Yes, it does, your Honor. And I
22       anticipated that. Significant, we thought, in their papers
         was that . . . they cited to the fact that Mr. Bryant admitted
23       in his deposition that there were holes in some of the
         documents that he didn't know how they got there
24       originally. As an example, if you look at part of Zeller,
         Exhibit 17, Bates number Bryant 201, that's an example of
25       one of the documents that's been tested.

26           THE COURT: One second so I have that in front of
         me. Okay.

27           MS. CENDALI: There are many many others that were
28       submitted that were also submitted to this type of ink
         testing, but this is just an example of one of them. And if

                                    12

EXHIBIT _____ 20

PAGE _____ 235

you look at the document, you would never know — granted, this is smaller, so the actual drawing is even larger than this, so there's even more ink on the larger drawing than there would be available on this reproduction size.

But if you look at it — and I'll represent to you that we didn't test the face; the face is absent before and after the testing — but if you look at it, you couldn't even see that there were any pin pricks to it. If you look very, very carefully at the signature at the bottom, you can maybe see where it says "Ramona Prints, 8-26-99"; that maybe there was like a little tiny hole in one of the little slash marks; that was a teeny little pin prick hole that showed the testing. There's ample amount of ink to do the testing on all of these documents. This is the normal course of procedure that was done.

When asked by the Court whether it accepted MGA's representation that there was "ample amount of ink" left on the same marks that the microplugs were taken from for further microplug testing, Mattel, in seeming contradiction to its position in its papers, said it did: "I agree with Ms. Cendali. We do not maintain any portion of the ink on a signature or an image has been so obliterated that you couldn't take a plug now on any of it; that's not our point." (Emphasis added).

In light of this concession by Mattel, the Court finds that no colorable claim of spoliation has been established at this time vis-à-vis Mr. Speckin's testing of the documents to warrant the appointment of an expert by the Court to investigate the same. See Sedrati v. Allstate Life Ins. Co., 185 F.R.D. 388, 393 (M.D. Ga. 1998)(sanction warranted where because "defendant's expert has conducted destructive tests on the original documents," plaintiff's expert "cannot duplicate the conditions of the original documents"). If there was any evidence indicating that MGA, Bryant, or their counsel had engaged in acts that could compromise Mattel's ability to discover crucial information in this case, the Court would be sympathetic to the appointment of an expert to investigate the same. Here, no such evidence exists. The tests done by Mr. Speckin have not left the marks that were micro-sampled or the documents that were handled so compromised that Mattel cannot perform the exact same tests on those exact same marks as performed by Mr. Speckin.

13

EXHIBIT   2 0

PAGE   236

1      Indeed, the only basis for spoliation that Mattel has left to argue – that the

2  passage of time has left the ability to perform any meaningful ink testing at this time

3  problematic – is an argument that has nothing to do with MGA's conduct, but much

4  more with Mattel's own dereliction. As the Court understands it, the process of dating

5  when ink was placed on a document has only a limited window of time in which it can

6  be accomplished because, eventually, the ink dries (be it in 2 years or 3 to 4 years),

7  leaving nothing capable of being sampled after that point to test (save to acknowledge

8  that the ink in question was put on the paper some time more than 3 to 4 years ago).

9  Mattel essentially argues that the impossibility of testing ink after a certain period

10  mandates that, if the other side is going to test ink while "fresh" ink remains on the

11  document, that party has an obligation to inform the other side so that they can do the

12  same before the ink "dries out"; failure to do so renders the test performed something

13  that cannot be replicated.[4] By Mattel's own admission, they knew there had been

14  testing done on the BRATZ original drawings as far back as November, 2004, during

15  Bryant's deposition testimony when they saw some of the original BRATZ drawings

16  (drawings that had been tested by Mr. Speckin five months earlier). Rather than

17  immediately seeking the production of those documents and having its own expert

18  perform similar tests on them, Mattel sat idly by, waiting until June of this year to do

19  anything, either by way of court-pleadings or formal requests made to MGA and

20  Braynt, related to having ink tests performed on the documents. Nowhere has Mattel

21

22      [4] The basic factual assumption in Mattel's argument may indeed be faulty – that

23  when MGA tested the ink there was enough "fresh" ink to test. Mr. Speckin states that
"[I]nk takes approximately 3 to 4 years to dry on paper. Thus, by testing the ink to

24  determine if it is dry, it can be determined whether the document was created within the
last [3 to] 4 years, or whether the ink, and thus the drawing, is more than [3 to] 4 years

25  old." (Decl. Erich J. Speckin ¶ 13). Given that Mr. Speckin performed his ink dating

26  test in June, 2004, at best he could determine whether the ink had been put on the
paper on or after June, 2000. Beyond that time frame his test could not tell when the

27  now-dried ink was marked on the document. Given that the relevant period in question
in this case is from August, 1998, to October, 2000, Mr. Speckin's test results would

28  appear to be only marginally relevant in adducing proof as to when the BRATZ
drawings were made.

14

EXHIBIT _____ 20

PAGE _____ 237

1  explained how MGA or Bryant had anything to do with it not having the ability to

2  perform such testing until now.  Mattel's allusion to the fact that a stay on discovery

3  was put in place by this Court in 2005 is misguided.  If Mattel thought that it was losing

4  valuable time on account of the stay, it could have at any time filed with this Court an

5  emergency request for relief from the stay to have such tests performed.  All it needed

6  to do was inform the Court that it had only a short period of time to perform the test on

7  account of the fact that ink dries; something which it never did in this case.

8        Mattel's citation to the case Edwardes v. Southampton Hospital Associates,

9  278 N.Y.S.2d 283 (1967) is equally unhelpful to their argument.  In that case, the court

10  was presented with an application to prevent the testing of a intramedullary pin for

11  discovery and testing.  Id. at 284.  The court held that, "[s]ince the pin is crucial to the

12  action it is not too difficult to appreciate that any change, however slight, assumes an

13  importance magnified proportionately. And undoubtedly tests which would destroy or

14  alter most or all of a particular article ought not be permitted in the first instance

15  without providing adequate safeguards to protect all concerned."  Id. at 286.  Here,

16  such an argument cannot be made because, for the reasons cited above, Mattel has

17  conceded that even in performing the tests of the original BRATZ drawings Mr.

18  Speckin left enough ink of the same pen stroke for its own experts to test.  In short,

19  there has been no alteration, however slight, made to the documents insofar as

20  Mattel's ability to replicate the exact same test is concerned.  The only change that

21  has occurred is in Mattel's ability to retrieve any relevant information from such a test

22  on account of the passage of time that has elapsed.  The test Mr. Speckin performed

23  is not responsible for this negative occurrence.  MGA is similarly not responsible for

24  the passage of time or Mattel's inability to retrieve useful information from the testing

25  process.  On that point, Mattel should look itself in the mirror for any finding of fault or

26  blame.

27        Moreover, aside from the potential for "destroying" key portions of the original

28  documents, it is alleged that MGA and Bryant's actions carry other means of

15

EXHIBIT       2 0

PAGE          238

1  prejudicing Mattel's ability to pursue lines of potential evidence in this case. The

2  expert declaration submitted by Mattel notes another possible spoilation of the original

3  drawings even if there remained enough of the pertinent portion of the document in

4  question to sample: The sampling process itself may have contaminated the

5  document in question by obliterating potential crucial clues that were on the document

6  or otherwise the sampling process led to the introduction of foreign materials onto the

7  documents themselves which may complicate any future analysis. As explained by

8  Mattel's expert:

9          [P]erforming many such types of testing, even if described
        as "non-destructive," on a particular original document
10        carries the risk that potential evidence on it, including
        indentations in the paper fiber, might be contaminated or
11        destroyed in the process. Furthermore, the order of the
        types of testing to be performed on a given document
12        might have an impact on developing potential evidence
        during subsequent examinations. . . .

13          . . . . [With respect to the original BRATZ drawings
14        containing holes in them,] it is possible that the destructive
        testing performed on the document may have caused
15        some form of contamination and/or alteration, which carries
        the further prospect that subsequent examinations by
16        experts may not enable them to develop potential evidence
        or the same evidence that the other [earlier] expert
17        developed.

18  (Decl. Lloyd Cunningham ¶¶ 4-5).

19          MGA has rebutted this risk of contamination argument by proffering Mr.

20  Speckin's declaration, the expert who actually performed the tests in question. Mr.

21  Speckin states that he "exercised the utmost care in handling the documents [he]

22  tested," that a number of the tests he performed on the documents "has absolutely no

23  effect on the tested document whatsoever," and that with respect to those tests that

24  could effect the document he followed established procedures in carrying out the test

25  in question. (Decl. Erich J. Speckin ¶¶ 8, 9, 10, 11, 12, 13). Nowhere has Mattel

26  proffered any evidence rebutting or calling into question Mr. Speckin's

27  representations. The Court therefore finds that, based on the evidence that is

28  currently before it, Mattel has not established a colorable claim of spoliation by way of

16

EXHIBIT          20

PAGE          239

1    contamination in the tests MGA performed on the documents in question.

2              b.    Alteration of Fax Headers

3              Insofar as O'Connor's deposition testimony relating to the white out of the fax

4    header on the October, 2000, contract between Bryant and MGA, this too is

5    downplayed by MGA and Bryant as being irrelevant because "there is no dispute that

6    Mr. Bryant faxed his signed contract from a fax machine at Mattel and, indeed, Mr.

7    Bryant readily admitted that fact at his deposition, which took place before Ms.

8    O'Connor's deposition." (Joint Opp. at 8 (emphasis in original)). This argument seeks

9    to compare apples to oranges. While it may be true that now there is no dispute by

10   MGA and Bryant that he faxed his portion of the contract to MGA from his office at

11   Mattel, at the time O'Connor did the white out of the fax header such a lack of dispute

12   was not apparent. It is from that perspective in time -- the prologue to the litigation --

13   that O'Connor's deposition testimony is to be judged. And from that perspective her

14   testimony calls into question MGA's handling of relevant documents in its possession.

15             When the contract was first executed there is no indication that MGA and/or

16   Bryant would admit to the fact that Bryant negotiated his contract with MGA while he

17   was still working at Mattel; rather, at that point, that issue appeared to be an open one.

18   Indeed, the fact that MGA's CEO would direct O'Connor to tamper with the contract's

19   fax header clearly indicates that they would not admit to the fact. If MGA mistreated

20   this document where an open issue existed, it is not unreasonable to infer that it may

21   have been just as cavalier with its obligations to maintain the other documents in their

22   possession -- say, for instance, the original BRATZ drawings -- where similar open

23   issues remained. This concern with MGA's handling of documents in its possession at

24   the prologue to this litigation is reinforced by MGA and Bryant's blasé mention in a

25   footnote to their opposition that the original to this contract, the one which they

26   describe as being irrelevant, "has not been found." (Joint Opp. at 15 n.6). Indeed, it

27   has been suggested that MGA and Bryant or their counsel have made representations

28   that they are not sure of the exact whereabouts of a number of the original BRATZ

                                               17

EXHIBIT      2 0

PAGE         2 4 0

1  drawings. (Decl. Shane McKenzie ¶ 3 ("Mr. Bryant's counsel[, at the December 22 to

2  23, 2004, inspection of the originals by counsel for Mattel,] claimed not to have the

3  majority of the originals of BRATZ drawings and sketches, and further claimed not to

4  know where those originals were located")).

5      All that being said, the Court does not find that the alteration of the fax header

6  on the original Bryant/MGA contract warrants the appointment of an expert at this

7  time. Ms. O'Connor testified that, other than this one instance, she is aware of no

8  other documents that were purposefully altered by MGA. While the evidence related

9  to the missing fax header on the April, 2000, BRATZ accessories fax may indicate that

10  more than one document had been tampered with by MGA personnel, the Court has

11  nothing at this time to basis that conclusion on other than speculation and conjecture.

12  Without any tangible, concrete proof that MGA's mishandling of documents was more

13  widespread, the Court is left with what appears simply as an isolated instance of

14  tampering.

15      Accordingly, the motion for appointment of expert witnesses is **DENIED**.

16      IT IS SO ORDERED.

17

18  DATE:  8-9-06 .

19

20

21  STEPHEN G. LARSON
     UNITED STATES DISTRICT JUDGE

22

23

24

25

26

27

28

EXHIBIT ___ 26

PAGE ___ 241

# EXHIBIT 21

**THIS EXHIBIT IS FILED UNDER SEAL**
**PURSUANT TO PROTECTIVE ORDER**

# EXHIBIT 22

1 | QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
2 |   John B. Quinn (Bar No. 090378)
    |   (johnquinn@quinnemanuel.com)
    |   Michael T. Zeller (Bar No. 196417)
3 |   (michaelzeller@quinnemanuel.com)
    |   Jon D. Corey (Bar No. 185066)
4 |   (joncorey@quinnemanuel.com)
    | 865 South Figueroa Street, 10th Floor
5 | Los Angeles, California 90017-2543
    | Telephone:  (213) 443-3000
6 | Facsimile:   (213) 443-3100

7 | Attorneys for Mattel, Inc.

8 |

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| CARTER BRYANT, an individual, | CASE NO. CV 04-9049 SGL (RNBx) |
| Plaintiff, | |
| | SECOND NOTICE OF DEPOSITION OF MGA ENTERTAINMENT, INC. PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 30(B)(6) |
| vs. | |
| MATTEL, INC., a Delaware corporation, | Discovery Cut-off:  None Set |
| Defendant. | Pre-trial Conference: None Set |
| | Trial Date: None Set |
| AND CONSOLIDATED ACTIONS | |

Δ π EXHIBIT 452
Deponent Lockhart
Date 6/14/07 Rptr Dupre
WWW.DEPOBOOK.COM

2-1

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on February 15, 2007 beginning on 9:30 a.m. Mattel, Inc. ("Mattel") will take the deposition upon oral examination of defendant MGA Entertainment, Inc. at the offices of Quinn Emanuel Urquhart Oliver & Hedges LLP, 865 S. Figueroa Street, 10th Floor, Los Angeles, CA 90017. Pursuant to Fed. R. Civ. P. 30(b)(6), MGA Entertainment, Inc. shall designate one or more officers, directors, managing agents or other persons who consent to testify on its behalf concerning each of the topics set forth in Exhibit A hereto.

PLEASE TAKE FURTHER NOTICE that the deposition will take place before a duly authorized notary public or other officer authorized to administer oaths at depositions, and will continue from day to day, Sundays, Saturdays and legal holidays excepted, until completed.

PLEASE TAKE FURTHER NOTICE that, pursuant to Fed. R. Civ. P. 30(b)(2), the deposition will be videotaped.

DATED:  February 1, 2007

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

By _____
Michael T. Zeller
Attorneys for Mattel, Inc.

452·2

NOTICE OF DEPOSITION OF MGA ENTERTAINMENT, INC.

EXHIBIT ____22____

PAGE ____251____

9/2048031.

**Exhibit A**

EXHIBIT ____2̲2̲____

PAGE ____2̲5̲2̲____

4523

## EXHIBIT A

1.  "YOU," "YOUR" or "MGA" means MGA Entertainment, Inc., any of its current or former employees, officers, directors, agents, representatives, attorneys, parents, subsidiaries, divisions, affiliates, predecessors-in-interest and successors-in-interest, and any other PERSON acting on its behalf, pursuant to its authority or subject to its control.

2.  "BRYANT" means Carter Bryant, any of his current or former agents, representatives, attorneys, employees, partners, joint venturers, predecessors-in-interest and successors-in-interest, and any other PERSON acting on his behalf, pursuant to his authority or subject to his control.

3.  "BRATZ" means any project ever known by that name (whether in whole or in part and regardless of what such project is or has been also, previously or subsequently called) and any product or doll or any portion thereof that is now or has ever been known as, or sold or marketed under, the name or term "Bratz" (whether in whole or in part and regardless of what such product or doll or portion thereof is or has been also, previously or subsequently called) or that is now or has ever been sold or marketed as part of the "Bratz" line, and each EMBODIMENT of such doll or any portion thereof. As used herein, "product or doll or any portion thereof" also includes without limitation any names, fashions, accessories, artwork, packaging or any other works, materials, matters or items included or associated therewith.

4.  "DESIGN" or "DESIGNS" means any and all works, designs, artwork, sketches, drawings, illustrations, representations, depictions, blueprints, schematics, diagrams, descriptions, sculptures, prototypes, models, samples, reductions to practice, developments, know-how, ideas, concepts, inventions and/or improvements, as well as all other items, things and DOCUMENTS in which any of the

7209/2048031.

-2-
NOTICE OF DEPOSITION OF MGA ENTERTAINMENT, INC.

452-4

EXHIBIT __22__

PAGE __253__

foregoing are or have been expressed, embodied, contained, fixed or reflected in any manner, whether in whole or in part.

5.   "EMBODIMENT" means any representation, whether two-dimensional or three-dimensional, and whether in tangible, digital, electronic or other form, including but not limited to all works, designs, artwork, sketches, drawings, illustrations, representations, depictions, blueprints, schematics, diagrams, images, sculptures, prototypes, models, samples, reductions to practice, developments, inventions and/or improvements, as well as all other items, things and DOCUMENTS in which any of the foregoing are or have been expressed, embodied, contained, fixed or reflected in any manner, whether in whole or in part.

6.   The DRAWINGS means those documents produced as Bates Nos. MGA000053-57,   MGA000392-395,   MGA000435-439,   MGA000455-481 MGA004606,   MGA004608,   MGA004640,   MGA005065,   MGA006423-6426, MGA006432-6436, MGA006438-06440, MGA006442-6467, and SL00016-45.

7.   "BASED ON" means copied or reproduced from, substantially similar to, based on or derived from in any manner, whether in whole or in part.

8.   "CREATED" means produced, prepared, created, authored, conceived of or reduced to practice, whether in whole or in part and whether alone or jointly with others.

9.   "IDENTIFY" or "IDENTITY" means the following:

(a)   With reference to an individual, means such individual's name, current or last known business title, current or last known business affiliation, current or last known relationship to YOU, current or last known residential and business address, and current or last known telephone number.

(b)   With reference to an entity or governmental organization, means such entity's or organization's name, present or last-known address, and present

452-5

NOTICE OF DEPOSITION OF MGA ENTERTAINMENT, INC.

EXHIBIT ___2 2___

PAGE ___25 4___

209/2048031.

or last-known telephone number and the IDENTITY of each individual who has served or participated as a contact for or on behalf of such entity or organization.

(c)     With reference to an EMBODIMENT, means the IDENTITY of the individual author(s) or creator(s) of the EMBODIMENT as well as of each other individual who contributed in any manner to the EMBODIMENT; the form, material and medium of the EMBODIMENT (*e.g.*, preliminary three-dimensional resin sculpture, final three-dimensional wax sculpture, digitized file of final three-dimensional wax sculpture, two-dimensional design drawing on paper); each title or name of the EMBODIMENT; the start and end date(s) of the EMBODIMENT's creation or preparation; and the current location of the EMBODIMENT.

10.     "COMMUNICATION" or "COMMUNICATIONS" means and includes any disclosure, transfer or exchange of information between two or more PERSONS, whether orally or in writing, including, without limitation, any conversation or discussion by means of meeting, letter, telephone, note, memorandum, telegraph, telex, telecopier, electronic mail, or any other electronic or other medium, including without limitation in written, audio or video form.

11.     "ACTION" shall mean this action now consolidated under Case No. 04-9049 before the Hon. Stephen Larson and formerly *Mattel v. Bryant, Inc.*, first filed in Los Angeles County Superior Court; *Bryant v. Mattel, Inc.*; and *MGA Entertainment, Inc. v. Mattel, Inc.*; and all counterclaims, cross-claims and defenses therein.

12.     "DIGITAL INFORMATION" shall mean any information created or stored digitally, including but not limited to electronically, magnetically or optically.

13.     "SYSTEM" or "SYSTEMS" shall mean any computer or network of computers or other network devices that allow a two or more computers to share information and equipment, including but not limited to local area networks, wide area networks, storage area networks, client-server networks or peer-to-peer networks. The

209/2048031.

-4-

452-b

EXHIBIT ___22___

PAGE ___255___

use of the term "SYSTEM" or "SYSTEMS" shall also include the brand, model number, technical specifications, and capacities of the computers who are part of each such SYSTEM.

14. "REFER OR RELATE TO" means constituting, embodying, containing, referring to, commenting on, evidencing, regarding, discussing, describing, mentioning, reflecting, expressing, pertaining to, concerning, supporting, contradicting, negating, revoking or otherwise relating to in any manner.

15. "DOCUMENT" means all "WRITINGS" and "RECORDINGS" as those terms are defined in Rule 34 of the Federal Rules of Civil Procedure and Rule 1001 of the Federal Rules of Evidence, including, but not limited to, all writings and records of every type and description including, but not limited to, contracts, agreements, correspondence, memoranda, letters, facsimiles, electronic mail ("e-mail"), records of telephone conversations, handwritten and typewritten notes of any kind, statements, reports, minutes, recordings, transcripts and summaries of meetings, voice recordings, pictures, photographs, drawings, computer cards, tapes, discs, printouts and records of all types, studies, instruction manuals, policy manuals and statements, books, pamphlets, invoices, canceled checks and every other device or medium by which or through which information of any type is transmitted, recorded or preserved. Without any limitation on the foregoing, the term "DOCUMENT" shall include all copies that differ in any respect from the original or other versions of the DOCUMENT, including, but not limited to, all drafts and all copies of such drafts or originals containing initials, comments, notations, insertions, corrections, marginal notes, amendments or any other variation of any kind.

16. "PERSON" or "PERSONS" means all natural persons, partnerships, corporations, joint ventures and any kind of business, legal or public entity or organization, as well as its, his or her agents, representatives, employees, officers and

452-7

EXHIBIT 22

PAGE 256

directors and any one else acting on its, his or her behalf, pursuant to its, his or her authority or subject to its, his or her control.

17.   The singular form of a noun or pronoun includes within its meaning the plural form of the noun or pronoun so used, and *vice versa*; the use of the masculine form of a pronoun also includes within its meaning the feminine form of the pronoun so used, and *vice versa*; the use of any tense of any verb includes also within its meaning all other tenses of the verb so used, whenever such construction results in a broader request for information; and "and" includes "or" and *vice versa*, whenever such construction results in a broader disclosure of documents or information.

### Topics of Examination

1.   The origin, conception, creation, design, sculpting, development, engineering, rotocasting, modeling and prototyping of BRATZ and BRATZ DESIGNS CREATED prior to June 30, 2001 (regardless of when or whether such was released in any form to the public), including without limitation the timing thereof, the IDENTITY of each PERSON with knowledge thereof, the IDENTITY of each PERSON involved therein, and the nature, extent and time period(s) of each such PERSON's involvement.

2.   The circumstances under which BRATZ or any BRATZ DESIGN first came to YOUR attention, including without limitation the timing, method and manner thereof and the IDENTITY of each PERSON with knowledge thereof.

3.   The identity of each doll, product, work or item produced, developed, manufactured, licensed, sold or offered for sale by or for YOU or on YOUR behalf that was BASED ON any BRATZ DESIGN which BRYANT CREATED.

4.   To the extent not covered by Topic 3, each EMBODIMENT of any doll, doll accessory or toy that BRYANT CREATED prior to June 30, 2001.

5.   The work, activities and/or services that BRYANT performed for or with YOU or on YOUR behalf prior to June 30, 2001.

452-8

EXHIBIT _____ 2 2

PAGE _____ 2 5 7

1      6.    The origin, conception and creation of DESIGNS that BRYANT

2  CREATED prior to June 30, 2001 and in which YOU claim to have, or have ever

3  claimed to have, any right, title or interest (whether in whole or in part).

4      7.    The identity of, and the design, development, sculpting,

5  development, engineering, rotocasting, modeling, prototyping and first sale of, any doll,

6  product, work or item that has been produced, developed, manufactured, licensed, sold

7  or offered for sale by, for or on behalf of YOU and that was BASED ON any DESIGN

8  referenced in Topic 6.

9      8.    Each EMBODIMENT of BRATZ that was CREATED prior to June

10  30, 2001 or that was at any time BASED ON any BRATZ DESIGN which was

11  CREATED prior to June 30, 2001.

12      9.    The DRAWINGS, including without limitation the authorship,

13  creation, dissemination and use thereof and the source, meaning, authenticity and

14  timing of any dates thereon.

15      10.   The IDENTITY of each vendor or third party who performed or

16  contributed, or who was considered, solicited, requested, proposed or contemplated by

17  YOU or BRYANT to perform or contribute, any activities, work or services in

18  connection with BRATZ or BRATZ DESIGNS prior to June 30, 2001, YOUR

19  COMMUNICATIONS therewith, and the nature, extent and timing of such activities,

20  work or services.

21      11.   The exhibition, or proposed, offered, contemplated or requested

22  exhibition, of BRATZ or any BRATZ DESIGN to any third party prior to June 30,

23  2001, including without limitation each instance in which BRATZ or any BRATZ

24  DESIGN was marketed, offered for sale, pitched, shown or disclosed to, or otherwise

25  discussed with or communicated to, any retailer, wholesaler or distributor and the

26  DOCUMENTS that REFER OR RELATE thereto.

27      12.   The actual, proposed, requested or contemplated manufacture,

28  fabrication or tooling (including the production of molds) of BRATZ, including without

452-9

EXHIBIT _____ 2 2

PAGE _____ 2 5 8

1  limitation the timing thereof and the IDENTITY of each manufacturer and potential
2  manufacturer used, proposed or considered.

3      13.  COMMUNICATIONS prior to June 30, 2001 between YOU and
4  any manufacturer, distributor, wholesaler, retailer, or any contemplated, proposed or
5  potential manufacturer, distributor, wholesaler or retailer, that REFER OR RELATE
6  TO BRATZ or any BRATZ DESIGN.

7      14.  When and where BRATZ was first manufactured, shipped,
8  distributed and sold, and the IDENTITIES and roles of PERSONS involved therein.

9      15.  The licensing, including without limitation the proposed or
10  requested licensing, of BRATZ or any BRATZ DESIGN prior to December 31, 2001,
11  including without limitation the timing thereof, the IDENTITY of each such licensee or
12  proposed or requested licensee and the product(s) or proposed product(s) involved.

13      16.  COMMUNICATIONS between YOU and BRYANT prior to
14  January 1, 2001, including without limitation the content, means and timing of such
15  COMMUNICATIONS, the IDENTITY of the PERSONS who were parties thereto and
16  the DOCUMENTS that REFER OR RELATE TO such COMMUNICATIONS.

17      17.  COMMUNICATIONS that BRYANT made for YOU or on YOUR
18  behalf with any PERSON other than YOU that REFER OR RELATE TO BRATZ prior
19  to June 30, 2001.

20      18.  YOUR agreements and contracts with BRYANT, including without
21  limitation the timing thereof, the negotiations, drafts and COMMUNICATIONS that
22  REFER OR RELATE thereto, and any actual or proposed amendments thereto.

23      19.  Each agreement or contract between YOU and any PERSON other
24  than BRYANT that REFERS OR RELATES TO BRATZ or BRATZ DESIGNS that
25  REFERS OR RELATES to the time period prior to December 31, 2001 (regardless of
26  when such agreement or contract was negotiated or executed), including without
27  limitation the timing thereof, the negotiations, drafts and COMMUNICATIONS that
28  REFER OR RELATE thereto, and any actual or proposed amendments thereto.

-8-

452-10

NOTICE OF DEPOSITION OF MGA ENTERTAINMENT, INC.

EXHIBIT _____ 2 2

PAGE _____ 259

20.    YOUR knowledge, prior to April 29, 2004, of BRYANT's contracts and agreements with, and his obligations to, MATTEL.

21.    YOUR knowledge of, and access to, non-public MATTEL DIVA STARZ project information and DESIGNS prior to June 30, 2001.

22.    The payment of money or anything of value by or for YOU or on YOUR behalf that has been made to, for or on behalf of BRYANT (a) for work, services or activities performed by BRYANT prior to January 1, 2001 (regardless of when such payment was actually made), (b) for DESIGNS CREATED by BRYANT prior to January 1, 2001 (regardless of when such payment was actually made) or (c) in connection with BRATZ or any BRATZ DESIGN at any time, including without limitation the timing, manner and amount(s) thereof and the reasons therefor.

23.    The payment of royalties to, for or on behalf of BRYANT made by or for YOU or on YOUR behalf, including the timing, manner and amounts of such payments and the reasons therefor.

24.    Any indemnification and fee arrangement that YOU and/or BRYANT has sought, proposed, requested or obtained in connection with this ACTION.

25.    YOUR revenues and profits from BRATZ, including without limitation YOUR gross and net profits, and YOUR costs associated therewith.

26.    YOUR net worth.

27.    The payment of money or anything of value that YOU have made or offered to make to, for or on behalf of Elise Cloonan, or that has been requested, sought or received by, for or on behalf of Elise Cloonan, and the timing, manner, amount(s) and reasons therefor.

28.    COMMUNICATIONS between YOU and Elise Cloonan that REFER OR RELATE TO BRYANT, MATTEL, BRATZ and/or Anna Rhee, including the DOCUMENTS that REFER OR RELATE TO such COMMUNICATIONS.

29. COMMUNICATIONS made by, for or on behalf of YOU, whether directly or indirectly, with Anna Rhee, including without limitation since February 2005 (but not including any such COMMUNICATIONS with her legal counsel).

30. COMMUNICATIONS between YOU and Veronica Marlow, Margaret Hatch (also known as Margaret Leahy and/or Margaret Hatch-Leahy), Sarah Halpern, Steve Linker, Liz Hogan and/or Jesse Ramirez that REFER OR RELATE TO BRYANT, MATTEL, BRATZ and/or Anna Rhee, including without limitation all DOCUMENTS that REFER OR RELATE TO such COMMUNICATIONS.

31. The IDENTITY of each PERSON who, at any time since January 1, 1998, has performed any work or services for, by or on behalf of YOU while such PERSON was employed by MATTEL, the nature and timing of each such PERSON's work or services and the amount(s) paid by YOU to each such PERSON.

32. COMMUNICATIONS between YOU and BRYANT that REFER OR RELATE TO MATTEL or REFER OR RELATE TO any DOCUMENT that was prepared, authored or created by MATTEL that BRYANT has ever provided to, shown, described to, communicated to or disclosed in any manner to YOU.

33. The applications for registration and the registrations for copyright, patent, trademark or any other right that REFER OR RELATE TO BRATZ or BRATZ DESIGNS sought, made or obtained by, for or on behalf of YOU or BRYANT, including without limitation COMMUNICATIONS pertaining thereto.

34. Other than those previously filed and served in this ACTION or in which Mattel, Inc.'s counsel in this ACTION was in attendance, the testimony, transcripts, declarations, affidavits and other sworn written statements of any other type by or from YOU or made on YOUR behalf that REFER OR RELATE TO BRATZ THAT REFER OR RELATE TO the time period prior to June 30, 2001 (regardless of when such testimony or sworn statement was taken, given, signed, made or filed).

35. COMMUNICATIONS between YOU and Universal Commerce Corp., Ltd. prior to June 30, 2001.

-10-

NOTICE OF DEPOSITION OF MGA ENTERTAINMENT, INC.

452-12

EXHIBIT ___ 22

PAGE ___ 26

1     36.    The source, meaning and authenticity of SL00013-14, including
2  without limitation the timing of its creation and the handwriting thereon.

3     37.    YOUR corporate structure since January 1, 1999, including without
4  limitation the relationship between MGA Entertainment, Inc. and any of its
5  predecessors, affiliates and subsidiaries.

6     38.    The retention or destruction policies, procedures and practices for
7  YOUR DOCUMENTS and DIGITAL INFORMATION that REFER OR RELATE TO
8  BRATZ since January 1, 1999, including without limitation the retention or destruction
9  of DOCUMENTS and DIGITAL INFORMATION when (a) hardware is replaced,
10  modified or upgraded and (b) when PERSONS leave YOUR employ.

11     39.    The preservation, collection, destruction, removal, transfer, loss or
12  impairment of YOUR DOCUMENTS and DIGITAL INFORMATION in connection
13  with the ACTION and/or any DOCUMENTS requested by MATTEL in the ACTION.

14     40.    The preservation, collection, destruction, removal, transfer, loss or
15  impairment of YOUR DOCUMENTS and DIGITAL INFORMATION since January 1,
16  1999 that REFER OR RELATE TO MATTEL (including without limitation to any
17  MATTEL product, plan or information) that YOU received in any manner from any
18  PERSON who was at the time an employee of MATTEL or who had previously been
19  an employee of MATTEL.

20     41.    The testing of or sampling from DOCUMENTS that REFER OR
21  RELATE TO BRATZ or BRYANT, including without limitation such testing or
22  sampling in connection with any ink, paper or chemical analysis performed or
23  attempted to be performed to date, any DOCUMENTS that REFER OR RELATE
24  thereto and all results and reports relating thereto.

25     42.    YOUR DIGITAL INFORMATION data backup policies, practices
26  and procedures from January 1, 1999 to the present, including without limitation the
27  location and specifications of any media used to preserve YOUR DIGITAL

28

209/2048031.

-11-

452-13

EXHIBIT ____22____

PAGE ____262____

1  INFORMATION and the software, if any, used to preserve YOUR DIGITAL
2  INFORMATION.

3      43.    The DIGITAL INFORMATION SYSTEMS and the application
4  software that YOU have used since January 1, 1999 that REFER OR RELATE TO
5  design, development, planning, inventory, manufacturing, sales, shipping and
6  accounting, including without limitation the common or shared storage for such
7  DIGITAL INFORMATION SYSTEMS, remote access of such DIGITAL
8  INFORMATION SYSTEMS, and any changes, modifications or upgrades to such
9  DIGITAL INFORMATION SYSTEMS or application software.

10     44.    The IDENTITY of PERSONS, including without limitation
11  vendors, who since January 1, 1999 have been responsible for or supported YOUR
12  DIGITAL INFORMATION SYSTEMS, including without limitation the IDENTITY of
13  such PERSON who serviced or provided hardware for YOUR DIGITAL
14  INFORMATION SYSTEMS, hosted, stored, archived or maintained YOUR DIGITAL
15  INFORMATION, including but not limited to internet service providers, and provided
16  analytical, training or implementation services with respect to YOUR DIGITAL
17  INFORMATION SYSTEMS.

18     45.    The electronic messaging SYSTEMS used by YOUR employees
19  within the scope of their employment between January 1, 1999 and the present,
20  including but not limited to electronic mail, instant messenger, telephone or voice-mail,
21  and the routing of such electronic messages to, from or within MGA.

22     46.    YOUR policies, practices and procedures regarding the use of
23  transportable media that contain or are capable of containing DIGITAL
24  INFORMATION, including but not limited to floppy discs, compact discs, DVDs, USB
25  drives, portable hard drives, digital cameras and personal digital assistants.

26

27

28

209/2048031.

452-14

22

PAGE  263

## PROOF OF SERVICE

I am employed in the County of Los Angeles, State of California. I am over the age of eighteen years and not a party to the within action; my business address is 865 South Figueroa Street, 10th Floor, Los Angeles, California 90017-2543.

On February 1, 2007, I served true copies of the following document(s) described as **SECOND NOTICE OF DEPOSITION OF MGA ENTERTAINMENT, INC. PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 30(B)(6)** on the parties in this action as follows:

**BY MAIL TO:**

Keith A. Jacoby, Esq.
Littler Mendelson
2049 Century Park East, 5th Floor
Los Angeles, CA 90067-3107
Telephone: (310) 553-0308
Facsimile: (310) 553-5583

I enclosed the foregoing as well as a **COURTESY COPY** into sealed envelope(s) addressed as shown above, and I deposited such envelope(s) in the mail at Los Angeles, California. The envelope was mailed with postage thereon fully prepaid. (Courtesy copy

**BY PERSONAL SERVICE ON:**

Diana M. Torres, Esq.
O'Melveny & Meyers
400 So. Hope Street
Los Angeles, CA 90071
Telephone: (213) 430-6000
Facsimile: (213) 430-6407

I delivered such envelope(s) **(COURTESY COPY INCLUDED)** by hand to the office of the person(s) being served.

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on February 1, 2007, at Los Angeles, California.

_____
Mia Albert

_____
Dave Quintana

07209/2049386.1

452-15

EXHIBIT _____22_____

PAGE _____264_____

# EXHIBIT 23

1   Hon. Edward A. Infante (Ret.)
    JAMS
2   Two Embarcadero Center
    Suite 1500
3   San Francisco, California 94111
    Telephone:   (415) 774-2611
4   Facsimile:   (415) 982-5287

5

6

7

8                   UNITED STATES DISTRICT COURT

9                  CENTRAL DISTRICT OF CALIFORNIA

10                        EASTERN DIVISION

11

12   CARTER BRYANT, an individual,          CASE NO. CV 04-09049 SGL (RNBx)
                                            JAMS Reference No. 1100049530
13            Plaintiff,

14        v.                                Consolidated with
                                            Case No. CV 04-09059
15   MATTEL, INC., a Delaware corporation,  Case No. CV 05-2727

16            Defendant.                    **ORDER GRANTING IN PART AND
                                            DENYING IN PART MATTEL'S
17                                          MOTION TO ENFORCE COURT'S
                                            DISCOVERY ORDERS AND TO
18                                          COMPEL; TO OVERRULE
                                            PURPORTEDLY IMPROPER
19                                          INSTRUCTIONS; AND FOR
                                            SANCTIONS**
20

21   CONSOLIDATED WITH
     MATTEL, INC. v. BRYANT and
22   MGA ENTERTAINMENT, INC. v. MATTEL,
     INC.
23

24

25

26

27

28

1

1-9

EXHIBIT ___23___

PAGE ___265___

## I. INTRODUCTION

On December 5, Mattel, Inc. ("Mattel") submitted a "Motion to (1) Enforce Court's Discovery Orders and to Compel; (2) to Overrule Improper Instructions; and (3) for Sanctions." Mattel's motion challenges the sufficiency of the testimony provided by four of MGA Entertainment Inc.'s Rule 30(b)(6) witnesses, Lisa Tonnu, Kenneth Lockhart, Rebecca Harris, and Spencer Woodman, on sixteen separate topics identified in Mattel's Second Notice of Deposition of MGA.  MGA submitted an opposition on December 18, 2007.  Mattel submitted a reply on December 26, 2007.  The matter was heard on January 3, 2008.  Having considered the motion papers and comments of counsel at the hearing, Mattel's motion to compel is granted in part and denied in part, and the request for sanctions is granted in part.

## II. BACKGROUND

On May 16, 2007, MGA was ordered to produce Rule 30(b)(6) designees for all topics identified in Mattel's Second Notice of Deposition of MGA, except Topic Nos. 25 and 26, on or before June 30, 2007.  Mattel's Second Notice of Deposition includes many topics relevant to the case, including, *inter alia*, the development of Bratz before it was made available for purchase; when and whom MGA first offered Bratz for sale; who first manufactured, shipped and distributed Bratz; Bratz revenues and profits; MGA's access to Mattel's earlier DIVA STARZ project that allegedly had elements which subsequently appeared in Bratz; the identity of persons who worked on Bratz and payments made to them; fee and indemnification agreements; MGA's testing and handling of original Bratz drawings; MGA's sworn statements pertaining to Bratz's creation and development; and MGA's evidence preservation and collection.  On July 2, 2007, the district court rejected MGA's objections to the May 16, 2007 Order.

MGA designated four different witnesses to testify on the topics identified in Mattel's Second Notice of Deposition of MGA.  First, MGA designated Kenneth Lockhart to testify on Topic Nos. 38, 39 and 42.  He testified on June 14-15, 2007.

Second, MGA designated Lisa Tonnu to testify on Topic Nos. 24-25, 31, 37, 39 (in part), 40 and 41.  She testified on July 19, 2007.  In the meantime, Mattel moved for an order compelling MGA to produce witnesses for deposition and sanctions because MGA did not

1  produce witnesses on certain topics as required by the May 16, 2007 Order.  On August 14, 2007,

2  Mattel's motion was granted in part and denied in part and MGA was ordered, once again, to

3  produce witnesses to testify on several topics.  On September 24-25, 2007, Mattel deposed Ms.

4  Tonnu further on Topic Nos. 21, 24-26, 31, 39, 40 and 41.

5       Third, MGA designated Rebecca Harris to testify on Topic Nos. 11, 13, 14, 19, 22-23 and

6  27-28.  Ms. Harris' deposition was scheduled, but unilaterally cancelled by MGA, on two

7  different occasions.  MGA ultimately produced Ms. Harris on July 20, 2007.

8       Fourth, MGA designated Spencer Woodman to testify on Topic No. 34.  He testified on

9  October 9, 2007.

10      In September of 2007, the parties exchanged several meet and confer letters regarding

11  purported deficiencies in the witnesses' depositions.  In mid October, MGA notified Mattel that it

12  had retained new counsel who would be responding to Mattel's letters.  After a month-long stay

13  that MGA obtained as a result of its substitution of counsel, the parties met and conferred on

14  November 16, 2007 and again on November 21, 2007.  MGA offered to produce Ms. Tonnu

15  again, but only on some of the topics for which she had been designated previously, and only

16  during the second week of January 2008.  The parties continued to exchange letters; however,

17  they were apparently unable to resolve any issues before Mattel filed the instant motion on

18  December 5, 2007.

19      Mattel essentially contends that MGA's witnesses were not sufficiently knowledgeable to

20  provide complete testimony on the 30(b)(6) topics at issue, and furthermore, that MGA's counsel

21  obstructed the depositions by making improper objections and instructing witnesses not to

22  answer.  Accordingly, Mattel seeks the following eight categories of relief:  (1) an order enforcing

23  the May 16, 2007 and August 14, 2007 Orders and compelling MGA to comply therewith by

24  designating and producing fully prepared witnesses to testify on Topic Nos. 11, 13, 14, 19, 21-25,

25  27, 28, 31, 34 and 39-41 in Mattel's Second Notice of Deposition of MGA on dates of Mattel's

26  selection; (2) an order overruling each of the purportedly improper instructions not to answer

27  questions interposed at the deposition of MGA designees Spencer Woodman and compelling

28  Woodman or other such person selected by MGA as its designee to provide complete testimony

on Topic No. 34; (3) an order compelling MGA to produce documents that MGA designee Kenneth Lockhart identified during his June 14, 2007 deposition as documents which he reviewed and relied upon to refresh his recollection in preparation for his deposition; (4) an order overruling each of the purportedly improper instructions not to answer questions interposed at the deposition of MGA designee Lisa Tonnu; (5) an order reopening the deposition of MGA designee Lisa Tonnu based on a purported "complete reversal of testimony" made through written "changes" to her deposition transcript; (6) an order compelling Rebecca Harris to sit for the completion of her deposition and/or compelling such person selected by MGA as its designee to complete the testimony on topics for which Harris was previously designated; (7) an order imposing monetary sanctions ($10,000) for MGA's alleged willful violations of the May 16, 2007 and August 14, 2007 Orders, for MGA's allegedly improper instructions not to answer deposition questions and for MGA's alleged improper coaching, harassing and obstructionist conduct at the September 24-25, 2007 deposition of Lisa Tonnu and at the October 9, 2007 deposition of Spencer Woodman; and (8) a report and recommendation to Judge Stephen G. Larson that recommends the imposition of preclusion sanctions, that certain facts related to the topics compelled be deemed admitted, and/or that MGA be found in contempt for MGA's allegedly willful and repeated violations of the Orders.

MGA opposes the motion, contending that it substantially complied with its obligation to produce witnesses knowledgeable on each of the topics at issue and that Mattel has had a full and fair opportunity to conduct its examinations. According to MGA's calculations, the four witnesses testified intelligently for nearly 36 hours over five deposition days. MGA also explains that its counsel instructed witnesses not to answer two types of questions, namely questions that invaded MGA's work product protection or attorney-client privilege, and questions that exceeded the scope of Topic No. 34. MGA also contends that Mattel is not entitled to additional time to depose Ms. Harris in particular because Mattel's counsel wasted time and badgered the witness. MGA acknowledges, however, that Ms. Tonnu did change her testimony and that there are some deficiencies in its witnesses' testimony that justify additional deposition time. Indeed, MGA points out that prior to the filing of the instant motion, MGA agreed to produce witnesses to

1  provide additional testimony on Topic Nos. 21, 24, 25, 31, 34 and 40.  Further, after the filing of

2  the motion, MGA agreed to produce witnesses to provide additional testimony on Topic No. 39.

3  MGA contends that Mattel's motion to compel additional testimony with respect to topics on

4  which MGA has already agreed to provide additional testimony is premature and should be

5  denied.

6  ### III. STANDARDS

7  Depositions of a corporation are governed by Rule 30(b)(6) of the Federal Rules of Civil

8  Procedure, which provides in pertinent part that:

9  In its notice or subpoena, a party may name as the deponent a public or
   private corporation, a partnership, an association, a governmental agency, or other
   entity and must describe with reasonable particularity the matters for examination.
10  The named organization must then designate one or more officers, directors, or
   managing agents, or designate other persons who consent to testify on its behalf;
11  and it may set out the matters on which each person designated will testify. . . .
   The persons designated must testify about information known or reasonably
12  available to the organization.

13

14  Fed.R.Civ.P. 30(b)(6) (effective Dec. 1, 2007).  Rule 30 also provides that the examination and

15  cross-examination of a deponent proceed as they would at trial under the Federal Rules of

16  Evidence.  Fed.R.Civ.P. 30(c)(1).  Further, "[a]n objection at the time of the examination--

17  whether to evidence, to a party's conduct, to the officer's qualifications, to the manner of taking

18  the deposition, or to any other aspect of the deposition--must be noted on the record, but the

19  examination still proceeds; the testimony is taken subject to any objection."  Fed.R.Civ.P.

20  30(c)(2).  "An objection must be stated concisely in a nonargumentative and nonsuggestive

21  manner. A person may instruct a deponent not to answer only when necessary to preserve a

22  privilege, to enforce a limitation ordered by the court, or to present a motion under Rule

23  30(d)(3)."  Id.

24  Rule 30(d)(1), Fed.R.Civ.P., provides that a deposition is limited to one day of seven

25  hours, unless otherwise stipulated or ordered by the court.  "The court must allow additional time

26  consistent with Rule 26(b)(2) if needed to fairly examine the deponent or if the deponent, another

27

28

1   person, or any other circumstance impedes or delays the examination."[1] Fed.R.Civ.P. 30(d)(1).

2   Furthermore, sanctions may be imposed --including the reasonable expenses and attorney's fees

3   incurred by any party--on a person who impedes, delays, or frustrates the fair examination of the

4   deponent. Fed.R.Civ.P. 30(d)(2).

5                                    IV. DISCUSSION

6   A. Mattel's Request for Relief No. 1: Mattel seeks an order enforcing the May 16, 2007 and
    August 14, 2007 Orders and compelling MGA to comply therewith by designating and producing

7   fully prepared witnesses to testify on Topic Nos. 11, 13, 14, 19, 21-25, 27, 28, 31, 34 and 39-41 in
    Mattel's Second Notice of Deposition of MGA on dates of Mattel's selection.

8
9           Mattel contends that MGA's witnesses were inadequately prepared and failed to provide

10  sufficient testimony on sixteen of the topics identified in the Second Notice of Deposition of

11  MGA. Each of the sixteen 30(b)(6) topics at issue is addressed separately below.

12          **Topic No. 11:** The exhibition, or proposed, offered, contemplated or requested exhibition,
            of BRATZ or any BRATZ DESIGN to any third party prior to June 30, 2001, including

13          without limitation each instance in which BRATZ or any BRATZ DESIGN was marketed,
            offered for sale, pitched, shown or disclosed to, or otherwise discussed with or

14          communicated to, any retailer, wholesaler or distributor and the DOCUMENTS that
            REFER OR RELATE thereto.

15          Mattel contends that Ms. Harris lacked sufficient knowledge on this topic. In particular,

16  Mattel contends that Ms. Harris could not confirm what form of Bratz or Bratz design ("sculpts")

17  was first exhibited to third parties prior to June 30, 2001.

18          MGA contends that Ms. Harris substantially discharged MGA's obligation to testify on

19  this topic. More specifically, MGA contends that Ms. Harris testified about the first exhibition,

20  sale and distribution of Bratz, including presentations to Target stores, and the first sale,

21  distribution and shipment of Bratz under an agreement with Bandai in Spain. MGA contends that

22  it is not reasonable to expect MGA to have investigated specifically what type of Bratz "sculpts"

23  were shown at particular exhibitions.

24  ───────────────────────
        [1] Rule 26(b)(2), Fed.R.Civ.P., provides that the court shall limit the frequency or extent of use of the
25  discovery methods if the court determines that "(i) the discovery sought is unreasonably cumulative or duplicative, or
    is obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) the party
26  seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or (iii) the
    burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case,
27  the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the
    importance of the proposed discovery in resolving the issues." Fed.R.Civ.P. 26(b)(2).

28
                                                                                             6
    Bryant v. Mattel, Inc.,
    CV-04-09049 SGL (RNBx)

                                                    EXHIBIT ___23___

                                                    PAGE ___270___

Furthermore, MGA points out that Mattel has taken the deposition of MGA HK on the subject of the initial manufacture of Bratz. More specifically, MGA contends that Mattel took the deposition of the head of MGA's Hong Kong operations, Edmond Lee, for two full days, and questioned him about the first manufacture of Bratz by Early Light. Therefore, MGA contends that Mattel has had a full and fair opportunity to examine MGA regarding the first manufacture of Bratz.

A review of the transcript confirms that Ms. Harris was not reasonably prepared for her deposition, especially in light of the importance of the timing of the creation of Bratz. For example, she could not specify what was shown to retailers during the year 2000. She testified that MGA used "boards" (i.e. sketched drawings) to show retailers Bratz during the year 2000 based upon a telephone conversation she had with Paula Garcia during a break. Mattel is entitled to delve into more detail about these "boards," and such information should be reasonably available to MGA. Ms. Harris testified that Julie Chemo likely attended presentations during the year 2000. Therefore, Mattel is entitled to an order compelling MGA to produce a witness to provide complete testimony on Topic No. 11.

**Topic No. 13:** COMMUNICATIONS prior to June 30, 2001 between YOU and any manufacturer, distributor, wholesaler, retailer, or any contemplated, proposed or potential manufacturer, distributor, wholesaler or retailer, that REFER OR RELATE TO BRATZ or any BRATZ DESIGN.

Mattel contends that Ms. Harris' testimony was wholly inadequate. In particular, Mattel contends that Ms. Harris had no knowledge concerning early MGA communications with Bandai, which distributed Bratz in the first market in which it was allegedly sold. Ms. Harris did not have any knowledge or information as to when MGA and Bandai first had any type of contact or communication regarding Bratz. Similarly, Ms. Harris did not have any knowledge or information as to when MGA first had contact with a company called J.H.N. regarding the sale of Bratz in Australia.

MGA contends that Ms. Harris substantially discharged MGA's obligation to testify on Topic No. 13, as described above in connection with Topic No. 11. Accordingly, MGA objects to any further examination on Topic No. 13.

A review of the deposition transcript confirms that Ms. Harris provided significant

EXHIBIT  23

PAGE  271

1   testimony on Topic No. 13.  However, as Mattel points out, her testimony lacked many details

2   relevant to when Bratz was developed.  For example, Ms. Harris was unable to testify as to any

3   communications or negotiations between MGA and Bandai leading up to the execution of written

4   agreements.  Indeed, Ms. Harris did not know when MGA and Bandia first had any contact

5   regarding Bratz.  Furthermore, MGA did not conduct a reasonable investigation to prepare Ms.

6   Harris for Topic No. 13.  Among other things, MGA made no effort to determine whether the

7   former MGA HK employee known to have been directly involved in the first discussions with

8   Bandai (Martin Hitch) had retained any documents responsive to this topic.  Nor did Ms. Harris

9   speak to Isaac Larian and Jim Olmstead, both of whom authored emails referencing existing

10  distributorship deals in Europe and Australia.  Therefore, Ms. Harris did not fulfill MGA's duty to

11  produce a witness to testify on information known or reasonably available to MGA.  Mattel is

12  entitled to an order compelling MGA to produce a witness to provide complete testimony on

13  Topic No. 13.

    **Topic No. 14**:  When and where BRATZ was first manufactured, shipped, distributed and
14  sold, and the IDENTITIES and roles of PERSONS involved therein.

15       Mattel contends that Ms. Harris did not have any knowledge regarding the identity or role

16  of any person who was involved in the first manufacture of Bratz dolls by Early Light.  Mattel

17  also contends that Ms. Harris had no knowledge as to the date when manufacturing began for the

18  first Bratz dolls.  Furthermore, Mattel contends that MGA should not be permitted to rely on the

19  testimony given by MGA HK's corporate designee to evade providing testimony on this topic

20  because that designee's testimony was deficient.

21       MGA contends that Ms. Harris substantially discharged MGA's obligation to testify on

22  Topic No. 14, as described above in connection with Topic No. 11.  Accordingly, MGA objects to

23  any further examination on Topic No. 14.

24       A review of the deposition transcript confirms that Ms. Harris did not have any knowledge

25  regarding the identity or role of any person at MGA who first had contact with Early Light, the

26  first manufacturer of Bratz dolls.  Nor did she know the identity of any person at MGA or at Early

27  Light who was involved in the first manufacture of Bratz dolls.  Furthermore, Ms. Harris stated

28  that she did not undertake any investigation to uncover these facts.  Ms. Harris also had no

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

8

EXHIBIT 23

PAGE 272

1   information or knowledge regarding the date when manufacturing began for the first Bratz dolls.

2   Ms. Harris testified that personnel in MGA's Hong Kong affiliate coordinated with Early Light.

3   Thus, the information sought by Mattel is reasonably available to MGA.  That Mattel also seeks

4   testimony from MGA's Hong Kong affiliate does not excuse MGA from producing a witness

5   sufficiently knowledgeable on Topic No. 14.  Therefore, Mattel is entitled to an order compelling

6   MGA to produce a witness to provide complete testimony on Topic No. 14.

7         **Topic No. 21:**  YOUR knowledge of, and access to, non-public MATTEL DIVA STARZ
          project information and DESIGNS prior to June 30, 2001.

8

9        Mattel contends that Ms. Tonnu was not sufficiently prepared to provide testimony, as

10  evidenced by the fact that two other MGA employees, Paula Garcia and Margaret Leahy, testified

    that they had "access" to non-public DIVA STARZ information.

11

12       MGA contends that Ms. Tonnu prepared for her deposition by speaking with five MGA

    employees, including Paula Garcia.  Based upon that investigation, Ms. Harris testified that the

13  five employees did not work on DIVA STARZ.  MGA explains that Ms. Garcia merely testified

14  that when she was at Mattel she often spoke to co-workers at Mattel who happened to work on the

15  DIVA STARZ, that those co-workers may have mentioned the existence of the project and that

16  they told Ms. Garcia it was confidential.  MGA contends that Ms. Garcia's testimony does not

17  establish "access to" DIVA STARZ information, but the opposite – that the employees did not

18  share details with Ms. Garcia and told her the project was confidential.  MGA acknowledges,

19  however, that Ms. Garcia testified that on one occasion she saw a sketch of a DIVA STARZ

20  character.

21       Nevertheless, MGA represents that during the meet and confer process MGA designated

22  Ms. Tonnu to provide further testimony on Topic No. 21, and that she will be deposed on January

23  9, 2008.  MGA represents that Ms. Tonnu will be prepared to testify whether each former Mattel

24  employee now employed by MGA had "access to" DIVA STARZ information while employed by

    Mattel.

25

26       A review of the deposition transcript confirms that Ms. Tonnu was not sufficiently

    prepared to testify on Topic No. 21.  Ms. Tonnu did not know what DIVA STARZ was.

27  Furthermore, she was not sufficiently informed of the identities of the MGA employees and

28

EXHIBIT _____ 23

PAGE _____ 273

1  contractors who had access to or worked on DIVA STARZ.  For example, Ms. Tonnu was

2  uninformed of Ms. Garcia's and Ms. Leahy's knowledge and access to DIVA STARZ

3  information while employed by Mattel.  Such information was known or reasonably available to

4  MGA.  Therefore, Mattel is entitled to an order compelling MGA to produce a knowledgeable

5  witness to provide complete testimony on Topic No. 21.

6      **Topic No. 24:**  Any indemnification and fee arrangement that YOU and/or BRYANT has

7  sought proposed, requested or obtained in connection with this ACTION.

8      Mattel contends that MGA's designee, Lisa Tonnu, was not sufficiently prepared to

9  testify, despite having been produced twice to testify on this topic.  For example, Mattel points

10  out that Ms. Tonnu did not know why MGA agreed to pay Carter Bryant's attorneys' fees or how

11  much MGA had paid or whether Littler Mendelson's fees had been paid in full.  Mattel's Motion

12  at pp. 14-15.  Furthermore, Mattel points out that Ms. Tonnu did not make any effort to find out

13  the answers to these questions.

14      MGA contends that Ms. Tonnu substantially discharged MGA's obligation to provide

15  testimony in response to this topic.  MGA contends that Ms. Tonnu reviewed responsive

16  documents and was able to identify the agreements in her deposition.  Further, MGA contends

17  that Ms. Tonnu spoke to MGA's in-house counsel about the agreements and was able to identify

18  the individuals involved in the negotiations of those agreements.

19      MGA acknowledges, however, that Ms. Tonnu was not able to testify regarding the

20  specifics of those negotiations or the terms of those agreements.  MGA represents that prior to the

21  filing of this motion, it designated in-house counsel Sam Khare to provide additional testimony on

22  this topic and that Mattel will depose him on January 8, 2008.

23      A review of the deposition transcript confirms that Ms. Tonnu was not prepared to testify

24  as to information known or reasonably available to MGA.  For example, Ms. Tonnu did not know

25  why MGA agreed to pay Bryant's fees, did not know how much MGA had paid in fees, and did

26  not know whether MGA had paid Littler Mendelson's fees in full.  Accordingly, Mattel is entitled

27  to an order compelling MGA to produce a knowledgeable witness to provide complete testimony

28  on Topic No. 24.

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

10

EXHIBIT ___2-3___

PAGE ___274___

**Topic No. 25:** YOUR revenues and profits from BRATZ, including without limitation, YOUR gross and net profits, and YOUR costs associated therewith.

Mattel contends that Ms. Tonnu lacked the most basic information called for by this topic. For example, Mattel contends that Ms. Tonnu testified that: she did not recall nor could she provide an estimate of how much distribution revenue MGA derived from the Bratz brand between 2001 and the end of 2006; she did not know and could not provide a best estimate for the episodic costs or production costs associated with the distribution revenue; she did not know who in the company could provide this information; she did not know and could not provide a range for how much licensing revenue MGA had received for licensing anything associated with the Bratz brand between 2001 and the end of 2006; she did not know and could not estimate how much revenue the Bratz movie generated; she did not know how much revenue MGA had earned from the Bratz brand; and she did not know how much profit MGA had generated from the Bratz brand.

MGA contends that it substantially discharged its obligation to provide testimony on this topic. More specifically, MGA contends that Ms. Tonnu testified with the aid of Exhibit 660, a 143-page report summarizing the units sold from 2001 to 2006 organized by "stock-keeping-unit" or "SKU." MGA contends that Ms. Tonnu prepared for her deposition by speaking with MGA's Director of Finance, Anisse Evans, regarding Exhibit 660.

In the meet and confer process, MGA's counsel offered to provide Mattel with source information from which the profitability of Bratz products at the SKU level could be derived and to produce Ms. Tonnu for follow-up testimony regarding that source financial information so that Mattel's experts would be in a position to draw their own conclusions and opinions as to MGA's profits from Bratz. MGA represents that Mattel has agreed to depose Tonnu on this topic on January 9, 2008. MGA also represents that it has produced more than 27,700 pages of source financial information that will be the "starting point" from which MGA's and Mattel's experts will analyze the profitability of Bratz products. MGA represents that Ms. Tonnu will be prepared to discuss the source financial information produced to Mattel at her continued deposition.

A review of the deposition transcript confirms that Ms. Tonnu was not sufficiently prepared to provide testimony on Topic No. 25. Ms. Tonnu could not identify, generally or by

EXHIBIT ___23___

PAGE ___275___

1   product, Bratz revenues, costs, or gross or net profits. Furthermore, MGA has failed to provide

2   any explanation for why Ms. Tonnu was not educated on the source financial information before

3   her deposition. Accordingly, Mattel is entitled to an order compelling MGA to produce a

4   knowledgeable witness to provide complete testimony on Topic No. 25.

> **Topic No. 27:** The payment of money or anything of value that YOU have made or
> offered to make to, for or on behalf of Elise Cloonan, or that has been requested, sought or
> received by, for or on behalf of Elise Cloonan, and the timing, manner, amount(s) and
> reasons therefore.

8   Ms. Cloonan was Carter Bryant's roommate at some point. Bryant testified that he

9   showed her early drawings prior to showing them to MGA. She is not and never has been an

10  employee of MGA.

11  Mattel contends that Ms. Harris' testimony was incomplete because she only searched for

12  evidence of payment by reviewing vendor files and MGA's electronic purchase order files, and

13  did not review the individual documents within each account payable vendor file. Mattel also

14  contends that Ms. Harris was not sufficiently prepared because she had no knowledge or

15  information as to who was paying her legal fees in this case.

16  MGA contends that it discharged its obligation to testify on Topic No. 27, emphasizing

17  that Ms. Harris unequivocally represented on behalf of MGA that MGA made no payments to,

18  had no agreements with and had no communications with Elise Cloonan. Furthermore, MGA

19  points out that Mattel took the deposition of Elise Cloonan on December 14, 2007, and she

20  confirmed that she had received no payments from and had no communications with MGA.

21  A review of the transcript confirms that Ms. Harris' preparation for and testimony

22  regarding Topic No. 27 was adequate. Furthermore, the burden and expense of conducting a

23  deposition on this topic substantially outweigh the potential relevance of the testimony sought.

24  Mattel's motion is denied with respect to Topic No. 27.

> **Topic No. 28:** COMMUNICATIONS between YOU and Elise Cloonan that REFER OR
> RELATE TO BRYANT, MATTEL, BRATZ and/or Anna Rhee, including
> DOCUMENTS that REFER OR RELATE TO such COMMUNICATIONS.

26  Mattel contends that Ms. Harris's testimony was insufficient because she admitted she did

27  not have any knowledge or information as to what systems or hard drives in MGA were searched

28  

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

12

EXHIBIT ____23____

PAGE ____2 76____

1   for e-mails referencing Elise Cloonan.

2      MGA contends that Mattel is not entitled to further examination on Topic No. 28 because

3   Ms. Harris substantially discharged MGA's obligation to testify on the topic, as described above

4   in reference to Topic No. 27 above.

5      A review of the transcript confirms that Ms. Harris' preparation for and testimony

6   regarding Topic No. 28 was adequate.  Furthermore, the burden and expense of conducting a

7   deposition on this topic substantially outweigh the potential relevance of the testimony sought.

8   Mattel's motion is denied with respect to Topic No. 28.

9      **Topic No. 31**: The IDENTITY of each PERSON who, at any time since January 1, 1998, has performed any work or services for, by or on behalf of YOU while such PERSON was employed by MATTEL, the nature and timing of each such PERSON's work or services and the amount(s) paid by YOU to each such PERSON.

10

11     Mattel contends that the first time MGA produced Ms. Tonnu to testify, she lacked any

12  personal knowledge regarding this topic and that MGA failed to educate her properly on the topic.

13  Ms. Tonnu testified that she spoke to an accounts payable clerk, Ms. Brooks, who had "a list of

14  vendors and the dates in which they were either employed or freelancing with Mattel, and she

15  cross-referenced that in her research." Tonnu Tr. at 147:5-148:20.  Mattel points out, however,

16  that Ms. Tonnu testified that she did not know who prepared the list; did not see the criteria used

17  to prepare the list; did not know who the vendors or freelance people were on the list; and did not

18  know whether the list included all former Mattel employees who were working at MGA.  MGA

19  produced Ms. Tonnu for a second time regarding Topic No. 31, however, Mattel contends that she

20  was still unprepared.

21     MGA contends that it has substantially discharged its obligation to provide testimony on

22  this topic.  MGA explains that Ms. Tonnu testified on this topic based on a review of MGA

23  business records.  MGA explains that to prepare for the deposition, it prepared a list of MGA

24  employees who were former Mattel employees, including the dates each person was employed by

25  Mattel.  Next, Ms. Brooks searched MGA's accounting records reflecting payments to outside

26  vendors for any evidence of a payment to a former Mattel employee on the list during the period

27  of that person's Mattel employment, or with respect to work or services performed during that

28  period.  MGA contends that Ms. Tonnu testified about this search and the results of the search

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

13

EXHIBIT _____23_____

PAGE _____277_____

1   leading to the identification of three instances of payments to former Mattel employees while the

2   employee was still at Mattel.

3        Nevertheless, MGA represents that prior to the filing of this motion, it designated Ms.

4   Tonnu to provide additional testimony on this topic.  Specifically, MGA is prepared to produce

5   Ms. Tonnu to testify regarding whether former Mattel employees may have performed work or

6   services for MGA during their employment with Mattel without being paid for those services.

7   Ms. Tonnu's deposition is scheduled for January 9, 2008.

8        A review of the deposition transcript confirms that Ms. Tonnu was not sufficiently

9   prepared to testify on Topic No. 31.  Notably, Ms. Tonnu admitted that she did not know whether

10   any person has at any time since 1998 performed work or services for MGA while that person

11   was a Mattel employee.  Further, she testified that she did not speak with or ask any of the former

12   Mattel employees who were working at MGA whether they had provided work or services for

13   MGA while they were Mattel employees.  Instead, Ms. Tonnu only knew whether or not

14   payments were made to the former Mattel employees while they were still employees of Mattel.

15   Furthermore, the list of former Mattel employees provided by Ms. Brooks was incomplete

16   because it did not include twelve former Mattel employees.  Accordingly, Mattel is entitled to an

17   order compelling MGA to produce a witness to provide complete testimony on Topic No. 31.

18        **Topic No. 34:** Other than those previously filed and served in this ACTION or in which
Mattel, Inc.'s counsel in this ACTION was in attendance, the testimony, transcripts,
declarations, affidavits and other sworn written statements of any other type by or from
YOU or made on YOUR behalf that REFER OR RELATE TO BRATZ THAT REFER
OR RELATE TO the time period prior to June 30, 2001 (regardless of when such
testimony or sworn statement was taken, given, signed, made or filed).

21        Mattel contends that Mr. Woodman had not been adequately prepared for his deposition

22   and lacked the most basic knowledge on the topic.  Mattel points out that Mr. Woodman had been

23   employed with MGA for less than one year and that his responsibilities had been limited to the

24   administration of licensing contracts and royalties.  Further, Mattel contends that in preparation

25   for his deposition, Mr. Woodman "did no more than review a selection of sworn statements

26   previously made by others, review transcripts of Carter Bryant's deposition testimony, and speak

27   'for a few minutes' with one other person besides counsel."  Mattel's Consolidated Separate

28   Statement, p.130.

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

14

EXHIBIT _____ 23

PAGE _____ 278

1    Mattel also contends that Mr. Woodman was not sufficiently prepared to testify regarding

2    "sworn statements in MGA's many submissions to the Copyright Office or Patent and Trademark

3    Office," and sworn testimony from the "Art Attacks" trial.  Id.  Further, Mattel contends that

4    MGA's counsel improperly instructed Mr. Woodman not to answer certain questions on the basis

5    that Topic No. 34 did not include sworn statements made in connection with the "Art Attacks"

6    matter or statements made in various submissions to the Copyright Office or Patent and

7    Trademark Office.  Counsel also instructed Mr. Woodman not to answer certain questions about

8    sworn statements that related to Topic No. 33 and statements that MGA believed did not

9    sufficiently relate to conduct prior to June 30, 2001.  Topic No. 33 seeks testimony on

10   applications for registration and the registrations for copyright, patent, trademark or any other

11   right that refer or relate to Bratz or Bratz designs, sought, made or obtained by, for or on behalf of

12   MGA or Bryant, including communications pertaining thereto.

13         MGA contends that Mattel is not entitled to any further testimony on this topic.  MGA

14   explains that Mr. Woodman reviewed 30-50 sworn statements, read the transcript of the

15   depositions of Carter Bryant and Victoria O'Connor, MGA's former Vice President of Licensing,

16   and interviewed Leon Djiguerian in MGA's Product Development.  MGA further asserts that Mr.

17   Woodman answered questions as to the completeness or incorrectness of many factual statements

18   contained in the sworn statements placed in front of him by Mattel's counsel.  Thus, MGA

19   contends that Mattel obtained exactly the testimony it sought.  In MGA's view, Mr. Woodman's

20   testimony regarding the correctness or incorrectness of factual statements identified from the

21   sworn statements is binding on MGA.  MGA also contends that Mr. Woodman was not required

22   to investigate the preparation, review and approval of MGA's various sworn statements because

23   such information would be protected from disclosure by the attorney-client privilege and work

24   product doctrine.

25         MGA next contends that most of the documents shown to Mr. Woodman were not "sworn

26   statements," but rather (i) copyright registrations and certificates that include a statement that the

27   application is "correct to the best of my knowledge," (ii) certificates of registration issued by the

28   USPTO, and (iii) an office action summary by the USPTO.  Nevertheless, MGA implicitly

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

15

EXHIBIT   23

PAGE   279

1   acknowledges that Mr. Woodman did not provide sufficient testimony as to certain applications

2   for registrations containing declarations by Isaac Larian documents (Exhibits 580-584, 590), a

3   declaration by Bryant (Exhibit 502), and an application and amendment referred to in the Bryant

4   declaration (Exhibits 500, 548), and one additional declaration by Isaac Larian, by agreeing to

5   produce Sam Khare to testify regarding these documents.  Mattel is scheduled to depose Mr.

6   Khare on January 8, 2008.

7       MGA contends that prior counsel properly objected to certain questions as outside the

8   scope of Topic No. 34.  In particular, MGA contends that questions directed at statements that did

9   not refer or relate to the time period prior to June 30, 2001 are outside the scope of Topic No. 34.

10  Further, MGA contends that where a sworn statement relates in part to the time period before

11  June 30, 2001, and in part to other time periods, the scope of Topic No. 34 is limited by its own

12  terms to that portion of the statement that relates to the specified time period.  MGA also contends

13  that sworn testimony taken at the Art Attacks trial is outside the scope of Topic No. 34 because

14  Mattel's counsel was present at that trial.

15      MGA represents that its present counsel does not condone the instructions not to answer

16  made by prior counsel, and will not attempt to justify those instructions.  Nevertheless, MGA

17  contends that Mattel was not deprived of any discoverable testimony by those instructions

18  because the disputed questions sought information outside the scope of Topic No. 34.  More

19  specifically, MGA represents that each exhibit that was excluded from Mr. Woodman's testimony

20  on the grounds that it was not a "sworn statement" was the subject of examination of MGA's

21  designees on Topic No. 33, Bryan Armstrong and Sam Khare.  MGA also contends that

22  resumption of a deposition on Topic No. 34 beyond what MGA has agreed to provide is

23  unwarranted because Mattel obtained two full days of 30(b)(6) testimony on Topic No. 33.

24      A review of the deposition transcript confirms that Mr. Woodman was not sufficiently

25  prepared to provide testimony on Topic No. 34.  Mr. Woodman did no more than review the

26  sworn statements made by others and the transcripts of Carter Bryant's deposition.  For the sworn

27  statements he did review, Mr. Woodman offered little information beyond what was apparent on

28  the face of the documents.  For example, Mr. Woodman did not know who authorized submitting

Bryant v. Mattel, Inc.,
CV-04-09049 SOL (RNBx)

16

EXHIBIT  23

PAGE  290

1   the sworn statement. Ultimately, Mr. Woodman only testified as to whether or not a particular

2   sworn statement was consistent with deposition testimony of Carter Bryant. Furthermore, Mr.

3   Woodman admitted that the testimony he gave had nothing to do with MGA's current beliefs, was

4   not based on any investigation, and had nothing to do with the actual correctness or incorrectness

5   of any of the sworn statements. Mr. Woodman admitted that no matter what inconsistencies

6   existed between Carter Bryant's testimony and MGA's sworn statements, Mr. Woodman always

7   presented Carter Bryant's testimony as to the facts as "true." Thus, Mr. Woodman failed to

8   testify as to information known or reasonably available to MGA. Mr. Woodman's lack of

9   preparedness alone justifies re-opening Topic No. 34. Furthermore, MGA cannot rely on blanket

10  claims of privilege to preclude testimony on Topic No. 34.

11      A further deposition on Topic No. 34 is also justified in light of the admittedly improper

12  instructions not to answer, and MGA's acknowledgement that Mr. Woodman did not provide

13  testimony as to Exhibits 500, 502, 548, 580-584, 590. MGA shall abide by its agreement to

14  produce a witness to testify on these exhibits.

15      MGA's interpretation of Topic No. 34 as excluding statements not made under oath or

16  penalty of perjury, and as excluding any portion of a statement under oath that does not refer or

17  relate to the time period prior to June 30, 2001, is overly technical. There is, however, a clear

18  overlap between Topic No. 34 and Topic No. 33, which is not at issue in this motion. When the

19  deposition on Topic No. 34 is resumed, MGA's corporate designee is not required to provide

20  further testimony on statements that were the subject of examination of MGA's designees on

    Topic No. 33.

21      MGA's interpretation of Topic No. 34 as excluding testimony from the Art Attacks trial is

22  appropriate. Mattel does not contest that its counsel attended the Art Attacks trial. Topic No. 34

23  clearly excludes any proceeding attended by Mattel's counsel. When the deposition on Topic No.

24  34 is resumed, MGA's corporate designee is not required to provide further testimony with

25  respect to the Art Attacks trial.

26      **Topic No. 39**: The preservation, collection, destruction, removal, transfer, loss or

27  impairment of YOUR DOCUMENTS and DIGITAL INFORMATION in connection with

28  the ACTION and/or any DOCUMENTS requested by MATTEL in the ACTION.

EXHIBIT   23

PAGE   291

MGA designated two individuals to testify on this topic: Kenneth Lockhart to testify on electronic evidence; and Lisa Tonnu, to testify to documentary evidence. Mattel contends that both designees were unable to provide substantive testimony.

Mattel points out that Mr. Lockhart did not know whether the MGA's "PST files" had been searched; whether e-mails had been deleted from the exchange mailbox between late 2004 and the present; whether MGA's "snap servers" had been searched; whether keywords were used to search "PST" files; and what user files were searched. Further, Mattel contends that Mr. Lockhart was not aware of the location of any hard drive or any image of any hard drive that had been preserved for litigation purposes.

MGA contends that Mr. Lockhart substantially discharged MGA's obligation on Topic 39 with respect to electronic documents. MGA represents that Mr. Lockhart prepared extensively for his testimony by speaking with various individuals and that he testified at length about the configuration of MGA's computer systems and MGA's policies, practices and procedures for the retention and preservation of electronic documents.

Nevertheless, MGA is willing to produce a witness to testify on its behalf regarding the collection of electronic documents in connection with this action in order to shore up the one area of Mr. Lockhart's testimony that MGA agrees was lacking.

As for Ms. Tonnu, Mattel contends that MGA made no discernible effort to educate her concerning the topic. Ms. Tonnu testified that she did not know whether MGA has a document retention policy. Mattel also contends that MGA's counsel instructed Ms. Tonnu not to answer any questions about MGA's preservation and collection of documents based upon unfounded claims of attorney-client privilege.[2]

MGA produced Ms. Tonnu a second time to testify on Topic No. 39, however Mattel contends that her testimony remained deficient. For example, Ms. Tonnu testified that she prepared for the deposition by speaking with Rich Daniels, MGA's counsel, and by reviewing a

//

---

[2] The instructions not to answer are discussed in a separate section of this Order.

1  declaration prepared by Daphne Gronich, MGA's General Counsel on the subject of document
2  preservation. Mattel points out, however, that Ms. Tonnu never spoke with Ms. Gronich, and
3  therefore was unable to provide any information beyond what was stated in the four corners of the
4  declaration. In particular, Mattel contends that Ms. Tonnu did not know whether any documents
5  at the MGA campus had been searched for responsive documents. Nor did Ms. Tonnu know what
6  documents were stored at MGA's three off-site facilities and could not confirm whether they had
7  been searched for documents responsive to Mattel's requests.

8      MGA contends that Ms. Tonnu testified fully and completely regarding MGA's
9  preservation of documents in connection with this action. Indeed, MGA contends that the
10  Gronich declaration, which had already been provided to Mattel, contains detailed information
11  regarding MGA's document preservation efforts. MGA also points out that Tonnu testified,
12  based on her investigation and MGA's general policy (that documents generated by employees in
13  the ordinary course of business should not be destroyed and the wide distribution of document
14  preservation notices to MGA employees), that MGA did not knowingly destroy any documents
   potentially relevant to this action.

15      MGA acknowledges, however, that Ms. Tonnu was not able to testify regarding the actual
16  collection of documents for production in this action. MGA represents that it is willing to
17  produce an additional witness to discuss the collection of hard copy and electronic documents in
18  connection with this action.

19      A review of the deposition transcripts confirms that MGA's witnesses provided a
20  significant amount of testimony on this topic, and in particular regarding document preservation.
21  The one area where they were glaringly deficient was regarding document "collection."
22  Accordingly, MGA is ordered to abide by its agreement to produce a witness to testify further
23  with respect to the "collection" of hard copy and electronic documents. In all other respects,
24  MGA is in substantial compliance with Topic No. 39, and the burden and expense of re-opening a
25  deposition on the entirety of Topic No. 39 outweighs the likely benefit of the testimony Mattel
26  seeks.

27      **Topic No. 40:** The preservation, collection, destruction, removal, transfer, loss or

28

EXHIBIT ___23___

PAGE ___283___

1    impairment of YOUR DOCUMENTS and DIGITAL INFORMATION since January 1, 1999 that

2    REFER OR RELATE TO MATTEL (including without limitation to any MATTEL product, plan

3    or information) that YOU received in any manner from any PERSON who was at the time an

4    employee of MATTEL or who had previously been an employee of MATTEL.

5         This topic appears to be based, at least in part, upon Mattel's allegations that former

6    Mattel employee Ron Brawer, former Mattel employees in Mattel's offices in Mexico; and a

7    former Mattel employee located in Canada improperly provided MGA with documents containing

8    Mattel trade secrets.

9         Mattel contends that MGA made no discernible effort to educate Ms. Tonnu on Topic No.

10   40, and therefore she was unable to answer whether MGA has or has had in its possession any (1)

11   Mattel strategic plans, (2) any sales or profit information of Mattel, (3) any documents related to

12   Mattel's advertising strategy, (4) any documents relating to the results of Mattel's advertising, (5)

13   documents related to Mattel's pre-release line lists, and (6) documents related to Mattel's strategy

14   with respect to specific customers.  MGA produced Ms. Tonnu a second time, however, Mattel

15   contends that her testimony remained deficient.  In particular, Mattel complains that MGA spoke

16   with only two former employees about the documents described above, when there are many

17   more former Mattel employees working at MGA.

18        MGA contends that Ms. Tonnu spoke with the three individuals at MGA who would be

19   most knowledgeable about the allegations against MGA and testified as to any documents they

20   brought with them from Mattel: Ron Brawer, Susana Kuemmerle and Janine Brisbois.  MGA

21   contends that Ms. Tonnu's preparation to testify on Topic 40 was reasonable.

22        Nevertheless, MGA represents that it has agreed to provide additional testimony through

23   Ms. Tonnu to address Mattel's concerns, and that her deposition will take place on January 9,

     2008.

24        A review of the deposition transcript indicates that Ms. Tonnu did not prepare sufficiently

25   for her testimony.  Ms. Tonnu spoke to only three individuals.  Clearly, there are far more sources

26   of information reasonably available to MGA, namely the many more former Mattel employees

27   now employed at MGA.  MGA made no effort to determine what Mattel documents, if any, these

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)                                                                  20

EXHIBIT ___23___

PAGE ___284___

1  individuals possess. Therefore, Mattel is entitled to an order compelling MGA to produce a

2  witness to provide complete testimony on Topic No. 40.

3  **Topic No. 41:** The testing or sampling from DOCUMENTS that REFER OR RELATE

4  TO BRATZ or BRYANT, including without limitation such testing or sampling in connection with any ink, paper or chemical analysis performed or attempted to be performed to date, any DOCUMENTS that REFER OR RELATE thereto and all results

5  and reports relating thereto.

6  Mattel deposed Ms. Tonnu on this topic on two separate occasions. Mattel contends that

7  in each instance, she was unprepared to given any meaningful testimony regarding any ink, paper

8  or chemistry testing performed on Bratz documents. In particular, Mattel contends that Ms.

9  Tonnu's preparation for her deposition was inadequate because she did not speak to the MGA

10  litigation consultant who performed the testing, Mr. Speckin, but merely read his declaration.

11  Furthermore, Mattel contends that MGA's counsel improperly instructed Ms. Tonnu not to

12  answer questions based upon unfounded claims of work product protection. Mattel explains that

13  it is not seeking information concerning Mr. Speckin's opinions or the results of his test on Bratz

14  documents. Instead, Mattel contends that it is seeking factual information concerning the

15  handling and shipment of original Bratz documents, as well as the specific documents that were

16  tested. In Mattel's view, the factual circumstances surrounding Mr. Speckin's testing are not

17  protected from discovery by the work-product doctrine.

18  Moreover, Mattel contends that MGA provided Mattel's counsel with a list identifying the

19  documents that Mr. Speckin tested and allowed Ms. Tonnu to testify about the identification of

20  documents, thereby waiving any work product protection with respect to the identification of

21  documents. Mattel also contends that Mr. Speckin's declaration, which was submitted in the

22  case, already discloses the types of tests conducted and therefore any privilege that may have

23  applied has been waived with respect to this subject.

24  MGA contends that it complied with this topic and that Mattel is not entitled to any further

25  examination because further questioning about the testing performed by Mr. Speckin would

26  violate MGA's attorney work product protection. Mr. Speckin is one of MGA's non-testifying

27  experts. MGA objects to any further questioning regarding Mr. Speckin's selection of which

28  documents to test, how the documents were handled, which tests were performed on the

21

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

EXHIBIT 23

PAGE 295

1   documents, how they were shipped and how they were stored.  MGA contends that further

2   questioning on these subjects would necessarily reveal the mental impressions, legal theories, and

3   conclusions of MGA's counsel and its non-testifying experts formed in anticipation of litigation

4   with Mattel.  Further, MGA contends that Mattel has not carried its heavy burden to demonstrate

5   the "exceptional circumstances" required to invade MGA's work product.

6        A review of the deposition transcript confirms that Ms. Tonnu was not reasonably

7   prepared to testify on Topic No. 41.  Ms. Tonnu did not speak with Mr. Speckin or anyone

8   involved in the testing.  She had only read Mr. Speckin's declaration.  Therefore, she clearly was

9   not in a position to testify as to information known or reasonably available to MGA.  On this basis

10  alone, Mattel is entitled to an order compelling MGA to produce a witness to testify fully on

11  Topic No. 41.

12       As for MGA's claims of work production protection, Judge Larson has already indicated

13  that questions of privilege regarding the testing of the Bratz documents must be handled on a

14  question-by-question basis.  The questions at issue are set forth in Mattel's Separate Statement

15  No. 2, and are discussed below in connection with Mattel's Request for Relief No. 4.

16  B. Mattel's Request for Relief No. 2:  Mattel seeks an order overruling each of the purportedly
    improper instructions not to answer questions interposed at the deposition of MGA designees

17  Spencer Woodman (Instruction Nos. 46-57) and compelling Woodman or other such person
    selected by MGA as its designee to provide complete testimony on Topic No. 34.

18       Mattel identifies each instance of allegedly improper instructions in its Separate Statement

19  No. 2.  In each instance identified by Mattel, MGA's counsel instructed the witness not to answer

20  questions about matters that counsel believed exceeded the scope of the deposition.  The

21  instructions not to answer were not based upon a claim of privilege, and therefore were clearly

22  improper.

23       Furthermore, as stated previously, MGA has acknowledged that some questions fell within

24  the scope of Topic No. 34 and should be answered.  To that end, MGA has agreed to produce a

25  corporate designee to provide supplemental testimony as to Exhibits 500, 502, 548, 580-584, 590.

26  MGA shall abide by its agreement to produce a witness to testify on these exhibits.

27       Nevertheless, many of the questions identified in the Separate Statement No. 2 for which

28

EXHIBIT  2 3

PAGE  286

1    an improper instruction not to answer was given clearly exceeded the scope of the deposition

2    notice.  MGA is not required to provide further testimony as to those questions.  For example, the

3    question regarding the Art Attacks trial that Mattel's counsel attended (Instruction No. 46) exceed

4    the scope of Topic No. 34, and do not require any further testimony.  MGA is also not required to

5    provide further testimony as to documents that have been the subject of questioning during the

6    30(b)(6) deposition on Topic No. 33.[3]

7    C. Mattel's Request for Relief No. 3:  Mattel seeks an order compelling MGA to produce
     documents that MGA designee Kenneth Lockhart identified during his June 14, 2007 deposition
8    as documents which he reviewed and relied upon to refresh his recollection in preparation for his
     deposition.

9            Mattel seeks an order compelling MGA to produce documents that Mr. Lockhart

10   identified during his deposition as documents which he reviewed and relied upon to refresh his

11   recollection in preparation for his deposition.

12           MGA contends that the documents Mattel seeks are privileged e-mail communications

13   from MGA's General Counsel to MGA employees regarding their document preservation

14   obligations in light of the present action.  MGA contends that its privilege log demonstrates that

15   the documents are protected by both the attorney-client privilege and the work product doctrine.

16   Furthermore, MGA contends that Mr. Lockhart was required to review the privileged emails

17   because they related to MGA's preservation of documents in connection with this action and they

18   were reasonably available to MGA.

19           Moreover, MGA contends that waiver of the attorney-client privilege and work product

20   doctrine is not automatic where a witness refreshes his recollection with privileged prior to a

21   deposition.  In re Managed Care Litig., 415 F.Supp.2d 1378 (S.D. Fla. 2006); Medtronic Xomed,

22   Inc. v. Gyrus ENT LLC, 2006 WL 786425, at *1, 3, 6-7 (M.D. Fla. March 27, 2006).

23           MGA's bare bones privilege log, unaccompanied by any supporting declarations, is

24   insufficient to establish the attorney-client privilege and the work product doctrine.  Further,

25   although there appears to be a split in authority, the weight of authority supports a finding of

26

27   [3] MGA represents that virtually all of the questioning quoted in Mattel's Separate Statement No. 2 at
     Instruction Nos. 47-57 was covered in the deposition on Topic No. 33.  However, MGA's representation cannot be
     confirmed by the excerpts of the deposition transcript submitted in connection with this motion.

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)                                                                              23

EXHIBIT   23

PAGE   297

1   waiver. See e.g. United States ex rel. Bagley v. TRW Inc., 212 F.R.D. 554, 565-566 (C.D. Cal.

2   2003) (requiring disclosure of documents reviewed by relator in preparing for his deposition

3   based upon waiver of work product protection); U.S. v. 22.80 Acres of Land, 107 F.R.D. 25-26

4   (N.D. Cal. 1985) (work product waived where deponents used documents to refresh recollection);

5   Ehrlich v. Howe, 848 F.Supp. 482, 493 (S.D.N.Y. 1994) ("when [c]onfronted with the conflict

6   between the command of Rule 612 to disclose materials used to refresh recollection and the

7   protection afforded by the attorney-client privilege . . . the weight of the authority holds that the

8   privilege is waived."); Marshall v. United States Postal Service, 88 F.R.D. 348, 350 (D. D.C.

9   1980) ("[I]t is apparent that once a document is used to refresh the recollection of a witness,

    privileges as to that document have been waived.").

10          Furthermore, the interests of justice compel production of the e-mail documents used by

11  Mr. Lockhart to refresh his recollection. MGA acknowledges that Mr. Lockhart was required to

12  review the e-mails because they related to MGA's preservation of documents. Mr. Lockart

13  testified that the e-mails refreshed his recollection as to what MGA employees had been requested

14  to preserve. Accordingly, MGA is ordered to produce the e-mails reference in Mr. Lockhart's

15  deposition.

16  D. Mattel's Request for Relief No. 4. Mattel seeks an order overruling each of the purportedly
    improper instructions not to answer questions interposed at the deposition of MGA designee Lisa
17  Tonnu.

18          In Mattel's Separate Statement No. 2, Mattel identifies each purported instance of

19  improper objections and/or instructions not to answer for which it seeks a ruling. Each instance

20  of allegedly improper conduct is discussed below.

21

22                          Instruction Nos. 1-5

23          Mattel's counsel posed a series of questions regarding Mr. Larian's trusts. In each

24  instance, MGA's counsel instructed Ms. Tonnu not to answer. MGA's counsel objected to the

25  question on privilege and privacy grounds, and objected that the question exceeded the scope of

26  deposition.

27          The privilege objections are overruled because MGA has failed to establish the requisite

28
    Bryant v. Mattel, Inc.,                                                                    24
    CV-04-09049 SGL (RNBx)

EXHIBIT    2 3

PAGE    2 8 8

1    elements of any applicable privilege.  The privacy objections are overruled since there is a

2    protective order in place to address Mr. Larian's privacy concerns regarding his personal finances.

3    The remaining objections do not justify an instruction not to answer.  See Fed.R.Civ.P. 30(c)(2)

4    (an objection must be noted on the record, but the examination still proceeds and the testimony is

5    taken subject to any objection).  Accordingly, MGA shall produce a knowledgeable 30(b)(6)

6    designee to provide complete responses to the questions identified in Mattel's Separate Statement

7    No. 2 as Instruction Nos. 1-5.

Instruction No. 6

8

9        In this excerpt, the witness wanted to clarify her testimony regarding voucher payments,

10    which prompted Mattel's counsel to ask a series of questions about what prompted her make the

11    clarification, including "that's what counsel told you at the break?"; "[h]ow was your recollection

12    refreshed"; and "[d]id Mr. Jenal tell you what the dates were?"  MGA's counsel objected on

    privilege grounds and instructed the witness not to answer.

13

14        The objections are overruled.  The attorney-client privilege protects an attorney's

15    communication of legal advice to his client, as well as the client's communication of information

16    to the attorney "to enable him to give sound and informed advice."  Upjohn Co. v. United States,

17    449 U.S. 383, 390 (1981).  In this instance, the question posed did not require the witness to

18    disclose the substance of an attorney-client communication.  Instead, the questions posed called

19    for the disclosure of underlying facts to which Mattel is entitled.  See Upjohn, supra at 395

20    (finding that the attorney-client privilege does not preclude disclosure of factual information and

    that the privilege does not protect facts communicated to an attorney).

21        Accordingly, MGA shall produce a knowledgeable 30(b)(6) designee to provide complete

22    responses to the questions identified in Mattel's Separate Statement No. 2 as Instruction No. 6.

Instruction Nos. 7-20 and 23

23

24        In each of these excerpts, Mattel's counsel posed questions regarding testing performed on

25    Bratz drawings.  MGA's counsel objected to the questions based upon the work product doctrine

26    and instructed the witness not to answer.

27        The work product objections are overruled.  The work product doctrine, now codified in

28

25

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

1  part in Rule 26(b)(3) of the Federal Rules of Civil Procedure, provides qualified protection for

2  materials prepared by or at the behest of counsel in anticipation of litigation or for trial. The party

3  claiming work product immunity has the burden of establishing its elements by competent

4  evidence. In re Kidder Peabody Securities Litigation, 168 F.R.D. 459, 462 (S.D. N.Y. 1996).

5       In the instant case, all of the questions posed to the witness take one of four forms: "do

6  you know whether" or "do you know who" or "do you know what" or "do you know why." The

7  questions thus call for a simple "yes" or "no" response that did not require divulging any

8  information protected by the work product doctrine.

9       Even if the questions are construed to require substantive responses beyond "yes" or "no,"

10 the information sought is factual (what test was conducted, how documents were stored, whether

11 the documents were handled with cotton or latex gloves, who was with the expert when he

12 performed his tests, what precautions he took). The questions do not require the witness to

13 divulge the mental impressions, the legal theories, or conclusions of Mr. Speckin.

14      Moreover, Rule 26(b)(4)(B), Fed.R.Civ.P., provides that a party may discover facts known

15 or opinions held by an non-testifying expert upon a showing of exceptional circumstances under

16 which it is impracticable for the party seeking discovery to obtain facts or opinions on the same

17 subject by other means. In the instant case, there is no other practicable means for Mattel to

18 obtain information about the handling, shipping and testing of original Bratz documents while in

19 Mr. Speckin's possession. Mr. Speckin is a non-testifying expert. The manner in which Mr.

20 Speckin transported, analyzed, tested or otherwise used the original Bratz drawings is uniquely

21 within his knowledge and plainly relevant. The original Bratz drawings are a key piece of

22 evidence in this case. Mattel needs information concerning what, if any, changes, damage, or

23 other alterations were made to the original Bratz drawings. Mattel is not seeking information

24 regarding Mr. Speckin's opinions or the results of his tests. Rather, Mattel is seeking only

25 information regarding the handling of the original Bratz documents and more precise

26 identification information for the specific documents that were handled by Mr. Speckin.

27      MGA objects to providing information concerning Mr. Speckin's testing, the testing

28 conditions, the selection of which drawings to test and other logistics. MGA, however, has

1   already disclosed the types of tests performed by Mr. Speckin in a declaration submitted to the

2   court, and has provided Mattel with a list identifying the documents that Mr. Speckin tested,

3   although the list did not identify the documents by Bates numbers.  Therefore, MGA has waived

4   any work product protection to which it may have been entitled with respect to the identification

5   of the original Bratz drawings that were subjected to testing and which tests were performed.

6         Accordingly, MGA shall produce a knowledgeable 30(b)(6) designee to provide complete

7   responses to the questions identified in Mattel's Separate Statement No. 2 as Instruction Nos. 7-

8   20 and 23.

9                  Instruction Nos. 21-22

10       In these excerpts, Mattel's counsel asked Ms. Tonnu whether she could identify or

11   describe any of the documents that were tested by Mr. Speckin.  MGA's counsel objected to the

12   questions based upon the work product doctrine and instructed the witness not to answer

13   The objections are overruled.  As discussed immediately above, the questions call for factual

14   information that is not protected by the work product doctrine.  Even if the work product doctrine

15   applied, the protection has been waived.  Furthermore, this case presents exceptional

16   circumstances under which it is impracticable for Mattel to obtain the information sought by other

17   means.  Accordingly, MGA shall produce a knowledgeable 30(b)(6) designee to provide complete

18   responses to the questions identified in Mattel's Separate Statement No. 2 as Instruction Nos. 21-

19   22.

20                  Instruction Nos. 24-26

21       In these excerpts, Mattel's counsel asked the witness (1) what Ms. Garcia told her about

22   Diva Starz and (2) whether Ms. Garcia told the witness she had access to Diva Starz information

23   while she was at Mattel.  MGA's counsel objected to the questions to the extent the witness'

24   conversations with Ms. Garcia occurred in the presence of counsel and instructed the witness not

25   to answer.

26        The objections are overruled.  The questions do not require the witness to divulge the

27   substance of any privileged communication.  Instead, the questions call for factual information to

28   which Mattel is entitled.

EXHIBIT _____23_____

PAGE _____291_____

1    Accordingly, MGA shall produce a knowledgeable 30(b)(6) designee to provide complete

2  responses to the questions identified in Mattel's Separate Statement No. 2 as Instruction Nos. 24-

3  26.

### Instruction No. 27

4

5    In this excerpt, Mattel's counsel asked the witness twice whether MGA had access to

6  Mattel internal information regarding Diva Starz prior to February 1st, 2000. MGA's counsel

7  made a speaking objection, which clearly violated Rule 30(c)(2), Fed.R.Civ.P. However, the

8  questions do not need to be repeated because the witness provided responses.

### Instruction No. 28

9

10    In this excerpt, Mattel's counsel asked, "MGA is denying that it had access to internal

11  information about Mattel's Diva Starz project prior to September 1st, 2000?" MGA's counsel .

12  objected on the grounds that the question calls for a legal conclusion, calls for the disclosure of

13  privileged information, and exceeds the scope of the deposition. Counsel also instructed the

14  witness not to answer.

15    The objections are overruled. The question does not call for a legal conclusion and MGA

16  has failed to establish the elements of the attorney-client privilege.

17    Accordingly, MGA shall produce a knowledgeable 30(b)(6) designee to provide complete

18  responses to the questions identified in Mattel's Separate Statement No. 2 as Instruction Nos. 28.

### Instruction Nos. 29-34

19    In these excerpts, Mattel's counsel asked as series of questions regarding whether MGA

20  knew Mattel was considering using the name "Brats" and "Boyz" in connection with the Diva

21  Starz project and whether MGA knew Mr. Linker worked on the project. MGA's counsel made

22  several objections including the following: assumes facts not in evidence; misstates the witness'

23  prior testimony; compound; outside the scope of the deposition; improper as to form; lacks

24  foundation; vague and ambiguous; calls for speculation; argumentative; and asked and answered.

25  MGA's counsel objected to one question (Instruction No. 30) on the additional ground that it may

26  call for attorney-client communications. MGA's counsel also instructed the witness not to

27  answer.

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

EXHIBIT ___23___

PAGE ___292___

The repeated instructions not to answer were clearly improper.  Accordingly, MGA shall produce a knowledgeable 30(b)(6) designee to provide complete responses to the questions identified in Mattel's Separate Statement No. 2 as Instruction Nos. 29-34.

### Instruction No. 35

In this excerpt, the witness indicated that she did not know whether Mr. Linker worked on the Bratz project.  Mattel's counsel then asked, "But you don't know one way or the other?"  MGA's counsel objected to the question, asserting that it had been asked and answered and was argumentative.  MGA's counsel also instructed the witness not to answer.

The instruction not to answer was clearly improper.  Accordingly, MGA shall produce a knowledgeable 30(b)(6) designee to provide complete responses to the questions identified in Mattel's Separate Statement No. 2 as Instruction No. 35.

### Instruction No. 36

In this excerpt, Mattel's counsel asked, "Did you have a conversation with Mr. Jenal about the net worth or the valuation of the company?"  MGA's counsel objected on privilege grounds and instructed the witness not to answer.

The objection is overruled.  The question calls for a "yes" or "no" answer and does not require the witness to divulge the substance of a privileged communication.

Accordingly, MGA shall produce a knowledgeable 30(b)(6) designee to provide complete responses to the questions identified in Mattel's Separate Statement No. 2 as Instruction No. 36.

### Instruction No. 37

In this excerpt, Mattel's counsel asked, "What did Mr. Daniels tell you about the net worth or valuation of the company?"  MGA's counsel objected on privilege grounds.

The objection is sustained.  As phrased, the question potentially calls for the disclosure of the substance of a privileged communication.

### Instruction Nos. 38-40

In these excerpts, MGA's counsel instructed the witness not to answer.  The instruction was not based upon a claim of privilege, and therefore was improper.  MGA's counsel also made an improper speaking objection.  Accordingly, MGA shall produce a knowledgeable 30(b)(6)

29

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

EXHIBIT   2 3

PAGE   2 93

1  designee to provide complete responses to the questions identified in Mattel's Separate Statement
2  No. 2 as Instruction Nos. 38-40.

3  Instruction No. 41

4      In this excerpt, Mattel's counsel asked the witness to identify the litigation for which
5  Exhibit 660 was prepared. MGA's counsel objected to the question as calling for work product
6  and instructed the witness not to answer.

7      The work product objection is overruled. The question calls for the disclosure of facts, not
8  work product. Accordingly, MGA shall produce a knowledgeable 30(b)(6) designee to provide
9  complete responses to the questions identified in Mattel's Separate Statement No. 2 as Instruction
   No. 41.
10

11  Instruction Nos. 42-44

12      In these excerpts, Mattel's counsel posed more questions about the litigation for which
13  Exhibit 660 was prepared, including the identity of the parties to the litigation and whether the
   litigation was ongoing. MGA's counsel objected on privilege and work product grounds.
14

15      The objections are overruled. The questions call for the disclosure of facts, not work
16  product. Further, MGA has failed to establish that the questions require the witness to disclose
17  the substance of a privileged communication. Accordingly, MGA shall produce a knowledgeable
18  30(b)(6) designee to provide complete responses to the questions identified in Mattel's Separate
   Statement No. 2 as Instruction Nos. 42-44.

19  Instruction No. 45

20      In this excerpt, Mattel's counsel asked whether an attorney by the name of Mr. Daniels
21  wrote a document. The work product objection by MGA's counsel is overruled. The "yes" or
22  "no" question calls for the disclosure of facts, not work product. Accordingly, MGA shall
23  produce a knowledgeable 30(b)(6) designee to provide complete responses to the questions
24  identified in Mattel's Separate Statement No. 2 as Instruction No. 45.

25  E. Mattel's Request for Relief No. 5: Mattel seeks an order reopening the deposition of MGA
   designee Lisa Tonnu based on a purported "complete reversal of testimony" made through written
26  "changes" to her deposition transcript.

27      Ms. Tonnu made changes to her deposition transcript after her deposition was completed.

28
                                                                                      30

EXHIBIT ___23___

PAGE ___294___

1   Counsel asked Ms. Tonnu whether any documents had been collected from MGA's Filenet

2   storage facility, to which she responded "no"; whether Mr. Daniels told her that he was going to

3   collect documents from Filenet, to which she responded "yes"; and whether the documents at

4   Filenet contained any documents responsive to Mattel's request, to which she responded "no."

5   Later, Ms. Tonnu revised her deposition transcript and reversed each of her answers.

6          Mattel contends that Ms. Tonnu's initial answers in the negative precluded a line of

7   questioning into, for example, who collected documents, which documents were collected and

8   how.

9          MGA contends that the changes Ms. Tonnu made do not justify re-opening a deposition.

10  Nevertheless, MGA has no objection to follow-up questions about Ms. Tonnu's revision when she

11  is deposed again in January.

12         In light of MGA's lack of opposition, MGA shall make Ms. Tonnu available for follow-up

13  questioning regarding the revisions to her deposition testimony.

14  F. Mattel's Request for Relief No. 6: Mattel seeks an order compelling Rebecca Harris to sit for
    the completion of her deposition and/or compelling such person selected by MGA as its designee
15  to complete the testimony on topics for which Harris was previously designated.

16         Mattel seeks an additional day to depose Ms. Harris. Mattel contends that it needs more

17  than the 7-hours it has already deposed Ms. Harris to complete its questioning on all topics for

18  which she was designated. Mattel emphasizes that Ms. Harris is designated to testify on nine

19  separate topics, each of which pertains to issues at the heart of the litigation, including the origin,

20  creation, design and development of Bratz prior to June 30, 2001; relevant contracts concerning

21  Carter Bryant and Bratz; payments made to Bryant and other financial information relating to

22  Bratz; and third parties who were involved in or otherwise have knowledge about the creation,

23  design and development of Bratz.

24         In addition to the topics already discussed above in Section "A" to this Order, Mattel

25  contends that it did not have sufficient time to depose Ms. Harris on Topic Nos. 19, 22 and 23,

26  which are set forth below:

27         **Topic No. 19:** Each agreement or contract between YOU and any PERSON other than
           BRYANT that REFERS OR RELATES TO BRATZ or BRATZ DESIGNS that REFERS
28         OR RELATES to the time period prior to December 31, 2001 (regardless of when such
           agreement or contract was negotiated or executed), including without limitation the timing
           thereof, the negotiations, drafts and COMMUNICATIONS that REFER OR RELATE

                                                                                                      31

EXHIBIT ___23___

PAGE ___295___

1    thereto, and any actual or proposed amendments thereto.

2    **Topic No. 22:**  The payment of money or anything of value by or for YOU or on YOUR
     behalf that has been made to, for or on behalf of BRYANT (a) for work, services or
3    activities performed by BRYANT prior to January 1, 2001 (regardless of when such
     payment was actually made), (2) for DESIGNS CREATED by BRYANT prior to January
4    1, 2001 (regardless of when such payment was actually made) or (c) in connection with
     BRATZ or any BRATZ DESIGN at any time, including amount(s) thereof and the reasons
5    therefore,

6    **Topic No. 23:**  The payment of royalties to, for or on behalf or BRYANT made by or for
     YOU or on YOUR behalf, including the timing, manner and amounts of such payments
7    and the reasons therefore.

8    MGA contends that Mattel has not made the required showing that additional time is "needed to

9    fairly examine the deponent" or that "the deponent, another person, or any other circumstance

10   impedes or delays the examination." Fed.R.Civ.P. 30(d)(1).  Furthermore, MGA contends that

11   Mattel wasted much of the 7-hours with Ms. Harris by asking questions outside the topics for

12   which she was designated and badgering the witness.

13         As discussed already above, Ms. Harris was not sufficiently prepared to testify on several

14   topics and did not discharge MGA's duty to produce a witness to testify as to information known

15   or reasonably available to MGA.  Her lack of preparedness alone justifies additional deposition

16   time.  The relatively large number of topics for which Ms. Harris was designated (Topic Nos. 11,

17   13, 14, 19, 21, 22, 23, 27 and 28), also justifies additional deposition time to enable Mattel to

18   fairly examine the deponent.  Many of the topics for which Ms. Harris was designated are highly

19   relevant to the case.  Mattel has identified a few instances where Mattel was inefficient in

20   conducting her deposition; however, the deposition generally proceeded at a reasonable pace.

21   Accordingly, Mattel is granted an additional four hours to complete the deposition of Ms. Harris

22   on all of the topics for which she was designated, except Topic Nos. 27 and 28 which were

23   discussed previously.

     G. Mattel's Request for Relief No. 7:  Mattel seeks an order imposing sanctions for MGA's
24   alleged willful violations of the May 16, 2007 and August 14, 2007 Orders, for MGA's allegedly
     improper instructions not to answer deposition questions and for MGA's alleged improper
25   coaching, harassing and obstructionist conduct at the September 24-25, 2007 deposition of Lisa
     Tonnu and at the October 9, 2007 deposition of Spencer Woodman in the amount of $10,000.

26         Sanctions are appropriate based upon MGA's failure to produce 30(b)(6) designees who

27   were reasonably prepared to testify on seven out of the sixteen topics at issue, namely Topic Nos.

28                                                                                      32

     Bryant v. Mattel, Inc.,
     CV-04-09049 SGL (RNBx)

EXHIBIT ___23___

PAGE ___2%___

21, 24, 25, 31, 34, 39 and 40.  By agreeing to provide supplemental testimony on these topics, MGA implicitly acknowledges that the witnesses provided insufficient testimony.  Further, MGA's counsel also repeatedly flouted Rule 30(c)(2), Fed.R.Civ.P., and prior orders prohibiting instructions not to answer for reasons other than privilege.  Accordingly, pursuant to Rule 30(d)(2) and 37(b), Fed.R.Civ.P., sanctions are imposed in the amount of $6,000.

H.  Mattel's Request for Relief No. 8:  Mattel seeks a report and recommendation to Judge Stephen G. Larson that recommends the imposition of preclusion sanctions, that certain facts related to the topics compelled be deemed admitted, and/or that MGA be found in contempt for MGA's allegedly willful and repeated violations of the Orders.

As previously stated at the December 14, 2007 hearing, it is premature to consider preclusion sanctions and contempt at this time.  If Mattel intends to pursue such sanctions, it may do so only after the close of Phase 1 discovery.

## V. CONCLUSION

For the reasons set forth above, it is hereby ordered as follows:

1.     No later than January 30, 2008, MGA shall produce witnesses who are prepared to testify about information known or reasonably available to MGA in accordance with Rule 30(b)(6), Fed.R.Civ.P., and to provide complete testimony on the following topics as specified herein:  Topic Nos. 11, 13, 14, 19, 21-25, 31, 34 (with limitations noted herein) 39 (with limitations noted herein), 40 and 41.  Mattel's motion is denied as to Topic Nos. 27 and 28.

2.     MGA's 30(b)(6) designee Spencer Woodman shall provide full and complete responses to each of the questions identified in Mattel's Separate Statement No. 2 that are identified herein as requiring a further response because the objections have been overruled and/or the instructions not to answer have been found improper, and the question seeks relevant and/or privileged information to which Mattel is entitled.

3.     MGA shall produce the e-mails that MGA designee Kenneth Lockhart identified during his June 14, 2007 deposition as documents which he reviewed and relied upon to refresh his recollection in preparation for his deposition.  Mattel is also permitted to conduct reasonable follow-up questioning regarding those documents.

4.     MGA's 30(b)(6) designee Lisa Tonnu shall provide full and complete responses to each of the questions identified in Mattel's Separate Statement No. 2 that are identified herein as

33

EXHIBIT     23

PAGE     297

1  requiring a further response because the objections have been overruled and/or the instructions

2  not to answer have been found improper, and the question seeks relevant information to which

3  Mattel is entitled.

4       5.    In addition to the deposition testimony authorized above, Mattel is granted leave to

5  depose Ms. Tonnu regarding the changes she made to her deposition transcript.

6       6.    Mattel is granted additional time to complete a full and fair examination of Ms.

7  Harris on all of the topics for which she was designated, except Topic Nos. 27 and 28. The

8  deposition of Ms. Harris shall not exceed four (4) hours.

9       7.    Mattel's request for monetary sanctions is granted in part pursuant to Fed.R.Civ.P.

10  37(b). MGA shall pay sanctions in the amount of $6,000 no later than February 11, 2008.

11       8.    Mattel's request for preclusion sanctions and/or a finding of contempt is denied

12  without prejudice.

13       Pursuant to Paragraph 6 of the Stipulation and Order for Appointment of a Discovery

14  Master, Mattel shall file this Order with the Clerk of Court forthwith.

15

16  Dated: January 8, 2008

                                      _Edward A. Infante_

17                               HON. EDWARD A. INFANTE (Ret.)

18                                 Discovery Master

19

20

21

22

23

24

25

26

27

28

                                                                     34

EXHIBIT ___23___

PAGE ___298___

## PROOF OF SERVICE BY E-MAIL

I, Sandra Chan, not a party to the within action, hereby declare that on January 9, 2008, I served the attached ORDER GRANTING IN PART AND DENYING IN PART MATTEL'S MOTION TO ENFORCE COURT'S DISCOVERY ORDERS AND TO COMPEL; TO OVERRULE PURPORTEDLY IMPROPER INSTRUCTIONS; AND FOR SANCTIONS in the within action by email addressed as follows:

| | | |
|---|---|---|
| John W. Keker, Esq. | Keker & Van Nest | jkeker@kvn.com |
| Michael H. Page, Esq. | Keker & Van Nest | mhp@kvn.com |
| Christa Anderson, Esq. | Keker & Van Nest | cma@kvn.com |
| Matthew M. Werdegar, Esq. | Keker & Van Nest | mwerdegar@kvn.com |
| John E. Trinidad, Esq. | Keker & Van Nest | jtrinidad@kvn.com |
| Audrey Walton-Hadlock, Esq. | Keker & Van Nest | awalton-hadlock@kvn.com |
| John Quinn Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | johnquinn@quinnemanuel.com |
| Michael Zeller Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | michaelzeller@quinnemanuel.com |
| Jon Corey Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | joncorey@quinnemanuel.com |
| Duane Lyons Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | duanelyons@quinnemanuel.com |
| Timothy Alger Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | timalger@quinnemanuel.com |
| Dominic Surprenant Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | DominicSurprenant@QuinnEmanuel.com |
| B. Dylan Proctor Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | dylanproctor@quinnemanuel.com |
| Shane McKenzie Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | shanemckenzie@quinnemanuel.com |
| Bridget Hauler Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | bridgethauler@quinnemanuel.com |
| Tamar Buchakjian Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | tamarbuchakjian@quinnemanuel.com |
| Juan Pablo Alban, Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | juanpabloalban@quinnemanuel.com |
| Thomas J. Nolan, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | tnolan@skadden.com |
| Raoul D. Kennedy, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | rkennedy@skadden.com |
| Amy S. Park, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | apark@skadden.com |
| Harriet S. Posner, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | hposner@skadden.com |
| Carl Alan Roth, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | croth@skadden.com |
| Timothy A. Miller, Esq. | Skadden, Arps, Slate, Meagher & Flom LLP | tmiller@skadden.com |

I declare under penalty of perjury under the laws of the Untied States of America that the above is true and correct.

Executed on January 9, 2008, at San Francisco, California.

Sandra Chan

EXHIBIT ___23___

PAGE ___249___