# EXHIBIT 43

THOMAS J. NOLAN (Bar No. 066992)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue
Los Angeles, California 90071-3144
Telephone: (213) 687-5000
Facsimile: (213) 687-5600
E-mail: tnolan@skadden.com

RAOUL D. KENNEDY (Bar No. 40892)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
4 Embarcadero Center, 38th Floor
San Francisco, CA 94111-5974
Telephone: (415) 984-6400
Facsimile: (415) 984-2698
Email: rkennedy@skadden.com

Attorneys for Counter-Defendants,
MGA ENTERTAINMENT, INC., ISAAC LARIAN, MGA ENTERTAINMENT
(HK) LIMITED, AND MGAE de MEXICO S.R.L. de C.V.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual<br><br>Plaintiff,<br><br>v.<br><br>MATTEL, INC., a Delaware corporation<br><br>Defendant. | CASE NO. CV 04-9049 SGL (RNBx)<br><br>Consolidated with Case No. 04-9059 and Case No. 05-2727<br><br>**NOTICE OF THIRD-PARTY SUBPOENA TO JACQUELINE RAMONA PRINCE** |
| Consolidated with MATTEL, INC. v. BRYANT and MGA ENTERTAINMENT, INC. v. MATTEL, INC. | |

EXHIBIT ____43____

3.5.08

PAGE ____395____

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that, pursuant to Rule 45 of the Federal Rules of Civil Procedure, MGA Entertainment, Inc., by its attorneys, Skadden, Arps, Slate, Meagher & Flom LLP, has demanded that Jacqueline Ramona Prince is to produce her notary log book, entitled "Official Journal of Notarial Acts", which contains, inter alia, an entry dated 8/26/99 relating to certain original sketches of Carter Bryant.

PLEASE TAKE FURTHER NOTICE that, on or before March 7, 2008 at 10:00 a.m., Jacqueline Ramona Prince, is to produce to Federal Forensic Associates, Inc. c/o Albert H. Lyter III, 7425 Capstone Dr., Raleigh, N.C. 27615, the notary log book described above and in the attached Subpoena in a Civil Case.

DATED:  March 5, 2008

SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

By: _Ryan Weinstein /cp_
Ryan Weinstein
Attorneys for Counter-Defendants, MGA ENTERTAINMENT, INC., ISAAC LARIAN, MGA ENTERTAINMENT (HK) LIMITED, AND MGAE de MEXICO S.R.L. de C.

EXHIBIT ___43___

PAGE ___396___

2

AO88 (Rev. 12/07) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT
### Northern District of Georgia

CARTER BRYANT, an individual, Plaintiff,

V.

MATTEL, INC., a Delaware corporation, Defendant

**SUBPOENA IN A CIVIL CASE**

Case Number:[1] CV 04-09049 SGL (RNBx)
Central District of CA

TO:   JACQUELINE RAMONA PRINCE
    c/o Daniel J. Warren, Esq.
    Sutherland Asbill & Brennan LLP, 999 Peachtree Street, Suite 2300, Atlanta, GA 30309

☐   YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☐   YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

☒   YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

Ms. Prince's notary log book, entitled "Official Journal of Notarial Acts", which contains, inter alia, an entry dated 8/26/99 relating to certain original sketches of Carter Bryant.

| PLACE | DATE AND TIME |
|---|---|
| Federal Forensic Assoc., c/o Albert H. Lyter III, 7425 Capstone Dr., Raleigh, N.C. 27615 | March 7, 2008  10:00 AM |

☐   YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rule of Civil Procedure 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| _Ryan Wi__  Atty for Counter Defendant MGA Ent. et al. | March 5, 2008 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Ryan Weinstein, Skadden, Arps, Slate, Meagher & Flom LLP, 300 S. Grand Ave., Los Angeles, CA 90071-3144 (213) 687-5000

(See Federal Rule of Civil Procedure 45 (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

EXHIBIT _____ 43

PAGE _____ 397

American LegalNet, Inc.
www.FormsWorkflow.com

AO88 (Rev. 12/07) Subpoena in a Civil Case (Page 2)

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

Federal Rule of Civil Procedure 45 (c), (d), and (e), as amended on December 1, 2007:

(c) PROTECTING A PERSON SUBJECT TO A SUBPOENA.
(1) Avoiding Undue Burden or Expense; Sanctions. A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.
(2) Command to Produce Materials or Permit Inspection.
(A) Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
(B) Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises— or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.
(3) Quashing or Modifying a Subpoena.
(A) When Required. On timely motion, the issuing court must quash or modify a subpoena that:
(i) fails to allow a reasonable time to comply;
(ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
(B) When Permitted. To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:
(i) disclosing a trade secret or other confidential research, development, or commercial information;
(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or
(iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial
(C) Specifying Conditions as an Alternative. In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

(d) DUTIES IN RESPONDING TO A SUBPOENA.
(1) Producing Documents or Electronically Stored Information. These procedures apply to producing documents or electronically stored information:
(A) Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
(B) Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
(C) Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.
(D) Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.
(2) Claiming Privilege or Protection.
(A) Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
(B) Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT.
The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

EXHIBIT _____43_____

PAGE _____398_____

American LegalNet, Inc.
www.FormsWorkflow.com

**PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the county of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 300 South Grand Avenue, 34th Floor, Los Angeles, CA 90071.

On **March 5, 2008**, I served the foregoing document described as:

**NOTICE OF THIRD-PARTY SUBPOENA TO JACQUELINE RAMONA PRINCE**

on the interested parties in this action addressed as follows:

**SEE ATTACHED SERVICE LIST**

[X]   **(BY PERSONAL SERVICE)** ☐   By personally delivering copies to the person served. (FEDERAL) (As Noted.)

[X]   I caused such documents to be hand delivered to the office of the addressee. (FEDERAL) (As Noted.)

[X]   **(BY FEDERAL EXPRESS)** I am readily familiar with the firm's practice for the collection and processing of correspondence for mailing with Federal Express and the fact that the correspondence would be deposited with Federal Express that same day in the ordinary course of business; on this date, the above-referenced correspondence was placed for deposit at Los Angeles, California and placed for collection and mailing following ordinary business practices. (As Noted.)

I declare under penalty of perjury under the laws of the State of California and the United States of America that the above is true and correct.

Executed on **March 5, 2008** at Los Angeles, California.

___Cecilia Reyes___                    _____
PRINT NAME                                SIGNATURE

EXHIBIT ___43___

PAGE ___399___

1

PROOF OF SERVICE                                      NO. CV 04-9049 SGL (RNBx)

1

## SERVICE LIST

2

3 | John B. Quinn, Esq.
Michael T. Zeller, Esq.
4 | Jon D. Corey, Esq.
Timothy L. Alger, Esq.
5 | Quinn Emanuel Urquhart Oliver &
Hedges, LLP
6 | 865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543
7 | (213) 443-3000
(213) 443-3100 (Fax)

8

Attorneys for Mattel, Inc.
9 | [Personal Service]

10

11

Mark E. Overland, Esq.
12 | Alexander H. Cote, Esq.
David C. Scheper, Esq.
13 | Overland Borenstein Scheper & Kim
300 South Grand Avenue, Suite 2750
14 | Los Angeles, CA 90071
(213) 613-4655
15 | (213) 613-4656 (Fax)

16 | Attorneys for Carlos Gustavo Machado
Gomez
17 | [Federal Express]

John W. Keker, Esq.
Michael H. Page, Esq.
Keker & Van Nest, LLP
710 Sansome Street
San Francisco, CA 94111
(415) 391-5400
(415) 397-7188 (Fax)

Attorneys for Carter Bryant
[Federal Express]

18

19

20

21

22

23

24

25

26

EXHIBIT ___43___

27

PAGE ___400___

28

2

NOTE: SERVICE OF
PROCESS WAS REFUSED,
LATER, MESSENGER
RETURNED AND DROPPED
ENVELOPE WITH RECEPTION.

EXHIBIT ____43____

PAGE ____401____

# EXHIBIT 44

# SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

### 300 SOUTH GRAND AVENUE
### LOS ANGELES, CALIFORNIA 90071-3144

TEL: (213) 687-5000
FAX: (213) 687-5600
www.skadden.com

DIRECT DIAL
21 3687-5276
DIRECT FAX
21 3621-5276
EMAIL ADDRESS
MATTHEW.SLOAN@SKADDEN.COM

FIRM/AFFILIATE OFFICES
———
BOSTON
CHICAGO
HOUSTON
NEW YORK
PALO ALTO
SAN FRANCISCO
WASHINGTON, D.C.
WILMINGTON
———
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

March 6, 2008

**VIA E-MAIL AND U.S. MAIL**

Diane C. Hutnyan, Esq.
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017

RE:   Bryant v. Mattel:  Notice of MGA's Intent to Perform Sampling on
Jacqueline Prince's Notary Book

Dear Diane:

As Ryan Weinstein and I indicated in our phone call with you on February 25, 2008 and in our numerous letters and emails, MGA intends to have its expert, Dr. Albert Lyter III, take "microplug" samples from Jacqueline Prince's notary log book in order to test the ink from the notary book in preparation for MGA's rebuttal expert report. Dr. Lyter will also perform various non-destructive, visual examinations of the notary book.  I write to inform you that, pursuant to the notice already provided by the proposed stipulation we sent you last Wednesday, February 27, Dr. Lyter plans to perform this testing on Monday, March 10 or Tuesday, March 11, 2008. *See* Stipulation, ¶ 10.  The testing will be performed at Dr. Lyter's laboratory located at the following address:

Federal Forensic Associates
7425 Capstone Drive
Raleigh, NC 27615

Please inform us in writing if Mattel would like to have its expert attend and observe the extraction of the "microplug" samples.  If you elect to do so, please also provide us with the credentials of your observing expert.  We will make all

EXHIBIT ___ 4 7

PAGE ___ 402

Diane C. Hutnyan, Esq.
March 6, 2008
Page 2

reasonable efforts to accommodate your expert's schedule, but due to the impending March 17 deadline for submitting MGA's rebuttal expert report, and Dr. Lyter's own schedule, the sampling must be conducted by no later than Tuesday, March 11.

I received your letter yesterday in which you state your objection to our proposed stipulation and request a meet and confer, pursuant to the stipulation appointing Judge Infante as the discovery master. I note, however, that you have not specifically set forth "the relief sought" -- unless you seek to preclude us from taking samples under any circumstances -- nor identified "the authority supporting [your] requested relief," as required by that stipulation. *See* Stipulation for Appointment of a Discovery Master, ¶ 5. Upon your provision of the specific relief sought and the supporting authorities for such relief, I am ready to have a telephonic meet and confer today or any time tomorrow.

Very truly yours,

Matthew E. Sloan

Enclosures

cc:  Ryan Weinstein, Esq.
     Carl Roth, Esq.

EXHIBIT _____ 4*

PAGE _____ 403

# EXHIBIT 45

**Cyrus Naim**

| | |
|---|---|
| **From:** | Sloan, Matthew E [Matthew.Sloan@skadden.com] |
| **Sent:** | Sunday, March 09, 2008 6:38 PM |
| **To:** | Michael T Zeller |
| **Cc:** | Diane Hutnyan; Weinstein, Ryan (LAC) |
| **Subject:** | RE: Notice of Intent To Move Ex Parte |

Mike  -- With all due respect, I am unaware of any basis for your claim that "destructive sampling is permitted only with the Court's approval or [Mattel's] agreement" and that it would be "a violation of law" for MGA to engage in the proposed sampling of the notary book.  If you are referring to the sampling protocol set forth in Judge Infante's August 30 Order, as you well know that Order applied only to Mattel's request to perform destructive testing on Bryant's drawings; it does not reference and does not apply to the testing of Ms. Prince's notary book by MGA or anyone else.  Moreover, as you also know -- and as my colleague Ryan Weinstein and I have repeatedly reminded your partner, Diane Hutnyan -- the protocol in that Order requiring court approval of your experts prior to any sampling was only required because you refused to reveal the identity of your experts to Bryant (or MGA) before the testing.  Here, by contrast, we revealed the identity of the expert who will be performing the sampling (Dr. Albert Lyter) and his CV over ten days ago, and we take it from your silence that you have no basis to contest his credentials or contend that he would mishandle the relevant documents.

Very simply, we are only asking for the same opportunity to take samples from the notary book which we provided you and your expert, Dr. Aginsky, without objection.  Nothing more, nothing less.  We have provided you with a detailed description of the amount and size of microplug samples to be taken, and offered to allow your expert the opportunity to observe the taking of any samples.   We are simply at a loss as to what
additional procedure you need to protect your interests, and must sadly conclude that your real purpose is to thwart MGA's right to replicate Dr. Aginsky's testing so that we can check the accuracy of his findings.
Your claim that MGA is somehow at fault because we have "had years" to conduct the requested testing is specious, as you must know.  MGA had no reason to conduct the testing of the notary book until we received Dr.
Aginsky's report in February, and we have been diligently trying to perform the testing since that time.  The whole reason the the courts allow expert rebuttal is to rebut the opposing party's experts; your tactics appear transparently designed to deny us this opportunity.

That having been said, I realize we are not going to resolve this dispute through emails.  Therefore, I am simply writing to repeat the request I made to Ms. Hutnyan this morning that Mattel agree to enter a stipulation to extend the deadline for MGA to submit the expert rebuttal report of Dr. Lyter until after the court's resolution of your ex parte motion.  If your intent in filing this ex parte motion is merely to preserve the integrity of the notary book, you should have no reason to object to this request.  If you refuse, we will be left to conclude that your real intent is to thwart our right to perform any testing at all under any circumstances.

Please inform me immediately whether you will agree to such a stipulation so that we can inform Judge Infante of your position at the telephonic status conference with Judge Infante tomorrow morning.

Very truly yours,

Matt


Matthew E. Sloan
Skadden, Arps, Slate, Meagher & Flom LLP

Los Angeles Office
300 South Grand Ave., Suite 3400
Los Angeles, CA 90071
T: (213) 687-5276 | F: (213) 687-5600

**EXHIBIT** 45

**PAGE** 404

1

Main: (213) 687-5000
E: matthew.sloan@skadden.com


-----Original Message-----
From: Michael T Zeller [mailto:michaelzeller@quinnemanuel.com]
Sent: Sunday, March 09, 2008 1:05 PM
To: Sloan, Matthew E (LAC); Diane Hutnyan
Cc: Chris Grohman; Andrea Hoeven; Weinstein, Ryan (LAC)
Subject: Re: Notice of Intent To Move Ex Parte

As you know, destructive sampling is permitted only with the Court's approval or our
agreement. You have neither. As a result, should you proceed with such a violation of law,
we will seek sanctions that will include, among other things, the entry of orders barring
defendants from contesting the testing that was done with Court authorization.  Your
threatened violation of law is particularly egregious given that you are apparently
planning to proceed with destructive sampling for the purpose of thwarting the ex parte
and the Court's ruling on it.

Nor does your latest unilateral demand for a stipulation excuse your threatened
misconduct.  Defendants have had years to conduct any and all testing they wished by
simply following the rules.  They also could have conducted sampling by now had they
abided by the requirements that defendants insisted Mattel comply with but now insist they
are free to ignore.  Defendants' recourse as far as any rebuttal report goes is to comply
with the Rules and, if a pre-filing conference fails to reach agreement, is bring a motion
as Judge Larson already instructed.  What defendants are not entitled to do is to
unilaterally destructively sample documents.

Michael Zeller
Quinn, Emanuel, Urquhart, Oliver & Hedges, LLP
865 South Figueroa Street, 3rd Floor
Los Angeles, CA   90017

Direct:  (213) 443-3180
Main Phone:  (213) 443-3000
Main Fax:  (213) 443-3100

E-mail:  michaelzeller@quinnemanuel.com
Web:   www.quinnemanuel.com

The information contained in this e-mail message is intended only for the personal and
confidential use of the recipient(s) named above.  This message may be an attorney-client
communication and/or work product and as such is privileged and confidential.  If the
reader of this message is not the intended recipient or agent responsible for delivering
it to the intended recipient, you are hereby notified that you have received this document
in error and that any review, dissemination, distribution, or copying of this message is
strictly prohibited.  If you have received this communication in error, please notify us
immediately by e-mail, and delete the original message.


----- Original Message -----
From: Sloan, Matthew E <Matthew.Sloan@skadden.com>
To: Diane Hutnyan
Cc: Michael T Zeller; Chris Grohman; Andrea Hoeven; Weinstein, Ryan
(LAC) <Ryan.Weinstein@skadden.com>
Sent: Sun Mar 09 12:16:07 2008
Subject: RE: Notice of Intent To Move Ex Parte

Diane -- MGA strongly opposes your proposed motion.   In the interim,
please let me know whether you will agree to file a Stipulation with Judge Larson agreeing
to extend the deadline for MGA to file the rebuttal report of our ink chemist until after
the court has resolved your ex parte motion.  Without such a commitment on your part, we
have little choice but to proceed with the sampling immediately in order to meet the
Court's expert discovery deadline.

EXHIBIT ____45____

PAGE____405____

- Matt

---

From: Diane Hutnyan [mailto:dianehutnyan@quinnemanuel.com]
Sent: Saturday, March 08, 2008 4:21 PM
To: Weinstein, Ryan (LAC); Sloan, Matthew E (LAC)
Cc: Michael T Zeller; Chris Grohman; Andrea Hoeven
Subject: Notice of Intent To Move Ex Parte


Dear Ryan and Matthew:

This email is intended to provide notice of Mattel's intention to move before Judge
Infante on an ex parte basis to enjoin MGA and its experts from handling or performing
destructive tests on Jacqueline Prince's notary book without an agreement with Mattel
and/or Court oversight and approval.

We plan to file the motion on Monday, March 10, 2008, for a hearing time and date TBA.
Please instruct your experts not to handle or take samples from the notary book until the
court has resolved our motion.

Please let me know at your earliest convenience whether MGA opposes the motion, or if you
have any questions.

I have left this message on your voicemail as well.


---------------------------------------------------------------------
------ *************************************************** To ensure compliance with
Treasury Department regulations, we advise you that, unless otherwise expressly indicated,
any federal tax advice contained in this message was not intended or written to be used,
and cannot be used, for the purpose of (i) avoiding tax-related penalties under the
Internal Revenue Code or applicable state or local tax law provisions or
(ii) promoting, marketing or recommending to another party any tax-related matters
addressed herein.
**************************************************
**************************************************** This email and any attachments
thereto, is intended only for use by the addressee(s) named herein and may contain legally
privileged and/or confidential information. If you are not the intended recipient of this
email, you are hereby notified any dissemination, distribution or copying of this email,
and any attachments thereto, is strictly prohibited. If you receive this email in error
please immediately notify me at (212) 735-3000 and permanently delete the original copy
and any copy of any email, and any printout thereof. Further information about the firm, a
list of the Partners and their professional qualifications will be provided upon request.
**************************************************
==========================================================================
======


---------------------------------------------------------------------------
****************************************************

To ensure compliance with Treasury Department regulations, we advise you that, unless
otherwise expressly indicated, any federal tax advice contained in this message was not
intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-
related penalties under the Internal Revenue Code or applicable state or local tax law
provisions or (ii) promoting, marketing or recommending to another party any tax-related
matters addressed herein.
**************************************************
****************************************************

This email and any attachments thereto, is intended only for use by the addressee(s) named

3

**EXHIBIT** _____ 4's

**PAGE** _____ 406

herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified any dissemination, distribution or copying of this email, and any attachments thereto, is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original copy and any copy of any email, and any printout thereof.

Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.
*************************************************

=============================================================================

EXHIBIT  45

PAGE  407

4

# EXHIBIT 46

**Cyrus Naim**

| | |
|---|---|
| **From:** | Weinstein, Ryan [Ryan.Weinstein@skadden.com] |
| **Sent:** | Thursday, January 03, 2008 9:44 AM |
| **To:** | Diane Hutnyan |
| **Cc:** | Roth, Carl A (LAC); mwerdegar@kvn.com; daniel.warren@sablaw.com; Andrea Hoeven; Michael T Zeller; Chris Grohman; Huh, Peter J (CHI) |

**Subject:** RE: Mattel v. Bryant

Diane,

Jason Harner is the ink testing consultant who will be observing the micro-plug sampling for MGA. Additionally, Peter Huh from our Chicago office will also attend.

Ryan

---

**From:** Diane Hutnyan [mailto:dianehutnyan@quinnemanuel.com]
**Sent:** Wednesday, January 02, 2008 10:48 AM
**To:** Weinstein, Ryan (LAC)
**Cc:** Roth, Carl A (LAC); 'mwerdegar@kvn.com'; 'daniel.warren@sablaw.com'; Andrea Hoeven; Michael T Zeller; Chris Grohman
**Subject:** RE: Mattel v. Bryant

Ryan,

We are all set for January 4. The procedure should take about an hour. It can be done between 11:00 a.m. and 4:00 p.m. EST. Please let me know what times your consultant is available within that range. Also, please let me know who your consultant is.

I also have confirmed the location for the microplugging. It is not, as I reported earlier, in Grand Ledge. It is in Lansing. The address is: 2511 Lafayette Avenue, Lansing, Michigan. That should be good news for your consultant traveler.

Please confirm that you have received this and everything is in order.

I am still confirming arrangements for the sampling of the Bryant originals. I hope to get back to you on that later today.

Thanks,

Diane

---

**From:** Weinstein, Ryan [mailto:Ryan.Weinstein@skadden.com]
**Sent:** Friday, December 28, 2007 2:42 PM
**To:** Diane Hutnyan
**Cc:** Roth, Carl A (LAC); mwerdegar@kvn.com; daniel.warren@sablaw.com; Andrea Hoeven; Michael T Zeller; Chris Grohman
**Subject:** RE: Mattel v. Bryant

Diane,

EXHIBIT __46__

PAGE __408__

3/18/2008

We're confirmed for January 4.

As for the following week, our consultant is available January 10 and 11.  Please let us know how you'd like to proceed.

Ryan

---

**From:** Diane Hutnyan [mailto:dianehutnyan@quinnemanuel.com]
**Sent:** Friday, December 28, 2007 12:30 PM
**To:** Weinstein, Ryan (LAC)
**Cc:** Roth, Carl A (LAC); 'mwerdegar@kvn.com'; 'daniel.warren@sablaw.com'; Andrea Hoeven; Michael T Zeller; Chris Grohman
**Subject:** RE: Mattel v. Bryant

Ryan,

Of the dates you gave me, the only day I have available for the ink micro-plugging on the notary book is January 4.  We should go ahead and schedule that, as our expert is completely unavailable all around those dates (except for the 2nd and 3rd but your consultant is not available then).  The plugs would be taken in Grand Ledge, Michigan, which is very close to Lansing.  Please confirm.

As for the paper plugging, your consultant has no availability at all on the week of the 7th?  I am trying to check the following week for you but may not get an answer today.  Please have your consultant hold open the week of the 14th if he can, okay?  Also, he should try to hold the 11th in the event that we need that extra day to get a four-day spread into the next week.

Thanks.

---

**From:** Weinstein, Ryan [mailto:Ryan.Weinstein@skadden.com]
**Sent:** Friday, December 28, 2007 12:02 PM
**To:** Diane Hutnyan
**Cc:** Roth, Carl A (LAC); mwerdegar@kvn.com; daniel.warren@sablaw.com; Andrea Hoeven
**Subject:** RE: Mattel v. Bryant

Great - thank you.

Ryan

---

**From:** Diane Hutnyan [mailto:dianehutnyan@quinnemanuel.com]
**Sent:** Friday, December 28, 2007 11:58 AM
**To:** Weinstein, Ryan (LAC)
**Cc:** Roth, Carl A (LAC); 'mwerdegar@kvn.com'; 'daniel.warren@sablaw.com'; Andrea Hoeven
**Subject:** RE: Mattel v. Bryant

Hi, Ryan,

Thanks for your email and clarification.

I was just about to send over a note saying I was checking those dates and would hopefully have some answers shortly.  I will let you know as soon as I can confirm our experts' availability (I hope today but cannot promise).

Thanks

EXHIBIT ___46___

PAGE ___404___

3/18/2008

**From:** Weinstein, Ryan [mailto:Ryan.Weinstein@skadden.com]
**Sent:** Friday, December 28, 2007 11:00 AM
**To:** Diane Hutnyan
**Cc:** Roth, Carl A (LAC); mwerdegar@kvn.com; daniel.warren@sablaw.com
**Subject:** Mattel v. Bryant

Diane,

I write to follow up on Carl Roth's letters to you, dated December 20 and December 26, 2007.  In those letters, MGA requested that its ink testing consultant observe Mattel's "destructive testing" of Ramona Prince's log books, and proposed dates for that testing.  Please confirm that one or more of the proposed dates work for the testing of both Ms. Prince's log books and Carter Bryant's original drawings.  As set forth in Carl's December 26 letter, MGA proposes January 4, 5, 6 and 11, and the entire week of January 14.  Additionally, we again request that Mattel propose a location for the testing.

Regards,
Ryan

Ryan Weinstein
Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue
Los Angeles, CA 90071
Phone:  (213) 687-5526
Fax:  (213) 621-5526
E-mail:  rweinste@skadden.com


--------------------------------------------------------------------------
To ensure compliance with Treasury Department regulations, we advise you that, unless otherwise (

*****************************************************
This email and any attachments thereto, is intended only for use by the addressee(s) named herei

Further information about the firm, a list of the Partners and their professional qualifications
*****************************************************
===========================================================================

--------------------------------------------------------------------------
*****************************************************
This e-mail and any attachments thereto, is intended only for use by the addressee(s) named here:

Further information about the firm, a list of the Partners and their professional qualifications
*****************************************************
===========================================================================

-----------------------------------------------------------------
***************************************************** To ensure compliance with Treasury Department regulations, we advise you that, unless otherwise expressly indicated, any federal tax advice contained in this message was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or applicable state or local tax law provisions or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein.
*****************************************************
***************************************************** This email and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified any dissemination, distribution or copying of this

EXHIBIT 46

email, and any attachments thereto, is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original copy and any copy of any email, and any printout thereof. Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

EXHIBIT _____ 46

PAGE _____ 411

# EXHIBIT 47



# FEDERAL FORENSIC ASSOCIATES, INC.

Post Office Box 31567 • Raleigh, North Carolina 27612
(919) 848-3696 • FAX (919) 848-9849

January 20, 2005

Tania Krebs
Quinn Emanuel
865 South Figueroa St.
10th Floor
Los Angeles, CA  90017

RE:  retention as consulting expert

Dear Ms. Krebs:

As we discussed yesterday, January 19, 2005, we mistakenly accepted your offer to act as a consulting expert in the matter of Mattel Inc. regarding ink analysis.  We had previously accepted a similar assignment with the firm of O'Melveny and Myers of Los Angeles and as such are returning your previously received retainer of $2500.00.  Please find enclosed our check number 5827 in that amount.

We regret any inconvenience this may have caused you and hope we will have an opportunity to aid you on other matters in the future.

Sincerely,

Albert H. Lyter III, Ph.D.
Forensic Chemist

Enc. Check #5827

EXHIBIT ____47____

PAGE ____412____

# EXHIBIT 48

**los angeles**

865 South Figueroa Street, 10th Floor   Los Angeles, California 90017   TEL 213-624-7707 FAX 213-624-0643

November 22, 2004

**ATTORNEY-CLIENT PRIVILEGE**
**CONFIDENTIAL**

**VIA FEDERAL EXPRESS**

Albert H. Lyter, III
Federal Forensic Associates, Inc.
7425 Capstone Drive
Raleigh, NC 27615

Retention as Consulting Expert

Dear Mr. Lyter:

Per our telephone discussion, we wish to retain you on behalf of our client, Mattel, Inc., to provide advice and opinions on ink chemistry analysis as a consulting expert.  We are enclosing a retainer fee of $2,500 per our discussion.  We agree to your fee schedule as described in our conversation:$310 per hour for time of any nature, as well as payment of expenses such as travel and any necessary equipment rental .

All services performed by you in connection with this matter and all related reports and other data generated by you are privileged and are to be treated in the strictest confidence.  Opinions, reports, and all other information relating to this matter are not to be disclosed to any third party without the express consent of Mattel.  At the end of this letter is a signature line; please sign and return to us to indicate your agreement with this provision.

EXHIBIT ___48___

PAGE ___413___

quinn emanuel urquhart oliver & hedges, llp

SAN FRANCISCO  PALO ALTO  INDIAN WELLS

201 Sansome Street, 6th Floor, San Francisco, California 94104. TEL 415-986-5700 FAX 415-986-5707
2479 East Bayshore Road, Suite 809, Palo Alto, California 94303. TEL 650-494-3900 FAX 650-494-3928
45-025 Manitou Drive, Suite 8, Indian Wells, California  92210. TEL 760-345-4757 FAX 760-345-2414

We look forward to working with you.  Please call me directly at 213-443-3675 with any
questions.

Best regards,

Tania Krebs
taniakrebs@quinnemanuel.com

Albert H. Lyter, III

2

EXHIBIT _____ 48
PAGE _____ 414

287869

| VENDOR NO. 7085 | | | VENDOR NAME: ALBERT LYTER | | |
|---|---|---|---|---|---|
| | | | | | CHECK DATE: 11/19/04 |
| REFERENCE NUMBER | INVOICE DATE | G/L ACCOUNT | DESCRIPTION | GROSS AMOUNT | NET AMOUNT PAID |
| 7209EW | 11-18-04 | 120000100000 | #7209/EXPERT WITNESS | 2,500.00 | 2,500.00 |
| | | | | | |
| | | | **TOTAL** | | $2,500.00 |

18755C

---

**QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP**
865 S. FIGUEROA ST., 10TH FLOOR
LOS ANGELES, CA 90017

CITY NATIONAL BANK
LIBRARY TOWER
LOS ANGELES, CALIFORNIA 90071
16-1606-1220

287869

| DATE | 11/19/04 |
|---|---|
| AMOUNT | $2,500.00**** |

PAY  TWO THOUSAND FIVE HUNDRED AND 00/100 Dollars

TO THE
ORDER
OF
**ALBERT LYTER**
P.O. BOX 31567
RALEIGH, NC 27612

EXHIBIT _____ 48

PAGE _____ 415

_David C. Henri_

MP

⑈287869⑈ ⑈122016066⑈ 210⑈032312⑈

FedEx | Ship Manager | Label 7903 4556 2930

From:   Origin ID: (213)624-7707
TANIA KREBS
QUINN EMANUEL URQUHART OLIVER & HED
865 SOUTH FIGUEROA STREET
10TH FLOOR
LOS ANGELES, CA 90017



Ship Date: 22NOV04
Actual Wgt: 1 LB
System#: 3952732/INET2000
Account#: S *********

REF:

SHIP TO:   (000)000-0000        BILL SENDER
**Albert H. Lyter, III**

**7425 Capstone Drive**

**Raleigh, NC 27615**

Delivery Address Bar Code

**PRIORITY OVERNIGHT**

**TUE**
Deliver By:
23NOV04

TRK#   **7903  4556  2930**   FORM 0201

**RDU**    A1

**27615**    -NC-US

**XH RZZA**



Shipping Label: Your shipment is complete

1.  Use the 'Print' feature from your browser to send this page to your laser or inkjet printer.
2.  Fold the printed page along the horizontal line.
3.  Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning:** Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $500, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

EXHIBIT _____ 48

PAGE _____ 466

# EXHIBIT 49

**THIS EXHIBIT IS FILED UNDER SEAL
PURSUANT TO PROTECTIVE ORDER**

# EXHIBIT 50

Ryan

**From:** Diane Hutnyan [mailto:dianehutnyan@quinnemanuel.com]
**Sent:** Wednesday, January 02, 2008 10:48 AM
**To:** Weinstein, Ryan (LAC)
**Cc:** Roth, Carl A (LAC); 'mwerdegar@kvn.com'; 'daniel.warren@sablaw.com'; Andrea Hoeven; Michael T Zeller; Chris Grohman
**Subject:** RE: Mattel v. Bryant

Ryan,

We are all set for January 4. The procedure should take about an hour. It can be done between 11:00 a.m. and 4:00 p.m. EST. Please let me know what times your consultant is available within that range. Also, please let me know who your consultant is.

I also have confirmed the location for the microplugging. It is not, as I reported earlier, in Grand Ledge. It is in Lansing. The address is: 2511 Lafayette Avenue, Lansing, Michigan. That should be good news for your consultant traveler.

Please confirm that you have received this and everything is in order.

I am still confirming arrangements for the sampling of the Bryant originals. I hope to get back to you on that later today.

Thanks,

Diane

**From:** Weinstein, Ryan [mailto:Ryan.Weinstein@skadden.com]
**Sent:** Friday, December 28, 2007 2:42 PM
**To:** Diane Hutnyan
**Cc:** Roth, Carl A (LAC); mwerdegar@kvn.com; daniel.warren@sablaw.com; Andrea Hoeven; Michael T Zeller; Chris Grohman
**Subject:** RE: Mattel v. Bryant

Diane,

We're confirmed for January 4.

As for the following week, our consultant is available January 10 and 11. Please let us know how you'd like to proceed.

Ryan

**From:** Diane Hutnyan [mailto:dianehutnyan@quinnemanuel.com]
**Sent:** Friday, December 28, 2007 12:30 PM
**To:** Weinstein, Ryan (LAC)

EXHIBIT _____ 53 _____

PAGE _____ 443 _____

3/13/2008

Chris Grohman; Huh, Peter J (CHI)
**Subject:** RE: Mattel v. Bryant

Diane,

Jason Harner is the ink testing consultant who will be observing the micro-plug sampling for MGA. Additionally, Peter Huh from our Chicago office will also attend.

Ryan

**From:** Diane Hutnyan [mailto:dianehutnyan@quinnemanuel.com]
**Sent:** Wednesday, January 02, 2008 10:48 AM
**To:** Weinstein, Ryan (LAC)
**Cc:** Roth, Carl A (LAC); 'mwerdegar@kvn.com'; 'daniel.warren@sablaw.com'; Andrea Hoeven; Michael T Zeller; Chris Grohman
**Subject:** RE: Mattel v. Bryant

Ryan,

We are all set for January 4. The procedure should take about an hour. It can be done between 11:00 a.m. and 4:00 p.m. EST. Please let me know what times your consultant is available within that range. Also, please let me know who your consultant is.

I also have confirmed the location for the microplugging. It is not, as I reported earlier, in Grand Ledge. It is in Lansing. The address is: 2511 Lafayette Avenue, Lansing, Michigan. That should be good news for your consultant traveler.

Please confirm that you have received this and everything is in order.

I am still confirming arrangements for the sampling of the Bryant originals. I hope to get back to you on that later today.

Thanks,

Diane

**From:** Weinstein, Ryan [mailto:Ryan.Weinstein@skadden.com]
**Sent:** Friday, December 28, 2007 2:42 PM
**To:** Diane Hutnyan
**Cc:** Roth, Carl A (LAC); mwerdegar@kvn.com; daniel.warren@sablaw.com; Andrea Hoeven; Michael T Zeller; Chris Grohman
**Subject:** RE: Mattel v. Bryant

Diane,

We're confirmed for January 4.

As for the following week, our consultant is available January 10 and 11. Please let us know how you'd like to proceed.

3/13/2008

EXHIBIT _____ 50 _____

PAGE _____ 444 _____



2105 University Park Drive, Suite A
Okemos, Michigan 48864
(517) 349-3528 (Voice)
(888) 999-1009 (Toll Free)
(517) 349-5538 (FAX)
www.4N6.com

**Leonard A. Speckin**
Retired Document Analyst

**Michael J. Sinke**
Latent Print Specialist
Crime Scene Reconstruction
Forensic Document Analyst

**Robert D. Kullman**
Forensic Document Analyst

**Larry A. Dalman**
Computer Recovery Specialist

**Karl V. Ebner, Ph.D.**
Forensic Toxocologist

**Erich J. Speckin**
Forensic Document Analyst
Ink Dating Specialist

**Roger J. Bolhouse**
Laboratory Director
Crime Scene Reconstruction
Forensic Analyst & Consultant

**Marco A. Scarpetta, Ph.D.**
DNA Analyst and Consultant

**David G. Townshend**
Forensic Firearms Examiner

**Richard L. Brunelle**
Retired Ink Dating Consultant

**Ann E. Chamberlain, M.S.**
Serologist
DNA Analyst & Consultant
Crime Scene Reconstruction

**Laurence R. Simson, M.D.**
Forensic Pathologist

**Jay A. Siegel, Ph.D.**
Analytical Chemist

**Jason S. Harner, B.S.**
Forensic Chemist

# Jason S. Harner

## *Forensic Chemist*

### EDUCATION

- **Michigan State University – Bachelor of Science in Chemistry, May 2007**

### WORK EXPERIENCE

- **Speckin Forensic Laboratories**                              **Okemos, MI**
  **Forensic Chemist**                                                   **May 2007 – present**
  Duties include performing various analyses on casework including chemical ink analysis and ink
  dating procedures as well as conducting VSC-2000 and ESDA examinations on questioned
  documents.  Primarily involved in the analysis of documents for alterations, additions, and rewritings.

- **Speckin Forensic Laboratories**                              **Okemos, MI**
  **Intern**                                                                     **September 2005 – May 2007**

### RELATED SKILLS

- Trained in the chemical analysis of ink including:

    - ink identification of manufacturer and formulation to determine first date of production.

    - ink comparisons for similarities or differences in formulation or batch.

    - examination of ink for detection of fluorescent date tags.

- Skilled in the utilization of thin layer chromatography and densitometry for the relative ink age
  analysis using rate of extraction, percent extraction, and the accelerated aging sample preparation
  technique.

- Proficient in ink identifications and comparisons to a known library of thousands of inks.

- Processed over 1000 documents for impressed writings on the ESDA instrument

- Performed VSC-2000 examinations of thousands of different inks and documents in actual case work

EXHIBIT __50__

PAGE __445__

## TRAINED IN USING THE FOLLOWING INSTRUMENTS

- Gas chromatography / Mass spectrometer

- Fourier transform infrared spectrophotometer

- VSC-2000

- Scanning Video Densitometer

- ESDA

EXHIBIT _____ 5-0 _____

PAGE _____ 446 _____

# EXHIBIT 51

www.rileywelch.com

# RILEY WELCH AGINSKY
## &
### FORENSIC DOCUMENT EXAMINATIONS, Inc.
P.O. Box 80225, Lansing, Michigan 48908-0225
Telephone (517) 394-1512  Fax (517) 882-2767

Thomas P. Riley, BS
Forensic Document Examiner *, **

Valery N. Aginsky, Ph.D., Ink Chemist
Gregoire P. Michaud, BA, Latent Print Examiner
Felix Adatsi, Ph.D., Toxicologist

Todd W. Welch, BA
Forensic Document Examiner*

February 8, 2008

Diane Cafferata Hutnyan, Esq.
Quinn Emanuel Urquhart Oliver & Hedges LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3666

      Re:    Bryant v. Mattel

Dear Ms. Hutnyan:

I have examined the following document:

A-1:    Official Journal of Notarial Acts comprising handwritten entries dated from 1/15/96 (pages 1 and 2) to 9/14/99 (pages 11 and 12).[1]

## EXAMINATION TASK

I was asked to determine whether the 8/26/99 notation "From 1998 Missouri" was written contemporaneously with the rest of the entry dated 8/26/99 on pages 11 and 12 of document A-1 or whether it was written at a later date.

## QUALIFICATIONS

I am a forensic chemist of 27 years' experience.  I am currently employed, as a Forensic Chemist specializing in the field of ink analysis and document dating, with Riley, Welch & Aginsky Forensic Document Examinations, Inc. (formerly known as Riley, Welch & Associates Forensic Document Examinations, Inc.)  I received my Ph.D. in Analytical Chemistry in 1980.  Prior to joining Riley, Welch & Associates I worked as a senior research chemist with the Forensic

---

[1] Also, I have reviewed the following documents:  the August 30, 2007 Order of Judge Infante;  8 boxes of original Carter Bryant production documents described in Judge Infante's August 30, 2007 Order;  bates numbered photocopies, video and photographs of these documents;  the transcripts of Carter Bryant's depositions taken on 11/4/2004 (Vol. 1), 11/5/2004 (Vol. 2), 11/8/2004 (Vol. 3);  the transcripts of Jacqueline Prince's deposition taken on 12/21/2004.

*Diplomate of the American Board of Forensic Document Examiners, Inc.
**American Society of Questioned Document Examiners

EXHIBIT ____51____

PAGE ____447____


**RILEY WELCH & AGINSKY**
FORENSIC DOCUMENT EXAMINATIONS, LLC

Science Center, Ministry of the Interior, Russia. I am experienced in a wide range of examination techniques, but my particular specialty is the analysis and dating of ink on documents by Thin-Layer Chromatography and Gas Chromatography-Mass Spectrometry. I am the author of more than 20 peer-reviewed articles on ink analysis and dating, including chapters in three books and two encyclopedias.

A copy of my curriculum vitae showing further details of my professional history and a list of my professional publications is attached hereto as Exhibit "VNA-1."

In the past five years I have been deposed in my capacity as an expert fifteen times and have testified at trial and hearings as an expert on thirteen occasions, a list of which is attached hereto as Exhibit "VNA-2." I am being compensated for my work in this case according to my hourly rate, which is outlined in the fee schedule attached hereto as Exhibit "VNA-3."

## REPORT OF LABORATORY EXAMINATION

The addition of extra writing can greatly change the meaning of the wording or the value of a document. Therefore, forensic document examinations are often conducted in order to determine whether two pieces of written text originated from the same pen.

As it is usually preferable not to damage the document, the process of forensic ink comparison always begins with the physical examination of the inks using techniques designed to obtain as much information as possible from the ink (and the document as a whole) by visual examination and other nondestructive means, such as microscopic and infrared absorption examinations.[2] If any of the nondestructive techniques shows that the inks being compared are different, then no additional tests, including more sophisticated chemical tests, are required to prove that the two pieces of the written text did not originate from the same pen.

If the nondestructive techniques cannot discriminate between the inks being compared, then chemical methods are to be used. A few samples of each ink are taken from the paper for their chemical analysis. Chemical methods are more effective for discriminating between inks of the same color than the physical (nondestructive) methods. It is widely accepted in the field of forensic writing ink analysis that a combination of two chemical methods, thin-layer chromatography (TLC) and gas chromatography-mass spectrometry (GC-MS), allows the examiner to retrieve maximum information about the composition of writing ink.

Writing inks are made of colorants (dyes, pigments) and a carrier (vehicle). Oil- and water-based ballpoint ink vehicles consist of two main ingredients – solvents that are used to dissolve or disperse the colorants, and the resins that are used to thicken the inks. TLC analyzes ink colorants (ink colored components) and GC-MS analyzes ink vehicle components (volatile solvents, resins and other noncolored ink components, such as modifiers, lubricants, thickeners, antiseptics, surfactants, by-products, etc.) That is, each of these two chemical methods, TLC and

---

[2] ASTM Standard Guide E1422-05, "Standard Guide for Test Methods for Forensic Writing Ink Comparison." Published January 2006. Originally approved in 1991. Last previous edition approved in 2001 as E 1422 – 01.

EXHIBIT ___51___

PAGE ___448___



**Ms. Diane Hutnyan**                    **February 8, 2008**                    **Page 3 of 8**

GC-MS, can provide only some partial information about the composition of writing ink. In simple terms, TLC can analyze one half of the ink composition (1/2 of the "chemical fingerprint" of an ink), and GC-MS can analyze the other half of the ink composition (the other 1/2 of the "chemical fingerprint" of the ink). Thus, these two methods perfectly complement each other.[3]

The physical and chemical examinations including visual, microscopic, and infrared absorption examinations, TLC, and GC-MS were conducted in the following succession.

## PHYSICAL (NONDESTRUCTIVE OPTICAL) EXAMINATIONS

VISUAL EXAMINATION

As mentioned above, the insertion of a modifying clause or sentence may change the meaning of a document. Visual examination is an accepted method in the field of forensic document examination that is used to detect insertions (interlineations or additions). To determine that an insertion or addition has been made usually involves a study of the document as a whole.

Two most common indications of the insertion of a handwritten sentence are as follows[4]:

1.  The inserted sentence and the balance of the document are written with different inks.

2.  Some sentence is either (*A*) inserted between the lines of the initial text (if no sufficient space was available within the initial text) or (*B*) inserted/added immediately after the last line of the initial text (if no sufficient space is available immediately after the last line of the initial text, then the spacing/distance between the inserted sentence and the last line of the text is usually smaller than the spacing between the lines of this text).

All the pages of document A-1 that contained handwritten entries were examined visually (pages 1 through 12; entries dated 1/15/96 through 9/14/99; see Attachment 3). Among these pages, the only place that showed the insertion of material to the initial text was where the notation "From 1998 Missouri" was added to the entry dated 8/26/99 on page 11.[5] The 4 lines of the text "Original sketches of doll idea -- characters 6-total = Names are: Zoe, Lupe, Hallidae, Jade, 2 males." appear evenly spaced and, without the presence of the 5th line (the notation "From 1998 Missouri"), they appear to fill up the entire cell of the table on page 11. Thus, a person wishing to add further information to this 4-line entry would have to squeeze the new wording in between the last line of the entry and the printed horizontal line of the cell of the table in a way that would prevent the same even spacing as was in the original entry. Because no sufficient space was available immediately after the last line of the initial 4-line entry, there is almost no spacing

---

[3] Aginsky, V.N. "Using TLC and GC-MS to Determine whether Inks Came from the Same Manufacturing Batch," *Journal of the American Society of Questioned Document Examiners*, Vol. 9, No. 1, 2006, pp. 19-27.

[4] Scientific Examination of Questioned Documents / Edited by J.S. Kelly and B.S. Lindblom. -- 2nd edition, CRC Press, Taylor & Francis, 2006, pp. 319-335.

[5] There might be other notations on pages 1 through 12 that could have been inserted, but the overall appearance of the other entries on pages 1 through 12 did not suggest later insertion.

EXHIBIT ___ 51 ___

PAGE ___ 449 ___



**R**ILEY **W**ELCH **A**GINSKY
F̶O̶R̶E̶N̶S̶I̶C̶ ̶D̶O̶C̶U̶M̶E̶N̶T̶ ̶E̶X̶A̶M̶I̶N̶A̶T̶I̶O̶N̶S̶,̶ ̶L̶L̶C̶

**Ms. Diane Hutnyan**                    **February 8, 2008**                    **Page 4 of 8**

between the inserted 5th line (the notation "From 1998 Missouri") and the last line of the initial 4-line entry.

## MICROSCOPY

The eye is in itself a powerful scientific instrument capable of discovering much information from an examination of ink on paper. With the aid of glass lenses for magnifying and focusing or a microscope (that uses visual light for illumination), the appearance of a line written on paper gives the document examiner valuable information that may allow discrimination between inks or may individualize the writing instrument through its performance characteristics.

In this examination, 4X and 10X magnifying glasses and a microscope with magnification up to 140X were used. I noted that the width of the ink lines in the notation "From 1998 Missouri" was slightly larger than the width of the ink lines in the rest of the 8/26/99 entry.

The microscopic study did not detect any significant differences between the inks or writing instruments used to produce the notation "From 1998 Missouri" and the surrounding entries written by the Notary Public on pages 11 and 12 of document **A-1**. This indicates that these inks are either of the same composition (formulation) or of different compositions that cannot be distinguished by the microscopic examination.

## INFRARED·ABSORPTION

Inks of the same color (indistinguishable to the naked eye) may differently absorb/reflect invisible radiation beyond the red portion of the visible spectrum. This may allow discrimination between similar (in color) but not identical (in composition) inks. The infrared absorption examination did not detect any differences between the inks used to produce the notation "From 1998 Missouri" and the surrounding entries written by the Notary Public on pages 11 and 12 of document **A-1**. This indicates that these inks are either of the same composition (formulation) or of different compositions that cannot be distinguished by the infrared absorption examination method.

## CHEMICAL EXAMINATIONS

## SAMPLING

The sampling procedure involved removing portions of the written lines from the entries to be examined. This was accomplished with a hypodermic needle sized hole punch, which removes hole punches of less than 1 mm in diameter. (The bored out ink samples are removed with a plunger). The ink-on-paper samples were taken from 17 areas on pages 11 and 12 of document **A-1**. The paper blank samples were taken from two areas of paper (on page 11) that did not contain ink. These 17 sets of ink samples and 2 sets of paper blank samples were then analyzed by TLC and GC-MS (as described below). Prior to their analysis by TLC and GC-MS, the samples were kept in my laboratory at normal environmental conditions.[6]

---

[6] Normal room/office humidity and temperature: 72 degrees Fahrenheit plus/minus up to approximately 15 degrees Fahrenheit (i.e. 22$^{0}$C +/- ca. 8$^{0}$C).

EXHIBIT ____5 l

PAGE ____450



RILEY WELCH AGINSKY
Forensic Document Examiners, Inc.

Ms. Diane Hutnyan                    February 8, 2008                    Page 5 of 8

Black and white copies of pages 11 and 12 from which I took ink samples are attached to this report as Attachments 1 and 2, respectively. On these two attachments, each of the above 17 areas is circled and numbered. The questioned notation "From 1998 Missouri" is numbered as entry "8" (see Attachment 1).

CHROMATOGRAPHY

Chromatography is used to separate mixtures of substances into their components. Chromatography was discovered in 1901 when Michael S. Tswett separated pigments from chlorophyll using self-made chromatographic columns packed with various adsorbents. This fundamental discovery marked a milestone in the development of chromatographic separation techniques that led to Nobel prizes in chemistry. Today, chromatography has become the main analytical method in the pharmaceutical industry, food analysis, petrochemical analysis (crude oil, gasoline, kerosene, etc.), biochemical research, environmental analysis (e.g., pesticides in drinking water), clinical analysis (e.g., therapeutic drug monitoring, metabolism disorders), toxicology, forensic and doping analysis, and in many other areas. Thin-layer chromatography (TLC) and gas chromatography-mass spectrometry (GC-MS) are 2 chromatographic methods that are most widely used in analytical and forensic science laboratories all over the world.

Both methods, TLC and GC-MS, were used in this examination.

THIN-LAYER CHROMATOGRAPHY (TLC)

A TLC plate is a sheet of glass or plastic that is coated with a thin layer of a solid adsorbent (usually silica). A sample of the substance to be analyzed is dissolved in an appropriate solvent, and a small amount of the obtained solution is spotted near the bottom of the TLC plate. The TLC plate is then placed in a shallow pool of a solvent in a developing chamber so that only the very bottom of the plate is in the liquid. This liquid, or the eluent, is the mobile phase, and it slowly rises up the TLC plate by capillary action. The components of the sample become separated from one another because of their different degrees of attachment to the coating material (stationary phase) on the plate. The solvent is then allowed to evaporate, and the separated components of the mixture are visualized. If the separated components are colored, visualization is straightforward. If the colorant of ink is a mixture of different dyes, then these dyes are separated on the TLC plate into spots of different colors. Thus, TLC is a very effective method for discriminating between similarly colored inks (if the colorants of the inks consist of different ink dye components that can be separated on the TLC plate).

In this examination, the TLC analysis of the ink samples was conducted as follows. A subset consisting of 3 samples of ink (microplugs) was isolated from each of the above 17 sets of ink samples. Each subset of microplugs was placed into a small glass vial. To each of the vials 2-3 microliters of dimethylformamide were added. The ink was extracted for 30 minutes. The ink extract (visually colorless) was transferred by a capillary pipette to the TLC plate. This transfer process continued until the entire extract had been transferred to the TLC plate (for each sample to be tested). The TLC plate was allowed to air dry and was then placed in a vertical orientation into a developing tank. The tank was a glass enclosure with a removable lid and contained a few milliliters of solution (ethyl acetate – isopropanol – water – acetic acid = 30:15:10:1). After 10 minutes of development the TLC plate was removed from the tank and viewed in both UV (254

EXHIBIT _____ 51

PAGE _____ 451



and 365 nm) and white light with the unaided eye. Often similarities and differences in colored (dyes) and non-colored components present and relative proportions of the components are noted resulting in conclusions about the number of different ink formulations within the ink samples examined. In this examination, the TLC analysis of the ink samples showed that none of them contained any extractable ink components that could be seen in the form of separated colored spots on the TLC plate. It indicates that the colorant of the ink(s) within the ink samples examined is either carbon black or another insoluble black pigment. Thus, the TLC analysis did not detect any differences between the inks used to produce the notation "From 1998 Missouri" and the surrounding entries written by the Notary Public on pages 11 and 12 of document **A-1**. This indicates that these inks are either of the same composition (formulation) or of different compositions that cannot be distinguished by TLC.

GAS CHROMATOGRAPHY-MASS SPECTROMETRY (GC-MS)

GC-MS is a widely accepted analytical method of determining the qualitative composition of multi-component systems. It is routinely used in analytical and forensic science laboratories all over the world.[7] In the field of forensic document examination, GC-MS is used for discriminating between similarly colored inks that have been made using different ink vehicle components (solvents, resins, modifiers, lubricants, thickeners, antiseptics, surfactants, by-products, etc.)

The procedure of the GC-MS analysis involves vaporizing a sample and sweeping it through a column with a moving stream of gas termed the mobile phase or the carrier gas. Compressed gas cylinders commonly supply the gases. The sample is introduced into the injection port. The most common type of analysis involves the injection of approximately 1 microliter of a liquid sample into a heated injection port, which is interfaced to the capillary column where the actual separation takes place. The capillary column's inner walls are coated with a viscous liquid material (it is called the stationary phase). This inner coating will interact with different molecules to different extents. Those components of the mixture, which weakly interact with the stationary phase, pass more quickly through the column than those compounds, which have strong interactions with the stationary phase. For this reason, different components of the mixture exit the column at different times. As each component of the mixture comes off the column, it is detected by the MS detector. The detector sends a signal to the attached computer, which displays each signal as a peak on a chart. The array of peaks (one peak for each component) is called a chromatogram. A chromatogram obtained for a certain material can be considered as a "chemical fingerprint" of the vehicle components of this material. When GC-MS is used for comparing, say, 10 entries written with similarly colored inks, the chromatograms are recorded for each of the 10 inks, and then these "chemical fingerprints" are compared to determine the number of different ink formulations used to produce the entries.

In this examination, the GC-MS analysis of the ink samples was conducted as follows. A subset consisting of 3 to 5 microplugs was isolated from each of the above 17 sets of ink samples. Each subset of microplugs was placed into a small glass vial. (3 microplugs of the paper blanks were placed into another vial). To each of the vials 2 microliters of chloroform were added. The ink

---

[7] For example, GC-MS is used for separating accelerants in fire residue from suspected arson fires and for the analysis of drugs.

EXHIBIT _____ 51

PAGE _____ 452



**RILEY WELCH & AGINSKY**
FORENSIC DOCUMENT EXAMINERS, INC.

Ms. Diane Hutnyan                        **February 8, 2008**                        Page 7 of 8

was extracted for 30 minutes. The extracts were analyzed using an Agilent 6850 gas
chromatograph interfaced with an Agilent 5973N mass selective detector and equipped with a
split/splitless injection system.

The GC-MS conditions and parameters were as follows:

Column: HP-5MS, 30 m x 0.25 mm ID x 0.25-micrometer film thickness (cross-linked 5%-
phenyl-95%-dimethylpolysiloxane)

Carrier: helium (column flow 1 mL/min)

Oven program: isothermal for 1 min at 35°C, program 15°C/min to 230°C and hold for 7 minutes

Injection: 1 microliter, splitless, T=250°C

Purge on time: 1 minute

GC-MS transfer line: 280°C

The GC-MS analysis revealed the presence of 2 different inks of black color within the ink
samples examined: the ink (*ink 1*) used to produce the notation "From 1998 Missouri" on page
11 of document A-1 and the ink (*ink 2*) used to produce the other examined entries on pages 11
and 12 of document A-1.

The difference between *ink 1* and *ink 2* revealed by the GC-MS test is that *ink 1* contains a
vehicle component (alkyl derivative of cyclohexanol) that is absent in *ink 2*. This result of the
GC-MS analysis shows that *ink 1* and *ink 2* are of different compositions.

## SUMMARY OF EXAMINATION RESULTS

I.      The black inks of two different compositions were found among the examined entries
        appearing on pages 11 and 12 of document A-1:

- *Ink 1:* the ink used to produce the notation "From 1998 Missouri" on page 11 of
  document A-1 (entry 8; see Attachment 1).

- *Ink 2:* the ink used to produce the remainder of the writing made by the Notary Public on
  pages 11 and 12 of document A-1 (entries **1** through 7 and 9 through **17**; see Attachments
  1 and 2).

II.     As considered above, in section Visual Examination, the location of the notation "From
        1998 Missouri" on page 11 of document A-1 clearly shows that this notation is squeezed
        in between the last line of the 8/26/99 entry "Original sketches of doll idea – characters 6-
        total = Names are: Zoe, Lupe, Hallidae, Jade, 2 males." and the printed horizontal line
        below it.

EXHIBIT ____51____

PAGE ____453____



**RILEY WELCH AGINSKY**
FORENSIC DOCUMENT EXAMINATIONS, Inc.

Ms. Diane Hutnyan                    February 8, 2008                    Page 8 of 8

## CONCLUSION

Based on the results of this examination and my professional experience, it is my opinion that the notation "From 1998 Missouri" was written on page 11 of document **A-1** at a later time compared to the rest of the 8/26/99 entry written on pages 11 and 12 of document **A-1**.

It is also my opinion that the most probable sequence of the writing of the entries on pages 11 and 12 of document **A-1** was as follows:

1. The entry dated 8/26/99

2. The entry dated 9/14/99

3. The second entry dated 9/14/99

4. The notation "From 1998 Missouri"

## DISPOSITION OF EVIDENCE

The evidence was returned to Mr. Daniel J. Warren, Esq. (Sutherland Asbill & Brennan, LLP, 999 Peachtree Street, Suite 2300, Atlanta, GA 30309) on January 31, 2008 via Federal Express, tracking number 8635 6224 9130.

Very truly yours,

RILEY, WELCH & AGINSKY
FORENSIC DOCUMENT EXAMINATIONS, INC.

Valery N. Aginsky, Ph.D.
Forensic Chemist

Attachments:

Attachment 1 – Reduced copy of page 11 of document **A-1**
Attachment 2 – Reduced copy of page 12 of document **A-1**
Attachment 3 – Reduced copies of the cover page and pages 1 through 12 of document **A-1**
Exhibit "VNA-1" – Curriculum Vitae (incl. List of publications)
Exhibit "VNA-2" – Court Cases and Depositions
Exhibit "VNA-3" – RWAFDE Schedule of Fees

EXHIBIT ___51___

PAGE ___454___