1 | QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
2 | John B. Quinn (Bar No. 090378)
johnquinn@quinnemanuel.com
Michael T. Zeller (Bar No. 196417)
3 | (michaelzeller@quinnemanuel.com)
Jon D. Corey (Bar No. 185066)
4 | (joncorey@quinnemanuel.com)
Timothy L. Alger (Bar No. 160303)
5 | (timalger@quinnemanuel.com)
865 South Figueroa Street, 10th Floor
6 | Los Angeles, California 90017-2543
Telephone: (213) 443-3000
7 | Facsimile: (213) 443-3100

8 | Attorneys for Mattel, Inc.

9 | UNITED STATES DISTRICT COURT

10 | CENTRAL DISTRICT OF CALIFORNIA

11 | EASTERN DIVISION

12 | CARTER BRYANT, an individual,

13 | Plaintiff,

14 | vs.

15 | MATTEL, INC., a Delaware corporation,

16 | Defendant.

17 |

18 | AND CONSOLIDATED ACTIONS

19 |

20 | **PUBLIC REDACTED**

---

CASE NO. CV 04-9049 SGL (RNBx)
Consolidated with
Case No. CV 04-09059
Case No. CV 05-02727

The Honorable Stephen G. Larson

**NOTICE OF MOTION AND MOTION OF MATTEL, INC. TO DISQUALIFY MGA ENTERTAINMENT, INC.'S COUNSEL SKADDEN ARPS AND EXPERT CHRISTINA TOMIYAMA; AND**

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

[Declarations of Michael T. Zeller, Dylan Proctor and Michael Moore filed concurrently herewith]

Hearing Date: April 14, 2008
Time: 10:00 a.m.
Place: Courtroom 1

**Phase 1:**
Discovery Cut-Off: January 28, 2008
Pre-Trial Conference: May 5, 2008
Trial Date: May 27, 2008

---

MATTEL'S MOTION TO DISQUALIFY MGA'S COUNSEL SKADDEN ARPS AND EXPERT TOMIYAMA

1 TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2    PLEASE TAKE NOTICE that on April 14, 2008, at 10:00 a.m., or as soon as

3 the matter may be heard, Mattel, Inc. ("Mattel") will, and hereby does, move the

4 Court for an Order granting the following relief:

5    (1) disqualifying Christina Tomiyama from acting or testifying as an

6 expert for defendants MGA Entertainment, Inc., MGA Entertainment (HK)

7 Limited MGAE de Mexico S.R.L. de C.V. and Isaac Larian ("the MGA

8 defendants") or Carter Bryant in this matter and providing that no defendant

9 may designate a new expert to replace her;

10    (2) disqualifying the law firm of Skadden Arps Slate Meagher & Flom,

11 LLP, MGA in-house counsel Craig Holden, and all other in-house or outside

12 counsel of MGA with whom Tomiyama has communicated, from acting as

13 counsel for the MGA defendants or any other party in this matter;

14    (3) for an injunction barring Tomiyama, the MGA defendants, their

15 counsel and those persons subject to their authority or control, or acting in

16 concert with them, from using, disclosing or otherwise disseminating Mattel's

17 privileged communications or work product;

18    (4) for an injunction ordering Tomiyama, the MGA defendants, their

19 counsel, and any persons subject to their authority or control, or acting in

20 concert with them, to (i) return all of Mattel's privileged and work-product

21 materials; (ii) deliver up and/or destroy any documents reflecting Mattel's

22 privileged communications and work product or conversations with

23 Tomiyama; and (iii) identify all persons who have interacted with Tomiyama

24 or reviewed her report or any other Mattel privileged communications or

25 work product;

26    (5) for an order precluding the MGA defendants from offering any fact

27 or expert testimony as to any topic addressed by Tomiyama's expert report;

28

1    (6) for an award of the attorneys fees and costs Mattel incurred

2    preparing for and taking Tomiyama's deposition and preparing this Motion.

3    This Motion is made on the grounds that (1) Ms. Tomiyama, a former Mattel

4    employee who worked closely with Mattel's counsel on litigation matters, including

5    Mattel's present litigation with Bryant and MGA, has been designated as an expert

6    for the MGA defendants and Bryant and has disclosed privileged communications,

7    work product and confidential information belonging to Mattel that relates directly

8    to this and other Mattel litigation, in violation of ongoing duties Tomiyama owes to

9    Mattel to maintain in confidence all privileged and work product information she

10   obtained while employed by Mattel; and (2) the Skadden Arps law firm and MGA's

11   in-house counsel violated their ethical obligations and impaired the integrity of these

12   proceedings by obtaining, disclosing and using Mattel's privileged communications

13   and work product information, while inducing Tomiyama to violate her duties to

14   Mattel.

15   This Motion is based on this Notice of Motion and Motion, the accompanying

16   Memorandum of Points and Authorities, the Declarations of Michael T. Zeller,

17   Dylan Proctor and Michael Moore, all filed concurrently herewith, the records and

18   files of this matter, and all other matters of which the Court may take judicial notice.

19   **Certification of Local Rule 7-3 Compliance**

20   This motion is made following the conference of counsel pursuant to Local

21   Rule 7-3 which took place on March 4 and 11, 2008.

22

23   DATED: March 18, 2008        QUINN EMANUEL URQUHART OLIVER &
                                   HEDGES, LLP
24

25                               By
                                    John B. Quinn
26                                  Attorneys for Mattel, Inc.

27

28

07209/2435140.11

-ii-
MATTEL'S MOTION TO DISQUALIFY MGA'S COUNSEL SKADDEN ARPS AND EXPERT TOMIYAMA

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ............................................. 1

PRELIMINARY STATEMENT ....................................................................... 1

STATEMENT OF FACTS ........................................................................... 3

ARGUMENT ......................................................................................... 13

I.  THE COURT SHOULD DISQUALIFY TOMIYAMA ................................. 13

    A.  Mattel Had A Confidential Relationship With Tomiyama .................. 14

    B.  Tomiyama Received And Disclosed Mattel's Privileged And Confidential Information Related To This Litigation ........................... 14

    C.  The Interests Of Fairness And The Integrity Of The Judicial Process Warrant Disqualification Of Tomiyama .................................. 15

II.  SKADDEN ARPS AND MGA IN-HOUSE COUNSEL CRAIG HOLDEN MUST BE DISQUALIFIED ........................................................ 16

    A.  This Court Has Inherent Authority to Disqualify Counsel Whose Conduct Compromises the Integrity of the Adversarial Process .......... 16

    B.  Improperly Obtaining and Using An Adversary's Privileged Information, as Skadden Did, Warrants Disqualification .................... 17

    C.  Skadden's Conduct Requires Disqualification ............................... 18

        1.  Skadden Obtained and Used Mattel Privileged Information to Gain an Advantage in this Litigation ................................. 18

        2.  Skadden Concealed Tomiyama's Disclosures and Interfered with Mattel's Ability to Seek a Protective Order By Counseling Her to Breach Her Contract with Mattel ........... 20

        3.  Courts Have Found Similar Misconduct Warrants Disqualification ........................................................... 22

        4.  Disqualification Is The Appropriate Remedy ...................... 24

CONCLUSION ...................................................................................... 25

07209/2435140.11

# TABLE OF AUTHORITIES

**Page**

## Cases

American Empire Surplus Lines Ins. Co. v. Care Centers, Inc.,
484 F. Supp. 2d 855 (N.D. Ill. 2007) .................................................... 13

In re AFI Holding, Inc.,
355 B.R. 139, 153 n.15 (B.A.P. 9th Cir., 2006)................................... 18

Cargill Inc. v. Budine,
2007 WL. 1813762 (E.D. Cal. June 22, 2007)...................................... 18

Chugach Elec. Assn. v. United States District Court,
370 F.2d 441 (9th Cir. 1966)................................................................ 18

County of Los Angeles v. Superior Court,
222 Cal. App. 3d 647, 271 Cal. Rptr. 698 (1990)................................ 23

Emle Industries, Inc. v. Patentex, Inc.,
478 F.2d 562 (2nd Cir. 1973)............................................................... 18

Erickson v. Newmar Corp.,
87 F.3d 298 (9th Cir. 1996)...................................................... 16, 18, 21

Koch Refining Co. v. Jennifer L. Boudreaux M/V,
85 F.3d 1178 (5th Cir. 1996)........................................................ 13, 14

MMR/Wallace Power & Indus., Inc. v. Thames Assoc.,
764 F. Supp. 712 (D. Conn. 1991) ........................................ 17, 18, 23, 24

Papanicolaou v. Chase Manhattan Bank, N.A.,
720 F. Supp. 1080 (S.D.N.Y. 1989)..................................................... 17

Richards v. Jain,
168 F. Supp. 2d 1195 (W.D. Wash. 2001)...................................... passim

Richardson v. Hamilton Int'l Corp.,
469 F.2d 1382 (3rd Cir. 1972).............................................................. 18

Rico v. Mitsubishi Motors Co.,
42 Cal. 4th 807 (2007)............................................................. 17, 19, 21

Shadow Traffic Network v. Superior Court,
24 Cal. App. 4th 1067, 29 Cal. Rptr. 2d 693 (1994)........................... 23

Space Systems/Loral v. Martin Marietta Corp.,
1995 WL. 686369 (N.D. Cal. 1995)..................................................... 15

MATTEL'S MOTION TO DISQUALIFY MGA'S COUNSEL SKADDEN ARPS AND EXPERT TOMIYAMA

State Comp. Ins. Fund v. WPS, Inc.,
    70 Cal. App. 4th 644 (1999)......................................................................... 17

Wang Labs., Inc. v. Toshiba Corp.,
    762 F. Supp. 1246 (E.D. Va. 1991)......................................................... 13, 15

Williams v. Trans World Airlines, Inc.,
    588 F. Supp. 1037 (W.D. Mo. 1984)................................................. 18, 24, 25

## **Statutes**

Local Rule 83-3.1.2 ................................................................................ 17

MATTEL'S MOTION TO DISQUALIFY MGA'S COUNSEL SKADDEN ARPS AND EXPERT TOMIYAMA

# MEMORANDUM OF POINTS AND AUTHORITIES

## Preliminary Statement

Skadden Arps appears to have knowingly violated its ethical duties in order to obtain a tactical advantage in this case. Its conduct warrants disqualification.

Christina Tomiyama was a Mattel manager until 2006 and a Mattel consultant through April 2007. On dozens of occasions, she worked with Mattel's in-house and outside counsel (Quinn Emanuel) on this case and others to assist in providing legal advice to Mattel. Mattel's lawyers told her their theories and strategies concerning Mattel's claims against Bryant, MGA's claims against Mattel, and other relevant matters. Tomiyama provided specifics regarding those theories, gave direction on additional investigation into them, analyzed dolls for litigation purposes and reported her findings to Mattel's counsel. She performed these tasks at the direction of Mattel's lawyers, and became privy to counsel's protected opinion work product so she could assist counsel in advising Mattel.

She has now passed to MGA some or all of the protected information to which she was exposed at Mattel. Either while she was a paid Mattel consultant or shortly thereafter (MGA refuses to say which), and unbeknownst to Mattel, Tomiyama was contacted by MGA lawyers and started cooperating with them. When Skadden was brought in, Tomiyama's mere cooperation was apparently not enough—it formally retained her as an expert witness. Last month Skadden served an expert report by Tomiyama that discloses privileged Mattel information and actually attaches a privileged Mattel document. Tomiyama admits she is relying on Mattel's privileged information for her expert opinions in this case and testified that Skadden ███████ the topics she covered in her report, including the section called █████████████████████████ that describes work product analysis she did for Mattel's Law Department. At no time did Skadden ever tell Tomiyama not to disclose Mattel's privileged information or take any

1  precautions to avoid obtaining it.  Instead, it encouraged her to affirmatively use it
2  against Mattel.

3      Skadden also induced Tomiyama to breach her contractual obligations to
4  Mattel, apparently to conceal its undisclosed contacts with her.   Under her
5  Separation Agreement with Mattel, Tomiyama was required to notify Mattel before
6  providing services to a Mattel competitor.  According to Tomiyama, she did not do
7  so because Skadden asked her ▉▉▉▉▉▉▉ it.  In fact, after a senior Skadden
8  partner reviewed her agreement, Skadden advised her that she need not disclose her
9  contacts with Skadden.  Tomiyama understood that she need not disclose because
10  she purportedly would not be providing services to a ▉▉▉▉▉ she would be
11  ▉▉▉▉▉▉▉▉▉▉ not MGA.  Regardless of that spurious distinction,
12  Tomiyama's agreement separately required her to notify Mattel when MGA's
13  lawyers sought information from her (whether she was working for "Skadden" or
14  "MGA").  Tomiyama admittedly breached her obligations to Mattel at Skadden's
15  urging, preventing Mattel from learning Skadden was working with Tomiyama—
16  and compromising protected Mattel information—until it received her expert report
17  last month.

18      Tomiyama must be disqualified.  An expert is not permitted to disclose or use
19  information obtained in confidence during employment with one party—especially
20  privileged information—against that party.  Here, Tomiyama admits her expert
21  opinions rely on privileged Mattel information.  She cannot be an expert against
22  Mattel.

23      Likewise, Skadden (and any MGA in-house counsel with whom Tomiyama
24  has been in contact, including Craig Holden) must be disqualified.  Skadden's
25  lawyers knew Tomiyama had privileged information, and they obtained it.
26  Appellate courts have instructed what an attorney must do if he comes into
27  possession—even inadvertently—of an opponent's protected communications and
28  work product.  Stop looking at it; notify the other side; and return it.  Skadden did

1   exactly the opposite, affirmatively counseling its expert to use it.  Moreover, rather
2   than ensure compliance with her contractual and fiduciary obligations to Mattel,
3   Skadden's lawyers advised Tomiyama not to reveal to Mattel their cooperation
4   when she sought their advice.  Any reasonable lawyer would have heard the alarm
5   bells ringing and seen the red flags waving long ago.  And yet even now, Skadden
6   refuses to withdraw Tomiyama or return Mattel's protected information.  Skadden's
7   violations of its ethical obligations have been repeated, and appear to have been
8   deliberate and tactical.  They require disqualification.

9   **Statement of Facts**

10   _Tomiyama's Mattel Employment._  In October 1991, Christina Tomiyama
11   began working as a face painter in Mattel's Face Design Group.[1]  She worked there
12   until November 1995, when she moved to Mattel's BARBIE Collectibles Group.[2]
13   In April 2003, Tomiyama returned to manage the Face Design Group where she
14   oversaw face painting for Mattel's BARBIE and MY SCENE doll lines.[3]  MGA
15   alleges in this action that the MY SCENE dolls, and their face paint in particular,
16   infringe MGA's trade dress and other purported rights in Bratz.[4]  On February 4,
17   2006, Mattel laid off Ms. Tomiyama, and Tomiyama entered into a Separation
18
19
20

[1]   Expert Report of Christina Tomiyama ("Tomiyama Report") at 1, attached as exhibit 8 to the Declaration of Michael T. Zeller ("Zeller Dec").  In order to avoid any potential waiver argument by MGA or its counsel, Mattel has submitted declarations of counsel sufficient only to prove the existence of attorney-client privilege and work product protection.  Should the Court direct it, Mattel will provide for _in camera_ review further information and details regarding any of the matters discussed herein, including the particulars of Mattel's privileged and work product communications with Ms. Tomiyama.
[2]   _Id._ at 1-2.
[3]   Transcript of Deposition of Christina Tomiyama, February 27, 2008 ("Tomiyama Tr.") at 196:20-22, Zeller Dec. Ex. 1; Tomiyama Report at 2.
[4]   MGA's Complaint for False Designation of Origin, Affiliation, Association or Sponsorship, Unfair Competition, Dilution, and Unjust Enrichment, dated April 13, 2005, ¶¶ 36-66, Zeller Dec. Ex. 7.

1   Agreement and General Release ("Separation Agreement").[5]   Under that agreement,

2   Mattel paid Tomiyama to provide consulting services to Mattel through April 2007.[6]

3       <u>Tomiyama's Work With Mattel's Legal Department, Including In Connection</u>

4   <u>With This Case.</u>   When Tomiyama was a Mattel employee, members of Mattel's

5   Law Department and its outside litigation counsel often called on her to assist in

6   litigation matters.[7]   She had numerous direct communications with Mattel's in-

7   house lawyers and paralegals, including Michael Moore and Adelle Jones, and its

8   outside counsel, including Michael Zeller of Quinn Emanuel, about the prosecution

9   and defense of pending and potential litigation.[8]

10       As Tomiyama's expert report confirms, ███████████████

11   ████████████████████████████████████████████████

12   ████████████████████████████████████████████████

13   ████████████████████[9]   Tomiyama admits in her report that she engaged in

14   such consultations approximately a dozen times a year.[10]   While seeking her input,

15   Mattel's counsel often disclosed to Tomiyama their opinions and work product.[11]

16       Tomiyama worked with Mattel's lawyers directly in connection with this

17   action.[12]   A central claim in MGA's complaint against Mattel is that the face

18   painting for Mattel's MY SCENE doll line changed over time to look more like

19   Bratz dolls.[13]   At the time these alleged changes occurred, Tomiyama managed the

20

21

---

22   [5] Zeller Dec. Ex. 3, ¶ 4.

    [6] <u>Id.</u>

23   [7] Declaration of Michael Moore ("Moore Dec.") ¶ 4; <u>see, e.g.,</u> Tomiyama Tr. at 261:25-263:4; 268:3-270:4.

24   [8] Tomiyama Tr. at 247:13-248:17; Moore Dec. ¶¶ 5-10.

25   [9] Tomiyama Report at 2.

    [10] Tomiyama Report at 9 (describing how she assisted Mattel's legal department in this

26   kind of analysis ███████).

    [11] Moore Dec. ¶ 5-10; Zeller Dec. ¶ 12.

27   [12] Moore Dec. ¶¶ 5-7; Zeller Dec ¶ 12; <u>see also</u> Tomiyama Tr. at 260:20-261:6.

28   [13] Zeller Dec. Ex 7.

-4-

MATTEL'S MOTION TO DISQUALIFY MGA'S COUNSEL SKADDEN ARPS AND EXPERT TOMIYAMA

1    Mattel group responsible for face painting the MY SCENE dolls.[14]  As a Mattel

2    employee, Tomiyama met with Mattel's counsel regarding MGA's complaint, and

3    in these meetings, Mattel's counsel shared with Tomiyama their thoughts and

4    impressions about MGA's suit.[15]  Tomiyama's expert report acknowledges she ███

5    ███████████████████████████████████████████████ while employed

6    by Mattel.[16]  Mattel's counsel discussed MGA's allegations with Tomiyama, and

7    disclosed to her work product in the form of mental impressions and thoughts with

8    respect to those claims.[17]

9        Mattel's lawyers also consulted Tomiyama in connection with Mattel's claims

10   against Bryant and its investigation into such claims.  Mattel's counsel discussed

11   these claims with Tomiyama while she was employed by Mattel, again disclosing

12   counsel's theories regarding this action.[18]  Working with Mattel's law Department,

13   Ms. Tomiyama gave direction on additional investigation into those theories as

14   well.[19]

15       Tomiyama was frequently directed by Mattel's Law Department to make

16   comparisons of Mattel's MY SCENE dolls to dolls of competitors in connection

17   with other pending and potential litigation.[20]  One such case was the Simba matter,

18   which MGA has asserted is directly relevant to this action.[21]  In Simba, Mattel sued

19   another doll manufacturer for infringing its rights in MY SCENE and BARBIE

20   dolls.   At the direction of Mattel's Law Department, Tomiyama prepared a

21   document to be used by counsel in evaluating Mattel's intellectual property rights

22

23

24   [14] Tomiyama Tr. at 196:20-22.

25   [15] Moore Dec. ¶¶ 6, 7; see also Tomiyama Tr. 262:4-263:4.
     [16] Tomiyama Report at 3.

26   [17] Tomiyama Tr. at 252:17-22, 253:12-254:3, 254:23-255:2; Moore Decl ¶ 6.
     [18] Moore Dec. ¶ 5; Zeller Dec. ¶ 12.

27   [19] Moore Dec. ¶ 5.
     [20] Tomiyama Tr. at 251:2-25.

28   [21] See infra at page 11 & n.57.

-5-

1   and what dolls would and would not infringe Mattel's rights.[22]  This document is
2   privileged and work product; Mattel maintained it in confidence and did not disclose
3   it to any third party.[23]  Despite her written representations that she had returned all
4   confidential Mattel documents to Mattel when she left Mattel, as discussed below,
5   Tomiyama kept a copy of it, provided it to Skadden Arps and attached it to her
6   expert report in this case.[24]

7          Tomiyama's Agreements to Preserve Mattel's Confidential Information.
8   Tomiyama signed two agreements with Mattel documenting the duty of
9   confidentiality she owed and continues to owe to Mattel.  In 1991, when Tomiyama
10  became a full-time Mattel employee, she signed an Employee Patent and
11  Confidence Agreement.[25]  Tomiyama acknowledged that she would be exposed to
12  confidential and proprietary information belonging to Mattel and that public
13  disclosure of such information would damage it.[26]  She agreed to keep Mattel's non-
14  public information in strict confidence, both while employed by Mattel and
15  thereafter.[27]

16         When Tomiyama left Mattel in 2006, she signed a Separation Agreement.[28]
17  She agreed, among other things, to continue to work for Mattel in the role of a
18  consultant through April 2007.[29]   Tomiyama agreed to preserve Mattel's
19  confidential information,[30] to cooperate and assist Mattel in any legal claims or
20  investigations involving the company,[31] and to notify Mattel if she was contacted by

21

22   [22] Tomiyama Tr. at 234:16-235:9; 239:6-21; Tomiyama Report at 2.
     [23] Moore Dec. ¶ 9; Zeller Dec. ¶ 13.
23   [24] Separation Agreement, Zeller Dec. Ex. 3 at Section 3(c); Tomiyama Tr. at 238:5-
     239:23.
24   [25] Employee Patent and Confidence Agreement, Zeller Dec. Ex. 2.
     [26] Id., Section 5; Separation Agreement, Zeller Dec. Ex. 3 Section 3(e).
25   [27] Employee Patent and Confidence Agreement, Zeller Dec. Ex. 2, Section 5.
26   [28] Separation Agreement, Zeller Dec. Ex. 3.
     [29] Id.
27   [30] Id., Section 3(e); see also id., Section 3(c) at p. 4.
28   [31] Id., Section 3(j).

1   an attorney relating to any claims against Mattel.[32]   These obligations did not
2   terminate when the consulting period ended.[33]   Tomiyama also agreed to give
3   written notice to Mattel prior to providing services for a Mattel competitor—a
4   provision that also remains in effect.[34]

5   <u>MGA Retains Tomiyama As An Expert</u>.   Tomiyama testified that MGA's
6   prior lawyers, O'Melveny & Myers, first contacted her sometime in 2007.[35]   At
7   some point in 2007, Ms. Tomiyama also met in-person with O'Melveny lawyers and
8   others, including MGA's in-house counsel, Craig Holden.[36]   At that meeting she was
9   given MGA's complaint against Mattel and asked for information about Mattel's
10  litigation with MGA and Carter Bryant.[37]   Tomiyama was, of course, already aware
11  of the lawsuits.   She had discussed them with Mattel's counsel while at Mattel and
12  had previously assisted Mattel's counsel in connection with them.[38]

13  Skadden later contacted Tomiyama to retain her as an expert.[39]   In early
14  November 2007, Tomiyama signed an expert retention agreement.[40]   Under
15  Skadden's direction, Tomiyama prepared an expert report dated February 8, 2008.[41]
16  On February 17, 2008, Mattel served a subpoena on Tomiyama requesting
17  documents related to Bryant and MGA, her employment at Mattel, and her status as
18  an expert.[42]   On February 26, 2008, Ms. Tomiyama produced responsive documents
19  to some of Mattel's requests while refusing as to others.[43]   Mattel deposed her the

20

---

21  [32]  <u>Id.</u>
21  [33]  <u>Id.</u>, Sections 3(e) and 3(j).
22  [34]  <u>Id.</u>, Section 3(l).
22  [35]  Tomiyama Tr. at 131:5-15.
23  [36]  <u>Id.</u> at 132:17-133:12.
23  [37]  <u>Id.</u> at 134:14-19; 258:8-14.
24  [38]  <u>Id.</u> at 252:17-253:14; Moore Dec. ¶¶ 5, 6.
25  [39]  Tomiyama Tr. at 127:2-10; Tomiyama Report at 3.
25  [40]  Tomiyama Report at 3.
26  [41]  <u>See</u> Zeller Dec. Ex. 8.
27  [42]  <u>See</u> Subpoena to Christina Tomiyama, dated February 15, 2008, Zeller Dec. Ex. 9.
27  [43]  <u>See</u> Objections of Non-Party Christina Tomiyama to Mattel's Subpoena for the
28  Production of Documents, dated February 26, 2008, Zeller Decl., Ex. 10.

1 next day.[44]

2    <u>Skadden Counsels Tomiyama To Breach Her Agreements With Mattel.</u>

3 When Skadden retained her, Tomiyama ███████████████████████████

4 ██████████ and told Skadden that she was concerned that acting as an expert for

5 MGA would conflict with her obligations to Mattel.[45]   Tomiyama gave a copy of her

6 Separation Agreement to Kenneth Plevan, a senior Skadden partner, and asked him,

7 in light of her promises to Mattel, ████████████████████████████

8 ████████████████████[46]   According to Tomiyama, █████████

9 ██████████████████████████████████████████████[47]

10 Mr. Plevan advised Tomiyama that her Separation Agreement did not pose a

11 problem with Tomiyama's acting as an MGA expert.[48]

12    At deposition, Ms. Tomiyama admitted that she violated the Separation

13 Agreement.  For instance, Tomiyama acknowledged that the Separation Agreement

14 required her to notify Mattel after MGA's lawyers sought information from her and

15 that she did not do so, ██████████ of the requirement.[49]   Tomiyama also violated

16 her promise to inform Mattel before providing services to a Mattel competitor,

17 explaining that she did not notify Mattel because Skadden asked her ████████

18 ████[50]   Tomiyama testified that Skadden advised her that she did not need to

19

20

---

44 <u>See</u> Zeller Dec. Ex. 1.
45 Tomiyama Tr. at 361:21-362:21.
46 <u>Id.</u> at 361:8-14.
47 <u>Id.</u> at 362:19-21.
48 <u>Id.</u> at 349:25-350:2.
49 <u>Id.</u> at 353:25-354:21.
50 <u>Id.</u> at 351:8-352:2.

MATTEL'S MOTION TO DISQUALIFY MGA'S COUNSEL SKADDEN ARPS AND EXPERT TOMIYAMA

1  provide such notice, notwithstanding her clear obligation to do so.[51]  Tomiyama

2  claimed this obligation did not attach because she was ███████████████████

3  not MGA.[52]  In fact, Skadden and Tomiyama discussed this specific issue:



[53]

13  Tomiyama's Disclosures of Attorney-Client Privileged Communications and

14  Work Product.   Tomiyama also disclosed privileged Mattel communications to

15  Skadden.   Indeed, Tomiyama is expressly relying on privileged communications

16  with Mattel's lawyers and Mattel's attorney work product to provide her opinions.

17  Her expert report sets forth steps she took—at the direction of Mattel's counsel—to

18  assist in determining whether competing products infringed Mattel products,

19  including the MY SCENE line, for purposes of actual and potential litigation.[54]  In

20  discussing the section of her report titled ██████████████████████████

21  ████████  Tomiyama testified:

22  ██████████████████████████████████████████

23  ██████████████████████████████████████

24

25  [51] Id. at 356:18-23; 357:9-12.

26  [52] Id. at 355:5-357:12.

27  [53] Id. at 356:18-23; 357:9-12.  Tomiyama also disclosed her agreement with Mattel to Skadden, despite the fact that she understood that she was under an obligation to Mattel to keep the agreement itself confidential.  Id. at 358:5-9.

28  [54] Tomiyama Report at 9.



[55]

17  Tomiyama's report included a discussion of her work for the Mattel Law

18  Department in the Simba matter, which also concerned Mattel's MY SCENE line of

19  dolls and allegations of infringement.[56]  In Simba, Mattel obtained damages and

20  injunctive relief against a manufacturer of dolls that infringed Mattel's intellectual

21  property rights in its MY SCENE dolls.  MGA has consistently argued that the

22  Simba litigation is directly relevant to this action because "it involved claims and

23  facts similar to those at issue in this case."[57]  Mattel's Law Department asked

---

[55] Tomiyama Tr. at 268:3-270:4.
[56] Id. at 246:3-7; 250:15-251:1; Tomiyama Report at 9.
[57] January 4, 2008 letter from R. Herrington to J. Corey, Zeller Decl., Ex. 4.  See also MGA's Fifth Set of Requests for Production, No. 472, Zeller Decl., Ex. 5 (MGA request seeking "ALL DOCUMENTS REFERRING OR RELATING TO any SIMBA
(footnote continued)

07209/2435140.11

Tomiyama to prepare a document for Mattel's counsel for the purpose of providing legal advice for the <u>Simba</u> litigation.[58]   That document is privileged and work product.[59]  Violating her representations to Mattel, Tomiyama kept a copy of it when she left.[60]  She then provided it to Skadden and attached a copy of it as Exhibit A to her expert report.[61]  Her testimony confirms that the exhibit is a privileged Mattel attorney-client communication and work product document prepared at the direction of Mattel's lawyers for the <u>Simba</u> matter.[62]  Nevertheless, Tomiyama testified that she is ████████████████████████[63]

Tomiyama acknowledges that she discussed with Skadden all the matters related in her expert report, including the work she performed at the direction of Mattel's Law Department to assist Mattel's lawyers in litigation matters.[64]  In fact, according to Tomiyama, the areas she covered in her report were ███████ by Skadden.[65]  Skadden did not take any steps to prevent Tomiyama from disclosing

---

LITIGATION"); MGA's Eighth Set of Requests for Production, Nos. 781-784, Zeller Decl., Ex. 6 (MGA requests seeking a variety of documents related to <u>Simba</u>).
[58] Tomiyama Tr. at 230:19-233:1.
[59] Moore Dec. ¶ 9.
[60] Zeller Dec. Exs. 2 (Section 6) & 3 (Section 3(c)); Moore Dec. ¶ 9; Tomiyama Tr. 238:5-20.  Both the Employee Patent and Confidence Agreement which Tomiyama executed when she joined Mattel in 1991 and the 2006 Separation Agreement required that Tomiyama return to Mattel all files, documents and written information relating to Mattel's business at the termination of her employment with the company.
[61] Tomiyama Tr. at 238:5-239:23.
[62] <u>Id.</u> at 234:7-235:13; 238:5-21.
[63] <u>Id.</u> at 238:21-23.
[64] <u>Id.</u> at 224:8-12; 246:3-7.

████████████████████████████████

[65] <u>Id.</u> at 328:23-329:13.

1  Mattel's privileged information she had acquired while assisting on litigation

2  matters:



[66]

15      At her deposition, Tomiyama blurted out privileged Mattel communications

16  in response to questions that did not call for such information, confirming that she

17  has no understanding of what Mattel communications she should be protecting.[67]

18      <u>Skadden's Refusal To Take Any Steps To Correct Its Misconduct</u>.  Following

19  Tomiyama's deposition, Mattel's counsel informed Skadden that it had improperly

20  obtained Mattel attorney-client communications and attorney work product.  During

21  calls on March 4 and 11, 2008, the parties discussed these issues.[68]  Bryant's counsel

22  at least implicitly acknowledged Skadden's wrongdoing when they informed Mattel

23  that they had destroyed all copies of Tomiyama's report and represented that they

24  had never spoken with her.[69]

---

26  [66] <u>Id.</u> at 221:21-222:11.

27  [67] <u>E.g.</u>, <u>id.</u> at 214:7-217:8.
    [68] Declaration of Dylan Proctor ("Proctor Dec.") at ¶ 2.

28  [69] <u>Id.</u> at ¶ 3.

Skadden, in contrast, refused to answer any questions about MGA's relationship with Tomiyama, including: (i) who else at MGA, Skadden, or other outside MGA counsel spoke with her; (ii) when MGA first contacted her (*i.e.*, whether it was when she was still a Mattel consultant); and (iii) whether Skadden agreed with Tomiyama's testimony that the firm represents her personally.[70] Trivializing the matter, Skadden offered that the situation was analogous to an inadvertent production of privileged material.[71]   Skadden also refused to withdraw Ms. Tomiyama as an expert or return Mattel's privileged or work product documents.[72]

**Argument**

## I.   THE COURT SHOULD DISQUALIFY TOMIYAMA

Federal courts have inherent power to disqualify experts. Koch Refining Co. v. Jennifer L. Boudreaux M/V, 85 F.3d 1178, 1181 (5th Cir. 1996); American Empire Surplus Lines Ins. Co. v. Care Centers, Inc., 484 F. Supp. 2d 855, 856-857 (N.D. Ill. 2007) (court has inherent power to disqualify experts "[t]o protect privileges and ensure confidence in the fairness and integrity of the judicial process").   Disqualification based on a prior relationship with an adversary is warranted when (1) the adversary had a confidential relationship with the expert and (2) the adversary disclosed confidential information to the expert that is relevant to the current litigation. Wang Labs., Inc. v. Toshiba Corp., 762 F. Supp. 1246, 1248 (E.D. Va. 1991) (disqualifying defendant's expert in patent case where plaintiff's counsel had previously sought to engage expert and had disclosed to him confidential information and work product).

---

[70] Id. at ¶ 4; see Tomiyama Tr. at 349:18-22.
[71] Id. at ¶ 5.
[72] Id.

-13-

### A.  Mattel Had A Confidential Relationship With Tomiyama

A party has a confidential relationship with an expert if it is "objectively reasonable" for the party to believe that such a relationship exists.  Koch, 85 F.3d at 1181.  The 1991 and 2006 agreements prove the confidential relationship between Mattel and Tomiyama.  In both agreements Tomiyama expressly agreed to preserve inviolate Mattel's confidential and proprietary information.[73]  She agreed that this obligation would ███████████[74]

### B.  Tomiyama Received And Disclosed Mattel's Privileged And Confidential Information Related To This Litigation

Tomiyama acted as an in-house consultant for Mattel's lawyers and received confidential and privileged Mattel information relevant to this case.  She specifically discussed with Mattel's counsel their theories and mental impressions regarding Mattel's claims against Bryant and assisted Mattel's Law Department in investigating those theories.[75]  She also discussed with Mattel's counsel their theories about MGA's suit against Mattel.[76]  She admits that she ███████ ███████ with Mattel's lawyers in matters relating to the infringement of Mattel's intellectual property in doll products during her Mattel employment.[77]  This included discussions with Mattel's counsel about Mattel's theories and strategies with respect to the dolls at issue in this case.[78]  For example, she further admits she evaluated, for Mattel's counsel, the MY SCENE dolls at issue in this case and competitive products to assist counsel in litigation, including in the Simba matter that MGA itself has urged is relevant to this case.[79]  This information is of the type that warrants her disqualification.  See Koch, 85 F.3d at 1182 (confidential

---

[73] Zeller Dec. Ex. 2, Section 5; Id. Ex. 3, Section 3(e).
[74] Id. Ex. 3, Section 3(e).
[75] Moore Dec. ¶ 5.
[76] Tomiyama Tr. at 252:17-253:14; Moore Dec. ¶ 6; Zeller Dec. ¶ 10.
[77] Tomiyama Report at 2.
[78] Moore Dec. ¶¶ 7, 10.
[79] Tomiyama Tr. at 251:2-25; 261:4-6; 262:4-263:4.

1  information may include "discussion of [the moving party's] strategies in the
2  litigation, the kinds of experts [the party] expected to retain, [the party's] views of
3  the strengths and weaknesses of each side, the role of the [party's] witnesses to be
4  hired, and anticipated defenses") (citations omitted).

5       Tomiyama disclosed Mattel's privileged communications and work product
6  to MGA's counsel, disclosed and used them in her report, and even attached them to
7  her report.[80]  Tomiyama admits she relies on Mattel's privileged information and
8  work product in rendering the opinions set forth in her report.[81]  These facts clearly
9  require that she be disqualified from acting as an expert in this case.  See Space
10 Systems/Loral v. Martin Marietta Corp., 1995 WL 686369, *2 (N.D. Cal. 1995)
11 ("There is no doubt that [former employee of adversary] must be disqualified as an
12 expert witness" where he was privy to substantial confidential information from
13 adversary relevant to the issues in the case); Wang Labs, 762 F. Supp. at 1248
14 ("[N]o one would seriously contend that a court should permit a consultant to serve
15 as one party's expert where it is undisputed that the consultant was previously
16 retained as an expert by the adverse party in the same litigation and had received
17 confidential information from the adverse party pursuant to the earlier retention.").

18    C.    **Fairness And The Integrity Of The Judicial Process Warrant**
19          **Disqualification Of Tomiyama**

20       In determining whether to disqualify an expert, courts balance competing
21 policy objectives.  Space Systems/Loral, 1995 WL 686369 at *2.  "Policies favoring
22 disqualification include ensuring fairness and preventing conflicts of interest," while
23 "[p]olicies militating against disqualification include guaranteeing that parties have
24 access to expert witnesses who possess specialized knowledge and allowing experts
25 to pursue their professional callings."  Id.  Each policy favors disqualification here.

26 _____

27  [80]  Id. at 224:8-12; 232:4-18; 246:3-7; 234:4-235:1; 238:5-239:21; 250:15-18; 268:3-270:4.
28  [81]  Id. at 238:5-239:23.

-15-
MATTEL'S MOTION TO DISQUALIFY MGA'S COUNSEL SKADDEN ARPS AND EXPERT TOMIYAMA

1    Tomiyama's disclosures create an inexcusable conflict of interest. Tomiyama

2  acted at the direction of Mattel's lawyers to provide the company analysis

3  supporting legal advice and to create work product on litigation matters directly

4  bearing on this case. MGA now seeks to use that protected work against Mattel by

5  having Tomiyama offer expert opinions on it. Tomiyama's ongoing obligations to

6  Mattel directly conflict with the work she has performed and would continue to

7  perform for MGA as an expert witness if permitted to play any further role for

8  MGA. Nor will disqualifying Tomiyama hinder the "pursuit of her professional

9  calling." She is not an expert by profession. The policy considerations favor

10  Tomiyama's disqualification.

11  **II.**   **SKADDEN ARPS AND MGA IN-HOUSE COUNSEL CRAIG HOLDEN**

12      **MUST BE DISQUALIFIED**

13    Skadden Arps, Mr. Holden, and likely others obtained Mattel's privileged

14  information and litigation strategy regarding this case from Tomiyama. Skadden did

15  not comply with its ethical obligations to remedy this disclosure by notifying Mattel.

16  Instead, to prevent Mattel from taking steps to protect its privileged information,

17  Skadden Arps advised Ms. Tomiyama to keep their contacts secret—in direct

18  violation of her contract with Mattel. Skadden's pattern of eliciting from Tomiyama

19  privileged information, advising her to breach her agreement to conceal their

20  misconduct and failing to remedy its ethical breaches once they occurred warrants

21  disqualification.

22    **A.**   **This Court Has Inherent Authority to Disqualify Counsel Whose**

23        **Conduct Compromises the Integrity of the Adversarial Process**

24    The Court's authority to disqualify an attorney for unethical conduct arises

25  from its inherent power to control the conduct of those who appear before it and to

26  preserve the integrity of the adversarial process. <u>Erickson v. Newmar Corp.</u>, 87

27  F.3d 298, 303 (9th Cir. 1996); <u>Richards v. Jain</u>, 168 F. Supp. 2d 1195 (W.D. Wash.

28  2001) (disqualifying counsel who came into possession of privileged documents and

failed to cease review or notify opposing counsel). Where the "asserted course of conduct by counsel threatens to affect the integrity of the adversarial process, [the court] should take appropriate measures, including disqualification, to eliminate such taint." MMR/Wallace Power & Indus., Inc. v. Thames Assoc., 764 F. Supp. 712, 718 (D. Conn. 1991) (citing Papanicolaou v. Chase Manhattan Bank, N.A., 720 F. Supp. 1080, 1083 (S.D.N.Y. 1989)).

### B. Improperly Obtaining and Using An Adversary's Privileged Information, as Skadden Did, Warrants Disqualification

Attorneys practicing before this Court must comply with the ethical obligations imposed upon California attorneys. Local Rule 83-3.1.2.[82] Improper access to or use of an adversary's privileged information has long been grounds for disqualification. As recently as last year, the California Supreme Court confirmed that a lawyer who receives another party's privileged information must refrain from examining the materials any more than is essential to ascertain if the material is privileged and immediately notify the opposing counsel or sender that he possesses the privileged material. See Rico v. Mitsubishi Motors Co., 42 Cal. 4th 807, 817 (2007) (adopting the standard articulated in State Comp. Ins. Fund v. WPS, Inc., 70 Cal. App. 4th 644, 656 (1999)). Disqualification is appropriate when the lawyer fails to do so, and "act[s] unethically in making full use of the confidential document" to place opposing counsel at a disadvantage. Rico, 42 Cal. 4th at 819.

Federal law on this point is no different. "An attorney who receives privileged documents has an ethical duty upon notice of the privileged nature of the

---

[82] Under Local Rule 83-3.1.2, "each attorney shall be familiar with and comply with the standards of professional conduct required of members of the State Bar of California and contained in the State Bar Act, the Rules of Professional Conduct of the State Bar of California, and the decisions of any court applicable thereto." The Central District has adopted the "statutes, rules and decisions" of California "as the standards of professional conduct, and any breach or violation thereof may be the basis for the imposition of discipline. The Model Rules of Professional Conduct of the American Bar Association may be considered as guidance." Local Rule 83-3.1.2.

documents to cease review of the documents, notify the privilege holder, and return the documents. A failure by an attorney to abide by these rules is grounds for disqualification." Richards, 168 F. Supp. 2d at 1200-1201 (citing ABA Comm. on Ethics and Professional Responsibility, Formal Op. 94-382 (1994)).[83]

A court may disqualify counsel "not only for acting improperly, but also for failing to avoid the appearance of impropriety." Erickson v. Newmar Corp., 87 F.3d 298, 303 (9th Cir. 1996) (citations and quotations omitted); see also Richardson v. Hamilton Int'l Corp., 469 F.2d 1382, 1385-86 (3rd Cir. 1972) (remanding for new trial where district court failed to remedy an appearance of impropriety). In determining whether to disqualify counsel in cases involving violation of privilege, "the Court should resolve any doubts in favor of disqualification." Richards, 168 F. Supp. 2d at 1209.[84]

### C.   Skadden's Conduct Requires Disqualification

#### 1.   Skadden Obtained and Used Mattel Privileged Information to Gain an Advantage in this Litigation

Skadden's conduct fell far short of the standard required of attorneys practicing in this Court. It was or should have been entirely foreseeable to Skadden that, as a manager on the MY SCENE line through 2006, Tomiyama might have

---

[83] See Cargill Inc. v. Budine, 2007 WL 1813762 (E.D. Cal. June 22, 2007) (reiterating the inherent power of federal courts to apply the 'appearance of impropriety' standard) (citing In re AFI Holding, Inc., 355 B.R. 139, 153 n.15 (B.A.P. 9th Cir., 2006)); Williams v. Trans World Airlines, Inc., 588 F. Supp. 1037, 1045 (W.D. Mo. 1984) ("[T]he potential for unfair discovery of information through private consultation rather than through normal discovery procedures threatens the integrity of the trial process."); see also MMR/Wallace, 764 F. Supp. 712, 719 (the mere possibility that privileged information had been released "threaten[ed] to taint the integrity of [the] case" and was sufficient to warrant disqualification).

[84] See Emle Industries, Inc. v. Patentex, Inc., 478 F.2d 562, 565 (2nd Cir. 1973) (affirming disqualification of plaintiffs' counsel who obtained confidential information in the course of representing defendant in an earlier case); Chugach Elec. Assn. v. United States District Court, 370 F.2d 441, 444 (9th Cir. 1966) ("Where conflict of interest or abuse of professional confidence is asserted, the right of an attorney freely to practice his profession must, in the public interest, give way in cases of doubt.").

privileged information relating to this case.  Upon contacting her, Skadden should have taken steps to avoid coming into possession of such information.  "With respect to any unrepresented former employee, of course, the potentially-communicating adversary attorney must be careful not to seek to induce the former employee to violate the [attorney-client] privilege."  ABA Comm. on Ethics and Prof. Responsibility, Formal Op. 91-359 (1991); see also Rico, 42 Cal. 4th at 818 (counsel has an obligation "to respect the legitimate interests of fellow members of the bar, the judiciary, and the administration of justice," and must not examine or use opposing party's privileged information) (citation omitted).

Notwithstanding these requirements, Skadden took no measures to ensure that it did not come into possession of Mattel's privileged information.  It neither told Tomiyama not to disclose privileged Mattel information nor explained to her what types of communications were privileged—something she clearly did not understand.[85]   As a consequence, Tomiyama did disclose Mattel's privileged communications and work product to Skadden during the preparation of her expert report, including the steps she took at the direction of Mattel's counsel to assist them in evaluating infringement claims.[86]  Although the full scope of Skadden's improper acquisition of Mattel's privileged information is unknown to Mattel (in part because Skadden refuses to disclose it), Mattel does know that Tomiyama possesses a wealth of such information and does not know the difference between privileged and non-privileged information.[87]   Confirming that she does not, Tomiyama blurted out privileged communications with Mattel's Law Department in response to questions that did not seek the substance of such communications during her deposition.[88]

---

[85]  Tomiyama Tr. at 221:14-222:11.
[86]  Id. at 224:8-12; 232:14-18; 234:16:-235:13; 238:5-239:21; 246:3-7; 247:19-248:17; 250:15-18; 268:3-270:4.
[87]  Moore Dec. ¶¶4-10; Zeller Dec. ¶¶9, 10; Tomiyama Tr. at 221:14-222:11.
[88]  See, e.g. id. at 214:7-217:8.

1   Rather than refraining from examining Mattel's privileged information and
2   notifying Mattel it possessed it once it was disclosed, Skadden did the opposite: it
3   prompted Tomiyama to affirmatively rely on this information for her opinions.
4   Skadden ████████ that Tomiyama include the work she did at counsel's direction
5   in her report, and she attached a privileged Mattel document to her report.[89]

6   Skadden's refusal to comply with its ethical obligations continues to this day.
7   After Mattel requested a conference of counsel prior to filing this motion, Skadden
8   trivialized its conduct, saying that situation was akin to the inadvertent production of
9   a privileged document in discovery.[90]   Skadden did not destroy Tomiyama's expert
10  report or its other documents containing Mattel's privileged information and refused
11  to withdraw Tomiyama as a designated expert.[91]   By contrast, the Keker firm, after
12  learning what Skadden and Tomiyama had done, destroyed all copies of the report
13  and confirmed that its lawyers had not spoken with Tomiyama.[92]

14       **2.   Skadden Concealed Tomiyama's Disclosures and Interfered**
15              **with Mattel's Ability to Seek a Protective Order By**
16              **Counseling Her to Breach Her Contract with Mattel**

17  Compounding its violations, Skadden counseled Tomiyama to breach her
18  obligations to conceal what she, and they, were doing. Although she had never been
19  an expert before, even Tomiyama questioned the propriety of serving as an expert
20  for MGA.[93]   She asked Skadden for advice, and gave a senior Skadden partner her

21

22  [89]   Tomiyama Tr. at 328:23-329:13.
    [90]   Proctor Dec. at ¶ 4.  See Richards, 168 F. Supp. 2d at 1208 ("This is not a case of
23  inadvertent disclosure during the normal discovery process that could potentially constitute
    a waiver of privilege.  Defendants did not provide any of the contested documents to
24  Plaintiffs.  [Plaintiff's counsel] received the Disk outside of the discovery process and
25  through no fault of Defendants.  In fact, Defendants made every effort to protect their
    privileged and confidential documents by requiring employees to sign a Non-Disclosure
26  Agreement.").
    [91]   Proctor Dec. at ¶ 3.
27  [92]   Proctor Dec. at ¶ 2.
28  [93]   Tomiyama Tr. at 361:21-362:21.

Separation Agreement with Mattel.[94]   Violating its ethical obligations, Skadden encouraged her to stay silent and to violate her obligations to Mattel.[95]   That Tomiyama breached her obligations to Mattel—pursuant to Skadden's advice—is beyond question.  She admitted it.  Tomiyama promised Mattel:  ███████████ ███████████████████████████████████████████████████[96]   Tomiyama quite clearly violated this requirement, as she acknowledged.[97]

Following Skadden's advice, Tomiyama also violated another provision of the Agreement.  Tomiyama agreed that if she ████████████████████████████ ████████████████████████████████████████████████████████████████ █████████████████████████████ she would provide Mattel written notice.[98] According to Tomiyama, she had no obligation to notify Mattel under this provision because Skadden *expressly* had advised her that it ███████████████[99]   Her understanding was that this is because she was not working for MGA—she was █████████████████[100]   Skadden's complicity presents far more than the requisite "appearance of impropriety;" it warrants disqualification.  See <u>Erickson</u>, 87 F.3d at 303; <u>Rico</u>, 42 Cal. 4th at 819.[101]

---

[94] <u>Id.</u> at 361:8-14; 362:19-21.
[95] <u>Id.</u> at 351:8-352:2.
[96] Zeller Dec. Ex. 3, Section 3(j).
[97] Tomiyama Tr. at 354:17-21.
███████████████████████████████████████████████████
███████████████████████████████████████████████████
[98] Zeller Dec. Ex. Section 3(l).
[99] Tomiyama Tr. at 355:-357:12.
[100] <u>Id.</u>
[101] Tomiyama may also be in breach of a separate term of her Separation Agreement which precluded her from working for MGA while a Mattel consultant.  Zeller Dec. Ex 3, Section 3(f) at p. 5.  Mattel does not know is she has breached this provision because Skadden refuses to disclose when she first spoke with MGA's counsel.  Proctor Dec. ¶ 4.

1    This is not a case where a lawyer innocently failed to live up to technical or

2 obscure ethical requirements. Far from it—it appears that Skadden intentionally

3 engaged in a pattern of misconduct to gain a tactical advantage: with full knowledge

4 of the facts, Skadden actively induced and cooperated in multiple violations of

5 Tomiyama's agreements and affirmatively encouraged her to disclose and to rely

6 upon Mattel's privileged communications and work product. Skadden has

7 compromised the integrity of these proceedings.

### 3. Courts Have Found Similar Misconduct Warrants Disqualification

10    Case law makes clear that Skadden must be disqualified. In Richards, the

11 court found disqualification "necessary to remedy the substantial taint placed on any

12 future proceedings by [counsel's] possession and review" of business e-mails

13 provided to it by its client, a former executive of the defendant. 168 F. Supp. 2d at

14 1200. Plaintiff's counsel, like MGA's counsel here, took no steps to ensure that the

15 information provided to it did not include defendant's privileged material. Id. at

16 1202. Nor did counsel take any measures to cease review of the material once it

17 became apparent that it was privileged, to notify defendant of the disclosure or to

18 prevent any further disclosure. Id. The court disqualified counsel, explaining that

19 "access to privileged materials creates an appearance of impropriety and so taints

20 the proceedings that the harsh remedy of disqualification is justified."[102]

21    In MMR/Wallace, defense counsel hired Richard Willett—a former employee

22 of the plaintiff with knowledge of the project at issue—as a litigation consultant.

23 764 F. Supp. at 715-716. While employed by the plaintiff, Willett (like Tomiyama

24 here) had provided assistance to plaintiff's lawyers by directing them to relevant

---

[102] The Richards court found that the knowing retention of privileged information presented an easy case for disqualification, but for the fact that a paralegal, not attorneys, had reviewed the opposing party's privileged documents. 168 F. Supp. 2d at 1201. Nevertheless, the court disqualified counsel. This case is easier—the privileged materials were reviewed by a senior partner and other Skadden attorneys.

1   documents, preparing reports on issues related to the case, and attending meetings in
2   which confidential litigation strategies were discussed.  Id. at 714-715.  While
3   Willett had only "limited responsibilities" with the plaintiff (and the defendant
4   contended he was merely a "document clerk"), he had obtained confidential
5   information about the case. Id. at 725. Defense counsel gave specific instructions
6   to Willett, *verbally and in writing*, to refrain from disclosing any privileged
7   information.   Nevertheless, the court held that disqualification was appropriate,
8   particularly "in light of Willett's own admission that, as a lay person, he did not
9   know what information or communications were protected by the attorney-client
10  privilege," because any further involvement in the case by defense counsel
11  "threaten[ed] to taint the integrity" of the case and would "create[] at least an
12  appearance that defendant ha[d] obtained an unfair advantage at trial." Id. at 716-
13  17, 726-27.[103]

14      Skadden's   misconduct   presents   a   far   more   compelling   case   for
15  disqualification than Richards or MMR/Wallace.  Tomiyama, a Mattel manager,
16  acknowledged that she had no ability to discern which communications were
17  protected by privilege,[104] and yet Skadden made no efforts to prevent her disclosure
18  of privileged communications or work product.[105]  Instead, it misused for tactical
19  advantage the protected information she disclosed, induced her to conceal her
20

---

21  [103] California state court cases take the same approach with similar results. See, e.g.,
22  County of Los Angeles v. Superior Court, 222 Cal. App. 3d 647, 657-658, 271 Cal. Rptr.
    698 (1990) (when an attorney consults with an expert and discloses privileged information,
23  and the opposing attorney later acquires the privileged information during communications
    with that expert, the opposing attorney must be disqualified because, "[h]aving become
24  privy to [the privileged information], there is no way the offending attorney could separate
25  that knowledge from his or her preparation of the case."); Shadow Traffic Network v.
    Superior Court, 24 Cal. App. 4th 1067, 1085-1087, 29 Cal. Rptr. 2d 693 (1994) (counsel
26  disqualified where it retained accounting firm as experts where opponents had previously
27  consulted with same accountants).
    [104] Id. at 247:7-12.
28  [105] Tomiyama Tr. at 221:14-222:11.

MATTEL'S MOTION TO DISQUALIFY MGA'S COUNSEL SKADDEN ARPS AND EXPERT TOMIYAMA

1    cooperation with MGA and, even now, refuses to take any steps to mitigate its

2    misconduct.

3              **4.    Disqualification Is The Appropriate Remedy**

4              Mattel submits the only appropriate remedy for Skadden's misconduct is

5    disqualification.   MGA and Skadden may argue that, despite the evidence of

6    impropriety, disqualification is too harsh and would deprive MGA of counsel of

7    choice, as well as disrupt trial preparation.  The Court should not be swayed.  When

8    the client and its lawyers themselves "are directly responsible for the breach of

9    privilege . . . the deprivation of counsel of choice does not weigh heavily against

10   disqualification." Richards, 168 F. Supp. 2d at 1208; see MMR/Wallace , 764 F.

11   Supp. at 728 ("While the court is concerned about interfering with Thames' right to

12   freely select counsel of its choice, that concern is outweighed by MMR's interest in

13   a trial free from the risk that confidential information has been used against it and in

14   the public's interest in the integrity of the judicial process itself.").  Here, Skadden

15   and MGA are complicit.  MGA is not the victim here, but an active participant.[106]

16             The Court should also provide additional relief beyond the disqualification of

17   Skadden.    All  members  of  MGA  in-house  Law  Department  who  had

18   communications with Tomiyama should also be disqualified.   While MGA has

19   refused to identify these attorneys, Tomiyama has testified that she discussed this

20   case with at least one in-house MGA counsel, ▮▮▮▮—who is presumably Craig

21   Holden.[107]  The Court should also issue an injunction ordering MGA and its counsel

22

---

23        [106]  Moreover, means exist to ameliorate any hardship of disqualification. For example,
24   "this hardship can be reduced by allowing portions of [the disqualified firm's] work
     product to be turned over to new counsel and by allowing limited consultation with
25   disqualified counsel for the purpose of explaining the work product." Williams, 588 F.2d
     at 1046. The timing of disqualification should not be weighed heavily when compared to
26   the paramount need to uphold "[the moving party's] legitimate interest in a trial free from
     the risk that confidential information has been unfairly used against it." Id. (granting
27   motion to disqualify counsel filed less than two weeks before trial).
28        [107] Tomiyama Tr. at 132:17-133:2 (identifying MGA's in-house counsel ▮▮▮▮).

1  to return all Mattel's privileged and work-product materials, directing the delivery
2  up or destruction of any documents generated by MGA or its counsel reflecting
3  those materials or any conversations with Tomiyama, and barring MGA and its
4  counsel from further disclosing or using Mattel's privileged communications and
5  work product.  See Williams, 588 F. Supp. at 1046 (any information developed or
6  created after the date privileged materials were received should not be given to new
7  counsel).    Last, the Court should require MGA to identify all other persons,
8  including other outside experts, who have interacted with Tomiyama or reviewed
9  her report.  Mattel reserves the right to seek to exclude or strike any testimony by a
10  witness who has spoken to Tomiyama or reviewed her report, and to strike any
11  expert reports that rely upon her analysis, once this information is disclosed.

12  **Conclusion**

13       For the foregoing reasons, Mattel respectfully requests that the Court enter an
14  Order (1) disqualifying Christina Tomiyama as an expert in this lawsuit, (2)
15  disqualifying Skadden Arps; (3) disqualifying Craig Holden and any other MGA in-
16  house counsel engaged in communications with Tomiyama; and (4) issuing an
17  injunction to protect Mattel as set forth above.

18
19  DATED: March 18, 2008          QUINN EMANUEL URQUHART OLIVER &
20                                 HEDGES, LLP
21                                 By_____
22                                    John B. Quinn
                                   Attorneys for Mattel, Inc.
23
24
25
26
27
28