1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
     John B. Quinn (Bar No. 090378)
2     (johnquinn@quinnemanuel.com)
     Michael T. Zeller (Bar No. 196417)
3     (michaelzeller@quinnemanuel.com)
     Jon D. Corey (Bar No. 185066)
4     (joncorey@quinnemanuel.com)
   865 South Figueroa Street, 10th Floor
5  Los Angeles, California  90017-2543
   Telephone:  (213) 443-3000
6  Facsimile:   (213) 443-3100

7  Attorneys for Mattel, Inc.

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10                    EASTERN DIVISION

11  CARTER BRYANT, an individual,          CASE NO. CV 04-9049 SGL (RNBx)
                                           Consolidated with
12              Plaintiff,                 Case No. CV 04-09059
                                           Case No. CV 05-02727
13        vs.
                                           Hon. Stephen G. Larson
14  MATTEL, INC., a Delaware
   corporation,                            [PUBLIC REDACTED] MATTEL
15                                         INC.'S OPPOSITION TO THE MGA
               Defendant.                  PARTIES' AND CARTER BRYANT'S
16                                         MOTIONS FOR PARTIAL
                                           SUMMARY JUDGMENT
17  AND CONSOLIDATED ACTIONS
                                           Date:  April 22, 2008
18                                         Time:  10:00 a.m.
                                           Courtroom: 1
19
                                           **Phase 1:**
20                                         Discovery Cut-Off:   January 28, 2008
                                           Pre-Trial Conference: May 5, 2008
21                                         Trial Date:          May 27, 2008

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ..................................................................................... 2

ARGUMENT ....................................................................................................... 11

I.   THE INVENTIONS AGREEMENT COVERS THE BRATZ WORKS ....... 11

   A.   The Agreement's Plain Text Precludes Bryant's Interpretation ............ 11

   B.   Rules of Construction For Contracts of Adhesion Do Not Apply ........ 15

   C.   Extrinsic Evidence Refutes Bryant's Interpretation .............................. 16

   D.   Bryant 's Unconscionability Defense Has Been Rejected .................... 18

   E.   The Conflict of Interest Questionnaire Imposes Enforceable Duties .......................................................................................................... 19

II.  MATTEL'S STATE LAW CLAIMS ARE TIMELY ..................................... 20

   A.   Defendants Do Not Prove By Undisputed Facts That Inquiry In 2001 Or 2002 Would Have Revealed Their Wrongdoing .................. 20

   B.   MGA Does Not Present Undisputed Evidence Of The Date Any Claim Accrued ........................................................................................ 21

      1.   A Claim Does Not Accrue Until All Elements Are Complete and a Plaintiff Is On Inquiry Notice ........................... 21

      2.   Mattel Did Not Have Inquiry Notice of Bryant's Misconduct Prior to 2003 ....................................................... 22

         (a)   Factual Disputes Surround The Purported 2000-2001 Triggering Events. ................................................... 22

            (i)    Bryant's Resignation from Mattel .......................... 22

            (ii)   Knowledge of Bryant's Supervisors/Co-Workers ............................................................... 23

            (iii)  Perceptions Among Mattel's Designers/Executives About Bratz ..................... 23

            (iv)  Doll Development Timeline .................................... 23

         (b)   Mattel's March 2002 Investigation Did Not Establish Notice ..................................................................... 24

-i-

(c)   Mattel Was Not on Inquiry Notice of MGA and Larian's Misconduct Until November 4, 2004. ............... 26

3.   The Statute of Limitations Was Tolled Due to Defendants' Fraudulent Concealment. ................................................ 27

4.   The Stay of Proceedings Tolled the Statute of Limitations. ...... 30

C.   As The Court Correctly Held, Mattel's Phase One Claims Added In 2006 Relate Back To The 2004 Complaint And Are Timely. ......... 31

1.   Mattel's Amended Claims Against Bryant Relate Back to the April 2004 Complaint. .......................................... 34

2.   Mattel's Phase One Claims Against MGA Relate Back to the April 2004 Complaint. .......................................... 35

3.   Mattel's Phase One Claims Against the Other Defendants Also Relate Back to the April 2004 Complaint. ...................... 36

4.   Defendants' Assertion That Mattel's Claims Relate Back to the '05 Action Misstates the Court's Order. ...................... 39

D.   Mattel's Claims Are Timely. ............................................ 41

1.   The Intentional Interference Claim Is Timely. ...................... 41

2.   The Aiding and Abetting Claims Are Timely. ...................... 41

3.   The Conversion Claim Is Timely. ................................. 42

4.   The Unfair Competition Claim Is Timely. ......................... 42

III.   MATTEL'S FEDERAL COPYRIGHT CLAIM IS TIMELY. ...................... 43

A.   Mattel Asserted Its Copyright Claim Within Three Years of Accrual. ............................................................... 43

1.   The Standard for Accrual of Copyright Infringement Claims. ............................................................. 43

2.   Mattel's Copyright Claim Could Not Have Accrued Prior to November 24, 2003. ................................................ 44

3.   The Stay In the Action Tolled the Statute of Limitations on the Copyright Claim. ............................................ 45

B.   The Copyright Infringement Claim Against Bryant and MGA Relates Back to the '04 Complaint. .................................... 46

1.   Mattel's Copyright Infringement Claim Against Bryant and MGA is Timely. ................................................. 46

2.   The Timing Of Mattel's Registration Of Its Copyrights Does Not Affect the Viability of Its Claims. ...................... 46

C.    The Rolling Statute of Limitations Applies to Mattel's Copyright Claims Against All Defendants. ........................................................ 48

D.    Defendants' Fraudulent Concealment Tolls the Limitations Period. ................................................................................................ 50

IV.   BRYANT BREACHED HIS FIDUCIARY DUTY TO MATTEL, AND THE MGA DEFENDANTS HELPED HIM ...................................... 51

A.    Bryant Owed Mattel a Fiduciary Duty. .............................................. 51

B.    Bryant Breached His Fiduciary Duty ................................................. 53

C.    The MGA Defendants Aided And Abetted Bryant's Breach of Fiduciary Duty ..................................................................................... 55

V.    MATTEL WILL PREVAIL ON ITS TORTIOUS INTERFERENCE CLAIM .............................................................................................. 57

A.    Mattel Is Not Accusing Defendants of Interfering with Bryant's At-Will Employment Contract ............................................................ 57

B.    Bryant Had a Valid, Binding Contract With Mattel ............................ 57

C.    MGA Defendants Knew of Bryant's Contractual Obligations ............ 57

D.    The MGA Defendants Engaged in Intentional Acts Designed to Breach or Disrupt Bryant's Contractual Relationship With Mattel ...... 59

E.    Bryant Breached His Contractual Obligations To Mattel ................... 63

VI.   MATTEL WILL PREVAIL ON ITS UNFAIR COMPETITION CLAIM .............................................................................................. 64

A.    MGA's Conduct Is Unlawful ............................................................. 64

B.    MGA's Conduct Is "Unfair" Under the UCL ...................................... 67

C.    Mattel's Common Law Unfair Competition Claim is Supported by the Law and Facts ......................................................................... 68

VII.  MATTEL'S STATE LAW CLAIMS ARE NOT PREEMPTED ................... 69

A.    Mattel's Conversion Claim Is Not Preempted. ................................... 70

      1.    Theft of Ideas or Concepts Falls Outside the Copyright Act. ............................................................................................ 70

      2.    Mattel's Claims Regarding Defendants' Conversion of Tangible Materials Are Not Preempted ...................................... 72

      3.    Conversion Claims Based on Ownership Are Not Preempted. ...................................................................................... 74

JOINT OPPOSITION

4.   The Damages Mattel Seeks Have No Bearing on the Court's Preemption Analysis ...................................... 74

B.   The Copyright Act Does Not Preempt Mattel's Claim for Intentional Interference with Contract ............................ 75

C.   Mattel's Unfair Competition Claim Is Not Preempted. ....................... 77

CONCLUSION ............................................................................ 79

# TABLE OF AUTHORITIES

**Page**

## Cases

1-800 Contacts, Inc. v. Steinberg,
107 Cal. App. 4th 568 (2003) ............................................................... 62, 63

AIU Ins. Co. v. Superior Court,
51 Cal. 3d 807 (1990) ............................................................................. 11

Altera Corp. v. Clear Logic,
424 F.3d 1079 (9th Cir. 2005) ............................................................... 76

AmerUS Life Ins. Co. v. Bank of Am., N.A.,
143 Cal. App. 4th 631 (2006) ................................................................ 42

April Enterprises, Inc. v. KTTV,
147 Cal. App. 3d 805 (1983) ........................................................... 28, 30

Austin v. Mass. Bonding and Ins. Co.,
56 Cal. 2d 596 (1961) ............................................................................ 37

Baker v. Aubry,
216 Cal. App. 3d 1259 (1989) ............................................................... 19

Balboa Ins. Co. v. Trans Global Equities,
218 Cal. App. 3d 1327 (1990) ......................................................... 69, 78

Bamery v. Greif Bd. Corp.,
949 F. Supp. 523 (N.D. Ohio 1996) ...................................................... 16

Bancroft-Whitney Co. v. Glen,
64 Cal. 2d 327 (1966) ............................................................................ 54

Bank of New York v. Fremont General Corp.,
514 F.3d 1008 (9th Cir. 2008) ......................................................... 61, 63

Barksdale v. Robinson,
211 F.R.D. 240 (S.D.N.Y. 2002) ........................................................... 50

Berg & Berg Enters., LLC v. Sherwood Partners, Inc.,
131 Cal. App. 4th 802 (2005) ................................................................ 56

Bernson v. Browning-Ferris Indus.,
7 Cal. 4th 926 (1994) ............................................................................. 30

Big East Entm't, Inc. v. Zomba Enters., Inc.,
453 F. Supp. 2d 788 (S.D.N.Y. 2006) ................................................... 50

Borges v. Home Ins. Co.,
239 Cal. App. 2d 275 (1966) ................................................................. 59

-v-

JOINT OPPOSITION

Brown Bag Software v. Symantec,
    960 F.2d 1465 (9th Cir. 1992)............................................................74, 75

Brown v. Demco Inc.,
    792 F.2d 478 (5th Cir. 1986)....................................................................36

Brush Creek Media, Inc. v. Boujakian,
    2002 WL 1906620 (N.D. Cal. 2002).......................................................74, 75

Burlesci v. Petersen,
    68 Cal. App. 4th 1062 (1998)................................................................74, 75

CRST Van Expedited, Inc. v. Werner Enterprises, Inc.,
    479 F.3d 1099 (9th Cir. 2007)..................................................................65

Carrell v. Shubert Org.,
    104 F. Supp. 2d 236 (S.D.N.Y. 2000)......................................................50, 51

Casey v. U.S. Bank National Ass'n,
    127 Cal. App. 4th 1138 (2005)..................................................................56

Castle v. Wells Fargo Financial, Inc.,
    2007 WL 1105118 (N.D. Cal. 2007)..........................................................30

Cavalier v. Jim Henson Co., Inc.,
    2000 WL 3398969 (C.D. Cal. 2000).........................................................72

Cel-Tech Comm., Inc. v. Los Angeles Cellular Tel. Co,
    20 Cal. 4th 163 (1999).............................................................................68

Celestrial Mechanix, Inc. v. Susquehannaa Radio Corp.,
    2005 WL 4715213 (C.D. Cal. 2005).......................................................70, 77

Chow v. Levi Stauss & Co.,
    49 Cal. App. 3d 315 (1975).......................................................................15

City Solutions, Inc v. Clear Channel Commn's, Inc.,
    201 F. Supp. 2d 1048 (N.D. Cal. 2002).....................................................52

Co-Opportunities Inc. v. National Broad. Co.,
    510 F. Supp. 43 (N.D. Cal. 1981)..............................................................47

Colvig v. KSFO,
    224 Cal. App. 2d 357 (Cal. App. 1964)......................................................71

Committee on Children's Television v. General Food Corp.,
    35 Cal. 3d 197 (1983)...............................................................................53

Compare Mass. Mut. Life Ins. Co. v. Superior Court,
    97 Cal. App. 4th 1282 (2002)....................................................................43

Crocker Nat. Bank v. Rockwell Int'l. Corp.,
    555 F. Supp. 47 (N.D. Cal. 1982)..............................................................68

1

Daniel Orifice Fitting Co. v. Whalen,
    198 Cal. App. 2d 791 (1962)................................................. 55

2

Dead Kennedys v. Biaf,
    37 F. Supp. 2d 1151 (S.D. Cal. 1999)............................. 74, 75

3

4

Desny v. Wilder,
    46 Cal. 2d 715, 299 P.2d 257 (Cal. 1956)........................... 71

5

Dielsi v. Falk,
    916 F. Supp. 985 (C.D.Cal 1996).................................. 73, 76

6

7

Dore v. Arnold Worldwide, Inc.,
    9 Cal. 4th 384 (2006)....................................................... 16

8

Dunlap v. G&L Holding Group, Inc.,
    381 F.3d 1285 (11th Cir. 2004)........................................ 72

9

10

Dyna Med, Inc. v. Fair Employment & Housing Comm'n,
    43 Cal. 3d 1379 (1987)..................................................... 12

11

Educational Testing Service v. Simon,
    95 F. Supp. 2d 108 (C.D. Cal. 1999)................................ 79

12

13

Effects Assocs., Inc. v. Cohen,
    908 F.2d 555 (9th Cir. 1990)........................................... 18

14

Elder v. Ashcroft,
    537 U.S. 186 (2003).................................................... 14, 71

15

16

Enreach technology, Inc. v. Embedded Internet Solutions, Inc.,
    403 F. Supp. 2d 968 (N.D. Cal. 2005).............................. 53

17

In re Envirodyne Indus., Inc.,
    29 F.3d 301 (7th Cir. 1994)............................................. 13

18

19

FTC v. Henry Broch & Co.,
    363 U.S. 166 (1960)........................................................ 68

20

Firoozye v. Earthlink Network,
    153 F. Supp. 2d 1115 (N.D. Cal. 2001) ........................... 79

21

22

Fitzgerald v. Seamans,
    553 F.2d 220 (D.C. Cir. 1977) ........................................ 27

23

Fox v. Ethicon Endo-Surgery, Inc.,,
    35 Cal. 4th 797 (2005)....................................... 21, 22, 23, 25, 27

24

25

Fuller v. Tucker,
    84 Cal. App. 4th 1163 (2000)........................................... 39

26

GAB Bus. Svcs, Inc. v. Lindsey & Newsom Claim Servs., Inc.,
    83 Cal. App. 4th 409 (2000)................................. 51, 52, 53

27

28

Garamendi v. SDI Vendome S.A.,
   276 F. Supp. 2d 1030 (C.D. Cal. 2003) ............................................. 21, 28

Gemcraft Homes, Inc. v. Sumurdy,
   688 F. Supp. 289 (E.D. Tex. 1988) ........................................................ 76

General Motors Corp. v. Superior Court,
   48 Cal. App. 4th 80 (1996) ................................................................... 39

Goldberg v. Cameron,
   482 F. Supp. 2d 1136 (N.D. Cal. 2007) ................................................. 75

Graham v. Scissor-Tail, Inc.,
   28 Cal. 3d 807 (1981) ........................................................................... 15

Grisham v. Philip Morris U.S.A., Inc.,
   40 Cal. 4th 623 (2007) .......................................................................... 28

Grosso v. Miramax Film Corp.,
   383 F.3d 965 (9th Cir. 2004) ................................................................. 69

Grudt v. City of Los Angeles,
   2 Cal. 3d 575 (1970) ............................................................................. 35

Gryczman v. 4550 Pico Partners, Ltd.,
   107 Cal. App. 4th 1 (2003) .................................................................... 41

Guaranty Trust Co. of N.Y. v. York,
   326 U.S. 99 (1945) ................................................................................ 41

Halstead v. Grinnan,
   152 U.S. 412 (1894) .............................................................................. 45

Harper & Row Publrs. v. Nation Enters.,
   723 F.2d 195 (2d Cir. 1983) .................................................................. 76

Hobson v. Wilson,
   737 F.2d 1 (D.C. Cir. 1984) .................................................................. 27

Idema v. Dreamworks, Inc.,
   162 F. Supp. 2d 1129 (C.D.Cal. 2001) ............................................. 74, 76

Intermedics, Inc. v. Ventritex, Inc.,
   775 F. Supp. 1258 (N.D. Cal. 1991) ..................................................... 21

Javier H. v. Garcia-Botello,
   239 F.R.D. 342 (W.D.N.Y. 2006) ......................................................... 31

Jolly v. Eli Lilly & Co.,
   44 Cal. 3d 1103 (1988) ......................................................................... 30

King v. Curtis,
   133 Cal. App. 2d Supp. 806 (1955) ...................................................... 67

Kling v. Hallmark Cards, Inc.,
    225 F.3d 1030 (9th Cir. 2000)................................................................44, 45

Ko v. Lin,
    2002 WL 830863 (Cal. Ct. App. 2002)........................................................30

Kodadek v. MTV Networks,
    152 F.3d 1209 (9th Cir. 1998)......................................................................78

Korea Supply Co. v. Lockheed Martin Corp.,
    29 Cal. 4th 1134 (2003)................................................................................65

Lamont v. Wolfe,
    142 Cal. App. 3d 375 (1983).........................................................................35

Lattie v. Murdach,
    1997 WL 33803, 42 U.S.P.Q. 2d 1240 (N.D. Cal. 1997) ......................72, 74

Maglica v. Maglica,
    66 Cal. App. 4th 442 (1998)..........................................................................53

Martel v. Trilogy Ltd.,
    872 F.2d 322 (9th Cir. 1989).........................................................................35

Melchior v. New Line Productions, Inc.,
    106 Cal. App. 4th 779 (2003)........................................................................71

Meridian Project Systems, Inc. v. Hardin Const. Co., LLC,
    2006 WL 1062070 (E.D. Cal. 2006)..............................................................73

Michelson v. Hamada,
    29 Cal. App. 4th 1566 (1994)........................................................................52

Miguel v. Country Funding Corp.,
    309 F.3d 1161 (9th Cir. 2002)........................................................................48

Minder Music Ltd., v. Mellow Smoke Music Co.,
    1999 WL 820575 (S.D.N.Y. 1999)...............................................................50

Motley v. Parks,
    198 F.R.D. 532 (C.D. Cal. 2000) ..................................................................34

Motown Record v. George A. Hormel & Co.,
    657 F. Supp. 1236 (C.D. Cal. 1987)..............................................................76

Myers v. Phillip Morris, Inc.,
    2003 WL 21756086 (E.D. Cal. 2003) ...........................................................35

Neilson v. Union Bank of Calif.,
    290 F. Supp. 2d 1101 (C.D. Cal. 2003)....................................................56, 57

Netzer v Continuity Graphic Assocs.,
    963 F. Supp. 1308 (S.D.N.Y. 1997)..............................................................50

JOINT OPPOSITION

Norgart v. Upjohn Co.,
  21 Cal. 4th 383 (1999).................................................. 35

Northeast Clackamas Co. Elec. Coop., Inc. v Continental Gas Co.,
  221 F.2d 329 (9th Cir. 1955)......................................... 36

Oddo v. Ries,
  743 F.2d 630 (9th Cir. 1984).......................................... 73

Orkin v. Taylor,
  487 F.3d 734 (9th Cir. 2007).......................................... 42

PMC, Inc. v. Saban Entertainment, Inc.,
  45 Cal. App. 4th 579 (1996)........................................... 77

Palo Alto Mut. Bldg. & Loan Ass'n v. First Nat'l Bank,
  33 Cal. App. 214 (1917)............................................... 54

Estate of Peterson,
  28 Cal. App. 4th 1742 (1994).......................................... 17

Phil. & Trenton R. Co. v. Stimpson,
  39 U.S. 448 (1840) ................................................... 14

Plessinger v. Castleman and Haskell,
  838 F. Supp. 448 (N.D. Cal. 1993)..................................... 60

Polar Bear Prods., Inc. v. Timex Corp.,
  384 F.3d 700 (9th Cir. 2004)....................................... 44, 45

Radio Television Espanola S.A. v. New World Entm't, Ltd.,
  183 F.3d 922 (9th Cir. 1999).......................................... 18

Ramona Manor Conv. Hosp. v. Care Enterprises,
  177 Cal. App. 3d 1120 (1986)...................................... 58, 59

Reeves v. Hanlon,
  33 Cal. 4th 1140 (2004)........................................... 57, 59

Regents of University of California v. Superior Court,
  20 Cal. 4th 509 (1990)................................................ 29

Rita Medical Systems Inc v. Resect Medical, Inc.,
  2007 WL 161049 (N.D. Cal. 2007)...................................... 53

Rokos v. Peck,
  182 Cal. App. 3d 604 (1986)....................................... 71, 73

Roley v. New World Pictures, Ltd.,
  19 F.3d 479 (9th Cir. 1994)....................................... 44, 48

Roth v. Malson,
  67 Cal. App. 4th 552 (1998)........................................... 20

Ruskin v. Sunrise Mgmt., Inc.,
506 F. Supp. 1284 (D. Colo. 1981) ................................................. 47

San Jose Const., Inc. v. S.B.C.C., Inc.,
155 Cal. App. 4th 1528 (2007) ........................................................ 69

Savage v. Pacific  Gas & Electric Company,
21 Cal. App. 4th 434 (1994) ........................................................... 59

Seaman's Direct Buying Serv., Inc. v. Standard Oil Co.,
36 Cal. 3d 752 (1984) ..................................................................... 60

Sebastian International, Inc. v. Russolillo,
162 F. Supp. 2d 1198 (C.D. Cal. 2001) ..................................... 58, 59

Selby v. New Line Cinema Corp.,
96 F. Supp. 2d 1053 (C.D. Cal. 2000) ............................................. 72

Selph v. Nelson, Reabe & Synder, Inc.,
966 F.2d 411 (8th Cir. 1992) ........................................................... 30

Semiconductor Energy Lab. Co. Ltd. v. Chi Mei Optoelectronics Corp.,
531 F. Supp. 2d 1084 (N.D. Cal. 2007) ..................................... 62, 63

Sequoia Vacuum Sys. v. Stransky,
229 Cal. App. 2d 281 (1964) ........................................................... 55

Silicon Image, Inc. v. Analogix Semiconductor, Inc.,
2007 WL. 1455903 (N.D. Cal. 207) ........................................... 59, 77

Smeltzley v. Nicholson Mfg. Co.,
18 Cal. 3d 932 (1977) ..................................................................... 37

Smith & Hawken, Ltd. v. Gardendance, Inc.,
2004 WL. 2496163 (N.D. Cal. 2004) ............................................... 69

Snapp & Assocs. Ins. Svcs. v. Robertson,
96 Cal. App. 4th 884 (2002) ........................................................... 43

Snow v. A.H. Robins Company,
165 Cal. App. 3d 120 (1985) ........................................................... 27

Sobeck & Assocs., Inc. v. B & R Investments,
215 Cal. App. 3d 861 (1989) ........................................................... 37

Stacey v. Charles J. Rogers, Inc.,
756 F.2d 440 (6th Cir. 1985) ........................................................... 41

Stevens v. Marco,
147 Cal. App. 2d 357 (1956) ........................................................... 52

Summit Mach. Tools Mfg. Corp. v. Victor CNC Systems, Inc.,
7 F.3d 1434 (9th Cir. 1993) ............................................................. 70

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

07209/2444438.1

JOINT OPPOSITION

T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n,
     809 F.2d 626 (9th Cir. 1987)......................................................2

Topolos v. Caldewey,
     698 F.2d 991 (9th Cir. 1993).....................................................70

U. S. v. Oregon,
     657 F.2d 1009 (9th Cir. 1981)...................................................36

Unisys Corp. v. Varilease Technology Group, Inc.,
     1999 WL. 34782848 (D. Ariz. 1999).........................................77

United States v. Tri-State Ins. Co.,
     946 F.2d 581 (8th Cir. 1991).....................................................26

Villeroy & Boch, S.a.r.l. v. THC Sys., Inc.,
     1989 WL. 8936 (S.D.N.Y. Jan. 30 1989).................................47

Warrington Associates, Inc. v. Real-Time Engineering Systems, Inc.,
     522 F. Supp. 367 (N.D. Ill. 1981)...........................................79

Watermark Publishers V. High Tech. Sys., Inc.,
     1997 WL. 717677, 44 U.S.P.Q. 2d 1578 (S.D. Cal. 1997)................46

Welles v. Turner Enter. Co.,
     503 F.3d 728 (9th Cir. 2007)...................................................49

Westlye v. Look Sports, Inc.,
     17 Cal. App. 4th 1715 (1993)..................................................18

Wolf v. Superior Court,
     106 Cal. App. 4th 625...............................................................53

Wood v. Santa Barbara Chamber of Commerce, Inc.,
     705 F.2d 1515 (9th Cir. 1983)..................................................51

Worldvision Enterprises, Inc. v. American Broadcasting Cos.,
     142 Cal. App. 3d 589 (1983)....................................................53

Worth v. Universal Pictures, Inc.,
     5 F. Supp. 2d 816 (C.D. Cal. 1997).........................................76

Xerox Corp. v. Apple Computer, Inc.,
     743 F. Supp. 1542 (N.D. Cal. 1990).........................................70

Zuill v. Shanahan,
     80 F.3d 1366 (9th Cir. 1996)..............................................49, 50

**Statutes**

15 U.S.C. § 13(c)....................................................................68

17 U.S.C. § 102(b)............................................................71, 72

17 U.S.C. § 205(d)................................................................48

07209/2444438.1

17 U.S.C. § 507(b) ............................................................................ 44, 48

18 U.S.C. § 1832(a) ............................................................................ 65, 78

28 U.S.C. § 2072(b) ............................................................................ 41

Cal. Bus. and Prof. Code § 123 ........................................................ 79

Cal. Civ. Code §§ 1638-39 ................................................................ 11

Cal. Code Civ. Proc. § 583.210(a) .................................................... 37

Cal. Labor Code 2870 .................................................................. 4, 13, 14

Cal. Penal Code § 641.3 .................................................................. 65, 78

Fed. R. Civ. P. 11 ........................................................................... 21, 26

Fed. R. Civ. P. 15(c) ...................................................................... 33, 42

Fed. R. Civ. P. 15(c)(1) .................................................................. 35

Fed. R. Civ. P. 15(c)(1)(B) ............................................................ 35, 46

Fed. R. Civ. P. 15(c)(3) .................................................................. 35

Fed. R. Civ. P. 16 .......................................................................... 41

Fed. R. Civ. P. 24(a)(2) .................................................................. 36

## Miscellaneous

Arthur L. Corbin, Corbin on Contracts § 542 at 112 (1960) ................. 15

H. Rep. No. 9401476, 94th Con., 2d Sess. 132 (1976), reprinted in 5 U.S. Code Cong. & Admin. News at 5659, 5746-5747 (1976) ............................ 79

Local Rule 7-18 ............................................................................... 34

Nimmer On Copyright, § 1.01[B][1][b] at 1-28 ............................... 77

Section 106 ..................................................................................... 78

Section 204(a) ................................................................................ 18

Section 17200 ................................................................................. 65

07209;2444438 1

JOINT OPPOSITION

## Preliminary Statement

Defendants ask the Court to prevent the jury from hearing the overwhelming evidence of their intentional misconduct.  As that evidence establishes, Bryant created Bratz not in 1998, as he claims, but in 1999 and 2000, while working for Mattel, and then secretly sold it to MGA and worked with MGA to develop it, while also employed by Mattel.  The evidence also shows that MGA was complicit in Bryant's wrongdoing, and had become so long before it admits.

Because they cannot plausibly contest this in a trial, defendants attempt to distort the language of the Inventions Agreement to suggest that Mattel never intended to cover Bryant's doll designs though it hired him as a doll designer.  According to defendants, Bryant's doll designs are his and he only assigned to Mattel "technical, scientific discoveries and devices" of the type that doll designers typically do not  create.  Defendants' interpretation is contrary to the plain language of the Inventions Agreement, which provides that "inventions" include "designs" — whether patentable or unpatentable — and indeed cover "copyrights."  Defendants' interpretation also ignores that Mattel is a toy company, and obviously hires and pays its doll designers to create doll designs for it.  And it ignores defendants' repeated statements that what Bryant did — toy designing — is the same as toy inventing, and that Bryant was the inventor of Bratz.

Defendants also try to escape liability on limitations grounds, but fail.  According to defendants, the statute of limitations began running months before Bratz was released for sale.  By defendants' theory, MGA's mere showing of the first Bratz doll triggered the limitations period because a confluence of a dozen claimed facts, when all tied together by lawyers with the benefit of hindsight, purportedly *could have* permitted Mattel to *suspect* Bryant's wrongdoing.  Not even defendants suggest that Mattel actually suspected wrongdoing — of any type — when Bratz was first shown, however, and there was no reason for it to.  At that time, Mattel did not even know Bryant was the creator of Bratz, let alone know he

-1-

created it while employed by Mattel.  Mattel did not even know Bryant had left to join a competitor because of Bryant's misrepresentations that he had not (although defendants mistakenly assert otherwise).  Mattel knew nothing that could remotely put it on notice of the claims that it has asserted in this case.

Defendants also ignore their concealment of their misconduct.. They claim Mattel had a duty to inquire, but there was no one to make inquiries of because defendants ushered in a code of silence about Bryant's role on Bratz after he left Mattel and then propagated false information about the origins of Bratz.  MGA's witnesses have acknowledged this.  In cases of fraudulent concealment, inquiry notice standards do not even apply, and defendants' statute of limitations arguments are erroneous.

Finally, defendants raise a host of other issues they assert can be resolved on "undisputed" facts, like whether Bryant intended to defraud Mattel or acted "corruptly."  The fact is that Bryant *clearly* perpetrated such a fraud.  He *clearly* created Bratz while employed by Mattel, and has gone to lengths to conceal his misconduct.  As set forth in Mattel's motion, many of these issues should be adjudicated in Mattel's favor now; at most these are issues for the jury.  Defendants' motions should be denied.

## Statement of Facts[1]

Bryant Works in Mainline BARBIE at Mattel from 1995-1998.  Carter Bryant joined Mattel in 1995 as a designer in Mattel's mainline BARBIE group.[2]  When he started, he signed an agreement assigning to Mattel inventions that he created or conceived during his Mattel employment.[3]  He also signed a Conflict of Interest

---

[1]  Upon a motion for summary judgment, the evidence and all reasonable inferences therefrom must be viewed in the light most favorable to the nonmoving party.  T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630-31 (9th Cir. 1987)

[2]  Mattel, Inc.'s Separate Statement of Genuine Issues Regarding Bryant's Separate Statement of Uncontested Facts and Conclusions of Law in Support of Bryant's Motion for Partial Summary Judgment, Additional Material Fact ("CB AMF"), Material Facts ("CB MF").  CB AMF #79.

[3]  CB AMF # 97.

07209/2445047.1

[PUBLIC REDACTED] JOINT OPPOSITION

1   Questionnaire.[4]  (This first set of agreements is not directly at issue here.)  Bryant

2   describes this initial period of employment at Mattel as including ████████████

3   ████████████████████████████████████████████████████████████

4   ████████████████████████████████████████████████████████████

5   ████████████████████████████████████████████████[5]

6       <u>Bryant Quit Mattel for Eight Months.</u>  Bryant left California in early 1998 and

7   moved to Missouri to live with his parents.[6]  He continued to work for Mattel

8   through April 1998, then quit.[7]  While in Missouri, he also worked for Old Navy and

9   created some designs for Ashton Drake, a collectibles company.[8]

10      <u>Bryant Returns to Mattel Full Time.</u>  Bryant asked to return to Mattel in late

11  1998.[9]  Mattel hired him to be one of a handful of preliminary designers in Mattel's

12  BARBIE Collectibles department, which creates high-end BARBIE products for

13  doll collectors.[10]

14      As it did when it first hired Bryant, Mattel sent him an Employee Confidential

15  Information and Inventions Agreement ("Inventions Agreement") and a Conflict of

16  Interest Questionnaire prior to the day of his orientation at Mattel.[11]  When he

17  arrived at Mattel, Bryant did not ask questions about either agreement.[12]  He signed

18  both agreements, as he had done in 1995.[13]

19      In the Inventions Agreement, Bryant agreed "promptly and fully" to disclose

20  to Mattel any "inventions" he created, conceived or reduced to practice while a

21  Mattel employee.[14]  He also assigned all such "inventions" to Mattel.  The

22  Agreement defines "inventions" to include "designs" that he might conceive or

---

23  [4] CB AMF # 169.
   [5] CB AMF #80
24  [6] CB MF #4
   [7] CB MF #6
25  [8] CB AMF #53, CB MF # 1; Zeller Dec. Exh. 1 at 143:12-16.
   [9] CB AMF #2.
26  [10] CB MF #3 and #27.
   [11] CB AMF #59, 106.
27  [12] CB AMF # 167
   [13] CB AMF #59, 106.
28  [14] CB AMF # 109

-3-

reduce to practice during his Mattel employment.[15]   The Inventions Agreement provided, in compliance with California Labor Code § 2870, that Bryant's assignment did not reach inventions he created  exclusively on his own time and with his own resources, unless they related to Mattel's toy business or resulted from work he performed for Mattel.[16]

The Conflict of Interest Questionnaire that Bryant signed asked him to disclose any activity in which he had engaged in the past 12 months (*i.e.*, at any time in 1998) "which could be objectively construed as being a conflict of interest or allegiance."[17]   Bryant admits he understood this requirement when he completed the Questionnaire.[18]   Although Bryant disclosed the design work that he actually *did* do while he was in Missouri (for Ashton Drake), he did not disclose any work related to Bratz as having been done during that time.[19]

In the Questionnaire, Bryant also certified that he had not "engaged in a business venture or transaction involving a Mattel supplier or competitor" that would constitute a conflict of interest or allegiance, and agreed to notify Mattel if that certification were to change in the future.[20]   At no time did Bryant disclose to Mattel either his work on Bratz or for MGA, or the agreement that he entered into with MGA while a Mattel employee.[21]

Bryant Has Admitted Creating and Working On Bratz While a Mattel Employee.  One of Bryant's last projects for Mattel was his "Grand Entrance" doll.[22] The BARBIE Collectibles department conceived of this "Grand Entrance" line as a

---

[15] CB AMF # 77
[16] CB AMF # 109, 111 (Inventions Agreement at ¶2(a)); CB AMF # 171.
[17] CB AMF # 116
[18] CB AMF #118
[19] CB AMF # 54, 170.
[20] CB AMF #116
[21] CB AMF #119, 172
[22] CB AMF # 166.

series of dolls created to introduce to the public some of the more accomplished collectibles designers.  Bryant was the first designer featured.[23]

At the same time, however, Bryant was concealing from Mattel that he was working on a doll project, Bratz, to compete with Mattel's BARBIE.  According to Bryant, he never had any intention of offering Bratz to Mattel, notwithstanding his contractual and legal obligations under the Inventions Agreement.  His plan from the time he started on Bratz was to cash in by shopping Bratz to a Mattel competitor. ██████████████████████████████████████████[24]

Bryant has admitted creating and/or revising more than a dozen of his Bratz drawings while employed by Mattel, including works registered with the Copyright Office by Mattel.[25]  Some of these drawings he has admitted creating *exclusively*— start to finish—while he was employed by Mattel.[26]  Bryant also admits he created a three-dimensional Bratz doll using Mattel resources while he was a Mattel employee.[27]  Bryant tricked others at Mattel into helping him on his secret project— not revealing that he was doing it for a competitor.[28]  He paid one Mattel employee to induce her—under false pretenses—to help him create his Bratz pitch materials, for which she (like Bryant) used Mattel resources.[29]

The Bratz drawings that Bryant claims were created during his eight-month hiatus from Mattel in 1998 were demonstrably not created then.  When asked what he did during that time, Bryant did not mention Bratz, but testified that that he had not done anything in the "design field" in 1998.[30]  In this case, Bryant claims he made the first Bratz drawings in 1998, after seeing trendy high school kids in

---

[23] CB AMF # 166.
[24] CB AMF # 174
[25] CB AMF # 173;  See also CB AMF # 64, 65, 68, 69, 71.
[26] CB AMF # 68, 69.
[27] CB AMF # 62.
[28] CB AMF # 63
[29] CB AMF # 62, 65.
[30] CB AMF # 54.

[PUBLIC REDACTED] JOINT OPPOSITION

1    Missouri in 1998.[31]   In fact, those drawings appear on pages torn from a notebook
2    that has drawings, images and entries relating to projects that Bryant did for Mattel
3    *in 1999 and 2000*.[32]   Moreover, forensic examination confirms that the drawings
4    Bryant claimed to have created in 1998 in Missouri were created *after* drawings
5    Bryant admits he created in 1999.[33]

6        Bryant's work on Bratz was so far along by Spring 2000 that he was
7    exchanging faxes with MGA's subsidiary in Hong Kong, which was involved in the
8    manufacture of the dolls and the fashions.[34]   Bryant placed dozens of calls to MGA
9    from his extension at Mattel, and sent faxes to MGA from the BARBIE
10   COLLECTIBLES fax line, all in furtherance of his secret Bratz project.[35]

11       While a Mattel employee, Bryant met with Margaret Leahy (a vendor he met
12   at Mattel), who sculpted Bryant's Bratz doll, and oversaw the dolls' sculpting,
13   including giving her drawings that he created at Mattel[36] to use in the sculpting and
14   verbal guidance and direction on the appearance of the sculpts.[37]   She completed at
15   least two versions of the Bratz sculpt, on which Bryant gave feedback, guidance and
16   direction, before he left Mattel.[38]   Similarly, Bryant approached Anna Rhee, a face
17   painter in the Mattel Design Center, and asked her to work on a "secret" project.[39]
18   She agreed and painted the Bratz sculpt.[40]   Her first invoice for painting the Bratz
19   sculpt is dated June 12, 2000, although Bryant asked her to use the "code name"

20

21

22   ---

     [31] CB AMF # 53.
23   [32] CB AMF # 88.
     [33] CB AMF # 87.
24   [34] CB AMF # 64
     [35] CB AMF # 67, 133.
25   [36] CB AMF # 69.
     [37] CB AMF # 65.
26   [38] CB AMF # 125.
     [39]  Mattel, Inc.'s Separate Statement of Genuine Issues Regarding MGA Parties's
     [Proposed] Statement of Uncontroverted Facts and Conclusions of Law in Support of Their
27   Motion for  Partial Summary Judgment, Additional Material Fact ("MGA AMF"), Material
     Facts ("MGA MF"), MGA AMF # 115, 116.
28   [40]  MGA AMF # 115, 116.

U7209/2445047.1

[PUBLIC REDACTED] JOINT OPPOSITION

1  "Angel" for her work.[41]   Nana Ashong, a former MGA employee, confirmed that

2  "Angel" was a name used internally at MGA for a Bratz character.[42]

3  Bryant sought for Bratz from a Mattel vendor in Hong Kong.  Although he

4  was still a Mattel employee, he told the vendor that he worked for MGA.[43]   Also

5  while a Mattel employee, Bryant met with two other Mattel vendors, Steven Linker

6  and Liz Hogan about developing the Bratz doll packaging and provided them with

7  detailed information regarding the piece count and size of the Bratz dolls.[44]   Bryant

8  told Linker and Hogan falsely that he was no longer working for Mattel.[45]

9  <u>Bryant Worked for MGA While a Mattel Employee</u>.  At some point by late

10  199 or the first half of 2000, Bryant started meeting with MGA representatives,

11  including Larian, about Bratz.[46]   MGA has admitted that it knew he was employed

12  by Mattel at the time.[47]   Although Bryant and MGA claim that they were not even

13  introduced until late August or early September 2000, the facts show otherwise.  For

14  example, in July 2003, Larian told a reporter from the *Wall Street Journal* that Bratz

15  came from a sort of fashion doll contest in late 1999.[48]   A former MGA employee,

16  Jennifer Maurus, has testified that she knew by the early summer of 2000 that

17  Bryant was already working with MGA.[49]   Bratz project manager Paula Garcia

18  informed MGA's trademark counsel that MGA was using the name "Bratz" and the

19  individual doll names – including the "Yasmin" name that was based on the name of

20  Isaac Larian's daughter – at least as early as June 15, 2000. [50]   Another MGA

21  employee confirmed that the creation date of the actual Bratz dolls was September

22

23

24  [41] MGA AMF # 115, 116.
[42] MGA AMF # 116.

25  [43] CB AMF # 126.
[44] CB AMF # 127.

26  [45] CB AMF # 128.
[46] CB AMF # 81.

27  [47] MGA MF # 13, MGA AMF # 118.
[48] MGA AMF 140.

28  [49] MGA AMF # 81.
[50] MGA AMF # 96.

[PUBLIC REDACTED] JOINT OPPOSITION

18, 2000.[51]   And, as noted, there are faxes reflecting that Bryant was working with MGA during the Spring of 2000, and Bryant had two face painters already working on three-dimensional representations of Bratz by approximately June 2000.

While still working for Mattel, Bryant entered into an agreement with MGA "dated as of September 18, 2000" in which he sold and assigned to MGA the rights to the Bratz designs.  In other litigation, MGA has represented that the Bryant-MGA Agreement was a "confirmatory assignment."[52]

Bryant's written agreement with MGA also required him to work on Bratz for MGA on a "top priority basis" while employed by Mattel.[53]   He did so, and MGA paid him for it.[54]   During the last portion of Bryant's employment with Mattel, he did not record any time in Mattel's time-keeping system to any Mattel projects, but rather to "vacation."[55]   Bryant was not really on vacation, but working for MGA.  In an October 10, 2000 e-mail, MGA's Paula Garcia confirmed that Bryant "has worked on average about 4 hours a day" on Bratz for MGA since the beginning of September.[56]   MGA has refused to identify when Bryant started working for it.  MGA prepared and produced a list of former Mattel employees and vendors working for MGA.  The entry for Bryant shows his "MGA DATES" to be "????-PRESENT" and his "MATTEL DATES" as "*DON'T ASK*."[57]

<u>Bryant Concealed From Mattel That He Created Bratz While at Mattel</u>. Bryant never told anyone at Mattel about Bratz.[58]   He claims he solicited Elise Cloonan—his roommate and a fellow Mattel employee—to help him prepare his Bratz pitch materials, but she has no recollection of this.[59]   Rather, she testified her

---

[51] MGA AMF # 140.
[52] CB AMF # 165.
[53] CB AMF # 75.
[54] CB AMF # 124.
[55] CB AMF # 176.
[56] Zeller Dec. Exh. 77.
[57] CB AMF # 134.
[58] CB AMF # 72.
[59] CB AMF # 177.

first discussion with Bryant about Bratz was in November 2002, after she left Mattel.[60]

To ensure Mattel did not find out about Bratz's true creation date, Bryant doctored documents. Bryant wrote "1998" on some color Bratz drawings, even though he now admits he created all color Bratz drawings in 1999.[61] He could not recall whether he mis-dated the drawings before or after Mattel sued him.[62] Bryant also asked a notary to notarize some of his Bratz drawings in August 1999. He told the notary that he wanted to "document" that he created them in 1998 for "protection."[63] The notary could not back-date the drawings, and a forensic expert has found that the key words "From 1998 Missouri" were added to the notary book after the original entry was written using a different pen.[64]

Unlike Mattel, MGA did know Bryant worked on Bratz while in Mattel's employ—and not in 1998. MGA has repeatedly and publicly stated that Bratz was created in 1999 and 2000. For example, ███████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████[66]   Isaac Larian told the press MGA obtained Bratz after holding a doll design contest in 1999.[67]

<u>Bryant Lied About Going to MGA When He Left Mattel.</u>   When he left Mattel, Bryant claimed he was going to start his own freelancing business to design greeting cards and posters.[68]   Bryant expressly told Mattel supervisors and co-

---

[60] CB AMF # 160.
[61] CB AMF # 90-92.
[62] CB AMF 79.
[63] CB AMF # 152.
[64] CB AMF # 88, 89.
[65] CB AMF # 164.
[66] MGA AMF # 163.
[67] MGA AMF # 119.
[68] CB AMF # 129.

1   workers that he was *not* leaving to work for a competitor.[69]  Bryant also falsely

2   certified that he had returned to Mattel all the designs and other work he had done

3   while employed by Mattel.[70]  It is undisputed that Bryant did not tell anyone at

4   Mattel he was leaving for MGA or to work on Bratz, or that he had worked on Bratz

5   or for MGA previously.[71]

6         Even After Bryant Left Mattel, MGA Went Out Of Its Way to Conceal

7   Bryant's Connection to Bratz.  The MGA Defendants concealed Bryant's role on

8   Bratz for years after he left Mattel.  Both Isaac Larian and Paula Garcia gave strict

9   instructions that no one at MGA was to discuss Bryant's involvement with Bratz

10  outside of the company.[72]  Well over a year after Bryant left, ███████████

11  ████████████████████████████████████████████████████

12  ████████████████████████████[73]  The MGA employees

13  understood this.  In response to a Larian e-mail proposing a collectible Bratz doll, an

14  MGA employee suggested creating a limited edition model that would cause a

15  marketing "frenzy."  She raised the question: ████████████████

16  ██████████████████[74]  When an MGA vendor innocently revealed Bryant's

17  role as the creator of Bratz on a Bratz fan site, Larian demanded that the vendor

18  receive no more work from MGA.[75]

19        Not only had Larian and MGA imposed a strict code of silence about Bryant's

20  creation of Bratz, Larian went out of his way to spread false information about

21  Bratz's creation.  Larian variously: (1) identified himself, not Bryant, as the creator

22  of Bratz; (2) claimed that he, Larian, "was the inspiration behind the Bratz dolls";

23

---

24  [69] CB AMF # 131, 132.  Had Mattel known he was going to a competitor, it would
25  have followed its established policy of terminating the employees who leave for
     competitors the day they announce their resignation. CB AMF # 130.
     [70] CB AMF # 179.
26  [71] CB AMF # 131, 132.
     [72] CB AMF # 135, 136.
27  [73] CB AMF # 136.
     [74] CB AMF # 138.
28  [75] CB AMF # 137.

07209/2445047.1

(3) told a reporter that "he got the idea for Bratz after seeing his own kids run around in navel-baring tops and hip-huggers"; (4) claimed in July 2003 that it was his son's "idea for Bratz"; and (5) represented to the U.S. Patent and Trademark Office that he personally had created the Bratz feet and packaging.[76]  MGA admits the pattern of concealment worked, conceding that no public statement recognized *Bryant* as Bratz's creator until a July 18, 2003 Wall Street Journal article.[77]

## Argument

### I.  THE INVENTIONS AGREEMENT COVERS THE BRATZ WORKS

Bryant does not dispute the general enforceability of the Inventions Agreement and concedes for purposes of his Motion that he created artwork for Bratz while employed by Mattel. Bryant Mem. 18:2-5.  Instead, he argues that the Inventions Agreement does not assign creative works such as Bratz designs, but rather "is limited to technical, scientific discoveries and devices." Id. at 21:20-22:1. This interpretation fails as a matter of law based on the plain language of the Agreement and the undisputed extrinsic evidence.

### A.  The Agreement's Plain Text Precludes Bryant's Interpretation

The parties' intent should be ascertained solely from the written provisions of a contract where possible.  Cal. Civ. Code §§ 1638-39; AIU Ins. Co. v. Superior Court, 51 Cal. 3d 807, 822 (1990).  Here, the Agreement's text forecloses Bryant's artificial, patent-only limitation.

First, the Agreement defines "invention" to include unpatentable works: "the term 'inventions' includes, but is not limited to, all discoveries, improvements, processes, developments, designs, know-how, data computer programs and formulae, *whether patentable or unpatentable*."[78]  With limited exceptions, works that can be copyrighted cannot also be patented, and thus fall squarely within the

---

[76] CB AMF #139.
[77] CB AMF #93
[78] CB AMF # 111.

-11-

1   scope of the term "unpatentable."  Bryant tries to avoid this result by arguing that

2   "'unpatentable' must refer to subject matter that falls within the scope of patentable

3   subject matter," Bryant Mem. 24:8-9, but cites no authority that defines

4   "unpatentable" as "being of or relating to patentable subject matter" or anything

5   similar.  To the contrary, the prefix "un-" obviously means "not" or "giving negative

6   or opposite force in adjectives," see, e.g., Webster Unabridged Dictionary 1536,

7   meaning that "patentable or unpatentable" plainly encompasses both inventions that

8   may be patented *and* those that may not be.

9       Second, the Invention Agreement's definition of "invention" specifically

10  includes words, such as "designs," that commonly refer to drawings and other

11  copyrightable material.  Bryant himself testified that "designing toys" is equivalent

12  to "toy inventing,"[79] an admission that puts his Bratz works within the Agreement.

13      Third, the Agreement contains the word "copyright" numerous times in the

14  "Ownership of Inventions" section, leaving no room for doubt that "inventions"

15  encompasses creative, copyrightable materials within the meaning of "inventions":

16  I hereby assign to the Company and/or its nominees all my right, title and interest in

17  such inventions, and all my right, title and interest in any patents, copyrights, patent

18  applications or copyright applications based thereon."[80]   Bryant argues the

19  "copyrights" referred to are only those that are "ancillary" to patents.  But nothing in

20  the Agreement supports this narrow interpretation.

21      A fair reading of the Agreement as a whole confirms that Bryant assigned his

22  rights to the fullest extent permitted by California law.    First, the Agreement

23  expressly assigns "*all*" inventions, "*including but not limited to*" specified

24  examples.[81]   The phrase "includes, but is not limited to" enlarges the meaning of

25  "invention" even beyond the listed examples.   See Dyna Med, Inc. v. Fair

---

[79]  CB AMF # 175.  Further, Anna Rhee testified that Bryant personally described his work on the Bratz designs to her as "inventing." MGA AMF # 120.
[80]  MGA AMF # 77.
[81]  MGA AMF # 111.

[PUBLIC REDACTED] JOINT OPPOSITION

1  Employment & Housing Comm'n, 43 Cal. 3d 1379, 1389 (1987).   Second, the

2  Agreement recognizes that such an assignment must be consistent with the strictures

3  of Labor Code § 2870, which allows assignment even of inventions "that the

4  employee developed entirely on his or her own time."  Read together, these clauses

5  establish the assignment extends to the limits of that statute.  Bryant's own counsel

6  has conceded "[t]he nature of the assignment here is that it is a broad based

7  assignment of all inventions during their employment; all things that were conceived

8  and practiced."[82]

9       The Agreement's definition of "inventions" as encompassing creative,

10 copyrightable works, ideas, and designs of the type at issue here is also confirmed

11 by multiple external sources evidencing the term's plain and ordinary meaning:

12      •    Dictionaries.  Dictionaries consistently define "invention" as including

13 designs, without any technological limitation.  See, e.g., Oxford English Dictionary,

14 2d ed. (1989) (defining "invention" as, among other things, "the thing invented;

15 something devised; a method of action, etc. contrived by the mind; a device,

16 contrivance, design, plan, scheme"); Black's Law Dictionary, 7th ed. (1999)

17 (defining "invention" as, among other things, "anything that is created or

18 devised").[83]  Bryant cites a single dictionary definition (Bryant Mem. 22:6-9), but

19

_____

20 [82] CB AMF # 180.  In another failed effort to find an ambiguity in the agreement, Bryant contends that "at any time during my employment at [sic] the Company" must
21 mean "during the performance of my duties and during working hours."  Bryant Mem. 28:16-21.  First, Bryant misquotes the agreement, which actually says "at any time during
22 my employment by the Company," a broader statement that is not limited to when Bryant was physically "at" Mattel.  Second, in analyzing the meaning of "during," Bryant ignores
   the preceding modifier "at any time during."  at Id. 28:27-29:1.  Finally, the assignment
23 provision specifically excepts certain works created "entirely on [the employee's] own time," in compliance with Cal. Labor Code 2870.  If the temporal scope of "at any time
24 during my employment by the Company" were narrower than the language of 2870, as Bryant would have it, the agreement's express exception for § 2870 would be rendered
25 unnecessary.  Bryant's arguments contradict common sense and the Agreement's plain language.
26 [83] See In re Envirodyne Indus., Inc., 29 F.3d 301, 305 (7th Cir. 1994) ("dictionaries, treatises, articles, and other published materials created by strangers to the dispute, like
27 evidence of trade usage, which is also admissible because it is also evidence created by strangers rather than by a party trying to slip out of a contractual bind, do not present a
   similar danger [as extrinsic evidence does] and are therefore entirely appropriate for use in
28 contract cases as interpretive aids.").

1   even that definition does not exclude creative works: while it describes an invention

2   in part as a "device," it then broadly defines "device" to include "a decorative

3   design, figure, or pattern," or "a graphic symbol."  American Heritage Dictionary

4   (4th ed. 2006).

5       •   <u>Copyright Authorities</u>.   Contrary to Bryant's contentions, the term

6   "invention" has been used to refer to creative copyrightable material—not just

7   patentable material—throughout the history of copyright law.  "Those who wrote

8   the House Report on the landmark Copyright Act of 1909, for example, said that

9   copyright was . . . [designed to] 'stimulate writing and invention.'"   <u>Eldred v.</u>

10  <u>Ashcroft</u>, 537 U.S. 186, 247 (2003) (Breyer, J. dissenting) (quoting H. R. Rep.

11  No. 2222, 60th Cong., 2d Sess., 6-7 (1909)).  <u>See also</u> <u>Phil. & Trenton R. Co. v.</u>

12  <u>Stimpson</u>, 39 U.S. 448, 455 (1840) ("In maintaining copyrights, the writing of the

13  party is the essence of the discovery, and the sole proof of invention or

14  originality.").

15      •   <u>California Statutes</u>.  Throughout this litigation, Bryant has invoked

16  Labor Code § 2870 as limiting his obligation to assign creative material.[84]  No case

17  has ever held, or even suggested, that § 2870, which notably is also couched in

18  terms of "inventions," applies only to patentable works.

19      Thus, *all* objective sources upon which a court might rely to determine

20  meaning uniformly define the term "invention" to include creative works like

21  Bryant's Bratz drawings.  "Without a doubt, in supporting the interest of their

22  clients, counsel often urge upon the court interpretations of the language of a

23  contract that are far removed from the common and ordinary usage, without

24  producing any substantial evidence that the other party to the transaction gave the

25  unusual meaning to the language or had any reason to suppose that the first party did

26  so.  In such cases the harassed judge is justified in saying that the words are too

27

28  [84]  <u>See e.g.</u>, Order Granting Motion to Dismiss, Zeller Dec. Exh. 105.

[PUBLIC REDACTED] JOINT OPPOSITION

1  plain and clear to justify such an interpretation." 3 ARTHUR L. CORBIN, CORBIN ON
2  CONTRACTS § 542 at 112 (1960).  This is precisely such a case.

3  **B.   Rules of Construction For Contracts of Adhesion Do Not Apply**

4       Bryant also asserts that the Inventions Agreement should be construed against
5  Mattel because it is a contract of adhesion.  Bryant Mem. at 20.  But "contracts of
6  adhesion . . . are perfectly valid and, in the absence of ambiguity, are enforced
7  according to their terms."  Chow v. Levi Stauss & Co., 49 Cal. App. 3d 315, 325
8  (1975).  As shown above, the Inventions Agreement is unambiguous, and thus must
9  be enforced according to its plain meaning.

10      In any event, the Inventions Agreement is not a contract of adhesion.  A
11 contract of adhesion "relegates to the subscribing party only the opportunity to
12 adhere to the contract or reject it.'"  Graham v. Scissor-Tail, Inc., 28 Cal. 3d 807,
13 817 (1981).  Thus, the ability to negotiate changes negates adhesion.  Id. at 817-19.

14      Here, the undisputed evidence shows that other Mattel employees negotiated
15 elements of this very agreement, including the assignment provision.  For example,
16 one employee who had worked at Mattel previously and created protectible works
17 between stints—just as Bryant claims—disclosed those works and negotiated a side
18 agreement clarifying ownership to those non-Mattel works.[85]  Similarly, another
19 employee testified that she owned a separate small company and thus negotiated a
20 carve out to the Inventions Agreement—a carve out that was required because it was
21 clear to her the Agreement meant "whatever happened at Mattel Mattel owned and
22 you weren't able to do anything else while you were working at Mattel."[86]  Bryant
23 offers no evidence that he tried to negotiate any term of the contract and was
24 rebuffed, or that the agreement was presented to him as non-negotiable.
25 Accordingly, the Inventions Agreement is not a contract of adhesion.

---

[85] CB AMF # 57, 99.
[86] CB AMF # 57, 99, See also Zeller Dec. Exh. 114 at 26:11-28:3.

07209/2445047.1

[PUBLIC REDACTED] JOINT OPPOSITION

## C.   Extrinsic Evidence Refutes Bryant's Interpretation

Where the contract language is not "reasonably susceptible" to the interpretation of the party proffering extrinsic evidence, the agreement should be interpreted by its terms. See Dore v. Arnold Worldwide, Inc., 9 Cal. 4th 384, 393 (2006) ("at any time" was unambiguous, and thus extrinsic evidence was inadmissible). As shown above, the unambiguous language of the Agreement refutes Bryant's interpretation. In any event, the extrinsic evidence confirms, rather than negates, the plain meaning.

First, Bryant's proffered evidence is largely irrelevant. For example, he contends there is evidence that "Mattel did not ensure that employees had read the document, did not explain its current view" of the agreement, "and did not advise employees to seek the advice of counsel before signing the document." (Bryant Mem. 26:3-7). But he does not explain how his supposed failure to read the contract or consult counsel supports his interpretation of the scope of the term "inventions."

Similarly, Bryant argues that Mattel did not sufficiently "prevent" its employees from violating their obligations under the Inventions Agreement, id. at 26:8-14, and that later changes to the Agreement indicate Bryant's contract should be read more narrowly, id. at 26. Again, both issues are irrelevant to interpreting the Inventions Agreement. Whether Mattel took sufficient steps to monitor "independent creative efforts by its employees" does not aid in determining whether the Agreement covered Bratz works that, for purposes of this motion, he concedes he developed while employed by Mattel. Nor are later changes to contracts with other employees relevant. See, e.g., Bamery v. Greif Bd. Corp., 949 F. Supp. 523, 526 (N.D. Ohio 1996) ("The only . . . agreement to be considered by this Court is that agreement which was in force at the time of the alleged incident. Any subsequent change in the agreement[] . . . is irrelevant . . . .").

The extrinsic evidence that *does* bear on interpreting the contract confirms that Bryant knew and intended to assign inventions that included creative

copyrightable works.   It is undisputed Bryant was hired as an artist to create copyrightable designs, and that he did so.   Although he now contends that Mattel required him only to assign his patent rights should he ever create "a lightbulb or a robot" (Bryant Mem. at 22:9-10), both parties knew that Bryant was not being hired to produce lightbulbs or robots, but to produce designs for dolls, which are copyrightable.   Bryant's assignment of rights would have been pointless if it only applied to patentable works that he was not hired to produce.   <u>See</u> <u>Estate of</u> <u>Peterson</u>, 28 Cal. App. 4th 1742, 1753 n.3 (1994) ("A contract term should not be construed to render some of its provisions meaningless or irrelevant.").

Moreover, both Bryant and MGA consistently use the term "inventor" and "invention" to apply to toy designs, and Bryant's Bratz designs specifically. ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████[90]

Finally, the evidence shows Bryant actually understood his obligations to Mattel—and that his creative works were covered by the Agreement.[91]   First, when

---

[87]   CB AMF # 175. Further, Anna Rhee testified that Bryant personally described his work on Bratz as "inventing." Deposition of Anna Rhee, Feb. 3, 2005, at 204:3-4, Zeller Dec. Exh. 66.
[88]   CB AMF # 105.
[89]   Zeller Dec. Exh. 21 at 33:21-35:1.
[90]   CB AMF # 105.
[91]   Bryant was certainly capable of understanding his agreement. In 2001, he explained the assignment in his contract with MGA—which used at least as much "legalese" as his Mattel Inventions Agreement and included an assignment of Bryant's "inventions"—to a fellow designer in detail. CB AMF # 83.

Bryant was "subcontracting" for Mattel in 1998, he told his mother he could not sell sketches on the side because it would "interfere with [his] contract" with Mattel.[92] Second, Bryant's steadfast efforts to *conceal* his work on Bratz strongly suggest he knew Mattel rightfully owns it. It is undisputed that Bryant attempted to document that his drawings were created in 1998 to "protect" himself (by having his drawings notarized and described in a forged notary book).[93] It is undisputed that Bryant never told anyone at Mattel about his work on Bratz and never showed his Bratz drawings to Mattel.[94] And Bryant falsely told vendors whom he contacted for the Bratz project that he was no longer working for Mattel.[95] This concealment would not have occurred if Bryant did not think his Bratz work was outside the scope of the Inventions Agreement.[96]

## D.  Bryant 's Unconscionability Defense Has Been Rejected

Unconscionability is an affirmative defense that must be raised in the pleadings. See, e.g., Westlye v. Look Sports, Inc., 17 Cal. App. 4th 1715, 1736-41 (1993). Here, although Bryant initially pleaded unconscionability as a defense, he later stipulated he was abandoning it, and filed a Second Amended Reply to Mattel's

---

[92]  CB AMF # 82.
[93]  CB AMF # 152.
[94]  CB AMF # 72. As mentioned previously, Bryant claims Elise Cloonan, helped him on the pitch materials. But Cloonan did not recall ever seeing the drawings. CB AMF # 177.
[95]  CB AMF # 128.
[96]  Bryant also argues that the Inventions Agreement fails as a copyright assignment under the requirements of Section 204(a) of the Copyright Act. (Bryant Mem. at 34:18-36:12). "Section 204(a)'s 'requirement is not unduly burdensome. . . . The rule is really quite simple: If the copyright holder agrees to transfer ownership . . . that party must get the copyright holder to sign a piece of paper saying so. It doesn't have to be the Magna Carta; a one-line pro forma statement will do." Radio Television Espanola S.A. v. New World Entm't, Ltd., 183 F.3d 922, 927 (9th Cir. 1999) (quoting Effects Assocs., Inc. v. Cohen, 908 F.2d 555, 557 (9th Cir. 1990). Further, section 204(a) "necessitates neither protracted negotiations not substantial expense." Effects Assocs., 908 F.2d at 555. The Inventions Agreement clearly passes muster under these standards. Moreover, Bryant knowingly abandoned his Ninth Affirmative Defense that the assignment agreement was "vague and uncertain," Oct. 9, 2007, Stipulation and Order Regarding Carter Bryant's Amended Reply to Mattel's Counterclaims, at 1:18-21—essentially the same argument as he makes here under section 204(a), Proctor Dec., Exh. 3.

1  Counterclaims that did so.[97]   Bryant abandoned the defense following the Court's
2  July 18, 2006 Order rejecting it on the merits.  See July 18, 2006 Order at 14 ("It is
3  not surprising or overly harsh that Mattel would expect . . . that the works of its
4  design staff—created by Mattel's employees, using Mattel's resources, during time
5  for which Mattel paid the employee—be considered its property").  Bryant's current
6  motion brushes aside the Court's ruling in a footnote, asserting that the Court never
7  addressed whether the agreement would be "unconscionable as applied."  (Bryant
8  Mem. 33 n.19.)  But the Order suggests no such limitation, and in any event does
9  not negate Bryant's knowing withdrawal of the defense.

10      **E.      The Conflict of Interest Questionnaire Imposes Enforceable Duties**

11          Bryant first contends the Questionnaire is barred by the integration clause of
12  the Inventions Agreement.  Bryant Mem. 36:20-26.  But Bryant expressly agreed in
13  the Inventions Agreement to "fully comply with the Company's Conflict of Interest
14  Policy, as it may be amended from time to time."   The Conflict of Interest
15  Questionnaire,   which   Bryant   acknowledges   he   was   required   to   sign
16  contemporaneously with the Inventions Agreement, Bryant Mem. 36:19-20, simply
17  effectuates the referenced Conflict of Interest Policy by requiring him to inform
18  Mattel of conflicts arising in the future.  An integration clause obviously does not
19  bar the explicit inclusion by reference of terms in other documents.  See, e.g., Baker
20  v. Aubry, 216 Cal. App. 3d 1259, 1264 (1989).  Employment agreements routinely
21  incorporate various company policies not fully set forth within the agreement itself.

22          Bryant next asserts, without authority, that the Conflict Questionnaire is not
23  enforceable because it is "labeled a 'questionnaire,' not a 'contract' or an
24  'agreement.'" (Bryant Mem. at 37:__-__).  But "contract formation is not a matter of
25  form but substance; there are no magic words and no magic forms essential to the

26

---

27  [97]  Oct. 9, 2007, Stipulation and Order Regarding Carter Bryant's Amended Reply to
Mattel's Counterclaims, at 1:18-21, Proctor Dec., Exh. 3; Sept. 12, 2007, Carter Bryant's
28  Amended Reply to Mattel's Counterclaims, at 15-18, Proctor Dec. Exh.114.

creation of binding agreement."  <u>Roth v. Malson</u>, 67 Cal. App. 4th 552, 562 (1998). The plain language of the Questionnaire demonstrates an intent to create binding obligations. Directly above the signature line, the Questionnaire provides:  "I *agree* not to divulge any company information to unauthorized recipients.  I also *agree* to notify my superior immediately of any changes in my situation that would cause me to answer any of the above questions differently."[98]  This language unambiguously imposes contractual duties.

Finally, Bryant suggests Mattel could not have intended the Questionnaire to impose "forward-looking obligations" because "[n]o evidence suggests that Bryant was ever asked to sign a follow-up questionnaire."  (Bryant Mem. 37:18-21).  But Finally, Bryant suggests Mattel could not have intended the Questionnaire to impose "forward-looking obligations" because "[n]o evidence suggests that Bryant was ever asked to sign a follow-up questionnaire."  (Bryant Mem. 37:18-21).  But Bryant expressly agreed in the 1999 Questionnaire that he had a *continuing* duty to "notify my superior immediately of any changes in my situation . . . ."  This language refers to the future, and made "follow-up" questionnaires unnecessary.[99]

## II.  **MATTEL'S STATE LAW CLAIMS ARE TIMELY.**

### A.  **Defendants Do Not Prove By Undisputed Facts That Inquiry In 2001 Or 2002 Would Have Revealed Their Wrongdoing**

The Court need not even consider defendants' assertions that Mattel was on "inquiry notice."  Inquiry notice means that if a plaintiff had made an inquiry, it would have learned the facts essential to prove a claim.  Thus, it is not enough to have "notice," if an "inquiry" would not have revealed *actionable facts*.  And Rule 11 requires *facts*, not unverifiable suspicion.  <u>Fed. R. Civ. P.</u> 11.  <u>See generally</u> <u>Intermedics, Inc. v. Ventritex, Inc.</u>, 775 F. Supp. 1258, 1266 (N.D. Cal. 1991) ("We

---

[98]  CB AMF # 78.
[99]  Bryant also contends that even if the Conflict Questionnaire is valid, "it could transfer no rights in Bratz to Mattel."  (Bryant Mem. 37:26-27).  This is irrelevant because Mattel has not contended that Bryant assigned rights to Bratz in the Questionnaire.

cannot apply statute of limitations in a way that pressures litigants to file suits based merely on suspicions and fears. ...[S]uspicion and fear are not sufficient predicates for launching a lawsuit, and to file an action with no other basis would offend norms articulated in rules like Federal Rule of Civil Procedure 11.").   Nowhere do defendants explain what inquiry Mattel could have done that would have given it any good faith basis to sue earlier than it did.

**B.      MGA Does Not Present Undisputed Evidence Of The Date Any Claim Accrued**

**1.      A Claim Does Not Accrue Until All Elements Are Complete and a Plaintiff Is On Inquiry Notice**

Defendants quote a snippet of a case saying that "mere suspicion" suffices to trigger inquiry notice. (MGA Mem. 17 (quoting <u>Fox v. Ethicon Endo-Surgery, Inc</u>,. 35 Cal. 4th 797, 806 (2005)).  But they ignore limiting language emphasizing that the suspicion cannot be general or abstract.  The "suspicion" must relate <u>specifically</u> to the elements of the specific cause of action sued upon.  <u>Fox</u>, 35 Cal. 4th at 806, 808 (quoting <u>Norgart v. Upjohn Co.</u>, 21 Cal. 4th 383 (1999)).  Plaintiffs have a duty to investigate only "after becoming aware of an injury, and are charged with knowledge of the information that would have been revealed by such an investigation."  <u>Id</u>. at 808.  <u>See also</u> <u>Garamendi v. SDI Vendome S.A.</u>, 276 F. Supp. 2d 1030, 1043 (C.D. Cal. 2003) (plaintiff is "on notice" only when he has "'an awareness of sufficient facts to identify a particular cause of action.'") (citation omitted).

This oversight infects defendants' statute of limitations analysis.  They incorrectly frame the inquiry as "When did Mattel reasonably suspect it had suffered some injury relating to Bratz?", rather than "When did Mattel reasonably suspect that it had a claim to ownership of Bratz <u>based upon work that Bryant did while a Mattel employee</u>?"  The California Supreme Court has recognized that accrual of a cause of action is delayed when a plaintiff has "ignorance of a generic element of

[PUBLIC REDACTED] JOINT OPPOSITION

the cause of action." Fox, 35 Cal. 4th at 813. Here, the missing "generic element" of wrongdoing was Bryant's creation and sale of Bratz-related materials, and work for MGA, *while employed by Mattel*. Mattel was on notice of this missing "element" no earlier than November 24, 2003, when it received a copy of Bryant's employment agreement with MGA.[100]   This agreement, and specifically the dates of the agreement, triggered the investigation that led to Mattel's conclusion that Bryant had violated the Inventions Agreement and Conflict of Interest Questionnaire and the filing of this suit.[101]

Defendants argue that Mattel's claims accrued by February 2001 as a result of a number of "triggering events." MGA Mem. 17-18. But none of those events put Mattel on inquiry notice of the claim on which Mattel ultimately sued. At most, these so-called "triggering" events show that Mattel knew that Bryant, MGA and Larian were involved with Bratz. Those facts are not actionable.

### 2. Mattel Did Not Have Inquiry Notice of Bryant's Misconduct Prior to 2003.

#### (a) Factual Disputes Surround The Purported 2000-2001 Triggering Events.

Even accepting defendants' accounts of the triggering events as accurate, contrary evidence creates factual disputes that preclude summary judgment. In addition, those purported triggers, even when taken together, did not disclose to Mattel any wrongful conduct.

##### (i) Bryant's Resignation from Mattel

Defendants argue that Mattel's claims accrued October 2000 because Bryant announced "he was leaving to design dolls." MGA Mem. at 17. But Bryant testified at deposition that he had said he would *not* work for a competitor.[102]

---

[100]  MGA AMF # 127.
[101]  MGA AMF # 127.
[102]  MGA 0305916; CB AMF # 131.

[PUBLIC REDACTED] JOINT OPPOSITION

1  Moreover, even if he said he was going to design dolls, that hardly constitutes a

2  reasonable suspicion of unlawful activity.  Nor does it suggest that he had designed

3  dolls during his Mattel employment that he had already sold to a competitor.

**(ii)     Knowledge of Bryant's Supervisors/Co-Workers**

5      MGA asserts that Bryant's supervisors believed "he was going to a

6  competitor." Id. at 18.  The evidence contradicts that assertion.  Jill Nordquist,

7  Bryant's co-worker, had speculative suspicions that Bryant was going to a

8  competitor, but he assured her he was not.[103] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

11 ▮▮▮▮▮▮▮▮▮▮▮▮[104]   In other words, Bryant repeatedly lied to friends and

12 co-workers and now wants to exploit his deception.  He (and the MGA defendants)

13 petition the Court to conclude as a matter of law that if an employee successfully

14 conceals his true activity by falsehood, the employer must still sue him.

**(iii)     Perceptions Among Mattel's**

**Designers/Executives About Bratz**

17     MGA asserts that Mattel designers and executives believed after the New

18 York and Hong Kong toy fairs that "Bratz was copied from Mattel products." (MGA

19 Mem. 18).  Even assuming arguendo the truth of that assertion (it is not true[105]), it is

20 irrelevant—that is not the claim on which Mattel has sued.

**(iv)     Doll Development Timeline**

22     MGA asserts that Mattel's knowledge of how long it takes to develop a doll

23 shows that it must have known that Bryant had created Bratz at Mattel.  But MGA

24 itself has always denied that Bryant created Bratz at Mattel, and does so to this day,

25 so why Mattel "must have" known this is unclear.  Moreover, even according to

---

[103] CB AMF # 131; MGA AMF # 92
[104] CB AMF # 131.
[105] MGA AMF # 131, 157.

1    MGA's own experts there is no such bright line "doll development timeline."  For

2    example, MGA's expert Robert Tonner opines:

3    ███████████████████████████████████████

4    ██████████████████████████████████

5    ████████████████████████████████████

6    ██████████████████████████████████[106]

7    MGA's claim that Mattel should have known Bryant created Bratz at Mattel merely

8    because it was released at Toy Fair in 2001, and that Mattel was therefore on notice,

9    is wrong even according to its own experts.

10                    **(b)    Mattel's March 2002 Investigation Did Not Establish**

11                            **Notice.**

12           MGA argues as a fall-back that Mattel had notice as of March 2002 because it

13   launched an investigation into "MGA and Larian's involvement in Bryant's creation

14   and development of the BRATZ."  (MGA Mem. 19).   First, the argument is

15   factually wrong. Mattel's March 15, 2002 investigation involved only allegations

16   that Bratz may have been "plagiarized" from Mattel designs known as "Toon

17   Teens." The investigation was to determine whether someone at MGA had accessed

18   Mattel's Toon Teens drawings.[107]  Based on the scope of the investigation, Mattel

19   was not looking for and did not discover that Bryant created Bratz while employed

20   by Mattel.[108]  Nor do defendants suggest that the investigation disclosed, or could

21   have disclosed, any evidence that he did so.  Notice of those facts came only when

22   Mattel received a copy of the MGA-Bryant contract in November 2003.[109]   The

23   2002 investigation gave no notice of the elements of the specific causes of action

24   Mattel sued upon. Fox, 35 Cal. 4th at 806, 808.

25

26   -----------------------------------------------

     [106]   Expert Report of Robert Tonner dated February 11, 2008, at 16.
27   [107]   MGA AMF # 112, 113, 114.
     [108]   MGA AMF # 114.
28   [109]   MGA AMF # 127.

Defendants also claim that an anonymous letter triggered inquiry notice in 2002. Id. at 10-11. It did not. On August 5, 2002, Mattel's CEO Robert Eckert received a letter suggesting that Bryant created Bratz and sold his concept to MGA while a Mattel employee. It was one of many anonymous letters that Mr. Eckert receives as CEO of a public company.[110] The letter was passed along to Mattel's Worldwide Security, Richard De Anda. He looked at it and determined that because the letter was anonymous and had no indicators of identity on which he could follow up to assess reliability. In addition, he understood the letter to refer, albeit inaccurately, to the pending investigation into whether Bratz infringed Mattel's rights in Toon Teens.[111] Mr. De Anda never understood the letter to suggest that Bryant secretly created Bratz while at Mattel.[112]

Anonymous tips are not sufficient to justify a lawsuit. As this Court observed, referring to MGA's prior counsel, "I certainly know that O'Melveny & Myers would not file a complaint based on an anonymous letter from somebody suggesting that there is a copyright infringement."[113] United States v. Tri-State Ins. Co., 946 F.2d 581 (8th Cir. 1991), is on point. There, an anonymous tipster provided a "penciled-over financial statement" suggesting that the insured had misstated to the United States its "net worth, its solvency, and the value of the grain on hand." Id. at 582. The Eighth Circuit held that an anonymous tip "does not put a person on sufficient notice of the facts indicated in the tip to trigger the statute of limitations *until a reasonably prompt investigation either identifies the source as probably reliable or shows the information as probably accurate*." Id. (emphasis added). The Eighth Circuit, like this Court, went on to acknowledge that filing a suit

---

[110] (Id.).
[111] MGA AMF # 125.
[112] MGA AMF # 113, 114.
[113] January 8, 2007 Hearing Tr. at 16:24-17:2, Zeller Dec. Ex. 7; see Court's Order Regarding Mattel's Motion for Leave to Amend, dated Jan. 11, 2007, Proctor Dec., Exh. 95.

1   based on an unverified source could subject counsel to serious Rule 11 sanctions.

2   Id. at 583.

3       Hindsight has revealed that the letter was accurate (at least on one

4   interpretation of it), but only years later, when Mattel obtained concrete evidence of

5   Bryant's wrongs was this revealed.  It does not follow that the anonymous letter—

6   which independently was a dead end—was notice at the time.  <u>Tri-State Ins.</u>

7   addressed that exact issue.  The anonymous penciled-over financial statement was

8   accurate, but the Eighth Circuit rejected the argument that it provided notice.  It

9   found notice only after the plaintiff possessed "sufficient facts to verify the probably

10  accuracy of the information" received anonymously.  <u>Id</u>.  Here, Mattel did not have

11  that information until it obtained Bryant's contract with MGA in Hong Kong in

12  November 2003.[114]

13          (c)    <u>**Mattel Was Not on Inquiry Notice of MGA and**</u>

14                 <u>**Larian's Misconduct Until November 4, 2004.**</u>

15      Mattel had no reason to know that MGA or Larian had engaged in any

16  actionable conduct with Bryant until Bryant's deposition on November 4, 2004.

17  Mattel discovered the crucial facts of "wrongdoing, causation and harm," <u>Fox</u>, 35

18  Cal. 4th at 806 (quoting <u>Norgart</u>, 21 Cal. 4th at 397), when Bryant admitted that

19  MGA and Larian were fully aware of his employment relationship with Mattel when

20  they put him under contract and bought his Bratz-related drawings and designs.[115]

21  Only then did Mattel have reasonable suspicion of actionable wrongdoing.  <u>See</u>

22  <u>Hobson</u> v. Wilson, 737 F.2d 1, 36 (D.C.Cir. 1984) ("[S]imply because a person

23  knows he has been injured by one person cannot reasonably mean he should be held

24

---

25  [114]   MGA AMF # 127.  For the same reasons, the Wall Street Journal article in July
2003 did not provide notice.  That article suggested that Bryant had created Bratz.  But

26  other, earlier articles stated that Larian was the doll's creator.  CB AMF # 140.  Notably,
the article did not state that Bryant conceived of Bratz or created Bratz-related materials

27  during his Mattel tenure, and noted that Bryant "didn't work on the line that Mattel
scrapped...."

28  [115]   MGA MF # 13.

1  to know of every other participant."); <u>Fitzgerald v. Seamans</u>, 553 F.2d 220, 229

2  (D.C. Cir. 1977) (plaintiff had reason to know of alleged misconduct by Air Force

3  officials within the applicable period but not of involvement of a White House

4  official until significantly later).   After Bryant was deposed, Mattel timely sought

5  leave to amend its Complaint to formally name MGA and Larian as defendants

6  (although, as discussed below, MGA was already a party since it had intervened).

### 3.    The Statute of Limitations Was Tolled Due to Defendants' Fraudulent Concealment.

9        Defendants sought actively to conceal Bryant's involvement in Bratz while

10  employed at Mattel, as well as MGA and Larian's culpability, and were successful in

11  doing so.  (<u>See supra</u> at 9-10; Mattel's Motion at 46).  Defendants' pattern of

12  concealment has two effects.  First, it tolls the limitations period on all claims,

13  including those as to which the discovery rule may not apply <u>See</u> <u>Snow v. A.H.</u>

14  <u>Robins Company</u>, 165 Cal.App.3d 120, 133, 211 Cal. Rptr. 271 (Cal. App. 1985)

15  (applying discovery rule to fraudulent concealment and misrepresentation claims

16  because defendant falsely concealed the true pregnancy rates associated with the

17  IUD, and thus "excuse[d] any greater diligence on [plaintiff's] part."); <u>Grisham v.</u>

18  <u>Philip Morris U.S.A., Inc.</u>, 40 Cal.4th 623 (2007) ("[a] defendant's fraud in

19  concealing a cause of action against him will toll the statute of limitations.").

20        In <u>April Enterprises, Inc. v. KTTV</u>, 147 Cal. App. 3d 805 (1983), the court

21  applied the discovery rule to a breach of contract claim where the defendant

22  destroyed tapes of a television show while the tapes were in its custody and control.

23  The court held that "the discovery rule may be applied to breaches which can be,

24  and are, committed in secret, and moreover, where the harm flowing from those

25  breaches will not be reasonably discoverable by plaintiffs until a future time." <u>Id.</u> at

26  832.  The court noted that "plaintiffs should not suffer where circumstances prevent

27  them from knowing they have been harmed. And often this is accompanied by the

28

1  corollary notion that defendants should not be allowed to knowingly profit from

2  their injuree's ignorance." Id. at 831.

3      Second, fraudulent concealment tolls the statute of limitations *even where the*

4  *plaintiff would have inquiry notice*.  "[M]ere inquiry notice will not necessarily end

5  a period of equitable tolling arising out of the defendant's fraudulent concealment.

6  When intentional concealment tolls a statute of limitations, something closer to

7  actual notice than mere inquiry notice is required to end the tolling period.  For

8  example, . . . if a plaintiff suspects that she has been wronged but does not know the

9  specific facts that constitute the wrong, the statute may be tolled until she learns of

10  those facts if the defendant takes steps to conceal them.  Again, this is true even if

11  the plaintiff is already on inquiry notice as to her claim."  Garamendi v. SDI

12  Vendome S.A., 276 F. Supp. 2d 1030, 1043 (C.D. Cal. 2003) (citations omitted).

13  The purpose is of this rule is "to disarm a defendant who, by his own deception, has

14  caused a claim to become stale and a plaintiff dilatory."  Regents of University of

15  California v. Superior Court, 20 Cal. 4th 509, 533 (1990).

16      Defendants concealment of their wrong from Mattel is indisputable.  Bryant

17  never revealed Bratz to anyone at Mattel.[116]  He did not even tell his roommate,

18  Elise Cloonan.[117]  Bryant wrote "1998" on some of the Bratz drawings that he

19  admitted to creating in 1999.[118]  A false entry was made in a notary book indicating

20  that certain drawings notarized in August 1999 were "From 1998 Missouri."[119]

21  When Bryant left Mattel, he expressly told Mattel supervisors and co-workers that

22  he was *not* leaving to work for a competitor,[120] and never told anyone at Mattel that

23

24

25

   [116] CB AMF # 72.
26     [117] CB AMF # 60.
   [118] CB MF # 90-92, MGA AMF # 86.
27     [119] CB AMF # 60.
   [120] CB AMF # 131. .  Had Mattel known he was going to a competitor, it would have
28  followed its established policy of terminating him immediately. CB AMF # 130.

[PUBLIC REDACTED] JOINT OPPOSITION

1  he was leaving for MGA or to work on Bratz, or that he had worked on Bratz or for

2  MGA previously.[121]

3      The MGA Defendants concealed Bryant's role on Bratz for years after he left

4  Mattel.  Both Isaac Larian and Paula Garcia gave strict instructions that no one at

5  MGA was to discuss Bryant's involvement with Bratz outside of the company.[122]

6  ██████████████████████████████████████████████████████████████████

7  ██████████████████████████████████████████████████████████████████

8  ███████████████████████████████████[123]███████████████████████████

9  ██████████████████████████████████████████████████████████████████

10 █████████████████████████████████████[124]

11 ███████████████████████████████████[125]  Larian himself spread false

12 information about Bratz's creation to conceal Bryant, describing himself or his son

13 as the creator of Bratz.[126]  MGA effectively has admitted this pattern of concealment

14 by conceding that no public statement recognized Bryant as Bratz's creator until a

15 July 18, 2003 Wall Street Journal article.[127]

16      Defendants' fraudulent conduct delayed accrual of all of Mattel's causes of

17 action.   See Bernson v. Browning-Ferris Indus., 7 Cal. 4th 926, 931 (1994)

18 (reversing summary judgment because "defendant's fraud in concealing a cause of

19 action against him tolls the applicable statute of limitations"); see April Enters., 147

20 Cal. App. 3d at 832 (1983) ("discovery rule protects those who are ignorant of their

21 cause of action through no fault of their own").[128]

22

---

23  [121] CB AMF # 72.
    [122] CB AMF # 135.
    [123] CB AMF # 134.
24  [124] CB AMF 136.
    [125] CB AMF # 138.
25  [126] CB AMF #139.
    [127] CB AMF #140.
26  [128] Jolly v. Eli Lilly & Co., 44 Cal.3d 1103 (1988), does not disturb these holdings.
    The plaintiff alleged injury caused by her mother's ingestion of the synthetic drug DES
27  during pregnancy.  See id. at 1107.   However, undisputed evidence showed that the
    plaintiff had admitted over a year before she filed her suit that she believed that someone
28  "had done something wrong to her concerning DES, that it was a defective drug and that
           (footnote continued)

## 4.   The Stay of Proceedings Tolled the Statute of Limitations.

The Court's year-long stay of proceedings while the Ninth Circuit considered an interlocutory appeal tolled the limitations period for Mattel's counterclaims for the duration of the stay, May 20, 2005 until May 16, 2006.[129]  In Castle v. Wells Fargo Financial, Inc., 2007 WL 1105118 (N.D. Cal. 2007), the plaintiffs' putative class action was stayed on March 2, 2007, pending the California Supreme Court's review of a related case.  When asked to rule on whether the stay affected the limitations period, the district court ruled that the "statute of limitations should be equitably tolled for all putative class members ... from March 2, 2007 until the stay is lifted." Id. at *1; see also Selph v. Nelson, Reabe & Synder, Inc., 966 F.2d 411, 413 (8th Cir. 1992) ("A stay tolls the statute of limitations...").[130]  Stays have also been held to toll the statute of limitations in cases involving leave to add claims against new defendants.  Javier H. v. Garcia-Botello, 239 F.R.D. 342, 347-48 (W.D.N.Y. 2006) (permitting leave to add a RICO claim against new defendants and finding that the claim was timely because the "[t]he statute of limitations was equitably tolled during the stay of discovery").

This stay, which defendants ignore, extends by a year the time that Mattel had to assert amended Phase One claims against Bryant (copyright infringement), MGA, MGA Hong Kong, and Isaac Larian (copyright infringement, intentional interference with contract, aiding/abetting breach of fiduciary duty, statutory unfair competition, and common law unfair competition).  Setting aside whether each claim relates back to Mattel's 2004 complaint (discussed below), the 362-day stay

---

she should be compensated." Id. at 1112. Here, Mattel made no such admissions and had no knowledge of Bryant's or MGA's wrongdoing until 2003 and 2004, respectively.

[129]   Minute Order, dated May 20, 2005, Zeller Dec., Exh. 111; Minute Order, dated May 16, 2006, Zeller Dec., Exh. 112.

[130]   Likewise, in Ko v. Lin, 2002 WL 830863 (Cal. Ct. App. 2002), the case was stayed for four months while the defendants sought to disqualify plaintiffs' attorney. See id. at *2-3.  Defendants cross-complained and plaintiff challenged the timeliness of the cross-claims.  In determining whether the cross-claims were timely, the court tolled the limitations period for the four-month stay.

07209/2445047.1

[PUBLIC REDACTED] JOINT OPPOSITION

means that these claims must be treated as having been filed on November 24, 2005, almost a year before Mattel sought leave to amend them on November 20, 2006. Given that Mattel had notice of its claims against Bryant only as of November 24, 2003,[131] and of its claims against the MGA defendants and Larian only as of November 4, 2004,[132] the claims with two-year statutes of limitations (aiding/abetting breach of fiduciary duty and duty of loyalty and interference with contract) are timely—those claims had to be filed on or before November 4, 2006, and here they are treated as having been filed on November 24, 2005. *A fortiori* the other claims, which have statutes of limitations longer than two years, are also timely.

## C.    As The Court Correctly Held, Mattel's Phase One Claims Added In 2006 Relate Back To The 2004 Complaint And Are Timely.

On several occasions, defendants have challenged the timeliness of Mattel's amended claims. The Court rejected those challenges before, and MGA offers no reason why it should not do so again.

Mattel filed its original complaint against Bryant and ten Doe defendants on April 27, 2004 (the "'04 Action"). It alleged state-law claims for breach of contract, breach of fiduciary duty, breach of duty of loyalty, unjust enrichment, and conversion. Mattel based those claims on the allegations that Bryant "had secretly aided, assisted, and worked for a Mattel competitor, including without limitation by entering into the agreement with the competitor, during the time Bryant was employed by Mattel ... and was being paid by Mattel as a product designer."[133] Mattel further alleged that "Bryant and other defendants converted, misappropriated and misused Mattel property ...."[134]

---

[131] MGA AMF # 127.
[132] MGA MF # 13.
[133] Complaint, ¶ 3, 4, 12, Proctor Dec., Exh. 91.
[134] Complaint, ¶ 12. Proctor Dec., Exh. 91.

On December 7, 2004, MGA Entertainment, Inc. ("MGA") intervened as a defendant because it claimed to have "a significant protectable interest relating to the subject matter of the action."[135]   On the same day, MGA answered the complaint, denying most of its substantive allegations and asserting a litany of affirmative defenses.[136]   MGA also contended that Mattel's original conversion claim was really "a copyright claim under federal law" and described this case as a "copyright action."[137]   MGA has been an active participant in the litigation since then.

On November 20, 2006, Mattel sought leave to file an amended complaint that added, inter alia, (a) claims of copyright infringement and other related state law claims against the existing parties to the action, Bryant and MGA; and (b) the same claims against new parties, MGA Hong Kong, and Isaac Larian, substituting them for the Doe defendants named in Mattel's original complaint.   Defendants opposed the amendment, arguing that Mattel's copyright infringement and contract-interference claims were time-barred, and that its substitution of MGA Hong Kong and Larian was improper because Mattel previously knew their identities.

Although the Court considered and rejected both of these arguments, defendants seek to resuscitate them now.   In its Order dated January 12, 2007, the Court found that both the copyright infringement claims and contract-interference claims arise from the same general set of facts as Mattel's original 2004 complaint, and therefore relate back to that complaint.   (Order, at 13:27-28 (the copyright claim relates back to "the same conduct or transaction contained in the original complaint, filed in April 2004")); (id., at 14:16-17, 15:1 ("through Rule 15(c) Mattel's intentional interference claim would relate back to when it filed its original complaint in April 2004, well before the statute of limitations expired")).

---

[135]   Stipulation Permitting MGA to Intervene as a Party to this Action, 1:5-9, Zeller Dec., Exh. 122.
[136]   MGA's Answer in Case No. CV 04-9059, Zeller Dec., Exh. 123.
[137]   Id.

[PUBLIC REDACTED] JOINT OPPOSITION

Defendants themselves recognized that the new claims arose from the same set of facts as the original claims.[138]   Moreover, the Court noted that MGA and Bryant could hardly claim to be prejudiced by the amendment:  "it is readily apparent . . . that both [MGA and Bryant] have been aware for some time of the factual predicates now underlying Mattel's copyright claims and intentional interference claim."  (Order, at 9:11-13).   The Court also found that substitution of the Doe defendants was proper because "[a]s made clear by Mattel, California law allows a plaintiff to substitute in a defendant for a 'Doe' if the plaintiff was ignorant of that defendant's . . . basis for liability at the time the [original] complaint was filed." (Order, at 15 fn. 5).

In the interest of orderly scheduling, the Court directed that Mattel's new claims should be asserted as counterclaims to MGA's complaint against Mattel, filed in April 2005, rather than added to Mattel's 2004 complaint.  However, the Court made clear that it had not intended that Mattel was to be prejudiced thereby.  It stated: "None of the substantive concerns raised by MGA and Bryant to the present amended complaint, e.g., statutes of limitations, would appear to be affected if the new claims and defendants were brought as defenses and counterclaims in the 05-2727 case as opposed to the 04-9059 one."  (Order on Motion to Amend, p. 22:8-12.).

Defendants concede that Mattel's claims "survive . . . if they relate back to the '04 Complaint," MGA Mot., 29:21-22, which this Court has already held they do.

---

[138]   In its unsuccessful opposition to Mattel's motion to amend, MGA contended that the allegations in Mattel's original Complaint "underlie the copyright infringement and intentional interference contract claims Mattel now seeks to allege against MGA, Mr. Larian and Bryant" and that "Mattel's present theory of copyright infringement is not new at all." (MGA Opp. to Mtn. to Amend, at 12:7-9, 9:2-4).  MGA also conceded that the interference claim arises out of the same operative events set forth in Mattel's original Complaint.  (Id. at 12:7-9).

1   The Court should revisit this decision only if defendants can show new material

2   facts or new controlling law. <u>See</u> <u>Local Rule</u> 7-18. They cannot.[139]

### 1.   Mattel's Amended Claims Against Bryant Relate Back to the April 2004 Complaint.

5         California's rules on relation back govern Mattel's amended state law claims.

6   <u>See</u> Advisory Committee Notes to 1991 Amendment ("if the controlling body of

7   limitations law . . . affords a more forgiving principle of relation back than the one

8   provided in . . . rule [15(c)], it should be available to save the claim"); <u>Motley v.

9   Parks</u>, 198 F.R.D. 532, 534 (C.D. Cal. 2000) ("Because California law regarding the

10   relation back of claims is more liberal than the standard set forth in <u>Rule</u> 15(c)(3),

11   <u>Rule</u> 15(c)(1) applies."). California favors "liberality in the amendment of pleadings

12   to encourage litigating causes on their merits." <u>Myers v. Phillip Morris, Inc.</u>, 2003

13   WL 21756086 at *4 (E.D. Cal. 2003) (citation omitted).

14         California's "relation-back doctrine requires that the amended complaint must

15   (1) rest on the same general set of facts, (2) involve the same injury, and (3) refer to

16   the same instrumentality, as the original one." <u>Norgart v. Upjohn Co.</u>, 21 Cal. 4th

17   383, 408-09 (1999) (citations and emphasis omitted); <u>see</u> <u>also</u> <u>Fed. R. Civ. P.</u>

18   15(c)(1)(B) (claim relates back if it "arose out of the conduct, transaction, or

19   occurrence set out—or attempted to be set out—in the original pleading").

---

[139] This Court also addressed the issue of the date of accrual in its order on defendants' unsuccessful motion for terminating sanctions. There, defendants argued that Mattel was on notice of its claims by 2002. Court's Order dated August 27, 2007, Proctor Dec., Exh. 94. As it had before, the Court rejected this contention, holding:

> [T]he Court determines that November 24, 2003, marks the date when litigation between Mattel and Bryant became more than merely speculative and in fact became probable. . . . ***[T]here was no evidence presented to the Court that Mattel should have known it had a viable claim against Bryant before November 2003.***

Court's Order dated August 27, 2007, Proctor Dec., Exh. 94. This is the standard that applies now. Unless Mattel should have known it had a viable claim, its claims could not have accrued.

1    Here, all the Phase One claims against Bryant relate back to the filing date of

2 the original complaint because they arise from the same common transaction or

3 occurrence as Mattel's other claims—namely, Bryant's clandestine work on Bratz for

4 MGA while employed by Mattel.  Ample precedent supports this conclusion.  See,

5 e.g., Martel v. Trilogy Ltd., 872 F.2d 322, 327 (9th Cir. 1989) (new claim related

6 back because it arose from the same transaction and occurrence as original claim);

7 Grudt v. City of Los Angeles, 2 Cal. 3d 575, 583-84 (1970) (amended complaint

8 related back to filing of original complaint where new claim added new theory of

9 recovery based on same acts and same injury alleged in original pleading);

10 Lamont v. Wolfe, 142 Cal.App.3d 375, 379 (1983) (similar).  Bryant says nothing

11 about this precedent.

### 2.    Mattel's Phase One Claims Against MGA Relate Back to the April 2004 Complaint.

14    The analysis is the same for Mattel's Phase One claims against MGA.

15 Because MGA intervened in the '04 Action as a defendant, it became a party to that

16 action for all purposes.

17    On December 7, 2004, MGA intervened as a defendant pursuant to Fed. R.

18 Civ. P. 24(a)(2), claiming to have a "significantly protectable interest relating to the

19 subject matter of the action."[140]  The same day, MGA answered Mattel's

20 complaint.[141]  From the outset, MGA participated in all phases of the litigation

21 including discovery, briefing, and motion practice, and attended all court hearings.

22 It acted in all respects as a full party to this action.  It never once claimed to seek

23 conditions from the court on its intervention. Now, it claims it intervened purely as a

---

[140]   See Stipulation to Intervene filed Dec. 7, 2004; Defendants' Supplemental Brief in Opposition to Plaintiff Mattel's Motion to Remand dated Jan 10, 2005 7-8; Bryant and MGA's Brief in Response to Court's Questions Regarding Rules 24 and 19B) in Connection with Plaintiff Mattel's Motion to Remand, dated Feb 7, 2005 at 1-8.
[141]   MGA's Answer, Zeller Dec., Exh. 123.

[PUBLIC REDACTED] JOINT OPPOSITION

1  procedural matter and that Mattel's claims against it therefore cannot relate back to

2  the April 2004 Complaint.

3       MGA's argument is specious.  It is well-settled that, once a party intervenes

4  under Fed. R. Civ. P. 24(a)(2), it takes on the status of a full party to the action.  See

5  U. S. v. Oregon, 657 F.2d 1009, 1014 (9th Cir. 1981) (intervenors under Fed. R.

6  Civ. P. 24(a)(2), enter the suit with the status of original parties and are fully bound

7  by all court orders); see also Northeast Clackamas Co. Elec. Coop., Inc. v

8  Continental Gas Co., 221 F2d 329, 332-33 (9th Cir. 1955) (intervenor has the right

9  to conduct discovery, assert counterclaims against the original parties, participate at

10  trial, and appeal); Brown v. Demco Inc., 792 F.2d 478, 480 (5th Cir. 1986) (if a

11  motion to intervene is granted, the intervenor is treated as if it were an original party

12  and  has  equal  standing  with  the  original  parties).   With  rights  come

13  responsibilities.  By successfully intervening, MGA has made itself subject to

14  complete adjudication of all issues in the litigation between itself and Mattel. Id.

15       Mattel's Phase One claims against MGA, like its claims against Bryant

16  himself, therefore relate back to the April 2004 complaint.  Because all the claims

17  against MGA arise out of the same underlying misconduct (Bryant's work on Bratz

18  during his Mattel tenure) as do Mattel's original claims against Bryant, they fully

19  satisfy the "transactional" requirements of both federal and state law governing

20  relation back.[142]

21       **3.**     **Mattel's Phase One Claims Against the Other Defendants**

22            **Also Relate Back to the April 2004 Complaint.**

23       Under California's relation back doctrine, the claims against the Doe

24  defendants relate back to the date of the original complaint, as long as (1) they are

25

26  [142] At the very least, the claims against MGA relate back to the date of MGA's intervention, December 7, 2004.  Since, as shown above, Mattel lacked inquiry notice prior
27  to November 24, 2003, even those claims with two-year statutes of limitations are timely because they needed to be filed only before November 24, 2005.

28

based on the same general set of facts as the original claims, and (2) Mattel's failure to name the Doe defendant by name was the result of Mattel's ignorance as to the basis for the defendants' liability at the time the lawsuit was originally filed. <u>See</u>, <u>e.g.</u>, <u>Smeltzley v. Nicholson Mfg. Co.</u>, 18 Cal. 3d 932, 939-40 (1977); <u>Austin v. Mass. Bonding and Ins. Co.</u>, 56 Cal. 2d 596, 600 (1961). Relation back in this context means that, if a defendant was named as a Doe, the original complaint is treated as the filing date and it does not matter if the statute of limitations expired before the plaintiff substituted a named party for that Doe. <u>See Sobeck & Assocs., Inc. v. B & R Investments</u>, 215 Cal. App. 3d 861, 869-70 (1989).[143]

Here, the Court held—and defendants cannot credibly dispute—that Mattel's counterclaims against MGA Hong Kong and Larian arise from the same general set of facts as the claims against Bryant.[144] The original complaint alleged that Doe defendants assisted Bryant in violating his contractual, common law, and fiduciary obligations to Mattel by working for a Mattel competitor while remaining a Mattel employee, and misappropriating Mattel's property. (Complaint ¶¶ 3, 4, 12). The amended claims allege additional facts showing that the MGA defendants were complicit in that misconduct. The amended and supplemental Phase One claims are based on the same general set of facts as the original claims.

Defendants assert that relation back is nonetheless improper because "there was no mistake in identity of either MGA or Larian at the time Mattel filed its '04 Complaint nor was there lack of notice as to their involvement in the development of Bratz . . ." (MGA Mem. at 33:3-5). This is the same argument that MGA made

---

[143]   Doe defendants must be named and served within three years of commencement of the action. <u>Cal. Code Civ. Proc.</u> § 583.210(a). Here, Mattel moved to amend in November 2006, less than three years after the commencement of the 2004 action.

[144]   As set forth above, MGA intervened to become a defendant in the '04 Action almost two years before Mattel moved to amend the complaint. Therefore, it was not a true "Doe" when Mattel moved to amend. Mattel uses the term "MGA defendants" for the Court's convenience. Whether considered as a defendant in its own name or a Doe defendant, MGA has no basis to argue that it was unfairly prejudiced, or not on notice, as to the claims against it, all of which are timely.

07209/2445047.1

1  in its opposition to Mattel's motion to amend.  (See MGA Opp., 20:17-22:17)

2  (arguing leave to amend should be denied because "Mattel [cannot] credibly claim

3  that it was unaware of the alleged wrongdoing of which it accuses MGA and

4  Mr. Larian now").  The Court already considered and rejected this argument.[145]

5       As discussed above, mere knowledge of MGA's "involvement in the

6  development of Bratz" is wholly irrelevant.  There is no evidence, and certainly no

7  undisputed evidence, that Mattel knew on April 27, 2004 that the MGA defendants

8  had actively participated in Bryant's wrongdoing.  As recognized in General Motors

9  Corp. v. Superior Court, 48 Cal. App. 4th  80, 593-94 (1996), even where the

10 plaintiff knows the existence and identity of the defendant, "the plaintiff is 'ignorant'

11 within the meaning of the statute if he lacks knowledge of that person's connection

12 with the case or with his injuries."  See also Fuller v. Tucker, 84 Cal. App. 4th 1163,

13 1170 (2000) ("The [Doe statute's] phrase 'ignorant of the name of a defendant' is

14 broadly interpreted to mean not only ignorant of the defendant's identity, but also

15 ignorant of the facts giving rise to a cause of action against that defendant.").

16 Where, as here, "a lawsuit is initiated within the applicable period of limitations . . .

17 and the plaintiff has complied with section 474 by alleging the existence of

18 unknown additional defendants, the relevant inquiry is *what facts the plaintiff*

---

[145] As the Court held:

> MGA also argues that Mattel's effort to substitute MGA and its CEO, Isaac Larian, for the "Doe" defendants listed in its original complaint is improper because Mattel knew of their identity when it filed the original complain. The argument is misplaced.  As made clear by Mattel, California law allows to substitute in a defendant for a "Doe" if the plaintiff was ignorant of that defendant's . . . basis for liability at the time the complaint was filed. [citation] . . . MGA notes that the original complaint spoke of Bryant working for one of Mattel's competitors and of that employee's theft of Mattel's intellectual property before leaving to work for that competitor.  At most, all this shows is that Mattel knew that Bryant went to work for MGA, not that MGA or Mr. Larian encouraged Bryant's alleged unlawful behavior recited in the original complaint.

Order 15-16.  Nothing has changed now.

*actually knew* at the time the original complaint was filed." General Motors, 48 Cal. App. at 588 (emphasis in original). The answer here is that Mattel did not *know* of the MGA defendants' knowing involvement in Bryant's wrongdoing in April 2004.[146]  Accordingly, as the Court ruled previously, all of Mattel's Phase One state-law claims relate back to the original Complaint, and are timely.

### 4.    Defendants' Assertion That Mattel's Claims Relate Back to the '05 Action Misstates the Court's Order.

Defendants concede that the Court held that "Mattel's claims against MGA and Larian could relate back to the '04 Complaint . . . as arising 'out of the same conduct or transaction' contained in the '04 Complaint." MGA Mot, at 16:17-18. They also acknowledge that the Court directed the amendment to proceed as counterclaims in the '05 Action only because doing so served "judicial economy considerations." (Id. at 16:14). Nonetheless, defendants assert that Mattel's claims relate back to MGA's complaint or Mattel's answer in the '05 Action, and not Mattel's complaint in the '04 Action. (See, e.g., id. at 27:28; 28:28). Defendants are incorrect.

First, there is no evidence that, by instructing Mattel to amend in the form of counterclaims in the '05 action, the Court intended to deprive Mattel of eleven months of time to file its claims. To the contrary, the Court expressly contemplated relation back to the '04 Action.[147]  (Order at 13:26-14:1) ("By MGA's own admission Mattel's copyright claim arises out of the same conduct or transaction *contained in the original complaint filed in April, 2004*, well within the applicable limitations period.") (emphasis added). The Court allowed amendment in the context of the '05 Action because it was presented with an "amended complaint

---

[146]    Defendants bear the burden of proof on the issue of actual knowledge. See Breceda v. Gamsby, 267 Cal. App. 2d 167, 179 (1968) ("No evidence was produced to prove or from which any reasonable inference could be drawn that plaintiff was aware earlier of facts not pleaded and not disclosed. Gamsby had the burden of proving such awareness if it existed.").

[147]    Order, dated Jan. 11, 2007 at 13:21-14:1, Proctor Dec., Exh. 95.

[PUBLIC REDACTED] JOINT OPPOSITION

1   [that] adds five more defendants and nine new legal claims, alleging a wide range of

2   commercial disputes between rival doll makers that spans three countries." (Order,

3   4:8-10).   These additional claims and defendants pertain largely to Phase Two.

4   Defendants' assertion that Mattel's Phase One claims relate to pleadings in the '05

5   Action is inconsistent with the Court's stated intent to streamline the litigation

6   without sacrificing the parties' substantive rights.

7       Second, amended Phase One claims logically relate back to the '04 Complaint

8   rather than any pleading in the '05 Action.   The amended Phase One claims share a

9   common nucleus of facts with the '04 Action (which addresses issues relating to the

10  ownership of Bratz based upon Bryant's work on Bratz during his Mattel tenure),

11  not MGA's claims or Mattel's answer in the '05 Action.   Not surprisingly, the

12  suggestion (by Bryant) that led to this Court's direction to file the claims as

13  counterclaims in the '05 Action extended only to the proposed additional Phase Two

14  claims of RICO violations and trade secret theft.   Neither Bryant nor the MGA

15  defendants asked that Mattel's aiding and abetting, copyright infringement, or

16  contract-interference claims be alleged as counterclaims in the '05 Action.[148]

17      Finally, an interpretation of the Court's order that would deprive Mattel of at

18  least eleven months for statute of limitations purposes would violate the Rules

19  Enabling Act.   As noted, the Court's decision to allow amendment in the form of

20  counterclaims, rather than amendment of the Mattel v. Bryant complaint, was based

21  solely on case management concerns.   The Court's discretion to manage its docket in

22  the most efficient manner arises from Fed. R. Civ. P. 16, which provides a

23  procedural mechanism for case management by the district courts.   The Rules

24  Enabling Act, however, states that rules of procedure "shall not abridge, enlarge or

25

26  [148]   Defendants' attempted distinction between the '04 and 05 Actions with respect to
    relation back is also contrary to the Court's consolidation order. The Court had previously

27  ordered that Case No. "05-02727 [i.e., the '05 Action] be CLOSED by the clerk,"
    consolidated that with the earlier filed action, and that "that all further documents and

28  proceedings occur under Bryant v. Mattel, 04-09049 SGL." See June 19, 2006 Order.

1  modify any substantive right."   28 U.S.C. § 2072(b); cf. Stacey v. Charles J.

2  Rogers, Inc., 756 F.2d 440, 442 (6th Cir. 1985) (consolidation is "a matter of

3  convenience and economy in administration, but does not . . . change the rights of

4  the parties").   Whether the statute of limitations bars Mattel's claims indisputably

5  implicates Mattel's fundamental substantive rights.  See, e.g., Guaranty Trust Co. of

6  N.Y. v. York, 326 U.S. 99, 109-12 (1945) (applicability of state's statute of

7  limitations implicated matters of substance, not procedure).   Accordingly, the

8  Court's decision to permit Mattel's amended claims to proceed as counterclaims in

9  the '05 Action cannot prejudice Mattel's substantive right to pursue these claims.

10         **D.     Mattel's Claims Are Timely.**

11        Defendants include a claim by claim analysis purporting to show the

12  untimeliness of Mattel's claims.  The analysis is erroneous.

13              **1.     The Intentional Interference Claim Is Timely.**

14        Defendants argue that that claims for intentional interference with contract

15  accrue upon breach of the contract.  MGA Mot. at 20-21.  But this principle is

16  inoperative where, as here, the plaintiff, as a result of defendants' fraudulent

17  concealment, hid both the evidence of the breach and of the interference.  See

18  Gryczman v. 4550 Pico Partners, Ltd., 107 Cal. App. 4th 1, 5-6 (2003) (discovery

19  rule applied to contract claim brought four years after defendant secretly conveyed

20  certain real property).

21        Moreover, because Mattel's interference claim arises from the same nucleus

22  of facts alleged in Mattel's April 2004 complaint, it relates back to that complaint,

23  wherein defendants were named as Does.  Because the '04 Action was filed less than

24  two years after Mattel's discovery of defendants' legal wrongdoing, the interference

25  claim is timely.   Indeed, the Court already held "through Rule 15(c) Mattel's

26  intentional interference claim would relate to when it filed its original complaint in

27  April 2004, well before the limitations period expired."

28

07209/2445047.1

1

## 2.   The Aiding and Abetting Claims Are Timely.

2   As set forth above, Mattel's aiding and abetting claims against the MGA

3   defendants relate back to its April 2004 complaint.  Assuming that a two-year statute

4   of limitations applies, the claims are timely because Mattel did not learn of the

5   MGA defendants' wrongdoing until well after April 2002.  Even if Mattel's aiding

6   and abetting claims relate back only to the '05 Action, the claims are timely because

7   less than a year passed between Bryant's November 2004 deposition, where Mattel

8   learned of actionable misconduct involving MGA and Larian, and Mattel's May

9   2005 answer in the '05 Action.

10   ## 3.   The Conversion Claim Is Timely.[149]

11   Defendants assert that the "discovery rule does not apply to a claim for

12   conversion." (MGA Mem. 26:8-9 (citing AmerUS Life Ins. Co. v. Bank of Am.,

13   N.A., 143 Cal. App. 4th 631, 639 (2006) (emphasis in original)).  The case

14   defendants themselves cite for this proposition defeats their argument.  "[W]hen the

15   defendant in a conversion action fraudulently conceals the relevant facts or where

16   the defendant fails to disclose such facts in violation of his or her fiduciary duty to

17   the plaintiff," the discovery rule applies.  AmerUS Life Ins. Co., 143 Cal. App. 4th

18   at 639; see also Orkin v. Taylor, 487 F.3d 734, 741-42 (9th Cir. 2007) (same).  Such

19   concealment clearly occurred here — at the very least, disputed issues of fact are

20   present that preclude summary judgment.

21   ## 4.   The Unfair Competition Claim Is Timely.

22   Defendants argue that the limitations period applicable to Mattel's claim for

23   statutory unfair competition expired in October 2004, four years after Bryant left

24   Mattel, because the discovery rule does not apply to such claims.  MGA Mot. at 27.

25   California courts are divided on this point.  Compare Mass. Mut. Life Ins. Co. v.

26
_____

27   [149] Defendants contend that the limitation periods for Mattel's copyright infringement and conversion claims apply to its claim for declaratory relief.  As explained in text, Mattel's claims for copyright infringement and conversion are timely.  Accordingly, under

28   defendants' own logic, the declaratory relief claim is timely as well.

1  Superior Court, 97 Cal. App. 4th 1282, 1295 (2002) (citations omitted) (statute "will

2  probably run from the time a reasonable person would have discovered the basis for

3  a claim") with Snapp & Assocs. Ins. Svcs. v. Robertson, 96 Cal. App. 4th 884, 890-

4  91 (2002) (discovery rule does not apply).  But the Court need not address this issue

5  because Mattel filed suit against Bryant in April 2004, less than four years after he

6  left Mattel.  As the Court already held, Mattel's claims against MGA and Larian

7  relate back to its original complaint against Bryant and are thus timely.[150]

8      MGA advances a number of subsidiary arguments, none of which is

9  persuasive.  First, MGA contends that the claim is based on an at-will employment

10  contract, and thus requires an independent wrong.  But Bryant's at-will relationship

11  has no bearing on his breaches of the Inventions Agreement or other unfair

12  practices. See infra, at V.A.  Second, defendants incorporate, without elaboration,

13  Bryant's unsubstantiated contention that he did not breach the Inventions

14  Agreement.  As shown above, this argument is meritless.  Third, defendants assert

15  they lacked the requisite knowledge or intent to induce Bryant to breach his

16  contract—a claim that is clearly subject to factual dispute.  Finally, defendants argue

17  that, despite dangling large sums of money, and an opportunity to develop a doll line

18  of his own, they did not cause Bryant to breach the Inventions Agreement.  But their

19  conduct proves otherwise, and at the very least, creates a genuine issue for trial, as

20  discussed in further detail below.

21

22

23

24

25

26

27

28

---

[150] The Court does not need to resolve whether a claim of common law unfair competition is governed by a three or four year statute of limitations.  Because Mattel's claim of common law unfair competition did not accrue until well after April 2002, and relates back to Mattel's April 2004 complaint, it is timely under either limitations period.

III.    **MATTEL'S FEDERAL COPYRIGHT CLAIM IS TIMELY.**

   A.    **Mattel Asserted Its Copyright Claim Within Three Years of Accrual.**

           1.    **The Standard for Accrual of Copyright Infringement Claims.**

   The copyright infringement claim is timely as to all defendants because Mattel asserted it within three years of accrual, the applicable statute of limitations under 17 U.S.C. § 507(b).  Copyright claims accrue "when [the plaintiff] has knowledge of a violation or is chargeable with such knowledge."  Roley v. New World Pictures, Ltd., 19 F.3d 479, 481 (9th Cir. 1994)).  Thus, "if the copyright plaintiff was unaware of the infringement, and that lack of knowledge was reasonable under the circumstances," the infringement does not start the limitations clock.  Polar Bear Prods., Inc. v. Timex Corp., 384 F.3d 700, 706 (9th Cir. 2004).

           2.    **Mattel's Copyright Claim Could Not Have Accrued Prior to November 24, 2003.**

   MGA cannot establish that, prior to November 24, 2003, Mattel either actually knew of the infringement or "is chargeable with such knowledge." Allegations of ownership and substantial similarity are essential to a copyright infringement claim.  See Kling v. Hallmark Cards, Inc., 225 F.3d 1030, 1037-38 (9th Cir. 2000).  Mattel could not have alleged in either element in February 2001, or in fact any time prior to 2003.  Prior to November 24, 2003, Mattel *had not even obtained Bryant's drawings*.[151]  Without Bryant's drawings—the copyrighted works Mattel claims were infringed—Mattel could not perform a substantial similarity analysis.   Accordingly, prior to 2003, Mattel could not have brought suit for copyright infringement because it did not know that it owned Bratz, let alone that defendants were infringing its rights in Bratz.  Cf. Kling, 225 F.3d at 1036 ("there can be no laches in failing to assert rights of which a party is wholly ignorant, and

---

[151]   MGA AMF # 127.

1    whose existence he had no reason to apprehend") (quoting Halstead v. Grinnan, 152

2    U.S. 412, 417 (1894)).

3          In Kling, the plaintiff filed suit thirteen years after the defendants' written

4    refusal to compensate him for the cartoon scripts at issue, but within three years of

5    coming across the allegedly infringing cartoons in a video store.  The Ninth Circuit

6    reversed the district court's grant of summary judgment to the defendant on the basis

7    of laches, holding that "the period of delay for laches for a copyright infringement

8    claims runs only from the time that the plaintiff knew or should have known about

9    an actual or impending infringement, *not an adverse claim of ownership*."  Id. at

10   1032 (emphasis added).  The court explained that the plaintiff cannot sue based

11   upon a bare claim of adverse ownership, because a showing of infringement is

12   required as an element of the claim. Id. at 1037-38.  The Ninth Circuit recognized,

13   "[t]o require every owner whose right was not 'obviously' established to sue for a

14   declaration of ownership whenever a dispute arises or to forfeit his right to seek

15   relief against possible infringements in the future, could engender much needless

16   litigation." Id. at 1038.

17         MGA's principal authority for its claim that "attendance at trade show [is]

18   sufficient `discovery' to start the statute of limitations on copyright infringement

19   claim" (MGA Mem. 19) is Polar Bear, 384 F.3d at 707.  That aspect of Polar Bear is

20   readily distinguished.  In that case, the defendant there displayed at a trade show

21   footage of plaintiff's "copyrighted film" without authorization; because the plaintiff

22   had made the film, it clearly knew it owned the copyright and that this copyright

23   was being infringed by the exhibition. Id. at 703.  Here, Mattel had markedly less

24   knowledge at the time of the trade show referenced by MGA.  Mattel did not know

25   then that Bryant created Bratz works at Mattel, let alone what they looked like or

26

27

28

1 that they were substantially similar to the dolls released by MGA.[152]  Any notice of

2 these crucial facts came only in late 2003.

      **3.**     **The Stay In the Action Tolled the Statute of Limitations on the Copyright Claim.**

5       As explained above, the limitation periods on Mattel's claims were tolled due

6 to the stay related to the interlocutory appeal of an Order removing the case to

7 federal court.  The proceedings in this case were stayed for nearly a year (May 20,

8 2005 until May, 16, 2006).  Id.  Mattel's copyright claim is timely regardless of the

9 stay; this further shows its timeliness.  The Court should exclude the period of the

10 stay in performing its statute of limitations analysis.

      **B.**     **The Copyright Infringement Claim Against Bryant and MGA Relates Back to the '04 Complaint.**

      **1.**     **Mattel's Copyright Infringement Claim Against Bryant and MGA is Timely.**

15       Whether the Court applies state or federal relation back rules with respect to

16 the copyright infringement claims against Bryant and MGA, the result is the same:

17 the claims are timely.  When Mattel filed its motion to amend, both Bryant and, as

18 explained above, MGA, were parties to the '04 Action.  Therefore, the copyright

19 claim against them relates back to the '04 Complaint as long as it arises from the

20 "conduct, transaction, or occurrence" alleged therein.  Fed. R. Civ. P. 15(c)(1)(B).  It

21 does.  The complaint in the '04 Action alleged that "Bryant and other defendants

22 converted, misappropriated and misused Mattel property . . ."[153]  The amended

23 complaint expands upon this allegation by asserting that defendants infringed

24 Mattel's copyrights in Bratz, i.e., its property.  Indeed, the Court already held that

---

[152]  Watermark Publishers V. High Tech. Sys., Inc., 1997 WL 717677, 44 U.S.P.Q.2d 1578 (S.D. Cal. 1997), is also inapposite.  In that case, the plaintiff "immediately identified" the disputed map "as infringing upon viewing it for the first time in 1991," id. at 1583, and then informed her attorney.  See id.  Such known acts of infringement were not present here until Mattel saw Bryant's drawings in 2003.

[153]  Complaint, ¶ 12, Proctor Dec., Exh. 72.

the copyright claim relates back to "the same conduct or transaction contained in the original complaint, filed in April 2004."    Order, at 13:27-28.    Because Mattel's copyright claim against Bryant and MGA relates back to the complaint in the '04 Action, it is indisputably timely.

## 2.    <u>The Timing Of Mattel's Registration Of Its Copyrights Does Not Affect the Viability of Its Claims.</u>

MGA contends that Mattel's claim for copyright infringement "may not relate back to any pleading filed prior to October 30, 2006, when Mattel obtained registrations of its alleged copyright in BRATZ . . . because copyright registration is a jurisdictional prerequisite . . . and 'relation-back' rules cannot supplant jurisdictional standing."    MGA Mot. at 24.    MGA does not cite any applicable precedent to support this argument.    It is contrary to settled law.

"[C]ourts have allowed the plaintiff's subsequent compliance with the registration . . . requirements to relate back to the date the lawsuit was filed, thus preserving claims that might otherwise have been barred by the statute of limitations."    PAUL GOLDSTEIN, GOLDSTEIN ON COPYRIGHT, § 15.2 at p. 15:11 (citations omitted); see also Co-Opportunities Inc. v. National Broad. Co., 510 F. Supp. 43, 49 (N.D. Cal. 1981) ("the subsequent recordation [of the copyright assignment] will be allowed to relate back so that the assignee acquires a right to sue as of the date of filing the action"); Ruskin v. Sunrise Mgmt., Inc., 506 F. Supp. 1284, 1289 (D. Colo. 1981) ("Upon amendment [to allege recordation of copyright transfer], the copyright claim would relate back, for statute of limitation purposes, to the original filing date of the complaint."); Villeroy & Boch, S.a.r.l. v. THC Sys., Inc., 1989 WL 8936, at * 2 (S.D.N.Y. Jan. 30 1989) (denying defendant's motion for summary judgment that argued the Court lacked subject matter jurisdiction because the plaintiff did not record his copyright transfer, and granting leave to amend

1  complaint so that "supplemental complaint relates back to the filing date of the

2  initial complaint for statute of limitations purposes.").[154]

3  　　　　The slim authority that MGA cites is inapposite. The cases cited in footnote

4  33 of MGA's brief hold simply that copyright registration is a prerequisite of an

5  infringement claim. But it is undisputed that Mattel registered copyrights in Bratz

6  drawings; the question, which the above-cited cases address, is what effect the

7  timing of recordation/registration has on relation-back principles. It has none.

8  Miguel v. Country Funding Corp., 309 F. 3d 1161, 1165 (9th Cir. 2002), is also

9  distinguishable. Miguel concerned an action under the Truth in Lending Act, not

10  the Copyright Act. It did not address or alter the body of authority permitting

11  relation back of copyright claims when registration or recordation occurs after suit is

12  filed.

13  **C.**　　**The Rolling Statute of Limitations Applies to Mattel's Copyright**

14  　　　　**Claims Against All Defendants.**

15  　　　　In cases of copyright infringement, the three year limitations period is rolling,

16  i.e., it allows recovery for all infringing acts committed within three years prior to

17  the filing of suit, even if infringement commenced more than three years prior. As

18  the Ninth Circuit has held: "Section 507(b) is clear on its face. 'It does not provide

19  for a waiver of infringing acts within the limitation period if earlier infringements

20  were discovered and not sued upon, nor does it provide for any reach back if an act

21  of infringement occurs within the statutory period." Roley, 19 F.3d at 481 (citing

22  Hoey v. Dexel Systems Corp., 716 F. Supp 222, 223 (E.D. Va. 1989)). Thus, in

23  Roley, the Court reasoned that "in a case of continuing copyright infringements, an

24  action may be brought for all acts that accrued within the three years preceding the

25  filing of suit." Id.

26

---

27  [154] It is irrelevant that these cases address recordation of a transfer of copyright, not registration of copyright, because both recordation and registration are jurisdictional pre-

28  requisites to an infringement action. See 17 U.S.C. §§ 205(d); 411(a).

1    Accordingly, even if the Court were to find that Mattel discovered its rights to

2    Bratz before November 24, 2003, and that relation back does not apply, the

3    copyright claim is still timely as to acts of infringement occurring within three years

4    before Mattel amended its complaint in November 2006. Such acts are plentiful and

5    recurring. Defendants' infringement of Bratz continues today, as each new model of

6    a Bratz doll constitutes a new, and independently actionable, act of infringement.

7    Seeking to avoid the effect of the rolling statute of limitations, MGA claims

8    that Mattel's copyright infringement claim is "essentially a claim for copyright

9    ownership," and that Mattel's claims are therefore time-barred. (MGA's Motion at

10    23 (quoting Welles v. Turner Enter. Co., 503 F.3d 728, 734 (9th Cir. 2007)). MGA

11    asserts that it expressly repudiated Mattel's ownership in Bratz "as soon as the dolls

12    entered the market." (Id.)

13    The argument fails because Mattel asserted "a cause of action for

14    infringement that is separate and distinct from [its] ownership claim." Specifically,

15    Mattel alleges that it owns certain copyright registrations. (Counterclaims, ¶ 83).

16    Mattel further alleges that "[c]ounter-defendants have reproduced, created derivative

17    works from and otherwise infringed upon the exclusive rights of Mattel in its

18    protected works without Mattel's authorization." (Id., ¶ 84). This is a copyright

19    infringement claim, pure and simple, even though Mattel's complaint additionally

20    includes allegations of ownership of Bratz. Indeed, defendants strongly dispute that

21    the Bratz dolls are substantially similar to Bryant's drawings,[155] and both parties

22    have retained experts on this issue.

23    MGA's authorities are also inapposite, involving situations where the

24    copyright owner was aware of his rights. See Zuill v. Shanahan, 80 F.3d 1366,

25    1367-68 (9th Cir. 1996) (defendant expressly repudiated the plaintiff's "claims to

26    ownership" of music that the plaintiff created more than three years before filing of

27

28

[155]  Defendants' Responses to Mattel's Revised Fourth Set of Interrogatories at No. 42, Zeller Dec., Exhs. 29, 109, 110,

1  suit);[156] <u>Big East Entm't, Inc. v. Zomba Enters., Inc.</u>, 453 F. Supp. 2d 788, 795

2  (S.D.N.Y. 2006) ("Although Allen asserted an ownership claim on behalf of Rock

3  Candy at various times after 1991… he failed to act within the three-year statute of

4  limitations."); <u>Barksdale v. Robinson</u>, 211 F.R.D. 240, 244-45 (S.D.N.Y. 2002) (the

5  statute of limitations on plaintiff's copyright ownership claim began to run when the

6  plaintiff sent a cease-and-desist letter claiming ownership of works); <u>Minder Music</u>

7  <u>Ltd., v. Mellow Smoke Music Co.</u>, 1999 WL 820575, * 2 (S.D.N.Y. 1999)

8  ("Plaintiff knew that defendants were asserting a right to 50% ownership from the

9  moment that plaintiff acquired its rights, because defendants' interest was noted in

10  plaintiff's 1990 purchase agreement [eight years before filing suit]."); <u>Netzer v</u>

11  <u>Continuity Graphic Assocs.</u>, 963 F. Supp. 1308, 1315-16 (S.D.N.Y. 1997) (plaintiff

12  received a copy of a comic book with a copyright notice that did not recognize his

13  contribution in 1984, nine years before plaintiff brought suit for co-ownership of

14  copyright). Since Mattel was not aware that Bryant had created Bratz drawings at

15  Mattel or that it owned copyrights in Bryant's drawings prior to 2003 at the earliest,

16  these cases are inapplicable. Further, as explained above, ownership of Bratz is only

17  one element of Mattel's infringement claim.

18       Moreover, MGA ignores authority that contradicts its position. For instance,

19  in <u>Carrell v. Shubert Org.</u>, 104 F. Supp. 2d 236 (S.D.N.Y. 2000), the plaintiff

20  brought both a declaratory relief claim concerning ownership of certain make-up

21  designs for the Broadway show "Cats" and a copyright claim for the infringement of

22  the designs. The court found that, although the ownership claims were time-barred,

23  the plaintiff could pursue an infringement claim since "[a] plaintiff's right to sue as a

24  copyright owner is not a remedy that flows from a declaration of ownership." <u>Id.</u> at

25

---

26    [156] Importantly, <u>Zuill</u> did not address the issue whether an infringement action is time

barred if the co-ownership claim was untimely. 80 F.3d at 1369 ("We conclude that claims

27  of co-ownership, <u>as distinct from claims of infringement</u>, accrue when plain and express

repudiation of co-ownership is communicated to the claimant, and are barred three years

28  from the time of repudiation.") (emphasis added).

252-53.  The court denied a motion to dismiss because "plaintiff has sufficiently articulated a cause of action for infringement that is separate and distinct from her ownership claim."  Id. at 254.  The same is true here.

**D.    Defendants' Fraudulent Concealment Tolls the Limitations Period.**

As with Mattel's state law claims, defendants' fraudulent concealment of the fact that Bryant created Bratz tolls the statute of limitations on Mattel's claim of copyright infringement.  See Wood v. Santa Barbara Chamber of Commerce, Inc., 705 F.2d 1515, 1521 (9th Cir. 1983) ("A fraudulent concealment defense requires a showing both that the defendant used fraudulent means to keep the plaintiff unaware of his cause of action, and also that the plaintiff was, in fact, ignorant of the existence of his cause of action.") (citation omitted).  Here, as shown above in connection with the state law claims, defendants intentionally, persistently, and fraudulently sought to conceal the true facts of Bratz' origin.  These efforts made it impossible for Mattel to discover that Bryant created Bratz during his Mattel tenure, and that Mattel therefore owns Bratz pursuant to the Inventions Agreement.  Defendants cannot use their own misconduct to defeat Mattel's copyright claim on statute of limitations grounds.

**IV.    BRYANT BREACHED HIS FIDUCIARY DUTY TO MATTEL, AND THE MGA DEFENDANTS HELPED HIM.**

**A.    Bryant Owed Mattel a Fiduciary Duty.**

Bryant contends that he entered into a "straightforward employment relationship" with Mattel (Bryant Mot. at 10), and that such a relationship is insufficient to establish a fiduciary relationship as a matter of law.  Id.  But, as noted by Bryant, a fiduciary duty may be imposed by law *or* undertaken by agreement, see GAB Bus. Svcs. Inc. v. Lindsey & Newsom Claim Servs., Inc., 83 Cal. App. 4th 409, 417 (2000), overruled on other grounds, Reeves v. Hanlon, 33 Cal. 4th 1140 (2004).  Here, the undisputed facts show that Bryant undertook his fiduciary duty to

[PUBLIC REDACTED] JOINT OPPOSITION

Mattel by agreement.[157]   In the Inventions Agreement, Bryant specifically acknowledged: "The Company depends on me to maintain that confidentiality, and I accept that position of trust."[158]   The Agreement required Bryant to maintain Mattel's proprietary information in strict confidence.[159]   Immediately above the signature line, the Agreement emphasizes: "**CAUTION: THIS AGREEMENT CREATES IMPORTANT OBLIGATIONS OF TRUST . . .**"[160]   These provisions create a fiduciary duty under California law.   See, e.g., GAB Bus. Svcs., Inc., 83 Cal. App. 4th at 417.[161]

Even absent these contractual provisions, Bryant owed Mattel a fiduciary duty because Mattel entrusted him with highly confidential information. See Stevens v. Marco, 147 Cal. App. 2d 357, 373 (1956) (fiduciary relationship existed because one party confidentially entrusted another with "a new and valuable idea"); Michelson v. Hamada, 29 Cal. App. 4th 1566, 1581 (1994) ("Confidential and fiduciary relations are, in law, synonymous, and may be said to exist whenever trust and confidence is reposed by one person in the integrity and fidelity of another.") (citations and quotation omitted).   It is undisputed that, while at Mattel, Bryant had extensive access to confidential information (including designs for BARBIE and

---

[157] Bryant contends that his employment offer letter makes no mention of a fiduciary relationship. (Bryant Mot. at 15.) But the December 9, 1998 offer letter from Mattel to Bryant clearly reflects that "this offer is contingent upon . . . the signing of a Confidential Information and Inventions Agreement." Ex. 10 (BRYANT 001198-001199). CB AMF # 96.

[158] CB AMF 113, (Inventions Agreement ¶ 1(a)).

[159] CB AMF 110, (Inventions Agreement ¶ 1(a)-(d)).

[160] Thus, the plain language of the Inventions Agreement contradicts Bryant's claim that the document did not apprise him that he had a fiduciary duty to Mattel and that Mattel never informed him that the company wanted to "saddle him with such a duty." (Bryant Memo at 15).

[161] Bryant's reliance on City Solutions, Inc v. Clear Channel Commn's, Inc., 201 F.Supp.2d 1048 (N.D. Cal. 2002) for the proposition that the Inventions Agreement did not create a fiduciary duty is misplaced. In that case, the confidentiality agreement signed by the parties specifically stated that it did not create any agency, partnership or joint venture agreement.   Id. 1050.   Here, there is no similar statement disclaiming a fiduciary relationship in the Inventions Agreement. Instead, there is language overtly reposing trust and confidence in a party, Bryant, who accepted that placement of trust. Moreover, City Solutions left open the possibility of finding a breach of fiduciary duty on the confidentiality agreement at issue if that breach had been more tailored to subject matter of the agreement on which it was based, as is the case here.

-52-

1   proposed lines of other dolls); confidential knowledge relating to design, marketing,

2   production, and sales; and access to the creative resources and concepts at the core

3   of Mattel's business.[162]   This evidence establishes that Bryant occupied a position of

4   trust within Mattel. ████████████████████████████████████

5   ████████████████████████████████████████████████

6   ██████████████████████████████                    [163]

7       Bryant cites deposition testimony from Teresa Newcomb and Maureen

8   Tafoya to suggest that Mattel did not instruct its employees to read the Inventions

9   Agreement before signing, that Mattel did not verify that its employees understood

10  the Agreements before signing them, and that employees could not ask questions

11  about the Agreements before signing them. (Bryant Mot., at 15)  Newcomb actually

12  testified that new employees easily could obtain answers to questions about the

13  document from a Mattel employee, simply by asking.[164]   In any case, this is not

14  material.

15      GAB Business Services, 83 Cal. App. 4th at 417, does not aid Bryant.  GAB

16  stands for the uncontroversial proposition that corporate officers may owe a

17  fiduciary duty to the corporation.  Id.  No one contends that Bryant is an officer of

18  Mattel;  rather, Bryant's fiduciary duty to Mattel was created by the Inventions

19  Agreement, as well as by the trust he was given.  As GAB itself shows, fiduciary

20  duties may be undertaken by agreement.  Id. The other cases Bryant cites are even

21  more inapposite.[165]

22  _____

23  [162]   CB AMF # 120.
    [163]   CB AMF # 120.
    [164]   See Newcomb Tr. at 223:12-225:20.
24  [165]   In Worldvision Enterprises, Inc. v. American Broadcasting Cos., 142 Cal. App. 3d
    589, 594 (2d Dist 1983), the parties were merely former employer and employee without
25  more.  There was no agreement creating a fiduciary relationship between the parties and no
    other additional ties, as contemplated in Odorizzi.  Similarly, in Wolf v. Superior Court,
26  107 Cal. App. 4th 25, 30-36, there was no agreement creating a fiduciary relationship.
    Rather, the plaintiff was an author suing a production company and attempting to read a
27  fiduciary duty into contracts for contingent compensation, revenue and profit sharing, and
    an accounting.  In Maglica v. Maglica, 66 Cal. App. 4th 442, 447-48 (1998), a man and
28  woman in a common law marriage split up and the court found that because they never
        (footnote continued)

                                                        [PUBLIC REDACTED] JOINT OPPOSITION

**B.    Bryant Breached His Fiduciary Duty.**

A broad variety of conduct can breach an employee's fiduciary duty.  <u>See</u> <u>Bancroft-Whitney Co. v. Glen</u>, 64 Cal. 2d 327, 346 (1966).  Here, evidence shows beyond any reasonable dispute that Bryant worked for MGA and accepted payments from MGA, conveyed Mattel property and concepts to MGA, and ultimately misrepresented to Mattel his future plans — all while still employed by Mattel.  This pattern of conduct is a classic breach of fiduciary duty.

Bryant breached his duty by conveying to MGA drawings, models and concepts he created and conceived while employed by Mattel or that derived from his work at Mattel.  "[I]n the absence of authority, express or implied, [an agent] cannot transfer his principal's property, and such authority will not be presumed." <u>Palo Alto Mut. Bldg. & Loan Ass'n v. First Nat'l Bank</u>, 33 Cal. App. 214, 221 (1917) (quotation and citation omitted).  Bryant breached his fiduciary duty by secretly contracting with MGA while employed by Mattel.[166]  <u>See also</u> Mattel's Motion at 33-39 (discussing breaches).  And Bryant breached his fiduciary duty by using Mattel resources for Bratz, soliciting Mattel employees and vendors for Bratz

_____

formally married there was no fiduciary relationship imposed by law.  In <u>Rita Medical Systems Inc v. Resect Medical, Inc.</u>, 2007 WL 161049, *6 (N.D. Cal. Jan 17, 2007), although the defendant employee's employment contract contained confidentiality and non-compete provisions, it "did not clearly indicate that [the employee] had a fiduciary duty." Here, the Inventions Agreement expressly states that Bryant will have a position of trust at Mattel.  Further, in <u>Enreach Technology, Inc. v. Embedded Internet Solutions, Inc.</u>, 403 F. Supp. 2d 968, 976 (N.D.Cal. 2005), the court actually denied summary judgment on the fiduciary duty claim because there were triable issues whether the employee was an officer of the company.  Moreover, in Enreach Technology, there was no evidence that the employee at issue was exposed to highly sensitive confidential information, as Bryant indisputably was.  In <u>Committee on Children's Television v. General Food Corp.</u>, 35 Cal.3d 197, 221-22 (1983) (superceded by statute on other grounds), plaintiffs attempted to assert a fiduciary duty in the consumer context on a seller and manufacturer of breakfast cereals who were purportedly mis-advertising sugared cereals as healthful.  The court was reluctant to impose a fiduciary duty on commercial sellers, even those with superior bargaining power, merely because they profit from the trust of consumers.  <u>Id.</u>  These cases are all notable for how immaterial they are to the issue before the Court.
[166]    CB AMF # 76.

before he left Mattel, and working on MGA's "Angel" project while at Mattel.[167] His breaches are multiple.

Defendants have argued that Bryant's work on Bratz while employed at Mattel should be dismissed as mere preparation to compete with Mattel, rather than actual competition breaching his duties. But for any such "preparation to compete" defense to apply, Bryant had to disclose his plans to Mattel. See Daniel Orifice Fitting Co., 198 Cal. App. 2d at 800-01 (employee liable where he did not make "full disclosure of acts undertaken in preparation for entering into competition") (quotation and citation omitted); Sequoia Vacuum Sys. v. Stransky, 229 Cal. App. 2d 281, 287 (1964) ("[T]he protection of the principal's interest requires a full disclosure of acts undertaken in preparation of entering into competition").

Far from disclosing his plans, Bryant concealed his creation of Bratz and relationship with MGA from Mattel. Thus, he did not disclose his invention and/or assignment of Bratz to MGA in his exit interview[168] or when he signed the Proprietary Information Checkout Form, on October 19, 2000, in which he certified that "[a]ll documents . . . and other items including, but not limited to . . . sketches … relating to the business of the Company, made or obtained by me while employed by the Company shall be the exclusive property of the Company and shall be delivered by me to the Company on termination of my employment or at any time as requested by the Company."[169]   Bryant even hid the truth from his co-workers.[170]

---

[167] CB AMF # 62, 63, 66, 67, 126, 127.
[168] CB MF # 44..
[169] Proprietary Information Checkout Form, Proctor Dec., Exh. 7.
[170] CB AMF # 131.

07209/2445047.1

Because of his contractual agreements and the nature of this work, he is a fiduciary. Rather than devote his time and talents to his employer, Bryant plotted against Mattel, exploited the resources available to him, accepted secret payments, pitched creations to MGA, secretly paid Mattel employees to work on Bratz, entered into a secret contract to work for MGA, and then took affirmative steps to conceal it. Reasonable jurors could easily find that Bryant breached his fiduciary duty.

## C.   The MGA Defendants Aided And Abetted Bryant's Breach of Fiduciary Duty

A defendant aids and abets a breach of fiduciary duty if he (1) knows the other's conduct constitutes a breach of duty, and (2) gives substantial assistance or encouragement to the other so to act. See, e.g., Neilson v. Union Bank of Calif., 290 F. Supp. 2d 1101, 1119 (C.D. Cal. 2003). Aiding and abetting does not require a defendant to agree to join the wrongful conduct in the way one joins a conspiracy. See Berg & Berg Enters., LLC v. Sherwood Partners, Inc., 131 Cal. App. 4th 802, 823 n.10 (2005). It is enough if there is knowledge of the acts giving rise to the breach. Neilson, 290 F. Supp. 2d at 1118-19.

Here, defendants not only possessed the requisite knowledge of Bryant's breaches of his fiduciary and loyalty duties, but they encouraged them. At every turn, defendants substantially assisted Bryant's wrongdoing. They paid Bryant for his Bratz expenses and related items[171]; they had him sign an agreement that directly contravened his Inventions Agreement and Conflict of Interest Policies with Mattel[172]; and they aided his efforts to cover-up his involvement with Bratz during his tenure at Mattel.[173] See also Mattel's Motion, at 39-43. California courts have long held that even "ordinary business transactions" that a bank performs for a customer can satisfy the substantial assistance element. Casey, 127 Cal. App. 4th at

---

[171] CB AMF # 124.
[172] Garcia Tr. Vol. 1 at 244:1-245:15, Zeller Dec., Exh. 67.
[173] CB AMF # 133.

07209/2445047.1

1145.  MGA and Larian did much more, while knowing that Bryant was committing acts that constituted a breach of his fiduciary duty.

Finally, it is undisputed that defendants profited financially from encouraging Bryant to breach his duties to Mattel.  Financial gain and self-interested profit corroborate the two elements of aiding and abetting.  See Neilson, 290 F. Supp. 2d at 1127-28.  In other words, if the defendant reaps the benefit of participating in a breach of a fiduciary duty, he cannot disclaim the burden of liability.  See id. (citing Heckmann v. Ahmanson, 168 Cal. App. 3d 119, 127 (1985)).  Because that is unquestionably the case here, there is no basis to grant defendants' motion.  At a minimum, genuine issues preclude summary judgment.

## V.  MATTEL WILL PREVAIL ON ITS TORTIOUS INTERFERENCE CLAIM

### A.  Mattel Is Not Accusing Defendants of Interfering with Bryant's At-Will Employment Contract.

Defendants claim that MGA did not cause Bryant to breach his "at-will" agreement by inducing Bryant to leave Mattel.  MGA Mot. at 45-50.  Mattel's tortuous interference claim is based on MGA's having induced Bryant to breach the Inventions Agreement and the Conflict of Interest Questionnaire, not his "at-will" employment agreement.  With respect to the claim for interference with those contracts, there are disputed issues of material fact.

### B.  Bryant Had a Valid, Binding Contract With Mattel

The first element of an interference claim is the existence of a valid, binding contract.  Reeves v. Hanlon, 33 Cal. 4th 1140, 1148 (2004).  Mattel and Bryant had two such agreements: the Inventions Agreement and Conflict of Interest Questionnaire.  As set forth in Mattel's Motion (at pp. 3-4) and above, this Court has already rejected efforts to challenge the enforceability of the Inventions Agreement.  Neither MGA nor Bryant challenges this holding.  Bryant claims the Court did not rule on the enforceability of the Conflict of Interest Questionnaire, but as explained

-57-

1    above the Questionnaire is valid and enforceable, and the obligations it imposed are
2    specifically included within the Inventions Agreement.  See supra Part I.

3    ## C.   MGA Defendants Knew of Bryant's Contractual Obligations

4            The MGA defendants ask the Court to rule as a matter of law that they were
5    ignorant of Bryant's contractual obligations to Mattel.  MGA's own documents and
6    admissions compel the conclusion that MGA and Larian did have requisite
7    knowledge or, at least, that it is a triable issue of fact.

8            The MGA defendants claim that the intentional interference claim fails
9    because they "did not know the specific requirements of Bryant's Employment
10   Agreement."  Motion at 48:5-6.  Knowledge of the specific terms of the contract is
11   not what the law requires.   Indeed, not even knowledge of the *identity* of the
12   contracting parties is required.  See Sebastian International, Inc. v. Russolillo, 162 F.
13   Supp. 2d 1198, 1203-04 (C.D. Cal. 2001) ("If a potential defendant was completely
14   unaware of contractual relations with a third party, then it would be impossible to
15   infer any intent to interfere on the defendant's part. However, such intent can
16   certainly be inferred *if the defendant knows that contractual relations with a third*
17   *party exist*, but does not know the specific identity of the contractual party.")
18   (emphasis added) (citing Ramona Manor Conv. Hosp. v. Care Enterprises, 177 Cal.
19   App. 3d 1120, 1133 (1986)).

20           The MGA defendants admit knowing that Bryant was a Mattel employee
21   when he presented his drawings to MGA.[174]  They also knew that Bryant was a doll
22   designer and that he had signed a confidentiality agreement.[175]  Larian asked David
23   Rosenbaum, counsel for MGA, to find out what Bryant's agreements said.[176]  Bryant

24

25

26

---

[174]  MGA MF # 13.
[175]  MGA MF # 16.
[176]  CB AMF # 73.

1   told Rosenbaum that he had signed a confidentiality agreement with Mattel, ███

2   ████████████████████████████████████████████████████[177]

3        Even assuming MGA did not see Bryant's actual agreement, the evidence is

4   more than adequate to infer that MGA and Larian knew the basic terms of the

5   Inventions Agreement and Conflict Questionnaire that Bryant had signed.  Senior

6   MGA employees had formerly worked at Mattel and had signed identical or similar

7   agreements.[178]   MGA requires its own designers to sign similar agreements.[179]

8   Inventions agreements are an industry standard.[180]   See Silicon Image, Inc. v.

9   Analogix Semiconductor Inc., 2007 WL 1455903 at *4 (N.D. Cal. 2007) (holding

10  that use of licensing agreements which are "common in the industry" created a

11  reasonable inference that defendant, a competitor to plaintiff, "knew that sale of its

12  product to Silicon Image customers violated the Software License Agreement").

13       Knowledge of a third party's contractual obligations can be inferred from

14  circumstantial evidence, including intent to conceal or avoid actual knowledge of

15  the agreement.   Borges v. Home Ins. Co., 239 Cal. App. 2d 275, 282-83 (1966)

16  (reversing grant of summary judgment on interference claim on the ground that

17  circumstantial evidence supported an inference of knowledge of a contractual

18  relationship).   There is more than enough evidence to permit the jury to infer the

19  requisite knowledge here.

20  **D.   The MGA Defendants Engaged in Intentional Acts Designed to**

21  **Breach or Disrupt Bryant's Contractual Relationship With Mattel**

22       The MGA defendants claim they have not intentionally caused Bryant to

23  breach his obligations to Mattel.  MGA Mot. at 48; Reeves, 33 Cal. 4th at 1148.  To

24  satisfy this element, a plaintiff need not prove that the defendant acted with the

25  primary purpose of disrupting the contract, but only that the defendant knew such

---

[177]   CB AMF # 73.
[178]   CB AMF # 102.
[179]   Id.
[180]   Declaration of Bruce Stein, Exh. 1.

1   interference was substantially certain to occur and that its own actions were a

2   "substantial factor" in causing it.  Id.; C.A.C.I. Model Instruction No. 2202.  The

3   requisite "intentional acts" "may be established by inference as well as by direct

4   proof."   Savage v. Pacific Gas & Electric Company, 21 Cal. App. 4th 434, 449

5   (1994) (quoting Seaman's Direct Buying Serv., Inc. v. Standard Oil Co., 36 Cal.

6   3d 752, 765-66 (1984)).

7        Defendants argue they did nothing to cause Bryant to breach his agreements

8   because "the record is undisputed that Bryant was the one searching for a company

9   to develop his Bratz line and he was the initiating party."  MGA Motion at 49.  But

10  the issue is not who called whom first,[181] but whether MGA and Larian engaged in

11  acts which they knew would cause Bryant to breach his contract with Mattel.  As the

12  court recognized in Plessinger v. Castleman and Haskell, 838 F. Supp. 448, 452

13  (N.D. Cal. 1993), "'intent' . . . can be met by an allegation that the defendant

14  engaged in an intentional act designed to `disrupt' the plaintiff's contractual

15  relationship..., and that disruption includes acts which make the plaintiff's

16  performance under the contract more difficult or burdensome."  Id. at 452 (quoting

17  Pacific Gas & Electric Co. v. Bear Stearns & Co, 50 Cal. 3d 1118, 1126 (1990).

18       In this case, the MGA defendants' acts were flatly at odds with Bryant's

19  fulfillment of his contract with Mattel in every respect.  After the initial Bratz pitch,

20  MGA paid Bryant for his Bratz expenses and related charges while he was still a

21  Mattel employee.[182]   MGA also paid Bryant to work on an ostensibly separate

22  project called "Prayer Angels."[183]  Long before Bryant left Mattel, MGA, Larian,

23

---

[181]  That Bryant was a willing seller does not negate the fact that a seller needs a buyer,
24   and MGA and Larian were ready, willing and eager to buy.  Larian was looking for a
     fashion doll to compete with BARBIE; Wal-Mart had approached him to find such a doll;
25   and he told the Wall Street Journal that he ran a doll contest in 1999 which led to the
     selection of Bratz.  MGA AMF # 119.  Until he found MGA, Bryant did not breach his
26   agreement; when he did, and MGA met with him, paid him, encouraged him to use
     Mattel's resources, and even contracted with him, its involvement was clearly a substantial,
27   indeed the precipitating factor, in his breach.
     [182]  CB AMF # 124.
28   [183]  Garcia Tr. Vol. 1 at 244:1-245:15, Zeller Dec., Exh. 67.

and his team encouraged Bryant to use Mattel's resources to develop Bratz.  MGA entered into a contract with Bryant that required him to perform work for MGA on a "top priority" basis while he was still employed by Mattel, and assigned to MGA ownership rights in pre-existing inventions even though it knew Bryant, as a Mattel designer, was bound by an inventions agreement with Mattel.[184]

And these are only the *undisputed* facts.  While MGA denies this, the evidence strongly supports a finding that MGA was integrally involved in Bratz months before it has admitted, and many months before Bryant left Mattel.  MGA claims its personnel first met Bryant in late August or early September.[185]  However, MGA has been unable to tell a single, consistent story about even things as basic as whether it knew Bryant was a Mattel employee or not (Larian says yes, Garcia says no[186]) and when the first pitch meeting happened (the various stories widely diverge).[187]

Moreover, the evidence flatly contradicts MGA's version of events.  Anna Rhee testified that she painted Bratz heads under the "code name" Angel in June 2000.  Nana Ashong, another former MGA employee, confirmed that "Angel" was indeed a name used for Bratz at MGA in 2000.[188]  A former MGA employee, Jennifer Maurus, testified that she participated in a Bratz meeting at MGA in early summer 2000, at which point Paula Garcia, MGA's project manager for Bratz, had already met with Bryant previously.[189]  Paula Garcia admitted that the names of the first four Bratz dolls were in use at MGA no later than June 2000.[190]

The jury can infer from this evidence, and from MGA's concealment and lies, that it *did* know of Bryant's obligations and affirmatively encouraged him to ignore

---

[184] CB AMF # 75.
[185] MGA AMF # 81.
[186] Id.
[187] Id.
[188] MGA AMF # 116.
[189] MGA AMF # 81.
[190] CB AMF # 163.

them.  See, e.g., Bank of New York v. Fremont General Corp., 514 F.3d 1008, 1016 (9th Cir. 2008) ("Intent, of course, may be established by inference as well as by direct proof.") (quoting Savage v. Pacific Gas & Electric Co., 21 Cal. App. 4th 434 (1993)); Semiconductor Energy Lab. Co. Ltd. v. Chi Mei Optoelectronics Corp., 531 F. Supp. 2d 1084, 1113 (N.D. Cal. 2007) (finding summary judgment regarding specific intent inappropriate because "jury should be permitted to determine whether to infer intent based on the totality of the circumstantial evidence presented").  The jury is entitled to reach its own conclusions.

The MGA defendants also rely on 1-800 Contacts, Inc. v. Steinberg, 107 Cal. App. 4th 568 (2003), to argue that "[t]here is no intent to interfere where the defendant knows or believes its agreement with a third party will not infringe the rights of the plaintiff."  MGA Mot. at 47.  MGA claims that the "undisputed facts here show that Larian and MGA took steps to verify that by contracting with Bryant for the ownership of BRATZ, they would not infringe any potential rights of Mattel."  Not only are the "facts" MGA cites disputed, but the evidence is to the contrary.

First, MGA does not deny that it knew Bryant was employed by Mattel when it contracted with him and that its attorney, David Rosenbaum, received a facsimile from Bryant in which Bryant enclosed his offer letter with Mattel ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮.[191]  That offer letter expressly called attention to Bryant's Confidential Information and Inventions Agreement.[192]  Rosenbaum acknowledged that he knew such an agreement likely meant that any work Bryant did while employed by Mattel would be owned by Mattel.[193]

---

[191] CB AMF # 73
[192] CB AMF # 73.
[193] MGA AMF # 82.

1       Yet, notwithstanding this, MGA and Larian engaged in virtually no diligence

2   to determine whether contracting with Bryant would infringe Mattel's rights.  The

3   entirety of MGA's claimed "diligence" regarding Mattel's rights in Bratz amounts to

4   approximately half of a mere five minute conversation in which Rosenbaum asked

5   Bryant's attorney, Anne Wang, whether Bryant owned the rights to Bratz and was

6   told that Wang would check with Bryant.[194]  Wang testified that she did not even

7   provide Rosenbaum a substantive response.[195]  During their conversation,

8   Rosenbaum did not even ask where Bryant had developed Bratz.[196]  And

9   Rosenbaum acknowledges he did not ask Bryant's attorney whether Bryant owned

10  the copyrights in any of the Bratz materials he was seeking to sell to MGA.[197]

11      Moreover, what little MGA actually does claim to have done is contradicted

12  by the record.  ████████████████████████████████████

13  ████████████████████████[198]████████████████

14  ██████████████████████████████████████

15  ████████████████████████████████████████

16  ████████████████████[199]  Similarly, Larian claims MGA obtained

17  documentation from Bryant to verify the date of creation of Bratz.[200]  But when

18  asked to produce it, MGA's lawyers confirmed no such document exists.[201]

19      MGA's claimed "diligence" was hardly sufficient.  To the contrary, MGA's

20  lack of diligence and Larian's lies regarding what he and MGA purportedly did to

21  investigate Bryant's obligations demonstrate that MGA and Larian were complicit in

22  the breach of Bryant's duties to Mattel.  This is itself sufficient evidence for a jury to

23  infer that MGA and Larian intentionally interfered with Bryant's agreement.  <u>See</u>

24  

---

[194]  MGA AMF # 128.
[195]  Id.
[196]  Id..
[197]  MGA AMF # 83.
[198]  MGA AMF # 130.
[199]  Id.
[200]  Zeller Dec., Exhs. 97-99.
[201]  Id.

1   Bank of New York., 514 F.3d at 1016 (9th Cir. 2008) ("Intent, of course, may be
2   established by inference as well as by direct proof."); Semiconductor Energy Lab.
3   Co. Ltd., 531 F. Supp. 2d at 1113.

4       **E.    Bryant Breached His Contractual Obligations To Mattel**

5       Defendants cannot credibly dispute that Bryant breached his contractual
6   relationship with Mattel.  As discussed more fully elsewhere, defendants do not
7   contest (a) that Bryant assigned Bratz to MGA while a Mattel employee,[202] (b) that
8   Bryant worked for and accepted money from MGA while a Mattel employee,[203] or
9   (c) that he failed to disclose to Mattel that he conveyed Bratz to MGA and was
10  helping MGA race a competitive fashion doll to market.[204]  Rather, defendants argue
11  only that Bryant did not breach because Mattel does not own the Bratz designs that
12  Bryant created while a Mattel employee.  Mattel rebuts this argument in Part I.

13      Moreover, Bryant's breaches are not limited to assigning rights to MGA that
14  Mattel owns under the Inventions Agreement.  Bryant breached his contractual
15  obligations by failing to disclose Bratz to Mattel promptly and fully after he
16  conceived it.[205]  He also breached his contractual duties by not disclosing, and
17  failing to obtain written consent to, "engage in any employment or business other
18  than for the Company, or invest or assist (in any manner) any business competitive
19  with the business or future plans of the Company.[206]  Further, Bryant breached the
20  Inventions Agreement by disclosing proprietary information he developed as a result
21  of his employment with Mattel to MGA, and by refusing to return all materials used
22  in connection with Bratz to Mattel when he left its employ.[207]  Finally, Bryant
23  violated the  Conflict of Interest Questionnaire by failing to disclose to Mattel that

---

[202]  CB AMF # 76.
[203]  MGA AMF # 118.
[204]  CB AMF # 72, 76.
[205]  Inventions Agreement ¶ 2(a) and CB AMF # 108, 109, 119, 124, 129 and 131.
[206]  Inventions Agreement ¶ 3, CB AMF # 115.
[207]  Inventions Agreement 1(a), (d) and CB AMF # 113, 162.

07209/2445047.1

[PUBLIC REDACTED] JOINT OPPOSITION

1  he was working for, and was accepting money from, a Mattel competitor.[208]   Under

2  these circumstances, summary judgment *for Mattel* is appropriate.   See Mattel's

3  Motion at 31-33.   At the very least, there are at least triable issues of fact.

## VI.   MATTEL WILL PREVAIL ON ITS UNFAIR COMPETITION CLAIM

### A.   MGA's Conduct Is Unlawful

MGA argues that "'commercial bribery' is the only express predicate that would support the 'unlawful' prong of Mattel's unfair competition claims." (MGA Mem. at 42.) Not so. Mattel's UCL claim is based on all the wrongdoing by MGA and Larian that is alleged in Mattel's counterclaims. "Section 17200 'borrows' violations from other laws by making them independently actionable as unfair competitive practices.'" CRST Van Expedited, Inc. v. Werner Enterprises, Inc., 479 F.3d 1099, 1107 (9th Cir. 2007) (quoting Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134, 1143 (2003)). Thus, any of Mattel's claims against defendants can constitute the predicate unlawful act supporting Mattel's UCL claim. For instance, in addition to asserting a commercial bribery claim, Mattel alleges misappropriation of trade secrets in violation of 18 U.S.C. § 1832(a), intentional interference with contract and copyright infringement.[209] If any of these claims is at least subject to dispute, the unfair competition claim survives this motion. See CRST, 479 F.2d at 1107 (finding that allegations of intentional interference with contracts with employees constituted an unlawful business practice supporting a Section 17200 claim).

Moreover, the MGA defendants are wrong when they claim that Mattel has no evidence of commercial bribery. Cal. Penal Code § 641.3 states that "[a]ny employee who solicits, accepts or agrees to accept money or any thing of value from a person other than his or her employer, other than in trust for the employer, corruptly and without the knowledge or consent of the employer, in return for using

---

[208]   CB AMF # 116, MGA AMF # 118.
[209]   Second Amended Answer and Counterclaims ¶¶ 106-115, 122-128, 82-87.

1   or agreeing to use his or her position for the benefit of that other person, and any

2   person who offers or gives an employee money or any thing of value under those

3   circumstances, is guilty of commercial bribery."

4        Although MGA does not contest that it paid Bryant while he was employed

5   by Mattel,[210] it nonetheless denies that it could have violated the commercial bribery

6   statute, claiming that: (1) Mattel has no evidence that Bryant acted "corruptly,"

7   (2) Mattel has no evidence that MGA asked Bryant to use his position with Mattel

8   for MGA's benefit, and (3) Mattel has no evidence that Bryant used his position with

9   Mattel to benefit MGA.  MGA Mot. at 42-43.  MGA is wrong on all three counts.

10       First, Mattel does have evidence that Bryant acted "corruptly" within the

11  meaning of the commercial bribery statute when he purportedly sold and assigned

12  the rights to Bratz to MGA.  As MGA notes, 'corruptly' means that the person

13  specifically intends to injure or defraud his or her employer.    MGA Motion at

14  42:17-18.  Bryant admits he created at least some Bratz drawings while at Mattel

15  that, pursuant to his Inventions Agreement, Mattel believes it owns.[211]  MGA claims

16  that "[w]hen Bryant contracted with MGA he knew that he had created the BRATZ

17  concept in August 1998, before entering Mattel's employ, and he subjectively

18  believed that Mattel could lay no claim to his drawings."  MGA Motion at 42:20-

19  43:2.  But that assertion is far from undisputed; substantial evidence suggests that

20  Bryant knew that Mattel had an ownership interest in his work, which is why he and

21  MGA took elaborate steps to conceal their relationship from Mattel, as discussed

22  above.[212]

23       Second, MGA claims that "Mattel cannot establish that MGA 'asked' Bryant

24  to use his position with Mattel for MGA's benefit."  MGA Mem. At 43:5-6.   But

25  Mattel has presented evidence that MGA offered Bryant money to do just that.

26

27  [210]  MGA AMF # 118.
    [211]  CB AMF # 64, 68, 69, 70, 71, 90, 92.
28  [212]  CB AMF # 82, 83.

MGA AMF # 118.  MGA asked Bryant to work 16 hours a day on Bratz while he was still with Mattel.  Obviously, MGA was asking Bryant to use his position at Mattel for MGA's benefit.  Otherwise, considering that Bryant was still employed by Mattel, MGA was asking Bryant never to sleep.  MGA and Larian also knew that Bryant had entered into a Confidential Information and Inventions Agreement with Mattel.  MGA AMF # 118..  In short, MGA and Larian knew that Mattel had rights to all of Bryant's work and that in paying Bryant for the purported rights to Bratz, they were "asking" Bryant to use his position at Mattel for MGA's benefit.

MGA's claim that it asked for and received "a warranty" from Bryant and his attorney that his contract with MGA did not breach any existing contract with Mattel in no way immunizes it from liability.  MGA Mot. at 43.  To the contrary, MGA's failure to insist that Bryant provide a copy of the agreements they knew he had signed with Mattel is entirely consistent with a deliberate effort to hide beyond a suspect warranty, as is also discussed above.  MGA cannot avoid liability based on its willful ignorance of Bryant's contractual duties to Mattel.  See King v. Curtis, 133 Cal. App. 2d Supp. 806, 809-10 (1955) (finding that a party should not be able to take advantage of willful ignorance that a contract exists when the party can readily ascertain the information).

Third, MGA incorrectly claims that "Mattel does not allege, nor is there any evidence to prove, that Bryant used his position at Mattel to benefit MGA."  MGA Mot. at 44.  Substantial evidence establishes that Bryant did just that.  He used Mattel's resources, his Mattel contacts, and Mattel's vendors to design and develop Bratz.[213]  He used his training, experience and salary at Mattel to develop Bratz.[214] He recruited other Mattel employees to assist him.[215]  He used Mattel's equipment to

---

[213] CB AMF # 55, 62, 63, 66, 67, 70, 127.
[214] CB AMF # 65, 69, 71.
[215] CB AMF # 62 and 63.

1  communicate with MGA, and to negotiate the terms of his contract with MGA.[216]

2  He sent faxes to MGA from the Mattel fax machine.[217] He contacted one of Mattel's

3  hair vendors to provide hair for Bratz.[218]

4      MGA also claims, without citing any evidence, that "it is undisputed that

5  Bryant's creation of the BRATZ concept was something that was not done during

6  the normal course and scope of his employment at Mattel or at the direction of

7  Mattel." This is irrelevant. The commercial bribery statute does not require that an

8  employee use his position "in the normal course and scope of employment" to injure

9  or defraud his employer. All that is required is that the employee "use his or her

10  position for the benefit" of another. The evidence shows Bryant used his position at

11  Mattel to exploit Mattel's resources for MGA's benefit.

12  **B.    MGA's Conduct Is "Unfair" Under the UCL**

13      MGA argues that its conduct is not "unfair" under the UCL because Mattel's

14  claims do not "threaten or harm competition" or "threaten an incipient violation of

15  an antitrust law." (MGA Mem. at 41, quoting Cel-Tech Comm., Inc. v. Los Angeles

16  Cellular Tel. Co, 20 Cal. 4th 163, 186-87 (1999)). Not so. Commercial bribery is

17  explicitly prohibited by federal antitrust laws, specifically the Robinson-Patman

18  Act, which also prohibits price discrimination. 15 U.S.C. § 13(c); see FTC v. Henry

19  Broch & Co., 363 U.S. 166, 169-70 n.6 (1960). Mattel's UCL claim also

20  incorporates Mattel's RICO allegations.[219] Actionable civil racketeering creates "a

21  general harm to competition." See Crocker Nat. Bank v. Rockwell Int'l. Corp.,

22  555 F. Supp. 47, 49 (N.D. Cal. 1982). Accordingly, defendants' wrongdoing is

23  actionable under the "unfairness" prong of the UCL.

24

25

26

27

28

---

[216]  CB AMF # 67.
[217]  CB AMF # 73.
[218]  CB AMF # 126.
[219]  Second Amended Answer and Counterclaims ¶ 163.

[PUBLIC REDACTED] JOINT OPPOSITION

**C.** **Mattel's Common Law Unfair Competition Claim is Supported by the Law and Facts**

MGA oversimplifies the law of unfair competition when it states that "[t]he common law tort of unfair competition is generally thought to be synonymous with the act of 'passing off' one's goods as those of another." (MGA Motion at 44-45.) In fact, common law unfair competition is broader than that. For instance, a competitor's misappropriation of proprietary information to compete with the plaintiff constitutes unfair competition even where there is no allegation of "passing off." See, e.g., San Jose Const., Inc. v. S.B.C.C., Inc., 155 Cal. App. 4th 1528, 1546 (2007) (reversing summary judgment to defendant on common law unfair competition claims based on, among other things, allegations that defendants misappropriated information). Here, defendants' misappropriation of Bratz alone supports Mattel's claim.

MGA also misstates the factual record when it argues that Mattel cannot present evidence of the first two elements of its claim: "(1) the [counterclaimant] has invested substantial time and money in development of its . . . 'property'; [and] (2) the [counterclaim] defendant has appropriated the [property] at little or no cost." Smith & Hawken, Ltd. v. Gardendance, Inc., 2004 WL 2496163, at *6 (N.D. Cal. 2004) (quoting Balboa Ins. Co. v. Trans Global Equities, 218 Cal. App. 3d 1327, 1342 (1990)).

With respect to the first element, Mattel paid Bryant a salary, and provided various employment benefits, while Bryant created Bratz.[220] Because defendants misappropriated Bratz, Mattel had no chance to realize a return on its investment.

As for the second element, the question is not whether MGA itself spent money to develop Bratz, as it claims that it has (MGA Mot. at 44), but whether it paid Mattel anything at all for the rights it appropriated. In fact, MGA has made

---

[220]  MGA MF #1.

1  substantial profits on Bratz dolls without ever paying Mattel a dime.  MGA thus

2  "has appropriated [Bratz] at little or no cost."

3  **VII.  MATTEL'S STATE LAW CLAIMS ARE NOT PREEMPTED**

4       "Claims under state law are preempted where: (1) the work at issue comes

5  within the subject matter of copyright, and (2) the state law rights are equivalent to

6  any of the exclusive rights within the general scope of copyright."  Grosso v.

7  Miramax Film Corp., 383 F.3d 965, 968 (9th Cir. 2004) (quotation and citation

8  omitted).   Accordingly, that this action involves a copyrightable work—Bratz

9  drawings and related products—does not mean that *all* of Mattel's claims are

10 governed and preempted by the Copyright Act.  See Topolos v. Caldewey, 698 F.2d

11 991, 993 (9th Cir. 1993) ("[A] case does not arise under the federal copyright

12 laws . . . merely because the subject matter of the action involves or affects a

13 copyright. . . . the word 'copyright' is not so compelling as to invoke federal

14 jurisdiction upon its mere mention.'") (citation omitted).  To assess preemption, this

15 Court must engage in a fact-specific inquiry into Mattel's allegations to determine

16 whether the "'gravamen' of the state law claim asserted is identical to the rights

17 protected by the Copyright Act.'"  Celestrial Mechanix, Inc. v. Susquehannaa Radio

18 Corp., 2005 WL 4715213, at *6 (C.D. Cal. 2005) (citation omitted); see Summit

19 Mach. Tools Mfg. Corp. v. Victor CNC Systems, Inc., 7 F.3d 1434, 1440 (9th Cir.

20 1993) (applying fact-specific inquiry in preemption analysis).

21      MGA seeks summary judgment on preemption grounds as to state law claims

22 that are fundamentally different from conduct protected by the Copyright Act.  A

23 critical aspect of the claims that MGA challenges—that defendants' "stole" ideas

24 and concepts owned by Mattel under the Inventions Agreement—falls outside the

25 purview of federal copyright, and is thus not preempted.  Other conduct, such as

26 inducement to breach a contractual relationship, improper removal and possession

27 of Mattel's tangible property and trade secrets, and unfair business practices

28 involving misappropriation of trade secrets and criminal bribery, clearly involve an

"extra element that changes the nature of the action so that it is qualitatively different from a copyright infringement claim." Xerox Corp. v. Apple Computer, Inc., 743 F. Supp. 1542, 1550 (N.D. Cal. 1990). We address these claims in turn.

### A.   Mattel's Conversion Claim Is Not Preempted.

The MGA defendants have already argued to this Court (Judge Manella) that the Copyright Act preempts Mattel's conversion claim. Judge Manella rejected that argument, and there is no reason to revisit that ruling.[221]

### 1.   Theft of Ideas or Concepts Falls Outside the Copyright Act.

Under California law, abstract ideas generally do not create any protected property interests, see Desny v. Wilder, 46 Cal. 2d 715, 731, 299 P.2d 257 (Cal. 1956), and generally "[t]he tort of conversion does not apply to ideas," see Melchior v. New Line Productions, Inc., 106 Cal. App. 4th 779, 793 (2003). However, where such ideas/concepts are governed by a contractual agreement, a legally enforceable property interest is created. See Desny, 46 Cal. 2d at 733 ("the policy that precludes protection of an abstract idea by copyright does not prevent its protection by contract"). See also Rokos v. Peck, 182 Cal.App.3d 604, 614 (1986) ("By the early 1950's, the principle that 'ideas' could be protected by contract became firmly embedded in the laws of this state."); Colvig v. KSFO, 224 Cal.App.2d 357, 367 (Cal. App. 1964) ("abstract idea [is] subject to express or implied contract."). As explained in Mattel's Motion (at 6-10), Mattel owns the intangible Bratz ideas and concepts pursuant to the Inventions Agreement. Accordingly, the Inventions Agreement creates a protected property interest in the ideas/concepts Bryant created or conceived while employed at Mattel.

Unlike California law, the Copyright Act provides no protection for such ideas or concepts. Section 102(b) expressly provides: "In no case does copyright

---

[221]   See March 4, 2005 Order Denying Plaintiff Mattel, Inc.'s Motion to Remand and Certifying Question for Interlocutory Review at 14-17, Zeller Dec. Exh. 124.

1  protection for an original work of authorship *extend to any idea*, procedure, process,
2  system, method of operation, *concept*, principle, or discovery, regardless of the form
3  in which it is described, explained, illustrated, or embodied in such a work."
4  (emphasis added).  See Eldred v. Ashcroft, 537 U.S. 186, 190 (2003) ("17 U.S.C.
5  § 102(b) . . . makes only expression, not ideas, eligible for copyright protection.").
6  Because these contractually protected ideas and concepts do not receive federal
7  copyright protection, a claim based on the conversion of such ideas and concepts
8  does not fall within the "subject matter" prong of the preemption test.  As the court
9  recognized in Lattie v. Murdach, 1997 WL 33803, at *3, 42 U.S.P.Q.2d 1240, 1243
10  (N.D. Cal. 1997), "Section 102(b) expressly precludes the extension of copyright
11  protection for an original work of authorship to an idea.  Thus, ideas do not come
12  under the subject matter of copyright, and claims based upon them are not
13  preempted by federal copyright law."  See id. (quoting 4 Paul Goldstein, Copyright
14  § 15.9.1.2 (1996)) ("states are free to protect ideas, even tangibly fixed ideas, under
15  any theory of recovery"); see also Dunlap v. G&L Holding Group, Inc., 381 F.3d
16  1285, 1295 (11th Cir. 2004) ("because ideas are substantively excluded from the
17  protection of the Copyright Act, they do not fall within the subject matter of
18  copyright: 'the assertion that an element which is not protected by copyright is
19  included in the subject matter of copyright is completely illogical'") (citation
20  omitted).[222]

21     Mattel's conversion claim also does not satisfy the second preemption test
22  because state law protection of its contractually-created interest in Bryant's ideas
23  and concepts (i.e., the concept of "Bratz") is not "equivalent" to the rights protected
24  by the Copyright Act.   As California courts have long recognized, non-
25  copyrightable ideas are fundamentally different from tangible expressions that are

26  ───────────
[222] But see Selby v. New Line Cinema Corp., 96 F. Supp.2d 1053, 1058 (C.D. Cal.
27  2000) ("'ideas embodied in a work covered by the [Act] are nevertheless within the subject
   matter of copyright for purposes of preemption because 'scope' and protection are not
28  synonymous'" (citation omitted).

1    subject to copyright protection.  See Cavalier v. Jim Henson Co., Inc., 2000 WL
2    3398969 * 3 (C.D. Cal. 2000) (permitting claim based on theft of ideas since "the
3    scope of this tort is qualitatively different from the scope of the Copyright Act.");
4    Rokos, 182 Cal. App. 3d at 617 ("[t]he rights flowing from such an agreement are
5    qualitatively different from copyright protection, and their recognition creates no
6    monopoly in the ideas involved.").[223]   That Bryant's ideas/concepts for the Bratz
7    dolls were later fixed in tangible form, thereby becoming copyrightable, does not
8    deny Mattel a separate conversion cause of action based on the theft of the
9    precursory ideas or concepts themselves, which are not protected by copyright.

10              **2.      Mattel's Claims Regarding Defendants' Conversion of**
11                        **Tangible Materials Are Not Preempted.**

12          Mattel's conversion claim also extends to tangible materials owned by Mattel.
13   Specifically, Mattel cites:  (1) the removal by Bryant of drawings, sculpts and other
14   tangible materials owned by Mattel, see Complaint ¶ 157; (2) the unlawful
15   possession by MGA and Larian of such tangible materials, see id.; and (3) the
16   removal of Trade Secret Materials—also tangible items—in electronic and paper
17   form from Mattel's offices. See id., para. 158. These claims fall squarely within the
18   state-created right of conversion, and do not implicate the federal copyright laws.[224]

19          As the Ninth Circuit has recognized, "conversion of tangible property
20   involves actions different from those proscribed by the copyright laws, and thus is
21   not preempted." Oddo v. Ries, 743 F.2d 630, 635 (9th Cir. 1984).  Meridian Project
22   Systems, Inc. v. Hardin Const. Co., LLC, 2006 WL 1062070 * 2 (E.D. Cal. 2006), is

23

24   _____
         [223]  Dielsi v. Falk, 916 F. Supp. 985 (C.D.Cal 1996) is distinguishable because there
25   the stolen idea was embodied in a script.  Thus, the claim was for effectively for
     plagiarism, and therefore preempted.  Id. at 992.  Here, by contrast, defendants have
26   converted Bryant's idea for Bratz which existed -- and belongs to Mattel -- independent of
     any of his drawings.
         [224]  MGA's contention that Mattel discarded items Bryant allegedly used in assembling
27   the early Bratz sculpts, see MGA Mot., at 37 n.39, even if true, is of no moment since the
     cause of action is predicated on Bryant's improper removal and possession of Mattel's
28   property.  Even Mattel's discarded dolls parts belong to Mattel.

1    instructive.   Meridian involved allegations by a software company that two

2    customers improperly tried to reverse engineer its "Prolog" software.   2006 WL

3    1062070 at * 1.   Under an End User License Agreement ("EULA"), any violations

4    of the EULA required the breaching party to destroy or return to Meridian copies of

5    the software.   Meridian alleged "that defendants violated the EULA in various ways

6    including reverse engineering, copying, and modifying Prolog," and "since the

7    physical components of the program were not destroyed or returned, defendants

8    wrongfully possessed such items."   Id.

9           Notably, in rejecting defendants' copyright preemption defense, the court

10   found no preemption even though copyrightable, intangible intellectual property was

11   also involved.   The court held that the conversion claim was qualitatively different

12   since it "requires plaintiff to demonstrate that defendants wrongfully obtained

13   possession over a specific piece of property."   2006 WL 1062070, at *2.   See also

14   Lattie v. Murdach, 1997 WL 33803 * 5 (N.D. Cal. 1997) ("Conversion claims based

15   on physical deprivation of property are not preempted"); Brush Creek Media, Inc. v.

16   Boujakian, 2002 WL 1906620, *5 (N.D. Cal. 2002) (no exclusive federal

17   jurisdiction—a corollary to preemption—where the claim is "most generally for a

18   naked declaration of ownership or contractual rights").[225]   The same is true here.[226]

19

20

21

---

[225]   The presence of an "extra element" is also clear from the differing kinds of proof required. Copyright infringement generally requires a showing not only of ownership of a valid copyright, but also access to the original, and substantial similarity of the works. See Brown Bag Software v. Symantec, 960 F.2d 1465, 1472 (9th Cir. 1992). In contrast, conversion requires the "extra element" of whether a defendant converted the property by a wrongful act or disposition of property rights. See Burlesci, 68 Cal. App. 4th at 1066. "Ownership and title rights are matters of common law and do not arise under the Copyright Act." Dead Kennedys v. Biafra, 37 F. Supp.2d 1151, 1154 (S.D. Cal. 1999).

[226]   Defendants' reliance on Idema v. Dreamworks, Inc., 162 F. Supp. 2d 1129 (C.D.Cal. 2001), is misplaced because there the conversion claim was held preempted because the plaintiff did not seek "a return of the documents . . . but instead damages based on their value." Id., at 1193. But, as defendants acknowledge, Mattel does seek recovery of tangible materials stolen by defendants. See MGA Motion, 36:16-18. Accordingly, Idema is inapposite.

### 3.  Conversion Claims Based on Ownership Are Not Preempted.

Finally, since Mattel's conversion claims fundamentally involve questions of ownership—the rights to the Bratz-related materials defendants improperly removed and acquired—they are not pre-empted. See Brush Creek Media, Inc. v. Boujakian, 2002 WL 1906620, at *5 (N.D.Cal. 2002) (no exclusive federal jurisdiction—a corollary to preemption—where the claim is "most generally for a naked declaration of ownership or contractual rights").

### 4.  The Damages Mattel Seeks Have No Bearing on the Court's Preemption Analysis

MGA's attempt to convert Mattel's conversion claims into a copyright claim based on the relief sought is misguided.  First, in evaluating preemption, courts look at the allegations, not the remedies sought.   See Goldberg v. Cameron, 482 F. Supp.2d 1136, 1151 (N.D. Cal. 2007) ("The remedy for violation of the state claim does not inform the court's decision, only whether the state law right includes an extra element.").

Second, and in any event, the damages Mattel seeks do not replicate those sought under copyright.   Rather, Mattel seeks compensation for the loss of its property interest in Bryant's Bratz-related ideas/concepts, tangible materials, and Mattel's trade secrets.   One potential way to assess these "loss of possession" damages is to look at either the lost profits Mattel incurred as a result of the deprivation or the amount of profits defendants generated through the conversion.[227] That some overlap may exist in the damages analysis for conversion and copyright infringement does not convert claims involving unlawful theft and possession of property interests into a copyright claim. See Brush Creek Media, 2002 WL at *6 ("conversion claim could well support . . . [an] accounting of profits from [the

---

[227]  (Second Amended Complaint para. 160 at 73).

[PUBLIC REDACTED] JOINT OPPOSITION

1   property's] illicit use while stolen" and these "remedies are not per se preempted by

2   the Copyright Act.").[228]

3   **B.    The Copyright Act Does Not Preempt Mattel's Claim for**

4         **Intentional Interference with Contract**

5         Because Mattel's intentional interference claim contains an extra element—

6   inducement of Bryant to improperly use Mattel's property and to betray his

7   obligations of confidentiality and loyalty to Mattel—the Copyright Act does not

8   preempt it.  In arguing to the contrary, MGA ignores a body of controlling case law

9   holding that contract-interference claims contain an "extra element" not present in

10  copyright.[229]   See, e.g., Altera Corp. v. Clear Logic, 424 F.3d 1079, 1089 (9th Cir.

11  2005) (rejecting claim that interference with software license agreement by copying

12  software files to attract new customers is preempted and holding that "[t]he right at

13  issue is not the reproduction of the software . . . but is more appropriately

14  characterized as the use of the bitstream," which provided the "extra element'

15  necessary to defeat preemption") (citing Nat'l Car Rental Sys., Inc. v. Computer

16  Assocs. Int'l, 991 F.2d 426, 432 (8th Cir. 1993); Summit Machine Tool

17  Manufacturing Corp. v. Victor CNC Systems, Inc., 7 F.3d 1434, 1442 (9th Cir.

18  _____

19  [228]   MGA's authorities are inapposite. Dielsi v. Falk, 916 F. Supp. 985, 992 (C.D. Cal.
    1996) involved intangible property subject to copyright protection.  Because ideas are not
20  copyrightable, Dielsi is distinguishable.   Likewise, Harper & Row Publrs. v. Nation
    Enters., 723 F.2d 195, (2d Cir. 1983) involved only a temporary and minimal deprivation
    of property rights.   See id. at 201 ("[m]erely removing one of a number of copies of a
21  manuscript . . . for a short time, copying parts of it, and returning it undamaged, constitutes
    far too insubstantial an interference with property rights to demonstrate conversion.").
22  Here, defendants' misappropriation of Bratz made it impossible for Mattel to capitalize on
    that property.  Finally, in Worth v. Universal Pictures, Inc., 5 F.Supp.2d 816 (C.D. Cal.
23  1997), the plaintiffs sought damages for the "unauthorized reproduction and distribution"
    of a movie.   Id. at 822.   However, their conversion claim was predicated upon the
24  submission of a variety of protected works of authorship, see id., whereas, the predicate
    ideas/concepts in this case receive no such copyright protection.  Additionally, unlike the
25  plaintiffs in Worth, Mattel claims a "physical deprivation", id., thereby further
    distinguishing its claim from copyright.
    [229]   MGA cites only non-binding cases from outside this circuit, see MGA Motion at
26  37-38 (citing Harper & Row (2d Cir.) and Gemcraft Homes, Inc. v. Sumurdy, 688 F.
    Supp. 289, 295-96 (E.D. Tex. 1988), or cases involving reproduction of intangible
27  intellectual property subject to copyright protection.  See id. (citing Motown Record v.
    George A. Hormel & Co., 657 F. Supp. 1236, 1240 (C.D. Cal. 1987), and Idema v.
28  Dreamworks, Inc., 162 F.Supp.2d 1129, 1193 (C.D. Cal. 2001)).

1  1993) (interference claim that defendant appropriated property that plaintiff had the

2  exclusive right to "includes the requisite extra element and therefore is not

3  preempted by federal law.")[230]

4      So too here.   Mattel's interference claim rests on MGA's inducement of

5  Bryant improperly to use Mattel's property—conduct entirely different from the

6  reproduction and distribution of the property itself.   Moreover, the Inventions

7  Agreement created a contractual duty as well as a fiduciary duty, <u>see</u> Mattel Motion

8  at 31-33, and MGA's inducement of Bryant to breach such duties involves "extra

9  elements" absent from copyright law.  <u>See</u> Nimmer On Copyright, § 1.01[B][1][b] at

10  1-28 ("breach of trust requires the existence of a trust relationship which is of course

11  not a prerequisite to a copyright infringement action. The same additional ingredient

12  applies to an action for breach of fiduciary duty in as much as no such duty attends a

13  copyrighted work.").[231]

14      Finally, insofar as Mattel's interference claim is premised on MGA's

15  inducement of Bryant improperly to use trade secret materials in violation of the

16  Inventions Agreement, it is not preempted because "a status of secrecy [is] not

17  required for copyright …."  Nimmer, <u>supra</u> § 1.01[B][1][h] & n.357 (citing cases).

18      **C.**    <u>**Mattel's Unfair Competition Claim Is Not Preempted.**</u>

19      MGA's contention that Mattel's UCL claims are preempted because the

20  Complaint "specifically incorporates allegations made earlier in its complaint,"

---

21      [230]   <u>Unisys Corp. v. Varilease Technology Group, Inc.</u>, 1999 WL 34782848, at *2 (D.

22  Ariz. 1999) (no preemption because "intentional interference claim includes additional or extra elements…; specifically, breach of an alleged fiduciary duty and intentional

23  misconduct); <u>PMC, Inc. v. Saban Entertainment, Inc.</u>, 45 Cal. App. 4th 579, 594 n.8 (1996) (allegation defendant prevented plaintiff from "finalizing a deal … is qualitatively

24  different from conduct charged as an infringer"); <u>Celestial Mechanix</u>, 2005 WL at * 11 (wrongfully inducing defendant to breach a contract is "qualitatively different from a

25  copyright claim, and it is not preempted"); <u>See also Silicon Image, Inc. v. Analogix Semiconductor, Inc.</u>, 2007 WL 1455903, at *9 (N.D. Cal. 207) (the allegation of "the use

26  of Silicon Image's software in a matter that is in violation of the Software License Agreement … provides the 'extra element' necessary to avoid preemption.").

    [231]   Further, to the extent that Mattel's claim involves ideas/concepts unprotected by

27  copyright, its interference claim, like its conversion claim, does not fall within the "subject matter" of the Copyright Act, and is therefore not preempted for this additional reason..

28  <u>See supra</u> at VII.A.1 (discussing cases).

MGA Motion at 40, is specious.  And its contention that the claims merely replicate copyright claims is similarly unpersuasive.

That Mattel followed the customary pleading practice of incorporating all of its prior allegations in its Complaint says nothing about whether its UCL claims are preempted.  Were MGA's view the law, courts would not engage in a fact-specific preemption analysis (as they do under well-settled precedent), but would simply skim a complaint to see if it incorporated prior allegations involving copyright, and if so, summarily find preemption.

Kodadek v. MTV Networks, 152 F.3d 1209 (9th Cir. 1998), does not support MGA's position.  Kodadek found preemption because the incorporated "paragraphs of consequence," id., at 1212 (emphasis added), involved the unauthorized reproduction, preparation and distribution of works of authorship—conduct covered by Section 106 of the Copyright Act.  It did not hold that any incorporation of prior allegations, irrespective of the specific nature of the claim, automatically triggers preemption.  Such a "kitchen sink" approach would ignore the important legal distinction courts have drawn between UCL claims that merely replicate copyright protection and those premised on conduct involving "extra elements," such as "breach of fiduciary duty, breach of confidentiality or improper revelation of a trade secret," which are not preempted.  See Balboa Ins. Co. v. Trans Global Equities, 218 Cal. App. 3d 1327, 1351 (1990).

Mattel's claims are clearly not preempted by the Copyright Act because they are premised in part on "MGA's commercial bribery of Bryant in violation of Calif Penal Code § 641.3, misappropriation of trade secrets in violation of 18 U.S.C. § 1832(a)," Complaint ¶ 165, at 74, and MGA's and Larian's disparagement of and misrepresentations regarding Mattel's products.  See id.[232]  The "extra elements" in these claims are analogous to other claims courts have found not preempted.  See,

---

[232]  Some of these claims pertain to Phase II.

[PUBLIC REDACTED] JOINT OPPOSITION

1  e.g., Firoozye v. Earthlink Network, 153 F.Supp.2d 1115, 1131 (N.D. Cal. 2001)

2  (UCL claim premised on misrepresentation and misappropriation of trade secrets not

3  preempted) (quoting Trandes Corp. v. Guy F. Atkinson Co., 996 F.2d 655, 660 (4th

4  Cir. 1993); Lattie v. Murdach, 1997 WL 33803 at *5 (no preemption of fraudulent

5  misrepresentation   allegations   in   UCL   claim);   Vigilante.com, Inc. v.  Argus

6  Test.com, Inc., 2005 WL 2218405, at * 13 n. 12 (D. Or. 2005) (no preemption of

7  unfair competition claim involving breach of confidentiality of information and use

8  of infringing materials to steal customers, distributors, and employees).

9      In Educational Testing Service v. Simon, 95 F.Supp.2d 108, 1091 (C.D. Cal.

10  1999), the court rejected an argument that the Copyright Act preempted a UCL

11  claim involving the defendants' use of reconstructed test questions created by ETS

12  to prepare future test-takers.  The court held that the conduct violated a separate

13  statute, Section 123 of the California Business and Professions Code, and thus,

14  involved an "extra element" that was qualitatively different from copyright. See id.

15  Notably, the court found no preemption despite plaintiff's coterminous copyright

16  infringement claims for unauthorized reproduction of the test questions. See id. at

17  1090. ETS thus establishes that UCL claims and copyright claims can coexist.[233]

18

19                                   **Conclusion**

20      For the foregoing reasons, the Court should deny defendants' motions for

21  partial summary judgment.

22

23

24

25

26

27

28

---

[233] Moreover, the legislative history of the Copyright Act evinces a clear intent to permit state law unfair competition claims provided, as here, they "'contain elements such as an invasion of personal rights or a breach of trust or confidentiality.'"  See id. at n.28 (quoting Warrington Associates, Inc. v. Real-Time Engineering Systems, Inc., 522 F. Supp. 367, 369 (N.D. Ill. 1981) (quoting H. Rep. No. 9401476, 94th Con., 2d Sess. 132 (1976), reprinted in 5 U.S. Code Cong. & Admin. News at 5659, 5746-5747 (1976)).

[PUBLIC REDACTED] JOINT OPPOSITION

1   DATED: March 24, 2008     QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

2

3                         By _____

4                             John B. Quinn
                            Attorneys for Mattel, Inc.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT OPPOSITION