# EXHIBIT 1



# FORM 10-K405

## MATTEL INC /DE/ - mat

**Filed: March 28, 2001 (period: December 31, 2000)**

Annual report. The Regulation S-K Item 405 box on the cover page is checked

EXHIBIT

2501

1-24-08

EXHIBIT_____1_____

PAGE_____14_____

## PART I

| Item 1. | Business |
| Item 2. | Properties |
| Item 3. | Legal Proceedings |
| Item 4. | Submission of Matters to a Vote of Security Holders |

## PART II

| Item 5. | Market for the Registrant's Common Equity and Related Stockholder |
| Item 6. | Selected Financial Data |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results |
| Item 7a. | Quantitative and Qualitative Disclosures About Market Risk |
| Item 8. | Financial Statements and Supplementary Data |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and |

## PART III

| Item 10. | Directors and Executive Officers of the Registrant |
| Item 11. | Executive Compensation |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management |
| Item 13. | Certain Relationships and Related Transactions |

## PART IV

| Item 14. | Exhibits, Financial Statement Schedules and Reports on Form 8-K |
| SIGNATURES | |
| Item 14(a)(2) | of this Form 10-K. In our opinion, this Financial Statement |

EX-2.2 (SALE AND PURCHASE AGREEMENTAMENDMENT NO. 1)

EX-2.3 (AMENDMENT NO. 2 TO THE SALE AND PURCHASE AGRE

EX-3.0

EX-3.3 (BY-LAWS OF MATTEL)

EX-4.13 ((INCLUDING ANY FUTURE HOLDER) IS BOUND BY THEAGREEMENT BETWEEN THE ORIGINAL PURCHASER AND OBTAINED FROM THE COMPANY).)

EX-10.9 (INDEMNITY AGREEMENT)

EXHIBIT _____ 1

PAGE _____ 15

EX-10.10 (EXECUTIVE EMPLOYMENT AGREEMENT)

EX-10.13 (Material contracts)

EX-10.19 (Re: Amendment to Your Employment Agreement——————————————————)

EX-10.24 (Re: Amendment to Your Employment Agreement——————————————————)

EX-10.29 (Re: Amendment to Your Employment Agreement——————————————————)

EX-10.33 (AMENDED AND RESTATED EXECUTIVE EMPLOYMENT AGR)

EX-10.34 (Re: Amendment to Your Employment Agreement an——————————————————)

EX-10.35 (LOAN AGREEMENT)

EX-10.36 (LOAN AGREEMENT)

EX-10.37 (MATTEL)

EX-10.39 (MATTEL)

EX-10.43 (AMND #1 TO MATTEL)

EX-10.49 (Material contracts)

EX-10.57 (AMENDMENT TO MATTEL 1990 STOCK OPTION PLAN)

EX-10.60 (FIRST AMENDMENT TO AWARD AGREEMENT)

EX-10.61 (MATTEL,INC.NOTICE OF GRANT OF STOCK OPTIONS AND GRANT AGREEMENT)

EX-10.62 (GRANT AGREEMENT FOR A NON-QUALIFIED STOCK OPTION)

EX-10.63 (AWARD CANCELLATION AGREEMENT)

EX-10.68 (Material contracts)

EX-10.75 (Material contracts)

EX-10.80 (AMENDMENT NO. 2 TO MATTEL 1999 STOCK OPTION PLAN)

EX-11.0 (Statement regarding computation of per-share earnings)

EX-12.0 (Statement regarding computation of ratios)

EX-13.0 (PAGES 17-48 OF THE MATTEL)

EX-21.0 (Subsidiaries of the registrant)

EX-23.0 (Consents of experts and counsel)

EXHIBIT _____ 1 _____

PAGE _____ 16 _____

---

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

----------------

FORM 10-K

(Mark One)
[X] ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2000

[_] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from        to

Commission File Number 001-05647

----------------

MATTEL, INC.
(Exact name of registrant as specified in its charter)

Delaware
(State or other jurisdiction of incorporation or organization)

95-1567322
(I.R.S. Employer Identification No.)

333 Continental Boulevard
El Segundo, California 90245-5012
(Address of principal executive offices)

(310) 252-2000
(Registrant's telephone number)

Securities registered pursuant to Section 12(b) of the Act:

Title of each class
--------------------

Name of each exchange on which registered
------------------------------------------

Common Stock, $1.00 par value
(and the associated Preference Share Purchase Rights)

New York Stock Exchange
Pacific Exchange, Inc.

----------------

Securities registered pursuant to Section 12(g) of the Act:

(NONE)

----------------

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes [X] No [_]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statement incorporated by reference in Part III of this Form 10-K or any amendment of this Form 10-K. [X]

The aggregate market value of the voting stock held by non-affiliates of the registrant as of the close of business on March 16, 2001 was $7,591,444,190.

Number of shares outstanding of registrant's common stock, $1.00 par value, (including 1,682,138 common shares issuable upon exchange of outstanding exchangeable shares of Softkey Software Products Inc.) as of March 16, 2001:

430,577,290 shares

Source: MATTEL INC /DE/, 10-K405, March 28, 2001

EXHIBIT _____ 1

PAGE _____ 17

DOCUMENTS INCORPORATED BY REFERENCE

1. Portions of the Mattel, Inc. Annual Report to Stockholders for the year ended December 31, 2000 (Incorporated into Parts I, II and IV)

2. Portions of the Mattel, Inc. 2001 Notice of Annual Meeting of Stockholders and Proxy Statement, to be filed with the Securities and Exchange Commission within 120 days after the close of the registrant's fiscal year (Incorporated into Part III).

---

Source: MATTEL INC /DE/, 10-K405, March 28, 2001

EXHIBIT _____ 1

PAGE _____ 18

PART I

Item 1. Business

Mattel, Inc. ("Mattel") designs, manufactures, and markets a broad variety of toy products on a worldwide basis through both sales to retailers and direct to consumers.

Mattel believes its products are among the most widely recognized toy products in the world. Mattel's portfolio of brands and products are grouped in the following categories:

Girls--Barbie(R) fashion dolls and accessories, collector dolls, Cabbage Patch Kids(R), Polly Pocket(R), and Diva Starz(TM)

Boys-Entertainment--including Hot Wheels(R), Matchbox(R), Tyco(R) Electric Racing and Tyco(R) Radio Control (collectively "Wheels"), and Disney, Nickelodeon(R), Harry Potter(TM), Max Steel(TM), games and puzzles (collectively "Entertainment")

Infant & Preschool--including Fisher-Price(R), Power Wheels(R), Sesame Street(R), Disney preschool and plush, Winnie the Pooh(R), Blues Clues(R), See 'N Say(R), Magna Doodle(R), and View-Master(R)

Direct Marketing--American Girl(R), Barbie(R), Wheels and Fisher-Price(R)

Mattel plans to continue to focus on its portfolio of traditional brands that have historically had worldwide sustainable appeal, to create new brands utilizing its knowledge of children's play patterns and to target customer and consumer preferences around the world. Mattel also intends to expand its core brands through the Internet, and licensing and entertainment partnerships.

On May 16, 2000, Robert A. Eckert was unanimously elected Chairman of the Board of Directors and Chief Executive Officer of Mattel. Previously, he had been president and chief executive officer of Kraft Foods, Inc., the largest packaged food company in North America. Mr. Eckert has outlined a new strategy for Mattel that includes building core brands, cutting costs and attracting and developing people. Mattel also added two new outside directors during 2000 and one new outside director during 2001 to its Board of Directors.

In 2000, Mattel implemented a new two phase interactive media strategy, consisting of the disposition of the Learning Company division as phase one and licensing agreements with leading interactive companies for Mattel's core brands as phase two. The disposition of the Learning Company division was completed in October 2000. Licensing agreements with Vivendi Universal Publishing for Barbie(R) and Fisher-Price(R) brands, and THQ, Inc. for Hot Wheels(R) and Matchbox(R) brands, were announced in January 2001.

During the third quarter of 2000, Mattel initiated a financial realignment plan designed to improve gross margin; selling, general and administrative expenses; operating profit, and cash flow. The plan will require a total pre-tax charge estimated at approximately $250 million, or $170 million on an after-tax basis. These costs will be recorded over the next two years. Under the plan, Mattel expects to generate approximately $200 million of cost savings over the next three years. See "Management's Discussion and Analysis of Financial Condition and Results of Operations--2000 Financial Realignment Plan", Note 9 to the Consolidated Financial Statements in the Annual Report to Stockholders, incorporated herein by reference, and "Risk Factors."

Mattel also announced a change in its dividend policy, from the past policy of paying $0.09 per share quarterly when and as declared by the Board of Directors to $0.05 per share annually when and as declared by the Board of Directors. See Part II, Item 5., "Market for the Registrant's Common Equity and Related Stockholder Matters."

Mattel was incorporated in California in 1948 and reincorporated in Delaware in 1968. Its executive offices are located at 333 Continental Boulevard, El Segundo, California 90245-5012, telephone (310) 252-2000.

2

Source: MATTEL INC /DE/, 10-K405, March 28, 2001

EXHIBIT ____1____

PAGE ___19___

# EXHIBIT 2

Received:   7/18/06   4:40PM          RightFAX -> JetFax   `20;   Page 2
RightFAX            7/18/2006 4:37   PAGE 002/019   Fax Server



FILED



2006 JUL 18  AM 10: 16

**ENTERED**

JUL 1 8 2006

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION
                              DEPUTY

Priority
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

CARTER BRYANT,

              Plaintiff,

v.

MATTEL, INC.,

              Defendant,

and related actions.

CASE NO. CV 04-09049 SGL (RNBx)

(Consolidated with cases CV 04-09059 and CV 05-02727)

ORDER GRANTING MOTIONS TO DISMISS

## I. Introduction

    This consolidated action involves the individual cases of <u>Bryant v. Mattel, Inc.</u>, CV 04-09049; <u>Mattel, Inc. v. Bryant</u>, CV 04-09059; and <u>MGA Entertainment, Inc. v. Mattel, Inc.</u>, CV 05-02727. This Order rules on Motions to Dismiss previously docketed in cases 04-09049 and 04-9059.

    The factual background underlying this consolidated action is complex. The Court sets forth the factual background only to the extent that it is necessary to discuss its ruling on two pending motions to dismiss. A hearing regarding these motions was held on June 26, 2006. For the reasons and in the manner set forth below, the Court grants both motions.

THIS CONSTITUTES NOTICE OF ENTRY AS REQUIRED BY FRCP, RULE 77(D).

DOCKETED ON CM

JUL 1 8 2006

EXHIBIT _____2_____   7-18

PAGE _____20_____

Received:    7/18/06   4:41PM                    RightFAX -> JetFax   '20;   Page 3
RightFAX                 7/_d/2006 4:37   PAGE 003/019   Fax Server

## II. Motion to Dismiss (04-09049)

A.    **Factual Background**

Carter Bryant is a designer to whom creation of MGA's "Bratz" line of dolls has been attributed. Compl. ¶ 6. Mattel has sued him under a variety of state-law theories relating to certain agreements Bryant signed while an employee with Mattel. See generally Compl. filed in 04-09059. Although Mattel has not sued him for copyright infringement of any Mattel product, Bryant nevertheless claims that he is reasonably apprehensive regarding being sued for copyright infringement. Specifically, Bryant makes the following allegations in his complaint seeking declaratory relief:

First, Bryant claims that an article published in the Wall Street Journal in July, 2003, attributed to Mattel sources a belief that "the Bratz borrow liberally from a Mattel project that was scrapped at the testing stage in 1998." Compl. Ex. A; Compl. ¶ 54. The scrapped Mattel project is alleged to be the project referred to by Mattel as "Toon Teens." Compl. ¶ 56.

Second, Bryant alleges that he suggested, as a way to resolve a discovery dispute, that Mattel stipulate that it would not sue based on "Toon Teens." Compl. ¶ 55. Mattel refused to do so. Id. However, since that initial refusal, Mattel has represented to the Court that it "will not maintain that Bratz infringes the copyright in Toon Teens." June 26, 2006, Tr. at 64 (statement of Mattel counsel John B. Quinn). Mattel has reiterated this position in a post-hearing brief, filed on July 5, 2006.

Third, Mattel cooperated with a Hong Kong toy company that MGA sued for copyright infringement. Compl. ¶ 56. MGA's claims involved the Bratz dolls. Id. Mattel's cooperation consisted of providing the Hong Kong toy company with documents and photographs of the Toon Teens products, ostensibly to help prove that Bratz was not an original design and that Bryant had copied and infringed Toon Teens. Compl. ¶ 57.

Finally, Bryant notes that Mattel did not seek copyright registration until November, 2003, which is the same time Mattel claims it first learned of Bryant's

EXHIBIT ____ 2

PAGE ____ 21

2

Received:   7/18/06   4:41PM          RightFAX -> JetFax     20;   Page 4
RightFAX              7/13/2006 4:37   PAGE 004/019   Fax Server

1   contract with MGA. Compl. ¶¶ 59-60. Bryant alleges that registration of a copyright is

2   a necessary step to be taken prior to filing a copyright infringement action. Compl.

3   ¶ 60.

4   **B.   Standing to Seek Declaratory Relief**

5        The purpose of the Declaratory Judgment Act is "to relieve potential defendants

6   from the Damoclean threat of impending litigation which a harassing adversary might

7   brandish, while initiating suit at his leisure — or never." Societe de Conditionnement

8   v. Hunter Engineering Co., 655 F.2d 938, 943 (9th Cir.1981). However, a party

9   seeking declaratory relief must still satisfy the "case or controversy" requirement found

10  in 28 U.S.C. § 2201(a). Hal Roach Studios, Inc. v. Richard Felner and Co., Inc., 896

11  F.2d 1542,1555 (9th Cir. 1990). This requirement must be satisfied at the time the

12  suit is filed and must continue throughout the term of the suit. Id. at 1556 (citing

13  International Harvester Co. v. Deere & Co., 623 F.2d 1207, 1210 (7th Cir.1980)).

14       To meet this requirement, a party seeking declaratory relief must show that,

15  based on his reasonable perceptions, under all the circumstances of the case, there is

16  a substantial controversy between parties having adverse legal interests that causes

17  in the plaintiff a real and reasonable apprehension that he will be subject to liability,

18  and the controversy is of sufficient immediacy and reality to warrant declaratory relief.

19  Hal Roach, 896 F.2d at 1555. The apprehension must have been caused by the

20  defendant's actions. Id. (citing International Harvester, 623 F.2d at 1211).

21       Viewing Bryant's allegations in light of this standard, and in light of recent

22  developments, the Court must conclude that Bryant, although having a reasonable

23  apprehension of suit prior to counsel's representations regarding the intent to sue

24  based on Toon Teens, no longer has a reasonable apprehension that he will be

25  subject to liability. Bryant's Complaint, of course, makes reference to "other Mattel

26  products;" however, the substance of his allegations all address the product "Toon

27  Teens." The Wall Street Journal article is alleged to have involved Toon Teens.

28  Mattel's cooperation with the Hong Kong toy company allegedly involved Toon Teens.

3

EXHIBIT _____ 2

PAGE _____ 22

Received:   7/18/08   4:42P1          RightFAX -> JetFax   20;   Page 5
RightFAX              7/13/2006 4:37   PAGE 005/019   Fax Server

1   The copyright registration referenced in the Complaint relates to Toon Teens.  No
2   other allegations are made that might tend to raise a real and reasonable
3   apprehension that Bryant could be subject to liability for copyright infringement based
4   on any other Mattel product.  Accordingly, Bryant has not met the standard for
5   asserting a claim for declaratory relief.

6   **C.**    <u>**Ruling on Motion to Dismiss**</u>

7          Accordingly, the Court **GRANTS** the Motion to Dismiss and dismisses without
8   prejudice Bryant's claim for declaratory relief.  Should Bryant, through discovery or
9   otherwise, acquire a real and reasonable apprehension of being subject to liability on
10  the basis of another identifiable Mattel product, Bryant may file a declaratory relief
11  claim.  A claim by Mattel of copyright infringement based on the Toon Teens product
12  is barred by counsel's representation; therefore, Bryant may not seek declaratory relief
13  regarding this issue.

14                  **III. Motion to Dismiss (04-9059)**

15  **A.**    <u>**Factual Background**</u>

16          The parties make the following factual allegations and assert the following
17  claims and counterclaims.

18          Bryant was employed by Mattel from September, 1995, to April, 1998, and
19  again beginning in January, 1999, and ending in October, 2000.  Compl. ¶ 9.  In
20  January, 1999, Bryant signed documents entitled "Employee Confidential Information
21  and Inventions Agreement" ("Employee Agreement") and "Conflict of Interest
22  Questionnaire" ("COI Questionnaire").  The Employee Agreement provides:

23          This Agreement is designed to make clear that: (i) I will maintain the
24          confidentiality of the Company's trade secrets; (ii) I will use those trade
25          secrets for the exclusive benefit of the Company; (iii) inventions that I
26          create will be owned by the Company; (iv) my prior and continuing
27          activities separate from the Company will not conflict with the Company's
28          development of its proprietary rights; and (v) when and if my employment

EXHIBIT _____ 2

PAGE _____ 73

Received:   7/18/06   4:42PM                    RightFAX -> JetFax   20;   Page 6
RightFAX            7/18/2006 4:37    PAGE 006/019    Fax Server

1  with the Company terminates I will not use my prior position with the

2  Company to the detriment of the Company.

3      1.    Provisions Related to Trade Secrets

4  . . . .

5      (b) As used in the Agreement, "Proprietary Information" means

6  any information (including formula, pattern, compilation, device, method,

7  technique or process) that derives independent economic value, actual

8  or potential, from not being generally known to the public or to other

9  persons who can obtain economic value from its disclosure or use, and

10  includes information on the Company, its customers, suppliers, joint

11  ventures, licensors, licensees, distributors and other persons and entities

12  with whom the Company does Business.

13      (c) I will not disclose or use at any time either during or after my

14  employment with the Company, any Proprietary Information except for

15  the exclusive benefit of the Company as required by my duties for the

16  Company, or as the Company expressly may consent to in writing, I will

17  cooperate with the Company and use my best efforts to prevent the

18  unauthorized disclosure, use or reproduction of all Proprietary

19  Information.

20  . . . .

21      2.    Ownership of Inventions

22      (a) I agree to communicate to the Company as promptly and fully

23  as practicable all inventions [as defined below] conceived or reduced to

24  practice to me (alone or jointly by others) at any time during my

25  employment by the Company, I hereby assign to the Company and/or its

26  nominees all my right, title and interest in such inventions, and all my

27  right, title and interest in any patents, copyrights, patent applications or

28  copyright applications based thereon. . . .

EXHIBIT 2

5

PAGE 24

Received: 7/18/06 4:42PM    RightFAX -> JetFax    ?O; Page 7
RightFAX         7/18/2006 4:37    PAGE 007/019    Fax Server



(b) As used in this Agreement, the term "Inventions" includes, but is not limited to, all discoveries, improvements, processes, developments, designs, know-how, data computer programs and formulae, whether patentable or unpatentable.

(c) Any provision in this Agreement requiring me to assign my rights in any invention does not apply to an invention which qualifies under the provision of Section 2870 of the California Labor Code. That section provides that the requirement to assign "shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities or trade secret information except for those inventions that either (1) relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or (2) result from any work performed by the employee for the employer." I understand that I bear the burden of proving that an invention qualifies under Section 2870.

. . . .

3.    Conflicts with Other Activities

(a) My employment with the Company requires my undivided attention and effort. Therefore, during my employment with the Company, I will fully comply with the Company's Conflict of Interest Policy, as it may be amended from time to time. I shall not, without the Company's express written consent, engage in any employment or business other than for the Company, or invest in or assist (in any manner) any business competitive with the business or future business plans of the Company.

4.    Miscellaneous

. . . .

6

EXHIBIT ___2___

PAGE ___25___

Received:   7/18/08   4:43PM          RightFAX -> JetFax   20;  Page 8
RightFAX          7/18/2008 4:37    PAGE 008/019    Fax Server

1        (f) This agreement will be governed by and interpreted in

2    accordance with the laws of the State of California.

3        . . . .

4        CAUTION: THIS AGREEMENT CREATES IMPORTANT

5    OBLIGATIONS OF TRUST AND AFFECTS THE EMPLOYEE'S RIGHTS

6    TO INVENTIONS THE EMPLOYEE MAY MAKE DURING HIS OR HER

7    EMPLOYMENT.

8    Employment Agreement, attached to the Compl. as Ex. A.[1]

9    **B.    The Parties' Claims**

10       Mattel brings a number of claims based on these documents, including breach

11   of contract, breach of fiduciary duty, breach of the duty of loyalty, unjust enrichment,

12   and conversion.

13       Bryant brings a number of counterclaims based on these documents.

14   Specifically, Bryant makes the following challenges to the Employment Agreement:

15       In his first counterclaim, Bryant claims that the Employment Agreement violates

16   Cal. Bus. & Prof. Code §§ 17200 (unfair competition law) because (a) it is an unfair

17   restraint of trade (restricting job mobility and use of publicly available information) in

18   violation of Cal. Bus. & Prof. Code § 16600; (b) it violates Cal. Labor Code §§ 96(k),

19   98.6, and 2699; (c) it violates Cal. Labor Code § 2870; and (d) it is procedurally and

20   substantively unconscionable.  See Bryant's Counterclaims ¶¶ 33-47.

21       In his second counterclaim, Bryant claims that the Employment Agreement

22   should be rescinded because it was procured due to mistake, duress, menace and/or

23

24   _____

25      [1] Bryant objects to the Court's consideration of the Agreement and the COI
Questionnaire.  Bryant purports to dispute the authenticity of these documents.

26   However, examining the substance of Bryant's objections, it becomes clear that Bryant
objects not to the content of these documents, but to the validity and legal effect of

27   these documents.  Accordingly, the Court's consideration of these documents in
connection with the present Motion to Dismiss is proper.  See Parrino v. FHP, Inc., 146

28   F.3d 699, 706 (9th Cir. 1998) (the Court may consider documents whose authenticity is
not questioned and upon which the complaint necessarily relies).

EXHIBIT ____ 2

PAGE ____ 26

1  fraud. See Bryant's Counterclaims ¶¶ 48-54.

2      In his third counterclaim, Bryant alleges that the Employment Agreement was

3  procured by fraud in that Mattel "fail[ed] to disclose to Bryant the true meaning of the

4  terms and the purported legal effect of the [Employment] Agreement." See Bryant's

5  Counterclaims ¶¶ 55-60.

6      Finally, in his fourth counterclaim, Bryant seeks declaratory judgment that

7  Mattel's conduct in requiring Bryant and other employees to execute the Employment

8  Agreement constitutes unfair competition and unfair business practices in violation of

9  Cal. Bus. & Prof. Code §§ 17200 and 16600. Bryant also seeks a declaration that the

10  Employment Agreement is unlawful and unenforceable as to him and as to other

11  current and former employees of Mattel. See Bryant's Counterclaims ¶¶ 61-65.

12  **C.**   **Standard for Dismissal Pursuant to Fed. R. Civ. P. 12(b)(6)**

13      The present Motion to Dismiss requires the Court to determine whether the

14  counterclaims state any claim upon which relief may be granted. See Fed R. Civ. P.

15  12(b)(6). The Court will not dismiss the claims for relief unless Bryant cannot prove

16  any set of facts in support of the claims that would entitle him to relief. See Steckman

17  v. Hart Brewing, Inc., 143 F.3d 1293, 1295 (9th Cir. 1998). In limiting its inquiry to the

18  content of the counterclaims, the Court must take the allegations of material fact as

19  true and construe them in the light most favorable to Bryant. See Western Reserve

20  Oil & Gas Co. v. New, 765 F.2d 1428, 1430 (9th Cir. 1985). Additionally, the Court "is

21  not required to accept legal conclusions cast in the form of factual allegations if those

22  conclusions cannot be reasonably drawn from the facts alleged." Clegg v. Cult

23  Awareness Network, 18 F.3d 752, 755 (9th Cir. 1994).

24  **D.**   **§ 17200 Claim**

25      **1.**   **Generally**

26      "California's unfair competition law (UCL) (17200 et seq.) defines 'unfair

27  competition' to mean and include any unlawful, unfair or fraudulent business act or

28  practice. . . ." Kasky v. Nike, Inc., 27 Cal.4th 939, 949, 119 Cal.Rptr.2d 296 (2002)

EXHIBIT _____ 2

PAGE _____ 27

1   (internal quotation marks and citation omitted).  Because "section 17200 is written in

2   the disjunctive, it establishes three varieties of unfair competition--acts or practices

3   which are unlawful, unfair, or fraudulent."  Cel-Tech Communications v. Los Angeles

4   Cellular Telephone Co., 20 Cal.4th 163, 180, 83 Cal.Rptr.2d 548 (1999) (emphasis

5   added).  "Unlawful" practices are those practices that are prohibited by law, whether

6   "civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made."

7   Saunders v. Superior Court, 27 Cal.App.4th 832, 839 (citing People v. McKale, 25

8   Cal.3d 626, 632 (1979)).  The prohibition against "unfair" conduct is not as broad as it

9   would seem.  In Cel-Tech, the California Supreme Court announced that the test of

10  "unfairness" for commercial cases:  "Unfair" means "conduct that threatens an

11  incipient violation of an antitrust law, or violates the policy or spirit of one of those laws

12  because its effects are comparable to or the same as a violation of the law, or

13  otherwise significantly threatens or harms competition."  Cel-Tech, 20 Cal.4th at 187.

14          **2.      Standing**

15          Bryant claims to be bringing the § 17200 "on his own behalf, on behalf of all

16  current and former employees of Mattel employees . . . and on behalf of the general

17  public."  See Counterclaims ¶ 10.  The parties disagree as to whether he may bring

18  such a claim on behalf of anyone other than himself and argue this point on state-law

19  grounds.  However, it is clear under established Ninth Circuit authority that Bryant's

20  purported claims on behalf of others suffer from a federal constitutional deficiency:

21  Bryant must satisfy the case-or-controversy requirement of Article III for any claim that

22  he brings under § 17200.  Bryant has not alleged facts that establish that he has

23  standing to bring his claims on behalf of anyone other than himself.[2]  See Lee v.

24  American Nat. Ins. Co., 260 F.3d 997, 1001 (9th Cir. 2001) (rejecting, on

25  constitutional grounds, a plaintiff's attempt to assert a § 17200 claim on behalf of

26  others noting that "Article III of the Constitution . . . limits the jurisdiction of the federal

27

28

───────────────

[2] As stated below, Bryant has failed to state a claim on his own behalf as well.

9

EXHIBIT _____2
PAGE ____28

Received: 7/18/06 4:44PM      RightFAX -> JetFax   ?0;  Page 11
RightFAX            7/18/2006 4:37   PAGE 011/019   Fax Server

1  courts to 'cases and controversies,' a restriction that has been held to require a

2  plaintiff to show, *inter alia*, that he has actually been injured by the defendant's

3  challenged conduct.") (citing Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.,

4  528 U.S. 167, 180, 120 S.Ct. 693 (2000)).

5       Absent class-action type allegations (and a successful motion to certify a class

6  pursuant to Fed. R. Civ. P. 23), it appears to the Court that Bryant cannot assert

7  claims challenging the Employee Agreement or the COI Questionnaire on behalf of

8  anyone other than himself. Therefore, the Court considers only whether Bryant has

9  stated a claim pursuant to § 17200 on his own behalf.

10       **3.**    **Cal. Bus. & Prof. Code § 16600**

11       Bryant argues that the Agreement is "unlawful" because it violates Cal. Bus. &

12  Prof. Code § 16600, which provides: "Except as provided in this chapter, every

13  contract by which anyone is restrained from engaging in a lawful profession, trade, or

14  business of any kind is to that extent void." Id. Specifically, Bryant argues (without

15  further elaboration) that "the [Employment] Agreement unlawfully impair[s] Bryant's

16  right to prepare to compete with Mattel." Opp. at 7.

17       California law permits an employee to seek other employment and even to

18  make some "preparations to compete" before resigning. See Bancroft-Whitney Co. v.

19  Glen, 64 Cal.2d 327, 346 (1966) ("The mere fact that the officer makes preparations

20  to compete before he resigns his office is not sufficient to constitute a breach of duty.

21  It is the nature of his preparations which is significant.") However, "an employee may

22  not transfer his loyalty to a competitor." Stokes v. Dole Nut Co., 41 Cal.App.4th 285,

23  295 (1995). "During the term of employment, an employer is entitled to its employees'

24  undivided loyalty." Id. (internal citations and quotation marks omitted).

25       Mattel alleges in the Complaint that Bryant entered into an agreement with

26  MGA to provide MGA design services on a "top priority" basis while he was still

27  employed with by Mattel. Compl. ¶ 13. Bryant also makes similar allegations in the

28  related case, Bryant v. Mattel, Inc., 04-09049: "MGA ultimately offered Bryant a

PAGE 29

1    consulting arrangement.  His agreement with MGA was signed on or about October 4,

2    2000. Bryant resigned from Mattel immediately, giving two weeks notice, but stayed at

3    the company until October 20 to finish up and transition the projects on which he had

4    been working."  Compl. ¶ 38.

5          The parties' arguments assume that the Employment Agreement would prohibit

6    such conduct;[3] therefore, the Court considers whether an agreement prohibiting an

7    employee from entering into a contract with a competitor *during the course of his*

8    *employment* constitutes an unfair restraint of trade in violation of § 16600.  The Court

9    concludes that it does not.  Such an agreement is more akin to ensuring the employer

10   has the "employee's undivided loyalty" than it is to an agreement that restricts an

11   employee from "prepar[ing] to compete."  For this reason, Plaintiff cannot state a

12   § 17200 claim on this basis.

13         **4.     Cal. Labor Code §§ 96(k), 98.6 and 2699**

14         Bryant also argues that the Agreement is "unlawful" because it violates a

15   number of provisions of the California Labor Code.  Specifically, Bryant alleges that

16   the Agreement is "unlawful" because it violates § 96(k), which provides:

17              The Labor Commissioner and his or her deputies and

18         representatives authorized by him or her in writing shall, upon the filing

19         of a claim therefor by an employee, or an employee representative

20         authorized in writing by an employee, with the Labor Commissioner, take

21         assignments of: . . . (k) Claims for loss of wages as the result of

22         demotion, suspension, or discharge from employment for lawful conduct

23         occurring during nonworking hours away from the employer's premises.

24   Cal. Labor Code § 96(k).

25         Section 98.6 prohibits discrimination or retaliation against an employee who

26   engages in conduct described in §96(k).  Section 2699 authorizes a private right of

27

28   ───────────────

     [3]  The Court does not mean to imply that Bryant has conceded this point.

                              EXHIBIT _____2_____

                    11                PAGE _____30_____

1  action for certain violations of the Labor Code.

2        Assuming that § 96(k) would otherwise support a § 17200 claim, Bryant has still

3  failed to allege any "loss of wages" or "demotion, suspension or discharge" based on

4  lawful off-duty conduct. Therefore, Bryant has not alleged facts sufficient to support a

5  violation of § 96(k) that would, in turn, support his § 17200 claim.

6        Despite Mattel's arguments against § 98.6 and § 2699 as a proper basis for

7  Bryant's § 17200 claim, Bryant did not defend such claims in his opposition; therefore,

8  the Court treats these claims as abandoned.

9        5.    **Cal. Labor Code § 2870**

10       Bryant also argues that the Agreement is "unlawful" because it violates Cal.

11 Labor Code § 2870. That provision states:

12             (a) Any provision in an employment agreement which provides

13       that an employee shall assign, or offer to assign, any of his or her rights

14       in an invention to his or her employer shall not apply to an invention that

15       the employee developed entirely on his or her own time without using the

16       employer's equipment, supplies, facilities, or trade secret information

17       except for those inventions that either:

18             (1) Relate at the time of conception or reduction to practice of the

19       invention to the employer's business, or actual or demonstrably

20       anticipated research or development of the employer; or

21             (2) Result from any work performed by the employee for the

22       employer.

23             (b) To the extent a provision in an employment agreement

24       purports to require an employee to assign an invention otherwise

25       excluded from being required to be assigned under subdivision (a), the

26       provision is against the public policy of this state and is unenforceable.

27 Cal. Labor Code § 2870.

28       The Employment Agreement assigns the rights to certain inventions by the

EXHIBIT _____ 2

PAGE _____ 31

Received:   7/18/06   4:45PM          RightFAX -> JetFax    20;   Page 14
RightFAX              7/13/2006 4:37   PAGE 014/019   Fax Server

employee to the Company.  The Agreement limits the scope of this assignment to the extent required by § 2870 by specifically incorporating and quoting § 2870.  The Agreement also informs the employee that he bears the burden of proving that the invention falls within the scope of § 2870.  This is consistent with California law.  See Cal. Labor Code § 2872 ("In any suit or action arising thereunder, the burden of proof shall be on the employee claiming the benefits of its provisions.").

Therefore, Bryant cannot maintain a § 17200 claim based on § 2870.

### 6.   Unconscionability

Unconscionability has both procedural and substantive elements.  Armendariz v. Foundation Health Psychcare Services, Inc., 24 Cal.4th 83, 99 (2000).  Both must be present for a court to invalidate a contract or one of the contract's provisions.  Id. at 114.  However, "[t]he more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa."  Id.

Procedural unconscionability focuses on the elements of oppression and surprise.  Discover Bank v. Superior Court, 36 Cal.4th 148, 160 (2005).  "Oppression arises from an inequality of bargaining power which results in no real negotiation and an absence of meaningful choice . . . . Surprise involves the extent to which the terms of the bargain are hidden in a 'prolix printed form' drafted by a party in a superior bargaining position."  Crippen v. Central Valley RV Outlet, 124 Cal.App.4th 1159, 1165 (2004).

Substantive unconscionability focuses on the actual terms of the agreement and evaluates whether they create "overly harsh" or "one-sided results."  Armendariz, 24 Cal.4th at 114.  To be substantively unconscionable, a contractual provision must shock the conscience.  California Grocers Assn. v. Bank of America, 22 Cal.App.4th 205, 214 (1994).

Here, Bryant alleges that the Employee Agreement is a contract of adhesion.  Counterclaims ¶ 26.  For purposes of the present analysis, the Court assumes that the

EXHIBIT _____ 2

PAGE _____ 32

1   Employment Agreement is procedurally unconscionable.  See Discover Bank v.

2   Superior Court, 36 Cal.4th 148, 160 (2005) ("The procedural element of an

3   unconscionable contract generally takes the form of a contract of adhesion, which,

4   imposed and drafted by the party of superior bargaining strength, relegates to the

5   subscribing party only the opportunity to adhere to the contract or reject it.") (internal

6   quotation marks and citation omitted).  However, upon examination of the terms of the

7   Employment Agreement, the Court is unable to conclude that the element of

8   substantive unconscionability has been met.  It is not surprising or overly harsh that

9   Mattel would expect its trade secrets and proprietary information to be kept

10  confidential; the same is true regarding Mattel's expectation that the works of its

11  design staff — created by Mattel's employees, using Mattel's resources, during time

12  for which Mattel paid the employee — be considered its property.  Therefore, Bryant

13  cannot state a claim based on unconscionability.

14          **7.    Cal. Labor Code §§ 232 and 232.5**

15          Although not pleaded in the Counterclaims, Bryant argues that his § 17200

16  claim is supported by an alleged violation of §§ 232 and 232.5.  These provisions

17  prohibit limitations on an employee's ability to disclose the amount of his or her wages

18  or information about his or her working conditions.  Bryant's arguments fail to address

19  how the Employment Agreement (which prohibits the disclosure of "trade secrets" and

20  "proprietary information") prevented him from disclosing the amount of his wages or

21  information about his working conditions.  Bryant has failed to state a § 17200 claim

22  based on §§ 232 and 232.5.

23          **8.    Unfairness**

24          As noted above, there is only a limited basis on which a plaintiff may challenge

25  conduct as an "unfair" business practice.  See Cel-Tech Communications, 20 Cal.4th

26  at 187 ("unfair" conduct that may be challenged pursuant to § 17200 is conduct that is,

27  or is similar to, conduct that constitutes a violation of antitrust laws).  Bryant's

28  allegations do not state a claim for an "unfair" business practice in violation of

14

EXHIBIT ____2___

PAGE_____33___

§ 17200.

### 9.   "Fraudulent" Conduct

Bryant also argues that the same conduct complained of in connection with his
fraud claim also supports a § 17200 claim based on the prohibition against
"fraudulent" conduct. This claim is not cognizable. Bryant's fraud claim, explored
more fully in the following section, is based upon Mattel's alleged failure to explain to
him the terms of the Employment Agreement. However, to allege a "fraudulent
business practice" under § 17200, a plaintiff must allege that "members of the public
are likely to be deceived." Comm. on Children's Television, Inc. v. Gen. Foods Corp.,
35 Cal.3d 197, 211 (1983). Bryant has not alleged facts that would tend to establish
that the public might be deceived by Mattel's conduct regarding its employment
practices.

### E.   Fraud Claim

The parties agree that Bryant's fraud claim is one for fraudulent concealment,
and that Bryant must allege all the elements set forth in Marketing West, Inc. v. Sanyo
Fisher Corp., 6 Cal.App.4th 603, 612-13 (1992):  (1) Mattel must have concealed or
suppressed a material fact; (2) Mattel must have been under a duty to disclose the
fact to Bryant; (3) Mattel must have intentionally concealed or suppressed the fact with
the intent to defraud Bryant; (4) Bryant must have been unaware of the fact and would
not have acted as he did if he had known of the concealed or suppressed fact; and (5)
as a result of the concealment or suppression of the fact, Bryant must have sustained
damage. Bryant alleges that "Mattel required [him] to execute the [Employment]
Agreement without disclosing to him its true import and terms." Counterclaims ¶ 56.
Bryant's claim is, in essence, that Mattel failed to inform him of the potential legal
effect the Agreement might have; in other words, Bryant claims that Mattel failed to
fully explain the Agreement to him. This does not support a fraudulent concealment
claim.

Bryant argues, based on Marketing West, that because Mattel chose to

15

EXHIBIT _____ 2

PAGE _____ 34

Received:    7/18/06   4:47PM·                RightFAX -> JetFax M⁻⁻O;  Page 17
RightFAX                    7/ͱ /2006 4:37    PAGE 017/019   Fax Server

1  respond to his inquiries, Mattel was under a duty to disclose material facts.  Under

2  Marketing West, where a party is "under no duty to speak" but nevertheless

3  "undertakes to do so, either voluntarily or in response to inquiries, he is bound not only

4  to state truly what he tells but also not to suppress or conceal any facts within his

5  knowledge which materially qualify those stated."  Marketing West, 6 Cal.App.4th at

6  613 (citing Rogers v. Warden, 20 Cal.2d 286, 289 (1942)) (internal quotation marks

7  omitted).  In other words, one who speaks "must make a full and fair disclosure."  Id.

8         Bryant makes no allegations that suggest that anyone at Mattel falls into this

9  category.  He alleges that he was "presented with the form Agreement by Mattel," and

10  that "he was told that his execution of the Agreement was a condition of his

11  employment."  Counterclaims ¶ 26.  He then alleges that "[t]he terms of the Agreement

12  were not explained to him."  Id.  This is not the situation discussed in Marketing West

13  which, not surprisingly, prohibits a party from disclosing only that part of the truth that

14  favors it.  Here, Bryant's allegations complain that Mattel did not disclose anything

15  regarding the Employment Agreement.

16  F.    **Rescission**

17         Bryant asserts that rescission is proper because (1) the Agreement was

18  obtained through fraud; (2) Mattel required Bryant to execute the document as a

19  condition of employment, which resulted in duress; and (3) Mattel did not explain the

20  terms of the Agreement to Bryant, did not give him sufficient time to review it, and did

21  not permit or encourage him to seek legal counsel regarding the Agreement.

22         Bryant failed to state a fraud claim; therefore, rescission based on his fraud

23  claim would be improper.

24         Bryant's allegations do not meet the standard for duress, and Mattel's failure to

25  encourage him to seek legal counsel also does not require rescission of the

26  Employment Agreement.  See Robison v. City of Manteca, 78 Cal.App.4th 452, 457

27  (2000).  Additionally, although Bryant argues that he was not "given a meaningful

28  opportunity to review the Agreement at the time he executed it," he does not allege

16

EXHIBIT _____ 2

PAGE _____ 35

Received:    7/18/08  4:47PM·              RightFAX -> JetFax M*30;   Page 18
RightFAX                    7/ /2008 4:37    PAGE 018/019    Fax Server

1   that he asked for, and was refused, sufficient time to actually read the Agreement with

2   which he was presented.

3   **G.    Declaratory Relief**

4        Finally, in his fourth counterclaim, Bryant seeks declaratory judgment that

5   Mattel's conduct in requiring Bryant and other employees to execute the Employment

6   Agreement constitutes unfair competition and unfair business practices in violation of

7   Cal. Bus. & Prof. Code §§ 17200 and 16600.  This claim for declaratory relief fails

8   because the underlying § 17200 fails.

9        Bryant also seeks a declaration that the Employment Agreement is unlawful

10  and unenforceable as to him and as to other current and former employees of Mattel.

11  See Bryant's Counterclaims ¶¶ 61-65. As discussed previously, Bryant has no

12  standing to assert claims on behalf of anyone other than himself.  As discussed

13  throughout this Order, Bryant has not sufficiently alleged that the Employment

14  Agreement is unlawful or unenforceable as to him.

15  **H.    Ruling on Motion to Dismiss (04-09059)**

16        The Motion to Dismiss is **GRANTED** in its entirety.  Bryant requested in his

17  Opposition for an opportunity to amend his counterclaims.  Therefore, the Court

18  dismisses Bryant's counterclaims without prejudice.  Bryant may file Amended

19  Counterclaims that conform with this Order within ten days of the entry of this Order.

20                            **IV. Conclusion**

21        For the reasons set forth above, the Court **GRANTS** the Motion to Dismiss in

22  04-09049 and **DISMISSES WITHOUT PREJUDICE** Bryant's action for declaratory

23  relief.  The Court also **GRANTS** the Motion to Dismiss in 04-09059, and **DISMISSES**

24  **WITHOUT PREJUDICE** Bryant's counterclaims.  Bryant is granted ten days' leave to

25  amend the counterclaims in conformity with this Order.

26

27

28

EXHIBIT ___2___

PAGE ___36___

Received:   7/18/06   4:47PM·                    RightFAX -> JetFax '':20;   Page 19
RightFAX                 7/  /2006 4:37    PAGE 019/019   Fax Server

1    Although this Order dismisses the Complaint in 04-09049, any future filings in

2    the consolidated action shall continue to be filed under 04-09049 in conformity with

3    the Court's consolidation order.

4        IT IS SO ORDERED.

5    DATE:  7 - 17 - 07

6

7                                    STEPHEN G. LARSON
                                     UNITED STATES DISTRICT JUDGE
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

18

EXHIBIT ___2___

PAGE ___37___

# EXHIBIT 3



1   QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
    John B. Quinn (Bar No. 090378)
2   johnquinn@quinnemanuel.com
    Michael T. Zeller (Bar No. 196417)
3   (michaelzeller@quinnemanuel.com)
    Jon D. Corey (Bar No. 185066)
4   (joncorey@quinnemanuel.com)
    Timothy L. Alger (Bar No. 160303)
5   (timalger@quinnemanuel.com)
    865 South Figueroa Street, 10th Floor
6   Los Angeles, California 90017-2543
    Telephone:  (213) 443-3000
7   Facsimile:   (213) 443-3100

8   Attorneys for Plaintiff Mattel, Inc.

9

10                    UNITED STATES DISTRICT COURT

11                  CENTRAL DISTRICT OF CALIFORNIA

12                          EASTERN DIVISION

13  CARTER BRYANT, an                CASE NO. CV 04-9049 SGL (RNBx)
    individual,
14                                   Consolidated with Case Nos. CV 04-09059
              Plaintiff,             and CV 05-02727
15
         vs.                         Hon. Stephen G. Larson
16
    MATTEL, INC., a Delaware         STIPULATION AND [PROPOSED]
17  corporation,                     ORDER REGARDING CARTER
                                     BRYANT'S AMENDED REPLY TO
18            Defendant.             MATTEL'S COUNTERCLAIMS

19  AND CONSOLIDATED                 Phase 1
20  ACTIONS                          Discovery Cut-Off:   January 14, 2008
                                     Pre-Trial Conference: April 7, 2008
21                                   Trial Date:           April 29, 2008

22                                   Phase 2
                                     Discovery Cut-Off:   March 3, 2008
23                                   Pre-Trial Conference: June 2, 2008
                                     Trial Date:           July 1, 2008

24

25

26

27

28

404050.01
07209/2211520.1                      10-5

                                          STIPULATION AND [PROPOSED] ORDER

                                     EXHIBIT _____ 3
                                     PAGE _____ 38

FILED
CLERK, U.S. DISTRICT COURT

OCT - 9 2007

CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION          BY DEPUTY

## Stipulation

1        WHEREAS, on July 12, 2007, Mattel, Inc. ("Mattel") filed its Second

2 Amended Answer in Case No. 05-2727 and Counterclaims ("Counterclaims"),

3        WHEREAS, on August 13, 2007, Carter Bryant ("Bryant") filed his reply to

4 Mattel's Counterclaims and asserted twenty-two affirmative defenses,

5        WHEREAS, Mattel contended that Bryant's affirmative defenses were

6 inadequately pleaded and that certain of the defenses were insufficient as a matter of

7 law, and the parties met and conferred regarding a motion Mattel contemplated

8 filing to strike the defenses on those grounds,

9        WHEREAS, Bryant agreed to voluntarily amend his reply to eliminate some

10 of the disputes between the parties and, pursuant to a Stipulation and Order dated

11 September 6, 2007, filed an amended reply to Mattel's Counterclaims on September

12 12, 2007, asserting seventeen affirmative defenses,

13        WHEREAS, Mattel believes that certain of Bryant's defenses remain

14 inadequately pleaded and that certain of the defenses remain insufficient as a matter

15 of law, and the parties have again met and conferred regarding Mattel's

16 contemplated motion to strike the defenses on these grounds, and

17        WHEREAS, Bryant is willing to voluntarily amend his amended reply again

18 in an attempt to eliminate further disputes between the parties, including by

19 withdrawing his Ninth, Tenth, and Eleventh affirmative defenses of "failure of

20 contract," "duress/unconscionability" and "alleged duties contrary to law,"

21 respectively,

22 ///

23 ///

24 ///

25 ///

26 ///

27 ///

28 ///

404060.01
07209/2211520.1

STIPULATION AND [PROPOSED] ORDER

EXHIBIT _____ 3

PAGE _____ 39

1  ///

2    NOW, THEREFORE, Mattel and Bryant hereby stipulate, by and through

3  their counsel of record and subject to the Court's approval, that Bryant will file a

4  Second Amended Reply to Mattel's Counterclaims on or before October 15, 2007.

5  Mattel may then file a motion to strike Bryant's Second Amended Reply pursuant to

6  the time limits set forth in Fed. R. Civ. P. 12(f) as may be appropriate.

7    IT IS SO STIPULATED.

8

9  DATED:  October 4, 2007       QUINN EMANUEL URQUHART OLIVER &
                                  HEDGES, LLP
10

11

12                              By _____
                                    B. Dylan Proctor
13                                  Attorneys for Mattel, Inc.

14

15  DATED:  October 4, 2007       KEKER & VAN NEST, LLP

16

17                              By _____
                                    John Trinidad
18                                  Attorneys for Carter Bryant

19

20

21    IT IS SO ORDERED.

22

23  DATED:  October___, 2007     By _____
                                      STEPHEN G. LARSON
                                    UNITED STATES DISTRICT JUDGE
24                                  Hon. Stephen G. Larson
                                    United States District Court Judge
25

26

27

28

STIPULATION AND [PROPOSED] ORDER

EXHIBIT _____3_____

PAGE _____40_____

## PROOF OF SERVICE

I am employed in the County of Los Angeles, State of California.  I am over the age of eighteen years and not a party to the within action; my business address is 865 South Figueroa Street, 10th Floor, Los Angeles, California 90017-2543.

On October 5, 2007, I served true copies of the following document(s) described as **STIPULATION AND [PROPOSED] ORDER REGARDING CARTER BRYANT'S AMENDED REPLY TO MATTEL'S COUNTERCLAIMS** on the parties in this action as follows:

Diana Torres, Esq.
**O'MELVENY & MYERS, LLP**
400 S. Hope Street
Los Angeles, CA 90071

*Attorneys for MGA Entertainment, Inc.*

Michael H. Page, Esq.
**KEKER & VAN NEST, LLP**
710 Sansome Street
San Francisco, CA 94111

*Attorneys for Carter Bryant*

Patricia Glaser, Esq.
**CHRISTENSEN, GLASER, FINK, JACOBS, WEIL & SHAPIRO, LLP**
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067

*Attorneys for MGA Entertainment*

Mark E. Overland, Esq.
David C. Scheper, Esq.
Alexander H. Cote, Esq.
**OVERLAND, BORENSTEIN, SCHEPER & KIM, LLP**
300 S. Grand Avenue, Suite 2750
Los Angeles, CA 90071

*Attorneys for Carlos Gustav Machado Gomez*

**BY MAIL:**  I enclosed the foregoing into sealed envelope(s) addressed as shown above, and I deposited such envelope(s) in the mail at Los Angeles, California.  The envelope was mailed with postage thereon fully prepaid.

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on October 5, 2007, at Los Angeles, California.

*Laura Kinsey*
Laura Kinsey

EXHIBIT _3_

PAGE _41_

# EXHIBIT 4

# THIS EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

# EXHIBIT 5

# EMPLOYEE CONFIDENTIAL INFORMATION AND INVENTIONS AGREEMENT

I acknowledge that Mattel, Inc. (the "Company") operates in a competitive environment and that it enhances its opportunities to succeed by establishing certain policies, including those included in this Agreement. This Agreement is designed to make clear that: (i) I will maintain the confidentiality of the Company's trade secrets; (ii) I will use those trade secrets for the exclusive benefit of the Company; (iii) inventions that I create will be owned by the Company; (iv) my prior and continuing activities separate from the Company will not conflict with the Company's development of its proprietary rights; and (v) when and if my employment with the Company terminates I will not use my prior position with the Company to the detriment of the Company. In consideration of my employment with the Company and other good and valuable consideration, I agree that:

## 1. Provisions Related to Trade Secrets

(a) I acknowledge that the Company possesses and will continue to develop and acquire valuable Proprietary Information (as defined below), including information that I may develop or discover as a result of my employment by the Company. The value of that Proprietary Information depends on it remaining confidential. The Company depends on me to maintain that confidentiality, and I accept that position of trust.

(b) As used in the Agreement, "Proprietary Information" means any information (including formula, pattern, compilation, device, method, technique or process) that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use, and includes information on the Company, its customers, suppliers, joint ventures, licensors, licensees, distributors and other persons and entities with whom the Company does business.

(c) I will not disclose or use at any time either during or after my employment with the Company, any Proprietary Information except for the exclusive benefit of the Company as required by my duties for the Company, or as the Company expressly may consent to in writing. I will cooperate with the Company and use my best efforts to prevent the unauthorized disclosure, use or reproduction of all Proprietary Information.

(d) Upon leaving employment with the Company for any reason, I immediately will deliver to the Company all tangible, written, graphical, machine readable and other materials (including all copies) in my possession or under my control containing or disclosing Proprietary Information.

## 2. Ownership of Inventions

(a) I agree to communicate to the Company as promptly and fully as practicable all inventions (as defined below) conceived or reduced to practice by me (alone or jointly by others) at any time during my employment by the Company. I hereby assign to the Company and/or its nominees all my right, title and interest in such inventions, and all my right, title and interest in any patents, copyrights, patent applications or copyright applications based thereon. I will assist the Company and/or its nominees (without charge but at no expense to me) at any time in every proper way to obtain for its and/or their own benefit, patents and copyrights for all such inventions anywhere in the world and to enforce its and/or their rights in legal proceedings.

(b) As used in this Agreement, the term "inventions" includes, but is not limited to, all discoveries, improvements, processes, developments, designs, know-how, data computer programs and formulas, whether patentable or unpatentable.

(c) Any provision in this agreement requiring me to assign my rights in any invention does not apply to an invention which qualifies under the provision of Section 2870 of the California Labor Code. That section provides that the requirement to assign "shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities or trade secret information except for those inventions that either (1) relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or (2) result from any work performed by the employee for the employer." I understand that I bear the burden of proving that an invention qualifies under Section 2870.

(d) I hereby irrevocably designate and appoint the Company and each of its duly authorized officers and agents as my agent and attorney-in-fact to act for and in my behalf and instead to execute and file any document and to do all other lawfully permitted acts to further the prosecution, issuance and enforcement of patents, copyrights and other proprietary rights with the same force and effect as if executed and delivered by me.

## 3. Conflicts with Other Activities

(a) My employment with the Company requires my undivided attention and effort. Therefore, during my employment with the Company, I will fully comply with the Company's Conflict of Interest Policy, as it may be amended from time to time. I shall not, without the Company's express written consent, engage in any employment or business other than for the Company, or invest in or assist (in any manner) any business competitive with the business or future business plans of the Company.

## 4. Miscellaneous

(a) My obligations under this Agreement may not be modified or terminated, in whole or in part, except in writing signed by a Vice-President of the Company. Any waiver by the Company of a breach on any provision of this Agreement will not operate or be construed as a waiver of any subsequent breach.

(b) Each provision of this Agreement will be treated as a separate and independent clause, and the unenforceability of any one provision will in no way impair the enforceability of any other provision. If any provision is held to be unenforceable, such provision will be construed by the appropriate judicial body by limiting or reducing it to the minimum extent necessary to make it legally enforceable.

(c) My obligation under this Agreement will survive the termination of my employment, regardless of the manner of such termination. This Agreement will insure to the benefit of and be binding upon the successors and assigns of the the Company.

(d) I understand that the provisions of this Agreement are a material condition to my employment with the Company. I also understand that this Agreement is not an employment contract, and nothing in this Agreement creates any right to my continuous employment by the Company, or to my employment for any particular term.

(e) Any breach of this Agreement likely will cause irreparable harm to the Company for which money damages could not reasonably or adequately compensate the Company. Accordingly, I agree that the Company will be entitled to injunctive relief to enforce this Agreement, in addition to damages and other available remedies.

(f) This agreement will be governed by and interpreted in accordance with the laws of the State of California.

(g) This Agreement contains the complete agreement between the Company and me concerning the subject matter hereof and supersedes all other agreements and understandings. This Agreement may be executed in counterparts. This Agreement will be deemed effective as of the start of Employee's employment with the Company.

**CAUTION: THIS AGREEMENT CREATES IMPORTANT OBLIGATIONS OF TRUST AND AFFECTS THE EMPLOYEE'S RIGHTS TO INVENTIONS THE EMPLOYEE MAY MAKE DURING HIS OR HER EMPLOYMENT.**

Employee Signature: _Carter H. Bryant_

Employee Name (print): CARTER H. BRYANT

Date: 01/04/99

MATTEL, INC.

Signature: _Teresa Newcomb_

Name of Witness (print): TERESA NEWCOMB

M 0001596

DEPOSITION EXHIBIT

25

11.8.04   SH

EXHIBIT ___5___

PAGE ___185___

# EXHIBIT 6

# Webster's
# Third
# New International
# Dictionary

## OF THE ENGLISH LANGUAGE

## UNABRIDGED

### *A Merriam-Webster*

REG. U.S. PAT. OFF.

*Utilizing all the experience and resources of more than one hundred years of Merriam-Webster® dictionaries*

EDITOR IN CHIEF

PHILIP BABCOCK GOVE, Ph.D.

AND

THE MERRIAM-WEBSTER
EDITORIAL STAFF



MERRIAM-WEBSTER INC., *Publishers*

SPRINGFIELD, MASSACHUSETTS, U.S.A.

EXHIBIT 6

PAGE 186



### A GENUINE MERRIAM-WEBSTER

The name *Webster* alone is no guarantee of excellence. It is used by a number of publishers and may serve mainly to mislead an unwary buyer.

*Merriam-Webster*™ is the name you should look for when you consider the purchase of dictionaries or other fine reference books. It carries the reputation of a company that has been publishing since 1831 and is your assurance of quality and authority.

COPYRIGHT © 1993 BY MERRIAM-WEBSTER, INCORPORATED

PHILIPPINES COPYRIGHT 1993 BY MERRIAM-WEBSTER, INCORPORATED

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY
PRINCIPAL COPYRIGHT 1961

Library of Congress Cataloging in Publication Data
Main entry under title:

Webster's third new international dictionary of the English language,
unabridged: a Merriam-Webster/editor in chief, Philip Babcock
Gove and the Merriam-Webster editorial staff.
      p.     cm.
  ISBN 0-87779-201-1

   1. English language—Dictionaries.   1. Gove, Philip Babcock,
1902–1972.   II. Merriam-Webster, Inc.
PE1625.W36 1993
423–dc20                                            93-10630
                                                       CIP

*All rights reserved. No part of this book covered by the copyrights hereon may be reproduced or copied in any form or by any means—graphic, electronic, or mechanical, including photocopying, taping, or information storage and retrieval systems—without written permission of the publisher.*

MADE IN THE UNITED STATES OF AMERICA
495051 QP/H009998

EXHIBIT _____ 6

PAGE _____ 187

EXHIBIT

PAGE 188

Case 2:04-cv-09049-DOC-RNB   Document 2819-2   Filed 03/26/08   Page 40 of 75   Page ID #:45051

*[Dense dictionary text in three columns, including entries such as "desert ironwood", "desert mouse", "desertion", "deserve", "design", and related derivatives. The fine print is not legibly reproducible.]*

EXHIBIT

PAGE 189

**design**                                                                 **desk**

617

EXHIBIT ___6___

PAGE _____190_____

Case 2:04-cv-09049-DOC-RNB   Document 2819-2   Filed 03/26/08   Page 42 of 75   Page ID #:45051

EXHIBIT 6

Case 2:04-cv-09049-DOC-RNB   Document 2819-2   Filed 03/26/08   Page 43 of 75   Page ID #:45054

**EXHIBIT** 6

PAGE _____ 192

Case 2:04-cv-09049-DOC-RNB   Document 2819-2   Filed 03/26/08   Page 44 of 75   Page ID #:45055

*[This page reproduces a densely printed dictionary page with entries spanning* **imputational** *through* **inadvertence***. The body text is set in extremely small type across multiple columns and is largely illegible at this resolution.]*

EXHIBIT
PAGE **A3**





Webster's
Third New
International
Dictionary

UNABRIDGED

EXHIBIT _____ 6

PAGE _____ 194

# EXHIBIT 7

 **Mattel**

PROPRIETARY INFORMATION CHECKOUT   MAT-4125-B

Each terminating employee should be aware that, in his Employee's Agreement, he has agreed to transfer all inventions made or conceived during the period of his employment to Mattel and to do all acts necessary to secure patent protection for such inventions for Mattel.

Each employee should also be aware that he has agreed to protect the proprietary information of Mattel. More particularly, he has agreed essentially as follows:

"In consideration of my employment by MATTEL, INC., or any of its subsidiaries or affiliated companies now or hereafter existing (hereinafter referred to individually and collectively as 'MATTEL'), I hereby covenant and agree that:

My interest in (a) any and all inventions, improvements and ideas (whether or not patentable) which I have made or conceived, or may make or conceive at any time during the period of my employment with the Company, either solely or jointly with others and in (b) any suggestions, designs, trademarks, copyright subject matter, literary or artistic works which I have made or conceived, or may make or conceive at any time during the period of my employment which relate or are applicable directly or indirectly to any phase of the Company's business shall be the exclusive property of the Company, its successors, assignees or nominees. (The items defined in (a) and (b) above will hereinafter be referred to collectively as 'Proprietary Subject Matter'.)

I shall make full and prompt disclosure in writing to an officer or official of the Company, or to anyone designated for that purpose by the Company, of all Proprietary Subject Matter made or conceived during the term of my employment. I agree, at the request of Mattel's Patent counsel, to provide additional information to more fully define the specific structure of the disclosed subject matter and to present support documents evidencing my conception and development of the subject matter.

Since the work for which I am employed upon which I shall be engaged will include Company knowledge and information of a private, confidential, or secret nature, I shall not, except as required in the conduct of the Company's business or as authorized in writing by the Company, during the course of my employment or thereafter, publish, disclose, or make use of, or authorize anyone else to publish, disclose or otherwise make use of any such knowledge or information, of a confidential nature to and the secret property of the Company or the design, construction, manufacture or sale of the Company's products or services. This obligation shall apply even to Company information created by me.

All documents, written information and other items including, but not limited to, notes, sketches, manuals, blueprints, notebooks, products, tools, fixtures, records and information relating to the business of the Company, made or obtained by me while employed by the Company shall be the exclusive property of the Company and shall be delivered by me to the Company on termination of my employment or at any time as requested by the Company".

Please acknowledge the above by signing and dating in the spaces provided below.

after Expiry a.s.a.

SIGNATURE _____   DATE  10/19/00

WITNESS _____   DATE  10/19/00

M 0001604

DEPOSITION EXHIBIT
27
118·04      5H

EXHIBIT _____ 7

PAGE _____ 195

# EXHIBIT 8

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

- - -

HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

- - -

| | |
|---|---|
| CARTER BRYANT, )<br>)<br>PLAINTIFF, )<br>)<br>VS. )<br>)<br>MATTEL, INC., )<br>)<br>DEFENDANT. )<br>_____ )<br>AND RELATED ACTIONS, )<br>_____ ) | NO. ED CV 04-09049<br>(LEAD LOW NUMBER) |

**CERTIFIED COPY**

REPORTER'S TRANSCRIPT OF PROCEEDINGS

RIVERSIDE, CALIFORNIA

MONDAY, JUNE 26, 2006

10:56 A.M.

THERESA A. LANZA, RPR, CSR
FEDERAL OFFICIAL COURT REPORTER
3470 12TH STREET, RM. 134
RIVERSIDE, CALIFORNIA  92501
(951) 274-0844
CSR11457@SBCGLOBAL.NET

EXHIBIT _____ 8

PAGE _____ 196

```
 1   APPEARANCES:

 2

 3   ON BEHALF OF PLAINTIFF/COUNTER DEFENDANT MATTEL, INC.:

 4
                         QUINN EMANUEL
 5                       BY:   JON D. COREY
                         BY:   JOHN B. QUINN
 6                       865 S. FIGUEROA STREET,
                         10TH FLOOR
 7                       LOS ANGELES, CALIFORNIA  90017
                         (213) 624-7707
 8

 9
     ON BEHALF OF PLAINTIFF/COUNTER COMPLAINANT/DEFENDANT,
10   CARTER BRYANT:

11                       LITTLER MENDELSON
                         BY:   KEITH A. JACOBY
12                       BY:   DOUGLAS A. WICKHAM
                         2049 CENTURY PARK EAST,
13                       FIFTH FLOOR
                         LOS ANGELES, CALIFORNIA  90067
14                       (310) 553-0308

15

16   ON BEHALF OF MGA ENTERTAINMENT:

17                       O'MELVENY & MYERS LLP
                         BY:   DIANA M. TORRES
18                       BY:   DALE CENDALI
                         400 SOUTH HOPE STREET
19                       LOS ANGELES, CALIFORNIA  90071
                         (213) 430-6000
20

21

22

23

24
                                         EXHIBIT_____8___
25
                                         PAGE_____197___
```

JUNE 26, 2006        ED CV 04-9049-SGL

1    BROUGHT.  WHAT'S NOT CLEAR TO THE COURT AT THIS POINT IS

2    EXACTLY WHAT ALLEGATIONS ARE SUPPORTING THESE CLAIMS.

3            FOR EXAMPLE, YOU ARGUE THAT IT'S UNCONSCIONABLE.

4    WHAT ABOUT IT IS UNCONSCIONABLE?  YOU CAN CERTAINLY

5    CHARACTERIZE THIS VERY EASILY AS SOMETHING WHICH IS SIMPLY AN    11:09

6    EFFORT -- EVEN IF I ASSUME THAT PROCEDURALLY IT'S AN ADHESION

7    CONTRACT -- IS AN EFFORT BY MATTEL TO REQUIRE EMPLOYEE LOYALTY

8    BY ITSELF UNCONSCIONABLE?

9            MR. WICKHAM:  THE NINTH CIRCUIT IN THE LAST SEVERAL

10   YEARS -- I'D SAY ACTUALLY ABOUT THE LAST SEVEN OR EIGHT YEARS    11:09

11   -- HAS DEVELOPED A DOCTRINE AND A BODY OF LAW GOVERNING

12   UNCONSCIONABILITY.  ACTUALLY, IT'S SOME OFFSHOOT FROM

13   CALIFORNIA COURT DECISIONS -- TING VERSUS AT&T AND INGALL

14   VERSUS CIRCUIT CITY -- AND THOSE CASES HAVE ANALYZED THE

15   UNCONSCIONABILITY ISSUE IN THE CONTEXT OF PRE-DISPUTE    11:09

16   ARBITRATION AGREEMENTS IN THE EMPLOYMENT CONTEXT.  THOSE CASES

17   THEMSELVES APPLIED AND ANALYZED THE CALIFORNIA SUPREME COURT'S

18   DECISION IN ALMENDAREZ.

19           THERE'S TWO ELEMENTS TO ESTABLISH A CLAIM OF

20   UNCONSCIONABILITY:  ONE IS PROCEDURAL UNCONSCIONABILITY; THE    11:10

21   OTHER IS SUBSTANTIVE UNCONSCIONABILITY.  THE PROCEDURAL

22   UNCONSCIONABILITY GOES TO THE MANNER OF FORMATION.  IS THE

23   AGREEMENT ON A PRE-PRINTED FORM CONTRACT, A CONTRACT OF

24   ADHESION?  IS THERE ANY MEANINGFUL OPPORTUNITY FOR

25   NEGOTIATIONS?  IS IT PRESENTED TO THE EMPLOYEE ON A TAKE IT OR    11:10

EXHIBIT  8

PAGE  198

12

1    LEAVE IT BASIS?

2            WE WOULD SUBMIT THAT, FIRST OF ALL, THOSE ARE PLED IN

3    THE COUNTERCLAIM AND THAT THOSE ESTABLISH THE EXISTENCE OF

4    PROCEDURAL UNCONSCIONABILITY.

5            THE COURT:  I'M ASSUMING THAT FROM MY QUESTION, IS          11:10

6    THE SUBSTANTIVE UNCONSCIONABILITY --

7            MR. WICKHAM:  WITH REGARD TO SUBSTANTIVE

8    UNCONSCIONABILITY, THIS GOES TO SOME OF THE CLAIMS THAT ARE

9    PART AND PARCEL OF THE 17200 CLAIM:  ARE THERE PROVISIONS IN

10   THE AGREEMENT THAT ARE UNFAIR OR UNLAWFUL?                          11:10

11           AND WE WOULD SUBMIT THAT, FIRST OF ALL, WITH REGARD

12   TO THE INVENTIONS ASSIGNMENT, AS DRAFTED HERE, IT VIOLATES

13   CALIFORNIA LABOR CODE SECTION 2870 AND 2871.

14           THE COURT:  WHICH IS SPECIFICALLY REFERENCED IN THE

15   AGREEMENT, IS IT NOT?                                               11:11

16           MR. WICKHAM:  YOUR HONOR, IT'S REFERENCED IN THE

17   AGREEMENT, BUT IT IS NOT REFERENCED IN THE MANNER THAT THE

18   STATUTE ACTUALLY CONTEMPLATES.  THE STATUTE SPECIFICALLY

19   CONTEMPLATES THAT THE NATURE OF ANY ASSIGNMENT, AS A

20   SUBSTANTIVE MATTER OF THE CONTRACT, WOULD NOT EXTEND TO THOSE       11:11

21   MATTERS.  2871 SAYS THAT ANY ASSIGNMENT THAT GOES BEYOND WHAT

22   2870 PERMITS IS, TO THAT EXTENT, VOID.

23           THE NATURE OF THE ASSIGNMENT HERE IS THAT IT IS A

24   BROAD BASED ASSIGNMENT OF ALL INVENTIONS DURING THEIR

25   EMPLOYMENT; ALL THINGS THAT WERE CONCEIVED AND PRACTICED.          11:11

JUNE 26, 2006        ED CV 04-9049-SGL

EXHIBIT _____ 8

PAGE 199

1          NOW, TWO PARAGRAPHS DOWN, IT SAYS, 'OF COURSE,

2     NOTHING IN HERE WILL APPLY IF 2870 APPLIES.'

3          WELL, THERE'S TWO RESPONSES WITH REGARD TO THAT.

4          FIRST OF ALL, THAT IS A SEPARATE NOTICE THAT THEY ARE

5     REQUIRED TO PROVIDE IN THE CONTRACT UNDER 2872.  AND SECONDLY,          11:12

6     THAT IF YOU PUT YOURSELF IN THE POSITION OF AN EMPLOYEE WHO

7     DOES NOT HAVE A COLLEGE DEGREE; WHO IS GETTING A $30,000 A YEAR

8     JOB; WHO DOESN'T HAVE THE WHEREWITHAL TO RETAIN COUNSEL TO BE

9     ABLE TO INFORM THEM WHAT 2870 MEANS...  MY EYES ARE GLAZING

10    OVER; I HAVE NO IDEA; I'M NOT A LAWYER ON THIS.          11:12

11          YOUR HONOR, WHAT IS PARTICULARLY TELLING ABOUT THIS

12    IS THAT SUBSEQUENT TO THE MOTION, WE DEPOSED MR. BRYANT'S

13    SUPERVISOR, ANN DRISCAL.  THE AGREEMENT IS PREDICATED ON AN

14    ASSIGNMENT OF THINGS THAT WERE CONCEIVED OR THAT WERE REDUCED

15    TO PRACTICE.          11:13

16          I WILL CONFESS, YOUR HONOR, THAT PRIOR TO THIS CASE,

17    I DID NOT KNOW WHAT 'REDUCED TO PRACTICE' WAS; AND, IN FACT, IT

18    IS A TERM OF ART WHICH IS IN THE PATENT FIELD; AND AS AN

19    EMPLOYMENT LAWYER, I'M NOT FAMILIAR WITH THAT.  AND HERE WE'RE

20    EXPECTING 30-YEAR OLD PEOPLE WITHOUT COLLEGE DEGREES TO KNOW          11:13

21    WHAT 'REDUCED TO PRACTICE' MEANS?

22          WELL, WE ASKED MR. BRYANT'S SUPERVISOR, THE ONE WHO

23    WAS CHARGED AT LEAST WITH SOME RESPONSIBILITY FOR THIS

24    AGREEMENT; WE ASKED HER WHETHER OR NOT SHE KNEW WHAT LABOR CODE

25    SECTION 2870 WAS.          11:13

EXHIBIT _____ 8

PAGE 20D

JUNE 26, 2006          ED CV 04-9049-SGL

66

1              THE CLERK:   COURT STANDS IN RECESS.

2

3

4

5

6

7

8

9

10

11

12

13

14

15                          CERTIFICATE

16

17    I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
      STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
18    THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE ABOVE-
      ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
19    CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
      THE UNITED STATES.

20

21    _____          7-3-06
      THERESA A. LANZA, RPR, CSR                _____
22    OFFICIAL COURT REPORTER                        DATE

23

24
                                              EXHIBIT _____  8
25
                                              PAGE _____ 201

              JUNE 26, 2006          ED CV 04-9049-SGL

# EXHIBIT 9

**THIS EXHIBIT IS FILED UNDER SEAL**
**PURSUANT TO PROTECTIVE ORDER**

# EXHIBIT 10

**THIS EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

# EXHIBIT 11

**THIS EXHIBIT IS FILED UNDER SEAL
PURSUANT TO PROTECTIVE ORDER**

# EXHIBIT 12

**THIS EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

# EXHIBIT 13



HCA 2152/2002

IN THE HIGH COURT OF THE

HONG KONG SPECIAL ADMINISTRATIVE REGION

COURT OF FIRST INSTANCE

CIVIL ACTION NO. 2152 OF 2002

BETWEEN

ABC INTERNATIONAL TRADERS, INC.                    Plaintiff
doing business as MGA ENTERTAINMENT

and

(1) TOYS & TRENDS (HONG KONG) LIMITED

(2) CITYWORLD LIMITED

(3) JURG WILLI KESSELRING                          Defendants

AFFIRMATION OF LEE SHIU CHEUNG

I, Lee Shiu Cheung of Room 1001, Empire Centre, 68 Mody Road, Tsimshatsui East, Kowloon, Hong Kong do solemnly, sincerely and truly affirm and say as follows: -

1.  I am the Managing Director of MGA (HK) Entertainment Ltd. (hereinafter referred to as "MGAHK"), an affiliate of ABC International Traders Inc, doing business as MGA Entertainment, the Plaintiff herein (hereinafter referred to as "MGA") and duly authorised by MGA to make this affirmation on its behalf. Unless otherwise stated, the facts and matters contained herein are true and they are either within my own personal knowledge or gleaned from books and records of MGAHK to which I have free access or supplied or related to me by Isaac Larain, the CEO of MGA. Insofar as facts and matters that do not fall within the aforesaid category, they are related to me by the respective sources stated hereinafter and are true to the best of my information and belief.

Exhibit 941
E. Lee
10. 5 / 07  12 Pos
Angela Dupre, CSR 7804

M 0001570

EXHIBIT _____ 13 _____

PAGE _____ 217 _____

2.   MGA was originally founded in 1979 as a consumer electronics business. However, in 1987 MGA obtained exclusive rights to sell Nintendo hand held LCD games (Game Boy) in the USA and naturally, Game Boy was an instant success which paved the way for MGA to enter the toy business.   MGA obtained licenses to deal with a series of action figures known as Power Rangers back in the 1990s which was again another mega success worldwide. This year MGA added Spider-Man: The Movie to its already existing collection of licences. Thus one can see that MGA is a reputable company in the toy business with substantial goodwill by successfully acquiring the aforesaid licences of these "mega hits". MGA holds a total of 17 licences and others include Hello Kitty and Coca Cola.  Now produced and shown to me marked "LSC-1" is a copy of the corporate profile of MGA downloaded from its website.

3.   Since 1987 MGA has primarily concentrated and focused its efforts in the toy industry and as at the date hereof, MGA has 8 product categories and they are smart toys, interactive dolls, handheld games, fashion dolls, youth electronics, music, licensed products and small dolls. In the years 2000 and 2001, MGA's revenue exceeded US$93 million and US$98 million respectively.  The projected revenue for the year 2002 is US$250 million due to the success of a range of dolls known as BRATZ which is the subject matter of this action and will be dealt with in detail hereinafter.  For the year 2001, the sale of BRATZ dolls, accessories and income from licence fees accounted for 22% of the total revenue of US$160 million.   MGA forecasts that the sale of BRATZ dolls, accessories and income from licence fees for the year 2002 will account for 50% of the revenue for that year.

4.   Toys designed and marketed by MGA have been the subject of numerous awards and prizes. However, the most successful toy designed and marketed by MGA must be the BRATZ dolls. In the year 2001, BRATZ dolls won the

2

M 0001571

EXHIBIT ____13____                    941-2

PAGE ____218____

following awards in the USA, namely, Toy of the Year Award (Winner) and People's Choice Toy of the Year (Winner).

**BRATZ DOLLS**

5. On 18 September 2000, MGA entered into an agreement to commission Mr. Carter Bryant (hereinafter referred to as "Mr. Bryant") to design and develop a line of dolls known as BRATZ (hereinafter referred to as "the Agreement"). Mr. Bryant was a graduate of Ottis College in fashion and toy design. Although BRATZ is a misspelling of the word "brats", the former was coined by MGA not to denote naughty or spoilt children but to denote hip and cool young adolescent or teenage girls. This idea of hip and cool is born out in the design of the BRATZ dolls.

6. Now produced and shown to me marked "LSC-2" is a copy of the Agreement. I crave leave to draw this Court's attention to clause 3 of the Agreement whereby all intellectual property right including copyright subsisting in the works generated by Mr. Bryant shall be owned by MGA. Pursuant and prior to the Agreement and commission, Mr. Bryant did design a range of 4 dolls known as BRATZ and did make original design drawings of the BRATZ dolls. At all material times, Mr. Bryant is a resident of and domiciled in the USA.

7. Now produced and shown to me marked "LSC-3" are copies of 17 initial concept and design drawings of the BRATZ dolls made by Mr. Bryant in the year 2000 pursuant to the Agreement. Now produced and shown to me marked "LSC-4" is a copy of a sheet of paper setting out the initial concept and idea of the BRATZ dolls by Mr. Bryant. The 4 dolls represent 4 best friends in high school who love to trade clothes, shoes and hairdos. Since these accessories are interchangeable, the 4 dolls can look different every day. And furthermore, there would be a lucrative business of supplying accessories to the owners of BRATZ dolls thus ensuring a steady stream of revenue.

3

M 0001572

EXHIBIT _____ 13 _____ 942-3

PAGE _____ 211

8.   Each of the 4 BRATZ dolls was given a name and a different ethnic origin so they could appeal to everyone in the targeted age group of girls between 5 to 14 years old.   Chloe is Caucasian, Sasha is black, Yasmin is Hispanic and Jade is Oriental.

9.   The BRATZ dolls are the subject matter of copyright protection in the United States and copies of their registration certificates are now produced and shown to me marked "LSC-5".   Samples of each of the 4 dolls in their original packaging are now produced and shown to me marked "LSC-6a to d".

10.   The BRATZ dolls and accessories are marketed and sold in the following packs: -

a)   BRATZ dolls, Beach Party doll and micro BRATZ doll- BRATZ dolls are those exhibited as "IL-6a to d", Beach Party dolls are BRATZ dolls wearing beach apparel and micro BRATZ dolls are smaller versions of BRATZ dolls.   The total sales of the Bratz dolls and Micro Bratz dolls for 2001 was over US$22 million.   The 1st quarter sales (FOB) for dolls this year has so far been over US$17 Million.   Now produced and shown to me marked "LSC-7" is a sample of 1 micro BRATZ doll.

b)   BRATZ fashion pack- These are separately sold apparel so that the dolls could have a wider selection of new clothing.   The total sales value (FOB) of the fashion packs for the year 2001 was over US$940,000.   The first quarter sales(FOB) for the said fashion packs this year has so far been over US$1.5 million.   Now produced and shown to me marked "LSC-8" is a sample of a BRATZ fashion pack.

c)   BRATZ shoe pack- These are additional shoes of different styles sold in separate packs.   The total sales value (FOB) of the shoe packs for the year 2001 was over US$140,000.

4

M 0001573

EXHIBIT _____ 13 _____ 941-4

PAGE _____ 220

11.    The BRATZ dolls and accessories are marketed and sold in the European Union, the Americas, Australia, New Zealand, Philippines, Indonesia, Israel, Japan and Switzerland.

12.    The BRATZ dolls have their own website at www.bratzpack.com. The site also maintains a fan club known as BRATZ pack which maintains a list of its members. The aim of this fan club is to notify its members of new fashion trends that the BRATZ dolls will wear themselves and the launch and marketing thereof. Now produced and shown to me marked "LSC-9" are downloaded copies from the said website.

13.    So far MGA has spent a total of US$7.5 million in advertising and promotion expenses in USA alone. A further sum of US$5 million has been spent in MGA's other markets worldwide as listed hereinabove.

14.    As mentioned hereinbefore, the BRATZ dolls have become an instant success and they have become collectibles. Considerable media coverage have been given to these dolls and now produced and shown to me marked "LSC-10" is a selection of press cuttings and celebrity photos of the BRATZ pack.

15.    Another major source of revenue generated by the BRATZ dolls is income derived from merchandising rights by granting non-exclusive licences to other companies worldwide. So far, 27 merchandise licence agreements have been granted in respect of a wide range of products including paper napkins, girls clothing, jewelry, bedding, home furnishing, stationery, toiletries, video games and footwear etc. Now produced and shown to me marked "LSC-11" is a sample of a merchandise licence agreement.

16.    Furthermore, MGA has granted exclusive distribution rights of the BRATZ dolls and accessories to Bandai Inc. for a term of 3 years starting from 1 April 2001 in France, Belgium, Germany, Austria, Switzerland, Spain, UK, Portugal, Ireland, Luxembourg and Netherlands.

5

M 0001574

941-5

EXHIBIT _____ 13

PAGE _____ 221

17.

18.

19.

20.

6

M 0001575

EXHIBIT ____13____        941-6

PAGE ____222____

21.

22.

23.

24.

7

M 0001576

EXHIBIT ___13___    941-7

PAGE ___223___

25.

26.

27.

28.

29.

8

M 0001577

EXHIBIT ____ 13 ____  9418

PAGE ____ 224 ____

30.

31.

32.

9

M 0001578

EXHIBIT _____ 13 _____        941-9

PAGE _____ 225 _____

33.

34.

35.

10

M 0001579

EXHIBIT      13           941-10

PAGE         226

36.

37.

38.

11

M 0001580

EXHIBIT _____ 13 _____ 941-11

PAGE _____ 227

39.   Finally, I state that this affidavit is made on behalf of MGA, the owner of the copyright subsisting in the artistic works exhibited as "LSC-3" herein and: -

a)   The said artistic works were made on divers dates between 1998 and 2000 in the USA;

b)   The author of the said artistic works is one Carter Bryant and at all material times he was a resident of and domiciled in the USA;

c)   Copies of the said artistic works exhibited as "IL-3" are true copies of the said artistic works.

Affirmed at the office of Messrs.   )
C.L. Chow Mackson Chan,   )
Rooms 801-807, 8th. Hang   )
Seng Bldg, 77 Des Voeux   )
Road Central, H.K   )
this 18th day of June   2002   )

Before me,

Chan Yiu Chee
Solicitor, Hong Kong SAR
C.L. Chow & Mackxion Chan, Solicitors

Solicitor

This affirmation is filed on behalf of the Plaintiff.

12

M 0001581

EXHIBIT _____13_____

PAGE _____228_____

941-12