# EXHIBIT 93

COPY

FILED

2006 NOV 20  AM 10: 09

L...C.U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
RIVERSIDE

BY _____

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
  John B. Quinn (Bar No. 090378)
  johnquinn@quinnemanuel.com
  Michael T. Zeller (Bar No. 196417)
  (michaelzeller@quinnemanuel.com)
  Jon D. Corey (Bar No. 185066)
  (joncorey@quinnemanuel.com)
  Duane R. Lyons (Bar No. 125091)
  (duanelyons@quinnemanuel.com)
865 South Figueroa Street, 10th Floor
Los Angeles, California  90017-2543
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100

Attorneys for Plaintiff and Counter-
Defendant Mattel, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual,<br><br>　　　　Plaintiff,<br><br>　　vs.<br><br>MATTEL, INC., a Delaware corporation,<br><br>　　　　Defendant. | CASE NO. CV 04-9049 SGL (RNBx)<br><br>Consolidated With Case No. 04-9059 and Case No. 05-2727<br><br>Hon. Stephen G. Larson<br><br>MATTEL, INC.'S NOTICE OF MOTION AND MOTION  FOR LEAVE TO FILE AMENDED COMPLAINT; AND<br><br>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF<br><br>[Proposed Amended Complaint lodged concurrently herewith]<br><br>[Declaration of Jon D. Corey filed concurrently herewith]<br><br>Hearing Date:  January 8, 2007<br>Time:  10:00 a.m.<br>Place:  Courtroom 1<br><br>Discovery Cut-off:  None Set<br>Pre-trial Conference:  None Set<br>Trial Date:  None Set |

EXHIBIT ___ 93 ___

PAGE ___ 768 ___ 1-20

07934/2000569.7

MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on January 8, 2006 at 10:00 a.m., or as soon thereafter as the matter may be heard in the courtroom of the Honorable Stephen G. Larson located at 3470 Twelfth Street, Riverside, California, 92501, Mattel, Inc. ("Mattel") will, and hereby does, move this Court pursuant to Rule 15 of the Federal Rules of Civil Procedure for an order granting Mattel leave to file an Amended Complaint lodged concurrently herewith, including to substitute Defendant MGA Entertainment, Inc. for Defendant Doe 1, defendant MGA Entertainment (HK) Limited for Defendant Doe 2, and defendant Isaac Larian for Defendant Doe 3.

This motion is made on the grounds that discovery in this case has revealed facts showing that Mattel has a right to additional and further relief against the named and additional defendants; defendants also have engaged in further conduct since Mattel's original Complaint was filed for which Mattel seeks relief; defendants will not be unduly prejudiced by amendment; Mattel has not unduly delayed seeking its requested relief; and Mattel's proposed amendment is made in good faith.

This Motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the concurrently-filed Declaration of Jon D. Corey, the concurrently-lodged proposed Amended Complaint, the pleadings and other papers on file in this action, any matters of which this Court may take judicial notice, and such further evidence and argument as may be presented at or before the hearing on this matter.

EXHIBIT ___93___

PAGE ___769___

MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT

34/2000569.7

1

**Local Rule 7-3 Certification**

2

This motion is made following the conference of counsel in compliance

3
with Local Rule 7-3, which took place on October 31, 2006 and thereafter.

4

5
DATED:  November 19, 2006          QUINN EMANUEL URQUHART OLIVER &
                                                        HEDGES, LLP
6

7
                                               By _____
8
                                               John B. Quinn
                                               Attorneys for Plaintiff and Counter-
9
                                               Defendant Mattel, Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT _____ 93
PAGE _____ 770

- 3 -

MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT

1 that Bryant was still employed by Mattel and in breach of his contractual, statutory

2 and common law duties to Mattel.

3         Mattel also seeks to add new causes of action against MGA, Larian,

4 Bryant, MGA Entertainment (HK) Limited, MGA de Mexico and Gustavo Machado

5 arising out of defendants' pattern of unfair competition and related illegal conduct.

6 This pattern of illegal conduct — most of which occurred after Mattel had filed its

7 original Complaint — consists of aiding and abetting Mattel employees in stealing

8 Mattel's confidential information and delivering it to MGA to further MGA's

9 business interests.  Among other things, Mattel has discovered since the filing of its

10 original Complaint that: (1) MGA stole Mattel's trade secrets by enticing three

11 employees of Mattel's Mexican subsidiary, including defendant Machado, to steal

12 sensitive business planning materials, and then hired them to join MGA; (2) MGA

13 stole Mattel trade secrets by enticing an employee of Mattel's Canadian subsidiary

14 to steal proprietary advertising, project, sales, customer and strategy information for

15 Canada, the United States and the rest of the world, and then hired her to join MGA;

16 and (3) in May 2006, Isaac Larian made misrepresentations to retailers, including

17 Target and TRU, about Mattel's products, particularly the MY SCENE MY BLING

18 BLING product with real gems, which caused at least one retailer to cancel its order

19 for 75,000 units of the product.

20         After the discovery of these facts, Mattel can now allege, and is

21 alleging, claims for misappropriation of trade secrets against MGA, MGA de

22 Mexico, Larian and Machado; claims for breach of fiduciary duty and breach of

23 duty of loyalty against Machado; claims for intentional interference with contract,

24 aiding and abetting breach of fiduciary duty, and aiding and abetting breach of duty

25 of loyalty against MGA and Larian; and a claim for copyright infringement against

26 MGA, MGA Entertainment (HK) Limited, Larian and Bryant.  Mattel is also

27 moving to add claims for violation of the Racketeer Influenced and Corrupt

28 Organizations Act (18 U.S.C. §§ 1962(c) and 1964(c)), conspiracy to violate the

# EXHIBIT 94

RightFAX                    8/30/2007 2:34    PAGE 002/006    Fax Server

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
Priority _____  Send _____
Entered _____  Closed _____
JS-5/JS-6 _____  JS-2/JS-3 _____
Scan Only _____  Docketed on CM _____
THIS CONSTITUTES NOTICE OF
ENTRY AS REQUIRED BY FRCP 77(d)

8/29/07

EASTERN DIVISION
BY _____ DEPUTY

**PRIORITY SEND**
**& ENTERED**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
CIVIL MINUTES — GENERAL

Case No.   CV 04-09049 SGL (RNBx)                    Date: August 27, 2007

Title:     CARTER BRYANT -v- MATTEL, INC.
           AND CONSOLIDATED ACTIONS

========================================================================

PRESENT:   HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

           Gina L. Guzman                    Theresa Lanza
           Courtroom Deputy Clerk            Court Reporter

ATTORNEYS PRESENT FOR CARTER              ATTORNEYS PRESENT FOR MATTEL:
BRYANT:

John W. Keker, Esq.                       John B. Quinn, Esq.
(morning session only)                    Michael T. Zeller, Esq.
                                          Jon D. Corey, Esq.

ATTORNEYS PRESENT FOR MGA:

Patricia Glaser, Esq.
Diana M. Torres, Esq.

PROCEEDINGS:    **ORDER DENYING MOTION FOR TERMINATING SANCTIONS;**
                **ORDER DENYING REQUEST FOR INTERLOCUTORY**
                **APPEAL; ORDER REQUIRING FILING OF AFFIDAVITS RE**
                **EVIDENCE PRESERVATION**

       This matter is before the Court on MGA's and Carter Bryant's Motion for Terminating
Sanctions, filed on July 24, 2007 (docket #689). This matter was heard on August 27, 2007, at
which time it was taken under submission. The Court has considered the moving, opposition, and
reply briefs, as well as the many declarations and other evidence presented by the parties. The

MINUTES FORM 90                                   Initials of Deputy Clerk __ glg
CIVIL — GEN                                        Time: 02/52
                              1                   Docket No. 895

EXHIBIT ___94___

PAGE ___771___

Court has also considered the arguments presented at the August 27 hearing and the sworn testimony given by Michael C. Moore, in-house counsel for Mattel. Although at the hearing the Court indicated it would defer ruling on the present motion pending further filings by all parties regarding their efforts to preserve evidence, upon further reflection the Court sees no reason to delay ruling on the current motion.[1] As set forth below, the Court **DENIES** the motion.

Based on their inherent power to sanction for "abusive litigation practices," district courts may impose sanctions against a party who destroys evidence, including the ultimate sanction of dismissal. Leon v. IDX Systems Corp., 464 F.3d 951, 958 (9th Cir. 2006). Dismissal is a harsh sanction, which may nonetheless be imposed upon those parties who have "engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings." Anheuser-Busch, Inc. v. Natural Beverage Distributors, 69 F.3d 337, 348 (9th Cir. 1995). However, before imposing the ultimate sanction of dismissal, district courts should consider five factors: "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions." Id. Nevertheless, district courts need not make explicit findings regarding each of these factors and, in any event, "a finding of willfulness, fault, or bad faith is required for dismissal to be proper." Leon, 464 F.3d 951, 958 (9th Cir. 2006) (internal quotation marks and citation omitted).

"A party's destruction of evidence qualifies as willful spoliation if the party has 'some notice that the documents were potentially relevant to the litigation before they were destroyed.'" Id. at 959 (quoting United States v. Kitsap Physicians Serv., 314 F.3d 995, 1001 (9th Cir. 2002) (finding no willful spoliation where documents were destroyed in the routine course of business)). Neither Leon nor Kitsap elaborate on when a party has the "notice" necessary to trigger the duty to preserve evidence. However, in In re Napster, Inc. Copyright Litigation, 462 F.Supp.2d 1060, 1068 (N.D. Cal. 2006), the district court presented a persuasive discussion of the standard, first rejecting an argument that the duty to preserve evidence arises only when litigation is "imminent," and then setting forth a lesser standard. Specifically, the Napster court noted that the duty arose "when a party should have known that the evidence may be relevant to future litigation," and that any such "future litigation" must be "probable," and not merely "possibl[e]." (Internal quotation marks and citation omitted).

Keeping in mind these standards, the Court turns to the categories of evidence MGA and Bryant allege that Mattel has despoiled. As articulated by the Court at the hearing on this matter, those categories are (1) Mattel employees' emails, (2) documents maintained on the Zeus document storage system, (3) the delay in producing certain Rule 30(b)(6) witnesses, (4) Carter

---

[1] By the same token, upon further reflection, the Court sees no reason to delay ruling on MGA's request for interlocutory appeal of the present order. See 28 U.S.C. § 1292(b) (stating that certifications for interlocutory appeal should be set forth in the order to be appealed). The Court's ruling on that matter appears infra.

MINUTES FORM 90
CIVIL – GEN

Initials of Deputy Clerk __glg__
Time: 02/52
**Docket No. 895**

EXHIBIT ____94____

PAGE ____772____

Bryant's missing phone records, and (5) Carter Bryant's missing time records.

In considering the arguments of the parties regarding when Mattel's duty to begin to preserve evidence arose, the Court determines that November 24, 2003, marks the date when litigation between Mattel and Bryant became more than merely speculative and in fact became probable. On this date, in-house counsel for Mattel received in discovery in an unrelated action a copy of a contract between MGA and Bryant that pre-dated Bryant's resignation from Mattel. This contract appeared to Mattel to violate certain employment agreements executed by Bryant and Mattel, thus giving rise to one of the current consolidated actions. Although prior to this date an internal investigation may have raised a suspicion on Mattel's part that litigation might arise, there was no evidence presented to the Court that Mattel should have known it had a viable claim against Bryant before November 2003. Cf. Fed. R. Civ. P. 11(b)(3) ("By presenting to the court . . . a pleading . . . , an attorney . . . is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, . . . the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery . . . .").

The Court heard testimony from Michael C. Moore, in-house counsel for Mattel, regarding the efforts to preserve email communications and other evidence. Counsel for MGA and Bryant cross-examined Mr. Moore at the hearing on this matter. The Court credits his testimony. The efforts Mr. Moore described regarding the preservation of emails is reasonable, and certainly does not amount to spoliation. Moore described communications with specific individuals identified by Mattel as those most likely to have information relevant to the litigation and efforts made to preserve any evidence those individuals had in their custody or control. Emails not otherwise archived from the relevant time period – mostly September and October, 2000 – had already been deleted from Mattel's email servers in accordance with its email retention policies. Mattel cannot be faulted for deleting these emails in the regular course of business before it had notice of its claims against Bryant.

In April, 2005, the current litigation took a dramatic turn, when MGA filed suit against Mattel. At that time, all Mattel employees were instructed to maintain any evidence potentially relevant to the litigation. When that suit was filed, Mattel took action to preserve all of its emails, capturing emails that date back to December, 2004. They retain these backup tapes to this day. MGA and Bryant make much of Mattel's failure to suspend its 90-day auto-delete policy regarding emails, but fail to address two key points: First, Mattel altered only the storage mechanism for its emails, it did not actually delete any emails; and second, Mattel, a number of years ago, informed MGA that it was not planning on suspending its 90-day auto-delete policy, and MGA did not at that time object.

As for the Zeus tapes, there is simply no evidence of spoliation. First and foremost, as the system has been described to the Court, the system is a cumulative file system that continues to accumulate. The system is still in operation, does not have an auto-delete function, and

MINUTES FORM 90
CIVIL -- GEN

Initials of Deputy Clerk ___gjg_____
Time: 02/52

3

Docket No. 895

EXHIBIT _____94

PAGE _____773

information dating back to all relevant time period in this case may be accessed from it. Additionally, Mattel's in-house counsel testified as to the existence of several backup tapes that it can make available to MGA and Bryant. Finally, outside of pure speculation, there is no evidence that anyone has deleted anything from the Zeus system. Although production issues may still remain with respect to these data, preservation of this data, in the Court's view, is simply not an issue based on the record before the Court.

The delay in producing certain Rule 30(b)(6) witnesses is not a proper basis for terminating sanctions in this case. No motions to compel were brought to compel these witnesses's depositions at earlier times, and MGA and Bryant's accusations that the delay in producing them for deposition is part of a cover-up of the destruction of evidence is mere unfounded speculation. Moreover, the Court is mindful that MGA has been found by the discovery master to be guilty of the very same unexcused delay of which it accuses Mattel. See August 14, 2007, J. Infante Order, at 8 and 9 (attached to the Supplemental Proctor Decl. as Ex. 1).

Although Mattel is at a loss to explain the missing phone records from the critical month of October, 2000, there is no evidence that the records were destroyed. Moreover, other evidence presented by Mattel, especially phone records produced by Bryant that show he was in contact with MGA during that time period, suggest that the missing records would not assist Bryant.

The "missing" time records were either never created or were deleted. There is no evidence that the latter occurred. In fact, the only evidence on this point, from Mattel's Rule 30(b)(6) witness, is that although deletion of time records is possible, he was unaware of any instances of that occurring. Artavia Depo. 116, 170-71.

In sum, MGA and Bryant have failed to present any evidence regarding the "willfulness, fault, or bad faith" required to justify the imposition of terminating sanctions. Leon, 464 F.3d at 958. Many of MGA and Bryant's allegations, especially those raised in connection with Mattel's failure to suspend its auto-delete policy (portrayed as a wholesale failure to preserve emails less than 90-days old) and the availability of data from the Zeus system, are nothing more than rhetoric laced with hyperbole. Other allegations, such as Mattel's motive for delaying certain Rule 30(b)(6) depositions, and the destruction of Bryant's October, 2000, phone records and time records, are nothing more than sheer speculation, unsupported by evidence. Although counsel impressed upon the Court MGA's conviction of the righteousness of its cause, such overzealous conviction as witnessed by the Court at the hearing is no substitute for proof.

Accordingly, the Court **DENIES** MGA's and Bryant's Motion for Terminating Sanctions.

At the hearing, counsel for MGA and Bryant requested the Court certify the present order for interlocutory appeal. That request is **DENIED.** Permissive interlocutory appeals are governed by 28 U.S.C. § 1292(b):

When a district judge, in making in a civil action an order not otherwise

Initials of Deputy Clerk __dlg_____
Time: 02/52

**Docket No. 895**

EXHIBIT _____94_____

PAGE _____774_____

appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order.

Id. Here, there is no "controlling question of law" in controversy. The law is quite settled. Accordingly, certification for interlocutory appeal of the present order is unwarranted.

As stated at the hearing, the Court **ORDERS** all parties to set forth, in affidavit form, their preservation efforts and policies with respect to the present litigation on or before September 10, 2007.

**IT IS SO ORDERED.**

EXHIBIT ____94____

PAGE ____715____

`RightFAX                    8/30/2007 2:34    PAGE 001/006    Fax Server

**·rom:**    Name:     United States District Court
                        312 North Spring Street
                        Los Angeles, CA  90012
             Voice Phone: (213) 894-5474


**To:**      Name:     Michael Zeller
             Company:

                        865 S Figueroa St, 10th Fl,
             City/State: Los Angeles, CA 90017-2543
             Fax Number: 213-624-0643



### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

## Automated Document Delivery Service
*Notice pursuant to Rule 77(d) FRCiv.P*
*The attached copy is hereby served upon you pursuant to Federal Rule of Civil Procedure 77(d).*

**Fax Notes:**

Case 2:04-CV-09049 : CARTER BRYANT V. MATTEL INC

*Pursuant to General Order 06-07, Section F, the following documents shall be submitted in the traditional manner: Pen Registers, Search Warrants, Seizure Warrants, Wire Taps, Bond Related Documents, Under Seal and In-Camera Documents, and All Charging Documents (Complaints, Informations, Indictments, and Superseding Charging Documents). All other documents filed in cases unassigned to a judge shall be filed electronically with a copy e-mailed to the criminal intake mailbox for the appropriate division. The proper e-mail address for each division is as follows:*

*Western Division: CrimIntakeCourtDocs-LA@cacd.uscourts.gov*
*Southern Division: CrimIntakeCourtDocs-SA@cacd.uscouts.gov*
*Eastern Division: CrimIntakeCourtDocs-RS@cacd.uscourts.gov*

*For additional information and assistance, please refer to the CM/ECF page on the Court website at www.cacd.uscourts.gov.*

**Switch to e-mail delivery and get these documents sooner!**
**To switch, complete and submit**
**Optical Scanning Enrollment / Update form G-76.**
**Call 213-894-5474 for help and free technical support.**

*If you received this document in error because the attorney with whom this document is directed is no longer the attorney on the case, a Notice of Change of Attorney Information, form G-6, must be filed. If there are other cases which you've received documents for which you are no longer the attorney, separate notices must be filed for each case. Failure to do so will result in the continued sending of documents to you. Form G-6 is available on the court's website at www.cacd.uscourts.gov or at the Clerk's Office.*

Date and time of transmission:        Thursday, August 30, 2007 2:34:04 PM
Number of pages including this cover sheet:  06

8/29

EXHIBIT ___94___

PAGE ___770___

# EXHIBIT 95

P.Send

```
ENTERED
CLERK, U.S. DISTRICT COURT

JAN 1 2 2006

CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION      BY DEPUTY
```

FILED

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

CARTER BRYANT,

                    Plaintiff,

v.

MATTEL, INC.,

                    Defendant.

and related actions.

CASE NO. CV-04-9049-SGL

(Consolidated with cases CV-04-9059 and CV-05-2727)

ORDER REGARDING MATTEL'S MOTION FOR LEAVE TO AMEND

THIS CONSTITUTES NOTICE OF ENTRY AS REQUIRED BY FRCP, RULE 77(D).

This case has, increasingly, become one of the proverbial tail wagging the proverbial dog.

Back in April, 2004, Mattel, Inc., ("Mattel") filed a complaint in Los Angeles County Superior Court against its former employee and the reputed creator of the BRATZ dolls, Carter Bryant. The complaint pressed five separate state-law theories relating to certain agreements Bryant signed while an employee with Mattel, namely, an Employee Confidential Information and Inventions Agreement ("Inventions Agreement") and a Conflict of Interest Questionnaire ("COI Questionnaire"). Although couched in state law terms and ostensibly pled as a simple employment action, lurking beneath the allegations in the complaint was whether Bryant had either misappropriated Mattel's intellectual property or

EXHIBIT 95

PAGE 777 (142)

1  resources in creating and/or developing the BRATZ dolls or whether he continued
2  to develop his BRATZ design while still working in Mattel's employ.  In either event,
3  the rights to the BRATZ dolls could become the property of Mattel, either through
4  infringement or through operation of the agreements noted above.  The case was
5  later removed to this Court and was assigned the case number CV-04-9059.  MGA
6  Entertainment, Inc. ("MGA"), the maker of the BRATZ doll line, then intervened "to
7  protect its rights to Bratz dolls" that were at stake in the action.  Mattel, Inc. v.
8  Bryant, 446 F.3d 1011, 1012 (9th Cir. 2006); see also id. at 1013 ("Mattel argues, 'a
9  significant risk of prejudice' to MGA [exists] if the ownership of rights to intellectual
10 property, i.e., the Bratz creations, were decided in the absence of MGA").

11         In the interim, Bryant filed a declaratory judgment action in this Court,
12 seeking for the Court to declare that his BRATZ doll creations did not infringe
13 Mattel's copyright in its Toon Teens products.  See Court's July 18, 2006, Order at
14 3 (noting that, although "Bryant's complaint . . . makes reference to 'other Mattel
15 products,' . . . the substance of his allegations all address the product 'Toon
16 Teens'").  The declaratory judgment action was assigned the case number CV-04-
17 9049.

18         MGA then filed an action against Mattel in this Court broadening the scope
19 of the controversy beyond that concerned with the ownership rights to the BRATZ
20 doll line.  MGA's complaint asserted various Lanham Act claims and their California
21 state law equivalent arising out of Mattel's alleged "habitual and unfair tactics of
22 competition-by-intimidation and serial copycatting of MGA's products."  (Compl.
23 ¶ 7).  In essence, although the prior actions were concerned with ownership in the
24 rights to the BRATZ doll line, the allegations in 05-2727 concerned whether there
25 had been unlawful efforts to block the marketing of those rights in the BRATZ dolls.
26 MGA's complaint did make mention of other products that were affected by Mattel's
27 alleged predatory business practices, but by far the largest portion of its complaint
28 concerned Mattel's conduct in undermining (or seeking to undermine) MGA's rival

EXHIBIT  95

2

PAGE  778

1  line of BRATZ dolls.[1]

2      By Order dated June 19, 2006, the Court consolidated all three cases "for all

3  purposes" as they "involve[d] a number of common issues of law and fact." As the

4  Court later noted in its August 10, 2006, Order: "At its heart, this case asks the

5  question: Who owns the rights to the Bratz dolls?" Resolution of this question lies

6  at the heart of or, at the very least, affects many of the other claims set forth in

7  each of the three respective cases. For instance, even though the allegations in

8  05-2727 concern Mattel's alleged efforts at defeating the marketing of the BRATZ

9  dolls, resolution of who owned the rights to the BRATZ dolls could serve to moot

10  many of those allegations. It is hard to imagine how it is unlawful for a company to

11  thwart or otherwise undermine the marketing of a product it owns. Thus, if Mattel

12  owned the rights to the BRATZ dolls, many of the allegations in the 05-2727

13  complaint would become moot. That said, such consolidation did not do away with

14  the distinctions that do exist between the three cases. As the Court highlighted in

15  its consolidation order, when either party files a pleading in the case, "the first

16  paragraph of [that] document . . . shall inform the Court to which case(s) the

17  document relates."

18      On July 18, 2006, the Court dismissed Bryant's declaratory judgment action,

19  04-9049, finding there existed no reasonable apprehension of an imminent

20  copyright infringement claim being filed against him by Mattel based on Mattel's

21  Toon Teen intellectual property. See Court's July 18, 2006, Order at 4. The

22  Court's Order was predicated entirely upon counsel for Mattel's representation

23  during oral argument that it "will not maintain that Bratz infringes the copyright in

24  Toon Teens." Owing to this representation, the Court, in dismissing the declaratory

25  judgment action, made clear that any future "claim by Mattel of copyright

26

27      [1] That the marketing of the BRATZ dolls lies at the heart of the issues
between the rival doll makers in the 05-2727 case is best illustrated by the Court's

28  discussion of those allegations in its August 26, 2005, Order, Granting in Part and
Denying Part Mattel's Motion to Strike portions of MGA's complaint.

EXHIBIT 95

PAGE 777

1  infringement based on the Toon Teens product is barred by counsel's

2  representation." July 18, 2006, Order at 4.

3       Presently before the Court is Mattel's request for leave to file an amended

4  complaint in the 04-9059 action. The complaint broadens considerably the nature

5  of the action from its genesis in state court. Whereas before the complaint simply

6  sought to litigate alleged contractual and fiduciary breaches by Bryant while in the

7  employ of Mattel (no doubt geared toward procuring a legal basis for Mattel to lay

8  claim to the BRATZ doll line), the amended complaint adds five more defendants

9  and nine new legal claims, alleging a wide range of commercial disputes between

10  the rival doll makers that spans three countries. For instance, the amended

11  complaint now contains RICO claims, a misappropriation of trade secrets claim,

12  and various aiding and abetting claims all stemming from allegations that MGA

13  cherry-picked certain high-ranking Mattel executives in foreign markets (many also

14  named as defendants in the amended complaint) or designers (namely, Bryant),

15  and then enticed or encouraged those same individuals to steal various trade and

16  proprietary secrets (be it sales plans, sales projections, customer profiles, or

17  intellectual property) from Mattel and hand them over to MGA before going to work

18  at MGA.

19       Moreover, the amended complaint expands upon the existing breaches of

20  contract and fiduciary duty claims in the original complaint by expanding the

21  universe of former employees (namely, the cherry-picked executives) to whom

22  those claims now apply.

23       Finally, Mattel now makes plain what was always lurking in its original

24  complaint — a copyright claim, but one directed not only to Bryant but also to MGA,

25  MGA's Hong Kong subsidiary, and MGA's President and CEO Isaac Larian.

26  Moreover, Mattel characterizes its copyright claim somewhat differently from that at

27  issue in Bryant's declaratory relief action: "The Amended Complaint does not

28  include a claim for infringement of copyrights in Toon Teens, but rather

EXHIBIT  95

PAGE  780

4

1  infringement of copyrights in Bratz." (Reply to MGA Opp. at 11).  Toward that end,

2  Mattel has recently filed copyright registrations with the U.S. Copyright Office

3  claiming ownership in various BRATZ doll design drawings penned by Bryant.

4  A.    ANALYSIS

5        Federal Rule of Civil Procedure 15(a) provides that, once a responsive

6  pleading has been served, "a party may amend the party's pleading only by leave of

7  court or by written consent of the adverse party; and leave shall be freely given

8  when justice so requires."  With no consent to Mattel's proposed filing proffered by

9  MGA and Bryant, determining whether to grant Mattel leave to file an amended

10  complaint is gauged by looking to the familiar formulation of factors set forth by the

11  Supreme Court in Forman v. Davis:

12
13          In the absence of any apparent or declared
            reason—such as undue delay, bad faith or dilatory
14          motive on the part of the movant, repeated failure to
            cure deficiencies by amendments previously allowed,
15          undue prejudice to the opposing party by virtue of
            allowance of the amendment, futility of amendment,
16          etc.—the leave sought should, as the rules require, be
            'freely given.' Of course, the grant or denial of an
17          opportunity to amend is within the discretion of the
            District Court, but outright refusal to grant the leave
18          without any justifying reason appearing for the denial is
            not an exercise of discretion; it is merely abuse of that
19          discretion and inconsistent with the spirit of the Federal
            Rules.

20  371 U.S. 178, 182 (1962).

21        MGA and Bryant offer the following reasons for denying Mattel leave to

22  amend: (1) Mattel has long known of the factual predicates underlying its copyright

23  and intentional interference claims but delayed in asserting them; (2) the proposed

24  amendment to add the copyright claim and the intentional interference claims

25  (against the new defendants) are futile because they are barred by the applicable

26  statute of limitations; (3) the copyright claim had been brought in bad faith by Mattel

27  because of its prior public disavowal of an intent to assert such a claim; and (4)

28  MGA and Bryant would incur undue prejudice were the copyright claim added to the

5

EXHIBIT  95

PAGE  781

1  suit because of alleged spoilation of evidence issues involving Mattel's ZEUS

2  computer system used by doll designers at Mattel and its e-mail system.  None of

3  these arguments are persuasive.

4       1.     Awareness of Factual Predicate for Copyright and Intentional

5              Interference Claims

6       MGA argues that Mattel has long known about the factual predicate for its

7  recently added copyright claim, observing that, "[o]ver four years ago, in August

8  2002, Mattel CEO Bob Eckert received an anonymous letter stating that Bryant

9  created the project that became the 'Bratz' dolls — and worked with MGA to 'steal'

10 that project — while still employed at Mattel."  (MGA Opp. at 9).  Similarly, MGA

11 argues that Mattel has long known of the factual predicate for its intentional

12 interference claim with respect to Bryant's contract given that, "[b]y Mattel's own

13 admission, it learned in November 2003 — more than three years ago — that

14 Bryant had signed a contract with MGA 'dated as of' a month prior to his final day at

15 Mattel."  (MGA Opp. at 11-12).

16      At the outset it must be observed that "[m]ere delay in proffering an

17 amendment does not justify denying leave to amend."  Sierra Club v. Union Oil Co.

18 of California, 813 F.2d 1480, 1493 (9th Cir. 1987), vacated on other grounds by,

19 485 U.S. 931 (1988), and reinstated by, 853 F.2d 667 (9th Cir. 1988).  Seizing upon

20 this point of law, Mattel argues that "only in . . . cases" when "granting leave would

21 require discovery to be reopened after summary judgment motions have been filed"

22 has the Ninth Circuit found the denial of leave "justified" based on the passage of

23 time alone.  (Reply to MGA Opp. at 3).  That is incorrect.  There is a line of cases

24 from the Ninth Circuit finding that, if a "party seeking amendment knows or should

25 know of the facts underlying the amendment when the original complaint is filed,

26 the motion to amend may be denied."  Sierra Club, 813 F.2d at 1493 (citing Jordan

27 v. County of Los Angeles, 669 F.2d 1311, 1324 (9th Cir. 1982)).  And, recently, the

28 Ninth Circuit upheld the denial of leave to amend based on the passage of time

6

EXHIBIT___95

PAGE___782

1   even though the requested leave to amend was tendered <u>before</u> the time, as set

2   forth in a Rule 16(b) pre-trial scheduling order, for amending pleadings had expired.

3   See <u>AmerisourceBergen Corp. v. Dialysist West, Inc.</u>, 465 F.3d 946 (9th Cir. 2006).

4   The Ninth Circuit observed that, even when a request for leave to amend is timely

5   under a Rule 16(b) schedule for pretrial motions, the district court may nonetheless

6   still deny the request based on any of the <u>Forman</u> factors. <u>Id.</u> at 951-52. The Ninth

7   Circuit then noted that the issue of untimeliness (regardless of whether the

8   amendment is tendered "within the period of time allotted by the district court in a

9   Rule 16 scheduling order") in seeking to amend can constitute a justification for

10  denying leave to amend if "the moving party knew or should have known the facts

11  and theories raised by the amendment in the original pleading." <u>Id.</u> at 953.

12  Toward that end, the Ninth Circuit observed that "an eight month delay between the

13  time of obtaining a relevant fact and seeking a leave to amend is unreasonable."

14  <u>Id.</u> In this regard, the Ninth Circuit in <u>Dialysist</u> was unpersuaded by the fact that,

15  even though the moving party had known of the facts prompting the amendment for

16  a long period of time, there still remained eight more months of discovery for the

17  parties to marshal facts against the allegations raised by the amended pleading:

18  "Even though eight months of discovery remained, requiring the parties to scramble

19  and attempt to ascertain whether the Procrit purchased by AmerisourceBergen was

20  tainted, would have unfairly imposed potentially high, additional litigation costs on

21  Dialysist West that could have easily been avoided had AmerisourceBergen

22  pursued its 'tainted product' theory in its original complaint or reply." <u>Id.</u> Thus,

23  absent "a satisfactory explanation" for the delay in amending the complaint, the

24  Court is well within its rights to deny leave to amend. <u>Id.</u>

25          Mattel proffers the following reasons for taking the time that it did before

26  presenting its amended complaint: (1) Acting out of an abundance of caution to its

27  obligations under Rule 11 to present "factual contentions [that] have evidentiary

28  support," Mattel waited until its claims were better supported by evidence

7

EXHIBIT ____95____

PAGE ____783____

1   uncovered in discovery; and (2) the delay in the proceedings caused by "the year-

2   long stay and the parties' prior jurisdictional disputes" have left the case still in its

3   "nascent stage." (Reply to MGA Opp. at 2, 4).

4        The first reason is not well-founded. Rule 11 specifically allows parties to

5   aver factual allegations that "are likely to have evidentiary support after a

6   reasonable opportunity for further investigation or discovery" so long as the party

7   makes clear in its pleading that its factual contentions on those points are with the

8   caveat that they are based on a good faith belief that further discovery would

9   unearth evidence to support them. See FED. R. CIV. P. 11(b)(3). Simply put, Rule

10  11 did not stand in the way of Mattel averring the factual contentions it now claims it

11  "merely suspected" as being the case based on the limited information before it.

12  Mattel could have gone ahead and made such suspected factual allegations so

13  long as it caveated those claims with the declaration that it reasonably believed that

14  those allegations would be borne out by further discovery. Perhaps the time by

15  which Mattel could have reasonably believed such allegations would be borne out

16  by further discovery occurred after the dates noted by MGA, but it is hard to fathom

17  that such materialization took three or four years to occur.

18       The second reason would have some merit to it but for the fact that the

19  information that alerted (or should have alerted) Mattel to the existence of its now

20  asserted copyright and intentional interference claims was brought to Mattel's

21  attention well before the case was stayed on May 20, 2005. The stay, therefore,

22  did not operate as an obstacle to Mattel asserting its claims; nor even if it did, the

23  stay does not explain why Mattel waited nearly six months after the stay was lifted

24  on May 16, 2006, to present those claims now.

25       All of that being said, the one thing that gives the Court pause in denying

26  leave based on the tardiness in Mattel's presentation is the lack of any evidence

27  that MGA or Bryant have been prejudiced by the delay. Delay unconnected to

28  some showing of prejudice, be it prejudice to the parties or disruption in judicial

8

EXHIBIT ___95___

PAGE ___784___

1   management of the case, does not suffice to deny granting leave to amend.  The

2   Ninth Circuit has noted that, "where a defendant is on notice of the facts contained

3   in an amendment to a complaint, there is no serious prejudice to defendant in

4   allowing the amendment" even if it is made tardily.  Sierra Club, 813 F.2d at 1493.

5   Indeed, the denial of leave was proper in the Dialysist case not simply because of

6   the length of the delay, but because the delay itself was "detrimental" in that it

7   would entail the opposing party to have "unfairly" incurred "potentially high,

8   additional litigation costs" that could have been avoided if the moving party had

9   made clear its intentions earlier.  465 F.3d at 953.

10          Here, as well demonstrated in Mattel's papers, it is readily apparent from the

11   pleadings filed by MGA and Bryant in this case that both have been aware for some

12   time of the factual predicates now underlying Mattel's copyright claim and

13   intentional interference claim.  (See MGA Opp. at 5 ("As Bryant and MGA

14   suspected at the time of filing — and Mattel now concedes by conduct — those

15   deceptively-pled state-law claims [in 04-9059] were copyright infringement claims all

16   along")(emphasis added)).  The parties have engaged in meaningful discovery

17   regarding many of the facts touched upon by these new claims, be it tracking down

18   experts in various forensic fields or taking depositions of various of the key players

19   to those claims.   In point of fact, in their papers filed with this Court before this

20   present motion, both Bryant and MGA have made it abundantly clear that they have

21   long suspected that a copyright infringement claim was in the offing as evidenced

22   by Bryant's filing of the declaratory judgment action and MGA's intervention in the

23   05-9059 matter to protect its rights to the BRATZ dolls.  Similarly, MGA and Bryant

24   have been on notice to the facts comprising the interference claim concerning

25   Bryant's contract as evidenced by the identity of the individuals who have been

26   deposed by Mattel, as well as the nature of the questions posed and the testimony

27   proffered at those depositions.  MGA's argument that, with the amendments, it

28   faces the prospect of defending "against stale claims" owing to faded memories and

EXHIBIT ___95___

PAGE ___783___

1    loss of documents caused by the great passage of time, (see MGA Opp. at 3, 13),

2    is diminished by the fact that (no doubt owing to the sophistication of all counsel

3    involved) discovery on these very issues have been proceeding apace by both

4    sides long before Mattel filed its proposed amendments.  This is simply not a case

5    where "additional litigation costs" will be "unfairly" visited upon Bryant and MGA by

6    allowing the proposed amendments; much of those costs have already been borne

7    by the parties for some time.

8       2.    <u>Spoilation of Evidence</u>

9       MGA next argues that Mattel's delay in bringing the amended complaint has

10    caused it prejudice as, in the interim, critical pieces of evidence have been or are

11    suspected of having become lost.  For instance, MGA asserts that Mattel's Rule

12    30(b)(6) witness concerning its Zeus computer system, Julia Marine, testified that,

13    "although Mattel identified and segregated its most relevant backup tapes available

14    for Zeus, Mattel allowed its tape backup system to expire the database for those

15    backup tapes, thereby eliminating all information about what was actually stored on

16    those backup tapes."  (MGA Opp. at 9-10).  Information on the Zeus computer

17    system is critical because of Mattel's assertion that part of its copyright claim rests

18    on Bryant's exposure to Mattel development programs.  (First Am. Compl. ¶ 26(a)).

19    As explained by MGA: "[C]oncept data and drawings created by [Mattel] design

20    center personnel are stored on Zeus.  Thus, the electronic documents stored on

21    Zeus – which should include the metadata showing who created, edited and

22    accessed Mattel's concept drawings and designs – during the time Bryant worked

23    in the design center at Mattel is vitally important to defending against Mattel's

24    claims."  (MGA Opp. at 14).  MGA's argument is neither an accurate

25    characterization of Ms. Marine's testimony nor of the nature of Mattel's exposure

26    claim.

27       Ms. Marine did not testify that the information on the backup tapes (some

28    fifty in total) was lost, but rather that Mattel no longer carried the type of hardware

10

EXHIBIT ___95___

PAGE ___78U___

1   that could restore the information still found on those tapes:

2       Q.      So if you wanted to restore that 2002 backup
                tape[s] then, how would you go about doing that?

3

4                       . . . .

4       A.      You need the hardware so if we don't have the
5               hardware — if [the technology used by the tape
                is] DLT we don't have the hardware and you've
6               got to buy it and – well, first you have to find a
                place to put it with adequate power which we
7               don't have in the design center.  You need to
                have a tape library.  You need to have the tape
8               drives that carried those tapes.  You need a
                server that has the capability to – that's big
9               enough to handle all of the hardware.  You need
                the software – the license for the backup
10              software[, Net Backup].  You need the disk space
                to restore it to and then you have to start reading
11              in all those tapes.

12      Q.      You said that you don't have that in the design
                center.  Do you have that hardware anywhere
13              else in the company?

14      A.      DLT? No, no.

15      Q.      At what point did you get rid of the hardware?

16      A.      Once the last backups — DLT backups expired
                so it would have been a couple years ago
17              probably.

18  (Decl. Diana Torres, Ex. K at 118-119).

19          The above testimony clearly denotes the difficulty in restoring what was on

20  Mattel's Zeus computer system during the relevant time frame, but it certainly does

21  not demonstrate that the information on those backup tapes has been "eliminated"

22  or forever lost.  Undoubtedly it will be a costly endeavor to recover that information

23  (not to mention to later search and sort through it); but to argue, as MGA does, that

24  the information is "unavailable" or "lost", (MGA Opp. at 9, 14), exaggerates its

25  plight.  Indeed, Ms. Marine's testimony indicates that the difficulty in retrieving the

26  information on the Zeus backup tapes has been present for some time (maybe

27  since 2004 or perhaps even earlier).  This is important because it undermines

28  MGA's claim that Mattel's undue delay in bringing its amended complaint will cause

EXHIBIT _____ 95

11

PAGE _____ 787

1   it to suffer prejudice it otherwise would not have faced if the amendments were

2   brought sooner.  Such prejudice has been present for years, and Mattel's failure to

3   bring its amended complaint sooner would not have changed this situation.

4   　　　Similarly, MGA's point that access to what was on the Zeus computer

5   system is vital in demonstrating that Bryant was not exposed to or otherwise did not

6   hack the system to steal other designers work is diminished to some extent by the

7   fact that Bryant himself testified that he did not use the Zeus computer system and

8   was "pretty much computer illiterate" while employed at Mattel.  Admittedly, the

9   ability to point to information on the Zeus system backup tapes to prove that Bryant

10  did not access other designers drawings or to prove the date those drawings were

11  created by those other designers would be useful evidence to negate Mattel's

12  factual claims.  Nonetheless, such evidence still would not discount other avenues

13  outside of the Zeus computer system by which Mattel could seek to prove that

14  Bryant was exposed to its copyrighted works, e.g., witness testimony that Bryant

15  saw drawings of the same posted on other designers' cubicles.

16  　　　MGA next surmises that Mattel's e-mail records have disappeared, not

17  because it has any proof on that point, but simply because Mattel has postponed

18  the deposition of the individual most knowledgeable of Mattel's e-mail records until

19  after the hearing on Mattel's motion for leave to amend.  (MGA Opp. at 10).

20  Speculation of spoilation does not suffice.  That MGA's argumentation on this point

21  is nothing more than speculation is best exhibited by the evidence it has proffered

22  in support of its argument:  "[I]f the sole retained backup for Zeus is no longer

23  available, it is not hard to imagine that Mattel's electronic mail archives are similarly

24  out of reach."  (MGA Opp. at 15 (emphasis added)).  MGA then makes much of a

25  deposition from a Mattel executive, Alan Kaye, who testified that e-mails in his

26  inbox would be automatically deleted if they had remained there for more than a

27  certain time period.  (Decl. Diana Torres, Ex. H at 292-93).  MGA takes from this

28  acknowledgment that Mattel has an "automatic email deletion system" that has

EXHIBIT___95

PAGE____788

1   compromised Mattel's "duty to preserve documents." (MGA's Opp. at 14).

2   Noticeably absent from MGA's argument is any evidence that the e-mails so

3   deleted from a Mattel employee's inbox are forever lost or, as is far more likely,

4   whether such information remains or is otherwise archived on some backup file on

5   Mattel's computer system. Absent concrete proof that spoilation has occurred,

6   nothing in MGA's argument forms a basis for denying Mattel its requested leave to

7   amend.

8        3.    Statute of Limitations

9        MGA next argues that Mattel's copyright and intentional interference claims

10  are futile as both are barred by the applicable statute of limitations. This argument

11  was pressed emphatically at oral argument. With respect to the copyright claim,

12  MGA argues that the applicable statute of limitations is three years, with the

13  limitations period accruing from when a party has knowledge of a violation or when

14  a reasonably diligent person would have been put on inquiry of the infringement.

15  (MGA Opp. at 16 (citing Roley v. New World Pictures, 19 F.3d 479, 481 (9th Cir.

16  1994)). MGA argues that Mattel was put on notice about its copyright claim in

17  August, 2002, upon the receipt of the anonymous letter to Mattel's CEO that Bryant

18  had stolen the idea for BRATZ while working at Mattel. Thus, according to MGA,

19  the limitations period on Mattel's claim expired in August, 2005, rendering Mattel's

20  current copyright claim stale.

21       The problem with MGA's analysis is it fails to take into account the relations-

22  back principles found in Rule 15(c), which provides that "[a]n amendment of a

23  pleading relates back to the date of the original pleading when "the claim . . . in the

24  amended pleading arose out of the conduct, transaction, or occurrence set forth . . .

25  in the original pleading," or if such relation back is otherwise permissible by the

26  state "law that provides the statute of limitations applicable to the action." By

27  MGA's own admission Mattel's copyright claim arises out of the same conduct or

28  transaction contained in the original complaint filed in April, 2004, well within the

EXHIBIT _____ 95

13

PAGE _____ 789

1  applicable limitations period.[2] (MGA Opp. at 12 ("These very same allegations

2  [contained in the original complaint] underlie the copyright infringement and

3  intentional interference contract claims Mattel now seeks to allege against MGA,

4  Mr. Larian and Bryant")).

5      MGA's statute of limitations argument with respect to the intentional

6  interference claims fares no better.  According to MGA, the applicable statute of

7  limitations is two years for an intentional interference with contract claim and Mattel

8  was aware of the facts alerting it to this claim (insofar as Bryant's contract is

9  concerned) on November 24, 2003, when it learned "that Bryant worked with MGA

10  to develop the 'Bratz' dolls prior to his last day of employment by Mattel and, hence,

11  prior to the expiration of his contractual relationship with Mattel."[3] (MGA Opp. at 18

12  (citing Knoell v. Petrovich, 76 Cal. App.4th 164, 168 (1999) .  Such a time line

13  would, according to MGA, mean that the applicable limitations period expired on

14  Mattel's interference with Bryant's contract claim on November 24, 2005, well

15  before Mattel sought leave to file its amended complaint. (Id).  The problem again

16  with MGA's argument is that it ignores that through Rule 15(c) Mattel's intentional

17  interference claim would relate back to when it filed its original complaint in April,

18

19

20

21  [2] The same would appear to be true — that the amendments would be timely

22  — if the amendments related back to Mattel's answer (filed on May 13, 2005) to MGA's complaint in the 05-2727 case.

23  [3] With respect to Mattel's interference with contract claim as to one of its

24  former executives, Ron Brawer, MGA claims Mattel was put on notice of that claim on September 17, 2004, when Brawer informed Mattel that he leaving to go to work for MGA.  (MGA Opp. at 19-20).  The problem with this argument is that nothing from

25  that simple event — Brawer's declaration of his intent to leave — in any way would apprise Mattel that MGA had encouraged Brawer to engage in nefarious conduct

26  (the stealing of proprietary information) causing Brawer to breach his contract with Mattel that he would not do anything to help a competitor while working for them.

27  MGA's contention that Mattel must have known of those misdeeds in mid-September

28  is nothing more than speculation.  Futility cannot be founded on what might or might not be the case; either a claim is futile to bring or it is not.

14

EXHIBIT ___95___

PAGE ___790___

1    2004, well before the limitations period expired.[4]

2          Accordingly, MGA's futility argument is not well-founded.

3          4.    Prior Disavowals of Asserting a Copyright Claim

4          Finally, MGA takes umbrage with the cageyness to which Mattel has taken in

5    this case as to whether or not it is asserting a copyright infringement claim against

6    it. To MGA, such ducking and weaving on Mattel's part renders its effort to now

7    bring such a copyright claim as one done in bad faith. No doubt the Court itself has

8    been subjected to Mattel's overly vague statements on this point, but in the end

9    nothing in those statements has ever foreclosed the possibility that such a claim

10    may be in the offing. Indeed, during the oral argument on Mattel's motion to

11    dismiss Bryant's declaratory judgment action, the Court pressed Mattel's counsel as

12    to whether it would assert such a copyright claim against Bryant as it is currently

13    seeking to do. The most that Mattel's counsel would proffer was that Mattel would

14    not assert a copyright claim against Bryant based on Mattel's copyright rights in

15    TOON TEENS. At that point, the Court directed the parties to engage in a meet

16    and confer based on counsel for Mattel's representation and to provide a report to

17    the Court based on those discussions. The report submitted to the Court made

18    clear that, although Mattel was willing to accede that it would not bring a copyright

19    claim based on TOON TEENS, it refused to accede to Bryant's broader request

20    that "Bryant 'never copied anything' and that no Mattel product has any 'relevance'

21    to any claim that Mattel has or ever will assert against Bryant." This by itself should

22    have dispelled any illusion either Bryant or MGA was operating under that Mattel's

23    prior statements had foreclosed any potential copyright claim against them.[5]

24    _____

25          [4] Again the relations-back principle would also seem to render its claim timely
26    if it were filed as an amended answer (the original having been filed in May, 2005) in
      the 05-2727 case.

27          [5] MGA also argues that Mattel's effort to substitute MGA and its CEO, Isaac
28    Larian, for the "Doe" defendants listed in its original complaint is improper because
      Mattel knew of their identity when it filed the original complaint. The argument is

EXHIBIT

PAGE    791

1    That said, Mattel's allegation in the amended complaint as to how it is

2   seeking to lay claim to the copyright in BRATZ is disconcerting.  Paragraph 26,

3   subsection a, in the amended complaint alleges that Bryant "misappropriated and

4   misused Mattel property" by "using his exposure to Mattel development programs to

5   create the concept, design and name of Bratz."  (First Am. Compl. ¶ 26(a)).  Such

6   "exposure" could include Bryant misappropriating the Mattel design concept in

7   TOON TEENS in drawing his inspiration for the BRATZ doll.  Were Mattel's

8   copyright claim so predicated it would be barred by this Court's July, 2006, Order,

9   dismissing Bryant's declaratory judgment action.  Mattel was pressed on this point

10   during oral argument and conceded that such "exposure" to Mattel "development

11   programs" did not include TOON TEENS.  With this representation, nothing in

12   Mattel's proposed copyright claim is barred under the rubric of bad faith.

13       5.    Judicial Economy Considerations

14       In his opposition, Bryant adds an additional reason for denying leave beyond

15   those contained in MGA's papers — the amendment would muddy the waters in the

16   04-9059 by adding "tangential" issues that would only serve to delay resolution of

17   the key issue lying at the heart of the complaint:  Who owns the rights to the

18   BRATZ line of dolls.  (Bryant Opp. at 2 ).  Bryant notes that the case has proceeded

19   apace in moving toward resolving that issue, and the amendment would "transform

20

21   _____

22   misplaced.  As made clear by Mattel, California law allows a plaintiff to substitute in a
    defendant for a "Doe" if the plaintiff was ignorant of that defendant's identity or

23   ignorant of the basis for liability at the time the complaint was filed.  See Miller v.
    Thomas, 121 Cal.App.3d 440 (1981).  MGA does not dispute this legal contention

24   but at oral argument disputed that Mattel did not know the basis for liability against
    itself or Mr. Larian due to the "uncanny" similarity between the allegations averred in

25   the original complaint and those now proffered against the two in the amended
    complaint.  Specifically, MGA notes that the original complaint spoke of Bryant

26   working for one of Mattel's competitiors and of that employee's theft of Mattel's
    intellectual property before leaving to work for that competitior.  At most, all this

27   shows is that Mattel knew that Bryant went to work for MGA, not that MGA or Mr.
    Larian encouraged Bryant's alleged unlawful behavior recited in the original

28   complaint.

16

EXHIBIT 95

PAGE 792

1   what Mattel has always claimed was a straightforward employment action against

2   an individual defendant into a global commercial dispute against Mattel's primary

3   competitor, MGA," that "will last years" thereby "delay[ing]" resolution of who owns

4   BRATZ.[6] (Bryant Opp. at 2). Mattel argues that "the law does not deny leave to

5   amend because claims are 'tangential'" and then reiterates its point that some

6   showing of prejudice, namely, seeking leave after expiration of discovery, is

7   necessary. (Reply to Bryant Opp. at 3). That is not entirely correct.

8       As noted previously, the Ninth Circuit recently upheld a denial for leave to

9   amend because the amendment would have "drastically changed" the litigation,

10  even though the leave request was tendered <u>before</u> the time, as set forth in a Rule

11  16(b) pre-trial scheduling order, for filing a motion to amend had expired and well

12  before the discovery cut-off. <u>See AmerisourceBergen Corp. v. Dialysist West, Inc.</u>,

13  465 F.3d 946, 953 (9th Cir. 2006). In justifying its reasoning the Ninth Circuit cited

14  approvingly to the following statement from a well-respected treatise: "If an

15  amendment substantially changes the theory on which the case has been

16  proceeding and is proposed late enough so that the opponent would be required to

17  engage in significant new preparation, the court may deem it prejudicial." <u>Id</u>. at 953

18  n.2 (quoting 6 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE,

19  FEDERAL PRACTICE AND PROCEDURE § 1487 (2nd ed. 1990)). Thus, <u>Dialysist</u>

20  recognized that the introduction of "different legal theories" and/or proof of

21  materially different facts well into the litigation can itself be a basis for finding

22  prejudice regardless of whether the period for discovery has expired (or is even

23  close to expiring) or the parties have already filed summary judgment motions. <u>Id</u>.

24  at 953-54.

25      Although the parties can safely be said to be at this point well into the

26

27      _____

        [6] Bryant also brings intricate legal arguments about the sufficiency of the
28  allegations Mattel has averred in building its RICO claims against him. Such
        considerations are best left to be resolved on a properly filed motion to dismiss.

17

EXHIBIT 95

PAGE 743

1   litigation in this consolidated action (as evidenced by the protracted discovery

2   disputes contained in the docket sheet that the parties have had before the

3   magistrate judge and now the special master, and the litigation of motions to

4   dismiss in both the 04-9049 and 04-9059 cases), the fact remains that, as Mattel

5   has made painfully clear in its papers, no scheduling order has been entered in this

6   case.[7] This takes away somewhat from the prejudice Dialysist found to exist when

7   a "drastic change [in a party's] litigation theory" takes place mid-stream in the

8   litigation process. Id. at 953.  Simply put, without a schedule for the filing of pre-trial

9   motions and other matters (e.g., discovery cutoff), the parties have been given free

10  reign in how to conduct the litigation in this case.

11      That the delay in bringing the proposed amendments and the relative length

12  of time into the litigation when those amendments were brought may not neatly fold

13  into Dialysist's reasoning does not mean that leave must nonetheless be granted.

14  The 04-9059 action, as it is presently constituted, is not a complex one.  It asks a

15  rather narrow and straightforward question — Did anything from Bryant's

16  employment at Mattel during the 1999-2000 period give Mattel ownership rights to

17  the BRATZ doll line?  The proposed amendments would radically alter the litigation

18  in that case to include far ranging disputes involving multiple parties and concerning

19  events not connected with the BRATZ ownership issue.  That the original action

20  was a relatively simple and straight-forward matter raises another point beyond the

21  change in the action's litigation posture — whether entangling the rival doll makers'

22  other commercial disputes into this particular case would serve to muddy the waters

23  and make the matter that much more difficult to manage from the Court's

24  perspective.

25  _____

26      [7] Mattel's repeated refrain that the matter is in its nascent stage as evidenced by the fact that the parties only just recently exchanged in initial disclosures is

27  misleading.  The exchange of initial disclosures referred to by Mattel is in the 05-2727 case.  With respect to the 04-9059 case it appears that such initial disclosures

28  were completed long ago as evidenced by the fact that discovery disputes appeared in that case as far back as January, 2005.

EXHIBIT 9

PAGE 744

1   As has long been recognized, equally important in determining whether to

2   grant such leave is what impact such amendments would have on the court's ability

3   to manage the case.  See 3 JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE

4   § 15.15[1] at 15-42.1 to 15-43 (3rd ed. 2006)("A court should also consider judicial

5   economy and its ability to manage the case. . . . The court should also temper the

6   policy favoring freely granting leave to amend with consideration of the ability of the

7   district court to manage the case adequately if amendment is allowed").  As Judge

8   Clark for the Fifth Circuit once observed:  "In keeping with the purposes of the rule,

9   the court should consider judicial economy and whether the amendments would

10   lead to expeditious disposition of the merits of the litigation.  Finally, the court

11   should consider whether the amendment adds substance to the original allegations,

12   and whether it is germane to the original case of action."  Chitimacha Tribe of

13   Louisiana v. Harry L. Laws Co., 690 F.2d 1157, 1163 (5th Cir. 1982); see also

14   Sierra Club v. Union Oil Co. of California, 813 F.2d 1480, 1493 (9th Cir.

15   1987)("General considerations of judicial economy also justify allowing the

16   amendments. The violations included in the proposed amendment relate to the

17   same subject matter as the original complaint.  Allowing the amendment will further

18   the federal policy of 'wrapping in one bundle all matters concerning the same

19   subject matter.'").

20       Mattel's amendments do not add substance to the claims contained in its

21   original complaint.  Rather, they would expand the universe of claims and

22   defendants stretching well-beyond the questions raised in the original complaint

23   over whether Bryant's conduct while in the employ of Mattel subjected his later

24   attributed creation of the BRATZ dolls to the provisions in Mattel's Inventions

25   Agreement or otherwise rendered his creation subject to an infringement action.

26   Nowhere does Mattel seek to reconcile the breadth of its present amendments with

27   the narrowness of the allegations contained in its original complaint.  In fact, the

28   precise opposite is true.  Mattel acknowledges that its proposed amendments bear

EXHIBIT ___95___

PAGE ___715___

1    more congruity to the allegations leveled against it in MGA's Lanham Act case than

2    to those in the action to which it seeks to add them:

3            [M]any of the matters raised by Mattel's proposed
4            Amended Complaint are and will remain at issue
             because of MGA's Complaint, whether or not leave to
5            amend is granted. MGA's claims allege that a broad
             array of purported Mattel conduct across the globe,
6            starting at least as early as 1999, has violated the
             Lanham Act and unfair competition law. This includes
7            Mattel's alleged infringement of Bratz and other MGA
             products. As a result, issues in the proposed Amended
8            Complaint are already part and parcel of Mattel's
             defenses to MGA's unfair competition claims, including
9            because they show that MGA and Bryant, and not
             Mattel, are ones who stole the products and other
10           properties involved.

11   (Reply to Bryant Opp. at 7 (emphasis added)). Mattel apparently finds this

12   discongruity unimportant because "all of these matters have been consolidated with

13   the Bryant case." (Id. at 7). As noted earlier, the fact that the cases have been

14   consolidated does not mean that the parties can ignore the distinctions that still

15   exist between them. If, as Mattel acknowledges, the present amendments are

16   nothing more than re-formulated defenses and counterclaims it presently has to

17   MGA's complaint against it in the 05-2727 case, then such amendments should be

18   brought in the form of an amended answer and counterclaim in that case.

19           Consideration of the distinctions between the two cases is wise as it serves

20   as a useful tool in providing the Court a better means to manage the cases now

21   that they have been consolidated. The proverbial dog (ownership in BRATZ)

22   should be wagging the proverbial tail (the remaining commercial disputes), not the

23   other way around. Admittedly, the dog's tail has grown in size both by MGA's filing

24   of its complaint in the 05-2727 action and Mattel's response thereto through its

25   proposed amendments. Nonetheless, it is readily apparent to the Court that the

26   crown jewel in this action still remains the ownership rights to the BRATZ dolls. The

27   parties have engaged in extensive and undoubtedly expensive discovery on this

28   very issue (from hiring world-renowned experts to test the age of Bryant's design

20

EXHIBIT _____ 95

PAGE _____ 796

1   drawings to technically complex discovery of what is on each other's computers).

2       Indeed the separateness of the two matters is reflected in how the cases are

3   currently structured, namely, the narrowness of the issue involved in 04-9059 and

4   the expansiveness of the facts at issue in 05-2727.  In light of this fact, the Court

5   believes a two-track scheduling order wherein the 04-9059 matter's discovery cut

6   off and trial date are set well-ahead of those in 05-2727 makes the most sense.  As

7   noted earlier, many of the legal claims being pressed in 05-2727 will be affected by

8   the result of the litigation in 04-9059.  If, for instance, Mattel does own the rights to

9   the BRATZ dolls (either owing to Bryant's stealing his idea from one of Mattel's

10  "development programs" or by way of the Inventions Agreement because he

11  continued to work on his designs while at Mattel), then large portions of MGA's

12  Lanham Act infringement claims may become moot.  By the same token, if Mattel

13  does not own rights to BRATZ, then some of the defenses and counterclaims set

14  forth as independent claims in the present amended complaint may become moot,

15  including Mattel's copyright infringement claim as well as portions of its remaining

16  RICO, misappropriation, and aiding and abetting claims.  If, however, the Court

17  were to allow the amended complaint to be filed in the 04-9059 action, such case

18  management would be difficult, if not impossible as many of the issues being

19  litigated in the 05-2727 case would have been poured into the 04-9059 case by the

20  amendment.  Due to this substantial overlap in claims and facts, a two-track

21  scheduling order utilizing the case number distinctions would be impossible to craft.

22  When pressed by the Court at oral argument as to which of its proposed claims it

23  believed would not undermine the BRATZ ownership posture of the 04-9059 case,

24  Mattel cited to its copyright and RICO claims.  However, upon further questioning

25  by the Court, counsel for Mattel acknowledged that much of those claims were, like

26  the claims at issue in 05-2727, dependent upon resolution of the ownership issue.

27      In light of the burden allowing Mattel's amendment to proceed would have on

28  this Court's ability to efficiently manage these consolidated matters denial of

EXHIBIT  95

PAGE  797

1   Mattel's request to amend its complaint in the 04-9059 matter is justified. See
2   Perrian v. O'Grady, 958 F.2d 192, 195 (7th Cir. 1992)("The burden to the judicial
3   system can justify a denial of a motion to amend 'even if the amendment would
4   cause no hardship at all to the opposing party'"). Buttressing the Court's decision is
5   the fact that, even with such a denial, Mattel may file (and the Court provides leave
6   to Mattel to so file) an amended answer and counterclaim in the 05-2727 case
7   raising all the new claims and defendants presently sought to be achieved through
8   amendment of its complaint in the 04-9059 action. None of the substantive
9   concerns raised by MGA and Bryant to the present amended complaint, e.g.,
10  statutes of limitations, would appear to be affected if the new claims and
11  defendants were brought as defenses and counterclaims in the 05-2727 case as
12  opposed to the 04-9059 one.

13        Accordingly, the Court GRANTS Mattel's motion for leave to file its proposed
14  amendments, but only insofar as they are pled in the form of an amended answer
15  and counterclaim in the 05-2727 case.

16        Finally, the lack of a scheduling order in this case is problematic; one should
17  have been entered long ago. See Fed. R. Civ. P. 16(b)(noting that a scheduling
18  "order shall issue as soon as practicable but in any event within 90 days after the
19  appearance of a defendant and within 120 days after the complaint has been
20  served on a defendant"). In light of the fact that entry of a scheduling order is
21  woefully overdue in this case, the Court hereby ORDERS that a Rule 16(b)
22  scheduling conference be held in this consolidated matter on February 12, 2007, at
23  1:30 p.m. in Courtroom One. The parties are directed to file a Joint Rule 26(f)
24  report with the Court by February 5, 2007.

25        IT IS SO ORDERED.
26  DATE:  /-//-07

27
28  STEPHEN G. LARSON
    UNITED STATES DISTRICT JUDGE

EXHIBIT 95
PAGE 198

# EXHIBIT 96

**[FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER]**

# EXHIBIT 97

**THIS EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

# EXHIBIT 98

**THIS EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

# EXHIBIT 99

**THIS EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

.

# EXHIBIT 100

ANNUAL RETIREMENT GUIDE

The McGraw·Hill Companies

# BusinessWeek

JULY 28, 2003                                            www.businessweek.com

## STOCK VS. OPTIONS
**THE NEW EXEC COMP GAME**

## STRATEGIES
▸ YAHOO!
▸ GENERAL MILLS
▸ MATTEL

## GE
**MEET CHARLENE BEGLEY, A RISING STAR**

## INVESTING
**HOW OUR WALL STREET COLUMN PERFORMED**

# CITI'S NEXT ACT



**CHUCK PRINCE** Sandy Weill's top troubleshooter is the unlikely choice to become CEO. Does he have the right stuff to lead the world's most important bank? PAGE 30

#BX8BGDD ***CR LOT 0016A*C033
#JLI2121G091 0#300116    BX003676

IlIaIlImmIlIaIllIaIlIlIllIaIlImmIlIaIllIaIl
                              071994
                    MAR 22 04   0975
GARY JOLICOPUR        T099
2121 GATES AVE B
REDONDO BEACH  CA  90278-2007

EXHIBIT _____ 100

PAGE _____ 832                    M 0074054

stead, regular uniform fabric may sport nano-size umbrellas that open to seal the cloth's pores, making it impervious to airborne chemicals and pathogens.

In both cases, a key objective is to take a load off soldiers' backs. Today, they lug 60 pounds or more into battle, depending upon which weapon they carry, and the so-called marching load is almost twice as heavy. In five years, the Army wants to trim the combat load to 40 pounds, and then to 15 pounds with the Future Warrior outfit. MIT's Vest predicts that armored vests, which weigh 28 pounds now, will end up "at around eight pounds, maybe even five."

Artificial muscles that could enable soldiers to leap tall walls, if not buildings, are in the works, too. One candidate is made from polypyrrole. It flexes when jolted by electricity, then relaxes when the juice is turned off. So far, though, its reactions are due too slow.

Even with the best armor, wounds are inevitable. So when a soldier is hit in an arm or leg, special fibers in the uniform would constrict into a tourniquet. This will be a real life-saver, because half of all battlefeild deaths are due to massive blood loss before wounded soldiers can be treated. In addition, sensors would provide the soldier's vital signs and location to medics via radio. Until the Future Warrior garment is ready, soldiers will wear an adhesive chest patch fitted with sensors and a tiny radio. It's being developed by MIT partner CIMIT (Center for Integration of Medicine & Innovative Technology) in Cambridge, Mass.

To satisfy its industrial partners and avoid chewing up money needlessly, the new institute will be "run on a business model, with regular milestone reviews," says Edwin L. "Ned" Thomas, the MIT materials-science professor tapped as its head. It will have a staff of 40 MIT scientists from eight departments, plus 100-odd graduate students and visiting researchers from the Army and industry.

Thomas admits that some wish-list items may never materialize. But that's okay—the idea is to infuse army research with new thinking. So the Pentagon plans to announce, starting in August, more research centers at other universities, focused on such areas as biotechnology and detecting landmines. In the same spirit, to supplement its $1.2 billion research effort, the Army will funnel $25 million to small, innovative companies that probably never dreamed of getting a Pentagon contract. The fund's top priority? Finding better ways to generate and store power for the Army's high-tech gadgets. It's easy to see why: A brigade of 1,500 troops goes through 120 tons of batteries a year. And that's before they hit their invisibility buttons.

*By Otis Port in Cambridge, Mass.*

## The Corporation

### COMMENTARY
By Christopher Palmeri

# TO REALLY BE A PLAYER, MATTEL NEEDS HOTTER TOYS

The Bratz pack has invaded the Gabriele house. The line of trendy dolls burst on the scene two years ago, offering girls a hipper alternative to that old standby, Barbie. This Jennifer Lopez to Barbie's Reese Witherspoon. Joan Gabriele, a Hollywood (Fla.) mother of two, now has eight Bratz dolls in her home. Her daughters, ages 6 and 8, rarely touch their Barbies. "Barbie is pretty much a thing of the past," she says. "They like Bratz better."

That's bad news for Barbie's maker, Mattel Inc.—and for the three-year-old turnaround efforts of CEO Robert A. Eckert, the ex-president of Kraft Foods Inc. who replaced the embattled Jill E. Barad. The El Segundo (Calif.) toy giant counts on Barbie for about one-third of its revenues and more of its profits. But Mattel says U.S. Barbie sales declined 2% last year and 14% in this year's first quarter. The overall doll category, says market researcher NPD Group Inc., dropped only 3% in the quarter.

Give Eckert, 48, his due: He pulled Mattel out of its tailspin after its disastrous $3.8 billion acquisition of Learning Co. He got rid of the money-losing computer-game maker and slashed costs. His goal: to bring the stability of a consumer-products company to the hit-driven toymaker. And using such practices as computer-aided design to speed up product development and just-in-time inventory management, he succeeded.

But now it looks like Eckert is learning a valuable lesson: Mattel is selling toys, not soap or cornflakes. Good brand management goes only so far in a business that caters to children's whims. Like it or not, the key to success is launching innovative products and promoting the heck out of them. If you don't do it, your competitors will.

Eckert's strategy has been great for Mattel's bottom line. Profits last year, before special charges, were a healthy $455 million, and the stock has nearly doubled, to $20, since Eckert arrived in May, 2000. But top-line growth has sputtered. U.S. revenues, $3.4 billion in 2002, have declined marginally in the past few years. Total 2002 sales of $4.9 billion crept up from $4.6 billion in 2000—thanks to overseas expansion.

While Eckert continues to build on the massive Barbie franchise that Barad constructed, he now knows that he needs hot new toys. Recycling old characters like *Sesame Street*'s Elmo just won't be enough. "We need to do a better job on the top line," he says. "The good news is it's only spring training, and we have a long season ahead of us."

To that end, Eckert has begun an ambitious push. Between now and Christmas, he hopes to launch 250 new toys, including dozens of Hot Wheels models and Flavas, a Bratz-like hip-hop posse with baggy jeans and serious bling-bling. Originally, half of these toys weren't scheduled until 2004.



**FIRST CAME BRATZ...**

| | |
|---|---|
| **MAKER** | MGA Entertainment |
| **DEBUT** | 2001 |
| **NAMES** | Yasmin, Sasha, Cloe, Jade, and Meygan |
| **MOTTO** | The girls with a passion for fashion |
| **HER RIDE** | Late-night stretch limo |

EXHIBIT  100

PAGE  833

M 0074055

BusinessWeek

That should help boost sales. But it's even more important that Mattel prove it can respond to nimble upstarts as well as traditional big rivals like Hasbro Inc. After all, it took the company more than a year to launch a competitor to MGA Entertainment's Bratz. My Scene Barbie didn't hit stores until last October and has yet to make a dent in Bratz's success. At its Santa Monica (Calif.) store recently, Toy 'R' Us Inc. devoted just a sliver of the shelf space to My Scene that it did to Bratz. And My Scene dolls were being offered at 2 for 1. "It's not really catching ground," says Sean P. McGowan, toy industry analyst at Harris Nesbitt Gerard Inc.

Mattel will start tossing in a cell phone with 300 free minutes if you buy four of the $13.99 dolls. It also plans to add accessories and boy versions—Hudson, River, and Bryant.

Barbie isn't the only Mattel stalwart under attack. Its Fisher-Price unit, long the king of preschool, is losing sales to newcomer LeapFrog Enterprises Inc., whose electronic interactive books have captured 19% of the $2.9 billion preschool toy and electronic learning aid markets. Eckert is counting on a successful launch in August for PowerTouch, Mattel's version of LeapFrog's popular interactive book. PowerTouch is operated by pointing a finger at an image or a word, instead of the stylus used in LeapFrog's original products. That's key for younger kids. "It's much easier for her to use," says Christopher Coye, a Los Angeles-area parent whose 4-year-old tested a PowerTouch. Still, LeapFrog releases a finger-operated system in August, too.

Over the long term, Eckert puts at risk one of the strongest toy companies around if he can't instill innovation and rapid reaction in his much-tightened organization. To his credit, he is making it crystal clear that he doesn't want ideas to linger in the pipeline. When Matchbox brand managers mentioned this year that they had designed a toy firehouse that could be shipped with no assembly required, Eckert told them to get it out by fall. "Why wait?" he says. "If you've got it, sell it." And not a moment too soon: Sales of Mattel's Hot Wheels and Matchbox cars fell 6% in the first quarter, thanks to competition for boys' attention from action figures like Hasbro's resurgent G.I. Joe and Transformers.

The question is how much Eckert needs to tweak his model. He probably cut back too much, for instance, on marketing. In 1998, Mattel's advertising and promotional spending totaled $631 million, or 13.8% of sales. By last year, it had fallen to $552 million, or 11.2% of sales. Aggressive television marketing boosted sales of Hot Wheels cars in Spain last year, and a strong new campaign could help Mattel toys here.

Mattel won't live or die on every new toy it develops. But it can't just rely on Barbies, either. "Like they say in business school—no risk, no reward," says Isaac Larian, CEO of privately held MGA. He should know: He got the idea for Bratz after seeing his own kids run around in navel-baring tops and hip-huggers. (As Eckert is finding out, sometimes the best ideas are right in front of you.)

*Palmeri covers toys from Los Angeles.*



## ...THEN, MY SCENE BARBIE

| | |
|---|---|
| **MAKER** | Mattel |
| **DEBUT** | 2002 |
| **NAMES** | Barbie, Madison, Chelsea, and Nolee |
| **MOTTO** | My city. My style. My scene. |
| **HER RIDE** | Vespa motorscooter |

Data: MGA Entertainment, Mattel

# Manage your account online

Now you can manage your subscription through the Internet. You may change your delivery address, check your account status, renew your subscription, pay your invoice, report a missing or damaged copy, or suspend delivery of your magazine through our Customer Service site. You may go directly to **www.businessweek.com/service.htm** or follow these simple steps:

1. Go to **www.businessweek.com**.

2. Scroll down the left side listings until you reach the "Customer Service" link.

3. Click on the "Customer Service" link.

4. Scroll down below and click on US/Canadian subscribers link.

**NOTE:** You will ▮▮▮▮▮▮▮ number, which appears on the label of your magazine.

For individual subscriptions, changes, or inquiries:
Phone: (800) 635-1200
Email: bwcustomerservice@neodata.com

**Education Department**
Phone: (800) 843-7352
Fax: (800) 876-9416
Email: bw_group@businessweek.com
Web Site:
www.resourcecenter.businessweek.com

EXHIBIT 100

PAGE 834

M 0074056



# Close-Knit Companies

### FAMILY TIES STRENGTHEN VALLEY-AREA BUSINESSES AS THEY GROW THEIR FIRMS AND ADAPT TO CHANGE

EXHIBIT 100

PAGE 835

## SPECIAL REPORT – THE FAMILY BUSINESS EXPERIENCE

# Immigrant's Creative Company Shakes Up Toy Industry

By JEFF WEISS
*Contributing Reporter*

ONLY 16 years old, with a mere $750 in his pocket, and with parents across the globe in Iran, Isaac Larian never expected to eventually be the founder of one of the fastest growing toy companies in the world.

Initially undecided whether to emigrate to the United States or to Israel, Larian opted to pursue the American dream. The Business Journal's recipient of the family business Best Large Company award, MGA Entertainment, is the end product of Larian's hard work, determination, and foresight in capitalizing upon opportunity.

Yet before becoming a toy mogul, Larian set out to forge a career in the civil engineering industry before realizing his true talents lay elsewhere.

"I came here to get a civil engineering degree because I thought I'd be a civil engineer and go back to Iran and build infrastructure," Larian said. "I graduated in 1978 from Cal State Los Angeles but I never worked as an engineer. Shortly after graduating, the (Iranian) revolution broke out and I discovered that engineering wasn't for me. I was more of an entrepreneur."

The following year Larian and his brother Farhad founded MGA as a consumer electronics company. Their first foray into the toy industry didn't come until 1987 when Isaac saw the opportunity to manufacture Nintendo's hand-held electronic games.

"I'm an entrepreneur and in 1987 I saw an opportunity to become the distributor for Nintendo's hand-held games. I just saw opportunity. Most entrepreneurs do that," Larian said.

After two years in the hand-held video game industry, MGA left the toy game and returned to consumer electronics. Returning in 1993 to produce Mighty Morphin Power Rangers accessories, MGA never left the toy industry, having its first breakthrough item with 1997's wildly successful Singing Bouncing Baby Doll.

"Singing Bouncing Baby was our first doll and it was a huge hit," Larian said. "We ended up winning Family Fun Toy of the Year which is the Oscars of the toy industry. We ended up doing in excess of a million pieces," said Larian.

### Introducing Bratz

But MGA's greatest success came later,





Trendy: Isaac Larian, above, has led MGA to huge growth with the help of the company's Bratz dolls, left.

with the introduction of 2001's Bratz dolls. Against all odds, Larian pioneered a line of dolls able to undercut the success of Barbie, the only company to do so since Barbie's 1959 debut.

However, the modest Larian is quick to acknowledge others for contributing to the company's success. A close knit family, Larian's sister, Shirin Makabi, is the company's director of travel and expenses. Shirin's husband, Eli Makabi, is MGA's vice-president in charge of traffic in sales. In addition, the Makabis co-own the business with Larian. But Larian family involvement does not stop there; Larian's children have played a crucial role in MGA's development.

"My oldest son, 17-year-old Jason, is very creative and a music writer. He has come up with some of our popular toys," Larian said. "He came up with Commandobot—a robot that was the first ever robot toy to work on voice recognition. It was a fantastic seller that was featured in *Wired* magazine. It was Jason's idea for Bratz."

Larian's other children have also been key to product development.

"Yasmin, my 15-year-old daughter, is involved in the business as well. She's particularly interested in fashion and focus groups. One of the Bratz is named after her," Larian said. "My 10-year-old son, Cameron, is also the namesake for one of the boy Bratz. Cameron comes up with different product ideas. One of our best ideas was a winter wonderland Bratz line…We were on a family ski vacation and he said 'Dad, you should do a Bratz winter break.' So we did it and it sold wonderfully."

*Please see MGA page 18*

# Sky's the Limit for Helicopter Firm's Services

By SLAV KANDYBA
*Staff Reporter*

HELINET Aviation Services flies presidents, celebrities and TV crews – yet it still makes time to save lives, including one time when an infant had to be transported to Childrens Hospital Los Angeles.

Judith Sherif, in charge of the children's emergency transport there, said the baby was having trouble breathing and needed special care, but was at another hospital and had to be flown in. Sherif immediately dialed Alan Purwin, president of Van Nuys-based Helinet. Purwin sent a chopper and made calls to the LAPD to ask for permission to land on the street in front of the hospital. The baby survived and Purwin was essentially the main reason.

"I can't even count the number of times" ... ... ... Sherif said. "He's doing it

on blockbusters including "Jurassic Park," "Pearl Harbor" and others.

### Founded in 1987

Purwin went into business himself in 1987, when he decided to start a helicopter company. He previously noticed that "no one seemed interested in running a full-service, highly professional flight services company," according to Helinet's Web site. He sensed an opportunity and went after



Purwin: Kathryn, left, with Michaela, Alan and Kyle.

them to land stop some downtown L.A. skyscrapers. Hospitals and medical centers often call on them, too, to transport organ transplant teams across state lines. The company also leases helicopters for movie and television production and does coordination work.

For each of the services, Helinet has a range of different helicopters. There are more than 55 of them in total, including 12 brand new choppers bought recently, which are equipped with high-definition cameras. Helinet's expansion plans are contingent on that technology picking up in the broadcast TV market, as well as law enforcement and other uses.

### High-definition capabilities

Helinet is the only helicopter leaser in the U.S. that has the ability to provide high-definition viewing technology on its choppers. The cameras aren't cheap – at $400,000 a piece – but are expected to be popular with ... ... and law enforcement agen-

## SPECIAL REPORT – THE FAMILY BUSINESS EXPERIENCE

# Galpin: Boeckmanns Build Empire of Auto Dealerships

Continued from page 16

"There's a number of reasons why they're successful," Steve Bussjaeger, owner of Glendale-based Star Auto Group, said. "Bert Boeckmann is a brilliant guy and an extremely competitive person. He only wants to be No. 1. I have the utmost respect for him."

With a litany of awards bestowed on him over the years, billions of dollars earned in sales, and the respect of many of his peers, Boeckmann has carved out a notable legacy. Yet predictably, the automotive mogul's proudest achievements are family related.

"My proudest achievement is having a wonderful family. I don't know if that's exactly my own achievement. But I think that's what's of the greatest importance to me," Boeckmann said. "I've received a lot of acknowledgements. I received the Horatio Alger Award, I've been recognized by the White House and been involved with Mother Teresa.

"Time magazine even named the number one quality dealer in America, out of 20,000 dealerships in the country. But I think my true legacy would be having a wonderful family and marriage. I've had a wonderful life." Besides a strong work ethic, Boeckmann chalks up much of his family's success to a firm belief in God and unvarnished honesty, virtues firmly ingrained in him by his own father.

"My son has spoken publicly about me a couple times and he said 'my dad is the most honest man that I've ever known,'" Boeckmann said. "I've never thought of things that way. When I grew up you told the truth, you were honest. You did those things, you didn't question, you were either right or you were wrong."

### Leaving a legacy

He said his father was very specific in what kind of legacy he wanted to leave.

"I remember my father said there were three things he wanted to leave to his sons. One was a belief in God. The other was an unblemished name. Number three was that his two sons were to attend the University of Southern California. I didn't require the USC part although two of them did go there."

Galpin Motors has certainly evolved a great deal since the 50s, when Bert Boeckmann decided to work part-time selling automobiles during his final year at USC...Boeckmann has transformed a previously sad-sack dealership into a continually growing behemoth.

During the next period the boys will take more responsibility, there will be more growth, and a continued controlled expansion. As long as we can focus on the customers and serve them well, we will do that," Boeckmann said. "If people looked back at me I would hope that they would say he did the best he knew how. I've just wanted to do the best that I can possibly do."

# MGA: Toy Firm Closing in On $1 Billion in Revenues

Continued from page 16

### Thanking the employees

Larian also credits the company's 430 employees for much of MGA's success.

"Our success is due to the passion of the people we have working for us. Each one has contributed to our success because they are passionate about the company and winning."

With business booming, a Bratz licensing deal with 20th Century Fox has been inked: A Bratz DVD and a Bratz feature film are soon on the way.

"The Bratz are a true phenomenon that has taken the toy/doll industry by storm," Jim Glenopolus, chairman of Fox Filmed Entertainment, said. "They are more than just toys; they reflect the cultural diversity and contemporary style that kids relate to. That kind of success and impact on young people make the company a natural in a major motion picture, and we look forward to turning the Bratz figures into major motion picture stars."

MGA's projected revenue for 2004 is $1 billion and the company has openings for 110 employees in a variety of positions. Although MGA's success is now assured, there were obstacles along the way.

"I noticed some discrimination when I first got into the business world. I think that after living here for 33 years, there is unfortunately discrimination whether you're Jewish, Persian, black or whatever," Larian said. "But it made me stronger to go out and fight. People become resilient and they get angry and they need to turn that anger into positive energy."

Larian has certainly come a great distance from being a teenager with inclinations towards civil engineering and less than a thousand dollars in his pocket. Thanks to MGA, Barbie's pedestal seems a little less secure.

"I'm having a lot of fun and enjoying what I'm doing here right now and I think as long as you have fun at your job, it's a great thing," Larian said. "I believe that in life you have to have passion for what you do and if you lose that passion you shouldn't do it. My vision is for MGA to become a multibillion-dollar entertainment company and specialize in other things besides just toys."

Looking back on the whirlwind rise of MGA, Larian still seems a bit surprised by the amount of success he's encountered.

"My life is proof that dreams come true. You can't give up. They were definitely moments of self-doubt. I just didn't want to fail, I always had that desire to win," Larian said. "We've made history by unseating Barbie and for a small San Fernando Valley company to do that is a miracle."

# Founder: Surviving Family Members Move On

Continued from page 1

2001. This merger led to a loss of 80 percent of Digital International's business. To cap off this disastrous year, the company's founder Roberto Ceja, died. The elder Ceja had been a veteran of the music industry since 1946, with a special expertise in production, manufacturing and sales. Founded in 1994, Digital International manufactures compact discs, cassettes, and DVDs and was originally focused on the Latin music industry, where Ceja had previously worked. In order to further the business' development, Ceja had brought in three of his sons to help.

"Although we knew that any father was not well, it was still a shock and surprise when he passed away," Ed Ceja, Roberto's son and director of sales, said. "Things got complicated when we lost the majority of our business and then to

the state of the music industry. With CD sales in decline, Digital International's fate appeared bleak, but the Cejas devised a strategy on the fly to cope with these challenges.

"We knew we needed to diversify our client base. We needed new clients and clients from different areas (other than music). Anyone who makes CDs we targeted."

Ed Ceja said, "We learned that the more you can spread your base, the better it is. We don't really solicit music labels anymore. We go after DVD companies, language companies, software companies, etc."

Business has equaled and will likely soon pass the level it was at before the confluence of misfortune at the end of 2001. Digital International currently has 110 to 115 employees and six customer service representatives, up from only 15 to 20 overall employees to begin with.

"Business improves every month. Obvious-

### Coping with emotions

While Glendale-based Star Auto Group might not have faced extinction when co-owner Greg Bussjaeger died four years ago, the emotional loss was quite severe.

"It was very difficult when my father passed away," Star co-owner and manager Steve Bussjaeger said. "It was very hard to keep going. It definitely took the wind out of our sails. You just have to keep pressing on. And we've been as successful as we were before he died."

The elder Bussjaeger had co-owned the business with founder Ed Jussen since 1970. The business includes three auto dealerships and an off-site used vehicle operation. Steve Bussjaeger joined his father's company in 1975 and currently is in charge of its day-to-day operation. His brother Gary Bussjaeger also works for the company, running some of its

going to do. I decided that rather than sell the business, we would continue," Mona Bouchard said. "I stepped right into his big shoes. I had worked at a bank so I knew accounting but it was quite hard to deal with all of the stuff that I had hard to learn. It was also incredibly difficult to lose him."

Edmund Bouchard Jr. founded North Hollywood-based Bouchard Communications in October 1981 after leaving Pacific Telephone. Designed to provide all types of construction services to the communications industry, Bouchard acquired 30 to 35 trucks and watched his business grow. In order to help his company expand, Bouchard brought in his sons Bart and Kirk Bouchard in 1982 and 1989, respectively. Currently, Bart works as fleet manager while Kirk is the superintendent.

"We're strong minded people. What we start out with, we strive to complete. We never

# EXHIBIT 101

Matter No. 15904-142

UNITED STATES PATENT APPLICATION

For

## DOLL WITH AESTHETIC CHANGEABLE FOOTGEAR

Inventor:    Isaac Larian

OPPENHEIMER

OPPENHEIMER WOLFF & DONNELLY LLP
2029 Century Park East, Suite 3800
Los Angeles, California 90067
(310) 788-5000
Fax (310) 788-5100

Attorney Matter No. 15904-142



Δπ EXHIBIT 500
Deponent ARMSTRONG
Date 7/18/07 Rptr ACC
WWW.DEPOBOOK.COM

LA: 333498 v01 02/13/2003

EXHIBIT    101

PAGE    838

MGA 0825485

# DOLL WITH AESTHETIC CHANGEABLE FOOTGEAR

## FIELD OF THE INVENTION

[0001]   This invention relates to dolls or toy figures with changeable footgear.

## BACKGROUND OF THE INVENTION

[0002]   It has previously been proposed to make dolls with shoes, boots or footgear which may be changed, and patents which relate to such arrangements include the following:

[0003]
| L. Schmetzer | U.S. Pat. No. 187,322 | Granted February 13, 1877 |
|---|---|---|
| G. Doebrich | U.S. Pat. No. 831,330 | Granted September 18, 1906 |
| F. Steiff | U.S. Pat. No. 898,018 | Granted September 8, 1908 |
| P.H. Young | U.S. Pat. No. 2,175,789 | Granted October 10, 1939 |
| G.H. Calverley | U.S. Pat. No. 2,662,335 | Granted December 15, 1953 |
| S.F. Speers et al. | U.S. Pat. No. 3,475,042 | Granted October 28, 1969 |
| H.J. Solson et al. | U.S. Pat. No. 3,624,960 | Granted December 7, 1971 |
| Goldfarb et al. | U.S. Pat. No. 3,782,027 | Granted January 1, 1974 |
| Port | U.S. Pat. No. 4,030,240 | Granted June 21, 1977 |
| Lambert | U.S. Pat. No. 4,137,115 | Granted January 30, 1979 |
| Rahmstorf | U.S. Pat. No. 4,185,412 | Granted January 29, 1980 |
| Keiji | U.S. Pat. No. 4,643,691 | Granted February 17, 1987 |
| Schiavo et al. | U.S. Pat. No. 4,729,751 | Granted March 8, 1988 |
| Fogarty et al. | U.S. Pat. No. 1,186,673 | Granted February 16, 1993 |
| Larson | U.S. Pat. No. 5,588,895 | Granted December 31, 1996 |
| Kulchyski | U.S. Pat. No. 5,803,787 | Granted September 8, 1998 |
| Toft | U.S. Pat. No. 6,179,685 | Granted January 30, 2001 |
| Asmussen et al. | U.S. Pat. No. 6,203,396 | Granted March 20, 2001 |

[0004]   In reviewing these patents, the appearance of the resultant dolls or figures is relatively "clunky" and not aesthetically pleasing.

## SUMMARY OF THE INVENTION

[0005]   In accordance with the present invention a more aesthetically pleasing and elegant doll with changeable footgear, includes open work shoes with exposed portions of the feet matching the color and texture of the exposed legs; and straps of the shoes extend around the lower legs at the separation point where the removable foot/shoe assemblies mate with the lower leg.  With this configuration, the straps of the shoes conceal the joint between the leg and the foot/shoe assembly, resulting in a more realistic and elegant doll construction.

-1-

EXHIBIT _101_

PAGE _831_

MGA 0825486

Matter No. 15904-142

[0006] Additional features which may be included would involve the use of colored shoes and shoe straps which contrast sharply with the exposed skin areas of the foot; and snap-in mechanical arrangements for assembling the shoe/foot assemblies to the legs of the doll.

[0007] Other objects, features and advantages will become apparent from a consideration of the following detailed description, and from the accompanying drawings.

BRIEF DESCRIPTION OF THE DRAWINGS

[0008] Fig. 1 shows a doll provided with changeable shoes or footgear, illustrating the principles of the invention;

[0009] Fig. 2 is an enlarged cross-sectional view taken along the plane indicated at 2-2 of Fig. 1; and

[0010] Figs. 3 – 5 illustrate alternative shoes or foot/shoe assemblies shown mounted on one leg of the doll of Fig. 1.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

[0011] While the specification describes particular embodiments of the present invention, those of ordinary skill can devise variations of the present invention without departing from the inventive concepts.

[0012] Referring more particularly to the drawings, Fig. 1 shows a doll 12 formed of known materials employed for dolls, such as resilient plastic material. The doll 12 has lower legs 14, 16 and foot and shoe assemblies 18, 20 for mounting on the lower legs 14, 16, respectively.

[0013] Fig. 2 is an enlarged cross-sectional view taken in the plane indicated at 2 – 2 in Fig. 1.

[0014] In order to removably secure the shoe and foot assemblies 18, 20 to the legs 14, 16, the leg 14 has an enlarged protuberance 22 which snaps into a recess 24 in the assembly 18; and similarly, as shown in Fig. 2, the leg 16 has an enlarged protuberance 26 which locks into a recess 28 in the shoe and foot assembly 20.

2

EXHIBIT ___ 101

PAGE ___ 840

MGA 0825487

Matter No. 15904-142

[0015]   It is desirable that the separation points 30 and 32 be concealed or made less noticeable, to provide a more realistic appearance.  This is accomplished by providing the shoes with the appearance of a strap 34 on assembly 18, and strap 36 on assembly 20.  With the upper edge of the simulated strap enlargements 34, 36 coincident with the separation points 30, 32, the separation points are not conspicuous.

[0016]   This effect is enhanced by the exposed skin areas 42 on assembly 18 and 44 on assembly 20.  Further, the color and texture of the lower legs 14, 16 are substantially the same as the color and texture of the exposed feet areas 42 and 44.

[0017]   Figs. 3, 4 and 5 illustrate typical alternative shoe styles which may be employed with the doll 12 of Fig. 1.  Thus, a shoe/foot assembly may be selected of a color to match the color of a dress to be worn by the doll, or may be selected for special activities such as beach wear or formal occasions.

[0018]   In Fig. 3 the leg 52, separation point 54, and upper strap 56 on the foot/shoe assembly 58, are shown.  In addition, the skin area 60 of the foot/shoe assembly 58 is substantially the same as that of the leg 52.

[0019]   Fig. 4 shows another alternative shoe/foot configuration 64 mounted on the leg 66 at separation point 68.  As in the arrangements of Figs. 1 – 3, the simulated strap 70 conceals the separation point 68, and the skin area 72 of the foot matches that of the lower leg 66.

[0020]   Fig. 5 is a similar showing of a shoe/foot assembly 76 mounted on the lower leg 78 of the doll at separation point 80.  The simulated strap 82 serves to camouflage the separation point.  In Fig. 5 the shoe is shown darkened to emphasize that different colored shoes may be employed, and that it is desirable that the shoe color contrast sharply with the skin color for more effective concealment or camouflaging of the separation point.  For specific examples, the shoe colors may be blue, green, red, black or some combination thereof.

[0021]   Return to Fig. 2 of the drawings, it may be noted that the protuberance 26 has a larger cross-sectional configuration than the mouth 27 of the opening 28.  Accordingly, with both the doll legs 16, 18 and the foot/shoe assemblies 18 and 20 being of resilient

3

EXHIBIT ___ 101

PAGE _____ 841

MGA 0825488

Matter No. 15904-142

material, the protuberance 26 may be snapped through the mouth 27 of the opening 28, and thereafter the shoe/foot assemblies are firmly held onto the legs 14, 16 of the doll.

[0022]   In the foregoing detailed description, specific embodiments of the invention have been described.   However, it is to be understood that various changes and modifications may be made without departing from the spirit and scope of the invention. Thus, by way of example and not of limitation instead of having the protuberance 26 on the leg 16 and the recess 28 on the shoe/foot assemblies, this configuration may be reversed, with the protuberance on the shoe/foot assembly, and the recess on the doll legs.   Further, instead of a single protuberance and mating recess, other snap-together arrangements may be employed, using more than one protuberance/recess, or a snap-in ring and mating ring shaped recess could be used.   It is also noted that, instead of using resilient plastic for the doll, stiffer plastic could be employed, and the foot/shoe assemblies may be attached using a simple concealed mechanical latch.   Accordingly, the invention is not limited to the exact embodiments described hereinabove and shown in the drawings.

4

EXHIBIT ___101___

PAGE ___842___

MGA 0825489

Matter No. 15904-142

**WE CLAIM:**

1.   A doll with changeable footgear comprising:

a torso having a body and legs, said legs having a predetermined skin color and texture;

a pair of foot/shoe assemblies, each including an open shoe with straps, with the shoe being open to expose at least part of the foot, the foot having substantially the same predetermined skin color and texture;

each said assembly being removable secured to one of said legs at the lower leg or ankle of said doll at a separation point;

each said assembly and lower legs having a snap-together joint with a protuberance on one part and a mating recess on the other part; and

a simulated strap forming part of said shoe extending around said assembly at said separation point.

2.   A doll as defined in claim 1 wherein the shoe portion of the foot/shoe assembly is colored to contrast sharply with the exposed skin areas of the foot.

3.   A doll with changeable footgear as defined in claim 1 further including a plurality of different sets of shoes of different styles for selectively mounting on said legs.

4.   A doll as defined in claim 1 wherein said doll and said foot/shoe assemblies are formed of resilient plastic material.

5.   A doll with changeable footgear comprising:

a torso having a body and legs, said legs having a predetermined color;

a pair of foot/shoe assemblies, each including an open shoe with straps, with the shoe being open to expose at least part of the foot, the foot having substantially the same predetermined color;

each said assembly being removable secured to one of said legs at the lower leg or ankle of said doll at a separation point;

5

EXHIBIT ___ 101

PAGE ___ 843

MGA 0825490

Matter No. 15904–142

each said assembly and lower legs having a joint for releasably securing the foot/shoe assemblies to the legs; and

a simulated strap forming part of said shoe extending around said assembly at said separation point.

6.   A doll as defined in claim 5 wherein the shoe portion of the foot/shoe assembly is colored to contrast sharply with the exposed skin areas of the foot.

7.   A doll with changeable footgear as defined in claim 5 further including a plurality of different sets of shoes of different styles for selectively mounting on said legs.

8.   A doll as defined in claim 5 wherein said doll and said foot/shoe assemblies are formed of resilient plastic material.

9.   A doll with changeable footgear comprising:

a torso having a body and legs, said legs having a predetermined color;

a pair of foot/shoe assemblies, each including an open shoe with straps, with the shoe being open to expose at least part of the foot, the foot having substantially the same predetermined color;

each said assembly being removable secured to one of said legs at the lower leg or ankle of said doll at a separation point;

each said assembly and lower legs having a snap-together joint; and

a simulated strap forming part of said shoe extending around said assembly at said separation point.

10.   A doll as defined in claim 9 wherein the shoe portion of the foot/shoe assembly is colored to contrast sharply with the exposed skin areas of the foot.

11.   A doll with changeable footgear as defined in claim 9 further including a plurality of different sets of shoes of different styles for selectively mounting on said legs.

12.   A doll as defined in claim 9 wherein said doll and said foot/shoe assemblies are formed of resilient plastic material.

£

EXHIBIT ___ 101

PAGE ___ 894

MGA 0825491

Matter No. 15904-142

13. A doll with changeable footgear comprising:

a torso having a body and legs;

a pair of foot/shoe assemblies, each including an open shoe with straps, with the shoe being open to expose at least part of the foot;

each said assembly being removable secured to one of said legs at the lower leg or ankle of said doll at a separation point;

each said assembly and lower legs having a joint for releasably securing the foot/shoe assemblies to the legs; and

a simulated strap forming part of said shoe extending around said assembly at said separation point.

14. A doll as defined in claim 13 wherein the shoe portion of the foot/shoe assembly is colored to contrast sharply with the exposed skin areas of the foot.

15. A doll with changeable footgear as defined in claim 13 further including a plurality of different sets of shoes of different styles for selectively mounting on said legs.

16. A doll as defined in claim 13 wherein said doll and said foot/shoe assemblies are formed of resilient plastic material.

17. A doll as defined in claim 13 wherein said exposed parts of the feet have substantially the same color as said legs.

I

EXHIBIT ___101___

PAGE ___845___

MGA 0825492

Matter No. 15904-142

## Doll With Aesthetic Changeable Footgear

ABSTRACT OF THE DISCLOSURE

A doll with changeable footgear includes a torso with legs, and a pair of foot/shoe assemblies mounted on the legs at separation points; and each foot shoe assembly has exposed skin of a color and texture substantially matching the skin of the legs, and the simulated shoes include simulated straps extending around the foot/shoe assembly immediately adjacent the separation point on each leg. Each foot/shoe assembly may be mounted on one of the doll legs, employing a protuberance on one part and a recess on the other part, with a snap-in locking fit between the two parts. The simulated shoes may be of a sharply contrasting color relative to the skin color.

8

EXHIBIT __101__

PAGE __846__

MGA 0825493

1/2



FIG. 1

FIG. 2

EXHIBIT ___ 101

PAGE ___ 847

MGA 0825494

2/2



FIG. 3

FIG. 4

FIG. 5

EXHIBIT ___ 101

PACE ___ 848

MGA 0825495

# EXHIBIT 102

15904-142

I hereby certify that this correspondence is being deposited
on August 12, 2003 with the United States Postal Service
as first class mail in an envelope addressed to:  Mail Stop
Non-Fee Amendment, Commissioner for Patents, P.O. Box
1450, Alexandria, VA 22313-1450.

Justina S. Townsend

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re application of        :        Group Art Unit:  3712
                            :
Isaac Larian                :        Examiner:  Ali F. Abdelwahed
                            :
Title:  **Doll With Aesthetic Changeable**        :
        **Footgear**
                            :
Serial No.:  10/373,602     :
                            :
Filed:  February 24, 2003   :

Mail Stop Non-Fee Amendment
Commissioner of Patents
P.O. Box 1450
Alexandria, VA  22313-1450

## AMENDMENT

Sir:

    In response to the Office Action dated May 12, 2003, please amend the application as set forth below, with the amendments to the specification, to the claims, to the abstract and the Remarks starting on separate pages of this amendment.



EXHIBIT ___ 102

PAGE ___ 849

MGA 0825447

15904-142

## Amendments to the Specification

Please amend the Specification as set forth below:

[0016]    This effect is enhanced by the exposed skin areas 42 on assembly 18 and 44 on assembly 20.  Further, the color and texture of the lower legs 14, 16 are substantially the same as the color and texture of the exposed ~~feet~~ skin areas 42 and 44.


[0021]    Return to Fig. 2 of the drawings, it may be noted that the protuberance 26 has a larger cross-sectional configuration than the mouth 27 of the ~~opening~~ recess 28.  Accordingly, with both the doll legs ~~16, 18~~ 14, 16 and the foot/shoe assemblies 18 and 20 being of resilient material, the protuberance 26 may be snapped through the mouth 27 of the ~~opening~~ recess 28, and thereafter the shoe/foot assemblies are firmly held onto the legs 14, 16 of the doll.

EXHIBIT ___ 102

PAGE ___ 850

548-2

MGA 0825448

2

15904-142

## Amendments to the Claims

Please amend the claims as set forth below:

1. (Currently Amended)  A doll with changeable footgear comprising:

a torso having a body and legs, <u>each said leg including a lower leg, ankle and foot,</u> <u>constituting one part and another part of said leg;</u> said legs having a predetermined skin color and texture;

a pair of foot/shoe assemblies, each including an open shoe with straps, with the shoe being open to expose at least part of the foot, the foot having substantially ~~the same~~ <u>said</u> predetermined skin color and texture;

each said assembly being ~~removable~~ <u>removably</u> secured to one of said legs at the lower leg or ankle of said doll at a separation point;

each said assembly and lower legs having a snap-together joint with a protuberance on one part and a mating recess on the other part; and

a simulated strap forming part of said shoe extending around said assembly at said separation point.

2. (Currently Amended)  A doll as defined in claim 1 wherein <u>said foot/shoe assembles</u> <u>include a shoe portion and exposed skin areas, and wherein</u> the shoe portion of the foot/shoe ~~assembly is~~ <u>assemblies are</u> colored to contrast sharply with the exposed skin areas ~~of the foot~~.

3. (Original)  A doll with changeable footgear as defined in claim 1 further including a plurality of different sets of shoes of different styles for selectively mounting on said legs.

4. (Original)  A doll as defined in claim 1 wherein said doll and said foot/shoe assemblies are formed of resilient plastic material.

5. (Currently Amended)  A doll with changeable footgear comprising:

a torso having a body and legs, <u>each said leg including a lower leg, ankle and foot,</u> <u>constituting one part and another part of said leg;</u> said legs having a predetermined color;

EXHIBIT ___ 102

PAGE ___ 851

3

548-3

MGA 0825449

15904-142

a pair of foot/shoe assemblies, each including an open shoe with straps, with the shoe being open to expose at least part of the foot, the foot having substantially the same predetermined color;

each said assembly being removable secured to one of said legs at the lower leg or ankle of said doll at a separation point;

each said assembly and lower legs having a joint at a separation point for releasably securing the foot/shoe assemblies to the legs; and

a simulated strap forming part of said shoe extending around said assembly at said separation point.

6. (Currently Amended)  A doll as defined in claim 5 wherein said foot/shoe assembles include a shoe portion and exposed skin areas, and wherein the shoe portion of the foot/shoe assembly is colored to contrast sharply with the exposed skin areas of the foot.

7. (Original)  A doll with changeable footgear as defined in claim 5 further including a plurality of different sets of shoes of different styles for selectively mounting on said legs.

8. (Original)  A doll as defined in claim 5 wherein said doll and said foot/shoe assemblies are formed of resilient plastic material.

9. (Currently Amended)  A doll with changeable footgear comprising:

a torso having a body and legs, each said leg including a lower leg, ankle and foot, constituting one part and another part of said leg; said legs having a predetermined color;

a pair of foot/shoe assemblies, each including an open shoe with straps, with the shoe being open to expose at least part of the foot, the foot having substantially the same said predetermined color;

each said assembly being removable removably secured to one of said legs at the lower leg or ankle of said doll at a separation point;

each said assembly and lower legs having a snap-together joint; and

a simulated strap forming part of said shoe extending around said assembly at said separation point.

4

EXHIBIT 102

PAGE 852

548-4

MGA 0825450

15904-142

10.  (Currently Amended)  A doll as defined in claim 9 wherein said foot/shoe assembles include a shoe portion and exposed skin areas, and wherein the shoe portion of the foot/shoe ~~assembly is~~ assemblies are colored to contrast sharply with the exposed skin areas ~~of the foot~~.

11.  (Original)  A doll with changeable footgear as defined in claim 9 further including a plurality of different sets of shoes of different styles for selectively mounting on said legs.

12.  (Original)  A doll as defined in claim 9 wherein said doll and said foot/shoe assemblies are formed of resilient plastic material.

13.  (Currently Amended)  A doll with changeable footgear comprising:

a torso having a body and legs; each said leg including a lower leg, ankle and foot, constituting one part and another part of said leg;

a pair of foot/shoe assemblies, each including an open shoe with straps, with the shoe being open to expose at least part of the foot;

each said assembly being ~~removable~~ removably secured to one of said legs at the lower leg or ankle of said doll at a separation point;

each said assembly and lower legs having a joint for releasably securing the foot/shoe assemblies to the legs; and

a simulated strap forming part of said shoe extending around said assembly at said separation point.

14.  (Currently Amended)  A doll as defined in claim 13 wherein said foot/shoe assembles include a shoe portion and exposed skin areas, and wherein the shoe portion of the foot/shoe ~~assembly is~~ assemblies are colored to contrast sharply with the exposed skin areas ~~of the foot~~.

15.  (Original)  A doll with changeable footgear as defined in claim 13 further including a plurality of different sets of shoes of different styles for selectively mounting on said legs.

16.  (Original)  A doll as defined in claim 13 wherein said doll and said foot/shoe assemblies are formed of resilient plastic material.

EXHIBIT ___102___

PAGE ___853___

5

548-5

MGA 0825451

15904-142

17. (Currently Amended)  A doll as defined in claim 13 wherein said foot/shoe assembles include a shoe portion and exposed skin areas, and wherein said exposed parts of the feet have substantially the same color as said legs.

EXHIBIT ___102___

PAGE ___854___

6

54 8 - 6

MGA 0825452

15904-142

<u>Amendment to the Abstract of the Disclosure</u>

Please amend the Abstract of the Disclosure to read as follows:

## ABSTRACT OF THE DISCLOSURE

A doll with changeable footgear includes a torso with legs, and a pair of foot/shoe assemblies mounted on the legs at separation points; and each ~~foot shoe~~ <u>foot/shoe</u> assembly has exposed skin of a color and texture substantially matching the skin of the legs, and the simulated shoes include simulated straps extending around the foot/shoe assembly immediately adjacent the separation point on each leg. Each foot/shoe assembly may be mounted on one of the doll legs, employing a protuberance on one part and a recess on the other part, with a snap-in locking fit between the two parts. The simulated shoes may be of a sharply contrasting color relative to the skin color.

EXHIBIT ___ 102

PAGE ___ 855

7

548-7

MGA 0825453

15904-142

## REMARKS

The matters raised by the Office Action of May 12, 2003 will now be considered in the order presented in the Office Action.

First, the list of references in the specification is now provided in the form of an IDS attached to this amendment with the references cited and provided with the Office Action being omitted.

Regarding the drawings, a new amended second sheet of drawings is provided with this amendment, with the lead lines from reference numerals 54 and 68 being shortened to end at the separation point.

The specification has been modified as suggested in the Office Action, and specification amendments are provided hereinabove.

Concerning the claim objections and 35 USC 112 rejections, the claims have been amended as suggested in the Office Action, and to provide antecedent basis for the claim language under consideration.

Regarding the 35 USC 102 rejection of all claims, attention is respectfully directed to the attached Declaration of Carter Bryant, a Freelance Designer who worked with the inventor on the Bratz doll project; and who confirms that the release date for the dolls as claimed in this patent application, did not occur until the fall of 2002. Of course, this is only a few months prior to the February 24, 2003 filing date of the present application. Accordingly, it is respectfully requested that the rejection based on the Bratz article be withdrawn.

Regarding the rejection under 35 USC 103, it is based on a combination of the Barlow patent with the Rahmstorf patent. In considering these patents it is noted that the Rahmsdorf patent was cited in applicant's specification. Further, it clearly does <u>not</u> show (1) an open-work strap type shoe, (2) with the skin color above and below the joint being the same, nor does it show (3) an open-work strap type shoe with the upper strap also defining the separation point between the removable foot/shoe and the lower leg of the doll.

In addition, the Barlow reference discloses ballet slippers (see col. 1, lines 50 and 53), and not (1) open-work, strap type shoes with (2) removability of the shoe/feet at the upper strap, and (3) foot skin coloring the same above and below the separation point.

These three features facilitate the provision of changeable footgear which is aesthetically pleasing and elegant.

EXHIBIT _____ 102

PAGE _____ 856

8

548-8

MGA 0825454

15904-142

Accordingly, the references are clearly lacking the following three features:

(1) Open-work, strap type shoes.

(2) Removability of the shoe/feet assemblies at the upper strap line of the shoes.

(3) Foot skin coloring matching the lower leg coloring below and above the separation point..

Where these features are missing from the references and result in an elegant and aesthetically pleasing doll configuration, patentability is clearly present.

In view of the foregoing amendments and analysis, an early Notice of Allowance is solicited.

Attached to this amendment is the Declaration of Carter Bryant with attachments, as mentioned above; and sent herewith is an IDS relating to the references cited in the specification (except those provided with the Office Action).

In the event that this patent application is not considered to be entirely in condition for allowance, it would be appreciated if the Examiner would grant a telephone interview. Applicant's attorney would prefer a personal interview with the Examiner, but is located in Los Angeles so that a personal interview is not practical. Accordingly, a comparable telephone interview would be appreciated if the application is not considered allowable. Thank you.

**The Commissioner is hereby authorized to charge any additional filing fees under 37 C.F.R. § 1.16, or application processing fees under 37 C.F.R. § 1.17, which may be required now or during the pendency of this application, or credit any overpayment to Account No. 16-2230. A duplicate copy of this sheet is enclosed.**

Respectfully submitted,

*Alan C. Rose*

Alan C. Rose, Reg. 17,047
Attorney for Applicant

OPPENHEIMER WOLFF & DONNELLY LLP
233 Wilshire Blvd., Suite 700
Santa Monica, CA 90401
Telephone: 310/319-5456
Facsimile: 310/319-3508

Enclosures: As Noted Above.

EXHIBIT ____ 102

PAGE ____ 857

9                    OPPENHEIMER: 1476813 v01 08/12/2003

548-9

MGA 0825455

Receipt is hereby acknowledged for the following in the U.S. Patent and Trademark Office:

OWD Ref.: 15904-142
Applicant:  Isaac Larian
Client:  MGA Entertainment
Serial No.:  10/373,602
Filed:  February 24, 2003
Title:  DOLL WITH AESTHETIC CHANGEABLE FOOTGEAR

Date of Deposit:  August 12, 2003

☒  Amendment to 5/12/03 OA
☒  Declaration of Carter Bryant w/2 sheets drawings attached
☒  Change of Address letter
☒  Information Disclosure Statement w/PTO 1449 and 15 refs
☒  Acknowledgement Postcard

ACR/jst

OPPENHEIMER: 1476918 v01 08/12/2003

EXHIBIT ___102___

PAGE ___858___

548-10

MGA 0825456

# EXHIBIT 103

# The United States of America

## The Director of the United States Patent and Trademark Office

*Has received an application for a new, original, and ornamental design for an article of manufacture. The title and description of the design are enclosed. The requirements of law have been complied with, and it has been determined that a patent on the design shall be granted under the law.*

*Therefore, this*

### United States Patent

*Grants to the person(s) having title to this patent the right to exclude others from making, using, offering for sale, or selling the design throughout the United States of America, or importing the design into the United States of America for the term of fourteen years from the date of grant of this patent.*

*Director of the United States Patent and Trademark Office*

Δ π EXHIBIT 552
Deponent Armstrong
Date 8/1/07 Rptr. AC
WWW.DEPOBOOK.COM

EXHIBIT ___103___

PAGE ___857___

MGA 0825262

US00D469687S

(12) **United States Design Patent**   (10) Patent No.:   **US D469,687 S**

Larian   (45) Date of Patent:   **   **Feb. 4, 2003**

(54) TRANSPARENT DISPLAY PACKAGING

(76) Inventor: Isaac Larian, 237 Carnlwood, Los Angeles, CA (US) 90077

(**) Term: 14 Years

(21) Appl. No.: 29/158,530

(22) Filed: Apr. 3, 2002

(51) LOC (7) Cl. ........................................... 09-03
(52) U.S. Cl. ..................................... D9/415; D9/418
(58) Field of Search .......................... D9/415, 418, 414, D9/430, 431, 432, 337, 416; 229/111, 112, 116.1, 117.09, 117.19, 117.21, 117.23, 117.24, 162; 206/769, 770, 771, 349, 776, 806

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 1,268,318 A | * | 6/1918 | Brown | 229/117.09 |
| 2,483,030 A | * | 9/1949 | Ameson | 229/117.21 |
| 2,591,593 A | * | 4/1952 | Nolan | 229/117.09 |
| 3,001,688 A | * | 9/1961 | Hokenson | 229/117.21 |
| D265,723 S | * | 8/1982 | Rosenthal | D9/418 |
| D303,088 S | * | 8/1989 | Fireman | D9/418 |
| 5,040,683 A | * | 8/1991 | Marsilio | 206/320 |
| D320,346 S | * | 10/1991 | Wagner | D9/415 |

* cited by examiner

*Primary Examiner*—Prabhakar Deshmukh
(74) *Attorney, Agent, or Firm*—Oppenheimer Wolff & Donnelly LLP

(57) **CLAIM**

The ornamental design for a transparent display packaging, as shown and described.

**DESCRIPTION**

FIG. 1 is a perspective view of my transparent display packaging;
FIG. 2 is a front view thereof;
FIG. 3 is a right side view thereof with the left side view being a mirror image of the right side view;
FIG. 4 is a rear view thereof;
FIG. 5 is a top plan view thereof;
FIG. 6 is a bottom plan view thereof; and,
FIG. 7 is a perspective view of an alternative embodiment.

1 Claim, 3 Drawing Sheets



EXHIBIT 103

PAGE 860

552-2

MGA 0825263

**U.S. Patent**   Feb. 4, 2003   Sheet 1 of 3   US D469,687 S



*FIG. 2*

*FIG. 1*

EXHIBIT 103

PAGE 861

552-3

MGA 0825264



FIG. 4

FIG. 3

EXHIBIT 103

PAGE **862**

552-4

MGA 0825265

**U.S. Patent**     Feb. 4, 2003     Sheet 3 of 3     US D469,687 S



FIG. 7

FIG. 6

FIG. 5

EXHIBIT 103

PAGE 863

552-5

MGA 0825266