**EXHIBIT 101**

**ATTACHMENT 5**
**CONFLICT OF INTEREST QUESTIONNAIRE**

MAT-2940-D

| NAME (PLEASE TYPE OR PRINT) *CARTER H. BRYANT* | BUSINESS TELEPHONE AND EXTENSION (310) 252-4942 | DATE 11/6/95 |
|---|---|---|
| JOB TITLE *ASSOSIATE DESIGNER* | DEPARTMENT/MAIL STOP *BARBIE PRELIM* | COMPANY *MATTEL TOYS* |

**INSTRUCTIONS:** The purpose of this questionnaire is to confirm the propriety of relations between our key employees and our suppliers and competitors. Please read the definitions below and Mattel's policies concerning Conflicts of Interest (Attachment 4). Then answer the questions by checking the correct answer. Base your answers on personal knowledge. There is no need to make inquiries or seek additional information since lack of knowledge of a situation indicates that there is no conflict of interest. Your answers to questions 1 through 8 should cover the past twelve months and the term "you" should include members of your immediate family.

**MATTEL SUPPLIER** is interpreted broadly for purposes of this questionnaire. A Mattel supplier is any person, partnership, trust, corporation, or other enterprise which during the past twelve months has done business or currently contemplates doing business with Mattel or any Mattel subsidiary.

**MATTEL COMPETITOR** is interpreted broadly for purposes of this questionnaire. A Mattel competitor is any person, partnership, trust, corporation or other enterprise which has done business or contemplates doing business in any field that is in competition with Mattel or any Mattel subsidiary.

**INTEREST** means direct or indirect ownership of any stock, bond, option or right to purchase any security, share in profits, investment, partnership interest or other profit participation or equity interest whatsoever. Interest also means any agreement to perform services for or consult with or to deliver materials to or to receive compensation of any kind from any supplier or competitor. YOU MAY DISREGARD MUTUAL INVESTMENT TRUSTS AND PUBLICLY-OWNED CORPORATIONS WHOSE SECURITIES ARE TRADED PUBLICLY, IN WHICH YOU OWN NOT MORE THAN $25,000 IN MARKET VALUE, BUT NOT TO EXCEED 10% OF AN INDIVIDUAL'S NET WORTH.

**RECIPIENT OF ANY COMMISSION, etc.,** means receipt of anything of value, in cash or in kind, over $60 on any one occasion or over $300 total during the past twelve months.

| | | |
|---|---|---|
| 1. Have you owned, directly or indirectly, any interest in a Mattel supplier? (See definition above.) | ☐ YES | ☒ NO |
| 2. Have you owned, directly or indirectly, any interest in a Mattel competitor? (See definition above.) | ☐ YES | ☒ NO |
| 3. Have you been the recipient of any commission, fee, loan, trip, gift, benefit or anything else of value that is derived in any way from a Mattel supplier? | ☐ YES | ☒ NO |
| 4. Have you been the recipient of any commission, fee, loan, trip, gift, benefit or anything else of value that is derived in any way from a Mattel competitor? | ☐ YES | ☒ NO |
| 5. Have you or any relative of yours by blood or marriage been a director, officer, consultant, agent, employee, or representative of or acted for any Mattel competitor in any capacity? | ☐ YES | ☒ NO |

CONTINUED ON REVERSE SIDE

EXHIBIT ___101___

PAGE ___1576___

M 0001636

DEPOSITION EXHIBIT 24

11-5-04   SH

| | | |
|---|---|---|
| 6. Have you or any relative of yours by blood or marriage been a director, officer, consultant, agent, employee or representative of or acted for any Mattel supplier in any capacity? | ☐ YES | ☒ NO |
| 7. Have you engaged in any activity including the acquisition or ownership of any interest for personal profit, not expressly within the scope of the foregoing with respect to any supplier or competitor? | ☐ YES | ☒ NO |
| 8. Excepting normal everyday transactions (purchase or toys, etc.,) have you engaged in any business venture or transaction involving a Mattel supplier or competitor or engaged in any activity which could be objectively construed as being a conflict of interest or allegiance? | ☐ YES | ☒ NO |
| 9. Are you aware of any activity of any employee which you believe could be construed as a potential conflict of interest with Mattel? | ☐ YES | ☒ NO |

I certify that I have read Mattel's policies concerning Conflict of Interest (Attachment 4) and the answers to the above questions are true. I understand that failure to answer this Questionnaire fully and truthfully constitutes grounds for immediate termination of my employment. I agree not to divulge any company information to unauthorized recipients. I also agree to notify my superior immediately of any changes in my situation that would cause me to answer any of the above questions differently. I further certify that, to the best of my knowledge, neither I nor any member of my immediate family is or has been engaged since the date of the last Questionnaire in any capacity which creates a Conflict of Interest.

SIGNATURE REQUIRED BELOW

SIGNATURE _Carter H. Bryant_   DATE _11/6/95_

IF YOUR ANSWER TO ANY OF THE ABOVE IS "YES" PLEASE EXPLAIN IN THE SPACE BELOW

EXHIBIT ___101___

PAGE ___1577___

M 0001637

**EXHIBIT   102**

1   KEKER & VAN NEST, LLP
    JOHN W. KEKER - #49092
2   jkeker@kvn.com
    MICHAEL H. PAGE - #154913
3   mpage@kvn.com
    CHRISTA M. ANDERSON - #184325
4   canderson@kvn.com
    710 Sansome Street
5   San Francisco, CA  94111-1704
    Telephone:  (415) 391-5400
6   Facsimile:  (415) 397-7188

7   Attorneys for Plaintiff
    CARTER BRYANT
8

9

10                  UNITED STATES DISTRICT COURT

11                 CENTRAL DISTRICT OF CALIFORNIA

12                        EASTERN DIVISION

13

14   CARTER BRYANT, an individual,        Case No. CV 04-09049 SGL (RNBx)
                                           (consolidated with CV 04-9059 & 05-
15                    Plaintiff,           2727

16        v.                               **CARTER BRYANT'S RESPONSES
                                           TO MATTEL, INC'S FIFTH SET
17   MATTEL, INC. a Delaware               OF REQUESTS FOR ADMISSION
     Corporation,                          TO CARTER BRYANT**
18
                      Defendant.
19
     CONSOLIDATED WITH MATTEL,
20   INC., v. BRYANT and MGA
     ENTERTAINMENT, INC. v.
21   MATTEL, INC.

22

23

24   PROPOUNDING PARTY:        Defendant MATTEL, INC. ("Defendant")

25   RESPONDING PARTY:         Plaintiff CARTER BRYANT ("Plaintiff")

26   SET NUMBER:               FIFTH (5)

27                             EXHIBIT ___102___

28                             PAGE ___1578___

398501.01
              CARTER BRYANT'S RESPONSES TO MATTEL, INC.'S
         FIFTH SET OF REQUESTS FOR ADMISSION TO CARTER BRYANT
                     CASE NO. CV 04-09049 SGL (RNBx)

1    Carter Bryant ("Defendant" or "Bryant") hereby objects and responds to

2    Mattel, Inc.'s ("Plaintiff" or "Mattel") Fifth Set of Requests for Admission.

3    Bryant's responses and objections are made solely for the purpose of this

4    action.

5    Bryant points out that discovery is still pending, that he has not concluded

6    his investigation of the facts relating to this case, has not completed his own

7    discovery in this case, and has not completed preparation for trial. In light of the

8    foregoing, the following Responses are given without prejudice to Bryant's right to

9    stand on his objections, to continue his investigation and discovery, to rely on

10   subsequently discovered facts, and to utilize subsequently discovered or

11   subsequently identified evidence or documents.

12   The following Responses reflect the current status of Bryant's knowledge

13   and belief respecting the matters about which inquiry is made. Discovery will

14   continue as long as permitted by statute or stipulation of the parties, and

15   investigation by Bryant, his attorneys and agents will continue up to and

16   throughout the trial of this action. Bryant specifically reserves the right to

17   introduce at the time of trial any evidence from any source, including documents

18   and testimony from any witnesses which may hereafter be discovered.

19   If any information has been unintentionally omitted from these Responses,

20   Bryant hereby reserves the right to amend these Responses to include the omitted

21   information. Bryant also reserves the right to change, amend or supplement any or

22   all of the matters contained in these responses as additional facts are ascertained,

23   analyses are made, and research is completed. These introductory paragraphs

24   apply to each and every Response herein and shall be incorporated as though fully

25   set forth in each and every Response.

26   All of Bryant's responses are based upon information and documentation

27   that is currently available and specifically known to Bryant. The responses are

28   made in a good-faith effort to provide information now known to Bryant which is

1

CARTER BRYANT'S RESPONSES TO MATTEL, INC.'S
FIFTH SET OF REQUESTS FOR ADMISSION TO CARTER BRYANT
CASE NO. CV 04-09049 SGL (RNBx)

398501.01

EXHIBIT ___102___

PAGE ___1579___

1   responsive, but Bryant specifically reserves the right both to supplement any of the

2   responses set forth below and to utilize at trial any further information or

3   documents.

4   **GENERAL OBJECTIONS**

5       The following general objections apply to the entirety of Mattel's Fourth Set

6   of Requests for Admission (the "Requests"). The assertion of the same, similar, or

7   additional objections to the individual requests does not waive any of Bryant's

8   general objections as set forth below.

9       1.    To the extent these Requests request Bryant to provide information

10   concerning the legal basis of his defense of this matter, Bryant objects on the

11   grounds that the Requests impermissibly call for mental impressions, conclusions,

12   opinions and/or legal theories of Bryant's attorneys.

13       2.    Bryant also objects to the extent these Requests call for the disclosure

14   of information protected by the attorney-client privilege, the work-product

15   doctrine, the joint defense or common interest privilege or any other applicable

16   privilege.

17       3.    Bryant objects to the Requests to the extent that they call for legal

18   conclusions.

19       4.    Bryant objects to the extent that these Requests seek information

20   comprising the trade secrets of MGA and/or third parties, and/or otherwise

21   comprising confidential information, protected from disclosure by California

22   and/or federal law.

23       5.    Bryant objects to the Requests on the grounds that they attempt to

24   unfairly restrict the facts on which Bryant may rely at trial. Discovery has not

25   been completed and Bryant is not yet necessarily in possession of all the facts and

26   documents upon which Bryant intends to rely. All of the responses submitted

27   herewith are tendered to Mattel with the reservation that discovery is ongoing and

28   thus the responses are submitted without limiting the evidence on which Bryant

2

CARTER BRYANT'S RESPONSES TO MATTEL, INC.'S<br>FIFTH SET OF REQUESTS FOR ADMISSION TO CARTER BRYANT<br>CASE NO. CV 04-09049 SGL (RNBx)

EXHIBIT ___102___

PAGE ___1580___

1    may rely to support the contentions that Bryant may assert at the trial of this action.

2    Further, Bryant reserves the right to supplement or amend these responses in the

3    future if it deems that to be appropriate.

4        6.    Bryant objects to the Requests to the extent that they are compound.

5        7.    Bryant objects to the Requests on the grounds that they are vague and

6    overbroad, unduly burdensome and oppressive, seek information that is not

7    reasonably within Bryant's knowledge, and/or seek information that is neither

8    relevant to this litigation nor reasonably calculated to lead to the discovery of

9    admissible evidence. In particular, Bryant also objects to these Requests on the

10   grounds that they are oppressively repetitive.  Bryant also objects to these Requests

11   as burdensome in their sheer number (Mattel has now propounded nearly 500

12   Requests to Bryant alone, many of which consists of multiple interlocking

13   Requests apparently designed to take the place of a single interrogatory).

14       8.    Bryant objects to the Requests to the extent they are vague and

15   ambiguous or call for a legal conclusion as to the scope of Bryant's employment at

16   Mattel.  To the extent that Bryant responds to any request regarding what Bryant

17   did or did not do "while employed" at Mattel, Bryant does so without waiving or

18   intending to waive but rather, on the contrary, preserving and intending to

19   preserve, his contention that anything Bryant did on weekends, evenings ,vacation

20   and any other time outside ordinary business hours was not done while he was

21   working for Mattel. Bryant's response to any such request may not be taken as an

22   admission that the information provided in his response in any way reflects or

23   evidences work performed by Bryant while he was working for Mattel or that

24   Bryant adopts or agrees with any fact or legal conclusion assumed, presumed or

25   contained in Mattel's request.

26       9.    Bryant objects to the defined terms YOU, BRYANT, MGA,

27   AFFILIATES, BRATZ, BRATZ WORK and BRATZ WORKS, THE BRATZ

28   PITCH MATERIALS, BRYANT/MGA AGREEMENT, CONTEND, CREATE

3

CARTER BRYANT'S RESPONSES TO MATTEL, INC.'S
FIFTH SET OF REQUESTS FOR ADMISSION TO CARTER BRYANT
CASE NO. CV 04-09049 SGL (RNBx)

398501.01

EXHIBIT _____ 102

PAGE _____ 1581

1 the BRYANT/MGA AGREEMENT that entering into the BRYANT/MGA

2 AGREEMENT could or might subject YOU to legal liability.

3 **RESPONSE TO REQUEST FOR ADMISSION NO. 26:**

4     Bryant incorporates by reference the above-stated general objections as if

5 fully set forth herein. Bryant also specifically objects to this request on the

6 grounds that it is compound. Bryant also specifically objects to this request on the

7 ground that it calls for information that is beyond the scope of this litigation.

8 Bryant also specifically objects to this request on the grounds that it calls for

9 disclosure of information protected by the attorney-client privilege, the work

10 product doctrine, the joint defense privilege, and any other applicable privileges.

11 Bryant also specifically objects to this request on the grounds that it is oppressively

12 repetitive and unnecessary in combination with Mattel's other requests.

13     Subject to and without waiving the foregoing general and specific

14 objections, Bryant responds to this request as follows: Bryant denies that anyone

15 told him the BRYANT/MGA AGREEMENT could or might subject him to legal

16 liability to Mattel.

17 **REQUEST FOR ADMISSION NO. 27:**

18     Admit that YOU CREATED OR IMPROVED at least one of THE BRATZ

19 PITCH MATERIALS while employed by MATTEL.

20 **RESPONSE TO REQUEST FOR ADMISSION NO. 27:**

21     Bryant incorporates by reference the above-stated general objections as if

22 fully set forth herein. Bryant also specifically objects to this request on the

23 grounds that it is compound. Bryant also specifically objects to this request on the

24 grounds that it calls for legal conclusions as to what constitutes "CREATED OR

25 IMPROVED" and "employed." Bryant also specifically objects to this request

26 because "while employed at Mattel" is vague and ambiguous; without waiving or

27 intending to waive, but rather preserving and intending to preserve, his contention

28 that anything Bryant did on weekends, evenings ,vacation and any other time

CARTER BRYANT'S RESPONSES TO MATTEL, INC.'S
FIFTH SET OF REQUESTS FOR ADMISSION TO CARTER BRYANT
CASE NO. CV 04-09049 SGL (RNBx)

EXHIBIT _____ 102

PAGE _____ 1582

1   outside ordinary business hours was not done while he was working for Mattel,
2   Bryant responds to this request based on his interpretation that "while employed"
3   refers only to the dates of Bryant's employment, and not to whether Bryant's
4   specific acts at specific times were part of his employment at Mattel. Bryant's
5   response, based on that interpretation, is not an admission that the information
6   provided in his response in any way reflects or evidences work performed by
7   Bryant while he was working for Mattel or that Bryant adopts or agrees with any
8   fact or legal conclusion assumed, presumed or contained in Mattel's request. To
9   the extent this request asks Bryant to provide information concerning the legal
10  basis of his defense of this matter, Bryant also specifically objects on the grounds
11  that the request impermissibly calls for mental impressions, conclusions, opinions
12  and/or legal theories of Bryant's attorneys. Bryant also specifically objects to this
13  request on the grounds that it calls for disclosure of information protected by the
14  attorney-client privilege, the work product doctrine, the joint defense privilege, and
15  any other applicable privileges. Bryant also specifically objects to this request on
16  the grounds that it is oppressively repetitive and unnecessary in combination with
17  Mattel's other requests.

18      Subject to and without waiving the foregoing general and specific
19  objections, Bryant responds to this request as follows: Bryant admits that he traced
20  his 1998 drawings and colored such tracings in the spring or summer of 1999, a
21  period in which he was employed by Mattel, and that he traced his 1998 drawings,
22  colored such tracings, and drew a few outfits of formal wear between January 1,
23  2000 and October 20, 2000, a period in which he was employed by Mattel. Bryant
24  accordingly admits this request to the extent that this tracing, coloring such
25  tracings, and drawing formal wear outfits constitutes CREAT[ING] OR
26  IMPROV[ING] BRATZ PITCH MATERIALS while employed at Mattel, as
27  Bryant interprets those terms.
28

CARTER BRYANT'S RESPONSES TO MATTEL, INC.'S
FIFTH SET OF REQUESTS FOR ADMISSION TO CARTER BRYANT
CASE NO. CV 04-09049 SGL (RNBx)

398501.01

EXHIBIT ___102___

PAGE ___1583___

**REQUEST FOR ADMISSION NO. 28:**

Admit that YOU CREATED OR IMPROVED more than one of THE BRATZ PITCH MATERIALS while employed by MATTEL.

**RESPONSE TO REQUEST FOR ADMISSION NO. 28:**

Bryant incorporates by reference the above-stated general objections as if fully set forth herein. Bryant also specifically objects to this request on the grounds that it is compound. Bryant also specifically objects to this request on the grounds that it calls for legal conclusions as to what constitutes "CREATED OR IMPROVED" and "employed." Bryant also specifically objects to this request because "while employed at Mattel" is vague and ambiguous; without waiving or intending to waive, but rather preserving and intending to preserve, his contention that anything Bryant did on weekends, evenings ,vacation and any other time outside ordinary business hours was not done while he was working for Mattel, Bryant responds to this request based on his interpretation that "while employed" refers only to the dates of Bryant's employment, and not to whether Bryant's specific acts at specific times were part of his employment at Mattel. Bryant's response, based on that interpretation, is not an admission that the information provided in his response in any way reflects or evidences work performed by Bryant while he was working for Mattel or that Bryant adopts or agrees with any fact or legal conclusion assumed, presumed or contained in Mattel's request. To the extent this request asks Bryant to provide information concerning the legal basis of his defense of this matter, Bryant also specifically objects on the grounds that the request impermissibly calls for mental impressions, conclusions, opinions and/or legal theories of Bryant's attorneys. Bryant also specifically objects to this request on the grounds that it calls for disclosure of information protected by the attorney-client privilege, the work product doctrine, the joint defense privilege, and any other applicable privileges. Bryant also specifically objects to this request on the grounds that it is oppressively repetitive and unnecessary in combination with

26

398501.01

EXHIBIT _102_

PAGE _1584_

1 | Mattel's other requests.

2 |      Subject to and without waiving the foregoing general and specific

3 | objections, Bryant responds to this request as follows: Bryant admits that he traced

4 | his 1998 drawings and colored such tracings in the spring or summer of 1999, a

5 | period in which he was employed by Mattel, and that he traced his 1998 drawings,

6 | colored such tracings, and drew a few outfits of formal wear between January 1,

7 | 2000 and October 20, 2000, a period in which he was employed by Mattel. Bryant

8 | accordingly admits this request to the extent that this tracing, coloring such

9 | tracings, and drawing formal wear outfits constitutes CREAT[ING] OR

10 | IMPROV[ING] BRATZ PITCH MATERIALS while employed at Mattel, as

11 | Bryant interprets those terms.

12 | **REQUEST FOR ADMISSION NO. 29:**

13 |      Admit that YOU CREATED OR IMPROVED all of THE BRATZ PITCH

14 | MATERIALS while employed by MATTEL.

15 | **RESPONSE TO REQUEST FOR ADMISSION NO. 29:**

16 |      Bryant incorporates by reference the above-stated general objections as if

17 | fully set forth herein. Bryant also specifically objects to this request on the

18 | grounds that it is compound. Bryant also specifically objects to this request on the

19 | grounds that it calls for legal conclusions as to what constitutes "CREATED OR

20 | IMPROVED" and "employed." Bryant also specifically objects to this request

21 | because "while employed at Mattel" is vague and ambiguous; without waiving or

22 | intending to waive, but rather preserving and intending to preserve, his contention

23 | that anything Bryant did on weekends, evenings ,vacation and any other time

24 | outside ordinary business hours was not done while he was working for Mattel,

25 | Bryant responds to this request based on his interpretation that "while employed"

26 | refers only to the dates of Bryant's employment, and not to whether Bryant's

27 | specific acts at specific times were part of his employment at Mattel. Bryant's

28 | response, based on that interpretation, is not an admission that the information

398501.01

EXHIBIT ___102___

PAGE ___1585___

1   provided in his response in any way reflects or evidences work performed by

2   Bryant while he was working for Mattel or that Bryant adopts or agrees with any

3   fact or legal conclusion assumed, presumed or contained in Mattel's request. To

4   the extent this request asks Bryant to provide information concerning the legal

5   basis of his defense of this matter, Bryant also specifically objects on the grounds

6   that the request impermissibly calls for mental impressions, conclusions, opinions

7   and/or legal theories of Bryant's attorneys. Bryant also specifically objects to this

8   request on the grounds that it calls for disclosure of information protected by the

9   attorney-client privilege, the work product doctrine, the joint defense privilege, and

10   any other applicable privileges. Bryant also specifically objects to this request on

11   the grounds that it is oppressively repetitive and unnecessary in combination with

12   Mattel's other requests.

13       Subject to and without waiving the foregoing general and specific

14   objections, Bryant responds to this request as follows: Bryant admits that he traced

15   his 1998 drawings and colored such tracings in the spring or summer of 1999, a

16   period in which he was employed by Mattel, and that he traced his 1998 drawings,

17   colored such tracings, and drew a few outfits of formal wear between January 1,

18   2000 and October 20, 2000, a period in which he was employed by Mattel. Bryant

19   accordingly admits this request to the extent that this tracing, coloring such

20   tracings, and drawing formal wear outfits constitutes CREAT[ING] OR

21   IMPROV[ING] BRATZ PITCH MATERIALS while employed at Mattel, as

22   Bryant interprets those terms.

23   **REQUEST FOR ADMISSION NO. 30:**

24       Admit that YOU deny YOU willfully infringed any copyrights in BRATZ

25   WORKS.

26   **RESPONSE TO REQUEST FOR ADMISSION NO. 30:**

27       Bryant incorporates by reference the above-stated general objections as if

28   fully set forth herein. Bryant also specifically objects to this request on the

398501.01

EXHIBIT __102__

PAGE __1586__

1   Dated: July 9, 2007                    KEKER & VAN NEST, LLP

2

3

4   By: _____ / AWM
    MICHAEL H. PAGE
5   Attorneys for Plaintiff
    CARTER BRYANT

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

46
CARTER BRYANT'S RESPONSES TO MATTEL, INC.'S
FIFTH SET OF REQUESTS FOR ADMISSION TO CARTER BRYANT
CASE NO. CV 04-09049 SGL (RNBx)

398501.01

EXHIBIT ___102___

PAGE ___1587___

PROOF OF SERVICE

I am employed in the City and County of San Francisco, State of California in the office of a member of the bar of this court at whose direction the following service was made. I am over the age of eighteen years and not a party to the within action. My business address is Keker & Van Nest, LLP, 710 Sansome Street, San Francisco, California 94111.

On July 9, 2007, I served the following document(s):

**CARTER BRYANT'S RESPONSES TO MATTEL, INC'S FIFTH SET OF REQUESTS FOR ADMISSION TO CARTER BRYANT**

by **FEDERAL EXPRESS**, by placing a true and correct copy in a sealed envelope addressed as shown below. I am readily familiar with the practice of Keker & Van Nest, LLP for correspondence for delivery by FedEx Corporation. According to that practice, items are retrieved daily by a FedEx Corporation employee for overnight delivery; AND

by **E-MAIL VIA PDF FILE**, by transmitting on this date via e-mail a true and correct copy scanned into an electronic file in Adobe "pdf" format. The transmission was reported as complete and without error.

John B. Quinn
Michael T. Zeller
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543
Tel:    213/443-3000
Fax:   213/443-3100
Email: johnquinn@quinnemanuel.com
Email: michaelzeller@quinnemanuel.com

Diana M. Torres
O'Melveny & Myers, LLP
400 S. Hope Street
Los Angeles, CA 90071
Tel:    213/430-6000
Fax:   213/430-6407
Email: dtorres@omm.com

Patricia L. Glaser
Christensen Glaser Fink Jacobs Weil & Shapiro
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067
Tel:    310/553-3000
Fax:   310/556-2920
Email: pglaser@chrisglase.com

Executed on July 9, 2007, at San Francisco, California.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

_Julie Selby_
JULIE A. SELBY

PROOF OF SERVICE
CASE NO. CV 04-09049 SGL (RNBx)

EXHIBIT _102_

PAGE _1588_

**EXHIBIT   103**

**THIS EXHIBIT IS FILED UNDER SEAL
PURSUANT TO PROTECTIVE ORDER**

**EXHIBIT   104**

**THIS EXHIBIT IS FILED UNDER SEAL
PURSUANT TO PROTECTIVE ORDER**

**EXHIBIT   105**

Received:   7/18/06   4:40PM         RightFAX -> JetFax   `20;   Page 2
RightFAX                 7/_8/2006 4:37   PAGE 002/019   Fax Server



FILED

2006 JUL 18 AM 10: 16

ENTERED

JUL 18 2006

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION
DEPUTY

Priority
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARTER BRYANT, | |
| Plaintiff, | CASE NO. CV 04-09049 SGL (RNBx) |
| v. | (Consolidated with cases CV 04-09059 and CV 05-02727) |
| MATTEL, INC., | |
| Defendant, | ORDER GRANTING MOTIONS TO DISMISS |
| and related actions. | |

**THIS CONSTITUTES NOTICE OF ENTRY AS REQUIRED BY FRCP, RULE 77(D).**

## I. Introduction

This consolidated action involves the individual cases of Bryant v. Mattel, Inc., CV 04-09049; Mattel, Inc. v. Bryant, CV 04-09059; and MGA Entertainment, Inc. v. Mattel, Inc., CV 05-02727. This Order rules on Motions to Dismiss previously docketed in cases 04-09049 and 04-9059.

The factual background underlying this consolidated action is complex. The Court sets forth the factual background only to the extent that it is necessary to discuss its ruling on two pending motions to dismiss. A hearing regarding these motions was held on June 26, 2006. For the reasons and in the manner set forth below, the Court grants both motions.

DOCKETED ON CM
JUL 18 2006
04

EXHIBIT    1 05

PAGE       1603          7-18

Received: 7/18/06 4:41PM    RightFAX -> JetFax    '20;   Page 3
RightFAX              7/_d/2006 4:37   PAGE 003/019   Fax Server

## II. Motion to Dismiss (04-09049)

### A.    Factual Background

Carter Bryant is a designer to whom creation of MGA's "Bratz" line of dolls has been attributed. Compl. ¶ 6. Mattel has sued him under a variety of state-law theories relating to certain agreements Bryant signed while an employee with Mattel. See generally Compl. filed in 04-09059. Although Mattel has not sued him for copyright infringement of any Mattel product, Bryant nevertheless claims that he is reasonably apprehensive regarding being sued for copyright infringement. Specifically, Bryant makes the following allegations in his complaint seeking declaratory relief:

First, Bryant claims that an article published in the Wall Street Journal in July, 2003, attributed to Mattel sources a belief that "the Bratz borrow liberally from a Mattel project that was scrapped at the testing stage in 1998." Compl. Ex. A; Compl. ¶ 54. The scrapped Mattel project is alleged to be the project referred to by Mattel as "Toon Teens." Compl. ¶ 56.

Second, Bryant alleges that he suggested, as a way to resolve a discovery dispute, that Mattel stipulate that it would not sue based on "Toon Teens." Compl. ¶ 55. Mattel refused to do so. Id. However, since that initial refusal, Mattel has represented to the Court that it "will not maintain that Bratz infringes the copyright in Toon Teens." June 26, 2006, Tr. at 64 (statement of Mattel counsel John B. Quinn). Mattel has reiterated this position in a post-hearing brief, filed on July 5, 2006.

Third, Mattel cooperated with a Hong Kong toy company that MGA sued for copyright infringement. Compl. ¶ 56. MGA's claims involved the Bratz dolls. Id. Mattel's cooperation consisted of providing the Hong Kong toy company with documents and photographs of the Toon Teens products, ostensibly to help prove that Bratz was not an original design and that Bryant had copied and infringed Toon Teens. Compl. ¶ 57.

Finally, Bryant notes that Mattel did not seek copyright registration until November, 2003, which is the same time Mattel claims it first learned of Bryant's

EXHIBIT _____ 105

PAGE _____ 1604

2

Received:   7/18/06   4:41PM         RightFAX -> JotFax   '20;   Page 4
RightFAX                7/18/2006 4:37     PAGE 004/019     Fax Server

1  contract with MGA. Compl. ¶¶ 59-60. Bryant alleges that registration of a copyright is

2  a necessary step to be taken prior to filing a copyright infringement action. Compl.

3  ¶ 60.

4  **B.     Standing to Seek Declaratory Relief**

5        The purpose of the Declaratory Judgment Act is "to relieve potential defendants

6  from the Damoclean threat of impending litigation which a harassing adversary might

7  brandish, while initiating suit at his leisure — or never." Societe de Conditionnement

8  v. Hunter Engineering Co., 655 F.2d 938, 943 (9th Cir.1981). However, a party

9  seeking declaratory relief must still satisfy the "case or controversy" requirement found

10  in 28 U.S.C. § 2201(a). Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc., 896

11  F.2d 1542,1555 (9th Cir. 1990). This requirement must be satisfied at the time the

12  suit is filed and must continue throughout the term of the suit. Id. at 1556 (citing

13  International Harvester Co. v. Deere & Co., 623 F.2d 1207, 1210 (7th Cir.1980)).

14        To meet this requirement, a party seeking declaratory relief must show that,

15  based on his reasonable perceptions, under all the circumstances of the case, there is

16  a substantial controversy between parties having adverse legal interests that causes

17  in the plaintiff a real and reasonable apprehension that he will be subject to liability,

18  and the controversy is of sufficient immediacy and reality to warrant declaratory relief.

19  Hal Roach, 896 F.2d at 1555. The apprehension must have been caused by the

20  defendant's actions. Id. (citing International Harvester, 623 F.2d at 1211).

21        Viewing Bryant's allegations in light of this standard, and in light of recent

22  developments, the Court must conclude that Bryant, although having a reasonable

23  apprehension of suit prior to counsel's representations regarding the intent to sue

24  based on Toon Teens, no longer has a reasonable apprehension that he will be

25  subject to liability. Bryant's Complaint, of course, makes reference to "other Mattel

26  products;" however, the substance of his allegations all address the product "Toon

27  Teens." The Wall Street Journal article is alleged to have involved Toon Teens.

28  Mattel's cooperation with the Hong Kong toy company allegedly involved Toon Teens.

EXHIBIT _105_

3

PAGE _1605_

1   The copyright registration referenced in the Complaint relates to Toon Teens. No

2   other allegations are made that might tend to raise a real and reasonable

3   apprehension that Bryant could be subject to liability for copyright infringement based

4   on any other Mattel product. Accordingly, Bryant has not met the standard for

5   asserting a claim for declaratory relief.

6   **C.**   **Ruling on Motion to Dismiss**

7        Accordingly, the Court **GRANTS** the Motion to Dismiss and dismisses without

8   prejudice Bryant's claim for declaratory relief. Should Bryant, through discovery or

9   otherwise, acquire a real and reasonable apprehension of being subject to liability on

10   the basis of another identifiable Mattel product, Bryant may file a declaratory relief

11   claim. A claim by Mattel of copyright infringement based on the Toon Teens product

12   is barred by counsel's representation; therefore, Bryant may not seek declaratory relief

13   regarding this issue.

14            **III. Motion to Dismiss (04-9059)**

15   **A.**   **Factual Background**

16        The parties make the following factual allegations and assert the following

17   claims and counterclaims.

18        Bryant was employed by Mattel from September, 1995, to April, 1998, and

19   again beginning in January, 1999, and ending in October, 2000. Compl. ¶ 9. In

20   January, 1999, Bryant signed documents entitled "Employee Confidential Information

21   and Inventions Agreement" ("Employee Agreement") and "Conflict of Interest

22   Questionnaire" ("COI Questionnaire"). The Employee Agreement provides:

23        This Agreement is designed to make clear that: (I) I will maintain the

24        confidentiality of the Company's trade secrets; (ii) I will use those trade

25        secrets for the exclusive benefit of the Company; (iii) inventions that I

26        create will be owned by the Company; (iv) my prior and continuing

27        activities separate from the Company will not conflict with the Company's

28        development of its proprietary rights; and (v) when and if my employment

EXHIBIT ____ 105

PAGE ____ 1606

4

1   with the Company terminates I will not use my prior position with the

2   Company to the detriment of the Company.

3        1.    Provisions Related to Trade Secrets

4                                    . . . .

5        (b) As used in the Agreement, "Proprietary Information" means

6   any information (including formula, pattern, compilation, device, method,

7   technique or process) that derives independent economic value, actual

8   or potential, from not being generally known to the public or to other

9   persons who can obtain economic value from its disclosure or use, and

10   includes information on the Company, its customers, suppliers, joint

11   ventures, licensors, licensees, distributors and other persons and entities

12   with whom the Company does Business.

13        (c) I will not disclose or use at any time either during or after my

14   employment with the Company, any Proprietary Information except for

15   the exclusive benefit of the Company as required by my duties for the

16   Company, or as the Company expressly may consent to in writing, I will

17   cooperate with the Company and use my best efforts to prevent the

18   unauthorized disclosure, use or reproduction of all Proprietary

19   Information.

20                                    . . . .

21        2.    Ownership of Inventions

22        (a) I agree to communicate to the Company as promptly and fully

23   as practicable all inventions [as defined below] conceived or reduced to

24   practice to me (alone or jointly by others) at any time during my

25   employment by the Company, I hereby assign to the Company and/or its

26   nominees all my right, title and interest in such inventions, and all my

27   right, title and interest in any patents, copyrights, patent applications or

28   copyright applications based thereon. . . .

EXHIBIT ___105___

PAGE ___1607___

5

Received:    7/16/08   4:42PM          RightFAX -> JetFax     TO;  Page 7
RightFAX              7/13/2006 4:37    PAGE 007/019    Fax Server



1    (b) As used in this Agreement, the term "Inventions" includes, but

2    is not limited to, all discoveries, improvements, processes,

3    developments, designs, know-how, data computer programs and

4    formulae, whether patentable or unpatentable.

5    (c) Any provision in this Agreement requiring me to assign my

6    rights in any invention does not apply to an invention which qualifies

7    under the provision of Section 2870 of the California Labor Code.  That

8    section provides that the requirement to assign "shall not apply to an

9    invention that the employee developed entirely on his or her own time

10   without using the employer's equipment, supplies, facilities or trade

11   secret information except for those inventions that either (1) relate at the

12   time of conception or reduction to practice of the invention to the

13   employer's business, or actual or demonstrably anticipated research or

14   development of the employer; or (2) result from any work performed by

15   the employee for the employer."  I understand that I bear the burden of

16   proving that an invention qualifies under Section 2870.

17                                          . . . .

18       3.      Conflicts with Other Activities

19   (a) My employment with the Company requires my undivided

20   attention and effort.  Therefore, during my employment with the

21   Company, I will fully comply with the Company's Conflict of Interest

22   Policy, as it may be amended from time to time.  I shall not, without the

23   Company's express written consent, engage in any employment or

24   business other than for the Company, or invest in or assist (in any

25   manner) any business competitive with the business or future business

26   plans of the Company.

27       4.      Miscellaneous

28                                    . . . .    EXHIBIT ___105___

                                           6    PAGE ___1608___

Received:   7/18/08   4:43PM            RightFAX -> JetFax   20;   Page 8
RightFAX            7/13/2006 4:37    PAGE 008/019   Fax Server

1  (f) This agreement will be governed by and interpreted in

2  accordance with the laws of the State of California.

3  . . . .

4  CAUTION: THIS AGREEMENT CREATES IMPORTANT

5  OBLIGATIONS OF TRUST AND AFFECTS THE EMPLOYEE'S RIGHTS

6  TO INVENTIONS THE EMPLOYEE MAY MAKE DURING HIS OR HER

7  EMPLOYMENT.

8  Employment Agreement, attached to the Compl. as Ex. A.[1]

9  **B.    The Parties' Claims**

10  Mattel brings a number of claims based on these documents, including breach

11  of contract, breach of fiduciary duty, breach of the duty of loyalty, unjust enrichment,

12  and conversion.

13  Bryant brings a number of counterclaims based on these documents.

14  Specifically, Bryant makes the following challenges to the Employment Agreement:

15  In his first counterclaim, Bryant claims that the Employment Agreement violates

16  Cal. Bus. & Prof. Code §§ 17200 (unfair competition law) because (a) it is an unfair

17  restraint of trade (restricting job mobility and use of publicly available information) in

18  violation of Cal. Bus. & Prof. Code § 16600; (b) it violates Cal. Labor Code §§ 96(k),

19  98.6, and 2699; (c) it violates Cal. Labor Code § 2870; and (d) it is procedurally and

20  substantively unconscionable. See Bryant's Counterclaims ¶¶ 33-47.

21  In his second counterclaim, Bryant claims that the Employment Agreement

22  should be rescinded because it was procured due to mistake, duress, menace and/or

23

24  _____

25  [1] Bryant objects to the Court's consideration of the Agreement and the COI Questionnaire. Bryant purports to dispute the authenticity of these documents. However, examining the substance of Bryant's objections, it becomes clear that Bryant

26  objects not to the content of these documents, but to the validity and legal effect of these documents. Accordingly, the Court's consideration of these documents in

27  connection with the present Motion to Dismiss is proper. See Parrino v. FHP, Inc., 146

28  F.3d 699, 706 (9th Cir. 1998) (the Court may consider documents whose authenticity is not questioned and upon which the complaint necessarily relies).

7

EXHIBIT  105

PAGE  1609

Received:   7/18/06   4:43PM        RightFAX -> JetFax   20;   Page 9
RightFAX              7/18/2006 4:37   PAGE 009/019   Fax Server

1  fraud. See Bryant's Counterclaims ¶¶ 48-54.

2      In his third counterclaim, Bryant alleges that the Employment Agreement was

3  procured by fraud in that Mattel "fail[ed] to disclose to Bryant the true meaning of the

4  terms and the purported legal effect of the [Employment] Agreement." See Bryant's

5  Counterclaims ¶¶ 55-60.

6      Finally, in his fourth counterclaim, Bryant seeks declaratory judgment that

7  Mattel's conduct in requiring Bryant and other employees to execute the Employment

8  Agreement constitutes unfair competition and unfair business practices in violation of

9  Cal. Bus. & Prof. Code §§ 17200 and 16600.  Bryant also seeks a declaration that the

10  Employment Agreement is unlawful and unenforceable as to him and as to other

11  current and former employees of Mattel.  See Bryant's Counterclaims ¶¶ 61-65.

12  C.    **Standard for Dismissal Pursuant to Fed. R. Civ. P. 12(b)(6)**

13      The present Motion to Dismiss requires the Court to determine whether the

14  counterclaims state any claim upon which relief may be granted.  See Fed R. Civ. P.

15  12(b)(6).  The Court will not dismiss the claims for relief unless Bryant cannot prove

16  any set of facts in support of the claims that would entitle him to relief.  See Steckman

17  v. Hart Brewing, Inc., 143 F.3d 1293, 1295 (9th Cir. 1998).  In limiting its inquiry to the

18  content of the counterclaims, the Court must take the allegations of material fact as

19  true and construe them in the light most favorable to Bryant.  See Western Reserve

20  Oil & Gas Co. v. New, 765 F.2d 1428, 1430 (9th Cir. 1985).  Additionally, the Court "is

21  not required to accept legal conclusions cast in the form of factual allegations if those

22  conclusions cannot be reasonably drawn from the facts alleged."  Clegg v. Cult

23  Awareness Network, 18 F.3d 752, 755 (9th Cir. 1994).

24  D.    **§ 17200 Claim**

25      1.    **Generally**

26      "California's unfair competition law (UCL) (17200 et seq.) defines 'unfair

27  competition' to mean and include any unlawful, unfair or fraudulent business act or

28  practice. . . ."  Kasky v. Nike, Inc., 27 Cal.4th 939, 949, 119 Cal.Rptr.2d 296 (2002)

8

EXHIBIT __105__

PAGE __1010__

1   (internal quotation marks and citation omitted).  Because "section 17200 is written in

2   the disjunctive, it establishes three varieties of unfair competition--acts or practices

3   which are unlawful, unfair, or fraudulent."  Cel-Tech Communications v. Los Angeles

4   Cellular Telephone Co., 20 Cal.4th 163, 180, 83 Cal.Rptr.2d 548 (1999) (emphasis

5   added).  "Unlawful" practices are those practices that are prohibited by law, whether

6   "civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made."

7   Saunders v. Superior Court, 27 Cal.App.4th 832, 839 (citing People v. McKale, 25

8   Cal.3d 626, 632 (1979).  The prohibition against "unfair" conduct is not as broad as it

9   would seem.  In Cel-Tech, the California Supreme Court announced that the test of

10  "unfairness" for commercial cases: "Unfair" means "conduct that threatens an

11  incipient violation of an antitrust law, or violates the policy or spirit of one of those laws

12  because its effects are comparable to or the same as a violation of the law, or

13  otherwise significantly threatens or harms competition." Cel-Tech, 20 Cal.4th at 187.

14       **2.    Standing**

15       Bryant claims to be bringing the § 17200 "on his own behalf, on behalf of all

16  current and former employees of Mattel employees . . . and on behalf of the general

17  public."  See Counterclaims ¶ 10.  The parties disagree as to whether he may bring

18  such a claim on behalf of anyone other than himself and argue this point on state-law

19  grounds.  However, it is clear under established Ninth Circuit authority that Bryant's

20  purported claims on behalf of others suffer from a federal constitutional deficiency:

21  Bryant must satisfy the case-or-controversy requirement of Article III for any claim that

22  he brings under § 17200.  Bryant has not alleged facts that establish that he has

23  standing to bring his claims on behalf of anyone other than himself.[2]  See Lee v.

24  American Nat. Ins. Co., 260 F.3d 997, 1001 (9th Cir. 2001) (rejecting, on

25  constitutional grounds, a plaintiff's attempt to assert a § 17200 claim on behalf of

26  others noting that "Article III of the Constitution . . . limits the jurisdiction of the federal

27

28

---

[2] As stated below, Bryant has failed to state a claim on his own behalf as well.

9

EXHIBIT  105

PAGE  1611

Received:    7/18/06  4:44PM        RightFAX -> JetFax    to;  Page 11
RightFAX           7/18/2006  4:37    PAGE 011/019    Fax Server

1  courts to 'cases and controversies,' a restriction that has been held to require a

2  plaintiff to show, *inter alia*, that he has actually been injured by the defendant's

3  challenged conduct.") (citing <u>Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.,</u>

4  528 U.S. 167, 180, 120 S.Ct. 693 (2000)).

5      Absent class-action type allegations (and a successful motion to certify a class

6  pursuant to Fed. R. Civ. P. 23), it appears to the Court that Bryant cannot assert

7  claims challenging the Employee Agreement or the COI Questionnaire on behalf of

8  anyone other than himself.  Therefore, the Court considers only whether Bryant has

9  stated a claim pursuant to § 17200 on his own behalf.

10      **3.    Cal. Bus. & Prof. Code § 16600**

11      Bryant argues that the Agreement is "unlawful" because it violates Cal. Bus. &

12  Prof. Code § 16600, which provides: "Except as provided in this chapter, every

13  contract by which anyone is restrained from engaging in a lawful profession, trade, or

14  business of any kind is to that extent void."  <u>Id.</u>  Specifically, Bryant argues (without

15  further elaboration) that "the [Employment] Agreement unlawfully impair[s] Bryant's

16  right to prepare to compete with Mattel."  Opp. at 7.

17      California law permits an employee to seek other employment and even to

18  make some "preparations to compete" before resigning.  <u>See</u> <u>Bancroft-Whitney Co. v.</u>

19  <u>Glen</u>, 64 Cal.2d 327, 346 (1966) ("The mere fact that the officer makes preparations

20  to compete before he resigns his office is not sufficient to constitute a breach of duty.

21  It is the nature of his preparations which is significant.")  However, "an employee may

22  not transfer his loyalty to a competitor."  <u>Stokes v. Dole Nut Co.</u>, 41 Cal.App.4th 285,

23  295 (1995).  "During the term of employment, an employer is entitled to its employees'

24  undivided loyalty."  <u>Id.</u>  (internal citations and quotation marks omitted).

25      Mattel alleges in the Complaint that Bryant entered into an agreement with

26  MGA to provide MGA design services on a "top priority" basis while he was still

27  employed with by Mattel.  Compl. ¶ 13.  Bryant also makes similar allegations in the

28  related case, <u>Bryant v. Mattel, Inc.</u>, 04-09049: "MGA ultimately offered Bryant a

EXHIBIT ___ 105

PAGE ___ 1612

10

Received:   7/18/08   4:46PM          RightFAX -> JetFax   20;   Page 12
RightFAX                    7/13/2006 4:37    PAGE 012/019    Fax Server

1   consulting arrangement.  His agreement with MGA was signed on or about October 4,

2   2000.  Bryant resigned from Mattel immediately, giving two weeks notice, but stayed at

3   the company until October 20 to finish up and transition the projects on which he had

4   been working."  Compl. ¶ 38.

5          The parties' arguments assume that the Employment Agreement would prohibit

6   such conduct;[3] therefore, the Court considers whether an agreement prohibiting an

7   employee from entering into a contract with a competitor *during the course of his*

8   *employment* constitutes an unfair restraint of trade in violation of § 16600.  The Court

9   concludes that it does not.  Such an agreement is more akin to ensuring the employer

10  has the "employee's undivided loyalty" than it is to an agreement that restricts an

11  employee from "prepar[ing] to compete."  For this reason, Plaintiff cannot state a

12  § 17200 claim on this basis.

13          4.    Cal. Labor Code §§ 96(k), 98.6 and 2699

14          Bryant also argues that the Agreement is "unlawful" because it violates a

15  number of provisions of the California Labor Code.  Specifically, Bryant alleges that

16  the Agreement is "unlawful" because it violates § 96(k), which provides:

17          The Labor Commissioner and his or her deputies and

18          representatives authorized by him or her in writing shall, upon the filing

19          of a claim therefor by an employee, or an employee representative

20          authorized in writing by an employee, with the Labor Commissioner, take

21          assignments of: . . . (k) Claims for loss of wages as the result of

22          demotion, suspension, or discharge from employment for lawful conduct

23          occurring during nonworking hours away from the employer's premises.

24  Cal. Labor Code § 96(k).

25          Section 98.6 prohibits discrimination or retaliation against an employee who

26  engages in conduct described in §96(k).  Section 2699 authorizes a private right of

27

28  _____

[3] The Court does not mean to imply that Bryant has conceded this point.

11

EXHIBIT 105

PAGE 1013

Received:   7/18/06   4:46PM        RightFAX -> JetFax   20;   Page 13
RightFAX              7/18/2006 4:37   PAGE 013/019   Fax Server

1   action for certain violations of the Labor Code.

2        Assuming that § 96(k) would otherwise support a § 17200 claim, Bryant has still

3   failed to allege any "loss of wages" or "demotion, suspension or discharge" based on

4   lawful off-duty conduct.  Therefore, Bryant has not alleged facts sufficient to support a

5   violation of § 96(k) that would, in turn, support his § 17200 claim.

6        Despite Mattel's arguments against § 98.6 and § 2699 as a proper basis for

7   Bryant's § 17200 claim, Bryant did not defend such claims in his opposition; therefore,

8   the Court treats these claims as abandoned.

9        5.   **Cal. Labor Code § 2870**

10        Bryant also argues that the Agreement is "unlawful" because it violates Cal.

11   Labor Code § 2870.  That provision states:

12             (a) Any provision in an employment agreement which provides

13        that an employee shall assign, or offer to assign, any of his or her rights

14        in an invention to his or her employer shall not apply to an invention that

15        the employee developed entirely on his or her own time without using the

16        employer's equipment, supplies, facilities, or trade secret information

17        except for those inventions that either:

18             (1) Relate at the time of conception or reduction to practice of the

19        invention to the employer's business, or actual or demonstrably

20        anticipated research or development of the employer; or

21             (2) Result from any work performed by the employee for the

22        employer.

23             (b) To the extent a provision in an employment agreement

24        purports to require an employee to assign an invention otherwise

25        excluded from being required to be assigned under subdivision (a), the

26        provision is against the public policy of this state and is unenforceable.

27   Cal. Labor Code § 2870.

28        The Employment Agreement assigns the rights to certain inventions by the

12

EXHIBIT _105_

PAGE __1014__

Received:    7/18/06   4:45PM          RightFAX -> JotFax    20;  Page 14
RightFAX              7/18/2006 4:37    PAGE 014/019    Fax Server

1  employee to the Company. The Agreement limits the scope of this assignment to the

2  extent required by § 2870 by specifically incorporating and quoting § 2870. The

3  Agreement also informs the employee that he bears the burden of proving that the

4  invention falls within the scope of § 2870. This is consistent with California law. See

5  Cal. Labor Code § 2872 ("In any suit or action arising thereunder, the burden of proof

6  shall be on the employee claiming the benefits of its provisions.").

7      Therefore, Bryant cannot maintain a § 17200 claim based on § 2870.

8      **6.    Unconscionability**

9      Unconscionability has both procedural and substantive elements. Armendariz

10  v. Foundation Health Psychcare Services, Inc., 24 Cal.4th 83, 99 (2000). Both must

11  be present for a court to invalidate a contract or one of the contract's provisions. Id. at

12  114. However, "[t]he more substantively oppressive the contract term, the less

13  evidence of procedural unconscionability is required to come to the conclusion that the

14  term is unenforceable, and vice versa." Id.

15      Procedural unconscionability focuses on the elements of oppression and

16  surprise. Discover Bank v. Superior Court, 36 Cal.4th 148, 160 (2005). "Oppression

17  arises from an inequality of bargaining power which results in no real negotiation and

18  an absence of meaningful choice . . . . Surprise involves the extent to which the terms

19  of the bargain are hidden in a 'prolix printed form' drafted by a party in a superior

20  bargaining position." Crippen v. Central Valley RV Outlet, 124 Cal.App.4th 1159, 1165

21  (2004).

22      Substantive unconscionability focuses on the actual terms of the agreement

23  and evaluates whether they create "overly harsh" or "one-sided results." Armendariz,

24  24 Cal.4th at 114. To be substantively unconscionable, a contractual provision must

25  shock the conscience. California Grocers Assn. v. Bank of America, 22 Cal.App.4th

26  205, 214 (1994).

27      Here, Bryant alleges that the Employee Agreement is a contract of adhesion.

28  Counterclaims ¶ 26. For purposes of the present analysis, the Court assumes that the

13

EXHIBIT _105_

PAGE _1615_

1  Employment Agreement is procedurally unconscionable.  See Discover Bank v.

2  Superior Court, 36 Cal.4th 148, 160 (2005) ("The procedural element of an

3  unconscionable contract generally takes the form of a contract of adhesion, which,

4  imposed and drafted by the party of superior bargaining strength, relegates to the

5  subscribing party only the opportunity to adhere to the contract or reject it.") (internal

6  quotation marks and citation omitted).  However, upon examination of the terms of the

7  Employment Agreement, the Court is unable to conclude that the element of

8  substantive unconscionability has been met.  It is not surprising or overly harsh that

9  Mattel would expect its trade secrets and proprietary information to be kept

10  confidential; the same is true regarding Mattel's expectation that the works of its

11  design staff — created by Mattel's employees, using Mattel's resources, during time

12  for which Mattel paid the employee — be considered its property.  Therefore, Bryant

13  cannot state a claim based on unconscionability.

14      **7.    Cal. Labor Code §§ 232 and 232.5**

15      Although not pleaded in the Counterclaims, Bryant argues that his § 17200

16  claim is supported by an alleged violation of §§ 232 and 232.5.  These provisions

17  prohibit limitations on an employee's ability to disclose the amount of his or her wages

18  or information about his or her working conditions.  Bryant's arguments fail to address

19  how the Employment Agreement (which prohibits the disclosure of "trade secrets" and

20  "proprietary information") prevented him from disclosing the amount of his wages or

21  information about his working conditions.  Bryant has failed to state a § 17200 claim

22  based on §§ 232 and 232.5.

23      **8.    Unfairness**

24      As noted above, there is only a limited basis on which a plaintiff may challenge

25  conduct as an "unfair" business practice.  See Cel-Tech Communications, 20 Cal.4th

26  at 187 ("unfair" conduct that may be challenged pursuant to § 17200 is conduct that is,

27  or is similar to, conduct that constitutes a violation of antitrust laws).  Bryant's

28  allegations do not state a claim for an "unfair" business practice in violation of

14

EXHIBIT  105

PAGE  1616

Received:    7/18/06  4:46PM        RightFAX -> JetFax  '-20;  Page 16
RightFAX              7/__/2006 4:37    PAGE 016/019    Fax Server

§ 17200.

9.    **"Fraudulent" Conduct**

Bryant also argues that the same conduct complained of in connection with his fraud claim also supports a § 17200 claim based on the prohibition against "fraudulent" conduct. This claim is not cognizable. Bryant's fraud claim, explored more fully in the following section, is based upon Mattel's alleged failure to explain to him the terms of the Employment Agreement. However, to allege a "fraudulent business practice" under § 17200, a plaintiff must allege that "members of the public are likely to be deceived." Comm. on Children's Television, Inc. v. Gen. Foods Corp., 35 Cal.3d 197, 211 (1983). Bryant has not alleged facts that would tend to establish that the public might be deceived by Mattel's conduct regarding its employment practices.

E.    **Fraud Claim**

The parties agree that Bryant's fraud claim is one for fraudulent concealment, and that Bryant must allege all the elements set forth in Marketing West, Inc. v. Sanyo Fisher Corp., 6 Cal.App.4th 603, 612-13 (1992): (1) Mattel must have concealed or suppressed a material fact; (2) Mattel must have been under a duty to disclose the fact to Bryant; (3) Mattel must have intentionally concealed or suppressed the fact with the intent to defraud Bryant; (4) Bryant must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact; and (5) as a result of the concealment or suppression of the fact, Bryant must have sustained damage. Bryant alleges that "Mattel required [him] to execute the [Employment] Agreement without disclosing to him its true import and terms." Counterclaims ¶ 56. Bryant's claim is, in essence, that Mattel failed to inform him of the potential legal effect the Agreement might have; in other words, Bryant claims that Mattel failed to fully explain the Agreement to him. This does not support a fraudulent concealment claim.

Bryant argues, based on Marketing West, that because Mattel chose to

EXHIBIT  10 5
1617

Received:   7/18/06  4:47PM;                RightFAX -> JetFax M-20;  Page 17
RightFAX                     7/. /2006 4:37   PAGE 017/019   Fax Server

1   respond to his inquiries, Mattel was under a duty to disclose material facts. Under

2   Marketing West, where a party is "under no duty to speak" but nevertheless

3   "undertakes to do so, either voluntarily or in response to inquiries, he is bound not only

4   to state truly what he tells but also not to suppress or conceal any facts within his

5   knowledge which materially qualify those stated." Marketing West, 6 Cal.App.4th at

6   613 (citing Rogers v. Warden, 20 Cal.2d 286, 289 (1942)) (internal quotation marks

7   omitted). In other words, one who speaks "must make a full and fair disclosure." Id.

8        Bryant makes no allegations that suggest that anyone at Mattel falls into this

9   category. He alleges that he was "presented with the form Agreement by Mattel," and

10  that "he was told that his execution of the Agreement was a condition of his

11  employment." Counterclaims ¶ 26. He then alleges that "[t]he terms of the Agreement

12  were not explained to him." Id. This is not the situation discussed in Marketing West

13  which, not surprisingly, prohibits a party from disclosing only that part of the truth that

14  favors it. Here, Bryant's allegations complain that Mattel did not disclose anything

15  regarding the Employment Agreement.

16  F.   Rescission

17       Bryant asserts that rescission is proper because (1) the Agreement was

18  obtained through fraud; (2) Mattel required Bryant to execute the document as a

19  condition of employment, which resulted in duress; and (3) Mattel did not explain the

20  terms of the Agreement to Bryant, did not give him sufficient time to review it, and did

21  not permit or encourage him to seek legal counsel regarding the Agreement.

22       Bryant failed to state a fraud claim; therefore, rescission based on his fraud

23  claim would be improper.

24       Bryant's allegations do not meet the standard for duress, and Mattel's failure to

25  encourage him to seek legal counsel also does not require rescission of the

26  Employment Agreement. See Robison v. City of Manteca, 78 Cal.App.4th 452, 457

27  (2000). Additionally, although Bryant argues that he was not "given a meaningful

28  opportunity to review the Agreement at the time he executed it," he does not allege

16

EXHIBIT /65

PAGE 1618

Received:   7/18/06   4:47PM·                RightFAX -> JetFax N°20;   Page 18
RightFAX                    7/../2006  4:37    PAGE 018/019    Fax Server

1   that he asked for, and was refused, sufficient time to actually read the Agreement with

2   which he was presented.

3   **G.   Declaratory Relief**

4         Finally, in his fourth counterclaim, Bryant seeks declaratory judgment that

5   Mattel's conduct in requiring Bryant and other employees to execute the Employment

6   Agreement constitutes unfair competition and unfair business practices in violation of

7   Cal. Bus. & Prof. Code §§ 17200 and 16600.  This claim for declaratory relief fails

8   because the underlying § 17200 fails.

9         Bryant also seeks a declaration that the Employment Agreement is unlawful

10  and unenforceable as to him and as to other current and former employees of Mattel.

11  See Bryant's Counterclaims ¶¶ 61-65.  As discussed previously, Bryant has no

12  standing to assert claims on behalf of anyone other than himself.  As discussed

13  throughout this Order, Bryant has not sufficiently alleged that the Employment

14  Agreement is unlawful or unenforceable as to him.

15  **H.   Ruling on Motion to Dismiss (04-09059)**

16        The Motion to Dismiss is **GRANTED** in its entirety.  Bryant requested in his

17  Opposition for an opportunity to amend his counterclaims.  Therefore, the Court

18  dismisses Bryant's counterclaims without prejudice.  Bryant may file Amended

19  Counterclaims that conform with this Order within ten days of the entry of this Order.

20                               **IV. Conclusion**

21        For the reasons set forth above, the Court **GRANTS** the Motion to Dismiss in

22  04-09049 and **DISMISSES WITHOUT PREJUDICE** Bryant's action for declaratory

23  relief.  The Court also **GRANTS** the Motion to Dismiss in 04-09059, and **DISMISSES**

24  **WITHOUT PREJUDICE** Bryant's counterclaims.  Bryant is granted ten days' leave to

25  amend the counterclaims in conformity with this Order.

26

27

28

                                    /05

                                    169

Received:    7/18/06   4:47PM·              RightFAX -> JetFax ''20;   Page 19
RightFAX                  7/  /2006 4:37    PAGE 019/019    Fax Server

1      Although this Order dismisses the Complaint in 04-09049, any future filings in

2 the consolidated action shall continue to be filed under 04-09049 in conformity with

3 the Court's consolidation order.

4      IT IS SO ORDERED.

5 DATE:   7 - 17 - 06

6

7                STEPHEN G. LARSON
                UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 105

PAGE 1620

18

**EXHIBIT  106**

JUN 2 0 2006

**PRIORITY SEND &
ENTER JS-6**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
CIVIL MINUTES – GENERAL

Case No.    CV 05-02727 SGL(RNBx)                    Date: June 19, 2006

Title:    MGA ENTERTAINMENT, INC. -v- MATTEL, INC.

========================================================================

PRESENT:  HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

        Jim Holmes                          None Present
        Courtroom Deputy                    Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:   ATTORNEYS PRESENT FOR DEFENDANTS:

None present                        None present

PROCEEDINGS:    MINUTE ORDER (IN CHAMBERS) RE CONSOLIDATION

    On May 16, 2006, this Court issued orders to show cause why the following three cases should not be consolidated: Bryant v. Mattel, Inc.; CV 04-09049; Mattel, Inc. v. Bryant, CV 04-09059; MGA Entertainment, Inc. v. Mattel, Inc., CV 05-02727. All parties have responded, and the Court has reviewed those responses. Because the Court has determined that these actions involve a number of common issues of law and fact, the Court orders that these three cases be consolidated for all purposes.

    Mattel's request that the Court stay MGA Entertainment, Inc. v. Mattel, Inc., CV 05-02727, pending the outcome of the other two cases. The Court denies this request.

    For ease of record keeping, the Court **ORDERS** that all further documents and proceedings occur under Bryant v. Mattel, 04-09049 SGL, and that Case Number CV 04-09059 and 05-02727 be **CLOSED** by the Clerk. Counsel are directed to file all further documents under Case Number CV 04-09049. The first paragraph of any document filed with the Court shall inform the Court to which case(s) the document relates.

    IT IS SO ORDERED.

MINUTES FORM 90
CIVIL – GEN

EXHIBIT ___10 b___

PAGE ___1621___

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
Priority ___✓___    Send ___
Entered ___    Closed ___
JS-5/JS-6 ___    JS-2/JS-3 ___
Scan Only ___    Docketed on CM ___ /Initials of Deputy Clerk __jh__
___THIS CONSTITUTES NOTICE OF
ENTRY AS REQUIRED BY FRCP 77(d)
JUN 2 0 2006
EASTERN DIVISION

#47

**EXHIBIT   107**

1

1      UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA

3          EASTERN DIVISION

4             - - -

5    HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6             - - -

7  CARTER BRYANT, INDIV,                    )
                                            )
8                    PLAINTIFF,             )
                                            )
9            VS.                            )   NO. ED CV 04-09049
                                            )   (LEAD LOW NUMBER)
10  MATTEL, INC.,                           )
                                            )
11                   DEFENDANTS.            )
   _____ )
12  AND RELATED ACTIONS,                    )
   _____ )
13

**CERTIFIED COPY**

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15             RIVERSIDE, CALIFORNIA

16            MONDAY, JANUARY 8, 2007

17               10:26 A.M.

18

19

20

21

22

23          THERESA A. LANZA, RPR, CSR
         FEDERAL OFFICIAL COURT REPORTER
24          3470 12TH STREET, RM. 134
         RIVERSIDE, CALIFORNIA  92501
25             (951) 274-0844
            CSR11457@SBCGLOBAL.NET

EXHIBIT _____187_____

PAGE _____11022_____

1-8-07          ED CV 04-09049

15

1    AND THEY ARE IN THE 'OR.'  THEY'RE NOT ALL OF THEM; ANY ONE OF

2    THEM COULD SURVIVE.

3              IN THIS SITUATION, EVERY SINGLE FACTOR IS IN PLACE

4    WITH REGARD TO THEIR COPYRIGHT INFRINGEMENT AND THEIR TORTIOUS

5    INTERFERENCE CLAIMS, AT LEAST WITH REGARD TO MGA AND LARIAN.      10:42

6              LET'S TALK ABOUT UNDUE DELAY, BECAUSE AS JACKSON SAID

7    IN THE NINTH CIRCUIT, IN DETERMINING WHETHER THERE'S DELAY,

8    COURTS LOOK TO WHETHER THE MOVING PARTY KNEW OR SHOULD HAVE

9    KNOWN THE FACTS AND THEORIES RAISED BY THE AMENDMENT IN THE

10   ORIGINAL PLEADING.                                               10:43

11             SO YOU'VE GOT TO LOOK BACK AT THE ORIGINAL PLEADING.

12             AND THE AMENDMENT IS NOT VIEWED FAVORABLY WHEN THE

13   PLAINTIFF KNEW THE FACTS AND THEORIES SINCE THE INCEPTION.  AND

14   THE NINTH CIRCUIT, EVEN IN THE ACURA CASE, WENT ON TO

15   SPECIFICALLY SAY, IF SOMEBODY IS PLAYING A TACTICAL GAME IN      10:43

16   CHOOSING NOT TO DO SOMETHING, THAT'S REALLY NOT GOING TO BE

17   FAVORED.

18             NOW, LET'S LOOK AT TORRES EXHIBIT G.

19             TORRES EXHIBIT G IS THE ANONYMOUS LETTER THAT WAS

20   SENT IN AUGUST OF 2002 TO MATTEL'S CEO, BOB ECKERT.  AND THINK   10:43

21   HOW MUCH IT EXACTLY TRACKS BOTH THEIR ORIGINAL COMPLAINT AND

22   THE AMENDED COMPLAINT.

23             "I HAVE INFORMATION MATTEL SHOULD INVESTIGATE.  IN

24   2000, A MATTEL EMPLOYEE BY THE NAME OF CARTER BRYANT WAS

25   WORKING WITH MATTEL TO DESIGN DOLLS.  ONE OF THE DOLLS HE WAS    10:44

EXHIBIT _10X_

1    WORKING ON CREATING WAS THE BRATZ DOLLS."  IT GOES ON TO SAY,

2    "WHILE HE WAS WORKING WITH MATTEL AND WORKING TO CREATE THESE

3    DOLLS, HE WORKED OUT A DEAL WITH MGA THAT LET HIM COLLECT MONEY

4    IN EXCHANGE FOR THESE DOLLS BEING HIS."

5         MGA KNEW THAT CARTER WAS AN EMPLOYEE WITH MATTEL AND          10:44

6    THAT IT WAS WRONG TO PAY HIM TO STEAL THIS PRODUCT FROM MATTEL.

7         THE COURT:  COUNSEL, I WOULD HATE TO HAVE SOMEONE

8    BRING A COMPLAINT BASED ON AN ANONYMOUS LETTER.  I MEAN, THE

9    LANGUAGE IN THE LETTER ITSELF STATES THAT THIS IS SOMETHING

10   MATTEL SHOULD INVESTIGATE.  MR. QUINN'S POSITION IS TO SATISFY     10:44

11   THE RULE 11 REQUIREMENT.  THAT'S EXACTLY WHAT THEY DID, AND

12   THAT'S WHAT THEY HAVE BEEN DOING, AND NOW THEY'RE SATISFIED,

13   FROM THEIR PERSPECTIVE, THAT THE INFORMATION IS TRUE.

14        MS. CENDALI:  WELL, FIRST OFF, YOUR HONOR, THIS

15   LETTER IS NOT TRUE.  BUT TO BE CLEAR -- JUST TO BE CLEAR THAT      10:44

16   MR. ECKERT DIDN'T JUST PUT IT IN A BOX, HE ASKED HIS HEAD OF HR

17   TO HAVE HIS HEAD OF SECURITY INVESTIGATE IT.  WHAT THEY DID

18   BEYOND THAT WE DON'T KNOW BECAUSE THEY REFUSE TO ANSWER

19   QUESTIONS AND TO PRODUCE A PRIVILEGE LOG ABOUT IT.

20        BUT WHAT WE DO KNOW IS, ON APRIL 27, 2004, THEY WERE          10:45

21   ABLE TO FILE THE ORIGINAL COMPLAINT IN THIS ACTION AGAINST

22   MR. BRYANT; SO CLEARLY, THEY HAD SATISFIED THEIR DUE DILIGENCE

23   OBLIGATIONS --

24        THE COURT:  WITH RESPECT TO THAT ASPECT, RIGHT.  BUT

25   I CERTAINLY KNOW THAT O'MELVENY & MYERS WOULD NOT FILE A          10:45

EXHIBIT 107

PAGE 1624

1-8-07          ED CV 04-09049

17

 1  COMPLAINT BASED ON AN ANONYMOUS LETTER FROM SOMEBODY SUGGESTING

 2  THAT THERE IS A COPYRIGHT INFRINGEMENT.

 3           MS. CENDALI:  WELL, IF THEY INVESTIGATE IT AS THEY

 4  SHOULD, BECAUSE THERE IS A DUTY OF INQUIRY WITH REGARD TO

 5  ALLEGATIONS.  THEY WERE ON INQUIRY NOTICE AT THIS TIME.  AND      10:45

 6  THEN LET'S TAKE A LOOK AT WHAT THEIR ACTUAL COMPLAINT ENDED UP

 7  SAYING THAT THEY FILED AGAINST --

 8           THE COURT:  COUNSEL, I UNDERSTAND.  IT SAID THE

 9  SAME -- I UNDERSTAND YOUR ARGUMENT.  THERE'S NOTHING WHICH

10  REFUTES THE POSITION OF MR. QUINN THAT IT TOOK HIM THAT LONG,    10:46

11  THIS MUCH TIME, TO REASONABLY AND DILIGENTLY INVESTIGATE THIS.

12           MS. CENDALI:  BUT THIS IS THE POINT I WANT TO MAKE,

13  YOUR HONOR, AND IT'S IN PARAGRAPHS 12, 19, 23, 30, 36, AND 41

14  OF THE ORIGINAL COMPLAINT.  WHAT I'M TRYING TO SAY IS THAT THE

15  ORIGINAL COMPLAINT ALLEGED AT ITS TIME -- THOUGH IT DIDN'T NAME   10:46

16  MGA AND LARIAN BY NAME, THEY ADMITTED THAT THEY HAD A COPY OF

17  HIS CONTRACT WITH MGA.  IT SAID MGA ON IT.  IT WAS SIGNED BY

18  MR. LARIAN.  AND WHAT DID THEY SAY?

19           THEY DIDN'T JUST SAY THINGS ABOUT BRYANT.  THEY SAID

20  THAT, IN PARAGRAPH 12, "MATTEL LEARNED THAT BRYANT HAD SECRETLY   10:46

21  AIDED, ASSISTED AND WORKED FOR A MATTEL COMPETITOR, INCLUDING

22  WITH THAT LIMITATION BY ENTERING INTO AN AGREEMENT.  IN

23  ADDITION, WHILE BRYANT WAS EMPLOYED, BRYANT AND THE OTHER

24  DEFENDANTS CONVERTED MISAPPROPRIATE AND MISUSED MATTEL

25  PROPERTY."  IT GOES ON TO SAY THAT IT --                         10:47

30

1

2

3                                    CERTIFICATE

4

5    I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
     STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
6    THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE
     ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
7    CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
     THE UNITED STATES.

8

9    _Theresa A. Lanza_                          _7-9-07_
10   THERESA A. LANZA, RPR, CSR                      DATE
     OFFICIAL COURT REPORTER

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT 107

PAGE 1626

1-8-07          ED CV 04-09049

**EXHIBIT   108**

**THIS EXHIBIT IS FILED UNDER SEAL
PURSUANT TO PROTECTIVE ORDER**

**EXHIBIT   109**

**THIS EXHIBIT IS FILED UNDER SEAL
PURSUANT TO PROTECTIVE ORDER**

**EXHIBIT   110**

1  THOMAS J. NOLAN (Bar No. 66992)
   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
2  300 South Grand Avenue
   Los Angeles, California 90071-3144
3  Telephone: (213) 687-5000
   Facsimile:  (213) 687-5600
4  E-mail:    tnolan@skadden.com

5  RAOUL D. KENNEDY (Bar No. 40892)
   TIMOTHY A. MILLER (Bar No. 154744)
6  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
   Four Embarcadero Center, 38th Floor
7  San Francisco, California 94111-5974
   Telephone: (415) 984-6400
8  Facsimile:  (415) 984-2698
   E-mail:    rkennedy@skadden.com

9
   Attorneys for Cross-Defendants
10 MGA Entertainment, Inc., MGA Entertainment (HK) Limited,
   MGAE De Mexico, S.R.L. De C.V., and ISAAC LARIAN

11                   UNITED STATES DISTRICT COURT

12                 CENTRAL DISTRICT OF CALIFORNIA

13                        EASTERN DIVISION

14
   CARTER BRYANT, an individual        )  CASE NO. CV 04-9049 SGL (RNBx)
15                                      )
                  Plaintiff,            )  Consolidated with Case No. 04-9059
16                                      )  and Case No. 05-2727
        v.                             )
17                                      )  **DISCOVERY MATTER**
   MATTEL, INC., a Delaware            )
18 corporation                         )  **ISAAC LARIAN'S THIRD**
                                        )  **SUPPLEMENTAL RESPONSES TO**
19                Defendant.            )  **MATTEL, INC.'S AMENDED**
                                        )  **FOURTH SET OF**
20 _____        )  **INTERROGATORIES**
   Consolidated with MATTEL, INC. v.   )
21 BRYANT and MGA                      )
   ENTERTAINMENT, INC. v.              )
22 MATTEL, INC.                         )
                                        )  **Phase 1:**
23                                      )  Discovery Cut-Off:  January 28, 2008
   **CONFIDENTIAL – ATTORNEYS'**        )  Pre-Trial Conference: May 5, 2008
24 **EYES ONLY**                        )  Trial Date:          May 27, 2008
                                        )
25
   PROPOUNDING PARTY:      MATTEL, INC. ("MATTEL")
26
   RESPONDING PARTY:       ISAAC LARIAN
27
   SET NUMBER:             AMENDED FOURTH
28
                           1-28-08
   LARIAN'S 3RD SUPPLEMENTAL RESPONSE TO MATTEL'S AMENDED 4TH SET OF INTERROGATORIES

EXHIBIT 110
PAGE 1744

**PRELIMINARY STATEMENT**

1
2          The General Response set forth herein applies to all responses that
3    Isaac Larian ("Larian") is providing in response to these interrogatories (the
4    "Interrogatories") or may in the future provide in response to any discovery request
5    in this action. The Response is made without waiving, or intending to waive but, on
6    the contrary, expressly reserving: (a) the right to object, on the grounds of
7    competency, privilege, relevancy or materiality, or any other proper grounds, to the
8    use of the Response, for any purpose in whole or in part, in any subsequent step or
9    proceeding in this action or any other action; (b) the right to object on any and all
10   grounds, at any time, to other interrogatories or other discovery procedures; and (c)
11   the right at any time to revise, correct, add to, or clarify any of the responses
12   propounded herein.

13          The Response reflects only the present state of Larian's discovery
14   regarding the information that Mattel seeks.  Discovery for Phase Two and other
15   investigation or research concerning this litigation are continuing. It is anticipated
16   that further discovery, independent investigation, and legal research and analysis will
17   supply additional facts and meaning to the known facts, as well as establish entirely
18   new factual conclusions, all of which may lead Larian to discover other information
19   responsive to these Interrogatories. Larian therefore reserves the right to amend or
20   supplement this Response at any time in light of future investigation, research or
21   analysis, and also expressly reserves the right to rely on, at any time, including trial,
22   subsequently discovered information omitted from this Response as a result of
23   mistake, error, oversight or inadvertence. Larian does not hereby admit, adopt or
24   acquiesce in any factual or legal contention, assertion or characterization contained
25   in the Interrogatories or any particular request therein, even where Larian has not
26   otherwise objected to a particular interrogatory, or has agreed to provide information
27   responsive to a particular interrogatory.

28          No incidental or implied admissions are intended by this Response.

1

EXHIBIT _____ 11 0

PAGE _____ 1745

1   These responses should not be taken as an admission that Larian accepts or admits

2   the existence of any facts set forth or assumed by any instruction, definition or

3   interrogatory.

### GENERAL OBJECTIONS

5           Larian responds to these Interrogatories subject to the following general

6   objections and limitations, each of which is incorporated into each and every

7   response as though fully set forth therein:

8           1.    Larian objects to these Interrogatories to the extent they seek

9   information that is not subject to disclosure under any applicable privilege, doctrine

10  or immunity, including without limitation the attorney-client privilege, the work

11  product doctrine, the right of privacy, and all other privileges recognized under the

12  constitutional, statutory or decisional law of the United States of America, the State

13  of California or any other applicable jurisdiction. Larian shall not produce such

14  information in response to Mattel's interrogatories. Any disclosure of such protected

15  or privileged information is inadvertent and shall not be construed as a waiver of

16  those privileges or protections. Larian reserves the right to correct the record with

17  regard to any such inadvertent disclosure, as provided for in the Protective Order

18  governing this case.

19          2.    Larian objects to these Interrogatories to the extent they seek

20  information not relevant to the claims or defenses of any party to this action and not

21  reasonably calculated to lead to the discovery of admissible evidence.

22          3.    Larian objects to these Interrogatories to the extent they seek

23  information which by reason of public filing or otherwise is already in Mattel's

24  possession or is readily accessible to Mattel.

25          4.    Larian objects to these Interrogatories to the extent they seek the

26  disclosure of information (1) not within his possession, custody or control; (2) that

27  Larian cannot locate after a reasonably diligent search; or (3) that refer to persons,

28  entities, or events not known to Larian. Such instructions, definitions, or requests are

2

EXHIBIT _1/0_

PAGE _1746_

)                                              )

1 | objectionable where they seek to require more of Larian than any obligation imposed
2 | by the Federal Rules of Civil Procedure; subject Larian to unreasonable and undue
3 | annoyance, oppression, burden, and expense; and/or seek to impose upon Larian an
4 | obligation to investigate or discover information or materials from sources equally
5 | accessible to Mattel.

6 |         5.     Larian objects to these Interrogatories to the extent they are
7 | overbroad and unduly burdensome.

8 |         6.     Larian objects to the definitions and instructions to the extent
9 | such definitions and instructions purport to enlarge, expand, or alter in any way the
10 | plain meaning and scope of any specific term or specific interrogatories on the
11 | ground that such enlargement, expansion, or alteration renders such a term or request
12 | vague, ambiguous, unintelligible, overly broad, unduly burdensome, and/or
13 | uncertain.

14 |         7.     Larian objects to the terms YOU, YOUR, BRYANT, LARIAN,
15 | MGA, MATTEL, AFFILIATES, PERSON, PERSONS, DESIGN, DESIGNS,
16 | BRATZ, SOLD, SELL, SALE, BRATZ DOLL, BRATZ PRODUCT, BRATZ
17 | MOVIE, BRATZ TELEVISION SHOW, BASED ON, and REFER OR RELATE
18 | TO on the grounds that these terms render the interrogatories overbroad, unduly
19 | burdensome, vague and ambiguous and to the extent that they could be read to call
20 | for legal conclusions in responding to the interrogatories, including, by way of
21 | example and without limitation, as follows:

22 |         (a)    Larian objects to the definition of the term "BRATZ"
23 | (Definitions ¶ 9) as vague, ambiguous, overly broad and unduly burdensome, and
24 | designed to mislead and confuse the trier of fact. The definition includes "any
25 | project, product, doll or DESIGN ever known by [the Bratz] name (whether in whole
26 | or in part and regardless of what such project, product or doll is or has been also,
27 | previously or subsequently called) and any product, doll or DESIGN or any portion
28 | thereof that is now or has ever been known as, or sold or marketed under, the name

3

EXHIBIT _110_

PAGE _1747_

1 || or term 'Bratz' (whether in whole or in part and regardless of what such product, doll
2 || or DESIGN or portion thereof is or has been also, previously or subsequently called)
3 || or that is now or has ever been sold or marketed as part of the 'Bratz' line, and each
4 || version or iteration of such product, doll or DESIGN or any portion thereof," and it
5 || goes on. By incorporating the definition of DESIGN, the overly broad definition of
6 || BRATZ includes two-dimensional and three-dimensional representations, including
7 || "works, designs, artwork, sketches, drawings, illustrations, representations,
8 || depictions, blueprints, schematics, diagrams, images, sculptures, prototypes, models,
9 || samples, rotocasts, reductions to practice, developments, inventions and/or
10 || improvements ...." (Definitions ¶ 8.) These convoluted and multi-part definitions
11 || combine to render the interrogatories vague, ambiguous and overly broad, and to
12 || include within the term BRATZ things that do not fairly represent the Bratz line of
13 || dolls, accessories and related products that are the subject of this case. In responding
14 || to these interrogatories, Larian will interpret the term BRATZ to mean the line of
15 || dolls introduced by MGA to the market for sale in May or June of 2001 and
16 || subsequent dolls, accessories and other products known as Bratz or associated by
17 || Larian with the Bratz line of dolls;

18 ||          (b)     Larian objects to the definition of the term "BRATZ
19 || DOLL" (Definitions ¶ 12) as vague, ambiguous, overly broad and unduly
20 || burdensome, and designed to mislead and confuse the trier of fact. The definition
21 || includes any doll that "REFERS OR RELATES TO BRATZ." Mattel's definition of
22 || the terms "BRATZ" and "REFERS OR RELATES" renders the definition of
23 || "BRATZ DOLL" unintelligible because Larian cannot know, by way of example,
24 || what dolls may "deal with, comment on, respond to,... or pertain" (Definitions ¶ 17)
25 || to "BRATZ." In responding to these interrogatories, Larian will interpret the term
26 || "BRATZ DOLL" to mean the line of dolls introduced by MGA to the market for sale
27 || in May or June of 2001 and subsequent dolls known as Bratz;

28 ||          (c)     Larian objects to the definition of the term "BASED ON,"

LARIAN'S 3RD SUPPLEMENTAL RESPONSE TO MATTEL'S AMENDED 4TH SET OF INTERROGATORIES

EXHIBIT ___110___

PAGE ___1748___

1  as vague, ambiguous, overly broad and unduly burdensome, and designed to mislead
2  and confuse the trier of fact. The definition strays far from the English meaning of
3  "based on" by including terms loaded with legal significance in intellectual property
4  law, such as "substantially similar to," or "a derivative of." In responding to these
5  interrogatories, Larian will not interpret the term "BASED ON," but rather will
6  respond using "based on" in its normal accepted meaning.

7          (d)    Larian objects to the terms "IDENTIFY" or "IDENTITY"
8  as overbroad, unduly burdensome, vague, ambiguous, and oppressive. Mattel's
9  definition of these terms inherently call for answers to multiple discrete questions or
10 subparts to questions. For example, when those terms are used to reference any
11 BRATZ PRODUCT, the use of those terms requests at least 6 different and distinct
12 facts: (a) the full name of the product; (b) the number of the product; (c) the SKU of
13 the number; (d) any other applicable designation of the product useful for
14 identification; (e) the period of time during which the product was, has been, or will
15 be sold; and (f) the identity of each person who has licensed from YOU the right to
16 sell such BRATZ PRODUCT. Therefore, any interrogatory that includes or
17 incorporates the terms IDENTIFY or IDENTITY are necessarily compound and
18 should be posed as separate interrogatories.

19         (e)    Larian objects to the term "any" and "REFER OR
20 RELATE TO" on the grounds and to the extent that they are overbroad, unduly
21 burdensome, and/or are vague and ambiguous in the context of the interrogatories as
22 written and as those interrogatories would be plainly understood absent Mattel's
23 definitions.

24      8.    Larian objects to these interrogatories to the extent that they may
25 unfairly seek to restrict the facts on which Larian may rely at trial. Discovery has not
26 been completed and Larian is not yet necessarily in possession of all the facts and
27 documents upon which Larian intends to rely. All of the responses submitted
28 herewith are tendered to Mattel with the reservation that the responses are submitted

EXHIBIT ____ 1\ \0

PAGE ____ 1749

1 | without limiting the evidence on which Larian may rely to support the contentions
2 | and defenses that Larian may assert at the trial of this action and to rebut or impeach
3 | the contentions, assertions and evidence that Mattel may present. Larian reserves the
4 | right to supplement or amend these responses at a future date.

5 |      9.    Larian objects to each interrogatory to the extent that it seeks
6 | information that will be the subject of expert witness testimony and that is therefore
7 | premature.

8 |      10.   In responding to these interrogatories, Larian has not and will not
9 | comply with any instructions or definitions that seek to impose requirements in
10 | addition to those imposed by the Federal Rules of Civil Procedure and any applicable
11 | local rule, any orders entered by the Court in this Action, or other applicable law.

12 |      11.   Consistent with Rule 33(d) of the Federal Rules of Civil
13 | Procedure, Larian objects to providing responses to interrogatories that can be
14 | derived from documents that have or will be produced (when requested in
15 | compliance with Rule 26) and where the burden to derive such information is
16 | substantially the same for Mattel as it is for Larian.

17 |      12.   Larian objects to each interrogatory to the extent that it seeks the
18 | disclosure of confidential, proprietary, or trade-secret information.

19 |      13.   Larian objects to each interrogatory to the extent that it calls for a
20 | legal conclusion.

21 |      14.   Larian objects to several of those interrogatories that appear to be
22 | directed at other parties to the litigation and not to Larian, given the nature of the
23 | claims asserted against Larian in this case.

24 |      15.   Larian reserves the right to object on any ground at any time to
25 | such other or supplemental discovery requests as Mattel may propound involving or
26 | relating to the same subject matter of these interrogatories.

27 |      16.   To the extent Larian responds to an interrogatory, he does so
28 | without waiving or intending to waive but rather, on the contrary, preserving and

LARIAN'S 3RD SUPPLEMENTAL RESPONSE TO MATTEL'S AMENDED 4TH SET OF INTERROGATORIES

EXHIBIT _____ _11 0_
_1760_

1 | intending to preserve, his contention that anything Mr. Bryant did on weekends,
2 | evenings, vacation and any other time outside ordinary business hours was not done
3 | while he was working for Mattel. Larian's response may not be taken as an admission
4 | that the information he provides in his response in any way reflects or evidences
5 | work performed by Mr. Bryant while he was working for Mattel or that Larian
6 | adopts or agrees with any fact or legal conclusion assumed, presumed or contained in
7 | Mattel's interrogatory.

8 |      17.    Larian objects to each of Mattel's interrogatories because Mattel
9 | has propounded more than 50 interrogatories, including discrete subparts. Under
10 | Judge Larson's order of February 22, 2007, "Interrogatories are limited to 50 for each
11 | side for both [Case Nos. CV 04-04049-SGL and CV 05-02727]."

12 |      18.    Larian's responses are made based on his understanding and
13 | interpretation of each interrogatory. Larian reserves the right to supplement its
14 | objections and responses should Mattel subsequently put forth an interpretation of
15 | any interrogatory that differs from those of Larian.

16 | **OBJECTIONS AND RESPONSES TO SPECIFIC INTERROGATORIES**

17 |      Without waiving or departing from his General Response and General
18 | Objections, and specifically incorporating them in his response to each Interrogatory
19 | below, Larian makes the following additional objections and responses to specific
20 | Interrogatories:

21 | **INTERROGATORY NO. 42:**

22 |      State all facts that support YOUR contention, if YOU so contend, that
23 | any BRATZ DOLLS are not BASED ON BRATZ DESIGNS created by BRYANT
24 | on or before October 19, 2000, and IDENTIFY all PERSONS with knowledge of
25 | such facts and all DOCUMENTS that REFER OR RELATE TO such facts.

26 | **RESPONSE TO INTERROGATORY NO. 42:**

27 |      Larian incorporates by reference his General Response and General
28 | Objections above, as though fully set forth herein and specifically incorporates

7

EXHIBIT _____ 110

PAGE _____ 1751

1  General Objection No. 7 (regarding Definitions), including without limitation
2  Larian's objection to the definition of the terms BASED ON, BRATZ DOLLS,
3  BRATZ, DESIGN, IDENTIFY and REFER OR RELATE TO, and further objects to
4  this interrogatory on the ground that it is overbroad, unduly burdensome, vague and
5  ambiguous.

6          Larian also objects to this interrogatory to the extent it seeks
7  information that is not subject to disclosure under any applicable privilege, doctrine
8  or immunity, including without limitation the attorney-client privilege, the work
9  product doctrine, the right of privacy, and all other privileges recognized under the
10  constitutional, statutory or decisional law of the United States of America, the State
11  of California or any other applicable jurisdiction. Larian objects to this interrogatory
12  to the extent it calls for a legal conclusion.

13          Larian further objects to this interrogatory on the ground that it is
14  premature because the invention, creation, conception, or reduction to practice of
15  Bratz (and other legal concepts that may be relevant) will be the subject of expert
16  testimony at trial. Larian objects to this interrogatory to the extent it seeks to limit
17  the expert testimony that Larian may seek to introduce at trial. Larian will identify
18  his experts and make related disclosures in accordance with the Court's orders and
19  applicable rules.

20          Larian further objects to this interrogatory on the grounds that it seeks
21  information that is not relevant to the claims or defenses of any party to the action
22  and is not reasonably calculated to lead to the discovery of admissible evidence
23  because the INVENTIONS AGREEMENT executed by Carter Bryant in or around
24  January 1999, purports to state that any inventions conceived or reduced to practice
25  by him during his employment with Mattel would be owned by Mattel. The
26  references to the conception and reduction to practice of an invention are terms of art
27  in patent law. Accordingly, copyright law principles of substantial similarity,
28  copying, and derivative works are not relevant to the INVENTIONS AGREEMENT

8

LARIAN'S 3RD SUPPLEMENTAL RESPONSE TO MATTEL'S AMENDED 4TH SET OF INTERROGATORIES

1  which, by its terms, involves only principles of patent law.

2      Larian further objects on the ground that this interrogatory is an
3  overbroad and unduly burdensome contention interrogatory to the extent it asks for
4  "all facts" which supports the denial of a statement or allegation. *See e.g., Safeco of*
5  *Am. v. Rawstron*, 181 F.R.D. 441,447-48 (CD. Cal. 1998) (rejecting discovery
6  requests seeking "all facts, documents, and witnesses that support the denial of a
7  statement or allegation of fact" because the "universe of potentially responsive
8  information is almost endless").

9      Larian further objects to the extent that this interrogatory seeks
10  information that is outside Larian's knowledge and is not in Larian's possession,
11  custody, or control. In particular, Larian objects to this interrogatory to the extent
12  that it requests that Larian "state *all* facts ... and IDENTIFY *all* PERSONS... and *all*
13  DOCUMENTS" (emphasis added).

14      Larian further objects to this interrogatory because Mattel has
15  propounded more than 50 interrogatories. Under Judge Larson's order of February
16  22, 2007, "Interrogatories are limited to 50 for each side for both [Case Nos. CV 04-
17  04049-SGL and CV 05-02727]."

18  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 42:**

19      Larian incorporates by reference his General Response and General
20  Objections above, as though fully set forth herein and specifically incorporates
21  General Objection No. 7 (regarding Definitions), including without limitation
22  Larian's objection to the definition of the terms BASED ON, BRATZ DOLLS,
23  BRATZ, DESIGN, IDENTIFY and REFER OR RELATE TO, and further objects to
24  this interrogatory on the ground that it is overbroad, unduly burdensome, vague and
25  ambiguous.

26      Larian also objects to this interrogatory to the extent it seeks
27  information that is not subject to disclosure under any applicable privilege, doctrine
28  or immunity, including without limitation the attorney-client privilege, the work

9

EXHIBIT  11 0

DADE  1753

1  product doctrine, the right of privacy, and all other privileges recognized under the

2  constitutional, statutory or decisional law of the United States of America, the State

3  of California or any other applicable jurisdiction. Larian objects to this interrogatory

4  to the extent it calls for a legal conclusion.

5      Larian further objects to this interrogatory on the ground that it is

6  premature because the invention, creation, conception, or reduction to practice of

7  Bratz (and other legal concepts that may be relevant) will be the subject of expert

8  testimony at trial. Larian objects to this interrogatory to the extent it seeks to limit

9  the expert testimony that Larian may seek to introduce at trial. Larian will identify

10  his experts and make related disclosures in accordance with the Court's orders and

11  applicable rules.

12      Larian further objects to this interrogatory on the grounds that it seeks

13  information that is not relevant to the claims or defenses of any party to the action

14  and is not reasonably calculated to lead to the discovery of admissible evidence

15  because the INVENTIONS AGREEMENT executed by Carter Bryant in or around

16  January 1999, purports to state that any inventions conceived or reduced to practice

17  by him during his employment with Mattel would be owned by Mattel. The

18  references to the conception and reduction to practice of an invention are terms of art

19  in patent law. Accordingly, copyright law principles of substantial similarity,

20  copying, and derivative works are not relevant to the INVENTIONS AGREEMENT

21  which, by its terms, involves only principles of patent law.

22      Larian further objects on the ground that this interrogatory is an

23  overbroad and unduly burdensome contention interrogatory to the extent it asks for

24  "all facts" which supports the denial of a statement or allegation. *See e.g., Safeco of*

25  *Am. v. Rawstron*, 181 F.R.D. 441,447-48 (CD. Cal. 1998) (rejecting discovery

26  requests seeking "all facts, documents, and witnesses that support the denial of a

27  statement or allegation of fact" because the "universe of potentially responsive

28  information is almost endless").

EXHIBIT ___  
PAGE ___ 1754

1    Larian further objects to the extent that this interrogatory seeks
2 information that is outside Larian's knowledge and is not in Larian's possession,
3 custody, or control. In particular, Larian objects to this interrogatory to the extent
4 that it requests that Larian "state *all* facts ... and IDENTIFY *all* PERSONS... and *all*
5 DOCUMENTS" (emphasis added).
6    Subject to and without waiving the foregoing objections, Larian
7 responds as follows:
8    Should there be a finding that any intellectual property rights associated
9 with the drawings completed by Carter Bryant in August or September, 1998, and/or
10 subsequent drawings, sketches, and/or representations that Bryant created prior to
11 October 4, 2000, are owned by Mattel, it is Larian's position that the first generation
12 of Bratz dolls, first "reduced to practice," and first expressed in a tangible medium,
13 after October 20, 2000, and all subsequent Bratz dolls, are not substantially similar
14 to, are not a copy of, and are not derivative of Carter Bryant's aforementioned works.
15    Larian further responds that said first generation of Bratz dolls differ
16 markedly and significantly from the drawings or designs completed by Carter Bryant
17 prior to October 19, 2000. First, with respect to the three-dimensional "dummy" to
18 which Bryant referred at his deposition, it had no material resemblance to the first
19 generation of Bratz dolls. Second, with respect to Carter Bryant's drawings, Larian
20 points out that two-dimensional drawings do not translate into three-dimensional
21 dolls without original, creative effort. Third, there are recognizable and material
22 differences in the total overall look and feel of the first generation Bratz dolls
23 compared to Carter Bryant's drawings completed prior to October 21, 2000. Fourth,
24 there are recognizable and material differences in individual elements of the first
25 generation Bratz dolls compared to Carter Bryant's drawings completed prior to
26 October 21, 2000, including, but not limited to, with respect to the following: hair
27 styles; hair colors; facial expression; depiction of noses; eye art; extent of detail of
28 eye art; lip art; eyebrow art; proportions of the bodies; posture; spatial arrangement

11
LARIAN'S 3RD SUPPLEMENTAL RESPONSE TO MATTEL'S AMENDED 4TH SET OF INTERROGATORIES

EXHIBIT ____ 110

PAGE ____ 1755

1 of hands; wrists and arms; and proportions and spatial arrangements of the eyes,

2 noses, and mouths. Additional details regarding such differences will be the subject

3 of expert disclosures and will be provided at a later time.

4       With respect to any design relating to the Bratz concept that Carter

5 Bryant may have contributed after October 4, 2000 and before October 21, 2000, i.e.,

6 during a period that he was performing such services for MGA pursuant to a

7 freelance contract, Larian notes that any such design would have incorporated the

8 original and/or creative input of other artists working for or on behalf of MGA on the

9 Bratz concept, which was owned by MGA as a consequence of the October 4, 2000

10 transfer of rights from Bryant to MGA. In addition, the first generation of Bratz

11 dolls, and all subsequent Bratz dolls, are not substantially similar to, derivative of,

12 and/or a copy of any work performed or created by Carter Bryant from October 4-

13 October 20, 2000.

14       The following persons have knowledge of said facts: Isaac Larian;

15 Carter Bryant; Margaret Leahy; Veronica Marlow; Anna Rhee; Mercedeh Ward;

16 Sarah Halpern; Paula Treantafelles (Garcia); Steve Tarmichael; Rebecca Harris;

17 Cecilia Kwok; David Dees; Jesse Ramirez; and Samuel Wong.

18       The following documents may be relevant to these facts: all

19 DOCUMENTS that refer to or evidence the work performed by MGA employees

20 and freelancers toward the reduction to practice of the first generation of Bratz dolls

21 during the period after October 20, 2000 through June 1, 2001, including but not

22 limited to: Carter Bryant's drawings; the Bratz dolls; My Scene dolls;

23 DOCUMENTS evidencing the development of the first generation of Bratz dolls by

24 employees and freelance artists working for MGA; and invoices submitted by

25 freelancers for work performed on the Bratz Project. The documents evidencing this

26 work are too numerous to identify individually.

27 **SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 42:**

28       Larian incorporates by reference his General Response and General

EXHIBIT __ 10

PAGE ____ 1756

1  Objections above, as though fully set forth herein and specifically incorporates General
2  Objection No. 7 (regarding Definitions), including without limitation Larian's objection to
3  the definition of the terms BASED ON, BRATZ DOLLS, BRATZ, DESIGN, IDENTIFY
4  and REFER OR RELATE TO, and further objects to this interrogatory on the ground that it
5  is overbroad, unduly burdensome, vague and ambiguous.

6        Larian also objects to this interrogatory to the extent it seeks information that
7  is not subject to disclosure under any applicable privilege, doctrine or immunity, including
8  without limitation the attorney-client privilege, the work product doctrine, the right of
9  privacy, and all other privileges recognized under the constitutional, statutory or decisional
10  law of the United States of America, the State of California or any other applicable
11  jurisdiction. Larian objects to this interrogatory to the extent it calls for a legal conclusion.

12        Larian further objects to this interrogatory on the ground that it is
13  premature because the invention, creation, conception, or reduction to practice of
14  Bratz (and other legal concepts that may be relevant) will be the subject of expert
15  testimony at trial. Larian objects to this interrogatory to the extent it seeks to limit
16  the expert testimony that Larian may seek to introduce at trial. Larian will identify
17  his experts and make related disclosures in accordance with the Court's orders and
18  applicable rules.

19        Larian further objects to this interrogatory on the grounds that it seeks
20  information that is not relevant to the claims or defenses of any party to the action
21  and is not reasonably calculated to lead to the discovery of admissible evidence
22  because the INVENTIONS AGREEMENT executed by Carter Bryant in or around
23  January 1999, purports to state that any inventions conceived or reduced to practice
24  by him during his employment with Mattel would be owned by Mattel. The
25  references to the conception and reduction to practice of an invention are terms of art
26  in patent law. Accordingly, copyright law principles of substantial similarity,
27  copying, and derivative works are not relevant to the INVENTIONS AGREEMENT
28  which, by its terms, involves only principles of patent law.

EXHIBIT ___11 D___

PAGE ___1757___

1          Larian further objects on the ground that this interrogatory is an

2  overbroad and unduly burdensome contention interrogatory to the extent it asks for

3  "all facts" which supports the denial of a statement or allegation. *See e.g., Safeco of*

4  *Am. v. Rawstron*, 181 F.R.D. 441,447-48 (CD. Cal. 1998) (rejecting discovery

5  requests seeking "all facts, documents, and witnesses that support the denial of a

6  statement or allegation of fact" because the "universe of potentially responsive

7  information is almost endless").

8          Larian further objects to the extent that this interrogatory seeks

9  information that is outside Larian's knowledge and is not in Larian's possession,

10  custody, or control. In particular, Larian objects to this interrogatory to the extent

11  that it requests that Larian "state *all* facts ... and IDENTIFY *all* PERSONS...and *all*

12  DOCUMENTS" (emphasis added).

13          Larian objects to the interrogatory on the ground that it is compound

14  and therefore Mattel has propounded more than 50 interrogatories, including discrete

15  subparts, in violation of Judge Larson's order of February 22, 2007, that

16  "Interrogatories are limited to 50 for each side for both [Case Nos. CV 04-04049-

17  SGL and CV 05-02727]." In its supplemental response to this interrogatory, Larian

18  did not refuse to answer the interrogatory based on the 50-interrogatory limit, but

19  rather refused to use the compound and misleading defined terms that permeate

20  Mattel's interrogatories. The interrogatories attempt to use misleading and unfair

21  definitions to create jury confusion or to circumvent 50-interrogatory limit. For

22  example, Mattel's definition of "BRATZ INVENTION" contains ten separate

23  component parts ("representation, idea, concept, work, process, procedure, plan,

24  improvement, DESIGN or other development"). The incorporation of the defined

25  term "DESIGN" adds at least another 21 elements ("all works, designs, artwork,

26  sketches, drawings, illustrations, representations, depictions, blueprints, schematics,

27  diagrams, images, sculptures, prototypes, models, samples, rotocasts, reductions to

28  practice, developments, inventions and/or improvements"). The inclusion of these

LARIAN'S 3RD SUPPLEMENTAL RESPONSE TO MATTEL'S AMENDED 4TH SET OF INTERROGATORIES

EXHIBIT 11

PAGE 1758

1 disparate concepts in the term "invention" improperly conflates distinct issues of
2 patent law, copyright protection, trade secret law and the common law protecting
3 original ideas, many of which have no place in the ordinary usage of the term
4 "invention." In its previous supplemental responses, Larian used the word
5 "invention" in its ordinary usage, and does so again in these second supplemental
6 responses. During the meet and confer process regarding Larian's supplemental
7 responses, Mattel's counsel objected to Larian's responses, and argued that Larian
8 must either use Mattel's distorted definitions or respond to each of the many
9 component parts of Mattel's defined terms. As was made clear during the meet and
10 confer process and as more fully set forth in MGA's Opposition to Mattel, Inc.'s
11 Motion To Compel Responses To Interrogatories (Nos. 27, 28, 29, 30, 31, 32, 33, 34,
12 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 46, 47, 48, 49 and 50) By The MGA Parties,
13 Larian objects to this interrogatory as compound and a violation of the 50-
14 interrogatory limit to the extent that Mattel continues to assert that Larian is required
15 to respond to each component part of Mattel's defined terms.

16      Subject to and without waiving the foregoing objections, Larian
17 provides its Second Supplemental Response as follows:

18      Larian contends that, applying the generally-accepted definitions of the
19 words "based on" and "design", neither the first generation of Bratz dolls nor any
20 subsequent Bratz products were based on any Carter Bryant designs created on or
21 before October 19, 2000. Larian further contends that even if Larian applies Mattel's
22 misleading definitions of "BASED ON" and "DESIGN," neither the first generation
23 of Bratz dolls nor any of subsequent Bratz products were "BASED ON" any Carter
24 Bryant "DESIGNS" created on or before October 19, 2000. Larian further contends
25 that the first generation of Bratz dolls (and subsequent Bratz products) were
26 "conceived of" and "reduced to practice" for purposes of design patent law, and first
27 expressed in a tangible medium for purposes of copyright law, after October 20,
28 2000, as a result of original, creative efforts of artists employed by, or working on

15

LARIAN'S 3RD SUPPLEMENTAL RESPONSE TO MATTEL'S AMENDED 4TH SET OF INTERROGATORIES

EXHIBIT ____ 110

PAGE ____ 1759

1  behalf of, MGA.  All first-generation Bratz dolls and subsequent Bratz products are

2  not substantially similar to, are not a copy of, and are not derivative of, any Carter

3  Bryant designs completed on or before October 19, 2000.

4          To the extent that Mattel argues that the shapes of characters in Carter

5  Bryant's drawings that he called "Bratz" (including, but not limited to, those

6  drawings identified by Carter Bryant in Exhibit 5 of his deposition as being sketched

7  in August 1998) represented a conception of what could have later become a three-

8  dimensional object that could have been the subject of a design patent, Larian

9  contends as follows:

10          Carter Bryant was not a sculptor, and any effort to translate his pre-1999

11  two-dimensional flat art into a three-dimensional form for use as a fashion doll sculpt

12  would have produced shapes that were different from the actual shape of the final

13  three-dimensional Bratz sculpt used in manufacturing the first generation of Bratz

14  dolls released on the market by MGA in or about June 2001.  Also, different sculpt

15  artists would have created different sculpts – Bryant's two-dimensional drawings did

16  not dictate a specific three-dimensional object.  The shapes of the characters in

17  Bryant's drawings bear little resemblance to the final shape of the actual Bratz dolls.

18  Differences between the drawings and the final shape of the actual Bratz dolls

19  include, but are not limited to, the following:  posture; hip-to-waist ratio; feet size

20  (dolls' feet are not as exaggerated as characters' feet in the drawings); head size

21  (dolls' heads are proportionally smaller than characters' heads in the drawings); eyes

22  (dolls' eyes are more open than characters' eyes in the drawings); other facial

23  features including lips, cheek bones, chin and forehead.

24          Moreover, the final physical shape of the first generation of Bratz dolls,

25  released on the market by MGA in or about June 2001, was conceived of by

26  Margaret Leahy, working on behalf of MGA, along with other MGA agents and

27  employees such as employees in Hong Kong and Mercedeh Ward.  The conception

28  of this physical shape was completed on or after October 20, 2000, and reduced to

16

EXHIBIT ___ 1 1 O

PAGE ___ 1 7 6 0

1 | practice no earlier than December 19, 2000.

2 |        Copyright infringement analysis under Ninth Circuit law requires that
3 | "objective" or "extrinsic" elements that are "scènes-à-faire" in the public domain, or
4 | public domain materials that Bryant was aware of and that directly or indirectly
5 | influenced him in developing his concept for a new line of fashion dolls, be filtered
6 | out of the subject works, and, thereafter, that the remaining "subjective" or
7 | "intrinsic" elements be evaluated for substantial similarity. Carter Bryant's 1998
8 | drawings contain many elements that must be filtered out, including but not limited
9 | to the oversized head, eyes, lips, and feet of the figures in Bryant's drawings and the
10 | stock model and/or doll poses. A non-exhaustive list of examples of prior existing
11 | works that incorporate such elements includes the following: sources of inspiration
12 | specifically identified by Carter Bryant, including Steve Madden advertisements and
13 | Paris Blues advertisements, which were highly visible in 1998 (various Steve
14 | Madden advertisements also served as a key inspiration for Mattel's own "Toon
15 | Teens" dolls); Blythe dolls; Lisa Frank designs; Takara's Jenny, Licca, and Barbie
16 | dolls; Mattel's Liddle Kiddles; Margaret Keane artwork; Betty Boop; Little Miss No
17 | Name; Hello Kitty; Coca-Cola advertisements; anime, including, e.g., Sailor Moon;
18 | and manga.

19 |        Once all of the materials that directly or indirectly influenced Bryant
20 | and all "scène-à-faire" features are eliminated from the analysis, the first generation
21 | Bratz dolls (and all subsequent Bratz products) are readily seen as not substantially
22 | similar to Carter Bryant's 1998 drawings. The differences between the drawings and
23 | the first generation Bratz dolls include, but are not limited to, the following:

24 |      • Posture
25 |      • Hip-to-waist ratio
26 |      • Feet size (dolls' feet are not as exaggerated as characters' feet in
27 |        the drawings)
28 |      • Head size (dolls' heads are proportionally smaller than

EXHIBIT _1/2_

PAGE _1701_

1   characters' heads in the drawings)

2   • Eyes (dolls' eyes are more open than characters' eyes in the

3   drawings)

4   • Eye to lips ratio (lips of characters in drawings are proportionally

5   larger relative to eyes than are lips of dolls)

6   • Hair (characters in drawings have much edgier hairstyles than the

7   dolls do)

8   • Shapes of eyes and eye design

9   • Shapes of lips

10  • Overall look and feel (dolls are overall softer, less extreme than

11  drawings)

12      That the dolls and the drawings are not substantially similar also is

13  consistent with the fact that Carter Bryant was not a sculptor, and, as discussed

14  above, any effort to translate his pre-1999 two-dimensional flat art into a three-

15  dimensional form for use as a fashion doll sculpt would have produced shapes that

16  were different from the actual shape of the final three-dimensional Bratz sculpt used

17  in manufacturing the first generation of Bratz dolls released on the market by MGA

18  in or about June 2001.  Indeed, a team of highly-skilled artists (including several that

19  had been used by Mattel) spent months developing the Bratz first-generation dolls—

20  valuable time and original creative effort that would not have been necessary if said

21  first-generation Bratz dolls were simply a copy of Bryant's designs.

22      The absence of substantial similarity is further shown in the close

23  correlation between Bryant's drawings and the inspiration he points to, including but

24  not limited to the Steve Madden and Paris Blues advertisements in the August 1998

25  issue of *Seventeen Magazine*, as well as other advertisements in that issue, such as

26  the Coca Cola advertisement.

27      Mattel's own My Scene Barbie line of dolls provides further proof that

28  the first generation of Bratz dolls was not substantially similar to the Bryant

18

EXHIBIT __11 0__

PAGE __1762__

1 drawings, in that (i) Mattel asserts that the My Scene Barbie dolls are independent
2 works of art, not copied from Bratz, yet (ii) said dolls are far closer in appearance to
3 Bratz dolls than are Bryant's two-dimensional drawings.

4 Additional details regarding such differences will be the subject of
5 expert disclosures and will be provided in accordance with the Court's schedule for
6 expert discovery.

7 With respect to any Carter Bryant contribution to the first generation
8 Bratz product after October 4, 2000 and before October 21, 2000, i.e., during a
9 period that he was performing such services for MGA pursuant to a freelance
10 contract while completing a two-week end-of-employment notice period at Mattel,
11 Larian notes that any such contribution was far outweighed by the original and/or
12 creative input of other artists working for or on behalf of MGA on the Bratz concept,
13 which was owned by MGA as a consequence of the October 4, 2000 transfer of
14 rights from Bryant to MGA.

15 With respect to Bratz two-dimensional character art utilized on, for
16 example, Bratz product packaging and licensed products, while the initial Bratz
17 character art was derivative of Bryant's initial sketches from 1998, by no later than
18 August, 2003, the Bratz character art had changed sufficiently such that it was no
19 longer derivative of Bryant's sketches.

20 The following persons have knowledge of facts and circumstances
21 surrounding the foregoing: Isaac Larian; Carter Bryant; Margaret Leahy; Veronica
22 Marlow; Mercedeh Ward; Sarah Halpern; Paula Garcia; Steve Tarmichael; Rebecca
23 Harris; Tina Tomiyama; Cecilia Kwok; David Dees; Jesse Ramirez; Samuel Wong;
24 Lily Martinez; Ei Akiko Fong; John Steven Baulch; Aileen Storer; Debora
25 Middleton; Ronan Spelman; Charlotte Broussard.

26 The following documents may be relevant to the foregoing: all
27 DOCUMENTS that refer to or evidence the work performed by MGA employees
28 and freelancers toward the reduction to practice of the first generation of Bratz dolls

19

EXHIBIT _____ 11 U

PAGE _____ 1703

1 during the period after October 20, 2000 through June 1, 2001, including but not
2 limited to: Carter Bryant's drawings; documents and tangible things produced by
3 Margaret Leahy; tangible things produced by Veronica Marlow; invoices submitted
4 by employees and/or freelance artists working for MGA for work performed on the
5 Bratz project; all DOCUMENTS that constitute samples of the following items in the
6 public domain in 1998: Blythe dolls; Lisa Frank designs; Takara's Jenny, Licca, and
7 Barbie dolls; Mattel's Liddle Kiddles; Margaret Keane artwork; Betty Boop; Little
8 Miss No Name; Hello Kitty; anime, including, e.g., Sailor Moon; manga; Coca-Cola
9 advertisements; Steve Madden advertisements; and Paris Blues advertisements;
10 Bratz prototypes, samples, sculpts, and rotocasts found in Hong Kong and produced
11 to Mattel. The documents evidencing this work are too numerous to identify
12 individually.

13 **THIRD SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 42:**

14       Larian incorporates by reference his General Response and General
15 Objections above, as though fully set forth herein and specifically incorporates General
16 Objection No. 7 (regarding Definitions), including without limitation Larian's objection to
17 the definition of the terms BASED ON, BRATZ DOLLS, BRATZ, DESIGN, IDENTIFY
18 and REFER OR RELATE TO, and further objects to this interrogatory on the ground that it
19 is overbroad, unduly burdensome, vague and ambiguous.

20       Larian also objects to this interrogatory to the extent it seeks information that
21 is not subject to disclosure under any applicable privilege, doctrine or immunity, including
22 without limitation the attorney-client privilege, the work product doctrine, the right of
23 privacy, and all other privileges recognized under the constitutional, statutory or decisional
24 law of the United States of America, the State of California or any other applicable
25 jurisdiction. Larian objects to this interrogatory to the extent it calls for a legal conclusion.

26       Larian further objects to this interrogatory on the ground that it is
27 premature because the invention, creation, conception, or reduction to practice of
28 Bratz (and other legal concepts that may be relevant) will be the subject of expert

EXHIBIT _____ 11 U

PAGE _____ 1764

1   testimony at trial. Larian objects to this interrogatory to the extent it seeks to limit

2   the expert testimony that Larian may seek to introduce at trial. Larian will identify

3   his experts and make related disclosures in accordance with the Court's orders and

4   applicable rules.

5       Larian further objects to this interrogatory on the grounds that it seeks

6   information that is not relevant to the claims or defenses of any party to the action

7   and is not reasonably calculated to lead to the discovery of admissible evidence

8   because the INVENTIONS AGREEMENT executed by Carter Bryant in or around

9   January 1999, purports to state that any inventions conceived or reduced to practice

10  by him during his employment with Mattel would be owned by Mattel. The

11  references to the conception and reduction to practice of an invention are terms of art

12  in patent law. Accordingly, copyright law principles of substantial similarity,

13  copying, and derivative works are not relevant to the INVENTIONS AGREEMENT

14  which, by its terms, involves only principles of patent law.

15      Larian further objects on the ground that this interrogatory is an

16  overbroad and unduly burdensome contention interrogatory to the extent it asks for

17  "all facts" which supports the denial of a statement or allegation. *See e.g., Safeco of*

18  *Am. v. Rawstron*, 181 F.R.D. 441, 447-48 (CD. Cal. 1998) (rejecting discovery

19  requests seeking "all facts, documents, and witnesses that support the denial of a

20  statement or allegation of fact" because the "universe of potentially responsive

21  information is almost endless").

22      Larian further objects to the extent that this interrogatory seeks

23  information that is outside Larian's knowledge and is not in Larian's possession,

24  custody, or control. In particular, Larian objects to this interrogatory to the extent

25  that it requests that Larian "state *all* facts ... and IDENTIFY *all* PERSONS ... and *all*

26  DOCUMENTS" (emphasis added).

27      Larian objects to the interrogatory on the ground that it is compound

28  and therefore Mattel has propounded more than 50 interrogatories, including discrete

21

LARIAN'S 3RD SUPPLEMENTAL RESPONSE TO MATTEL'S AMENDED 4TH SET OF INTERROGATORIES

EXHIBIT ____ 11 U

PAGE ____ 1705

1 subparts, in violation of Judge Larson's order of February 22, 2007, that

2 "Interrogatories are limited to 50 for each side for both [Case Nos. CV 04-04049-

3 SGL and CV 05-02727]." In its supplemental response to this interrogatory, Larian

4 did not refuse to answer the interrogatory based on the 50-interrogatory limit, but

5 rather refused to use the compound and misleading defined terms that permeate

6 Mattel's interrogatories. The interrogatories attempt to use misleading and unfair

7 definitions to create jury confusion or to circumvent the 50-interrogatory limit. For

8 example, Mattel's definition of "BRATZ INVENTION" contains ten separate

9 component parts ("representation, idea, concept, work, process, procedure, plan,

10 improvement, DESIGN or other development"). The incorporation of the defined

11 term "DESIGN" adds at least another 21 elements ("all works, designs, artwork,

12 sketches, drawings, illustrations, representations, depictions, blueprints, schematics,

13 diagrams, images, sculptures, prototypes, models, samples, rotocasts, reductions to

14 practice, developments, inventions and/or improvements"). The inclusion of these

15 disparate concepts in the term "invention" improperly conflates distinct issues of

16 patent law, copyright protection, trade secret law and the common law protecting

17 original ideas, many of which have no place in the ordinary usage of the term

18 "invention." In its previous supplemental responses, Larian used the word

19 "invention" in its ordinary usage, and does so again in these third supplemental

20 responses. During the meet and confer process regarding Larian's supplemental

21 responses, Mattel's counsel objected to Larian's responses, and argued that Larian

22 must either use Mattel's distorted definitions or respond to each of the many

23 component parts of Mattel's defined terms. As was made clear during the meet and

24 confer process and as more fully set forth in MGA's Opposition to Mattel, Inc.'s

25 Motion To Compel Responses To Interrogatories (Nos. 27, 28, 29, 30, 31, 32, 33, 34,

26 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 46, 47, 48, 49 and 50) By The MGA Parties,

27 Larian objects to this interrogatory as compound and a violation of the 50-

28 interrogatory limit to the extent that Mattel continues to assert that Larian is required

22

EXHIBIT 110

PAGE 1766

1  to respond to each component part of Mattel's defined terms.

2  Subject to and without waiving the foregoing objections, Larian
3  provides his Third Supplemental Response as follows:

4  Larian contends that, applying the generally-accepted definitions of the
5  words "based on" and "design", neither the first generation of Bratz dolls nor any
6  subsequent Bratz products were based on any Carter Bryant designs created on or
7  before October 19, 2000. Larian further contends that even if Larian applies Mattel's
8  misleading definitions of "BASED ON" and "DESIGN," neither the first generation
9  of Bratz dolls nor any of the subsequent Bratz products were "BASED ON" any
10  Carter Bryant "DESIGNS" created on or before October 19, 2000. Larian further
11  contends that the first generation of Bratz dolls (and subsequent Bratz products) were
12  "conceived of" and "reduced to practice" for purposes of design patent law, and first
13  expressed in a tangible medium for purposes of copyright law, after October 20,
14  2000, as a result of original, creative efforts of artists employed by, or working on
15  behalf of, MGA. All first-generation Bratz dolls and subsequent Bratz products are
16  not substantially similar to, are not a copy of, and are not derivative of, any Carter
17  Bryant designs completed on or before October 19, 2000.

18  To the extent that Mattel argues that the shapes of characters in Carter
19  Bryant's drawings that he called "Bratz" (including, but not limited to, those
20  drawings identified by Carter Bryant in Exhibit 5 of his deposition as being sketched
21  in August 1998) represented a conception of what could have later become a three-
22  dimensional object that could have been the subject of a design patent, Larian
23  contends as follows:

24  Carter Bryant was not a sculptor, and any effort to translate his pre-1999
25  two-dimensional flat art into a three-dimensional form for use as a fashion doll sculpt
26  would have produced shapes that were different from the actual shape of the final
27  three-dimensional Bratz sculpt used in manufacturing the first generation of Bratz
28  dolls released on the market by MGA in or about June 2001. Also, different sculpt

23

LARIAN'S 3RD SUPPLEMENTAL RESPONSE TO MATTEL'S AMENDED 4TH SET OF INTERROGATORIES

EXHIBIT _____ 4 O
PAGE_____ 1767

1  artists would have created different sculpts – Bryant's two-dimensional drawings did
2  not dictate a specific three-dimensional object.  The shapes of the characters in
3  Bryant's drawings bear little resemblance to the final shape of the actual Bratz dolls.
4  Differences between the drawings and the final shape of the actual Bratz dolls
5  include, but are not limited to, the following:  posture; hip-to-waist ratio; feet size
6  (dolls' feet are not as exaggerated as characters' feet in the drawings); head size
7  (dolls' heads are proportionally smaller than characters' heads in the drawings); eyes
8  (dolls' eyes are more open than characters' eyes in the drawings); removable hair (a
9  feature present only in the drawings); other facial features including lips, cheek
10  bones, chin and forehead.

11        Moreover, the final physical shape of the first generation of Bratz dolls,
12  released on the market by MGA in or about June 2001, was conceived of by
13  Margaret Leahy, working on behalf of MGA, along with other MGA agents and
14  employees such as employees in Hong Kong and Mercedeh Ward.  The conception
15  of this physical shape was completed on or after October 20, 2000, and reduced to
16  practice no earlier than December 19, 2000.

17        Copyright infringement analysis under Ninth Circuit law requires that
18  "objective" or "extrinsic" elements that are "scènes-à-faire" in the public domain, or
19  public domain materials that Bryant was aware of and that directly or indirectly
20  influenced him in developing his concept for a new line of fashion dolls, be filtered
21  out of the subject works, and, thereafter, that the remaining "subjective" or
22  "intrinsic" elements be evaluated for substantial similarity.  Carter Bryant's 1998
23  drawings contain many elements that must be filtered out, including but not limited
24  to the oversized head, eyes, lips, and feet of the figures in Bryant's drawings and the
25  stock model and/or doll poses.  A non-exhaustive list of examples of prior existing
26  works that incorporate such elements includes the following:  sources of inspiration
27  specifically identified by Carter Bryant, including Steve Madden advertisements and
28  Paris Blues advertisements, which were highly visible in 1998 (various Steve

24

LARIAN'S 3RD SUPPLEMENTAL RESPONSE TO MATTEL'S AMENDED 4TH SET OF INTERROGATORIES

EXHIBIT _____ 17 U

PAGE _____ 1768

1  Madden advertisements also served as a key inspiration for Mattel's own "Toon

2  Teens" dolls); Blythe dolls; Lisa Frank designs; Takara's Jenny, Licca, and Barbie

3  dolls; Mattel's Liddle Kiddles; Margaret Keane artwork; Betty Boop; Little Miss No

4  Name; Hello Kitty; Coca-Cola advertisements; anime, including, e.g., Sailor Moon;

5  and manga.

6            Once all of the materials that directly or indirectly influenced Bryant

7  and all "scène-à-faire" features are eliminated from the analysis, the first generation

8  Bratz dolls (and all subsequent Bratz products) are readily seen as not substantially

9  similar to Carter Bryant's 1998 drawings.  The differences between the drawings and

10  the first generation Bratz dolls include, but are not limited to, the following:

11            • Posture

12            • Hip-to-waist ratio

13            • Feet size (dolls' feet are not as exaggerated as characters' feet in

14               the drawings)

15            • Head size (dolls' heads are proportionally smaller than

16               characters' heads in the drawings)

17            • Eyes (dolls' eyes are more open than characters' eyes in the

18               drawings)

19            • Eye to lips ratio (lips of characters in drawings are proportionally

20               larger relative to eyes than are lips of dolls)

21            • Hair (characters in drawings have much edgier hairstyles than the

22               dolls do; unlike the drawings, the dolls' hair is not removable)

23            • Shapes of eyes and eye design

24            • Shapes of lips

25            • Overall look and feel (dolls are overall softer, less extreme than

26               drawings)

27            That the dolls and the drawings are not substantially similar also is

28  consistent with the fact that Carter Bryant was not a sculptor, and, as discussed

25

LARIAN'S 3RD SUPPLEMENTAL RESPONSE TO MATTEL'S AMENDED 4TH SET OF INTERROGATORIES

EXHIBIT ___ 110

PAGE ___ 1769

1  above, any effort to translate his pre-1999 two-dimensional flat art into a three-
2  dimensional form for use as a fashion doll sculpt would have produced shapes that
3  were different from the actual shape of the final three-dimensional Bratz sculpt used
4  in manufacturing the first generation of Bratz dolls released on the market by MGA
5  in or about June 2001.  Indeed, a team of highly-skilled artists (including several that
6  had been used by Mattel and other toy companies in the past) spent months
7  developing the Bratz first-generation dolls—valuable time and original creative
8  effort that would not have been necessary if said first-generation Bratz dolls were
9  simply a copy of Bryant's designs.

10      The absence of substantial similarity is further shown in the close
11  correlation between Bryant's drawings and the inspiration he points to, including but
12  not limited to the Steve Madden and Paris Blues advertisements in the August 1998
13  issue of *Seventeen Magazine*, as well as other advertisements in that issue, such as
14  the Coca Cola advertisement.

15      Mattel's own My Scene Barbie line of dolls provides further proof that
16  the first generation of Bratz dolls was not substantially similar to the Bryant
17  drawings, in that (i) Mattel asserts that the My Scene Barbie dolls are independent
18  works of art, not copied from Bratz, yet (ii) said dolls are far closer in appearance to
19  Bratz dolls than are Bryant's two-dimensional drawings.

20      Additional details regarding such differences will be the subject of
21  expert disclosures and will be provided in accordance with the Court's schedule for
22  expert discovery.

23      With respect to any Carter Bryant contribution to the first generation
24  Bratz product after October 4, 2000 and before October 21, 2000, i.e., during a
25  period that he was performing such services for MGA pursuant to a freelance
26  contract while completing a two-week end-of-employment notice period at Mattel,
27  Larian notes that any such contribution was far outweighed by the original and/or
28  creative input of other artists working for or on behalf of MGA on the Bratz concept,

26
LARIAN'S 3RD SUPPLEMENTAL RESPONSE TO MATTEL'S AMENDED 4TH SET OF INTERROGATORIES

EXHIBIT __11 O__

PAGE __1770__

1 | which was owned by MGA as a consequence of the October 4, 2000 transfer of
2 | rights from Bryant to MGA.

3 |      With respect to Bratz two-dimensional character art utilized on, for
4 | example, Bratz product packaging and licensed products, while the initial Bratz
5 | character art was derivative of Bryant's initial sketches from 1998, by no later than
6 | August 2003, the Bratz character art had changed sufficiently such that it was no
7 | longer derivative of Bryant's sketches.

8 |      The following persons have knowledge of facts and circumstances
9 | surrounding the foregoing: Isaac Larian; Carter Bryant; Margaret Leahy; Veronica
10 | Marlow; Mercedeh Ward; Sarah Halpern; Paula Garcia; Steve Tarmichael; Rebecca
11 | Harris; Tina Tomiyama; Cecilia Kwok; David Dees; Jesse Ramirez; Samuel Wong;
12 | Lily Martinez; Ei Akiko Fong; John Steven Baulch; Aileen Storer; Debora
13 | Middleton; Ronan Spelman; Charlotte Broussard; Cassidy Park; Katherine Dumas;
14 | Michelle McShane; Ivy Ross.

15 |      The following documents may be relevant to the foregoing: all
16 | DOCUMENTS that refer to or evidence the work performed by MGA employees
17 | and freelancers toward the reduction to practice of the first generation of Bratz dolls
18 | during the period after October 20, 2000 through June 1, 2001, including but not
19 | limited to: Carter Bryant's drawings; documents and tangible things produced by
20 | Margaret Leahy; tangible things produced by Veronica Marlow; invoices submitted
21 | by employees and/or freelance artists working for MGA for work performed on the
22 | Bratz project; all DOCUMENTS that constitute samples of the following items in the
23 | public domain in 1998: Blythe dolls; Lisa Frank designs; Takara's Jenny, Licca, and
24 | Barbie dolls; Mattel's Liddle Kiddles; Margaret Keane artwork; Betty Boop; Little
25 | Miss No Name; Hello Kitty; anime, including, e.g., Sailor Moon; manga; Coca-Cola
26 | advertisements; Steve Madden advertisements; and Paris Blues advertisements;
27 | Bratz prototypes, samples, sculpts, and rotocasts found in Hong Kong and produced
28 | to Mattel.  The documents evidencing this work are too numerous to identify

EXHIBIT ___10___

PAGE ___171___

1 | individually.

2 | **INTERROGATORY NO. 43:**

3 |       For each concept, design, product, product packaging or other matter
4 | that YOU contend MATTEL copied or infringed, including but not limited to those
5 | identified in MGA's Responses To Mattel, Inc.'s First Set Of Interrogatories Re
6 | Claims Of Unfair Competition, Response To Interrogatory No. 2 (and any
7 | Supplemental Responses to such Interrogatory), state the date that each such concept,
8 | design, product, product packaging or other matter was conceived, and IDENTIFY
9 | all PERSONS with knowledge of, and all DOCUMENTS that REFER OR RELATE
10 | TO, the foregoing.

11 | **RESPONSE TO INTERROGATORY NO. 43:**

12 |       Larian incorporates by reference his General Response and General
13 | Objections above, as though fully set forth herein and specifically incorporates
14 | General Objection No. 7 (regarding Definitions), including without limitation its
15 | objections to the terms IDENTIFY and REFER OR RELATE.

16 |       Larian also objects to this interrogatory to the extent it seeks
17 | information that is not subject to disclosure under any applicable privilege, doctrine
18 | or immunity, including without limitation the attorney-client privilege, the work
19 | product doctrine, the right of privacy, and all other privileges recognized under the
20 | constitutional, statutory or decisional law of the United States of America, the State
21 | of California or any other applicable jurisdiction. Larian further objects to the
22 | interrogatory to the extent it calls for a legal conclusion.

23 |       Larian also objects to this interrogatory on the ground that it is
24 | premature because the invention, creation, conception, or reduction to practice of
25 | Bratz (and related issues) will be the subject of expert testimony at trial. Larian
26 | objects to this interrogatory to the extent it seeks to limit the expert testimony that
27 | Larian may seek to introduce at trial. Larian will identify his experts and make
28 | related disclosures in accordance with the Court's orders and applicable rules.

28

EXHIBIT   11U

PAGE   1772

1    Larian further objects to this interrogatory to the extent that it seeks
2  information that is not relevant to the claims or defenses of any party to this action
3  and is not reasonably calculated to lead to the discovery of admissible evidence; the
4  term "conceived" is not a legal term of art that is relevant to Larian's affirmative
5  claims for false designation of origin, affiliation, association or sponsorship, unfair
6  competition, dilution, and unjust enrichment.

7    Larian further objects to the extent that this interrogatory seeks
8  information that is outside Larian's knowledge and is not in Larian's possession,
9  custody, or control. In particular, Larian objects to this interrogatory to the extent
10  that it requests that Larian "IDENTIFY *all* PERSONS... and *all* DOCUMENTS"
11  (emphasis added).

12    Larian further objects to this interrogatory because Mattel has
13  propounded more than 50 interrogatories. Under Judge Larson's order of February.
14  22, 2007, "Interrogatories are limited to 50 for each side for both [Case Nos. CV 04-
15  04049-SGL and CV 05-02727]."

16    Subject to and without waiving the foregoing objections, Larian
17  responds as follows:  Larian is willing to meet and confer with Mattel regarding this
18  interrogatory and the obligation of Mattel to supplement its responses to MGA's First
19  Set of Interrogatories.

20  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 43:**

21    Larian incorporates by reference his General Response and General
22  Objections above, as though fully set forth herein and specifically incorporates
23  General Objection No. 7 (regarding Definitions), including without limitation its
24  objections to the terms IDENTIFY and REFER OR RELATE.

25    Larian also objects to this interrogatory to the extent it seeks
26  information that is not subject to disclosure under any applicable privilege, doctrine
27  or immunity, including without limitation the attorney-client privilege, the work
28  product doctrine, the right of privacy, and all other privileges recognized under the

29
LARIAN'S 3RD SUPPLEMENTAL RESPONSE TO MATTEL'S AMENDED 6TH SET OF INTERROGATORIES

EXHIBIT _____ *11*

1 | constitutional, statutory or decisional law of the United States of America, the State
2 | of California or any other applicable jurisdiction. Larian further objects to the
3 | interrogatory to the extent it calls for a legal conclusion.

4 |      Larian also objects to this interrogatory on the ground that it is
5 | premature because the invention, creation, conception, or reduction to practice of
6 | Bratz (and related issues) will be the subject of expert testimony at trial. Larian
7 | objects to this interrogatory to the extent it seeks to limit the expert testimony that
8 | Larian may seek to introduce at trial. Larian will identify his experts and make
9 | related disclosures in accordance with the Court's orders and applicable rules.

10 |      Larian further objects to this interrogatory to the extent that it seeks
11 | information that is not relevant to the claims or defenses of any party to this action
12 | and is not reasonably calculated to lead to the discovery of admissible evidence; the
13 | term "conceived" is not a legal term of art that is relevant to Larian's affirmative
14 | claims for false designation of origin, affiliation, association or sponsorship, unfair
15 | competition, dilution, and unjust enrichment.

16 |      Larian further objects to the extent that this interrogatory seeks
17 | information that is outside Larian's knowledge and is not in Larian's possession,
18 | custody, or control. In particular, Larian objects to this interrogatory to the extent
19 | that it requests that Larian "IDENTIFY *all* PERSONS...and *all* DOCUMENTS"
20 | (emphasis added).

21 |      Subject to and without waiving the foregoing objections, Larian
22 | responds as follows:

23 |      The interrogatory appears to be directed to other parties. Larian does not
24 | assert claims of copying or infringement against Mattel. MGA will respond to this
25 | interrogatory.

26 | **INTERROGATORY NO. 44:**

27 |      For each concept, design, product, product packaging or other matter
28 | that YOU contend MATTEL copied or infringed, including but not limited to those

EXHIBIT ____ 1 ( )

PAGE ____ 1774

1  identified in MGA's Responses To Mattel, Inc.'s First Set Of Interrogatories Re

2  Claims Of Unfair Competition, Response To Interrogatory No. 2 (and any

3  Supplemental Responses to such Interrogatory), state the date that each such concept,

4  design, product, product packaging or other matter was first fixed in any tangible

5  medium of expression (if ever), and IDENTIFY all PERSONS with knowledge of,

6  and all DOCUMENTS that REFER OR RELATE TO, the foregoing.

7  **RESPONSE TO INTERROGATORY NO. 44:**

8    Larian incorporates by reference his General Response and General

9  Objections above, as though fully set forth herein and specifically incorporates

10  General Objection No. 7 (regarding Definitions), including without limitation its

11  objections to the terms IDENTIFY and REFER OR RELATE. Larian also objects to

12  this interrogatory to the extent it seeks information that is not subject to disclosure

13  under any applicable privilege, doctrine or immunity, including without limitation

14  the attorney-client privilege, the work product doctrine, the right of privacy, and all

15  other privileges recognized under the constitutional, statutory or decisional law of

16  the United States of America, the State of California or any other applicable

17  jurisdiction. Larian also objects to this interrogatory to the extent that it calls for a

18  legal conclusion.

19    Larian also objects to this interrogatory on the ground that it is

20  premature because the invention, creation, conception, or reduction to practice of

21  Bratz (and related issues) will be the subject of expert testimony at trial. Larian

22  objects to this interrogatory to the extent it seeks to limit the expert testimony that

23  Larian may seek to introduce at trial. Larian will identify his experts and make

24  related disclosures in accordance with the Court's orders and applicable rules.

25    Larian further objects to this interrogatory to the extent that it seeks

26  information that is not relevant to the claims or defenses of any party to this action

27  and not reasonably calculated to lead to the discovery of admissible evidence

28  because the phrase "fixed in a tangible medium of expression" is a legal term of art

31

LARIAN'S 3RD SUPPLEMENTAL RESPONSE TO MATTEL'S AMENDED 4TH SET OF INTERROGATORIES

EXHIBIT ___11 0___

DACE ___1775___

1   that does not have relevance to Larian's affirmative claims, which are for false

2   designation of origin, affiliation, association or sponsorship, unfair competition,

3   dilution, and unjust enrichment.

4          Larian further objects to the extent that this interrogatory seeks

5   information that is outside Larian's knowledge and is not in Larian's possession,

6   custody, or control. In particular, Larian objects to this interrogatory to the extent

7   that it requests that Larian "IDENTIFY *all* PERSONS... and *all* DOCUMENTS"

8   (emphasis added).

9          Larian further objects to this interrogatory because Mattel has

10  propounded more than 50 interrogatories. Under Judge Larson's order of February

11  22, 2007, "Interrogatories are limited to 50 for each side for both [Case Nos. CV 04-

12  04049-SGL and CV 05-02727]."

13         Subject to and without waiving the foregoing objections, Larian

14  responds as follows: Larian is willing to meet and confer with Mattel regarding this

15  interrogatory and the obligation of Mattel to supplement its responses to MGA's First

16  Set of Interrogatories.

17  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 44:**

18         Larian incorporates by reference his General Response and General

19  Objections above, as though fully set forth herein and specifically incorporates

20  General Objection No. 7 (regarding Definitions), including without limitation its

21  objections to the terms IDENTIFY and REFER OR RELATE. Larian also objects to

22  this interrogatory to the extent it seeks information that is not subject to disclosure

23  under any applicable privilege, doctrine or immunity, including without limitation

24  the attorney-client privilege, the work product doctrine, the right of privacy, and all

25  other privileges recognized under the constitutional, statutory or decisional law of

26  the United States of America, the State of California or any other applicable

27  jurisdiction. Larian also objects to this interrogatory to the extent that it calls for a

28  legal conclusion.

LARIAN'S 3RD SUPPLEMENTAL RESPONSE TO MATTEL'S AMENDED 4TH SET OF INTERROGATORIES

EXHIBIT _____ 11 U

PAGE _____ 171U

1    Larian also objects to this interrogatory on the ground that it is
2   premature because the invention, creation, conception, or reduction to practice of
3   Bratz (and related issues) will be the subject of expert testimony at trial. Larian
4   objects to this interrogatory to the extent it seeks to limit the expert testimony that
5   Larian may seek to introduce at trial. Larian will identify his experts and make
6   related disclosures in accordance with the Court's orders and applicable rules.

7    Larian further objects to this interrogatory to the extent that it seeks
8   information that is not relevant to the claims or defenses of any party to this action
9   and not reasonably calculated to lead to the discovery of admissible evidence
10   because the phrase "fixed in a tangible medium of expression" is a legal term of art
11   that does not have relevance to Larian's affirmative claims, which are for false
12   designation of origin, affiliation, association or sponsorship, unfair competition,
13   dilution, and unjust enrichment.

14    Larian further objects to the extent that this interrogatory seeks
15   information that is outside Larian's knowledge and is not in Larian's possession,
16   custody, or control. In particular, Larian objects to this interrogatory to the extent
17   that it requests that Larian "IDENTIFY *all* PERSONS...and *all* DOCUMENTS"
18   (emphasis added).

19    `Subject to and without waiving the foregoing objections, Larian
20   responds as follows:

21    The interrogatory appears to be directed to other parties. Larian does not
22   assert claims of copying or infringement against Mattel. MGA will respond to this
23   interrogatory.

24
25
26
27
28

EXHIBIT ____ 110

PAGE ____ 1777

DATED:  January 28, 2008

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By: _____
          Timothy A. Miller
Attorneys for Counter-Defendants, MGA ENTERTAINMENT, INC., ISAAC LARIAN, MGA ENTERTAINMENT (HK) LTD., and MGAE de MEXICO S.R.L.de C.V.

34

LARIAN'S 3RD SUPPLEMENTAL RESPONSE TO MATTEL'S AMENDED 4TH SET OF INTERROGATORIES
203369-San Francisco Server 1A - MSW

EXHIBIT ___110___

PAGE ___1178___

## VERIFICATION

I, Isaac Larian, declare:

I have read ISAAC LARIAN'S THIRD SUPPLEMENTAL RESPONSES TO MATTEL INC.'S AMENDED FOURTH SET OF INTERROGATORIES (including the supplemental, second supplemental and third supplemental responses) and know the contents thereof. The same is true of my own knowledge, except as to those matters which are therein stated on information and belief, and, as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed in Van Nuys, California on this 28 day of January, 2008.

EXHIBIT ___11U___

PAGE ___1779___

**EXHIBIT   111**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES-GENERAL

CV04-09059-NM(RNBx)
CASE NO.  CV05-02727-NM(RNBx)          DATE:  5/20/05

TITLE:  Mattel Inc. -v- Carter Bryant, et al
        MGA Entertainment Inc. -v- Mattel, Inc.

PRESENT:          HON. NORA M. MANELLA, JUDGE

Judith Hurley              N/A
Deputy Clerk               Court Reporter

ATTORNEY FOR PLAINTIFF        ATTORNEY FOR DEFENDANT

      N/A                           N/A

PROCEEDINGS:  IN CHAMBERS

      Now that the Ninth Circuit has granted Mattel's petition for permission to file
an interlocutory appeal, all discovery in these actions is stayed pending the
determination of the appeal.  The stay of discovery also applies to pending &
prospective discovery motions.

cc: Counsel
CIVIL MINUTES 11

Initials of Deputy Clerk

EXHIBIT ___III___

PAGE ___1780___

EXHIBIT ___111___

PAGE ___1781___

**EXHIBIT   112**

RightFAX          5/17/2006 2:28    PAGE 002/002   Fax Server

# PRIORITY SEND

## UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
__CIVIL MINUTES -- GENERAL__

Case No.    CV 05-02727 SGL(RNBx)                    Date: May 16, 2006

Title:   MGA ENTERTAINMENT, INC. -v- MATTEL, INC.
=================================================================================
PRESENT:  HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

              Jim Holmes                        None Present
              Courtroom Deputy                  Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:      ATTORNEYS PRESENT FOR DEFENDANTS:

None present                           None present

PROCEEDINGS:   MINUTE ORDER (IN CHAMBERS)

     This matter is before the Court on its own motion. The Court orders the parties to show cause why this action should not be consolidated for all purposes with the two related actions: Bryant v. Mattel, Inc., CV 04-09049 SGL (RNBx); Mattel, Inc. v. Bryant, CV 04-09059 SGL (RNBx). The parties' briefs re consolidation must be filed no later than June 5, 2006. The Court will address the matter at the hearing on the motions set in the related cases on June 26, 2006.

     The Court's stay order, entered May 20, 2005, is vacated.

     IT IS SO ORDERED.

MINUTES FORM 90
CIVIL -- GEN                        1

ENTERED ON CM
MAY 17
045
Initials of Deputy Clerk   jh

ORIGINAL        35

EXHIBIT 112
PAGE 1782

**EXHIBIT   113**

1   DALE M. CENDALI (admitted *pro hac vice*)
    O'MELVENY & MYERS LLP
2   400 South Hope Street
    Los Angeles, CA 90071-2899
3   Telephone:  (213) 430-6000
    Facsimile:  (213) 430-6407
4   Email:      jjenal@omm.com

5   PATRICIA GLASER (S.B. # 55668)
    CHRISTENSEN, GLASER, FINK,
6   JACOBS, WEIL & SHAPIRO, LLP
    10250 Constellation Boulevard, 19th Floor
7   Los Angeles, CA 90067
    Telephone:  (310) 553-3000
8   Facsimile:  (310) 557-9815

9   Attorneys for MGA Entertainment, Inc.

10  JOHN KECKER
    KECKER & VAN NEST, LLP
11  710 Sansome Street
    San Francisco, CA 94111
12  Telephone:  (415) 391-5400
    Facsimile:  (415) 397-7188

13
    Attorneys for Carter Bryant

14

RECEIVED

JUL 2 3 2007
BRL 4:45

CALENDARED

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARTER BRYANT, an individual,<br><br>Plaintiff,<br><br>v.<br><br>MATTEL, INC., a Delaware Corporation,<br><br>Defendant.<br><br><br>AND CONSOLIDATED ACTIONS | Case No. CV 04-09049 SGL (RNBx)<br>(consolidated with CV 04-9059 & 05-2727)<br><br>**MGA ENTERTAINMENT, INC.'S NOTICE OF MOTION FOR TERMINATING SANCTIONS AGAINST MATTEL, INC. DUE TO SPOLIATION OF EVIDENCE; AND**<br><br>**[PROPOSED] ORDER**<br><br>Hearing Date:  August 13, 2007<br>Time:  10:00 a.m.<br>Place:  Courtroom 1<br><br>Discovery Cutoff: January 14, 2008<br>Pre-trial Conference: April 7, 2008<br>Trial Date: April 29, 2008 |

EXHIBIT ___113___

PAGE ___1783___

1    TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2           PLEASE TAKE NOTICE that, on August 13, 2007, at 10:00 a.m.

3    before Hon. Stephen G. Larson, MGA Entertainment, Inc. ("MGA") and Carter

4    Bryant ("Bryant") jointly will, and hereby do, move the Court to issue an order for

5    terminating sanctions against Mattel, Inc. ("Mattel") due to Mattel's spoliation of

6    evidence.

7           This Motion is made on the grounds that Mattel has engaged in a

8    conscious and systematic effort to destroy evidence relevant to its claims against

9    MGA and Mr. Bryant, and then deliberately sought to conceal its efforts.  Mattel's

10   conduct is in plain violation of its legal obligations, is highly prejudicial, and

11   warrants terminating sanctions.

12          This Motion is based on this Notice of Motion, the accompanying

13   Memorandum of Points and Authorities, the Declaration of Michael Keats filed

14   concurrently herewith and attached exhibits, the Declaration of Kendall J. Burr filed

15   concurrently herewith and attached exhibits, the Declaration of James P. Jenal filed

16   concurrently herewith and attached exhibits, the Declaration of Yvonne L. Garcia

17   filed concurrently herewith and attached exhibits, the record and files of this Court,

18   and all other matters of which the Court may take judicial notice.

19

20

21   Dated:     July 23 , 2007       MICHAEL KEATS
                                      O'MELVENY & MYERS LLP
22

23                                   By: _Michael Keats_
24                                      Michael Keats
                                        Attorneys for MGA Entertainment, Inc.
25

26

27

28

                                                    MGA'S NOTICE OF MTN FOR
                                   - 2 -            TERMINATING SANCTIONS DUE TO
                                                    SPOLIATION CV 04-09049 SGL (RNBX)

EXHIBIT ___113___

PAGE ___1784___

1

## [PROPOSED] ORDER

2

3        Based on the above Application, and good cause appearing for the

4   entry thereof, IT IS HEREBY ORDERED that each of the following actions:

5        1. Case No. CV 04-9059 SGL (RNBx); and

6        2. Mattel's Counterclaims in Case No. CV 05-2727 SGL (RNBx)

7   are hereby dismissed with prejudice.

8

9   DATED: _____

10                                   _____

11                                   Hon. Stephen G. Larson

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 3 -

MGA'S NOTICE OF MTN FOR
TERMINATING SANCTIONS DUE TO
SPOLIATION CV 04-09049 SGL (RNBX)

EXHIBIT _____ 113

PAGE _____ 1785

1   DALE M. CENDALI (admitted *pro hac vice*)
    O'MELVENY & MYERS LLP
2   400 South Hope Street
    Los Angeles, CA 90071-2899
3   Telephone: (213) 430-6000
    Facsimile: (213) 430-6407
4   Email: jjenal@omm.com

5   PATRICIA GLASER (S.B. #55668)
    CHRISTENSEN, GLASER, FINK,
6   JACOBS, WEIL & SHAPIRO, LLP
    10250 Constellation Boulevard, 19th Floor
7   Los Angeles, CA 90067
    Telephone: (310) 553-3000
8   Facsimile: (310) 557-9815

9   Attorneys for MGA Entertainment, Inc.

10  JOHN W. KEKER (S.B. #49092)
    KEKER & VAN NEST, LLP
11  710 Sansome Street
    San Francisco, CA 94111
12  Telephone: (415) 391-5400
    Fax: (415) 397-7188

13

14  Attorneys for Carter Bryant

15            **UNITED STATES DISTRICT COURT**
             **CENTRAL DISTRICT OF CALIFORNIA**
16                **EASTERN DIVISION**

RECEIVED

JUL 20 2007

BNC 4:45

| | |
|---|---|
| 17  CARTER BRYANT, an individual,<br>18        Plaintiff,<br>19    v.<br>20  MATTEL, INC., a Delaware<br>21  Corporation,<br>22        Defendant.<br><br>23  AND CONSOLIDATED ACTIONS | Case No. CV 04-09049 SGL (RNBx)<br>(consolidated with CV 04-9059 & 05-2727)<br><br>**CONFIDENTIAL- FILED UNDER SEAL**<br><br>**MGA ENTERTAINMENT, INC.'S MOTION FOR TERMINATING SANCTIONS AGAINST MATTEL, INC. DUE TO SPOLIATION OF EVIDENCE**<br><br>Hon. Stephen G. Larson<br><br>Discovery Cut-off: January 14, 2008<br>Pre-trial Conference: April 7, 2008<br>Trial Date: April 29, 2008<br><br>Hearing Date: August 13, 2007<br>Hearing Time: 10:00 am<br>Courtroom: 1 |

24

25

26

27

28

EXHIBIT 113
1785-001
PAGE

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ......................................................................................... 1
II.    BACKGROUND ........................................................................................... 3
       A.   Mattel Never Suspended Its Auto Delete Policy ..................................... 3
       B.   Mattel Was on Notice of Its Claims by 2002 .......................................... 4
       C.   The 2003 Investigation and the Wall Street Journal Article ................... 5
       D.   Mattel Sues Bryant and "Does" in 2004 ................................................ 6
       E.   MGA's Document Retention Demands .................................................... 7
       F.   Mattel Stonewalls MGA's Efforts to Obtain Discovery about
            Email Preservation ................................................................................... 8
       G.   Mattel Perpetrates a Fraud on the Court .............................................. 10
       H.   Discovery Has Revealed Mattel's Spoliation ....................................... 11
            (a)   Mattel Overwrote Its Backup Tapes from 2002-2005 .............. 12
            (b)   There Are No Zeus Server Backup Tapes from 1998-2001 ..... 13
            (c)   Mattel "Lost" Carter Bryant's October 2000 Phone
                  Records ...................................................................................... 14
III.   ARGUMENT ............................................................................................. 14
       A.   Mattel's Conduct Warrants Terminating Sanctions ............................. 15
            1.   The Court Has Inherent Power To Dismiss Mattel's
                 Claims for Spoliation of Evidence ........................................... 15
            2.   Mattel Had a Duty To Preserve Evidence At Least As
                 Early As March 2002 ................................................................ 16
            3.   Mattel's Duty to Preserve Required It to Suspend its
                 Routine Document Destruction Policies .................................... 17
            4.   Mattel's Failure to Suspend Auto Delete and Maintain
                 Backup Tapes Constitutes "Willfulness, Fault or Bad
                 Faith" Warranting Terminating Sanctions ................................ 18
       B.   Mattel's Spoliation Meets The Test Set Forth In Anheuser
            Busch ...................................................................................................... 20
            1.   The Public's Interest In Expeditious Resolution of
                 Litigation and The Court's Ability To Manage Its Docket
                 Have Both Been Compromised By Mattel's Conduct .............. 20
            2.   Mattel's Spoliation Has Prejudiced MGA and Bryant ............. 21
            3.   Mattel's Spoliation Warrants Dismissal And Less Drastic
                 Sanctions Are Not Appropriate ................................................. 24
       C.   CONCLUSION ......................................................................................... 25

EXHIBIT ___ 11 ___
1985.005

MGA'S MOTION FOR TERMINATING SANCTIONS
PAGE ___
CV 04-09049 SGL (RNBX)

- i -

**TABLE OF AUTHORITIES**

Page

**CASES**

*Akiona v. United States,*
  938 F.2d 158 (9th Cir. 1991) ................................................................ 16

*Alexander v. Nat'l Farmers Org.,*
  687 F.2d 1173 (8th Cir. 1982) ........................................................ 19, 22

*Anheuser-Busch, Inc. v. Natural Beverage Distribs.,*
  69 F.3d 337 (9th Cir. 1995) ...................................................... 15, 16, 20

*Broccoli v. Echostar Communications Corp.,*
  229 F.R.D. 506 (D. Md. 2005) ............................................................ 19

*Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.,*
  2007 WL 684001 (D. Colo. Mar. 2, 2007) ............................................ 18

*Carlucci v. Piper Aircraft Corp.,*
  102 F.R.D. 472 (S.D. Fla. 1984) ........................................................ 15

*Cecconi v. Cecconi,*
  2007 Bankr. LEXIS 1323 (Bankr. N.D. Cal. April 17, 2007) ................ 16

*Computer Associates Int'l. v. American Fundware, Inc.,*
  133 F.R.D. 166 (D. Colo. 1990) ........................................................ 15

*Convolve, Inc. v. Compaq Computer Corp.,*
  223 F.R.D. 162 (S.D.N.Y. 2004) ........................................................ 20

*DaimlerChrysler Motors v. Bill Davis Racing, Inc.,*
  2005 U.S. Dist. LEXIS 38162 (D. Mich. 2005) .................................. 18

*Frame v. S-H, Inc.,*
  967 F.2d 194 (5th Cir. 1992) ............................................................ 15

*Google Inc. v. Am. Blind & Wallpaper Factory, Inc.,*
  2007 U.S. Dist. LEXIS 48309 (N.D. Cal. June 27, 2007) .................... 21

*Halaco Eng'g Co. v. Costle,*
  843 F.2d 376 (9th Cir. 1988) ............................................................ 21

*Henry v. Gill Industries, Inc.,*
  983 F.2d 943 (9th Cir. 1993) ............................................................ 16

*Housing Rights Ctr. v. Sterling,*
  2004 U.S. Dist. LEXIS 28877 (C.D. Cal. Dec. 6, 2004) ...................... 17

*In re Fitzsimmons,*
  920 F.2d 1468 (9th Cir. 1990) .......................................................... 20

*In re Wechsler,*
  121 F. Supp. 2d 404 (D. Del. 2000) .................................................. 15

*Leon v. IDX Sys. Corp.,*
  464 F.3d 951 (9th Cir. 2006) ....................................................passim

*Metropolitan Opera Ass'n, Inc. v. Local 100 Hotel Employees and Restaurant Employees Int'l Union,*
  212 F.R.D. 178 (S.D.N.Y. 2003) ...................................................... 15

EXHIBIT 13

PAGE 1785.003

MGA'S MOTION FOR TERMINATING
SANCTIONS
CV 04-09049 SGL (RNBX)

- ii -

**TABLE OF AUTHORITIES**
(Continued)

Page

*Mosaid Technologies Inc. v. Samsung Elecs. Co., Ltd.,*
348 F. Supp. 2d 332 (D.N.J. 2004) .................................................. 20

*National Ass'n of Radiation Survivors v. Turnage,*
115 F.R.D. 543 (N.D. Cal. 1987) ................................................... 16

*Padgett v. City of Monte Sereno,*
No. C 04-03946 JW, 2007 U.S. Dist. LEXIS 24301 (N.D. Cal.
March 20, 2007) ................................................................... 19

*Residential Funding Corp. v. DeGeorge Fin. Corp.,*
306 F.3d 99 (2d Cir. 2002) ...................................................... 21

*Synanon Church v. United States,*
820 F.2d 421 (D.C. Cir. 1987),
*aff'd* 579 F. Supp. 967 (D.D.C. 1984) ............................................ 15

*Telectron, Inc. v. Overhead Door Corp.,*
116 F.R.D. 107 (S.D. Fla. 1987) .................................................. 21

*UMG Recordings, Inc. v. Hummer Winblad Venture Partners,*
462 F. Supp. 2d 1060 (N.D. Cal. 2006) ....................................... 19, 21

*Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.,*
982 F.2d 363 (9th Cir. 1992) ................................................. 15, 16

*United States v. Kitsap Physicians Serv.,*
314 F.3d 995 (9th Cir. 2002) .................................................... 19

*United States v. Nat'l Medical Enters., Inc.,*
792 F.2d 906 (9th Cir. 1986) .................................................... 21

*Wm. T. Thompson Co. v. General Nutrition Corp.,*
593 F. Supp. 1443 (C.D. Cal. 1984) .......................................... 15, 17

*Zubulake v. UBS Warburg LLC,*
220 F.R.D. 212 (S.D.N.Y. 2003) ............................................. 17, 21

**OTHER AUTHORITIES**

Quinn Emanuel, Business Litigation Report, *New e-Discovery Rules
Go Into Effect* (Jan. 2007) ....................................................... 17

Quinn Emanuel, Business Litigation Report, *Preservation of
Electronic Information for Discovery: Emerging Standards* (Nov.
2004) ......................................................................... 17, 18

Quinn Emanuel, Business Litigation Report, *Spoliation of Electronic
Evidence Gives Rise to Adverse Jury Instructions* (April 2005) ...................... 2

**RULES**

Fed. R. Civ. P. 30(b)(6) ..................................................... 8, 10, 14

Fed. R. Civ. P. 37 ................................................................ 21

EXHIBIT 113

MGA'S MOTION FOR TERMINATING
SANCTIONS

PAGE ___ CV 04-09049 SGL (RNBX)

1          **MEMORANDUM OF POINTS AND AUTHORITIES**

2  **I.**   **INTRODUCTION**

3        Mattel, Inc. ("Mattel") cleaned house before it went to war with MGA

4  Entertainment, Inc. ("MGA") by making sure that evidence helpful to Carter Bryant

5  and MGA would not be preserved for trial. As the Court is aware, Mattel has

6  brought claims against MGA and Mr. Bryant purportedly based on events that

7  allegedly occurred nearly a decade ago. In fact, Mattel obtained leave to amend its

8  complaint to assert claims against MGA, in part, by representing to the Court that it

9  had preserved the evidence that would be relevant to those claims. Discovery,

10  however, has revealed Mattel's representations to be a sham: in fact, Mattel has

11  engaged in a deliberate and systematic attempt to destroy relevant evidence, in

12  violation of its legal obligations and in a calculated effort to force defendants to

13  litigate this case on an evidentiary record riddled with gaps Mattel itself created.

14        Mattel's spoliation of evidence is astonishing both in its scope and in its

15  thoroughness. While Mattel admits that its 25,000 employees exchange more than

16  80,000 emails daily (or over 20,000,000 per year), Mattel has, to date, produced just

17  *1,200 emails*. Mattel's production of emails is so sparse because, despite

18  conducting a number of substantial investigations since at least early 2002 of the

19  very claims at issue here, *Mattel did not suspend its auto-deletion of email for*

20  *anyone, even its most obvious potential witnesses, or preserve any email backup*

21  *tapes*. In fact, Mattel continued to auto-delete email and to recycle backup tapes for

22  an *entire year after Mattel sued Mr. Bryant*. And although one Mattel witness

23  claims that Mattel "probably" preserved a 2002 backup tape for the server used by

24  its design center employees such as Carter Bryant, Mattel disposed of the hardware

25  necessary to review it, and it now admits -- contrary to its counsel's express

26  representations to this Court under oath -- that it has no backup tapes at all (1) for

27  the 1999-2001 period, (2) for 2003 (when the *Wall Street Journal* article was

28  published, in which Mattel first made its allegations public), or (3) for 2004 (when

EXHIBIT _____ MGA'S MOTION FOR TERMINATING
                           1                   SANCTIONS
PAGE _____         CV 04-09049 SGL (RNBX)

1    Mattel filed suit).

2         Mattel likewise did nothing to preserve physical documents. Mattel has thus

3    "lost" critical physical documents in this case: the phone records for Mr. Bryant's

4    telephone extension at Mattel for October 2000. These records are significant

5    because Mattel seeks to claim "Bratz" on the theory that he used Mattel resources

6    that very month to help MGA meet key milestones in the development of "Bratz."

7         As Mattel's counsel has written, "[b]y now, all lawyers know — or should

8    know — that bad things can happen if electronic evidence is not preserved."[1] Thus,

9    aware of the consequences of its misdeeds, Mattel attempted a cover-up:

10   •    Mattel concealed its internal investigation and other documents that
        reveal that it first was on notice of its claims against Bryant and MGA
11       no later than March 2002, at which time its duty to preserve relevant
        evidence attached.
12

13   •    Mattel repeatedly and aggressively evaded discovery by refusing for
        two years to produce witnesses familiar with its electronic document
14       preservation efforts.

15   •    When it finally produced those witnesses, Mattel's counsel directed
        them not to answer questions about post-2000 preservation practices.
16

17   •    Mattel represented to the Court, MGA, and Bryant that there had been
        no spoliation -- representations on which the Court expressly relied[2] --
18       but Mattel's witnesses have since admitted under oath that Mattel has
        no backup tapes for its e-mail servers for 1998 through April 2005.

19        The prejudice resulting directly from Mattel's actions cannot be overstated.

20   Mattel is asserting claims based on events that allegedly transpired long ago, in

21   1998-2000. It investigated these very claims when evidence existed and memories

22   were fresh, selectively saving certain evidence and destroying the rest. It then

23   waited years -- until memories had faded -- before bringing its claims.

24

25   [1] Quinn Emanuel, Business Litigation Report, *Spoliation of Electronic Evidence Gives
     Rise to Adverse Jury Instructions* (April 2005), Ex. 22 to the Declaration of Kendall Burr,
26   dated July 20, 2007 ("Burr Decl.").
     [2] *Bryant v. Mattel, Inc.,* No. CV-04-9049-SGL, slip op., at 13 (C.D. Cal. Jan. 12, 2006)
27   (allowing amendment because no "evidence that the e-mails so deleted from a Mattel
     employee's inbox are forever lost or, as is far more likely, whether such information
28   remains or is otherwise archived on some backup file on Mattel's computer system").

EXHIBIT'S MOTION FOR TERMINATING
SANCTIONS
CV 04-09049 SGL (RNBX)

PAGE _1785.006_

1     Mattel is a large, sophisticated company, with seemingly unlimited resources

2 to conduct scorched-earth litigation. It has retained prominent outside counsel, and

3 more than 30 lawyers have appeared in this case on its behalf. Given the attention

4 that Mattel and its lawyers have lavished on this case, Mattel's failure to preserve

5 and produce evidence, and its efforts to conceal its spoliation from the Court,

6 MGA, and Bryant, can lead only to the conclusion that its spoliation was intentional

7 and in bad faith. Mattel and its counsel sought to obstruct these proceedings,

8 deprive MGA and Bryant of relevant evidence that would support their defenses,

9 and gain an unfair advantage by convincing the Court that it should be allowed to

10 bring its claims long after the underlying facts at issue took place. Mattel's years of

11 misconduct and brazen misrepresentations warrant the imposition of the most

12 serious sanctions available: dismissal of Mattel's claims against Bryant and MGA.

13 **II.    BACKGROUND**

14     The following facts are based on testimony from Mattel's own witnesses and

15 documents that Mattel was ordered to produce:

16     **A.    Mattel Never Suspended Its Auto Delete Policy**

17     Mattel has an automatic e-mail destruction policy that has been in force since

18 1999, pursuant to which, Mattel's computer systems automatically delete emails

19 from an employee's in-box after 90 days. *See* Declaration of James P. Jenal, dated

20 July 20, 2007 ("Jenal Decl.") ¶9 Ex. 8 at 355-356. *Mattel has never suspended*

21 *that policy at any time during this litigation -- not even for key witnesses* of whom

22 it has known for years, like those listed in Mattel's initial disclosures. *See* Jenal

23 Decl., ¶9, Ex. 8 at 380-381; Declaration of Michael Keats, dated July 20, 2007

24 ("Keats Decl."), ¶5. The only reason Mattel has proffered for its failure to do so is

25 that it was supposedly too expensive for Mattel, a multi-billion dollar publicly held

26 company, to do so.[3] *Id.*

27 ──────────────────────

[3] Notably, Mattel seeks hundreds of millions of dollars of damages from Bryant and MGA

28 and has insisted that they incur enormous sums themselves to review and produce
electronic evidence. *See* Burr Decl., Ex. 2.

3     EXHIBIT MGA'S MOTION FOR TERMINATING SANCTIONS
CV 04-09049 SGL (RNBX)

PAGE _1785.007_

1    Similarly, Mattel did not retain backup tapes of its email systems from 1998-
2    April 2005. Jenal Decl., ¶3, Ex. 2 at 230-235. Mattel's email systems are backed-
3    up on tapes that are ordinarily kept for 30 days and then recycled. *Id.* ¶7, Ex. 6 at
4    157-158:5. Mattel did not suspend this practice until April 2005, *Id.* ¶9, Ex. 8 at
5    366-369, which again resulted in the destruction of potentially relevant emails.
6    Mattel offers no excuse for this destruction.

7    **B.    Mattel Was on Notice of Its Claims by 2002**

8    Mattel's failure to preserve evidence, in accordance with its legal obligations,
9    is particularly egregious given that Mattel was on notice of its claims against
10   Bryant and MGA since at least March 2002, when it conducted an extensive
11   internal investigation into the allegations that form the basis for this lawsuit. *See*
12   Burr Decl., ¶2. MGA and Bryant were unaware of this investigation until Mattel
13   produced documents concerning the investigation after being compelled to do so by
14   the Discovery Master.[4]  *Id.*, ¶2, Ex. 1.

15   Those documents reveal that, in March 2002, Mattel opened a formal
16   investigation in response to information provided by two Mattel employees, Evelyn
17   Viohl and Ivy Ross. *Id.*, ¶4, Ex. 3. According to Mattel's documents, Ms. Viohl
18   and Ms. Ross told Mattel that MGA had hired a number of former Mattel
19   employees and was manufacturing products they believed were based on Mattel
20   designs. *Id.* Mattel's investigators then set about to obtain information about MGA,
21   Isaac Larian, and Carter Bryant to support those allegations. On March 28, 2002,
22   Mattel employee Cassidy Park suggested to a Mattel investigator that Mr. Bryant, a
23   former employee and Mattel illustrator, had plagiarized the designs of Lily
24   Martinez in creating MGA's "Bratz" dolls. *Id.* ¶5, Ex. 4. That same day, a Mattel
25   investigator contacted Mattel's human resources department to obtain Mr. Bryant's
26

27   _____
     [4] Mattel refused to disclose any material documents regarding Mattel's investigation of
     MGA, MGA employees, and Mattel employees. On January 30, 2007, Judge Infante
28   ordered Mattel to produce its investigation files.

4

MEMRANDUM IN SUPPORT OF TERMINATING SANCTIONS
CV 04-09049 SGL (RNBX)

EXHIBIT
1785.008
PAGE

1   file for his investigation. Mattel also conducted an extensive investigation of MGA

2   and its employees.[5] *Id.*

3      Five months later, in August 2002, Mattel's CEO Bob Eckert received an

4   anonymous letter reciting the allegations that ultimately formed the basis for

5   Mattel's lawsuit against Mr. Bryant and MGA. *Id.* ¶6, Ex. 6. Richard De Anda, the

6   Head of Mattel's Worldwide Security Department, wrote an email to Alan Kaye,

7   Head of Human Resources, in response to Mattel's receipt of the August 2002

8   "anonymous letter," confirming that the allegations raised in the letter had been

9   under investigation for months. *Id.* ¶6, Ex. 7. In the email, Mr. De Anda states, "I

10   am aware of this situation and have been working on it for several months. My

11   frustration in this matter was the genesis of [redacted] *and that is now in the hands*

12   *of [Mattel's General Counsel,] Robert Normile.*" *Id.* (emphasis added).

13      Thus, Mattel and its General Counsel were on notice of Mattel's claims

14   against Bryant and MGA just months after MGA's "Bratz" dolls first went to

15   market in June 2001.[6] *See* Burr Decl., Ex. 23. Yet in spite of Mattel's internal

16   investigation, which began in early 2002 and involved Mattel's General Counsel,

17   Mattel did nothing between 2002-2005 to collect relevant email, to suspend its

18   auto-delete policy, or to preserve back-up tapes of electronic files.

19     **C.**    **The 2003 Investigation and the *Wall Street Journal* Article**

20      Mattel's focus on MGA and Bryant did not let up after 2002. In mid-2003,

21   Mattel initiated yet another investigation of MGA. This investigation, too, involved

22   allegations of misappropriating Mattel's intellectual property and copying of Mattel

23

24

25

26

27

28

---

[5] In addition to information about Mr. Bryant and MGA, the March 2002 investigation file contains personal information about Mr. Larian, such as his social security number, age, home address, and business address, and similar information for his parents, wife, and children. Burr Decl. ¶ 5, Ex. 5. Mattel investigators even probed into details about Larian's personal endeavors, including information about Larian's involvement with the Parent-Teacher Association at El Rodeo School and his attendance at the Stephen S. Wise Temple, as well as his hobbies. *Id.*

[6] Notwithstanding the facts revealed by its own evidence, Mattel falsely alleges in its Amended Answer and Counterclaims and elsewhere, that it only learned of Bryant's association with MGA on November 24, 2003. Burr Decl. ¶3, Ex. 2.

MGA'S MOTION FOR TERMINATING
SANCTIONS
CV 04-09049 SGL (RNBX)

EXHIBIT _____

PAGE _1785.009_

1  products by MGA employees.  Again, Mattel conducted an FBI-type investigation

2  of MGA and its employees.  Burr Decl. ¶30, Ex. 30.

3      In April 2004, Mattel turned its suspicious eye toward a new employee,

4  Ronald Brawer.  Mattel learned that Brawer had been communicating with MGA

5  and immediately opened a new investigation.  Mattel searched public records using

6  Brawer's social security number, reviewed his e-mails, searched his phone records,

7  and searched his corporate apartment in New York City.  *Id.* ¶31, Ex. 31.  Thus, by

8  that time, Mattel was on notice of potential trade secret claims that it did not

9  ultimately bring until January 2007.  *Id.*, Ex. 2.

10     Mattel also admits that, in mid-2003, it placed a story with the *Wall Street*

11  *Journal* as part of its effort to promote a new product line intended to compete with

12  "Bratz."  Keats Decl. ¶2, Ex. 1.  In doing so, Mattel employees took the opportunity

13  to publish Mattel's theory.  The *Wall Street Journal* reported:

> Inside Mattel, some are convinced the "Bratz" borrow liberally from a
> Mattel project that was scrapped at the testing stage in 1998…[The
> "Bratz"] oversized heads - with their pursed lips and cartoonist eyes -
> are "virtually identical" to the heads of the dolls her team created, says
> the designer, who left Mattel in 2001…"The big heads, the big eyes,
> the big feet - they were all the same" as 'Bratz.'"

18  *Id.* ¶3, Ex. 2.  Julia Jensen, the Mattel employee who placed the article, specifically

19  testified that she exchanged emails with the *Wall Street Journal* reporter who wrote

20  this article yet, to this day, Mattel has not produced any emails reflecting her

21  communications or internal discussions about those communications or about the

22  article itself.  *Id.* ¶4, Ex. 1 at 103-104, 170-171; Ex. 3; Burr Decl. ¶7.  Why?

23  Because Mattel knowingly allowed those emails to be destroyed, even though it

24  was actively investigating MGA and Bryant for the same conduct.

25  **D.    Mattel Sues Bryant and "Does" in 2004**

26     Mattel filed its original complaint against Bryant in April 2004.  *See* Burr

27  Decl., Ex. 8.  That complaint contained, almost verbatim, the allegations that Mattel

28  investigated in 2002.  Yet at no time *before or for an entire year after* filing its

6

MOTION FOR TERMINATING
SANCTIONS
CV 04-09049 SGL (RNBX)

EXHIBIT
PAGE   1785. 010

1   lawsuit did Mattel do anything to suspend its auto-delete policy for possible

2   witnesses or take backup tapes out of circulation.  Jenal Decl., ¶9, Ex. 8 at 366-369.

3       It was only *after* MGA sued Mattel in 2005 (hereinafter "*MGA v. Mattel*")

4   that Mattel started taking email backup tapes out of circulation. *Id.*  In fact, Mattel

5   concealed the existence of these tapes from MGA until only recently, and admits

6   that it has not searched them and has no intention of doing so. Keats Decl., ¶¶5-6,

7   Exs. 4-7. Even if the tapes were searched, the earliest emails on those tapes would

8   date back only to early 2005 -- leaving a gaping evidentiary hole prior to that time.

9   Jenal Decl., ¶9, Ex. 8 at 366-369.

10      **E.    MGA's Document Retention Demands**

11      In mid-April, 2005, MGA filed its own suit against Mattel.  In a letter dated

12  April 16, 2005, MGA demanded that Mattel "immediately suspend any document

13  retention or destruction policy, including, but not limited to, the deletion of emails

14  or other electronic records, and take any and all measures necessary, including

15  retaining archival documents in storage and backing-up and/or mirroring electronic

16  records and metadata . . ." Burr Decl., Ex. 12.  Mattel promptly assured MGA that

17  *it would* preserve documents "relating to the accused Mattel products and the third-

18  party organizations referenced in the complaint." *Id.*, Ex. 13.  Mattel went on to

19  explain that it would not suspend its auto-delete policy for *all* of its 25,000

20  employees (a request that MGA never made), because of the purported massive

21  volume of email and other electronic data created by its employees worldwide;

22  according to Mattel's counsel, Mattel processes over 80,000 email messages per

23  day over its servers.[7] *Id.*  Mattel nonetheless indicated in its response that it was

24  aware of its obligations to preserve evidence, and would comply with them -- which

25  obligations clearly encompass a duty to preserve emails and electronic documents

26  _____

27  [7]  Mattel invited MGA to agree to Mattel's approach to document preservation and
    threatened to seek intervention from the Court if MGA did not, including requiring MGA
    to bear the cost of document retention. Burr Decl., Ex. 13.  Mattel's preservation

28  obligations arise by law, and MGA saw no reason to enter into any such agreement.

MGA'S MOTION FOR TERMINATING
SANCTIONS
CV 04-09049 SGL (RNBX)

EXHIBIT

PAGE      17-85.011

1   of reasonably likely witnesses. *Id.* MGA sent Mattel another preservation demand

2   on September 5, 2005. *Id.*, Ex. 14. MGA sent these letters to make sure Mattel

3   would retain documents relevant to MGA's claims against Mattel, not knowing that

4   Mattel had chosen not to retain documents concerning the claims Mattel had

5   brought the previous year.

**F.   Mattel Stonewalls MGA's Efforts to Obtain Discovery about Email Preservation**

8        The record is similarly replete with evidence that Mattel actively sought to

9   frustrate MGA's efforts to obtain discovery concerning Mattel's preservation

10  efforts. On December 21, 2004, just days after MGA intervened, Mr. Bryant served

11  a 30(b)(6) deposition notice requesting that Mattel provide designees on the issues

12  of email and document retention. Jenal Decl. ¶4. Mattel refused to do so. At Mr.

13  Bryant's request, he and Mattel met and conferred on March 14 and 15, 2005,

14  regarding Mattel's failure to designate witnesses in response to Bryant's 30(b)(6)

15  notice. *Id.* ¶4. Mattel delayed another two months -- until May 16, 2005 -- before

16  designating its witnesses. *Id.* ¶4. On May 23, 2005, this Court stayed discovery

17  pending Mattel's appeal to the Ninth Circuit of the Court's denial of Mattel's

18  motion to remand, thus saving Mattel from having to produce its Information

19  Technology witnesses for deposition. Burr Decl., Ex. 15.

20       On August 10, 2006, after the stay was lifted, MGA requested deposition

21  dates for Mattel's 30(b)(6) witnesses on, among other topics, Mattel's "Zeus"

22  server (which is used by Mattel doll designers and others in its design center) and

23  its email servers. Jenal Decl. ¶4. On September 12 and November 8, 2006, MGA

24  deposed Julia Marine, the administrator of Mattel's Zeus file server, who testified

25  that, although a backup tape set "probably" from 2002 had been provided to

26  Mattel's legal department, Mattel no longer had the ability to restore and search

27  those tapes for responsive documents because it had disposed of the hardware

28  needed to read the backup tapes. *Id.* ¶2, Ex. 1 at 111-112, 117-119. Ms. Marine

1    further testified that she had no idea what was on the 2002 backup tapes. *Id.*

2        Over the next several months, MGA and Bryant sought to depose Mattel's

3    designated witness on its email system. *Id.* ¶ 4. Although Mattel had identified

4    witnesses for *other* electronic information categories on or about August 18, 2006,

5    notably, Mattel had refused to identify a witness or provide a date for a deposition

6    on topics *concerning Mattel's electronic mail.* *Id.* On three separate occasions

7    throughout the Fall, MGA reiterated, in writing, its previously ignored requests that

8    Mattel schedule the deposition of its "email" designee. *Id.* ¶4, Ex. 3. Mattel finally

9    responded by letter on October 20, 2006, offering David Kayano as its designee and

10   setting the week of December 6 – nearly seven weeks later and nearly four months

11   after being first asked in August 2006 – for a deposition on its electronic mail

12   system and practices. *Id.* Mattel ignored MGA's requests for an earlier date, and

13   when MGA consented to go forward on December 6, Mattel unilaterally cancelled

14   the deposition pending agreement on the appointment of a discovery master. *Id.*

15   Once the parties had reached agreement on a discovery master, Mattel again refused

16   to produce Mr. Kayano on December 6, claiming by letter on December 1 that Mr.

17   Kayano would be unavailable until after January 16, 2007. *Id.* ¶5, Ex. 4. This time,

18   Mattel's excuse for Mr. Kayano's unavailability was that Mattel had recently

19   acquired another company and that Mr. Kayano would be busy working on that

20   acquisition; a press release on Mattel's website stating that the acquisition had been

21   completed on October 3, 2006, *before* Mattel had even designated Mr. Kayano as

22   its witness belied Mattel's assertion, however. *Id.* ¶6, Ex. 5.

23       When Mattel finally produced Mr. Kawashima as a substitute for deposition

24   after the hearing on Mattel's motion for leave to amend, Mr. Kawashima admitted

25   that Mattel had no email backups at all from 1998 through 2000. *Id.* ¶7, Ex.6 at

26   195-198. When MGA tried to question Kawashima about email backups after

27   2000, Mattel's counsel instructed him not to answer, purportedly because, in 2004,

28   well before MGA sued Mattel or Mattel amended its Answer and Counterclaims,

MGA'S MOTION FOR TERMINATING
SANCTIONS

EXHIBIT
PAGE    CV 04-09049 SGL (RNBx)

1  the parties had supposedly agreed to limit the 30(b)(6) testimony concerning emails

2  to the period during which Bryant was employed at Mattel. *Id.* at 195-198. MGA

3  disagreed and was forced to file a motion to compel to obtain information about

4  Mattel's post-2000 email preservation efforts. Burr Decl., Ex. 24. Even in the face

5  of a court order, Mattel delayed further, refusing to make Mr. Kawashima available

6  for deposition until June 2007. Jenal Decl., ¶8.

7  **G.  Mattel Perpetrates a Fraud on the Court**

8  Mattel's pattern of improper conduct extended to its submissions to the

9  Court. In November 2006, Mattel moved to amend its complaint so that it could

10  bring "aiding and abetting" and copyright infringement claims against MGA, and to

11  assert other claims for misappropriation of trade secrets and RICO violations in the

12  *Bryant* case. MGA opposed Mattel's motion to amend on several grounds,

13  including because the proposed claims related to events of long ago, and also

14  because it appeared that Mattel had not preserved key electronic documents, in two

15  forms – (1) although Mattel had led MGA to believe that it has preserved backup

16  tapes of its Zeus server, it had not preserved hardware capable of reading it;[8] and

17  (2) it appeared that emails were not being preserved. Burr Decl., Ex. 17 at 9:15-

18  10:16, 15:6-15:11. Mattel has more than 25,000 employees and claims that its

19  email server handles 80,000 emails on a *daily* basis, yet had produced virtually no

20  emails. Indeed, to date, Mattel's production has included only a mere 1,200 emails.

21  MGA strongly suspected, and hence argued, that Mattel had purposely delayed the

22  deposition of Mattel's witness on electronic document retention in an effort to

23  deprive MGA and Bryant of evidence to back up their spoliation concerns. *Id.*

24  For its part, Mattel denied that spoliation had occurred. *Id.*, Ex. 18 at 5:1-6:6.

25  To support that denial, Mattel's counsel submitted a sworn declaration claiming

26  that Mattel had backups of the "file server known as Zeus that were created in

27

28  [8] The Zeus server houses concept data and design drawings. Electronic mail also can be stored on Zeus, but that is not its main function. Jenal Decl ¶ 2, Ex. 1 at 94:5-95:4.

10

EXHIBIT

PAGE     1785.014

1    1998, 1999, 2000, and 2001 and at various other times." *Id.*, Ex. 19 at ¶14.

2    Regarding email preservation, Mattel also argued that "equally erroneous is MGA's

3    unexplained assertion that 'email records' have 'disappeared.'" Id., Ex. 18 at 5:25.

4    In conclusion, Mattel argued that MGA could not "identify any relevant evidence

5    that was lost" and that "[t]here had been no spoliation." *Id.* at 6:5-6.

6        Relying in part on Mattel's representation that evidence had been preserved

7    and was readily available, the Court granted Mattel's motion for leave to amend.

8    *Id.* ¶20, Ex. 20. The Court did not interpret Ms. Marine as saying that information

9    on the Zeus server backup tapes that Mattel may possess had been "'eliminated' or

10   forever lost." *Id.* at 11:19-25. Turning to MGA's claim that email records were

11   also missing, the Court then noted:

12           MGA next surmises that Mattel's e-mail records have disappeared, not
             because it has any proof on that point, but simply because Mattel has
13           postponed the deposition of the individual most knowledgeable of
             Mattel's email records until after the hearing on Mattel's motion for
14           leave to amend. ... MGA then makes much of a deposition from a
             Mattel executive, Alan Kaye, who testified that e-mails in his inbox
15           would be automatically deleted if they had remained there for more
             than a certain time period. ... *Noticeably absent from MGA's*
16           *argument is any evidence that the e-mails so deleted from a Mattel*
             *employee's inbox are forever lost or, as is far more likely, whether*
17           *such information remains or is otherwise archived on some backup file*
             *on Mattel's computer system.*[9]
18

19       The Court determined that "absent concrete proof that spoliation has

20   occurred, nothing in MGA's argument forms a basis for denying Mattel its

21   requested leave to amend." *Id.* at 13:5-13:7. Mattel's representations to the Court

22   on these issues, however, were demonstrably false.

23   **H.    Discovery Has Revealed Mattel's Spoliation**

24       In spite of Mattel's efforts at concealment, defendants have now uncovered

25   the "concrete proof" of spoliation to which the Court's decision alluded.

26

27

28   ⁹ *Id.* at 12:16-13:5. (citations omitted) (emphasis supplied).

MGA'S MOTION FOR TERMINATING
SANCTIONS
CV-04-09049 SGL (RNBX)

11

EXHIBIT 12
PAGE 1785-875

1          (a)    **Mattel Overwrote Its Backup Tapes from 2002-2005**

2        On June 13, 2007, during a meeting about Mattel's deficient document

3 production, Mattel revealed for the first time that it had not suspended its auto

4 delete policy for anyone, and that it either had no back-up tapes or would not search

5 them. Keats Decl. ¶5. When MGA advised Mattel of MGA's serious concerns

6 about these revelations, Mattel scrambled to take back its admission, assuring MGA

7 that a satisfactory explanation would be provided the following week at the long-

8 delayed continuation of the Kawashima deposition. *Id.* at ¶6, Exs. 5-7. Mattel also

9 took the insupportable position that its May 2005 response to MGA's preservation

10 letter relieved it of any obligation to suspend its auto delete policy. *Id.*, Ex. 7.

11        On June 19, 2007, Mr. Kawashima confirmed what Mattel's counsel had told

12 MGA during the June 13, 2007 meet and confer, namely, that Mattel had *not*

13 suspended its auto delete policy for anyone. Mr. Kawashima also revealed that

14 Mattel had only started preserving its back-up tapes on **April 19, 2005** -- a full

15 *three years* after Mattel began its investigation into Bryant, MGA, and the origin of

16 "Bratz," and more than *one year after* Mattel had brought suit against Carter

17 Bryant. Jenal Decl. ¶9, Ex. 8 at 300. Mr. Kawashima further testified that Mattel

18 had not preserved the emails from the year 2000 of Carter Bryant, and key

19 witnesses Mercedeh Ward, Cassidy Park, Lily Martinez, Ann Driskill, Paula

20 Treantafelles or the Diva Starz designers, or emails of Robert Eckert, Alan Kaye,

21 and Richard De Anda from 2002 - 2005, while these very people were investigating

22 the allegations brought here.[10] *Id.* ¶9, Ex. 8 at 493-503.

23        As Mattel watched its spoliation story spill out through Mr. Kawashima's

24 testimony, Mattel once again attempted to stem the tide by instructing him not to

25 answer questions about document retention, purportedly on the ground that a level

26 of confidentiality *beyond attorneys' eyes only* should apply. *Id.* ¶8, Ex. 7.

27

---

28 [10] Mattel has not searched its post-April 2005 backup tapes either. Jenal Decl. ¶9, Ex. 8 at 311:25-312:24.

1   Notwithstanding Mattel's last-minute request, and the lack of merit in its position,

2   MGA agreed to treat Mr. Kawashima's answers as Mattel requested, subject to

3   MGA's right to challenge Mattel's newly-invented designation at a later date before

4   the Discovery Master. *Id.* Mattel rejected MGA's proposed accommodation and

5   instructed Mr. Kawashima not to answer on the grounds that his answers might

6   reveal Mattel's "security measures." *Id.*[11]

7         (b)   **There Are No Zeus Server Backup Tapes from 1998-2001**

8        Not only did Mattel fail to suspend its auto delete policy, at the very least, for

9   key witnesses, as it was required by law to do, but Mattel also permitted

10   destruction of relevant backup tapes that would have allowed it to recover the files

11   it had destroyed. At the continuation of the deposition of Julia Marine on June 26,

12   2007, Ms. Marine testified, on behalf of Mattel, that while Mattel may have

13   retained a backup of the Zeus server in 2002,[12] it had not retained *any other* backup

14   tapes *prior to 2002.* Jenal Decl. ¶3, Ex. 2 at 230-235. Ms. Marine's testimony

15   squarely contradicts the sworn declaration Mattel submitted in support of its

16   motion for leave to amend its Answer and Counterclaims, in which Mattel's

17   counsel told this Court that Mattel had backup tapes of the Zeus server "created in

18   1998, 1999, 2000, and 2001 and at various other times." Burr Decl., Ex. 19 at ¶14.

19

20   [11] Indeed, recent deposition testimony from just one week ago demonstrates that Mattel
21   continues to improperly restrict questioning of witnesses regarding the preservation of
     emails, and is apparently coaching its witnesses during breaks in order to prepare them to
     "clean up the record" when the depositions continue. Burr Decl. ¶26, Exs. 25-26.

22   [12] Marine's testimony that the oldest preserved backup for Zeus is from "probably 2002"
     is suspect. She testified that regular off-site backups were rotated on a two to three month
23   cycle until she received an email from Mattel's legal department to preserve documents.
     Jenal Decl. ¶ 2, Ex. 1 at 101:3-16. Although Marine testified that she had "no idea" when
24   she received that email, Kawashima was absolutely certain it was April 18, 2005. *Id.* ¶ 9,
     Ex. 8 at 366:1-14. Thus, it is highly unlikely that Mattel still had a 2002 backup tape in
25   2005 -- unless Mattel had previously set it aside for other reasons as yet unrevealed. In
     her resumed deposition in June of this year, Marine revealed for the first time that from
26   time-to-time -- literally whenever it seemed to her like a good idea and she had enough
     tapes lying around to do it (*Id.* ¶3, Ex. 2 at 230:17-235:21) -- she would create a backup
27   that would be kept for two years. She testified that the oldest such backup that she would
     have "might" date back to 2005. Thus, by to her own calculations, her oldest backup tape
28   would date to 2003, not 2002.

13

EXHIBIT _113_

PAGE _1785.017_

MGA'S MOTION FOR TERMINATING SANCTIONS
CV 04-09049 SGL (RNBX)

1  Ms. Marine specifically stated that she -- as the Zeus server administrator and the

2  person responsible for performing the backups of that server -- was unaware of the

3  existence of *any* backups going back to 2001, let alone for 1998-2000.[13]  Jenal

4  Decl. ¶3, Ex.2 at 230-235.  To this day, Mattel's counsel has not filed anything

5  with the Court to correct the clearly false statements of its counsel.

6         (c)    **Mattel "Lost" Carter Bryant's October 2000 Phone Records**

7        MGA long ago requested, but has yet to receive, logs for Carter Bryant's

8  telephone extension at Mattel for the month of October 2000, the month in which

9  he signed his contract with MGA and left Mattel.  Burr Decl. ¶22, Ex. 21.  At the

10  deposition of Rodney Palmer, Jr., Mattel's designated 30(b)(6) witness on Mattel's

11  phone logs, Mr. Palmer testified that Mattel retains data going back to 2000

12  regarding calls placed from Bryant's extension, but that he had no knowledge of

13  what became of the data for October 2000. Jenal Decl. ¶11, Ex. 9 at 55-57, 103-

14  110. Mr. Palmer believes that these logs must have gotten "lost," even though they

15  were supposedly turned over to Mattel's Legal Department sometime *in the 2003-*

16  *2004* period. *Id*.  The month of October 2000 is a critical time period relevant to

17  Mattel's claims against Mr. Bryant that he, while still employed at Mattel in

18  October 2000, assisted MGA in meeting important milestones in the development

19  of "Bratz." Mattel has yet to explain their disappearance.[14]

20  **III.  ARGUMENT**

21        Mattel has engaged in a conscious and systematic effort to destroy evidence

22  relevant to its claims against MGA and Mr. Bryant thereto, and then deliberately

23  sought to conceal its efforts.  Mattel's conduct is in plain violation of its legal

24

25  [13] Mattel still has not searched whatever Zeus backup tapes it claims to have and Ms. Marine testified that she had "no idea" what is on them. Jenal Decl. ¶2, Ex.1 at 111-112.

26  [14] This may not be the only instance of crucial evidence from October 2000 disappearing. Mattel claims that it cannot locate any of Bryant's time records after September 8, 2000.

27  Although its 30(b)(6) witness speculated that those records never existed, he conceded that they could have been deleted without leaving any record that they had been deleted.

28  Burr Decl., Ex. 27 at 115-16.

1    obligations, is highly prejudicial, and warrants terminating sanctions.

2    **A.    Mattel's Conduct Warrants Terminating Sanctions**

3            **1.    The Court Has Inherent Power To Dismiss Mattel's Claims
4                    for Spoliation of Evidence**

5        The Court may impose terminating sanctions when "a party has engaged

6    deliberately in deceptive practices that undermine the integrity of judicial

7    proceedings." *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006) (affirming

8    dismissal sanction with prejudice where plaintiff had deleted files from laptop

9    during pendency of litigation); *Anheuser-Busch, Inc. v. Natural Beverage Distribs.*,

10   69 F.3d 337, 348 (9th Cir. 1995) (affirming dismissal of counterclaim).[15]  The

11   power to terminate is part of the inherent power "necessarily vested in courts to

12   manage their own affairs so as to achieve the orderly and expeditious disposition of

13   cases." *Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363, 368

14   (9th Cir. 1992) (citation omitted).  This power allows the Court "to levy sanctions

15   in response to abusive litigation practices" like those at issue here, namely,

16   spoliation of evidence. *Id.*; *Leon,* 464 F.3d at 958.  Imposition of dismissal

---

17   [15] Numerous other courts have issued terminating sanctions for the failure to preserve
18   evidence. *See Wm. T. Thompson Co. v. General Nutrition Corp.*, 593 F. Supp. 1443, 1455
     (C.D. Cal. 1984) (entering default judgment where defendant failed to preserve documents
19   that it reasonably should have known were relevant to litigation and responsive to
     discovery requests); *Metropolitan Opera Ass'n, Inc. v. Local 100 Hotel Employees and*
20   *Restaurant Employees Int'l Union*, 212 F.R.D. 178 (S.D.N.Y. 2003) (granting terminating
     sanctions where defendants destroyed "a year's worth" of electronic documents from the
21   most relevant time period in the action); *In re Wechsler*, 121 F. Supp. 2d 404, 415 (D.
     Del. 2000) ("When [document] destruction is willful or in bad faith and intended to
22   prevent the other side from examining the evidence, the court may impose the most severe
     sanction of all – the outright dismissal of a claim or the entry of a default judgment.");
23   *Carlucci v. Piper Aircraft Corp.*, 102 F.R.D. 472, 485-86 (S.D. Fla. 1984) (entry of
     default is an appropriate remedy for litigants who destroy evidence and for remedying the
24   wrong caused to the other side); *Computer Associates Int'l. v. American Fundware, Inc.*,
     133 F.R.D. 166, 170 (D. Colo. 1990) (entering default judgment where defendant failed to
25   suspend general practice of destroying previous versions of software code after it should
     have been aware that litigation over code was imminent); *Synanon Church v. United*
26   *States*, 820 F.2d 421, 427-28 (D.C. Cir. 1987), *aff'd* 579 F. Supp. 967 (D.D.C. 1984)
     (affirming dismissal based on finding in separate litigation that plaintiff deliberately
27   destroyed documents relevant to claims and potential defenses); *Frame v. S-H, Inc.*, 967
     F.2d 194, 203 (5th Cir. 1992) (striking defendant's pleadings where incomplete
28   production indicated that relevant documents and electronic records were destroyed).

MGA'S MOTION FOR TERMINATING
SANCTIONS
CV 04-09049 SGL (RNBX)

EXHIBIT ___ *113*

PAGE ___ *1785.019*

1    sanctions is appropriate if there is evidence of "willfulness, fault, or bad faith" by

2    the sanctioned party. *See id.* (affirming dismissal of counterclaim where plaintiff

3    was prejudiced by counter-claimant's willful concealment of relevant documents);

4    *Unigard*, 982 F.2d at 368 n.2; *Anheuser-Busch*, 69 F.3d at 348.

5         A party need not demonstrate that spoliation was deliberate or in bad faith to

6    support sanctions, however.  In this Circuit, the moving party need show only that

7    the spoliating party had notice that the destroyed evidence was potentially relevant

8    to the litigation. *Leon,* 464 F.3d at 959; *Akiona v. United States*, 938 F.2d 158, 161

9    (9th Cir. 1991).  Indeed, a district court need only find "disobedient conduct not

10   shown to be outside the control of the litigant" before ordering dismissal sanctions.

11   *Henry v. Gill Industries, Inc.*, 983 F.2d 943, 948-949 (9th Cir. 1993) (plaintiff

12   offered various explanations for his conduct delaying discovery, but "none

13   persuades that circumstances outside his control caused his transgressions").

14   Dismissal sanctions are available where the conduct to be sanctioned is due to

15   "willfulness, fault, *or* bad faith." *Id.* at 946 (citation omitted); *Anheuser Busch*, 69

16   F.3d at 348 (emphasis added).  Mattel's conduct warrants terminating sanctions

17   under any of these standards.

             **2.    Mattel Had a Duty To Preserve Evidence At Least As Early
18                   As March 2002**

19

20        A party has a duty to preserve evidence as soon as it is on notice of its

21   potential claims. *National Ass'n of Radiation Survivors v. Turnage*, 115 F.R.D. 543,

22   556-57 (N.D. Cal. 1987); *Cecconi v. Cecconi*, 2007 Bankr. LEXIS 1323 *56 (Bankr.

23   N.D. Cal. April 17, 2007) (plaintiff had duty to preserve evidence "as soon as a

24   potential claim is identified") (citation omitted).  Mattel was on notice of the very

25   claims it brings here at least as early as March, 2002 when it began investigating

26   allegations that Mr. Bryant had stolen Mattel designs and given them to MGA to

27   manufacture and produce "Bratz" dolls.  Accordingly, Mattel has had a duty to

28   preserve evidence -- whether helpful to it or not -- since at least March, 2002.

EXHIBIT _____ 113

PAGE    1785.020

### 3.  Mattel's Duty to Preserve Required It to Suspend its Routine Document Destruction Policies

Once a plaintiff reasonably anticipates litigation, it must "suspend its routine document retention and destruction policies and put in place a 'litigation hold' to ensure the preservation of relevant documents." *Housing Rights Ctr. v. Sterling*, 2004 U.S. Dist. LEXIS 28877, at *21 (C.D. Cal. Dec. 6, 2004) (quoting *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003) ("*Zubulake IV*"). Mattel and its counsel were well aware of this obligation. Quinn Emanuel, Business Litigation Report, *New e-Discovery Rules Go Into Effect* (Jan. 2007) ("good faith may require…that a party intervene to suspend certain features of the routine operation of an information system to prevent loss of information"); Quinn Emanuel, Business Litigation Report, *Preservation of Electronic Information for Discovery: Emerging Standards* (Nov. 2004) ("at the outset of litigation or "when litigation is reasonably anticipated," party should suspend routine document retention or destruction policy and implement litigation hold). Burr Decl. Exs. 28-29. "While a litigant is under no duty to keep or retain every document in its possession… it is under a duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery, and/or is the subject of a pending discovery request." *Wm. T. Thompson Co. v. General Nutrition Corp.*, 593 F. Supp. 1443, 1455 (C.D. Cal. 1984).[16] Mattel did not do so.

---

[16] *Zubulake IV* set forth a party's basic obligations when the duty to preserve arises: (a) a party must "preserve what it knows, or reasonably should know, is relevant to the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request;" (b) this duty extends to the key individuals in a case – those who are likely to have relevant information – and encompasses documents created by and prepared for them; (c) although a litigation hold need not apply to backup tapes maintained solely for disaster recovery, such a hold should apply to backup tapes used on a regular basis for information retrieval; and (d) to the extent a party can identify backup tapes containing documents of "key players," these tapes, for disaster recovery and information retrieval, should be preserved if the information is not otherwise available. 220 F.R.D. at 217-18.

MGA'S MOTION FOR TERMINATING SANCTIONS
CV 04-09049 SGL (RNBX)

EXHIBIT ___113___

PAGE ___1785.021___

1     Beginning in March 2002, Mattel was required to maintain the relevant
2  electronic evidence for individual witnesses, including emails and other electronic
3  documents, and to preserve backup tapes of those witnesses' files related to the
4  litigation if the information was not otherwise available. *See Cache La Poudre*
5  *Feeds, LLC v. Land O'Lakes, Inc.*, 2007 WL 684001 (D. Colo. Mar. 2, 2007)
6  ("Once a 'litigation hold' has been established, a party cannot continue a routine
7  procedure that effectively ensures that potentially relevant and readily available
8  information is no longer 'reasonably accessible'"); *DaimlerChrysler Motors v. Bill*
9  *Davis Racing, Inc.*, 2005 U.S. Dist. LEXIS 38162 (D. Mich. 2005) (normal
10  procedures for destruction of documents must be suspended when a party is on
11  notice that documents may be relevant to litigation); Quinn Emanuel, Business
12  Litigation Report, *Preservation of Electronic Information for Discovery: Emerging*
13  *Standards* (recommending that companies preserve electronically stored
14  information of key employees even if "inaccessible") (Burr Decl., Ex. 29).

15     Mattel's spoliation of evidence cannot seriously be disputed. Mattel admits
16  that it did not suspend the automatic deletion of email for potential witnesses at any
17  time, Jenal Decl., ¶9, Ex. 8 at 380:14-381:3, and admits that it maintained no
18  backup tapes for email before April 2005. *Id.* at 300:12-301:7. Similarly, while
19  Mattel claims it "probably" has a 2002 back up tape of the "Zeus" server used by its
20  design center employees, *Id.*, ¶2, Ex. 1 at 99:4-15; ¶3, Ex. 2 at 209:1-24, it admits it
21  retained no other back up tape until April 2005 and did not issue a litigation hold
22  memo until April 2005. *Id.*, ¶9, Ex. 8 at 367:25-369, 404:4-405:16. Therefore
23  email and data from before April 2005, save for what might be on a 2002 Zeus back
24  up tape Mattel "probably" kept, are permanently lost. *Id.*

25          **4.   Mattel's Failure to Suspend Auto Delete and Maintain**
26               **Backup Tapes Constitutes "Willfulness, Fault or Bad Faith"**
               **Warranting Terminating Sanctions**

27     A party's destruction of evidence qualifies as willful spoliation if the party
28  has "some notice that the documents were potentially relevant to the litigation be-

MGA'S MOTION FOR TERMINATING
SANCTIONS
CV 04-09049 SGL (RNBX)

18

EXHIBIT _____ 113 _____

PAGE _____ 1785 022 _____

1   fore they were destroyed." *United States v. Kitsap Physicians Serv.*, 314 F.3d 995,

2   1001 (9th Cir. 2002) (emphasis added) (internal quotation marks and citation

3   omitted).  Moreover, because "the relevance of . . . [destroyed] documents cannot

4   be clearly ascertained because the documents no longer exist," a spoliating party

5   "can hardly assert any presumption of irrelevance as to the destroyed documents."

6   *Alexander v. Nat'l Farmers Org.*, 687 F.2d 1173, 1205 (8th Cir. 1982).  As set forth

7   above, Mattel was well on notice of its claims -- and indeed investigated those

8   claims -- in 2002, yet chose to allow obvious evidence concerning the factual

9   underpinnings of its claims to be destroyed.  Then, in addition to failing to suspend

10   its routine document destruction policies, Mattel actively concealed its failure from

11   both MGA and this Court.  Such conduct is "willful" spoliation.

12         Even if its conduct had not been willful (which it was), Mattel's failure to

13   implement a litigation hold or take adequate measures to preserve evidence

14   constitutes the requisite "fault" warranting terminating sanctions.  *UMG*

15   *Recordings, Inc. v. Hummer Winbald Venture Partners*, 462 F. Supp. 2d 1060,

16   1068 (N.D. Cal. 2006) (deletion of emails in violation of a duty to preserve, even if

17   not willful, can still meet the "fault" standard because such conduct demonstrates

18   gross negligence); *see also Padgett v. City of Monte Sereno*, No. C 04-03946 JW,

19   2007 U.S. Dist. LEXIS 24301 *9 (N.D. Cal. March 20, 2007) ("Whether

20   characterized as willful or negligent, [defendant's] conduct constitutes the kind of

21   "fault" sufficient to warrant sanctions, including dismissal").  Indeed, such a

22   failure, especially for a party clearly on notice of potential litigation, goes beyond

23   mere "fault," and constitutes bad faith, "gross spoliation" warranting severe

24   sanctions.  *Broccoli v. Echostar Communications Corp.*, 229 F.R.D. 506, 510-512

25   (D. Md. 2005) (large corporation with ample financial resources had "clearly acted

26   in bad faith in its failure to suspend its email and data destruction policy" after its

27   duty to preserve electronic documents had been triggered).  *See also Mosaid*

28   *Technologies Inc. v. Samsung Elecs. Co., Ltd.*, 348 F. Supp. 2d 332, 339 (D.N.J.

EXHIBIT __113__                    MGA'S MOTION FOR TERMINATING
                                   SANCTIONS
                                   CV 04-09049 SGL (RNBX)

PAGE ____1785.023____

1   2004) ("When the duty [to preserve potentially relevant evidence] is triggered, it

2   cannot be a defense to a spoliation claim that the party inadvertently failed to place

3   a 'litigation hold' or 'off switch' on its document retention policy to stop the

4   destruction of that evidence"); *Convolve, Inc. v. Compaq Computer Corp.*, 223

5   F.R.D. 162 (S.D.N.Y. 2004) ("in the world of electronic data, the preservation

6   obligation is not limited simply to avoiding affirmative acts of destruction").

7       Mattel's spoliation was in bad faith and -- at a minimum -- satisfies the

8   "fault" requirement to impose severe sanctions. *See In re Fitzsimmons*, 920 F.2d

9   1468, 1472 (9th Cir. 1990) (misrepresentation of facts to court is bad faith).[17]

10      **B.      Mattel's Spoliation Meets The Test Set Forth In *Anheuser Busch***

11      Before issuing terminating sanctions, district courts in this Circuit should

12  consider the following factors: "(1) the public's interest in expeditious resolution of

13  litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the

14  party seeking sanctions; (4) the public policy favoring disposition of cases on their

15  merits; and (5) the availability of less drastic sanctions." *Anheuser-Busch*, 69

16  F.3d at 348; *see also Leon*, 464 F.3d at 958 (applying five-part standard in the

17  context of dismissal sanctions for spoliation of evidence pursuant to the district

18  court's inherent authority to sanction). The district court need not make explicit

19  findings regarding each of these factors. *Id.* Moreover, "the public policy favoring

20  disposition of cases on their merits" is not sufficient to outweigh the other four

21  factors, *Leon*, 464 F.3d at 960-61, all of which weigh in favor of dismissal here.

22          1.    **The Public's Interest In Expeditious Resolution of Litigation
23                and The Court's Ability To Manage Its Docket Have Both
                  Been Compromised By Mattel's Conduct**

24      The first two factors weigh strongly in favor of dismissal. Mattel waited

25  more than two years to bring its initial claims against Mr. Bryant and almost five

26  years to bring its claims against MGA and add additional claims against Bryant.

27  _____

28  [17] A timeline in the Appendix to this brief illustrates Mattel's bad faith conduct in failing
    to preserve electronic evidence.

EXHIBIT 20    113            MGA'S MOTION FOR TERMINATING
                            SANCTIONS
                            CV 04-09049 SGL (RNBX)

PAGE     1785.024

1   Throughout this time, Mattel knowingly allowed evidence to be destroyed.  Then,

2   Mattel made demonstrably false representations to this Court denying its spoliation,

3   and did so for the express purpose of convincing this Court to allow its five-year-

4   old claims to proceed.  Mattel's tactic worked -- the Court relied on Mattel's

5   misrepresentations in determining that there would be no prejudice in allowing

6   Mattel to amend its Answer to assert counterclaims against MGA and Bryant.  It is

7   difficult to conceive of conduct that more severely interfered with expeditious

8   resolution of litigation or the Court's ability to manage its docket.

9          2.   **Mattel's Spoliation Has Prejudiced MGA and Bryant**

10  Although prejudice is not required for an award of terminating sanctions,[18]

11  this factor, too, favors terminating sanctions.  Courts have held that, when a party

12  destroys documents through its own gross negligence, a presumption arises that the

13  documents were relevant and would have supported its adversary's case.  *See, e.g.,*

14  *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 109 (2d Cir.

15  2002) ("[A] showing of gross negligence in the destruction or untimely production

16  of evidence may, standing alone, support a finding that the evidence was

17  unfavorable to the grossly negligent party."); *Google Inc. v. Am. Blind & Wallpaper*

18  *Factory, Inc.*, 2007 U.S. Dist. LEXIS 48309 (N.D. Cal. June 27, 2007)

19  ("[S]poliation of evidence raises a presumption that the destroyed evidence goes to

20  the merits of the case, and further, that such evidence was adverse to the party that

21  destroyed it.").[19]  Indeed, were the rule otherwise, the guilty party would profit

22

23  [18] *Halaco Eng'g Co. v. Costle*, 843 F.2d 376, 379 (9th Cir. 1988) (finding prejudice
    optional in awarding sanctions); *United States v. Nat'l Medical Enters., Inc.*, 792 F.2d
24  906, 912-913 (9th Cir. 1986) (prejudice is not required for a dismissal); *UMG Recordings*,
    462 F. Supp. 2d at 1075 n.4 (although prejudice might be required for terminating
25  sanctions under Rule 37, prejudice is only an essential consideration for courts granting
    terminating sanctions pursuant to its inherent power).

26  [19] *See also Telectron, Inc. v. Overhead Door Corp.*, 116 F.R.D. 107, 133 (S.D. Fla. 1987)
    ("[W]hile it is now impossible to determine precisely what or how many documents were
27  destroyed, the bad-faith destruction of a relevant document, by itself, gives rise to a strong
    inference that the production of the document would have been unfavorable to the party
28  responsible for its destruction."); *Zubulake IV*, 220 F.R.D. at 220 ("When evidence is
    destroyed in bad faith (*i.e.*, intentionally or willfully), that fact alone is sufficient to

EXHIBIT 21    113    MGA'S MOTION FOR TERMINATING
                      SANCTIONS
                      CV 04-09049 SGL (RNBX)

PAGE    1785025

1    from its spoliation of evidence by being able to point to the other party's lack of

2    specific evidence -- evidence that the spoliating party made unavailable in the first

3    place. The Ninth Circuit has not endorsed such a rule. *See Leon*, 464 F.3d at 959

4    ("because the relevance of . . . [destroyed] documents cannot be clearly ascertained

5    because the documents no longer exist, a party can hardly assert any presumption of

6    irrelevance as to the destroyed documents").[20] Prejudice must be presumed here.

7            Moreover, the Court need not just presume prejudice here because actual

8    prejudice exists. Despite Mattel's wholesale destruction of evidence, there are

9    guideposts to what Mattel destroyed. The 2002-2005 period is particularly crucial

10   because one of the central themes of Bryant's and MGA's defense is that Mattel

11   deliberately delayed bringing this lawsuit for years because it knew its claims were

12   speculative and it had to win in the marketplace by offering competing products.

13   When Mattel could not compete fairly in the marketplace, it then turned to the

14   courts as a last resort. The deleted email would have told this story, and at a

15   minimum, would have explained Mattel's long delay between its discovery of its

16   claims, and the filing of this lawsuit.

17           The deleted email would also have provided other relevant information. As

18   Mattel was conducting its investigation of MGA and Bryant in 2002 and 2003, its

19   investigators talked to a number of people who are now witnesses in this case. Burr

20   Decl., ¶33, Ex. 32. Mattel's employees and its investigators communicated about

21   and in connection with those investigations by email. Id. ¶34. Ex. 33. Mattel also

22   sponsored an article published in the *Wall Street Journal* in July 2003, in which it

23   was reported that "some" "inside Mattel" were making the allegations Mattel makes

24   in this lawsuit. Mattel employees communicated extensively with the *Wall Street*

25   *Journal* in 2003 to provide information for that article and indeed communicated

26   about that article internally. Keats Decl. ¶4, Ex. 1 at 25:21-24; 26:11-36:7; 78:9-

27   _____

demonstrate relevance").

28   [20] *See also Alexander v. Nat'l Farmers Org.*, 687 F.2d 1173, 1205-06 (8th Cir. 1982).

EXHIBIT _____ 22 _____ 113

PAGE _____ 1785.026

MGA'S MOTION FOR TERMINATING
SANCTIONS
CV 04-09049 SGL (RNBX)

1    79:15; 92:13-93:18; 114:8-115:6.  Further, Mattel executives made public

2    announcements to Mattel employees on the day Mattel filed its suit against Mr.

3    Bryant.  As Mattel witnesses have conceded, Mattel employees discussed that

4    event, and expressed sympathy for Mr. Bryant and the view that Mattel was wrong.

5    Burr Decl. ¶31, Ex. 31 at 192:15-19; 201:23-202:25; 280:13-24.  In a case such as

6    this, against a behemoth corporation that has listed no fewer than 153 people on its

7    initial disclosures, the content of communications about the subject matter of the

8    litigation and their identification of witnesses with relevant information and

9    sympathetic views towards Mr. Bryant would be enormously helpful.  The

10   destruction of that evidence, in turn, is enormously prejudicial.

11        In sum, the lost email correspondence was relevant to, or likely to lead to the

12   discovery of admissible evidence regarding, among other things: (a) Carter

13   Bryant's employment and work at Mattel, including emails and data that would

14   refute Mattel's claims that he did not meet his employment obligations; (b) Mattel's

15   awareness of "Bratz" and the bases, if any, of its suspicions concerning Bryant's

16   alleged misconduct in developing "Bratz;" (c) the reasons Mattel delayed bringing

17   suit for so many years; (d) Mattel's investigation of its claims against Bryant, MGA

18   and Isaac Larian in 2002; (e) Mattel's 2003 communications with the *Wall Street*

19   *Journal,* in which Mattel employees accused Bryant and MGA of stealing Mattel's

20   designs; (f) the early development of MY SCENE; (g) Mattel's communications

21   with suppliers, retailers, and others to impair MGA's ability to compete.

22        The failure to preserve backup tapes of the Zeus server is also prejudicial.

23   The latest incarnation of Mattel's claims is based on Mattel's theory that Bryant and

24   possibly[21] another MGA employee, Paula Garcia, who left Mattel even before

25   Bryant, were exposed to a Mattel product called "Diva Starz" and used designs

26   from that project to create "Bratz."  Jenal Decl. ¶12.  Mattel bases its allegations

27   _____

28   [21] The word "possibly" is used because Mattel refuses to make its claims clear, lest it decide to change its theory yet again.

1    regarding Ms. Garcia on three documents (Garcia Dep. Exs. 305, 306, 307) that it

2    miraculously saved from a 10 day period in the summer of 1998 that suggest that

3    Ms. Garcia was assigned (for 10 days, at any rate) to a project that bears no

4    physical resemblance to "Diva Starz" and that Mattel admits was cancelled shortly

5    thereafter but somehow morphed into "Diva Starz." Declaration of Yvonne Garcia,

6    ("Garcia Decl."), ¶2, Ex. 1 at 106:19-109:5, 152:11-156:5, Ex. 2. Mattel bases its

7    claims regarding Mr. Bryant on the fact that he worked in the design center at

8    Mattel and may have had access to designs through Mattel's Zeus server. Jenal

9    Decl., ¶10. Documents on that server detailing the day-to-day development of

10   Mattel's "Diva Starz" project, and the metadata associated with such documents,

11   would demonstrate whether Mr. Bryant or Ms. Garcia even had access to them and

12   could have copied any "Diva Starz" design. Those design center documents, all of

13   which were available in 2002, *are the very documents Mattel destroyed.*

14        Finally, the prejudice resulting from Mattel's "loss" of Mr. Bryant's October

15   2000 time records is significant. It is in that very month that Mattel claims Mr.

16   Bryant worked with MGA to complete the sculpt of MGA's "Bratz" dolls. Those

17   records -- if they were still available -- would help to exonerate Mr. Bryant.

18        3.   **Mattel's Spoliation Warrants Dismissal And Less Drastic
            Sanctions Are Not Appropriate**

19

20        Mattel cannot save its claims by pointing to the fifth factor, the supposed

21   availability of less drastic remedies. First, the District court need only determine

22   the feasibility and appropriateness of less drastic sanctions; even where less drastic

23   remedies are available, the Court need not forego terminating sanctions. *Leon*, 464

24   F.3d at 960 ("lesser" sanctions of excluding evidence and jury instruction creating

25   presumption inappropriate because they left defendants "equally helpless to rebut

26   any material that plaintiffs might use to overcome the presumption"). Moreover,

27   less drastic sanctions would do nothing to remedy Mattel's misconduct here

28   because MGA and Mr. Bryant have been deprived of evidence necessary to prove

1    their defenses.  This is particularly true because Mattel waited so long to bring its

2    claims and witnesses' memories have faded.  *See* Garcia Decl., ¶2, Ex. 1 at 42:13-

3    20; 47:2-7; 166:21-24; Burr Decl., ¶32, Ex. 31 at 262:18-263:1; 270:19-25.

4    **C.   CONCLUSION**

5         Long aware that its claims had no merit, Mattel engaged in the deliberate and

6    systematic destruction of relevant evidence in a calculated effort to litigate its

7    claims after memories had faded, on a cherry-picked record that Mattel itself

8    designed.  Mattel's actions -- and its flagrant misrepresentations to this Court -- are

9    precisely the type of conduct that warrants the serious sanction of termination.  For

10   the foregoing reasons, this motion should be granted.

11

12   Dated: July 23, 2007                    O'MELVENY & MYERS LLP

13

14                                           By:  Dale M. Cendali
                                             Attorneys for MGA Entertainment, Inc.
15

16

17   Dated: July 23 2007                     CHRISTENSEN, GLASER, FINK,
                                             JACOBS, WEIL & SHAPIRO, LLP
18

19                                           By:  Patricia Glaser
                                             Attorneys for MGA Entertainment, Inc.
20

21   Dated: July 23 2007                     KEKER & VAN NEST, LLP

22

23                                           By:  John W. Keker
24                                           Attorneys for Carter Bryant

25

26

27

28

EXHIBIT   113
25        MGA'S MOTION FOR TERMINATING
1785.029  SANCTIONS
PAGE      CV 04-09049 SGL (RNBX)

# EXHIBIT   114

THIS EXHIBIT IS FILED UNDER SEAL
PURSUANT TO PROTECTIVE ORDER

**EXHIBIT   115**





(folio 1)

**HCA 3856/2003**

IN THE HIGH COURT OF THE
HONG KONG SPECIAL ADMINISTRATIVE REGION
COURT OF FIRST INSTANCE
CIVIL ACTION NO. 3856 OF 2003

HIGH COURT ACC. OFFICE

Served by   FEESPAID

FC2                          1045
CHEQUE                    1045.(
OCT16 '03S001A0101 16:01R   FEESPA

BETWEEN:-

MGA ENTERTAINMENT INC.                         **Plaintiff**

and

UNI-FORTUNE TOYS INDUSTRIAL LIMITED      1ˢᵗ  **Defendant**
FU WEI TOYS COMPANY LIMITED              2ⁿᵈ  **Defendant**

*********************************

To the 1ˢᵗ Defendant **UNI-FORTUNE TOYS INDUSTRIAL LIMITED** whose registered office is situate at Flat A-B, 21ˢᵗ Floor, Cheung Hing Shing Centre, 23 Sha Tsui Road, Tsuen Wan, New Territories, Hong Kong

And to the 2ⁿᵈ Defendant **FU WEI TOYS COMPANY LIMITED** whose registered office situate at Flat A-B, 21ˢᵗ Floor, Cheung Hing Shing Centre, 23 Sha Tsui Road, Tsuen Wan, New Territories, Hong Kong

**THIS WRIT OF SUMMONS** has been issued against you by the above-named Plaintiff in respect of the claim set out on the back.

Within 14 days after the service of this Writ on you, counting the day of service, you must either satisfy the claim or return to the Registry of High court the accompanying ACKNOWLEDGEMENT OF SERVICE stating therein whether you intend to contest these proceedings.

If you fail to satisfy the claim or to return the Acknowledgement within the time stated, or if you return the Acknowledgement without stating therein an intention to contest the proceedings, the Plaintiff(s) may proceed with the action and judgment may be entered against you forthwith without further notice.

Issued from the Registry of the High Court this 16ᵗʰ day of October 2003

Note:-    This Writ may not be served later than 12 calendar months beginning with that date unless renewed by order of the Court.

**IMPORTANT**
Directions for Acknowledgement of Service are given with the accompanying form.
S.C.549 (s)

C:\MAGGIE\IP\copyright\wrt - 1878-6-MCA\WHL.doc

M0012593

EXHIBIT _____115_____   (32)

PAGE _____1795_____

## STATEMENT OF CLAIM

### (Please see attached)

*(Where the Plaintiff's claim is for a debt or liquidated demand only: If, within the time for returning the Acknowledgment of Service, the Defendant pays the amount claimed and $1,550.00 for costs and, if the Plaintiff obtains an order for substituted service, the additional sum of $565.00, further proceedings will stayed. The money must be paid to the Plaintiff or his Solicitors.)

**THIS WRIT**   was issued by Messrs. William W. L. Fan & Co. of Room 507, 5th Floor, Hang Seng Building, 77 Des Voeux Road Central, Hong Kong, Solicitors for the Plaintiff MGA Entertainment Inc. whose principal place of business is situate at 16730 Schoenborn Street, North Hills, Ca 91343-6122, USA and c/o Room 1001, 10th Floor, Empire Centre, 68 Mody Road, Tsimshatsui East, Kowloon, Hong Kong.

C:\MAGGIE\P\dippright\WWF - 1576-MGAWrit.doc

M0012594

EXHIBIT ____115____

PAGE ____1796____

## STATEMENT OF CLAIM

1. The Plaintiff is and at all material times a corporation existing under the laws of the U.S.A. carrying on business in the design, manufacture, marketing and selling of toys, in particular, fashion dolls.

2. The 1st and 2nd Defendants were and at all material times companies incorporated and existing under the laws of Hong Kong carrying on the business in the manufacture and marketing of toys. The shareholders, directors and registered office of 1st and 2nd Defendant are identical.

3. The Plaintiff is and at all material times, has been the owner of the copyright subsisting in original artistic works in respect of the Plaintiff's Bratz fashion dolls ("the said Artistic Works").

### Particulars of Original Artistic Works

(a) 18 design drawings of various Bratz fashion dolls made between the years 1998 and 2000.

(b) Wax models of the head, body and shoes of the Bratz fashion dolls made between the year 2000 and 2001.

M0012595

EXHIBIT __115__

PAGE __1797__

(c) Silicon rubber moulds and polyurethane samples made therefrom of the Bratz fashion dolls made between the years 2000 and 2001.

(d) 4 drawings of the facial decoration of the Bratz fashion dolls made between the years 2000 and 2001.

(e) 8 drawings 4 of which are pantone colour guides of the facial decorations of the Bratz fashion dolls made between the years of 2000 and 2001.

(f) 4 hand painted deco-masters on 4 rubber head sculpts made between the years 2000 and 2001.

### Particulars of Ownership and Subsistence

(g) Carter Bryant (hereinafter referred to as "Mr. Bryant") was commissioned by the Plaintiff to make the design drawings referred to in sub-paragraphs (a) and (e) hereof. At all material times, it was the understanding and agreement between the Plaintiff and Mr. Bryant that copyright subsisting in the artistic works should vest in the Plaintiff.  Pursuant thereto, a confirmatory assignment was made between the Plaintiff and Mr. Bryant in September 2000.

C:\MAGGIE\IP\copyright\WWY.1878-MGAWin.doc

M0012596

EXHIBIT  115

PAGE  1798

(h) At all material times, Mr. Bryant is a resident of and domiciled in the U.S.A.

(i) Margaret Leahy (hereinunder referred to as "Ms. Leahy") was commissioned by the Plaintiff to make the artistic works referred to in subparagraph (b) hereof.  At all material times, it was the understanding and agreement between the Plaintiff and Ms. Leahy that copyright subsisting in the artistic works should vest in the Plaintiff.  Pursuant thereto, a confirmatory assignment was made between the Plaintiff and Ms. Leahy in June 2003.

(j) At all material times, Ms. Leahy is a resident of and domiciled in the USA.

(k) Jessie Ramirez (hereinunder referred to as "Ms. Ramirez") was commissioned by the Plaintiff to make the silicon rubber moulds and polyurethane samples referred in subparagraph (c) hereof.  At all material times, it was the understanding and agreement between the Plaintiff and Ms. Ramirez that copyright subsisting in the artistic works should vest in the Plaintiff.  Pursuant thereto, a confirmatory assignment was made between the Plaintiff and Ms. Ramirez on 16th June 2003.

(l) At all material times, Ms. Ramirez is a resident of and domiciled in the USA.

(m) Anna Rhee (hereinunder referred to as "Ms. Rhee") was commissioned by the Plaintiff to make the artistic works referred to in sub-paragraphs (d) and (f) hereof.  At all material times, it was the understanding and agreement

C:\MAGGIE\P\copyright\WP -1976-MCA\Work.doc

M0012597

EXHIBIT ___115___

PAGE ___1799___

between the Plaintiff and Ms. Rhee that copyright subsisting in the artistic works should vest in the Plaintiff.   Pursuant thereto, a confirmatory assignment was made between the Plaintiff and Ms. Rhee on 12th June 2003.

(n) At all material times, Ms. Rhee is a resident of and domiciled in the USA.

(o) The said Artistic Works as described in sub-paragraphs (a) to (f) above were first published in the USA in or about June 2001 when the Bratz fashion dolls were exhibited and offered for sale.  Alternatively, the said Artistic Works are unpublished.   The artistic works referred to in sub-paragraph (b) hereof and the silicon rubber moulds referred to in sub-paragraph (c) hereof were destroyed in the course of the Plaintiff's business.

4.   Prior to the issue of the Writ herein, the 1st and 2nd Defendants have infringed the said Artistic Works by authorising the manufacture, the manufacture of and/or importing into and exporting from Hong Kong in its course of business, possessing for the purpose of trade or business, selling or offering or exposing for sale, for the purpose of trade or business exhibiting in public or distributing fashion dolls known as Glitter Girls which are reproductions of or a reproduction of a substantial part of the said Artistic Works without the license of the Plaintiff (hereinafter collectively

C:\MAGGIE\VPI\COPYRIGHT - 1878-MCA\WPL.DOC

M0012598

EXHIBIT 115

PAGE 1800

referred as "the Infringing Dolls")

## Particulars

The Plaintiff will in particular rely on the following facts and matters:-

a) The exposure for sale of the Infringing Dolls to an investigator employed by the Plaintiff by the distribution of leaflets depicting the Infringing Dolls on 8th February 2003 and 14th February 2003.

b) The possession for the purpose of trade or business and exposure for sale of the Infringing Dolls by the 1st and/or the 2nd Defendants in a showroom at Room 802A, Empire Centre, Tsimshatsui East, Kowloon on the 14th February 2003 to an investigator employed by the Plaintiff.

c) The sale and/or distribution of 2 Infringing Dolls by the 1st Defendant at the 1st and 2nd Defendant's registered offices on the 11th March 2003 to an investigator employed by the Plaintiff.

d) The exposure for sale by the 2nd Defendant of the Infringing Dolls by the provision of a quotation dated 11th March 2003.

e) The exposure for sale of the Infringing Dolls by the 1st and 2nd Defendants

C:\MACO\EVP\copyright\INF-1878-A4CA\WRI.doc

M0012599

EXHIBIT __115__

PAGE __1801__

by way of an advertisement in p.140 of Vol. 2 of 2003 issue of the Hong Kong Toys Magazine.

f) The exhibition in public of the Infringing Dolls by the 1st and/or 2nd Defendants at the Hong Kong Houseware Fair and Hong Kong Gifts & Premium Fair 2003 ("the Hong Kong Fair") in July 2003.

g) The manufacture, authorization of manufacture, sale and export on divers dates an unknown quantity of the Infringing Dolls to Europe and the United States by the 1st and 2nd Defendants.

h) The admission by the 1st and 2nd Defendants that the 2nd Defendant was the supplier of the Infringing Dolls to the 1st Defendant in a letter dated 21st August 2003 sent by the 1st and 2nd Defendants' solicitor to the Plaintiff's solicitors.

The Plaintiff is, prior to proper discovery and/or interrogatories, unable to give full particulars of all the wrongful acts of copyright infringement of the 1st and 2nd Defendants but will seek to recover damages in respect of each and every such wrongful act.

5. The Plaintiff will in so far as is necessary rely on the fact that at all material times

C:\MAOCHEVP\20\W5\NEWF-1278-MGAWH.doc

M0012600

EXHIBIT 115

PAGE 1802

by way of an advertisement in p.140 of Vol. 2 of 2003 issue of the Hong Kong Toys Magazine.

f)  The exhibition in public of the Infringing Dolls by the 1st and/or 2nd Defendants at the Hong Kong Houseware Fair and Hong Kong Gifts & Premium Fair 2003 ("the Hong Kong Fair") in July 2003.

g)  The manufacture, authorization of manufacture, sale and export on divers dates an unknown quantity of the Infringing Dolls to Europe and the United States by the 1st and 2nd Defendants.

h)  The admission by the 1st and 2nd Defendants that the 2nd Defendant was the supplier of the Infringing Dolls to the 1st Defendant in a letter dated 21st August 2003 sent by the 1st and 2nd Defendants' solicitor to the Plaintiff's solicitors.

The Plaintiff is, prior to proper discovery and/or interrogatories, unable to give full particulars of all the wrongful acts of copyright infringement of the 1st and 2nd Defendants but will seek to recover damages in respect of each and every such wrongful act.

5.  The Plaintiff will in so far as is necessary rely on the fact that at all material times

C:\MAGGIE\Pcopyright\F-1876-44DAW\PL.doc

M0012601

EXHIBIT ___115___

PAGE ___1803___

the 1st and 2nd Defendants knew or had reason to believe that the Infringing Dolls are infringing copies of the said Artistic Works within the meaning of the Copyright Ord., Cap. 528.

### Particulars of Knowledge

The Plaintiff will in particular rely upon the following facts and matters:-

(a)    The Plaintiff relies on the fact that the 1st and 2nd Defendants are in the same business as the Plaintiff, the Bratz fashion dolls being first exhibited and sold in the USA in June 2001.

(b)    The Bratz fashion dolls have won numerous awards including Toy of the Year Award, People's Choice of the Year Award, Doctor Toy Award and Family Fun Best Toy Award and numerous articles have been about the Bratz fashion dolls and their success. The Bratz fashion dolls have achieved worldwide fame and publicity.

(c)    The Plaintiff relies on the objective similarity between the said Artistic Works and the Infringing Dolls.

(d)    On 14th February 2003, a Mr. Allen Ho on behalf of the 1st and 2nd Defendants informed an investigator employed by the Plaintiff that some modifications were made to the Infringing Dolls so that the Infringing Dolls would not resemble the Bratz fashion dolls too much.

(e)    In correspondence dated 7th August 2003 between the solicitors for the

C:\MAG\GIS\VP\copyright\MYT - 1876-MGAMYK.DOC

M0012602

EXHIBIT __115__

PAGE __1804__

the 1st and 2nd Defendants knew or had reason to believe that the Infringing Dolls are infringing copies of the said Artistic Works within the meaning of the Copyright Ord., Cap. 528.

<u>Particulars of Knowledge</u>

The Plaintiff will in particular rely upon the following facts and matters:-

(a)     The Plaintiff relies on the fact that the 1st and 2nd Defendants are in the same business as the Plaintiff, the Bratz fashion dolls being first exhibited and sold in the USA in June 2001.

(b)     The Bratz fashion dolls have won numerous awards including Toy of the Year Award, People's Choice of the Year Award, Doctor Toy Award and Family Fun Best Toy Award and numerous articles have been about the Bratz fashion dolls and their success.  The Bratz fashion dolls have achieved worldwide fame and publicity.

(c)   .  The Plaintiff relies on the objective similarity between the said Artistic Works and the Infringing Dolls.

(d)     On 14th February 2003, a Mr. Allen Ho on behalf of the 1st and 2nd Defendants informed an investigator employed by the Plaintiff that some modifications were made to the Infringing Dolls so that the Infringing Dolls would not resemble the Bratz fashion dolls too much.

(e)     In correspondence dated 7th August 2003 between the solicitors for the

C:\MAGGIE\P\copyright\WF-1874-MCA\writ.doc

M0012603

EXHIBIT __115__

PAGE __1805__

1st and 2nd Defendants and the Plaintiff's solicitors, the 1st Defendant
asserted that it ceased dealing with the Infringing Dolls upon learning
the infringement of copyright, however on 21 August 2003, the 1st
Defendant asserted that prior to the receipt of the cease and desist
letter dated 30th July 2003, it had not promoted, offered and/or exposed
for sale and/or sold the Infringing Dolls. On 10th September 2003, the 1st
Defendant further asserted that it has not promoted, offered and/or
exposed for sale and/or sold the Infringing Dolls. The Plaintiff refers to
sub-paragraphs (a) to (e) of paragraph 4 herein. In light of the foregoing,
the Plaintiff relies on the deliberate attempt by the 1st Defendant to
conceal its infringing activities to show that the 1st Defendant had
knowledge or had reason to believe that the Infringing Dolls were
infringing copies of the said Artistic Works.  The Plaintiff also relies on
the fact that the 1st and 2nd Defendants have identical directors and thus
any knowledge of the 1st Defendant is imputed to the 2nd Defendant as
well.

The Plaintiff is, prior to proper discovery and/or interrogatories, unable to give full
particulars of all the particulars of knowledge of the 1st and 2nd Defendants.

6.  By reason of the foregoing, the Plaintiff has suffered loss and unless the 1st and 2nd
Defendants are restrained by this Honourable Court, will continue to suffer loss
and damage.

7.  By reason of all the circumstances of this case, including the flagrancy of the
infringement, the benefit accruing to the 1st and 2nd Defendants by reason of the

C:\MAGGIE\VP2000\HONT\H7-1578-MGAWHK.DOC

M0012604

EXHIBIT ___115___

PAGE ___1806___

infringement and the completeness, accuracy and reliability of the 1st and 2nd Defendants' business accounts and records, the Plaintiff claims additional damages under Section 108 of the Copyright Ord., Cap. 528.

## Particulars

The Plaintiff will in particular rely upon the following facts and matters:-

(a) The Plaintiff repeats the particulars supplied under paragraphs 5 hereof.

(b) The 1st and 2nd Defendants in infringing the said Artistic Works have reaped substantial benefits in that the 1st and 2nd Defendants do not have to incur development costs, marketing costs and the risks that the Infringing Dolls might not be popular with its customers. The 1st and 2nd Defendants knew that in copying the said Artistic Works they will be able to produce, market and sell a product that has proven to be successful and is in demand by members of the trade and public.

8. By reason of the 1st and 2nd Defendants' wrongful acts and/or by reason of the 1st and 2nd Defendants' dealing in the Infringing Dolls, the 1st and 2nd Defendants owe a duty to the Plaintiff to assist the Plaintiff by supplying the Plaintiff with full information relating to the products complained of, all dealings therein or therewith

C:\MAGGIE\IP\copyright\WF-1878-MGA\f\WL.doc

M0012605

EXHIBIT __115__

PAGE __1807__

and the identities of all other wrong doers.

9. Further by virtue of sections 48 and 49 of the High Court Ordinance (Cap. 4) the Plaintiff is entitled to and claims to recover interest on any amount found to be due to the Plaintiff at such rate(s) and for such period(s) as this Honourable Court considers just and proper.

AND the Plaintiff claims:-

1. An injunction to restrain the 1st and 2nd Defendants whether acting by themselves, their directors, officers, servants or agents or any of them or otherwise howsoever from infringing the Plaintiff's copyright in original artistic works relating to the Plaintiff's fashion dolls under the name "Bratz" and/or from directing, procuring, instigating, causing, enabling or assisting others to do so.

2. An order for delivery up or destruction upon oath of all articles and materials in the 1st and 2nd Defendants' possession, power, custody or control including dies, plates, templates, labels, moulds, leaflets, catalogues and packaging the use or sale or dealing therewith by the 1st and 2nd Defendants would offend against the foregoing injunction.

C:\MAG\DEV\Pcopymgrshtf\.1315-64GA\win.doc

M0012606

EXHIBIT _____ 115 _____

PAGE _____ 1808 _____

3. An inquiry as to damages, alternatively damages or, at the Plaintiff's option, account of profits, in respect of the 1st and 2nd Defendants' wrongful acts of infringement of copyright.

4. Additional damages pursuant to section 108(2) of the Copyright Ordinance.

5. An order for the payment by the 1st and 2nd Defendants' of all sums found due to the Plaintiff upon making such inquiries and/or accounts together with such interest thereon as this Honourable Court shall deem just pursuant to Section 48 of the High Court Ordinance.

6. An order for discovery or verification upon oath of all matters relating to the foregoing.

7. Costs

8. Such further or other relief as this Honourable Court shall deem just.

Dated this 16th day of October 2003.

William W.L. Fan & Co.

Solicitors for the Plaintiff

C:\MAGGIE\IP\copyright\W9-1878-MGAWHL.doc

M0012607

EXHIBIT   115

PAGE   1809

HCA   /2003

## IN THE HIGH COURT OF THE
## HONG KONG SPECIAL ADMINISTRATIVE REGION
## COURT OF FIRST INSTANCE
## ACTION NO.   OF 2003

BETWEEN:-

MGA ENTERTAINMENT INC.                                    Plaintiff

and

UNI-FORTUNE TOYS INDUSTRIAL LIMITED                 1st Defendant
FU WEI TOYS COMPANY LIMITED                          2nd Defendant

### ACKNOWLEDGMENT OF SERVICE OF WRIT OF SUMMONS
**If you intend to instruct a Solicitor to act for you, give him this form IMMEDIATELY.**

**Important.** Read the accompanying directions and notes for guidance carefully before completing this form. If any information required is omitted or given wrongly, **THIS FORM MAY HAVE TO BE RETURNED.**

Delay may result in judgment being entered against a Defendant whereby he or his Solicitor may have to pay the costs of applying to set it aside.

See Notes 1, 3,4, and 5

1. State the full name of the Defendant by whom or on whose behalf the service of the Writ of Summons is being acknowledged.

2. State whether the Defendant intends to contest the proceedings (tick appropriate box)     Yes [    ]     No [    ]

See Direction 3.

3. If the claim against the Defendant is for a debt or liquidated demand, AND he does not intend to contest the proceedings, state if the Defendant intends to apply for a stay of execution against any judgment entered by the Plaintiff(s) (tick box)

where words appear between square brackets delete if inapplicable

Service of the Writ of Summons is acknowledged accordingly.

(Signed) [Defendant in person] [Solicitor] (                    )
Address for service :-

Notice as to Address for Service
   Solicitor.   Where the Defendant is represented by a Solicitor, state the Solicitor's place of business in Hong Kong.
   Defendant in person.   Where the Defendant is acting in person, he must give his residence OR, if he does not reside in Hong Kong, he must give an address in Hong Kong where communications for him should be sent. In the case of a limited company, "residence" mean its registered or principal office.
S.C 551(s)

William W. L. Fan & Co., Solicitors for the Plaintiff,
Room 507, 5th Floor, Hang Seng Building,
77 Des Voeux Road Central, Hong Kong.
[Ref: WF-1878-RC]

C:\MAGGIE\Pozoynqrewf -1878-MCAWrit.doc

M0012608

EXHIBIT  115

PAGE  1810

HCA    /2003

## IN THE HIGH COURT OF THE
### HONG KONG SPECIAL ADMINISTRATIVE REGION
### COURT OF FIRST INSTANCE
### ACTION NO.      OF 2003

BETWEEN:-

MGA ENTERTAINMENT INC.                                    Plaintiff

and

UNI-FORTUNE TOYS INDUSTRIAL LIMITED                      1st Defendant
FIJ WEI TOYS COMPANY LIMITED                             2nd Defendant

### ACKNOWLEDGMENT OF SERVICE OF WRIT OF SUMMONS
**If you intend to instruct a Solicitor to act for you, give him this form IMMEDIATELY.**

**Important.**   Read the accompanying directions and notes for guidance carefully before completing this form.  If any information required is omitted or given wrongly, **THIS FORM MAY HAVE TO BE RETURNED.**

Delay may result in judgment being entered against a Defendant whereby he or his Solicitor may have to pay the costs of applying to set it aside.

See Notes 1.
3,4, and 5

1.   State the full name of the Defendant by whom or on whose behalf the service of the Writ of Summons is being acknowledged.

2.   State whether the Defendant intends to contest the proceedings (tick appropriate box)       Yes [        ]      No [        ]

See
Direction 3.

3.   If the claim against the Defendant is for a debt or liquidated demand, AND he does not intend to contest the proceedings, state if the Defendant intends to apply for a stay of execution against any judgment entered by the Plaintiff(s) (tick box)

where words appear
between square brackets
delete if inapplicable

Service of the Writ of Summons is acknowledged accordingly.

(Signed) [Defendant in person] [Solicitor] (                    )
Address for service :-

Notice as to Address for Service
Solicitor.   Where the Defendant is represented by a Solicitor, state the Solicitor's place of business in Hong Kong.
Defendant in person.  Where the Defendant is acting in person, he must give his residence OR, if he does not reside in Hong Kong, he must give an address in Hong Kong where communications for him should be sent.  In the case of a limited company, "residence" mean its registered or principal office.
S.C 551(s)

William W. L. Fan & Co., Solicitors for the Plaintiff,
Room 507, 5th Floor, Hang Seng Building,
77 Des Voeux Road Central, Hong Kong.
[Ref: WF-1878-RC]

C:\MAGGIE\P\copyright\WF-1878-MGAW\rt.doc

M0012609

EXHIBIT   115

PAGE   1811

**HCA**    **/2003**

### IN THE HIGH COURT OF THE
### HONG KONG SPECIAL ADMINISTRATIVE REGION
### COURT OF FIRST INSTANCE
### ACTION NO.    OF 2003

BETWEEN:-

MGA ENTERTAINMENT INC.                    **Plaintiff**

and

UNI-FORTUNE TOYS INDUSTRIAL LIMITED       **1ˢᵗ Defendant**

FU WEI TOYS COMPANY LIMITED               **2ⁿᵈ Defendant**

### ACKNOWLEDGMENT OF SERVICE OF WRIT OF SUMMONS

**If you intend to instruct a Solicitor to act for you, give him this form IMMEDIATELY.**

**Important.**   Read the accompanying directions and notes for guidance carefully before completing this form.  If any information required is omitted or given wrongly, **THIS FORM MAY HAVE TO BE RETURNED.**

Delay may result in judgment being entered against a Defendant whereby he or his Solicitor may have to pay the costs of applying to set it aside.

| See Notes1, 3,4, and 5 | 1. | State the full name of the Defendant by whom or on whose behalf the service of the Writ of Summons is being acknowledged. |
|---|---|---|
| | 2. | State whether the Defendant intends to contest the proceedings (tick appropriate box)      Yes ☐      No ☐ |
| See Direction 3, | 3. | If the claim against the Defendant is for a debt or liquidated demand, AND he does not intend to contest the proceedings, state if the Defendant intends to apply for a stay of execution against any judgment entered by the Plaintiff(s) (tick box) |

where words appear between square brackets delete if inapplicable

Service of the Writ of Summons is acknowledged accordingly.

(Signed) [Defendant in person] [Solicitor] (                    )
Address for service :-

Notice as to Address for Service
Solicitor.   Where the Defendant is represented by a Solicitor, state the Solicitor's place of business in Hong Kong.
Defendant in person.   Where the Defendant is acting in person, he must give his residence OR, if he does not reside in Hong Kong, he must give an address in Hong Kong where communications for him should be sent.  In the case of a limited company, "residence" mean its registered or principal office.
S.C 551(s)

William W. L. Fan & Co., Solicitors for the Plaintiff,
Room 507, 5ᵗʰ Floor, Hang Seng Building,
77 Des Voeux Road Central, Hong Kong.
[Ref: WF-1878-RC]

C:\MAGGIE\Photocopies\WF-1878-MGA\Writ.doc

M0012610

EXHIBIT   115

PAGE   1812

Acknowledgment of Service of Writ of Summons

(O.12   r.3)

Directions for Acknowledgment of Service

1.  The accompanying from of ACKNOWLEDGMENT OF SERVICE should be detached and completed by Solicitor acting on behalf of the Defendant or by the Defendant if acting in person. After completion it must delivered or sent by post to the Registry of the High Court at the following address:-

LG1, High Court Building, 38 Queensway, Hong Kong.

2.  A Defendant who states in this Acknowledgment of Service that he intends to contest the proceedings MUS ALSO file a DEFENCE which has written in the English language with the registry and serve a cop thereof on the Solicitor for the Plaintiff (or on the Plaintiff if acting in person).

If a statement of Claim is indorsed on the Writ (i.e. the words "Statement of Claim" appear at the top of the back the Defence must be filed and served within 14 days after the time for acknowledging service of the Writ, unless in th meantime a summons for judgment is served on the Defendant.

If a Statement of Claim is not indorsed on the Writ, the Defence need not be filed and served until 14 days after Statement of Claim has been served on the Defendant.

If the Defendant fails to the file and save his defence within the appropriate time, the Plaintiff may enter judgmer against him without further notice.

3.  A STAY OF EXECUTION against the Defendant's goods may be applied for where the Defendant is unable t pay the money for which any judgment is entered. If a Defendant to an action for a debt or liquidated deman (i.e. a fixed sum) who does not intend to contest the proceedings states, in answer to Question 3 in th Acknowledgment of Service, that he intends to apply for a stay, execution will be stayed for 14 days after hi Acknowledgment, but he must within that time, ISSUE A SUMMONS for a stay of execution, supported b and affidavit of his means. The affidavit should state any offer which the Defendant desires to make fo payment of the money by instalments or otherwise.

See attached Notes for Guidance

Notes for Guidance

1.  Each Defendant (if there are more than one) is required to complete an Acknowledgment of Service an return it to the Registry of the High Court.

2.  For the purpose of calculating the period of 14 days for acknowledging service, a writ served on the Defendant personally is treated as having been served on the day it was delivered to him and a writ served by post or by insertion through the Defendant's letter box is treated as having been served on the seventh day after the date of posting or insertion.[Not applicable if the defendant is a company served at its registerec office.]

3.  Where the Defendant is sued in a name different from his own, the form must be completed by him with the addition in paragraph 1 of the words "sued as (the name stated on the Writ of Summons)".

4.  Where the Defendant is a FIRM and a Solicitor is not instructed, the form must be completed by a PARTNER by name, with the addition in paragraph 1 of the description "partner in the firm of (.........)" after his name.

5.  Where the Defendant is sued as an individual TRADING IN A NAME OTHER THAN HIS OWN, the form must be completed by him with the addition in paragraph 1 of the description" trading as (.........)" after his name.

6.  Where the Defendant is a LIMITED COMPANY the form must be completed by a Solicitor or by someone authorized to act on behalf of the Company, but the Company can take no further step in the proceedings without a Solicitor acting on its behalf.

7.  Where the Defendant is a MINOR or a MENTAL Patient, the form must be completed by a Solicitor acting for guardian ad litem.

8.  A Defendant acting in person may obtain help in completing the form at the Registry of the High Court.

9.  These notes deal only with the more usual cases. In case of difficulty a Defendant in person should refer to paragraph 8 above.

M0012611

115

1813

因這是法律文件，忽視它可帶來嚴重的後果，如有疑問，請儘向發出文件的法庭登記處，香港金鐘道38號高等法院大樓LG1查詢你亦應考慮聽取律師的意見或是申請法律援助。

(This is legal document. The consequences of ignoring it may serious. If in doubt you should enquire as soon as possible at the Regis of the Court issuing the document, namely, LG1 High Court Buildin No.38 Queensway, Hong Kong. You should also consider taking t advice of a Solicitor or applying for legal Aid.).

M0012612

EXHIBIT ___115___

PAGE ___1814___

HCA　　　　/2003

香港特別行政區

高等法院

原訟法庭

高院民事訴訟二零零三年第　　　號

原告人

對

被告人

致被告人.............................................................

地址.............................................................

　　本傳訊令狀由上述原告人就背頁所列出的索償聲請而向你發出。

　　在本令狀送達給你（14）天內，由送達之日起計，你必須清償有關的索償要求，或於夾附的令狀送達認收書內述明是否擬對本訴訟進行抗辯，然後把該認收書交回高等法院登記處。

　　若你在上述指定期限內不清償有關的索償要求，或不交回送達認收書，或不在交回的送達認收書內述明是否擬提出抗辯，則你不會接獲進一步通知，原告人即可繼續進行訴訟，而屆時法庭亦可逕行判你敗訴。

　　本令狀由高等法院登記處在二零零三年　　　月　　　日發出。

　　註：本令狀必須在發出日期起計 12 個曆月內送達被告人；但經法庭下令准予延期則不在此限。

重要事項

有關填寫送達認收書的須知事項已載列在夾附表格內。

M0012613

EXHIBIT 115

PAGE 1815

　　　　若原告人的索償請只是爲了追討一筆債務或算定索償款額時：在交回送達認收書的規定期限內，如果被告人清付所索償款額和訟費 $　　　又倘原告人獲准以間接方式送達令狀時，另加數額 $　　　則本訴訟即于擱置。該筆款項必須付給原告人或其代表律師。

　　　　本令狀由范偉廉律師行，地址爲香港中環德輔道中七十七號恒生大廈五字樓五零七室代表上述原告人申請發出，原告人的地址爲：

　　　　　　　　　　　　　　　　原告人代表律師
　　　　　　　　　　　　　　　　范偉廉律師事務所

M0012614

EXHIBIT 115

PAGE 1816

香港高等法院

原訴法庭

2009 年訟案第　　　　　　號

原告人

被告人

傳訊令狀送達認收書

如你獲委託律師代為辯護，須把這表格交給他處理。

重要事項：填寫這表格時，必須小心閱讀附件內載的填寫須知事項和指南。如所提供的資料有錯漏時，則這份表格可能被退回。

如延遲填覆，可導致被告人被判敗訴，而被告人或其代表律師申請繳錄判列時，或須付出訟費。

參閱填寫指南 1、3、4 及 5 項。

1. 請填寫認收傳訊令狀的被告人全名；或倘由他人代表你已送達的令狀時，亦請填寫該名被告人的全名。

2. 請註明被告人是否擬就訴訟提出抗辯（請在適用的方格內加「✓」符號）。

□ 是　　　　　□ 否

請再填寫寫如答項 3。

3. 如果訴訟是關於責請被告人清付一筆債款或一筆算定索價款，而被告人不擬對訴訟加以抗辯時，則須註明是否有意申請延緩執行由原告人且訴法庭款定的事項。（請在方格內加上「✓」符號）

□

方格內所不適用的字句略去。

本人現承認已收到傳訊令狀。

（簽署）[律師]（　　　　　　　　　　）
[無律師代表的被告人]
認收傳訊令狀地址

填寫有關認收傳訊令狀地址須如：

律師：如被告人由律師代表他，則須填寫律師在香港的辦事處。

沒有律師代表的被告人——如被告人沒有律師代表他，則他須填寫他本人的住址；或如果他並非居於香港，則須填寫他在本港的通訊地址。如果被告人是一間有限公司時，則須填寫公司的註冊地址或被設辦事處地址。

原告人代表律師　：范偉業律師事務所
地址　　　　　　：香港中環德輔道中七十七號匯生大廈五字樓五零七室
電話號碼　　　　：2110 2128
傳真號碼　　　　：2111 9336
檔案號碼　　　　：WF-1

M0012615

EXHIBIT 115

PAGE 1817

傳訊令狀送達認收書

填寫送達認收書須知

(一)　關於令狀上的送達認收書者，應由被告人的代表律師填寫，或如無律師代表他，則由被告本人把附件拆出填妥，然後送交或用郵遞方式交高等法院登記；該登記處地址是：—

香港金鐘道三十八號高等法院地下一層

(二)　被告人如在令狀送達認收書內表示確認擬提出抗爭時，必須同時以英文填寫一份需保書呈交高等法院登記處，並把副本一份送達原告人的代表律師（或如原告人並無律師代表他，則送達原告人）。

令狀背面如果載有案情聲書（即在前頁上端住有「案情聲書」等字樣）時，被告人須要在認收傳訊令狀期限屆滿後 14 天內，把需保書呈交高等法院登記處和送達原告人，但如在該段期限內，被告人已接獲原告人呈請法院判決傳第一份，則不在此限。

傳訊令狀面如果並未載有案情聲書時，則被告人須要在收到案情聲書書滿 14 天後，把需保書呈交法院和送達原告人。

如被告人於指定期限內不把需保書呈交法院和送達原告人，則原告人毋須再行通知，即可呈請法院直判被告人敗訴。

(三)　如法庭宣判被告人敗訴，而被告人未能清付所判款項時，被告人可向法庭申請暫緩執行法令對被告人財物令，如果被告人是由於一筆債務或一筆某定款項（即一固定款項）而被宣判，而又不接受該項案情宣審又擬出抗爭，但都在傳訊令狀送達認收書第三部內表明該被執行法者判付物令時，則法庭在令書予令差方認收傳訊令 14 天後予予執行；但在追段期間內，他必須取得要求延緩執行法令令的令書，並且要另一份列明其實產及支款狀況的令書，以作佐證。被告人並須在宣審內送明分期付款數額及期限或其他清償辦法。

(請參閱背頁內的填寫指南)

填寫指南

(一)　每一被告人（如需逾一名）必須填送達認收書一份，並把認收書交回高等法院登記處。

(二)　就如何計算傳訊令狀送達 14 天期限來說，如果傳票令送達被告人本身，則以傳訊令狀交到被告人手上當天作為送達日期；如以郵遞方式或把傳訊令送達被告人的適當方式時，則以傳訊令狀寄出之日起就入被告人信箱日起計的第七天作送達日期。(如被告人是一間公司，而傳票是送達該公司的注冊辦事處，則此條並不適用)。

(三)　如被告人以另一名稱被告訴時，則該表格必須由他本人填寫，並須在第一段內加上「以某某名稱被告」字樣（即顯示傳訊令狀上的名稱）。

(四)　如被告人是一商號，而並沒有委託律師作代表時，則該表格必須由一名合夥人填寫，並須在第一段內寫明此姓名之後加填「某某商號合夥人」字樣。

(五)　被告人是以個人身份用其他姓名經營商號而被告訴時，則該表格必須由他填寫，並須在第一段內寫明其本身姓名之後加填「經營某某商號」字樣。

(六)　如被告是一間有限公司，該表格必須由律師代為填寫，或由該公司所授權人士填寫，但如無律師代表，該公司不得採取進一步訴訟程序。

(七)　如被告是未成年或是一名精神病患者，則該表格必須由他的監護人的代表律師填寫。

(八)　如被告人沒有律師代表他，可到高等法院登記處請求協助填寫表格。

(九)　此「填寫指南」只適用於一般案件，沒有律師代表的被告人送到困難時，可參閱上文第 8 段。

M0012616

EXHIBIT ___115___

PAGE ___1818___

HCA    /2003

## IN THE HIGH COURT OF THE

## HONG KONG SPECIAL ADMINISTRATIVE REGION

## COURT OF FIRST INSTANCE

ACTION NO. 3856 OF 2003

---

| | |
|---|---|
| MGA ENTERTAINMENT INC. | Plaintiff |
| and | |
| UNI-FORTUNE TOYS INDUSTRIAL LIMITED | 1st Defendant |
| FU WEI TOYS COMPANY LIMITED | 2nd Defendant |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## WRIT OF SUMMONS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Issued this 16th day of October 2003. at 4:25 pm.

WILLIAM W. L. FAN & CO.
SOLICITORS
Room 507, 5th Floor,
Hang Seng Building,
77 Des Voeux Road Central,
Hong Kong.
Tel.: 2110 2128  Fax: 2111 9336
Ref: WF-1878-RC

M0012617

EXHIBIT ___115___

PAGE ___1819___

**EXHIBIT   116**

**THIS EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

**EXHIBIT   117**

**THIS EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

**EXHIBIT   118**

7/18/03 WSJ A1
7/18/03 Wall St. J. A1
2003 WL-WSJ 3974434
(Publication page references are not available for this document.)

Page 2

The Wall Street Journal
(Copyright (c) 2003, Dow Jones & Company, Inc.)

Friday, July 18, 2003

Dolled Up: To Lure Older Girls, Mattel Brings In Hip-Hop Crowd

It Sees Stalwart Barbie Lose Market Share, So 'Flavas' Will Take on the 'Bratz'

Battle of the Big Heads
By Maureen Tkacik

LOS ANGELES -- Tika, 10 inches tall with two-toned hair, is of ambiguous ethnic origin -- maybe she's Asian, maybe Latina -- but her "platinum" medallion, airbrushed jean jacket, shell-toe sneakers and graffiti-streaked packaging make one thing clear.

"She's like . . . hip-hop," said Crystal Audigier, 10 years old, as she rifled through the first crate of "Flavas" dolls to arrive at a Los Angeles FAO Schwarz store last week.

Mattel Inc. hopes the dolls are hip enough to take on the "Bratz." The Flavas (pronounced "Flay-vuhs," like "flavors"), a set of six dolls brought from design to production in just three months, represent a striking gamble for the giant toy company. In the 44 years since it introduced its bombshell Barbie, Mattel has rarely brought out a doll line to compete with her.

But Mattel, which had become accustomed to its buxom blonde dominating the market, has watched in alarm as Barbie has been challenged by a smaller toy maker's Bratz -- a line of big-headed, pouty-lipped characters. While Barbie, which posted about $1.7 billion in sales for Mattel last year, is still queen, her share of the so-called fashion-doll market has fallen, almost entirely due to the Bratz.

After trying -- and failing -- to defeat the Bratz with a trendier Barbie last year, Mattel has come up with a radical battle plan. Among other things, that means curtailing its reliance on, and near-reverence toward, its cash cow. While Barbie is still a plaything of choice for girls 3 to 7 years old, it's been years since she managed to hold the attention of the tweens, or 8- to 12- year-olds. With the Flavas, Mattel is trying to get back into that market -- even if it risks cannibalizing its biggest product.

Mattel has tweaked Barbie many times since she was introduced in 1959: bronzing her skin during the 1970s, introducing black and Hispanic counterparts and giving her a band (the fuchsia-clad "Rockers") during the 1980s. Mattel even shrunk her chest and widened her hips in 1998.

But Mattel now concedes Barbie has gradually lost touch with some young girls' lives. "Barbie began as a great girl who was simply a reflection of popular culture, but in the past few years we had sort of put her on a pedestal," says Matt Bousquette, president of the newly created Mattel Brands unit, which consolidated the boys' and girls' toys divisions. "We're taking her off that pedestal."

While Mr. Bousquette and his team overhaul Barbie, he is also enlisting the Flavas, who wear sweats and heavy chains and have names like "Tre" and "P. Bo," as a second force with which to fight the Bratz. Mattel says hip-hop -- which it defines as "a cultural phenomenon . . . dimensionalized through freestyle dance, street sports, music and fashion" -- has gained sufficient ground in the mainstream to have its own toy line.

"Mattel is recognizing that there are other trends besides Barbie that girls want to play with," says Manny Francione, divisional merchandise manager for Toys "R" Us Inc., Paramus, N.J. "Hip-hop is one of those trends."

The Bratz, developed by a toy maker called MGA Entertainment Inc., North Hills, Calif., were introduced in the summer of 2001. They became a hit with tweens, an age group of girls that the toy industry had almost written off.

For the past decade, toy makers have been grappling with a phenomenon analysts call "age compression," in which media-saturated youngsters are outgrowing dolls and other toys at an earlier age. NPD Group Inc., a market-research firm, says toy spending on children peaks at age 3 and steadily declines after

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

DEPOSITION EXHIBIT

M 0012536

EXHIBIT 118
PAGE 1842

7/18/03 WSJ A1
7/18/03 Wall St. J. A1
2003 WL-WSJ 3974434
(Publication page references are not available for this document.)

Page 3

that, with spending on 12-year-olds at about a quarter of the peak level. By attracting tweens, the Bratz bucked that trend.

Bratz "appealed to an older girl . . . who is not necessarily still a Barbie customer," says Sean McGowan, a longtime industry analyst with Gerard Klauer Mattison. "Nothing's ever challenged Barbie like the Bratz." At Barbie's 1997 peak, a year in which Mattel posted $1.9 billion in sales of the doll, her clothing and accessories, she boasted more than a 90% share of the fashion-doll market, Mr. McGowan says. Barbie held at least 85% of the market right before the Bratz were introduced, he says, but her share has now dropped to about 70%.

The history of the Bratz is intertwined with Mattel. MGA says the Bratz were designed by Carter Bryant, a former member of the Barbie team. Inside Mattel, some are convinced the Bratz borrow liberally from a Mattel project that was scrapped at the testing stage in 1998; Mattel declined to comment.

Mr. Bryant didn't work on the line that Mattel scrapped, according to former and current Mattel designers. But most Barbie designers had seen the prototypes, his former colleagues say. Mr. Bryant, through MGA, declined to be interviewed.

The Mattel doll line that was scrapped wasn't exactly like the Bratz, says a longtime Mattel designer who worked on the project. But the Bratz's oversized heads -- with their pursed lips and cartoonish eyes -- are "virtually identical" to the heads of the dolls her team created, says the designer, who left Mattel in 2001.

Lily Martinez, a designer who still works at Mattel, came up with the idea for the big doll heads for Mattel, colleagues say. Mattel declined to comment. She even posted her sketch on her cubicle, colleagues say. "Anyone who passed by her cubicle would see the picture up on the wall," says another designer who also left Mattel in 2001. "The big heads, the big eyes, the big feet -- they were all the same" as the Bratz. Ms. Martinez declined to comment.

The Mattel dolls were scrapped in testing, current and

former designers say, because Mattel had strict quotas that allowed only one "flanker brand" -- that is, a brand that would compete with Barbie for shelf space -- on the market at a time. At the time, Mattel chose a product called "What's Her Face" -- a doll with a blank face on which kids could draw expressions. That doll remains on the market; Mattel declined to discuss its sales.

Designers say they often faced a higher bar for non-Barbie projects. And Barbie's image was carefully protected. Bruce Stein, who was president of Mattel until 1998, says that former Chief Executive Jill Barad nixed an idea for "Barbie as Xena" dolls in 1998.

Ms. Barad was replaced in 2000, after Mattel's disastrous $3.5 billion acquisition of a software maker called The Learning Company. Under her successor, Robert Eckert, a former Kraft Foods president, the company has returned to profitability by cutting its work force 10%, streamlining its supply chain and developing international sales, among other things. Mattel, which reported a net loss of $431 million in 2000, reported net income of $230 million last year. Its stock has risen about 76% since Mr. Eckert arrived.

Isaac Larian, chief executive of MGA, says he had never heard of a project similar to the Bratz at Mattel. He says he chose Mr. Bryant's idea for the Bratz over several others after holding a sort of fashion-doll design contest in late 1999.

Mr. Larian, who emigrated to the U.S. from Iran, founded his company in the late 1970s, making a name by picking up the license for hand-held Pac-Man games. Though his company had made baby dolls before, it had never made fashion dolls. He says he was motivated by a challenge from a Wal-Mart Stores Inc. buyer to "give me something that can compete with Barbie."

This year, closely held MGA expects revenue of about $800 million -- with 65% of that coming from the Bratz. The company says it's profitable, but won't discuss specifics. Mr. Bryant still does design work for MGA, Mr. Larian says, and collects royalties on the Bratz line.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

M 0012537

EXHIBIT 118
PAGE 1843

7/18/03 WSJ A1
7/18/03 Wall St. J. A1
2003 WL-WSJ 3974434
(Publication page references are not available for this document.)

Page 4

Mattel began worrying about the Bratz's momentum during the 2001 holiday season. Barbie sales fell 12% in the U.S. that year, despite a marketing campaign featuring an animated video, "Barbie in the Nutcracker."

By spring of 2002, Adrienne Fontanella, then president of the girls' division, decided to launch what the company termed a more "reality based" Barbie line. Like the Bratz, the "My Scene" Barbies boasted bigger heads and feet and fuller lips, as well as trendier clothes.

Mr. Larian, the head of MGA, calls the My Scene dolls a "cheap imitation" of the Bratz. Mattel declined to comment. Introduced in October 2002, the My Scene Barbies helped Mattel's sales, but still ranked behind the Bratz during the 2002 holiday season, according to NPD. "My Scene has been just OK for us," says Fred Hurley, a longtime girls'-toys buyer for KB Toys Inc., Pittsfield, Mass.

In February, Ms. Fontanella's job, along with others, was eliminated in what Mr. Eckert called a "restructuring" of Mattel's executive ranks aimed at "increasing efficiency."

Mr. Bousquette, the then-head of Mattel's boys' toy division, became the first man to take control of Barbie in more than a decade. "It used to be that whoever ran Barbie ran the company, not the other way around," says Mr. Stein, the former president. "For Matt to be in charge is a major shift."

Mattel no longer has quotas on how many products can compete with Barbie. After sitting through a girls'-design-team presentation in March, Mr. Bousquette seized upon the Flavas as the ideal dolls to compete for the dollars of Bratz buyers. Ivy Ross, head of girls' design, suggested bringing them to market for the spring 2004 season. Mr. Bousquette said the company should aim for this July instead.

"We were stunned," says a designer who worked on the Flavas and left the company in May. Another surprise: Mr. Bousquette asked the team to make the dolls look more hip-hop than the prototypes. "No one had really believed in the concept before that meeting, and it was stuck in this back-and-forth where first they were too edgy, then they weren't edgy enough," says the designer. "Matt came through and cut all of that out." Mr. Bousquette says he told designers to make the dolls "as authentic as possible, as quickly as possible."

Flavas are more complicated to manufacture than most fashion dolls. They are all different heights -- meaning separate molds -- and they have 10 points at which they can move, allowing them to strike a variety of poses. The Flavas design team often slept in their cubicles to get the dolls ready in time for summer shipment. Two designers each clocked 53 hours during Memorial Day weekend to prepare the line for the company's annual toy fair held in the first week of June.

Some buyers have been impressed. Mattel's girls' division "has never been a particularly forward-thinking group, but the Flavas are right on trend," says KB's Mr. Hurley. The six dolls in the Flavas line are certainly edgier than anyone in Barbie's clique. The Flavas girls have highlighted hair, flashier jewelry and wear midriff-baring tops with low-slung pants. Unlike Barbie, they have flat feet and wear sneakers. The two boy Flavas dolls sport earrings and serious expressions. Boxer underwear appears to show from the top of their cargo pants.

The Flavas come in boxes splashed with black-and-white photos of urban scenes shot around Venice Beach. When arranged together, the boxes create a "graffiti" mural that reads: "FA SIZZLE." It is a play on the hip-hop expression "Fa' shizzle," which means "For sure." Marketing director Lisa Tauber explains that it is also an acronym that stands for "Fashion, Attitude and Sizzlin' Style." The dolls, aimed at 9- to 11-year-olds, are "all about fearless self- expression," she says.

MGA's Mr. Larian says he isn't scared by the Flavas. "The only thing that's missing is a cocaine vial," he says. "You think of Mattel, you think of Barbie and you think of sweetness. . . . This is like 'gangster' Barbie, and I think it's going to backfire."

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

M 0012538

EXHIBIT __118__

_E __1844__

7/18/03 WSJ A1
7/18/03 Wall St. J. A1
2003 WL-WSJ 3974434
(Publication page references are not available for this document.)

Page 5

Telejah Dean, a nine-year-old from West Los Angeles noticed the Flavas last week, as she was admiring Mattel's Mary-Kate and Ashley dolls. The Flavas are "not as pretty as Barbie," she said. But her older sister, Tiffany, 22, seemed impressed by the blond Happy D. doll. "Look, she's got black [hair] extensions like Christina," she exclaimed, referring to pop singer Christina Aguilera.

In fact, Mattel has hired people to give out Flavas hats, wristbands and decals during Ms. Aguilera's concert tour this summer. Ms. Aguilera, who got her start on the Disney Channel, is now probably as well known for her 11_body piercings and her mud wrestling-themed MTV video called "Dirrty." "It's a sign of the changing times, says Mattel spokeswoman Julia Jensen. "The old Mattel probably wouldn't try to tie up with someone like Christina Aguilera."

---- INDEX REFERENCES ----

COMPANY:     KB Holdings LLC (KBTY);
Mattel Inc (MATL)

NEWS SUBJECT:     (Marketing (C31); Market Share (C313); Corporate/Industrial News (CCAT); Content Types (NCAT); Page-One Story (NPAG); Editor's Choice - Consumer Products (REQRCP); Editor's Choice - Industry Trends/Analysis (REQR))

INDUSTRY:     (Dolls/Toys/Games (I4941); Retail (I64); Specialty Stores (I654); Hobby/Toy/Game Stores (I6540030); Consumer Products (ICNP); Media (IMED))

REGION:     (North American Countries (NAMZ); United States (USA); United States - California (USCA); Northeast U.S. (USE); United States - Massachusetts (USMA); Western U.S. (USW))

OTHER INDEXING:     Marketing; Market Share; Page-One Story; Content Types; Corporate/Industrial News; United States - California; United States - Massachusetts; United States; Northeast U.S.; Western U.S.; North American Countries; Dolls/Toys/Games; Retail; Specialty Stores; Hobby/Toy/Game Stores; Consumer Products;

Media; Consumer Cyclical; Newswire More Code; Newswire End Code; All Entertainment & Leisure; Limited Product Specialty Retailers; Recreational Products & Services; All Specialty Retailers; Toys; Islamic Index; S&P 500 Index component; Newspapers' Section Fronts; Marketing; Market

Word Count: 2217

7/18/03 WSJ A1

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

M 0012539

EXHIBIT _____ 118

PAGE _____ 1845

**EXHIBIT   119**

**THIS EXHIBIT IS FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

**EXHIBIT   120**

THIS EXHIBIT IS FILED UNDER SEAL
PURSUANT TO PROTECTIVE ORDER

**EXHIBIT   121**

**THIS EXHIBIT IS FILED UNDER SEAL
PURSUANT TO PROTECTIVE ORDER**

**EXHIBIT   122**

RECEIVED

DEC 10 2004

SEND

FILED
CLERK, U.S. DISTRICT COURT

DEC 7 2004

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

1  M. RANDALL OPPENHEIMER (S.B. #77649)
   DIANA M. TORRES (S.B. #162284)
2  O'MELVENY & MYERS LLP
   400 South Hope Street
3  Los Angeles, California 90071-2899
   Telephone:  (213) 430-6000
4  Facsimile:  (213) 430-6407

5

6  Attorneys for Applicant-Intervenor
   MGA ENTERTAINMENT, INC.

7

8

9

10

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

11  MATTEL, INC., a Delaware
    Corporation,
12
                Plaintiff,
13
        v.
14
    CARTER BRYANT, an individual;
15  and DOES 1 through 10, inclusive,
16
                Defendant.
17

18

19

20

21

22

23

24

25

26

27

28

Case No. CV 04-9059 NM (RNBx)

**STIPULATION PERMITTING MGA TO INTERVENE AS A PARTY TO THIS ACTION** ~ORDER~

Hon. Nora Manella

DOCKETED ON CM

DEC - 8 2004

BY                    006

STIPULATION PERMITTING MGA TO
INTERVENE AS A PARTY

EXHIBIT ___122___

PAGE ___1864___

1    WHEREAS, on April 27, 2004, Plaintiff Mattel, Inc. ("Mattel") filed suit

2    against Carter Bryant ("Bryant") and ten unnamed "Does" alleging breach of

3    contract, breach of the duty of loyalty, breach of fiduciary duty, conversion and

4    unjust enrichment.

5    WHEREAS, MGA, believes, at this time, that it has a significantly

6    protectable interest relating to the subject matter of the action, that the disposition

7    of the action may impair or impede MGA's ability to protect its interest absent

8    intervention, and that MGA's interest is not adequately represented by the existing

9    parties.

10   WHEREAS, Mattel is agreeable to the filing of the Answer in Intervention as

11   a procedural matter pursuant to this Stipulation, without waiver of, or prejudice to,

12   its rights, defenses or positions in this or any other action or to the Answer in

13   Intervention, including without limitation to Mattel's jurisdictional objections;

14   WHEREAS, Bryant is agreeable to the filing of the Answer in Intervention as

15   a procedural matter pursuant to this Stipulation, without waiver of, or prejudice to,

16   his rights, defenses or positions in this or any other action;

17   NOW THEREFORE, MGA, Mattel and Bryant hereby stipulate, subject to

18   this Court's approval, as follows:

19       1.    MGA may intervene as a party to this action; and

20   //

21   //

22   //

23   //

24   //

25   //

26   //

27   //

28   //

- 1 -

EXHIBIT    122

PAGE    1865

1    2.    MGA shall be permitted to file its Answer in Intervention, lodged

2    concurrently with this Stipulation.

3

4    Dated:    December 3, 2004    O'MELVENY & MYERS LLP

5

6    By: _____
         Diana M. Torres
7        Attorneys for Applicant-Intervenor
         MGA ENTERTAINMENT, INC.

8

9    Dated:    December___, 2004    QUINN EMANUEL URQUHART
                                     OLIVER & HEDGES LLP
10

11

12   By:_____
         Michael T. Zeller
13       Attorneys for Plaintiff
         MATTEL, INC.

14

15   Dated:    December___, 2004    LITTLER MENDELSON, P.C.

16

17   By:_____
         Keith A. Jacoby
18       Attorneys for Defendant
         CARTER BRYANT

19   IT IS SO ORDERED.

20

21   Dated:    December___, 2004

22

23                              Hon. Nora M. Manella
                                United States District Judge

24

25

26

27

28

- 2 -

EXHIBIT 122

PAGE 1860

2.    MGA shall be permitted to file its Answer in Intervention, lodged concurrently with this Stipulation.

Dated:    December___, 2004    O'MELVENY & MYERS LLP

By:_____
      Diana M. Torres
Attorneys for Applicant-Intervenor
MGA ENTERTAINMENT, INC.

Dated:    December___, 2004    QUINN EMANUEL URQUHART
                              OLIVER & HEDGES LLP

By: _Michael T. Zeller_____
      Michael T. Zeller
Attorneys for Plaintiff
MATTEL, INC.

Dated:    December___, 2004    LITTLER MENDELSON, P.C.

By:_____
      Keith A. Jacoby
Attorneys for Defendant
CARTER BRYANT

IT IS SO ORDERED.

Dated:    December___, 2004

_____
Hon. Nora M. Manella
United States District Judge

- 2 -

EXHIBIT _122_

PAGE _1867_

DEC-03-2004 09:27 FROM:LITTLER MENDELSON    310 553 5583    2#852#12134306407    P.4/4

2.    MGA shall be permitted to file its Answer in Intervention, lodged concurrently with this Stipulation.

Dated:    December___, 2004    O'MELVENY & MYERS LLP

By:_____
        Diana M. Torres
Attorneys for Applicant-Intervenor
MGA ENTERTAINMENT, INC.

Dated:    December___, 2004    QUINN EMANUEL URQUHART
                             OLIVER & HEDGES LLP

By:_____
        Michael T. Zeller
Attorneys for Plaintiff
MATTEL, INC.

Dated:    December 3, 2004    LITTLER MENDELSON, P.C.

By:_____
        Keith A. Jacoby
Attorneys for Defendant
CARTER BRYANT

IT IS SO ORDERED.

Dated:    December 7th, 2004    _____
                             Hon. Nora M. Manella
                             United States District Judge

- 2 -

EXHIBIT 122

PAGE 2868

**EXHIBIT   123**

1   M. RANDALL OPPENHEIMER (S.B. #77649)
    DIANA M. TORRES (S.B. #162284)
2   O'MELVENY & MYERS LLP
    400 South Hope Street
3   Los Angeles, California 90071-2899
    Telephone: (213) 430-6000
4   Facsimile: (213) 430-6407

5   Attorneys for Applicant-Intervenor
    MGA ENTERTAINMENT, INC.
6

7

8              UNITED STATES DISTRICT COURT

9             CENTRAL DISTRICT OF CALIFORNIA

10

11  MATTEL, INC., a Delaware          Case No. CV 04-9059 NM (RNBx)
    Corporation,
12                                    **MGA ENTERTAINMENT, INC.'S**
              Plaintiff,              **ANSWER IN INTERVENTION TO**
13                                    **PLAINTIFF'S UNVERIFIED**
         v.                           **COMPLAINT**
14
    CARTER BRYANT, an individual;     Hon. Nora Manella
15  and DOES 1 through 10, inclusive,

16            Defendant.

17

18

19

20

21

22

23

24

25

26

27

28
    LA2:730044

                                    ANSWER IN INTERVENTION TO
                                    PLAINTIFF'S UNVERIFIED COMPLAINT

EXHIBIT ___123___

PAGE __1869__ #247

1    As it has now become abundantly clear that its rights are directly at stake in

2    this action, MGA Entertainment, Inc. ("MGA") intervenes in this case as a

3    defendant.  Plaintiff Mattel, Inc. ("Mattel") filed suit against Carter Bryant

4    ("Bryant"), a design consultant for MGA, asserting, among other claims, that he

5    "wrongfully converted Mattel property" for his own benefit and "the benefit and

6    gain of others" and seeking both monetary and injunctive relief.  It is now evident

7    that Mattel's claims are based on Mattel's misguided theory that Bryant allegedly

8    converted intellectual property from Mattel and used it as the underlying work for

9    his own and MGA's benefit.  MGA reaches this conclusion in light of at least the

10   following:

11        (a)    Mattel's recent registration for an unreleased project created in

12               approximately 1999 that it now calls "Toon Teens," from which Mattel

13               has asserted in the press Bryant "borrowed liberally" for his work on

14               "Bratz," and which is also the subject of the declaratory relief action

15               that Bryant has filed;

16        (b)    the questioning of Bryant at his recent deposition focusing on the

17               creation and development of "Bratz;"

18        (c)    Mattel's recent efforts to subpoena third parties who worked on

19               MGA's "Bratz" products and have no information concerning Bryant's

20               employment relationship with Mattel; and

21        (d)    Mattel's recent attempts to assist those who have infringed MGA's

22               rights in other countries to prove (falsely) that MGA does not own the

23               copyrights to its "Bratz" products.

24   Indeed, Mattel's purported conversion claim is nothing more than a copyright claim

25   in disguise.  It is preempted by federal copyright law, accordingly, and must be

26   recast as a copyright claim under federal law.  This copyright action necessarily

27   implicates MGA's rights, as MGA owns all intellectual property rights in "Bratz."

28   While MGA denies that Mattel is entitled to rights in any of MGA's intellectual

LA2:730044                          - 1 -              ANSWER IN INTERVENTION TO
                                                       PLAINTIFF'S UNVERIFIED COMPLAINT

EXHIBIT ___123___

PAGE ___1870___

1   property, including, without limitation, MGA's copyrights in the "Bratz" line of

2   products, MGA must now intervene in this action to defend its intellectual property

3   rights. Therefore Defendant in Intervention MGA, as answer to the Complaint

4   herein, admits, denies, and alleges as follows:

5        1.      Upon information and belief, MGA admits that Mattel is a corporation

6   organized and existing under the laws of the State of Delaware and has a place of

7   business in El Segundo, California. Except as so admitted, MGA is without

8   sufficient information to admit the allegations of ¶ 1, and on that basis denies the

9   same.

10       2.      MGA admits that defendant Bryant is an individual currently residing

11  in Springfield, Missouri.

12       3.      MGA is without sufficient information concerning either Mattel's

13  knowledge or the identities of the Doe Defendants, if any, to enable it to admit the

14  allegations of ¶ 3, and on that basis denies the same.

15       4.      MGA denies the allegations of ¶ 4.

16       5.      MGA denies the allegations of ¶ 5.

17       6.      MGA admits that Bryant does not currently reside in California and

18  that Los Angeles County is a proper venue for this action. Except as so admitted,

19  MGA denies the allegations of ¶ 6.

20       7.      MGA is without information to admit the specific allegations of ¶ 7

21  and on that basis denies the same, but admits that reports from Mattel and other

22  public sources make assertions similar to those alleged in ¶ 7.

23       8.      MGA is without information to admit the specific allegations of ¶ 8

24  pertaining to Mattel's operations, and on that basis denies the same, but admits that

25  Mattel has a large facility in El Segundo, California, in which Mattel employs a

26  number of people.

27       9.      MGA is without information to admit the specific allegations of ¶ 9

28  pertaining to Mattel's operations, and on that basis denies the same, but admits that

LA2:730044                     - 2 -            ANSWER IN INTERVENTION TO
                                                PLAINTIFF'S UNVERIFIED COMPLAINT

EXHIBIT _____ 123

PAGE _____ 1871

1    Bryant was employed by Mattel during two time periods.

2        10.    MGA is informed and on that basis admits that Bryant signed

3    documents during his employment at Mattel. MGA alleges that Exhibit A speaks

4    for itself as to its contents. MGA lacks information sufficient to enable it to

5    identify or authenticate Exhibit A and on that basis denies each and every allegation

6    in ¶ 10 purporting to describe the content of Exhibit A. MGA further alleges that

7    the allegations in ¶ 10 purporting to describe the legal effect of Exhibit A consist of

8    legal argument and conclusions to which no response is required.

9        11.    MGA is informed and on that basis admits that Bryant signed

10   documents during his employment at Mattel. MGA alleges that Exhibit B speaks

11   for itself as to its contents. MGA lacks information sufficient to enable it to

12   identify or authenticate Exhibit B and on that basis denies each and every allegation

13   in ¶ 11 purporting to describe the content of Exhibit A. MGA further alleges that

14   the allegations in ¶ 11 purporting to describe the legal effect of Exhibit B consist of

15   legal argument and conclusions to which no response is required.

16       12.    MGA admits that Bryant signed a contract with MGA on or about

17   October 4, 2000 that provided that Bryant would receive royalties in connection

18   with certain work to be performed by him thereafter under that agreement, and that

19   MGA would own all intellectual property rights in property for which Bryant

20   provided services, as well as in the work assigned thereunder by Bryant to MGA.

21   Except as so admitted, MGA denies the allegations of ¶ 12.

22       13.    MGA is without information sufficient to admit the allegations in ¶ 13

23   and on that basis denies the same.

24       14.    MGA denies the allegations of ¶ 14.

25       15.    In answer to ¶ 15, MGA repeats its answers to the allegations in

26   paragraphs 1 through 14, above.

27       16.    MGA is informed and on that basis admits that Bryant signed

28   documents during his employment at Mattel. MGA alleges that any purported

LA2:730044                          - 3 -          ANSWER IN INTERVENTION TO
                                                   PLAINTIFF'S UNVERIFIED COMPLAINT

EXHIBIT _____123_____

PAGE _____1872_____

1 | "Mattel Employment Agreement" and "Conflict Questionnaire" speak for
2 | themselves as to their contents. MGA lacks information sufficient to enable it to
3 | identify or authenticate the purported "Mattel Employment Agreement" and
4 | "Conflict Questionnaire" and on that basis denies each and every allegation in ¶ 16
5 | purporting to describe the contents of such documents. MGA further alleges that
6 | the allegations in ¶ 16 purporting to describe the legal effect of any purported
7 | "Mattel Employment Agreement" or "Conflict Questionnaire" consist of legal
8 | argument and conclusions to which no response is required.

9 |        17.    MGA alleges that any purported "Mattel Employment Agreement" and
10 | "Conflict Questionnaire" speak for themselves as to their contents. MGA lacks
11 | information sufficient to enable it to identify or authenticate the purported "Mattel
12 | Employment Agreement" and "Conflict Questionnaire" and on that basis denies
13 | each and every allegation in ¶ 16 purporting to describe the contents of such
14 | documents. MGA further alleges that the allegations in ¶ 16 purporting to describe
15 | the legal effect of any purported "Mattel Employment Agreement" or "Conflict
16 | Questionnaire" consist of legal argument and conclusions to which no response is
17 | required. MGA is without sufficient information concerning Mattel's performance,
18 | if any, and on that basis denies all allegations regarding the same.

19 |        18.    MGA denies the allegations of ¶ 18.

20 |        19.    MGA denies the allegations of ¶ 19 and affirmatively asserts that the
21 | relief sought by Mattel in this paragraph indicates that Mattel's first cause of action
22 | implicates federal copyright laws. To the extent that Mattel herein purports to set
23 | forth the allegations in support of its first cause of action to substantiate a federal
24 | copyright claim, these allegations are also expressly denied.

25 |        20.    MGA denies the allegations of ¶ 20 except that MGA alleges that any
26 | purported "Employment Agreement" speaks for itself as to its contents. MGA
27 | lacks information sufficient to enable it to identify or authenticate the purported
28 | "Employment Agreement" and on that basis denies each and every allegation in ¶

LA2:730044                                  - 4 -                    ANSWER IN INTERVENTION TO
                                                            PLAINTIFF'S UNVERIFIED COMPLAINT

EXHIBIT ____123____

PAGE ____1873____

20 purporting to describe the contents of such document. MGA further alleges that
the allegations in ¶ 20 purporting to describe the legal effect of any purported
"Employment Agreement" consist of legal argument and conclusions to which no
response is required.

21.    In answer to ¶ 21, MGA repeats its answers to the allegations in
paragraphs 1 through 20, above.

22.    MGA is without information sufficient to admit the allegations of ¶ 22,
and on that basis denies same except that MGA alleges that any purported
"Employee Agreement" speaks for itself as to its contents. MGA lacks information
sufficient to enable it to identify or authenticate the purported "Employee
Agreement" and on that basis denies each and every allegation in ¶ 22 purporting to
describe the contents of such document. MGA further alleges that the allegations in
¶ 22 purporting to describe the legal effect of any purported "Employee
Agreement" consist of legal argument and conclusions to which no response is
required.

23.    MGA denies the allegations of ¶ 23 and affirmatively asserts that the
relief sought by Mattel in this paragraph indicates that Mattel's first cause of action
implicates federal copyright laws. To the extent that Mattel herein purports to set
forth the allegations in support of its first cause of action to substantiate a federal
copyright claim, these allegations are also expressly denied.

24.    MGA denies the allegations of ¶ 24.

25.    MGA denies the allegations of ¶ 25.

26.    MGA denies the allegations of ¶ 26.

27.    MGA denies the allegations of ¶ 27.

28.    In answer to ¶ 28, MGA repeats its answers to the allegations in
paragraphs 1 through 27, above.

29.    MGA denies the allegations of ¶ 29.

30.    MGA denies the allegations of ¶ 30 and affirmatively asserts that the

LA2:730044                          - 5 -          ANSWER IN INTERVENTION TO
                                                   PLAINTIFF'S UNVERIFIED COMPLAINT

EXHIBIT ___121___

PAGE ___474___

1    relief sought by Mattel in this paragraph indicates that Mattel's first cause of action

2    implicates federal copyright laws. To the extent that Mattel herein purports to set

3    forth the allegations in support of its first cause of action to substantiate a federal

4    copyright claim, these allegations are also expressly denied.

5         31.    MGA denies the allegations of ¶ 31.

6         32.    MGA denies the allegations of ¶ 32.

7         33.    MGA denies the allegations of ¶ 33.

8         34.    MGA denies the allegations of ¶ 34.

9         35.    In answer to ¶ 35, MGA repeats its answers to the allegations in

10   paragraphs 1 through 34, above.

11        36.    MGA denies the allegations of ¶ 36 and affirmatively asserts that the

12   allegations in this paragraph indicate that Mattel's fourth cause of action implicates

13   federal copyright laws. To the extent that Mattel herein purports to set forth the

14   allegations in support of its fourth cause of action to substantiate a federal copyright

15   claim, these allegations are also expressly denied..

16        37.    MGA denies the allegations of ¶ 37.

17        38.    MGA denies the allegations of ¶ 38.

18        39.    MGA denies the allegations of ¶ 39.

19        40.    In answer to ¶ 40, MGA repeats its answers to the allegations in

20   paragraphs 1 through 39, above.

21        41.    MGA denies the allegations of ¶ 41 and affirmatively asserts that the

22   allegations in this paragraph assert legal or equitable rights that are equivalent to

23   exclusive rights within the general scope of copyright protection and are, therefore,

24   expressly preempted by the Copyright Act, 17 U.S.C. § 101 *et seq.* and must be

25   recast as a federal question under copyright law. To the extent that Mattel herein

26   purports to set forth the allegations in support of its fifth cause of action to support

27   a federal copyright claim, these allegations are also expressly denied.

28        42.    MGA denies the allegations of ¶ 42 and affirmatively asserts that the

EXHIBIT _____ 123

PAGE _____ 1875

1  allegations in this paragraph assert legal or equitable rights that are equivalent to
2  exclusive rights within the general scope of copyright protection, which are
3  expressly preempted by the Copyright Act, 17 U.S.C. § 101 *et seq.* and must be
4  recast as a federal question under copyright law. To the extent that Mattel herein
5  purports to set forth the allegations in support of its fifth cause of action to
6  substantiate a federal copyright claim, these allegations are also expressly denied.
7      43.   MGA denies the allegations of ¶ 43 and affirmatively asserts that the
8  allegations in this paragraph assert legal or equitable rights that are equivalent to
9  exclusive rights within the general scope of copyright protection, which are
10  expressly preempted by the Copyright Act, 17 U.S.C. § 101 *et seq.* and must be
11  recast as a federal question under copyright law. To the extent that Mattel herein
12  purports to set forth the allegations in support of its fifth cause of action to
13  substantiate a federal copyright claim, these allegations are also expressly denied.
14      44.   MGA denies the allegations of ¶ 44.
15      45.   MGA denies the allegations of ¶ 45.
16
17             **AFFIRMATIVE DEFENSES**
18      MGA asserts the following affirmative defenses:
19             **FIRST AFFIRMATIVE DEFENSE**
20      1.   Plaintiff's Complaint and each purported claim for relief therein is
21  preempted by the Federal Copyright Act.
22             **SECOND AFFIRMATIVE DEFENSE**
23      2.   Plaintiff's Complaint and each purported claim for relief therein fail to
24  state facts sufficient to constitute a claim for relief.
25             **THIRD AFFIRMATIVE DEFENSE**
26      3.   Plaintiff's Complaint and each purported claim for relief therein are
27  barred by the equitable doctrine of unclean hands.
28

LA2:730044

- 7 -

ANSWER IN INTERVENTION TO
PLAINTIFF'S UNVERIFIED COMPLAINT

EXHIBIT ____

PAGE ____

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### FOURTH AFFIRMATIVE DEFENSE

4.     Plaintiff's Complaint and each purported claim for relief therein are barred by the equitable doctrine of waiver.

### FIFTH AFFIRMATIVE DEFENSE

5.     Plaintiff's Complaint and each purported claim for relief therein are barred by the equitable doctrine of estoppel.

### SIXTH AFFIRMATIVE DEFENSE

6.     Plaintiff's Complaint and each purported claim for relief therein are barred by the equitable doctrine of laches.

### SEVENTH AFFIRMATIVE DEFENSE

7.     Plaintiff's Complaint and each purported claim for relief therein are barred by the equitable doctrine of consent.

### EIGHTH AFFIRMATIVE DEFENSE

8.     Plaintiff's Complaint and each purported claim for relief therein, or some of them, are barred by the applicable statutes of limitations, including California Code of Civil Procedure sections 337, 339, 343 and 338(c) .

### NINTH AFFIRMATIVE DEFENSE

9.     Plaintiff's Complaint and each purported claim for relief therein, or some of them, are barred because no Defendant owed a legal duty to Plaintiff or, if any legal duty arose, it was not breached by any Defendant.

### TENTH AFFIRMATIVE DEFENSE

10.     Without admitting, and specifically denying, that any Defendant owed any duty to Plaintiff, any duty or obligation, contractual or otherwise, which Plaintiff claims was owed by any Defendant has been fully performed, satisfied and/or discharged.

### ELEVENTH AFFIRMATIVE DEFENSE

11.     Plaintiff's Complaint and each purported claim for relief therein are barred because each Defendant has complied fully with his and/or its obligations, if

LA2:730044

- 8 -

ANSWER IN INTERVENTION TO
PLAINTIFF'S UNVERIFIED COMPLAINT

EXHIBIT _____

PAGE _____ 1677

1   any, under all applicable laws.

2   **TWELFTH AFFIRMATIVE DEFENSE**

3   12.   Plaintiff's Complaint and each purported claim for relief therein are

4   barred because Plaintiff has failed to exercise reasonable diligence in properly

5   mitigating its damages, if any in fact were suffered.

6   **THIRTEENTH AFFIRMATIVE DEFENSE**

7   13.   Plaintiff's Complaint and each purported claim for relief therein are

8   barred because the alleged losses or harms sustained by Plaintiff, if any, resulted

9   from causes other than any act or omission by any Defendant.

10   **FOURTEENTH AFFIRMATIVE DEFENSE**

11   14.   Plaintiff's Complaint and each purported claim for relief therein, or

12   some of them, are barred because to the extent Plaintiff has suffered any harm, and

13   Defendant in Intervention denies that Plaintiff has suffered any harm, it is due to

14   Plaintiff's own acts and omissions.

15   **FIFTEENTH AFFIRMATIVE DEFENSE**

16   15.   Plaintiff's Complaint and each purported claim for relief therein, or

17   some of them, are barred because any alleged contract between Plaintiff and

18   Defendant Bryant fails for lack of consideration, is vague and uncertain, and

19   therefore is void, voidable and/or unenforceable.

20   **SIXTEENTH AFFIRMATIVE DEFENSE**

21   16.   Plaintiff's Complaint and each purported claim for relief therein, or

22   some of them, are barred because any breaches of an alleged contract or duty,

23   which Defendant in Intervention denies, are excused by Plaintiff's acts or

24   omissions.

25   **SEVENTEENTH AFFIRMATIVE DEFENSE**

26   17.   To the extent Plaintiff's Complaint and any purported claim for relief

27   therein, or some of them, seek the remedy of injunctive relief, that remedy is barred

28   because Plaintiff's remedies at law are adequate and any alleged harms, and

LA2:730044                                    - 9 -                ANSWER IN INTERVENTION TO
                                                                  PLAINTIFF'S UNVERIFIED COMPLAINT

EXHIBIT ____ B3
PAGE ____ 1878

1   Defendant in Intervention denies that there are harms, are not irreparable.

2   **EIGHTEENTH AFFIRMATIVE DEFENSE**

3   18.   Plaintiff's Complaint and each purported claim for relief therein

4   cannot be maintained because any duties or obligations, contractual or otherwise,

5   which Plaintiff claims are owed by Defendant Bryant, are contrary to applicable

6   law.

7   **NINETEENTH AFFIRMATIVE DEFENSE**

8   19.   Plaintiff is barred from recovering punitive and/or exemplary damages

9   from Defendant or Defendant in Intervention ("Defendants") because an award of

10   such damages would violate the United States and/or California Constitutions, and

11   applicable case law.

12   **TWENTIETH AFFIRMATIVE DEFENSE**

13   20.   Defendant in Intervention does not presently know all facts concerning

14   the conduct of Plaintiff sufficient to state all affirmative defenses at this time.

15   Defendant in Intervention will seek leave of Court to amend this Answer in

16   Intervention should it later discover facts demonstrating the existence of additional

17   affirmative defenses.

18

19   **WHEREFORE**, Defendant in Intervention prays for judgment as follows:

20   1.   Plaintiff's Complaint shall be dismissed in its entirety with prejudice;

21   2.   Plaintiff shall take nothing by its action against Defendant;

22   3.   Defendant in Intervention shall be awarded its costs of suit and

23   attorneys' fees incurred in this matter (to the extent permitted by applicable law);

24   and

25   4.   Defendant in Intervention shall be awarded such other further relief as

26   may be deemed just and proper.

27

28

LA2:730044                              - 10 -                 ANSWER IN INTERVENTION TO
                                                            PLAINTIFF'S UNVERIFIED COMPLAINT

EXHIBIT _____ 23

PAGE _____ 1879

1

2     Dated:     December 3, 2004

3

4                                      O'MELVENY & MYERS LLP

5                                      By: _____
                                           Diana M. Torres
6                                      Attorneys for Defendant-in-Intervention
                                       MGA ENTERTAINMENT, INC.
7

8
LA2:730044
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                       ANSWER IN INTERVENTION TO
                                    PLAINTIFF'S UNVERIFIED COMPLAINT

EXHIBIT 123
PAGE 1880

**EXHIBIT 24**

| Week Ending Friday | Badge Number | Project (P2MST = Admin Time) | | Hours Reported | TRACS Internal Project Task Identifier |
|---|---|---|---|---|---|
| Jul 5 1996 12:00:00:000AM | 90202 | PA106 | O | 20 | PA10650136 |
| Jul 5 1996 12:00:00:000AM | 90202 | PW116 | O | 5.5 | PW11650003 |
| Jul 5 1996 12:00:00:000AM | 90202 | P2MST | | 13.5 | 80170 |
| Jul 12 1996 12:00:00:000AM | 90202 | PA106 | O | 20 | PA10650136 |
| Jul 12 1996 12:00:00:000AM | 90202 | PW116 | O | 8 | PW11650003 |
| Jul 12 1996 12:00:00:000AM | 90202 | P2MST | | 4 | 80020 |
| Jul 12 1996 12:00:00:000AM | 90202 | RA111 | O | 4 | RA11150130 |
| Jul 12 1996 12:00:00:000AM | 90202 | RA173 | O | 1 | RA17350131 |
| Jul 12 1996 12:00:00:000AM | 90202 | RA174 | O | 1 | RA17450131 |
| Jul 12 1996 12:00:00:000AM | 90202 | RA175 | O | 1 | RA17550131 |
| Jul 19 1996 12:00:00:000AM | 90202 | PA106 | O | 16 | PA10650136 |
| Jul 19 1996 12:00:00:000AM | 90202 | PW116 | O | 2 | PW11650003 |
| Jul 19 1996 12:00:00:000AM | 90202 | P2MST | | 13 | 80050 |
| Jul 19 1996 12:00:00:000AM | 90202 | RA111 | O | 8 | RA11150130 |
| Jul 26 1996 12:00:00:000AM | 90202 | PW116 | O | 5 | PW11650003 |
| Jul 26 1996 12:00:00:000AM | 90202 | P2MST | | 2 | 80020 |
| Jul 26 1996 12:00:00:000AM | 90202 | RA049 | O | 20 | RA04950129 |
| Jul 26 1996 12:00:00:000AM | 90202 | RA049 | | 2 | 90010 |
| Jul 26 1996 12:00:00:000AM | 90202 | RA111 | O | 8 | RA11150130 |
| Jul 26 1996 12:00:00:000AM | 90202 | RA176 | O | 2 | RA17650130 |
| Jul 26 1996 12:00:00:000AM | 90202 | PW116 | O | 5 | PW11650003 |
| Aug 2 1996 12:00:00:000AM | 90202 | PW242 | O | 2 | PW24250003 |
| Aug 2 1996 12:00:00:000AM | 90202 | P2MST | | 2 | 80020 |
| Aug 2 1996 12:00:00:000AM | 90202 | RA049 | O | 29 | RA04950129 |
| Aug 2 1996 12:00:00:000AM | 90202 | RA176 | | 1 | RA17650130 |
| Aug 9 1996 12:00:00:000AM | 90202 | PA106 | O | 31 | PA10650136 |
| Aug 9 1996 12:00:00:000AM | 90202 | P2MST | | 8 | 80020 |
| Aug 16 1996 12:00:00:000AM | 90202 | PW116 | O | 2 | PW11650003 |
| Aug 16 1996 12:00:00:000AM | 90202 | PW242 | O | 2 | PW24250003 |
| Aug 16 1996 12:00:00:000AM | 90202 | P2MST | | 5 | 80170 |
| Aug 16 1996 12:00:00:000AM | 90202 | RA049 | O | 20 | RA04950129 |
| Aug 16 1996 12:00:00:000AM | 90202 | RA176 | | 10 | RA17650130 |
| Aug 23 1996 12:00:00:000AM | 90202 | PW242 | O | 39 | PW24250003 |
| Aug 30 1996 12:00:00:000AM | 90202 | PW242 | O | 23 | PW24250003 |
| Aug 30 1996 12:00:00:000AM | 90202 | P2MST | | 16 | 80050 |
| Sep 6 1996 12:00:00:000AM | 90202 | PW242 | O | 22 | PW24250003 |

EXHIBIT 124
PAGE

DEPOSITION
EXHIBIT
350
9.21.6  MN
PENGAD 800-631-6989

| Week Ending Friday | Badge Number | Project (P2MST = Admin Time) | | Hours Reported | TRACS Internal Project Task Identifier |
|---|---|---|---|---|---|
| Sep 6 1996 12:00:00:000AM | 90202 | P2MST | | 8.5 | 80050 |
| Sep 6 1996 12:00:00:000AM | 90202 | P2MST | | 8.5 | 80170 |
| Sep 13 1996 12:00:00:000AM | 90202 | PW242 | O | 29 | PW24250003 |
| Sep 13 1996 12:00:00:000AM | 90202 | RA176 | O | 10 | RA17650130 |
| Sep 20 1996 12:00:00:000AM | 90202 | PW242 | O | 16 | PW24250003 |
| Sep 20 1996 12:00:00:000AM | 90202 | P2MST | | 5 | 80050 |
| Sep 20 1996 12:00:00:000AM | 90202 | RA176 | O | 18 | RA17650130 |
| Sep 27 1996 12:00:00:000AM | 90202 | PW242 | O | 15 | PW24250003 |
| Sep 27 1996 12:00:00:000AM | 90202 | RA049 | O | 6 | RA04950130 |
| Sep 27 1996 12:00:00:000AM | 90202 | RA051 | O | 6 | RA05150110 |
| Sep 27 1996 12:00:00:000AM | 90202 | RA052 | O | 6 | RA05250110 |
| Sep 27 1996 12:00:00:000AM | 90202 | RA176 | O | 6 | RA17650130 |
| Oct 4 1996 12:00:00:000AM | 90202 | PW242 | O | 25 | PW24250003 |
| Oct 4 1996 12:00:00:000AM | 90202 | RA049 | O | 4 | RA04950130 |
| Oct 4 1996 12:00:00:000AM | 90202 | RA176 | O | 10 | RA17650131 |
| Oct 11 1996 12:00:00:000AM | 90202 | PW242 | O | 30 | PW24250003 |
| Oct 11 1996 12:00:00:000AM | 90202 | RA176 | O | 9 | RA17650130 |
| Oct 18 1996 12:00:00:000AM | 90202 | PW242 | O | 45 | PW24250003 |
| Oct 25 1996 12:00:00:000AM | 90202 | PW242 | O | 39 | PW24250003 |
| Nov 1 1996 12:00:00:000AM | 90202 | PW242 | O | 39 | PW24250003 |
| Nov 8 1996 12:00:00:000AM | 90202 | PW242 | O | 27 | PW24250003 |
| Nov 8 1996 12:00:00:000AM | 90202 | P2MST | | 2 | 80020 |
| Nov 8 1996 12:00:00:000AM | 90202 | RA176 | O | 10 | RA17650130 |
| Nov 15 1996 12:00:00:000AM | 90202 | PW242 | O | 2 | PW24250003 |
| Nov 15 1996 12:00:00:000AM | 90202 | RA176 | O | 37 | RA17650130 |
| Nov 22 1996 12:00:00:000AM | 90202 | PW242 | O | 4 | PW24250003 |
| Nov 22 1996 12:00:00:000AM | 90202 | P2MST | | 5 | 80020 |
| Nov 22 1996 12:00:00:000AM | 90202 | RA176 | O | 30 | RA17650130 |
| Nov 29 1996 12:00:00:000AM | 90202 | PW242 | O | 12 | PW24250003 |
| Nov 29 1996 12:00:00:000AM | 90202 | P2MST | | 21 | 80170 |
| Nov 29 1996 12:00:00:000AM | 90202 | RA176 | O | 4 | RA17650130 |
| Dec 6 1996 12:00:00:000AM | 90202 | PW242 | O | 21 | PW24250003 |
| Dec 6 1996 12:00:00:000AM | 90202 | P2MST | | 2 | 80020 |
| Dec 6 1996 12:00:00:000AM | 90202 | RA176 | O | 16 | RA17650130 |
| Dec 13 1996 12:00:00:000AM | 90202 | PW242 | O | 45 | PW24250003 |
| Dec 27 1996 12:00:00:000AM | 90202 | P2MST | | 40 | 80170 |

EXHIBIT  124

PAGE  1882

| Week Ending Friday | Badge Number | Project (P2MST = Admin Time) | | Hours Reported | TRACS Internal Project Task Identifier |
|---|---|---|---|---|---|
| Jan 3 1997 12:00:00:000AM | 90202 | P2MST | | 40 | 80170 |
| Jan 10 1997 12:00:00:000AM | 90202 | P2MST | | 40 | 80170 |
| Jan 17 1997 12:00:00:000AM | 90202 | RA176 | O | 9 | RA17650130 |
| Jan 17 1997 12:00:00:000AM | 90202 | RA195 | O | 30 | RA19550131 |
| Jan 24 1997 12:00:00:000AM | 90202 | NS054 | O | 15 | NS05450003 |
| Jan 24 1997 12:00:00:000AM | 90202 | RA176 | O | 15 | RA17650130 |
| Jan 24 1997 12:00:00:000AM | 90202 | SA035 | O | 15 | SA03550133 |
| Jan 31 1997 12:00:00:000AM | 90202 | SA120 | O | 39 | SA12050133 |
| Feb 7 1997 12:00:00:000AM | 90202 | RA176 | O | 2 | RA17650131 |
| Feb 7 1997 12:00:00:000AM | 90202 | SA030 | O | 37 | SA03050133 |
| Feb 14 1997 12:00:00:000AM | 90202 | SA030 | O | 39 | SA03050133 |
| Feb 21 1997 12:00:00:000AM | 90202 | P2MST | | 16 | 80010 |
| Feb 21 1997 12:00:00:000AM | 90202 | SA030 | | 2 | 80020 |
| Feb 21 1997 12:00:00:000AM | 90202 | SA030 | O | 21 | SA03050133 |
| Feb 28 1997 12:00:00:000AM | 90202 | SA090 | O | 20 | SA09050133 |
| Feb 28 1997 12:00:00:000AM | 90202 | SA100 | O | 19 | SA10050133 |
| Mar 7 1997 12:00:00:000AM | 90202 | SA090 | O | 19 | SA09050133 |
| Mar 7 1997 12:00:00:000AM | 90202 | SA100 | O | 20 | SA10050133 |
| Mar 14 1997 12:00:00:000AM | 90202 | SA090 | O | 19 | SA09050133 |
| Mar 14 1997 12:00:00:000AM | 90202 | SA100 | O | 20 | SA10050133 |
| Mar 21 1997 12:00:00:000AM | 90202 | SA090 | O | 19 | SA09050133 |
| Mar 21 1997 12:00:00:000AM | 90202 | SA100 | O | 20 | SA10050133 |
| Mar 28 1997 12:00:00:000AM | 90202 | P2MST | | 15 | 80170 |
| Mar 28 1997 12:00:00:000AM | 90202 | SA090 | O | 12 | SA09050133 |
| Mar 28 1997 12:00:00:000AM | 90202 | SA100 | O | 12 | SA10050133 |
| Apr 4 1997 12:00:00:000AM | 90202 | SA090 | O | 14 | SA09050133 |
| Apr 4 1997 12:00:00:000AM | 90202 | SA100 | O | 25 | SA10050133 |
| Apr 11 1997 12:00:00:000AM | 90202 | SA090 | O | 15 | SA09050133 |
| Apr 11 1997 12:00:00:000AM | 90202 | SA100 | O | 15 | SA10050133 |
| Apr 11 1997 12:00:00:000AM | 90202 | SA503 | O | 15 | SA50350084 |
| Apr 18 1997 12:00:00:000AM | 90202 | SA090 | O | 15 | SA09050133 |
| Apr 18 1997 12:00:00:000AM | 90202 | SA100 | O | 15 | SA10050133 |
| Apr 18 1997 12:00:00:000AM | 90202 | SA503 | O | 20 | SA50350084 |
| Apr 25 1997 12:00:00:000AM | 90202 | SA090 | O | 10 | SA09050133 |
| Apr 25 1997 12:00:00:000AM | 90202 | SA100 | O | 10 | SA10050133 |
| Apr 25 1997 12:00:00:000AM | 90202 | SA503 | O | 30 | SA50350084 |

EXHIBIT 124

PAGE 1883

| Week Ending Friday | Badge Number | Project (P2MST = Admin Time) | | Hours Reported | TRACS Internal Project Task Identifier | |
|---|---|---|---|---|---|---|
| May 2 1997 12:00:00:000AM | 90202 | SA090 | O | 15 | SA09050133 | |
| May 2 1997 12:00:00:000AM | 90202 | SA503 | O | 30 | SA50350084 | 80020 |
| May 9 1997 12:00:00:000AM | 90202 | P2MST | | 5 | | |
| May 9 1997 12:00:00:000AM | 90202 | SA090 | O | 15 | SA09050133 | |
| May 9 1997 12:00:00:000AM | 90202 | SA100 | O | 5 | SA10050133 | |
| May 9 1997 12:00:00:000AM | 90202 | SA503 | O | 20 | SA50350084 | |
| May 16 1997 12:00:00:000AM | 90202 | SA090 | O | 10 | SA09050133 | |
| May 16 1997 12:00:00:000AM | 90202 | SA503 | O | 30 | SA50350084 | 80170 |
| May 23 1997 12:00:00:000AM | 90202 | P2MST | | 5 | | |
| May 23 1997 12:00:00:000AM | 90202 | SA100 | O | 10 | SA10050133 | |
| May 23 1997 12:00:00:000AM | 90202 | SA503 | O | 30 | SA50350084 | 80170 |
| May 30 1997 12:00:00:000AM | 90202 | P2MST | | 8.5 | | |
| May 30 1997 12:00:00:000AM | 90202 | SA100 | O | 11 | SA10050133 | |
| May 30 1997 12:00:00:000AM | 90202 | SA503 | O | 25 | SA50350084 | |
| Jun 6 1997 12:00:00:000AM | 90202 | SA100 | O | 20 | SA10050133 | |
| Jun 6 1997 12:00:00:000AM | 90202 | SA503 | O | 19 | SA50350084 | 80050 |
| Jun 13 1997 12:00:00:000AM | 90202 | P2MST | | 16 | | |
| Jun 13 1997 12:00:00:000AM | 90202 | SA100 | O | 15 | SA10050133 | |
| Jun 13 1997 12:00:00:000AM | 90202 | SA503 | O | 8 | SA50350084 | |
| Jun 20 1997 12:00:00:000AM | 90202 | PW242 | O | 10 | PW24250003 | |
| Jun 20 1997 12:00:00:000AM | 90202 | P2MST | | 8 | | 80050 |
| Jun 20 1997 12:00:00:000AM | 90202 | SA100 | O | 21 | SA10050133 | |
| Jun 27 1997 12:00:00:000AM | 90202 | PW242 | O | 19 | PW24250003 | |
| Jun 27 1997 12:00:00:000AM | 90202 | SA100 | O | 20 | SA10050133 | |
| Jul 4 1997 12:00:00:000AM | 90202 | PW242 | O | 12 | PW24250003 | |
| Jul 4 1997 12:00:00:000AM | 90202 | P2MST | | 15 | | 80170 |
| Jul 4 1997 12:00:00:000AM | 90202 | SA100 | O | 12 | SA10050133 | |
| Jul 11 1997 12:00:00:000AM | 90202 | PW242 | O | 10 | PW24250003 | |
| Jul 11 1997 12:00:00:000AM | 90202 | P2MST | | 8.5 | | 80050 |
| Jul 11 1997 12:00:00:000AM | 90202 | SA100 | O | 12 | SA10050133 | |
| Jul 11 1997 12:00:00:000AM | 90202 | SA503 | O | 8.5 | SA50350084 | |
| Jul 18 1997 12:00:00:000AM | 90202 | PW242 | O | 20 | PW24250003 | |
| Jul 18 1997 12:00:00:000AM | 90202 | SA100 | O | 19 | SA10050133 | |
| Jul 25 1997 12:00:00:000AM | 90202 | SA082 | O | 39 | SA08250131 | |
| Aug 1 1997 12:00:00:000AM | 90202 | SA082 | O | 45 | SA08250131 | |
| Aug 8 1997 12:00:00:000AM | 90202 | P2MST | | 3 | | 80020 |

EXHIBIT 124

PAGE 1887

| Week Ending Friday | Badge Number | Project (P2MST = Admin Time) | | Hours Reported | TRACS Internal Project Task Identifier |
|---|---|---|---|---|---|
| Aug 8 1997 12:00:00.000AM | 90202 | SA082 | O | 9 | SA08250131 |
| Aug 8 1997 12:00:00.000AM | 90202 | SA083 | O | 15 | SA08350111 |
| Aug 8 1997 12:00:00.000AM | 90202 | SA084 | O | 15 | SA08450111 |
| Aug 15 1997 12:00:00.000AM | 90202 | SA082 | O | 45 | SA08250131 |
| Aug 22 1997 12:00:00.000AM | 90202 | SA082 | O | 39 | SA08250131 |
| Aug 29 1997 12:00:00.000AM | 90202 | SN020 | O | 39 | SN02050001 |
| Sep 5 1997 12:00:00.000AM | 90202 | SN020 | O | 39 | SN02050001 |
| Sep 5 1997 12:00:00.000AM | 90202 | SN020 | O | 39 | SN02050001 |
| Sep 12 1997 12:00:00.000AM | 90202 | SN020 | O | 39 | SN02050001 |
| Sep 19 1997 12:00:00.000AM | 90202 | SN020 | O | 44 | SN02050001 |
| Sep 26 1997 12:00:00.000AM | 90202 | SN100 | O | 39 | SN10050001 |
| Oct 3 1997 12:00:00.000AM | 90202 | PW242 | O | 20 | PW24250003 |
| Oct 3 1997 12:00:00.000AM | 90202 | SN020 | O | 20 | SN02050004 |
| Oct 10 1997 12:00:00.000AM | 90202 | SN015 | O | 39 | SN01550003 |
| Oct 17 1997 12:00:00.000AM | 90202 | PW501 | O | 5 | PW50150003 |
| Oct 17 1997 12:00:00.000AM | 90202 | SN015 | O | 4 | SN01550003 |
| Oct 17 1997 12:00:00.000AM | 90202 | SN100 | O | 30 | SN10050003 |
| Oct 24 1997 12:00:00.000AM | 90202 | SN015 | O | 10 | SN01550003 |
| Oct 24 1997 12:00:00.000AM | 90202 | SN100 | O | 29 | SN10050003 |
| Oct 31 1997 12:00:00.000AM | 90202 | SN100 | O | 39 | SN10050003 |
| Nov 7 1997 12:00:00.000AM | 90202 | SN100 | O | 39 | SN10050003 |
| Nov 14 1997 12:00:00.000AM | 90202 | SN100 | O | 30 | SN10050003 |
| Nov 14 1997 12:00:00.000AM | 90202 | SN155 | O | 9 | SN15550003 |
| Nov 21 1997 12:00:00.000AM | 90202 | SN100 | O | 39 | SN10050003 |
| Nov 28 1997 12:00:00.000AM | 90202 | P2MST | | 39 | 80170 |
| Dec 5 1997 12:00:00.000AM | 90202 | SA082 | O | 19 | SA08250007 |
| Dec 5 1997 12:00:00.000AM | 90202 | SN100 | O | 20 | SN10050003 |
| Dec 12 1997 12:00:00.000AM | 90202 | SA082 | O | 19 | SA08250007 |
| Dec 12 1997 12:00:00.000AM | 90202 | SN100 | O | 20 | SN10050003 |
| Dec 26 1997 12:00:00.000AM | 90202 | P2MST | | 39 | 80170 |
| Jan 2 1998 12:00:00.000AM | 90202 | P2MST | | 39 | 80180 |
| Jan 9 1998 12:00:00.000AM | 90202 | P2MST | | 40 | 80180 |
| Jan 16 1998 12:00:00.000AM | 90202 | P2MST | | 40 | 80180 |
| Jan 23 1998 12:00:00.000AM | 90202 | P2MST | | 40 | 80180 |
| Jan 30 1998 12:00:00.000AM | 90202 | P2MST | | 40 | 80180 |
| Feb 6 1998 12:00:00.000AM | 90202 | P2MST | | 40 | 80180 |
| Feb 13 1998 12:00:00.000AM | 90202 | P2MST | | 40 | 80180 |

EXHIBIT 124

PAGE 1885

| Week Ending Friday | Badge Number | Project (P2MST = Admin Time) | | Hours Reported | TRACS Internal Project Task Identifier |
|---|---|---|---|---|---|
| Feb 20 1998 12:00:00:000AM | 90202 | P2MST | | 40 | 80180 |
| Feb 27 1998 12:00:00:000AM | 90202 | P2MST | | 40 | 80180 |
| Mar  6 1998 12:00:00:000AM | 90202 | P2MST | | 40 | 80180 |
| Mar 13 1998 12:00:00:000AM | 90202 | P2MST | | 40 | 80180 |
| Mar 20 1998 12:00:00:000AM | 90202 | P2MST | | 40 | 80180 |
| Mar 27 1998 12:00:00:000AM | 90202 | P2MST | | 40 | 80180 |
| Apr  3 1998 12:00:00:000AM | 90202 | P2MST | | 40 | 80180 |
| Apr 10 1998 12:00:00:000AM | 90202 | P2MST | | 40 | 80180 |
| Apr 17 1998 12:00:00:000AM | 90202 | P2MST | | 40 | 80180 |
| Apr 24 1998 12:00:00:000AM | 90202 | P2MST | | 40 | 80180 |
| May  1 1998 12:00:00:000AM | 90202 | P2MST | | 40 | 80180 |
| May  8 1998 12:00:00:000AM | 90202 | P2MST | | 40 | 80180 |
| May 15 1998 12:00:00:000AM | 90202 | P2MST | | 40 | 80180 |
| Jan  8 1999 12:00:00:000AM | 90202 | BA724 | | 19 | BA72450110 |
| Jan  8 1999 12:00:00:000AM | 90202 | BA760 | | 20 | BA76050110 |
| Jan  8 1999 12:00:00:000AM | 90202 | BA724 | | 39 | BA72450110 |
| Jan 15 1999 12:00:00:000AM | 90202 | BA724 | | 22.5 | BA72450110 |
| Jan 22 1999 12:00:00:000AM | 90202 | BA775 | | 8 | BA77550110 |
| Jan 22 1999 12:00:00:000AM | 90202 | P2MST | | 8.5 | 80170 |
| Jan 22 1999 12:00:00:000AM | 90202 | BA724 | O | 9 | BA72450110 |
| Jan 29 1999 12:00:00:000AM | 90202 | BA744 | O | 20 | BA74450110 |
| Jan 29 1999 12:00:00:000AM | 90202 | BA775 | O | 10 | BA77550110 |
| Jan 29 1999 12:00:00:000AM | 90202 | BA724 | | 10 | BA72450110 |
| Feb  5 1999 12:00:00:000AM | 90202 | BA744 | | 9 | BA74450110 |
| Feb  5 1999 12:00:00:000AM | 90202 | BA775 | | 20 | BA77550110 |
| Feb  5 1999 12:00:00:000AM | 90202 | BA724 | | 0 | BA72450110 |
| Feb 12 1999 12:00:00:000AM | 90202 | BA744 | | 30 | BA74450110 |
| Feb 12 1999 12:00:00:000AM | 90202 | BA775 | | 9 | BA77550110 |
| Feb 12 1999 12:00:00:000AM | 90202 | BA724 | | 5 | BA72450110 |
| Feb 19 1999 12:00:00:000AM | 90202 | BA744 | | 34 | BA74450110 |
| Feb 19 1999 12:00:00:000AM | 90202 | BA744 | | 35 | BA74450110 |
| Mar  5 1999 12:00:00:000AM | 90202 | BA724 | | 9 | BA72450110 |
| Feb 26 1999 12:00:00:000AM | 90202 | BA744 | | 30 | BA74450110 |
| Feb 26 1999 12:00:00:000AM | 90202 | BA724 | | 5 | BA72450110 |
| Mar 12 1999 12:00:00:000AM | 90202 | BA744 | | 34 | BA74450110 |
| Mar 19 1999 12:00:00:000AM | 90202 | P2MST | | 5 | 80010 |

EXHIBIT ___124___

PAGE _____

| Week Ending Friday | Badge Number | Project (P2MST = Admin Time) | Hours Reported | TRACOS Internal Project Task Identifier |
|---|---|---|---|---|
| Mar 19 1999 12:00:00:000AM | 90202 | BA724 | 2 | BA7245O110 |
| Mar 19 1999 12:00:00:000AM | 90202 | BA744 | 2 | BA74450110 |
| Mar 26 1999 12:00:00:000AM | 90202 | BA744 | 15 | BA74450110 |
| Apr 2 1999 12:00:00:000AM | 90202 | BA744 | 10 | BA74450110 |
| Apr 2 1999 12:00:00:000AM | 90202 | P2MST | 13 | | 80170 |
| Apr 9 1999 12:00:00:000AM | 90202 | BA744 | 5 | BA74450110 |
| Apr 9 1999 12:00:00:000AM | 90202 | P2MST | 8.5 | | 80050 |
| Apr 9 1999 12:00:00:000AM | 90202 | P2MST | 17 | | 80170 |
| Apr 16 1999 12:00:00:000AM | 90202 | BA744 | 20 | BA74450110 |
| Apr 23 1999 12:00:00:000AM | 90202 | BA744 | 20 | BA74450110 |
| Apr 30 1999 12:00:00:000AM | 90202 | BA744 | 20 | BA74450110 |
| May 14 1999 12:00:00:000AM | 90202 | BA744 | 2 | BA74450110 |
| May 7 1999 12:00:00:000AM | 90202 | BA744 | 2 | BA74450110 |
| May 7 1999 12:00:00:000AM | 90202 | PW645 | 10 | PW64550003 |
| May 14 1999 12:00:00:000AM | 90202 | PW645 | 10 | PW64550003 |
| May 21 1999 12:00:00:000AM | 90202 | PW645 | 15 | PW64550003 |
| May 28 1999 12:00:00:000AM | 90202 | PW645 | 12 | PW64550003 |
| May 28 1999 12:00:00:000AM | 90202 | P2MST | 5 | | 80170 |
| Jun 4 1999 12:00:00:000AM | 90202 | P2MST | 39 | | 80170 |
| Jun 11 1999 12:00:00:000AM | 90202 | P2MST | 8.5 | | 80050 |
| Jun 11 1999 12:00:00:000AM | 90202 | BA744 | 3 | BA74450110 |
| Jun 11 1999 12:00:00:000AM | 90202 | BA747 | 0.5 | BA74750109 |
| Jun 11 1999 12:00:00:000AM | 90202 | PW645 | 8.5 | PW64550003 |
| Jun 25 1999 12:00:00:000AM | 90202 | P2MST | 0 | | 80020 |
| Jun 18 1999 12:00:00:000AM | 90202 | BA744 | 5 | BA74450110 |
| Jun 18 1999 12:00:00:000AM | 90202 | BA747 | 5 | BA74750109 |
| Jun 18 1999 12:00:00:000AM | 90202 | PW645 | 5 | PW64550003 |
| Jun 18 1999 12:00:00:000AM | 90202 | P2MST | 14 | | 80020 |
| Jul 2 1999 12:00:00:000AM | 90202 | P2MST | 5 | | 80170 |
| Jul 9 1999 12:00:00:000AM | 90202 | P2MST | 8.5 | | 80170 |
| Aug 27 1999 12:00:00:000AM | 90202 | P2MST | 8.5 | | 80050 |
| Sep 3 1999 12:00:00:000AM | 90202 | PW645 | 15 | PW64550003 |
| Sep 10 1999 12:00:00:000AM | 90202 | P2MST | 8.5 | | 80170 |
| Sep 17 1999 12:00:00:000AM | 90202 | PW645 | 20 | PW64550003 |
| Sep 24 1999 12:00:00:000AM | 90202 | PW645 | 20 | PW64550003 |
| Sep 24 1999 12:00:00:000AM | 90202 | BA775 | 5 | BA77550110 |

EXHIBIT ___124___

PAGE ___1887___

| Week Ending Friday | Badge Number | Project (P2MST = Admin Time) | Hours Reported | TRACS Internal Project Task Identifier |
|---|---|---|---|---|
| Oct 1 1999 12:00:00:000AM | 90202 | BA775 | 10 | BA77550110 |
| Oct 8 1999 12:00:00:000AM | 90202 | PW645 | 29 | PW64550003 |
| Nov 19 1999 12:00:00:000AM | 90202 | P2MST | 5 | 80170 |
| Nov 26 1999 12:00:00:000AM | 90202 | P2MST | 39 | 80170 |
| Dec 3 1999 12:00:00:000AM | 90202 | BA747 | 3 | BA74750110 |
| Dec 3 1999 12:00:00:000AM | 90202 | BA775 | 2 | BA77550126 |
| Dec 10 1999 12:00:00:000AM | 90202 | BA747 | 3 | BA74750110 |
| Dec 10 1999 12:00:00:000AM | 90202 | BA775 | 2 | BA77550126 |
| Dec 17 1999 12:00:00:000AM | 90202 | BA775 | 2 | BA77550126 |
| Dec 17 1999 12:00:00:000AM | 90202 | BA747 | 4 | BA74750038 |
| Dec 31 1999 12:00:00:000AM | 90202 | P2MST | 40 | 80170 |
| Dec 24 1999 12:00:00:000AM | 90202 | P2MST | 22 | 80170 |
| Jan 7 2000 12:00:00:000AM | 90202 | P2MST | 8.5 | 80050 |
| Mar 31 2000 12:00:00:000AM | 90202 | P2MST | 15 | 80020 |
| Mar 31 2000 12:00:00:000AM | 90202 | P2MST | 5 | 80010 |
| Apr 21 2000 12:00:00:000AM | 90202 | P2MST | 13.5 | 80170 |
| May 19 2000 12:00:00:000AM | 90202 | P2MST | 8.5 | 80050 |
| May 26 2000 12:00:00:000AM | 90202 | P2MST | 13.5 | 80170 |
| Jun 2 2000 12:00:00:000AM | 90202 | P2MST | 25.5 | 80170 |
| Jun 16 2000 12:00:00:000AM | 90202 | P2MST | 21 | 80030 |
| Jun 23 2000 12:00:00:000AM | 90202 | P2MST | 39 | 80170 |
| Jul 7 2000 12:00:00:000AM | 90202 | P2MST | 17 | 80170 |
| Aug 4 2000 12:00:00:000AM | 90202 | P2MST | 5 | 80170 |
| Aug 11 2000 12:00:00:000AM | 90202 | P2MST | 8.5 | 80050 |
| Sep 1 2000 12:00:00:000AM | 90202 | P2MST | 5 | 80170 |
| Sep 8 2000 12:00:00:000AM | 90202 | P2MST | 8.5 | 80050 |
| Sep 8 2000 12:00:00:000AM | 90202 | P2MST | 8.5 | 80170 |

EXHIBIT _124_

PAGE _1888_

**EXHIBIT 25**

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**