THOMAS J. NOLAN (Bar No. 66992)
(tnolan@skadden.com)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California  90071
Tel.: (213) 687-5000/Fax: (213) 687-5600

RAOUL D. KENNEDY (Bar No. 40892)
(rkennedy@skadden.com)
JAMES E. LYONS (Bar No. 112582)
(James.Lyons@skadden.com)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
4 Embarcadero Center, Suite 3800
San Francisco, California  94111-5974
Tel.: (415) 984-6400/Fax:  (415) 984-2698

AMY R. SABRIN (pro hac vice admission pending)
(Amy.Sabrin@skadden.com)
MICHAEL P. KELLY (pro hac vice admission pending)
(mikelly@skadden.com)
DAVID W. FOSTER (pro hac vice admission pending)
(David.Foster@skadden.com)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, DC  20005-2111
Tel: (202) 371-7000/Fax: (202) 393-5760

Attorneys for MGA Entertainment, Inc., MGA Entertainment (HK) Limited, MGAE de Mexico, S.R.L. DE C.V., and Isaac Larian

UNITED STATED DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARTER BRYANT, an individual, | CASE NO. CV 04-9049 SGL (RNBx) |
| Plaintiff, | Consolidated with Case No. 04-9059 and Case No. 05-2727 |
| v. | [PUBLIC REDACTED] MGA'S RESPONSE IN OPPOSITION TO MATTEL'S MOTION TO DISQUALIFY |
| MATTEL, INC., a Delaware corporation, | |
| Defendant. | |
| | Honorable Stephen G. Larson |
| AND CONSOLIDATED ACTIONS | Hearing Date:  April 7, 2008 Time:  10:00 a.m. Place:  Courtroom 1 |

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

<u>TABLE OF AUTHORITIES</u>................................................................. ii

<u>PRELIMINARY STATEMENT</u> ........................................................ 1

<u>FACTUAL BACKGROUND</u> ............................................................. 3

<u>ARGUMENT</u> .................................................................................... 7

I.   <u>There Is No Reason to Disqualify Lawyers for MGA.</u>................... 7

   A.   <u>Attorney Disqualification in California Is Subject to Strict Scrutiny.</u> ........ 7

   B.   There Was No Improper Attempt by Anyone
       to Obtain Privileged Mattel Information. ...................................... 8

      1.   California Law Permits Attorneys to
          Contact Former Employees of Adversaries. .......................... 8

      2.   Lawyers for MGA Did Not Seek Out or Knowingly
          Receive Mattel's Privileged Information. ........................... 10

         a.   Ms. Tomiyama Did Not Disclose Any
             Mattel Privileged Information About This Case. ...................... 11

         b.   The *Simba* Document. .................................................... 16

         c.   Ms. Tomiyama's Methodology for Comparing Dolls. .............. 18

         d.   Mattel's Separation Agreement. .......................................... 20

      3.   Disqualification of Counsel Is Not an Appropriate Remedy. ............. 21

II.   There Is No Reason to Disqualify Ms. Tomiyama. .......................... 23

<u>CONCLUSION</u> ................................................................................ 25

# TABLE OF AUTHORITIES

## Cases

Abubakar v. County of Solano, No. CIV. S-06-2268,
2008 WL 336727 (E.D. Cal. Feb. 4, 2008) ...................................... 8, 22

Baugh v. Garl, 137 Cal. App. 4th 737, 40 Cal. Rptr. 3d 539 (2006) .................. 8, 21

Collins v. State, 121 Cal. App. 4th 1112,
18 Cal. Rptr. 3d 112 (2004).............................................. 10, 14, 18

Comedy Club, Inc. v. Improv West Associates,
514 F.3d 833 (9th Cir. 2007)................................................ 21

Concat LP v. Unilever, PLC, 350 F. Supp. 2d 796 (N.D. Cal. 2004).................... 10

Continental Insurance Co. v. Superior Court, 32 Cal. App. 4th 94,
37 Cal. Rptr. 843 (1995)................................................ 9, 10

In re County of Los Angeles, 223 F.3d 990 (9th Cir. 2000) ........................ 7

County of Los Angeles v. Superior Court, 222 Cal. App. 3d 647,
271 Cal. Rptr. 698 (1990)................................................ 15

In re EXDS, Inc., No. C05-0787 PVT, 2005 WL 2043020
(N.D. Cal. Aug. 24, 2005) ........................................ passim

Gillam v. Nevada Power Co., 488 F.3d 1189 (9th Cir. 2007) ...................... 20

In re Grand Jury Proceedings, 658 F.2d 782 (10th Cir. 1981)...................... 19

Gregori v. Bank of America, 207 Cal. App. 3d 291,
254 Cal. Rptr. 853 (1985) ........................................... 12, 14

Hewlett-Packard Co. v. EMC Corp.,
330 F. Supp. 2d 1087 (N.D. Cal. 2004) ...................................... 23, 24

Jorgensen v. Taco Bell Corp., 50 Cal. App. 4th 1398,
58 Cal. Rptr. 2d 178 (1996).............................................. 10

Marcum v. Channel Lumber Co., No. CV 94-2637,
1995 WL 225708 (N.D. Cal. March 24, 1995) ............................ 3, 8, 22

Maruman Integrated Circuits, Inc. v. Consortium Co.,
166 Cal. App. 3d 443, 212 Cal. Rptr. 497 (1985) .............................. 9

Nalian Truck Lines, Inc. v. Nakano Warehouse & Transportation Corp.,
6 Cal App. 4th 1256, 8 Cal. Rptr. 2d 467 (1992)........................... passim

Optyl Eyewear Fashion International Corp. v. Style Cos.,
760 F.2d 1045 (9th Cir. 1985)........................................... 7

Richards v. Jain, 168 F. Supp. 2d 1195 (W.D. Wash. 2001) ...................... 15

(ii)

Richardson-Merrell, Inc. v. Roller, 472 U.S. 424, 105 S. Ct. 2757,
    86 L.Ed. 2d 340 (1985) ............................................................ 1, 7

Rico v. Mitsubishi Motors Corp., 42 Cal. 4th 807,
    171 P.3d 1092 (2007) ............................................................ 15, 17

Roush v. Seagate Technology, LLC, 150 Cal App. 4th 210
    58 Cal. Rptr. 3d 275 (2007) ......................................................... 8

SEC v. Talbot, No. CV 044556, 2005 WL 1213797 (C.D. Cal. Apr. 21, 2005) .... 18

Shadow Traffic Network v. Superior Court, 24 Cal. App. 4th 1067,
    29 Cal. Rptr 2d 693 (1994) ........................................................ 15

Shurance v. Planning Control Inter., 839 F.2d 1347 (9th Cir. 1985) .................. 1, 7

In re Six Grand Jury Witnesses, 979 F.2d 939 (2d Cir. 1992) ................................ 18

Smith v. Superior Court, 41 Cal. App. 4th 1014, 49 Cal. Rptr. 20 (1996) ....... 21, 25

Stencel v. Fairchild Corp., 174 F. Supp. 2d 1080 (C.D. Cal. 2001) ...................... 23

In re Syncor ERISA Litigation, 229 F.R.D. 636 (C.D. Cal. 2005) ........................ 17

Taylor v. Lifetouch National School Studios, Inc.,
    490 F. Supp. 2d 944 (N.D. Ind. 2007) ......................................... 20

UMG Recordings, Inc. v. MySpace, Inc.,
    526 F. Supp. 2d 1046 (C.D. Cal. 2007) ..................................... passim

United States v. Rockwell International, 897 F.2d 1255 (3d Cir. 1990) ................ 17

Wang Labs., Inc. v. Toshiba Corp., 762 F. Supp. 1246, 1250 (E.D. Va. 1991) .... 24

## Statutes and Rules

CAL. R. PROF'L CONDUCT 2-100 ....................................................... 9


## Additional Sources

11 WILLISTON ON CONTRACTS § 31:5 (4th ed. 1999) ............................... 20

Response in Opposition to Motion to Disqualify
Case No. CV 04-9049 SGL (RNBx)

**PRELIMINARY STATEMENT**

Mattel's motion to disqualify epitomizes a "deeply disturbing phenomenon in modern civil litigation"–the "tactical use of attorney-misconduct motions." Richardson-Merrell, Inc. v. Koller, 472 U.S. 424, 441, 105 S. Ct. 2757, 2766, 86 L. Ed. 2d 340, 353 (1985) (Brennan, J., concurring). It relies not on fact, but on innuendo, unsubstantiated personal attack, and blatant distortions of the record. The simple facts are that (1) no lawyer for MGA acted improperly to try to obtain Mattel privileged information, and (2) they did not obtain any Mattel privileged information.

Specifically, Mattel's former chief face painter, Christina Tomiyama, agreed to testify as a combination fact and expert witness, and in particular, to render an opinion on whether the first generation Bratz dolls are substantially similar to certain sketches by Carter Bryant. On this score, Ms. Tomiyama's expert report concluded that " <span style="font-size:1.5em">**REDACTED**</span> ." Rather than confront this damaging evidence on its merits, Mattel seeks instead to disqualify Ms. Tomiyama, MGA's outside counsel, Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), and Craig Holden, an in-house lawyer for MGA.

Because attorney disqualification negates a client's vital right to counsel of its choice, disqualification motions in the Ninth Circuit are "subjected to a particularly strict judicial scrutiny." Shurance v. Planning Control Int'l, Inc., 839 F.2d 1347, 1349 (9th Cir. 1988). Mattel's baseless disqualification motion cannot withstand even minimal scrutiny, however. The salient facts are these:

- Counsel for MGA first contacted Ms. Tomiyama well after she left Mattel;
- Both MGA's prior attorneys and Skadden cautioned her not to disclose the substance of any communications she may have had with Mattel counsel about this litigation or any other matter;
- Ms. Tomiyama told Skadden that she had not been consulted by Mattel lawyers with respect to this litigation and in particular that she was not asked by them to analyze Bratz dolls in connection with this litigation;

1

- Notwithstanding Mattel's intimidating questioning of Ms. Tomiyama at her deposition, she consistently answered that

# REDACTED

the type of non-substantive comment consistently held to be non-privileged;

- Ms. Tomiyama's expert report contains no information that by any stretch of the law could be considered Mattel-privileged information or work product, and certainly no information that lawyers for MGA had reason to believe was privileged or work product; and

- There is no other evidence that Ms. Tomiyama conveyed any such information to MGA's attorneys about this or any other case.

Significantly, even Mattel's over-reaching brief and self-serving declarations do not assert that it ever retained Ms. Tomiyama as an expert or consultant for Mattel in this case, or that she signed an agreement to serve as a consultant or expert for Mattel in this litigation, or that she signed a confidentiality agreement specifically regarding this case, or even that its lawyers orally advised her that their purported discussions with her were confidential. Indeed, there is no evidence that Ms. Tomiyama had any role for Mattel in this case other than as a former employee with knowledge of some relevant facts. She had no understanding that Mattel viewed her as an expert or a consultant in this matter; indeed, she had little memory of ever speaking to Mattel lawyers about this litigation.

MGA informed Mattel on January 7, 2008, that Ms. Tomiyama might serve as its witness, yet Mattel took no action. Only now – with summary judgment motions pending and trial looming – does Mattel seek to gain tactical advantage by asking the Court, without any basis, to neutralize a damaging witness, deprive MGA of its counsel of choice, delay trial, and give Mattel a substantial advantage on the merits by precluding MGA from presenting evidence on a wide array of topics. This is exactly the type of motion decried by the U.S. Supreme Court. The motion must be

2

1 | rejected because under California law, disqualification is appropriate only where

2 | misconduct can be shown <u>and</u> where that misconduct "will, not might," have a

3 | "continuing effect" on judicial proceedings.  This Mattel cannot do.  <u>Marcum v.</u>

4 | <u>Channel Lumber Co.</u>, No. CV 94-2637, 1995 WL 225708, at *2 (N.D. Cal. Mar. 24,

5 | 1995) (emphasis omitted).

6 | **FACTUAL BACKGROUND**

7 |      In July 2007, MGA's prior outside counsel contacted a former head of Mattel's

8 | face painting group, Christina Tomiyama, to see if she would consider serving as an

9 | expert witness in this case.[1]  Ms. Tomiyama had left Mattel's employ in February

10 | 2006.[2]  At the time, she signed a fourteen-month Mattel separation agreement, which

11 | expired on April 13, 2007.[3]  While the agreement was in effect, Mattel seldom called

12 | upon Ms. Tomiyama's services.  (Plevan Dec. at ¶ 30.)  Thus, by the time MGA's

13 | prior counsel contacted Ms. Tomiyama, she had had no sustained contact with Mattel

14 | for nearly a year and a half, and was simply a former employee of Mattel.  (Tom. Dep.

15 | at 136:3.)

16 |      Ms. Tomiyama's first meeting with lawyers for MGA occurred on August 2,

17 | 2007.  (Holden Dec. at ¶ 2.)  MGA in-house counsel Craig Holden attended this

18 | meeting along with MGA's previous counsel of record.  (<u>Id.</u>)  At this meeting, Ms.

19 | Tomiyama was expressly warned "not to discuss any information she possessed from

20 | her time working for Mattel that was privileged or confidential," and she did not

21 | provide any such information.  (<u>Id.</u> at ¶¶ 3, 5.)  This was the only substantive

22 | communication Mr. Holden had with Ms. Tomiyama.  (<u>Id.</u> at ¶ 6.)

23 |

24 |

25 | [1]      Tomiyama Deposition at 131:13, Ex. B to Eckles Declaration ("Tom. Dep.").

26 | [2]      Tomiyama Expert Report at 3, Ex. 8 to Michael T. Zeller Dec. filed on March 18,
27 | 2008 ("Tom. Exp. Rpt.").

28 | [3]      Tomiyama Separation Agreement at §3, ¶(f), Ex. 3 to Michael T. Zeller Dec. filed on
March 18, 2008 ("Tom. Spt. Agt.").

3

1   Skadden substituted as MGA's counsel on October 12, 2007, and first met with
2   Ms. Tomiyama on November 1, 2007.  (Plevan Dec. at ¶ 4; Campana Dec. at ¶¶ 4-7.)
3   The discussion centered on her professional expertise and experience, including her
4   15 years at Mattel.  (Plevan Dec. at ¶ 8; Campana Dec. at ¶ 6.)  At the meeting,
5   Skadden partner Kenneth A. Plevan asked Ms. Tomiyama a series of questions
6   designed to ensure that Mattel's privileged information would be protected.
7   Specifically, Mr. Plevan asked Ms. Tomiyama whether she had any dealing with
8   Mattel's attorneys.  (Plevan Dec. at ¶ 8; Campana Dec. at ¶ 5.)  Ms. Tomiyama stated
9   generally that from time to time she had been asked by Mattel lawyers to compare
10  Mattel dolls with competing dolls in the market place.  (Plevan Dec. at ¶ 8; Campana
11  Dec. at ¶ 6.)  Mr. Plevan cautioned her not tell Skadden "any of the substance of her
12  conversations with Mattel's attorneys" and in particular that "she should not tell us
13  either what she said to the lawyers or what they said to her, nor identify any specific
14  analysis that she had conducted or the results thereof."  (Plevan Dec. at ¶ 8; see also
15  Campana Dec. at ¶ 6.)  Ms. Tomiyama did not at this meeting or any other time
16  convey information to Skadden lawyers that they knew or had reason to believe was
17  privileged Mattel information.  (Plevan Dec. at ¶¶ 10, 18, 31; Campana Dec. at ¶¶ 6,
18  8.)

19      At the November 1 meeting, Ms. Tomiyama stated that "the approach she used
20  in making a comparison of dolls was hers alone, based on her experience, and that no
21  one in the Mattel legal department had ever told her how to analyze or compare
22  dolls."  (Plevan Dec. at ¶ 9; Campana Dec. at ¶ 7.)  At no time did she mention
23  ## REDACTED
24                                                     (Tom. Dep. at 249:1-4;
25  see also Plevan Dec. at ¶ 10.)

26      As a further layer of protection, Mr. Plevan asked Ms. Tomiyama whether she
27  had ever consulted with Mattel attorneys concerning any possible dispute between an
28  MGA product and a Mattel product.  (Plevan Dec. at ¶ 11; see also Campana Dec. at

4

1  ¶ 6.)  She responded that she had not.  (Plevan Dec. at ¶ 11; Campana Dec. at ¶ 6.)

2  Mr. Plevan also asked whether Mattel lawyers had ever asked her to compare the

3  Mattel My Scene product with MGA's Bratz product.  (Plevan Dec. at ¶ 12; see also

4  Campana Dec. at ¶ 6.)  Ms. Tomiyama stated that she had not had any such

5  discussions and that the substance of the legal matters in dispute or possible dispute

6  with MGA and Carter Bryant had not been raised with her by Mattel's lawyers, nor

7  did she raise the subject.  (Plevan Dec. at ¶ 12; Campana Dec. at ¶ 6.)  She added that

8  

# REDACTED

9  

10  but she stated that she was never asked for her

11  substantive input on the complaint and that the Mattel lawyers never discussed

12  anything further with her about the case.  (Plevan Dec. at ¶ 13; Campana Dec. at ¶ 6.)

13      At or around the time of this meeting, Ms. Tomiyama signed an expert

14  consultant/witness engagement agreement with Skadden.  In that agreement, Ms.

15  Tomiyama stated that she "believe[d] there are no present conflicts of interest that

16  would prohibit her" from serving as an expert for Skadden.  (Plevan Dec., Ex. A,

17  Tom. Exp. Consult./Wit. Eng. Agr., at ¶ 7.)

18      In late December 2008, Skadden sent Ms. Tomiyama some publicly available

19  materials from a lawsuit which Mattel had resolved against Simba Toys.  (Plevan Dec.

20  at ¶ 24.)  At that time, Ms. Tomiyama told Skadden that before she left Mattel, after

21  the Simba dispute was resolved, her department was asked to create examples of face

22  paints for Simba that in her view were not objectionable to be given to Simba for

23  guidance.  (Id. at ¶ 25.)  Ms. Tomiyama told Skadden that she had found on her home

24  computer a copy of what is Exhibit A to her report, a set of photos of the examples

25  created by her face-paint team for Simba.  (Id.)  She stated that the document had

26  been provided to Simba.  (Plevan Dec. at ¶ 26;  **REDACTED**

27  .)  There were no markings on the photos indicating that they

28  were privileged or work product.  (Tom. Exp. Rpt., Ex. A.)

5

1  MGA first notified Mattel that Ms. Tomiyama was a potential witness on

2  January 7, 2008.  (Eckles Dec., Ex. A at 19, 49, 56, 70, 98.)  Ms. Tomiyama's expert

3  report was served on Mattel on February 11, 2008.  Her report transparently

4  referenced both her methodology in comparing dolls while at Mattel and the doll-face

5  montage prepared for Simba.  (Tom. Exp. Rpt. at 9, Ex. A.)

6  Despite its lawyers' current allegations that they had extensive conversations

7  with Ms. Tomiyama concerning this case and other matters, Mattel did not

8  immediately notify opposing counsel that Ms. Tomiyama possessed privileged

9  information, or that the report in their view contained such information, or that it ever

10  consulted with Ms. Tomiyama as an expert in this case.  Nor did Mattel seek the

11  return of the Simba document or claim privilege for that document on its privilege log.

12  (Eckles Dec. at ¶ 5.)  Nor did MGA seek any type of relief from the Court.

13  Instead, Mattel proceeded to take Ms. Tomiyama's deposition on February 27,

14  2008, questioning her extensively about whether she had provided any confidential

15  information to Skadden.  Ms. Tomiyama consistently testified that

16

17  (See, e.g., Tom. Dep. at 256:12; id. at 256:17-19; id. at 256:25.)  Although she

18

19  (id. at 222:6), her testimony made clear that

20  **REDACTED**

21

22  (See, e.g., id. at 249:1-4.)  Ms. Tomiyama further testified

23  that

24  (Id. at 267:10-21.)  As to the Simba document, Ms. Tomiyama

25  testified that

26  (See, e.g., id. at 238:24 – 239:5.)

27

28

# ARGUMENT

## I.     There Is No Reason to Disqualify Lawyers for MGA.

Mattel's motion to disqualify is wrong on every front.  Mattel is wrong on the facts because lawyers for MGA did not attempt improperly to obtain, and never received, any work product or privileged Mattel information.  Mattel is wrong on the law because California does <u>not</u> permit disqualification of opposing counsel based on innuendo and speculation, and California emphatically does <u>not</u> "resolve any doubts in favor of disqualification."  (Mot. to Disq. at 18.)  Mattel is even wrong on the choice of law:  California federal courts apply California state law, not Connecticut or Washington cases, in determining attorney disqualification.  <u>In re County of Los Angeles</u>, 223 F.3d 990, 995 (9th Cir. 2000).  And as discussed below, California law in these circumstances is substantially more skeptical of motions to disqualify counsel than is the law of other jurisdictions on which Mattel relies.

### A.     Attorney Disqualification in California Is Subject to Strict Scrutiny.

The United States Supreme Court has expressed "concern about the tactical use of disqualification motions to harass opposing counsel."  <u>Richardson-Merrell</u>, 472 U.S. at 436 (quotation omitted).  "The cost and inconvenience to clients and the judicial system from misuse of the rules for tactical purposes is significant."  <u>Optyl Eyewear Fashion Int'l Corp. v. Style Cos.</u>, 760 F.2d 1045, 1050 (9th Cir. 1985).  Courts "have an interest in preserving the continuity of the lawyer-client relationship; otherwise, if such relationships were easily disrupted, complicated cases such as this would take even longer to resolve, the costs of litigation would be even higher, and unscrupulous attorneys would have an incentive to seize on strained facts and theories to pursue the tactical advantage of ousting their adversary's lawyers."  <u>UMG Recordings, Inc. v. MySpace, Inc.</u>, 526 F. Supp. 2d 1046, 1065 (C.D. Cal. 2007).  "Because of this potential for abuse, disqualification motions should be subjected to 'particularly strict judicial scrutiny.'"  <u>Shurance</u>, 839 F.2d at 1349 (quotation omitted).  Moreover, "[b]ecause disqualification is a drastic measure, it is generally

7

disfavored and should only be imposed when absolutely necessary." <u>UMG</u>, 526 F. Supp. 2d at 1062 (quotation omitted).

Notably, "disqualification is a drastic measure that should not be taken simply out of hypersensitivity to ethical nuances or the appearance of impropriety." <u>Roush v. Seagate Tech., LLC</u>, 150 Cal. App. 4th 210, 219, 58 Cal. Rptr. 3d 275, 281 (2007). Thus, "[c]ourts have been admonished to take a 'functional' approach pursuant to which disqualifications are evaluated with a keen sense of practicality." <u>UMG</u>, 526 F. Supp. 2d at 1063 (quotations and citation omitted).  And California courts generally reject disqualification motions based on arguments alleging the "appearance of impropriety." <u>See, e.g.</u>, <u>Abubakar v. County of Solano</u>, No. CIV. S-06-2268, 2008 WL 336727, at *2 (E.D. Cal. Feb. 4, 2008).

Finally, "[d]isqualification is only justified where the misconduct will have a 'continuing effect' on judicial proceedings." <u>Baugh v. Garl</u>, 137 Cal. App. 4th 737, 744, 40 Cal. Rptr. 3d 539, 543 (2006).  "Only conduct that *will* have a continuing effect, not *might* have a continuing effect, justifies disqualification.  Disqualification must be *necessary*." <u>Marcum</u>, 1995 WL 225708, at *2 (emphasis in the original).  In this case, neither the Skadden attorneys nor MGA in-house counsel acted improperly to obtain any Mattel work product or attorney-client communication (collectively, "privileged information").  Even if Mattel's untrue allegations were taken at face value (which they should not be), disqualification is an inappropriate remedy.

## B.   There Was No Improper Attempt by Anyone to Obtain Privileged Mattel Information.

### 1.   California Law Permits Attorneys to Contact Former Employees of Adversaries.

It is appropriate for attorneys to contact an opponent's former employees in order to develop their client's case.  "California cases have stressed that prohibiting attorneys from contacting an opponent's former employees would unfairly hinder litigants from investigating and pursuing factual evidence relevant to their case." <u>In</u>

1  re EXDS, Inc., No. C05-0787, 2005 WL 2043020, at *3 (N.D. Cal. Aug. 24, 2005).

2  Cf. CAL. R. PROF'L CONDUCT 2-100; Continental Ins. Co. v. Superior Court, 32 Cal.

3  App. 4th 94, 120, 37 Cal. Rptr. 843, 852 (1995) ("[P]rohibiting ex parte contact with

4  former employees . . . unduly impedes the flow of information and unnecessarily

5  increases the cost of litigation").

6      This is true even for former employees who, unlike Ms. Tomiyama, were in the

7  control group of the opponent or who communicated extensively with the opponent's

8  counsel concerning the particular case at issue.  See Nalian Truck Lines, Inc. v.

9  Nakano Warehouse & Transp. Corp., 6 Cal. App. 4th 1256, 1260, 1265, 8 Cal. Rptr.

10  2d 467, 469, 472 (1992) (no disqualification even where the employer's counsel

11  "actively discussed [with the former employee] the theories" that the employer's

12  counsel intended to pursue in the litigation and where the former employee "was the

13  key employee in supplying information" that was eventually used in calculating the

14  employer's damages); Maruman Integrated Circuits, Inc. v. Consortium Co., 166 Cal.

15  App. 3d 443, 446, 212 Cal. Rptr. 497, 498 (1985) (no disqualification where former

16  company employee went to work for opposing party even though she had been

17  providing assistance to her former employer in litigation against the opposing party).

18      Moreover, California courts have found "no general duty to 'warn' the

19  opposing party's former employee not to disclose confidential or privileged

20  information." In re EXDS, Inc., 2005 WL 2043020, at *4.  The reasoning is that:

21      [w]ith regard to the ethical boundaries of an attorney's conduct, a bright

22      line test is essential. . . .  Unclear rules risk blunting an advocate's

23      zealous representation of a client.  This is not to say that a privileged

24      matter should not be protected.  Rather, it is incumbent upon a party who

25      knows that its former employees, including former control group

26      employees, possessed privileged information to seek a protective order.

27

28

Nalian, 6 Cal. App. 4th at 1264; see also Continental Ins. Co., 32 Cal. App. 4th at 119 (quoting and agreeing with this rationale); Concat LP v. Unilever, PLC, 350 F. Supp. 2d 796, 814 (N.D. Cal. 2004) (same).

While a lawyer cannot affirmatively seek to acquire an opponent's privileged material through improper means, it is well settled that "[m]ere exposure to the confidences of an adversary does not, standing alone, warrant disqualification." In re EXDS, Inc., 2005 WL 2043020, at *2 (quotation omitted). "Protecting the integrity of judicial proceedings does not require so draconian a rule" because "[s]uch a rule would nullify a party's right to representation by chosen counsel any time inadvertence or devious design put an adversary's confidences in an attorney's mailbox." Collins v. State, 121 Cal. App. 4th 1112, 1131, 18 Cal. Rptr. 3d 112, 125-26 (2004) (emphasis omitted). Thus, California courts have rejected motions for disqualification based on negligence-type arguments that an attorney "should have known" of an ethical issue. See, e.g., Jorgensen v. Taco Bell Corp., 50 Cal. App. 4th 1398, 1401, 58 Cal. Rptr. 2d 178, 180 (1996) (an attorney does not violate ethical rules when he has ex parte conversations with company employees that he "should have known" were represented by company counsel).

### 2. Lawyers for MGA Did Not Seek Out or Knowingly Receive Mattel's Privileged Information.

Although there is no duty under California law to protect Mattel's privileged information, both Skadden and MGA's prior counsel warned Ms. Tomiyama not to disclose the substance of any discussions with any Mattel attorney. Even after Mattel's aggressive questioning of Ms. Tomiyama in her deposition, the undisputed evidence is that lawyers for MGA never received any Mattel privileged information from Ms. Tomiyama concerning this litigation or any other Mattel legal matters. And even if one document received from Ms. Tomiyama was Mattel work product – which was not the case – the attorneys received it without knowing of its privileged nature. In short, Mattel's allegations are baseless.

### a. Ms. Tomiyama Did Not Disclose Any Mattel Privileged Information About This Case.

Ms. Tomiyama was consistently warned not to disclose the substance of communications with or from Mattel's attorneys. (Plevan Dec. at ¶¶ 8-12; Campana Dec. at ¶ 6; Holden Dec. at ¶ 3.)  Although Ms. Tomiyama testified that

(Tom. Dep. at 222:6),                                **REDACTED**

                                                                        the MGA attorneys' declarations that she, in fact, was warned and never communicated any Mattel privileged information to them.

Mattel's brief blatantly misleads the Court when it argues that Ms. Tomiyama's deposition testimony shows that "Mattel's counsel discussed MGA's allegations with Tomiyama, and disclosed to her work product in the form of mental impressions and thoughts with respect to those claims." (Mot. to Disq. at 5 and n.17; see also id. at 14 and n.76.)  This is a patent mischaracterization and distortion of the record.  In reality, the three references cited by Mattel to support this claim are as follows:

Q.

A.

(Tom. Dep. at 252:17-22.)

Q.                                                **REDACTED**

A.

Q.

11

1    A.

2

3

4

5

6    Q.

7
                              **REDACTED**
8    A.

9

10   (Tom. Dep. at 253:12 – 254:3.)

11   Q.

12

13

14   A.

15   (Tom. Dep. 254:23 – 255:2.)

16       Mattel's citation of this testimony, by itself, is misleading because it implies

17   that Mattel lawyers discussed something with Ms. Tomiyama beyond the

18   personalities of the case, which is not privileged under California law.  Gregori v.

19   Bank of America, 207 Cal. App. 3d 291, 309, 254 Cal. Rptr. 853, 865 (1989).  What

20   is particularly egregious, however, is that Mattel fails to acknowledge that,

21   immediately following the above testimony, Ms. Tomiyama repeatedly

22   .

23   Q.
                              **REDACTED**
24

25

26

27

28

A.

# REDACTED

(Tom. Dep. at 255:3-11.)

Not satisfied, Mattel pushed Ms. Tomiyama over and over again on this point. Yet even in the face of repeated intimidating questioning, Ms. Tomiyama provided the same answer.  (See, e.g., Tom. Dep. at 256:12 (

); id. at 256:17-19 (

); id. at 256:25 (

); id. at 257:19-21 (

);

id. at 258:5-7 (

# REDACTED

); id. at 263:12-13 (

); id. at 263:18-22 (

); id. at 263:24-25

); id.

at 264:9-11 (

).[4]  Based on this record, no advocate could responsibly represent to the Court, as did Mattel's counsel, that "Skadden, Arps, Mr. Holden and likely others obtained Mattel's privileged information and litigation strategy regarding this case from Tomiyama."  (Mot. to Disq. at 16.)

---

[4]   See also Tom. Dep. at 264:24-25 (

); id. at 265:2-4 (

); id. at 265:9-14 (

# REDACTED

); id. at 265:20-22 (

); id. at 266:14-15 (

).

13

1   In addition to the misleading citation of the Tomiyama deposition, Mattel

2   counsel Michael Moore and Michael Zeller submitted declarations stating in broad

3   and conclusory terms that they shared their mental impressions of the case with Ms.

4   Tomiyama.  By mimicking the legal standard for claiming work product, they provide

5   no concrete support for the claim that they discussed privileged information with Ms.

6   Tomiyama.  And even these self-serving declarations do not claim that the lawyers

7   ever told Ms. Tomiyama to maintain the confidentiality of their conversations.  Given

8   the startling overbreadth of Mattel's privilege claims as to matters for which we have

9   a full record,[5] and given Mattel's misleading use of Ms. Tomiyama's testimony, there

10  is substantial reason to believe that the Zeller and Moore declarations, as well as any

11  *in camera* submission by Mattel, should be taken with a large dose of salt.

12      The Mattel declarations, moreover, have no bearing on whether Ms. Tomiyama

13  shared the information with Skadden or any other lawyer for MGA – which is the

14  burden of proof that Mattel must carry in seeking disqualification.  Nalian, 6 Cal.

15  App. 4th at 472 (denying motion for disqualification where "the showing made by

16  [the adversary] at best demonstrated that [its former employee] possessed certain

17  information protected by the attorney-client privilege, but was wholly inadequate to

18  prove that particular communications were divulged [by the former employee to the

19  law firm sought to be disqualified]"); Collins, 121 Cal. App. 3d at 1130 (denying

20  motion for disqualification where, as here, plaintiff's consultant testified that he

21  "forgot that he had spoken" with plaintiff's counsel about his theories of the case and

22  defendant's attorney testified that he never discussed plaintiff's privileged

23  information with consultant); Gregori, 207 Cal. App. 3d at 296, 305, 309 (holding

24  that evidence concerning legal secretary who began dating opposing counsel and who

25

26  [5]   For example, asserting a baseless claim of privilege, Mattel repeatedly admonished

27  Ms. Tomiyama not to testify about   **REDACTED**

28  (Tom. Dep. at 214:7-217:12.)

1  was "intimately familiar with virtually every aspect of the case" "did not provide the

2  necessary evidentiary basis for the legal presumption that [opposing counsel]

3  acquired confidential information useful to his clients").

4       Mattel relies on cases that are not remotely analogous or controlling.  For

5  instance, Mattel relies on cases where there was no dispute that the attorneys

6  knowingly obtained and used documentary evidence memorializing the other side's

7  privileged information.  See Rico v. Mitsubishi Motors Corp., 42 Cal. 4th 807, 812,

8  171 P.3d 1092, 1095 (2007) (attorney engaged in misconduct where there was no

9  question that the attorney had somehow obtained notes of the opposing counsel's

10  evaluations of its experts, that the attorney knew "within a minute or two" that the

11  notes had not been intended to be produced, and that the attorney actively used those

12  notes as "powerful impeachment evidence" against the opposing side's expert);

13  Richards v. Jain, 168 F. Supp. 2d 1195, 1198, 1208-09 (W.D. Wash. 2001) (in a case

14  not applying California law, firm committed misconduct where it had access to over a

15  thousand privileged e-mails over eleven months).

16       Mattel also invites the Court to presume that Ms. Tomiyama provided

17  privileged information to Skadden lawyers – even where there are detailed

18  declarations and deposition testimony proving that no such information was shared.

19  The cases relied on by Mattel for this proposition are cases where an outside

20  consultant switched sides in litigation, not where, as here, a party has contacted an

21  opposing party's former employee;[6] California courts consistently do not apply the

22  presumption is not applied in the latter instance.  See, e.g., Nalian, 6 Cal. App. 4th at

23  1264; In re EXDS, Inc., 2005 WL 2043020, at *7 (presumption is not applied "in the

24  context of ex parte contacts with an opposing party's former employee").  Indeed, if it

25

26  [6]  See Shadow Traffic Network v. Superior Court, 24 Cal. App. 4th 1067, 29 Cal. Rptr. 2d 693 (1994) (applying rebuttable presumption in case involving outside expert consulted

27  by both sides); County of Los Angeles v. Superior Court, 222 Cal. App. 3d 647, 657-58, 271 Cal. Rptr. 698, 704-05 (1990) (same).  Given the declarations and deposition testimony

28  submitted by MGA showing that its lawyers received no such information, MGA would rebut this presumption even if it were applicable (which it is not).

15

1  were otherwise, opposing counsel could never interview former employees out of fear

2  that those employees, sometime in the past, might have spoken with company counsel

3  about the events in the lawsuit (or company counsel might claim they had).  Even if

4  the lawyers cautioned them not to disclose privileged information (as happened here)

5  and the employee professed not to have any privileged information or could not

6  remember receiving privileged information (as happened here), the former

7  employer's counsel could nonetheless try to use innuendo and presumption to argue

8  that opposing counsel should be disqualified.  That result is flatly inconsistent with

9  California law.  See, e.g., Nalian, 6 Cal. App. 4th at 1264 (observing that "a bright

10  line test is essential" because "an attorney must be able to determine beforehand

11  whether particular conduct is permissible; otherwise, an attorney would be uncertain

12  whether the rules had been violated until . . . he or she is disqualified").

13        In short, Mattel's arguments rely on the type of "strained facts and theories",

14  UMG, 526 F. Supp. 2d at 1065, that California courts consistently reject as a basis for

15  disqualification.  Because the evidence is undisputed that Ms. Tomiyama did not

16  share any Mattel privileged information concerning this case with Skadden or any

17  other lawyer for MGA, Mattel's baseless speculation cannot be used as a basis to

18  disqualify counsel of MGA's choosing and to disrupt the imminent trial date.

19             **b.**      **The *Simba* Document.**

20        Nor did Skadden commit any misconduct with respect to the only document

21  challenged by Mattel – a compilation of nine doll faces painted for the purpose of

22  showing a Mattel competitor, Simba Toys, examples of face painting that would not

23  infringe on Mattel's dolls.  The photo montage, created entirely by Ms. Tomiyama

24  and her staff, does not reflect any attorney opinions, analysis or thought process.

25  Moreover, Ms. Tomiyama repeatedly testified that, to her knowledge,

26                    **REDACTED**

27                                                            (See, e.g., Tom. Dep. at

28  234:21-235:3; id. at 238:24-239:5 (                                        ); id.

16

1  at 241:4-5 (                                                  ); id. at 241:23-242:4; id. at

2  244:17-18 (                          **REDACTED**                         ).

3

4          Documents are not protected by an attorney-client privilege or the work

5  product doctrine if they are created with the intent to produce them to an adversary.

6  In re Syncor ERISA Litig., 229 F.R.D. 636, 644-45 (C.D. Cal. 2005); see also United

7  States v. Rockwell Int'l, 897 F.2d 1255, 1265 (3d Cir. 1990).  Moreover, the privilege

8  and work product doctrine are waived where disclosure of an otherwise privileged

9  document is made to a third party.  Syncor, 229 F.R.D. at 645 (citation omitted).  And

10 "once a party has disclosed work product to an adversary, it has waived work product

11 protection as to all other adversaries."  Id. at 646.  Thus, the document was not

12 covered by the work product doctrine and the Skadden attorneys engaged in no

13 misconduct in obtaining it.

14         Even if the doll-head montage were work product, Skadden's receipt of it was

15 inadvertent and would not warrant disqualification.  In re EXDS, Inc., 2005 WL

16 2043020, at *2 ("Mere exposure to the confidences of an adversary does not, standing

17 alone, warrant disqualification.").  The document did not bear any indication that it

18 was privileged or confidential, or reflect the opinions or thought processes of

19 attorneys.  And it is undisputed that Ms. Tomiyama told Skadden that the montage

20 had been provided to Simba.  (Plevan Dec. at ¶ 26.)  Moreover, the document was not

21 listed (and still is not listed) on any Mattel privilege log.  (Eckles Dec. at ¶ 5.)  There

22 was nothing in the document or about the circumstances of it being provided to

23 Skadden to suggest it was work product, or that Skadden knew it to be.  Cf. Rico, 42

24 Cal. 4th at 812 (attorney engaged in misconduct where the attorney could see "in a

25 minute or two" that the notes had not been intended to be produced and still tried to

26 exploit them).

27         It should also be emphasized that the document was included in Ms.

28 Tomiyama's expert report solely to show her experience as a face painter.  It was not

created for this litigation.  It bears no significance to any substantive issue in this case or to the specific matter on which Ms. Tomiyama opined – the comparison of the Bryant drawings to the Bratz dolls.  Mattel's attempt to seize on this photo montage as grounds to disqualify Skadden and Ms. Tominyama only serves to illustrate how baseless and over-reaching its motion is.

Finally, upon hearing that Mattel claimed that the document constituted work product – and even though Skadden disagrees with this claim – Skadden promptly took steps to recall, sequester, or destroy the document.  (Eckles Dec. at ¶ 4.)  It is being kept under lock and key and has only been accessed by the few Skadden attorneys necessary to respond to Mattel's motion to disqualify (most of whom have had no involvement in this case except to respond to Mattel's motion).  (Id.)  These steps are further evidence that Skadden did not act improperly with regard to obtaining this information from Ms. Tomiyama.  Collins, 121 Cal. App. 4th at 1132 (denying disqualification in part because that the law firm acted with "high ethical standards" after being notified there was an issue).

### c.    Ms. Tomiyama's Methodology for Comparing Dolls.

Mattel also erroneously argues that Ms. Tomiyama's general methodology in examining dolls, as set out in her expert report at page 9, is protected work product.  The work product doctrine, however, "is intended to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy with an eye toward litigation, free from unnecessary intrusion by his adversaries."  SEC v. Talbot, No. CV 044556, 2005 WL 1213797, at *1 (C.D. Cal. Apr. 21, 2005) (quotations omitted).  "Both common law principles embodied in the attorney-client privilege and the work product doctrine are to be applied in a common sense way in light of reason and experience as determined on a case-by-case basis."  In re Six Grand Jury Witnesses, 979 F.2d 939, 944 (2d Cir. 1992). The existence of attorney mental impressions in a document or a communication is "a prerequisite to the invocation of

1  the work product doctrine." <u>In re Grand Jury Proceedings</u>, 658 F.2d 782, 784-85

2  (10th Cir. 1981).

3      Mattel asserts that Ms. Tomiyama's general methodology of comparing dolls is

4  privileged because she compared dolls at the request of Mattel lawyers while at

5  Mattel.  This simply ignores her testimony that

6  .                                        For

7  instance, notwithstanding Mattel's efforts to put words in her mouth, she testified:

8      Q.

9

10

11      A.

12                      **REDACTED**

13

14

15  (Tom. Dep. at 267:10-21; <u>see also</u> .             --       `.)

16      Moreover, when asked about

17  .               , Ms. Tomiyama emphatically testified that         :

18

19                                        (Tom. Dep. at

20  249:1-4.)  Devoid of any details describing their application to any particular case,

21  Ms. Tomiyama's general practices of analyzing dolls reveal nothing of the thought

22  processes of Mattel attorneys and therefore cannot be privileged under any common

23  sense interpretation of the doctrine.  <u>See e.g.</u>, <u>In re Grand Jury Proceedings</u>, 658 F.2d

24  at 784-85 (accountant's work prepared at the direction of attorney not covered by the

25  work product doctrine because the work did not reflect attorney mental impressions).

26  Her description of the methodology, untethered to any particular case, was no more

27  privileged than would be a DNA expert's general discussion of the scientific

28  methodology used to compare DNA samples.  Because Ms. Tomiyama's general

19

1  practices of analyzing dolls are not privileged, and because she did not communicate

2  any privileged information to any MGA attorney, this cannot form the basis of a

3  finding that a Skadden or MGA attorney committed any misconduct.

### d.   Mattel's Separation Agreement.

5  Finally, Mattel makes a series of arguments why it believes that Ms. Tomiyama

6  should not have agreed to act as an expert witness here, all of which are based on an

7  expired separation agreement she had with Mattel, a copy of which she first provided

8  to Skadden nearly eight weeks after she agreed to be an expert witness.  (Plevan Dec.

9  at ¶ 4, 30.)  Mattel asserts that the separation agreement, which expired on April 13,

10  2007, required Ms. Tomiyama – in perpetuity – (1)

11  **REDACTED**                                      and (2)

12                                                 (See Tom. Spt. Agt. § 3, ¶ f.)  But in contrast

13  to other provisions in the agreement (including

14                  ), this provision does not state that it survives the termination

15  of the separation agreement, and therefore imposed no obligation upon Ms.

16  Tomiyama after the termination of her separation agreement.  See Gillam v. Nevada

17  Power Co., 488 F.3d 1189, 1195 (9th Cir. 2007) (under "a familiar principle of

18  contract law," a court "may not make a new contract for the parties or rewrite their

19  contract while purporting to interpret or construe it." (quoting 11 WILLISTON ON

20  CONTRACTS § 31:5, at 299 (4th ed. 1999))); see also Taylor v. Lifetouch Nat'l Sch.

21  Studios, Inc., 490 F. Supp. 2d 944, 953 (N.D. Ind. 2007) (specific provision in an

22  employment agreement did not survive the agreement's termination where, unlike

23  other provisions in the agreement, there was no language extending it beyond the life

24  of the contract).  If Mattel wanted it to be otherwise, it should have stated so in the

25  agreement that it drafted.

26  Similarly, Mattel argues that Ms. Tomiyama was required to

27

28  **REDACTED**            .  The separation agreement, however, provided that

(Tom. Spt. Agt. § 3, ¶ 1 (emphasis added).)  As is the standard practice in any litigation,

**REDACTED**

In any event, neither of these       provisions prohibited Ms. Tomiyama from becoming an expert witness or from giving testimony as a fact witness here.  Indeed, Mattel did not and could not prohibit Ms. Tomiyama from working even directly for MGA, because covenants-not-to-compete are void as a matter of public policy in California.  See Comedy Club, Inc. v. Improv West Assocs., 514 F.3d 833, 845 (9th Cir. 2007); see also Smith v. Superior Court, 41 Cal. App. 4th 1014, 1026-27, 49 Cal. Rptr. 20, 26-28 (1996) (refusing to enforce a Michigan injunction which sought to prevent former employee from testifying as an expert witness for the opposing side based on a confidentiality agreement with his former employer and noting California's "fundamental public policy against suppression of evidence").  Ms. Tomiyama could have become employed directly by MGA the day after her separation agreement expired.  Given that no privileged information was communicated to Skadden, Mattel's attempt to use Ms. Tomiyama's expired agreement as a reason to disqualify Skadden is nothing more than an attempt "to seize on strained facts and theories to pursue the tactical advantage of ousting their adversary's lawyers."  UMG, 526 F. Supp. 2d at 1062.

### 3.   Disqualification of Counsel Is Not an Appropriate Remedy.

Even if Mattel's allegations were taken at face value (and they should not be for the reasons described above), they do not warrant disqualification of any lawyer for MGA.  As stated above, "[d]isqualification is only justified where the misconduct will have a 'continuing effect' on judicial proceedings."  Baugh, 137 Cal. App. 4th at

21

744 (no disqualification where plaintiff's counsel was alleged to have ex parte conversation with represented defendant outside the presence of counsel).  "If, on the other hand, the court's purpose is to punish a transgression which has no substantial continuing effect on the judicial proceedings to occur in the future, disqualification is not proper."  Marcum, 1995 WL 225708, at *2 (same).  A party should not be disqualified for learning information which could "have been learned through interrogatories, depositions, etc."  Id.; Abubakar, 2008 WL 336727, at *6 (no continuing effect in a case where opposing attorney previously interviewed litigants while representing their employer because "credibility assessments [of those employees] can also be made during the course of depositions").  Moreover, a court should evaluate whether there are measures short of disqualification which would remedy any alleged misconduct.  UMG, 526 F. Supp. 2d at 1063.

Mattel has not and cannot meet the exacting "continuing effects" standard.  Even if Ms. Tomiyama had discussed this litigation with Mattel's lawyers, her inability to remember any such conversations – even under Mattel's intense cross-examination – demonstrates that no such conversations were or could be shared with Skadden.  Conversations Ms. Tomiyama cannot remember cannot affect the case.  Moreover, Mattel cannot point to a single piece of information that opposing counsel received from Ms. Tomiyama that could not have been obtained from Ms. Tomiyama as a third party fact witness.  See, e.g., Marcum, 1995 WL 225708, at *2.

Similarly, the Simba montage is irrelevant to this litigation and therefore could not have any continuing effect on the case.  In any event, the matter can be addressed by a protective order requiring MGA to return the document to Mattel or destroy it and not to rely on the document in any way.  Indeed, on at least nine separate occasions in this case, Mattel has produced its privileged information and MGA, in compliance with an agreed-upon order, has returned it without relying on it.  The Simba document can be addressed in the same manner.

1    Likewise, the description of Ms. Tomiyama's methodology for comparing

2  dolls is something she could have been asked to testify about as a fact witness.  Even

3  if it somehow were work product, its inclusion in the expert report will not have a

4  continuing effect on the litigation, and it too can be addressed through a protective

5  order.  Moreover, again, there is no evidence that this methodology was the product

6  of Mattel's lawyers; indeed, not even Mattel's self-serving declarations claim it was.

7    As the Court is well aware, this case has been thoroughly litigated.  There have

8  been 121 depositions, 123 interrogatories, 6,961 admissions, 4,225 requests for

9  production, 5,093,546 pages of documents produced, and 25 meetings with Judge

10  Infante.  Ms. Tomiyama is but one of 28 experts who have submitted reports on

11  behalf of all the parties.  Her knowledge encompasses a relatively small portion of the

12  information relevant to this case.  And Mattel and MGA have fully set forth the

13  various legal and factual theories concerning whether the Carter Bryant drawings

14  have any resemblance to the early Bratz dolls.  At this stage, there are no surprises or

15  any advantages to be gained by whatever information Ms. Tomiyama could have

16  learned before her regular employment with Mattel was terminated over two years

17  ago.  Because Mattel cannot satisfy its heavy burden of showing that Ms.

18  Tomiyama's communications of allegedly privileged information to opposing counsel

19  will, not might, have a continuing effect in the case, Mattel's motion to disqualify

20  should be denied for this independent reason alone.

21  **II.    There Is No Reason to Disqualify Ms. Tomiyama.**

22    Mattel similarly fails to make the case that Ms. Tomiyama should be

23  disqualified.  "[D]isqualification [of experts] is a drastic measure that courts should

24  impose only hesitantly, reluctantly, and rarely."  Hewlett-Packard Co. v. EMC Corp.,

25  330 F. Supp. 2d 1087, 1092 (N.D. Cal. 2004).  In evaluating whether an expert should

26  be disqualified, courts follow a three-step analysis:  "First, the moving party must

27  prove that it was objectively reasonable for it . . . to believe that a confidential

28  relationship existed."  Stencel v. Fairchild Corp., 174 F. Supp. 2d 1080, 1083 (C.D.

23

1  Cal. 2001).  Second, the moving party must have "disclosed confidential information

2  to the expert that is relevant to the current litigation."  Hewlett-Packard, 330 F. Supp.

3  2d at 1092.  Third, "[t]he Court also should consider whether disqualification would

4  be fair to the affected party and would promote the integrity of the legal process."  Id.

5      As stated above, Mattel has not shown that it had a confidential relationship

6  with Ms. Tomiyama, and except for its self-serving declarations, there is no evidence

7  that Mattel in fact shared any confidential or privileged information with her relevant

8  to this litigation.  Nor is there any evidence that Mattel took any of the requisite steps

9  to make clear to Ms. Tomiyama that they had retained her to be an expert or

10  consultant to them in this litigation or that she agreed to so serve.  Cf. Wang Labs.,

11  Inc. v. Toshiba Corp., 762 F. Supp. 1246, 1250 (E.D. Va. 1991) ("[A] lawyer seeking

12  to retain an expert and establish a confidential relationship should make this intention

13  *unmistakably clear* and should confirm it in writing.") (emphasis added)).  Ms.

14  Tomiyama's status was simply that of a former employee.  She does not recall being

15  consulted by Mattel lawyers about the substance of this case and has never provided

16  Skadden or any MGA attorney with any Mattel privileged information relevant to this

17  or any litigation.

18      And in no event should these events result in her disqualification because

19  MGA would be unduly prejudiced at this late stage of the proceedings.  While her

20  expert testimony covers a relatively small portion of the case, Ms. Tomiyama's

21  opinion testimony relates to an important perspective – that of a face painter.  There

22  are a limited number of doll face painters (let alone face painters willing to incur the

23  wrath of Mattel by testifying), and MGA should not be prejudiced at this late stage by

24  having its expert on this subject disqualified.  This is particularly true when any

25  prejudice to Mattel can be cured by having Mattel instruct Ms. Tomiyama concerning

26  the information that Mattel believes is privileged – none of which pertains to Ms.

27  Tomiyama's comparison of Bryant's drawings to the Bratz dolls.  Under Mattel's

28  theory, a company can disqualify all of its witnesses from ever serving as expert

1 witnesses against it by discussing their impressions of any important litigation. That

2 is not the law. <u>Smith</u>, 41 Cal. App. 4th at 1026-27.

3       Mattel's requested relief, however, is not ultimately about Ms. Tomiyama.

4 What Mattel really seeks is an "order precluding the MGA defendants from offering

5 any fact or expert testimony as to any topic addressed by Tomiyama's expert report."

6 (Mot. to Disq. at i.)  In addition to the critical comparison of the Bryant drawings to

7 the Bratz dolls, Ms. Tomiyama's report addressed fashion doll painting, how she

8 reviewed possible knockoffs for Mattel, her working relationship with Carter Bryant,

9 Bratz face paint, Mattel's "Inventions" agreement, and the moonlighting policy at

10 Mattel. (Tom. Exp. Rpt. at 4-5.) This staggering request, which Mattel does not even

11 attempt to justify in its brief, is yet another indication that its motion to disqualify is

12 not about protecting confidential or privileged information, but rather about tactical

13 moves designed to win this lawsuit.

14                           **CONCLUSION**

15       MGA respectfully submits that the Court should not condone a litigant's

16 attempt to gain tactical advantage by baselessly dragging the reputation of opposing

17 counsel through the mud.  Because Mattel's over-reaching motion to disqualify has

18 no foundation in fact or law, MGA respectfully requests that it be denied.

19 DATED:  March 31, 2008

20                     SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

21

22                     By:

23                     Thomas J. Nolan

                      Attorney for MGA Entertainment, Inc.

24

25

26

27

28

Response in Opposition to Motion to Disqualify
Case No. CV 04-9049 SGL (RNBx)