1  THOMAS J. NOLAN (Bar No. 66992)
   (tnolan@skadden.com)
2  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
   300 South Grand Avenue
3  Los Angeles, California 90071-3144
   Tel.: (213) 687-5000/Fax: (213) 687-5600
4
   RAOUL D. KENNEDY (Bar No. 40892)
5  (rkennedy@skadden.com)
   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
6  4 Embarcadero Center, Suite 3800
   San Francisco, California 94111-5974
7  Tel.: (415) 984-6400/Fax: (415) 984-2698

8  Attorneys for MGA Entertainment, Inc., MGA Entertainment (HK) Limited,
   MGAE de Mexico, S.R.L. de C.V., and Isaac Larian
9

10
                    UNITED STATED DISTRICT COURT
11
                   CENTRAL DISTRICT OF CALIFORNIA
12
                          EASTERN DIVISION
13

14 | CARTER BRYANT, an individual,        ) CASE NO. CV 04-9049 SGL (RNBx)
                                          )
15 |                    Plaintiff,         ) Consolidated with Case No. 04-9059
                                          ) and Case No. 05-2727
16 |        v.                             )
                                          ) Honorable Stephen G. Larson
17 | MATTEL, INC., a Delaware             )
   | corporation,                          ) [PUBLIC REDACTED]
18 |                                       ) DECLARATION OF KENNETH A.
   |                   Defendant.          ) PLEVAN IN OPPOSITION TO
19 |                                       ) MATTEL'S MOTION TO
                                          ) DISQUALIFY
20 | AND CONSOLIDATED ACTIONS             )
                                          ) Hearing Date: April 7, 2008
21                                          Time: 10:00 a.m.

22

23

24

25

26

27

28

I, Kenneth A. Plevan, hereby declare as follows:

1. I am a partner in the law firm of Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), resident in its New York office. I was admitted pro hac vice in this matter after Skadden became counsel of record for MGA. I respectfully submit this declaration in opposition to Mattel's Motion to Disqualify MGA Entertainment, Inc.'s Counsel Skadden Arps and Expert Christina Tomiyama. Unless otherwise stated, I have personal knowledge of the facts set forth below and, if called as a witness, I could and would testify competently thereto.

### Retention of Tina Tomiyama as an Expert Witness

2. In mid-October, 2007, after Skadden became counsel for MGA herein, I received a schedule of possible expert witnesses who had been interviewed by prior counsel of record, O'Melveny & Myers ("OMM"). The schedule included Ms. Christina (Tina) Tomiyama. I understood she was a former employee of Mattel who had expertise in the area of face painting of dolls.

3. Around this same time, I learned that Ms. Tomiyama had met with MGA's counsel on August 2, 2007 and that MGA in-house counsel Craig Holden was present at that meeting. I was never told that at that meeting Ms. Tomiyama provided any information of the type that could be subject to a claim of privilege or work product by Mattel.

4. In late October, 2007, I or one of my colleagues contacted Ms. Tomiyama and arranged to interview her at our offices in Los Angeles on November 1, 2007.

5. Throughout the relevant period, I was the Skadden attorney chiefly responsible for dealing with Ms. Tomiyama. The only other Skadden attorney with any degree of regular contact with Ms. Tomiyama is my colleague from New York, Michelle Campana. Ms. Campana has submitted her own declaration.

---

Declaration of Kenneth Plevan in Support of MGA's Opposition to Mattel's Motion to Disqualify
Case No. CV 04-9049 SGL (RNBx)

1

6. At our initial meeting, Ms. Tomiyama told me that she had been discharged by Mattel in February, 2006, as part of a reduction in force, and opted to retire at that point, after approximately 16 years of employment at Mattel. She advised that her final position was manager of Mattel's face-painting group.

7. Just prior to this meeting, I had a proposed engagement letter sent to Ms. Tomiyama. At the conclusion of the November 1 meeting, I asked Ms. Tomiyama if she would agree to serve as a consultant and possible testifying expert witness for MGA, and she agreed. To the best of my recollection, the engagement letter was signed on that day. A true and correct copy of the expert engagement letter is attached as Exhibit A to this declaration. The expert engagement letter states that "Consultant [Ms. Tomiyama] believes that there are no present conflicts of interest that would prohibit her from performing the services contemplated hereunder. To avoid any conflict of interest, or the appearance of any conflict of interest, Consultant agrees to notify Skadden of any engagements, prior or subsequent to this Agreement, that could generate a possible conflict of interest or the appearance of such a conflict." (Ex. A, ¶¶ 7, 8.)

### Steps Taken To Avoid Inquiry Into Privileged Mattel Communications

8. Discussions at that first meeting focused on Ms. Tomiyama's professional experience and expertise. Knowing Ms. Tomiyama was a former Mattel employee, I specifically asked her to state generally whether she had had any dealings with Mattel's lawyers while in Mattel's employ. In response, Ms. Tomiyama told us generally that the Mattel legal department had, during a period beginning approximately two years prior to her departure, consulted with her approximately once per month regarding how dolls that had been found in the market compared to Mattel's dolls. I told Ms. Tomiyama she should not tell us any of the substance of her conversations with Mattel's attorneys. In particular, I told her she should not tell us either what she said to the

---
Declaration of Kenneth Plevan in Support of MGA's Opposition to Mattel's Motion to Disqualify
Case No. CV 04-9049 SGL (RNBx)

2

lawyers or what they said to her, nor identify any specific analysis that she had conducted or the results thereof.

9. Ms. Tomiyama told us that the approach she used in making a comparison of dolls was hers alone, based on her experience, and that no one in the Mattel legal department had ever told her how to analyze or compare dolls.

**REDACTED**

10. At no time during this meeting did Ms. Tomiyama provide me or my colleagues with any information whatsoever concerning her specific assignments or the substance of any analyses done at the request of the Mattel legal department. For example, she never related (i) the identity of the competitor or the competitor's product, (ii) which Mattel product was being reviewed, (iii) the results of her analyses, i.e. her conclusions, (iv) what she told the representative of the Mattel legal department, or (v) anything that the legal department stated or told her about any of the specific situations she was asked to review. This information was never provided to me or, to my knowledge, to anyone else at Skadden at this or any subsequent time.

11. Also in the first meeting on November 1, 2007, as a follow-up to the foregoing discussion, I specifically asked Ms. Tomiyama if she was ever asked by Mattel to discuss or address any dispute or possible dispute between any MGA product and any Mattel product. She assured us that she had not been.

12. I then followed up by specifically asking if her views had been sought concerning any comparison between Bratz and Mattel's My Scene dolls. Again Ms. Tomiyama responded in the negative. Ms. Tomiyama told us that the substance of the legal matters in dispute or possible dispute with MGA and Carter Bryant had never been raised with her by Mattel's lawyers, nor did she raise the subject.

---
Declaration of Kenneth Plevan in Support of MGA's Opposition to Mattel's Motion to Disqualify
Case No. CV 04-9049 SGL (RNBx)

3

13.

**REDACTED**

14. To me, this incident related by Ms. Tomiyama further confirmed that she had not given any input or feedback on Mattel's disputes with MGA or Bryant to Mattel's attorneys, and that her views on those disputes had never been sought by Mattel or its attorneys.

15. In that first meeting, I also showed Ms. Tomiyama a copy of Carter Bryant's sketches that had been in his "pitch book" (i.e.

). Ms. Tomiyama stated that she had never seen these sketches before. As I understood at that time that the Bryant sketches are the basis for Mattel's copyright infringement claim, this further confirmed to me that Ms. Tomiyama had not while at Mattel been asked to express any views related to this lawsuit or any dispute between Mattel and Carter Bryant or MGA.

16. In sum, as of the end of that meeting, I understood that Ms. Tomiyama had not been consulted by Mattel with respect to any disputes in these consolidated proceedings. I believed, therefore, that there were no issues regarding privileged

---

Declaration of Kenneth Plevan in Support of MGA's Opposition to Mattel's Motion to Disqualify
Case No. CV 04-9049 SGL (RNBx)

4

communications or attorney work product in connection with the instant consolidated proceedings that would preclude MGA from using Ms. Tomiyama as an expert witness in this litigation. Indeed, because she had told us she had not been consulted by Mattel counsel about the substance of the legal issues in dispute with MGA and Bryant, we had no reason to believe that any of our inquiries relevant to the issues in this litigation would have implicated in any way Mattel's attorney-client or work product privileges.

17. As to the other interactions with Mattel counsel she described in a general way, it has long been my view that the mere identification or disclosure of the general topic of discussion with a lawyer – such as stating that from time to time she had been asked to conduct analyses of dolls – as contrasted with the substance of the communication, is not protected by the attorney-client privilege. Ms. Tomiyama had only identified the general topic of discussion or general type of consultation she had with Mattel's attorneys, and had described her personal methodology she employed to compare dolls in general terms, relying on her own expertise and not on any instruction from Mattel. She was not asked to and did not discuss how the methodology was applied in any particular case. She told me that her expertise was based on her personal doll industry experience, not something she had ever learned from Mattel's lawyers.

18. Thus, we only discussed factual matters regarding her work experience at Mattel. At no time during any of our discussions with Ms. Tomiyama did I ever have a concern that she was revealing Mattel attorney-client communications or Mattel work product.

19. I recognize that

**REDACTED**

But I do specifically recall cautioning her broadly that she should not tell us the substance or back-and-forth of <u>any</u> communications with

---
Declaration of Kenneth Plevan in Support of MGA's Opposition to Mattel's Motion to Disqualify
Case No. CV 04-9049 SGL (RNBx)

5

any of Mattel's lawyers—not only communications that might be privileged, but any communications—and other than she did not.

### Expert Credentials

20. I viewed the fact that Ms. Tomiyama had been asked by Mattel's legal department to review competitive products to be a proper subject relevant to her expert credentials. I knew that Ms. Tomiyama had never been a testifying consultant of this type before and had never been hired as an expert witness on face painting before. I assumed that her expert credentials would be attacked later in a <u>Daubert</u> motion.

21. I accordingly asked Ms. Tomiyama to set forth in her expert report the approach that she had used to perform those kinds of analyses of competing products. As noted, Ms. Tomiyama had told us that the approach she used was based solely on her own expertise and experience, and that the Mattel legal department had never given her any direction or guidance on how to perform an analysis.

22. The entire description that appears in her expert report is as follows:

**REDACTED**

Declaration of Kenneth Plevan in Support of MGA's Opposition to Mattel's Motion to Disqualify
Case No. CV 04-9049 SGL (RNBx)

6

**REDACTED**

23. It is evident from the face of this description that it reveals absolutely no privileged information or attorney thoughts and impressions whatsoever, but only information relevant to Ms. Tomiyama's credentials. It is certainly not confidential information that a major toy company monitors the marketplace for possible violations of its rights, and indeed Mattel is the plaintiff in numerous lawsuits on the public record.

### Simba Photo Montage

24. My recollection is that Ms. Tomiyama did not relate her involvement with respect to a Mattel dispute with Simba until late December, 2007. Specifically, on December 27, 2007, we sent her publicly available materials from a lawsuit filed by Mattel in the United Kingdom against Simba, which had been resolved. My recollection is that after receiving those materials, Ms. Tomiyama advised us that while the face paint manager, she recalled being told that a

(At her deposition, **REDACTED**

25. Ms. Tomiyama further explained to me that with respect to the resolved Simba dispute, she had suggested that her department could create examples of face paints for Simba that in her view were not objectionable, and that these could then be given to Simba for guidance. Ms. Tomiyama also told us that she had found on her home computer a copy of what is Ex. A to her report, a set of photos of the examples of doll heads created by her face-paint team to illustrate doll faces that would not in her view be of concern to Mattel. She explained that the document was on her home computer because she had worked at home to prepare the composite of the photos.

Declaration of Kenneth Plevan in Support of MGA's Opposition to Mattel's Motion to Disqualify
Case No. CV 04-9049 SGL (RNBx)

7

**REDACTED**

26. Ms. Tomiyama also told me in this initial conversation about Simba that the photo montage her group had prepared had been given to Simba. Her expert report                                                                                      Also, the document itself was not marked "confidential," "privileged" or "work product." Therefore, we had no reason to believe it was confidential, or that it fell within the work-product doctrine, inasmuch as it had to our knowledge been prepared for the purpose of giving it to a third party and had been given to that third party.

27. Ms. Tomiyama thereafter added a reference to the composite of photos of the Simba doll heads to her expert report as an example of the kind of work she performed, solely for the purpose of demonstrating her credentials. The document did not in any other way relate to any issue in this case, or to any issue on which she was being asked to opine; it was included simply as further evidence of her bona fides as an expert on face paint for dolls.

28. I did not consider the document confidential because to my knowledge and belief it was prepared with the intent that it be given to Simba, and had been given by Mattel to Simba, there were no markings of any kind on the document that would have suggested it was confidential, and Ms. Tomiyama had told me that the document was given to Simba. Nor did I consider it a confidential fact that Mattel had litigated a dispute with Simba, as portions of the papers from a Mattel dispute with Simba were publicly available.

29. To the best of my recollection I never discussed the Simba document with any other of Mattel's experts, or with anyone at Skadden or MGA with the exception of my colleague, Ms. Campana. The document was not attached to drafts of Ms. Tomiyama's expert report. None of the credential documents were added until Ms. Tomiyama's report was completed, signed, and ready to be served. Again, the Simba

Declaration of Kenneth Plevan in Support of MGA's Opposition to Mattel's Motion to Disqualify
Case No. CV 04-9049 SGL (RNBx)

8

document was used simply as further help in establishing Ms. Tomiyama's credentials in anticipation of an attack on her credentials on a <u>Daubert</u> motion.

30. In later December 2007, I learned that Ms. Tomiyama had a separation agreement with Mattel that had expired on April 13, 2007. Ms. Tomiyama told me that during the period covered by her separation agreement, Mattel contacted her infrequently, and only about inconsequential matters. In its Memorandum on page 22, Mattel contends that Skadden, presumably meaning me, "induced" Ms. Tomiyama to violate this separation agreement and "affirmatively encouraged Tomiyama to disclose and to rely on privileged communications and work product." This is a completely false and unfair accusation, and I deny it.

31. In particular, at no time did I encourage – or even ask – Ms. Tomiyama to provide us with Mattel-privileged communications or work product. Until Ms. Tomiyama's deposition, I had no idea that any information provided to me by Ms. Tomiyama might even be considered by Mattel to be privileged, work product, or confidential information. Other than the            referred to above, Ms. Tomiyama never once related the substance of any communication with any Mattel lawyer. With the Simba document, when she first brought it to my attention, Ms. Tomiyama affirmatively told me it had been given to Simba, **REDACTED**

32. Mattel has only at most challenged two credential-related references in Ms. Tomiyama's expert report. An examination of the report as a whole shows that Ms. Tomiyama is a knowledgeable industry participant who addresses in her report, based on her personal expertise, many issues that are relevant to the disputes before the Court.

### January 3, 2008 Meeting

33. On January 3, 2008, Ms. Tomiyama attended a meeting with lawyers at our offices, during which two other expert witnesses (but not Ms. Tomiyama) made

Declaration of Kenneth Plevan in Support of MGA's Opposition to Mattel's Motion to Disqualify
Case No. CV 04-9049 SGL (RNBx)

9

presentations. Ms. Tomiyama made a few general comments from the audience concerning Mr. Bryant's sketches of Bratz dolls and her views of the Bratz face paint. Ms. Tomiyama's comments had nothing to do with any of the information purported by Mattel to be privileged.

### Actions Upon Learning That Mattel Alleged That Ms. Tomiyama's Expert Report Contained Mattel Work Product and Privileged Information

34. Upon being notified in early March that Mattel was claiming that portions of the Tomiyama report and Exhibit A thereto were subject to Mattel claims of privilege and work product – and even though we disagreed with Mattel's position – we promptly took steps to recall, sequester, or destroy all copies thereof and all copies of Ms. Tomiyama's deposition. We also removed all electronic copies of the report, exhibits thereto, and the deposition from the Firm's electronic databases. We only maintained a few copies of these, which we locked up for safekeeping. Since that time, access to these materials has been strictly limited only to those few lawyers and legal assistants who had a need to see these materials in connection with preparing MGA's response to Mattel's Motion to Disqualify.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed on March 30, 2008, at New York, New York.

*/s/ Kenneth Plevan*
Kenneth Plevan

Declaration of Kenneth Plevan in Support of MGA's Opposition to Mattel's Motion to Disqualify
Case No. CV 04-9049 SGL (RNBx)

10

# EXHIBIT A

## EXPERT CONSULTANT/WITNESS ENGAGEMENT AGREEMENT

This EXPERT CONSULTANT/WITNESS ENGAGEMENT AGREEMENT ("Agreement") is entered into by and between Tina Tomiyama ("Consultant") and Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), legal counsel to MGA Entertainment, Inc. ("MGA"), as of November 1, 2007.

Skadden, which is representing MGA, has engaged Consultant's services as a consultant and possible testifying expert witness for MGA in connection with the litigation entitled Bryant v. Mattel, 2:04-cv-09049 (SGL)(RNBx) and consolidated actions, 2:04-cv-09059 and 2:05-cv-02727, pending in the United States District Court for the Central District of California (the "Litigation"), and matters ancillary thereto.

Consultant's preparation and consultation will require Consultant to receive and to use privileged and confidential information, opinions and materials, and also will require the preparation and compilation by Consultant of privileged and confidential materials to be used by MGA's attorneys, including Skadden.

The Agreement between Consultant and Skadden is on the following terms:

1. Consultant acknowledges that she is being retained by Skadden to assist Skadden on issues relating to Consultant's areas of expertise, including development of doll designs and related topics. Consultant further acknowledges that she may be asked to act as a testifying expert. Consultant knows of no reason that would preclude her from acting in either a consulting or testifying capacity in connection with the Litigation.

2. The specific scope and nature of the work to be undertaken by Consultant are subject to mutual agreement of Consultant and Skadden from time to time.

3. All materials gathered and prepared by Consultant in furtherance of the engagement shall be the property of MGA, and shall not be retained, in copies, or in any other form, by Consultant after the end of this consultation. Consultation services provided by Consultant will be treated as the confidential work product of MGA's

Exhibit A ,
P. 11

attorneys, including Skadden. Consultant will return all materials, including personal notes and memoranda, to Skadden at the conclusion of the consultation.

4. All information gained in connection with the consultation, whether from documents or conversations, and including the terms of this Agreement, will be held in the strictest of confidence by Consultant, and will not be used by Consultant for any purpose, including, without limitation, for scholarly writing or teaching, without the prior written agreement of MGA. None of the foregoing information shall be disclosed by Consultant to anyone, without the specific written agreement of MGA.

5. Consultant shall not reveal to anyone the existence of this Agreement or Consultant's engagement in this matter.

6. Consultant agrees to assert all applicable privileges to any discovery request served by other parties (including parties in the Litigation) on Consultant or any authorized persons assisting on this engagement. Consultant further agrees to turn over the defense or opposition to any such attempted discovery to Skadden.

7. Consultant believes that there are no present conflicts of interest that would prohibit her from performing the services contemplated hereunder.

8. To avoid any conflict of interest, or the appearance of any conflict of interest, Consultant agrees to notify Skadden of any engagements, prior or subsequent to this Agreement, that could generate a possible conflict of interest or the appearance of such a conflict. Consultant is not permitted to represent interests adverse to MGA or MGA's attorneys, including Skadden in matters that are substantially related to the work done for MGA's attorneys, including Skadden, in connection with its representation of MGA.

9. Consultant will be compensated for her consulting services, time spent preparing for testimony, and time spent testifying at the rate of two-hundred fifty dollars ($250) per hour. Consultant will be reimbursed for her reasonable actual expenses incurred in the providing of services, provided that such expenses have been incurred at the request or direction, and with the prior approval, of MGA and/or its attorneys, including Skadden.

2

Exhibit A ,
P. 12

10. Consultant will prepare invoice(s) for her fees and expenses. Consultant will submit her invoices promptly to Skadden to the attention of Kenneth A. Plevan and Michelle M. Campana, who will forward Consultant's invoices to MGA for remittance. Skadden will undertake to contact Consultant promptly in the event that Skadden raises any issues with respect to the propriety of the charges or requiring further documentation.

11. Consultant understands and agrees that the only entity which will have any obligation for the payment of Consultant's fees or expenses for the engagement pursuant to this Agreement will be MGA, not Skadden. By executing this Agreement, MGA agrees to pay all such amounts as are actually due Consultant in accordance with the terms of this Agreement within 45 days of receipt by Skadden of an invoice as to which no issues are raised.

MGA ENTERTAINMENT, INC.:                CONSULTANT:

                                        _____
By: _____             Tina Tomiyama

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP:

By: _____
    KENNETH A. PLEVAN