# FAX TRANSMITTAL

CONFIDENTIAL

# Conkle & Olesten

William C. Conkle
Christina Olesten
John A. Conkle
Mark D. Kremer
Eric S. Engel
Scott A. Hampton

**Professional Law Corporation**
3130 Wilshire Boulevard, Suite 500
Santa Monica, California 90403
(310) 998-9100
FAX: (310) 998-9109
Direct E-Mail: Attorney's Initials *@conklelaw.com*
Internet Homepage: *http://www.conklelaw.com*

DATE: September 7, 2005      TOTAL PAGES:   3   (Including Cover)

FROM: Mark D. Kremer

CLIENT/MATTER NAME: Larian v. Larian

CLIENT/MATTER NUMBER: 2221.002

DOCUMENT NUMBER (IF APPLICABLE): 9787

DELIVER TO: Daphne Gronich

FAX NUMBER: 818-895-0771

THIS FAX _x_ WILL __ WILL NOT BE FORWARDED UNDER SEPARATE COVER

MESSAGE:

## IN CASE OF TRANSMISSION PROBLEMS, CALL (310) 998-9100

The information transmitted in this fax message, including any attachments, is intended only for the addressee. The information may be confidential and legally privileged under attorney-client, attorney work product, or other applicable privileges. Unauthorized access to this message may violate federal and state civil and criminal laws. If you have received this message, but are not the addressee, you are advised that any use, copying, disclosure or distribution of the information in this message is prohibited. Please call 310 998-9100 and destroy all copies of this fax message. Thank you.

EXHIBIT _____12_____

PAGE _____149_____

FL 0274

CONFIDENTIAL

## CONKLE & OLESTEN
PROFESSIONAL LAW CORPORATION

WILLIAM C. CONKLE
CHRISTINA OLESTEN
JOHN A. CONKLE
MARK D. KREMER
ERIC S. ENGEL
SCOTT A. HAMPTON

3130 WILSHIRE BOULEVARD, SUITE 500
SANTA MONICA, CALIFORNIA 90403-2304
TELEPHONE: (310) 998-9100

TELECOPIER
(310) 998-9109
TAXPAYER ID #
95-3774564

DIRECT E-MAIL: Attorney's Initials@conklelaw.com
INTERNET HOMEPAGE: http://www.conklelaw.com

September 7, 2005

Via Facsimile
and U.S. Mail

Daphne Gronich
16360 Roscoe Blvd.
Van Nuys, CA 91406

Re:   Farhad Larian/Isaac Larian and MGA Entertainment, Inc.
Our File No. 2221.002

Dear Ms Gronich:

Thank you for your letter of August 19, 2005. This shall constitute Farhad ("Fred") Larian's substance to response.

1.   Fred did not obtain while at MGA and does not have a confidential list of home telephone numbers of MGA's current or former employees.

2.   We are unaware of any current or former employee complaints about Fred's efforts to contact them. We are aware of persons reporting that they have been threatened by you and other lawyers acting on behalf of MGA with litigation in an effort to block disclosure of information. These activities raise ethical, not legal concerns and we suggest you look with some circumspection on them.

3.   Because of the generalizations you use to identify MGA's "trade secrets" we are unable to intelligently evaluate your claim that any are involved here, but we look with skepticism upon it. It is certainly not clear what, if any, information concerning development of the Bratz Dolls is a "trade secret". Isaac has made numerous public statements about the subject. Much of the information is so old that

2221.002\9787

EXHIBIT _____ 12

PAGE _____ 150

FL 0275

CONKLE & OLESTEN
PROFESSIONAL LAW CORPORATION

Daphne Gronich
September 7, 2005
Page 2

CONFIDENTIAL

it cannot possibly have any commercial value from being "secret" assuming that it ever did. Fred is not a competitor of MGA and has no use for any information which would impair its commercial value to MGA. Fred's interest in the information is for use in the arbitration over Isaac's concealment of it in 2000 when it should have been disclosed to Fred and the appraisal. And in any event, MGA may not use a claim of "trade secret" privilege to assist Isaac in perpetrating a fraud.

4.     We cannot agree that Fred is attempting to induce any person to break a contract. We are not aware of any contractual provision that would be violated by Fred's request for information and as indicated earlier we are skeptical of the claim that any of the information Fred wants would qualify as a trade secret. Please send us a copy of the contact provisions upon which MGA relies so we may evaluate it.

Please call me to have a full airing of MGA's and Fred's concerns.

Very truly yours,

Mark D. Kremer

MDK/pi

2221.002\9787

EXHIBIT ___12___

PAGE ___151___

FL 0276

.RANSMISSION VERIFICATION REPORT

CONFIDENTIAL

```
                                    TIME : 09/07/2005 17:59
                                    NAME :
                                    FAX  : 3109989109
                                    TEL  :
```

```
DATE,TIME              09/07  17:58
FAX NO./NAME           918180950771
DURATION               00:01:01
PAGE(S)                03
RESULT                 OK
MODE                   STANDARD
                       ECM
```

EXHIBIT _____ 12

PAGE _____ 152

FL 0277

# EXHIBIT 13

1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
   John B. Quinn (Bar No. 90378)
2  Michael T. Zeller (Bar No. 196417)
   Jon D. Corey (Bar No. 185066)
3  865 South Figueroa Street, 10th Floor
   Los Angeles, California 90017-2543
4  Telephone: (213) 443-3000
   Facsimile: (213) 443-3100
5
   Attorneys for Plaintiff
6  Mattel, Inc.

7

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10                  WESTERN DIVISION

11

12  MATTEL, INC., a Delaware corporation,  )  CASE NO. CV 04-9059 NM (RNBx)
                     Plaintiff,            )
13                                         )
              v.                           )  MATTEL, INC.'S
14                                         )  SUPPLEMENTAL INITIAL
    CARTER BRYANT, an individual, and      )  DISCLOSURES PURSUANT TO
15  DOES 1 through 10, inclusive,          )  RULE 26
                     Defendants.           )
16  _____  )
                                           )
17  CARTER BRYANT, on behalf of himself,   )
    all present and former employees of    )
18  Mattel, Inc., and the general public,  )
                                           )
19              Counter-Claimant,          )
                                           )
20              v.                         )
                                           )
21  MATTEL, INC., a Delaware corporation,  )
                                           )
22              Counter-Defendant.         )
    _____  )
23

24

25

26

27          EXHIBIT _____13_____

28          PAGE _____153_____

07209/652980.1

1            Pursuant to Fed. R. Civ. P. 26(a)(1), plaintiff Mattel, Inc. ("Mattel")

2  hereby provides the following supplemental initial disclosures to defendant Carter

3  Bryant and defendant-in-intervention MGA Entertainment, Inc. ("MGA")

4  (collectively Bryant and MGA shall be referred to as "defendants"):

5

6  I.      <u>Witnesses</u>

7

8            In accordance with Fed. R. Civ. P. 26(a)(1)(A), Mattel states that,

9  based on the information currently known to it, at least the following persons

10  (exclusive of expert witnesses, attorneys, and their support staff) have knowledge

11  of facts that Mattel may use to support its claims and defenses to Bryant's counter-

12  claims that survive the pending motion to dismiss (if any):

13

14        1.     Carter Bryant. Projects Bryant worked on for competitors

15  while employed by Mattel and Bryant's breach of obligations to Mattel.

16

17        2.     Isaac Larian, MGA Entertainment, Inc., 16730 Schoenborn

18  Street, North Hills, CA 91343-6122. Bryant's work on projects for MGA while

19  employed by Mattel, Bryant's breach of obligations to Mattel and MGA's efforts to

20  conceal same.

21

22        3.     Ivy Ross, c/o Mattel, Inc., 333 Continental Blvd., El Segundo,

23  California. Carter Bryant's breach of obligations to Mattel.

24

25        4.     Jill Nordquist, c/o Mattel, Inc., 333 Continental Blvd., El

26  Segundo, California. Carter Bryant's breach of obligations to Mattel.

27

28

**EXHIBIT** \_\_\_\_\_**13**\_\_\_\_\_

**PAGE** \_\_\_\_\_**154**\_\_\_\_\_

-1-

MATTEL'S SUPPLEMENTAL INITIAL DISCLOSURES

1            5.     Maureen Tafoya, c/o Mattel, Inc., 333 Continental Blvd., El

2 Segundo, California. Carter Bryant's breach of obligations to Mattel.

3

4            6.     Alan Kaye, Mattel, Inc., c/o 333 Continental Blvd., El

5 Segundo, California. Carter Bryant's breach of obligations to Mattel.

6

7            7.     Lily Martinez, Mattel, Inc., c/o 333 Continental Blvd., El

8 Segundo, California. Carter Bryant's breach of obligations to Mattel.

9

10           8.     Cassidy Park, c/o Mattel, Inc., 333 Continental Blvd., El

11 Segundo, California. Carter Bryant's breach of obligations to Mattel.

12

13           9.     Ann Driskill, c/o Mattel, Inc., 333 Continental Blvd., El

14 Segundo, California. Carter Bryant's breach of obligations to Mattel.

15

16          10.    Jacqueline Prince, 300 Timber Laurel Lane, Lawrenceville,

17 Georgia 30043. Chronology of Bryant's work on projects for a competitor while

18 employed by Mattel and Bryant's breach of obligations to Mattel.

19

20          11.    Margaret Hatch-Leahy, 1824 Braeburn Road, Altadena,

21 California 91001. Chronology of Bryant's work on projects for a competitor while

22 employed by Mattel and Bryant's breach of obligations to Mattel.

23

24          12.    Veronica Marlow, 12250 Woodley, Granada Hills, California

25 91344. Chronology of Bryant's work on projects for a competitor while employed

26 by Mattel.

27

28

EXHIBIT ____13____

PAGE ____155____

-2-

MATTEL'S SUPPLEMENTAL INITIAL DISCLOSURES

13. Jesse Ramirez, 538 Maryann Drive, Redondo Beach, California 90278. Chronology of Bryant's work on projects for a competitor while employed by Mattel.

14. Sarah Halpern, 1418 Hillcrest Avenue, Glendale, California 91202. Chronology of Bryant's work on projects for a competitor while employed by Mattel and Bryant's breach of obligations to Mattel.

15. Paula Treantafelles, MGA Entertainment, Inc., 16730 Schoenborn Street, North Hills, CA 91343-6122. Chronology of Bryant's work on projects for a competitor while employed by Mattel.

16. Mercedeh Ward, MGA Entertainment, Inc., 16730 Schoenborn Street, North Hills, CA 91343-6122. Chronology of Bryant's work on projects for a competitor while employed by Mattel and Bryant's breach of obligations to Mattel.

17. Elise Cloonan, 1219 W. 160th Street, Gardena, California 90247. Chronology of Bryant's work on projects for a competitor while employed by Mattel and Bryant's breach of obligations to Mattel.

18. Anna Rhee, 101 Avenue G, Redondo Beach, CA 90277. Chronology of Bryant's work on projects for a competitor while employed by Mattel and Bryant's breach of obligations to Mattel.

19. Victoria O'Connor, Warner Bros. Consumer Products, 4001 West Olive Ave., 3rd Floor, Burbank, CA 91505. Chronology of Bryant's work on

EXHIBIT 13

PAGE 156

07209/652980.1

-3-

MATTEL'S SUPPLEMENTAL INITIAL DISCLOSURES

1  projects for a competitor while employed by Mattel and MGA's efforts to conceal

2  same.

3

4          20.     Farhad Larian, 160 Delfern Drive, Los Angeles, California

5  90077.  Chronology of development of Bratz.

6

7          21.     Morad Zarabi, Felina Lingerie, Chairman and President, 721

8  No. Bedford Drive, Beverly Hills, California 91311.  Chronology of development

9  of Bratz.

10

11          22.     Don Howarth, Howarth & Smith, 800 Wilshire Boulevard,

12  Suite 750, Los Angeles, California 90017. Chronology of development of Bratz.

13

14          23.     Joel N. Klevins, Fogel, Feldman, Ostrov, Ringler & Klevins,

15  1620 26th Street, Suite 100 South, Santa Monica, California 90404-4040.

16  Chronology of development of Bratz.

17

18          24.     Joyce Ng, Karrenbrock & Joyce Associates, 848 Radcliffe

19  Avenue, Pacific Palisades, California 90272.  Chronology of Bryant's work on

20  projects for a competitor while employed by Mattel.

21

22          25.     Wendy Feinberg, L.A. Focus, 17337 Ventura Boulevard, Suite

23  301, Encino, California 91316.  Chronology of Bryant's work on projects for a

24  competitor while employed by Mattel.

25

26          26.     Cynthia Pierce, Union Bank, 5855 Topanga Canyon Boulevard,

27  Woodland Hills, California 91367.  Payment from MGA to Carter Bryant.

28

EXHIBIT _____ 13 _____

PAGE _____ 157 _____

-4-

MATTEL'S SUPPLEMENTAL INITIAL DISCLOSURES

27.    Sandy Yamamoto, Mattel, Inc., 333 Continental Blvd., El Segundo, California.  Misrepresentations to Mattel that Carter Bryant made during his exit interview.

The above witnesses who are employed by Mattel, Inc. or identified c/o Mattel, Inc. may be contacted through Mattel's counsel, Quinn Emanuel Urquhart Oliver & Hedges, LLP.

Mattel's investigation of this matter is not yet complete nor has Mattel concluded its discovery in this matter.  In particular, Mattel anticipates that other third parties, including without limitation persons currently or formerly employed by or associated with MGA Entertainment, Inc. and/or Bryant may have percipient knowledge, but Mattel cannot identify such persons without further discovery. Mattel reserves the right to identify additional individuals with such knowledge as such persons become known to Mattel or the information they possess becomes relevant to Mattel's claims or Bryant's counter-claims that survive the pending motion to dismiss (if any).

II.    Documents

In accordance with Fed. R. Civ. P. 26(a)(1)(B), Mattel discloses the following categories of documents and tangible things in its custody or control that Mattel may use to support its claims and defenses to Bryant's counter-claims that survive the pending motion to dismiss (if any):

1.    Carter Bryant's agreements with Mattel.

2.    Carty Bryant's Mattel personnel file.

EXHIBIT _____13_____

PAGE _____58_____

-5-

07209/652980.1

MATTEL'S SUPPLEMENTAL INITIAL DISCLOSURES

1          3.      Records concerning the compensation that Bryant received

2    from Mattel.

3

4          4.      Documents evidencing Bryant's work for and aid and assistance

5    to defendant in intervention MGA Entertainment while defendant Bryant was

6    employed by Mattel, including but not limited to, Carter Bryant's contract with

7    MGA Entertainment dated "as of" September 18, 2000.

8

9          5.      Telephone records of communications between defendant

10   Bryant and defendant-in-intervention MGA Entertainment while defendant Bryant

11   was employed by Mattel.

12

13         6.      Certain design drawings, declarations and/or affidavits and

14   other materials relating to "Bratz."

15

16         7.      Documents evidencing defendant-in-intervention MGA

17   Entertainment's efforts to conceal communications with defendant Carter Bryant

18   while he was employed by Mattel.

19

20         8.      Documents evidencing defendant-in-intervention MGA

21   Entertainment's efforts to conceal the fact that defendant Bryant worked for it

22   while he was employed by Mattel

23

24         9.      Documents evidencing defendant-in-intervention MGA

25   Entertainment's payments made to defendant Bryant while he was employed by

26   Mattel.

27

28

EXHIBIT ___13___

PAGE ___159___

MATTEL'S SUPPLEMENTAL INITIAL DISCLOSURES

1       Mattel considers some documents identified above to be confidential,
2   proprietary or otherwise protected and will make them available for inspection and
3   copying subject to the operative protective order.  In addition, Mattel's
4   investigation of this matter is not yet complete.  Mattel will disclose additional
5   documents and/or tangible things when they become known or relevant to its
6   claims and defenses to Bryant's counter-claims that survive the pending motion to
7   dismiss (if any).  Mattel also believes that additional categories of documents
8   and/or tangible things, and information concerning such additional documents
9   and/or tangible things, are known to, and/or in the possession of, defendant and
10  his counsel.

11

12  III.    Computation of Damages

13

14      In accordance with <u>Fed. R. Civ. P.</u> 26(a)(1)(C), Mattel states:

15

16      Mattel has not yet computed damages because no discovery has yet
17  been obtained, including in particular discovery necessary to compute damages
18  that is uniquely in the possession of defendant and third parties.  Mattel has sought
19  this discovery from defendants and third-parties (to the extent applicable).
20  Defendants, in particular, have refused to comply with their obligations and
21  produce documents necessary for Mattel to calculate any claim of damages.  As of
22  the date of these supplemental initial disclosures, Mattel's motions to compel the
23  production of this information are pending.  Once Mattel has possession of
24  information and/or other documents sufficient to calculate its damages, then
25  Mattel will provide supplemental initial disclosures.

26

27      At a minimum, Mattel's damages computation will include without
28  limitation the following: monies paid to Bryant by any Mattel competitor during

EXHIBIT _____ 13

1  his period of disloyalty and/or as a result of his misconduct; disgorgement of any
2  other benefit, or its value, or its proceeds, derived or obtained by Bryant as a result
3  of his disloyalty, his breach of contract and other actionable misconduct and/or as
4  a result of work that he performed for any Mattel competitor during his Mattel
5  employment; any profits and the value of any other benefits that Bryant's co-
6  conspirators' derived or obtained as a result of his disloyalty and other
7  misconduct; the value of Mattel assets, resources, opportunities and/or property,
8  including intellectual property, that Bryant and his co-conspirators converted,
9  diverted from Mattel and/or otherwise improperly used or usurped; the value of
10  information and intellectual property owned by Mattel which Bryant provided to
11  any Mattel competitor in violation of his obligations to Mattel; compensation paid
12  by Mattel to Bryant during his period of disloyalty; the costs of maintaining this
13  action and attorney's fees; and punitive damages for his willful and fraudulent
14  conduct.

15

16  All non-privileged documents and other materials upon which
17  Mattel's damages are based and are within Mattel's possession, custody or control
18  will be made available to defendant for inspection and copying as they are
19  obtained or created, pursuant to the Federal Rules of Civil Procedure and other
20  applicable rules.

21

22  IV.   Insurance Agreements

23

24  In accordance with Fed. R. Civ. P. 26(a)(1)(D), Mattel states that it is
25  not aware of any applicable insurance policy.

26

27  Counsel for Mattel certify that, to the best of their knowledge,
28  information and belief, formed after an inquiry that is reasonable under the

EXHIBIT _____ 13
_____ 14 _____

1  circumstances, this disclosure is complete and correct as of the date indicated

2  below. Mattel's investigation into this matter is continuing and discovery

3  continues and is not complete. Mattel, therefore, reserves the right to supplement

4  or amend this disclosure as additional information becomes available, through

5  discovery or otherwise.

6

7  DATED: May 16, 2005

8                                          QUINN EMANUEL URQUHART
                                           OLIVER & HEDGES, LLP

9

10                              By_____
                                    Jon D. Corey

11                                  Attorneys for Plaintiff
                                    Mattel, Inc.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT _____13_____

PAGE _____162_____

-9-

07209/652980.1

MATTEL'S SUPPLEMENTAL INITIAL DISCLOSURES

**EXHIBIT 14**

# THR, Esq. Entertainment & Media Law Blog

**February 07, 2008**

## The Anthony Pellicano Trial: Will Patty Glaser Be a Witness or Defense Counsel?

### Posted by Eriq Gardner



We noticed an interesting motion yesterday out of the Anthony Pellicano wiretapping case.

The government is opposing a motion by Terry Christensen, the well-known entertainment lawyer and one of the indicted defendants, to add his law partner Patricia Glaser to his legal team. According to the government's motion, Christensen wants Glaser as part of his team in an attempt "to use privilege to suppress from public disclosure information adverse to his potential interests."

Christensen, managing partner of LA law firm Christensen Glaser Fink Jacobs Weil & Shapiro, is accused of using private eye Pellicano to wiretap the ex-wife of client Kirk Kerkorian. Trial is scheduled to begin Feb. 27 in downtown LA.

On Jan. 25, Glaser was served with a trial subpeona. The government says that six days later she called government counsel and agreed to testify. According to the motion, she asked to know what the substance of her testimony would be, and the government declined to answer. Two days after that, Christensen's counsel notified the government that Glaser would be joining the defendant's litigation team.

The feds want Glaser, who has developed a reputation as one of the toughest entertainment litigators in town, to be disqualified from representing her partner because it violates the "advocate-witness rule," prohibiting an attorney from serving both functions.

With Glaser involved, it's a good bet this will become a hotly contested issue.

Posted at 11:32 AM in Celebrity, Patty Glaser, Pellicano | Permalink

### TrackBack

TrackBack URL for this entry:
http://www.typepad.com/t/trackback/550202/25891896
Listed below are links to weblogs that reference The Anthony Pellicano Trial: Will Patty Glaser Be a Witness or Defense Counsel? :

### Comments

In California, without a warrant signed by a judge, it is crime to record a conversation without the consent of both parties, on a phone or in person, it's the same crime.

Some will say it is okay if there is no expectation of privacy. This is false.
Some will say you can record, but you just can't use the tapes in court. This is false. It is illegal without consent of both parties. Here is the statute.

http://www.rcfp.org/taping/states/california.html

Posted by: Ben | February 11, 2008 at 03:22 PM

EXHIBIT ___14___

PAGE ___143___

# EXHIBIT 15

Judge: Separate Trials For Lawyer, Pellicano In Racketeering Case - Printed Entertainment News Stories - K... Page 1 of 2

#:47460

# knbc.com

# Judge: Separate Trials For Lawyer, Pellicano In Racketeering Case

POSTED: 11:29 am PST February 19, 2008
UPDATED: 2:57 pm PST February 19, 2008

**LOS ANGELES --** Noted entertainment lawyer Terry Christensen will be tried separately from jailed private eye Anthony Pellicano and four co-defendants named in a federal racketeering indictment, a judge ruled Tuesday.

**More**



Anthony Pellicano

U.S. District Judge Dale Fischer granted Christensen's request to have his trial separated from Pellicano, who is accused of illegally wiretapping businessmen, spouses and celebrities, including Sylvester Stallone and Garry Shandling.

Christensen's trial could begin as soon as two weeks after the conclusion of Pellicano's, which is scheduled to begin next week and is expected to last up to 10 weeks.

Speaking to reporters after Tuesday's hearing, a beaming Christensen praised his attorneys, Terree Bowers and Patricia Glaser, who is a name partner at Christensen's Westside law firm.

"I got a good guy and a good lady in there," he said.

Glaser told reporters that Fischer's ruling wasn't a victory.

"It's just an effort to avoid prejudice," she said.

In 2006, Christensen was added to the list of Pellicano defendants who were named in a previous 110-count indictment.

Christensen is accused of paying the private eye $100,000 in 2002 to illegally wiretap the telephone of Lisa Bonder Kerkorian, the ex-wife of billionaire and Christensen client Kirk Kerkorian. The Kerkorians were locked in a bitter child support dispute at the time Pellicano allegedly placed the wiretaps.

Christensen's attorneys have long argued that he was a small part of Pellicano's alleged larger conspiracy.

"He should not have been included with these other people," Bowers told reporters.

Christensen is due back in court Thursday to hammer out a schedule for his trial.

The trial for Pellicano and his four remaining co-defendants -- ex-LAPD Sgt. Mark Arneson, former SBC employee Rayford Earl Turner, businessman Abner Nicherie and computer technician Kevin Kachikian -- is scheduled to start next week. Jury selection is set to begin Feb. 27.

In other developments, Fischer denied a prosecution motion to bar Glaser from representing Christensen at trial. The U.S. Attorney's Office said it sent Glaser a subpoena more than a week before Christensen announced she would be his lead attorney at trial.

Fischer ordered Bowers to come up with a suitable waiver for his client to sign in case the government did call Glaser as a witness at trial. The judge also admonished attorneys on both sides to stop bickering with each other.

**EXHIBIT** _15_

Judge: Separate Trials For Lawyer Pellicano In Racketeering Case | Print Story | News from...- KNBC ID Page 2 of 2
Case 2:04-cv-09049-DOC-RNB Document 2870-3 Filed 04/01/08 Page 20 of 110 Page ID
#:47461

Relations between attorneys on both sides have been strained, primarily due to accusations that both the prosecution and defense have been slow in turning over documents before the start of the trial.

"It appears that personalities have gotten in the way of professionalism in this case," Fischer said. "Law is a profession, not a game."

**Previous Stories:**

- January 9, 2008: Private Eye Pellicano To Represent Self In Trial
- December 10, 2007: 'Die Hard' Director Out Of Jail Pending Appeal In Pellicano Case
- September 24, 2007: Film Director Sentenced In Connection With Pellicano Case
- March 21, 2007: Pellicano Case Lawyer Excused From Spector Jury
- January 16, 2007: Lawyers To Represent Hollywood Private Eye In Wiretapping Trial
- June 12, 2006: Attorneys Clash Over Recordings In Pellicano Case
- April 26, 2006: Report: Chris Rock Hired Pellicano To Investigate Pregnant Model

Copyright 2008 by KNBC.com and KNBC (NBC4 Los Angeles). All rights reserved. This material may not be published, broadcast, rewritten or redistributed.

EXHIBIT _____15_____

PAGE _____165_____

# EXHIBIT 16

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3              EASTERN DIVISION

4                 - - -

5     HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                 - - -

7  MATTEL, INC.,                    )
                                    )
8                   PLAINTIFF,      )
                                    )
9           VS.                     )  NO. ED CV 04-09049
                                    )  (LEAD LOW NUMBER)
10  CARTER BRYANT, ET. AL.,         )
                                    )
11                  DEFENDANTS.     )
    _____)  HEARING
12  AND RELATED ACTIONS,            )
    _____)

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16              RIVERSIDE, CALIFORNIA

17              MONDAY, JULY 2, 2007

18                 1:51 P.M.

19

20

21

22

23          THERESA A. LANZA, RPR, CSR
        FEDERAL OFFICIAL COURT REPORTER
24          3470 12TH STREET, RM. 134
        RIVERSIDE, CALIFORNIA  92501
25              (951) 274-0844
        CSR11457@SBCGLOBAL.NET

**CERTIFIED COPY**

EXHIBIT _____ 16

JULY 2, 2007   PAGE _____ 166   CV04-09049-SGL

```
 1    APPEARANCES:

 2

 3    ON BEHALF OF PLAINTIFF, CARTER BRYANT:

 4                          KEKER & VAN NEST LLP
                            BY:   JOHN W. KEKER
 5                          710 SANSOME STREET
                            SAN FRANCISCO, CALIFORNIA  94111-1704
 6                          (415) 391-5400

 7

 8    ON BEHALF OF DEFENDANT MATTEL, INC.:

 9                          QUINN EMANUEL
                            BY:   JOHN B. QUINN
10                          BY:   B. DYLAN PROCTOR
                            BY:   MIKE ZELLER
11                          865 S. FIGUEROA STREET,
                            10TH FLOOR
12                          LOS ANGELES, CALIFORNIA  90017
                            (213) 624-7707
13

14

      ON BEHALF OF DEFENDANTS MGA ENTERTAINMENT AND ISAAC LARIAN:
15
                            O'MELVENY & MYERS LLP
16                          BY:   DALE CENDALI
                            7 TIMES SQUARE
17                          NEW YORK, NEW YORK  10036
                            (212) 326-2000
18
                            CHRISTENSEN, GLASER, FINK,
19                           JACOBS, WEIL & SHAPIRO, LLP
                            BY:   PATRICIA GLASER
20                          10250 CONSTELLATION BOULEVARD
                            LOS ANGELES, CALIFORNIA  90067
21                          (310) 553-3000

22

23    ALSO PRESENT:         SHIRLEY MORALES

24

25                    EXHIBIT ____ 16

                      PAGE ____ 167
```

1        RIVERSIDE, CALIFORNIA; MONDAY, JULY 2, 2007; 1:51 P.M.

2                              -OOO-

3            THE CLERK:   CALLING CALENDAR ITEM 11, CARTER BRYANT,

4    ET AL., VERSUS MATTEL, INC., ED CV 04-09049, AND RELATED

5    ACTIONS, CV 04-09049-SGL.                                        03:11

6            MAY WE HAVE COUNSEL PLEASE COME FORWARD AND STATE

7    YOUR APPEARANCES FOR THE RECORD.

8            MR. QUINN:   JOHN QUINN, MIKE ZELLER, DYLAN PROCTOR

9    FOR MATTEL.

10           MR. KEKER:   JOHN KEKER FOR MR. BRYANT.              01:51

11           MS. CENDALI:   DALE CENDALI FOR MGA, MR. LARIAN.

12           MS. GLASER:   PATRICIA GLASER FOR ISAAC LARIAN AND MGA

13   AS WELL.

14           THE COURT:   WE'RE ON CALENDAR THIS AFTERNOON FOR

15   THREE MATTERS.                                                   01:51

16           FIRST OF ALL, MGA'S MOTION REGARDING THE MAY 15, 2007

17   ORDER OF THE DESIGNATED MASTER, THE SPECIAL MASTER.   THERE'S

18   ALSO AN EX-PARTE APPLICATION RELATED TO THAT.  MGA'S MOTION

19   REGARDING THE MAY 16, 2007 ORDER; AND THEN, FOR LACK OF A

20   BETTER PHRASE, THE TRIAL-PHASING MOTION, WHICH, ESSENTIALLY, I   01:51

21   CARRIED OVER FROM A MOTION BROUGHT BY MATTEL EARLIER.

22           THOSE ARE THE THREE MOTIONS THAT I'D LIKE TO GET

23   THROUGH TODAY, AND THEN, HOPEFULLY, ISSUE AN ORDER LATER THIS

24   WEEK ON ALL THREE OF THOSE.

25           MS. GLASER:   WE HAVE, ACTUALLY, GOOD NEWS IN           01:52

EXHIBIT ___16___

JULY 2, 2007    PAGE ___148___    CV04-09049-SGL

1  BEEN A MOVING TARGET.  WE'RE NOW TOLD THAT DOMESTIC DOCUMENTS

2  AREN'T EVEN GOING TO BE AVAILABLE FROM MGA UNTIL THE END OF

3  JULY, AND THEN TWO WEEKS BEYOND THAT FOR HONG KONG.

4       THE COURT, I'M SURE, IS AWARE THAT BACK IN FEBRUARY,

5  WHEN WE MADE THIS MOTION, MGA REPRESENTED TO JUDGE INFANTE THAT       02:25

6  THEY WERE IN THE PROCESS OF COLLECTING THOSE DOCUMENTS AND

7  WOULD BE PRODUCING THEM.

8       THE COURT:  DO WE HAVE ANY REASON TO BELIEVE THEY'RE

9  NOT WORKING AS HARD AS THEY CAN TO GET THESE DOCUMENTS

10 PRODUCED?                                                            02:25

11      MR. ZELLER:  I DON'T KNOW IF THAT'S THE ISSUE AT THIS

12 POINT, YOUR HONOR.

13      THERE WAS A COURT ORDER TELLING THEM IN FEBRUARY --

14 OR, EXCUSE ME, AT THE HEARING IN MARCH, THAT THEY WERE GOING TO

15 HAVE TO PRODUCE THESE DOCUMENTS, AND THEY ADMITTED THAT THEY         02:25

16 DIDN'T EVEN START DOING THAT UNTIL NOW.

17      SO, YOUR HONOR, I THINK IT'S A LITTLE LATE JUST IN

18 TERMS OF WHETHER OR NOT THEY'RE WORKING HARD.

19      THE FACT IS, TOO, ON THE HONG KONG DOCUMENTS, THERE

20 IS EVIDENCE THAT THEY CAN ACCESS, AT LEAST THE ELECTRONIC            02:25

21 DOCUMENTS THAT THEY HAVE IN HONG KONG, FROM THE UNITED STATES.

22 AND THAT HAS NOT BEEN ADDRESSED AT ALL.

23      SO, I MEAN, LOOK, JUDGE INFANTE HAS OBVIOUSLY BEEN

24 SUPERVISING DISCOVERY NOW FOR MANY MONTHS.  HE PASSED ON THE

25 EXCUSES THAT MGA GAVE HIM AS TO WHY THEY HAD NOT COMPLIED WITH       02:26

EXHIBIT ____16____

JULY 2, 2007      PAGE ___169___   CV04-09049-SGL

1   HIS ORDER, AND HE FOUND THEM TO BE WANTING.  THAT'S NOT CLEAR

2   ERROR.  THAT'S, IN FACT, QUITE SUPPORTED BY THE RECORD.

3          WE ARE GIVEN A MOVING TARGET OF WHEN IT IS THAT MGA

4   SAYS IT'S GOING TO EVENTUALLY COMPLY WITH THIS ORDER ON

5   DOCUMENTS THAT WE HAVE BEEN SEEKING FOR QUITE SOME TIME, AND,       02:26

6   AS THE COURT POINTED OUT EARLIER THIS YEAR, ARE THE SAME

7   CATEGORIES OF DOCUMENTS THAT SHOULD HAVE BEEN PRODUCED UP

8   FRONT.

9          AND, OF COURSE, WE WERE ALSO TOLD LAST WEEK THAT MGA

10  WAS GOING TO PRODUCE ITS DOMESTIC DOCUMENTS BY THE END OF THIS      02:26

11  WEEK.

12         THE COURT:  IS THAT TRUE?

13         MS. CENDALI:  WE TOLD THEM THAT WE INTENDED TO

14  SUBSTANTIALLY COMPLY WITH THE ORDER FOR THE DOMESTIC DOCUMENTS,

15  WHICH IS WHY, AS OF FRIDAY, WE PRODUCED ANOTHER 10,000            02:26

16  DOCUMENTS.

17         I'M TOLD THAT WE'RE TRYING TO DO CLEAN-UP ANALYSIS

18  AND WE'RE TRYING TO DO A GOOD JOB AND SEE IF WE CAN FIND

19  EVERYTHING THAT MIGHT BE THERE.

20         I DON'T KNOW HOW MUCH IS LEFT.  I'M TOLD THAT THERE          02:27

21  MAY BE SOME HARD COPIES, SOME ADDITIONAL ELECTRONIC --

22         THE COURT:  SO THIS ADDITIONAL FOUR WEEKS THAT YOU'RE

23  ASKING FOR AT THIS POINT FOR THE DOMESTIC DOCUMENTS, YOU DON'T

24  ANTICIPATE A LARGE VOLUME IN THAT FOUR WEEKS?

25         MS. CENDALI:  CORRECT.                                      02:27

EXHIBIT ___ 16

JULY 2, 2007    PAGE___ 170    CV04-09049-SGL

1        I'M DOING THE BEST I CAN, YOU KNOW.  I THINK HE WANTS

2    MORE DOCUMENTS RATHER THAN FEWER DOCUMENTS, AND WE'RE SEARCHING

3    HARD TO GET EVERY POSSIBLE DOCUMENT THAT WE CAN.

4        THE COURT:  THE INTERNATIONAL, DO THEY HAVE THE BULK

5    OF THE INTERNATIONAL DOCUMENTS?                                02:27

6        MS. CENDALI:  WELL, YES AND NO.

7        ON THE INTERNATIONAL DOCUMENTS -- AND I THINK THESE

8    ARE THE KEY DOCUMENTS -- BACK IN THE DAY, BACK IN 2004, WE

9    PRODUCED OUR INITIAL PRODUCTION OF 10,000 DOCUMENTS LONG

10   BEFORE, YOUR HONOR, MATTEL EVER PRODUCED ANYTHING RELEVANT TO   02:27

11   THIS CASE.  AND I REALIZE THAT IT'S NOT GOOD TO GET INTO

12   TIT-FOR-TAT ARGUMENTS ON THIS; BUT THERE WILL COME A TIME WHERE

13   YOU WILL SEE THE NATURE OF MATTEL'S POOR DOCUMENT PRODUCTIONS

14   TO-DATE.  BUT I'M PUTTING A PIN IN THAT FOR RIGHT NOW.

15       WHAT I'M SAYING IS, WE PRODUCED, BACK IN 2004 -- AND       02:28

16   THERE WERE DEPOSITIONS ON THEM THAT BOTH PARTIES HAVE REALIZED

17   WERE THE CORE DOCUMENTS IN THE CASE.  THESE INCLUDED

18   COMMUNICATIONS BETWEEN HONG KONG AND MGA HONG KONG, WHICH ONLY,

19   AS OF JUNE 27TH, WHEN YOUR HONOR ISSUED HIS ORDER WITH REGARD

20   TO THE MOTION TO DISMISS, WAS EVEN DEFINITELY A PARTY TO THIS   02:28

21   CASE.  BUT THE COMMUNICATIONS BETWEEN THE U.S. AND HONG KONG

22   HAD PREVIOUSLY BEEN PRODUCED.  SO WHAT YOU'RE TALKING ABOUT NOW

23   ARE INTERNAL HONG KONG DOCUMENTS.

24       THE COURT:  VERY WELL.

25       LET ME HEAR YOUR FURTHER RESPONSES ON THE 30(B)(6),        02:28

EXHIBIT ____16

JULY 2, 2007    PAGE ____171    CV04-09049-SGL

1    THINGS BETWEEN THE TWO, AND IT WOULD SAVE 10,000 COPIES AND INK

2    TESTS AND STUFF LIKE THAT.

3            THE COURT:  WELL, I'LL TAKE A REAL CLOSE LOOK AT YOUR

4    COMPLAINT, AND WE'LL GO FROM THERE.  OKAY?

5            MS. MORALES:  OKAY.  THANK YOU.                    02:43

6            THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH, MA'AM.

7            MS. CENDALI:  THANK YOU, YOUR HONOR.

8            MS. GLASER:  THANK YOU, YOUR HONOR.

9            THE COURT:  WE'LL TAKE A BRIEF RECESS BEFORE THE

10   CRIMINAL CALENDAR.                                        02:43

11           THE CLERK:  THIS COURT IS NOW IN RECESS.

12

13

14

15

16

17                          CERTIFICATE

18

19   I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
     STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
20   THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE ABOVE-
     ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
21   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
     THE UNITED STATES.

22

23   _____          8-13-07
     THERESA A. LANZA, CSR, RPR                  DATE
24   FEDERAL OFFICIAL COURT REPORTER

25                          EXHIBIT _____ 16 _____

                            PAGE _____ 172 _____

# EXHIBIT 17

11-15-05

KAYE SCHOLER LLP
Larry R. Feldman, Bar Number 45126
Robert M. Turner, Bar Number 44075
Matthew G. Clark, Bar Number 233736
1999 Avenue of the Stars, Suite 1700
Los Angeles, California 90067
Telephone: (310) 788-1000
Facsimile: (310) 788-1200

Attorneys for Respondent
ISAAC LARIAN

ARBITRATION

| | |
|---|---|
| FARHAD LARIAN, | ADRS CASE NO. 05-2096-ABH |
|     Claimant, | LASC CASE NO. BC 301371 |
|   v. | **RESPONSE TO NEW ISSUES IN FARHAD LARIAN'S OPENING ARBITRATION BRIEF** |
| ISAAC LARIAN, | |
|     Respondent. | |

EXHIBIT _____17_____

PAGE _____173_____

1

23183692.DOC

CC 00801

## I.   INTRODUCTION

Claimant Farhad Larian ("Farhad") has had the same goal since 2003: He wants to get a piece of "Bratz." Consistent factual or legal theories, however, have never been important to Farhad. Now, two days before trial, Farhad has submitted a trial brief in which he asserts for the first time a number of new theories that do not appear in his pleadings. Accordingly, Respondent Isaac Larian ("Isaac") submits this response to address Farhad's eleventh hour legal maneuvering.

Unfortunately for Farhad, none of the new arguments changes the fact that Farhad is entitled to no recovery on his claims. *First*, Farhad has invented a brand-new mutual mistake argument, claiming that he and Isaac thought Morad Zarabi ("Morad") had decided the sales price of MGA exclusively from an appraisal. This cause of action was not alleged in the arbitration complaint and, for that reason alone, should be barred. Moreover, this argument is wholly without merit. The contract itself provides that Morad set the price through his own investigation – not from any appraisal. Isaac obviously understood the clear terms of the contract, and was not mistaken about Morad's decision making process, thus precluding relief for mutual mistake. Further, Isaac did not know of or encourage Farhad's purported belief in complete variance with the contract, thus precluding relief for unilateral mistake under California law.

*Second*, Farhad has announced two new purported reasons why Isaac should have told Farhad about "Bratz." Farhad first claims that Isaac knew "special facts" that generated a fiduciary duty to disclose. But Isaac had no "special facts" here. "Bratz" was not a secret – Farhad had received emails about "Bratz." Farhad also claims that Isaac was actively concealing "Bratz" from him and therefore had a duty to speak. But Farhad's so-called "evidence" of active concealment is paper-thin and wholly unconvincing. Accordingly, Isaac had no duty to disclose "Bratz" to Farhad.

As explained in his Motion *in Limine*, it is Isaac's position that no evidence regarding the alleged activities of Morad and Ernest Dutcher is subject to judicial review. Farhad contends that Dutcher will testify that Morad ordered him to alter his appraisal in order to understate the market

2

23183692.DOC

EXHIBIT _____17_____     CC 00802

PAGE _____174_____

1   value of MGA. If Dutcher so testifies, he either will have severely misremembered his

2   conversations or will providing deliberately false testimony. Dutcher, in a tape recorded

3   conversation, admits that Morad never gave Dutcher any such instruction.

4   **II.    FARHAD'S LAST-MINUTE THEORY OF MUTUAL MISTAKE FAILS ON THE LAW AND FACTS**

5           Two days before trial, Farhad has invented a new legal theory: he is entitled to rescind the

6   December 4, 2000 Agreement because he and Isaac executed it under a mutual mistake. According

7   to Farhad, both he and Isaac believed that Morad had set the price of MGA using the exact number

8   reported in an appraisal. According to Farhad, the December 4, 2000 Agreement must therefore be

9   rescinded for mutual mistake. But Farhad's position is both factually incredible and legally

10  untenable.

12          In the first place, Farhad's factual position is preposterous. As both Isaac and Farhad well

13  knew, Morad determined the price that would be paid for MGA through consultations with the

14  parties and through his own outside investigation. The December 4, 2000 Agreement clearly

15  provides that Morad has determined the price of MGA "from consultations with each of the parties

16  and by undertaking his own outside independent research." It plainly does *not* say that "Morad has

18  adopted the price as determined in an appraisal." This memorialization is perfectly consistent with

19  the parties' understanding.

20          The simple truth is that the parties did not hire Morad simply to obtain an appraisal of MGA.

21  Morad was, after all, a family member settling a family dispute. Morad was also a highly successful

22  businessman and was capable of determining a fair price and working out the brothers' differences

23  in a manner that was acceptable to both parties. Accordingly, Morad was charged to find a solution

24  to allow one brother to buy the other out. If the brothers had wanted to find the exact appraised

25  value of MGA, they would have hired an appraiser instead of an arbitrator. At the very least, they

26  would have provided in the September 28, 2000 Agreement to Arbitrate that Morad would determine

27  the price of MGA from an appraisal. Instead, the September 28, 2000 Agreement never mentions an

3

EXHIBIT _____ 17

PAGE _____ 175

CC 00803

KAYE SCHOLER LLP

1    appraisal, but provides instead that Morad may admit whatever evidence he chooses to settle the

2    brothers' dispute.

3        As it happened, Morad chose during his investigation to employ the services of an appraiser

4    to help him determine a fair price for MGA. As noted above, Morad was under no contractual

5    obligation even to obtain an appraisal, much less to use that appraisal as the sole basis for selecting a

6
7    sale price for MGA. Instead, Morad used the appraisal to assist him in his own investigation to help

8    him weigh the evidence presented to him by the Larian brothers. Notably, Morad kept the results of

9    the appraisal for his own use and did not share them with either Isaac or Farhad. Clearly, if the

10   parties expected Morad simply to regurgitate the appraiser's bottom line, it would have made no

11   sense for Morad to keep the appraisal for his own use.

12       But the parties understood that Morad was serving as an arbitrator, and that Morad had set

13   the price using his consultations with the parties and his own personal investigation. This fact was

14
15   specifically memorialized in the December 4, 2000 Agreement about which Farhad claims mistake.

16   That agreement provides that Morad has determined the price of MGA "from consultations with

17   each of the parties and by undertaking his own outside independent research."

18       Given these clear contractual terms, Farhad is estopped as a matter of law from claiming that

19   he thought Morad had only used the appraisal to set the price of MGA. Parties are deemed to know

20   the terms of their written contracts as a matter of law. "The general rule is that when a person with

21   the capacity of reading and understanding an instrument signs it, he is, in the absence of fraud and

22
23   imposition, bound by its contents, and is estopped from saying that its provisions are contrary to his

24   intentions or understanding." *Jefferson v. California Dept. of Youth Authority*, 28 Cal. 4th 299, 303

25   (2002). Even if Farhad legitimately had been mistaken, therefore, he cannot rescind the December

26   20, 2000 Agreement. Farhad is presumed to know the plain terms of his contract and is bound by

27   them. Accordingly, Farhad's eleventh hour legal theory of mutual mistake must fail. Factually,

28

KAYE SCHOLER LLP

4

23183692.DOC

EXHIBIT 17

PAGE 176

CC 00804

1    Farhad's theory cannot succeed given the terms of the contract and surrounding circumstances as

2    summarized above.

3        In any event, Farhad is estopped to events directly contradicted by his contract.

4    III.  FARHAD'S THEORY OF UNILATERAL MISTAKE FAILS BECAUSE FARHAD CANNOT SHOW
5         THAT ISAAC KNEW OF AND ENCOURAGED FARHAD'S PURPORTED MISTAKE

6        Even if Farhad recharacterizes his theory as a unilateral mistake, he still cannot prevail.

7    Farhad's claim that he somehow made a mistake about Morad's setting the price when the contract

8    clearly explained Morad's methods remains highly implausible. Moreover, Farhad remains estopped

9    to deny that his understanding was anything other than the plain provisions of the December 4, 2000

10   Agreement for the reasons set forth above.

11       Further, Farhad cannot rescind because of his purported mistake because he does not allege

12   that Isaac knew of and encouraged the mistake. If California law permitted a party to rescind a

13   contract whenever he claimed a unilateral mistake, few if any contracts would be enforced.

14   Accordingly, California law permits rescission for unilateral mistake only where the non-mistaken

15   party knows of the mistake and takes advantage of the other party by "encourag[ing] or foster[ing]"

16   that mistake. *E.g., Bunnett v. Regents of University of California*, 35 Cal. App. 4th 843, 854-55

17   (1995) ("[R]escission is available for a unilateral mistake, when the unilateral mistake is known to

18   the other contracting party and is encouraged or fostered by that party."). In *Bunnett*, the Court of

19   Appeal refused to allow rescission on the basis of unilateral mistake because "[p]laintiff submitted

20   no evidence that defendant knew about his mistake and encouraged or fostered the mistake."

21

22       In this case, there is no evidence that Isaac knew about Farhad's purported mistake, much

23   less that Isaac "encouraged or fostered" that mistake. No rational person could possibly believe that

24   his contracting partner thought a price was based exclusively on an appraisal where the contract

25   explicitly stated that the price was determined from the arbitrator's "consultations with each of the

26   parties and by undertaking his own outside independent research." Farhad has alleged no facts to

5

23183692.DOC

EXHIBIT ___17___

PAGE ___177___

CC 00805

KAYE SCHOLER LLP

1  show knowledge or encouragement by Isaac of Farhad's purported mistake. Farhad's unilateral

2  mistake of fact argument, therefore, fails as a matter of law.

3  IV.   ISAAC WAS UNDER NO DUTY TO DISCLOSE THE "BRATZ" LINE OF DOLLS TO FARHAD.

4       In general, a party is under no obligation to make a disclosure to a contracting partner except

5  in certain limited situations, such as when (1) he is under a fiduciary duty; or (2) he actively conceals

6  a material fact. *See, e.g., Warner Const. Corp. v. Los Angeles*, 2 Cal. 3d 285, 294 (1970). In this

7  case, there is no basis for imposing a fiduciary duty on Isaac, because the parties were equal

8  shareholders and each had access to all relevant information. Further, Isaac never concealed any

9  material fact from Farhad. Farhad knew about "Bratz" before he sold his stock. Farhad has not

10  advanced any other legal theory regarding why Isaac was under a duty to tell him about "Bratz."

11  Accordingly, Isaac was under no duty to tell Farhad about "Bratz."

12       A.    ISAAC OWED NO FIDUCIARY DUTY TO FARHAD.

13       The courts have held that no fiduciary duty applies among equal shareholders. *Persson v.*

14  *Smart Inventions, Inc.*, 125 Cal. App. 4th 1141 (2005), which Farhad cites extensively in his trial

15  brief, reiterates this point. *Persson* held that *no fiduciary duty* generally exists between equal

16  shareholders negotiating the sale of a closely held corporation. *Id. Persson* clearly states that:

17       The evidence, at most, is that Nokes undertook to tell Persson everything about the

18       current state of the business, and Persson trusted him to do so. . . . [W]e reject the

19       notion that a confidential relationship may arise, in the course of arms-length buyout

20       negotiations between two equal shareholders of a corporate enterprise, both of whom

21       are represented by counsel and accountants, simply because one undertakes to "paint

22       you the truest picture possible of where the company is right now," and the other

23       relies on him to do so. (*Persson*, 125 Cal. App. 4th at 1162)

KAYE SCHOLER LLP

6

23183692.DOC

CC 00806

EXHIBIT _____ 17

PAGE _____ 178

1    Nor does Isaac's purported superior knowledge create a fiduciary duty. The *Persson* court expressly

2    held that Nokes' superior knowledge was not enough to make one party "weaker" and the other

3    "stronger." *Id.* at 1161-62. Thus, the court held: "We decline to extend the scope of fiduciary

4    obligations to an arms-length negotiation for the sale of shares in a corporate enterprise. The trial

5    court erred in doing so, and the judgment awarding damages for breach of fiduciary duty must be

6

7    reversed." *Id.* at 1162.

8      Farhad attempts to resuscitate his claim by arguing that Isaac was his fiduciary pursuant to

9    the "special facts" doctrine articulated by *Hobart v. Hobart Estate Co.*, 26 Cal. 2d 412 (1945). *See*

10    Farhad's Trial Brief at 13-15. Under that doctrine, a director must disclose "knowledge of special

11    facts" to a shareholder before making a purchase or sale of stock.

12      But the development of "Bratz" was common knowledge at MGA and did not constitute a

13    "special fact." In *Hobart*, the "special fact" was known only to the director because "the books of

14    the company . . . contained inaccurate valuations of the company's assets so that it would have been

15    impossible for plaintiff to have ascertained the true value of his stock from this source." 26 Cal. 2d

16

17    at 432. Here, in contrast, the "Bratz" license and other relevant information were in the company's

18    records and were fully available to Farhad, who was a significant shareholder and owner.

19      Indeed, the items alleged could hardly be "special facts" when Farhad's own evidence is that

20    "former employees of MGA will testify that there was prolific email traffic regarding Bratz." *See*

21

22    Farhad's Trial Brief at 4. It is inconceivable that a subject about which "there was prolific email

23    traffic" will constitute "special knowledge" upon which there rests a fiduciary duty.

24      Farhad could have spoken to any of his employees who received the "prolific email traffic"

25    that he alleges in his Trial Brief; and he could have hired accountants, lawyers, or other professionals

26    to assist him. It simply is inconceivable that the facts that were fully available to him – had he

27

28

KAYE SCHOLER LLP

endeavored to look or ask -- can be construed as "special knowledge" giving rise to a special fiduciary duty.

Accordingly, Isaac did not owe Farhad a fiduciary duty with regard to Farhad's sale of stock, and was under no duty to disclose to Isaac the development of the "Bratz" doll line.

**B.    ISAAC DID NOT ACTIVELY CONCEAL A MATERIAL FACT FROM FARHAD.**

As explained in Isaac's trial brief, at the time of the parties' agreements, "Bratz" did not yet exist as anything more than one potential toy among numerous projects under development at MGA. Although Isaac was optimistic about "Bratz," it was impossible to predict whether "Bratz" would have any significant positive or negative impact on MGA's financial prospects. Thus, there was no presently existing material fact for Isaac to conceal from Farhad.

But even if "Bratz" constituted a material fact, *Farhad has pointed to no evidence suggesting that Isaac concealed "Bratz" from him.* As noted in Isaac's trial brief, Farhad was sent email messages before he signed the December 4, 2000 Agreement asking him to work on "Bratz." In fact, Farhad would later perform work on "Bratz," including trademarking and shipping arrangements.

Farhad's only claim of concealment is that Isaac purportedly told an MGA employee in October 2000 that Isaac "owned the business." *See* Farhad's Trial Brief at 20-21. This allegation, even if true, was factually accurate -- Isaac did own 45% of MGA in October 2000.

More importantly, however, this kind of purported concealment does not come close to the level of actual fraudulent concealment necessary to impose a duty to disclose a material fact. *Persson v. Smart Inventions*, 125 Cal. App. 4th 1141 (2005), cited by Farhad, provides a sharp contrast with Isaac's alleged activity in this case and shows why there was no fraudulent concealment here.

23183692.DOC

**CC 00808**

EXHIBIT ___17___

PAGE ___180___

1    Unlike this case, *Persson* was a case of classic fraud. In *Persson*, Jon Nokes and Thomas

2    Persson owned equal shares of stock in a closely held corporation. *Id.* at 1147. Subsequently, they

3    decided that Persson would sell his corporate shares to Nokes. *Id.* at 1148. Nokes told Persson he

4    would personally "paint [Persson] the truest picture possible of where the company is right now."

5    *Id.* Nokes personally prepared detailed analyses of the corporation and its circumstances. He

6    reported to Persson on the various deals he had made or was negotiating. *Id.*

7

8    In the context of his report, Nokes made to Persson a number of material claims that were

9    demonstrably false and fraudulent. Nokes specifically represented to Persson that there were no new

10   promotional campaigns in development. *Id.* Nokes also told Persson that the company was losing

11   considerable money each month; that he was unaware of any present or future business opportunities

12   which might change the company's financial condition going forward; and that they would have to

13   reduce the factory workforce by two-thirds, terminate his and Persson's salaries, cut the salaries of

14   salespeople and factory management by 40 percent minimum, and reduce their work week to three

15   days if necessary. *Id.* at 1148-49.

16

17   After making the foregoing fraudulent statements, Nokes made Persson a purchase offer,

18   which Persson accepted. *Id.* at 1149.   Nokes and Persson finalized the deal a month later. *Id.* But

19   on the very same day that Nokes finalized the deal with Persson, he launched an infomercial for the

20   Tap Light product which – within just 72 hours – was "an unmitigated success" that "generated

21   millions of dollars in revenue." *Id.* at 1146, 1149.

22

23   On these facts, the court had no trouble deciding that Nokes had fraudulently concealed the

24   Tap Light development from Persson. *Id.* at 1164-65. At the same time he was unambiguously

25   telling Persson there was no new product in the "corporate pipeline," Nokes had arranged for the

26   professional production of the infomercial by a well-known producer and infomercial host. *Id.* at

27

28                                                                      **CC 00809**

9

23183692.DOC

EXHIBIT _____ 17

PAGE _____ 181

1148-49, 1164.  He omitted all of this even as he offered to painstakingly "paint [Persson] the truest picture possible of where the company is right now."  *Id.* at 1148-49.

In the instant case, Farhad never alleges any such fraudulent misrepresentations by Isaac. Isaac did not provide his opinion about future prospects for any of the existing toys and future concepts in the company's product line.  Neither Farhad nor Morad ever requested any such item-by-item analysis from Isaac.

Critically, Farhad has never even alleged that Isaac misrepresented anything.  Farhad has never claimed that Isaac was asked about "Bratz" and lied, nor that Isaac told anyone to hide "Bratz" from Farhad.  This is nothing like the active concealment of the Tap Light discussed in *Persson*.

Because Isaac was not actively concealing "Bratz" from Farhad, Isaac was under no legal duty to tell Farhad about "Bratz."  Accordingly, Farhad cannot rescind the December 4, 2000 Stock Sale Agreement or obtain damages.

## VI.  CONCLUSION

As stated in Isaac's Trial Brief and for the foregoing reasons, none of Farhad's last-minute legal theories entitles him to any relief against Isaac.  Accordingly, the Arbitrator should enter an award that Farhad take nothing on his claims.

DATED: November 15, 2005 .

KAYE SCHOLER LLP

By: _Larry R. Feldman_
Larry R. Feldman
Attorneys for Respondent
ISAAC LARIAN

CC 00810

10

23183692.DOC

EXHIBIT ___17___

PAGE ___182___

KAYE SCHOLER LLP

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is KAYE SCHOLER LLP, 1999 Avenue of the Stars, Suite 1700, Los Angeles, California 90067-6048.

On November 15, 2005, I served the foregoing document described as:

**RESPONSE TO CLAIMANT'S OPENING ARBITRATION BRIEF**

by placing a true copy of the above entitled document in a sealed envelope addressed as follows:

| | |
|---|---|
| Michael Brown<br>Richard L. Kellner<br>Kabateck Brown Kellner LLP<br>350 South Grand Avenue, 39th Floor<br>Los Angeles, CA 90071<br>Ph: (213) 217-5000<br>Fax: (213) 217-5010 | Hon. Alan B. Haber<br>ADR Services Inc.<br>1900 Avenue of the Stars, Suite 250<br>Los Angeles, CA 90067<br>(Personal Delivery) |
| Robert G. Wilson<br>Cotkin, Collins & Ginsburg<br>300 South Grand Ave., 24th Floor<br>Los Angeles, CA 90071-3134<br>Ph: (213) 688-9350<br>Fax: (213) 688-9351 | |

__X__   by FACSIMILE

__X__   by U.S. MAIL (I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.)

Executed on November 15, 2005, at Los Angeles, California.

_Rita Mehler_
Rita Mehler

CC 00811

EXHIBIT PROOF OF SERVICE **17**

PAGE **163**

# EXHIBIT 18



**KAYE SCHOLER** LLP **RECEIVED**

**FEB 1 5 2008**

1999 Avenue of the Stars, Suite 1700
Los Angeles, California 90067-6048
310 788-1000
Fax 310 788-1200
www.kayescholer.com

Bryant S. Delgadillo
310 788-1341
Fax 310 788-1200
bdelgadillo@kayescholer.com

February 14, 2008

**VIA OVERNIGHT MAIL**
Juan Pablo Alban
Quinn Emanuel
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017

Re:  **Mattel v. Bryant, et al. Case No.: CV 04-9049-SGL(RNBx)**

Dear Mr. Alban:

As we discussed on the telephone yesterday, although Kaye Scholer had no obligation to search for and produce documents outside of the scope of Judge Infante's January 25 Order, I have located a copy of a rough transcript from the 2005 *Larian v. Larian* proceeding (which was found in a file that Kaye Scholer was *not* ordered to review for responsive documents). Without waiving any objections or expanding the scope of Kaye Scholer's obligation under the January 25 Order, I have agreed to provide you a copy of the transcript. The transcript is bates labeled KS10825-KS10994. Please note the appropriate level of confidentiality indicated on the documents. These documents are being produced pursuant to the stipulated Protective Order entered by the Court in this case, and we trust that they will be treated accordingly.

Lastly, I remind you of your obligation to remit payment for the cost of copying and bates labeling the documents which were produced to you on January 30, 2008. We have still not receive payment for this cost (which was $2,519.15).

Sincerely yours,

Bryant S. Delgadillo

BSD:vjh

cc:  Jose R. Allen (w/out enclosures)
23239231.DOC

**18**

NEW YORK · CHICAGO   LOS ANGELES   WASHINGTON, D.C.   WEST PALM BEACH   FRANKFURT   LONDON   SHANGHAI

EXHIBIT _____

PAGE _____ 164

# EXHIBIT 19





## KABATECK
## BROWN
## KELLNER LLP

350 SOUTH GRAND AVENUE, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3801
TEL: (213) 217-5000   FAX: (213) 217-5010
WWW.KBKLAWYERS.COM

November 10, 2005

**Via Facsimile & U.S. Mail**
The Honorable Alan B. Haber
ADR Services, Inc.
1900 Avenue of the Stars
Suite 250
Los Angeles, CA  90067

Re:      In re Arbitration Between Farhad Larian and Isaac Larian
         ADRS Case No. 05-2096-ABH

Dear Judge Haber:

This firm, along with Cotkin, Collins & Ginsburg, represents Fred Larian in the above-referenced arbitration. In anticipation of the November 16, 2005 arbitration hearing, we write to you regarding a number of administrative issues.

First, pursuant to your Honor's scheduling order, the parties were provided with the opportunity to proffer pre-arbitration briefs to you five days prior to the hearing. We have discussed this matter with Isaac Larian's counsel, who have stated that they will not be prepared to proffer the briefs until Monday, November 14, 2005. In light of your Honor's prior Order, would you prefer that we submit the brief to you on Friday, November 11, 2005, and exchange the brief with counsel on Monday, November 14, 2005?

Second, Claimants have retained Barkley Court Reporters to record the arbitration proceedings. Respondent's attorneys have indicated that they are not interested in sharing the costs of the court reporter.

Third, Mercedeh Ward is a key witness to this arbitration who resides in Colorado and cannot leave her children to attend this arbitration. However, Ms. Ward has agreed to testify via a two-way live video hookup from a Denver location. Claimants have determined that ADR does not have the in-house technology to permit this hook-up, but Barkley Court Reporters can bring the appropriate equipment into ADR to facilitate the live video testimony. Does your Honor have any objection to Claimants bringing in an outside vendor to facilitate the live video testimony of this witness?

CC 00125

LOS ANGELES  •  PHOENIX  •  NEWPORT BEACH  •  SACRAMENTO  •  LAS VEGAS

EXHIBIT _____

PAGE _____ 185

Finally, Claimants request that the proceedings on Friday, November 18, 2005 conclude at 3:30 p.m. I am one of the two trial attorneys representing Fred Larian and am an orthodox Jew. I must conclude my workday at that time so that I can be home before the beginning of my Sabbath.

Respectfully submitted,

KABATECK BROWN KELLNER LLP

Richard L. Kellner

cc:    Robert Wilson, Esq. (via facsimile)
       Larry Feldman, Esq. (via facsimile)

CC 00126

EXHIBIT ___19___

PAGE ___186___

# EXHIBIT 20

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# EXHIBIT 21

10786
(scanned)
ORIGINAL

## DECLARATION OF MERCEDEH WARD

I, Mercedeh Ward, hereby declare and state as follows:

1. I am a resident of the State of Colorado, and from 1985 through October 2005, I have been employed in various capacities in the toy industry. I have personal knowledge of the facts contained herein and, if called to testify, would and could testify competently and from personal knowledge as to these facts.

2. I was born in Teheran, Iran, and came to the United States on December 31, 1978, at the age 13.

3. I have a degree in mechanical engineering from Worchester Polytechnic Institute, in Worchester, Massachusetts.

4. In 1985, I was employed by Mattel at its Hawthorne, California facility. My initial position with the company was in design and development, as a designer's aid.

5. During the next 15 years, I held positions as a senior engineer, project administrator and project designer. As part of my responsibilities, I was intimately involved in design and development of Barbie dolls and accessories.

6. In 2000, the design and development department for Barbie where I was employed was comprised of approximately 12 workers, including about 6 designers.

7. In the Fall of 2000, I was on disability leave from Mattel (I had back surgery as a result of an accident at work). At the time, Mattel had advised me that there were no positions available for me upon my return from disability.

8. In or around October 2000, Victoria O'Connor from MGA contacted me and asked me to come in for an interview. When I asked her how she had gotten my name, she stated that Carter Bryant had provided MGA with my name. Carter Bryant was another Mattel employee in the Barbie design and development department that I had worked.

9. In the early to middle of October 2000, I had an interview with Isaac Larian, who introduced himself to me as the owner of MGA.

1

KBK 02073

Declaration Of Mercedeh Ward

**EXHIBIT** 21

**PAGE** 214

10. Isaac Larian showed me sketches of the Bratz doll concept, and he asked me to develop the dolls for production and sale. He offered me a senior position as a product designer and engineering manager.

11. Mr. Larian told me that he wanted the dolls available for presentation at the Hong Kong Toy Fair and the New York Toy Fair.

12. Mr. Larian stated that there was no one at the company capable of completing the design of the Bratz doll, and that he had heard a great deal of good things about me.

13. Isaac Larian made it very clear to me at this initial meeting, and throughout my employment, that Bratz was no ordinary toy design concept. At our first meeting, Isaac Larian told me that he was going to "beat Mattel at the game."

14. The Bratz doll was to be my main area of concentration.

15. Based upon Isaac Larian's representations, I accepted Isaac Larian's offer and immediately started working at MGA in October 2000.

16. When I started working at MGA, they had already begun sculpting the head for the Bratz doll.

17. During the next few months, I met with Carter Bryant on an almost daily basis to work on the design and production of the Bratz dolls.

18. On a daily basis, I spoke with Isaac Larian about the Bratz dolls, and he was extremely excited about the product. In my observations, Isaac Larian was more excited about Bratz than any other project that was in development.

19. In fact, Isaac Larian told me on repeated occasions in 2000 that money was no impediment to complete the development and production of Bratz.

20. Within two or three weeks at the job, Isaac Larian sent me and Carter Bryant to Hong Kong to approve manufacturers and source fabrics for the Bratz dolls.

21. I was also made aware of the fact that prior to December 6, 2000, MGA had conducted focus groups and tests of the Bratz dolls on children and mothers. Some of the

2

Declaration Of Mercedeз Ward

**EXHIBIT** 21

**PAGE** 215

**KBK 02074**

focus groups were at MGA, and others were at off-site locations (including an elementary school).

22. The results of the focus groups were always amazing. In fact, I was personally surprised that the mothers even liked the name "Bratz."

23. In 2000, I had limited interaction with Fred Larian. I was instructed by Isaac Larian that Fred Larian was not involved in the toy side of the company.

24. In fact, it was my impression that Isaac Larian was the sole owner of the company.

25. I had no conversations with Fred Larian in 2000 regarding Bratz, and have no knowledge that Fred Larian was aware of the Bratz concept.

26. As we had hoped, the Bratz dolls received a tremendous reception at the Hong Kong and New York toy fairs. In fact, the Bratz dolls exceeded our expectations.

27. After the toy fairs were completed, and it was now clear that Bratz would be the blockbuster toy that Isaac Larian had envisioned, I was abruptly terminated.

28. I was terminated in or around March 2001.

29. No reason was given for my termination.

30. Thereafter, I worked at other toy companies as a senior manage and director for design and development, including Educational Insight, JAKKS Pacific, Inc., Equity Marketing, Playmate Toys and did some contract work for Neurosmith.

31. In or around March 2005, while I was working at Playmate Toys, Isaac Larian contacted me and asked if I would return to the company as a senior director of product development for girls and preschool products.

32. I accepted Mr. Larian's offer and began to work with MGA in March 2005.

33. I voluntarily left MGA's employment in October 2005.

34. I presently reside in Aurora, Colorado and am primarily responsible for the care of my two children. I presently cannot commute to California because there is no one who is available to take care of my children.

3

KBK 02075

35. My husband works full time and cannot take off from work to take care of my children. I have no other family residing in Colorado.

I declare under penalty of perjury under the laws of the State of California and the State of Colorado, the foregoing is true and correct.

Executed at Aurora, Colorado, this 3rd day of November, 2005.


_Mercedeh Ward_
Mercedeh Ward

Declaration Of Mercedeh Ward

**KBK 02076**

**EXHIBIT** __21__

**PAGE** __217__

# EXHIBIT 22

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# EXHIBIT 23

Priority
Send
Enter
Closed
JS-5/JS-6 ____
JS-2/JS-3 ____
Scan Only ____

FILED - EASTERN DIVISION
CLERK, U.S. DISTRICT COURT

**AUG 1 0 2006**

CENTRAL DISTRICT OF CALIFORNIA
BY                        DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

CARTER BRYANT,

                Plaintiff,

v.

MATTEL, INC.,

                Defendant,

and related actions.

CASE NO.  CV 04-9049 SGL (RNBx)

(Consolidated with cases CV-04-9059 and CV-05-2727)

**ORDER DENYING MOTION FOR APPOINTMENT OF EXPERT WITNESSES**

Presently before the Court is Mattel, Inc.'s ("Mattel") motion for the appointment of expert witnesses pursuant to Federal Rule of Evidence 706, Carter Bryant and MGA Entertainment, Inc.'s ("MGA") opposition and response thereto, and Mattel's reply. For the reasons set forth below, the Court **DENIES** the motion for the appointment of expert witnesses.

Federal Rule of Evidence 706(a) provides

> The court may . . . on the motion of any party enter an order to show cause why expert witnesses should not be appointed, and may request the parties to submit nominations. The court may appoint any expert witnesses agreed upon by the parties, and may appoint expert witness of its own selection. An expert witness shall not be appointed by the court unless the witness consents to act.

DOCKETED ON CM

AUG 1 1 2006

BY

044

EXHIBIT __23__

PAGE __219__

1
2
3

> A witness so appointed shall be informed of the witness' duties by the court in writing, a copy of which shall be filed with the clerk, or at a conference in which the parties shall have opportunity to participate.

The appointment of an expert by a federal court is a rare occurrence. Much of this stems from a concept "[d]eeply ingrained" in the common law "that it is the responsibility of the parties to produce the evidence while the court looks on to assure that the rules are followed." 4 JOSEPH M. MCLAUGHLIN, WEINSTEIN'S FEDERAL EVIDENCE § 706.02[1], at 706-6 (2nd ed. 2006). The reluctance of courts to intrude into the evidence-gathering function normally assigned to counsel is borne out of "the fear of ex parte communications between the court and its expert," as well as the unseemliness of "[c]ollecting a share of the expense [for the work performed by the court appointed expert] from a party who has been damaged by the expert's report." Id. at 706-6, 706-7. As a result of these institutional concerns, "experts are usually appointed only in exceptional cases that present unwieldy, complex, or technical issues" or where "there is a need for an impartial, independent assessment of a disputed issue." Id. § 706.02[3], at 706-8 706-9.

Here, Mattel seeks for the court to appoint experts in the fields of questioned document examination, ink chemistry analysis, and paper chemistry analysis in order to "analyze and date (1) the originals of 'BRATZ' design drawings, (2) the faxed-version of the BRATZ-related contract between . . . Carter Bryant and MGA Entertainment, Inc., (3) MGA's internal documents relating to work performed by Anna Rhee on Bryant-related projects in the year 2000, and (4) a facsimile of BRATZ drawings bearing a fax header date of April 10, 2000," as well as "(5) any other documents that cannot be sampled or tested without destroying the sample tested or analyzed." (Mattel's Mot. Appt. Expert, Preface at 2). The reason proffered for such an appointment is two-fold: First, a generalized concern that, because the documents sought to be examined are "highly relevant" to the litigation, having a neutral expert perform the testing on the same may obviate a battle of the experts that would make

2

EXHIBIT _____ 23

PAGE _____ 220

1    the jury's function of sorting out the truth much more arduous; and second, concerns,

2    deduced during discovery, about the possible spoliation of key documents in the case

3    by MGA/Bryant and their counsel.

4    A.    AVERTING A BATTLE OF THE EXPERTS

5         Mattel's argument that the Court should appoint an expert because otherwise

6    each side will perform "separate, partisan destructive analyses of separate samples of

7    the documents" with "wide divergence" of opinion "virtually assured" is not well-

8    founded. (Mattel's Mot. Appt. Expert at 18, 20). Explicit in Mattel's argument is that

9    this feared divergence in each side's retained expert's opinions has yet to materialize.

10   This is not surprising as it appears that discovery in this case is in its nascent stage,

11   owed largely to the fact that the Court had earlier stayed the case while Mattel

12   appealed the denial of its motion to remand the case to state court. Mattel's argument

13   instead is that the Court should appoint an expert now to avoid the possibility that

14   there may be such wide divergence in each side's privately retained expert in the

15   future. Needless to say from the jabs each party took at the credibility and even

16   trustworthiness of the other side's retained expert during the oral argument on this

17   motion (one going so far as to label the competing ink chemistry experts as being the

18   modern day equivalent of one's Hatfield to the other's McCoy), such a possibility may

19   be more easier to imagine occurring here than in ordinary cases. Nevertheless, such

20   divergence, even if likely, is still that – a possibility, not an inevitability.

21        In those cases where an expert has been appointed by a court on account of

22   the excessive partisanship in the expert opinions retained by counsel, the rationale for

23   the appointment was based on the fact that the feared wide divergence in opinion had

24   already materialized. See Students of California Sch. for the Blind v. Honig, 736 F.2d

25   538, 548 (9th Cir. 1984)("the judge could not decide the merits of the students' seismic

26   safety claims on the basis of evidence presented at trial, so he reopened the case and

27   appointed a neutral expert to evaluate the adequacy of seismic testing at the Fremont

28   site"), vacated on other grounds, 471 U.S. 148 (1985); Eastern Air Lines, Inc. v.

EXHIBIT ___3___ 23

PAGE _____221_____

1   McDonnell Douglas Corp., 532 F.2d 957 (5th Cir. 1976); 4 WEINSTEIN § 706App.100 at

2   706App.-5 (noting that legal commentators' "imprecations against the parties' 'battle of

3   experts'", not the potential for such a battle, "led to the drafting of the Uniform Expert

4   Testimony Act in 1937," the precursor to Federal Rule of Evidence 706).

5           In no instance uncovered by the Court's research (or by Mattel's citation to

6   authority) has a court appointed an expert because of a fear, even one that is well-

7   founded, that such wide divergence in privately-retained expert testimony may

8   materialize in the future.  Were the Court to adopt Mattel's analysis, appointment of

9   experts by courts would expand exponentially, limited only by a court's assessment of

10  how partisan the experts in a given case may become in the future.  Such a

11  proliferation has not occurred precisely because courts generally require that the

12  divergent "horse" be placed before the expert witness "cart."  See FED. R. EVID. 706

13  advisory committee's note ("actual appointment is a relatively infrequent occurrence").

14  Unless and until this feared divergence in opinion becomes reality, the Court finds that

15  the potential (which itself cannot be quantified at this point) for its occurrence does not

16  warrant the Court's intrusion into the adversarial process through the appointment of

17  an expert at this stage.

18  B.    SPOILATION OF EVIDENCE

19          The question is much closer with respect to Mattel's other reason for the Court

20  to appoint an expert in this case:  Concern that opposing counsel or their clients may

21  have destroyed or altered key documents in the case.  Mattel's basis for such concern

22  is predicated on three facts uncovered during discovery.

23          1.    Evidence of spoilation

24          Before being deposed Bryant was asked to bring all his original BRATZ design

25  drawings.  When he arrived at his deposition, however, Bryant only had in his

26  possession a few of the originals.  (Decl. Michael T. Zeller ¶ 13).  Among these some

27  "contained holes where plugs apparently had already been removed.  Bryant

28  acknowledged . . . that his drawings had no holes in them when he gave them to his

EXHIBIT  4  23

PAGE  222

1  lawyers." (Mattel's Mot. Appt. Expert at 2; see also Decl. Michael T. Zeller ¶ 14).

2  Specifically, at Bryant's deposition the following exchange took place between Bryant

3  and counsel for Mattel:

4      Q.   (By Mr. Quinn) I wanted to ask you about one of
            these original drawings that were produced today.

5           – what we're talking about here.  This is – the Post-it
6           says that's Bryant – that's the original of Bryant
            192, Bates has number 192, which has the heads on it,
7           and this is one of the originals that your counsel was
            kind enough to have shipped here today for us to
8           look at.

9      A.   Yes

10     Q.   And we were just looking at these this afternoon and
            we notice[d] that there's a bunch of holes on the
11          page, including in the signature, as if somebody
            were taking ink samples.

12     A.   Uh-huh.
13
       Q.   Do you see that?
14     A.   Yes.
15
       Q.   Do you know anything about why those holes were
16          made or how or when?

17     A.   I have no idea what those are.

18     Q.   I mean, when you had – when you had possession
            of this document did it have those holes in it?
19
       A.   Not that I remember.
20
       Q.   You certainly never had anything to do with that?
21
       A.   No.  I don't know anything about those holes.
22
       Q.   And, similarly, if you wouldn't mind holding this up to
23          the camera, this is the original of Bryant 210 and it's
            also – if you take a look at it, I think you'll see it has
24          some of those holes in it, although not as many as
            the last one we looked at.  Again, you don't know
25          anything about how or why those holes got put on
            there?
26
       A.   I don't.
27

28  (Decl. Michael T. Zeller, Ex. 7 at 161-163).

EXHIBIT _____5___ 23

PAGE _____ 223

1    Mattel has submitted the declaration of a questioned document analysis expert,

2    Lloyd Cunningham, who has opined that the holes described in the document

3    mentioned above are consistent with those that would be generated by taking

4    microplug samples to perform analysis of the ink found on a document. (Decl. Lloyd

5    Cunningham ¶ 5). Bryant and MGA eventually conceded (although at first refusing to

6    do so under the veil of work-product privilege) that they tested some of the original

7    BRATZ drawings by an expert they retained in the field of forensic chemistry, Erich J.

8    Speckin. (Response to Order to Show Cause ("Response") at 1-2).

9    Mr. Speckin states that in June, 2004, he performed a series of tests "on

10   various 'Bratz' documents" at the request of MGA's counsel.[1] (Decl. Erich J. Speckin

11   ¶ 8). Those tests included examining the documents in question under an infrared

12   light as well as performing sidelight testing, which involves "visually inspecting a

13   document by holding a side light up to the document at an oblique angel . . . to

14   determine preliminarily whether the document contains impressions, or markings

15   impressed upon the document by drawing and writing done on a sheet of paper laid

16   on top of the document being tested." (Decl. Erich J. Speckin ¶¶ 9, 10). Mr. Speckin

17   also performed an electrostatic detection apparatus to see if there was indented

18   impressions on the documents. (Decl. Erich J. Speckin ¶ 11). Finally, Mr. Speckin

19   "performed ink identifications tests" on the documents. (Decl. Erich Speckin ¶¶ 12-

20   13). Such testing involved Mr. Speckin removing "very small microplug samples from

21   the document at issue and testing the microplug." (Decl. Erich Speckin ¶13).

22   Nowhere is it averred by MGA, Bryant, or Mr. Speckin which or how many of the

23   original BRATZ drawings were subjected to this microplug sampling procedure, nor is

24   it averred from what parts of the documents that were tested was the microplug taken.

25   Instead, Mr. Speckin simply notes that in taking the microplugs he "le[ft] more than

26

27        [1] At the time the testing was done by Mr. Speckin, Bryant had already been
28   sued by Mattel for violating the terms of the invention agreement he signed when he
     worked for them from 1999 to 2000. (Response at 1).

6

EXHIBIT ___23___

PAGE ___224___

1  sufficient material for another expert to test the exact same documents," but admits

2  that "another expert cannot test the very same microplug that I tested . . . ." (Decl.

3  Erich J. Speckin ¶14).

4         Another episode brought to light during discovery causing Mattel concern

5  relates to MGA's handling of the original Bryant/MGA contract before the inception of

6  the instant litigation. At the deposition of a former MGA executive, Victoria O'Connor,

7  testimony was elicited that O'Connor, "on explicit instructions of MGA's [CEO] Isaac

8  Lariam, . . . [made] redact[ions from] the fax header . . . on the BRATZ contract

9  between Bryant and MGA for the year 2000 to conceal the fact that Bryant sent the

10  contract from Mattel's Design Center while he was still employed at Mattel." (Mattel's

11  Mot. Appt. Expert at 3).  O'Connor's deposition appears to indicate that such alteration

12  occurred before the present litigation began (indeed, perhaps even before MGA

13  marketed the BRATZ doll).

14         Q.    . . . Was there ever anything that you were asked to
              do that you -- made you feel kind of uncomfortable?
15
       A.    Yes.
16                        . . . .

17         Q.    And what was that?

18         A.    When the original contract was executed by Carter
              Bryant, it was sent to me via fax, and on the top of
19             the fax listed the phone number from where it was
              faxed, which said "Barbie Collectibles," and at one
20             point my boss, Isaac Larian, asked me to white that
              out and send it to a lawyer, Patty Glaser.
21

22  (Decl. Michael T. Zeller, Ex. 19 at 306).  Upon further examination, however,

23  O'Connor stated that she did not participate in or have knowledge of any other

24  instances in which any other agreement between Bryant and MGA was directed to be

25  altered:

26         Q.    Were you ever asked to change the date on any
              agreements between Mr. Bryant and MGA?
27
       A.    No.
28


EXHIBIT        7  23

PAGE        225

1     Q.    Are you aware of anybody being asked to change
           the date on any of those agreements?

2

3     A.    No.

4     Q.    I mean, do you have any reason to believe that any
           agreement that was entered into between Mr. Bryant
           and MGA had a date altered or changed?

5

6     A.    No.

       Q.    You never heard that from – from any source?

7     A.    No.

8

9   (Decl. Paula E. Ambrosini, Ex. 3).

10      Finally, Mattel speculates that a drawing of some BRATZ doll accessories

11  faxed on April 10, 2000, had the fax header altered, much in the same manner

12  described in O'Connor's testimony vis-à-vis the MGA/Bryant faxed contract, as the

13  fields on the fax header for the sender's name and the sender's telephone number are

14  missing. (Decl. Michael T. Zeller ¶ 23 & Ex. 24).[2] As explained by Mattel, "Because

15

16     [2] Mattel speculates that the time sheets produced by MGA for one of its
17  employees, Anna Rhee (who did doll face painting work for the BRATZ mock-up), from
    "mid-to-late 2000" were altered or recently created by MGA to show that Rhee worked
18  on projects called "Angel" or "Prayer Angel," when in fact she was working at the time
    painting faces for BRATZ dolls at the direction of Bryant. (Mattel's Mot. Appt. Expert at
19  3). The basis for this speculation is based on the fact that the initial disclosure by MGA
    of Rhee's time sheets comprised only 8 pages. (Decl. Michael T. Zeller ¶ 20). Then,
20  on January 7, 2005, Rhee produced 20 separate invoices of her work at MGA during
21  mid-to-late 2000, indicating that Rhee performed work for MGA prior to Bryant's
    departure from Mattel, most notably on June 12, 2000. (Decl. Michael T. Zeller ¶ 21).
22  Within a couple of weeks after Rhee's production of invoices to Mattel, MGA
    supplemented its earlier production of Rhee's time sheets showing that during the mid-
23  to-late 2000 period Rhee was working on a MGA project known as "Angel" or "Prayer
24  Angels" and was not involved in any BRATZ-related work until after Bryant's departure
    from Mattel. (Decl. Michael T. Zeller ¶ 22). Mattel's surmise that the supplemental time
25  sheets were altered is allegedly bolstered by the fact that Rhee testified during her
    deposition that the only work she performed in mid-to-late 2000 was on BRATZ and
26  that the supplemental time sheets reference to the "Angel" and "Prayer Angel" was
27  nothing but a cover or code word for BRATZ-related work. This argument is hard to
    accept. First, even the invoices Rhee turned over to Mattel contain the phrase "Angel"
28  for the mid-2000 project she worked on. (Decl. Michael T. Zeller, Ex. 22 at 356-60,
    362). It is not until December, 2000, that any of the invoices submitted by Rhee show

EXHIBIT    <sup>8</sup>  23

PAGE    226

1   facsimile machines normally insert senders' names and numbers as a matter of

2   course, and indeed is required by law [to do so], it appears likely that the document

3   was altered to conceal the sender's information. See 47 U.S.C. § 227(d)(1)(B)."

4   (Mattel's Mot. Appt. Expert at 10). The premise underlying Mattel's concern on this

5   topic is not unreasonable. The law requires such information to be found on any

6   document, like the one in question, that has been faxed. Additionally, the testimony

7   elicited from Ms. O'Connor that MGA altered the fax header for other documents

8   related to BRATZ from the same time period leads to an obvious inference that other

9   documents where spaces on other fax headers are absent suffered a similar fate.

10      2.   Analysis

11         a.   Microplug Ink Testing

12      Bryant and MGA begin by downplaying the significance of the spoliation issue

13   in this case. With respect to the holes on some of the original BRATZ design

14   drawings produced at Bryant's deposition, they note that, even with these holes,

15   nothing prevents Mattel from performing its own testing on the remaining portions of

16   the drawings on the document. "Indeed, the very fact that Mattel is asking for court-

17   appointed experts to perform ink and paper testing only underscores the fact that

18   nothing has been 'destroyed.'" (Joint Opp. at 2). Mr. Speckin makes similar assertions

19   in his declaration, stating that the fact that the same microplug cannot be tested "is

20   entirely irrelevant because there is more than enough ink on each of the documents I

21   tested to allow numerous microplug samples to be extracted and tested by different

22   experts." (Decl. Erich J. Speckin ¶ 14 (emphasis added); see also Response at 5-6

23   ("While another expert cannot test the very same microplug that Mr. Speckin tested,

24

25

26   her doing work on the BRATZ doll, well after Bryant had left Mattel. (Decl. Michael T.
Zeller, Ex. 21 at 367, 370, 373). To accept Mattel's argument, not only would MGA

27   have had to alter the invoices it produced in the supplemental production, but the
documents produced by Rhee would also have to be similarly altered. An alternative

28   and just as plausible explanation is that Rhee is simply mistaken as to when she began
performing work on the BRATZ project.

EXHIBIT   9   23

PAGE    227

1   that fact is entirely irrelevant because, unlike in a situation where the entire object is

2   destroyed during the testing, there is more than enough ink on each of the <u>documents</u>

3   Mr. Speckin tested to allow numerous microplug samples to be extracted and tested"

4   (emphasis added))). This argument is not persuasive. This is not a case where

5   everyone concedes that the documents in question were created at one point in time,

6   but dispute what that date may have been. In such a circumstance all the ink

7   markings on the documents are comparable to one another as it is conceded that all

8   the marks came from one point in time.

9        Here, however, it is Mattel's theory that Bryant made drawings in 1998 and then

10  periodically touched up or made refinements/additions to those drawings, adding more

11  marks in 1999 and 2000 during the time he was employed by Mattel.   An ink mark

12  from one part of the document is not necessarily comparable to another set of ink

13  markings found elsewhere on the document.  One ink mark on a drawing could have

14  been made in 1998, for example, while another ink mark found on the same drawing

15  could have been put there sometime later.  In taking microplug samples from one of

16  these ink markings without the ability of the other side to test <u>the same mark</u> would

17  forever foreclose a potential avenue of crucial evidence in this case.  It is on that point

18  that taking microplug samples of the marks on these drawings is akin to the spoilation.

19  Therefore the fact that another expert could test other parts of the document does not

20  mean that key relevant evidence found on that document has not been destroyed. As

21  MGA and Bryant make clear spoilation of evidence occurs through the "destruction or

22  significant alteration of evidence, or the failure to preserve property for another's use

23  as evidence in pending or reasonably foreseeable litigation." <u>West v. Goodyear Tire &</u>

24  <u>Rubber Co.</u>, 167 F.3d 776, 779 (2ⁿᵈ Cir. 1999).[3]

25        At this point, it should not be lost that the documents in question are not

26  _____

27       [3] The Court does not mean to suggest that Mattel's theory is correct.  Instead,
    the Court simply notes this theory as refuting MGA and Bryant's argument that only the

28  <u>complete</u> destruction of a document would amount to spoilation under the particular
    circumstances in this case.

EXHIBIT ¹⁰ 23

PAGE ___ 228

1   peripheral to the case. At its heart, this case asks the question: Who owns the rights
2   to the Bratz dolls? Bryant asserts that he came up with the idea for the Bratz dolls
3   while on a break from his employment at Mattel in 1998, and that he sold his idea to
4   MGA when he went to work for them in October, 2000. Mattel claims, among other
5   things, that Bryant "developed" or "continued to develop" his idea for Bratz dolls while
6   he was working for them from January, 1999, to October, 2000, and that pursuant to
7   an inventions agreement he signed with the Mattel when he went to work for them,
8   that idea now belongs to Mattel. As this clash of factual contentions makes clear, the
9   dating of the original BRATZ drawings and the markings contained thereon is a
10  fundamental, perhaps despositive, issue to this case. That there are serious
11  questions concerning the handling of these critical documents certainly causes the
12  Court much concern about whether the truth seeking functions of the adversarial
13  system have been fundamentally compromised in this case. As Mattel rightly notes,
14  "The adversarial process is not an end in itself; its value is in its ability to promote a
15  search for truth." (Mattel's Reply at 9).

16      Bryant and MGA concede that the sections that were holed out contained
17  markings, be they handwritten dates or other words or letters, that may be crucial to
18  the case. Indeed, one of the drawings – Bryant 192 – had a portion of the signature
19  line sampled. What is left unclear is whether, for those portions of the document
20  where ink or signatures were sampled, enough of the same part of the document in
21  question (meaning the same mark) remains to be sampled by Mattel. For instance, is
22  there enough of the signature line from Bryant 192 left to sample, or has too much of it
23  already been sampled? In that sense, MGA's and Bryant's argument that nothing has
24  been destroyed by the microplug testing procedure because other parts of the
25  document still exist is misplaced. Indeed, MGA and Bryant later admit that the
26  circumstances allowing for "multiple experts [to] remove multiple microplugs and test
27  the exact same paper and ink" is dependent upon there being the same exact paper
28  and ink there to test. (Joint Opp. at 15 ("[a]s long as there is paper and ink to test")).

11
EXHIBIT _____ 23

PAGE _____ 229

1   The continued existence of the "exact same pen stroke" is the very issue that is now

2   left open because of the holes in some of Bryant's original BRATZ design drawings.

3   Is there anything left of that exact same pen stroke that was sampled by Mr. Speckin

4   remaining on the original drawing for Mattel to test? None of these questions have

5   been addressed by MGA, Bryant, or Mr. Speckin in their papers. Instead, they simply

6   make the observation that there remain other ink markings on the same drawings for

7   Mattel to test, a reason which, as explained above, is wholly insufficient to assure the

8   Court that Mattel has not been prejudiced by MGA's actions.

9         Given the absence of any representation by them on this point, the Court

10  pressed MGA's counsel about the same at oral argument:

11              THE COURT: And part of your argument is that
       while a small portion of the small portion of the page may
12     be gone, as you in your most recent papers concede is
       gone, there are other portions of the page that can be
13     tested. The concern I have, I guess – and maybe you can
       clear this up for me – I've seen some of the drawings and I
14     have a pretty good mental image of what the drawings look
       like. But there is also writing on these drawings,
15     signatures, copyright registration indications; some are
       large, some are small. As I gather from the plaintiff, from
16     Mattel, the concern is that these different drawings or
       writings were done at different times. And I guess I can
17     understand why when those drawings or writings were
       done could be significant from an evidentiary standpoint.
18     So the concern is not so much there's another part of the
       paper that can be tested; it's whether or not the particular
19     marking in question has been so damages as to not permit
       a full further testing on that particular marking. Does my
20     question make sense?

21              MS. CENDALI: Yes, it does, your Honor. And I
       anticipated that. Significant, we thought, in their papers
22     was that . . . they cited to the fact that Mr. Bryant admitted
       in his deposition that there were holes in some of the
23     documents that he didn't know how they got there
       originally. As an example, if you look at part of Zeller,
24     Exhibit 17, Bates number Bryant 201, that's an example of
       one of the documents that's been tested.

25              THE COURT: One second so I have that in front of
26     me. Okay.

27              MS. CENDALI: There are many many others that were
       submitted that were also submitted to this type of ink
28     testing, but this is just an example of one of them. And if

EXHIBIT    12    23

PAGE    236

1    you look at the document, you would never know —
2    granted, this is smaller, so the actual drawing is even larger
     than this, so there's even more ink on the larger drawing
3    than there would be available on this reproduction size.

4         But if you look at it — and I'll represent to you that we
     didn't test the face; the face is absent before and after the
5    testing — but if you look at it, you couldn't even see that
     there were any pin pricks to it. If you look very, very
6    carefully at the signature at the bottom, you can maybe see
     where it says "Ramona Prints, 8-26-99"; that maybe there
7    was like a little tiny hole in one of the little slash marks; that
     was a teeny little pin prick hole that showed the testing.
8    There's ample amount of ink to do the testing on all of
     these documents. This is the normal course of procedure
9    that was done.

10        When asked by the Court whether it accepted MGA's representation that there

11   was "ample amount of ink" left on the same marks that the microplugs were taken

12   from for further microplug testing, Mattel, in seeming contradiction to its position in its

13   papers, said it did: "I agree with Ms. Cendali. We do not maintain any portion of the

14   ink on a signature or an image has been so obliterated that you couldn't take a plug

15   now on any of it; that's not our point." (Emphasis added).

16        In light of this concession by Mattel, the Court finds that no colorable claim of

17   spoilation has been established at this time vis-à-vis Mr. Speckin's testing of the

18   documents to warrant the appointment of an expert by the Court to investigate the

19   same. See Sedrati v. Allstate Life Ins. Co., 185 F.R.D. 388, 393 (M.D. Ga.

20   1998)(sanction warranted where because "defendant's expert has conducted

21   destructive tests on the original documents," plaintiff's expert "cannot duplicate the

22   conditions of the original documents"). If there was any evidence indicating that MGA,

23   Bryant, or their counsel had engaged in acts that could compromise Mattel's ability to

24   discover crucial information in this case, the Court would be sympathetic to the

25   appointment of an expert to investigate the same. Here, no such evidence exists.

26   The tests done by Mr. Speckin have not left the marks that were micro-sampled or the

27   documents that were handled so compromised that Mattel cannot perform the exact

28   same tests on those exact same marks as performed by Mr. Speckin.

13

EXHIBIT ___23___

PAGE ___231___

1    Indeed, the only basis for spoliation that Mattel has left to argue – that the
2    passage of time has left the ability to perform any meaningful ink testing at this time
3    problematic – is an argument that has nothing to do with MGA's conduct, but much
4    more with Mattel's own dereliction. As the Court understands it, the process of dating
5    when ink was placed on a document has only a limited window of time in which it can
6    be accomplished because, eventually, the ink dries (be it in 2 years or 3 to 4 years),
7    leaving nothing capable of being sampled after that point to test (save to acknowledge
8    that the ink in question was put on the paper some time more than 3 to 4 years ago).
9    Mattel essentially argues that the impossibility of testing ink after a certain period
10   mandates that, if the other side is going to test ink while "fresh" ink remains on the
11   document, that party has an obligation to inform the other side so that they can do the
12   same before the ink "dries out"; failure to do so renders the test performed something
13   that cannot be replicated.[4]  By Mattel's own admission, they knew there had been
14   testing done on the BRATZ original drawings as far back as November, 2004, during
15   Bryant's deposition testimony when they saw some of the original BRATZ drawings
16   (drawings that had been tested by Mr. Speckin five months earlier). Rather than
17   immediately seeking the production of those documents and having its own expert
18   perform similar tests on them, Mattel sat idly by, waiting until June of this year to do
19   anything, either by way of court-pleadings or formal requests made to MGA and
20   Braynt, related to having ink tests performed on the documents. Nowhere has Mattel
21

22      [4] The basic factual assumption in Mattel's argument may indeed be faulty – that
23   when MGA tested the ink there was enough "fresh" ink to test. Mr. Speckin states that
     "[I]nk takes approximately 3 to 4 years to dry on paper. Thus, by testing the ink to
24   determine if it is dry, it can be determined whether the document was created within the
     last [3 to] 4 years, or whether the ink, and thus the drawing, is more than [3 to] 4 years
25   old." (Decl. Erich J. Speckin ¶ 13). Given that Mr. Speckin performed his ink dating
     test in June, 2004, at best he could determine whether the ink had been put on the
26   paper on or after June, 2000. Beyond that time frame his test could not tell when the
     now-dried ink was marked on the document. Given that the relevant period in question
27   in this case is from August, 1998, to October, 2000, Mr. Speckin's test results would
28   appear to be only marginally relevant in adducing proof as to when the BRATZ
     drawings were made.

EXHIBIT __14__   23

PAGE _____  232

1   explained how MGA or Bryant had anything to do with it not having the ability to

2   perform such testing until now.  Mattel's allusion to the fact that a stay on discovery

3   was put in place by this Court in 2005 is misguided.  If Mattel thought that it was losing

4   valuable time on account of the stay, it could have at any time filed with this Court an

5   emergency request for relief from the stay to have such tests performed.  All it needed

6   to do was inform the Court that it had only a short period of time to perform the test on

7   account of the fact that ink dries; something which it never did in this case.

8         Mattel's citation to the case <u>Edwardes v. Southampton Hospital Associates,</u>

9   278 N.Y.S.2d 283 (1967) is equally unhelpful to their argument.  In that case, the court

10  was presented with an application to prevent the testing of a intramedullary pin for

11  discovery and testing.  <u>Id.</u> at 284.  The court held that, "[s]ince the pin is crucial to the

12  action it is not too difficult to appreciate that any change, however slight, assumes an

13  importance magnified proportionately. And undoubtedly tests which would destroy or

14  alter most or all of a particular article ought not be permitted in the first instance

15  without providing adequate safeguards to protect all concerned."  <u>Id.</u> at 286.  Here,

16  such an argument cannot be made because, for the reasons cited above, Mattel has

17  conceded that even in performing the tests of the original BRATZ drawings Mr.

18  Speckin left enough ink of the same pen stroke for its own experts to test.  In short,

19  there has been no alteration, however slight, made to the documents insofar as

20  Mattel's ability to replicate the exact same test is concerned.  The only change that

21  has occurred is in Mattel's ability to retrieve any relevant information from such a test

22  <u>on account of the passage of time that has elapsed.</u>  The test Mr. Speckin performed

23  is not responsible for this negative occurrence.  MGA is similarly not responsible for

24  the passage of time or Mattel's inability to retrieve useful information from the testing

25  process.  On that point, Mattel should look itself in the mirror for any finding of fault or

26  blame.

27        Moreover, aside from the potential for "destroying" key portions of the original

28  documents, it is alleged that MGA and Bryant's actions carry other means of

EXHIBIT ___15___ 23

PAGE _____ 233

1   prejudicing Mattel's ability to pursue lines of potential evidence in this case.  The

2   expert declaration submitted by Mattel notes another possible spoliation of the original

3   drawings even if there remained enough of the pertinent portion of the document in

4   question to sample: The sampling process itself may have contaminated the

5   document in question by obliterating potential crucial clues that were on the document

6   or otherwise the sampling process led to the introduction of foreign materials onto the

7   documents themselves which may complicate any future analysis.  As explained by

8   Mattel's expert:

9           [P]erforming many such types of testing, even if described
            as "non-destructive," on a particular original document
10          carries the risk that potential evidence on it, including
            indentations in the paper fiber, might be contaminated or
11          destroyed in the process.  Furthermore, the order of the
            types of testing to be performed on a given document
12          might have an impact on developing potential evidence
            during subsequent examinations. . . .
13

14          . . . . [With respect to the original BRATZ drawings
            containing holes in them,] it is possible that the destructive
15          testing performed on the document may have caused
            some form of contamination and/or alteration, which carries
16          the further prospect that subsequent examinations by
            experts may not enable them to develop potential evidence
17          or the same evidence that the other [earlier] expert
            developed.

18   (Decl. Lloyd Cunningham ¶¶ 4-5).

19          MGA has rebutted this risk of contamination argument by proffering Mr.

20   Speckin's declaration, the expert who actually performed the tests in question.  Mr.

21   Speckin states that he "exercised the utmost care in handling the documents [he]

22   tested," that a number of the tests he performed on the documents "has absolutely no

23   effect on the tested document whatsoever," and that with respect to those tests that

24   could effect the document he followed established procedures in carrying out the test

25   in question. (Decl. Erich J. Speckin ¶¶ 8, 9, 10, 11, 12, 13). Nowhere has Mattel

26   proffered any evidence rebutting or calling into question Mr. Speckin's

27   representations.  The Court therefore finds that, based on the evidence that is

28   currently before it, Mattel has not established a colorable claim of spoliation by way of

16

EXHIBIT ____ 23

PAGE ____ 234

1  contamination in the tests MGA performed on the documents in question.

2           b.   Alteration of Fax Headers

3           Insofar as O'Connor's deposition testimony relating to the white out of the fax

4  header on the October, 2000, contract between Bryant and MGA, this too is

5  downplayed by MGA and Bryant as being irrelevant because "there is no dispute that

6  Mr. Bryant faxed his signed contract from a fax machine at Mattel and, indeed, Mr.

7  Bryant readily admitted that fact at his deposition, which took place before Ms.

8  O'Connor's deposition." (Joint Opp. at 8 (emphasis in original)). This argument seeks

9  to compare apples to oranges. While it may be true that now there is no dispute by

10  MGA and Bryant that he faxed his portion of the contract to MGA from his office at

11  Mattel, at the time O'Connor did the white out of the fax header such a lack of dispute

12  was not apparent. It is from that perspective in time – the prologue to the litigation —

13  that O'Connor's deposition testimony is to be judged. And from that perspective her

14  testimony calls into question MGA's handling of relevant documents in its possession.

15           When the contract was first executed there is no indication that MGA and/or

16  Bryant would admit to the fact that Bryant negotiated his contract with MGA while he

17  was still working at Mattel; rather, at that point, that issue appeared to be an open one.

18  Indeed, the fact that MGA's CEO would direct O'Connor to tamper with the contract's

19  fax header clearly indicates that they would not admit to the fact. If MGA mistreated

20  this document where an open issue existed, it is not unreasonable to infer that it may

21  have been just as cavalier with its obligations to maintain the other documents in their

22  possession – say, for instance, the original BRATZ drawings – where similar open

23  issues remained. This concern with MGA's handling of documents in its possession at

24  the prologue to this litigation is reinforced by MGA and Bryant's blasé mention in a

25  footnote to their opposition that the original to this contract, the one which they

26  describe as being irrelevant, "has not been found." (Joint Opp. at 15 n.6). Indeed, it

27  has been suggested that MGA and Bryant or their counsel have made representations

28  that they are not sure of the exact whereabouts of a number of the original BRATZ

EXHIBIT   17   23

PAGE   235

1  drawings. (Decl. Shane McKenzie ¶ 3 ("Mr. Bryant's counsel[, at the December 22 to

2  23, 2004, inspection of the originals by counsel for Mattel,] claimed not to have the

3  majority of the originals of BRATZ drawings and sketches, and further claimed not to

4  know where those originals were located")).

5       All that being said, the Court does not find that the alteration of the fax header

6  on the original Bryant/MGA contract warrants the appointment of an expert at this

7  time. Ms. O'Connor testified that, other than this one instance, she is aware of no

8  other documents that were purposefully altered by MGA. While the evidence related

9  to the missing fax header on the April, 2000, BRATZ accessories fax may indicate that

10  more than one document had been tampered with by MGA personnel, the Court has

11  nothing at this time to basis that conclusion on other than speculation and conjecture.

12  Without any tangible, concrete proof that MGA's mishandling of documents was more

13  widespread, the Court is left with what appears simply as an isolated instance of

14  tampering.

15       Accordingly, the motion for appointment of expert witnesses is **DENIED**.

16       IT IS SO ORDERED.

17

18  DATE: _8-9-06_.

19

20

21       STEPHEN G. LARSON
         UNITED STATES DISTRICT JUDGE

22

23

24

25

26

27

28

                              EXHIBIT _23_

18                            PAGE _236_

# EXHIBIT 24

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(D).

**PRIORITY SEND**
& ENTERED

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
<u>CIVIL MINUTES -- GENERAL</u>

Case No.   CV 04-09049 SGL(RNBx)                    Date: July 2, 2007

Title:   CARTER BRYANT -v- MATTEL, INC.
         AND CONSOLIDATED ACTIONS
=================================================================

PRESENT:  HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

Jim Holmes                          Theresa Lanza
Courtroom Deputy Clerk              Court Reporter

ATTORNEYS PRESENT FOR CARTER        ATTORNEYS PRESENT FOR MATTEL:
BRYANT:

John W. Keker                       John B. Quinn
                                    Brett Dylan Proctor
                                    Michael T. Zeller

ATTORNEYS PRESENT FOR MGA:

Dale M. Cendall
Patricia Glaser

PROCEEDINGS:   MINUTE ORDER

ENTERED
CLERK, U.S. DISTRICT COURT

JUL - 5 2007

CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION   BY DEPUTY

DOCKETED ON CM

JUL - 5 2007

BY           164

        As set forth more fully herein, the Court hereby makes the following ruling regarding matters
heard on July 2, 2007:

(1)    The Court **GRANTS** Mattel's Motion re Trial Structure (docket #462);

(2)    The Court **GRANTS IN PART AND DENIES IN PART** MGA's Motion re Discovery Master's
       May 15, 2007, Order (docket #505);

(3)    The Court **GRANTS IN PART AND DENIES IN PART** MGA's Ex Parte Application

MINUTES FORM 90                                    Initials of Deputy Clerk _jh_
CIVIL -- GEN                          1            Time: 01/15

EXHIBIT  24
PAGE  237

07|c2|c7

regarding date of production of documents (docket #545); and

(4)    The Court **DENIES** MGA's Motion re Discovery Master's May 16, 2007, Order (docket #508).

(5)    The Court **DENIES** the parties' oral request for modification of pretrial and trial dates.


(1)    Motion re Trial Structure (docket #462)

        Previous orders of the Court specified that the claims and counterclaims brought in this action will be tried in two phases. The parties have agreed, in large part, to a refinement of the Court's mandate that all issues regarding the ownership of Bratz shall be tried in Phase 1. Where the parties differ is upon a proposal by Mattel that the Phase 1 be bifurcated into two sub-phases, with Mattel's copyright infringement claim (its first counterclaim in the 05-02727 case) and all Phase 1 damages being tried after all the other issues. Phase 1(a) would be limited to issues surrounding Carter Bryant's employment with Mattel, and how those issues impact the ownership of certain original Bratz drawings, while Phase 1(b) would address approximately two-hundred Bratz products that are potentially derivative of the original drawings. This approach has the appeal of limiting Phase 1(a) to discrete issue of the ownership of the original Bratz drawings. A finding that Bryant owns these original drawings in Phase 1(a) has the potential to eliminate the need for Phase 1(b).

        Accordingly, **THE COURT ADOPTS MATTEL'S MODIFICATION OF DEFENDANTS' PROPOSAL**, as set forth at 8-9 of its Memorandum Regarding Trial Structure, filed June 20, 2007. Phase 1(a) and Phase 1(b) (if necessary) will be tried to the same jury.

(2)    MGA's Motion re Discovery Master's May 15, 2007, Order (docket #505), and
(3)    MGA's Ex Parte Application regarding date of production of documents (docket #545).

        The Discovery Master's May 15, 2007, Order compels production of documents regarding ink, paper, and chemical analysis and documents relating to unreleased MGA products. The order required that documents be produced no later than the end of May.

        The Court reviews the Discovery Master's orders under the "clearly erroneous" or "contrary to law" standard set forth in Fed. R. Civ. P. 72(a).

        The Discovery Master's order compels the production of only non-privileged documents. Therefore, MGA's arguments that the Discovery Master's order requires production of documents in violation of the attorney-client privilege are misplaced. If the only responsive documents are privileged, then MGA need not produce them, but must produce a privilege log.

        MGA acknowledges that it has raised an argument before the Court that was not raised

MINUTES FORM 90
CIVIL – GEN

2

Initials of Deputy Clerk __jh_____
Time: 01/15

EXHIBIT ___24___

PAGE ___238___

before the Discovery Master, namely, that Mattel has failed to establish that there are "exceptional circumstances" that allow Mattel to "discover facts known or opinions held by an expert . . . who is not expected to be called as a witness at trial." Fed. R. Civ. P. 26(b)(4)(B). MGA contends that the Discovery Master's order is contrary to law based on this standard, and that it was incumbent upon Mattel to raise it below. The Court disagrees. Mattel would be required to establish that exceptional circumstances existed if MGA objected to production on that grounds. A party seeking production cannot be expected to rebut all arguments that could possibly be raised by a party resisting production. MGA has not convinced the Court that the Discovery Master's failure to require Mattel to rebut an argument that was not raised by MGA is contrary to law.

MGA contends that the Discovery Master's order compelling production of documents regarding unreleased products is contrary to law. Relevant to that determination is a balancing test required to be applied by the Ninth Circuit when trade secrets are requested by a competitor in discovery. See Brown Bag Software v. Symantec Corp., 960 F.2d 1465, 1470 (9th Cir. 1992) ("Specifically, in this case we must balance the risk to [defendant] of inadvertent disclosure of trade secrets to competitors against the risk to [plaintiff] that protection of [defendant's] trade secrets [will] impair[] prosecution of [plaintiff's] claims.").

Here, the documents sought are of a particularly sensitive nature. They represent some of the most secretive documents maintained by MGA, and they are being ordered to be produced to MGA's fierce competitor. The Discovery Master recognized the sensitive nature of the documents and entered a strict protective order that severely limits access to those documents and that goes well beyond the normal "attorney eyes only" designation.

MGA argues that unreleased products are irrelevant to the issue of who owns the original Bratz drawings. That is clear. However, MGA's argument attempts to limit the discovery to issues involved in Phase 1 of the trial. There has been no bifurcation of discovery.

Mattel correctly points out that these documents are relevant to a number of its other claims. Specifically, if they show unreleased products that are similar to Mattel's unreleased products, the documents would be highly probative of Mattel's misappropriation of trade secrets claim. Moreover, these documents could be relevant to Mattel's RICO claims based on alleged acts of criminal copyright infringement.

Balancing tests are inherently subjective and particularly susceptible to varying interpretation by individual judicial officers. This Court, upon considering this issue from the outset, may very well have weighed the evidence differently and reached a contrary result. However, this Court is bound by the standard of review, and MGA's motion falls far short of convincing the Court that the Discovery Master's order is contrary to law.

The parties have a long history regarding the production of documents ordered in the May 15, 2007, Order, which is set forth in their papers and which need not be repeated here. Counsel for MGA represented that the remaining documents could be produced no later than July 31, 2007, with the exception of the documents from MGA Hong Kong, which could be produced no

MINUTES FORM 90
CIVIL -- GEN

Initials of Deputy Clerk __jh_____
Time: 01/15

EXHIBIT __24__
PAGE __239__

3

later than two weeks after that date. Accordingly, the Court **ORDERS** that MGA complete the document production set forth in the Discovery Master's May 15, 2007, order no later than July 31, 2007, with the exception of the documents from MGA Hong Kong, which shall be produced no later than August 14, 2007.

Accordingly, the Court **GRANTS** in part MGA's motion re the Discovery Master's May 15, 2007, Order, extending the document production date as set forth above. The Motion is **DENIED** in all other respects.

Likewise, the Court **GRANTS** in part MGA's ex parte application re date of production of documents, extending the document production date as set forth above. The application is **DENIED** in all other respects.

(4)   MGA's Motion re Discovery Master's May 16, 2007, Order (docket #508)

The Discovery Master's May 16, 2007, Order compelled the Rule 30(b)(6) depositions of witnesses on the topics of MGA's net worth, prior sworn statements, and ink, paper, and chemical analysis performed by MGA.

> A party may in the party's notice and in a subpoena name as the deponent a
> public or private corporation or a partnership or association or governmental agency
> and describe with reasonable particularity the matters on which examination is
> requested. In that event, the organization so named shall designate one or more
> officers, directors, or managing agents, or other persons who consent to testify on its
> behalf, and may set forth, for each person designated, the matters on which the
> person will testify. . . . The persons so designated shall testify as to matters ***known
> or reasonably available*** to the organization.

Fed. R. Civ. P. 30(b)(6) (emphasis added). "The purpose behind Rule 30(b)(6) is to create testimony that will bind the corporation." Sanders v. Circle K Corp., 137 F.R.D. 292, 294 (D. Ariz. 1991) (internal citation omitted). Another purpose of Rule 30(b)(6) is aptly described by the District Court for the District of Columbia:

> [The purpose of Rule 30(b)(6) is to] prevent[] serial depositions of various witnesses
> without knowledge within an organization and eliminating 'bandying', which is the
> name given to the practice in which people are deposed in turn but each disclaims
> knowledge of facts that are clearly known to persons in the organization and thereby
> to the organization itself.

Alexander v. F.B.I., 186 F.R.D. 148, 152 (D.D.C. 1999) (citing the 1970 Advisory Committee Notes to Rule 30(b)(6)).

The Discovery Master's order compelling Rule 30(b)(6) depositions in the specified

MINUTES FORM 90
CIVIL – GEN

4

Initials of Deputy Clerk __jh_____
Time: 01/15

EXHIBIT ___24___

PAGE ___240___

categories serve both these purposes and is not contrary to law.

Although MGA's net worth may not be known to it, MGA does not contend that the information is not readily available. That net worth is generally the subject of expert testimony at trial -- a proposition disputed by neither Mattel nor the Court -- does not render it an improper subject for a Rule 30(b)(6). Therefore, the Discovery Master's ruling on this issue is not contrary to law.

MGA likewise does not contend that information regarding prior sworn statements are not readily available to it. Although contending that this is not an appropriate subject for a Rule 30(b)(6) deposition, MGA fails to cite authority in support of that contention. Therefore, the Discovery Master's ruling on this issue is not contrary to law.

The ink, paper, and chemical analysis topic is likewise a proper subject of a Rule 30(b)(6) deposition. To the extent that such a deposition has the potential to encroach upon information protected by the work-product privilege, then that objection must be made on a question-by-question basis. MGA may not make a blanket objection and justify its refusal to produce a Rule 30(b)(6) designee on this topic based on that blanket objection. Therefore, the Discovery Master's ruling on this issue is not contrary to law.

Accordingly, the Court **DENIES** MGA's motion re the Discovery Master's May 16, 2007, Order.

(5)     Oral Request for Modification of pretrial and trial dates.

Although no motion or ex parte application on the subject was pending before the Court, the parties made an oral request at the hearing to continue certain pretrial and trial dates. A discussion ensued and it became apparent that no final agreement was reached by the parties regarding extending these dates. Accordingly, the Court **DENIES** the parties' oral request for modification of pretrial and trial dates. The Court will consider counsels' stipulation regarding extensions of those dates only where all counsel unqualifiedly stipulate to those dates. Until the scheduling order is modified by the Court, the dates previously set by the Court remain in effect. In addition, the Court is unlikely to entertain a continuance of the Phase 1 trial past April, 2008.

IT IS SO ORDERED.

EXHIBIT ____24____

PAGE ____241____

# EXHIBIT 25

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# EXHIBIT 26

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# EXHIBIT 27

**KAYE SCHOLER** LLP

1999 Avenue of the Stars, Suite 1700
Los Angeles, California 90067-6048
310 788-1000
Fax 310 788-1200
www.kayescholer.com

Bryant S. Delgadillo
310 788-1341
Fax 310 788-1200
bdelgadillo@kayescholer.com

February 11, 2008

**VIA FACSIMILE AND MAIL**
Juan Pablo Alban
Quinn Emanuel
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017

      Re:     **Mattel v. Bryant, et al. Case No.: CV 04-9049-SGL(RNBx)**

Dear Mr. Alban:

      I am in receipt of your letter of February 7, 2008, outlining alleged deficiencies in Kaye Scholer's production of documents in the above-captioned case, and demanding that Kaye Scholer produce "all information, including court reporter information and invoices, transcripts and declarations, relating to that arbitration . . . ." As outlined below, your claim that Kaye Scholer failed to produce certain documents is baseless, and your demand that Kaye Scholer produce such documents is outside the scope of Judge Infante's January 25, 2008 Order Granting in Part and Denying in Part Mattel's Motion to Compel Kaye Scholer to Produce Documents ("January 25 Order").

      As you are aware, in the January 25 Order, Judge Infante approved Kaye Scholer's proposal to review only a certain, limited number of files for responsive documents. *See* January 25, 2008 Order at 18. Specifically, Judge Infante ruled that Kaye Scholer's proposal to review (1) pleading files; (2) discovery files; and (3) arbitration exhibits was "reasonable under the circumstances." In addition, Judge Infante further ruled that Kaye Scholer did not have to produce documents responsive to Requests Numbers 1-3, 6 and 10, as those requests were overbroad. Kaye Scholer has completed its review and produced documents in accordance with Judge Infante's January 25 Order.

      The documents you are demanding Kaye Scholer to produce were either in fact already produced as part of Kaye Scholer's production, or outside the scope of Judge Infante's January 25 Order.

      For example, Kaye Scholer has produced all responsive arbitration exhibits. This includes exhibits that were identified but not used during the arbitration, as well as those exhibits used during the arbitration. Indeed, a large number of the documents Kaye Scholer produced
23238981.DOC

NEW YORK   CHICAGO   LOS ANGELES   WASHINGTON, D.C.   WEST PALM BEACH   FRANKFURT   LONDON   SHANGHAI

EXHIBIT _____ 27

PAGE _____ 274

FEB-12-08   11:49AM   FROM-      T-805  P.003/003  F-074

# KAYE SCHOLER LLP

Juan Pablo Alban
February 11, 2008
Page 2

came from its "arbitration exhibits" files. Therefore, your contention that Kaye Scholer failed to produce "exhibits used during the testimony" in the *Larian v. Larian* arbitration in 2005 is wholly without merit. You either have failed to review the documents Kaye Scholer has produced or sent your letter merely to harass us. In either event, I am sure Judge Infante would not look favorably upon your conduct.

With respect to your demand for court reporter information, invoices and transcripts from the 2005 arbitration, those requests fall outside of the scope of Judge Infante's January 25 Order. As discussed above, Judge Infante specifically ruled that Request Number 1 (which sought all documents relating to the 2005 arbitration, including transcripts) was overbroad, and concluded that Kaye Scholer did not have to respond to this request.[1] Thus, there is no basis for your demand that Kaye Scholer produce such documents.

Nevertheless, with respect to arbitration transcripts, if Kaye Scholer would have found a copy of an arbitration transcript in the files it was ordered to review, Kaye Scholer would have produced it. However, no arbitration transcripts were found in those files.[2]

Lastly, we still have not received from Mattel repayment for the cost of copying and bates-labeling the documents we produce to you. We provided you with a copy of the invoice reflecting those charges ($2,519.15) with our production almost two weeks ago. Please send payment to us immediately.

Sincerely yours,

Bryant S. Delgadillo

BSD:vjh

---

[1]  Indeed, your demand for "court reporter information and invoices" arguably does not even fall within this grossly overbroad request.

[2]  Kaye Scholer, as promised, did produce an index of the pleading files in its possession. As I am sure you noticed, an "arbitration transcript" was not reflected on any index. In addition, if there is a specific "declaration" relating to that arbitration which is identified on the index, and you would like Kaye Scholer to copy and produce it, please let me know.
23238981.DOC

NEW YORK   CHICAGO   LOS ANGELES   WASHINGTON, D.C.   WEST PALM BEACH   FRANKFURT   LONDON   SHANGHAI

EXHIBIT _____ 27

PAGE _____ 275

# EXHIBIT 28

RECEIVED

FEB 1 5 2008

LAW OFFICES

**CHRISTENSEN, GLASER, FINK, JACOBS, WEIL & SHAPIRO, LLP**

10250 CONSTELLATION BOULEVARD
NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90067
(310) 553-3000
FAX (310) 556-2920

DIRECT DIAL NUMBER
(310) 282-6287
EMAIL: AMORGENTHALER@CHRISGLASE.COM

February 13, 2008

ᵂ MERITAS LAW FIRMS WORLDWIDE

VIA FACSIMILE AND U.S. MAIL

Juan Pablo Alban, Esq.
Quinn Emanuel Urquhart Oliver
  & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017

    Re:    Mattel v. Bryant, Case No. CV 04-9049 SGL (RNBx)

Dear Juan Pablo:

        This is in response to your letter of February 7, 2008 as it pertains to Farhad Larian.

        Your assertion that Farhad Larian failed to disclose or produce to Mattel any information or documents which the Court either ordered or he promised to produce is wholly unfounded. First, your letter complains that Mr. Larian failed to produce court reporter invoices from the *Larian v. Larian* arbitration. Initially, Mattel is not entitled to the receipt of such invoices because they do not relate to Bratz, and thus, do not fall within Judge Infante's rulings regarding the permissible scope of Mattel's subpoenas seeking documents related to the *Larian v. Larian* proceedings. More to the point, Mr. Larian did not produce any court reporter invoices from the *Larian v. Larian* arbitration because he does not have such invoices in his possession, custody or control. None of the testimony provided by Mr. Larian suggests to the contrary. Indeed, Mr. Larian testified that he never received any court reporter invoices and that he did not even know which party paid for the court reporter. (Transcript of the Deposition of Farhad Larian at 105:4, 8-9. 11, 14, 16-17, 19.)

        In short, Mr. Larian has produced all non-privileged documents in his possession, custody or control which he promised to produce in his response and supplemental response to Mattel's subpoena, including all pleadings from the *Larian v. Larian* proceedings. Moreover, Mr. Larian has produced all non-privileged documents in his possession, custody or control that relate to Bratz, including its origin, Carter Bryant or Mattel, with the exception of documents which were Bates labeled "ED" or "MZ" and are specifically covered by the protective orders in those proceedings. As we have stated on numerous occasions, Mr. Larian is willing to produce these documents as soon as the protective order issue is resolved.

618150v1

EXHIBIT ____28____

PAGE ____276____

Juan Pablo Alban, Esq.
February 13, 2008
Page 2

Second, we take exception to your assertion that Mr. Larian testified to a massive destruction of evidence in late 2005 or that Mr. Larian had any obligation whatsoever to produce the USB storage device. To the contrary, Mr. Larian testified that he deleted from the device all documents which related to his litigation with Isaac Larian or MGA and that the only possible information remaining on the device was personal information which is not responsive to Mattel's subpoena or relevant to this action. Thus, Mr. Larian has no obligation to produce the USB device or make it available for inspection. Nevertheless, in a show of good faith, Mr. Larian is willing to allow Mattel's counsel and/or Mattel's expert to inspect the USB device at this office. Please contact the undersigned if you would like to arrange such inspection.

Finally, your suggestion that Mr. Larian failed to comply with any obligation to preserve documents is ludicrous. Mr. Larian testified that he discarded certain documents related to the *Larian v. Larian* proceedings shortly after he dismissed the arbitration in November 2005. Such discarding took place several years prior to Mr. Larian being served with Mattel's subpoena and prior to Mr. Larian's receipt of the letter dated November 28, 2005 which your law firm sent to Robert Wilson asking Mr. Larian to preserve documents regarding Bratz prior to June 30, 2001. The November 28, 2005 letter imposed absolutely no obligation on Mr. Larian with respect to the manner in which he chose to preserve or maintain his documents. As non-party to this action, Mr. Larian was free to maintain and preserve his documents without regard to this action until he was served with Mattel's subpoena, and any suggestion to the contrary is misplaced.

I trust that the foregoing is sufficient to resolve your concerns. Please contact me if you have questions regarding the foregoing or have additional concerns regarding Mr. Larian's production in response to Mattel's subpoena.

Very truly yours,

*Alisa Morgenthaler Lever*

Alisa Morgenthaler Lever
of CHRISTENSEN, GLASER, FINK, JACOBS,
WEIL & SHAPIRO, LLP

AML/eb

cc:   Patricia L. Glaser, Esq.
      Jose Allen, sq. (via facsimile)
      Scott Gizer, Esq.
      Bryant Delgadillo, Esq. (via facsimile)

618150v1

EXHIBIT ___28___

PAGE ___277___

# EXHIBIT 29

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-624-7707 FAX 213-624-0643

December 23, 2004

**By Facsimile**

Alecia Meyers, Esq.
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, California 90071-2899

Re:     *Mattel, Inc. v. Carter Bryant*

Dear Ms. Meyers:

It was good meeting you this morning. I am writing to memorialize aspects of our meet and confer earlier today regarding MGA's production and responses in this case.

## I.      Inadequate Production

### A.      Contracts With Bryant

Mattel requested MGA to produce all of its contracts with Bryant and all documents referring or relating to its agreements with Bryant, including all drafts. You stated that MGA has no additional contracts with Bryant, other than the Bratz contract with the purported date of April 11, 2001, which you agreed that MGA would produce.

As stated in Jon Corey's letter of December 13, 2004, and as I reiterated today, MGA has produced no drafts, correspondence, notes, memoranda, e-mails, or other documents concerning any of its agreements with Bryant, with the exception of a single email dated October 6, 2000. You asserted that such communications are privileged and asked me for authority stating otherwise. As I mentioned, our portions of the draft Joint Stipulation previously served on Bryant cite several cases holding that contracts and contract-related discussions, negotiations and communications between parties (whether exchanged directly or by their respective legal counsel) are not, and cannot be, protected by the attorney-client privilege. Although you first tried to suggest that MGA did not have the draft Joint Stipulation, as I stated earlier today, MGA quotes it (albeit erroneously) in its Joinder to Bryant's Opposition to the Motion for Remand and therefore clearly has it.

**quinn emanuel urquhart oliver & hedges, llp**

NEW YORK | 865 Third Avenue, 11th Floor, New York, New York 10022 | TEL 212-702-8100 FAX 212-702-8200.
SAN FRANCISCO | 201 Sansome Street, 6th Floor, San Francisco, California 94104 | TEL 415-986-7000 FAX 415-986-7007.
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL 650-620-4500 FAX 650-620-4555
PALM SPRINGS | 45-025 Manitou Drive, Suite 8, Indian Wells, California 92210 | TEL 760-345-1347 FAX 760-345-2414
SAN DIEGO | 4445 Eastgate Mall, San Diego, California 92121 | TEL 858-812-3100 FAX 858-812-3336

**EXHIBIT** 2

PAGE _____ 278

In any event, I direct your attention to the following authorities, which make clear that MGA's privilege assertion as to such documents is not meritorious: Potter v. United States, 2002 WL 31409613, at *6 (S.D. Cal. July 26, 2002); Southern Union Co. v. Southwest Gas Corp., 205 F.R.D. 542, 548 (D. Ariz. 2002); Winchester Capital Management Co., Inc. v. Manufacturers Hanover Trust Co., 144 F.R.D. 170, 174 (D. Mass. 1992); Manufacturing Systems, Inc. of Milwaukee v. Computer Technology, Inc., 99 F.R.D. 335, 337 (E.D. Wis. 1983). Indeed, this result is simply an extension of the normal rule that privilege cannot attach to a communication or document disclosed to a third party. See Clady v. County of Los Angeles, 770 F.2d 1421, 1433 (9th Cir. 1985); Griffith v. Davis, 161 F.R.D. 687, 698 (C.D. Cal. 1995).

While you initially also claimed today that MGA has given us "everything" responsive to these requests, we know, as I mentioned, that additional, non-privileged documents such as drafts exist from Bryant's counsel's statements. Moreover, Ms. O'Connor testified to the existence of written attorney communications on this subject. Yet, none of the documents identified by Mr. Bryant's counsel or by Ms. O'Connor have been produced or listed on a privilege log. You stated that MGA will look and produce such responsive documents relating to Bryant's agreements.

### B.    Contracts, Invoices And Related Documents Regarding Others

Also missing from MGA's production are contracts, quotations, invoices, purchase orders, check stubs, requisition forms and related documents pertaining to others who worked on the Bratz project prior to January 1, 2001, including without limitation those for Margaret Leahy, Jesse Ramirez, Anna Rhee, Sarah Halpern and Veronica Marlow. You agreed MGA would produce these documents.

### C.    Missing Records Of Payments To Bryant

MGA has not produced a complete set of its documents reflecting payments made to Bryant. You agreed that MGA would produce all documents relating to payments made to Bryant "during the time of his Mattel employment," but asserted that, based upon authority you have, Mattel cannot recover or obtain damages for any payment made to Bryant after he left Mattel's employment. Accordingly, you claimed that all payments made to Bryant after his employment by Mattel were irrelevant and would not be produced. I asked for you to provide me with the authority you referenced, which you agreed to do, and I look forward to receiving it.

### D.    Redactions And Other Missing Referenced Documents

You stated during the meeting that MGA will look for the "binder" and "physical samples" that are mentioned in MGA's September 27, 2000 email, but that have not been produced. You otherwise claimed that all of the attachments or accompanying materials referred to in MGA's documents which exist have been produced.

As for the multitude of redactions in MGA's production that Mr. Corey's letter identified, you stated that these redactions were based on relevance or trade secret. There is, however, a protective order

2

EXHIBIT ___29___

PAGE ___279___

in place, so we do not agree that trade secret is a legitimate basis for the redactions here. You agreed that MGA will produce documents in unredacted form if the redacted matter relates in any manner to Bryant or projects he worked on. You also agreed that, as to any documents which remain in redacted form based upon relevance grounds, MGA will provide a representation that all such redacted matter is completely unrelated to Bryant or any projects he worked on.

### E.    Contacts And Meetings With Bryant

Missing from the MGA production are documents (whether internal or external) reflecting its contacts and meetings with Bryant. The earliest communication produced by MGA on this topic is dated October 6, 2000, even though Bryant testified that he met and communicated with MGA (at least) many weeks before that and even though Victoria O'Connor testified that emails on this subject existed. Nor has MGA produced any notes, emails, letters or other communications regarding its development meetings with Bryant, even though Bryant testified that he held such meetings and even though Bryant has produced some of his notes reflecting the meetings. You stated that MGA would produce such documents. In response to my point that no emails to or from Victoria O'Connor have been produced, you also agreed that MGA would produce any responsive emails to or from Ms. O'Connor.

### F.    Altered Documents And Originals

Although we specifically had requested that MGA provide proposed dates on which it would make available for our inspection and photographing the originals of all documents and tangible things that MGA has produced in this matter, you did not have any such dates for me. Although you first suggested that Mattel had no right to inspect the originals,[1] you agreed to provide me with proposed dates no later than January 10, 2005. Although we do not believe such a delay is well-founded in light of our earlier requests, and in light of the fact that MGA's production is not extensive, we look forward to hearing from you on this. You also agreed to produce color copies of any documents that are in color.

You stated that MGA has not located the fax of the 2000 Bryant-MGA contract which Bryant sent to MGA and which, according to Victoria O'Connor's testimony, MGA altered. You even referred to this as a "purported document." We obviously find this revelation troubling. There is no question that the contract was faxed to MGA from Mattel's Design Center. Both the sender, Carter Bryant, and the recipient, Victoria O'Connor, so testified. Indeed, Ms. O'Connor testified that the *entire* contract was faxed to MGA from Bryant. Yet, neither MGA nor Bryant have produced *any* copy (let alone the original) of the contract that bears fax header information on any page other than the last page--and even that last page is missing the fax header information showing where the fax was sent from. This clearly reveals that the 2000 contract which Bryant faxed to MGA has never been

---

[1] As I mentioned, Rule 34 by its terms authorizes Mattel's request for inspection and photographing.

3

EXHIBIT ___29___

PAGE ___280___

produced. It also strains credulity to suggest that MGA inadvertently discarded not only all of the pages of the original of this signed contract that was faxed to it, but all copies of them as well.

MGA would not agree to Mattel's request that it produce in electronic form emails and other electronic data that it previously produced in hard copy form or the metadata associated with any of the electronic data that it had produced. You asked me to provide authority to support Mattel's request. Not only does the plain terms of Rule 34 contemplate that such information be produced, but courts have found it appropriate for a producing party to provide both a hard copy and any available electronic copy of responsive data. E.g., Anti-Monopoly, Inc. v. Hasbro, Inc., 1995 WL 649934, at *1, 1995-2 Trade Cases ¶ 71,218 (S.D.N.Y. Nov. 3, 1995) ("[T]he rule is clear: production of information in 'hard copy' documentary form does not preclude a party from receiving that same information in computerized/electronic form."); Storch v. IPCO Safety Products Co., 1997 WL 401589, at *2 (E.D. Pa. July 16, 1997) ("in this age of high-technology where much of our information is transmitted by computer and computer disks, it is not unreasonable for the defendant to produce the information on computer disk for the plaintiff").

We believe that our request for the electronic data (and to inspect original hard copies) is particularly justified here, given the serious questions that Ms. O'Connor's testimony has raised about the integrity of MGA's documents. Our concern has become all the more acute since learning from Bryant's counsel, only earlier today, that they allegedly do not have the vast majority of his original "Bratz" drawings and sketches, despite Bryant's sworn testimony that he turned all of them over to his counsel and despite Bryant's counsel's promises (after weeks of delay) that they would provide these originals for our inspection.

If, after further considering our discussion today, MGA changes its mind on this request and will agree to turn over its data in electronic form, please let me know promptly. Otherwise, based upon MGA's position as articulated today, we plan to serve MGA with a draft Joint Stipulation on this issue.

### G.   Bryant's Work On "Angel"

You agreed that MGA will produce all documents, including its records of payment to Bryant, relating to the so-called "Angel" project.

## II.   No Privilege Log

Mattel has requested a privilege log from MGA. You would not commit to providing one, but stated that you would let me know MGA's position on this issue.

## III.   Objections

As identified at length in Mr. Corey's letter, MGA has objected to Mattel's requests on various grounds. For reasons already discussed, we do not believe that these objections are either proper or

4

EXHIBIT _____29_____

PAGE _____281_____

well-founded in fact or law. Mr. Corey's letter asked that MGA be prepared at the meet and confer to advise us whether MGA has withheld any documents based on these objections. At our meeting, however, you stated that you did not know and would have to speak to your client. On this issue, as with the other issues that you would not provide a position on, you stated that MGA would get back to us no later than January 10, 2005 with its position. While we again do not believe that such a delay is warranted, we nevertheless look forward to hearing from you in the hope that Court intervention will be unnecessary as to those issues.

Relatedly, you would not commit to MGA's provision of amended responses to Mattel's requests. As I mentioned, not only do we believe that the objections and responses are without substance, but they do not provide fair notice of what MGA is agreeing to produce and what it is refusing to produce. You stated that you would let us know MGA's position on serving amended responses no later than January 10, 2005.

I hope you have an enjoyable holiday and look forward to hearing from you.

Very truly yours,

*Michael T. Zeller*

Michael T. Zeller

07209/626658.1

5
**EXHIBIT** 29

**PAGE** 282

# EXHIBIT 30

Received:   1/ 7/05  6.
JAN-07-2005  17:13                                            -> QUI.   /ANUEL;  Page 2

P.02/03

# O

## O'MELVENY & MYERS LLP

BEIJING
BRUSSELS
CENTURY CITY
HONG KONG
IRVINE SPECTRUM
LONDON
NEWPORT BEACH

400 South Hope Street
Los Angeles, California 90071-2899

TELEPHONE (213) 430-6000
FACSIMILE (213) 430-6407
www.omm.com

NEW YORK
SAN FRANCISCO
SHANGHAI
SILICON VALLEY
TOKYO
WASHINGTON, D.C.

January 7, 2005

OUR FILE NUMBER
527,436-04

### VIA FACSIMILE (213-624-0643)

WRITER'S DIRECT DIAL
(213) 430-8307

Michael T. Zeller, Esq.
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 Figueroa Street, 10th Floor
Los Angeles, California 90017

WRITER'S E-MAIL ADDRESS
ameyer@omm.com

Re:    *Mattel, Inc. v. Carter Bryant*

Dear Mr. Zeller:

Having now had a chance to review, in greater detail, your letter purporting to summarize certain aspects of our December 23, 2004 meet and confer, I would like to respond to certain mischaracterizations of our meeting. This letter is not intended as a complete response to your letter of December 23, 2004, nor a statement of MGA's substantive positions on the many discovery issues discussed at our December 23 meeting. As we agreed at the December 23 meeting, we will provide a full and complete response on January 10, 2005 after we have had a chance to review the authority you have cited and to discuss the issues with our client. This letter is intended only to correct the record on certain points where I believe your December 23, 2004 letter is inaccurate.

- First, contrary to your assertion, I did not state that MGA has no additional contracts with Bryant.

- Second, as to documents related to contracts with Bryant, I stated that I believed that MGA has produced everything responsive to your request *which has been found to be relevant and non-privileged*, but that we will look into the issue.

- Third, I stated that all of the attachments to the emails that MGA produced have been produced, to the extent they have been found in MGA's possession. I made no representation as to whether any attachments may *exist* that have not been found in MGA's possession.

- Fourth, we mutually agreed that information unrelated to Bryant or any projects on which Bryant worked is irrelevant to this case, and therefore properly redacted from MGA documents. I did not, however, conversely agree to produce in

EXHIBIT _____ 30 _____

PAGE _____ 283 _____

Received:   1/ 7/05
JAN-07-2005   17:13                                    -> QU.    ´ANUEL;   Page 3

P.03/03

**O'MELVENY & MYERS LLP**
Michael T. Zeller, Esq., January 7, 2005 - Page 2

unredacted form all matter that relates "in any manner" to Bryant or projects he worked on. To the contrary, I agreed to take your position on this issue under advisement and give you a further response on January 10, 2005. Indeed, it appears that in including the phrase "in any manner" in your letter, you are attempting to limit the scope of relevance-based redactions contrary to our discussions. For example, at our December 23 meeting, you agreed that the amounts MGA paid to Anna Rhee for her work on "Bratz" are irrelevant and therefore properly redacted on MGA documents Bates numbered MGA000669-676. However, your broad request that MGA produce documents in unredacted form if the redacted matter "relates in any manner to Bryant or projects he worked on," could now be construed to require the disclosure of this information, contrary to your express agreement otherwise.

• Finally, in the instances in which I agreed that MGA would look for additional responsive documents, I agreed only that MGA would produce any relevant, responsive and non-privileged documents, if any, that it locates.

I reiterate that we are hopeful that we will be able to resolve our differences informally. Please expect a more complete statement of MGA's positions on the discovery issues discussed at our December 23 meeting on January 10, 2005.

Very truly yours,

Alicia C. Meyer

Alicia C. Meyer
for O'MELVENY & MYERS LLP

LA2:746743

EXHIBIT     30
PAGE     284

# EXHIBIT 31

RECEIVED

JUN 2 6 2006

1   DIANA M. TORRES (S.B. #162284)
    PAULA E. AMBROSINI (S.B. #193126)
2   O'MELVENY & MYERS LLP
    400 South Hope Street
3   Los Angeles, CA 90071-2899
    Telephone: (213) 430-6000
4   Facsimile: (213) 430-6407
    Email:    dtorres@omm.com
5
    Attorneys for
6   MGA Entertainment, Inc.

7

8   DOUGLAS A. WICKHAM (S.B. #127268)
    KEITH A. JACOBY (S.B. #150233)
    LITTLER MENDELSON
9   A Professional Corporation
    2049 Century Park East, 5th Floor
10  Los Angeles, CA 90067.3107
    Telephone:   310-553-0308
11  Facsimile:   310-553-5583

12  Attorneys for Carter Bryant

13              UNITED STATES DISTRICT COURT

14             CENTRAL DISTRICT OF CALIFORNIA

15

16  | CARTER BRYANT, an individual, | Case No. CV 04-09049 SGL (RNBx) |
    |---|---|
    | Plaintiff, | (consolidated with CV 04-0959 and 05-02727) |
    | v. | |
    | MATTEL, INC., a Delaware Corporation, | **MGA AND BRYANT'S JOINT OPPOSITION TO MATTEL'S MOTION FOR APPOINTMENT OF EXPERT WITNESSES** |
    | Defendant. | **CONFIDENTIAL - UNDER SEAL** |
    | CONSOLIDATED WITH | Judge: Hon. Stephen G. Larson Hearing Date: July 10, 2006. |
    | MATTEL, INC. v. BRYANT and | Discovery Cut-Off:       TBD Pretrial Conference:   TBD |
    | MGA ENTERTAINMENT, INC. v. MATTEL, INC. | Trial:                         TBD |

OPP'N TO MOTION FOR COURT
APPOINTMENT OF EXPERT WITNESSES
CV 04-09049 SGL (RNBX)

EXHIBIT ___31___

PAGE ___285___   6/26

CALENDARED

EXHIBIT ____ 31

PAGE ____ 286

1

# TABLE OF CONTENTS

2

Page

3   I.      INTRODUCTION ...................................................................................1

4   II.     FACTUAL BACKGROUND...................................................................3

        A.      Mattel Files Suit ...........................................................................4

5       B.      Bryant Developed The "Bratz" Dolls While Freelancing At
6               Home In Missouri..........................................................................5

7       C.      MGA Acquires The Rights To The "Bratz" Drawings And
                Develops An International Sensation............................................6

8       D.      Mattel's Attempts To Back Date The Development Of The
                "Bratz" Doll...................................................................................7

9       E.      The Wholly Irrelevant Testimony of Victoria O'Connor and
                Anna Rhee ......................................................................................8

10  III.    ARGUMENT......................................................................................... 10

11      A.      Courts Should Not Interfere In The Adversarial Process By
                Appointing Court-Ordered Expert Witnesses Absent
12              Extraordinary Circumstances ...................................................... 10

13      B.      There Is No Compelling Reason To Deviate From The
                Adversarial Process Here ............................................................ 12

14              1.      Mattel's Belief That There Will Be A "Wide Divergence"
                        Of Opinion Between The Parties' Own Experts Is Not A
15                      Compelling Circumstance Justifying A Court-Appointed
                        Expert -- and Certainly Not At This Stage of Litigation ......... 13

16              2.      Each Parties' Experts Can Test The Documents Without
17                      Destroying The Other Parties' Ability To Test The Same
                        Documents................................................................................. 14

18      C.      Mattel Can, And Should, Hire Its Own Expert Witnesses -- And
                MGA and Bryant Should Not Be Forced To Pay For Mattel's
19              Expert Work ................................................................................. 15

20      D.      Mattel Is Trying To Circumvent The Rules Of Expert Discovery .... 17

    IV.     CONCLUSION...................................................................................... 18

21

22

23

24

25

26

27

28

EXHIBIT ___31___  -i-

PAGE ___287___

1    This memorandum of points and authorities responds to and opposes a

2    motion that Mattel, Inc. filed prior to consolidation in Case No. CV 04-9059 SGL

3    (RNBx), *Mattel, Inc. v. Bryant,* seeking Court appointment of expert witnesses.

4    **I.    INTRODUCTION**

5        Through the guise of this motion, Mattel, Inc. ("Mattel") attempts to

6    persuade the Court that Carter Bryant ("Bryant") lied under oath about the timing of

7    his creation of the "Bratz" drawings and that the business records of MGA

8    Entertainment, Inc. ("MGA") have all been doctored to support his story. For this

9    reason, Mattel claims that the Court should appoint one or more experts to examine

10   countless documents in the hope of supporting Mattel's version of the facts and

11   establishing that the "Bratz" dolls were conceived or reduced to practice on Mattel

12   time.

13       Mattel's Motion is rife with salacious allegations, but wholly bereft of any

14   authority that would support the extraordinary action Mattel asks the Court to take

15   here. While courts have inherent authority to appoint experts, it is rarely done, and

16   only then under compelling circumstances. There is good reason for this. The

17   Court appointment of experts is not in keeping with the adversary system of justice

18   followed in the United States. Under the adversary system, the parties ordinarily

19   hire their own independent expert witnesses -- including for the testing of ink and

20   paper, where appropriate -- and perform the tests they want to perform, using the

21   experts of their choice.

22       Courts generally do not intervene except under rare and unusual

23   circumstances, for instance where the parties' own experts have expressed such

24   vastly divergent views that the Court feels it is absolutely necessary to appoint a

25   third independent expert to resolve the problem, or where the Court requires

26   additional expert assistance to understand complex, technical issues. The Court's

27   role is to ensure that the rules of expert discovery and presentation of expert

28   testimony are obeyed, it is not to decide who the experts should be, what testing

1

OPP'N TO MOTION FOR COURT
APPOINTMENT OF EXPERT WITNESSES
CV 04-09049 SGL (RNBX)

EXHIBIT ____31____

PAGE ____288____

1    should be performed, what and how the tests should be conducted, and how the

2    experts should be paid and by whom. Indeed, it is well recognized that Court

3    appointed experts -- whose testimony inevitably favors one side more than the other

4    -- may signal to the jury that the Court has taken sides.

5         Mattel has not shown any compelling reason for the Court to deviate from

6    the normal, adversarial process in this case. Rather, Mattel can and should hire its

7    own experts. Indeed, its eagerness to have the Court superintend is, itself,

8    suspicious.

9         In asking the Court to appoint Court-ordered experts, Mattel falsely accuses

10   MGA and Bryant of having already conducted what Mattel terms "destructive"

11   testing and which, it claims, is sanctionable conduct. Notably, Mattel stops far

12   short of accusing MGA or Bryant of doing anything that would preclude or prevent

13   Mattel from testing any document, ink or paper that it wishes to test. Indeed, the

14   very fact that Mattel is asking for court-appointed experts to perform ink and paper

15   testing only underscores the fact that nothing has been "destroyed." Mattel itself

16   has examined Mr. Bryant's original drawings and many other documents over the

17   course of many days, and has professionally photographed and videotaped its

18   examination. Yet, Mattel has *never even asked* to have the documents tested by

19   experts. It simply filed this motion, instead.

20        Perhaps Mattel is simply hoping to force MGA and Bryant to foot half of the

21   bill for the extensive and expensive testing that Mattel is seeking. More likely,

22   however, Mattel is hoping to force MGA and Bryant to disclose what testing MGA

23   and/or Bryant have done. As Mattel well knows, the time for expert discovery is

24   far off and, unless and until MGA designates an expert in this area, any expert work

25   it performs is protected work product and it has no obligation to tell Mattel what, if

26   any, testing that expert has performed on MGA's behalf. Mattel's surreptitious

27   attempts to obtain information about MGA's work product should not be condoned.

28        Discovery in this case is at its inception. Mattel has seized this motion as an

                                    2          OPP'N TO MOTION FOR COURT
                                               APPOINTMENT OF EXPERT WITNESSES
                                               CV 04-09049 SGL (RNBX)

EXHIBIT _____31_____

PAGE _____289_____

1   opportunity to get its theory of the case before the Court as early as possible to try

2   to inflame the Court against Bryant and MGA, and, at the same time, try to discover

3   MGA's work product and require MGA and Bryant to pay half of the no doubt

4   exorbitant expert fees Mattel will seek to incur if the Court grants this motion.

5   Mattel's agenda should not be sanctioned. Mattel has utterly failed to show any

6   compelling reason for the Court to discard the adversarial system here. Its motion

7   should be denied.

8   **II.    FACTUAL BACKGROUND**

9       For over forty years, Mattel's world-famous "Barbie" doll dominated the doll

10  industry. (Declaration of Paula E. Ambrosini ("Ambrosini Decl.") filed

11  concurrently, Ex. 1 at SER 272-273.) Introduced in 1959, the original "Barbie"

12  doll grew to be enormously popular in a relatively short period of time. (*Id.*) Due

13  largely to the success of its "Barbie" line, Mattel became one of the world's largest

14  toymakers. (*Id.; see also* MGA Compl. ¶ 9 (quoting Mattel's website).)

15      Although the "Barbie" doll was, by far, the best-selling fashion doll for

16  nearly four decades, Barbie's popularity began to fade in the late 1990s. By that

17  time, Mattel's "Barbie" line had come to appeal only to young girls. (Ambrosini

18  Decl., Ex. 1 at SER 277-278.) Mattel, unable to attract the influential "tween"

19  market (*i.e.*, children between childhood and adolescence), developed products on

20  the assumption that girls in that age range were no longer interested in dolls.

21  (Ambrosini Decl., Ex. 1 at SER 272-73; 277-78; Ex. 2 ¶ 5.)

22      MGA, a family-owned business headquartered in Van Nuys, California,

23  began in 1979 as a small consumer electronics business. In 1987, the company

24  made its first foray into the toy business when it secured rights to market handheld

25  LCD games featuring licensed Nintendo® characters. This little-known but already

26  successful company, however, was propelled into the limelight -- and onto Mattel's

27  radar screen -- in 2001 when it introduced its own, innovative line of fashion dolls

28  named the "Bratz," which demonstrated the ability to do what no fashion doll had

3

OPP'N TO MOTION FOR COURT
APPOINTMENT OF EXPERT WITNESSES
CV 04-09049 SGL (RNBX)

EXHIBIT __31__

PAGE __290__

1  without authority, that if the parties take their own samples from the same

2  document, they "will talk past one another." (Mot. 19.) As Mattel explains on

3  page 12 of its motion, however, ink and paper chemical analysis involves taking

4  "microplugs," or tiny, pinpoint samples from documents and performing various

5  testing on the samples. *See Ethan Allen,* 259 F. Supp. 2d at 626; *Janopoulos,* 866

6  F. Supp. at 1095. The document itself is not destroyed, and testing performed by

7  one party does not preclude another party from testing the exact same document or,

8  indeed, the exact same pen stroke. *See Ethan Allen,* 259 F. Supp. 2d at 626. As

9  long as there is paper and ink to test, multiple experts may remove multiple

10  microplugs and test the exact same paper and ink. And Mattel does not -- and

11  cannot -- contend that there is not paper and ink available to test.

12      Indeed, Mattel's own authority *confirms* that two experts can chemically test

13  the same ink and paper from adjacent samples taken from the same document. *See,*

14  *e.g., Janopoulos,* 866 F. Supp. at 1095 (defendant retained its own expert to analyze

15  ink samples); *Ethan Allen,* 259 F. Supp. 2d at 626 (plaintiff retained own expert to

16  perform ink chemical analysis). There is no reason, therefore, for this Court to

17  appoint a single expert to test the documents rather than allow each of the parties to

18  hire its or his own experts.

19      **C.    Mattel Can, And Should, Hire Its Own Expert Witnesses -- And**

20           **MGA and Bryant Should Not Be Forced To Pay For Mattel's**

21           **Expert Work.**

22      Mattel claims that quite a number of documents need to be tested, by a wide

23  variety of different methods. Specifically, Mattel wants to have experts examine

24  and test: (1) all of the original "Bratz" drawings (Mot. at 3-6); (2) Mr. Bryant's

25  contract with MGA[6] (Mot. at 6-7): (3) an unidentified number of documents

26  relating to MGA's "Angel" doll project (Mot. at 9-10, 13); and (4) a facsimile of a

27

28  [6] It bears noting that the original contract has not been found and thus it is unclear what
Mattel hopes to test.

1    "Bratz" drawing (Mot. at 10-11).  Mattel proposes that one or more experts be

2    appointed to test these documents visually, "employing such techniques as

3    'stereomicroscopes or other magnifiers, various light sources, scanners with special

4    filters, and measuring instruments or grids.'" (Mot. at 11.)  Mattel also wants the

5    Court to appoint experts to test the ink on the paper documents using "expert ink

6    chemistry" analysis, including the performance of "extraction" or "thin-layer

7    chromatography" tests and "relative ink age" comparisons.  (Mot. at 12-13.)  And

8    Mattel wants the Court to appoint experts to test the paper itself using "paper

9    chromatography."  (Mot. at 13.)

10         While Mattel expounds, at length, about why such extensive testing is

11   supposedly necessary, nowhere does Mattel even attempt to explain why it cannot,

12   and should not, simply hire its own experts to perform the tests.  In fact, *Mattel*

13   *concedes that it will retain its own experts if the Court does not appoint them.*

14   (Mot. at 15.)  And neither MGA nor Bryant has refused to allow such testing.  In

15   fact, ***Mattel has never even asked.***  While Mattel implies that MGA and Bryant

16   have somehow kept original documents secreted away, this is not the truth.  Mattel

17   has closely examined original Bryant documents on more than one occasion.

18   Indeed, to comply with a last-minute request by Mattel to have original drawings

19   available at Mr. Bryant's deposition, his counsel went to extraordinary measures to

20   retrieve the documents from a safe deposit box in California and fly them to

21   Missouri in time for the deposition.  That was nearly two years ago.  Mattel has also

22   separately examined original Bryant documents over the course of three days in

23   California, and professionally photographed and videotaped the examination.  In

24   addition to this, the parties have recently agreed to a bilateral protocol that will

25   allow Mattel further access to original documents.  (Ambrosini Decl. ¶ 6.)

26         Of course, if Mattel were to retain its own experts to further examine the

27   documents, it would have to pay for it alone.  In contrast, Court appointed experts

28   are entitled to "reasonable compensation in whatever sum the court may allow."

16                    OPP'N TO MOTION FOR COURT
                              APPOINTMENT OF EXPERT WITNESSES
                              CV 04-09049 SGL (RNBX)

EXHIBIT     31

PAGE     292

1    Fed. R. Evid. 706(b). In civil cases, the parties must share the cost "in such
2    proportion. . . as the court directs." *Id.* Mattel's motion, coming before Mattel has
3    even attempted to perform its own testing with its own experts, seems designed to
4    get MGA to foot half the bill for the extensive, expensive and, in MGA and
5    Bryant's view, unnecessary testing that Mattel wants to have performed. (Mot. at
6    14 note 49.) While Mattel would no doubt like to shift its expenses to MGA and
7    Bryant, there is no reason that MGA and Bryant should be forced to bear those
8    costs. Mattel is clearly not indigent, and can, and should, hire its own expert
9    witnesses.[7] *See, e.g., Applegate,* 628 F. Supp. at 383 (no justification for appointing
10   expert witness where plaintiff was not indigent and did not claim that he had failed
11   to obtain expert because he could not afford one).

12        **D.    Mattel Is Trying To Circumvent The Rules Of Expert Discovery.**

13        Finally, there is no merit to Mattel's claim that MGA and Bryant have
14   already engaged in destructive testing. Without question, Courts may sanction a
15   party who destroys evidence, such as by shredding, burning, erasing or otherwise
16   completely destroying a document. In such cases, however, sanctions are
17   appropriate because one party has precluded the other party from testing or gaining
18   access to the evidence at issue. *See, e.g., Lewis v. J.C. Penny, Inc.,* 12 F. Supp. 2d
19   1083, 1086 (E.D. Cal. 1998) (explaining that spoliation or destruction of evidence
20   generally refers to the "destruction or significant alteration of evidence, or the
21   failure to preserve property for another's use as evidence, in pending or future
22   litigation."); *United States v. Salazar,* 443 F.3d 1153, 1154-55 (9th Cir. 2006)
23   (finding that defendant destroyed documents where defendant instructed co-
24   workers to shred INS documents); *Cabinetware, Inc. v. Sullivan,* 1991 WL 327959,
25   at *2 (E.D. Cal. 1991) (finding that defendant destroyed documents where

26   _____

27   [7] Mattel, whose market capitalization according to public sources is approximately $6.4
     *billion,* should not be allowed to conduct overreaching discovery for the purpose of
28   increasing the costs to MGA and Bryant. *Mattel, Inc. v. Walking Mountain Prods.,* 353 F.
     3d 792, 812-14 (9th Cir. 2003).

                                                    17          OPP'N TO MOTION FOR COURT
                                                          APPOINTMENT OF EXPERT WITNESSES
                                                                      CV 04-09049 SGL (RNBX)

     EXHIBIT    31

     PAGE    293

## IV.   CONCLUSION

For the foregoing reasons, the Court should decline Mattel's invitation to intercede in the adversarial process through the appointment of court-ordered expert witnesses and allow the parties to retain their own experts in support of their case.

Dated:        June 26, 2006           DIANA M. TORRES
                                      PAULA E. AMBROSINI
                                      O'MELVENY & MYERS LLP

                                      By: _____
                                           Paula E. Ambrosini
                                      Attorneys for
                                      MGA Entertainment, Inc.

Dated:        June 26, 2006           DOUGLAS A. WICKHAM
                                      KEITH A. JACOBY
                                      LITTLER MENDELSON, P.C.

                                      By _____
                                           Keith A. Jacoby
                                      Attorneys for Carter Bryant

19                        OPP'N TO MOTION FOR COURT
                         APPOINTMENT OF EXPERT WITNESSES
                              CV 04-09049 SGL (RNBX)

EXHIBIT ____31____

PAGE ____294____

1
## PROOF OF PERSONAL SERVICE

2      I am a citizen of the United States and employed in the County of Los

3   Angeles, State of California, at the law firm of O'Melveny & Myers, located at 400 South

4   Hope Street, Los Angeles, CA 90071-2899. I am not a party to this action.

5   On June 26, 2006 I caused the personal service of the following document(s):

6   **MGA AND BRYANT'S JOINT OPPOSITION TO MATTEL'S MOTION FOR**
    **APPOINTMENT OF EXPERT WITNESSES**
7   **CONFIDENTIAL - UNDER SEAL**

8   by requesting that an agent or employee of Worldwide Network, Inc. deliver to the office

9   of the recipient named below, either by handing the document(s) to the recipient or by

10   leaving the document(s) with the receptionist or other person apparently in charge of the

11   recipient's office:

12   Michael T. Zeller, Esq.
     Jon D. Corey, Esq.
13   Quinn Emanuel Urquhart Oliver & Hedges, LLP
14   865 Figueroa Street, 10th Floor
     Los Angeles, California  90017
15   Tel: (213) 443-3000
     Fax: (213) 443-3100
16

17      I declare under penalty of perjury under the laws of the State of California

18   that the above is true and correct. Executed on June 26, 2006, at Los Angeles, California.

19

20   _____
                Linda M. Rich
21

22

23

24

25

26

27

28

LA2:803473.1

EXHIBIT ____31____

PAGE ____295____