1   QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
      John B. Quinn (Bar No. 090378)
2      johnquinn@quinnemanuel.com
      Michael T. Zeller (Bar No. 196417)
3      (michaelzeller@quinnemanuel.com)
      Jon D. Corey (Bar No. 185066)
4      (joncorey@quinnemanuel.com)
    865 South Figueroa Street, 10th Floor
5   Los Angeles, California 90017-2543
    Telephone: (213) 443-3000
6   Facsimile: (213) 443-3100

7   Attorneys for Mattel, Inc.

8

9                  UNITED STATES DISTRICT COURT

10              CENTRAL DISTRICT OF CALIFORNIA

11                      EASTERN DIVISION

12  CARTER BRYANT, an individual,         CASE NO. CV 04-9049 SGL (RNBx)

13              Plaintiff,                Consolidated with
                                          Case No. CV 04-09059
14         vs.                            Case No. CV 05-02727

15  MATTEL, INC., a Delaware              [PUBLIC REDACTED] MATTEL,
    corporation,                          INC.'S REPLY MEMORANDUM OF
16                                        POINTS AND AUTHORITIES IN
              Defendant.                  FURTHER SUPPORT OF ITS
17                                        MOTION FOR PARTIAL SUMMARY
                                          JUDGMENT
18  AND CONSOLIDATED ACTIONS

19                                        Hearing Date:    April 22, 2008
                                          Time:            10:00 a.m.
20                                        Place:           Courtroom 1

21                                        Discovery Cut-off:    January 28, 2008
                                          Pre-trial Conference: May 5, 2008
22                                        Trial Date:           May 27, 2008

23

24

25

26

27

28

07209/2456078.1

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT ........................................................................................................... 1

I.    THE INVENTIONS AGREEMENT IS ENFORCEABLE AND THE WORKS AT ISSUE ARE NOT WITHIN THE SCOPE OF CALIFORNIA LABOR CODE § 2870. ............................................................. 1

    A.    This Court Has Already Ruled the Agreement Enforceable. .................. 2

    B.    Bryant's Work on Bratz Is Not Made Non-Assignable by California Labor Code § 2870. ............................................................. 2

II.    MATTEL OWNS ANY BRATZ INVENTIONS THAT BRYANT CREATED, MADE, CONCEIVED, OR REDUCED TO PRACTICE WHILE EMPLOYED BY MATTEL. ....................................................... 4

    A.    Bryant's Interpretation Contradicts the Agreement's Plain Meaning................................................................................................. 4

    B.    California Labor Code § 2870 Does Not Narrow The Term "Inventions" in the Agreement, But Confirms its Breadth. ................... 7

    C.    Tie-Breaking Interpretive Principles Do Not Apply............................... 9

    D.    The Agreement Satisfies Section 204 of the Copyright Act................... 9

III.    THE FIRST-WAVE BRATZ DOLLS ARE SUBSTANTIALLY SIMILAR TO CERTAIN OF BRYANT'S DRAWINGS............................... 10

    A.    As a Matter of Law, The Drawings Are Original and Deserve Full Copyright Protection. ..................................................................... 11

        1.    MGA Fails To Confront Its Prior Statements and Conduct Regarding Originality of the Drawings. ....................................... 11

        2.    MGA's Cited Cases Involve Factual, Not Creative Works. ......... 12

        3.    MGA Misunderstands and Misapplies Filtration Analysis. ......... 12

4.      Being Inspired by Prior Works Is Distinct from Slavishly Copying Them. .................................................................. 14

B.    That the Bratz Dolls Are Substantially Similar to the Drawings Cannot Be Reasonably Disputed. .......................................... 14

IV.   BRYANT IS LIABLE FOR BREACH OF CONTRACT, BREACH OF THE DUTY OF LOYALTY, AND BREACH OF FIDUCIARY DUTY. ........ 19

A.    Bryant Is Liable for Breach of Contract. ............................... 19

B.    Bryant Is Liable for Breach of the Duty of Loyalty and Breach of Fiduciary Duty. ............................................................. 21

1.      Bryant Owed Mattel a Duty of Loyalty and a Fiduciary Duty. ...................................................................... 21

2.      Bryant Clearly Breached His Duties. .......................... 25

V.    MGA AND LARIAN ARE LIABLE FOR AIDING AND ABETTING BRYANT'S BREACHES OF HIS DUTIES. .................................... 28

A.    There Is No Genuine Dispute That MGA Knew of the Breaches. ......... 28

B.    There Is No Genuine Dispute That MGA Provided Substantial Assistance to Bryant. ........................................................ 30

C.    The MGA Defendants Profited from Bryant's Breaches. .............. 32

VI.   DEFENDANTS' REMAINING AFFIRMATIVE DEFENSES FAIL. ........... 32

A.    Good Faith and 17 U.S.C. § 205. ........................................ 32

B.    Statute of Limitations. ..................................................... 35

C.    Laches. ....................................................................... 42

D.    Waiver and Consent. ...................................................... 44

E.    Abandonment. .............................................................. 46

F.    Estoppel. ..................................................................... 46

G.    Acquiescence. ............................................................... 47

H.    Unclean Hands. ............................................................ 47

07209/2456078.1

1

    I.     Mitigation of Damages.............................................................................48

2  CONCLUSION.......................................................................................................49

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MATTEL, INC.'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF AUTHORITIES

**Page**

## Cases

Applera Corp. v. Illumina, Inc.,
    2008 WL. 170597 (N.D. Cal. Jan. 17, 2008) ........................... 3, 4

Bancroft-Whitney Co. v. Glen,
    64 Cal. 2d 327 (Cal. 1966) ........................................ 28

BensBargains.net, LLC v. xpbargains.com,
    2007 WL. 2385092 (S.D. Cal. Aug. 16, 2007) ....................... 17

Berkla v. Corel Corp.,
    66 F. Supp. 2d 1129 (E.D. Cal. 1999) .............................. 17

Breceda v. Gamsby,
    267 Cal. App. 2d 167 (1968) ...................................... 45

Bull Publ'g Co., v. Sandoz Nutrition Corp.,
    1989 WL. 201080 (N.D. Cal. 1989) ................................. 10

Cadence Design Sys., Inc. v. Bhandari,
    2007 WL. 3343085 (N.D. Cal. 2007) ............................. 3, 4, 9

Carpenter v. United States,
    484 U.S. 19 (1987) ............................................... 25

Casey v. U.S. Bank National Ass'n,
    127 Cal. App. 4th 1138 (2005) ................................. 33, 34

Cavalier v. Random House, Inc.,
    297 F.3d 815 (9th Cir. 2002) ..................................... 13

Central Lewmar, L.P. v. Gentilin,
    2005 WL. 1308235 (D. N.J. June 1, 2005) .......................... 30

Chosun Int'l Inc. v. Chrisha Creations, Ltd.,
    413 F.3d 324 (2d Cir. 2005) ...................................... 20

City of New York v. Geodata Plus, LLC,
    2007 WL. 2891427 (E.D.N.Y. Sept. 28, 2007) .................... 16, 19

City Solutions, Inc. v. Clear Channel Communications, Inc.,
    201 F. Supp. 2d 1048 (N.D. Cal. 2002) ............................ 24

Cofre, Inc. v. Lollytogs, Ltd.,
    1991 WL. 40366 (S.D.N.Y. Mar. 15, 1991) .......................... 16

Compagnie Financiere de CIC et de l'Union Europeene v. Merrill Lynch,
    232 F.3d 153 (2d Cir. 2000) ...................................... 17

Cosmos Jewelry Ltd. v. Po Sun Hon Co.,
  470 F. Supp. 2d 1072 (C.D. Cal. 2006) .................................................. 13

Country Kids 'N City Slicks, Inc. v. Sheen,
  77 F.3d 1280 (10th Cir. 1999) .............................................................. 13

Cubic Corp v. Marty,
  185 Cal. App. 3d 438 (1986) .................................................................. 3

Danjaq, LLC v. Sony Corp.,
  263 F.3d 942 (9th Cir. 2001) ................................................................ 47

Davis v. Outdoor Equip. Co.,
  551 S.W.2d 72 (Tex. Ct. App. 1977) ................................................... 44

Dyna Med, Inc. v. Fair Employment & Housing Comm'n,
  43 Cal. 3d 1379 (1987) .......................................................................... 7

Eckard Brandes, Inc. v. Riley,
  338 F.3d 1082 (9th Cir. 2003) .............................................................. 30

Educ. Testing Serv. v. Simon,
  95 F. Supp. 2d 1081 (C.D. Cal. 1999) ................................................. 16

Effects Assocs., Inc. v. Cohen,
  908 F.2d 555 (9th Cir. 1990) ............................................................... 10

Eldred v. Ashcroft,
  537 U.S. 186 (2003) ............................................................................... 5

Enreach Tech., Inc. v. Embedded Internet Solutions, Inc.,
  403 F. Supp. 2d 968 (N.D. Cal. 2005) ................................................ 23

Enterprise Leasing Corp. v. Shugart Corp.,
  231 Cal. App. 3d 737 (1991) ............................................................... 36

Feist Publ'ns, Inc. v. Rural Tel. Serv.,
  499 U.S. 340 (1990) ............................................................................. 17

In re First Alliance Mortgage Co.,
  471 F.3d 977 (9th Cir. 2006) ............................................................... 33

Fleisher Studios v. Ralph A. Freundlich, Inc.,
  73 F.2d 276 ) (2d Cir. 1934 ................................................................. 20

Fogerty v. Fantasy, Inc.,
  510 U.S. 517 (1994) ............................................................................. 13

Fox v. Ethicon Endo-Surgery, Inc.,
  35 Cal. 4th 797 (2005) ......................................................................... 37

GAB Bus. Servs., Inc. v. Lindsey & Newsom Claim Servs., Inc.,
  83 Cal. App. 4th 409 (2000) ............................................................... 23

*Garamendi v. SDI Vendome S.A.,*
    276 F. Supp. 2d 1030 (C.D. Cal. 2003)..............................41

*Gay Toys, Inc. v. Buddy L Corp.,*
    703 F.2d 970 (6th Cir. 1983)..............................21

*Graham v. Scissor-Tail, Inc.,*
    28 Cal. 3d 807 (1981)..............................10

*Harper House, Inc. v. Thomas Nelson, Inc.,*
    889 F.2d 197 (9th Cir. 1989)..............................12

*Hobson v. Wilson,*
    737 F.2d 1 (D.C. Cir. 1984)..............................41, 43

*Hudson v. Moore Business Forms, Inc.,*
    836 F.2d 1156 (9th Cir. 1987)..............................28

*Huong Que Inc. v. Liu,*
    150 Cal. App. 4th 400 (2007)..............................28, 29

*Hynix Semiconductor v. Rambus, Inc.,*
    2007 WL 3284060 (N.D. Cal. Nov. 2, 2007)..............................41

*Iconix, Inc. v. Tokuda,*
    457 F. Supp. 2d 969 (N.D. Cal. 2006)..............................8, 9, 10

*Ideal Toy Corp. v. Fab-Lu, Ltd.,*
    261 F. Supp. 238 (S.D.N.Y. 1966)..............................17, 19

*Idema v. Dreamworks, Inc.,*
    162 F. Supp. 2d 1129 (C.D. Cal. 2001)..............................12

*JCW Invs., Inc. v. Novelty, Inc.,*
    289 F. Supp. 2d 1023 (N.D. Ill. 2003), aff'd,
    482 F.3d 910 (7th Cir. 2007)..............................14, 16

*Jarrow Formulas, Inc. v. Nutrition Now, Inc.,*
    304 F.3d 829 (9th Cir. 2002)..............................47

*King Features Syndicate v. Fleisher,*
    299 F. 533 (2d Cir. 1924)..............................20

*Kling v. Hallmark Cards, Inc.,*
    225 F.3d 1030 (9th Cir. 2000)..............................46

*Knickerbocker Toy Co. v. Etone Intern., Inc.,*
    1980 WL 1141 (D. N.J. March 10, 1980)..............................6

*Kobzoff v. Los Angeles Cty. Harbor/UCLA Med. Ctr.,*
    19 Cal. 4th 851 (1998)..............................8

*Louis Vuitton S.A. v. Lee,*
    875 F.2d 584 (7th Cir. 1989)..............................31

MGM Studios, Inc. v. Grokster, Ltd.,
    518 F. Supp. 2d 1197 (C.D. Cal. 2007) .................................................. 48, 49

M. Lady, LLC v. Aji, Inc.,
    2007 WL. 2728711 (S.D.N.Y. Sept. 19, 2007) ...................................... 16

In re Marriage of Varner,
    55 Cal. App. 4th 128 (1997) .................................................................. 25

Masquerade Novelty, Inc. v. Unique Indus., Inc.,
    912 F.2d 663 (3d Cir. 1990) .................................................................. 21

Mattel, Inc. v. Goldberger Doll Mfg. Co.,
    365 F.3d 133 ...................................................................................... 14, 18

McCulloch v. Albert E. Price, Inc.,
    823 F.2d 316 (9th Cir. 1987) ................................................................ 13

McLaughlin v. Liu,
    849 F.2d 1205 (9th Cir. 1988) .............................................................. 48

Michelson v. Hamada,
    29 Cal. App. 4th 1566 (1991) ............................................................... 23

Nat'l Ass'n for Stock Car Auto Racing, Inc. v. Scharle,
    356 F. Supp. 2d 515 (E.D. Pa. 2005) ................................................... 10

National Subscription Television v. S & H TV,
    644 F.2d 820 (9th Cir. 1981) ................................................................ 47

Neilson v. Union Bank of Calif.,
    290 F. Supp. 2d 1101 (C.D. Cal. 2003) ................................................ 34

O'Neill v. Jesco Imports, Inc.,
    2006 WL. 2623220 (W.D. Mo., Sept. 12, 2006) .................................. 5

Peer Int'l Corp. v. Latin American Music Corp.,
    161 F. Supp. 2d 38 (D.P.R. 2001) ........................................................ 35

Polar Bear Prods, Inc. v. Timex Corp.,
    384 F.3d 700 (9th Cir. 2004) ................................................................ 38

Radio Television Espanola S.A. v. New World Entm't, Ltd.,
    183 F.3d 922 (9th Cir. 1999) ................................................................ 10

Reeves v. Hanlon,
    33 Cal.4th 1140 (2004) ......................................................................... 23

Roley v. New World Pictures, Ltd.,
    19 F.3d 479 (9th Cir. 1994) .................................................................. 44

San Jose Const., Inc. v. S.B.C.C., Inc.,
    155 Cal. App. 4th 1528 (2007) ............................................................. 36

1
Satava v. Lowry,
    323 F.3d 805 (9th Cir. 2003) ............................................................. 12
2
3
Science Accessories Corp. v. Summagraphics Corp.,
    425 A.2d 957 (Del. 1980) ................................................................... 30
4
Sheldon v. Metro-Goldwyn Pictures Corp.,
    81 F.2d 49 (2d Cir. 1936) ................................................................... 19
5
6
Shine v. Childs,
    382 F. Supp. 2d 602 (S.D.N.Y. 2005) ................................................ 20
7
Shloss v. Sweeney,
    515 F. Supp. 2d 1068 (N.D. Cal. 2007) ............................................... 5
8
9
Sony Computer Entm't America, Inc. v. Gamemasters,
    87 F. Supp. 2d 976 (N.D. Cal. 1999) .................................................. 31
10
Stevens v. Marco,
    147 Cal. App. 2d 357 (1956) .............................................................. 25
11
12
Stokes v. Dole Nut Co.,
    41 Cal. App. 285 (1995) ..................................................................... 28
13
Taylor v. Metro-Goldwyn-Mayer Studios,
    115 F. Supp. 156 (S.D. Cal. 1953) ..................................................... 15
14
15
Three Boys Music Corp. v. Bolton,
    212 F.3d 477 (9th Cir. 2000) ............................................................. 17
16
Tufenkian Import/Export Ventures, Inc. v. Einstein Moomjy, Inc.,
    338 F.3d 127 (2d Cir. 2003) ............................................................... 15
17
18
United States v. King Features Entm't, Inc.,
    843 F.2d 394 (9th Cir. 1988) ............................................................. 49
19
Wells Fargo Bank v. Bank of Am.,
    32 Cal. App. 4th 424 (1995) ............................................................... 46
20
21
Wood v. Santa Barbara Chamber of Comm., Inc.,
    705 F.2d 1515 (9th Cir. 1983) ....................................................... 38, 39
22
Wyatt v. Union Mortgage Co.,
    24 Cal. 3d 773 (1979) ......................................................................... 32
23
24
Yeti by Molly, Ltd. v. Deckers Outdoor Corp.,
    259 F.3d 1101 (9th Cir. 2001) ............................................................ 52
25
Zella v. E.W. Scripps Co.,
    529 F. Supp. 2d 1124 (C.D. Cal. 2007) .............................................. 17
26
27
**Statutes**

28
17 U.S.C. § 101 .................................................................................... 21

07209/2456078.1

-viii-
MATTEL, INC.'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF ITS
MOTION FOR PARTIAL SUMMARY JUDGMENT

17 U.S.C. § 204 .................................................................................................. 10

17 U.S.C. § 205 .............................................................................................. 4, 5

17 U.S.C. § 205(c) ............................................................................................ 35

17 U.S.C. § 205(d) ............................................................................................ 35

17 U.S.C. § 504(c) ............................................................................................ 35

California Labor Code § 2863 ..................................................................... 22, 27

California Labor Code § 2870 .................................................................... 1, 2, 4, 9

California Labor Code § 2870(a)(1) ................................................................... 3

California Labor Code § 2872 ........................................................................... 4

Fed. R. Civ. P. 15(c) ......................................................................................... 44

Fed. R. Civ. P. 37(c)(1) ..................................................................................... 52

## Other Authorities

Hon. Jon O. Newman, New Lyrics for an Old Melody:
    The Idea/Expression Dichotomy in the Computer Age,
    17 Cardozo Arts & Ent. L.J. 691 (1999) .................................................. 13

Michael D. Murray, Copyright, Originality, and the End of the
    Scenes Faire and Merger Doctrines for Visual Works,
    58 Baylor L. Rev. 779 (2006) .................................................................. 14

Restatement (Third) of Agency § 8.04 (2006) ....................................... 29

## REPLY MEMORANDUM OF POINTS AND AUTHORITIES

### Preliminary Statement

Although defendants' oppositions labor to demonstrate disputed issues of fact, they reveal that the dispositive issues are purely legal and thus appropriate for resolution on partial summary judgment.  For example:

- Whether Bryant's Bratz copyrightable (but non-patentable) works are "inventions" as that term is defined by the Inventions Agreement depends on interpreting the Agreement's phrase "patentable or unpatentable," the Agreement's explicit reference to copyright, the ordinary meaning of the term, and the legislative history of § 2870.

- Whether Bryant's Bratz works are original and fully protectable under copyright turns on whether defendants are estopped by their prior statements and whether their cited cases dealing with factual compilations apply to a creative visual work like the Bratz drawings.

- Whether Mattel's claims are timely turns on identifying the correct notice standard—MGA argues the standard is one of notice of potential injury to any property interest of Mattel's; Mattel contends the standard is one of notice of potential injury to its property interest in the Bratz works Bryant created during his Mattel tenure.

Mattel demonstrates below why these and other dispositive legal issues should be decided in its favor, rendering defendants' allegations of disputed fact irrelevant.

### Argument

### I.   THE INVENTIONS AGREEMENT IS ENFORCEABLE AND THE WORKS AT ISSUE ARE NOT WITHIN THE SCOPE OF CALIFORNIA LABOR CODE § 2870.

Mattel explained in its Motion for Partial Summary Judgment ("MPSJ") (at Point I.A) that there is no reason to revisit this Court's rulings that the Inventions Agreement is neither unconscionable nor otherwise unenforceable.  Mattel then

1  showed (MPSJ, Point I.B) that the works at issue are not made non-assignable by

2  California Labor Code § 2870.

###### A.      This Court Has Already Ruled the Agreement Enforceable.

4      Bryant concedes that the Court already rejected his arguments that the

5  Inventions Agreement is unconscionable.  (Bryant Opp. 15.)  Nor does he dispute that

6  he then abandoned his unconscionability defense.[1]

7      Bryant nonetheless tries to revive the defense by claiming that the Court did

8  not consider unconscionability "given the meaning Mattel now claims for [the

9  Agreement], on the facts of this particular case."  (Bryant Opp. 15-16.)  But this

10  mischaracterizes the Court's decision, which *was* rendered against the same "as

11  applied" backdrop that exists now—Mattel's contention that Bryant "assigned his

12  creative works to Mattel,"[2] and Bryant's response that Mattel's reading rendered the

13  contract unconscionable.  No basis exists to revisit that decision.

###### B.      Bryant's Work on Bratz Is Not Made Non-Assignable by California Labor Code § 2870.

16      Bryant argues that there is a dispute of fact concerning whether section 2870

17  encompasses Bryant's works and thus exempts them from the scope of the Inventions

18  Agreement's assignment to Mattel.  (Bryant Opp. 8-13.)  Specifically, Bryant

19  contends there is evidence from which jurors could conclude that he developed Bratz

20  on his own time and without using Mattel resources.  (Id. at 12.)

21      Bryant misreads the statute.  Even assuming *arguendo* that Bryant conceived of

22  and developed Bratz on his own time without using Mattel resources, an assignment

23  is still enforceable under section 2870 if the works "*[r]elate* at the time of conception

24  or reduction to practice of the invention *to the employer's business* ...."  Cal. Labor

---

[1]  See Bryant's Second Amended Reply to Mattel's Counterclaims.
[2]  Mem. ISO MTD 2:9-10.

MATTEL, INC.'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT

07209/2456078.1

1  Code § 2870(a)(1) (emphasis added); Cadence Design Sys., Inc. v. Bhandari, 2007

2  WL 3343085 (N.D. Cal. 2007).

3      Bryant cannot dispute that Mattel is in the doll business, Bratz is a ███

4  ███████████████████████████████████████████████████████

5  ███████████████████████████████████████████████████████

6  ███████████████████████████████████████████████████████████

7  ██████████████████████. (Bryant Opp. 12.)  Even if that were true (which

8  could be determined only if Bryant had offered his Bratz work to Mattel rather than

9  concealing it), ███████████████████████████████████████

10  ██████  hardly means that similar products are not "related."  By Bryant's own

11  description, ██████████████████████████████████████████

12  ████████████████████████████.[4]  A mouse-trap manufacturer may

13  elect to market only one model, but that does not suggest it has no interest in

14  preventing its designer from taking his plans for a novel mouse-trap to a competitor.

15      Thus, courts interpreting assignment agreements in the context of Section 2870

16  have construed the "related to" phrase broadly.  See Cubic Corp. v. Marty, 185 Cal.

17  App. 3d 438, 451 (1986); Cadence Design Sys., 2007 WL 3343085, at *5.  In

18  Cadence Design Systems, the employee contended, similarly to Bryant here, that

19  "relate to" should be interpreted to refer only to the business operations of the

20  "smallest business division in which the employee actually works."  Id. at *7.  The

21  court found that such a narrow reading contradicted "the language of the statute

22  [which] contained a broad phrase permitting assignments of inventions that 'relate to

23  the business of the employer,"  including all business lines.  Id.[5]

24  

25  [3]  UF 1.
26  [4]  UF 1.
    [5]  Applera Corp. v. Illumina, Inc., 2008 WL 170597 (N.D. Cal. Jan. 17, 2008), is
27  inapposite.  In Applera, the employee had offered his invention to the employer, told fellow
    employees about it, and used the company's patent lawyer to patent the invention, yet the
28  company did not file suit for years after learning of the patent.  Id. at *4.  Although Bryant
    (footnote continued)

1      Measured against this standard, and keeping in mind that Bryant bears the

2 burden of showing that section 2870 applies to his Bratz work, see Cal. Labor Code

3 § 2872, the undisputed facts establish that the Bratz doll designs "relate to" Mattel's

4 business.[6]  The Court thus need not even consider Bryant has established a factual

5 dispute concerning whether he created Bratz on his own time using his own

6 resources.  See Cadence Design Sys., 2007 WL 3343085, at *8 ("Since the court has

7 concluded the [disputed invention] is 'related to' LSI's business, it need not address

8 whether Watkins used company resources to develop it.").

9 **II.**    **MATTEL OWNS ANY BRATZ INVENTIONS THAT BRYANT**

10        **CREATED, MADE, CONCEIVED, OR REDUCED TO PRACTICE**

11        **WHILE EMPLOYED BY MATTEL.**

12      Mattel explained (MPSJ, Point II.C) why Bryant's former counsel was correct

13 to characterize the Inventions Agreement as a "broad-based assignment" of the

14 employee's works to Mattel.[7]  Bryant's arguments to the contrary mischaracterize the

15 Agreement as exclusively focused on patents (rather than the designs and associated

16 copyrights that are the stock-in-trade of the toy industry), and seek to import

17 unwarranted limitations on the term "invention" from the legislative history of section

18 2870.  (Bryant Opp. 8-11.)  Bryant's strained effort to rewrite the contract underscores

19 why this purely legal issue should be resolved now.

20     **A.**    **Bryant's Interpretation Contradicts the Agreement's Plain Meaning.**

21     1.  The Inventions Agreement assigns to Mattel "all" of Bryant's "inventions,"[8]

22 which Bryant now urges means only patentable inventions.  (Bryant Opp. 10.)  But

23 the Inventions Agreement expressly defines "invention" to include both patentable

24

25

---

26 contends Mattel also delayed in bringing suit, neither Applera nor § 2870 suggests this
matters where, as here, the invention falls within the employer's core business.

27 [6]  UF 1.
[7]  UF 15.

28 [8]  UF 9-10 (Inventions Agreement, at ¶ 2(a)-(b)).

MATTEL, INC.'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF ITS
MOTION FOR PARTIAL SUMMARY JUDGMENT

07209/2456078.1

*and unpatentable* works.[9]  The phrase "patentable or unpatentable" encompasses both inventions that may be patented and those that may not be—such as copyrightable creative works.  Moreover, the Inventions Agreement specifically assigns to Mattel "all [Bryant's] right, title and interest" in "any" copyrights or copyright applications based on any of Bryant's inventions.[10]  The assignment of "any" copyrights expressly contradicts Bryant's suggestion that it conveys only copyrights that are "ancillary" to patents.  (Bryant Opp. 10-11.)  The phrase "ancillary to patents" nowhere appears in the Agreement.

Relatedly, Bryant incorrectly asserts that the term "invention" conventionally reflects only "the language of patent," not copyright.  (Bryant Opp. 10).  "Invention" is consistently used in copyright law to refer to creative copyrightable material.  "Those who wrote the House Report on the landmark Copyright Act of 1909, for example, said that copyright was . . . [designed to] 'stimulate writing and invention.'" Eldred v. Ashcroft, 537 U.S. 186, 247 (2003) (Breyer, J. dissenting) (quoting H. R. Rep. No. 2222, 60th Cong., 2d Sess., 6-7 (1909)).  See also, e.g., Shloss v. Sweeney, 515 F. Supp. 2d 1068, 1080 (N.D. Cal. 2007) (noting copyright policy of "promoting invention and creative expression").  Indeed, courts have used the term "invent" in the specific context of doll design.  See O'Neill v. Jesco Imports, Inc., 2006 WL 2623220, at *1 (W.D. Mo., Sept. 12, 2006) ("Plaintiffs are descendants of Rose O'Neill, the inventor of the kewpie doll."); Knickerbocker Toy Co. v. Etone Intern., Inc., 1980 WL 1141, at *2 (D. N.J. March 10, 1980) ("I had a case a number of years ago on the Sesame Street dolls, the little piggy wasn't invented at that time ....").  Thus, while "invention" may be the mother of patent, it has multiple offspring and copyright is among them.

---

[9]  UF 9 (Inventions Agreement, at ¶ 2(b)).
[10]  UF 10 (Inventions Agreement, at ¶ 2(a)).

07209/2456078.1

2.  The Inventions Agreement's definition of "invention" specifically includes "designs,"[11] a term that is used universally—including by Bryant himself[12]—to refer to drawings, sketches and other creative copyrightable material, with no technological limitation.  Bryant now contends that his admission that "█████████" is equivalent to █████████ was taken out of context because he was not addressing the Inventions Agreement when he provided that testimony.  (Bryant Opp. 8.)  But that is precisely the point:  the common, everyday usage of "inventing" encompasses design.  The Inventions Agreement adopts this ordinary usage.

3.  Bryant argues that Mattel has adduced no evidence of the parties' intent that Bryant assign his rights to Mattel to the fullest extent permitted by California law.  (Bryant Opp. 8-13.)  But the Agreement contains three clauses that reflect just that intent.  First, the introductory paragraph states that "[t]his Agreement is designed to make clear that ... inventions that I create will be owned by the Company."[13]  Second, the cautionary statement above the signature block makes clear that the Agreement "AFFECTS THE EMPLOYEE'S RIGHTS TO INVENTIONS THE EMPLOYEE MAY MAKE DURING HIS OR HER EMPLOYMENT."[14]  Third, the operative paragraph contains a catch-all clause by which Bryant expressly assigned "all" inventions, "includ[ing], but [] not limited to" specified examples.[15]  The phrase "includes, but is not limited to" enlarges the meaning of "invention" even beyond the listed examples, see Dyna Med, Inc. v. Fair Employment & Housing Comm'n, 43 Cal. 3d 1379, 1389 (1987), and provides yet another reason to reject Bryant's notion that "inventions" means only patentable inventions.

4.  Bryant argues that, even if the Inventions Agreement applies to creative copyrightable works, his particular creations fall outside the Agreement.  (Bryant

---

[11]  UF 9 (Inventions Agreement, at ¶ 2(b)).
[12]  See id. [█████████]
[13]  UF 67.
[14]   CB AMF 110.
[15]  UF 9 (Inventions Agreement, at ¶ 2(b)).

1    Opp. 11.)  First, Bryant contends, without evidence or authority, that his sketches for
2    the Bratz dolls are not "designs" within the Agreement's definition of "inventions."
3    (Bryant Opp. 8.)  But definitions of "design" consistently include sketches and
4    preliminary drawings such as those done by Bryant.  See, e.g., MERRIAM-WEBSTER
5    ONLINE DICTIONARY (defining "design" as "the arrangement of elements or details in
6    a product or work of art" and "a preliminary sketch or outline showing the main
7    features of something to be executed <the design for the new stadium>"); WEBSTER'S
8    THIRD NEW INT'L DICTIONARY (1993) ("[D]esign" is "a preliminary sketch or outline
9    (as a drawing on paper or a modeling in clay) showing the main features of
10   something to be executed[.]").  For his part, Bryant proffers no dictionary definition
11   that defines "design" to exclude drawings and models.

12        Second, Bryant argues that the Bratz works he created at Mattel, even if
13   considered "designs," were not "conceived or reduced to practice" during his Mattel
14   tenure.  (Bryant Opp. 13-14.)  He does not dispute working on Bratz designs while
15   employed by Mattel; rather, echoing his argument that "inventions" means only
16   patentable subject matter, he submits that "conceived or reduced to practice" should
17   be considered "terms of art in patent law that do not encompass sketching [or other
18   copyrightable expression]."  (Id. at n.9).  As shown above, Bryant's "patent" gloss on
19   the Inventions Agreement contradicts the Agreement's plain terms.

**B.  California Labor Code § 2870 Does Not Narrow The Term "Inventions" in the Agreement, But Confirms its Breadth.**

22        In a final effort to avoid the plain meaning of the Agreement, Bryant contends
23   that California Labor Code § 2870 limits the Agreement's definition of "inventions."
24   (Bryant Opp. 8-11.)  The opposite is true.

25        Bryant argues that section 2870 is "patent-oriented" (Opp. 10)—and thus that
26   employees who create copyrightable (but non-patentable) works receive no protection
27   under the statute.  But none of Bryant's cases interpreting section 2870 (Opp. 11-12)
28   hold or even suggest that "inventions" as used in section 2870 includes only

patentable works.  Rather, at least one court has assumed that section 2870 applies to creative copyrightable works, and proceeded to address on the merits whether the employee could invoke its protections.  See Iconix, Inc. v. Tokuda, 457 F. Supp. 2d 969, 992-3 (N.D. Cal. 2006) (employer was likely to prove copyright infringement because employees conceived the works and/or reduced them to practice while employed).

Nor does the legislative history of section 2870 support reading the statute's term "inventions" as Bryant proposes.  First, there is no need even to consider legislative history in these circumstances because the express language of the statute is clear for the same reasons discussed above in connection with the Inventions Agreement.  See Kobzoff v. Los Angeles Cty. Harbor/UCLA Med. Ctr., 19 Cal. 4th 851, 860-861 (1998) ("If the plain language of a statute is unambiguous, no court need, or should, go beyond that pure expression of legislative intent.").

Second, and in any event, the legislative history does no more than explain that *one purpose* of the bill was to protect inventors and patent rights;[16] it does not suggest an intent to limit the statute to patentable works.  Indeed, two predecessor bills, which specifically referred to patents, were *not* enacted;[17] the version that *was* enacted removed any specific mention of patents.[18]  Thus, to the extent the history of section 2870 is relevant, it indicates the legislature's intent was to *remove* language that imposed a patent-based limitation.  Cf. Cadence Design Sys., 2007 WL 3343085, at *7 ("Had the California Legislature intended [Section 2870] to be restricted they would have used such language in the statute itself.").

In short, far from showing that the Agreement is narrow in scope, section 2870 confirms its breadth.  When an agreement "closely tracks the language of section 2870" and "expressly references the statute," as the Inventions Agreement does, "the

---

[16]  Assembly Bill ("AB") 2256 (Jan. 18, 1978); AB 2902 (Jan. 29, 1976).
[17]  Id.
[18]  AB 474.

MATTEL, INC.'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT

1 | Agreement assigns to [the employer] all inventions that section 2870 does not
2 | specifically prohibit." Cadence Design Sys., 2007 WL 3343085, at *5.  Just as
3 | section 2870 extends beyond patentable inventions, see Iconix, 457 F. Supp. 2d at
4 | 987-1004, so too does the Inventions Agreement.

5 | **C.   Tie-Breaking Interpretive Principles Do Not Apply.**

6 | Neither *contra preferentem* nor principles of construction for contracts of
7 | adhesion apply where, as here, the relevant provisions are not reasonably susceptible
8 | to multiple interpretations.  As shown, there is simply no basis in the language or
9 | structure of the Agreement to construe "inventions" or "designs" in a way that would
10 | render the Inventions Agreement inapplicable to the very sort of work Bryant was
11 | hired to do.  Moreover, as detailed in Mattel's Opposition (at 15-16), the Inventions
12 | Agreement is not a contract of adhesion. Numerous Mattel employees negotiated
13 | their Agreements—including terms relating specifically to inventions and conflicting
14 | business interests.  Bryant presented no evidence that he could not have done
15 | likewise.[19]  See Graham v. Scissor-Tail, Inc., 28 Cal. 3d 807, 817-19 (1981) (ability
16 | to negotiate negates adhesion).

17 | **D.   The Agreement Satisfies Section 204 of the Copyright Act.**

18 | Bryant claims the "Agreement is not a valid transfer of copyright ownership
19 | under 17 U.S.C. § 204(a)." (Bryant Opp. 10 n.7.)  But he ignores that section 204(a)'s
20 | "requirement is not unduly burdensome. . . .  [The transferee] must get the copyright
21 | holder to sign a piece of paper saying so.  It doesn't have to be the Magna Carta; a
22 | one-line pro forma statement will do." Radio Television Espanola S.A. v. New
23 | World Entm't, Ltd., 183 F.3d 922, 927 (9th Cir. 1999) (quoting Effects Assocs., Inc.
24 | v. Cohen, 908 F.2d 555, 557 (9th Cir. 1990).  The Inventions Agreement easily meets
25 | this minimal requirement.  Moreover, that the Agreement applies to works that were
26 | yet to be created by Bryant does not affect its validity.  See Nat'l Ass'n for Stock Car

27 |

28 | [19]   CB AMF 99.

Auto Racing, Inc. v. Scharle, 356 F. Supp. 2d 515, 523-24 (E.D. Pa. 2005) (upholding transfer under document stating that "Scharle would be paid for his [future] work [on a project], and the Mint would retain the copyrights"); Iconix, 457 F. Supp. 2d 969 (N.D.Cal. 2006) (similar, under pre-inventions assignment agreement); Bull Publ'g Co., v. Sandoz Nutrition Corp., 1989 WL 201080, *2, 4-5 (N.D. Cal. 1989) (upholding transfer under publishing agreement that granted plaintiffs all copyrights in works to be created in the future, including derivative works).  Bryant has cited no contrary precedent.

## III.   THE FIRST-WAVE BRATZ DOLLS ARE SUBSTANTIALLY SIMILAR TO CERTAIN OF BRYANT'S DRAWINGS.

As Mattel demonstrated (MPSJ 10-30), defendants cannot reasonably dispute that the first-wave Bratz dolls are substantially similar to certain of Bryant's Bratz drawings.  First, Mattel showed (id. at 13-14), the Court need look no further than MGA's own prior statements, including MGA's description of Bryant's drawings as "███████████";[20] MGA's Bratz Project Manager's statement that "████████████████████";[21] and MGA's assertions in its U.S. Copyright Office Form CAs that the dolls are derivative works of Bryant's drawings.[22]  Second, Mattel set forth (MPSJ 15-22) a comprehensive, graphic analysis of the dolls and the drawings and explained why common sense and applicable precedent compels a conclusion of substantial similarity here.[23]  Third, Mattel demonstrated (MPSJ 24-30), again based in part on MGA's own prior statements, that the drawings are sufficiently original to qualify for copyright protection.

---

[20]  UF 99 (2004 Modification of 2000 Agreement § 3.2).
[21]  UF 68.
[22]  UF 40.
[23]  Mattel also argued (MPSJ 23-24) that a showing of substantial similarity defeats MGA's affirmative defense of de minimis use.  MGA does not respond.

07209/2456078.1

A.     **As a Matter of Law, The Drawings Are Original and Deserve Full Copyright Protection.**

Mattel begins with the originality/protectability issue in this reply because it stands at the threshold of the analysis.

MGA does not contest that the drawings are original and hence protectable by copyright law.  (MGA Opp. 15 n.5.[24])  Rather, it argues the drawings deserve only "thin" protection.  (MGA Opp. 4.)  But MGA's made-for-this-litigation position contradicts its prior statements and is wrong as a matter of law.

1.     MGA Fails To Confront Its Prior Statements and Conduct Regarding Originality of the Drawings.

MGA's Opposition simply fails to confront its prior statements and conduct regarding the originality of the drawings.  MGA does not dispute the legal principle that positions successfully taken in prior litigation estop a party from asserting the contrary in subsequent litigation.  Nor does MGA dispute that (1) it prevailed as a plaintiff in a suit in Hong Kong *for infringement of Bryant's drawings* on the theory that the drawings were fully protected, not thinly protected, by copyright law;[25] and (2) it registered copyrights in the drawings,[26] again indicating its view that they are fully protectable.  Indeed, Bryant admitted earlier in this case, in response to a Request for Admission, that his drawings are original works of authorship.[27]  These statements bar defendants from suddenly contending now that the drawings are barely protectable and effectively incapable of being infringed.

---

[24]   MGA maintains only the sculpt drawing is not protectable.  (MGA Opp. 15 n.5.)
[25]   MGA's Larian submitted a sworn affidavit it in that litigation that the defendant's dolls "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."  UF 41 (emphasis added).
[26]   UF 39-40.
[27]   UF 44.

07209/2456078.1

2.     MGA's Cited Cases Involve Factual, Not Creative Works.

MGA's about-face on the degree of protection afforded the drawings is, not surprisingly, wrong as a matter of law.  The works in MGA's cited cases, unlike the Bratz drawings, were *factual* (or relatedly, based on natural phenomena), not *creative*.  See Idema v. Dreamworks, Inc., 162 F. Supp. 2d 1129, 117 (C.D. Cal. 2001) ("[s]even of the eight works upon which Plaintiffs base their claims are primarily or purportedly factual in nature"); Harper House, Inc. v. Thomas Nelson, Inc., 889 F.2d 197, 205 (9th Cir. 1989) ("A *factual* compilation receives only limited copyright protection.") (emphasis in original); Satava v. Lowry, 323 F.3d 805, 810 (9th Cir. 2003) ("Satava may not prevent others from copying aspects of his sculptures resulting from … jellyfish physiology …."); Cosmos Jewelry Ltd. v. Po Sun Hon Co., 470 F. Supp. 2d 1072, 1082 (C.D. Cal. 2006) ("representation of the plumeria flower as having … features occur[ring] frequently in natural plumeria flowers").

As the Ninth Circuit has emphasized, "works that are not factual receive much broader protection under the copyright laws because of the endless variations of expression available to the artist."  McCulloch v. Albert E. Price, Inc., 823 F.2d 316, 321 (9th Cir. 1987), disapproved on other grounds, Fogerty v. Fantasy, Inc., 510 U.S. 517 (1994).

3.     MGA Misunderstands and Misapplies Filtration Analysis.

MGA wrongly relies on filtration analysis to argue that because the drawings use well-worn features like big heads and big eyes, they add little new.  (MGA Opp. 14.)  Initially, filtration analysis does not even apply to visual works (such as drawings) in the same way it applies to literary works or computer programs.  As the Ninth Circuit held in Cavalier v. Random House, Inc., 297 F.3d 815 (9th Cir. 2002), "[t]he precise factors evaluated for literary works do not readily apply to art works. Rather, a court looks to the similarity of the objective details in appearance."  Id. at

826.  Judge Newman, whose work in this area is praised by MGA's expert Menell,[28] has explained the rationale for this approach:  Filtration analysis should not be applied in cases of visual works (specifically, dolls) because "one cannot divide a visual work into neat layers of abstraction in precisely the same manner one could with a text."  Hon. Jon O. Newman, New Lyrics for an Old Melody: The Idea/ Expression Dichotomy in the Computer Age, 17 Cardozo Arts & Ent. L.J. 691, 698 (1999); see also id. at 697 & nn. 36-37 (criticizing Country Kids 'N City Slicks, Inc. v. Sheen, 77 F.3d 1280 (10th Cir. 1999), which applied filtration in a doll case); Michael D. Murray, Copyright, Originality, and the End of the Scenes à Faire and Merger Doctrines for Visual Works, 58 Baylor L. Rev. 779, 784 (2006) ("merger doctrine and scènes à faire doctrine are perfectly well adapted to verbal and literary works, but have no meaning and no proper application with regard to visual works and should be discarded in the consideration of infringement of visual works").

Even if it could invoke filtration analysis, MGA misapplies it here.  MGA's own complaint in this case undermines its contention that "the concept of big head/big feet/big eyes was not original" because oversized heads and feet had appeared in the Steve Madden and Paris Blues ads, and oversized heads and eyes had appeared in Japanese anime art.  (MGA Opp. 13-14.)  It was the combination of all of these elements *in the same visual image* that was creative and unprecedented.  (See MGA Compl. ¶ 25, at p. 7 (Bratz dolls "looked like no other" because they had "disproportionately large heads, big, dramatic eyes and lips, small, thin bodies, oversized feet (to emphasize shoe fashion and to stand on their own, unlike 'Barbie' which requires a stand), *and* up-to-date fashions.") (emphasis added).)  As Mattel explained, creative compilations of elements, as well as variations on those elements, must be *included*, not filtered out, in assessing the degree of protection that the work deserves.  (See MPSJ 29-30 (quoting Mattel, Inc. v. Goldberger Doll Mfg. Co.,

---

[28]  Menell Report at 14.

07209/2456078.1

-13-
MATTEL, INC.'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT

1  365 F.3d 133, 136 ("One artist's version of a doll face with upturned nose, bow lips,
2  and widely spaced eyes will be irresistible to an eight-year-old collector. … We can
3  surmise that in the highly competitive, billion-dollar doll industry, getting the doll's
4  face and expression exactly right is crucial to success.").)  See also JCW Investments,
5  Inc. v. Novelty, Inc., 482 F.3d 910, 916-17 (7th Cir. 2007) (affirming grant of partial
6  summary judgment to plaintiff; "[Defendant] wants us to take the entity that is Fred,
7  subtract each element that it contends is common, and then consider whether
8  [defendant] copied whatever leftover components are creative. But this ignores the
9  fact that the details—such as the appearance of Fred's face or even his chair—
10  represent creative expression.").

11          4.    Being Inspired by Prior Works Is Distinct from Slavishly Copying
12               Them.

13       In his declaration, Bryant emphasizes that he did not slavishly copy pre-
14  existing works, but was rather creatively inspired by them.  See, e.g., Bryant Decl., ¶¶
15  ████████████████████████████████████████████
16  ████████████████████████████████████████████████
17  ████████████████████████████████████████████████
18  ████████████████████████████  Indeed, every artist is influenced by
19  works created by others.  See, e.g., Tufenkian Import/Export Ventures, Inc. v.
20  Einstein Moomjy, Inc., 338 F.3d 127 (2d Cir. 2003) ("all creative works draw on the
21  wellspring that is the public domain"); Taylor v. Metro-Goldwyn-Mayer Studios, 115
22  F.Supp. 156,157 (S.D. Cal. 1953) ("Ideas are free to the world, and one person's idea
23  can be appropriated by another with impunity.").  Neither these cases, nor any MGA
24  has cited, hold that such works warrant reduced copyright protection.

25      **B.**    **That the Bratz Dolls Are Substantially Similar to the Drawings**
26          **Cannot Be Reasonably Disputed.**

27       In contesting substantial similarity, MGA again runs squarely into its prior,
28  lengthy history of statements to judges, tribunals, and agencies of the U.S.

MATTEL, INC.'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF ITS
MOTION FOR PARTIAL SUMMARY JUDGMENT

government.  For example, MGA described Bryant's drawings as "███████ ██████";[29] MGA's Bratz Project Manager stated that "I ██████████ ████████████████;[30] and MGA asserted in its copyright registrations that the dolls are derivative works of Bryant's drawings.[31]  MGA barely confronts these statements and instead relies on a host of unpersuasive subsidiary legal arguments.

1.  MGA blithely attempts to dismiss its prior statements as "loose phraseology [that] could be interpreted by a jury as reflecting [only] MGA's intent to use Bryant's 'idea.'"  (MGA Opp. 15.)  But MGA's explicit representations to the U.S. Copyright Office shows otherwise, as MGA, *for purposes of registering its copyright in the dolls*—not its or Bryant's "idea," which is not protected by copyright—represented that the dolls were "derivative works" of the drawings.[32]

MGA's prior statement that it ████████████████████████████ ███████[33] also undermines its contention that the dolls cannot be substantially similar to the drawings because "████████████████████████████ ████████████████████████████████████████ ███████  (MGA Opp. 5.)  Indeed, even in its opposition brief, MGA cannot keep its story straight.  (Compare MGA Opp. 9 (characters in "Bryant's [sketches] were 'older'"), with id. at 11 ("the doll has a more 'adult' profile").)

2.  MGA argues that "plaintiffs almost never are granted summary judgment" on substantial similarity.  (MGA Opp. 3.)  But MGA does not acknowledge the cases, including one involving toys and another from this District, showing that summary judgment in favor of copyright infringement plaintiffs is no rarity.  (See MPSJ 11 (citing JCW Invs., Inc. v. Novelty, Inc., 289 F. Supp. 2d 1023 (N.D. Ill. 2003), aff'd, 482 F.3d 910 (7th Cir. 2007); Educ. Testing Serv. v. Simon, 95 F. Supp. 2d 1081

---

[29] UF 99 (2004 Modification of 2000 Agreement § 3.2).
[30] UF 68.
[31] UF 40.
[32] UF 40.
[33] UF 68.

1   (C.D. Cal. 1999)).  See also, e.g., City of New York v. Geodata Plus, LLC, 2007 WL

2   2891427 (E.D.N.Y. Sept. 28, 2007); M. Lady, LLC v. Aji, Inc., 2007 WL 2728711

3   (S.D.N.Y. Sept. 19, 2007); Cofre, Inc. v. Lollytogs, Ltd., 1991 WL 40366 (S.D.N.Y.

4   Mar. 15, 1991); Ideal Toy Corp. v. Fab-Lu, Ltd., 261 F. Supp. 238 (S.D.N.Y. 1966).[34]

5        3.  MGA unsuccessfully attempts (Opp. 8-9) to evade the Ninth Circuit's

6   holding that "we require a lower standard of proof of substantial similarity when a

7   high degree of access is shown."  Three Boys Music Corp. v. Bolton, 212 F.3d 477,

8   485 (9th Cir. 2000).  MGA argues (Opp. 8) that access is relevant to factual copying,

9   not legally actionable copying.  But MGA's only support comes from an unpublished

10  decision, BensBargains.net, LLC v. xpbargains.com, 2007 WL 2385092, at *3 (S.D.

11  Cal. Aug. 16, 2007), which failed to acknowledge that the "substantial similarity"

12  phrase used by the Ninth Circuit is the *sine qua non* of legally actionable copying.

13  The remainder of MGA's citations (Opp. 8-9) are unavailing because they say only

14  that access does not *obviate* the need to show substantial similarity[35]—Mattel has

15  always recognized it must make that showing.

16        4.  MGA mischaracterizes Mattel's MPSJ as not "even offering a filtration

17  analysis."  (MGA Opp. 6-7.)  As discussed above, filtration analysis does not apply

18  _____

19  [34]  MGA invokes (Opp. 3) Mattel's expert Lind to support the notion that summary
    judgment is never appropriate on substantial similarity.  To the extent Lind made such a

20  suggestion, he did so only as to the intrinsic test.  See Lind Report at 10 ("[s]ubjective
    assessments of similarity … are deemed best suited to the trier of fact *as part of the intrinsic*

21  *test*") (emphasis added).  Thus, this Court should at a minimum grant partial summary
    judgment to Mattel on the extrinsic test.  We note, however, that the intrinsic test is

22  amenable to summary judgment in an appropriate case, *i.e.*, where reasonable jurors would
    be compelled to find substantial similarity.  Cf. Compagnie Financiere de CIC et de l'Union

23  Europeene v. Merrill Lynch, 232 F.3d 153, 159 (2d Cir. 2000) ("This Court may resolve the
    ambiguity in the contractual language as a matter of law if … the extrinsic evidence is so

24  one-sided that no reasonable factfinder could decide contrary to one party's interpretation.").
    Here, 92% of children surveyed stated that Bryant's drawings "look like" the Bratz dolls.

25  See Hollander Report at 15, Hollander Dec., Exh. 1.
    [35]  Zella v. E.W. Scripps Co., 529 F. Supp. 2d 1124, 1133 (C.D. Cal. 2007); Berkla v.

26  Corel Corp., 66 F. Supp. 2d 1129, 1131 (E.D. Cal. 1999).  Similarly, the Lind publication
    quoted by MGA states that "[n]o amount of access negates the need to prove substantial

27  similarity" (Opp. 9 (quoting Lind, Copyright Law 168)), not that the burden of proving
    substantial similarity is not *reduced* by proof of access.  Finally, Feist Publ'ns, Inc. v. Rural

28  Tel. Serv., 499 U.S. 340 (1990), involved a factual compilation, not a creative visual work.

1    here.  In any event, even excluding "common facial features" (MPSJ 29) and other

2    stock elements, the dolls are substantially similar to the drawings because creative

3    variations on those elements, as well as a creative compilation of them, must be

4    **_included_** in the comparative analysis.  (See MPSJ 29-30 (quoting Mattel, Inc., 365

5    F.3d at 136).)  Mattel's comprehensive comparison of the dolls with the drawings

6    focused not on identifying common facial or anatomical features, but on describing

7    how the drawings and dolls made those features distinctive in a substantially similar

8    way.  (See, e.g., MPSJ 16 ("cheek color application … [and] moles are in the same

9    location"); 17 ("the characters' eyes have three eyelashes … [and] the eyeliner design

10    is similar in its painterly thickness and sweeping upward curves"); 20 ("backpacks …

11    display the same graphic motifs, such as a bunny with the words 'Hip Hop'").)[36]

12       MGA's critique of Mattel's filtration analysis is particularly empty given

13    MGA's prior statements.  As discussed above, in marked contrast to its current

14    position that the Bratz drawings consist primarily of unprotected stock elements,

15    MGA previously asserted that the drawings are quite capable of being infringed.[37]

16    Indeed, MGA's complaint in this very case—which we quoted (MPSJ 26-27) but

17    MGA ignores—emphasized that the first-wave Bratz dolls, which of course contain

18    common facial and anatomical features, "looked like no other" given the creative

19    variations on, and compilation of, those features.[38]

20       5. MGA's rebuttal (Opp. 10-12) of Mattel's graphic comparison of the dolls

21    and drawings is notable for its steadfast attention to the **_differences_** between the dolls

22

23

---

24    [36] MGA argues "the 'rolling' theory [of statute of limitations for copyright claims] is

25    inapplicable where, as here, Mattel's claim is for copyright ownership," not infringement.
(MGA Opp. 25.)  But MGA's opposition to Mattel's substantial-similarity argument shows

26    that Mattel's copyright infringement claim is just that—a claim for infringement, where
infringement and not just ownership is disputed.  Hence, the statute of limitations on the

27    copyright claim indisputably is a rolling one.
[37] UF 41 (emphasis added).

28    [38] UF 93.

1   and drawings.[39]  MGA's catalogue of differences does not create an issue of disputed

2   ***material*** fact because "no plagiarist can excuse the wrong by showing how much of

3   his work he did not pirate." Sheldon v. Metro-Goldwyn Pictures Corp., 81 F.2d 49,

4   56 (2d Cir. 1936) (L. Hand, J.)); see also Ideal Toy, 261 F. Supp. at 242 ("In

5   [youngsters'] enthusiasm to acquire Tammy or Pepper [dolls] they certainly are not

6   bent upon 'detecting disparities' ….").[40]  Regarding accessories, for example, MGA

7   cannot deny that both doll and drawing have rabbit motifs on their backpacks, as well

8   as the identical words "Hip Hop"; instead, MGA protests (Opp. 12) that "the rabbits

9   are different."



Exhibit 7

---

[39] MGA's opposition tellingly omits to include any pictures—which, as Mattel's MPSJ shows, are worth the proverbial thousand words.

[40] See also, e.g., City of New York, 2007 WL 2891427, at *10 ("[Defendant] attempts to obscure the problem of the identical control points [on the maps] by highlighting numerous differences between the maps. …. [But] 'no plagiarist can excuse the wrong by showing how much of the work he did not pirate.'") (quoting Sheldon, 81 F.2d at 56).

6.  MGA's erroneous emphasis on minor differences is compounded by other legal errors.  For example, MGA and its expert Vilppu argue that the dolls cannot be substantially similar to the drawings because "'Bryant's sketches lack three-dimensional information.'"  (MGA Opp. 10 (quoting Vilppu Report ¶¶ 25-26).)  But no statute or case law imposes such a requirement; MGA ignores the cases cited by Mattel that hold that three-dimensional toys can infringe comic book characters.  (See MPSJ 23 n.63 (citing Fleisher Studios v. Ralph A. Freundlich, Inc., 73 F.2d 276, 278) (2d Cir. 1934); King Features Syndicate v. Fleisher, 299 F. 533 (2d Cir. 1924)).)  See also Shine v. Childs, 382 F. Supp. 2d 602, 608 (S.D.N.Y. 2005) (architectural "plans or designs not sufficiently detailed to allow for construction still may be protected").

Similarly, MGA is just wrong in contending that, on dolls, "'articles of clothing … [are] excluded from copyright eligibility.'"  (MGA Opp. 14 (quoting Chosun Int'l Inc. v. Chrisha Creations, Ltd., 413 F.3d 324, 328 (2d Cir. 2005).)  To be sure, clothing *for humans* is excluded from copyrightability because it is a "useful article" under 17 U.S.C. § 101.  But it is well-settled that toys, and hence any clothing that adorns them, are not.  See, e.g., Masquerade Novelty, Inc. v. Unique Indus., Inc., 912 F.2d 663, 670 (3d Cir. 1990) (masks portraying animals); Gay Toys, Inc. v. Buddy L Corp., 703 F.2d 970, 973 (6th Cir. 1983) (toy airplanes).

## IV.   BRYANT IS LIABLE FOR BREACH OF CONTRACT, BREACH OF THE DUTY OF LOYALTY, AND BREACH OF FIDUCIARY DUTY.

### A.   Bryant Is Liable for Breach of Contract.

1.  Bryant's contention (Opp. 8) that he did not breach his contractual duties to Mattel turns entirely on the argument that the Inventions Agreement does not apply to the Bratz materials that Bryant has conceded he worked on during his Mattel tenure. As shown above, Bryant is wrong as a matter of law.  Accordingly, because Bryant resisted transferring to Mattel the ideas, drawings, and model that it owned by virtue of the Agreement, he breached the Agreement.

2.  Ownership of the Bratz works aside, Bryant breached the Inventions Agreement by violating its provision barring Bryant from "engaging in employment or business other than for the company, or investing in or assisting (in any manner) any business competitive with the business or future business plans of the Company, without Mattel's consent."[41]  Bryant invokes (Opp. 24) the preparation-to-compete defense, but as detailed below with respect to Bryant's breaches of his fiduciary duty and his duty of loyalty, even the broadest understanding of "preparation to compete" does not encompass the activities in which Bryant secretly engaged, from pitching drawings, to soliciting vendors, to accepting payments, to entering into a contract with MGA weeks before he left Mattel in which he committed himself to providing similar services on a ██████████ (MPSJ 36-7)  The facts are not subject to reasonable dispute; whether they amount to a breach is a question of law.

3.  Finally, Bryant challenges the validity of the Conflict of Interest Questionnaire, claiming that its provisions were not binding and that, in any event, he did tell Mattel that he was planning to leave to work on "██████████ (Bryant Opp. 17.)  But Bryant admits that he never told anyone at Mattel about his work on Bratz or his collaboration with MGA.[42]  As to the former point, the Conflict Questionnaire was specifically incorporated by the Inventions Agreement,[43] which even Bryant concedes (Opp. 15) is an enforceable contract.  Whether considered as two separate contracts or one, they imposed on Bryant an absolute obligation to inform Mattel of any competitive activities, and he failed to do so.[44]

---

[41] UF 50 (Inventions Agreement, at ¶ 3(a)).
[42] UF 101, CB AMF 160-1.
[43] UF 50 (Inventions Agreement, at ¶ 3(a)).
[44] UF 88 & 130.

**B.   Bryant Is Liable for Breach of the Duty of Loyalty and Breach of Fiduciary Duty.**

1.   Bryant Owed Mattel a Duty of Loyalty and a Fiduciary Duty.

Bryant's fiduciary duty to Mattel emanates from two sources:  (1) the Inventions Agreement, which by its terms imposed on Bryant an obligation of confidentiality and "trust," (MPSJ at 34); (2) Bryant's role at Mattel, which endowed him with trust and gave him broad access to confidential information (id.).[45]  His duty of loyalty is one that all California employees owe their employers by virtue of California Labor Code § 2863.

1.   Defendants posit that a fiduciary duty can never attach to an employee unless the employee "is an officer of the company" *and* "participate[s] in management of the company" *and* has "discretionary authority in his managerial capacity." (Bryant Opp. 18.)  Defendants rely on GAB Bus. Servs., Inc. v. Lindsey & Newsom Claim Servs., Inc., 83 Cal. App. 4th 409, 420-21 (2000), overruled on other grounds, Reeves v. Hanlon, 33 Cal.4th 1140 (2004), and Enreach Tech., Inc. v. Embedded Internet Solutions, Inc., 403 F. Supp. 2d 968 (N.D. Cal. 2005).

Defendants misread these cases.  The "officer" test promulgated in GAB and Enreach applies to fiduciary duties created *by law*, not to those created, as in this case, *by agreement* and/or *by confidential relationship*.  GAB recognizes "[t]here are two kinds of fiduciary duties—those imposed by law and those undertaken by agreement."  83 Cal. App. 4th at 416.  The court considered only the former because the plaintiff "contend[ed that] the relationship between a corporation and its officers belongs on the list of legally recognized fiduciary duties." Id.[46]  Enreach is distinguishable for the same reason.  See 403 F. Supp. 2d at 976.[47]

---

[45]   UF 51, 53, 67.

[46]   Indeed, GAB recognized that fiduciary duties may be created separate from an employee's position in the corporate hierarchy: "A fiduciary duty is undertaken by agreement when one person enters into a confidential relationship with another. [A] (footnote continued)

2.  Defendants mischaracterize Mattel's MPSJ as contending that, merely because the Inventions Agreement provides that Bryant accepts a "████████," this three-word phrase creates a fiduciary duty.  (Bryant Opp. 19.)  To the contrary, Mattel relies on the Agreement *as a whole*, which not only imposed a duty of trust, but repeatedly drove home Bryant's obligation to maintain Mattel's proprietary information in strict confidence.  (See MPSJ 34 & n.96.)

From the outset, Bryant's offer letter conveyed the importance to Mattel of Bryant's preservation of confidentiality as a Mattel employee, stating that "this offer is contingent upon satisfactory verification of all information…, and the signing of a Confidential Information and Inventions Agreement."[48]  The Inventions Agreement further manifested an intent to create a confidential relationship, underscoring the "competitive environment" in which Mattel operates and requiring Bryant to "maintain the confidentiality of the Company's trade secrets," and to "use those trade secrets for the exclusive benefit of the Company."[49]  And upon leaving the Company, Bryant was obligated by the Agreement to "deliver all tangible, written, graphical, machine readable and other materials (including all copies) in my possession or under my control containing or disclosing Proprietary information."[50]  Taken together, these provisions, among others, clearly evince an intent to create a close, confidential relationship between Mattel and Bryant.  Bryant's acceptance of these terms as a condition of employment manifests his intent to be bound.

_____

confidential relationship arises 'where a confidence is reposed by one person in the integrity of another, and … the party in whom the confidence is reposes,… voluntarily accepts or assumes to accept the confidence.'"  83 Cal. App. 4th at 417 ; see also Michelson v. Hamada, 29 Cal. App. 4th 1566, 1581 (1991) (fiduciary relationships arise "whenever trust and confidence is reposed by one person in the integrity of another").

[47]  Although the defendants in Enreach signed a confidentiality agreement, at 971, the plaintiff appears not to have argued that a fiduciary duty was created by agreement.  Accordingly, the court considered only the defendants' functional roles at the company.

[48]  CB AMF 56, Zeller Dec. Exh. 11.

[49]  Inventions Agreement, Zeller Dec. Exh. 31.

[50]  Id. at ¶ 1 (d), Zeller Dec., Exh. 31.

07209/2456078.1

3.  Defendants erroneously claim that Mattel overlooks additional requirements that defendants assert are set forth in <u>City Solutions, Inc. v. Clear Channel Communications, Inc.</u>, 201 F. Supp. 2d 1048, 1050-51 (N.D. Cal. 2002), namely "the ***voluntary and knowing*** acceptance of trust that creates a ***legally recognized*** fiduciary relationship, placing the fiduciary in a superior position of control over the dependent party." (Bryant Opp. 20 (emphasis added)).  Defendants merely assert without explanation that Mattel "fails to mention these established requirements." (<u>Id.</u>)  To the extent defendants suggest that the contract was not voluntary because it was a contract of adhesion, please see Point II, <u>supra</u>.

4.  Bryant's exposure to confidential information[51] gave rise to a fiduciary duty even apart from the terms of the Inventions Agreement; at the very least, it corroborates that the Inventions Agreement created such a duty.  Defendants misread <u>Stevens v. Marco</u>, 147 Cal. App. 2d 357 (1956), to espouse a constricted definition of confidential relationship.  <u>Stevens</u> does not limit the creation of a fiduciary duty based on a confidential relationship to circumstances in which a defendant:  (1) is entrusted with a "secret invention" with the "ability to develop, patent and exploit it;" (2) holds a superior position, or (3) has a relationship with the plaintiff "akin to that of a trustee or joint venture." (Bryant Opp. 21.)  Were that the case, the court would not have embraced the broader definition of a confidential relationship as one that "exist[s] ***whenever*** trust and confidence is reposed by one person in the integrity and fidelity of another." <u>Id.</u> at 372 (emphasis added).  <u>See also</u> <u>Carpenter v. United States</u>, 484 U.S. 19, 27 (1987) (at common law, "even in the absence of a written contract, an employee has a fiduciary obligation to protect confidential information obtained during the course of his employment"); <u>In re Marriage of Varner</u>, 55 Cal. App. 4th 128, 141 (1997) ("[a] fiduciary relationship has been defined as any relation existing between parties to a transaction wherein one of the parties is … duty bound

---

[51]  CB AMF 120.

1    to act with the utmost good faith for the benefit of the other party") (internal

2    quotation marks omitted).

3         5.   Defendants contend that the information to which Bryant had access was

4    "nothing more than the information he needed to do his job."  (Bryant Opp. 22.)  But

5    defendants' own statements demonstrate the sweeping scope of that job, which

6    involved confidential information at every turn.[52]  Specifically, as the Designer or

7    Preliminary Designer of several Barbie doll lines, including dolls within Barbie

8    Collectibles,[53] Bryant drew or had access to the two-dimensional design drawings

9    from which such dolls or toys were created, developed, and marketed as final

10   products.[54]  In addition, he was integrally involved in every phase of the Mattel

11   design process.[55]  Bryant—like other Mattel doll designers—directed or worked with

12   Mattel face painters, hair designers, sample makers, pattern makers, fashion

13   designers, and sculptors on each of his projects.[56]  He also worked with his

14   counterpart in Mattel's marketing department and was given access to highly

15   confidential and proprietary documents concerning the strategic direction Mattel

16   envisioned for each of his projects, as well as the price points and margin information

17   that Mattel management had developed for them.[57]

18   _____

19        [52]   See Decl. of Paula D. Garcia in Support of Carter Bryant and MGA's Requests for
20   Clarification, Reconsideration, and/or Further Protection, dated Feb. 9, 2007, ¶¶ 3-7.
21   ("███████████████████████████████████████████████████████████████████
22   ██████████████████.")  Indeed, Magistrate Judge Block, the Discovery Master, and this Court
23   have recognized the confidential nature of the design processes and drawings used by MGA
     and Mattel.  See Stipulated Protective Order, entered Jan. 4, 2005 (governing, production of
24   documents pertaining to released products); Order Modifying Protective Order, and Order
     Thereon, entered May 16, 2007 (adding third-tier protection for documents pertaining to
25   unreleased products), aff'd, Civil Minute Order Denying MGA's Motion re Discovery
     Master's May 16, 2007 Order, entered July 5, 2007.
26        [53]   CB 27.
          [54]   See UF 53.
27        [55]   CB AMF 121-3, 148-9.
          [56]   CB AMF 121-3, 148-50.
28        [57]   UF 53.

That Mattel design work is performed in Mattel's highly secure El Segundo Design Center confirms the confidential, sensitive nature of Mattel's design development process and the position of trust doll designers like Bryant hold at Mattel.[58] As Bryant testified, he fully understood that his work at Mattel was to be done in "███."[59] He also understood that every facet of the design and product development process to which he was privy in the Design Center—including the work of other designers—was to be kept secret as well.[60]

6. Finally, even if Bryant were not a fiduciary in the common-law sense of the word, he was certainly a Mattel employee and thus owed Mattel a duty of loyalty under California law. "[T]he employee's fiduciary duty is codified in Labor Code Sec. 2863, which articulates the fiduciary duty of preference owed by the employee to his employer—which is quite the same duty the agent owes to his principal." Rafael Chodos, Law of Fiduciary Duties § 1:13 at 29 (Blackstone Legal Press 2000).[61] Defendants concede the point. (See Bryant Opp. 23-25.)

## 2. Bryant Clearly Breached His Duties.

When it comes to the question of **breach**, defendants primarily address only the duty of loyalty, not fiduciary duty. (See Bryant Opp., Point III.C.3.) Thus, they appear to concede that, if a fiduciary duty is found, Bryant breached it by, among other things, selling his Bratz-related drawings and models to a competitor; secretly contracting with MGA while employed by Mattel; using Mattel resources for Bratz; soliciting Mattel vendors for Bratz; and working on MGA's "Angel" projects while employed by Mattel. (See MPSJ at 36-37.)

---

[58] UF 53.
[59] Id.
[60] Id.; CB AMF 120.
[61] Section 2863 provides: "An employee who has any business to transact on his own account, similar to that entrusted to him by his employer, shall always give the preference to the business of the employer." Cal. Labor Code § 2863.

07209/2456078.1

1    Concerning breach of the duty of loyalty, defendants principally contend that
2    "mere preparation to compete" and "de minimis" use of company resources do not
3    breach the employee's duties.  (Bryant Opp. 24.)

4    As an initial matter, defendants misapprehend the contours of the duty of
5    loyalty, which, it should be emphasized, applies (and was breached here) even if
6    Bryant was not a fiduciary of Mattel.  Precedent embraces a much broader conception
7    of the duty of loyalty than defendants' dichotomy of non-actionable "preparatory"
8    acts/de minimis use and actionable "direct competition" with an employer.  (Bryant
9    Opp. 25.)  To be sure, "[w]hile California law does permit an employee to seek other
10   employment and even to make some 'preparations to compete' before resigning,
11   California law does not authorize an employee to transfer his loyalty to a competitor."
12   Huong Que Inc. v. Liu, 150 Cal. App. 4th 400, 414 (2007).  "Thus, an employee,
13   while employed, owes undivided loyalty to his employer …. The duty of loyalty is
14   breached, and the breach 'may give rise to a cause of action in the employer, when the
15   employee takes action which is inimical to the best interests of the employer.'"  Id.
16   (quoting Stokes v. Dole Nut Co., 41 Cal. App. 285, 295 (1995)).  See also, e.g.,
17   Hudson v. Moore Business Forms, Inc., 836 F.2d 1156, 1161 (9th Cir. 1987)
18   (reinstating employer's claim that its employee's filing of a wrongful discharge action
19   against it violated her duty of loyalty).

20   Even Bancroft-Whitney Co. v. Glen, 64 Cal.2d 327 (1966), on which
21   defendants rely for the "preparation to compete" standard, recognized that "it is the
22   *nature* of his preparations which are significant."  Id. at 346 (emphasis added).  The
23   Court gave several examples where preparatory actions could be actionable,
24   including use of "confidential information peculiar to his employer's business and
25   acquired therein," solicitation of an employer's customers before the end of
26   employment, and "other similar acts in direct competition with the employer's
27   business."  Id.  Additionally, failure to disclose acts of preparation is actionable where
28   the nondisclosure was harmful to the corporation.  See id. at 347.

-26-

07209/2456078.1

1        Huong Que rejected the very claim defendants make here:  that they were

2    entitled "to meet with other individuals to discuss the formation of a new business …

3    that might compete" with their employer.  150 Cal. App. 4th at 417.  In finding

4    probable success on the merits of a breach of loyalty claim, the court recognized that

5    the duty of loyalty embodies a number of obligations, including "to refrain from

6    competing with the principal and from taking action on behalf of or ***otherwise***

7    ***assisting*** the principal's competitors."  Id. at 416 (quoting Restatement (Third) of

8    Agency § 8.04 (2006)) (emphasis added).  Here, it is undisputed that Bryant lent

9    exactly such assistance when he (1) conveyed to MGA drawings and models he

10   created or derived while employed at Mattel; (2) secretly signed a contract with MGA

11   that required him to provide design services on a " ███████████ " and thus put

12   MGA's business interests ahead of Mattel's; (3) worked on MGA's "Angel" Project;

13   (4) solicited Mattel's vendors on behalf of Bratz and MGA; and (5) used Mattel

14   employees and resources to prepare a three-dimensional doll prototype for his pitch to

15   MGA.  (See MPSJ 36-7.)[62]

16       Defendants fare no better when it comes to Bryant's use of Mattel resources.

17   Defendants characterize this conduct as "de minimis" (Bryant Opp. 26), but this is ***not***

18   a case in which an employee made a few phone calls, sent a few faxes or snuck in a

19   few hours of work time on an unrelated moonlighting project.  Rather, as shown

20   above and in Mattel's MPSJ (at 36-38), Bryant indisputably engaged in ongoing,

21   pervasive and secretive interactions with a competitor involved in the ***same business***

22   as Mattel for private gain at his employer's expense.  Bryant repeatedly used not only

23   Mattel's telephones and fax machines, but its employees and vendors.  (See MPSJ

24   37.)  Indeed, Bryant even paid at least one Mattel employee to work on Bratz, and

25

26   _____

27   [62] Huong Que also identified a duty "not to acquire a material benefit from a third party
     in connection with ... actions taken ... through the agent's use of the agent's position."  150
     Cal. App. 4th at 416.  Here, it is undisputed that Bryant's Bratz expenses were reimbursed

28   by MGA and that MGA paid Bryant for working on "Angel."  UF 65 & 56.

MATTEL, INC.'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF ITS
MOTION FOR PARTIAL SUMMARY JUDGMENT

07209/2456078.1

1   Bryant himself devoted work time to MGA while employed by Mattel.  (Id.)  None of

2   defendants' cases involves actual (and compensated) work for a competitor while the

3   employee was still employed, or solicitation of other employees or vendors to work

4   for a competitor.  And defendants' assertion that employees "may discuss their

5   competing venture with other employees" (Bryant Opp. 26), while perhaps true in

6   some circumstances, is inapplicable here because Bryant did just the opposite:  he

7   concealed his future plans from his colleagues.  (See MPSJ 38).  The cases

8   defendants cite (Bryant Opp. 26-27) are therefore irrelevant.[63]

9       Where the evidence is overwhelming that an employee breached the duty of

10  loyalty, courts have not hesitated to rule on summary judgment.  See, e.g., Eckard

11  Brandes, Inc. v. Riley, 338 F.3d 1082, 1085-86 (9th Cir. 2003) (affirming district

12  court's grant of summary judgment to employer on breach of duty of loyalty claims

13  against former employees); Central Lewmar, L.P. v. Gentilin, 2005 WL 1308235, at

14  *3-4 (D. N.J. June 1, 2005) (same).  This Court should do so here.

15  **V.    MGA AND LARIAN ARE LIABLE FOR AIDING AND ABETTING**

16          **BRYANT'S BREACHES OF HIS DUTIES.**

17          **A.    There Is No Genuine Dispute That MGA Knew of the Breaches.**

18      It is helpful to examine Bryant's breach of the duty of loyalty separately from

19  his breach of his fiduciary duty.

20      Duty of Loyalty.  Mattel demonstrated (MPSJ 40) that Bryant admitted to

21  MGA at an early pitch meeting that he was still a Mattel employee.[64]  Thus, MGA

22  indisputably knew that Bryant owed Mattel the duty of loyalty that all California

23

24      [63] Science Accessories Corp. v. Summagraphics Corp., 425 A.2d 957 (Del. 1980), also
25  provides no support to defendants.  The court there found that the employees could pursue
    the opportunity without breaching their duties because the opportunity was not available to
26  the company.  See id. at 963-964.  Here, by contrast, Bryant worked for Mattel and created
    an invention that fell within his contractual obligation to assign to Mattel.  Bryant's claim
27  (Opp. 30 n.29) that Mattel never would have developed Bratz is neither supported by the
    evidence nor relevant because Bryant was not entitled to make that determination for Mattel.
28      [64]   UF 62-3; see also UF 104.

1  employees owe their employers.  MGA also knew that Bryant, while still a Mattel

2  employee, did work for MGA and received payment from MGA.[65]  As shown above,

3  these acts constitute a breach of the duty of loyalty as a matter of law.

4      Fiduciary Duty.  The same Bryant acts relevant to breach of the duty of loyalty

5  are relevant here; MGA indisputably had knowledge of those acts and is charged with

6  notice that those acts violate the law.  The closer question regarding fiduciary duty

7  concerns MGA's knowledge that Bryant owed such a duty.  On that point, Mattel

8  explained (MPSJ 41-42) that MGA willfully and intentionally blinded itself to (1) the

9  terms of the Bryant-Mattel Inventions Agreement and (2) the nature of Bryant's role

10  at Mattel, both of which Mattel has demonstrated give rise to a duty of loyalty.  For

11  example, MGA knew—because Bryant told them and because MGA saw it

12  mentioned in a copy of Mattel's offer letter to Bryant—that Bryant had signed a

13  confidentiality agreement with Mattel; MGA also knew that Bryant could (but did not

14  want to) procure a copy of the agreement from Mattel.[66]  Yet MGA did not press

15  Bryant to obtain the copy or inquire as to the nature of his confidential role at Mattel.

16  Instead, it satisfied itself with Bryant's "███████████████████████

17  ███████" and Bryant's promise to "████████████████████████

18  ████████████████" (MGA Opp. 18.)

19      1.  As to Bryant's fiduciary duty, MGA seeks solace in the fact that it had not

20  seen the Mattel-Bryant Inventions Agreement or heard specific details regarding

21  Bryant's confidential roles at Mattel.  (MGA Opp. 17.)  But the law equates such

22  willful blindness with knowledge.  See, e.g., Sony Computer Entm't America, Inc. v.

23  Gamemasters, 87 F. Supp. 2d 976, 985 (N.D. Cal. 1999) ("'[W]illful blindness' is no

24  defense to a charge of knowing and intentional counterfeiting. It is enough that a

25  [defendant] 'failed to inquire further because he was afraid of what the inquiry would

---

[65]  UF 62-3; see also UF 104, UF 56, UF 65.
[66]  UF 64 & 95.

-29-
MATTEL, INC.'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF ITS
MOTION FOR PARTIAL SUMMARY JUDGMENT

1    yield.'") (quoting Louis Vuitton S.A. v. Lee, 875 F.2d 584, 590 (7th Cir. 1989))

2    (second alteration in original).  See also Wyatt v. Union Mortgage Co., 24 Cal. 3d

3    773, 785 (1979) ("the requisite concurrence and knowledge may be inferred from the

4    nature of the acts done, the relation of the parties, the interests of the alleged

5    conspirators, and other circumstances") (internal quotation marks omitted).[67]

6         2.  Nor is there any genuine dispute as a factual matter that MGA deliberately

7    kept itself in the dark.  Indeed, MGA entirely ignores that Bryant informed MGA that

8    he had entered into a confidentiality agreement with Mattel, and that Bryant could

9    (but did not want to) obtain a copy of that agreement.[68]  *MGA's lawyer Rosenbaum*

10   *has admitted that he knew such an agreement likely meant that any work Bryant*

11   *did while employed by Mattel would be owned by Mattel*.[69]  Notwithstanding this,

12   MGA's "diligence" regarding Mattel's rights in Bratz amounted to approximately half

13   of a five-minute conversation in which Rosenbaum asked Bryant's attorney, Anne

14   Wang, whether Bryant owned the rights to Bratz; Wang told MGA's Rosenbaum she

15   would check with Bryant, but never provided Rosenbaum a substantive response.[70]

16        **B.    There Is No Genuine Dispute That MGA Provided Substantial**

17              **Assistance to Bryant.**

18        As Mattel demonstrated (MPSJ 42), MGA's misconduct was an essential factor

19   in defendants' scheme to steal Bratz from Mattel.  Indeed, MGA's agreement to

20   purchase Bratz aggravated Bryant's disloyalty.  To take just one example, Bryant

21   would not have commenced his secret campaign of soliciting Mattel's vendors had

22   MGA not agreed to develop Bratz, and pay him handsomely for it.  Without MGA,

23   Bryant was only a willing seller of stolen property; MGA provided him a buyer.

24   _____

25   [67]  Relatedly, MGA's suggestion (Opp. 18) that employers can rely on assurances or
26   indemnification from their new employees to negate knowledge—regardless of the nature of
     contrary facts known to the employer—would nullify the aiding/abetting tort.
27   [68]  UF 95.
     [69]  UF 96.
28   [70]  UF 94.

1. MGA concedes Bryant worked on and was paid for an MGA project, Prayer Angels, while he was still employed by Mattel, but seeks to justify this as "an accepted industry hiring practice." (MGA Opp. 20.) MGA ignores, however, that "ordinary business transactions ... can satisfy the substantial assistance element of an aiding and abetting claim if [MGA] actually knew those transactions were assisting [Bryant] in committing a specific tort. Knowledge is the crucial element." In re First Alliance Mortgage Co., 471 F.3d 977, 995 (9th Cir. 2006) (citing Casey v. U.S. Bank National Ass'n, 127 Cal. App. 4th 1138, 1145 (2005)). As shown above, MGA knew that Bryant was a Mattel employee when he worked on Prayer Angels. Therefore, it is no excuse that "tryout projects" by **unaffiliated** prospective employees are purportedly industry practice.[71] In any event, MGA is precluded from pursuing its tryout project defense because, earlier in this litigation, MGA disclaimed that it would do so.[72]

2. MGA dismisses its payments to Bryant while he was a Mattel employee as "hardly substantial." (MGA Opp. 21.) MGA misses the point. First, MGA not only paid Bryant for his work on Prayer Angels, it reimbursed him for all expenses incurred regarding development of Bratz,[73] thus freeing Bryant from the burden of speculating on this concept on his own dime. Second, MGA dangled the carrot of revenue-sharing in the future, payments that ultimately added up to tens of millions of dollars.[74] That these payments commenced after Bryant left Mattel is irrelevant: the

---

[71]  MGA's assertion (Opp. 20) that Bryant did a tryout project for Mattel is irrelevant because there is no evidence that Bryant was then employed by a Mattel competitor.
[72]  Mattel, Inc.'s Supplemental Interrogatory Pursuant to Order dated September 25, 2009; MGA's Objections and Responses to Mattel Inc.'s Supplemental Set of dated November 19, 2007.
[73]  UF 65.
[74]  CB AMF 174.

07209/2456078.1

1  undisputed evidence shows that MGA encouraged Bryant's misappropriation of Bratz

2  by promising him huge potential profits.[75]

3  **C.   The MGA Defendants Profited from Bryant's Breaches.**

4  Mattel also highlighted (MPSJ 43) the absence of dispute that the MGA

5  defendants profited financially from encouraging Bryant to breach his duties to

6  Mattel, including by selling Bratz to MGA.  Such financial gain, Mattel explained,

7  corroborates the two elements of an aiding/abetting claim.  (Id. (citing Neilson v.

8  Union Bank of Calif., 290 F. Supp. 2d 1101, 1127-28 (C.D. Cal. 2003).)  MGA notes

9  (Opp. 16 n.7) that Neilson arose on a motion to dismiss, but does not contest the legal

10  principle it announces or its clear application to the facts here.

11  **VI.   DEFENDANTS' REMAINING AFFIRMATIVE DEFENSES FAIL.**

12  Mattel explained (MPSJ 43-64) that defendants' myriad affirmative defenses

13  are fundamentally flawed and should be rejected on partial summary judgment.

14  Defendants' oppositions fail to rescue these defenses.

15  **A.   Good Faith and 17 U.S.C. § 205.**

16  Following Mattel's MPSJ (at 44-46), we address these supposed defenses as

17  relevant to Mattel's copyright infringement claim, Mattel's other strict-liability claims,

18  and Mattel's intentional tort claims.

19  Copyright infringement. Mattel argued that good faith is not a defense because

20  infringement does not require intent, and that 17 U.S.C. § 205 is not a defense

21  because MGA failed to fulfill the prerequisite that MGA (as the later transferee from

22  Bryant) record its transfer before Mattel (as the earlier transferee from Bryant)

23  recorded its transfer.  (See MPSJ at 44-45.)

24  MGA does not refute the cases Mattel cited to show that copyright

25  infringement does not require intent and therefore is not subject to a good-faith

26  _____

27  [75]   MGA does not contest that its Eighth Affirmative Defense (acts or omissions of
others) fails if Mattel shows that MGA aided and abetted Bryant's breaches.  (See MGA

28  Opp. 21.)

1   defense.  Rather, MGA suggests that Mattel has subjected itself to such a defense by

2   "indicating that Mattel intends to seek enhanced statutory damages under 17 U.S.C.

3   § 504(c)," which does impose a scienter requirement.  (MGA Opp. 32.)  But MGA's

4   prognostication is off-base:  Mattel does *not* intend to seek enhanced statutory

5   damages.  And Mattel's inclusion in its complaint of words like "knowingly" and

6   "deliberately" do not change the legal elements of ordinary copyright infringement.

7          MGA's analysis of 17 U.S.C. § 205 misreads the Nimmer treatise as stating

8   that the latter transferee (here, MGA) need only register the transferred copyright, not

9   record the transfer agreement, before the earlier transferee (here, Mattel).  (MGA

10  Opp. 30-31.)  To be sure, MGA registered the copyright first.[76]  But Mattel was the

11  first to accomplish *both* recordation and registration.[77]  (Indeed, MGA still has not

12  recorded its transfer document.[78])  The statute clearly states that the transferee who

13  first registers and records prevails over any later recording transferee.  See 17 U.S.C.

14  § 205(d) ("later transfer prevails if recorded first *in such manner*" (*i.e.*, "in the

15  manner required to give constructive notice under subsection (c)") (emphasis added);

16  id. § 205(c) (for a recordation to give constructive notice, it must be "(1) [a]

17  document … [that] specifically identifies the [transferred] work …; and (2)

18  registration must be made for the work").  MGA simply ignores this language, as well

19  as the case Mattel cited corroborating its plain meaning.  (See MPSJ 45 (citing Peer

20  Int'l Corp. v. Latin American Music Corp., 161 F. Supp. 2d 38, 48 (D.P.R. 2001)).

21         Strict Liability Claims.  Mattel's cases (MPSJ 45) show that good faith is not a

22  defense to Mattel's claims for unfair competition and conversion because these are

23  strict-liability offenses for which intent is not an element.  As to conversion, MGA

24  does not address Mattel's cited case but instead invokes the "public policy … of pro-

25  employee mobility."  (MGA Opp. 32.)  This betrays MGA's misunderstanding of

26  _____

27  [76]  UF 23.
    [77]  UF 24 & 128.
28  [78]  UF 92.

1  Mattel's conversion claim, which does not concern Bryant's ability to change jobs but
2  his theft of Mattel's property.[79]  See, e.g., Enterprise Leasing Corp. v. Shugart Corp.,
3  231 Cal. App. 3d 737, 747-48 (1991) ("Because the tort of conversion is a species of
4  strict liability, defendant's good faith, ignorance, mistake or motive is irrelevant and
5  does not constitute a defense.").

6  Concerning statutory unfair competition, MGA argues that evidence of good
7  faith is relevant even where the claim is governed by a strict-liability standard.
8  (MGA Opp. 33.) That is not the law.  See Enterprise Leasing, 231 Cal. App. 3d at
9  747-48.  MGA also argues that evidence of good faith is relevant to the "unfairness"
10  prong of the claim.  (MGA Opp. 33.) But determination of unfairness is objective; it
11  focuses on the defendant's actions, not his thoughts.

12  Finally, good faith is also irrelevant to Mattel's common-law unfair
13  competition claim.  MGA's argument that this claim is limited to "passing off" (MGA
14  Opp. 33 n.33) misstates the law.  As relevant here, a competitor's misappropriation of
15  proprietary information to compete with the plaintiff constitutes common-law unfair
16  competition.  See, e.g., San Jose Const., Inc. v. S.B.C.C., Inc., 155 Cal. App. 4th
17  1528, 1546 (2007).  Such conduct is analogous to conversion; as explained above,
18  evidence of good faith is irrelevant to a conversion claim.

19  Intentional tort claims.  MGA concedes that good faith is not a defense to these
20  claims, and seeks to excuse "prior counsel['s]" assertion of the defense as "over-
21  cautious."  (MGA Opp. 32.)

22  *    *    *    *    *

23  Mattel further showed (MPSJ 46) that, even if good faith were a defense to any
24  of the foregoing claims, the defense should still be rejected on summary judgment
25  because defendants cannot reasonably dispute that they acted in bad faith.  MGA

---

26
27  [79]  As with the copyright infringement claim, any allegations in Mattel's complaint do
28  not change the elements of the California tort of conversion.

-34-

responds that it entered into its contract with Bryant "without any knowledge of Mattel's alleged ownership over Bryant's drawings." (MGA Opp. 33-34.) But MGA conveniently fails to confront its deceitful tactics of blinding itself to the facts, such as MGA's file on former Mattel employees listing Bryant's end date at Mattel and start date at MGA as ███████████[80] and misrepresenting Larian as the creator of Bratz.[81] MGA does not dispute those facts, and they demonstrate its bad faith as a matter of law. At bottom, it is evident that MGA's good faith defense is nothing but an attempt to open the door to irrelevant and prejudicial evidence, leading to time-consuming litigation of peripheral issues.

### B.   Statute of Limitations.

The statute of limitations issue has regrettably been made to appear more complex than it is. Once the correct "notice" standard (which starts the limitations clock) is applied, the rest of the analysis largely follows.

<u>Choosing the "notice" standard</u>. Notice is a question of when the plaintiff "knew or should have known" (MGA Opp. 24) or had a "suspicion" (id.) "that ***an injury*** has been wrongfully caused." <u>Fox v. Ethicon Endo-Surgery, Inc.</u>, 35 Cal. 4th 797, 808 (2005) (emphasis added). The parties essentially disagree on how to define "injury." According to MGA, it is a sweeping concept that includes injury from the Bratz dolls' potential infringement of "Mattel's 'Diva Starz' and 'Toon Teens'" (MGA Opp. 22) and/or a possible taking of confidential information regarding "'Toon Teens'" by a disloyal "former Mattel insider" (id. at 23). According to Mattel, the relevant "injury" is injury to Mattel's property right in the Bratz drawings.

Given this Court's observation that "a copyright claim" was "always lurking in [Mattel's] original complaint,"[82] copyright cases are instructive in resolving how to define injury. Such cases equate injury with "infringement." <u>E.g.</u>, <u>Polar Bear Prods,</u>

---

[80]   UF 107.
[81]   UF 85.
[82]   Order Regarding Mattel's Motion for Leave To Amend, at 4:23-24.

1   Inc. v. Timex Corp., 384 F.3d 700, 706 (9th Cir. 2004); see also MGA Opp. 24

2   (describing Polar Bear as holding that "copyright statute of limitations is triggered

3   when plaintiff knew or should have known of *the* alleged infringement") (emphasis

4   added).  And *the* infringement here was not of "Diva Starz" or "Toon Teens" or other

5   Mattel products, but of an entirely separate property—the Bratz drawings Bryant

6   created during his Mattel employment.[83]   Mattel obviously could not have had reason

7   to suspect the elements of its claims *until it had a "suspicion" that it owned the*

8   *Bratz drawings*.[84]   Nor could Mattel have conducted the substantial-similarity

9   analysis that both parties agree is a prerequisite to copyright infringement (see MGA

10   Opp. 5; MPSJ 12) *until it had seen the Bratz drawings*.

11        When did Mattel have a "suspicion" it owned the Bratz drawings?  Once the

12   inquiry is appropriately framed in this way, the facts cited by MGA are irrelevant:

13   •   Any suspicion "in October 2000 that [Bryant] was leaving to design a

14        line of dolls … for a competitor" (MGA Opp. 22) suggests nothing about

15        Bryant having done such design work during his Mattel employment.

16        To the contrary, "leaving *to* design" implies that Bryant had not already

17        done the design.

18   •   Similarly, Mattel phone records showing that "calls were placed from

19        Bryant's extension to MGA" (id.) carry no implication that Bryant

20        created the Bratz drawings during his Mattel employment.

21   •   That the Bratz display at the early 2001 New York and Hong Kong toy

22        fairs revealed "alleged similarities between [the Bratz prototypes] and

23        *Mattel's 'Diva Starz' and 'Toon Teens'*" (id. (emphasis added))

---

[83]   See id. at 4:26-5:3.

[84]   This distinguishes MGA's lone copyright case (MGA Opp. 23 n.18), Wood v. Santa Barbara Chamber of Comm., Inc., 705 F.2d 1515 (9th Cir. 1983).  Wood held that, where the plaintiff had "suspicion that at least one of *his* photographs had been infringed," he had a duty "to investigate further into possible infringements of *his* copyrights [as to other photographs]."  Id. at 1521 (emphasis added).  Thus, unlike Mattel, the Wood plaintiff suspected (indeed, knew) it owned copyrights in the other materials being infringed.

MATTEL, INC.'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT

1  obviously gave Mattel no inkling that Bryant had created **the Bratz**
2  **drawings** during his Mattel employment.[85]

3  • Even assuming that, "in summer 2001, it was 'common knowledge'
4  within Mattel's design center that Bryant was the BRATZ's creator"
5  (MGA Opp. 23), Mattel had no reason to suspect that Bryant did the
6  creating during his Mattel employment.

7  We note that MGA's opposition brief sensibly abandons MGA's earlier suggestions,
8  frowned upon by this Court,[86] that an anonymous 2002 letter to Mattel's CEO gave
9  Mattel notice that Bryant created Bratz drawings during his Mattel employment.

10  November 24, 2003 was the first time that Mattel **did** have reason to suspect
11  that Bryant had created Bratz drawings during his Mattel employment. On that day,
12  in discovery in another case (the Cityworld case), Mattel obtained a copy of MGA's
13  contract with Bryant.[87] Unlike any of the "notice" facts cited by MGA, this contract
14  raised a suspicion that Bryant had created the Bratz drawings during his Mattel
15  employment because: (1) the contract was ▆▆▆▆▆▆▆▆▆▆▆[88] *i.e.*,
16  before Bryant's Mattel employment ended on October 19, 2000[89]; and (2) the contract
17  purported to transfer to MGA Bryant's ownership of any ▆▆▆▆▆▆▆▆▆▆

18

---

19  [85] Thus, it is irrelevant that "BRATZ drawings from Bryant's sketches" (MGA Opp. 23)
20  were also displayed at the toy fair because Mattel had no reason to suspect that Bryant had
   created Bratz drawings during his Mattel employment (such that Mattel would have a claim
21  to ownership). A former Mattel employee, who attended the toy fairs and conducted
   preliminary negotiations with MGA regarding Mattel Latin America's potential distribution
22  of Bratz, explained that "▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆." Decl. of
23  Mateo Ramano ISO Mattel, Inc.'s Consolidated Opposition to Defendants' Motion for
   Partial Summary Judgment, dated March 20, 2008 at ¶ 7; MGA AMF 110.
24  Additionally, any links between the Bratz dolls and Mattel products **on the internet** (see
   MGA Opp. 24) are no more probative of the existence or origin of Bryant's Bratz drawings
25  than such links **at the toy fair booth**.
   [86] UF 73; Court's Order Denying MGA's Motion for Terminating Sanctions, dated
26  August 27, 2007, at 3, Proctor Dec., Exh. 94; Hearing: Mattel Motion to Amend Complaint,
   dated January 8, 2007, at 16:7-13, Supp. Proctor Dec., Exh. 36.
27  [87] UF 126.
   [88] Id.; Moore Decl., Ex. 1 at 4 (MGA-Bryant contract).
28  [89] UF 69.

1  ███████████████████████████████████████

2  █████████████████████[90]  In other words, the contract effectively told Mattel that

3  Bryant had created works prior to September 18, 2000—and hence possibly[91] during

4  his Mattel employment.  MGA and Bryant have not identified any earlier event that

5  gave Mattel this crucial information.

6      Mattel recognizes that a different accrual date would follow from MGA's

7  conception of the "notice" standard, *i.e.*, that a potential infringement of such

8  disparate products as "Toon Teens" somehow alerted Mattel to the possibility that

9  Bryant created Bratz while a Mattel employee, Mattel owned the Bratz drawings and

10  that MGA's products were infringing the Bratz drawings.  (MGA Opp. 22-23.)  In the

11  event this Court accepts MGA's view, it will become necessary to address whether

12  the "notice" standard even applies here given MGA's fraudulent concealment of the

13  facts by, to take the most prominent example, repeatedly and falsely claiming that

14  Larian (not Bryant) was the creator of Bratz.  (See Mattel Opp. 29.)  ***MGA does not***

15  ***dispute that Larian did so***.  Accordingly, "near-actual" notice, rather than "inquiry

16  notice," is the governing standard.  Garamendi v. SDI Vendome S.A., 276 F. Supp.

17  2d 1030, 1042-3 (C.D. Cal. 2003).[92]  Such "near-actual" notice certainly did not come

18  until November 24, 2003.

19  _____

20  [90]  Moore Decl., Ex. 1 at 5 (emphasis added) (MGA-Bryant contract, ¶ 3(b)).  Even if

21  the Court accepts MGA's assertion (Opp. 19) that the MGA-Bryant contract was effective as of October 4, 2000, that date still precedes the end of Bryant's Mattel employment on

22  October 19, 2000, and the MGA-Bryant contract still reaches back to earlier works created by Bryant "relating to the MGA Products" (*i.e.*, to Bratz).

       [91]  "Possibly," because it was also conceivable that Bryant had created the works prior to

23  his Mattel tenure.  Accordingly, Mattel even on November 24, 2003 had only notice (which, to be sure, suffices to start the limitations clock ticking absent fraudulent concealment), not

24  knowledge, that Bryant created the works during his Mattel tenure.

       [92]  See also, e.g., Hynix Semiconductor v. Rambus, Inc., 2007 WL 3284060, at *3 (N.D.

25  Cal. Nov. 2, 2007) (tolling based on fraudulent concealment ends when the plaintiff has "a

26  suspicion of wrongdoing, *coupled with a knowledge* of the harm and its cause") (emphasis added).

27      MGA mischaracterizes (Opp. 22 n.16) Garamendi as suggesting that California courts do not follow this "near-actual" notice formulation (originally announced in Hobson v. Wilson,

28  737 F.2d 1, 25 (D.C. Cir. 1984).  MGA ignores that Garamendi, just after noting that "[n]o (footnote continued)

-38-

07209/2456078.1

What does the November 24, 2003 accrual date mean for timeliness?  This accrual date means that claims with a two-year limitations period had to be filed by November 24, 2005; claims with a three-year limitations period had to be filed by November 24, 2006; and claims with a four-year limitations period had to be filed by November 24, 2007.  Each of these dates was extended by virtue of the 362-day stay of proceedings, which commenced on May 20, 2005 and ended on May 16, 2006, while the Ninth Circuit considered an interlocutory appeal.[93]  As shown below, every claim against Bryant is timely and the copyright infringement claims against the MGA defendants are timely, even without consideration of relation-back principles or whether some later (than November 24, 2003) accrual date applies to the claims against the MGA defendants.

       *a. Original claims against Bryant.*  Mattel filed its original claims (breach of contract, breach of the duty of loyalty, breach of fiduciary duty, and conversion) against Bryant on April 27, 2004.[94]  None of these claims has a limitations period shorter than three years.  (See MPSJ 47-48.)  Thus, Mattel beat the November 24, 2006 (or November 20, 2007, see n.92, supra) deadline by filing on April 27, 2004.

       *b. New claims against Bryant.*  On November 20, 2006, Mattel sought leave to amend its complaint to add a copyright infringement claim against Bryant.[95]  This was timely, since the three-year limitations period made for a November 24, 2006 (or November 20, 2007, see n.92, supra) expiration date.

---

California court appears *explicitly* to have adopted this formulation," explained that "the California Court of Appeal has cited *Hobson* approvingly … and the *Hobson* standard is consistent with language in both state and federal cases applying California's fraudulent concealment doctrine." Garamendi, 276 F. Supp. 2d at 1043 (emphasis added).

[93]  See Mattel Opp. 30-31.  Thus, the November 24, 2005 date was extended to approximately November 20, 2006; November 24, 2006 to approximately November 20, 2007; and November 24, 2007 to approximately November 20, 2008.

[94]  UF 70.

[95]  UF 72.

1           *c. Claims against MGA and the other defendants.*  Also on November

2    20, 2006, Mattel sought leave to file claims against MGA and the other

3    defendants for copyright infringement, contract-interference, aiding/abetting

4    breach of the duty of loyalty, aiding/abetting breach of fiduciary duty, statutory

5    unfair competition, and common-law unfair competition.[96]

6           The contract-interference, aiding/abetting, and common-law unfair

7    competition claims are subject to a two-year limitations period (see MPSJ 47-

8    48) and hence are timely since they were filed on November 20, 2006, the date

9    to which November 24, 2005, was extended by the stay, see n. 92, supra.

10          The copyright infringement and statutory unfair competition are subject

11   to limitations periods of three and four years, respectively.  Accordingly, both

12   are timely given a November 24, 2003, accrual date: the infringement claim

13   was filed some six months before the stay-extended November 20, 2007,

14   deadline, and the statutory unfair competition claim was filed well in advance

15   of its stay-extended November 20, 2008, deadline.

16   <u>Does a later accrual date apply to the claims against the MGA defendants?</u>

17   There can be no reasonable dispute that a later accrual date—namely, November 4,

18   2004—applies to the claims against the MGA defendants.  As Mattel explained (Opp.

19   26-27), while the November 24, 2003 revelation of the MGA-Bryant contract put

20   Mattel on notice of its claims against Bryant, it gave Mattel no reason to suspect the

21   *MGA defendants* had engaged in any wrongdoing, for the MGA-Bryant contract

22   nowhere suggested that the MGA defendants knew that Bryant was even a Mattel

23   employee.  Mattel acquired notice of the MGA defendants' wrongdoing only on

24

25

26

27   _____

28     [96] <u>Id.</u>

1    November 4, 2004, when Bryant admitted at deposition that the MGA defendants

2    were fully aware of his employment with Mattel when they entered the contract.[97]

3         <u>Relation-back principles apply</u>.  As noted, this Court need not reach relation

4    back if it finds that (a) the claims against Bryant and the copyright infringement and

5    statutory unfair competition claims against the MGA defendants accrued on

6    November 24, 2003; and (b) the remaining claims against the MGA defendants

7    accrued on November 4, 2004.  In the event the Court does not so find, it will be

8    necessary to address whether the amended claims relate back to Mattel's April 27,

9    2004, complaint.

10         *a. Bryant: relation back of copyright claim.*  There is no dispute that

11    "Mattel's copyright claim arises out of the same conduct or transaction

12    contained in the April 27, 2004 complaint"[98] and hence relates back to that

13    complaint under <u>Fed. R. Civ. P.</u> 15(c).[99]

14         *b. MGA: relation back of all claims.*  MGA concedes (Opp. 25 n.21)

15    that these claims arise out of the same conduct or transaction contained in the

16    original complaint, and that relation-back principles apply in favor of

17    intervening plaintiffs, but argues that relation-back principles do not apply to

18    claims ***against intervening defendants***.  But MGA's lone authority, a 1977

19    Texas decision, (<u>see</u> <u>id</u>. (citing <u>Davis v. Outdoor Equip. Co.</u>, 551 S.W.2d 72

20    (Tex. Ct. App. 1977)), is plainly inapposite.  In <u>Davis</u>, there was an

21    "unchallenged finding" that the original defendant and the intervening

22    defendant "have no relationship with each other."  <u>Id</u>. at 73.  Here, by contrast,

23    the MGA-Bryant relationship extends back at least to September 18, 2000;

---

25    [97]   MGA MF # 13.  It is well-settled that "'simply because a person knows he has been injured by one person [here, Bryant] cannot reasonably mean that he should be held to know

26    of every other participant.'" (Mattel Opp. 26-27 (<u>quoting</u> <u>Hobson</u>, 737 F.2d at 36)).

     [98]   Order Regarding Mattel's Motion To Amend 13:26-28.

27    [99]   Further, the statute of limitations on copyright claims is "rolling," so that all infringing acts within three years of filing may be prosecuted, even if some infringing acts occurred

28    earlier.  <u>Roley v. New World Pictures, Ltd.</u>, 19 F.3d 479, 481 (9th Cir. 1994).

indeed, MGA predicated its intervention on its claim to "a significant protectable interest relating to the subject matter of the action,"[100] *i.e.*, the rightful ownership of Bratz.  And since "it is readily apparent … that both [MGA and Bryant] have been aware for some time of the factual predicates now underlying Mattel's copyright claims and intentional interference claims,"[101] MGA cannot seriously invoke a policy of keeping intervening defendants "free from stale claims."  (MGA Opp. 25 n.21.)

    *c.  Other defendants: relation back of all state-law claims.*  These defendants concede that relation back is available against Doe defendants if Mattel can "show that it was ignorant of MGA (HK)'s and Larian's identities *or their role in the alleged wrongs* when Mattel filed its '04 Complaint."  (MGA Opp. 27 (emphasis added).)  There can be no reasonable dispute that Mattel was ignorant of these defendants' role in the alleged wrongs, especially given that the burden lies with defendants to prove otherwise.[102]  As this Court explained:  "MGA notes that the original complaint spoke of Bryant working for one of Mattel's competitors and of that employee's theft of Mattel's intellectual property before leaving to work for that competitor.  At most, all this shows is that Mattel knew that Bryant went to work for MGA, not that MGA or Mr. Larian encouraged Bryant's alleged unlawful behavior recited in the original complaint."[103]

## C.  <u>Laches.</u>

Mattel argued (MPSJ 52-54) that (1) the only state-law claims to which laches even potentially applies are the equitable claims for unfair competition and declaratory relief; (2) laches bars a copyright claim only in unusual or extraordinary

---

[100]   Stipulation Permitting MGA to Intervene as a Party to this Action, 1:5-9, Zeller Dec., Exh. 122.
[101]   Order Regarding Mattel's Motion To Amend 9:11-13.
[102]   See <u>Breceda v. Gamsby</u>, 267 Cal. App. 2d 167, 179 (1968).
[103]   Order Regarding Mattel's Motion To Amend 15-16.

MATTEL, INC.'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT

1   circumstances, which can hardly be present when the claim is filed within the

2   limitations period; and (3) there is in any event no reasonable dispute that MGA

3   cannot satisfy the delay and prejudice elements of laches.  MGA's responses are

4   unpersuasive.

5        1.  MGA invokes the Ninth Circuit's observation that laches is "'seldom

6   susceptible to resolution by summary judgment.'"  (MGA Opp. 27 (quoting Kling v.

7   Hallmark Cards, Inc., 225 F.3d 1030, 1041 (9th Cir. 2000)).  MGA omits to mention

8   that the rationale for the Ninth Circuit's decision was the existence of "a genuine issue

9   of material fact as to whether [plaintiffs] knew or had reason to know about the actual

10   or impending infringement of their alleged copyrights prior to August 1994."  Kling,

11   225 F.3d at 1041.  As shown in the statute of limitations discussion above, here the

12   dispute is purely a legal one, and thus partial summary judgment is entirely

13   appropriate.  MGA's refrain that "Mattel waited over *five years* before challenging

14   MGA's ownership" (MGA Opp. 28 (emphasis in original); see also id. at 29) rests

15   entirely on MGA's incorrect conception of the standard for determining accrual.  As

16   shown above, Mattel filed its claims less than three years after receiving notice that

17   Bryant might have created Bratz drawings during his Mattel tenure.

18        2.  MGA does not dispute that laches is inapplicable as a matter of law to state-

19   law legal claims (here, all of Mattel's claims save unfair competition and, possibly,

20   declaratory relief).  (MGA Opp. 29.)  Instead, it argues (id.) that the Court should

21   inquire into whether the "gravamen" of these claims is equitable.  MGA cites no

22   authority for this approach, and Mattel is aware of none.  Rather, the only type of

23   claim where "the nature of the underlying claim" matters is one for declaratory relief.

24   See Wells Fargo Bank v. Bank of Am., 32 Cal. App. 4th 424, 439 (1995).  And MGA

25   does not address Mattel's argument (MPSJ 53) that the nature of the claim underlying

26   declaratory relief here is legal because establishing that Bratz profits should be placed

27   in a constructive trust resembles an action at law for damages.  Regarding the

28

-43-

1   copyright claim, MGA does not dispute laches bars such a claim only in unusual or

2   extraordinary circumstances.  (See MGA Opp. 28-29.)

3       3.  MGA misapplies the delay and prejudice elements of laches.  As to delay,

4   Mattel explained in the statute of limitations discussion above that the delay was

5   entirely reasonable.  Indeed, that the claims were filed within the applicable

6   limitations periods creates a "strong presumption" against the laches defense.  Jarrow

7   Formulas, Inc. v. Nutrition Now, Inc., 304 F.3d 829, 835-36 (9th Cir. 2002).

8       As to prejudice, it is MGA that "has it backwards."  (MGA Opp. 30.)  MGA

9   emphasizes its investment in Bratz before Mattel filed suit, but ignores its equally

10  substantial investment *after* Mattel filed suit.[104]  That MGA kept investing in Bratz

11  after the filing shows that its conduct was unaffected by Mattel's suit, and therefore

12  that the timing of the suit could not have prejudiced MGA.[105]  MGA's instances of

13  evidentiary prejudice again betray its misunderstanding of the correct notice standard.

14  No lost "internal Mattel emails" or "phone records" would have revealed that Bryant

15  did or did not create Bratz drawings during his Mattel employment.  Moreover, this

16  Court has thoroughly examined this issue and determined not to impose sanctions on

17  Mattel.[106]

18      **D.    Waiver and Consent.**

19      Mattel explained that the waiver and consent defenses must be rejected on

20  partial summary judgment because, among other things, (1) the plain language of the

21  Inventions Agreement precludes the defenses; (2) as a matter of law, failure to pursue

22  one offender does not waive rights to sue another offender, again as a matter of law;

23  _____

24  [104]  Any attempt by MGA to link the post-suit investment to the pre-suit investment
    would disregard the economic principle that "sunk costs" are truly sunk and do not affect

25  future investments.  See, e.g., National Subscription Television v. S & H TV, 644 F.2d 820,
    825 n.7 (9th Cir. 1981) ("contemporary economic theory ... maintains that current

26  consumption choices are unaffected by sunk costs").
    [105]  Mattel cited (MPSJ 54) two cases in support.  MGA attempts to distinguish only one

27  of them, ignoring Danjaq, LLC v. Sony Corp., 263 F.3d 942, 955 (9th Cir. 2001).
    [106]  Order Denying MGA's Motion for Terminating Sanctions, dated August 27, 2007,

28  Proctor Dec., Exh. 94.

and (3) in any event, reasonable jurors could not find a waiver here because none of the employee moonlighting countenanced by Mattel had anything remotely to do with developing (and then selling) doll designs to a Mattel competitor.  (See MPSJ 34-35.)

1.  MGA does not even respond to the first point, which undercuts MGA's platitude that "[w]aiver is not appropriately resolved on summary judgment, as it is a quintessential factual question." (MGA Opp. 34.)  MGA overlooks that interpretation of the unambiguous terms of the Inventions Agreement is a pure legal question suitable for resolution on summary judgment.  A case cited by MGA confirms this well-settled principle, explaining that "whether a contract interpretation was plausible … is a matter of law." McLaughlin v. Liu, 849 F.2d 1205, 1208 n.8 (9th Cir. 1988) (quoted at MGA Opp. 34 n.34).

2.  MGA barely addresses the principle that litigants need not choose between pursuing all offenders or none.  MGA attempts to distinguish only one of Mattel's four case citations, MGM Studios, Inc. v. Grokster, Ltd., 518 F. Supp. 2d 1197 (C.D. Cal. 2007), and fails.  (See MGA Opp. 35)  Nowhere did MGM state that it was addressing and rejecting only the extreme argument that "MGM had to first show that it pursued **every** copyright infringer on the internet."  (MGA Opp. 35 n.35 (emphasis in original).)  Rather, the court clearly held that "waiver analysis should ordinarily be limited to evaluating the conduct and/or communications that occur between a plaintiff and a defendant claiming the waiver defense." MGM, 518 F. Supp. 2d at 1225.  Here, the plaintiff is Mattel and the defendants are Bryant and the MGA defendants.  Mattel's conduct vis-à-vis other employees is irrelevant.

3.  Though the Court need not even reach the facts, they are undisputed.  MGA erroneously treats "moonlighting" as a monolith (Opp. 34-35), and does not even attempt to engage our recital of the undisputed facts that other instances of moonlighting tolerated by Mattel—such as working at a nail salon, making handbags,

1   and writing volleyball books[107]—were entirely different from Bryant's work for

2   MGA.  Further, waiver requires that Mattel have full, unquestionable knowledge of

3   the rights it purportedly waived.  See, e.g., United States v. King Features Entm't,

4   Inc., 843 F. 2d 394, 399 (9th Cir. 1988). As set forth in the statute of limitations

5   discussion, MGA and Bryant do not claim that Bryant disclosed his drawings to

6   Mattel.[108]

7       **E.**     **Abandonment.**

8       MGA's opposition (at 38-39) reveals that its abandonment defense is largely

9   predicated on its statute of limitations defense.  Because, as shown above, Mattel did

10  not suspect it owned the copyright in the Bratz drawings "as early as 2001" (MGA

11  Opp. 39), it is nonsensical to say that Mattel "abandoned any copyrights it may have

12  had in the BRATZ in favor of the MGA Parties" (id.).  MGA also continues to fail to

13  identify any overt act of abandonment, which Mattel explained (MPSJ 59) is an

14  essential prerequisite to the defense.

15      **F.**     **Estoppel.**

16      Again, it is clear from MGA's opposition (at 35-36) that this defense rests on

17  the notion that, in 2001 or 2002, Mattel knew or had notice of its ownership of the

18  copyright in the Bratz drawings.  As shown above, MGA cannot reasonably dispute

19  that Mattel lacked such notice before November 24, 2003.  Additionally, MGA offers

20  no response concerning the fourth element of estoppel, that it "rel[ied] on [Mattel's]

21  conduct to [its] injury." MGM, 518 F. Supp. 2d at 1225.  As shown concerning

22  laches, MGA invested in Bratz both before and after Mattel filed suit.

23

24

25

26  _____

27  [107]  UF 89.

28  [108]  Bryant also acknowledged he had no reason to believe that Mattel permitted him to work for a competitor.  UF 50.

G.   **Acquiescence.**

MGA repeats the refrain that "Mattel learned of the BRATZ dolls five and a half years before bringing an action against MGA Parties" and also rehashes its moonlighting story.  (MGA Opp. 38.)  Mattel addressed both points above.

H.   **Unclean Hands.**

While MGA abandoned its Phase I "unclean hands" defense,[109] recognizing that its claims of misconduct lacked the required connection to the ownership and infringement issues at stake, Bryant purportedly retained at least part of his "unclean hands" defense.[110]  Bryant now claims that, while he cannot point to any "overt, easily documented crimes or illegality" that would bar Mattel from recovering, the defense turns on "a more subtle balance of equities and intent" that the jury must consider.  (Bryant Opp. 34.)  But when it comes to detailing those wrongs, Bryant fails to demonstrate a material issue of disputed fact.

1.  Bryant argues (Opp. 34-35) Mattel's Proprietary Information Checkout Form was deceptive.  Bryant is incorrect, but in any event his point is irrelevant because Mattel has not claimed Bryant breached the Form; rather, Bryant breached the Inventions Agreement and the Conflict Questionnaire.  (See MPSJ 31, 33.)

2.  Bryant argues (Opp. 36) that Mattel acted inequitably in investigating claims that other Mattel employees had also performed work on Bratz.  Mattel has separately answered these baseless claims of witness tampering, emphasizing that the employees have not complained of unfair treatment, and that no one has suggested that anything they told investigators was in any way false.[111]  In these circumstances, Bryant's assertion that these investigations were "intended to gain an improper

---

[109]  UF 18.
[110]  UF 17.
[111]  Mattel, Inc.'s Opposition to MGA and Carter Bryant's Motion For an Evidentiary Hearing Regarding Witness Tampering, dated March 31, 2008.

07209/2456078.1

1  advantage in trying Mattel's Phase I claims against Bryant" (Bryant Opp. 36), lacks

2  foundation.

### I.      Mitigation of Damages.

4      MGA concedes (Opp. 39-40) this defense rises or falls with its (erroneous)

5  assertion that "Mattel delayed for five and a half years before filing suit."

6                          *     *     *     *     *

7      Although defendants' affirmative defenses fail even considering all of their

8  supporting evidence, some of that evidence is not properly before the Court.

9      Mattel asked MGA to "[s]tate the facts upon which YOU intend to rely at trial

10  to support YOUR affirmative defenses, and IDENTIFY all PERSONS with

11  knowledge of those facts and all DOCUMENTS that REFER OR RELATE TO those

12  facts."[112] This Court ordered MGA to comply with Mattel's interrogatory.[113]

13  However, in its response, MGA did not identify many of the facts it now invokes.

14  For example, regarding laches, MGA failed to disclose that it would support the

15  defense with Brawer's testimony that Mattel purportedly wanted to ██████████

16  ████████ or with evidence that MGA was allegedly prejudiced because Mattel

17  "misplaced" or "destroyed" evidence.[114] Likewise, with respect to statute of

18  limitations, MGA did not allege that Mattel was put on notice of its claims by Mattel

19  employees' attendance at the toy fairs or by "internet publications linking the BRATZ

20  with Mattel's line of DIVA STARZ."[115]

---

[112]   See Mattel, Inc.'s Supplemental Interrogatory Regarding Defendants' Affirmative Defenses, dated December 3, 2007, Supp. Proctor Dec. Exh. 32.
[113]   See Order Granting Motion for Leave to Serve a Supplemental Interrogatory, dated December 3, 2007, Supp. Proctor Dec. Exh. 33.
[114]   See MGA's Response to Mattel's Amended Supplemental Interrogatory Regarding Defendants' Affirmative Defenses, dated January 7, 2008, at 23:28-29:25 (discussing facts supporting its laches defense); see also Amended Answer and Affirmative Defenses of MGA Entertainment, Inc. to Mattel's Second Amended Answer and Counterclaims, dated September 19, 2007, at 21:19-22:2 (asserting laches defense).
[115]   See MGA's Response to Mattel's Amended Supplemental Interrogatory Regarding Defendants' Affirmative Defenses, dated January 7, 2008, at 28:26-32:12 (discussing facts supporting its statute of limitations defense); Amended Answer and Affirmative Defenses of (footnote continued)

Accordingly, MGA's affirmative defense arguments must be stricken to the extent they are outside the scope of MGA's interrogatory response.  <u>See</u> <u>Fed. R. Civ. P.</u> 37(c)(1); <u>Yeti by Molly, Ltd. v. Deckers Outdoor Corp.</u>, 259 F.3d 1101, 1106 (9th Cir. 2001).  Notably, "[c]ourts have upheld the use of the sanction even when a litigant's entire cause of action or defense has been precluded."  <u>Id.</u>

**Conclusion**

This Court should grant Mattel's motion in its entirety.

DATED:  April 1, 2008          Respectfully submitted,

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP


By_____
     John B. Quinn
     Attorneys for Mattel, Inc.

---

MGA Entertainment, Inc. to Mattel's Second Amended Answer and Counterclaims, dated September 19, 2007, at 22:4-7 (asserting statute of limitations defense).

MATTEL, INC.'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT

07209/2456078.1