**EXHIBIT A**

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

# EXHIBIT B

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

# EXHIBIT C

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

**EXHIBIT D**

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

# EXHIBIT E

1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
   John B. Quinn (Bar No. 090378)
2  (johnquinn@quinnemanuel.com)
   Michael T. Zeller (Bar No. 196417)
3  (michaelzeller@quinnemanuel.com)
   Jon D. Corey (Bar No. 185066)
4  (joncorey@quinnemanuel.com)
   865 South Figueroa Street, 10th Floor
5  Los Angeles, California 90017-2543
   Telephone: (213) 443-3000
6  Facsimile: (213) 443-3100

7  Attorneys for Mattel, Inc.

8

9                    UNITED STATES DISTRICT COURT

10                  CENTRAL DISTRICT OF CALIFORNIA

11                         EASTERN DIVISION

12  CARTER BRYANT, an individual,      CASE NO. CV 04-9049 SGL (RNBx)

13              Plaintiff,             Consolidated with
                                       Case No. CV 04-09059
14       vs.                           Case No. CV 05-02727

15  MATTEL, INC., a Delaware           DECLARATION OF VALERY
    corporation,                       AGINSKY IN SUPPORT OF
16                                      MATTEL, INC.'S CONSOLIDATED
                Defendant.             OPPOSITION TO DEFENDANTS'
17                                     MOTIONS FOR PARTIAL
                                       SUMMARY ADJUDICATION
18  AND CONSOLIDATED ACTIONS

19                                     Date:  April 22, 2008
                                       Time:  10:00 a.m.
20                                     Place: Courtroom 1

21                                     **Phase 1**
                                       Discovery Cut-Off:    Jan. 28, 2008
22                                     Pre-Trial Conference:  May 5, 2008
                                       Trial Date:           May 27, 2008
23

24

25

26

27

28

## DECLARATION OF VALERY AGINSKY

I, Valery Aginsky, declare as follows:

1.    I make this declaration of my personal and firsthand knowledge and, if called and sworn as a witness, I could and would testify competently hereto.

2.    I make this declaration in support of plaintiff Mattel, Inc.'s ("Mattel") Consolidated Opposition to Defendants' Motions for Partial Summary Adjudication.

3.    I have been retained on behalf of Mattel to provide opinions regarding forensic ink testing. I have over 27 years experience as an expert in the field of forensic chemistry. As evidence and proof of this experience, I attach a true and correct copy of my *curriculum vitae* as Exhibit A to this Declaration.

4.    Attached as Exhibit B is a true and correct copy of the expert report I prepared in this case, dated February 8, 2008. I certify that this report is true, accurate and correct, and accurately sets forth my opinions in this case.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 21, 2008, at LANSING, MICHIGAN.

Valery Aginsky

-2-

**Exhibit A**

# VALERY N. AGINSKY, Ph.D.

## Curriculum Vitae

**Position:** *Forensic Chemist / Document Dating Specialist*
Riley, Welch & Aginsky Forensic Document Examinations, Inc.
Lansing, Michigan

**Education:** *Ph.D. Analytical Chemistry - 1980*
Military Academy of Chemical Defense (formerly known as the Chemical
Faculty of the Institute of Mechanical Engineering prior to 1940), Moscow,
USSR

*M.S. Analytical Chemistry - 1977*
Military Academy of Chemical Defense, Moscow, USSR

**Professional**
**Experience:** Riley, Welch & Associates Forensic Document Examinations, Inc.,
Lansing, Michigan
*Forensic Chemist* (1998 to April 2005)

Riley, Welch & Aginsky Forensic Document Examinations, Inc.,
Lansing, Michigan
*Forensic Chemist* (April 2005 to present)

Responsible for chemical analysis of ink on documents (ink comparison and
dating). Uses ink dating methods developed as a result of many years of research
of the methodology developed and published by Dr. Antonio Cantu. These
methods measure certain parameters of ink that decrease as ink ages on paper.
They analyze *ink volatile components* (their residues are always present in ink
lines, no matter the ink age) and enable *absolute* ink age determination: one
determines a time frame within which a questioned entry has been written, not
relative to other known dated entries, as *relative* ink age determination technology
requires.

Forensic Science Center of the Ministry of the Interior, Moscow, Russia
*Senior Research Chemist* (1980 to 2000)

**EXHIBIT** A

**PAGE** 3

*Aginsky CV*
*Page 2 of 6*

Involved in methods development, technical assistance to investigative personnel, including training and presentations to legal proceedings and routine examination of evidence. Developed several techniques for examining questioned documents, drugs of abuse, explosives and gunshot residues.

About ten years of professional research and practical experience as a questioned document examiner: the dating of writing, stamp pad and printing inks, alteration of records, indented writings, erasures/eradications/obliterations, sequence of strokes, paper/ink/toners, computer printers and documents generated, counterfeit currency, currency exposed to an exploding dye-pack.

*Methods:* microscopy, microspectrophotometry, electrostatic imaging analysis, video enhancement techniques, infrared spectroscopy, ultraviolet/visual spectrophotometry, thin-layer chromatography, and gas chromatography-mass spectrometry.

**Honors/Awards:**    *Diploma and the First Prize for new techniques on Dating Inks*
Ministry of the Interior, 1993

*Award for excellence in service (Best Forensic Chemist)*
Ministry of the Interior, 1982

*Silver medal in chemistry at the 1976 All-Union Contest of Scientific Works,*
*Ministry of Defense*

*Co-Chair of the Questioned Documents Sections at the First International Forensic Science Symposium, Moscow, Russia, 1994, the 13th and 14th Meetings of the International Association of Forensic Sciences, Dusseldorf, Germany, 1993, and Tokyo, Japan, 1996.*

**Teaching**
**Experience:**    Conducted numerous training seminars for the personnel of forensic laboratories in Russia and the former Soviet Union in the framework of the Ministry of the Interior's training programs:

*Technical and Chemical Examination of Counterfeit Currency*

*Detecting and Dating Alterations Made to Documents*

*Ink/Paper Comparison by Thin-Layer Chromatography and Other Analytical Methods*

*Detection and Characterization of Explosive Residues*

EXHIBIT ____ A ____

PAGE ____ 4 ____

Served as visiting examiner to the Division of Identification and Forensic Science, Israel Police Headquarters, 1996 & 1997.

Conducted seminars on ink analysis and dating for the Division of Identification and Forensic Science, Israel Police Headquarters, Jerusalem, Israel, 1995; Ministry of Justice and Ministry of the Interior Combined Scientific Council for Forensic Science and Criminalistics, Moscow, Russia, 1997;   the Forensic Sciences Division of the Canada Customs and Revenue Agency, Ottawa, Canada, 1998; Istanbul University, Institute of Forensic Sciences, Istanbul, Turkey 2000.

Conducted a seminar on Quantitative Thin-Layer Chromatography (Internal Standard Method) at the Russian-German Summer School on Thin-Layer Chromatography, Moscow, Russia, 1993.

**Court
Testimony:**    Testified regarding ink analysis and ink and document dating in criminal and civil matters and in arbitrations.

**Professional
Affiliations:**    International Association for Identification, Questioned Documents Section (1992 - present)

International Association of Forensic Sciences, Questioned Documents Section (1993 - present)

Ministry of Justice and Ministry of the Interior Combined Scientific Council for Forensic Science and Criminalistics (Russia, 1995-1999)

Regional Representative for the Russian Charted Division of the International Association for Identification (1998 - 2000)

American Society for Testing & Materials (2003 - present)

EXHIBIT ___A___

PAGE ___5___

## Professional Publications

## Books

1. Document Analysis / Analytical Methods. *Encyclopedia of Forensic Sciences*, J.A. Siegel (Ed.), Academic Press, Harcourt Publishers Ltd., 2000.

2. Writing Media and Documents. Chapter 19. *Handbook of Analytical Separations*. Vol. 2 – Forensic Science, M.J. Bogucz (Ed.), ELSEVIER, Amsterdam – New York – Oxford – Shannon – Singapore – Tokyo, 2000.

3. Writing Media and Documents. Chapter 28. *Handbook of Analytical Separations (2nd Edition)*. Vol. II – Forensic Science (publication pending).

4. An Application of Chromatographic Methods for Dating Questioned Documents. *Chromatography (Celebrating the 125th Birthday of the Inventor of Chromatography, Dr. Michael Tswett)*, O. Kaiser, R.E. Kaiser, H. Gunz, and W. Gunther (Eds.), InCOM, Duesseldorf, Germany, 1997.

5. A New Version of the Internal Standard Method in Quantitative Thin-Layer Chromatography. Chapter 4.6. *Handbook of Modern Thin-Layer Chromatography*, O.G. Larionov (Ed.), Russian Academy of Science, Chromatography Council, Moscow, Russia, 1994 (in Russian).

6. Aginsky, V.N. and Dildin, Yr. M., *Forensic Examination of Explosives*, VNII MVD SSSR, Moscow, USSR, 1982 (in Russian).

7. Aginsky, V.N., Safronenko, T.I., and Sorokina, G.I., *Forensic Examination of Questioned Documents*, VNII MVD SSSR, Moscow, USSR, 1987 (in Russian).

8. Aginsky, V.N., Safronenko, T.I., and Sorokina, G.I., *Detecting and Dating Alterations Made to Documents*, VNII MVD SSSR, Moscow, USSR, 1989 (in Russian).

9. Aginsky, V.N., Zibrov, G.S., and Sorokina, G.I., *Analysis of Drugs, Inks, Petroleum Products, and Explosives by Reversed Phase Thin-Layer Chromatography*, Forensic Science Center of the Russia's Ministry of the Interior, Moscow, 1993 (in Russian).

## Peer-Reviewed Articles and Presentations at Scientific Conferences

10. A New Application of Instrumental Planar Chromatography in Forensic Analysis, *Journal of Planar Chromatography*, Vol. 4, 1991, pp. 167-169.

11. Some New Ideas for Dating Ballpoint Inks – A Feasibility Study, *Journal of Forensic Sciences*, 1993, No. 5.

12. Comparative Examination of Inks by Using Instrumental Thin-Layer Chromatography and Microspectrophotometry, *Journal of Forensic Sciences*, Vol. 38, No. 5, Sept. 1993, pp. 1111-1130.

13. Forensic Examination of "Slightly Soluble" Inks Pigments Using Thin-Layer Chromatography, *Journal of Forensic Sciences*, Vol. 38, No. 5, Sept. 1993, pp. 1131-1133.

EXHiBiT _____ A_____

PAGE _____ 6_____

14. Mechanism and Kinetics of the Aging of Some Ink Dyes. *Advances in Forensic Sciences*. Vol. 3 - Forensic Criminalistics, Proceedings of the 13th Meeting of the International Association of Forensic Sciences, Dusseldorf 1993, B. Jacob and W. Bonte, Eds., Verlag Dr. Koster, Berlin, 1995.

15. Discrimination between Naturally and Artificially Aged Ballpoint Inks, ibid.

16. Determination of the Age of Ballpoint Pen Ink by Gas and Densitometric Thin-Layer Chromatography, *J. Chromatography*, 1994, Vol. 678.

17. A New Version of the Internal Standard Method in Quantitative Thin-Layer Chromatography, *Journal of Planar Chromatography*, July/August 1994, Vol. 7, pp. 309-314.

18. A Microspectrophotometric Method for Dating Ballpoint Inks - A Feasibility Study, *Journal of Forensic Sciences*, Vol. 40, No. 3, May 1995, pp. 475-478.

19. Dating and Characterizing Writing, Stamp Pad and Jet Printer Inks by Gas Chromatography/Mass Spectrometry, *International J. Forensic Document Examiners*, 1996, No. 2, pp. 103-115.

20. Accelerated Aging – Its Use in Methods for Dating Ink (Letter to the Editor), *International J. Forensic Document Examiners*, 1996, No. 3.

21. Ink Dating – The State of the Art in 1996, Proceedings of the 14th Meeting of the International Association of Forensic Sciences, Tokyo 1996, Shunderson Communications, 1997, Vol. 4.

22. Current Methods for Dating Inks – Which is the Best? Presented at the 49th Annual Meeting of the American Academy of Forensic Sciences, New York, NY, 1997.

23. Dating Ink on Questioned Documents – The State of the Art in 1997, presented at the First European Meeting of Forensic Science, Lausanne, Switzerland, 1997.

24. Measuring Ink Extractability as a Function of Age – Why the Relative Aging Approach is Unreliable and why it is More Correct to Measure Ink Volatile Components than Dyes, *International J. Forensic Document Examiners*, 1998, No. 3.

25. Ink Dating – The State of the Art, presented at the 50th Annual Meeting of the American Academy of Forensic Sciences, San Francisco, CA, 1998.

26. Ink Dating – The State of the Art, presented at the First Regional Symposium on Criminalistics, April 20-22, 2000, Istanbul University, Institute of Forensic Sciences, Turkey.

27. Determining the Sequence of Non-Intersecting Media on Documents: Ballpoint Pen Ink and Laser Toner Entries, *Journal of the American Society of Questioned Document Examiners*, 2002.

28. Current Methods for Dating Ink on Documents, presented at the 60th Annual Conference of the American Society of Questioned Document Examiners, San Diego, California, August 14-19, 2002, and at the Midwestern Association of Forensic Scientists Fall 2002 Meeting, Milwaukee, Wisconsin, September 15-20, 2002.

29. Using TLC and GC-MS to Determine whether Inks Came from the Same Manufacturing

EXHIBIT _____ A _____

PAGE _____ 17 _____

Batch, presented at the 63rd Annual Conference of the American Society of Questioned Document Examiners, Montreal, Canada, August 11-16, 2005.

30. Using TLC and GC-MS to Determine whether Inks Came from the Same Manufacturing Batch, *Journal of the American Society of Questioned Document Examiners*, Vol. 9, No. 1, 2006, pp. 19-27.

31. Current Methods for Dating Ink on Documents, presented at the 65th Annual Conference of the American Society of Questioned Document Examiners, Boulder, Colorado, August 11-16, 2007.

## Other Professional Publications

32. Aginsky, V.N. and Sorokina, G.I., "Detecting Explosives in Post Explosion Debris Contaminated by Petroleum Products", *Expertnaya Praktika [Expert Practice]*, Vol. 19, 1982, pp. 73-75 (in Russian).

33. Aginsky, V.N. and Sorokina, G.I., "Detection of Explosive Residues Intruded into Asphalt", *Expertnaya Praktika [Expert Practice]*, Vol. 20, 1983, pp. 109, 110 (in Russian).

34. Aginsky, V.N. and Sorokina, G.I., *Detection and Quantitative Determination of Clonidine and Other Psychotropic Drugs in Beverages*, VNII MVD SSSR, Moscow, USSR, 1990 (in Russian).

35. Aginsky, V.N., "A New Application of Instrumental Planar Chromatography in Forensic Analysis," presented at the 6th International Symposium on Instrumental Planar Chromatography, Interlaken, Switzerland, April 23-26, 1991.

36. Aginsky, V.N., Sorokina, G.I., and Zibrov, G.S., "Detection, Identification and Comparative Examination of Narcotics and Drugs of Abuse," Proceedings of the Forensic Science Symposium, Linkoping, June 1992, Report 27, National Laboratory of Forensic Science, Linkoping, Sweden, 1993.

37. Aginsky, V.N., Savilov, A.P., and Sorokina, G.I., "Chromatographic Screening of Drugs of Abuse," Proceedings of the Forensic Science Symposium, Moscow, March 1994, Forensic Science Center of the Ministry of the Interior, Moscow, Russia, 1994.

38. Aginsky, V.N., "Increasing the Reliability of the Identification of Separated Substances in Densitometric Thin-Layer Chromatography", *Advances in Forensic Sciences*. Vol. 3 - Forensic Criminalistics, Proceedings of the 13th Meeting of the International Association of Forensic Sciences, Dusseldorf 1993, B. Jacob and W. Bonte, Eds., Verlag Dr. Koster, Berlin, 1995.

39. Aginsky, V.N., "A New Approach in Determining the Age of Inks Using Densitometric Thin-Layer Chromatography," ibid.

40. Aginsky, V.N., "Instrumental Techniques for Comparing Similarly Colored Inks," ibid.

41. Aginsky, V.N., Lesnikov, V.A. and Sorokina, G.I., "Time of Shooting - Feasibility of Discriminating "Fresh" and "Old" Organic Gunshot Residues," Proceedings of the 14th Meeting of the International Association of Forensic Sciences, Tokyo 1996, Shunderson Communications, 1997, Vol. 4.

42. Aginsky, V.N., "Application of GC/MS in Some Areas of Forensic Analysis," presented at the Hewlett-Packard Analytical Forum, Moscow, Russia, April 1998.

43. Aginsky, V.N., "Determining the Sequence of Non-Intersecting Media on Documents – Ballpoint pen ink and laser toner entries," presented at the 49th Annual Conference of the American Society of Questioned Document Examiners, Des Moines, Iowa, August 2001.

EXHIBIT ____ A

PAGE ____ 8

**Exhibit B**

# RILEYWELCHAGINSKY

## FORENSIC DOCUMENT EXAMINATIONS, Inc.

P.O. Box 80225, Lansing, Michigan 48908-0225
Telephone (517) 394-1512  Fax (517) 882-2767

Thomas P. Riley, BS
Forensic Document Examiner *, **

Valery N. Aginsky, Ph.D., Ink Chemist
Gregoire P. Michaud, BA, Latent Print Examiner
Felix Adatsi, Ph.D., Toxicologist

Todd W. Welch, BA
Forensic Document Examiner*

February 8, 2008

Diane Cafferata Hutnyan, Esq.
Quinn Emanuel Urquhart Oliver & Hedges LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3666

**Re:**  Bryant v. Mattel

Dear Ms. Hutnyan:

I have examined the following document:

**A-1:**  Official Journal of Notarial Acts comprising handwritten entries dated from 1/15/96 (pages 1 and 2) to 9/14/99 (pages 11 and 12).[1]

## EXAMINATION TASK

I was asked to determine whether the 8/26/99 notation "From 1998 Missouri" was written contemporaneously with the rest of the entry dated 8/26/99 on pages 11 and 12 of document **A-1** or whether it was written at a later date.

## QUALIFICATIONS

I am a forensic chemist of 27 years' experience. I am currently employed, as a Forensic Chemist specializing in the field of ink analysis and document dating, with Riley, Welch & Aginsky Forensic Document Examinations, Inc. (formerly known as Riley, Welch & Associates Forensic Document Examinations, Inc.) I received my Ph.D. in Analytical Chemistry in 1980. Prior to joining Riley, Welch & Associates I worked as a senior research chemist with the Forensic

---

[1] Also, I have reviewed the following documents: the August 30, 2007 Order of Judge Infante; 8 boxes of original Carter Bryant production documents described in Judge Infante's August 30, 2007 Order; bates numbered photocopies, video and photographs of these documents; the transcripts of Carter Bryant's depositions taken on 11/4/2004 (Vol. 1), 11/5/2004 (Vol. 2), 11/8/2004 (Vol. 3); the transcripts of Jacqueline Prince's deposition taken on 12/21/2004.

*Diplomate of the American Board of Forensic Document Examiners, Inc.
**American Society of Questioned Document Examiners

EXHIBIT _____ B

PAGE _____ 9



Science Center, Ministry of the Interior, Russia. I am experienced in a wide range of examination techniques, but my particular specialty is the analysis and dating of ink on documents by Thin-Layer Chromatography and Gas Chromatography-Mass Spectrometry. I am the author of more than 20 peer-reviewed articles on ink analysis and dating, including chapters in three books and two encyclopedias.

A copy of my curriculum vitae showing further details of my professional history and a list of my professional publications is attached hereto as Exhibit "VNA-1."

In the past five years I have been deposed in my capacity as an expert fifteen times and have testified at trial and hearings as an expert on thirteen occasions, a list of which is attached hereto as Exhibit "VNA-2." I am being compensated for my work in this case according to my hourly rate, which is outlined in the fee schedule attached hereto as Exhibit "VNA-3."

## REPORT OF LABORATORY EXAMINATION

The addition of extra writing can greatly change the meaning of the wording or the value of a document. Therefore, forensic document examinations are often conducted in order to determine whether two pieces of written text originated from the same pen.

As it is usually preferable not to damage the document, the process of forensic ink comparison always begins with the physical examination of the inks using techniques designed to obtain as much information as possible from the ink (and the document as a whole) by visual examination and other nondestructive means, such as microscopic and infrared absorption examinations.[2] If any of the nondestructive techniques shows that the inks being compared are different, then no additional tests, including more sophisticated chemical tests, are required to prove that the two pieces of the written text did not originate from the same pen.

If the nondestructive techniques cannot discriminate between the inks being compared, then chemical methods are to be used. A few samples of each ink are taken from the paper for their chemical analysis. Chemical methods are more effective for discriminating between inks of the same color than the physical (nondestructive) methods. It is widely accepted in the field of forensic writing ink analysis that a combination of two chemical methods, thin-layer chromatography (TLC) and gas chromatography-mass spectrometry (GC-MS), allows the examiner to retrieve maximum information about the composition of writing ink.

Writing inks are made of colorants (dyes, pigments) and a carrier (vehicle). Oil- and water-based ballpoint ink vehicles consist of two main ingredients – solvents that are used to dissolve or disperse the colorants, and the resins that are used to thicken the inks. TLC analyzes ink colorants (ink colored components) and GC-MS analyzes ink vehicle components (volatile solvents, resins and other noncolored ink components, such as modifiers, lubricants, thickeners, antiseptics, surfactants, by-products, etc.) That is, each of these two chemical methods, TLC and

---

[2] ASTM Standard Guide E1422-05, "Standard Guide for Test Methods for Forensic Writing Ink Comparison." Published January 2006. Originally approved in 1991. Last previous edition approved in 2001 as E 1422 – 01.

EXHIBIT    B

PAGE    10



GC-MS, can provide only some partial information about the composition of writing ink. In simple terms, TLC can analyze one half of the ink composition (1/2 of the "chemical fingerprint" of an ink), and GC-MS can analyze the other half of the ink composition (the other 1/2 of the "chemical fingerprint" of the ink). Thus, these two methods perfectly complement each other.[3]

The physical and chemical examinations including visual, microscopic, and infrared absorption examinations, TLC, and GC-MS were conducted in the following succession.

## PHYSICAL (NONDESTRUCTIVE OPTICAL) EXAMINATIONS

VISUAL EXAMINATION

As mentioned above, the insertion of a modifying clause or sentence may change the meaning of a document. Visual examination is an accepted method in the field of forensic document examination that is used to detect insertions (interlineations or additions). To determine that an insertion or addition has been made usually involves a study of the document as a whole.

Two most common indications of the insertion of a handwritten sentence are as follows[4]:

1.  The inserted sentence and the balance of the document are written with different inks.

2.  Some sentence is either (*A*) inserted between the lines of the initial text (if no sufficient space was available within the initial text) or (*B*) inserted/added immediately after the last line of the initial text (if no sufficient space is available immediately after the last line of the initial text, then the spacing/distance between the inserted sentence and the last line of the text is usually smaller than the spacing between the lines of this text).

All the pages of document A-1 that contained handwritten entries were examined visually (pages 1 through 12; entries dated 1/15/96 through 9/14/99; see Attachment 3). Among these pages, the only place that showed the insertion of material to the initial text was where the notation "From 1998 Missouri" was added to the entry dated 8/26/99 on page 11.[5] The 4 lines of the text "Original sketches of doll idea – characters 6-total = Names are: Zoe, Lupe, Hallidae, Jade, 2 males." appear evenly spaced and, without the presence of the 5th line (the notation "From 1998 Missouri"), they appear to fill up the entire cell of the table on page 11. Thus, a person wishing to add further information to this 4-line entry would have to squeeze the new wording in between the last line of the entry and the printed horizontal line of the cell of the table in a way that would prevent the same even spacing as was in the original entry. Because no sufficient space was available immediately after the last line of the initial 4-line entry, there is almost no spacing

---

[3] Aginsky, V.N. "Using TLC and GC-MS to Determine whether Inks Came from the Same Manufacturing Batch," *Journal of the American Society of Questioned Document Examiners*, Vol. 9, No. 1, 2006, pp. 19-27.

[4] Scientific Examination of Questioned Documents / Edited by J.S. Kelly and B.S. Lindblom. – 2nd edition, CRC Press, Taylor & Francis, 2006, pp. 319-335.

[5] There might be other notations on pages 1 through 12 that could have been inserted, but the overall appearance of the other entries on pages 1 through 12 did not suggest later insertion.

EXHIBIT _____ B

PAGE _____ 11



between the inserted 5th line (the notation "From 1998 Missouri") and the last line of the initial 4-line entry.

## MICROSCOPY

The eye is in itself a powerful scientific instrument capable of discovering much information from an examination of ink on paper. With the aid of glass lenses for magnifying and focusing or a microscope (that uses visual light for illumination), the appearance of a line written on paper gives the document examiner valuable information that may allow discrimination between inks or may individualize the writing instrument through its performance characteristics.

In this examination, 4X and 10X magnifying glasses and a microscope with magnification up to 140X were used. I noted that the width of the ink lines in the notation "From 1998 Missouri" was slightly larger than the width of the ink lines in the rest of the 8/26/99 entry.

The microscopic study did not detect any significant differences between the inks or writing instruments used to produce the notation "From 1998 Missouri" and the surrounding entries written by the Notary Public on pages 11 and 12 of document A-1. This indicates that these inks are either of the same composition (formulation) or of different compositions that cannot be distinguished by the microscopic examination.

## INFRARED ABSORPTION

Inks of the same color (indistinguishable to the naked eye) may differently absorb/reflect invisible radiation beyond the red portion of the visible spectrum. This may allow discrimination between similar (in color) but not identical (in composition) inks. The infrared absorption examination did not detect any differences between the inks used to produce the notation "From 1998 Missouri" and the surrounding entries written by the Notary Public on pages 11 and 12 of document A-1. This indicates that these inks are either of the same composition (formulation) or of different compositions that cannot be distinguished by the infrared absorption examination method.

## CHEMICAL EXAMINATIONS

## SAMPLING

The sampling procedure involved removing portions of the written lines from the entries to be examined. This was accomplished with a hypodermic needle sized hole punch, which removes hole punches of less than 1 mm in diameter. (The bored out ink samples are removed with a plunger). The ink-on-paper samples were taken from 17 areas on pages 11 and 12 of document A-1. The paper blank samples were taken from two areas of paper (on page 11) that did not contain ink. These 17 sets of ink samples and 2 sets of paper blank samples were then analyzed by TLC and GC-MS (as described below). Prior to their analysis by TLC and GC-MS, the samples were kept in my laboratory at normal environmental conditions.[6]

---

[6] Normal room/office humidity and temperature: 72 degrees Fahrenheit plus/minus up to approximately 15 degrees Fahrenheit (i.e. 22°C +/- ca. 8°C).

EXHIBIT ___ B

PAGE ___ 12



Black and white copies of pages 11 and 12 from which I took ink samples are attached to this report as Attachments 1 and 2, respectively. On these two attachments, each of the above 17 areas is circled and numbered. The questioned notation "From 1998 Missouri" is numbered as entry "8" (see Attachment 1).

CHROMATOGRAPHY

Chromatography is used to separate mixtures of substances into their components. Chromatography was discovered in 1901 when Michael S. Tswett separated pigments from chlorophyll using self-made chromatographic columns packed with various adsorbents. This fundamental discovery marked a milestone in the development of chromatographic separation techniques that led to Nobel prizes in chemistry. Today, chromatography has become the main analytical method in the pharmaceutical industry, food analysis, petrochemical analysis (crude oil, gasoline, kerosene, etc.), biochemical research, environmental analysis (e.g., pesticides in drinking water), clinical analysis (e.g., therapeutic drug monitoring, metabolism disorders), toxicology, forensic and doping analysis, and in many other areas. Thin-layer chromatography (TLC) and gas chromatography-mass spectrometry (GC-MS) are 2 chromatographic methods that are most widely used in analytical and forensic science laboratories all over the world.

Both methods, TLC and GC-MS, were used in this examination.

THIN-LAYER CHROMATOGRAPHY (TLC)

A TLC plate is a sheet of glass or plastic that is coated with a thin layer of a solid adsorbent (usually silica). A sample of the substance to be analyzed is dissolved in an appropriate solvent, and a small amount of the obtained solution is spotted near the bottom of the TLC plate. The TLC plate is then placed in a shallow pool of a solvent in a developing chamber so that only the very bottom of the plate is in the liquid. This liquid, or the eluent, is the mobile phase, and it slowly rises up the TLC plate by capillary action. The components of the sample become separated from one another because of their different degrees of attachment to the coating material (stationary phase) on the plate. The solvent is then allowed to evaporate, and the separated components of the mixture are visualized. If the separated components are colored, visualization is straightforward. If the colorant of ink is a mixture of different dyes, then these dyes are separated on the TLC plate into spots of different colors. Thus, TLC is a very effective method for discriminating between similarly colored inks (if the colorants of the inks consist of different ink dye components that can be separated on the TLC plate).

In this examination, the TLC analysis of the ink samples was conducted as follows. A subset consisting of 3 samples of ink (microplugs) was isolated from each of the above 17 sets of ink samples. Each subset of microplugs was placed into a small glass vial. To each of the vials 2-3 microliters of dimethylformamide were added. The ink was extracted for 30 minutes. The ink extract (visually colorless) was transferred by a capillary pipette to the TLC plate. This transfer process continued until the entire extract had been transferred to the TLC plate (for each sample to be tested). The TLC plate was allowed to air dry and was then placed in a vertical orientation into a developing tank. The tank was a glass enclosure with a removable lid and contained a few milliliters of solution (ethyl acetate – isopropanol – water – acetic acid = 30:15:10:1). After 10 minutes of development the TLC plate was removed from the tank and viewed in both UV (254

EXHIBIT _____ B

PAGE _____ 13



and 365 nm) and white light with the unaided eye. Often similarities and differences in colored (dyes) and non-colored components present and relative proportions of the components are noted resulting in conclusions about the number of different ink formulations within the ink samples examined. In this examination, the TLC analysis of the ink samples showed that none of them contained any extractable ink components that could be seen in the form of separated colored spots on the TLC plate. It indicates that the colorant of the ink(s) within the ink samples examined is either carbon black or another insoluble black pigment. Thus, the TLC analysis did not detect any differences between the inks used to produce the notation "From 1998 Missouri" and the surrounding entries written by the Notary Public on pages 11 and 12 of document A-1. This indicates that these inks are either of the same composition (formulation) or of different compositions that cannot be distinguished by TLC.

GAS CHROMATOGRAPHY-MASS SPECTROMETRY (GC-MS)

GC-MS is a widely accepted analytical method of determining the qualitative composition of multi-component systems. It is routinely used in analytical and forensic science laboratories all over the world.[7] In the field of forensic document examination, GC-MS is used for discriminating between similarly colored inks that have been made using different ink vehicle components (solvents, resins, modifiers, lubricants, thickeners, antiseptics, surfactants, by-products, etc.)

The procedure of the GC-MS analysis involves vaporizing a sample and sweeping it through a column with a moving stream of gas termed the mobile phase or the carrier gas. Compressed gas cylinders commonly supply the gases. The sample is introduced into the injection port. The most common type of analysis involves the injection of approximately 1 microliter of a liquid sample into a heated injection port, which is interfaced to the capillary column where the actual separation takes place. The capillary column's inner walls are coated with a viscous liquid material (it is called the stationary phase). This inner coating will interact with different molecules to different extents. Those components of the mixture, which weakly interact with the stationary phase, pass more quickly through the column than those compounds, which have strong interactions with the stationary phase. For this reason, different components of the mixture exit the column at different times. As each component of the mixture comes off the column, it is detected by the MS detector. The detector sends a signal to the attached computer, which displays each signal as a peak on a chart. The array of peaks (one peak for each component) is called a chromatogram. A chromatogram obtained for a certain material can be considered as a "chemical fingerprint" of the vehicle components of this material. When GC-MS is used for comparing, say, 10 entries written with similarly colored inks, the chromatograms are recorded for each of the 10 inks, and then these "chemical fingerprints" are compared to determine the number of different ink formulations used to produce the entries.

In this examination, the GC-MS analysis of the ink samples was conducted as follows. A subset consisting of 3 to 5 microplugs was isolated from each of the above 17 sets of ink samples. Each subset of microplugs was placed into a small glass vial. (3 microplugs of the paper blanks were placed into another vial). To each of the vials 2 microliters of chloroform were added. The ink

---

[7] For example, GC-MS is used for separating accelerants in fire residue from suspected arson fires and for the analysis of drugs.

EXHIBIT _____ B

PAGE _____ 14



RILEY WELCH AGINSKY

Forensic Document Examiners

**Ms. Diane Hutnyan**        **February 8, 2008**        **Page 7 of 8**

was extracted for 30 minutes. The extracts were analyzed using an Agilent 6850 gas chromatograph interfaced with an Agilent 5973N mass selective detector and equipped with a split/splitless injection system.

The GC-MS conditions and parameters were as follows:

Column: HP-5MS, 30 m x 0.25 mm ID x 0.25-micrometer film thickness (cross-linked 5%-phenyl-95%-dimethylpolysiloxane)

Carrier: helium (column flow 1 mL/min)

Oven program: isothermal for 1 min at 35°C, program 15°C/min to 230°C and hold for 7 minutes

Injection: 1 microliter, splitless, T=250°C

Purge on time: 1 minute

GC-MS transfer line: 280°C

The GC-MS analysis revealed the presence of 2 different inks of black color within the ink samples examined: the ink (*ink 1*) used to produce the notation "From 1998 Missouri" on page 11 of document A-1 and the ink (*ink 2*) used to produce the other examined entries on pages 11 and 12 of document A-1.

The difference between *ink 1* and *ink 2* revealed by the GC-MS test is that *ink 1* contains a vehicle component (alkyl derivative of cyclohexanol) that is absent in *ink 2*. This result of the GC-MS analysis shows that *ink 1* and *ink 2* are of different compositions.

## SUMMARY OF EXAMINATION RESULTS

I.     The black inks of two different compositions were found among the examined entries appearing on pages 11 and 12 of document A-1:

- *Ink 1*: the ink used to produce the notation "From 1998 Missouri" on page 11 of document A-1 (entry 8; see Attachment 1).

- *Ink 2*: the ink used to produce the remainder of the writing made by the Notary Public on pages 11 and 12 of document A-1 (entries 1 through 7 and 9 through 17; see Attachments 1 and 2).

II.     As considered above, in section Visual Examination, the location of the notation "From 1998 Missouri" on page 11 of document A-1 clearly shows that this notation is squeezed in between the last line of the 8/26/99 entry "Original sketches of doll idea – characters 6-total = Names are: Zoe, Lupe, Hallidae, Jade, 2 males." and the printed horizontal line below it.

EXHIBIT _____ B _____

PAGE _____ 15 _____



**R**ILEY **W**ELCH **A**GINSKY
Forensic Document Examinations

**Ms. Diane Hutnyan**                    **February 8, 2008**                    **Page 8 of 8**

## CONCLUSION

Based on the results of this examination and my professional experience, it is my opinion that the notation "From 1998 Missouri" was written on page 11 of document A-1 at a later time compared to the rest of the 8/26/99 entry written on pages 11 and 12 of document A-1.

It is also my opinion that the most probable sequence of the writing of the entries on pages 11 and 12 of document A-1 was as follows:

1. The entry dated 8/26/99
2. The entry dated 9/14/99
3. The second entry dated 9/14/99
4. The notation "From 1998 Missouri"

## DISPOSITION OF EVIDENCE

The evidence was returned to Mr. Daniel J. Warren, Esq. (Sutherland Asbill & Brennan, LLP, 999 Peachtree Street, Suite 2300, Atlanta, GA 30309) on January 31, 2008 via Federal Express, tracking number 8635 6224 9130.

Very truly yours,

RILEY, WELCH & AGINSKY
FORENSIC DOCUMENT EXAMINATIONS, INC.

Valery N. Aginsky, Ph.D.
Forensic Chemist

Attachments:

Attachment 1 – Reduced copy of page 11 of document A-1
Attachment 2 – Reduced copy of page 12 of document A-1
Attachment 3 – Reduced copies of the cover page and pages 1 through 12 of document A-1
Exhibit "VNA-1" – Curriculum Vitae (incl. List of publications)
Exhibit "VNA-2" – Court Cases and Depositions
Exhibit "VNA-3" – RWAFDE Schedule of Fees

EXHIBIT ___B___

PAGE ___16___

# Attachment 1

## Reduced copy of page 11

## of document A-1

EXHIBIT _____ B _____

PAGE _____ 17 _____