QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
John B. Quinn (Bar No. 090378)
johnquinn@quinnemanuel.com
Michael T. Zeller (Bar No. 196417)
(michaelzeller@quinnemanuel.com)
Jon D. Corey (Bar No. 185066)
(joncorey@quinnemanuel.com)
Timothy L. Alger (Bar No. 160303)
(timalger@quinnemanuel.com)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Attorneys for Mattel, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>MATTEL, INC., a Delaware corporation,<br><br>Defendant.<br><br>AND CONSOLIDATED ACTIONS | CASE NO. CV 04-9049 SGL (RNBx)<br><br>Consolidated with Case Nos. CV 04-09059 and CV 05-02727<br><br>**DISCOVERY MATTER**<br><br>**[To Be Heard By Discovery Master Hon. Edward Infante (Ret.) Pursuant To The Court's Order Of December 6, 2006]**<br><br>MATTEL, INC.'S *EX PARTE* APPLICATION TO COMPEL ACCESS TO CERTAIN BRYANT ORIGINALS FOR NON-DESTRUCTIVE EXPERT EXAMINATION AND IMAGING;<br><br>AND MEMORANDUM OF POINTS AND AUTHORITIES<br><br>[Declaration of Diane C. Hutnyan filed concurrently herewith]<br>Date: TBA<br>Time: TBA<br>Place: TBA<br><br>**Phase 1:**<br>Discovery Cut-off: January 28, 2008<br>Pre-trial Conference: May 5, 2008<br>Trial Date: May 27, 2008 |

1   TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2       Pursuant to <u>Local Rule</u> 7-19, Mattel, Inc. respectfully submits this *ex parte*
3   application for two total weeks' access to certain of Carter Bryant's originals for
4   expert examination and non-destructive testing and imaging by Discovery Master-
5   approved experts Lloyd Cunningham and William Flynn.  The application is made
6   simultaneously with an *ex parte* Application to Judge Larson for permission to file
7   supplemental reports within two weeks of these experts' additional access to the
8   documents.

9       Mattel makes this Application pursuant to <u>Federal Rules of Civil Procedure</u>
10  26 and 34 and 37, and pursuant to the on-the-record stipulation before Judge Block
11  that requires Bryant and MGA to make original documents available to Mattel upon
12  request.  Mattel's request for access is made on the grounds that after Bryant and
13  MGA severely limited Mattel's experts' access to the Bryant original documents at
14  issue in this case, MGA's purported experts then went well beyond rebutting the
15  stated bases of Mattel's experts' opinion and did special reflected infrared and
16  infrared luminescence testing that they now claim revealed to them underlying
17  pencil marks that cannot be seen without such testing.  (The original documents to
18  which access is requested are those whose bates number was identified or referenced
19  in Mr. Kullman and/or Dr. Lyter's reports, as well as any additional documents
20  referenced in Mssrs. Flynn and Cunningham's reports.)  Though they claim this
21  supposed evidence rebuts Mattel's experts' opinions, they refuse to allow Mattel's
22  experts' access to the originals so that they too can see the evidence supposedly
23  revealed by those tests and fully and fairly address the points raised.  Mattel is
24  entitled to an even playing field, and MGA's and Bryant's refusal to share access to
25  Bryant's originals precludes that and constitutes discovery abuse.

26

27

28

1 | **Statement of Compliance with Local Rule 7-19**

2      Counsel for Carter Bryant is Matthew M. Werdegar of Keker and Van Nest

3 | LLP (telephone: 415-391- 5400, Address: 710 Sansome Street, San Francisco, CA

4 | 94111-1704).

5      Counsel for MGA Entertainment Inc., MGA Entertainment (HK) Limited,

6 | MGAE de Mexico , S.R.L. de C.V. and Isaac Larian (collectively "MGA") is

7 | Matthew E. Sloan of Skadden, Arps, Slate, Meagher & Sloan (Telephone: 213-687-

8 | 5276;   Address: 300 South Grand Ave., Los Angeles, CA  90017-3144).

9      Pursuant to <u>Local Rule</u> 7-19.1, Mattel gave notice of its intent to file this *ex*

10 | *parte* Application by letter dated April 2, 2008 if defendants failed to comply with

11 | its request to have additional access to Bryant's original documents.  Counsel for

12 | Bryant and MGA indicated their intent to deny  Mattel's request and to oppose the

13 | Application by letters dated April 3, 2008 and April 4, 2008, respectively.

14      This Application is based on this Notice of Application, the accompanying

15 | Memorandum of Points and Authorities, the Declaration of Diane C. Hutnyan filed

16 | concurrently herewith, the records and files of this Court, and all other matters of

17 | which the Court may take judicial notice.

18 |

19 | DATED:  April 7, 2008        QUINN EMANUEL URQUHART OLIVER &

20 |                                HEDGES, LLP

21 |

22 |                     By *Diane C. Hutnyan*

23 |                          Diane C. Hutnyan

                         Attorneys for Mattel, Inc.

24 |

25 |

26 |

27 |

28 |

-3-

*quinn emanuel*

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

FACTUAL BACKGROUND ...................................................................................... 3

ARGUMENT.............................................................................................................. 8

I.   MATTEL WILL BE IRREPARABLY PREJUDICED IF IT IS NOT GRANTED THE REQUESTED ACCESS TO THE BRYANT DOCUMENTS. ................................................................................................ 9

II.  THE COURT SHOULD GRANT MATTEL'S APPLICATION BECAUSE MATTEL DID NOT CREATE THE CIRCUMSTANCES REQUIRING *EX PARTE* RELIEF. ................................................................. 12

III. AS GATEKEEPER, THE COURT HAS A RESPONSIBILITY TO ENSURE THAT THE EXPERTS ARE ABLE TO RENDER COMPLETE AND RELIABLE EXPERT TESTIMONY AND THAT CAN ONLY HAPPEN HERE WITH REASONABLE ACCESS TO THE EVIDENCE FOR BOTH SIDES. ......................................... 13

CONCLUSION........................................................................................................ 14

quinn emanuel

# TABLE OF AUTHORITIES

**Page**

## Cases

*Carr v. Pacific Maritime Ass'n,*
  904 F.2d 1313 (9th Cir. 1990)........................................................................... 9

*Daubert v. Merrell Dow Pharm., Inc.,*
  509 U.S. 579 (1993) ............................................................................... 11, 13

*Mission Power Eng'g Co. v Continental Cas. Co.,*
  883 F. Supp. 488 (C.D. Cal. 1995)................................................................. 8, 12

*Phillips v. Netblue, Inc.,*
  2007 WL. 528722 (N.D. Cal. 2007)................................................................... 13

*Rivera v. NIBCO, Inc.,*
  384 F.3d 822 (9th Cir. 2004)............................................................................. 9

*Shoen v. Shoen,*
  5 F.3d 1289 (9th Cir. 1993)............................................................................. 9

*Taylor v. Burlington Northern R. Co.,*
  787 F.2d 1309 (9th Cir. 1986)........................................................................ 13

*United States v. Hempfling,*
  2008 WL. 703809 (E.D. Cal. 2008) ........................................................ 9, 11, 12

*Universal Trading,*
  2007 WL. at 2 ................................................................................................ 14

*Universal Trading & Inv. Co. v. Kiritchenko,*
  2007 WL. 2141296 (2007) .............................................................................. 14

## Statutes

Fed. R. Civ. P. 26(e)(2) ...................................................................................... 13

Fed.R. Evid. 702 ................................................................................................. 14

quinn emanuel

## MEMORANDUM OF POINTS AND AUTHORITIES

### Preliminary Statement

Last summer, Mattel sought access for its four forensic document examiners to eight boxes of Bryant originals -- among them drawings and other materials that Bryant claimed supported his chronology of events -- for non-destructive[1] examination and testing. Although Rule 34 entitles Mattel to such access, Bryant opposed the request unless Mattel accepted a number of inappropriate conditions and restrictions designed to substantially hinder or even preclude Mattel's experts' examination and analysis of the originals.[2]  Most of the objections and restrictions were overruled by the Court, but the Court did, at Bryant's urging, severely limit the time period in which the non-destructive examination could take place.  The Court permitted a total of 35 days for the documents to be shipped, in their original order and all together, to each of the four experts in their laboratories around the country.[3]

---

[1]   Non-destructive testing is any testing that would not alter the documents' inherent physical status.

[2]   Among them:  Bryant's counsel would only allow Mattel's experts to examine the originals if the originals were limited to a  small number of documents - and only drawings -- that had to be cleared by him in advance; if Mattel's experts (whose identity was work product at that point) were identified in advance; if the originals stayed in the custody of Mattel's law firm and were never sent to the experts' laboratories; and if Mattel would share its access time with Bryant, who already had unlimited access to his own documents.  See Declaration of Diane C. Hutnyan In Support Of Ex Parte Application To Compel Access To Certain Bryant Originals For Non-Destructive Expert Examination and Imaging, dated April 7, 2008 (hereinafter, "Hutnyan Decl."), ¶ 3 and Exh. 1 (Mattel, Inc.'s Notice of Motion and Motion to Compel Bryant To Make Original Documents Available For Expert Examination and Testing, and For Sanctions, dated July 6, 2007), at 10; and Exh. 2 (Carter Bryant's Opposition To Mattel, Inc.'s Motion to Compel Bryant To Make Original Documents Available For Expert Examination and Testing And For Sanctions, dated July 16, 2007), at 1, 8-9.

[3]   Id., Exh. 3 (August 30, 2007 Discovery Master Order).

quinn emanuel

1    Mattel's four experts, each of whom has a different special area of expertise,[4]
2    made the most of their time, examining and non-destructively testing[5] the thousands
3    of documents as best they could, looking broadly for erasures, alterations, or other
4    potentially probative evidence.  As the result of that analysis, two of Mattel's experts
5    drew important conclusions pertinent to whether certain documents in the case were
6    original drawings, as alleged by Carter Bryant; whether they were traced; and/or
7    whether they were traced from other documents that could be identified.   Their
8    conclusions were based on examinations under special lenses, special lighting, and
9    under microscopes.  Both of them observed that there appeared to be pencil lines
10   obscured some of the ink, or colored, portions of the drawings, but they did not
11   regard them as significant to their analysis at the time, as the pencil lines that stuck
12   out from under those sections of the drawings were consistent with their other
13   findings.

14       In rebuttal, MGA's two forensic "experts" -- Dr. Lyter and Mr. Kullman --
15   who had unlimited access to Bryant's documents, as well as Mssrs. Flynn's and
16   Cunningham's roadmap to the small subset of documents among the thousands that
17   were significant to this analysis -- zeroed in on these obscured pencil lines.  They
18   conducted reflected infrared and infrared luminescence testing that might or might
19   not reveal pencil lines under the coloring.  They then developed a theory around the
20   pencil lines that conveniently only they now had access to.  Bryant then freely sent
21   these key originals to MGA for use at Mssrs. Cunningham's and Flynn's depositions,
22   where they were asked to testify and draw conclusions about the pencil lines at their
23   depositions, which of course they were unable to do since they could not see them.

24

25   [4]   Id., ¶ 5, Exhs. 4-7 (In Camera Declarations for Mssrs. Cunningham, Flynn,
26   and Rantanen, and Dr. Aginsky).
27   [5]   "Non-destructive testing" methods include examining the documents using
     microscopes, magnifiers, light sources, scanners with special filters and measuring
28   instruments in ways that do not alter the documents.

quinn emanuel

1    After the depositions, each of Mattel's experts sought access to the originals

2  again so that they could also fully examine and photograph the pencil lines, but

3  Bryant would not share access to them.  Bryant and MGA hope to prevent Mattel's

4  experts from (1) ever fully examining that aspect of the drawings and those portions

5  of MGA's experts' reports that rely on that aspect of the drawings, and (2) being able

6  to photograph -- and show to the jury -- the evidence MGA's "experts" claim exist

7  and claim is so significant.

8    The Court cannot permit Bryant and MGA to keep their thumb on the scale.

9  If MGA's experts are permitted to opine about the significance of the pencil lines,

10  Mattel's experts must be given the opportunity to fully examine this supposedly

11  significant evidence and supplement their reports to address this evidence.

12

13                        **Factual Background**

14    By Order on August 30, 2007, the Discovery Master granted Mattel 35 days

15  "for the expert examination and testing of the materials requested for the preparation

16  of its initial expert report[.]"[6]  The time period allotted was much shorter than the 60

17  days Mattel had requested as the bare minimum for this initial review,[7] but the

18  limitation was imposed at Bryant's and MGA's insistence and over Mattel's

19  objection.[8]

20    The parties had agreed for various reasons, but especially in light of the fact

21  that the originals were not marked or even ordered according to their Bates

22  numbered counterparts, to keep the originals in their original order, all together, in

23  the eight boxes Bryant kept them in.[9]   The boxes were, pursuant to the Court's

24  Order, sent as a collection by overnight mail to each of Mattel's four Court-approved

25

26   [6]  Id., Exh. 3, at ¶ 4.

27   [7]  Id., Exh. 2, 1.
     [8]  Id., Exh. 2.

28   [9]  Id., ¶ 6.

quinn emanuel

1 experts in their four different labs around the country.[10]   Deliveries were carefully
2 timed to avoid meetings and other activities on the experts' other matters, so as to
3 minimize down-time for the documents.[11]

4      The first of Mattel's forensic experts to see the originals, Lloyd Cunningham,
5 was allotted eight days to non-destructively examine and test the eight boxes of
6 documents.[12]   The second, expert, William Flynn, had "just over three work days"
7 for his examination and testing.[13]   Mattel's counsel did not steer the examination,
8 instead allowing each expert to review the entire universe of documents without
9 preconceived notions and to highlight any findings they individually considered
10 significant based on the evidence in the originals themselves.[14]   As a result, most of
11 the 35 days was spent generally examining the thousands of pages of documents to
12 determine whether they yielded relevant evidence or clues, and to do this, Mssrs.
13 Cunningham and Flynn examined the documents directly, and/or with oblique or
14 other special lighting, and/or with special lenses and magnifiers or microscopes.[15]

15      Mssrs. Flynn and Cunningham both drew conclusions, based on the testing
16 and examination they did, as to whether certain tracing paper drawings and certain

17 ───────────────
  [10] Id.
18   [11] Id.
  [12] Id., ¶ 7.
19   [13] Id. ¶ 7, Exh. 9 (Transcript of William Flynn, March 27, 2008), at 19:5-7.
20 Walter Rantanen, a paper chemist, conducted a paper analysis, and Dr. Valery
Aginksy, an ink chemist, performed an ink test on the documents.  Mr. Rantanen
21 and Dr. Aginsky's access were the subject of agreement and/or are not at issue in
22 this application.
  [14] Id., ¶ 7.
23   [15] Id., Exh. 8 (Rough Transcript of Lloyd Cunningham, March 31, 2008), at
24 44:3-48:5, 54:5-16, 159:15-160:7 (Cunningham used magnifiers, oblique or side
lighting, transmitted lighting, fiber-optic slidings, dichroic filters, a light table,
25 microscopes, reflected infrared, infrared luminescence, ultraviolet, and indentation
26 analyses to examine documents among the eight boxes); Exh. 9 (Transcript of
William Flynn, March 27, 2008), at 54:20-24, 160:1-11 (Flynn conducted
27 microscopic examination and used a light table, among other tools, for his
28 examination of the eight boxes of materials).

quinn emanuel

1  multimedia posterboard drawings were sketches or tracings, and/or tracings of each
2  other.[16]  Each of them testified that although their access was more limited than they
3  would have liked due to the restrictions of the August 30, 2007 Order, they felt the
4  examinations they did were sufficient to draw the conclusions and develop the
5  opinions that they had in their reports.[17]  They believed there were obscured pencil
6  lines underneath the ink and colorant of these key documents which could not be
7  viewed without reflected infrared or infrared luminescence (and maybe not even
8  with those tools) but did not believe them significant to their analysis at the time, or
9  to their ultimate opinions as expressed in their reports, as the pencil markings they
10 could see were not significant.[18]

11      In contrast, unfettered by any limitations on their time or access, and knowing
12 from the Flynn and Cunningham reports which documents in the eight boxes were
13 significant to the tracing/sequencing issues, MGA's purported experts, Dr. Lyter and
14 Mr. Kullman, each conducted infrared testing using the VSC machine that they
15 claim (1) revealed pencil lines and (2) did so in a way that was purportedly
16 significant to the sequencing issue.[19]  Mr. Kullman even referenced "attachments" in
17

18      [16]  Id., Exhs. 10 and 11 (Cunningham and Flynn Reports).
19      [17]  Id., Exh. 9 (Flynn), at 229:23-230:4 (sufficient to conclude outline drawings
20 were traced, as in his report); Exh. 8 (Cunningham), at 202:20-203:7 (he evaluated
   the evidence significant to his report).
21      [18]  Id., Exh. 9 (Flynn), at at 59:23-60:9 (found that there were pencil lines);
   63:25-64:3 (unclear whether infrared would have allowed viewing of pencil lines);
22 76:1-77:17 (even if obscured pencil lines seen, they might or might not be
   significant); Exh. 8 (Cunningham), at 70:3-21 (recognizing pencil on multimedia
23 drawings);  138:12-137:8 (used infrared and infrared luminescence on the
24 multimedia posterboard drawings to look at certain portions of pencil lines and for
   chemical erasures that he thought might be significant); 161:11-25 (at the time he
25 was permitted access, he did not realize the pencil on the multimedia drawings
26 might be significant to sequencing; he had not even identified the sequencing issue);
27 178:8-179:2 (did do infrared luminescence to detect erasures and noticed pencil
   lines).
28      [19]  Hutnyan Decl, Exhs. 12 and 13 (Kullman and Lyter reports).

quinn emanuel

1  his report that purportedly demonstrated a comparison he was able to make between
2  the tracing paper drawings and the multimedia posterboard drawings using the VSC
3  testing, although the attachments were never served with the report.[20]

4      At Mssrs. Flynn's and Cunningham's depositions, MGA's counsel quizzed
5  them about the supposed obscured pencil findings.  No documents were presented at
6  the depositions that indicated the presence or location, or supported the purported
7  significance, of such lines.[21]      Since Mssrs. Cunningham and Flynn had not
8  performed that analysis, and could not see the supposed lines in question, they were
9  unable to comment on the specific pencil marks referred to or fully address the
10  issue.[22]

11      Both Mssrs. Flynn and Cunningham testified that they did not have time to
12  conduct reflected infrared and/or infrared luminescence testing on the multimedia
13  posterboard drawings because of the time constraints that had been imposed by the
14  August 30, 2007 Order. Flynn testified:

15          . . . there were severe time constraints placed on these examinations.
16          The scope of my examination was vast and I had to make some
17          decisions about an examination strategy that would accomplish the
18          most that I could accomplish in the three days or so that I had with
19          these documents. . . .[23]

20

21

22  [20]  Id., Exh. 12 (Kullman Report at 3).
     [21]  Id., ¶ 13.
23  [22]  Id., Exh. 9 (Flynn), at 62:22-63:9 (Flynn had no opinion one way or the other
24  because he could not see them given the time available to him); 131:23-132:19 (he
     could not see completely covered pencil without infrared); 135:21-136:11 (infrared
25  might have helped see quality of pencil lines); Exh. 8 (Cunningham), at 128:4-129:3
26  (could not see pencil without infrared); 143:20-144:9 (would not necessarily see
     pencil without the further testing); 150:4-151:6 (declining to render an on-the-spot
27  opinion on pencil lines not visible at the deposition).
     [23]  Id., Exh. 9 (Flynn), at 20:25-21:14.
28

quinn emanuel

1        Q.   Why didn't you [use the video spectro comparator to see the
2    obscured pencil lines]?
3        A.   . . . Mr. Bryant had put a severe limitation, in my opinion, on the
4    amount of time that I had to do an examination, so I had to make
5    decisions about what, how much time to spend with each of the
6    examinations and how much -- what kind of block testing I was going
7    to do, not only with these documents but other documents
8    downstream from here.[24]

9    Mr. Flynn testified that he would have done the infrared examinations had he had
10   more time.

11       Q.   So you're saying [that to see the underlying pencil lines] you
12   would have liked to have performed additional examinations [on those
13   drawings] with what type of a device?
14       A.   I mean, there were multiple types of examinations that could have
15   been performed, infrared examinations, infrared luminescent
16   examinations. Had I had the time, I would have moved into the other
17   part of the laboratory and taken photomicrographs.[25]

18   Mr. Cunningham explained that the issue of obscured pencil line identification
19   location was not something he was doing in his "cursory examination of the
20   documents" because when he was doing his examination -- the first few days that
21   any Mattel expert would be able to see the eight boxes -- he did not even foresee
22   that sequencing of those materials would be an issue.[26]

23         Two days after these depositions concluded, Mattel requested, pursuant to the
24   June 20, 2006 stipulation on the record before Magistrate Judge Block, one week
25   each for Mssrs. Flynn and Cunningham to have access to the original documents

26   _____

27   [24] Id., Exh. 9 (Flynn), at 73:8-74:17.
    [25] Id., Exh. 9 (Flynn), at 59:6-61:5.
28   [26] Id., Exh. 8 (Cunningham), at 161:11-25.

quinn emanuel

1  they referred to in their reports, or that were referred to in the rebuttal reports
2  prepared by Drs. Lyter and Kullman, and gave notice that if the requested access
3  was not granted voluntarily, we would be bringing this *Ex Parte* Application for
4  relief.[27]

5      Preferring to keep the playing field uneven, counsel for Bryant and MGA
6  ignored the request to meet and confer and refused the request, citing no reason why
7  parting with the documents for two weeks would have any effect on Bryant or
8  MGA.[28]  Mattel's counsel invited counsel for Bryant and MGA to meet and confer
9  and again confirmed its plans to bring this Application.[29]

10     On April 4, three days after Mattel requested Mr. Kullman's missing
11 "attachments," Mr. Kullman submitted an amended expert report excluding any
12 reference to those attachments.[30]  MGA refused to provide the attachments.[31]

### Argument

14     An *ex parte* application may be granted where, as here, "the moving party's
15 cause will be irreparably prejudiced if the underlying motion is heard according to
16 the regular noticed motion procedures" and "the moving party is without fault in
17 creating the crisis that requires *ex parte* relief, or that the crisis occurred as a result
18 of excusable neglect."  Mission Power Eng'g Co. v Continental Cas. Co., 883
19 F.Supp. 488, 492 (C.D. Cal. 1995). Those standards are clearly met here.

20
21
22
23

---

[27]  Id., Exh. 14 (Letter from D. Hutnyan to M. Sloan and M. Werdegar, dated
24  April 2, 2008).
[28]  Id., Exhs. 15 and 16 (Letter from M. Werdegar to D. Hutnyan, dated April 3,
25  2008 and Letter from M. Sloan to D. Hutnyan, dated April 4, 2008).
[29]  Id., ¶ 15 and Exh. 17.  The telephonic meet and confer, held with Matt
26  Werdegar on April 7 as the result of this invitation, was unsuccessful. Id., ¶ 16.
27  [30]  Id., Exh. 19.
28  [31]  Id., Exh. 18 (Email from M. Sloan to D. Hutnyan, dated April 3, 2008).

## I. **MATTEL WILL BE IRREPARABLY PREJUDICED IF IT IS NOT GRANTED THE REQUESTED ACCESS TO THE BRYANT DOCUMENTS.**

"The Federal Rules authorize broad pretrial discovery based on the general principle that litigants have a right to 'every man's evidence,' and that wide access to relevant facts serves the integrity and fairness of the judicial process by promoting the search for the truth." Id. (quoting Rivera v. NIBCO, Inc., 384 F.3d 822, 824 (9th Cir. 2004). See also Shoen v. Shoen, 5 F.3d 1289, 1292 (9th Cir. 1993) ("broad right of discovery is based on the general principle that litigants have a right to 'every man's evidence'") (quoting United States v. Bryan, 339 U.S. 323, 331 (1950)).

Notably, embodied within litigants' right to conduct broad discovery is the recognition that such discovery must be *meaningful*. See, e.g., Carr v. Pacific Maritime Ass'n, 904 F.2d 1313, 1321 (9th Cir. 1990) (grievance and arbitration procedures "conducted within an extremely constricted time frame and without provisions for any meaningful discovery, were wholly inadequate to the task of fairly adjudicating the individual or class claims...."); United States v. Hempfling, 2008 WL 703809 * 9 (E.D. Cal. 2008) ("Government's prejudice continues with its inability to conduct meaningful discovery to pursue its claims.").

Here, Mattel tried to abide by the 35-day non-destructive examination and testing restriction that had been imposed over its objection, forcing Mssrs. Flynn and Cunningham each to quickly sort through and perform general examinations on thousands of documents, gathering evidence of erasures, alterations or any other forensic evidence that could shed light on issues of relevance to this case, in a few days. This was an extremely unusual limitation, but since Mattel's experts were still able to conduct a sufficient examination in the timeframe to render the opinions they did, Mattel did not need to seek more time pursuant to paragraph 4 allowing for more access with the documents upon a showing of "good cause."

1   But having insisted on, and won, this narrow time window for Mattel's four
2   experts, MGA and Bryant then refused to limit themselves in any way. Although the
3   concerns of the Discovery Master that resulted in the non-destructive protocol set
4   forth for Mattel in August 2007 were imposed in response to *MGA's* and *Bryant's*
5   consultant having admittedly put holes in key documents unbeknownst to Mattel, its
6   counsel or the Court, MGA and Bryant do not believe the same rules -- or any rules
7   -- should apply to them.  In February 2008, MGA and Bryant gave Dr. Lyter and
8   Mr. Kullman whatever access they wanted -- without any notice to Mattel, any
9   Court approval of their credentials, any review of their laboratory facilities, any
10  statements as to their practices with regard to the safeguarding and preservation of
11  original evidence, and any statement of their understanding that they were
12  accountable for the evidence while in their possession.

13  Then, with the benefit of Mattel's experts' reports having narrowed down the
14  issues for them, and having no restrictions whatsoever, much less Court oversight,
15  as to their activities, Dr. Lyter and Mr. Kullman conducted tests they knew Mssrs.
16  Flynn and Cunningham had no time to perform.  Then, taking full advantage of the
17  fact that the evidence they supposedly developed cannot even be seen by Mattel's
18  experts without further access to the documents, they created a whole novel theory
19  around the supposed pencil lines -- supposed pencil lines that can be questioned but
20  never fully tested or assessed by Mattel.

21  Thus, although Mattel was given <u>access</u> to the documents at one time, the
22  unusual circumstances here -- the extreme 35-day limitation on Mattel's access; the
23  unlimited access provided to MGA's experts; and the inherent invisibility of the
24  obscured pencil lines without access and special testing -- have all worked to
25  deprive Mattel of fair opportunity to challenge Defendants' conclusions, rendering
26  the playing field uneven and preventing Mattel's access from being <u>meaningful</u>.  For
27  all Mattel knows, the pencil lines Dr. Lyter and Mr. Kullman find so significant do
28  not even exist, or in fact cut against Lyter's and Kullman's conclusions.  Mattel has a

quinn emanuel

1  right to see this same evidence, explore it and fully address it.  It is simply not fair to
2  allow two parties almost all of the control over the key evidence while not even
3  allowing *access* to another party.

4      Meanwhile, MGA's recent request for access to the notary book for
5  destructive testing, supposedly to "replicate" the testing that Dr. Aginsky did (which
6  is the subject of Mattel's pending Mattel Inc's *Ex Parte* Application for Protective
7  Order Preventing MGA's Destructive Sampling of the Prince Notary Book due to
8  MGA's efforts, unabated even now, to go far beyond replication) implicitly
9  recognizes that Mattel has good cause for its request.  In MGA's Opposition to that
10  Application, MGA argued that defendants should be allowed to conduct the exact
11  same testing as Mattel, arguing that "the issue is one of simple fairness.  Should
12  MGA be granted the same right to test documents as Mattel? Or should Mattel be
13  allowed to impose a double standard and prevent MGA from performing the very
14  same forensic testing it performed just two months ago?  The answer," MGA
15  claimed, "is clear."[32]  As a result, MGA argued, since Mattel was able to take some
16  samples from Jacqueline Prince's notary book in order to perform forensic ink
17  testing, MGA should have "the right to perform the same testing, under the exact
18  same circumstances."[33]

19      As defendants themselves have argued: "[t]he denial of the opportunity to test
20  and challenge evidence imposes irreparable prejudice."[34]  Here, Mattel similarly
21  seeks access to the questioned materials to replicate and respond to arguments made

22

23  [32] Id., Exh. 20 (MGA's Opposition to Mattel, Inc.'s *Ex Parte* Application For
24  Protective Order Preventing MGA's Destructive Sampling of The Prince Notary
   Book, dated March 12, 2008) at 1.
25  [33] Id. Exh. 20, at 1. See id., Exh. 20 at 16-17 ("All that MGA seeks is the
   opportunity to perform the *same* testing performed by Mattel's expert, pursuant to
26  the *same* protocol employed by Mattel, so that it can prepare a rebuttal expert
27  report") (emphasis added).
   [34] Id. Exh. 20, at 15 (citing Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579,
28  596 (1993)).

1  by MGA and Bryant.[35]  If MGA has the right to replicate any testing done by

2  Mattel, Mattel surely has a corresponding right to replicate testing done by MGA.

3  Without the opportunity to conduct additional testing and file a supplemental

4  report based on that testing, which will allow full rebuttal of defendants' experts'

5  conclusions, Mattel will be irreparably prejudiced at trial.   Similarly, granting

6  Mattel's request for access to the originals to allow more extensive testing will help

7  to level the playing field, and provide the trier of fact a more complete analysis of

8  these key documents.

9  **II.    THE COURT SHOULD GRANT MATTEL'S APPLICATION**

10  **BECAUSE MATTEL  DID NOT CREATE THE CIRCUMSTANCES**

11  **REQUIRING *EX PARTE* RELIEF.**

12  The circumstances creating the need for relief were created by Bryant and

13  MGA, not Mattel. The limitations placed on Mattel's experts' original review of the

14  materials were due to the 35-day limitation on Mattel's access, which was instituted

15  at Bryant's and MGA's urging.  The unlimited access MGA's un-Court-approved

16  experts were given -- despite the clear indications by the Discovery Master last fall

17  that he had concern about who was examining the key documents in this case, and

18  how they were doing it, was given by Bryant.  The decision to develop a rebuttal

19  theory not based on the evidence presented in Mssrs. Flynn's and Cunningham'

20  reports, and  supposedly relying on obscured pencil lines that could only be seen by

21  experts with sufficient access to the materials to do special testing, was Bryant's and

22  MGA's.  Accordingly, Mattel satisfies the requirement set forth in Mission Power,

23  883 F. Supp. at 493, for establishing that the moving party is without fault or guilty

24  only of excusable neglect – namely that the movant "used the entire discovery

25

26

---

27  [35]    Although in contrast to MGA, Mattel is seeking only non-destructive

28  examination testing and by two experts that were already scrutinized by, and found
    to be satisfactory to, the Discovery Master.

1 | period efficiently and could not have, with due diligence, sought to obtain the
2 | discovery earlier in the discovery period." Id.

3 | Indeed, to the extent that such pencil lines exist, are visible, and are material
4 | to the opinions expressed in Mssrs. Flynn's and Cunningham's reports, as Dr. Lyter
5 | and Mr. Kullman contend, MGA and Bryant have arguably created an obligation
6 | pursuant to Fed. R. Civ. P. 26(e)(2) for Mattel's experts to investigate and
7 | supplement their reports. Under that rule, "parties must supplement or correct their
8 | experts' reports or deposition testimony if they learn these items are incomplete or
9 | incorrect in some material respect." Rutter Group Practice Guide: Federal Civil
10 | Trials and Evidence Ch. 11-A 2a.5 § 11:25 (citing Walsh v. McCain Foods Ltd., 81
11 | F.3d 722, 727 (7th Cir. 1996)). If Mattel's experts' inability to conduct infrared
12 | luminescence and reflective infrared testing and the pencil lines such testing may
13 | reveal are material to their conclusions, Mattel has a right of access to the
14 | documents so that it can fulfill that obligation.

15 | **III.   AS GATEKEEPER, THE COURT HAS A RESPONSIBILITY TO**
16 | **ENSURE THAT THE EXPERTS ARE ABLE TO RENDER**
17 | **COMPLETE AND RELIABLE EXPERT TESTIMONY AND THAT**
18 | **CAN ONLY HAPPEN HERE WITH REASONABLE ACCESS TO THE**
19 | **EVIDENCE FOR BOTH SIDES.**

20 | It is the Court's duty to safeguard the trial process by ensuring that the trier of
21 | fact has access to complete, reliable and credible expert testimony, and it does this
22 | by safeguarding the process governing expert testimony. As the court stated in
23 | Phillips v. Netblue, Inc., 2007 WL 528722 (N.D. Cal. 2007), "sitting in its capacity
24 | as gatekeeper, the Court must ensure that an expert's testimony 'both rests on a
25 | reliable foundation and is relevant to the task at hand.'" (quoting Daubert, 509 U.S.
26 | at 597). In doing so, "[t]he trial court has broad discretion in admitting and
27 | excluding expert testimony." Taylor v. Burlington Northern R. Co., 787 F.2d 1309,
28 | 1315 (9th Cir. 1986).

1   Rule 702 of the Federal Rules of Evidence "allows witnesses to present
2   testimony to the trier of fact based on 'scientific, technical, or other specialized
3   knowledge' in order to assist the trier of fact to understand the evidence or to
4   determine a fact in issue." <u>Universal Trading & Inv. Co. v. Kiritchenko</u>, 2007 WL
5   2141296 * 2 (2007) (quoting Fed.R. Evid. 702).  As a result of the limitations place
6   on Mattel's experts' access to the pertinent materials, their ability to help the trier of
7   fact fully "understand the evidence or to determine a fact in issue," <u>Universal</u>
8   <u>Trading</u>, 2007 WL at * 2, has potentially been compromised by the severe
9   disparities in the degree of access afforded Mattel's and MGA's experts to the
10  evidence.  Similarly, MGA's experts' ability to educate the trier of fact on these
11  issues is compromised because they will not have the benefit of having their
12  opinions fully tested by Mattel's experts.

13  In short, both to prevent Mattel's irreparable injury, and to preserve the
14  principles embodied in the federal rules governing expert testimony, the Court
15  should allow Mssrs. Cunningham and Flynn two weeks access to conduct additional
16  non-destructive examination and testing of the te tracing paper drawings and
17  multimedia posterboard drawings so they can see the underlying evidence and
18  properly respond to the conclusions reached by Drs. Lyter and Kullman with regard
19  to obscured pencil markings and any related evidence on the drawings.

20                              **CONCLUSION**

21  For the reasons stated, Mattel's *ex parte* Application to grant Mssrs.
22  Flynn and Cunningham access to Carter Bryant's original documents for a total of
23  two weeks should be granted.

24  DATED:  April 7, 2008            QUINN EMANUEL URQUHART OLIVER &
25                                   HEDGES, LLP

26

27  By _____

28     Diane C. Hutnyan
       Attorneys for Mattel, Inc.

quinn emanuel