EXHIBIT 1

**CONFORMED COPY**

1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
   John B. Quinn (Bar No. 090378)
2  (johnquinn@quinnemanuel.com)
   Michael T. Zeller (Bar No. 196417)
3  (michaelzeller@quinnemanuel.com)
   Jon D. Corey (Bar No. 185066)
4  (joncorey@quinnemanuel.com)
   865 South Figueroa Street, 10th Floor
5  Los Angeles, California 90017-2543
   Telephone:(213) 443-3000
6  Facsimile:(213) 443-3100

7  Attorneys for Plaintiff Mattel, Inc.

8

9              UNITED STATES DISTRICT COURT

10             CENTRAL DISTRICT OF CALIFORNIA

11                    EASTERN DIVISION

12  CARTER BRYANT, an individual,       CASE NO. CV 04-9049 SGL (RNBx)

13            Plaintiff,                Consolidated with Case No. CV 04-
                                        09059 and Case No. CV 05-02727
14     vs.
                                        **DISCOVERY MATTER**
15
16  MATTEL, INC., a Delaware corporation,   MATTEL, INC.'S NOTICE OF
            Defendant.                   MOTION AND MOTION TO
17                                       COMPEL BRYANT TO MAKE
                                         ORIGINAL DOCUMENTS
18                                       AVAILABLE FOR EXPERT
    AND CONSOLIDATED ACTIONS            EXAMINATION AND TESTING
19                                       AND FOR SANCTIONS; AND
                                         MEMORANDUM OF POINTS AND
20                                       AUTHORITIES IN SUPPORT

21                                       Declaration of Diane C. Hutnyan,
                                         Notices of Lodging for Declarations of
22                                       Michael T. Zeller, Shane McKenzie,
                                         and Dylan Proctor, and Proposed Order
23                                       filed concurrently herewith]

24                                       Hearing Date: TBA
                                         Time: TBA
25                                       Place: TBA

26  EXHIBIT _____1_____                  Discovery Cut-off: October 22, 2007
                                         Pre-trial Conference: January 14, 2008
27                                       Trial Date: February 12, 2008
    PAGE _____⊌_____
28

07209/2158174.1

1 | TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2 |         PLEASE TAKE NOTICE that at a telephonic conference before

3 | Discovery Master Hon. Edward Infante (Ret.), that will occur on a date and at a time to

4 | be determined by Judge Infante, plaintiff Mattel, Inc. ("Mattel") will, and hereby does,

5 | move the Court: (1) to compel Defendant Carter Bryant to make the originals of his

6 | documents available for examination, analysis and testing by Mattel's experts; and (2)

7 | for an award of sanctions against Bryant in the amount of $2,500, which represents a

8 | portion of the fees incurred by Mattel in bringing this Motion.

9 |         This Motion is made pursuant to Federal Rules of Civil Procedure 34 and

10 | 37 on the grounds that this Court has previously ordered Bryant to allow access to his

11 | originals for inspection and testing, and although Bryant concedes Mattel's right to have

12 | expert examination and testing of the originals, he nevertheless has sought to impose a

13 | number of limitations on the examinations which are improper and unsupported by law.

14 |         This Motion is based on this Notice of Motion and Motion, the

15 | accompanying Memorandum of Points and Authorities, the Declaration of Diane C.

16 | Hutnyan filed concurrently herewith, and the Notices of Lodging of the Declarations of

17 | Michael T. Zeller, Dylan Proctor and Shane McKenzie, separately lodged concurrently

18 | herewith, the records and files of this Court, and all other matters of which the Court

19 | may take judicial notice.

20

21

22

23

24

25

26

27

28

EXHIBIT \_\_\_\_ **1**

PAGE \_\_\_\_ **7**

07209/2158174.1

-1-

MATTEL'S MOTION TO COMPEL ORIGINALS FOR EXPERT EXAMINATION AND TESTING

1  **Rule 37-1 Compliance**

2      The parties have met and conferred on the subject of Mattel's and Mattel's

3  experts' access to Bryant's originals numerous times pursuant to <u>Local Rule</u> 37-1,

4  including most recently and explicitly with regard to access for examination, analysis

5  and testing by Mattel's experts, on June 22, 26, 27, and 30, 2007.

6

7  DATED:  July 6, 2007                    QUINN EMANUEL URQUHART OLIVER &
                                           HEDGES, LLP
8

9                                          By
10                                             Diane C. Hutnyan
                                              Attorneys for Plaintiff and Cross-Defendant
11                                            Mattel, Inc.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                                         EXHIBIT ___ **1**

28                                         PAGE ___ **8**

07209/2158174.1

-2-

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ............................................. 1

PRELIMINARY STATEMENT ............................................................................... 1

BACKGROUND ...................................................................................................... 3

ARGUMENT........................................................................................................... 11

I.   MATTEL IS ENTITLED TO HAVE ITS EXPERTS EXAMINE, ANALYZE AND TEST THE ORIGINAL DOCUMENTS UNDER THE FEDERAL RULES ........................................................................... 11

II.  BRYANT HAS NO LEGITIMATE JUSTIFICATION FOR REFUSING EXAMINATION, ANALYSIS AND TESTING ...................... 16

    A.   Non-Destructive Testing.................................................................... 16

    B.   Destructive Testing ............................................................................ 20

III. THE DISCOVERY MASTER SHOULD SANCTION BRYANT................ 22

CONCLUSION........................................................................................................ 23

EXHIBIT 1

PAGE 9

MATTEL'S MOTION TO COMPEL ORIGINALS FOR EXPERT EXAMINATION AND TESTING

07209/2158174.1

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

Braley v. Campbell,
   832 F.2d 1504 (10th Cir. 1987)............................................................................23

Dabney v. Montgomery Ward & Co., Inc.,
   761 F.2d 494 (8th Cir. 1985)..............................................................................20

Diepenhorst v. City of Battle Creek,
   2006 WL 1851243 (W.D. Mich. 2007).....................................................18, 20, 21

Equal Employment Opportunity Commission v. Ethan Allen, Inc.,
   259 F. Supp. 2d 625 (N.D. Ohio 2003)..............................................................13

Gielow v. Warner Bros. Pictures,
   26 F. Supp. 425 (S.D.N.Y. 1938).......................................................................11

Hickman v. Taylor,
   329 U.S. 495 (1947)...........................................................................................17

House v. Combined Ins. Co. of Amer.,
   168 F.R.D. 236 (N.D. Iowa 1996).......................................................................18

Hyde & Drath v. Baker,
   24 F.3d 1162 (9th Cir. 1994)..............................................................................22

In re Kolinsky,
   140 B.R. 79 (S.D.N.Y. 1992)..............................................................................11

National Hockey League, Inc. v. Metropolitan Hockey Club, Inc.,
   427 U.S. 639 (1976)...........................................................................................23

Paul Morelli Design, Inc. v. Merit Diamond Corp.,
   2000 WL 1340464 (E.D. Pa. 2000).....................................................................21

In re Pizza Time Theatre Securities Litigation,
   113 F.R.D. 94 (N.D. Cal. 1986)..........................................................................19

RTC v. Dabney,
   73 F.3d 262 (10th Cir. 1995)..............................................................................23

Sedrati v. Allstate Life Insurance Co.,
   185 F.R.D. 388 (M.D. Ga. 1998).........................................................................21

United States v. Yamin,
   868 F.2d 130 (5th Cir. 1989)..............................................................................12

EXHIBIT ____1____

PAGE ____10____

-ii-

**<u>Statutes</u>**

47 U.S.C. § 227(d)(1)(B)..................................................................15

28 U.S.C. § 1927.............................................................................22

<u>Federal Rules of Civil Procedure</u>

   <u>Rule</u> 26(b)................................................................................11

   <u>Rule</u> 26(b)(2) .........................................................................20

   <u>Rule</u> 26(c) ..............................................................................20

   <u>Rule</u> 34...................................................................................11

   <u>Rule</u> 34(a) ..............................................................................11

   <u>Rule</u> 34(a)(1) .........................................................................11

   <u>Rule</u> 37(a)(4) .........................................................................22

<u>Federal Rule of Evidence</u> 1002 .....................................................12

**<u>Other Authorities</u>**

McCormick, <u>Evidence</u> §§ 231, 236 (4th ed. 1992) .........................12

Am. Jur. 2d Depositions and Discovery § 166................................22

EXHIBIT 1

PAGE 11

-iii-

## MEMORANDUM OF POINTS AND AUTHORITIES

### Preliminary Statement

For more than two years, and in violation of both a Court Order and an on-the-record stipulation, Bryant has repeatedly blocked and delayed Mattel's access to the originals of his Bratz drawings and other key materials that are at the center of this litigation. After Bryant had reneged on his numerous promises to make all of his originals available for inspection,[1] Mattel filed in February 2005 a motion to compel Bryant to produce the originals of his documents, including most importantly his Bratz drawings, for inspection and photographing.[2] Before the motion was ruled upon, the case was then stayed for a year. After discovery resumed, Magistrate Judge Block ordered the parties to further meet and confer about the motion in his courtroom on June 20, 2006. At that time, Mattel's motion was resolved by an on-the-record stipulation by the parties that Bryant would make his originals available on 15 days' notice.[3]

But Bryant did not honor the stipulation. He largely ignored Mattel's requests for originals and, as even to the ones he did eventually provide, strung out Mattel for weeks by claims that he needed more time to locate his originals.[4]  Then, after wearing out those excuses, Bryant purported to unilaterally jettison his on-the-record stipulation and began to insist that Mattel agree to new, and unreasonable

---

[1] Declaration of Michael T. Zeller In Support of Mattel, Inc.'s Motion to Enforce Stipulation and Compel Bryant to Make Original Documents Available and For Sanctions, dated January 19, 2007 and lodged concurrently herewith ("Zeller Dec."), ¶¶ 11, 14, 16 and Exh. 11.

[2]  Id., Exh. 15.

[3]  Id., ¶ 17.

[4]  Declaration of Shane H. McKenzie In Support of Mattel, Inc.'s Motion to Enforce Stipulation and Compel Bryant to Make Original Documents Available and For Sanctions, dated January 19, 2007 and lodged concurrently herewith ("McKenzie Dec."), ¶ 8.

EXHIBIT 1

PAGE 12

MATTEL'S MOTION TO COMPEL ORIGINALS FOR EXPERT EXAMINATION AND TESTING

1  conditions--including access to Mattel work product--before he would allow Mattel to

2  inspect the originals.

3      Mattel therefore had to commence with the Joint Stipulation process yet

4  again to bring a second motion to compel and to enforce the parties' June 20, 2006

5  stipulation.  In the interim, Judge Infante was appointed Discovery Master, and in

6  January 2007, Mattel brought a motion to compel Bryant to make his originals

7  available on the dual grounds that these documents were the subject of the parties' June

8  20, 2006 stipulation, and that even in the absence of such stipulation, Mattel was

9  entitled to inspect and photograph the originals.  The inspection and photographing

10 were necessary to determine what other information is available on the originals (such

11 as impressions, watermarks or alterations) which is not disclosed by the poor, black-

12 and-white photocopies that Bryant produced and to determine what expert analysis of

13 them might be appropriate for such purposes as ascertaining their true dates of creation

14 and whether the documents had been altered.

15     The Discovery Master granted Mattel's motion, and ordered Bryant to

16 allow inspection and photographing by February 28.  Even in the face of that Court

17 Order, Bryant continued to string Mattel along up through May, continuing to delay

18 Mattel's access to many of the originals of the documents he had initially produced as

19 well as the approximately 16,800 additional pages of documents that the Discovery

20 Master also compelled Bryant to produce in March and April of 2007.

21     In late May and June of 2007, Bryant finally allowed Mattel to inspect and

22 photograph a substantial portion of the remaining "originals" corresponding to Bryant's

23 document productions--that is, excluding some originals Mattel had asked to see for

24 months that Bryant's counsel finally admitted do not exist, and excluding every page in

25 Bryant's production that had been redacted.  Further, Bryant provided the "originals"

26 in a scrambled order that did not correspond to their earlier-produced Bates-numbered

27 counterparts, making it extremely difficult to determine, even after hours of post-

28 inspection comparison, which originals were the documents about which Bryant and

-2-

EXHIBIT

PAGE ___

13

1  other witnesses have testified.   Nonetheless, these two inspections made it possible--
2  for the first time--for Mattel to come up with at least a tentative list of those documents
3  that might be appropriate for expert analysis and might shed light on when Bryant
4  created the original Bratz drawings and when he was working with MGA on Bratz.

5          When Mattel requested access for its document experts' examination,
6  analysis and testing, Bryant said he would "make it happen," but only if Mattel
7  accepted a number of inappropriate conditions and restrictions designed to substantially
8  hinder or even preclude altogether Mattel's experts' examination and analysis of the
9  originals.  Although the parties met and conferred, and even though Mattel proposed a
10  detailed protocol to address the examination and analysis by its experts, Bryant's
11  continuing insistence on these baseless conditions and limitations could not be
12  overcome.

13          As a result, despite Bryant's concession that Mattel has a right to expert
14  examination and testing, he has chosen to force Mattel to bring yet another motion to
15  gain access to the originals to conduct that examination and testing.   Bryant should be
16  sanctioned for requiring Mattel to bring this motion to overcome the clearly improper
17  and quite substantial limitations on Mattel's expert examination and testing that he has
18  attempted to impose forno other purpose than to cause yet more delay and interfere
19  with the truth-finding function of this proceeding.

20                        **Background**

21        ***Carter Bryant's Work On Bratz.***   Defendant Carter Bryant is a former
22  Mattel employee.   He worked as a Mattel product designer from September 1995 to
23  April 1998, and then again from January 1999 to October 2000.[5]  Upon starting his
24  second term of employment with Mattel, Bryant executed an Employee Confidential
25  Information and Inventions Agreement.[6]   There, he agreed that during his Mattel

26

27    [5]  See Zeller Dec., Exh. 1 at ¶ 9, Exh. 2 at 29:16-18 & Exh. 3 at ¶ 7.
      [6]  Id., ¶ 2 and Exh. 1.
28

EXHIBIT PAGE __ 14

1  employment he would not, without Mattel's express written consent, "engage in any
2  employment or business other than for [Mattel], or invest in or assist (in any manner)
3  any business competitive with the business or future business plans of [Mattel]."
4  Bryant also assigned to Mattel all rights in "inventions," including "designs," that he
5  created during his Mattel employment.  He also promised not to disclose or misuse
6  Mattel's proprietary or confidential information, an obligation that continues today.

7         Despite this, during his employment with Mattel, Bryant entered into a
8  contract with MGA, a Mattel competitor.[7]  That contract purported to grant MGA
9  ownership of works made by Bryant, both before and after the agreement's effective
10  date, in contravention of his obligations to Mattel.  It also required Bryant to provide
11  design services to MGA on a "top priority" basis, in further conflict with his then-
12  existing duties to Mattel.

13         The timing of Bryant's actions are important to many of Mattel's claims.
14  Among other things,  Bryant's drawings and other works that were created during his
15  Mattel employment are owned by Mattel and thus their dates of creation are highly
16  relevant.  Indeed, Bryant and MGA have put timing at issue by claiming that Bryant
17  created most or all of his drawings, and performed other relevant work, either during
18  the few months in 1998 when he was not working for Mattel, or else after the time he
19  had left Mattel.[8]  Bryant worked on at least two projects with MGA while he was
20  employed by Mattel.  One was the "Bratz" project.[9]  The other was an ostensibly
21  separate project known as "Angel."[10]

22         ***Bryant Agrees, But Then Refuses, To Make Originals Available.***  Much
23  of the documentary evidence produced by Bryant consists of undated design drawings,

24

25    [7]  Id., ¶ 3 and Exh. 3.
26    [8]  E.g., id., ¶ 4 and Exhs. 3 at ¶ 24 and Exh. 4 at 45:7-14, 139:23-141:8.
27    [9]  Id., Exh. 4 at 178:3-22.
      [10]  Id., Exh. 4 at 178:3-18, 195:21-196:20.
28

PAGE ___  EXHIBIT ___ 15

07209/2158174.1

-4-

1 | which Bryant produced to Mattel as black and white photocopies.[11]   Moreover,
2 | information that one would naturally expect—such as complete fax headers, date and
3 | time stamps and fax cover pages—are missing from the production.[12]

4 |    Thus, Mattel began asking Bryant to make his originals available for
5 | inspection and photographing at least as early as October 25, 2004.[13] Bryant responded
6 | that Mattel could have the inspection on November 1, 2004.[14]  Mattel asked Bryant to
7 | confirm that the inspection would include all the non-privileged responsive documents
8 | in Bryant's possession or control and certain tangible items it had requested.[15]  Bryant,
9 | however, only permitted Mattel to inspect a few tangible items and not the originals of
10 | the drawings or other documents that Bryant had produced.[16]

11 |    Mattel again asked that the originals of Bryant's Bratz drawings and other
12 | documents be made available for inspection during Bryant's November 2004
13 | deposition—which took place only after two Court Orders compelling his attendance
14 | and only after Bryant's counsel had broken their "word as attorneys" that he would
15 | earlier appear.[17]  Although Bryant's counsel indicated that the originals would be sent
16 | to Missouri for the deposition,[18] Bryant made only a few original drawings available.[19]
17 | At the deposition, Bryant's counsel represented that Bryant's original documents and
18 | drawings would "certainly" be made "available for inspection at a reasonable time upon
19 | reasonable notice."[20]

20 |
21 | [11] Id., ¶ 6 and Exh. 5.
22 | [12] Id., ¶ 7 and Exh. 7.
23 | [13] Zeller Dec., Exh. 9.
24 | [14] Id., Exh. 10.
24 | [15] Id., Exh. 11.
25 | [16] Id., ¶ 11.
25 | [17] Zeller Dec., Exh. 12.
26 | [18] Id., Exh. 13.
27 | [19] Id., ¶ 14.
27 | [20] Id., ¶ 14 and Exh. 4 at 616:17-18.
28 |

MATTEL'S MOTION TO COMPEL ORIGINALS FOR EXPERT EXAMINATION AND TESTING

1    ***Mattel's Motion To Compel And The Parties' Resulting On-The-Record***
2    ***June 20, 2006 Stipulation Before Judge Block.*** After the deposition, and after
3    multiple additional requests from Mattel, Bryant's counsel agreed, again, to make all
4    original documents available for inspection and photographing beginning on
5    December 22, 2004.[21] Mattel's counsel, with a videographer and photographer, was
6    permitted to inspect 462 pages of the originals on December 22 and on December 23,
7    2004.[22] But Bryant's counsel did not turn over a single original Bratz drawing or
8    sketch[23] and, indeed, did not turn over the majority of the originals of the 1,588
9    documents that had been produced as of that time.[24] Bryant's counsel then claimed not
10   to be able to turn over or even locate many of the originals,[25] and repeatedly promised
11   that all original documents would be made available for inspection "when found."[26]

12   For another month, Mattel requested inspection of the remaining original
13   documents,[27] but despite Bryant's earlier promises, and more than three months after
14   Mattel began asking for the inspection, Bryant still had failed to turn over for inspection
15   and photographing the majority of the originals in his production.[28] He also had failed
16   to allow the inspection and photographing of any of the originals of Bratz drawings in
17   his production.[29] The only "originals" of Bratz drawings that Mattel had been allowed
18   to inspect and photograph were, in fact, photocopies.[30]

19

20   [21]  Zeller Dec., ¶ 17.
21   [22]  McKenzie Dec., ¶¶ 2-3 & Exh. 1..
     [23]  McKenzie Dec., ¶¶ 2-4 & Exh. 1.
22   [24]  Id. A complete listing of the original Bratz drawings, sketches and other
23   documents that Bryant's counsel could not account for in any way, even as to their
     whereabouts, are detailed in Exhibit 1 to the McKenzie Dec.
24   [25]  McKenzie Dec., ¶¶ 3-4 & Exh. 1.
25   [26]  McKenzie Dec., ¶ 3.
     [27]  Zeller Dec., Exh. 14.
26   [28]  Id., ¶ 19.
27   [29]  McKenzie Dec., ¶ 3 & Exh. 1.
     [30]  Id.

28

EXHIBIT _____**1**_____

PAGE _____**17**_____

07209/2158174.1

-6-
MATTEL'S MOTION TO COMPEL ORIGINALS FOR EXPERT EXAMINATION AND TESTING

1  On February 18, 2005, Mattel therefore filed a motion to compel Bryant to
2  produce his originals for inspection and photographing.[31] Before the motion was heard,
3  however, the case was stayed for approximately a year while the Ninth Circuit
4  considered an interlocutory jurisdictional appeal.  After the jurisdictional appeal was
5  resolved and the parties' various cases were consolidated, Judge Block ordered the
6  parties to appear in his courtroom on June 20, 2006 to further meet and confer on then-
7  pending discovery motions which included Mattel's motion to compel Bryant to
8  produce his originals.[32] After so meeting and conferring, the parties stated on the
9  record before Judge Block on June 20, 2006 their agreement that Bryant would produce
10  for inspection and photographing originals requested by Mattel (or any other party) on
11  15 days' notice.[33]

12  ***Mattel Again Seeks, And Bryant Refuses, Production Of Originals***
13  ***Pursuant To The June 20, 2006 On-The-Record Stipulation.***  Pursuant to the
14  stipulation, Mattel requested in writing on June 21, 2006 that certain originals be made
15  available by Bryant.[34] But again Bryant's counsel only made some, but not all, of the
16  requested originals available.[35] Bryant then ignored two further written requests, dated
17  August 8, 2006[36] and August 21, 2006,[37] that Bryant make his missing originals
18  available for inspection and photographing.[38]

19  Eventually, after Mattel's numerous attempts to confer on the issue and
20  after Mattel made clear it was filing another motion to obtain the originals, Bryant
21

22  [31] Zeller Dec., Exh. 15.
23  [32] Zeller Dec. ¶ 17.
   [33] Id.; see also McKenzie Dec., ¶ 3.
24  [34] McKenzie Dec., Exh. 2.
25  [35] Only 267 originals were made available to Mattel at the July 21, 2006
   inspection.  McKenzie Dec. at ¶ 8.
26  [36] Id., Exh. 3.
27  [37] Id., Exh. 4.
   [38] Zeller Dec. ¶ 19.
28

EXHIBIT _____ **1**
PAGE _____ **18**

07209/2158174.1

-7-

1   claimed that Mattel was not entitled to see all of the original documents, including all
2   the original pages of a spiral notebook containing Bratz drawings.[39]   Bryant also
3   demanded that Mattel agree to conditions which were not part of the stipulation such as,
4   most notably, that Mattel surrender to him its work product photographs, before he
5   would provide his originals for inspection and photographing.[40]

6           ***The Court Orders Bryant To Allow The Inspection and Photographing***
7   ***of All His Originals By February 28, 2007, But Even By Late May, Bryant Fails To***
8   ***Comply.***   On January 23, 2007, Mattel filed its Motion To Enforce Stipulation And
9   Compel Bryant To Make Original Documents Available.[41]

10          On February 14, 2007, the Discovery Master granted the motion and
11  ordered that Carter Bryant make all original documents and three-dimensional items
12  requested by Mattel available for inspection and photographing by February 28, 2007.[42]
13  On February 27 and 28, 2007, Bryant allowed Mattel to inspect some, but not all, of the
14  remaining original documents that Bryant had refused to previously produce for
15  inspection.

16          Meanwhile, on January 25, 2007, the Discovery Master also compelled
17  Bryant to produce key documents relating to the origins of Bratz that Bryant had
18  improperly withheld from production.  Bryant produced approximately 16,800 more
19  documents in March and April of 2007.[43]   While Mattel was reviewing these, it

20  _____

21  [39]   Zeller Dec., ¶ 18 and Exhs. 16 & 17.
    [40]   Declaration of B. Dylan Proctor In Support of Mattel, Inc.'s Motion to
22  Enforce Stipulation and Compel Bryant to Make Original Documents Available and
    For Sanctions, dated January 19, 2007 and lodged concurrently herewith ("Proctor
23  Dec."), ¶ 2.
24  [41]   Declaration of Diane C. Hutnyan In Support of Mattel, Inc.'s Motion To
25  Compel Bryant To Make Original Documents Available For Expert Examination
    And Testing And For Sanctions, dated July 6, 2007 and filed concurrently herewith
26  ("Hutnyan Dec."), Exh. 1
    [42]   Hutnyan Dec., Exh. 2 at 4.
27  [43]   Hutnyan Dec., ¶ 3.

EXHIBIT _____**1**_____

PAGE _____**19**_____

1    requested again that Bryant make available for inspection key original documents
2    Bryant had never allowed Mattel to inspect and photograph: (1) a sketch book of
3    original Carter Bryant drawings; (2) two original Bratz drawings purportedly notarized
4    by Jacqueline Prince; and (3) the notary book of Jacqueline Prince relating to those
5    Bratz drawings.[44]   After simply ignoring two letters, and in response to the third,
6    Bryant's counsel said these items would be made available but at some later,
7    unspecified time.[45]  Mattel's counsel requested again that Bryant comply with the Order
8    compelling inspection[46] and finally, the inspection was set to take place beginning on
9    May 31, 2007.[47]   Bryant's counsel then stated that they in fact intended to provide
10   "access to all originals of drawings and other documents produced by Bryant" on May
11   31.[48]

12         Although the inspection and photographing took place and even continued
13   the following morning, Bryant still did not make available many documents, notably
14   including the two purportedly notarized drawings and the sketch book Mattel had
15   specifically requested to inspect that day.[49]   Only after the inspection, when Mattel
16   threatened to bring yet another a motion to compel their inspection, did Bryant's
17   counsel finally claim that the notarized drawings and sketch book were no longer in
18   existence.[50]

19        ***Bryant Refuses To Allow Mattel's Experts' Examination and Analysis of***
20   ***His Originals.***  Bryant belatedly made further originals available for inspection and
21   photographing on June 20 and 21, after which Mattel requested that Bryant make a

22

23    [44]   Hutnyan Dec., Exhs. 3, 4 and 5.
     [45]   Hutnyan Dec., Exh. 6.
24    [46]   Hutnyan Dec., Exh. 7.
     [47]   Hutnyan Dec., Exh. 8.
25    [48]   Hutnyan Dec., Exh. 9; see also Hutnyan Dec., Exh. 8.
26    [49]   Hutnyan Dec., Exh. 10.
     [50]   Hutnyan Dec., Exhs. 11 and 12.
27

28

EXHIBIT __1__

PAGE __20__

-9-

1  subset of the originals available to Mattel's experts for expert examination, testing and

2  analysis, and proposed a specific protocol for doing so.[51]  The protocol contemplated

3  examination and non-destructive testing of Bryant's documents, as well as a special

4  procedure for any destructive testing that might be recommended, whereby Bryant

5  would be given reasonable notice as to the items being tested and the testing being done

6  and would have the option of either objecting (at which point the matter would be

7  resolved by the Court), or of having his expert(s) attend and observe the testing.[52]

8            The parties met and conferred about the proposed protocol,[53] but Bryant's

9  counsel would only allow Mattel's experts to examine the originals if the originals to be

10  examined and tested were limited to a small number of documents--drawings only--that

11  had to be identified and cleared by Bryant's counsel in advance; if Mattel's experts were

12  identified to Bryant's counsel in advance; if the originals stayed in the "custody and

13  control" of Mattel's law firm at all times and thus could not be examined at the experts'

14  laboratories; and if Mattel would agree to share the time it had requested for its own

15  experts' examination with Bryant, even though Bryant has had unfettered, unilateral

16  access to his own originals for years.[54]  Bryant did not, however, communicate any

17  objection as to the contemplated procedure for destructive testing.[55]  Mattel attempted

18  to resolve the supposed issues in further correspondence,[56] but to no avail.[57]  Mattel

19

20

21

22  [51]  Hutnyan Dec., Exh. 13.
[52]  Id.
23  [53]  The meet and confer session in which the protocol was first discussed was on
24  June 22, and was followed by a June 26 correspondence outlining the protocol.
Hutnyan Dec., ¶ 13, and Exh. 13.
25  [54]  Hutnyan Dec., Exh. 14.
26  [55]  Hutnyan Dec., Exh. 14.
[56]  Hutnyan Dec., Exh. 15.
27  [57]  Hutnyan Dec., Exh. 16.

EXHIBIT ____ **1**

28  PAGE ____ **21**

07209/2158174.1

1 | also invited MGA's counsel to comment on or object to the proposed protocol, but
2 | MGA never responded.[58]

3 | **Argument**

4 | **I.    MATTEL IS ENTITLED TO HAVE ITS EXPERTS EXAMINE,**
5 | **ANALYZE AND TEST THE ORIGINAL DOCUMENTS UNDER THE**
6 | **FEDERAL RULES**

7 | Rule 34 permits Mattel, *or someone acting on its behalf,* to "inspect, copy,
8 | *test,* or sample any designated documents . . . including writings, drawings, graphs,
9 | charts, photographs, . . . [and] images. . . . or to inspect, copy, *test,* or sample any
10 | designated tangible things which constitute or contain matters within the scope of Rule
11 | 26(b) and which are in the possession, custody or control of the party upon whom the
12 | request is served. . . ." Fed. R. Civ. P. 34(a) (emphasis added). This language means
13 | what it says. As the Advisory Committee Notes to the 2006 amendment state:

14 | Rule 34(a)(1) is also amended to make clear that parties may request an
15 | opportunity to test or sample materials sought under the rule in addition to
16 | inspecting and copying them. That opportunity may be important for both
17 | electronically stored information and hard-copy materials. The current
18 | rule is not clear that such testing or sampling is authorized; *the*
19 | *amendment expressly permits it.*

20 | Fed. R. Civ. P. 34, Advisory Committee Notes, 2006 Amendment (emphasis added).

21 | Rule 34 confers a right to test Bryant's originals specifically, as they are
22 | "things which constitute or contain matters within the scope of Rule 26(b)."  See also
23 | In re Kolinsky, 140 B.R. 79, 87 (S.D.N.Y. 1992) (holding that parties "have a right to
24 | inspect the originals"); Gielow v. Warner Bros. Pictures, 26 F. Supp. 425 (S.D.N.Y.
25 | 1938) (holding originals were "evidence material to any matter involved" within Rule
26 | 34). This is because originals can reveal significant information not obtainable from

27 | [58]  Hutnyan Dec., Exh. 13.
28 |

EXHIBIT  **1**

PAGE  **22**

1 copies. As McCormick has stated, "[i]t has long been observed that the opportunity to
2 inspect original writings may be of substantial importance in the detection of fraud,"
3 and "[m]any indicia of putative fraud such as watermarks, types of paper and inks, etc.,
4 will not be discernable on the copy." McCormick, Evidence §§ 231, 236 (4th ed.
5 1992). Indeed, the policies seeking to prevent inaccuracy and fraud with respect to
6 documents are what animate Federal Rule of Evidence 1002, which independently
7 requires production of originals. "[W]ritings exhibit a fineness of detail . . . which will
8 often be of critical importance. Prevention of loss of this fine detail through
9 mistransmission is a basic objective of the rule requiring production of documentary
10 originals." McCormick, supra, § 232; see also United States v. Yamin, 868 F.2d 130,
11 134 (5th Cir. 1989) (explaining purpose of rule requiring production of originals is "to
12 prevent inaccuracy and fraud when attempting to prove the contents of a writing.").

13          Allowing Mattel's experts equal access to the information shown by the
14 originals is particularly important in this case. This case involves numerous drawings
15 that were created using different kinds and colors of pencils, inks and markers.[59] They
16 also have what appears to be different handwriting from different sources made at
17 different times on them.[60] Two different third-party witnesses, Jacqueline Prince and
18 Steve Linker, also have testified that certain, highly material dates and annotations on
19 the copies of Bryant drawings as produced to Mattel by defendants here did **not** in fact
20 appear on the original drawings that defendants had previously shown them.[61] The
21 timing of the creation of these documents and of the various additional matter on them
22 can be critical in this case, and Mattel has a right to evidence that may shed light on
23 this.

24

25    [59] E.g., Zeller Dec., ¶ 6.
26    [60] Id.
27    [61] Zeller Dec., Exhs. 20 (at 171:25, 172-175:1-23) & 21 (at 131:22-24, 132-
      138:1-12).
28

EXHIBIT ____**1**____

PACE ____**23**____

MATTEL'S MOTION TO COMPEL ORIGINALS FOR EXPERT EXAMINATION AND TESTING

1        The chemical composition of certain types of inks and papers, the

2  handwriting or printed characters, and details such as watermarks and other impressions

3  ascertainable from analysis of the originals may bear on when a document was created

4  and on when the various writings on them were made.[62] Such information is relevant in

5  this case because it may either confirm or contradict Bryant's testimony about when he

6  was doing the work on Bratz and/or Angel that he says he did. Information about the

7  paper used, about watermarks or impressions found on the documents, and about any

8  inks or printing or chemicals on the documents cannot be fully examined without the

9  use of microscopes, magnifiers, light sources, scanners with special filters, measuring

10  instruments and other special instruments and techniques in a laboratory. As Bryant

11  knows, without expert examination and analysis of the original materials, it will be

12  much more difficult, if not impossible, for Mattel's experts to thoroughly assess claims

13  that the drawings and their claimed dates of creation are authentic.

14        Mattel is also entitled to information accessible through expert analysis

15  about which originals have been altered and how. As noted, witnesses have testified

16  that key aspects of drawings, such as dates, that Bryant purports to rely on were added

17  only later. And, as the testimony of a former MGA executive revealed, there has been

18  an alteration of originals by defendants in this case. Victoria O'Connor was an MGA

19  executive who worked for MGA when Bryant and MGA signed what they claim is their

20  first Bratz-related agreement (the "Bryant/MGA Contract").[63] According to Ms.

21  O'Connor, Bryant faxed a signed copy of the Bryant/MGA Contract to MGA from

22

23    [62]  See, e.g., Equal Employment Opportunity Commission v. Ethan Allen, Inc.,

24  259 F. Supp. 2d 625, 626 n.1 (N.D. Ohio 2003) ("Sometimes, the determination of

25  the type of ink used can, by itself, prove conclusively that the claimed date of
writing is false. For example, a given ink may: (1) have been manufactured only

26  during certain years; and/or (2) contain 'tags,' which are chemical components

27  added to the ink for the precise purpose of providing a date of manufacture.").

    [63]  Zeller Dec., Exh. 8 (at 13:2-9).

28

EXHIBIT ___**1**___

PAGE ___**24**___

1   Mattel.[64]  Upon receipt, each page of the contract included a fax header that read
2   "Barbie Collectibles" (which is the Mattel design group that Bryant worked in) and
3   bore the number of the Mattel fax machine that it came from, revealing that it came
4   from Mattel's Design Center where Bryant worked.[65]  When Ms. O'Connor brought
5   this to the attention of her boss--Isaac Larian, MGA's CEO and founder--Mr. Larian
6   instructed her to "white out" the fax header information on all pages of the contract and
7   send the contract, as altered, to an outside MGA attorney.[66]  At Mr. Larian's direction,
8   Ms. O'Connor proceeded to alter each page of the contract in order to conceal, as Ms.
9   O'Connor testified, that Bryant "was still employed at Mattel at the time the contract
10   [between MGA and Bryant] was executed."[67]

11          As the District Court has noted, other documents in this case bear indicia
12   of having been altered from their original state.  For example, Bryant had produced a
13   fax of Bratz drawings with a fax header date of April 10, 2000[68]--a time during which
14   Bryant was working for Mattel and during which Bryant claims he was not working on
15   Bratz.  Although the fax header information on the page produced by Bryant states that
16   it was the third page of a fax transmission, neither the preceding nor subsequent pages,
17   nor any cover sheet, has been produced.[69]  Further, even though the fax header on the
18   produced page has fields for both the sender's name and the sender's telephone number,
19   neither the name of the sender nor the sender's telephone number appears in the fax
20   header.[70]  That information is simply missing.  Because facsimile machines normally
21   insert senders' names and numbers as a matter of course, and indeed is required by
22

23   [64]  Zeller Dec., Exh. 8 (at 18:13-14).
24   [65]  Zeller Dec., Exh. 8 (at 18:13-16).
25   [66]  Zeller Dec., Exh. 8 (at 18:13-18).
  [67]  Zeller Dec., Exh. 8 (at 19:1-4, 20:8-21:18).
26   [68]  Zeller Dec., Exh. 7.
27   [69]  Zeller Dec., Exh. 6.
  [70]  Zeller Dec. ¶ 7 and Exhs. 6 & 7.
28

EXHIBIT ____**1**____

PAGE ____**25**____

1   law,[71] there is reason to believe that the document was altered to conceal the sender's
2   information.  As Judge Larson has put, "the testimony elicited from Ms. O'Connor that
3   MGA altered the fax header from other documents related to Bratz from the same time
4   period leads to an obvious inference that other documents where spaces on other fax
5   headers are absent suffered a similar fate."[72]

6          Finally, as both Judge Infante and Judge Larson have now ruled,[73] Mattel
7   has a right to discovery as to matters relating to the destructive sampling and testing of
8   key Bratz design drawings that defendants conducted without the Court's or Mattel's
9   permission.  MGA's potential spoliation of evidence is a very real issue in this case:
10  *"That there are serious questions concerning the handling of these critical documents*
11  *certainly causes the Court much concern about whether the truth seeking functions of*
12  *the adversarial system have been fundamentally compromised in this case."[74]*  Mattel
13  certainly has a right to have its own document experts examine the documents that were
14  subjected to unauthorized destructive sampling by defendants, to determine (1) the
15  nature and extent of the sampling and testing, (2) whether and what evidence was
16  destroyed as a result of the sampling and testing, and (3) whatever information can still
17  be gained from examination of those documents.  In opposing a motion by Mattel for
18  the appointment of a neutral document examination expert, MGA and Bryant argued
19  that their expert's secret activities did not prevent Mattel's experts from being able to do
20

---

21  [71]  See 47 U.S.C. § 227(d)(1)(B) ("It shall be unlawful for any person within the
22  United States . . . to use a computer or other electronic device to send any message
    via a telephone facsimile machine unless such person clearly marks, in a margin at
23  the top or bottom of each transmitted page of the message or on the first page of the
24  transmission, the date and time it is sent and an identification of the business, other
    entity, or individual sending the message and the telephone number of the sending
25  machine or of such business, other entity, or individual.").
26  [72]  Zeller Dec., Exh. 19 at 9:6-9.
27  [73]  Hutnyan Dec., Exhs. 17 and 18.
28  [74]  Zeller Dec., Exh. 19.

EXHIBIT ___1___

PAGE ___26___

1 | their own testing on the documents;[75] nevertheless, Bryant now seeks to prevent
2 | precisely that.

3 | **II.    BRYANT HAS NO LEGITIMATE JUSTIFICATION FOR REFUSING**
4 | **EXAMINATION, ANALYSIS AND TESTING**

5 | This motion is just the latest in a long series of efforts by Bryant to prevent
6 | anyone from scrutinizing the original documents he claims help establish a timeline in
7 | which he conceived of Bratz. For literally *years,* and in violation of an on-the-record
8 | stipulation and then a Court Order, Bryant has fought at every step to prevent and delay
9 | Mattel from being able to inspect or photograph the original drawings and other
10 | documents, hoping he could continue to conceal matters from Mattel beyond the
11 | meager information conveyed in black and white photocopies. He fought appointment
12 | of neutral expert witnesses that could examine and test the documents. Now, although
13 | he has conceded that Mattel has the right to have its experts examine and test the
14 | originals, he hopes to prevent or severely limit that process by imposing untenable
15 | conditions before the originals can be analyzed.

16 | Bryant has presented no justification for these conditions; indeed, there is
17 | no justification, as we show in the subsection below.

18 | A.    **Non-Destructive Testing**

19 | Bryant's counsel says he will allow expert examination and analysis of any
20 | documents, provided that his counsel can take over and control Mattel's experts'
21 | examination. Specifically, his counsel has stated that Mattel must:

22 | "identify a *reasonable number* of *drawings* [it] would like to test
23 | (on the order of *scores,* not thousands), propose a *schedule* less
24 | one-sided, *identify the experts* to whom [Mattel] wish[es] to
25 | submit the documents, and provide a protocol that assures

26 |

27 | [75] Hutnyan Dec., Exh. 19.

EXHIBIT ___**1**___

28 | PAGE ___**27**___

1    [Bryant's counsel] that the drawings will be in the *custody and*
2    *control of [Mattel's law] firm throughout . . . .*"[76]
3  Other than arguing that Mattel's proposal was "unreasonable," Bryant has provided no
4  legal or factual justification for these demands.[77]

5        That is because there is no justification.   Here, Mattel contemplates, in
6  part, the non-destructive examination, analysis and testing of Bryant's materials, by
7  experts in document examination at their laboratories, and has identified a reasonably
8  specific subset of Bryant's originals, both drawings and other documents, for that
9  purpose.[78]  And, absent exceptional circumstances, Mattel has the right to do that as
10 part of its trial preparation without the knowledge or approval of the opposing party.
11 As Bryant put it while trying to keep a Court-appointed neutral document examination
12 expert from seeing the originals, parties typically "hire their own independent expert
13 witnesses--including for the testing of ink and paper, where appropriate--and perform
14 the tests they want to perform, using the experts of their choice."[79]

15       It is well established under the Federal Rules that parties are entitled to
16 conduct their own trial preparation activities without the interference, supervision or
17 knowledge of opposing counsel or their opposing party. Hickman v. Taylor, 329 U.S.
18 495, 511 (1947).  This general rule is just as applicable to non-destructive forensic
19 document examination as it is for other types of inspection, examination and testing.
20 One District Court recently confronted a similar issue where a party would not allow
21 non-destructive forensic examination and testing of documents unless the party's
22 counsel or expert were present at all times.  The Court found:

23

24    [76] Hutnyan Dec., Exh. 14.
25    [77] Hutnyan Dec., 14 and 16.
      [78] Hutnyan Dec., Exh. 13 (of the more than fifteen boxes of Bryant's originals,
26 Mattel specifically requested eight boxes and several specific folders from other
27 boxes to be sent for examination and testing).
      [79] Hutnyan Dec., Exh. 19 at 1.

EXHIBIT ____1____

PAGE ____28____

07209/2158174.1

-17-
MATTEL'S MOTION TO COMPEL ORIGINALS FOR EXPERT EXAMINATION AND TESTING

1      ... plaintiff's proposed conditions to be unreasonable.  In general,

2      each party should be free to engage in its own trial preparation

3      unhampered by the intrusive supervision of the opposing party.

4      In cases such as this, where purely nondestructive testing is

5      proposed, the court generally allows the examiner to perform his

6      or her work without being scrutinized by the opposing expert. ...

7      In the absence of [special] circumstances [such as destructive

8      testing], the balance of hardships usually tips in favor of allowing

9      the examiner to work in peace.

10 Diepenhorst v. City of Battle Creek, 2006 WL 1851243, at *1 (W.D. Mich. 2007).

11 Here Bryant seeks to go much further, controlling the type and number of documents

12 Mattel's experts can even look at, and even purporting to limit their examination

13 capabilities substantially by not allowing them to examine the documents in the

14 laboratory.

15      Mattel's trial preparation, including the names of its undesignated experts

16 and the type and number of documents it seeks to examine, is its work product and

17 Bryant is not entitled to know it, much less to dictate it. "Parties should be encouraged

18 to consult experts to formulate their own cases, to discard those experts for any reason,

19 and to place them beyond the reach of an opposing party, if they have never indicated

20 an intention to use the expert at trial."  House v. Combined Ins. Co. of Amer., 168

21 F.R.D. 236, 245 (N.D. Iowa 1996). Absent "extraordinary circumstances," information

22 as to the identity of the non-testifying expert and his work falls solidly under work

23 product doctrine and is privileged from disclosure. Bryant has not and cannot show

24 that any such extraordinary circumstances exist with respect to Mattel's consulting

25 experts.  Indeed, MGA has itself vehemently, and repeatedly, argued this point--

26 although quite inappropriately with respect to the "expert" who secretly took Bryant's

27 documents and *destructively* tested them without the approval or knowledge of Mattel

28 or of the Court, in the process altering the documents forever and later testified about it

EXHIBIT
PAGE
17

-18-

1  in a declaration--that undesignated experts' identities and their work product are not
2  discoverable. See In re Pizza Time Theatre Securities Litigation, 113 F.R.D. 94, 97-98
3  (N.D. Cal. 1986).[80]

4         Mattel has made no determination as to which experts it might designate as
5  testifying experts in this litigation, and will make such disclosures and submit expert
6  reports on the schedule set by this Court and the Federal Rules of Civil Procedure.
7  Until then, Bryant is simply not entitled to the information.

8         As to timing:  Because Mattel contemplates examination, analysis and
9  testing by multiple experts at their laboratories which are in various locations
10 throughout the country, because some of their examinations may build on prior experts'
11 findings, and because it wants to keep the documents together and in their current order
12 for each of the experts and for the entire time they are in Mattel's counsel's control, it
13 requested two months' access to the documents for the primary examinations, and then
14 another one-week period of examination so as to prepare rebuttal reports, with the
15 access scheduled a week apart to allow Bryant's own experts equal access to the
16 documents to prepare their rebuttal reports.

17        Bryant complains that this schedule is "one-sided," but he fails to count the
18 three-plus years of this case that he has had unfettered access to the originals--and he
19 ignored that his expert already did testing on them. Further, Bryant cannot be heard to
20 complain about Mattel's proposed schedule as to inspection of these materials when he
21 has wasted *years* fighting tooth and nail to prevent inspection and photographing of the
22 originals, even defying an on-the-record stipulation and the Court Order in the process.
23 May 31, 2007 was the very first time Mattel was actually allowed to see most of the
24 originals, and it wasn't until early June that Bryant's counsel finally admitted that some
25

26  [80]  See also Hutnyan Dec., Exh. 20, at 9 (arguing that "MGA and Bryant were
27  *forced* to explain in general terms the testing procedure they had used") (emphasis
    added); Hutnyan Dec., Exh. 21, at 28 (same).
28

EXHIBIT

PAGE

30

1   of the documents Mattel had been trying to inspect did not exist.[81]  Had Bryant turned

2   over his originals for inspection and photographing when they were first requested, or

3   after the June 2006 stipulation--or even by the Court's February 28, 2007 deadline, the

4   parties would not be up against the expert discovery deadline, but that was Bryant's

5   choice, and Mattel should not suffer any further prejudice as a result of it.

6       **B.**   **Destructive Testing**

7           The term "destructive" testing means any testing that would alter the

8   documents' inherent physical status.  One example of this is taking plugs from the

9   document, as MGA's and Bryant's "expert" did; another would be treating a document

10  with chemicals.[82]

11          As set forth above, the Federal Rules "expressly permit" forensic testing of

12  hard-copy materials.  Advisory Committee's Notes, 2006 Amendment.  They further

13  contemplate that any "issues of burden and intrusiveness raised by requests to test or

14  sample can be addressed under Rules 26(b)(2) and 26(c)."  Id.  "The district court thus

15  retains discretion to impose reasonable conditions surrounding a request to test tangible

16  objects, especially to protect against damage by destructive testing."  Diepenhorst,

17  2006 WL 1851243, at *1; see also Dabney v. Montgomery Ward & Co., Inc., 761 F.2d

18  494, 498 (8th Cir. 1985) (same).

19          One or more experts might recommend that a form or forms of destructive

20  testing be done on one or more of Bryant's originals.  In its suggested protocol, Mattel

21  proposed that in the event of such a recommendation, the following procedure would be

22  used:

23

24

---

25  [81]   Hutnyan Dec., Exhs. 11 and 12.

26  [82]   "Non-destructive testing" methods, in contrast, would include examining the
    documents using microscopes, magnifiers, light sources, scanners with special filters

27  and measuring instruments in ways that do not alter the documents.

28

PAGE _____  EXHIBIT _____ 3/ _____

1    First, Mattel will send a request in writing to Bryant explaining

2    what would be tested and what test or tests would be conducted.

3    Then Bryant will have 5 court days to object, in which case the

4    parties must meet and confer and within 3 more court days, file a

5    joint statement with Judge Infante to seek resolution of the

6    dispute. In lieu of objection, Bryant could elect to have his own

7    expert attend for any destructive testing being done, so long as he

8    makes this election in writing to Mattel within the 5-court-day

9    objection period, and so long as the testing can take place within

10   ten court days of the original request. If Bryant's expert raises any

11   issues about the testing being done, the parties agree to go

12   immediately to Judge Infante to resolve the dispute so that the

13   testing will not be delayed. If Bryant's counsel does not object or

14   seek attendance by its expert within five days of the request, the

15   proposed destructive testing will be deemed as unobjectionable

16   and will be carried out without further delay.

17   Bryant registered no objection to this portion of the protocol, perhaps

18   recognizing that the courts frequently authorize destructive testing where the party

19   seeking to do such testing notifies the opposing party in advance, so that its

20   representative may be present to observe such testing. See, e.g., Paul Morelli Design,

21   Inc. v. Merit Diamond Corp., 2000 WL 1340464, at *1 (E.D. Pa. 2000) (plaintiff shall

22   not engage in destructive testing without first giving advance notice to defendant which

23   shall be entitled to have a representative and expert present to observe such testing);

24   Sedrati v. Allstate Life Insurance Co., 185 F.R.D. 388, 391-394 (M.D. Ga. 1998)

25   (prohibiting introduction of testing evidence where plaintiff's counsel was not properly

26   notified of the date, place, and time of the proposed destructive testing, and defendant

27   failed to create a "pictorial history" memorializing the testing); Diepenhorst, 2006 WL

28   1851243, at *1 ("when a party proposes destructive testing, or there is controversy

EXHIBIT

PAGE

32

1    concerning the nature of the test, it sometimes becomes necessary to force the experts
2    to collaborate"); 23 Am. Jur. 2d Depositions and Discovery § 166 (". . . Destructive
3    testing may be permitted in the court's discretion, [] if the rights of opposing litigants
4    are protected, such as by assuring that the object is not totally consumed[] or by giving
5    the parties adequate opportunity to photograph and inspect the object before destructive
6    testing and an opportunity to view the tests with their experts or representatives.[]
7    Protective arrangements are necessary if the test would so alter the exhibit that it would
8    be difficult for the [other party] to present his or her claim") (citations omitted).

9            Accordingly, Bryant should be compelled to immediately make his
10   originals available to Mattel for non-destructive testing, and for potential destructive
11   testing pursuant to the terms and procedure proposed by Mattel above. Mattel requires
12   at least two months for examination and testing for its initial expert reports, and at least
13   one week for examination and testing to prepare any rebuttal reports.

14   **III.   THE DISCOVERY MASTER SHOULD SANCTION BRYANT.**

15           Rule 37(a)(4) of the Federal Rules of Civil Procedure provides that a party
16   bringing a motion to compel is entitled to the "reasonable expenses incurred in making
17   the motion, including attorney's fees, unless the court finds that the motion was filed
18   without the movant's first making a good faith effort to obtain the disclosure or
19   discovery without court action, or that the opposing party's nondisclosure, response or
20   objection was substantially justified, or that other circumstances make an award of
21   expenses unjust." Fed. R. Civ. P. 37(a)(4). The burden of establishing substantial
22   justification is on the party being sanctioned. Hyde & Drath v. Baker, 24 F.3d 1162,
23   1171 (9th Cir. 1994). Independently, sanctions may be imposed under 28 U.S.C.
24   § 1927, which provides that "[a]ny attorney . . . who so multiplies the proceedings in
25   any case unreasonably and vexatiously may be required by the court to satisfy
26   personally the excess costs, expenses, and attorneys' fees reasonably incurred because
27   of such conduct." Sanctions under this section are appropriate "for conduct that,
28   viewed objectively, manifests either intentional or reckless disregard of the attorney's

EXHIBIT

PAGE

**37**

07209/2158174.1

-22-

1   duties to the court."   RTC v. Dabney, 73 F.3d 262, 265 (10th Cir. 1995) (citing
2   Braley v. Campbell, 832 F.2d 1504, 1512 (10th Cir. 1987)).

3           There is no legitimate excuse for the restrictions Bryant has attempted to
4   impose on Mattel's experts' examination and testing.  Bryant has no say over what
5   Mattel's experts examine, or how they do it, as long as the testing is non-destructive and
6   he has an opportunity for his own experts to conduct testing.  As to destructive testing,
7   Mattel agrees to provide notice and opportunity to object or participate, which is not
8   only consistent with existing authority on the subject, but goes far beyond what Bryant
9   accepted from MGA, which was to turn over his originals to defendants' expert who
10  then admittedly conducted destructive testing on them without the Court's permission or
11  even any notice. As Bryant has conceded, Mattel has a right to have experts examine
12  and test his originals, and his attempts to control and severely limit the examinations
13  are clearly improper.  That kind of bad faith and callous disregard of his discovery
14  obligations is sanctionable.  National Hockey League, Inc. v. Metropolitan Hockey
15  Club, Inc., 427 U.S. 639 (1976).

16          Mattel therefore requests that Bryant be ordered to pay $2,500 as partial
17  reimbursement for the fees and costs that Mattel has incurred on this motion.[83]

18
19                          **Conclusion**
20          For the foregoing reasons, Mattel respectfully requests that the Discovery
21  Master grant Mattel's motion in its entirety and order Bryant to immediately make his
22  originals available to Mattel for non-destructive examination and testing, and for
23  potential destructive testing pursuant to the terms and procedure proposed by Mattel
24
25
26
27  ─────────────────────
    [83]  Zeller Dec., ¶ 35.
28

                MATTEL'S MOTION TO COMPEL ORIGINALS FOR EXPERT EXAMINATION AND TESTING

PAGE   EXHIBIT   34

1  above, and to pay sanctions for his bad-faith refusal to allow the examination and

2  testing.

3  DATED:  July 6, 2007                    QUINN EMANUEL URQUHART OLIVER &

4                                          HEDGES, LLP

5

6                                          By

7                                             Diane C. Hutnyan
                                              Attorneys for Plaintiff Mattel, Inc.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT
PAGE
39

EXHIBIT 2

RECEIVED

JUL 1 6 2007
CALENDARED

1  KEKER & VAN NEST, LLP
   JOHN W. KEKER - #49092
2  jkeker@kvn.com
   MICHAEL H. PAGE - #154913
3  mpage@kvn.com
   CHRISTA M. ANDERSON - #184325
4  canderson@kvn.com
   710 Sansome Street
5  San Francisco, CA  94111-1704
   Telephone: (415) 391-5400
6  Facsimile:  (415) 397-7188

7  Attorneys for Plaintiff
   CARTER BRYANT

8

9

10                 UNITED STATES DISTRICT COURT

11                CENTRAL DISTRICT OF CALIFORNIA

12                      EASTERN DIVISION

13

14  CARTER BRYANT, an individual,          Case No. CV 04-09049 SGL (RNBx)
                                           (consolidated with CV 04-9059 & 05-
15                          Plaintiff,     2727

16         v.                              DISCOVERY MOTION

17  MATTEL, INC. a Delaware                CARTER BRYANT'S OPPOSITION
    Corporation,                           TO MATTEL, INC.'S MOTION TO
18                                         COMPEL BRYANT TO MAKE
                            Defendant.     ORIGINAL DOCUMENTS
19                                         AVAILABLE FOR EXPERT
    CONSOLIDATED WITH MATTEL,              EXAMINATION AND TESTING
20  INC., v. BRYANT and MGA                AND FOR SANCTIONS
    ENTERTAINMENT, INC. v.
21  MATTEL, INC.                           [To be heard by Discovery Master Hon.
                                           Edward Infante (Ret.) Pursuant to the
22                                         Court's Order of December 6, 2006]

23                                         Date:     TBA
                                           Time:     TBA
24                                         Place:    TBA

25                                         Discovery Cut-Off:  Oct. 22, 2007
                                           Pre-Trial Conference: Jan. 14, 2008
26                                         Trial Date:  Feb. 12, 2008

27

28

PAGE _____ EXHIBIT 2

36

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................... 1

II. BACKGROUND ............................................................................................ 2

    A. In February 2007, Mattel reviewed and inspected Bryant's original drawings over the course of two days to determine which drawings are potential candidates for expert analysis ............... 2

    B. Over two months later, Mattel demanded additional inspections of Bryant's original drawings. ........................................... 2

    C. Mattel conducted three additional days of inspection in May and June, and declined an additional day of inspection that Bryant had made available. ................................................................ 4

    D. Mattel requests possession of nearly all of Bryant's drawings for expert inspection. ................................................. 5

III. ARGUMENT .................................................................................................. 7

    A. Mattel's proposed inspection procedures are patently unreasonable. ........................................................................................ 7

    B. Bryant has proposed a reasonable and fair process for expert examination. ......................................................................................... 9

    C. Sanctions are not warranted ................................................................ 11

IV. CONCLUSION ............................................................................................... 11

EXHIBIT **2**

PAGE **37**

i

CASE NO. CV 04-09049 SGL (RNBx)

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*Pierce v. Underwood*
487 U.S. 552 (1988)................................................................................11

*Reygo Pacific Corp. v. Johnston Pump Co.*
680 F.2d 647 (9th Cir. 1982).................................................................11

## FEDERAL STATUTES

Fed. R. Civ. P. 34(b) ...............................................................................7

EXHIBIT _____ **2**

PAGE _____ **38**

ii

# I.   INTRODUCTION

Despite Mattel's strident rhetoric, there is no dispute between the parties regarding the central issue raised by Mattel's motion. No one disputes that Mattel's experts may subject key documents to forensic testing on a reasonable schedule, subject to reasonable safeguards. We have never disputed that, and we do not dispute it now.

What we do dispute is Mattel's unilateral announcement that it can simply appropriate massive quantities of Mr. Bryant's personal property for however long, and in whatever manner, it chooses. Mattel's nonnegotiable demand is (1) that Mr. Bryant deliver more than **two thousand** separate original drawings (all of which have already been subject to three days of inspections, and many to four), (2) that Mattel then be allowed to redistribute them to unnamed experts in undisclosed locations for unspecified testing, and (3) that Mattel be allowed to keep all of those drawing for **two full months**, returning them to Bryant in time to allow Bryant's and MGA's own experts only **seven days** to conduct rebuttal testing and prepare rebuttal reports.[1]

We have accommodated Mattel's steadily escalating inspection demands, which began with a request for a single-day inspection of about thirty drawings, but then morphed quickly to three days of attorney and photographic inspection of thousands of drawings. We then repeated the process with Mattel's demands for a separate expert examination of those same documents. We have tried to negotiate a reasonable accommodation, only to be repeatedly rebuffed. Once it became clear that Mattel's goal was motion practice rather than cooperation, we suggested a streamlined means of bringing the issue before the Discovery Master, only to be rebuffed yet again. Enough is enough. Bryant is fully prepared to make a reasonable universe of his original drawings available for expert testing under

---

[1] As noted in Mattel's papers, the parties are continuing to negotiate modifications to the trial schedule; that schedule may have changed by the time this motion is heard.

OPPOSITION TO MATTEL, INC.'S MOTION TO COMPEL BRYANT TO MAKE ORIGINAL DOCUMENTS AVAILABLE FOR EXPERT EXAMINATION AND TESTING AND FOR SANCTIONS
CASE NO. CV 04-09049 SGL (RNBx)



EXHIBIT

PAGE

32

1   reasonable protocols for a reasonable time. Unfortunately, it must once again fall

2   to the Discovery Master to impose that reason.

3                               II.    BACKGROUND

4   **A.   In February 2007, Mattel reviewed and inspected Bryant's original**

5   **drawings over the course of two days to determine which drawings are potential candidates for expert analysis.**

6         In order to resolve this motion, it is regrettably necessary to review the

7   recent history of inspection demands by Mattel, and Bryant's response to those

8   demands.[2] On February 27 and 28, 2007, Bryant made original documents

9   available for inspection and photographing pursuant to the Discovery Master's

10  February 14, 2007 order. Mattel requested this inspection, arguing that it needed

11  to inspect and photograph Bryant's originals "to determine which of the originals

12  are potentially appropriate candidates for expert analysis."[3] Mattel did not raise

13  any concerns regarding the February inspection, and Bryant considered its

14  obligations under the Discovery Master's order satisfied and the matter closed.

15  **B.   Over two months later, Mattel demanded additional inspections of**

16  **Bryant's original drawings.**

17        More than two months later, Mattel demanded a meet-and-confer concerning

18  Bryant's alleged failure to have produced for inspection three items in response to

19  this Court's prior orders.[4] In fact, Bryant does not have two of them (a pad of

20  drawing paper apparently discarded nearly 10 years ago, and two notarized

21  drawings which were lost sometime between 1999 and the filing of this suit in

22  2004), and did not own the other (the notary book owned by Jacqueline Ramona

23  Prince, that Mattel now seeks to inspect for a **third** time).

24

25  [2] Mattel would have the Court believe that this motion is the culmination of a multi-year refusal
26  to respond to discovery. It is nothing of the sort. Most of Mattel's motion rehashes a long-
    resolved dispute that has nothing to do with the instant motion, while eliding the fact that the
27  order in that previous motion was complied with long ago.

    [3] *See* Hutnyan Decl. In Support Of Mattel's Motion to Compel, Exh. 1 at 15.

28  [4] *See* Page Dec., Exh. 1.

                                          2

EXHIBIT

PAGE

1  Also in mid-May, Keker & Van Nest replaced Mr. Bryant's prior counsel,[5]
2  and was in the process of having all of the litigation files in this case, including
3  thousands of Mr. Bryant's original drawings, transferred from Los Angeles to San
4  Francisco. Nevertheless, we informed Mattel that we would be happy to make
5  available any of Bryant's original drawings as soon as we received them from
6  predecessor counsel.[6] We asked that Mattel wait until we had an opportunity to
7  inventory and index the materials upon receiving them.[7]

8  Mattel refused that request. In a letter dated May 22, 2007, Mattel's counsel
9  Diane Hutnyan insisted that the drawings and notary book be produced for
10  inspection immediately, writing that "any indexing Bryant cares to carry out for his
11  own purposes has nothing to do with Mattel and could be done after Bryant abides
12  by the Court's Orders to provide the documents for the inspection and
13  photographing."[8]

14  We acceded to Mattel's demands and agreed to make Mr. Bryant's originals
15  available for inspection immediately, scheduling that inspection for May 30, 2007.[9]
16  We also volunteered to arrange for Ms. Prince's counsel to ship her notary book
17  and notary stamp[10] to us from Atlanta, so that they would be available for
18  inspection without the need for a trip to Georgia.[11] Finally, we asked Mattel to let
19  us know if there were any other originals they wished to inspect at the same time.

20  Near midnight on the Friday of Memorial Day weekend, Mattel sent us an
21  email listing more than **two thousand** additional pages of original drawings and

22

23  [5] *See* Page Dec., Exh. 2.
24  [6] *See* Page Dec., Exh. 3.
25  [7] *Id.*
    [8] *See* Page Dec., Exh. 4.
26  [9] *See* Page Dec., Exh. 5. At the request of Mattel's counsel, the inspection was moved to May
27  31. *See* Page Dec., Exh. 6.
    [10] Mattel requested the notary stamp for the first time on May 22, 2007. *See* Page Dec., Exh. 7.
28  [11] *See* Page Dec., Exh. 5.

PAGE ____  EXHIBIT ____ 3  2

1 other documents it wished to inspect, multiplying the scope of the inspection by a
2 factor of one hundred with only two business days' notice. Mattel also requested
3 to "inspect/photograph anything on sketch paper, anything on tracing paper,
4 anything on notebook paper, [and] any books."[12] Not only was this request
5 onerous, but it basically encompassed all of Mr. Bryant's drawings. Nonetheless,
6 we set about gathering all the originals we had not yet had the opportunity to index
7 and made them available for Mattel's inspection.[13]

8 Next, on the day before the scheduled inspection, Mattel asked for a second
9 day of inspection. Despite the short notice, we again complied, rearranging
10 schedules to provide coverage for an additional half-day of inspection.

11 **C.   Mattel conducted three additional days of inspection in May and June,**
**and declined an additional day of inspection that Bryant had made**
12 **available.**

13 On May 31 and June 1, Mattel's counsel, accompanied by a photographer
14 and videographer and under the supervision of a Keker & Van Nest attorney,
15 painstakingly reviewed, inventoried, catalogued, and photographed approximately
16 two thirds of Bryant's originals. At the end of those two days, Bryant's counsel
17 expressed their willingness to schedule an additional day of inspection.

18 Instead of accepting Bryant's offer, Mattel sent an incendiary letter claiming
19 that the inspection had been "sabotaged." By letter of June 6, Ms. Hutnyan—
20 having insisted that the first inspection occur before Keker & Van Nest had been
21 able to index any of the drawings—complained that the documents had not been
22 indexed, and complained that Bryant had not produced documents he simply does
23 not have.[14] We explained to Ms. Hutnyan that we had produced every original
24 drawing in our possession, and reiterated our offer to schedule yet another day of

25 ─────────────
[12] *See* Page Dec., Exh. 8.
26
[13] Bryant's counsel also made clear that they had only recently received this material from
27 Littler, and were "conducting the inspection -- at your request -- prior to having the opportunity
to properly index the originals." *See* Page Dec., Exh 9.
28 [14] *See* Page Dec., Exh 10.

1 | inspection.[15]  Bryant agreed to set aside two days, June 20 and 21, in order to allow
2 | Mattel to complete its inspection.[16]

3 |     Mattel conducted only one additional day of photographing and inspection,
4 | on June 20, apparently conceding that another day of inspection was not necessary.

5 | **D.  Mattel requests possession of nearly all of Bryant's drawings for expert inspection.**

7 |     Just prior to its fifth day of inspection of the originals, Mattel asked to meet
8 | and confer concerning its request that some unspecified set of drawings be
9 | submitted to forensic testing by Mattel's experts.[17]  On June 22, Bryant's counsel
10 | participated in a telephonic conference with Ms. Hutnyan, in which Ms. Hutnyan
11 | proposed the following:

12 | • that Bryant ship all of his original drawings (11 oversized boxes,
13 | totaling about 2,500 drawings) to Quinn Emanuel within six days,

14 | • that Mattel's counsel and experts would keep those originals for two
15 | months,

16 | • that the documents would be returned only a week before Bryant's
17 | and MGA's rebuttal expert reports would be due.

18 |     We told Mattel that this was unacceptable, but that if they could identify
19 | particular documents they wished to test, and could propose a reasonable protocol
20 | for the handling and timing of testing, we would be happy to comply.[18]  In
21 | response, Ms. Hutnyan could not identify any particular documents for testing
22 | other than the 11 notarized drawings, and would not identify the experts to whom
23 | she proposed giving the documents.[19]  We concluded the call by asking that Mattel

---

24 | [15] *See* Page Dec., Exh. 11.
25 | [16] *See* Page Dec., Exh 12.
26 | [17] *See* Page Dec., Exh. 13.
26 | [18] *See* Page Dec., ¶ 16.
27 | [19] Mattel previously argued that it needed to inspect and photograph Bryant's originals "to determine which of the originals are potentially appropriate candidates for expert analysis." Hutnyan Dec. In Support Of Mattel's Motion to Compel, Exh. 1 at 15.  It is incomprehensible

EXHIBIT 43 PAGE

1  send us a letter identifying the drawings they wished to test and the protocols they

2  proposed.

3       On June 26, Ms. Hutnyan wrote to us, refusing to make any particular

4  identification of drawings to be subjected to testing, but instead demanding that we

5  ship to her the entirety of eight large boxes of originals and significant portions of

6  another three boxes.[20]  Mattel also again demanded that its unidentified experts

7  have two months of unsupervised possession of the originals, leaving Bryant's and

8  MGA's experts seven days to conduct their own rebuttal testing and prepare

9  rebuttal reports.  Mattel made no effort to narrow its demands to any reasonable set

10 of documents, instead including in its demands hundreds of drawings that were

11 created years after the relevant events in this case.

12      The next day we responded, again stating that we were willing to subject a

13 reasonable universe of documents to reasonable testing, and asking Mattel to select

14 "scores rather than thousands" of documents.[21]  We also noted that, having just put

15 us through the expense and effort of three days of inspection and photographing –

16 in addition to the two days of inspection that took place in February – Mattel

17 should have been in a position to make a more specific identification than simply

18 "all of them."

19      On June 30, Mattel again wrote to us, and refused to modify its original

20 demands in any way, threatening motion practice if we did not simply turn over

21 virtually all of Mr. Bryant's original works to them for two months and allow them

22 to ship them off to whomever they elect without restriction.[22]

23 _____

24 why after five days of inspection Mattel refuses to identify the originals they would like to
present to their experts.

25 [20] *See* Page Dec., Exh. 14.  Those eight boxes contain virtually all of the drawings from Bryant's
2004 and March 2, 2007 production, including non-responsive drawings that were collected.

26 [21] *See* Page Dec., Exh. 15.

27 [22] The June 30, 2007 letter also objects to a requirement we never proposed: that Mattel not be
allowed to take the originals to its experts' laboratories.  We proposed no such limitation: rather,

28 we asked that the documents remain in the custody of Mattel's counsel.  If they choose to take
the documents to a laboratory, we have no objection, provided that custody of the documents—

6

PAGE     EXHIBIT
44   2

1        At this point, it was apparent that Mattel had no intention of reaching any

2   agreement, instead preferring to bring yet another discovery motion. Accordingly,

3   on July 5, we wrote to Mattel to propose a simple solution: that we provide Your

4   Honor with copies of our correspondence to date, ask you to sit down with counsel

5   for both sides at our offices in a room with the original drawings in front of us.

6   After each side presented their positions, we would submit whatever originals

7   Your Honor ordered to be tested, and subject those originals to testing under a

8   protocol determined by you.[23]

9        By letter of July 6, Mattel rejected that proposal out of hand. That same day,

10  the instant motion was filed.

11  ## III.  ARGUMENT

12       Mattel's brief is dedicated to making a point that no one disputes: that

13  inspection requests under the Federal Rules of Civil Procedure include requests for

14  scientific testing. Of course they do. Bryant has never argued otherwise. But

15  those Rules do not authorize one party in a lawsuit to demand that the other turn

16  over massive amounts of his personal property to months of unsupervised custody

17  by his opponent. Instead, Fed. R. Civ. P. 34(b) clearly states that any request must

18  specify a "reasonable time, place, and manner" for the inspection. Mattel's

19  demands in this regard are patently unreasonable, and no amount of repeating the

20  mantra that its demands are "reasonable by any measure" can make them so.

21  **A.   Mattel's proposed inspection procedures are patently unreasonable.**

22       Mattel's proposed procedure is unreasonable for a number of reasons. First,

23  the universe of drawings to be tested is wildly over-inclusive. Mattel has to date

24  identified only the eleven original notarized drawings as testing targets.[24] Mattel

25

26  and responsibility for their preservation—remains with counsel. *See* Page Dec., Exh. 16.
    [23] *See* Page Dec., Exh. 17.

27  [24] Mattel has also identified Ms. Prince's notary book for testing. Mr. Bryant doesn't own it, and
    has no objection to it being tested as long as equal access is afforded to MGA's and Bryant's

28  experts.

OPPOSITION TO MATTEL, INC.'S MOTION TO COMPEL BRYANT TO MAKE ORIGINAL DOCUMENTS
AVAILABLE FOR EXPERT EXAMINATION AND TESTING AND FOR SANCTIONS
CASE NO. CV 04-09049 SGL (RNBx)

PAGE _____    EXHIBIT _____    45  2

1  hopes to dispute Mr. Bryant's testimony that those drawings were created in

2  August 1998, and to argue that they were instead created in the first half of 1999.

3  When pressed, Mattel says that its experts may also wish to examine other

4  drawings on identical paper, in hopes of finding impressions that would indicate

5  they were created at the same time. Mattel has had multiple days of inspection to

6  determine which originals they believe are on paper that matches the eleven

7  notarized drawings. Mattel also turned down an additional day of inspection that

8  Bryant made available.

9      Instead, Mattel has asked that it be handed more than two thousand separate

10  drawings, without any rhyme or reason to the demand. For the vast majority, there

11  can be no good reason for testing. For example, Mattel has requested boxes 1

12  through 8, which include: (1) hundreds of pages of torn magazine pages; (2)

13  fashion designs drawn by Bryant from as far back as 1985, when he was 17 years

14  old, and (3) a cartoon drawing by Bryant of his family given to his dad on Father's

15  Day 1982. Even Mattel's more detailed requests for specific folders in boxes 9,

16  10, 11 are overbroad. One folder labeled "Bratz Petz S04" contains over 60

17  drawings of animals that were designed for potential release in Spring 2004.

18      Furthermore, it is frustrating that after conducting five days of inspection

19  and photographing of Mr. Bryant's originals, Mattel is still not able to identify a

20  reasonable subset of documents that are proper subjects of expert inspection.

21  Presumably, Mattel photographed the originals they wish to inspect, and should be

22  able to provide Bryant with those photographs. Yet, to date, Mattel has refused to

23  do so, instead asking for an unreasonable number of Bryant's originals.

24      Second, Mattel's assertion that it is entitled to lock up virtually all of Mr.

25  Bryant's drawings for two months is just as unreasonable. Mattel has not

26  presented any explanation why all the drawings need to be retained for the full two

27  month period. More baffling is why Mattel believes it needs two months to inspect

28  the documents when under its plan, yet Bryant and MGA would only receive seven

PAGE ___  EXHIBIT ___  $\mathcal{L}$ ~

8

1    days of inspection prior to the expert discovery cut-off date.

2        Third, Mattel has not responded to Bryant's request that Mattel take

3    responsibility for the integrity of the original drawings when they are provided for

4    expert inspection. Mattel has stated its intention to send Bryant's originals to

5    "multiple experts at their laboratories which are in various locations throughout the

6    country."[25] Bryant cannot be expected to hand over his valuable property to a party

7    that refuses to take responsibility for its maintenance and safekeeping.[26]

8        Finally, Mattel's proposed protocol forces Bryant to waive his right to have

9    an expert present during any destructive testing if he initially objects to such

10   testing. While Mattel's protocol requires that Bryant receive notice before any

11   destructive testing is conducted and grants him five court days to object, the

12   protocol then states that "[i]n lieu of objection, Bryant could elect to have his own

13   expert attend for a any destructive testing being done...."[27] Bryant cannot be

14   expected to waive his right to have his own expert be present simply by voicing an

15   initial objection to such testing. Nor can Bryant be expected to waive his right to

16   object to certain testing simply by choosing to have his expert attend the testing.[28]

17   Such restrictions are unreasonable, and make Mattel's protocol unacceptable.

18   **B.    Bryant has proposed a reasonable and fair process for expert examination.**

19

20       For each of these reasons, Mattel's demands are patently unreasonable. We

21   propose that the Court instead issue the following order:

22       1.    That Mattel identify no more than 50 particular drawings for testing.

23   That identification may be made either by Bates number or by providing Bryant

---

[25] Mattel's Mot. to Compel, at 19.

[26] Contrary to Mattel's argument in its brief, Bryant has never blanketly refused to allow Mattel's experts to perform tests in their laboratories. Mattel can of course test documents in a laboratory, but its counsel must maintain custody of—and responsibility for—those documents.

[27] See Page Dec., Exh. 14 at 2.

[28] In fact, Mattel's proposed protocol seems to concede this point, by stating that Bryant's expert can "raise[] any issues about the testing being done, the parties agree to go immediately to Judge Infante to resolve the dispute so tha thte testing will not be delayed." *Id.*

OPPOSITION TO MATTEL, INC.'S MOTION TO COMPEL BRYANT TO MAKE ORIGINAL DOCUMENTS AVAILABLE FOR EXPERT EXAMINATION AND TESTING AND FOR SANCTIONS
CASE NO. CV 04-09049 SGL (RNBx)

EXHIBIT
PAGE
4 2

1   with photographs of the requested documents.

2      2.    That those drawings be turned over to Quinn Emanuel or its agent at

3   the offices of Keker & Van Nest within 5 days of receipt of the aforementioned

4   identification.

5      3.    That the originals be maintained in the personal custody and control

6   of Quinn Emanuel, with the understanding that a responsible Quinn Emanuel

7   employee may personally transport them to any location necessary for testing but

8   must maintain physical custody of the originals at all times, and must keep the

9   originals in a secure, locked location when not in use.

10      4.    That the drawings be returned to Keker & Van Nest within 21 days.

11      5.    That any request for destructive testing[29] be governed by the following

12   protocol:

13         i)    Mattel will provide a written request to Bryant explaining what

14   document would be tested and what test or tests would be conducted prior to any

15   destructive testing;

16         ii)    Bryant will have 5 court days to object, in which case the

17   parties must meet and confer and, within 3 more court days, file a joint statement

18   with Judge Infante to seek resolution of the dispute;

19         iii)    Bryant will have the opportunity to have his own expert attend

20   any destructive testing being done, provided such election is made in writing to

21   Mattel within the 5-court-day objection period, and provided the testing can take

22   place within ten court days of the original request;

23         iv)    Bryant's expert may raise any issues about the testing being

24   done, and the parties agree to go immediately to Judge Infante to resolve the

25   dispute;

26

27   [29] "Destructive testing" is defined as any testing that would chemically or physically alter the
document, and includes ink dating, paper fiber and chemical analysis, treating the document with
28   chemicals, or taking plugs from the document.

1        v)    In addition, MGA will be given notice of any destructive

2    testing, and will be given an opportunity to attend and observe any such testing.

3

4    **C.   Sanctions are not warranted**

5        Attorney's fees are not warranted in the context of discovery when there is a

6    "genuine dispute" of fact or law or "if reasonable people could differ as to [the

7    appropriateness of the contested action]."[30]  There is a valid and legitimate dispute

8    between the parties as to Mattel's proposed protocol for expert inspection of

9    Bryant's original documents.  Bryant has raised concerns as to the fairness of

10   Mattel's protocol and Mattel's unwillingness to accept responsibility for the care

11   and maintenance of those documents while they are inspected by their own experts.

12   Sanctions, therefore, are not warranted.

13                 **IV.   CONCLUSION**

14       For the above-mentioned reasons, Bryant respectfully requests that the

15   Discovery Master deny Mattel's motion and instead adopt the terms and procedure

16   proposed by Bryant above.

17

18   Dated:  July 13, 2007              Respectfully submitted,
                                          KEKER & VAN NEST, LLP

19

20

21                               By:

22                                   MICHAEL PAGE
                                Attorneys for Plaintiff

23                                   CARTER BRYANT

24

25

26   _____
[30] *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Reygo Pacific Corp. v. Johnston*
*Pump Co.*, 680 F.2d 647, 649 (9th Cir. 1982) (alteration in original).

27

28

PAGE _____  EXHIBIT _____

PROOF OF SERVICE

I am employed in the City and County of San Francisco, State of California in the office of a member of the bar of this court at whose direction the following service was made. I am over the age of eighteen years and not a party to the within action. My business address is Keker & Van Nest, LLP, 710 Sansome Street, San Francisco, California 94111.

On July 13, 2007, I served the following document(s):

**CARTER BRYANT'S OPPOSITION TO MATTEL, INC.'S MOTION TO COMPEL BRYANT TO MAKE ORIGINAL DOCUMENTS AVAILABLE FOR EXPERT EXAMINATION AND TESTING AND FOR SANCTIONS**

by **FEDERAL EXPRESS**, by placing a true and correct copy in a sealed envelope addressed as shown below. I am readily familiar with the practice of Keker & Van Nest, LLP for correspondence for delivery by FedEx Corporation. According to that practice, items are retrieved daily by a FedEx Corporation employee for overnight delivery;

*AND*

by **E-MAIL VIA PDF FILE**, by transmitting on this date via e-mail a true and correct copy scanned into an electronic file in Adobe "pdf" format. The transmission was reported as complete and without error.

| | |
|---|---|
| Hon. Edward A. Infante | John B. Quinn |
| JAMS | Michael T. Zeller |
| Two Embarcadero Center, Suite 1500 | Quinn Emanuel Urquhart Oliver & Hedges, |
| San Francisco, CA 94111 | LLP |
| Tel:    415/774-2649 | 865 South Figueroa Street, 10th Floor |
| Fax:    415/982-5287 | Los Angeles, CA 90017-2543 |
| Email: schan@jamsadr.com | Tel:    213/443-3000 |
| | Fax:    213/443-3100 |
| | Email: johnquinn@quinnemanuel.com |
| | Email: michaelzeller@quinnemanuel.com |
| | |
| Diana M. Torres | Patricia L. Glaser |
| O'Melveny & Myers, LLP | Christensen Glaser Fink Jacobs Weil & |
| 400 S. Hope Street | Shapiro |
| Los Angeles, CA 90071 | 10250 Constellation Blvd., 19th Floor |
| Tel:    213/430-6000 | Los Angeles, CA 90067 |
| Fax:    213/430-6407 | Tel:    310/553-3000 |
| Email: dtorres@omm.com | Fax:    310/556-2920 |
| | Email: pglaser@chrisglase.com |

396176.01

EXHIBIT 3

PAGE 96

1    Executed on July 13, 2007, at San Francisco, California.

2        I declare under penalty of perjury under the laws of the State of California that the above
     is true and correct.
3

4

5                                    _____
                                     JULIE A. SELBY
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PROOF OF SERVICE
CASE NO. CV 04-09049 SGL (RNBx)

EXHIBIT 2
PAGE 51

# EXHIBIT 3



1 QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
   John B. Quinn (Bar No. 090378)
2  johnquinn@quinnemanuel.com
   Michael T. Zeller (Bar No. 196417)
3  (michaelzeller@quinnemanuel.com)
   Jon D. Corey (Bar No. 185066)
4  (joncorey@quinnemanuel.com)
   Timothy L. Alger (Bar No. 160303)
5  (timalger@quinnemanuel.com)
   865 South Figueroa Street, 10th Floor
6  Los Angeles, California 90017-2543
   Telephone: (213) 443-3000
7  Facsimile: (213) 443-3100

8  Attorneys for Mattel, Inc.

9              UNITED STATES DISTRICT COURT

10             CENTRAL DISTRICT OF CALIFORNIA

11                   EASTERN DIVISION

12 CARTER BRYANT, an individual,        Case No. CV 04-09049 SGL (RNBx)
13              Plaintiff,
                                        Consolidated with
14    vs.                               Case No. CV 04-09059
                                        Case No. CV 05-02727
15 MATTEL, INC., a Delaware corporation,  **DISCOVERY MATTER**
16              Defendant.
                                        Hon. Edward A. Infante (Ret.)
17                                      Discovery Master

18 AND CONSOLIDATED CASES              [PROPOSED] ORDER GRANTING
                                        MATTEL, INC.'S MOTION TO
19                                      COMPEL BRYANT TO MAKE
                                        ORIGINAL DOCUMENTS
20                                      AVAILABLE FOR EXPERT
                                        EXAMINATION AND TESTING
21
                                        Date: August 23, 2007
22                                      Time: 9:00 a.m.
                                        Place: Telephonic
23
                                        Discovery Cut-Off: October 22, 2007
24                                      Pre-Trial Conference: January 14, 2008
                                        Trial Date: February 12, 2008
25
26                                      EXHIBIT ___3___
27
28                                      PAGE ___62___
        8-80
07209/2201994.1
                                                        [PROPOSED] ORDER

1      Having considered Mattel, Inc.'s Motion To Compel Bryant To Make
2  Original Documents Available For Expert Examination and Testing (the "Motion"),
3  and all other papers and argument submitted in support of or opposition to the
4  Motion, and finding good cause therefore,

5      IT IS HEREBY ORDERED that:

6      1.    Mattel's Motion is GRANTED IN PART, as follows:

7      2.    The following materials were provided to the Discovery Master, at
8  his request, for *in camera* review:  the C.V. of the four experts who will be
9  conducting examination, inspection and testing of the documents; and statements
10 from each of them as to the location and nature of their laboratory facilities, as to
11 their individual practices with regard to the preservation of evidence, and as to their
12 understanding that they are fully accountable for Bryant's original documents while
13 those documents are in their custody.  The Discovery Master has found Mattel's
14 showing with respect to the experts satisfactory.

15     3.    Accordingly, Bryant shall produce to Mattel, within ten (10) Court
16 days of entry of this Order, on the day that Mattel specifies, the original documents
17 listed below for Mattel's experts' examination, testing and/or analysis:

18     • the originals of boxes 1 through 8 inclusive;

19     • from box 9: folders "Sugar Planet Spring 2003 Tropical" and "Sugar
20       Planet General 2001-2002?";

21
22     • from box 10: folders "Baby Bratz," "F 04 Retro Funk General," "Sugar
         Planet Butterfly Purse & Character S 04," "Lipstixx 2003," Sugar Planet
23       Candyland Purse: Character S 04" and "Sugar Planet Tropical 2001"

24     • from box 11: folders entitled "Bratz Dollpack Fall 2003," "S04 Girls
25       Night Out," "Bratz New Accessories Etc. 2002," "Bratz Petz S04,"
         "Winter Wonderland F03 Dolls," "Bratz Spring 2002 7.99 molded
26       pieces," "S04 Sweetheart," "Jade Dollpack Spring 2003," "Jade Fall
27       2002," "Sasha Fall 2002," "Yasmin Fall 2002," "Cloe Fall 2002," "New

28

-1-

PROPOSED ORDER

EXHIBIT ___3___

PAGE ___53___

Girl 2002 Fall," "Bratz $7.99 2002 Spring Break," and "Bratz Spring
2002 14.99 segment."

~~If Mattel's experts determine that their analysis would potentially benefit from access to other original documents not listed above, Bryant will make those originals available to Mattel's counsel or Mattel's expert(s) at Mattel's counsel's direction upon five (5) Court days' notice.~~

4.   On the day specified, Mattel will pick up the documents listed above from Keker & Van Nest's San Francisco office during normal business hours. The next day after the documents are removed from Keker & Van Nest shall be the first of 35 days that Mattel will have for the expert examination and testing of the materials requested for preparation of its initial expert reports, which time period may be extended upon a showing by Mattel of good cause by further Order of the Discovery Master. The documents shall be returned to Keker & Van Nest's San Francisco office on the 35th day during normal business hours.

5.   The experts' examination, testing and analysis may take place at the experts' laboratories. Any shipping of the originals will be done by overnight mail, for earliest delivery possible to the destination area, using Federal Express or UPS or a similar service that Bryant selects.

6.   If any of Mattel's experts recommends that a form of destructive testing (that is, any testing that would alter the documents' inherent physical status) be conducted, the following procedure shall be used. First, Mattel will send a request in writing to Bryant and MGA explaining what would be tested and what test or tests would be conducted. Then Bryant and MGA will have five (5) Court days to object, in which case the parties must meet and confer and, within three (3) more Court days, file a joint statement with Judge Infante to seek resolution of the dispute. Bryant and MGA may also elect to have their own experts attend for any destructive testing being done, so long as they make this election in writing to Mattel within the five-Court-day objection period, and so long as the testing can take place within ten (10)

PROPOSED ORDER

EXHIBIT _____ **3**

PAGE _____ **54**

1   Court days of the original request. If Bryant's or MGA's expert, while he or she is
2   observing the examination or destructive testing, raises any issues about sampling or
3   testing being done or any other aspects of the expert's or experts' process, the parties
4   will seek immediate resolution from this Court so that the sampling, testing or other
5   activity will not be delayed. If Bryant's counsel or MGA's counsel does not object or
6   seek attendance by its expert within five days of the request, the proposed destructive
7   testing shall be deemed as unobjectionable and may be carried out without further
8   delay.

9           7.      With the exception of alterations resulting from any destructive
10  testing, which would be conducted in accordance with the protocol above, all the
11  Bryant documents that are provided for inspection, examination and testing shall be
12  returned in the same condition, sequence and order in which they were received.

13          **IT IS SO ORDERED.**

14

15  DATED: _Aug 30_, 2007

16

17

18                              Hon. Edward Infante (Ret.)
                                Discovery Master

19

20

21

22

23

24

25

26

27

28

07209/2201994.1

-3-

PROPOSED ORDER

EXHIBIT _____ 2

PAGE _____ 55

1  Prepared and respectfully submitted by:
2  QUINN EMANUEL URQUHART
   OLIVER & HEDGES, LLP
3

4
5  Diane C. Hutnyan
6  Attorneys for Mattel, Inc.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

07209/2201994.1

-4-

PROPOSED ORDER

EXHIBIT _____ 3
PAGE _____ 56

## PROOF OF SERVICE BY E-MAIL

I, Sandra Chan, not a party to the within action, hereby declare that on August 30,
2007, I served the attached ORDER GRANTING MATTEL, INC'S MOTION TO COMPEL
BRYANT TO MAKE ORIGINAL DOCUMENTS AVAILABLE FOR EXPERT
EXAMINATION AND TESTING in the within action by e-mail addressed as follows:

| | | |
|---|---|---|
| John W. Keker, Esq. | Keker & Van Nest | jkeker@kvn.com |
| Michael H. Page, Esq. | Keker & Van Nest | mhp@kvn.com |
| Christa Anderson, Esq. | Keker & Van Nest | cma@kvn.com |
| John E. Trinidad, Esq. | Keker & Van Nest | jtrinidad@kvn.com |
| John Quinn Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | johnquinn@quinnemanuel.com |
| Michael Zeller Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | michaelzeller@quinnemanuel.com |
| Jon Corey Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | joncorey@quinnemanuel.com |
| Duane Lyons Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | duanelyons@quinnemanuel.com |
| Timothy Alger Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | timalger@quinnemanuel.com |
| Dominic Surprenant Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | DominicSurprenant@QuinnEmanuel.com |
| B. Dylan Proctor Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | dylanproctor@quinnemanuel.com |
| Shane McKenzie Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | shanemckenzie@quinnemanuel.com |
| Bridget Hauler Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | bridgethauler@quinnemanuel.com |
| Tamar Buchakjian Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | tamarbuchakjian@quinnemanuel.com |
| Juan Pablo Alban, Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | juanpabloalban@quinnemanuel.com |
| Dale Cendali Esq. | O'Melveny & Myers LLP | dcendali@omm.com |
| Diana Torres Esq. | O'Melveny & Myers LLP | dtorres@omm.com |
| James Jenal Esq. | O'Melveny & Myers LLP | jjenal@omm.com |
| Alicia Meyer Esq. | O'Melveny & Myers LLP | ameyer@omm.com |
| Jennifer Glad Esq. | O'Melveny & Myers LLP | jglad@omm.com |
| David Hurwitz, Esq. | O'Melveny & Myers LLP | dhurwitz@omm.com |
| Johanna Schmitt Esq. | O'Melveny & Myers LLP | jschmitt@omm.com |
| Michael C. Keats, Esq. | O'Melveny & Myers LLP | mkeats@omm.com |
| Kendall Burr, Esq. | O'Melveny & Myers LLP | kburr@omm.com |
| Melanie Bradley, Esq. | O'Melveny & Myers LLP | mbradley@omm.com |
| Marvin Putnam, Jr., Esq. | O'Melveny & Myers LLP | mputnam@omm.com |
| William Charron, Esq. | O'Melveny & Myers LLP | wcharron@omm.com |
| Marc Feinstein, Esq. | O'Melveny & Myers LLP | mfeinstein@omm.com |
| Patricia Glaser Esq. | Christensen, Glaser, Fink, Jacobs, Weil & Shapiro, LLP | pglaser@chrisglase.com |

I declare under penalty of perjury under the laws of the Untied States of America that
the above is true and correct.

Executed on August 30, 2007, at San Francisco, California.

Sandra Chan

EXHIBIT _____ 2

PAGE _____ 51

EXHIBIT 4



1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
   John B. Quinn (Bar No. 090378)
2    johnquinn@quinnemanuel.com
   Michael T. Zeller (Bar No. 196417)
3    (michaelzeller@quinnemanuel.com)
   Jon D. Corey (Bar No. 185066)
4    (joncorey@quinnemanuel.com)
   Timothy L. Alger (Bar No. 160303)
5    (timalger@quinnemanuel.com)
   865 South Figueroa Street, 10th Floor
6  Los Angeles, California 90017-2543
   Telephone:  (213) 443-3000
7  Facsimile:  (213) 443-3100

8  Attorneys for Mattel, Inc.

9                    UNITED STATES DISTRICT COURT

10               CENTRAL DISTRICT OF CALIFORNIA

11                        EASTERN DIVISION

12

13 | CARTER BRYANT, an individual, | Case No. CV 04-09049 SGL (RNBx)
   |                               |
14 |         Plaintiff,            | Consolidated with
   |                               | Case No. CV 04-09059
15 |    vs.                        | Case No. CV 05-02727
   |                               |
16 | MATTEL, INC., a Delaware corporation, | **DISCOVERY MATTER**
   |                               |
17 |         Defendant.            | Hon. Edward A. Infante (Ret.)
   |                               | Discovery Master
18 |                               |
   | AND CONSOLIDATED CASES        | *IN CAMERA* DECLARATION # 1 AS
19 |                               | TO EXPERT EXAMINATION AND
   |                               | TESTING OF BRYANT'S ORIGINAL
20 |                               | DOCUMENTS
   |                               |
21 |                               | Date: August 23, 2007
   |                               | Time: 9:00 a.m.
22 |                               | Place: Telephonic
   |                               |
23 |                               | Discovery Cut-Off: October 22, 2007
   |                               | Pre-Trial Conference: January 14, 2008
24 |                               | Trial Date: February 12, 2008

25

26            SUBMITTED PER JUDGE INFANTE'S REQUEST ON AN

27                       *IN CAMERA* BASIS

28   ~ **Not For Dissemination To Defendants/Counterclaimants** ~

07209/2205386.1

                                        IN CAMERA DECLARATION NO. 1

                                EXHIBIT       4

                                PAGE      5B

## DECLARATION OF VALERY N. AGINSKY, PhD

I, Valery N. Aginsky, Ph.D., declare as follows:

1.  I am a forensic chemist specializing in the field of forensic document examination. I am submitting this declaration *in camera* in response to a request from the Discovery Master in connection with Mattel's Motion to Compel Bryant To Make Original Documents Available For Expert Examination and Testing. I am more than twenty-one (21) years of age; I make this declaration of personal, firsthand knowledge; and if called and sworn as a witness, I could and would testify competently thereto.

2.  I have been a forensic chemist for 27 years. I am currently employed with Riley, Welch & Aginsky Forensic Document Examinations, Inc. (formerly known as Riley, Welch & Associates Forensic Document Examinations, Inc.) I received my Ph.D. in Analytical Chemistry in 1980. Prior to joining Riley, Welch & Associates I worked as a senior research chemist with the Forensic Science Center, Ministry of the Interior, Russia. I am experienced in a wide range of examination techniques, but my particular specialty is the analysis and dating of ink on documents by Thin-Layer Chromatography and Gas Chromatography-Mass Spectrometry. I am the author of more than 20 peer-reviewed articles on ink analysis and dating, including chapters in three books and two encyclopedias. A true and correct copy of my curriculum vitae showing further details of my professional history and a list of my professional publications is attached hereto as Exhibit 1.

3.  Attached hereto as Exhibit 2 is a true and correct copy of a list of the cases in which I have testified for the last five years. One of the famous cases I was involved in was the multi-billion-dollar will contest of Chinachem magnate Teddy Wang, "In The Matter of Wang Teh Huei," in The High Court of the Hong Kong Special Administrative Region. Attached hereto as Exhibit 3 is a true and

EXHIBIT _____ 4

PAGE _____ 59



1  correct copy of excerpts of the Hong Kong Court's ruling assessing my work in that
2  case.

3       4.     I understand that the parties have stipulated to, and the Court has
4  tentatively approved, a special protocol for any destructive testing that might be
5  advisable. I have been informed of this protocol and, to the extent that destructive
6  testing is authorized in accordance with the protocol and appropriate in this case, will
7  follow it with regard to any destructive testing that might need to be done.

8       5.     To properly examine and test documents, as well as to ensure that
9  they are properly handled and preserved, I conduct my analysis and testing in my
10  laboratory in Lansing, Michigan. The laboratory contains specialized scientific
11  equipment that I use to conduct the examination and testing of documents. Some of
12  this equipment includes: a gas chromatograph equipped with a mass selective
13  detector (GC-MS), a kit for conducting thin-layer chromatographic (TLC) analysis of
14  ink, and necessary laboratory instruments and chemicals, such as organic solvents
15  used to extract ink from ink-on-paper samples taken from documents. I may perform
16  the chemical analysis of ink by GC-MS and TLC on one or more of the original
17  documents from Mr. Bryant. GC-MS and TLC are separation techniques ideally
18  suited to the characterization and dating of writing ink, printing ink, and other colored
19  materials on documents. Most important parts of the above scientific equipment are
20  not portable, meaning that it is practically impossible to transport this equipment to
21  California for me to perform the chemical analysis of the original documents from
22  Mr. Bryant there. As an option, I can conduct some preliminary analysis and testing
23  of Mr. Bryant's original documents in Mr. Cunningham's office in California,
24  including taking ink samples from the documents. I would then bring these ink
25  samples to my laboratory in Lansing, Michigan for their chemical analysis by GC-
26  MS and TLC.

27       6.     In the event that any destructive testing is authorized in
28  accordance with the protocol and is appropriate, the sampling procedure that I

-2-

IN CAMERA DECLARATION NO. 1

EXHIBIT **4**

PAGE **60**

1 conduct as an expert involves removing portions of the written lines from the entries
2 to be examined. This is accomplished with a hypodermic needle sized hole punch,
3 which removes hole punches about the size of a typewriter period (less than 1 mm in
4 diameter). Approximately 10 tiny plugs of ink-on-paper will be punched out from
5 each questioned entry on the document. The method of removing ink samples from
6 documents that I use has been accepted by courts in the United States for over 30
7 years. While tiny holes will be visible in the writing, the writing remains completely
8 legible. Therefore, as I perform such sampling, the documents will be nearly intact.
9 Each document will be photographed at varying high resolutions before and after any
10 samples of ink are removed. These images provide a permanent record of the
11 condition of the document before and after ink testing was conducted.

12        7.     As an expert in the field of forensic document examination, I
13 recognize the extreme importance of preserving the integrity of the evidence I am
14 sent for review and analysis. When materials arrive at my laboratory, they will
15 remain securely stored (when not being examined) while they are in my custody. The
16 laboratory facilities are locked and no one else has access to the materials that are
17 sent to me for examination and testing. My laboratory is located in my house at 2511
18 Lafayette Avenue, Lansing, Michigan 48906. I certainly understand the critical
19 nature of each of Mr. Bryant's original documents and will be fully accountable for
20 them while they are in my custody. The ink comparison and age determination
21 procedures I use will not affect the documents in any way so as to be prejudicial to
22 the owner of the documents' interest.

23        8.     With the exception of alterations resulting from any destructive
24 testing, which would be conducted in accordance with the protocol above, all the
25 Bryant documents that are provided for inspection, examination and testing shall be
26 returned by me in the same condition, sequence and order in which they were
27 received.

28

07209/2205386.1

-3-

IN CAMERA DECLARATION NO. 1

EXHIBIT_____ 4

PAGE_____ 61

1 | conduct as an expert involves removing portions of the written lines from the entries
2 | to be examined. This is accomplished with a hypodermic needle sized hole punch,
3 | which removes hole punches about the size of a typewriter period (less than 1 mm in
4 | diameter). Approximately 10 tiny plugs of ink-on-paper will be punched out from
5 | each questioned entry on the document. The method of removing ink samples from
6 | documents that I use has been accepted by courts in the United States for over 30
7 | years. While tiny holes will be visible in the writing, the writing remains completely
8 | legible. Therefore, as I perform such sampling, the documents will be nearly intact.
9 | Each document will be photographed at varying high resolutions before and after any
10 | samples of ink are removed. These images provide a permanent record of the
11 | condition of the document before and after ink testing was conducted.

12 |       7.    As an expert in the field of forensic document examination, I
13 | recognize the extreme importance of preserving the integrity of the evidence I am
14 | sent for review and analysis. When materials arrive at my laboratory, they will
15 | remain securely stored (when not being examined) while they are in my custody. The
16 | laboratory facilities are locked and no one else has access to the materials that are
17 | sent to me for examination and testing. My laboratory is located in my house at 2511
18 | Lafayette Avenue, Lansing, Michigan 48906. I certainly understand the critical
19 | nature of each of Mr. Bryant's original documents and will be fully accountable for
20 | them while they are in my custody. The ink comparison and age determination
21 | procedures I use will not affect the documents in any way so as to be prejudicial to
22 | the owner of the documents' interest.

23 |       8.    With the exception of alterations resulting from any destructive
24 | testing, which would be conducted in accordance with the protocol above, all the
25 | Bryant documents that are provided for inspection, examination and testing shall be
26 | returned by me in the same condition, sequence and order in which they were
27 | received.

28 |

07209/2205386.1

-3-

EXHIBIT _____ 4

PAGE _____ 61

1    I declare under penalty of perjury under the laws of the State of

2  California and the United States of America that the foregoing is true and correct.

3    Executed this 28th day of August, 2007, at Lansing, Michigan.

4

5

6

7    _____

     Valery N. Aginsky, Ph.D.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

07209/2205386.1

-4-

IN CAMERA DECLARATION NO. 1

EXHIBIT _____ 4

PAGE_____ 62

# Exhibit 1

EXHIBIT ____4____

PAGE ____63____

# VALERY N. AGINSKY, Ph.D.

## Curriculum Vitae

**Position:**   *Forensic Chemist / Document Dating Specialist*
Riley, Welch & Aginsky Forensic Document Examinations, Inc.
Lansing, Michigan

**Education:**   *Ph.D. Analytical Chemistry - 1980*
Military Academy of Chemical Defense (formerly known as the Chemical Faculty of the Institute of Mechanical Engineering prior to 1940), Moscow, USSR

*M.S. Analytical Chemistry - 1977*
Military Academy of Chemical Defense, Moscow, USSR

**Professional Experience:**   Riley, Welch & Associates Forensic Document Examinations, Inc.,
Lansing, Michigan
*Forensic Chemist* (1998 to April 2005)

Riley, Welch & Aginsky Forensic Document Examinations, Inc.,
Lansing, Michigan
*Forensic Chemist* (April 2005 to present)

Responsible for chemical analysis of ink on documents (ink comparison and dating). Uses ink dating methods developed as a result of many years of research of the methodology developed and published by Dr. Antonio Cantu. These methods measure certain parameters of ink that decrease as ink ages on paper. They analyze *ink volatile components* (their residues are always present in ink lines, no matter the ink age) and enable <u>*absolute*</u> ink age determination: one determines a time frame within which a questioned entry has been written, not relative to other known dated entries, as *relative* ink age determination technology requires.

Forensic Science Center of the Ministry of the Interior, Moscow, Russia
*Senior Research Chemist* (1980 to 2000)

Exhibit 1 Page 5

EXHIBIT 4

PAGE 04

Involved in methods development, technical assistance to investigative personnel, including training and presentations to legal proceedings and routine examination of evidence. Developed several techniques for examining questioned documents, drugs of abuse, explosives and gunshot residues.

About ten years of professional research and practical experience as a questioned document examiner: the dating of writing, stamp pad and printing inks, alteration of records, indented writings, erasures/eradications/obliterations, sequence of strokes, paper/ink/toners, computer printers and documents generated, counterfeit currency, currency exposed to an exploding dye-pack.

*Methods:* microscopy, microspectrophotometry, electrostatic imaging analysis, video enhancement techniques, infrared spectroscopy, ultraviolet/visual spectrophotometry, thin-layer chromatography, and gas chromatography-mass spectrometry.

**Honors/Awards:**   *Diploma and the First Prize for new techniques on Dating Inks*
Ministry of the Interior, 1993

*Award for excellence in service (Best Forensic Chemist)*
Ministry of the Interior, 1982

*Silver medal in chemistry at the 1976 All-Union Contest of Scientific Works,*
Ministry of Defense

*Co-Chair of the Questioned Documents Sections at the First International Forensic Science Symposium, Moscow, Russia, 1994, the 13th and 14th Meetings of the International Association of Forensic Sciences, Dusseldorf, Germany, 1993, and Tokyo, Japan, 1996.*

**Teaching**
**Experience:**   Conducted numerous training seminars for the personnel of forensic laboratories in Russia and the former Soviet Union in the framework of the Ministry of the Interior's training programs:

*Technical and Chemical Examination of Counterfeit Currency*

*Detecting and Dating Alterations Made to Documents*

*Ink/Paper Comparison by Thin-Layer Chromatography and Other Analytical Methods*

*Detection and Characterization of Explosive Residues*

Exhibit **1** Page **6**

EXHIBIT **4**

PAGE **65**

Served as visiting examiner to the Division of Identification and Forensic Science, Israel Police Headquarters, 1996 & 1997.

Conducted seminars on ink analysis and dating for the Division of Identification and Forensic Science, Israel Police Headquarters, Jerusalem, Israel, 1995; Ministry of Justice and Ministry of the Interior Combined Scientific Council for Forensic Science and Criminalistics, Moscow, Russia, 1997; the Forensic Sciences Division of the Canada Customs and Revenue Agency, Ottawa, Canada, 1998; Istanbul University, Institute of Forensic Sciences, Istanbul, Turkey 2000.

Conducted a seminar on Quantitative Thin-Layer Chromatography (Internal Standard Method) at the Russian-German Summer School on Thin-Layer Chromatography, Moscow, Russia, 1993.

**Court**
**Testimony:** Testified regarding ink analysis and ink and document dating in criminal and civil matters and in arbitrations.

**Professional**
**Affiliations:**     International Association for Identification,
Questioned Documents Section (1992 - present)

International Association of Forensic Sciences,
Questioned Documents Section (1993 - present)

Ministry of Justice and Ministry of the Interior Combined Scientific Council for Forensic Science and Criminalistics (Russia, 1995-1999)

Regional Representative for the Russian Charted Division of the International Association for Identification (1998 - 2000)

American Society for Testing & Materials (2003 - present)

Exhibit ⎿ Page �⊤

EXHIBIT ____ 4

PAGE ____ 66

## Professional Publications

### Books

1. Document Analysis / Analytical Methods. *Encyclopedia of Forensic Sciences*, J.A. Siegel (Ed.), Academic Press, Harcourt Publishers Ltd., 2000.

2. Writing Media and Documents. Chapter 19. *Handbook of Analytical Separations*. Vol. 2 – Forensic Science, M.J. Bogucz (Ed.), ELSEVIER, Amsterdam – New York – Oxford – Shannon – Singapore – Tokyo, 2000.

3. Writing Media and Documents. Chapter 28. *Handbook of Analytical Separations (2nd Edition)*. Vol. II – Forensic Science (publication pending).

4. An Application of Chromatographic Methods for Dating Questioned Documents. *Chromatography (Celebrating the 125th Birthday of the Inventor of Chromatography, Dr. Michael Tswett)*, O. Kaiser, R.E. Kaiser, H. Gunz, and W. Gunther (Eds.), InCOM, Duesseldorf, Germany, 1997.

5. A New Version of the Internal Standard Method in Quantitative Thin-Layer Chromatography. Chapter 4.6. *Handbook of Modern Thin-Layer Chromatography*, O.G. Larionov (Ed.), Russian Academy of Science, Chromatography Council, Moscow, Russia, 1994 (in Russian).

6. Aginsky, V.N. and Dildin, Yr. M., *Forensic Examination of Explosives*, VNII MVD SSSR, Moscow, USSR, 1982 (in Russian).

7. Aginsky, V.N., Safronenko, T.I., and Sorokina, G.I., *Forensic Examination of Questioned Documents*, VNII MVD SSSR, Moscow, USSR, 1987 (in Russian).

8. Aginsky, V.N., Safronenko, T.I., and Sorokina, G.I., *Detecting and Dating Alterations Made to Documents*, VNII MVD SSSR, Moscow, USSR, 1989 (in Russian).

9. Aginsky, V.N., Zibrov, G.S., and Sorokina, G.I., *Analysis of Drugs, Inks, Petroleum Products, and Explosives by Reversed Phase Thin-Layer Chromatography*, Forensic Science Center of the Russia's Ministry of the Interior, Moscow, 1993 (in Russian).

### Peer-Reviewed Articles and Presentations at Scientific Conferences

10. A New Application of Instrumental Planar Chromatography in Forensic Analysis, *Journal of Planar Chromatography*, Vol. 4, 1991, pp. 167-169.

11. Some New Ideas for Dating Ballpoint Inks – A Feasibility Study, *Journal of Forensic Sciences*, 1993, No. 5.

12. Comparative Examination of Inks by Using Instrumental Thin-Layer Chromatography and Microspectrophotometry, *Journal of Forensic Sciences*, Vol. 38, No. 5, Sept. 1993, pp. 1111-1130.

13. Forensic Examination of "Slightly Soluble" Inks Pigments Using Thin-Layer Chromatography, *Journal of Forensic Sciences*, Vol. 38, No. 5, Sept. 1993, pp. 1131-1133.

Exhibit **l** Page **8**

EXHIBIT _____ **4**

PAGE _____ **67**

14. Mechanism and Kinetics of the Aging of Some Ink Dyes. *Advances in Forensic Sciences*.
    Vol. 3 - Forensic Criminalistics, Proceedings of the 13th Meeting of the International
    Association of Forensic Sciences, Dusseldorf 1993, B. Jacob and W. Bonte, Eds., Verlag Dr.
    Koster, Berlin, 1995.

15. Discrimination between Naturally and Artificially Aged Ballpoint Inks, ibid.

16. Determination of the Age of Ballpoint Pen Ink by Gas and Densitometric Thin-Layer
    Chromatography, *J. Chromatography*, 1994, Vol. 678.

17. A New Version of the Internal Standard Method in Quantitative Thin-Layer Chromatography,
    *Journal of Planar Chromatography*, July/August 1994, Vol. 7, pp. 309-314.

18. A Microspectrophotometric Method for Dating Ballpoint Inks - A Feasibility Study, *Journal
    of Forensic Sciences*, Vol. 40, No. 3, May 1995, pp. 475-478.

19. Dating and Characterizing Writing, Stamp Pad and Jet Printer Inks by Gas
    Chromatography/Mass Spectrometry, *International J. Forensic Document Examiners*, 1996,
    No. 2, pp.103-115.

20. Accelerated Aging – Its Use in Methods for Dating Ink (Letter to the Editor), *International J.
    Forensic Document Examiners*, 1996, No. 3.

21. Ink Dating – The State of the Art in 1996, Proceedings of the 14th Meeting of the
    International Association of Forensic Sciences, Tokyo 1996, Shunderson Communications,
    1997, Vol. 4.

22. Current Methods for Dating Inks – Which is the Best? Presented at the 49th Annual Meeting
    of the American Academy of Forensic Sciences, New York, NY, 1997.

23. Dating Ink on Questioned Documents – The State of the Art in 1997, presented at the First
    European Meeting of Forensic Science, Lausanne, Switzerland, 1997.

24. Measuring Ink Extractability as a Function of Age – Why the Relative Aging Approach is
    Unreliable and why it is More Correct to Measure Ink Volatile Components than Dyes,
    *International J. Forensic Document Examiners*, 1998, No. 3.

25. Ink Dating – The State of the Art, presented at the 50th Annual Meeting of the American
    Academy of Forensic Sciences, San Francisco, CA, 1998.

26. Ink Dating – The State of the Art, presented at the First Regional Symposium on
    Criminalistics, April 20-22, 2000, Istanbul University, Institute of Forensic Sciences, Turkey.

27. Determining the Sequence of Non-Intersecting Media on Documents: Ballpoint Pen Ink and
    Laser Toner Entries, *Journal of the American Society of Questioned Document Examiners*,
    2002.

28. Current Methods for Dating Ink on Documents, presented at the 60th Annual Conference of
    the American Society of Questioned Document Examiners, San Diego, California, August
    14-19, 2002, and at the Midwestern Association of Forensic Scientists Fall 2002 Meeting,
    Milwaukee, Wisconsin, September 15-20, 2002.

29. Using TLC and GC-MS to Determine whether Inks Came from the Same Manufacturing

Batch, presented at the 63rd Annual Conference of the American Society of Questioned
Document Examiners, Montreal, Canada, August 11-16, 2005.

30. Using TLC and GC-MS to Determine whether Inks Came from the Same Manufacturing
Batch, *Journal of the American Society of Questioned Document Examiners*, Vol. 9, No. 1,
2006, pp. 19-27.

31. Current Methods for Dating Ink on Documents, presented at the 65th Annual Conference of
the American Society of Questioned Document Examiners, Boulder, Colorado, August 11-16,
2007.

## Other Professional Publications

32. Aginsky, V.N. and Sorokina, G.I., "Detecting Explosives in Post Explosion Debris Contaminated by
Petroleum Products", *Expertnaya Praktika [Expert Practice]*, Vol. 19, 1982, pp. 73-75 (in Russian).

33. Aginsky, V.N. and Sorokina, G.I., "Detection of Explosive Residues Intruded into Asphalt",
*Expertnaya Praktika [Expert Practice]*, Vol. 20, 1983, pp. 109, 110 (in Russian).

34. Aginsky, V.N. and Sorokina, G.I., *Detection and Quantitative Determination of Clonidine and Other
Psychotropic Drugs in Beverages*, VNII MVD SSSR, Moscow, USSR, 1990 (in Russian).

35. Aginsky, V.N., "A New Application of Instrumental Planar Chromatography in Forensic Analysis,"
presented at the 6th International Symposium on Instrumental Planar Chromatography, Interlaken,
Switzerland, April 23-26, 1991.

36. Aginsky, V.N., Sorokina, G.I., and Zibrov, G.S., "Detection, Identification and Comparative
Examination of Narcotics and Drugs of Abuse," Proceedings of the Forensic Science Symposium,
Linkoping, June 1992, Report 27, National Laboratory of Forensic Science, Linkoping, Sweden,
1993.

37. Aginsky, V.N., Savilov, A.P., and Sorokina, G.I., "Chromatographic Screening of Drugs of Abuse,"
Proceedings of the Forensic Science Symposium, Moscow, March 1994, Forensic Science Center of
the Ministry of the Interior, Moscow, Russia, 1994.

38. Aginsky, V.N., "Increasing the Reliability of the Identification of Separated Substances in
Densitometric Thin-Layer Chromatography", *Advances in Forensic Sciences*, Vol. 3 - Forensic
Criminalistics, Proceedings of the 13th Meeting of the International Association of Forensic Sciences,
Dusseldorf 1993, B. Jacob and W. Bonte, Eds., Verlag Dr. Koster, Berlin, 1995.

39. Aginsky, V.N., "A New Approach in Determining the Age of Inks Using Densitometric Thin-Layer
Chromatography," ibid.

40. Aginsky, V.N., "Instrumental Techniques for Comparing Similarly Colored Inks," ibid.

41. Aginsky, V.N., Lesnikov, V.A. and Sorokina, G.I., "Time of Shooting - Feasibility of Discriminating
"Fresh" and "Old" Organic Gunshot Residues," Proceedings of the 14th Meeting of the International
Association of Forensic Sciences, Tokyo 1996, Shunderson Communications, 1997, Vol. 4.

42. Aginsky, V.N., "Application of GC/MS in Some Areas of Forensic Analysis," presented at the
Hewlett-Packard Analytical Forum, Moscow, Russia, April 1998.

43. Aginsky, V.N., "Determining the Sequence of Non-Intersecting Media on Documents – Ballpoint pen
ink and laser toner entries," presented at the 49th Annual Conference of the American Society of
Questioned Document Examiners, Des Moines, Iowa, August 2001.

**Exhibit** <u>I</u> **Page** <u>10</u>

EXHIBIT _____ **4**

PAGE _____ **67**

# Exhibit 2

EXHIBIT ___ 4

PAGE ___ 70



**Valery N. Aginsky, Ph.D.**                                          - 1 -
**COURT CASES AND DEPOSITIONS**

| Date | Location | Type of Proceeding | Case |
|------|----------|--------------------|------|
| 10-22-01 through 10-31-01 | Hong Kong | Trial | Wang Din Shin  vs  Nina Kung alias Nina T.H. Wang<br>High Court,  Case No. HCAP8/1999 |
| 01-15-02 | Pennsylvania | Arbitration Hearing | Labor's Union International of North America  - vs - Prudencio Martinez, Jr. |
| 05-06-02 | Cayman Islands | Trial | CVC/Opportunity Equity Partners Limited  - vs - Luis Roberto Demarco Almeida<br>The Grand Court of the Cayman Islands<br>Case No. 389 of 1999 |
| 8-21-02 8-22-02 | Chicago, IL | Trial | MULTIUT CORPORATION  - vs -  DRAIMAN, et al<br>Circuit Court of Cook County, Illinois<br>Case No. 01 CH 9989 |
| 10-16-02 | Farmington Hills MI | Deposition | Robert J. Petz |
| 03-12-03 | Los Angeles, CA | Trial | Estate of Yvette Smith<br>Superior Court of the State of California<br>Case No. 069111 |
| 09-26-03 | Toronto, Canada | Arbitration Hearing | FCLG Enterprises, Ltd.  - vs - 668152 ONTARIO, Ltd., et al |
| 11-05-03 | Chicago, IL | Deposition | Rempala  - vs -  Ebner, et al<br>Circuit Court of Cook County, Illinois<br>Case No. 00 CH 01783 |
| 02-11-04 | Okemos, MI | Deposition | JJK Industries, L.P.  - vs -  KPlus, et al<br>District Court for the Southern District of Taxes, Houston,  Case No. H-02-2252 |
| 05-06-04 | East Lansing, MI | Deposition | Digital Control, Inc.  - vs -  Charles Machine Works,  Arbitration Hearing, Seattle, Washington |
| 01-26-05 12-05-05 | Okemos, MI<br>West Palm Beach, FL | Deposition<br>Hearing | Jupiter Medical Center  - vs -  Orlon Carr, III, MD<br>Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida, Case No. CL-00-9971-AD |
| 03-14-05 04-06-05 | Glendale, CA<br>Van Nuys, CA | Deposition<br>Trial | SP22, Inc. et al v. Yurdumyan, et al<br>Superior Court of the State of California<br>County of Los Angeles, Northwest District<br>Case No. LC067829 |

**Exhibit 2 Page 11**

EXHIBIT       4

PAGE _____ 71

**Valery N. Aginsky, Ph.D.**                                                                    **- 2 -**
**COURT CASES AND DEPOSITIONS**

| Date | Location | Type of Proceeding | Case |
|------|----------|--------------------|------|
| 10-27-05 | Washington, DC | Deposition | L.G. Phillips LCD Co., Ltd. v. Tatung Co. of America, Tatung Company, and Chunghwa Picture Tubes, Ltd.<br><br>District Court, Central District of California<br>Case No. CV-02-6775 CBM (JTLx) |
| 04-14-06<br><br>06-20-06<br>06-20-06 | Los Angeles, CA | Deposition<br><br>Court Hearing<br>Trial | 1124 Marilyn Drive Development LLC v. Shahram Elyaszadeh<br>Superior Court of California, County of Los Angeles,  Case No. SC 085 437 |
| 05-29-06 | Lansing, MI | Deposition | Van Cleave v. Newbrough, M.D., et al<br>Superior Court of California, County of Kern<br>Case No. S-1500-CV-255754-AEW |
| 09-07-06 | Wichita, KS | Deposition | Bolton v. Coombs, et al<br>District Court, Sedgwick County, Kansas<br>Case No. 05 CV 2332 |
| 02-06-06<br>03-09-07 | Laguna Hills, CA<br>Los Angeles, CA | Deposition<br>Arbitration Hearing | Angeline Hebert v. Bank of America, et al<br>Superior Court of California, County of Orange<br>Case No. 04CC10405 |
| 05-07-07 | Vancouver, Canada | Trial | Osooli-Talesh v. Emami<br>Supreme Court of British Columbia<br>Vancouver Registry No. S026800 |
| 07-07-06<br><br>06-29-07 | Lansing, MI<br><br>Clearwater, FL | Deposition<br><br>Trial | Estate of Paul R. Smith et al v. William P. Gregory, et al<br>Circuit Court of the 6th Judicial Circuit in and for Pinellas County, Florida, Probate Division<br>Case No. 02-4488-ES-003 |
| 04-26-07<br>07-18-07 | Okemos, MI<br>Troy, MI | Deposition<br>Trial | Quality Manufacturing, Inc. v. Brian D. Mann, et al<br>Genesee County Circuit Court<br>Case No. 04-79512-CZ |
| 08-03-07 | Lansing, MI | Deposition | Hypoxico v. Colorado Altitude Training, et al<br>District Court, Southern District of New York<br>Case No. 02 Civ 6191 (JGK) |

Exhibit _2_ Page _12_

EXHIBIT _4_

PAGE _72_

# Exhibit 3

EXHIBIT ____ 4

PAGE ____ 73

18.13    EJS submitted a Second Report ("EJS 2") dated 19 February 2001 and a further Third Report ("EJS 3") dated 3 August 2001. I shall consider them hereinbelow when the validity of EJS's method and results are considered.

18.14    EJS contended that his conclusion was drawn upon results he obtained from the Dye-ratio method, which he claimed to be a well-established method having been in use worldwide (including law enforcement agencies in the United States) for many years, and accepted universally by the scientific community at large and numerous courts at various levels in the United States and in other countries.[10] He said that the research has already been done to show the reliability of the relative ink-dating procedures using the Dye-ratio method of analysis,[11] and that the data collection in this case was performed on accepted standards in the field of forensic ink analysis and in a manner that has been tested and proven reliable on many occasions in the past.[12]

18.15    He claimed that there are many publications that show the method utilized by him in this case is valid, reproducible, and reliable.[13]

18.16    He contended that he has personal knowledge of at least two cases in which the United States Secret Service has performed testing in the same manner as he performed in this case and it has used this technique between 1995 and today.

18.17    In the end, EJS also contended that his testing is based upon sound objective scientific testing and his opinion is based upon sound scientific principles.

*THE DEFENCE*

18.18    The defence contended otherwise. They said that the contrary is true, EJS was cross-examined in depth and the defence called two experts, Dr Valery N. Aginsky ("VNA") and one Mr Peter Tytell ("PVT"). They did not perform any tests on the documents but they have put in reports in contradiction to EJS's reports with their critical analysis.

18.19    Before I consider the validity of the methods and findings of EJS and their scientific theory and validity, I would like to approach the problem from a layman's point of view first which I think ordinary people would understand. This is what the defence called "the true proficiency or blind test".

Footnote:

1 p.409, E4-E5
2 p.409, E4-E5 and T35:62:9
3 p.409, E4-E5
4 T35:54-55
5 p.923, E13
6 T35:58-61
7 T35:61:17-62:10
8 T35:62:18
9 p.413, EJS 1, E4-E5
10 para.5, p.909, EJS 3, E13
11 para.15, p.885, EJS 3, E13
12 para.42, p.897, EJS 3, E13
13 para.47, p.898, EJS 3, E13

Exhibit 3 Page 13

EXHIBIT 4

PAGE 74

36 Decision dated 2 January 2001, pp.967-977, F5 and Submissions at pp.1464-1491, F6
37 p.1483, F6
38 14 May, 1996, pp.340-343, G2
39 See Memorandum Opinion and Order 31 March 2000, pp.2085-2087, G8
40 p.1776, F7
41 pp.3154-3195, G11
42 p.3191, G11
43 T48:129:15-130:2

## Chapter 24 - Arbitrary Separation Of Fused/Overlapped Chromatographic Peaks

24.1        The chromatographic peaks shown on EJS's densitochromatograms were not smooth and bell-shaped but they were like a "range of mountains". EJS did not know why they were so overlapped.[1] Thus they required him to manipulate the integration marks between the poor separation of the dye components or chromatographic zones on the TLC plates he developed. VNA has the strongest objection in this kind of manipulation. He considered that in no circumstances should EJS have manipulated with the raw data provided by the video densitometer by arbitrarily separating almost completely fused/overlapped peaks on the densitochromatograms. As a consequence of him doing so, the data upon which he conducted statistical analysis are subjective, possibly pre-determined and therefore utterly unreliable.

24.2        VNA is an acknowledged world expert in chromatography. He explained that the prerequisite of obtaining reliable data/results was that the chromatographic peaks have to be properly resolved to the baseline, if the purpose of their analysis is to obtain *quantitative* data. The very basis of chromatographic technique is to separate one substance from another. The dye components on the TLC plates should be well separated and the peaks on the densitochromatograms should be resolved to the baseline. VNA said his contention is borne out by all the articles and textbooks on chromatography, some of which were exhibited.[2] The problem of analysing fused chromatographic peaks is summarised as follows[3] :

"The experimental errors in the determination of the area of fused non-Gaussian peaks are so large as to shed doubt on the usefulness of such methods for quantitative purposes."

24.3        Contrary to what EJS had argued, VNA said the same principles of evaluating the peaks would apply to both thin-layer and gas or liquid chromatography.[4] Since EJS's densitochromatograms have the poor quality of fused/overlapped peaks, he had to manipulate the integration marks to "help" the computer to separate the unseparated peaks. This manipulation is subjective and are prone to produce erroneous results. The most important ones are those from the densitochromatograms of Vial 2 at the 30 seconds time frame. These are the worst resolved chromatograms.[5] These are important chromatograms, because according to EJS, they gave a "significant statistical difference" upon which EJS relied heavily.

Exhibit 3 Page 14

EXHIBIT 4

PAGE 15

24.4      EJS's manipulation and subjective marking of the demarcation line would have the four following pitfalls. *First*, EJS claimed that the ink dye components separated on the TLC plate were *"... scanned using white light and the amount of absorption was measured using a computer driven video densitometer with automatic integration"*.[6] This was misleading and untrue. On the contrary, the integration marks were manipulated and arbitrarily placed by EJS. The data were used to calculate dye ratios and they were subjective, possibly pre-determined, and are therefore unreliable.

24.5      According to VNA, usually, the dye components applied closer to the sides of a TLC plate would travel somewhat further than the same dye components applied closer to the middle of the TLC plate. They would also have different shapes.[7] This is because the solvent, an eluent used to do chromatographic separation, evaporates faster from the side than the middle of the TLC plate.[8] When the chromatographic peaks are fused, it is impossible to know how each of them behaved within the area where they fused.[9]

24.6      EJS claimed that it does not matter where you put the vertical line as long as it is in the same on both the heated and unheated chromatograms,[10] however, VNA's measurements (combined in Slide 29) show that the integration marks placed by EJS were not in the same place in both densitochromatograms. Consequently, EJS had to admit that the integration marks could only be placed at *"... the same relative position with the peak"* but not at identical position.[11] He said he could only *"... chose where the peaks were separated as best [he] could tell."*[12]

24.7      *Secondly*, EJS claimed that he was comparing one peak to another. As considered hereinbefore, the area under each of the chromatographic peaks could not be ascertained. Any comparison of these peaks is, at best, guesswork. Thus it cannot be ascertained whether he was comparing one dye component to another dye component or a group of components to another dye components or a group of dye components to another group.

24.8      But more importantly, the concept of measuring a composition of dye components has never been published, or ever referred to or raised in any published paper. EJS himself was unable to refer to any support for his own method. The scientific basis of such a comparison is also unclear.

24.9      EJS further claimed that if Mr Brunelle were faced with the same problem of fused chromatographic peaks, he would also *"lump them together"*.[13] In fact, Mr Brunelle suggested the contrary. He considered that if the dye components were not separated adequately for accurate densitometer readings, the test should be repeated using another solvent.[14] This is in line with the suggestion of VNA.

24.10      *Thirdly*, EJS claimed that if the integration marks were moved as he did in this case, no significant change occurs in the data or the results.[15] This must be mathematically incorrect since he was comparing the values of each of the peaks by dividing them against each other. His manipulation would obviously affect the values of the area under the peaks, which were values used as numerators and denominators in his analysis.

24.11      *Fourthly*, EJS claimed that *"... you could move it [i.e. the integration mark] one click one way or the other and it is not going to affect the data or the results."*[16] This, too, is untrue.

24.12      VNA demonstrated with the aid of Slides 27 to 29, G8A, that one click would drastically change the results of the Dye-ratio method. He demonstrated further the sensitivity of the placing of integration marks at 30 seconds for dye 2/dye 3 of Vial 2. In such circumstances, the ratio

Exhibit 3 Page 15

EXHIBIT 4

PAGE 76

would overlap and therefore, show no statistically significant difference.[17] Thus, the slightest shift of the integration marks will give a completely opposite conclusion.

24.13    Further, EJS took no account of the small peaks in the chromatograms which contained dirt and impurities collected from the solvent front, for example, the peak for dye 1 in Vial 2.[18]

### HIGHER RESOLUTION SHOULD BE USED

24.14    In light of the poor quality of the chromatography, VNA considered that EJS should have, at least, scanned the TLC plates at the highest optical resolution possible. The difference of using high and low resolution can be found at p.3228, G11.[19] However, EJS inexplicably only used the standard resolution of his video densitometer even when scanning at a higher resolution was available. Consequently, the amount of pixels inside each chromatographic zone was too low for the video densitometer to give good images. Although this point was not specifically and satisfactorily put to EJS, yet again VNA's contention could be refuted in cross-examination of VNA upon EJS's instructions. Similar incidents occurred in a few points raised by counsel for the plaintiff. Whilst this court is not encouraging the other party for not putting certain points to a witness, yet the special circumstances of this long case when each party is trying to improve his case in this kind of complicated matter, the other party's failure of putting certain matters have been carefully assessed in the scale before accepting the other party's contention. (This same point would not be repeated in similar situations hereinbelow). In the end, it was demonstrated that EJS was actually unfamiliar even with his own video densitometer by his ignorance as to the meaning of "Max" and "Wide" which appeared on the monitor next to "Area".[20] He later admitted that he had no idea what their functions were or what they were used for.[21]

24.15    VNA suggested that EJS should re-do the chromatographic separation with another solvent and re-scan the TLC plates at high resolution until he obtained satisfactorily resolved chromatographic peaks by his video densitometer, subject to such video densitometer being properly calibrated. This view is actually shared by Mr Brunelle who developed the Dye-ratio method.[22]

### CONCLUSION

24.16    In the circumstances, the data obtained from the video densitometer after EJS's admitted manipulation were subjective and unreliable. Any conclusion drawn on the basis of the dye-ratios calculated using these unreliable data cannot be accepted.

Footnote:

1 T42:29:10-32:9; T42:46:7-12
2 pp.2209-2241, G8
3 Quantitative Analysis using Chromatographic Techniques, E. Katz (Ed.) John Wiley & Sons, New York, 1987 - Slide 19, G8A
4 T51:66:1-8
5 Slides 26-1 and 27-1, G8A
6 p.412, EJS 1
7 T51:40:3-5
8 T51:40:6-41:24, Plates V and VI
9 T51:70:16-22, Slide 18, G8A
10 T42:25:16-19
11 T42:89:22-23
12 T44:124:5-6; T44:147:19-24

Exhibit 3 Page 16

ᗩ𝚍𝚞𝚘𝚐𝚘𝚝𝚌𝚑𝚊𝚝𝚜ᗩᗢ

EXHIBIT    4
PAGE    77

13 T44:29:6-17
14 p.526, F2-3
15 p.896, EJS 3, para.41, as illustrated in VNA-12 on p.755, E7-E10
16 T42:16:13-14
17 Slide 51, G8A
18 VNA's Slide 22-1, G8A and his contention at T51:60:15-61:24
19 See also VNA's explanation at T55:92:21-94:11
20 T40:38:4-12
21 T42:14:11-21
22 p.526, F2-3

☐

☐

## Chapter 25 - Illogical Results Of Dye-ratio Method

☐

25.1        The validity of the Dye-ratio method depends, inter alia, on obtaining reliable raw data after each of the ink dye components separated on the TLC plates were evaluated using the video densitometer. According to EJS, he would be measuring the extractability or the decomposition of the dye components of the ink samples obtained from Documents A and C, or both. It is just remarkable that the dye components extracted in the weak solvent (*n*-butanol) exhibited illogical behaviour, which is inexplicable.

25.2 I        accept VNA's contention that half of the results EJS obtained from his examination conducted upon the heated and unheated samples of each of Documents A and C behaved illogically and unpredictably.[1] There are three major criticism listed hereinbelow.

*CRITICISM 1*

25.3        If the tests were performed correctly, logic dictates that the values of measurements would increase with time, as the concentration of the substance being extracted in the solvent increases with time. It is analogous to one putting a teabag in a glass of hot water. It is just common sense and logic that the longer the teabag was left in the hot water, the darker the water would become as more tea was zipped into the hot water. Visual examinations on the TLC plates, Plates V and VI, would show that the intensity of the dye components increased logically from 30 seconds, 90 seconds to 180 seconds. However, contrary to what is shown on the TLC plates, the data EJS obtained from the video densitometers were illogical.

25.4        The measurements of the following dyes at 90 seconds/ 180 seconds are lower than those at 30 seconds, bearing in mind that, for each ink sample (heated, unheated) being extracted, the aliquots were taken successively from the same vial :

| (a) | Vial 2 - unheated 1 | | |
|-----|---------------------|------------|------------|
|     | Dye                 | 90 Seconds | 30 Seconds |
|     | 2                   | 783        | 917        |
| (b) | Vial 2 - unheated   | | |

Exhibit 3 Page 17

EXHIBIT _____ 4

PAGE _____ 78

| | Dye | 90 Seconds | 30 Seconds |
|---|---|---|---|
| | 1 | 1156 | 1324 |
| | 2 | 757 | 1043 |
| | 3 | 452 | 569 |
| (c) | Vial 2 - heated 1 | | |
| | Dye | 90 Seconds | 30 Seconds |
| | 2 | 689 | 976 |
| | 3 | 345 | 375 |
| (d) | Vial 6 - heated 2 | | |
| | Dye | 90 Seconds | 30 Seconds |
| | 1 | 667 | 1324 |
| | 2 | 935 | 1158 |
| | 3 | 1430 | 1437 |
| (e) | Vial 6 - unheated 2 | | |
| | Dye | 90 Seconds | 30 Seconds |
| | 1 | 652 | 701 |

25.5    VNA explained such illogical behaviour of the dye components extracted in the weak solvent with the aid of two sketch drawings.[2] They borrowed from the example of fertilizer offered by EJS. VNA explained that it was only logical that the tree grows bigger after 90 days than 30 days. It would be illogical if, however, by using fertilizer, the tree shrunk from 30 days to 90 days, but after 180 days, it became taller than it was even after 30 days.

25.6    According to EJS's evidence, he did not know what to expect of his results :

| (a) | On one day, he said such illogical behaviour of his results was not what he would expect to typically see;[3] yet |
|---|---|
| (b) | on another, he said, "It is well recognised that from one sample to another, it can go down slightly".[4] |

25.7    The results of dye 1 in unheated 2, Vial 6 (Document C) were as follows :

| Dye | 30 Seconds | 90 Seconds | 30 Seconds |
|---|---|---|---|
| 1 | 701 (108%) | 590 (90%) | 652 (100%) |

In terms of percentages, we would have 108% at 30 seconds, 90% at 90 seconds and 100% at 180 seconds.[5] A graphical representation of such results can be found in Slide 12, Bundle G8A (the dotted red line). These results are clearly illogical. There should be most concentration at 180 seconds, followed by that at 90 seconds, and least at 30 seconds, and not vice versa and certainly not the most at 30 seconds, followed by 180 seconds and the least at 90 seconds. These results are inexplicable.

Exhibit **3** Page **18**

EXHIBIT ____ **4**

PAGE ____ **79**

### CRITICISM 2

25.8        EJS said the Dye-ratio method could be measuring the extractability, or decomposition of dyes, or both. He said he did not know what parameters the R-ratio method, the Percent Extraction method and the Dye-ratio method were measuring.[6] As considered hereinbefore, we can deduce from the experimental results published by Brunelle and Lee that the Dye-ratio method could only be measuring the decomposition of dye components, and not their respective extractability.

25.9        If the Dye-ratio method measures the extractability of the dye components, which was found otherwise hereinbefore, the rate of extraction is slower with old ink than with new ink. Then one would expect to see that the values of the measurements obtained from the heated sample (old) are less or lower than those from the unheated sample (new). Again, this is not what we see from EJS's data.

*Vial 6 - 180 Seconds*

| Dye | Heated | Unheated 1 | Heated 2 | Unheated 2 |
|-----|--------|-----------|----------|-----------|
| 1   | 878    | 624       | 941      | 652       |
| 2   | 1221   | 1170      | 1361     | 1070      |
| 3   | 1653   | 1627      | 1934     | 1474      |

In the 180 seconds extraction for Vial 6 (which produced two allegedly "positive" results), all the value of the measurements of dyes 1, 2 and 3 in the heated samples are higher than those in the unheated samples.

25.10        Further at the same time frame, one dye shows higher value for the heated samples than for the unheated ones, whilst another dye has a lower value for the heated samples than the unheated samples, as follows :

*Vial 2 - 180 Seconds*

| Dye | Heated 2 | Unheated 2 |
|-----|----------|-----------|
| 1   | 2014     | 1790      |
| 2   | 1319     | 1117      |
| 3   | 690      | 725       |

25.11        In this case dyes 1 and 2 of heated 2 have higher values than those with unheated 2, whereas dye 3 shows the opposite circumstance, that is, the value of dye 3 of heated 2 is lower than that of unheated 2.

25.12        Still further what we see in these two samples is not, however, what we can expect to see in the *other* two samples taken from the *same* Vial 2, i.e. heated/unheated 1. All values at the same time frame of heated 1 are lower than those of unheated 1, which appears to be logical :

*Vial 2 - 180 seconds*

| Dye | Heated 1 | Unheated 1 |
|-----|----------|-----------|
| 1   | 1722     | 2026      |
| 2   | 1005     | 1190      |
| 3   | 516      | 623       |

25.13        What also causes concern is the inconsistent behaviour of the dyes being extracted from the same sample, as well as the inconsistent behaviour of the dyes being extracted from the two samples

Exhibit **3** Page **19**

EXHIBIT ___ **4**

PAGE ___ **80**

of the same ink. As the examination was conducted in duplicates, in the absence of a scientifically sound explanation to these illogical data, there is no means of knowing which of these sets of data is correct, if at all. If one of them is wrong, then the Court would be left with a conclusion based on one sample only and of course, in that case, no statistical analysis could be conducted.

## CRITICISM 3

25.14        There is the additional situation that there is very large difference in measurements obtained between duplicates samples taken from the same handwritten entry on Documents A and C, as follows :

   (a) *Vial 2 - 90 seconds, dye 1*

The difference between heated 1 and heated 2 is 30%;[7] and,

   (b) *Vial 6 - 30 seconds, dye 2*

The difference between heated 1 and heated 2 is 31%.[8]

Sketches of graphical representations on such percentages can be found at pp.2270-1, and 2270-2, G8.

25.15        It is not clear from the evidence of EJS whether he claimed that such a large difference was acceptable or not.[9] He classified this huge difference as a "variation". Whilst VNA agreed that variation exists in any analytical procedure, he stressed that it should be within a few percent, say 1% to 3%, certainly not 20% or 30%.[10] Even in the case of *Calloway v. Richter*,[11] EJS gave evidence that there should be about 1% to 2% error between duplicated samples, not a difference of up to 31% as we have in this case. Indeed, EJS did not use the Dye-ratio method in that case.[12]

## EJS'S DEFENCES

25.16        When EJS was challenged with the above criticisms, he claimed that one cannot compare raw data against each other, as they are mass-dependant.[13] The ratio of these raw data should be calculated and could then be compared against each other, as the ratios are mass independant.[14] Further, he claimed that the behaviour of these ratios were predictable.

25.17 However, it is difficult to appreciate why the raw data could not be considered and compared, but only their ratios, given that the ratios were calculated from the raw data. EJS was unable to offer explanation to what appears to be an unreasonable and illogical claim.[15]

25.18        In any event, the *ratios* behaved unpredictably too and did not, therefore, assist EJS. VNA gave two examples on the unpredictably behaved ratios in VNA-5 and VNA-6[16] as follows :

   (a) *The ratios of dye 2/dye 3 in Vial 2 (VNA-5) :*

   *Vial 2 - Dye 2/Dye 3*

|          | 30 Seconds | 90 Seconds | 180 Seconds |
|----------|------------|------------|-------------|
| Heated 1 | 2.6        | 2.0        | 1.95        |
| Heated 2 | 2.55       | 1.69       | 1.91        |

Exhibit 3 Page 70

EXHIBIT 4

PAGE 81

It is apparent that the two heated samples behaved in the opposite manner to each other, contrary to
EJS's claim that the ratios are predictable. In heated 1, the ratios decreased with time whereas the ratio in
heated 2 decreased from 30 seconds to 90 seconds only but it increased again at 180 seconds.

*Vial 2 - Dye 2/Dye 3*

|            | 30 Seconds | 90 Seconds | 180 Seconds |
|------------|------------|------------|-------------|
| Unheated 1 | 1.83       | 1.49       | 1.91        |
| Unheated 2 | 1.83       | 1.67       | 1.54        |

In relation to the two unheated samples, they behaved just as unpredictable as the heated samples.

25.19     The ratios of dye 1 to dye 3 in Vial 6, as illustrated in VNA-6, behaved as unpredictably
as those of dye 2/dye 3 in Vial 2 (VNA-5) as pointed out hereinbefore.

25.20     Therefore, even if we were to restrict ourselves and consider only the *ratios* of the dyes
as EJS suggested, they are also illogical and unpredictable. Again, if there were errors in only one of the
two samples, in the absence of any scientifically sound explanation to these illogical data, there is no
means of knowing which of the two samples is correct, if at all. Again, no statistical analysis could be
conducted with one sample only.

25.21     When VNA was cross-examined,[17] various graphs[18] (presumably prepared by EJS)
using different scale in the x-axis and y-axis were shown to him, in an attempt to show that the ratios
given in EJS 2 behaved uniformly to each other or at least, not as drastically as they appear in VNA-5
and VNA-6.[19] The difference between these graphs and VNA's illustrations are no more than difference
in graphical presentations. However the graphs were misleading. As VNA explained,[20] the graphs were
plotted with one curve representing the average of the two ratios of the two sample runs. It is therefore
impossible to tell by these graphs how each of the samples behaved. The two readings may be miles
apart but because an average was taken, they would only be represented by one point on the graph.
Indeed, it was never suggested by EJS, nor in any publication, that the average of duplicate runs should
(or could) be considered.

25.22     The range of possible explanations offered by EJS were :

(a)  It was as a consequence of "some interaction once the dye is extracting with the solvent to reduce
the optical density of the dye".[21]

(b)  "It could have some leaching back into the paper, or something like that".[22]

(c)  "...depending on the size of the difference, could just be a variation in the measurements".[23]

(d)  This "variation" within samples had been "factored" into the calculations by applying 1 STD.[24]

25.23     In the end, none of the possible reasons offered by EJS were acceptable as pointed out
by VNA. EJS should have at least investigated into the reasons of his examinations which gave him the
illogical data or as VNA suggested, simply re-do the examination. As EJS did not conduct any scientific
research with the view to evaluating the capabilities and limitations of the Dye-ratio method, he was
therefore unable to offer any scientifically sound explanation as to why the method he used in this case
produced such illogical results. For example, if he suggested boldly that there could have been some
leaching back into the paper or something like that, there is no reason why, after the decease in the 90
seconds reading because the colour somehow leach back into the paper, the concentration increased
again after 180 seconds. Even if that is so, how can any measurement be accurate if there is such a
"leaching back" factor.

Exhibit 3 Page 21

EXHIBIT 4
PAGE 82

25.24       By reason of the aforesaid matters, I accept VNA's contention that the illogical data primarily attributed to EJS arbitrarily separating the badly resolved chromatographic peaks into dyes 1, 2 and 3. This is supported by the fact that before they were separated by thin-layer chromatography, the dyes behaved logically according to the visual examination of the TLC plates and the data obtained from the Percent Extraction and R-ratio methods.[25]

*CONCLUSION*

25.25       By reason of the aforesaid matters, the Court cannot and should not place any reliance whatsoever on the illogical and unreliable results obtained by EJS using the Dye-ratio method in this case. The conclusion drawn by him from these results cannot be accepted.

Footnote:

1 Slides 1 to 13, G8A, pp.2270-1 and 2270-2, G8, and in VNA-5 and VNA-6 of VNA 2
2 pp.2207-2208, G8
3 T40:88:17
4 T44:76:1-2
5 Slide 13, Bundle G8A
6 T38:20:24-22:1; T22:22-23:5
7 Slide 6, G8A
8 Slide 13, G8A
9 T44:77:2-11
10 T51:32:16-25
11 p.1073 (lines 4-8) and p.1089 (lines 3-14), F5
12 T44:57:1-12
13 T44:79:24-25
14 T44:77:8-19
15 T44:100:23-101:23
16 pp.699 and 701, E7-E10 (VNA 2) and T51:27:18-29:4
17 T56:12:10-18:5
18 pp.1929-1934, F7
19 pp.699 and 701, E7-E10 (VNA 2)
20 T56:17:9-17
21 T41:70:6-9; T48:71:21-23
22 T41:70:14-15
23 T41:70:15-17
24 T40:85:12-16
25 See illustrations at pp.2270-1 and 2, G8

◻

◻

## Chapter 26 - Mass Independence

◻

26.1       Both VNA and EJS agreed that to obtain Dye-ratios that would be independant of the amount of ink on the samples of microplugs taken from Documents A and C, (i.e. the mass of the ink) the data (optical signals) received by the video densitometer must be *directly proportional* to the

Exhibit 3 Page 29

EXHIBIT 4
PAGE 83