EXHIBIT 5



1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
      John B. Quinn (Bar No. 090378)
2     johnquinn@quinnemanuel.com
      Michael T. Zeller (Bar No. 196417)
3     (michaelzeller@quinnemanuel.com)
      Jon D. Corey (Bar No. 185066)
4     (joncorey@quinnemanuel.com)
      Timothy L. Alger (Bar No. 160303)
5     (timalger@quinnemanuel.com)
   865 South Figueroa Street, 10th Floor
6  Los Angeles, California 90017-2543
   Telephone: (213) 443-3000
7  Facsimile: (213) 443-3100

8  Attorneys for Mattel, Inc.

9              UNITED STATES DISTRICT COURT

10             CENTRAL DISTRICT OF CALIFORNIA

11                   EASTERN DIVISION

12  CARTER BRYANT, an individual,        Case No. CV 04-09049 SGL (RNBx)

13             Plaintiff,                Consolidated with
                                         Case No. CV 04-09059
14      vs.                              Case No. CV 05-02727

15  MATTEL, INC., a Delaware corporation, **DISCOVERY MATTER**

16             Defendant.                Hon. Edward A. Infante (Ret.)
17                                       Discovery Master

18  ─────────────────────────────       *IN CAMERA* DECLARATION #2 AS
    AND CONSOLIDATED CASES               TO EXPERT EXAMINATION AND
19                                       TESTING OF BRYANT'S ORIGINAL
                                         DOCUMENTS
20
                                         Date: August 23, 2007
21                                       Time: 9:00 a.m.
                                         Place: Telephonic
22
                                         Discovery Cut-Off: October 22, 2007
23                                       Pre-Trial Conference: January 14, 2008
                                         Trial Date: February 12, 2008
24

25      **SUBMITTED PER JUDGE INFANTE'S REQUEST ON AN**

26                    *IN CAMERA* **BASIS**

27      **~ Not For Dissemination To Defendants/Counterclaimants ~**

28

07209/2161753.1

                                         IN CAMERA DECLARATION NO. 2

EXHIBIT 5

PAGE 84

# DECLARATION OF WILLIAM J. FLYNN

I, William J. Flynn, declare as follows:

1.      I am an expert in the field of forensic document examination. I am submitting this declaration *in camera* in response to a request from the Discovery Master in connection with Mattel's Motion to Compel Bryant To Make Original Documents Available For Expert Examination and Testing. I am more than twenty-one (21) years of age; I make this declaration of personal, firsthand knowledge; and if called and sworn as a witness, I could and would testify competently thereto.

2.      Attached hereto as Exhibit 1 is a true and correct copy of my curriculum vitae. I have been a questioned document examiner for more than 39 years and have testified in hundreds of cases.

3.      I have been asked to examine and provide opinions as to the authenticity of documents in many high-profile cases. For example, I examined the memoranda that served as the bases for *60 Minutes'* widely-publicized 2004 story about George W. Bush supposedly evading his National Guard Service. Attached hereto as Exhibit 2 is a true and correct copy of two articles discussing my work on that case. I also was called upon to examine and render opinions on the authenticity and source of the ransom note that was found at the scene of JonBenet Ramsey's murder. Attached hereto as Exhibit 3 is a true and correct copy from MSNBC's website featuring some of the work I did in that case.

4.      To properly examine and test documents, as well as to ensure that they are properly handled and preserved, I conduct my analysis and testing in my laboratory in Phoenix, Arizona. The laboratory contains specialized equipment that I use to conduct the examination and testing of documents. Some of this equipment includes:

        a.      The VSC-4c – an instrument used to view documents in
                various frequencies ranging from ultra violet into the near

-1-

EXHIBIT     5

PAGE     85

infrared. The VSC-4c is used primarily to non-destructively differentiate inks.

b. An ESDA (Electrostatic Document Apparatus) which is used to detect and decipher faint indentations on paper.

c. A microscope with digital video capture. This allows digital photomicrographs to be taken so that observations can be permanently recorded and presented at trial if necessary.

d. A wide variety of specialized typographic measuring devices and grids that are used to detect typographically altered texts.

e. High quality digital scanners are also employed to produce full-color images of the documents that are examined and to record evidence that may become part of my testimony as an expert witness.

I also have a specialty in analyzing machine-created documents of all types, and may perform the following types of examination and testing on one or more of the original documents from Mr. Bryant:

a. The examinations which I anticipate are all non-destructive in nature and may include ink comparisons, detection of indented data, microscopic examinations, and typographic analyses.

5. The building that the laboratory facilities are in has a 24-hour guard and features a locked file room with several locked storage cabinets in it. This is where I keep any materials that are sent to me for examination and testing when they are not being examined or tested.

6. As a recognized expert in the field of forensic document examination, I recognize the extreme importance of preserving the integrity of the evidence I am sent for review and analysis. When materials arrive at my laboratory, I have procedures in place to log the evidence into our networked tracking system which "follows" the evidence from submission to return. The physical storage of the

EXHIBIT 5

PAGE 86

1 evidence is in a dedicated evidence file room that also contains locking file cabinets.
2 In addition, our laboratory is located in the Bank of America Building which is under
3 24 hour guard. I certainly understand the critical nature of each of Mr. Bryant's
4 original documents and will be fully accountable for them while they are in my
5 custody.

6        7. All the Bryant documents that are provided for inspection,
7 examination and testing shall be returned by me in the same condition, sequence and
8 order in which they were received.

9       I declare under penalty of perjury under the laws of the State of
10 California and the United States of America that the foregoing is true and correct.

11       Executed this 28th day of August, 2007, at ___2007____.

12

13 DATED: August 28, 2007

14

15                         _____
16                       William J. Flynn

17

18

19

20

21

22

23

24

25

26

27

28

07209/2161753.1

                                -3-

EXHIBIT 5

PAGE 87

# Exhibit 1

EXHIBIT    5

PAGE     88

# WILLIAM J. FLYNN, B.S., D-ABFDE
### Forensic Document Examiner
### Curriculum Vitae

## EXPERIENCE (CIVIL):

October 1983 - Present:

### PRESIDENT AND CEO - AFFILIATED FORENSIC LABORATORY, INC.

Founded and Incorporated Affiliated Forensic Laboratories in 1983 to provide the legal and business communities with professional forensic questioned document services.

January 1973 - September 1983:

Private civil practice in Questioned Document Examination - Phoenix, Arizona

## EXPERIENCE (CRIMINAL):

Jan 1973 - July 1991:

### QUESTIONED DOCUMENT SUPERVISOR - ARIZONA DEPARTMENT OF PUBLIC SAFETY.

Supervising Analyst, Arizona Department of Public Safety, Questioned Document Laboratory. Was responsible for determining authorship of questioned handwritings and handprintings; detecting alterations, additions, interlineations, chemical and mechanical erasures, evidence of tracings or other tampering with original documents. Used stereoscopic microscopes, test plates, infrared, ultraviolet and other spectral devices and video conversion equipment. Conducted counterfeit detection, ink and paper analyses. Have qualified and rendered expert testimony in Federal, State, and Municipal courts throughout the United States. Prepared court exhibits to illustrate my conclusions at these judicial proceedings. Lectured on related subjects for law enforcement and citizen groups.

Supervised and evaluated subordinate document examiners, as well as trained apprentice examiners. Conducted research in the field to further the science of questioned document examination.

1

rev. 2/06

Exhibit 1 Page 4

EXHIBIT 5

PAGE 89

February 1965 - December 1972:

## QUESTIONED DOCUMENT EXAMINER/SERGEANT - PHILADELPHIA POLICE DEPARTMENT CRIME LABORATORY

Initially hired as a Patrolman with the Philadelphia Police Department. After two
and one half years was promoted to Detective and subsequently assigned to the
Crime Laboratory as a Questioned Document Examiner trainee. Completed
apprenticeship in 1970 and was promoted to Detective Sergeant/Questioned
Document Examiner. Remained in that capacity until joining the Arizona State
Crime Laboratory in January of 1973.

## SPECIALIZED TRAINING COURSES IN QUESTIONED DOCUMENTS:

### SOUTHWESTERN ASSOCIATION OF FORENSIC DOCUMENT EXAMINERS / ASQDE / ABFDE

a.   Medical/Legal Symposium on the Forensic Examination of Medical
     Records and Testimony Related to Medical Malpractice Cases – Miami,
     FL, May 1997.

b.   Identification of typewriter fonts utilizing the Bouffard Electronic
     Database System - Dr. Bouffard 1994

c.   Forensic Paper Identification Symposium - Mead Paper Co. 1992

### FEDERAL BUREAU OF INVESTIGATION, TRAINING ACADEMY, QUANTICO, VIRGINIA:

a.   Typewriter Identification School - 1987.

b.   International Symposium on Questioned Documents - 1985.

c.   Legal Aspects of Questioned Document Examination - 1978.

d.   Questioned Document Laboratory Photography - 1975

e.   Survey of Questioned Document Examiners - 1974.

2

## INSTITUTE OF PAPER CHEMISTRY, APPLETON WISCONSIN:

a.    Forensic Identification of Paper - 1973.

## U.S. SECRET SERVICE, WASHINGTON, D.C.:

a.    Questioned Document School - 1970.

## PHILADELPHIA POLICE DEPARTMENT CRIME LABORATORY:

a.    Two year apprenticeship with the Chief Document Examiner for the Philadelphia Police Crime Laboratory - 1968 through 1970

## PENNSYLVANIA STATE POLICE DOCUMENT LABORATORY:

a.    Initial Questioned Document Training with the Chief Document Examiner for the Pennsylvania State Police Laboratories, 1968.

## CONTINUING TRAINING:

Over the past thirty four years, have attended, and/or conducted, more than ninety seminars, training workshops, scientific symposia, and professional meetings involving such organizations as: The American Academy of Forensic Sciences, American Society of Questioned Document Examiners, American Board of Forensic Document Examiners, Southwestern Association of Forensic Document Examiners, and the International Association for Identification.

Exhibit 1 Page 6

EXHIBIT    5

PAGE    91

## PROFESSIONAL AFFILIATIONS:

Member - American Academy of Forensic Sciences

Member – American Society of Questioned Document Examiner

Member – Southwestern Association of Forensic Document Examiners (President 1985-1987)

Librarian/Historian - Southwestern Association of Forensic Document Examiners. (1981 - Present)

President - American Board of Forensic Document Examiners (1989 - 1991)

## EDUCATION and CERTIFICATIONS:

B.S., University of Phoenix (Computer Information Systems)

Board Certified by the American Board of Forensic Document Examiners.

## COURT QUALIFICATIONS:

Qualified as a Questioned Document Examiner in Federal, State and Municipal Courts throughout the United States.  Have also testified as an expert in Europe and the Middle East.

## PAPERS PUBLISHED:

a.   "The Illusion of Traced Forgery on Zinc Oxide Photocopy Paper" - *Journal of Police Science and Administration* - Vol. 2:No.3 Dec. 1974.

b.   "Forgery by Phone" - ibid. Vol. 4:No.3 Sept. 1976.

c.   "PaperMate's New Erasable Ink Pen" - ibid. Vol. 7:No.3 Sept. 1979.

d.   "Instant Winner Lottery Tickets - Examination and Testing Procedures" Presented at the AAFS Meeting Feb. 1988.

e.   "Laser Printers - Nemesis of the '90's" Co-authored with Robert G. Lockard. Presented at the ASQDE Meeting Aug. 1990.

f.   "Typography for Document Examiners" - Presented at the Fall 1991 meeting of the Southwestern Association of Forensic Document Examiners.

g.   "Light, Color, and Filters" – biannual publication of the Southwestern Association of Forensic Document Examiners - 1992.

h.   "Utilizing Computer Generated Graphics as an Aid to Expert Testimony"    Presented at the Fall 1992 meeting of the Southwestern Association of Forensic Document Examiners.

rev. 2/06

Exhibit 1 Page 7

EXHIBIT _____ **5**

PAGE _____ **12**

i.    "Identification of Non-Impact Printing Devices" - Published as a series (1993-1994) in the *ABFDE NEWS* the quarterly publication of the American Board of Forensic Document Examiners.

j.    "Light, Color, and Filters Revisited" – biannual publication of the Southwestern Association of Forensic Document Examiners Vol. XII-#3, Fall 1993 co-authored with Gerald B. Richards, F.B.I. Laboratory, Wash. D.C.

k.    "Electronic Typography for Document Examiners (update)" - Presented at the 52nd annual meeting of the American Society of Forensic Document Examiners. August 1994

l.    "Production and Utilization of Computer Generated Court Exhibits for Document Examiners" Presented as a workshop at the Southwestern Association of Forensic Document Examiners meeting, Spring 1995

m.    "Widows and Orphans Provide Clues as to Facsimile Transmission Methodology" – *ABFDE NEWS* the quarterly publication of the American Board of Forensic Document Examiners (Spring 1995)

n.    "Measurement of Repeating Image Defects as a Method for the Identification of Hewlett Packard Laser Printers" – ibid. (Spring 1996)

o.    "Hewlett Packard's Printer Control Language - PCL" – ibid. (Summer 1996)

p.    "Using Digital Photography for Courtroom Presentations". Talk presented at the spring 1997 meeting of the Southwestern Association of Forensic Document Examiners.

## EXAMINATIONS:

During the past thirty four years I have either written or reviewed (as Senior Analyst) more than 19,500 Questioned Document laboratory reports including those for some of the following agencies:

### FEDERAL AGENCIES:

U.S. Treasury Dept., U.S. Secret Service, Federal Bureau of Investigation, U.S. Dept. of Immigration and Naturalization, United States Attorney's Offices, U.S. Postal Service, United States Internal Revenue Service, U.S. Bureau of Alcohol Tobacco and Firearms, U.S. Drug Enforcement Administration, U.S. Army C.I.D., U.S. Air Force O.S.I., U.S. Department of Agriculture, U.S. State Department, U.S. Department of Justice, U.S. Department of Defense.

rev. 2/06

Exhibit 1 Page 8

EXHIBIT 5

PAGE 93

*STATE AGENCIES:*

More than fifty (50) different State Agencies in Arizona, New Mexico, California,
Nevada, Colorado, Utah, Montana, North Dakota, Georgia, Pennsylvania, Alaska
and Guam.

*MUNICIPAL AGENCIES:*

More than sixty (60) different Municipal Law Enforcement Agencies in Arizona
as well as most of the Agencies in the five county area around Philadelphia,
Pennsylvania.

*PRIVATE PRACTICE:*

More than a thousand cases worked for attorneys in civil litigations, as clients of
Affiliated Forensic Laboratory's private practice.

## AWARDS:

More than 220 letters of commendation from the various U.S. Government
Agencies, State Agencies, County Government and Municipalities for whom
documents have been examined and/or testimony rendered.

## TEACHING ACTIVITIES:

1990 – Present:

Guest lecturer, National Association of Legal Investigators Seminar, "Blazing the
Investigative Trail," Scottsdale, AZ, 1/26/01

Guest lecturer, International Association of Internal Auditors Conference, Atlanta,
GA.

Guest lecturer, International Association of Internal Auditors Conference,
Phoenix, AZ.

Guest lecturer, American Medical Records Association, Casa Grande, AZ.

Guest speaker Medical Records Litigations (ATLA), Steamboat Springs, CO.

Conducted a series of seminars and workshops for forensic document examiners
concerning computer printing devices and electronic typography (1992-Present)

Guest Lecturer, International Association of Credit Card Investigators, Scottsdale,
AZ

Exhibit 1 Page 9



EXHIBIT          5

PAGE        44

**1975 - 1991:**

### INSTRUCTOR - CRIMINAL JUSTICE AGENCIES:

Advanced Investigator's training for all law enforcement agencies in Arizona at
the ALETA Academy.

Numerous classes and symposia for Maricopa County Bar Association, American
Trial Lawyers Association, DES, Phoenix Police Academy, Arizona Attorney
General's Office, U.S. Internal Revenue Service, etc.

**1973 - 1991:**

### INSTRUCTOR - PHOENIX COLLEGE, AND AMERICAN INSTITUTE OF BANKING:

Conducted a course of instruction at Phoenix College for fourteen years, dealing
with investigation of document crimes, forgery and counterfeiting matters through
the Administration of Justice Department. Conducted Forgery and Counterfeiting
seminars for the American Institute of Banking. Taught Computer Science
courses at Gateway Community College - Beginning and Advanced Operating
Systems, and various computer program applications.

rev. 2/06

**Exhibit 1 Page 10**

EXHIBIT       5

PAGE       95

# Exhibit 2

EXHIBIT **5**

PAGE **16**



the weekly
**Standard**

Is It a Hoax?
Experts weigh in on the 60 Minutes documents. Says one: "I'm a Kerry supporter myself, but . . . I'm 99% sure that these documents were not produced in the early 1970s."
by Stephen F. Hayes
09/09/2004 7:20:00 PM

DOCUMENTS CITED Wednesday by *60 Minutes* in a widely-publicized expose of George W. Bush's National Guard Service are very likely forgeries, according to several experts on document authenticity and typography. The documents--four memos from Killian to himself or his files written in 1972 and 1973--appear to indicate that Bush refused or ignored orders to have a physical exam required to continue flying. CBS News anchor Dan Rather reported the segment and sourced the documents this way: "*60 Minutes* has obtained a number of documents we are told were taken from Col. Killian's personal file," he said. The *60 Minutes* story served as the basis for follow-up news reports for dozens of news organizations across the country. The memos were almost immediately questioned in the blog world, with blog Power Line leading the charge.

And according to several forensic document experts contacted by THE WEEKLY STANDARD say the Killian memos appear to be forgeries. Although it is nearly impossible to establish with certainty the authenticity of documents without a careful examination of the originals, several irregularities in the Killian memos suggest that CBS may have been the victim of a hoax.

"These sure look like forgeries," says William Flynn, a forensic document expert widely considered the nation's top analyst of computer-generated documents. Flynn looked at copies of the documents posted on the CBS News website (here, here, here, and here). Flynn says, "I would say it looks very likely that these documents could not have existed" in the early 1970s, when they were allegedly written.

Several other experts agree. "They look mighty suspicious," says a veteran forensic document expert who asked not to be quoted by name. Richard Polt, a Xavier University philosophy professor who operates a website dedicated to typewriters, says that while he is not an expert on typesetting, the documents "look like typical word-processed documents."

There are several reasons these experts are skeptical of the authenticity of the Killian memos. First the typographic spacing is proportional, as is routine with professional typesetting and computer typography, not monospace, as was common in typewriters in the 1970s. (In proportional type, thin letters like "i" and "l" are spaced closer together than thick letters like "W" and "M". In monospace, all the letter widths are the same.)

Second, the font appears to be identical to the Times New Roman font that is the default typeface in Microsoft Word and other modern word processing programs. According to Flynn, the font is not listed in the Haas Atlas--the definitive encyclopedia of typewriter type fonts.

Exhibit **2** Page **11**

EXHIBIT       **5**

PAGE       **17**

Third, the apostrophes are curlicues of the sort produced by word processors on personal computers, not the straight vertical hashmarks typical of typewriters. Finally, in some references to Bush's unit--the 111[th]Fighter Interceptor Squadron--the "th" is a superscript in a smaller size than the other type. Again, this is typical (and often done automatically) in modern word processing programs. Although several experts allow that such a rendering might have been theoretically possible in the early 1970s, it would have been highly unlikely. Superscripts produced on typewriters--the numbers preceding footnotes in term papers, for example--were almost always in the same size as the regular type.

So can we say with absolute certainty that the documents were forged? Not yet. Xavier University's Polt, in an email, offers two possible scenarios. "Either these are later transcriptions of earlier documents (which may have been handwritten or typed on a typewriter), or they are crude and amazingly foolish forgeries. I'm a Kerry supporter myself, but I won't let that cloud my objective judgment: I'm 99% sure that these documents were not produced in the early 1970s."

Says Flynn: "This looks pretty much like a hoax at this point in time."

CBS, in a statement Thursday afternoon, said it stands by the story. The network claims that its own document expert concluded the memos were authentic. There are several things CBS could do to clear up any confusion:

(1) Provide the name of the expert who authenticated the documents for *Sixty Minutes*.

(2) Provide the original documents to outside experts--William Flynn, Gerald Reynolds, and Peter Tytell seem to be the consensus top three in the United States--for further analysis.

(3) Provide more information on the source of the documents.

(A spokeswoman for CBS, Kelly Edwards, said she was overwhelmed with phone calls and did not respond to specific requests for comment.)

*Stephen F. Hayes is a staff writer at The Weekly Standard.*

© Copyright 2007, News Corporation, Weekly Standard, All Rights Reserved.

Exhibit **2** Page **12**

EXHIBIT _____ **5**

PAGE _____ **18**

# washingtonpost.com    Sign In | Register Now

**The Washington Post**
Print Edition | Subscribe

| NEWS | POLITICS | OPINIONS | LOCAL | SPORTS | ARTS & LIVING | CITY GUIDE | | JOBS |

CLAS

SEARCH: [          ] go ⊛ washingtonpost.com  ⊛ Web Search by Google | Search Ar

Advertisement

🚙 Chevy. Do more. Use less.     Fuel Efficiency     E85 Ethanol

---

washingtonpost.com > Politics > Elections > 2004 Election

| | Advert |

Print This Article
E-Mail This Article

**MOST VIEWED ARTICLES**
Politics    On the Site

Updated 12:46 a.m. ET
- DNC May Deny Florida Slots at '08 Convention
- No Big Shifts Planned After Report on Iraq
- Warner Calls for Pullouts By Winter

**RSS NEWS FEEDS**
Top News
2004 Election
What is RSS? | All RSS Feeds

## Some Question Authenticity of Papers on Bush

*By Michael Dobbs and Mike Allen*
*Washington Post Staff Writers*
*Friday, September 10, 2004; Page A01*

Documents unearthed by CBS News that raise doubts about whether President Bush fulfilled his obligations to the Texas Air National Guard include several features suggesting that they were generated by a computer or word processor rather than a Vietnam War-era typewriter, experts said yesterday.

Experts consulted by a range of news organizations pointed out typographical and formatting questions about four documents as they considered the possibility that they were forged. The widow of the National Guard officer whose signature is on the bottom of the documents also disputed their authenticity.

The documents, which were shown Wednesday night on "60 Minutes II," bear dates from 1972 and 1973 and include an order for Bush to report for his annual physical exam and a discussion of how he could get out of "coming to drill."

The dispute over the documents' authenticity came as Democrats stepped up their criticism of Bush's service with the National Guard between 1968 and 1973. The Democratic National Committee sought to fuel the

————Documents in Dispute————
* **Analyzing the Documents:** Several characteristics shown in this letter call into question its authenticity.
* **Documents:** All of the Memos in Question (PDF)

————Military Service Records————
* **President Bush**
* **Sen. John F. Kerry**

————Message Boards————
* **Post Your Comments**

Free E-mail Newsletters

• **Daily Politics News & Analysis**

CU
TH

Exhibit *2* Page *13*

EXHIBIT ____ **5**

PAGE ____ **99**

controversy yesterday by
holding a news conference at
which Sen. Tom Harkin (Iowa)
pointed to the documents as a
fresh indictment of Bush's credibility.

See a Sample | Sign Up Now
● Federal Insider
See a Sample | Sign Up Now
● Breaking News Alerts
See a Sample | Sign Up Now

FEAT
Refin
$300,
Inves
Be Pi
$400,
Asbe
T-Shi
Cool
T-Mo

CBS News released a statement yesterday standing by its reporting,
saying that each of the documents "was thoroughly vetted by
independent experts and we are convinced of their authenticity." The
statement added that CBS reporters had verified the documents by
talking to unidentified people who saw them "at the time they were
written."

CBS spokeswoman Kelli Edwards declined to respond to questions
raised by experts who examined copies of the papers at the request of
The Washington Post, or to provide the names of the experts CBS
consulted. Experts interviewed by The Post pointed to a series of
telltale signs suggesting that the documents were generated by a
computer or word processor rather than the typewriters in
widespread use by Bush's National Guard unit.

A senior CBS official, who asked not to be named because CBS
managers did not want to go beyond their official statement, named
one of the network's sources as retired Maj. Gen. Bobby W. Hodges,
the immediate superior of the documents' alleged author, Lt. Col.
Jerry B. Killian. He said a CBS reporter read the documents to
Hodges over the phone and Hodges replied that "these are the things
that Killian had expressed to me at the time."

"These documents represent what Killian not only was putting in
memoranda, but was telling other people," the CBS News official
said. "Journalistically, we've gone several extra miles."

The official said the network regarded Hodges's comments as "the
trump card" on the question of authenticity, as he is a Republican
who acknowledged that he did not want to hurt Bush. Hodges, who
declined to grant an on-camera interview to CBS, did not respond to
messages left on his home answering machine in Texas.

In a telephone interview from her Texas home, Killian's widow,
Marjorie Connell, described the records as "a farce," saying she was
with her husband until the day he died in 1984 and he did not "keep
files." She said her husband considered Bush "an excellent pilot."

"I don't think there were any documents. He was not a paper person,"
she said, adding that she was "livid" at CBS. A CBS reporter
contacted her briefly before Wednesday night's broadcasts, she said,
but did not ask her to authenticate the records.

Exhibit 2 Page 14

EXHIBIT ____5____

PAGE ___100___

If demonstrated to be authentic, the documents would contradict several long-standing claims by the White House about an episode in Bush's National Guard service in 1972, when he abruptly gave up flying and moved from Texas to Alabama to take part in a political campaign. The CBS documents purport to show that Killian, who was Bush's squadron commander, was unhappy with Bush for his performance toward meeting his National Guard commitments and resisted pressure from his superiors to "sugarcoat" the record.

After their initial airing on the "CBS Evening News" and "60 Minutes II" programs Wednesday night, the documents were picked up by other news organizations, including The Post. A front-page story in The Post yesterday noted that CBS declined to provide details about the source of the documents, the authenticity of which could not be independently confirmed.

On Wednesday evening, the White House e-mailed reporters copies of the documents, as supplied by CBS, as well as the transcript of a CBS interview with White House communications director Dan Bartlett rebutting allegations that Bush had shirked his military duties. While Bartlett described the emergence of the documents as "dirty politics," he did not dispute their authenticity.

After doubts about the documents began circulating on the Internet yesterday morning, The Post contacted several independent experts who said they appeared to have been generated by a word processor. An examination of the documents by The Post shows that they are formatted differently from other Texas Air National Guard documents whose authenticity is not questioned.

William Flynn, a forensic document specialist with 35 years of experience in police crime labs and private practice, said the CBS documents raise suspicions because of their use of proportional spacing techniques. Documents generated by the kind of typewriters that were widely used in 1972 space letters evenly across the page, so that an "i" uses as much space as an "m." In the CBS documents, by contrast, each letter uses a different amount of space.

While IBM had introduced an electric typewriter that used proportional spacing by the early 1970s, it was not widely used in government. In addition, Flynn said, the CBS documents appear to use proportional spacing both across and down the page, a relatively recent innovation. Other anomalies in the documents include the use of the superscripted letters "th" in phrases such as 111th Fighter Interceptor Squadron, Bush's unit.

"It would be nearly impossible for all this technology to have existed at that time," said Flynn, who runs a document-authentication company in Phoenix.

Exhibit **2** Page **15**



Other experts largely concurred. Phil Bouffard, a forensic document examiner from Cleveland, said the font used in the CBS documents appeared to be Times Roman, which is widely used by word-processing programs but was not common on typewriters.

CBS officials insisted that the network had done due diligence in checking out the authenticity of the documents with independent experts over six weeks. The senior CBS official said the network had talked to four typewriting and handwriting experts "who put our concerns to rest" and confirmed the authenticity of Killian's signature.

The doubts about the documents left the White House and the Bush campaign in a state of suspended animation, with Bush aides encouraging doubts about the documents but conceding that the possibility that they were forged seemed too good to be true. White House spokeswoman Claire Buchan said that officials there had not attempted to authenticate the documents but simply released copies "provided to us by CBS in the interests of openness."

The Bush administration's strategy yesterday was to let news organizations raise doubts and conduct forensic examinations, without taking an official position on whether the documents were genuine.

"It's clear in reviewing the documents that they do nothing to change the fact that the president served honorably, and was proud of his service in the Air National Guard," Bush campaign spokesman Steve Schmidt said.

*Staff writer Howard Kurtz and researcher Lucy Shackelford contributed to this report.*

| Print This Article | E-Mail This Article | Permission to Republish |
|---|---|---|

© 2004 The Washington Post Company

SEARCH:                    go ⊙ washingtonpost.com ○ Web  Google

NEWS | POLITICS | OPINIONS | LOCAL | SPORTS | ARTS & LIVING | CITY GUIDE                    JOBS

washingtonpost.com: Help | Contact Us | About Us | Advertisers | Site Index | Site Map | Make Us Your Home Page | mywasl
The Washington Post: Subscribe | Subscriber Services | Advertisers | Electronic Edition | Online Photo Store | The Washington
The Washington Post Company: Information and Other Post Co. Websites

© Copyright 1996- 2007 The Washington Post Company | User Agreement and Privacy Policy | Rights and Permissions

Exhibit 2 Page 16



# Exhibit 3

EXHIBIT 5

PAGE 103



Web ● MSNBC [                    ]                    Make MSNBC Your Homepage | MSN Home | Hotmail | Sign In

  Home » MSNBC TV » Morning Joe

## MORNING JOE
JOE.MSNBC.COM
EMAIL THE SHOW | TRANSCRIPTS | ABOU

**MSNBC TV**
Experts
Morning Joe
Tucker
Hardball
Countdown
Abrams
Documentaries
Your Business
**Video**
**U.S. News**
**Politics**
**World News**
**Business**
**Sports**
**Entertainment**
**Health**
**Tech / Science**
**Travel**
**Weather**
**Blogs Etc.**
**Local News**
**Newsweek**
**Multimedia**
**Most Popular**
**NBC NEWS**
**Today Show**
**Nightly News**
**Dateline NBC**
**Meet the Press**
**MSNBC TV**

# 'Scarborough Country' for August 16
## Read the transcript to the Wednesday show

Updated: 8:26 a.m. PT Aug 17, 2006

Guests: Pam Paugh, Lisa Bloom, Bill Flynn, Marc Klaas, Jeralyn Merritt, Bill Fallon, Pam Bondi, Courtney Hazlett, Dina Sansing

JOE SCARBOROUGH, HOST: Right now in SCARBOROUGH COUNTRY, breaking news. A young beauty queen, a brutal murder and a lurid murder mystery now a decade old. But tonight, a break in the beauty queen's murder mystery. We've got the up-to-the-minute details tonight. Justice delayed but not denied as police made the arrest half a world away. How did they track down the American suspect living in Thailand? We've got the inside story.

Plus: All fingers pointed to the parents. Are their names finally cleared? Some say no, and we'll tell you why.

Story continues below ↓
_____
advertisement

**Most Popular**
Most Viewed  ·  Top Rated  ·

Utah town rallies around lost mir
More U.S. women dying in childb
No big shifts planned after repor
Rumors that Castro has died exc
Rising floodwaters threaten Chic
Most viewed on MSNBC.com

Exhibit 3 Page 17

EXHIBIT 5

PAGE 104



MSNBC Classifieds
**Shopping**

• Disable Fly-out

Advertisement
**MSN SHOPPING**



**Summer décor**
• Bedroom
• Living room
• Dining room
• Bathroom

Search

**RESOURCE GUIDE**

Dating - Get two
months free!
Find your dream
home today!
Find a business
to start
Fast $7 trades,
no limit
Home Equity
Wells Fargo
Online Degrees
under 2 yr
Shopping

**Sponsors:**

Welcome to SCARBOROUGH COUNTRY. No passport required, only common sense allowed.

After a decade of false leads and dead ends, an arrest and possible break in the murder mystery of JonBenet Ramsey, the story first broken right here on MSNBC. Authorities in Thailand arrested 42-year-old John Mark Karr, a American school teacher from Georgia who is being held in Bangkok on unrelated sex charges. For families and friends of JonBenet Ramsey, who would be starting her junior year in high school, were she still alive, the news had to be bittersweet. While celebrating a break in the case, many are sad because Patsy Ramsey, the woman most of the world suspected of murdering her own little girl, died of ovarian cancer before the arrest could be made. Today, a family friend visited the grave sites of the mother and daughter and left a note on that headstone that said, "Dearest Patsy, justice has finally come for you and John. Rest in peace."

But there will be no resting for the authorities as they continue to nail down the case. For the very latest on this unfolding story, here's NBC News chief legal correspondent Dan Abrams. Dan, tell us how the day unfolded.

DAN ABRAMS, NBC CHIEF LEGAL CORRESPONDENT: Well, Joe, at a little after 3:00 o'clock, we got a tip that there had been an arrest made in connection with the JonBenet Ramsey case. And you can imagine, after having covered this case for nearly 10 years now, we were pretty stunned when someone says an arrest in the JonBenet Ramsey case. We're thinking, Oh, some peripheral player. Maybe it's someone who's lied to the authorities or something. And no, then we hear this is real. This is in regard to the murder of JonBenet Ramsey. We were able to confirm it about 25 minutes later, at least, that John Ramsey, the father of JonBenet, had been told an arrest had been

Exhibit 3 Page 18

8/24/2007



EXHIBIT          5

PAGE       105



made, and he was expecting that the DA was going to make an announcement today.

As the day continued, we were able to further confirm the details, many of which you've reported, about who was arrested, where he was arrested, et cetera. But I'll tell you, Joe, this is what the Ramseys have been saying for years. They've been saying for years, it's a convicted sex offender. We believe that people have not investigated enough convicted sex offenders. And now we're told that, according to the authorities, he is a convicted sex offender.

SCARBOROUGH: Well, Dan, let's take a listen to what the father had to say earlier today.

(BEGIN VIDEO CLIP)

JOHN RAMSEY, FATHER: Based on what happened to us, I don't think it's proper that we speculate or discuss the case. I think it's important that justice be allowed to run its course and do its job. And so I really won't speculate or discuss what I know or don't know. I think that's an important lesson we can learn from this whole episode, that we shouldn't—we shouldn't subvert a very good justice system.

UNIDENTIFIED FEMALE: What was the hardest part for you and your wife during this ordeal since your daughter was murdered?

JOHN RAMSEY: Well, the hardest part was losing your child and—by far.

(END VIDEO CLIP)

SCARBOROUGH: Dan, you've covered this case as long as anybody. Tell me why these parents were suspects from the very beginning and why Patsy Ramsey died a woman who really was a suspect in the minds of most Americans and most everybody that followed this case?

ABRAMS: I think the authorities from early on became convinced that someone inside the house had committed the crime. There was a ransom note that had been left, and people always said, Well, why would an intruder have left a long, somewhat rambling and also false ransom note? Because JonBenet, of course, was already dead. There was a practice note that appeared to have been written in the house. Again, people said, Why would an intruder have spent so much time writing a practice note? Those were the sorts of questions that were asked. And I think that very early on, the Ramseys became very distrustful of the police, and that made the police even more distrustful of the Ramseys.

Exhibit **3** Page **19**            8/24/2007





PAGE _____ **106**

And from there, things appeared to have snowballed. Now, keep in mind, you know, you have former detectives on this case who have written books, you know, well after the fact, still saying that they believe that the Ramseys committed this crime.

But as time has passed, as a new DA has taken over, many of the old folks in the police department now gone, a new lawyer for the Ramseys, who have gone after the authorities and the DA like no one else had, I think you've seen a shift here, where starting in 2001, 2002, you saw the authorities looking beyond John and Patsy Ramsey. And that has now concluded with the arrest of a 41-year-old school teacher.

SCARBOROUGH: And that's why they finally broke the case. Hey, Dan, congratulations on breaking this story earlier today. You're way in front of everybody else, and we appreciate you being with us tonight.

ABRAMS: Thanks, Joe.

SCARBOROUGH: And of course, it does have to be a great day for the Ramsey family. For so long, all fingers pointed especially towards Patsy Ramsey. With us now on the phone is Patsy Ramsey's sister, Pam Paugh. Pam, this has to be a great day for your family. Talk about how you're feeling tonight.

PAM PAUGH, PATSY RAMSEY'S SISTER: Well, Joe, I can't describe it.

It's a long time in coming. Nine-and-a-half years is a long time to wait. But we stood on truth and the fact that Patsy and John absolutely would not be anything but relentless in seeking out JonBenet's killer. We've done that. Mary Keenan (ph) has led a brilliant team of detectives, and now look what we have today, the wonderful news that this criminal is off the streets, never to hurt another child again. And we could not be more happy.

SCARBOROUGH: Pam, I remember, I think it was around '97, '98, I was in Washington, eating in a restaurant called Capitol Grille (ph), and I saw your sister and brother-in-law come in. And all eyes immediately went to them in the front of the restaurant, and everybody started whispering. And I just thought, what a living hell your sister had to be going through, first losing her beautiful daughter and then knowing that everybody that—whether she walked into a restaurant or a church or into a Wal-Mart, whenever she went, everybody thought she killed her daughter.

How did she endure all those years? And did she know before she died

Exhibit 3 Page 20

8/24/2007

EXHIBIT 5

PAGE 107

that, in fact, there was a suspect, that this case was going to be broken and that her name would be cleared?

PAUGH: Well, let me see if I can answer both of those questions. The first one, how did she live with all that scrutiny? You know, Joe, when you live your life cleanly and you live on faith and obedience to your religion, then you know that truth is in your heart. And she knew wherever she went that she could do so with her head held high. She absolutely never hurt her child, nor did John, Burke (ph), or anyone in the family.

The second part of the question, did she know before she went on to be with her Creator? I know for a fact that John and Patsy were given specific information with regards to what was going on with the investigation, and they did have some kind of level of comfort that an arrest was imminent and that it was to be soon. Not soon enough to be before Patsy leaving this earth as we know it, but let me just say this, that in her final days, she had such a peace about her. I think she knew where she was going. I know when she got there, she saw her two daughters and her mother and she knew wholeheartedly that the four of them together could help this truth come out a little sooner, and I think that's what we're seeing here today.

SCARBOROUGH: Did she die bitter at all for the accusations? Is her husband bitter today?

PAUGH: No, I don't believe so. They're not bitter people. Were they persecuted unmercifully by some? Yes. But I think also, what the public doesn't realize, Joe, is that there were thousands and thousands of the silent few out there who would send cards and write and call and pray and who have stood with us, with our entire family, for all these nine-and-a-half years. It wasn't like we were out there swimming alone. It's just that their accolades never made it to the media.

SCARBOROUGH: Never made it to the news media, and unfortunately, it always seems to go that way. Pam, did Patsy know this murder suspect?

PAUGH: You know, I do not know the name. John does not know the name. And nor does anyone in my family or our immediate friends know this name. So I would have to say that she does not—or did not know this name.

SCARBOROUGH: All right. Hey, Pam, congratulations. I know that this is a night that has to be very special for you. We appreciate you being with us tonight and sharing the good news with us.

Exhibit 3 Page 21

8/24/2007

EXHIBIT 5

PAGE 108

Now let's go live to Denver and talk to NBC's Leanne Gregg. Leanne, what's the latest from there?

LEANNE GREGG, NBC CORRESPONDENT: Well, Joe, the Boulder district attorney is apparently going to bring the suspect back to the United States perhaps some time this weekend. Of course, he was picked up on unrelated sex charges. And investigators told KUSA— their sources told KUSA, the local Denver affiliate, that he admitted to at least some facts of the crime that no one else could know except the killer himself.

Of course, JonBenet's family, you just heard, feels very vindicated, perhaps, by this arrest. And the case may have taken a new twist when the new district attorney was appointed, Mary Keenan, a couple of years ago. Several reasons why investigators and prosecutors thought the Ramseys were innocent—first of all, there were signs an intruder entered the basement. They found DNA they believe was left by the intruder. And there was no motive for the family to kill their daughter.

People here are in shock. People are stunned. There were a lot of folk who never thought there would be resolution to this case, 10 years in the making. There's a lot of surprise in the Denver community.

SCARBOROUGH: No doubt about it. Thank you so much, Leanne. Greatly appreciate that report from Denver.

And coming up next in SCARBOROUGH COUNTRY, our all-star panel joins us, as investigators crack the JonBenet cold case after almost 10 years. But how did they break it? And is this really the guy that did it? We're going to break down exactly how they managed to put the pieces together that led them to Thailand. Plus: JonBenet's parents have long been suspected of being involved in their daughter's own murder. Does today's arrest clear their name forever, or does doubt still linger?

(BEGIN VIDEO CLIP)

PATSY RAMSEY, MOTHER: Let me assure you that I did not kill JonBenet. I did not have anything to do with it. I loved that child with my whole of my heart and soul.

(END VIDEO CLIP)

(COMMERCIAL BREAK)

SCARBOROUGH: Welcome back to our breaking news coverage of the

Exhibit 3 Page 29                8/24/2007

EXHIBIT _____ 5

PAGE _____ 109

arrest in the JonBenet Ramsey murder case. Now we're talking about
how they tracked the suspect down with Lisa Bloom from Court TV.
We also have Jeralyn Merritt (ph), criminal defense attorney, Pam
Bondi (ph), who's a Florida prosecutor, and Clint Van Zandt, a former
FBI profiler and MSNBC analyst.

Clint, let me start with you. Of course, many in the family very
pleased tonight at this arrest.

CLINT VAN ZANDT, FORMER FBI PROFILER, MSNBC ANALYST:  Yes.

Absolutely.

SCARBOROUGH:  But several still looking at this evidence say it just
looks like an inside job. Can you explain how investigators from the
very beginning looked at the parents or somebody inside the family?

VAN ZANDT:  Well, Joe, to start out with, whether your name is John
Ramsey or John Walsh, as we know, law enforcement always has to
look at the family to begin with, unless there is, you know, irrefutable
evidence otherwise. I read one article on this case that suggested a
statistic—I don't know where they came up with it, but it said 14 to 1
that the killer of a child comes from a common household. Well, law
enforcement has to get by the prejudices that you and I have, as
parents, that say, Hey, I would never hurt my child. Don't look at me.
Law enforcement has to start at ground zero, which is the parents, and
then move on from there.

But in this particular case, they start at ground zero with the parents.
They look at this demand note, Joe, the longest demand note I think
the FBI has ever seen, that has—the ransom demand is almost to the
dollar of what John Ramsey's bonus was that year. Who would know
that?  Then how did an unknown offender get in the house, find
JonBenet's bedroom, be able to commit this horrific crime, carry her
body down to the basement, what they're now calling the wine cellar,
write this demand note after two or three attempts at doing it, use
implements in the house to commit the crime and then stealthily get
away without any evidence whatsoever?

Well, you know, I think law enforcement was totally justified in looking
at the Ramseys, just like they'd have to look at me or you or anybody
else if something terrible happened to our child.

But Joe, you made the point, and it's so valid right now, that the only
thing worse than losing a child is being accused of having anything to
do with the death of your child. And here we are for almost a decade
that the Ramseys had to live with this—this cloud of suspicion that has

Exhibit __3__ Page __23__         8/24/2007

EXHIBIT _____ __5__

PAGE _____ **110**



hung over them...

(CROSSTALK)

SCARBOROUGH: If you were the investigator on this case right now,
though, would you lift that cloud of suspicion from the Ramseys?
Because even tonight, 10 years later, hearing you talk about it, sounds
like there's some—some facts that still don't add up in your mind.

VAN ZANDT: Well, I've got to make sure who this guy is, Joe, and that
this is not someone who's looking for 15 minutes of fame. We've had a
lot of people over the years confess to crimes, and they've had nothing
to do with it whatsoever. So just as I think we were wrong—the public,
the media, otherwise—to be quick to indict the Ramseys in the court of
public opinion, I think we have to afford this person the same level of
scrutiny to make sure we've got our right guy.

SCARBOROUGH: Lisa Bloom, talk about what role the Internet and
DNA evidence played in this case.

LISA BLOOM, COURT TV: Well, we don't know all the facts yet, but my
suspicion are those are probably the two keys to getting this guy, if,
indeed, this is the killer of JonBenet Ramsey. Unknown DNA from a
male was found under the fingernails of JonBenet Ramsey, probably
when she was trying to fight for her life. Unknown DNA from an
unknown male was also found in her underwear. And that wasn't
found until 2003, Joe, seven years after her murder.

Now, law enforcement routinely checks that kind of DNA against new
samples that are coming in because new criminals are giving DNA
samples all of the time. And so there was always the hope that
perhaps this person would be found that way, and that may have been
what did it.

The other thing is on line communications, and we are hearing some
information that this guy is a pedophile who has done on line
communications, talking about his sexual predilections. And that's the
way that a lot of pedophiles are getting caught, thank God, these days.

I want to point out he was in Bangkok, a place known for sexual

activity between adults and children. He's also a 2nd grade teacher,
may -

showing an unnatural interest in children. JonBenet Ramsey is 6 years
old, close in age. So we put all this together, this may be—may be—I
emphasize may—but it may be a sexual predator who had access to

Exhibit 3 Page 24

8/24/2007



EXHIBIT 5

PAGE 111

the home as hundreds of people did, Joe, because this is a family known for entertaining, known for leaving their doors open, having contractors and construction workers coming in all the time. So he could have had easy access to the home, could have followed the patterns and the habits of this family.

SCARBOROUGH: I'm going ask my all-star panel to stay with me. And a

question that I want answered is, Why did it take authorities seven years -

seven years! -- to find that DNA evidence on JonBenet Ramsey that could have broken this case a long time ago? We'll get answers to that and much more when we come back.

But still to come tonight: The 10-year hunt for JonBenet's killer may finally be over, but when will Americans get their first look at the man allegedly behind that brutal murder? Plus: John and Patsy Ramsey— they've lived under an umbrella of suspicion for a decade now. What did today's arrest finally do to get them off the hook? Tonight, some are saying, Not so fast.

(COMMERCIAL BREAK)

SCARBOROUGH: The big news tonight, an arrest in the decade-old murder of 6-year-old beauty queen JonBenet Ramsey. Now, police in Thailand arrested an American today in his 40s. His name, John Mark Karr. He's a former school teacher who once lived near the Ramseys when they lived in Conyers, Georgia. But now the big question is, What happens next?

According to our NBC affiliate in Denver, Karr has already confessed to certain parts of the crime that are still unknown to the public. Right now, he's in the process of being extradited back to the United States and expected to arrive here within the next two days. Karr will reportedly be accompanied by an investigator from the Boulder DA's office. That office says they'll hold a press conference on the arrest tomorrow afternoon.

Of course, that's the same DA's office that really screwed up this case in the beginning, and many people, especially in the Benet family—

JonBenet Ramsey family, believe that that's the reason why this investigation has gone on for so long and has been so painful for the family.

Exhibit __3__ Page __25__

8/24/2007

EXHIBIT __5__



PAGE ___ **112**

Now, when we come back, we've got a packed show in the back half, talking much more about this breaking news. And we're going to have more live up-to-date breaking news coverage when we return. Stay with us.

(COMMERCIAL BREAK)

(NEWSBREAK)

SCARBOROUGH: Welcome back. Does today's arrest in Thailand close the book on the JonBenet case? We're going to be asking our all-star panel that question in a minute. But first, NBC's Mike Taibbi looks at the investigation that captured a nation—Mike?

MIKE TAIBBI, NBC NEWS CORRESPONDENT: Joe, finally a break in a case that had gone as cold as the Colorado winter, when a 6-year-old girl was brutally killed 10 long years ago, an arrest of the suspect half a world away.

(BEGIN VIDEOTAPE)

TAIBBI (voice-over): It was a story that, as they say, had all the elements. A pretty, little girl with a melodic name, JonBenet, a beauty pageant veteran already at age 6, found strangled, possibly sexually abused and beaten to death in her own Boulder, Colorado, home on the day after Christmas 10 years ago. Now, an arrest in Bangkok, Thailand, of an American named John Mark Karr.

ABRAMS: My understanding is that this is a suspect in connection with the murder of JonBenet Ramsey, not a witness, not a peripheral player, but a suspect.

TAIBBI: The suspect was described as a 41-year-old second-grade teacher arrested by the Royal Thai Police at the request of the U.S. Justice Department, the warrant issued by the Boulder police.

It was the Ramseys themselves, John and Patsy, who were for long stretches described as the key suspects, persons under the umbrella of suspicion, investigators said. In books and in their rare interviews, both denied it.

JOHN RAMSEY: Let me address very directly: I did not kill my daughter, JonBenet.

PATSY RAMSEY: Let me assure you that I did not kill JonBenet. I did not have anything to do with it. I loved that child with my whole of my heart and soul.

Exhibit 3 Page 26

8/24/2007




EXHIBIT 5

PAGE 113

TAIBBI: And though Patsy Ramsey died of ovarian cancer this past June, she apparently had a clue about what was coming.

ABRAMS: I'm told that Patsy Ramsey, who has since died, knew about this suspect and was waiting for the authorities to move forward on this suspect before she died.

TAIBBI: The case was a sensation, for years really. As one investigator put it, "This was the biggest child murder case since the death of the Lindbergh baby." Late Thursday afternoon, a telephone interview by our affiliate, KUSA, with John Ramsey.

J. RAMSEY: I was notified this morning that an arrest had been made. And I'm just absolutely impressed with the effort that went into accomplishing this by the Boulder D.A.'s office and the other agencies that were involved.

TAIBBI: An explosive murder case that will now rule the headlines again, perhaps for the beginning of the end of the story.

(END VIDEOTAPE)

TAIBBI: The suspect, John Mark Karr, is under the control of U.S. Justice Department officials in Bangkok at the moment. It's expected he'll be returned to the U.S. as soon as possible and could be back in Colorado as early as this coming weekend—Joe?

SCARBOROUGH: Thanks so much, Mike.

So after 10 years of suspicions, are the Ramseys vindicated or does today's arrest just bring up more questions? With me now to talk about it, forensic document examiner Bill Flynn, who examined the ransom note for JonBenet Ramsey.

Marc Klaas, his daughter, Polly Klaas, was kidnapped and murdered by a pedophile.

And, of course, our all-star panel, which we'll be getting back to in a second.

But, Bill Flynn, let me start with you. You examined this ransom note. Respond to today's arrest?

BILL FLYNN, FORENSIC DOCUMENT EXAMINER: Well, I and many, actually, forensic document examiners that were involved in the criminal case had an opportunity to compare the writing of John and Patsy Ramsey to the note. And to the best of my knowledge, in spite

Exhibit 3 Page 27

EXHIBIT 5
PAGE 114

of what must have been enormous pressure, especially on the CBI examiners, none of us actually identified Patsy Ramsey as having written the note.

So it wasn't too much of a surprise. The real question now is and the final piece of the puzzle will be if this man, Karr, actually did commit the murder, did he write the note? So that's a second possibility, as well.

SCARBOROUGH: But, of course, it didn't really—as Clint was saying earlier, it didn't make sense that the guy would kill this little girl and then hang around in the basement and write a long ransom note.

FLYNN: It didn't. All of the physical evidence, I'm sure, and the investigation would have indicated someone inside the house. It was a long, rambling note. It was written while inside the house, not written outside and brought into the house.

So certainly all of the initial evidence would have indicated that someone in the house, Patsy or John Ramsey, had written the note. Forensically, though, no one that looked at the note on the criminal side was able to identify Patsy Ramsey as having written it.

SCARBOROUGH: Marc Klaas, as Clint told us earlier, if you're a parent and you go through the tragedy of your daughter being killer or your son being killed, like you had to go through with your daughter, police immediately look at the parent as a suspect. You were a suspect. It had to be painful. Do you think, though, that this arrest vindicates completely the parents?

MARC KLAAS, FOUNDER OF BEYOND MISSING: No, no, not at all, for a variety of reasons. First of all, this might simply be a case of a very bad individual who was facing maybe the rest of his life in a Bangkok prison coming up with a reason to get back to the United States. If I were in his shoes, I would cop to the Lindbergh kidnapping if I thought it would get me back to the United States, so it could be as simple as that.

But also, Joe, remember, on this ransom note, she may not have been able to be implicated, but she was never eliminated, either, at least not by the authorities.

SCARBOROUGH: Jeralyn Merritt, you think the parents were treated very badly by the investigators early on. Why?

JERALYN MERRITT, CRIMINAL DEFENSE ATTORNEY: I think that the Ramseys were vilified more than anyone else in the last 10 years. The



police in this case jumped on them right from the beginning. You had the mayor of Boulder coming out within two days of JonBenet's death telling the people of Boulder on television they didn't need to worry about a killer being loose in their community.

These police, they've picked on the Ramseys. And then, when they got lawyers, the police used that as a reason as if to suggest that made them guilty. And it just spiraled from there.

The people said the Ramseys didn't cooperate. The Ramseys did cooperate. They gave an unbelievable amount of consent for the police to search their home, for handwriting exemplars, and yet they were vilified from the very beginning, with people who didn't know anything about the case, but all speculated that it must be the Ramseys, because who else could it have been?

SCARBOROUGH: But, Bill Fallon, you believe that the Ramseys acted in such a bizarre way that investigators had no other choice but to focus almost solely on them. Explain.

BILL FALLON, FORMER PROSECUTOR: Well, Joe, for me, we talk about a rush to judgment. No, a rush to suspicion, yes. You get an umbrella of suspicion. The middle of the umbrella involves the family, the people surrounding, whether it's the Ramseys, whether it's their son, whether it's anybody who had access to that house. What you usually get in reviewing, Jeralyn, as you know, thousands of these cases, you do look to the family, not just to say, "Did they do it?" but let's see if we can clear them so we can move on.

This is a family that didn't, as I understand it from 10 years ago, as I remember, didn't want to take lie detector tests, didn't want to be interviewed except separately—together. We never interview parents together.

Now, the point is—that doesn't mean they did it, but it does mean that there—in my mind, there are secrets in that house that we may never know. And if I were an investigator or I were the prosecutor, I would say:

This doesn't ring true to a poor child's family, a child who has been potentially molested, who has been murdered. What is up here?

Then we had no clues of anyone else. Remember, somebody only came forward now, as was just said that I think, "Let me get out of this jail in Thailand." Now, the truth is, whether this guy did it or not, what we know is we would have never had access to him, except that he seems to have come forward in some way. But, again, does it not...

Exhibit 3 Page 29

8/24/2007

EXHIBIT

PAGE 

Case 2:04-cv-09049-DOC-RNB Document 3005-4 Filed 04/08/08 Page 35 of 102 Page ID
#:50570
'Scarborough Country' for August 16 - Morning Joe - MSNBC.com                    Page 14 of 22

SCARBOROUGH: Pam Bondi...

FALLON: ... mean the Ramseys had anything to do with it, but they did not act, I think, in the best interests of the investigation, the best interests of finding out who the child murdered.

SCARBOROUGH: I think most people looking—so many people at this case from the very beginning just said they acted in a strange and inappropriate way. I have no idea, though, how I would respond if I were going through the same pressures of them.

But, Pam Bondi, let's talk about cracking this cold case. Let's say this guy is (INAUDIBLE) I've got to say, Marc Klaas paints a pretty darn good excuse for this guy to cop a plea to this case, to get out of Thailand and come back here to the United States. But let's say this is the guy. How do you crack a cold case—and this is the coldest of cold cases, over 10 years old—and track down somebody that's on the other side of the world?

PAM BONDI, PROSECUTOR: You know, Joe, when you say a "cold case," sometimes that's deceiving. There are cold cases out there, but let me tell you, they are being worked on every day. In fact, here we have full-time detectives assigned to cold cases, to old cases.

SCARBOROUGH: So just so...

(CROSSTALK)

BONDI: They re-submit DNA constantly.

SCARBOROUGH: ... Pam, just because the media is not looking at these cases anymore, you guys are still looking at it.

BONDI: Right, constantly.

SCARBOROUGH: But let's talk about—Lisa brought up earlier that DNA wasn't found on her undergarments for seven years.

BONDI: Right.

SCARBOROUGH: How do you mess that up so badly?

BONDI: Well, Joe, we have made tremendous advancements in the last decade in DNA. We now have something called mitochondria DNA. Even the smallest amount of DNA can be analyzed.

DNA in old cases, whether they're high-profile or not, are constantly

Exhibit 3 Page 30

8/24/2007

EXHIBIT ___ 5

PAGE ___ 117



being re-submitted for analysis, whether or not now they have enough with the new advancements to find DNA or they may get a hit on a suspect who has since been incarcerated and they may get a match. But, believe it or not, it's frequent, and it happens, and it's great. And, you know, it's just great that they haven't let this case die in any way and, especially in this case, I think they've been working on it around the clock for things we didn't know about.

SCARBOROUGH: Let me ask Lisa Bloom, going back to this seven-year delay, do you think it's possible, Lisa Bloom—because I know Jeralyn believes this—that because the Boulder D.A. focused so much on the parents...

MERRITT: No, the Boulder police.

BLOOM: The police.

MERRITT: Not the D.A.

SCARBOROUGH: The Boulder police, I'm sorry, the Boulder police focused so much on the family and botched this investigation from the very beginning, from the first hours of this investigation, is it possible that they missed some evidence that actually could have let this guy go free for over a decade?

BLOOM: It's not possible. It's crystal clear, Joe. They walked around through the crime scene. They failed to secure it. They fingered these parents from the very beginning, as they should, but to the exclusion of all others, which is what the big error was in this case.

Usually Jeralyn and I disagree; here I'm in complete agreement. There's no question, if you look back at the facts of this case, as we've done on Court TV, and exhaustive reviews of these 10 years, there's no question that the Boulder police misstepped.

The good news is that a new D.A. did come in, took a closer look at it, and hopefully this is the guy. But I think it's a shame that people even today are still attacking the Ramseys. I mean, I think they're going to go down in American history with Wen Ho Lee, with Richard Jewell, as people who were falsely accused.

They lived through a hell over the last 10 years, and poor Patsy passed away without ever seeing justice, having this cloud of suspicion over them. They never had any history of abusing their children. They had no motivation to kill JonBenet Ramsey. She was killed with a sophisticated, sadistic garrote around her neck and around her wrists.

Exhibit 3 Page 31

8/24/2007



EXHIBIT 5 

PAGE 118

It all looked like a pedophile. This was a pretty little girl who was out
in pageants with wealthy parents. Of course, she's a target for a
kidnapper or a pedophile. It wouldn't make any sense if they would
have written that ransom note. I just think, from the beginning, the
police botched it, and it's time, frankly, for an apology to the
Ramseys.

SCARBOROUGH: And the family has been vilified, like you said, for
over a decade. Lisa, thank you so much for being with us. And I want
to ask the rest of our panel, if you will, please stay with us. More on
the Ramsey investigation, the arrest coming up.

But later, we're going to change pace and lighten things up a little bit.
Find out what American legend reportedly thought about Tom Cruise,
how he was creepy, so creepy that Joltin' Joe almost called the cops.

(COMMERCIAL BREAK)

SCARBOROUGH: Our all-star panel still with us. Let's go back to Clint
Van Zandt.

Clint, if in fact this family didn't know the suspect as the sister
suggested, that contradicts news reports, but what is his connection to
this case?

VAN ZANDT: Well, Joe, that really changes the equation on this. If no
one in the family knew this guy whatsoever—we know he would have
been 32 at the time this crime took place, that he is alleged to have been a
second-grade school teacher and subsequent, you'd like to believe, a
known pedophile. How did this guy become so fixated on JonBenet
Ramsey that he would have traveled potentially from Georgia to
Boulder, Colorado, not just to this town and not just to this house, but
for this particular child, and still know enough about the Ramsey family
to know how much John bonus was and to be comfortable enough to
write that demand note inside the house?

I mean, there are questions that obviously are going to be answered,
but right now, Joe, it still doesn't make sense. Motive and opportunity,
law enforcement still has to put that together. And we need something
more than, "I have confession." We need linking physical evidence to
tie this guy in.

SCARBOROUGH: Yes, Clint. So much of this still doesn't add up.

And Marc Klaas, is that why you're still so suspicious of the Ramseys?

KLAAS: Well, Joe, I'm suspicious for two reasons. Number one, their

Exhibit _3_ Page _32_

8/24/2007



EXHIBIT ____ 5

PAGE ____ 119

conduct in the immediate aftermath of the murder of the child. And it's mentioned: They were not cooperative with law enforcement. They did not take independent interviews with law enforcement. They did not take polygraph exams. They put lawyers between themselves and law enforcement almost immediately. And we all know...

SCARBOROUGH: And you didn't do any of that in your case?

KLAAS: No, sir, because it was—I understood that I was the parent of a murdered child and immediately the suspicion would fall on me. And it was explained to me that I had to eliminate myself from suspicion and that the best way to do this—and I truly believe this—was to cooperate with law enforcement, and to cooperate with the media, and be as transparent as humanly possible so that I would no longer be considered as a suspect and they could move on. That's the first reason. They never did any of those things.

The other reason are all of these pieces of evidence, the three-page note, the information about the $118,000, having a ransom note and finding the little girl downstairs, having Patsy's sweater fibers on the inside of the duct tape that was covering her mouth, having her sweater fibers entwined in the garrote that was around the little girl's neck, having the little girl wrapped in her favorite blanket.

This sounds like staging. And as Clint said, and as others have said, until you can show otherwise, I think we have to look very, very askance at this gentleman and his confession.

SCARBOROUGH: Bill Fallon, it sounds like there's still clouds of suspicion over the Ramseys. Why?

FALLON: Joe, because, just as Mark just said, from the beginning they didn't act the way everybody thinks they should act when their child's death is imminent or the child has died. We want transparency.

But I will say, if this guy did do it, it might give us a light, shine a light on just what a fixated pedophile—we've talked about them for decades—just how fixated, almost mentally ill they can become. Every moment becomes fixated on one child. Usually we see it on several children, their movements.

I mean, if he actually went all those states to go to this child, maybe he was following this career that Patsy Ramsey had set up. Maybe somebody was sending him, "This is the little child in the limelight" thing. We don't really know that.

And, again, I'm suspicious that we can ever trust everything any

Exhibit **3** Page **33**

8/24/2007

EXHIBIT _____ **5**

PAGE _____ **120**


pedophile says, because they always put it in their best light. Sadly, we're talking 10 years later about what could parents have done differently, so maybe the light would have cleared, that maybe we could have focused in on them.

But I don't say this: I am not willing to say that, even if they had cooperated, that the light would have shown that this guy several states away was, in fact, the guy that murdered her at the time. So maybe years have actually helped the case, not hurt it.

SCARBOROUGH: And as Marc proved in his own case, his own tragic case, it's transparency, when you're in this sort of situation, that makes all the difference in the world.

FALLON: Put the child first.

SCARBOROUGH: Hey, I want to thank all of our panelists. Yes, put the child first. I want to thank all of our panelists.

Up next, we're going to try to lighten things up. Paris Hilton actually is in the record books. Really? Wait until you see why.

Pack your bags for a trip to Hollyweird, as we also talk to you why and tell you why Joe DiMaggio was scared of Tom Cruise.

(COMMERCIAL BREAK)

SCARBOROUGH: Roll out the red carpet. It's time to take a trip to Hollyweird.

First up, the star that just keeps falling. First Star Jones booted from "The View," now the other shoe drops. Payless Shoes has fired Jones as its spokeswoman. With us now to talk about celebrities and more proof that they're not like you and me, we've got "OK's" senior reporter, Courtney Hazlett, and we also have West Coast deputy editor of "US Weekly," Dina Sansing.

Let's start with you, Courtney. First, "The View," and then, of course, Payless Shoes. It looks like being a diva doesn't pay well these days.

COURTNEY HAZLETT, "OK" MAGAZINE: Well, you know, it's kind of funny. Star Jones has definitely proven that she does like to pay less for things, as evidenced by her behavior during her wedding, which she has, in her defense, since apologized for. But Payless has decided to drop her as a spokesperson. That said, her contract was up, as well. But it's definitely showing that it seems like Star's star is falling somewhat, that she's not—she doesn't have the equity that she once

Exhibit 3 Page 34

8/24/2007

EXHIBIT 5

PAGE 121

did. And maybe a little bit of time out of the limelight is going to do her a lot more good in the long run.

SCARBOROUGH: And, Dina, it looks like, in the end, Barbara Walters may get the last laugh, that as long as she's with "The View," she's a hot commodity. They take her off of there, and she can't even hold a contractual deal with Payless Shoes, right?

DINA SANSING, "US WEEKLY": Well, I think one of the problems here is there is lots of controversy around Star. And the last thing that you want with a spokesperson is to have controversy. You want someone who's loved by all and who will help sell shoes and not have a lot of baggage. And that's exactly what Star has right now.

SCARBOROUGH: And talking about a lot of baggage, Paris Hilton is now a world record holder. I know you all are very excited about it. But she's probably not going to be popping any champagne. The 2007 Guinness Book of World Records names Paris Hilton the most overrated person in the world.

Dina, that's pretty impressive, even for Paris Hilton, in the Guinness world book of records. They said that they put her up there, though, because she just kept up coming up as the most irritating, obnoxious celebrity. Why is it though that everybody likes talking about her and likes reading about her?

SANSING: Well, that's the thing about Paris. You know, she became famous for being famous. Initially there was really no other reason for this fame that she had. But at the same time, she really turned it into something.

Here's a girl who essentially did nothing, got a lot of press for it. And then she's now a very successful perfume maker. Her line is very popular. She's releasing a record that's said to be doing pretty well. People like the single. You know, people like to talk about Paris. And you can say what you want to say about her, but she's made something from nothing, essentially.

SCARBOROUGH: And she certainly has.

And, Courtney, I remember the "New York Times" had a front page article in their business section, called it "Paris Inc." I mean, it started with a sex tape. This woman is actually making a lot of money doing nothing.

HAZLETT: You know, you've got to hand it to her. A lot of people who start their careers with a sex tape, they don't really go as far, do they?



SCARBOROUGH: No, it hasn't really helped me.

HAZLETT: But as we speak, literally, Paris Hilton is having a huge party here in New York City, and it's to celebrate her single and her album dropping. And so, you know what, Paris is probably going to be having the last laugh when this is all said and done.

She's always said, you know what, say what you will say about me, but I work really hard. And, you know what, now it's actually starting to look like she's working hard in spite of her Guinness title.

SCARBOROUGH: Works hard, makes a lot of money.

HAZLETT: Definitely.

SCARBOROUGH: And long before he jumped on Oprah's sofa and gave the rest of us the creeps, Tom Cruise—I love this story—reportedly followed around baseball great Joe DiMaggio so much that Joltin' Joe thought about calling the cops. And, Dina, he said that this guy gave him the creeps. What is it about Tom Cruise that gives so many Americans the creeps these days?

SANSING: Yes, Joe, you know, join the club there. You know, he does everything over the top. And, you know, this was probably not expected. You know, I would be creeped out if someone was hanging outside my doorstep all the time.

You know, when he wants something, he fights really hard to get it, and I think that's what happened. He was just really trying to get the story of Joe. He wanted to make the movie, and he decided to do everything he could. But in the process, he really probably hurt his chances and just creeped him out.

SCARBOROUGH: No doubt about it. And, Courtney, you know, we'd call guys like this back in high school a spaz. He's just over the top, isn't he?

HAZLETT: You know what? Tom Cruise, he's a lot to handle all at once. And, you know, this story coming out about Joe DiMaggio, it is a little bit believable, because J.J. Abrams was recently saying, when Tom was courting him to direct "Mission Impossible III," "You know what? The guy used to show up at my house like at midnight on his motorcycle by himself saying, 'J.J., please, come on, you've got to do this movie for me.' And how could I say no?" J.J. was saying. So you know...

SANSING: But he got what he wanted, you know?

Exhibit _3_ Page _36_

8/24/2007



EXHIBIT _5_

PAGE _123_

HAZLETT: Exactly.

SANSING: Sometimes that works.

SCARBOROUGH: All right, we're going to have to leave it there. He may be a spaz, but he makes $100 million.

That's all the time we have for tonight. Stay tuned. More MSNBC straight ahead.

THIS IS A RUSH TRANSCRIPT. THIS COPY MAY NOT BE IN ITS FINAL FORM AND MAY BE UPDATED.

END

Copy: Content and programming copyright 2006 MSNBC. ALL RIGHTS RESERVED. Transcription Copyright 2006 Voxant, Inc. ALL RIGHTS RESERVED. No license is granted to the user of this material other than for research. User may not reproduce or redistribute the material except for user's personal or internal use and, in such case, only one copy may be printed, nor shall user use any material for commercial purposes or in any fashion that may infringe upon MSNBC and Voxant, Inc.'s copyright or other proprietary rights or interests in the material. This is not a legal transcript for purposes of litigation.

transcript

*Watch Scarborough Country each weeknight at 9 p.m. ET*

| Rate this story   Low ☆☆☆☆☆ High |
| --- |
| Current rating: 0 by 0 users     • **View Top Rated stories** |

| Print this | Email this | Blog this | IM this |
| --- | --- | --- | --- |

**MORE FROM MORNING JOE**

**Morning Joe Section Front**

Obama hopes for a unified government

Exhibit **3** Page **37**

8/24/2007

EXHIBIT  **5**

PAGE **124**

**Housing recession vs. consumer spending**

| Top MSNBC stories | NBC News highlights |
|---|---|
| **Deadly fires rage across Greece** | **Agony of Mother Teresa** |
| **Iraq report unlikely to move Bush** | **Lauer rocks the WristStrong bracelet** |
| **Chicago braces for second storm** | **Williams on 'Nightly News' office quirks** |
| **NFL suspends Vick indefinitely** | **Kid reality show flout labor laws?** |
| **Town wants to dig hole to miners** | **Sagging slacks — offensive or stylish?** |

**SPONSORED LINKS**                                      Get listed here

**Ann Coulter Weekly - Free**
Be among the first to read Ann weekly column by email - Free!
HumanEvents.com

**AARP & The Hartford Auto Insurance**
Over 50? Save $303 on no hassle auto ins from AARP & Hartford today.
AARP.TheHartford.com

**Affordable Health Coverage - Blue Cross**
Need health coverage? Quality health plans. Request information today!
www.BCCHealthPlans.com

**A Different Sleep Aid**
Learn about a two-layered med to help you fall asleep & stay asleep.
SleepMedication.Info

**Back Surgery Alternative**
Minimally Invasive Laser Procedures Quick Recovery - Learn More Now.
www.laserspineinstitute.com

Cover | U.S. News | Politics | World News | Business | Sports | Tech/Science | Entertainment | Travel | Health | Blogs Etc. | Weather
Newsweek | Today Show | Nightly News | Dateline NBC | Meet the Press | MSNBC TV

About | Alerts | Newsletters | RSS | Mobile | Podcasts | Site Map | Help | News Tools | Jobs | Contact Us | Terms & Conditions
© 2007 MSNBC.com

© 2007 Microsoft   MSN Privacy   Legal   Advertise   Feedback   |   Help

Exhibit __3__ Page __38__

EXHIBIT ____5____
PAGE ____125____

# EXHIBIT 6

1   QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
2     John B. Quinn (Bar No. 090378)
   johnquinn@quinnemanuel.com
3     Michael T. Zeller (Bar No. 196417)
   (michaelzeller@quinnemanuel.com)
4     Jon D. Corey (Bar No. 185066)
   (joncorey@quinnemanuel.com)
5     Timothy L. Alger (Bar No. 160303)
   (timalger@quinnemanuel.com)
6   865 South Figueroa Street, 10th Floor
  Los Angeles, California 90017-2543
7   Telephone:  (213) 443-3000
  Facsimile:   (213) 443-3100

8   Attorneys for Mattel, Inc.

9             UNITED STATES DISTRICT COURT

10           CENTRAL DISTRICT OF CALIFORNIA

11              EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual, | Case No. CV 04-09049 SGL (RNBx) |
| Plaintiff, | Consolidated with<br>Case No. CV 04-09059<br>Case No. CV 05-02727 |
| vs. | |
| MATTEL, INC., a Delaware corporation, | **DISCOVERY MATTER** |
| Defendant. | Hon. Edward A. Infante (Ret.)<br>Discovery Master |
| AND CONSOLIDATED CASES | *IN CAMERA* DECLARATION #3 AS TO EXPERT EXAMINATION AND TESTING OF BRYANT'S ORIGINAL DOCUMENTS |
| | Date: August 23, 2007<br>Time: 9:00 a.m.<br>Place: Telephonic |
| | Discovery Cut-Off: October 22, 2007<br>Pre-Trial Conference: January 14, 2008<br>Trial Date: February 12, 2008 |

**SUBMITTED PER JUDGE INFANTE'S REQUEST ON AN**

*IN CAMERA* **BASIS**

~ **Not For Dissemination To Defendants/Counterclaimants** ~

## DECLARATION OF WALTER J. RANTANEN

I, Walter J. Rantanen, declare as follows:

1.      I am an expert in the field of forensic paper fiber analysis.  I am submitting this declaration *in camera* in response to a request from the Discovery Master in connection with Mattel's Motion to Compel Bryant To Make Original Documents Available For Expert Examination and Testing.  I am more than twenty-one (21) years of age; I make this declaration of personal, firsthand knowledge; and if called and sworn as a witness, I could and would testify competently thereto.

2.      Attached hereto as Exhibit 1 is a true and correct copy of my curriculum vitae.  I have been a paper fiber analyst for about 30 years and have been qualified as an expert in many cases.

3.      I have been asked to examine and provide opinions as to paper fiber analysis in many high-profile cases.  For example, I was involved in testing the punch card ballots that were used for voting in Florida in the 2000 U.S. Presidential election.  Attached hereto as Exhibit 2 is a true and correct copy of some excerpts from my interview with Dan Rather about my findings.  Also in 2000, I conducted a study to assist Paul Messier, a conservator of photographic works for institutions like Carnegie Museum of Art, the George Eastman House, the Harvard University Archives and the U.S. Bureau of Engraving and Printing, on determining the authenticity of certain Lewis W. Hine photographs.  Attached hereto as Exhibit 3 is a true and correct copy of a June 2003 article from Atlantic Monthly about my study. In March of 1990, I was also qualified as an expert and testified in the case of Her Majesty The Queen v. Imre Finta.  In that case, Mr. Finta was the first person to be prosecuted under Canada's war crimes legislation.  Attached hereto as Exhibit 4 is a true and correct copy of an article from the *Toronto Star* about the case.

4.      To properly examine and test documents, as well as to ensure that they are properly handled and preserved, I conduct my analysis and testing in my

1  laboratory in Appleton, Wisconsin.  The laboratory contains specialized equipment
2  that I use to conduct the examination and testing of documents.  Some of this
3  equipment includes:  Transmitted light microscope used to determine fiber types and
4  composition; Energy Dispersive Spectroscopy component of the Scanning Electron
5  Microscope used to determine inorganic elemental composition; Ultraviolet Lamp
6  used to detect optical brightening agents; Light box to observe watermarks and paper
7  formation.  I may perform the following types of examination and testing on one or
8  more of the original documents from Mr. Bryant:  Optical examination of sheet, Fiber
9  Analysis, chemical spot testing, and Energy Dispersive Spectroscopy,

10          5.      The laboratory facilities also include a locked, secure room, where
11  I keep any materials that are sent to me for examination and testing when they are not
12  being examined or tested.

13          6.      As a recognized expert in the field of paper fiber science and
14  forensic paper analysis, I recognize the extreme importance of preserving the
15  integrity of the evidence I am sent for review and analysis.  When materials arrive at
16  my laboratory, they are signed for and recorded in the shipping department receipt
17  log.  The materials are delivered to the addressee in the appropriate laboratory and
18  opened.  Known forensic samples are opened only by myself, or if I am not available
19  are locked in a secure desk or room.  When I open the samples, they are recorded into
20  our tracking system.  If a client provides a chain of custody letter, this is filled out
21  and the samples are locked in the secure location until work can be started on them.
22  When the documents have been examined or sampled, they are afterward returned to
23  the secure location until being reexamined or returned.  I certainly understand the
24  critical nature of each of Mr. Bryant's original documents and will be fully
25  accountable for them while they are in my custody.

26          7.      I understand that the parties have stipulated to, and the Court has
27  tentatively approved, a special protocol for any destructive testing that might be
28

PAGE

EXHIBIT

126

SENT BY: INTEGRATED PAPER SERVICES,          9207493046;          AUG-2. .7  6:58PM;          PAGE 5/5

1    I declare under penalty of perjury under the laws of the State of
2  California and the United States of America that the foregoing is true and correct.
3       Executed this 27th day of August, 2007, at _____Appleton, WI_____.
4
5  DATED:  August 28. 2007
6
7                    _Walter J. Rantanen_
                     Walter J. Rantanen
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26                                      EXHIBIT ____6____
27                                      PAGE ____129____
28



## FACSIMILE TRANSMITTAL

DATE: _August 27, 2007_

### PLEASE DELIVER THE FOLLOWING PAGES TO:

NAME: _Diane Hutnyan_
_& Scott Kidman_

_Quinn Emanuel Urquart Oliver & Hedges, LLP_

FAX: _( 213 )  443 - 3100_

FROM: _Walter J. Rantanen_

SUBJECT: _Declaration_

NUMBER OF PAGES TRANSMITTED INCLUDING COVER SHEET: _6_

IF ALL PAGES ARE NOT LEGIBLE, PLEASE CALL (920) 749-3040.

MESSAGE:

_This is a re-send as fax skipped some pages._

EXHIBIT _6_

PAGE _130_

3211 E Capitol Drive • Appleton, WI 54911

EXHIBIT 7

1 | QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
    John B. Quinn (Bar No. 090378)
2 |   johnquinn@quinnemanuel.com
    Michael T. Zeller (Bar No. 196417)
3 |   (michaelzeller@quinnemanuel.com)
    Jon D. Corey (Bar No. 185066)
4 |   (joncorey@quinnemanuel.com)
    Timothy L. Alger (Bar No. 160303)
5 |   (timalger@quinnemanuel.com)
    865 South Figueroa Street, 10th Floor
6 | Los Angeles, California 90017-2543
    Telephone: (213) 443-3000
7 | Facsimile: (213) 443-3100

8 | Attorneys for Mattel, Inc.

9 |

10 |                    UNITED STATES DISTRICT COURT

11 |                   CENTRAL DISTRICT OF CALIFORNIA

12 |                          EASTERN DIVISION

13 |

| CARTER BRYANT, an individual, | Case No. CV 04-09049 SGL (RNBx) |
|---|---|
| Plaintiff, | Consolidated with<br>Case No. CV 04-09059<br>Case No. CV 05-02727 |
| vs. | |
| MATTEL, INC., a Delaware corporation, | **DISCOVERY MATTER** |
| Defendant. | Hon. Edward A. Infante (Ret.)<br>Discovery Master |
| AND CONSOLIDATED CASES | *IN CAMERA* DECLARATION #4 AS<br>TO EXPERT EXAMINATION AND<br>TESTING OF BRYANT'S ORIGINAL<br>DOCUMENTS |
| | Date: August 23, 2007<br>Time: 9:00 a.m.<br>Place: Telephonic |
| | Discovery Cut-Off: October 22, 2007<br>Pre-Trial Conference: January 14, 2008<br>Trial Date: February 12, 2008 |

25 |
26 | **SUBMITTED PER JUDGE INFANTE'S REQUEST ON AN**
27 | *IN CAMERA* **BASIS**
28 | **~ Not For Dissemination To Defendants/Counterclaimants ~**

PAGE ___ EXHIBIT ___ 13 ___

07132/2203613.1

IN CAMERA DECLARATION NO. 4

# DECLARATION OF LLOYD CUNNINGHAM

I, Lloyd Cunningham, declare as follows:

1.     I am self-employed as a Forensic Document Examiner, which includes the examination of handwriting and questioned documents. I am submitting this declaration *in camera* in response to a request from the Discovery Master in connection with Mattel's Motion to Compel Bryant To Make Original Documents Available For Expert Examination and Testing. I am more than twenty-one (21) years of age; I make this declaration of personal, firsthand knowledge; and if called and sworn as a witness, I could and would testify competently thereto.

2.     I have extensive experience in the questioned document field. I have testified and have been accepted as an expert witness more than 500 times in state and federal courts, as well as in depositions and hearings. I spent twenty-seven years with the San Francisco Police Department (and retired as Inspector of Police), where I established and supervised the first full time Questioned Document Section within the SFPD Crime Laboratory. I have examined items and prepared formal reports for approximately 6,000 questioned document cases which were submitted by law enforcement investigators, corporate security, civil attorneys, criminal defense attorneys, and for federal and state agencies including the Federal Bureau of Investigation, the Secret Service, the Internal Revenue Service, U.S. Customs, the Drug Enforcement Agency, and the California Highway Patrol. Attached hereto as Exhibit 1 is a true and correct copy of my current CV.

3.     Attached hereto as Exhibit 2 is a true and correct copy of an article about my work analyzing the handwriting of the "Zodiac," the 1960s serial killer. I also was retained to examine the handwritten ransom note that was found at the scene of JonBenet Ramsey's murder and to testify at the Grand Jury hearing in Boulder, Colorado. *See* Exhibit 2.

EXHIBIT 132

PAGE

4.       To properly examine and test documents, as well as to ensure that they are properly handled and preserved, I conduct my analysis and testing in either of my two laboratories in Indian Wells and Alamo, California.   The laboratories contain specialized scientific instrumentation that I use to conduct the examination and testing of documents.   Some of this instrumentation includes, but is not limited to the following:   Stereoscopic microscope, Electro-Static Detection Apparatus (ESDA), specialized lighting sources, infrared luminescence, reflected infrared, and UV.   I may perform the following types of non-destructive examinations and testing on one or more of the original documents from Mr. Bryant: a) (ESDA) examination of the paper fiber of selected documents for evidence of indented handwriting or any other indented impressions. b) Examination of ink/writing instrument characteristics with a stereoscopic microscopic, specialized lighting sources, infrared luminescence, reflected infrared, UV and the dichroic filter. c) Examination of the paper fiber of selected documents for evidence of chemical and/or mechanical erasures. d) Examination of handwritten entries/drawings for evidence of additions and/or alterations. e) Examination of handwritten entries to determine authorship.

5.       The laboratories where I conduct my examinations are each protected by a security system, and a locked fireproof safe where I keep materials that are sent to me for examination and testing when they are not being examined or tested.   It should be noted that the safes have limited space and may not be able to accommodate very large documents or a voluminous number of documents.

6.       As a recognized expert in the field of forensic document examination, I am fully aware of the extreme importance of preserving the integrity of the evidence that is in my custody.   When materials arrive at my laboratories I carefully record the condition of the documents when they are received, they are placed in a protected area away from other cases and away from any chemicals or elements they could cause contamination to them, and if possible they are placed in protective envelopes.   In addition, the submitted documents are color photocopied by

PAGE ___  EXHIBIT ___  155

07209/2161753.1

-2-

1  either me or my client.  I certainly understand the critical nature of each of Mr.

2  Bryant's original documents and will be fully accountable for them while they are in

3  my custody.

4        7.    All the Bryant documents that are provided for examination and

5  testing shall be returned by me in the same condition, sequence and order in which

6  they were received.

7        I declare under penalty of perjury under the laws of the State of

8  California and the United States of America that the foregoing is true and correct.

9        Executed this 27th day of August, 2007, at Alamo, California.

10

11  DATED: August 27. 2007

12

13  _____

14        Lloyd W. Cunningham

15

16

17

18

19

20

21

22

23

24

25

26  EXHIBIT _____ **7** _____

27  PAGE _____ **134** _____

28

07209/2161753.1

3

# Exhibit 1

EXHIBIT 7

PAGE 135

**LLOYD CUNNINGHAM**
**FORENSIC DOCUMENT EXAMINER**
**67 OAK MEADOW COURT, ALAMO, CA 94507**
**OFFICE PHONE: 925-831-0790**
**FAX: 925-831-0791**

# CURRICULUM VITAE

Currently I am self-employed as a Forensic Document Examiner.

The following is a resume of my qualifications as they relate to my expertise. I would testify to these qualifications in a court of law as an expert in the examination of questioned handwriting and documents.

| | |
|---|---|
| 1963-1990 | Twenty-seven years of service with the San Francisco Police Department. Retired Inspector of Police. |
| 1977-1980 | Assigned to the San Francisco Police Department Fraud Unit, Embezzlement Investigations. |
| 1980 | Graduated from the United States Secret Service Questioned Documents Course in Washington, D.C. |
| 1980-1982 | Completed a 2-1/2 year course of studies as an intern with the Questioned Document Section of the United States Postal Crime Laboratory. |
| 1982 | Graduated from the F.B.I. Questioned Documents Course in Quantico, VA. |

Established the first full time Questioned Document Section within the San Francisco Police Department Crime Laboratory and supervised this section from 1980 – 1990.

Past president of the Southwestern Association of Forensic Document Examiners.

## MEMBER

Honorary member of the American Society of Questioned Document Examiners.

International Association for Identification – Questioned Document Section. Life Member.

EXHIBIT ___7___

PAGE ___130___

Exhibit_1_ Page_4_

## ATTEND FORENSIC WORKSHOPS SPONSORED BY:

Southwestern Association of Forensic Document Examiners
American Society of Questioned Document Examiners
American Board of Forensic Document Examiners
International Association for Identification
American Academy of Forensic Sciences

Prepared scientific research papers which were presented at forensic
seminars and published in forensic and law enforcement journals.

## LECTURED

San Francisco Police Department Academy
Oakland Police Department
District Attorney Investigator's Association
California District Attorney's Association
Trial Lawyer's Association
American Bar Association
California Department of Motor Vehicles Investigators
U.S.F Law School. Hasting Law School
Numerous Bank Investigators and Investigative Associations.

## INSTRUCTOR

Certified by the California Commission of Peace Officer Standards and Training
to teach Questioned Document Investigative Techniques in the Institute of
Criminal Investigation.

Taught (POST) Questioned Document Investigative Techniques in conjunction
with the San Jose State University Administration of Justice Department from
1991 – 2003.

Examined items and prepared formal reports for approximately 6,000 questioned
document cases which were submitted by law enforcement investigators,
corporate security, civil attorneys, criminal defense attorneys, and for federal and
state agencies such as the F.B.I, Secret Service, I.R.S., U.S. Customs, D.E.A.,
California Highway Patrol, etc.

Testified and have been accepted as an expert Forensic Document Examiner in
excess of 500 times in State and Federal Courts, and in depositions and hearings.

EXHIBIT __7__

PAGE __137__

**Exhibit 1 Page 5**

# Exhibit 2

EXHIBIT ___7___

PAGE ___138___

**SFGate.com**

## Zodiac's written clues fascinate document expert

Lance Williams, Chronicle Staff Writer
Saturday, March 3, 2007



It's a task that the world's leading expert on the handwriting of San Francisco's most notorious
fugitive killer has undertaken literally thousands of times.

From somewhere in the world, someone -- police officer, news reporter or amateur sleuth -- has
sent a document that person suspects was written by the Zodiac, the 1960s serial killer who taunted
police with handwritten notes boasting of his crimes, then disappeared.

Patiently and methodically, forensic document examiner Lloyd Cunningham reviews the
handwriting, comparing it to known samples of the Zodiac's own script, looking for a clue that
finally will break the case.

But for 27 years, the result has always been the same: no match.

Cunningham, 67, began investigating the Zodiac while a San Francisco police officer and has
continued on the case as a private consultant. He insists he feels no frustration when he sits down
to examine the latest purported Zodiac document, knowing it is likely to turn out to be junk.

Nor, he says, is he daunted by the avalanche of new Zodiac suspects -- "friends, neighbors,
relatives, ex-spouses, whoever people want to pin the Zodiac murders on," as he describes them --
likely to be generated by the new "Zodiac" movie.

"Who knows?" he said Thursday in a phone interview from his home near Palm Springs. "Maybe
one of them is right."

Cunningham became a police officer in 1963. On the night of Oct. 11, 1969, while working a
plainclothes assignment, he was among dozens of officers who flooded the Presidio after the
shooting of cab driver Paul Stine -- the last of the Zodiac's verified kills.

In 1980, after training with the U.S. Secret Service, Cunningham became the department's first
forensic document examiner. Before then, police had relied on the state crime lab to analyze
documentary evidence.

While an officer, and since he retired in 1991, Cunningham has worked on hundreds of legal cases.
For Colorado authorities, he examined the ransom letter in the JonBenet Ramsey case. He

**Exhibit 2  Page 6**

reconstructed notes that mass killers Leonard Lake and Charles Ng forced their victims to write in the 1980s sex-slave murder ring in Calaveras County.

Nothing in his career has been quite like Zodiac. Cunningham plunged into the case immediately after finishing his forensic training. In those days, police received as many as 30 purported Zodiac documents per week.

"All over the world, people were mesmerized by the Zodiac mystery," he says, "and everyone's relative or ex-friend became a suspect."

Cunningham spent long hours with what he calls the case's "Rosetta Stone" -- the letter received by The Chronicle two days after the Stine killing in 1969. Because it contains a bloodstained piece of the victim's shirt, it's the only Zodiac letter that undeniably came from the killer.

Over the years, Cunningham says he memorized Zodiac's handwriting, including the uniqueness of its letter forms. The killer crossed his "t" low on the vertical stroke, Cunningham notes, and formed a distinctive "saddle" between the legs of his lowercase "m." He usually left generous spacing between lines, Cunningham says.

Copycat Zodiac missives often can be easy to spot, he says. A tip-off to copied or disguised handwriting is a lack of "fluency," he says.

"There's a rhythm in writing," he says -- when people jot notes or sign documents, they write quickly and confidently. "But if someone tries to copy or disguise their handwriting, it's no longer spontaneous," he says, and an expert can see signs of the effort in the script.

Soon after he retired, Cunningham says he was brought back into the Zodiac case by the Vallejo police, who were taking a new run at solving the crime. Their suspect was Arthur Leigh Allen, a retired schoolteacher, former mental patient and convicted child molester who had been singled out by Zodiac investigators in the 1970s but was cleared after he passed a lie detector test. Allen, who died in 1992, is still the favorite Zodiac suspect of some experts on the case, including Robert Graysmith, the former Chronicle editorial cartoonist who wrote the book on which the movie was based.

In 1991, police raided Allen's home in Vallejo and seized a trove of potential evidence, including a box of handwritten letters that spanned 25 years. Cunningham spent days examining them.

"I went through every piece of his known writing and compared it, and I couldn't find any evidence to link him to the Zodiac writings," Cunningham says.

But police didn't give up on Allen. They theorized that Allen had committed the Zodiac killings with an accomplice and that the accomplice had written the Zodiac letters. Cunningham says he thought

Exhibit **2** Page **7**

the theory was promising. When police seized specimens of the suspected accomplice's handwriting, Cunningham believed a break in the case had finally come.

"My heart was going pitter-pat," he says. Then he sat down with the documents.

"We really thought Arthur Leigh Allen did the killings and this guy did the writing," Cunningham says. "I was never so let down -- it just wasn't the guy."

The most recent Zodiac-style document that Cunningham has examined came to him via The Chronicle's photo archive.

In an envelope of old news photos of the Zodiac case, editorial assistant Daniel King found a Christmas card addressed to The Chronicle and postmarked 1990. The handwriting resembled the Zodiac's, and the card itself was similar to one the killer is thought to have sent to the newspaper during his killing spree.

No one at the newspaper today remembers receiving the Christmas card or how it came to be put in the Zodiac photo file. The Chronicle gave the card and envelope last week to Vallejo police, the lead agency on the Zodiac murders, and provided Cunningham with scans of the documents.

Cunningham pointed out several similarities between the writing on the envelope and the Zodiac's script but noted discrepancies as well. More important, he says, the writing looked like it had been done slowly and carefully and in places appeared to have been overwritten.

"The big problem you have here is, why would a person overwrite all of these letters?" he says. "The Zodiac never did that in any of his writings." The overwriting led him to suspect that the writer was copying or tracing the script from another document.

"I could never conclude that this is the writing of the Zodiac," he says. "It tends to lean the other way -- I have the impression that someone tried to imitate the Zodiac's handwriting."

*E-mail Lance Williams at lwilliams@sfchronicle.com.*

http://sfgate.com/cgi-bin/article.cgi?f=/c/a/2007/03/03/MNG37OETI71.DTL

This article appeared on page **A - 1** of the San Francisco Chronicle

EXHIBIT **7**

PAGE **141**

Exhibit **2** Page **8**

1 either me or my client. I certainly understand the critical nature of each of Mr.

2 Bryant's original documents and will be fully accountable for them while they are in

3 my custody.

4        7.     All the Bryant documents that are provided for examination and

5 testing shall be returned by me in the same condition, sequence and order in which

6 they were received.

7        I declare under penalty of perjury under the laws of the State of

8 California and the United States of America that the foregoing is true and correct.

9        Executed this 27th day of August, 2007, at Alamo, California.

10

11 DATED: August 27. 2007

12

13                          Lloyd W. Cunningham

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 7

PAGE 142

07209/2161753.1

2

LLOYD CUNNINGHAM
FORENSIC DOCUMENT EXAMINER
67 OAK MEADOW COURT
ALAMO, CA 94507

OAKLAND CA 946

28 AUG 2007 PM 8 T

EXHIBIT ___7___

PAGE ___143___

EXHIBIT 8

1    Lloyd W. Cunningham

2              VIDEO OPERATOR:   Good morning.   We are now

3    on the record.   The date today is March 31st, 2008.

4    The time is approximately 9:59 a.m.   My name is

5    David West with Veritext of Los Angeles, California.

6              We're providing video services today at

7    Skadden, Arps, 300 South Grand Avenue, 32nd Floor,

8    Los Angeles, California.

9              This is the recorded testimony of Lloyd W.

10   Cunningham in the matter of Carter Bryant versus

11   Mattel, Inc. and consolidated.   It is in United

12   States District Court, Central District of

13   California, Eastern Division, the case number CV 04

14   0949 SGL.

15             Counsel will now introduce themselves for

16   the record.

17             MR. SLOAN:   Matthew Sloan for -- from

18   Skadden, Arps, Slate, Meagher & Flom on behalf of

19   MGA Entertainment.

20             MS. HUTNYAN:   Diane Hutnyan of Quinn,

21   Emanuel, Urquhart, Oliver & Hedges for Mattel.

22             VIDEO OPERATOR:   Thank you.   Miss Court

23   Reporter, would you please swear in the witness and

24   we will begin.

25   BY MR. SLOAN:

EXHIBIT ___8___

PAGE ___144___

1       A.    It would be very difficult.  I would say
2    including travel and my deposition -- and I'm not
3    sure who pays for the depositions in this matter,
4    whether it's my counsel or opposing counsel -- so I
5    wouldn't know if I'm supposed to bill my counsel for
6    the deposition or not so I don't know if that would
7    be included.

8       Q.    Let me -- let's say this.  Up to the time of
9    the deposition this morning which started
10    approximately 9:58 a.m., how much time did you spend
11    and will you likely bill to Quinn Emanuel in
12    connection with this case?  I understand it's an
13    estimate, sir.  Can you give me a ballpark?

14      A.    Maybe ten more hours.

15      Q.    And you indicated that you also reviewed
16    Mr. Robert Kullman's report, correct?

17      A.    Yes.

18      Q.    And approximately how much time did you
19    spend reviewing Robert Kullman's report?

20      A.    At least 45 minutes, maybe more time.

21            MR. SLOAN:  Can we take a break now.

22            VIDEO OPERATOR:  Let's go off the record at
23    11:05.

24                      (Brief recess.)

25            VIDEO OPERATOR:  The time is 11:12 and we

1    are back on the record.

2    BY MR. SLOAN:

3        Q.    Mr. Cunningham, I wanted to ask you about

4    some of the methods you employed in connection with

5    your examination.   The first one I want to ask you

6    about is the indentation materializer.   Can you

7    briefly explain what that device is and how it's

8    used.

9        A.    Yes.   The indentation materializer is a

10   prototype of the electrostatic detection apparatus.

11   The electrostatic detection apparatus was invented

12   and marketed by a firm in London, England by the

13   name of Foster and Freeman.   A Swedish firm -- and I

14   don't remember the name of the Swedish firm --

15   subsequently produced an instrument similar to the

16   electrostatic detection apparatus and they call it

17   the indentation materializer.   They both perform the

18   same type of testing.   The process is that it's an

19   electrostatic process similar to the electrostatic

20   process found in copiers and the elements of the

21   instrument include a Corona wire which emits an

22   electrostatic charge.   Another component is imaging

23   film which is very similar in appearance to Saran

24   wrap.   And another element is dry toner which is

25   applied to the imaging film.   Another element are

EXHIBIT ____ 8 ____

PAGE ____ 146

1    adhesive sealants to seal and preserve the

2    visualized indentations in the paper fiber.  The

3    document on both type instruments, the EDSA and the

4    indentation materializer, is placed upon a platen

5    that has numerous holes or pores on the -- in it and

6    that's hooked up to a suction pump per se.  When

7    this is turned on, this causes the document to in a

8    sense be sucked down onto the platen.  Then the

9    imaging film is pulled over the subject document to

10   be examined.  The imaging film is then cut and then

11   the imaging film and the document are

12   electrostatically charged with the Corona wire and I

13   have to step back.  Prior to the document being

14   placed onto the platen and covered with the imaging

15   film generally it is humidified in a humidity

16   chamber.

17        Q.   Mr. Cunningham, I'm going to actually break

18   one of my own cardinal rules because you've given a

19   very explicit and comprehensive explanation but

20   perhaps more comprehensive than I need.

21        A.   Oh.

22        Q.   Let me ask you this.  The purpose of the

23   indentation materializer, can you briefly explain

24   what it is and how it accomplishes that purpose.

25        A.   Yes.  Its purpose is to visualize

1   indentations in the paper fiber that are generally

2   not observable to the unaided eye. Sometimes these

3   indentations are observable to the unaided -- well,

4   to the eye with other means such as magnification

5   and oblique or side lighting. This instrument will

6   visualize those indentations in the paper fiber and

7   the visualized indentations are then sealed for

8   permanent record.

9        Q.   And are they sealed on the film that you've

10  spoken about?

11       A.   Yes, the imaging film on top of the imaging

12  film dry toner is applied which if indentations in

13  the paper fiber exist generally they are developed

14  with the dry toner. What's they're visualized, then

15  there is a clear sealant and that is placed over the

16  visualized indented writing and it's a permanent

17  record at that point.

18       Q.   And are the -- any indentations that are

19  made in the question document, are those reflected

20  as usually black or dark lines on the indentation

21  materializer film?

22       A.   Yes. They vary in shades, anything from

23  extremely dark to very, very faint.

24       Q.   What other methods besides the indentation

25  materializer did you employ in connection with your

1   examination of the documents at issue in this case?

2      A.    I scanned many of the documents with oblique

3   lighting to determine if there were visible

4   indentations in the paper fiber which in return

5   would prompt me to evaluate whether the document

6   should be further tested with the indentation

7   materialize error not.  I examined the documents

8   with, once again, side lighting or oblique lighting

9   to determine if there was any disturbance of the

10  paper fiber.  If that was so noted, I would then

11  attempt to evaluate the cause of the disturbance of

12  the paper fiber.  I examined the documents with

13  oblique lighting once again to determine if any

14  erasures had occurred or if there was evidence that

15  erasures had occurred by disturbing the paper fiber.

16  I examined the documents with reflected infrared,

17  infrared luminescence, ultraviolet and I should add

18  some of the documents I examined with these

19  methodologies, not all.  I examined the documents --

20  some of the documents with a dichroic -- that's

21  d-i-c-h-r-o-i-c -- filter.  That would be

22  examination of the ink.  I examined handwritten

23  information such as the date 1998 and such as the

24  crowded entry in the notary journal.

25      Q.    Did you examine in this case with a

EXHIBIT ____ 8 ____

PAGE ____ 149 ____

1    microscope?

2        A.    Oh, yes, various documents were examined

3    under high magnification with a stereoscopic

4    microscope.   Some of the documents were examined

5    with hand-held magnifiers.

6        Q.    And did you feel that you had a sufficient

7    amount of time to perform your examination of all of

8    the documents that you received in connection with

9    this case?

10       A.    Well, that depends on the type of

11   examination.   The majority of my examination was

12   based on somewhat of a cursory examination.   A

13   cursory examination versus a detailed examination

14   are two completely different things.   Would I have

15   enough time to examine all documents as a detailed

16   examination?   No.   Did I have enough time to examine

17   the documents for a cursory examination?   Yes.

18       Q.    In connection with the specific documents

19   which you discuss in your expert report, did you

20   have sufficient time in your professional opinion to

21   examine those?

22       A.    Yes.

23       Q.    Let me ask you some questions about -- about

24   Exhibits 179 -- I'm sorry, not exhibits, but Bryant

25   179, 180, 181 and 182.   You refer to these on the

1    bottom of page 2 of your report.  And in that

2    portion of the report you specifically say that 179,

3    180, 181 and Exhibit paper characteristics that are

4    similar to the paper characteristics in the Q4

5    spiral notebook Z.  Can you explain what you meant

6    by that.

7         A.    Yes.  The color of the paper, the nature of

8    the lines, the nature of the spiral-ring tears are

9    very similar between 179, 180, 181 and 182 and then

10   very similar between those documents and the other

11   pages in the Q4 spiral notebook.  I couldn't find

12   any differences to lead me to a conclusion that 179,

13   180, 181 and 182 were from a different spiral

14   notebook.

15        Q.    Can you state or is it your opinion to a

16   certainty that, in fact, 179, 180, 181 and 182 come

17   from the same spiral notebook as Q4?

18        A.    Well, it's quite obvious in my report that I

19   used the word "similar" and if they were the same, I

20   would have said that they did come from that

21   notebook.  So obviously not.  They're just similar.

22             MS. HUTNYAN:  The exhibits in my copy are

23   all screwy so I don't know if yours are the same but

24   the tabs don't correspond to the documents.

25             MR. SLOAN:  The tabs are exactly as we

EXHIBIT _____ 8 _____

PAGE _____ 151

1   the other hand you were talking about one of these

2   multicolored drawings?

3      A.   Yes, a common model, yes.  Not from one

4   another per se but both from a common model.

5      Q.   Again, in those instances where you indicate

6   that they were superimposed from sufficient areas to

7   conclude that they were both from the same model,

8   are you saying -- were you in a position or are you

9   in a position today to make or render some

10   conclusion as to which of those two drawings came

11   first in those cases I he, whether it was X the

12   black and white drawing or the non-colored drawing

13   on the tracing paper or whether it was the

14   multicolored drawing?

15      A.   No.

16      Q.   You have no opinion on which one of those

17   drawings came first.  Is that what you're saying?

18      A.   I have an opinion but it doesn't -- it's not

19   restricted to which one came first because in my

20   opinion it could be either way.

21      Q.   But with respect to some of the drawings

22   which you described as sort of bare-body drawings

23   which have no clothes on them -- correct?

24      A.   Correct.

25      Q.   -- is it your opinion that those drawings

1    preceded drawings that had clothes on them?

2        A.   My testimony I clearly stated may have

3    preceded, may not have.  I don't know.

4        Q.   When you indicate in your report that

5    various of these documents are superimposed in

6    sufficient areas to conclude that they were both

7    from the same model, can you describe in general

8    what methods you used to determine that they were

9    actually superimposed in sufficient areas to make

10   that determination?

11       A.   Yes, I used transmitted lighting.  I place

12   one document on top of another and I attempted to

13   line up both images to determine what did and what

14   did not superimpose.

15       Q.   Did you do that on a light table?

16       A.   Yes.

17       Q.   Did you use any other devices such as a VSC

18   machine?

19       A.   No.

20       Q.   Do you have a VSC machine?

21       A.   No.

22       Q.   What is a VSC machine?

23       A.   Video spectral comparator and there are

24   different models.

25       Q.   Are you trained in the use of video spectral

1    comparative?

2        A.    A VSC IV I'm trained in but not the VSC 2000

3    or the newer models and I don't remember what the

4    nomenclature and number of them are.

5        Q.    Do you think that it would have been useful

6    for you to have used a VSC in connection with this

7    examination?

8                 MS. HUTNYAN:    Vague.

9                 THE WITNESS:    In order to do a accurate

10   superimposition of figures or handwriting, as long

11   as the subject document and and the document to use

12   as a comparison for superimposition are both

13   reduced, enlarged or they remain at the same size

14   such as one to one, all I feel that is necessary is

15   a transparency or a light table in order to do such

16   a comparison, a transparency if you wanted to record

17   that information, a transparency and a photocopier

18   could easily capture that image as a permanent

19   record, but to say that the use of a VSC 2000 is a

20   necessity to use such old methodology which has been

21   very successful would be in my estimation an

22   overkill.    It's not that you shouldn't use a VSC

23   2000 but a VSC 2000 isn't the only methodology or

24   instrument that can provide accurate details as to

25   whether two images superimpose or not.

1    Q.   Did you look at these documents

2    microscopically?

3    A.   I don't know which ones that I examined

4    microscopically.  I do have notes, however, given a

5    brief summary of my examination on each document

6    that I examined.

7    Q.   When you examined them, did you attempt to

8    determine the speed with which the different

9    documents were made?

10   A.   I didn't attempt to determine it but I

11   certainly saw it.

12   Q.   Now, you also examined the multicolored

13   drawings, correct?

14   A.   Yes.

15   Q.   And you're familiar with those?

16   A.   Yes.

17   Q.   And can you describe in general from your

18   examination how those were drawn?

19        MS. HUTNYAN:   Objection:   vague and calls

20   for speculation.

21   BY MR. SLOAN:

22   Q.   Let me be more specific.  Were those

23   generally also done with pencil -- with a graphite

24   pencil and then ink was put on top of them?

25        MS. HUTNYAN:   Which drawings?  I don't like

1    this question.

2    BY MR. SLOAN:

3       Q.   I'm talking about the multicolored drawings.

4    Are you familiar with the ones I'm talking about?

5       A.   Yes.

6       Q.   You're comfortable with what I'm describing

7    as the multicolored drawings?

8       A.   Could I add one more thing?  You mean on the

9    poster board?

10       Q.   On the poster board, right.

11       A.   Yes, I am.

12       Q.   Is it fair to say that those were generally

13    done with both pencil and ink?

14       A.   Well, in addition colorant as well.

15       Q.   Correct, but pencil, ink and colorant?

16       A.   I did see remnants of graphite which would

17    be the pencil on some of them and I did see what

18    appeared to be an ink outline and obviously I did

19    see the colorant.  So to answer your question I'd

20    say at least some of them have those three

21    components.

22       Q.   Let me ask you some questions about your

23    comments on Bryant 196, 198, 201, 204, 208 and 213

24    which appear on page 14 of your report, and I'm

25    referring to the third paragraph of page 4.

EXHIBIT _____ 8

PAGE _____ 156

1          MS. HUTNYAN:   14?

2          MR. SLOAN:   Page 4.

3          THE WITNESS:   Okay, could you repeat that

4     again, sir?

5     Q.   Sure.   I was just directing you to this

6     portion of your report and you indicate here that

7     your examination of Bryant 201, 204, 208 and 213

8     reveal that they may be the product of two different

9     models which are 196 and 198.   Do you see that?

10    A.   I do.

11         MR. SLOAN:   I believe we're running out of

12    tape so why don't we stop here and change the tape.

13         VIDEO OPERATOR:   11:56 off the record.

14                    (Brief recess.)

15         VIDEO OPERATOR:   The time is 12:01 p.m.   We

16    are back on the record.   This is tape No. 2 of the

17    deposition of Lloyd W.  Cunningham.   All parties may

18    continue.

19    BY MR. SLOAN:

20    Q.   Mr. Cunningham, you indicate on page 4 that

21    your examination of Bryant 201, 204, 208 and 213

22    revealed that they may be the product of two

23    different models which are Bryant 196 and 198.   Can

24    you explain to me what you mean by that and what the

25    basis of your opinion is?

EXHIBIT _____ 

PAGE _____ 157

1 curvature part there's no doubt that it's pretty --
2 pretty wobbly. Not tremulous but pretty wobbly and
3 slow.
4    Q.   Now, when you say "the right side," are you
5 talking about the observer's right or the model's
6 right?
7    A.   As I'm facing the document and looking at
8 the document, it would be to the right.
9    Q.   The top of the hairline?
10    A.   Yes, I'll point it out to you.
11    Q.   The top line?
12    A.   Yes, the top line. And that's just one.
13 That doesn't mean there aren't others. I'm just
14 focused in on that to give an example.
15    Q.   Is Bryant 199, is that a drawing in ink or
16 pencil or is it ink on top of pencil?
17    A.   I see some fragments of what appear to be
18 graphite in a portion of the shoe. At least with
19 the unaided eye it appears to be that way,
20 magnification and a lighting source. There may be X
21 some fragments of graphite around one of the
22 thumbs -- on both thumbs actually but I can't be
23 sure without sufficient lighting and magnification.
24 And the media used to do the bold outline certainly
25 could be pen but I haven't evaluated that at all.

1   And when I refer to certain things as pen/ink, I'm

2   referring to in my report that it certainly appears

3   to be pen.

4       Q.   The outline that you see appears to be pen?

5       A.   Yes.

6       Q.   But what I'm asking is is there pencil under

7   it?  You've indicated in some places there is.

8       A.   Yeah, and I can't tell you if there's pencil

9   under the incline just from a visual examination

10  with no, for example, reflected infrared technology.

11      Q.   Did you perform any tests using infrared

12  technology when you examined 199?

13      A.   I don't recall.

14      Q.   Do you think it would -- would it be

15  significant if there's pencil lines underneath those

16  pen lines?

17      A.   I guess it could be significant for a

18  certain purpose if I was advised of the certain

19  purpose during my initial examination, but my

20  initial examination, once again, was a cursory

21  examination with no specific purpose to determine

22  whether pencil was under the ink line.

23      Q.   Well, to the extent -- to the extent that

24  you can see pencil lines, can you tell whether the

25  pencil lines are rapidly made or are slower?

EXHIBIT ___8___

PAGE ___159___

 1      A.    They're too brief for me to reach that

 2  determination if, in fact, they are pencil lines.  I

 3  couldn't tell you just from looking at them, no.

 4      Q.    Could any slowness that you observed in the

 5  ink lines be a result of the artist essentially

 6  tracing over pencil lines that he had already put

 7  down on the document?

 8      A.    That's a possibility as well.

 9      Q.    Did you do any ESDA testing or indentation

10  testing on 199?

11      A.    I don't know, I'd have to go through all my

12  ESDA lifts.

13      Q.    Well, your report at page 6 does not

14  indicate that you performed any indentation testing.

15  Am I correct about that?

16      A.    That's correct.

17      Q.    And is it a fair assumption from that that

18  you didn't perform any indentation testing or not?

19      A.    It's a fair assumption.

20      Q.    If you had noted something that was indented

21  in it, you would have noted it?

22          MS. HUTNYAN:  Calls for speculation.

23          THE WITNESS:  It depends on the significance

24  of it to my client.  In other words, I have numerous

25  ESDA lifts where indentations are developed but not

EXHIBIT ____ 8 ____ Page 129

PAGE ____ 100 ____

1  noted in my report.

2  BY MR. SLOAN:

3  Q. Did you -- let me ask you this. If a

4  tracing were made with tracing paper over one of the

5  poster boards with coloring, would you expect that

6  some colorant would be left on the back of the

7  tracing paper?

8  A. That's a pretty broad question. I'll answer

9  it the best I can for you. No. 1, it depends on the

10  media used as a colorant, how fixed it can become.

11  Is it subject to being easily transferred? Or if

12  something like Krylon protective coating was sprayed

13  on it which many artists do. In fact, I do that

14  with a lot of my artwork. So there are a lot of

15  variables here on if, No. 1, the colorant could be

16  transferred. No. 2, if it's been coated. And so I

17  don't know, sir.

18  Q. The colorant that was used on, say, for

19  instance, Bryant 220, do you know what type of

20  coloring material was used on that?

21  A. No.

22  Q. Did you make any effort to determine what

23  coloring material was used?

24  A. No.

25  Q. Did you ever -- did you observe any transfer

1    A.    Could have been, yes.

2    Q.    And what's your basis for concluding that?

3    A.    As I just previously testified to,

4  specifically concentrating on the back heel of the

5  second shoe, that line is pretty slow and that line

6  is quite parallel to the ink line of the back heel

7  of that shoe.  That's not conclusive evidence that

8  it's a tracing but it impresses me that it could be

9  a feature or characteristic of tracing.  As I

10 mentioned in my report, a possible that's a line so

11 it's not conclusive.

12    Q.    I want to ask you some questions about

13 Bryant 206 and Bryant 224 now.  You indicate that

14 the tracing paper image on 206 and the final colored

15 image on 224 were superimposed in sufficient areas

16 to conclude that they were both from the same model,

17 correct?

18    A.    Yes.

19    Q.    And, again, that's by virtue of you

20 superimposing them on a light table?

21    A.    Yes.

22    Q.    Did you look at them through a microscope?

23    A.    I believe so.

24    Q.    Did you use infrared light?

25    A.    I did use infrared and infrared luminescence

EXHIBIT ____ 8 ____

PAGE ____ 102

1  on the poster board drawings to determine if there
2  was a pencil line under some of the bold outline
3  which it appeared that there were pencil strokes
4  under some of the bold lines. One of the main
5  purposes that I used infrared luminescence, however,
6  was to determine if any chemical erasures had been
7  made on the paper fiber and I also used ultraviolet
8  radiation for the same purpose.

9      Q.   Why were you concerned to see whether you
10  found any evidence of chemical erasures on the
11  document?

12     A.   Because at times people who have written the
13  date or a notation on paper don't want anyone else
14  to see it especially if a lawsuit is filed or say
15  criminal charges are filed against someone so
16  they'll make every effort to erase or redact that
17  information and quite often they do a pretty good
18  job by using chemicals rather than abrasive measure
19  such as a physical erasure.

20     Q.   So was one of your principle tasks in
21  performing your examination of these documents to
22  see whether anyone had erased any dates from the
23  documents?

24     A.   Erased anything.  Not just dates, anything,
25  which includes dates and that's listed clearly in

1    the purpose of my examination in my Rule 26 report.

2         Q.    Did you find any faint or partially obscured

3    pencil lines, graphite pencil lines, in Bryant 224?

4         A.    I don't have my notes to refer to it but I

5    could certainly look for you if you like.

6         Q.    Yes, please do so.

7         A.    Yes, in the area of the hair there are some

8    faint what appear to be graphite or pencil markings.

9         Q.    Where in the hair?

10        A.    On the -- as I face and look at the doll, on

11   the left side of the doll's hair just before it

12   descends down into the long stroke that's near her

13   eyebrow.

14        Q.    Again, I'm sorry, you're talking about the

15   doll's left or your left?

16        A.    As I mentioned -- as I just testified, as I

17   face the doll or look at the doll, it's on its left

18   side.

19        Q.    I'm sorry, on your left side or the doll's

20   left side?

21        A.    The doll's left side.

22        Q.    Okay, the doll's left side.  Which is your

23   right side?

24        A.    No, the doll's left side as I face it is the

25   doll's left side and it's my left side as well.

EXHIBIT _____ 2

PAGE _____ 1041

1    Q.    You said though that if the pencil line on

2    the colored drawing 224 superimposed with one of the

3    ink lines on Bryant 206 that that might be

4    significant in making a determination in terms of

5    which drawing came first; is that correct?

6    A.    Possibly.  I don't know.  I haven't

7    conducted that examination and I haven't really had

8    time to evaluate it.

9    Q.    I understand, sir, but I'm posing a

10   hypothetical.  If, in fact, the facts were as I've

11   stated they are, assume that they're one of the

12   pencil lines on the colored drawing, Bryant 224,

13   superimposed exactly with an ink line on Bryant 206.

14   You would agree that that is something that might be

15   significant in being able to determine which drawing

16   came first.  In other words, if one drawing was a

17   tracing of another drawing, correct?

18            MS. HUTNYAN:  Calls for speculation.

19            THE WITNESS:  It is speculation because I

20   haven't conducted such an exam but, yeah, it might

21   be significant.

22   BY MR. SLOAN:

23   Q.    How might it be significant?

24            MS. HUTNYAN:  Same objection.

25            THE WITNESS:  Well actually it could work

EXHIBIT _____ 8 _____          Page 142

PAGE _____ 165 _____

1    either way.  If you had an, ink line on one document

2    and you used that to trace another document with a

3    pencil, then one line would end up being pencil and

4    one would end up ink and vice versa.  If you had a

5    pencil line on one document and an ink line that

6    super imposes with it on another document, I -- at

7    this point unless I really thought about it I can't

8    see the significance of it because it could work

9    both ways.

10   BY MR. SLOAN:

11       Q.   As you look at Bryant 206, do you agree that

12   that is a -- that that's a pen image but it's pen

13   written over graphite?

14       A.   Yes, it certainly appears to be a pen ink

15   line and there certainly is what appears to be

16   graphite lines intermingled with the pen lines.

17       Q.   Can you tell whether the pen lines are over

18   the pencil lines?

19       A.   No.

20       Q.   If you looked at it microscopically or with

21   some other method of observation, would you be able

22   to possibly determine whether the ink was over the

23   pencil?

24            MS. HUTNYAN:  Calls for speculation.

25            THE WITNESS:  Possibly.

EXHIBIT _____ **8** _____

PAGE _____ 166 _____

1    BY MR. SLOAN:

2        Q.   If you looked at it with a microscope, could

3    you possibly determine that?

4            MS. HUTNYAN:   Same objection.

5            THE WITNESS:   Possibly.   This is all

6    speculation on my part.   I would have to do a

7    detailed examination and utilize all that

8    instrumentation in order to determine if it was

9.   doable or not.

10   BY MR. SLOAN:

11       Q.   Did you make any observation of those

12   drawings with microscope to determine whether the

13   ink was over the pencil?

14       A.   No.

15       Q.   Did you make any observations with infrared

16   luminescence to determine whether the ink was over

17   the pencil?

18       A.   No.

19       Q.   Did you make any observations with any other

20   method to determine whether the ink was over the

21   pencil?

22       A.   No.

23       Q.   You also indicate that the details like the

24   shoe lace he is on Bryant 224 were finished although

25   they had not been completed on the tracing paper.

1    Is that correct?

2         A.    Yes.

3         Q.    Does that suggest to you that the colored

4    image on 224 was a -- a final image that was

5    intended to be complete?

6              MS. HUTNYAN:  Vague, calls for speculation.

7              THE WITNESS:  I don't understand that.

8    Complete compared to what?

9    BY MR. HANSEN:

10        Q.    Okay.  What is the significance of the fact

11   that the shoe laces on Bryant 224 were colored

12   whereas the -- I'm sorry, what is the significance

13   that the shoe laces on Bryant 224 were finished

14   whereas they weren't completed on Bryant 206?

15   What's the significance of that to you?

16        A.    It's just the observation that I made.  It's

17   just a very clear observation that really has no

18   significance.

19        Q.    There's no reason you made that observation?

20        A.    Yeah, I made the observation because one had

21   shoe laces and one didn't have shoe laces.

22        Q.    Did you make any attempt to determine the

23   source of the stray pencil lines on Bryant 224?

24        A.    That question I really don't understand.

25        Q.    Okay.  Is it possible that the pencil lines

1    could have been traced from?

2       A.   No.

3       Q.   And why -- why did you specifically say they

4    could have been tracing outlines from another

5    document?

6       A.   Let's see, 232, 225.  I said in my report

7    that they could have been tracing lines.  That

8    doesn't mean that they are conclusively tracing

9    lines.  It could have also been sketching lines.

10      Q.   But why did you say that they could be

11   tracing lines?

12      A.   Because they follow the contour of some of

13   the clothing that the hair lines quite closely.

14      Q.   And you're talking about the hairline in the

15   contours of the clothing on 225?

16      A.   Yes.

17      Q.   Did you make any attempts to determine

18   whether any of the pencil lines from 225 match the

19   ink lines from Bryant 232?

20      A.   There aren't ink lines that I could see on

21   232.

22      Q.   Is 232 all in graphite?

23      A.   I don't know.  The stem of the bouquet or

24   one of the stems of the bouquet -- and this is just

25   examination with a hand-held magnifier under poor

EXHIBIT _____

1   lighting conditions, that may be -- that may be ink

2   and it appears that the rest of the image was

3   prepared with graphite.

4       Q.   Can you tell me whether the -- any of the

5   ink lines on -- I'm sorry, whether any of the pencil

6   lines on Bryant 225 which you testified earlier

7   match the drawing from 232?  In other words, whether

8   they superimpose?

9       A.   Yes, as stated in my report they superimpose

10  in sufficient areas to conclude that they are from a

11  common model.

12      Q.   Oh, I understand that.  I'm saying

13  specifically the pencil lines on 225, whether the

14  pencil lines on 225 superimpose with the lines on

15  232.  Can you tell me that?

16      A.   No, I haven't conducted that examination.

17      Q.   Can you look now and tell me whether that's,

18  in fact, the case?

19      A.   I wouldn't want to do an off-hand exam like

20  that.  I'd rather do a real detailed examination of

21  something of that nature to superimpose and make any

22  definitive conclusions.

23      Q.   Why can't you do that right now?

24      A.   Because you're asking me to give a

25  definitive conclusion and I don't really do off-hand

EXHIBIT _____ **8**

PAGE _____ 170

1    examinations to determine something definitively.  I

2    don't have any problem with being asked is this

3    pencil or is this ink, I have no problem being asked

4    do you see any pencil lines, but to do an evaluation

5    and comparison is completely different than just

6    making observations.

7        Q.   So even if you superimpose the two images on

8    top of one another you wouldn't be in a position to

9    make that comparison?

10       A.   Not at this point.  I wouldn't venture into

11   it at this point.

12       Q.   I'm going to hand you Bryant 226 and 204 and

13   why don't you take a look at those.

14       A.   Okay, I've looked at them, sir.

15       Q.   Okay.  You indicate here that there are

16   pencil strokes present that could have been for

17   either a rough sketch or tracing outlines from

18   another document on Bryant 226.  Correct?

19       A.   That's correct.

20       Q.   Can you indicate where those pencil tracings

21   are?

22            MS. HUTNYAN:  On 226?

23            THE WITNESS:  You're just using the term

24   "pencil tracings."  /KWEUGS mentioned in my report

25   pencil tracing or sketches.

1    Q.    Why don't we mention strokes.    Where are
2    those pencil strokes on the colored drawing 226?
3    A.    There's some extraneous strokes adjacent to
4    the -- as I face and looking at the image, that
5    would be on the dolls right side where the hand
6    is -- some extraneous it appears to be graphite
7    strokes in that area that are not related to the
8    actual contour of the image.    There is a graphite
9    stroke -- what appears to be a graphite stroke
10   behind the cuff of the right leg as I look at the
11   image and also some graphite strokes at the bottom
12   of the sole of the shoe which would be the right
13   foot as I look at the image.    There appears to be
14   some graphite strokes also at the bottom of the sole
15   of the left foot as I look at the image and at the
16   bottom of the left hem in the dress as I look at the
17   image.    At the wrist of the left arm as I face the
18   image -- that enough?

19   Q.    Yes.

20   A.    Oh, okay.

21   Q.    Let me ask you another thing.    Do you see
22   any pencil strokes near the triangular-shaped object
23   on the right side bottom of the vest?    Do you see
24   what I'm talking about?

25   A.    Triangular image.    I don't see anything that

EXHIBIT _____ **8**

1    answer.  What I want to determine is if I had Bryant
2    213 -- if I could show you Bryant 213, which I have
3    somewhere back there, am I correct that you would
4    not be prepared to make an examination now to
5    determine whether or not the faint pencil lines that
6    you see on Bryant 227 reflect or superimpose with
7    lines on Bryant 213?
8        A.   Yes, I'm not prepared to conduct such an
9    examination or to give such -- or to make such an
10   evaluation at this time outside of laboratory
11   conditions.
12       Q.   I'm going to hand you Bryant 228 and Bryant
13   237.  Take a look at those.
14       A.   Yes, I've looked at these.
15       Q.   Again, you indicate in Bryant 228 that there
16   are light pencil strokes that could be from a rough
17   sketch or tracing outlines from another document.
18   Correct?
19       A.   Yes.
20       Q.   Can you indicate where some of those light
21   pencil lines are?
22       A.   Certainly.  It appears that there's a light
23   pencil line as I face the document on the longest
24   descending curl in her hair.
25       Q.   I'm sorry, is that on the right side?

1   A.   Yeah, longest descending curl which is on

2   the right side.  There appears to be an area of

3   pencil line behind the calf or at the back of the

4   calf of her leg on the right side right leg as I'm

5   facing this image.  There appears to be a slight

6   graphite stroke as I face the image on the right

7   side of the dress at the very bottom of the hem.

8   And appears there's a little light -- very, very

9   light pencil stroke once again at the bottom of the

10  right side of the dress to the right edge that

11  extends out past the right edge forming a slight

12  loop.  Is that enough?

13  Q.   That's enough.

14  A.   Okay.

15  Q.   And when you made these initial

16  observations, did you just make them from observing

17  with a magnifying glass like you've just done or did

18  you use other methods?

19  A.   I probably used a fiberoptic sliding and

20  also a microscope at times.  Most of the time a

21  hand-held magnifier is sufficient if you have the

22  proper lighting to observe graphite strokes versus

23  ink strokes or coloring.

24  Q.   What is fiberoptic sliding?

25  A.   Fiberoptic sliding is a high intense

1    lighting source that is in a flexible container or

2    tubing that you can point and aim the lighting in

3    any direction you see fit.  They're generally used

4    in microscope -- for microscopes to adjust the

5    lighting properly but we also use them for

6    examinations with oblique or side lighting and

7    sometimes for transmitted lighting as well.

8        Q.    Why was it significant enough for you to

9    note the presence of these pencil lines in your

10   report?

11       A.    Very simply, they're observations I made and

12   any observations such as the adhesive or fragments

13   of tape on the paper or indented lines on the paper

14   or pencil versus ink versus color I make a notation

15   of any observation.  That doesn't necessarily mean

16   that I have evaluated it and compared it with

17   anything but it is an observation.

18       Q.    Did you make any efforts to determine

19   whether these faint pencil lines superimposed with

20   either ink or pencil lines on the corresponding

21   outline drawing which is Bryant 237?

22              MS. HUTNYAN:  Comparing it with 228?

23              MR. SLOAN:  Comparing it with 228.

24              THE WITNESS:  Well, I certainly superimposed

25   the images.  Now, whether they're -- go ahead.

EXHIBIT ____ 8

PAGE ____ 175

1    Whether they're pencil or ink, there was

2    superimposition of the lines that were sufficient to

3    conclude that they were from a common model.  I

4    didn't at that point evaluate which was

5    superimposing on which.  For example, pencil on

6    pencil or ink on ink.

7    BY MR. SLOAN:

8        Q.   And why didn't you do that?

9             MS. HUTNYAN:  Asked and answered.

10   BY MR. SLOAN:

11       Q.   I'm asking with respect to these two

12   documents, Bryant 228 and 1237, is there a reason

13   you didn't try to determine whether the

14   superimposition was between the ink on 228 and the

15   graphite on 237 as opposed to the ink on 228 and the

16   ink on 237?

17       A.   At that point it had no bearing on my

18   examination.  At that point I was conducting a

19   cursory examination of the documents and making

20   observations.  There was no issue presented to me or

21   no assignment presented to me by my clients to

22   determine which came first, the tracing paper or the

23   image on the poster board.  Therefore, since no such

24   assignment was provided to me I didn't conduct such

25   an examination.  I just made my observations.

1    Q.    Okay, I'm going to hand you what's labeled

2    Bryant 229.  Do you recall that document?

3        A.    Just a moment, sir.  Yes, I do.

4        Q.    And you indicate that there were pencil

5    strokes that you noted on Bryant 229 that could have

6    been either from a rough sketch or tracing outlines

7    from another document, correct?

8        A.    Correct.

9        Q.    And where -- where did you note those lines?

10       A.    Once again, I'll have to look for them now.

11   There's a slight little graphite marking in the

12   lower lobe of the ear it appears of the image.  It

13   appears there's a slight graphite marking at the top

14   of the hair in the image.  Right along the bottom of

15   the hem of the dress, the scalloped effect at the

16   bottom on the right side as I face the image,

17   there's areas of little loops of what appears to be

18   graphite.  At the bulb portion of the shoe which is

19   the left shoe as I face the image there's a line of

20   what appears to be graphite.  It appears that

21   there's some extraneous little deposits of graphite

22   not in line with any outline of the right shoe but

23   near the right shoe.  There is an area of graphite

24   lines on the buckle of the right shoe and at the top

25   of the little design above the strap of the right

1             THE WITNESS:  When you use the term

2     "might," --

3        Q.   Might.

4        A.   -- yes, it might be doable.

5        Q.   You didn't attempt to do that; is that

6     correct?

7        A.   Of course not.  It wasn't part of my

8     assignment.

9        Q.   If you had performed that analysis and had

10    determined that it, in fact, was those horizontal

11    straps on 231 were done in pencil rather than ink,

12    would it be a safe assumption then to assume that

13    that indicated that those pencil lines were traced

14    from 201 onto 231?

15       A.   No, because it could be the opposite way

16    around.  If pencil lines of those two straps as you

17    call them were originally on 231 in pencil form and

18    then someone placed the tracing paper on top, then

19    the person tracing the pencil lines could have

20    traced the little straps as you've mentioned.  So it

21    could be done both ways.

22       Q.   Bryant 231, would you agree that it has

23    pencil and pen, correct?

24       A.   There's some areas of pencil and the bold

25    outline appears to have been done in pen and then

EXHIBIT ____ 7

PAGE ____ 178

1    there's a colorant.

2        Q.   So are you saying -- when you say the bold

3    outline, that means the final outline is one that's

4    done in pen on 231, correct?

5            MS. HUTNYAN:   Argumentative.

6            THE WITNESS:   It appears to be pen, yes.

7    BY MR. SLOAN:

8        Q.   And is that pen written over pencil?

9        A.   I don't know.

10       Q.   Because you didn't examine that, correct?

11       A.    I may have on some of them conducted a

12   cursory examination while I did the infrared

13   luminescence and ultraviolet to determine if there

14   are any erasures or disturbance of paper fiber,

15   et cetera, and I know I did look at some of them

16   because I could see with side lighting that there

17   was a groove in the middle of the ink lines at times

18   and I determined that the ink I believe -- I can't

19   say for certain -- but I think the ink dropped out.

20   That means it transmitted infrared radiation and the

21   pencil line absorbed the infrared radiation and I

22   was able to visualize and see the pencil line.   So

23   on some of them, yes, I'm pretty sure that the bold

24   outline was drawn over pencil and as in this case

25   sometimes the person fell out of the track when they

EXHIBIT ___9___

PAGE ___179___

1   were drawing over it.  That's why we're still able
2   to see some fragments of the graphite.

3       Q.   Can you explain why someone would draw 231
4   in pencil and then trace something from the pencil
5   rather than wait until they had completed the pen
6   drawing of 231 before tracing?

7           MS. HUTNYAN:  Calls for speculation.

8           THE WITNESS:  It's -- once again, it's
9   absolutely speculation because I have never
10  conducted such examinations but if you want, you
11  know, my feelings on the subject, I can say that --
12  or give a hypothetical that if this was to be the
13  final product of an artist and the artist was very
14  happy and satisfied with the final product, the
15  artist could simply say to himself or herself, you
16  know, I'm going to capture that image because I may
17  want to use it again from a tracing paper.  So I'm
18  going to trace it now and I will keep this in my
19  files in case I want to use it again later.  And
20  then continue on to do the bold outline and the
21  colorant.  The artist -- another hypothetical -- may
22  have said to himself or herself, whoever, you know,
23  would do it because I'm not pertaining to this
24  particular case that once the colorant is done I
25  don't want to damage anything so I better do the

EXHIBIT _____ **8** _____

1    tracing before I add the color.  These are just

2    hypotheticals and as I start out to say it's

3    speculation on my part because I never conducted

4    such an examination.

5    BY MR. SLOAN:

6        Q.   So it's fair to say that you -- you didn't

7    conduct an examination to determine whether the

8    pencil lines on 231 superimposed with the pen or the

9    pencil lines on 201.  In other words, did you make

10   any sort of determination as to whether the pencil

11   lines on 231 -- did they match the pencil lines on

12   201 or the pen lines in 201?  Did you make that

13   determination?

14              THE WITNESS:  No.

15              MS. HUTNYAN:  Vague and ambiguous.

16   BY MR. SLOAN:

17       Q.   I'm going to hand you Bryant 230.

18       A.   Would you like this back, sir?

19       Q.   Sure.  You indicate in your report that you

20   also saw slight pencil strokes that may be from a

21   rough sketch or tracing outlines from another

22   document on Bryant 230, correct?

23       A.   Yes, sir.

24       Q.   Can you indicate where some of those light

25   pencil lines are?

EXHIBIT _____ 8 _____