# EXHIBIT 9

```
 1            IN THE UNITED STATES DISTRICT COURT
 2       FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3                 EASTERN DIVISION
```

**Certified Copy**

```
 4
 5    ------------------------
 6   CARTER BRYANT,            )
 7   an individual,           )
 8          Plaintiff,        )
 9      vs.                   ) No. CV 04-09049 SGL (RNBx)
10   MATTEL, INC., a          )    Consolidated with
11   Delaware corporation,    )    CV 04-09059
12          Defendant.        )    CV 05-02727
13   ------------------------
14
15
16       Videotaped Deposition of WILLIAM J. FLYNN,
17       taken at Phoenix, Arizona commencing at 9:31 a.m.
18       March 27, 2008 before Robin L. B. Osterode,
19       RPR, CSR, Arizona, Certified Reporter No. 50695.
20
21
22
23
24
25   PAGE 1 - 252
```

EXHIBIT _____ 9 _____

PAGE _____ 182 _____

```
 1              DEPOSITION OF WILLIAM J. FLYNN, commenced at
 2     9:31 a.m. on March 27, 2008, at Phoenix, Arizona,
        before Robin L. B. Osterode, RPR, CSR, Arizona
 3     Certified Reporter No. 50695.
 4
                              *  *  *
 5
        APPEARANCES:
 6
 7          For Plaintiff:
 8              QUINN EMANUEL URQUHART
                OLIVER & HEDGES, LLP
 9              By: Diane Cafferata Hutnyan
                865 South Figueroa Street, 10th Floor
10              Los Angeles, California  90017
                (213) 443-3666
11
            For Defendants:
12
                SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
13              By: Matthew E. Sloan
                300 South Grand Avenue
14              Los Angeles, California  90071-3144
                (213) 697-5000
15
        The Videographer:
16
                Kayla Camenzind
17
18
19
20
21
22
23                                    EXHIBIT ____ 9 _____
24
25                                    PAGE _____ 183 _____
                                                            2
```

1          Did you understand that your purpose in

2     conducting this examination was to be both of those,

3     i.e., to determine forensic evidence of the dating of

4     the documents, as well as any evidence regarding the

5     sequencing?

6          A.    Yes.

7          Q.    Did you get the understanding that what you

8     were supposed to determine is the sequencing, from

9     any source, other than communications with Quinn

10    Emanuel?

11              MS. HUTNYAN:  This is still running into

12    the same problem.  He's already testified he didn't

13    receive instructions from anybody other than us,

14    so --

15              MR. SLOAN:  Okay.

16              MS. HUTNYAN:  You know.

17    BY MR. SLOAN:

18         Q.    How did you -- were you given any

19    indication as to how long you would have to examine

20    these documents?

21         A.    Yes.

22         Q.    How long were you told you would have to

23    examine the documents?

24         A.    The documents would be in my lab for a

25    total of four days; however, within that four days

18

EXHIBIT _____ 9

PAGE _____ 184

1    would include the time it took to organize the

2    documents that were to be examined, the repackaging

3    of the documents to put them back in the boxes, the

4    sealing of the boxes, and all of the administrative

5    overhead and notetaking that I would have to do.  So

6    the reality is that I probably had just over three

7    workdays with these hundreds of documents.

8         Q.   Do you have a machine or are you familiar

9    with what's called a video spectro comparator?  Let

10   me rephrase that.  Are you familiar with a machine

11   called a VSC or a video spectro comparator?

12        A.   I am, and I own one.

13        Q.   Did you -- and you're trained in the use of

14   the VSC?

15        A.   I am.

16        Q.   Which type of VSC do you have, which

17   machine?

18        A.   It's called the 4C, as in Charles.

19        Q.   Did you perform any VSC testing on the

20   Carter Bryant documents?

21        A.   Yes.

22        Q.   You did?

23        A.   I did.

24        Q.   Do you have a record of which documents you

25   prepared testing on or you performed the VSC testing

19

EXHIBIT _____ 9 _____

PAGE _____ 185

1     on?

2          A.     I know I can tell you specifically which

3     ones they were, they were the documents that had the

4     CPS codes.  I used the VSC to image the CPS codes on

5     the color copies.

6          Q.     Did you use the VSC machine on any other

7     documents besides those documents?

8          A.     I did not.

9          Q.     And to be clear, those were Bryant Exhibit

10    310 through 319 and Bryant Exhibit 214?

11         A.     Yes, exactly.

12              MS. HUTNYAN:  When you say "exhibit,"

13    Counsel, you mean Bates number?

14              MR. SLOAN:  That's correct.

15              MS. HUTNYAN:  Okay.

16              THE WITNESS:  There were -- actually,

17    that's not entirely accurate, there were other color

18    copies in this set that had CPS codes that were not

19    decodable, and I realized were not decodable, so the

20    answer is that there were many more documents than

21    just 210 and 310 through 319 that I examined in the

22    VSC.  It's just that I imaged the CPS bar codes on

23    214 and 310 through 319.

24    BY MR. SLOAN:

25         Q.     Did you perform any VSC testing on any of

                                                          20

EXHIBIT _____ 9

PAGE _____ 186

1    the documents which you have referred to in your

2    report as the mixed media or multicolor poster board

3    drawings?

4         A.    I did not.

5         Q.    Why not?

6         A.    There was -- again, there were severe time

7    constraints placed on these examinations.  The scope

8    of my examination was vast and I had to make some

9    decisions about an examination strategy that would

10   accomplish the most that I could accomplish in the

11   three days or so that I had with these documents.  So

12   I recorded my findings, but I had no opportunity in

13   that regard to make video captures or

14   photomicrographs.

15        Q.    By the way, do you have any notations of

16   the exact date on which you received the Carter

17   Bryant documents and the date on which you sent them

18   out?

19        A.    I don't have it with me, but that certainly

20   would be available in my computer system and I could

21   provide that to you if you would like.

22             MR. SLOAN:  Counsel, would you --

23             MS. HUTNYAN:  We'll give you the date if

24   you want.

25             MR. SLOAN:  Okay.

                                                      21

EXHIBIT ____ _a_)

PAGE ____ 187

1     Q.   Do you know when you sent the documents

2  off, who did you send them to at the end of this

3  four-day period?

4     A.   I believe that the next recipient down the

5  chain was Mr. Aginsky.

6     Q.   How many times have you been retained to

7  testify as an expert in court proceedings?

8     A.   Many, many hundreds, I don't have a number

9  that I can give you.

10     Q.   Have you ever been offered as an expert and

11  had a situation where the court found you were not

12  qualified to testify as an expert?

13     A.   Never.

14     Q.   Never?

15     A.   Never.

16     Q.   Have you ever been criticized or has your

17  testimony ever been criticized by a court?

18     A.   Not that -- no, not that I'm aware of,

19  never.

20     Q.   Have you ever been retained by Mattel or

21  any of its subsidiaries or affiliates to act as

22  either a testifying expert or consultant?

23     MS. HUTNYAN:  Objection; it calls for

24  speculation, "affiliates," I don't know that I know

25  what that is, so I don't know how you would answer

22

EXHIBIT _____ 9

PAGE _____ 198

1         Q.    And how about if we look at the next page,
2     Bryant 180?
3         A.    Yes.  That is also one of the -- what I
4     considered to be one of Mr. Bryant's original pieces
5     of artwork.
6         Q.    And what are you basing that on that it's
7     an original work of art?
8         A.    I had the original document in my
9     laboratory and examined it, so it is original pencil
10    and ink.
11        Q.    But would you agree that these documents
12    have both pencil lines and ink lines on it?
13        A.    Yes.
14             MS. HUTNYAN:  Objection.  Do you have the
15    originals?  We asked to have the originals provided.
16    These are photocopies and based on that -- he hasn't
17    seen these in months and I don't think it should be a
18    memory test of what media was used in a particular
19    document, that's why we asked for the originals,
20    so --
21             MR. SLOAN:  Thank you for your objection,
22    Diane.
23        Q.    Mr. Flynn, Exhibits 17 -- I'm sorry, Bryant
24    179 and 180, do you recall these documents?
25        A.    Yes.

                                                    53

1     Q.   And if you look at Bryant 180, do you see,

2  in fact, that there appear to be pencil lines or

3  lighter lines --

4     A.   I do.

5     Q.   -- on that page as well?

6     A.   I do.

7     Q.   And you're referring to this as an original

8  artwork, as opposed to something that's traced?

9     A.   Yes.

10     Q.   And what is that conclusion based on?

11     A.   This is -- to me, this is typical of what

12  you see is an artist that is doing an under sketch.

13  The pencil being just a series of free flowing lines.

14  The other thing that can be determined when I looked

15  at this was that it was done very rapidly.  My

16  position is that almost by definition a tracing is

17  done much slower than a free flowing natural type of

18  movement, and these were very rapidly executed, in my

19  opinion.

20     Q.   How did you determine that -- what's the

21  basis for your conclusion that Bryant 179 and 180

22  were very rapidly drawn?

23     A.   I did a microscopic examination of these

24  documents and the strokes were very long.  They're

25  not a series of smaller shorter choppier strokes.

54

EXHIBIT _____ 9

PAGE ___ 190

1    There's very good what's called line quality, meaning

2    that when a hand slows down some of the -- some of

3    the tremor that's normally present in everyone's hand

4    begins to manifest.  There was no evidence at all of

5    slowness in this document, in my opinion.

6        Q.    Now, you indicated that there were also

7    documents that I think you referred to in your report

8    as tracings on tracing paper?

9        A.    Yes.

10       Q.    Okay.  And those were generally done with

11   ink and pencil?

12       A.    Yes.  Yeah, I mean, to me these were the

13   ideal -- these were the ideal exemplars because the

14   questioned documents were ink and pencil or ink and

15   pen -- I'm sorry, were pencil and ink, and these

16   sketches were pencil and ink, so if Mr. Bryant had

17   created original artwork, then I would have expected

18   them to look like this.  That was the hypothesis that

19   I was working under.

20       Q.    And you would have expected the original

21   artwork to look like the drawings on Bryant 179 and

22   180?

23            MS. HUTNYAN:  Objection; vague.

24            THE WITNESS:  Yeah, well, in the class

25   characteristics, I'm talking about the speed, the

                                                          55

EXHIBIT _____ **9**

PAGE _____ 191

1      A.    Certainly.

2      Q.    Let me ask you this -- stop me if you need

3   to actually look at the drawing.

4      A.    Sure.

5      Q.    With respect to, let's just take Bryant

6   220 --

7            MS. HUTNYAN:  Is there a reason you

8   wouldn't just use the originals?  I don't want him

9   giving testimony with documents he hasn't seen for

10  months, if you have anything that he can benefit of

11  the originals from here, can we just use them?

12           MR. SLOAN:  Well, I think it will take more

13  time, but we can do that, if you wish.

14           MS. HUTNYAN:  My intent is not to do that.

15  My intent is to actually save time by getting you

16  better answers, to the extent that he be able to see

17  it.

18           MR. SLOAN:  Can we take a break.

19           THE VIDEOGRAPHER:  Absolutely.  We're off

20  the record at 10:50 a.m.

21           (Recessed from 10:50 a.m. until 10:52 a.m.)

22           THE VIDEOGRAPHER:  We're back on the record

23  at 10:52 a.m.

24  BY MR. SLOAN:

25      Q.    Mr. Flynn, you're now examining the

                                                    58

EXHIBIT ____ 9

PAGE ____ 102

1    original Bryant 220; is that correct?

2         A.    Yes.

3         Q.    And you've had a couple minutes to look at

4    it?

5         A.    I have.

6         Q.    And that's a color drawing, multicolor

7    drawing on poster board, correct?

8         A.    Yes.

9         Q.    And do you see evidence in that drawing as

10   to the speed with which the lines were drawn?

11        A.    It was difficult to determine because the

12   lines have been overwritten on the poster board

13   characters.  There were underlined pencil lines, and

14   there were overwritten -- the waxy-type crayon pencil

15   was actually used for much of the dark areas on the

16   drawings.  Those -- that dark pencil was made in a

17   very fluid way, but I couldn't tell from the

18   underline because I had no opportunity to do infrared

19   examinations of them, so -- my point is that the

20   finished product is done very rapidly.  What the

21   underlying lines look like, I don't know at this

22   point in time.

23        Q.    Did you examine Bryant 220 and the other

24   documents like that, which are Bryant's 220 to

25   approximately 232?

                                                    59

EXHIBIT _____ 9

PAGE _____ 193

1      A.    Yes.

2      Q.    Did you examine them microscopically?

3      A.    I did.

4      Q.    And were you able to determine in many

5   cases that there was pencil line under the ink lines?

6      A.    That was my impression, yes.  Not my

7   impression, my finding.

8      Q.    There were pencil lines?

9      A.    Yes.

10      Q.    And are you saying that you were unable to

11   determine the speed with which those pencil lines

12   were performed?

13      A.    Yes, because once the pencil lines were

14   overwritten with the coloring material, I would have

15   needed other examinations other than microscopic to

16   make that examination, and I just felt I did not have

17   the time to do that, given the constraints of the

18   examinations, the multiple examinations that I had to

19   make.

20      Q.    And the constraints you're talking about

21   are just time constraints?

22      A.    Exactly.

23      Q.    So you're saying you would have liked to

24   have performed additional examinations with what type

25   of a device?

60

EXHIBIT _____ 9

PAGE _____ 194

1     A.    I mean, there were multiple types of

2   examinations that could have been performed, infrared

3   examinations, infrared luminescent examinations.  Had

4   I had the time, I would have moved into the other

5   part of the laboratory and taken photomicrographs.

6     Q.    And if you had performed those types of

7   tests, might you have been in a better position to be

8   able to render an opinion as to the length of time or

9   the speed with which the underlying pencil strokes

10  were made?

11          MS. HUTNYAN:  Objection; calls for

12  speculation.  Are you talking about on this document,

13  the speed?

14  BY MR. SLOAN:

15    Q.    Let's start with this document

16  particularly.

17    A.    Sure.

18    Q.    You're saying if you had more time you

19  would have liked to have performed, you said, tests

20  with infrared, infrared luminescents, and one other

21  type of test; is that correct?  What was the third

22  type of test?

23    A.    I would have recorded the results using

24  photomicrographs.  I would have taken

25  photomicrographs of those areas that were of interest

                                                  61

```
 1    to me.
 2         Q.    And why would you have liked to have done
 3    that?
 4                MS. HUTNYAN:  Objection.  This is
 5    outside -- I mean, the speed relates to other
 6    documents.  I mean -- are you willing to provide the
 7    documents for this analysis?  I see you have them
 8    readily available to you.
 9                MR. SLOAN:  Diane, you're not listening to
10    the questions.  I'm asking him about that document.
11                MS. HUTNYAN:  Show me in his report where
12    he's opining as to the slowness of the underlying
13    pencil lines on this document and we can have this
14    discussion, but I think you're trying to get a false
15    record.
16    BY MR. SLOAN:
17         Q.    Mr. Flynn?
18                MS. HUTNYAN:  About what he would have
19    liked to have done and all kinds of speculative stuff
20    and that's outside the bounds.
21    BY MR. SLOAN:
22         Q.    Mr. Flynn, let me ask you, do you have any
23    opinion as you sit here today with respect to the
24    underlying speed with which the pencil strokes on
25    Bryant 220 were made?
                                                        62
```

1        A.    No, what I said at the very start of the

2    discussion is that once those pencil lines were

3    covered over with the waxy black material, I wasn't

4    able to actually see the pencil lines underneath it.

5    The over-strokes are very rapidly done.  The strokes

6    that were made with the pencil, as far as the

7    underlying pencil, I have no opinion one way or the

8    other because I couldn't see them using what I had

9    available to me.

10        Q.    Is it your opinion, as a professional with

11    over 20 years of experience, that if you had the time

12    to perform the other tests you've indicated that you

13    may have been able to determine the speed with which

14    the underlying pencil strokes were made?

15              MS. HUTNYAN:  Calls for speculation.

16              THE WITNESS:  If I had -- well, if I could

17    have -- yes, if I could have imaged the under --

18    here's -- the caveat is this, I don't know whether or

19    not it's possible to penetrate through infrared.

20    True nondestructive means the overriding pencil.  If

21    it is possible to penetrate it, then I could have

22    probably gotten enough of the image to make that

23    call, but on the other hand, it's also possible that

24    the pencil is infrared opaque, and I just would never

25    have known.  As I sit here today, I don't know one

63

EXHIBIT _____ **9**

PAGE __197__

1    way or another that it would have helped.  It's

2    simply a test that I could have done had I had more

3    time.

4    BY MR. SLOAN:

5        Q.    If you were able to determine the speed

6    with which the underlying pencil strokes were made on

7    Bryant 220, and you had determined that they were, in

8    fact, also made slowly, would that have affected your

9    opinion with respect to the sequencing of the

10   drawings in this case?

11       A.    Yes.  I mean, I think it would have raised

12   the potential third possibility.

13       Q.    And what would that third possibility be?

14       A.    That both the finished drawing and the

15   outline drawings were both tracings, originally,

16   instead of one being original artwork.

17       Q.    Would it have been affected, if you

18   determined that the pencil lines on Bryant 220 and

19   the other colored documents like it were made slowly,

20   would it have affected your opinion regarding the

21   sequencing that were made in your report?

22              MS. HUTNYAN:  Asked and answered.

23              THE WITNESS:  The report really, in a

24   sense, although I understand, I mean it appears to be

25   sequencing, but what actually, the assignment that I

                                                      64

EXHIBIT _____ 9 _____

PAGE _____ 198 _____

1    imposed on myself at the start of this examination

2    was to try to ascertain whether or not the outline

3    drawings were -- appeared to be qualitatively

4    original artwork or tracings.

5    BY MR. SLOAN:

6        Q.    Let me stop you for one second because you

7    keep using the word "outline drawings" and it's not

8    clear to me what you mean by "outline drawings"?

9        A.    Sure.  I mean, you probably have them.

10         MS. HUTNYAN:  Look at the Bates numbers

11    there in your report there?

12    BY MR. SLOAN:

13        Q.    Look back at 194 and 197 and tell me if

14    those are things that you considered to be outline

15    drawings?

16        A.    194, 195, I guess looks like an outline of

17    a head.  196 is an outline, 197.  197 is, in my

18    opinion, likely actually an example of an -- almost

19    an example of a known tracing because of the way that

20    it was constructed.  198, definitely an outline

21    drawing.

22        Q.    Okay.  Those are what you consider to be

23    outline drawings?

24        A.    Yes.

25        Q.    And is -- what is your overall conclusion

65

EXHIBIT 9

PAGE 199

1          Q.     But were you able, by the use of any

2     device, to determine that, in fact, the two figures

3     superimpose?

4          A.     They superimpose but I could never get --

5     in no instance was I ever able to get any of the

6     outline drawings to precisely line up over all of the

7     outlines of what I would consider the corresponding

8     poster board, and at that time I was trying to line

9     them up microscopically, so that if I could see a

10    place on the poster board where a pencil line

11    existed, then I would try to line up the pencil on

12    the outline drawing with the pencil on the poster

13    board.  Then I would try to line up the ink on the

14    outline drawing with the ink on the poster board, and

15    finally, I would try to line up the ink on the poster

16    board with any of the combinations on the outline

17    drawings.  And there were always differences.  It was

18    like squeezing Jell-o.  There were never -- there was

19    never an instance where there was exact congruence in

20    those outlines, in my opinion.

21         Q.     And that's looking at the documents

22    microscopically or --

23         A.     Yes.  Well, looking at them -- looking at

24    them -- I moved them under the microscope.  If I

25    could see a pencil line, then I would try to

                                                      72

EXHIBIT _____ 9

PAGE _____ 200

1    position, using the microscope, the corresponding

2    outline drawing to that pencil line, and then

3    obviously I had to step back and see whether or not

4    the rest of the drawing overlaid or not.  So, I mean,

5    I went back and forth actually for some time through

6    all of these trying to see if there was an exact

7    congruence, and I could never find it.

8         Q.    You said that you're familiar with the use

9    of the video spectro comparator, correct?

10        A.    I am.

11        Q.    And you have one of those devices in your

12   lab?

13        A.    I do.

14        Q.    And if you had used the video spectro

15   comparator, wouldn't you have been able to see

16   whether, in fact, the lines from the outline drawings

17   matched up with the lines from the color drawings?

18             MS. HUTNYAN:   Objection; speculation.

19             THE WITNESS:   Yeah, I don't know.

20             MS. HUTNYAN:   Asked and answered.

21             THE WITNESS:   I don't know whether -- at

22   this point in time, I don't know whether or not it's

23   possible to penetrate the finished -- the finished

24   pencil.  If it had been possible, then you could make

25   actual video overlays to see whether that's true or

73

EXHIBIT _____ 9

PAGE ____ 201

```
 1    not.
 2    BY MR. SLOAN:
 3         Q.    But you didn't try to do that?
 4         A.    There was -- I did not do that, no.
 5         Q.    Why didn't you do that?
 6               MS. HUTNYAN:  Objection; asked and
 7    answered.
 8               THE WITNESS:  There were two reasons.
 9    Number 1 is that I was under -- this was not the only
10    examinations that I had on my mind during these three
11    days.  I had -- again, Mr. Bryant had put a severe
12    limitation, in my opinion, on the amount of time that
13    I had to do an examination, so I had to make
14    decisions about what, how much time to spend with
15    each of the examinations and how much -- what kind of
16    block testing I was going to do, not only with these
17    documents but other documents downstream from here.
18    BY MR. SLOAN:
19         Q.    By the way, when you say that Mr. Bryant
20    had put time constraints on your ability to test --
21         A.    Well --
22         Q.    -- what's your basis for saying Mr. Bryant
23    had put time constraints?
24         A.    Well, ultimately it was the judge's order
25    that put the time constraints, but I'm assuming that
```
                                                          74

1    Mr. Bryant, through his attorneys, would be the ones

2    that had agreed to a certain amount of time that

3    these documents would be examined, that's -- I'm

4    assuming that's true.

5         Q.    Are you aware of any constraints that the

6    judge or Mr. Bryant specifically put on your time

7    that you could spend examining these documents?

8         A.    I believe that what -- the time constraint

9    was actually the overall time.  I think there was a

10   limit of 30 days or 31 days, or something like that,

11   and -- but because the documents had to move around

12   the country, there were transit days that were not

13   fruitful.  There were -- the first day the documents

14   arrived were administrative nightmares, so there was

15   a lot of time that could not be devoted to

16   examination of these documents, and I'm sure that

17   wasn't true in just my case.  It had to be true in

18   Mr. Rantanen's and Mr. Aginsky's case as well, so

19   definite -- there was definite time constraints

20   because downstream from me the ink analyses were

21   going to be performed and later the paper

22   examinations too and then ultimately Mr. Cunningham,

23   I believe, was going to do the final examination on

24   these documents, so there were constraints placed on

25   them.

75

EXHIBIT ____ 9

PAGE 203

1          Q.    Mr. Flynn, in your opinion, would it be

2     significant if there were faint pencil lines or

3     partially obscured or colored over pencil lines on

4     the colored drawings?

5          A.    No.  No, I would expect that.

6          Q.    You would expect that?

7          A.    Yes.

8          Q.    But what I'm asking is would the presence

9     of lines like that be significant?

10               MS. HUTNYAN:  Objection; calls for

11    speculation, vague and ambiguous.

12    BY MR. SLOAN:

13         Q.    Let me ask you this, would it be

14    significant with respect to your determination of

15    sequencing, as between the tracings and the colored

16    drawings, if there were faint or partially obscured

17    pencil lines on the colored drawings, which did not

18    form part of the outline or the main figures in the

19    outlines?

20               MS. HUTNYAN:  Objection --

21               MR. SLOAN:  I'm sorry, in the colored

22    drawings?

23               MS. HUTNYAN:  Vague, ambiguous,

24    unintelligible.

25    BY MR. SLOAN:

76

EXHIBIT _____ 9

PAGE _____ 204

1 Q. Did you understand the question?

2 A. I think so, for the most part. First of

3 all, I knew I had seen microscopically, that there

4 were faint pencil lines. But -- so, did it weigh

5 into my decision-making process? It did to some

6 extent, but the unknown here is whether or not there

7 is a third source and whether or not the tracings

8 took place before they were colored, i.e., were the

9 pencil lines at that time not erased and still very

10 clear on the transparency paper. If the tracings

11 were made before the coloring took place, there would

12 have been no problem seeing those pencils, pencil

13 outlines. It was only subsequent, in my opinion,

14 when the drawing was colored that those pencil lines

15 were erased and/or covered with the black pencil. So

16 could it be significant? Certainly. Might it not be

17 significant? That's also true.

18 Q. You said that you did note the presence of

19 those faint pencil lines?

20 A. Sure. They're not only -- they're not all

21 the faint pencil lines. I mean, there are pencil

22 lines that are incorporated into the drawing itself.

23 Q. Did you note the presence of those pencil

24 lines anywhere in your report?

25 A. I don't recall.

77

1        Q.    Can you take a look at your report and let

2    me know whether you noted the presence of those

3    faint --

4              MS. HUTNYAN:   Take your time and read it?

5              THE WITNESS:   No, I know.   I referred to it

6    as "mixed media," and certainly that's what I

7    intended.

8              MS. HUTNYAN:   Please look at your report

9    and look for each instance of discussion of this,

10   because it's -- he's asking you to find in your

11   report instances of your discussion of this, and

12   it's -- there's more than that.

13             MR. SLOAN:   Well, Diane, I just -- I'd ask

14   you not to direct the witness how to answer.

15             MS. HUTNYAN:   I want an accurate record,

16   I'm sure you do too, if you want instances of

17   discussion.   You seem to be -- on purpose you seem to

18   be avoiding his very clear statements about pencil

19   and ink reflected on the Bates numbers.   He has to

20   look at the Bates numbers, he has to find which ones

21   he referred to and point it out to you, if that's

22   what your question is.   Unless you want to withdraw

23   your question.

24   BY MR. SLOAN:

25        Q.    No, what I'm asking --

                                                        78

1    197.  I mean, I think that that's clear.  The one --

2    I think that what happened is that 194 was produced

3    before there was a leftmost character.

4         Q.    And how do you reach that conclusion?

5         A.    Because there -- because there is no

6    leftmost character that matches even remotely close

7    to the leftmost character that's on 194 in the

8    finished drawing 222.  It then looked to me that, I

9    think, I believe, that the rightmost or the leftmost

10   character on 222 was freehand drawn onto 222.

11        Q.    What's your basis for that?

12        A.    There were no -- there were no pencil

13   outlines that I could find that were visible around

14   220 -- around that leftmost character on 222, and

15   then --

16        Q.    I'm sorry, there were no pencil -- there

17   were no pencil marks on 222 with respect to the

18   leftmost character from the viewer's perspective,

19   correct?

20        A.    That I could see, that's right.

21        Q.    And that suggested to you that that was

22   freehand drawn, correct?

23        A.    Yes.

24        Q.    It suggested to you that it was not traced

25   from something else, correct?

                                                    130

```
 1          A.    ' Yes.

 2          Q.    If there had been pencil drawings or pencil

 3     lines under that leftmost character, that would have

 4     suggested to you that it had been traced from

 5     something else, correct?

 6                MS. HUTNYAN:  Calls for speculation.

 7                You can answer.

 8                THE WITNESS:  It still could have been

 9     freehand drawn with a pencil first and then inked, so

10     no, it doesn't -- that wouldn't change anything.

11     Because I can't see the pencil doesn't mean, as he

12     always does, that he freehand sketches with pencil

13     first and then inks it, you know.

14     BY MR. SLOAN:

15          Q.    So you're -- but you're saying with respect

16     to the three rightmost figures from the viewer's

17     perspective on Bryant 222 you see pencil and then pen

18     on top of it, correct?

19          A.    No, I think when I examined it

20     microscopically there were places where the pencil

21     was visible around the outlines of the characters

22     when I looked at 222 microscopically.

23          Q.    But you didn't see any evidence of an

24     underlying pencil on the leftmost figure on 222,

25     correct?
```

131

EXHIBIT _____ 9

PAGE _____ 208

```
 1        A.    Right.  And the problem there was that if

 2    there was underlying pencil and it was completely

 3    covered, I wouldn't have seen it microscopically.  It

 4    would have required the infrared examination to find

 5    that.

 6        Q.    So you're saying there might be pencil

 7    underneath the leftmost figure on 222, but you didn't

 8    observe it?

 9        A.    Yeah.  And I mean it might -- I mean, I

10    even think that it's likely that there's pencil

11    underneath there because it was certainly Mr.

12    Bryant's style to do that.

13        Q.    Any other reason to believe that there

14    would be likely to be pencil underneath that, other

15    than you believe that it was Mr. Bryant's style?

16        A.    No, I think that that was -- let's see,

17    yeah, I mean, I think that 197 plays some role in

18    this.  Let's take a look.  No, that was probably

19    all -- I just don't know.

20        Q.    Okay.  So can you explain to me, as you see

21    it, the sequencing of how this was drawn and the

22    basis for it?

23        A.    Well, as I said, I -- I was actually

24    talking about a process where these -- these things

25    evolved rather than exact sequencing of events.  I
```

132

EXHIBIT _____ 9

PAGE _____ 209

1    thought that -- I thought and I think right correctly

2    that 222 was a tracing of the three rightmost

3    characters.

4         MS. HUTNYAN:  I think you have the wrong

5    numbers, concentrate on, what are you referring to,

6    the transparency or the poster board?

7         THE WITNESS:  I felt that the outline

8    drawings had, in fact, originated or traced from 222,

9    that they were tracings of the three rightmost

10   characters on 222.

11   BY MR. SLOAN:

12        Q.   And again, the basis by which you -- and

13   that's because they -- they're superimposed?

14        A.   They -- they almost superimpose, right.

15        MR. SLOAN:  We have two minutes left on the

16   tape, so let's take a break here.

17        THE VIDEOGRAPHER:  This ends tape 3 of the

18   videotaped deposition of William Flynn.  We are off

19   the record at 12:52 p.m.

20        (Recessed from 12:52 p.m. until 12:55 p.m.)

21        THE VIDEOGRAPHER:  This is tape 4 of the

22   videotaped deposition of William Flynn.  We are back

23   on the record at 12:55 p.m.

24   BY MR. SLOAN:

25        Q.   Mr. Flynn, I was just asking you your basis

                                                         133

EXHIBIT _____ 9

PAGE _____ 210

1    for determining that the three rightmost figures in
2    194 are tracings from Bryant 222.  And you said that
3    they superimpose in most respects, correct?
4         A.    And have the characteristics of a tracing,
5    so it was those, the fact that they superimposed, for
6    the most part, gives me a source and the fact that
7    they appear to be tracings gives the second part of
8    the answer that they appear to be slowly done and as
9    I've already talked about --
10        Q.    And you're saying that the ink lines for
11   the three most -- the three rightmost characters on
12   Bryant 222 do not have the attributes of a tracing?
13        A.    The ink lines --
14        Q.    On the three rightmost characters in Bryant
15   222?
16        A.    I can't tell now.  I mean, the -- the ink
17   lines don't, but whether they -- if there's
18   underlying pencil, I mean whether that would or not,
19   I don't know.  But the -- no, I mean, the ink lines
20   are actually pretty smoothly done.
21        Q.    So the ink lines are smoothly done?
22        A.    On -- yes.
23        Q.    The -- you said that there are; however,
24   you can see underlying pencil lines on those three
25   rightmost figures, correct?

                                                    134

EXHIBIT _____ 9

PAGE ____ 211

```
1        A.    Yes.   There were places where I could
2   actually see the pencil underline.
3        Q.    And could you see that with the naked eye
4   or microscopically?
5        A.    Microscopically.
6        Q.    And when you looked at them
7   microscopically, could you tell whether those were
8   done slowly or rapidly?
9        A.    No, because there were only little tiny
10   pieces that would show through, so I don't know.
11        Q.    If those in fact had been done more
12   slowly --
13            MS. HUTNYAN:   Which?
14   BY MR. SLOAN:
15        Q.    I'm sorry, if the underlying pencil strokes
16   of the three rightmost figures on Bryant 222 had been
17   done more slowly, might that suggest to you that
18   those pencil lines on 222 had actually been traced
19   from something else?
20        A.    Yes.   Sure.
21        Q.    And would there have been a way to have
22   seen how slowly those pencil lines were done?
23        A.    I don't know.   I mean, the test would have
24   been to examine everything through the various
25   spectrum of infrared that's available through the
```

135

EXHIBIT _____ 9 _____

PAGE _____ 212 _____

1    VSC.

2    Q.   So if you had done a VSC test, you may have

3    been able to determine the speed with which the

4    pencil lines had been done on one -- on 222?

5    A.   It was possible to image the pencil lines

6    clearly, yes.  The problem with black ink is it's

7    usually opaque, very often opaque, to infrared and

8    wouldn't allow infrared penetration, but if it were,

9    and you can get a clear enough image of the pencil,

10    then yes, you might be able to tell if it was rapidly

11    or slowly done.

12    Q.   Now, I -- I keep on interrupting you, but I

13    still want you to sort of finish what you see as the

14    chronology of the sequencing of these drawings.  I

15    think you testified that 194 was a tracing of the

16    three rightmost characters of Bryant 222; is that

17    correct?

18    A.   Yes.

19    Q.   And is it your belief that at that time

20    that it was traced that the rightmost, or I'm sorry,

21    the leftmost figure on Bryant 222 was not there?

22    A.   Right.

23    Q.   And why do you believe that?

24    A.   Because the character that now appears on

25    194 is actually quite a different character and the

136

EXHIBIT _____ 9 _____

PAGE _____ 213 _____

```
 1        to your conclusion that 199 is a pencil tracing of

 2        220?

 3             A.    199, that 199 is a tracing of 220.  Yes, I

 4        would say it's very probably so.

 5             Q.    And would you say the same thing with

 6        respect to your conclusion that 194 is a tracing of

 7        the three rightmost dolls that appear on Bryant 222?

 8             A.    Yes.

 9             Q.    Very probably?

10             A.    Yes.

11             Q.    Okay.  So let me show you Bryant 212 and

12        234.

13             A.    Sure.

14             Q.    Here is Bryant 212, it's that way actually,

15        and here is Bryant 234.

16             A.    Yes.

17             Q.    On what basis do you conclude that Bryant

18        212 is a tracing of 234?

19             A.    The overall matching of the doll

20        configuration and in this case I think the doll's

21        clothing as well would lead me to believe that, that

22        they are, in fact, the same figure.

23             Q.    Well, did you superimpose one on top of

24        another?

25             A.    Yes.
```

159

EXHIBIT _____ 9

PAGE _____ 214

```
1        Q.    And how did you do that?

2        A.    I literally superimposed it one on top of

3   another.

4        Q.    Just like you're doing right now?

5        A.    Yes.

6        Q.    Did you do it like you're doing it right

7   now or on a light table?

8        A.    I don't recall specifically in this

9   particular instance.  We had a light table there, but

10  I can't tell you for sure if I used the light table

11  or not.

12       Q.    Other than the fact that they superimpose,

13  I mean, if you had only found that they superimpose

14  one on the other, you wouldn't be able to tell us

15  sequencing; is that correct?

16       A.    Not just because of the fact that they

17  superimpose, no.

18       Q.    What other facts are you relying on or what

19  other observations are you relying on to draw the

20  conclusion that Bryant 212 is a tracing of 234?

21       A.    Again, to me it does not look like a

22  rapidly made piece of artwork that --

23       Q.    Which doesn't?

24       A.    The transparencies that should be.

25       Q.    That's 212?
```

160

1      A.    212, yes.

2      Q.    You said does not appear to be rapidly

3    made?

4      A.    No.

5      Q.    Are there -- is there evidence of slowness?

6      A.    Yeah, there's places, again, where the

7    naked eye, without the benefit of the microscope,

8    there are definitely places along the hemline of the

9    skirt that are slowly made.  The outside of the

10   doll's right thighs there's -- there's evidence that

11   it's been overwritten in that location.  The left

12   shoe, the sole of the shoe appears to be very slowly

13   done.  The straps on the shoes appear to be slowly

14   done.  The area up around the hair, the long portion

15   of the hair, not the long portion, the crown, the

16   crown of the hair, looks like it's been overwritten

17   several times.

18     Q.    Are you talking now about the ink portion

19   of 212 or the pencil portion?

20     A.    The ink portion.  There isn't much of the

21   pencil portion that I can see.

22     Q.    So you can't tell whether the pencil lines

23   -- well, let me ask you this first, there are pencil

24   lines that you see on Bryant 212?

25     A.    Yes.

161

EXHIBIT _____ 9

PAGE ____ 216

1          A.    I think in some ways that's the same

2     question, and no, I did not.

3          Q.    Are you aware of any errors or

4     misstatements that need to be revised in your report?

5          A.    It's hard for me to say.  I often read my

6     deposition and wonder if that was really me talking

7     at the time, so I'll certainly review the deposition

8     for accuracy and if there are changes that are

9     necessary, I'll be sure and fill out the correction

10    sheet.

11          MS. HUTNYAN:  I think he's asking about

12    your report.

13          MR. SLOAN:  I was asking about your report.

14          THE WITNESS:  Oh, I thought you said

15    testimony.

16    BY MR. SLOAN:

17          Q.    You preceded me.  That was going to be my

18    next question.  You beat me to the punch.

19          A.    No, I think the report as it stands today

20    is accurate.

21          Q.    You indicated in your report at page 3, I

22    believe, that there are -- let me take that back.

23    You mentioned that you'd also read Mr. Cunningham's

24    report, correct?

25          A.    No.

                                                        228

EXHIBIT _____ 9

PAGE _____ 217

```
 1        Q.    You haven't read it?
 2        A.    No, I haven't read it.
 3              MS. HUTNYAN:  That was the 20 seconds,
 4    remember, the 20-second read?
 5              THE WITNESS:  Earlier this morning there
 6    were some passages that we covered very early this
 7    morning.  That was my only exposure.
 8    BY MR. SLOAN:
 9        Q.    Counsel read passages to you, in other
10    words?
11        A.    The attorney, Ms. Hutnyan.
12              MR. SLOAN:  Okay.  I have no further
13    questions.
14              MS. HUTNYAN:  Okay.  I have a few
15    questions.
16              E X A M I N A T I O N
17    BY MS. HUTNYAN:
18        Q.    Mr. Flynn, you talked about the time that
19    you had with the documents in question?
20        A.    Yes.
21        Q.    There were eight boxes of documents?
22        A.    Correct.
23        Q.    In your view, did you have enough time to
24    draw the conclusions that you drew in your report?
25        A.    Certainly.
                                                  229
```

EXHIBIT _____ 9

PAGE _____ 218

```
 1        Q.    And as part of those conclusions you
 2   concluded that the outline drawings were not original
 3   pieces of artwork?
 4        A.    That was -- yes, that was my conclusion.
 5        Q.    Are you aware of anyone having produced any
 6   common source documents, other than that we've talked
 7   about here today?
 8        A.    There's been discussion of those documents
 9   potentially existing that I -- but no, as far as I
10   know, they don't exist.  I haven't seen them.
11        Q.    When you had the eight boxes, did you look
12   for other documents that might serve as the source
13   for the tracings that were outline by?
14        A.    Yes.
15        Q.    Did you find them?
16        A.    No.
17        Q.    You've seen the reports of Dr. Lyter and
18   Dr. Kullman?
19        A.    Yes.
20        Q.    And they described the possibility of a
21   common source as well?
22        A.    Yes.
23        Q.    Did you see any indication in their reports
24   that they had found such a common source document?
25        A.    No.
```

230

EXHIBIT _____ 9

PAGE _____ 219

```
 1        Q.    To you knowledge, is there such a common
 2   source document?
 3        A.    As far as I know, there is not.
 4        Q.    There's been a fair amount of discussion
 5   about the speed of pencil lines on the outline
 6   drawings, do you remember those multiple lines of
 7   questioning?
 8        A.    Yes.
 9        Q.    And do you recall testifying about
10   Mr. Bryant experimenting with the outline drawings?
11        A.    Yes.
12        Q.    Is -- if there are rapid looking pencil
13   lines on the outline drawings, is it possible that
14   they might be the product of some of this
15   experimentation?
16        A.    I think, yes, because I think in at least
17   one case that's indisputable, certainly he took an
18   outline drawing that had a different head of hair and
19   a different hat and certainly, in my opinion,
20   freehand draw -- drew a new hat and some hair on it,
21   so that did take place, in my opinion.
22        Q.    Well, in some of the drawings that you
23   looked at today on the outline drawings, you may have
24   noticed some pencil lines near the ink lines?
25        A.    Yes.
```

231

```
 1                MS. HUTNYAN:  Okay.

 2                THE VIDEOGRAPHER:  This ends the videotaped

 3     deposition of William Flynn.  We are off the record

 4     at 4:58 p.m.

 5

 6                (Deposition concluded at 4:58 p.m.)

 7

 8

                          _____

 9                     WILLIAM J. FLYNN

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
                                                      250
```

EXHIBIT _____ 9

PAGE _____ 221

```
 1                    CERTIFICATE

 2

 3           I, ROBIN L. B. OSTERODE, Certified

 4    Reporter for the State of Arizona, certify:

 5           That the foregoing deposition was taken

 6    by me; that I am authorized to administer an oath;

 7    that the witness, before testifying, was duly sworn

 8    by me to testify to the whole truth; that the

 9    questions propounded by counsel and the answers of

10    the witness were taken down by me in shorthand and

11    thereafter reduced to print by computer-aided

12    transcription under my direction; that deposition

13    review and signature was requested; that the

14    foregoing pages are a full, true, and accurate

15    transcript of all proceedings and testimony had upon

16    the taking of said deposition, all to the best of my

17    skill and ability.

18           I FURTHER CERTIFY that I am in no way

19    related to nor employed by any of the parties hereto,

20    nor am I in any way interested in the outcome hereof.

21           DATED this 30th day of March, 2008.

22

23

                    _____
                    ROBIN L. B. OSTERODE
24                  Certified Reporter No. 50695
                    For the State of Arizona

25
                                                    251
```

EXHIBIT _____ 9 _____

PAGE _____ 222 _____

1    outline drawings that were on the transparencies.

2    Do you recall that?

3        A.    I do.

4        Q.    I'm sorry, tracing.  Tracing paper --

5        A.    Tracing paper.

6        Q.    -- I believe is more accurate.  You didn't

7    do that full analysis in terms of the sequencing of

8    one to the other, did you?

9        A.    No.  As I testified to, it's -- the purpose

10   of my examination as stated in the Rule 26 report

11   was to make mainly observations and I didn't do a

12   detailed examination of that.

13       Q.    So when you did your cursory examination of

14   the documents and you made various references to the

15   fact that certain lines might have been evidence of

16   tracings, were those cursory examinations sufficient

17   to make the observations that you did?

18   ·   A.    Yes.

19       Q.    Where you testified today that it was a

20   possibility that one document could be traced from

21   another, for example, when Mr. Sloan asked you

22   whether the outline drawings could have come first

23   and then the poster board drawings could have been

24   traced from them, you said that could be a

25   possibility --

EXHIBIT _____ 9 _____

PAGE _____ 223 _____

1      A.    Yes.

2      Q.    -- is that statement based on a full

3    examination of the type that you would normally do

4    with respect to a document?

5      A.    Absolutely not.  It's just based on my

6    training and experience dealing with tracings and my

7    cursory observations.

8      Q.    Is it equally possible that the outline

9    drawing could have been traced from the poster board

10   in some form?

11     A.    Yes.

12     Q.    Do you have an understanding of why you were

13   asked to review Mr. Bryant's testimony?

14     A.    I don't recall.

15     Q.    Do you think it colored any of your opinions

16   in this case?

17     A.    No, especially since I didn't remember any

18   of his testimony by the time I examined the

19   documents.

20     Q.    That's all part of the plan there were a

21   number of questions today about whether certain

22   things were significant to you.  Do you recall that?

23     A.    Vaguely.

24     Q.    Usually relating to the significance of

25   being able to see pencil lines under ink lines and

EXHIBIT _____9_____

PAGE _____224_____

1    such.  Do you recall that?

2         A.    I do recall that.

3         Q.    Given your actual opinions in this case do

4    you believe that you evaluated the significant

5    evidence?

6         A.    The significant evidence that relates to my

7    Rule 26 report and which I may testify to, yes.

8              MS. HUTNYAN:  Okay.  That's all I have.

9              MR. SLOAN:  A couple follow-up questions.

10

11                    FURTHER EXAMINATION

12   BY MR. SLOAN:

13        Q.    First of all, Ms. Hutnyan just asked you

14   about whether your review of Mr. Bryant's deposition

15   testimony colored your examination in any way.  And

16   you indicated that you didn't think so because you

17   didn't recall what his testimony was.  Correct?

18        A.    I didn't say I didn't think so, I said it

19   didn't.

20        Q.    Okay.  You testified earlier when I asked

21   you about it that you didn't recall today as you sit

22   here today what Mr. Bryant's testimony was, correct?

23        A.    Could you repeat that?

24        Q.    When I asked you earlier this morning I

25   believe whether you recalled what Mr. Bryant's

EXHIBIT ____9____

PAGE ____225____

1   testimony was about how he created the documents and

2   the sequence in which he created the documents, you

3   testified that you didn't recall. Is that correct?

4       A.   That's correct.

5       Q.   It's now March 31st of 2008, correct?

6       A.   Yes.

7       Q.   You performed the bulk of the examination on

8   these documents back in September of 2007, correct?

9       A.   Yes.

10      Q.   More than six months ago.

11      A.   Yes.

12      Q.   Now, at that time isn't it fair to say that

13  you had a recollection of what Mr. Bryant had

14  testified in his depositions?

15      A.   No.

16      Q.   When did -- when did you review Mr. Bryant's

17  deposition testimony?

18      A.   I don't recall. It could have been a couple

19  of years before I examined the original documents.

20      Q.   Do you know for certainty that at the time

21  you were reviewing the documents in September of

22  2007 that you did not recall Mr. Bryant's testimony?

23      A.   It didn't enter my mind when I was reviewing

24  the documents I didn't rely upon any of his

25  testimony and, in fact, I couldn't remember it.  I

EXHIBIT ____9____   Page 204

PAGE____220____

# EXHIBIT 10

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 11

# EXHIBIT 12

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 13

# EXHIBIT 14

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL: (213) 443-3000 FAX: (213) 443-3100

WRITER'S DIRECT DIAL NO.
**(213) 443-3666**

WRITER'S INTERNET ADDRESS
**dianebutnyan@quinnemanuel.com**

April 2, 2008

**VIA E-MAIL AND FACSIMILE**

Matthew E. Sloan, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue
Suite 3400
Los Angeles, CA 90071

Matthew Werdegar, Esq.
Keker and Van Nest LLP
710 Sansome Street
San Francisco, CA 94111

Re:     Mattel v. Carter Bryant

Dear Matt(s):

I write about two related issues.

The first is to ask you to confirm that you will make available at Kullman's and Lyter's depositions the original Bryant documents and original ESDA films that pertain to the opinions they rendered and/or the reports they issued in this case. Specifically, we would expect access to every original document whose bates number was referenced in either of their reports and any others they relied upon that they may not have referenced. As Matt Sloan witnessed, MGA's examination of our experts was facilitated by the availability of these materials at their depositions.

The second is to request, pursuant to the June 20, 2006 stipulation on the record before Magistrate Judge Block, reasonable access for further non-destructive examination and imaging of the pertinent originals for Messrs. Flynn and Cunningham. It is clear from these experts' depositions that the brief time that they were permitted for non-destructive examination of the eight boxes of Bryant original documents last fall was too limited for them to do all the analysis

quinn emanuel urquhart oliver & hedges, llp

NEW YORK | 51 Madison Avenue, 22nd Floor, New York, NY  10010 | TEL (212) 849-7000 FAX (212) 849-7100
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, CA  94111 | TEL (415) 875-6600 FAX (415) 875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, CA  94065 | TEL (650) 801-5000 FAX (650) 801-5100
TOKYO | Akasaka Twin Tower Main Building, 6th Floor, 17-22 Akasaka 2-Chome, Minato-ku, Tokyo 107-0052, Japan | TEL 81 3 5561-1711 FAX 81 3 5561-1712

EXHIBIT **14**

PAGE____272____

Matthew E. Sloan / Matthew Werdegar
April 2, 2008

that they would normally be able to do with the evidence presented to them. Further, the Lyter and Kullman reports suggest that, having had the benefit of our narrowing down the eight boxes of original documents to a few hundred items, as well as the benefit of unlimited access to the materials generally, Dr. Lyter and Dr. Kullman had sufficient time to do certain non-destructive tests and imaging that Messrs. Flynn and Cunningham were unable to do and which apparently allowed Drs. Lyter and Kullman to develop opinions that cannot be fully assessed and tested without similar access by our experts.

For these reasons, we would like to request on behalf of Mr. Flynn one week of access to all the original documents he referred to in his report or that were referred to in the portions of Dr. Kullman's or Dr. Lyter's reports rebutting his report. We would also like to request on behalf of Mr. Cunningham one week of access to all the original documents he referred to in his report or that were referred to in the portions of Dr. Kullman's or Dr. Lyter's reports rebutting his report. Please let me know if you would voluntarily agree to such access.

I hope you will see the inappropriateness of denying this limited request. But to the extent you are unwilling to produce these original documents for examination and imaging as requested, please also consider this letter notice that we will be filing an *ex parte* application before Judge Larson to allow for further expert reports and an *ex parte* application before the Discovery Master to compel the originals.

Very truly yours,

Diane C. Hutnyan

2

EXHIBIT 14

PAGE 273

EXHIBIT 15

LAW OFFICES

# KEKER & VAN NEST
## LLP

710 SANSOME STREET
SAN FRANCISCO, CA 94111-1704
TELEPHONE (415) 391-5400
FAX (415) 397-7188
WWW.KVN.COM

MATTHEW M. WERDEGAR
MWERDEGAR@KVN.COM

April 3, 2008

**VIA FACSIMILE & U.S. MAIL**

Diane C. Hutnyan, Esq.
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543

Re:     Mattel v. Bryant

Dear Diane:

      I am writing in response to your letter dated April 2, 2008 regarding certain of Carter Bryant's original documents.

      Mr. Bryant is willing to accommodate your request that he make available at Bob Kullman's and Al Lyter's depositions the Bryant original documents that these experts referenced or relied upon in their expert reports. As for the original ESDA films prepared by these experts, you will have to obtain MGA's approval, as we do not have custody of those materials.

      The second request in your letter, that Mr. Bryant make certain of his original documents available to Mattel and its experts yet again for examining and testing, however, is inappropriate and unacceptable for a litany of reasons.

      First, fact discovery closed more than two months ago. *See* Order Re Status Conference dated Oct. 31, 2007 [Docket No. 1104]. Moreover, expert discovery, absent any agreement between the parties to extend the time within which certain expert depositions may be conducted, is also now closed. *See id.* Thus, your request is exceedingly untimely. Indeed, your colleagues, when it suited Mattel's litigation purposes, have argued vociferously that the discovery cut-offs ordered by the Court are firm cut-offs, and that no discovery motions, much less additional discovery, is permitted after those cut-offs. *See, e.g.*, Mattel, Inc.'s *Ex Parte* Application to Strike Carter Bryant's Motion to Compel Responses to Discovery Requests, dated Feb. 12, 2008. The fact that Mattel chose to wait for more than two weeks after receiving Mr. Lyter's and Mr. Kullman's reports before raising this issue only adds to the tardiness of Mattel's request, and compounds the prejudice to Mr. Bryant of such intrusive additional fact and expert discovery on the eve of trial.

EXHIBIT ____15____

PAGE ____274____

414571.01

Diane C. Hutnyan, Esq.
April 3, 2008
Page 2

Second, Mattel and its experts already have had ample opportunity to inspect and test Mr. Bryant's original documents. As you are well-aware, in his August 31, 2007 Order the Discovery Master granted Mattel 35 days "for the expert examination and testing of the materials requested for the preparation of its initial expert reports[.]" Aug. 31, 2007 Order, at ¶ 4. Mattel took possession of Mr. Bryant's originals last Fall, and retained possession of them for the full 35 days granted by the Discovery Master. The August 31, 2007 Order also expressly permitted Mattel to request an extension of the 35 day inspection period "upon a showing by Mattel of good cause by further Order of the Discovery Master." *Id.* at ¶ 4. Yet at no point during the 35-day period that it had possession of Mr. Bryant's documents did Mattel indicate that it required more time for its experts to conduct their testing. Instead, Mattel simply returned the documents on the 35th day.

Months later, on December 13, 2007, Mattel requested additional time to inspect and test Mr. Bryant's original documents. Although Mr. Bryant was no longer under any obligation to make those documents available to Mattel—having fully complied with the August 31, 2007 Order, and Mattel having failed to seek any order extending its time to perform its analysis of the documents—Mr. Bryant agreed to make his documents available for a second time. Specifically, Mr. Bryant agreed to make the documents available for more testing by Mattel's experts for another four days, which was all of the additional time that Mattel requested for its testing (I note that Mattel originally said that it would only need a day or two to conduct the additional testing, but then expanded its request to four days, which Mr. Bryant fully accommodated). At the end of this four-day period, Mattel returned Mr. Bryant's documents, again without any suggestion that its experts needed more time to complete their work.[1]

In short, Mattel's experts have had more than seven weeks to perform their testing and analysis of Mr. Bryant's documents, and Mattel never requested additional time from Mr. Bryant or the Discovery Master. Thus, the assertion in your letter that the time available to them was "too limited for them to do all the analysis they normally would be able to do" is simply false. The truth of the matter is that Mattel's experts simply chose not to perform certain tests when they had the opportunity to do so. Having made that choice, Mattel cannot now seek to reopen discovery in an effort to fix its expert's deficient reports.

Third, in your letter you suggest that Mattel is going to seek leave from the Court, via an *ex parte* application, to allow for further expert reports. Any such *ex parte* application would be entirely inappropriate. The Court's scheduling orders in this case are clear that there are to be two, and only two, rounds of expert reports – opening reports and rebuttal reports. *See, e.g.,* Oct. 31, 2007 Order. There is no provision in the Court's schedule for any "reply" reports under any circumstances. I assume that you are not suggesting that all parties should be permitted to file reply expert reports on any issue that they failed to address in their experts' original reports, but

---

[1] All of this, of course, was in addition to the three separate occasions, spanning some five full days, that Mr. Bryant made his documents available to Mattel's counsel for review and inspection, during which Mattel photographed, videotaped, and 3D-digitally scanned many, if not all, of the documents.

EXHIBIT _____ 15

PAGE _____ 275

Diane C. Hutnyan, Esq.
April 3, 2008
Page 3

rather that only Mattel should have this unsanctioned opportunity. Obviously, such a one-sided approach to expert discovery would be unfair and prejudicial.

Lastly, with respect to your threatened *ex parte* application to the Discovery Master for leave to reopen fact and expert discovery and to compel further inspection of Mr. Bryant's documents, you should be aware that there are numerous motions currently before the Discovery Master, many of which have been pending for months. All of these motions involve important and pressing discovery issues, the resolution of many of which are necessary for Mr. Bryant and MGA adequately to prepare for trial. Any effort by Mattel to "jump the line" and obtain an expedited hearing on this issue, especially given Mattel's delay in raising this issue and the lack of merit of Mattel's position, therefore would be inappropriate and contrary to the parties' ongoing efforts to prioritize the matters before the Discovery Master.

In light of the foregoing, I trust Mattel will see the inappropriateness of further pursuing this issue. But please note that if Mattel does insist on doing so, Mr. Bryant will seek to recover any and all fees and costs he is forced to incur in responding to Mattel's baseless demand.

Very truly yours,

Matthew Werdegar

MMW/mls

cc:    Matthew E. Sloan

EXHIBIT ___15___
PAGE ___276___

414571.01

LAW OFFICES

# KEKER & VAN NEST
## LLP

710 SANSOME STREET
SAN FRANCISCO, CA 94111-1704
TELEPHONE (415) 391-5400
FAX (415) 397-7188

## FACSIMILE TRANSMISSION COVER SHEET

### April 3, 2008

| To | Telephone | Facsimile |
|---|---|---|
| Diane C. Hutnyan Quinn Emanuel Urquhart Oliver & Hedges, LLP | 213/443-3000 | 213/443-3100 |

| cc: | | |
|---|---|---|
| Michael E. Sloan Skadden Arps Slate Meagher & Flom | 213/687-5000 | 213/687-5600 |

| From | Telephone | Code |
|---|---|---|
| Matthew Werdegar | 415-391-5400 | 6647/mls |

Re    **Bryant v. Mattel: (ED) 2:04-cv-09049-SGL-RNB**

### Number of Pages (Including Cover): 4

## COMMENTS

Please see attached.

EXHIBIT ____ 15

PAGE ____ 277

Operator _____                    Time Sent _____

## IF YOU ENCOUNTER ANY DIFFICULTIES RECEIVING THIS TRANSMISSION,
## PLEASE CALL (415) 676-2277 OR (415) 391-5400

The information contained in this facsimile transmission is legally privileged and confidential and intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you receive this communication in error, please notify us immediately by telephone, and return the original transmission to us at the above address via the U.S. Postal Service. Thank you.

EXHIBIT 16

## Andrea Hoeven

| | |
|---|---|
| **From:** | Sloan, Matthew E [Matthew.Sloan@skadden.com] |
| **Sent:** | Friday, April 04, 2008 6:05 PM |
| **To:** | Diane Hutnyan |
| **Cc:** | Matthew Werdegar; Lanstra, Allen L (LAC); Weinstein, Ryan (LAC) |
| **Subject:** | Sloan 4/4/08 Letter to D. Hutnyan |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Red |
| **Attachments:** | lac2-511429-1.pdf |

Diane -- Attached please find MGA's response to your letter to me, dated April 2, 2008.

Thanks, Matt

**Matthew E. Sloan**
**Skadden, Arps, Slate, Meagher & Flom LLP**

**Los Angeles Office**
*300 South Grand Ave., Suite 3400*
*Los Angeles, CA 90071*
*T: (213) 687-5276 | F: (213) 687-5600*
*Main: (213) 687-5000*
*E: matthew.sloan@skadden.com*

---------------------------------------------------------------------------------
*************************************************** To ensure compliance with Treasury
Department regulations, we advise you that, unless otherwise expressly indicated, any federal tax advice
contained in this message was not intended or written to be used, and cannot be used, for the purpose of
(i) avoiding tax-related penalties under the Internal Revenue Code or applicable state or local tax law
provisions or (ii) promoting, marketing or recommending to another party any tax-related matters
addressed herein. ***************************************************
*************************************************** This email and any attachments
thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged
and/or confidential information. If you are not the intended recipient of this email, you are hereby
notified any dissemination, distribution or copying of this email, and any attachments thereto, is strictly
prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and
permanently delete the original copy and any copy of any email, and any printout thereof. Further
information about the firm, a list of the Partners and their professional qualifications will be provided
upon request. ***************************************************

EXHIBIT _____ 16
PAGE _____ 278

4/7/2008

# SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

300 SOUTH GRAND AVENUE

LOS ANGELES, CALIFORNIA 90071-3144

TEL: (213) 687-5000
FAX: (213) 687-5600
www.skadden.com

DIRECT DIAL
213-687-5276
DIRECT FAX
213-687-5600
EMAIL ADDRESS
MATTHEW.SLOAN@SKADDEN.COM

FIRM/AFFILIATE OFFICES
———
BOSTON
CHICAGO
HOUSTON
NEW YORK
PALO ALTO
SAN FRANCISCO
WASHINGTON, D.C.
WILMINGTON
———
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

April 4, 2008

## VIA FACSIMILE AND EMAIL

Diane C. Hutnyan, Esq.
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543

   RE: Bryant v. Mattel, Inc.

Dear Ms. Hutnyan:

   I am writing in response to your letter of April 2, 2008, requesting that MGA (1) make the original Bryant documents and the original ESDA lifts prepared by Dr. Lyter and Mr. Kullman available at their upcoming depositions; and (2) agree to allow Mattel's experts, Lloyd Cunningham and William Flynn, an additional week each to perform examinations of the original Bryant documents relied upon by Dr. Lyter and Mr. Kullman in their expert reports. As we have informed you before by email, we have no objection to your first request, and with Mr. Bryant's assent (which his counsel has already granted), we will make available all the original Bryant drawings currently in Skadden's possession, as well as the original ESDA lifts on which Mr. Kullman and Dr. Lyter relied in their reports, at their upcoming depositions on April 8 and April 17, 2008.

   MGA vehemently opposes your unjustified and untimely request to conduct further expert examination of the Bryant documents, however, and joins Carter Bryant's objections to your request. Quite simply, Mattel's experts had ample time to conduct their examinations last fall and never asked for additional time for examinations. Having bypassed that opportunity last year, Mattel cannot now, on the eve of trial, seek special accommodation to correct the deficiencies in its expert

EXHIBIT _____ 10

PAGE _____ 279

Diane C. Hutnyan, Esq.
April 4, 2008
Page 2

reports which Mattel only learned about as a result of Dr. Lyter and Mr. Kullman's
expert reports, and MGA's recent depositions of Mr Cunningham and Mr. Flynn.

MGA agrees with each of the reasons opposing Mattel's reqeust set forth in
Matthew Werdegar's letter to you, dated April 3, 2008. In addition, I note that
contrary to the representation in your letter that Mattel's experts did not have
sufficient time with the documents at issue, Mr. Flynn testified at his deposition just
last week that he had "certainly" had enough time to draw the conclusions he drew in
his report. (Tr. at 229.) Accordingly, by his own admission, Mr. Flynn does not
need further time to test the documents. Similarly, Mr. Cunningham testified at his
deposition that the expert report submitted by Dr. Lyter "has nothing to do with my
findings and conclusions as set forth in my Rule 26 report," and Dr. Kullman's report
"has no bearing on my direct testimony." (Rough Tr. at 193, 198.) Accordingly,
your rationale that additional testing time is needed in order for Mattel's experts to
fully assess and test the rebuttal opinions of Dr. Lyter and Mr. Kullman is simply
unfounded.

It is undisputed that Mattel's experts spent weeks with the documents last fall
and that Mattel never requested additional time for testing (with the exception of the
four days mentioned in Mr. Werdegar's letter), despite the fact that the August 31,
2007 Order of the Discovery Master expressly provided Mattel the ability to request
such an extension upon a showing of good cause. Expert discovery is now closed.
Accordingly, your request to re-open discovery for additional testing is inappropriate
and unwarranted.

Further, your suggestion that Mattel will seek to re-open discovery by means
of an *ex parte* application is wholly improper. An *ex parte* application may be filed
only where the evidence shows that the moving party's cause will be irreparably
prejudiced if the motion is heard according to the regular noticed motion procedures,
and the moving party is without fault in creating the crisis that requires *ex parte*
relief. *Mission Power Eng'g Co. v. Cont'l Cas. Co.*, 883 F. Supp. 488, 492 (C.D.
Cal. 1995). For numerous reasons well known to Mattel, including among other
things the extensive list of motions already pending before the Discovery Master,
your request for additional expert analysis clearly does not meet this *ex parte*
standard. Thus, should Mattel seek to re-open discovery by means of an *ex parte*

EXHIBIT ___16.___

PAGE ___280___

Apr-04-2008  03:30pm  From-SASMF    419A                    +2136877823              T-960  P.004/004  F-392

Diane C. Hutnyan, Esq.
April 4, 2008
Page 3

application, MGA reserves the right to seek sanctions, including the recovery of all
fees and costs incurred in opposing such an *ex parte* application, for wrongly
invoking the extraordinary *ex parte* procedures.

Very truly yours,

Matthew E. Sloan

cc:     Matthew Werdegar

EXHIBIT _____ 10

PAGE _____ 281

# SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

300 SOUTH GRAND AVENUE
LOS ANGELES, CALIFORNIA 90071-3144

TELEPHONE No.: (213) 687-5000
FACSIMILE No.: (213) 687-5600

DIRECT FACSIMILE No: 213-621-5276
EMAIL: matthew.sloan@skadden.com

## FACSIMILE TRANSMITTAL SHEET

PLEASE DELIVER THE FOLLOWING PAGE(S) TO:

| | | | |
|---|---|---|---|
| NAME: | Diane C. Hutnyan, Esq. | | |
| FIRM: | Quinn Emanuel | | |
| CITY: | Los Angeles | DATE: | April 4, 2008 |
| TELEPHONE No.: | 213-443-3000 | | |
| FACSIMILE No.: | 213-443-3100 | | |
| FROM: | Matthew E. Sloan | FLR/RM: | Suite 3400 |
| | | DIRECT DIAL: | 213-687-5276 |

TOTAL NUMBER OF PAGES INCLUDING COVER(S):                    4

THIS FACSIMILE IS INTENDED ONLY FOR USE OF THE ADDRESSEE(S) NAMED HEREIN AND MAY CONTAIN LEGALLY PRIVILEGED AND/OR CONFIDENTIAL INFORMATION. IF YOU ARE NOT THE INTENDED RECIPIENT OF THIS FACSIMILE, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS FACSIMILE IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS FACSIMILE IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE AND RETURN THE ORIGINAL FACSIMILE TO US AT THE ADDRESS ABOVE VIA THE LOCAL POSTAL SERVICE. WE WILL REIMBURSE ANY COSTS YOU INCUR IN NOTIFYING US AND RETURNING THE FACSIMILE TO US.

IF THIS TRANSMISSION IS UNCLEAR OR INCOMPLETE, PLEASE CONTACT THE FACSIMILE DEPARTMENT AT 213-687-5276. WHEN TRANSMITTING TO OUR MACHINES, PLEASE INCLUDE YOUR COVER SHEET AND NUMBER ALL PAGES CONSECUTIVELY

MESSAGE: Re: Mattel request for further examination of the Bryant Documents.

EXHIBIT _____ 10

PAGE _____ 282

EXHIBIT 17

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL (213) 443-3000 FAX (213) 443-3100

WRITER'S DIRECT DIAL NO.
**(213) 443-3666**

WRITER'S INTERNET ADDRESS
**dianchutnyan@quinnemanuel.com**

April 6, 2008

VIA E-MAIL AND FACSIMILE

Matthew E. Sloan, Esq.                    Matthew Werdegar, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP  Keker and Van Nest LLP
300 South Grand Avenue                    710 Sansome Street
Suite 3400                                San Francisco, CA 94111
Los Angeles, CA 90071

Re:    Mattel v. Carter Bryant

Dear Matt(s):

I have received your April 3 and April 4 letters denying our request for reasonable access for further non-destructive examination and imaging of the pertinent originals for Messrs. Flynn and Cunningham. We disagree with the points in each of your letters.

As indicated in my correspondence of April 2, we intend to file an *ex parte* application before Judge Larson to allow for further expert reports and an *ex parte* application before the Discovery Master to compel the requested access to the originals. We plan to file the motions on Monday, April 7, 2008, for a hearing time and date TBD. We will let the Court know that you both oppose. If you care to fulfill your meet-and-confer obligations, please let me know.

Please note that if we are not permitted to replicate the testing done by Messrs. Kullman and Lyter, we will move to exclude the portions of their reports that relied on that testing.

quinn emanuel urquhart oliver & hedges, llp

NEW YORK | 51 Madison Avenue, 22nd Floor, New York, NY 10010 | TEL (212) 849-7000 FAX (212) 849-7100
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, CA 94111 | TEL (415) 875-6600 FAX (415) 875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, CA 94065 | TEL (650) 801-5000 FAX (650) 801-5100
TOKYO | Akasaka Twin Tower Main Building 8th Floor, 17-22 Akasaka 2-Chome, Minato-ku, Tokyo 107-0052, Japan | TEL 81 3 5561-1711

EXHIBIT ____17____

Matthew E. Sloan / Matthew Werdegar
April 6, 2008

Very truly yours,

*[signature]*

Diane C. Hutnyan

20078/2461446.1

2

EXHIBIT _____ 17
PAGE _____ 284

EXHIBIT 18

## Andrea Hoeven

**From:**     Sloan, Matthew E [Matthew.Sloan@skadden.com]
**Sent:**     Thursday, April 03, 2008 7:37 PM
**To:**       Diane Hutnyan
**Cc:**       Weinstein, Ryan (LAC); Lanstra, Allen L (LAC)
**Subject:** RE: Kullman's report.

Diane --- Sorry for the delay. I didn't have a chance to look into this until today.

Upon reviewing the report further, our understanding is that Mr. Kullman anticipated preparing a VSC print with green and yellow highlighting as a demonstrative exhibit for trial, but no such print was ever prepared. Therefore, there is nothing for Mr. Kullman to produce. We apologize for the confusion. Mr. Kullman has indicated that this sentence should have been deleted from the the final report and his failure to do so was an oversight. Mr. Kullman, accordingly, intends to prepare an amended report deleting this sentence as well as amending the erroneous references to "March 17, 2007" on the top of each page. Although Mr. Kullman may have made other VSC prints, to our knowlege he did not prepare green and yellow highlights on these prints. More importantly, he did not "rely" or consider these prints as a basis for his ultimate opinion, so they are not responsive to Mattel's document requests and MGA has no obligation to produce them under the expert stipulation.

I hope this answers your questions.

Thanks,

 Matt

---

**From:** Diane Hutnyan [mailto:dianehutnyan@quinnemanuel.com]
**Sent:** Thursday, April 03, 2008 3:41 PM
**To:** Weinstein, Ryan (LAC); Sloan, Matthew E (LAC)
**Cc:** Lanstra, Allen L (LAC); Michael T Zeller
**Subject:** RE: Kullman's report.

Gentlemen:

I am still waiting for these attachments, which were never served on us. MGA's continuing failure to serve them are causing Mattel prejudice. Please send them to me this afternoon, or let me know what is causing the trouble and when I will receive them.

Thank you.

---

**From:** Diane Hutnyan
**Sent:** Wednesday, April 02, 2008 4:30 PM
**To:** 'Weinstein, Ryan'; 'Sloan, Matthew E (LAC)'
**Cc:** 'Lanstra, Allen L (LAC)'
**Subject:** RE: Kullman's report.

Thank you.

EXHIBIT _____ 18

PAGE _____ 285

4/7/2008

**From:** Weinstein, Ryan [mailto:Ryan.Weinstein@skadden.com]
**Sent:** Wednesday, April 02, 2008 4:29 PM
**To:** Diane Hutnyan; Sloan, Matthew E (LAC)
**Cc:** Lanstra, Allen L (LAC)
**Subject:** RE: Kullman's report.

Diane -- we're looking into this now and will provide any missing attachments ASAP.

---

**From:** Diane Hutnyan [mailto:dianehutnyan@quinnemanuel.com]
**Sent:** Wednesday, April 02, 2008 3:31 PM
**To:** Sloan, Matthew E (LAC)
**Cc:** Weinstein, Ryan (LAC); Lanstra, Allen L (LAC)
**Subject:** RE: Kullman's report.

Hi,

Have heard nothing on this. Could someone please send these to me right away? Thanks

---

**From:** Diane Hutnyan
**Sent:** Tuesday, April 01, 2008 4:58 PM
**To:** 'Sloan, Matthew E'
**Subject:** Kullman's report.

Hi again. I have checked around for the green- and yellow-highlighted "attachments" referenced in Kullman's report (p. 3, VSC paragraph) and have been unable to find them. I checked with my team and we do not think they ever came in. Could you please send them to me? Thanks

Diane Cafferata Hutnyan, Esq.
**quinn emanuel urquhart oliver & hedges llp**
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Direct: (213) 443-3666
Main Phone: (213) 443-3000
Main Fax: (213) 443-3100
E-mail: dianehutnyan@quinnemanuel.com
Web: www.quinnemanuel.com

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

------------------------------------------------------------------------------
**************************************************** To ensure compliance with Treasury Department regulations, we advise you that, unless otherwise expressly indicated, any federal tax advice contained in this message was not intended or written to be used, and cannot be used, for the purpose of

EXHIBIT _____ **13**

PAGE _____ 286

(i) avoiding tax-related penalties under the Internal Revenue Code or applicable state or local tax law provisions or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein. ************************************************ This email and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified any dissemination, distribution or copying of this email, and any attachments thereto, is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original copy and any copy of any email, and any printout thereof. Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request. ************************************************

************************************************** To ensure compliance with Treasury Department regulations, we advise you that, unless otherwise expressly indicated, any federal tax advice contained in this message was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or applicable state or local tax law provisions or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein. ************************************************ This email and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified any dissemination, distribution or copying of this email, and any attachments thereto, is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original copy and any copy of any email, and any printout thereof. Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request. ************************************************

EXHIBIT 18

PAGE 287

4/7/2008

EXHIBIT 19

## Andrea Hoeven

| | |
|---|---|
| **From:** | Sloan, Matthew E [Matthew.Sloan@skadden.com] |
| **Sent:** | Friday, April 04, 2008 6:42 PM |
| **To:** | Diane Hutnyan |
| **Cc:** | Weinstein, Ryan (LAC); Lanstra, Allen L (LAC) |
| **Subject:** | Amended Kullman Report |

**Attachments:** lac2-511432-1.pdf

Diane — Attached please find a faxed version of the amended report of Robert Kullman. To my knowledge, the original report has only been amended in two minor respects. First, the sentence beginning, "In the attachments, areas of interest........................." on p. 3 of the report has been deleted. In addition, the date on the top of each page has been corrected to read "March 17, 2008" and the notation "[Amended 4-04-08]" has been added. We will bring a photocopied (non-faxed) version of the original to the depositon on Tuesday.

Let me know if you have any questions.

Would you also please let me know the location and time for the April 8 and April 17 depositions of Kullman and Dr. Lyter.

Thanks,

Matt

**Matthew E. Sloan**
**Skadden, Arps, Slate, Meagher & Flom LLP**

**Los Angeles Office**
*300 South Grand Ave., Suite 3400*
*Los Angeles, CA 90071*
*T: (213) 687-5276 | F: (213) 687-5600*
*Main: (213) 687-5000*
*E: matthew.sloan@skadden.com*

-----------------------------------------------------------------------------
*************************************************** To ensure compliance with Treasury Department regulations, we advise you that, unless otherwise expressly indicated, any federal tax advice contained in this message was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or applicable state or local tax law provisions or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein. *************************************************** This email and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified any dissemination, distribution or copying of this email, and any attachments thereto, is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original copy and any copy of any email, and any printout thereof. Further information about the firm, a list of the Partners and their professional qualifications will be provided

EXHIBIT _____ 19

PAGE _____ 288

upon request. **************************************************

EXHIBIT _____ 19
PAGE _____ 289

Ø 002/007

## Speckin Forensic Laboratories

20040202

2105 UNIVERSITY PARK DRIVE, SUITE A
OKEMOS, MICHIGAN 48864
517-349-3528 • FAX 517-349-5538

**LEONARD A. SPECKIN**
RETIRED DOCUMENT ANALYST

**MICHAEL J. SINKE**
LATENT PRINT SPECIALIST
CRIME SCENE RECONSTRUCTION
FORENSIC DOCUMENT ANALYST

**ROBERT D. KULLMAN**
FORENSIC DOCUMENT ANALYST

**LARRY A. DALMAN**
COMPUTER RECOVERY SPECIALIST

**KARL V. EBNER Ph.D.**
FORENSIC TOXICOLOGIST

**ERICH J. SPECKIN**
FORENSIC DOCUMENT ANALYST
INK DATING SPECIALIST

**ROGER J. BOLHOUSE MBA**
LABORATORY DIRECTOR
CRIME SCENE RECONSTRUCTION
FORENSIC ANALYST & CONSULTANT

**MARGO A. SCARPETTA Ph.D.**
DNA ANALYST & CONSULTANT

**DAVID G. TOWNSHEND M.S.**
FORENSIC FIREARMS EXAMINER

March 17, 2008

**RICHARD L. BRUNELLE**
RETIRED INK DATING CONSULTANT

**ANN E. CHAMBERLAIN M.S.**
SEROLOGIST
DNA ANALYST & CONSULTANT
CRIME SCENE RECONSTRUCTION
BLOODSTAIN PATTERN ANALYST

**LAURENCE R. SIMSON M.D.**
FORENSIC PATHOLOGIST

**JAY A. SIEGEL Ph.D.**
ANALYTICAL CHEMIST

**JASON S. HARNER B.S.**
FORENSIC CHEMIST

Mr. Matthew E. Sloan
Mr. Ryan Weinstein
Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue, Suite 3400
Los Angeles, CA 90071

Re: Carter Bryant v. Mattel
Rule 26 Rebuttal Expert Report

Dear Mr.'s Sloan and Weinstein:

I received and considered the following evidence for examination in my office in connection with this case:

Seven boxes of original Carter Bryant Production documents, including;
- Original sheets of tracing paper containing pencil and ink drawings and corresponding to bates numbered documents – BRYANT 00193 - 00209, BRYANT 00212 and 00213
- Various individual documents containing pencil and ink drawings and corresponding to bates numbered documents –BRYANT 00192, 00140, 00176, 00177, 00179 – 00184, 00232, 00235 and 00237.
- The pages of an original Pen-Tab Perforated Notebook that correspond to bates numbered documents BRYANT 01589 – 01624.
- The pages of an original Pen-Tab Spiral Ring Notebook that correspond to bates numbered documents BRYANT 01625 – 01665.
- Original multi-colored drawings on poster board corresponding to bates numbered documents BRYANT 00220, 00221, 00222, 00224, 00225, 00226, 00227, 00228, 00231, 00233 and 00234.

Machine copies of bates numbered documents BRYANT 00001 –BRYANT 01721, BRYANT 2692 and BRYANT 5025.

Rule 26 export reports and exhibits of William Flynn, Lloyd Cunningham, Valery Aginsky, and Walter Rantanen and "corrected" pages 5 and 6 of William Flynn's expert report.

Carter Bryant's deposition testimony, Volumes I, II and III.

EXAMINATION TASK;

My examination task was to determine if the conclusions drawn by Mr. Flynn, Mr. Cunningham and Mr. Rantanen in their expert reports are consistent with the observable forensic evidence.

I have not evaluated the ink tests performed by Valery Aginsky on Ramona Prince's notary book as part of my examinations, nor have I performed chemical ink testing or sampling of any kind.

EXHIBIT _____ 19

PAGE _____ 290

Report 20040202 [AMENDED 4-04-08]
March 17, 2008
Page 2

## PROCEDURES, OBSERVATIONS, AND RESULTS:

I assessed the documents submitted using my education, training, and experience in forensic document analysis. At all times during the examinations that I conducted, I adhered to techniques and procedures that are generally (if not universally) accepted in the relevant scientific community.

### Initial Examination

The documents submitted were written on several different types of paper and my initial examinations revealed that many of the documents contained visible but not necessarily discernable impressions.

### ESDA Examinations

I processed most of the mixed media drawings (Bryant 00220-00234), most of the drawings on transparent tracing paper (scattered numbers, but largely between Bryant 00192-00216), the pages from the notebooks (Bryant 01589-01624 and Bryant 01625-01665), and several other pages on the ESDA instrument. This instrument is used to detect the presence of impressed writing on a document. The ESDA is a non-destructive examination tool that uses the reaction between humidity and electricity to develop the impressions in paper with toner-coated beads in order to create a film that can be read. The examiner can use this instrument to determine what was written on top of the page being processed. This instrument is a generally (if not universally) accepted tool used in forensic science. I adhered to the procedures set forth by the manufacturer of the instrument and the training I received in the use of the instrument. The procedures I employed are generally accepted as appropriate in the field of forensic document examination.

Many of the documents processed had no detectable impressions or had impressions that could not be linked to a specific source. The chart below summarizes some of the documents that yielded impressions and the likely sources of those impressions.

| BRYANT # Processed | Source of Impressions by BRYANT # |
|---|---|
| 00178 | 00194 |
| 00186 | 00194 |
| 00190 | 00177 |
| 00192 | 00208 and 00212 |
| 00194 | 00222 |
| 00196 | 00233 |
| 00198 | 00204 (top half) |
| 00203 | 00200, 00240, and 00359 |
| 00211 | 00193 |
| 00218 | 00193 |
| 00235 | 00236 |
| 00237 | 00228 |
| 00970 | 00962 (left figure) |
| 01016 | 00243 and 01100 |
| 01118 | 01015 |
| 01246 | 01100 |
| 01247 | 01098 |
| 01647 | 05025 (in reverse) |
| 01648 and 00179 | 02692 |

The ESDA tests indicate that Bryant 05025, Bryant 02692 and Bryant 00179 -- 00182 were created within close proximity of one another and within the same Pen-Tab notebook.

EXHIBIT _____  19

PAGE _____  291

Report 20040202 [AMENDED 4-04-08]
March 17, 2008
Page 3

### Microscopic Examinations

First, my microscopic examinations confirmed that many of the documents were created from one another
or from the same model. Below is a partial list of the documents included in this category:
-       Bryant 00194 and 00222; Bryant 00198 and 00204; Bryant 00199 and 00220;
        Bryant 00201 and 00231; Bryant 00204 and 00226; Bryant 00206 and 00224;
        along with Bryant 00213 and 00227.

I conducted a microscopic examination on the mixed media drawings (Bryant 00220-00234) and the
tracing paper documents to determine if a sequence for the drawings could be established. If the tracing
paper had been laid over a finished drawing and a tracing made of the finished drawing, as Mr. Flynn
concludes, I would expect to find color from the finished drawing offset onto the back of the tracing paper.
I only found evidence of color offset on the back of the tracing paper on one document. This document is
Bryant 00232 and likely came as offset from Bryant 00225. The evidence of the offset color on the back of
Bryant 00232 is consistent with Carter Bryant's testimony. The evidence is clear on this document of the
offset, specifically on the reverse side of the lines where the pressure was the greatest while tracing. The
documents that were similar to the mixed media drawings were all examined visually and microscopically
on the reverse for offset by tracing. No other tracing paper documents showed any evidence of this type of
offset from tracing.

The second examination I conducted was to determine if any faint or erased lines were present in either the
tracing paper or the mixed media drawings. I used two methods to conduct these examinations. First,
along with visual and microscopic examinations, I used the capture/mix image capabilities of the Video
Spectral Comparator 2000 (VSC2000). The VSC2000, among other things, uses ultraviolet light and
infrared analysis techniques to evaluate and compare inks and/or latent chemicals on documents along with
capabilities to store and mix documents to determine if they superimpose. The second method involved
computer scanning and mixing of images. Using the VSC2000, first the image of the mixed media was
captured, a digital negative was made from that image (black turned to white and white turned to black) and
the image from the tracing paper in black was superimposed (mixed) with the negative at various
alignments (including overlapping) to show the similarities and proximity of faint lines to existing lines in
the tracing paper. While the computer scanning method is similar to the VSC2000 method, instead of using
a negative to superimpose the two images of interest, the images are shown in a series. Each set of
documents being compared is shown through a series of images that get closer and closer to overlapping to
show the areas of interest and their relative positions to one another.

The majority of the mixed media drawings contained faint lines obscured by erasures, coloring over, or
similar method. In every case, the faint lines in the mixed media drawings matched with the lines from the
tracing paper sketches/drawings. I further observed that the faint lines appearing in the mixed-media
drawings were not visible to the naked eye through tracing paper. It therefore follows that a person
overlaying tracing paper on top of the mixed media drawings could not have traced these faint lines.
Instead, a person would have traced the far darker, more visible lines. This also makes logical sense; a
person tracing a sketch would not trace lines that he had erased or colored over. The forensic evidence
therefore indicates that the mixed-media drawings were traced from the tracing paper sketches/drawings,
rather than vice versa, which is consistent with Mr. Bryant's testimony.

Below is a brief description of the documents that show this evidence:

EXHIBIT _____ 19

PAGE _____ 292

Report 20040202 [AMENDED 4-04-08]
March 17, 2008
Page 4

| Tracing paper (Bryant #) | Mixed-media (Bryant #) | Areas of Evidential Value |
|---|---|---|
| 00194 | 00222 | Line between hems at bottom of skirt of third doll<br>Missing upper crease in skirt of third doll<br>Corner of pant cuff on upper left leg of second doll<br>Crease in cuff left side of left leg of second doll |
| 00199 | 00220 | Left side of doll's left leg<br>Left side of doll's right leg |
| 00201 | 00231 | Two lines between sock and buckle on doll's left leg<br>Two lines between sock and buckle on doll's right leg<br>Vertical line on shoe near buckle |
| 00201 | 00230 | Left and right vertical lines of skirt |
| 00204 | 00226 | Triangle shaped object on right side bottom of vest |
| 00206 | 00224 | Area at bottom of pant leg on left leg<br>Straight lines in area of crease in lower left leg |
| 00213 | 00227 | Lines of offset in hem at bottom of shirt on left and right<br>Vertical line between two lines of hem on left of skirt |

At the time of trial, I anticipate using a series of each type of demonstrative mentioned above to show the evidence observed.

In a few instances (including one where the sequence could not be established using the methods above), the tracing paper contains both ink (darker in document) and pencil (lighter in document). These examples include: Bryant 00201 / 00231; Bryant 00204 / 00226; and Bryant 00208 / 00233 (sequence could not be established by other means). In these examples, where there is a divergence in the forms in the tracing paper, the mixed media drawing lines follow the lines of the ink in the tracing paper and not the pencil. This is a further indication of the tracing paper drawings being done before the mixed media drawings. On the tracing paper, it is more logical that the pencil was on the paper first and the ink was added and used to create the desired appearance of the finished product. The opposite scenario (if the ink were there and bold, to outline the areas in pencil that is faint) does not logically fit. Therefore, since the mixed media and the ink portions of the tracing paper line up, and two of the above examples (Bryant 00201-00231 and Bryant 00204-00226) were already established, it is more likely that Bryant 00233 (mixed-media) was created from the pen outline in Bryant 00208 (tracing paper). This is the same manner that shows the other drawings (Bryant 00201-00231 and Bryant 00204-00226) were created as well.

When the results of the above examinations and methods are combined and put in series, a distinct pattern can be seen as to the manner that the drawings progressed from one to the next by using one as a model for the next. The first distinct stage seen is the basic form of a doll (Bryant 00186 for example); from that form a more detailed version typically including clothing was created also on tracing paper (Bryant 00194 for example); culminating in several instances with the mixed media type drawings (Bryant 00222 for example). Below is a chart of the flow of the documents that can be established to show the progression of the concept:

EXHIBIT 19

PAGE 293

Report 20040202 [AMENDED 4-04-08]
March 17, 2008
Page 5

| Form (Bryant #) | Tracing paper with clothes (Bryant #) | Significant detail typically mixed media (Bryant #) |
|---|---|---|
| 00186 | 00194 | 00222 |
| 00178 | 00194 | 00222 |
| 00196 (in reverse) | ---- | 00233 |
| 00198 | 00204 | 00226 |
| 00203 | ---- | 00240 |
| 00211 | 00193 | ---- |
| 00218 (hair) | 00193 (hair) | ---- |
| ---- | 00237 | 00228 |
| 00970 | 00962 | ---- |
| 01016 | 00243 | ---- |
| 01118 | 01015 | ---- |
| 01246 | 01100 | ---- |
| 01247 | 01098 | ---- |

## EXAMINATIONS OF PAGES REMOVED FROM NOTEBOOKS (BRYANT 00179-00182):

Impressions were found of two sketches (Bryant 00179 and Bryant 00182) into pages still in the notebook (Bryant 01648 and Bryant 01647). The removed pages also showed evidence of being written on top of each other, probably while still in the notebook.

No evidence exists that Bryant 00179-00182 were used as a model to trace or create any of the submitted drawings or sketches and they were not traced or created from any of the submitted documents.

## COMMENTS ON THE REPORT OF WILLIAM FLYNN:

Mr. Flynn states that the reverse side of Bryant 00199 contains remnants of offset from Bryant 00220 that was transferred while tracing Bryant 00199 from Bryant 00220. I performed a complete examination of the reverse side of Bryant 00199 including a visual examination, microscopic examination, and an infrared examination to look for luminescent traces of offset. None of these three examinations showed any evidence of offset or embedded color. This is especially significant considering the offset that was seen on the reverse side of Bryant 00232, which was a document known to have been created by tracing from a mixed-media drawing. I also note in the report of Lloyd Cunningham that he performed his examination before William Flynn and Mr. Cunningham's examination procedure was to place the tracing paper over the mixed-media drawing and move it to confirm if sufficient portions were in agreement to conclude that one drawing was created from the other. It is possible through this process that a small offset was created that was transient, in other words the offset was present for Mr. Flynn and disappeared by the time my laboratory received the document for examination. However, if this were the case, the color that was seen by Mr. Flynn could not have been offset onto Bryant 00199 by tracing from Bryant 00220. Once a known offset such as present on the reverse of Bryant 00232 is seen, it could not be mistaken for a transfer by casual contact or a minor "fleck" of color. I would therefore conclude that Bryant 00199 was not created by tracing from Bryant 00220 as claimed in Mr. Flynn's report.

## COMMENTS ON THE REPORT OF LLOYD CUNNINGHAM:

1. In the area of Mr. Cunningham's report regarding the examination of Bryant 01647 and Bryant 01648, he notes and relies on several pieces of evidence. The first is that Bryant 01647 and 01648 appear to (but not conclusively) contain impressions from Bryant 00182 and 00179 respectively. Second, Mr. Cunningham concludes that the non-ballpoint portion of Bryant 00179 and 00182 have bled-through the paper and that this bleed-through for Bryant 00179 matches up with the spots on Bryant 01648 and the bleed through for Bryant 00182 matches up with the spots on

EXHIBIT _____ 19

PAGE _____ 294

Report 20040202 [AMENDED 4-04-08]
March 17, 2008
Page 6

Bryant 01647.  However, when I use the capture/mix imaging capabilities of the VSC2000 to superimpose the spots with the non-ballpoint ink on each drawing, with the edges and pre-printed lines of each page aligned with the other page, I do not find sufficient evidence that the blood through can be associated with either sketch.

2.   Both Mr. Flynn and Mr. Cunningham indicate in their examination of the notary journal that the entry "from 1998 Missouri" appears cramped or squeezed in and may have been added.  Based on my review of color photocopies of Ms. Prince's log book, I agree that this is the appearance of the entry; however, like Mr. Flynn and Mr. Cunningham, I draw no definitive conclusion that the entry was added at a later time.  There is insufficient evidence to support a conclusion of that nature, especially considering that the size of the box for the entry in the notary book was pre-printed.  In simple terms, if someone wanted to enter that much information into a box that small, it is not surprising that some of the writing would cramped in to conform to the size.

I am being compensated at my standard rate of $250.00 per hour for my time spent on this case.  In conducting my examinations, I have been assisted by other examiners at Speckin Forensic Laboratory who have also been compensated at their customary rates.  Neither my compensation nor the compensation of my colleagues is tied in any way to the outcome of this litigation.

I have attached my Curriculum Vitae, which lists my testimony over the last four years and my publications over the last ten years.

Very Truly Yours,

Robert D. Kullman
Forensic Document Analyst

Current CV with last 4 years testimony and publications attached

EXHIBIT _____ 19

PAGE _____ 295

EXHIBIT 20

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**