EXHIBIT 1

1 | QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
John B. Quinn (Bar No. 090378)
2 | johnquinn@quinnemanuel.com
Michael T. Zeller (Bar No. 196417)
3 | (michaelzeller@quinnemanuel.com)
Jon D. Corey (Bar No. 185066)
4 | (joncorey@quinnemanuel.com)
Timothy L. Alger (Bar No. 160303)
5 | (timalger@quinnemanuel.com)
865 South Figueroa Street, 10th Floor
6 | Los Angeles, California 90017-2543
Telephone: (213) 443-3000
7 | Facsimile: (213) 443-3100

8 | Attorneys for Mattel, Inc.

9

UNITED STATES DISTRICT COURT

10

CENTRAL DISTRICT OF CALIFORNIA

11

EASTERN DIVISION

12

| | |
|---|---|
| CARTER BRYANT, an individual, | CASE NO. CV 04-9049 SGL (RNBx) |
| | Consolidated with Case Nos. CV 04-09059 and CV 05-02727 |
| Plaintiff, | |
| vs. | **DISCOVERY MATTER** |
| MATTEL, INC., a Delaware corporation, | **[To Be Heard By Discovery Master Hon. Edward Infante (Ret.) Pursuant To The Court's Order Of December 6, 2006]** |
| Defendant. | MATTEL, INC.'S *EX PARTE* APPLICATION TO COMPEL ACCESS TO CERTAIN BRYANT ORIGINALS FOR NON-DESTRUCTIVE EXPERT EXAMINATION AND IMAGING; |
| AND CONSOLIDATED ACTIONS | AND MEMORANDUM OF POINTS AND AUTHORITIES |
| | [Declaration of Diane C. Hutnyan filed concurrently herewith]<br>Date:    TBA<br>Time:    TBA<br>Place:   TBA |
| | **Phase 1:**<br>Discovery Cut-off:        January 28, 2008<br>Pre-trial Conference:     May 5, 2008<br>Trial Date:                 May 27, 2008 |

**EXHIBIT** 1

**PAGE** 5

1  TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2      Pursuant to <u>Local Rule</u> 7-19, Mattel, Inc. respectfully submits this *ex parte*
3  application for two total weeks' access to certain of Carter Bryant's originals for
4  expert examination and non-destructive testing and imaging by Discovery Master-
5  approved experts Lloyd Cunningham and William Flynn.  The application is made
6  simultaneously with an *ex parte* Application to Judge Larson for permission to file
7  supplemental reports within two weeks of these experts' additional access to the
8  documents.

9      Mattel makes this Application pursuant to <u>Federal Rules of Civil Procedure</u>
10  26 and 34 and 37, and pursuant to the on-the-record stipulation before Judge Block
11  that requires Bryant and MGA to make original documents available to Mattel upon
12  request.  Mattel's request for access is made on the grounds that after Bryant and
13  MGA severely limited Mattel's experts' access to the Bryant original documents at
14  issue in this case, MGA's purported experts then went well beyond rebutting the
15  stated bases of Mattel's experts' opinion and did special reflected infrared and
16  infrared luminescence testing that they now claim revealed to them underlying
17  pencil marks that cannot be seen without such testing.  (The original documents to
18  which access is requested are those whose bates number was identified or referenced
19  in Mr. Kullman and/or Dr. Lyter's reports, as well as any additional documents
20  referenced in Mssrs. Flynn and Cunningham's reports.)  Though they claim this
21  supposed evidence rebuts Mattel's experts' opinions, they refuse to allow Mattel's
22  experts' access to the originals so that they too can see the evidence supposedly
23  revealed by those tests and fully and fairly address the points raised.  Mattel is
24  entitled to an even playing field, and MGA's and Bryant's refusal to share access to
25  Bryant's originals precludes that and constitutes discovery abuse.

26

27  EXHIBIT __**1**__

28  PAGE __**6**__

quinn emanuel

**Statement of Compliance with Local Rule 7-19**

Counsel for Carter Bryant is Matthew M. Werdegar of Keker and Van Nest LLP (telephone: 415-391- 5400, Address: 710 Sansome Street, San Francisco, CA 94111-1704).

Counsel for MGA Entertainment Inc., MGA Entertainment (HK) Limited, MGAE de Mexico , S.R.L. de C.V. and Isaac Larian (collectively "MGA") is Matthew E. Sloan of Skadden, Arps, Slate, Meagher & Sloan (Telephone: 213-687-5276; Address: 300 South Grand Ave., Los Angeles, CA 90017-3144).

Pursuant to Local Rule 7-19.1, Mattel gave notice of its intent to file this *ex parte* Application by letter dated April 2, 2008 if defendants failed to comply with its request to have additional access to Bryant's original documents. Counsel for Bryant and MGA indicated their intent to deny Mattel's request and to oppose the Application by letters dated April 3, 2008 and April 4, 2008, respectively.

This Application is based on this Notice of Application, the accompanying Memorandum of Points and Authorities, the Declaration of Diane C. Hutnyan filed concurrently herewith, the records and files of this Court, and all other matters of which the Court may take judicial notice.

DATED: April 7, 2008           QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

By _____
Diane C. Hutnyan
Attorneys for Mattel, Inc.

EXHIBIT ___1___

PAGE ___7___

Case No. CV 04-9049 SGL (RNBx)
MATTEL'S EX PARTE APPLICATION TO COMPEL ACCESS TO BRYANT ORIGINALS

quinn emanuel

07209/2461527.1

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

FACTUAL BACKGROUND .................................................................................. 3

ARGUMENT........................................................................................................ 8

I.     MATTEL WILL BE IRREPARABLY PREJUDICED IF IT IS NOT
       GRANTED THE REQUESTED ACCESS TO THE BRYANT
       DOCUMENTS. .............................................................................................. 9

II.    THE COURT SHOULD GRANT MATTEL'S APPLICATION
       BECAUSE MATTEL DID NOT CREATE THE CIRCUMSTANCES
       REQUIRING *EX PARTE* RELIEF. ................................................................. 12

III.   AS GATEKEEPER, THE COURT HAS A RESPONSIBILITY TO
       ENSURE THAT THE EXPERTS ARE ABLE TO RENDER
       COMPLETE AND RELIABLE EXPERT TESTIMONY AND THAT
       CAN ONLY HAPPEN HERE WITH REASONABLE ACCESS TO
       THE EVIDENCE FOR BOTH SIDES. ............................................................. 13

CONCLUSION.................................................................................................... 14

EXHIBIT **1**

PAGE **8**

quinn emanuel

1

## **TABLE OF AUTHORITIES**

2

**Page**

3

### **Cases**

4

*Carr v. Pacific Maritime Ass'n,*
5  904 F.2d 1313 (9th Cir. 1990)................................................................................ 9

6 *Daubert v. Merrell Dow Pharm., Inc.,*
  509 U.S. 579 (1993) ...................................................................................... 11, 13
7

*Mission Power Eng'g Co. v Continental Cas. Co.,*
8  883 F. Supp. 488 (C.D. Cal. 1995)................................................................. 8, 12

9 *Phillips v. Netblue, Inc.,*
  2007 WL. 528722 (N.D. Cal. 2007)..................................................................... 13
10

*Rivera v. NIBCO, Inc.,*
11  384 F.3d 822 (9th Cir. 2004)................................................................................. 9

12 *Shoen v. Shoen,*
  5 F.3d 1289 (9th Cir. 1993).................................................................................... 9
13

*Taylor v. Burlington Northern R. Co.,*
14  787 F.2d 1309 (9th Cir. 1986)............................................................................. 13

15 *United States v. Hempfling,*
  2008 WL. 703809 (E.D. Cal. 2008) ......................................................... 9, 11, 12
16

*Universal Trading,*
17  2007 WL. at 2................................................................................................... 14

18 *Universal Trading & Inv. Co. v. Kiritchenko,*
  2007 WL. 2141296 (2007) ................................................................................... 14
19

20

### **Statutes**

21 Fed. R. Civ. P. 26(e)(2) ........................................................................................ 13

22 Fed.R. Evid. 702 .................................................................................................... 14

23

24

25

26

27   EXHIBIT ___**1**___

28   PAGE ___**9**___

quinn emanuel

07209/2461527.1

# MEMORANDUM OF POINTS AND AUTHORITIES

## Preliminary Statement

Last summer, Mattel sought access for its four forensic document examiners to eight boxes of Bryant originals -- among them drawings and other materials that Bryant claimed supported his chronology of events -- for non-destructive[1] examination and testing. Although Rule 34 entitles Mattel to such access, Bryant opposed the request unless Mattel accepted a number of inappropriate conditions and restrictions designed to substantially hinder or even preclude Mattel's experts' examination and analysis of the originals.[2] Most of the objections and restrictions were overruled by the Court, but the Court did, at Bryant's urging, severely limit the time period in which the non-destructive examination could take place. The Court permitted a total of 35 days for the documents to be shipped, in their original order and all together, to each of the four experts in their laboratories around the country.[3]

---

[1] Non-destructive testing is any testing that would not alter the documents' inherent physical status.

[2] Among them: Bryant's counsel would only allow Mattel's experts to examine the originals if the originals were limited to a small number of documents - and only drawings -- that had to be cleared by him in advance; if Mattel's experts (whose identity was work product at that point) were identified in advance; if the originals stayed in the custody of Mattel's law firm and were never sent to the experts' laboratories; and if Mattel would share its access time with Bryant, who already had unlimited access to his own documents. *See* Declaration of Diane C. Hutnyan In Support Of Ex Parte Application To Compel Access To Certain Bryant Originals For Non-Destructive Expert Examination and Imaging, dated April 7, 2008 (hereinafter, "Hutnyan Decl."), ¶ 3 and Exh. 1 (Mattel, Inc.'s Notice of Motion and Motion to Compel Bryant To Make Original Documents Available For Expert Examination and Testing, and For Sanctions, dated July 6, 2007), at 10; and Exh. 2 (Carter Bryant's Opposition To Mattel, Inc.'s Motion to Compel Bryant To Make Original Documents Available For Expert Examination And Testing And For Sanctions, dated July 16, 2007), at 1, 8-9.

[3] Id., Exh. 3 (August 30, 2007 Discovery Master Order).

EXHIBIT __1__

PAGE __10__

quinn emanuel

1    Mattel's four experts, each of whom has a different special area of expertise,[4]
2  made the most of their time, examining and non-destructively testing[5] the thousands
3  of documents as best they could, looking broadly for erasures, alterations, or other
4  potentially probative evidence.  As the result of that analysis, two of Mattel's experts
5  drew important conclusions pertinent to whether certain documents in the case were
6  original drawings, as alleged by Carter Bryant; whether they were traced; and/or
7  whether they were traced from other documents that could be identified.   Their
8  conclusions were based on examinations under special lenses, special lighting, and
9  under microscopes.  Both of them observed that there appeared to be pencil lines
10  obscured some of the ink, or colored, portions of the drawings, but they did not
11  regard them as significant to their analysis at the time, as the pencil lines that stuck
12  out from under those sections of the drawings were consistent with their other
13  findings.

14    In rebuttal, MGA's two forensic "experts" -- Dr. Lyter and Mr. Kullman --
15  who had unlimited access to Bryant's documents, as well as Mssrs. Flynn's and
16  Cunningham's roadmap to the small subset of documents among the thousands that
17  were significant to this analysis -- zeroed in on these obscured pencil lines.  They
18  conducted reflected infrared and infrared luminescence testing that might or might
19  not reveal pencil lines under the coloring.  They then developed a theory around the
20  pencil lines that conveniently only they now had access to.  Bryant then freely sent
21  these key originals to MGA for use at Mssrs. Cunningham's and Flynn's depositions,
22  where they were asked to testify and draw conclusions about the pencil lines at their
23  depositions, which of course they were unable to do since they could not see them.

24

25    [4]  Id., ¶ 5, Exhs. 4-7 (In Camera Declarations for Mssrs. Cunningham, Flynn,
26  and Rantanen, and Dr. Aginsky).
27    [5]  "Non-destructive testing" methods include examining the documents using
    microscopes, magnifiers, light sources, scanners with special filters and measuring
28  instruments in ways that do not alter the documents.

1    After the depositions, each of Mattel's experts sought access to the originals
2  again so that they could also fully examine and photograph the pencil lines, but
3  Bryant would not share access to them.  Bryant and MGA hope to prevent Mattel's
4  experts from (1) ever fully examining that aspect of the drawings and those portions
5  of MGA's experts' reports that rely on that aspect of the drawings, and (2) being able
6  to photograph -- and show to the jury -- the evidence MGA's "experts" claim exist
7  and claim is so significant.

8    The Court cannot permit Bryant and MGA to keep their thumb on the scale.
9  If MGA's experts are permitted to opine about the significance of the pencil lines,
10  Mattel's experts must be given the opportunity to fully examine this supposedly
11  significant evidence and supplement their reports to address this evidence.

12

13  **Factual Background**

14    By Order on August 30, 2007, the Discovery Master granted Mattel 35 days
15  "for the expert examination and testing of the materials requested for the preparation
16  of its initial expert report[.]"[6]  The time period allotted was much shorter than the 60
17  days Mattel had requested as the bare minimum for this initial review,[7] but the
18  limitation was imposed at Bryant's and MGA's insistence and over Mattel's
19  objection.[8]

20    The parties had agreed for various reasons, but especially in light of the fact
21  that the originals were not marked or even ordered according to their Bates
22  numbered counterparts, to keep the originals in their original order, all together, in
23  the eight boxes Bryant kept them in.[9]  The boxes were, pursuant to the Court's
24  Order, sent as a collection by overnight mail to each of Mattel's four Court-approved

25

---

26  [6]  Id., Exh. 3, at ¶ 4.
27  [7]  Id., Exh. 2, 1.
     [8]  Id., Exh. 2.
28  [9]  Id., ¶ 6.

EXHIBIT __1__

PAGE __12__

quinn emanuel

1 | experts in their four different labs around the country.[10]  Deliveries were carefully

2 | timed to avoid meetings and other activities on the experts' other matters, so as to

3 | minimize down-time for the documents.[11]

4 |     The first of Mattel's forensic experts to see the originals, Lloyd Cunningham,

5 | was allotted eight days to non-destructively examine and test the eight boxes of

6 | documents.[12]  The second, expert, William Flynn, had "just over three work days"

7 | for his examination and testing.[13]  Mattel's counsel did not steer the examination,

8 | instead allowing each expert to review the entire universe of documents without

9 | preconceived notions and to highlight any findings they individually considered

10 | significant based on the evidence in the originals themselves.[14]  As a result, most of

11 | the 35 days was spent generally examining the thousands of pages of documents to

12 | determine whether they yielded relevant evidence or clues, and to do this, Mssrs.

13 | Cunningham and Flynn examined the documents directly, and/or with oblique or

14 | other special lighting, and/or with special lenses and magnifiers or microscopes.[15]

15 |     Mssrs. Flynn and Cunningham both drew conclusions, based on the testing

16 | and examination they did, as to whether certain tracing paper drawings and certain

---

[10] Id.

[11] Id.

[12] Id., ¶ 7.

[13] Id. ¶ 7, Exh. 9 (Transcript of William Flynn, March 27, 2008), at 19:5-7. Walter Rantanen, a paper chemist, conducted a paper analysis, and Dr. Valery Aginksy, an ink chemist, performed an ink test on the documents.  Mr. Rantanen and Dr. Aginsky's access were the subject of agreement and/or are not at issue in this application.

[14] Id., ¶ 7.

[15] Id., Exh. 8 (Rough Transcript of Lloyd Cunningham, March 31, 2008), at 44:3-48:5, 54:5-16, 159:15-160:7 (Cunningham used magnifiers, oblique or side lighting, transmitted lighting, fiber-optic slidings, dichroic filters, a light table, microscopes, reflected infrared, infrared luminescence, ultraviolet, and indentation analyses to examine documents among the eight boxes); Exh. 9 (Transcript of William Flynn, March 27, 2008), at 54:20-24, 160:1-11 (Flynn conducted microscopic examination and used a light table, among other tools, for his examination of the eight boxes of materials).

MATTEL'S EX PARTE APPLICATION  TO COMPEL ACCESS TO BRYANT ORIGINALS

1  multimedia posterboard drawings were sketches or tracings, and/or tracings of each
2  other.[16] Each of them testified that although their access was more limited than they
3  would have liked due to the restrictions of the August 30, 2007 Order, they felt the
4  examinations they did were sufficient to draw the conclusions and develop the
5  opinions that they had in their reports.[17] They believed there were obscured pencil
6  lines underneath the ink and colorant of these key documents which could not be
7  viewed without reflected infrared or infrared luminescence (and maybe not even
8  with those tools) but did not believe them significant to their analysis at the time, or
9  to their ultimate opinions as expressed in their reports, as the pencil markings they
10  could see were not significant.[18]

11      In contrast, unfettered by any limitations on their time or access, and knowing
12  from the Flynn and Cunningham reports which documents in the eight boxes were
13  significant to the tracing/sequencing issues, MGA's purported experts, Dr. Lyter and
14  Mr. Kullman, each conducted infrared testing using the VSC machine that they
15  claim (1) revealed pencil lines and (2) did so in a way that was purportedly
16  significant to the sequencing issue.[19] Mr. Kullman even referenced "attachments" in

17

18      [16]  Id., Exhs. 10 and 11 (Cunningham and Flynn Reports).
19      [17]  Id., Exh. 9 (Flynn), at 229:23-230:4 (sufficient to conclude outline drawings
   were traced, as in his report); Exh. 8 (Cunningham), at 202:20-203:7 (he evaluated
20  the evidence significant to his report).
21      [18]  Id., Exh. 9 (Flynn), at at 59:23-60:9 (found that there were pencil lines);
   63:25-64:3 (unclear whether infrared would have allowed viewing of pencil lines);
22  76:1-77:17 (even if obscured pencil lines seen, they might or might not be
23  significant); Exh. 8 (Cunningham), at 70:3-21 (recognizing pencil on multimedia
   drawings); 138:12-137:8 (used infrared and infrared luminescence on the
24  multimedia posterboard drawings to look at certain portions of pencil lines and for
25  chemical erasures that he thought might be significant); 161:11-25 (at the time he
   was permitted access, he did not realize the pencil on the multimedia drawings
26  might be significant to sequencing; he had not even identified the sequencing issue);
27  178:8-179:2 (did do infrared luminescence to detect erasures and noticed pencil
   lines).
28      [19]  Hutnyan Decl, Exhs. 12 and 13 (Kullman and Lyter reports).

quinn emanuel

EXHIBIT 14

PAGE

1  his report that purportedly demonstrated a comparison he was able to make between
2  the tracing paper drawings and the multimedia posterboard drawings using the VSC
3  testing, although the attachments were never served with the report.[20]

4        At Mssrs. Flynn's and Cunningham's depositions, MGA's counsel quizzed
5  them about the supposed obscured pencil findings.  No documents were presented at
6  the depositions that indicated the presence or location, or supported the purported
7  significance, of such lines.[21]    Since Mssrs. Cunningham and Flynn had not
8  performed that analysis, and could not see the supposed lines in question, they were
9  unable to comment on the specific pencil marks referred to or fully address the
10 issue.[22]

11       Both Mssrs. Flynn and Cunningham testified that they did not have time to
12 conduct reflected infrared and/or infrared luminescence testing on the multimedia
13 posterboard drawings because of the time constraints that had been imposed by the
14 August 30, 2007 Order.  Flynn testified:

15       . . . there were severe time constraints placed on these examinations.
16       The scope of my examination was vast and I had to make some
17       decisions about an examination strategy that would accomplish the
18       most that I could accomplish in the three days or so that I had with
19       these documents. . . .[23]

20

21

22    [20]  Id., Exh. 12 (Kullman Report at 3).
23    [21]  Id., ¶ 13.
      [22]  Id., Exh. 9 (Flynn), at 62:22-63:9 (Flynn had no opinion one way or the other
24 because he could not see them given the time available to him); 131:23-132:19 (he
25 could not see completely covered pencil without infrared); 135:21-136:11 (infrared
   might have helped see quality of pencil lines); Exh. 8 (Cunningham), at 128:4-129:3
26 (could not see pencil without infrared); 143:20-144:9 (would not necessarily see
27 pencil without the further testing); 150:4-151:6 (declining to render an on-the-spot
   opinion on pencil lines not visible at the deposition).
28    [23]  Id., Exh. 9 (Flynn), at 20:25-21:14.

quinn emanuel

EXHIBIT ___
PAGE ___

Q. Why didn't you [use the video spectro comparator to see the obscured pencil lines]?

A. ... Mr. Bryant had put a severe limitation, in my opinion, on the amount of time that I had to do an examination, so I had to make decisions about what, how much time to spend with each of the examinations and how much -- what kind of block testing I was going to do, not only with these documents but other documents downstream from here.[24]

Mr. Flynn testified that he would have done the infrared examinations had he had more time.

Q. So you're saying [that to see the underlying pencil lines] you would have liked to have performed additional examinations [on those drawings] with what type of a device?

A. I mean, there were multiple types of examinations that could have been performed, infrared examinations, infrared luminescent examinations. Had I had the time, I would have moved into the other part of the laboratory and taken photomicrographs.[25]

Mr. Cunningham explained that the issue of obscured pencil line identification location was not something he was doing in his "cursory examination of the documents" because when he was doing his examination -- the first few days that any Mattel expert would be able to see the eight boxes -- he did not even foresee that sequencing of those materials would be an issue.[26]

Two days after these depositions concluded, Mattel requested, pursuant to the June 20, 2006 stipulation on the record before Magistrate Judge Block, one week each for Mssrs. Flynn and Cunningham to have access to the original documents

---

[24] Id., Exh. 9 (Flynn), at 73:8-74:17.
[25] Id., Exh. 9 (Flynn), at 59:6-61:5.
[26] Id., Exh. 8 (Cunningham), at 161:11-25.

EXHIBIT **1**

PAGE **10**

quinn emanuel

1    they referred to in their reports, or that were referred to in the rebuttal reports
2    prepared by Drs. Lyter and Kullman, and gave notice that if the requested access
3    was not granted voluntarily, we would be bringing this *Ex Parte* Application for
4    relief.[27]

5        Preferring to keep the playing field uneven, counsel for Bryant and MGA
6    ignored the request to meet and confer and refused the request, citing no reason why
7    parting with the documents for two weeks would have any effect on Bryant or
8    MGA.[28]  Mattel's counsel invited counsel for Bryant and MGA to meet and confer
9    and again confirmed its plans to bring this Application.[29]

10       On April 4, three days after Mattel requested Mr. Kullman's missing
11   "attachments," Mr. Kullman submitted an amended expert report excluding any
12   reference to those attachments.[30]  MGA refused to provide the attachments.[31]

13                              **Argument**

14       An *ex parte* application may be granted where, as here, "the moving party's
15   cause will be irreparably prejudiced if the underlying motion is heard according to
16   the regular noticed motion procedures" and "the moving party is without fault in
17   creating the crisis that requires *ex parte* relief, or that the crisis occurred as a result
18   of excusable neglect."   Mission Power Eng'g Co. v Continental Cas. Co., 883
19   F.Supp. 488, 492 (C.D. Cal. 1995). Those standards are clearly met here.

20

21

22

23   ――――――――――
     [27]   Id., Exh. 14 (Letter from D. Hutnyan to M. Sloan and M. Werdegar, dated
24   April 2, 2008).
     [28]   Id., Exhs. 15 and 16 (Letter from M. Werdegar to D. Hutnyan, dated April 3,
25   2008 and Letter from M. Sloan to D. Hutnyan, dated April 4, 2008).
26   [29]   Id., ¶ 15 and Exh. 17.  The telephonic meet and confer, held with Matt
     Werdegar on April 7 as the result of this invitation, was unsuccessful. Id., ¶ 16.
27   [30]   Id., Exh. 19.
28   [31]   Id., Exh. 18 (Email from M. Sloan to D. Hutnyan, dated April 3, 2008).

quinn emanuel

EXHIBIT 17
PAGE

I.  **MATTEL WILL BE IRREPARABLY PREJUDICED IF IT IS NOT GRANTED THE REQUESTED ACCESS TO THE BRYANT DOCUMENTS.**

"The Federal Rules authorize broad pretrial discovery based on the general principle that litigants have a right to 'every man's evidence,' and that wide access to relevant facts serves the integrity and fairness of the judicial process by promoting the search for the truth." Id. (quoting Rivera v. NIBCO, Inc., 384 F.3d 822, 824 (9th Cir. 2004). See also Shoen v. Shoen, 5 F.3d 1289, 1292 (9th Cir. 1993) ("broad right of discovery is based on the general principle that litigants have a right to 'every man's evidence'") (quoting United States v. Bryan, 339 U.S. 323, 331 (1950)).

Notably, embodied within litigants' right to conduct broad discovery is the recognition that such discovery must be *meaningful*.  See, e.g., Carr v. Pacific Maritime Ass'n, 904 F.2d 1313, 1321 (9th Cir. 1990) (grievance and arbitration procedures "conducted within an extremely constricted time frame and without provisions for any meaningful discovery, were wholly inadequate to the task of fairly adjudicating the individual or class claims...."); United States v. Hempfling, 2008 WL 703809 * 9 (E.D. Cal. 2008) ("Government's prejudice continues with its inability to conduct meaningful discovery to pursue its claims.").

Here, Mattel tried to abide by the 35-day non-destructive examination and testing restriction that had been imposed over its objection, forcing Mssrs. Flynn and Cunningham each to quickly sort through and perform general examinations on thousands of documents, gathering evidence of erasures, alterations or any other forensic evidence that could shed light on issues of relevance to this case, in a few days.  This was an extremely unusual limitation, but since Mattel's experts were still able to conduct a sufficient examination in the timeframe to render the opinions they did, Mattel did not need to seek more time pursuant to paragraph 4 allowing for more access with the documents upon a showing of "good cause."  EXHIBIT **1**

PAGE **18**

quinn emanuel

1       But having insisted on, and won, this narrow time window for Mattel's four
2   experts, MGA and Bryant then refused to limit themselves in any way. Although the
3   concerns of the Discovery Master that resulted in the non-destructive protocol set
4   forth for Mattel in August 2007 were imposed in response to *MGA's* and *Bryant's*
5   consultant having admittedly put holes in key documents unbeknownst to Mattel, its
6   counsel or the Court, MGA and Bryant do not believe the same rules -- or any rules
7   -- should apply to them.  In February 2008, MGA and Bryant gave Dr. Lyter and
8   Mr. Kullman whatever access they wanted -- without any notice to Mattel, any
9   Court approval of their credentials, any review of their laboratory facilities, any
10  statements as to their practices with regard to the safeguarding and preservation of
11  original evidence, and any statement of their understanding that they were
12  accountable for the evidence while in their possession.

13      Then, with the benefit of Mattel's experts' reports having narrowed down the
14  issues for them, and having no restrictions whatsoever, much less Court oversight,
15  as to their activities, Dr. Lyter and Mr. Kullman conducted tests they knew Mssrs.
16  Flynn and Cunningham had no time to perform.  Then, taking full advantage of the
17  fact that the evidence they supposedly developed cannot even be seen by Mattel's
18  experts without further access to the documents, they created a whole novel theory
19  around the supposed pencil lines -- supposed pencil lines that can be questioned but
20  never fully tested or assessed by Mattel.

21      Thus, although Mattel was given <u>access</u> to the documents at one time, the
22  unusual circumstances here -- the extreme 35-day limitation on Mattel's access; the
23  unlimited access provided to MGA's experts; and the inherent invisibility of the
24  obscured pencil lines without access and special testing -- have all worked to
25  deprive Mattel of fair opportunity to challenge Defendants' conclusions, rendering
26  the playing field uneven and preventing Mattel's access from being <u>meaningful</u>.  For
27  all Mattel knows, the pencil lines Dr. Lyter and Mr. Kullman find so significant do
28  not even exist, or in fact cut against Lyter's and Kullman's conclusions.  Mattel has a

quinn emanuel

1   right to see this same evidence, explore it and fully address it.  It is simply not fair to
2   allow two parties almost all of the control over the key evidence while not even
3   allowing access to another party.

4   Meanwhile, MGA's recent request for access to the notary book for
5   destructive testing, supposedly to "replicate" the testing that Dr. Aginsky did (which
6   is the subject of Mattel's pending Mattel Inc's Ex Parte Application for Protective
7   Order Preventing MGA's Destructive Sampling of the Prince Notary Book due to
8   MGA's efforts, unabated even now, to go far beyond replication) implicitly
9   recognizes that Mattel has good cause for its request.  In MGA's Opposition to that
10  Application, MGA argued that defendants should be allowed to conduct the exact
11  same testing as Mattel, arguing that "the issue is one of simple fairness.  Should
12  MGA be granted the same right to test documents as Mattel?  Or should Mattel be
13  allowed to impose a double standard and prevent MGA from performing the very
14  same forensic testing it performed just two months ago?  The answer," MGA
15  claimed, "is clear."[32]  As a result, MGA argued, since Mattel was able to take some
16  samples from Jacqueline Prince's notary book in order to perform forensic ink
17  testing, MGA should have "the right to perform the same testing, under the exact
18  same circumstances."[33]

19  As defendants themselves have argued: "[t]he denial of the opportunity to test
20  and challenge evidence imposes irreparable prejudice."[34]  Here, Mattel similarly
21  seeks access to the questioned materials to replicate and respond to arguments made

22

23  [32]   Id., Exh. 20 (MGA's Opposition to Mattel, Inc.'s Ex Parte Application For
     Protective Order Preventing MGA's Destructive Sampling of The Prince Notary
24  Book, dated March 12, 2008) at 1.

25  [33]   Id. Exh. 20, at 1.  See id., Exh. 20 at 16-17 ("All that MGA seeks is the
     opportunity to perform the same testing performed by Mattel's expert, pursuant to
26  the same protocol employed by Mattel, so that it can prepare a rebuttal expert
27  report") (emphasis added).

    [34]   Id. Exh. 20, at 15 (citing Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579,
28  596 (1993)).

quinn emanuel

EXHIBIT 20
PAGE

1  by MGA and Bryant.[35]  If MGA has the right to replicate any testing done by
2  Mattel, Mattel surely has a corresponding right to replicate testing done by MGA.

3      Without the opportunity to conduct additional testing and file a supplemental
4  report based on that testing, which will allow full rebuttal of defendants' experts'
5  conclusions, Mattel will be irreparably prejudiced at trial.   Similarly, granting
6  Mattel's request for access to the originals to allow more extensive testing will help
7  to level the playing field, and provide the trier of fact a more complete analysis of
8  these key documents.

9  **II.    THE COURT SHOULD GRANT MATTEL'S APPLICATION**
10         **BECAUSE MATTEL  DID NOT CREATE THE CIRCUMSTANCES**
11         **REQUIRING *EX PARTE* RELIEF.**

12      The circumstances creating the need for relief were created by Bryant and
13  MGA, not Mattel.  The limitations placed on Mattel's experts' original review of the
14  materials were due to the 35-day limitation on Mattel's access, which was instituted
15  at Bryant's and MGA's urging.   The unlimited access MGA's un-Court-approved
16  experts were given -- despite the clear indications by the Discovery Master last fall
17  that he had concern about who was examining the key documents in this case, and
18  how they were doing it, was given by Bryant.  The decision to develop a rebuttal
19  theory not based on the evidence presented in Mssrs. Flynn's and Cunningham'
20  reports, and  supposedly relying on obscured pencil lines that could only be seen by
21  experts with sufficient access to the materials to do special testing, was Bryant's and
22  MGA's. Accordingly, Mattel satisfies the requirement set forth in Mission Power,
23  883 F. Supp. at 493, for establishing that the moving party is without fault or guilty
24  only of excusable neglect – namely that the movant "used the entire discovery

---

[35]    Although in contrast to MGA, Mattel is seeking only non-destructive
examination testing and by two experts that were already scrutinized by, and found
to be satisfactory to, the Discovery Master.

1   period efficiently and could not have, with due diligence, sought to obtain the
2   discovery earlier in the discovery period." Id.

3       Indeed, to the extent that such pencil lines exist, are visible, and are material
4   to the opinions expressed in Mssrs. Flynn's and Cunningham's reports, as Dr. Lyter
5   and Mr. Kullman contend, MGA and Bryant have arguably created an obligation
6   pursuant to Fed. R. Civ. P. 26(e)(2) for Mattel's experts to investigate and
7   supplement their reports. Under that rule, "parties must supplement or correct their
8   experts' reports or deposition testimony if they learn these items are incomplete or
9   incorrect in some material respect." Rutter Group Practice Guide: Federal Civil
10  Trials and Evidence Ch. 11-A 2a.5 § 11:25 (citing Walsh v. McCain Foods Ltd., 81
11  F.3d 722, 727 (7th Cir. 1996)). If Mattel's experts' inability to conduct infrared
12  luminescence and reflective infrared testing and the pencil lines such testing may
13  reveal are material to their conclusions, Mattel has a right of access to the
14  documents so that it can fulfill that obligation.

15  **III.   AS GATEKEEPER, THE COURT HAS A RESPONSIBILITY TO**
16  **ENSURE THAT THE EXPERTS ARE ABLE TO RENDER**
17  **COMPLETE AND RELIABLE EXPERT TESTIMONY AND THAT**
18  **CAN ONLY HAPPEN HERE WITH REASONABLE ACCESS TO THE**
19  **EVIDENCE FOR BOTH SIDES.**

20      It is the Court's duty to safeguard the trial process by ensuring that the trier of
21  fact has access to complete, reliable and credible expert testimony, and it does this
22  by safeguarding the process governing expert testimony. As the court stated in
23  Phillips v. Netblue, Inc., 2007 WL 528722 (N.D. Cal. 2007), "sitting in its capacity
24  as gatekeeper, the Court must ensure that an expert's testimony 'both rests on a
25  reliable foundation and is relevant to the task at hand.'" (quoting Daubert, 509 U.S.
26  at 597). In doing so, "[t]he trial court has broad discretion in admitting and
27  excluding expert testimony." Taylor v. Burlington Northern R. Co., 787 F.2d 1309,
28  1315 (9th Cir. 1986).

quinn emanuel

EXHIBIT 22

PAGE

1    Rule 702 of the Federal Rules of Evidence "allows witnesses to present
2 testimony to the trier of fact based on 'scientific, technical, or other specialized
3 knowledge' in order to assist the trier of fact to understand the evidence or to
4 determine a fact in issue." Universal Trading & Inv. Co. v. Kiritchenko, 2007 WL
5 2141296 * 2 (2007) (quoting Fed.R. Evid. 702). As a result of the limitations place
6 on Mattel's experts' access to the pertinent materials, their ability to help the trier of
7 fact fully "understand the evidence or to determine a fact in issue," Universal
8 Trading, 2007 WL at * 2, has potentially been compromised by the severe
9 disparities in the degree of access afforded Mattel's and MGA's experts to the
10 evidence.  Similarly, MGA's experts' ability to educate the trier of fact on these
11 issues is compromised because they will not have the benefit of having their
12 opinions fully tested by Mattel's experts.

13    In short, both to prevent Mattel's irreparable injury, and to preserve the
14 principles embodied in the federal rules governing expert testimony, the Court
15 should allow Mssrs. Cunningham and Flynn two weeks access to conduct additional
16 non-destructive examination and testing of the te tracing paper drawings and
17 multimedia posterboard drawings so they can see the underlying evidence and
18 properly respond to the conclusions reached by Drs. Lyter and Kullman with regard
19 to obscured pencil markings and any related evidence on the drawings.

20                                   **CONCLUSION**

21    For the reasons stated, Mattel's *ex parte* Application to grant Mssrs.
22 Flynn and Cunningham access to Carter Bryant's original documents for a total of
23 two weeks should be granted.

24 DATED: April 7, 2008          QUINN EMANUEL URQUHART OLIVER &
                                 HEDGES, LLP
25

26

27                              By
                                   Diane C. Hutnyan
28                                 Attorneys for Mattel, Inc.

quinn emanuel

EXHIBIT 23
PAGE

EXHIBIT 2

1 QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
   John B. Quinn (Bar No. 090378)
2   johnquinn@quinnemanuel.com
   Michael T. Zeller (Bar No. 196417)
3   (michaelzeller@quinnemanuel.com)
   Jon D. Corey (Bar No. 185066)
4   (joncorey@quinnemanuel.com)
   Timothy L. Alger (Bar No. 160303)
5   (timalger@quinnemanuel.com)
   865 South Figueroa Street, 10th Floor
6 Los Angeles, California 90017-2543
   Telephone: (213) 443-3000
7 Facsimile: (213) 443-3100

8 Attorneys for Mattel, Inc.

9                    UNITED STATES DISTRICT COURT

10                  CENTRAL DISTRICT OF CALIFORNIA

11                        EASTERN DIVISION

12

13 CARTER BRYANT, an individual,        Case No. CV 04-09049 SGL (RNBx)

        Plaintiff,                      Consolidated with
14                                      Case No. CV 04-09059
        vs.                             Case No. CV 05-02727
15
   MATTEL, INC., a Delaware corporation,  **DISCOVERY MATTER**
16
        Defendant.                      Hon. Edward A. Infante (Ret.)
17                                      Discovery Master

18 ─────────────────────────────────    *IN CAMERA* DECLARATION # 1 AS
   AND CONSOLIDATED CASES                TO EXPERT EXAMINATION AND
19                                      TESTING OF BRYANT'S ORIGINAL
                                        DOCUMENTS
20
                                        Date: August 23, 2007
21                                      Time: 9:00 a.m.
                                        Place: Telephonic
22
                                        Discovery Cut-Off: October 22, 2007
23                                      Pre-Trial Conference: January 14, 2008
                                        Trial Date: February 12, 2008
24

25 ┌──────────────────────────────────────────────────┐
   │                                                    │
26 │   **SUBMITTED PER JUDGE INFANTE'S REQUEST ON AN**   │
   │                                                    │
27 │            *IN CAMERA* BASIS                        │
   │                                                    │
28 │   ~ **Not For Dissemination To Defendants/Counterclaimants** ~ │
   └──────────────────────────────────────────────────┘

07209/2205386.1

                                        IN CAMERA DECLARATION NO. 1

EXHIBIT __2__

PAGE __24__

## DECLARATION OF VALERY N. AGINSKY, PhD

I, Valery N. Aginsky, Ph.D., declare as follows:

1.      I am a forensic chemist specializing in the field of forensic document examination. I am submitting this declaration *in camera* in response to a request from the Discovery Master in connection with Mattel's Motion to Compel Bryant To Make Original Documents Available For Expert Examination and Testing. I am more than twenty-one (21) years of age; I make this declaration of personal, firsthand knowledge; and if called and sworn as a witness, I could and would testify competently thereto.

2.      I have been a forensic chemist for 27 years. I am currently employed with Riley, Welch & Aginsky Forensic Document Examinations, Inc. (formerly known as Riley, Welch & Associates Forensic Document Examinations, Inc.) I received my Ph.D. in Analytical Chemistry in 1980. Prior to joining Riley, Welch & Associates I worked as a senior research chemist with the Forensic Science Center, Ministry of the Interior, Russia. I am experienced in a wide range of examination techniques, but my particular specialty is the analysis and dating of ink on documents by Thin-Layer Chromatography and Gas Chromatography-Mass Spectrometry. I am the author of more than 20 peer-reviewed articles on ink analysis and dating, including chapters in three books and two encyclopedias. A true and correct copy of my curriculum vitae showing further details of my professional history and a list of my professional publications is attached hereto as Exhibit 1.

3.      Attached hereto as Exhibit 2 is a true and correct copy of a list of the cases in which I have testified for the last five years. One of the famous cases I was involved in was the multi-billion-dollar will contest of Chinachem magnate Teddy Wang, "In The Matter of Wang Teh Huei," in The High Court of the Hong Kong Special Administrative Region. Attached hereto as Exhibit 3 is a true and

07209/2205386.1

-1-

EXHIBIT **2**

PAGE **25**

1 correct copy of excerpts of the Hong Kong Court's ruling assessing my work in that
2 case.

3       4.    I understand that the parties have stipulated to, and the Court has
4 tentatively approved, a special protocol for any destructive testing that might be
5 advisable. I have been informed of this protocol and, to the extent that destructive
6 testing is authorized in accordance with the protocol and appropriate in this case, will
7 follow it with regard to any destructive testing that might need to be done.

8       5.    To properly examine and test documents, as well as to ensure that
9 they are properly handled and preserved, I conduct my analysis and testing in my
10 laboratory in Lansing, Michigan. The laboratory contains specialized scientific
11 equipment that I use to conduct the examination and testing of documents. Some of
12 this equipment includes: a gas chromatograph equipped with a mass selective
13 detector (GC-MS), a kit for conducting thin-layer chromatographic (TLC) analysis of
14 ink, and necessary laboratory instruments and chemicals, such as organic solvents
15 used to extract ink from ink-on-paper samples taken from documents. I may perform
16 the chemical analysis of ink by GC-MS and TLC on one or more of the original
17 documents from Mr. Bryant. GC-MS and TLC are separation techniques ideally
18 suited to the characterization and dating of writing ink, printing ink, and other colored
19 materials on documents. Most important parts of the above scientific equipment are
20 not portable, meaning that it is practically impossible to transport this equipment to
21 California for me to perform the chemical analysis of the original documents from
22 Mr. Bryant there. As an option, I can conduct some preliminary analysis and testing
23 of Mr. Bryant's original documents in Mr. Cunningham's office in California,
24 including taking ink samples from the documents. I would then bring these ink
25 samples to my laboratory in Lansing, Michigan for their chemical analysis by GC-
26 MS and TLC.

27       6.    In the event that any destructive testing is authorized in
28 accordance with the protocol and is appropriate, the sampling procedure that I

07209/2203386.1

-2-

EXHIBIT **2**

PAGE **26**

1  conduct as an expert involves removing portions of the written lines from the entries
2  to be examined. This is accomplished with a hypodermic needle sized hole punch,
3  which removes hole punches about the size of a typewriter period (less than 1 mm in
4  diameter). Approximately 10 tiny plugs of ink-on-paper will be punched out from
5  each questioned entry on the document. The method of removing ink samples from
6  documents that I use has been accepted by courts in the United States for over 30
7  years. While tiny holes will be visible in the writing, the writing remains completely
8  legible. Therefore, as I perform such sampling, the documents will be nearly intact.
9  Each document will be photographed at varying high resolutions before and after any
10  samples of ink are removed. These images provide a permanent record of the
11  condition of the document before and after ink testing was conducted.

12      7.    As an expert in the field of forensic document examination, I
13  recognize the extreme importance of preserving the integrity of the evidence I am
14  sent for review and analysis. When materials arrive at my laboratory, they will
15  remain securely stored (when not being examined) while they are in my custody. The
16  laboratory facilities are locked and no one else has access to the materials that are
17  sent to me for examination and testing. My laboratory is located in my house at 2511
18  Lafayette Avenue, Lansing, Michigan 48906. I certainly understand the critical
19  nature of each of Mr. Bryant's original documents and will be fully accountable for
20  them while they are in my custody. The ink comparison and age determination
21  procedures I use will not affect the documents in any way so as to be prejudicial to
22  the owner of the documents' interest.

23      8.    With the exception of alterations resulting from any destructive
24  testing, which would be conducted in accordance with the protocol above, all the
25  Bryant documents that are provided for inspection, examination and testing shall be
26  returned by me in the same condition, sequence and order in which they were
27  received.

28

EXHIBIT __2__

PAGE __27__

1        I declare under penalty of perjury under the laws of the State of

2  California and the United States of America that the foregoing is true and correct.

3        Executed this __28th__ day of August, 2007, at Lansing, Michigan.

4

5

6

7                                                  

8                     Valery N. Aginsky, Ph.D.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

07209/2205386.1

-4-

IN CAMERA DECLARATION NO. 1

EXHIBIT __2__

PAGE __28__

EXHIBIT 3

# VALERY N. AGINSKY, Ph.D.

## Curriculum Vitae

**Position:** *Forensic Chemist / Document Dating Specialist*
Riley, Welch & Aginsky Forensic Document Examinations, Inc.
Lansing, Michigan

**Education:** *Ph.D. Analytical Chemistry - 1980*
Military Academy of Chemical Defense (formerly known as the Chemical Faculty of the Institute of Mechanical Engineering prior to 1940), Moscow, USSR

*M.S. Analytical Chemistry - 1977*
Military Academy of Chemical Defense, Moscow, USSR

**Professional Experience:** Riley, Welch & Associates Forensic Document Examinations, Inc., Lansing, Michigan
*Forensic Chemist* (1998 to April 2005)

Riley, Welch & Aginsky Forensic Document Examinations, Inc., Lansing, Michigan
*Forensic Chemist* (April 2005 to present)

Responsible for chemical analysis of ink on documents (ink comparison and dating). Uses ink dating methods developed as a result of many years of research of the methodology developed and published by Dr. Antonio Cantu. These methods measure certain parameters of ink that decrease as ink ages on paper. They analyze *ink volatile components* (their residues are always present in ink lines, no matter the ink age) and enable *absolute* ink age determination: one determines a time frame within which a questioned entry has been written, not relative to other known dated entries, as *relative* ink age determination technology requires.

Forensic Science Center of the Ministry of the Interior, Moscow, Russia
*Senior Research Chemist* (1980 to 2000)

**Exhibit 1 Page 5**

EXHIBIT **3**

PAGE **29**

Involved in methods development, technical assistance to investigative personnel, including training and presentations to legal proceedings and routine examination of evidence. Developed several techniques for examining questioned documents, drugs of abuse, explosives and gunshot residues.

About ten years of professional research and practical experience as a questioned document examiner: the dating of writing, stamp pad and printing inks, alteration of records, indented writings, erasures/eradications/obliterations, sequence of strokes, paper/ink/toners, computer printers and documents generated, counterfeit currency, currency exposed to an exploding dye-pack.

*Methods:* microscopy, microspectrophotometry, electrostatic imaging analysis, video enhancement techniques, infrared spectroscopy, ultraviolet/visual spectrophotometry, thin-layer chromatography, and gas chromatography-mass spectrometry.

**Honors/Awards:**   *Diploma and the First Prize for new techniques on Dating Inks*
Ministry of the Interior, 1993

*Award for excellence in service (Best Forensic Chemist)*
Ministry of the Interior, 1982

*Silver medal in chemistry at the 1976 All-Union Contest of Scientific Works,*
Ministry of Defense

*Co-Chair of the Questioned Documents Sections at the First International Forensic Science Symposium, Moscow, Russia, 1994, the 13th and 14th Meetings of the International Association of Forensic Sciences, Dusseldorf, Germany, 1993, and Tokyo, Japan, 1996.*

**Teaching**
**Experience:**   Conducted numerous training seminars for the personnel of forensic laboratories in Russia and the former Soviet Union in the framework of the Ministry of the Interior's training programs:

*Technical and Chemical Examination of Counterfeit Currency*

*Detecting and Dating Alterations Made to Documents*

*Ink/Paper Comparison by Thin-Layer Chromatography and Other Analytical Methods*

*Detection and Characterization of Explosive Residues*

Exhibit **1** Page **6**

EXHIBIT **3**

PAGE **30**

Served as visiting examiner to the Division of Identification and Forensic
Science, Israel Police Headquarters, 1996 & 1997.

Conducted seminars on ink analysis and dating for the Division of Identification
and Forensic Science, Israel Police Headquarters, Jerusalem, Israel, 1995;
Ministry of Justice and Ministry of the Interior Combined Scientific Council for
Forensic Science and Criminalistics, Moscow, Russia, 1997; the Forensic
Sciences Division of the Canada Customs and Revenue Agency, Ottawa,
Canada, 1998; Istanbul University, Institute of Forensic Sciences, Istanbul,
Turkey 2000.

Conducted a seminar on Quantitative Thin-Layer Chromatography (Internal
Standard Method) at the Russian-German Summer School on Thin-Layer
Chromatography, Moscow, Russia, 1993.

**Court**
**Testimony:** Testified regarding ink analysis and ink and document dating in criminal and
civil matters and in arbitrations.

**Professional**
**Affiliations:**       International Association for Identification,
                        Questioned Documents Section (1992 - present)

                        International Association of Forensic Sciences,
                        Questioned Documents Section (1993 - present)

                        Ministry of Justice and Ministry of the Interior Combined Scientific
                        Council for Forensic Science and Criminalistics (Russia, 1995-1999)

                        Regional Representative for the Russian Charted Division of the
                        International Association for Identification (1998 - 2000)

                        American Society for Testing & Materials (2003 - present)

**Exhibit <u>1</u> Page <u>7</u>**

EXHIBIT **3**

PAGE **31**

## Professional Publications

### Books

1. Document Analysis / Analytical Methods. *Encyclopedia of Forensic Sciences*, J.A. Siegel (Ed.), Academic Press, Harcourt Publishers Ltd., 2000.

2. Writing Media and Documents. Chapter 19. *Handbook of Analytical Separations*. Vol. 2 – Forensic Science, M.J. Bogucz (Ed.), ELSEVIER, Amsterdam – New York – Oxford – Shannon – Singapore – Tokyo, 2000.

3. Writing Media and Documents. Chapter 28. *Handbook of Analytical Separations (2nd Edition)*. Vol. II – Forensic Science (publication pending).

4. An Application of Chromatographic Methods for Dating Questioned Documents. *Chromatography (Celebrating the 125th Birthday of the Inventor of Chromatography, Dr. Michael Tswett)*, O. Kaiser, R.E. Kaiser, H. Gunz, and W. Gunther (Eds.), InCOM, Duesseldorf, Germany, 1997.

5. A New Version of the Internal Standard Method in Quantitative Thin-Layer Chromatography. Chapter 4.6. *Handbook of Modern Thin-Layer Chromatography*, O.G. Larionov (Ed.), Russian Academy of Science, Chromatography Council, Moscow, Russia, 1994 (in Russian).

6. Aginsky, V.N. and Dildin, Yr. M., *Forensic Examination of Explosives*, VNII MVD SSSR, Moscow, USSR, 1982 (in Russian).

7. Aginsky, V.N., Safronenko, T.I., and Sorokina, G.I., *Forensic Examination of Questioned Documents*, VNII MVD SSSR, Moscow, USSR, 1987 (in Russian).

8. Aginsky, V.N., Safronenko, T.I., and Sorokina, G.I., *Detecting and Dating Alterations Made to Documents*, VNII MVD SSSR, Moscow, USSR, 1989 (in Russian).

9. Aginsky, V.N., Zibrov, G.S., and Sorokina, G.I., *Analysis of Drugs, Inks, Petroleum Products, and Explosives by Reversed Phase Thin-Layer Chromatography*, Forensic Science Center of the Russia's Ministry of the Interior, Moscow, 1993 (in Russian).

### Peer-Reviewed Articles and Presentations at Scientific Conferences

10. A New Application of Instrumental Planar Chromatography in Forensic Analysis, *Journal of Planar Chromatography*, Vol. 4, 1991, pp. 167-169.

11. Some New Ideas for Dating Ballpoint Inks – A Feasibility Study, *Journal of Forensic Sciences*, 1993, No. 5.

12. Comparative Examination of Inks by Using Instrumental Thin-Layer Chromatography and Microspectrophotometry, *Journal of Forensic Sciences*, Vol. 38, No. 5, Sept. 1993, pp. 1111-1130.

13. Forensic Examination of "Slightly Soluble" Inks Pigments Using Thin-Layer Chromatography, *Journal of Forensic Sciences*, Vol. 38, No. 5, Sept. 1993, pp. 1131-1133.

Exhibit 1 Page 8

EXHIBIT 3

PAGE 32

14. Mechanism and Kinetics of the Aging of Some Ink Dyes. *Advances in Forensic Sciences.* Vol. 3 - Forensic Criminalistics, Proceedings of the 13th Meeting of the International Association of Forensic Sciences, Dusseldorf 1993, B. Jacob and W. Bonte, Eds., Verlag Dr. Koster, Berlin, 1995.

15. Discrimination between Naturally and Artificially Aged Ballpoint Inks, ibid.

16. Determination of the Age of Ballpoint Pen Ink by Gas and Densitometric Thin-Layer Chromatography, *J. Chromatography*, 1994, Vol. 678.

17. A New Version of the Internal Standard Method in Quantitative Thin-Layer Chromatography, *Journal of Planar Chromatography*, July/August 1994, Vol. 7, pp. 309-314.

18. A Microspectrophotometric Method for Dating Ballpoint Inks - A Feasibility Study, *Journal of Forensic Sciences*, Vol. 40, No. 3, May 1995, pp. 475-478.

19. Dating and Characterizing Writing, Stamp Pad and Jet Printer Inks by Gas Chromatography/Mass Spectrometry, *International J. Forensic Document Examiners*, 1996, No. 2, pp.103-115.

20. Accelerated Aging – Its Use in Methods for Dating Ink (Letter to the Editor), *International J. Forensic Document Examiners*, 1996, No. 3.

21. Ink Dating – The State of the Art in 1996, Proceedings of the 14th Meeting of the International Association of Forensic Sciences, Tokyo 1996, Shunderson Communications, 1997, Vol. 4.

22. Current Methods for Dating Inks – Which is the Best? Presented at the 49th Annual Meeting of the American Academy of Forensic Sciences, New York, NY, 1997.

23. Dating Ink on Questioned Documents – The State of the Art in 1997, presented at the First European Meeting of Forensic Science, Lausanne, Switzerland, 1997.

24. Measuring Ink Extractability as a Function of Age – Why the Relative Aging Approach is Unreliable and why it is More Correct to Measure Ink Volatile Components than Dyes, *International J. Forensic Document Examiners*, 1998, No. 3.

25. Ink Dating – The State of the Art, presented at the 50th Annual Meeting of the American Academy of Forensic Sciences, San Francisco, CA, 1998.

26. Ink Dating – The State of the Art, presented at the First Regional Symposium on Criminalistics, April 20-22, 2000, Istanbul University, Institute of Forensic Sciences, Turkey.

27. Determining the Sequence of Non-Intersecting Media on Documents: Ballpoint Pen Ink and Laser Toner Entries, *Journal of the American Society of Questioned Document Examiners*, 2002.

28. Current Methods for Dating Ink on Documents, presented at the 60th Annual Conference of the American Society of Questioned Document Examiners, San Diego, California, August 14-19, 2002, and at the Midwestern Association of Forensic Scientists Fall 2002 Meeting, Milwaukee, Wisconsin, September 15-20, 2002.

29. Using TLC and GC-MS to Determine whether Inks Came from the Same Manufacturing

Exhibit 1 Page 9

EXHIBIT 3

PAGE 53

    Batch, presented at the 63rd Annual Conference of the American Society of Questioned
Document Examiners, Montreal, Canada, August 11-16, 2005.

30. Using TLC and GC-MS to Determine whether Inks Came from the Same Manufacturing
Batch, *Journal of the American Society of Questioned Document Examiners*, Vol. 9, No. 1,
2006, pp. 19-27.

31. Current Methods for Dating Ink on Documents, presented at the 65th Annual Conference of
the American Society of Questioned Document Examiners, Boulder, Colorado, August 11-16,
2007.

## Other Professional Publications

32. Aginsky, V.N. and Sorokina, G.I., "Detecting Explosives in Post Explosion Debris Contaminated by
Petroleum Products", *Expertnaya Praktika [Expert Practice]*, Vol. 19, 1982, pp. 73-75 (in Russian).

33. Aginsky, V.N. and Sorokina, G.I., "Detection of Explosive Residues Intruded into Asphalt",
*Expertnaya Praktika [Expert Practice]*, Vol. 20, 1983, pp. 109, 110 (in Russian).

34. Aginsky, V.N. and Sorokina, G.I., *Detection and Quantitative Determination of Clonidine and Other
Psychotropic Drugs in Beverages*, VNII MVD SSSR, Moscow, USSR, 1990 (in Russian).

35. Aginsky, V.N., "A New Application of Instrumental Planar Chromatography in Forensic Analysis,"
presented at the 6th International Symposium on Instrumental Planar Chromatography, Interlaken,
Switzerland, April 23-26, 1991.

36. Aginsky, V.N., Sorokina, G.I., and Zibrov, G.S., "Detection, Identification and Comparative
Examination of Narcotics and Drugs of Abuse," Proceedings of the Forensic Science Symposium,
Linkoping, June 1992, Report 27, National Laboratory of Forensic Science, Linkoping, Sweden,
1993.

37. Aginsky, V.N., Savilov, A.P., and Sorokina, G.I., "Chromatographic Screening of Drugs of Abuse,"
Proceedings of the Forensic Science Symposium, Moscow, March 1994, Forensic Science Center of
the Ministry of the Interior, Moscow, Russia, 1994.

38. Aginsky, V.N., "Increasing the Reliability of the Identification of Separated Substances in
Densitometric Thin-Layer Chromatography", *Advances in Forensic Sciences*. Vol. 3 - Forensic
Criminalistics, Proceedings of the 13th Meeting of the International Association of Forensic Sciences,
Dusseldorf 1993, B. Jacob and W. Bonte, Eds., Verlag Dr. Koster, Berlin, 1995.

39. Aginsky, V.N., "A New Approach in Determining the Age of Inks Using Densitometric Thin-Layer
Chromatography," ibid.

40. Aginsky, V.N., "Instrumental Techniques for Comparing Similarly Colored Inks," ibid.

41. Aginsky, V.N., Lesnikov, V.A. and Sorokina, G.I., "Time of Shooting - Feasibility of Discriminating
"Fresh" and "Old" Organic Gunshot Residues," Proceedings of the 14th Meeting of the International
Association of Forensic Sciences, Tokyo 1996, Shunderson Communications, 1997, Vol. 4.

42. Aginsky, V.N., "Application of GC/MS in Some Areas of Forensic Analysis," presented at the
Hewlett-Packard Analytical Forum, Moscow, Russia, April 1998.

43. Aginsky, V.N., "Determining the Sequence of Non-Intersecting Media on Documents – Ballpoint pen
ink and laser toner entries," presented at the 49th Annual Conference of the American Society of
Questioned Document Examiners, Des Moines, Iowa, August 2001.

Exhibit 1 Page 10

EXHIBIT 3

PAGE 34

# Exhibit 2

EXHIBIT __3__

PAGE __35__

**Valery N. Aginsky, Ph.D.**             **- 1 -**

**COURT CASES AND DEPOSITIONS**

| Date | Location | Type of Proceeding | Case |
|------|----------|--------------------|------|
| 10-22-01 through 10-31-01 | Hong Kong | Trial | Wang Din Shin  vs  Nina Kung alias Nina T.H. Wang<br><br>High Court,  Case No. HCAP8/1999 |
| 01-15-02 | Pennsylvania | Arbitration Hearing | Labor's Union International of North America  - vs - Prudencio Martínez, Jr. |
| 05-06-02 | Cayman Islands | Trial | CVC/Opportunity Equity Partners Limited  - vs - Luis Roberto Demarco Almeida<br><br>The Grand Court of the Cayman Islands Case No. 389 of 1999 |
| 8-21-02<br>8-22-02 | Chicago, IL | Trial | MULTIUT CORPORATION  - vs -  DRAIMAN, *et al*<br>Circuit Court of Cook County, Illinois Case No. 01 CH 9989 |
| 10-16-02 | Farmington Hills MI | Deposition | Robert J. Petz |
| 03-12-03 | Los Angeles, CA | Trial | Estate of Yvette Smith<br><br>Superior Court of the State of California Case No. 069111 |
| 09-26-03 | Toronto, Canada | Arbitration Hearing | FCLG Enterprises, Ltd.  - vs - 668152 ONTARIO, Ltd., *et al* |
| 11-05-03 | Chicago, IL | Deposition | Rempala  - vs -  Ebner, *et al*<br><br>Circuit Court of Cook County, Illinois Case No. 00 CH 01783 |
| 02-11-04 | Okemos, MI | Deposition | JJK Industries, L.P.  - vs -  KPlus, *et al*<br><br>District Court for the Southern District of Taxes, Houston,  Case No. H-02-2252 |
| 05-06-04 | East Lansing, MI | Deposition | Digital Control, Inc.  - vs -  Charles Machine Works,  Arbitration Hearing, Seattle, Washington |
| 01-26-05<br><br>12-05-05 | Okemos, MI<br><br>West Palm Beach, FL | Deposition<br><br>Hearing | Jupiter Medical Center  - vs -  Orlon Carr, III, MD<br>Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida, Case No. CL-00-9971-AD |
| 03-14-05<br><br>04-06-05 | Glendale, CA<br><br>Van Nuys, CA | Deposition<br><br>Trial | SP22, Inc. *et al* v. Yurdumyan, *et al*<br><br>Superior Court of the State of California County of Los Angeles, Northwest District Case No. LC067829 |

Exhibit _2_ Page _11_

EXHIBIT _3_

PAGE _36_

**Valery N. Aginsky, Ph.D.**                                                                    - 2 -

**COURT CASES AND DEPOSITIONS**

| Date | Location | Type of Proceeding | Case |
|------|----------|--------------------|------|
| 10-27-05 | Washington, DC | Deposition | LG. Phillips LCD Co., Ltd. v. Tatung Co. of America, Tatung Company, and Chunghwa Picture Tubes, Ltd. <br><br> District Court, Central District of California <br> Case No. CV-02-6775 CBM (JTLx) |
| 04-14-06 <br><br> 06-20-06 <br> 06-20-06 | Los Angeles, CA | Deposition <br><br> Court Hearing <br> Trial | 1124 Marilyn Drive Development LLC v. Shahram Elyaszadeh <br><br> Superior Court of California, County of Los Angeles,  Case No. SC 085 437 |
| 05-29-06 | Lansing, MI | Deposition | Van Cleave v. Newbrough, M.D., et al <br><br> Superior Court of California, County of Kern <br> Case No. S-1500-CV-255754-AEW |
| 09-07-06 | Wichita, KS | Deposition | Bolton v. Coombs, et al <br><br> District Court, Sedgwick County, Kansas <br> Case No. 05 CV 2332 |
| 02-06-06 <br> 03-09-07 | Laguna Hills, CA <br> Los Angeles, CA | Deposition <br> Arbitration Hearing | Angeline Hebert v. Bank of America, et al <br><br> Superior Court of California, County of Orange <br> Case No. 04CC10405 |
| 05-07-07 | Vancouver, Canada | Trial | Osooli-Talesh v. Emami <br><br> Supreme Court of British Columbia <br> Vancouver Registry No. S026800 |
| 07-07-06 <br><br> 06-29-07 | Lansing, MI <br><br> Clearwater, FL | Deposition <br><br> Trial | Estate of Paul R. Smith et al v. William P. Gregory, et al <br><br> Circuit Court of the 6th Judicial Circuit in and for Pinellas County, Florida, Probate Division <br> Case No. 02-4488-ES-003 |
| 04-26-07 <br> 07-18-07 | Okemos, MI <br> Troy, MI | Deposition <br> Trial | Quality Manufacturing, Inc. v. Brian D. Mann, et al <br><br> Genesee County Circuit Court <br> Case No. 04-79512-CZ |
| 08-03-07 | Lansing, MI | Deposition | Hypoxico v. Colorado Altitude Training, et al <br><br> District Court, Southern District of New York <br> Case No. 02 Civ 6191 (JGK) |

Exhibit __2__ Page __12__

EXHIBIT __3__

PAGE __37__

# Exhibit 3

EXHIBIT __3__

PAGE __38__

18.13      EJS submitted a Second Report ("EJS 2") dated 19 February 2001 and a further Third Report ("EJS 3") dated 3 August 2001. I shall consider them hereinbelow when the validity of EJS's method and results are considered.

18.14      EJS contended that his conclusion was drawn upon results he obtained from the Dye-ratio method, which he claimed to be a well-established method having been in use worldwide (including law enforcement agencies in the United States) for many years, and accepted universally by the scientific community at large and numerous courts at various levels in the United States and in other countries.[10] He said that the research has already been done to show the reliability of the relative ink-dating procedures using the Dye-ratio method of analysis,[11] and that the data collection in this case was performed on accepted standards in the field of forensic ink analysis and in a manner that has been tested and proven reliable on many occasions in the past.[12]

18.15      He claimed that there are many publications that show the method utilized by him in this case is valid, reproducible, and reliable.[13]

18.16      He contended that he has personal knowledge of at least two cases in which the United States Secret Service has performed testing in the same manner as he performed in this case and it has used this technique between 1995 and today.

18.17      In the end, EJS also contended that his testing is based upon sound objective scientific testing and his opinion is based upon sound scientific principles.

### THE DEFENCE

18.18      The defence contended otherwise. They said that the contrary is true, EJS was cross-examined in depth and the defence called two experts, Dr Valery N. Aginsky ("VNA") and one Mr Peter Tytell ("PVT"). They did not perform any tests on the documents but they have put in reports in contradiction to EJS's reports with their critical analysis.

18.19      Before I consider the validity of the methods and findings of EJS and their scientific theory and validity, I would like to approach the problem from a layman's point of view first which I think ordinary people would understand. This is what the defence called "the true proficiency or blind test".

---

Footnote:

1 p.409, E4-E5
2 p.409, E4-E5 and T35:62:9
3 p.409, E4-E5
4 T35:54-55
5 p.923, E13
6 T35:58-61
7 T35:61:17-62:10
8 T35:62:18
9 p.413, EJS 1, E4-E5
10 para.5, p.909, EJS 3, E13
11 para.15, p.885, EJS 3, E13
12 para.42, p.897, EJS 3, E13
13 para.47, p.898, EJS 3, E13

Exhibit 3 Page 13

EXHIBIT 3

PAGE 39

36 Decision dated 2 January 2001, pp.967-977, F5 and Submissions at pp.1464-1491, F6
37 p.1483, F6
38 14 May, 1996, pp.340-343, G2
39 See Memorandum Opinion and Order 31 March 2000, pp.2085-2087, G8
40 p.1776, F7
41 pp.3154-3195, G11
42 p.3191, G11
43 T48:129:15-130:2

口

đ

## Chapter 24 - Arbitrary Separation Of Fused/Overlapped Chromatographic Peaks

口

24.1        The chromatographic peaks shown on EJS's densitochromatograms were not smooth and
bell-shaped but they were like a "range of mountains". EJS did not know why they were so overlapped.[1]
Thus they required him to manipulate the integration marks between the poor separation of the dye
components or chromatographic zones on the TLC plates he developed. VNA has the strongest
objection in this kind of manipulation. He considered that in no circumstances should EJS have
manipulated with the raw data provided by the video densitometer by arbitrarily separating almost
completely fused/overlapped peaks on the densitochromatograms. As a consequence of him doing so,
the data upon which he conducted statistical analysis are subjective, possibly pre-determined and
therefore utterly unreliable.

24.2        VNA is an acknowledged world expert in chromatography. He explained that the
prerequisite of obtaining reliable data/results was that the chromatographic peaks have to be properly
resolved to the baseline, if the purpose of their analysis is to obtain *quantitative* data. The very basis of
chromatographic technique is to separate one substance from another. The dye components on the TLC
plates should be well separated and the peaks on the densitochromatograms should be resolved to the
baseline. VNA said his contention is borne out by all the articles and textbooks on chromatography,
some of which were exhibited.[2] The problem of analysing fused chromatographic peaks is summarised
as follows[3]:

    "The experimental errors in the determination of the area of fused non-Gaussian peaks
    are so large as to shed doubt on the usefulness of such methods for quantitative
    purposes."

24.3        Contrary to what EJS had argued, VNA said the same principles of evaluating the peaks
would apply to both thin-layer and gas or liquid chromatography.[4] Since EJS's densitochromatograms
have the poor quality of fused/overlapped peaks, he had to manipulate the integration marks to "help"
the computer to separate the unseparated peaks. This manipulation is subjective and are prone to
produce erroneous results. The most important ones are those from the densitochromatograms of Vial 2
at the 30 seconds time frame. These are the worst resolved chromatograms.[5] These are important
chromatograms, because according to EJS, they gave a "significant statistical difference" upon which
EJS relied heavily.

Exhibit 3 Page 14

☐☐☐☐☐☐☐☐☐☐☐

EXHIBIT    3

PAGE    40

24.4        EJS's manipulation and subjective marking of the demarcation line would have the four following pitfalls. *First*, EJS claimed that the ink dye components separated on the TLC plate were *"... scanned using white light and the amount of absorption was measured using a computer driven video densitometer with automatic integration".*[6] This was misleading and untrue. On the contrary, the integration marks were manipulated and arbitrarily placed by EJS. The data were used to calculate dye ratios and they were subjective, possibly pre-determined, and are therefore unreliable.

24.5        According to VNA, usually, the dye components applied closer to the sides of a TLC plate would travel somewhat further than the same dye components applied closer to the middle of the TLC plate. They would also have different shapes.[7] This is because the solvent, an eluent used to do chromatographic separation, evaporates faster from the side than the middle of the TLC plate.[8] When the chromatographic peaks are fused, it is impossible to know how each of them behaved within the area where they fused.[9]

24.6        EJS claimed that it does not matter where you put the vertical line as long as it is in the same on both the heated and unheated chromatograms,[10] however, VNA's measurements (combined in Slide 29) show that the integration marks placed by EJS were not in the same place in both densitochromatograms. Consequently, EJS had to admit that the integration marks could only be placed at *"... the same relative position with the peak"* but not at identical position.[11] He said he could only *"... chose where the peaks were separated as best [he] could tell."*[12]

24.7        *Secondly*, EJS claimed that he was comparing one peak to another. As considered hereinbefore, the area under each of the chromatographic peaks could not be ascertained. Any comparison of these peaks is, at best, guesswork. Thus it cannot be ascertained whether he was comparing one dye component to another dye component or a group of components to another dye components or a group of dye components to another group.

24.8        But more importantly, the concept of measuring a composition of dye components has never been published, or ever referred to or raised in any published paper. EJS himself was unable to refer to any support for his own method. The scientific basis of such a comparison is also unclear.

24.9        EJS further claimed that if Mr Brunelle were faced with the same problem of fused chromatographic peaks, he would also *"lump them together".*[13] In fact, Mr Brunelle suggested the contrary. He considered that if the dye components were not separated adequately for accurate densitometer readings, the test should be repeated using another solvent.[14] This is in line with the suggestion of VNA.

24.10       *Thirdly*, EJS claimed that if the integration marks were moved as he did in this case, no significant change occurs in the data or the results.[15] This must be mathematically incorrect since he was comparing the values of each of the peaks by dividing them against each other. His manipulation would obviously affect the values of the area under the peaks, which were values used as numerators and denominators in his analysis.

24.11       *Fourthly*, EJS claimed that *"... you could move it [i.e. the integration mark] one click one way or the other and it is not going to affect the data or the results."*[16] This, too, is untrue.

24.12       VNA demonstrated with the aid of Slides 27 to 29, G8A, that one click would drastically change the results of the Dye-ratio method. He demonstrated further the sensitivity of the placing of integration marks at 30 seconds for dye 2/dye 3 of Vial 2. In such circumstances, the ratio

Exhibit 3 Page 15

EXHIBIT 3

PAGE 41

would overlap and therefore, show no statistically significant difference.[17] Thus, the slightest shift of the integration marks will give a completely opposite conclusion.

24.13        Further, EJS took no account of the small peaks in the chromatograms which contained dirt and impurities collected from the solvent front, for example, the peak for dye 1 in Vial 2.[18]

## HIGHER RESOLUTION SHOULD BE USED

24.14        In light of the poor quality of the chromatography, VNA considered that EJS should have, at least, scanned the TLC plates at the highest optical resolution possible. The difference of using high and low resolution can be found at p.3228, G11.[19] However, EJS inexplicably only used the standard resolution of his video densitometer even when scanning at a higher resolution was available. Consequently, the amount of pixels inside each chromatographic zone was too low for the video densitometer to give good images. Although this point was not specifically and satisfactorily put to EJS, yet again VNA's contention could be refuted in cross-examination of VNA upon EJS's instructions. Similar incidents occurred in a few points raised by counsel for the plaintiff. Whilst this court is not encouraging the other party for not putting certain points to a witness, yet the special circumstances of this long case when each party is trying to improve his case in this kind of complicated matter, the other party's failure of putting certain matters have been carefully assessed in the scale before accepting the other party's contention. (This same point would not be repeated in similar situations hereinbelow). In the end, it was demonstrated that EJS was actually unfamiliar even with his own video densitometer by his ignorance as to the meaning of "Max" and "Wide" which appeared on the monitor next to "Area".[20] He later admitted that he had no idea what their functions were or what they were used for.[21]

24.15        VNA suggested that EJS should re-do the chromatographic separation with another solvent and re-scan the TLC plates at high resolution until he obtained satisfactorily resolved chromatographic peaks by his video densitometer, subject to such video densitometer being properly calibrated. This view is actually shared by Mr Brunelle who developed the Dye-ratio method.[22]

## CONCLUSION

24.16        In the circumstances, the data obtained from the video densitometer after EJS's admitted manipulation were subjective and unreliable. Any conclusion drawn on the basis of the dye-ratios calculated using these unreliable data cannot be accepted.

---

Footnote:

1 T42:29:10-32:9; T42:46:7-12
2 pp.2209-2241, G8
3 Quantitative Analysis using Chromatographic Techniques, E. Katz (Ed.) John Wiley & Sons, New York, 1987 - Slide 19, G8A
4 T51:66:1-8
5 Slides 26-1 and 27-1, G8A
6 p.412, EJS 1
7 T51:40:3-5
8 T51:40:6-41:24, Plates V and VI
9 T51:70:16-22, Slide 18, G8A
10 T42:25:16-19
11 T42:89:22-23
12 T44:124:5-6; T44:147:19-24

Exhibit _3_ Page _16_

☐☐☐☐☐☐☐☐☐☐☐

EXHIBIT ___3___

PAGE ___42___

13 T44:29:6-17
14 p.526, F2-3
15 p.896, EJS 3, para.41, as illustrated in VNA-12 on p.755, E7-E10
16 T42:16:13-14
17 Slide 51, G8A
18 VNA's Slide 22-1, G8A and his contention at T51:60:15-61:24
19 See also VNA's explanation at T55:92:21-94:11
20 T40:38:4-12
21 T42:14:11-21
22 p.526, F2-3

☐

☐

## Chapter 25 – Illogical Results Of Dye-ratio Method

☐

25.1        The validity of the Dye-ratio method depends, inter alia, on obtaining reliable raw data after each of the ink dye components separated on the TLC plates were evaluated using the video densitometer. According to EJS, he would be measuring the extractability or the decomposition of the dye components of the ink samples obtained from Documents A and C, or both. It is just remarkable that the dye components extracted in the weak solvent (*n*-butanol) exhibited illogical behaviour, which is inexplicable.

25.2 I        accept VNA's contention that half of the results EJS obtained from his examination conducted upon the heated and unheated samples of each of Documents A and C behaved illogically and unpredictably.[1] There are three major criticism listed hereinbelow.

### CRITICISM 1

25.3        .If the tests were performed correctly, logic dictates that the values of measurements would increase with time, as the concentration of the substance being extracted in the solvent increases with time. It is analogous to one putting a teabag in a glass of hot water. It is just common sense and logic that the longer the teabag was left in the hot water, the darker the water would become as more tea was zipped into the hot water. Visual examinations on the TLC plates, Plates V and VI, would show that the intensity of the dye components increased logically from 30 seconds, 90 seconds to 180 seconds.· However, contrary to what is shown on the TLC plates, the data EJS obtained from the video densitometers were illogical.

25.4        The measurements of the following dyes at 90 seconds/ 180 seconds are lower than those at 30 seconds, bearing in mind that, for each ink sample (heated, unheated) being extracted, the aliquots were taken successively from the same vial :

| (a) | Vial 2 - unheated 1 | | |
|-----|---------------------|------------|------------|
| | Dye | 90 Seconds | 30 Seconds |
| | 2 | 783 | 917 |
| (b) | Vial 2 - unheated | | |

Exhibit _3_ Page _17_

EXHIBIT __3__

PAGE __43__

| | Dye | 90 Seconds | 30 Seconds |
|---|---|---|---|
| | 1 | 1156 | 1324 |
| | 2 | 757 | 1043 |
| | 3 | 452 | 569 |
| (c) | Vial 2 - heated 1 | | |
| | Dye | 90 Seconds | 30 Seconds |
| | 2 | 689 | 976 |
| | 3 | 345 | 375 |
| (d) | Vial 6 - heated 2 | | |
| | Dye | 90 Seconds | 30 Seconds |
| | 1 | 667 | 1324 |
| | 2 | 935 | 1158 |
| | 3 | 1430 | 1437 |
| (e) | Vial 6 - unheated 2 | | |
| | Dye | 90 Seconds | 30 Seconds |
| | 1 | 652 | 701 |

25.5    VNA explained such illogical behaviour of the dye components extracted in the weak
solvent with the aid of two sketch drawings.[2] They borrowed from the example of fertilizer offered by
EJS. VNA explained that it was only logical that the tree grows bigger after 90 days than 30 days. It
would be illogical if, however, by using fertilizer, the tree shrunk from 30 days to 90 days, but after 180
days, it became taller than it was even after 30 days.

25.6    According to EJS's evidence, he did not know what to expect of his results :

| (a) | On one day, he said such illogical behaviour of his results was not what he would expect to typically see;[3] yet |
|---|---|
| (b) | on another, he said, "It is well recognised that from one sample to another, it can go down slightly".[4] |

25.7    The results of dye 1 in unheated 2, Vial 6 (Document C) were as follows :

| Dye | 30 Seconds | 90 Seconds | 30 Seconds |
|---|---|---|---|
| 1 | 701 (108%) | 590 (90%) | 652 (100%) |

In terms of percentages, we would have 108% at 30 seconds, 90% at 90 seconds and 100% at 180
seconds.[5] A graphical representation of such results can be found in Slide 12, Bundle G8A (the dotted
red line). These results are clearly illogical. There should be most concentration at 180 seconds,
followed by that at 90 seconds, and least at 30 seconds, and not vice versa and certainly not the most at
30 seconds, followed by 180 seconds and the least at 90 seconds. These results are inexplicable.

Exhibit **3** Page 18

EXHIBIT **3**

PAGE **44**

*CRITICISM 2*

25.8    EJS said the Dye-ratio method could be measuring the extractability, or decomposition of dyes, or both. He said he did not know what parameters the R-ratio method, the Percent Extraction method and the Dye-ratio method were measuring.[6] As considered hereinbefore, we can deduce from the experimental results published by Brunelle and Lee that the Dye-ratio method could only be measuring the decomposition of dye components, and not their respective extractability.

25.9    If the Dye-ratio method measures the extractability of the dye components, which was found otherwise hereinbefore, the rate of extraction is slower with old ink than with new ink. Then one would expect to see that the values of the measurements obtained from the heated sample (old) are less or lower than those from the unheated sample (new). Again, this is not what we see from EJS's data.

*Vial 6 - 180 Seconds*

| Dye | Heated | Unheated 1 | Heated 2 | Unheated 2 |
|-----|--------|------------|----------|------------|
| 1 | 878 | 624 | 941 | 652 |
| 2 | 1221 | 1170 | 1361 | 1070 |
| 3 | 1653 | 1627 | 1934 | 1474 |

In the 180 seconds extraction for Vial 6 (which produced two allegedly "positive" results), all the value of the measurements of dyes 1, 2 and 3 in the heated samples are higher than those in the unheated samples.

25.10    Further at the same time frame, one dye shows higher value for the heated samples than for the unheated ones, whilst another dye has a lower value for the heated samples than the unheated samples, as follows :

*Vial 2 - 180 Seconds*

| Dye | Heated 2 | Unheated 2 |
|-----|----------|------------|
| 1 | 2014 | 1790 |
| 2 | 1319 | 1117 |
| 3 | 690 | 725 |

25.11    In this case dyes 1 and 2 of heated 2 have higher values than those with unheated 2, whereas dye 3 shows the opposite circumstance, that is, the value of dye 3 of heated 2 is lower than that of unheated 2.

25.12    Still further what we see in these two samples is not, however, what we can expect to see in the *other* two samples taken from the *same* Vial 2, i.e. heated/unheated 1. All values at the same time frame of heated 1 are lower than those of unheated 1, which appears to be logical :

*Vial 2 - 180 seconds*

| Dye | Heated 1 | Unheated 1 |
|-----|----------|------------|
| 1 | 1722 | 2026 |
| 2 | 1005 | 1190 |
| 3 | 516 | 623 |

25.13    What also causes concern is the inconsistent behaviour of the dyes being extracted from the same sample, as well as the inconsistent behaviour of the dyes being extracted from the two samples

Exhibit 3 Page 19

EXHIBIT 3

PAGE 45

of the same ink. As the examination was conducted in duplicates, in the absence of a scientifically sound explanation to these illogical data, there is no means of knowing which of these sets of data is correct, if at all. If one of them is wrong, then the Court would be left with a conclusion based on one sample only and of course, in that case, no statistical analysis could be conducted.

### CRITICISM 3

25.14    There is the additional situation that there is very large difference in measurements obtained between duplicates samples taken from the same handwritten entry on Documents A and C, as follows :

(a) *Vial 2 - 90 seconds, dye 1*

The difference between heated 1 and heated 2 is 30%;[7] and,

(b) *Vial 6 - 30 seconds, dye 2*

The difference between heated 1 and heated 2 is 31%.[8]

Sketches of graphical representations on such percentages can be found at pp.2270-1, and 2270-2, G8.

25.15    It is not clear from the evidence of EJS whether he claimed that such a large difference was acceptable or not.[9] He classified this huge difference as a "variation". Whilst VNA agreed that variation exists in any analytical procedure, he stressed that it should be within a few percent, say 1% to 3%, certainly not 20% or 30%.[10] Even in the case of *Calloway v. Richter*,[11] EJS gave evidence that there should be about 1% to 2% error between duplicated samples, not a difference of up to 31% as we have in this case. Indeed, EJS did not use the Dye-ratio method in that case.[12]

### EJS'S DEFENCES

25.16    When EJS was challenged with the above criticisms, he claimed that one cannot compare raw data against each other, as they are mass-dependant.[13] The ratio of these raw data should be calculated and could then be compared against each other, as the ratios are mass independant.[14] Further, he claimed that the behaviour of these ratios were predictable.

25.17 However, it is difficult to appreciate why the raw data could not be considered and compared, but only their ratios, given that the ratios were calculated from the raw data. EJS was unable to offer explanation to what appears to be an unreasonable and illogical claim.[15]

25.18    In any event, the *ratios* behaved unpredictably too and did not, therefore, assist EJS. VNA gave two examples on the unpredictably behaved ratios in VNA-5 and VNA-6[16] as follows :

(a) *The ratios of dye 2/dye 3 in Vial 2 (VNA-5)* :

*Vial 2 - Dye 2/Dye 3*

|  | 30 Seconds | 90 Seconds | 180 Seconds |
|---|---|---|---|
| Heated 1 | 2.6 | 2.0 | 1.95 |
| Heated 2 | 2.55 | 1.69 | 1.91 |

Exhibit __3__ Page __20__

EXHIBIT __3__

PAGE __46__

It is apparent that the two heated samples behaved in the opposite manner to each other, contrary to EJS's claim that the ratios are predictable. In heated 1, the ratios decreased with time whereas the ratio in heated 2 decreased from 30 seconds to 90 seconds only but it increased again at 180 seconds.

*Vial 2 - Dye 2/Dye 3*

|  | 30 Seconds | 90 Seconds | 180 Seconds |
|---|---|---|---|
| Unheated 1 | 1.83 | 1.49 | 1.91 |
| Unheated 2 | 1.83 | 1.67 | 1.54 |

In relation to the two unheated samples, they behaved just as unpredictable as the heated samples.

25.19       The ratios of dye 1 to dye 3 in Vial 6, as illustrated in VNA-6, behaved as unpredictably as those of dye 2/dye 3 in Vial 2 (VNA-5) as pointed out hereinbefore.

25.20       Therefore, even if we were to restrict ourselves and consider only the *ratios* of the dyes as EJS suggested, they are also illogical and unpredictable. Again, if there were errors in only one of the two samples, in the absence of any scientifically sound explanation to these illogical data, there is no means of knowing which of the two samples is correct, if at all. Again, no statistical analysis could be conducted with one sample only.

25.21       When VNA was cross-examined,[17] various graphs[18] (presumably prepared by EJS) using different scale in the x-axis and y-axis were shown to him, in an attempt to show that the ratios given in EJS 2 behaved uniformly to each other or at least, not as drastically as they appear in VNA-5 and VNA-6.[19] The difference between these graphs and VNA's illustrations are no more than difference in graphical presentations. However the graphs were misleading. As VNA explained,[20] the graphs were plotted with one curve representing the average of the two ratios of the two sample runs. It is therefore impossible to tell by these graphs how each of the samples behaved. The two readings may be miles apart but because an average was taken, they would only be represented by one point on the graph. Indeed, it was never suggested by EJS, nor in any publication, that the average of duplicate runs should (or could) be considered.

25.22       The range of possible explanations offered by EJS were :

(a) It was as a consequence of "some interaction once the dye is extracting with the solvent to reduce the optical density of the dye".[21]

(b) "It could have some leaching back into the paper, or something like that".[22]

(c) "...depending on the size of the difference, could just be a variation in the measurements".[23]

(d) This "variation" within samples had been "factored" into the calculations by applying 1 STD.[24]

25.23       In the end, none of the possible reasons offered by EJS were acceptable as pointed out by VNA. EJS should have at least investigated into the reasons of his examinations which gave him the illogical data or as VNA suggested, simply re-do the examination. As EJS did not conduct any scientific research with the view to evaluating the capabilities and limitations of the Dye-ratio method, he was therefore unable to offer any scientifically sound explanation as to why the method he used in this case produced such illogical results. For example, if he suggested boldly that there could have been some leaching back into the paper or something like that, there is no reason why, after the decease in the 90 seconds reading because the colour somehow leach back into the paper, the concentration increased again after 180 seconds. Even if that is so, how can any measurement be accurate if there is such a "leaching back" factor.

Exhibit 3 Page 21

EXHIBIT 3
PAGE 41

25.24       By reason of the aforesaid matters, I accept VNA's contention that the illogical data primarily attributed to EJS arbitrarily separating the badly resolved chromatographic peaks into dyes 1, 2 and 3. This is supported by the fact that before they were separated by thin-layer chromatography, the dyes behaved logically according to the visual examination of the TLC plates and the data obtained from the Percent Extraction and R-ratio methods.[25]

## CONCLUSION

25.25       By reason of the aforesaid matters, the Court cannot and should not place any reliance whatsoever on the illogical and unreliable results obtained by EJS using the Dye-ratio method in this case. The conclusion drawn by him from these results cannot be accepted.

---

Footnote:

1 Slides 1 to 13, G8A, pp.2270-1 and 2270-2, G8, and in VNA-5 and VNA-6 of VNA 2
2 pp.2207-2208, G8
3 T40:88:17
4 T44:76:1-2
5 Slide 13, Bundle G8A
6 T38:20:24-22:1; T22:22-23:5
7 Slide 6, G8A
8 Slide 13, G8A
9 T44:77:2-11
10 T51:32:16-25
11 p.1073 (lines 4-8) and p.1089 (lines 3-14), F5
12 T44:57:1-12
13 T44:79:24-25
14 T44:77:8-19
15 T44:100:23-101:23
16 pp.699 and 701, E7-E10 (VNA 2) and T51:27:18-29:4
17 T56:12:10-18:5
18 pp.1929-1934, F7
19 pp.699 and 701, E7-E10 (VNA 2)
20 T56:17:9-17
21 T41:70:6-9; T48:71:21-23
22 T41:70:14-15
23 T41:70:15-17
24 T40:85:12-16
25 See illustrations at pp.2270-1 and 2, G8

0

0

## Chapter 26 - Mass Independence

0

26.1       Both VNA and EJS agreed that to obtain Dye-ratios that would be independant of the amount of ink on the samples of microplugs taken from Documents A and C, (i.e. the mass of the ink) the data (optical signals) received by the video densitometer must be *directly proportional* to the

Exhibit 3 Page 22

EXHIBIT 3
PAGE 48

EXHIBIT 4



1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
2    John B. Quinn (Bar No. 090378)
     johnquinn@quinnemanuel.com
3    Michael T. Zeller (Bar No, 196417)
     (michaelzeller@quinnemanuel.com)
4    Jon D. Corey (Bar No. 185066)
     (joncorey@quinnemanuel.com)
5    Timothy L. Alger (Bar No. 160303)
     (timalger@quinnemanuel.com)
6  865 South Figueroa Street, 10th Floor
   Los Angeles, California  90017-2543
   Telephone:  (213) 443-3000
7  Facsimile:   (213) 443-3100

8  Attorneys for Mattel, Inc.

9                 UNITED STATES DISTRICT COURT

10                CENTRAL DISTRICT OF CALIFORNIA

11                      EASTERN DIVISION

12
   CARTER BRYANT, an individual,        Case No. CV 04-09049 SGL (RNBx)
13
            Plaintiff,                  Consolidated with
14                                      Case No. CV 04-09059
      vs.                               Case No. CV 05-02727
15
   MATTEL, INC., a Delaware corporation,  **DISCOVERY MATTER**
16
            Defendant.                  Hon. Edward A. Infante (Ret.)
17                                      Discovery Master

18 ─────────────────────────────────    *IN CAMERA* DECLARATION #2 AS
   AND CONSOLIDATED CASES               TO EXPERT EXAMINATION AND
19                                      TESTING OF BRYANT'S ORIGINAL
                                        DOCUMENTS
20
                                        Date:  August 23, 2007
21                                      Time:  9:00 a.m.
                                        Place:  Telephonic
22
                                        Discovery Cut-Off:  October 22, 2007
23                                      Pre-Trial Conference: January 14, 2008
                                        Trial Date:  February 12. 2008
24

25         **SUBMITTED PER JUDGE INFANTE'S REQUEST ON AN**

26                          *IN CAMERA* BASIS

27         ~ Not For Dissemination To Defendants/Counterclaimants ~

28

07209/2161753.1

                                        IN CAMERA DECLARATION NO. 2

EXHIBIT  4
PAGE  49

## DECLARATION OF WILLIAM J. FLYNN

I, William J. Flynn, declare as follows:

1. I am an expert in the field of forensic document examination. I am submitting this declaration *in camera* in response to a request from the Discovery Master in connection with Mattel's Motion to Compel Bryant To Make Original Documents Available For Expert Examination and Testing. I am more than twenty-one (21) years of age; I make this declaration of personal, firsthand knowledge; and if called and sworn as a witness, I could and would testify competently thereto.

2. Attached hereto as Exhibit 1 is a true and correct copy of my curriculum vitae. I have been a questioned document examiner for more than 39 years and have testified in hundreds of cases.

3. I have been asked to examine and provide opinions as to the authenticity of documents in many high-profile cases. For example, I examined the memoranda that served as the bases for *60 Minutes'* widely-publicized 2004 story about George W. Bush supposedly evading his National Guard Service. Attached hereto as Exhibit 2 is a true and correct copy of two articles discussing my work on that case. I also was called upon to examine and render opinions on the authenticity and source of the ransom note that was found at the scene of JonBenet Ramsey's murder. Attached hereto as Exhibit 3 is a true and correct copy from MSNBC's website featuring some of the work I did in that case.

4. To properly examine and test documents, as well as to ensure that they are properly handled and preserved, I conduct my analysis and testing in my laboratory in Phoenix, Arizona. The laboratory contains specialized equipment that I use to conduct the examination and testing of documents. Some of this equipment includes:

        a. The VSC-4c – an instrument used to view documents in various frequencies ranging from ultra violet into the near

-1-

IN CAMERA DECLARATION NO. 2

EXHIBIT 4

PAGE 50

infrared. The VSC-4c is used primarily to non-destructively differentiate inks.

b. An ESDA (Electrostatic Document Apparatus) which is used to detect and decipher faint indentations on paper.

c. A microscope with digital video capture. This allows digital photomicrographs to be taken so that observations can be permanently recorded and presented at trial if necessary.

d. A wide variety of specialized typographic measuring devices and grids that are used to detect typographically altered texts.

e. High quality digital scanners are also employed to produce full-color images of the documents that are examined and to record evidence that may become part of my testimony as an expert witness.

I also have a specialty in analyzing machine-created documents of all types, and may perform the following types of examination and testing on one or more of the original documents from Mr. Bryant:

a. The examinations which I anticipate are all non-destructive in nature and may include ink comparisons, detection of indented data, microscopic examinations, and typographic analyses.

5. The building that the laboratory facilities are in has a 24-hour guard and features a locked file room with several locked storage cabinets in it. This is where I keep any materials that are sent to me for examination and testing when they are not being examined or tested.

6. As a recognized expert in the field of forensic document examination, I recognize the extreme importance of preserving the integrity of the evidence I am sent for review and analysis. When materials arrive at my laboratory, I have procedures in place to log the evidence into our networked tracking system which "follows" the evidence from submission to return. The physical storage of the

EXHIBIT __4__

PAGE __51__

1   evidence is in a dedicated evidence file room that also contains locking file cabinets.

2   In addition, our laboratory is located in the Bank of America Building which is under

3   24 hour guard. I certainly understand the critical nature of each of Mr. Bryant's

4   original documents and will be fully accountable for them while they are in my

5   custody.

6         7.    All the Bryant documents that are provided for inspection,

7   examination and testing shall be returned by me in the same condition, sequence and

8   order in which they were received.

9         I declare under penalty of perjury under the laws of the State of

10   California and the United States of America that the foregoing is true and correct.

11         Executed this 28th day of August, 2007, at ___2007___.

12

13   DATED: August 28, 2007

14

15                             _____

16                       William J. Flynn

17

18

19

20

21

22

23

24

25

26

27

28

07209/2161753.1

-3-

IN CAMERA DECLARATION NO. 2

EXHIBIT 4

PAGE 52

# Exhibit 1

EXHIBIT 4

PAGE 53

○   ·   ·                    ○

# WILLIAM J. FLYNN, B.S., D-ABFDE
## Forensic Document Examiner
### Curriculum Vitae

## EXPERIENCE (CIVIL):

October 1983 - Present:

### PRESIDENT AND CEO - AFFILIATED FORENSIC LABORATORY, INC.

Founded and Incorporated Affiliated Forensic Laboratories in 1983 to provide the legal and business communities with professional forensic questioned document services.

January 1973 - September 1983:

Private civil practice in Questioned Document Examination - Phoenix, Arizona

## EXPERIENCE (CRIMINAL):

Jan 1973 - July 1991:

### QUESTIONED DOCUMENT SUPERVISOR - ARIZONA DEPARTMENT OF PUBLIC SAFETY.

Supervising Analyst, Arizona Department of Public Safety, Questioned Document Laboratory. Was responsible for determining authorship of questioned handwritings and handprintings; detecting alterations, additions, interlineations, chemical and mechanical erasures, evidence of tracings or other tampering with original documents. Used stereoscopic microscopes, test plates, infrared, ultraviolet and other spectral devices and video conversion equipment. Conducted counterfeit detection, ink and paper analyses. Have qualified and rendered expert testimony in Federal, State, and Municipal courts throughout the United States. Prepared court exhibits to illustrate my conclusions at these judicial proceedings. Lectured on related subjects for law enforcement and citizen groups.

Supervised and evaluated subordinate document examiners, as well as trained apprentice examiners. Conducted research in the field to further the science of questioned document examination.

1

rev. 2/06

Exhibit 1 Page 4

EXHIBIT 4

PAGE 54

February 1965 - December 1972:

## QUESTIONED DOCUMENT EXAMINER/SERGEANT - PHILADELPHIA POLICE DEPARTMENT CRIME LABORATORY

Initially hired as a Patrolman with the Philadelphia Police Department. After two and one half years was promoted to Detective and subsequently assigned to the Crime Laboratory as a Questioned Document Examiner trainee. Completed apprenticeship in 1970 and was promoted to Detective Sergeant/Questioned Document Examiner. Remained in that capacity until joining the Arizona State Crime Laboratory in January of 1973.

## SPECIALIZED TRAINING COURSES IN QUESTIONED DOCUMENTS:

### SOUTHWESTERN ASSOCIATION OF FORENSIC DOCUMENT EXAMINERS / ASQDE / ABFDE

a. Medical/Legal Symposium on the Forensic Examination of Medical Records and Testimony Related to Medical Malpractice Cases – Miami, FL, May 1997.

b. Identification of typewriter fonts utilizing the Bouffard Electronic Database System - Dr. Bouffard 1994

c. Forensic Paper Identification Symposium - Mead Paper Co. 1992

### FEDERAL BUREAU OF INVESTIGATION, TRAINING ACADEMY, QUANTICO, VIRGINIA:

a. Typewriter Identification School - 1987.

b. International Symposium on Questioned Documents - 1985.

c. Legal Aspects of Questioned Document Examination - 1978.

d. Questioned Document Laboratory Photography - 1975

e. Survey of Questioned Document Examiners - 1974.

rev. 2/06

Exhibit 1 Page 5

EXHIBIT 4

PAGE 55

## INSTITUTE OF PAPER CHEMISTRY, APPLETON WISCONSIN:

a.   Forensic Identification of Paper - 1973.

## U.S. SECRET SERVICE, WASHINGTON, D.C.:

a.   Questioned Document School - 1970.

## PHILADELPHIA POLICE DEPARTMENT CRIME LABORATORY:

a.   Two year apprenticeship with the Chief Document Examiner for the Philadelphia Police Crime Laboratory - 1968 through 1970

## PENNSYLVANIA STATE POLICE DOCUMENT LABORATORY:

a.   Initial Questioned Document Training with the Chief Document Examiner for the Pennsylvania State Police Laboratories, 1968.

## CONTINUING TRAINING:

Over the past thirty four years, have attended, and/or conducted, more than ninety seminars, training workshops, scientific symposia, and professional meetings involving such organizations as: The American Academy of Forensic Sciences, American Society of Questioned Document Examiners, American Board of Forensic Document Examiners, Southwestern Association of Forensic Document Examiners, and the International Association for Identification.

3

rev. 2/06

Exhibit 1 Page 6

EXHIBIT 4

PAGE 56

## PROFESSIONAL AFFILIATIONS:

Member - American Academy of Forensic Sciences

Member – American Society of Questioned Document Examiner

Member – Southwestern Association of Forensic Document Examiners (President 1985-1987)

Librarian/Historian - Southwestern Association of Forensic Document Examiners. (1981 - Present)

President - American Board of Forensic Document Examiners (1989 - 1991)

## EDUCATION and CERTIFICATIONS:

B.S., University of Phoenix (Computer Information Systems)

Board Certified by the American Board of Forensic Document Examiners.

## COURT QUALIFICATIONS:

Qualified as a Questioned Document Examiner in Federal, State and Municipal Courts throughout the United States. Have also testified as an expert in Europe and the Middle East.

## PAPERS PUBLISHED:

a.  "The Illusion of Traced Forgery on Zinc Oxide Photocopy Paper" - *Journal of Police Science and Administration* - Vol. 2:No.3 Dec. 1974.

b.  "Forgery by Phone" - ibid. Vol. 4:No.3 Sept. 1976.

c.  "PaperMate's New Erasable Ink Pen" - ibid. Vol. 7:No.3 Sept. 1979.

d.  "Instant Winner Lottery Tickets - Examination and Testing Procedures" Presented at the AAFS Meeting Feb. 1988.

e.  "Laser Printers - Nemesis of the '90's" Co-authored with Robert G. Lockard. Presented at the ASQDE Meeting Aug. 1990.

f.  "Typography for Document Examiners" - Presented at the Fall 1991 meeting of the Southwestern Association of Forensic Document Examiners.

g.  "Light, Color, and Filters" – biannual publication of the Southwestern Association of Forensic Document Examiners - 1992.

h.  "Utilizing Computer Generated Graphics as an Aid to Expert Testimony" Presented at the Fall 1992 meeting of the Southwestern Association of Forensic Document Examiners.

4                                          rev. 2/06

Exhibit 1 Page 7

EXHIBIT 4

PAGE 57

i. "Identification of Non-Impact Printing Devices" - Published as a series (1993-1994) in the *ABFDE NEWS* the quarterly publication of the American Board of Forensic Document Examiners.

j. "Light, Color, and Filters Revisited" – biannual publication of the Southwestern Association of Forensic Document Examiners Vol. XII-#3, Fall 1993 co-authored with Gerald B. Richards, F.B.I. Laboratory, Wash. D.C.

k. "Electronic Typography for Document Examiners (update)" - Presented at the 52nd annual meeting of the American Society of Forensic Document Examiners. August 1994

l. "Production and Utilization of Computer Generated Court Exhibits for Document Examiners" Presented as a workshop at the Southwestern Association of Forensic Document Examiners meeting, Spring 1995

m. "Widows and Orphans Provide Clues as to Facsimile Transmission Methodology" – *ABFDE NEWS* the quarterly publication of the American Board of Forensic Document Examiners (Spring 1995)

n. "Measurement of Repeating Image Defects as a Method for the Identification of Hewlett Packard Laser Printers" – ibid. (Spring 1996)

o. "Hewlett Packard's Printer Control Language - PCL" – ibid. (Summer 1996)

p. "Using Digital Photography for Courtroom Presentations". Talk presented at the spring 1997 meeting of the Southwestern Association of Forensic Document Examiners.

## EXAMINATIONS:

During the past thirty four years I have either written or reviewed (as Senior Analyst) more than 19,500 Questioned Document laboratory reports including those for some of the following agencies:

### *FEDERAL AGENCIES:*

U.S. Treasury Dept., U.S. Secret Service, Federal Bureau of Investigation, U.S. Dept. of Immigration and Naturalization, United States Attorney's Offices, U.S. Postal Service, United States Internal Revenue Service, U.S. Bureau of Alcohol Tobacco and Firearms, U.S. Drug Enforcement Administration, U.S. Army C.I.D., U.S. Air Force O.S.I., U.S. Department of Agriculture, U.S. State Department, U.S. Department of Justice, U.S. Department of Defense.

rev. 2/06

Exhibit 1 Page 8

EXHIBIT 4

PAGE 58

*STATE AGENCIES:*

More than fifty (50) different State Agencies in Arizona, New Mexico, California, Nevada, Colorado, Utah, Montana, North Dakota, Georgia, Pennsylvania, Alaska and Guam.

*MUNICIPAL AGENCIES:*

More than sixty (60) different Municipal Law Enforcement Agencies in Arizona as well as most of the Agencies in the five county area around Philadelphia, Pennsylvania.

*PRIVATE PRACTICE:*

More than a thousand cases worked for attorneys in civil litigations, as clients of Affiliated Forensic Laboratory's private practice.

## AWARDS:

More than 220 letters of commendation from the various U.S. Government Agencies, State Agencies, County Government and Municipalities for whom documents have been examined and/or testimony rendered.

## TEACHING ACTIVITIES:

1990 - Present:

Guest lecturer, National Association of Legal Investigators Seminar, "Blazing the Investigative Trail," Scottsdale, AZ, 1/26/01

Guest lecturer, International Association of Internal Auditors Conference, Atlanta, GA.

Guest lecturer, International Association of Internal Auditors Conference, Phoenix, AZ.

Guest lecturer, American Medical Records Association, Casa Grande, AZ.

Guest speaker Medical Records Litigations (ATLA), Steamboat Springs, CO.

Conducted a series of seminars and workshops for forensic document examiners concerning computer printing devices and electronic typography (1992-Present)

Guest Lecturer, International Association of Credit Card Investigators, Scottsdale, AZ

Exhibit 1 Page 9

EXHIBIT ____4____

PAGE ____59____

1975 - 1991:

### INSTRUCTOR - CRIMINAL JUSTICE AGENCIES:

Advanced Investigator's training for all law enforcement agencies in Arizona at the ALETA Academy.

Numerous classes and symposia for Maricopa County Bar Association, American Trial Lawyers Association, DES, Phoenix Police Academy, Arizona Attorney General's Office, U.S. Internal Revenue Service, etc.

1973 - 1991:

### INSTRUCTOR - PHOENIX COLLEGE, AND AMERICAN INSTITUTE OF BANKING:

Conducted a course of instruction at Phoenix College for fourteen years, dealing with investigation of document crimes, forgery and counterfeiting matters through the Administration of Justice Department. Conducted Forgery and Counterfeiting seminars for the American Institute of Banking. Taught Computer Science courses at Gateway Community College - Beginning and Advanced Operating Systems, and various computer program applications.

7

rev. 2/06

Exhibit 1 Page 10

EXHIBIT 4

PAGE 60

# Exhibit 2

EXHIBIT ___4___

PAGE ___61___



Is It a Hoax?
Experts weigh in on the 60 Minutes documents. Says one: "I'm a Kerry supporter myself, but . . . I'm
99% sure that these documents were not produced in the early 1970s."
by Stephen F. Hayes
09/09/2004 7:20:00 PM

DOCUMENTS CITED Wednesday by *60 Minutes* in a widely-publicized expose of George W.
Bush's National Guard Service are very likely forgeries, according to several experts on document
authenticity and typography. The documents--four memos from Killian to himself or his files written
in 1972 and 1973--appear to indicate that Bush refused or ignored orders to have a physical exam
required to continue flying. CBS News anchor Dan Rather reported the segment and sourced the
documents this way: "*60 Minutes* has obtained a number of documents we are told were taken from
Col. Killian's personal file," he said. The *60 Minutes* story served as the basis for follow-up news
reports for dozens of news organizations across the country. The memos were almost immediately
questioned in the blog world, with blog Power Line leading the charge.

And according to several forensic document experts contacted by THE WEEKLY STANDARD say
the Killian memos appear to be forgeries. Although it is nearly impossible to establish with certainty
the authenticity of documents without a careful examination of the originals, several irregularities in
the Killian memos suggest that CBS may have been the victim of a hoax.

"These sure look like forgeries," says William Flynn, a forensic document expert widely considered
the nation's top analyst of computer-generated documents. Flynn looked at copies of the documents
posted on the CBS News website (here, here, here, and here). Flynn says, "I would say it looks very
likely that these documents could not have existed" in the early 1970s, when they were allegedly
written.

Several other experts agree. "They look mighty suspicious," says a veteran forensic document expert
who asked not to be quoted by name. Richard Polt, a Xavier University philosophy professor who
operates a website dedicated to typewriters, says that while he is not an expert on typesetting, the
documents "look like typical word-processed documents."

There are several reasons these experts are skeptical of the authenticity of the Killian memos. First
the typographic spacing is proportional, as is routine with professional typesetting and computer
typography, not monospace, as was common in typewriters in the 1970s. (In proportional type, thin
letters like "i" and "l" are spaced closer together than thick letters like "W" and "M". In monospace,
all the letter widths are the same.)

Second, the font appears to be identical to the Times New Roman font that is the default typeface in
Microsoft Word and other modern word processing programs. According to Flynn, the font is not
listed in the Haas Atlas--the definitive encyclopedia of typewriter type fonts.

Exhibit 2 Page 11

EXHIBIT 4

PAGE 62

Third, the apostrophes are curlicues of the sort produced by word processors on personal computers, not the straight vertical hashmarks typical of typewriters. Finally, in some references to Bush's unit-- the 111th Fighter Interceptor Squadron--the "th" is a superscript in a smaller size than the other type. Again, this is typical (and often done automatically) in modern word processing programs. Although several experts allow that such a rendering might have been theoretically possible in the early 1970s, it would have been highly unlikely. Superscripts produced on typewriters--the numbers preceding footnotes in term papers, for example--were almost always in the same size as the regular type.

So can we say with absolute certainty that the documents were forged? Not yet. Xavier University's Polt, in an email, offers two possible scenarios. "Either these are later transcriptions of earlier documents (which may have been handwritten or typed on a typewriter), or they are crude and amazingly foolish forgeries. I'm a Kerry supporter myself, but I won't let that cloud my objective judgment: I'm 99% sure that these documents were not produced in the early 1970s."

Says Flynn: "This looks pretty much like a hoax at this point in time."

CBS, in a statement Thursday afternoon, said it stands by the story. The network claims that its own document expert concluded the memos were authentic. There are several things CBS could do to clear up any confusion:

(1) Provide the name of the expert who authenticated the documents for *Sixty Minutes*.

(2) Provide the original documents to outside experts--William Flynn, Gerald Reynolds, and Peter Tytell seem to be the consensus top three in the United States--for further analysis.

(3) Provide more information on the source of the documents.

(A spokeswoman for CBS, Kelly Edwards, said she was overwhelmed with phone calls and did not respond to specific requests for comment.)

*Stephen F. Hayes is a staff writer at The Weekly Standard.*
© Copyright 2007, News Corporation, Weekly Standard, All Rights Reserved.

Exhibit **2** Page **12**

EXHIBIT **4**

PAGE **63**

# washingtonpost.com   Sign In | Register Now

**The Washington Post**
**Print Edition | Subscribe**

| NEWS | POLITICS | OPINIONS | LOCAL | SPORTS | ARTS & LIVING | CITY GUIDE | | JOBS |

CLAS

SEARCH: [_____]  go  washingtonpost.com  Web  _____  | Search Ar

Advertisement

Chevy. Do more. Use less.

Fuel Efficiency    E85 Ethanol

washingtonpost.com > Politics > Elections > 2004 Election

Print This Article
E-Mail This Article

**MOST VIEWED ARTICLES**
Politics    On the Site

Updated 12:46 a.m. ET
- DNC May Deny Florida Slots at '08 Convention
- No Big Shifts Planned After Report on Iraq
- Warner Calls for Pullouts By Winter

**RSS NEWS FEEDS**
Top News
2004 Election
What is RSS? | All RSS Feeds

## Some Question Authenticity of Papers on Bush

*By Michael Dobbs and Mike Allen*
Washington Post Staff Writers
Friday, September 10, 2004; Page A01

Documents unearthed by CBS News that raise doubts about whether President Bush fulfilled his obligations to the Texas Air National Guard include several features suggesting that they were generated by a computer or word processor rather than a Vietnam War-era typewriter, experts said yesterday.

Experts consulted by a range of news organizations pointed out typographical and formatting questions about four documents as they considered the possibility that they were forged. The widow of the National Guard officer whose signature is on the bottom of the documents also disputed their authenticity.

The documents, which were shown Wednesday night on "60 Minutes II," bear dates from 1972 and 1973 and include an order for Bush to report for his annual physical exam and a discussion of how he could get out of "coming to drill."

The dispute over the documents' authenticity came as Democrats stepped up their criticism of Bush's service with the National Guard between 1968 and 1973. The Democratic National Committee sought to fuel the

————Documents in Dispute————
- **Analyzing the Documents:** Several characteristics shown in this letter call into question its authenticity.
- **Documents:** All of the Memos in Question (PDF)

————Military Service Records————
- **President Bush**
- **Sen. John F. Kerry**

————Message Boards————
- **Post Your Comments**

Free E-mail Newsletters

- **Daily Politics News & Analysis**

Advert

CI
TH

Exhibit 2 Page 13



controversy yesterday by
holding a news conference at
which Sen. Tom Harkin (Iowa)
pointed to the documents as a
fresh indictment of Bush's credibility.

See a Sample | Sign Up Now
• Federal Insider
See a Sample | Sign Up Now
• Breaking News Alerts
See a Sample | Sign Up Now

FEAT
Refin
$300,
Inves
Be Pi
$400,
Asbe
T-Shi
Cool
T-Mo

CBS News released a statement yesterday standing by its reporting,
saying that each of the documents "was thoroughly vetted by
independent experts and we are convinced of their authenticity." The
statement added that CBS reporters had verified the documents by
talking to unidentified people who saw them "at the time they were
written."

CBS spokeswoman Kelli Edwards declined to respond to questions
raised by experts who examined copies of the papers at the request of
The Washington Post, or to provide the names of the experts CBS
consulted. Experts interviewed by The Post pointed to a series of
telltale signs suggesting that the documents were generated by a
computer or word processor rather than the typewriters in
widespread use by Bush's National Guard unit.

A senior CBS official, who asked not to be named because CBS
managers did not want to go beyond their official statement, named
one of the network's sources as retired Maj. Gen. Bobby W. Hodges,
the immediate superior of the documents' alleged author, Lt. Col.
Jerry B. Killian. He said a CBS reporter read the documents to
Hodges over the phone and Hodges replied that "these are the things
that Killian had expressed to me at the time."

"These documents represent what Killian not only was putting in
memoranda, but was telling other people," the CBS News official
said. "Journalistically, we've gone several extra miles."

The official said the network regarded Hodges's comments as "the
trump card" on the question of authenticity, as he is a Republican
who acknowledged that he did not want to hurt Bush. Hodges, who
declined to grant an on-camera interview to CBS, did not respond to
messages left on his home answering machine in Texas.

In a telephone interview from her Texas home, Killian's widow,
Marjorie Connell, described the records as "a farce," saying she was
with her husband until the day he died in 1984 and he did not "keep
files." She said her husband considered Bush "an excellent pilot."

"I don't think there were any documents. He was not a paper person,"
she said, adding that she was "livid" at CBS. A CBS reporter
contacted her briefly before Wednesday night's broadcasts, she said,
but did not ask her to authenticate the records.

Exhibit *2* Page **14**

PAGE **65**

If demonstrated to be authentic, the documents would contradict several long-standing claims by the White House about an episode in Bush's National Guard service in 1972, when he abruptly gave up flying and moved from Texas to Alabama to take part in a political campaign. The CBS documents purport to show that Killian, who was Bush's squadron commander, was unhappy with Bush for his performance toward meeting his National Guard commitments and resisted pressure from his superiors to "sugarcoat" the record.

After their initial airing on the "CBS Evening News" and "60 Minutes II" programs Wednesday night, the documents were picked up by other news organizations, including The Post. A front-page story in The Post yesterday noted that CBS declined to provide details about the source of the documents, the authenticity of which could not be independently confirmed.

On Wednesday evening, the White House e-mailed reporters copies of the documents, as supplied by CBS, as well as the transcript of a CBS interview with White House communications director Dan Bartlett rebutting allegations that Bush had shirked his military duties. While Bartlett described the emergence of the documents as "dirty politics," he did not dispute their authenticity.

After doubts about the documents began circulating on the Internet yesterday morning, The Post contacted several independent experts who said they appeared to have been generated by a word processor. An examination of the documents by The Post shows that they are formatted differently from other Texas Air National Guard documents whose authenticity is not questioned.

William Flynn, a forensic document specialist with 35 years of experience in police crime labs and private practice, said the CBS documents raise suspicions because of their use of proportional spacing techniques. Documents generated by the kind of typewriters that were widely used in 1972 space letters evenly across the page, so that an "i" uses as much space as an "m." In the CBS documents, by contrast, each letter uses a different amount of space.

While IBM had introduced an electric typewriter that used proportional spacing by the early 1970s, it was not widely used in government. In addition, Flynn said, the CBS documents appear to use proportional spacing both across and down the page, a relatively recent innovation. Other anomalies in the documents include the use of the superscripted letters "th" in phrases such as 111th Fighter Interceptor Squadron, Bush's unit.

"It would be nearly impossible for all this technology to have existed at that time," said Flynn, who runs a document-authentication company in Phoenix.

Exhibit 2 Page 15



PAGE 66

Other experts largely concurred. Phil Bouffard, a forensic document examiner from Cleveland, said the font used in the CBS documents appeared to be Times Roman, which is widely used by word-processing programs but was not common on typewriters.

CBS officials insisted that the network had done due diligence in checking out the authenticity of the documents with independent experts over six weeks. The senior CBS official said the network had talked to four typewriting and handwriting experts "who put our concerns to rest" and confirmed the authenticity of Killian's signature.

The doubts about the documents left the White House and the Bush campaign in a state of suspended animation, with Bush aides encouraging doubts about the documents but conceding that the possibility that they were forged seemed too good to be true. White House spokeswoman Claire Buchan said that officials there had not attempted to authenticate the documents but simply released copies "provided to us by CBS in the interests of openness."

The Bush administration's strategy yesterday was to let news organizations raise doubts and conduct forensic examinations, without taking an official position on whether the documents were genuine.

"It's clear in reviewing the documents that they do nothing to change the fact that the president served honorably, and was proud of his service in the Air National Guard," Bush campaign spokesman Steve Schmidt said.

*Staff writer Howard Kurtz and researcher Lucy Shackelford contributed to this report.*

---

Print This Article        E-Mail This Article        Permission to Republish

© 2004 The Washington Post Company

SEARCH:                                    go ⊙ washingtonpost.com  ○ Web   Results by Google

NEWS | POLITICS | OPINIONS | LOCAL | SPORTS | ARTS & LIVING | CITY GUIDE                    JOB!

washingtonpost.com: Help | Contact Us | About Us | Advertisers | Site Index | Site Map | Make Us Your Home Page | mywasl
The Washington Post: Subscribe | Subscriber Services | Advertisers | Electronic Edition | Online Photo Store | The Washington
The Washington Post Company: Information and Other Post Co. Websites

© Copyright 1996- 2007 The Washington Post Company | User Agreement and Privacy Policy | Rights and Permissions

Exhibit 2 Page 16

EXHIBIT 4

PAGE 67

# Exhibit 3

EXHIBIT 4

PAGE 68

'Scarborough Country' for August 16 – Morning Joe – MSNBC.com



See the world through the eyes of the Human Element.

Visit www.theclement.com today.

Web MSNBC

Make MSNBC Your Homepage | MSN Home | Hotmail | Sign In



Home » MSNBC TV » Morning Joe

**MORNING JOE**

JOE.MSNBC.COM
EMAIL THE SHOW | TRANSCRIPTS | ABOU

MSNBC TV
Experts
Morning Joe
Tucker
Hardball
Countdown
Abrams
Documentaries
Your Business
Video
U.S. News
Politics
World News
Business
Sports
Entertainment
Health
Tech / Science
Travel
Weather
Blogs Etc.
Local News
Newsweek
Multimedia
Most Popular
NBC NEWS
Today Show
Nightly News
Dateline NBC
Meet the Press
MSNBC TV

# 'Scarborough Country' for August 16
## Read the transcript to the Wednesday show

Updated: 8:26 a.m. PT Aug 17, 2006

Guests: Pam Paugh, Lisa Bloom, Bill Flynn, Marc Klaas, Jeralyn Merritt, Bill Fallon, Pam Bondi, Courtney Hazlett, Dina Sansing

JOE SCARBOROUGH, HOST:  Right now in SCARBOROUGH COUNTRY, breaking news.  A young beauty queen, a brutal murder and a lurid murder mystery now a decade old.  But tonight, a break in the beauty queen's murder mystery.  We've got the up-to-the-minute details tonight.  Justice delayed but not denied as police made the arrest half a world away.  How did they track down the American suspect living in Thailand?  We've got the inside story.

Plus: All fingers pointed to the parents.  Are their names finally cleared?  Some say no, and we'll tell you why.

Story continues below ↓

advertisement

### Most Popular

**Most Viewed  ·  Top Rated  ·**

Utah town rallies around lost min

More U.S. women dying in childt

No big shifts planned after repor

Rumors that Castro has died exc

Rising floodwaters threaten Chic

Most viewed on MSNBC.com

Exhibit 3 Page 17

8/24/2007

EXHIBIT 4

PAGE 69

'Scarborough Country' for August 16 - Morning Joe - MSNBC.com



**Shopping**



• **Disable Fly-out**

Advertisement

**MSN SHOPPING**



**Summer décor**
• Bedroom
• Living room
• Dining room
• Bathroom

Search

**RESOURCE GUIDE**

Dating - Get two months free!
Find your dream home today!
Find a business to start
Fast $7 trades, no limit
Home Equity Wells Fargo
Online Degrees under 2 yr
Shopping

Sponsors:

Welcome to SCARBOROUGH COUNTRY. No passport required, only common sense allowed.

After a decade of false leads and dead ends, an arrest and possible break in the murder mystery of JonBenet Ramsey, the story first broken right here on MSNBC. Authorities in Thailand arrested 42-year-old John Mark Karr, a American school teacher from Georgia who is being held in Bangkok on unrelated sex charges. For families and friends of JonBenet Ramsey, who would be starting her junior year in high school, were she still alive, the news had to be bittersweet. While celebrating a break in the case, many are sad because Patsy Ramsey, the woman most of the world suspected of murdering her own little girl, died of ovarian cancer before the arrest could be made. Today, a family friend visited the grave sites of the mother and daughter and left a note on that headstone that said, "Dearest Patsy, justice has finally come for you and John. Rest in peace."

But there will be no resting for the authorities as they continue to nail down the case. For the very latest on this unfolding story, here's NBC News chief legal correspondent Dan Abrams. Dan, tell us how the day unfolded.

DAN ABRAMS, NBC CHIEF LEGAL CORRESPONDENT: Well, Joe, at a little after 3:00 o'clock, we got a tip that there had been an arrest made in connection with the JonBenet Ramsey case. And you can imagine, after having covered this case for nearly 10 years now, we were pretty stunned when someone says an arrest in the JonBenet Ramsey case. We're thinking, Oh, some peripheral player. Maybe it's someone who's lied to the authorities or something. And no, then we hear this is real. This is in regard to the murder of JonBenet Ramsey. We were able to confirm it about 25 minutes later, at least, that John Ramsey, the father of JonBenet, had been told an arrest had been

Exhibit **3** Page **18**

8/24/2007

EXHIBIT **4**

PAGE **70**



made, and he was expecting that the DA was going to make an announcement today.

As the day continued, we were able to further confirm the details, many of which you've reported, about who was arrested, where he was arrested, et cetera. But I'll tell you, Joe, this is what the Ramseys have been saying for years. They've been saying for years, It's a convicted sex offender. We believe that people have not investigated enough convicted sex offenders. And now we're told that, according to the authorities, he is a convicted sex offender.

SCARBOROUGH: Well, Dan, let's take a listen to what the father had to say earlier today.

(BEGIN VIDEO CLIP)

JOHN RAMSEY, FATHER: Based on what happened to us, I don't think it's proper that we speculate or discuss the case. I think it's important that justice be allowed to run its course and do its job. And so I really won't speculate or discuss what I know or don't know. I think that's an important lesson we can learn from this whole episode, that we shouldn't—we shouldn't subvert a very good justice system.

UNIDENTIFIED FEMALE: What was the hardest part for you and your wife during this ordeal since your daughter was murdered?

JOHN RAMSEY: Well, the hardest part was losing your child and—by far.

(END VIDEO CLIP)

SCARBOROUGH: Dan, you've covered this case as long as anybody. Tell me why these parents were suspects from the very beginning and why Patsy Ramsey died a woman who really was a suspect in the minds of most Americans and most everybody that followed this case?

ABRAMS: I think the authorities from early on became convinced that someone inside the house had committed the crime. There was a ransom note that had been left, and people always said, Well, why would an intruder have left a long, somewhat rambling and also false ransom note? Because JonBenet, of course, was already dead. There was a practice note that appeared to have been written in the house. Again, people said, Why would an intruder have spent so much time writing a practice note? Those were the sorts of questions that were asked. And I think that very early on, the Ramseys became very distrustful of the police, and that made the police even more distrustful of the Ramseys.

Exhibit 3 Page 19          8/24/2007

EXHIBIT 4

PAGE 71

And from there, things appeared to have snowballed. Now, keep in mind, you know, you have former detectives on this case who have written books, you know, well after the fact, still saying that they believe that the Ramseys committed this crime.

But as time has passed, as a new DA has taken over, many of the old folks in the police department now gone, a new lawyer for the Ramseys, who have gone after the authorities and the DA like no one else had, I think you've seen a shift here, where starting in 2001, 2002, you saw the authorities looking beyond John and Patsy Ramsey. And that has now concluded with the arrest of a 41-year-old school teacher.

SCARBOROUGH: And that's why they finally broke the case. Hey, Dan, congratulations on breaking this story earlier today. You're way in front of everybody else, and we appreciate you being with us tonight.

ABRAMS: Thanks, Joe.

SCARBOROUGH: And of course, it does have to be a great day for the Ramsey family. For so long, all fingers pointed especially towards Patsy Ramsey. With us now on the phone is Patsy Ramsey's sister, Pam Paugh. Pam, this has to be a great day for your family. Talk about how you're feeling tonight.

PAM PAUGH, PATSY RAMSEY'S SISTER: Well, Joe, I can't describe it.

It's a long time in coming. Nine-and-a-half years is a long time to wait. But we stood on truth and the fact that Patsy and John absolutely would not be anything but relentless in seeking out JonBenet's killer. We've done that. Mary Keenan (ph) has led a brilliant team of detectives, and now look what we have today, the wonderful news that this criminal is off the streets, never to hurt another child again. And we could not be more happy.

SCARBOROUGH: Pam, I remember, I think it was around '97, '98, I was in Washington, eating in a restaurant called Capitol Grille (ph), and I saw your sister and brother-in-law come in. And all eyes immediately went to them in the front of the restaurant, and everybody started whispering. And I just thought, what a living hell your sister had to be going through, first losing her beautiful daughter and then knowing that everybody that—whether she walked into a restaurant or a church or into a Wal-Mart, whenever she went, everybody thought she killed her daughter.

How did she endure all those years? And did she know before she died

Exhibit 3 Page 20

EXHIBIT 4

PAGE 72

that, in fact, there was a suspect, that this case was going to be broken and that her name would be cleared?

PAUGH: Well, let me see if I can answer both of those questions. The first one, how did she live with all that scrutiny? You know, Joe, when you live your life cleanly and you live on faith and obedience to your religion, then you know that truth is in your heart. And she knew wherever she went that she could do so with her head held high. She absolutely never hurt her child, nor did John, Burke (ph), or anyone in the family.

The second part of the question, did she know before she went on to be with her Creator? I know for a fact that John and Patsy were given specific information with regards to what was going on with the investigation, and they did have some kind of level of comfort that an arrest was imminent and that it was to be soon. Not soon enough to be before Patsy leaving this earth as we know it, but let me just say this, that in her final days, she had such a peace about her. I think she knew where she was going. I know when she got there, she saw her two daughters and her mother and she knew wholeheartedly that the four of them together could help this truth come out a little sooner, and I think that's what we're seeing here today.

SCARBOROUGH: Did she die bitter at all for the accusations? Is her husband bitter today?

PAUGH: No, I don't believe so. They're not bitter people. Were they persecuted unmercifully by some? Yes. But I think also, what the public doesn't realize, Joe, is that there were thousands and thousands of the silent few out there who would send cards and write and call and pray and who have stood with us, with our entire family, for all these nine-and-a-half years. It wasn't like we were out there swimming alone. It's just that their accolades never made it to the media.

SCARBOROUGH: Never made it to the news media, and unfortunately, it always seems to go that way. Pam, did Patsy know this murder suspect?

PAUGH: You know, I do not know the name. John does not know the name. And nor does anyone in my family or our immediate friends know this name. So I would have to say that she does not—or did not know this name.

SCARBOROUGH: All right. Hey, Pam, congratulations. I know that this is a night that has to be very special for you. We appreciate you being with us tonight and sharing the good news with us.

Exhibit 3 Page 21

8/24/2007

EXHIBIT 4

PAGE 13

Now let's go live to Denver and talk to NBC's Leanne Gregg. Leanne, what's the latest from there?

LEANNE GREGG, NBC CORRESPONDENT: Well, Joe, the Boulder district attorney is apparently going to bring the suspect back to the United States perhaps some time this weekend. Of course, he was picked up on unrelated sex charges. And investigators told KUSA— their sources told KUSA, the local Denver affiliate, that he admitted to at least some facts of the crime that no one else could know except the killer himself.

Of course, JonBenet's family, you just heard, feels very vindicated, perhaps, by this arrest. And the case may have taken a new twist when the new district attorney was appointed, Mary Keenan, a couple of years ago. Several reasons why investigators and prosecutors thought the Ramseys were innocent—first of all, there were signs an intruder entered the basement. They found DNA they believe was left by the intruder. And there was no motive for the family to kill their daughter.

People here are in shock. People are stunned. There were a lot of folk who never thought there would be resolution to this case, 10 years in the making. There's a lot of surprise in the Denver community.

SCARBOROUGH: No doubt about it. Thank you so much, Leanne. Greatly appreciate that report from Denver.

And coming up next in SCARBOROUGH COUNTRY, our all-star panel joins us, as investigators crack the JonBenet cold case after almost 10 years. But how did they break it? And is this really the guy that did it? We're going to break down exactly how they managed to put the pieces together that led them to Thailand. Plus: JonBenet's parents have long been suspected of being involved in their daughter's own murder. Does today's arrest clear their name forever, or does doubt still linger?

(BEGIN VIDEO CLIP)

PATSY RAMSEY, MOTHER: Let me assure you that I did not kill JonBenet. I did not have anything to do with it. I loved that child with my whole of my heart and soul.

(END VIDEO CLIP)

(COMMERCIAL BREAK)

SCARBOROUGH: Welcome back to our breaking news coverage of the

Exhibit 3 Page 22

8/24/2007

EXHIBIT 4

PAGE 74

arrest in the JonBenet Ramsey murder case. Now we're talking about how they tracked the suspect down with Lisa Bloom from Court TV. We also have Jeralyn Merritt (ph), criminal defense attorney, Pam Bondi (ph), who's a Florida prosecutor, and Clint Van Zandt, a former FBI profiler and MSNBC analyst.

Clint, let me start with you. Of course, many in the family very pleased tonight at this arrest.

CLINT VAN ZANDT, FORMER FBI PROFILER, MSNBC ANALYST: Yes.

Absolutely.

SCARBOROUGH: But several still looking at this evidence say it just looks like an inside job. Can you explain how investigators from the very beginning looked at the parents or somebody inside the family?

VAN ZANDT: Well, Joe, to start out with, whether your name is John Ramsey or John Walsh, as we know, law enforcement always has to look at the family to begin with, unless there is, you know, irrefutable evidence otherwise. I read one article on this case that suggested a statistic—I don't know where they came up with it, but it said 14 to 1 that the killer of a child comes from a common household. Well, law enforcement has to get by the prejudices that you and I have, as parents, that say, Hey, I would never hurt my child. Don't look at me. Law enforcement has to start at ground zero, which is the parents, and then move on from there.

But in this particular case, they start at ground zero with the parents. They look at this demand note, Joe, the longest demand note I think the FBI has ever seen, that has—the ransom demand is almost to the dollar of what John Ramsey's bonus was that year. Who would know that? Then how did an unknown offender get in the house, find JonBenet's bedroom, be able to commit this horrific crime, carry her body down to the basement, what they're now calling the wine cellar, write this demand note after two or three attempts at doing it, use implements in the house to commit the crime and then stealthily get away without any evidence whatsoever?

Well, you know, I think law enforcement was totally justified in looking at the Ramseys, just like they'd have to look at me or you or anybody else if something terrible happened to our child.

But Joe, you made the point, and it's so valid right now, that the only thing worse than losing a child is being accused of having anything to do with the death of your child. And here we are for almost a decade that the Ramseys had to live with this—this cloud of suspicion that has

Exhibit 3 Page 23

8/24/2007

EXHIBIT 4

PAGE 15

hung over them...

(CROSSTALK)

SCARBOROUGH: If you were the investigator on this case right now, though, would you lift that cloud of suspicion from the Ramseys? Because even tonight, 10 years later, hearing you talk about it, sounds like there's some—some facts that still don't add up in your mind.

VAN ZANDT: Well, I've got to make sure who this guy is, Joe, and that this is not someone who's looking for 15 minutes of fame. We've had a lot of people over the years confess to crimes, and they've had nothing to do with it whatsoever. So just as I think we were wrong—the public, the media, otherwise—to be quick to indict the Ramseys in the court of public opinion, I think we have to afford this person the same level of scrutiny to make sure we've got our right guy.

SCARBOROUGH: Lisa Bloom, talk about what role the Internet and DNA evidence played in this case.

LISA BLOOM, COURT TV: Well, we don't know all the facts yet, but my suspicion are those are probably the two keys to getting this guy, if, indeed, this is the killer of JonBenet Ramsey. Unknown DNA from a male was found under the fingernails of JonBenet Ramsey, probably when she was trying to fight for her life. Unknown DNA from an unknown male was also found in her underwear. And that wasn't found until 2003, Joe, seven years after her murder.

Now, law enforcement routinely checks that kind of DNA against new samples that are coming in because new criminals are giving DNA samples all of the time. And so there was always the hope that perhaps this person would be found that way, and that may have been what did it.

The other thing is on line communications, and we are hearing some information that this guy is a pedophile who has done on line communications, talking about his sexual predilections. And that's the way that a lot of pedophiles are getting caught, thank God, these days.

I want to point out he was in Bangkok, a place known for sexual

activity between adults and children. He's also a 2nd grade teacher, may -

showing an unnatural interest in children. JonBenet Ramsey is 6 years old, close in age. So we put all this together, this may be—may be—I emphasize may—but it may be a sexual predator who had access to

Exhibit 3 Page 24              8/24/2007

EXHIBIT ___4

PAGE ___76

the home as hundreds of people did, Joe, because this is a family
known for entertaining, known for leaving their doors open, having
contractors and construction workers coming in all the time. So he
could have had easy access to the home, could have followed the
patterns and the habits of this family.

SCARBOROUGH: I'm going ask my all-star panel to stay with me. And
a

question that I want answered is, Why did it take authorities seven
years -

seven years! -- to find that DNA evidence on JonBenet Ramsey that
could have broken this case a long time ago? We'll get answers to that
and much more when we come back.

But still to come tonight: The 10-year hunt for JonBenet's killer may
finally be over, but when will Americans get their first look at the man
allegedly behind that brutal murder? Plus: John and Patsy Ramsey—
they've lived under an umbrella of suspicion for a decade now. What
did today's arrest finally do to get them off the hook? Tonight, some
are saying, Not so fast.

(COMMERCIAL BREAK)

SCARBOROUGH: The big news tonight, an arrest in the decade-old
murder of 6-year-old beauty queen JonBenet Ramsey. Now, police in
Thailand arrested an American today in his 40s. His name, John Mark
Karr. He's a former school teacher who once lived near the Ramseys
when they lived in Conyers, Georgia. But now the big question is,
What happens next?

According to our NBC affiliate in Denver, Karr has already confessed to
certain parts of the crime that are still unknown to the public. Right
now, he's in the process of being extradited back to the United States
and expected to arrive here within the next two days. Karr will
reportedly be accompanied by an investigator from the Boulder DA's
office. That office says they'll hold a press conference on the arrest
tomorrow afternoon.

Of course, that's the same DA's office that really screwed up this case
in the beginning, and many people, especially in the Benet family—

JonBenet Ramsey family, believe that that's the reason why this
investigation has gone on for so long and has been so painful for the
family.

Exhibit 3 Page 25

8/24/2007

EXHIBIT 4

PAGE 11

Now, when we come back, we've got a packed show in the back half, talking much more about this breaking news. And we're going to have more live up-to-date breaking news coverage when we return. Stay with us.

(COMMERCIAL BREAK)

(NEWSBREAK)

SCARBOROUGH: Welcome back. Does today's arrest in Thailand close the book on the JonBenet case? We're going to be asking our all-star panel that question in a minute. But first, NBC's Mike Taibbi looks at the investigation that captured a nation—Mike?

MIKE TAIBBI, NBC NEWS CORRESPONDENT: Joe, finally a break in a case that had gone as cold as the Colorado winter, when a 6-year-old girl was brutally killed 10 long years ago, an arrest of the suspect half a world away.

(BEGIN VIDEOTAPE)

TAIBBI (voice-over): It was a story that, as they say, had all the elements. A pretty, little girl with a melodic name, JonBenet, a beauty pageant veteran already at age 6, found strangled, possibly sexually abused and beaten to death in her own Boulder, Colorado, home on the day after Christmas 10 years ago. Now, an arrest in Bangkok, Thailand, of an American named John Mark Karr.

ABRAMS: My understanding is that this is a suspect in connection with the murder of JonBenet Ramsey, not a witness, not a peripheral player, but a suspect.

TAIBBI: The suspect was described as a 41-year-old second-grade teacher arrested by the Royal Thai Police at the request of the U.S. Justice Department, the warrant issued by the Boulder police.

It was the Ramseys themselves, John and Patsy, who were for long stretches described as the key suspects, persons under the umbrella of suspicion, investigators said. In books and in their rare interviews, both denied it.

JOHN RAMSEY: Let me address very directly: I did not kill my daughter, JonBenet.

PATSY RAMSEY: Let me assure you that I did not kill JonBenet. I did not have anything to do with it. I loved that child with my whole of my heart and soul.

Exhibit 3 Page 26                8/24/2007

EXHIBIT 4

PAGE 78

TAIBBI:  And though Patsy Ramsey died of ovarian cancer this past
June, she apparently had a clue about what was coming.

ABRAMS:  I'm told that Patsy Ramsey, who has since died, knew about
this suspect and was waiting for the authorities to move forward on
this suspect before she died.

TAIBBI:  The case was a sensation, for years really.  As one
investigator put it, "This was the biggest child murder case since the
death of the Lindbergh baby."  Late Thursday afternoon, a telephone
interview by our affiliate, KUSA, with John Ramsey.

J. RAMSEY:  I was notified this morning that an arrest had been made.
And I'm just absolutely impressed with the effort that went into
accomplishing this by the Boulder D.A.'s office and the other agencies
that were involved.

TAIBBI:  An explosive murder case that will now rule the headlines
again, perhaps for the beginning of the end of the story.

(END VIDEOTAPE)

TAIBBI:  The suspect, John Mark Karr, is under the control of U.S.
Justice Department officials in Bangkok at the moment.  It's expected
he'll be returned to the U.S. as soon as possible and could be back in
Colorado as early as this coming weekend—Joe?

SCARBOROUGH:  Thanks so much, Mike.

So after 10 years of suspicions, are the Ramseys vindicated or does
today's arrest just bring up more questions?  With me now to talk
about it, forensic document examiner Bill Flynn, who examined the
ransom note for JonBenet Ramsey.

Marc Klaas, his daughter, Polly Klaas, was kidnapped and murdered by
a pedophile.

And, of course, our all-star panel, which we'll be getting back to in a
second.

But, Bill Flynn, let me start with you.  You examined this ransom note.
Respond to today's arrest?

BILL FLYNN, FORENSIC DOCUMENT EXAMINER:  Well, I and many,
actually, forensic document examiners that were involved in the
criminal case had an opportunity to compare the writing of John and
Patsy Ramsey to the note.  And to the best of my knowledge, in spite

Exhibit 3 Page 27

8/24/2007

EXHIBIT 4

PAGE 79

of what must have been enormous pressure, especially on the CBI examiners, none of us actually identified Patsy Ramsey as having written the note.

So it wasn't too much of a surprise. The real question now is and the final piece of the puzzle will be if this man, Karr, actually did commit the murder, did he write the note? So that's a second possibility, as well.

SCARBOROUGH: But, of course, it didn't really—as Clint was saying earlier, it didn't make sense that the guy would kill this little girl and then hang around in the basement and write a long ransom note.

FLYNN: It didn't. All of the physical evidence, I'm sure, and the investigation would have indicated someone inside the house. It was a long, rambling note. It was written while inside the house, not written outside and brought into the house.

So certainly all of the initial evidence would have indicated that someone in the house, Patsy or John Ramsey, had written the note. Forensically, though, no one that looked at the note on the criminal side was able to identify Patsy Ramsey as having written it.

SCARBOROUGH: Marc Klaas, as Clint told us earlier, if you're a parent and you go through the tragedy of your daughter being killer or your son being killed, like you had to go through with your daughter, police immediately look at the parent as a suspect. You were a suspect. It had to be painful. Do you think, though, that this arrest vindicates completely the parents?

MARC KLAAS, FOUNDER OF BEYOND MISSING: No, no, not at all, for a variety of reasons. First of all, this might simply be a case of a very bad individual who was facing maybe the rest of his life in a Bangkok prison coming up with a reason to get back to the United States. If I were in his shoes, I would cop to the Lindbergh kidnapping if I thought it would get me back to the United States, so it could be as simple as that.

But also, Joe, remember, on this ransom note, she may not have been able to be implicated, but she was never eliminated, either, at least not by the authorities.

SCARBOROUGH: Jeralyn Merritt, you think the parents were treated very badly by the investigators early on. Why?

JERALYN MERRITT, CRIMINAL DEFENSE ATTORNEY: I think that the Ramseys were vilified more than anyone else in the last 10 years. The

Exhibit 3 Page 28          8/24/2007

EXHIBIT 4

PAGE 80

police in this case jumped on them right from the beginning. You had the mayor of Boulder coming out within two days of JonBenet's death telling the people of Boulder on television they didn't need to worry about a killer being loose in their community.

These police, they've picked on the Ramseys. And then, when they got lawyers, the police used that as a reason as if to suggest that made them guilty. And it just spiraled from there.

The people said the Ramseys didn't cooperate. The Ramseys did cooperate. They gave an unbelievable amount of consent for the police to search their home, for handwriting exemplars, and yet they were vilified from the very beginning, with people who didn't know anything about the case, but all speculated that it must be the Ramseys, because who else could it have been?

SCARBOROUGH: But, Bill Fallon, you believe that the Ramseys acted in such a bizarre way that investigators had no other choice but to focus almost solely on them. Explain.

BILL FALLON, FORMER PROSECUTOR: Well, Joe, for me, we talk about a rush to judgment. No, a rush to suspicion, yes. You get an umbrella of suspicion. The middle of the umbrella involves the family, the people surrounding, whether it's the Ramseys, whether it's their son, whether it's anybody who had access to that house. What you usually get in reviewing, Jeralyn, as you know, thousands of these cases, you do look to the family, not just to say, "Did they do it?" but let's see if we can clear them so we can move on.

This is a family that didn't, as I understand it from 10 years ago, as I remember, didn't want to take lie detector tests, didn't want to be interviewed except separately—together. We never interview parents together.

Now, the point is—that doesn't mean they did it, but it does mean that there—in my mind, there are secrets in that house that we may never know. And if I were an investigator or I were the prosecutor, I would say:

This doesn't ring true to a poor child's family, a child who has been potentially molested, who has been murdered. What is up here?

Then we had no clues of anyone else. Remember, somebody only came forward now, as was just said that I think, "Let me get out of this jail in Thailand." Now, the truth is, whether this guy did it or not, what we know is we would have never had access to him, except that he seems to have come forward in some way. But, again, does it not...

Exhibit 3 Page 29          8/24/2007

EXHIBIT 4

PAGE 81

SCARBOROUGH: Pam Bondi...

FALLON: ... mean the Ramseys had anything to do with it, but they did not act, I think, in the best interests of the investigation, the best interests of finding out who the child murdered.

SCARBOROUGH: I think most people looking—so many people at this case from the very beginning just said they acted in a strange and inappropriate way. I have no idea, though, how I would respond if I were going through the same pressures of them.

But, Pam Bondi, let's talk about cracking this cold case. Let's say this guy is (INAUDIBLE) I've got to say, Marc Klaas paints a pretty darn good excuse for this guy to cop a plea to this case, to get out of Thailand and come back here to the United States. But let's say this is the guy. How do you crack a cold case—and this is the coldest of cold cases, over 10 years old—and track down somebody that's on the other side of the world?

PAM BONDI, PROSECUTOR: You know, Joe, when you say a "cold case," sometimes that's deceiving. There are cold cases out there, but let me tell you, they are being worked on every day. In fact, here we have full-time detectives assigned to cold cases, to old cases.

SCARBOROUGH: So just so...

(CROSSTALK)

BONDI: They re-submit DNA constantly.

SCARBOROUGH: ... Pam, just because the media is not looking at these cases anymore, you guys are still looking at it.

BONDI: Right, constantly.

SCARBOROUGH: But let's talk about—Lisa brought up earlier that DNA wasn't found on her undergarments for seven years.

BONDI: Right.

SCARBOROUGH: How do you mess that up so badly?

BONDI: Well, Joe, we have made tremendous advancements in the last decade in DNA. We now have something called mitochondria DNA. Even the smallest amount of DNA can be analyzed.

DNA in old cases, whether they're high-profile or not, are constantly

Exhibit 3 Page 30          8/24/2007

EXHIBIT 4

PAGE 82

being re-submitted for analysis, whether or not now they have enough with the new advancements to find DNA or they may get a hit on a suspect who has since been incarcerated and they may get a match. But, believe it or not, it's frequent, and it happens, and it's great. And, you know, it's just great that they haven't let this case die in any way and, especially in this case, I think they've been working on it around the clock for things we didn't know about.

SCARBOROUGH: Let me ask Lisa Bloom, going back to this seven-year delay, do you think it's possible, Lisa Bloom—because I know Jeralyn believes this—that because the Boulder D.A. focused so much on the parents...

MERRITT: No, the Boulder police.

BLOOM: The police.

MERRITT: Not the D.A.

SCARBOROUGH: The Boulder police, I'm sorry, the Boulder police focused so much on the family and botched this investigation from the very beginning, from the first hours of this investigation, is it possible that they missed some evidence that actually could have let this guy go free for over a decade?

BLOOM: It's not possible. It's crystal clear, Joe. They walked around through the crime scene. They failed to secure it. They fingered these parents from the very beginning, as they should, but to the exclusion of all others, which is what the big error was in this case.

Usually Jeralyn and I disagree; here I'm in complete agreement. There's no question, if you look back at the facts of this case, as we've done on Court TV, and exhaustive reviews of these 10 years, there's no question that the Boulder police misstepped.

The good news is that a new D.A. did come in, took a closer look at it, and hopefully this is the guy. But I think it's a shame that people even today are still attacking the Ramseys. I mean, I think they're going to go down in American history with Wen Ho Lee, with Richard Jewell, as people who were falsely accused.

They lived through a hell over the last 10 years, and poor Patsy passed away without ever seeing justice, having this cloud of suspicion over them. They never had any history of abusing their children. They had no motivation to kill JonBenet Ramsey. She was killed with a sophisticated, sadistic garrote around her neck and around her wrists.

Exhibit _3_ Page _31_     8/24/2007

EXHIBIT _4_

PAGE _83_

It all looked like a pedophile. This was a pretty little girl who was out in pageants with wealthy parents. Of course, she's a target for a kidnapper or a pedophile. It wouldn't make any sense if they would have written that ransom note. I just think, from the beginning, the police botched it, and it's time, frankly, for an apology to the Ramseys.

SCARBOROUGH: And the family has been vilified, like you said, for over a decade. Lisa, thank you so much for being with us. And I want to ask the rest of our panel, if you will, please stay with us. More on the Ramsey investigation, the arrest coming up.

But later, we're going to change pace and lighten things up a little bit. Find out what American legend reportedly thought about Tom Cruise, how he was creepy, so creepy that Joltin' Joe almost called the cops.

(COMMERCIAL BREAK)

SCARBOROUGH: Our all-star panel still with us. Let's go back to Clint Van Zandt.

Clint, if in fact this family didn't know the suspect as the sister suggested, that contradicts news reports, but what is his connection to this case?

VAN ZANDT: Well, Joe, that really changes the equation on this. If no one in the family knew this guy whatsoever—we know he would have been 32 at the time this crime took place, that he is alleged to be a second-grade school teacher and subsequent, you'd like to believe, a known pedophile. How did this guy become so fixated on JonBenet Ramsey that he would have traveled potentially from Georgia to Boulder, Colorado, not just to this town and not just to this house, but for this particular child, and still know enough about the Ramsey family to know how much John bonus was and to be comfortable enough to write that demand note inside the house?

I mean, there are questions that obviously are going to be answered, but right now, Joe, it still doesn't make sense. Motive and opportunity, law enforcement still has to put that together. And we need something more than, "I have confession." We need linking physical evidence to tie this guy in.

SCARBOROUGH: Yes, Clint. So much of this still doesn't add up.

And Marc Klaas, is that why you're still so suspicious of the Ramseys?

KLAAS: Well, Joe, I'm suspicious for two reasons. Number one, their

Exhibit _3_ Page _32_

8/24/2007

EXHIBIT __4__

PAGE __84__

conduct in the immediate aftermath of the murder of the child. And it's mentioned: They were not cooperative with law enforcement. They did not take independent interviews with law enforcement. They did not take polygraph exams. They put lawyers between themselves and law enforcement almost immediately. And we all know...

SCARBOROUGH: And you didn't do any of that in your case?

KLAAS: No, sir, because it was—I understood that I was the parent of a murdered child and immediately the suspicion would fall on me. And it was explained to me that I had to eliminate myself from suspicion and that the best way to do this—and I truly believe this—was to cooperate with law enforcement, and to cooperate with the media, and be as transparent as humanly possible so that I would no longer be considered as a suspect and they could move on. That's the first reason. They never did any of those things.

The other reason are all of these pieces of evidence, the three-page note, the information about the $118,000, having a ransom note and finding the little girl downstairs, having Patsy's sweater fibers on the inside of the duct tape that was covering her mouth, having her sweater fibers entwined in the garrote that was around the little girl's neck, having the little girl wrapped in her favorite blanket.

This sounds like staging. And as Clint said, and as others have said, until you can show otherwise, I think we have to look very, very askance at this gentleman and his confession.

SCARBOROUGH: Bill Fallon, it sounds like there's still clouds of suspicion over the Ramseys. Why?

FALLON: Joe, because, just as Mark just said, from the beginning they didn't act the way everybody thinks they should act when their child's death is imminent or the child has died. We want transparency.

But I will say, if this guy did do it, it might give us a light, shine a light on just what a fixated pedophile—we've talked about them for decades—just how fixated, almost mentally ill they can become. Every moment becomes fixated on one child. Usually we see it on several children, their movements.

I mean, if he actually went all those states to go to this child, maybe he was following this career that Patsy Ramsey had set up. Maybe somebody was sending him, "This is the little child in the limelight" thing. We don't really know that.

And, again, I'm suspicious that we can ever trust everything any

Exhibit 3 Page 33

EXHIBIT 4

PAGE 85

pedophile says, because they always put it in their best light. Sadly, we're talking 10 years later about what could parents have done differently, so maybe the light would have cleared, that maybe we could have focused in on them.

But I don't say this: I am not willing to say that, even if they had cooperated, that the light would have shown that this guy several states away was, in fact, the guy that murdered her at the time. So maybe years have actually helped the case, not hurt it.

SCARBOROUGH: And as Marc proved in his own case, his own tragic case, it's transparency, when you're in this sort of situation, that makes all the difference in the world.

FALLON: Put the child first.

SCARBOROUGH: Hey, I want to thank all of our panelists. Yes, put the child first. I want to thank all of our panelists.

Up next, we're going to try to lighten things up. Paris Hilton actually is in the record books. Really? Wait until you see why.

Pack your bags for a trip to Hollyweird, as we also talk to you why and tell you why Joe DiMaggio was scared of Tom Cruise.

(COMMERCIAL BREAK)

SCARBOROUGH: Roll out the red carpet. It's time to take a trip to Hollyweird.

First up, the star that just keeps falling. First Star Jones booted from "The View," now the other shoe drops. Payless Shoes has fired Jones as its spokeswoman. With us now to talk about celebrities and more proof that they're not like you and me, we've got "OK's" senior reporter, Courtney Hazlett, and we also have West Coast deputy editor of "US Weekly," Dina Sansing.

Let's start with you, Courtney. First, "The View," and then, of course, Payless Shoes. It looks like being a diva doesn't pay well these days.

COURTNEY HAZLETT, "OK" MAGAZINE: Well, you know, it's kind of funny. Star Jones has definitely proven that she does like to pay less for things, as evidenced by her behavior during her wedding, which she has, in her defense, since apologized for. But Payless has decided to drop her as a spokesperson. That said, her contract was up, as well. But it's definitely showing that it seems like Star's star is falling somewhat, that she's not—she doesn't have the equity that she once

Exhibit 3 Page 34

8/24/2007

EXHIBIT 4

PAGE 86

did. And maybe a little bit of time out of the limelight is going to do
her a lot more good in the long run.

SCARBOROUGH: And, Dina, it looks like, in the end, Barbara Walters
may get the last laugh, that as long as she's with "The View," she's a
hot commodity. They take her off of there, and she can't even hold a
contractual deal with Payless Shoes, right?

DINA SANSING, "US WEEKLY": Well, I think one of the problems here
is there is lots of controversy around Star. And the last thing that you
want with a spokesperson is to have controversy. You want someone
who's loved by all and who will help sell shoes and not have a lot of
baggage. And that's exactly what Star has right now.

SCARBOROUGH: And talking about a lot of baggage, Paris Hilton is
now a world record holder. I know you all are very excited about it.
But she's probably not going to be popping any champagne. The 2007
Guinness Book of World Records names Paris Hilton the most overrated
person in the world.

Dina, that's pretty impressive, even for Paris Hilton, in the Guinness
world book of records. They said that they put her up there, though,
because she just kept up coming up as the most irritating, obnoxious
celebrity. Why is it though that everybody likes talking about her and
likes reading about her?

SANSING: Well, that's the thing about Paris. You know, she became
famous for being famous. Initially there was really no other reason for
this fame that she had. But at the same time, she really turned it into
something.

Here's a girl who essentially did nothing, got a lot of press for it. And
then she's now a very successful perfume maker. Her line is very
popular. She's releasing a record that's said to be doing pretty well.
People like the single. You know, people like to talk about Paris. And
you can say what you want to say about her, but she's made
something from nothing, essentially.

SCARBOROUGH: And she certainly has.

And, Courtney, I remember the "New York Times" had a front page
article in their business section, called it "Paris Inc." I mean, it started
with a sex tape. This woman is actually making a lot of money doing
nothing.

HAZLETT: You know, you've got to hand it to her. A lot of people who
start their careers with a sex tape, they don't really go as far, do they?

Exhibit 3 Page 35

8/24/2007

EXHIBIT 4

PAGE 81

'Scarborough Country' for Aug 16 - Morning Joe - MSNBC.com                    Page 20 of 22

SCARBOROUGH: No, it hasn't really helped me.

HAZLETT: But as we speak, literally, Paris Hilton is having a huge party here in New York City, and it's to celebrate her single and her album dropping. And so, you know what, Paris is probably going to be having the last laugh when this is all said and done.

She's always said, you know what, say what you will say about me, but I work really hard. And, you know what, now it's actually starting to look like she's working hard in spite of her Guinness title.

SCARBOROUGH: Works hard, makes a lot of money.

HAZLETT: Definitely.

SCARBOROUGH: And long before he jumped on Oprah's sofa and gave the rest of us the creeps, Tom Cruise—I love this story—reportedly followed around baseball great Joe DiMaggio so much that Joltin' Joe thought about calling the cops. And, Dina, he said that this guy gave him the creeps. What is it about Tom Cruise that gives so many Americans the creeps these days?

SANSING: Yes, Joe, you know, join the club there. You know, he does everything over the top. And, you know, this was probably not expected. You know, I would be creeped out if someone was hanging outside my doorstep all the time.

You know, when he wants something, he fights really hard to get it, and I think that's what happened. He was just really trying to get the story of Joe. He wanted to make the movie, and he decided to do everything he could. But in the process, he really probably hurt his chances and just creeped him out.

SCARBOROUGH: No doubt about it. And, Courtney, you know, we'd call guys like this back in high school a spaz. He's just over the top, isn't he?

HAZLETT: You know what? Tom Cruise, he's a lot to handle all at once. And, you know, this story coming out about Joe DiMaggio, it is a little bit believable, because J.J. Abrams was recently saying, when Tom was courting him to direct "Mission Impossible III," "You know what? The guy used to show up at my house like at midnight on his motorcycle by himself saying, 'J.J., please, come on, you've got to do this movie for me.' And how could I say no?" J.J. was saying. So you know...

SANSING: But he got what he wanted, you know?

Exhibit _3_ Page _36_                    8/24/2007

EXHIBIT __4__

PAGE __88__

HAZLETT:  Exactly.

SANSING:  Sometimes that works.

SCARBOROUGH:  All right, we're going to have to leave it there.  He may be a spaz, but he makes $100 million.

That's all the time we have for tonight.  Stay tuned.  More MSNBC straight ahead.

THIS IS A RUSH TRANSCRIPT. THIS COPY MAY NOT BE IN ITS FINAL FORM AND MAY BE UPDATED.

END

Copy: Content and programming copyright 2006 MSNBC.  ALL RIGHTS RESERVED.  Transcription Copyright 2006 Voxant, Inc. ALL RIGHTS RESERVED. No license is granted to the user of this material other than for research. User may not reproduce or redistribute the material except for user's personal or internal use and, in such case, only one copy may be printed, nor shall user use any material for commercial purposes or in any fashion that may infringe upon MSNBC and Voxant, Inc.'s copyright or other proprietary rights or interests in the material. This is not a legal transcript for purposes of litigation.

transcript

*Watch Scarborough Country each weeknight at 9 p.m. ET*

---

**Rate this story   Low ☆☆☆☆☆ High**

Current rating: **0** by **0** users        **• View Top Rated stories**

---

🖶 Print this        ✉ Email this        📧 Blog this        ⌨ IM this

---

**MORE FROM MORNING JOE**

Next    **Morning Joe Section Front**

**Obama hopes for a unified government**

Exhibit 3 Page 37

8/24/2007

EXHIBIT 4

PAGE 89

Housing recession vs. consumer spending

| **Top MSNBC stories** | **NBC News highlights** |
|---|---|
| Deadly fires rage across Greece | Agony of Mother Teresa |
| Iraq report unlikely to move Bush | Lauer rocks the WristStrong bracelet |
| Chicago braces for second storm | Williams on 'Nightly News' office quirks |
| NFL suspends Vick indefinitely | Kid reality show flout labor laws? |
| Town wants to dig hole to miners | Sagging slacks — offensive or stylish? |

SPONSORED LINKS                                    Get listed here

**Ann Coulter Weekly - Free**
Be among the first to read Ann weekly column by email - Free!
HumanEvents.com

**AARP & The Hartford Auto Insurance**
Over 50? Save $303 on no hassle auto ins from AARP & Hartford today.
AARP.TheHartford.com

**Affordable Health Coverage - Blue Cross**
Need health coverage? Quality health plans. Request information today!
www.BCCHealthPlans.com

**A Different Sleep Aid**
Learn about a two-layered med to help you fall asleep & stay asleep.
SleepMedication.Info

**Back Surgery Alternative**
Minimally Invasive Laser Procedures Quick Recovery - Learn More Now.
www.laserspineinstitute.com

Cover | U.S. News | Politics | World News | Business | Sports | Tech/Science | Entertainment | Travel | Health | Blogs Etc. | Weathe
Newsweek | Today Show | Nightly News | Dateline NBC | Meet the Press | MSNBC TV

About | Alerts | Newsletters | RSS | Mobile | Podcasts | Site Map | Help | News Tools | Jobs | Contact Us | Terms & Conditions
© 2007 MSNBC.com

© 2007 Microsoft   MSN Privacy   Legal   Advertise   Feedback   |   Help

Exhibit 3 Page 38

8/24/2007

EXHIBIT 4

PAGE 90

EXHIBIT 5

SENT BY: INTEGRATED PAPER SERVICES,        9207493046;        AUG-2, J7  6:57PM;        PAGE 2

1 | QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
  | John B. Quinn (Bar No. 090378)
2 | johnquinn@quinnemanuel.com
  | Michael T. Zeller (Bar No. 196417)
3 | (michaelzeller@quinnemanuel.com)
  | Jon D. Corey (Bar No. 185066)
4 | (joncorey@quinnemanuel.com)
  | Timothy L. Alger (Bar No. 160303)
5 | (timalger@quinnemanuel.com)
  | 865 South Figueroa Street, 10th Floor
6 | Los Angeles, California 90017-2543
  | Telephone: (213) 443-3000
7 | Facsimile: (213) 443-3100

8 | Attorneys for Mattel, Inc.

9

10 | UNITED STATES DISTRICT COURT

11 | CENTRAL DISTRICT OF CALIFORNIA

12 | EASTERN DIVISION

13 | CARTER BRYANT, an individual,

Plaintiff,

vs.

MATTEL, INC., a Delaware corporation,

Defendant.

AND CONSOLIDATED CASES

---

Case No. CV 04-09049 SGL (RNBx)

Consolidated with
Case No. CV 04-09059
Case No. CV 05-02727

**DISCOVERY MATTER**

Hon. Edward A. Infante (Ret.)
Discovery Master

*IN CAMERA* DECLARATION #3 AS
TO EXPERT EXAMINATION AND
TESTING OF BRYANT'S ORIGINAL
DOCUMENTS

Date: August 23, 2007
Time: 9:00 a.m.
Place: Telephonic

Discovery Cut-Off: October 22, 2007
Pre-Trial Conference: January 14, 2008
Trial Date: February 12, 2008

---

**SUBMITTED PER JUDGE INFANTE'S REQUEST ON AN**

*IN CAMERA* **BASIS**

~ **Not For Dissemination To Defendants/Counterclaimants** ~

8<del>28</del>

EXHIBIT **5**

PAGE **5**

SENT BY: INTEGRATED PAPER SERVICES,        9207493046;        AUG-2  J7  6:57PM;        PAGE 3

## DECLARATION OF WALTER J. RANTANEN

I, Walter J. Rantanen, declare as follows:

1.      I am an expert in the field of forensic paper fiber analysis.  I am submitting this declaration *in camera* in response to a request from the Discovery Master in connection with Mattel's Motion to Compel Bryant To Make Original Documents Available For Expert Examination and Testing.  I am more than twenty-one (21) years of age; I make this declaration of personal, firsthand knowledge; and if called and sworn as a witness, I could and would testify competently thereto.

2.      Attached hereto as Exhibit 1 is a true and correct copy of my curriculum vitae.  I have been a paper fiber analyst for about 30 years and have been qualified as an expert in many cases.

3.      I have been asked to examine and provide opinions as to paper fiber analysis in many high-profile cases.  For example, I was involved in testing the punch card ballots that were used for voting in Florida in the 2000 U.S. Presidential election.  Attached hereto as Exhibit 2 is a true and correct copy of some excerpts from my interview with Dan Rather about my findings.  Also in 2000, I conducted a study to assist Paul Messier, a conservator of photographic works for institutions like Carnegie Museum of Art, the George Eastman House, the Harvard University Archives and the U.S. Bureau of Engraving and Printing, on determining the authenticity of certain Lewis W. Hine photographs. Attached hereto as Exhibit 3 is a true and correct copy of a June 2003 article from Atlantic Monthly about my study. In March of 1990, I was also qualified as an expert and testified in the case of Her Majesty The Queen v. Imre Finta.  In that case, Mr. Finta was the first person to be prosecuted under Canada's war crimes legislation. Attached hereto as Exhibit 4 is a true and correct copy of an article from the *Toronto Star* about the case.

4.      To properly examine and test documents, as well as to ensure that they are properly handled and preserved, I conduct my analysis and testing in my

1   laboratory in Appleton, Wisconsin.  The laboratory contains specialized equipment
2   that I use to conduct the examination and testing of documents.  Some of this
3   equipment includes:  Transmitted light microscope used to determine fiber types and
4   composition; Energy Dispersive Spectroscopy component of the Scanning Electron
5   Microscope used to determine inorganic elemental composition; Ultraviolet Lamp
6   used to detect optical brightening agents; Light box to observe watermarks and paper
7   formation.  I may perform the following types of examination and testing on one or
8   more of the original documents from Mr. Bryant:  Optical examination of sheet, Fiber
9   Analysis, chemical spot testing, and Energy Dispersive Spectroscopy.

10         5.    The laboratory facilities also include a locked, secure room, where
11   I keep any materials that are sent to me for examination and testing when they are not
12   being examined or tested.

13         6.    As a recognized expert in the field of paper fiber science and
14   forensic paper analysis, I recognize the extreme importance of preserving the
15   integrity of the evidence I am sent for review and analysis.  When materials arrive at
16   my laboratory, they are signed for and recorded in the shipping department receipt
17   log.  The materials are delivered to the addressee in the appropriate laboratory and
18   opened.  Known forensic samples are opened only by myself, or if I am not available
19   are locked in a secure desk or room.  When I open the samples, they are recorded into
20   our tracking system.  If a client provides a chain of custody letter, this is filled out
21   and the samples are locked in the secure location until work can be started on them.
22   When the documents have been examined or sampled, they are afterward returned to
23   the secure location until being reexamined or returned.  I certainly understand the
24   critical nature of each of Mr. Bryant's original documents and will be fully
25   accountable for them while they are in my custody.

26         7.    I understand that the parties have stipulated to, and the Court has
27   tentatively approved, a special protocol for any destructive testing that might be
28

1           I declare under penalty of perjury under the laws of the State of

2    California and the United States of America that the foregoing is true and correct.

3           Executed this _27th_ day of August, 2007, at   _Appleton, WI_.

4

5    DATED:  August 28. 2007

6

7                              _Walter J. Rantanen_
                               Walter J. Rantanen

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                             EXHIBIT __5__

28                             PAGE __93__



## FACSIMILE TRANSMITTAL

DATE: _August 27, 2007_

### PLEASE DELIVER THE FOLLOWING PAGES TO:

NAME: _Diane Hutnyan_
_& Scott Kidman_

_Quinn Emanuel Urquart Oliver & Hedges, LLP_

FAX: _(213) 443-3100_

FROM: _Walter J. Rantanen_

SUBJECT: _Declaration_

NUMBER OF PAGES TRANSMITTED INCLUDING COVER SHEET: _6_

IF ALL PAGES ARE NOT LEGIBLE, PLEASE CALL (920) 749-3040.

MESSAGE:

_This is a re-send as fax skipped some pages._

EXHIBIT _5_

PAGE _94_

3211 E Capitol Drive • Appleton, WI 54911