EXHIBIT 6

1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
   John B. Quinn (Bar No. 090378)
2    johnquinn@quinnemanuel.com
   Michael T. Zeller (Bar No. 196417)
3    (michaelzeller@quinnemanuel.com)
   Jon D. Corey (Bar No. 185066)
4    (joncorey@quinnemanuel.com)
   Timothy L. Alger (Bar No. 160303)
5    (timalger@quinnemanuel.com)
   865 South Figueroa Street, 10th Floor
6  Los Angeles, California 90017-2543
   Telephone:  (213) 443-3000
7  Facsimile:  (213) 443-3100

8  Attorneys for Mattel, Inc.

9              UNITED STATES DISTRICT COURT

10            CENTRAL DISTRICT OF CALIFORNIA

11                 EASTERN DIVISION

12

13  CARTER BRYANT, an individual,      Case No. CV 04-09049 SGL (RNBx)

          Plaintiff,               Consolidated with
14                                   Case No. CV 04-09059
                                     Case No. CV 05-02727
15        vs.

   MATTEL, INC., a Delaware corporation,   **DISCOVERY MATTER**
16
          Defendant.                Hon. Edward A. Infante (Ret.)
17                                   Discovery Master

18  ──────────────────────────────    *IN CAMERA* DECLARATION #4 AS
   AND CONSOLIDATED CASES           TO EXPERT EXAMINATION AND
19                                   TESTING OF BRYANT'S ORIGINAL
                                     DOCUMENTS
20
                                     Date:  August 23, 2007
21                                   Time:  9:00 a.m.
                                     Place:  Telephonic
22
                                     Discovery Cut-Off:  October 22, 2007
23                                   Pre-Trial Conference: January 14, 2008
                                     Trial Date:  February 12, 2008
24

25        **SUBMITTED PER JUDGE INFANTE'S REQUEST ON AN**

26                    *IN CAMERA* **BASIS**

27       **~ Not For Dissemination To Defendants/Counterclaimants ~**

28

07132/2203613.1

IN CAMERA DECLARATION NO. 4

## DECLARATION OF LLOYD CUNNINGHAM

I, Lloyd Cunningham, declare as follows:

1.    I am self-employed as a Forensic Document Examiner, which includes the examination of handwriting and questioned documents. I am submitting this declaration *in camera* in response to a request from the Discovery Master in connection with Mattel's Motion to Compel Bryant To Make Original Documents Available For Expert Examination and Testing. I am more than twenty-one (21) years of age; I make this declaration of personal, firsthand knowledge; and if called and sworn as a witness, I could and would testify competently thereto.

2.    I have extensive experience in the questioned document field. I have testified and have been accepted as an expert witness more than 500 times in state and federal courts, as well as in depositions and hearings. I spent twenty-seven years with the San Francisco Police Department (and retired as Inspector of Police), where I established and supervised the first full time Questioned Document Section within the SFPD Crime Laboratory. I have examined items and prepared formal reports for approximately 6,000 questioned document cases which were submitted by law enforcement investigators, corporate security, civil attorneys, criminal defense attorneys, and for federal and state agencies including the Federal Bureau of Investigation, the Secret Service, the Internal Revenue Service, U.S. Customs, the Drug Enforcement Agency, and the California Highway Patrol. Attached hereto as Exhibit 1 is a true and correct copy of my current CV.

3.    Attached hereto as Exhibit 2 is a true and correct copy of an article about my work analyzing the handwriting of the "Zodiac," the 1960s serial killer. I also was retained to examine the handwritten ransom note that was found at the scene of JonBenet Ramsey's murder and to testify at the Grand Jury hearing in Boulder, Colorado. *See* Exhibit 2.

EXHIBIT **6**

PAGE **96**

IN CAMERA DECLARATION NO. 4

1    4.    To properly examine and test documents, as well as to ensure that
2    they are properly handled and preserved, I conduct my analysis and testing in either
3    of my two laboratories in Indian Wells and Alamo, California.  The laboratories
4    contain specialized scientific instrumentation that I use to conduct the examination
5    and testing of documents.  Some of this instrumentation includes, but is not limited to
6    the following:  Stereoscopic microscope, Electro-Static Detection Apparatus (ESDA),
7    specialized lighting sources, infrared luminescence, reflected infrared, and UV.    I
8    may perform the following types of non-destructive examinations and testing on one
9    or more of the original documents from Mr. Bryant: a) (ESDA) examination of the
10   paper fiber of selected documents for evidence of indented handwriting or any other
11   indented impressions. b) Examination of ink/writing instrument characteristics with a
12   stereoscopic  microscopic,  specialized  lighting  sources,  infrared  luminescence,
13   reflected infrared, UV and the dichroic filter. c) Examination of the paper fiber of
14   selected  documents  for  evidence  of  chemical  and/or  mechanical  erasures.  d)
15   Examination  of  handwritten  entries/drawings  for  evidence  of  additions  and/or
16   alterations. e) Examination of handwritten entries to determine authorship.

17   5.    The  laboratories  where  I  conduct  my  examinations  are  each
18   protected by a security system, and a locked fireproof safe where I keep materials that
19   are sent to me for examination and testing when they are not being examined or
20   tested.  It should be noted that the safes have limited space and may not be able to
21   accommodate very large documents or a voluminous number of documents.

22   6.    As  a  recognized  expert  in  the  field  of  forensic  document
23   examination, I am fully aware of the extreme importance of preserving the integrity
24   of the evidence that is in my custody.  When materials arrive at my laboratories I
25   carefully record the condition of the documents when they are received, they are
26   placed in a protected area away from other cases and away from any chemicals or
27   elements they could cause contamination to them, and if possible they are placed in
28   protective envelopes.  In addition, the submitted documents are color photocopied by

07209/2161753.1

-2-

IN CAMERA DECLARATION NO. 4

1    either me or my client. I certainly understand the critical nature of each of Mr.

2    Bryant's original documents and will be fully accountable for them while they are in

3    my custody.

4         7.      All the Bryant documents that are provided for examination and

5    testing shall be returned by me in the same condition, sequence and order in which

6    they were received.

7         I declare under penalty of perjury under the laws of the State of

8    California and the United States of America that the foregoing is true and correct.

9         Executed this 27th day of August, 2007, at Alamo, California.

10

11    DATED: August 27. 2007

12

13

14                      Lloyd W. Cunningham

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 6

PAGE 98

# Exhibit 1

EXHIBIT ___6___

PAGE ___99___

| LLOYD CUNNINGHAM |
| --- |
| FORENSIC DOCUMENT EXAMINER |
| 67 OAK MEADOW COURT, ALAMO, CA 94507 |
| OFFICE PHONE: 925-831-0790 |
| FAX: 925-831-0791 |

# CURRICULUM VITAE

Currently I am self-employed as a Forensic Document Examiner.

The following is a resume of my qualifications as they relate to my expertise. I would testify to these qualifications in a court of law as an expert in the examination of questioned handwriting and documents.

1963-1990   Twenty-seven years of service with the San Francisco Police Department. Retired Inspector of Police.

1977-1980   Assigned to the San Francisco Police Department Fraud Unit, Embezzlement Investigations.

1980   Graduated from the United States Secret Service Questioned Documents Course in Washington, D.C.

1980-1982   Completed a 2-1/2 year course of studies as an intern with the Questioned Document Section of the United States Postal Crime Laboratory.

1982   Graduated from the F.B.I. Questioned Documents Course in Quantico, VA.

Established the first full time Questioned Document Section within the San Francisco Police Department Crime Laboratory and supervised this section from 1980 – 1990.

Past president of the Southwestern Association of Forensic Document Examiners.

## MEMBER

Honorary member of the American Society of Questioned Document Examiners.

International Association for Identification – Questioned Document Section. Life Member.

EXHIBIT __6__

PAGE ___100___

Exhibit 1  Page 4

## ATTEND FORENSIC WORKSHOPS SPONSORED BY:

Southwestern Association of Forensic Document Examiners
American Society of Questioned Document Examiners
American Board of Forensic Document Examiners
International Association for Identification
American Academy of Forensic Sciences

Prepared scientific research papers which were presented at forensic seminars and published in forensic and law enforcement journals.

## LECTURED

San Francisco Police Department Academy
Oakland Police Department
District Attorney Investigator's Association
California District Attorney's Association
Trial Lawyer's Association
American Bar Association
California Department of Motor Vehicles Investigators
U.S.F Law School  Hasting Law School
Numerous Bank Investigators and Investigative Associations.

## INSTRUCTOR

Certified by the California Commission of Peace Officer Standards and Training to teach Questioned Document Investigative Techniques in the Institute of Criminal Investigation.

Taught (POST) Questioned Document Investigative Techniques in conjunction with the San Jose State University Administration of Justice Department from 1991 – 2003.

Examined items and prepared formal reports for approximately 6,000 questioned document cases which were submitted by law enforcement investigators, corporate security, civil attorneys, criminal defense attorneys, and for federal and state agencies such as the F.B.I, Secret Service, I.R.S., U.S. Customs, D.E.A., California Highway Patrol, etc.

Testified and have been accepted as an expert Forensic Document Examiner in excess of 500 times in State and Federal Courts, and in depositions and hearings.

EXHIBIT ____ 6

PAGE ____ 101

Exhibit 1 Page 5

# Exhibit 2

EXHIBIT **6**

PAGE **102**

**SFGate**.com

## Zodiac's written clues fascinate document expert

Lance Williams, Chronicle Staff Writer
Saturday, March 3, 2007

 

It's a task that the world's leading expert on the handwriting of San Francisco's most notorious fugitive killer has undertaken literally thousands of times.

From somewhere in the world, someone -- police officer, news reporter or amateur sleuth -- has sent a document that person suspects was written by the Zodiac, the 1960s serial killer who taunted police with handwritten notes boasting of his crimes, then disappeared.

Patiently and methodically, forensic document examiner Lloyd Cunningham reviews the handwriting, comparing it to known samples of the Zodiac's own script, looking for a clue that finally will break the case.

But for 27 years, the result has always been the same: no match.

Cunningham, 67, began investigating the Zodiac while a San Francisco police officer and has continued on the case as a private consultant. He insists he feels no frustration when he sits down to examine the latest purported Zodiac document, knowing it is likely to turn out to be junk.

Nor, he says, is he daunted by the avalanche of new Zodiac suspects -- "friends, neighbors, relatives, ex-spouses, whoever people want to pin the Zodiac murders on," as he describes them -- likely to be generated by the new "Zodiac" movie.

"Who knows?" he said Thursday in a phone interview from his home near Palm Springs. "Maybe one of them is right."

Cunningham became a police officer in 1963. On the night of Oct. 11, 1969, while working a plainclothes assignment, he was among dozens of officers who flooded the Presidio after the shooting of cab driver Paul Stine -- the last of the Zodiac's verified kills.

In 1980, after training with the U.S. Secret Service, Cunningham became the department's first forensic document examiner. Before then, police had relied on the state crime lab to analyze documentary evidence.

While an officer, and since he retired in 1991, Cunningham has worked on hundreds of legal cases. For Colorado authorities, he examined the ransom letter in the JonBenet Ramsey case. He

EXHIBIT **5**    PAGE **103**

Exhibit **2** Page **6**

reconstructed notes that mass killers Leonard Lake and Charles Ng forced their victims to write in the 1980s sex-slave murder ring in Calaveras County.

Nothing in his career has been quite like Zodiac. Cunningham plunged into the case immediately after finishing his forensic training. In those days, police received as many as 30 purported Zodiac documents per week.

"All over the world, people were mesmerized by the Zodiac mystery," he says, "and everyone's relative or ex-friend became a suspect."

Cunningham spent long hours with what he calls the case's "Rosetta Stone" -- the letter received by The Chronicle two days after the Stine killing in 1969. Because it contains a bloodstained piece of the victim's shirt, it's the only Zodiac letter that undeniably came from the killer.

Over the years, Cunningham says he memorized Zodiac's handwriting, including the uniqueness of its letter forms. The killer crossed his "t" low on the vertical stroke, Cunningham notes, and formed a distinctive "saddle" between the legs of his lowercase "m." He usually left generous spacing between lines, Cunningham says.

Copycat Zodiac missives often can be easy to spot, he says. A tip-off to copied or disguised handwriting is a lack of "fluency," he says.

"There's a rhythm in writing," he says -- when people jot notes or sign documents, they write quickly and confidently. "But if someone tries to copy or disguise their handwriting, it's no longer spontaneous," he says, and an expert can see signs of the effort in the script.

Soon after he retired, Cunningham says he was brought back into the Zodiac case by the Vallejo police, who were taking a new run at solving the crime. Their suspect was Arthur Leigh Allen, a retired schoolteacher, former mental patient and convicted child molester who had been singled out by Zodiac investigators in the 1970s but was cleared after he passed a lie detector test. Allen, who died in 1992, is still the favorite Zodiac suspect of some experts on the case, including Robert Graysmith, the former Chronicle editorial cartoonist who wrote the book on which the movie was based.

In 1991, police raided Allen's home in Vallejo and seized a trove of potential evidence, including a box of handwritten letters that spanned 25 years. Cunningham spent days examining them.

"I went through every piece of his known writing and compared it, and I couldn't find any evidence to link him to the Zodiac writings," Cunningham says.

But police didn't give up on Allen. They theorized that Allen had committed the Zodiac killings with an accomplice and that the accomplice had written the Zodiac letters. Cunningham says he thought

EXHIBIT 104

Exhibit 2 Page 7

the theory was promising. When police seized specimens of the suspected accomplice's handwriting, Cunningham believed a break in the case had finally come.

"My heart was going pitter-pat," he says. Then he sat down with the documents.

"We really thought Arthur Leigh Allen did the killings and this guy did the writing," Cunningham says. "I was never so let down -- it just wasn't the guy."

The most recent Zodiac-style document that Cunningham has examined came to him via The Chronicle's photo archive.

In an envelope of old news photos of the Zodiac case, editorial assistant Daniel King found a Christmas card addressed to The Chronicle and postmarked 1990. The handwriting resembled the Zodiac's, and the card itself was similar to one the killer is thought to have sent to the newspaper during his killing spree.

No one at the newspaper today remembers receiving the Christmas card or how it came to be put in the Zodiac photo file. The Chronicle gave the card and envelope last week to Vallejo police, the lead agency on the Zodiac murders, and provided Cunningham with scans of the documents.

Cunningham pointed out several similarities between the writing on the envelope and the Zodiac's script but noted discrepancies as well. More important, he says, the writing looked like it had been done slowly and carefully and in places appeared to have been overwritten.

"The big problem you have here is, why would a person overwrite all of these letters?" he says. "The Zodiac never did that in any of his writings." The overwriting led him to suspect that the writer was copying or tracing the script from another document.

"I could never conclude that this is the writing of the Zodiac," he says. "It tends to lean the other way -- I have the impression that someone tried to imitate the Zodiac's handwriting."

*E-mail Lance Williams at lwilliams@sfchronicle.com.*

http://sfgate.com/cgi-bin/article.cgi?f=/c/a/2007/03/03/MNG37OETI71.DTL

This article appeared on page **A - 1** of the San Francisco Chronicle

EXHIBIT __**6**__

PAGE ___**105**___

Exhibit *2* Page *8*

1  either me or my client. I certainly understand the critical nature of each of Mr.
2  Bryant's original documents and will be fully accountable for them while they are in
3  my custody.

4         7.    All the Bryant documents that are provided for examination and
5  testing shall be returned by me in the same condition, sequence and order in which
6  they were received.

7        I declare under penalty of perjury under the laws of the State of
8  California and the United States of America that the foregoing is true and correct.

9        Executed this 27th day of August, 2007, at Alamo, California.

10

11  DATED: August 27. 2007

12

13

14                  Lloyd W. Cunningham

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 6
PAGE 106

LLOYD CUNNINGHAM
FORENSIC DOCUMENT EXAMINER
67 OAK MEADOW COURT
ALAMO, CA 94507

54G017/2543

28 AUG 2007 PM 8 T

OAKLAND CA 946

Diane Hutnyan, Esquire
Quinn, Emanuel, et al.
865 So. Figueroa St., 10th Fl.
Los Angeles, Ca. 90017-2543

EXHIBIT 6
PAGE 107

EXHIBIT 7

1    Lloyd W. Cunningham

2            VIDEO OPERATOR:  Good morning.  We are now

3    on the record.  The date today is March 31st, 2008.

4    The time is approximately 9:59 a.m.  My name is

5    David West with Veritext of Los Angeles, California.

6            We're providing video services today at

7    Skadden, Arps, 300 South Grand Avenue, 32nd Floor,

8    Los Angeles, California.

9            This is the recorded testimony of Lloyd W.

10   Cunningham in the matter of Carter Bryant versus

11   Mattel, Inc. and consolidated.  It is in United

12   States District Court, Central District of

13   California, Eastern Division, the case number CV 04

14   0949 SGL.

15           Counsel will now introduce themselves for

16   the record.

17           MR. SLOAN:  Matthew Sloan for -- from

18   Skadden, Arps, Slate, Meagher & Flom on behalf of

19   MGA Entertainment.

20           MS. HUTNYAN:  Diane Hutnyan of Quinn,

21   Emanuel, Urquhart, Oliver & Hedges for Mattel.

22           VIDEO OPERATOR:  Thank you.  Miss Court

23   Reporter, would you please swear in the witness and

24   we will begin.

25   BY MR. SLOAN:

EXHIBIT __7__

1       A.    It would be very difficult.  I would say

2   including travel and my deposition -- and I'm not

3   sure who pays for the depositions in this matter,

4   whether it's my counsel or opposing counsel -- so I

5   wouldn't know if I'm supposed to bill my counsel for

6   the deposition or not so I don't know if that would

7   be included.

8       Q.    Let me -- let's say this.  Up to the time of

9   the deposition this morning which started

10  approximately 9:58 a.m., how much time did you spend

11  and will you likely bill to Quinn Emanuel in

12  connection with this case?  I understand it's an

13  estimate, sir.  Can you give me a ballpark?

14      A.    Maybe ten more hours.

15      Q.    And you indicated that you also reviewed

16  Mr. Robert Kullman's report, correct?

17      A.    Yes.

18      Q.    And approximately how much time did you

19  spend reviewing Robert Kullman's report?

20      A.    At least 45 minutes, maybe more time.

21            MR. SLOAN:  Can we take a break now.

22            VIDEO OPERATOR:  Let's go off the record at

23  11:05.

24                     (Brief recess.)

25            VIDEO OPERATOR:  The time is 11:12 and we

EXHIBIT ___1___

PAGE ___109___

1    are back on the record.

2    BY MR. SLOAN:

3        Q.    Mr. Cunningham, I wanted to ask you about

4    some of the methods you employed in connection with

5    your examination.  The first one I want to ask you

6    about is the indentation materializer.  Can you

7    briefly explain what that device is and how it's

8    used.

9        A.    Yes.    The indentation materializer is a

10   prototype of the electrostatic detection apparatus.

11   The electrostatic detection apparatus was invented

12   and marketed by a firm in London, England by the

13   name of Foster and Freeman.  A Swedish firm -- and I

14   don't remember the name of the Swedish firm --

15   subsequently produced an instrument similar to the

16   electrostatic detection apparatus and they call it

17   the indentation materializer.  They both perform the

18   same type of testing.  The process is that it's an

19   electrostatic process similar to the electrostatic

20   process found in copiers and the elements of the

21   instrument include a Corona wire which emits an

22   electrostatic charge.  Another component is imaging

23   film which is very similar in appearance to Saran

24   wrap.  And another element is dry toner which is

25   applied to the imaging film.  Another element are

EXHIBIT 7

1   adhesive sealants to seal and preserve the

2   visualized indentations in the paper fiber.  The

3   document on both type instruments, the EDSA and the

4   indentation materializer, is placed upon a platen

5   that has numerous holes or pores on the -- in it and

6   that's hooked up to a suction pump per se.  When

7   this is turned on, this causes the document to in a

8   sense be sucked down onto the platen.  Then the

9   imaging film is pulled over the subject document to

10  be examined.  The imaging film is then cut and then

11  the imaging film and the document are

12  electrostatically charged with the Corona wire and I

13  have to step back.  Prior to the document being

14  placed onto the platen and covered with the imaging

15  film generally it is humidified in a humidity

16  chamber.

17       Q.   Mr. Cunningham, I'm going to actually break

18  one of my own cardinal rules because you've given a

19  very explicit and comprehensive explanation but

20  perhaps more comprehensive than I need.

21       A.   Oh.

22       Q.   Let me ask you this.  The purpose of the

23  indentation materializer, can you briefly explain

24  what it is and how it accomplishes that purpose.

25       A.   Yes.  Its purpose is to visualize

EXHIBIT __7__

PAGE __111__

1   indentations in the paper fiber that are generally

2   not observable to the unaided eye.  Sometimes these

3   indentations are observable to the unaided -- well,

4   to the eye with other means such as magnification

5   and oblique or side lighting.  This instrument will

6   visualize those indentations in the paper fiber and

7   the visualized indentations are then sealed for

8   permanent record.

9        Q.   And are they sealed on the film that you've

10   spoken about?

11       A.   Yes, the imaging film on top of the imaging

12   film dry toner is applied which if indentations in

13   the paper fiber exist generally they are developed

14   with the dry toner.  What's they're visualized, then

15   there is a clear sealant and that is placed over the

16   visualized indented writing and it's a permanent

17   record at that point.

18       Q.   And are the -- any indentations that are

19   made in the question document, are those reflected

20   as usually black or dark lines on the indentation

21   materializer film?

22       A.   Yes.  They vary in shades, anything from

23   extremely dark to very, very faint.

24       Q.   What other methods besides the indentation

25   materializer did you employ in connection with your

EXHIBIT ____7____

PAGE ____112____

1    examination of the documents at issue in this case?

2         A.    I scanned many of the documents with oblique

3    lighting to determine if there were visible

4    indentations in the paper fiber which in return

5    would prompt me to evaluate whether the document

6    should be further tested with the indentation

7    materialize error not.  I examined the documents

8    with, once again, side lighting or oblique lighting

9    to determine if there was any disturbance of the

10   paper fiber.  If that was so noted, I would then

11   attempt to evaluate the cause of the disturbance of

12   the paper fiber.  I examined the documents with

13   oblique lighting once again to determine if any

14   erasures had occurred or if there was evidence that

15   erasures had occurred by disturbing the paper fiber.

16   I examined the documents with reflected infrared,

17   infrared luminescence, ultraviolet and I should add

18   some of the documents I examined with these

19   methodologies, not all.  I examined the documents --

20   some of the documents with a dichroic -- that's

21   d-i-c-h-r-o-i-c -- filter.  That would be

22   examination of the ink.  I examined handwritten

23   information such as the date 1998 and such as the

24   crowded entry in the notary journal.

25        Q.    Did you examine in this case with a

EXHIBIT ___1___

1    microscope?

2         A.    Oh, yes, various documents were examined

3    under high magnification with a stereoscopic

4    microscope.   Some of the documents were examined

5    with hand-held magnifiers.

6         Q.    And did you feel that you had a sufficient

7    amount of time to perform your examination of all of

8    the documents that you received in connection with

9    this case?

10        A.    Well, that depends on the type of

11   examination.   The majority of my examination was

12   based on somewhat of a cursory examination.   A

13   cursory examination versus a detailed examination

14   are two completely different things.   Would I have

15   enough time to examine all documents as a detailed

16   examination?   No.   Did I have enough time to examine

17   the documents for a cursory examination?   Yes.

18        Q.    In connection with the specific documents

19   which you discuss in your expert report, did you

20   have sufficient time in your professional opinion to

21   examine those?

22        A.    Yes.

23        Q.    Let me ask you some questions about -- about

24   Exhibits 179 -- I'm sorry, not exhibits, but Bryant

25   179, 180, 181 and 182.   You refer to these on the

EXHIBIT __7__

1    bottom of page 2 of your report.  And in that
2    portion of the report you specifically say that 179,
3    180, 181 and Exhibit paper characteristics that are
4    similar to the paper characteristics in the Q4
5    spiral notebook Z.  Can you explain what you meant
6    by that.

7         A.   Yes.  The color of the paper, the nature of
8    the lines, the nature of the spiral-ring tears are
9    very similar between 179, 180, 181 and 182 and then
10   very similar between those documents and the other
11   pages in the Q4 spiral notebook.  I couldn't find
12   any differences to lead me to a conclusion that 179,
13   180, 181 and 182 were from a different spiral
14   notebook.

15        Q.   Can you state or is it your opinion to a
16   certainty that, in fact, 179, 180, 181 and 182 come
17   from the same spiral notebook as Q4?

18        A.   Well, it's quite obvious in my report that I
19   used the word "similar" and if they were the same, I
20   would have said that they did come from that
21   notebook.  So obviously not.  They're just similar.

22             MS. HUTNYAN:  The exhibits in my copy are
23   all screwy so I don't know if yours are the same but
24   the tabs don't correspond to the documents.

25             MR. SLOAN:  The tabs are exactly as we

EXHIBIT ___1___

1    the other hand you were talking about one of these

2    multicolored drawings?

3         A.   Yes, a common model, yes.  Not from one

4    another per se but both from a common model.

5         Q.   Again, in those instances where you indicate

6    that they were superimposed from sufficient areas to

7    conclude that they were both from the same model,

8    are you saying -- were you in a position or are you

9    in a position today to make or render some

10   conclusion as to which of those two drawings came

11   first in those cases I he, whether it was X the

12   black and white drawing or the non-colored drawing

13   on the tracing paper or whether it was the

14   multicolored drawing?

15        A.   No.

16        Q.   You have no opinion on which one of those

17   drawings came first.  Is that what you're saying?

18        A.   I have an opinion but it doesn't -- it's not

19   restricted to which one came first because in my

20   opinion it could be either way.

21        Q.   But with respect to some of the drawings

22   which you described as sort of bare-body drawings

23   which have no clothes on them -- correct?

24        A.   Correct.

25        Q.   -- is it your opinion that those drawings

EXHIBIT __7__

PAGE __116__

1    preceded drawings that had clothes on them?

2        A.    My testimony I clearly stated may have

3    preceded, may not have.  I don't know.

4        Q.    When you indicate in your report that

5    various of these documents are superimposed in

6    sufficient areas to conclude that they were both

7    from the same model, can you describe in general

8    what methods you used to determine that they were

9    actually superimposed in sufficient areas to make

10   that determination?

11       A.    Yes, I used transmitted lighting.  I place

12   one document on top of another and I attempted to

13   line up both images to determine what did and what

14   did not superimpose.

15       Q.    Did you do that on a light table?

16       A.    Yes.

17       Q.    Did you use any other devices such as a VSC

18   machine?

19       A.    No.

20       Q.    Do you have a VSC machine?

21       A.    No.

22       Q.    What is a VSC machine?

23       A.    Video spectral comparator and there are

24   different models.

25       Q.    Are you trained in the use of video spectral

EXHIBIT _____ 7

PAGE _____ 117

1  comparative?

2      A.    A VSC IV I'm trained in but not the VSC 2000

3  or the newer models and I don't remember what the

4  nomenclature and number of them are.

5      Q.    Do you think that it would have been useful

6  for you to have used a VSC in connection with this

7  examination?

8          MS. HUTNYAN:  Vague.

9          THE WITNESS:  In order to do a accurate

10 superimposition of figures or handwriting, as long

11 as the subject document and and the document to use

12 as a comparison for superimposition are both

13 reduced, enlarged or they remain at the same size

14 such as one to one, all I feel that is necessary is

15 a transparency or a light table in order to do such

16 a comparison, a transparency if you wanted to record

17 that information, a transparency and a photocopier

18 could easily capture that image as a permanent

19 record, but to say that the use of a VSC 2000 is a

20 necessity to use such old methodology which has been

21 very successful would be in my estimation an

22 overkill.  It's not that you shouldn't use a VSC

23 2000 but a VSC 2000 isn't the only methodology or

24 instrument that can provide accurate details as to

25 whether two images superimpose or not.

EXHIBIT ____7____

1      Q.    Did you look at these documents

2   microscopically?

3      A.    I don't know which ones that I examined

4   microscopically.  I do have notes, however, given a

5   brief summary of my examination on each document

6   that I examined.

7      Q.    When you examined them, did you attempt to

8   determine the speed with which the different

9   documents were made?

10     A.    I didn't attempt to determine it but I

11  certainly saw it.

12     Q.    Now, you also examined the multicolored

13  drawings, correct?

14     A.    Yes.

15     Q.    And you're familiar with those?

16     A.    Yes.

17     Q.    And can you describe in general from your

18  examination how those were drawn?

19         MS. HUTNYAN:  Objection:  vague and calls

20  for speculation.

21  BY MR. SLOAN:

22     Q.    Let me be more specific.  Were those

23  generally also done with pencil -- with a graphite

24  pencil and then ink was put on top of them?

25         MS. HUTNYAN:  Which drawings?  I don't like

EXHIBIT ____1____

PAGE ____119____

1  this question.

2  BY MR. SLOAN:

3       Q.   I'm talking about the multicolored drawings.

4  Are you familiar with the ones I'm talking about?

5       A.   Yes.

6       Q.   You're comfortable with what I'm describing

7  as the multicolored drawings?

8       A.   Could I add one more thing?  You mean on the

9  poster board?

10      Q.   On the poster board, right.

11      A.   Yes, I am.

12      Q.   Is it fair to say that those were generally

13  done with both pencil and ink?

14      A.   Well, in addition colorant as well.

15      Q.   Correct, but pencil, ink and colorant?

16      A.   I did see remnants of graphite which would

17  be the pencil on some of them and I did see what

18  appeared to be an ink outline and obviously I did

19  see the colorant.  So to answer your question I'd

20  say at least some of them have those three

21  components.

22      Q.   Let me ask you some questions about your

23  comments on Bryant 196, 198, 201, 204, 208 and 213

24  which appear on page 14 of your report, and I'm

25  referring to the third paragraph of page 4.

EXHIBIT 7

1           MS. HUTNYAN:  14?

2           MR. SLOAN:  Page 4.

3           THE WITNESS:  Okay, could you repeat that

4   again, sir?

5      Q.   Sure.  I was just directing you to this

6   portion of your report and you indicate here that

7   your examination of Bryant 201, 204, 208 and 213

8   reveal that they may be the product of two different

9   models which are 196 and 198.  Do you see that?

10     A.   I do.

11          MR. SLOAN:  I believe we're running out of

12  tape so why don't we stop here and change the tape.

13          VIDEO OPERATOR:  11:56 off the record.

14                    (Brief recess.)

15          VIDEO OPERATOR:  The time is 12:01 p.m.  We

16  are back on the record.  This is tape No. 2 of the

17  deposition of Lloyd W. Cunningham.  All parties may

18  continue.

19  BY MR. SLOAN:

20     Q.   Mr. Cunningham, you indicate on page 4 that

21  your examination of Bryant 201, 204, 208 and 213

22  revealed that they may be the product of two

23  different models which are Bryant 196 and 198.  Can

24  you explain to me what you mean by that and what the

25  basis of your opinion is?

EXHIBIT ___1___

PAGE ___121___

1   curvature part there's no doubt that it's pretty --

2   pretty wobbly.  Not tremulous but pretty wobbly and

3   slow.

4        Q.    Now, when you say "the right side," are you

5   talking about the observer's right or the model's

6   right?

7        A.    As I'm facing the document and looking at

8   the document, it would be to the right.

9        Q.    The top of the hairline?

10       A.    Yes, I'll point it out to you.

11       Q.    The top line?

12       A.    Yes, the top line.  And that's just one.

13   That doesn't mean there aren't others.  I'm just

14   focused in on that to give an example.

15       Q.    Is Bryant 199, is that a drawing in ink or

16   pencil or is it ink on top of pencil?

17       A.    I see some fragments of what appear to be

18   graphite in a portion of the shoe.  At least with

19   the unaided eye it appears to be that way,

20   magnification and a lighting source.  There may be X

21   some fragments of graphite around one of the

22   thumbs -- on both thumbs actually but I can't be

23   sure without sufficient lighting and magnification.

24   And the media used to do the bold outline certainly

25   could be pen but I haven't evaluated that at all.

EXHIBIT ___**7**___

1  And when I refer to certain things as pen/ink, I'm

2  referring to in my report that it certainly appears

3  to be pen.

4      Q.   The outline that you see appears to be pen?

5      A.   Yes.

6      Q.   But what I'm asking is is there pencil under

7  it?  You've indicated in some places there is.

8      A.   Yeah, and I can't tell you if there's pencil

9  under the incline just from a visual examination

10  with no, for example, reflected infrared technology.

11      Q.   Did you perform any tests using infrared

12  technology when you examined 199?

13      A.   I don't recall.

14      Q.   Do you think it would -- would it be

15  significant if there's pencil lines underneath those

16  pen lines?

17      A.   I guess it could be significant for a

18  certain purpose if I was advised of the certain

19  purpose during my initial examination, but my

20  initial examination, once again, was a cursory

21  examination with no specific purpose to determine

22  whether pencil was under the ink line.

23      Q.   Well, to the extent -- to the extent that

24  you can see pencil lines, can you tell whether the

25  pencil lines are rapidly made or are slower?

EXHIBIT _____ 1 _____

1    A.    They're too brief for me to reach that

2    determination if, in fact, they are pencil lines.    I

3    couldn't tell you just from looking at them, no.

4        Q.    Could any slowness that you observed in the

5    ink lines be a result of the artist essentially

6    tracing over pencil lines that he had already put

7    down on the document?

8        A.    That's a possibility as well.

9        Q.    Did you do any ESDA testing or indentation

10   testing on 199?

11       A.    I don't know, I'd have to go through all my

12   ESDA lifts.

13       Q.    Well, your report at page 6 does not

14   indicate that you performed any indentation testing.

15   Am I correct about that?

16       A.    That's correct.

17       Q.    And is it a fair assumption from that that

18   you didn't perform any indentation testing or not?

19       A.    It's a fair assumption.

20       Q.    If you had noted something that was indented

21   in it, you would have noted it?

22           MS. HUTNYAN:    Calls for speculation.

23           THE WITNESS:    It depends on the significance

24   of it to my client.    In other words, I have numerous

25   ESDA lifts where indentations are developed but not

EXHIBIT    7

1    noted in my report.

2    BY MR. SLOAN:

3        Q.    Did you -- let me ask you this.   If a

4    tracing were made with tracing paper over one of the

5    poster boards with coloring, would you expect that

6    some colorant would be left on the back of the

7    tracing paper?

8        A.    That's a pretty broad question.   I'll answer

9    it the best I can for you.   No. 1, it depends on the

10   media used as a colorant, how fixed it can become.

11   Is it subject to being easily transferred?   Or if

12   something like Krylon protective coating was sprayed

13   on it which many artists do.   In fact, I do that

14   with a lot of my artwork.   So there are a lot of

15   variables here on if, No. 1, the colorant could be

16   transferred.   No. 2, if it's been coated.   And so I

17   don't know, sir.

18       Q.    The colorant that was used on, say, for

19   instance, Bryant 220, do you know what type of

20   coloring material was used on that?

21       A.    No.

22       Q.    Did you make any effort to determine what

23   coloring material was used?

24       A.    No.

25       Q.    Did you ever -- did you observe any transfer

EXHIBIT __7__

PAGE __125__

1       A.    Could have been, yes.

2       Q.    And what's your basis for concluding that?

3       A.    As I just previously testified to,

4    specifically concentrating on the back heel of the

5    second shoe, that line is pretty slow and that line

6    is quite parallel to the ink line of the back heel

7    of that shoe.   That's not conclusive evidence that

8    it's a tracing but it impresses me that it could be

9    a feature or characteristic of tracing.   As I

10   mentioned in my report, a possible that's a line so

11   it's not conclusive.

12      Q.    I want to ask you some questions about

13   Bryant 206 and Bryant 224 now.   You indicate that

14   the tracing paper image on 206 and the final colored

15   image on 224 were superimposed in sufficient areas

16   to conclude that they were both from the same model,

17   correct?

18      A.    Yes.

19      Q.    And, again, that's by virtue of you

20   superimposing them on a light table?

21      A.    Yes.

22      Q.    Did you look at them through a microscope?

23      A.    I believe so.

24      Q.    Did you use infrared light?

25      A.    I did use infrared and infrared luminescence

7

1   on the poster board drawings to determine if there

2   was a pencil line under some of the bold outline

3   which it appeared that there were pencil strokes

4   under some of the bold lines. One of the main

5   purposes that I used infrared luminescence, however,

6   was to determine if any chemical erasures had been

7   made on the paper fiber and I also used ultraviolet

8   radiation for the same purpose.

9        Q.   Why were you concerned to see whether you

10  found any evidence of chemical erasures on the

11  document?

12       A.   Because at times people who have written the

13  date or a notation on paper don't want anyone else

14  to see it especially if a lawsuit is filed or say

15  criminal charges are filed against someone so

16  they'll make every effort to erase or redact that

17  information and quite often they do a pretty good

18  job by using chemicals rather than abrasive measure

19  such as a physical erasure.

20       Q.   So was one of your principle tasks in

21  performing your examination of these documents to

22  see whether anyone had erased any dates from the

23  documents?

24       A.   Erased anything.  Not just dates, anything,

25  which includes dates and that's listed clearly in

EXHIBIT ___1___

PAGE ___127___

1    the purpose of my examination in my Rule 26 report.

2        Q.    Did you find any faint or partially obscured

3    pencil lines, graphite pencil lines, in Bryant 224?

4        A.    I don't have my notes to refer to it but I

5    could certainly look for you if you like.

6        Q.    Yes, please do so.

7        A.    Yes, in the area of the hair there are some

8    faint what appear to be graphite or pencil markings.

9        Q.    Where in the hair?

10       A.    On the -- as I face and look at the doll, on

11   the left side of the doll's hair just before it

12   descends down into the long stroke that's near her

13   eyebrow.

14       Q.    Again, I'm sorry, you're talking about the

15   doll's left or your left?

16       A.    As I mentioned -- as I just testified, as I

17   face the doll or look at the doll, it's on its left

18   side.

19       Q.    I'm sorry, on your left side or the doll's

20   left side?

21       A.    The doll's left side.

22       Q.    Okay, the doll's left side.  Which is your

23   right side?

24       A.    No, the doll's left side as I face it is the

25   doll's left side and it's my left side as well.

EXHIBIT 7

1      Q.    You said though that if the pencil line on

2   the colored drawing 224 superimposed with one of the

3   ink lines on Bryant 206 that that might be

4   significant in making a determination in terms of

5   which drawing came first; is that correct?

6      A.    Possibly.  I don't know.  I haven't

7   conducted that examination and I haven't really had

8   time to evaluate it.

9      Q.    I understand, sir, but I'm posing a

10  hypothetical.  If, in fact, the facts were as I've

11  stated they are, assume that they're one of the

12  pencil lines on the colored drawing, Bryant 224,

13  superimposed exactly with an ink line on Bryant 206.

14  You would agree that that is something that might be

15  significant in being able to determine which drawing

16  came first.  In other words, if one drawing was a

17  tracing of another drawing, correct?

18             MS. HUTNYAN:  Calls for speculation.

19             THE WITNESS:  It is speculation because I

20  haven't conducted such an exam but, yeah, it might

21  be significant.

22  BY MR. SLOAN:

23      Q.    How might it be significant?

24             MS. HUTNYAN:  Same objection.

25             THE WITNESS:  Well actually it could work

EXHIBIT __7__

1    either way.  If you had an, ink line on one document
2    and you used that to trace another document with a
3    pencil, then one line would end up being pencil and
4    one would end up ink and vice versa.  If you had a
5    pencil line on one document and an ink line that
6    super imposes with it on another document, I -- at
7    this point unless I really thought about it I can't
8    see the significance of it because it could work
9    both ways.
10   BY MR. SLOAN:
11       Q.   As you look at Bryant 206, do you agree that
12   that is a -- that that's a pen image but it's pen
13   written over graphite?
14       A.   Yes, it certainly appears to be a pen ink
15   line and there certainly is what appears to be
16   graphite lines intermingled with the pen lines.
17       Q.   Can you tell whether the pen lines are over
18   the pencil lines?
19       A.   No.
20       Q.   If you looked at it microscopically or with
21   some other method of observation, would you be able
22   to possibly determine whether the ink was over the
23   pencil?
24            MS. HUTNYAN:  Calls for speculation.
25            THE WITNESS:  Possibly.

EXHIBIT 7

PAGE 130

1   BY MR. SLOAN:

2       Q.   If you looked at it with a microscope, could

3   you possibly determine that?

4           MS. HUTNYAN:   Same objection.

5           THE WITNESS:   Possibly.   This is all

6   speculation on my part.   I would have to do a

7   detailed examination and utilize all that

8   instrumentation in order to determine if it was

9   doable or not.

10  BY MR. SLOAN:

11      Q.   Did you make any observation of those

12  drawings with microscope to determine whether the

13  ink was over the pencil?

14      A.   No.

15      Q.   Did you make any observations with infrared

16  luminescence to determine whether the ink was over

17  the pencil?

18      A.   No.

19      Q.   Did you make any observations with any other

20  method to determine whether the ink was over the

21  pencil?

22      A.   No.

23      Q.   You also indicate that the details like the

24  shoe lace he is on Bryant 224 were finished although

25  they had not been completed on the tracing paper.

EXHIBIT __7__

PAGE __131__

1    Is that correct?

2         A.    Yes.

3         Q.    Does that suggest to you that the colored

4    image on 224 was a -- a final image that was

5    intended to be complete?

6              MS. HUTNYAN:   Vague, calls for speculation.

7              THE WITNESS:   I don't understand that.

8    Complete compared to what?

9    BY MR. HANSEN:

10        Q.    Okay.  What is the significance of the fact

11   that the shoe laces on Bryant 224 were colored

12   whereas the -- I'm sorry, what is the significance

13   that the shoe laces on Bryant 224 were finished

14   whereas they weren't completed on Bryant 206?

15   What's the significance of that to you?

16        A.    It's just the observation that I made.  It's

17   just a very clear observation that really has no

18   significance.

19        Q.    There's no reason you made that observation?

20        A.    Yeah, I made the observation because one had

21   shoe laces and one didn't have shoe laces.

22        Q.    Did you make any attempt to determine the

23   source of the stray pencil lines on Bryant 224?

24        A.    That question I really don't understand.

25        Q.    Okay.  Is it possible that the pencil lines

EXHIBIT __7__

1    could have been traced from?

2        A.    No.

3        Q.    And why -- why did you specifically say they

4    could have been tracing outlines from another

5    document?

6        A.    Let's see, 232, 225.  I said in my report

7    that they could have been tracing lines.  That

8    doesn't mean that they are conclusively tracing

9    lines.  It could have also been sketching lines.

10       Q.    But why did you say that they could be

11   tracing lines?

12       A.    Because they follow the contour of some of

13   the clothing that the hair lines quite closely.

14       Q.    And you're talking about the hairline in the

15   contours of the clothing on 225?

16       A.    Yes.

17       Q.    Did you make any attempts to determine

18   whether any of the pencil lines from 225 match the

19   ink lines from Bryant 232?

20       A.    There aren't ink lines that I could see on

21   232.

22       Q.    Is 232 all in graphite?

23       A.    I don't know.  The stem of the bouquet or

24   one of the stems of the bouquet -- and this is just

25   examination with a hand-held magnifier under poor

EXHIBIT __7__

1  lighting conditions, that may be -- that may be ink

2  and it appears that the rest of the image was

3  prepared with graphite.

4      Q.  Can you tell me whether the -- any of the

5  ink lines on -- I'm sorry, whether any of the pencil

6  lines on Bryant 225 which you testified earlier

7  match the drawing from 232?  In other words, whether

8  they superimpose?

9      A.  Yes, as stated in my report they superimpose

10  in sufficient areas to conclude that they are from a

11  common model.

12      Q.  Oh, I understand that.  I'm saying

13  specifically the pencil lines on 225, whether the

14  pencil lines on 225 superimpose with the lines on

15  232.  Can you tell me that?

16      A.  No, I haven't conducted that examination.

17      Q.  Can you look now and tell me whether that's,

18  in fact, the case?

19      A.  I wouldn't want to do an off-hand exam like

20  that.  I'd rather do a real detailed examination of

21  something of that nature to superimpose and make any

22  definitive conclusions.

23      Q.  Why can't you do that right now?

24      A.  Because you're asking me to give a

25  definitive conclusion and I don't really do off-hand

EXHIBIT ___7___

PAGE ___134___

1    examinations to determine something definitively.  I

2    don't have any problem with being asked is this

3    pencil or is this ink, I have no problem being asked

4    do you see any pencil lines, but to do an evaluation

5    and comparison is completely different than just

6    making observations.

7         Q.   So even if you superimpose the two images on

8    top of one another you wouldn't be in a position to

9    make that comparison?

10        A.   Not at this point.  I wouldn't venture into

11   it at this point.

12        Q.   I'm going to hand you Bryant 226 and 204 and

13   why don't you take a look at those.

14        A.   Okay, I've looked at them, sir.

15        Q.   Okay.  You indicate here that there are

16   pencil strokes present that could have been for

17   either a rough sketch or tracing outlines from

18   another document on Bryant 226.  Correct?

19        A.   That's correct.

20        Q.   Can you indicate where those pencil tracings

21   are?

22             MS. HUTNYAN:  On 226?

23             THE WITNESS:  You're just using the term

24   "pencil tracings."  /KWEUGS mentioned in my report

25   pencil tracing or sketches.

EXHIBIT __7__

PAGE __135__

1    Q.    Why don't we mention strokes.  Where are

2  those pencil strokes on the colored drawing 226?

3    A.    There's some extraneous strokes adjacent to

4  the -- as I face and looking at the image, that

5  would be on the dolls right side where the hand

6  is -- some extraneous it appears to be graphite

7  strokes in that area that are not related to the

8  actual contour of the image.  There is a graphite

9  stroke -- what appears to be a graphite stroke

10 behind the cuff of the right leg as I look at the

11 image and also some graphite strokes at the bottom

12 of the sole of the shoe which would be the right

13 foot as I look at the image.  There appears to be

14 some graphite strokes also at the bottom of the sole

15 of the left foot as I look at the image and at the

16 bottom of the left hem in the dress as I look at the

17 image.  At the wrist of the left arm as I face the

18 image -- that enough?

19    Q.    Yes.

20    A.    Oh, okay.

21    Q.    Let me ask you another thing.  Do you see

22 any pencil strokes near the triangular-shaped object

23 on the right side bottom of the vest?  Do you see

24 what I'm talking about?

25    A.    Triangular image.  I don't see anything that

EXHIBIT __7__

PAGE __136__

1    answer.  What I want to determine is if I had Bryant
2    213 -- if I could show you Bryant 213, which I have
3    somewhere back there, am I correct that you would
4    not be prepared to make an examination now to
5    determine whether or not the faint pencil lines that
6    you see on Bryant 227 reflect or superimpose with
7    lines on Bryant 213?

8        A.   Yes, I'm not prepared to conduct such an
9    examination or to give such -- or to make such an
10   evaluation at this time outside of laboratory
11   conditions.

12       Q.   I'm going to hand you Bryant 228 and Bryant
13   237.  Take a look at those.

14       A.   Yes, I've looked at these.

15       Q.   Again, you indicate in Bryant 228 that there
16   are light pencil strokes that could be from a rough
17   sketch or tracing outlines from another document.
18   Correct?

19       A.   Yes.

20       Q.   Can you indicate where some of those light
21   pencil lines are?

22       A.   Certainly.  It appears that there's a light
23   pencil line as I face the document on the longest
24   descending curl in her hair.

25       Q.   I'm sorry, is that on the right side?

EXHIBIT __7__

1    A.    Yeah, longest descending curl which is on
2    the right side.   There appears to be an area of
3    pencil line behind the calf or at the back of the
4    calf of her leg on the right side right leg as I'm
5    facing this image.   There appears to be a slight
6    graphite stroke as I face the image on the right
7    side of the dress at the very bottom of the hem.
8    And appears there's a little light -- very, very
9    light pencil stroke once again at the bottom of the
10   right side of the dress to the right edge that
11   extends out past the right edge forming a slight
12   loop.   Is that enough?
13   Q.    That's enough.
14   A.    Okay.
15   Q.    And when you made these initial
16   observations, did you just make them from observing
17   with a magnifying glass like you've just done or did
18   you use other methods?
19   A.    I probably used a fiberoptic sliding and
20   also a microscope at times.   Most of the time a
21   hand-held magnifier is sufficient if you have the
22   proper lighting to observe graphite strokes versus
23   ink strokes or coloring.
24   Q.    What is fiberoptic sliding?
25   A.    Fiberoptic sliding is a high intense

EXHIBIT __7__

PAGE __138__

1    lighting source that is in a flexible container or
2    tubing that you can point and aim the lighting in
3    any direction you see fit.  They're generally used
4    in microscope -- for microscopes to adjust the
5    lighting properly but we also use them for
6    examinations with oblique or side lighting and
7    sometimes for transmitted lighting as well.
8         Q.   Why was it significant enough for you to
9    note the presence of these pencil lines in your
10   report?
11        A.   Very simply, they're observations I made and
12   any observations such as the adhesive or fragments
13   of tape on the paper or indented lines on the paper
14   or pencil versus ink versus color I make a notation
15   of any observation.  That doesn't necessarily mean
16   that I have evaluated it and compared it with
17   anything but it is an observation.
18        Q.   Did you make any efforts to determine
19   whether these faint pencil lines superimposed with
20   either ink or pencil lines on the corresponding
21   outline drawing which is Bryant 237?
22             MS. HUTNYAN:  Comparing it with 228?
23             MR. SLOAN:  Comparing it with 228.
24             THE WITNESS:  Well, I certainly superimposed
25   the images.  Now, whether they're -- go ahead.

EXHIBIT __7__

PAGE __139__

1    Whether they're pencil or ink, there was

2    superimposition of the lines that were sufficient to

3    conclude that they were from a common model.  I

4    didn't at that point evaluate which was

5    superimposing on which.  For example, pencil on

6    pencil or ink on ink.

7    BY MR. SLOAN:

8        Q.   And why didn't you do that?

9             MS. HUTNYAN:  Asked and answered.

10   BY MR. SLOAN:

11       Q.   I'm asking with respect to these two

12   documents, Bryant 228 and 1237, is there a reason

13   you didn't try to determine whether the

14   superimposition was between the ink on 228 and the

15   graphite on 237 as opposed to the ink on 228 and the

16   ink on 237?

17       A.   At that point it had no bearing on my

18   examination.  At that point I was conducting a

19   cursory examination of the documents and making

20   observations.  There was no issue presented to me or

21   no assignment presented to me by my clients to

22   determine which came first, the tracing paper or the

23   image on the poster board.  Therefore, since no such

24   assignment was provided to me I didn't conduct such

25   an examination.  I just made my observations.

EXHIBIT ___7___

PAGE ___140___

1      Q.    Okay, I'm going to hand you what's labeled
2    Bryant 229.  Do you recall that document?

3      A.    Just a moment, sir.  Yes, I do.

4      Q.    And you indicate that there were pencil
5    strokes that you noted on Bryant 229 that could have
6    been either from a rough sketch or tracing outlines
7    from another document, correct?

8      A.    Correct.

9      Q.    And where -- where did you note those lines?

10     A.    Once again, I'll have to look for them now.
11   There's a slight little graphite marking in the
12   lower lobe of the ear it appears of the image.  It
13   appears there's a slight graphite marking at the top
14   of the hair in the image.  Right along the bottom of
15   the hem of the dress, the scalloped effect at the
16   bottom on the right side as I face the image,
17   there's areas of little loops of what appears to be
18   graphite.  At the bulb portion of the shoe which is
19   the left shoe as I face the image there's a line of
20   what appears to be graphite.  It appears that
21   there's some extraneous little deposits of graphite
22   not in line with any outline of the right shoe but
23   near the right shoe.  There is an area of graphite
24   lines on the buckle of the right shoe and at the top
25   of the little design above the strap of the right

EXHIBIT __7__

1             THE WITNESS:   When you use the term
2    "might," --
3         Q.   Might.
4         A.   -- yes, it might be doable.
5         Q.   You didn't attempt to do that; is that
6    correct?
7         A.   Of course not.  It wasn't part of my
8    assignment.
9         Q.   If you had performed that analysis and had
10   determined that it, in fact, was those horizontal
11   straps on 231 were done in pencil rather than ink,
12   would it be a safe assumption then to assume that
13   that indicated that those pencil lines were traced
14   from 201 onto 231?
15        A.   No, because it could be the opposite way
16   around.  If pencil lines of those two straps as you
17   call them were originally on 231 in pencil form and
18   then someone placed the tracing paper on top, then
19   the person tracing the pencil lines could have
20   traced the little straps as you've mentioned.  So it
21   could be done both ways.
22        Q.   Bryant 231, would you agree that it has
23   pencil and pen, correct?
24        A.   There's some areas of pencil and the bold
25   outline appears to have been done in pen and then

EXHIBIT 7

PAGE 142

1    there's a colorant.

2        Q.    So are you saying -- when you say the bold

3    outline, that means the final outline is one that's

4    done in pen on 231, correct?

5            MS. HUTNYAN:   Argumentative.

6            THE WITNESS:   It appears to be pen, yes.

7    BY MR. SLOAN:

8        Q.    And is that pen written over pencil?

9        A.    I don't know.

10       Q.    Because you didn't examine that, correct?

11       A.    I may have on some of them conducted a

12    cursory examination while I did the infrared

13    luminescence and ultraviolet to determine if there

14    are any erasures or disturbance of paper fiber,

15    et cetera, and I know I did look at some of them

16    because I could see with side lighting that there

17    was a groove in the middle of the ink lines at times

18    and I determined that the ink I believe -- I can't

19    say for certain -- but I think the ink dropped out.

20    That means it transmitted infrared radiation and the

21    pencil line absorbed the infrared radiation and I

22    was able to visualize and see the pencil line.   So

23    on some of them, yes, I'm pretty sure that the bold

24    outline was drawn over pencil and as in this case

25    sometimes the person fell out of the track when they

EXHIBIT __7__

PAGE __143__

1   were drawing over it.   That's why we're still able

2   to see some fragments of the graphite.

3       Q.   Can you explain why someone would draw 231

4   in pencil and then trace something from the pencil

5   rather than wait until they had completed the pen

6   drawing of 231 before tracing?

7           MS. HUTNYAN:   Calls for speculation.

8           THE WITNESS:   It's -- once again, it's

9   absolutely speculation because I have never

10   conducted such examinations but if you want, you

11   know, my feelings on the subject, I can say that --

12   or give a hypothetical that if this was to be the

13   final product of an artist and the artist was very

14   happy and satisfied with the final product, the

15   artist could simply say to himself or herself, you

16   know, I'm going to capture that image because I may

17   want to use it again from a tracing paper.   So I'm

18   going to trace it now and I will keep this in my

19   files in case I want to use it again later.   And

20   then continue on to do the bold outline and the

21   colorant.   The artist -- another hypothetical -- may

22   have said to himself or herself, whoever, you know,

23   would do it because I'm not pertaining to this

24   particular case that once the colorant is done I

25   don't want to damage anything so I better do the

EXHIBIT 7

PAGE 144

1    tracing before I add the color.  These are just

2    hypotheticals and as I start out to say it's

3    speculation on my part because I never conducted

4    such an examination.

5    BY MR. SLOAN:

6        Q.    So it's fair to say that you -- you didn't

7    conduct an examination to determine whether the

8    pencil lines on 231 superimposed with the pen or the

9    pencil lines on 201.  In other words, did you make

10   any sort of determination as to whether the pencil

11   lines on 231 -- did they match the pencil lines on

12   201 or the pen lines in 201?  Did you make that

13   determination?

14           THE WITNESS:  No.

15           MS. HUTNYAN:  Vague and ambiguous.

16   BY MR. SLOAN:

17       Q.    I'm going to hand you Bryant 230.

18       A.    Would you like this back, sir?

19       Q.    Sure.  You indicate in your report that you

20   also saw slight pencil strokes that may be from a

21   rough sketch or tracing outlines from another

22   document on Bryant 230, correct?

23       A.    Yes, sir.

24       Q.    Can you indicate where some of those light

25   pencil lines are?

EXHIBIT __7__

EXHIBIT 8

1           IN THE UNITED STATES DISTRICT COURT

2        FOR THE CENTRAL DISTRICT OF CALIFORNIA

3                  EASTERN DIVISION

4                                          **Certified Copy**

5      ------------------------

6      CARTER BRYANT,              )

7      an individual,             )

8              Plaintiff,         )

9          vs.                    ) No. CV 04-09049 SGL (RNBx)

10     MATTEL, INC., a            )    Consolidated with

11     Delaware corporation,      )    CV 04-09059

12             Defendant.         )    CV 05-02727

13     ------------------------

14

15

16         Videotaped Deposition of WILLIAM J. FLYNN,

17         taken at Phoenix, Arizona commencing at 9:31 a.m.

18         March 27, 2008 before Robin L. B. Osterode,

19         RPR, CSR, Arizona, Certified Reporter No. 50695.

20

21

22

23

24

25     PAGE 1 - 252

                                                              1

EXHIBIT **8**

PAGE **146**

1            DEPOSITION OF WILLIAM J. FLYNN, commenced at
2     9:31 a.m. on March 27, 2008, at Phoenix, Arizona,
      before Robin L. B. Osterode, RPR, CSR, Arizona
3     Certified Reporter No. 50695.
4
                         * * *
5

      APPEARANCES:
6
7        For Plaintiff:
8            QUINN EMANUEL URQUHART
             OLIVER & HEDGES, LLP
9            By: Diane Cafferata Hutnyan
             865 South Figueroa Street, 10th Floor
10           Los Angeles, California  90017
             (213) 443-3666
11
         For Defendants:
12
             SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
13           By: Matthew E. Sloan
             300 South Grand Avenue
14           Los Angeles, California  90071-3144
             (213) 697-5000
15
         The Videographer:
16
             Kayla Camenzind
17
18
19
20
21
22
23
24
25
                                                    2

```
 1              Did you understand that your purpose in
 2    conducting this examination was to be both of those,
 3    i.e., to determine forensic evidence of the dating of
 4    the documents, as well as any evidence regarding the
 5    sequencing?
 6         A.   Yes.
 7         Q.   Did you get the understanding that what you
 8    were supposed to determine is the sequencing, from
 9    any source, other than communications with Quinn
10    Emanuel?
11              MS. HUTNYAN:  This is still running into
12    the same problem.  He's already testified he didn't
13    receive instructions from anybody other than us,
14    so --
15              MR. SLOAN:  Okay.
16              MS. HUTNYAN:  You know.
17    BY MR. SLOAN:
18         Q.   How did you -- were you given any
19    indication as to how long you would have to examine
20    these documents?
21         A.   Yes.
22         Q.   How long were you told you would have to
23    examine the documents?
24         A.   The documents would be in my lab for a
25    total of four days; however, within that four days
```
                                                          18

EXHIBIT **B**

PAGE **148**

1    would include the time it took to organize the

2    documents that were to be examined, the repackaging

3    of the documents to put them back in the boxes, the

4    sealing of the boxes, and all of the administrative

5    overhead and notetaking that I would have to do.  So

6    the reality is that I probably had just over three

7    workdays with these hundreds of documents.

8         Q.    Do you have a machine or are you familiar

9    with what's called a video spectro comparator?  Let

10   me rephrase that.  Are you familiar with a machine

11   called a VSC or a video spectro comparator?

12        A.    I am, and I own one.

13        Q.    Did you -- and you're trained in the use of

14   the VSC?

15        A.    I am.

16        Q.    Which type of VSC do you have, which

17   machine?

18        A.    It's called the 4C, as in Charles.

19        Q.    Did you perform any VSC testing on the

20   Carter Bryant documents?

21        A.    Yes.

22        Q.    You did?

23        A.    I did.

24        Q.    Do you have a record of which documents you

25   prepared testing on or you performed the VSC testing

                                                        19

EXHIBIT __**8**__

PAGE __**149**__

1    on?

2        A.    I know I can tell you specifically which

3    ones they were, they were the documents that had the

4    CPS codes.  I used the VSC to image the CPS codes on

5    the color copies.

6        Q.    Did you use the VSC machine on any other

7    documents besides those documents?

8        A.    I did not.

9        Q.    And to be clear, those were Bryant Exhibit

10   310 through 319 and Bryant Exhibit 214?

11       A.    Yes, exactly.

12           MS. HUTNYAN:  When you say "exhibit,"

13   Counsel, you mean Bates number?

14           MR. SLOAN:  That's correct.

15           MS. HUTNYAN:  Okay.

16           THE WITNESS:  There were -- actually,

17   that's not entirely accurate, there were other color

18   copies in this set that had CPS codes that were not

19   decodable, and I realized were not decodable, so the

20   answer is that there were many more documents than

21   just 210 and 310 through 319 that I examined in the

22   VSC.  It's just that I imaged the CPS bar codes on

23   214 and 310 through 319.

24   BY MR. SLOAN:

25       Q.    Did you perform any VSC testing on any of

                                                        20



EXHIBIT  8

PAGE  150

1    the documents which you have referred to in your

2    report as the mixed media or multicolor poster board

3    drawings?

4        A.    I did not.

5        Q.    Why not?

6        A.    There was -- again, there were severe time

7    constraints placed on these examinations.  The scope

8    of my examination was vast and I had to make some

9    decisions about an examination strategy that would

10    accomplish the most that I could accomplish in the

11    three days or so that I had with these documents.  So

12    I recorded my findings, but I had no opportunity in

13    that regard to make video captures or

14    photomicrographs.

15        Q.    By the way, do you have any notations of

16    the exact date on which you received the Carter

17    Bryant documents and the date on which you sent them

18    out?

19        A.    I don't have it with me, but that certainly

20    would be available in my computer system and I could

21    provide that to you if you would like.

22            MR. SLOAN:  Counsel, would you --

23            MS. HUTNYAN:  We'll give you the date if

24    you want.

25            MR. SLOAN:  Okay.

21

EXHIBIT 8

PAGE 151

```
 1        Q.    Do you know when you sent the documents
 2    off, who did you send them to at the end of this
 3    four-day period?
 4        A.    I believe that the next recipient down the
 5    chain was Mr. Aginsky.
 6        Q.    How many times have you been retained to
 7    testify as an expert in court proceedings?
 8        A.    Many, many hundreds, I don't have a number
 9    that I can give you.
10        Q.    Have you ever been offered as an expert and
11    had a situation where the court found you were not
12    qualified to testify as an expert?
13        A.    Never.
14        Q.    Never?
15        A.    Never.
16        Q.    Have you ever been criticized or has your
17    testimony ever been criticized by a court?
18        A.    Not that -- no, not that I'm aware of,
19    never.
20        Q.    Have you ever been retained by Mattel or
21    any of its subsidiaries or affiliates to act as
22    either a testifying expert or consultant?
23            MS. HUTNYAN:   Objection; it calls for
24    speculation, "affiliates," I don't know that I know
25    what that is, so I don't know how you would answer
```

                                                          22

EXHIBIT  8

PAGE  152

```
 1        Q.    And how about if we look at the next page,

 2   Bryant 180?

 3        A.    Yes.  That is also one of the -- what I

 4   considered to be one of Mr. Bryant's original pieces

 5   of artwork.

 6        Q.    And what are you basing that on that it's

 7   an original work of art?

 8        A.    I had the original document in my

 9   laboratory and examined it, so it is original pencil

10   and ink.

11        Q.    But would you agree that these documents

12   have both pencil lines and ink lines on it?

13        A.    Yes.

14             MS. HUTNYAN:  Objection.  Do you have the

15   originals?  We asked to have the originals provided.

16   These are photocopies and based on that -- he hasn't

17   seen these in months and I don't think it should be a

18   memory test of what media was used in a particular

19   document, that's why we asked for the originals,

20   so --

21             MR. SLOAN:  Thank you for your objection,

22   Diane.

23        Q.    Mr. Flynn, Exhibits 17 -- I'm sorry, Bryant

24   179 and 180, do you recall these documents?

25        A.    Yes.
```

                                                        53

```
 1        Q.    And if you look at Bryant 180, do you see,
 2   in fact, that there appear to be pencil lines or
 3   lighter lines --
 4        A.    I do.
 5        Q.    -- on that page as well?
 6        A.    I do.
 7        Q.    And you're referring to this as an original
 8   artwork, as opposed to something that's traced?
 9        A.    Yes.
10        Q.    And what is that conclusion based on?
11        A.    This is -- to me, this is typical of what
12   you see is an artist that is doing an under sketch.
13   The pencil being just a series of free flowing lines.
14   The other thing that can be determined when I looked
15   at this was that it was done very rapidly.  My
16   position is that almost by definition a tracing is
17   done much slower than a free flowing natural type of
18   movement, and these were very rapidly executed, in my
19   opinion.
20        Q.    How did you determine that -- what's the
21   basis for your conclusion that Bryant 179 and 180
22   were very rapidly drawn?
23        A.    I did a microscopic examination of these
24   documents and the strokes were very long.  They're
25   not a series of smaller shorter choppier strokes.
```

54

| 1  | There's very good what's called line quality, meaning |
|----|---|
| 2  | that when a hand slows down some of the -- some of |
| 3  | the tremor that's normally present in everyone's hand |
| 4  | begins to manifest. There was no evidence at all of |
| 5  | slowness in this document, in my opinion. |
| 6  | Q. Now, you indicated that there were also |
| 7  | documents that I think you referred to in your report |
| 8  | as tracings on tracing paper? |
| 9  | A. Yes. |
| 10 | Q. Okay. And those were generally done with |
| 11 | ink and pencil? |
| 12 | A. Yes. Yeah, I mean, to me these were the |
| 13 | ideal -- these were the ideal exemplars because the |
| 14 | questioned documents were ink and pencil or ink and |
| 15 | pen -- I'm sorry, were pencil and ink, and these |
| 16 | sketches were pencil and ink, so if Mr. Bryant had |
| 17 | created original artwork, then I would have expected |
| 18 | them to look like this. That was the hypothesis that |
| 19 | I was working under. |
| 20 | Q. And you would have expected the original |
| 21 | artwork to look like the drawings on Bryant 179 and |
| 22 | 180? |
| 23 | MS. HUTNYAN: Objection; vague. |
| 24 | THE WITNESS: Yeah, well, in the class |
| 25 | characteristics, I'm talking about the speed, the |

55

EXHIBIT **8**

PAGE **165**

```
 1        A.    Certainly.

 2        Q.    Let me ask you this -- stop me if you need

 3   to actually look at the drawing.

 4        A.    Sure.

 5        Q.    With respect to, let's just take Bryant

 6   220 --

 7              MS. HUTNYAN:  Is there a reason you

 8   wouldn't just use the originals?  I don't want him

 9   giving testimony with documents he hasn't seen for

10   months, if you have anything that he can benefit of

11   the originals from here, can we just use them?

12              MR. SLOAN:  Well, I think it will take more

13   time, but we can do that, if you wish.

14              MS. HUTNYAN:  My intent is not to do that.

15   My intent is to actually save time by getting you

16   better answers, to the extent that he be able to see

17   it.

18              MR. SLOAN:  Can we take a break.

19              THE VIDEOGRAPHER:  Absolutely.  We're off

20   the record at 10:50 a.m.

21              (Recessed from 10:50 a.m. until 10:52 a.m.)

22              THE VIDEOGRAPHER:  We're back on the record

23   at 10:52 a.m.

24   BY MR. SLOAN:

25        Q.    Mr. Flynn, you're now examining the
```

58

1    original Bryant 220; is that correct?

2         A.    Yes.

3         Q.    And you've had a couple minutes to look at

4    it?

5         A.    I have.

6         Q.    And that's a color drawing, multicolor

7    drawing on poster board, correct?

8         A.    Yes.

9         Q.    And do you see evidence in that drawing as

10   to the speed with which the lines were drawn?

11        A.    It was difficult to determine because the

12   lines have been overwritten on the poster board

13   characters.  There were underlined pencil lines, and

14   there were overwritten -- the waxy-type crayon pencil

15   was actually used for much of the dark areas on the

16   drawings.  Those -- that dark pencil was made in a

17   very fluid way, but I couldn't tell from the

18   underline because I had no opportunity to do infrared

19   examinations of them, so -- my point is that the

20   finished product is done very rapidly.  What the

21   underlying lines look like, I don't know at this

22   point in time.

23        Q.    Did you examine Bryant 220 and the other

24   documents like that, which are Bryant's 220 to

25   approximately 232?

59

EXHIBIT **8**

PAGE **157**

```
 1        A.    Yes.

 2        Q.    Did you examine them microscopically?

 3        A.    I did.

 4        Q.    And were you able to determine in many

 5   cases that there was pencil line under the ink lines?

 6        A.    That was my impression, yes.  Not my

 7   impression, my finding.

 8        Q.    There were pencil lines?

 9        A.    Yes.

10        Q.    And are you saying that you were unable to

11   determine the speed with which those pencil lines

12   were performed?

13        A.    Yes, because once the pencil lines were

14   overwritten with the coloring material, I would have

15   needed other examinations other than microscopic to

16   make that examination, and I just felt I did not have

17   the time to do that, given the constraints of the

18   examinations, the multiple examinations that I had to

19   make.

20        Q.    And the constraints you're talking about

21   are just time constraints?

22        A.    Exactly.

23        Q.    So you're saying you would have liked to

24   have performed additional examinations with what type

25   of a device?
```

                                                          60

PAGE _____ 158

1          A.     I mean, there were multiple types of

2     examinations that could have been performed, infrared

3     examinations, infrared luminescent examinations.   Had

4     I had the time, I would have moved into the other

5     part of the laboratory and taken photomicrographs.

6          Q.     And if you had performed those types of

7     tests, might you have been in a better position to be

8     able to render an opinion as to the length of time or

9     the speed with which the underlying pencil strokes

10    were made?

11               MS. HUTNYAN:   Objection; calls for

12    speculation.   Are you talking about on this document,

13    the speed?

14    BY MR. SLOAN:

15         Q.     Let's start with this document

16    particularly.

17         A.     Sure.

18         Q.     You're saying if you had more time you

19    would have liked to have performed, you said, tests

20    with infrared, infrared luminescents, and one other

21    type of test; is that correct?   What was the third

22    type of test?

23         A.     I would have recorded the results using

24    photomicrographs.   I would have taken

25    photomicrographs of those areas that were of interest

                                                        61

EXHIBIT  8

PAGE  159

```
 1    to me.
 2         Q.    And why would you have liked to have done
 3    that?
 4              MS. HUTNYAN:  Objection.  This is
 5    outside -- I mean, the speed relates to other
 6    documents.  I mean -- are you willing to provide the
 7    documents for this analysis?  I see you have them
 8    readily available to you.
 9              MR. SLOAN:  Diane, you're not listening to
10    the questions.  I'm asking him about that document.
11              MS. HUTNYAN:  Show me in his report where
12    he's opining as to the slowness of the underlying
13    pencil lines on this document and we can have this
14    discussion, but I think you're trying to get a false
15    record.
16    BY MR. SLOAN:
17         Q.    Mr. Flynn?
18              MS. HUTNYAN:  About what he would have
19    liked to have done and all kinds of speculative stuff
20    and that's outside the bounds.
21    BY MR. SLOAN:
22         Q.    Mr. Flynn, let me ask you, do you have any
23    opinion as you sit here today with respect to the
24    underlying speed with which the pencil strokes on
25    Bryant 220 were made?
```
                                                          62

1         A.     No, what I said at the very start of the

2     discussion is that once those pencil lines were

3     covered over with the waxy black material, I wasn't

4     able to actually see the pencil lines underneath it.

5     The over-strokes are very rapidly done.  The strokes

6     that were made with the pencil, as far as the

7     underlying pencil, I have no opinion one way or the

8     other because I couldn't see them using what I had

9     available to me.

10        Q.     Is it your opinion, as a professional with

11    over 20 years of experience, that if you had the time

12    to perform the other tests you've indicated that you

13    may have been able to determine the speed with which

14    the underlying pencil strokes were made?

15              MS. HUTNYAN:  Calls for speculation.

16              THE WITNESS:  If I had -- well, if I could

17    have -- yes, if I could have imaged the under --

18    here's -- the caveat is this, I don't know whether or

19    not it's possible to penetrate through infrared.

20    True nondestructive means the overriding pencil.  If

21    it is possible to penetrate it, then I could have

22    probably gotten enough of the image to make that

23    call, but on the other hand, it's also possible that

24    the pencil is infrared opaque, and I just would never

25    have known.  As I sit here today, I don't know one

63

EXHIBIT ___8___

PAGE ___161___

1    way or another that it would have helped.  It's

2    simply a test that I could have done had I had more

3    time.

4    BY MR. SLOAN:

5        Q.    If you were able to determine the speed

6    with which the underlying pencil strokes were made on

7    Bryant 220, and you had determined that they were, in

8    fact, also made slowly, would that have affected your

9    opinion with respect to the sequencing of the

10   drawings in this case?

11       A.    Yes.  I mean, I think it would have raised

12   the potential third possibility.

13       Q.    And what would that third possibility be?

14       A.    That both the finished drawing and the

15   outline drawings were both tracings, originally,

16   instead of one being original artwork.

17       Q.    Would it have been affected, if you

18   determined that the pencil lines on Bryant 220 and

19   the other colored documents like it were made slowly,

20   would it have affected your opinion regarding the

21   sequencing that were made in your report?

22             MS. HUTNYAN:  Asked and answered.

23             THE WITNESS:  The report really, in a

24   sense, although I understand, I mean it appears to be

25   sequencing, but what actually, the assignment that I

                                                    64

EXHIBIT __8__

PAGE __162__

1    imposed on myself at the start of this examination

2    was to try to ascertain whether or not the outline

3    drawings were -- appeared to be qualitatively

4    original artwork or tracings.

5    BY MR. SLOAN:

6       Q.    Let me stop you for one second because you

7    keep using the word "outline drawings" and it's not

8    clear to me what you mean by "outline drawings"?

9       A.    Sure.   I mean, you probably have them.

10              MS. HUTNYAN:   Look at the Bates numbers

11   there in your report there?

12   BY MR. SLOAN:

13      Q.    Look back at 194 and 197 and tell me if

14   those are things that you considered to be outline

15   drawings?

16      A.    194, 195, I guess looks like an outline of

17   a head.   196 is an outline, 197.   197 is, in my

18   opinion, likely actually an example of an -- almost

19   an example of a known tracing because of the way that

20   it was constructed.   198, definitely an outline

21   drawing.

22      Q.    Okay.   Those are what you consider to be

23   outline drawings?

24      A.    Yes.

25      Q.    And is -- what is your overall conclusion

                                                           65

EXHIBIT ___8___

PAGE ___163___

```
 1        Q.    But were you able, by the use of any

 2   device, to determine that, in fact, the two figures

 3   superimpose?

 4        A.    They superimpose but I could never get --

 5   in no instance was I ever able to get any of the

 6   outline drawings to precisely line up over all of the

 7   outlines of what I would consider the corresponding

 8   poster board, and at that time I was trying to line

 9   them up microscopically, so that if I could see a

10   place on the poster board where a pencil line

11   existed, then I would try to line up the pencil on

12   the outline drawing with the pencil on the poster

13   board.  Then I would try to line up the ink on the

14   outline drawing with the ink on the poster board, and

15   finally, I would try to line up the ink on the poster

16   board with any of the combinations on the outline

17   drawings.  And there were always differences.  It was

18   like squeezing Jell-o.  There were never -- there was

19   never an instance where there was exact congruence in

20   those outlines, in my opinion.

21        Q.    And that's looking at the documents

22   microscopically or --

23        A.    Yes.  Well, looking at them -- looking at

24   them -- I moved them under the microscope.  If I

25   could see a pencil line, then I would try to
```

72

1    position, using the microscope, the corresponding

2    outline drawing to that pencil line, and then

3    obviously I had to step back and see whether or not

4    the rest of the drawing overlaid or not.  So, I mean,

5    I went back and forth actually for some time through

6    all of these trying to see if there was an exact

7    congruence, and I could never find it.

8        Q.    You said that you're familiar with the use

9    of the video spectro comparator, correct?

10       A.    I am.

11       Q.    And you have one of those devices in your

12   lab?

13       A.    I do.

14       Q.    And if you had used the video spectro

15   comparator, wouldn't you have been able to see

16   whether, in fact, the lines from the outline drawings

17   matched up with the lines from the color drawings?

18            MS. HUTNYAN:  Objection; speculation.

19            THE WITNESS:  Yeah, I don't know.

20            MS. HUTNYAN:  Asked and answered.

21            THE WITNESS:  I don't know whether -- at

22   this point in time, I don't know whether or not it's

23   possible to penetrate the finished -- the finished

24   pencil.  If it had been possible, then you could make

25   actual video overlays to see whether that's true or

73

EXHIBIT  8

PAGE  165

```
 1    not.

 2    BY MR. SLOAN:

 3         Q.    But you didn't try to do that?

 4         A.    There was -- I did not do that, no.

 5         Q.    Why didn't you do that?

 6               MS. HUTNYAN:   Objection; asked and

 7    answered.

 8               THE WITNESS:   There were two reasons.

 9    Number 1 is that I was under -- this was not the only

10    examinations that I had on my mind during these three

11    days.  I had -- again, Mr. Bryant had put a severe

12    limitation, in my opinion, on the amount of time that

13    I had to do an examination, so I had to make

14    decisions about what, how much time to spend with

15    each of the examinations and how much -- what kind of

16    block testing I was going to do, not only with these

17    documents but other documents downstream from here.

18    BY MR. SLOAN:

19         Q.    By the way, when you say that Mr. Bryant

20    had put time constraints on your ability to test --

21         A.    Well --

22         Q.    -- what's your basis for saying Mr. Bryant

23    had put time constraints?

24         A.    Well, ultimately it was the judge's order

25    that put the time constraints, but I'm assuming that
```
                                                          74

 1       Mr. Bryant, through his attorneys, would be the ones

 2       that had agreed to a certain amount of time that

 3       these documents would be examined, that's -- I'm

 4       assuming that's true.

 5           Q.    Are you aware of any constraints that the

 6       judge or Mr. Bryant specifically put on your time

 7       that you could spend examining these documents?

 8           A.    I believe that what -- the time constraint

 9       was actually the overall time.  I think there was a

10       limit of 30 days or 31 days, or something like that,

11       and -- but because the documents had to move around

12       the country, there were transit days that were not

13       fruitful.  There were -- the first day the documents

14       arrived were administrative nightmares, so there was

15       a lot of time that could not be devoted to

16       examination of these documents, and I'm sure that

17       wasn't true in just my case.  It had to be true in

18       Mr. Rantanen's and Mr. Aginsky's case as well, so

19       definite -- there was definite time constraints

20       because downstream from me the ink analyses were

21       going to be performed and later the paper

22       examinations too and then ultimately Mr. Cunningham,

23       I believe, was going to do the final examination on

24       these documents, so there were constraints placed on

25       them.

                                                        75

EXHIBIT ___8___

PAGE ___107___

```
 1          Q.    Mr. Flynn, in your opinion, would it be
 2    significant if there were faint pencil lines or
 3    partially obscured or colored over pencil lines on
 4    the colored drawings?
 5          A.    No.  No, I would expect that.
 6          Q.    You would expect that?
 7          A.    Yes.
 8          Q.    But what I'm asking is would the presence
 9    of lines like that be significant?
10          MS. HUTNYAN:  Objection; calls for
11    speculation, vague and ambiguous.
12    BY MR. SLOAN:
13          Q.    Let me ask you this, would it be
14    significant with respect to your determination of
15    sequencing, as between the tracings and the colored
16    drawings, if there were faint or partially obscured
17    pencil lines on the colored drawings, which did not
18    form part of the outline or the main figures in the
19    outlines?
20          MS. HUTNYAN:  Objection --
21          MR. SLOAN:  I'm sorry, in the colored
22    drawings?
23          MS. HUTNYAN:  Vague, ambiguous,
24    unintelligible.
25    BY MR. SLOAN:
```

76

1      Q.    Did you understand the question?

2      A.    I think so, for the most part.  First of

3   all, I knew I had seen microscopically, that there

4   were faint pencil lines.  But -- so, did it weigh

5   into my decision-making process?  It did to some

6   extent, but the unknown here is whether or not there

7   is a third source and whether or not the tracings

8   took place before they were colored, i.e., were the

9   pencil lines at that time not erased and still very

10  clear on the transparency paper.  If the tracings

11  were made before the coloring took place, there would

12  have been no problem seeing those pencils, pencil

13  outlines.  It was only subsequent, in my opinion,

14  when the drawing was colored that those pencil lines

15  were erased and/or covered with the black pencil.  So

16  could it be significant?  Certainly.  Might it not be

17  significant?  That's also true.

18     Q.    You said that you did note the presence of

19  those faint pencil lines?

20     A.    Sure.  They're not only -- they're not all

21  the faint pencil lines.  I mean, there are pencil

22  lines that are incorporated into the drawing itself.

23     Q.    Did you note the presence of those pencil

24  lines anywhere in your report?

25     A.    I don't recall.

77

EXHIBIT __8__
PAGE __167__

```
 1          Q.    Can you take a look at your report and let
 2    me know whether you noted the presence of those
 3    faint --
 4               MS. HUTNYAN:   Take your time and read it?
 5               THE WITNESS:   No, I know.  I referred to it
 6    as "mixed media," and certainly that's what I
 7    intended.
 8               MS. HUTNYAN:  Please look at your report
 9    and look for each instance of discussion of this,
10    because it's -- he's asking you to find in your
11    report instances of your discussion of this, and
12    it's -- there's more than that.
13               MR. SLOAN:   Well, Diane, I just -- I'd ask
14    you not to direct the witness how to answer.
15               MS. HUTNYAN:   I want an accurate record,
16    I'm sure you do too, if you want instances of
17    discussion.   You seem to be -- on purpose you seem to
18    be avoiding his very clear statements about pencil
19    and ink reflected on the Bates numbers.   He has to
20    look at the Bates numbers, he has to find which ones
21    he referred to and point it out to you, if that's
22    what your question is.   Unless you want to withdraw
23    your question.
24    BY MR. SLOAN:
25          Q.    No, what I'm asking --
```

                                                          78

EXHIBIT __8__

PAGE __170__

1    197.   I mean, I think that that's clear.  The one --
2    I think that what happened is that 194 was produced
3    before there was a leftmost character.
4         Q.    And how do you reach that conclusion?
5         A.    Because there -- because there is no
6    leftmost character that matches even remotely close
7    to the leftmost character that's on 194 in the
8    finished drawing 222.  It then looked to me that, I
9    think, I believe, that the rightmost or the leftmost
10   character on 222 was freehand drawn onto 222.
11        Q.    What's your basis for that?
12        A.    There were no -- there were no pencil
13   outlines that I could find that were visible around
14   220 -- around that leftmost character on 222, and
15   then --
16        Q.    I'm sorry, there were no pencil -- there
17   were no pencil marks on 222 with respect to the
18   leftmost character from the viewer's perspective,
19   correct?
20        A.    That I could see, that's right.
21        Q.    And that suggested to you that that was
22   freehand drawn, correct?
23        A.    Yes.
24        Q.    It suggested to you that it was not traced
25   from something else, correct?

                                                      130

```
 1        A.    Yes.

 2        Q.    If there had been pencil drawings or pencil

 3   lines under that leftmost character, that would have

 4   suggested to you that it had been traced from

 5   something else, correct?

 6             MS. HUTNYAN:  Calls for speculation.

 7             You can answer.

 8             THE WITNESS:  It still could have been

 9   freehand drawn with a pencil first and then inked, so

10   no, it doesn't -- that wouldn't change anything.

11   Because I can't see the pencil doesn't mean, as he

12   always does, that he freehand sketches with pencil

13   first and then inks it, you know.

14   BY MR. SLOAN:

15        Q.    So you're -- but you're saying with respect

16   to the three rightmost figures from the viewer's

17   perspective on Bryant 222 you see pencil and then pen

18   on top of it, correct?

19        A.    No, I think when I examined it

20   microscopically there were places where the pencil

21   was visible around the outlines of the characters

22   when I looked at 222 microscopically.

23        Q.    But you didn't see any evidence of an

24   underlying pencil on the leftmost figure on 222,

25   correct?
```

131

EXHIBIT __8__

PAGE __172__

1        A.    Right.  And the problem there was that if

2    there was underlying pencil and it was completely

3    covered, I wouldn't have seen it microscopically.  It

4    would have required the infrared examination to find

5    that.

6        Q.    So you're saying there might be pencil

7    underneath the leftmost figure on 222, but you didn't

8    observe it?

9        A.    Yeah.  And I mean it might -- I mean, I

10   even think that it's likely that there's pencil

11   underneath there because it was certainly Mr.

12   Bryant's style to do that.

13       Q.    Any other reason to believe that there

14   would be likely to be pencil underneath that, other

15   than you believe that it was Mr. Bryant's style?

16       A.    No, I think that that was -- let's see,

17   yeah, I mean, I think that 197 plays some role in

18   this.  Let's take a look.  No, that was probably

19   all -- I just don't know.

20       Q.    Okay.  So can you explain to me, as you see

21   it, the sequencing of how this was drawn and the

22   basis for it?

23       A.    Well, as I said, I -- I was actually

24   talking about a process where these -- these things

25   evolved rather than exact sequencing of events.  I

                                                    132

EXHIBIT   8

PAGE   113

1    thought that -- I thought and I think right correctly

2    that 222 was a tracing of the three rightmost

3    characters.

4              MS. HUTNYAN:  I think you have the wrong

5    numbers, concentrate on, what are you referring to,

6    the transparency or the poster board?

7              THE WITNESS:  I felt that the outline

8    drawings had, in fact, originated or traced from 222,

9    that they were tracings of the three rightmost

10   characters on 222.

11   BY MR. SLOAN:

12        Q.   And again, the basis by which you -- and

13   that's because they -- they're superimposed?

14        A.   They -- they almost superimpose, right.

15             MR. SLOAN:  We have two minutes left on the

16   tape, so let's take a break here.

17             THE VIDEOGRAPHER:  This ends tape 3 of the

18   videotaped deposition of William Flynn.  We are off

19   the record at 12:52 p.m.

20             (Recessed from 12:52 p.m. until 12:55 p.m.)

21             THE VIDEOGRAPHER:  This is tape 4 of the

22   videotaped deposition of William Flynn.  We are back

23   on the record at 12:55 p.m.

24   BY MR. SLOAN:

25        Q.   Mr. Flynn, I was just asking you your basis

133

EXHIBIT ___8___

PAGE ___174___

1    for determining that the three rightmost figures in

2    194 are tracings from Bryant 222.  And you said that

3    they superimpose in most respects, correct?

4         A.    And have the characteristics of a tracing,

5    so it was those, the fact that they superimposed, for

6    the most part, gives me a source and the fact that

7    they appear to be tracings gives the second part of

8    the answer that they appear to be slowly done and as

9    I've already talked about --

10        Q.    And you're saying that the ink lines for

11   the three most -- the three rightmost characters on

12   Bryant 222 do not have the attributes of a tracing?

13        A.    The ink lines --

14        Q.    On the three rightmost characters in Bryant

15   222?

16        A.    I can't tell now.  I mean, the -- the ink

17   lines don't, but whether they -- if there's

18   underlying pencil, I mean whether that would or not,

19   I don't know.  But the -- no, I mean, the ink lines

20   are actually pretty smoothly done.

21        Q.    So the ink lines are smoothly done?

22        A.    On -- yes.

23        Q.    The -- you said that there are; however,

24   you can see underlying pencil lines on those three

25   rightmost figures, correct?

                                                      134

EXHIBIT 8
PAGE 175

1        A.    Yes.   There were places where I could

2    actually see the pencil underline.

3        Q.    And could you see that with the naked eye

4    or microscopically?

5        A.    Microscopically.

6        Q.    And when you looked at them

7    microscopically, could you tell whether those were

8    done slowly or rapidly?

9        A.    No, because there were only little tiny

10    pieces that would show through, so I don't know.

11        Q.    If those in fact had been done more

12    slowly --

13              MS. HUTNYAN:   Which?

14    BY MR. SLOAN:

15        Q.    I'm sorry, if the underlying pencil strokes

16    of the three rightmost figures on Bryant 222 had been

17    done more slowly, might that suggest to you that

18    those pencil lines on 222 had actually been traced

19    from something else?

20        A.    Yes.   Sure.

21        Q.    And would there have been a way to have

22    seen how slowly those pencil lines were done?

23        A.    I don't know.   I mean, the test would have

24    been to examine everything through the various

25    spectrum of infrared that's available through the

                                                    135

EXHIBIT ___**8**___

PAGE ___**176**___

1    VSC.

2         Q.    So if you had done a VSC test, you may have

3    been able to determine the speed with which the

4    pencil lines had been done on one -- on 222?

5         A.    It was possible to image the pencil lines

6    clearly, yes.  The problem with black ink is it's

7    usually opaque, very often opaque, to infrared and

8    wouldn't allow infrared penetration, but if it were,

9    and you can get a clear enough image of the pencil,

10   then yes, you might be able to tell if it was rapidly

11   or slowly done.

12        Q.    Now, I -- I keep on interrupting you, but I

13   still want you to sort of finish what you see as the

14   chronology of the sequencing of these drawings.  I

15   think you testified that 194 was a tracing of the

16   three rightmost characters of Bryant 222; is that

17   correct?

18        A.    Yes.

19        Q.    And is it your belief that at that time

20   that it was traced that the rightmost, or I'm sorry,

21   the leftmost figure on Bryant 222 was not there?

22        A.    Right.

23        Q.    And why do you believe that?

24        A.    Because the character that now appears on

25   194 is actually quite a different character and the

                                                    136

EXHIBIT __8__

PAGE __177__

1    to your conclusion that 199 is a pencil tracing of

2    220?

3        A.    199, that 199 is a tracing of 220.  Yes, I

4    would say it's very probably so.

5        Q.    And would you say the same thing with

6    respect to your conclusion that 194 is a tracing of

7    the three rightmost dolls that appear on Bryant 222?

8        A.    Yes.

9        Q.    Very probably?

10       A.    Yes.

11       Q.    Okay.  So let me show you Bryant 212 and

12   234.

13       A.    Sure.

14       Q.    Here is Bryant 212, it's that way actually,

15   and here is Bryant 234.

16       A.    Yes.

17       Q.    On what basis do you conclude that Bryant

18   212 is a tracing of 234?

19       A.    The overall matching of the doll

20   configuration and in this case I think the doll's

21   clothing as well would lead me to believe that, that

22   they are, in fact, the same figure.

23       Q.    Well, did you superimpose one on top of

24   another?

25       A.    Yes.

159

EXHIBIT __8__

PAGE __178__

```
 1        Q.    And how did you do that?

 2        A.    I literally superimposed it one on top of

 3   another.

 4        Q.    Just like you're doing right now?

 5        A.    Yes.

 6        Q.    Did you do it like you're doing it right

 7   now or on a light table?

 8        A.    I don't recall specifically in this

 9   particular instance.  We had a light table there, but

10   I can't tell you for sure if I used the light table

11   or not.

12        Q.    Other than the fact that they superimpose,

13   I mean, if you had only found that they superimpose

14   one on the other, you wouldn't be able to tell us

15   sequencing; is that correct?

16        A.    Not just because of the fact that they

17   superimpose, no.

18        Q.    What other facts are you relying on or what

19   other observations are you relying on to draw the

20   conclusion that Bryant 212 is a tracing of 234?

21        A.    Again, to me it does not look like a

22   rapidly made piece of artwork that --

23        Q.    Which doesn't?

24        A.    The transparencies that should be.

25        Q.    That's 212?
```

                                                          160

EXHIBIT **8**

PAGE **179**

1        A.     212, yes.

2        Q.     You said does not appear to be rapidly

3    made?

4        A.     No.

5        Q.     Are there -- is there evidence of slowness?

6        A.     Yeah, there's places, again, where the

7    naked eye, without the benefit of the microscope,

8    there are definitely places along the hemline of the

9    skirt that are slowly made.  The outside of the

10   doll's right thighs there's -- there's evidence that

11   it's been overwritten in that location.  The left

12   shoe, the sole of the shoe appears to be very slowly

13   done.  The straps on the shoes appear to be slowly

14   done.  The area up around the hair, the long portion

15   of the hair, not the long portion, the crown, the

16   crown of the hair, looks like it's been overwritten

17   several times.

18       Q.     Are you talking now about the ink portion

19   of 212 or the pencil portion?

20       A.     The ink portion.  There isn't much of the

21   pencil portion that I can see.

22       Q.     So you can't tell whether the pencil lines

23   -- well, let me ask you this first, there are pencil

24   lines that you see on Bryant 212?

25       A.     Yes.

161

EXHIBIT __8__

PAGE __180__

 1        A.    I think in some ways that's the same

 2   question, and no, I did not.

 3        Q.    Are you aware of any errors or

 4   misstatements that need to be revised in your report?

 5        A.    It's hard for me to say.  I often read my

 6   deposition and wonder if that was really me talking

 7   at the time, so I'll certainly review the deposition

 8   for accuracy and if there are changes that are

 9   necessary, I'll be sure and fill out the correction

10   sheet.

11             MS. HUTNYAN:  I think he's asking about

12   your report.

13             MR. SLOAN:  I was asking about your report.

14             THE WITNESS:  Oh, I thought you said

15   testimony.

16   BY MR. SLOAN:

17        Q.    You preceded me.  That was going to be my

18   next question.  You beat me to the punch.

19        A.    No, I think the report as it stands today

20   is accurate.

21        Q.    You indicated in your report at page 3, I

22   believe, that there are -- let me take that back.

23   You mentioned that you'd also read Mr. Cunningham's

24   report, correct?

25        A.    No.

                                                      228

EXHIBIT 8

PAGE 181

```
 1        Q.    You haven't read it?
 2        A.    No, I haven't read it.
 3              MS. HUTNYAN:  That was the 20 seconds,
 4    remember, the 20-second read?
 5              THE WITNESS:  Earlier this morning there
 6    were some passages that we covered very early this
 7    morning.  That was my only exposure.
 8    BY MR. SLOAN:
 9        Q.    Counsel read passages to you, in other
10    words?
11        A.    The attorney, Ms. Hutnyan.
12              MR. SLOAN:  Okay.  I have no further
13    questions.
14              MS. HUTNYAN:  Okay.  I have a few
15    questions.
16                  E X A M I N A T I O N
17    BY MS. HUTNYAN:
18        Q.    Mr. Flynn, you talked about the time that
19    you had with the documents in question?
20        A.    Yes.
21        Q.    There were eight boxes of documents?
22        A.    Correct.
23        Q.    In your view, did you have enough time to
24    draw the conclusions that you drew in your report?
25        A.    Certainly.
```

229

EXHIBIT **8**

PAGE **182**

```
1          Q.    And as part of those conclusions you

2     concluded that the outline drawings were not original

3     pieces of artwork?

4          A.    That was -- yes, that was my conclusion.

5          Q.    Are you aware of anyone having produced any

6     common source documents, other than that we've talked

7     about here today?

8          A.    There's been discussion of those documents

9     potentially existing that I -- but no, as far as I

10    know, they don't exist.  I haven't seen them.

11         Q.    When you had the eight boxes, did you look

12    for other documents that might serve as the source

13    for the tracings that were outline by?

14         A.    Yes.

15         Q.    Did you find them?

16         A.    No.

17         Q.    You've seen the reports of Dr. Lyter and

18    Dr. Kullman?

19         A.    Yes.

20         Q.    And they described the possibility of a

21    common source as well?

22         A.    Yes.

23         Q.    Did you see any indication in their reports

24    that they had found such a common source document?

25         A.    No.
```

                                                              230

EXHIBIT __B__

PAGE __183__

```
 1        Q.    To you knowledge, is there such a common
 2    source document?
 3        A.    As far as I know, there is not.
 4        Q.    There's been a fair amount of discussion
 5    about the speed of pencil lines on the outline
 6    drawings, do you remember those multiple lines of
 7    questioning?
 8        A.    Yes.
 9        Q.    And do you recall testifying about
10    Mr. Bryant experimenting with the outline drawings?
11        A.    Yes.
12        Q.    Is -- if there are rapid looking pencil
13    lines on the outline drawings, is it possible that
14    they might be the product of some of this
15    experimentation?
16        A.    I think, yes, because I think in at least
17    one case that's indisputable, certainly he took an
18    outline drawing that had a different head of hair and
19    a different hat and certainly, in my opinion,
20    freehand draw -- drew a new hat and some hair on it,
21    so that did take place, in my opinion.
22        Q.    Well, in some of the drawings that you
23    looked at today on the outline drawings, you may have
24    noticed some pencil lines near the ink lines?
25        A.    Yes.
```

231

EXHIBIT **8**

PAGE **184**

1            MS. HUTNYAN:  Okay.

2            THE VIDEOGRAPHER:  This ends the videotaped

3   deposition of William Flynn.  We are off the record

4   at 4:58 p.m.

5

6           (Deposition concluded at 4:58 p.m.)

7

8

                _____

9             WILLIAM J. FLYNN

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                             250

EXHIBIT **8**

PAGE **185**

```
 1                          CERTIFICATE

 2

 3              I, ROBIN L. B. OSTERODE, Certified

 4    Reporter for the State of Arizona, certify:

 5                  That the foregoing deposition was taken

 6    by me; that I am authorized to administer an oath;

 7    that the witness, before testifying, was duly sworn

 8    by me to testify to the whole truth; that the

 9    questions propounded by counsel and the answers of

10    the witness were taken down by me in shorthand and

11    thereafter reduced to print by computer-aided

12    transcription under my direction; that deposition

13    review and signature was requested; that the

14    foregoing pages are a full, true, and accurate

15    transcript of all proceedings and testimony had upon

16    the taking of said deposition, all to the best of my

17    skill and ability.

18              I FURTHER CERTIFY that I am in no way

19    related to nor employed by any of the parties hereto,

20    nor am I in any way interested in the outcome hereof.

21              DATED this 30th day of March, 2008.

22

23              _____
                ROBIN L. B. OSTERODE
                Certified Reporter No. 50695
24              For the State of Arizona

25

                                                        251
```

EXHIBIT **8**

PAGE **186**

EXHIBIT 9

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 10

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**