THOMAS J. NOLAN (Bar No. 66992)
(tnolan@skadden.com)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue
Los Angeles, CA 90071-3144
Tel.: (213) 687-5000 / Fax: (213) 687-5600

RAOUL D. KENNEDY (Bar No. 40892)
(rkennedy@skadden.com)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
4 Embarcadero Center, 38th Floor
San Francisco, CA 94111-5974
Tel.: (415) 984-6400 / Fax: (415) 984-2698

Attorneys for MGA Entertainment, Inc., MGA Entertainment (HK) Limited,
MGAE de Mexico, S.R.L. de C.V., and Isaac Larian

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARTER BRYANT, an individual, | CASE NO. CV 04-9049 SGL (RNBx) |
| Plaintiff, | Consolidated with Case No. 04-9059 and Case No. 05-2727 |
| v. | |
| MATTEL, INC., a Delaware corporation, | MGA'S AND CARTER BRYANT'S JOINT OPPOSITION TO MATTEL, INC.'S *EX PARTE* APPLICATION TO FILE SUPPLEMENTAL EXPERT REPORTS BY MESSRS. WILLIAM FLYNN AND LLOYD CUNNINGHAM REGARDING CERTAIN BRYANT ORIGINALS |
| Defendant. | |
| AND CONSOLIDATED ACTIONS | |

Date:  TBD
Time:  TBD
Place:  TBD

**Phase 1:**
Discovery Cut-off:   January 28, 2008
Expert Discovery Cut-off:
                     March 31, 2008
Motions in Limine:  May 5, 2008
Pre-trial Conference: May 5, 2008
Trial Date:          May 27, 2008

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ..................................................................... iii

I.     PRELIMINARY STATEMENT ........................................................ 1

II.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY ................. 3

    A.    The Key Carter Bryant Drawings ......................................... 3

    B.    Mattel Examined, Photographed and Videotaped The Bryant Documents for 5 Days in February, May and June 2007 ..................... 4

    C.    Mattel's July 2007 Motion to Compel Bryant to Make Original Documents Available For Expert Examination and Testing ................ 5

    D.    Mattel's Experts Examined and Performed Destructive and Non-Destructive Testing on the Bryant Documents for a Total of Approximately 40 Days in September and October, 2007, and January 2008 .................................................. 7

    E.    Mattel's Expert Reports ........................................................ 8

    F.    MGA's Expert Examinations and Reports ............................... 9

    G.    MGA's Experts Admitted to Seeing Faint Pencil Lines in The Multi-Colored Drawings During Their Depositions ......................... 10

    H.    Mattel's Belated Requests for Further Expert Examination of the Bryant Documents .............................................. 12

III.    ARGUMENT ..................................................................... 13

    A.    Mattel's Motion is Procedurally Defective -- By Moving For Leave To File A Sur-Rebuttal Expert Report, Rather Than Moving to Amend the Court's Scheduling Order, Mattel Has Put The Cart Before The Horse ......................................... 13

    B.    Mattel's Application Is Untimely ....................................... 15

    C.    Mattel Has Not – and Cannot --  Establish The Good Cause Necessary To Excuse its Last Minute Attempt to Amend The Rule 16 Scheduling Order .......................................... 16

    D.    MGA's And Bryant's Actions Do Not Provide Mattel Any Good Cause Nor Do They Excuse Mattel's Lack Of Diligence And/Or Negligence ........................................................ 19

    E.    Mattel's Argument That It Merely Seeks The Right To File Rule 26(e) "Supplemental" Expert Reports Is Wrong ......................... 21

F.  A Second Round Of Testing, Expert Reports And Depositions Is Not Only Unnecessary, But Threatens The Entire Trial Schedule .... 23

G.  Mattel's Attempt to Analogize Its Application to This Court's Order Granting MGA's Request for An Extension Of The March 17, 2008 Deadline For Rebuttal Expert Reports is Misplaced........... 25

IV.  CONCLUSION ............................................................................. 25

# TABLE OF AUTHORITIES

**Cases**

*Beller v. Beller*,
221 F.R.D. 689 (D.N.M. 2003) .................................................................. 19, 20, 22

*Braun v. Agri-Systems*,
No. F-02-6482, 2006 WL 278592 (E.D. Cal. Feb. 2, 2006) ......................... 12

*Estate of Gonzalez v. Hickman*,
No. EDCV 05-660 MMM (RCx), 2007 WL 3237639 (C.D.
Cal. Jan. 8, 2007) .......................................................................................... 21

*Internet Specialities West, Inc. v. ISPWest*,
No. CV 05-3296 FMC AJWX, 2006 WL 4568796 (C.D. Cal.
Sept. 19, 2006) .............................................................................................. 21

*Jackson v. Laureate, Inc.*,
186 F.R.D. 605 (E.D. Cal. 1999) .................................................................. 14

*Jenkins v. Wholesale Alley, Inc.*,
No. 1:05-CV-3266 JEC, 2006 WL 2716091 (N.D. Ga. Sept.
22, 2006) ........................................................................................................ 12

*Johnson v. Mammoth Recreations, Inc.*,
975 F.2d 604 (9th Cir. 1992) ...................................................... 1, 13, 15, 16

*Keener v. U.S.*,
181 F.R.D. 639 (D. Mont. 1998) .................................................................. 18

*Lindner v. Meadow Gold Dairies, Inc.*,
Civil No. 06-00394 JMS-LEK, 2008 WL 763236 (D. Haw.
Mar. 19, 2008) ............................................................................................... 20

*Matrix Motor Co. v. Toyota Jidosha Kabushiki Kaisha*,
218 F.R.D. 667 (C.D. Cal. 2003) ................................................................. 14

*Miller ex rel. S.M. v. Board of Education*,
455 F. Supp. 2d 1286 (D.N.M. 2006) ........................................................... 21

*Mission Power Engineering Co. v. Continental Casualty Co.*,
883 F. Supp. 488 (C.D. Cal. 1995) ......................................................... 14, 17

*Palmer v. Asarco, Inc.*,
No. -3-CV-0498-CVE-PJC, 2007 WL 2254343 (N.D. Okla.
Aug. 3, 2007) ................................................................................................. 20

*Phillips v. Netblue, Inc.*,
No. C-05-4401 SC, 2007 WL 528722 (N.D. Cal. Feb. 13,
2007) ............................................................................................................... 21

*Schwerdt v. International Fidelity Insurance Co.*,
    28 Fed. Appx. 715 (9th Cir. 2002) .................................................... 15, 16

*Telemasters, Inc. v. Vintage Club Masters Association*,
    No. CV 05-05139 FMC (VBKx), 2007 WL 1839701 (C.D.
    Cal. Feb. 2, 2007) .................................................................................. 13

*Turner v. Schering-Plough Corp.*,
    901 F.2d 335 (3d Cir. 1990) ................................................................. 17

*Wong v. Regents of University of California*,
    410 F.3d 1052 (9th Cir. 2005) .............................................................. 21

*Yent v. Baca*,
    No. CV-01-10672 (VBKX), 2002 WL 32810316 (C.D. Cal.
    Dec. 16, 2002) ............................................................................ 15, 16, 17

**Statutes**

C.D. Cal. Local Rule 16-14 ........................................................................ 12

F. R. Civ. No. P. 16 ..................................................................................... 12

Fed. R. Civ. P. 16(b)(4) ............................................................................... 14

Fed. R. Civ. P. 26(a)(2)(B) .......................................................................... 19

Fed. R. Civ. P. 26(a)(3) & (e) ..................................................................... 19

Fed. R. Civ. P. 6(b)(1) ................................................................................. 14

# I.   **PRELIMINARY STATEMENT**

Mattel claims that this is a matter of simple "fairness."  What Mattel seeks, however, is anything but fair.  Rather, at the eleventh hour, less than two months before trial, Mattel seeks to fundamentally rewrite the rules by radically altering the Court's scheduling order and turning back the clock so that Mattel's experts can have a second chance to do what they should have done – and had a full opportunity to do --months ago.  Mattel's experts are not entitled to "re-do" their examination and prepare new, improved reports just because they got it wrong the first time, or failed to notice what MGA's experts saw, however.  Nor should Mattel be allowed to re-open discovery after it has been closed to MGA and Bryant.   Far from "leveling the playing field," (App. at 8), such relief would tilt it unfairly in Mattel's favor.

Mattel's *Ex Parte* Application should thus be denied in its entirety for at least three reasons.   First, the Application is untimely because it seeks to extend an important deadline, the March 31, 2008 expert discovery deadline, that has already passed.  In order to preserve efficient and fair case management, this Court's Standing Order specifically requires that all applications to extend a scheduling order deadline "must be filed in advance of the due date."

Second, Mattel has failed to establish the "good cause" required under Fed. R. Civ. P. 16(e) to modify a scheduling order, as it was not diligent in pursuing the examination and discovery it now belatedly seeks.  Mattel requests the ability to re-open expert discovery to perform testing in order to then file a sur-rebuttal expert report.  However, Mattel had a full and fair opportunity to perform its expert analysis last fall when Judge Infante ordered Bryant to produce over 2,000 original documents to Mattel's experts for a period of 35 days.  During that time, Mattel's principal document examiner, Lloyd Cunningham, had the documents for over two weeks; examined them for over 80 hours, including through use of infrared light and

1 infrared luminescence; and spotted many of the same faint and partially obscured

2 pencil lines that MGA's experts found so significant.

3      While in hindsight, after reviewing MGA's expert reports, Mattel now claims

4 its experts *needed* more time to complete their examinations, neither Mattel nor its

5 experts requested such relief at the time.   In fact, Mr. Cunningham and Mr. Flynn

6 were apparently very happy with their results – at least until they reviewed Dr. Lyter

7 and Mr. Kullman's reports.  Mattel's claim that it was hamstrung by Judge Infante's

8 35-day time limits is thus unfounded.   As Mattel well knows, but fails to reveal,

9 Judge Infante's August 30, 2007 Order specifically authorized Mattel to seek an

10 extension of the 35-day deadline for "good cause."   Mattel never sought such relief

11 for Messrs. Flynn and Cunningham, however.

12      Mattel was also dilatory in seeking further expert examinations after it was put

13 on notice of MGA's experts' findings.  During the two weeks between MGA's expert

14 reports being served (March 17, 2008) and the close of expert discovery (March 31,

15 2008), Mattel literally did nothing to pursue the discovery it now demands.  Where a

16 party is not diligent, a motion to modify a scheduling order must be denied. *Johnson*

17 *v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992).

18      <u>Third</u>, and perhaps most importantly, allowing Mattel to re-open expert

19 discovery, examine the Bryant documents *yet again,* and submit new sur-rebuttal

20 reports on the eve of trial will have a cascading effect on nearly every scheduling

21 item pertaining to this case, and will significantly prejudice MGA and Bryant.  If

22 Mattel is permitted a second round of expert discovery, and allowed to submit sur-

23 rebuttal reports, then MGA and Bryant will be entitled to – and will almost certainly

24 seek to – re-depose both Mr. Cunningham and Mr. Flynn, which the parties would

25 likely have to conduct a matter of weeks or days before trial.  Particularly where

26 Mattel is solely to blame for its predicament, Mattel should not be permitted to

27

28

1  disrupt the Court's schedule and interfere with MGA's trial preparations with the
2  Phase I proceedings only weeks away.

3       For these and other reasons, as more fully explained below, Mattel's
4  Application should be denied in its entirety.

## II.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.   The Key Carter Bryant Drawings

A central theme in Mattel's brief is that Mattel's experts, and particularly Mr.
Flynn and Mr. Cunningham, were overwhelmed by the sheer magnitude of the
Bryant documents, which number over 2,000 documents.  In fact, however, Mattel
has known since at least 2004 that there were only several dozen key documents in
this case, including the outline drawings on tracing paper and the color poster-board
drawings which are at issue in Mr. Flynn's and Mr. Cunningham's reports.  The date
on which Carter Bryant produced these drawings has been at the center of this case
from its inception in 2004.

From the start, Byrant and MGA have truthfully contended that Byrant created
the outline drawings (the pencil and black ink drawings of early Bratz-like figures on
thin, tracing paper) after Bryant resigned from Mattel in April 1998 and returned to
live with his parents in Missouri.  This was made known to Mattel at least as early as
November 2004 when Mattel took 3 days of back-to-back deposition testimony from
Bryant in Springfield, Missouri.   During that testimony, Mattel's attorneys grilled

Bryant about the dates on which he created hundreds of key drawings, including substantially all of the documents at issue in the reports of Mattel's four experts.

In his deposition, Bryant also testified that he had traced the "multi-color posterboard drawings" from the outline drawings, and then added color to them, in 1999.[1] Thus, Byrant's contention about the dates and sequence in which these two categories of documents were created—which is at the heart of all of Mattel's expert reports—have been front and center in Mattel's thinking since at least 2004.

**B.    Mattel Examined, Photographed and Videotaped The Bryant Documents for 5 Days in February, May and June 2007**

Nevertheless, Mattel sought and obtained permission to inspect and photograph all 2000 original Bryant documents long before Messrs. Cunningham and Flynn conducted their examinations.   Between February and June 2007, Mattel's attorneys spent five separate days examining,  photographing, and videotaping all of these documents in order "to determine which of the originals are potentially appropriate candidates for expert analysis."[2]  Mattel first began is inspection and photographing of the documents on February 27 and 28, 2007.

More than two months later, in May 2007, Mattel demanded that Bryant make further documents available for inspection.  Pursuant to this request, Byrant's new counsel, Keker & Van Nest ("Keker"), which had just replaced Bryant's former

---

[1]    Declaration of Matthew E. Sloan ("Sloan Decl."), Ex. 1: Depo. Tr. of Carter Bryant (Nov. 4, 2004), at pp. 151-152.

[2]    Sloan Decl., Ex. 2: D. Hutnyan Decl. in Support of Mattel's Motion to Compel Carter Bryant to Make Original Documents Available for Expert Examination and Testing and For Sanctions (July 6, 2007), at Ex. 1 thereto at 15.

1  counsel in mid-May, made every original document in Bryant's possession,
2  constituting approximately 2,000 pages of original documents, available for Mattel's
3  inspection.[3]  On May 31 and June 1, 2007, Mattel's counsel, accompanied by a
4  photographer and a videographer, painstakingly reviewed, inventoried, catalogued
5  and photographed approximately two-thirds of the Bryant's originals.[4]  When Mattel
6  complained that its efforts at photographing and cataloging the documents had been
7  hampered by the failure to properly index the documents, Bryant agreed to set aside
8  an additional two days, June 20 and June 21, 2007, for Mattel to complete its
9  inspection.[5]  Mattel subsequently examined and photographed the Bryant originals
10 for an additional day on June 20, 2007, but decided not to spend the additional day
11 for review offered by Bryant.[6]

12
13  **C.    Mattel's July 2007 Motion to Compel Bryant to Make Original Documents Available For Expert Examination and Testing**

14      In July 2007, Mattel moved to compel Bryant to make over 2,000 of Bryant's
15  original documents available for expert examination and testing.[7]  Although Mattel
16  had previously examined and had the opportunity to photograph and videotape all of
17  these documents, Mattel made little or no attempt to narrow down the universe of
18  documents for its expert's review.  Moreover, Mattel demanded that it be given total
19

20  [3]    Sloan Decl., Ex. 4: Mattel's Motion to Compel Carter Bryant to Make Original
21  Documents Available for Expert Examination and Testing and For Sanctions, at 3-4.
     [4]    *Id.* at 2.
22  [5]    Sloan Decl., Ex. 3: M. Page Decl. in Opposition to Mattel's Motion to Compel
23  Carter Bryant to Make Original Documents Available for Expert Examination and Testing and For Sanctions (July 13, 2007), at Ex. 12 thereto.
24  [6]    Sloan Decl., Ex. 5: Carter Bryant's Opposition to Mattel's Motion to Compel
25  Carter Bryant to Make Original Documents Available for Expert Examination and Testing and For Sanctions (July 13, 2007), at 5.
     [7]    Sloan Decl., Ex. 5: Carter Bryant's Opposition to Mattel's Motion to Compel
26  Carter Bryant to Make Original Documents Available for Expert Examination and Testing and For Sanctions (July 13, 2007), at 3-4.
27
28

1   control over the documents for a period of over two months, and that it be allowed to

2   shuttle the documents to three or four different experts, all of whom it refused to

3   identify to Bryant on work product grounds.  Although Bryant did not dispute

4   Mattel's right to have its experts examine and subject certain key Bryant documents

5   to forensic testing, Bryant objected that Mattel's request was overly broad and failed

6   to provide adequate safeguards for the documents.

7        While Judge Infante generally agreed with Bryant's objection to the lack of

8   specificity and sheer volume of Mattel's request – noting that "a smaller universe of

9   documents would probably be adequate for testing" – he ultimately granted Mattel's

10  requests with only two conditions.[8]  First, he required Mattel to submit the names

11  and credentials of its experts to him *in camera*.[9]  Second, he found that the two-

12  month time period requested by Mattel was "excessive" and ruled that Mattel's

13  experts should only have 35 days to complete their examination.[10]  Judge Infante

14  indicated in the hearing, however, that he would agree to give Mattel additional time

15  for its experts to complete their examinations for "good cause" if the experts were

16  not able to complete their tasks "within the time allotted."[11]

17       Judge Infante's August 30, 2007 Order, which tracked *Mattel's* proposed order

18  in almost every respect except the total time granted at the outset, similarly provided

19  that the 35 day time limit "may be extended upon a showing by Mattel of good

20  cause."[12]  Despite the inclusion of this provision, however, Mattel, never sought

21  _____

      [8]      Sloan Decl., Ex. 6: Infante Hearing Tr. (Aug. 23, 2007), at 15.

22    [9]      Significantly, at least one of Mattel's experts, Lloyd Cunningham, informed

23  Judge Infante in his *in camera* declaration, that he might perform the very same
    types of forensic examinations that Mattel now seeks leave to perform now:

24  examinations using infrared luminescence and reflected infrared light.  *See* Hutnyan
    Decl., Ex. 6: Cunningham *In Camera* Decl., ¶4.

25    [10]     Sloan Decl., Ex. 6: Infante Hearing Tr. (Aug. 23, 2007), at 18.

26    [11]     *Id.* at 20.

27    [12]     Sloan Decl., Ex. 7: August 30, 2007 Order, ¶ 4.

28

leave from the Discovery Master for more time for its experts to conduct additional testing.  Instead, at the end of the 35-day period granted by the Discovery Master, Mattel simply returned the documents to Bryant without comment or complaint.

### D.  Mattel's Experts Examined and Performed Destructive and Non-Destructive Testing on the Bryant Documents for a Total of Approximately 40 Days in September and October, 2007, and January 2008

In total, Mattel's experts had possession of the Bryant documents for testing for approximately 40 days.  Lloyd Cunningham, Mattel's principal forensic document examiner, obtained the documents on September 12, 2007 and maintained possession of the documents until September 28, 2007.[13]  During that 16-day period, Cunningham spent over 80 hours examining the documents.[14]   Cunningham has stated that he used numerous different methods of examination, including the use of oblique lighting, magnification, reflected infrared luminescence, UV lighting, as well as the examination of indented writing with the indentation materializer device.[15]

William Flynn, Mattel's second forensic document examiner, received the Bryant documents from Mr. Cunningham on September 29, 2007 and had a total of four days to examine the documents.[16]  Flynn indicated that he spent approximately 35 hours examining the documents.[17]

Mattel's paper expert, Walter Rantenen and its ink chemist, Valery Aginsky, also spent substantial time, reviewing the documents.  After completing its

---

[13]     Sloan Decl., Ex. 8: Depo. Tr. of Lloyd Cunningham (Mar. 31, 2008), at 27:23-28:23; Ex. 10: Invoices of Lloyd Cunningham.

[14]     Id.

[15]     Hutnyan Decl., Ex. 10: Expert Report of Lloyd Cunningham, at 9.

[16]     Sloan Decl., Ex. 11: Depo. Tr. of William J. Flynn (Mar. 27, 2008), at 30:16-31:2; Ex. 12: Invoices of William J. Flynn.

[17]     Id.

1  examinations, Mattel's counsel returned the Bryant documents to Bryant's counsel on
2  October 17, 2007.

3      In December 2007, Mattel asked Bryant's counsel for permission to have Mr.
4  Rantanen perform destructive testing on the Bryant originals.  In response, Mattel
5  and Bryant worked out a stipulation providing that the originals would be sent to Mr.
6  Rantanen for an additional four days so that he could take small punches or snippets
7  of paper samples from a select group of the original Bryant documents.[18]  Pursuant to
8  that stipulation, the documents were sent to Mr. Rantanen's laboratory for delivery
9  on January 14, 2008, and he maintained possession of them for 4 business days
10 before returning them to Bryant's counsel on January 17, 2008.

11     Prior to April 2, 2008, Mattel never indicated that Mr. Cunningham or Mr.
12 Flynn needed additional time to perform their examination of the Bryant documents.
13 Nor did Mattel seek leave from Bryant, MGA or Judge Infante to give Mr.
14 Cunningham or Mr. Flynn additional time to perform such examinations.

15     **E.    Mattel's Expert Reports**

16

17     Mattel served Mr. Cunningham's and Mr. Flynn's expert reports on MGA and
18 Byrant on or about February 11, 2008.  Mr. Cunningham indicated in his report that
19 he noticed "light pencil" strokes on several of the multi-color posterboard drawings
20 that could have been from either "a rough sketch" or "tracing outlines" from another
21 drawing.[19]  Contrary to Mattel's Application (*see* App. at 4), Mr. Cunningham's

22

23

24

25 [18]    Sloan Decl., Ex. 12: Jan. 15, 2008 Stipulation Re: Mattel's Destructive Testing
   of Bryant Original Documents, at 2-4.
26 [19]    Hutnyan Decl., Ex. 10: Expert Report of Lloyd Cunningham, at 6-8
27 (discussing Bryant 223, 225, 226, 227, 228, 229, 230, 231, 233, 234).

28

report specifically states that he did employ infrared luminescence and reflective infrared testing.[20]

## F.   MGA's Expert Examinations and Reports

MGA has retained two forensic documents examiners to review the Cunningham and Flynn reports, and the Bryant originals, and provide expert rebuttal reports: Robert Kullman and Dr. Albert Lyter.   Mr. Kullman, who works at Speckin Laboratories in Okemos, Michigan, received the seven boxes of Bryant documents on or about January 26, 2008, and sent them to Dr. Lyter in North Carolina on approximately, March 6, 2008.   Because Mr. Kullman did not receive the Cunningham and Flynn reports until approximately February 11, 2008, however, he only had a little over three weeks to digest their reports and compare their conclusions with his own examination of the Bryant documents.

Dr. Lyter received the original Bryant documents on or about March 7, 2008 and only had a total of approximately 10 days to examine the documents and prepare his expert report.   Dr. Lyter and Mr. Kullman finalized their reports on March 17, 2008.  Both Mr. Kullman and Dr. Lyter found evidence of faint or partially obscured lines in the colored poster-board drawings which superimposed with the final ink lines on the outline drawings on the tracing paper.[21]   Based on this, and other observations, Mr. Kullman and Dr. Lyter concluded, in most instances, that the multi-color poster board drawings were traced from the outline drawings on the tracing paper.

---

[20]      Hutnyan Decl., Ex. 10: Expert Report of Lloyd Cunningham, at 9 (stating that he employed "oblique lighting, magnification, reflected infrared, infrared luminescence and UV [tests]").

[21]      Sloan Decl., Ex. 13: Expert Report of Robert Kullman, at 3 ("In every case, the faint lines in the mixed media drawings matched with the lines from the tracing paper sketches/drawings."); Ex. 14: Expert Report of Albert Lyter, at 5-9.

### G. **MGA's Experts Admitted to Seeing Faint Pencil Lines in The Multi-Colored Drawings During Their Depositions**

On March 27, 2008, Mr. Flynn was deposed by MGA. Mr. Flynn admitted that he had, in fact, seen "faint pencil lines" in the multi-color drawings through his microscopic analysis.[22] Mr. Flynn also testified that, like Mr. Kullman and Dr. Lyter, he tried to see whether the faint pencil lines on the multi-color drawings matched up with the ink lines on the outline drawings.[23] Unlike Kullman and Lyter, however, Mr. Flynn indicated that there was "never an exact one-to-one" match between the faint pencil lines and the ink on the outline tracings.[24] Accordingly, Flynn disagreed with Lyter and Kullman's conclusion that the poster-board drawings had been traced from the outline drawings.[25] Indeed, Mr. Flynn reached the exact opposite conclusion: namely, that the outline tracings were "traced" from the poster-boards.[26]

Mr. Flynn also expressly testified that he had had sufficient time to reach the conclusion set forth in his report.

> Q:  In your view, did you have enough time to draw the conclusion that you drew in your report?
>
> A:  Certainly.

---

[22]   Sloan Decl., Ex. 10: Depo. Tr. of William J. Flynn (Mar. 27, 2008), at 77; *see also id.* at 174-175: "Q. Did you find any partially obscured pencil lines on 227? I'm sorry, let me direct your attention to 227, which is the colored or multimedia drawing, do you see any partially obscured pencil lines on 227? A. There -- yes, in only one area, I think what I see is a partially obscured pencil line. Q. Where is that? A. There's a fold in the doll's skirt just below her right hip and it appears on the poster board that there's almost a semi-circular pencil line that is on the right side of the skirt."

[23]   *Id.* at 80-81.

[24]   *Id.* at 81-82.

[25]   *Id.* at 225.

[26]   *See* Hutnyan Decl., Ex. 9: Expert Report of William J. Flynn, at 7-8.

---

(Sloan Decl., Ex. 10: Depo. Tr. of William J. Flynn, at 229:23-25.)

On March 31, 2008, MGA took Mr. Cunningham's deposition.   Like Mr. Flynn, Mr. Cunningham testified that he saw many areas of faint or partially obscured pencil lines on the multi-colored posterboard drawings.[27]   Consistent with his report,  Cunningham testified that he believed these pencil lines in some cases might be evidence that those pencil lines were traced from other documents.

> Q:    And you indicated that there was a possible pencil
>        tracing outline from another document on Bryant 223; is
>        that correct?
>
> A:    Yes.
>
>                    *      *      *      *
>
> Q:    [Y]ou testified that [the faint pencil lines] exhibit
>        possible evidence or they are possible evidence that
>        those lines were traced from another drawing, correct?
>
> A:    Could have been, yes.

(Sloan Decl., Ex. 8: Depo. Tr. of Lloyd Cunningham, at 140:7-10; 141:23-142:2.)

Contrary to Mattel's Application,[28] Mr. Cunningham specifically testified that, "I did use infrared and infrared luminescence on the posterboard drawings to determine if there was a pencil line under some of the bold outline which it appeared that there were pencil strokes under some of the bold lines."[29]  Mr. Cunningham also stated that although he only conducted a "cursory examination" on some of the documents, in his professional opinion, he had sufficient time to examine the specific documents which are actually discussed in his report.[30]

---

[27]     Sloan Decl, Ex. 8: Depo. Tr. of Lloyd Cunningham, at 141, 144-45 (describing where he observes faint pencil strokes).

[28]     *See* App. at 4 (complaint that Mattel's experts did not have time to conduct infrared luminescence and reflective infrared testing).

[29]     Sloan Decl, Ex. 8: Depo. Tr. of Lloyd Cunningham, at 143:1-5.

[30]     *Id.* at 53.

### H.   Mattel's Belated Requests for Further Expert Examination of the Bryant Documents

On March 31, 2008, two weeks after Dr. Lyter's and Mr. Kullman's reports were released to Mattel, the expert discovery deadline imposed by this Court's scheduling order expired.[31]   Two days later, on April 2, 2008, Mattel's attorneys sent a letter to MGA and Bryant demanding that Bryant agree to provide Mr. Cunningham and Mr. Flynn with an additional one week each to perform additional non-destructive testing and examination of the documents.[32]   Bryant rejected Mattel's request in a letter dated April 3, 2008, in which Bryant noted that Mattel's request was improper for numerous reasons, including because Mattel's experts had already had sufficient time to examine the documents and had not requested additional time for testing, as permitted by Judge Infante's August 30 Order.[33]   In addition, Byrant noted that fact discovery in the case had closed more than two months ago, and expert discovery, absent agreement between the parties, had closed on March 31, 2008.[34]   On April 4, 2008, MGA sent Mattel's counsel a letter joining in Bryant's objections.[35]

---

[31]   Sloan Decl., Ex. 15: Scheduling Order (Oct. 31, 2007).

[32]   Hutnyan Decl., Ex. 13.

[33]   Hutnyan Decl., Ex. 14, at 2.

[34]   *Id.* at 1.

[35]   Hutnyan Decl., Ex. 15.

1

## III.    ARGUMENT

2

**A.    Mattel's Motion is Procedurally Defective -- By Moving For Leave To File A Sur-Rebuttal Report, Rather Than Moving to Amend the Court's Scheduling Order, Mattel Has Put The Cart Before The Horse**

3

4

5

6      As an initial matter, Mattel's motion is procedurally defective, and must be

7    denied, because it seeks the wrong relief.   During the parties' meet-and-confer, in an

8    e-mail letter to Mattel's counsel, and in MGA's and Carter Bryant's Joint Preliminary

9    Opposition to the *ex parte* application submitted to Judge Infante, Mattel was

10   informed that because the expert discovery deadline expired on March 31, 2008, the

11   Scheduling Order issued by this Court would need to be modified before its experts

12   could perform any further testing or examination of the Bryant original documents.[36]

13   Despite being armed with this information before filing this *ex parte* Application,

14   Mattel has not moved to modify the Rule 16 Scheduling Order to re-open expert

15   discovery to perform the testing that must logically precede any sur-rebuttal expert

16   report.  Rather, Mattel has sought only the right to file a sur-rebuttal expert report,

17   failing to present, much less establish any "good cause" for modifying the

18   Scheduling Order to re-open expert discovery at this late stage of the pre-trial

19   proceedings.  Simply put, Mattel has put the cart before the horse, intentionally

20   refusing to address the consequences that a second round of expert discovery would

21   have on the Court's scheduling of Phase 1 of the trial.[37]

22   ───────────────────
[36]    *See* Sloan Decl. ¶ 17 & Ex. 18: Carter Bryant's and MGA's Joint Preliminary Opposition to Ex Parte Application to Compel Access to Certain Bryant Originals (filed with Judge Infante); Hutnyan Decl., Ex. 16 (e-mail).

23

24   [37]    Attempting to avoid these central issues, Mattel's counsel erroneously argued during the meet-and-confer that a Scheduling Order modification from this Court was not necessary because the parties had (purportedly) stipulated on the record during a June 20, 2006 hearing before Magistrate Judge Block to allow access to Carter Bryant's original drawings upon 15 days notice at any time, including months after the close of discovery.  (Sloan Decl. ¶ 17.)  Regardless of Mattel's characterization of that stipulation, it certainly did not and could not extend beyond

25

26

27

*(cont'd)*

28

1     As also explained to Mattel's counsel before the filing of its dual *ex parte*

2  applications, Mattel must seek from this Court—as opposed to the Discovery

3  Master—the right to re-open discovery for further testing because it requires a

4  modification of the Scheduling Order.  *See Braun v. Agri-Systems*, No. F-02-6482,

5  2006 WL 278592, at *5 (E.D. Cal. Feb. 2, 2006) (finding that party waived right to

6  inspect documents because it did not seek to inspect them before the close of

7  discovery); *Jenkins v. Wholesale Alley, Inc.*, No. 1:05-CV-3266 JEC, 2006 WL

8  2716091, at *9 (N.D. Ga. Sept. 22, 2006) (finding demand to inspect property made

9  after discovery cut-off to be untimely).  Judge Infante cannot modify the Scheduling

10  Order and re-open expert discovery.  *See* C.D. Cal. R. 16-14 ("Any application to

11  modify an order entered pursuant to F. R. Civ. No. P. 16 shall be made to the judicial

12  officer who entered the order.")  Besides being the law, this only makes sense since

13  such a decision would have a significant, cascading effect on the scheduling of the

14  trial.  Indeed, as discussed below (*see infra* Section III. F), granting Mattel's

15  requested relief here could have the disastrous effect of pushing expert discovery up

16  to or beyond the eve of trial, and could therefore seriously undermine the Court's trial

17  schedule.   Of course, by avoiding the issue altogether, Mattel has presented neither

18  this Court nor Judge Infante with an analysis of the consequences of modifying the

19  Scheduling Order to re-open expert discovery.[38]

20

21  *(cont'd from previous page)*
   the discovery schedule set forth in the Rule 16 Scheduling Order.  Magistrate Judge

22  Block lacked the jurisdictional authority to provide the sweeping order that Mattel's
   counsel maintains he did, an order that would transcend this Court's own orders and

23  management of this case.

24  [38]   Curiously, in a Reply submitted to Judge Infante on April 9, 2008, Mattel
   represented that it had sought by its *ex parte* Application to this Court to re-open

25  expert discovery and modify the Rule 16 Scheduling Order accordingly.  (Sloan
   Decl., Ex. 17.)  Of course, out of the other side of its mouth, Mattel has advised this

26  Court that it "has applied to the Discovery Master to order Bryant to make available
   the documents in question for a period of two weeks," i.e., re-open discovery.  (App.

27  at 3.)  Mattel's two-step has resulted in the elephant in the room going unaddressed
   *(cont'd)*

28

1   In short, absent a stipulation or modification of the Scheduling Order ordered

2   by this Court, and not the Discovery Master, expert discovery in this case is closed.

3   Because Mattel's Application does not seek an extension of the March 31, 2008

4   expert discovery deadline, and fails to present much less establish any "good cause"

5   for a modification of the Scheduling Order to do so, pursuant to Rule 16(e), the

6   Application to file a sur-rebuttal report should be denied.  "[W]here a party has not

7   sought to modify a scheduling order deadline, this Court may deny as untimely any

8   motion filed after that deadline." *Telemasters, Inc. v. Vintage Club Masters Ass'n*,

9   No. CV 05-05139 FMC (VBKx), 2007 WL 1839701, at *2 (C.D. Cal. Feb. 2, 2007)

10  (citing *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 608 (9th Cir. 1992)).

11   **B.   Mattel's Application Is Untimely**

12

13   Regardless, any effort by Mattel to modify the Scheduling Order to re-open

14   expert discovery and file sur-rebuttal expert reports should be denied as untimely.

15   The operative Scheduling Order in this case, issued on October 31, 2007, established

16   a fact discovery cutoff of January 28, 2008 and an expert discovery cutoff of March

17   31, 2008.  (Sch. Order, p. 2.)  It is elementary that extensions of time are to be

18   brought before the prescribed time has expired.  *See* Fed. R. Civ. P. 6(b)(1); *Jackson*

19   *v. Laureate, Inc.*, 186 F.R.D. 605, 607-08 (E.D. Cal. 1999) (a party should make a

20   prompt request for modification once it becomes apparent that compliance is not

21   possible).  In fact, this Court's "Standing Order" specifically requires that

22   applications to extend scheduling order deadlines "must be filed in advance of the

23   date due."  (Standing Order ¶ 7.)

24

25

———————

*(cont'd from previous page)*

26   by Mattel: namely, the substantial consequences of re-opening expert discovery on
the eve of trial.

27

28

1   Here, Mattel did not file the present *ex parte* Application until April 8, 2008,[39]

2   more than one week after the expert discovery cutoff of March 31, 2008, and more

3   than two months after the fact discovery cutoff of January 28, 2008.[40]   Accordingly,

4   Mattel's request to amend the scheduling order is untimely and should be denied.[41]

5       **C.   Mattel Has Not – and Cannot --  Establish The Good Cause**

6       **Necessary To Excuse its Last Minute Attempt to Amend The Rule**

7       **16 Scheduling Order**

8       A Rule 16 scheduling order may be modified only for good cause.  Fed. R. Civ.

9   P. 16(b)(4); *Matrix Motor Co. v. Toyota Jidosha Kabushiki Kaisha*, 218 F.R.D. 667,

10  671 (C.D. Cal. 2003).  Mattel does not and cannot meet this requirement.

11      "[T]he 'good cause' standard set forth in Rule 16 primarily focuses upon the

12  diligence of the party requesting the amendment."  *Schwerdt v. Int'l Fid. Ins. Co.*, 28

13  Fed. Appx. 715, 719 (9th Cir. 2002).  "[G]ood cause can only be shown if the pretrial

14  schedule 'cannot reasonably be met despite the diligence of the party seeking the

15  extension.'"  *Yent v. Baca*, No. CV-01-10672 (VBKX), 2002 WL 32810316, at *1

---

16  [39]   Mattel electronically filed a copy of its *ex parte* Application and a publicly

17  redacted copy of the Hutnyan Declaration at 10:08 p.m. on April 8, 2008.  MGA and Bryant were not served with full copies of the filing, including an unredacted copy of

18  the Hutnyan Declaration and the required Proposed *Ex Parte* Order, until April 9, 2008, at 11:25 a.m. and 12:50 p.m. respectively.

19      Given the 24-hour post-service deadline for MGA and Bryant to file this Opposition, it should be noted for the record that the execution by Dave Quintana of

20  the Proof of Service attesting to personal service by hand on Skadden, Arps, Slate, Meagher & Flom ("Skadden") and Keker & Van Nest ("Keker") on April 9, 2008,

21  and the electronic filing with the Court of that Proof of Service by Diane Hutnyan at 11:07 a.m. on April 9, 2008, both preceded in time the actual personal service to

22  Skadden (11:25 a.m.) and Keker (12:50 p.m.) attested to as having *already been made* by hand in the Proof of Service.

23  [40]   By contrast, MGA filed its *ex parte* application to extend the expert rebuttal

24  report deadline for Ms. Prince's notary book a week before the March 17, 2008 deadline.

25  [41]   "'Ex parte applications are not intended to save the day for parties who have

26  failed to present requests when they should have . . . .'"  *Mission Power Eng'g Co. v. Cont'l Cas. Co.*, 883 F. Supp. 488, 492 (C.D. Cal. 1995)  (alteration in original)

27  (citation omitted).

28

(C.D. Cal. Dec. 16, 2002) (citation omitted).  "'If that party was not diligent, the inquiry should end.'"  *Id.* (quoting *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 2002) and *Schwerdt*, 28 F. Appx. at 719).  Here, Mattel was far from diligent.  In fact, Mattel, its counsel, and its experts were negligent in at least two respects, both of which independently bar the extraordinary relief which Mattel seeks here.

First, Mattel and its experts were either negligent in their initial testing of the Bryant drawings or negligent in not asking Bryant or the Court for more time to perform their initial testing in the fall of 2007.  In their depositions, Mr. Cunningham and Mr. Flynn have taken seemingly contradictory positions.   On the one hand, both Mr. Cunningham and Mr. Flynn have represented that they had sufficient time to reach the conclusions set forth in their respective reports.   [*See supra* Section II.G.] Indeed, Mr. Cunningham expressly states that he had sufficient time to examine all the documents discussed in his report and that he performed examinations using both infrared luminescence and infrared light.[42]  On the other hand, Mattel now claims that both Cunningham and Flynn were hampered by the 35-day deadline imposed by Judge Infante from performing thorough testing.

The problem is that Judge Infante expressly advised Mattel that he would grant an extension of this 35-day deadline for "good cause" if Mattel could show that its experts had not had sufficient time to perform the requisite tests within the time allotted.  Mattel, however, failed to seek such an extension either from Bryant or from the Court, despite the fact that Bryant later voluntarily granted Mattel's paper expert, Walter Rantanen, an additional four days to conduct destructive sampling on the documents.

---

[42]     Sloan Dec., Ex. 8: Depo. Tr. Of Lloyd Cunningham (Mar. 31, 2008), at 53, 142-43.

1    Mattel's failure to seek such additional testing is instructive.  Either Mattel's

2  experts believed that they had performed a thorough review at the time (and were

3  negligent) or they were lying in the weeds and intentionally failed to perform certain

4  tests for fear of finding facts that would support Bryant's account of the sequencing

5  of the drawings.   Alternatively, Mattel's counsel may have been negligent in failing

6  to seek relief from the Court for additional testing.  Regardless of the reason,

7  however, Mattel was clearly negligent in not seeking leave to perform additional

8  testing in the fall of 2007.  Under no standard can such conduct be deemed "diligent"

9  and if a party is not diligent, its motion to extend the scheduling order must be

10  denied. *Johnson*, 975 F.2d at 608-09.[43]

11    Second, Mattel was also negligent in failing to move for further expert

12  discovery in March 2008 before the expiration of the March 31 expert discovery cut-

13  off.  Mattel alleges in its Application that its need for further expert examination was

14  created by the new and unanticipated testing performed by Mr. Kullman and Dr.

15  Lyter.  However, even if Kullman and Lyter's examinations justified Mattel's request

16  for further examination, Mattel should have filed for such relief promptly upon

17  receiving this reports on March 17, 2008.  Instead, Mattel waited for more than three

18  weeks, until April 8, 2008, to file this motion for relief, and therefore missed the

19  March 31 expert discovery deadline by over a week.   As such, Mattel cannot

20  establish the good cause necessary to amend the Schedule Order under Rule 16.

21  Sitting on one's hands while the discovery clock expires does not constitute diligence

22  _____

23  [43]    Besides rendering their present claim disingenuous at best, Mattel's failure to make the request for additional time specifically invited by Judge Infante

24  demonstrates a lack of diligence amounting to a lack of good cause to now amend

25  the Rule 16 scheduling order to re-open expert discovery on the eve of trial.  *See Johnson*, 975 F.2d at 609; *Schwerdt*, 28 F. Appx. at 719; *Yent*, 2002 WL 32810316,

26  at *1.

27

28

or establish good cause for a scheduling order deadline extension.  As explained in *Yent*:

> Plaintiff has not established good cause.  He does not explain why the underlying motion was not brought in a timely fashion so that the motion could be heard prior to the discovery motion deadline.  In short, Plaintiff neither cites nor grapples with the high standards of Rule 16, and has failed to make the necessary showing of diligence.
>
> Similarly, plaintiff fails to explain why his waiting until the eve of the close of discovery to file his application moving for relief is not a crisis of his own creation precluding him from seeking *ex parte* relief.

*Yent*, 2002 WL 32810316, at \*1; *see Mission Power Eng'g Co. v. Cont'l Cas. Co.*, 883 F. Supp. 488, 492-93 (C.D. Cal. 1995).

### D.   MGA's And Bryant's Actions Do Not Provide Mattel Any Good Cause Nor Do They Excuse Mattel's Lack Of Diligence And/Or Negligence

Contrary to Mattel's argument, MGA's and Bryant's actions do not supply the "good cause" necessary to support Mattel's requested amendment of the scheduling order, nor do their actions establish that Mattel is without fault or guilty only of excusable neglect to justify the use of *ex parte* procedures.  (App. at 8-9.)  Mattel has only itself to blame for its predicament.  "Rule 16 scheduling orders are at the heart of case management and if they can be flouted every time counsel determines she made a tactical error in . . . discovery, their utility will be severely impaired."  *Yent*, 2002 WL 32810316, at \*1 (quoting *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 341 n.4 (3d Cir. 1990) (internal quotation marks omitted)).

1    First, contrary to Mattel's repeated statements, it was not MGA and Bryant that
2  "severely limited Mattel's experts' access to Bryant's original documents." (App. at
3  2.)  The 35-day access period was the product of motion practice, ultimately decided
4  and ordered by Judge Infante after an *in camera* review of declarations from Mattel's
5  experts that included statements (unknown to MGA or Bryant at the time) about the
6  contemplated testing.[44]  Moreover, Judge Infante specifically granted Mattel the
7  opportunity to seek additional time upon "good cause" shown, a fact which is
8  curiously absent from Mattel's Application.  Mattel never asked Judge Infante for
9  any additional time to perform the testing that is now says it did not have the time to
10  do the first time.
11    Second, as Mattel has admitted in its Application, and both Cunningham and
12  Flynn admitted in their deposition, Cunningham and Flynn both saw the faint or
13  partially obscured pencil lines in the multi-colored posterboard drawings.   Despite
14  their proclaimed expertise in the field, however, Cunningham and Flynn decided—
15  depending on which of the two contradictory Mattel stories is to be credited— either
16  that they wanted to perform further examination of the lines but did not have the time,
17  or that they did not examine the lines more closely because they did not believe them
18  to be significant.  (App. at 2).  Either way, Mattel and its experts were either
19  negligent in failing to request more time to perform the testing necessary to submit a
20  complete report under Rule 26, negligent in the application of their scientific
21  expertise, or intentionally decided to "lie in the weeds" until MGA's experts issued
22  their reports.  *See Keener v. U.S.*, 181 F.R.D. 639, 641 (D. Mont. 1998).  MGA and
23  Bryant should not pay the price for Mattel's poor strategic choices.
24    Third, contrary to Mattel's claims, MGA's expert reports are proper *rebuttal*
25  reports.  MGA's experts did not, as Mattel misleadingly claims, "develop a rebuttal

26  _____
[44]    Hutnyan Decl., Exs. 3-6.
27

28

theory not based on the evidence presented in Mssrs. Flynn's and Cunningham'[s] reports." (App. at 9.) MGA's experts scientifically examined the same "evidence" that Mattel's experts examined (the original Bryant drawings) with the same instruments and methods available to, and in some cases, employed by Mssrs. Cunningham and Flynn.   MGA's experts just performed their jobs more thoroughly and completely than Mssrs. Flynn and Cunningham.  Mattel's argument that MGA's rebuttal report was improper merely because Mr. Kullman and Dr. Lyter used methods not employed by Mattel's experts, or performed a more thorough analysis of the documents, is absurd.   Mr. Cunningham and Mr. Flynn are not entitled to a "re-do" merely because they failed to perform the same tests or focus on the same lines as Mr. Kullman and Dr. Lyter.

### E.   Mattel's Argument That It Merely Seeks The Right To File Rule 26(e) "Supplemental" Expert Reports Is Wrong

Mattel attempts to disguise its request by characterizing it as one for a mere "supplemental" report required by the Fed. R. Civ. P. 26(e)(2).  (App. at 9.)  This is simply wrong.  As an obvious matter, if Mattel was seeking merely to file a "supplemental" expert report, there would be no need to re-open expert discovery and no need for the present Application seeking the right to file such a "supplemental" expert report.  *See* Fed. R. Civ. P. 26(a)(3) & (e) (corrections may be made through a supplemental report up to 30 days before trial).

Further, contrary to Mattel's plea that it "has a responsibility to conduct that testing and supplement its reports," (App. at 9), Mattel's "responsibility" was to conduct a "complete" and accurate report in the first instance.  *See* Fed. R. Civ. P. 26(a)(2)(B).  A "supplemental" report is not the vehicle sought to be employed by Mattel here.  "Although Fed. R. Civ. P. 26(e) requires a party to 'supplement or correct' disclosure upon information later acquired, that provision does not give

1   license to sandbag one's opponent with claims and issues which should have been

2   included in the expert witness' report . . . ." *Beller ex rel. Beller v. U.S.r*, 221 F.R.D.

3   689, 695 (D.N.M. 2003).  "For example, courts have rejected supplemental expert

4   reports that: 1) 'were significantly different' from the expert's original report and

5   effectively altered the expert's theories; or 2) attempted to 'deepen' and 'strengthen'

6   the expert's prior reports."  *Lindner v. Meadow Gold Dairies, Inc.*, Civil No. 06-

7   00394 JMS-LEK, 2008 WL 763236, at *13 (D. Haw. Mar. 19, 2008).  In agreement

8   with *Beller*, the court stated that:

> To allow these types of supplemental reports "would create a
> system where preliminary reports could be followed by
> supplementary reports and there would be no finality to expert
> reports, as each side, in order to buttress its case or position,
> could 'supplement' existing reports and modify opinions
> previously given.  This practice would surely circumvent the
> full disclosure requirement implicit in Rule 26 and would
> interfere with the Court's ability to set case management
> deadlines, because new reports and opinions would warrant
> further consultation with one's own expert and virtually require
> new rounds of depositions.  That process would hinder rather
> than facilitate settlement and the final disposition of the case."

18  *Id.* at *13-14 (quoting *Beller* at 695).  In particular, courts have rejected supplemental

19  expert reports that rely upon testing or analyses that, with proper diligence, could

20  have been done earlier and incorporated in the experts' original report.  *See Lindner*,

21  2008 WL 763236, at *14 (rejecting supplemental expert report where report was

22  based upon additional field work that expert "could have conducted ... prior to his

23  original expert disclosure"); *Palmer v. Asarco Inc.*, No. 03-CV-0498-CVE-PJC, 2007

24  WL 2254343, at *4 (N.D.Okla. Aug. 3, 2007) (rejecting supplemental report where

25  expert could have performed the "could have performed the same modeling in a

26  timely fashion").

1   This is precisely what Mattel is trying to do here: evade Rule 26's requirement
2   that it submit a complete report by trying to "deepen" and "strengthen" its report in
3   response to MGA's rebuttal reports through additional testing that they could have
4   done months ago.  Here, both Cunningham and Flynn saw the faint pencil lines, but
5   either through negligence or lack of time (which they could have cured by asking for
6   a "good cause" extension), they failed to perform all of the relevant testing.   Flynn
7   and Cunningham do not get a "re-do" under the guise of a Rule 26(e) "supplemental"
8   expert report, however.

9   Mattel's reliance on *Phillips v. Netblue, Inc.*, No. C-05-4401 SC, 2007 WL
10   528722 (N.D. Cal. Feb. 13, 2007), is misplaced.  (App. at 5, 6, 7 & 10.)  That case
11   involved a Rule 26(e) "supplemental" expert report, not a reply/sur-rebuttal report or
12   the re-opening of expert discovery after the cut-off.  *Id.* at *2.  Of note, the *Netblue*
13   court specifically held that the supplemental report did not add anything or fill-in any
14   gaps.  *Id.*  That is precisely what Mattel seeks to do here.

15   **F.**   **Granting Mattel's Request for A Second Round Of Testing, Expert**
16   **Reports And Depositions Would Threatens The Current Trial**
         **Schedule**
17
18   Another fundamental reason for denying the Application, which goes
19   unaddressed by Mattel, is the prejudice that MGA and Bryant would suffer if the
20   scheduling order were modified on the eve of trial, after the close of expert discovery.
21   *E.g., Estate of Gonzalez v. Hickman*, No. EDCV 05-660 MMM (RCx), 2007 WL
22   3237639, at *2 (C.D. Cal. Jan. 8, 2007).  Where expert witness deadlines are
23   extended, "the rest of the schedule laid out by the court months in advance, and
24   understood by the parties, would have to [be] altered as well.  Disruption to the
25   schedule of the court and other parties in that manner is not harmless."  *Wong v.*
26   *Regents of Univ. of Cal.*, 410 F.3d 1052, 1062 (9th Cir. 2005).

27
28

1        If expert discovery were re-opened and leave granted to submit a "sur-

2   rebuttal" expert report, MGA respectfully submits that it would in turn be entitled to,

3   among other things: (1) additional testing; (2) a second rebuttal expert report; (3) the

4   opportunity to re-depose Mssrs. Flynn and Cunningham; and (4) the opportunity to

5   consider filing motions *in limine.* *E.g., Miller ex rel. S.M. v. Bd. of Educ.*, 455 F.

6   Supp. 2d 1286, 1299 (D.N.M. 2006) (permitting late expert reports has the effect of

7   denying the opposing party the opportunity to file a meaningful *Daubert* motion);

8   *Beller*, 221 F.R.D. at 694-95 (where supplemental expert report allowed, court is

9   bound to reopen discovery to allow opposing party time for its own experts to view

10  the reports and formulate new opinions and permit new depositions, which could

11  lead to modification of prior reports and new counter-experts).  This would surely

12  disrupt the Court's current schedule.

13       In fact, Mattel's "sur-rebuttal" expert reports would not be due until 3 weeks

14  after any request to re-open expert discovery is granted.[45]  *From today's date*, that

15  means that Mattel's "sur-rebuttal" reports would not be due until May 1, 2008.

16  Among the slew of other scheduling deadlines thrown into disarray by such an

17  extension, motions *in limine* are due April 14, 2008, the final pre-trial conference,

18  which is supposed to address witnesses and exhibits, is set for May 5, 2008, and the

19  trial is set for May 27, 2008.  In short, if granted, Mattel's request would have a

20  detrimental domino effect on numerous scheduling issues and threaten to

21  substantially disrupt the procession towards the Phase 1 of the trial.

22

23

24

25  _____

[45]       Mattel has asked Judge Infante for two weeks to test the Bryant original

26  drawings, (cite), and requests by this Application an additional seven days to prepare the sur-rebuttal report.

27

28

### G.   **Mattel's Attempt to Analogize Its Application to This Court's Order Granting MGA's Request for An Extension Of The March 17, 2008 Deadline For Rebuttal Expert Reports is Misplaced**

Mattel's repeated attempts to compare this Application to MGA's *ex parte* application to extend the March 17 deadline for submitting expert rebuttal reports regarding MGA's testing of Ms. Prince's notary book is misplaced and disingenuous. First, unlike Mattel here, MGA sought an extension of the March 17 deadline before the deadline had expired.   Second, and more importantly, the Scheduling Order specifically contemplated MGA's right to submit a rebuttal expert report.  MGA was just seeking its *frist* chance to test the notary book and submit a report; it wasn't seeking leave to test the document for a *second* time and submit a *second* expert report, as MGA is here.  Third, MGA's testing of the notary book was delayed solely to Mattel's filing of a motion for a protective order; Master; Mattel's failure to test the original Bryant documents more thoroughly, by contrast, was its own choice.

### IV.   **CONCLUSION**

For these reasons set forth above, Mattel's *Ex Parte* Application should be denied in its entirety.

DATED:  April 10, 2008

SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP


By: /s/ Thomas J. Nolan
     Thomas J. Nolan
     Attorneys for MGA Entertainment, Inc.,
     MGA Entertainment (HK) Limited,
     MGAE de Mexico, S.R.L. de C.V., and Isaac
     Larian


KEKER & VAN NEST, LLP


By: /s/ Matthew M. Werdegar
     Matthew M. Werdegar
     Attorneys for Carter Bryant