EXHIBIT 1

## Diane Hutnyan

**From:** Matthew Werdegar [MWerdegar@kvn.com]

**Sent:** Tuesday, April 08, 2008 12:46 PM

**To:** Diane Hutnyan

**Cc:** Lanstra, Allen L; Sloan, Matthew E (LAC)

**Subject:** Mattel v. Bryant et al. -- ex parte application to Judge Infante

Dear Diane:

We are in receipt of your *ex parte* application to compel access to certain Bryant original documents for additional, non-destructive expert examination and imaging. Reviewing the application and the relevant case law, it is apparent to us that Judge Infante does not have the authority to grant the relief you are seeking. The Court's October 31, 2007 Rule 16 Scheduling Order set January 28, 2007 as the fact discovery cut off, and March 31, 2008 as the expert discovery cut off. Because your application is seeking additional discovery beyond these cut-off dates, which were ordered by Judge Larson, only Judge Larson, and not Judge Infante, may grant Mattel's request. Central District Local Rule 16-14 states that "[a]ny application to modify an order entered pursuant to F.R.Civ.P. 16 shall be made to the judicial officer who entered the order," *i.e.*, Judge Larson. Additionally, for the same reasons, Judge Larson must grant Mattel leave to file its contemplated supplemental expert reports, as the current scheduling order only provides for opening and rebuttal reports, and not any supplemental or reply reports.

In light of the foregoing, we are hereby requesting that you agree either (1) to dismiss your *ex parte* application without prejudice to renewing it if and when Judge Larson agrees to modify his scheduling order or (2) stay consideration of the motion until Judge Larson rules on the schedule issues. Please let me know by 5 p.m. today whether you are willing to agree to this request, in which case I will provide you with a proposed stipulation and order memorializing our agreement. If you do not agree, we will file a preliminary opposition with Judge Infante on grounds that he lacks authority to grant the requested relief and, in the unlikely event he disagrees with our analysis, requesting that he set an appropriate schedule for the submission of our opposition and Mattel's reply briefs on the merits of Mattel's request.

I have spoken with counsel for MGA, and they agree with the foregoing analysis and join in our request that you agree to dismiss or stay consideration of the *ex parte* application.

Regards,

Matthew M. Werdegar

**KEKER & VAN NEST LLP**

710 Sansome Street
San Francisco, CA 94111-1704
tel: (415) 391-5400
fax: (415) 397-7188
www.kvn.com

EXHIBIT ___1___

PAGE ___3___

EXHIBIT 2

RECEIVED

DEC 1 1 2006

Send

1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
2    John B. Quinn (Bar No. 090378)
     (johnquinn@quinnemanuel.com)
3    Michael T. Zeller (Bar No. 196417)
     (michaelzeller@quinnemanuel.com)
4    Jon D. Corey (Bar No. 185066)
     (joncorey@quinnemnauel.com)
5  865 South Figueroa Street, 10th Floor
   Los Angeles, California 90017-2543
6  Telephone: (213) 443-3000
   Facsimile: (213) 443-3100
7
   Attorneys for Mattel, Inc.
8
   [Additional counsel listed on following page]
9

10                      UNITED STATES DISTRICT COURT

11                     CENTRAL DISTRICT OF CALIFORNIA

12  CARTER BRYANT, an individual,          )  Case No. CV 04-09049 SGL (RNBx)
                                           )
13                    Plaintiff,           )  Consolidated with
                                           )  Case No. CV 04-09059
14         v.                              )  Case No. CV 05-02727
                                           )
15  MATTEL, INC., a Delaware               )  STIPULATION FOR APPOINTMENT
    corporation,                           )  OF A DISCOVERY MASTER; AND
16                                         )
                      Defendant.           )  [PROPOSED] ORDER
17                                         )
                                           )  Discovery Cutoff Date: Not Set
18                                            Trial Date: Not Set

19

20

21

22

23

24

25

26

27

28

EXHIBIT ___2___

PAGE ___4___

1  LITTLER MENDELSON
      Robert F. Millman (Bar No. 062152)
2     Douglas A. Wickham (Bar No. 127268)
      Keith A. Jacoby (Bar No. 150233)
3  2049 Century Park East, 5th Floor
   Los Angeles, California 90067-3107
4  Telephone:  (310) 553-0308
   Facsimile:  (310) 553-5583
5
   Attorneys for Carter Bryant
6
   O'MELVENY & MYERS LLP
7     Diana M. Torres (Bar No. 162284)
   400 S. Hope Street
8  Los Angeles, California 90017
   Telephone:  (213) 430-6000
9  Facsimile:  (213) 430-6407

10  O'MELVENY & MYERS LLP
       Dale Cendali
11  Times Square Tower
   7 Times Square
12  New York, NY 10036

13  CHRISTENSEN, GLASER, FINK, JACOBS WEIL & SHAPIRO, LLP
       Patricia Glaser (Bar No. 55668)
14  10250 Constellation Boulevard - 19th Floor
   Los Angeles, CA 90067
15  Telephone:  (310) 553-3000
   Facsimile:  (310) 556-2920
16
   Attorneys for MGA Entertainment, Inc.
17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT _____ 2 _____

PAGE _____ 5 _____

STIPULATION FOR APPOINTMENT OF A DISCOVERY
MASTER AND [PROPOSED] ORDER

1    WHEREAS, the parties are in agreement that a discovery master should be
2  appointed in this matter to resolve any discovery disputes and to minimize the
3  burden on the Court; and

4    WHEREAS, the parties have agreed upon a nominee, Hon. Edward A. Infante
5  (Ret.), and he has agreed to serve as a discovery master in this matter;

6    NOW, THEREFORE, to facilitate the fair and efficient completion of pre-
7  trial discovery, the parties Mattel, Inc. and Carter Bryant and MGA Entertainment,
8  Inc., by and through their respective counsel of record, hereby stipulate and agree as
9  follows:

10    1.    The Discovery Master shall be appointed to assure and provide cost-
11  effective discovery and to minimize the burden of discovery disputes upon the
12  Court. Any and all discovery motions and other discovery disputes in the above
13  captioned action shall be decided by a master ("Discovery Master") pursuant to
14  Federal Rule of Civil Procedure 53. Any motions currently pending before
15  Magistrate Judge Block shall be transferred to the Discovery Master. The moving
16  party shall provide to the Discovery Master all papers associated with each pending
17  motion.

18    2.    The Discovery Master shall be Hon. Edward A. Infante (Ret.). His
19  business address is: Two Embarcadero Center, Suite 1500, San Francisco, CA
20  94111.

21    3.    Judge Infante shall serve as the Discovery Master until all issues herein
22  have been finally disposed of or determined, or until he shall withdraw in
23  accordance with applicable law. If at any time he becomes unable to serve as the
24  Discovery Master, the parties shall confer to present an alternative agreed-upon
25  designee to the Court. In the event that the parties cannot agree to an alternate
26  designee, then the Court shall appoint a Discovery Master.

27    4.    The Discovery Master shall have the authority to set the date, time, and
28  place for all hearings determined by the Discovery Master to be necessary; to

EXHIBIT ____2____

PAGE ____6____                    -3-                STIPULATION FOR APPOINTMENT OF A DISCOVERY
                                                     MASTER AND [PROPOSED] ORDER

1  preside over hearings (whether telephonic or in-person); to take evidence in
2  connection with discovery disputes; to issue orders resolving discovery motions
3  submitted to the Discovery Master; to conduct telephonic conferences to resolve
4  discovery disputes arising during depositions; to issue orders awarding non-
5  contempt sanctions, including, without limitation, the award of attorney's fees, as
6  provided by Rules 37 and 45; and to prepare, file and serve other orders, reports and
7  recommendations, as appropriate.

8      5.    All discovery disputes shall be resolved by motion (except those arising
9  during a deposition which the Discovery Master determines can be resolved by
10  telephonic conference during the deposition).  The moving party shall first identify
11  each dispute, state the relief sought, and identify the authority supporting the
12  requested relief in a meet and confer letter that shall be served on all parties by
13  facsimile or electronic mail.  The parties shall have five court days from the date of
14  service of that letter to conduct an in-person conference to attempt to resolve the
15  dispute.  If the dispute has not been resolved within five court days after such
16  service, the moving party may seek relief from the Discovery Master by formal
17  motion or letter brief, at the moving party's option.  The opposing party shall have
18  five court days from the date of service of the motion or letter brief to submit a
19  formal opposition or response.  Any reply brief or letter brief shall be served within
20  three court days from the date of service of a formal opposition or response.  The
21  hearing on the motion shall take place within five court days of the service of any
22  reply brief or letter unless (a) the parties agree to another hearing date or agree that
23  no hearing is necessary; (b) the Discovery Master determines that no hearing is
24  necessary; or (c) the Discovery Master is not available, in which case the hearing
25  shall take place on the Discovery Master's first available date.  The foregoing shall
26  not prohibit (i) the parties from agreeing to alternate procedures, or (ii) a party from
27  seeking the Discovery Master's immediate resolution of a dispute or resolution of a
28  dispute upon shortened time upon a showing of good cause why a party would be

EXHIBIT ___2___

PAGE ___7___                                    - 4 -

1  prejudiced absent prompt resolution. Service of any document by fax or electronic
2  mail prior to 6:00 p.m. shall constitute service on that day.

3      6.      The Discovery Master's orders resolving discovery disputes, reports, or
4  recommendations pursuant to Rule 53(e) or (f) shall be treated as rulings made by a
5  Magistrate Judge of the United States District Court. The Discovery Master shall
6  file each order, report, or recommendation pursuant to Rule 53(e) or (f) and serve
7  the parties within five court days of his/her decision on a matter.

8      7.      A court reporter shall transcribe any hearing or other proceeding before
9  the Discovery Master.

10      8.      The cost of any proceeding before the Discovery Master, including the
11  fees of the Discovery Master, the fees of court reporters who transcribe hearings or
12  other proceedings before the Discovery Master, and the fees of any other person
13  necessary to the efficient administration of the proceeding before the Discovery
14  Master, shall be paid one-half by Mattel, Inc., and one-half by MGA Entertainment,
15  Inc. and Carter Bryant unless, consistent with the Federal Rules of Civil Procedure,
16  the Discovery Master Orders otherwise. By agreeing to share costs among the
17  parties, no party waives its right to seek recovery or reimbursement for such costs
18  from any other party.

19      9.      The Discovery Master shall be compensated according to his regular
20  hourly rate of $750.

21      10.     Pursuant to Federal Rule of Civil Procedure 53(b)(2), the Discovery
22  Master shall proceed with all reasonable diligence.

23      11.     Based on an affidavit filed by Hon. Edward A. Infante pursuant to
24  28 U.S.C. § 455 and Federal Rule of Civil Procedure 53(b)(3), the parties are not
25  aware that he has a relationship to the parties, to counsel, to the action, or to the
26  Court that would require disqualification of a judge under 28 U.S.C. § 455, and
27  based thereon the parties expressly waive any ground for disqualification disclosed
28  therein of Hon. Edward A. Infante to serve as master in these proceedings.

EXHIBIT 7

PAGE 8

- 5 -

12.    The Discovery Master shall not have ex parte communications with ~~the Court,~~ a party or counsel.

13.    The Discovery Master shall preserve and maintain all documents and materials submitted by the parties as well as all orders, reports, and recommendations issued by the Discovery Master.  These documents, materials, orders, reports and recommendations shall be the record of the Discovery Master's activities, and shall be maintained in chronological order until the Discovery Master is informed by the parties that all issues herein have been finally disposed of and determined.

14.    The Discovery Master is hereby authorized to receive and consider information and documents designated "CONFIDENTIAL" and "CONFIDENTIAL-ATTORNEYS EYES ONLY" pursuant to the January 4, 2005 Stipulated Protective Order.  The Discovery Master agrees to be bound by the January 4, 2005 Order.

15.    All third parties subject to discovery requests or deposition in this litigation shall be bound by the terms of this Stipulation and Order.

Dated: November 2?, 2006                     O'MELVENY & MYERS LLP

                                             By: _____
                                                 Diana Torres
                                                 Attorneys for MGA Entertainment, Inc.

Dated:  November 2?, 2006                    LITTLER MENDELSON

                                             By: _____
                                                 Douglas A. Wickham
                                                 Attorneys for Carter Bryant

STIPULATION FOR APPOINTMENT OF A DISCOVERY
MASTER AND [PROPOSED] ORDER

- 6 -

EXHIBIT _____ 2
PAGE _____ 9

1 | Dated: ~~November~~ December 4, 2006            QUINN EMANUEL URQUHART
                                                    OLIVER & HEDGES, LLP

2

3                                                   By: _____
                                                        Jon D. Corey
4                                                       Attorneys for Mattel, Inc.

5

6                          **ORDER**

7      The foregoing Stipulation for Appointment of a Discovery Master is SO

8  ORDERED, *as modified*.

9

10 Dated:  12-6-06 .                         _____
                                             Hon. Stephen G. Larson
11                                           United States District Court Judge

12

13

14                 **CONSENT OF DISCOVERY MASTER**

       If appointed by the Court, I, the undersigned, consent to serve as Discovery
15
   Master in the above referenced proceeding consistent with this Order.
16

17
   Dated:  12-5-06 .                         _____
18                                           Hon. Edward A. Infante (Ret.)

19

20

21

22

23

24

25

26

27

28

STIPULATION FOR APPOINTMENT OF A DISCOVERY
MASTER AND [PROPOSED] ORDER

EXHIBIT ___ 2

PAGE ___ 10

## PROOF OF SERVICE
1013A(3) CCP Revised 5/1/88

1  **STATE OF CALIFORNIA** )
2  **COUNTY OF LOS ANGELES** )

3      I am employed in the county of Los Angeles  State of California.  I am over the age of 18
   and not a party to the within action; my business address is: 865 South Figueroa Street, 10th Floor,
4  Los Angeles, CA 90012.

5      On December 5, 2006, I served the foregoing document described as **STIPULATION FOR APPOINTMENT OF A DISCOVERY MASTER; AND [PROPOSED ORDER** on all
   interested parties in this action.

6

7  **Keith A. Jacoby, Esq.**                          **Diana M. Torres, Esq.**
   **Douglas Wickham, Esq.**                          **O'Melveny & Meyers**
   **Littler Mendelson**                              400 S. Hope Street
8  **A Professional Corporation**                     Los Angeles, CA 90071
   2049 Century Park East, 5th Floor                  Phone: 213-430-6000
9  Los Angeles, California 90067-3107                 **Fax: 213-430-6407**
   Phone: 310-553-0308
10 **Fax: 310-553-5583**

11

12 [ ]  By placing [ ] the original [X] true copies thereof enclosed in sealed envelopes addressed
13      as follows:

14 **[X]  BY MAIL**

15 [ ]  I deposited such envelope in the mail at Los Angeles, California.  The envelope was mailed
        with postage thereon fully prepaid.

16 [ ]  As follows: I am "readily familiar" with the firm's practice of collection and processing
        correspondence for mailing.  Under that practice it would be deposited with U.S. postal
17      service on that same day with postage thereon fully prepaid at Los Angeles, California in the
        ordinary course of business.  I am aware that on motion of the party served, service is
18      presumed invalid if postal cancellation date or postage meter date is more than one day after
        date of deposit for mailing in affidavit.

19 [ ]  **BY TELECOPIER** By transmitting the above listed document(s) to the fax number(s)
20      set forth above on this date.

21 [ ]  **BY PERSONAL SERVICE** I delivered such envelope by hand to the addressee.

22 Executed on December 5, 2006, at Los Angeles, California.

23 [ ]  (State) I declare under penalty of perjury under the laws of the State of California that the
        above is true and correct.

24 [X]  (Federal) I declare that I am employed in the office of a member of the bar of this court at
        whose direction the service was made.

25

26 _____
   Cheri Hatch                                        _____
27 Print Name                                         Signature

28

EXHIBIT ___2___

PAGE ___11___

EXHIBIT 3

040808KK.txt

```
 1              UNITED STATES DISTRICT COURT

 2             CENTRAL DISTRICT OF CALIFORNIA

 3                    EASTERN DIVISION

 4

 5    CARTER BRYANT, an            )
      individual,                  )
 6                                 )
                   Plaintiff,      )
 7                                 )
      vs.                          )   No. CV 04-9049
 8                                 )      SGL (RNBx)
      MATTEL, INC., a Delaware     )
 9    corporation,                 )
                                   )
10                 Defendant.      )
                                   )
11                                 )
      AND CONSOLIDATED ACTIONS     )
12    _____)

13

14

15         ***ROUGH COPY - NOT FOR OFFICIAL USE***

16            DEPOSITION OF ROBERT KULLMAN

17               Los Angeles, California

18              Tuesday, April 8, 2008

19

20

21
      Reported by:
22    Stephanie Leslie
      CSR No. 12893
23    Job No. 85751

24

25
```

                                                    1

□


```
 1              UNITED STATES DISTRICT COURT

 2             CENTRAL DISTRICT OF CALIFORNIA
```
                        Page 1

EXHIBIT ___3___

PAGE ___12___

040808KK.txt

3                          EASTERN DIVISION

4

5       CARTER BRYANT, an                    )
        individual,                          )
6                                            )
                    Plaintiff,               )
7                                            )
        vs.                                  )  No. CV 04-9049
8                                            )     SGL (RNBx)
        MATTEL, INC., a Delaware             )
9       corporation,                         )
                                             )
10                  Defendant.               )
                                             )
11

12

13

14              Deposition of ROBERT KULLMAN, taken on behalf

15      of Defendant, at Quinn Emanuel, 865 South Figueroa

16      Street, Tenth Floor, Los Angeles, California, beginning

17      at 9:48 a.m. and ending at 8:14 p.m. on  Tuesday, April

18      8, 2008, before Stephanie Leslie, Certified Shorthand

19      Reporter No. 12893.

20

21

22

23

24

25
                                                                2

1       APPEARANCES:

2

3       For Defendant, MATTEL, INC.:

4               QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
                BY:   DIANE CAFFERATA HUTNYAN
5               ATTORNEY AT LAW
                865 South Figueroa Street, Tenth Floor
6               Los Angeles, California  90017

EXHIBIT ____3____

PAGE ____13____

```
                        040808KK.txt
                     (213) 443-3666
 7                   dianehutnyan@quinnemanuel.com

 8
        For Defendant and Cross-Complainant, MGA:
 9
                     SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
10                   BY:  MATTHEW E. SLOAN
                     ATTORNEY AT LAW
11                   300 South Grand Avenue
                     Los Angeles, California  90071
12                   (213) 687-5276
                     matthew.sloan@skadden.com
13

14
        ALSO PRESENT:
15

16                   GREGORY PAPIGNY, Videographer

17

18

19

20

21

22

23

24

25
                                                              3
    0


 1                              INDEX

 2      WITNESS                              EXAMINATION

 3      ROBERT KULLMAN

 4                   BY MS. HUTNYAN                   **

 5
                              EXHIBITS
 6
        DEFENDANT'S                                  PAGE
 7

 8

 9

10
                          Page 3
```

EXHIBIT _____ 3

PAGE _____ 14

040808KK.txt

1     documents -- if you look back at page 1 of your amended
2     report, Exhibit 5201, you'll see a number of hyphenated
3     bullet points there highlighting different documents
4     that were included among the seven boxes. Do you see
5     that?
6          A     Correct.
7          Q     Does that describe the documents that you
8     focused on, those bullet pointed ones in your 2008
9     initial examination?
10         A     Yes.
11         Q     And you were able to find those because
12    Mr. Harner pulled them out of the boxes for you, or
13    somebody set them aside (**) or what state were they
14    in?
15         A     Yeah.  One, we initially opened the boxes.  I
16    think I was there in the initial state (**) because I
17    want to label the box.  As a matter of fact, I got some
18    pieces of wrapping paper, large paper that we have,
19    spread it out within our -- one of the conference
20    rooms, and put a label on that piece -- each individual
21    piece of paper.  That label identified which box things
22    came from.  And then at that point, I directed Jason
23    and another assistant that we had brought in there, an
24    intern that we had to say, what is in this box?  I want
25    it on this meses of paper, because it was labeled, and
                                                         167



1     I want it labeled.  If there's Bates labels, we can put
2     them in order.  (**) and I want them on each individual
3     sheet so we can have some organization of where it
4     came, where it was.  If we have to send it back in the

Page 146

EXHIBIT     3

PAGE     15

040808KK.txt

5    same boxes, we put it in the same boxes that we

6    received. So that was the initial item.

7           I helped take some of them out of the boxes,

8    but, you know, it's not something that you generally

9    would train a forensic document -- we take them out of

10    the box and put them in order. That's why you have a

11    system. That's why they came into play. As long as

12    they were doing it the way I expected them to do it, we

13    went on and do it with gloves.

14       Q    What kind of gloves did you use?

15       A    Cloth gloves. I said, "I want cloth gloves

16 ·    used whenever we handle these documents." I didn't

17    want to disturb anything or add anything to it,

18    fingerprints and that sort of thing. I gave

19    directions, and Eric also gave directions that whenever

20    we handle these documents, we handle them with cloth

21    gloves on them. Hopefully everybody did thatment I

22    did.

23       Q    Were those cotton gloves?

24       A    Yes, yes. They're very fine white cotton

25    gloves. I -- you've seen them in many forensic

168

0

1    laboratories, I'm sure. We used to have them in our

2    state police laboratory. We have them in our Speckin

3    laboratories.

4       Q    Do you also use rubber or Latex gloves?

5       A    I don't like Latex gloves. They make my hands

6    sweat. (**) the experience I had, in training with the

7    state police, sometimes the latex gloves will leave

8    tracings on the paper, whereas the cloth gloves leave

Page 147

EXHIBIT   3

PAGE   16

040808KK.txt
9    less incidents of leaving any sort of fingerprints or
10   tracings on the paper or disturbances.
11       Q    So let me understand what you were saying
12   about the paper that you spread out and then pulling
13   the documents out. Are you saying that the original
14   documents were pulled out and then put in order
15   corresponding to the Bates numbers that were --
16       A    The ones that had Bates numbers were put in
17   order corresponding to the Bates number within each
18   box. So if the Bates numbers may be different from --
19   I mean, let me give you an example. Box one may have
20   one Bates numbered one, box one, two, three, and it
21   skips to eat. Maybe Number 7 is in two. Well, you
22   laid them out on each piece of paper by box in order.
23   Now, they may not be in Bates order all the way
24   through, because maybe box two, three, or four had one
25   that was in this order.

169

1    Q    Sure.
2    A    But that's the way they were laid out.
3    Q    Okay. I think I get that part, but let me ask
4    something else. Let's say box one has one, ten, 100,
5    and 1,000 in it.
6    A    Okay.
7    Q    But they're all mixed up. So are you saying
8    that what was pulled out on the big pieces of paper
9    that you had in the boxes, those would be reorderd?
10   The actual original documents would be reordered so
11   they would be one, ten, 100, 110, 1,000?
12   A    Absolutely.

Page 148

EXHIBIT        3

PAGE           17

040808KK.txt
13     Q     And was a record kept of their original order?

14     A     No.  You didn't see how they came to us.

15     Q     I think I did.

16     A     Did you?  No.  I don't know that you could

17  have kept any reason -- because some were mixed up and

18  some were tangled.  No.  There was no any reference of

19  the original order.  What there was reference to was

20  what was in each box, and then they were put in order,

21  by Bates number if they had Bates number or Bryant

22  number, or whatever it's called.

23     Q     It would have been quite difficult to keep

24  them in their original order at all times, wouldn't it?

25     A     You bet.

                                                          170


1      Q     It would have been time consuming probably?

2      A     Yes.  It would have taken much longer to do

3   than it did to keep them in the original order, put

4   them back, put a marker when you're now doing some

5   evaluation of what you discovered, put them back.  No.

6   When I do document cases, I attempt to record the order

7   that I received them in, especially medical cases.  I

8   always record the order that I received them in, either

9   by photocopying and writing on the photocopies or

10  handwritten order.  They get jumbled around and (**) as

11  I examine them and then put back in.  In this

12  particular case, this wasn't done, and I don't know

13  that it would have been a time efficient manner to do

14  it, no.

15     Q     So the documents are now currently not in

16  their original order?

                        Page 149

EXHIBIT _____ 3

PAGE _____ 18

040808KK.txt
17      A    They should be in the original -- not the
18   original boxes, but for instance, the original box one,
19   that should be in the box one.  Box two should be in
20   the original box two.  But not in the order that they
21   were received.
22      Q    Right.  And so any evidence that -- of one
23   document being next to each other in the box is gone?
24   There's no record of the order that they were
25   originally in?

171

1      A    That's a fair statement, yes, unless whoever
2   shipped them to us had an order and the way they
3   came -- if they did, I'm sure that that order was
4   disturbed in transportation, because they weren't
5   sufficiently packed that they couldn't move around
6   somewhat.  But I'm not certain.  I know we do not have
7   an order that we received them in.
8      Q    And you departed from your regular practice of
9   keeping documents in their original order in this case?
10          MR. SLOAN:  Objection, misstates his earlier
11   testimony.
12          THE WITNESS:  I didn't keep them in order.  I
13   generally don't keep them in order when I examine
14   cases.  What I do is I either note the order that they
15   were in or I photocopy each page and write on my
16   photocopy the order they're in so that after I've
17   jumbled them around and examined them, I can put them
18   back in the order that I received them to give them
19   back.  In this particular case, we did not do that.  I
20   did not recommend we do that.  It dealt a lot with the

Page 150

EXHIBIT _____3_____

PAGE _____19_____

040808KK.txt
21      volume of what we received and the way they were when

22      we received them.  They -- I'll tell you right now they

23      are in a much better order now than they were then, at

24      least my opinion.

25          Q    So evidence, for example, of a colorant being
                                                            172

1       on one page that might have come from a source document

2       that was resting alongside it in the box, you wouldn't

3       know about that, would you?

4               MR. SLOAN:  Objection, compound, calls for

5       speculation, incomplete hypothetical, assumes facts not

6       in evidence.

7       BY MS. HUTNYAN:

8          Q    I thought you said the evidence was lost.

9          A    What I can tell you, if you're talking about

10      the mixed media drawings --

11         Q    Any.  I mean --

12         A    The mixed media drawings I can tell you were

13      wrapped in a bubble wrap.  So was there going to be any

14      transfer of those?  I don't see how there could have

15      been?  The other things were -- a lot of this was

16      wrapped in bubble wrap and also wrapped in regular

17      brown wrapping paper.

18              So if what you're telling me or asking me is

19      if there was at one time evidence on one of the

20      documents that when we received it, it was there, and

21      after we got -- received it, and it's gone, the answer

22      to that would be no.  I don't believe that would occur.

23      Could there be evidence that may have gotten

24      transferred onto a document from the shipping or off,

Page 151

EXHIBIT _____3_____

PAGE _____20_____

040808KK.txt
25      that's a possibility, I would think.

                                                                    173

1       Q    Do you remember any of the documents being in
2    envelopes?
3       A    I don't, but there very well have been some.
4    I don't recall how all of them were received, because I
5    didn't unpackage all of them.  But there could have
6    been some.  I don't know.  I know some of them were in
7    boxes inside these big boxes, as I recall.
8       Q    You didn't see any envelopes?  You don't
9    remember any envelopes?
10      A    I'm saying I don't remember.  I'm not saying I
11   didn't see any.  What I'm saying is I don't remember
12   whether I saw any or didn't see any.  I just don't
13   know.  I don't recall that.
14      Q    But you were supervising this organization
15   process; right?
16      A    To a standpoint, yeah.  I mean, to a point,
17   yes.  I was saying, we need to unload these.  Eric and
18   I -- he and I were both saying, we need to unload these
19   and see what they are.  And I was the one saying that
20   this is what we want to unload them (**).  This is how
21   I want to unload these things.  I was the one that was
22   in charge of that particular aspect.
23      Q    And to do that, you looked at the boxes when
24   they came in, and you saw the current state that they
25   were in?

                                                                    174

1       A    Yes.  I -- when we opened the boxes, then I
                         Page 152

EXHIBIT _____3_____

PAGE _____2\_____

040808KK.txt

2      could see the current state that they were in, sure.

3          Q     But you don't recall whether they were in

4      envelopes or not?

5          A     Whether there was any envelopes in the boxes?

6      Is that what you're saying?

7          Q     Big manila or --

8          A     I mean, the boxes weren't in envelopes, no.

9      The boxes were in big cardboard boxes with shipping

10     labels on top of them.

11         Q     You don't remember groupings of drawings in

12     envelopes in the boxes, big envelopes?

13         A     Again, I'm telling you I don't recall it.

14         Q     Yeah.

15         A     If they were like that, they may have been

16     like that.  I just don't recall.

17         Q     Do you remember anybody coming to you and

18     saying, how do we reorder documents that are in an

19     envelope?  Did that issue come up (**)?

20         A     There may have been some that were marked with

21     Bryant numbers.  There were some -- I don't know if

22     they were envelopes or they were wrapped -- that didn't

23     have Bryant numbers on them.  We were organizing them

24     by Bryant number in the box.  So if there were some

25     with Bryant numbers, they would be at the far end.
                                                        175

□

1      (**) the highest number down to the lowest number

2      toward the front.  That's the way they were arranged.

3          Q     And you did a number of ESDA indentation

4      analyses within the boxes; right (**)?

5          A     Ones with Bryant numbers on them, yes.
                         Page 153

EXHIBIT ____3____

PAGE ____22____

040808KK.txt

3      documents were there?

4          A      I don't know.

5          Q      When you say there were more than you could

6      examine time-wise, there weren't the seven boxes?

7          A      No, there weren't seven boxes.

8          Q      Was it one box?

9          A      I don't think they were in boxes, but I'm not

10     certain.

11         Q      Was it a small box of documents?  (**) You've

12     testified under oath that it was more than you could

13     examine time-wise.  And I'm trying to figure out what

14     the pace is.  How long does it take for you to go

15     through 100 documents (**)?

16         A      If somebody says, run ESDAs on these without

17     looking at them otherwise, sideline evaluations (**), I

18     can possibly run six, possibly seven ESDAs in an hour's

19     time.  But I wasn't just looking at ESDAs.  I was

20     looking at the documents -- again, as I stated earlier,

21     look at them to see what I could see with lighting,

22     some side lighting.  I believe I even had the Dage

23     instrument, which is an infrared type instrument to

24     use.  So I don't remember if I examined with that, but

25     I know I took the time to set it up in case I did, set

191

1      up a microscope, set up the ESDA, run the calibration

2      on the ESDA, run the calibration on the Dage.  That

3      takes time.

4              And then there's the breakdown time.  I had to

5      take all these instruments back, put them back in the

6      case to get my flight.  So we had examined.  There were

Page 167

EXHIBIT _____3_____

PAGE _____23_____

040808KK.txt

```
 7      other documents there that could have been examined.
 8      One of the other problems that occurred was --
 9          Q    I think we're kind of far afield from my
10      question.
11          A    Okay.  Then I'm done.  You said there was more
12      than I could examine.  What I'm saying is yes, there
13      was more -- I did not complete an examination of all of
14      the documents.
15          Q    I understand.  What is the average pace?  Once
16      you have all the equipment set up, let's say, you're
17      ready to go, and you're just doing your initial
18      examination, which would include whatever you normally
19      do with your initialtion examination, microscopic,
20      infrared, ESDA -- how many documents an hour could you
21      cover?
22               MR. SLOAN:  Objection.
23      BY MS. HUTNYAN:
24          Q    Everything's set up and calibrated?
25               MR. SLOAN:  Objection, calls for speculation,
```
                                                              192

```
 1      it's an incomplete hypothetical, assumes facts not in
 2      evidence.
 3               THE WITNESS:  It is basically unanswerable,
 4      but I'll try.  You may spend three or four hours
 5      examining one document.  It depends on what you
 6      observe, what you don't observe.  You may spend -- if
 7      you're going to run ESDA on it and possibly aDage and
 8      possibly microscopic, you may spend 20 minutes to a
 9      half an hour on a document.  If you're not going to do
10      all those exams, you may only spend five or ten
```
                            Page 168

EXHIBIT ____3____

PAGE ____24____

040808KK.txt

11    minutes.  It varies.  I couldn't say how long it takes
12    average to examine a document.  It is what you observe,
13    what you're looking for.  And things that you're
14    looking for you may not even see (**).  You can't say.
15    I wish I could.  I wish I could say, I could do 50 in
16    30 hours (**).
17         Q    It would be a lot less to do a thorough
18    examination.
19         A    To do a thorough examination, I don't think
20    you could do 50 in two hours or so.  No.  To do a
21    thorough examination of a document takes time.  And it
22    depends on what you all look for.  If you're looking to
23    see if the printing aligns, if there's additions,
24    deletions to it, it may take hours to review one
25    document.

                                                          193

1         Q    So the seven boxes that you received in 2008,
2    could you do a thorough examination of all of those
3    documents -- let's say you're not looking for anything
4    in particular.  You're looking for the evidence that
5    the documents show.  Could you do that in eight days?
6              MR. SLOAN:  Objection, vague as to what
7    particular tasks he would be performing, what
8    documents.  Again, it assumes facts not in evidence.
9    BY MS. HUTNYAN:
10         Q    Thorough examination.  You know what a
11    thorough examination is.  I mean, I'm not saying
12    exhaustively, referencing every single thing in the
13    document.  But the one we've been talking about, your
14    thorough examination of a document.  Let's see what
                        Page 169

EXHIBIT _____3_____

PAGE _____25_____

040808KK.txt

15    this one has to tell me.  (**) whatever you normally

16    do?

17              MR. SLOAN:  Same objection.

18    BY MS. HUTNYAN:

19        Q    Could you go through all those seven boxes and

20    do that kind of basic examination in eight days?

21              MR. SLOAN:  Same objection.

22              THE WITNESS:  Eight days of ten-hour days?

23    BY MS. HUTNYAN:

24        Q    Sure.

25        A    No.  I couldn't.  Some people may be able to.
                                                            194


1    I couldn't, no.

2        Q    If -- could you do it in 15 days?

3              MR. SLOAN:  Same objection.

4    BY MS. HUTNYAN:

5        Q    You saw the documents.  You have more --

6        A    First off, as I stated before, I didn't

7    examine all the document tz in the box.  Had I examined

8    all the documents in the box for each of the

9    examinations that I conducted on the majority of the --

10    of the ones I did on the tracing papers, on the

11    notebook, and on the mixed media, I don't know how long

12    it would take me, as an individual, by myself, but it

13    would be a career maker.  I'm sure I would have to

14    devote the majority of my time for an extended period

15    of time to do that.  So -- but as I stated, the

16    examinations that I did alone, I probably spent

17    anywhere from 50 to 100 hours, I would think.  I don't

18    know exactly, but I would think that much time.  And I
                              Page 170

EXHIBIT ___3___

PAGE ___𝒩ℓ___

040808KK.txt

19      certainly didn't take them all out of the box,

20      individually catalog them all, individually examine

21      every document that was in there.  Some of them didn't

22      have Bryant on them.  They weren't examined.  So -- I

23      had a task.  I had a task related to Mr. Flynn and

24      Mr. Cunningham's reports.  So that's what the

25      examination sounded.

195

0

1           Q    So you were going to zero in on the ones that

2      they were focusing on and examine those.  And even

3      then, it took 50 to 100 hours, you think?

4           A    Yes.  And I examined more than what they did,

5      from what I can see.  Mr. Cunningham ran some ESDAs.  I

6      don't believe Mr. Flynn did, from my recollection of

7      his report.  I conducted probably 150 to 180, 190

8      ESDAs.  So just doing the ESDAs alone, if you can run

9      through maybe six or seven hours at a reasonable pace,

10      that takes a long time to go through that many.

11           Q    So if somebody told you that you had a total

12      of eight days to thoroughly examine -- not every single

13      piece of evidence, but basically do an examination of

14      each document in those seven documents, what would you

15      think of that?

16           MR. SLOAN:  Objection, vague and ambiguous,

17      incomplete hypothetical.

18      BY MS. HUTNYAN:

19           Q    Impossible task?

20           A    It depends on what type of task you're asking

21      me to perform.  If all you're asking me to do is go

22      through these boxes and record and log all these

Page 171

EXHIBIT _____3_____

PAGE _____27_____

040808KK.txt

23      numbers that are in there, no.  I think I could do

24      that.  If you're asking me to examine it for any

25      forensic evidence that's possible to find, to sequence,
                                                            196

1       for instance -- if you're asking me to sequence --

2           Q      Let me specify so we don't have to go through

3       all the iterations.  What if you were asked to go

4       through alterations or anything suspicious (**)?

5           A      On which documents?

6           Q      On all the seven boxes.

7           A      If I could find any erasures and what else?

8       I'm sorry.

9           Q      Any evidence of alterations or anything else

10      suspicious in the documents?

11          A      And I had how long to do it?

12                 MR. SLOAN:  Objection --

13      BY MS. HUTNYAN:

14          Q      Eight days.

15                 MR. SLOAN:  -- vague and ambiguous as to what

16      qualifies as "suspicious."

17                 THE WITNESS:  I'm sure I could go through that

18      and examine it.  I couldn't run ESDAs on all of them, I

19      don't believe, in eight days.

20      BY MS. HUTNYAN:

21          Q      I thought you said that was always part of

22      your basic analysis.

23          A      No.  I said I always run general analysis.

24      (**) but if the client said I had eight days to do it,

25      then I would have to get it done in eight days.  And if
                                                            197

Page 172

EXHIBIT ____3____

PAGE ____28____

040808KK.txt

1       I can't complete it, I would have to tell him, I worked
2       14 hour days for eight days and I can't complete it.
3       Do you want me to continue, or do you want them back?
4              That happens all the time. Clients will call
5       and get specific time schedule. (**) I can't get them
6       done. Do you want the documents back back, or do you
7       want me to go further? (**) so in this case, if I had
8       those documents, I would say, I don't know if I can
9       complete it, but I'll certainly try. But I'm not going
10      to kill myself by working 20 hour days to try to get it
11      done. I would hope I'm not.
12          Q    But you would look at the task before you to
13      have to do it in eight days as a potentially difficult
14      task; correct?
15          A    If I was doing it by myself?
16              MR. SLOAN: Objection, vague and ambiguous as
17      to what specifically you're asking him to do.
18      BY MS. HUTNYAN:
19          Q    Yeah, if you were all by yourself. I mean,
20      that's a severe limitation on the time to be spent on
21      that quantity of documents, isn't it?
22              MR. SLOAN: Objection as to "severe," vague
23      and ambiguous.
24              THE WITNESS: I don't know. It probably
25      depends on the examiner, on what the examiner's looking
                                                        198

1       for, on the instrumentation available to the examiner.
2       Somebody may --

                        Page 173

EXHIBIT ___3___

PAGE _____

040808KK.txt

3    BY MS. HUTNYAN:

4        Q    Same hypothetical.  Never has changed.

5        A    Pardon?

6        Q    Your basic examination, doing a basic

7    examination of all of the documents -- meaning some

8    ESDA perhaps, looking for erasures, looking for

9    alterations, looking for things that are suspicious,

10    looking for interesting things in handwriting,

11    whatever -- doing a basic initial examination of all of

12    those documents (**).  That would be a daunting task;

13    right?

14           MR. SLOAN:  Objection, argumentative.

15    BY MS. HUTNYAN:

16        Q    You wouldn't want to work 20 hour days?

17        A    (**) generally, I wouldn't say -- if a client

18    sent me a box full of documents and said, look at these

19    documents and tell me if there's anything suspicious in

20    them, I would say, well, I'm not going to do it.  You

21    give me a more narrow task.  What is it that you're

22    trying to show, and then I'll tell you whether the

23    evidence has anything to back that up or refute it.

24    That's what I would tell the client.

25           If a client just sent me a box full of boxes

                                                      199


1    and said, go through these and see if you can find

2    anything suspicious, you know, I would need more

3    specific instructions from them.

4        Q    Would you need information from the client?

5        A    Certainly.  I would need to know what the task

6    isment what is it that we're attempting -- what do you

                        Page 174

EXHIBIT ____3____

PAGE ____30____

040808KK.txt
7       want to show?  And I'll tell you whether the evidence
8       shows it and whether the evidence refutes it.
9               And I can give you an example of that.
10      Somebody sends me ten documents with signatures on them
11      and says, here.  I want to know if these signatures are
12      all by the same person.  That's specific.  But if they
13      send me ten documents and say, tell me if there's
14      anything suspicious about these, I would say, what do
15      you mean by suspicious?  Tell me what you're looking
16      for.  Well, I want to know whether document B, E, or F
17      were written by the same person who wrote all the other
18      documents, I'd say, "Great.  Now, that I can do for you
19      in a reasonable length of time."
20          Q     So in the criminal cases that you worked on as
21      part of the Michigan State Police, did you always have
22      somebody tell you what might be sustain pirns about
23      documents?
24          A     Certainly.  There's some reason they're
25      sending it to us.  They didn't just send me documents.
                                                             200

1       They would send me documents and say, here.  This is a
2       bank robbery note that was at the bank.  Can you find
3       anybody to link it to somebody?  Or here are some
4       checks we think are forged.  Can you find a way to link
5       them to someone?  Sure.  That's the way you do
6       examinations.  (**) and if they sent me a robbery note
7       and say, "Can you tell me anything about it," then I
8       would examine it and see if there's anything of
9       evidentiary value to it, whether there's a watermark or
10      somebody's handwriting.  Yeah.  It's the way the work's

Page 175

EXHIBIT _____ 3

PAGE _____ 31

040808KK.txt
11      done, I believe.  You have to have a task in mind if
12      you're going to do something.
13          Q      But the purpose of examination should include
14      a hypothesis of what you might be able to find or what
15      you'd like to show?
16          A      Generally, when I talk to clients, I tell them
17      what type of exams I can do and what they may or may
18      not show us.  And then I want to know, what is it that
19      you're trying to show?  What are you trying to show?
20              In this particular case, I had reports of
21      Flynn and Cunningham.  What I was trying to see is,
22      does the evidence that I can determine -- does it
23      support or refute what they're saying in their reports?
24      So that's what I do, and that's what most document
25      examiners do, I'm sure.  I'm sure if you sent Mr. Flynn
                                                        201

1       or Ms. Cunningham a box of things and said, tell me if
2       there's something suspicious, I would think that they
3       would say, what is it you're looking for?  (**) maybe
4       they don't do it that way.  Maybe.
5           Q      Is forensic document examination an iterate I
6       have process?
7           A      You'd have to tell me what that means, iterate
8       I have.
9           Q      Well, is it common for you to do an
10      examination on, let's say, a group of documents for a
11      case and then come back and make findings later based
12      on a further examination of those documents that you
13      didn't notice before based on your -- based on
14      examination of other materials in the case?

Page 176

EXHIBIT     3
PAGE        32

040808KK.txt

15    A    It can happen.

16    Q    Have you had that happen before?

17    A    With medical records, generally, sure. I've

18  had it happen where I've examined handwriting, for

19  instance, and then said, well, what I can tell you is,

20  it's probably written by the same person or probably

21  not, but I need additional known samples to

22  determine -- make a more determined -- definitive

23  determination. So then I get it back, I reexamine,

24  come up with findings, sure.

25        I examined documents before that I never --

202

1  the task may have been to determine if page 1 was a

2  page substitution in a three-page document. I may find

3  folds that are different, staple holes that are

4  different. So I say, yes. Page 1 was not always

5  attached to page 2 and 3. And then later on, they call

6  back and say, look. We need to know if there are any

7  other evidence of impressions if page 1 was dated when

8  it was attached to page 2. So I've reexamined things

9  later.

10    Q    And you felt that it was useful to go back to

11  the documents that you examined before and take another

12  look?

13    A    It was obviously useful to the client, or they

14  wouldn't have sent me additional materials. I run a

15  finding (**) and they're probably not going to send me

16  something back. I'm not going to say, you have to send

17  me something back. It doesn't matter to me if they

18  want to or not.

Page 177

EXHIBIT    3

PAGE    33

040808KK.txt

19    So the best way to put this is I'm a

20    disinterested party.  I receive items, I examine them,

21    I give them the forensic answer.  If it helps you,

22    that's excellent.  If it hurts you, that's what you

23    have to deal with.  I guide people.  I recommend to

24    clients what would help their case, what would help my

25    examination, but you don't always get it, and --

203

1    Q    I guess my question is a little different,

2    though.  If -- if you have one examination of documents

3    and then -- I mean, it's not just the client that would

4    potentially benefit from further examination.  You may

5    have different findings or better findings or more

6    accurate findings based on a further examination.

7    That's something you would care about; right?

8    A    Well, you always want the most accurate

9    finding, correct.  But you are an attorney.  I'm a

10    forensic document examiner.  You were hired by somebody

11    to do work.  They may say, I don't want you to do any

12    additional work.  You don't do additional work.  If I'm

13    hired, I do work.  They say, I don't want you to do any

14    additional work.  I stop doing additional work.  We're

15    in private business.  Would I want to do addition 58

16    work?  Absolutely.  But I'm not going to do this free.

17    We're paid for this service.  And I'm not going to go

18    beyond the breach of what the client is telling me.

19    Now, I may find things beyond the breach of

20    what the client wants, and I'll tell the client that.

21    But if --

22    Q    So your view -- so your philosophy is to look

Page 178

EXHIBIT _____ 3

PAGE _____ 34

040808KK.txt

23   at the information that the client presents you, and

24   render conclusions based on whatever that is, as

25   opposed to finding out the ultimate answer of the

204

1   evidence?

2        MR. SLOAN:  Objection, vague, misstates the

3   evidence -- misstates his prior testimony is what I

4   meant to say.

5        THE WITNESS:  I think it does, too, because I

6   said, you always want the truth.  You always want the

7   ultimate answer.  But do you always get it?

8   Absolutely, you don't.  There are time tz when you may

9   examine documents -- we'll use a signature, for

10   instance -- and I may say there is indications that the

11   person signed this, but I need more known writing.  And

12   they don't want it to be the person's writing, and so

13   they won't send me (**).  Fine.  Does that mean I

14   didn't do my job?  No.  I was retained by a particular

15   person.  We have a client privilege, just as you do as

16   an attorney.  At least I do it that way.

17   BY MS. HUTNYAN:

18      Q    I'm talking about you, though.

19      A    I think we should be talking about anybody

20   with ethics in the field -- professional field.  If you

21   have ethics in the professional field, you're not going

22   to examine documents, find that the person that

23   retained you, the evidence hurts their case, so you get

24   on the phone and tell the attorney (**), let me tell

25   you this.

205

Page 179

EXHIBIT _____ 3 _____

PAGE _____ 35 _____

040808KK.txt

```
 1        Q    I don't know what you're talking about, but
 2   I'm looking for the truth, and it sounds like you're
 3   looking for the truth as much as the client's willing
 4   to pay.  Let's say you come into this situation, and
 5   you say, I really need to see this other document.  I
 6   need more access to it because I need to check this
 7   thing.  They say, "No, I don't think you should do
 8   that."  At that point, do you say, "Well, I can't
 9   render any report for you"?  What happens?
10        MR. SLOAN:  Objection, compound, and very,
11   very argumentative and improper.  Please ask a new
12   question.
13        THE WITNESS:  I think you misunderstand what
14   I'm saying.
15   BY MS. HUTNYAN:
16        Q    I must.
17        A    You must, just from the answer, I would say --
18   or question.  I examine documents.  The answer I give
19   is where I would need more documents to get the
20   right -- the correct answer.
21        Q    Okay.
22        A    The client says, no.  I don't want you to
23   examine any additional.  That's the client that hired
24   me, so I say, well, without that, I can't give you an
25   opinion.  Okay.  And you give them back their
```
                                                         206


```
 1   documents.  That's what forensic document examination
 2   is if you're in the private field.
 3           When I was in the state police, if I said to
```
                          Page 180

EXHIBIT _____3_____

PAGE _____36_____

040808KK.txt

 4      the investigator, I need more known writing about this
 5      person, I can't do any more (**) examinations of it.  I
 6      can't make them bring me stuff.
 7              But as I talked about ethics before, (**) I
 8      tell them, I can't say that.
 9          Q    I was a little confused about your statements
10      about, well, if the client doesn't want to pay, then
11      that's it.  So you would not render an opinion in that
12      instance is what you're saying?
13          A    Absolutely not.
14          Q    You wouldn't just go ahead knowing you were
15      missing evidence?
16          A    If I did an examination -- and I've done this
17      many times -- and I tell the client, here's the
18      findings.  Do you want a written report?  Because
19      that's always what I say.  If they say, no, I don't do
20      one.  Why would I do a written report?  We're hired by
21      somebody to do some work.  As I said, we're a private
22      entity.  We're a for profit company.  Certainly we're
23      not going to do work that we're not going to be paid
24      for.  It doesn't make sense.
25              Bop let me adjust that slightly.  I have done
                                                            207


 1      work before as pro bono stuff for indigent people, but
 2      not a paying client.
 3          Q    Uh-huh.
 4              So turning to page 3 of Exhibit 5201, do you
 5      see the likely in the middle of the paragraph there,
 6      likely came is offset from 221 (**)?
 7              THE COURT REPORTER:  Likely what?
                          Page 181

EXHIBIT ___3___

PAGE ___37___

EXHIBIT 4

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
  John B. Quinn (Bar No. 090378)
  johnquinn@quinnemanuel.com
  Michael T. Zeller (Bar No. 196417)
  (michaelzeller@quinnemanuel.com)
  Jon D. Corey (Bar No. 185066)
  (joncorey@quinnemanuel.com)
  Timothy L. Alger (Bar No. 160303)
  (timalger@quinnemanuel.com)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100

Attorneys for Mattel, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual, | CASE NO. CV 04-9049 SGL (RNBx) |
| Plaintiff, | Consolidated with Case Nos. CV 04-09059 and CV 05-02727 |
| vs. | Hon. Stephen G. Larson |
| MATTEL, INC., a Delaware corporation, | MATTEL, INC.'S *EX PARTE* APPLICATION TO FILE SUPPLEMENTAL EXPERT REPORTS BY MESSRS. WILLIAM FLYNN AND LLOYD CUNNINGHAM REGARDING CERTAIN BRYANT ORIGINALS; |
| Defendant. | |
| AND CONSOLIDATED ACTIONS | AND MEMORANDUM OF POINTS AND AUTHORITIES |
| | [Declaration of Diane C. Hutnyan filed concurrently herewith] |
| | Date:  TBA<br>Time:  TBA<br>Courtroom: 1 |
| | **Phase 1:**<br>Discovery Cut-off:        January 28, 2008<br>Pre-trial Conference:    May 5, 2008<br>Trial Date:                   May 27, 2008 |

EXHIBIT ___4___
            _38_
PAGE _____

1 | TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2 |     PLEASE TAKE NOTICE that pursuant to Local Rules 7-19 and 16-14 and
3 | Rules 16 and 26 of the Federal Rules of Civil Procedure, Mattel, Inc. hereby files
4 | this *ex parte* Application to File Supplemental Expert Reports by Messrs. William
5 | Flynn and Lloyd Cunningham Regarding Certain Carter Bryant original documents.
6 | The application is made in conjunction with an *ex parte* application to Judge Infante
7 | seeking additional access to these documents for essential non-destructive testing.

8 |     Mattel files this Application on the ground that supplemental expert reports –
9 | based on additional review and forensic testing of Bryant's documents[1] – are
10 | essential to the fairness and the accuracy of the factfinding process. MGA's experts
11 | have performed and are relying on tests which Mattel has a right to replicate. After
12 | Bryant and MGA severely limited Mattel's experts' access to Bryant's original
13 | documents, MGA's designated experts went well beyond rebutting Mattel's experts'
14 | opinions and did reflected infrared and infrared luminescence testing that they now
15 | claim revealed underlying pencil marks that cannot be seen without such testing.
16 | Though they claim this supposed evidence rebuts Mattel's experts' opinions, they
17 | refuse to allow Mattel's experts access to the originals so that they can perform the
18 | same tests and address the points raised.

19 |     Mattel is entitled to an even playing field. Mattel has filed an Ex Parte
20 | Application with the Discovery Master seeking access to the documents for its
21 | experts for a period of two weeks to allow the same tests to be conducted. There is,
22 | however, no point to conducting such tests unless Mattel's experts are permitted to
23 | file supplementary expert reports in this Court reflecting their results. Because
24 | matters of scheduling are for this Court to decide, this Application simply seeks

25 | ─────────────────
26 | [1] The original documents to which access has been requested in the application to Judge Infante are those whose bates number was identified or referenced in
27 | (footnote continued)

EXHIBIT ___4___

PAGE ___39___

1  permission to file supplementary expert reports within seven (7) days of the

2  completion of the testing.

3                    **Statement of Compliance with Local Rule 7-19**

4        Counsel for Carter Bryant is Matthew M. Werdegar of Keker and Van Nest

5  LLP (telephone: 415-391- 5400, Address: 710 Sansome Street, San Francisco, CA

6  94111-1704).

7        Counsel for MGA Entertainment Inc., MGA Entertainment (HK) Limited,

8  MGAE de Mexico , S.R.L. de C.V. and Isaac Larian (collectively "MGA") is

9  Matthew E. Sloan of Skadden, Arps, Slate, Meagher & Sloan (Telephone: 213-687-

10  5276;   Address: 300 South Grand Ave., Los Angeles, CA  90017-3144).

11        Pursuant to Local Rule 7-19.1, Mattel gave notice of its intent to file the

12  *ex parte* Applications to Judge Infante and to this Court by letter dated April 2, 2008

13  if defendants failed to comply with its request to have additional access to Bryant's

14  original documents.  Counsel for Bryant and MGA indicated their intent to deny

15  Mattel's request and to oppose the Applications by letters dated April 3, 2008 and

16  April 4, 2008, respectively.

17        This Application is based on this Notice of Application, the accompanying

18  Memorandum of Points and Authorities, the Declaration of Diane C. Hutnyan filed

19  concurrently herewith, the records and files of this Court, and all other matters of

20  which the Court may take judicial notice.

21  DATED:  April 8, 2008              QUINN EMANUEL URQUHART OLIVER &
                                       HEDGES, LLP
22

23                                     By
24                                       Diane C. Hutnyan
                                         Attorneys for Mattel, Inc.
25

26  _____

27  Mr. Kullman and/or Dr. Lyter's reports, as well as any additional documents
    referenced in Mssrs. Flynn and Cunningham's reports.   EXHIBIT ___4___

28
                                       PAGE ___40___

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ............................................. 1

PRELIMINARY STATEMENT ................................................................................. 1

FACTUAL BACKGROUND ..................................................................................... 1

ARGUMENT.............................................................................................................. 3

I.     MATTEL WILL BE IRREPARABLY PREJUDICED BY A DENIAL OF THIS *EX PARTE* APPLICATION OR IF IT IS HEARD THROUGH REGULAR NOTICED MOTION PROCEDURES..................... 4

I.     THE COURT SHOULD GRANT MATTEL'S APPLICATION BECAUSE MATTEL  DID NOT CREATE THE CIRCUMSTANCES REQUIRING *EX PARTE* RELIEF. ................................................................ 8

IIII.  DEFENDANTS HAVE NO CREDIBLE BASIS TO OBJECT TO THIS *EX PARTE* APPLICATION. ................................................................ 9

CONCLUSION........................................................................................................... 11

EXHIBIT _____ 4

PAGE _____ 41

# **TABLE OF AUTHORITIES**

**Page**

### **Cases**

Carr v. Pacific Maritime Ass'n,
  904 F.2d 1313 (9th Cir. 1990)................................................................ 6

Daubert v. Merrell Dow Pharm., Inc.,
  509 U.S. 579 (1993)................................................................ 5, 8, 10

Internet Specialties West, Inc. v. ISPWest,
  2006 WL. 4568796 (C.D. Cal. 2006)............................................ 6, 7

Johnson v. Sacramento County,
  2007 WL. 127799 (E.D. Cal. 2007) ................................................ 3

Mission Power Eng'g Co. v Continental Cas. Co.,
  883 F. Supp. 488 (C.D. Cal. 1995)............................................ 3, 8, 9

Phillips v. Netblue, Inc.,
  2007 WL. 528722 (N.D. Cal. 2007)........................................ 5, 6, 7, 10

Rivera v. NIBCO, Inc.,
  384 F.3d 822 (9th Cir. 2004)................................................................ 6

Shoen v. Shoen,
  5 F.3d 1289 (9th Cir. 1993)................................................................ 6

Taylor v. Burlington Northern R. Co.,
  787 F.2d 1309 (9th Cir. 1986)............................................ 5, 10

United States v. Bryan,
  339 U.S. 323 (1950) ............................................................... 6

United States v. Hempfling,
  2008 WL. 703809 (E.D. Cal. 2008) ................................................ 6

Universal Trading & Inv. Co. v. Kiritchenko,
  2007 WL. 2141296 (2007) ............................................................. 10

Walsh v. McCain Foods Ltd.,
  81 F.3d 722 (7th Cir. 1996) ................................................................ 9

### **Statutes**

Fed. R. Civ. P. 16(b)(4) ............................................................. 3

Fed. R. Civ. P. 26(e)(1) ............................................................. 10

Fed. R. Civ. P. 26(e)(2) ............................................................. 9

EXHIBIT ____4____

PAGE ____42____

1  Fed.R. Evid. 702 ................................................................................................. 10

2                              **Other Authorities**

3  Rutter Group Practice Guide: Federal Civil Trials and Evidence Ch. 11-A 2a.5 §
4      11:25 ................................................................................................................ 9

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26                                  EXHIBIT ___4___

27                                  PAGE ___43___

28

07209/2463004.1

## MEMORANDUM OF POINTS AND AUTHORITIES

### Preliminary Statement

The issue before this Court is simple:  assuming, as fairness requires, that Judge Infante grants Mattel's experts the access they need in order to conduct the very same tests that MGA's experts have already conducted, should the Scheduling Order be modified to allow those experts seven (7) days following the completion of that testing in order to file supplementary expert reports.   There is no point to allowing the additional testing unless Mattel's experts are permitted to file supplementary reports which can then serve as a basis for their testimony at trial. And there is ample precedent that in these circumstances, supplementary expert reports are not only justified, but required.

### FACTUAL BACKGROUND

As detailed in the *Ex Parte* Application for Access to Certain Bryant Originals, attached to this Application as Exhibit 1,[2] Mattel's access to eight boxes of Bryant originals for its forensic experts was extremely limited, at MGA and Bryant's request.   These documents, which include drawings and other materials that Bryant claimed supported his chronology of events, go to the heart of the issues to be tried in Phase 1 of this case.  Mattel's four experts, each of whom has a different special area of expertise,[3] made the most of their time, examining and non-

---

[2]   See Exh. 1 to the Declaration of Diane C. Hutnyan, Esq. ("Hutnyan Dec.")
[3]   See Discovery Master's August 30, 2007 Order, attached as Exh. 2 to the Hutnyan Dec., and In Camera Declarations for Mssrs. Cunningham, Flynn, and Rantanen, and Dr. Aginsky, attached as Exhs. Exhs. 3-6 to the Hutnyan Dec.

EXHIBIT

PAGE

1   destructively testing[4] the thousands of documents as best they could, looking
2   broadly for erasures, alterations, or other potentially probative evidence. As a result
3   of that analysis, two of Mattel's experts drew important conclusions pertinent to
4   whether certain documents in the case were original drawings, as alleged by Carter
5   Bryant; whether they were traced; and/or whether they were traced from other
6   documents that could be identified. Their conclusions were based on examinations
7   under special lenses, special lighting, and under microscopes. Both of these experts
8   observed that what appeared to be pencil lines obscured some of the ink, or colored,
9   portions of the drawings, but they did not regard them as significant to their analysis
10  at the time, as the pencil lines that stuck out from under those sections of the
11  drawings were consistent with their other findings.

12      In rebuttal, MGA's two forensic "experts" -- Dr. Lyter and Mr. Kullman --
13  who had unlimited access to Bryant's documents, as well as the information
14  contained in Mssrs. Flynn's and Cunningham's roadmap to the small subset of
15  documents among the thousands that were significant to their analysis -- zeroed in
16  on these obscured pencil lines. They conducted reflected infrared and infrared
17  luminescence testing of the lines, and then developed a theory around the pencil
18  lines that conveniently only they now had access to. Bryant then freely sent these
19  key originals to MGA for use at Mssrs. Cunningham's and Flynn's depositions,
20  where the Mattel experts were asked to testify and draw conclusions about the
21  pencil lines, which of course they were unable to do since they could not see them.

22      After their depositions, each of Mattel's experts sought access to the originals
23  again so that they could also fully examine and photograph the pencil lines, as
24  MGA's experts had done. Bryant refused. Bryant and MGA hope to prevent

25

26  _____
    [4]  "Non-destructive testing" methods include examining the documents using
27  microscopes, magnifiers, light sources, scanners with special filters and measuring
    instruments in ways that do not alter the documents.   **EXHIBIT** ____9____
28
                                                              45
                                                        **PAGE** _____

1  Mattel's experts from (1) ever fully examining that aspect of the drawings and those
2  portions of MGA's experts' reports that rely on that aspect of the drawings, and
3  (2) being able to photograph -- and show to the jury -- the evidence MGA's
4  "experts" claim exist and claim is so significant.

5       Unable to secure voluntarily the access that fairness requires, Mattel has
6  applied to the Discovery Master to order Bryant to make available the documents in
7  question for a period of two weeks. Consistent with the procedure established in
8  similar circumstances in this case, Mattel is simultaneously applying to this Court
9  for permission to file supplementary expert reports based on such access within
10 seven (7) days of the completion of the two-week access period. [5] It is even more
11 imperative that this Court hear this Application because MGA has stated that it
12 intends to challenge the Discovery Master's very authority to rule upon Mattel's
13 application to compel Bryant to make available the documents in question.[6] If
14 MGA's experts are permitted to opine about the significance of pencil lines, Mattel's
15 experts must be given the opportunity to fully examine this supposedly significant
16 evidence and supplement their reports to address this evidence.

17

18                          **ARGUMENT**

19

20      An *ex parte* application may be granted where, as here, "the moving party's
21 cause will be irreparably prejudiced if the underlying motion is heard according to
22 the regular noticed motion procedures" and "the moving party is without fault in

23

24      [5]  See Order dated March 19, 2008 extending the March 17, 2008 deadline for
25 service of expert report by MGA concerning Jacqueline Prince notary book
   (rejecting argument that application sought hypothetical ruling) attached as Exh. 21
26 to the Hutnyan Dec.
      [6]  See Email from Matthew Werdegar to Diane Hutnyan, dated April 8, 2004,
27 attached as Exh. 19 to the Hutnyan Dec.     EXHIBIT ___4___

28
                                          PAGE ___46___

1  creating the crisis that requires *ex parte* relief, or that the crisis occurred as a result
2  of excusable neglect." Mission Power Eng'g Co. v Continental Cas. Co.,
3  883 F. Supp. 488, 492 (C.D. Cal. 1995). A scheduling order may be modified where
4  there is "good cause" for the change. Fed. R. Civ. P. 16(b)(4); Johnson v.
5  Sacramento County, 2007 WL 127799 * 3 (E.D. Cal. 2007). These standards are
6  clearly met here.

7

8  **I.    MATTEL WILL BE IRREPARABLY PREJUDICED BY A DENIAL**
9  **OF THIS *EX PARTE* APPLICATION OR IF IT IS HEARD THROUGH**
10  **REGULAR NOTICED MOTION PROCEDURES.**

11

12  Mattel's experts worked diligently to do as much testing as they could within
13  the limited time-frame of 35 days allowed by the Discovery Master, and they
14  prepared expert reports based on that analysis. However, as became apparent
15  during the depositions of Mssrs. Flynn and Cunningham, as well as from the rebuttal
16  reports prepared by Dr. Lyter and Mr. Kullman, defendants' experts had far more
17  extensive access to the documents than Mattel's experts, as well as the additional
18  tactical advantage of being able to focus on a much smaller subset of documents
19  identified in Mattel's reports. As a result, defendants' rebuttal reports included the
20  results and analysis of testing that Mattel's experts did not conduct, including
21  infrared luminescence and reflective infrared testing. Drs. Lyter and Kullman drew
22  a number of evidentiary conclusions from such tests, which Mattel's experts could
23  not comment on or refute because they were unable to conduct the same testing.
24  Without the opportunity to conduct additional testing and file a supplemental report
25  based on that testing, which will rebut defendants' experts' conclusions, Mattel will
26  be irreparably prejudiced at trial. Accordingly, Mattel's Application to file
27  supplemental reports is founded on "good cause." (Order, para. 4).

EXHIBIT ___ 4 ___

PAGE ___ 47 ___

28

07209/2463004.1

-4-

Case No. CV 04-9049 SGL (RNBx)

MATTEL'S EX PARTE APPLICATION TO FILE SUPPLEMENTAL EXPERT REPORTS

1       The unusual circumstances here -- the extreme 35-day limitation on Mattel's
2  access, which Bryant and MGA insisted upon; the unlimited access provided to
3  MGA's experts; and the inherent invisibility of the obscured pencil lines without
4  access and special testing -- have all worked to deprive Mattel of fair opportunity to
5  challenge Defendants' conclusions, rendering the playing field uneven. For all
6  Mattel knows, the pencil lines Dr. Lyter and Mr. Kullman find so significant do not
7  even exist, or in fact cut against Lyter's and Kullman's conclusions. Mattel has a
8  right to see this same evidence, explore it and fully address it in supplementary
9  expert reports.

10      In numerous circumstances, California courts have recognized the need to
11  safeguard the process governing expert testimony to assure fairness to both sides,
12  and accurate information to the trier of fact. As the court stated in Phillips v.
13  Netblue, Inc., 2007 WL 528722 (N.D. Cal. 2007), "sitting in its capacity as
14  gatekeeper, the Court must ensure that an expert's testimony 'both rests on a reliable
15  foundation and is relevant to the task at hand.'" (quoting Daubert, 509 U.S. at 597).
16  In doing so, "[t]he trial court has broad discretion in admitting and excluding expert
17  testimony." Taylor v. Burlington Northern R. Co., 787 F.2d 1309, 1315 (9th Cir.
18  1986). While these cases pertain to the reliability of expert testimony, the
19  fundamental principle is the same: the court must safeguard the trial process by
20  ensuring that the trier of fact has access to complete, reliable and credible expert
21  testimony.

22      In Netblue, the court rejected defendants' argument that the plaintiffs'
23  supplemental report should be disregarded because it was submitted after various
24  deadlines and events had passed. The court found that "no prejudice was caused to
25  Defendants by the Supplemental Report's timing." Id. at *2. The could held that
26  since the Supplemental Report did "not add anything new" to the original expert
27  report "or fill-in any gaps in required information," id., its submission was
28  appropriate. Notably, the court held that if the expert report "had actually been

EXHIBIT 4

PAGE 48

1 deficient, and the Supplemental Report resolved those deficiencies, the proper
2 remedy by this Court would have been to give Defendants additional time to address
3 the new information. It would not be, as Defendants suggest, to ignore or strike the
4 Supplemental Report, strike the original Report, and exclude any testimony by [the
5 expert] at trial." Id.

6      Netblue is significant for two reasons. First, it recognizes the appropriateness
7 of filing supplemental reports, even if, as here, they are technically untimely.
8 Second, the court rejected the notion that exclusion of supplemental reports is
9 appropriate either where the report fleshes out existing information OR where it
10 addresses new issues, concluding that even in the latter situation, the appropriate
11 remedy would be to give the other party adequate opportunity to respond, not to
12 deny to the court and the jury relevant and important information.

13      Likewise, in Internet Specialties West, Inc. v. ISPWest, 2006 WL 4568796 *
14 4 (C.D. Cal. 2006), the court suggested that it would have been appropriate for
15 defendants to rebut new issues raised in a rebuttal report with a supplemental expert
16 report of their own, and could have sought permission to do so. The court further
17 rejected the notion that exclusion of rebuttal reports would be justified.

18      The Federal Rules authorize broad pretrial discovery based on the general
19 principle that litigants have a right to 'every man's evidence,' and that wide access to
20 relevant facts serves the integrity and fairness of the judicial process by promoting
21 the search for the truth." Id. (quoting Rivera v. NIBCO, Inc., 384 F.3d 822, 824 (9th
22 Cir. 2004). See also Shoen v. Shoen, 5 F.3d 1289, 1292 (9th Cir. 1993) ("broad right
23 of discovery is based on the general principle that litigants have a right to 'every
24 man's evidence'") (quoting United States v. Bryan, 339 U.S. 323, 331 (1950)).

25      Notably, embodied within litigants' right to conduct broad discovery is the
26 recognition that such discovery must be *meaningful*. See, e.g., Carr v. Pacific
27 Maritime Ass'n, 904 F.2d 1313, 1321 (9th Cir. 1990) (grievance and arbitration
28 procedures "conducted within an extremely constricted time frame and without

EXHIBIT 4

PAGE 1/9

1  provisions for any meaningful discovery, were wholly inadequate to the task of
2  fairly adjudicating the individual or class claims . . . ."); United States v. Hempfling,
3  2008 WL 703809 * 9 (E.D. Cal. 2008) ("Government's prejudice continues with its
4  inability to conduct meaningful discovery to pursue its claims.").

5      While Mattel's expert reports are not deficient and reach appropriate
6  conclusions based on the testing that was feasible at the time, they nonetheless
7  require supplementing to respond to the panoply of conclusions Drs. Lyter and
8  Kullman reached based on the additional testing they were able to conduct. As in
9  Netblue and ISPWest, this court should recognize the appropriateness of filing such
10 a supplemental report, and grant Mattel leave to do so once Judge Infante grants
11 Mattel access to Bryant's original documents for additional non-destructive forensic
12 testing. Denying Mattel's application here would unfairly prevent it from being able
13 to supplement its analysis of Bryant's documents or adequately respond to
14 defendants' rebuttal reports in ways that will irreparably prejudice the trial.

15     MGA itself has recognized as much in its own recent request for access to the
16 notary book of Jacqueline Prince for destructive testing, supposedly to "replicate"
17 the testing that Dr. Aginsky did (which is the subject of Mattel's pending Mattel
18 Inc's Ex Parte Application for Protective Order Preventing MGA's Destructive
19 Sampling of the Prince Notary Book due to MGA's efforts, unabated even now, to
20 go far beyond replication). In MGA's Opposition to that Application, MGA argued
21 for an extension of time in which to file an expert report to allow defendants to
22 conduct the exact same testing as Mattel. In that instance, MGA argued that since
23 Mattel was able to take some samples from Jacqueline Prince's notary book in order
24 to perform forensic ink testing, MGA should have "the right to perform the same
25 testing, under the exact same circumstances,"[7] and should be granted an extension of
26
27  [7] See MGA's Opposition to Mattel, Inc.'s Ex Parte Application for Protective
    Order Preventing MGA's Destructive Sampling of the Prince Notary Book at 16-17
28  (footnote continued)

1 time to file its expert report to reflect the additional testing. As defendants pointed
2 out there: "[t]he denial of the opportunity to test and challenge evidence imposes
3 irreparable prejudice."[8] Here, Mattel seeks precisely that same opportunity. If
4 MGA has the right to replicate any testing done by Mattel, Mattel surely has a
5 corresponding right to replicate testing done by MGA and to present those results to
6 the trier of fact. Without the opportunity to conduct additional testing and file a
7 supplemental report based on that testing, which will allow full rebuttal of
8 defendants' experts' conclusions, Mattel will be irreparably prejudiced at trial.
9 Granting Mattel's request will not only help to level the playing field, but also will
10 provide the trier of fact a more complete analysis of these key documents.

11

12 **II.    THE COURT SHOULD GRANT MATTEL'S APPLICATION**
13     **BECAUSE MATTEL DID NOT CREATE THE CIRCUMSTANCES**
14     **REQUIRING _EX PARTE_ RELIEF.**

15

16         The circumstances creating the need for relief were created by Bryant and
17 MGA, not Mattel. The limitations placed on Mattel's experts' original review of the
18 materials were due to the 35-day limitation on Mattel's access, which was instituted
19 at Bryant's and MGA's urging. The unlimited access MGA's un-Court-approved
20 experts were given -- despite the clear indications by the Discovery Master last fall
21 that he had concern about who was examining the key documents in this case, and

22

23 ("All that MGA seeks is the opportunity to perform the _same_ testing performed by
   Mattel's expert, pursuant to the _same_ protocol employed by Mattel, so that it can
24 prepare a rebuttal expert report") (emphasis added) attached as Exh. 20 to the
   Hutnyan Dec.
25     [8] See MGA's _Ex Parte_ Application for an Order Extending the March 17
26 Deadline for MGA to Serve Its Rebuttal Expert Report Concerning Ms. Prince's
   Notary Book at 15 (citing <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579, 596
27 (1993)) attached as Exh. 22 to the Hutnyan Dec.    EXHIBIT __4__
28                                                     5|
                                                     PAGE _____

1  how they were doing it, was given by Bryant.  The decision to develop a rebuttal
2  theory not based on the evidence presented in Mssrs. Flynn's and Cunningham'
3  reports, and supposedly relying on obscured pencil lines that could only be seen by
4  experts with sufficient access to the materials to do special testing, was Bryant's and
5  MGA's.  Accordingly, Mattel satisfies the requirement set forth in Mission Power,
6  883 F. Supp. at 493, for establishing that the moving party is without fault or guilty
7  only of excusable neglect -- namely that the movant "used the entire discovery
8  period efficiently and could not have, with due diligence, sought to obtain the
9  discovery earlier in the discovery period."  Id.

10     Indeed, to the extent that such pencil lines exist, are visible, and are material
11  to the opinions expressed in Mssrs. Flynn's and Cunningham's reports, as Dr. Lyter
12  and Mr. Kullman contend, MGA and Bryant have arguably created an obligation
13  pursuant to Fed. R. Civ. P. 26(e)(2) for Mattel's experts to investigate and
14  supplement their reports.  Under that rule, "parties must supplement or correct their
15  experts' reports or deposition testimony if they learn these items are incomplete or
16  incorrect in some material respect."  Rutter Group Practice Guide: Federal Civil
17  Trials and Evidence Ch. 11-A 2a.5 § 11:25 (citing Walsh v. McCain Foods Ltd., 81
18  F.3d 722, 727 (7th Cir. 1996)).  If Mattel's experts' inability to conduct infrared
19  luminescence and reflective infrared testing and the pencil lines such testing may
20  reveal are material to their conclusions, Mattel has a responsibility to conduct that
21  testing and supplement its reports.

22

23  **III.    DEFENDANTS HAVE NO CREDIBLE BASIS TO OBJECT TO THIS**
24  **_EX PARTE_ APPLICATION.**

25

26     Once Judge Infante grants permission for Mattel to conduct additional
27  non-destructive testing of Bryant's original documents, defendants have no basis to
28  object to the filing of a supplemental report analyzing the results of such testing.

1   Indeed, there is no point to conducting the additional testing without the ability to
2   submit the results of that testing to the Court.  The issue for this Court, strictly
3   stated, is not whether access and testing should be allowed, but whether any testing
4   that is allowed by Judge Infante should in turn be available to aid the trier of fact;
5   that is, whether it is appropriate to permit Mssrs. Cunningham and Flynn to provide
6   supplemental analysis of the documents based on those testing results.  There is no
7   basis to deny Mattel that opportunity, and indeed, given the material omissions in its
8   current report, Mattel is obligated to provide such supplementation.  See Fed. R.
9   Civ. P. 26(e)(1).

10      It is the Court's duty to safeguard the trial process by ensuring that the trier of
11   fact has access to complete, reliable and credible expert testimony, and it does this
12   by safeguarding the process governing expert testimony.  As the court stated in
13   Phillips v. Netblue, Inc., 2007 WL 528722 (N.D. Cal. 2007), "sitting in its capacity
14   as gatekeeper, the Court must ensure that an expert's testimony 'both rests on a
15   reliable foundation and is relevant to the task at hand.'" (quoting Daubert, 509 U.S.
16   at 597).  In doing so, "[t]he trial court has broad discretion in admitting and
17   excluding expert testimony." Taylor v. Burlington Northern R. Co., 787 F.2d 1309,
18   1315 (9th Cir. 1986).

19      Rule 702 "allows witnesses to present testimony to the trier of fact based on
20   'scientific, technical, or other specialized knowledge' in order to assist the trier of
21   fact to understand the evidence or to determine a fact in issue." Universal Trading &
22   Inv. Co. v. Kiritchenko, 2007 WL 2141296 * 2 (2007) (quoting Fed. R. Evid. 702).
23   As a result of the limitations place on Mattel's experts' access to the pertinent
24   materials, their ability to help the trier of fact fully "understand the evidence or to
25   determine a fact in issue," Universal Trading, 2007 WL at * 2, has potentially been
26   compromised by the severe disparities in the degree of access afforded Mattel's and
27   MGA's experts to the evidence.  Similarly, MGA's experts' ability to educate the
28

1 || trier of fact on these issues is compromised because they will not have the benefit of
2 || having their opinions fully tested by Mattel's experts.

3      As noted earlier, whatever objections defendants proffer now, they have
4 || argued precisely the opposite in circumstances where extension of time limits to
5 || allow for parity of testing would benefit them. In MGA's Opposition to Mattel Inc's
6 || *Ex Parte* Application for Protective Order Preventing MGA's Destructive Sampling
7 || of the Prince Notary Book, MGA argued that defendants should be allowed to
8 || conduct the exact same testing as Mattel, arguing that "the issue is one of simple
9 || fairness. Should MGA be granted the same right to test documents as Mattel? Or
10 || should Mattel be allowed to impose a double standard and prevent MGA from
11 || performing the very same forensic testing it performed just two months ago? The
12 || answer," MGA claimed, "is clear." (Id. at 1, 16-17) ("All that MGA seeks is the
13 || opportunity to perform the *same* testing performed by Mattel's expert, pursuant to
14 || the *same* protocol employed by Mattel, so that it can prepare a rebuttal expert
15 || report.")) (emphasis supplied).

16      Having argued for parity in one circumstance, which would benefit
17 || defendants, defendants cannot now credibly seek to deny Mattel the same equality
18 || here. Accordingly, Mattel should be permitted to file supplemental expert reports
19 || based on additional forensic testing of Bryant's original documents.

20

21                       **CONCLUSION**

22

23      For the reasons stated, Mattel's *ex parte* Application to supplement the expert

24

25

26

27                      EXHIBIT _____ 4

28                      PAGE _____ 54

1  reports of Mssrs. Flynn and Cunningham after they have had access to Carter

2  Bryant's original documents should be granted.

3

4  DATED:  April 8, 2008          QUINN EMANUEL URQUHART OLIVER &
                                   HEDGES, LLP
5

6                                  By
7                                     Diane C. Hutnyan
                                      Attorneys for Mattel, Inc.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                                 EXHIBIT ____4____

28                                 PAGE ____55____

07209/2463004.1