EXHIBIT 5

**Cunningham, Lloyd - Vol 1**

1           UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3              EASTERN DIVISION

4

5   MATTEL, INC., a Delaware     )

    Corporation,               )

6                         )

             Plaintiff,      )

7                         )

            vs.            ) No. CV 04-9059 NM

8                         ) (RNBx)

    CARTER BRYANT, an individual; )

9   and DOES 1 through 10,     )

    Inclusive,              )

10                        )

           Defendants.     )

11  ------------------------------ )

    (COMPLETE CAPTION ON NEXT PAGE.)

12

13

14

15      Videotaped Deposition of LLOYD W. CUNNINGHAM,

16      taken on behalf of Defendants, at 300 South

17      Grand Street, Los Angeles, California,

18      beginning at 9:59 A.M. and ending at 5:25 P.M.,

19      on Monday, March 31, 2008, before Wendy S.

20      Schreiber, CSR No. 3558, RPR, CLR.

21

22

23

24

25   PAGES 1 - 223

EXHIBIT _____5_____

PAGE _____40_____

```
 1    machine-printed material he was assigned to examine.
 2    And Mr. Rantanen who is a paper chemist was assigned
 3    to examine characteristics of the paper and I wasn't
 4    privy to the types of examinations or what documents
 5    he was assigned to examine.                          10:36AM
 6         Q.   When you say that you were assigned to
 7    determine if there was anything unusual or
 8    suspicious about the documents, what do you mean by
 9    "unusual or suspicious"?
10         A.   Well, an example would be if I was         10:36AM
11    conducting -- conducting a cursory search of the
12    documents and I observed that there was a
13    disturbance of the paper fiber, I would then try to
14    evaluate what was the cause of the disturbance of
15    the paper fiber.  Was it because a piece of adhesive 10:36AM
16    was removed from the document?  Was it because an
17    erasure had occurred whether mechanical or chemical?
18    Or was the disturbance something just caused by an
19    accident?  That would be an example of anything
20    suspicious or unusual.                               10:37AM
21         Q.   You indicated you were also asked to
22    determine whether there was any indented material
23    found in the drawings; is that correct?
24         A.   Yes.
25         Q.   And did you understand that these would be 10:37AM
```

EXHIBIT __5__

PAGE __41__

1   drawings that you would be examining?

2       A.   Well, excuse me, you used the word

3   "drawings." Any indentations in any documents, not

4   just drawings.

5       Q.   Why were you asked to look at whether there    10:37AM

6   was any evidence of indentations in the documents?

7           MS. HUTNYAN:  Are we getting into

8   communications?

9   BY MR. SLOAN:

10      Q.   Without disclosing any communications with    10:37AM

11  counsel, can you indicate to me your understanding

12  as to why you were being asked to determine whether

13  there were any indentations in the documents?

14          MS. HUTNYAN:  Calls for speculation.

15          THE WITNESS:  Because indented writing or    10:37AM

16  just indentations in the paper fiber generally may

17  be a good indicator of when a document was prepared.

18  BY MR. SLOAN:

19      Q.   Were you -- well, let me ask you this.

20  Without, again, disclosing any communications with    10:38AM

21  counsel, were you under the belief or understanding

22  that you were being asked to determine the

23  sequencing of certain documents?

24      A.   No, not at that point I wasn't.

25      Q.   If we can again look at 4625, the entry for    10:38AM

EXHIBIT ___5___

PAGE ___42___

```
 1   September 12th of 2007 indicates a meeting with

 2   Ms. Hutnyan and Mr. Tanden.  Is that an attorney or

 3   is that someone else?

 4       A.   Mr. Tanden?

 5       Q.   Yes.                                          10:38AM

 6       A.   He's an attorney now.  At that point he was

 7   awaiting his results of the bar examination so he

 8   wasn't an attorney at that point.

 9            MR. SLOAN:   Is he an attorney at Quinn

10   Emanuel?                                               10:39AM

11            MS. HUTNYAN:   No.

12            MR. SLOAN:   Was he at your office in his

13   capacity as an attorney?

14            MS. HUTNYAN:   He was hired as a law clerk by

15   us.                                                    10:39AM

16            MR. SLOAN:   Okay.

17       Q.   The same entry on September 12th, 2007

18   indicates that you discussed the documents to be

19   examined and opened boxes that contained documents.

20   Was that the first day on which you had actually       10:39AM

21   reviewed any original documents in this case?

22       A.   Yes.

23       Q.   September 12th, 2007?

24       A.   Yes.

25       Q.   Were they brought to you by counsel?          10:39AM
```

EXHIBIT ___5___

PAGE ___43___

1      A.    Yes.

2      Q.    On the third page of this invoice which is

3  Bates-labeled M-LC 00140, the entry for September

4  28, 2007 indicates that on that day you returned --

5  there's a return of documents to boxes and FedEx          10:40AM

6  pick up.  Who do you -- who did you send the

7  documents to at that time?

8      A.    I believe it was William Flynn.

9      Q.    By the way, can you describe the

10  documents -- the amount of documents and the type of    10:40AM

11  documents that you were looking at during that time

12  period from September 12 through September 28, 2007?

13      A.    Just voluminous documents.  I didn't take

14  notes describing each individual document so I truly

15  can't remember the nature of each document, but          10:41AM

16  generally I examined sketches, color copies,

17  handwritten notations and paper in general.

18      Q.    And these are the documents that are

19  referenced in your expert report, correct?

20      A.    Some of them, yes.                              10:41AM

21      Q.    If you can turn to the next page in Exhibit

22  4625 which is an invoice entitled "Supplemental

23  Billing" and dated October 18th, 2007, do you see

24  that?

25      A.    I do.                                          10:41AM

EXHIBIT ___5___

```
 1      Q.    On the entry for October 6, 2007 it
 2   indicates that you opened boxes containing question
 3   documents and witnessed the photography and scanning
 4   of the selected question documents.  Which documents
 5   were -- were those?                                10:42AM
 6      A.    I can only state that there were numerous
 7   documents.  Many of them were drawings of Bratz
 8   dolls.  I didn't take notes as to each individual
 9   document that was photographed or scanned.  I was
10   just present as a witness to the photography and     10:42AM
11   scanning and to make sure no destruction was done to
12   the documents at that time.
13      Q.    Were these the same or some of the same
14   documents that you had examined earlier and sent to
15   Mr. Flynn on September 28th, 2007?                   10:42AM
16      A.    Yes.
17      Q.    And why were they shipped back to you?
18           MS. HUTNYAN:  Calls for speculation.
19           THE WITNESS:  I don't know why they were
20   shipped back to me but eventually I was asked to     10:43AM
21   witness the scanning and photography of selected
22   documents.
23   BY MR. SLOAN:
24      Q.    And where did that scanning and photography
25   take place?                                          10:43AM
```

EXHIBIT ___5___

PAGE ___45___

1    A.    At a professional -- I guess you'd call it a

2    professional scanning and photography shop in

3    San Francisco. I don't recall the address or the

4    name of the firm.

5    Q.    To the best of your knowledge between          10:43AM

6    September 28th, 2007 when you say you sent those

7    documents or you sent a package of documents to

8    Mr. Flynn and October 6, 2007 when you opened the

9    boxes containing question documents, do you know

10   where those documents were?                          10:44AM

11   A.    No.

12   Q.    Do you believe that they were with Mr. Flynn

13   during that time period?

14   A.    Possibly since I observed the FedEx billing

15   being sent to his location.                           10:44AM

16   Q.    You had sent the documents to Mr. Flynn,

17   correct?

18   A.    No. They were sent from my office to

19   Mr. Flynn's office, however, counsel is the person

20   who prepared the FedEx air bills.                     10:44AM

21   Q.    Was that Ms. Hutnyan?

22   A.    No.

23   Q.    Other counsel from Quinn Emanuel?

24   A.    No, it was Mr. Tanden.

25   Q.    Mr. Tanden was a law clerk with Quinn          10:44AM

EXHIBIT   5

PAGE   46

Cunningham, Lloyd - Vol 1

1    IN WITNESS WHEREOF, I have subscribed my

2    name this 7th day of April, 2008.

3

4

5

6

7    WENDY S. SCHREIBER, CSR No. 3558, RPR

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT 6

```
 1            IN THE UNITED STATES DISTRICT COURT

 2         FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3                   EASTERN DIVISION

 4                                        Certified Copy

 5    ------------------------

 6    CARTER BRYANT,            )

 7    an individual,           )

 8           Plaintiff,        )

 9        vs.                  ) No. CV 04-09049 SGL (RNBx)

10    MATTEL, INC., a          )    Consolidated with

11    Delaware corporation,    )    CV 04-09059

12           Defendant.        )    CV 05-02727

13    ------------------------

14

15

16       Videotaped Deposition of WILLIAM J. FLYNN,

17       taken at Phoenix, Arizona commencing at 9:31 a.m.

18       March 27, 2008 before Robin L. B. Osterode,

19       RPR, CSR, Arizona, Certified Reporter No. 50695.

20

21

22

23

24

25    PAGE 1 - 252
                                                        1
```

EXHIBIT ___0___

PAGE ___48___

```
 1    believe.
 2        Q.    But he had examined the documents -- you're
 3    saying that he had examined the documents before you
 4    received them, but he had not reached any
 5    conclusions?
 6             MS. HUTNYAN:  Objection; calls for
 7    speculation.
 8             THE WITNESS:  What I'm telling you is I had
 9    no discussion with Mr. Cunningham about his
10    conclusions prior to my receiving the case.
11    BY MR. SLOAN:
12        Q.    When they -- when the documents were sent
13    to you, the Carter Bryant documents?
14        A.    Yes.
15        Q.    Did you understand that your role was just
16    to examine the machine-produced documents or to
17    examine all the documents?
18             MS. HUTNYAN:  This is starting to get a
19    little close to the stipulation in this case about
20    what we asked him to do and what our communications
21    were with him and what the assignment was and my
22    understanding was that was off limits, so where are
23    we going?
24             MR. SLOAN:  Let me ask it a different way,
25    because I appreciate your concern.  Did you have any
```

16

EXHIBIT ___6___

PAGE ___49___

1    understanding other than from your conversations with

2    lawyers at Quinn Emanuel as to what your -- what the

3    purpose of your examination was to be.

4         MS. HUTNYAN:  I don't think that helps.

5    Where else would he get an understanding of what his

6    role was.  I think that's clearly off limits.

7    BY MR. SLOAN:

8         Q.    Let me ask you this, did you have any

9    discussions with either Lloyd Cunningham or anyone at

10   Mattel about what you were supposed to do in your

11   examination of these documents before you received

12   them in or about October of 2007?

13        A.    No, I had -- until the documents arrived at

14   my laboratory, I had no idea how many documents were

15   going to be involved in my examination or what the

16   scope of the examination was going to be.

17        Q.    Let's -- let's turn to the very first page

18   of your report?

19        A.    Yes.

20        Q.    And the second sentence of your report says

21   the purpose of my examination was to determine, if

22   possible, any forensic evidence that would indicate

23   when documents had been created.  I also attempted to

24   ascertain the sequencing of sketches and drawings of

25   the BRATZ dolls.

                                                        17

EXHIBIT _____ 6

PAGE _____ 50

1           Did you understand that your purpose in
2  conducting this examination was to be both of those,
3  i.e., to determine forensic evidence of the dating of
4  the documents, as well as any evidence regarding the
5  sequencing?
6       A.   Yes.
7       Q.   Did you get the understanding that what you
8  were supposed to determine is the sequencing, from
9  any source, other than communications with Quinn
10 Emanuel?
11          MS. HUTNYAN:  This is still running into
12 the same problem.  He's already testified he didn't
13 receive instructions from anybody other than us,
14 so --
15          MR. SLOAN:  Okay.
16          MS. HUTNYAN:  You know.
17 BY MR. SLOAN:
18      Q.   How did you -- were you given any
19 indication as to how long you would have to examine
20 these documents?
21      A.   Yes.
22      Q.   How long were you told you would have to
23 examine the documents?
24      A.   The documents would be in my lab for a
25 total of four days; however, within that four days

18

EXHIBIT ___6___

PAGE ___51___

```
 1    would include the time it took to organize the
 2    documents that were to be examined, the repackaging
 3    of the documents to put them back in the boxes, the
 4    sealing of the boxes, and all of the administrative
 5    overhead and notetaking that I would have to do.  So
 6    the reality is that I probably had just over three
 7    workdays with these hundreds of documents.
 8         Q.    Do you have a machine or are you familiar
 9    with what's called a video spectro comparator?  Let
10    me rephrase that.  Are you familiar with a machine
11    called a VSC or a video spectro comparator?
12         A.    I am, and I own one.
13         Q.    Did you -- and you're trained in the use of
14    the VSC?
15         A.    I am.
16         Q.    Which type of VSC do you have, which
17    machine?
18         A.    It's called the 4C, as in Charles.
19         Q.    Did you perform any VSC testing on the
20    Carter Bryant documents?
21         A.    Yes.
22         Q.    You did?
23         A.    I did.
24         Q.    Do you have a record of which documents you
25    prepared testing on or you performed the VSC testing
```

                                                        19

EXHIBIT ___6___

PAGE ___52___

```
 1    on?

 2         A.    I know I can tell you specifically which

 3    ones they were, they were the documents that had the

 4    CPS codes.  I used the VSC to image the CPS codes on

 5    the color copies.

 6         Q.    Did you use the VSC machine on any other

 7    documents besides those documents?

 8         A.    I did not.

 9         Q.    And to be clear, those were Bryant Exhibit

10    310 through 319 and Bryant Exhibit 214?

11         A.    Yes, exactly.

12              MS. HUTNYAN:   When you say "exhibit,"

13    Counsel, you mean Bates number?

14              MR. SLOAN:   That's correct.

15              MS. HUTNYAN:   Okay.

16              THE WITNESS:   There were -- actually,

17    that's not entirely accurate, there were other color

18    copies in this set that had CPS codes that were not

19    decodable, and I realized were not decodable, so the

20    answer is that there were many more documents than

21    just 210 and 310 through 319 that I examined in the

22    VSC.  It's just that I imaged the CPS bar codes on

23    214 and 310 through 319.

24    BY MR. SLOAN:

25         Q.    Did you perform any VSC testing on any of
```

                                                          20

EXHIBIT ___6___

PAGE ___53___

```
 1        the documents which you have referred to in your
 2        report as the mixed media or multicolor poster board
 3        drawings?
 4            A.    I did not.
 5            Q.    Why not?
 6            A.    There was -- again, there were severe time
 7        constraints placed on these examinations.  The scope
 8        of my examination was vast and I had to make some
 9        decisions about an examination strategy that would
10        accomplish the most that I could accomplish in the
11        three days or so that I had with these documents.  So
12        I recorded my findings, but I had no opportunity in
13        that regard to make video captures or
14        photomicrographs.
15            Q.    By the way, do you have any notations of
16        the exact date on which you received the Carter
17        Bryant documents and the date on which you sent them
18        out?
19            A.    I don't have it with me, but that certainly
20        would be available in my computer system and I could
21        provide that to you if you would like.
22                 MR. SLOAN:  Counsel, would you --
23                 MS. HUTNYAN:  We'll give you the date if
24        you want.
25                 MR. SLOAN:  Okay.
```

21

EXHIBIT __6__

PAGE __54__

```
 1              MS. HUTNYAN:  Okay.

 2              THE VIDEOGRAPHER:  This ends the videotaped

 3    deposition of William Flynn.  We are off the record

 4    at 4:58 p.m.

 5

 6              (Deposition concluded at 4:58 p.m.)

 7

 8

                  _____

 9                      WILLIAM J. FLYNN

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
                                                      250
```

EXHIBIT ___6___

PAGE ___55___

EXHIBIT 7

## Andrea Hoeven

**From:** Diane Hutnyan

**Sent:** Friday, April 11, 2008 1:12 PM

**To:** Chris Grohman

**Subject:** FW: Bryant v. Mattel, Inc. JAMS Ref. 1100049530

---

**From:** Diane Hutnyan
**Sent:** Monday, April 07, 2008 8:58 AM
**To:** 'Chan Sandra'; 'mhp@kvn.com'; 'Kennedy, Raoul D (SFC)'
**Cc:** 'Kennedy, Raoul D (SFC)'; 'Rubalcaba, Mary Ann'
**Subject:** RE: Bryant v. Mattel, Inc. JAMS Ref. 1100049530

Ms. Chan,

We do oppose, because I am unfortunately not available on the 11th. We are amenable to working out some kind of expedited schedule, however, and suggest that MGA's counsel and we work together on that and then propose a date to you that will work for both of us.

We will be responding to the balance of Mr. Kennedy's April 4 letter a bit later today.

Thank you.

---

**From:** Chan Sandra [mailto:SChan@JAMSADR.com]
**Sent:** Friday, April 04, 2008 2:41 PM
**To:** Diane Hutnyan; mhp@kvn.com; Kennedy, Raoul D (SFC)
**Cc:** Kennedy, Raoul D (SFC); Rubalcaba, Mary Ann
**Subject:** RE: Bryant v. Mattel, Inc. JAMS Ref. 1100049530

Dear Counsel:

Please advise if Mattel has any opposition to MGA's request to substitute the matter number 10 on the April 11 hearing calendar with Mattels' ex parte application for a protective order preventing MGA"s destructive sampling of the Prince Notary Book. Thank you.

Best Regards,
Sandra Chan
JAMS
Two Embarcadero Center, Suite 1500
San Francisco, CA 94111
Tel: 415-982-5267
Direct Dial: 415-774-2611
Fax: 415-982-5287
email: schan@jamsadr.com

---

**From:** Rubalcaba, Mary Ann [mailto:MaryAnn.Rubalcaba@skadden.com]
**Sent:** Friday, April 04, 2008 10:54 AM
**To:** Chan Sandra
**Cc:** dianehutnyan@quinnemanuel.com; mhp@kvn.com; Kennedy, Raoul D (SFC)
**Subject:** Bryant v. Mattel, Inc. JAMS Ref. 1100049530

EXHIBIT ____7____

PAGE ____56____

Per Mr. Kennedy's request, attached is a letter with enclosures in regard to the above-referenced case. A hard copy is also being messengered for your convenience.

Thank you for your assistance.


Mary Ann Rubalcaba
Temporary Assistant to Raoul D. Kennedy
Skadden, Arps, Slate, Meagher & Flom LLP
Four Embarcadero Center, Suite 3800
San Francisco | California | 94111-5974
T: 415.984.2668 | F: 888.329.1913
mrubalca@skadden.com

# Skadden


---------------------------------------------------------------------------
************************************************** This email and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified any dissemination, distribution or copying of this email, and any attachments thereto, is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original copy and any copy of any email, and any printout thereof. Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request. **************************************************

EXHIBIT ___7___

PAGE ___57___

EXHIBIT 8

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-443-3000 FAX 213-443-3100

April 8, 2008

Hon. Edward Infante (Ret.)
Discovery Master
c/o Sandra Chan
JAMS
Two Embarcadero Center, Suite 500
San Francisco, California 94111

Re:     Bryant v. Mattel, Inc., JAMS Ref. 1100049530

Dear Judge Infante:

I write in response to MGA's letter to you of April 4, 2008 ("April 4 Letter") regarding Mattel's pending *Ex Parte* Application for a Protective Order Preventing MGA's Destructive Sampling of the Prince Notary Book, filed March 10, 2008.

It would be inappropriate for the Discovery Master to design a protocol for MGA's testing.

First, the issue before the Discovery Master on Mattel's Application is not to "establish a testing protocol" for MGA or to determine "the amount of time Dr. Lyter should have to complete his testing." It is whether a protective order should be issued preventing destructive testing of the notary book by MGA unless and until MGA obtains this Court's approval or Mattel's consent to the expert(s) involved and the protocol to be employed. There is no discussion in that briefing that would even advise the Discovery Master of specific protocols that might be appropriate for MGA's planned destructive testing.

Besides, as MGA and Bryant argued when Mattel requested that the Court appoint a neutral expert in this case, "[t]he Court's role is to ensure that the rules of expert discovery and presentation of expert testimony are obeyed, [sic] it is not to decide who the experts should be,

EXHIBIT ____ 8 ____

**quinn emanuel urquhart oliver & hedges, llp**                    PAGE ____ 58 ____

07209/2462964.1

NEW YORK | 51 Madison Avenue, 22nd Floor, New York, New York 10010 | TEL 212-849-7000 FAX 212-849-7100
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94111 | TEL 415-875-6600 FAX 415-875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL 650-801-5000 FAX 650-801-5100
TOKYO | Akasaka Twin Tower Main Building, 6th Floor, 17-22 Akasaka 2-Chome, Minato-ku, Tokyo 107-0052, Japan | TEL +81-3-5561-1711 FAX +81-3-5561-1712

Hon. Edward Infante (Ret.) c/o Sandra Chan
April 8, 2008

what testing should be performed, what and how the tests should be conducted, and how the experts should be paid and by whom." MGA and Bryant further argued that asking the Court to "superintend is, itself, suspicious," and that appointing a neutral expert would signal to the jury that the Court had taken sides. *See* MGA and Bryant's Joint Opposition To Mattel's Motion For Appointment Of Expert Witnesses, at 1-2 (attached hereto for the Discovery Master's convenience).

Here MGA seeks to go much farther and have the Court establish an entire testing protocol, which could legitimize in the eyes of the jury not only MGA's testing of the notary book, but likely MGA's past destructive and non-destructive testing as well. To date, MGA has had at least three individuals conduct testing on Bryant's original drawings. None of these individuals was identified to Mattel or to the Discovery Master, much less reviewed and pre-approved by the Discovery Master, in advance or anytime since. None of their protocols was presented to the Court, and in at least one case, MGA has admitted that the individual handling the documents did not even keep track of which ones he handled.

If time were truly an issue, absent an agreement with Mattel, MGA could have long ago submitted an affirmative protocol for the Discovery Master's consideration. But MGA refuses to limit its earlier proposals in any way. On a call just yesterday, I asked MGA's counsel, Mr. Sloan, about whether MGA was amenable to limiting its destructive testing to Dr. Lyter, as it implies it is doing in the April 4 letter. The answer was no: MGA insists that its "protocol" include unlimited, unnamed, and unauthorized "experts" in addition to Dr. Lyter.

And if time were truly an issue, MGA's counsel would have accepted my invitation yesterday morning to work out an expedited date for the hearing that we could then propose to the Discovery Master. No one ever called to do so, and Mr. Sloan did not even raise the issue on yesterday's telephone call.

The "two points" raised by MGA at the end of its letter do illustrate a double standard, but it is the double standard *MGA* seeks to apply to this case. Ignoring the Discovery Master's past statements about the importance of knowing who touches the original documents in this case, and his requirement that Mattel's four world-class experts submit their credentials and other detailed information before even allowing non-destructive examination in this case, MGA calls it "game playing" to apply the same Rule to it and require it to seek the Discovery Master's approval for its purported experts. Moreover, four weeks have elapsed since Mattel filed its brief, during which MGA could have submitted declarations of the sort Mattel submitted for its experts, but MGA failed to do so.

Further, MGA does not explain why Mattel's counsel's having called Dr. Lyter one day in 2004 to retain him as a non-testifying consultant would be probative of Dr. Lyter's integrity or destructive-testing skills, much less would substitute for the other specific information the Discovery Master ordered be submitted to him with respect to other experts in this case (such as laboratory facilities, preservation of evidence, statement of accountability). If anything, the

EXHIBIT __B__

PAGE __59__

Hon. Edward Infante (Ret.) c/o Sandra Chan
April 8, 2008

incident is an embarrassing reflection on Dr. Lyter's failure to keep appropriate records. He "declined" to act as a consultant for Mattel a moment after apologizing for having accidentally accepted a consulting position with Mattel when he had already been retained by MGA.

MGA's discussion of Dr. Aginsky -- erroneously stripped of his title in MGA's April 4 letter -- is another striking example of the double standard MGA favors. While (1) arguing in opposition to Mattel's Motion For Protective Order that it needs no authorization from the Discovery Master to conduct destructive testing, (2) refusing to submit any information about its three "experts" to the Discovery Master or to Mattel before their handling of original documents; and (3) refusing any limitation on the number of plugs it can take from two pages of the notary book -- MGA argues that it is a scandalous transgression for Mattel's world-class, Discovery-Master-reviewed-and-approved ink chemist to have taken 4 hypodermic-needle-sized plugs (2% of the total plugs) outside the presence of MGA's "expert." MGA's position is all the more groundless in light of the fact that MGA's observing "expert" was actually Dr. Speckin's young trainee, Jason Harner, who had just recently graduated from college. Clearly, MGA regards almost anyone an "expert," which is all the more reason why the Discovery Master should apply the same standards to MGA as he applied to Mattel: requiring Court approval of MGA's "experts" and protocols before they are allowed to handle original documents.

Due to my intimate knowledge of the history of forensic document examination in this case, Mattel would like me to handle any oral argument on the pending motion. As I stated in my email yesterday, while I am not available on the 11th, I am willing to work with MGA to set an earlier hearing date to accommodate MGA, if it would like to pursue that option.

Very truly yours,

*Diane C. Hutnyan*

Diane C. Hutnyan

Enclosure

3

EXHIBIT ___ B
PAGE ___ 100