EXHIBIT 8

THIS EXHIBIT IS FILED UNDER SEAL

PURSUANT TO PROTECTIVE ORDER

EXHIBIT 9

THIS EXHIBIT IS FILED UNDER SEAL

PURSUANT TO PROTECTIVE ORDER

EXHIBIT 10

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 11

THIS EXHIBIT IS FILED UNDER SEAL

PURSUANT TO PROTECTIVE ORDER

EXHIBIT 12

THIS EXHIBIT IS FILED UNDER SEAL

PURSUANT TO PROTECTIVE ORDER

EXHIBIT 13

**COPY**

1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
   John B. Quinn (Bar No. 90378)
2  Michael T. Zeller (Bar No. 196417)
   865 South Figueroa Street, 10th Floor
3  Los Angeles, California 90017
   Telephone:   (213) 443-3000
4  Facsimile:   (213) 443-3100

5  Attorneys for Plaintiff
   Mattel, Inc.
6

**CONFORMED COPY**
OF ORIGINAL FILED
Los Angeles Superior Court

APR 27 2004

John A. Clarke, Executive Officer/Clerk
By _____ Deputy
            SUE GABB

7

8             SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                   FOR THE COUNTY OF LOS ANGELES

10

11  MATTEL, INC., a Delaware corporation,        CASE NO.   BC314398

12                       Plaintiff,

13                                               COMPLAINT FOR:

14         v.                                    (1)  BREACH OF CONTRACT;
                                                 (2)  BREACH OF FIDUCIARY
15                                                    DUTY;
    CARTER BRYANT, an individual; and            (3)  BREACH OF DUTY OF
16  DOES 1 through 10, inclusive,                     LOYALTY;
                                                 (4)  UNJUST ENRICHMENT; AND
17                       Defendants.             (5)  CONVERSION

18

19

20

21

22

23

24

25

26

27

28

'209/579342.1

**EXHIBIT 13**
**PAGE 354**

COMPLAINT

1    Plaintiff Mattel, Inc. ("Mattel") brings this action against defendants Carter

2  Bryant ("Bryant") and Does 1 through 10 (all defendants being collectively referred to as

3  "defendants") and alleges as follows:

4

5                                    Parties

6

7    1.    Mattel is a corporation organized and existing under the laws of the

8  State of Delaware and has its principal place of business in El Segundo, California.

9    2.    Mattel is informed and believes, and on that basis alleges, that defendant

10  Bryant is an individual currently residing in Springfield, Missouri.

11    3.    The true names and capacities of defendants sued herein as Does 1

12  through 10, inclusive, are unknown to Mattel, which therefore sues said defendants by such

13  fictitious names. Mattel will amend this Complaint to allege their true names and capacities

14  when the same are ascertained.

15    4.    Mattel is informed and believes, and on that basis alleges, that at all

16  times relevant herein, defendants, and each of them, were acting in concert and active

17  participation with each other in committing the wrongful acts alleged herein, and were the

18  agents of each other, and in doing the things alleged herein, each defendant was acting

19  within the course and scope of his, her or its agency and was subject to and under the

20  supervision of, and was acting with the knowledge of, his, her or its co-defendants.

21

22                            Jurisdiction and Venue

23

24    5.    During the time of the acts complained of herein, Bryant was employed

25  by Mattel in, and was a resident of, Los Angeles County. Bryant's contracts with Mattel that

26  are at issue in this action were executed, performed and breached by Bryant in Los Angeles

27  County. In addition, defendants committed the tortious conduct alleged herein while

28  physically located in Los Angeles County, and Mattel felt the effects of Bryant's breach and

7209/579342.1                         -2-
EXHIBIT 13
PAGE 355
COMPLAINT

1 defendants' other wrongful acts in Los Angeles County. Accordingly, this Court has

2 personal jurisdiction over defendants.

3        6.      Venue is proper pursuant to <u>Code of Civil Procedure</u> §§ 393 and 395(a),

4 as the causes of action arose in Los Angeles County, the contractual obligations at issue were

5 incurred, were to be performed and were breached by Bryant in Los Angeles County, and

6 Bryant does not currently reside in California.

7

8                                  <u>Factual Background</u>

9

10       7.      Mattel is a long standing and successful independent manufacturer and

11 marketer of toys, dolls, games and stuffed toys and animals. Mattel was founded in 1945 by

12 Elliot and Ruth Handler and Harold "Matt" Mattson. The name of the company was created

13 by incorporating the names of two of its founders, "MATT-son" and "EL-liot." Originating

14 from the Handlers' garage in Southern California, the company greatly expanded its

15 operations following World War II and soon began to thrive as its reputation for producing

16 high-quality toys spread. During the next several decades, Mattel became world famous for

17 producing high-quality products at reasonable prices. Today, some of Mattel's most famous

18 brands include BARBIE, HOT WHEELS, MATCHBOX and FISHER-PRICE.

19       8.      Critical to Mattel's success, and to the livelihood of its employees, is

20 Mattel's ability to design and develop new products. Mattel invests many millions of dollars

21 in product design and development annually, and it introduces hundreds of new products

22 each year. In El Segundo, California alone, Mattel maintains a 180,000 square-foot design

23 center that houses more than 850 designers, sculptors, painters and other artists, whom

24 Mattel pays to work exclusively and full-time to create the products that Mattel sells and on

25 which Mattel's business depends.

26       9.      Defendant Bryant was employed by Mattel from September 1995

27 through April 1998, and then again from January 1999 through October 2000, as a product

28 designer at Mattel's design center in El Segundo, California.

EXHIBIT 13
PAGE 356

7209/579342.1

-3-

COMPLAINT

1    10. On January 4, 1999, upon starting his second term of employment by

2 Mattel, and as a condition of and in consideration for his employment, Bryant executed an

3 Employee Confidential Information and Inventions Agreement (the "Employee

4 Agreement"). Among other things, Bryant agreed that he would not, without Mattel's

5 express written consent, "engage in any employment or business other than for [Mattel], or

6 invest in or assist (in any manner) any business competitive with the business or future

7 business plans of [Mattel]." Bryant further acknowledged that he held a position of trust

8 with Mattel. In addition, Bryant assigned to Mattel all rights, title and interest in

9 "inventions," including without limitation "designs," that he conceived or reduced to practice

10 during his employment by Mattel. A true and correct copy of Bryant's Employee Agreement

11 with Mattel is attached as Exhibit A.

12    11. Also on January 4, 1999, Bryant executed Mattel's Conflict of Interest

13 Questionnaire (the "Conflict Questionnaire"). Among other things, Bryant certified in the

14 Conflict Questionnaire that, other than as disclosed, he had not worked for any competitor

15 of Mattel in the prior twelve months and had not engaged in any business venture or

16 transaction involving a Mattel competitor that could be construed as a conflict of interest.

17 Bryant specifically agreed that he would immediately notify his supervisor of any change

18 in his situation that would cause him to change any of the foregoing certifications. The only

19 conflict disclosure that Bryant made on the Conflict Questionnaire (or at any time

20 subsequently) concerned freelance work that is unrelated to the conduct alleged herein. A

21 true and correct copy of the Conflict Questionnaire executed by Bryant is attached as

22 Exhibit B.

23    12. In late November 2003, Mattel learned that Bryant had secretly aided,

24 assisted and worked for a Mattel competitor, including without limitation by entering into

25 an agreement with the competitor, during the time Bryant was employed by Mattel pursuant

26 to the above-referenced agreements and was being paid by Mattel as a product designer.

27 Bryant's agreement with the competitor obligated Bryant to provide product design services

28 to the competitor on a "top priority" basis. Bryant's agreement also provided, among other

1  things, that Bryant would receive royalties and other consideration for sales of products on

2  which Bryant provided aid or assistance; that all work and services furnished by Bryant to

3  the competitor under the agreement purportedly would be considered "works for hire"; and

4  that all intellectual property rights to preexisting work by Bryant purportedly would be

5  assigned to the competitor. In addition, while Bryant was employed by Mattel, Bryant and

6  the other defendants converted, misappropriated and misused Mattel property and resources

7  for the benefit of, and to aid and assist, Bryant personally and Mattel's competitor.

8          13.    During the time that he was employed by Mattel and thereafter, Bryant

9  concealed these actions from Mattel, including without limitation by failing to notify his

10 supervisor of his conflict of interest regarding the competitor and by making affirmative

11 misrepresentations to Mattel management upon his departure from Mattel. Because of

12 Bryant's acts of concealment and his misrepresentations to Mattel, Mattel had no reason to

13 suspect that Bryant had worked for the competitor while still employed by Mattel until late

14 November 2003, when Mattel received, through an unrelated legal action, a copy of Bryant's

15 agreement with the competitor and saw that the date of the agreement predated Bryant's

16 departure from Mattel.

17         14.    As a consequence, Bryant breached his contracts with Mattel and

18 violated his duty of loyalty and his fiduciary duties to Mattel; the other defendants have

19 unlawfully aided and abetted his violation of such duties; and each of the defendants has

20 been unjustly enriched and engaged in acts of conversion.

21

22                      FIRST CLAIM FOR RELIEF

23                         (Breach of Contract)

24

25         15.    Mattel repeats and realleges each and every allegation set forth in

26 paragraphs 1 through 14, above, as though fully set forth at length.

27         16.    Pursuant to his Mattel Employment Agreement, and for good and

28 valuable consideration, Bryant agreed that he would not, without Mattel's express written

EXHIBIT 13
PAGE 358

COMPLAINT

consent, engage in any employment or business other than for Mattel or assist in any manner any business competitive with the business or future business plans of Mattel during his employment with Mattel. Pursuant to his Mattel Employment Agreement, Bryant further assigned to Mattel all right, title and interest in "inventions," including without limitation "designs," that he conceived or reduced to practice during his employment by Mattel. In addition, pursuant to the Conflict Questionnaire, Bryant certified that, other than as disclosed, he had not worked for any competitor of Mattel and had not engaged in any business venture or transaction involving a Mattel competitor that could be construed as a conflict of interest. Bryant further promised that he would notify his superior immediately of any change in his situation that would cause him to change any of the foregoing certifications or representations.

17.    The Employment Agreement and the Conflict Questionnaire are valid, enforceable contracts, and Mattel has performed each and every term and condition of the Employment Agreement and Conflict Questionnaire required to be performed by Mattel.

18.    Bryant materially breached the foregoing contracts with Mattel, in that, among other things, he secretly aided, assisted and worked for a Mattel competitor during his employment with Mattel, without the express written consent of Mattel.

19.    As a consequence of Bryant's breach, Mattel has suffered and will in the future continue to suffer damages in an amount to be proven at trial. Such damages include, without limitation, the amounts paid by the competitor to Bryant during his Mattel employment; the amounts paid by the competitor to Bryant as a result of the work he performed for the competitor during his Mattel employment; the amount that Mattel paid Bryant during the time he wrongfully worked for the competitor; the value of information and intellectual property owned by Mattel which Bryant provided to the competitor; the value of the benefits the competitor obtained from Bryant during the time he was employed by Mattel; and the value of the benefits the competitor obtained from Bryant as a result of the work he performed for the competitor during his Mattel employment.

**EXHIBIT 13**
**PAGE 359**

COMPLAINT

1      20.    Furthermore, Bryant's conduct has caused, and unless enjoined will

2 continue to cause, irreparable injury to Mattel that cannot be adequately compensated by

3 money damages and for which Mattel has no adequate remedy at law.  Bryant specifically

4 acknowledged in his Employment Agreement that his breach of the Agreement "likely will

5 cause irreparable harm" to Mattel and that Mattel "will be entitled to injunctive relief to

6 enforce this Agreement, in addition to damages and other available remedies."  Accordingly,

7 Mattel is entitled to orders mandating Bryant's specific performance of his contracts with

8 Mattel and restraining Bryant from further breach.

9

10                    SECOND CLAIM FOR RELIEF

11                    (Breach of Fiduciary Duty)

12

13      21.    Mattel repeats and realleges each and every allegation set forth in

14 paragraphs 1 through 20, above, as though fully set forth at length.

15      22.    Bryant held a position of trust and confidence with Mattel.  In his

16 position, Bryant had access to and was entrusted with Mattel's proprietary and confidential

17 information, supervised the work of others, exercised discretion and worked independently

18 in many of his job assignments and duties.  In his position, Bryant also represented Mattel

19 in its dealings with third parties and, in his actions in the course and scope of his

20 employment with Mattel, was an agent of Mattel.  Bryant confirmed his relationship of trust

21 with Mattel in the Employee Agreement.  Bryant thus owed Mattel a fiduciary duty that

22 included, but was not limited to, an obligation not to take any action that would be contrary

23 to Mattel's best interests or that would deprive Mattel of any opportunities, profit or

24 advantage which Bryant might bring to Mattel.

25      23.    Bryant breached his fiduciary duty to Mattel in that, while employed

26 by Mattel, he secretly aided, assisted and worked for a competitor of Mattel, including

27 without limitation by entering into an agreement with a Mattel competitor.  As alleged

28

**EXHIBIT 13**
**PAGE 360**

COMPLAINT

1 | above, Bryant also breached the aforementioned duty by using Mattel property and resources
2 | for the benefit of, and to aid and assist, himself personally and the competitor of Mattel.

3 |        24.     The other defendants, acting with full knowledge of Bryant's obligations
4 | to Mattel, aided and abetted Bryant in such conduct.

5 |        25.     As a direct and proximate result of defendants' wrongful conduct,
6 | Mattel has incurred damages in an amount to be determined at trial.

7 |        26.     Defendants acted with malice, fraud and oppression, and in conscious
8 | disregard of Mattel's rights. Accordingly, Mattel is entitled to an award of punitive damages
9 | against defendants in an amount to be determined at trial.

10 |        27.     Furthermore, defendants' conduct has caused, and unless enjoined will
11 | continue to cause, irreparable injury to Mattel that cannot be adequately compensated by
12 | money damages and for which Mattel has no adequate remedy at law. Accordingly, Mattel
13 | is entitled to an order restraining further breach of Bryant's fiduciary duty to Mattel and/or
14 | restraining defendants from continuing to benefit from such breach.

15 |

16 |                          THIRD CLAIM FOR RELIEF
17 |                          (Breach of Duty of Loyalty)
18 |

19 |        28.     Mattel repeats and realleges each and every allegation set forth in
20 | paragraphs 1 through 27, above, as though fully set forth at length.

21 |        29.     As an employee of Mattel, Bryant owed a duty of undivided loyalty to
22 | Mattel, his employer. Pursuant to this duty, Bryant could not compete with Mattel or assist
23 | a competitor of Mattel during his employment with Mattel. Pursuant to this duty, Bryant
24 | was required to always give preference to Mattel's business over his own, similar interests
25 | during the course of his employment with Mattel.

26 |        30.     Bryant breached his duty of loyalty to Mattel in that, while employed
27 | by Mattel, he secretly aided, assisted and worked for a competitor of Mattel, including
28 | without limitation by entering into an agreement with a Mattel competitor. As alleged

EXHIBIT 13
PAGE 361
COMPLAINT

1 | above, Bryant also breached the aforementioned duty by using Mattel property and resources
2 | for the benefit of, and to aid and assist, himself personally and the competitor of Mattel.

3 |        31.    The other defendants, acting with full knowledge of Bryant's obligations
4 | to Mattel, aided and abetted Bryant in such wrongful conduct.

5 |        32.    As a direct and proximate result of defendants' wrongful conduct,
6 | Mattel has incurred damages in an amount to be determined at trial.

7 |        33.    Defendants acted with malice, fraud and oppression, and in conscious
8 | disregard of Mattel's rights. Accordingly, Mattel is entitled to an award of punitive damages
9 | against defendants in an amount to be determined at trial.

10 |        34.    Furthermore, defendants' conduct has caused, and unless enjoined will
11 | continue to cause, irreparable injury to Mattel that cannot be adequately compensated by
12 | money damages and for which Mattel has no adequate remedy at law.  Accordingly, Mattel
13 | is entitled to an order restraining further breach of Bryant's duty of loyalty to Mattel and/or
14 | restraining defendants from continuing to benefit from such breach.

15 |

16 | <center>FOURTH CLAIM FOR RELIEF</center>

17 | <center>(Unjust Enrichment)</center>

18 |

19 |        35.    Mattel repeats and realleges each and every allegation set forth in
20 | paragraphs 1 through 34, above, as though fully set forth at length.

21 |        36.    Defendants, by the aforementioned conduct, unfairly used and diverted
22 | Mattel property, resources and opportunities for the benefit of, and to aid and assist,
23 | themselves, all without authorization by or payment to Mattel for the same. Defendants have
24 | been unjustly enriched as a result.

25 |        37.    Mattel is entitled to an award of all such amounts by which defendants
26 | have been unjustly enriched in an amount to be determined at trial.

27 |

28 |

EXHIBIT 13
PAGE 362

7209/579342.1

-9-

COMPLAINT

38.     Defendants acted with malice, fraud and oppression, and in conscious disregard of Mattel's rights.  Accordingly, Mattel is entitled to an award of punitive damages against defendants in an amount to be determined at trial.

39.     Furthermore, defendants' conduct has caused, and unless enjoined will continue to cause, irreparable injury to Mattel that cannot be adequately compensated by money damages and for which Mattel has no adequate remedy at law.  Accordingly, Mattel is entitled to an order restraining defendants from any further unjust enrichment.

## FIFTH CLAIM FOR RELIEF

### (Conversion)

40.     Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 39, above, as though fully set forth at length.

41.     Mattel was entitled to, inter alia, Bryant's exclusive services and the exclusive ownership of his inventions as a Mattel product designer.  However, Bryant provided such services, and purported to grant rights to such inventions, to a competitor during the time of his exclusive Mattel employment.  All such services and the inventions and work product resulting from such services, including without limitation ideas, concepts, rights, designs, proprietary information, and other intellectual property and intangible property created by Bryant during the term of the aforesaid agreements, were the property of Mattel.  Such services and property were provided by Bryant to others, including defendants, and used by them.

42.     Defendants wrongfully converted Mattel property and resources by asserting ownership thereto and by appropriating and using Mattel's property and resources for their own benefit and gain and for the benefit and gain of others, without the permission of Mattel.

EXHIBIT 13
PAGE 363

7209/579342.1

-10-

COMPLAINT

43.     As a direct and proximate result of defendants' wrongful conversion of Mattel's property and resources, Mattel has incurred damages.  Mattel is entitled to recover compensatory damages against defendants in an amount to be determined at trial.

44.     Defendants acted with malice, fraud and oppression, and in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to an award of punitive damages against defendants in an amount to be determined at trial.

45.     Furthermore, defendants' conduct has caused, and unless enjoined will continue to cause, irreparable injury to Mattel that cannot be adequately compensated by money damages and for which Mattel has no adequate remedy at law.  Accordingly, Mattel is entitled to an order restraining defendants from further conversion of Mattel property and resources and/or restraining defendants from continuing to benefit from such conversion.

## PRAYER FOR RELIEF

WHEREFORE, Mattel hereby respectfully requests that this Court:

A.     Award Mattel its damages;

B.     Order defendants to disgorge to Mattel all payments, revenue, profits, monies, royalties and any other benefits derived or obtained by defendants as a result of the conduct described herein;

C.     Order specific performance by Bryant to comply with and satisfy Bryant's contractual obligations to Mattel;

D.     Enter an injunction restraining defendants, and all those acting in concert or participation with them, from engaging in further wrongful conduct and/or from continuing to benefit from their wrongful conduct;

E.     Order defendants to pay Mattel the full cost of this action and Mattel's reasonable attorneys' fees;

F.     Award Mattel punitive damages in an amount sufficient to punish defendants and deter such misconduct in the future; and

**EXHIBIT 13**
**PAGE 364**

COMPLAINT

1          G.     Award such other and further relief as this Court deems just and proper.

2

3 DATED:  April 27, 2004         QUINN EMANUEL URQUHART OLIVER &
                                             HEDGES, LLP

4

5                                       By

6                                          Michael T. Zeller

7                                          Attorneys for Plaintiff
                                         Mattel, Inc.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT

**EXHIBIT 13**
**PAGE 365**

**Exhibit A**

**EXHIBIT 13
PAGE 366**

# EMPLOYEE CONFIDENTIAL INFORMATION AND INVENTIONS AGREEMENT

I acknowledge that Mattel, Inc. (the "Company") operates in a competitive environment and that it enhances its opportunities to succeed by establishing certain policies, including those included in this Agreement. This Agreement is designed to make clear that: (i) I will maintain the confidentiality of the Company's trade secrets; (ii) I will use those trade secrets for the exclusive benefit of the Company; (iii) inventions that I create will be owned by the Company; (iv) my prior and continuing activities separate from the Company will not conflict with the Company's development of its proprietary rights; and (v) when and if my employment with the Company terminates I will not use my prior position with the Company to the detriment of the Company. In consideration of my employment with the Company and other good and valuable consideration, I agree that:

## 1. Provisions Related to Trade Secrets

(a) I acknowledge that the Company possesses and will continue to develop and acquire valuable Proprietary Information (as defined below), including information that I may develop or discover as a result of my employment with the Company. The value of that Proprietary Information depends on it remaining confidential. The Company depends on me to maintain that confidentiality, and I accept that position of trust.

(b) As used in this Agreement, "Proprietary Information" means any information (including formula, pattern, compilation, device, method, technique or process) that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use, and includes information on the Company, its customers, suppliers, joint-ventures, licensors, licensees, distributors and other persons and entities with whom the Company does business.

(c) I will not disclose or use at any time either during or after my employment with the Company, any Proprietary Information except for the exclusive benefit of the Company as required by my duties for the Company, or as the Company expressly may consent to in writing. I will cooperate with the Company and use my best efforts to prevent the unauthorized disclosure, use or reproduction of all Proprietary Information.

(d) Upon leaving employment with the Company for any reason, I immediately will deliver to the Company all tangible, written, graphical, machine readable and other materials (including all copies) in my possession or under my control containing or disclosing Proprietary Information.

## 2. Ownership of Inventions

(a) I agree to communicate to the Company as promptly and fully as practicable all Inventions (as defined below) conceived or reduced to practice by me alone or jointly by others at any time during my employment by the Company. I hereby assign to the Company and/or its nominees all my right, title and interest in such Inventions, and all my right, title and interest in any patents, copyrights, patent applications or copyright applications based thereon. I will assist the Company and/or its nominees (without charge but at no expense to me) at any time in every proper way to obtain for its and/or their own benefit, patents and copyrights for all such Inventions anywhere in the world and to enforce its and/or their rights in legal proceedings.

(b) As used in this Agreement, the term "Inventions" includes, but is not limited to, all discoveries, improvements, processes, developments, designs, know-how, data computer programs and formulae, whether patentable or unpatentable.

(c) Any provision in this agreement requiring me to assign my rights in any Invention does not apply to an Invention which qualifies under the provision of Section 2870 of the California Labor Code. That section provides that the requirement to assign "shall not apply to an Invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities or trade secret information except for those Inventions that either (1) relate at the time of conception or reduction to practice of the Invention to the employer's business or actual or demonstrably anticipated research or development of the employer; or (2) result from any work performed by the employee for the employer." I understand that I bear the burden of proving that an Invention qualifies under Section 2870.

(d) I hereby irrevocably designate and appoint the Company and each of its duly authorized officers and agents as my agent and attorney-in-fact to act for and in my behalf and stead to execute and file any document and to do all other lawfully permitted acts to further the prosecution, issuance and enforcement of patents, copyrights and other proprietary rights with the same force and effect as if executed and delivered by me.

## 3. Conflicts with Other Activities

(a) My employment with the Company requires my undivided attention and effort. Therefore, during my employment with the Company, I will fully comply with the Company's Conflict of Interest Policy, as it may be amended from time to time. I shall not, without the Company's express written consent, engage in any employment or business other than for the Company, or invest in or assist (in any manner) any business competitive with the business or future business plans of the Company.

## 4. Miscellaneous

(a) My obligations under this Agreement may not be modified or terminated, in whole or in part, except in writing signed by a Vice-President of the Company. Any waiver by the Company of a breach on any provision of this Agreement will not operate or be construed as a waiver of any subsequent breach.

(b) Each provision of this Agreement will be treated as a separate and independent clause; and the unenforceability of any one provision will in no way impair the enforceability of any other provision. If any provision is held to be unenforceable, such provision will be construed by the appropriate judicial body by limiting or reducing it to the minimum extent necessary to make it legally enforceable.

(c) My obligation under this Agreement will survive the termination of my employment, regardless of the manner of such termination. This Agreement will inure to the benefit of and be binding upon the successors and assigns of the Company.

(d) I understand that the provisions of this Agreement are a material condition to my employment with the Company. I also understand that this Agreement is not an employment contract, and nothing in this Agreement creates any right to my continuous employment by the Company, or to any employment for any particular term.

(e) Any breach of this Agreement likely will cause irreparable harm to the Company for which money damages could not reasonably or adequately compensate the Company. Accordingly, I agree that the Company will be entitled to injunctive relief to enforce this Agreement. In addition to damages and other available remedies.

(f) This agreement will be governed by and interpreted in accordance with the laws of the State of California.

(g) This Agreement contains the complete agreement between the Company and me concerning the subject matter hereof and supersedes all other agreements and understandings. This Agreement may be executed in counterparts. This Agreement will be deemed effective as of the start of Employee's employment with the Company.

**CAUTION: THIS AGREEMENT CREATES IMPORTANT OBLIGATIONS OF TRUST AND AFFECTS
THE EMPLOYEE'S RIGHTS TO INVENTIONS THE EMPLOYEE MAY MAKE DURING HIS OR HER EMPLOYMENT.**

Employee Signature

Employee Name (print)   CARTER H. BRYANT

Date   01/04/99

MATTEL, INC.
By: _Teresa Newcomb_
Signature

TERESA NEWCOMB
Name of Witness (print)

EXHIBIT A PAGE 13

EXHIBIT 13
PAGE 367

**Exhibit B**

EXHIBIT 13
PAGE 368

## CONFLICT OF INTEREST QUESTIONNAIRE

**BRYANT, CARTER H.    PROJECT DESIGNER**

Name (Last, First, M.I.)                Job Title                Department

**Instructions:** The purpose of this questionnaire is to confirm the propriety of relations between our key employees and our suppliers and competitors. Please read the definitions below and Mattel's policies concerning Conflicts of Interest. Then answer the questions by checking the correct answer. Base your answers on personal knowledge. There is no need to make inquiries or seek additional information since lack of knowledge of a situation indicates that there is no conflict of interest. Your answers to questions 1 through 8 should cover the past twelve months and the term "you" should include members of your immediate family.

**Mattel Supplier** is interpreted broadly for purposes of this questionnaire. A Mattel supplier is any person, partnership, trust, corporation, or other enterprise which during the past twelve months has done business or currently contemplates doing business with Mattel or any Mattel subsidiary.

**Mattel Competitor** is interpreted broadly for purposes of this questionnaire. A Mattel competitor is any person, partnership, trust, corporation, or other enterprise which has done business or contemplates doing business in any field that is in competition with Mattel or any Mattel subsidiary.

**Interest** means direct or indirect ownership of any stock, bond, option or right to purchase any security, share in profits, investment, partnership interest or other profit participation or equity interest whatsoever. Interest also means any agreement to perform services for or consult with or to deliver materials to or to receive compensation of any kind from any supplier or competitor. You may disregard mutual investment trusts and publicly-owned corporations whose securities are traded publicly, in which you own not more than $25,000 in market value, but not to exceed 10% of an individual's net worth.

**Recipient of any commission, etc.,** means receipt of anything of value, in cash or in kind, over $60 on any one occasion or over $300 total during the past twelve months.

○ YES  ● NO   1. Have you owned, directly or indirectly, any interest in a Mattel supplier?

○ YES  ● NO   2. Have you owned, directly or indirectly, and interest in a Mattel competitor?

○ YES  ● NO   3. Have you been the recipient of any commission, fee, loan, trip, gift, benefit or anything else of value that is derived in any way from a Mattel supplier?

● YES  ○ NO   4. Have you been the recipient of any commission, fee, loan, trip, gift, benefit or anything else of value that is derived in any way from a Mattel competitor?

● YES  ○ NO   5. Have you or any relative of yours by blood or marriage been a director, officer, consultant, agent, employee, or representative of or acted for any Mattel competitor in any capacity?

○ YES  ● NO   6. Have you or any relative of yours by blood or marriage been a director, officer, consultant, agent, employee, or representative of or acted for any Mattel supplier in any capacity?

○ YES  ● NO   7. Have you engaged in any activity including the acquisition or ownership of any interest, for personal profit, not expressly within the scope of the foregoing with respect to any supplier or competitor?

○ YES  ● NO   8. Excepting normal everyday transactions (purchase of toys, etc.) have you engaged in any business venture or transaction involving a Mattel supplier or competitor or engaged in any activity which could be objectively construed as being a conflict of interest or allegiance?

○ YES  ● NO   9. Are you aware of any activity of any employee which you believe could be construed as a potential conflict of interest with Mattel?

If your answer to any of the above questions is "yes," please explain in the space below:

4, 5,  freelance design & artwork in 1998,
from appx. 5/98 - 11/98. for the Ashton Drake
galleries.

I certify that I have read Mattel's policies concerning Conflict of Interest and the answers to the above questions are true. I understand that failure to answer this questionnaire fully and truthfully constitutes grounds for immediate termination of my employment. I agree not to divulge any company information to unauthorized recipients. I also agree to notify my superior immediately of any changes in my situation that would cause me to answer any of the above questions differently. I further certify that, to the best of my knowledge, neither I nor any member of my immediate family is or has been engaged in any capacity which creates a Conflict of Interest.

Signature                                                Date  01/04/98

## EXHIBIT B  PAGE 14

EXHIBIT 13
PAGE 369

EXHIBIT 14

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

# EXHIBIT 15

1   DALE M. CENDALI
    (of counsel, not admitted in California)
2   DIANA M. TORRES (S.B. #162284)
    PAULA E. AMBROSINI (S.B. #193126)
3   O'MELVENY & MYERS LLP
    400 South Hope Street
4   Los Angeles, CA 90071-2899
    Telephone: (213) 430-6000
5   Facsimile: (213) 430-6407
    email: dtorres@omm.com
6
    PATRICIA GLASER (S.B. # 55668)
7   CHRISTENSEN, MILLER, FINK,
    JACOBS, GLASER, WEIL &
8   SHAPIRO LLP
    10250 Constellation Boulevard, 19th Floor
9   Los Angeles, CA 90067
    Telephone: (310) 553-3000
10  Facsimile: (310) 556-2920

11  Attorneys for Plaintiff
    MGA Entertainment, Inc.
12

13
14                  UNITED STATES DISTRICT COURT

15              CENTRAL DISTRICT OF CALIFORNIA

                      CV 05-02727 CBM (RZx)

16  MGA ENTERTAINMENT, INC.,       Case No.
17                Plaintiff,       COMPLAINT FOR FALSE
                                   DESIGNATION OF ORIGIN,
18       v.                        AFFILIATION, ASSOCIATION OR
                                   SPONSORSHIP (15 U.S.C. § 1125
19  MATTEL, INC., a Delaware       (a)); UNFAIR COMPETITION (15
    Corporation, and DOES 1-10,    U.S.C. § 1125 (a), Cal. Bus. & Prof.
20                                 Code § 17200 et seq. and California
                 Defendants.       Common Law); DILUTION (15
21                                 U.S.C. § 1125 (c), Cal. Bus. & Prof
                                   Code § 14330 and California Common
22                                 Law); AND UNJUST ENRICHMENT

23                                 DEMAND FOR JURY TRIAL

24
25
26
27
28

EXHIBIT 15
PAGE 489

1    Plaintiff MGA Entertainment, Inc. for its complaint against
2    Defendants Mattel, Inc. and DOES 1-10 alleges and avers as follows:
3
4                                    **PARTIES**
5        1.      Plaintiff MGA Entertainment, Inc. ("MGA") is a California
6    corporation organized and existing under the laws of the State of California, with a
7    principal place of business in Van Nuys, California.
8        2.      MGA is informed and believes, and based thereon alleges, that
9    Defendant Mattel, Inc. ("Mattel") is a Delaware corporation with a principal place
10   of business in El Segundo, California.
11       3.      MGA is ignorant of the true names and capacities of the defendants
12   sued herein under the fictitious names DOES 1 through 10 inclusive. MGA will
13   seek leave of court to amend this complaint to allege such names and capacities
14   when they are ascertained. MGA is informed and believes, and based thereon
15   alleges, that each of the fictitiously named DOE defendants is responsible in some
16   manner for the wrongful conduct alleged herein. MGA further alleges that each
17   defendant acted in concert with, as agent or representative for, or at the request or
18   on behalf of another or Mattel. Each charging allegation contained herein is,
19   therefore, also hereby alleged against each fictitiously named DOE defendant.
20
21                          **JURISDICTION AND VENUE**
22       4.      Through this action MGA asserts claims against Mattel arising under
23   the Lanham Act, 15 U.S.C. Sections 1125 (a) and (c), California Business and
24   Professions Code Sections 17200 *et seq.*, California Business and Professions Code
25   Section 14330 and California common law. This Court has original subject matter
26   jurisdiction over MGA's federal claims pursuant to 15 U.S.C. Sections 1116 and
27   1121, 28 U.S.C. Section 1338(a), and 28 U.S.C. Section 1331, and supplemental
28

**EXHIBIT 15**
**PAGE 490**

1   subject matter jurisdiction over MGA's state law claims pursuant to 28 U.S.C.

2   Section 1367(a).

3       5.      This Court has specific personal jurisdiction over Mattel, as it has

4   purposefully committed, within the State of California, the acts from which these

5   claims arise and/or has committed tortious acts outside California, knowing and

6   intending that such acts would cause injury to MGA within the state.  The Court

7   also has general personal jurisdiction over Mattel, as it conducts continuous,

8   systematic and routine business within the State of California and the County of

9   Los Angeles.

10      6.      Venue is proper in the United States District Court for the Central

11  District of California pursuant to 28 U.S.C. Sections 1391(b) and 1391(c).

12

13                      **FACTUAL BACKGROUND**

14      7.      MGA seeks by this action to halt Mattel's habitual and unfair tactics of

15  competition-by-intimidation and serial copycatting of MGA's products, which

16  Mattel has used in an unbridled effort to cause confusion in the market place and

17  eliminate MGA as a competitor in the toy and fashion doll market long dominated

18  and controlled by Mattel.

19      8.      MGA is a privately-held company in the San Fernando Valley that

20  began in 1979 as a small consumer electronics business.  In 1987, the company

21  made its first foray into the toy business when it secured rights to market handheld

22  LCD games featuring licensed Nintendo® characters.  Building on that small

23  success, the company began marketing products for popular licensed properties

24  such as the "Power Rangers"® and "Hello Kitty"®.  This little-known but

25  successful company, however, was propelled into the limelight after its daring

26  release in June 2001 of an innovative line of fashion dolls called "BRATZ".

27  "BRATZ" are multi-ethnic fashion dolls that sport a fresh new urban and

28  contemporary look and fashion.  At the time of the release of "BRATZ", "Barbie"

2

EXHIBIT 15
PAGE 491

1    sales were in a slump, Mattel was in turmoil, and the market was ripe for something
2    new, exciting and inventive. "BRATZ" fit the bill. It is the first fashion doll that
3    has been able to seriously challenge "Barbie" for market share, and begin to loosen
4    Mattel's 50-year iron-fisted grip on the fashion doll market.

5         9.    Mattel has not taken kindly to the challenge. Either unable or
6    unwilling to compete against "BRATZ" fairly, and on a level-playing field, Mattel
7    has, instead, taken a more expeditious approach, resorting to unfair and anti-
8    competitive business practices. Wielding its substantial clout and influence in the
9    toy industry, Mattel has tried to muscle MGA out of business. MGA is informed
10   and believes that Mattel has intimidated, coerced and threatened retailers, licensees,
11   suppliers and others in the industry – both in the U.S. and internationally – in order
12   to inhibit and stifle MGA's ability to compete with Mattel and to prevent MGA
13   from obtaining licensees, contracts and supplies for its products. Mattel has also
14   serially imitated and copy-catted the look of MGA products, trade dress,
15   trademarks, themes, ideas, advertising and packaging, including for the "BRATZ"
16   line of dolls. MGA brings this action to stop Mattel's tortious, unfair and anti-
17   competitive conduct and to recover the extensive damage that Mattel's illicit
18   behavior has caused, and continues to cause, MGA. Mattel's own website states:
19   "As the global leader in the toy industry, we believe that how we achieve success is
20   just as important as the success itself." It also proclaims that "unwavering integrity
21   defines our corporate culture on every level, guiding how we work and how we do
22   business." Mattel's own corporate governance standards require it to "play by the
23   rules," complete fairly and be a good corporate citizen. Mattel's actions, however,
24   speak louder than its words.

25
26
27
28

3

EXHIBIT 15
PAGE 492

**Mattel History and Performance**

10.     Mattel is the world's largest toy company, but it owes its immense success chiefly to a single product: "Barbie." Since her debut in 1959, "Barbie" has been the fuel for Mattel's growth and success, turning Mattel into an international powerhouse. By the late 1990's, Mattel's annual sales of the doll approached or topped $1.8 billion and Mattel stock reached a record high of approximately $45.00 a share. At that time, the average American girl had eight "Barbie" dolls, and "Barbie" was the world's best-selling toy.

11.     Mattel's reliance on a single, 40-year old product for as much as 50% of its business turned out to be a risky business model, however. Resting on its laurels, Mattel failed to react to the shifting tastes of consumers, changing dynamics in the industry, and an increasing focus on technologically advanced and interactive toys. "Barbie's" record sales fell into a tailspin. According to one report, Adrienne Fontanella, Mattel's "Barbie" brand president, would later be quoted as saying that, "The world changed very quickly, and we missed a beat. . . Barbie wasn't talking to girls. She just wasn't hitting it."

12.     Sales began to plunge in 1997, and Mattel began posting a series of net income losses. In the first quarter of 1998, sales of the "Barbie" brand dropped 17%. This steep slide was followed by another in the second quarter, when sales fell again, down by 15%. By the end of 1998, Mattel reported an overall 14% decline in "Barbie" sales for the year and analysts were using words such as "devastating" and "a catastrophe" to describe Mattel's earnings. The company's stock fell as much as 27% in a single day. "Barbie" was having a crisis.

13.     Jill Barad, who had taken over as Mattel's chairman and chief executive in January 1997, at the height of Mattel's success, had to do something fast. Instead of focusing on and investing in new product development, however, which would obviously take time, Mattel embarked on a series of acquisitions that were seemingly aimed at quickly diversifying the company's product line and

4

**EXHIBIT 15**
**PAGE 493**

1   reducing its reliance on "Barbie" and on traditional retailers, such as Toys-R-Us
2   and Wal-Mart.  Mattel spent a reported $881 million in March 1997 to purchase
3   Tyco Toys and acquire the "Matchbox" toy car brand.  Just more than a year later,
4   it spent $700 million for the Pleasant Co., a mail-order doll company and maker of
5   the "American Girl" doll collection.  And in December 1998, Mattel announced
6   plans to fork out a monumental $3.5 billion to buy the Learning Company,
7   followed quickly by Mattel's purchase, in March 1999, of a software company,
8   Purple Moon.

9         14.    Despite these acquisitions, the company continued to struggle.  The
10   retail environment and buying patterns had unquestionably changed, but Mattel had
11   not kept up.  Despite Mattel's feverish acquisitions, Mattel's mainstay and primary
12   profit-generator was still "Barbie."  But "Barbie" had grown stale, and sales
13   languished.  Posting additional losses in the first quarter of 1999, Mattel announced
14   that it would lay off 3,000 employees – 10% of its work force.

15        15.    Mattel's stock plummeted again in late 1999, dropping 30% on
16   Mattel's announcement that it would fall as much as 55% short of analysts' earning
17   estimates for the third quarter.  Mattel blamed its troubles primarily on its
18   expensive, $3.5 billion acquisition of the Learning Company, which had turned out
19   to be a disaster fraught with licensing and distribution problems, bad debt, high
20   product returns and high advertising costs.

21        16.    By early 2000, Mattel's stock had crashed to as low as $8 per share,
22   and some analysts considered Mattel vulnerable to a takeover.  Investors clamored
23   for Ms. Barad's resignation, and got their wish.

24        17.    Jill Barad resigned from Mattel in February 2000.

25        18.    For three months, the company was without a permanent chief
26   executive until Robert Eckert took the helm in May 2000.  Mr. Eckert had spent 23
27   years at Kraft Foods, a subsidiary of Altria Group, Inc., and was widely credited
28

5

**EXHIBIT 15**
**PAGE 494**

1    with reviving its ailing cheese business. Investors looked for him to do the same

2    for Mattel.

3          19.    Upon his arrival at Mattel, Mr. Eckert's promise, according to *Wall*

4    *Street Journal* reports, was to deliver a "leaner and meaner" Mattel.

5          20.    The "leaner" Mattel came quickly. Mr. Eckert laid off hundreds,

6    closed factories in the United States, shipped production to Mexico, and sold off the

7    Learning Company at a fraction of what Mattel had paid for it. It helped Mattel's

8    bottom-line, but did nothing to spur sales growth. Even under Mr. Eckert's "leaner

9    meaner" leadership, domestic "Barbie" sales remained in a slump into 2001. In an

10   industry that had become increasingly driven by consumer whims and fads, and the

11   hot, must-have toys of the moment, Mattel remained disinterested in devoting its

12   resources to searching for or developing a new blockbuster toy. Mr. Eckert's

13   business plan was not to diversify, but to build upon and expand sales of its existing

14   brands. Mattel was, after all, still generating billions in revenue despite the decline

15   of "Barbie." And so, Mattel remained committed to its age-worn icon and its two

16   other core brands, Fisher-Price and Hot Wheels, with each of the three accounting

17   for approximately a third of the company's sales.

18         21.    Then came the competition – MGA's "BRATZ".

19

20   **"BRATZ" Dolls Revolutionize The Fashion Doll Market**

21         22.    "BRATZ" challenged "Barbie's" half-century domination of the

22   fashion-doll market like nothing ever before had been able to do.

23         23.    MGA unveiled a preliminary sample of the "BRATZ" doll at the Hong

24   Kong Toy Fair in January 2001, while continuing to finalize the product throughout

25   that spring. Finished products were first shipped in May 2001. MGA introduced

26   the line to consumers in June 2001.

27

28

6

**EXHIBIT 15**
**PAGE 495**

24.     Unlike "Barbie" dolls, the "BRATZ" line of dolls and branded products sported a hip, multi-ethnic urban look that appealed to contemporary teenage and pre-teen girls.

### MGA's "BRATZ"



25.     At approximately 9.5 to 10 inches tall, the "BRATZ" dolls were intentionally shorter than "Barbie" dolls and looked like no other, with disproportionately large heads, big, dramatic eyes and lips, small, thin bodies, oversized feet (to emphasize shoe fashion and to stand on their own, unlike "Barbie," which requires a stand), and up-to-date fashions.

7

EXHIBIT 15
PAGE 496

26.   Indeed, the classic "Barbie" look was nowhere to be seen in these dolls; they would never be confused with "Barbie".

| **MGA's "BRATZ"** | **Mattel's "Barbie"** |
|:---:|:---:|
|  |  |

27.   Featuring and embodying the slogan "The Girls With a Passion for Fashion!", "BRATZ" dolls revitalized, transformed and expanded the fashion doll market, in particular proving popular among "tween" age girls – those between childhood and adolescence – who had been all but abandoned as a market by Mattel.

28.   The "BRATZ" line – with its unique and distinctive look – is well recognized and has been critically acclaimed and praised by consumers, retailers and toy industry analysts alike.  In 2001, the "BRATZ" line won the Toy Industry Association ("TIA") People's Choice Toy of the Year Award, the Family Fun Toy of the Year Award and Toy Wishes Hot Pick Award.  In 2002, the "BRATZ" line again won the TIA People's Choice Toy of the Year Award and the Family Fun Toy of the Year Award.  LIMA, the licensing industry's official arm, awarded MGA's "BRATZ" the best character license of the year as well as the overall best licensed property of the year for 2003.  MGA's "BRATZ" also earned the coveted TIA "Property of the Year" and "Girl Toy of the Year" for 2003, as well as the Family Fun Toy of the Year Award.  MSNBC named "BRATZ" the "Hottest Toy of the Year," and both MGA and "BRATZ" received several other accolades in

8

EXHIBIT 15
PAGE 497

1  2004, including the Suppliers Performance Award by Retail Category (the

2  "SPARC" award) in the Girls' Toys category sponsored by DSN Retailing

3  Today/Apparel Merchandising.

4      29.    Although but a tiny fraction of Mattel's size, with "BRATZ", MGA

5  was able to chip away at Mattel's stranglehold on the fashion doll market, gaining

6  shelf space and market share as "Barbie" sales remained flat or, at times, declined.

7      30.    The competition that MGA (once a licensee of Mattel!) and "BRATZ"

8  posed to Mattel was unexpected and unwelcomed by Mattel. Where "Barbie" had

9  once enjoyed a 90% share of the fashion doll market in 1997, that share had already

10  slipped to 85% or less by the time of the release of "BRATZ". With the company

11  still struggling under Mr. Eckert to overcome prior years of declining sales and

12  mounting debt, "Barbie," Mattel – and Mr. Eckert – simply could not afford the

13  untimely competition. Mr. Eckert's "leaner" Mattel was not enough to battle more

14  potential erosion in "Barbie's" market share. Mattel had to combat "BRATZ" and

15  MGA, and in the process revealed Mr. Eckert's "meaner" Mattel.

16

17  **Mattel's Response to "BRATZ" and Efforts to Thwart MGA's Competition**

18      31.    Mattel was not poised to nimbly respond to "BRATZ" with a new,

19  creative product of its own – indeed, it had been antithetical to Mattel's corporate

20  culture and mentality for Mattel to even conceive that a product might vie for shelf

21  space with "Barbie", let alone be available for sale to consumers mere months after

22  first being shown to retailers. Mattel had to take a more expeditious route.

23      32.    Instead of fairly competing, Mattel waged war against MGA using a

24  wide-array of tortious, unfair and anti-competitive practices including systematic,

25  serial copycatting and intellectual property infringement, aided by intimidation,

26  threats and other acts of unfair competition and anti-competitive conduct, all with

27  one goal in mind – to banish MGA from the market – or minimize its ability to

28  capture any meaningful share before it could do any real harm to Mattel.

9

**EXHIBIT 15**
**PAGE 498**

**Mattel's serial copycatting and intellectual property infringement**

33.  Mattel's serial copycatting of MGA's product lines began with the "BRATZ" dolls themselves, but quickly extended to MGA's packaging, themes, accessories, advertising and even other product lines.

34.  The first four "BRATZ" dolls that MGA launched in 2001, named Jade, Yasmin, Cloe and Sasha, met their wannabe "BRATZ PACK" members in October 2002 with Mattel's launch of three "My Scene" dolls named Madison, Chelsea and "Barbie." This was no ordinary "Barbie", however. Indeed, not even close. Mattel designed its "My Scene" dolls to evoke the unique and distinctive look of the "BRATZ" – also with disproportionately oversized heads, artfully made-up almond-shaped eyes, large, overly-lined and lipsticked lips, trendy, hip clothes and hair styles, and over-sized feet.

**Mattel's Traditional "Barbie"**          **Mattel's "My Scene" Doll**

circa 2002          circa 2004



10

EXHIBIT 15
PAGE 499

35.    These confusingly similar "BRATZ" imitators may have been originally intended to buy Mattel time while it worked to release another product the following summer, called "Flavas". MGA's founder, Isaac Larian, was quoted by the media as having predicted that the move would backfire on Mattel, and it did. Released in July 2003, Mattel's "Flavas" dolls took the urban, "hip-hop" look too far, and were widely viewed as portraying a trampy, "bad-girl" image. The dolls were not well-received, and rumor has it that Mattel had to sell them at below cost prices to get rid of inventory. Most apparently wound up in discount bins, and Mattel has seemingly abandoned the line.

36.    Realizing that "My Scene" was its best bet for riding MGA's successful coattails and capitalizing on the unique and inherently distinctive look that MGA had developed in its "BRATZ" dolls - and MGA's substantial goodwill – Mattel has systematically proceeded to modify the "My Scene" dolls since their original release, particularly their eyes, to increase their similarity to "BRATZ" more and more over time.

37.    Indeed, when Mattel found out that its initial line of "My Scene" dolls had trouble competing with "BRATZ", they simply *became* "BRATZ", in every version, whether blonde, brunette or African American. A few pictures here are worth a thousand words.

### BLONDE

| Mattel's<br>Traditional "Barbie" | Mattel's<br>Original "My Scene" | Mattel's<br>Recent "My Scene" |
|---|---|---|
|  | |  |

11

EXHIBIT 15
PAGE 500

| Mattel's Traditional "Barbie" | Mattel's Original "My Scene" | Mattel's Recent "My Scene" |
|---|---|---|
|  |  |  |

**BRUNETTE**

| Mattel's Traditional "Theresa" | Mattel's Original "My Scene" | Mattel's Recent "My Scene" |
|---|---|---|
|  |  |  |
|  |  |  |

12

EXHIBIT 15
PAGE 501

# AFRICAN AMERICAN

| Mattel's Traditional "Barbie" | Mattel's Original "My Scene" | Mattel's Recent "My Scene" |
|---|---|---|



38.    The original "My Scene" eye, as shown here, for example, has recently turned into a virtual carbon-copy of the "BRATZ" eye.

## Original Mattel "My Scene" Eye



13

EXHIBIT 15
PAGE 502

39.   The "My Scene" eye pictured above, for instance, has lashes that radiate almost straight out, circumferentially, from the eyelids and, although the eye is more almond shaped than a "Barbie" eye, the eye is not so sleepy and heavy lidded as a "BRATZ" eye and is only lightly shadowed.  The new "My Scene" eye, in contrast, is dramatically more similar to a "BRATZ" eye, as shown below in a side-by-side comparison.  The doe-eyed innocent look of the "My Scene" eye shown above is gone; replaced with a sultrier look, characteristic of "BRATZ."  The new "My Scene" eye, as shown below, boasts lashes that sweep out and away from the outer corner of the eye, just like the "BRATZ" eye.  The new "My Scene" eye is also more heavy lidded and thickly lined, and the make-up is more markedly pronounced and dramatic.

**MGA's "BRATZ" Eye**          **New Mattel "My Scene" Eye**




40.   Indeed, the progression of the "My Scene" eye, as it has departed from "Barbie" and edged closer and closer to "BRATZ", is readily apparent from virtually every angle, as shown here:

14

EXHIBIT 15
PAGE 503

## BLONDE

| Mattel's Traditional "Barbie" | Mattel's Original "My Scene" | Mattel's Recent "My Scene" |
|---|---|---|



## BRUNETTE

| Mattel's Traditional "Theresa" | Mattel's Original "My Scene" | Mattel's Recent "My Scene" |
|---|---|---|



15

EXHIBIT 15
PAGE 504



EXHIBIT 15
PAGE 505

41.   Mattel has not stopped at the eyes, however.  Mattel has also incrementally but steadily modified its "My Scene" packaging, and the manner in which the dolls are displayed, to more closely mimic the packaging, trade-dress and overall look and total image of MGA's "BRATZ".

42.   To illustrate, Mattel's "My Scene" dolls were initially marketed like this:

### Mattel's Early "My Scene" Packaging



43.   Little by little, however, the packaging has changed, creeping ever closer and closer to the open and transparent style of the "BRATZ" packaging. First, the panels seen running down each side of the front of the "My Scene" box shown above, framing the doll and giving the packaging a closed-in look, were changed as shown here:

### Intermediate Mattel "My Scene" Packaging



17

EXHIBIT 15
PAGE 506

44.    Mattel replaced this intermediate packaging style with another that looked even more similar to the "BRATZ" packaging, as shown here in a side-by-side comparison:

**MGA's "BRATZ"**
**"Wintertime Wonderland" Packaging**

**Mattel's "My Scene"**
**"Chillin' Out" Packaging**




45.    Then later, Mattel changed its packaging and product display yet again to look even more closely and confusingly similar to MGA's packaging and "*tout ensemble*," as shown here

**MGA's "BRATZ"**
**"SPORTZ" Packaging**

**Mattel's Recent "My Scene"**
**"MIAMI GETAWAY" Packaging**




18

**EXHIBIT 15**
**PAGE 507**

46. In this incarnation, Mattel notably abandoned the signature figure-eight style design that had appeared on its prior "My Scene" packaging, making this recent version clearer and more transparent on the front and sides than ever before, and much more like "BRATZ", accordingly. Mattel also discarded its traditional, rectangular shaped box and, like "BRATZ", adopted an unusual, non-rectangular shaped box. Mattel even adopted the "flying banner" ribbon-style slogan running across the middle of the box, similar to that used on the "BRATZ" packaging.

47. As if these pointed and deliberate efforts to confuse and mislead consumers were not enough, Mattel exacerbated the confusion, and furthered the impression that the "My Scene" line and the "BRATZ" line are related, by taking up MGA's practice of regularly releasing new dolls in connection with a theme – but not just *any* theme, often *MGA's theme.*

48. For example, when MGA released its "Wintertime Wonderland" theme in Fall 2003, Mattel released its "Chillin Out!" theme. Each doll in MGA's line came with winter-sports accessories, such as a snowboard or skis and ski boots. Each doll in Mattel's line featured winter sports accessories, also including snowboards or ski and ski boots. Even MGA's color schemes and some of the clothing styles seemed to have made their way into the Mattel products.

49. When MGA released its "Formal Funk" theme, Mattel released its "Night on the Town" theme. "BRATZ Formal Funk" was an elaborately themed line with its dolls in hip formalwear; so was Mattel's "Night on the Town."

50. When MGA released its distinctive "Sun-Kissed Summer" theme, Mattel released its confusingly similar "Jammin' in Jamaica" theme. Each line featured a bright blue-and-orange color scheme, beach accessories, such as surfboards, and beachwear clothing. Mattel's "Jammin' in Jamaica" "Guava Gulch Tiki Lounge" playset also contained elements remarkably similar to MGA's "Sun-Kissed Summer" playset.

19

EXHIBIT 15
PAGE 508

51.     Mattel also began running television commercials for its "My Scene"
dolls bearing a remarkable similarity to "BRATZ" commercials, combining live
action with animated sequences set to similar sounding pop music and lyrics.

52.     Mattel even stooped so low as to mimic "BRATZ" accessories and
related products in order to further create consumer confusion in the marketplace.

53.     For instance, when MGA came up with its distinctive "BRATZ"
"Runway Disco", Mattel came out with a "My Scene" Sound Lounge with
packaging that imitated MGA's trapezoidal box.

54.     Mattel's conduct cannot be explained by sheer coincidence, nor is it
merely fair competition.  It is a calculated and intentional effort unquestionably
designed to trade off of MGA's hard work and goodwill, create confusion in the
marketplace, steal MGA's thunder and momentum, and dilute and blur away the
novelty and distinctiveness of MGA's products.  Out of the seemingly endless
possibilities that Mattel could have chosen for a new line of dolls, packaging,
themes, color schemes, commercials, accessories and playsets, Mattel deliberately
chose *not* to come out with something unique, new or different and has, instead,
focused its efforts and resources on flooding the market with something so close to
"BRATZ" that the public will, can, and does, simply mistake it for "BRATZ".

55.     As yet another example of this, when MGA came out with a "BRATZ"
"Funky Fashion Makeover Head," Mattel came out with a confusingly similar –
indeed, practically identical – "My Scene" styling head.

20

EXHIBIT 15
PAGE 509

| MGA's "BRATZ" | Mattel's "My Scene" |
|---|---|
| "Funky Fashion Makeover Head" | "Stylin' Head" |

56.     Indeed, Mattel's "My Scene" styling head is so close to the "BRATZ" styling head that even the press have mistakenly pictured and identified it as MGA's "BRATZ". The picture of Mattel's "My Scene" styling head shown below, for instance, appeared in the press with a caption indicating that the child was trying out different hairstyles "on a *Bratz* hair and makeup doll head."

Hairstyle practice



21

EXHIBIT 15
PAGE 510

57.    Creating further confusion, Mattel's television commercial for its "My Scene" styling head was like watching a re-run of MGA's commercial for its "Funky Fashion Makeover Head".

58.    At one point in time, Mattel also used a portion of the "BRATZ" dolls' now-famous trademarked tag line "The Girls With a Passion for Fashion" on Mattel's' website for its "Diva Starz" dolls, asking its website users:  "Do you have a passion for fashion?"

59.    Mattel has even recently come out with a confusingly similar line of "My Scene" plush pets, which adopt the distinctive look of MGA's "BRATZ" line. The "My Scene" pets feature large, humanlike eyes and wear clothing making them remarkably and confusingly similar to "BRATZ" products, including "BRATZ PETZ", as seen in this example where the pets each wear a jacket, a cap and carry a purse:

**MGA's "BRATZ Dogz"**                    **Mattel's "My Scene" dog**

    

60.    And here too, Mattel chose to package its pets the same way that MGA packaged its "BRATZ PETZ", sitting in an open box, with no top and with partial side panels that slope from a narrow front panel to a higher back panel.

61.    Indeed, the similarity of the "My Scene" pets to "BRATZ PETZ" has confused even sophisticated retailers who have mistakenly merchandised "My Scene" dogs in the middle of the "BRATZ" section of a retail display, next to and as if they were part of MGA's "BRATZ Petz" line.  It comes as no surprise that

22

EXHIBIT 15
PAGE 511

1   customers too have been confused.

2      .    62.   Indeed, Mattel's television commercials and "My Scene" products

3   have become so confusingly similar to MGA's that even advertising executives

4   have expressed concern. One went so far as to say that although imitation is the

5   best form of flattery, what the individual had seen at Mattel's showroom, and how

6   its "My Scene" dolls now look so confusingly similar to "BRATZ", was

7   "shocking." This person further opined that it was clear that Mattel is intending to

8   confuse customers and capture "BRATZ" market share, and even asked MGA if it

9   was considering legal action.

10         63.   The press also has taken notice of Mattel's attempts to confuse

11   consumers. On or about February 18, 2005, a visitor to MGA's showroom from a

12   prominent news publication stated, "Oh my, I just came from Mattel's showroom

13   and their new 'My Scene' packaging is just like 'BRATZ' minus the handle."

14   Another member of the press visiting MGA's showroom offered the unsolicited

15   comment, "have you seen the new 'My Scene' dolls eyes are exactly like

16   'BRATZ'?" Yet another opined that Mattel's "My Scene" line was exactly like

17   "BRATZ", indeed, so much so that the reporter confusingly thought that Mattel had

18   bought "BRATZ", and still another has commented on Mattel's imitation of MGA.

19   On or about February 16, 2005, during an interview of a Mattel representative on

20   local network news in New York, "My Scene Barbie" was displayed by a Mattel

21   representative. During conversation about the dolls, the interviewer exclaimed that

22   they looked like "BRATZ". The Mattel representative just laughed – but this is no

23   laughing matter. This colloquy was available for replay and viewing, and was even

24   transcribed, on the internet.

25         64.   Customers too have been similarly confused. Some actually contacted

26   MGA seeking to purchase "My Scene" dolls.

27         65.   Mattel's conduct is planned, deliberate and intentional. Mattel has

28   systematically, copied, imitated and liberally borrowed many of the distinctive,

**EXHIBIT 15**
**PAGE 512**

essential elements that identify and make "BRATZ" dolls "BRATZ" dolls, diluting the brand, creating customer confusion, and unfairly stifling competition.

66.    Ironically, Mattel sued one of its other competitors in Europe for doing much the same thing: "systematically copying and borrowing elements" from "My Scene", on grounds that "this conduct constitutes unfair competition and passing off." Indeed it does.

67.    What is more, Mattel's conduct has reached beyond "BRATZ" and "BRATZ"-related products to include other new MGA toy lines.

68.    For example, MGA's "4-Ever Best Friends" line was the obvious, and well-recognized model for Mattel's "Wee 3 Friends" line. Mattel even adopted changes to the color scheme of its similarly-shaped packaging to create confusion with MGA's distinctive packaging.

**MGA's "4-Ever Best Friends"**          **Mattel's "Wee 3 Friends"**

 

 

24

EXHIBIT 15
PAGE 513

69.    In the second half of 2002, MGA's "Mommy's Little Patient," originally designed as the first in a series of "Mommy's Little . . ." dolls, was followed by Mattel's "Little Mommy" doll.

| MGA's<br>"Mommy's Little Patient" | Mattel's<br>"Little Mommy Potty Training Baby Doll" |
|---|---|
|  |  |

70.    Sparing nothing, Mattel has also extended its monkey-see monkey-do behavior into its boys' line.  When MGA came out with its "Alien Racers" line of toy racing vehicles, for instance, Mattel rushed to revamp and rename one of its "Hot Wheels" lines.  Although well-known and clearly branded for decades as "Hot Wheels", Mattel's answer to MGA's "Alien Racers" was to re-brand and market its Hot Wheels Highway 35 line under an "AcceleRacerS" logo.  MGA's line consists of "extreme" radio controlled racing vehicles marketed in connection with a strong, almost battle-like, science fiction theme.  MGA's logo accentuates the "A", "R", and "S" in compressed block lettering.  Mattel's line also consists of extreme racing vehicles marketed in connection with a strong, almost battle-like, theme.  Mattel's logo too accentuates the "A", "R", and "S" in compressed block lettering.

25

EXHIBIT 15
PAGE 514

71. Here, too, Mattel's mimicry has spilled over into Mattel's advertising and thematic presentation and marketing of this toy line. In particular, Mattel has adopted MGA's "other-worldly" theme in its commercials. For instance, in Mattel's commercials, the product, whose logo appears as "AcceleRacerS", now compete against alien-like Cyborgs engaged in a "race to save the world," mimicking MGA's alien theme and commercials in which MGA's "Alien Racers" are engaged in a "race to save the universe."

72. None of this is coincidence. Mattel has deliberately adopted a pattern and practice of coming out with variations of MGA's products to create confusion in the marketplace, interfere with MGA's business and divert profits away from MGA. Mattel says, on its website, that it is in the business of creating "[t]he world's premier toy brands [of] today and tomorrow." It seemingly does so, however, by borrowing liberally from its competitors, even when it refreshes its own existing brands and products.

73. MGA has suffered extensive injury from Mattel's conduct. Mattel's habitual, serial simulation of MGA's products, product lines and trade dress has allowed Mattel to take a free ride on the extensive amount of time, expense and creative development MGA expends on developing new products, product packaging and presentation, giving Mattel an unfair advantage, and making it virtually impossible for MGA to compete with Mattel on a level playing field.

**Mattel's additional unfair, manipulative, anti-competitive conduct**

74. This already substantial injury has been exacerbated by the strong-arm tactics, and other illegitimate, unfair and anti-competitive means that Mattel has used to manipulate the market and ensure that its control and domination of the industry can continue unabated.

26

EXHIBIT 15
PAGE 515

1    75.    For example, wielding the litigation privilege as a potential shield for
2    intimidating conduct, Mattel has sent threatening letters to several of its former
3    employees who now work for MGA warning them not to disclose *even publicly*
4    *available information* about Mattel, including the names and positions of Mattel
5    employees. Mattel even went so far as to sue one of its former senior executives,
6    after he had the temerity to resign and join MGA in October 2004. Not only was
7    Mattel's lawsuit dismissed for failure to state a viable claim, but Mattel thereafter
8    seemingly could not muster up a shred of evidence sufficient to support an amended
9    complaint. As a result, Mattel's case against its former executive was dismissed
10   with prejudice.

11    76.    Mattel has also warned a number of companies, including the biggest
12   publishing entity in the United Kingdom, not to license MGA products, or risk
13   retribution. The threats are not idle. In May 2004, Mattel terminated one of its
14   licensees, apparently in retribution for licensing "BRATZ". While some companies
15   have been courageous enough to take the risk, others have not, and MGA has lost
16   valuable licensing opportunities as a result.

17    77.    Mattel has used similar intimidation to pressure distributors and
18   retailers, particularly in foreign countries, not to distribute "BRATZ", to reduce
19   shelf and display space for "BRATZ" and to place "BRATZ" in unfavorable
20   locations at retail outlets.

21    78.    When MGA faced a shortage of doll hair in October 2002, MGA is
22   informed and believes that the reason for that shortage was that Mattel had locked
23   MGA out by buying up the supply from the two main hair supply companies.

24    79.    Mattel has also manipulated the retail market. For instance, Mattel
25   merchandisers have been caught tampering with MGA's retail displays, replacing
26   favorably located MGA merchandise with Mattel merchandise instead. MGA is
27   also informed and believes that Mattel has falsely told a major United States retailer
28   that MGA was giving another major United States retailer below-market pricing

**EXHIBIT 15**
**PAGE 516**

1   and falsely told a United Kingdom retailer that MGA was discontinuing one of its

2   lines, in order to make such line less attractive to buyers and thereby attempt to

3   increase sales of the competitive Mattel product and improve its own sales, at

4   MGA's expense.

5       80.   Even supposedly unbiased and impartial industry organizations have

6   fallen prey to Mattel's abusive wield of power, to MGA's detriment.

7       81.   NPD Funworld ("NPD"), for one, is the leading supplier of sales

8   statistics in the toy industry. Accurate NPD statistics are essential for efficient

9   product-line management. Without these statistics, it is difficult, if not impossible,

10  for toy companies to assess and measure the relative success of their products in

11  key categories. It is, however, a subscription service, and NPD restricts the manner

12  in which its subscribers may use the data it provides:

13      82.   Mattel has regularly ignored the restrictions – using NPD data about

14  Mattel's comparative standing relative to other companies in press releases and in

15  communications with retailers and financial investors who are not NPD subscribers.

16      83.   Mattel generates substantially more annual subscription revenue for

17  NPD than does MGA, and carries more clout.

18      84.   After MGA had subscribed to the service for more than 12 years, NPD

19  terminated MGA's subscription in 2003 theoretically on the grounds that MGA

20  misused NPD data in a press release.

21      85.   MGA is informed and believes that the termination was the result of

22  pressure from Mattel, notwithstanding Mattel's own frequent violations of NPD's

23  restrictions.

24      86.   In addition to this, the market share numbers that NPD generates are

25  heavily dependent on the category in which NPD places a particular product. MGA

26  is informed and believes that Mattel also pressured NPD into changing certain

27  product classifications for its "BRATZ" products in order to manipulate the data

28

28

EXHIBIT 15
PAGE 517

1  and preserve Mattel's market share rankings in the critical fashion doll category –
2  and thereby lower MGA's.

3      87.    The Children's Advertising Review Unit ("CARU") is another
4  organization that, upon information and belief, appears to have been subject to
5  improper influence by Mattel. CARU is the toy industry's supposedly independent
6  self-regulatory body in charge of maintaining standards in advertising. CARU's
7  approval is considered critical within the toy industry to avoiding regulatory action
8  by the Federal Trade Commission.

9      88.    CARU is heavily subsidized by Mattel.

10      89.    Upon information and belief, Mattel has used its influence as a major
11  contributor to CARU's budget to induce CARU to place onerous restrictions on
12  MGA advertisements, and require MGA to amend aspects of commercials that have
13  gone unchallenged in other parties' commercials.

14      90.    As a result of CARU's restrictions, MGA has been forced to incur
15  unnecessary costs for reshooting and producing or re-editing its commercials.

16      91.    On several occasions, CARU has also either strongly suggested, if not
17  also required, that MGA respond to inquiries about its website policies and make
18  substantial changes to the "BRATZ" website notably and significantly in excess of
19  restrictions imposed on Mattel and others.

20      92.    Even TIA, the toy industry's trade association, is apparently not
21  untainted by Mattel's influence and power. Each year, TIA presents the Toy-of-
22  the-Year Awards, the most prestigious of which had been the award for Toy of the
23  Year. Winning the Toy of the Year Award is a significant achievement that not
24  only very likely increases the sales of the winning toy, but also denotes the winning
25  company as a leader in toy innovation and generates substantial goodwill with
26  retailers, distributors, licensees, and customers.

27      93.    For the years 2000 (the first year of the award), 2001 and 2002, the
28  Toy of the Year award was chosen by consumer vote. The awards ceremony was

29

EXHIBIT 15
PAGE 518

1   then held the following year, at a dinner in New York. (For example, the awards

2   dinner for the year 2000 award was held in February 2001). Leap Frog won the

3   2000 People's Choice Toy of the Year Award and MGA won the 2001 and 2002

4   People's Choice Toy of the Year Awards. With the 2003 Toy of the Year Award,

5   however, the rules suddenly changed. Now, the award is selected by members of

6   the industry.

7        94.   Upon information and belief, this change was orchestrated by a Fisher

8   Price (a Mattel subsidiary) executive who, until recently, served as the Chairman of

9   TIA.

10       95.   Perhaps not surprisingly given this change in the winner selection

11  procedures, "Hokey Pokey Elmo" ("Elmo"), a Fisher Price toy, won for the year

12  2003 (awarded in 2004), beating out the other leading nominee, "BRATZ Formal

13  Funk Super Stylin' Runway Disco."

14       96.   TIA has refused to provide MGA with the vote count procedure and

15  totals for this award, despite repeated requests.

16       97.   MGA is also informed and believes that Mattel was instrumental in

17  attempting to keep MGA from participating as a sponsor in this year's "Kids'

18  Choice Awards."

19       98.   Mattel has clearly engaged in tortious, illegal and unethical behavior in

20  its unfettered efforts to disrupt, if not destroy, MGA. Indeed, this is apparently

21  Mattel's current *modus operandi* when it comes to "competing" in the industry.

22  The once immensely successful "LeapFrog" interactive learning product, for

23  example, has apparently been one of Mattel's other recent victims.

24       99.   Mattel may not shield its illegal, unfair and unethical business practices

25  from the public eye. It is time for the truth to be told, and the world to know of

26  Mattel's unfair, unethical and illegal business practices and unfair competition.

27  "Barbie" does not "play nice" with others (particularly her competitors), and needs

28  to be taught how "to share" (at least in the fashion doll marketplace). She cannot be

30

**EXHIBIT 15**
**PAGE 519**

1   allowed to continue to be the playground bully and trample on the rights of others,

2   including MGA.

3       100.  As a result of Mattel's manipulative, illegal, unfair, unethical and anti-

4   competitive conduct, MGA has suffered and, unless abated, will continue to suffer

5   lost sales, lost licensing fees, lost contracts, lost relationships, lost business

6   opportunities and other damages and harm for which there is no adequate remedy at

7   law.  Its ability to enter new markets and product lines has been hampered and

8   delayed.  Its production costs have increased, its reputation and relationships with

9   important players in the industry have been negatively impacted, the value of its

10   business has been diminished, and its ability to attract, hire and retain employees

11   has been affected.

12

13   **FIRST CLAIM FOR RELIEF**

14   **(False Designation of Origin or Affiliation in Violation of 15 U.S.C. § 1125 (a))**

15       101.  MGA repeats and realleges the allegations contained in paragraphs 1

16   through 100 of this Complaint and incorporates them by reference as though fully

17   and completely set forth herein.

18       102.  MGA's "BRATZ" line has a unique and distinctive style and

19   distinctive characteristics, such as the disproportionately large head, large dramatic

20   eyes with a distinctive presentation (including the eye shape, make-up and lashes),

21   pouty, plump lips with a distinctive presentation (including the lip shape and make-

22   up), small, thin bodies, oversized feet, and up-to-date fashions.  MGA's "BRATZ"

23   line is known for and recognized by the total image that is presented by its product

24   and the style and arrangement of the packaging and display.  This *"tout ensemble"*

25   is representatively described and depicted herein.  The characteristics of MGA's

26   "BRATZ" line, alone or in combination, have come to identify the "BRATZ" line

27   and its source, MGA, and thus serve as protectable trade dress.  MGA's trade dress

28   in its "BRATZ" line is purely aesthetic and non-functional or, if any utility exists, it

31

EXHIBIT 15
PAGE 520

1  is not essential to the purpose, quality or source identifying attributes of the

2  aesthetics. MGA's trade dress in its "BRATZ" line is inherently distinctive or has

3  acquired distinction within the meaning of the Lanham Act.

4      103. Similarly, MGA's "BRATZ PETZ," part of the "BRATZ" line, also

5  has its own unique and distinctive characteristics, such as the humanlike eye and

6  unusual appearance of the animals dressed in clothing. MGA's "BRATZ PETZ"

7  line has become known for and recognized by the total image that is presented by

8  the product and the style and arrangement of its packaging. This "*tout ensemble*" is

9  representatively described and depicted herein. The characteristics of MGA's

10  "BRATZ PETZ", alone or in combination, have come to identify the "BRATZ

11  PETZ" line and its source, MGA, and thus serve as protectable trade dress. MGA's

12  trade dress in its "BRATZ PETZ" line is purely aesthetic and non-functional or, if

13  any utility exists, it is not essential to the purpose, quality or source identifying

14  attributes of the aesthetics. MGA's trade dress in its "BRATZ PETZ" line is

15  inherently distinctive or has acquired distinction within the meaning of the Lanham

16  Act.

17      104. Mattel's production, sale and marketing of "My Scene" dolls,

18  including styling heads and doll heads, and "My Scene" pets that are confusingly

19  similar to MGA's "BRATZ" line (including its "BRATZ PETZ"), without MGA's

20  permission or consent, constitutes designation and use of a term, symbol, device or

21  combination thereof that is false or misleading within the meaning of 15 U.S.C.

22  Section 1125 and is likely to cause confusion, or to cause mistake, or to deceive as

23  to the affiliation, connection, or association, or as to the origin, sponsorship, or

24  approval of Mattel's goods or commercial activities, within the meaning of 15

25  U.S.C. Section 1125. MGA has been damaged by Mattel's acts.

26      105. Mattel's conduct has been intentional and willful, and is calculated

27  specifically to trade off the goodwill that MGA has developed in its successful

28  "BRATZ" line. By its aforesaid acts, particularly its imitation of the distinctive

32

EXHIBIT 15
PAGE 521

1   features of MGA's "BRATZ" line in connection with goods sold and distributed in

2   interstate commerce, Mattel has infringed and is likely to continue to infringe on

3   MGA's substantial rights in and to the "BRATZ" line trade dress. In so doing,

4   Mattel has falsely represented and designated to the public generally and consumers

5   of fashion doll products specifically the source and origin of Mattel's "My Scene"

6   fashion doll products in violation of 15 U.S.C. § 1125(a).

7       106.  MGA has been damaged by, and Mattel has profited from, Mattel's

8   wrongful conduct in an amount to be proven at trial.

9       107.  For each act of infringement, MGA is entitled to recover its actual

10  damages as well as Mattel's profits from such infringement.

11      108.  Monetary relief alone, however, is not adequate to address fully the

12  irreparable injury that Mattel's illegal actions have caused and will continue to

13  cause MGA, if not enjoined. MGA is therefore entitled to preliminary and

14  permanent injunctive relief to stop Mattel's ongoing infringement of MGA's trade

15  dress.

16              **SECOND CLAIM FOR RELIEF**

17      **(Unfair Competition in Violation of 15 U.S.C. § 1125 (a) and Unfair**

18  **Competition and Unfair Business Practices in Violation of Cal. Bus. & Prof.**

19            **Code § 17200 *et seq*. and California Common Law)**

20      109.  MGA repeats and realleges the allegations contained in paragraphs 1

21  through 108 of this Complaint and incorporates them by reference as though fully

22  and completely set forth herein.

23      110.  Mattel has deliberately and, indeed, repeatedly adopted, imitated and

24  mimicked the make-up, appearance, features, trade dress, and image of MGA's

25  products, packaging and advertising, including its repackaging and refreshing of

26  older Mattel toys. Mattel's actions were and are done with the intent to deceive

27  consumers, cause confusion and mistake, and interfere with the ability of

28  consumers to identify the source of goods by appearance and packaging. By this

33

**EXHIBIT 15**
**PAGE 522**

1   conduct, Mattel pirates and exploits, by subliminal or conscious association with

2   MGA, the goodwill and reputation of MGA and derives benefit therefrom.

3   111. Mattel has particularly and deliberately poached upon the commercial

4   magnetism of MGA's "BRATZ" and the success of "BRATZ". Mattel's conduct

5   has been intentional and willful, and is calculated specifically to trade off the

6   goodwill that MGA has developed in its successful "BRATZ" line.

7   112. By its acts, including its intentional imitation of the distinctive features

8   of MGA's "BRATZ" dolls, which has progressively become closer and closer, as

9   well as its imitation of "BRATZ" themes, packaging and the overall look, feel and

10  total image of the "BRATZ" line, imitation of other MGA products, packaging and

11  advertising, and other conduct alleged herein, Mattel has engaged in unfair

12  competition under both federal and California state law.

13  113. Mattel has also willfully and maliciously used its power, influence and

14  intimidation to threaten certain retailers, suppliers, licensees, distributors and

15  manufacturers so as to limit, if not prevent, MGA from doing business with these

16  retailers, suppliers, licensees, distributors and manufacturers, using its power and

17  influence to intimidate and manipulate industry bodies. Mattel has further used its

18  power and influence to attempt to, if not actually, intimidate and threaten MGA's

19  current and potential employees so as to cause MGA competitive injury.

20  114. Alone, in combination, or in totality, Mattel's actions discussed and

21  alleged herein constitute unfair competition and unfair business practices within the

22  meaning of federal law, California statutory law and/or California common law.

23  115. As a result of its conduct, Mattel has derived substantial monetary and

24  non-monetary benefit and business advantage. Mattel has also wrongfully diverted

25  profits away from MGA and to Mattel and, on information and belief, deprived

26  MGA of the patronage of a large number of actual and potential customers.

27  116. MGA has been damaged by, and Mattel has profited from, Mattel's

28  wrongful conduct in an amount to be proven at trial.

34

EXHIBIT 15
PAGE 523

117.   Monetary relief alone, however, is not adequate to address fully the irreparable injury that Mattel's actions have caused and will continue to cause MGA, if not enjoined.  MGA is therefore entitled to preliminary and permanent injunctive relief to stop Mattel, and all persons acting in concert with Mattel, from engaging in acts of unfair competition and unfair business practices.

118.   MGA is further entitled to relief whereby Mattel is ordered to pay restitution for damages resulting from Mattel's unfair competition and unfair business practices.

### THIRD CLAIM FOR RELIEF

### (Dilution in Violation of 15 U.S.C. § 1125 (c); Cal. Bus. & Prof. Code § 14330 and California Common Law)

119.   MGA repeats and realleges the allegations contained in paragraphs 1 through 118 of this Complaint and incorporates them by reference as though fully and completely set forth herein.

120.   The look and trade dress of the MGA products referenced herein are distinctive and famous, and have been since before Mattel launched its similar versions.  By its aforesaid acts, Mattel caused and continues to cause blurring and dilution of the distinctive look of MGA's products and trade dress, which previously served as a unique source identifier for MGA, within the meaning of the Lanham Act, California Business and Professions Code § 14330 and/or California common law.

121.   Mattel's conduct has been intentional and willful, calculated specifically to trade on MGA's goodwill and reputation and to cause dilution of MGA's famous marks, particularly those connected with MGA's famous and successful "BRATZ" doll head, "BRATZ" doll product line, "BRATZ Funky Fashion Makeover Head" and "BRATZ PETZ" line.

122.   MGA has been damaged by, and Mattel has profited from, Mattel's wrongful conduct in an amount to be proven at trial.

35

EXHIBIT 15
PAGE 524

123.   Monetary relief alone, however, is not adequate to address fully the irreparable injury that Mattel's actions have caused and will continue to cause MGA, if not enjoined.  MGA is therefore entitled to preliminary and permanent injunctive relief to stop Mattel's ongoing dilution.

## FOURTH CLAIM FOR RELIEF

### (Unjust Enrichment)

124.   MGA repeats and realleges the allegations contained in paragraphs 1 through 123 of this Complaint and incorporates them by reference as though fully and completely set forth herein.

125.   As a result of the conduct alleged herein, Mattel has been unjustly enriched to MGA's detriment.  MGA seeks a worldwide accounting and disgorgement of all ill-gotten gains and profits resulting from Mattel's inequitable activities.

## PRAYER FOR RELIEF

WHEREFORE, MGA prays for relief, as follows:

1.     That Mattel, its agents, servants and employees and all persons acting in concert be restrained preliminarily and permanently from directly or indirectly:

    a.     using confusingly similar trade dress;

    b.     improperly influencing, or attempting to improperly influence, standard-setting and industry organizations;

    c.     engaging in unfair competition and unfair business practices; and

    d.     diluting MGA's trade dress;

2.     For general and actual damages, according to proof at trial but believed to reach or exceed tens of millions of dollars;

3.     For the disgorgement of all profits derived by Mattel for its acts of:

    a.     false designation of origin or affiliation;

36

EXHIBIT 15
PAGE 525

1    b.  unfair competition and unfair business practices; and

2    c.  dilution;

3   4.  For costs of suit and reasonable attorneys' fees;

4   5.  For punitive and/or exemplary damages as a result of Mattel's willful

5 and malicious conduct to the extent allowable by law; and

6   6.  For such other and further relief as the Court deems just and proper.

7

8 Dated:  April 13, 2005     PATRICIA GLASER

9               CHRISTENSEN, MILLER, FINK, JACOBS, GLASER, WEIL & SHAPIRO LLP

10

11             DALE M. CENDALI
               DIANA M. TORRES

12             PAULA E. AMBROSINI
               O'MELVENY & MYERS LLP

13

14

15             By:_____
               Diana M. Torres

16             Attorneys for Plaintiff
               MGA ENTERTAINMENT, INC.

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 15
PAGE 526

1

## DEMAND FOR JURY TRIAL

2

3          MGA hereby demands a jury trial on all triable issues.

4

5    Dated:      April 13, 2005              PATRICIA GLASER
                                             CHRISTENSEN, MILLER, FINK,
6                                            JACOBS, GLASER, WEIL &
                                             SHAPIRO LLP
7
                                             DALE M. CENDALI
8                                            DIANA M. TORRES
                                             PAULA E. AMBROSINI
9                                            O'MELVENY & MYERS LLP

10
                                             By:
11                                               Diana M. Torres
                                             Attorneys for Plaintiff
12                                           MGA ENTERTAINMENT, INC.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

38

EXHIBIT 15
PAGE 527

EXHIBIT 16

CALENDARED

JAN 1 8 2007

P Send

ENTERED
CLERK, U.S. DISTRICT COURT

JAN 12 2006

CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION      BY DEPUTY

FILED

THIS CONSTITUTES NOTICE OF ENTRY AS REQUIRED BY FRCP, RULE 77(D).

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARTER BRYANT, | |
| Plaintiff, | CASE NO. CV-04-9049-SGL |
| | (Consolidated with cases CV-04-9059 and CV-05-2727) |
| v. | |
| MATTEL, INC., | ORDER REGARDING MATTEL'S MOTION FOR LEAVE TO AMEND |
| Defendant. | |
| and related actions. | |

This case has, increasingly, become one of the proverbial tail wagging the proverbial dog.

Back in April, 2004, Mattel, Inc., ("Mattel") filed a complaint in Los Angeles County Superior Court against its former employee and the reputed creator of the BRATZ dolls, Carter Bryant. The complaint pressed five separate state-law theories relating to certain agreements Bryant signed while an employee with Mattel, namely, an Employee Confidential Information and Inventions Agreement ("Inventions Agreement") and a Conflict of Interest Questionnaire ("COI Questionnaire"). Although couched in state law terms and ostensibly pled as a simple employment action, lurking beneath the allegations in the complaint was whether Bryant had either misappropriated Mattel's intellectual property or

EXHIBIT _____
PAGE _____

EXHIBIT 16
PAGE 528

1-12

1   resources in creating and/or developing the BRATZ dolls or whether he continued

2   to develop his BRATZ design while still working in Mattel's employ. In either event,

3   the rights to the BRATZ dolls could become the property of Mattel, either through

4   infringement or through operation of the agreements noted above. The case was

5   later removed to this Court and was assigned the case number CV-04-9059. MGA

6   Entertainment, Inc. ("MGA"), the maker of the BRATZ doll line, then intervened "to

7   protect its rights to Bratz dolls" that were at stake in the action. Mattel, Inc. v.

8   Bryant, 446 F.3d 1011, 1012 (9th Cir. 2006); see also id. at 1013 ("Mattel argues, 'a

9   significant risk of prejudice' to MGA [exists] if the ownership of rights to intellectual

10  property, i.e., the Bratz creations, were decided in the absence of MGA").

11          In the interim, Bryant filed a declaratory judgment action in this Court,

12  seeking for the Court to declare that his BRATZ doll creations did not infringe

13  Mattel's copyright in its Toon Teens products. See Court's July 18, 2006, Order at

14  3 (noting that, although "Bryant's complaint . . . makes reference to 'other Mattel

15  products,' . . . the substance of his allegations all address the product 'Toon

16  Teens'"). The declaratory judgment action was assigned the case number CV-04-

17  9049.

18          MGA then filed an action against Mattel in this Court broadening the scope

19  of the controversy beyond that concerned with the ownership rights to the BRATZ

20  doll line. MGA's complaint asserted various Lanham Act claims and their California

21  state law equivalent arising out of Mattel's alleged "habitual and unfair tactics of

22  competition-by-intimidation and serial copycatting of MGA's products." (Compl.

23  ¶ 7). In essence, although the prior actions were concerned with ownership in the

24  rights to the BRATZ doll line, the allegations in 05-2727 concerned whether there

25  had been unlawful efforts to block the marketing of those rights in the BRATZ dolls.

26  MGA's complaint did make mention of other products that were affected by Mattel's

27  alleged predatory business practices, but by far the largest portion of its complaint

28  concerned Mattel's conduct in undermining (or seeking to undermine) MGA's rival

EXHIBIT _____

2

PAGE _____

**EXHIBIT 16**
**PAGE 529**

1  line of BRATZ dolls.[1]

2      By Order dated June 19, 2006, the Court consolidated all three cases "for all
3  purposes" as they "involve[d] a number of common issues of law and fact." As the
4  Court later noted in its August 10, 2006, Order: "At its heart, this case asks the
5  question: Who owns the rights to the Bratz dolls?" Resolution of this question lies
6  at the heart of or, at the very least, affects many of the other claims set forth in
7  each of the three respective cases. For instance, even though the allegations in
8  05-2727 concern Mattel's alleged efforts at defeating the marketing of the BRATZ
9  dolls, resolution of who owned the rights to the BRATZ dolls could serve to moot
10 many of those allegations. It is hard to imagine how it is unlawful for a company to
11 thwart or otherwise undermine the marketing of a product it owns. Thus, if Mattel
12 owned the rights to the BRATZ dolls, many of the allegations in the 05-2727
13 complaint would become moot. That said, such consolidation did not do away with
14 the distinctions that do exist between the three cases. As the Court highlighted in
15 its consolidation order, when either party files a pleading in the case, "the first
16 paragraph of [that] document . . . shall inform the Court to which case(s) the
17 document relates."

18     On July 18, 2006, the Court dismissed Bryant's declaratory judgment action,
19 04-9049, finding there existed no reasonable apprehension of an imminent
20 copyright infringement claim being filed against him by Mattel based on Mattel's
21 Toon Teen intellectual property. See Court's July 18, 2006, Order at 4. The
22 Court's Order was predicated entirely upon counsel for Mattel's representation
23 during oral argument that it "will not maintain that Bratz infringes the copyright in
24 Toon Teens." Owing to this representation, the Court, in dismissing the declaratory
25 judgment action, made clear that any future "claim by Mattel of copyright

26

27     [1] That the marketing of the BRATZ dolls lies at the heart of the issues
between the rival doll makers in the 05-2727 case is best illustrated by the Court's
28 discussion of those allegations in its August 26, 2005, Order, Granting in Part and
Denying Part Mattel's Motion to Strike portions of MGA's complaint.

3          EXHIBIT

**EXHIBIT 16**
**PAGE 530**

1  infringement based on the Toon Teens product is barred by counsel's

2  representation." July 18, 2006, Order at 4.

3         Presently before the Court is Mattel's request for leave to file an amended

4  complaint in the 04-9059 action. The complaint broadens considerably the nature

5  of the action from its genesis in state court. Whereas before the complaint simply

6  sought to litigate alleged contractual and fiduciary breaches by Bryant while in the

7  employ of Mattel (no doubt geared toward procuring a legal basis for Mattel to lay

8  claim to the BRATZ doll line), the amended complaint adds five more defendants

9  and nine new legal claims, alleging a wide range of commercial disputes between

10  the rival doll makers that spans three countries. For instance, the amended

11  complaint now contains RICO claims, a misappropriation of trade secrets claim,

12  and various aiding and abetting claims all stemming from allegations that MGA

13  cherry-picked certain high-ranking Mattel executives in foreign markets (many also

14  named as defendants in the amended complaint) or designers (namely, Bryant),

15  and then enticed or encouraged those same individuals to steal various trade and

16  proprietary secrets (be it sales plans, sales projections, customer profiles, or

17  intellectual property) from Mattel and hand them over to MGA before going to work

18  at MGA.

19         Moreover, the amended complaint expands upon the existing breaches of

20  contract and fiduciary duty claims in the original complaint by expanding the

21  universe of former employees (namely, the cherry-picked executives) to whom

22  those claims now apply.

23         Finally, Mattel now makes plain what was always lurking in its original

24  complaint — a copyright claim, but one directed not only to Bryant but also to MGA,

25  MGA's Hong Kong subsidiary, and MGA's President and CEO Isaac Larian.

26  Moreover, Mattel characterizes its copyright claim somewhat differently from that at

27  issue in Bryant's declaratory relief action: "The Amended Complaint does not

28  include a claim for infringement of copyrights in Toon Teens, but rather

4

EXHIBIT

PAGE

EXHIBIT 16
PAGE 531

1    infringement of copyrights in Bratz." (Reply to MGA Opp. at 11). Toward that end,

2    Mattel has recently filed copyright registrations with the U.S. Copyright Office

3    claiming ownership in various BRATZ doll design drawings penned by Bryant.

4    A.    ANALYSIS

5          Federal Rule of Civil Procedure 15(a) provides that, once a responsive

6    pleading has been served, "a party may amend the party's pleading only by leave of

7    court or by written consent of the adverse party; and leave shall be freely given

8    when justice so requires." With no consent to Mattel's proposed filing proffered by

9    MGA and Bryant, determining whether to grant Mattel leave to file an amended

10   complaint is gauged by looking to the familiar formulation of factors set forth by the

11   Supreme Court in Forman v. Davis:

12                  In the absence of any apparent or declared
13              reason—such as undue delay, bad faith or dilatory
                motive on the part of the movant, repeated failure to
14              cure deficiencies by amendments previously allowed,
                undue prejudice to the opposing party by virtue of
15              allowance of the amendment, futility of amendment,
                etc.—the leave sought should, as the rules require, be
16              'freely given.' Of course, the grant or denial of an
                opportunity to amend is within the discretion of the
17              District Court, but outright refusal to grant the leave
                without any justifying reason appearing for the denial is
18              not an exercise of discretion; it is merely abuse of that
                discretion and inconsistent with the spirit of the Federal
19              Rules.

20   371 U.S. 178, 182 (1962).

21         MGA and Bryant offer the following reasons for denying Mattel leave to

22   amend: (1) Mattel has long known of the factual predicates underlying its copyright

23   and intentional interference claims but delayed in asserting them; (2) the proposed

24   amendment to add the copyright claim and the intentional interference claims

25   (against the new defendants) are futile because they are barred by the applicable

26   statute of limitations; (3) the copyright claim had been brought in bad faith by Mattel

27   because of its prior public disavowal of an intent to assert such a claim; and (4)

28   MGA and Bryant would incur undue prejudice were the copyright claim added to the

5

EXHIBIT

1   suit because of alleged spoilation of evidence issues involving Mattel's ZEUS

2   computer system used by doll designers at Mattel and its e-mail system. None of

3   these arguments are persuasive.

4       1.   Awareness of Factual Predicate for Copyright and Intentional

5            Interference Claims

6       MGA argues that Mattel has long known about the factual predicate for its

7   recently added copyright claim, observing that, "[o]ver four years ago, in August

8   2002, Mattel CEO Bob Eckert received an anonymous letter stating that Bryant

9   created the project that became the 'Bratz' dolls — and worked with MGA to 'steal'

10  that project — while still employed at Mattel." (MGA Opp. at 9). Similarly, MGA

11  argues that Mattel has long known of the factual predicate for its intentional

12  interference claim with respect to Bryant's contract given that, "[b]y Mattel's own

13  admission, it learned in November 2003 — more than three years ago — that

14  Bryant had signed a contract with MGA 'dated as of' a month prior to his final day at

15  Mattel." (MGA Opp. at 11-12).

16      At the outset it must be observed that "[m]ere delay in proffering an

17  amendment does not justify denying leave to amend." Sierra Club v. Union Oil Co.

18  of California, 813 F.2d 1480, 1493 (9th Cir. 1987), vacated on other grounds by,

19  485 U.S. 931 (1988), and reinstated by, 853 F.2d 667 (9th Cir. 1988). Seizing upon

20  this point of law, Mattel argues that "only in . . . cases" when "granting leave would

21  require discovery to be reopened after summary judgment motions have been filed"

22  has the Ninth Circuit found the denial of leave "justified" based on the passage of

23  time alone. (Reply to MGA Opp. at 3). That is incorrect. There is a line of cases

24  from the Ninth Circuit finding that, if a "party seeking amendment knows or should

25  know of the facts underlying the amendment when the original complaint is filed,

26  the motion to amend may be denied." Sierra Club, 813 F.2d at 1493 (citing Jordan

27  v. County of Los Angeles, 669 F.2d 1311, 1324 (9th Cir. 1982)). And, recently, the

28  Ninth Circuit upheld the denial of leave to amend based on the passage of time

6

1   even though the requested leave to amend was tendered <u>before</u> the time, as set
2   forth in a Rule 16(b) pre-trial scheduling order, for amending pleadings had expired.
3   See <u>AmerisourceBergen Corp. v. Dialysist West, Inc.,</u> 465 F.3d 946 (9th Cir. 2006).
4   The Ninth Circuit observed that, even when a request for leave to amend is timely
5   under a Rule 16(b) schedule for pretrial motions, the district court may nonetheless
6   still deny the request based on any of the <u>Forman</u> factors.  <u>Id.</u> at 951-52.  The Ninth
7   Circuit then noted that the issue of untimeliness (regardless of whether the
8   amendment is tendered "within the period of time allotted by the district court in a
9   Rule 16 scheduling order") in seeking to amend can constitute a justification for
10  denying leave to amend if "the moving party knew or should have known the facts
11  and theories raised by the amendment in the original pleading." <u>Id.</u> at 953.
12  Toward that end, the Ninth Circuit observed that "an eight month delay between the
13  time of obtaining a relevant fact and seeking a leave to amend is unreasonable."
14  <u>Id.</u>  In this regard, the Ninth Circuit in <u>Dialysist</u> was unpersuaded by the fact that,
15  even though the moving party had known of the facts prompting the amendment for
16  a long period of time, there still remained eight more months of discovery for the
17  parties to marshal facts against the allegations raised by the amended pleading:
18  "Even though eight months of discovery remained, requiring the parties to scramble
19  and attempt to ascertain whether the Procrit purchased by AmerisourceBergen was
20  tainted, would have unfairly imposed potentially high, additional litigation costs on
21  Dialysist West that could have easily been avoided had AmerisourceBergen
22  pursued its 'tainted product' theory in its original complaint or reply." <u>Id.</u>  Thus,
23  absent "a satisfactory explanation" for the delay in amending the complaint, the
24  Court is well within its rights to deny leave to amend.  <u>Id.</u>
25        Mattel proffers the following reasons for taking the time that it did before
26  presenting its amended complaint:  (1) Acting out of an abundance of caution to its
27  obligations under Rule 11 to present "factual contentions [that] have evidentiary
28  support," Mattel waited until its claims were better supported by evidence

7

EXHIBIT 16
PAGE 534

PAGE

1  uncovered in discovery; and (2) the delay in the proceedings caused by "the year-

2  long stay and the parties' prior jurisdictional disputes" have left the case still in its

3  "nascent stage." (Reply to MGA Opp. at 2, 4).

4        The first reason is not well-founded.  Rule 11 specifically allows parties to

5  aver factual allegations that "are likely to have evidentiary support after a

6  reasonable opportunity for further investigation or discovery" so long as the party

7  makes clear in its pleading that its factual contentions on those points are with the

8  caveat that they are based on a good faith belief that further discovery would

9  unearth evidence to support them.  See FED. R. CIV. P. 11(b)(3).  Simply put, Rule

10 11 did not stand in the way of Mattel averring the factual contentions it now claims it

11 "merely suspected" as being the case based on the limited information before it.

12 Mattel could have gone ahead and made such suspected factual allegations so

13 long as it caveated those claims with the declaration that it reasonably believed that

14 those allegations would be borne out by further discovery.  Perhaps the time by

15 which Mattel could have reasonably believed such allegations would be borne out

16 by further discovery occurred after the dates noted by MGA, but it is hard to fathom

17 that such materialization took three or four years to occur.

18       The second reason would have some merit to it but for the fact that the

19 information that alerted (or should have alerted) Mattel to the existence of its now

20 asserted copyright and intentional interference claims was brought to Mattel's

21 attention well before the case was stayed on May 20, 2005.  The stay, therefore,

22 did not operate as an obstacle to Mattel asserting its claims; nor even if it did, the

23 stay does not explain why Mattel waited nearly six months after the stay was lifted

24 on May 16, 2006, to present those claims now.

25       All of that being said, the one thing that gives the Court pause in denying

26 leave based on the tardiness in Mattel's presentation is the lack of any evidence

27 that MGA or Bryant have been prejudiced by the delay.  Delay unconnected to

28 some showing of prejudice, be it prejudice to the parties or disruption in judicial

8

EXHIBIT

PAGE

EXHIBIT 16
PAGE 535

1    management of the case, does not suffice to deny granting leave to amend.  The

2    Ninth Circuit has noted that, "where a defendant is on notice of the facts contained

3    in an amendment to a complaint, there is no serious prejudice to defendant in

4    allowing the amendment" even if it is made tardily.  Sierra Club, 813 F.2d at 1493.

5    Indeed, the denial of leave was proper in the Dialysist case not simply because of

6    the length of the delay, but because the delay itself was "detrimental" in that it

7    would entail the opposing party to have "unfairly" incurred "potentially high,

8    additional litigation costs" that could have been avoided if the moving party had

9    made clear its intentions earlier.  465 F.3d at 953.

10          Here, as well demonstrated in Mattel's papers, it is readily apparent from the

11   pleadings filed by MGA and Bryant in this case that both have been aware for some

12   time of the factual predicates now underlying Mattel's copyright claim and

13   intentional interference claim.  (See MGA Opp. at 5 ("As Bryant and MGA

14   suspected at the time of filing — and Mattel now concedes by conduct — those

15   deceptively-pled state-law claims [in 04-9059] were copyright infringement claims all

16   along")(emphasis added)).  The parties have engaged in meaningful discovery

17   regarding many of the facts touched upon by these new claims, be it tracking down

18   experts in various forensic fields or taking depositions of various of the key players

19   to those claims.  In point of fact, in their papers filed with this Court before this

20   present motion, both Bryant and MGA have made it abundantly clear that they have

21   long suspected that a copyright infringement claim was in the offing as evidenced

22   by Bryant's filing of the declaratory judgment action and MGA's intervention in the

23   05-9059 matter to protect its rights to the BRATZ dolls.  Similarly, MGA and Bryant

24   have been on notice to the facts comprising the interference claim concerning

25   Bryant's contract as evidenced by the identity of the individuals who have been

26   deposed by Mattel, as well as the nature of the questions posed and the testimony

27   proffered at those depositions.  MGA's argument that, with the amendments, it

28   faces the prospect of defending "against stale claims" owing to faded memories and

9

EXHIBIT 16
PAGE 536

1   loss of documents caused by the great passage of time, (see MGA Opp. at 3, 13),

2   is diminished by the fact that (no doubt owing to the sophistication of all counsel

3   involved) discovery on these very issues have been proceeding apace by both

4   sides long before Mattel filed its proposed amendments.  This is simply not a case

5   where "additional litigation costs" will be "unfairly" visited upon Bryant and MGA by

6   allowing the proposed amendments; much of those costs have already been borne

7   by the parties for some time.

8          2.    Spoilation of Evidence

9          MGA next argues that Mattel's delay in bringing the amended complaint has

10  caused it prejudice as, in the interim, critical pieces of evidence have been or are

11  suspected of having become lost.  For instance, MGA asserts that Mattel's Rule

12  30(b)(6) witness concerning its Zeus computer system, Julia Marine, testified that,

13  "although Mattel identified and segregated its most relevant backup tapes available

14  for Zeus, Mattel allowed its tape backup system to expire the database for those

15  backup tapes, thereby eliminating all information about what was actually stored on

16  those backup tapes."  (MGA Opp. at 9-10).  Information on the Zeus computer

17  system is critical because of Mattel's assertion that part of its copyright claim rests

18  on Bryant's exposure to Mattel development programs.  (First Am. Compl. ¶ 26(a)).

19  As explained by MGA: "[C]oncept data and drawings created by [Mattel] design

20  center personnel are stored on Zeus.  Thus, the electronic documents stored on

21  Zeus – which should include the metadata showing who created, edited and

22  accessed Mattel's concept drawings and designs – during the time Bryant worked

23  in the design center at Mattel is vitally important to defending against Mattel's

24  claims."  (MGA Opp. at 14).  MGA's argument is neither an accurate

25  characterization of Ms. Marine's testimony nor of the nature of Mattel's exposure

26  claim.

27         Ms. Marine did not testify that the information on the backup tapes (some

28  fifty in total) was lost, but rather that Mattel no longer carried the type of hardware

10

EXHIBIT

PAGE

EXHIBIT 16
PAGE 537

1    that could restore the information still found on those tapes:

2         Q.   So if you wanted to restore that 2002 backup
             tape[s] then, how would you go about doing that?

3              . . . .

4         A.   You need the hardware so if we don't have the
5              hardware — if [the technology used by the tape
             is] DLT we don't have the hardware and you've
6              got to buy it and — well, first you have to find a
             place to put it with adequate power which we
7              don't have in the design center. You need to
             have a tape library. You need to have the tape
8              drives that carried those tapes. You need a
             server that has the capability to – that's big
9              enough to handle all of the hardware. You need
             the software – the license for the backup
10             software[, Net Backup]. You need the disk space
             to restore it to and then you have to start reading
11             in all those tapes.

12        Q.   You said that you don't have that in the design
             center. Do you have that hardware anywhere
13             else in the company?

14        A.   DLT? No, no.

15        Q.   At what point did you get rid of the hardware?

16        A.   Once the last backups — DLT backups expired
             so it would have been a couple years ago
17             probably.

18   (Decl. Diana Torres, Ex. K at 118-119).

19        The above testimony clearly denotes the difficulty in restoring what was on

20   Mattel's Zeus computer system during the relevant time frame, but it certainly does

21   not demonstrate that the information on those backup tapes has been "eliminated"

22   or forever lost. Undoubtedly it will be a costly endeavor to recover that information

23   (not to mention to later search and sort through it); but to argue, as MGA does, that

24   the information is "unavailable" or "lost", (MGA Opp. at 9, 14), exaggerates its

25   plight. Indeed, Ms. Marine's testimony indicates that the difficulty in retrieving the

26   information on the Zeus backup tapes has been present for some time (maybe

27   since 2004 or perhaps even earlier). This is important because it undermines

28   MGA's claim that Mattel's undue delay in bringing its amended complaint will cause

                        11

EXHIBIT 16
PAGE 538

1   it to suffer prejudice it otherwise would not have faced if the amendments were

2   brought sooner.  Such prejudice has been present for years, and Mattel's failure to

3   bring its amended complaint sooner would not have changed this situation.

4          Similarly, MGA's point that access to what was on the Zeus computer

5   system is vital in demonstrating that Bryant was not exposed to or otherwise did not

6   hack the system to steal other designers work is diminshed to some extent by the

7   fact that Bryant himself testified that he did not use the Zeus computer system and

8   was "pretty much computer illiterate" while employed at Mattel.  Admittedly, the

9   ability to point to information on the Zeus system backup tapes to prove that Bryant

10  did not access other designers drawings or to prove the date those drawings were

11  created by those other designers would be useful evidence to negate Mattel's

12  factual claims.  Nonetheless, such evidence still would not discount other avenues

13  outside of the Zeus computer system by which Mattel could seek to prove that

14  Bryant was exposed to its copyrighted works, e.g., witness testimony that Bryant

15  saw drawings of the same posted on other designers' cubicles.

16         MGA next surmises that Mattel's e-mail records have disappeared, not

17  because it has any proof on that point, but simply because Mattel has postponed

18  the deposition of the individual most knowledgeable of Mattel's e-mail records until

19  after the hearing on Mattel's motion for leave to amend. (MGA Opp. at 10).

20  Speculation of spoilation does not suffice.  That MGA's argumentation on this point

21  is nothing more than speculation is best exhibited by the evidence it has proffered

22  in support of its argument:  "[I]f the sole retained backup for Zeus is no longer

23  available, it is not hard to imagine that Mattel's electronic mail archives are similarly

24  out of reach." (MGA Opp. at 15 (emphasis added)).  MGA then makes much of a

25  deposition from a Mattel executive, Alan Kaye, who testified that e-mails in his

26  inbox would be automatically deleted if they had remained there for more than a

27  certain time period. (Decl. Diana Torres, Ex. H at 292-93).  MGA takes from this

28  acknowledgment that Mattel has an "automatic email deletion system" that has

12

EXHIBIT

PAGE

EXHIBIT 16
PAGE 539

1  compromised Mattel's "duty to preserve documents." (MGA's Opp. at 14).

2  Noticeably absent from MGA's argument is any evidence that the e-mails so

3  deleted from a Mattel employee's inbox are forever lost or, as is far more likely,

4  whether such information remains or is otherwise archived on some backup file on

5  Mattel's computer system. Absent concrete proof that spoilation has occurred,

6  nothing in MGA's argument forms a basis for denying Mattel its requested leave to

7  amend.

8      3.    Statute of Limitations

9          MGA next argues that Mattel's copyright and intentional interference claims

10 are futile as both are barred by the applicable statute of limitations. This argument

11 was pressed emphatically at oral argument. With respect to the copyright claim,

12 MGA argues that the applicable statute of limitations is three years, with the

13 limitations period accruing from when a party has knowledge of a violation or when

14 a reasonably diligent person would have been put on inquiry of the infringement.

15 (MGA Opp. at 16 (citing Roley v. New World Pictures, 19 F.3d 479, 481 (9th Cir.

16 1994)). MGA argues that Mattel was put on notice about its copyright claim in

17 August, 2002, upon the receipt of the anonymous letter to Mattel's CEO that Bryant

18 had stolen the idea for BRATZ while working at Mattel. Thus, according to MGA,

19 the limitations period on Mattel's claim expired in August, 2005, rendering Mattel's

20 current copyright claim stale.

21         The problem with MGA's analysis is it fails to take into account the relations-

22 back principles found in Rule 15(c), which provides that "[a]n amendment of a

23 pleading relates back to the date of the original pleading when "the claim . . . in the

24 amended pleading arose out of the conduct, transaction, or occurrence set forth . . .

25 in the original pleading," or if such relation back is otherwise permissible by the

26 state "law that provides the statute of limitations applicable to the action." By

27 MGA's own admission Mattel's copyright claim arises out of the same conduct or

28 transaction contained in the original complaint filed in April, 2004, well within the

13

EXHIBIT _____

PAGE _____

EXHIBIT 16
PAGE 540

1  applicable limitations period.[2] (MGA Opp. at 12 ("These very same allegations

2  [contained in the original complaint] underlie the copyright infringement and

3  intentional interference contract claims Mattel now seeks to allege against MGA,

4  Mr. Larian and Bryant")).

5       MGA's statute of limitations argument with respect to the intentional

6  interference claims fares no better.  According to MGA, the applicable statute of

7  limitations is two years for an intentional interference with contract claim and Mattel

8  was aware of the facts alerting it to this claim (insofar as Bryant's contract is

9  concerned) on November 24, 2003, when it learned "that Bryant worked with MGA

10  to develop the 'Bratz' dolls prior to his last day of employment by Mattel and, hence,

11  prior to the expiration of his contractual relationship with Mattel."[3] (MGA Opp. at 18

12  (citing <u>Knoell v. Petrovich</u>, 76 Cal. App.4th 164, 168 (1999)) .  Such a time line

13  would, according to MGA, mean that the applicable limitations period expired on

14  Mattel's interference with Bryant's contract claim on November 24, 2005, well

15  before Mattel sought leave to file its amended complaint.  (<u>Id</u>).  The problem again

16  with MGA's argument is that it ignores that through Rule 15(c) Mattel's intentional

17  interference claim would relate back to when it filed its original complaint in April,

18

19

20       [2] The same would appear to be true — that the amendments would be timely

21  — if the amendments related back to Mattel's answer (filed on May 13, 2005) to MGA's complaint in the 05-2727 case.

22

23       [3] With respect to Mattel's interference with contract claim as to one of its

24  former executives, Ron Brawer, MGA claims Mattel was put on notice of that claim on September 17, 2004, when Brawer informed Mattel that he leaving to go to work

25  for MGA. (MGA Opp. at 19-20).  The problem with this argument is that nothing from that simple event — Brawer's declaration of his intent to leave — in any way would

26  apprise Mattel that MGA had encouraged Brawer to engage in nefarious conduct (the stealing of proprietary information) causing Brawer to breach his contract with

27  Mattel that he would not do anything to help a competitor while working for them. MGA's contention that Mattel must have known of those misdeeds in mid-September

28  is nothing more than speculation.  Futility cannot be founded on what might or might not be the case; either a claim is futile to bring or it is not.

14

EXHIBIT

PAGE

EXHIBIT 16
PAGE 541

1    2004, well before the limitations period expired.[4]

2         Accordingly, MGA's futility argument is not well-founded.

3        4.   <u>Prior Disavowals of Asserting a Copyright Claim</u>

4         Finally, MGA takes umbrage with the cageyness to which Mattel has taken in

5    this case as to whether or not it is asserting a copyright infringement claim against

6    it.  To MGA, such ducking and weaving on Mattel's part renders its effort to now

7    bring such a copyright claim as one done in bad faith.  No doubt the Court itself has

8    been subjected to Mattel's overly vague statements on this point, but in the end

9    nothing in those statements has ever foreclosed the possibility that such a claim

10   may be in the offing.  Indeed, during the oral argument on Mattel's motion to

11   dismiss Bryant's declaratory judgment action, the Court pressed Mattel's counsel as

12   to whether it would assert such a copyright claim against Bryant as it is currently

13   seeking to do.  The most that Mattel's counsel would proffer was that Mattel would

14   not assert a copyright claim against Bryant based on Mattel's copyright rights in

15   TOON TEENS.  At that point, the Court directed the parties to engage in a meet

16   and confer based on counsel for Mattel's representation and to provide a report to

17   the Court based on those discussions.  The report submitted to the Court made

18   clear that, although Mattel was willing to accede that it would not bring a copyright

19   claim based on TOON TEENS, it refused to accede to Bryant's broader request

20   that "Bryant 'never copied anything' and that no Mattel product has any 'relevance'

21   to any claim that Mattel has or ever will assert against Bryant."  This by itself should

22   have dispelled any illusion either Bryant or MGA was operating under that Mattel's

23   prior statements had foreclosed any potential copyright claim against them.[5]

24    

---

25       [4] Again the relations-back principle would also seem to render its claim timely
26   if it were filed as an amended answer (the original having been filed in May, 2005) in
     the 05-2727 case.

27       [5] MGA also argues that Mattel's effort to substitute MGA and its CEO, Isaac
28   Larian, for the "Doe" defendants listed in its original complaint is improper because
     Mattel knew of their identity when it filed the original complaint.  The argument is

EXHIBIT

PAGE

EXHIBIT 16
PAGE 542

1    That said, Mattel's allegation in the amended complaint as to how it is
2    seeking to lay claim to the copyright in BRATZ is disconcerting. Paragraph 26,
3    subsection a, in the amended complaint alleges that Bryant "misappropriated and
4    misused Mattel property" by "using his exposure to Mattel development programs to
5    create the concept, design and name of Bratz." (First Am. Compl. ¶ 26(a)). Such
6    "exposure" could include Bryant misappropriating the Mattel design concept in
7    TOON TEENS in drawing his inspiration for the BRATZ doll. Were Mattel's
8    copyright claim so predicated it would be barred by this Court's July, 2006, Order,
9    dismissing Bryant's declaratory judgment action. Mattel was pressed on this point
10   during oral argument and conceded that such "exposure" to Mattel "development
11   programs" did not include TOON TEENS. With this representation, nothing in
12   Mattel's proposed copyright claim is barred under the rubric of bad faith.

13        5.    Judicial Economy Considerations

14        In his opposition, Bryant adds an additional reason for denying leave beyond
15   those contained in MGA's papers — the amendment would muddy the waters in the
16   04-9059 by adding "tangential" issues that would only serve to delay resolution of
17   the key issue lying at the heart of the complaint: Who owns the rights to the
18   BRATZ line of dolls. (Bryant Opp. at 2 ). Bryant notes that the case has proceeded
19   apace in moving toward resolving that issue, and the amendment would "transform

20

21   misplaced. As made clear by Mattel, California law allows a plaintiff to substitute in a
22   defendant for a "Doe" if the plaintiff was ignorant of that defendant's identity or
     ignorant of the basis for liability at the time the complaint was filed. See Miller v.
23   Thomas, 121 Cal.App.3d 440 (1981). MGA does not dispute this legal contention
     but at oral argument disputed that Mattel did not know the basis for liability against
24   itself or Mr. Larian due to the "uncanny" similarity between the allegations averred in
25   the original complaint and those now proffered against the two in the amended
     complaint. Specifically, MGA notes that the original complaint spoke of Bryant
26   working for one of Mattel's competitiors and of that employee's theft of Mattel's
     intellectual property before leaving to work for that competitior. At most, all this
27   shows is that Mattel knew that Bryant went to work for MGA, not that MGA or Mr.
28   Larian encouraged Bryant's alleged unlawful behavior recited in the original
     complaint.

                                    16           EXHIBIT _____           **EXHIBIT 16**
                                                                          **PAGE 543**
                                                 PAGE _____

1  what Mattel has always claimed was a straightforward employment action against
2  an individual defendant into a global commercial dispute against Mattel's primary
3  competitor, MGA," that "will last years" thereby "delay[ing]" resolution of who owns
4  BRATZ.[6]  (Bryant Opp. at 2).  Mattel argues that "the law does not deny leave to
5  amend because claims are 'tangential'" and then reiterates its point that some
6  showing of prejudice, namely, seeking leave after expiration of discovery, is
7  necessary.  (Reply to Bryant Opp. at 3).  That is not entirely correct.

8      As noted previously, the Ninth Circuit recently upheld a denial for leave to
9  amend because the amendment would have "drastically changed" the litigation,
10  even though the leave request was tendered before the time, as set forth in a Rule
11  16(b) pre-trial scheduling order, for filing a motion to amend had expired and well
12  before the discovery cut-off.  See AmerisourceBergen Corp. v. Dialysist West, Inc.,
13  465 F.3d 946, 953 (9th Cir. 2006).  In justifying its reasoning the Ninth Circuit cited
14  approvingly to the following statement from a well-respected treatise: "If an
15  amendment substantially changes the theory on which the case has been
16  proceeding and is proposed late enough so that the opponent would be required to
17  engage in significant new preparation, the court may deem it prejudicial."  Id. at 953
18  n.2 (quoting 6 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE,
19  FEDERAL PRACTICE AND PROCEDURE § 1487 (2nd ed. 1990)).  Thus, Dialysist
20  recognized that the introduction of "different legal theories" and/or proof of
21  materially different facts well into the litigation can itself be a basis for finding
22  prejudice regardless of whether the period for discovery has expired (or is even
23  close to expiring) or the parties have already filed summary judgment motions.  Id.
24  at 953-54.

25      Although the parties can safely be said to be at this point well into the

26

27      [6] Bryant also brings intricate legal arguments about the sufficiency of the
28  allegations Mattel has averred in building its RICO claims against him.  Such
considerations are best left to be resolved on a properly filed motion to dismiss.

17                    EXHIBIT

PAGE

EXHIBIT 16
PAGE 544

1  litigation in this consolidated action (as evidenced by the protracted discovery
2  disputes contained in the docket sheet that the parties have had before the
3  magistrate judge and now the special master, and the litigation of motions to
4  dismiss in both the 04-9049 and 04-9059 cases), the fact remains that, as Mattel
5  has made painfully clear in its papers, no scheduling order has been entered in this
6  case.[7] This takes away somewhat from the prejudice <u>Dialysist</u> found to exist when
7  a "drastic change [in a party's] litigation theory" takes place mid-stream in the
8  litigation process. <u>Id</u>. at 953. Simply put, without a schedule for the filing of pre-trial
9  motions and other matters (<u>e.g.</u>, discovery cutoff), the parties have been given free
10 reign in how to conduct the litigation in this case.

11        That the delay in bringing the proposed amendments and the relative length
12 of time into the litigation when those amendments were brought may not neatly fold
13 into <u>Dialysist</u>'s reasoning does not mean that leave must nonetheless be granted.
14 The 04-9059 action, as it is presently constituted, is not a complex one. It asks a
15 rather narrow and straightforward question — Did anything from Bryant's
16 employment at Mattel during the 1999-2000 period give Mattel ownership rights to
17 the BRATZ doll line? The proposed amendments would radically alter the litigation
18 in that case to include far ranging disputes involving multiple parties and concerning
19 events not connected with the BRATZ ownership issue. That the original action
20 was a relatively simple and straight-forward matter raises another point beyond the
21 change in the action's litigation posture — whether entangling the rival doll makers'
22 other commercial disputes into this particular case would serve to muddy the waters
23 and make the matter that much more difficult to manage from the Court's
24 perspective.

25        [7] Mattel's repeated refrain that the matter is in its nascent stage as evidenced
26 by the fact that the parties only just recently exchanged in initial disclosures is
   misleading. The exchange of initial disclosures referred to by Mattel is in the 05-
27 2727 case. With respect to the 04-9059 case it appears that such initial disclosures
   were completed long ago as evidenced by the fact that discovery disputes appeared
28 in that case as far back as January, 2005.

18

EXHIBIT
PAGE

EXHIBIT 16
PAGE 545

1    As has long been recognized, equally important in determining whether to
2  grant such leave is what impact such amendments would have on the court's ability
3  to manage the case. See 3 JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE
4  § 15.15[1] at 15–42.1 to 15–43 (3rd ed. 2006)("A court should also consider judicial
5  economy and its ability to manage the case. . . . The court should also temper the
6  policy favoring freely granting leave to amend with consideration of the ability of the
7  district court to manage the case adequately if amendment is allowed"). As Judge
8  Clark for the Fifth Circuit once observed: "In keeping with the purposes of the rule,
9  the court should consider judicial economy and whether the amendments would
10  lead to expeditious disposition of the merits of the litigation. Finally, the court
11  should consider whether the amendment adds substance to the original allegations,
12  and whether it is germane to the original case of action." Chitimacha Tribe of
13  Louisiana v. Harry L. Laws Co., 690 F.2d 1157, 1163 (5th Cir. 1982); see also
14  Sierra Club v. Union Oil Co. of California, 813 F.2d 1480, 1493 (9th Cir.
15  1987)("General considerations of judicial economy also justify allowing the
16  amendments. The violations included in the proposed amendment relate to the
17  same subject matter as the original complaint. Allowing the amendment will further
18  the federal policy of 'wrapping in one bundle all matters concerning the same
19  subject matter.'").

20    Mattel's amendments do not add substance to the claims contained in its
21  original complaint. Rather, they would expand the universe of claims and
22  defendants stretching well-beyond the questions raised in the original complaint
23  over whether Bryant's conduct while in the employ of Mattel subjected his later
24  attributed creation of the BRATZ dolls to the provisions in Mattel's Inventions
25  Agreement or otherwise rendered his creation subject to an infringement action.
26  Nowhere does Mattel seek to reconcile the breadth of its present amendments with
27  the narrowness of the allegations contained in its original complaint. In fact, the
28  precise opposite is true. Mattel acknowledges that its proposed amendments bear

19

EXHIBIT

PAGE

EXHIBIT 16
PAGE 546

1  more congruity to the allegations leveled against it in MGA's Lanham Act case than

2  to those in the action to which it seeks to add them:

> [M]any of the matters raised by Mattel's proposed
> Amended Complaint are and will remain at issue
> because of MGA's Complaint, whether or not leave to
> amend is granted. MGA's claims allege that a broad
> array of purported Mattel conduct across the globe,
> starting at least as early as 1999, has violated the
> Lanham Act and unfair competition law. This includes
> Mattel's alleged infringement of Bratz and other MGA
> products. As a result, issues in the proposed Amended
> Complaint are already part and parcel of Mattel's
> defenses to MGA's unfair competition claims, including
> because they show that MGA and Bryant, and not
> Mattel, are ones who stole the products and other
> properties involved.

11  (Reply to Bryant Opp. at 7 (emphasis added)). Mattel apparently finds this

12  discongruity unimportant because "all of these matters have been consolidated with

13  the Bryant case." (Id. at 7). As noted earlier, the fact that the cases have been

14  consolidated does not mean that the parties can ignore the distinctions that still

15  exist between them. If, as Mattel acknowledges, the present amendments are

16  nothing more than re-formulated defenses and counterclaims it presently has to

17  MGA's complaint against it in the 05-2727 case, then such amendments should be

18  brought in the form of an amended answer and counterclaim in that case.

19      Consideration of the distinctions between the two cases is wise as it serves

20  as a useful tool in providing the Court a better means to manage the cases now

21  that they have been consolidated. The proverbial dog (ownership in BRATZ)

22  should be wagging the proverbial tail (the remaining commercial disputes), not the

23  other way around. Admittedly, the dog's tail has grown in size both by MGA's filing

24  of its complaint in the 05-2727 action and Mattel's response thereto through its

25  proposed amendments. Nonetheless, it is readily apparent to the Court that the

26  crown jewel in this action still remains the ownership rights to the BRATZ dolls. The

27  parties have engaged in extensive and undoubtedly expensive discovery on this

28  very issue (from hiring world-renowned experts to test the age of Bryant's design

20

EXHIBIT _____

PAGE _____

EXHIBIT 16
PAGE 547

1   drawings to technically complex discovery of what is on each other's computers).

2        Indeed the separateness of the two matters is reflected in how the cases are
3   currently structured, namely, the narrowness of the issue involved in 04-9059 and
4   the expansiveness of the facts at issue in 05-2727. In light of this fact, the Court
5   believes a two-track scheduling order wherein the 04-9059 matter's discovery cut
6   off and trial date are set well-ahead of those in 05-2727 makes the most sense. As
7   noted earlier, many of the legal claims being pressed in 05-2727 will be affected by
8   the result of the litigation in 04-9059. If, for instance, Mattel does own the rights to
9   the BRATZ dolls (either owing to Bryant's stealing his idea from one of Mattel's
10  "development programs" or by way of the Inventions Agreement because he
11  continued to work on his designs while at Mattel), then large portions of MGA's
12  Lanham Act infringement claims may become moot. By the same token, if Mattel
13  does not own rights to BRATZ, then some of the defenses and counterclaims set
14  forth as independent claims in the present amended complaint may become moot,
15  including Mattel's copyright infringement claim as well as portions of its remaining
16  RICO, misappropriation, and aiding and abetting claims. If, however, the Court
17  were to allow the amended complaint to be filed in the 04-9059 action, such case
18  management would be difficult, if not impossible as many of the issues being
19  litigated in the 05-2727 case would have been poured into the 04-9059 case by the
20  amendment. Due to this substantial overlap in claims and facts, a two-track
21  scheduling order utilizing the case number distinctions would be impossible to craft.
22  When pressed by the Court at oral argument as to which of its proposed claims it
23  believed would not undermine the BRATZ ownership posture of the 04-9059 case,
24  Mattel cited to its copyright and RICO claims. However, upon further questioning
25  by the Court, counsel for Mattel acknowledged that much of those claims were, like
26  the claims at issue in 05-2727, dependent upon resolution of the ownership issue.

27        In light of the burden allowing Mattel's amendment to proceed would have on
28  this Court's ability to efficiently manage these consolidated matters denial of

21

EXHIBIT
PAGE

**EXHIBIT 16
PAGE 548**

1   Mattel's request to amend its complaint in the 04-9059 matter is justified. <u>See</u>

2   <u>Perrian v. O'Grady</u>, 958 F.2d 192, 195 (7th Cir. 1992)("The burden to the judicial

3   system can justify a denial of a motion to amend 'even if the amendment would

4   cause no hardship at all to the opposing party'"). Buttressing the Court's decision is

5   the fact that, even with such a denial, Mattel may file (and the Court provides leave

6   to Mattel to so file) an amended answer and counterclaim in the 05-2727 case

7   raising all the new claims and defendants presently sought to be achieved through

8   amendment of its complaint in the 04-9059 action. None of the substantive

9   concerns raised by MGA and Bryant to the present amended complaint, <u>e.g.</u>,

10  statutes of limitations, would appear to be affected if the new claims and

11  defendants were brought as defenses and counterclaims in the 05-2727 case as

12  opposed to the 04-9059 one.

13      Accordingly, the Court GRANTS Mattel's motion for leave to file its proposed

14  amendments, but only insofar as they are pled in the form of an amended answer

15  and counterclaim in the 05-2727 case.

16      Finally, the lack of a scheduling order in this case is problematic; one should

17  have been entered long ago. <u>See</u> Fed. R. Civ. P. 16(b)(noting that a scheduling

18  "order shall issue as soon as practicable but in any event within 90 days after the

19  appearance of a defendant and within 120 days after the complaint has been

20  served on a defendant"). In light of the fact that entry of a scheduling order is

21  woefully overdue in this case, the Court hereby ORDERS that a Rule 16(b)

22  scheduling conference be held in this consolidated matter on February 12, 2007, at

23  1:30 p.m. in Courtroom One. The parties are directed to file a Joint Rule 26(f)

24  report with the Court by February 5, 2007.

25      IT IS SO ORDERED.

26  DATE: _/-//- 0 7_

27

28  STEPHEN G. LARSON
    UNITED STATES DISTRICT JUDGE

                            22          EXHIBIT _____

                                        PAGE _____

EXHIBIT 16
PAGE 549

EXHIBIT 17

**SEND**

## UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA - Eastern Division
#### CIVIL MINUTES - GENERAL

Case No.   CV 04-09059 SGL(RNBx)                    Date:  February 12, 2007
Title:   MATTEL, INC. -v- CARTER BRYANT, DOES 1-10, INCLUSIVE
         **Consolidated Action**
         CV 05-02727 SGL(RNBx)   MGA ENTERTAINMENT v. MATTEL, INC.,
==================================================================

PRESIDING: HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

Jim Holmes                           Theresa Lanza
Courtroom Deputy Clerk               Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:    ATTORNEYS PRESENT FOR DEFENDANTS:

John B. Quinn and Michael Zeller for   Diana M. Torres for MGA
Mattel                                 Keith A. Jacoby for Carter Bryant

PROCEEDINGS:   SCHEDULING CONFERENCE PURSUANT TO FRCP 16(b)

The Court convened a scheduling conference pursuant to FRCP 16(b).  Court and counsel discussed case management and thereafter the court set the following schedule:  See attachment "Schedule of Trial and Pretrial Dates."

Counsel stipulated pursuant to Local Rule 16-14, to settlement procedure #3, to a retired judicial officer or other private or non-profit dispute resolution body for mediation type settlement proceedings. The Court approves the request and refers this case to an outside Mediator to act as the Settlement Officer.  Counsel are directed to contact such outside Mediator to schedule a settlement conference as soon as the parties believe such a conference would be fruitful. The cut-off to complete the mandatory settlement procedures under Local Rule 16-14, is December 3, 2007, in Case No. CV 04-09059-SGL (RNBx) Mattel, Inc. v. Carter Bryant, and the cut-off to complete the mandatory settlement procedures under Local rule 16-14, is April 21, 2008, in Case No. CV 05-02727 SGL (RNBx) MGA Entertainment v. Mattel, Inc.

The Court further ordered that in both Case No. CV 04-09049-SGL (RNBx), Mattel, Inc. v. Carter Bryant, and Case No. CV 05-02727 SGL (RNBx), MGA Entertainment v. Mattel, Inc.:

1.   Non-Expert Depositions are limited to a total of 24 for each side for both cases.
2.   Expert Depositions are limited to a total of 20 for each side for both cases.
3.   Interrogatories are limited to 50 for each side for both cases.

IT IS SO ORDERED.

MINUTES FORM 90                                          Initials of Deputy Clerk: jh
CIVIL — GEN                    FEB 2 2 '0      00/30
                       Page 1

2-12-07

EXHIBIT 17
PAGE 550

## SCHEDULE OF TRIAL AND PRETRIAL DATES

**CASE NAME:**    CARTER BRYANT -v- MATTEL, INC., CASE NO: CV 04-09059-SGL(RNBx)

(Consolidated Case No: CV 05-2727-SGL(RNBx), MGA Entertainment, Inc. v. Mattel, Inc., et al.)

| Matter | Time | Court Order |
|---|---|---|
| Jury Trial Date | 9:30 am | 02/12/08 |
| Estimated Length of Trial | | |
| [Hearing on Motions in Limine; Hearing on Disputed Jury Instructions | 10:00 am | 02/04/08 |
| Final Pretrial Conference, LR 16-7 Motions in Limine to be filed | 11:00 am | 01/14/08 |
| Lodge Pretrial Conference Order, LR 16-6 to 16-6.2; File Contentions of Fact and Law, LR16-2.8; Exhibit & Witness Lists, LR 16-4 to 16-5; File Status Report regarding Settlement; File Rule 26(e)(1) Supplementation File Agreed Upon Set of Jury Instructions and Verdict Forms LR 49-1 to 49-2, 51-1 to 51-5.1; File Joint Statement regarding Disputed Instructions, Verdicts, etc. | | 12/31/07 |
| Last date to conduct Settlement Conference | | 12/03/07 |
| Last date for hearing motions, LR 7.2, et seq. | 10:00 am | 11/19/07 |
| Discovery cut-off | | 10/22/07 |
| Last date to Amend Pleadings or Add Parties | | Closed |

### ADDITIONAL MATTERS TO BE DETERMINED AT SCHEDULING CONFERENCE

LR 16-14.4 Settlement Selection:
to be discussed

☐ 1. CT/USMJ          ☑ 3. Outside ADR

☐ 2. Attorney Settlement Panel          ☐

DOE Dismissal:          Complaint Filed: 04/13/05          SET DATE

Dismissal Date:          to be discussed

S:\SGL\CIVIL ORDERS\Mattel 04-09059 MO 2-12-07 wpd

**EXHIBIT 17**
**PAGE 551**

CALENDARED

RECEIVED

FEB 2 3 2007

SEND

1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9       CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

10

11  MATTEL, INC.,                        Case No. CV 04-09059 SGL (RNBx)

12              Plaintiff,               SCHEDULING ORDER [FRCP 16(b)]

13       v.                              1.   Establishing a Discovery Cut-off Date of
                                              October 22, 2007
14  CARTER BRYANT, DOES 1-10,
    INCLUSIVE,                           2.   Non-Discovery Motion Hearing Cutoff
15                                            date of November 19, 2007, at 10:00
                Defendants.                   a.m.
16
                                         3.   Setting Final Pretrial Conference for
17                                            January 14, 2008, at 11:00 a.m.

18                                       4.   Setting Jury Trial Date of February 12,
                                              2008, at 9:30 a.m.
19

20

21      READ THIS ORDER CAREFULLY.  IT CONTROLS THE CASE

22      AND DIFFERS IN SOME RESPECTS FROM THE LOCAL RULES.

23

24      The above matter is set for trial before the Honorable Stephen G. Larson,

25  United States District Judge, Courtroom 1, United States District Court, Eastern

26  Division, 2nd Floor, Riverside, California.

                                              FEB 2 2 2007
27

28      1.      **Discovery Cut-Off:**  This is the last date to complete discovery, including
    expert discovery, and the resolution of any discovery motions before this court.  If

EXHIBIT 17
PAGE 552

1  expert witnesses are to be called at trial, the parties shall designate experts to be called
2  at trial and provide reports required by Fed. R. Civ. P. 26(a)(B), not later than eight
3  weeks prior to the discovery cutoff date. Rebuttal expert witnesses shall be designated
4  and reports provided as required by Fed.R.Civ.P. 26(a)(2)(B), not later than five weeks
5  prior to the discovery cutoff date. Failure to timely comply with this deadline may result
6  in the expert being excluded at trial as a witness. The Court requires compliance with
7  Local Rule 37-1 and 37-2 in the preparation and filing of discovery motions. Discovery
8  motions may not be heard on an ex parte basis.

9      2.      **Joinder of Parties and Amendment of Pleadings:**  This deadline does
10  not apply if the deadline for joining parties or amending pleadings has already been
11  calendared or occurred by virtue of an order issued by another Judge.

12      In addition to the requirements of Local Rule 15-1, all motions to amend the
13  pleadings shall (a) state the effect of the amendment; (b) be serially numbered to
14  differentiate the amendment from previous amendments and (c) state the page, line
15  number(s), and wording of any proposed change or addition of material.

16      3.      **Motion Filing Cut-Off:**  The Court hears motions on Mondays at 10:00
17  a.m. The motion filing cut-off date is the last day motions may be heard (not filed). The
18  Court will not decide late motions. Issues left undetermined by the passage of the
19  motion cut-off date should be listed as issues for trial in the Final Pretrial Conference
20  Order. As an exception to the above, motions in limine dealing with evidentiary matters
21  may be heard at or before trial; however, summary judgment motions disguised as
22  motions in limine will not be heard. Parties need not wait until the discovery cut-off to
23  bring motions for summary judgment or partial summary judgment. However, in the
24  usual case, the court expects that more than the minimum notice will be provided to
25  counsel opposing motions for summary judgment. In the usual case, the parties should
26  confer and agree on the date for setting such motions.

27

28

2

**EXHIBIT 17**
**PAGE 553**

1    Ex parte applications are entertained solely for extraordinary relief. See Mission
2    Power Eng. Co. v. Continental Casualty Co., 883 F.Supp. 488 (C.D. Cal. 1995). Strict
3    adherence to proper ex parte procedures is required for any ex parte application filed
4    with the Court.

5       4.   **Stipulations to Extend Time:** Stipulations to extend the time to file any
6    required document or to continue any pretrial or trial date must set forth (a) the existing
7    due date or hearing date; (b) the current pretrial conference date and trial date; (c) the
8    specific reasons supporting good cause for granting the extension or continuance; and
9    (d) whether there have been any prior requests for extensions or continuances, and
10   whether these were granted or denied by the Court.

11      5.   **Summary Judgment Motions:** The Separate Statement of Undisputed Facts
12   is to be prepared in a two-column format. The left-hand column should set forth the
13   allegedly undisputed fact. The right-hand column should set forth the evidence that
14   supports the factual statement. The fact statements should be set forth in sequentially
15   numbered paragraphs. Each paragraph should contain a narrowly focused statement
16   of fact. Each numbered paragraph should address a single subject in as concise a
17   manner as possible.

18      The opposing party's statement of genuine issues must be in two columns and
19   track the movant's separate statement exactly as prepared. The document must be in
20   two columns; the left-hand column must restate the allegedly undisputed fact, and the
21   right-hand column must indicate either undisputed, or disputed. The opposing party
22   may dispute all or only a portion of the statement, but if disputing only a portion, must
23   clearly indicate what part is being disputed. Where the opposing party is disputing the
24   fact in whole or part, the opposing party must, in the right-hand column, label and
25   restate the moving party's evidence in support of the fact, followed by the opposing
26   party's evidence controverting the fact. Where the opposing party is disputing the fact
27   on the basis of an evidentiary objection, the party must cite to the evidence alleged to
28

3

EXHIBIT 17
PAGE 554

1  be objectionable and state the ground of the objection and nothing more. **No**
2  **argument should be set forth in this document.**

3      The opposing party may submit additional material facts that bear on or relate to
4  the issues raised by the movant, which shall follow the format described above for the
5  moving party's separate statement.  These additional facts shall follow the movant's
6  facts, shall continue in sequentially numbered paragraphs (i.e., if movant's last
7  statement of fact was set forth in paragraph 30, then the first new fact will be set forth in
8  paragraph 31), and shall set forth in the right hand column the evidence that supports
9  that statement.

10      The moving party, in its reply, shall respond to the additional facts in the same
11  manner and format that the opposition party is required to adhere to in responding to
12  the
13  statement of undisputed facts, as described above.

14      **(a)  Supporting Evidence:** No party should submit any evidence other than
15  the specific items of evidence or testimony necessary to support or controvert a
16  proposed statement of undisputed fact.  Thus, for example, the entire transcript of a
17  deposition, entire sets of interrogatory responses, and documents that do not
18  specifically support or controvert material in the separate statements, should not be
19  submitted in support or opposition to a motion for summary judgment.  Any such
20  material will not be considered.

21      Evidence submitted in support of or in opposition to a motion should be
22  submitted either by way of stipulation or as exhibits to declarations sufficient to
23  authenticate the proffered evidence, and should not be attached to the Memorandum of
24  Points and Authorities.  The Court will accept counsel's authentication of deposition
25  transcript, of written discovery responses, and of the receipt of documents in discovery
26  if the fact that the document was in the opponent's possession is of independent
27  significance.  Documentary evidence as to which there is no stipulation regarding
28

<div align="center">4</div>

EXHIBIT 17
PAGE 555

1  foundation must be accompanied by the testimony, either by declaration or properly
2  authenticated deposition transcript, of a witness who can establish its authenticity.
3      If evidence in support of or in opposition to a motion exceeds twenty pages, the
4  evidence must be in a separate bound volume and include a Table of Contents.
5      (b) **Objections to Evidence:** If a party disputes a fact based in whole or in
6  part  on an evidentiary objection, the ground of the objection, as indicated above,
7  should be  stated in the separate statement but not argued in that document.
8  Evidentiary objections  are to be addressed in a separate memorandum to be filed with
9  the opposition or reply brief of the party.  This memorandum should be organized **to**
10 **track the paragraph numbers of the separate statement in sequence**.  It should
11 identify the specific item of evidence to which objection is made, the ground of the
12 objection, and a very brief argument with citation to authority as to why the objection is
13 well taken.  The following is an example of the format contemplated by the Court:
14      Separate Statement Paragraph 1:  Objection to the supporting deposition
15      transcript of Jane Smith at 60:1-10 on the grounds that the statement
16      constitutes inadmissible hearsay and no exception is applicable.  To the
17      extent it is offered to prove her state of mind, it is irrelevant since her state of
18      mind is not in issue.
19      Fed. R. Evid. 801, 802.
20      Do not submit blanket or boilerplate objections to the opponent's statements of
21 undisputed fact: these will be disregarded and overruled.
22      (c) **The Memorandum of Points and Authorities:**  The movant's
23 memorandum of points and authorities should be in the usual form required under
24 Local Rule 7-5 and should contain a narrative statement of facts as to those aspects of
25 the case that are before the Court. All facts should be supported with citations to the
26 paragraph number in the  Separate Statement that supports the factual assertion and
27 not to the underlying evidence.
28

5

EXHIBIT 17
PAGE 556

1          Unless the case involves some unusual twist on Rule 56, the motion need
2   only
3   contain a brief statement of the Rule 56 standard;  the Court is familiar with the Rule
4   and
5   with its interpretation under Celotex and its progeny. If at all possible, the argument
6   should be organized to focus on the pertinent elements of the cause(s) of action or
7   defense(s) in issue, with the purpose of showing the existence or non-existence of a
8   genuine issue of material fact for trial on that element of the claim or defense.
9          Likewise, the opposition memorandum of points and authorities should be in
10  the
11  usual form required by Local Rule 7-5, and where the opposition memorandum sets
12  forth facts, the memorandum should cite to paragraphs in the separate statement if
13  they are not in dispute, to the evidence that contravenes the fact where the fact is in
14  dispute or, if the fact is contravened by an additional fact in the statement of genuine
15  issues, the citation should be to such fact by paragraph number.
16          **(d) Timing:** In virtually every case, the Court expects that the moving party
17  will provide more than the minimum twenty-one (21) day notice for such motions. The
18  moving party should deliver to chambers a copy of a diskette, in WordPerfect format
19  (11.0 or earlier versions), containing the Statement of Uncontroverted Facts and
20  Conclusions of Law.
21      6.  **Motions in Limine:** The parties must file motions in limine addressing the
22  admissibility of evidence in accordance with Local Rule 7-3.  The parties shall file their
23  opposing and reply papers in accordance with Local Rules 7-9 and 7-10 respectively.
24      7.  **Pretrial Conference and Trial Setting:** Compliance with the requirements of
25  Local Rule 16 is mandatory.  Counsel shall submit carefully prepared Memoranda of
26  Contentions of Fact and Law (which may also serve as the trial briefs) and Proposed
27  Pre-Trial Conference Order ("PTCO") in accordance with the provisions of Local Rules
28  16-2.8 through 16-6. The Proposed Pre-Trial Conference Order shall conform to the

6

**EXHIBIT 17**
**PAGE 557**

1 | example set forth in Appendix A to the Local Rules, modified as necessary to comply
2 | with this order.                    The Memoranda of Contentions of Fact and Law, Exhibit
3 | Lists, and Witness Lists shall be served and filed no later than fourteen (14) calendar
4 | days before the Pre-Trial Conference. The Proposed Pre-Trial Conference Order shall
5 | be lodged fourteen (14) calendar days before the Pre-Trial Conference.

6 |            The Proposed Pre-Trial Conference Order must contain a Table of Contents.
7 | Place in all capital letters and in bold the separately numbered headings for each
8 | category in the PTCO. Under paragraph 1, list each claim, counterclaim, or defense
9 | that has been dismissed or abandoned. In multiple-party cases where not all claims or
10 | counterclaims will be prosecuted against all remaining parties on the other side, please
11 | specify to which party each claim or counterclaim is directed. The factual issues in
12 | dispute should track the elements of a claim or defense upon which the jury would be
13 | required to make findings. Counsel should state issues in ultimate fact form, not as
14 | evidentiary fact issues (i.e., "was the defendant negligent," "was defendant's negligence
15 | the proximate cause of plaintiff's injury;" not "was the plaintiff standing on the corner of
16 | 12th Street and Lemon Avenue at 10:00 a.m. on March 1"). Issues of law should state
17 | legal issues upon which the Court will be required to rule after the Pre-Trial Conference,
18 | including during the trial, and should not list ultimate fact issues to be submitted to the
19 | trier of fact.

20 |            In drafting the PTCO, the court expects that counsel will attempt to agree on
21 | and set forth as many non-contested facts as possible. The court will normally read the
22 | uncontested facts to the jury at the start of the trial. Carefully drafted and
23 | comprehensively stated stipulation of facts will reduce the length of trial and increase
24 | jury understanding of the case.

25 |            If expert witnesses are to be called at trial, each party must list and identify its
26 | respective expert witnesses, both retained and non-retained. Failure of a party to list
27 | and identify an expert witness in the Proposed Pre-Trial Conference Order shall
28 | preclude a party from calling that expert witness at trial.

7

EXHIBIT 17
PAGE 558

1        This case has been placed on calendar for a Final Pretrial Conference ("PTC")

2  pursuant to Fed. R. Civ. P. 16 and Local Rule 16-1, unless the PTC was expressly

3  waived at the Scheduling Conference by the court. Unless excused for good cause,

4  each party appearing in this action shall be represented at the PTC and all pretrial

5  meetings of counsel, by lead trial counsel. The failure to attend the PTC or to submit

6  the required pretrial documents may result in the dismissal of the action, striking the

7  answer and entering a default, and/or the imposition of sanctions.

8        A continuance of the Final Pretrial Conference at counsel's request or

9  stipulation will only be approved upon a showing of good cause. Counsel should plan

10 to do the necessary pretrial work on a schedule which will insure its completion with

11 time to spare before the Final Pretrial Conference. Specifically, failure to complete

12 discovery work, including expert discovery, is not a ground for a continuance.

13       Compliance with the requirements of Local Rules 16-1 to 16-13 is required by

14 the court. Carefully prepared Memoranda of Contentions of Fact (which may also serve

15 as the trial brief) and a proposed Final Pretrial Conference Order shall be submitted in

16 accordance with the provisions of Local Rule 16-6 and the form of the proposed Final

17 Pretrial Conference Order shall be in conformity with the format set forth in Appendix A

18 to the Local Rules.

19       At the PTC, counsel should be prepared to discuss means of streamlining the

20 trial, including, but not limited to: bifurcation, presentation of non-critical testimony by

21 deposition excerpts, stipulations as to the content of testimony, presentation of

22 testimony on direct examination by declaration subject to cross-examination, and

23 qualification of experts by admitted resumes. In certain cases where the PTC is waived

24 by the court, counsel must follow Local Rule 16-10.

25    **8.  Witness List and Times Estimates:** Counsel shall prepare a list of their

26 witnesses, an estimate of the length of time needed for direct examination for each

27 witness, and whether the witness will testify by deposition or in person. Counsel shall

28

8

EXHIBIT 17
PAGE 559

1   exchange these lists with opposing counsel.[1]  **Counsel shall jointly file a single**
2   **witness list, including estimates for direct examination of their own witnesses**
3   **and estimates for cross-examination of opposing witnesses.**  This list shall be filed
4   at the time counsel lodge the Proposed Pre-Trial Conference Order, i.e., fourteen (14)
5   days before the Pre-Trial Conference.

6       9.   <u>Jury Instructions and Verdict Forms:</u>  Fourteen (14) calendar days prior to
7   counsel's Rule 16 pre-trial meeting, counsel shall exchange proposed jury instructions
8   (general and special) and special verdict forms (if applicable).  Seven (7) calendar days
9   prior to the Rule 16-2 meeting, counsel shall exchange any objections to the
10  instructions and special verdict forms.  Prior to, or at the time of the Rule 16 meeting,
11  counsel shall meet and confer with the goal of reaching agreement on one set of joint
12  jury instructions and one special verdict form.

13          The parties should make every attempt to agree upon the jury instructions
14  before submitting them to the Court.  The Court expects counsel to agree on the
15  substantial majority of jury instructions, particularly when pattern instructions provide a
16  statement of applicable law.  When the Manual of Model Civil Jury Instructions for the
17  Ninth Circuit provides a version of an applicable requested instruction, the parties
18  should submit the most recent version of the Model instruction.  Where language
19  appears in brackets in the model instruction, counsel shall select the appropriate text
20  and eliminate the inapplicable bracketed text.  Where California law applies, counsel
21  should use <u>California Jury Instructions – Civil</u> (8th ed.) ("BAJI").  If neither of the above
22  sources is applicable, counsel are directed to use the instructions from O'Malley, Grenig
23  & Lee (formerly Devitt, <u>et al.</u>), <u>Federal Jury Practice and Instructions</u> (latest edition).
24  Each requested jury instruction shall cover only one subject or principle of law and shall
25  be numbered and set forth in full on a separate page, citing the authority or source of
26  the requested instruction (except for the "clean" jury copy discussed below).

27

28    [1]  <u>See</u> "Joint Trial Witness Estimate Form" appended to this order.

**EXHIBIT 17**
**PAGE 560**

1       When the parties disagree on an instruction, the party opposing the instruction

2  must attach a short statement (one to two paragraphs) supporting the objection, and

3  the party  submitting the instruction must attach a short statement supporting the

4  instruction.  Each statement should be on a separate page and should follow directly

5  after the disputed  instruction.

6       The parties ultimately must submit one document or, if the parties disagree

7  over any proposed jury instructions, two documents.  If the parties submit two

8  documents, those documents shall consist of: (a) a set of Joint Proposed Jury

9  Instructions and (b) a set of Disputed Jury Instructions, along with reasons supporting

10  and opposing each disputed instruction in the format set forth in the previous

11  paragraph.

12       The parties must file proposed jury instructions fourteen (14) calendar days

13  before the Pre-Trial Conference.  If the court is closed that day, counsel shall file the

14  proposed instructions the preceding Friday.  No later than 4:00 p.m. on the date such

15  instructions are due, the parties must submit conformed courtesy copies to the Court's

16  courtesy box located outside the entrance to Courtroom 1, United States District Court,

17  3470 Twelfth Street, 2nd Floor, Riverside, California.  Counsel shall also provide the

18  Court with a 3½ inch diskette compatible with WordPerfect version 11.0 or lower

19  containing the proposed jury instructions, in accordance with this paragraph and the

20  previous paragraph.

21       The Court will send a copy of the instructions into the jury room for the jury's

22  use during deliberations.  Accordingly, in addition to the file copies described above, the

23  diskette submitted with the jury instructions shall contain a "clean set" of Joint Proposed

24  and/or Disputed Jury Instructions, containing only the text of each instruction set forth in

25  full on each page, with the caption "Court's Instruction No. ___" (eliminating titles,

26  supporting authority, indication of party proposing, etc.).

27       An index page shall accompany all jury instructions submitted to the Court.

28  The index page shall indicate the following:

10

EXHIBIT 17
PAGE 561

(a) The number of the instruction;

(b) A brief title of the instruction;

(c) The source of the instruction and any relevant case citations; and

(d) The page number of the instruction.

EXAMPLE:

| Number | Title | Source | Page |
|--------|-------|--------|------|
| 1 | Trademark-Defined (15 U.S.C. § 1127) | 9th Cir. 15.3.2 | 7 |

Along with the jury instructions, counsel shall submit any necessary special verdict form fourteen (14) calendar days before the Pre-Trial Conference.

10. **Voir Dire Questions:** Counsel may, but need not, submit brief proposed voir dire questions for the jury at the Pre-Trial Conference. The Court will conduct its own voir dire after consulting any proposed voir dire submitted by counsel. After the Court conducts its own voir dire, counsel will be provided an opportunity to ask supplemental questions subject to Court approval.

11. **Joint Statement of the Case:** Counsel shall submit a joint statement of the case at the Pretrial Conference. The joint statement of the case will be read to the prospective panel of jurors prior to the commencement of voir dire. The statement should not exceed one page. The statement shall be filed with the Court no later than 4:00 p.m., on the Wednesday prior to the Pre-Trial Conference.

12. **Exhibits:** The parties shall file their witness lists and exhibits lists in accordance with Local Rule 16. Counsel are to assemble their exhibits by placing them in three-ring binders labeled on the spine portion of the binder showing both the volume number and the exhibit numbers. Each exhibit shall be separated by a tabbed divider on the right side. Counsel shall provide original exhibits for the courtroom deputy clerk and a duplicate set for the judge. The original exhibits shall be tagged with the appropriate exhibit tags in the upper or lower right corner of the first page of each exhibit and include the case number, case name, and exhibit number. Each binder

11

EXHIBIT 17
PAGE 562

1  shall contain a Table of Contents. Counsel must comply with Local Rule 26-4 when

2  numbering the exhibits. The Clerk's Office, located at the United States District Court,

3  3470 Twelfth Street, Riverside, California can supply counsel with appropriate exhibit

4  tags.

5      The Court requires the following to be submitted to the courtroom deputy clerk

6  on the first day of trial: (a) The original exhibits with the Court's exhibit tags; (b) one

7  bench book with a copy of each exhibit for the Court's use, tabbed as described above;

8  (c) three (3) copies of exhibit lists and a floppy disk containing the exhibit list; (d) three

9  (3) copies of witness lists in the order in which the witnesses will be called to testify; and

10  (e) file a Notice of Lodging of Deposition Transcripts (original and 2 copies) and Lodge

11  all anticipated trial deposition transcripts directly with the deputy clerk in the courtroom.

12      All counsel are to meet no later than ten (10) calendar days before trial to

13  discuss and agree to the extent possible on issues including foundation and

14  admissibility.

15      **13. Pre-Trial Exhibit Stipulation:** The parties shall prepare a Pre-Trial Exhibit

16  Stipulation which shall contain each party's numbered list of trial exhibits, with

17  objections, if any, to each exhibit including the basis of the objection and the offering

18  party's response. All exhibits to which there is no objection shall be deemed admitted.

19  All parties shall stipulate to the authenticity of exhibits whenever possible, and the Pre-

20  Trial Exhibit Stipulation shall identify any exhibits whose authenticity has not been

21  stipulated to and the specific reasons for the party's failure to stipulate.

22      The Stipulation shall be substantially in the following form:

23                    Pre-Trial Exhibit Stipulation

24  Plaintiff's Exhibits

25  Number     Description        Objection        Response to Question

26

27  Defendant's Exhibits

28  Number     Description        Objection        Response to Question

                              12

EXHIBIT 17
PAGE 563

1

2      The Pre-Trial Exhibit Stipulation shall be filed at the same time as counsel lodges

3 the Proposed Pre-Trial Conference Order. Failure to comply with this paragraph may

4 constitute a waiver of all objections.

5      **14. Findings of Fact and Conclusions of Law:** For a non-jury trial, counsel for

6 each party shall lodge proposed findings of fact and conclusions of law fourteen (14)

7 days before trial. The parties should deliver to chambers a copy of these findings and

8 conclusions of law on disk in WordPerfect format.

9             (a)    Underline in red the portions which it disputes;

10             (b)    Underline in blue the portions which it admits; and

11             (c)    Underline in black the portions which it deems not disputed, but

12                    deems irrelevant.

13      Counsel may agree with a part of a finding or conclusion, disagree with a part

14 of it and/or consider a part of irrelevant.

15      Two marked copies of opposing counsel's proposed findings of fact and

16 conclusions of law shall be lodged with the court seven (7) days before trial and one

17 marked copy shall be served on opposing counsel. Courtesy copies of the marked

18 copies shall be deposited in the drop box located outside the entrance of Courtroom 1

19 of the above-entitled court on the date due.

20      **15. Settlement:** Local Rule 16-14.2 provides that the Settlement Conference

21 shall be conducted not later than 45 days before the Pretrial Conference. The Court

22 believes that in most cases completion of all discovery and dispositive motions will help

23 the parties assess their positions before they embark on the costly pre-trial process.

24 However, in many cases, the parties find it more difficult to settle after they have

25 incurred the cost of all discovery and motion practice. Accordingly, the Court strongly

26 encourages counsel and the parties to pursue settlement earlier.

27      The Court has a keen interest in helping the parties achieve settlement. If the

28 parties believe that it would be more likely that a settlement would be reached if they

13

**EXHIBIT 17 PAGE 564**

1   conduct settlement conference at an earlier time than that specified by the Court, they
2   should conduct it at that time.  In any event, the parties must file a Status Report re
3   Settlement at the time they lodge the Proposed Pretrial Order.

4       The Court will not conduct settlement conferences in non-jury cases which the
5   Court will try.  In jury cases, the Court will conduct a settlement conference at the
6   parties' request if three conditions exist: (a) The parties are satisfied that the fact issues
7   in the case will be tried to a jury; (b) all significant pre-trial rulings which Court must
8   make have been made; and (c) the parties desire the Court to conduct the conference,
9   understanding that if settlement fails, the Court will preside over the trial of the case.

10      **If a settlement is reached, it shall be reported immediately to this Court as**
11  **required by Local Rule 16-14.7.**

12      16.  The failure to attend the pretrial conference or to submit timely in conformity
13  with the format set forth in this order, the jury instructions, pre-trial exhibit stipulation,
14  joint statement of the case, voir dire questions, summary of witness testimony and
15  times estimates, proposed Pretrial Conference Order or the memorandum of
16  contentions of fact and law may result in the dismissal of the action, striking the answer
17  and entering default and/or the imposition of sanctions.

18      **17.  Telephonic Status Conference:**

19      Telephonic status conferences are sometimes set by the court to discuss
20  settlement status and other pending issues.  If a telephonic status conference has been
21  set, all counsel are ordered to discuss the matter with their clients and opposing
22  counsel before the telephonic status conference.  Plaintiff's counsel must make the
23  arrangements and place the conference call.  Plaintiff's counsel shall include all counsel
24  of record and the Court on the date and time scheduled.  The conference operator is to
25  place the final call to the Court at (951) 328-4410.  To assist the Court and staff,
26  participants shall identify themselves each time they speak.  No cellular telephones or
27  speaker telephones will be allowed.

28

<p style="text-align:center;">14</p>

**EXHIBIT 17**
**PAGE 565**

1                             **Internet Site**

2        Counsel are encouraged to review the Central District's website for additional

3    information. The address is "http: //www.cacd.uscourts.gov"

4

5        The courtroom deputy clerk is ordered to serve a copy of this Order by mail,

6    facsimile or e-mail on counsel for all parties to this action.

7

8        IT IS SO ORDERED.

9    Dated: ___FEB 2 1 2008___

10

11

12

13                            STEPHEN G. LARSON
                                UNITED STATES DISTRICT JUDGE

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

15

**EXHIBIT 17**
**PAGE 566**

Joint Trial Witness Estimate Form

Case: _____                                    Trial Date: _____

| | WITNESS NAME | PARTY CALLING WITNESS AND ESTIMATE | X-EXAMINER'S ESTIMATE | DESCRIPTION OF TESTIMONY | COMMENTS |
|---|---|---|---|---|---|
| 1. | | | | | |
| 2. | | | | | |
| 3. | | | | | |
| 4. | | | | | |
| 5. | | | | | |
| 6. | | | | | |
| 7. | | | | | |
| 8. | | | | | |
| 9. | | | | | |
| 10. | | | | | |
| 11. | | | | | |
| 12. | | | | | |
| | Total Estimates This Page: | | | | |

**Instructions:**
(1) List witnesses (last name first); (2) For description, be extremely brief, e.g., "eyewitness to accident." Or "expert on standard of care"(3) Use estimates within fractions of an hour, rounded off to the closest quarter of an hour, e.g., if you estimate 20 minutes, make it .25. An estimate of one and one-half hours would be 1.5. An estimate of three-quarters of an hour would be .75; (4) Note special factors in "Comments" column. e.g., "Needs Interpreter." (5) Entries may be in handwriting if very neat and legible.

-16-

EXHIBIT 17
PAGE 567

EXHIBIT 18

Received:  2/22/07  3:32PM;            RightFAX -> JetFax M920;  Page 2
RightFAX              2/22/2007 3:16   PAGE 002/003  Fax Server

  

**SEND**

## UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA  - Eastern Division
#### CIVIL MINUTES - GENERAL

Case No.    CV 04-09059 SGL(RNBx)                    Date:  February 12, 2007
Title:      MATTEL, INC. -v- CARTER BRYANT, DOES 1-10, INCLUSIVE
            Consolidated Action
            CV 05-02727 SGL(RNBx)    MGA ENTERTAINMENT v. MATTEL, INC.,
==================================================================
PRESIDING:  HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

Jim Holmes                              Theresa Lanza
Courtroom Deputy Clerk                  Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:       ATTORNEYS PRESENT FOR DEFENDANTS:

John B. Quinn and Michael Zeller for    Diana M. Torres for MGA
Mattel                                  Keith A. Jacoby for Carter Bryant

PROCEEDINGS:    SCHEDULING CONFERENCE PURSUANT TO FRCP 16(b)

        The Court convened a scheduling conference pursuant to FRCP 16(b).  Court and counsel discussed case management and thereafter the court set the following schedule: See attachment "Schedule of Trial and Pretrial Dates."

        Counsel stipulated pursuant to Local Rule 16-14, to settlement procedure #3, to a retired judicial officer or other private or non-profit dispute resolution body for mediation type settlement proceedings. The Court approves the request and refers this case to an outside Mediator to act as the Settlement Officer. Counsel are directed to contact such outside Mediator to schedule a settlement conference as soon as the parties believe such a conference would be fruitful. The cut-off to complete the mandatory settlement procedures under Local Rule 16-14, is December 3, 2007, in Case No. CV 04-09059-SGL (RNBx) Mattel, Inc. v. Carter Bryant, and the cut-off to complete the mandatory settlement procedures under Local rule 16-14, is April 21, 2008, in Case No. CV 05-02727 SGL (RNBx) MGA Entertainment v. Mattel, Inc.

        The Court further ordered that in both Case No. CV 04-09049-SGL (RNBx), Mattel, Inc. v. Carter Bryant, and Case No. CV 05-02727 SGL (RNBx), MGA Entertainment v. Mattel, Inc.:

        1.    Non-Expert Depositions are limited to a total of 24 for each side for both cases.
        2.    Expert Depositions are limited to a total of 20 for each side for both cases.
        3.    Interrogatories are limited to 50 for each side for both cases.

        IT IS SO ORDERED.

MINUTES FORM 90                                          Initials of Deputy Clerk: jh
CIVIL — GEN                Page 1      EB 2 2 2007        00/30

                                                         EXHIBIT

                                                    PAGE_    **EXHIBIT 18**
                                                             **PAGE 568**

 

## SCHEDULE OF TRIAL AND PRETRIAL DATES

**CASE NAME:** MGA ENTERTAINMENT, INC. V. MATTEL, INC., et al.,

**CASE NO:** CV 05-2727-SGL (RNBx)

| Matter | Time | Court Order |
|---|---|---|
| Jury Trial Date | 9:30 am | 07/01/08 |
| Estimated Length of Trial | | |
| (Hearing on Motions in Limine; Hearing on Disputed Jury Instructions | 10:00 am | 06/23/08 |
| Final Pretrial Conference, LR 16-7 Motions in Limine to be filed | 11:00 am | 06/02/08 |
| Lodge Pretrial Conference Order, LR 16-6 to 16-6.2; File Contentions of Fact and Law, LR16-2.8; Exhibit & Witness Lists, LR 16-4 to 16-5; File Status Report regarding Settlement; File Rule 26(e)(1) Supplementation File Agreed Upon Set of Jury Instructions and Verdict Forms LR 49-1 to 49-2, 51-1 to 51-5.1; File Joint Statement regarding Disputed Instructions, Verdicts, etc. | | 05/19/08 |
| Last date to conduct Settlement Conference | | 04/21/08 |
| Last date for hearing motions, LR 7.2, et seq. | 10:00 am | 04/07/08 |
| Discovery cut-off | | 03/03/08 |
| Last date to Amend Pleadings or Add Parties | | Closed |

## ADDITIONAL MATTERS TO BE DETERMINED AT SCHEDULING CONFERENCE

LR 16-14.4 Settlement Selection: to be discussed

[ ] 1. CT/USMJ

[ ] 2. Attorney Settlement Panel

[✓] 3. Outside ADR

[ ]

DOE Dismissal:

Complaint Filed: 04/13/05

Dismissal Date:

SET DATE
to be discussed

S:\SGL\CIVIL ORDERS\MGA 05-2727 MO 2-12-07.wpd

EXHIBIT_

PAGE___

**EXHIBIT 18**
**PAGE 569**

**From:**  Name:  United States District Court
312 North Spring Street
Los Angeles, CA 90012
Voice Phone: (213) 894-5474

**To:**  Name:  Michael Zeller
Company:

865 S Figueroa St, 10th Floor,
City/State:  Los Angeles, CA 90017-2543
Fax Number:  213-443-3100



**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

## Automated Document Delivery Service
Notice pursuant to Rule 77(d) FRCiv.P
The attached copy is hereby served upon you pursuant to Federal Rule of Civil Procedure 77(d).

**Fax Notes:**

Case 2:05-CV-02727 : MGA ENTERTAINMENT INC V. MATTEL INC ET AL

Pursuant to General Order 06-07, Section F, the following documents shall be submitted in the traditional manner: Pen Registers, Search Warrants, Seizure Warrants, Wire Taps, Bond Related Documents, Under Seal and In-Camera Documents, and All Charging Documents (Complaints, Informations, Indictments, and Superseding Charging Documents). All other documents filed in cases unassigned to a judge shall be filed electronically with a copy e-mailed to the criminal intake mailbox for the appropriate division. The proper e-mail address for each division is as follows:

Western Division: CrimIntakeCourtDocs-LA@cacd.uscourts.gov
Southern Division: CrimIntakeCourtDocs-SA@cacd.uscourts.gov
Eastern Division: CrimIntakeCourtDocs-RS@cacd.uscourts.gov

For additional information and assistance, please refer to the CM/ECF page on the Court website at www.cacd.uscourts.gov.

Switch to e-mail delivery and get these documents sooner!
To switch, complete and submit
Optical Scanning Enrollment / Update form G-76.
Call 213-894-5474 for help and free technical support.

If you received this document in error because the attorney with whom this document is directed is no longer the attorney on the case, a Notice of Change of Attorney Information, form G-6, must be filed. If there are other cases which you've received documents for which you are no longer the attorney, separate notices must be filed for each case. Failure to do so will result in the continued sending of documents to you. Form G-6 is available on the court's website at www.cacd.uscourts.gov or at the Clerk's Office.

Date and time of transmission:        Thursday, February 22, 2007 3:14:36 PM
Number of pages including this cover sheet:  03

EXHIBIT _____
PAGE ___  **EXHIBIT 18
PAGE 570**