EXHIBIT 84



EXHIBIT 84
PAGE 2528

M 0059736

EXHIBIT 85

Copyright Office fees are subject to change
For current fees, check the Copyright Office
website at www.copyright.gov, write the Copy-
right Office, or call (202) 707-3000

*143 940   854*

**Form CA**
For Supplementary Registration
UNITED STATES COPYRIGHT OFFICE

REGISTRATION NUMBER

VA 1–301–533

| TX | TXU | PA | PAU | VA | VAU | SR | SRU | RE |

EFFECTIVE DATE OF SUPPLEMENTARY REGISTRATION

*March 28 2005*

Month   Day   Year

DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET

**A**

Title of Work ▼
Jade Doll Configuration, Accessories and Packaging

Registration Number of the Basic Registration ▼
VA 1-090-287

Year of Basic Registration ▼
2001

Name(s) of Author(s) ▼
ABC International Traders, Inc d/b/a MGA Entertainment, Inc

Name(s) of Copyright Claimant(s) ▼
ABC International Traders, Inc. d/b/a MGA Entertainment

**B**

Location and Nature of Incorrect Information in Basic Registration ▼

Line Number   2a          Line Heading or Description   Nature of Authorship

Incorrect Information as It Appears in Basic Registration ▼
Only "3-dimensional sculpture" box checked

Corrected Information ▼
Additional box "2-dimensional artwork" should be checked

Explanation of Correction ▼

**C**

Location and Nature of Information in Basic Registration to be Amplified ▼

Line Number   5          Line Heading or Description   Previous Registration

Amplified Information and Explanation of Information ▼
"No" box – checked, 5c box – unchecked
"Yes" box should be checked, 5c box should be checked

This basic registration VA 1-090-287 for the Jade Doll Configuration, Accessories and Packaging, should cite to registration VA 1-218-487 (December 22, 2003) for the Jade Drawing, which was registered after this basic registration but prior to the filing of this Form CA, and should include the following additional information.

Line 6a – Derivative Work
    Jade Drawing (VA 1-218-487)

Line 6b – Material Added
    3-dimensional doll, sculpt, artwork and packaging

MORE ON BACK ▶   • Complete all applicable spaces (D-G) on the reverse side of this page
                 • See detailed instructions.   Sign the form at Space F.

DO NOT WRITE HERE

Page 1 of ___ pages



Δ π EXHIBIT 258
Deponent Armstrong
Date 8/1/83   Rptr: RC
WWW.DEPOBOOK.COM

4966

M 0110217

**EXHIBIT 85
PAGE 2529**

✴ Added from C.O. records.

FORM CA RECEIVED
4/25/05

FUNDS RECEIVED DATE
3/28/05

EXAMINED BY
WM

CORRESPONDENCE ☒

REFERENCE TO THIS REGISTRATION ADDED TO BASIC REGISTRATION  ☐ YES ☐ NO

FORM CA/

FOR COPYRIGHT OFFICE USE ONLY

DO NOT WRITE ABOVE THIS LINE  IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET

Continuation of ☒ Part B or ☐ Part C

**D**

Line 3a - Year of Completion
    Incorrect information  2000
    Corrected information  2001

Line 3b - Year of Publication
    Incorrect information  February 12, 2001
    Corrected information  At least as early as May 21, 2001

**E**

Correspondence  Give name and address to which correspondence about this application should be sent
Carol A. Witschel
White & Case LLP
1155 Avenue of the Americas
New York, New York  10036
Phone ( 212 ) 819-8200     Fax ( 212 ) 354-8113     Email   cwitschel@whitecase.com

Deposit Account If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account
Name _____

Account Number _____

**F**

Certification* I, the undersigned, hereby certify that I am the  (Check only one)
☐ author
☐ other copyright claimant
☐ owner of exclusive right(s)
☒ duly authorized agent of  MGA Entertainment Inc.
Name of author or other copyright claimant, or owner of exclusive right(s) ▲
of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.

Typed or printed name ▼  Carol A. Witschel                    Date ▼ 4/22/05

Handwritten signature (X) ▼
Carol A. Witschel

**G**

Certificate will be mailed in window envelope to this address

Name ▼
Carol A. Witschel - White & Case LLP
Number/Street/Apt ▼
1155 Avenue of the Americas
City/State/ZIP ▼
New York, New York  10036

M 0110218

558-2

**EXHIBIT 85**
**PAGE 2530**

EXHIBIT 86

1  KEKER & VAN NEST, LLP
   JOHN W. KEKER - #49092
2  jkeker@kvn.com
   MICHAEL H. PAGE - #154913
3  mpage@kvn.com
   CHRISTA M. ANDERSON - #184325
4  canderson@kvn.com
   710 Sansome Street
5  San Francisco, CA 94111-1704
   Telephone: (415) 391-5400
6  Facsimile: (415) 397-7188

7  Attorneys for Plaintiff
   CARTER BRYANT
8

9

                    UNITED STATES DISTRICT COURT
10
                    CENTRAL DISTRICT OF CALIFORNIA
11
                         EASTERN DIVISION
12

13
   CARTER BRYANT, an individual,        Case No. CV 04-09049 SGL (RNBx)
14                                       (consolidated with CV 04-9059 & 05-
                        Plaintiff,       2727
15
                                         **CARTER BRYANT'S RESPONSES**
16      v.                               **TO MATTEL, INC.'S SIXTH SET**
                                         **OF REQUESTS FOR ADMISSION**
17  MATTEL, INC. a Delaware              **TO CARTER BRYANT**
    Corporation,
18                                       Date:
                        Defendant.       Time:
19                                       Dept:    Courtroom 1
    CONSOLIDATED WITH MATTEL,            Judge:   Hon. Stephen G. Larson
20  INC., v. BRYANT and MGA
    ENTERTAINMENT, INC. v.               Date Comp. Filed:
21  MATTEL, INC.
                                         Discovery Cut-Off: Oct. 22, 2007
22                                       Pre-Trial Conference: Jan. 14, 2008
                                         Trial Date: Feb. 12, 2008
23

24

25  PROPOUNDING PARTY:        Defendant MATTEL, INC. ("Defendant")

26  RESPONDING PARTY:         Plaintiff CARTER BRYANT ("Plaintiff")

27  SET NUMBER:               SIX (6)

28

                                    1
CARTER BRYANT'S RESPONSES TO MATTEL, INC.'S SIXTH SET OF REQUESTS FOR ADMISSION TO
CARTER BRYANT
CASE NO. CV 04-09049 SGL (RNBx) EXHIBIT

PAGE ___

EXHIBIT 86
PAGE 2531

1   produced as M 0001497, a copy of which is attached hereto as Exhibit 1.

2   **RESPONSE TO REQUEST FOR ADMISSION NO. 15:**

3       Bryant incorporates by reference the above-stated general objections as if

4   fully set forth herein.  Bryant specifically objects to this request on the grounds that

5   it is oppressively repetitive and unnecessary in combination with Mattel's other

6   requests.

7       Subject to and without waiving the foregoing general and specific

8   objections, Bryant responds to this request as follows:  Bryant denies the request.

9   **REQUEST FOR ADMISSION NO. 16:**

10       Admit that MGA placed the "8/1998" date on the BRATZ WORK produced

11   as M 0001497, a copy of which is attached hereto as Exhibit 1.

12   **RESPONSE TO REQUEST FOR ADMISSION NO. 16:**

13       Bryant incorporates by reference the above-stated general objections as if

14   fully set forth herein.  Bryant specifically objects to this request on the grounds that

15   it is oppressively repetitive and unnecessary in combination with Mattel's other

16   requests.

17       Subject to and without waiving the foregoing general and specific

18   objections, Bryant responds to this request as follows:  Bryant denies the request.

19   **REQUEST FOR ADMISSION NO. 17:**

20       Admit that MGA did not place the "8/1998" date on the BRATZ WORK

21   produced as M 0001497, a copy of which is attached hereto as Exhibit 1.

22   **RESPONSE TO REQUEST FOR ADMISSION NO. 17:**

23       Bryant incorporates by reference the above-stated general objections as if

24   fully set forth herein.  Bryant specifically objects to this request on the grounds that

25   it is oppressively repetitive and unnecessary in combination with Mattel's other

26   requests.

27       Subject to and without waiving the foregoing general and specific

28   objections, Bryant responds to this request as follows:  Bryant admits the request.

14

CARTER BRYANT'S RESPONSES TO MATTEL, INC.'S SIXTH SET OF REQUESTS FOR ADMISSION TO CARTER BRYANT
CASE NO. CV 04-09049 SGL (RNBx)

EXHIBIT _
PAGE ___

**EXHIBIT 86
PAGE 2532**

1  **REQUEST FOR ADMISSION NO. 18:**

2      Admit that the BRATZ WORK produced as M 0001497, a copy of which is

3  attached hereto as Exhibit 1, is an original work of authorship within the meaning

4  of 17 U.S.C. § 102.

5  **RESPONSE TO REQUEST FOR ADMISSION NO. 18:**

6      Bryant incorporates by reference the above-stated general objections as if

7  fully set forth herein.  Bryant specifically objects to this request on the grounds that

8  the phrase "the BRATZ WORK produced as [Bates Number]" is vague and

9  ambiguous.  It is unclear whether the request is asking about only the "BRATZ

10  WORK" depicted in the referenced document, or the referenced document itself.

11  Bryant interprets the request to be limited to the drawing depicted in the document

12  in question, Bryant also specifically objects to this request on the grounds that it

13  calls for legal conclusions as to what constitutes an original work of authorship

14  within the meaning of 17 U.S.C. § 102.  Bryant also specifically objects to this

15  request on the grounds that it calls for disclosure of information protected by the

16  attorney-client privilege, the work product doctrine, the joint defense privilege, and

17  any other applicable privileges.  Bryant also specifically objects to this request on

18  the grounds that it is oppressively repetitive and unnecessary in combination with

19  Mattel's other requests.

20      Subject to and without waiving the foregoing general and specific

21  objections, Bryant responds to this request as follows:  Bryant admits that the

22  BRATZ WORK depicted in M 0001497 is an original work of authorship within

23  the meaning of 17 U.S.C. § 102.

24  **REQUEST FOR ADMISSION NO. 19:**

25      Admit that the BRATZ WORK produced as M 0001497, a copy of which is

26  attached hereto as Exhibit 1, is not an original work of authorship within the

27  meaning of 17 U.S.C. § 102.

28

15
CARTER BRYANT'S RESPONSES TO MATTEL, INC.'S SIXTH SET OF REQUESTS FOR ADMISSION TO CARTER BRYANT
CASE NO. CV 04-09049 SGL (RNBx) EXHIBIT

EXHIBIT 86
PAGE 2533

PAGE ____

**RESPONSE TO REQUEST FOR ADMISSION NO. 19:**

Bryant incorporates by reference the above-stated general objections as if fully set forth herein. Bryant specifically objects to this request on the grounds that the phrase "the BRATZ WORK produced as [Bates Number]" is vague and ambiguous. It is unclear whether the request is asking about only the "BRATZ WORK" depicted in the referenced document, or the referenced document itself. Bryant interprets the request to be limited to the drawing depicted in the document in question, Bryant also specifically objects to this request on the grounds that it calls for legal conclusions as to what constitutes an original work of authorship within the meaning of 17 U.S.C. § 102. Bryant also specifically objects to this request on the grounds that it calls for disclosure of information protected by the attorney-client privilege, the work product doctrine, the joint defense privilege, and any other applicable privileges. Bryant also specifically objects to this request on the grounds that it is oppressively repetitive and unnecessary in combination with Mattel's other requests.

Subject to and without waiving the foregoing general and specific objections, Bryant responds to this request as follows: Bryant denies that the BRATZ WORK depicted in M 0001497 is not an original work of authorship within the meaning of 17 U.S.C. § 102.

**REQUEST FOR ADMISSION NO. 20:**

Admit that YOU were the sole author of the BRATZ WORK produced as M 0001497, a copy of which is attached hereto as Exhibit 1.

**RESPONSE TO REQUEST FOR ADMISSION NO. 20:**

Bryant incorporates by reference the above-stated general objections as if fully set forth herein. Bryant specifically objects to this request on the grounds that the phrase "the BRATZ WORK produced as [Bates Number]" is vague and ambiguous. It is unclear whether the request is asking about only the "BRATZ WORK" depicted in the referenced document, or the referenced document itself.

16

EXHIBIT

EXHIBIT 86
PAGE 2534

PAGE ___

1   **RESPONSE TO REQUEST FOR ADMISSION NO. 47:**

2       Bryant incorporates by reference the above-stated general objections as if

3   fully set forth herein. Bryant specifically objects to this request on the grounds that

4   it is oppressively repetitive and unnecessary in combination with Mattel's other

5   requests. ·

6       Subject to and without waiving the foregoing general and specific

7   objections, Bryant responds to this request as follows: Bryant denies the request.

8   **REQUEST FOR ADMISSION NO. 48:**

9       Admit that MGA placed the "8/1998" date on the BRATZ WORK produced

10   as Bryant 00222, a copy of which is attached hereto as Exhibit 3.

11   **RESPONSE TO REQUEST FOR ADMISSION NO. 48:**

12     · Bryant incorporates by reference the above-stated general objections as if

13   fully set forth herein. Bryant specifically objects to this request on the grounds that

14   it is oppressively repetitive and unnecessary in combination with Mattel's other

15   requests.

16       Subject to and without waiving the foregoing general and specific

17   objections, Bryant responds to this request as follows: Bryant denies the request.

18   **REQUEST FOR ADMISSION NO. 49:**

19       Admit that MGA did not place the "8/1998" date on the BRATZ WORK

20   produced as Bryant 00222, a copy of which is attached hereto as Exhibit 3.

21   **RESPONSE TO REQUEST FOR ADMISSION NO. 49:**

22       Bryant incorporates by reference the above-stated general objections as if

23   fully set forth herein. Bryant specifically objects to this request on the grounds that

24   it is oppressively repetitive and unnecessary in combination with Mattel's other

25   requests.

26       Subject to and without waiving the foregoing general and specific

27   objections, Bryant responds to this request as follows: Bryant admits the request.

28

CARTER BRYANT'S RESPONSES TO MATTEL, INC.'S SIXTH SET OF REQUESTS FOR ADMISSION TO
CARTER BRYANT
CASE NO. CV 04-09049 SGL (RNB) EXHIBIT ____

PAGE ____

**EXHIBIT 86**
**PAGE 2535**

1  it is oppressively repetitive and unnecessary in combination with Mattel's other

2  requests.

3        Subject to and without waiving the foregoing general and specific

4  objections, Bryant responds to this request as follows:  Bryant admits the request.

5  **REQUEST FOR ADMISSION NO. 68:**

6        Admit that YOU did not place the "8/1998" date on the BRATZ WORK

7  produced as Bryant 00223, a copy of which is attached hereto as Exhibit 4.

8  **RESPONSE TO REQUEST FOR ADMISSION NO. 68:**

9        Bryant incorporates by reference the above-stated general objections as if

10  fully set forth herein.  Bryant specifically objects to this request on the grounds that

11  it is oppressively repetitive and unnecessary in combination with Mattel's other

12  requests.

13        Subject to and without waiving the foregoing general and specific

14  objections, Bryant responds to this request as follows:  Bryant denies the request.

15  **REQUEST FOR ADMISSION NO. 69:**

16        Admit that MGA placed the "8/1998" date on the BRATZ WORK produced

17  as Bryant 00223, a copy of which is attached hereto as Exhibit 4.

18  **RESPONSE TO REQUEST FOR ADMISSION NO. 69:**

19        Bryant incorporates by reference the above-stated general objections as if

20  fully set forth herein.  Bryant specifically objects to this request on the grounds that

21  it is oppressively repetitive and unnecessary in combination with Mattel's other

22  requests.

23        Subject to and without waiving the foregoing general and specific

24  objections, Bryant responds to this request as follows:  Bryant denies the request.

25  **REQUEST FOR ADMISSION NO. 70:**

26        Admit that MGA did not place the "8/1998" date on the BRATZ WORK

27  produced as Bryant 00223, a copy of which is attached hereto as Exhibit 4.

28

CARTER BRYANT'S RESPONSES TO MATTEL, INC.'S SIXTH SET OF REQUESTS FOR ADMISSION TO
CARTER BRYANT     EXHIBIT
CASE NO. CV 04-09049 SGL (RNBx)

PAGE

**EXHIBIT 86**
**PAGE 2536**

**RESPONSE TO REQUEST FOR ADMISSION NO. 70:**

Bryant incorporates by reference the above-stated general objections as if fully set forth herein.  Bryant specifically objects to this request on the grounds that it is oppressively repetitive and unnecessary in combination with Mattel's other requests.

Subject to and without waiving the foregoing general and specific objections, Bryant responds to this request as follows:  Bryant admits the request.

**REQUEST FOR ADMISSION NO. 71:**

Admit that the BRATZ WORK produced as Bryant 00223, a copy of which is attached hereto as Exhibit 4, is an original work of authorship within the meaning of 17 U.S.C. § 102.

**RESPONSE TO REQUEST FOR ADMISSION NO. 71:**

Bryant incorporates by reference the above-stated general objections as if fully set forth herein.  Bryant specifically objects to this request on the grounds that the phrase "the BRATZ WORK produced as [Bates Number]" is vague and ambiguous.  It is unclear whether the request is asking about only the "BRATZ WORK" depicted in the referenced document, or the referenced document itself.  Bryant interprets the request to be limited to the drawing depicted in the document in question, Bryant also specifically objects to this request on the grounds that it calls for legal conclusions as to what constitutes an original work of authorship within the meaning of 17 U.S.C. § 102.  Bryant also specifically objects to this request on the grounds that it calls for disclosure of information protected by the attorney-client privilege, the work product doctrine, the joint defense privilege, and any other applicable privileges.  Bryant also specifically objects to this request on the grounds that it is oppressively repetitive and unnecessary in combination with Mattel's other requests.

Subject to and without waiving the foregoing general and specific objections, Bryant responds to this request as follows:  Bryant admits that the

47

EXHIBIT ___

**EXHIBIT 86**

PAGE ___

**PAGE 2537**

1  BRATZ WORK depicted in Bryant 00223 is an original work of authorship within

2  the meaning of 17 U.S.C. § 102.

3  **REQUEST FOR ADMISSION NO. 72:**

4  　　　Admit that the BRATZ WORK produced as Bryant 00223, a copy of which

5  is attached hereto as Exhibit 4, is not an original work of authorship within the

6  meaning of 17 U.S.C. § 102.

7  **RESPONSE TO REQUEST FOR ADMISSION NO. 72:**

8  　　　Bryant incorporates by reference the above-stated general objections as if

9  fully set forth herein. Bryant specifically objects to this request on the grounds that

10  the phrase "the BRATZ WORK produced as [Bates Number]" is vague and

11  ambiguous. It is unclear whether the request is asking about only the "BRATZ

12  WORK" depicted in the referenced document, or the referenced document itself.

13  Bryant interprets the request to be limited to the drawing depicted in the document

14  in question, Bryant also specifically objects to this request on the grounds that it

15  calls for legal conclusions as to what constitutes an original work of authorship

16  within the meaning of 17 U.S.C. § 102. Bryant also specifically objects to this

17  request on the grounds that it calls for disclosure of information protected by the

18  attorney-client privilege, the work product doctrine, the joint defense privilege, and

19  any other applicable privileges. Bryant also specifically objects to this request on

20  the grounds that it is oppressively repetitive and unnecessary in combination with

21  Mattel's other requests.

22  　　　Subject to and without waiving the foregoing general and specific

23  objections, Bryant responds to this request as follows: Bryant denies that the

24  BRATZ WORK depicted in Bryant 00223 is not an original work of authorship

25  within the meaning of 17 U.S.C. § 102.

26  **REQUEST FOR ADMISSION NO. 73:**

27  　　　Admit that YOU were the sole author of the BRATZ WORK produced as

28  Bryant 00223, a copy of which is attached hereto as Exhibit 4.

48

EXHIBIT

PAGE _____

**EXHIBIT 86**
**PAGE 2538**

**RESPONSE TO REQUEST FOR ADMISSION NO. 88:**

Bryant incorporates by reference the above-stated general objections as if fully set forth herein. Bryant specifically objects to this request on the grounds that it is oppressively repetitive and unnecessary in combination with Mattel's other requests.

Subject to and without waiving the foregoing general and specific objections, Bryant responds to this request as follows: Bryant admits that he placed the "8/1998" notation on the BRATZ WORK in question. After reasonable inquiry, Bryant has insufficient information or knowledge to enable him to admit or deny that he placed the "©" on the BRATZ WORK in question.

**REQUEST FOR ADMISSION NO. 89:**

Admit that YOU did not place the "© 8/1998" notation on the BRATZ WORK produced as M 0001492, a copy of which is attached hereto as Exhibit 5.

**RESPONSE TO REQUEST FOR ADMISSION NO. 89:**

Bryant incorporates by reference the above-stated general objections as if fully set forth herein. Bryant specifically objects to this request on the grounds that it is oppressively repetitive and unnecessary in combination with Mattel's other requests.

Subject to and without waiving the foregoing general and specific objections, Bryant responds to this request as follows: Bryant admits that he placed the "8/1998" notation on the BRATZ WORK in question. After reasonable inquiry, Bryant has insufficient information or knowledge to enable him to admit or deny that he placed the "©" on the BRATZ WORK in question.

**REQUEST FOR ADMISSION NO. 90:**

Admit that MGA placed the "© 8/1998" notation on the BRATZ WORK produced as M 0001492, a copy of which is attached hereto as Exhibit 5.

**RESPONSE TO REQUEST FOR ADMISSION NO. 90:**

Bryant incorporates by reference the above-stated general objections as if

58

EXHIBIT ___

PAGE ___

**EXHIBIT 86**
**PAGE 2539**

1  fully set forth herein. Bryant specifically objects to this request on the grounds that

2  it is oppressively repetitive and unnecessary in combination with Mattel's other

3  requests.

4      Subject to and without waiving the foregoing general and specific

5  objections, Bryant responds to this request as follows: Bryant admits that he

6  placed the "8/1998" notation on the BRATZ WORK in question. After reasonable

7  inquiry, Bryant has insufficient information or knowledge to enable him to admit

8  or deny that he placed the "©" on the BRATZ WORK in question.

9  **REQUEST FOR ADMISSION NO. 91:**

10      Admit that MGA did not place the "© 8/1998" notation on the BRATZ

11  WORK produced as M 0001492, a copy of which is attached hereto as Exhibit 5.

12  **RESPONSE TO REQUEST FOR ADMISSION NO. 91:**

13      Bryant incorporates by reference the above-stated general objections as if

14  fully set forth herein. Bryant specifically objects to this request on the grounds that

15  it is oppressively repetitive and unnecessary in combination with Mattel's other

16  requests.

17      Subject to and without waiving the foregoing general and specific

18  objections, Bryant responds to this request as follows: Bryant admits that he

19  placed the "8/1998" notation on the BRATZ WORK in question. After reasonable

20  inquiry, Bryant has insufficient information or knowledge to enable him to admit

21  or deny that he placed the "©" on the BRATZ WORK in question.

22  **REQUEST FOR ADMISSION NO. 92:**

23      Admit that the BRATZ WORK produced as M 0001492, a copy of which is

24  attached hereto as Exhibit 5, is an original work of authorship within the meaning

25  of 17 U.S.C. § 102.

26  **RESPONSE TO REQUEST FOR ADMISSION NO. 92:**

27      Bryant incorporates by reference the above-stated general objections as if

28  fully set forth herein. Bryant specifically objects to this request on the grounds that

CARTER BRYANT'S RESPONSES TO MATTEL, INC.'S SIXTH SET OF REQUESTS FOR ADMISSION TO
CARTER BRYANT
CASE NO. CV 04-09049 SGL (RNBx)

EXHIBIT

PAGE

**EXHIBIT 86**
**PAGE 2540**

1  the phrase "the BRATZ WORK produced as [Bates Number]" is vague and

2  ambiguous. It is unclear whether the request is asking about only the "BRATZ

3  WORK" depicted in the referenced document, or the referenced document itself.

4  Bryant interprets the request to be limited to the drawing depicted in the document

5  in question, Bryant also specifically objects to this request on the grounds that it

6  calls for legal conclusions as to what constitutes an original work of authorship

7  within the meaning of 17 U.S.C. § 102. Bryant also specifically objects to this

8  request on the grounds that it calls for disclosure of information protected by the

9  attorney-client privilege, the work product doctrine, the joint defense privilege, and

10 any other applicable privileges. Bryant also specifically objects to this request on

11 the grounds that it is oppressively repetitive and unnecessary in combination with

12 Mattel's other requests.

13      Subject to and without waiving the foregoing general and specific

14 objections, Bryant responds to this request as follows: Bryant admits that the

15 BRATZ WORK depicted in M 0001492 is an original work of authorship within

16 the meaning of 17 U.S.C. § 102.

17 **REQUEST FOR ADMISSION NO. 93:**

18      Admit that the BRATZ WORK produced as M 0001492, a copy of which is

19 attached hereto as Exhibit 5, is not an original work of authorship within the

20 meaning of 17 U.S.C. § 102.

21 **RESPONSE TO REQUEST FOR ADMISSION NO. 93:**

22      Bryant incorporates by reference the above-stated general objections as if

23 fully set forth herein. Bryant specifically objects to this request on the grounds that

24 the phrase "the BRATZ WORK produced as [Bates Number]" is vague and

25 ambiguous. It is unclear whether the request is asking about only the "BRATZ

26 WORK" depicted in the referenced document, or the referenced document itself.

27 Bryant interprets the request to be limited to the drawing depicted in the document

28 in question, Bryant also specifically objects to this request on the grounds that it

CARTER BRYANT'S RESPONSES TO MATTEL, INC.'S SIXTH SET OF REQUESTS FOR ADMISSION TO
CARTER BRYANT          EXHIBIT ___
CASE NO. CV 04-09049 SGL (RNBx)

PAGE ___

**EXHIBIT 86**
**PAGE 2541**

1   calls for legal conclusions as to what constitutes an original work of authorship

2   within the meaning of 17 U.S.C. § 102. Bryant also specifically objects to this

3   request on the grounds that it calls for disclosure of information protected by the

4   attorney-client privilege, the work product doctrine, the joint defense privilege, and

5   any other applicable privileges. Bryant also specifically objects to this request on

6   the grounds that it is oppressively repetitive and unnecessary in combination with

7   Mattel's other requests.

8        Subject to and without waiving the foregoing general and specific

9   objections, Bryant responds to this request as follows: Bryant denies that the

10  BRATZ WORK depicted in M 0001492 is not an original work of authorship

11  within the meaning of 17 U.S.C. § 102.

12  **REQUEST FOR ADMISSION NO. 94:**

13       Admit that YOU were the sole author of the BRATZ WORK produced as M

14  0001492, a copy of which is attached hereto as Exhibit 5.

15  **RESPONSE TO REQUEST FOR ADMISSION NO. 94:**

16       Bryant incorporates by reference the above-stated general objections as if

17  fully set forth herein. Bryant specifically objects to this request on the grounds that

18  the phrase "the BRATZ WORK produced as [Bates Number]" is vague and

19  ambiguous. It is unclear whether the request is asking about only the "BRATZ

20  WORK" depicted in the referenced document, or the referenced document itself.

21  Bryant also specifically objects to this request on the grounds that it calls for legal

22  conclusions as to what constitutes a "sole author". To the extent this request asks

23  Bryant to provide information concerning the legal basis of his defense of this

24  matter, Bryant also specifically objects on the grounds that the request

25  impermissibly calls for mental impressions, conclusions, opinions and/or legal

26  theories of Bryant's attorneys. Bryant also specifically objects to this request on

27  the grounds that it calls for disclosure of information protected by the attorney-

28  client privilege, the work product doctrine, the joint defense privilege, and any

CARTER BRYANT'S RESPONSES TO MATTEL, INC.'S SIXTH SET OF REQUESTS FOR ADMISSION TO
CARTER BRYANT
CASE NO. CV 04-09049 SGL (RNBx) EXHIBIT ___

EXHIBIT 86
PAGE 2542

PAGE _____

1   other applicable privileges.  Bryant also specifically objects to this request on the

2   grounds that it is oppressively repetitive and unnecessary in combination with

3   Mattel's other requests.

4

5   Dated:   August 22, 2007            KEKER & VAN NEST, LLP

6

7

8                              By: _____

                                 CHRISTA A. ANDERSON

9                                  Attorneys for Plaintiff
                                 CARTER BRYANT

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CARTER BRYANT'S RESPONSES TO MATTEL, INC.'S SIXTH SET OF REQUESTS FOR ADMISSION TO
CARTER BRYANT
CASE NO. CV 04-09049 SGL (RNBx)

EXHIBIT
PAGE ___

EXHIBIT 86
PAGE 2543

PROOF OF SERVICE

1

2    I am employed in the City and County of San Francisco, State of California in the office of a member of the bar of this court at whose direction the following service was made. I am over the age of eighteen years and not a party to the within action. My business address is Keker & Van Nest, LLP, 710 Sansome Street, San Francisco, California 94111.

3

4

5    On August 22, 2007, I served the following document(s):

6    **CARTER BRYANT'S RESPONSES TO MATTEL, INC.'S SIXTH SET OF REQUESTS FOR ADMISSION TO CARTER BRYANT**

7

8    by **FEDERAL EXPRESS**, by placing a true and correct copy in a sealed envelope addressed as shown below. I am readily familiar with the practice of Keker & Van Nest, LLP for correspondence for delivery to FedEx Corporation. According to that practice, items are retrieved daily by a FedEx Corporation employee for overnight delivery; AND

9

10

11   by **E-MAIL VIA PDF FILE**, by transmitting on this date via e-mail a true and correct copy scanned into an electronic file in Adobe "pdf" format. The transmission was reported as complete and without error.

12

13

14   John B. Quinn                        Diana M. Torres
     Michael T. Zeller                    O'Melveny & Myers, LLP
15   Quinn Emanuel Urquhart Oliver & Hedges, LLP    400 S. Hope Street
     865 South Figueroa Street, 10th Floor    Los Angeles, CA  90071
16   Los Angeles, CA 90017-2543           Tel:   213/430-6000
     Tel:   213/443-3000                  Fax:   213/430-6407
17   Fax:   213/443-3100                  Email: dtorres@omm.com
18   Email: johnquinn@quinnemanuel.com
     Email: michaelzeller@quinnemanuel.com
19
     Patricia L. Glaser
20   Christensen Glaser Fink Jacobs Weil & Shapiro
     10250 Constellation Blvd., 19th Floor
21   Los Angeles, CA  90067
     Tel:   310/553-3000
22   Fax:   310/556-2920
23   Email: pglaser@chrisglase.com

24

25   Executed on August 22, 2007, at San Francisco, California.

26   I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

27

28   _Julie Selby_
     JULIE A. SELBY

PROOF OF SERVICE
CASE NO. CV 04-09049 SGL (RNBx)    EXHIBIT ___

**EXHIBIT 86
PAGE 2544**

EXHIBIT 87

HCA 2152/2002

IN THE HIGH COURT OF THE

HONG KONG SPECIAL ADMINISTRATIVE REGION

COURT OF FIRST INSTANCE

CIVIL ACTION NO. 2152 OF 2002

BETWEEN

|  |  |
|---|---|
| ABC INTERNATIONAL TRADERS, INC. doing business as MGA ENTERTAINMENT | Plaintiff |
| and | |
| (1) TOYS & TRENDS (HONG KONG) LIMITED | |
| (2) CITYWORLD LIMITED | Defendants |
| (3) JURG WILLI KESSELRING | |

AFFIDAVIT OF ISAAC LARIAN

I, Isaac Larian of 16730 Schoenborn Street, North Hills, California, United States of American do make oath and say as follows: -

1.   I am the CEO of MGA and duly authorised by MGA to make this affidavit on its behalf.  Unless otherwise stated, the facts and matters contained herein are either within my own personal knowledge or gleaned from books and records of MGA to which I have free access.  Insofar as facts and matters that do not fall within the aforesaid category, they are related to me by the respective sources stated hereinafter and are true to the best of my information and belief. For the purpose of this affidavit, I shall adopt the abbreviations used in the First Affirmation of Lee Shiu Cheung filed on behalf of MGA on the 18th June 2002 (hereinafter referred to as "the 1st Lee Affirmation").

1

2.

3.

4.

5.

2

EXHIBIT _____

PAGE ___

**EXHIBIT 87
PAGE 2546**

M 0001559

6.

7.

8.

3

EXHIBIT
PAGE

EXHIBIT 87
PAGE 2547

M 0001560

9.

10.

11.

**Paragraphs 13 to 19**

12.   I fail to understand the point made by the Defendants in these paragraphs and consequently the relevance of these matters. Insofar as the concept of the Bratz dolls are concerned, the 1st Lee Affirmation dealt with these matters to provide the Court with the background and history of the Bratz dolls and mainly the marketing strategy or concept. Furthermore, I am advised by my legal advisors that copyright law does not protect concepts or ideas *per se* but the expression of an idea in a material form. And in this case, it is the 17 design drawings exhibited as "LSC-3". The complaint made by MGA is that

4

EXHIBIT ___

PAGE ___

**EXHIBIT 87**
**PAGE 2548**

M 0001561

the 3 dimensional Funky Tweenz dolls have infringed the 2 dimensional drawings which are artistic works in which copyright subsists. The aforesaid, I think, would be sufficient to deal with these paragraphs but for the sake of completeness I shall deal with the dolls mentioned therein.

13.  The Bratz dolls were first exhibited in the USA in November 2000. They were further exhibited in Hong Kong in January 2001. The Bratz dolls were first publicly made available for sale at the retail level in August 2001 in the USA.

14.  I have never heard of Simba Toys GmbH & Co. and have never come across these Girlz dolls until reading the Kesselring Affidavit. Just by looking at the photographs and not having seen the samples I cannot see how these dolls can infringe MGA's copyright in the artistic works for they do not look the same. Furthermore, I do not accept that these dolls were marketed all over Europe before the Nurnberg Toy Fair without any evidence but a bare allegation coming from Mr. Kesselring.

15.  The photographs of the We Teen dolls exhibited as "JWK-6" do not resemble the Bratz dolls by just looking at the pictures.

16.  To say the Fad dolls have similar dimensions and proportions to the Bratz dolls is just sheer nonsense. One can see very clearly from the photographs that they do not. These dolls have plastic hair and square faces Mr. Kesselring has not asserted that these dolls are published prior to the Bratz dolls.

17.  Looking at the photographs of the Sassy Secrets dolls one can see very clearly that they do not resemble the Bratz dolls at all. These are 6 inch electronic dolls which can talk. Further, they do not have change of fabric fashion and shoes that Bratz are popular for and Funky Tweenz have copied. Again Mr. Kesselring has not asserted that these dolls are published prior to the Bratz dolls.

5

EXHIBIT

PAGE

EXHIBIT 87
PAGE 2549

M 0001562

18.   In light of the foregoing, the existence of these dolls in the market can in no way impeach the originality of MGA's artistic works. Mr. Kesselring is again speculating without any evidence.  Furthermore, I find it quite odd for Mr. Kesselring to say that both Funky Tweenz dolls and the Bratz dolls originate from a common source when he attempts to explain how the Defendants came up with the Funky Tweenz dolls.

19.

20.

21.

6

EXHIBIT 87
PAGE 2550

M 0001563

22.    I fail to see any point in paragraph 19 of the Kesselring Affirmation.  I am advised by my legal advisors that copyright law is territorial and each jurisdiction has its own set laws regulating copyright.  MGA's cause of action is based on the Copyright Ordinance of Hong Kong and not the Federal Copyright Act of the USA.  The USA registration certificates were exhibited to show that the Bratz dolls enjoy copyright protection in the USA.

23.

24.

25.

7

EXHIBIT 87
PAGE 2551

M 0001564

26. Dressing dolls had always been a huge market for the toy industry. The Barbie doll has been around for over 43 years and has a retail turnover of US$1.5 billion a year. According to the leading USA toy market research company, TRSTS, Barbie dolls command 88.5% of the doll market last year. But the latest research results show this share has shrunken to 84.6% so far this year due to the appearance of the Bratz dolls which now command 10.1% of the market share which is the 2nd largest market share after Mattel and Barbie. Prior to the appearance of Bratz dolls, no doll could take away the market share enjoyed by Barbie. The Barbie doll has been so successful because it has been able to reinvent itself time and time again like 3 or 4 years ago, the Barbie doll range introduced a new range of dolls called the Generation Girls which is a dressing doll with a trendy look.

27.

28.

29.

8

EXHIBIT
PAGE

EXHIBIT 87
PAGE 2552

M 0001565

30.   Mr. Kesselring said he took inspiration from a lot of other dolls on the market but oddly, he never referred to the Bratz dolls. The Bratz dolls won the People's Choice Awards of the Toy Industry which is similar to the Oscars in the film industry, as well as Doctor Toy best top 10 Toy Award and Family Fun Best Toy Award. Bratz were further cited to be the first doll ever to beat Barbie in the fashion doll category. I find it quite inconceivable that he never referred to the Bratz dolls despite its huge success and wide media coverage evidenced by some of the sample media cuttings exhibited as "LSC-10" to the 1st Lee Affirmation. Even the article taken from The Toy Book which he exhibited as "JWK-10c" has a whole column devoted to Bratz dolls. The said article says and I quote, "Trying to capture some of MGA's success, a host of manufacturers are debuting personality/fashion dolls."

31.   The reason why design drawings of the dolls head had to be made was because they had to get the colour scheme of features of the head so that after moulding they can be dyed properly according to the scheme which serves as a benchmark. This is very apparent from paragraph 21 of the Affirmation of Wilson Lam.

32.   Having taken a look at the pictures of the Barbie dolls exhibited as "JWK-12" they bear no resemblance to the Funky Tweenz but Funky Tweenz bear a striking resemblance to the Bratz dolls.

Paragraphs 30-33

33.   The safety certificates exhibited as "JWK-13" only pertain to Europe and Canada and not the USA which has more stricter requirements. MGA's fears stated in paragraph 36 of the 1st Lee Affirmation are valid.

34.   I fail to see how that the life span of fashion dolls will only last 2 years as alleged. The Barbie doll has been around for over 43 years. The Defendants have not shown by way of evidence how an injunction would affect their reputation.

9

35. MGA is not using this action to stifle competition as alleged. MGA welcomes lawful competition but not copying. The other examples of dolls mentioned in the Kesselring Affidavit do not resemble the Bratz dolls at all. If MGA was to stifle lawful competition it would have taken legal action against those manufacturers. One must bear in mind that no one has stated that other dolls on the market resemble Bratz dolls save and except Funky Tweenz dolls. There is abundant evidence in this regard from independent third parties.

36.

37.

38.

10

EXHIBIT

PAGE

EXHIBIT 87
PAGE 2554

M 0001567

39.

40.

41.

42.

Sworn at State of California )
County of Los Angeles )
)
)
Subscribed and sworn to before )
me on )
this 2 day of July      2002 )

Before me, Eve Marie Johnson

Notary Public

EVE MARIE JOHNSON
COMM. # 1312814
NOTARY PUBLIC • CALIFORNIA
LOS ANGELES COUNTY
Comm. Exp. JULY 12, 2005

This affidavit is filed on behalf of the Plaintiff.

11

EXHIBIT

PAGE

EXHIBIT 87
PAGE 2555

M 0001568

HCA 2152/2002

IN THE HIGH COURT OF THE

HONG KONG SPECIAL ADMINISTRATIVE REGION

COURT OF FIRST INSTANCE

CIVIL ACTION NO. 2152 OF 2002

BETWEEN

|  |  |
|---|---|
| ABC INTERNATIONAL TRADERS, INC. doing business as MGA ENTERTAINMENT | Plaintiff |

and

(1) TOYS & TRENDS (HONG KONG) LIMITED

(2) CITYWORLD LIMITED

(3) JURG WILLI KESSELRING    Defendants

AFFIDAVIT OF ISAAC LARIAN

Filed this 5ᵗʰ day of July, 2002.

William WL Fan & Co.
507 Hang Seng Building
77 Des Voeux Road
Central
Hong Kong
Tel: 2110 2128

12

EXHIBIT 87
PAGE 2556

M 0001569

EXHIBIT 88



HCA 2152/2002

IN THE HIGH COURT OF THE

HONG KONG SPECIAL ADMINISTRATIVE REGION

COURT OF FIRST INSTANCE

CIVIL ACTION NO. 2152 OF 2002

BETWEEN

ABC INTERNATIONAL TRADERS, INC.                    Plaintiff
doing business as MGA ENTERTAINMENT

and

(1)  TOYS & TRENDS (HONG KONG) LIMITED

(2)  CITYWORLD LIMITED

(3)  JURG WILLI KESSELRING                    Defendants

This is the exhibit marked "LSC-3" referred to in the Affirmation of Lee Shiu Cheung
dated the 18th day of June 2002.

| Description of document | Date | No. of pages |
|---|---|---|
| Copies of 17 initial concept and Design drawings of the BRATZ Dolls made by Mr. Bryant in the year 2000 | divers | 17 |

Before me,

*Chang Jee*

Solicitor, HKSAR

Chan Yin Chee
Solicitor, Hong Kong SAR
C.L. Chow & Macksion Chan, Solicitors

M 0001489A

DEPOSITION
EXHIBIT

EXHIBIT 89



EXHIBIT ____

PAGE ___

**EXHIBIT 89**
**PAGE 2558**

All Rights Assigned to ABC International Traders
d/b/a MGA Entertainment.

Isaac Larian, CEO

JUNE 2000
Contract date : 9/18/2000

M 0001489



8/1998

All Rights Assigned to ABC International Traders
d/b/a MGA Entertainment.

Isaac Larian, CEO

Contract date 9/5/00

EXHIBIT _

PAGE ___

**EXHIBIT 89**
**PAGE 2559**

M 0001490



All Rights Assigned to ABC International Traders d/b/a MGA Entertainment.

Isaac Larian, CEO

Contract date 9/18/00

EXHIBIT.

PAGE ___

**EXHIBIT 89
PAGE 2560**

M 0001491



© 8/1998

All Rights Assigned to ABC International Traders
d/b/a MGA Entertainment.

Isaac Larian, CEO

Contract date  9/18/00

EXHIBIT

PAGE

EXHIBIT 89
PAGE 2561

M 0001492



© 1998

EXHIBIT __

PAGE _____

**EXHIBIT 89**
**PAGE 2562**

All Rights Assigned to ABC International Traders
d/b/a MGA Entertainment.

Isaac Larian, CEO

Contract date: 9/15/00

M 0001493



All Rights Assigned to ABC International Traders
d/b/a MGA Entertainment.

Isaac Larian, CEO

Contract date : 9/18/00

M 0001494

EXHIBIT __

PAGE ____

**EXHIBIT 89**
**PAGE 2563**



Ⓒ
8/1998

All Rights Assigned to ABC International Traders
d/b/a MGA Entertainment.

Isaac Larian, CEO

Contract date   9/18/00

EXHIBIT _

PAGE _

**EXHIBIT 89
PAGE 2564**

M 0001495



8/1998

All Rights Assigned to ABC International Traders
d/b/a MGA Entertainment.

Isaac Larian, CEO

Contract date    9/18/00

EXHIBIT _

PAGE __

**EXHIBIT 89**
**PAGE 2565**

M 0001496



8/1998

All Rights Assigned to ABC International Traders
d/b/a MGA Entertainment.

Isaac Larian, CEO

Convert date: 9/18/00

M 0001497

EXHIBIT

PAGE __

**EXHIBIT 89
PAGE 2566**



EXHIBIT.

PAGE ___

**EXHIBIT 89**
**PAGE 2567**

All Rights Assigned to ABC International Traders
d/b/a MGA Entertainment.

Isaac Larian, CEO

Contract date: 9/15/00

M 0001498



EXHIBIT.

PAGE _____

**EXHIBIT 89**
**PAGE 2568**

All Rights Assigned to ABC International Traders
d/b/a MGA Entertainment.

Isaac Larian, CEO

Contract dude: 9/18/00

M 0001499



All Rights Assigned to ABC International Traders d/b/a MGA Entertainment.

Isaac Larian, CEO

EXHIBIT

PAGE

**EXHIBIT 89
PAGE 2569**

M 0001500



All Rights Assigned to ABC International Traders
d/b/a MGA Entertainment.

Isaac Larian, CEO

Contract date. 9/18/00

EXHIBIT __

PAGE ____

**EXHIBIT 89**
**PAGE 2570**

M 0001501



*DOLL PIECE COUNT\**

LONG TEE

JEANS

SHORT TEE

HAIRSTYLE # 1

SNEAKERS

MARY JANES

HAIRSTYLE # 2

TOTAL PIECES\*
- LONG SLEEVED TEE SHIRT
- CUFFED "JEANS"
- SHORT SLEEVED TEE SHIRT
- SKIRT
- POP-ON/OFF SNEAKERS
- POP-ON/OFF MARY JANES
- BACKPACK
- LONG HAIRSTYLE "WIG" (POP-ON/OFF)
- SHORT HAIRSTYLE "WIG" (POP-ON/OFF)
- DOLL BODY/HEAD

\* DESIGN SUBJECT TO CHANGE

DRAWINGS NOT TO ACTUAL SIZE

EXHIBIT _

PAGE _

EXHIBIT 89
PAGE 2571

M 0001502

BODY



JOINTED NECK, @ SHOULDERS

POSSIBLE
TWIST.
WAIST.
BELOW
BELLY
BUTTON

JOINTED @
HIPS

SCULPTED
FINGERNAILS

BASIC SHOE
SCULPT

NOT ACTUAL
SIZE

ACTUAL DOLL
HEIGHT (WITH HEAD)
APPX. 9½" - 10"

M 0001503

EXHIBIT

PAGE _____

EXHIBIT 89
PAGE 2572



To give Zoe a whole new look for night, change her short dark brown hairstyle to her long blonde hairdo (included), change her pants to a skirt (also included) and change her sneakers to platform sandals (you get those too!)

M 0001504

EXHIBIT —

PAGE —

**EXHIBIT 89**
**PAGE 2573**



FACES
SAME HEAD BUT.
DIFF FACE PAINT

— NOT ACTUAL SIZE —

M 0001505

EXHIBIT.

PAGE ____

**EXHIBIT 89**
**PAGE 2574**

EXHIBIT 90

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 91

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 92

# 4.

# BARBIE GOES TO WAR: BATTLE OF THE DOLLS

EXHIBIT
6300

**B**arbie is in trouble. Deep trouble. And when Barbie is in trouble, everyone at Mattel, the world's biggest toy company, has problems, because Barbie, the world's most famous toy, a genuine American icon, is their meal ticket. In the words of analysts, "As Barbie goes, Mattel goes." Barbie—more than three sold somewhere in the world every single second—brings in around $3.6 billion a year in retail sales. She represents more than a fifth of all Mattel sales and more than a third of the company's profits. It doesn't end there—there are also all of the licensing spin-offs, everything from clothes to bedroom furniture, software and electronics to cosmetics, towels, bedding, and sporting goods.

If there is one toy that stands for the modern toy industry, it is Barbie.

Of all toys, she is extraordinary. Mattel boasts with justification that she is not just a toy; she is a "lifestyle brand." As such, she is high maintenance, requiring hundreds of personnel, including 50 designers, a dozen hairdressers, and almost 100 just to handle licensing her name. It's been claimed there are more Barbie dolls in America than there are people. She is the subject of innumerable academic papers, the centerpiece of countless artistic works—not all flattering—and

EXHIBIT 92
PAGE 2681

the focus of longtime feminist screams. A Barbie is so quintessentially American that she was included in the 1976 bicentennial time capsule. She is sold in 150 different countries. An advertisement selling the latest Barbie is showing somewhere on the globe every day of the year. There are Barbie conventions, clubs, Web sites, magazines, collectors' fairs. Most important for those who depend on her, she is the most valuable toy brand in the world, the only plaything to enter the list of the world's top 100 brands.[5]

Except, now sales are suffering. For the first time in Barbie's 50 years, another doll (and a pretty sleazy one at that) is stealing her sales. Because the toy industry is not growing, sales that go to one company come from rivals. In Barbie's case, it means that every dollar spent on Bratz dolls comes out of Mattel's pocket.

None of this, though, is apparent as I step out of the elevator on the tenth floor of Mattel's El Segundo, California, headquarters, known internally as the Pink Floor. Outside the elevator, the solitary small Christmas tree is indeed pink. It has taken me months to get this far. One longtime Barbie observer has likened getting into Mattel to crashing the Kremlin in the days of the Cold War. Security is tight: I am told toys are carried from floor to floor in boxes closed with numbered seals. A copywriter on the Mattel account recalls attending a meeting at which he was told to face away from windows because spies with telescopes might read his lips. Over at the even more tightly protected design building, a sign at the entrance exhorts: "Keep 'Em Guessing. Remember to keep Mattel secrets under wraps."

\* \* \*

[5]. In *Business Week's* 2003 Global Brands Scoreboard, Barbie ranked 97, one below FedEx and above the *Wall Street Journal* and Jack Daniel's.

EXHIBIT 92
PAGE 2682

78                    THE REAL TOY STORY

I have lost count of the unanswered e-mails, unreturned telephone calls, broken promises, excuses, and requests for information and assurances and question lists to satisfy the lawyers in the course of researching this book. You enter a special Mattel universe. "Welcome to our world," says one chirpy Mattel apparatchik, canceling yet another meeting (that is meant only to determine whether the next one will take place). This is Toyland meets Kafka. But suddenly, after weeks of keeping me hanging around, Mattel relents—provided I can make an 11,000-mile round-trip immediately. And now, it's nearly Christmas, and on the surface everyone is upbeat and full of excited Barbie-future talk. It's the same a few blocks away in the Mattel design center, where the current key figure in Barbie's life, designer supremo Ivy Ross, shares her thoughts and plans. Barbie, in adversity, can be a jinxed—albeit lucrative—product to become attached to. A succession of high-flying figures pass through her life. Ivy Ross is no exception. Within a month there will be a "revamp" of the management team that runs Barbie's division, and Ms. Ross will have moved to Gap. Mattel will also be back to its fortress mentality.

In the meantime, it is Ivy Ross's watch and, after a brief clash over my signing a secrecy agreement, all is sweetness and light; I find myself recalling that old saying: If you can keep your head when all around you are panicking, maybe they know something you don't. But in tough corporate Mattel land, you fix a smile on your face and don't admit weakness to outsiders. And, besides, Barbie has been under attack before, and has always seen off contenders with the ease of a pit bull facing a rabbit. We talk about how Barbie has constantly adapted to be up to the minute—Ms. Ross masterminded major innovations for the millennium. The hovering but unspoken suggestion is that this time Barbie just didn't adapt fast enough.


Twenty-two miles away in North Hills, on a gritty trading estate, Isaac Larian sits in his first-floor office. In line with the difference between the two toy companies, this also happens to be the building's top

EXHIBIT 92
PAGE 2683

floor. Unlike Mattel with its corporate sense, here there's a cottage industry feel. Reception is an apologetic woman—"I'd get you a coffee, but I can't leave the desk." Larian is relaxed too when he talks about Barbie. He can afford to be. It is his doll, Bratz, that is causing all the problems. Similar to Barbie in size, she has a cartoonish look with huge eyes and exaggerated features. She is hip and ethnic, and she too comes with endless accessories.

Larian, youthful looking with a shock of black hair, reminds me of actor Michael J. Fox, with the same ready smile. There are family portraits on his huge, half-circle desk, piles of boxes on the floor, Bratz dolls on shelves everywhere. He has become the little guy in a classic David and Goliath clash. Coming out of nowhere in the best toy industry tradition, he has gambled his own cash (more than $5 million, he tells me) on something no one else thought could fly—and in the process has turned the industry upside-down. From nothing, he has taken Bratz to a billion-dollar-plus property. (In 1 week, picked at random, the three top-selling toys in the United States for 5- to 7-year-olds at Toysrus.com were Bratz dolls. Barbie was down at 9 and 10.)

Larian loves goading Mattel in public. "It's too late for Mattel. They're not going to stop this train now. Mattel's boss comes from the cheese industry. They don't see that selling cheese and [selling] toys are very different." Today Larian is more dismissive than vicious about his rival. "Mattel can't even say our name," he assures me. "They call us 'our nearest competitor.' I'm thinking of changing our company name [from MGA Entertainment] to MNC Entertainment—Mattel's Nearest Competitor."[*]

There's a great touch of the actor about him, and he grins winningly before stressing that while other companies have red tape, he stays personally involved, approving everything. That he's done it all against Mattel, a mean, unlovable, corporate bully of a company, makes it all the sweeter. Many in the toy business still cannot believe it. They tell me it cannot last. He is too dependent on one product,

[*] Mattel fervently denies that executives have ever refused to speak aloud the name of MGA, though they say nothing about the tone they use.

EXHIBIT 92
PAGE 2684

80                           THE REAL TOY STORY

they say; when that crashes (as hot toys invariably do) the big chains will drop him and his other toys too. Those who once forecast that Larian's doll could never take off now tell me why it just had to succeed. Just as their predecessors did nearly a half century before when Barbie was born.

Barbie, even more than Bratz, was the creation of one entrepreneur. The doll's birth, her subsequent often stormy history, the scale of her success, the size and expertise and ruthlessness of those who safeguard her, all tell more about changes in the modern toy industry than almost anything else.

Like Bratz, Barbie began in California, and like Bratz Barbie was a product of her time. Before the 1950s, girls cradled and cuddled baby dolls. Most women still remained at home, cooking, cleaning, and caring for children. But their daughters were becoming a hitherto unidentified group—teenagers. Times were good, and it was a pampered generation. Barbie, with her freedom and purchasing power, reflected the new culture. Like other Americans reveling in a strong postwar economy, Barbie would seek her fulfillment in goods and gadgets.

Ruth Handler had already noticed how her daughter Barbara preferred playing with paper cutout dolls. She had begun to contemplate a new doll, grown-up looking, that would allow girls to project fantasies of adult independence and glamour. After all, these girls did not need to stay home. They could be models or career girls, wear fashionable clothes, and teeter on high heels.

All this was in the future. Ruth, the tenth child born to Polish immigrants in 1916, moved to California after graduating and married her high school sweetheart Elliot Handler. A penniless artist, he

EXHIBIT 92
PAGE 2685

housewares he made for their apartment proved popular and sold from their garage. They moved into jewelry, and business flourished until the war. In 1945, with their foreman Harold Matson, they formed Mattel (merging the men's names) to make picture frames. They found bigger profits in making dollhouses from picture frame scraps—and in doing so, discovered the toy market. Interviewed in 1998, Ruth told Forbes Small Business, "We didn't know how to run a business, but we had dreams and talent."

Elliot's contribution was visionary product development; Ruth's was as a marketer and salesperson. Matson was forced out by stress, while the Handlers virtually created the modern, professional toy industry. Their innovations were numerous: They became the first company to make toys from a variety of different materials. Starting with a music box, they produced toy mechanisms that could be used in a variety of products year after year. Ruth was credited with the then revolutionary decision to aim advertising directly at the child rather than the adult buyer.

What some observers have called the "single most important moment in the history of the American toy industry" occurred when, on vacation in Switzerland, Ruth Handler saw a very adult doll called Lilli. With curves perched above high heels, it was based—though Ruth did not know it then—on a prostitute from a German adult cartoon and aimed at men. M.G. Lord, Barbie's unauthorized biographer of Forever Barbie: The Unauthorized Biography of a Real Doll wrote, "Lilli isn't just a symbol of sex; she is a symbol of illicit sex." Vitally, though, this doll had the grown-up physical characteristics Ruth had envisaged for her doll—long legs, a tiny waist, a bust.

Back in California, Ruth had to overcome the resistance of engineers ("too expensive to produce"), advertising people ("too sexy"), and of other insider skeptics (she had never designed a toy). For economy, Barbie was manufactured in Japan out of injection-molded vinyl. Charlotte Johnson, a fashion designer, worked with a Japanese stylist to develop clothes that minimized the sewing process; then contracted to Japanese housewives. Finally, after 3 years, Ruth's doll was launched at the 1959 Toy Fair, named Barbie (after the Handlers' daughter) and labeled Barbie Teenage Fashion Model. The source was

Dec 17 2007 4:18PM   HP LASERJET FAX

EXHIBIT 92
PAGE 2686

82                             THE REAL TOY STORY

unmistakable: As with Lilli, there was overstated makeup, exaggerated shape, and a ponytail—but unlike for the German doll, there were no nipples. (Ken, introduced later as Barbie's boyfriend and named after the Handlers' son, is similarly desexed, his genitals a mere bump under his briefs.)

The new doll was totally out of sync with the sought-after toys of that year—large plastic playthings such as Ideal Toys' Mister Machine. Buyers hated it. They found Barbie's breasts particularly disturbing; no doll had looked like this before. Sears, the key toy-buying company of the time, would not place an order at all. The minority who did order bought small. Market research proved disappointing: Mothers hated the doll too. Barbie had "too much of a figure." Mattel lowered its sales projections of 20,000 dolls a week and 40,000 clothing items, and cut factory orders. But one finding in the research had been underestimated—no matter what mothers thought, girls themselves loved the doll. And soon they began to make their wants known.

By the end of the year more than 350,000 Barbies had been sold. Mattel needed a department just to deal with Barbie's 20,000 letters a week. As a result of her success, Mattel went public in 1960; its shares were selling at $10. A decade later those same shares topped $500. By 1963 it was on the Fortune 500 list. Ruth's genius was not just that she had sensed an unrealized and therefore unexploited gap but that what she created was a merchandiser's dream. It allowed girls to be part of the new world of fashion that had emerged after the shortages of World War II, beginning as couture and then filtering out to department stores. It was always part of Ruth's philosophy that Barbie could be whatever her owner wanted; that she had no predetermined personality. In crude marketing terms, this opened the way to scores of play accessories and clothes; each a money earner. And, as girls might want to project themselves differently in different moods, there was room for more than one Barbie in each girl's life—the average American girl, it was later estimated, owns 40. (Only one Ken, though. For most of his life he has been regarded as an accessory.)

"You get hooked on the doll, and then you buy the rest," acknowl-

EXHIBIT 92
PAGE 2687

edged Elliot Handler. "I know a lot of parents hate us for this, but it's going to be around a long time."

Barbie's—and Mattel's—life has been turbulent. Mattel's genius has always been its ability to reinvigorate its biggest earner. By the 1980s Barbie was needing it. Although still a mainstay of the business, she was looking passé. Mattel, hit by the failure of a diversification program, faced bankruptcy. Another woman entered Barbie's life—and saved both doll and company. Jill Barad joined Mattel as a product manager in 1981. Her starting salary was $38,000 a year; she was later to become arguably the highest paid woman in the world. She earned a reputation for being as tough within Mattel as she proved in dealing with competitors. A past colleague described her to me as "a killer—and that's the kindest thing you can say." Her former boss, Judy Shackelford, Mattel's first female vice president, told *Business Week*, "It's a shark pond. You throw people in and see if they can swim fast enough to stay alive. For Jill, it was a fit."

Reincarnated under Barad, Barbie entered a golden age. Her earnings soared from $200 million to $1.9 billion. Barbies were segmented, sold for a variety of different play patterns. Day-to-Night Barbie—executive and party girl—led the way. Instead of three new dolls a year, there were now dozens, all accessorized. Barbie, who had enraged feminists for encouraging girls to regard themselves as mannequins, sex objects, or housekeepers, was now presented as a symbol of female empowerment with an advertising campaign, "We Girls Can Do Anything."

In 1997, the year Barad became CEO, she earned a remuneration package of $26.3 million, had the building repainted in bright colors, and, extending both arms, told the company's 25,000 employees on video, "I love you all." Throughout nearly two decades, she became synonymous with her product. She dressed in Barbie-pink suits and signature high heels. Her Bel Air mansion fittingly displayed a 5-foot model of Barbie by the stairs and an Andy Warhol painting

EXHIBIT 92
PAGE 2688

84                              THE REAL TOY STORY

of the doll. Her "anything is possible" philosophy might have been Barbie's. She delighted in telling a bumblebee story recounted by her mother. "She told me, 'Aerodynamically, bees shouldn't be able to fly. But they do!'"

Barbie's ability to adapt, to be contemporary, depends on an intelligence machine that would have chilled George Orwell's blood. Insiders boast of its size and scope, its ability to feed exclusive information. Teams of research scientists take a constant flow of data collected internally and brought in from third parties and manipulate it with sophisticated software. There are sales figures, trend and demographic information from five or more market research companies, interviews in malls, anecdotal material culled from buyers about the competition, and material gathered from Web sites. There is a mass of "psychographic" data about girls of different ages, about how they play, their hobbies, the television programs, music, and clothes they like, their favorite singers. It pours in from focus groups worldwide, including Mattel's own test center where children are observed through one-way mirrors. Mattel researchers visit children's homes to watch girls play. Barbie's position in a room is noted. On the bed or on the floor next to dolls clothes is good: The first indicates love, the second active play. Out of the way on a shelf, unless it is a collector's Barbie, is bad—this Barbie isn't played with anymore. Research for years persuaded Mattel not to try to update the notorious Ken; outdated though he might look. Young girls found a more contemporary Ken too scary—they wanted him clean-cut, unthreatening, more like Dad.[7] Barbie designers videotape girls' birthday parties, and what they shoot is examined and analyzed.

    And Barbie has altered over the years—her looks, lifestyle, jobs, and fashions. The first Barbies had a sidelong glance, a closed mouth,

7. In 2005, to coincide with Toy Fair and as perhaps another sign of Mattel's desperation to keep pace, Ken finally did emerge with a new look, made over by Hollywood stylist Phillip Bloch, to be "more with it today."

EXHIBIT 92
PAGE 2689

what Mattel calls "a little more mysterious" look. Later she became more youthful, outdoorsy, carefree, smiling; later still there was a big grin, very bright eyes, lots of blue eye makeup, big hair. The Ponytails gave way to bubble cuts and pageboy hairstyles. She started as a model and over the years has had more than 90 careers. She has been fashion editor, ballerina, stewardess, astronaut, doctor, nurse, veterinarian, a paleontologist, firefighter, Marine Corps sergeant, concert pianist, aerobics instructor, rock star, fashion designer. She has run for president three times and competed in the Olympics. Barbies have been Italian, Parisian, British royalty, Eskimo, Japanese, Korean, Jamaican, Native American . . . Her clothes have been designed by many great names: Armani, Givenchi, Calvin Klein, Donna Karan, Christian Dior, Ralph Lauren, Gianni Versace, Bill Blass, Vivienne Westwood. After the Beatles invasion she adopted the "Carnaby Street" look, then went mod. She took on the "prairie look," and the glittery styles of the disco years. Her varied wardrobe is such, says Ivy Ross, that "we're bigger than any garment maker in the world." All in all, 92 percent of Barbie dolls are designed new every single year. "We're not in the business where you carry over last year's Barbie," says Ms. Ross. It is like fashion: "You wouldn't have the same slacks of that color sitting in Macy's for more than a season."

Barbie's family and friends have been developed—and exploited. Mattel helpfully has a Barbie Family Tree, listing them all with a separate column for pets, including several (named) horses, dogs, and kittens. (There have been failures. Barbie's little sister Skipper was engineered so that when her arm was twisted she grew breasts. Later Barbie's best friend Midge came pregnant with a protruding rounded belly; when it was lifted off, a baby dropped out. Not everyone welcomed it—Wal-Mart pulled them off the shelves after complaints.)

By the time Jill Barad went, the world around Barbie was shifting faster than ever. "She reinvents herself over and over again," says Julia

EXHIBIT 92
PAGE 2690

86                    THE REAL TOY STORY

Jensen, director of public relations for Barbie. Wasn't she, at heart, still the same old plastic princess?

Meanwhile, Isaac Larian was also contemplating dolls. After emigrating to Los Angeles in 1971 at age 17 with $750 in his pocket, Larian washed dishes at a diner and eventually earned a civil engineering degree from California State University. After college, he started a company importing consumer electronics and in 1987 scored big with a line of handheld games featuring characters licensed from Nintendo. The company, which had started as ABC International Tradings, became Microgames of America, and then later simply MGA Entertainment. It developed its first doll, Singing Bouncy Baby in 1997. Bounced, the doll sang, squeezed, and giggled. Larian says it sold 1 million pieces.

My Dream Baby, introduced in 2000, was interactive, grew from infant to toddler, learned to crawl and walk, to speak, sing, and play games. The price was a hefty $99.99. The following year, it morphed into a scaled-down version called Toddler Tabitha. Whatever their success, none had that wow factor. They certainly had nothing to worry about over at Mattel.

Exactly how Bratz was born runs to a number of versions. Some are no doubt the stuff of attorney conferences. Larian told *License Europe* that it all started when a Wal-Mart buyer told him that if he could bring in a doll that would compete with Barbie, he would take it. "Finally a designer came up with the Bratz look. We tested it and found it worked." The story Larian told me was this: "One inventor showed us sketches of what are Bratz dolls now, in September or October of 2000, and I felt in my gut it was a good thing." The name of Carter Bryant, a former Mattel designer, features several times. "In 2000 . . . Bryant walked into his California office with a drawing of a Bratz doll . . . Larian commissioned a prototype . . ." (In April 2004, Mattel filed a lawsuit in Los Angeles County Superior Court alleging that Bryant "aided and assisted" MGA while he was employed by Mat-

EXHIBIT 92
PAGE 2691

tel. Bryant asserted counterclaims in some of which he sought to invalidate Mattel's confidential information and propriety inventions agreements with its employees.) According to the London *Times*, it all began with Paula Treantafelles, a product designer who moved from Mattel to MGA in 1999. "Executives moaned that girls were getting older faster, so they couldn't be blamed for Barbie's diminishing age profile. I didn't agree. I'd heard about this crazy Iranian guy who could challenge their taboos. So I came here." Within six months, she had brought Larian her idea of a fashion doll targeted at 7- to 10-year-olds. The name Bratz was suggested by Carter Bryant, who provided initial drawings.

One thing is beyond dispute: Larian liked what he saw. "It was different . . . it was about fashion. Actually that day my daughter Yasmin, who was ten years old at that time—one of the dolls is named after her—was here, so you know I asked, 'What do you think?' And you could see the sparkle in her eyes, and she said, 'Dad, this is really good.' Always I've found kids are very honest. You know, if they don't like something, they tell you, 'Oh, its crap.' So I said, Lets take a risk—let's go."


Mattel's intelligence machine had long been picking up signs that older girls were losing interest in traditional Barbie. It was the toy industry's great dread: the KGOY—kids getting older younger—syndrome, in Barbie's case writ large. In the 1960s and 1970s girls played with Barbie until their early teens. Now her core fans were ages 3 to 6. It was extra frightening that the group abandoning Barbie was such a key one in marketing terms. Not long ago, the youth market divided neatly into 12 and under and teens. In the mid-1990s, the famous tweens emerged (a vague term, but generally defined as children age 7 to 12). Their attention has been increasingly coveted. Tweens are valuable because of their own spending power—they control $1.7 billion of their own money. But beyond this is their influence on what others buy, and their own future buying: Brand loyalties that

EXHIBIT 92
PAGE 2692

will last all their lives are formed at this age. Two thirds of tweens live in single-parent or two-parent working households, which means they often make crucial household decisions themselves. It is a group that has grown up with MTV, computers, and electronic gadgets. Some claim they are cynical; they are certainly media savvy. But they are also young and impressionable, greatly influenced by their peers, television, music, and fashion. Their attention span is short, their desire for topicality constant. In the mid-1990s, a trend could last 3 years; a decade later, it was down to months, a year tops. And as they have become ever more sophisticated consumers, they have become harder for the toy industry to attract.

Mattel knew Barbie was in urgent need of a revamp. Ivy Ross was pulled in to mount a major one. She grew up with design; her father designed the Studebaker Hawk; she herself has created products, from handbags to watches to jewelry (her work is in several major museums). She was just settling at Calvin Klein as president of the men's accessory division when she got a call inviting her to make Barbie a modern woman. "Literally my heart began to pound. I played with Barbie when I was a kid, and I know exactly what she did for me."

Sipping tea in her green-carpeted office with collector Barbies regarding us from the shelves, Ivy Ross is immediately likable. Animated in tight trousers, slashed black velvet shirt and drop earrings, she explains how she took the job and "arrived with two suitcases." Once in Mattel's long white design center building, she found 50 Barbie designers all working on their own, almost competitively. "People would design in a vacuum and they'd kind of come out when it was done and present their idea of the doll . . . And we'd recover their designs at night . . . they were very possessive." She set out to change the culture, make it more cooperative, more conscious of outside influences. "It was a sort of like-mind flash: What were modern women doing, aspiring to do, today?" Before dolls were started, collages were regularly put together from girls' magazines to show what they were seeing, and

EXHIBIT 92
PAGE 2693

reading, what their influences were. "I mean [once] you had long periods of time when French couture clothing was what people aspired to for ten years. Now what they aspire to this month could be different two months from now." Barbie's body shape changed. "My mind immediately went, 'Oh my God, the poor doll can't even do yoga. She's not designed to even bend.'" Barbie also grew wider hips, a fatter waist, and smaller breasts, to better display midriff-baring fashions like crop tops and hipster pants. Her look became what Mattel called "more subtle" with a less toothy grin, no more bright aqua-blue eye makeup. The new millennium Barbie came with softer pink packaging and hot fashions such as knit tops and bootleg pants, activity sets that allowed girls to create their own lip gloss and nail hues. She had high-tech products such as a scrapbook with talking stickers and voice-activated locks, and a compact that allowed users to record a secret message. Mattel trumpeted its updated creation: "The Barbie doll has done it again. She's reinvented herself to fit with the fast-paced, ultra-modern world of girls today. There's no mistaking Barbie for last millennium's doll . . . the line has a fresh feel to secure at least four more decades on top."

Mattel might have come up with a reinvention, but in North Hills, Larian was mounting a coup. His new doll went into prototype. Although a gambler, Larian is a great believer in asking kids and focus groups. "I can't make decisions for eleven- or twelve-year-olds. I didn't have many toys when I was a kid; my wife says, 'You're living your childhood.' Maybe I am. I communicate with children very well, and sometimes it's hard for adults to do that. I bring myself to their level, I'm like a four-year-old kid. I listen to them. They will always tell you truth because their mind has not been poisoned yet." He says if kids don't like a product, he will drop it no matter what designers and buyers say. This time his gut reaction was confirmed. What the girls saw was a lavishly made-up doll with a bored expression, its eyes heavy-lidded and loaded with color. The lips were bee-stung, the body curvaceous. Oversized heads were emphasized by the skinniness of the rest of the body.

EXHIBIT 92
PAGE 2694

The clothes were skimpy, ultra-fashionable, perched over pert little bottoms. Next to his doll he put Barbie and then asked what Barbie reminded them of. " 'Our mothers,' they replied."

It was not the first time Larian had been convinced he had a major winner. He'd tried the Magic Touch Pony—when it was brushed, electronics lit up its eyes or set it galloping. Only it didn't sell. Larian claims he lost millions. The amount he was gambling on Bratz was even greater: $5 million "just to get it out of the gate—the tooling alone was about a million dollars." Within 3 months samples were ready in Hong Kong. He launched Bratz in Spain, where sales were good. "Then we put it in the USA in August and we thought it was gonna be huge by September." Sales were not great. Those early days, he says, were a "big time" struggle. He toured buyers. "I was persuading them, begging: 'Please, this is good. I believe in it. Give me one chance. If you don't sell it, I'll take it back.' It's a hard thing, selling, and you get rejected every time. I have learned. I don't take no for an answer; I'm very persistent. Buyers have thrown me out of their office, and I have come back the next day. They say, 'Didn't I throw you out the door yesterday?' I say, 'Yes, you did, but . . .'" Toys "R" Us canceled a large order. "I remember thinking, 'Oh shit! Here we go again, another Magic Touch Pony. We're gonna go out!' But we had done so well in focus group studies and the kids really liked it . . . so we kept on the TV advertisement and pushed it more, and three weeks later . . . boom! All of a sudden it was like horses coming out of the gate! Toys "R" Us had canceled by the middle of September and by, I think, the end of September, early October, they came back and they wanted to buy all of those back and more, and by end of December it was the number one selling fashion doll in the industry, and it's been there since then."

*  *  *

EXHIBIT 92
PAGE 2695

On the surface, life for Barbie was looking good as the new century opened. *Barbie in the Nutcracker* was the first of a series of videos. Even if sales were down domestically, international markets showed double-digit sales growth. In the words of M.G. Lord, Barbie's unauthorized biographer, "Barbie's challengers do not tend to last long." They had all been "systematically annihilated." An early casualty was Miss Seventeen, from Marx Toys. Louis Marx had acquired rights to the Lilli doll and sued Mattel for patent infringement, claiming they had copied her and perpetuated a fraud by leading the public to believe Barbie was an original product. The suit was unsuccessful. Britain's big challenger, Sindy ("the doll you love to dress"), brought out the Mattel cavalry after Hasbro acquired the manufacturing rights from Pedigree Toys, updated her look and packaged her in Barbie pink. Legal battles raged in country after country, from Belgium to Australia. Finally Hasbro dropped the pink and agreed to give Sindy a different head, one cleared with Mattel. (In 1996 Sindy left Hasbro and 2 years later became a Vivid Imaginations product.)

Dolls offering something new and attention grabbing have often found themselves confronted with a fresh Barbie, featuring those same features, backed by all Mattel's clout. They trashed Hasbro's blond, busty Miss America doll by introducing American Beauty Queen Barbie. Likewise, Tyco Toys' Little Mermaid doll initially skyrocketed but eventually ran aground on a shoal of mermaid Barbies. Hasbro's Jem, in 1986, was a rock star fashion doll, and for a time looked like a very serious threat. She was launched complete with television show, books, posters, T-shirts, and tape recorder. Mattel struck back with an MTV version, Barbie and the Rockers, and outgunned its opponent with superior marketing power and faster-to-store shipping.

Underpinning Barbie's triumph over rivals has been Ruth Handler's original brilliant decision that the doll should be a blank canvas for a girl to make her whatever she wants. "She isn't anything in particular; she becomes a vehicle for their dreams, their aspirations, their frus-

P.1

**EXHIBIT 92
PAGE 2696**

trations—their dress and appeal for everyday life," says Ivy Ross. "Even when she's in a new movie, Barbie is to Rapunzel. It's not Barbie as Rapunzel." And here, she believes, lies Barbie's secret. Hasbro's Jem, for example, failed because she was presented as a rock star. "That's all she was, and you can't backtrack. They play with her only when they want a rock star. With Barbie, you just buy the rock star fashion. It's a fundamental mistake of their competitors," she says, "that they produce dolls with such fixed roles. It's too narrow a focus."

Barbie has always been discussed within Mattel as though she were a living being. "We all sit around and do this exercise about if she were a person," Ross and Julia Jensen tell me. "How would she be emotionally; would she have problems?" Her personality and core values are preserved with extreme vigilance. There are strict limits as to what Mattel will allow her to do or to be. "When she has, for instance, there were very serious dialogues. We realize the responsibility that comes with them when we put her in these roles. Is it right for her?" Ross insists this "is not overtly empowering. I recognize it's toys so there's something fun and lighthearted about it, but this particular toy comes infused with a lot of baggage because it is an iconic symbol."

And iconic it seems, even if the storybooks are rewritten. Barbie can never be the traditional damsel in distress. She has to be involved with her own rescue. This is also reflected in her clothes. "A confident woman knows exactly what she should wear," opines Ms. Ross. "We carry this line we use in training: Barbie's unapologetically all girl. That's where the confidence comes from. She is not going to apologize about being a woman, being a girl. If high-heeled shoes are in, she's going to be wearing them."

These core Barbie qualities constitute it. Therein lies her strength, but they are also her weakness. How, at a time of fast and drastic cultural shifts, can you alter Barbie dramatically without losing all those qualities that make her not only all girl but also uniquely clear?

Larian had no such problem. From the start, Bratz was aimed firmly at the 7- to 12-year-old girl market, Barbie's deserters. And he succeeded where Mattel and Barbie had failed—he got tweens to play with dolls. After the initial struggles, Bratz quickly became one of the best-selling toys in the United States. Before Bratz in 2001, Mattel was estimated to have about 90 percent of the U.S. fashion dolls market. Within three years it was down to 70 percent. In the United Kingdom, Bratz accounted for 4 percent of all toy purchases by Christmas 2004. Larian, delighting in his triumph, volunteers his explanation: "It's the look in the eyes of each doll. Go to China and take a look at the face painting—it takes sixteen layers by hand. And the kids are attracted to that; the amount of detail in the clothing, the fashion. It is what the girls want, and we're giving it to them." Another selling point is that they are multiethnic. "You could be in South America and look at Yasmin and say, 'Okay, it's a South American girl,' or you could be in the Middle East and you could say, 'Oh, she's from the Middle East.' But she's the same one. We decided at the beginning the key thing was to keep the characters ambiguous. Not everybody is blond and six foot two inches and has perfect proportions. We're gonna make these dolls multiracial, mix and match. That's the way society is. It was a risky decision because a lot of retailers are gonna say, 'Oh, African American dolls do not sell in our store or Hispanic dolls do not sell in our store.' It took us two years to convince everybody."

This time around, it took more than a year for Mattel to hit back. It conducted a global, ethnographic research project, designed to understand how girls at different ages spent every minute of the day. It emerged that the same qualities that made Barbie appealing to 3- to 6-year-olds also made her unappealing to older girls. The play patterns of younger girls and tweens are very different. Preschoolers are discovering the world and want fantasy; tweens are trying to determine who they are and desire more realistic play that reflects their increasing social interaction and their concerns. The result was My Scene, a

**EXHIBIT 92**
**PAGE 2698**

EXHIBIT 92
PAGE 2699

Mattel's attempts to retaliate led to a spectacular flop. Tattooed, hip-hop-styled Flavas were introduced in 2003, complete with exposed midriffs, bling, baggy pants, and a cardboard cutout wall with graffiti. Flavas—meaning "personal style"—were again aimed at the 7-to-12 group. Mattel was convinced they had caught the moment—hip-hop had moved into the daily consciousness of the tween generation. Critics thought them too edgy, too bad girl. On the Web, an anonymous poster asked, "What the hell is Mattel smoking? . . . My little sister [had] better not ask for one of these dolls." Isaac Larian, never one to pass up a good shot, commented, "The only thing missing is a cocaine vial." Critics were right. Flavas were discontinued within the year.

As rivals, Bratz and Barbie have at least three characteristics in common. Their makers see them less as dolls than as the center of lifestyle merchandising. They excite controversy, especially over their role in the premature sexualization of young girls. And their companies are utterly ruthless about protecting and defending their billion-dollar properties.

"Lifestyle merchandising" means Barbie and Bratz exist at the center of two vast global empires with products ranging from picture frames to bedding, digital cameras to cosmetics, designer clothes to sporting goods. Both Mattel and MGA have extended their franchises into music, movies, and DVDs. The sums involved are vast. Barbie licensed goods in 2004 were unofficially estimated to generate $2.2 billion to $2.4 billion in retail sales.

In a corner office with two glass walls on the pink floor of Mattel headquarters, Richard Dickson keeps a tight rein on the Barbie licensing empire. Stylish in a black sweater, he was brought in to overhaul the machine. It meant some blood on the carpet. He mentions in a gentle voice that "we had a lot of people who are unfortunately, not

EXHIBIT 92
PAGE 2700

with us." Under him business has doubled. Previously, Mattel simply reacted to requests for licenses. Now there are more than 600 licenses around the world and an overall proactive global strategy in more than 30 categories. "For instance, Barbie has the perfect name and heritage to be a fashion brand. So what does that really mean?" He takes a sip from his bottle of mineral water, then explains why Mattel has pursued fashion tie-ups. Data from 55 countries show that tweens spend their money on what Dickson terms "apparel and accessories," so much so that this has become bigger than the toy category. Hard work is its reward. "We now rank as the number one apparel brand in some countries. It's a very big piece of our business. Probably exceeding, at this point, four hundred million dollars," he flourishes a paint-fresh sample, a bathing suit by trendy Brazilian designer Rosa Chá.

Dickson straightens his leather jacket, considering the balancing act in which he is constantly engaged. "Licensed product can enhance the doll and the overall brand image, assist in difficult times, and, some would say, ride the wave in good times." But licensing, while lucrative, is also a potentially dangerous endeavor. There's a very fine line of oversaturation and destroying the halo effect if done improperly. Hence the tough control. Some massive low-priced food products, it was decided, diluted her fashion image, and others pushed a limited-edition lithograph of Barbie in evening dress (that 1950s fashion sketches), elaborately framed, signed and numbered, costs $200.

Mattel runs Barbie licenses with missionary zeal. It controls not only the look and feel of products that carry the famous name, but also the marketing. Dickson arrived to find seven hundred licensees around the world all advertising, promoting, doing special events with their own perspective, interpreting the brand image without the proper tools. Imagine. "He put a stop to that. "So we basically set the rules of engagement, and now have everything funneled through our creative office so that no matter what, consumers that are around us wherever you are, if you see a Barbie product, a Barbie product, this is a system around the globe . . . Now that's a very powerful thing that is so consistent and powerful that the perception is that we spend

EXHIBIT 92
PAGE 2701

millions on advertising when all we really do is control the creative of our licensees.... If you looked at my sales at a billion two and then took fifteen percent of that, it's a pretty significant number being spent (by the licensees) on advertising, so you have over a hundred million dollars in additional brand impression on top of what Mattel spends."

So say I've got a license—what do I have to clear with Mattel? "The product interpretation, the communications of the brand on all levels. If you're communicating to the trade or the consumer, to the retailer or the salespeople, all the materials need to feel branded consistently. The speak also needs to be consistent—what are the inherent messages when dealing with Barbie? Fashion, fun, friendship. Friendship is a big part of a little girl's life between three and eight years old, so fun, fashion, and friendship become key traits and words that we use throughout everything we do." In practice it means a licensee—especially a new one—must submit everything for approval "to make sure that you're up to speed with our expectations. After a series of successful events we probably will become more lenient, because there's already a learning process you've gone through that allows us to give you more flexibility." But the indoctrination goes further yet. "We put your items in a melting pot with what is happening around the world, around the country, around the category with the brand. Because in isolation a licensee doesn't know what is going on in the macro format of the brand, whereas we can see everything everyone is doing and then in some cases synergize people. We can say, 'Oh my goodness, do the backpack people know that the shoe people are doing an event that same week? If we put them together and provide merchandising, we can make a much bigger event.' So we pull all this information together to keep the brand consistent from a creative perspective, and from a business perspective the information is powerful because we're able to then feed back out ways to either maximize that event, expand on that event, or just acknowledge the event when there's an event."

Successful licensing grabs a girl very young and holds onto her, Julia Jensen enthuses. "You look at a little girl like, she's three years old, she loves Barbie, she's playing with fantasy dolls. She gets a little older, she's five or six and she's playing with fashion dolls now and all

EXHIBIT 92
PAGE 2702