98                    THE REAL TOY STORY

of a sudden she's going to first grade. She can't bring her Barbie because that feels kinda weird, like people will think that it might — there's all kinds of stigma attached — but she can carry her Barbie backpack. So here's this emotional something to her best friend Barbie as going to school with her. A lot of what we see is that girls will still play with the dolls at home, but in the outer world it's the Barbie T-shirt, it's the backpack, it's the handheld game. . . . It's like a brand that's gonna hold them all together." How far can you keep going up with age groups? Dickson tells me he thinks the Barbie name can be used to sell products well into adulthood, say 45. He claims Barbie is the first designer name a little girl knows. Not all find it so commendable. Commenting on a sultry Macdonald-Barbie-branded designer range for girls, the *Financial Times* wrote: "Mattel is behaving like a distiller that markets a limited edition 50-year-old whisky in the hope that the glamour rubs off on the cheaper blend drunk by the masses. . . . This strategy may be fine when aimed at middle-aged drinkers, but it might be wrong to encourage children to want products that in the vast majority of cases neither they nor their parents can afford." A collection for adult women debuted first in Japan, where Mattel has stand-alone stores. Globally, Mattel teamed up with the Italian clothing company to create a Barbie loves Benetton line with an introductory 40 garments and accessories. . . .

Barbie's role as a doll representing woman as sexual object has been supplanted by Bratz. Unsurprisingly, mothers, whose own applies squirmed at Barbie's impossible shape, now see her as the traditional safe dolly. Bratz is the doll of the Britney Spears generation, with her skimpy clothes, thick makeup, and suggestive toys and trappings. The spin-offs reinforce it. The *Bratz Superstyling Funktivity Book* invites a girl "Join the glamorous theme, design your own eye shadow and lipgloss." . . . being the insatiable elite. An advocacy group, Commercial Exploitation [illegible] tells a group of [illegible] in New York about the [illegible]

EXHIBIT 92
PAGE 2703

trend for girls that promotes stereotyped and sexualized behaviors that children cannot understand. They make the way bodies look a focus of play. P. Logan Brownei, writing in the college newspaper *Cornell Daily Sun*, described her shock at coming across Bratz in the toy aisles of Target. "I was, to say the least, disturbed by the fact that this is the most popular doll on the market for 9- to 12-year-old girls." Saying she does "not consider myself conservative," she added, "There is clearly a fundamental problem with young girls playing with dolls who are sluts. What next? Bratz Frat Party, with girls being date raped? Whatever happened to innocence? Barbie may have led girls to have harmful body images but she didn't show them how to sell their bodies." The Bratz doll toy package trumpets proudly: Toy of the Year," said an editorial in the *Times Herald-Record*, Middletown, New York. "Chosen by whom? *Penthouse*?" Lauren Beckham Falcone, at the *Boston Herald*, felt the same way. "Is it me, or does the doll section at Toys "R" Us resemble the Friday-night stripper lineup at the Foxy Lady? . . . Plus the accessories look like a pimp's laundry list. . . . I understand dolls are fantasy play for kids, and I know fashion dolls have always been a bit controversial—well, at least since Gloria Steinem came along. But when girls have their whole lives to play with this kind of fire, why give them the matches now?" Syndicated columnist Froma Harrop calls them "brazen," "trampy," and "appalling." Patricia Leavey, a sociologist specializing in gender issues at Stonehill College in Easton, Massachusetts, finds them repugnant and hypersexual. New York psychologist Dr. Sheena Hankin dislikes the cultural trend of earlier sexualization of little girls. "Overexposure to sexuality at a young age can lead to sexual dysfunction later in life." Robert Verdi, senior correspondent for the *Full Frontal Fashion* television show, commented on Yasmin, "Slutty, that's the only word for it." Teens and 20-year-olds in a class at New York's Fashion Institute of Technology were reportedly shocked by the doll's see-through thong underwear. One student said, "If kids are really playing with this, I would be concerned." . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

It is all part of the sexualizing of younger target groups for marketing reasons. Always a selling instrument, sex is now aimed firmly at tweens. It is meant to make them feel older, more empowered,

EXHIBIT 92
PAGE 2704

100                    THE REAL TOY STORY

more likely to demand successfully what they want. Toys are not the only villains. The bombardment also comes from the wide range of industries so cleverly linked to them: clothes, video games, music. At its extreme there is racy clothing, makeup, lingerie—for girls who don't need them. As one Canadian columnist put it, "Innocent six year olds are not as profitable as sophisticated ones." Small children are being cultivated to be consumers and to be consumed.

Unsurprisingly, no one will admit to this strategy. Larian, of course, disagrees—and no doubt relishes the publicity: "Children are growing up faster than ever but I just don't agree that my dolls are so sexualized." "This is not to do with sex, believe me. And it will not be as long as I am in control of my company. This is about giving children what they want." He says of complaints from mothers about the clothes, "That's the fight I always have with my wife. But their disapproval is the reason for Bratz's great success. Kids are little rebels. If Mom doesn't like something, then they like it." And, "you know, it's always adults who make these claims about sexualization. Ask the kids, and they say they like Bratz [toll] because they're sexy, but because they're fashionable." He is not alone in his protestations. Mattel has a Barbie perfume for young girls. Denying that it would project an adult sensuality onto children, Richard Dickson told the *Financial Times* that Mattel was trying to help girls discover their sense of smell.

Some countries have reacted to the sexy figurines with real anger. Barbie is banned in Saudi Arabia, where the religion police declare her a threat to morality: "Jewish Barbie dolls, with their revealing clothes and shameful postures, accessories, and tools are a symbol of decadence from the perverted West. Watch out for her." In Cairo, officials at the Arab League have headed efforts to create local dolls to oust Barbie. Dr. Able Ibrahiem explained, "Barbie wears a bikini and drinks champagne. We need to prevent our children from feeling torn between their Arab traditions and the lifestyle that Barbie represents." At the recently titled Institute for the Middle East Development of

EXHIBIT 92
PAGE 2705

## Barbie Goes to War: Battle of the Dolls

Children and Young Adults, a government agency affiliated with the Ministry of Education, developed two Muslim dolls, Dara and Sara, to compete. Each of the four models of Sara came with a white scarf. A toy seller, Masoumeh Rahimi, told the BBC, "I think every Barbie doll is more harmful than an American missile." The Iranians did not leave success entirely to conscience. The new dolls, manufactured in China, were priced at 125,000 rials ($15), compared with 332,000 rials for a genuine Barbie or 25,000 rials for a copy. Another Arab doll, Fulla, has skirts that fall below the knee, and her shoulders are always covered. In the 18 months after she was conceived in Syria in 2003, she became the biggest-selling doll in the Middle East, complete with several outfits, luggage, and friends. There were also Fulla umbrellas, watches, bicycles, CD players, swimming pools, and breakfast cereals. Fawaz Abidin, Fulla brand manager for the parent company, New Boy, said, "She's not only a sexy lady but she's [also] honest, loving, and caring and, respects her mother and father—things Arab parents would like for their kids." Like Barbie, she too is made in China, the accessories often in the same factories as Mattel's. She will be allowed to be a teacher or a doctor, but beyond that her life revolves around home and family. Nor will she have any boyfriends. Religious Jews have produced their own doll, Shimmi. Said to outsell Barbie in ultra-Orthodox areas of Israel, the doll avoids the biblical prohibition on creating idols by having only four fingers on each hand and a clown's red nose. Instead of the latest fashion, he wears tzitzit and a yarmulke. Press his hand, and he recites prayers in Hebrew. In Los Angeles, Monica Garcia, a convert to Judaism, built up a (very) small business with a line of modest Barbie clothing she designed and sold on the Web. "Barbie is a slut," she said, and her customers "want a doll that's dressed appropriately." In Russia, where Barbie dominates the doll market, there have been attempts to ban her on the grounds that she has harmful effects on the minds of young girls. The doll has been accused of awakening sexual impulses in the very young and encouraging consumerism among Russian infants.

EXHIBIT 92
PAGE 2706

The body text of this page is too faded and degraded to transcribe reliably.

EXHIBIT 92
PAGE 2707

Barbie Goes to War: Battle of the Dolls

103

tractors developed early, unauthorized Barbie art that began to proliferate by the late 1970s when the first generation of Barbie owners became adults. Although some were deferential, many used it to convey their strong views on race, consumer, culture or gender roles. Barbie was lambasted as a sexist role model because of her obsession with looks and her unrealistic measurements. (Finnish researchers claimed in 1994 that a real Barbie would not have enough fat to menstruate. Just what the original doll's measurements represent in terms of real women has been disputed. Among the most quoted comes from a Yale researcher of the mid-1990s in the *International Journal of Eating Disorders*. He claimed that Barbie's measurements, projected to human size, would make her 38-18-34.) Her original shape probably owed most to the need for her to be a clotheshorse for the Paris couture fashions of the day. Barbie, claim detractors, encourages girls to be dissatisfied with their own bodies, causing eating disorders: the 1965 version of Slumber Party Barbie came with a book called *How to Lose Weight* that included the advice "don't eat" and a bathroom scale set permanently at 110 pounds.[*]

Barbie is the woman who has everything and every year receives more. The plastic princess of capitalism, with her cars, houses, pools, and clothes, invites attack as a programmer of little consumers. Opponents have created Exorcist Barbie, Drag-Queen Barbie, and Sweat-shop Barbie. Trailer Trash Barbie, on sale in San Francisco, came with platinum hair revealing black roots, a dangling cigarette, and a baby slung on her hip. Big Dyke Barbie displayed a pierced nose. The Internet has produced an Anti-Barbie Club ("Let kids be kids and let's be honest about what Mattel really cares about: getting your money!")

[*] It should perhaps be noted that, in a study reported by the *New Scientist* in 2003, a research team at Jagellonian University, Krakow, who studied 119 Polish women, found that the Barbie shape with large breasts and a small waist was a good one. Biologically speaking. Women with these shapes had large amounts of female hormones and were about three times more likely to get pregnant than women of other shapes.

EXHIBIT 92
PAGE 2708

704                    THE REAL TOY STORY

There is a Mistress Barbie Bluff site. Remember the doll you used to make fun of with your friends, undressing her, pulling off her limbs and head. Now that Barbie doll has come to life. . . . Now it's time for HER REVENGE . . . a work by happy annoyed addicted young whimpering wads of jelly. Her detractors have included the self-styled Barbie Liberation Movement, which, memorably, switched voice boxes of Barbie and G.I. Joe in toy stores. The next day GI Joe started mouthing "Let's go shopping" and Barbie uttered, "Vengeance is mine."

In one of the most famous pursuits, Mattel chased after Tom Forsythe for 5 years, in an attempt to stop him publishing photographs of Barbie in ovens, under food mixers, and balding in martini glasses. Forsythe, a self-taught photographer who produces images with social and political overtones, believes that the dolls instill "gender oppressive values" in girls, and said that he purposely made some of the images "overtly sexual so [that] Barbie completely out of the context Mattel intends. I thought the pictures needed something that really said 'crass consumerism' and, to me, that's Barbie." The pictures, amusing yet disturbing, went on display in 1997 although, as the court noted, Forsythe's "market success was limited." Two years later, he received a writ claiming trademark and copyright infringement. Forsythe's case was taken up by the American Civil Liberties Union. Five years later a federal judge in Los Angeles said Mattel's action was "groundless," but awarded the artist $1.8 million legal fees, telling the case would be a warning to companies who tried to intimidate individuals for minor copyright infringements. The toy company, wrote Judge Ronald Lew, had access to sophisticated lawyers who could have determined "that such a suit was objectively unreasonable and frivolous." Instead, it appeared that Mattel forced the defendant into costly litigation to discourage him. It is not the only case Mattel has lost. Mattel sued MCA Records for a hit song by Dutch band Aqua, calling Barbie "a blond bimbo girl" and Nissan for a commercial featuring look-alikes Barbie and Ken. In the MCA case, at issue was the hit song "Barbie Girl," about animated toy girls that included lyrics "Barbie Roberts . . . come on Barbie, let's go dress me up, undress me . . . you can touch, you can play." The song's com-

cluded that the song's parody was protected speech and that First Amendment protection outweighed Mattel's property interest as a trademark owner. The court's decision ended with the words "The parties are advised to chill." In Germany, Mattel tried to prevent Simba Toys marketing a doll called Steffi Love. Mattel claimed that the company was exploiting its good reputation, systematically copying its ideas, and misleading consumers. Germany's Federal Court of Justice ruled against Mattel, saying that it was obvious there would be similarities among themed dolls and that the concept of a doll with accessories could not be copyrighted. Mattel also tried to stop a small specialist store in Calgary, with virtually no U.S. sales, using the name Barbie's Shop. Ms. Anderson Whalley, always known as Barbie, sold fetish wear and gothic-influenced designs. A Mattel spokeswoman said, "You have to go after everyone who steps on your trademark." The shop's owner retorted, "I was around before Barbie [the doll] was—maybe I should sue them over the name." To bring an action in the United States, Mattel's private investigator placed an order to have items from the shop sent to him in New York. However, a U.S. district judge in New York finally granted a motion by Ms. Anderson Whalley's lawyer to dismiss Mattel's suit on the basis of lack of jurisdiction. Apart from paying her lawyer, it cost her $10,000 in legal fees.

Mattel has won other cases. The company sued Barbara and Dan Miller, producers of *Miller's Magazine*. The suit claimed, "Each issue of this magazine is replete with articles, photographs and captions [of Barbie] which infringe, disparage and/or dilute Mattel's trademarks, copyrights, . . ." Supporters claimed the magazine commented on designs and marketing while promoting the doll itself. Challenged at Mattel's annual general meeting, Jill Barad said a photograph showing Barbie with alcohol and pills put the doll in an unflattering light. "What I do, first and foremost, is protect Barbie." Mattel proposed an agreement allowing them to review the magazine before it was published. In Mexico, Mattel managed to ban the film *Barbie Gets Sad Too*, which was "spoiling Barbie's image" by depicting her as a lesbian. The threat itself is usually enough for Mattel to triumph. Arguing is expensive. Artist Steven K. Smith replied to a Mattel legal letter requesting the removal of satirical material from his Internet site. Although he

EXHIBIT 92
PAGE 2710

Case 2:04-cv-09049-DOC-RNB   Document 3090-13   Filed 04/14/08   Page 8 of 52   Page ID #:52848

106                              THE REAL TOY STORY

believed he was protected by free speech, he said. "I am not a stupid person. I realize that Mattel has much deeper pockets than I do and do not wish to be involved in a legal battle regardless of the outcome. I have removed the page at your request."

In Isaac Larian, Mattel seems to have come up against an opponent as bellicose and litigious as itself. A Bratz-themed licensing supplement to the Hollywood Reporter included five ads from law firms congratulating Larian. He has clashed with George Lucas over rights to Star Wars handheld games and with McDonald's sued MGA after he challenged the company's design for Bratz Happy Meal dolls. That case was settled. Larian also filed a suit against Nordstrom claiming it sold unlicensed Bratz shoes, and he and his brother Farhad became engaged in a dispute over the price Farhad received for his stake in MGA.

He made it clear to me he bowed to no one. Talking about the enormous power of the retail chains that have most toy companies quaking, Larian vowed he would never compromise. He had taken to heart the advice of one of his mentors, Minoru Arakawa, then president and CEO of Nintendo of America, Inc. In the United States, unlike in Japan, retailers are far more powerful than manufacturers, Arakawa reasoned that success lay in making the best possible product because if the consumer wants it, then the retailers have to comply. Demand gives the maker the upper hand. "So this is the formula we use for Bratz—we make products frankly for girls. If they're buying it, then Toys "R" Us, Wal-Mart, Kmart have no choice, they have to buy."

It was inevitable that Mattel and Larian would square off against each other legally as well as commercially. After Mattel filed a lawsuit

EXHIBIT 92
PAGE 2711

Barbie Goes to War: Battle of the Dolls

107

against their former designer Carter Bryant in 2004, MGA intervened the same year, asserting that its rights to the Bratz property were at stake in the litigation. The following April, Larian sued Mattel in federal court, accusing the company of unfair competition, intellectual property infringement, and "serial copycatting." The suit claimed Mattel's latest Barbie dolls mimicked the look, themes, and packaging of Bratz. It alleged that Mattel had threatened retailers and licensees with retribution if they did business with MGA. And finally it complained that Mattel tried to lock up the supply of doll hair.

"I am just not going to be pushed around by these big bullies, whether it's Lucasfilm, McDonald's, or Mattel," Larian has said, *Business Week* commented, "All of which raises the question: Is Larian the little kid standing up to the bullies in the playground, or has he become the biggest brat in Toyland?" And Thomas P. Conley, president of the Toy Industry Association, has said, "There's no question that he has had phenomenal success. But he has done it at terrific expense, in terms of people's relationships."

With the success of Bratz, MGA claimed itself to be "the fastest-growing entertainment company in the world." It moved headquarters, but only a short distance to a nondescript office complex adjoining the airfield at Van Nuys. By 2005 it still had only 500 employees, a fraction of Mattel's 25,000. Larian himself comes across as totally unrepentant. "My philosophy is that we are the Rodney Dangerfield of the toy business—we got no respect . . . we still don't have. A lot of people say, 'Oh, he got lucky.' I don't care what people say. I just keep on doing it. . . . We won People's Choice, which is a very important award. The industry did not vote for Bratz." He laughs. "But the people who are the main consumers voted for it. The toy industry is very political also. That's the problem with the toy industry, frankly, a bunch of people who are sitting there scratching somebody else's back instead of coming up with innovation . . . It needs to get rid of the politicians, it needs to put creative people at the helm of the

EXHIBIT 92
PAGE 2712

**108**          **THE REAL TOY STORY**

company, who love toys, who think like children, who are in touch with kids. When Ruth Handler was running Mattel, she loved toys; she and her husband, they loved toys. The biggest issue of the toy industry is that people are afraid to take a risk, they're afraid to be innovative. It is controlled on the manufacturing side by two or three giant companies who have great resources, but they are not willing to innovate and take a risk. I wanna keep this company private, because I can do whatever I want. I don't have to answer to anybody, and I'm having a lot of fun." Once you become public, then instead of saying, "What is the best toy I'm gonna have in the next three months?" your mind goes, "Oh, my God, what's gonna happen to the stock price? Am I gonna make my numbers?" People are driven by different things. I'm content with what I have. My life has not changed since this has become successful. Same house, same car, same school for the kids. I still go to soccer games with my kids, and I am driven to see the happiness in the kids' faces, and driven by the challenge. I'm not so much after the gold party, because I gotta tell you, I've been to many funerals, unfortunately, and every time I go, I look very carefully—nobody's taking anything with them."

He shows me a sign he says he has put up to remind him of his priorities. It reads: "A hundred years from now it will not matter what my bank account was, the sort of house I lived in, or the kind of car I drove. But the world may be different because I was important in the life of a child."

EXHIBIT 92
PAGE 2713

EXHIBIT 93

THIS EXHIBIT IS FILED UNDER SEAL

PURSUANT TO PROTECTIVE ORDER

EXHIBIT 94

THIS EXHIBIT IS FILED UNDER SEAL

PURSUANT TO PROTECTIVE ORDER

EXHIBIT 95

1 of 1 DOCUMENT

Copyright 2003 Factiva, a Dow Jones and Reuters Company
All Rights Reserved



factiva.

(Copyright (c) 2003, Dow Jones & Company, Inc.)

# THE WALL STREET JOURNAL.

The Asian Wall Street Journal

July 21, 2003 Monday

SECTION: Pg. A8

LENGTH: 1031 words

HEADLINE: Mattel Tries Hip-Hop Dolls --- Firm's Stalwart Barbie Loses Market Share, So `Flavas' Will Take on Rivals the `Bratz'

BYLINE: By Maureen Tkacik

BODY:

Los Angeles -- TIKA, 25 CENTIMETERS tall with two-toned hair, is of ambiguous ethnic origin -- maybe she's Asian, maybe Latina -- but her "platinum" medallion, airbrushed jean jacket, shell-toe sneakers and graffiti-streaked packaging make one thing clear.

"She's like . . . hip-hop," said Crystal Audigier, 10 years old, as she rifled through the first crate of "Flavas" dolls to arrive at a Los Angeles FAO Schwarz toy store earlier this month.

Mattel Inc. hopes the dolls are hip enough to take on the "Bratz." The Flavas (pronounced "Flay-vuhs," like "flavors"), a set of six dolls brought from design to production in just three months, represent a striking gamble for the giant toy company. In the 44 years since it introduced its bombshell Barbie, Mattel has rarely brought out a doll line to compete with her.

But Mattel, which had become accustomed to its buxom blonde dominating the market, has watched in alarm as Barbie has been challenged by a smaller toy maker's Bratz -- a line of big-headed, pouty-lipped characters. While Barbie, which posted about $1.7 billion in sales for Mattel last year, is still queen, her share of the so-called fashion-doll market has fallen, almost entirely because of the Bratz.

After trying -- and failing -- to defeat the Bratz with a trendier Barbie last year, Mattel has come up with a radical battle plan. Among other things, that means curtailing its reliance on, and near-reverence toward, its cash cow. While Barbie is still a plaything of choice for girls 3 to 7 years old, it's been years since she managed to hold the attention of the tweens, or 8- to 12-year-olds. With the Flavas, Mattel is trying to get back into that market -- even if it risks cannibalizing its biggest product.

Exhibit 625
P. 695

EXHIBIT 95
PAGE 2744

Mattel Tries Hip-Hop Dolls --- Firm's Stalwart Barbie Loses Market Share, So `Flavas' Will Take on Rivals the `Bratz'
The Asian Wall Street Journal July 21, 2003 Monday

Mattel has tweaked Barbie many times since she was introduced in 1959. But Mattel now concedes Barbie has gradually lost touch with some young girls' lives. "Barbie began as a great girl who was simply a reflection of popular culture, but in the past few years we had sort of put her on a pedestal," says Matt Bousquette, president of the newly created Mattel Brands unit, which consolidated the boys' and girls' toys divisions. While Mr. Bousquette and his team overhaul Barbie, he is also enlisting the Flavas as a second force with which to fight the hip-hop -- which it defines as "a cultural phenomenon . . . dimensionalized through freestyle dance, street sports, music and fashion" -- has gained sufficient ground in the mainstream to have its own toy line.

The Bratz, developed by a toy maker called MGA Entertainment Inc., of North Hills, California, were introduced in the summer of 2001. They became a hit with tweens, an age group of girls that the toy industry had almost written off. Bratz "appealed to an older girl . . . who is not necessarily still a Barbie customer," says Sean McGowan, a longtime industry analyst with Gerard Klauer Mattison. "Nothing's ever challenged Barbie like the Bratz." Barbie held at least 85% of the fashion-doll market until the Bratz were introduced, he says, but her share has now dropped to about 70%.

Isaac Larian, chief executive of MGA, emigrated to the U.S. from Iran. He founded his company in the late 1970s, and says he was motivated to create the Bratz by a challenge from a Wal-Mart Stores Inc. buyer to "give me something that can compete with Barbie." This year, closely held MGA expects revenue of about $800 million -- with 65% of that coming from the Bratz.

Mattel began worrying about the Bratz's momentum during the 2001 holiday season. Barbie sales fell 12% in the U.S. that year. By spring of 2002, Adrienne Fontanella, then president of the girls' division, decided to launch what the company termed a more "reality based" Barbie line. Like the Bratz, the "My Scene" Barbies boasted bigger heads and feet and fuller lips, as well as trendier clothes. Introduced in October 2002, the My Scene Barbies helped Mattel's sales, but still ranked behind the Bratz during the 2002 holiday season, according to NPD Group Inc., a market-research firm.

In February, Ms. Fontanella's job, along with others, was eliminated in what CEO Robert Eckert called a "restructuring" of Mattel's executive ranks aimed at "increasing efficiency." Mr. Bousquette became the first man to take control of Barbie in more than a decade. After sitting through a girls'-design-team presentation in March, he seized upon the Flavas as the ideal dolls to compete for the dollars of Bratz buyers. Ivy Ross, head of girls' design, suggested bringing them to market for the spring 2004 season. Mr. Bousquette said the company should aim for this July instead.

"We were stunned," says a designer who worked on the Flavas and left the company in May. Another surprise: Mr. Bousquette asked the team to make the dolls look more hip-hop than the prototypes. "No one had really believed in the concept before that meeting, and it was stuck in this back-and-forth where first they were too edgy, then they weren't edgy enough," says the designer. "Matt came through and cut all of that out."

Some buyers have been impressed. Mattel's girls' division "has never been a particularly forward-thinking group, but the Flavas are right on trend," says Fred Hurley, a longtime girls'-toys buyer for KB Toys Inc., of Pittsfield, Massachusetts. The six dolls in the Flavas line are certainly edgier than anyone in Barbie's clique. The girls have highlighted hair, flashier jewelry and wear midriff-baring tops with low-slung pants. The two boys sport earrings and serious expressions.

The Flavas come in boxes splashed with black-and-white photos of scenes shot around Venice Beach, California. When arranged together, the boxes create a "graffiti" mural that reads: "FA SIZZLE." It is a play on the hip-hop expression "Fa' shizzle," which means "For sure." Marketing director Lisa Tauber explains that it is also an acronym that stands for "Fashion, Attitude and Sizzlin' Style."

MGA's Mr. Larian says he isn't scared. "The only thing that's missing is a cocaine vial," he says. "You think of Mattel, you think of Barbie and you think of sweetness. . . . This is like `gangster' Barbie, and I think it's going to backfire."

Exhibit 62
P. 696

EXHIBIT 95
PAGE 2745

Mattel Tries Hip-Hop Dolls --- Firm's Stalwart Barbie Loses Market Share, So `Flavas' Will Take on Rivals the `Bratz'
The Asian Wall Street Journal July 21, 2003 Monday

**LOAD-DATE:** December 6, 2004

Exhibit 62
P. 699

EXHIBIT 95
PAGE 2746

EXHIBIT 96

THIS EXHIBIT IS FILED UNDER SEAL

PURSUANT TO PROTECTIVE ORDER

EXHIBIT 97

THIS EXHIBIT IS FILED UNDER SEAL

PURSUANT TO PROTECTIVE ORDER

EXHIBIT 98

THIS EXHIBIT IS FILED UNDER SEAL

PURSUANT TO PROTECTIVE ORDER

EXHIBIT 99

THIS EXHIBIT IS FILED UNDER SEAL

PURSUANT TO PROTECTIVE ORDER

EXHIBIT 100

1  Hon. Edward A. Infante (Ret.)
   JAMS
2  Two Embarcadero Center
   Suite 1500
3  San Francisco, California 94111
   Telephone:     (415) 774-2611
4  Facsimile:     (415) 982-5287

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10                         EASTERN DIVISION

11

12  CARTER BRYANT, an individual,        CASE NO. CV 04-09049 SGL (RNBx)
                                         JAMS Reference No. 1100049530
13
              Plaintiff,
14                                       Consolidated with
       v.                                Case No. CV 04-09059
15                                       Case No. CV 05-2727
    MATTEL, INC., a Delaware corporation,
16                                       ORDER DENYING MGA'S MOTION
              Defendant.                 TO COMPEL PRODUCTION OF
17                                       DOCUMENTS FROM THIRD PARTY
                                         RIGHT MANAGEMENT
18                                       CONSULTANTS, INC.

19  CONSOLIDATED WITH
    MATTEL, INC. v. BRYANT and
20  MGA ENTERTAINMENT, INC. v. MATTEL,
    INC.
21

22

23                         I. INTRODUCTION

24        On March 3, 2008, MGA Entertainment, Inc. ("MGA") submitted a Motion to Compel

25  Production of Documents from Third Party Right Management Consultants, Inc. ("Right

26  Management").  MGA seeks an "order compelling Right Management to produce documents

27  responsive to MGA's subpoena relating to Phase I issues, specifically the computer printouts that

28
    Bryant v. Mattel, Inc.,
    CV-04-09049 SGL (RNBx)                                            1

EXHIBIT 100
PAGE 2773

1  have been previously collected by Right Management's counsel." MGA's Motion at p.7.  On

2  March 10, 2008, Mattel, Inc. ("Mattel") submitted an opposition and on March 19, 2008, Right

3  Management submitted a separate opposition.  On March 13, 2008, MGA submitted a reply to

4  Mattel's opposition, and on March 25, 2008, MGA submitted a reply to Right Management's

5  opposition.  The motion was heard on April 11, 2008.

6  II. BACKGROUND[1]

7       Right Management has provided outplacement services to laid-off Mattel employees.

8  MGA served Right Management with a subpoena in December of 2007, seeking, among other

9  things, "All COMMUNICATIONS with MATTEL REFERRING OR RELATING TO YOUR

10 participation or involvement in MATTEL LAYOFFS and all DOCUMENTS REFERRING OR

11 RELATING TO such communications."  Right Management served objections.

12      During the meet and confer process, Right Management indicated that it had collected a

13 one-and-a-half inch thick stack of hard copy documents that are responsive to MGA's requests –

14 consisting primarily of computer printouts of all Mattel employees, by name and title, who used

15 Right Management's services after having been laid off.  By this motion, MGA seeks production

16 of this one-and-a-half inch stack of documents.

17      MGA contends that the requested documents are relevant primarily to its statute of

18 limitations and laches defenses.  MGA reasons as follows:

19       Here, MGA asserts that Mattel failed to assert its purported ownership interest
         relating to Bratz in a timely fashion, doing so long after it was aware of the facts
20       underlying its claim, and then only when it had become clear that Bratz was a
         major threat to Barbie's share of the fashion doll market.  Whether Mattel in fact
21       sat on its claims until Bratz emerged as a formidable competitor and Mattel
         realized its "House [was] on Fire" before seeking to regain a competitive edge
22       through litigation is thus directly relevant to MGA's statute of limitations and
         laches defenses. [citation omitted].  The requested documents, which by Mattel's
23       own admission provide insight into one of the company's reactions to its market
         share crisis—*i.e.*, systemic cuts to its work force – are relevant to MGA's defenses
24       in this action.

25

26       [1] Because the parties and Right Management are familiar with the procedural history of this motion, the
27  "Background" section set forth herein includes only a brief summary of that history and a brief summary of each
    sides' main contentions.

28                                                                                                      2

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

EXHIBIT 100
PAGE 2774

1   MGA's Reply to Mattel's Opposition, pp. 1-2.  MGA also contends that the documents are

2   relevant to rebut Mattel's assertion that job stability at Mattel is one justification for what MGA

3   describes as Mattel's "one-sided employment agreements regarding intellectual property."  MGA's

4   Reply at p.6.  MGA further contends that the protective order entered in this case is sufficient to

5   address any confidentiality concerns, and that MGA has agreed to production of the requested

6   documents with the names of Mattel employees redacted.

7           Mattel and Right Management both oppose MGA's motion, contending that the documents

8   MGA seeks are irrelevant to any Phase I issue and contain the confidential information of Mattel

9   or Mattel's former employees.  Right Management also contends that the burden of producing the

10  requested documents, however great or small, is necessarily undue because the documents are

11  irrelevant to the lawsuit.  Further, Right Management contends that MGA's motion is untimely

12  and was improperly served.

13                                    III. DISCUSSION

14          Rule 26 of the Federal Rules of Civil Procedure provides that "[p]arties may obtain

15  discovery regarding any matter, not privileged, that is relevant to the claim or defense of any

16  party."  Fed.R.Civ.P. 26(b)(1).  The court shall, however, limit the frequency or extent of use of

17  the discovery methods if the court determines that (i) the discovery sought is unreasonably

18  cumulative or duplicative, or is obtainable from some other source that is more convenient, less

19  burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity by

20  discovery in the action to obtain the information sought; or (iii) the burden or expense of the

21  proposed discovery outweighs its likely benefit, taking into account the needs of the case, the

22  amount in controversy, the parties' resources, the importance of the issues at stake in the

23  litigation, and the importance of the proposed discovery in resolving the issues.  Fed.R.Civ.P.

24  26(b)(2)(C).

25          Rule 45 of the Federal Rules of Civil Procedure governs the use of subpoenas and

26  provides, in pertinent part, that a third party served with a subpoena for documents must produce

27

28  Bryant v. Mattel, Inc.,
    CV-04-09049 SGL (RNBx)                                                                        3

EXHIBIT 100
PAGE 2775

1   documents (and reasonably accessible electronically stored information) that are responsive to the

2   subpoena. Fed.R.Civ.P. 45 (b), (d). If the subpoenaed documents are relevant and there is good

3   cause for their production, the court will enforce the subpoena unless the documents are

4   privileged or the subpoena is unreasonable, oppressive, annoying or embarrassing. U.S. v.

5   American Optical Co., 39 F.R.D. 580, 583 (N.D. Cal. 1966).

6        Rule 45(c)(1), Fed.R.Civ.P., provides that "[a] party or attorney responsible for issuing

7   and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on

8   a person subject to the subpoena." Furthermore, "[t]he issuing court must enforce this duty and

9   impose an appropriate sanction--which may include lost earnings and reasonable attorney's fees--

10  on a party or attorney who fails to comply." Id.

11       In evaluating whether a subpoena imposes an undue burden, Rule 45(c)(3)(A),

12  Fed.R.Civ.P., "'requires the court to weigh the burden to the subpoenaed party against the value of

13  the information to the serving party,' . . . and in particular requires the court to consider: 'such

14  factors as relevance, the need of the party for the documents, the breadth of the document request,

15  the time period covered by it, the particularity with which the documents are described and the

16  burden imposed.'" Moon v. SCP Pool Corp., 232 F.R.D. 633, 637 (C.D. Cal. 2005), quoting

17  Travelers Indem. Co. v. Metropolitan Life Ins. Co., 228 F.R.D. 111, 113 (D. Conn. 2005).

18  Another important factor in evaluating burden is whether the subpoenaing party "can be more

19  easily and inexpensively obtain the documents from [another party], rather than from [the]

20  nonparty." Moon, 232 F.R.D. at 638. See also Lectrolarm Custom Sys. v. Pelco Sales, 212

21  F.R.D. 567, 573 (E.D. Cal. 2002) (protective order granted where plaintiff subpoenaed non-party

22  for documents that plaintiff had sought from defendant because the "burden and harassing nature

23  of the requests clearly outweigh[ed] the minimal need for the very limited amount of information

24  that could be discovered under the subpoenas.").

25       In this case, the documents MGA seeks have no or such minimal relevance to the claims

26  and defenses in the case that any burden associated with producing the documents outweighs its

27  likely benefit, taking into consideration all of the factors set forth in Rule 26(b)(2)(C),

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

4

EXHIBIT 100
PAGE 2776

1  Fed.R.Civ.P.  MGA has already pursued and obtained substantial discovery relating to its statute

2  of limitations and laches defenses and relating to Mattel's form employment agreements.

3  Furthermore, MGA could have, but apparently chose not to, seek documents concerning Mattel's

4  lay-offs directly from Mattel, and therefore failed to take the requisite reasonable steps to avoid

5  imposing undue burden and expense on Right Management.

6                                    IV. CONCLUSION

7          For the reasons set forth above, MGA's motion to compel production of documents from

8  Right Management is denied.  Pursuant to Paragraph 6 of the Stipulation and Order for

9  Appointment of a Discovery Master, Mattel shall file this Order with the Clerk of Court forthwith.

10

11  Dated: April 11, 2008

12                                    HON. EDWARD A. INFANTE (Ret.)
                                      Discovery Master
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
    Bryant v. Mattel, Inc.,                                                          5
    CV-04-09049 SGL (RNBx)

EXHIBIT 100
PAGE 2777

EXHIBIT 101

## Westlaw.

79 FEP Cases 570
1997 WL 1098409 (S.D.Ind.), 79 Fair Empl.Prac.Cas. (BNA) 570
**(Publication page references are not available for this document.)**

Page 1

S.D.Ind., 1998.
EQUAL EMPLOYMENT OPPORTUNITY COM-
MISSION, Plaintiff
v.
INDIANA BELL TELEPHONE CO., INC., d/b/a
AMERITECH INDIANA and AMERITECH
CORPORATION, Defendants
**No. IP 95-0217 C-M/S**

U.S. District Court Southern District of Indiana In-
dianapolis Division

February 24, 1997; Order On Motions to Exclude
Expert Testimony and Arbitration

Defense September 15, 1997; Entry of Judgment
October 3, 1997; Entry October
27, 1998; Entry December 22, 1998; Amended
Entry of Judgment December 22, 1998

BNA Labor Relations Reporter Headnote - FEP
Cases
CIVIL RIGHTS ACT OF 1964
Sexual harassment
C108.415909 C108.7209
S.D.Ind., 1998.
Adequacy of employer's attempt to remedy discrim-
ination is question of fact when federal district
court is satisfied that reasonable minds could differ
as to whether remedial action was reasonably calcu-
lated to end harassment, especially when there is
evidence that previous reprimands appear to have
failed to deter this type of conduct.
EEOC v. INDIANA BELL TELEPHONE CO.
79 FEP Cases 570

BNA Labor Relations Reporter Headnote - FEP
Cases
CIVIL RIGHTS ACT OF 1964
Sexual harassment
C108.415931
S.D.Ind., 1998.
Sexual harassment complaints in alleged harasser's

personnel records from female employees other
than three women on whose behalf EEOC is suing
provide context and background regarding women's
interpretation of his conduct toward them, are rel-
evant to issue of type of notice that employer had
about his conduct and consequent reasonableness of
any remedial action taken, demonstrate effect of
past remedial activity in terms of deterring such
conduct, and assist trier of fact in assessing proper
degree of intent to ascribe to any discrimination
that employer is found to have committed.
EEOC v. INDIANA BELL TELEPHONE CO.
79 FEP Cases 570

BNA Labor Relations Reporter Headnote - FEP
Cases
CIVIL RIGHTS ACT OF 1964
Sexual harassment
C108.415931 C108.8101
S.D.Ind., 1998.
Proposed testimony by sexual harassment educator
will not be relevant or helpful to jurors, who must
grapple with what happened over course of years
during which male employee allegedly harassed
many female employees, where she intends to com-
pare employer's conduct to type of conduct recom-
mended by educators like her at time, but this is not
relevant inquiry because employer's conduct is sub-
ject to reasonableness determination and hindsight
evaluation by jury, her testimony appears to come
dangerously close to being opinion on legal implic-
ations of conduct, it is not clear that foundation of
her testimony is based on anything other than her
own conjecture as to proper management practices,
and she will not be able to provide jurors with testi-
mony assisting them in determining whether em-
ployer's handling of complaints against male em-
ployee was negligent.
EEOC v. INDIANA BELL TELEPHONE CO.
79 FEP Cases 570

BNA Labor Relations Reporter Headnote - FEP
Cases
CIVIL RIGHTS ACT OF 1964

EXHIBIT ___101___

PAGE ___2778___

1997 WL 1098409 (S.D.Ind.), 79 Fair Empl.Prac.Cas. (BNA) 570

**(Publication page references are not available for this document.)**

Sexual harassment
C108.415915 C108.7181
S.D.Ind., 1998.
Evidence of risks faced by employer, which delayed discharge of male employee accused of sexual harassment because of concern that his premature discharge would lead to his subsequent reinstatement by arbitrator, is not relevant to determining reasonableness of its response to sexual harassment, despite its contention that important circumstance in determining whether its response was reasonable was its perception that moving too quickly to discharge him would cause union to file grievance and that arbitrator would ultimately find no just cause for termination, since any concerns by employer that arbitrator might undo discipline that it has meted out for misconduct does not excuse taking no, or very little, action when positive law requires it to act promptly to halt violations.
EEOC v. INDIANA BELL TELEPHONE CO.
79 FEP Cases 570

BNA Labor Relations Reporter Headnote - FEP Cases
CIVIL RIGHTS ACT OF 1964
Defense
C108.7181 C108.736
S.D.Ind., 1998.
Title VII does not allow for any "defense" involving arbitration risk, since to do so would subject whole of employment discrimination law to vagaries of collective bargaining and negotiated grievance and arbitration procedures whenever situation involved large employer and recognized collective bargaining unit.
EEOC v. INDIANA BELL TELEPHONE CO.
79 FEP Cases 570

Adele Rapport and Stanley H. Pitts, Detroit, Mich., and Laurie A. Young, Indianapolis, Ind., for plaintiff.

Michael A. Moffatt and Kenneth J. Yerkes (Barnes & Thornburg), Indianapolis, Ind., and R. Anthony Prather, Indianapolis, Ind., for defendant.

Full Text of Opinion

LARRY J. McKINNEY, District, Judge

This matter comes before the Court on the motion for summary judgment filed on July 15, 1996, by defendants, Indiana Bell Telephone Co., Inc., d/d/a/ Ameritech Indiana and Ameritech Corporation (collectively "Ameritech"), claiming entitlement to summary judgment on all claims in the second amended complaint filed on March 5, 1996. Plaintiff, the Equal Employment Opportunity Commission ("EEOC"), brought this action against Ameritech on behalf of Lori Everts ("Everts"), Debbie Wentland ("Wentland"), and Wendy Pollard ("Pollard"), who claim to have been subjected to hostile environment sexual harassment by their co-worker, Gary Amos ("Amos").

According to the EEOC, Amos' conduct created a hostile environment for some of his female co-workers over a period of several years, although the alleged victims of his harassment changed over time. All of this conduct, the EEOC alleges, was known, or should have been known, by Ameritech's management personnel. The responses by Ameritech each time a female employee complained of Amos' conduct apparently led to a cessation of that conduct toward the complainant, but it did not stop it toward others. As a consequence, the sexual harassment allegedly suffered by Wentland, Everts and Pollard, plaintiff argues, could have been avoided had Ameritech taken proper remedial action.

The EEOC brought this action pursuant to Title VII of the Civil Rights Act of 1964 and Title I of the Civil Rights Act of 1991. 42 U.S.C. §§2000e-5 and 1981a ("Title VII"). Plaintiff seeks a permanent injunction against any further discrimination by Ameritech, compensatory damages for the physical and emotional harm suffered by Wentland and Pollard because of the alleged discrimination, punitive damages for all of the complainants, and the costs of this action, including attorney's fees. The EEOC also prays for this Court to order Ameritech to "institute and carry out policies, practices and pro-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

EXHIBIT ___101___

PAGE ___2779___

79 FEP Cases 570                                                                                                   Page 3

1997 WL 1098409 (S.D.Ind.), 79 Fair Empl.Prac.Cas. (BNA) 570

**(Publication page references are not available for this document.)**

grams which provide equal employment opportunities for women, and which eradicate the effects of its past and present unlawful employment practices."

No dispute exists as to this Court's jurisdiction, and venue is proper. The pending motion, along with the briefs and designated evidence attached thereto, the EEOC's response and attachments, and Ameritech's reply have fully informed the Court as to the relevant issues, law, and undisputed facts. Having fully considered the matter, the Court finds that summary judgment in favor of Ameritech would be inappropriate. Upon review of the parties' arguments, statements of undisputed facts, and other submissions, the Court finds that the following material facts, or the inferences to be drawn from the facts, to be in dispute, thus preventing the entry of summary judgment:

1. Whether Amos' conduct towards Wentland in 1992, when considered in the context of any of his past conduct of which she had knowledge, would have created a hostile environment for a reasonable person in her shoes;

2. Whether Ameritech's response to Wentland's complaint, in light of Amos' personnel and Labor Relations records, was reasonably calculated to end the harassment or whether it was negligent;

3. Whether Amos' conduct towards Everts in 1993, when considered in the context of any of his past conduct of which she had knowledge, would have created a hostile environment for a reasonable person in her shoes;

4. Whether Amos' prior conduct and the deterrent effect of any prior discipline imposed on him by Ameritech put Ameritech on notice that he was likely to harass again;

5. Whether Ameritech's response to Everts' EEOC charge was negligent;

6. Whether Amos' conduct toward Pollard and in her presence, when considered in the context of his past conduct of which she had knowledge, would have created a hostile environment for a reasonable person in her shoes;

7. Whether Amos' prior conduct and the deterrent effect of any prior discipline imposed on him by Ameritech put Ameritech on notice that he was likely to harass again; and

8. Whether Ameritech's responses to the complaints against Amos reflected a malicious tendency to discriminate against women who complained about the conduct of a black male, or reckless indifference to their rights to be treated equally.

In light of these factual issues, and the reasonable inferences that can be drawn from the facts that are not in dispute, the Court cannot find that Ameritech is entitled to judgment as a matter of law on the EEOC's action against them.

The adequacy of an employer's attempt to remedy discrimination is a question of fact when the Court is satisfied that reasonable minds could differ as to whether the remedial action was reasonably calculated to end the harassment. See Paroline v. Unisys Corporation, 879 F.2d 100, 106 [ 50 FEP Cases 306] (4th Cir. 1989). This is especially true when, as here, evidence has been presented that previous reprimands appear to have failed to deter this type of conduct. See Id. at 107.

The parties have disagreed about the relevance of the complaints by other employees in Amos' personnel records, however, that evidence is relevant to several issues. First, it provides "context and background" regarding the women's interpretation of Amos' conduct toward them, which will aid the jury in determining a just verdict. See Hennessy v. Penril Datacomm Networks, Inc., 69 F.3d 1344, 1347 [ 69 FEP Cases 398] (7th Cir. 1995). Second, it is relevant to the issue of the type of notice that Ameritech had about Amos' conduct and the consequent reasonableness of any remedial action that was taken. Third, it demonstrates the effect of past remedial activity in terms of deterring such con-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works

EXHIBIT _____ 101

PAGE _____ 2780

79 FEP Cases 570                                                                    Page 4
1997 WL 1098409 (S.D.Ind.), 79 Fair Empl.Prac.Cas. (BNA) 570
**(Publication page references are not available for this document.)**

duct, and finally, it assists the trier of fact in assessing the proper degree of intent to ascribe to any discrimination Ameritech is found to have committed.

Women deal with sexual harassment in different ways. Some quit, others complain, while still others endure but learn to avoid the harasser at all costs. Id. Ameritech cannot defeat the claims at issue merely by pointing to the women's methods of dealing with Amos' conduct. In addition, "sexual harassment in the workplace raises sensitive and complex concerns."Id. To paraphrase the Hennessy court, for employers these concerns are often competing. Ameritech viewed the complaints of numerous female employees about Amos' conduct toward them as competing with its duties toward a black male and its obligations for imposing discipline under a collective bargaining agreement. However, it is not for the Court to decide on summary judgment whether the choices Ameritech made in dealing with the complaints in the past, or responding to the complaints that are the subject of this action, were reasonably calculated to end the harassment. Rather, that issue joins the others as needing the reasoned judgments of a jury.

For all of these reasons, the pending motion for summary judgment is DENIED.

IT IS SO ORDERED this 24 day February, 1997.

### ORDER ON MOTIONS TO EXCLUDE EXPERT TESTIMONY AND ARBITRATION DEFENSE

Defendant, Indiana Bell Telephone Co., Inc. d/b/a Ameritech, and Ameritech Corporation (collectively "Ameritech"), object to the admission of opinion testimony from plaintiff's expert, D. Jan Duffy ("Duffy"), on grounds that she will only offer her opinions on the "ultimate legal conclusions" in this Title VII matter. Specifically, Ameritech claims that Duffy will testify that Ameritech's sexual harassment prevention policy was inadequate, as compared to what other employers were doing and to corporate standards at that time; that its efforts to publicize, explain and educate managers and employees regarding such policies did not meet the

standards required of a reasonable employer; that Amos' alleged conduct constituted sexual harassment; that Ameritech management knew or should have known of the numerous allegations of sexual harassment against Amos; and that Ameritech management did not take appropriate corrective action in response to Amos' conduct.

Plaintiff, the Equal Employment Opportunity Commission ("EEOC"), argues that Duffy's testimony will introduce the relevant community standards for sexual harassment prevention policies, and should be admissible because it will help the jury. According to the EEOC, Duffy will testify as to standard employer practices and procedures regarding sexual harassment and the "comparative adequacy" of Ameritech's policies and procedures; Ameritech's efforts to educate and train managers about its sexual harassment policies and procedures; whether Ameritech's responses to complaints of sexual harassment were consistent with standard practices regarding investigation, thoroughness, commitment, recording, tracking, monitoring, follow-up and training; and whether DF complied with its own procedures.

Additionally, the EEOC argues that Ameritech will most likely claim that its responses were "adequate and reasonably calculated to end the harassment" by Amos, so Duffy's testimony will be needed to provide a "backdrop on standard corporate practices to assist the jury with evaluating that claim." Duffy will give the jurors a "different perspective" on whether Ameritech's policies, practices, and responses were adequate. The EEOC concedes that any opinions by Duffy that constitute a legal conclusion should be excluded.

The federal rules provide that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Fed. R. Evid. 702. On September 12, 1997, the Court held a hearing to ascertain whether the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

EXHIBIT ___101___

PAGE___2781___

1997 WL 1098409 (S.D.Ind.), 79 Fair Empl.Prac.Cas. (BNA) 570

**(Publication page references are not available for this document.)**

EEOC's proffered expert had "other specialized knowledge" that will assist the jury, and whether she was qualified to offer an opinion regarding same. During the hearing, counsel for both sides questioned Duffy as to the substance, validity and relevance of her testimony, and the Court likewise questioned her about matters that would enable it to determine the foundation for, validity, relevance and helpfulness of her potential testimony. At the close of the hearing, the Court sustained the defendant's objection to Duffy's testimony and ruled that it should not be allowed. It will endeavor to further explain that decision below.

Duffy, who describes herself as an "employment law educator," has a law degree, more than twenty years' experience practicing labor and employment law, and more than fifteen years' experience teaching this subject. She considers herself an expert because of her experience as an attorney practicing in this field, and because of her knowledge and training obtained in order to teach employment law. Specifically, Duffy explained that she is an advisor and consultant to between fifty and one hundred employers a year, whose businesses are located all across the country. She advises them on sexual harassment policies and consults with them to develop appropriate policies and training programs for their managers and employees. She has obtained knowledge used in this process from her role as an educator, her participation in public seminars and ABA meetings on the subject, and her participation as a speaker at many ABA continuing legal education programs on sexual harassment policies. The inhouse training she does with her consulting clients has enabled her to observe not only what constitutes the best practices, but also what works and what does not in terms of prevention and remediation.

Nevertheless, by her own admission, Duffy has taken no formal education in business management, or served as a business manager, or participated widely in relevant industry groups. The standards about which she wishes to testify have not been published in any article of which she is aware, nor have they been adopted by any industry group. Instead, the standards derive from the experience she has gained, and the body of knowledge of educators like her. It is created by these experts, passed on to employers through seminars, advice and training, and hopefully adopted by them. Duffy did not, and could not, state that widely-recognized nationwide minimum standards exist. Instead, she stated that an employer's conduct is governed by the law, by what is effective, and by what other employer's are doing at the time. This theory of liability underlies most of what Duffy intends to offer as her testimony.

It is true that courts do not just focus on whether an employer's policies are effective in preventing or stopping sexual harassment. Instead, they must consider the employer's total response given the circumstances and facts of the specific case, and decide whether the response was reasonable in light of those facts. McKenzie v. Illinois Dept. Of Transp., 92 F.3d 473, 480 [ 71 FEP Cases 1549] (7th Cir. 1996). The employer's "response must be reasonably calculated to prevent further harassment under the particular facts and circumstances of the case at the time the allegations are made. . . ."Id. Although Duffy undoubtedly possesses some form of specialized knowledge, the Court is not convinced that her knowledge will be relevant or helpful to the jurors in this case. They must grapple with What happened over the course of years during which Amos had allegedly harassed many service representatives at Ameritech. Duffy, on the other hand, intends to compare Ameritech's conduct to the type of conduct recommended by educators like her at the time. That is not the relevant inquiry. Instead, Ameritech's conduct is subject to a reasonableness determination and hindsight evaluation by a panel of impartial jurors.

Moreover, by her own admission, Duffy is not an expert on Seventh Circuit legal standards in this area of law. Rather, she considers herself an expert generally on the prevention and deterrence of sexual harassment. She admits that Title VII does not

EXHIBIT ___101___

PAGE ___2782___

79 FEP Cases 570                                                                      Page 6
1997 WL 1098409 (S.D.Ind.), 79 Fair Empl.Prac.Cas. (BNA) 570
**(Publication page references are not available for this document.)**

require education and training of its managers, but notes that EEOC guidelines and court-made law have directed such practices. It appears that Duffy has very little relevant "evidence" to offer beyond what the Court will include in jury instructions, and counsel will be able to argue. Her testimony appears to come dangerously close to being an opinion on the "legal implications of conduct."See United States v. Baskes, 649 F.2d 471, 479 (7th Cir. 1980), cert. denied, 101 S.Ct. 1706 (1981) (Rule 704, which allows testimony even if it embraces an "ultimate issue" in the case, does not mean an expert may offer an opinion "as to the legal implications of conduct."). Courts should not allow such testimony. Id.

In addition, it is not clear that the foundation of Duffy's testimony is based on anything but her own conjecture that her experience in the field of employment law provides her with the ability to identify normative industry standards. See Dana Corp. v. American Standard, Inc., 866 F.Supp. 1481, 1499 (N.D. Ind. 1994) (when basic foundation of expert testimony is "conjecturally premised" court should exclude it as speculation). No industry groups have adopted her standards, nor have they even been widely-published. Courts considering Title VII cases have not routinely allowed a reasonableness determination based on such industry standards. Finally, the relevance and helpfulness of Duffy's opinions are not only questionable, but may also prejudice or confuse the jury. See Snyder v. Consol. Coal Mines, 973 F.2d 555, 557 [ 59 FEP Cases 1143] (7th Cir. 1992) (where expert testimony was excluded from tort claims tried to jury, even though expert "consults with and advises companies on the problems of sexual harassment in the workplace," because its probative value was outweighed by its prejudicial effect).

For example, Duffy continually referred to what constitutes "good management practices" or "best practices." The proper inquiry, however, is not what is best, but what is reasonable under the circumstances. Duffy claims to have specialized knowledge as to what is reasonable based on her contact with a variety of employers and her "deeper understanding of the workplace" than most lawyers. Yet, she cannot claim any expertise in sociology, psychology, human relations, psychiatry or human resource management. Consequently, she is not qualified to render an opinion on any human factors, such as predicting or explaining human behavior in the workplace.

Both parties agree, as does Duffy, that the reasonableness of an employer's response to a complaint of sexual harassment depends on the gravity of the harassment. It also depends on the jurors' understanding of the law and its application to the conduct at issue. A national law exists prohibiting discrimination in the workplace based on certain immutable characteristics, yet courts have not recognized a particular set of standards that an employer must follow to avoid being found negligent. Instead, the Seventh Circuit standard is whether the employer, in response to an employee's complaint of sexual harassment took "reasonable steps to discover and rectify acts of sexual harassment of its employees, . . . . [and] what is reasonable depends on the gravity of the harassment."Baskerville v. Culligan Internat'l Co., Inc., 50 F.3d 428, 431 [ 67 FEP Cases 564] (7th Cir. 1995). The employer's responses must be "reasonably calculated to prevent further harassment under the particular facts and circumstances of the case at the time the allegations are made."McKenzie, 92 F.3d at 480 (citing Brooms v. Regal Tube Co., 881 F.2d 412, 421 [ 50 FEP Cases 1499] (7th Cir. 1989)).

Thus, Duffy will not be able to provide the jurors with testimony that will assist them in performing their duty of determining whether Ameritech's handling of the complaints for sexual harassment against Amos was negligent. Each investigation and circumstance is unique. Reasonableness will vary with the set of circumstances facing the employer. Nothing in Duffy's testimony connects her prior experience or knowledge to the facts and circumstances facing Ameritech. Instead she intends to

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

EXHIBIT ___101___

PAGE ___2783___

79 FEP Cases 570
1997 WL 1098409 (S.D.Ind.), 79 Fair Empl.Prac.Cas. (BNA) 570
**(Publication page references are not available for this document.)**

testify about whether Ameritech performed as other employers generally have done under similar circumstances. She states that her opinions are based not on individual incidents, but on the aggregate of conduct she and her colleagues have observed among other employers. As such, it has too little connection with the facts of this case to be useful to the jury, or to overcome the potential prejudicial effect of having a "qualified expert" giving her opinion on these matters.

The Court notes that Duffy stated that she will not testify about whether Amos' conduct constituted sexual harassment, whether Ameritech complied with its own procedures, or about whether Ameritech knew or should have known of the alleged harassment. Based on its full consideration of the value of Duffy's evidence, the Court will not allow her to testify at all.

Turning to another matter, the Court allowed the defendant, Ameritech, to present additional arguments on the issue of admissibility of evidence relating to its managers' consideration of the risks that a premature dismissal of Amos would lead to his subsequent reinstatement through a "just cause" determination by an arbitrator. According to Ameritech, the burden is on the plaintiff to show that Ameritech was negligent, which requires a determination of whether its response was reasonable under the circumstances. An important circumstance, in Ameritech's eyes, was the perception by management that if they moved too quickly to discharge Amos, the union would file a grievance under the collective bargaining agreement ("CBA"), and an arbitrator would ultimately find no just cause for the termination. The jury is entitled to hear this explanation, Ameritech contends, for it is the only explanation they have for how long it took to ultimately discharge Amos.

In support of this theory of its defense, Ameritech cites a Seventh Circuit case in which the district court had been asked to vacate an arbitration award reinstating an employee who had been discharged for sexually harassing a co-worker. Chrysler Motors Corp. v. International Union, 959 F.2d 685 [ 58 FEP Cases 692] (7th Cir. 1992) ("Chrysler II") . The district court affirmed the award, and on appeal the employer argued that the arbitrator's interpretation of the CBA and the arbitration order reinstating the employee violated public policy. Id. at 688. The appellate court noted that the question of public policy is "wholly independent from the collective bargaining agreement and is ultimately one for the courts."Id. at 687. The court further noted that the public policy against sexual harassment in the workplace is well-recognized. However, it then proceeded to determine whether reinstatement of the alleged harasser violated that public policy.

The arbitrator had found that the discharged employee received no warnings or discipline for any prior misconduct, and that the employer failed to show that he could not be rehabilitated with progressive discipline. Id. at 688-89. In fact, the arbitrator found that Chrysler offered no evidence that it had in place a system of progressive discipline. Id. Concluding that a thirty-day suspension would have been a better sanction, the arbitrator reinstated the discharged employee. Id.

The appellate court affirmed the reinstatement order, stating "[w]hile we do not condone Gallenbeck's behavior, it was within the purview of the collective bargaining agreement and public policy for the arbitrator to order his reinstatement."Id. at 689. This is the primary statement from this case offered by Ameritech in support of its conduct in dealing with Amos' alleged harassment of female co-workers. Aside from the fact that the two cases are very dissimilar factually, the defendant has failed to catch the import of one of the court's statements. Specifically, the court said that the public policy question is "wholly independent" from a CBA consideration, and that whether an arbitration decision violates public policy is for the courts to decide. What this means is twofold. First, an employer is subjected to separate duties under a positive law, such as Title VII, and under a CBA. When its duties under the CBA conflict with those under

EXHIBIT ___101___

PAGE ___2784___

79 FEP Cases 570                                                                                      Page 8
1997 WL 1098409 (S.D.Ind.), 79 Fair Empl.Prac.Cas. (BNA) 570
**(Publication page references are not available for this document.)**

the positive law, the positive law controls. Id. at 687. Second, any concerns by an employer that an arbitrator might undo the discipline it has meted out for misconduct does not excuse taking no, or very little, action when the positive law requires them to act promptly to halt any violations of its provisions. Should an arbitrator subsequently reinstate an offending employee, the employer may certainly avail itself of the opportunity to have a court decide if the arbitrator's decision violates public policy.

However, if an employer "delays unduly" in acting against an employee who has violated the law against sexual harassment, it will be subject to liability under Title VII. See Saxton v. American Telephone and Telegraph Co., 10 F.3d 526, 535-35 [ 63 FEP Cases 625] (7th Cir. 1993). The law is clear on this point. It does not allow for any "defense" involving an arbitration risk. To do so would subject the whole of employment discrimination law to the vagaries of collective bargaining and negotiated grievance and arbitration procedures, whenever the situation involved a large employer and a recognized collective bargaining unit. Nothing in the law indicates that this was Congress intent.

Courts have certainly vacated arbitration awards when they were inconsistent with public laws such as Title VII. See Cole v. Burns Internat'l Security Servs., 105 F.3d 1465, 1486 n.19 [ 72 FEP Cases 1775] (D.C. Cir. 1997) (noting cases); see also Chrysler Motors Corp. v. Internat'l Union, 2 F.3d 760. 763 [ 62 FEP Cases 1030] (7th Cir. 1993) ("Chrysler III") (noting that when arbitrator examines only evidence against employee known to employer at time of discharge, and not what was discovered subsequent to discharge, the employer is not forever bound by the arbitrator's order of reinstatement if subsequent facts provide just cause for dismissal). The latter case was a continuation of events that were discussed in the case on which Ameritech relies for its defense. The court in Chrysler III stated that just because "an arbitration award requires reinstatement of a discharged employee does not mean the employee has been gran-

ted perpetual job security."Chrysler III, 2 F.3d at 763 (quotations and citations omitted). The subsequent treatment of the Chrysler case was published and available to Ameritech's legal department at the time the employer was deciding what to do about the numerous complaints against Amos. In Chrysler II, the arbitrator had refused to examine evidence about Gallenbeck's conduct that had come to light after he was discharged because Chrysler had not known of that conduct at the time it discharged him. For this reason the courts had previously upheld the arbitrator's decision. Once Gallenbeck was reinstated, he was subject to the same lawful disciplinary action warranted by his conduct as any other employee. Consequently, the court in the second case refused to hold Chrysler in contempt for discharging him within a day of his reinstatement. Id. at 763.

In further support of its proposed defense, Ameritech argued that its concern about Amos's possible reinstatement was really concern about the female employees in its company. If their complaints about alleged sexual harassment led, after investigation, to the employer discharging the employee, and he is subsequently reinstated by an arbitrator, they would be discouraged from complaining in the future. Overlooked in this argument is the continuing adverse effect Amos's conduct may have on the female employees while the employer waits until it thinks it may have enough evidence to overcome an arbitration decision. This line of argument is without merit.

For the reasons stated above, the Court will not allow any testimony from the EEOC's expert witness, Duffy, because it will not be helpful to, and may prejudice, the jury. After fully considering Ameritech's arguments, the Court re-affirms its earlier ruling from the bench that, as a matter of law, evidence relating to the evidentiary requirements and risks of an arbitration proceeding is not relevant to a determination of the reasonableness of an employer's response to sexual harassment in the workplace.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

EXHIBIT ___101___

PAGE ___2785___

79 FEP Cases 570                                                                                    Page 9
1997 WL 1098409 (S.D.Ind.), 79 Fair Empl.Prac.Cas. (BNA) 570
**(Publication page references are not available for this document.)**

· IT IS SO ORDERED this 15th day of Sept.1997.

## ENTRY OF JUDGMENT

This action came before the Court for trial by jury. The issues have been duly tried and the jury has rendered its verdict in favor of the plaintiffs, the Equal Employment Opportunity Commission, on behalf of claimants Debbie Wentland, Lori Everts, and Wendy Pollard, and against defendants Indiana Bell Telephone Co., Inc., d/b/a Ameritech and Ameritech Corporation.

IT IS THEREFORE ORDERED AND ADJUDGED that plaintiff, Debbie Wentland, be awarded compensatory damages in the amount of Ten Thousand Dollars ($10,000.00) and punitive damages in the amount of Two Hundred Ninety Thousand Dollars ($290,000.00).

IT IS THEREFORE ORDERED AND ADJUDGED that plaintiff, Lori Everts, be awarded compensatory damages in the amount of Zero Dollars. The punitive damage award of Fifty Thousand Dollars ($50,000.00) is not supported by any compensatory damage award.

IT IS THEREFORE ORDERED AND ADJUDGED that plaintiff, Wendy Pollard, be awarded compensatory damages in the amount of Five Thousand Dollars ($5,000.00) and punitive damages in the amount of Two Hundred Ninety-five Thousand Dollars ($295,000.00).

## ENTRY

The Court has reviewed PLAINTIFF'S MOTION FOR MODIFICATION OF ENTRY OF JUDGMENT AND RECONSIDERATION OF ORDER OVERRULING MOTION TO AMEND JUDGMENT REGARDING DAMAGES FOR LORI EVERTS and recognizes that the matter is now on appeal. It appears the Court has made a mistake in not addressing the Motion in a timely fashion. Pursuant to Circuit Rule 57, the Court now indicates to the parties that it is inclined to grant the Motion to Amend the Judgment pursuant to Timm v. Progressive Steel Treating, Inc., 1998 WL 89625 [ 136

F.3d 1008, 76 FEP Cases 321] (7th Cir. Ill.)

## ENTRY

The Court being duly advised, now reconsiders its ruling on PLAINTIFF'S MOTION FOR MODIFICATION OF ENTRY OF JUDGMENT AND RECONSIDERATION OF ORDER OVERRULING MOTION TO AMEND JUDGMENT REGARDING DAMAGES FOR LORI EVERTS and GRANTS said Motion, pursuant to Timm v. Progressive Steel Treating, Inc., 137 F.3d 1008 [ 76 FEP Cases 321] (7th Cir. 1998).

## AMENDED ENTRY OF JUDGMENT

This action came before the Court for trial by jury. The issues have been duly tried and the jury has rendered its verdict in favor of the plaintiffs, the Equal Employment Opportunity Commission, on behalf of claimants Debbie Wentland, Lori Everts, and Wendy Pollard, and against defendants Indiana Bell Telephone Co., Inc., d/b/a Ameritech and Ameritech Corporation.

IT IS THEREFORE ORDERED AND ADJUDGED that plaintiff, Debbie Wentland, be awarded compensatory damages in the amount of Ten Thousand Dollars ($10,000.00) and punitive damages in the amount of Two Hundred Ninety Thousand Dollars ($290,000.00).

IT IS THEREFORE ORDERED AND ADJUDGED that plaintiff, Lori Everts, be awarded punitive damages in the amount of Fifty Thousand Dollars ($50,000.00).

IT IS THEREFORE ORDERED AND ADJUDGED that plaintiff, Wendy Pollard, be awarded compensatory damages in the amount of Five Thousand Dollars ($5,000.00) and punitive damages in the amount of Two Hundred Ninety-five Thousand Dollars ($295,000.00).

Dated this 22nd day of December, 1998.

110

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

EXHIBIT ___101___

PAGE ___278___

EXHIBIT 102

Westlaw.

203 F.3d 831                                                                          Page 1
203 F.3d 831, 1999 WL 1072270 (C.A.9 (Cal.))
(Cite as: 203 F.3d 831, 1999 WL 1072270)

**C**

Lee v. City and County of San Francisco
C.A.9 (Cal.),1999.
NOTICE: THIS IS AN UNPUBLISHED OPIN-
ION.(The Court's decision is referenced in a "Table
of Decisions Without Reported Opinions" appear-
ing in the Federal Reporter. Use FI CTA9 Rule
36-3 for rules regarding the citation of unpublished
opinions.)
United States Court of Appeals, Ninth Circuit.
George LEE, Plaintiff-Appellant,
v.
CITY AND COUNTY OF SAN FRANCISCO; Ter-
rence Hallinan, both as an individual and as District
Attorney of the City and County of San Francisco;
Libby Liu, as an individual and as Assistant District
Attorney; Edward S. Washburn, Special Master,
Defendants-Appellees.
No. 98-16487, 98-16701.
D.C. No. CV-96-02525-WHO.

Argued and Submitted Nov. 3, 1999.
Decided Nov. 23, 1999.

Appeal from the United States District Court for the
Northern District of California William H. Orrick,
Jr., District Judge, Presiding.

Before CANBY, THOMPSON, and GRABER, Cir-
cuit Judges.

MEMORANDUM [FN1]

> FN1. This disposition is not appropriate for
> publication and may not be cited to or by
> the courts of this circuit except as may be
> provided by 9th Cir. R. 36-3.

**\*1** Plaintiff George Lee was an Assistant District
Attorney (ADA) in San Francisco. He resigned un-
der pressure after a colleague, Libby Liu, accused
him of sexual harassment. Plaintiff filed this action
against the City and County of San Francisco, Dis-

trict Attorney Terence Hallinan, and Liu, asserting
numerous claims for relief. The district court dis-
missed several of those claims, and Defendants
moved for summary judgment on the others: defam-
ation; sex discrimination; wrongful termination in
violation of the public policy against sex discrim-
ination; deprivation of a liberty interest without ad-
equate opportunity for a hearing, in violation of the
Due Process Clause; breach of contract; and inten-
tional infliction of emotional distress. The district
court granted summary judgment for Defendants on
all those claims except the defamation claim against
Liu; as to that claim, the court granted the motion
in part and denied it in part. Plaintiff appeals. On de
novo review, *see Pacheco v. New Life Bakery, Inc.,*
187 F.3d 1055, 1059 (9th Cir.1999), we affirm in
part and reverse in part.

*I. Defamation Claims*

Plaintiff's defamation claims were based on three
groups of statements: Hallinan's statements to re-
porters; Liu's statements to Hallinan, Chief ADA
Marla Miller, and investigator Michael Koppel dur-
ing the investigation of the incident; and Liu's state-
ments to co-workers about the incident. The district
court denied Defendants' motion for summary judg-
ment as to the claim based on Liu's statements to
her co-workers, and that claim is not at issue in this
appeal.

*A. Defamation Claims Against Hallinan*

The district court concluded that Plaintiff was a
"public official" for purposes of his defamation
claims. Under *New York Times Co. v. Sullivan,* 376
U.S. 254, 279-80 (1964), a public official cannot
recover damages for defamatory statements relating
to official conduct unless he or she proves that
those statements were made with "actual malice." A
statement is made with "actual malice" if it is made
"with knowledge that it was false or with reckless
disregard of whether it was false or not."*Id.* at 280.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT ____102____

PAGE ____2787____

203 F.3d 831                                                                                          Page 2
203 F.3d 831, 1999 WL 1072270 (C.A.9 (Cal.))
**(Cite as: 203 F.3d 831, 1999 WL 1072270)**

As a San Francisco ADA, Plaintiff was a public of-
ficial. *See Crane v. Arizona Republic,* 972 F.2d
1511, 1525 (9th Cir.1992) (stating that a federal
prosecutor is a public official). However, he con-
tends that the "actual malice" standard applies only
to defamatory statements relating to official con-
duct. Plaintiff argues that the statements at issue did
not relate to his official conduct, but rather to his
personal and private activities.

However, as the Supreme Court has noted,
"society's interest in the officers of government is
not strictly limited to the formal discharge of offi-
cial duties.... [T]he public's interest extends to
'anything which might touch on an official's fitness
for office." ' *Gertz v. Robert Welch, Inc.,* 418 U.S.
323, 344-45 (1974) (quoting *Garrison v. Louisiana,*
379 U.S. 64, 77 (1964)). Allegations of sexual har-
assment against an ADA "touch on" that ADA's fit-
ness for office and, accordingly, relate to his offi-
cial conduct.

\*2 Further, the facts of this case are not as
"personal" and "private" as Plaintiff suggests.
Plaintiff was working in his office when the incid-
ent with Liu occurred. Liu was a less-senior col-
league. Plaintiff and Liu were government employ-
ees in a government building. Even assuming that
there is a point at which a public official's conduct
becomes sufficiently private and unrelated to public
duties to fall outside the "actual malice" standard,
Plaintiff's conduct in this case does not approach
that point.

The district court did not err in concluding that
Plaintiff was a "public official" for purposes of this
case. That does not end our inquiry, however.
Plaintiff also argues that Hallinan's statements to
the press were made with "actual malice." Plaintiff
must prove "actual malice" by clear and convincing
evidence. *Sullivan,* 376 U.S. at 285-86. On sum-
mary judgment, the question is "whether the evid-
ence in the record could support a reasonable jury
finding ... that the plaintiff has shown actual malice
by clear and convincing evidence."*Anderson v.
Liberty Lobby, Inc.,* 477 U.S. 242, 255-56 (1986).

Plaintiff submitted a list of allegedly defamatory
statements that Hallinan made to San Francisco
newspapers. The district court concluded that only
ten of those statements arguably were defamatory, a
conclusion that Plaintiff does not challenge on ap-
peal. The court then refused to consider four of the
ten remaining statements on the ground that they
were inadmissible hearsay. Plaintiff challenges the
district court's refusal to consider those four state-
ments. However, even granting that the court
should have examined all ten statements, its grant
of summary judgment on this issue was not error.

Plaintiff does not explain how statements 21, 28,
and 33, which relate to an earlier incident in which
he was disciplined for making inappropriate ad-
vances to a complaining witness in a domestic viol-
ence case that he was prosecuting, are false or de-
famatory. Two of the statements are true, and the
third merely is a statement of what Hallinan would
have done if he had been District Attorney at the
time of the incident. No reasonable jury could find
by clear and convincing evidence that those state-
ments were uttered with "actual malice."

The remaining statements reflect Hallinan's opin-
ions and impressions as to the state of the investiga-
tion and of Plaintiff's fitness to be an ADA.
Plaintiff does not allege that those statements were
false in the sense that they did not truly reflect what
Hallinan thought about the case or about Plaintiff.
Rather, he argues that the statements should be
viewed as expressing fact, not opinion. With re-
spect to many statements (such as, "I believed her
version"), that premise is untenable.

Even granting that premise, however, Plaintiff's ar-
gument fails, because there is insufficient evidence
to demonstrate that Hallinan made those statements
with *knowledge* of their falsehood or *deliberate dis-
regard* for whether they were true or false. Hallinan
investigated the incident, interviewed the parti-
cipants and witnesses, and came to a conclusion. As
the district court stated, "[t]here is no evidence that
Hallinan deliberately avoided the truth in his in-
vestigation, or that he knew Liu's version of the in-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT __102__

PAGE __2788__

203 F.3d 831
203 F.3d 831, 1999 WL 1072270 (C.A.9 (Cal.))
**(Cite as: 203 F.3d 831, 1999 WL 1072270)**

cident was false."

**\*3** Plaintiff also argues that Hallinan intentionally disregarded evidence and deliberately failed to investigate adequately, indicating that he had serious doubts about the truth of Liu's allegation. To the contrary, Hallinan's investigation was sufficiently detailed and comprehensive to defeat Plaintiff's argument. Plaintiff disagrees with the conclusions that Hallinan drew from that investigation; however, "[d]ifference of opinion as to the truth of a matter ... does not alone constitute clear and convincing evidence" of actual malice. *Harte-Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 681 (1989).

### B. *Defamation Claims Against Liu*

The district court held that Liu's statements to Hallinan, Miller, and Koppel during the investigation of her sexual harassment claim were absolutely privileged under § 47(b) of the California Civil Code. That provision extends an absolute privilege to statements made in any "(1) legislative proceeding, (2) judicial proceeding, [or] (3) in any other official proceeding authorized by law." The district court concluded that the District Attorney's internal investigation was an "official proceeding authorized by law" and that Liu's statements in furtherance of the investigation were absolutely privileged.

The district court did not err in so concluding: In *O'Shea v. General Telephone Co. of California,* 193 Cal.App.3d 1040, 1047-49 (1987), the court held that the privilege applied to statements made during an internal investigation of an applicant for the California Highway Patrol. The court concluded that an absolute privilege was appropriate to further the goal of "encourag[ing] the utmost freedom of communication between citizens and public authorities," given that the legislature had made a decision to require thorough background checks of Highway Patrol officers. *Id.* at 1048. That same rationale applies here; a government agency's internal investigations of employees charged with sexual harassment, like background investigations, are "official proceedings authorized by law," and Liu's statements are absolutely privileged under § 47(b)(3).

*Cruey v. Gannett Corp.,* 64 Cal.App. 4th 356 (1998), on which Plaintiff relies, is not to the contrary. In that case, an employee made allegations of sexual harassment to the Equal Opportunity Employment Commission (EEOC) and to her employer, Gannett. The California Court of Appeal concluded that the communication to the EEOC was absolutely privileged under § 47(b)(3) which, it concluded, applies to "communications both to and from government officials which may precede the initiation of formal proceedings." *Id.* at 368. However, the plaintiff's communications to Gannett's Vice President were not absolutely privileged, because Gannett "*is a private not a public entity and does not fall within the official duty privilege of § 47(b)(3), which has never been applied to private individuals.*" *Id.* at 369 (emphasis added); *see also Slaughter v. Friedman,* 32 Cal.3d 149, 156 (1982) (interpreting the § 47(b)(3) privilege "broadly to protect communications to and from government officials," but not "communications between private parties who were not acting in an official capacity").

**\*4** Here, Hallinan, Miller, and Koppel were public officials acting in their official capacities when they investigated Liu's sexual harassment claim. Accordingly, Liu's statements to them during the investigation were absolutely privileged and cannot serve as the basis for a defamation claim.

### II. *Sex Discrimination and Wrongful Termination*

The district court concluded that Plaintiff had failed to establish a prima facie case of sex discrimination, *see Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 256 (1981), and granted summary judgment for Defendants on that basis.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 102

PAGE 2789

203 F.3d 831                                                                          Page 4
203 F.3d 831, 1999 WL 1072270 (C.A.9 (Cal.))
**(Cite as: 203 F.3d 831, 1999 WL 1072270)**

Plaintiff's argument essentially is that he and Liu engaged in the same conduct, but were treated differently; he was forced to resign, while she was admonished. However, as the district court noted, Plaintiff and Liu were not "similarly situated employees" with respect to this incident. Plaintiff was *on probation* for another incident of inappropriate sexual behavior; Liu was not. Plaintiff's disciplinary record provides a legitimate, nondiscriminatory reason for disciplining him more severely. Moreover, Plaintiff was a more-senior employee. As the district court concluded, Plaintiff failed to establish a prima facie case of sex discrimination.

Plaintiff also argues that the district court erred in refusing to consider the declaration and report of his expert witness, D. Jan Duffy. Such evidentiary decisions are reviewed for abuse of discretion. *See Gilbrook v. City of Westminster,* 177 F.3d 839, 858 (9th Cir.1999). Here, the district court's decision was not an abuse of discretion: Duffy's report, while lengthy and critical of the investigation, does not adequately explain its conclusion that Plaintiff was disciplined for discriminatory reasons. Further, Plaintiff does not explain how the district court's refusal to consider Duffy's declaration was prejudicial, beyond stating broadly that Duffy was a "crucial witness."

In sum, the district court did not err in granting summary judgment for Defendants on Plaintiff's sex discrimination claim. It follows that the court also did not err in granting summary judgment on Plaintiff's claim that he was wrongfully terminated in violation of the public policy against sex discrimination.

III. *Due Process Violations*

Plaintiff also asserts that the City and Hallinan infringed on his liberty interests without due process, in violation of the Fifth and Fourteenth Amendments to the United States Constitution. The liberty interest that the Due Process Clause protects "encompasses an individual's freedom to work and

earn a living" and, "when the government dismisses an individual for reasons that might seriously damage his standing in the community, he is entitled to notice and a hearing to clear his name."*Bollow v. Federal Reserve Bank of San Francisco,* 650 F.2d 1093, 1100 (9th Cir.1981) (citing *Board of Regents v. Roth,* 408 U.S. 564, 573 & n. 12 (1972)).

In granting summary judgment for Defendants on that claim, the district court relied on *Codd v. Velger,* 429 U.S. 624, 628 (1977). In *Codd,* the Supreme Court stated that a "name-clearing hearing" is required only "if the employer creates and disseminates a false *and defamatory* impression about the employee in connection with his termination."*Id.* (emphasis added). Because Plaintiff failed to show that any of the statements that accompanied his resignation were defamatory, the district court concluded, he was not entitled to a hearing to clear his name.

*5 Plaintiff argues that the Supreme Court's use of the word "defamatory" in *Codd* was dictum and was not meant to suggest that a fired, stigmatized employee must satisfy the prerequisites for a state-law defamation claim before a due process hearing is required. Even if the district court placed too much weight on the *Codd* court's use of the word "defamatory," however, it still did not err in granting summary judgment on Plaintiff's due process claim. Under *Roth, Codd,* and *Bollow,* the process to which Plaintiff was entitled was notice and a hearing to clear his name. Plaintiff received notice of Liu's accusation, and he had an opportunity to present his side of the story to the person in charge, Hallinan.

Plaintiff argues that that hearing was inadequate and that he was entitled to additional process. But Plaintiff waived whatever additional process might have been available when he resigned and told Hallinan that he did not want to "fight[ ] this thing" and "tear the office apart." To be sure, that resignation was under threat of termination, but it was voluntary nonetheless.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT ___102___

PAGE ___2790___

203 F.3d 831

203 F.3d 831, 1999 WL 1072270 (C.A.9 (Cal.))

**(Cite as: 203 F.3d 831, 1999 WL 1072270)**

In sum, Plaintiff received an opportunity to present his side of the story. At the time he resigned, he could have chosen to "fight this thing"-that is, to contest his threatened firing further and to present more of his side of the story. He chose not to avail himself of that opportunity. The district court did not err in granting summary judgment on Plaintiff's due process claim.

### IV. Breach of Contract

The district court concluded that Defendant did not breach its Memorandum of Understanding (MOU) with Plaintiff and granted summary judgment for Defendants on Plaintiff's claim for breach of contract. The relevant portion of the MOU provides: "The city shall process complaints of sexual harassment pursuant to civil service rules, the administrative code and federal and state laws." Plaintiff argued that, by discriminating against him on the basis of sex and denying his due process rights, Defendants were not processing Liu's sexual harassment claim pursuant to state and federal law.

The district court rejected that argument because it depended on Plaintiff's sex discrimination and due process arguments, which the court already had ruled against. As we have held, Plaintiff's sex discrimination and due process claims are unavailing; accordingly, Defendants did not breach the MOU in the manner that Plaintiff suggests.

Plaintiff argues, however, that there is an independent basis for his contract claim, which the district court did not address. He asserts that Defendants failed to follow the procedures for processing sexual harassment claims in San Francisco Administrative Code § 16.9-25 and, accordingly, failed to process Liu's complaint "pursuant to ... the administrative code."

That argument is unpreserved. Plaintiff did not raise the issue of compliance with the San Francisco Administrative Code in his pleadings to the district court or at oral argument on Defendants'

motion for summary judgment. Plaintiff argues that the issue was before the district court because his expert, Duffy, mentioned the code provision in her declaration. That passing mention, however, was not sufficient to preserve the issue for appeal. Further, the district court properly refused to consider Duffy's declaration, and so not even Duffy's mention of the code was before the district court. We decline to address this argument for the first time on appeal.

### V. Intentional Infliction of Emotional Distress (IIED)

*6 Finally, Plaintiff alleged in his complaint that, by defaming him, Hallinan and Liu also committed the tort of IIED. Before the district court, the parties agreed that those claims depended entirely on the underlying defamation claims and that, if the defamation claims failed, the IIED claims also failed. The district court granted summary judgment for Defendants on nearly all of Plaintiff's defamation claims and, as a consequence, also granted summary judgment on nearly all of Plaintiff's IIED claims. As noted, the district court did not err in granting summary judgment on those defamation claims; accordingly, it did not err in granting summary judgment on the corresponding IIED claims.

However, Plaintiff's defamation claims against Liu for statements made to her co-workers survived. Accordingly, Plaintiff's IIED claims against Liu also survived, insofar as those claims were based on severe emotional distress caused by Liu's allegedly defamatory statements to her co-workers.

But the trial court granted summary judgment to Defendants on those claims on another ground. The court concluded that Plaintiff had "presented no evidence that he in fact did suffer such extreme distress" and ruled for Defendants on that basis.

Defendants did not move for summary judgment on that ground, however. The issue of the adequacy of Plaintiff's evidence of extreme distress was not dis-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT ___102___

PAGE ___2791___

cussed anywhere in Defendants' motion, Plaintiff's response to that motion, or in oral argument before the district court. Plaintiff argues, therefore, that he was denied any opportunity to present arguments or evidence on the issue on which the district court granted summary judgment, and he quotes the Supreme Court for the proposition that "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion."*Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

Defendants respond by arguing that, because a district court may grant summary judgment sua sponte for the *nonmoving* party, it follows that a court "may grant summary judgment to a *moving* party for any reason supported by the record."Although it is true that a court may grant summary judgment to a nonmoving party, "the losing party" always must have had "a full and fair opportunity to ventilate the issues" on which summary judgment is granted. *Cunningham v. Rothery (In re Rothery),* 143 F.3d 546, 549 (9th Cir.1998). Here, Plaintiff had *no* opportunity on summary judgment to "ventilate" the issue of the adequacy of his evidence of extreme emotional distress.

In the circumstances, the district court erred in granting summary judgment on a ground about which Plaintiff, the nonmoving party, had no notice or opportunity to be heard.

## CONCLUSION

We AFFIRM the district court's grant of summary judgment to Defendants on Plaintiff's defamation, due process, wrongful termination, sex discrimination, and breach of contract claims. We REVERSE the district court's grant of summary judgment to Defendants on Plaintiff's IIED claim against Liu and REMAND for further proceedings.

C.A.9 (Cal.),1999.
Lee v. City and County of San Francisco
203 F.3d 831, 1999 WL 1072270 (C.A.9 (Cal.))

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT ____102____

PAGE ____2792____

EXHIBIT 103

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**