# EXHIBIT 9

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

# EXHIBIT 10

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

# EXHIBIT 11

7/18/03 WSJ A1
7/18/03 Wall St. J. A1
2003 WL-WSJ 3974434
(Publication page references are not available for this document.)

Page 2

The Wall Street Journal
(Copyright (c) 2003, Dow Jones & Company, Inc.)

Friday, July 18, 2003

Dolled Up: To Lure Older Girls, Mattel Brings In
Hip-Hop Crowd

It Sees Stalwart Barbie Lose Market Share, So
'Flavas' Will Take on the 'Bratz'

Battle of the Big Heads
By Maureen Tkacik

LOS ANGELES -- Tika, 10 inches tall with two-toned hair, is of ambiguous ethnic origin -- maybe she's Asian, maybe Latina -- but her "platinum" medallion, airbrushed jean jacket, shell-toe sneakers and graffiti-streaked packaging make one thing clear.

"She's like . . . hip-hop," said Crystal Audigier, 10 years old, as she rifled through the first crate of "Flavas" dolls to arrive at a Los Angeles FAO Schwarz store last week.

Mattel Inc. hopes the dolls are hip enough to take on the "Bratz." The Flavas (pronounced "Flay-vuhs," like "flavors"), a set of six dolls brought from design to production in just three months, represent a striking gamble for the giant toy company. In the 44 years since it introduced its bombshell Barbie, Mattel has rarely brought out a doll line to compete with her.

But Mattel, which had become accustomed to its buxom blonde dominating the market, has watched in alarm as Barbie has been challenged by a smaller toy maker's Bratz -- a line of big-headed, pouty-lipped characters. While Barbie, which posted about $1.7 billion in sales for Mattel last year, is still queen, her share of the so-called fashion-doll market has fallen, almost entirely due to the Bratz.

After trying -- and failing -- to defeat the Bratz with a trendier Barbie last year, Mattel has come up with a radical battle plan. Among other things, that means curtailing its reliance on, and near-reverence toward, its cash cow. While Barbie is still a plaything of choice for girls 3 to 7 years old, it's been years since she managed to hold the attention of the tweens, or 8-

to 12- year-olds. With the Flavas, Mattel is trying to get back into that market -- even if it risks cannibalizing its biggest product.

Mattel has tweaked Barbie many times since she was introduced in 1959: bronzing her skin during the 1970s, introducing black and Hispanic counterparts and giving her a band (the fuchsia-clad "Rockers") during the 1980s. Mattel even shrunk her chest and widened her hips in 1998.

But Mattel now concedes Barbie has gradually lost touch with some young girls' lives. "Barbie began as a great girl who was simply a reflection of popular culture, but in the past few years we had sort of put her on a pedestal," says Matt Bousquette, president of the newly created Mattel Brands unit, which consolidated the boys' and girls' toys divisions. "We're taking her off that pedestal."

While Mr. Bousquette and his team overhaul Barbie, he is also enlisting the Flavas, who wear sweats and heavy chains and have names like "Tre" and "P. Bo," as a second force with which to fight the Bratz. Mattel says hip-hop -- which it defines as "a cultural phenomenon . . . dimensionalized through freestyle dance, street sports, music and fashion" -- has gained sufficient ground in the mainstream to have its own toy line.

"Mattel is recognizing that there are other trends besides Barbie that girls want to play with," says Manny Francione, divisional merchandise manager for Toys "R" Us Inc., Paramus, N.J. "Hip-hop is one of those trends."

The Bratz, developed by a toy maker called MGA Entertainment Inc., North Hills, Calif., were introduced in the summer of 2001. They became a hit with tweens, an age group of girls that the toy industry had almost written off.

For the past decade, toy makers have been grappling with a phenomenon analysts call "age compression," in which media-saturated youngsters are outgrowing dolls and other toys at an earlier age. NPD Group Inc., a market-research firm, says toy spending on children peaks at age 3 and steadily declines after

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

M 0012536

EXHIBIT 11

PAGE 151

7/18/03 WSJ A1
7/18/03 Wall St. J. A1
2003 WL-WSJ 3974434
(Publication page references are not available for this document.)

Page 3

that, with spending on 12-year-olds at about a quarter of the peak level. By attracting tweens, the Bratz bucked that trend.

Bratz "appealed to an older girl . . . who is not necessarily still a Barbie customer," says Sean McGowan, a longtime industry analyst with Gerard Klauer Mattison. "Nothing's ever challenged Barbie like the Bratz." At Barbie's 1997 peak, a year in which Mattel posted $1.9 billion in sales of the doll, her clothing and accessories, she boasted more than a 90% share of the fashion-doll market, Mr. McGowan says. Barbie held at least 85% of the market right before the Bratz were introduced, he says, but her share has now dropped to about 70%.

The history of the Bratz is intertwined with Mattel. MGA says the Bratz were designed by Carter Bryant, a former member of the Barbie team. Inside Mattel, some are convinced the Bratz borrow liberally from a Mattel project that was scrapped at the testing stage in 1998. Mattel declined to comment.

Mr. Bryant didn't work on the line that Mattel scrapped, according to former and current Mattel designers. But most Barbie designers had seen the prototypes, his former colleagues say. Mr. Bryant, through MGA, declined to be interviewed.

The Mattel doll line that was scrapped wasn't exactly like the Bratz, says a longtime Mattel designer who worked on the project. But the Bratz's oversized heads -- with their pursed lips and cartoonish eyes -- are "virtually identical" to the heads of the dolls her team created, says the designer, who left Mattel in 2001.

Lily Martinez, a designer who still works at Mattel, came up with the idea for the big doll heads for Mattel, colleagues say. Mattel declined to comment. She even posted her sketch on her cubicle, colleagues say. "Anyone who passed by her cubicle would see the picture up on the wall," says another designer who also left Mattel in 2001. "The big heads, the big eyes, the big feet -- they were all the same" as the Bratz. Ms. Martinez declined to comment.

The Mattel dolls were scrapped in testing, current and

former designers say, because Mattel had strict quotas that allowed only one "flanker brand" -- that is, a brand that would compete with Barbie for shelf space -- on the market at a time. At the time, Mattel chose a product called "What's Her Face" -- a doll with a blank face on which kids could draw expressions. That doll remains on the market; Mattel declined to discuss its sales.

Designers say they often faced a higher bar for non-Barbie projects. And Barbie's image was carefully protected. Bruce Stein, who was president of Mattel until 1998, says that former Chief Executive Jill Barad nixed an idea for "Barbie as Xena" dolls in 1998.

Ms. Barad was replaced in 2000, after Mattel's disastrous $3.5 billion acquisition of a software maker called The Learning Company. Under her successor, Robert Eckert, a former Kraft Foods president, the company has returned to profitability by cutting its work force 10%, streamlining its supply chain and developing international sales, among other things. Mattel, which reported a net loss of $431 million in 2000, reported net income of $230 million last year. Its stock has risen about 76% since Mr. Eckert arrived.

Isaac Larian, chief executive of MGA, says he had never heard of a project similar to the Bratz at Mattel. He says he chose Mr. Bryant's idea for the Bratz over several others after holding a sort of fashion-doll design contest in late 1999.

Mr. Larian, who emigrated to the U.S. from Iran, founded his company in the late 1970s, making a name by picking up the license for hand-held Pac-Man games. Though his company had made baby dolls before, it had never made fashion dolls: He says he was motivated by a challenge from a Wal-Mart Stores Inc. buyer to "give me something that can compete with Barbie."

This year, closely held MGA expects revenue of about $800 million -- with 65% of that coming from the Bratz. The company says it's profitable, but won't discuss specifics. Mr. Bryant still does design work for MGA, Mr. Larian says, and collects royalties on the Bratz line.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

M 0012537

EXHIBIT 11

PAGE 152

7/18/03 WSJ A1
7/18/03 Wall St. J. A1
2003 WL-WSJ 3974434
(Publication page references are not available for this document.)

Mattel began worrying about the Bratz's momentum during the 2001 holiday season. Barbie sales fell 12% in the U.S. that year, despite a marketing campaign featuring an animated video, "Barbie in the Nutcracker."

By spring of 2002, Adrienne Fontanella, then president of the girls' division, decided to launch what the company termed a more "reality based" Barbie line. Like the Bratz, the "My Scene" Barbies boasted bigger heads and feet and fuller lips, as well as trendier clothes.

Mr. Larian, the head of MGA, calls the My Scene dolls a "cheap imitation" of the Bratz. Mattel declined to comment. Introduced in October 2002, the My Scene Barbies helped Mattel's sales, but still ranked behind the Bratz during the 2002 holiday season, according to NPD. "My Scene has been just OK for us," says Fred Hurley, a longtime girls'-toys buyer for KB Toys Inc., Pittsfield, Mass.

In February, Ms. Fontanella's job, along with others, was eliminated in what Mr. Eckert called a "restructuring" of Mattel's executive ranks aimed at "increasing efficiency."

Mr. Bousquette, the then-head of Mattel's boys' toy division, became the first man to take control of Barbie in more than a decade. "It used to be that whoever ran Barbie ran the company, not the other way around," says Mr. Stein, the former president. "For Matt to be in charge is a major shift."

Mattel no longer has quotas on how many products can compete with Barbie. After sitting through a girls'-design-team presentation in March, Mr. Bousquette seized upon the Flavas as the ideal dolls to compete for the dollars of Bratz buyers. Ivy Ross, head of girls' design, suggested bringing them to market for the spring 2004 season. Mr. Bousquette said the company should aim for this July instead.

"We were stunned," says a designer who worked on the Flavas and left the company in May. Another surprise: Mr. Bousquette asked the team to make the dolls look more hip-hop than the prototypes. "No one had really believed in the concept before that meeting, and it was stuck in this back-and-forth where first they were too edgy, then they weren't edgy enough," says the designer. "Matt came through and cut all of that out." Mr. Bousquette says he told designers to make the dolls "as authentic as possible, as quickly as possible."

Flavas are more complicated to manufacture than most fashion dolls. They are all different heights -- meaning separate molds -- and they have 10 points at which they can move, allowing them to strike a variety of poses. The Flavas design team often slept in their cubicles to get the dolls ready in time for summer shipment. Two designers each clocked 53 hours during Memorial Day weekend to prepare the line for the company's annual toy fair held in the first week of June.

Some buyers have been impressed. Mattel's girls' division "has never been a particularly forward-thinking group, but the Flavas are right on trend," says KB's Mr. Hurley. The six dolls in the Flavas line are certainly edgier than anyone in Barbie's clique. The Flavas girls have highlighted hair, flashier jewelry and wear midriff-baring tops with low-slung pants. Unlike Barbie, they have flat feet and wear sneakers. The two boy Flavas dolls sport earrings and serious expressions. Boxer underwear appears to show from the top of their cargo pants.

The Flavas come in boxes splashed with black-and-white photos of urban scenes shot around Venice Beach. When arranged together, the boxes create a "graffiti" mural that reads: "FA SIZZLE." It is a play on the hip-hop expression "Fa' shizzle," which means "For sure." Marketing director Lisa Tauber explains that it is also an acronym that stands for "Fashion, Attitude and Sizzlin' Style." The dolls, aimed at 9- to 11-year-olds, are "all about fearless self- expression," she says.

MGA's Mr. Larian says he isn't scared by the Flavas. "The only thing that's missing is a cocaine vial," he says. "You think of Mattel, you think of Barbie and you think of sweetness. . . . This is like 'gangster' Barbie, and I think it's going to backfire."

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

M 0012538

EXHIBIT _11_

PAGE _153_

7/18/03 WSJ A1
7/18/03 Wall St. J: A1
2003 WL-WSJ 3974434
(Publication page references are not available for this document.)

Telejah Dean, a nine-year-old from West Los Angeles noticed the Flavas last week, as she was admiring Mattel's Mary-Kate and Ashley dolls. The Flavas are "not as pretty as Barbie," she said. But her older sister, Tiffany, 22, seemed impressed by the blond Happy D. doll. "Look, she's got black [hair] extensions like Christina," she exclaimed, referring to pop singer Christina Aguilera.

In fact, Mattel has hired people to give out Flavas hats, wristbands and decals during Ms. Aguilera's concert tour this summer. Ms. Aguilera, who got her start on the Disney Channel, is now probably as well known for her 11 body piercings and her mud wrestling-themed MTV video called "Dirty."It's a sign of the changing times, says Mattel spokeswoman Julia Jensen. "The old Mattel probably wouldn't try to tie up with someone like Christina Aguilera."

---- INDEX REFERENCES ----

COMPANY:         KB Holdings LLC (KBTY);
Mattel Inc (MATL)

NEWS SUBJECT:         (Marketing (C31); Market Share (C313); Corporate/Industrial News (CCAT); Content Types (NCAT); Page-One Story (NPAG); Editor's Choice - Consumer Products (REQRCP); Editor's Choice - Industry Trends/Analysis (REQR))

INDUSTRY:         (Dolls/Toys/Games (I4941); Retail (I64); Specialty Stores (I654); Hobby/Toy/Game Stores (I6540030); Consumer Products (ICNP); Media (IMED))

REGION:         (North American Countries (NAMZ); United States (USA); United States - California (USCA); Northeast U.S. (USE); United States - Massachusetts (USMA); Western U.S. (USW))

OTHER INDEXING:    Marketing; Market Share; Page-One Story; Content Types; Corporate/Industrial News; United States - California; United States - Massachusetts; United States; Northeast U.S.; Western U.S.; North American Countries; Dolls/Toys/Games; Retail; Specialty Stores; Hobby/Toy/Game Stores; Consumer Products;

Media; Consumer Cyclical; Newswire More Code; Newswire End Code; All Entertainment & Leisure; Limited Product Specialty Retailers; Recreational Products & Services; All Specialty Retailers; Toys; Islamic Index; S&P 500 Index component; Newspapers' Section Fronts; Marketing; Market

Word Count: 2217

7/18/03 WSJ A1

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

M 0012539

EXHIBIT  11

PAGE  154

# EXHIBIT 12

A107CD0
DENISE O'NEAL      OCTOBER 3, 2007

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION

CARTER BRYANT, an                    )
individual,                          )
                                     )
                                     ) Case No.
                        Plaintiff,   ) CV 04-9049
                                     ) SGL (RNBx)
          vs.                        ) Consolidated with
                                     ) No. CV 04-09059
MATTEL, INC., a                      ) No. CV 05-02727
Delaware corporation,                )
                                     )
                        Defendant.   )
_____      )
And Consolidated Cases

DISCOVERY DEPOSITION OF

DENISE O'NEAL

CHICAGO, ILLINOIS

OCTOBER 3, 2007

Atkinson-Baker, Inc.
Court Reporters
(800) 288-3376
www.depo.com

Reported by: Janice Smith, RPR
             No. 084-001346

FILE NO: A107CD0

Page 1

ATKINSON-BAKER, INC. COURT REPORTERS                    1 (800) 288-3376

EXHIBIT 12
PAGE 155

A107CD0

DENISE O'NEAL        OCTOBER 3, 2007

---

**Page 2**

```
1        UNITED STATES DISTRICT COURT
         CENTRAL DISTRICT OF CALIFORNIA
2            EASTERN DIVISION
3  CARTER BRYANT, an      )
   individual,            )
4                         )
                          ) Case No.
5        Plaintiff,       ) CV 04-9049
                          ) SGL (RNBx)
6     vs.                 ) Consolidated with
                          ) No. CV 04-09059
7  MATTEL, INC., a        ) No. CV 05-02727
   Delaware corporation,  )
8                         )
         Defendant.   )
9  _____)
   And Consolidated Cases
10
11        The deposition of DENISE O'NEAL,
12  called by Plaintiff for examination, taken
13  pursuant to the Federal Rules of Civil
14  Procedure of the United States District Courts
15  pertaining to the taking of depositions for
16  discovery, taken before Janice Smith, a Notary
17  Public within and for the County of Cook, State
18  of Illinois, and a Registered Professional
19  Reporter of said state, taken at Suite 2300,
20  55 W. Monroe St., Chicago, Illinois 60603, on
21  the 3rd day of October, A. D. 2007, at 2:07
22  p.m.
23
24
25
```

---

**Page 4**

```
1                    INDEX
   EXAMINATION
2
   Witness Name                    Page
3  DENISE O'NEAL
     By Mr. Niborski .................... 5
4     By Mr. O'Brien ..................... 18
      By Mr. Niborski (CONTINUED) .......... 19
5
6
7
                    EXHIBITS
8
                                    Page
9  Deposition Exhibit No. 927 Marked for
   Identification                     7
10
   Deposition Exhibit No. 928 Marked for    15
11  Identification
12 Deposition Exhibit No. 929 Marked for    15
   Identification
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

**Page 3**

```
1
2  APPEARANCES:
3  FUNKHOUSER VEGOSEN LIEBMAN & DUNN, LTD.,
   BY: DAMON E. DUNN, ESQ.,
4     55 West Monroe St.,
      Suite 2300,
5     Chicago, Illinois 60603,
6        Appeared on behalf of the Deponent;
7
8  STROOCK & STROOCK & LAVAN, LLP,
   BY: MICHAEL J. NIBORSKI, ESQ.,
9     2029 Century Park East, Suite 1600
10    Los Angeles, Ca. 90067-3086,
         Appeared on behalf of Mattel, Inc.;
11
12 QUINN, EMANUEL, URQUHART OLIVER &
   HEDGES, LLP;
13 BY: MICHAEL T. ZELLER, ESQ.,
      865 S. Figueroa St.,
14    10th Floor,
15    Los Angeles, Ca. 90017,
16       Appeared on behalf of Mattel, Inc.;
17 SIDLEY AUSTIN, LLP,
   BY: RICHARD J. O'BRIEN, ESQ.,
18    One South Dearborn St.,
19    Chicago, Il. 60603,
20       Appeared on behalf of MGA.
21 REPORTED BY: MS. JANICE SMITH, RPR
      License No. 084-1346
22
23
24
25
```

---

**Page 5**

```
1        THE VIDEOGRAPHER:  We are on the
2  record at 2:07 p.m. on October 3, 2007.  Here
3  begins the videotaped deposition of Denise
4  O'Neal, taking place in Chicago, Illinois.
5  This deposition is being taken in the matter of
6  Carter Bryant versus Mattel, Incorporated.
7        Will counsel please state the
8  names for the record?
9        MR. NIBORSKI:  Michael Niborski, of
10 Stroock & Stroock & Lavan, on behalf of Mattel.
11       MR. ZELLER:  Michael Zeller, Quinn
12 Emanuel, for Mattel.
13       MR. DUNN:  Damon Dunn, for the
14 witness.
15       MR. O'BRIEN:  Dick O'Brien, on behalf
16 of MGA.
17       THE VIDEOGRAPHER:  Thank you,
18 counsel.  The witness will now be sworn in.
19            (Witness sworn.)
20            DENISE O'NEAL,
21 called as a witness herein, having been first
22 duly sworn, was examined and testified, as
23 follows:
24            EXAMINATION
25 BY MR. NIBORSKI:
```

---

2 (Pages 2 to 5)

EXHIBIT 12

PAGE 156

A107CD0

DENISE O'NEAL        OCTOBER 3, 2007

**Page 6**

```
1    Q.   Good afternoon, Ms. O'Neal.      02:06
2    A.   Hi.
3    Q.   Could you spell your full name for   02:06
4  the record, please?
5    A.   My first name is Denise,
6  D-e-n-i-s-e.  My last name is O'Neal,
7  O'-N-e-a-l.
8    Q.   And could you also state for the     02:07
9  record your current address?
10   A.   14732 South Princeton Avenue,
11 Dolton, D-o-l-t-o-n, Illinois 60419.
12   Q.   And where are you currently          02:07
13 employed?
14   A.   Chicago Sun-Times.
15   Q.   And when did you start working for   02:07
16 the Sun-Times?
17   A.   December.  Yeah, December of 1990.
18   Q.   And have you worked for the          02:07
19 Sun-Times from December 1990 until now?
20   A.   Yes.
21   Q.   And did you have any -- what was     02:07
22 your employment history prior to the Sun-Times?
23   A.   Prior to the Sun-Times I worked for
24 Advertising Age Magazine.
25   Q.   Could you just give us a brief       02:07
```

**Page 7**

```
1  description of your educational background?
2    A.   I have a bachelor's from Roosevelt
3  University in Chicago, Illinois, in mass
4  communication, which covered broadcast and
5  print media.
6    Q.   Could you give us a brief summary of   02:08
7  your job titles while you have been at the
8  Sun-Times?
9    A.   I have been -- my current title is
10 editorial assistant, food staff writer.  I have
11 worked for a food section, our weekend section,
12 and have been assistant and still assistant to
13 our features editor.
14   Q.   And do you recall what your official   02:08
15 position was in March of 2004?
16   A.   Editorial assistant and staff
17 writer.
18   Q.   Thank you.  I would like to show you   02:08
19 an article and we will mark it as an exhibit
20 for the deposition, and I believe we are going
21 in order so that will be marked as Exhibit 927.
22          (Whereupon, Deposition Exhibit
23          No. 927 was marked for I.D.
24          as of 10-3-07.)
25 BY MR. NIBORSKI:
```

**Page 8**

```
1    Q.   I would ask you to take a quick      02:09
2  look at that and tell me if you recognize it,
3  this document?
4    A.   It appears to be a story that I
5  wrote for the paper.  It has my byline, so I am
6  assuming it is the story I wrote.
7    Q.   Do you recall this particular         02:09
8  article?
9    A.   I know that I wrote an article on
10 the Bratz, one lengthy article, and that is the
11 only I do believe.  It is the one that appeared
12 in 2004, yes.
13   Q.   Okay.  And would you like to take a   02:09
14 minute and review it, or are you quite
15 confident you wrote this article?
16   A.   If it has my byline, I am sure I
17 wrote it.
18   Q.   If you could turn to page 2, please?  02:09
19 You will see some highlighted portions.  And if
20 I could have you focus on the first sentence,
21 it says, "When Larian's daughter was 7, he
22 noticed she had become bored with Barbie
23 dolls."
24          Do you see that?
25   A.   Yes.
```

**Page 9**

```
1    Q.   Do you recall interviewing for this   02:10
2  article an individual named Isaac Larian?
3    A.   Yes.
4    Q.   You do.  Do you remember             02:10
5  approximately when that interview occurred
6  compared to the publication of this article?
7    A.   It would more likely be one to two
8  weeks prior to --
9    Q.   To the publication date?             02:10
10   A.   -- to the publication date.  Right.
11   Q.   So approximately between mid          02:10
12 February?
13   A.   Somewhere in February, yeah.
14   Q.   2004?                                 02:10
15   A.   Yeah.  Right.
16   Q.   Thank you.  Now turning back to that  02:10
17 first sentence, do you recall Mr. Larian
18 telling you that information during your
19 interview with him?
20   A.   I do.
21   Q.   And if I could have you focus on the  02:10
22 next sentence, it says, "He decided to again
23 change the focus of his company, wanting to
24 create a doll product for girls ages 7 to 13.
25 The dolls would have to be urban dolls
```

EXHIBIT *12*

PAGE *157*

A107CD0
DENISE O'NEAL        OCTOBER 3, 2007

1  representing America's multi-ethnicity.  They
2  also had to reflect the trends and attitudes of
3  the tween generation."
4        Do you recall Mr. Larian
5  telling you that information?
6    A.  To the best of my knowledge, yes.
7    Q.  Turning to the next paragraph, you      02:11
8  will see a quote.  It says, "We were looking
9  for a new toy to challenge Barbie.  Something
10 that would span girls' interest in dolls for a
11 few more years," says Larian.
12       And you attribute that quote to
13 Mr. Isaac Larian, correct?
14   A.  Yes.
15   Q.  And to the best of your knowledge,      02:11
16 that was an exact quote from him to you,
17 correct?
18   A.  Most quotes are pretty much
19 verbatim, yes.
20   Q.  And to the best of your memory, that    02:11
21 quote was words specifically spoken by Mr.
22 Larian?
23   A.  To the best of my knowledge, yes, it
24 was.
25   Q.  Thank you.  Turning to the next         02:11
                                          Page 10

1    Q.  If you could turn a few paragraphs      02:12
2  down below, you will see a highlighted quote
3  that reads, "We don't have plans laid out for
4  the Bratz.  We come up with new ideas as we go
5  along and we are having fun doing it."
6        Do you see that?
7    A.  Yes.
8    Q.  And is it your recollection that        02:13
9  that is a quote from Mr. Isaac Larian?
10   A.  It is in quotation marks.  Yes, it
11 would have been a quote from Mr. Larian.
12   Q.  Thank you.  If I could have you turn    02:13
13 back to page one of the exhibit, you will see
14 another series of paragraphs that are
15 highlighted.
16   A.  Um-hmm.
17   Q.  The first one is also a quote which     02:13
18 reads, "We wanted a respectable product that
19 reflected the lifestyle of school girls and
20 fashionable trends, but also one that
21 represented clean fun with learning values," he
22 says.
23       And is it your recollection
24 that that quote came from Mr. Larian as well?
25   A.  Yes, it did.
                                          Page 12

1  paragraph it says, "Larian began shopping
2  around for interested vendors.  Getting
3  negative response because of the company name,
4  Larian once again changed the company's name,
5  shortening it to MGA Entertainment.  That done,
6  Larry needed a name for his dolls."
7        Do you recall Mr. Larian telling
8  you that information?
9    A.  To the best of my knowledge, yes, I
10 do.
11   Q.  And the next paragraph reads, "His      02:12
12 creative team decided the name should be catchy
13 and not have more than six letters."
14       Do you recall him telling you
15 that?
16   A.  To the best of my knowledge, yes.
17   Q.  It goes on to say, "When looking at     02:12
18 sketches and pitching ideas, someone said the
19 dolls looked like little brats.  Keeping with
20 today's trend of making names more cool by
21 changing the spelling, MGA executives decided
22 to replace the S with a Z."
23       And you recall Mr. Larian
24 telling you that information?
25   A.  Yes.
                                          Page 11

1    Q.  Turning to the next paragraph, it       02:13
2  reads, "The Bratz are moving into another
3  medium this year, starring in their first
4  direct-to-DVD movie titled, "The Bratz Go
5  Hollywood."  The movie is set for a late summer
6  release.  The dolls also will star in an
7  animated feature film, which is expected to be
8  released in late 2005."
9        Do you recall Mr. Larian
10 telling you that information?
11   A.  To the best of my knowledge, yes.
12   Q.  Thank you.  And continuing with the     02:14
13 next paragraph, it reads, "Doll products new
14 for 2004 include Bratz Petz, cats Brigitte,
15 Kendall, Jolie and Daphne; Bratz Wild Life, an
16 exclusive set featuring Nevra, Meyghan and
17 Fianna; Bratz Girls Nite Out, with Cloe, Sasha,
18 Yasmin, Jade and Dana preparing for Saturday
19 night fun; Sun-kissed Summer, with Cloe,
20 Yasmin, Sasha, Jade and Dana dressed in beach
21 attire; Best Friends Beach Party, with friends
22 Calista and Noelle spending a day at the beach;
23 Best Friends Pajama Party, with Brianne and
24 Zana in a themed slumber party setting, and
25 Flower Fairies, featuring Rose, Daisy and
                                          Page 13

4 (Pages 10 to 13)

ATKINSON-BAKER, INC. COURT REPORTERS        1 (800) 288-3376

EXHIBIT  12

PAGE  158

A107CD0
DENISE O'NEAL          OCTOBER 3, 2007

**Page 14**

1  Sunflower, a trio of scented dolls."
2        Do you recall Mr. Larian
3  giving you all of that information?
4     A.  The best of my knowledge, yes, I do.
5     Q.  A few more quick housekeeping things    02:15
6  just for the record. Also did you -- do you
7  recall interviewing anybody else from MGA in
8  preparation for this article?
9     A.  No, I did not.
10    Q.  Just Mr. Larian?    02:15
11    A.  Isaac Larian, yes.
12    Q.  When we discuss the timing of the    02:15
13 interview, do you recall was it in person or
14 was it on the telephone?
15    A.  It was a telephone interview.
16    Q.  Do you recall approximately how long    02:15
17 it lasted?
18    A.  No, I don't.
19    Q.  Would you say more than a few    02:15
20 minutes, less than an hour?
21    A.  I would be speculating in saying
22 probably 15 to 20 minutes.
23    Q.  And was that your only conversation    02:15
24 with Mr. Larian in preparation for this
25 article?

**Page 15**

1     A.  Yes, it was. Yes.
2     Q.  I would like to just put for the    02:15
3  record exhibits -- I guess it would be 928 and
4  929. These are just for housekeeping. These
5  are the copies of the deposition notice and the
6  subpoena. No need to ask any questions. Just
7  would like to make them part of the record. We
8  will make the notice 928 and the subpoena 929.
9        (Whereupon, Deposition
10          Exhibit Nos. 928 and 929
11          were marked for I.D. as of
12          10-3-07.)
13 BY MR. NIBORSKI:
14    Q.  Were you ever contacted by Mr.    02:16
15 Larian at any point after this article was
16 published and asked for a correction or a
17 retraction of anything in this article?
18    A.  No.
19    Q.  Were you ever contacted by a person    02:16
20 named Carter Bryant asking for a retraction or
21 correction?
22    A.  No.
23    Q.  Do you recall ever being contacted    02:16
24 by anybody from MGA asking for a correction or
25 retraction of anything in this article?

**Page 16**

1     A.  No.
2     Q.  And are you aware of anybody ever    02:17
3  contacting the Chicago Sun-Times asking for a
4  correction or retraction of this article in any
5  way?
6     A.  No.
7     Q.  Okay. We need to take a 5 minutes    02:17
8  break. I think we can wrap up.
9        THE VIDEOGRAPHER: Going off the
10 record. The time now is 2:18 p.m.
11       (Recess was taken.)
12       THE VIDEOGRAPHER: We are back on the
13 record. Time now is 2:20 p.m.
14 BY MR. NIBORSKI:
15    Q.  Ms. O'Neal, just a few more    02:20
16 questions.
17       We talked briefly about the
18 timing of your interview with Mr. Larian. The
19 article again was published March 5, 2004, and
20 it is your recollection, correct, that you
21 interviewed Mr. Larian sometime in February of
22 2004, correct?
23    A.  Correct.
24    Q.  And to the best of your recollection    02:20
25 it would have been within one to two weeks

**Page 17**

1  before publication of the article?
2     A.  Normally that is the time span    02:20
3  between interviews because we have to have
4  stories filed a week prior to publication.
5     Q.  And you have a specific recollection    02:20
6  following that policy in this particular case
7  in interviewing Mr. Larian in February of '04?
8     A.  As I said, it was sometime within
9  two weeks prior to the publication. I can't
10 give you an exact date.
11    Q.  Sometime within two weeks before    02:20
12 publication?
13    A.  To my best recollection.
14    Q.  Okay. Thank you.    02:20
15       Just a couple of quick
16 admonitions in closing.
17       We will get -- I will get a copy
18 of the transcript of the deposition. I will
19 give it to your attorney. He will give you an
20 opportunity to review it and make any
21 corrections and we will retain custody of the
22 original. Just want to confirm that there is
23 no medical or other reason why you were unable
24 to give your best testimony today.
25    A.  No.

5 (Pages 14 to 17)

EXHIBIT 12

PAGE 159

A107CD0
DENISE O'NEAL        OCTOBER 3, 2007

**Page 18**

1     Q.   Okay.  And I have nothing further.     02:21
2  I really appreciate your time.  Thank you.
3     A.   Thank you.
4        MR. O'BRIEN:  I just have a few
5  follow-ups.
6            EXAMINATION
7  BY MR. O'BRIEN:
8     Q.   With respect to the stuff in the     02:21
9  article that you just attributed to Mr. Larian
10 which was not in quotes, were you
11 characterizing what Mr. Larian said to you?
12       MR. DUNN:  Yes or no.
13       THE WITNESS:  Yes.
14 BY MR. O'BRIEN:
15    Q.   Are there things that Mr. Larian     02:21
16 said to you during the interview that did not
17 find themselves in the article?
18       MR. DUNN:  You can give a yes or no
19 to that one.
20       THE WITNESS:  Yes, most likely.
21 BY MR. O'BRIEN:
22    Q.   And how did you, when you     02:22
23 interviewed him, record those things that you
24 put into quotes?
25       MR. DUNN:  I am going to object to

**Page 19**

1  that.  That goes into the substance of the
2  interview and Mr. Bryant and I basically, in
3  setting the ground rules for allowing this
4  deposition without filing a motion to quash,
5  limited it to the authentication of the story
6  itself, and for that reason the witness isn't
7  going to answer anything with respect to what
8  took place at the interview other than just to
9  set the general foundation of the situation,
10 though she will -- I will allow her to
11 voluntarily testify as to what was actually in
12 the story.
13       MR. DUNN:  I have nothing further.
14       EXAMINATION (continued)
15 BY MR. NIBORSKI:
16    Q.   Just one quick follow-up,     02:22
17 Ms. O'Neal.  Is there any reason to believe
18 that the information Mr. Larian provided you
19 was not accurately conveyed in your article?
20       MR. DUNN:  I am going to object to
21 that just because I think the question is too
22 broad.  If you are asking whether or not she
23 believes that she printed something in the
24 article that didn't come from that source, I
25 will let her answer that question yes or no.

**Page 20**

1  BY MR. NIBORSKI:
2     Q.   Let me rephrase.     02:23
3        MR. DUNN:  Okay.
4  BY MR. NIBORSKI:
5     Q.   Is this any reason to believe that     02:23
6  the information that you actually published in
7  the article does not accurately reflect what
8  Mr. Larian told you during your interview?
9        MR. DUNN:  You can answer that one.
10       THE WITNESS:  No.
11       MR. NIBORSKI:  Nothing further.
12 Thank you so much for your time.
13       THE WITNESS:  Thank you.
14       THE VIDEOGRAPHER:  Going off the
15 record.  The time now is 2:24 p.m.  This is the
16 end of videotape number one.
17       * * FURTHER DEPONENT SAYETH NOT * *
18
19
20
21
22
23
24
25

**Page 21**

1  STATE OF ILLINOIS )
2                    ) ss.
3  COUNTY OF C O O K )
          UNITED STATES DISTRICT COURT
          CENTRAL DISTRICT OF CALIFORNIA
4              EASTERN DIVISION
5  CARTER BRYANT, an      )
   individual,            )
6                         )
                          ) Case No.
7        Plaintiff,       ) CV 04-9049
                          ) SGL (RNBx)
8      vs.                ) Consolidated with
                          ) No. CV 04-09059
9  MATTEL, INC., a        ) No. CV 05-02727
   Delaware corporation,  )
10                        )
        Defendant.  )
11       I hereby certify that I have read
12 the foregoing transcript of my deposition, pages
13 1 through 23 inclusive, given at the time and
14 place aforesaid, and I do again subscribe and
15 make oath that the same is a true, correct, and
16 complete transcript of my deposition given as
17 aforesaid, with corrections, if any, appearing
18 on the attached correction sheet (s).
19
20           DENISE O'NEAL
21 No corrections (please initial)_____
22 Number of errata sheets submitted_____(pgs.)
23
   SUBSCRIBED AND SWORN TO
24 before me this_____ day of
   _____, A.D. 2007.
25 _____
   Notary Public

6 (Pages 18 to 21)

ATKINSON-BAKER, INC. COURT REPORTERS                    1 (800) 288-3376

EXHIBIT  12

PAGE  160

A107CD0
DENISE O'NEAL        OCTOBER 3, 2007

```
 1   STATE OF ILLINOIS )
                       ) SS.
 2   COUNTY OF C O O K )
 3
 4          I, JANICE SMITH, RPR, a
 5   Notary Public within and for the County of Cook,
 6   State of Illinois, and a Registered Professional
 7   Reporter of said state, do hereby certify:
 8          That, previous to the commencement of
 9   the examination of the witness, DENISE O'NEAL,
10   she was first duly sworn to testify the whole
11   truth concerning the matters herein;
12          That, the foregoing deposition
13   transcript was reported stenographically by me,
14   was thereafter reduced to typewriting, via
15   computer-aided transcription, under my personal
16   direction, and constitutes a true record of the
17   testimony given and the proceedings had;
18          That, the said deposition was taken
19   before me at 55 West Monroe Street, Suite 2300,
20   Chicago, Illinois 60603, on the 3rd day of
21   October, A.D. 2007;
22          That, the reading and signing by the
23   witness of the deposition transcript was not
24   waived;
25          That, I am not a relative or employee
                                          Page 22
```

```
 1   or
 2   attorney or counsel, nor a relative or employee
 3   of such attorney or counsel for any of the
 4   parties hereto; nor interested directly or
 5   indirectly in the outcome of this action.
 6          IN WITNESS WHEREOF, I do hereunto set
 7   my hand and affix my seal of office at Chicago,
 8   Illinois, this 3rd day of October, A. D. 2007.
 9
10          _____
              Janice Smith, RPR
              Cook County, Illinois
11            License No. 84-1346
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                          Page 23
```

7 (Pages 22 to 23)

ATKINSON-BAKER, INC. COURT REPORTERS                1 (800) 288-3376

EXHIBIT 12

PAGE 161

# EXHIBIT 13

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

# EXHIBIT 14

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

# EXHIBIT 15

# O

## O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

CENTURY CITY

HONG KONG

LONDON

NEWPORT BEACH

400 South Hope Street
Los Angeles, California 90071-2899

TELEPHONE (213) 430-6000
FACSIMILE (213) 430-6407
www.omm.com

NEW YORK

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

TOKYO

WASHINGTON, D.C.

May 17, 2006

OUR FILE NUMBER
527436-04

WRITER'S DIRECT DIAL
(213) 430-7466

WRITER'S E-MAIL ADDRESS
pambrosini@omm.com

### VIA FACSIMILE

Michael T. Zeller, Esq.
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 Figueroa Street, 10th Floor
Los Angeles, California 90017

Dear Mr. Zeller:

Pursuant to Local Rule 37-1, MGA requests to meet and confer with Mattel regarding Mattel's Objections and Responses to MGA's First Set of Interrogatories. To facilitate discussion, this letter is broken into two parts. The first concerns Mattel's "General Objections." The second concerns Mattel's objections and responses to individual interrogatories.

## I.      Mattel's General Objections

**Mattel's Preliminary Statement**

Mattel initially qualifies its responses to MGA's Interrogatories by stating that Mattel has not yet interviewed all witnesses in this action, and contends that it has yet to receive requested discovery from defendants. This, however, does not excuse Mattel from undertaking a reasonable inquiry and responding to the Interrogatories to the best of its present ability. Mattel must supplement its responses immediately to the extent that Mattel has failed to respond to any Interrogatory, or withheld information, because it is waiting until after it has interviewed all witnesses in the action and received all discovery from the defendants.

**General Objection No. 2.**

Mattel objects generally to the Interrogatories on the grounds that they call for the disclosure of information subject to the attorney-client privilege, work-product doctrine of "other applicable privilege" but has not indicated, specifically, what, if any, information has been withheld based on any asserted privilege. MGA insists that Mattel (1) state whether it has refused to respond fully and completely to any particular interrogatory, or qualified any particular response, to protect privileged information from disclosure; (2) if it has, identify which interrogatory(ies) and response(s) are implicated; and (3) provide information, in the nature of a

**EXHIBIT 15**

**PAGE 208**

O'MELVENY & MYERS LLP
Michael T. Zeller, Esq., May 17, 2006 - Page 2

privilege log, sufficient for MGA to evaluate the claim of privilege. Please confirm that Mattel will do so.

**General Objection No. 3:**

Mattel also generally objects to the Interrogatories on the grounds that "they seek the disclosure of information or documents that are "in the possession, custody and control of independent parties," and information or documents that are "in the possession, custody and control of defendants" or are " publicly available and hence equally available to all parties to this litigation." Mattel, however, must respond to the Interrogatories based on the information known to Mattel, irrespective of whether the source of the information was a third party, the defendants themselves, or a publicly available source.[1] Please confirm that Mattel has not withheld any responsive information because the source of the information was a third party, defendants, or a publicly available source.

**General Objection Number 4:**

Mattel generally objects to MGA's Interrogatories on the grounds that they call for information that is not relevant. Nowhere, however, does Mattel justify this blanket objection. Please confirm that Mattel has not withheld or qualified any response based on this objection or, if it has, please identify, with particularity, the specific interrogatory(ies) that Mattel has not answered, in full or in part, based on this objection.

**General Objection Number 5:**

Mattel also objects to MGA's requests on the grounds that they are "unduly burdensome and oppressive." A party asserting an objection such as this, however, bears the burden of justifying the objection by showing how and why any particular Interrogatory is unduly burdensome. Mattel has not done so. To the extent that Mattel has refused to respond to any Interrogatory or withheld information based on burden, MGA requests that Mattel identify, with specificity, each Interrogatory implicated and explain precisely why and in what way responding to the Interrogatory would impose an undue burden upon Mattel.

---

[1] *Orleman v. Jumpking, Inc.*, No. Civ. A. 99-2522-CM, 2000 WL 1114849, at *6 (D. Kan. July 11, 2000) ("The court counsels defendant that where responsive information is in its possession, it is obligated to produce the information, *whether or not plaintiff has obtained the information from an alternate source.* The rules of discovery *do not permit* parties to withhold material *because the opponent either has or could discover it on their own.* Accordingly, to the extent defendant has not produced all responsive information within its possession, it shall do so.") (citation omitted) (emphasis added); *St. Paul Reinsurance Co., Ltd. v. Commercial Financial Corp.*, 198 F.R.D. 508, 513 (N.D. Iowa 2000) ("The plaintiffs' fifth objection to CFC's request is based on the ground that it seeks information and documents equally available to the propounding parties from their own records or from records which are equally available to the propounding parties. However, with respect to this objection, courts have unambiguously stated that this exact objection is insufficient to resist a discovery request.").

EXHIBIT __15__

PAGE __209__

O'MELVENY & MYERS LLP
Michael T. Zeller, Esq., May 17, 2006 - Page 3

**General Objection No. 6:**

MGA also requests that Mattel provide further and more specific information to support its general objection that MGA's Interrogatories seek the disclosure of information or documents "in violation of the terms of agreements or protective orders entered into with third parties, or in violation of the privacy, contractual, or other rights of third parties." Specifically, MGA requests that Mattel (1) identify each Interrogatory to which Mattel claims it cannot fully respond without violating the rights of third parties; (2) with respect to each such Interrogatory, identify who the third party is and the nature of the right implicated (i.e. right of privacy, contractual rights, etc.); and (3) in each instance in which Mattel has withheld information based on a third party contract or protective order, produce each such contract or protective order, or such documents as may be necessary and sufficient for MGA to evaluate Mattel's assertion, and to challenge the protection, as appropriate.

**General Objection No. 7:**

Mattel's general objection that the definition of "Mattel" is vague, ambiguous and unduly burdensome is meritless. Mattel is obligated to use common sense and reason in responding to discovery.[2] Please confirm that Mattel has not refused to respond or qualified its response to any of MGA's Interrogatories based on this general objection.

### A.   Specific Interrogatories

**Interrogatories 1 and 2:** Facts supporting Mattel's contention, if Mattel so contends, that Mattel has suffered harm as a result of any act or omission of MGA; identify all persons with knowledge of each such facts.

Mattel's objections to these interrogatories lack merit. Each of these interrogatories seeks information simply requiring Mattel to prove its own contentions; MGA is clearly entitled to discovery on regarding Mattel's own contentions. Unless Mattel agrees to disavow any contention that it has suffered harm as a result of any alleged act or omission of MGA, the subject matter of these interrogatories is relevant and MGA is entitled to Mattel's responses.

**Interrogatory 3 and 4:** Damages; proof of Mattel's contention that it is entitled to punitive damages.

In response to these interrogatories, Mattel asserts that it has produced documents from which the answers to these interrogatories may be ascertained. MGA is entitled to know specifically the documents to which Mattel refers. In addition, the parties have already

---

[2]*Swackhammer v. Sprint Corp. PCS*, 225 F.R.D. 658, 662 (D. Kan. 2004) ("The party objecting to discovery as vague or ambiguous has the burden to show such vagueness or ambiguity. *A party responding to discovery requests 'should exercise reason and common sense to attribute ordinary definitions to terms and phrases* utilized in interrogatories.'") (emphasis added).

EXHIBIT 15

PAGE 210

O'MELVENY & MYERS LLP
Michael T. Zeller, Esq., May 17, 2006 - Page 4

conducted substantial discovery and MGA is entitled to the information presently in Mattel's possession, including "the value of Mattel assets, resources, opportunities and/or property, including intellectual property" that Mattel contends "Bryant converted, diverted from Mattel or otherwise improperly used or usurped." Finally, in connection with Mattel's response to Interrogatory No. 4, MGA is entitled to more specificity, particularly regarding Mattel's statement that "Bryant and MGA have concealed and intentionally spoliated evidence in an effort to conceal the true nature, timing and extent of their unlawful behavior."

**Interrogatory 5:** Facts to prove Mattel's contention that MGA copied Mattel's property, including, without limitation, "Toon Teens."

Mattel's objection that this subject matter has no bearing on this suit is baseless. Mattel contends that Bryant converted/copied/stole Mattel property. 2005 U.S. Dist. LEXIS 3568, at *26. Indeed, there is an abundance of evidence suggesting that Mattel contends that Bryant converted Mattel's scrapped "Toon Teens" idea. Moreover, the Court has concluded that "the rights to the Bratz were and are in controversy" and that Mattel is assisting another party in asserting that "the Bratz are knock-offs of the Toon Teens." *Id.* at *28-*29. Mattel must either disavow its contention or cooperate in discovery concerning this subject. Mattel simply cannot have it both ways.

Mattel's objection that this interrogatory is vague and ambiguous is not credible, as MGA's definitions of "your" and "property" cannot plausibly be said to render the phrase "your property" vague and ambiguous. Indeed, the referenced property is limited by Mattel's own contentions. The term "copied" is also perfectly comprehensible, as it has an ordinary, plain-language meaning. Mattel's objection to the term "some element" is a non-sequitur, as the interrogatory does not use that phrase. MGA's reference to "Toon Teens" must also be understandable to Mattel, as MGA's use of that phrase, by its own terms, is coterminous with Mattel's contention regarding them. It is not MGA's burden to discern, at this point, whether Mattel's contention about "Toon Teens," about which Mattel has refused to provide information, concerns drawings, prototypes, photographs, or the like.

In any case, to the extent Mattel contends that MGA has copied Mattel property in any way and seeks any remedies for such alleged copying, this interrogatory seeks relevant information regardless of whether Mattel's Complaint sounds in state tort law or in federal intellectual copyright law.

**Interrogatory 6:** Identify all communications that refer to this lawsuit.

Mattel has raised privilege objections to this interrogatory, and MGA offers to limit the interrogatory to "each non-public, non-privileged COMMUNICATION" Mattel has had about the suit, including, but not limited to, internal communications, communications with current or former employees, or with one or more of its investors. Excluded from this would be press releases or other statements to the press or in an open forum. Responsive communications, for example, might include non-privileged discussions between or among Mattel executives and/or

EXHIBIT 15

PAGE 211

O'MELVENY & MYERS LLP
Michael T. Zeller, Esq., May 17, 2006 - Page 5

officers, at non-privileged strategy or informational meetings with Mattel personnel, or at Board of Directors' meetings. How Mattel has described the suit, what it has said about the factual or legal basis of the suit, its damages, and its prospects is discoverable information relevant to Mattel's claims and prayer for relief.

**Interrogatory 7:** Identify all persons interviewed for the July 18, 2003, *Wall Street Journal* article.

Mattel's objection that this interrogatory is unreasonably burdensome and overbroad is baseless. Contrary to Mattel's assertion, interrogatory 7 does not require it to "gather and summarize all facts on the subject, including without limitation facts that are known to or in the possession, custody or control of defendants and non-parties, including the Wall Street Journal staff." Rather, this interrogatory simply requires Mattel to "identify" all persons interviewed for the article.

Mattel's relevance objections to these interrogatories are also insupportable. As Mattel knows, the article, which it produced, liberally quotes both named and unnamed Mattel employees foreshadowing Mattel's belief with regard to its core contention in this case – that Bryant copied one of its ideas, referring to "Toon Teens." MGA is clearly entitled to discovery concerning who was interviewed for the article. Indeed, the Court has already noted the importance of the article to the case. 2005 U.S. Dist. LEXIS 3568, at *7 n.4. Moreover, the discovery rules provides that parties should seek to obtain information from a party to the suit before attempting to obtain it from a non-party such as the Wall Street Journal or former Mattel employees. To the extent Mattel has any information concerning the identity of those who provided information for this article, Mattel is obligated to provide it, regardless of whether those people are identified in the article itself. Indeed, MGA is entitled to have Mattel's confirmation of the accuracy of the information provided therein with respect to the sources for the article so that MGA can pursue further discovery on its defense of laches, among other things.

**Interrogatory 8:** Identify each error in the *Wall Street Journal* article and explain why and in what way each fact is incorrect.

As with its objections to Interrogatory No. 7, Mattel's objections to interrogatory 8 are not well founded. The interrogatory does not require Mattel to "summarize all facts on this subject", but rather merely requires Mattel to "describe, with particularity, each error contained in [the article] by explaining why and in what way each fact is incorrect." The interrogatory as phrased is not overbroad or unduly burdensome, let alone "harassing." To the extent Mattel contends that the article contains misstatements that pertain to the issues in this lawsuit, Mattel is obligated to identify those misstatements and explain why it believes the statements are wrong.

**Interrogatories 10 and 11:** State when and how Mattel first learned that Bryant performed work for MGA; and when and how Mattel first learned that Bryant conceived of the Bratz concept.

EXHIBIT __15__

PAGE __212__

O'MELVENY & MYERS LLP
Michael T. Zeller, Esq., May 17, 2006 - Page 6

These requests seek the information Mattel had, and when it learned that information, regarding Bryant's involvement with MGA's "Bratz" property and his creation of the original "Bratz" concept.  Such information is pertinent to the affirmative defenses asserted in this case. In response to Interrogatory No. 10, Mattel asserts that it was first "confirmed" that Bryant was the Bratz designer by the Wall Street Journal's July 200 article.  Mattel appears to be equating MGA's confirmation with Mattel's knowledge.  In fact, the interrogatory seeks to learn when Mattel first obtained this information, regardless of whether it had been confirmed by MGA or anyone else.  Indeed, Mattel produced a document indicating that it was told in August 2002 that Bryant had supposedly created the "Bratz" dolls.  Thus, it appears that Mattel first had information concerning Bratz and Bryant's work for MGA before the July 2003 Wall Street Journal article, and MGA is entitled to know when.

Mattel's objection that the phrase "first learned that Bryant conceived of the Bratz Concept" is "vague and ambiguous" is meritless, as the phrase "first learned of" has a readily ascertainable, ordinary meaning, and Mattel does not object to MGA's definition of the term "Bratz Concept."  In combination, these words are not somehow rendered mysterious.  For purposes of these interrogatories only, MGA will define "Mattel" to include only persons who were employed by Mattel at the time they acquired the knowledge at issue.

In conclusion, counsel for MGA seek to meet and confer in person with you in the next ten days concerning the aforementioned discovery and issues.  In addition, as stated above, we urge you to give serious consideration to the appointment of a Discovery Special Master, the use of which would substantially reduce the burden on the Court and the costs to the parties, and would facilitate and expedite the resolution of discovery disputes (or perhaps avoid them in the first instance).

We look forward to your response.

Very truly yours,

Paula E. Ambrosini
for O'MELVENY & MYERS LLP

cc:    Keith Jacoby, Esq.

LA2:799782.1

EXHIBIT 15

PAGE 213