# EXHIBIT 16

RECEIVED

SEP 0 7 2007

1   DALE M. CENDALI (admitted *pro hac vice*)
    DIANA M. TORRES (S.B. #162284)
2   JAMES P. JENAL (S.B. #180190)
    O'MELVENY & MYERS LLP
3   400 South Hope Street
    Los Angeles, CA 90071-2899
4   Telephone: (213) 430-6000
    Facsimile:  (213) 430-6407
5   jjenal@omm.com

6   PATRICIA GLASER (S.B. #55668)
    CHRISTENSEN, GLASER, FINK,
7   JACOBS, WEIL & SHAPIRO, LLP
    10250 Constellation Boulevard, 19th Floor
8   Los Angeles, CA 90067
    Telephone: (310) 553-3000
9   Facsimile:  (310) 557-9815

10  Attorneys for MGA Entertainment, Inc.

11  MICHAEL H. PAGE (S.B. #154913)
    KEKER & VAN NEST LLP
12  710 Sansome Street
    San Francisco, CA 94111
13  Telephone: (415) 391-5400
    Facsimile:  (415) 397-7188
14
    Attorneys for Carter Bryant
15
                    UNITED STATES DISTRICT COURT
16
                    CENTRAL DISTRICT OF CALIFORNIA
17
                         EASTERN DIVISION
18

19
    CARTER BRYANT, an individual,          Case No. CV 04-09049 SGL (RNBx)
20                                          (consolidated with CV 04-9059 & 05-
                 Plaintiff,                 2727)
21
         v.                                 [DISCOVERY MATTER]
22
    MATTEL, INC., a Delaware               MGA ENTERTAINMENT, INC.'S
23  Corporation,                            AND CARTER BRYANT'S JOINT
                                            NOTICE OF MOTION TO COMPEL
24               Defendant.                 RE: MATTEL'S BANDYING OF
                                            30(B)(6) WITNESSES
25
                                            Hearing Date: T.B.D.
26                                          Time: T.B.D.

27  AND CONSOLIDATED ACTIONS

28
                                            NOTICE OF MTN TO COMPEL RE:
                                            MATTEL'S BANDYING OF 30(B)(6)
                                            WITNESSES CV 04-09049 SGL (RNBX)

EXHIBIT 16

PAGE 214

1    TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2

3          **PLEASE TAKE NOTICE** that, at a telephonic conference before

4    Discovery Master Hon. Edward Infante (Ret.) that will occur at a time to be

5    determined by Judge Infante, MGA Entertainment, Inc. ("MGA") and Carter

6    Bryant ("Bryant") jointly will, and hereby do, move the Discovery Master to issue

7    an order preventing Mattel, Inc. ("Mattel") from bandying and compelling Mattel to

8    produce within three weeks a properly educated 30(b)(6) witness who can testify

9    competently as to Mattel's knowledge regarding topics 41 and Zeus. As to topics

10   2-8, 11-13 and 24, MGA and Bryant jointly will, and hereby do, move the

11   Discovery Master to issue an order compelling Mattel to produce a single,

12   competent witness on each topic and, providing that if Mattel fails to comply,

13   Mattel shall be precluded from introducing any evidence at trial on those topics

14   beyond that to which its witnesses have testified. In addition, MGA and Bryant

15   jointly will, and hereby do, move the Discovery Master to sanction Mattel as partial

16   compensation to MGA and Bryant for the costs associated with the wasteful

17   depositions provided to date and for the attorneys' fees incurred in bringing this

18   Motion.

19          This Motion is made pursuant to Federal Rule of Civil Procedure 26

20   on the grounds that Mattel has violated Rule 30(b)(6) by producing seven

21   inadequately prepared 30(b)(6) witnesses, and as to topics 2-7, 8, 11-13, and 24, has

22   engaged in bandying.

23          The parties met and conferred regarding this Motion pursuant to Local

24   Rule 37-1 on July 10, 2007.

25

26          This Motion is based on this Notice of Motion, the accompanying

27   Memorandum of Points and Authorities, the Separate Statement filed concurrently

28   herewith, the Declaration of Yvonne L. Garcia filed concurrently herewith and

- 1 -

NOTICE OF MTN TO COMPEL RE:
MATTEL'S BANDYING OF 30(B)(6)
WITNESSES CV 04-09049 SGL (RNBX)

EXHIBIT 16

PAGE 215

1   attached exhibits, the Declaration of James P. Jenal filed concurrently herewith and

2   attached exhibits, the record and files of this Court, and all other matters of which

3   the Court may take judicial notice.

4

5   Dated: September 6, 2007            O'MELVENY & MYERS LLP

6

7                                 By: James P. Jenal
                                Attorneys for MGA Entertainment, Inc.

8

9   Dated: September 6, 2007            KEKER & VAN NEST LLP

10

11                                Megan H. Page  By: JPJ
                               By: Michael H. Page

12                                Attorneys for Carter Bryant (w/permission)

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 2 -

1  DALE M. CENDALI (admitted *pro hac vice*)
   DIANA M. TORRES (S.B. #162284)
2  JAMES P. JENAL (S.B. #180190)
   O'MELVENY & MYERS LLP
3  400 South Hope Street
   Los Angeles, CA 90071-2899
4  Telephone: (213) 430-6000
   Facsimile: (213) 430-6407
5  jjenal@omm.com

6  PATRICIA GLASER (S.B. #55668)
   CHRISTENSEN, GLASER, FINK,
7  JACOBS, WEIL & SHAPIRO, LLP
   10250 Constellation Boulevard, 19th Floor
8  Los Angeles, CA 90067
   Telephone: (310) 553-3000
9  Facsimile: (310) 557-9815

10 Attorneys for MGA Entertainment, Inc.

11 MICHAEL H. PAGE (S.B. #154913)
   KEKER & VAN NEST LLP
12 710 Sansome Street
   San Francisco, CA 94111
13 Telephone: (415) 391-5400
   Facsimile: (415) 397-7188

14
15 Attorneys for Carter Bryant

15                    UNITED STATES DISTRICT COURT

16                   CENTRAL DISTRICT OF CALIFORNIA

17                          EASTERN DIVISION

18

19 | CARTER BRYANT, an individual, | Case No. CV 04-09049 SGL (RNBx)
20 |                                | (consolidated with CV 04-9059 & 05-2727)
   |               Plaintiff,       |
21 |        v.                      | **[DISCOVERY MATTER]**
22 | MATTEL, INC., a Delaware       | **MEMORANDUM OF POINTS AND**
   | Corporation,                   | **AUTHORITIES IN SUPPORT OF**
23 |                                | **MGA ENTERTAINMENT, INC.'S**
   |               Defendant.       | **AND CARTER BRYANT'S JOINT**
24 |                                | **MOTION TO COMPEL RE:**
   |                                | **MATTEL'S BANDYING OF 30(B)(6)**
25 |                                | **WITNESSES**
26 |                                |
   | AND CONSOLIDATED ACTIONS       | Hearing Date: T.B.D.
27 |                                | Time: T.B.D.
28

              **CONFIDENTIAL - FILED UNDER SEAL**

LA2:836330

MEM P&A ISO MTN TO COMPEL RE 30(B)(6)
WITNESSES CV 04-09049 SGL (RNBX)

**EXHIBIT 16**

**PAGE 217**

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ............................................................................................ 1

II.  STATEMENT OF FACTS ............................................................................ 3

   A.   Mattel Refused to Produce Corporate Designees in Response to Bryant's 30(b)(6) Notice Until Ordered to do so by the Court ............ 3

   B.   Mattel Produced Numerous Inadequately Educated 30(b)(6) Witnesses ................................................................................................ 4

      1.   Topics 2-7: Mattel's Witnesses Were Not Educated as to Mattel's Knowledge, and Their Personal Knowledge Was Not Sufficient to Make Them Competent Witnesses. ................. 5

      2.   Topics 8, 11, 13 & 24: Mattel's Witnesses Were Not Educated as to Mattel's Knowledge, and Their Personal Knowledge Was Not Sufficient to Make Them Competent Witnesses. ......................................................................... 9

      3.   Topic 41: Mattel Failed to Educate Ms. Jensen as to Mattel's Knowledge, and She Testified Only as to Her Own Limited Personal Knowledge. ....................................... 12

      4.   Mr. Ongchangco and Ms. Yonemoto Were Produced for Additional Topics, But Mattel Failed to Educate Them as to Mattel's Knowledge, and They Did Not Have Personal Knowledge Related to Those Topics. ..................................... 13

      5.   Julia Marine's Testimony Is Contradicted by Mattel's In-House Counsel ...................................................................... 14

      6.   Mattel Refused to "Connect the Dots." ............................... 17

   C.   The Meet and Confer Process Is Similarly Stymied. ........................ 18

III. ARGUMENT ................................................................................................ 19

   A.   Mattel Violated Rule 30(b)(6) by Designating Multiple Witnesses, All of Whom Lacked Knowledge of the Topics for Which They Were Designated .................................................................. 19

      1.   Testimony Based Solely Upon the Incomplete Personal Knowledge of the Witness Does Not Satisfy Rule 30(b)(6). ..................................................................................... 19

      2.   Mattel Violated Its Duty Under Rule 30(b)(6) By Failing to Adequately Prepare and Educate Its Witnesses .................... 21

      3.   Mattel's Designation of Multiple Unknowledgeable Witnesses to Testify on the Same Topics Amounts to "Bandying" and is Prohibited. ................................................ 22

   B.   The Court Should Issue an Order Preventing Mattel From "Bandying" and Compelling the Production of Properly Prepared 30(b)(6) Witnesses, Subject to Preclusion at Trial If Mattel Fails to Comply .............................................................................. 24

IV.  CONCLUSION ............................................................................................. 25

EXHIBIT __16__

PAGE __218__

# TABLE OF AUTHORITIES

**Page**

## CASES

*Alexander v. F.B.I.*,
  186 F.R.D. 137 (D.D.C. 1998) ...............................................................19, 21, 22, 23

*Banks v. Office of the Senate Sergeant-At-Arms*,
  241 F.R.D. 370 (D.D.C. 2007) .....................................................................................21

*FDIC v. Butcher*,
  116 F.R.D. 196 (E.D. Tenn. 1986) ...................................................................2, 22, 24

*Resolution Trust Corp. v. Southern Union Co.*,
  985 F.2d 196 (5th Cir. 1993) ........................................................................................22

*United States ex rel Fago v. M&T Mortgage Corp.*,
  235 F.R.D. 11 (D.D.C. 2006) .................................................................................19, 22

*United States v. Taylor*,
  166 F.R.D. 356 (M.D.N.C. 1996) .........................................................................19, 21, 22

*Wilson v. Lakner*,
  228 F.R.D. 524 (D. Md. 2005) ...........................................................................passim

## RULES

Fed. R. Civ. P. 26(c) ...........................................................................................................24

Fed. R. Civ. P. 30(b)(6) .............................................................................................passim

MEM P&A ISO MTN TO COMPEL RE 30(B)(6)
WITNESSES CV 04-09049 SGL (RNBX)

EXHIBIT 16

PAGE 219

1    Carter Bryant ("Bryant") and MGA Entertainment, Inc. ("MGA", collectively

2    "Defendants") respectfully submit this Memorandum of Points and Authorities in

3    support of their Joint Motion to Compel re: Mattel's Bandying of 30(b)(6)

4    Witnesses in the case originally captioned *Mattel, Inc. v. Bryant*, Case No. CV 04-

5    9059 SGL (RNBx).

6    **I.    INTRODUCTION**

7            Mattel succeeded in delaying for years the production of witnesses in

8    response to Bryant's December 2004, Rule 30(b)(6) Notice of Deposition[1]

9    ("Bryant's 30(b)(6) Notice"), forcing Bryant and MGA to bring not one but two

10   separate motions to compel.   Having lost both motions, and facing a Court order to

11   produce its witnesses, Mattel has now shifted to "Plan B"—to continue to hide the

12   ball by bandying a string of witness, all of whom disclaim knowledge that is

13   pertinent to the topics in Bryant's 30(b)(6) Notice and that is reasonably available

14   to Mattel. These are not trifling topics; rather, they go to the heart of Mattel's

15   claims against Bryant and MGA such as: "The factual basis for Bryant's

16   contractual and non-contractual obligations to Mattel and Bryant's breach of those

17   obligations, including identification of what was disclosed, converted or

18   misappropriated."[2]  As a result of Mattel's cynical ploy, Bryant and MGA have

19   been prevented from getting testimony as to *Mattel's* knowledge of the factual

20   underpinnings for its claims that are to be tried in the Phase I trial next Spring.[3]

21           Rule 30(b)(6) requires the designating party to educate its witnesses so

22   that they can testify on the designated topics based on information "reasonably

23   available" to the corporation.  "One of the purposes of Rule 30(b)(6) is to curb any

24

25   [1] *See* Declaration of James P. Jenal filed concurrently ("Jenal Decl."), ¶2, Ex. 1.

26   [2] Opposition of Mattel, Inc. to Motion to Compel Production of Documents and Deposition of 30(b)(6) Witnesses ("Mattel's Jan. 16 Opposition"), dated January 16, 2007, at 19.

27   [3] In fact, Mattel's conduct has been so blatant that it allowed Ms. Marine to testify incorrectly while the Mattel in-house lawyer who had prepped her sat silently by and made no attempt whatsoever to correct the record – until he put in a declaration contradicting her testimony.  Jenal

28   Decl. ¶ 5.

EXHIBIT  16

PAGE  220

1   temptation a corporation might have to shunt a discovering party from 'pillar to

2   post' by presenting deponents who each disclaims knowledge of facts clearly

3   known to someone in the organization."[4]   Unfortunately—and unacceptably—that

4   is precisely what Mattel has done.  Under Rule 30(b)(6), Bryant and MGA are "not

5   obligated to depose a string of... employees, none of whom is able to speak for the

6   [company] as to how the incident or incidents in question occurred,"[5] but again that

7   is precisely what Mattel has forced Defendants to do here with the calculated result

8   that Bryant and MGA are still in the dark as to the facts known to Mattel in support

9   of its claims.  Mattel's bandying is just its latest abuse of the discovery process.

10  "Rule 30(b)(6) means what it says.  Corporations must act responsively... They

11  must produce live witnesses who know or who can reasonably find out what

12  happened in given circumstances."[6]

13          MGA met and conferred with Mattel regarding its abusive bandying

14  practices and requested that Mattel provide a properly educated 30(b)(6) witness

15  who can testify competently as to Mattel's knowledge regarding topics 2-8, 11-13,

16  24 and 41 from Bryant's 30(b)(6) Notice.  Mattel refused.  Mattel's attempt to

17  thwart Bryant and MGA's right to discovery by producing witnesses "none of

18  whom is able to speak for" Mattel on the topics for which they have been

19  designated is contrary to the Rules and should not be allowed.

20          Accordingly, for the reasons set forth in detail below, the Discovery

21  Master should issue an order preventing Mattel from bandying and compelling

22  Mattel to produce within two weeks a properly educated 30(b)(6) witness who can

23  testify competently as to *Mattel's* knowledge regarding topic 41.  As to topics 2-8,

24

25  [4] *FDIC v. Butcher*, 116 F.R.D. 196, 199 (E.D. Tenn. 1986). *See also,* Fed. R. Civ. P. 30(b)(6),
    1970 Advisory Committee Notes (stating that one of the purposes behind Rule 30(b)(6) was to

26  facilitate discovery by "curb[ing] the 'bandying' by which officers or managing agents of a
    corporation are deposed in turn but each disclaims knowledge of facts that are clearly known to

27  persons in the organization and thereby to it.")
    [5] *Wilson v. Lakner*, 228 F.R.D. 524, 528-30 (D. Md. 2005).

28  [6] *Id.* at 530.

EXHIBIT __16__

PAGE __221__

1   11-13 and 24, the Discovery Master should issue an order compelling Mattel to

2   produce a single, competent witness on each topic and providing that if Mattel fails

3   to comply, it shall be precluded from introducing any evidence at trial on those

4   topics.

5   **II.   STATEMENT OF FACTS**

6       A.   **Mattel Refused to Produce Corporate Designees in Response to**

7            **Bryant's 30(b)(6) Notice Until Ordered to do so by the Court.**

8            Mattel's latest ploy to obstruct discovery should come as no surprise

9   given that Mattel's attempts to stonewall the depositions of its corporate designees

10  date back more than two-and-a-half years.  Bryant served his Notice of Deposition

11  pursuant to Federal Rule of Civil Procedure 30(b)(6) on December 21, 2004.  But

12  as the Discovery Master knows all too well, the process of securing Mattel

13  witnesses on that Notice was tortured in the extreme.  After a two-day, transcribed

14  meet and confer held in March 2005, Mattel finally provided a list of its Rule

15  30(b)(6) designees on May 16, 2005—nearly five months after Mattel had been

16  served with Bryant's 30(b)(6) Notice.  Shortly thereafter, however, those

17  depositions were stayed while Mattel fought, unsuccessfully, to keep this case out

18  of federal court.[7]  In August 2006, after the stay was lifted, MGA and Bryant again

19  asked Mattel to offer deposition dates for its 30(b)(6) witnesses.  However, despite

20  numerous requests over the course of several months, Mattel refused to offer any

21  deposition dates for a majority of the witnesses listed in its May 16, 2005, letter.[8]

22          Given that failure, MGA and Bryant were forced to file their *first*

23

24  [7] Discovery was interrupted by a stay imposed between May 20, 2005, and May 16, 2006, while
    Mattel appealed certain jurisdictional issues to the Ninth Circuit.

25  [8] During that time, Mattel produced witnesses for deposition on only two narrow topics—the use
    of a time-recording system (known as P2) and a computer file storage system (known as Zeus)—

26  and even that testimony was artificially restricted to the years 1998 to 2000.  Meanwhile, Mattel's
    counsel either wholly ignored or repeatedly stalled in responding to MGA's repeated requests to

27  schedule the depositions of the remaining witnesses.  *See* Declaration of James P. Jenal in
    Support of MGA and Bryant's Joint Motion to Compel the Production of Documents and the

28  Deposition of 30(b)(6) Witnesses, dated January 5, 2007, ¶¶2-11, Exs. F-P.

**EXHIBIT 16**

**PAGE 222**

1   motion to compel production of Mattel's 30(b)(6) witnesses on January 5, 2007. In

2   its opposition, Mattel complained that the topics were an improper substitute for

3   contention interrogatories, yet *conceded that these topics went to the core of*

4   *Mattel's claims against Bryant (and now MGA)* by paraphrasing several of them

5   as: "Topics 2-6, 7, 22-23: The factual basis for Bryant's contractual and non-

6   contractual obligations to Mattel and Bryant's breach of those obligations,

7   including identification of what was disclosed, converted or misappropriated."[9]

8          On January 30, 2007, the Discovery Master overruled Mattel's

9   objections and ordered Mattel to produce corporate designees in response to

10   Bryant's 30(b)(6) Notice and to complete those depositions no later than March 31,

11   2007. However, Mattel violated that order by failing to produce the required

12   witnesses, forcing MGA and Bryant to file a second motion to compel. On April 4,

13   2007, the Discovery Master conducted a hearing on that motion. During the

14   hearing, Mattel's counsel was advised that Mattel finally must provide designations

15   and dates sufficient to satisfy Bryant's 30(b)(6) Notice.[10]

16          Having failed twice to prevent these 30(b)(6) depositions from going

17   forward, Mattel has now resorted to "Plan B": to produce numerous witnesses who

18   know next to nothing of the topics for which they have been designated, and to

19   obstinately refuse to educate them. Mattel's repeated misconduct is a calculated

20   effort to undermine the Rule 30(b)(6) process.

21   **B.    Mattel Produced Numerous Inadequately Educated 30(b)(6)**

22         **Witnesses.**

23          In response to the Court's Mandate during the April 4, 2007, hearing,

24   Mattel designated multiple witnesses on virtually every topic. Mattel designated a

25

26   [9] "Topics 13, 24: The factual basis for Mattel's contention, if any, that Bratz originated from or is
     substantially similar to a Mattel property or work created by Bryant while employed by Mattel."

27   Mattel's Jan. 16 Opposition, dated January 16, 2007, at 19.
     [10] Transcript of Proceedings Before Hon. Edward A. Infante, dated April 4, 2007 ("April 4

28   Hearing"), Declaration of Yvonne L. Garcia, filed concurrently ("Garcia Decl."), ¶1, Ex. 1.

EXHIBIT __1b__

PAGE __223__

1  total of six witnesses to testify regarding each of topics 2 through 7 in Bryant's

2  30(b)(6) Notice:  Robert Hudnut, Jill Nordquist, Kislap Ongchangco, Rene Pasko,

3  Joni Pratte, and Sandy Yonemoto.[11]  Mr. Hudnut, Mr. Ongchangco, and Ms. Pasko

4  were also designated to testify regarding each of topics 8, 11, 13, and 24.  Julia

5  Jensen was designated to testify regarding topic 41, and Julia Marine was

6  designated on Zeus.[12]

7       All of these individuals testified almost exclusively based upon their

8  *personal knowledge* of limited facts relating to the topics for which they were

9  designated.  Moreover, it has become abundantly clear throughout the various

10  depositions of Mattel's 30(b)(6) witnesses that Mattel has made minimal effort—in

11  fact, frequently *no effort*—to properly prepare and educate these witnesses.  While

12  Mattel has frequently touted to this Court the number of witnesses it has produced,

13  what it has hidden from the Court is the truth that its bandying of those witnesses

14  has caused discovery to be obstructed, not advanced.

15       1.    **Topics 2-7:  Mattel's Witnesses Were Not Educated as to**

16            **Mattel's Knowledge, and Their Personal Knowledge Was**

17            **Not Sufficient to Make Them Competent Witnesses.[13]**

18       Topics 2-7 from Bryant's 30(b)(6) Notice are fundamental to Bryant

19  and MGA's defense.  These topics seek testimony regarding Mattel's knowledge

20  about facts that form the basis for Mattel's claims against Bryant (and thus MGA),

21  including:

22  [11] The deposition of Jill Nordquist finally took place on July 31, 2007.  *See* Deposition of Jill
Nordquist ("Nordquist Dep."); Garcia Decl., ¶2, Ex. 2. The deposition of Robert Hudnut began on

23  July 13, 2007, but was terminated after only four hours and forty minutes of testimony because
Mr. Hudnut needed to address childcare issues.  See Deposition of Robert Hudnut ("Hudnut

24  Dep."), 230:1-12, Garcia Decl., ¶3, Ex. 3. That deposition was concluded on August 20, 2007.

25  [12] In addition, Ms. Nordquist was designated to testify regarding topics 22, 23, and 55. Mr.
Ongchangco and Ms. Pasko were also designated to testify regarding topic 13. Finally, Ms.

26  Yonemoto was also designated to testify regarding topics 22 and 54-56.

27  [13] For the convenience of the Discovery Master, all of the deposition passages related to this
motion are gathered in the Separate Statement In Support Of MGA Entertainment, Inc.'s and

28  Carter Bryant's Joint Motion To Compel Re: Mattel's Bandying Of 30(b)(6) Witnesses, filed
concurrently herewith.

EXHIBIT **16**

PAGE **224**

1      • Bryant's alleged duties owed to Mattel;

2      • Bryant's acts or omissions in breach of those duties, including

3          those related to Mattel's Confidential Information and Inventions

4          Agreement;

5      • Bryant's access to and alleged misappropriation of Mattel's

6          proprietary information;

7      • Bryant's alleged acts to aid a "competitor" (*i.e.*, MGA); and

8      • Bryant's providing of services or property of Mattel to MGA.[14]

9  There can be no doubt that at trial, Mattel will have to adduce evidence on all of

10  these subjects; yet, as will be shown, the knowledge of Mattel's 30(b)(6) witnesses,

11  individually or collectively, was woefully deficient on these topics.[15]

12          a.  **Mattel Failed to Educate Its Witnesses Regarding**

13              **Mattel's Knowledge of Topics 2-7.**

14          Mattel's designated 30(b)(6) witnesses on these topics did little, if

15  anything, to prepare for their depositions. Ms. Yonemoto revealed that, aside from

16  reviewing a handful of business records, she did nothing else to educate herself

17  about the topics for which she was designated, including topics 2-7.[16] Mr. Hudnut

---

18  [14] Topic 2 requests testimony regarding "[a]ll contractual and non-contractual duties and

19  obligations Bryant owed or performed for Mattel during his employment with Mattel, and thereafter." Bryant's 30(b)(6) Notice, at 4, ¶2. Topic 3 requests testimony regarding "[a]ll of

20  Bryant's acts or omissions which breached any contractual or non-contractual duty or obligation Bryant owed to Mattel." *Id.* at ¶3. Topic 4 requests testimony regarding "[a]ll of Bryant's acts or

21  omissions which breached any duties or obligations imposed by the Conflict of Interest

22  Questionnaire and/or the Employee Confidential Information and Inventions Agreement;" *Id.* at ¶4. Topic 5 requests testimony regarding "[a]ll Mattel proprietary or confidential information

23  Bryant had access to during his employment with Mattel." *Id.* at ¶5. Topic 6 requests testimony regarding "[a]ll of Bryant's acts or omissions pursuant to which he aided, assisted and worked for

24  a competitor of Mattel while employed by Mattel from 1995 to the present." *Id.* at ¶6. Topic 7

25  requests information regarding "[t]he services and property belonging to Mattel that Bryant provided to any third party, including MGA, from 1995 to the present." *Id.* at ¶7.

26  [15] For example, when MGA's counsel asked Mr. Hudnut about the factual basis for Mattel's assertion that Bryant had access to Mattel proprietary or confidential information, Mr. Hudnut

27  replied, "I don't know what information Carter Bryant had or did not have access to when he was at Mattel."[15]

28  [16] Deposition of Sandy Yonemoto ("Yonemoto Dep."), 15:23-16:7, Garcia Decl., ¶4, Ex. 4.

MEM P&A ISO MTN TO COMPEL RE 30(B)(6)
        WITNESSES CV 04-09049 SGL (RNBX)

EXHIBIT __16__

PAGE __225__

1  was also unprepared to testify regarding these topics.[17] When MGA's counsel

2  questioned Mr. Hudnut about his preparation to testify as to Bryant's duties to

3  Mattel, he conceded that he did "nothing direct" to prepare on that subject.[18]

4  Instead, he came to his deposition prepared only to testify as to his personal

5  knowledge.[19] Similarly, at the deposition of Ms. Pratte, Mattel's counsel admitted

6  that she was testifying only as to her own personal knowledge and that she had not

7  otherwise been educated as to topics 2-7, saying *"she is not someone we have*

8  *educated on topics that she does not otherwise have knowledge of."*[20]

9         Although Mr. Ongchangco met with Mattel's counsel to prepare for

10  his deposition, he never reviewed any emails or other corporate documents that may

11  have provided him with information about his designated topics.[21] What

12  documents he did review provided him with no information about topics 2-7.

13  When MGA's counsel asked Mr. Ongchangco about Bryant's involvement in the

14  creation of the Bratz dolls, Mr. Ongchangco's response was limited to "allegations"

15  he heard from unnamed and unknown Mattel employees that Bryant had either

16  copied Diva Starz or submitted drawings to MGA that were allegedly created while

17  he was still at Mattel.[22] Presumably Mattel is not intending to rely on inadmissible

18  water-cooler gossip to support its claims, but one would not know it from such

19  testimony.

20          b.   Mattel's Witnesses Admitted to Having No Relevant

21              Personal Knowledge About Carter Bryant or These Topics.

22         Mattel's lack of effort to educate its designees would only be

23  acceptable if their personal knowledge was sufficient to convey all information

24  reasonably available to Mattel, but time and again, Mattel's 30(b)(6) witnesses

25  [17] Hudnut Dep., 108:8-113:14, Garcia Decl., ¶3, Ex. 3.

26  [18] *Id.* at 96:19-97:5.

    [19] *Id.* at 94:20-24.

27  [20] Deposition of Joni Pratte ("Pratte Dep."), 8:16-25, Garcia Decl., ¶5, Ex. 5.

    [21] *Id.*

28  [22] *Id.* at 193:9-195:7.

LA2:836330

MEM P&A ISO MTN TO COMPEL RE 30(B)(6)
WITNESSES CV 04-09049 SGL (RNBX)

EXHIBIT 16

PAGE 226

1  failed that test.  Indeed, Mattel's 30(b)(6) witnesses who have been questioned as to

2  topics 2-7 have admitted knowing next to nothing about Carter Bryant or the facts

3  underlying Mattel's claims against him.  For example, Mr. Ongchangco stated that,

4  although he "might" have met Bryant before, he did not recall ever having a

5  conversation with him.[23]  Mr. Hudnut also revealed that he had practically no

6  knowledge regarding Bryant, saying, "*I don't have specific recollections of any*

7  *interactions with Carter Bryant.*"[24]  Similarly, Ms. Yonemoto admitted having no

8  knowledge of even basic facts related to Bryant's alleged breach of his duty under

9  Mattel's Employee Confidential Information and Inventions agreement.[25]

10  Ms. Pratte, as Mattel's designee regarding all of these topics, disclaimed having any

11  information to provide about Bryant at all:

12      Q:  Thanks.  Do you know Carter Bryant?

13      A:  No.
        Q:  Have you ever met him?

14      A:  Not to my knowledge.

15      Q:  Did you have any interaction with him of any sort while he
            was at Mattel?

16      A:  *I have no idea what he looks like or who he is.*

17      Q:  I just want to also make sure that you didn't have email

18          communications with him or non-face-to-face
            communications.

19      A:  *I never heard the name until counsel had given me the*

20      *name.*

21      Q:  So did Carter Bryant to your knowledge have any
            involvement at all in the Diva Starz project at any time?

22      A:  *I never had any interaction or knowledge of Carter Bryant*

23

24

25  [23] Ongchangco Dep., 147:22-148:2, Garcia Decl., ¶6, Ex. 6.

26  [24] Hudnut Dep., 97:6-12 (emphasis added), Garcia Decl., ¶3, Ex. 3.
    [25] Q:  Do you have any information about Mr. Bryant contacting people that he knew as a
    consequence of his Mattel employment and using that information in connection with

27  development of the Bratz dolls?  A:  No, I do not."  Yonemoto Dep., 74:25-75:22 (emphasis
    added), Garcia Decl., ¶4, Ex. 4.  Indeed, Ms. Yonemoto testified that her knowledge was limited

28  to the facts alleged in Mattel's complaint.  Id. at 76:10-77:17.

LA2:836330                          - 8 -              MEM P&A ISO MTN TO COMPEL RE 30(B)(6)
                                                       WITNESSES CV 04-09049 SGL (RNBX)

EXHIBIT __16__

PAGE __227__

*during my time at Mattel.*[26]

**2. Topics 8, 11, 13 & 24: Mattel's Witnesses Were Not Educated as to Mattel's Knowledge, and Their Personal Knowledge Was Not Sufficient to Make Them Competent Witnesses.**

Mattel's pattern continued as to topics 8, 11, 13, and 24, which seek information regarding:

- Mattel's creation and development of Diva Starz;

- Mattel's allegations that Bryant copied Mattel products or designs while creating Bratz; and

- Mattel's allegations that Bryant created Bratz while still employed by Mattel.[27]

It is beyond dispute that these topics go to the heart of Mattel's case; yet, once again, Mattel ignored its duty to educate its designees and their own personal knowledge was entirely lacking. For example, neither Mr. Ongchangco nor Ms. Pasko could even testify as to when the Diva Starz project was first released.[28]

---

[26] Pratte Dep., 70:11-71:5 (emphasis added), Garcia Decl., ¶5, Ex. 5.

[27] Topic 8 requests testimony regarding "All acts, omissions, circumstances and/or evidence showing, or tending to show, that any and all products of MGA, including but not limited to, any and all products sold under the trade name 'Bratz,' originated from, were derived from, are based upon, are copied or incorporated from, or are substantially or confusingly similar to, any design, research and developmental work, work in progress, or product owned at any time by Mattel or created by any Mattel employee, including but not limited to Bryant, or by any independent contractor during the time that such Person was working for Mattel." Bryant's 30(b)(6) Notice, at 4, ¶8. Topic 11 requests testimony regarding "All facts and circumstances showing the conception, origination, creation, development and/or reduction to practice of 'Diva Starz.'" *Id.* at 5, ¶11. Topic 13 requests testimony regarding "All acts, omissions, circumstances and/or evidence showing, or tending to show, that any product sold at any time by MGA under the trade name 'Bratz' originated from, is derived from, is based on, copies, incorporates, or is substantially or confusingly similar to any design or work product owned at any time by Mattel or created by Bryant during the time Bryant was working for Mattel. *Id.* at 5, ¶13. Topic 24 requests testimony regarding "All acts, omissions, circumstances and/or evidence showing, or tending to show, that prior to October 21, 2000, Mattel had any toy concept or project which had not yet been offered for sale to the public, including without limitation, any toy concept or project in the pre-production or development phase, that Bryant improperly copied, replicated, borrowed or otherwise used in whole, or in any part, during or after Bryant's employment with Mattel." *Id.* at 6, ¶24.

[28] Deposition of Rene Pasko ("Pasko Dep."), 89:3-21, Garcia Decl., ¶7, Ex. 7; Ongchangco Dep.,

EXHIBIT 16

PAGE 228

1     a.  Mattel's Failed to Educate its Witnesses Regarding Mattel's
2        Knowledge of Topics 8, 11, 13 & 24.

3    Mattel made no effort to educate its witnesses as to its corporate

4  knowledge of topics 8, 11, 13, or 24. Mr. Hudnut stated that he spoke to no one at

5  Mattel in preparation for his deposition, other than counsel.[29] According to Mr.

6  Hudnut's testimony, however, Mattel's counsel did not transfer any corporate

7  knowledge to Mr. Hudnut during these preparation sessions, as evidenced by Mr.

8  Hudnut's explanation that he was testifying solely as to his personal knowledge.[30]

9  Ms. Pasko admitted doing *nothing* to find out even basic facts about the Chat Girls

10  project, which evolved into Diva Starz, such as when the project began or who

11  conceived of the project,[31] and Mattel did not have Mr. Ongchangco speak with any

12  Mattel employees about his designated topics.[32] Such a strategy obstructs

13  discovery and precludes MGA and Bryant from obtaining Mattel's knowledge on

14  issues central to this litigation.

15     b.  Mattel's Witnesses Could Not Provide Information on
16        Topics 8, 11, 13 & 24 Beyond Their Own Limited Personal
         Experiences While Working at Mattel.

17    The personal knowledge of Mattel's 30(b)(6) witnesses was so limited

18  they could not provide basic information regarding topics 8, 11, 13, and 24. For

19  example, although Mr. Hudnut was able to testify about development meetings for

20  the so-called Diva Starz Entertainment project[33]—a failed television show concept

21  that never aired, not the dolls at issue—he could not even testify as to whether Diva

22  Starz was a fashion doll concept.[34] Mr. Hudnut also had no information about how

23

24

---

25 166:10--19, Garcia Decl., ¶6, Ex. 6.
 [29] Hudnut Dep., 104:2-7, Garcia Decl., ¶3, Ex. 3.
26 [30] *Id.* at 94:20-24.
 [31] Pasko Dep., 38:12-16; 38:23-39:8, Garcia Decl., ¶7, Ex. 7.
27 [32] Ongchangco Dep., 101:17-102:22, Garcia Decl., ¶6, Ex. 6.
 [33] Hudnut Dep., 153:17-155:3, Garcia Decl., ¶3, Ex. 3.
28 [34] *Id.* at 177:1-13.

LA2:836330        - 10 -   MEM P&A ISO MTN TO COMPEL RE 30(B)(6)
                WITNESSES CV 04-09049 SGL (RNBX)

EXHIBIT _16_

PAGE _229_

1   the name Diva Starz was chosen.[35]  Moreover, Mr. Hudnut could not explain the

2   origins and inspiration of the Diva Starz project—a subject clearly encompassed by

3   topic 11.[36]  To explain his inability to provide such fundamental information, Mr.

4   Hudnut simply reiterated that he could only testify regarding his personal

5   knowledge, which was that of a "screenwriter and a song writer and a producer.

6   Those are the things that I'm prepared to talk about."[37]

7         Ms. Pasko's personal knowledge regarding the Chat Girls project—

8   which would ultimately become Diva Starz—was also extremely limited.  She was

9   once the senior designer for Chat Girls, but could not even remember when the

10   project began, nor could she identify anyone at Mattel who could answer that

11   question.[38]  When asked about the early stages of the project, Ms. Pasko replied, "*I*

12   wasn't a designer on Chat – this Chat Girls project... in the beginning so *I* don't

13   know the whole history of the project."[39]

14         Mr. Ongchangco could not identify the person who conceived of the

15   idea of Diva Starz.[40]  He had no knowledge as to how many names were considered

16   for the Diva Starz project and was unable to identify anyone on the team who might

17   have that knowledge—even though he admitted being present at meetings where

18   the name for the Diva Starz project was discussed.[41]  Nor could Mr. Ongchangco,

19   on Mattel's behalf, even definitively identify the individuals who were present at

20   those meetings.[42]  When pressed for information, he stated, "It wasn't part of *my*

21   job so *I* don't know."[43]

22

23

24     [35] *Id.* at 131:23-132:18.

25     [36] *Id.* at 162:15-163:6.
       [37] *Id.* at 112:17-22.

26     [38] Pasko Dep., 38:2-39:12, Garcia Decl., ¶7, Ex. 7.
       [39] *Id.* at 110:2-5 (emphasis added).

27     [40] Ongchangco Dep., 19:12-20:14, Garcia Decl., ¶6, Ex. 6.
       [41] *Id.* at 211:7-212:1.

28     [42] *Id.* at 212:15-215:18.
       [43] *Id.* at 211:18-19 (emphasis added).

EXHIBIT 16

PAGE 230

3.   **Topic 41:  Mattel Failed to Educate Ms. Jensen as to
Mattel's Knowledge, and She Testified Only as to Her Own
Limited Personal Knowledge.**

Julia Jensen was designated to testify regarding topic 41, which calls
for testimony regarding Mattel's knowledge of statements attributed to Mattel
sources in a July 2003 Wall Street Journal article.[44]  That article, citing unnamed
Mattel sources, reported that "Inside Mattel some are convinced Bratz borrow
liberally from a Mattel project that was scrapped at the testing stage in 1998."[45]
Testimony about Mattel's knowledge here is vital to Defendants' laches defense.

Mattel scratched its original designee for topic 41, Jules Andres, *the
night before the deposition was scheduled to take place*, delaying the deposition by
three weeks.[46]  Instead, Mattel substituted Ms. Jensen, touting her alleged superior
knowledge on the subject as the justification for the eleventh-hour change.[47]  But as
with its other designees, Mattel did nothing to prepare Ms. Jensen, and she admitted
that she did not speak to any employees at Mattel outside of discussions with
counsel, nor did she review any emails related to the topic for which she was
designated.[48]  As a result, Ms. Jensen could not even identify on behalf of Mattel

---

[44] Topic 41 requests testimony regarding: "All statements of Mattel or ex-Mattel employees in the
July 2003 Wall Street Journal article (produced by Mattel to Bryant in the present case),
including, without limitation, 'Inside Mattel, some are convinced the Bratz borrow liberally from
a Mattel project that was scrapped at the testing stage in 1998'; 'But the Bratz' oversized heads
— with their pursed lips and cartoonist eyes — are 'virtually identical' to the heads of the dolls
her team created'; 'Anyone who passed by [Lily Martinez's] cubicle would see the picture up on
the wall'; and 'The big heads, the big eyes, the big feet — they were all the same [as the Bratz].'"
Bryant's 30(b)(6) Notice, at 9, ¶41.

[45] Maureen Tkacik, "Dolled Up: To Lure Older Girls, Mattel Brings In Hip-Hop Crowd—It Sees
Stalwart Barbie Lose Market Share, So 'Flavas' Will Take on the 'Bratz'—Battle of the Big
Heads" ("Dolled Up"), *Wall Street Journal*, July 18, 2003 ("Wall Street Journal Article"), A1,
Garcia Decl., ¶8, Ex. 8.

[46] Jenal Decl. ¶4. Indeed, Bryant's counsel had already flown to Los Angeles from San Francisco
for Ms. Andres deposition when Mattel announced its intention to make the switch. *Id.*

[47] *See* Email from James Jenal to Timothy Alger (May 16, 2007, 10:52 PM), Garcia Decl., ¶9, Ex.
9. Mattel justified this saying that its last-minute substitution "was driven by [Mattel's] desire to
make available the best witness on the topic." Email from Timothy Alger to James Jenal (May
17, 2007, 12:06 AM), Garcia Decl., ¶9, Ex. 9.

[48] Deposition of Julia Jensen ("Jensen Dep."), 23:12-24:17, Garcia Decl., ¶10, Ex. 10.

EXHIBIT __16__

PAGE __231__

1   any of the otherwise unidentified sources of statements included in the Wall Street

2   Journal Article:[49]

3      [Mr. Keats] Let's go to the next paragraph.  And I'm going to
   read it for the record.

4

5       "The history of the Bratz is intertwined with Mattel.
MGA says the Bratz were designed by Carter Bryant, a former

6   member of the Barbie team. Inside Mattel some are convinced
Bratz borrow liberally from a Mattel project that was scrapped

7   at the testing stage in 1998."  And then it says Mattel declined

8   to comment.

9       Let's break this down.  First, where it says *inside Mattel*

10  *some are convinced*, do you know who the "some" are, some
people, or whatever, are referred to in that sentence?

11     A.   I do not.

12     Q.   Did you ask anybody in preparation for this deposition
who those people were?

13     A.   I did not.

14     Q.   Did you do anything to find out, if it was possible to

15  figure out, who those people referred to are?

16     A.   I did not.[50]

17  Thus, despite Mattel's last minute substitution, its proffered witness was unable to

18  provide basic information that is reasonably available to Mattel and vital to

19  Defendants' defense.

20     4.   **Mr. Ongchangco and Ms. Yonemoto Were Produced for
Additional Topics, But Mattel Failed to Educate Them as to**

21      **Mattel's Knowledge, and They Did Not Have Personal**

22      **Knowledge Related to Those Topics.**

23     In addition to being produced on the topics mentioned above, Mr.

24  Ongchangco was produced on topic 12, and Ms. Yonemoto was produced on topics

25  22 and 54-56.[51]  As with the other topics, Mattel did not educate these witnesses

26  [49] *Id.* at 121:19-122:16.

27  [50] *Id.* at 112:4-24 (emphasis added).
[51] Topic 12 requests testimony regarding "[a]ll facts and circumstances showing the conception,

28  origination, creation, development and/or reduction to practice of 'Mini Diva Starz.'"  Bryant's
30(b)(6) Notice, at 5, ¶12.  Topic 22 requests testimony regarding "[a]ll acts, omissions,

LA2:836330          - 13 -     MEM P&A ISO MTN TO COMPEL RE 30(B)(6)
                  WITNESSES CV 04-09049 SGL (RNBX)

EXHIBIT 16

PAGE 232

1   and thus they were unable to testify competently as to Mattel's corporate

2   knowledge, precluding MGA and Bryant from uncovering key facts known to

3   Mattel.

4         Although topic 12 specifically includes the "*conception*, origination,

5   creation, development and/or reduction to practice of 'Mini Diva Starz,'" Mr.

6   Ongchangco testified that *he was not involved in the conception of the project*.[52]

7   Despite his lack of involvement, Mattel made no effort to prepare him to provide

8   any information beyond the realm of his own personal knowledge.  In fact, when

9   asked a simple question regarding when the Mini Diva Starz project ended, Mr.

10  Ongchangco admitted that he did not know.[53]

11        At Ms. Yonemoto's deposition, Mattel's counsel insisted that despite

12  her broader designations, she was only prepared to discuss Bryant's exit

13  interview.[54]  However, when she was questioned specifically about the interview,

14  Ms. Yonemoto had no information to offer other than what appeared on the face of

15  Mattel's personnel records.[55]

16       5.   **Julia Marine's Testimony Is Contradicted by Mattel's In-**

17           **House Counsel.**

18        Mattel's conduct of producing ill-prepared witnesses reached its

19  cynical apogee with the testimony of Julia Marine.  During the April 4, 2007

20  scheduling hearing before the Discovery Master, counsel for Mattel, Jon Corey,

21

22  circumstances and/or evidence showing, or tending to show, that Bryant misappropriated Mattel
property, including without limitation intellectual property, at any time." *Id.* at 6, ¶22. Topic 54

23  requests testimony regarding "Bryant's 'Job Summary' report, produced by Mattel as Document
Control Nos. M001667-68." *Id.* at 11, ¶54. Topic 55 requests testimony regarding "[a]ll acts,

24  omissions, circumstances and/or evidence showing, or tending to show, that Bryant made

25  affirmative misrepresentations to any and all Mattel employees upon his departure from Mattel."
*Id.* at ¶55. Topic 56 requests testimony regarding "Bryant's 'Exit Interview Report'" dated

26  October 19, 2000, produced by Mattel as Document Control No. M0001654." *Id.*, at ¶56.
[52] Ongchangco Dep., 30:9-11, Garcia Decl., ¶6, Ex. 6.

27  [53] *Id.* at 95:10-25.
[54] Yonemoto Dep., 37:7-15; Garcia Decl., ¶4, Ex. 4.

28  [55] *Id.* at 77:22-78:13.

LA2:836330               - 14 -        MEM P&A ISO MTN TO COMPEL RE 30(B)(6)
WITNESSES CV 04-09049 SGL (RNBX)

EXHIBIT 16

PAGE 233

1    described Mattel's designation of Ms. Marine this way:

2        MR. JENAL:  And who's the designee on the document
3        management system?

     MR. COREY:  That's Julia Marine.  What I can tell you is,
4    you've taken her deposition before.  **There was no formal**
5    **document management system.  What the designers used**
     **was simply the file system, the file management system on**
6    **the Zeus storage server -- the Zeus data server.  So she'll be**
7    **appearing to testify about that.**  You can go back and look at
8    her testimony and decide whether you want to take her
9    deposition again.[56]

10   At her renewed deposition – which finally took place on June 26, 2007 – Mattel

11   suddenly attempted to narrow her designation:

12       Q.   And you understand that you're here today to testify about
         the Zeus data system for lack of a better way of phrasing it as it
13       was used in the Design Center and elsewhere at Mattel from
14       basically 1998 through the present; is that correct?

15       MR. COREY:  Actually, the topic on which she's been
         designated is narrower than that.  It's the document
16       management system used by designers at the Design Center.

17       MR. JENAL:  I guess we'll explore what the difference is
         between those two understandings.[57]

18   Despite Mr. Corey's attempt to shift the ground, Ms. Marine confirmed – as Mr.

19   Corey had admitted himself during the hearing before the Discovery Master – that

20   the "document management system used by designers" at Mattel, was one and the

21   same as Zeus:

22       Q.   What document management system do you understand to
23       have been used by designers at Mattel?

24       A.   As far as I know, there isn't one.

25       Q.   So in terms of a document management system, is there --

26   ────────────────────────
     [56] April 4 Hearing at 16:17-24 (emphasis added).  Indeed, Bryant and MGA had to take her
     deposition again because Mattel had previously restricted her testimony to only the 1998-2000
27   time period.
     [57] Deposition of Julia Marine, Volume 3, dated June 26, 2007 ("Marine Dep."), 161:11-21,
28   attached as Ex. 3 to the Jenal Decl.

EXHIBIT 16

PAGE 234

1    there is a system where designers at Mattel were encouraged to
2    keep documents, correct?
     A.  A file server, yes.
3    Q.  And that's a file server that we talked about before that's
4    known as Zeus, correct?
5    A.  Correct.[58]

6        Ms. Marine also testified that in preparing for her renewed deposition
7    she only spoke with two people: Jon Corey, and Mattel's in-house counsel, Michael
8    Moore,[59] both of whom were in attendance at her deposition.

9        Ms. Marine was asked a series of questions regarding Mattel's
10   preservation of evidence regarding the Zeus server and in particular questions
11   regarding the existence of backup tapes for Zeus from 1998-2001.  Her testimony
12   was damning – admitting as Mattel's designee that, "I don't think we have anything
13   going back so far."[60]

14   While Mattel's corporate designee was so testifying, its in-house counsel, Michael
15   Moore sat by and said nothing.  Nor was any attempt made to correct the record
16   during the deposition, or by Ms. Marine at any time thereafter.

17       Relying in part on Ms. Marine's testimony, MGA and Bryant filed
18   their joint motion regarding spoliation and seeking terminating sanctions from

19
20   [58] Marine Dep., 161:25-162:9.
     [59] Marine Dep., 158:17-159:6.
21   [60] "[Q.]  Do you know whether Mattel has preserved backup tapes from the Zeus server for the
     period of 1998?  MR. COREY: Objection: scope.  THE WITNESS:  I'm not aware of that.  BY
22   MR. JENAL: Q.  Do you know whether Mattel has preserved backup tapes for the Zeus file
     server from 1999?  MR. COREY: Objection: scope.  THE WITNESS:  I'm not aware of
23   backups that old.  BY MR. JENAL: Q.  Are you aware of whether Mattel has preserved backup
     tapes from the Zeus server from the year 2000?  MR. COREY: Objection: scope.  THE
24   WITNESS: *I don't think we have anything going back so far.*  BY MR. JENAL: Q.  Do you
     know whether Mattel has preserved backup tapes from the Zeus file server for the year 2001?
25   MR. COREY: Objection: scope.  THE WITNESS:  I'm sorry, I don't know of old backups like
     this."  Marine Dep., 243:5-244:4 (emphasis added).  Ms. Marine's 30(b)(6) testimony directly
26   contradicted a prior sworn declaration put forward by Mattel's counsel, Michael Zeller to Judge
     Larson, in which he claimed that "Mattel has preserved backup tapes from Mattel's file server
27   known as Zeus that were created in 1998, 1999, 2000 and 2001 and at various other times."  Jenal
     Decl. ¶ 7, Ex. 4.
28

LA2:836330                        - 16 -        MEM P&A ISO MTN TO COMPEL RE 30(B)(6)
                                                WITNESSES CV 04-09049 SGL (RNBX)

EXHIBIT __16__

PAGE __235__

1   Judge Larson on July 24, 2007.  In opposition to that Motion, Mattel put in the

2   declaration of Michael Moore.  In his declaration, Mr. Moore flatly contradicted

3   Ms. Marine's sworn testimony, saying:

4       I also initiated a search for backup tapes for the data server
5       commonly known at Mattel as Zeus beginning in 2003….
        Some older Zeus backup tapes were separately discovered in
6       Mattel's Data Center, located in Phoenix, Arizona. These
7       backup tapes were delivered to me and are from the time
        periods April, May, August, September and December 1998,
8       January and February 1999, February, March, April, May,
9       June, July, August and December 2000 and January 2001. I
10      have also received Zeus backup tapes for later periods. All of
        the Zeus backup tapes that have been provided to me are
11      currently preserved in a secure, off-site storage facility.[61]

12  Thus, only to avoid potentially devastating sanctions did Mattel ever admit the

13  existence of these backup tapes – despite allowing its Rule 30(b)(6) designee to

14  testify to the contrary.

15          6.      **Mattel Refused to "Connect the Dots."**

16          Mattel's production of multiple 30(b)(6) witnesses who had no

17  knowledge of relevant facts beyond their own limited personal knowledge was just

18  another Mattel ruse to obstruct any meaningful form of discovery.  On several

19  occasions, Mattel's counsel unabashedly revealed the wild goose chase that Mattel

20  intended to create with its 30(b)(6) designees:

21      Q.   In your capacity as a representative of Mattel, do you have
22      any belief that any product from MGA originated from Diva
23      Starz?
            MR. ZELLER:  First of all, he's not here to give his
24      beliefs as a representative.  As we've already said, in terms of
25      the designations the people aren't here to connect the dots.[62]

26

27  ---
    [61] Declaration of Michael Moore in support of Mattel, Inc.'s Opposition to MGA Entertainment,
28  Inc.'s Motion for Terminating Sanctions, ¶ 11, attached to Jenal Decl. as Ex. 5.
    [62] Ongchangco Dep., 148:3-9, Garcia Decl., ¶6, Ex. 6.

EXHIBIT 16

PAGE 236

1    When Bryant's counsel asked whether Mr. Ongchangco was therefore "done as a

2    designee" once his personal knowledge was exhausted, Mattel's counsel agreed.[63]

3    But as Mattel's counsel so concisely summarized, "if you look at the transcript for

4    Rene Pasko, Kislap, Joni Pratte it's been the same practice for every single one of

5    those witnesses,"[64] and Mattel clearly intended not to "connect the dots"[65] – i.e., not

6    to produce witnesses able to speak to Mattel's corporate knowledge on the

7    designated topics.  As a result, MGA and Bryant have wasted time and resources

8    questioning Mattel's witnesses, and Mattel has thus far evaded its duty to provide

9    answers on key issues raised by its claims in this action.

10           C.    **The Meet and Confer Process Is Similarly Stymied.**

11                 MGA and Bryant attempted to meet and confer with Mattel about its

12    abusive bandying practices but encountered resistance and intransigence from

13    Mattel at every turn.  On July 2, 2007, MGA's counsel sent a letter to Mattel's

14    counsel requesting a meeting to specifically discuss these issues, in addition to

15    others.[66]  The parties met and conferred on July 10, 2007, but when MGA broached

16    the subject of Mattel's bandying practices, Mattel's counsel was unprepared to

17    discuss the issue.[67]  To facilitate the discussion, MGA's counsel identified some of

18    the witnesses and topics that were the source of the problem, as well as the relief

19    MGA and Bryant were seeking.[68]  Mattel's counsel, however, obstinately

20    demanded that MGA and Bryant send a separate meet and confer letter identifying

21    the witnesses and topics that they wished to discuss.[69]

22                 In an effort to resolve this dispute without motion practice, MGA's

23    counsel sent a second letter on July 11, 2007, specifically stating that Mattel's

24    _____

25    [63] Id. at 149:19-150:5.
      [64] Hudnut Dep., 94:9-13, Garcia Decl., ¶3, Ex. 3.

26    [65] Ongchangco Dep., 148:9, Garcia Decl., ¶6, Ex. 6; Pratte Dep., 73:23, Garcia Decl., ¶5, Ex. 5.
      [66] Letter from Jim Jenal to Dylan Proctor (July 2, 2007), Garcia Decl., ¶11, Ex. 11.

27    [67] Garcia Decl., ¶12.
      [68] Id.

28    [69] Id.

EXHIBIT **16**

PAGE **237**

1    witnesses were unknowledgeable about their designated topics, and requesting "a

2    properly educated 30(b)(6) witness who can testify competently as to Mattel's

3    knowledge."[70] This letter again identified witnesses and topics that were at issue

4    and proposed a time for the parties to reconvene and continue discussions.[71]

5    Mattel, however, refused MGA's invitation to continue the meet and confer,

6    erroneously arguing that MGA "still ha[d] not disclosed what the issues are or what

7    the potential dispute is."[72]

8          In light of Mattel's stonewalling and its failure to cooperate or to abide

9    by the clear requirements of the Rules, Bryant and MGA had no recourse but to

10    bring yet another motion to compel regarding Bryant's Rule 30(b)(6) Notice.

11  **III.   ARGUMENT**

12        **A.**    <u>**Mattel Violated Rule 30(b)(6) by Designating Multiple Witnesses,**</u>

13             <u>**All of Whom Lacked Knowledge of the Topics for Which They**</u>

14             <u>**Were Designated**</u>

15          **1.**    **Testimony Based Solely Upon the Incomplete Personal**

16               **Knowledge of the Witness Does Not Satisfy Rule 30(b)(6).**

17          Under Rule 30(b)(6), "The persons so designated shall testify as to

18    matters known or reasonably available to the organization." It is black letter law

19    that a designating party has a duty to prepare the witness to testify not only about

20    facts personally known to that witness, but also about facts that are reasonably

21    available to the corporation.[73] "There can be no question that the rule imposes a

22    [70] Letter from William Charron to Dylan Proctor (July 11, 2007), Garcia Decl., ¶13, Ex. 12.

      [71] *Id.*

23    [72] Letter from Dylan Proctor to William Charron and Jennifer Glad (July 15, 2007), Garcia Decl.,

24    ¶14, Ex. 13.

      [73] *See, e.g., Alexander v. F.B.I.*, 186 F.R.D. 137, 141 (D.D.C. 1998) ("[T]he designating party has

25    a duty to prepare the witness to testify on matters not only known by the deponent, but those that

      should be reasonably known by the designating party."); *United States ex rel Fago v. M&T*

26    *Mortgage Corp.*, 235 F.R.D. 11, 24 (D.D.C. 2006) (holding that corporation had duty to prepare

      its 30(b)(6) witness to testify not only to matters within her personal knowledge, but also on

27    matters known to the corporation); *United States v. Taylor*, 166 F.R.D. 356, 361 (M.D.N.C. 1996)

      ("The Rule 30(b)(6) designee does not give his personal opinions. Rather, he presents the

28    corporation's 'position' on the topic.").

EXHIBIT <u>16</u>

PAGE <u>238</u>

1  duty to prepare the designee that goes beyond matters personally known to the

2  designee or to matters in which that designee was personally involved."[74]

3         In *Wilson v. Lakner*, for example, plaintiff sued two physicians and a

4  hospital for medical malpractice after a sponge was left in her abdomen following a

5  surgery.  In response to plaintiffs' Rule 30(b)(6) notice, defendant hospital

6  produced three witnesses.  The first failed to investigate any facts beyond her own

7  personal knowledge of hospital procedures.  The second failed to make any inquiry

8  above and beyond her knowledge of the hospital policy for counting sponges during

9  operations.  She did not even speak to the nurse who was on duty during plaintiffs'

10  surgery.  Finally, the third witness did nothing more than review her own medical

11  records concerning treatment of the plaintiff.  The court held that the hospital's

12  production of a string of poorly educated witnesses amounted to bandying.[75]  The

13  court ordered the hospital to reconvene the depositions and "produce live witnesses

14  who know or who can reasonably find out what happened in [the] given

15  circumstances."[76]

16         Like the hospital in *Wilson*, Mattel has blatantly disregarded the

17  requirements of Rule 30(b)(6) by bandying witnesses who are only prepared to

18  discuss their incomplete personal knowledge—if they have any at all—of the topics

19  for which they have been designated.  At the depositions of Mr. Hudnut, Ms. Pratte,

20  and Mr. Ongchangco, Mattel's counsel openly acknowledged that its witnesses

21  would not be testifying as to facts that were outside of their personal knowledge,[77]

22  yet when pressed, the witnesses had no relevant personal knowledge at all.[78]

23  "Obviously, the purpose of a Rule 30(b)(6) deposition is to get answers on the

24

25  [74] *Wilson v. Lakner*, 228 F.R.D. 524, 528 (D. Md. 2005) (citations omitted).
   [75] *Id.* at 528-29.

26  [76] *Id.* at 530.
   [77] Hudnut Dep., 93:22-94:13, Garcia Decl., ¶3, Ex. 3; Ongchangco Dep., 148:6-7, 20-150:5,

27  Garcia Decl., ¶6, Ex. 6; Pratte Dep., 8:16-9:6, Garcia Decl., ¶5, Ex. 5.
   [78] *See, e.g.*, Ongchangco Dep., 95:8-9, Garcia Decl., ¶6, Ex. 6; Jensen Dep., 59:13-24, Garcia

28  Decl., ¶10, Ex. 10.

    MEM P&A ISO MTN TO COMPEL RE 30(B)(6)
                                        WITNESSES CV 04-09049 SGL (RNBX)

EXHIBIT **16**

PAGE **239**

1   subject matter described…not to simply get answers limited to what the deponent
2   happens to know."[79]  Mattel's unilateral attempt to limit the testimony of its
3   30(b)(6) designees to only personal knowledge is impermissible.

    **2.   Mattel Violated Its Duty Under Rule 30(b)(6) By Failing to Adequately Prepare and Educate Its Witnesses.**

6       Rule 30(b)(6) imposes an affirmative duty upon the designating party
7   to adequately prepare its witness so that he or she can testify on matters reasonably
8   known by the responding entity.[80]  Mattel clearly abdicated its responsibility to
9   properly educate its 30(b)(6) witnesses.  A corporation can fulfill its duty to educate
10  by collecting information, reviewing documents, and interviewing employees with
11  relevant knowledge about the topics and events at issue.[81]  Although Mattel's
12  witnesses spent some time in deposition "prep sessions" with Mattel's *counsel*,
13  several witnesses admittedly did no more than conduct cursory reviews of a handful
14  of documents, most of which were irrelevant to the designated topics.[82]  Time and
15  again, Mattel's designees admitted that they had not interviewed any other Mattel
16  employees that might have had information relevant to the designated topics.[83]
17  Such halfhearted efforts to prepare for 30(b)(6) depositions cannot seriously be
18  considered fulfillment of Mattel's duty to educate its witnesses with reasonably
19  available corporate knowledge.

20      Furthermore, Mattel's production of witnesses that simply defer to or

---

[79] *Alexander*, 186 F.R.D. at 141.

[80] *Banks v. Office of the Senate Sergeant-At-Arms*, 241 F.R.D. 370, 373 (D.D.C. 2007); *see also Taylor*, 166 F.R.D. at 361 (holding that a corporation had a duty to educate to the extent information was reasonably available even where the employees with the relevant knowledge no longer worked for the corporation).

[81] *Wilson*, 228 F.R.D. at 528-529.

[82] *See* Yonemoto Dep., 10:7-23, Garcia Decl., ¶4, Ex. 4; Ongchangco Dep., 97:9-103:23, Garcia Decl., ¶6, Ex. 6; Jensen Dep., 24:10-17, Garcia Decl., ¶10, Ex. 10.

[83] Hudnut Dep., 104:2-7, Garcia Decl., ¶3, Ex. 3; Yonemoto Dep., 15:23-16:7, Garcia Decl., ¶4, Ex. 4; Ongchangco Dep., 101:17-102:22, Garcia Decl., ¶6, Ex. 6; Pratte Dep., 8:16-25, Garcia Decl., ¶5, Ex. 5; Pasko Dep., 11:13-21, Garcia Decl., ¶7, Ex. 7; Jensen Dep., 96:16-19, Garcia Decl., ¶10, Ex. 10.

EXHIBIT _16_

PAGE _240_

1   direct MGA and Bryant to information contained in documents does not satisfy

2   Mattel's duty to educate its witnesses. For example, Ms. Yonemoto was designated

3   to discuss the circumstances of Bryant's exit interview, but during her deposition

4   she admitted to only having information contained on the face of Bryant's exit

5   interview form.[84]  At Mr. Hudnut's deposition, Mattel's counsel asserted that "the

6   document [in question] speaks for itself."[85]  Such testimony from witnesses and

7   objections from counsel are simply unacceptable. "Rule 30(b)(6) means what it

8   says. Corporations must act responsively; *they are not entitled to declare*

9   *themselves mere document-gatherers.* They must produce live witnesses who know

10  or who can reasonably find out what happened in given circumstances."[86]

### 3.   Mattel's Designation of Multiple Unknowledgeable Witnesses to Testify on the Same Topics Amounts to "Bandying" and is Prohibited.

14          Mattel's piecemeal designations of unknowledgeable witnesses has

15  delayed and obstructed discovery and violates one of the very purposes behind Rule

16  30(b)(6) – to "streamline[] the discovery process."[87]  The 1970 Advisory

    Committee Notes explain that the rule was carefully crafted to "curb the 'bandying'
17
    by which officers or managing agents of a corporation are deposed in turn but each
18
    disclaims knowledge of facts that are clearly known to persons in the organization
19
    and thereby to it."[88]  A deposing party "is not obligated to depose a string of…
20
    employees, none of whom is able to speak for the [company] as to how the incident
21

---

22  [84] Yonemoto Dep., 77:22-78:13, Garcia Decl., ¶4, Ex. 4.

    [85] Hudnut Dep., 221:15-16, Garcia Decl., ¶3, Ex. 3.

23  [86] *Wilson*, 228 F.R.D. at 530 (emphasis added); *see also Fago*, 235 F.R.D. at 24 (stating that "the
    availability of an informative document…is not the equivalent of corporate testimony regarding
24  the subject matter of that document").

    [87] *Resolution Trust Corp. v. Southern Union Co.*, 985 F.2d 196, 197 (5th Cir. 1993).
25
    [88] *See also, e.g., Alexander*, 186 F.R.D. at 141 (stating that Rule 30(b)(6) was aimed at preventing
26  "bandying"); *Fago*, 235 F.R.D. at 22 (same); *Taylor*, 166 F.R.D. at 360 (same); *Fed. Deposit Ins.
    Corp. v. Butcher*, 116 F.R.D. 196, 199 (E.D. Tenn. 1986) (explaining that Rule 30(b)(6) was
27  designed to diminish "any temptation a corporation might have to shunt a discovering party from
    'pillar to post' by presenting deponents who each disclaims knowledge of facts clearly known to
28  someone in the organization").

LA2:836330

MEM P&A ISO MTN TO COMPEL RE 30(B)(6)
WITNESSES CV 04-09049 SGL (RNBX)

EXHIBIT __16__

PAGE __241__

1    or incidents in question occurred."[89]

2        A corporation's duty to properly educate and prepare its 30(b)(6)

3    witnesses derives therefore from one of the rule's underlying purposes—to prevent

4    bandying.[90]  MGA and Bryant have been forced to do just what Rule 30(b)(6) was

5    designed to prevent—depose a string of employees, none of whom had adequate

6    knowledge to speak competently on behalf of Mattel.  For example:

7        • Ms. Pratte claimed that the very name "Bratz" was "knocked off"

8          from Mattel because it was a name that had been considered for the

9          "Diva Starz" project, but neither she, nor any other Mattel witness

10         could testify about the factual basis for Mattel's contention that

11         Bryant was ever exposed to that name while a Mattel employee.[91]

12       • Ms. Yonemoto was designated to testify regarding "Bryant's acts

13         or omissions which breached any duties or obligations imposed by

14         the Conflict of Interest Questionnaire," among others.

15         Nevertheless, she testified that, as Mattel's designee, she had no

16         information regarding the Conflict of Interest Questionnaire

17         because that was part of the 'onboarding' process, which was

18         handled by Mattel's Corporate Staffing group, not her.[92]

19        As a result of these witness's woefully deficient preparation and the

20   uncooperative attitude of Mattel's counsel, MGA and Bryant are left to guess what

21   evidence or theories Mattel might be relying on to support its claims.  This is not

22   simply a theoretical concern given that Mattel's original theory of this case was that

23   Bryant stole the "Bratz" idea from a Mattel project known as "Toon Teens" but

24   now it has morphed its allegations into a theft related somehow to "Diva Starz."[93]

25   _____

26   [89] *Wilson*, 228 F.R.D. at 529.
     [90] *Alexander*, 186 F.R.D. at 141.

27   [91] Pratte Dep., 72:12-75:7, Garcia Decl., ¶5, Ex. 5.
     [92] Yonemoto Dep., 109:1-113:3, Garcia Decl., ¶4, Ex. 4.

28   [93] Jenal Decl., ¶3 (Bryant deposed for three days in 2004 and questioned about Toon Teens but
     not at all about Diva Starz); *see* Tkacik, "Dolled Up," Garcia Decl., ¶8, Ex. 8; April 4 Hearing at

EXHIBIT __16__

PAGE __242__

1   The point of taking the deposition of a corporate party is to pin Mattel down, once

2   and for all, to the facts underlying the theory of the case that it intends to take to the

3   jury—a result that Mattel is resisting by all available means.  Mattel has a duty to

4   prepare its witnesses to provide "full, complete, and *unevasive* answers."[94]

5

6    **B.    The Court Should Issue an Order Preventing Mattel From**

7    **"Bandying" and Compelling the Production of Properly Prepared**

8    **30(b)(6) Witnesses, Subject to Preclusion at Trial If Mattel Fails to**

     **Comply.**

9          Under Federal Rule of Civil Procedure 26(c), a court may "make any

10   order which justice requires to protect a party or person from annoyance,

11   embarrassment, oppression, or undue burden or expense."  Mattel has produced

12   seven inadequately prepared 30(b)(6) witnesses and, as to topics 2-7, 8, 11, and 24,

13   has engaged in bandying.  Such abusive discovery tactics are not permitted by the

14   language or spirit of Rule 30(b)(6).  Accordingly, the Discovery Master should

15   issue an order directing Mattel to cease its abuses of the Rule 30(b)(6) process, and

16   compelling Mattel to produce, *at its own expense*, properly educated 30(b)(6)

17   witnesses who can testify competently as to *Mattel's* knowledge regarding topics 2-

18   8, 11-13, 24, 41 and Zeus.  The order should prohibit Mattel from designating

19   multiple witnesses on a particular topic and require Mattel to produce a single,

20   competent witness on any one topic.

21          Moreover, the Discovery Master should issue an order providing that if

22   Mattel fails to produce properly prepared witnesses regarding topics 2-8, 11-13 and

23   24 – the topics that relate to Mattel's claims against Bryant, as opposed to 41,

24   which goes to Defendants' laches defense – Mattel shall be precluded from

25   introducing at trial any evidence on those topics beyond that to which its designees

26

27   7:24-8:9, 11:4-11 (counsel for Mattel explaining that "The way that I read [topics] 2 through 7,
     Diva Starz falls within the scope of a significant part of those."), Garcia Decl., ¶1, Ex. 1.
28   [94] *Butcher*, 116 F.R.D. at 201 (emphasis added).

EXHIBIT **16**

PAGE **243**

1   have testified.

2           Finally, Mattel should be sanctioned in the amount of $32,000 as

3   partial compensation to Defendants for their attorneys' fees and costs associated

4   with the wasteful depositions provided to date and for the fees and costs in bringing

5   this Motion.[95]

6   **IV.   CONCLUSION**

7           For all the foregoing reasons, Bryant and MGA respectfully request

8   that the Discovery Master grant this Motion and provide the requested relief.

9   Bryant and MGA further request that the Discovery Master set a timeline for

10  Mattel's compliance by requiring that Mattel produce all of its designated witnesses

11  on the topics in question over a period of three weeks following the grant of the

12  Motion.

13      Dated:        September 6, 2007

14                                  DALE M. CENDALI
15                                  DIANA M. TORRES
                                    JAMES P. JENAL
16                                  O'MELVENY & MYERS LLP

17

18                          By:
                                    James P. Jenal
19                                  Attorneys for MGA Entertainment, Inc.

20      Dated:        September 6, 2007

21

22                                  MICHAEL H. PAGE
                                    KEKER & VAN NEST LLP
23

24                          By: _Keae H Page_   By: JPJ
                                    Michael H. Page   C/ Permission
25                                  Attorneys for Carter Bryant

26

27

28  ---
    [95] Jenal Decl., ¶ 9.

    LA2:836330                        - 25 -     MEM P&A ISO MTN TO COMPEL RE 30(B)(6)
                                                 WITNESSES CV 04-09049 SGL (RNBX)

EXHIBIT _16_

PAGE _244_

# EXHIBIT 17

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
JOHN B. QUINN (State Bar No. 090378)
MICHAEL T. ZELLER (State Bar No. 196417)
JON D. COREY (State Bar No. 185066)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000; Facsimile: (213) 443-3100

STROOCK & STROOCK & LAVAN LLP
BARRY B. LANGBERG (State Bar No. 048158)
MICHAEL J. NIBORSKI (State Bar No. 192111)
2029 Century Park East, Suite 1600
Los Angeles, California 90067-3086
(lacalendar@stroock.com)
Telephone: (310) 556-5800; Facsimile: (310) 556-5959

Attorneys for MATTEL, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual,<br><br>                    Plaintiff,<br><br>         vs.<br><br>MATTEL, INC., a Delaware<br>corporation,<br><br>                    Defendant.<br><br><br>AND CONSOLIDATED ACTIONS | Case No. CV 04-9049 SGL (RNBx)<br>Consolidated with<br>Case No. CV 04-09059<br>Case No. CV 05-02727<br><br>DISCOVERY MATTER<br>[To Be Heard by Discovery Master Hon.<br>Edward Infante (Ret.) Pursuant To The<br>Court's Order Of Dec. 6, 2006]<br><br>**[PUBLIC REDACTED]**<br>DECLARATION OF MICHAEL J.<br>NIBORSKI IN SUPPORT OF<br>MATTEL, INC.'S NOTICE OF<br>MOTION AND MOTION TO<br>COMPEL THE DEPOSITION OF<br>CHRISTOPHER PALMERI<br><br>Date:      February 8, 2008<br>Time:      9:30 a.m.<br>Place:     TBA |

EXHIBIT 17

PAGE 245

07209/2363314.1

DECLARATION OF MICHAEL J. NIBORSKI IN SUPPORT OF
MOTION TO COMPEL THE DEPOSITION OF CHRISTOPHER PALMERI

## DECLARATION OF MICHAEL J. NIBORSKI

I, Michael J. Niborski, declare as follows:

1.         I am an attorney licensed to practice before all courts of the State of California and am an attorney with the law firm of Stroock & Stroock & Lavan LLP, co-counsel for Mattel, Inc. ("Mattel") in the above-captioned action. I submit this declaration in support of Mattel, Inc.'s Notice of Motion and Motion to Compel the Deposition of Christopher Palmeri. The facts set forth in this declaration are true of my own personal knowledge, except where based on a review of the pleadings and records in this action and, if called as a witness, I could and would competently testify to such facts.

2.         Attached hereto as Exhibit 1 is a true and correct copy of an article published in BusinessWeek magazine in July 2003 entitled "To Really Be A Player, Mattel Needs Hotter Toys" (the "Article"). The by-line of the Article identifies Christopher Palmeri as the author of the Article.

3.         Attached hereto as Exhibit 2 is a true and correct copy of a deposition subpoena in this action that was served on Christopher Palmeri on July 25, 2007 (the "Subpoena").

4.         Prior to service of the Subpoena, co-counsel for Mattel in this matter, Timothy Alger of the law firm Quinn Emanuel Urquhart Oliver & Hedges, LLP, engaged in a series of meet-and-confer discussions by telephone and email with counsel for Christopher Palmeri and BusinessWeek magazine regarding the proposed deposition of Mr. Palmeri. During these discussions, Mr. Alger described the limited scope of the deposition and the importance of Mr. Palmeri's testimony. Attached hereto as Exhibit 3 is a true and correct copy of an exchange of emails between William Farley, associate general counsel of BusinessWeek, and Mr. Alger, between June 20 and 27, 2007. No agreement regarding Mr. Palmeri's deposition was reached.

**EXHIBIT 17**

**PAGE 246**

- 1 -

1       5.      On or about August 8, 2007, counsel for Mr. Palmeri served a

2    document entitled Non-Party Reporter Christopher Palmeri's Objections To

3    Plaintiff's Subpoena (the "Objections"), a true and correct copy of which is attached

4    hereto as Exhibit 4.

5       6.      Following service of the Objections, Mr. Alger and counsel for Mr.

6    Palmeri, Alonzo Wickers of the law firm Davis Wright Tremaine LLP, continued

7    meet and confer efforts in an attempt to resolve this dispute informally.  Attached

8    hereto as Exhibit 5 is a true and correct copy of a letter from Timothy Alger to

9    Alonzo Wickers, dated August 17, 2007.  These discussions included telephone

10    conversations, emails, and an in-person meet-and-confer at Mr. Alger's office on

11    August 24, 2007.

12       7.      During their discussions, Mr. Wickers represented to Mr. Alger that

13    no documents exist that are responsive to the documents requests in the subpoena.

14    True and correct copies of emails between Mr. Wickers and Mr. Alger are attached

15    as Exhibit 6.

16       8.      I continued the meet and confer efforts on behalf of Mattel in

17    connection with the Subpoena in early September 2007.  Attached hereto as Exhibit

18    7 is a true and correct copy of a letter from me to Mr. Wickers, dated September 5,

19    2007.  These discussions also failed to result in agreement regarding Mr. Palmeri's

20    deposition.

21       9.      On September 28, 2007, I took the deposition of Maureen Tkacik, a

22    former reporter for the Wall Street Journal.  Attached hereto as Exhibit 8 is a true

23    and correct copy of the transcript of my examination of Ms. Tkacik, dated

24    September 28, 2007.

25       10.    On October 3, 2007, I took the deposition of Denise O'Neal, a

26    reporter for the Chicago Sun-Times.  Attached hereto as Exhibit 9 is a true and

27

28

**EXHIBIT 17**

-2-

**PAGE 247**

correct copy of the transcript of my examination of Ms. O'Neal, dated October 3, 2007.

11.     Attached hereto as Exhibit 10 is a true and correct copy of the Motion of Mattel, Inc. for Leave to Take Additional Discovery and Objections to Discovery Master Order of September 28, 2007, dated November 19, 2007. Mr. Palmeri's deposition is described on pages 8 and 11.

12.     Attached hereto as Exhibit 11 is a true and correct copy of a transcript of the January 7, 2008 hearing before Judge Larson on Mattel's Motion for Leave to Take Additional Discovery, during which the reporter depositions were described to the Court at page 6.

13.     Attached hereto as Exhibit 12 is a true and correct copy of the Order Granting In Part and Denying In Part Mattel's Motion for Leave to Take Additional Discovery, dated January 7, 2008, and the Court's Order amending the Order, dated January 9, 2008. In the January 7, 2008 Order, Judge Larson approved the deposition of Mr. Palmeri and others at the top of page 3.

14.     On January 9, 2008, I spoke by telephone with Mr. Wickers in another attempt to resolve this matter. During this conversation, I informed Mr. Wickers that in order to limit any burden on Mr. Palmeri and BusinessWeek, Mattel would agree to conduct Mr. Palmeri's deposition at a date, time and location of Mr. Palmeri's choosing. I also informed Mr. Wickers that Mattel would agree to limit the time for questioning of Mr. Palmeri and discuss the anticipated questions in advance of the deposition.

15.     On January 11, 2008, I again spoke with Mr. Wickers at which time he informed me his client would consider this matter further and that he would attempt to provide me with an answer the following Monday.

16.     On January 14, 2008, Mr. Wickers telephoned and informed me that BusinessWeek had decided not to produce Mr. Palmeri for deposition in response to

- 3 -

EXHIBIT 17

PAGE 248

DECLARATION OF MICHAEL J. NIBORSKI IN SUPPORT OF MOTION TO COMPEL THE DEPOSITION OF CHRISTOPHER PALMERI

1  the Subpoena. During this conversation, Mr. Wickers and I confirmed an agreement

2  he made with Mr. Alger that the Subpoena served on July 25, 2007 would still be

3  considered valid, notwithstanding the delay in taking the deposition. Attached

4  hereto as Exhibit 13 is a true and correct copy of a letter from me Mr. Wickers,

5  dated January 14, 2008, memorializing this conversation.

6      17.      Attached hereto as Exhibit 14 is a true and correct copy of relevant

7  portions of the deposition transcript of Isaac Larian.

8      18.      Attached hereto as Exhibit 15 is a true and correct copy of the

9  public portion of Mattel, Inc.'s Second Amended Answer in Case No. 05-2727 and

10  Counterclaims.

11     I declare under penalty of perjury under the laws of the State of California that

12  the foregoing is true and correct. Executed this 20th day of January 2008, at Los

13  Angeles, California.

14

15                    Michael J. Niborski

16

17

18

19

20

21

22

23

24

25

26

27

28

- 4 -

DECLARATION OF MICHAEL J. NIBORSKI IN SUPPORT OF
MOTION TO COMPEL THE DEPOSITION OF CHRISTOPHER PALMERI

EXHIBIT 17

PAGE 249

# EXHIBIT 18

1   QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
2   JOHN B. QUINN (State Bar No. 090378)
    MICHAEL T. ZELLER (State Bar No. 196417)
3   JON D. COREY (State Bar No. 185066)
4   865 South Figueroa Street, 10th Floor
    Los Angeles, California 90017-2543
5   Telephone: (213) 443-3000; Facsimile: (213) 443-3100

6
    STROOCK & STROOCK & LAVAN LLP
7   BARRY B. LANGBERG (State Bar No. 048158)
8   MICHAEL J. NIBORSKI (State Bar No. 192111)
    2029 Century Park East, Suite 1600
9   Los Angeles, California 90067-3086
10  (lacalendar@stroock.com)
    Telephone: (310) 556-5800; Facsimile: (310) 556-5959
11
12  Attorneys for MATTEL, INC.

13              UNITED STATES DISTRICT COURT
14              CENTRAL DISTRICT OF CALIFORNIA
15                    EASTERN DIVISION
16
    CARTER BRYANT, an individual,      )   Case No. CV 04-9049 SGL (RNBx)
17                                      )
                 Plaintiff,            )   Consolidated with
18                                      )   Case No. CV 04-09059
         vs.                           )   Case No. CV 05-02727
19                                      )
    MATTEL, INC., a Delaware           )   DISCOVERY MATTER
20  corporation,                       )
                                        )   [To Be Heard by Discovery Master Hon.
21               Defendant.            )   Edward Infante (Ret.) Pursuant To The
                                        )   Court's Order Of Dec. 6, 2006]
22                                      )
                                        )   MATTEL, INC.'S NOTICE OF
23                                      )   MOTION AND MOTION TO
                                        )   COMPEL THE DEPOSITION OF
24  _____        )   CHRISTOPHER PALMERI
25  AND CONSOLIDATED ACTIONS           )
                                        )   Date:    February 8, 2008
26                                      )   Time:    9:30 a.m.
                                        )   Place:   TBA
27  _____        )

28                                          EXHIBIT **18**

                                            PAGE **250**

                            1-22

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ................................... 1

I.    PRELIMINARY STATEMENT ........................................................... 1

II.   STATEMENT OF FACTS ................................................................. 3

III.  ARGUMENT ...................................................................................... 5

    A.    Mr. Palmeri's Prospective Testimony Is Not Privileged And He Must Therefore Submit To Deposition ............................... 5

        1.    Mr. Palmeri's prospective testimony concerns information that is non-confidential and has already been published. ................................................................... 6

        2.    Even if Mr. Larian's identity as the source of the "He should know" statement is viewed as "unpublished," the journalist's privilege still does not apply. ......................... 8

    B.    Even If The Journalist's Privilege Applies, It Must Yield Here ............ 10

        1.    The testimony Mattel seeks from Mr. Palmeri is available from no other source. ................................... 11

        2.    The information Mattel seeks is non-cumulative. ........................ 12

        3.    The information Mattel seeks is critical to Mattel's claims regarding the ownership of Bratz. ..................................... 13

        4.    The information Mattel requests is not confidential. ................... 14

IV.   CONCLUSION ................................................................................... 15

EXHIBIT **18**

PAGE **251**

- 1 -

# TABLE OF AUTHORITIES

## Cases

Page

Agster v. Maricopa County,
   422 F.3d 836 (9th Cir. 2005) ........................................................ 10

Brinston v. Dunn,
   919 F. Supp. 240 (S.D. Miss. 1996) ........................................... 7, 8

Crowe v. County of San Diego,
   242 F. Supp. 2d 740 (S.D. Cal. 2003) ......................................... 10

De La Paz v. Henry's Diner,
   946 F. Supp. 484 (N.D. Tex. 1996) ............................................ 6, 9

Dillon v. City and County of San Francisco,
   748 F. Supp. 722 (N.D. Cal. 1990) ..................... 6, 9, 10, 11, 14

Don King Prod. v. Douglas,
   131 F.R.D. 421 (S.D.N.Y. 1990) ............................................. 12, 13

Farr v. Pitchess,
   522 F.2d 464 (9th Cir. 1975) ........................................................ 10

In re Maykuth,
   2006 WL 724241 (E.D. Pa. 2006) ................................................. 6

McKevitt v. Pallasch,
   339 F.3d 530 (7th Cir. 2003) ............................................ 7, 8, 9, 14

Miami Herald Pub. Co. v. Morejon,
   561 So. 2d 577 (Fla. 1990) ............................................................. 6

Prince George's County v. Hartley,
   822 A.2d 537 (Md. App. 2003) .................................................... 10

Shoen v. Shoen,
   5 F.3d 1289 (9th Cir. 1993) ................................................ 5, 10, 14

Shoen v. Shoen,
   48 F.3d 412 (9th Cir. 1995) .......................................................... 11

Solaia Technology, LLC v. Rockwell Automation, Inc.,
   2003 WL 22597611 (N.D. Ill. 2003) ............................................ 9

State of Minnesota v. Knutson,
   523 N.W.2d 909 (Minn. App. 1995) ........................................... 10

In re Vmark Software, Inc.,
   1998 WL 42252 (E.D. Pa. 1998) ..................................... 6, 11, 12

In re Ziegler,
   550 F. Supp. 530 (W.D.N.Y. 1982) ............................................ 10

- 2 -

EXHIBIT 18

PAGE 252

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that, at a hearing before Discovery Master Hon. Edward Infante (Ret.), that will occur at 9:30 a.m. on February 8, 2008 or at such other time set by Judge Infante, Mattel, Inc. ("Mattel") will, and hereby does, move the Court, pursuant to Federal Rule of Civil Procedure 37, to compel the deposition of Christopher Palmeri.

This Motion is made on the grounds that Mr. Palmeri has refused without justification to appear for deposition and provide testimony that is material – indeed, vital – to Mattel's claims.

This Motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the Declaration of Michael J. Niborski (and its exhibits) filed concurrently herewith, the records and files of this Court, and all other matters of which the Court may take judicial notice.

Statement Of Rule 37-1 Compliance

The parties met and conferred regarding Mattel's prospective deposition of Christopher Palmeri. See Declaration of Michael J. Niborski ("Niborski Dec."), filed concurrently herewith, at ¶¶ 4, 6-8, 14-16.

Dated: January 21, 2008          STROOCK & STROOCK & LAVAN LLP
                                 BARRY B. LANGBERG
                                 MICHAEL J. NIBORSKI


                        By: _____
                                 Michael J. Niborski

                            Attorneys for MATTEL, INC.

- 1 -

MOTION TO COMPEL DEPOSITION OF CHRISTOPHER PALMERI

EXHIBIT 18

PAGE 253

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   PRELIMINARY STATEMENT

Mattel seeks nothing more from reporter Christopher Palmeri than confirmation under oath of information he has already provided to the general public. Rather than provide testimony on a matter that goes to the heart of this litigation, Mr. Palmeri has refused outright to comply with a subpoena and appear for deposition. Mr. Palmeri remains steadfast in his refusal to obey the subpoena despite Mattel's willingness to limit the scope and duration of the deposition and to hold the deposition at the location of Mr. Palmeri's choice.

In July 2003, an article authored by Mr. Palmeri entitled "To Really Be A Player, Mattel Needs Hotter Toys" was published in BusinessWeek (the "Article"). The Article contains several statements clearly attributable to Isaac Larian, one of which is as follows:

> Mattel won't live or die on every new toy it develops. But
> it can't just rely on Barbies, either. "Like they say in
> business school – no risk, no reward," says Isaac Larian,
> CEO of privately held MGA. He should know: He got the
> idea for Bratz after seeing his own kids run around in
> navel-baring tops and hip-huggers.[1]

Mattel seeks limited deposition testimony from Mr. Palmeri that will confirm that Mr. Larian made these statements. The Article conveys through clear language and context that Mr. Larian told Mr. Palmeri that the Bratz dolls were his idea and the source of that idea was Mr. Larian's observation of "his own kids run[ning]

---

[1] Declaration of Michael J. Niborski filed concurrently herewith ("Niborski Dec."), ¶ 2, Ex. 1 (Article).

**EXHIBIT 18**

**PAGE 254**

- 1 -

MOTION TO COMPEL DEPOSITION OF CHRISTOPHER PALMERI

1  around in navel-baring tops and hip huggers." Mattel merely asks that Mr. Palmeri

2  confirm Mr. Larian's published statements about the origins of Bratz.

3      This information is material to Mattel's claims and is not available from any

4  other source. The information sought also is not confidential; BusinessWeek's

5  publication of Mr. Larian's statements about the origins of Bratz establishes that the

6  information obtained by Mr. Palmeri was not provided under any promise of

7  confidentiality. <u>Simply put, Mr. Palmeri is a witness to statements and conduct by</u>

8  <u>Mr. Larian – the public cover-up of Carter Bryant's development of Bratz while he</u>

9  <u>was a Mattel employee – that is central to this lawsuit.</u>

10      Despite the limited scope of Mattel's intended inquiry, Mr. Palmeri has

11  categorically refused to appear for deposition. Mr. Palmeri's counsel contends that

12  Mattel seeks unpublished information and that the testimony requested by Mattel is

13  shielded by the journalist's privilege. Mr. Palmeri has taken the untenable position –

14  unsupported by law – that he can completely avoid testifying simply because he

15  anticipates he will be asked a question that entitles him to assert the journalist's

16  privilege.

17      Clearly, Mattel is not seeking any unpublished information. It is hornbook law

18  that information that has already been revealed to the public at large may not be the

19  subject of a valid privilege. Moreover, even if the journalist's privilege were found

20  to apply here, it is qualified and yields when the litigant's need for the information

21  sought outweighs any public interest in non-disclosure. There is simply no public

22  policy rationale for a reporter's refusal to confirm under oath statements published in

23  a national news magazine. In contrast, Mr. Palmeri's prospective testimony is

24  crucial to Mattel's ability to prove its claim that Bryant and Larian, among others at

25  MGA, made inconsistent statements concerning the origins of Bratz and engaged in a

26  scheme to conceal the product's true origins. These statements offer direct proof that

27  Mr. Larian – who has since acknowledged under oath that Bryant brought him the

28

EXHIBIT **18**

-2-

PAGE **255**

MOTION TO COMPEL DEPOSITION OF CHRISTOPHER PALMERI

1   Bratz idea – falsely claimed that he (Larian) was the creator of Bratz.  That false

2   claim was part of a scheme to conceal the truth from the public and Mattel.

3       The scheme of concealment is central to this case in at least two respects.

4   First, it shows guilty knowledge by Larian and MGA that Bryant developed Bratz

5   while an employee of Mattel, in violation of his employment agreement with Mattel,

6   and an awareness by Larian and MGA that Bryant's inventions during his

7   employment at Mattel belong to Mattel.  Second, Larian's concealment, through

8   false statements to Mr. Palmeri in the summer of 2003, bears directly on MGA's

9   contention that Mattel had notice of Bryant's disloyalty prior to November 24, 2003,

10  when Mattel obtained a copy of Bryant's MGA agreement relating to Bratz.  Mr.

11  Larian obviously did his best to hide the existence of the claims against Bryant and

12  MGA by lying to the press.

13      Mattel has endeavored to depose Mr. Palmeri in the least burdensome manner

14  possible, offering not only to limit the time for questioning and conduct the

15  deposition at a time and place of Mr. Palmeri's choosing, but also to discuss the

16  prospective line of questioning in advance of the deposition with Mr. Palmeri's

17  counsel.  Simply put, Mattel has reasonably sought to procure testimony to which it

18  is entitled under the law.  In response, Mr. Palmeri has refused to appear.  Mattel

19  therefore seeks relief from the Court.

20

21  **II.    STATEMENT OF FACTS**

22      Mattel served Mr. Palmeri with a deposition subpoena on July 25, 2007.  The

23  parties do not dispute that service of the subpoena was proper.[2]  Mr. Palmeri served

24  objections to the deposition subpoena on August 8, 2007.[3]  While Mattel initially

25  requested documents in connection with the subpoena to ensure that Mr. Palmeri was

26  _____
    [2]  Niborski Dec., ¶¶ 2, 16; Ex. 3 (Subpoena to Christopher Palmeri, dated July 25,
27  2007); Ex. 13 (Letter from M. Niborski to A. Wickers dated January 14, 2008).

28  [3]  Niborski Dec., ¶ 5; Ex. 4 (Non-Party Reporter Christopher Palmeri's Objections
    To Plaintiff's Subpoena, dated August 8, 2007).

- 3 -

able to provide the most accurate testimony possible regarding Larian's published statements, BusinessWeek has represented that no such documents exist. As a result, only Mr. Palmeri's appearance for deposition remains at issue.[4]

Following service of the subpoena, counsel for Mattel and Palmeri engaged in and extended meet-and-confer process. Mattel consistently represented that it seeks testimony relating to published statements. In emails sent prior to serving Mr. Palmeri with the subpoena, as well as in the discussions that followed, Mattel has reiterated this fact.[5] Mattel also offered to conduct the deposition at a time and place of Mr. Palmeri's choosing, and offered to agree to a limited period of time for questioning. In addition, Mattel offered to discuss the exact scope of the prospective questions with counsel for Mr. Palmeri in advance of the deposition.[6]

Contemporaneous with the service of the subpoena on Mr. Palmeri, Mattel served deposition subpoenas on Maureen Tkacik, a reporter for the Wall Street Journal, and Denise O'Neal, a reporter for the Chicago Sun-Times. Like Mr. Palmeri, Ms. Tkacik and Ms. O'Neal wrote articles for their respective publications that contained statements attributed to Larian regarding the origins of Bratz which were inconsistent with Larian's, MGA's and Bryant's subsequent claims in this case. Following meet and confer efforts with counsel for the Wall Street Journal and Chicago Sun-Times, the two reporters were deposed on the same terms proposed by

---

[4]  Niborski Dec., ¶¶ 4, 6-7; Ex. 3 (Email exchange between Alger and Farley), Ex. 6 (Email from Wickers to Alger dated August 16, 2007); Ex. 5 (Letter from Alger to Wickers, dated August 17, 2007).

[5]  Niborski Dec., ¶¶ 6-8, 16; Ex. 6 (Email from Wickers to Alger dated August 16, 2007); Ex. 5 (Letter from Alger to Wickers, dated August 17, 2007); Ex. 7 (Letter from Niborski to Wickers, dated September 5, 2007); Ex. 13 (Letter from Niborski to Wickers, dated January 14, 2008).

[6]  Niborski Dec., ¶¶ 6-8, 14-16; Ex. 7 (Letter from Niborski to Wickers, dated September 5, 2007); Ex. 13 (Letter from Niborski to Wickers, dated January 14, 2008).

MOTION TO COMPEL DEPOSITION OF CHRISTOPHER PALMERI
EXHIBIT **18**

PAGE **257**

1 | Mattel here, with counsel for Mattel questioning the witnesses for less than 30
2 | minutes each.[7]

3 |     On January 7, 2008, the Court granted Mattel's Motion for Leave to Take
4 | Additional Discovery in this action. In the Court's Order, Judge Larson found that
5 | Mattel is entitled to conduct additional depositions.[8] Importantly, Judge Larson was
6 | informed of the reasons for and specifically granted Mattel permission to take the
7 | deposition of Mr. Palmeri. In its moving papers, Mattel identified Mr. Palmeri as
8 | one of the prospective deponents, informed the Court that Mr. Palmeri is a reporter
9 | for BusinessWeek, and provided the Court with a description of the relevance of Mr.
10 | Palmeri's anticipated testimony during oral argument.[9]

11 |     Despite this, on January 14, 2008, Mr. Palmeri's counsel informed counsel for
12 | Mattel that it would not agree to produce Mr. Palmeri for deposition in response to
13 | the deposition subpoena.[10]

14 |

15 | **III.   ARGUMENT**

16 |     **A.   <u>Mr. Palmeri's Prospective Testimony Is Not Privileged And He</u>**
17 |           **<u>Must Therefore Submit To Deposition</u>**

18 |     Because no privilege applies to Mr. Palmeri's prospective testimony, and that
19 | testimony is indisputably relevant to this action, he should be ordered to provide the
20 | requested testimony at deposition. <u>See</u> <u>Shoen v. Shoen</u>, 5 F.3d 1289, 1292 (9th Cir.
21 | 1993) (holding that in the absence of an applicable privilege, a non-party can be

22 |

---

23 | [7] Niborski Dec., ¶¶ 9-10; Ex. 8 (Transcript of deposition of Maureen Tkacik, dated
24 | September 28, 2007); Ex. 9 (Transcript of deposition of Denise O'Neal, dated October 3, 2007).

25 | [8] Niborski Dec., ¶ 13, Ex. 12 (Order Granting In Part And Denying In Part Mattel's
26 | Motion For Leave To Take Additional Discovery, dated January 7, 2008; Order Amending Court's Minute Order of January 7, 2008).

   | [9] Niborski Dec., ¶¶ 11-12; Ex. 10 (Motion of Mattel for Leave to Take Additional
27 | Discovery, at 8, 11); Ex. 11 (Transcript of January 7, 2008 hearing).

28 | [10] Niborski Dec., ¶¶ 1-16; Ex. 13 (Letter from Niborski to Wickers dated January 14, 2008).

MOTION TO COMPEL DEPOSITION OF CHRISTOPHER PALMERI

**EXHIBIT 18**

**PAGE 258**

1   compelled to produce evidence regarding any matter "reasonably calculated to lead

2   to the discovery of admissible evidence") (citing Fed. R. Civ. P. 26(b)(1)).  See also

3   In re Maykuth, 2006 WL 724241 at *3 (E.D. Pa. 2006) (granting defendant's motion

4   to compel the deposition of a reporter for the purposes of verifying whether or not

5   the plaintiffs actually made the comments attributed to them in the reporter's article);

6   see also In re Vmark Software, 1998 WL 42253 at *2 (E.D. Pa. 1998) (holding that

7   reporter's deposition was necessary to verify the statements of a party contained in a

8   published article).  Simply put, without the testimony that Mattel requests, the Article

9   is useless to Mattel because it does not constitute evidence admissible to prove a key

10  issue in the case – whether in fact Larian lied about the origins of Bratz.

11          **1.     Mr. Palmeri's prospective testimony concerns information**

12                  **that is non-confidential and has already been published.**

13          Mattel seeks nothing from Mr. Palmeri that is confidential or has not already

14  been published.  Mattel does not seek to reveal the identity of one of Mr. Palmeri's

15  sources, confidential or otherwise.  To the contrary, Mattel merely seeks to have

16  Mr. Palmeri testify to what anyone who read the Article would naturally conclude –

17  that the statements he attributes to Larian were actually made by Larian.  As a result,

18  the reporter's privilege is inapplicable to the information Mattel seeks from

19  Mr. Palmeri.  See Dillon v. City and County of San Francisco, 748 F. Supp 722, 726

20  (N.D. Cal. 1990) (holding that the privilege did not apply to the personal

21  observations of a reporter who "has not been asked to reveal any confidential sources

22  or information, nor has been requested to produce or discuss any resource

23  materials"); Miami Herald Pub. Co. v. Morejon, 561 So.2d 577, 581 (Fla. 1990)

24  (rejecting privilege for eyewitness observations (citing numerous cases)).

25          Federal courts – which apply federal common law privilege to non-diversity

26  cases[11] – have held that the journalist's privilege is inapplicable to all non-

27  _____

28  [11]  Dillon, 748 F. Supp. at 724-25.

- 6 -

EXHIBIT 18

PAGE 259

confidential information, even if unpublished.  See De La Paz v. Henry's Diner, 946
F. Supp. 484, 485 (N.D. Tex. 1996) (holding that plaintiff's subpoena *duces tecum*,
seeking to compel a reporter's deposition, as well as tape-recorded interviews with
the defendant, did not implicate the journalist's privilege as it sought only non-
confidential material); see also McKevitt v. Pallasch, 339 F. 3d 530, 532 (7th Cir.
2003) (holding that journalist had "no conceivable interest" in preventing disclosure
of tape recordings of interviews with key prosecution witness for use by defendant in
a criminal trial because the source of the information was non-confidential).

This verification testimony is not only non-confidential, but also constitutes
"published" material to which the journalist's privilege does not apply.  Brinston v.
Dunn, 919 F. Supp. 240, 244 (S.D. Miss. 1996) (holding that where the defendant
failed to overcome the journalist's privilege to obtain "unpublished" information, it
was still proper to compel the deposition of the author on the limited issue of the
accuracy of the article's assertions, including whether statements attributed to the
plaintiff were in fact made by the plaintiff).  In Brinston, the Court drew a distinction
between "unpublished" materials, such as "sources" and "resource materials," which
may be the subject of privilege, and simply questioning the author of an article about
its accuracy, which does not "impermissibly infringe on the First Amendment right
to freedom of the press."  Id. at 243-44.

Mr. Palmeri is likely to contend that his testimony regarding statements in the
Article made by Larian involve unpublished information.[12]  This argument is based
solely on the fact that Mr. Palmeri did not include the exact words "Larian said" in
the following portion of the passage: "He should know: He got the idea for Bratz
after seeing his own kids run around in navel-baring tops and hip-huggers."  In other
words, Mr. Palmeri attempts to avoid a deposition based on editorial technique and a
news magazine's natural aversion to plodding prose that includes repetitious, express

---

[12] Niborski Dec., ¶ 4; Ex. 3 (Email exchange between from Farley to Alger, dated
June 26, 2007).

- 7 -

EXHIBIT 18

PAGE 260

1  attribution.  The contents of the "He should know" passage, which immediately

2  follows express attribution of a direct quote to Larian, conveys to any reasonable

3  reader of Business Week that Mr. Larian told Mr. Palmeri that he (Larian) had the

4  idea for Bratz, and it was inspired by watching his children.

5       The attribution distinction also is a hollow one, because questioning

6  Mr. Palmeri about statements implicitly attributed to a source would subject

7  Mr. Palmeri to no different imposition than questions about direct quotes.  There

8  would be no greater burden on Mr. Palmeri or interference with his work.  And the

9  policy considerations that limit the journalist's privilege to unpublished information

10  apply equally whether the non-confidential source is expressly identified with "he

11  said" or the non-confidential source is identified by the content and context of the

12  published statement.

13       Drawing a distinction would make certain determinations of discoverability

14  turn on the stylistic choice of a reporter or his or her editors, and Mattel is aware of

15  no case that stretches the journalist's privilege that far.  Mattel seeks nothing more

16  than the defendant in <u>Brinston</u> – testimony verifying what was relayed to readers in

17  the Article.

18       **2.    Even if Mr. Larian's identity as the source of the "He should**

19              **know" statement is viewed as "unpublished," the journalist's**

20              **privilege still does not apply.**

21       As discussed above, Mr. Palmeri unconvincingly contended during the meet-

22  and-confer process that Mattel seeks unpublished, and therefore privileged,

23  information.  However, assuming, *arguendo*, that Larian's identity as the source of

24  the "He should know" statement can be characterized as unpublished research

25  material, it is still not protected by the journalist's privilege.  See <u>McKevitt v.</u>

26  <u>Pallasch</u>, 339 F. 3d 530, 532 (7th Cir. 2003) (holding that journalist had "no

27  conceivable interest" in preventing disclosure of tape recordings of interviews with

28  key prosecution witness for use by defendant in a criminal trial because the source of

- 8 -

EXHIBIT 18

PAGE 261

MOTION TO COMPEL DEPOSITION OF CHRISTOPHER PALMERI

the information was non-confidential).  Here, Mr. Palmeri is being asked to verify

statements made to him by Larian, who is identified and quoted as a source in the

Article.  Id. at 533 ("[W]hen the information in the reporter's possession does not

come from a confidential source, it is difficult to see what possible bearing the First

Amendment could have on the question of compelled disclosure."); see also De La

Paz, 946 F. Supp. at 485 (holding that plaintiff was entitled to compel production of

tape-recorded interviews conducted with defendants if doing so did not require the

revelation of any confidential sources); Solaia Technology, LLC v. Rockwell

Automation, Inc., 2003 WL 22597611 at 2-3 (N.D. Ill. 2003) (holding that "there can

be no dispute" that tapes of communications between defendant and journalist, which

were used as background for a published article, are not confidential because "the

sources of any information would be known").

     Here, Mattel seeks far less than the equivalent of a recording of the interview

between Mr. Palmeri and Mr. Larian.  Rather, Mattel requests that Mr. Palmeri verify

the accuracy of the portions of the interview that were disclosed to more than

900,000 readers of BusinessWeek.[13]  The result here must be the same as that

reached in Dillon.  There, Judge Patel held that a qualified privilege did not apply

because the journalist was being asked about things that he observed without any

promise of confidentiality.

> Mr. McEowen [a television news cameraman] has not been
> asked to reveal any confidential sources or information, nor
> has he been requested to produce or discuss any resource
> materials.  Instead, Mr. McEowen has been subpoenaed to
> testify regarding his personal observations as an eyewitness
> to the alleged beating of a citizen by two police officers.

---

[13] See Imitating the Web, for the Busy Reader (New York Times, Oct. 12, 2007,
available at www.nytimes.com/2007/10/12/business/media/12adco.html) (circulation
figures for BusinessWeek magazine).

- 9 -

EXHIBIT 18

PAGE 262

MOTION TO COMPEL DEPOSITION OF CHRISTOPHER PALMERI

1         This court knows of know authority to support the

2         proposition that such personal observations are privileged

3         simply because the eyewitness is a journalist. . . .

4 Dillon, 748 F. Supp. at 726; accord State of Minnesota v. Knutson, 523 N.W.2d 909,

5 913 (Minn. App. 1995) ("[T]he 'Constitution does not immunize a reporter from

6 testifying merely because he makes the observation as a news reporter.'" (quoting In

7 re Ziegler, 550 F. Supp. 530, 532 (W.D.N.Y. 1982)); Prince George's County v.

8 Hartley, 822 A.2d 537, 548 (Md. App. 2003) (requiring reporters to confirm

9 offensive statements made by police officers in a disciplinary hearing; "[The

10 reporters] are not protecting the confidential source of any information . . . The

11 testimony sought goes to the heart of the matter:  whether [the officer] made the

12 statements in question.").

13         Mattel is simply asking that Mr. Palmeri confirm statements by Mr. Larian that

14 are not confidential and which have been published in a national news magazine.  No

15 privilege is implicated here.

16

17     **B.**    **Even If The Journalist's Privilege Applies, It Must Yield Here**

18         Assuming (contrary to law) that any journalist's privilege is available to Mr.

19 Palmeri, it is a qualified one, which Mattel may overcome.[14]  See Shoen v. Shoen, 5

20 F.3d at 1292-93 ("[T]he privilege is a qualified one, not absolute . . . the process of

21 deciding whether the privilege is overcome requires that the claimed First

22 Amendment privilege and the opposing need for disclosure be judicially weighed in

23 light of the surrounding facts, and a balance struck to determine where lies the

24 paramount interest."); see also Farr v. Pitchess, 522 F.2d 464, 467-68 (9th Cir. 1975)

25 _____

26 [14]  See Agster v. Maricopa County, 422 F.3d 836, 839 (9th Cir. 2005) ("Where there are federal question claims and pendent state law claims present, the federal law of privilege law applies."); see also Crowe v. County of San Diego, 242 F. Supp. 2d

27 740, 749 (S.D. Cal. 2003) (holding that where a court has jurisdiction over a federal claim, as well as pendent state law claims, federal privilege law applies to both);

28 Dillon, 748 F. Supp. at 724-25 (rejecting application of the California shield law).

**EXHIBIT 18**

**PAGE 263**

1 (the federal privilege is a "limited" one that protects only "the right of the newsmen

2 to keep secret a source of information"); In re Vmark Software, Inc., 1998 WL

3 42252, *1 (E.D. Pa. 1998) ("this privilege is not absolute and must be weighed

4 against the strong interest of litigants in the full and complete disclosure of relevant

5 evidence"); Dillon, 748 F. Supp. at 726 (rejecting application of the privilege, but

6 proceeding to a balancing test in which the court found the federal privilege would

7 yield because the information sought was not confidential and went to the heart of

8 plaintiff's claim).

9      Because this privilege is qualified, a civil litigant may overcome a valid

10 assertion of the journalist's privilege by a non-party.  See Shoen v. Shoen, 48 F.3d

11 412, 416 (9th Cir. 1995). Therefore, even if we assume that a privilege applies, to

12 overcome that privilege Mattel need only demonstrate that the requested evidence is:

13 "(1) unavailable despite the exhaustion of all reasonable alternative sources; (2) non-

14 cumulative; and (3) clearly relevant to an important issue in the case." Id.  That test

15 is clearly met here.

16         **1.**    **The testimony Mattel seeks from Mr. Palmeri is available**

17               **from no other source.**

18      There are only two conceivable sources that can verify first-hand what Larian

19 said to Mr. Palmeri during their interview – Messrs. Palmeri and Larian.  Where one

20 of the sources is a self-interested party to the litigation – as here – the lack of other

21 witnesses permits the court to conclude that Mr. Palmeri is the only available source.

22 See In re Vmark Software, Inc., 1998 WL 42252 at *2 (E.D. Pa. 1998) (where

23 plaintiff sought deposition testimony and documents from a reporter regarding a

24 published interview with the defendant, the reporter was "the only access to this

25 information").  In Vmark, like the case at hand, the plaintiff sought verification of

26 statements attributed to the defendant in a published interview.  The Vmark court

27 reasoned that the reporter was the "only other person, apart from [the defendant],

28 who can verify the statements attributed to [the defendant]," as only the reporter was

EXHIBIT **18**

PAGE **264**

MOTION TO COMPEL DEPOSITION OF CHRISTOPHER PALMERI

1  "qualified to testify as to his reportorial practices with respect to the statements of

2  others." Id. Of the two people who witnessed the conversation, it is only Mr.

3  Palmeri – a trained listener – who can provide the jury with unbiased testimony

4  about Mr. Larian's statements.

5        Moreover, Mr. Larian already has testified about the origins of Bratz, and told

6  an entirely different story from that which he told to Mr. Palmeri. He has effectively

7  denied the accuracy of the Article. Larian stated under oath that it was a Mattel

8  employee, Carter Bryant, who came up with Bratz, and who brought the concept to

9  him at his office in September 2000.[15] Mr. Larian cannot be considered an

10  alternative source of the information Mattel needs – testimony about the various

11  conflicting and  false statements Mr. Larian made about Bratz. See Don King

12  Prod. v. Douglas, 131 F.R.D. 421, 426 (S.D.N.Y. 1990) (finding that tape-recording

13  of statements by plaintiffs was the only "obtainable" source of the statements, as

14  plaintiffs were asked questions at deposition "which would have required

15  communicating, in sum and substance, the information set forth on the tape" to

16  which the plaintiffs provided answers different from that contained in the tape).

17                **2.    The information Mattel seeks is non-cumulative.**

18        As evidenced by the contradiction between his press interviews and his

19  testimony under oath in this case, Larian has changed his story about the origin of

20  Bratz. Evidently, Larian no longer agrees with the statement he made to Mr. Palmeri

21  in 2003, namely, that he came up with the idea for Bratz.[16] Therefore, deposing

22  Mr. Palmeri is Mattel's only method by which Mattel can establish with admissible

23  evidence that Larian made the statements attributed to him in the Article.

24        The fact that Mattel has obtained testimony from two other reporters (Ms.

25  Tkacik and Ms. O'Neal) which clearly establishes that Larian has contradicted his

26

27  [15]  Niborski Dec., ¶ 17, Ex. 14 (Transcript of deposition of Isaac Larian at 55:23-78:10, 96:22-102:23).

28  [16]  Id.

- 12 -

EXHIBIT **16**

PAGE **265**

MOTION TO COMPEL DEPOSITION OF CHRISTOPHER PALMERI

1  sworn testimony on other occasions is of no moment.  Regardless of whether Mattel

2  has access to evidence of occasions on which Larian made other inconsistent claims,

3  only Mr. Palmeri can prove Larian made these particular statements.  Larian told

4  <u>different</u> stories about the origins of Bratz to Ms. Tkacik and Ms. O'Neal.[17]

5  Moreover, because of the nature of Mattel's claims – that, *inter alia*, MGA and

6  Bryant engaged in a scheme to conceal the origins of Bratz and a conspiracy to steal

7  Mattel's trade secrets[18] – proof of one instance of a false statement does nothing to

8  lessen the importance of evidence of a separate misrepresentation that furthers the

9  same conspiracy.  <u>See</u> <u>Don King Prod.</u>, 131 F.R.D. at 426 (finding that tape-

10  recording of statements by plaintiff that evidenced a breach of duty of good faith and

11  fair dealing to defendant was non-cumulative of other, similar statements, made at a

12  different time, that also evidenced the same breach).  Since Mr. Palmeri's requested

13  testimony is the only admissible evidence of particular statements made by Mr.

14  Larian, it can hardly be considered cumulative.

**3.  The information Mattel seeks is critical to Mattel's claims regarding the ownership of Bratz.**

17  The limited testimony Mattel requests from Mr. Palmeri is not only directly

18  relevant to Mattel's claims, but goes to the very heart of this case – the origins of

19  Bratz.[19]  And, proving that Larian made a false statement regarding the origins of

20  Bratz is directly relevant to Mattel's claim that "Bryant and MGA deliberately and

21  intentionally concealed facts sufficient for Mattel to suspect or know that it was the

22  true owner of Bratz," by, among other things, "concealing Bryant's role in Bratz by

23  falsely claiming that Larian and others were the creators of Bratz."[20]

[17]  Niborski Dec., ¶¶ 9-10, Ex. 8 (Tkacik deposition transcript at 8:13-10:5), Ex. 9 (O'Neal deposition transcript at 8:13-11:22).

[18]  <u>See</u> Niborski Dec., ¶ 18; Ex. 15 (Mattel's Second Amended Answer and Counterclaims, ¶¶ 35-36, 90, 102).

[19]  <u>See</u> Niborski Dec., ¶ 18; Ex. 15 (Mattel's Second Amended Answer and Counterclaims, ¶ 35).

[20]  <u>Id.</u>

- 13 -

EXHIBIT 18

PAGE 266

MOTION TO COMPEL DEPOSITION OF CHRISTOPHER PALMERI

1   Moreover, MGA contends in this litigation that the statute of limitations bars

2   Mattel's claims.  Larian and MGA made public statements that Larian invented Bratz

3   — rather than Mattel employee Carter Bryant.  Mr. Palmeri's testimony therefore

4   bears directly on whether Mattel was on notice of Bryant's disloyalty prior to

5   November 2003, when it first obtained a copy of Bryant's contract with MGA

6   (which was executed while Bryant was employed by Mattel).

7   Mr. Palmeri is thus a witness with knowledge of facts that are relevant,

8   material, and are central to the determination of this litigation.

9   **4.    The information Mattel requests is not confidential.**

10   Finally, it is important that Mattel is <u>not</u> seeking to obtain any confidential

11   information from Mr. Palmeri.  Mattel's limited inquiry into non-confidential matters

12   "may be considered in the balance of competing interests as a factor that diminishes

13   the journalist's, and the public's, interest in non-disclosure."  See <u>Shoen</u>, 5 F. 3d at

14   1295; <u>see also</u> <u>McKevitt</u>, 339 F.3d at 533 ("When the information in the reporter's

15   possession does not come from a confidential source, it is difficult to see what

16   possible bearing the first amendment could have on the question of compelled

17   disclosure."); <u>Dillon</u>, 748 F. Supp. at 726 ("[T]he lack of a confidential source may

18   be an important element in balancing the [] need for the material sought against the

19   interest of the journalist in preventing production in a particular case.").

20   Mattel is not attempting to uncover confidential sources or obtain access to

21   Mr. Palmeri's unpublished research.  Instead, Mattel seeks to confirm -- for

22   legitimate use in court proceedings where they are highly material -- statements

23   made by Mr. Larian to Mr. Palmeri that were shared with the public in

24   BusinessWeek.  This further tips the balance in favor of a finding that Mr. Palmeri be

25   required to sit for deposition in this matter.

26   In sum, the testimony sought here involves non-confidential, published

27   statements.  The qualified federal journalist's privilege does not apply here, and,

28   even if it did, the privilege must yield in these particular circumstances.

- 14 -

EXHIBIT **18**

PAGE **267**

MOTION TO COMPEL DEPOSITION OF CHRISTOPHER PALMERI

IV.    CONCLUSION

Based on the foregoing, Mattel respectfully requests that the Court order Mr. Palmeri to appear for his deposition.


Dated: January 21, 2008

STROOCK & STROOCK & LAVAN LLP
BARRY B. LANGBERG
MICHAEL J. NIBORSKI


By:  _____
Michael J. Niborski

Attorneys for MATTEL, INC.

- 15 -

EXHIBIT 18

PAGE 268

## PROOF OF SERVICE

1

2   I am employed in the County of Los Angeles, State of California.  I am over

3   the age of eighteen years and not a party to the within action; my business address is

4   NOW Messenger Service, 1301 West Second Street, Suite 206, Los Angeles,

5   California 90026.

6   On January 22, 2008, I served true copies of the following documents

7   described as:

8   **MATTEL, INC.'S NOTICE OF MOTION AND MOTION TO COMPEL THE DEPOSITION OF CHRISTOPHER PALMERI**

9

10   on the parties in this action as follows:

| | |
|---|---|
| Davis Wright Tremaine LLP<br>   Alonzo Wickers IV, Esq.<br>865 South Figueroa Street, Suite 2400<br>Los Angeles, California 90017-2566<br>Telephone:  213.633.6800<br>Facsimile:  213.633.6899 | **Attorneys for Non-Party**<br>*Christopher Palmeri* |
| Skadden, Arps, Slate, Meagher &<br>Flom LLP<br>   Thomas J. Nolan, Esq.<br>300 South Grand Avenue, Suite 3400<br>Los Angeles, CA  90071<br>Telephone:  213.687.5000<br>Facsimile:  213.687.5600 | **Attorneys for** *MGA Entertainment, Inc., MGA Entertainment (HK) Ltd., Isaac Larian and MGAE de Mexico, S.R.L. de C.V.* |

18

19   [√]   **[PERSONAL]** by personally delivering the document listed above to

20   the person(s) at the address(es) set forth above.

21

22   I declare that I am employed in the office of a member of the bar of this court

23   at whose direction the service was made

24   Executed on January 22 2008, at Los Angeles, California.

25

26   **EXHIBIT** _Ub_

27   _____

28   **PAGE** _269_   David Quintana

07209/2362666.1

## PROOF OF SERVICE

I am employed in the County of Los Angeles, State of California. I am over the age of eighteen years and not a party to the within action; my business address is 865 South Figueroa Street, 10th Floor, Los Angeles, California 90017.

On January 22, 2008, I served true copies of the following documents described as:

**MATTEL, INC.'S NOTICE OF MOTION AND MOTION TO COMPEL THE DEPOSITION OF CHRISTOPHER PALMERI**

on the parties in this action as follows:

| | |
|---|---|
| Keker & Van Nest, LLP<br>John W. Keker, Esq.<br>Michael H. Page, Esq.<br>Christa M. Anderson, Esq.<br>710 Sansome Street<br>San Francisco, CA 94111<br>Telephone: 415.391.5400<br>Facsimile: 415.397.7188 | **Attorneys for *Carter Bryant*** |
| Overland Borenstein Scheper &<br>Kim, LLP<br>Mark E. Overland, Esq.<br>David C. Scheper, Esq.<br>Alexander H. Cote, Esq.<br>300 South Grand Avenue, Suite 2750<br>Los Angeles, CA 90071<br>Telephone: 213.613.4655<br>Facsimile: 213.613.4656 | **Attorneys for *Carlos Gustavo Machado Gomez*** |

[√]   **[MAIL]** I enclosed the foregoing into sealed envelope(s) addressed as shown above, and I deposited such envelope(s) in the mail at Los Angeles, California. The envelope was mailed with postage thereon fully prepaid.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made

Executed on January 22, 2008, at Los Angeles, California.

EXHIBIT __18__

PAGE __270__

Albert V. Villamil

07209/2362666.1

-2-