EXHIBIT 1

Case 2:04-cv-09049-DOC-RNB  Document 3256-3  Filed 04/23/08  Page 2 of 91  Page ID
#:54801
Case 2:04-cv-09049-SGL-RNB  Document 3086  Filed 04/14/2008  Page 1 of 3

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
CIVIL MINUTES -- GENERAL

Case No.    CV 04-09049 SGL(RNBx)                    Date: April 14, 2008

Title:      CARTER BRYANT -v- MATTEL, INC.

Consolidated With Related Actions:
CASE NO. CV 04-09059 SGL(RNBx):  MATTEL, INC., v. CARTER BRYANT,
CASE NO. CV 05-02727 SGL (RNBx): MGA ENTERTAINMENT, INC., v. MATTEL, INC.,
============================================================================
PRESENT:  HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

             Jim Holmes                          Theresa Lanza
             Courtroom Deputy Clerk              Court Reporter

ATTORNEYS PRESENT FOR CARTER BRYANT:    ATTORNEYS PRESENT FOR MATTEL:
None present                            Timothy L. Alger
                                        Michael J. Niborski


ATTORNEYS PRESENT FOR MGA               Attorney for Non-Party Chris Palmeri
Robert J. Herrington                    Alonzo Wickers, IV



PROCEEDINGS:   Mattel's Motion Objecting to Discovery Master's February 26, 2008, Denying
               Mattel's Motion to Compel Deposition of Christopher Palmeri. (See Docket
               2859); Mattel's Ex Parte Application to file Supplemental Expert Reports

     The Court adopts the parties joint stipulation regarding pre-voir dire screening of the
prospective jury pool.

     The Court also **GRANTS** Mattel's ex parte application to file supplemental expert reports by
William Flynn and Lloyd Cunningham regarding certain Bryant originals within seven (7) days of
the completion of testing, provided that the Discovery Master authorizes said testing beforehand.
Nothing in this Order shall be construed as indicating whether or not there is cause to authorize
said testing; such a determination shall be made in the first instance by the Discovery Master.

MINUTES FORM 90                                              Initials of Deputy Clerk: jh
CIVIL -- GEN                    Page 1                       Time:  0/40

EXHIBIT _____

PAGE _____

Finally, the Court **DENIES** Mattel's Motion Objecting to the Discovery Master's February 26, 2008, Order Denying Mattel's Motion to Compel the Deposition of Christopher Palmeri. The Discovery Master's order was not contrary to law or clearly erroneous <u>at the time</u> it was entered. Mattel has subsequently produced <u>new</u> evidence and <u>new</u> theories for why deposition of Mr. Palmeri is warranted, none of which were presented to the Discovery Master prior to his ruling. Rather than allowing Mattel to call into question the correctness of the Discovery Master's order by submitting newly discovered information that was not presented to him, the Court finds the better practice is to require Mattel to first present that newly discovered information to the Discovery Master in the form of a motion for reconsideration.

**IT IS SO ORDERED.**

EXHIBIT _____ /

PAGE _____ 2

## NOTICE PARTY SERVICE LIST

**Case No.**  CV 04-09049 SGL(RNBx)   **Case Title** Carter Bryant v. Mattel, Inc.

**Title of Document**  Minute Order of April 14, 2008

| | |
|---|---|
| | Atty Sttlmnt Officer Panel Coordinator |
| | BAP (Bankruptcy Appellate Panel) |
| | Beck, Michael J (Clerk, MDL Panel) |
| | BOP (Bureau of Prisons) |
| | CA St Pub Defender (Calif. State PD) |
| | CAAG (California Attorney General's Office - Keith H. Borjon, L.A. Death Penalty Coordinator) |
| | Case Asgmt Admin (Case Assignment Administrator) |
| | Catterson, Cathy (9ᵗʰ Circuit Court of Appeal) |
| | Chief Deputy Admin |
| | Chief Deputy Ops |
| | Clerk of Court |
| | Death Penalty H/C (Law Clerks) |
| | Dep In Chg E Div |
| | Dep In Chg So  Div |
| | Federal Public Defender |
| | Fiscal Section |
| | Intake Section, Criminal LA |
| | Intake Section, Criminal SA |
| | Intake Supervisor, Civil |
| | PIA Clerk - Los Angeles (PIALA) |
| | PIA Clerk - Riverside (PIAED) |
| | PIA Clerk - Santa Ana (PIASA) |
| | PSA - Los Angeles (PSALA) |
| | PSA - Riverside (PSAED) |
| | PSA - Santa Ana (PSASA) |
| | Schnack, Randall (CJA Supervising Attorney) |
| | Statistics Clerk |

| | |
|---|---|
| | US Attorneys Office - Civil Division -L.A. |
| | US Attorneys Office - Civil Division - S.A. |
| | US Attorneys Office - Criminal Division -L.A. |
| | US Attorneys Office - Criminal Division -S.A. |
| | US Bankruptcy Court |
| | US Marshal Service - Los Angeles (USMLA) |
| | US Marshal Service -  Riverside (USMED) |
| | US Marshal Service -Santa Ana (USMSA) |
| | US Probation Office (USPO) |
| | US Trustee's Office |
| | Warden, San Quentin State Prison, CA |

| ✓ | ***ADD NEW NOTICE PARTY*** (if sending by fax, mailing address must also be provided) |
|---|---|

Name: Ambassador Pierre-Richard Prosper

Firm:

Address *(include suite or floor)*:  P.O. Box 581103

Salt Lake City,  UT   84158

*E-mail: Prosper.Pierre@Arentfox.com

*Fax No.:

\* For CIVIL cases only

| ***JUDGE / MAGISTRATE JUDGE (list below):*** |
|---|
| |
| |
| |
| |

**Initials of Deputy Clerk** jh

EXHIBIT ___1___

PAGE ___3___

EXHIBIT 2

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 3

RECEIVED

JUL 1 6 2007
CALENDARED

1   KEKER & VAN NEST, LLP
    JOHN W. KEKER - #49092
2   jkeker@kvn.com
    MICHAEL H. PAGE - #154913
3   mpage@kvn.com
    CHRISTA M. ANDERSON - #184325
4   canderson@kvn.com
    710 Sansome Street
5   San Francisco, CA 94111-1704
    Telephone: (415) 391-5400
6   Facsimile: (415) 397-7188

7   Attorneys for Plaintiff
    CARTER BRYANT
8

9

10              UNITED STATES DISTRICT COURT

11              CENTRAL DISTRICT OF CALIFORNIA

12                    EASTERN DIVISION

13

14   CARTER BRYANT, an individual,        Case No. CV 04-09049 SGL (RNBx)
                                          (consolidated with CV 04-9059 & 05-
15                          Plaintiff,    2727

16        v.                             **DISCOVERY MOTION**

17   MATTEL, INC. a Delaware
     Corporation,                        **CARTER BRYANT'S OPPOSITION
18                                        TO MATTEL, INC.'S MOTION TO
                           Defendant.    COMPEL BRYANT TO MAKE
19                                        ORIGINAL DOCUMENTS
                                         AVAILABLE FOR EXPERT
20   CONSOLIDATED WITH MATTEL,           EXAMINATION AND TESTING
     INC., v. BRYANT and MGA             AND FOR SANCTIONS**
21   ENTERTAINMENT, INC. v.
     MATTEL, INC.                        [To be heard by Discovery Master Hon.
22                                       Edward Infante (Ret.) Pursuant to the
                                         Court's Order of December 6, 2006]
23
                                         Date:    TBA
24                                       Time:    TBA
                                         Place:   TBA
25
                                         Discovery Cut-Off: Oct. 22, 2007
26                                       Pre-Trial Conference: Jan. 14, 2008
                                         Trial Date: Feb. 12, 2008
27                                       EXHIBIT _____ 3

28                                       PAGE _____ 29

OPPOSITION TO MATTEL, INC.'S MOTION TO COMPEL BRYANT TO MAKE ORIGINAL DOCUMENTS
AVAILABLE FOR EXPERT EXAMINATION AND TESTING AND FOR SANCTIONS
CASE NO. CV 04-09049 SGL (RNBx)   C 7 10 C 7

## TABLE OF CONTENTS

I.      INTRODUCTION ....................................................................................1

II.     BACKGROUND ....................................................................................2

    A.   In February 2007, Mattel reviewed and inspected Bryant's original drawings over the course of two days to determine which drawings are potential candidates for expert analysis...............2

    B.   Over two months later, Mattel demanded additional inspections of Bryant's original drawings. ...........................................2

    C.   Mattel conducted three additional days of inspection in May and June, and declined an additional day of inspection that Bryant had made available. ...............................................................4

    D.   Mattel requests possession of nearly all of Bryant's drawings for expert inspection. ..........................................................5

III.    ARGUMENT...........................................................................................7

    A.   Mattel's proposed inspection procedures are patently unreasonable...........................................................................................7

    B.   Bryant has proposed a reasonable and fair process for expert examination. ...........................................................................................9

    C.   Sanctions are not warranted .............................................................11

IV.     CONCLUSION ....................................................................................11

EXHIBIT ____3____

PAGE ____30____

i

CASE NO. CV 04-09049 SGL (RNBx)

# TABLE OF AUTHORITIES

<u>Page</u>

## FEDERAL CASES

*Pierce v. Underwood*
487 U.S. 552 (1988) ................................................................................ 11

*Reygo Pacific Corp. v. Johnston Pump Co.*
680 F.2d 647 (9th Cir. 1982) .................................................................... 11

## FEDERAL STATUTES

Fed. R. Civ. P. 34(b) .................................................................................... 7

EXHIBIT ___3___

PAGE ___31___

ii

# I.    INTRODUCTION

Despite Mattel's strident rhetoric, there is no dispute between the parties regarding the central issue raised by Mattel's motion. No one disputes that Mattel's experts may subject key documents to forensic testing on a reasonable schedule, subject to reasonable safeguards. We have never disputed that, and we do not dispute it now.

What we **do** dispute is Mattel's unilateral announcement that it can simply appropriate massive quantities of Mr. Bryant's personal property for however long, and in whatever manner, it chooses. Mattel's nonnegotiable demand is (1) that Mr. Bryant deliver more than **two thousand** separate original drawings (all of which have already been subject to three days of inspections, and many to four), (2) that Mattel then be allowed to redistribute them to unnamed experts in undisclosed locations for unspecified testing, and (3) that Mattel be allowed to keep all of those drawing for **two full months**, returning them to Bryant in time to allow Bryant's and MGA's own experts only **seven days** to conduct rebuttal testing and prepare rebuttal reports.[1]

We have accommodated Mattel's steadily escalating inspection demands, which began with a request for a single-day inspection of about thirty drawings, but then morphed quickly to three days of attorney and photographic inspection of thousands of drawings. We then repeated the process with Mattel's demands for a separate expert examination of those same documents. We have tried to negotiate a reasonable accommodation, only to be repeatedly rebuffed. Once it became clear that Mattel's goal was motion practice rather than cooperation, we suggested a streamlined means of bringing the issue before the Discovery Master, only to be rebuffed yet again. Enough is enough. Bryant is fully prepared to make a reasonable universe of his original drawings available for expert testing under

---

[1] As noted in Mattel's papers, the parties are continuing to negotiate modifications to the trial schedule; that schedule may have changed by the time this motion is heard.

1   reasonable protocols for a reasonable time.  Unfortunately, it must once again **fall**

2   to the Discovery Master to impose that reason.

3   ## II.   BACKGROUND

4   **A.   In February 2007, Mattel reviewed and inspected Bryant's original**
5   **drawings over the course of two days to determine which drawings are**
     **potential candidates for expert analysis.**

6        In order to resolve this motion, it is regrettably necessary to review the

7   recent history of inspection demands by Mattel, and Bryant's response to those

8   demands.[2]  On February 27 and 28, 2007, Bryant made original documents

9   available for inspection and photographing pursuant to the Discovery Master's

10  February 14, 2007 order.  Mattel requested this inspection, arguing that it needed

11  to inspect and photograph Bryant's originals "to determine which of the originals

12  are potentially appropriate candidates for expert analysis."[3]  Mattel did not raise

13  any concerns regarding the February inspection, and Bryant considered its

14  obligations under the Discovery Master's order satisfied and the matter closed.

15  **B.   Over two months later, Mattel demanded additional inspections of**
     **Bryant's original drawings.**
16
        More than two months later, Mattel demanded a meet-and-confer concerning
17
    Bryant's alleged failure to have produced for inspection three items in response to
18
    this Court's prior orders.[4]  In fact, Bryant does not have two of them (a pad of
19
    drawing paper apparently discarded nearly 10 years ago, and two notarized
20
    drawings which were lost sometime between 1999 and the filing of this suit in
21
    2004), and did not own the other (the notary book owned by Jacqueline Ramona
22
    Prince, that Mattel now seeks to inspect for a **third** time).   EXHIBIT ___3___
23
24                                                                  PAGE ___33___

25  _____
    [2] Mattel would have the Court believe that this motion is the culmination of a multi-year refusal
26  to respond to discovery.  It is nothing of the sort.  Most of Mattel's motion rehashes a long-
    resolved dispute that has nothing to do with the instant motion, while eliding the fact that the
    order in that previous motion was complied with long ago.
27
    [3] *See* Hutnyan Decl. In Support Of Mattel's Motion to Compel, Exh. 1 at 15.
28  [4] *See* Page Dec., Exh. 1.

1   Also in mid-May, Keker & Van Nest replaced Mr. Bryant's prior counsel,[5]
2   and was in the process of having all of the litigation files in this case, including
3   thousands of Mr. Bryant's original drawings, transferred from Los Angeles to San
4   Francisco.  Nevertheless, we informed Mattel that we would be happy to make
5   available any of Bryant's original drawings as soon as we received them from
6   predecessor counsel.[6]  We asked that Mattel wait until we had an opportunity to
7   inventory and index the materials upon receiving them.[7]

8   Mattel refused that request.  In a letter dated May 22, 2007, Mattel's counsel
9   Diane Hutnyan insisted that the drawings and notary book be produced for
10  inspection immediately, writing that "any indexing Bryant cares to carry out for his
11  own purposes has nothing to do with Mattel and could be done after Bryant abides
12  by the Court's Orders to provide the documents for the inspection and
13  photographing."[8]

14  We acceded to Mattel's demands and agreed to make Mr. Bryant's originals
15  available for inspection immediately, scheduling that inspection for May 30, 2007.[9]
16  We also volunteered to arrange for Ms. Prince's counsel to ship her notary book
17  and notary stamp[10] to us from Atlanta, so that they would be available for
18  inspection without the need for a trip to Georgia.[11]  Finally, we asked Mattel to let
19  us know if there were any other originals they wished to inspect at the same time.

20  Near midnight on the Friday of Memorial Day weekend, Mattel sent us an
21  email listing more than **two thousand** additional pages of original drawings and

22

23  [5] *See* Page Dec., Exh. 2.
24  [6] *See* Page Dec., Exh. 3.
25  [7] *Id.*
    [8] *See* Page Dec., Exh. 4.
26  [9] *See* Page Dec., Exh. 5.  At the request of Mattel's counsel, the inspection was moved to May
    31. *See* Page Dec., Exh. 6.
27  [10] Mattel requested the notary stamp for the first time on May 22, 2007. *See* Page Dec., Exh. 7.
28  [11] *See* Page Dec., Exh. 5.

EXHIBIT ___3___

PAGE ___34___

3

1    other documents it wished to inspect, multiplying the scope of the inspection by a

2    factor of one hundred with only two business days' notice.  Mattel also requested

3    to "inspect/photograph anything on sketch paper, anything on tracing paper,

4    anything on notebook paper, [and] any books."[12]  Not only was this request

5    onerous, but it basically encompassed all of Mr. Bryant's drawings.  Nonetheless,

6    we set about gathering all the originals we had not yet had the opportunity to index

7    and made them available for Mattel's inspection.[13]

8         Next, on the day before the scheduled inspection, Mattel asked for a second

9    day of inspection.  Despite the short notice, we again complied, rearranging

10   schedules to provide coverage for an additional half-day of inspection.

11   **C.   Mattel conducted three additional days of inspection in May and June,
         and declined an additional day of inspection that Bryant had made
12       available.**

13        On May 31 and June 1, Mattel's counsel, accompanied by a photographer

14   and videographer and under the supervision of a Keker & Van Nest attorney,

15   painstakingly reviewed, inventoried, catalogued, and photographed approximately

16   two thirds of Bryant's originals.  At the end of those two days, Bryant's counsel

17   expressed their willingness to schedule an additional day of inspection.

18        Instead of accepting Bryant's offer, Mattel sent an incendiary letter claiming

19   that the inspection had been "sabotaged."  By letter of June 6, Ms. Hutnyan—

20   having insisted that the first inspection occur before Keker & Van Nest had been

21   able to index any of the drawings—complained that the documents had not been

22   indexed, and complained that Bryant had not produced documents he simply does

23   not have.[14]  We explained to Ms. Hutnyan that we had produced every original

24   drawing in our possession, and reiterated our offer to schedule yet another day of

EXHIBIT ____5

PAGE ____35

---

25

26   [12] *See* Page Dec., Exh. 8.

     [13] Bryant's counsel also made clear that they had only recently received this material from
27   Littler, and were "conducting the inspection -- at your request -- prior to having the opportunity
     to properly index the originals."  *See* Page Dec., Exh 9.

28   [14] *See* Page Dec., Exh 10.

4

1  inspection.[15]  Bryant agreed to set aside two days, June 20 and 21, in order to allow
2  Mattel to complete its inspection.[16]

3       Mattel conducted only one additional day of photographing and inspection,
4  on June 20, apparently conceding that another day of inspection was not necessary.

5  **D.  Mattel requests possession of nearly all of Bryant's drawings for expert inspection.**

6
7       Just prior to its fifth day of inspection of the originals, Mattel asked to meet
   and confer concerning its request that some unspecified set of drawings be
8  submitted to forensic testing by Mattel's experts.[17]  On June 22, Bryant's counsel
9  participated in a telephonic conference with Ms. Hutnyan, in which Ms. Hutnyan
10 proposed the following:
11
12       • that Bryant ship all of his original drawings (11 oversized boxes,
           totaling about 2,500 drawings) to Quinn Emanuel within six days,
13
14       • that Mattel's counsel and experts would keep those originals for two
           months,
15
16       • that the documents would be returned only a week before Bryant's
           and MGA's rebuttal expert reports would be due.
17
18       We told Mattel that this was unacceptable, but that if they could identify
19 particular documents they wished to test, and could propose a reasonable protocol
   for the handling and timing of testing, we would be happy to comply.[18]  In
20 response, Ms. Hutnyan could not identify any particular documents for testing
21 other than the 11 notarized drawings, and would not identify the experts to whom
22 she proposed giving the documents.[19]  We concluded the call by asking that Mattel
23

24 [15] *See* Page Dec., Exh. 11.
25 [16] *See* Page Dec., Exh 12.
   [17] *See* Page Dec., Exh. 13.
26 [18] *See* Page Dec., ¶ 16.

EXHIBIT _____ 3_____
PAGE _____ 36_____

27 [19] Mattel previously argued that it needed to inspect and photograph Bryant's originals "to
   determine which of the originals are potentially appropriate candidates for expert analysis."
28 Hutnyan Dec. In Support Of Mattel's Motion to Compel, Exh. 1 at 15. It is incomprehensible

5

1   send us a letter identifying the drawings they wished to test and the protocols they

2   proposed.

3       On June 26, Ms. Hutnyan wrote to us, refusing to make any particular

4   identification of drawings to be subjected to testing, but instead demanding that we

5   ship to her the entirety of eight large boxes of originals and significant portions of

6   another three boxes.[20]  Mattel also again demanded that its unidentified experts

7   have two months of unsupervised possession of the originals, leaving Bryant's and

8   MGA's experts seven days to conduct their own rebuttal testing and prepare

9   rebuttal reports.  Mattel made no effort to narrow its demands to any reasonable set

10  of documents, instead including in its demands hundreds of drawings that were

11  created years after the relevant events in this case.

12      The next day we responded, again stating that we were willing to subject a

13  reasonable universe of documents to reasonable testing, and asking Mattel to select

14  "scores rather than thousands" of documents.[21]  We also noted that, having just put

15  us through the expense and effort of three days of inspection and photographing –

16  in addition to the two days of inspection that took place in February – Mattel

17  should have been in a position to make a more specific identification than simply

18  "all of them."

19      On June 30, Mattel again wrote to us, and refused to modify its original

20  demands in any way, threatening motion practice if we did not simply turn over

21  virtually all of Mr. Bryant's original works to them for two months and allow them

22  to ship them off to whomever they elect without restriction.[22]

23

24  why after five days of inspection Mattel refuses to identify the originals they would like to present to their experts.

25  [20] *See* Page Dec., Exh. 14. Those eight boxes contain virtually all of the drawings from Bryant's 2004 and March 2, 2007 production, including non-responsive drawings that were collected.

26  [21] *See* Page Dec., Exh. 15.

27  [22] The June 30, 2007 letter also objects to a requirement we never proposed: that Mattel not be allowed to take the originals to its experts' laboratories. We proposed no such limitation: rather, we asked that the documents remain in the custody of Mattel's counsel. If they choose to take

28  the documents to a laboratory, we have no objection, provided that custody of the documents—

6

1    At this point, it was apparent that Mattel had no intention of reaching any

2    agreement, instead preferring to bring yet another discovery motion. Accordingly,

3    on July 5, we wrote to Mattel to propose a simple solution:  that we provide Your

4    Honor with copies of our correspondence to date, ask you to sit down with counsel

5    for both sides at our offices in a room with the original drawings in front of us.

6    After each side presented their positions, we would submit whatever originals

7    Your Honor ordered to be tested, and subject those originals to testing under a

8    protocol determined by you.[23]

9    By letter of July 6, Mattel rejected that proposal out of hand.  That same day,

10   the instant motion was filed.

11                              III.   ARGUMENT

12   Mattel's brief is dedicated to making a point that no one disputes:  that

13   inspection requests under the Federal Rules of Civil Procedure include requests for

14   scientific testing.  Of course they do.  Bryant has never argued otherwise.  But

15   those Rules do not authorize one party in a lawsuit to demand that the other turn

16   over massive amounts of his personal property to months of unsupervised custody

17   by his opponent.  Instead, Fed. R. Civ. P. 34(b) clearly states that any request must

18   specify a "reasonable time, place, and manner" for the inspection.  Mattel's

19   demands in this regard are patently unreasonable, and no amount of repeating the

20   mantra that its demands are "reasonable by any measure" can make them so.

21   **A.    Mattel's proposed inspection procedures are patently unreasonable.**

22   Mattel's proposed procedure is unreasonable for a number of reasons.  First,

23   the universe of drawings to be tested is wildly over-inclusive.  Mattel has to date

24   identified only the eleven original notarized drawings as testing targets.[24]  Mattel

25

26   and responsibility for their preservation—remains with counsel. *See* Page Dec., Exh. 16.
     [23] *See* Page Dec., Exh. 17.

27   [24] Mattel has also identified Ms. Prince's notary book for testing.  Mr. Bryant doesn't own it, and
     has no objection to it being tested as long as equal access is afforded to MGA's and Bryant's
28   experts.

1   hopes to dispute Mr. Bryant's testimony that those drawings were created in
2   August 1998, and to argue that they were instead created in the first half of 1999.
3   When pressed, Mattel says that its experts may also wish to examine other
4   drawings on identical paper, in hopes of finding impressions that would indicate
5   they were created at the same time.  Mattel has had multiple days of inspection to
6   determine which originals they believe are on paper that matches the eleven
7   notarized drawings.  Mattel also turned down an additional day of inspection that
8   Bryant made available.

9         Instead, Mattel has asked that it be handed more than two thousand separate
10  drawings, without any rhyme or reason to the demand.  For the vast majority, there
11  can be no good reason for testing.  For example, Mattel has requested boxes 1
12  through 8, which include: (1) hundreds of pages of torn magazine pages; (2)
13  fashion designs drawn by Bryant from as far back as 1985, when he was 17 years
14  old, and (3) a cartoon drawing by Bryant of his family given to his dad on Father's
15  Day 1982.  Even Mattel's more detailed requests for specific folders in boxes 9,
16  10, 11 are overbroad.  One folder labeled "Bratz Petz S04" contains over 60
17  drawings of animals that were designed for potential release in Spring 2004.

18        Furthermore, it is frustrating that after conducting five days of inspection
19  and photographing of Mr. Bryant's originals, Mattel is still not able to identify a
20  reasonable subset of documents that are proper subjects of expert inspection.
21  Presumably, Mattel photographed the originals they wish to inspect, and should be
22  able to provide Bryant with those photographs.  Yet, to date, Mattel has refused to
23  do so, instead asking for an unreasonable number of Bryant's originals.

24        Second, Mattel's assertion that it is entitled to lock up virtually all of Mr.
25  Bryant's drawings for two months is just as unreasonable.  Mattel has not
26  presented any explanation why all the drawings need to be retained for the full two
27  month period.  More baffling is why Mattel believes it needs two months to inspect
28  the documents when under its plan, yet Bryant and MGA would only receive seven

EXHIBIT ___
PAGE ___

8

1    days of inspection prior to the expert discovery cut-off date.

2        Third, Mattel has not responded to Bryant's request that Mattel take

3    responsibility for the integrity of the original drawings when they are provided for

4    expert inspection.  Mattel has stated its intention to send Bryant's originals to

5    "multiple experts at their laboratories which are in various locations throughout the

6    country."[25]  Bryant cannot be expected to hand over his valuable property to a party

7    that refuses to take responsibility for its maintenance and safekeeping.[26]

8        Finally, Mattel's proposed protocol forces Bryant to waive his right to have

9    an expert present during any destructive testing if he initially objects to such

10   testing.  While Mattel's protocol requires that Bryant receive notice before any

11   destructive testing is conducted and grants him five court days to object, the

12   protocol then states that "[i]n lieu of objection, Bryant could elect to have his own

13   expert attend for a any destructive testing being done...."[27]  Bryant cannot be

14   expected to waive his right to have his own expert be present simply by voicing an

15   initial objection to such testing.  Nor can Bryant be expected to waive his right to

16   object to certain testing simply by choosing to have his expert attend the testing.[28]

17   Such restrictions are unreasonable, and make Mattel's protocol unacceptable.

18   **B.    Bryant has proposed a reasonable and fair process for expert examination.**

19

20       For each of these reasons, Mattel's demands are patently unreasonable.  We

     propose that the Court instead issue the following order:

21

22       1.    That Mattel identify no more than 50 particular drawings for testing.

     That identification may be made either by Bates number or by providing Bryant

23

---

24   [25] Mattel's Mot. to Compel, at 19.

25   [26] Contrary to Mattel's argument in its brief, Bryant has never blanketly refused to allow Mattel's
     experts to perform tests in their laboratories.  Mattel can of course test documents in a laboratory,
26   but its counsel must maintain custody of—and responsibility for—those documents.

     [27] See Page Dec., Exh. 14 at 2.

27   [28] In fact, Mattel's proposed protocol seems to concede this point, by stating that Bryant's expert
     can "raise[] any issues about the testing being done, the parties agree to go immediately to Judge
28   Infante to resolve the dispute so tha thte testing will not be delayed."  Id.

1   with photographs of the requested documents.

2       2.      That those drawings be turned over to Quinn Emanuel or its agent at
3   the offices of Keker & Van Nest within 5 days of receipt of the aforementioned
4   identification.

5       3.      That the originals be maintained in the personal custody and control
6   of Quinn Emanuel, with the understanding that a responsible Quinn Emanuel
7   employee may personally transport them to any location necessary for testing but
8   must maintain physical custody of the originals at all times, and must keep the
9   originals in a secure, locked location when not in use.

10      4.      That the drawings be returned to Keker & Van Nest within 21 days.

11      5.      That any request for destructive testing[29] be governed by the following
12  protocol:

13          i)      Mattel will provide a written request to Bryant explaining what
14  document would be tested and what test or tests would be conducted prior to any
15  destructive testing;

16          ii)     Bryant will have 5 court days to object, in which case the
17  parties must meet and confer and, within 3 more court days, file a joint statement
18  with Judge Infante to seek resolution of the dispute;

19          iii)    Bryant will have the opportunity to have his own expert attend
20  any destructive testing being done, provided such election is made in writing to
21  Mattel within the 5-court-day objection period, and provided the testing can take
22  place within ten court days of the original request;

23          iv)     Bryant's expert may raise any issues about the testing being
24  done, and the parties agree to go immediately to Judge Infante to resolve the
25  dispute;

EXHIBIT ___3___

PAGE ___41___

27  [29] "Destructive testing" is defined as any testing that would chemically or physically alter the
    document, and includes ink dating, paper fiber and chemical analysis, treating the document with
28  chemicals, or taking plugs from the document.

10

1         v)    In addition, MGA will be given notice of any destructive

2    testing, and will be given an opportunity to attend and observe any such testing.

3

4    **C.    Sanctions are not warranted**

5        Attorney's fees are not warranted in the context of discovery when there is a

6    "genuine dispute" of fact or law or "if reasonable people could differ as to [the

7    appropriateness of the contested action]."[30]   There is a valid and legitimate dispute

8    between the parties as to Mattel's proposed protocol for expert inspection of

9    Bryant's original documents.   Bryant has raised concerns as to the fairness of

10   Mattel's protocol and Mattel's unwillingness to accept responsibility for the care

11   and maintenance of those documents while they are inspected by their own experts.

12   Sanctions, therefore, are not warranted.

13                       **IV.   CONCLUSION**

14       For the above-mentioned reasons, Bryant respectfully requests that the

15   Discovery Master deny Mattel's motion and instead adopt the terms and procedure

16   proposed by Bryant above.

17

18   Dated:  July 13, 2007                   Respectfully submitted,
                                            KEKER & VAN NEST, LLP

19

20

21                               By: _____

22                                      MICHAEL PAGE
                                      Attorneys for Plaintiff

23                                    CARTER BRYANT

24

25

26   ────────────────
     [30] *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Reygo Pacific Corp. v. Johnston*
     *Pump Co.*, 680 F.2d 647, 649 (9th Cir. 1982) (alteration in original).

27                                    EXHIBIT ___3___

28                                    PAGE ___42___

11

OPPOSITION TO MATTEL, INC.'S MOTION TO COMPEL BRYANT TO MAKE ORIGINAL DOCUMENTS AVAILABLE FOR EXPERT EXAMINATION AND TESTING AND FOR SANCTIONS
CASE NO. CV 04-09049 SGL (RNBx)

1           PROOF OF SERVICE

2    I am employed in the City and County of San Francisco, State of California in the office of a member of the bar of this court at whose direction the following service was made. I am

3 over the age of eighteen years and not a party to the within action. My business address is

4 Keker & Van Nest, LLP, 710 Sansome Street, San Francisco, California 94111.

5 On July 13, 2007, I served the following document(s):

6 **CARTER BRYANT'S OPPOSITION TO MATTEL, INC.'S MOTION TO COMPEL BRYANT TO MAKE ORIGINAL DOCUMENTS AVAILABLE FOR EXPERT**

7 **EXAMINATION AND TESTING AND FOR SANCTIONS**

8

9 by **FEDERAL EXPRESS**, by placing a true and correct copy in a sealed envelope addressed as shown below. I am readily familiar with the practice of Keker & Van Nest, LLP for

10 correspondence for delivery by FedEx Corporation. According to that practice, items are retrieved daily by a FedEx Corporation employee for overnight delivery;

11

 *AND*

12

 by **E-MAIL VIA PDF FILE**, by transmitting on this date via e-mail a true and correct copy

13 scanned into an electronic file in Adobe "pdf" format. The transmission was reported as complete and without error.

14

15 Hon. Edward A. Infante       John B. Quinn
 JAMS            Michael T. Zeller

16 Two Embarcadero Center, Suite 1500  Quinn Emanuel Urquhart Oliver & Hedges,
 San Francisco, CA 94111      LLP

17 Tel: 415/774-2649       865 South Figueroa Street, 10th Floor
 Fax: 415/982-5287       Los Angeles, CA  90017-2543

18 Email: schan@jamsadr.com     Tel: 213/443-3000
                 Fax: 213/443-3100

19              Email: johnquinn@quinnemanuel.com

20              Email: michaelzeller@quinnemanuel.com

21 Diana M. Torres        Patricia L. Glaser
 O'Melveny & Myers, LLP     Christensen Glaser Fink Jacobs Weil &

22 400 S. Hope Street       Shapiro
 Los Angeles, CA  90071     10250 Constellation Blvd., 19th Floor

23 Tel: 213/430-6000       Los Angeles, CA  90067
 Fax: 213/430-6407       Tel: 310/553-3000

24 Email: dtorres@omm.com     Fax: 310/556-2920

25              Email: pglaser@chrisglase.com

26

27            EXHIBIT ___3___

28            PAGE ___42___

1    Executed on July 13, 2007, at San Francisco, California.

2        I declare under penalty of perjury under the laws of the State of California that the above
     is true and correct.
3

4

5                                        JOLIE A. SELBY

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                                            EXHIBIT _____ 3

28                                            PAGE _____ 44

EXHIBIT 4

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 5

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL: (213) 443-3000 FAX: (213) 443-3100

WRITER'S DIRECT DIAL NO.
(213) 443-3666

WRITER'S INTERNET ADDRESS
dianehutnyan@quinnemanuel.com

April 2, 2008

**VIA E-MAIL AND FACSIMILE**

Matthew E. Sloan, Esq.                    Matthew Werdegar, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP  Keker and Van Nest LLP
300 South Grand Avenue                    710 Sansome Street
Suite 3400                                San Francisco, CA 94111
Los Angeles, CA  90071

Re:     Mattel v. Carter Bryant

Dear Matt(s):

I write about two related issues.

The first is to ask you to confirm that you will make available at Kullman's and Lyter's
depositions the original Bryant documents and original ESDA films that pertain to the opinions
they rendered and/or the reports they issued in this case.  Specifically, we would expect access to
every original document whose bates number was referenced in either of their reports and any
others they relied upon that they may not have referenced.  As Matt Sloan witnessed, MGA's
examination of our experts was facilitated by the availability of these materials at their
depositions.

The second is to request, pursuant to the June 20, 2006 stipulation on the record before
Magistrate Judge Block, reasonable access for further non-destructive examination and imaging
of the pertinent originals for Messrs. Flynn and Cunningham.  It is clear from these experts'
depositions that the brief time that they were permitted for non-destructive examination of the
eight boxes of Bryant original documents last fall was too limited for them to do all the analysis

EXHIBIT ___5___

___75___

Matthew E. Sloan / Matthew Werdegar
April 2, 2008

that they would normally be able to do with the evidence presented to them. Further, the Lyter and Kullman reports suggest that, having had the benefit of our narrowing down the eight boxes of original documents to a few hundred items, as well as the benefit of unlimited access to the materials generally, Dr. Lyter and Dr. Kullman had sufficient time to do certain non-destructive tests and imaging that Messrs. Flynn and Cunningham were unable to do and which apparently allowed Drs. Lyter and Kullman to develop opinions that cannot be fully assessed and tested without similar access by our experts.

For these reasons, we would like to request on behalf of Mr. Flynn one week of access to all the original documents he referred to in his report or that were referred to in the portions of Dr. Kullman's or Dr. Lyter's reports rebutting his report. We would also like to request on behalf of Mr. Cunningham one week of access to all the original documents he referred to in his report or that were referred to in the portions of Dr. Kullman's or Dr. Lyter's reports rebutting his report. Please let me know if you would voluntarily agree to such access.

I hope you will see the inappropriateness of denying this limited request. But to the extent you are unwilling to produce these original documents for examination and imaging as requested, please also consider this letter notice that we will be filing an *ex parte* application before Judge Larson to allow for further expert reports and an *ex parte* application before the Discovery Master to compel the originals.

Very truly yours,

Diane C. Hutnyan

EXHIBIT     5

PAGE     76

EXHIBIT 6

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION


CARTER BRYANT, an
individual,

       Plaintiff,

vs.                                No. CV 04-9049
                                       SGL (RNBx)
MATTEL, INC., a Delaware
corporation,

       Defendant.

_____

AND CONSOLIDATED ACTIONS

**CERTIFIED**
**COPY**

_____


DEPOSITION OF ROBERT KULLMAN

Los Angeles, California

Tuesday, April 8, 2008


Reported by:
Stephanie Leslie
CSR No. 12893

Job No. 85751


EXHIBIT _____ 6 _____

PAGE _____ 77 _____

|      |    |                                                                    |
|------|----|--------------------------------------------------------------------|
|      | 1  | printing aligns, to see if there's additions to it,                |
|      | 2  | deletions, it may take hours to examine one document.              |
| 3:30 | 3  | Q    So the seven boxes that you received in 2008,                  |
|      | 4  | could you do a thorough examination of all of those                |
|      | 5  | documents and -- let's say you're not looking for                  |
|      | 6  | anything in particular.  You're looking for the                    |
|      | 7  | evidence that the documents show.  Could you do that in            |
|      | 8  | eight days?                                                          |
| 3:30 | 9  | MR. SLOAN:  Objection, vague as to what                             |
|      | 10 | particular tasks he would be performing and which                   |
|      | 11 | documents.  Again, it assumes facts that aren't in                 |
|      | 12 | evidence.                                                           |
| 3:30 | 13 | BY MS. HUTNYAN:                                                     |
| 3:30 | 14 | Q    Thorough examination.  You know what a                         |
|      | 15 | thorough examination is.  I mean, I'm not saying                    |
|      | 16 | exhaustively, referencing every single thing in the                 |
|      | 17 | document.  But the one that we've been talking about,               |
|      | 18 | your examination of a document.  Let's see what this                |
|      | 19 | document has to tell me -- you know, maybe oblique                   |
|      | 20 | lighting and microscopic, whatever you normally do.                 |
| 3:30 | 21 | A    Okay.                                                          |
| 3:30 | 22 | MR. SLOAN:  Same objection.                                         |
| 3:30 | 23 | BY MS. HUTNYAN:                                                     |
| 3:30 | 24 | Q    Could you go through all those seven boxes and                 |
|      | 25 | do that kind of basic examination in eight days?                    |

205

EXHIBIT _____ 6

PAGE _____ 78

**ROBERT KULLMAN**                                04/08/08

| | | |
|---|---|---|
| 3:30 | 1 | MR. SLOAN:  Same objection. |
| 3:30 | 2 | THE WITNESS:  Eight days of ten-hour days? |
| 3:30 | 3 | BY MS. HUTNYAN: |
| 3:30 | 4 | Q    Sure. |
| 3:30 | 5 | A    No, I couldn't.  Some people may be able to. |
| | 6 | I couldn't, no. |
| 3:31 | 7 | Q    If -- could you do it in 15 days? |
| 3:31 | 8 | MR. SLOAN:  Same objection. |
| 3:31 | 9 | BY MS. HUTNYAN: |
| 3:31 | 10 | Q    You saw the documents.  You have more -- |
| 3:31 | 11 | A    It depends.  First off, as I had stated |
| | 12 | before, I didn't examine all the documents in the box. |
| | 13 | Had I examined all the documents in the box for each of |
| | 14 | the examinations that I conducted on the majority of |
| | 15 | the -- of the ones I did on the tracing papers and on |
| | 16 | the notebook and on the mixed-media, I don't know how |
| | 17 | long it would take me, as an individual, by myself, but |
| | 18 | it would be a career maker.  I'm sure I would have to |
| | 19 | devote the majority of my time for an extended period |
| | 20 | of time to do that. |
| 3:31 | 21 | So -- but as I stated, the examinations that I |
| | 22 | did alone, I probably spent anywhere from 50 to 100 |
| | 23 | hours, I would think.  I don't know exactly, but I |
| | 24 | would think that much time.  And I certainly didn't |
| | 25 | take them all out of the box, individually catalog them |

206

EXHIBIT____ b

PAGE____ 79

1    Q    -- but they're all mixed up.  Then are you
2    saying that what was pulled out onto the big pieces of
3    paper that you had in front of the boxes -- those would
4    be reordered?  The actual original documents would be
5    reordered so that they would be 1, 10, 100, 110, 1,000?
6    A    Absolutely.
7    Q    Okay.  And was a record kept of their original
8    order?
9    A    No.  You didn't see how they came to us.  No.
10   Q    Oh, I think I did.
11   A    Did you?  Okay.  But no.  I don't know that
12   you could have kept any reason -- because some of them
13   were mixed up, and some were tangled.  But no, there
14   was not any reference of the original order.  What
15   there was reference to was what was in each box, and
16   then they were put in order by Bates number if they had
17   Bates number -- or Bryant number, or whatever it's
18   called.
19   Q    It would have been quite difficult to keep
20   them in their original order at all times, wouldn't it?
21   A    You bet.
22   Q    It would have been time-consuming probably?
23   A    Yes.  It would have taken much longer to do
24   than it did to keep them in the original order, put
25   them back, put a marker when you're now doing some

EXHIBIT __6__ PAGE __80__

1    evaluation of what you discovered, put them back.  No.

2         When I do document cases, I attempt to record

3    the order that I received them in, especially medical

4    cases.  I always record the order I received them in,

5    either by photocopying and then writing on the

6    photocopies or handwriting the order.  They get jumbled

7    around, out of order as I examine them, but when I'm

8    done with them, I put them back in that order I

9    received them.

10        In this particular case, no, that wasn't done,

11   and I don't know that it would have been a

12   time-efficient manner to do it, no.

13   Q    So the documents are now currently not in

14   their original order?

15   A    They should be in the original -- not the

16   original boxes; but, for instance, the original Box 1,

17   that should be in the Box 1.  Original Box 2 should be

18   in the original Box 2, but not in the order that they

19   were received.

20   Q    Right.  And so any evidence that -- of one

21   document being next to each other in the box is gone?

22   There's no record of the order that they were

23   originally in?

24   A    That's a fair statement, yes, unless whoever

25   shipped them to us had an order and the way they

EXHIBIT ___6___ PAGE ___91___

|        |    |                                                          |
|--------|----|----------------------------------------------------------|
|        | 1  | does the evidence that I can determine -- does it        |
|        | 2  | support or refute what they're saying in their reports?  |
|        | 3  | So that's what I do, and that's what most document       |
|        | 4  | examiners do, I'm sure.                                   |
| 3:40   | 5  | I'm sure if you sent Mr. Flynn or Mr.                    |
|        | 6  | Cunningham a box of things and said, "Here. Tell me if   |
|        | 7  | there's something suspicious," I would think they would  |
|        | 8  | say, "What is it you're looking for? Maybe I can help    |
|        | 9  | you." Maybe they don't do it that way. I would think     |
|        | 10 | they would. Maybe not.                                   |
| 3:40   | 11 | Q    Is forensic document examination an iterative       |
|        | 12 | process?                                                 |
| 3:40   | 13 | A    You'd have to tell me what that means,              |
|        | 14 | "iterative."                                             |
| 3:40   | 15 | Q    Well, is it -- is it common for you to do an        |
|        | 16 | examination on, let's say, a group of documents for a    |
|        | 17 | case and then come back and make findings later based    |
|        | 18 | on a further examination of those documents that you     |
|        | 19 | didn't notice before based on your -- based on           |
|        | 20 | examination of other materials in the case?             |
| 3:40   | 21 | A    It can happen.                                       |
| 3:40   | 22 | Q    Have you had that happen before?                     |
| 3:40   | 23 | A    With medical records, generally, sure. I've         |
|        | 24 | had it happen where I've examined handwriting, for       |
|        | 25 | instance, and then said, "Well, what I can tell you is   |

214

EXHIBIT ___ 6

PAGE ___ 82

```
 1    it's probably written by the same person or probably

 2    not, but I need additional known samples to

 3    determine -- make a more determined -- definitive

 4    determination."  So then I'd get it back.  I reexamine,

 5    come up with findings, sure.

 6           I examined documents before that I never --

 7    the task may have been to determine if page 1 was a

 8    page substitution in a three-page document.  I may find

 9    folds that are different, staple holes that are

10    different.  So I say, "Yes.  Page 1 was not always

11    attached to page 2 and 3."  And then later on, they've

12    called and said, "Look.  Now there -- we need to know

13    if there's other evidence of impressions that would

14    tell us that page 1 was initialed or dated when it was

15    attached to page 2."  So yeah, I've reexamined things

16    later.

17    Q    And you felt it was useful to be able to go

18    back to the documents that you examined before and take

19    another look?

20    A     It was obviously useful for the client, or

21    they wouldn't have sent me additional materials.  I

22    examine the documents, I run the finding.  If the

23    finding is probably and the client doesn't care anymore

24    then, then probably they're not going to send me

25    anything back.  I'm not going to say, "You have to send
```

3:41 6
3:41 17
3:42 20

215

EXHIBIT _____

PAGE _____

1        THE WITNESS:   If I could answer that, I

2    presented this particular publication at an American

3    Society meeting in Des Moines, Iowa.

4    BY MS. HUTNYAN:

5        Q    I was referring to your testimony a moment ago

6    that they published it, so they must not have had any

7    knowledge of this subject before that, and I was just

8    trying to find out the basis for that statement.

9        A    Oh, well --

10        Q    What makes you think that?

11        A    Because it had been published.  I'm sure --

12    had I presented this paper for publication, unless

13    there was something new in my finding, I'm sure they

14    would have said, "We already have this."  But maybe

15    not, maybe they would have published it anyway.

16        Q    But are you a current member of the American

17    Society of Questioned Document Examiners?

18        A    No, I only hold membership in the American

19    Academy of Forensic Scientists.

20        Q    And has that always been true?  You have never

21    been a member of the American Society of Questioned

22    Document Examiners?

23        A    I was a provisional member, or applied for

24    membership back a number of years ago, and because of

25    some of the requirements of attending meetings,

1    preparing papers and so forth, it was a business

2    decision that it was better that I didn't hold

3    membership to that.

4         Q    Did you take the test?

5         A    Yes.  I took part of the test, yes.

6         Q    You didn't take the whole test?

7         A    I don't know.  They had a proficiency -- or

8    not proficiency, but testing that you would conduct and

9    then send your answers in.  I don't know that I did any

10   follow-up interviews or presentation of that.

11        But maybe -- maybe they don't have that in the

12   American Academy.  I don't remember -- sorry, American

13   Society.  But yes, I took some practical problem tests,

14   excuse me, practical problem.

15        Q    Had you passed the test, you would have been a

16   full member of the American Society of Questioned

17   Document Examiners; correct?

18        A    I don't recall if passing the test, then you

19   automatically became a member or if you had to do a

20   presentation.  I just don't recall.

21        Q    But if you don't pass the test, you can't be a

22   member; right?

23        A    Oh, no.  You can still be a member, from my

24   understanding, if you are a member of the American

25   Board of Forensic Document Examiners.  That's my

EXHIBIT __6__ PAGE __85__

 1  understanding of it, but that may not be correct, but
 2  that's my understanding.

 3     Q    Okay.  So is that --

 4     A    But if you are not a member of the American
 5  Board and you don't pass the test, certainly you can't
 6  be a member, from my understanding.

 7     Q    And to be a member of the American Board, you
 8  have to be certified using their testing; correct?

 9     A    Now it's testing, yes.  It wasn't in the past,
10  but it is now, yes.

11     Q    So the way to be a member of the American
12  Society of Questioned Document Examiners would either
13  be to pass their test or to pass the certification by
14  the American Board?

15     A    Yes.

16     Q    And that's the American Board of Forensic
17  Document Examiners, Inc.; correct?

18     A    Yes.

19     Q    And you're not certified as a forensic
20  document examiner by the American Board of Forensic
21  Document Examiners; correct?           EXHIBIT _6_ PAGE 86

22     A    No, I'm not.

23     Q    Why not?

24     A    Basically, I went through the testing process,
25  passed the written test, passed the practical problems.

 1  And when I did presentation before the committee, they

 2  questioned me, asked me questions about computer

 3  printers that I was not prepared to answer.  And I'm

 4  not -- don't have a ready, retrievable knowledge on

 5  computer printers, so they said they would not

 6  recommend me for certification because they felt I had

 7  insufficient knowledge in computer printers.

 8      Q    Did you appeal that decision?

 9      A    Yes.

10      Q    What happened?

11      A    They sent me back a letter that said my appeal

12  was denied.

13      Q    Did you pursue it any further?

14      A    No.  I don't know if there is a further

15  pursuit.  There could have been, but did I, no.

16      Q    Well, did you get any training in the area of

17  computer printers that you apparently were lacking

18  earlier?

19      A    I had training in computer printers.  And as I

20  explained to the committee when they were asking me

21  about it, I said, "I'm not prepared.  You did not test

22  me on computer printers.  Part of my presentation has

23  nothing to do with computer printers.  If you want to

24  test me on computer printers, I would have to go back

25  to my research material, the reference materials that I

EXHIBIT  6  PAGE 8 /Page 34

EXHIBIT 7

```
 1              UNITED STATES DISTRICT COURT
 2            CENTRAL DISTRICT OF CALIFORNIA
 3                   EASTERN DIVISION
 4
 5   MATTEL, INC., a Delaware         )   Certified Copy
     Corporation,                     )
 6                                     )
                   Plaintiff,          )
 7                                     )
                     vs.               )  No. CV 04-9059 NM
 8                                     )  (RNBx)
     CARTER BRYANT, an individual;    )
 9   and DOES 1 through 10,           )
     Inclusive,                        )
10                                     )
                   Defendants.         )
11   ------------------------------   )
     (COMPLETE CAPTION ON NEXT PAGE.)
12
13
14
15       Videotaped Deposition of LLOYD W. CUNNINGHAM,
16       taken on behalf of Defendants, at 300 South
17       Grand Street, Los Angeles, California,
18       beginning at 9:59 A.M. and ending at 5:25 P.M.,
19       on Monday, March 31, 2008, before Wendy S.
20       Schreiber, CSR No. 3558, RPR, CLR.
21
22
23
24
25   PAGES 1 - 223
                                                        1
```

EXHIBIT     7

PAGE     88

```
 1    September 12th of 2007 indicates a meeting with

 2    Ms. Hutnyan and Mr. Tanden.  Is that an attorney or

 3    is that someone else?

 4         A.   Mr. Tanden?

 5         Q.   Yes.                                      10:38AM

 6         A.   He's an attorney now.  At that point he was

 7    awaiting his results of the bar examination so he

 8    wasn't an attorney at that point.

 9              MR. SLOAN:  Is he an attorney at Quinn

10    Emanuel?                                            10:39AM

11              MS. HUTNYAN:  No.

12              MR. SLOAN:  Was he at your office in his

13    capacity as an attorney?

14              MS. HUTNYAN:  He was hired as a law clerk by

15    us.                                                 10:39AM

16              MR. SLOAN:  Okay.

17         Q.   The same entry on September 12th, 2007

18    indicates that you discussed the documents to be

19    examined and opened boxes that contained documents.

20    Was that the first day on which you had actually     10:39AM

21    reviewed any original documents in this case?

22         A.   Yes.

23         Q.   September 12th, 2007?

24         A.   Yes.

25         Q.   Were they brought to you by counsel?       10:39AM
                                                              32
```

EXHIBIT ___7___

PAGE ___89___

```
 1     A.   Yes.

 2     Q.   On the third page of this invoice which is

 3  Bates-labeled M-LC 00140, the entry for September

 4  28, 2007 indicates that on that day you returned --

 5  there's a return of documents to boxes and FedEx      10:40AM

 6  pick up.  Who do you -- who did you send the

 7  documents to at that time?

 8     A.   I believe it was William Flynn.

 9     Q.   By the way, can you describe the

10  documents -- the amount of documents and the type of  10:40AM

11  documents that you were looking at during that time

12  period from September 12 through September 28, 2007?

13     A.   Just voluminous documents.  I didn't take

14  notes describing each individual document so I truly

15  can't remember the nature of each document, but       10:41AM

16  generally I examined sketches, color copies,

17  handwritten notations and paper in general.

18     Q.   And these are the documents that are

19  referenced in your expert report, correct?

20     A.   Some of them, yes.                             10:41AM

21     Q.   If you can turn to the next page in Exhibit

22  4625 which is an invoice entitled "Supplemental

23  Billing" and dated October 18th, 2007, do you see

24  that?

25     A.   I do.                                          10:41AM
                                                                33
```

EXHIBIT 8

```
 1            IN THE UNITED STATES DISTRICT COURT

 2         FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3                   EASTERN DIVISION

 4                                          Certified Copy

 5     ------------------------

 6     CARTER BRYANT,              )

 7     an individual,             )

 8             Plaintiff,         )

 9         vs.                     )  No. CV 04-09049 SGL (RNBx)

10     MATTEL, INC., a            )     Consolidated with

11     Delaware corporation,     )     CV 04-09059

12             Defendant.         )     CV 05-02727

13     ------------------------

14

15

16         Videotaped Deposition of WILLIAM J. FLYNN,

17         taken at Phoenix, Arizona commencing at 9:31 a.m.

18         March 27, 2008 before Robin L. B. Osterode,

19         RPR, CSR, Arizona, Certified Reporter No. 50695.

20

21

22

23

24

25     PAGE 1 - 252
```

                                                             1

EXHIBIT 8
PAGE 91

```
 1            Did you understand that your purpose in
 2    conducting this examination was to be both of those,
 3    i.e., to determine forensic evidence of the dating of
 4    the documents, as well as any evidence regarding the
 5    sequencing?
 6        A.   Yes.
 7        Q.   Did you get the understanding that what you
 8    were supposed to determine is the sequencing, from
 9    any source, other than communications with Quinn
10    Emanuel?
11            MS. HUTNYAN:  This is still running into
12    the same problem.  He's already testified he didn't
13    receive instructions from anybody other than us,
14    so --
15            MR. SLOAN:  Okay.
16            MS. HUTNYAN:  You know.
17    BY MR. SLOAN:
18        Q.   How did you -- were you given any
19    indication as to how long you would have to examine
20    these documents?
21        A.   Yes.
22        Q.   How long were you told you would have to
23    examine the documents?
24        A.   The documents would be in my lab for a
25    total of four days; however, within that four days
```

18

EXHIBIT _____ 8

PAGE 92

```
 1        would include the time it took to organize the
 2        documents that were to be examined, the repackaging
 3        of the documents to put them back in the boxes, the
 4        sealing of the boxes, and all of the administrative
 5        overhead and notetaking that I would have to do.  So
 6        the reality is that I probably had just over three
 7        workdays with these hundreds of documents.
 8             Q.   Do you have a machine or are you familiar
 9        with what's called a video spectro comparator?  Let
10        me rephrase that.  Are you familiar with a machine
11        called a VSC or a video spectro comparator?
12             A.   I am, and I own one.
13             Q.   Did you -- and you're trained in the use of
14        the VSC?
15             A.   I am.
16             Q.   Which type of VSC do you have, which
17        machine?
18             A.   It's called the 4C, as in Charles.
19             Q.   Did you perform any VSC testing on the
20        Carter Bryant documents?
21             A.   Yes.
22             Q.   You did?
23             A.   I did.
24             Q.   Do you have a record of which documents you
25        prepared testing on or you performed the VSC testing
                                                           19
```

EXHIBIT    8

PAGE      93

EXHIBIT 9

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
  John B. Quinn (Bar No. 090378)
  (johnquinn@quinnemanuel.com)
  Michael T. Zeller (Bar No. 196417)
  (michaelzeller@quinnemanuel.com)
  Jon D. Corey (Bar No. 185066)
  (joncorey@quinnemanuel.com)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100

Attorneys for Plaintiff Mattel, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>MATTEL, INC., a Delaware corporation,<br><br>Defendant.<br><br>AND CONSOLIDATED ACTIONS | CASE NO. CV 04-9049 SGL (RNBx)<br><br>Consolidated with Case No. CV 04-09059 and Case No. CV 05-02727<br><br>**DISCOVERY MATTER**<br><br>**[To Be Heard By Discovery Master Hon. Edward Infante (Ret.) Pursuant To The Court's Order Of December 6, 2006]**<br><br>MATTEL, INC.'S NOTICE OF MOTION AND MOTION TO ENFORCE STIPULATION AND COMPEL BRYANT TO MAKE ORIGINAL DOCUMENTS AVAILABLE AND FOR SANCTIONS; AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT<br><br>[Declarations of Michael T. Zeller, B. Dylan Proctor and Shane McKenzie filed concurrently herewith]<br><br>Hearing Date:  TBA<br>Time:  TBA<br>Place:  TBA<br><br>Discovery Cut-off:  None Set<br>Pre-trial Conference:  None Set<br>Trial Date:  None Set |

EXHIBIT 6 PAGE 94

07209/2039383.1

MATTEL'S MOTION TO COMPEL ORIGINALS

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................. 2

BACKGROUND ......................................................................................................... 4

ARGUMENT............................................................................................................. 10

I.   BRYANT SHOULD BE ORDERED TO MAKE HIS ORIGINAL DRAWINGS, DOCUMENTS AND TANGIBLE THINGS AVAILABLEFOR INSPECTION. ................................................................... 10

   A.   Bryant Stipulated On The Record That He Would Produce, And Otherwise Had Agreed On Numerous Occasions To Produce, These Very Documents, But Still Refuses To Do So. ............................ 10

   B.   Mattel Is Entitled to Inspect the Original Documents Under The Federal Rules........................................................................................ 11

   C.   Bryant Has No Legitimate Justification For His Refusals To Make His Originals Available.......................................................................... 15

II.  THE DISCOVERY MASTER SHOULD SANCTION BRYANT................. 18

EXHIBIT *9* PAGE *95*

07209/2039383.1

i

# TABLE OF AUTHORITIES

**Page**

### Cases

Braley v. Campbell,
832 F.2d 1504 (10th Cir. 1987) ............................................................ 17

Equal Employment Opportunity Commission v. Ethan Allen, Inc.,
259 F. Supp. 2d 625 (N.D. Ohio 2003) ................................................. 13

Gielow v. Warner Bros. Pictures,
26 F. Supp. 425 (S.D.N.Y. 1938) .......................................................... 11

Gonnuscio v. Seabrand Shipping Ltd.,
1997 WL. 118436 (D. Or. 1997) ............................................................ 15

Hyde & Drath v. Baker,
24 F.3d 1162 (9th Cir. 1994) ................................................................. 17

In re Kolinsky,
140 B.R. 79 (S.D.N.Y. 1992) ................................................................. 11

National Hockey League, Inc. v. Metropolitan Hockey Club, Inc.,
427 U.S. 639 (1976) .............................................................................. 18

RTC v. Dabney,
73 F.3d 262 (10th Cir. 1995) ................................................................. 17

United States v. Yamin,
868 F.2d 130 (5th Cir. 1989) ................................................................. 12

### Statutes

28 U.S.C. § 1927 ....................................................................................... 17

Fed. R. Civ. P. 26(b) ................................................................................. 11

Fed. R. Civ. P. 34 .................................................................................. 3, 15

Fed. R. Civ. P. 34(a) ................................................................................. 11

Fed. R. Civ. P. 37-1 .................................................................................... 7

Fed. R. Civ. P. 37(a)(4) ............................................................................ 17

Federal Rule of Evidence 1002 ............................................................ 3, 12

Local Rule 7-3 ............................................................................................. 1

EXHIBIT 9 PAGE 96

MATTEL'S MOTION TO COMPEL ORIGINALS

07209/2039383.1

**Miscellaneous**

4 Moore's Federal Practice, § 26-184 (2d ed. 1991) ..................................................... 11

McCormick, Evidence §§ 231, 232, 236 (4th ed. 1992) ............................................ 12

EXHIBIT __9__ PAGE __97__

07209/2039383.1

iii

1  TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2          PLEASE TAKE NOTICE that at a telephonic conference before Discovery

3  Master Hon. Edward Infante (Ret.), that will occur on a date and at a time to be

4  determined by Judge Infante, plaintiff Mattel, Inc. ("Mattel") will, and hereby does,

5  move the Court: (1) to compel Defendant Carter Bryant to make the originals of his

6  documents available for inspection and photographing by Mattel; and (2) for an award of

7  sanctions against Bryant in the amount of $2,200.00, which represents a portion of the

8  fees incurred by Mattel in bringing this Motion.

9          This Motion is made pursuant to Federal Rules of Civil Procedure 34 and 37

10  on the grounds that, in resolving a prior Mattel motion to compel Bryant to produce his

11  originals for inspection and photographing, Bryant had promised and agreed numerous

12  times to produce his originals for inspection and photographing, including through an on-

13  the-record stipulation before Magistrate Judge Block on June 20, 2006 that he would

14  make all of the originals requested by Mattel available on 15 days' notice.  Despite

15  Mattel's repeated requests since that time Bryant has failed and refused to do so.

16          The parties have met and conferred on the subject of Bryant's originals

17  numerous times pursuant to Local Rule 7-3, including without limitation in Magistrate

18  Judge Block's courtroom on June 20, 2006 and subsequently on December 28, 2006.

19          This Motion is based on this Notice of Motion and Motion, the

20  accompanying Memorandum of Points and Authorities, Separate Statement filed

21  concurrently herewith, the Declarations of Michael T. Zeller and Shane McKenzie filed

22  concurrently herewith, the records and files of this Court, and all other matters of which

23  the Court may take judicial notice.

24  DATED:  January 19, 2007          QUINN EMANUEL URQUHART OLIVER &
                                       HEDGES, LLP
25

26  EXHIBIT  9  PAGE  98          By  _Mirm T. Z—_
                                       Michael T. Zeller
27                                     Attorneys for Plaintiff and Cross-Defendant
                                       Mattel, Inc.
28

                                       MATTEL'S MOTION TO COMPEL ORIGINALS

## MEMORANDUM OF POINTS AND AUTHORITIES

### Preliminary Statement

The bulk of defendant Carter Bryant's document production consists of undated (and unorganized) design drawings pertaining to his work on MGA-related projects.[1]  Mattel has long been seeking to inspect and photograph the originals of drawings and other key materials produced by Bryant.  In fact, after Bryant had reneged on his repeated promises to make all of his originals available for inspection,[2] Mattel filed in February 2005 a motion to compel Bryant to produce the originals of his documents, including most importantly his Bratz drawings, for Mattel's inspection and photographing.[3]  The case was then stayed for a year, but after discovery resumed, Magistrate Judge Block ordered the parties to further meet and confer in his courtroom on June 20, 2006 on then-pending discovery motions that included Mattel's motion to compel Bryant's originals.  At the conclusion of the June 20, 2006 meet and confer under Judge Block's auspices, Mattel's motion was resolved by an on-the-record stipulation by the parties that Bryant (as well as the other parties) would make the originals of documents requested by another party available on 15 days' notice.[4]

Despite that on-the-record stipulation (which was also repeatedly documented in correspondence), and despite Mattel's numerous requests since then that Bryant make available his remaining originals,[5] Bryant has failed and refused to do so.  Thus, to date, Bryant has refused to make several originals—including Bratz design drawings as well as a signature page from an agreement with MGA—available for

EXHIBIT _9_ PAGE _99_

---

[1]   Declaration of Michael T. Zeller, dated January 19, 2007 and filed concurrently herewith ("Zeller Dec."), ¶ 6 Exh. 5.
[2]   Id., ¶¶ 11, 14, 16 and Exh. 11.
[3]   Id., Exh. 15.
[4]   Id., ¶ 17.
[5]   Declaration of Shane McKenzie, dated January 19, 2007 and filed concurrently herewith ("McKenzie Dec."), Exhs. 1-4. The originals that Bryant continues to withhold are listed in Exh. 3 to the McKenzie Declaration.

07209/2039383.1

MATTEL'S MOTION TO COMPEL ORIGINALS

1  inspection and photographing.[6] Not only were these documents the subject of the parties'
2  on-the-record June 20, 2006 stipulation, but Mattel is obviously entitled to inspect and
3  photograph the originals.  Key issues in this case is when Bryant created Bratz drawings
4  and when he was working with MGA on Bratz.   Mattel needs, and has the right, to
5  inspect and photograph the original documents to determine what other information is
6  available on them which is not disclosed by photocopies (such as impressions,
7  watermarks or alterations) and to determine what expert analysis of them might be
8  appropriate for such purposes as ascertaining their true dates of creation.  Indeed, even
9  apart from Bryant's stipulation and promises to produce, the express terms of Federal
10 Rule of Civil Procedure 34 and the policies underlying Federal Rule of Evidence 1002
11 give Mattel the right to inspect and photograph Bryant's originals.

12       Nevertheless, even after the June 20, 2006 stipulation, Bryant largely
13 ignored Mattel's requests for originals and, as even to the ones he did eventually provide,
14 strung out Mattel for weeks.[7]  He also still refuses, to this day, to provide a number of his
15 originals.  As one excuse for his refusals, Bryant claimed at one point that Mattel was not
16 entitled to see all the pages of a spiral notebook containing Bratz drawings.[8]  As Mattel
17 explained, that position was baseless, including because the other pages in the notebook
18 are likely to contain relevant information, such as impressions and even dates that would
19 bear on the creation dates of the Bratz drawings in that same notebook.[9]

20       Although Bryant then conceded that Mattel could inspect the entirety of the
21 spiral notebook, he still refused to produce the originals unless the June 20 stipulation
22 was re-negotiated and a new condition was imposed on Mattel:  namely, Bryant insisted
23 that he would provide Mattel his originals only if Mattel's counsel agreed to give him

---

26  [6] McKenzie Dec., ¶¶ 3 & 4 and Exh. 1; Zeller Dec., ¶ 19.
27  [7] McKenzie Dec., ¶ 8.
    [8] Zeller Dec., ¶ 18 and Exhs. 16 & 17.
28  [9] Id.

EXHIBIT 9  PAGE /00

07209/2039383 1

-3-

1 their work product photographs.[10] Bryant had no right to condition his compliance with
2 the binding, on-the-record stipulation by unilaterally imposing new terms, but Mattel
3 nevertheless tried to accommodate Bryant's evolving demands in the hopes of avoiding
4 motion practice. Mattel therefore stated it would be amendable to a reciprocal agreement
5 whereby all the parties would share their photographs, subject to an agreement that it
6 would not be deemed a waiver of work product protections and that a party could
7 withhold particular photographs if they revealed a party's litigation strategy, such as
8 photographs that focus in on particular portions of documents or tangible items.[11] Bryant
9 then insisted in response that Mattel provide him with authority for the proposition that
10 photographs taken by counsel are work product.[12] After Mattel provided that authority,
11 and although Mattel made yet another follow-up request, Bryant simply decided to
12 ignore Mattel, including a Mattel letter specifically warning that Mattel would have no
13 choice but to proceed with this motion unless it hear from him.[13]

14       Bryant's delays and his defiance of a binding stipulation need to brought to
15 an end. The parties' on-the-record stipulation should be enforced by its terms, and
16 Bryant should be ordered—without new conditions, caveats or cut-outs—to produce all
17 of his remaining originals requested by Mattel for inspection and photographing. He
18 also should be sanctioned for forcing Mattel to bring this motion to obtain what Bryant
19 acknowledged to Judge Block Mattel was entitled to and for his long, unjustified refusals
20 to produce this required discovery to Mattel.

21 **Background**

22     ***Carter Bryant's Work On Bratz.*** Defendant Carter Bryant is a former
23 Mattel employee. He worked as a Mattel product designer from September 1995 to

24

25 ―――――――――
26 [10] Declaration of B. Dylan Proctor, dated January 19, 2007 and filed concurrently herewith ("Proctor Dec."), ¶ 2.
27 [11] Id., ¶ 3 and Exh. 1.
[12] Id., ¶ 4 and Exh. 2.
28 [13] Id., ¶ 5 and Exh. 3.

EXHIBIT 9 PAGE 101

MATTEL'S MOTION TO COMPEL ORIGINALS

07209/2039383.1

1 April 1998, and then again from January 1999 to October 2000.[14]  Upon starting his
2 second term of employment with Mattel, Bryant executed an Employee Confidential
3 Information and Inventions Agreement.[15]  There, he agreed that during his Mattel
4 employment he would not, without Mattel's express written consent, "engage in any
5 employment or business other than for [Mattel], or invest in or assist (in any manner) any
6 business competitive with the business or future business plans of [Mattel]."  Bryant also
7 assigned to Mattel, to the fullest extent of the law, all rights in "inventions," including
8 "designs," that he created during his Mattel employment.  In his agreement, Bryant
9 further promised not to disclose or misuse Mattel's proprietary or confidential
10 information, which is an obligation that continues to this day.

11          In November 2003, Mattel obtained a copy of a contract between Bryant
12 and MGA, a Mattel competitor.[16]  That contract—which was entered into while Bryant
13 was employed by Mattel—required Bryant to provide design services to MGA on a "top
14 priority" basis, in conflict with his then-existing duties to Mattel.  It also purported to
15 grant MGA ownership of works made by Bryant, both before and after the agreement's
16 effective date, in further contravention of his obligations to Mattel.

17          Discovery has shown so far that Bryant worked on at least two projects with
18 MGA while he was employed by Mattel.  One was the "Bratz" project.[17]  The other was
19 an ostensibly separate project known as "Angel."[18]  In this case, the timing of Bryant's
20 actions are important to many of Mattel's claims.  Among other things,  Bryant's
21 drawings and other works that were created during his Mattel employment are owned by
22 Mattel and thus their dates of creation are highly relevant.  Indeed, Bryant and MGA
23 have put timing at issue by claiming that Bryant created most or all of his drawings, and

24

25  _____
   [14] See Zeller Dec., Exh. 1 at ¶ 9, Exh. 2 at 29:16-18 & Exh. 3 at ¶ 7.
26  [15] Id., ¶ 2 and Exh. 1.
   [16] Id., ¶ 3 and Exh. 3.                          EXHIBIT __9__ PAGE _102_
27  [17] Id., Exh. 4 at 178:3-22.
   [18] Id., Exh. 4 at 178:3-18, 195:21-196:20.
28

07209/2039383.1

-5-

1 | performed other relevant work, either during the few months in 1998 when he was not
2 | working for Mattel, or else after the time he had left Mattel.[19]

3 |      ***Bryant Agrees, But Then Refuses, To Make Originals Available.*** Much of
4 | the documentary evidence produced by Bryant consists of undated design drawings,
5 | which Bryant produced to Mattel as black and white photocopies.[20]   Moreover,
6 | information that one would naturally expect—such as complete fax headers, date and
7 | time stamps and fax cover pages—are missing from his production.[21]

8 |      Mattel began asking Bryant to make his originals available for inspection
9 | and photographing at least as early as October 25, 2004.[22]   Bryant responded that Mattel
10 | could make the inspection on November 1, 2004.[23]   Mattel asked Bryant to confirm that
11 | the inspection would include: "1) all of the non-privileged responsive documents in
12 | Bryant's possession or control; 2) the additional documents you agreed to allow us to
13 | inspect at the meeting of counsel; and 3) all of the tangible items that Mattel
14 | requested."[24]   Before the inspection, Bryant's counsel unilaterally limited Mattel's
15 | inspection to only the tangible things that Bryant had produced up to that point.[25]   Then,
16 | at the inspection on November 1, 2004, Bryant's counsel provided only a few tangible
17 | items for Mattel's inspection and none of the originals of the drawings or other
18 | documents that Bryant had produced.[26]

19 |      Mattel again asked that all of the originals be made available for inspection,
20 | this time requesting that the originals be made available for inspection during Bryant's
21 | deposition—which took place only after two Court Orders compelling his attendance and
22 | only after Bryant's counsel had broken their "word as attorneys" that he would earlier

23 |
24 | [19] E.g., id., ¶ 4 and Exhs. 3 at ¶ 24 and Exh. 4 at 45:7-14, 139:23-141:8.
25 | [20] Id., ¶ 6 and Exh. 5.
   | [21] Id., ¶ 7 and Exh. 7.
   | [22] Zeller Dec., Exh. 9.
26 | [23] Id., Exh. 10.
   | [24] Id., Exh. 11.
27 | [25] Id., ¶ 11.
   | [26] Id.
28 |

EXHIBIT ___9___ PAGE _103_

-6-

MATTEL'S MOTION TO COMPEL ORIGINALS

1    appear.[27]   Bryant's counsel stated that "we will have these originals sent to Missouri,"
2    where the deposition was taking place.[28]   Despite this, and despite Mattel's further
3    requests at that time for the originals, Bryant made only a few original drawings
4    available at the deposition.[29]   As shown by the deposition transcript, in response to
5    Mattel's additional inquiries, Bryant's counsel specifically represented that, as to Bryant's
6    original documents and drawings, "we certainly will make them available for inspection
7    at a reasonable time upon reasonable notice."[30]

8         *Mattel's Motion To Compel And The Parties' Resulting On-The-Record*
9    *June 20, 2006 Stipulation.* After the deposition, Mattel made additional requests to see
10   the originals of the documents produced by Mr. Bryant.  Bryant's counsel then agreed,
11   again, to make all original documents available for inspection and photographing, and
12   the inspection was scheduled to begin on December 22, 2004.[31]   Mattel's counsel, with a
13   videographer and photographer, inspected some originals on December 22 and on
14   December 23, 2004.[32]   Yet, at the inspection, Bryant's counsel did not turn over a single
15   original Bratz drawing or sketch[33] and, indeed, did not turn over the majority of the
16   originals of documents that he has produced.[34]   Equally troubling, Bryant's counsel
17   claimed not to be able to turn over or even locate many of the originals.[35]   During that
18   inspection, Bryant's counsel made repeated promises that all original documents would
19   be made available for inspection "when found."[36]

20

21   _____

22   [27] Zeller Dec., Exh. 12.
     [28] Id., Exh. 13.
23   [29] Id., ¶ 14.
     [30] Id., ¶ 14 and Exh. 4 at 616:17-18.
24   [31] Zeller Dec., ¶ 17.
     [32] McKenzie Dec., ¶ 2.
25   [33] McKenzie Dec., ¶¶ 2-4 & Exh. 1.
     [34]   Id.   A complete listing of the original Bratz drawings, sketches and other
26   documents that Bryant's counsel could not account for in any way, even as to their
     whereabouts, are detailed in Exhibit 1 to the McKenzie Dec.
27   [35] McKenzie Dec., ¶¶ 3-4 & Exh. 1.
     [36] McKenzie Dec., ¶ 3.
28

EXHIBIT 9 PAGE 104

07209/2039383.1

MATTEL'S MOTION TO COMPEL ORIGINALS

1    Over the course of yet another month following the incomplete inspection
2    of documents that Bryant allowed, Mattel made further requests to inspect the remaining
3    original documents, including on January 24, 2005,[37] but to no avail.  Thus, despite
4    Bryant's earlier promises, and more than three months after Mattel began asking for the
5    inspection, Bryant still had failed to turn over for inspection and photographing the
6    majority of the originals in his production.[38]  He also had failed to allow the inspection
7    and photographing of any of the originals of Bratz drawings in his production.[39]  Indeed,
8    the only "originals" of Bratz drawings that Mattel had been allowed to inspect and
9    photograph were, in fact, photocopies.[40]

10    On February 18, 2005, Mattel therefore filed a motion to compel Bryant to
11    produce his originals for inspection and photographing.[41]  Before the motion was heard,
12    however, the case was stayed for approximately a year while the Ninth Circuit
13    considered an interlocutory jurisdictional appeal.  After the jurisdictional appeal was
14    resolved and the parties' various cases were consolidated, Judge Block ordered the
15    parties to appear in his courtroom on June 20, 2006 to further meet and confer on then-
16    pending discovery motions, including Mattel's motion to compel Bryant to produce his
17    originals.[42]  After further discussing Mattel's motion to compel the originals, the parties
18    stated on the record before Judge Block on June 20, 2006 their agreement that the
19    parties, including Bryant, would produce for inspection and photographing originals
20    requested by another party on 15 days' notice.[43]

21    ***Mattel Again Seeks, And Bryant Refuses, Production Of Originals***
22    ***Pursuant To The June 20, 2005 On-The-Record Stipulation***.  Pursuant to the June 20,
23    2006 stipulation, Mattel requested in writing on June 21, 2006 that certain originals be

24
25    [37]  Zeller Dec., Exh. 14.
       [38]  Id., ¶ 19.
26    [39]  McKenzie Dec., ¶ 3 & Exh. 1.
       [40]  Id.
27    [41]  Zeller Dec., Exh. 15.
       [42]  Zeller Dec. ¶ 17.
28

EXHIBIT 9 PAGE 105

-8-

MATTEL'S MOTION TO COMPEL ORIGINALS

1    made available by Bryant.[44] Nevertheless, in response to Mattel's June 21, 2006 request,
2    Bryant's counsel only made some, but not all, of the originals available. Accordingly, on
3    August 8, 2006, Mattel sent Bryant an additional letter detailing the previously requested
4    original documents that had still not been provided for Mattel's inspection and
5    photographing.[45] When it received no response to that letter, Mattel sent *yet another*
6    written request to inspect the missing original documents on August 21, 2006.[46] Bryant
7    ignored that request as well.[47]

8          Eventually, after Mattel made clear it was filing another motion to obtain
9    the originals, Bryant claimed that Mattel was not entitled to see all the original pages of a
10   spiral notebook containing Bratz drawings.[48] Not only did that argument fail to explain
11   his long-standing failure to produce other originals, but as Mattel explained, his position
12   was baseless since the information on the other pages would contain relevant
13   information, such as impressions and even dates that would bear on the creation dates of
14   the Bratz drawings in that same notebook.[49]

15          Bryant then conceded that Mattel could inspect the entirety of the spiral
16   notebook, but he still refused to produce the originals unless Mattel agreed to modify the
17   June 20 stipulation with new terms: namely, Bryant insisted that he would provide
18   Mattel his originals only if Mattel's counsel gave him their work product photographs.[50]
19   Although Bryant had no right to condition his compliance with the binding, on-the-
20   record stipulation by unilaterally imposing new terms, Mattel nonetheless tried to
21   accommodate Bryant's newest demands in an effort to avoid further motion practice.
22   Mattel therefore stated it would be amendable to a reciprocal agreement whereby the

23

24   [43]   Id.; see also McKenzie Dec., ¶ 3.
      [44]   McKenzie Dec., Exh. 2.
25   [45]   Id., Exh. 3.
      [46]   Id., Exh. 4.
26   [47]   Zeller Dec. ¶ 19.
      [48]   Zeller Dec., ¶ 18 and Exhs. 16 & 17.
27   [49]   Id.
      [50]   Proctor Dec., ¶ 2.
28

EXHIBIT __9__ PAGE _106_

1   parties would share their photographs, subject to an agreement that it would not be
2   deemed a waiver of work product protections and that a party could withhold particular
3   photographs if they revealed a party's litigation strategy, such as photographs that focus
4   in on particular portions of documents or tangible items.[51]   In response, Bryant insisted
5   that Mattel provide him with authority for the proposition that photographs taken by
6   counsel are work product.[52]   Mattel provided that authority and made yet another follow-
7   up request to Bryant, including through a January 12, 2007 Mattel letter stating that
8   Mattel would proceed with this motion if Mattel did not hear from Bryant by January 16,
9   2007.[53]   Bryant, however, simply chose to ignore Mattel.[54]

10                                    **Argument**

11   **I.    BRYANT SHOULD BE ORDERED TO MAKE HIS ORIGINAL**
12   **DRAWINGS, DOCUMENTS AND TANGIBLE THINGS**
13   **AVAILABLEFOR INSPECTION.**

14          Bryant should be ordered to make his originals and tangible items available
15   for Mattel's inspection and photographing.  Not only did Bryant stipulate to make them
16   available on 15 days' notice on the record before Judge Block, but Mattel is clearly
17   entitled to inspection under the Federal Rules.

18          **A.    Bryant Stipulated On The Record That He Would Produce, And**
19                  **Otherwise Had Agreed On Numerous Occasions To Produce, These**
20                  **Very Documents, But Still Refuses To Do So.**

21          At the conclusion of the meet and confer on June 20, 2006 to resolve
22   Mattel's prior motion to compel Bryant to make his originals available for inspection and
23   photographing, the parties stipulated on the record before Judge Block that they—
24   including Bryant—would provide originals for inspection and photographing within 15

25   _____
                                              EXHIBIT 9 PAGE 107
26   [51] Id., Exh. 1.
27   [52] Id., Exh. 2.
     [53] Id., Exhs. 3 & 4.
28   [54] Id., ¶ 5 & Exh. 4.

J7209/2039383.1
                                         -10-

1  days of a request by another party. As noted, despite Mattel's repeated requests for
2  months now, Bryant failed to comply and then chose to simply ignore Mattel's requests
3  entirely.

4          Moreover, on multiple occasions as shown above, including on the record at
5  the Bryant deposition, Bryant stated to Mattel that he will provide his originals. Despite
6  the fact that Mattel has now spent considerable time and money in reliance on these
7  promises—showing up with attorneys, videographers and photographers on three
8  occasions to inspect documents and other tangible things—Bryant and his counsel have
9  not lived up to their promises and still refuse to provide his requested originals.
10 Therefore, Bryant should be compelled to do so.

11          **B.    Mattel Is Entitled to Inspect the Original Documents Under The**
12               **Federal Rules.**

13          Even apart from Bryant's binding, on-the-record stipulation and his
14 numerous, broken promises, Mattel is entitled to the originals under the law. The plain
15 language of Rule 34 allows Mattel to inspect Bryant's originals since it specifically
16 permits a party requesting documents "*to inspect* and copy, any designated
17 documents"—including "writings" and "*drawings*" —"or *to inspect* and copy, test, or
18 sample any tangible things which constitute or contain matters within the scope of Rule
19 26(b) and which are in the possession, custody or control of the party upon whom the
20 request is served." Fed. R. Civ. P. 34(a) (emphasis added). This language means what it
21 says. As one court has stated, Rule 34 confers "a right to inspect the originals.
22 Possession of copies of documents does not prevent discovery of actual documents so as
23 to avoid possible challenges to the genuineness of copies at the trial." In re Kolinsky,
24 140 B.R. 79, 87 (S.D.N.Y. 1992) (citing 4 Moore's Federal Practice, § 26-184 (2d ed.
25 1991)); see also Gielow v. Warner Bros. Pictures, 26 F. Supp. 425 (S.D.N.Y. 1938)
26 (holding originals were "evidence material to any matter involved" within Rule 34
27 providing for discovery and granting motion to compel).   EXHIBIT ___9___ PAGE /08

28

07209/2039383.1
-11-
MATTEL'S MOTION TO COMPEL ORIGINALS

14

1    The reasons for this are apparent:   Originals often reveal significant
2  information not obtainable from copies.  As McCormick has stated, "[i]t has long been
3  observed that the opportunity to inspect original writings may be of substantial
4  importance in the detection of fraud," and "[m]any indicia of putative fraud such as
5  watermarks, types of paper and inks, etc., will not be discernable on the copy."
6  McCormick, Evidence §§ 231, 236 (4th ed. 1992).  Indeed, the policies seeking to
7  prevent inaccuracy and fraud with respect to documents are what animate Federal Rule
8  of Evidence 1002, which independently requires Bryant to produce his originals here.
9  "[W]ritings exhibit a fineness of detail . . . which will often be of critical importance.
10 Prevention of loss of this fine detail through mistransmission is a basic objective of the
11 rule requiring production of documentary originals." McCormick, supra, § 232; see also
12 United States v. Yamin, 868 F.2d 130, 134 (5th Cir. 1989) (explaining purpose of rule
13 requiring production of originals is "to prevent inaccuracy and fraud when attempting to
14 prove the contents of a writing.").

15    Allowing Mattel equal access to the information shown by the originals—to
16 which defendants obviously have access but refuse to share—is particularly important in
17 this case.  This case involves numerous drawings, and the ones that Mattel has seen so
18 far were created using different kinds and colors of pencils, inks and markers.[55]  They
19 also have what appears to be different handwriting from different sources made at
20 different times on them.[56]  Two different third-party witnesses, Ramona Prince and Steve
21 Linker, also have testified that certain, highly material dates and annotations on the
22 copies of Bryant drawings as produced to Mattel by defendants here did **not** in fact
23 appear on the original drawings that defendants had previously shown them.[57]  The
24 timing of the creation of these documents and of the various additional matter on them
25                                                   EXHIBIT __9__ PAGE _109_

26 [55] E.g., Zeller Dec., ¶ 6.
   [56] Id.
27 [57] Zeller Dec., Exhs. 20 (at 171:25, 172-175:1-23) & 21 (at 131:22-24, 132-138:1-
28 12).

17209/2039383.1

MATTEL'S MOTION TO COMPEL ORIGINALS

1   can be critical in this case, as noted above. Mattel is entitled to know which originals

2   Bryant has and is entitled to know the information that is evident only from originals,

3   such as the existence of watermarks or impressions and the use of different inks on

4   particular documents. Without inspecting and photographing the originals of these

5   drawings, it will be effectively impossible for Mattel to fully understand the evidence

6   and to test any claims that the drawings and their claimed dates of creation are authentic.

7           Independently, Mattel is entitled to inspect and photograph to determine

8   which originals have been altered and how. As noted, witnesses have testified that key

9   aspects of drawings, such as dates, that Bryant purports to rely on were added only later.

10   And, as the testimony of a former MGA executive revealed, there has been an alteration

11   of originals by defendants in this case. Victoria O'Connor was an MGA executive who

12   worked for MGA when Bryant and MGA signed what they claim is their first Bratz-

13   related agreement (the "Bryant/MGA Contract").[58] According to Ms. O'Connor, Bryant

14   faxed a signed copy of the Bryant/MGA Contract to MGA from Mattel.[59] Upon receipt,

15   each page of the contract included a fax header that read "Barbie Collectibles" (which is

16   the Mattel design group that Bryant worked in) and bore the number of the Mattel fax

17   machine that it came from, revealing that it came from Mattel's Design Center where

18   Bryant worked.[60] When Ms. O'Connor brought this to the attention of her boss--Isaac

19   Larian, the CEO and founder of MGA--Mr. Larian instructed her to "white-out" the fax

20   header information on all pages of the contract and send the contract, as altered, to an

21   outside MGA attorney.[61] At Mr. Larian's direction, Ms. O'Connor proceeded to alter

22   each page of the contract in order to conceal, as Ms. O'Connor testified, that Bryant

23   "was still employed at Mattel at the time the contract [between MGA and Bryant] was

24   executed."[62]

25

EXHIBIT __9__ PAGE __110__

[58] Zeller Dec. Exh. 8 (at 13:2-9).

26 [59] Zeller Dec. Exh. 8 (at 18:13-14).

[60] Zeller Dec. Exh. 8 (at 18:13-16).

27 [61] Zeller Dec. Exh. 8 (at 18:13-18).

[62] Zeller Dec. Exh. 8 (at 19:1-4, 20:8-21:18).

28

1             Bryant likewise has produced documents in this case that bear indicia of
2   having been altered from their original state. For example, Bryant had produced a fax of
3   Bratz drawings that has a fax header date of April 10, 2000[63]--a time during which
4   Bryant was working for Mattel and during which Bryant claims he was not working on
5   Bratz. Although the fax header information on the page produced by Bryant states that it
6   was the third page of a fax transmission, neither the preceding nor subsequent pages, nor
7   any cover sheet, has been produced.[64] Further, even though the fax header on the
8   produced page has fields for both the sender's name and the sender's telephone number,
9   neither the name of the sender nor the sender's telephone number appears in the fax
10  header.[65] That information is simply missing. Because facsimile machines normally
11  insert senders' names and numbers as a matter of course, and indeed is required by law,[66]
12  there is reason to believe that the document was altered to conceal the sender's
13  information. As Judge Larson has put, "the testimony elicited from Ms. O'Connor that
14  MGA altered the fax header from other documents related to Bratz from the same time
15  period leads to an obvious inference that other documents where spaces on other fax
16  headers are absent suffered a similar fate."[67]

17            Furthermore, without an inspection, Mattel has no way of knowing what
18  drawings and other documents defendants even have originals of and cannot ascertain
19  whether expert analysis can potentially be performed. The chemical composition of
20  certain types of inks and papers, and details such as watermarks and other impressions
21  found only on the originals of the documents, may bear on when a document was created

22
      [63]   Zeller Dec., Exh. 7.
23       [64]   Zeller Dec., Exh. 6.
      [65]   Zeller Dec. ¶ 7 and Exhs. 6 & 7.
24       [66]   See 47 U.S.C. § 227(d)(1)(B) ("It shall be unlawful for any person within the
United States . . . to use a computer or other electronic device to send any message via a
25  telephone facsimile machine unless such person clearly marks, in a margin at the top or
bottom of each transmitted page of the message or on the first page of the transmission,
26  the date and time it is sent and an identification of the business, other entity, or
individual sending the message and the telephone number of the sending machine or of
27  such business, other entity, or individual.").   EXHIBIT 9   PAGE 111

28

07209/2039383.1

-14-

1 and on when the various writings on them were made.[68]  Mattel contemplates having
2 experts examine the documents to determine what the originals might reveal the true date
3 of their creation.  Such information is relevant in this case because it may either confirm
4 or contradict Bryant's testimony about when he was doing the work on Bratz and/or
5 Angel that he says he did.  But Mattel needs detailed information about the originals
6 before it can ascertain what, if any, type of expert analysis would be appropriate and
7 furthermore to determine which of the originals are potentially appropriate candidates for
8 expert analysis.  Mattel cannot even begin this process, however, without being able to
9 inspect and photograph the rest of Bryant's originals, including most critically the
10 originals of Bryant's Bratz drawings that he refuses to allow Mattel to inspect and
11 photograph.

12        **C.    Bryant Has No Legitimate Justification For His Refusals To Make
13              His Originals Available.**

14              The foregoing discussion also makes evident that Bryant's most recent set of
15 evolving excuses for violating his obligations are without merit.  Bryant at one point
16 tried to make, but then abandoned, an argument that Mattel was not entitled to see the
17 complete spiral notebook containing several of the as-yet-uninspected original Bratz
18 drawings and claimed that Mattel could only look at a narrowly defined set of pages of
19 Bryant's unilateral choosing.  Of course, this in no way explained Bryant's failure to
20 produce the other originals he has continued to withhold.  Nor was there any basis for
21 Bryant's insistence that he could withhold pages from the notebook.  Not only do any
22 number of the pages in the spiral notebook have Bratz-related material on them, but the
23 other pages will reveal information that bears on the dating of those drawings in the

---

24        [67]    Zeller Dec., Exh. 19 at 9:6-9.
25        [68]    See, e.g., Equal Employment Opportunity Commission v. Ethan Allen, Inc., 259
   F. Supp. 2d 625, 626 n.1 (N.D. Ohio 2003) ("Sometimes, the determination of the type of
26 ink used can, by itself, prove conclusively that the claimed date of writing is false.  For
   example, a given ink may:  (1) have been manufactured only during certain years;
27 (footnote continued)

EXHIBIT _9_ PAGE _112_

28

1 notebook in numerous ways. Notebook writings make impressions and markings on
2 other pages that can reveal the order in which, or the date on which, they were made.
3 Many or all of these pages thus may be candidates for expert analysis, including expert
4 impression analysis, to determine the order in which the writings in the notebook—and
5 thus the Bratz drawings—were actually created. Such analysis further may reveal
6 whether the notebook has been altered from its original state or whether pages have been
7 removed and, if so, what information was on those pages because of the impressions on
8 the remaining pages. The other pages also may bear ink or other chemical components
9 that can be tested to ascertain when those markings were made and thus when adjacent
10 Bratz drawings were made as well. Indeed, the other pages may themselves have
11 notations or impression that, on their face, reflect the time period in which Bratz sketches
12 and other relevant drawings were created. Even something as seemingly innocuous as a
13 phone number or similar information may tend to show when drawings were made. For
14 example, if it is known that Bryant did not first have contact with a particular person, yet
15 information about that person is reflected on a certain notebook page, it may serve as
16 evidence of a drawing's date. The significant likelihood of discovering relevant
17 contextual date information—and the potential dispositive nature of such information—
18 entitles Mattel inspect the notebook as a whole, not just isolated pages cherry-picked by
19 Bryant.

20        Bryant's more recent arguments in refusing to honor his on-the-record June
21 20, 2006 stipulation unless Mattel agreed to additional terms that were not part of the
22 stipulation fare no better. The parties' stipulation did not provide for the caveat that
23 Bryant need make his originals available for inspection 15 days' notice only if Mattel
24 gave him photographs. No such cut-out or condition was part of the stipulation. Not
25 only is Bryant's refusal to comply with the stipulation unless Mattel agreed to such terms

EXHIBIT __9__ PAGE __115__

26

27 and/or (2) contain 'tags,' which are chemical components added to the ink for the precise
28 purpose of providing a date of manufacture.").

-16-

MATTEL'S MOTION TO COMPEL ORIGINALS

1 | improper for that reason alone, but he had no legal basis to insist Mattel give him its
2 | photographs.[69] Although Mattel was willing to discuss with Bryant during the meet and
3 | confer process a sensible agreement that would be reciprocal among all the parties, and
·4 | so long as it would not prejudice Mattel's rights, in an effort to obtain Bryant's originals
5 | without resort to motion practice, Bryant's refusals to even respond to Mattel meant no
6 | such agreement was reached. As such, far from justifying Bryant's refusals to comply
7 | with the on-the-record stipulation and with his legal obligations to produce the originals,
8 | his improper demands turned out to be only another, equally improper delaying tactic.

9 |       Finally, Bryant cannot legitimately complain that an order compelling him
10 | to make the originals available would be burdensome. He stipulated on the record to
11 | provide them on 15 days' notice. Moreover, Bryant's entire production is only some

13 | [69] The language of Federal Rule of Civil Procedure 26(b)(3) itself makes clear that photographs taken at the direction of counsel during litigation can be protected from disclosure by the work product doctrine. Under that Rule, "a party may obtain discovery of documents and tangible things otherwise discoverable . . . and prepared in anticipation of litigation or for trial by or for another party or for that other party's representative . . . only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." Photographs, videos and the like prepared at the direction of Mattel's counsel, including photographs or images of original documents, fall under this Rule, since they reveal counsel's mental impressions and/or strategies (such as, for example, by focusing on particular aspects of particular dolls or drawings), as Bryant's counsel himself acknowledged during a recent meet and confer. Accordingly, courts have refused to compel disclosure of work product photographs taken by or at the direction of counsel. See, e.g., Gonnuscio v. Seabrand Shipping Ltd., 1997 WL 118436, at *1 (D. Or. 1997) (denying motion to compel photographs of accident scene taken by attorney because "photographs of this nature could easily contain the mental impressions and theories of the case of the attorney who was investigating and taking the photographs"). Furthermore, Bryant has access to "the substantial equivalent" of such materials because he has his own originals, which defeats any entitlement Bryant could attempt to make to the photographs absent Mattel's agreement. Of course, a party who wishes to use a photograph or other demonstrative at trial typically needs to disclose that demonstrative before the Final Pretrial Conference under Local Rules 16-2, 16-3 and 16-6, but that simply underscores that any photographs that counsel ultimately elects to use as demonstratives are not subject to discovery at this stage of litigation.

1  1588 pages.[70]  At the limited inspection in December 2004, Mattel was allowed to
2  inspect 462 pages of the "originals" of Bryant's production.[71] Another 267 pages were
3  produced on July 12, 2006 for Mattel's inspection.[72] The additional, remaining pages are
4  not an unreasonable amount for Bryant to collect and make available for inspection,
5  especially in light of the fact that several of the originals he has not produced for
6  inspection are among the most relevant and significant in this case.

7         Mattel therefore respectfully requests that the Discovery Master order
8  Bryant to immediately make available to Mattel the remaining original drawings and
9  documents for inspection and photographing.

10  **II.     THE DISCOVERY MASTER SHOULD SANCTION BRYANT.**

11         Rule 37(a)(4) of the <u>Federal Rules of Civil Procedure</u> provides that a party
12  bringing a motion to compel is entitled to the "reasonable expenses incurred in making
13  the motion, including attorney's fees, unless the court finds that the motion was filed
14  without the movant's first making a good faith effort to obtain the disclosure or discovery
15  without court action, or that the opposing party's nondisclosure, response or objection
16  was substantially justified, or that other circumstances make an award of expenses
17  unjust." <u>Fed. R. Civ. P.</u> 37(a)(4). The burden of establishing substantial justification is
18  on the party being sanctioned. <u>Hyde & Drath v. Baker</u>, 24 F.3d 1162, 1171 (9th Cir.
19  1994).   Independently, sanctions may be imposed under 28 U.S.C. § 1927, which
20  provides that "[a]ny attorney ... who so multiplies the proceedings in any case
21  unreasonably and vexatiously may be required by the court to satisfy personally the
22  excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."
23  Sanctions under this section are appropriate "for conduct that, viewed objectively,
24  manifests either intentional or reckless disregard of the attorney's duties to the court."
25
26  _____

[70]  <u>E.g.</u>, McKenzie Dec., ¶ 3 & Exh. 1.
27  [71]  <u>Id.</u>
28  [72]  <u>Id.</u> at ¶ 8.

EXHIBIT 9   PAGE 16

1 | RTC v. Dabney, 73 F.3d 262, 265 (10th Cir. 1995) (citing Braley v. Campbell, 832
2 | F.2d 1504, 1512 (10th Cir. 1987)).

3 |       Here, there is no legitimate excuse for Bryant's failures to produce the
4 | remaining originals for inspection and photographing. Mattel has been asking for these
5 | original documents since late 2004. Bryant agreed to produce these original documents
6 | on more than one occasion—including pursuant to an on-the-record stipulation before
7 | Judge Block on June 20, 2006—but then failed to abide by his promises and even a
8 | binding stipulation *yet again*. Nor, in any event, is there any substantial or good faith
9 | basis for Bryant's long-standing failures. It is more than obvious that Mattel is entitled to
10 | inspect and photograph the originals and gave Bryant more than an ample, reasonable
11 | time to collect them and make them available. Indeed, Mattel has given Bryant months
12 | to comply both before and after Bryant had stipulated in open Court on June 20, 2006
13 | that he would provide the documents on 15 days' notice. Instead, Mattel still has gotten
14 | the run-around yet again and thus is now forced to file yet another motion to obtain these
15 | originals as a result of Bryant's lack of cooperation and his defiance of an on-the-record
16 | stipulation.

17 |       National Hockey League, Inc. v. Metropolitan Hockey Club, Inc., 427 U.S.
18 | 639 (1976), is instructive here. There, the Supreme Court held that respondent's actions
19 | in failing to honor their "promises and commitments" in providing discovery, even
20 | despite having been given "numerous extensions," constituted "flagrant bad faith" and a
21 | "callous disregard" of their responsibilities that justified the sanctions imposed by the
22 | district court. Id. at 640. Bryant's failure to comply with an on-the-record stipulation
23 | and other repeated promises to provide the originals that Mattel has long been seeking is
24 | the very definition of "flagrant bad faith" and "callous disregard." Bryant should be
25 | sanctioned for the fees and costs that he has forced Mattel to expend as a result of his
26 | evasion and lack of a good faith justification for withholding the originals. Mattel

27 | EXHIBIT 9 PAGE 116

28 |

07209/2039383.1

-19-

1 | therefore requests that Bryant be ordered to pay $2,200 as partial reimbursement for the

2 | fees and costs that Mattel has incurred on this motion.[73]

3 | ### Conclusion

4 |      For the foregoing reasons, Mattel respectfully requests that the Discovery

5 | Master grant Mattel's motion in its entirety and order Bryant to produce the remaining

6 | originals immediately and to pay sanctions for his bad-faith delay tactics.

7 |

8 | DATED:  January 22, 2007          QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

9 |

10 |                          By _____

11 |                             Michael T. Zeller
                                Attorneys for Plaintiff Mattel, Inc.

12 |

EXHIBIT 9 PAGE 117

27 |

[73] Zeller Dec., ¶ 35.

-20-

MATTEL'S MOTION TO COMPEL ORIGINALS

)7209/2039383.1

EXHIBIT 10

1            UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3                 EASTERN DIVISION

4    - - - - - - - - - - - - - - - - - - - - - - - - -x

5    CARTER BRYANT, an
     individual,

6

                      Plaintiff,

7

         v.                          CV 04-9040 SGL(RNBx)

8                          Consolidated with
                           Case No. CV 04-09059

9                          Case No. CV 05-02727

10

     MATTEL, INC., a Delaware

11   corporation,

12                    Defendant.

13

     AND CONSOLIDATED ACTIONS

14   - - - - - - - - - - - - - - - - - - - - - - - - -x

15

16        Video Deposition of ALBERT LYTER, Ph.D.

17                  (Taken by Defendant)

18              Raleigh, North Carolina

19                  April 17, 2008

20

21   Reported by:      Marisa Munoz-Vourakis -
                       RMR, CRR and Notary Public

22

23                        EXHIBIT _10_   PAGE _118_

24

25

1      Q.      Besides line crossing and ink chemistry

2    what other document examination presentations have you

3    made at SWAT T?

4      A.      I don't remember.  I'd have to think about

5    that.

6      Q.      How long have you been a member of any

7    kind?

8      A.      Since 1984.

9      Q.      Do you have the credentials for membership

10   in SWAT T as a question document examiner?

11     A.      No, I don't do handwriting analysis.

12     Q.      So you've never applied for membership in

13   SWAT T?

14     A.      I can't I don't do handwriting analysis, so

15   I don't meet their qualifications.

16     Q.      Do you have the credentials for membership

17   in the American society for document examiners the

18   ASQDE as a question document examiner?     EXHIBIT _/0_ PAGE _//9_

19     A.      Well, I'm not sure they have aegis

20   instituted a new membership class and I'm not sure

21   exactly what they call it.  So I don't know whether

22   they call it a question document examiner or they call

23   it something different.  But apparently they made

24   changes so that people that do not do handwriting can

25   in fact be members.  And if that's the case, then yes I

EXHIBIT 11

Feb 11 08 04:14p     Llc   W. Cunningham        760- 1-5227            p.2

LLOYD CUNNINGHAM
FORENSIC DOCUMENT EXAMINER
67 OAK MEADOW COURT, ALAMO, CA 94507
OFFICE PHONE: 925-831-0790
FAX: 925-831-0791

## CURRICULUM VITAE

Currently I am self-employed as a Forensic Document Examiner.

The following is a resume of my qualifications as they relate to my expertise. I would testify to these qualifications in a court of law as an expert in the examination of questioned handwriting and documents.

| | |
|---|---|
| 1963-1990 | Twenty-seven years of service with the San Francisco Police Department. Retired Inspector of Police. |
| 1977-1980 | Assigned to the San Francisco Police Department Fraud Unit, Embezzlement Investigations. |
| 1980 | Graduated from the United States Secret Service Questioned Documents Course in Washington, D.C. |
| 1980-1982 | Completed a 2-1/2 year course of studies as an intern with the Questioned Document Section of the United States Postal Crime Laboratory. |
| 1982 | Graduated from the F.B.I. Questioned Documents Course in Quantico, VA. |

Established the first full time Questioned Document Section within the San Francisco Police Department Crime Laboratory and supervised this section from 1980 – 1990.

Past president of the Southwestern Association of Forensic Document Examiners.

### MEMBER

Southwestern Association of Forensic Document Examiners.

Honorary Member of the American Society of Questioned Document Examiners.

International Association for Identification – Questioned Document Section. Life Member.

EXHIBIT *19* PAGE *120*

## ATTEND FORENSIC WORKSHOPS SPONSORED BY:

Southwestern Association of Forensic Document Examiners
American Society of Questioned Document Examiners
American Board of Forensic Document Examiners
International Association for Identification
American Academy of Forensic Sciences

Prepared scientific research papers which were presented at forensic
seminars and published in forensic and law enforcement journals.

## LECTURED

San Francisco Police Department Academy
Oakland Police Department
District Attorney Investigator's Association
California District Attorney's Association
Trial Lawyer's Association
American Bar Association
California Department of Motor Vehicles Investigators
U.S.F Law School.  Hasting Law School
Numerous Bank Investigators and Investigative Associations.

## INSTRUCTOR

Certified by the California Commission of Peace Officer Standards and Training
to teach Questioned Document Investigative Techniques in the Institute of
Criminal Investigation.

Taught (POST) Questioned Document Investigative Techniques in conjunction
with the San Jose State University Administration of Justice Department from
1991 – 2003.

Examined items and prepared formal reports for approximately 6,000 questioned
document cases which were submitted by law enforcement investigators,
corporate security, civil attorneys, criminal defense attorneys, and for federal and
state agencies such as the F.B.I, Secret Service, I.R.S., U.S. Customs, D.E.A.,
California Highway Patrol, etc.

Testified and have been accepted as an expert Forensic Document Examiner in
excess of 500 times in State and Federal Courts, and in depositions and hearings.

EXHIBIT _*1*_ PAGE _121_

TESTIMONY
Page 10

06/06/02:  Court Testimony: Superior Court Dept. #21, San Mateo County.
Judge Robert D. Foiles. People v. Travis Wells. Private Defender
Edward Pomeroy. HW

08/27/02:  Court Testimony: Marriage of Dadres/Bahadori at Law Offices of
Montalvo, Esq. Attorney Charles Webb. Retired Judge James
Stewart. HW

08/30/02:  Court Testimony: Superior Court San Mateo County. Judge James
Stewart. Marriage of Dadres/Bahadori. Attorney Charles Webb.

12/02/02:  Arbitration Hearing: Garcia v. Chevron. Oakland, CA. Attorney
Brendan Dolan. HW

12/04/02:  Court Testimony: Superior Court Monterey County. Estate of
Garrett Quickert. Judge Dauphine. HW

12/09/02:  Arbitration Hearing: Concord, CA. Garcia v. Chevron. Attorney
Brenda Dolan. HW

12/30/02:  Deposition Testimony: Estate of Conlan. Attorney Jil Dalesandro.
HW.

02/18/03:  Court Testimony (JAMS). San Jose, CA, Summit Logic. Attorney
Michael Mazzocone.

06/11//03:  Grand Jury Testimony. Alameda County. DDA Wood.

07/29/03:  Grand Jury Testimony. San Francisco. DDA Diane Knoles. Estate
of George T. Young.

09/24/03:  Arbitration Hearing: Kaiser Permanente. Ana Linares v. Kaiser.
Attorney Tamara Mason-Williams. Oakland, CA

12/15/03:  Court Testimony. Superior Court #16 – Alameda County. Judge
Kratzer. Holmes v. Alta Bates Medical Center. Attorney Robert
Lamson.

EXHIBIT __*P*__ PAGE __122__

## TESTIMONY RECORD

07/16/04:    Court Testimony: Superior Court #305, Judge Alvarado-San
Francisco. Ricardo Celis Case. Atty. Daniel Murphy. HW

07/29/04:    Court Testimony: Superior Court #8, Judge Cummings-
Modesto, CA. Sharifi v. Stratton. Atty. Sidran. HW, Copies

10/14/04:    Court Testimony: Jerrold Boscoe v. Western Pacific
Development. San Francisco Superior Court #501. Judge
James McBride. Attorney William Farmer. HW, Alterations

11/04/04:    Court Testimony: Riders Case. Alameda Superior Court.
Judge Horner. Prosecution: Terry Wiley.

02/18/05:    Court Testimony: Riders Case. Alameda Superior Court.
Judge Horner. Defense: Michael Rains. HW, Alterations,
ESDA

02/22/05:    Deposition Testimony: Williams v. Masoumi. Attorney
Christopher Olson. HW

04/13/05:    Deposition Testimony: Kelly-Moore. Attorney David DeGroot.
Sheppard-Mullin. HW

05/31/05:    Deposition Testimony: Red Robin Rape Case. Attorney David
Cohen.

06/16/05:    Deposition Testimony: Norton v. Becker. Thomas Packer,
Esq. Gordon & Rees. HW

09/20/05:    Court Testimony: Fortenberry v. Red Robin. Los Angeles
Superior Court. Judge George H. Wu. Mancini and
Associates. HW

01/18/06:    Deposition Testimony: Chun v. Bank of America. San Jose.
HW

04/10/06:    Court Testimony: Chun v. Band of America. San Jose.
Superior Court #22, Judge Murphy. HW

04/12/06:    Deposition Testimony: James Shea v. ABD. Jennifer
Redmond, Esq. Bingham-McCutchen. HW

EXHIBIT  _/𝑝_  PAGE _/23_

EXHIBIT 12

# WILLIAM J. FLYNN, B.S., D-ABFDE
## Forensic Document Examiner
## Curriculum Vitae

## EXPERIENCE (CIVIL):

October 1983 - Present:

### PRESIDENT AND CEO - AFFILIATED FORENSIC LABORATORY, INC.

Founded and Incorporated Affiliated Forensic Laboratories in 1983 to provide the legal and business communities with professional forensic questioned document services.

January 1973 - September 1983:

Private civil practice in Questioned Document Examination - Phoenix, Arizona

## EXPERIENCE (CRIMINAL):

Jan 1973 - July 1991:

### QUESTIONED DOCUMENT SUPERVISOR - ARIZONA DEPARTMENT OF PUBLIC SAFETY.

Supervising Analyst. Arizona Department of Public Safety, Questioned Document Laboratory. Was responsible for determining authorship of questioned handwritings and handprintings; detecting alterations. additions. interlineations, chemical and mechanical erasures, evidence of tracings or other tampering with original documents. Used stereoscopic microscopes. test plates. infrared. ultraviolet and other spectral devices and video conversion equipment. Conducted counterfeit detection, ink and paper analyses. Have qualified and rendered expert testimony in Federal, State; and Municipal courts throughout the United States. Prepared court exhibits to illustrate my conclusions at these judicial proceedings. Lectured on related subjects for law enforcement and citizen groups.

Supervised and evaluated subordinate document examiners, as well as trained apprentice examiners. Conducted research in the field to further the science of questioned document examination.

EXHIBIT _12_ PAGE _124_

February 1965 - December 1972:

## QUESTIONED DOCUMENT EXAMINER/SERGEANT - PHILADELPHIA POLICE DEPARTMENT CRIME LABORATORY ·

Initially hired as a Patrolman with the Philadelphia Police Department. After two and one half years was promoted to Detective and subsequently assigned to the Crime Laboratory as a Questioned Document Examiner trainee. Completed apprenticeship in 1970 and was promoted to Detective Sergeant/Questioned Document Examiner. Remained in that capacity until joining the Arizona State Crime Laboratory in January of 1973.

## SPECIALIZED TRAINING COURSES IN QUESTIONED DOCUMENTS:

### SOUTHWESTERN ASSOCIATION OF FORENSIC DOCUMENT EXAMINERS / ASQDE / ABFDE

a.   Medical/Legal Symposium on the Forensic Examination of Medical Records and Testimony Related to Medical Malpractice Cases – Miami, FL, May 1997.

b.   Identification of typewriter fonts utilizing the Bouffard Electronic Database System - Dr. Bouffard 1994

c.   Forensic Paper Identification Symposium - Mead Paper Co. 1992

### FEDERAL BUREAU OF INVESTIGATION, TRAINING ACADEMY, QUANTICO, VIRGINIA:

a.   Typewriter Identification School - 1987.

b.   International Symposium on Questioned Documents - 1985.

c.   Legal Aspects of Questioned Document Examination - 1978.

d.   Questioned Document Laboratory Photography - 1975

e.   Survey of Questioned Document Examiners - 1974.

### INSTITUTE OF PAPER CHEMISTRY, APPLETON WISCONSIN:

EXHIBIT 12 PAGE 125

a.   Forensic Identification of Paper - 1973.

## U.S. SECRET SERVICE, WASHINGTON, D.C.:

a.     Questioned Document School - 1970.

## PHILADELPHIA POLICE DEPARTMENT CRIME LABORATORY:

a.     Two year apprenticeship with the Chief Document Examiner for the Philadelphia Police Crime Laboratory - 1968 through 1970

## PENNSYLVANIA STATE POLICE DOCUMENT LABORATORY:

a.     Initial Questioned Document Training with the Chief Document Examiner for the Pennsylvania State Police Laboratories, 1968.

## CONTINUING TRAINING:

Over the past thirty four years, have attended, and/or conducted, more than ninety seminars, training workshops, scientific symposia, and professional meetings involving such organizations as: The American Academy of Forensic Sciences, American Society of Questioned Document Examiners, American Board of Forensic Document Examiners, Southwestern Association of Forensic Document Examiners, and the International Association for Identification.

EXHIBIT _12_ PAGE _126_

## PROFESSIONAL AFFILIATIONS:

Member - American Academy of Forensic Sciences

Member – American Society of Questioned Document Examiner

Member – Southwestern Association of Forensic Document Examiners (President 1985-1987)

Librarian/Historian - Southwestern Association of Forensic Document Examiners. (1981 - Present)

President - American Board of Forensic Document Examiners (1989 - 1991)

## EDUCATION and CERTIFICATIONS:

B.S.. University of Phoenix (Computer Information Systems)

Board Certified by the American Board of Forensic Document Examiners.

## COURT QUALIFICATIONS:

Qualified as a Questioned Document Examiner in Federal. State and Municipal Courts throughout the United States. Have also testified as an expert in Europe and the Middle East.

## PAPERS PUBLISHED:

a. "The Illusion of Traced Forgery on Zinc Oxide Photocopy Paper" - *Journal of Police Science and Administration* - Vol. 2:No.3 Dec. 1974.

b. "Forgery by Phone" - ibid. Vol. 4:No.3 Sept. 1976.

c. "PaperMate's New Erasable Ink Pen" - ibid. Vol. 7:No.3 Sept. 1979.

d. "Instant Winner Lottery Tickets - Examination and Testing Procedures" Presented at the AAFS Meeting Feb. 1988.

e. "Laser Printers - Nemesis of the '90's" Co-authored with Robert G. Lockard. Presented at the ASQDE Meeting Aug. 1990.

f. "Typography for Document Examiners" - Presented at the Fall 1991 meeting of the Southwestern Association of Forensic Document Examiners.

g. "Light, Color. and Filters" – biannual publication of the Southwestern Association of Forensic Document Examiners - 1992.

h. "Utilizing Computer Generated Graphics as an Aid to Expert Testimony"   Presented at the Fall 1992 meeting of the Southwestern Association of Forensic Document Examiners.

4

i.  "Identification of Non-Impact Printing Devices" - Published as a series (1993-1994) in the *ABFDE NEWS* the quarterly publication of the American Board of Forensic Document Examiners.

j.  "Light, Color. and Filters Revisited" – biannual publication of the Southwestern Association of Forensic Document Examiners Vol. XII-#3, Fall 1993 co-authored with Gerald B. Richards, F.B.I. Laboratory. Wash. D.C.

k.  "Electronic Typography for Document Examiners (update)" - Presented at the 52nd annual meeting of the American Society of Forensic Document Examiners. August 1994

l.  "Production and Utilization of Computer Generated Court Exhibits for Document Examiners" Presented as a workshop at the Southwestern Association of Forensic Document Examiners meeting, Spring 1995

m.  "Widows and Orphans Provide Clues as to Facsimile Transmission Methodology" – *ABFDE NEWS* the quarterly publication of the American Board of Forensic Document Examiners (Spring 1995)

n.  "Measurement of Repeating Image Defects as a Method for the Identification of Hewlett Packard Laser Printers" – ibid. (Spring 1996)

o.  "Hewlett Packard's Printer Control Language - PCL" – ibid. (Summer 1996)

p.  "Using Digital Photography for Courtroom Presentations". Talk presented at the spring 1997 meeting of the Southwestern Association of Forensic Document Examiners.

q.  Co-author "Scientific Examination of Questioned Documents, Second Ed." Published 2006 by CRC Press Chapters - "The Examination of Computer Generated Documents" and "Typography."

## EXAMINATIONS:

During the past thirty four years I have either written or reviewed (as Senior Analyst) more than 19.500 Questioned Document laboratory reports including those for some of the following agencies:

### *FEDERAL AGENCIES*:

U.S. Treasury Dept.. U.S. Secret Service. Federal Bureau of Investigation, U.S. Dept. of Immigration and Naturalization, United States Attorney's Offices. U.S. Postal Service. United States Internal Revenue Service, U.S. Bureau of Alcohol Tobacco and Firearms, U.S. Drug Enforcement Administration, U.S. Army C.I.D.. U.S. Air Force O.S.I., U.S. Department of Agriculture, U.S. State Department, U.S. Department of Justice. U.S. Department of Defense.

### *STATE AGENCIES*:

EXHIBIT _12_ PAGE _128_

rev. 8/06

More than fifty (50) different State Agencies in Arizona, New Mexico, California, Nevada, Colorado, Utah, Montana, North Dakota, Georgia, Pennsylvania, Alaska and Guam.

### MUNICIPAL AGENCIES:

More than sixty (60) different Municipal Law Enforcement Agencies in Arizona as well as most of the Agencies in the five county area around Philadelphia, Pennsylvania.

### PRIVATE PRACTICE:

More than a fifteen hundred cases worked for attorneys in civil litigations, as clients of Affiliated Forensic Laboratory's private practice.

## AWARDS:

More than 220 letters of commendation from the various U.S. Government Agencies, State Agencies, County Government and Municipalities for whom documents have been examined and/or testimony rendered.

## TEACHING ACTIVITIES:

1990 - Present:

Guest lecturer, National Association of Legal Investigators Seminar, "Blazing the Investigative Trail," Scottsdale, AZ. 1/26/01

Guest lecturer, International Association of Internal Auditors Conference, Atlanta, GA.

Guest lecturer, International Association of Internal Auditors Conference, Phoenix, AZ.

Guest lecturer, American Medical Records Association, Casa Grande, AZ.

Guest speaker Medical Records Litigations (ATLA), Steamboat Springs, CO.

Conducted a series of seminars and workshops for forensic document examiners concerning computer printing devices and electronic typography (1992-Present)

Guest Lecturer, International Association of Credit Card Investigators, Scottsdale, AZ

EXHIBIT _12_ PAGE _129_

1975 - 1991:

6                                                                    rev. 8/06

### INSTRUCTOR - CRIMINAL JUSTICE AGENCIES:

Advanced Investigator's training for all law enforcement agencies in Arizona at
the ALETA Academy.

Numerous classes and symposia for Maricopa County Bar Association, American
Trial Lawyers Association, DES, Phoenix Police Academy, Arizona Attorney
General's Office, U.S. Internal Revenue Service, etc.

1973 - 1991:

### INSTRUCTOR - PHOENIX COLLEGE, AND AMERICAN
### INSTITUTE OF BANKING:

Conducted a course of instruction at Phoenix College for fourteen years, dealing
with investigation of document crimes, forgery and counterfeiting matters through
the Administration of Justice Department. Conducted Forgery and Counterfeiting
seminars for the American Institute of Banking. Taught Computer Science
courses at Gateway Community College - Beginning and Advanced Operating
Systems, and various computer program applications.

EXHIBIT _12_ PAGE _130_

rev. 8/06

EXHIBIT 13

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**