# SUPPLEMENTAL AUTHORITY

Westlaw.

--- Cal.Rptr.3d ----  
--- Cal.Rptr.3d ----, 2008 WL 1820916 (Cal.)  
(Cite as: --- Cal.Rptr.3d ----)

Page 1

**H**  
**CITY** OF HOPE NATIONAL MEDICAL CENTER, Plaintiff and Respondent, v. **GENENTECH**, INC., Defendant and Appellant.  
Cal.,2008.

CITY OF HOPE NATIONAL MEDICAL CENTER, Plaintiff and Respondent,  
v.  
GENENTECH, INC., Defendant and Appellant.  
S129463

Supreme Court of California.  
Filed 4/24/08

Ct.App. 2/2 B161549  
Los Angeles County Super. Ct. No. BC215152

Attorneys for Appellant:  
Howard, Rice, Nemerovski, Canady, Falk & Rabkin, Jerome B. Falk, Jr., Steven L. Mayer, Amy L. Bomse; Keker & Van Nest, Robert A. Van Nest, Susan J. Harriman, Kara M. Andersen, Steven A. Hirsch; Skadden, Arps, Slate, Meagher & Flom, Raoul D. Kennedy, Jeff G. Randall; Quinn Emanuel Urquhart Oliver & Hedges, Kathleen M. Sullivan, Daniel H. Bromberg and Victoria Maroulis for Defendant and Appellant.  
Paul, Hastings, Janofsky & Walker and Kevin C. McCann for Biotechnology Industry Organization as Amicus Curiae on behalf of Defendant and Appellant.  
Susan Liebeler; Daniel J. Popeo, Paul D. Kamenar; Zacks Utrecht & Leadbetter and Paul F. Utrecht for Washington Legal Foundation as Amicus Curiae on behalf of Defendant and Appellant.  
Hugh F. Young, Jr.; Gibson, Dunn & Crutcher, Theodore J. Boutrous, William E. Thomson and J. Christopher Jennings for Product Liability Advisory Council, Inc., as Amicus Curiae on behalf of Defendant and Appellant.  
Leopold, Petrich & Smith and Louis P. Petrich for Motion Picture Association of America, Inc., as Amicus Curiae on behalf of Defendant and Appellant.

Wilmer Cutler Pickering Hale and Dorr, Nader Mousavi, Mark C. Fleming, Seth P. Waxman and Edward C. DuMont for Biogen Idec Inc., as Amicus Curiae on behalf of Defendant and Appellant.  
Thomas W. Burt, Timothy G. Fielden; Munger, Tolles & Olson, Gregory P. Stone and Rohit K. Singla for Microsoft Corporation as Amicus Curiae on behalf of Defendant and Appellant.  
Fred J. Hiestand for The Civil Justice Association of California as Amicus Curiae on behalf of Defendant and Appellant.  
Attorneys for Appellant:  
Pillsbury Winthrop Shaw Pittman, Bruce A. Ericson and Robert J. Nolan for California Healthcare Institute as Amicus Curiae on behalf of Defendant and Appellant.  
Sheppard, Mullin, Richter & Hampton, Martin D. Katz, Lisa N. Stutz, Jean-Paul Jassy and Jeremiah Reynolds for Intel Corporation as Amicus Curiae on behalf of Defendant and Appellant.  
D. Bruce Sewell, Janet Craycroft; Thomas R. Lavelle; Fred Main; Erika Frank; Jim Hawley; National Chamber Litigation Center and Robin S. Conrad for Chamber of Commerce of the United States of America, California Chamber of Commerce and Technet as Amici Curiae on behalf of Defendant and Appellant.  
Skadden, Arps, Slate, Meagher & Flom and Jeff G. Randall for eBay, Inc., Xilinx, Inc., The Charles Schwab Corporation, Electronic Arts, Inc. Apple Computer, Inc, Applied Materials, Inc, and NVIDIA Corporation as Amici Curiae on behalf of Defendant and Appellant.  
Michael S. Kwun and Thomas R. Lavelle for Google Inc., and Xilinx, Inc., as Amici Curiae on behalf of Defendant and Appellant.  
Attorneys for Respondent:  
Horvitz & Levy, Ellis J. Horvitz; Eisenberg and Hancock, Jon B. Eisenberg, William N. Hancock; Irell & Manella, Morgan Chu, Gregory R. Smith, David I. Gindler, Joseph M. Lipner; Reed Smith Crosby Heafy, Reed Smith, Peter W. Davis, James C. Martin; Akin Gump Strauss Hauer & Feld and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- Cal.Rptr.3d ----  
--- Cal.Rptr.3d ----, 2008 WL 1820916 (Cal.)  
**(Cite as: --- Cal.Rptr.3d ----)**

Page 2

William A. Norris for Plaintiff and Respondent.
Lascher & Lascher and Wendy Cole Lascher for The Academy of Applied Science as Amicus Curiae on behalf of Plaintiff and Respondent.
Law Offices of Roman Melnik and Roman Melnik for United Inventors Association and Inventions, Patents and Trademarks Company as Amici Curiae on behalf of Plaintiff and Respondent.
Raisin & Kavcioglu, Armenak Kavcioglu, Aren Kavcioglu for Ian Ayres as Amicus Curiae on behalf of Plaintiff and Respondent.
Rodriguez, Horii & Choi and Reynolds T. Cafferata for Tamar Frankel as Amicus Curiae on behalf of Plaintiff and Respondent.
Alschuler Grossman Stein & Kahan, Stanton L. Stein, Michael J. Plonsker, David S. Gubman and Carla A. Veltman for Writers Guild of America, West, Inc., Directors Guild of America, Inc., and Screen Actors Guild, Inc., as Amici Curiae on behalf of Plaintiff and Respondent.
Turner Green Afrasiabi & Arledge and Peter R. Afrasiabi for Memorial Sloan-Kettering Cancer Center, Los Angeles Biomedical Research Institute, Board of Trustees of the University of Illinois, Loma Linda University Adventist Health Sciences Center and California Association of Nonprofits as Amici Curiae on behalf of Plaintiff and Respond- ent.

KENNARD, J.

In June 2002, after a jury trial, plaintiff City of Hope National Medical Center (City of Hope) obtained a judgment against defendant Genentech, Inc. (Genentech), for breach of fiduciary duty and for breach of contract.[FN1] The judgment awarded City of Hope $300,164,030 in compensatory damages and $200 million in punitive damages. The Court of Appeal affirmed. Genentech challenges that affirmance.

> 1. This judgment was entered after a second trial. The first trial ended in a mistrial when the jury deadlocked by a vote of seven to five in favor of Genentech.

In this complex case, which has 25,567 pages of reporter's transcript plus 12,267 pages of clerk's transcript and has generated 18 friend-of-the-court briefs, the primary issue is whether, as the jury found, a fiduciary relationship necessarily arose when City of Hope, in return for royalties, entrusted a secret scientific discovery to Genentech to develop, to patent, and to commercially exploit. Our answer is "no." That conclusion invalidates the jury's punitive damages award, which was based on City of Hope's tort claim for breach of fiduciary duty. In addition, that conclusion requires us to determine whether the evidence that City of Hope introduced at trial to prove that Genentech had breached a fiduciary duty so prejudiced the jury as to require setting aside the jury's award of compensatory damages for breach of contract. Here too, our answer is "no."

Genentech also asserts the trial court erred by (1) submitting interpretation of the contract to the jury; (2) instructing the jury that if, after applying other rules of interpretation, "there remains an uncertainty in the language of the contract, that language must be interpreted against the party who caused the uncertainty to exist"; and (3) admitting evidence of the resolution of a prior dispute between the parties. We conclude that the trial court did not err in any of those three instances.

We affirm that part of the judgment awarding City of Hope $300,164,030 in damages for Genentech's breach of contract. Because punitive damages cannot be awarded for breaching a contract, however, our conclusion that there was no fiduciary relationship requires us to set aside the jury's award of $200 million in punitive damages to City of Hope.

I

A. Parties' Initial Contacts and Negotiations

In the mid-1970's, Drs. Arthur Riggs and Keichi Itakura, two scientists employed by plaintiff City of Hope, developed a groundbreaking process for genetically engineering human proteins, enabling the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 2:04-cv-09049-DOC-RNB   Document 3283-2   Filed 04/24/08   Page 4 of 17   Page ID #:54980

--- Cal.Rptr.3d ----
--- Cal.Rptr.3d ----, 2008 WL 1820916 (Cal.)
(Cite as: --- Cal.Rptr.3d ----)

Page 4 of 17

Page 3

production of large quantities of various medicines of great therapeutic and commercial value. By 1976, Riggs and Itakura began preparing a confidential grant application relating to their scientific discovery. As they neared completion of the application, Dr. Herbert Boyer, a leader in the field of genetic engineering who had previously worked with Drs. Riggs and Itakura, telephoned Riggs in early 1976 and learned of the scientific discovery by Riggs and Itakura. In February 1976, Drs. Riggs and Itakura filed their confidential grant application with the National Institutes of Health. Soon thereafter, in April 1976, Dr. Boyer and venture capitalist Robert Swanson incorporated defendant Genentech, Inc. (Genentech) to commercially exploit biotechnology.

In May 1976, Swanson, Genentech's president, sent City of Hope a proposal to provide funding to City of Hope to use the scientific process of Drs. Riggs and Itakura to complete the process of synthesizing two proteins, somatostatin and insulin, and to secure patents "necessary for commercialization" as each product was developed. Discussions then followed between Swanson and City of Hope's patent lawyer John Hall concerning a possible agreement. On June 25, Hall sent Swanson a "Summary of Points for Agreement Between Genentech, Inc. and City of Hope," with a copy to Genentech patent lawyer Tom Kiley. On June 30, 1976, Genentech's Swanson and Kiley met with City of Hope's Hall to further discuss contract issues. Thereafter, on July 22, Genentech sent City of Hope a draft of an agreement that Genentech had prepared. The accompanying cover letter noted that the draft agreement, in Article 6.01, left blank the royalty rate to be paid to City of Hope because Genentech was considering City of Hope's proposal of a 2 percent flat rate.

After the parties discussed the draft, Genentech on July 28, 1976, sent City of Hope a second draft agreement. The cover letter mentioned that Article 6.01 now included sales by Genentech's affiliates and payment of 2 percent royalties to City of Hope.

Unchanged was Article 6.09, providing that Genentech would obtain from its licensees and pay to City of Hope the "same royalty" that City of Hope would receive if Genentech itself were to carry out the licensed activity.

**B.** Contract Between Genentech and City of Hope

On August 5, 1976, Genentech and City of Hope executed the contract. Below, we summarize the provisions pertinent here.

Article 1.03 sets forth the general objectives of the parties. As to Genentech, it states: "GENENTECH proposes to engage in the manufacture and sale of certain polypeptides. To do so, it requires synthetic DNA which codes for the production of a particular polypeptide when incorporated in a bacterial or other plasmid." The article then mentions that City of Hope has laboratory facilities with personnel qualified to synthesize DNA for selected polypeptides, that Genentech would provide funding for that process and would use the resulting DNA in the manufacture of polypeptides, and that Genentech would secure and hold patents "as may emerge from that work." As to City of Hope, Article 1.03 states: "For its part, CITY OF HOPE wishes to conduct DNA synthesis and related work with GENENTECH funding, to publish the results of such work, and to earn royalty income from GENENTECH sales of polypeptides in whose manufacture synthetic DNA is employed."

Article 3 of the contract describes the financial support Genentech was to provide to City of Hope, including funding for salaries, materials, and equipment. Article 3.04 states: "The parties contemplate that GENENTECH will solely and exclusively own such patent or other proprietary property as emerges from the work performed by CITY OF HOPE under this agreement...."

Article 5 grants Genentech the sole option to seek patents, but it also gives City of Hope the right to seek patents if Genentech either fails to do so or abandons a patent application.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Article 6.01 reads: "GENENTECH shall pay to CITY OF HOPE a royalty of two percent (2%) of the net sales of all polypeptides sold by it or its affiliates, *provided only that manufacture of the polypeptide employ DNA synthesized by CITY OF HOPE under this Agreement and provided to GENENTECH by CITY OF HOPE, or replications of that DNA.*" (Italics added.) (The italicized language is referred to by the parties as "the DNA use requirement.")

Article 6.02 states: "For the period commencing with the effective date of this Agreement and ending five (5) years thereafter, GENENTECH will pay to CITY OF HOPE the royalty provided for in Article 6.01 hereof regardless of whether GENENTECH has secured one or more patents on Developments. *Thereafter, GENENTECH's royalty obligations under Article 6.01 shall be limited to the payment of royalty only in respect to such manufacture, use or sale which would infringe the claims of an issued GENENTECH patent* on Genentech developments in the country of manufacture, use or sale, *but for GENENTECH's ownership of the patent,* and provided further that the patent has not been finally adjudicated as invalid or unenforceable by a court of competent jurisdiction." (Italics added.) (The italicized language is referred to by the parties as "the patent infringement requirement.")

Article 6.08 provides: "Should GENENTECH license any third party under any patent acquired by it hereunder, then GENENTECH shall secure from that party and pay to CITY OF HOPE the same royalty CITY OF HOPE would have received had GENENTECH itself carried out the licensed activity."

Article 7 pertains to the infringement of patents. Article 7.02 states: "Should GENENTECH recover from any infringer, whether by way of settlement or judgment, damages or profits for infringement of any patent secured by it under this Agreement, then after deduction from such recovery of GENENTECH's reasonable expenses in effecting the same, the balance shall be treated as net sales of GENENTECH for royalty purposes."

In Article 8, Genentech agrees to compute and pay royalties to City of Hope quarterly, "to keep regular books of account in sufficient detail to permit the royalties payable hereunder to be determined," and to permit City of Hope to inspect Genentech's books and related records.

Article 10.01 grants Genentech the right to assign and transfer its contractual rights, including patents and patent licenses. Article 10.02 grants City of Hope the right to assign and transfer its rights to payments from Genentech. Finally, Article 11.01 states: "Nothing herein contained shall be deemed to create an agency, joint venture or partnership relation between the parties hereto. It is agreed that the relationship between the parties is such that CITY OF HOPE in its performance of this Agreement is an independent contractor."

C. Parties' Actions After Contract's Execution

The collaboration between Genentech and City of Hope resulted in extraordinary scientific and commercial success. The groundbreaking scientific developments by City of Hope's Drs. Riggs and Itakura enabled Genentech to obtain a number of patents based on that scientific discovery. Based on these patents, Genentech granted licenses to various companies.

Genentech informed City of Hope that in August 1978 it had granted Eli Lilly a license to produce human insulin. But Genentech did not tell City of Hope about other licenses it had granted, such as one it granted to other companies for the production of interferon, which was then viewed as a potential cure for cancer and the sales of which Genentech projected as potentially exceeding its revenue from all other sources combined.

In its October 14, 1980, prospectus for its initial public offering of stock, Genentech described its royalty obligation to City of Hope as "contingent upon the existence of one or more patents arising

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 2:04-cv-09049-DOC-RNB   Document 3283-2   Filed 04/24/08   Page 6 of 17   Page ID #:54982

--- Cal.Rptr.3d ----
--- Cal.Rptr.3d ----, 2008 WL 1820916 (Cal.)
(Cite as: --- Cal.Rptr.3d ----)

Page 6 of 17

Page 5

from the funded research which would, but for Genentech's ownership of the patent(s), be infringed by the activities underlying the royalty payment."

On October 24, 1986, Dr. Eric Jurrus of City of Hope wrote a letter to Kiley, by then Genentech's general counsel, requesting, among other things, "a list of all products Genentech had produced or is now producing which involve any methods of genetic engineering or replication of DNA provided to Genentech by City of Hope," as well as a list "of companies Genentech has third party licenses with which relate to methods of genetic engineering or DNA provided to Genentech by the City of Hope."In November 1986, Dr. Jurrus and Ed Irons, an attorney for City of Hope, met with Genentech's Kiley. Thereafter, Irons wrote three letters to Genentech requesting unspecified documents, which, at the November meeting, Kiley apparently had promised to produce. In April 1987, Irons traveled from City of Hope's headquarters in Duarte, Southern California, to Genentech's headquarters in South San Francisco, where he reviewed files from a patent application; Kiley had told a subordinate not to show Irons any third party licenses.

By the late 1980's and early 1990's, Genentech had obtained a large number of United States and foreign patents in which City of Hope's scientists Riggs and Itakura were identified as the inventors, and Genentech had entered into a substantial number of licensing agreements with third parties, including companies such as Eli Lilly, Hoffman-La Roche, Monsanto Company, and Boehringer Ingelheim. City of Hope received $302 million in royalties on Genentech's sales and on sales by Genentech's licensees of somatostatin, insulin, and a human growth hormone that used DNA synthesized by City of Hope. But City of Hope received no royalties from sales by Genentech and by Genentech's licensees of other products, such as interferon and hepatitis B vaccine, that were based on the genetic engineering technique pioneered by City of Hope scientists Riggs and Itakura but did not use DNA synthesized by City of Hope.

On an unknown date in the 1990's, Genentech sued Eli Lilly, alleging infringement of the Riggs-Itakura patents by producing and selling human growth hormone. In December 1994, the two parties settled the lawsuit. As part of the settlement, Eli Lilly agreed to pay Genentech approximately $145 million, as well as a 6 percent royalty on future sales of human growth hormone. City of Hope then asserted that under Article 7.02 of its contract with Genentech it was entitled to 2 percent of Genentech's $145 million patent infringement settlement with Eli Lilly and a 2 percent royalty on Eli Lilly's future sales of human growth hormone. After initially rejecting City of Hope's claim, Genentech agreed to pay City of Hope $3 million and a 1.75 percent royalty on Eli Lilly's future sales of human growth hormone.

In 1998, Genentech settled for $20 million a lawsuit it had brought against a group of companies collectively called Novo Nordisk for infringing the Riggs-Itakura patents. When Genentech rejected City of Hope's claim for a share of that settlement, City of Hope brought this action against Genentech.

D. The Lawsuit in This Case

On August 13, 1999, City of Hope sued Genentech for breach of fiduciary duty and for breach of contract, including breach of the implied covenant of good faith and fair dealing. At the first trial the jurors were unable to reach a verdict, voting 7 to 5 in favor of Genentech. The case was then retried.

At the retrial, the parties presented conflicting extrinsic evidence concerning the meaning of various contractual provisions and the parties' intent relating to the contract. City of Hope maintained that the DNA use requirement in Article 6.01 (that the manufacture of the polypeptides use DNA synthesized and provided by City of Hope) and the patent infringement requirement of Article 6.02 (that royalties to City of Hope were to be limited to the manufacture, use, or sale that would infringe Gen-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

entech patents) did not apply to licenses granted by Genentech or monies received by Genentech in resolving Genentech's infringement claims against certain companies. City of Hope further asserted that its royalty rights did apply to products made by Genentech licensees using the genetic engineering techniques protected by the Riggs-Itakura patents. Genentech, on the other hand, argued that the DNA use requirement and the patent infringement requirement applied to Article 6.08's provision concerning licensing to third parties, as well as to Article 7.02's provision pertaining to Genentech's monetary recoveries for the infringement of patents by certain companies.

The jury found that Genentech had breached the contract with City of Hope, breached its fiduciary duty to City of Hope, and acted with fraud and malice. It awarded City of Hope compensatory damages of $300,164,030 (the exact amount City of Hope had claimed as unpaid royalties it was owed by Genentech), and $200 million in punitive damages.

The Court of Appeal affirmed. We granted Genentech's petition for review. Below, we discuss Genentech's contentions.

II

A. Fiduciary Relationship

Genentech contends that no fiduciary relationship arose from its contract with City of Hope, thus requiring reversal of the jury's award of punitive damages. We agree.

"[B]efore a person can be charged with a fiduciary obligation, he must either knowingly undertake to act on behalf and for the benefit of another, or must enter into a relationship which imposes that undertaking as a matter of law." (*Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 221(*Children's Television*).)

There is no indication in the contract that Genentech entered into it with the view of acting primarily for the benefit of City of Hope. Article 1 of the contract envisions a mutually beneficial relationship between the parties, as particularized in these provisions: Article 1.03 expresses Genentech's desire to acquire from City of Hope synthetic DNA for the purpose of manufacturing and selling certain polypeptides. Article 1.04 states that City of Hope would receive funding from Genentech to conduct the DNA synthesis work and would earn royalties from Genentech's sales. Article 3.04 gives Genentech exclusive ownership of patents and other proprietary property stemming from City of Hope's work under the contract. And Article 10.01 gives Genentech the right to assign and transfer its contractual rights, including patents and patent licenses. These contractual provisions indicate that the parties's common goal was to achieve a mutually beneficial arrangement, not that Genentech had undertaken a fiduciary obligation "to act on behalf of and for the benefit of another." (*Children's Television, supra,* 35 Cal.3d at p. 221.) And nothing in the contract indicates that Genentech was to subordinate its interests to those of City of Hope (*id.* at p. 222), a point conceded by City of Hope.

Nor is there a factual basis showing that Genentech through its conduct "knowingly" undertook the obligations of a fiduciary. (*Children's Television, supra,* 35 Cal.3d at p. 221; Chodos, The Law of Fiduciary Duties (2000) § 1.19, pp. 42-44 (Chodos).) The jury here was not instructed on, was not asked to determine, and did not decide that issue.

The remaining question then is whether an agreement to develop, patent, and commercially exploit a secret scientific discovery in exchange for the payment of royalties is the type of relationship "which imposes that undertaking [fiduciary obligation to act on behalf of and for the benefit of another] as a matter of law." (*Children's Television, supra,* 35 Cal.3d at p. 221.) Examples of such relationships are a joint venture, a partnership, or an agency. (Chodos, *supra,* §§ 1.6, 1.7, 1.8, 1.13, pp. 6-16,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 2:04-cv-09049-DOC-RNB   Document 3283-2   Filed 04/24/08   Page 8 of 17   Page ID #:54984

Page 8 of 17

--- Cal.Rptr.3d ----
--- Cal.Rptr.3d ----, 2008 WL 1820916 (Cal.)
(Cite as: --- Cal.Rptr.3d ----)

Page 7

23-29.) Here, Article 11.01 of the contract expressly states that the parties' relationship is not a joint venture, partnership, or agency, and City of Hope has conceded that its fiduciary duty does not rest on that basis. Those categories are merely illustrative of fiduciary relationships in which fiduciary duties are imposed by law.

At the request of City of Hope, the trial court instructed the jury that a "fiduciary relationship arises when a person entrusts a secret idea or device to another under an arrangement whereby the other party agrees to develop, patent and commercially exploit the idea in return for royalties." The source of this jury instruction is a Court of Appeal decision, *Stevens v. Marco* (1956) 147 Cal.App.2d 357(*Stevens* ). There the plaintiff invented a device that enabled airplane pilots to quickly determine the proper functioning of indicator lights in airplane instrument panels. The plaintiff, who had no experience with patents and product marketing, entered into a contract with the defendant. The plaintiff agreed to assign to the defendant all of his rights in the invention in exchange for a 3 percent interest in any patent or 3 percent of all net sales, and the defendant agreed to develop the plaintiff's invention and to obtain patents in the defendant's name. The defendant developed the device, filed patent applications, and licensed manufacture of the device to others. After years of working together, the defendant falsely told the plaintiff that the plaintiff's invention for which patents were pending conflicted with an existing patent held by another, and he obtained a release from the plaintiff. Years later, when the plaintiff learned that the defendant was still selling plaintiff's invention, he sued the defendant for breach of contract and for fraud. The trial court granted the defendant's motion for nonsuit. The Court of Appeal reversed. (*Id.* at pp. 362-372, 385.)

After reviewing the nature of the transaction between the parties, the Court of Appeal in *Stevens* concluded there was substantial evidence of a fiduciary relationship between the parties based on *the facts* presented. (*Stevens, supra,* 147 Cal.App.2d at p. 376.) But, as we noted earlier, *Stevens* also included language recognizing a new category of relationships in which a fiduciary obligation arises by operation of law: "Where an inventor entrusts his secret idea or device to another under an arrangement whereby the other party agrees to develop, patent and commercially exploit the idea in return for royalties to be paid the inventor, there arises a confidential or fiduciary relationship between the parties." (*Id.* at p. 373.) Here, City of Hope asserted at trial that this language from *Stevens* was its "one theory" and the basis of its fiduciary duty claim against Genentech ever "since the day [it] filed [the] complaint"; it asked the trial court to instruct the jury in the *Stevens* language. Over Genentech's objection, the court did so.

City of Hope insists the trial court's instruction based on *Stevens, supra,* 147 Cal.App.2d at page 373, was correct because the relationship with Genentech manifests these four characteristics that, according to City of Hope, are typical of a fiduciary relationship: (1) one party entrusts its affairs, interests or property to another; (2) there is a grant of broad discretion to another, generally because of a disparity in expertise or knowledge; (3) the two parties have an "asymmetrical access to information," meaning one party has little ability to monitor the other and must rely on the truth of the other party's representations; and (4) one party is vulnerable and dependent upon the other.

City of Hope acknowledges that none of these four characteristics standing alone is determinative of the existence of a fiduciary relationship. We disagree with City of Hope, however, that whenever the relationship between the parties exhibits these four characteristics the relationship is necessarily fiduciary. (See Chodos, *supra,* § 1:19, p. 44 [futile to try to identify single set of factors that give rise to fiduciary relationship].)

For example, in *Children's Television, supra,* 35 Cal.3d at pages 221-222, we refused to recognize a fiduciary relationship between commercial sellers and retail purchasers of breakfast cereals. It was

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

there alleged that the sellers had superior bargaining power and better access to information, and that the sellers made representations and gave advice based on claimed expert knowledge in an effort to exploit the trust and uncritical acceptance of children who in turn induced their parents to buy the cereal. It could be said that there the purchasers entrusted the health of their children to the sellers (factor 1 of City of Hope's test), who possessed the superior knowledge and expertise (factor 2), based on information not available to the children or their parents (factor 3), who were thus vulnerable and dependent on the sellers (factor 4). (See also *Persson v. Smart Inventions, Inc.* (2005) 125 Cal.App.4th 1141, 1148, 1159-1162 [50 percent shareholder in a close corporation did not owe fiduciary duties to shareholder being bought out when the selling shareholder relied on the purchasing shareholder's superior knowledge of the corporate affairs and position]; *Wolf v. Superior Court* (2003) 107 Cal.App.4th 25(*Wolf* ) [no fiduciary relationship between author of a novel and a film studio to which author had assigned his rights for possible commercial development in return for percentage of future revenues].)

Also, the four characteristics articulated by City of Hope and discussed above are common in many a contractual arrangement, yet do not necessarily give rise to a fiduciary relationship. For example, a person who takes a car to a garage for repairs has entrusted property to another (factor 1 of City of Hope's test). Because the garage operator has expertise in the field of automotive repair but the car owner does not, the car owner must grant the garage operator broad discretion to carry out the necessary work (factor 2) and must rely on the truth of the garage operator's representations about what repairs are needed and how they should be done (factor 3), leaving the car owner vulnerable and dependent on the garage operator (factor 4). Notwithstanding the presence of all these four factors, no court has ever held or suggested, as far as we know, that in this situation the garage operator owes fiduciary duties to the car owner. A similar situation might be presented when a manufacturer entrusts its product to a retailer on consignment.

This case illustrates that, contrary to the above-discussed overbroad language of the Court of Appeal in *Stevens, supra,* 147 Cal.App.2d 357, a fiduciary relationship is not necessarily created simply when one party, in exchange for royalty payments, entrusts a secret invention to another party to develop, patent, and market the eventual product. Here the contract was between two sophisticated parties of substantial bargaining power. Throughout the contractual negotiations, both parties were represented by counsel. The contract stated that, in return for the payment of royalties to City of Hope, Genentech was to be the sole owner of patents it would obtain for City of Hope's scientific discovery of synthetic DNA; that Genentech could assign and transfer its contractual rights, including patents; and that the parties' relationship was not one involving agency, joint venture, or partnership, which are categories in which fiduciary obligations are imposed by operation of law (Chodos, *supra,* §§ 1.6, 1.7, 1.8, 1.13, pp. 6-16, 23-29), but that City of Hope was to be an independent contractor.

Was City of Hope vulnerable because it had to rely on Genentech's superior ability in obtaining patents and in marketing products based on the secret scientific discovery of City of Hope scientists Drs. Riggs and Itakura? Yes, but not to the extent that would necessarily warrant recognition of a fiduciary duty. It is not at all unusual for a party to enter into a contract for the very purpose of obtaining the superior knowledge or expertise of the other party. Standing alone, that circumstance would not necessarily create fiduciary obligations, which generally come into play when one party's vulnerability is so substantial as to give rise to equitable concerns underlying the protection afforded by the law governing fiduciaries. (See generally *Persson v. Smart Inventions, Inc., supra,* 125 Cal.App.4th at p. 1161; *Richelle L. v. Roman Catholic Archbishop* (2003) 106 Cal.App.4th 257, 273.) Here, City of Hope has not made such a showing.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

With respect to City of Hope's claim that it reposed trust and confidence in Genentech, we note that "[e]very contract requires one party to repose an element of trust and confidence in the other to perform." (*Wolf, supra,* 107 Cal.App.4th at p. 31; see *Nelson v. Abraham* (1947) 29 Cal.2d 745, 750 [every contract calls for the highest degree of good faith and honest dealing between the parties].) And one party's "ability to exploit a disparity of bargaining power" between the parties does not necessarily create a fiduciary relationship. (*Children's Television, supra,* 35 Cal.3d at p. 221, fn. 21.)

Misplaced is City of Hope's reliance on this court's decisions in *Hollywood M.P. Equipment Co. v. Furer* (1940) 16 Cal.2d 184(*Furer* ) and in *Schaake v. Eagle Etc. Can Co.* (1902) 135 Cal. 472(*Schaake* ). In *Furer,* the defendant bailee misappropriated for his own use and profits the plaintiff bailor's patterns for the manufacture of devices based on the plaintiff's inventions. In explaining why, in order to state a claim for conversion, the plaintiff did not have to allege that his inventions were secret, we said that when "a bailee of an article has accepted it under definite terms to hold it and to use it for the benefit of the bailor, a confidence has been reposed which should remain inviolate." (*Furer, supra,* 16 Cal.2d at p. 188.) *Furer* concluded that the defendant as a bailee was liable for conversion. (*Id.* at pp. 188-189.) *Furer* did not address the question of whether a bailment necessarily creates fiduciary obligations.

*Schaake,* the other case relied on by City of Hope, involved an agreement under which an employee assigned to his corporate employer various patents for inventions, in return for which the employee retained an "indefeasible interest," the equivalent of 25 percent, in the profits. In discussing the sufficiency of the pleadings, this court in passing observed that "[t]he relation thus created was fiduciary." (*Schaake, supra,* 135 Cal. at p. 485.) That language was unnecessary to the holding in *Schaake* because under the contract the employee had an implicit right to an accounting. (*Id.*at pp. 475-476, 484-485; *Wolf, supra,* 107 Cal.App.4th at p. 34 & fn. 7.) This passing observation in *Schaake* was mere dictum and therefore lacking any precedential force. (*Hassan v. Mercy American River Hospital* (2003) 31 Cal.4th 709, 716.)

Thus, this court's holdings in *Furer, supra,* 16 Cal.2d 184, and in *Schaake, supra,* 135 Cal. 472, lend no support to City of Hope's argument that the nature of its contractual relationship with Genentech necessarily imposed fiduciary obligations on Genentech.

Genentech cites the Court of Appeal's decision in *Wolf, supra,* 107 Cal.App.4th 25, in arguing that its relationship with City of Hope was not fiduciary. In *Wolf,* the plaintiff, author of a novel entitled Who Censored Roger Rabbit? entered into a contract with Walt Disney Pictures and Television (Disney). In the contract, the plaintiff assigned to Disney his rights to the novel and the Roger Rabbit characters; in exchange, Disney agreed, among other things, to pay the plaintiff a percentage of net profits from a motion picture based on the novel, and 5 percent of any future gross receipts earned from merchandising or commercially exploiting the Roger Rabbit characters. Disney was given the right to assign or license any of its rights under the contract. (*Id.* at pp. 27-28.) And the contract expressly stated that the relationship of the parties was that of creditor-debtor and not that of a partnership or a joint venture, either one of which is a fiduciary relationship created by operation of law. (*Id.* at p. 28, fn. 5.)

After Disney developed and coproduced a highly successful motion picture entitled Who Framed Roger Rabbit, the plaintiff sued Disney for breach of contract and for breach of fiduciary duty, alleging that Disney had impaired his contractual audit right by refusing him access to Disney's records. The trial court sustained Disney's demurrer to the fiduciary duty cause of action. The Court of Appeal affirmed.

The Court of Appeal in *Wolf* concluded that a fiduciary duty did not arise simply from the plaintiff's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

contractual right to receive compensation contingent upon the receipt of future revenues (contingent compensation), or from the profit-sharing provisions of the agreement, or from the plaintiff's contractual right to an accounting, but that the profit-sharing provisions of the contract did shift the burden of proof to the defendant to prove compliance with the contractual payment obligations. (*Wolf, supra,* 107 Cal.App.4th at pp. 28-36.)

*Wolf* reasoned that because every contract to some extent requires a party to repose trust and confidence in the other, one party's right to contingent compensation, standing alone, does not give rise to a fiduciary duty. (*Wolf, supra,* 107 Cal.App.4th at p. 31.) *Wolf* also noted that one party's right to an accounting by the other party is a remedy that by itself is insufficient to give rise to fiduciary duties on the part of the party with the duty to render an accounting. (*Id.* at pp. 33-34.) And *Wolf,* at page 32, distinguished *Stevens* by noting that the court there recognized a *factual* basis for concluding that a fiduciary relationship existed between the parties. (See *Stevens, supra,* 147 Cal.App.2d at p. 374 ["the jury might also have found, as a matter of fact, that the parties were allied in an enterprise similar to that of joint venturers for mutual gain"]; see also *Nelson v. Abraham, supra,* 29 Cal.2d at p. 750 [disputed evidence of existence of joint venture presents question of fact]; *Universal Sales Corp. v. Cal. etc. Mfg. Co.* (1942) 20 Cal.2d 751, 765 [joint venture may be implied from conduct of the contractual parties]; *April Enterprises, Inc. v. KTTV* (1983) 147 Cal.App.3d 805, 820 [conduct of parties may create a joint venture despite an express declaration in a contract to the contrary].)

We agree with the holding in *Wolf, supra,* 107 Cal.App.4th 25, that fiduciary obligations are not necessarily created when one party entrusts valuable intellectual property to another for commercial development in exchange for the payment of compensation contingent on commercial success. The secrecy of information provided by one party to another - here the scientific discovery by City of Hope - may be considered by the trier of fact in deciding whether a fiduciary relationship exists, but it does not compel the imposition of fiduciary duties by operation of law. (See *Davies v. Krasna* (1975) 14 Cal.3d 502, 511 [submission of a written story in confidence to another "may impose upon [the other] a duty to refrain from unauthorized disclosure of the idea, but [it is] insufficient to impose upon him the fiduciary-like duties"]; *Chodos, supra,* § 1:21, p. 55 [mere receipt of confidential information does not create fiduciary duty].)

Accordingly, we conclude that the trial court here erred in instructing the jury that a fiduciary relationship is necessarily created when a party, in return for royalties, entrusts a secret idea to another to develop, patent, and commercially develop. [FN2] Because fiduciary duties do not necessarily arise from this type of relationship, City of Hope's only theory at trial for claiming a fiduciary relationship with Genentech was legally invalid, and therefore the judgment against Genentech is defective insofar as it is based on the jury's finding that Genentech breached fiduciary duties owed to City of Hope. (See *Amelco Electric v. City of Thousand Oaks* (2002) 27 Cal.4th 228, 238.) The only other ground for the jury's imposition of liability against Genentech was the jury's finding that Genentech had breached its contract with City of Hope. Because punitive damages may not be awarded for breach of contract (*Cates Construction, Inc. v. Talbot Partners* (1999) 21 Cal.4th 28, 61), the award of punitive damages must be set aside.

> 2. Because we conclude that Genentech was not in a fiduciary relationship with City of Hope, we need not decide whether Genentech's obtaining patents based on City of Hope's scientific discovery could have terminated a fiduciary duty.

We now consider Genentech's challenges to the judgment against it awarding compensatory damages for breach of contract.

B. Breach of Contract

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 2:04-cv-09049-DOC-RNB   Document 3283-2   Filed 04/24/08   Page 12 of 17   Page ID #:54988

--- Cal.Rptr.3d ----
--- Cal.Rptr.3d ----, 2008 WL 1820916 (Cal.)
(Cite as: --- Cal.Rptr.3d ----)

Page 11

Page 12 of 17

City of Hope's lawsuit against Genentech not only had a cause of action for breach of fiduciary duty but also one for breach of contract. City of Hope alleged that Genentech had breached the contract by failing to pay or report to City of Hope the full royalties due under the contract, and by failing to give City of Hope full access to Genentech's records to accurately determine the full royalties owed. On this claim, the jury returned a verdict in favor of City of Hope. Genentech challenges that verdict on a number of grounds.

*1. Claim that jury was prejudiced against Genentech by evidence admitted*

Genentech argues that certain evidence admitted at trial on the issue of breach of fiduciary duty improperly influenced the jury in rendering a verdict against Genentech on City of Hope's breach of contract claim. Although Genentech phrases its argument in terms of admission of evidence, it cites not to the evidence admitted but to comments by opposing counsel during closing argument to the jury and to a jury instruction on the fiduciary duty to act in good faith and make full disclosure.

Genentech characterizes opposing counsel's use of the word "concealment" at trial as inflammatory, and it complains that by linking issues of concealment, credibility, and contract, City of Hope successfully "leveraged" its "concealment evidence" to obtain a verdict against Genentech on the breach of contract claim. Genentech characterizes that "concealment evidence" as lacking probative value on the breach of contract claim, and it asserts that admission of that evidence prejudiced it because the trial was a "close case."

Evidence that Genentech concealed from City of Hope information about a number of licenses that Genentech had issued to certain companies was admissible on the claim that Genentech had breached the contract by failing to fully report royalties owed to City of Hope and by denying it access to Genentech's records to determine those royalties. As City of Hope points out, that evidence was relevant and admissible for three purposes: (1) to refute Genentech's claim that City of Hope's failure to challenge Genentech's performance under the contract demonstrated that it agreed with Genentech's interpretation of the contract; (2) to support City of Hope's argument that the concealment showed that Genentech itself did not believe its asserted interpretation of the contract; and (3) to counter Genentech's argument that City of Hope's breach of contract claim was barred by the applicable statute of limitations because City of Hope should have known earlier of Genentech's breach of contract. FN3

> 3. Our conclusion that the evidence was admissible makes it unnecessary for us to address City of Hope's assertion that Genentech has forfeited appellate review of its claim pertaining to the admission of evidence of concealment because it did not object to the introduction of such evidence at trial, did not request a limiting instruction, did not ask the trial court to bifurcate trial of the contract cause of action from the trial of the fiduciary duty cause of action, and neither objected to City of Hope counsel's comments during closing argument nor requested that the trial court give a curative admonition to the jury.

A party's conduct occurring between execution of the contract and a dispute about the meaning of the contract's terms may reveal what the parties understood and intended those terms to mean. For this reason, evidence of such conduct, including concealment of certain information, is admissible to resolve ambiguities in the contract's language. (*Oceanside 84 Ltd. v. Fidelity Federal Bank* (1997) 56 Cal.App.4th 1441, 1449.) Therefore, on City of Hope's claim here for breach of contract, the trial court properly admitted evidence that Genentech concealed certain information from City of Hope after execution of the contract but before a dispute arose about the meaning of particular terms in the contract. FN4

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

4. Inapposite here are the cases Genentech cites in support of its claim that the jury's breach of contract verdict against it should be set aside. In *Fidler v. Hollywood Park Operating Co.* (1990) 223 Cal.App.3d 483, 489, and in *Fed. Sav. & Loan Ins. Corp. v. T.F. Stone Liberty Land Assocs.* (Tex.1990) 787 S.W.2d 475, 493-494, the verdicts were reversed because extraneous and inadmissible prejudicial evidence was admitted. *Banks v. Crowner* (Wyo.1985) 694 P.2d 101 was an affirmance of a trial court's ruling excluding evidence as irrelevant and prejudicial, and therefore it is not a decision involving a claim of alleged erroneous admission of evidence, as asserted here. And *Rojas v. Richardson* (5th Cir.1983) 703 F.2d 186, itself reversed on rehearing in *Rojas v. Richardson* (5th Cir.1983) 713 F.2d 116, involved a reference by counsel in closing argument describing the plaintiff as an "illegal alien," a comment that was neither relevant nor supported by the evidence.

During closing argument, City of Hope's counsel asked the jury that, in determining witness credibility, it consider the witnesses' conflicting testimony about the meaning of key contract provisions; and counsel argued that determining witness credibility was important in deciding City of Hope's claim for breach of contract. Genentech challenges the propriety of this argument. We perceive no impropriety. Genentech's Tom Kiley and City of Hope's John Hall, the attorneys who had negotiated the contract, gave widely divergent testimony about what the parties understood certain contractual provisions to mean. Deciding which of these two witnesses to believe was a credibility determination for the jury, which had the task of interpreting the contract. Nor are we persuaded by Genentech's related claim that it was improper for City of Hope's counsel to tell the jurors, during closing argument, that in resolving witness credibility issues they should consider the "big picture" and not get lost in the minutiae of the contractual language.

Genentech also challenges opposing counsel's comment to the jury that it had to decide the breach of contract claim before resolving the breach of fiduciary duty claim. That comment was appropriate because it reflected what the verdict forms told the jury to do: to decide the breach of contract claim before the fiduciary duty claim.

Genentech complains about a jury instruction stating that fiduciary duties include acting in the utmost good faith and making full and fair disclosure of facts "which materially affect City of Hope's rights and interests under the 1976 agreement." Genentech appears to argue that the instruction improperly linked the contract claim to the fiduciary duty claim, so that a finding in City of Hope's favor on one would necessarily require a finding for City of Hope on the other as well. Not so. The jury was also instructed that it was to decide City of Hope's breach of contract claim separately from City of Hope's breach of fiduciary duty claim. These instructions, which we presume the jury followed (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 803), adequately distinguished the two claims.

*2. Genentech's challenge to the general verdict*

The jury returned a general verdict finding Genentech liable for, among other things, having breached the contract with City of Hope. Genentech contends interpretation of the contract was a question of law that should have been decided by the trial court, not the jury. Genentech argues the trial court should have asked the jury to make special findings on pertinent questions of fact, after which the court, taking into account the jury's special findings, should have undertaken the task of interpreting the contract. We disagree.

Juries are not prohibited from interpreting contracts. Interpretation of a written instrument becomes solely a judicial function only when it is based on the words of the instrument alone, when there is no conflict in the extrinsic evidence, or a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

determination was made based on incompetent evidence. (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865; *Estate of Platt* (1942) 21 Cal.2d 343, 352.) [FN5] But when, as here, ascertaining the intent of the parties at the time the contract was executed depends on the credibility of extrinsic evidence, that credibility determination and the interpretation of the contract are questions of fact that may properly be resolved by the jury (*Warner Constr. Corp. v. City of Los Angeles* (1970) 2 Cal.3d 285, 289 ["since the interpretation of the crucial provisions turned on the credibility of expert testimony, the court did not err in submitting the construction of the contract to the jury"]).

> 5. Genentech relies on tort cases to support its assertion that the existence of a legal duty is always a question of law. (E.g., *Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 477; *Alcaraz v. Vece* (1997) 14 Cal.4th 1149, 1162; *Ann M. v. Pac. Plaza Shopping Ctr.* (1993) 6 Cal.4th 666, 674.) Whether a duty exists under *tort* law is indeed a question of law based on a balancing of various considerations. (*Rowland v. Christian* (1968) 69 Cal.2d 108, 112-113.) Here, however, the legal duty arises under the law of contracts, not torts. The existence of a contractual legal duty is determined by the terms of the parties' contract. (*Pacific Gas & E. Co. v. G.W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 38 ["the intention of the parties as expressed in the contract is the source of contractual rights and duties"].) It does not entail balancing policy considerations, as is done under tort law.

This rule - that the jury may interpret an agreement when construction turns on the credibility of extrinsic evidence - is well established in our case law. (See, e.g., *Warner Constr. Corp. v. City of Los Angeles, supra,* 2 Cal.3d at p. 289; *Fischer v. First Internat. Bank* (2003) 109 Cal.App.4th 1433, 1443; *Horsemen's Benevolent & Protective Assn. v. Valley Racing Assn.* (1992) 4 Cal.App.4th 1538, 1562; *Kaufman & Broad Bldg. Co. v. City & Suburban Mortgage Co.* (1970) 10 Cal.App.3d 206, 216.) California's jury instructions reflect this (Judicial Council of Cal. Civ. Jury Instns. (2008) CACI No. 314; Com. to BAJI No. 10.75 (9th ed.2002) p. 407), as do authoritative secondary sources (11 Williston on Contracts (4th ed.2006) § 30:7, pp. 87-91; Rest.2d Contracts, § 212, subd. (2), p. 125).

In arguing to the contrary, Genentech relies on three Court of Appeal decisions: *De Guere v. Universal City Studios, Inc.* (1997) 56 Cal.App.4th 482, 505-506(*De Guere* ); *Medical Operations Management, Inc. v. National Health Laboratories, Inc.* (1986) 176 Cal.App.3d 886, 892, fn. 4 (*Medical Operations* ); and *Estate of Casey* (1982) 128 Cal.App.3d 867, 871(*Casey* ). Genentech's reliance is misplaced.

In *Medical Operations, supra,* 176 Cal.App.3d 886, a breach of contract case in which *the evidentiary facts were not in conflict,* the Court of Appeal suggested that if the evidence had been in conflict, a procedure "more in keeping with the rationale of *Parsons* [*v. Bristol Development Co., supra,* 62 Cal.2d 861]" would have been for the jury to make special findings and the trial court to interpret the contract. (*Id.,* at p. 892, fn. 4.) By using the phrase "more in keeping," the Court of Appeal in *Medical Operations* simply indicated a procedure that trial courts could use, not one that trial courts must use. Code of Civil Procedure section 625 supports our conclusion that a trial court is not required to submit special verdicts to the jury when construction of a written instrument turns on the credibility of extrinsic evidence. That statute states: "In all cases the court *may* direct the jury to find a special verdict in writing, upon all, or any of the issues, and in all cases *may* instruct them, if they render a general verdict, to find upon particular questions of fact, to be stated in writing, and *may* direct a written finding thereon." (*Ibid.,* italics added.) (See also *Li v. Yellow Cab. Co.* (1975) 13 Cal.3d 804, 824, fn. 18 [§ 625"reposes the matter of special findings within

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 2:04-cv-09049-DOC-RNB   Document 3283-2   Filed 04/24/08   Page 15 of 17   Page ID 15 of 17
#:54991

--- Cal.Rptr.3d ----
--- Cal.Rptr.3d ----, 2008 WL 1820916 (Cal.)
(Cite as: --- Cal.Rptr.3d ----)

Page 14

the sound discretion of the trial court"].)

*Casey, supra,* 128 Cal.App.3d 867, the second case relied on by Genentech, involved an issue of probate, not contract, law. At issue was the admissibility of extrinsic evidence to show the testator's intent. (128 Cal.App.3d at pp. 871-873.) *Casey* did state that once a jury determines the facts, "the interpretation of the testator's intent to be drawn from the established facts, is a matter of law for the court." (*Id.* at p. 871.) Because the extrinsic evidence offered in *Casey* sought to give the will a meaning to which it was not reasonably susceptible, it was inadmissible. Therefore, the *Casey* court's statement in question was unnecessary to its decision and as such mere dictum lacking precedential force. (*Hassan v. Mercy American River Hospital, supra,* 31 Cal.4th at p. 716.) Moreover, the statement is inconsistent with the statutory and decisional law we just discussed in the preceding paragraph.

With respect to *De Guere, supra,* 56 Cal.App.4th 482, the remaining case relied on by Genentech, the Court of Appeal there simply quoted language from *Medical Operations, supra,* 176 Cal.App.3d 886, and *Casey, supra,* 128 Cal.App.3d 867, without any accompanying analysis. (*De Guere, supra,* 56 Cal.App.4th at pp. 505-506.) Thus, *De Guere* provides no additional support for Genentech's position.

We conclude that the trial court here did not err in having the jury resolve the breach of contract claim.<sup>FN6</sup>

> 6. This conclusion renders it unnecessary to address City of Hope's assertion that because Genentech had proposed the general verdict form that the trial court provided to the jury, and did not request special findings by the jury, Genentech has forfeited its claim that special verdicts are required in contract cases.

*3. Jury instruction on resolving uncertainty in contract language*

The trial court gave the jury a series of instructions on the rules governing contract interpretation. The last of these instructions stated: "If, after considering the evidence in light of the foregoing rules of interpretation, there remains an uncertainty in the language of the contract, that language must be interpreted against the party who caused the uncertainty to exist." Genentech contends that the trial court erred in giving this jury instruction because the rule it states does not apply to contracts that are the result of negotiations, as was the contract between Genentech and City of Hope. Genentech relies on this statement from a 1962 Court of Appeal decision: "The contract ... here is not like an insurance policy to be construed against one party. Rather, its terms were admittedly arrived at by negotiations between two parties." (*Indenco, Inc. v. Evans* (1962) 201 Cal.App.2d 369, 375.)

Genentech reads too much into the quoted statement. Because "the insurer typically drafts policy language, leaving the insured little or no meaningful opportunity or ability to bargain for modifications," ambiguities in policy provisions are generally resolved against the insurer and in favor of coverage. (*AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 822.) The statement that a negotiated agreement "is not like an insurance policy to be construed against one party" (*Indenco, Inc. v. Evans, supra,* 201 Cal.App.2d at p. 375) simply means that special construction rules for insurance policies or similar types of adhesion contracts are not applicable to other type of agreements, and that instead the general rules of contract interpretation are to be used.

The challenged jury instruction at issue here is taken almost verbatim from Civil Code section 1654, which provides: "In cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist." The trial court's instruction thus embodies a general rule of contract interpretation that was applicable to the negotiated agreement between Genentech and City

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of Hope. It may well be that in a particular situation the discussions and exchanges between the parties in the negotiation process may make it difficult or even impossible for the jury to determine which party caused a particular contractual ambiguity to exist, but this added complexity does not make the underlying rule irrelevant or inappropriate for a jury instruction. We conclude, accordingly, that the trial court here did not err in instructing the jury on Civil Code section 1654's general rule of contract interpretation.

4. Admission of evidence of prior settlement

In 1995, before the lawsuit in this case was brought, Genentech and City of Hope settled a dispute concerning Genentech's settlement of its lawsuit against Eli Lilly for patent infringement. At the trial in this case, the court allowed City of Hope to present evidence of its settlement with Genentech under which Genentech agreed to pay City of Hope royalties on Eli Lilly's sales of products that did not use City of Hope's synthesized DNA. Genentech contends this evidence should have been excluded under Evidence Code section 1152, subdivision (a), as evidence of a prior settlement. Genentech, however, stipulated to admission of this evidence. Therefore it is now barred from raising this claim.

Controlling here is the general rule that stipulations pertaining to the admission of evidence, absent an express limitation, apply to a later trial of the same action, unless the trial court allows the stipulation to be withdrawn. (*Gonzales v. Pacific Greyhound Lines* (1950) 34 Cal.2d 749, 755; *Harris v. Spinali Auto Sales, Inc.* (1966) 240 Cal.App.2d 447, 453-454.) Before commencement of the first trial in this case, Genentech stipulated to the admission into evidence of its 1995 settlement with City of Hope on the Eli Lilly matter and documents relating to that settlement. Then, after the first trial but before commencement of the second trial in this case, Genentech moved to exclude the evidence at issue. The trial court ruled that all stipulations made at the first trial were binding at the second trial. Because the trial court did not allow Genentech's stipulation to be withdrawn, it is binding here. Misplaced is Genentech's reliance on two Court of Appeal decisions, *Brunt v. Occidental Life Ins. Co.* (1963) 223 Cal.App.2d 179, 183, and *Duncan v. Garrett* (1959) 176 Cal.App.2d 291, 294. Those decisions concern this principle: "When a particular legal conclusion follows from a given state of facts, no stipulation of counsel can prevent the court from so declaring it." (*San Francisco Lumber Co. v. Bibb* (1903) 139 Cal. 325, 326.) The stipulation here pertained not to a legal conclusion but to the admission of evidence.

III

The judgment of the Court of Appeal is reversed with directions that the Court of Appeal modify the trial court's judgment to award City of Hope $300,164,030 as damages on its breach of contract claim, striking the award of punitive damages on its breach of fiduciary duty claim, and as so modified to affirm the judgment.

WE CONCUR:

GEORGE, C. J.

BAXTER, J.

CHIN, J.

MORENO, J.

CORRIGAN, J.

LAMBDEN, J.

FN* *See last page for addresses and telephone numbers for counsel who argued in Supreme Court.*

   *. Associate Justice of the Court of Appeal, First Appellate District, Division Two, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**Name of Opinion** City of Hope National Medical

Center v. Genentech, Inc.

**Unpublished Opinion**

**Original Appeal**

**Original Proceeding**

**Review Granted** XXX 123 Cal.App.4th 306

**Rehearing Granted**

**Opinion No.** S129463

**Date Filed:** April 24, 2008

**Court:** Superior

**County:** Los Angeles

**Judge:** Edward Y. Kakita*

*Retired judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**Page 2 - S129463 - counsel continued**

Cal.,2008.
City of Hope Nat. Medical Center v. Genentech, Inc.
--- Cal.Rptr.3d ----, 2008 WL 1820916 (Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.