1 | QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
2 | John B. Quinn (Bar No. 090378)
(johnquinn@quinnemanuel.com)
Michael T. Zeller (Bar No. 196417)
3 | (michaelzeller@quinnemanuel.com)
Jon D. Corey (Bar No. 185066)
4 | (joncorey@quinnemanuel.com)
865 South Figueroa Street, 10th Floor
5 | Los Angeles, California 90017-2543
Telephone: (213) 443-3000
6 | Facsimile: (213) 443-3100

7 | Attorneys for Mattel, Inc.

8 | UNITED STATES DISTRICT COURT

9 | CENTRAL DISTRICT OF CALIFORNIA

10 | EASTERN DIVISION

11 | CARTER BRYANT, an individual,    CASE NO. CV 04-9049 SGL (RNBx)

12 | Plaintiff,    Consolidated with
Case No. CV 04-09059
13 | vs.    Case No. CV 05-02727

14 | MATTEL, INC., a Delaware corporation,    Hon. Stephen G. Larson

15 | Defendant.    [PUBLIC REDACTED] MATTEL, INC.'S MEMORANDUM OF POINTS AND
16 |    AUTHORITIES IN OPPOSITION TO MGA PARTIES' MOTION IN LIMINE
17 | AND CONSOLIDATED ACTIONS    NO. 10 TO EXCLUDE REFERENCE TO AND USE OF TESTIMONY OF CAROL
18 |    A. SCOTT

19 |    [Notice of Lodging and Declarations of Tamar Buchakjian and Stephen M. Hauss
20 |    filed concurrently herewith]

21 |    Hearing Date: May 21, 2008
Time: 1:00 p.m.
22 |    Place: Courtroom 1

23 |    **Phase 1:**
Pre-trial Conference: May 19, 2008
24 |    Trial Date: May 27, 2008

25 |
26 |
27 |
28 |

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT ............................................................................................................. 3

I. DR. SCOTT'S OPINIONS ARE RELEVANT AND WILL ASSIST THE TRIER OF FACT ........................................................................................ 3

    A. A Copyright Owner May Recover Profits From Non-Infringing Works to Make the Infringement Worthless to the Infringer ................ 3

    B. With Respect to Indirect Profits, a Copyright Owner Need Show Only That the Infringement Partially Caused Sales of Non-Infringing Products ......................................................................... 4

II. DR. SCOTT'S TESTIMONY COMPLIES WITH THE GATEKEEPING REQUIREMENTS SET FORTH IN DAUBERT ............. 9

    A. Dr. Scott's Testimony Is Reliable in Accordance with Daubert ............ 9

    B. Dr. Scott's Testimony is Not Speculative ............................................. 15

        1. Apportionment ........................................................................... 15

        2. Anecdotal Evidence ................................................................... 16

        3. Analysis of Financial Data ........................................................ 17

        4. Familiarity with Particular Accessory Products ........................ 17

        5. Temporal Proximity ................................................................... 18

        6. Professional Standards ............................................................... 18

III. MGA HAS NOT DEMONSTRATED THAT DR. SCOTT'S TESTIMONY WILL CONFUSE OR MISLEAD THE TRIER OF FACT ................................................................................................. 20

CONCLUSION ........................................................................................................ 20

1

# TABLE OF AUTHORITIES

2

**Page**

3

## Cases

4

Andreas v. Volkswagen of America, Inc.,
   336 F.3d 789 (8th Cir. 2003)..................................................................... 5

Bucklew v. Hawkins, Ash, Baptie & Co.,
   329 F.3d 923 (7th Cir. 2003)..................................................................... 3

Burns v. Imagine  Films Entm't, Inc.,
   2001 WL. 34059379 (W.D.N.Y. 2001)...................................................... 7

Claar v. Burlington Northern R.R.,
   29 F.3d 499 (9th Cir. 1999)..................................................................... 16

Daubert v. Merrell Dow Pharmaceuticals, Inc.,
   509 U.S. 579 (1993) ........................................................................... 3, 9

Frank Music Corp. v. Metro-Goldwyn-Mayer,
   772 F.2d 505 (9th Cir. 1985)..................................................................... 5

Kleier Advertising Co., Inc. v. James Miller Chevrolet, Inc.,
   722 F. Supp. 1544 (N.D. Ill. 1989).......................................................... 4

Kuhmo Tire Co., Ltd. v. Carmichael,
   526 U.S. 137 (1999) ................................................................................ 9

Mackie v. Reiser,
   296 F.3d 909 (9th Cir. 2002).................................................................. 4, 7

Masterson Marketing, Inc., v. KSL Recreation Corp.,
   495 F. Supp. 2d 1044 (S.D. Cal. 2007) .................................................... 4

Polar Bear Productions, Inc. v. Timex Corp.,
   384 F.3d 700 (9th Cir. 2004)........................................................... 4, 6, 16

U.S. Payphone, Inc. v. Executives Unlimited of Durham, Inc.,
   781 F. Supp. 412 (M.D.N.C. 1991)......................................................... 4

## Statutes

17 U.S.C. § 106.................................................................................... 8

17 U.S.C. § 106 (1)............................................................................... 5

17 U.S.C. § 106 (2)............................................................................... 5

17 U.S.C. § 106 (3)............................................................................... 5

17 U.S.C. § 504(b).................................................................. 3, 4 15, 16

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1  Fed. R. Evid. 403 .............................................................................................. 20

2

3                            **Other Authorities**

4  David A. Aaker,
       Building Strong Brands (1996) ..................................................... 10
5      Managing Brand Equity, (1991)................................................... 10

6  David A. Aaker & Erich Joachimisthaler,
       Brand Leadership (2000).............................................................. 10

7  David A. Aaker & Kevin Lane Keller,
       Consumer Evaluations of Brand Extensions, 54 Journal of Marketing, (1990) .. 11
8
   Franziska Volckner & Henrik Sattler, Drivers of Brand Extension Success,
9      70 Journal of Marketing, 18-34 (2006) ....................................... 11

10 H.R. Rep. No. 1476, 94th Cong., 2d Sess. 161 ............................... 4

11 Kevin Lane Keller,
       Strategic Brand Management, Building, Measuring,
12     and Managing Brand Equity 194 (3d ed. 2008)............................ 10

13 Philip Kotler & Kevin Lane Keller,
       Marketing Management 275 (12th ed. 2007).............................. 10
14
   Melville B Nimmer & David Nimmer, Nimmer on Copyright (2007)
15     § 14.03[D][1] ............................................................................ 15

16 Alice M. Tybout & Gregory S. Carpenter,
       Creating and Managing Brands, in Kellogg on Marketing 74-102
17     (Dawn Iacobucci ed. 2001) ........................................................ 10

18 Is It a Fashion Coup? Sassy Bratz Dolls Grab Some of Barbie's Limelight—Upstart
       Is Reaching Preteens With Street-Smart Look for Toys,
19     The Wall Street Journal Asia, Dec. 2, 2002.............................. 13

20

21

22

23

24

25

26

27

28

# MEMORANDUM OF POINT AND AUTHORITIES

## Preliminary Statement

The purpose of allowing a copyright owner to recover the profits of an infringer is to make the infringement "worthless" to the infringer. By this motion, however, defendants seek to exclude expert testimony so that they can keep hundreds of millions of dollars of profits even if it they are found liable for infringement. MGA misapprehends the applicable legal standard and both the substance and bases of Dr. Scott's testimony and, consequently, its motion should be denied.

The Copyright Act provides that with respect to direct profits from copyright infringement -- profits from the exploitation of infringing products -- Mattel has the burden of proving only MGA's "gross revenue." With respect to indirect profits -- profits from the exploitation of non-infringing products -- Mattel has the burden of proving a "causal nexus" between the profits and some infringement. To satisfy that burden, Mattel need only show that MGA's infringement "partially caused" the profits.

Dr. Scott, a professor of marketing at the Anderson Graduate School of Management at UCLA, will testify concerning the causal nexus between the MGA's copyright infringement and the sale of non-infringing Bratz merchandise. She will opines that the success of the Bratz dolls (which infringe Mattel's copyrights) drove the sale of other Bratz merchandise (some of which may not independently infringe Mattel's copyrights), i.e., if MGA had not sold the infringing Bratz dolls, it would not have sold and made profits from Bratz accessories and other products.

Dr. Scott bases her opinion on established marketing principles and theories about brand building and MGA's own documents which show that it acted consistently with these principles. Dr. Scott will testify that a strong brand allows

1   for product line and brand extensions and, in order to have a strong brand, one must

2   have a strong core product.  Here, MGA's "core" product is the infringing Bratz

3   dolls.  Following basic marketing principles, the success of the dolls allowed MGA

4   both to sell and license follow-on Bratz products.  Dr. Scott ultimately concludes

5   that the sales of accessories and other merchandise sold as part of the Bratz product

6   line or as Bratz-licensed goods are dependent on, and derive value from, the success

7   of the Bratz dolls.  In other words, she reaches the self-evident conclusions that

8   accessories and non-doll Bratz products would not sell if the Bratz dolls would not

9   sell.

10          MGA's motion to exclude Dr. Scott's testimony must be denied for a

11  variety of reasons.  Preliminarily, the motion is based on an incorrect legal standard.

12  MGA posits that the only infringing products are the fashion dolls themselves and,

13  accordingly, Dr. Scott must show that profits from all other Bratz merchandise was

14  caused by the design of the dolls.  MGA is wrong.

15          First, virtually all of the Bratz merchandise (doll and non-doll) infringe

16  either Mattel's right to reproduce a copyrighted work or to prepare derivative works.

17  Second, as to profits from any non-infringing products, Dr. Scott's testimony is

18  admissible so long as it is reliable and helpful to the jury in making a determination

19  of a causal nexus between any infringement and MGA's profits.

20          Third, MGA asserts that Dr. Scott has not distinguished between

21  infringing and non-infringing factors in the generation of MGA's profits; MGA,

22  however, conflates the issue of causation, on which a copyright plaintiff has the

23  burden of proof, with the issue of apportionment, on which a copyright defendant

24  bears the burden.  Dr. Scott will testify that MGA's Bratz line of accessories and

25  other follow-on Bratz products are driven by the success and sale of the Bratz dolls

26  themselves, i.e. there is a causal nexus between infringement and indirect profits.

27  MGA may argue at trial that some of its profits result from independent factors and,

28

therefore, that its profits should be apportioned.  But there is no reason that Dr. Scott must testify as to apportionment in order for her testimony to be admissible.

Furthermore, MGA ignores the bases of Dr. Scott's opinions in claiming that her testimony does not comport with the reliability requirements set forth in <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993).  For example, MGA argues that Dr. Scott relied on anecdotal evidence from which she "leapt" to her conclusions.  But, in fact, Dr. Scott reviewed thousands of documents produced by the parties and based her opinions on, among other things, a number of documents produced by MGA, MGA's responses to discovery and a number of treatises and publications, as well as her extensive marketing knowledge and experience.  Thus, Dr. Scott's conclusions are supported by established marketing principles and evidence produced by the parties (and they are even corroborated by MGA's own experts).

Therefore, as demonstrated below, MGA's motion should be denied.

## Argument

I. **DR. SCOTT'S OPINIONS ARE RELEVANT AND WILL ASSIST THE TRIER OF FACT**

A. **A Copyright Owner May Recover Profits From Non-Infringing Works to Make the Infringement Worthless to the Infringer**

Under 17 U.S.C. § 504(b), a "copyright owner is entitled to recover . . . any profits of the infringer that are attributable to the infringement. . . . "  The statute has been interpreted expansively to permit a copyright plaintiff to recover an infringer's indirect profits so as to make the infringement worthless to the infringer.  As Judge Posner wrote in <u>Bucklew v. Hawkins, Ash, Baptie & Co.</u>, 329 F.3d 923,

933 (7th Cir. 2003): "[T]he purpose of allowing suit for the infringer's lost profits is to make infringement worthless to the infringer.  This will sometimes require tracing those profits into another product. . . . "  (Original italics.)

Thus, profits -- direct and indirect -- are awarded to prevent infringers from benefiting in any way from their acts.  "According to H.R. Rep. No. 1476, 94th Cong., 2d Sess. 161, the 1976 Act was passed in order to reimburse copyright owners for losses, *and* to disgorge infringers of <u>any benefit</u> derived from their infringement."  <u>Kleier Advertising Co., Inc. v. James Miller Chevrolet, Inc.</u>, 722 F. Supp. 1544, 1545 (N.D. Ill. 1989) (original italics; underline added).  <u>See also</u> <u>U.S. Payphone, Inc. v. Executives Unlimited of Durham, Inc.</u>, 781 F.Supp. 412, 413 (M.D.N.C. 1991) (recovery of profits "designed to ensure that infringers are not able to retain some benefit").

**B.**       <u>With Respect to Indirect Profits, a Copyright Owner Need Show Only That the Infringement Partially Caused Sales of Non-Infringing Products</u>

17 U.S.C. § 504(b) creates a two-step framework for the recovery of indirect profits:  (1) the copyright owner must first show a causal nexus between the infringement and the infringer's gross revenues and (2) once the causal nexus is shown, the infringer bears the burden of deducting costs and apportioning profits that were not the result of the infringement.  <u>Polar Bear Productions, Inc. v. Timex Corp.</u>, 384 F.3d 700, 711 (9th Cir. 2004).

To establish a causal nexus, the copyright owner "must proffer some evidence . . . [that] the infringement at least partially caused the profits that the infringer generated as a result of the infringement."  <u>Mackie v. Reiser</u>, 296 F.3d 909, 911 (9th Cir. 2002) (emphasis added).  <u>See also</u> <u>Masterson Marketing, Inc., v. KSL Recreation Corp.</u>, 495 F. Supp. 2d 1044, 1049 n.5, (S.D. Cal. 2007) citing

1  <u>Andreas v. Volkswagen of America, Inc.</u>, 336 F.3d 789 (8th Cir. 2003) (indirect
2  profits arise when the alleged infringer does not sell the copyrighted work itself but
3  rather <u>uses the copyrighted work to sell another product</u>). Thus, Mattel only needs
4  to show that sales of MGA's non-infringing Bratz merchandise were "partially
5  caused" by one or more acts of infringement. It is up to MGA to apportion its
6  profits, and that proof has no bearing on the admissibility of Dr. Scott's testimony.

7      MGA claims Dr. Scott must establish that its indirect profits were
8  caused by the infringing design of the Bratz dolls. However, Mattel need only show
9  a nexus between the indirect profits and any infringement. <u>Polar Bear</u>, 384 F.3d at
10  711. Mattel alleges that MGA infringed its copyrights by, among other things,
11  creating unauthorized copies of the original Bratz drawings, preparing derivative
12  works *and selling* the Bratz dolls. 17 U.S.C. § 106 (1), (2) and (3). Moreover,
13  Mattel alleges that the dolls are infringing in their entirety. When Scott opines that
14  sales of the dolls drives sales of other products, that makes the required showing. It
15  is up to MGA to proffer evidence that its profits should be apportioned among
16  infringing and non-infringing factors.

17      Moreover, even if Dr. Scott's testimony by itself were insufficient to
18  establish the causal nexus (because she purportedly does not say which "aspects" of
19  the dolls drive the sales), that does not render it inadmissible -- which is the only
20  question on this motion. There will be ample evidence at trial showing that *the*
21  *design* of the Bratz dolls is the "aspect" of them that caused the sales of the follow-
22  on products. All Mattel needs to show in opposition to this motion is that Dr. Scott's
23  testimony would be helpful to the jury on the issue of the causal nexus. Whether or
24  not it is sufficient in and of itself, her reliable opinion that sales of Bratz dolls drive
25  and partially cause sales of other Bratz products clearly would be helpful to the jury
26  on that issue.

27      In <u>Frank Music Corp. v. Metro-Goldwyn-Mayer</u>, 772 F.2d 505 (9th
28  Cir. 1985), the Ninth Circuit addressed the propriety of awarding indirect profits.

1   The defendants had used several of plaintiffs' copyrighted songs in a musical revue
2   staged at the MGM Grand Hotel.  The district court awarded plaintiffs a portion of
3   the profits from the revue, but it declined to award any portion of MGM Grand
4   Hotel's earnings on hotel and gaming operations as profits.  The Ninth Circuit
5   reversed, holding that the "indirect profits from the hotel and gaming operations, as
6   well as direct profits from the show itself, are recoverable if ascertainable."  Id.
7   at 517.  Although the Court noted that the musical revue "had promotional value,"
8   there was no evidence that people stayed in the hotel or gambled because of the use
9   of the copyrighted songs in the revue.  Nevertheless, plaintiffs were entitled to
10  recover indirect profits because there was a causal nexus between the infringement
11  and those profits.

12          Indeed, MGA conflates two discrete tasks that are not even to be
13  performed by the same party -- Mattel has the burden of proof on the causal nexus,
14  but MGA has the burden on apportionment.  As the Ninth Circuit has stated, "a
15  copyright plaintiff is bound to no more and no less that its statutory obligation to
16  demonstrate a causal nexus between the infringement and the profits sought."  Polar
17  Bear, 384 F.3d 700, 712 (9th Cir. 2004).  In Polar Bear, a film production company
18  brought suit against the Timex Corporation for infringing its copyright in film
19  footage of extreme kayaking at trade shows and other promotional events.  The
20  production company offered expert testimony demonstrating that the use of the
21  kayaking film at trade shows caused Timex to achieve enhanced sales of its watches.
22  The Ninth Circuit  found that the expert's testimony established the requisite causal
23  connection "between the category of profits sought -- revenue from trade booth sales
24  and infringement."  Id.  In so doing, the court specifically noted that the production
25  company "was not required to separate gross profits resulting from the infringement
26  and from the profits resulting from other sources, but it undertook to do so anyway."
27  Id.

28

1    Despite the analysis in <u>Polar Bear</u>, MGA's position is that not only that

2  Mattel must produce evidence of a causal connection between its various acts of

3  infringement and indirect profits, Mattel must further apportion such profits to the

4  infringing aspects of the Bratz dolls even though apportionment is the domain of the

5  copyright defendant.  For example, in the motion, MGA attempts to discredit

6  Dr. Scott's testimony by showing that she did not perform an apportionment analysis

7  or "distinguish among the various reasons for the success of the Bratz doll line."[1]

8  Thus, MGA criticizes Dr. Scott for failing to perform an analysis on which it bears

9  the burden.  It is up to MGA to apportion its profits, and that proof has no bearing

10  on the admissibility of Dr. Scott's testimony.

11    MGA cites two cases[2] in an attempt to demonstrate that its non-doll

12  Bratz merchandise has no nexus with its acts of infringement, <u>Burns v. Imagine</u>

13  <u>Films Entm't, Inc.</u>, 2001 WL 34059379 (W.D.N.Y. 2001) and <u>Mackie v. Reiser</u>,

14  296 F.3d 909 (9th Cir. 2002).  Both are easily distinguishable.

15    In <u>Burns</u>, an unreported case from the Western District of New York,

16  plaintiffs alleged that the defendants had infringed the copyright in their screenplay

17  when producing the motion picture <u>Backdraft</u>.  After the picture had been released, a

18  Backdraft attraction was created at the Universal Studios theme park, and plaintiffs

19  sought a portion of the theme park's profits.  The court rejected plaintiffs' claim on

20  the ground that they had not established the necessary causal relationship between

21  the infringement and the profits.  Notably, in contrast to the instant case, the court

22  pointed out that if "there were no 'Backdraft attraction,' there likely would be an

23  attraction based on another Universal film in its place."  2001 WL 34059379 at *4.

24

25

26    [1]  <u>See</u> <u>Id</u>. at pp. 10-11.

27    [2]  In addition to these cases, MGA's motion includes a string cite of several cases
that merely restate the unremarkable principle of law that a copyright plaintiff may

28  not recover profits that are too speculative.

1        In <u>Mackie</u>, an artist brought a claim for indirect profits against the

2  Seattle Symphony Orchestra for copyright infringement due to the inclusion of an

3  image of his sculpture in the symphony's advertising brochure. The court rejected

4  the plaintiff's indirect profits claim on the ground that he could not establish a causal

5  link between the infringement and sales of concert tickets. 296 F.3d at 916. In fact,

6  the plaintiff's own expert stated that he could not "understand" how it would be

7  possible to establish a causal link between infringement and any of the indirect

8  profits at issue. <u>Id</u>.

9        Neither of MGA's cases addressed the issue of admissibility of expert

10  opinion testimony on causation. Furthermore, neither court had satisfied itself that

11  the plaintiff had proffered evidence of any causal connection between the

12  infringement and the profits from admittedly non-infringing products. Moreover,

13  both Universal Studios and the Seattle Symphony Orchestra had strong brands <u>prior</u>

14  <u>to</u> any claims of infringement, <u>i.e.</u>, they both had established followings and

15  customer bases. In each case, the court determined that ticket sales would have

16  occurred <u>even in the absence of the infringement</u>.

17        Here, unlike Universal Studios and the Seattle Symphony, MGA had

18  no established fashion doll brand before Bratz. Rather, it was a company that

19  specialized in consumer electronics, most notably, hand-held video games.

20  Likewise, there obviously were no accessory Bratz accessory products until there

21  were Bratz dolls. The Bratz brand is inextricably linked with MGA's infringing

22  Bratz dolls. As Dr. Scott concluded, the causal nexus between MGA's acts of

23  infringement and the sales of its non-infringing Bratz merchandise is the success of

24  the Bratz dolls themselves which propelled the Bratz brand.

25        Furthermore, MGA's assumption that the only MGA products that

26  infringe are the Bratz dolls themselves is incorrect. MGA has created hundreds of

27  Bratz products, virtually all of which constitute unauthorized reproductions of, or

28  unauthorized derivative works based on, the original Bratz drawings which are

1  direct infringements of exclusive rights afforded copyright owners under 17 U.S.C.
2  § 106.  MGA's contention that Mattel must show some type of a causal nexus
3  between the design of the Bratz dolls and profits generated from other products that
4  themselves infringe is simply incorrect.

6  **II.   DR. SCOTT'S TESTIMONY COMPLIES WITH THE GATEKEEPING**
7  **REQUIREMENTS SET FORTH IN DAUBERT**

9  **A.   Dr. Scott's Testimony Is Reliable in Accordance with Daubert**

11  Under <u>Daubert</u>, trial courts perform a gatekeeping function to ensure
12  that an expert's testimony is "the product of reliable principles and methods."
13  <u>Kuhmo Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 152 (1999).  An expert's
14  testimony is deemed reliable when it is based on knowledge and experience in his or
15  her discipline rather than on "subjective belief or unsupported speculation."
16  <u>Daubert</u>, 509 U.S. at 589.  MGA argues that Dr. Scott's testimony is unreliable,
17  citing cases holding that expert testimony may be excluded if it is based on "mere
18  supposition" or "rank speculation."

19  However, Dr. Scott's testimony concerning the causal nexus between
20  MGA's infringement and the indirect profits is based not only on her knowledge and
21  experience, but also on established marketing concepts and theories, treatises and
22  other publications, documents produced by MGA and MGA's responses to
23  interrogatories.  Moreover, her testimony is corroborated by MGA's own experts.
24  Undoubtedly, the testimony is more than sufficiently reliable to be presented to the
25  jury.

26  Dr. Scott is a Professor of Marketing at the Anderson Graduate School
27  of Management at UCLA, where she has served variously as the Chairman of the
28  Faculty, Associate Dean and Assistant Dean.  She has a Ph.D. in marketing and a

1  masters degree in management.  Dr. Scott has taught marketing strategy and

2  management, consumer behavior, advertising and distribution strategy, among other

3  things, at UCLA and Harvard Business School.  She also has testified as an expert

4  on a variety of marketing issues over the past 25 years.[3]

5        Dr. Scott expresses two opinions:  (i) MGA's Bratz lines of accessories

6  and other follow-on Bratz products are driven by the sale of Bratz dolls; and (ii) the

7  sale of accessories and other merchandise sold as part of the Bratz product line or as

8  Bratz licensed goods is directly dependent on, and derives value from, the success of

9  the Bratz dolls.

10        She explains that, in the mind of a consumer, a brand is closely tied to a

11  product; the product itself is the primary influence on what consumers experience

12  with a brand.[4]  Because the strength of the brand relates directly to the core product

13  that defines that brand, the core product must be successful.[5]  A strong brand

14  "signals quality, provides functional, emotional, self-expressive, and/or experiential

15  value, and sets consumers' expectations about product performance and use."[6]  In

16  addition, a strong brand is a significant business asset, and the strategic value of

17  brand building to a company and the economic value of a brand are well established

18  in both marketing theory and practice.[7]  Dr. Scott further explains that companies

19

20

---

21    [3]  Expert Report of Carol A. Scott ("Scott Report"), dated February 11, 2008, at

22  p. 1, attached as Exh. 57 to the Declaration of B. Dylan Proctor in Support of Mattel, Inc.'s Motions in Limine Nos. 1-13, lodged in connection with this brief.

23    [4]  Id., at p. 2.

  [5]  Id., citing to Philip Kotler & Kevin Lane Keller, Marketing Management 275

24  (12th ed. 2007).

25    [6]  Id., at p. 3, citing to Alice M. Tybout & Gregory S. Carpenter, Creating and Managing Brands, in Kellogg on Marketing 74-102 (Dawn Iacobucci ed. 2001).

26    [7]  Id., citing to David A. Aaker, Managing Brand Equity, (1991); David A.

27  Aaker, Building Strong Brands (1996); David A. Aaker & Erich Joachimisthaler, Brand Leadership (2000); and Kevin Lane Keller, Strategic Brand Management:

28  Building, Measuring, and Managing Brand Equity, (2d. ed. 2003).

1   leverage strong brands by using them to facilitate brand extensions[8] and line

2   extensions,[9] a view shared by marketing experts[10] and even MGA's expert,

3   Dr. Joachimsthaler.[11]

4        Dr. Scott observes (as MGA documents show) that Bratz is a strong

5   brand due primarily to the success of its centerpiece, the Bratz fashion dolls.[12] The

6   connection between the dolls and the Bratz brand is crucial; the former's success is

7   what shapes and defines the brand.[13]

8        Accordingly, subsequent to the Bratz dolls' introduction in 2001, MGA

9   created a variety of accessory products to complement and expand play with the

---

10

11   [8]  Scott Report, at p. 3, citing to Strategic Brand Management, at p. 90. (A brand extension "occurs when a firm uses an established brand name to enter a market.").

12   [9]  Id., citing to Strategic Brand Management, at 491 (A line extension occurs when "[m]arketers apply the parent brand to a new product that targets a new market

13   segment within a product category the parent brand currently serves.").

    [10]  See, e.g., Strategic Brand Management, supra, at 523 ("Successful brand

14   extensions occur when the parent brand has favorable associations and consumers perceive a fit between the parent brand the extension product."); David A. Aaker &

15   Kevin Lane Keller, Consumer Evaluations of Brand Extensions, 54 Journal of Marketing, 27-41 (1990) ("The success of a brand extension often depends on

16   certain assumptions about consumer behavior, as (1) consumers hold positive beliefs and favorable attitudes toward the original brand. . . . "); Franziska Volckner &

17   Henrik Sattler, Drivers of Brand Extension Success, 70 Journal of Marketing, 18-34

18   (2006) (". . . fit between the parent brand and an extension product is the most important driver of brand extension success, followed by marketing support, parent-

19   brand conviction, retailer acceptance, and parent-brand experience.").

    [11]  This view is corroborated by MGA's own expert. ███████████

20   ██████████████████████████████████████████

21   ██████████████████████████████████████████

22   ██████████████████████████ Expert Report of Dr. Erich J.

23   Joachimsthaler, dated February 11, 2008, at p. 25, attached as Exh. 22 to the Declaration of B. Dylan Proctor in Support of Mattel, Inc.'s Motions in Limine

24   Nos. 1-13, lodged in connection with this brief.

    [12]  According to MGA, ████████████████████████████

25   ████████████████████████████

26   ██████████████████, bearing Bates Nos. MGA 0883926-27, attached to Declaration of Tamar Buchakjian, ¶ 85, Exh. 83.

    [13]  Scott Report, at p. 2, citing to Kevin Lane Keller, Strategic Brand

27   Management, Building, Measuring, and Managing Brand Equity 194 (3d ed. 2008);

28   see also Joachimsthaler Report, at p.10 (███████████████████████████ ).

Bratz fashion dolls.[14]  MGA then implemented several brand extensions, selling a wide variety of products designed for use by girls that are associated with the Bratz brand image, such as Bratz branded fashion accessories.[15]  Dr. Scott testifies that the extension activities were consistent with typical branding strategy whereby a company leverages a successful brand based on a core product to promote additional products.[16]  Significantly, all of the line and brand extensions use the Bratz name and/or images of the Bratz dolls, and promote their connection to the dolls.[17]

An additional benefit of a strong brand identified by Dr. Scott is that it allows a company to generate additional revenue by licensing the brand.[18]  The rationale for the licensor is that consumers will pay more for a product because of the recognition and image of brand.[19]  Dr. Scott observes that MGA leveraged the strength of the Bratz brand by licensing it to other companies that benefit from an "███████████████████████████."[20]  This conclusion has been corroborated by MGA: ████████████████████████████████████████████

---

[14]  Id. at p. 5.

[15]  Id.

[16]  Id., at p. 7.

[17]  Id.

[18]  Scott Report, at pp. 3-4; citing to Strategic Brand Development, ("A strong brand often has associations that may be desirable in other product categories.  To capitalize on this value, a firm may choose to license its name, logo, or other trademark item to another company for use on its products and merchandise." Strategic Brand Development, supra, at 89-90; see also Joachimsthaler Report, at p. 14 ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████ Id. ███

[19]  Scott Report, at p. 4, citing to Strategic Brand Management, at 90, 110 (referencing one marketing research study showing that consumers would pay $60 for cookware licensed under the Julia Child name as opposed to only $40 for the identical cookware bearing the Sears name).

[20]  Id., at p. 8.

1   ████████████████████████████████████

2   ████████████[21]

3           In preparing her report, Dr. Scott consulted a number of treatises and

4   articles, and reviewed approximately 1,800 MGA documents, the transcripts and

5   exhibits from seven depositions, responses to interrogatories, photographs of Bratz

6   products and more.[22]  In short, Dr. Scott's expert opinions are based on established

7   marketing principles and MGA's marketing documents.  She shows through these

8   principles and documents that sales of Bratz accessories and other non-doll

9   products, as well as Bratz-licensed products of other manufacturers, are driven by

10  the success of the Bratz dolls.  She ultimately concludes that it is unlikely that these

11  products ████████████████████████████████

12          MGA attacks Dr. Scott's opinions as unreliable speculation:

13  "Ms. Scott's opinion rests entirely on a single untested supposition -- viz., that Bratz-

14  branded merchandise would not have been profitable absent the success of Bratz

15  fashion dolls."[24]  However, MGA is not only contradicted by the evidence cited

16  above, but one of MGA's own experts has corroborated Dr. Scott's opinion.[25]

17  Paul K. Meyer testified at his deposition:

18  ───────────────
      [21]  Excerpt from the Affirmation of Lee Shiu Cheung in the High Court of the
19  Hong Kong Special Administrative Region Court of First Instance Civil Action
20  No. 2687 of 2003 between MGA Entertainment, Inc. and Hunglam Toys Company
      Limited, dated August 17, 2003, MGA 0883929, Buchakjian Decl., ¶ 103, Exh. 101.
21    [22]  Scott Report, Exh. 3.
      [23]  Id., at p. 9, citing Is It a Fashion Coup? Sassy Bratz Dolls Grab Some of
22  Barbie's Limelight—Upstart Is Reaching Preteens With Street-Smart Look for Toys,
23  The Wall Street Journal Asia, Dec. 2, 2002 ("Bratz dolls are an inch shorter than
      Barbie, so the rivals can't share their wardrobes.").
24    [24]  Motion, at p. 12.
      [25]  See also Scott Report, at p. 8, citing to MGA 4033303 (In a business plan
25  dated March 2001, MGA recognized the potential opportunity of licensing the Bratz
26  brand and that the success of any licensing program would be based upon the
      success of the Bratz dolls; ████████████████████████
27  ████████████████

28



(Emphasis added.)

---

[26] Deposition Transcript of Paul K. Meyer, dated March 31, 2008, at pp. 154:23-155:25, Declaration of Stephen M. Hauss, ¶ 19, Exh. 18.

[27] Id. at p. 173:11-18.

[28] Id. at p. 231:2-17.

**B.**   **Dr. Scott's Testimony is Not Speculative**

MGA attempts to characterize Dr. Scott's testimony as speculative by highlighting that which she did not do (and ignoring what she did do) and taking portions of her deposition testimony out of context. But none of these attacks undermines the reliability of her testimony.

**1.**   **Apportionment**

MGA argues that Dr. Scott ignored the contributions of MGA's brand building to the success of its products and did not consider alternative explanations for the sale of MGA's non-doll Bratz merchandise. But, in fact, Dr. Scott did analyze MGA's brand building and testifies that it is based on the success of infringing products, the Bratz dolls. Dr. Scott's opinion addresses how MGA leveraged the strength of the Bratz brand, based on the dolls as the core product, to create indirect profits from the sale of accessories and other merchandise.

Moreover, to the extent that MGA's profits are due to factors unrelated to the infringement, it is MGA's burden to prove apportionment. The Copyright Act establishes each party's burden of proof with respect to the calculation of profits, _i.e._ the plaintiff has the burden of proving only the defendant's revenue and the defendant has the burden of proving its costs and apportionment. 17 U.S.C. § 504(b) provides:

> . . . In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

Accordingly, MGA has the burden of proving that some portion of its profits are attributable to factors other than the copyrighted work. See Melville B Nimmer & David Nimmer, _Nimmer on Copyright_ (2007), § 14.03[D][1].

1    Similarly, MGA argues that Dr. Scott did not analyze the extent to

2  which any particular attribute of the merchandise contributed to MGA's profits, such

3  as the quality of the "dazzling deco lamp" or the Bratz "tattoo package." But, again,

4  the contributions of non-infringing factors are issues of apportionment and MGA

5  bears the burden of proof. Dr. Scott's testimony is not made inadmissible just

6  because she does not perform an apportionment analysis.

7    In support of its argument, MGA cites <u>Claar v. Burlington Northern</u>

8  <u>R.R.</u>, 29 F.3d 499, 502-04 (9th Cir. 1999). But that case had nothing to do with

9  establishing a causal nexus between copyright infringement and indirect profits.

10  There, the plaintiffs sued their former employer for a variety of ailments stemming

11  from exposure to chemicals at work. The district court required that the plaintiffs'

12  physicians submit affidavits listing each of the plaintiffs' injuries, the chemicals that

13  caused each injury and the scientific bases for the physicians' conclusions. <u>Id</u>. at

14  500. The court excluded the affidavits because the physicians failed to consider

15  causes of the injuries other than the chemicals, such as preexisting medical

16  conditions. The ruling in that case spoke to establishing a causal link between

17  chemicals and personal injury, and had nothing to do with section 504(b), which

18  places the burden of apportionment on the copyright infringer. <u>See</u> <u>Polar Bear</u>,

19  <u>supra</u>, 384 F.3d at 711.

20    Therefore, MGA's claim that Dr. Scott's testimony should be excluded

21  because she did not consider other possible causes should simply be ignored.

22

23    **2.    <u>Anecdotal Evidence</u>**

24

25    MGA also argues that Dr. Scott's conclusion is based on anecdotal

26  evidence from a telephone conversation with a Mattel vice-president. In fact,

27  Dr. Scott cited the interview for one small point -- that ███████████████

28

1

2 MGA simply ignores that Dr. Scott bases the rest of her testimony on treatises,

3 MGA documents, responses to discovery, etc.  See § II.A., above.

4

5        **3.**      **Analysis of Financial Data**

6

7       MGA further attacks Dr. Scott because she did not personally analyze

8 financial data concerning sales of Bratz merchandise.  However, her colleagues did

9 analyze financial data.[30]  Moreover, Dr. Scott will not testify as a forensic

10 accountant and there is no reason that she had to personally analyze financial

11 information to arrive at her opinions.  Furthermore, as MGA acknowledges in its

12 motion, another Mattel expert, Michael Wagner, will testify regarding the profits

13 generated by MGA's products.

14

15        **4.**      **Familiarity with Particular Accessory Products**

16

17       MGA also argues that Dr. Scott was unfamiliar with certain of MGA's

18 Bratz products such as "Bratz Stylin' Slippers."  However, Dr. Scott's analysis of the

19 causal connection between the infringement and follow-on products does not require

20 a visual examination of each of the thousands of Bratz products (and MGA has not

21 demonstrated otherwise).[31]  Nevertheless, although Dr. Scott did not personally

22

23

24

25   [29]  Scott Report page 9, n. 31.

    [30]  Deposition Transcript of Carol A. Scott, dated April 3, 2008, at 69:14-16,

26 Hauss Decl., ¶ 23, Exh. 22.

    [31]  At best, this goes to the weight to be given to Dr. Scott's testimony.  MGA is

27 free to cross-examine Dr. Scott about this at trial, but it is not a basis for excluding

28 her testimony altogether.

07209/2486906.1

1  review every Bratz non-doll product, she reviewed photographs of myriad such
2  products in preparing her expert reports.[32]

3

4    **5.    Temporal Proximity**

5

6        MGA claims that Dr. Scott's testimony is predicated solely on temporal
7  proximity to establish a causal relationship.  MGA misstates Dr. Scott's testimony.
8  While it certainly is true that the dolls appeared in the market before other Bratz
9  non-doll merchandise, the temporal aspect is not the only basis for her conclusion.
10 In any event, it is certainly not surprising that Dr. Scott would consider timing--that
11 the dolls came first--when considering whether the Bratz doll gave strength to an
12 otherwise unknown brand, and drove sales of other product under the aegis of the
13 Bratz brand.  Her conclusion that, without the dolls and their concomitant success, it
14 would have been impossible for MGA to market its non-doll Bratz products is
15 eminently reasonable.  This conclusion finds support in MGA's own statements, as
16 one employee remarked ███████████████████████████████████
17 ████████████████████████████████████████████████████
18 ████████████████████[33]

19

20   **6.    Professional Standards**

21

22        Finally, MGA asserts that Dr. Scott did not apply the same professional
23 standards she would have used outside the context of this litigation.  Specifically,
24 MGA claims that Dr. Scott "admits that, if asked to address the same issue in her
25 professional consulting practice, she would have adopted a far more rigorous

26 _____
27 [32] Scott Report, Exhibit 3.
   [33] Excerpt from ABC International Traders, Inc. Business Plan, dated
28 March 2001, bearing Bates No. MGA 0883923, Buchakjian Decl., ¶ 85, Exh. 83.

1  approach.  According to Scott's testimony, that approach would have included

2  substantial focus group analysis and experimentation. . . . "[34]  An examination of the

3  cited portions of Dr. Scott's deposition testimony makes no reference to any

4  language concerning the adoption of a "more rigorous approach."  The questions to

5  which Dr. Scott responded were:

6

7

8

9

10

11

12      These questions were hypothetical in nature, asking whether a client

13  would ever ask to measure something and, if so, how would she respond.  Moreover,

14  the testimony MGA cites goes to the issue of apportionment of profits among

15  different factors, not the causal relationship between the sale of the Bratz dolls and

16  the sale of Bratz accessories and other follow-on products.  The testimony simply

17  does not support MGA's assertion that Dr. Scott did not apply the same level of

18  rigor as she would in other professional work.

19      Thus, rather than focus on Dr. Scott's opinions and the bases therefor,

20  MGA has made unwarranted attacks.  Dr. Scott plainly focused on the proper

21  inquiry and applied sound and established principles of marketing to the evidence of

22  this case.

23

24

25

26

27  [34]  Motion, at pp. 19-20.

28  [35]  Scott Depo. Transcript, at pp. 245:24-247:16, Hauss Decl., ¶ 23, Exh. 22.

1    **III.**    <u>**MGA HAS NOT DEMONSTRATED THAT DR. SCOTT'S**</u>

2         <u>**TESTIMONY WILL CONFUSE OR MISLEAD THE TRIER OF FACT**</u>

3

4         MGA asks the Court to exercise its discretion under Fed. R. Evid. 403

5 to exclude Dr. Scott's testimony, characterizing it as "certain to confuse and mislead

6 the trier of fact."  MGA's argument is bereft of any substance.  As set forth above,

7 Dr. Scott's testimony is tied to the appropriate legal standard and demonstrates a

8 causal nexus between MGA's infringement and its sales of its accessories and other

9 follow-on Bratz products.  As such, her testimony is relevant and will assist the trier

10 of fact.  MGA has failed to identify or present anything demonstrating that

11 Dr. Scott's testimony will confuse or mislead the jury.

12

13                       <u>**Conclusion**</u>

14

15         For the foregoing reasons, Mattel respectfully requests that the Court

16 deny the MGA Parties' Motion in Limine No. 10.

17

18 DATED: April 28, 2008          QUINN EMANUEL URQUHART OLIVER &

19                                 HEDGES, LLP

20

21                       By John B. Quinn TB.
                             John B. Quinn

22                              Attorneys for Plaintiff
                             Mattel, Inc.

23

24

25

26

27

28