EXHIBIT 1

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 2

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 3

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 4

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 5

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 6

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 7

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION

CARTER BRYANT, an individual,

Plaintiff,

vs. No. CV 04-09049 SGL (RNBx)

MATTEL, INC., a Delaware Corporation,

Defendants.

CERTIFIED COPY

CONSOLIDATED WITH MATTEL, INC., v BRYANT and MGA ENTERTAINMENT, INC., v MATTEL, INC.

---

DEPOSITION OF GARY FUNCK

San Francisco, California

Tuesday, April 8, 2008

REPORTED BY:
LYNNE LEDANOIS
CSR No. 6811

Job No. 86126

EXHIBIT 7

PAGE 87

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION

CARTER BRYANT, an individual,

Plaintiff,

vs. No. CV 04-09049 SGL (RNBx)

MATTEL, INC., a Delaware Corporation,

Defendants.

CONSOLIDATED WITH MATTEL, INC.,
v BRYANT and MGA ENTERTAINMENT, INC.,
v MATTEL, INC.

---

Deposition of GARY FUNCK, taken on behalf of Defendant, at 50 California Street, 21st Floor, San Francisco, California, beginning at 10:01 a.m. and ending at 2:25 p.m. on Tuesday, April 8, 2008, before LYNNE LEDANOIS, CSR 6811.

APPEARANCE OF COUNSEL:

For Plaintiff:

KEKER & VAN NEST
BY: MICHAEL H. PAGE
Attorney at Law
710 Sansome Street
San Francisco, California 94111-1704
415.391.5400
mpage@kvn.com

For Defendants:

QUINN EMANUEL URQUHART OLIVER & HEDGES
BY: CHRISTOPHER TAYBACK
Attorney at Law
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
213.433.3170
christayback@quinnemanuel.com

VIDEOGRAPHER:

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
BY: SEAN GRANT

EXHIBIT 7
PAGE 89

image --

A Yes.

Q -- would you have that meta data someplace?

A Yes.

Q Where?

A In the image file.

Q And that's an image file that you still have in your possession?

A Yes.

Q And is that information that you looked at in preparing this report?

A Incidentally, but since my statement is that I did not review it any further than -- then I did not include that.

Q Okay. So you had it, but you did not actually review it in any further detail other than as referenced here?

A I looked quickly at it, but when I noted that it was different than the ones that -- from the one that Menz had reviewed, I did not see any purpose in proceeding further.

Q Let me ask you, you note there -- not only is it predated; it has different content than another image that Mr. Menz reviewed.

What leads you to believe it had a different

content than that?

A The MD5 check sums are different.

Q Do you remember the difference, what the quantity of difference is?

A I did not look.

Q Do you know anything -- did you note any specific content that appeared to be different between what this is versus what had -- the April 27th version?

A No. Once I determined they were different, I did not see the purpose in proceeding.

Q Do you know what, if anything, happened to the original computer itself that was the subject of the April 20th and April 27th images between April 20th and April 27th, 2007?

A I do not.

Q With respect to the desktop that I am going to focus my questions, I think, on this -- on the one that's imaged dated July 13th, 2004 --

A That's the way I dated it, right.

Q Okay. Is it fair to say that that is the image that you performed your testing on, your analysis of?

A It's the system that I performed my analysis on.

Q Okay. Not the April 20th one?

A 2007?

12:00:48 Q 2007. Correct?
12:00:48 A Correct.
12:00:49 Q When I refer then to the image of the HP Pavilion or the desktop image, from now on I'm going to be focused on that, the July 13th, 2004 image that you performed your analysis of. Okay?
12:01:05 A Yes.
12:01:05 Q Is it your opinion that the Evidence Eliminator was never run on the desktop?
12:01:16 A No.
12:01:18 Q Is it your opinion that it was run on the desktop?
12:01:21 A No.
12:01:23 Q Did you look to determine whether it was ever run on the desktop?
12:01:27 A I want to be clear we're talking about the version -- the definition of run that we've agreed upon, meaning the user ran it to invoke its functions?
12:01:35 Q Yes.
12:01:36 A Okay. Now, please repeat your question.
12:01:39 Q Is that how you answered the last two questions, using that interpretation?
12:01:44 A Yes.
12:01:48 Q Did you look at the desktop to determine whether or not Evidence Eliminator had ever been run?

12:01:57 A I think we looked generally at the image and -- but we did not look particularly at that question.

12:02:07 Q Is there something you could have done in your analysis to determine whether it had ever been run?

12:02:24 A Yes.

12:02:25 Q What could you have done?

12:02:29 A We could have run tests on Evidence Eliminator having been run under the Windows ME operating system which was present on that system and on a hard drive that has the FAT32 format which is present in that image. From those tests, we could determine, perhaps, indicia of Evidence Eliminator having been run on that sort of system.

12:03:10 Q Why didn't you do that?

12:03:14 A There were many tasks that we had to perform. When we prioritized them, that didn't seem to be important. And it was also, obviously, time-consuming.

12:03:33 Q Is it possible that Evidence Eliminator was run on the desktop in 2002?

12:03:44 A It's possible.

12:03:46 Q Is it possible that it was run in 2003?

12:03:50 A Run by the user to perform its functions?

12:03:53 Q Using the definition --

12:03:55 A Based upon -- as I concluded in my report, we don't see -- we see indications that would imply or

EXHIBIT 7
PAGE 93

12:04:05 state that it was not run past a certain date in 2002.

12:04:16 Q But you cannot say that it was not run at

12:04:20 that -- on that date in 2002 or anytime before that?

12:04:27 A We can't say is a double negative, so I'm not

12:04:31 sure how to answer.

12:04:32 MR. PAGE: Object as compound.

12:04:34 MR. TAYBACK: Sure. That was unclear.

12:04:35 BY MR. TAYBACK:

12:04:36 Q But it's not your opinion that it was not

12:04:38 run -- withdraw that.

12:04:42 MR. PAGE: We're going to go for a triple

12:04:43 negative this time with a half-turn.

12:04:46 BY MR. TAYBACK:

12:04:47 Q You have no opinion -- it's correct that you

12:04:49 have no opinion as to whether or not it was run in 2002?

12:04:53 A That's correct.

12:05:11 MR. PAGE: Let me belatedly object to that as

12:05:13 vague and ambiguous.

12:05:14 BY MR. TAYBACK:

12:05:15 Q In your opinion, what is the latest date on

12:05:19 which Evidence Eliminator could have been run on the

12:05:24 desktop?

12:05:53 A July 29th, 2002.

12:06:25 Q July 29th, 2002 is a date after it was

12:06:28 originally installed?

application log.

Q What is that?

A Actually, I don't remember at the moment.

Q Is it something that you can look at on this desktop, for example, an application log somewhere?

A I don't know.

Q Would you -- maybe you can't answer this question either, given your last answer, but would it be unusual to see an empty application log?

A I can't answer.

Q Did you notice on the computer that there appeared to be what I think you might have just described as a gap, inactivity on the desktop?

A I did not look at that specifically.

Q Did you notice that there was -- did you notice, whether you looked at it specifically or not, any kind of a gap reflecting no activity between September of 2002 and October of 2003?

A I did not notice.

Q Would that affect your opinion in any way if that was the case?

MR. PAGE: Objection, vague and ambiguous.

THE WITNESS: You know, I think it would depend upon the particulars.

BY MR. TAYBACK:

01:30:55 Q Assume that you looked at the computer, the desktop, and it showed that there was no activity from September of 2002 to October of 2003. Would that affect your opinion in any way?

MR. PAGE: Objection, vague and ambiguous. Which opinion?

BY MR. TAYBACK:

Q Any of your opinions.

A I have to think about that. There's a lot of opinions.

No, I don't think so.

Q What is a setup log?

A That's another one of those logs that I am not sure what it is at the moment.

Q Did you notice that the setup log was dated January of 2004?

A No, I did not.

Q Is that significant at all to anything that you did with respect to your analysis?

A It's -- it did not affect my analysis.

Q Let me ask you -- let me turn to the laptop.

You agreed with Mr. Menz that the hard drive for the laptop reflects approximately 9400 files or file names were overwritten?

A File names or folder names were overwritten.

EXHIBIT 7

PAGE 96

01:32:59 Q On July 12th, 2004?

01:33:02 A Correct.

01:33:13 Q Do you know who ran Evidence Eliminator on July
01:33:17 12th, 2004?

01:33:18 A No, I do not.

01:33:20 Q Did you inquire about that?

01:33:22 A No, I did not.

01:33:25 Q Do you have any reason to believe it was Lee
01:33:27 Curtis?

01:33:28 MR. PAGE: Objection, calls for speculation.

01:33:34 THE WITNESS: Only the fact that he seemed to
01:33:35 show up to do the image two days later, so I guess his
01:33:40 name would be in play if you were trying to determine
01:33:44 that.

01:33:44 BY MR. TAYBACK:

01:33:44 Q Do you know whether it was Carter Bryant?

01:33:47 A I think I already answered, I don't know.

01:33:49 Q Do you have any understanding as to in whose
01:33:53 custody the laptop was in on July 12th, 2004?

01:33:57 A I don't know.

01:33:58 Q Did you make any effort to determine that?

01:34:00 A I did not.

01:34:05 Q As you, I believe, just alluded to, the image
01:34:09 that you reviewed was made two days after Internet --
01:34:14 Evidence Eliminator was run; correct?

was hard was the first part.

Q Do you have any understanding as to what Evidence Eliminator does, if anything, to make recovery of those recipes themselves, in my example, more difficult?

A Yes.

Q What?

A If the data were still present, then it might overwrite the data.

However, I just want to say that when you look at the data on the drive and you think about the time frames involved, for example in our particular example, then this hypothetical might not apply.

Q Put aside the specifics right now. I guess I want to understand what your understanding is of how Evidence Eliminator would overwrite the data itself.

A It probably -- I think we know from the description that it would probably overwrite the unallocated space.

Q And did you look to see whether that -- any unallocated space had been overwritten in the laptop?

A We did not look specifically.

Q When you say you did not look specifically --

A I mean, we looked at a lot of things, and from what I recall, we did not look for that specific

01:46:07 indication.

01:46:16 Q Is there something you would look for since
01:46:18 here the Evidence Eliminator was run -- withdraw that.

01:46:26 The 9400 plus file names and file folders that
01:46:33 were overwritten, do you have any way of knowing how
01:46:36 much data, if ever, was contained in any of those files
01:46:39 or folders?

01:46:44 A No.

01:46:44 Q Is there any way to recover that, to your
01:46:47 knowledge?

01:46:53 A No.

01:46:57 Q Is it your understanding that that's part of
01:46:59 the purpose of Evidence Eliminator?

01:47:01 MR. PAGE: Objection, calls for speculation.

01:47:06 THE WITNESS: I think part of the purpose of
01:47:08 Evidence Eliminator is to perform some of these cleaning
01:47:13 functions that we just talked about.

01:47:15 BY MR. TAYBACK:

01:47:15 Q And is one effect of Evidence Eliminator, in
01:47:18 your understanding, that it makes it impossible to know
01:47:21 how much data was ever contained in any of the 9400 plus
01:47:27 file names and file folders overwritten by Evidence
01:47:29 Eliminator?

01:47:30 MR. PAGE: Objection, vague and ambiguous.

01:47:33 THE WITNESS: Did you say file and folder names

EXHIBIT 7

PAGE 99

or did you say files and folders?

BY MR. TAYBACK:

Q The data contained in the files and folder names overwritten by Evidence Eliminator.

MR. PAGE: Same objection.

THE WITNESS: The difficulty in answering that question is that you can have a lot of leftover file and folder names and no data at all corresponding to them.

BY MR. TAYBACK:

Q I understand what you could have, but I'm saying, the ability to go back and figure out whether there was -- what data, if any, was in any given file folder or name, is it your understanding that Evidence Eliminator makes it impossible to go back and figure that out?

MR. PAGE: Same objection.

THE WITNESS: The name does not have the file data, so I can't answer the question as asked.

BY MR. TAYBACK:

Q In the absence of Evidence Eliminator in this case, could you do anything to determine whether any of the file names or file folders that are represented by the 9400 plus overwritten file names had data in them?

MR. PAGE: Objection, vague and ambiguous, incoherent.

01:48:38 THE WITNESS: They did not have data because they were already deleted.

01:48:41 BY MR. TAYBACK:

01:48:42 Q In the absence of Evidence Eliminator, is there anything you could do to determine whether the data that once was in those file names or folders was still on the computer?

01:48:53 MR. PAGE: Same objection.

01:49:00 THE WITNESS: I would say no.

01:49:01 BY MR. TAYBACK:

01:49:12 Q By eliminating the file names and folder names, what is the -- if you have any understanding, what's the -- withdraw that.

01:49:23 In your analysis of this particular -- withdraw that.

01:49:34 Do you know why whoever ran Evidence Eliminator on July 12th, 2004 ran it?

01:49:39 MR. PAGE: Objection, calls for speculation.

01:49:44 THE WITNESS: I have no clue.

01:49:44 BY MR. TAYBACK:

01:49:44 Q Is there any way to recover the file names or folder names that were overwritten on July 12th, 2004, to your knowledge?

01:49:55 A No.

01:49:56 Q And is that an effect of Evidence Eliminator?

EXHIBIT 7
PAGE 181

01:50:00 A Yes.

01:50:01 MR. PAGE: Objection, calls for speculation.

01:50:04 THE WITNESS: It seems so.

01:50:05 BY MR. TAYBACK:

01:50:05 Q If Evidence Eliminator had not been run on July 12th, 2004, could one recover the 9400 plus file names and folder names that were overwritten?

01:50:14 MR. PAGE: Objection, calls for speculation.

01:50:24 THE WITNESS: Yes.

01:50:25 BY MR. TAYBACK:

01:50:27 Q How?

01:50:43 A I suppose by looking at the information that's on the disk drive.

01:50:47 Q Where would you look exactly?

01:50:49 A In the MFT.

01:51:03 Q Can you tell me how many times Evidence Eliminator was run prior to July 12th, 2004 --

01:51:11 MR. PAGE: Objection, vague and ambiguous.

01:51:12 BY MR. TAYBACK:

01:51:12 Q -- on the laptop? Sorry.

01:51:15 A No.

01:51:17 Q Why not?

01:51:21 A Well, I think if you look for indications -- we talked before, if you looked at the dates and times of the configuration files that it accesses, then there's

01:59:43 A Correct.

01:59:44 Q Plus any additionally-deleted files between the April and the July --

01:59:48 A Or, more accurately, plus any other file names and folder names that have not been allocated to new files.

01:59:56 Q Okay. In your report again at page 3, you -- in the first bullet point around page 7, you say, Mr. Menz does not clarify his statement by mentioning that files names can be overwritten by Evidence Eliminator without any actual data being overwritten.

02:00:19 Can they -- is the opposite of that true? Is it that they can be overwritten and actual data also overwritten?

02:00:30 A Not if we consider data to be a separate entity from the file name.

02:00:36 Q So when you say it can be, are you saying, really, must be in this report?

02:00:42 A I'm not sure I understand the distinction.

02:00:49 Q Well, I guess I want to find out whether you're saying it can be this and it can be that, or, you know, it can only be this.

02:00:52 A Oh, okay. I think there are scenarios that are not difficult to conceive where the file names are overwritten and the data isn't.

EXHIBIT 7
PAGE 103

02:01:02 Q Do you know whether the -- I just want to make
02:01:06 sure that this is clear.
02:01:07 Do you know whether Evidence Eliminator as run
02:01:09 on this laptop did anything to overwrite unallocated
02:01:17 space?
02:01:22 A I think there are indications that it did
02:01:24 overwrite unallocated space.
02:01:27 Q And that would be where the remnants of the
02:01:31 files, the data within the various file names would be
02:01:38 found, typically, in the absence of Evidence Eliminator;
02:01:41 correct?
02:01:43 A If you could just say -- if you stop the
02:01:46 "typically," I would say yes.
02:01:49 Q What is the matter with the "typically"?
02:01:51 A It's just sort of compound. I don't really
02:01:53 know which part of the question to answer.
02:02:08 MR. TAYBACK: Okay. If we could have that read
02:02:08 back and I'll take out the "typically."
(Record Read.)
02:02:09 MR. TAYBACK: I'm not going to reask that. I
02:02:12 will rephrase it.
02:02:13 BY MR. TAYBACK:
02:02:14 Q In the unallocated space in this laptop that
02:02:16 you analyzed is where the underlying data would go once
02:02:22 a file is deleted, until it's used and allocated to some

EXHIBIT 7
PAGE 104

other new file; correct?

A Right, until it's reused.

Q So by overwriting the unallocated space, in addition to the file names and folder names, Evidence Eliminator as used on this laptop makes recovery of any previously-deleted data impossible; correct?

A Well, I think that the issue again there is that the previously-deleted data, okay, could be reused and is reused by the operating system. So that also makes it irrecoverable.

Q So either reused by the operating system and to the extent not reused by the operating system, the running of Evidence Eliminator, as was done on July 12th, 2004, makes recovery of that data impossible?

A And that data is?

Q That data is previously-deleted data, including the file names and whatever data may have previously existed under those files.

A But that's compound again because you're linking the files and the file data.

Q Okay. When you say "linking the files," you mean linking the file names --

A My point here is basically talking about file --

MR. PAGE: One at a time.

BY MR. TAYBACK:

Q Evidence Eliminator being run on July 12th, 2004 makes recovery of the previously-deleted file names impossible; correct?

MR. PAGE: Objection, misstates his previous testimony and calls for speculation.

THE WITNESS: We've already talked about the file names and the previous file names. So can you ask me a specific question?

BY MR. TAYBACK:

Q I thought that was a specific question.

The running of Evidence Eliminator on July 12th, 2004 makes recovery of the previously-deleted file or folder names impossible; correct?

MR. PAGE: Objection, calls for speculation and misstates his prior testimony.

BY MR. TAYBACK:

Q If you're saying no because it could have been run before and that would have previously deleted it, is that why --

A No.

Q -- or is there something else that I am missing? Okay.

What is wrong with my example? I don't want to misstate your testimony; I want to understand it.

EXHIBIT 7
PAGE 106

02:05:05 MR. PAGE: For the record, that was the basis of my objection.

02:05:08 MR. TAYBACK: All right.

02:05:17 THE WITNESS: Actually, I think now I'm confused.

02:05:19 So if -- the problem I'm having with this is that in this scenario there, these original file names, okay, and then there's the possibility of Evidence Eliminator having run and then those are new file names.

02:05:42 BY MR. TAYBACK:

02:05:43 Q Sure. Whatever the last existing file names were of deleted files.

02:05:47 A All right.

02:05:47 Q The running of Evidence Eliminator on July 12th, 2004 made recovery of those previously-deleted file names impossible to recover?

02:05:56 A And that includes the file names that might have been overwritten by a prior run of Evidence Eliminator?

02:06:03 Q Yes?

02:06:03 A Yes.

02:06:06 Q And by the same token, the running of Evidence Eliminator on July 12th, 2004 on the laptop made recovery of whatever remnants of previously-deleted data may have existed in unallocated space unrecoverable?

MR. PAGE: I object that it assumes facts.

THE WITNESS: So the answer is that if you go back again to Evidence Eliminator having been run before, it also affects the data, okay, which means that it cleaned the data, which means that that -- at that point in time, then there's -- you know, then whatever data you see is just the result of its cleaning.

Okay, that can be a lot of data, because on this hard drive, only about -- only like 4 gigs out of, say, 20 are actually in use. So there's a lot of it that's not in use. Okay.

Thus, when you combine that effect with the idea that the operating system is also reusing data, there could be a lot of data that is not recoverable because of the prior run of Evidence Eliminator. It could have been as far back as 2002, 2003. It's -- because the drive is mainly empty, you know, it depends upon the activity level.

BY MR. TAYBACK:

Q Assume that Evidence Eliminator had not been run prior to July 12th, 2004. Okay.

The running of Evidence Eliminator on July 12th, 2004 made the recovery of previously-deleted data that still existed in unallocated space as of July 11th, 2004 unrecoverable; correct?

EXHIBIT 7

108

MR. PAGE: Object, assumes facts.

THE WITNESS: Right. I mean, we don't have firsthand knowledge of that, so it's really a hypothetical.

BY MR. TAYBACK:

Q If there was data to recover from July 11th, 2004, that would be the case; right?

A If there were data, but I think there are situations where there is not data, where the operating system reused the space and allocated to another file.

Q I understand. I'm saying if there was data, that would be the result, wouldn't it?

If there was remnants of previously-deleted data in the unallocated space on this laptop on July 11th, 2004, the running of Evidence Eliminator on July 12th of 2004 would make those remnants unrecoverable; correct?

A I don't know what "those remnants" are, but there are situations in which there might be some data that was present and was overwritten. The real question is, is that data relevant at all?

Q I'm just saying can we recover anything in that scenario is my question, whether it's relevant or not --

A Or meaningful.

Q If there is -- let me ask it again.

EXHIBIT 7

PAGE 109

02:09:51 If there is any data to recover that exists as remnants of previously-deleted files in unallocated space on July 11th, 2004, would the running of Evidence Eliminator on July 12th, 2004 have prevented the recovery of that -- those remnants, whatever they might have been?

02:10:17 MR. PAGE: Object, assumes facts.

02:10:23 THE WITNESS: Given the hypothetical, I would say yes.

02:10:27 BY MR. TAYBACK:

02:10:32 Q Do you know as you sit here now whether there was any data in that unallocated space that relates to the issues in this lawsuit on July 11th, 2004?

02:10:47 A No.

02:10:47 Q You have no way of knowing one way or the other; correct?

02:10:50 A I don't even know what the data is that relates to the lawsuit.

02:10:54 Q And, in fact --

02:10:56 MR. PAGE: Objection. Excellent point.

02:10:57 BY MR. TAYBACK:

02:10:58 Q And, in fact, you have no way of knowing what data, if anything, existed in that unallocated space on July 11th, 2004?

02:11:06 A That's true.

EXHIBIT 7
PAGE 110

Q Let me ask you whether the following is consistent with your analysis and your findings.

A Okay.

Q Is it consistent with your opinion that in July -- between July 24th and July 29th, 2002, Carter Bryant installed Evidence Eliminator on his desktop and ran it?

A I think I've already --

MR. PAGE: Object as compound.

THE WITNESS: I think I already answered that.

BY MR. TAYBACK:

Q This is a slightly different question.

A Okay.

Q And I'll even break it down.

Is it consistent with your opinion in this case that in July 2002 Carter Bryant installed Evidence Eliminator on his desktop computer?

A Yes.

Q Is it consistent with your opinion that in July 2002 Carter Bryant ran Evidence Eliminator on his desktop?

A I think I've stated that I don't know.

Q I know you don't know whether he did or not. My question is, is it consistent with your opinion? Could that have happened and would it still -- your

EXHIBIT 7

111

EXHIBIT 8

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 9

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 10

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 11

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 12

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 13

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 14

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 15

THIS EXHIBIT IS FILED UNDER SEAL

PURSUANT TO PROTECTIVE ORDER

EXHIBIT 16

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 17

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

Certified Copy

-------------------------

CARTER BRYANT, an individual, Plaintiff,

vs.

MATTEL, INC., a Delaware corporation, Defendant.

) No. CV 04-9049 SGL (RNBx)

Consolidated with MATTEL, INC. V. BRYANT & MGA ENTERTAINMENT, INC. V. MATTEL, INC.

-------------------------

Videotaped Deposition of MARK MENZ, taken at 400 Capitol Mall, 30th Floor, Sacramento, California, commencing at 9:58 a.m., Thursday, March 13, 2008, before WENDY E. ARLEN, CSR No. 4355, RMR, CRR.

Pages 1 - 163

EXHIBIT 17

223

APPEARANCES OF COUNSEL:

FOR THE PLAINTIFF:

KEKER & VAN NEST LLP
BY: MICHAEL H. PAGE, ESQ.
710 Sansome Street
San Francisco, California 94111-1704
415.391.5400
E-mail: mpage@kvn.com

FOR THE DEFENDANT:

QUINN EMANUEL
BY: CHRISTOPHER TAYBACK, ESQ.
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
213.443.3000
christayback@quinnemanuel.com

ALSO PRESENT:

Sean McAleer, Videographer

EXHIBIT 17

224

A. If I am reading this correctly, it is set to overwrite the file names, yes.

Q. Okay. So is it your testimony that you think that from the data you've seen these 9400 files were actually deleted in the amount of 10:26AM time you found one by one on Mr. Bryant's computer and then overwritten individually?

MR. TAYBACK: I'm going to object to the form of the question, vague and confusing. You can answer. 10:26AM

Q. MR. PAGE: Do you understand the question?

A. There were 9400 file names or folder names that were overwritten by Evidence Eliminator that were on this machine. There 10:26AM would have been associated with those file names or folder names data as well. May have been, you know, zero, may have been a huge file. We don't know because since Evidence Eliminator was run, the only remnants we have is the fact that it 10:27AM have -- we have these 9400 file names and folders that were overwritten. And something was associated with those file names. We don't know because it's gone.

Q. MR. PAGE: That wasn't my question. 10:27AM

EXHIBIT 17

PAGE 225

Are you familiar with the safe shutdown procedure in Evidence Eliminator?

A. Yes.

Q. Okay. Under that procedure, when one does a safe shutdown of one's computer, Evidence Eliminator goes out and looks on the hard drive for any previously deleted files, correct? 10:27AM

A. Correct.

Q. Regardless of when they were deleted and not at the time they were deleted, correct? 10:27AM

A. Correct.

Q. And for each one it finds, it overwrites the file name, correct?

A. Correct.

Q. Okay. How do I cause Evidence Eliminator to do that physically? 10:28AM

A. At that moment?

Q. Any time I want to. Suppose I have it running on my computer, running in background. How do I tell Evidence Eliminator go find all the deleted files and overwrite them? 10:28AM

A. By setting up the configuration --

Q. No.

A. -- of Evidence Eliminator. Physically you don't have to do anything. The 10:28AM

EXHIBIT 17

226

program does that for you.

Q. When?

A. But you have to tell the program to do it at some point.

Q. And how do I tell the program to do it? 10:28AM

A. By having -- setting up the configuration.

Q. Assume that the configuration is already set up. Assume that the configuration was set up the day I installed it two years ago. 10:28AM

A. All right.

Q. Right? I'm sitting at my computer. Evidence Eliminator is running in the background. All it's doing is cleaning Internet files. How do I tell it to go look for all the deleted files in my computer and overwrite the file names? How do I cause that process to actually start? 10:28AM

A. You don't. It does it automatically. It does that automatically depending on what the configuration is. 10:29AM

Q. Over and over and over again constantly?

A. If it's configured for that, yes.

Q. Was it configured for that in this 10:29AM

EXHIBIT 17

PAGE 227

A. You can do this either on installation the first time you run it, or you can go back in the configuration and make the change whenever you want.

Q. Right. And if you flip to the next page, this shows a user having checked eliminate swap file, correct? 11:46AM

A. Yes.

Q. I assume if one does that on installation as is recommended, that will make a change in the config.dat file? 11:47AM

A. Yes.

Q. Okay. And if you looked -- do you know whether the config.dat file on the laptop had that option chosen? 11:47AM

A. At the time that they imaged the drive?

Q. Yes.

A. Which is the only one we have. Yes, swap -- yes, swap looks like it's selected. 11:47AM

Q. And that's about 15 entries down on the first page of 4527 where it says --

A. Right.

Q. -- chkwinswap=1?

A. Yes. 11:47AM

EXHIBIT 17

228

Q. Other than this change, you're not aware of anything in the config.dat file on the laptop, Exhibit 4527, that is a change from the out-of-the-box default other than that one option, correct? 11:48AM

MR. TAYBACK: Objection, asked and answered.

THE WITNESS: Yeah, I -- again, it varies with what -- I've seen variations. So...

Q. MR. PAGE: Okay. You just don't know. 11:48AM

A. I don't know at this point.

Q. Is Evidence Eliminator ever marketed as a means to cause your computer to run better or faster? 11:48AM

A. All the advertising that I have been associated with or seen with Evidence Eliminator -- and this is going over, again, quite a large -- a large period of time -- it's always been advertised as a way to wipe -- to be 11:48AM a wipe tool and to wipe evidence off your machine you don't want someone seeing.

It's not been advertised primarily as a tool to make your system, i.e., run better. When you look at the advertising that's been sent out, 11:49AM

EXHIBIT 17

229

hence, the name, Evidence Eliminator, the fact that it goes to the process of going out and overwriting files is a wiping tool. It's eliminating evidence from the drive.

To make a system -- the only -- again, the advertising that I've seen, and as I read through even their own advertising here, you know, it's talking about defeating forensic equipment, it talks about deleting and overwriting cache histories and what have you. 11:49AM 11:49AM

Occasionally you'll see a piece of advertising that that will have a testimonial or something that will talk about how it made their system faster, but I've never seen anyone use it for that purpose ever. It's always for getting rid of data on the drive. And, in fact, the way it works, it would make your system run slower because, again, it's a wiping tool, not a cleaning tool. 11:49AM

Q. So to repeat my question, have you ever seen Evidence Eliminator marketed as a tool to make your PC run faster? 11:50AM

MR. TAYBACK: Objection, asked and answered.

MR. PAGE: You're half right. 11:50AM

EXHIBIT 17

230

MR. TAYBACK: You can answer the question.

THE WITNESS: I have never seen it advertised as a tool to make your PC run faster as the primary reason to buy it.

Q. MR. PAGE: Okay. Let me ask the question again. Have you ever seen it marketed as a tool to make your PC run faster? Without the word primarily in my question. 11:50AM

MR. TAYBACK: Objection, asked and answered. 11:50AM

MR. PAGE: No, he wrote a new question and answered it. I'd like him to answer mine.

Q. Have you ever seen --

MR. TAYBACK: Objection, asked and answered. 11:50AM

Q. Have you ever seen Evidence Eliminator marketed as a tool to make your PC run faster?

A. And I have to ask what do you actually mean by marketed? 11:50AM

Q. Contained in marketing material distributed by the manufacturer.

A. Yes, I have seen Evidence Eliminator make -- again, in the side bar talking about part of their advertising material that it made the 11:51AM

EXHIBIT 17

PAGE 231

REPORTER'S CERTIFICATE

I certify that the witness in the foregoing deposition,

MARK MENZ,

was by me duly sworn to testify in the within-entitled cause; that said deposition was taken at the time and place therein named; that the testimony of said witness was reported by me, a duly Certified Shorthand Reporter of the State of California authorized to administer oaths and affirmations, and said testimony was thereafter transcribed into typewriting.

I further certify that I am not of counsel or attorney for either or any of the parties to said deposition, nor in any way interested in the outcome of the cause named in said deposition.

IN WITNESS WHEREOF, I have hereunto set my hand this 14th day of March,2008.

WENDY E. ARLEN
Certified shorthand Reporter
State of California
Certificate No. 4355

EXHIBIT 17

232

EXHIBIT 18

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 19

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 20

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

-------------------------------

CARTER BRYANT, an individual, ) No. CV
Plaintiff, ) 04-9049 SGL (RNBx)
vs. )
MATTEL, INC., a Delaware, ) Consolidated with
corporation, ) No. CV-04-09059
Defendant. ) No. CV 05-02727

-------------------------------

Videotaped Deposition of RALPH OMAN, at 1440 New York Avenue, Northwest, Washington, D.C., commencing at 10:00 a.m., Monday, March 31, 2008, before KAREN YOUNG, Notary Public.

PAGES 1 - 83

EXHIBIT 20

260

APPEARANCES OF COUNSEL:

FOR THE PLAINTIFF:

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
BY: MICHAEL T. ZELLER, ESQ.
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
michaelzeller@quinnemanuel.com
(213) 624-3180

FOR THE DEFENDANT:

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
BY: KENNETH A. PLEVAN, ESQ.
Four Times Square
New York, New York 10036
kenneth.plevan@skadden.com
(212) 735-3410

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
BY: PHILIP W. MARSH, ESQ.
1440 New York Avenue, Northwest
Washington, D.C. 20005-2111
pmarsh@skadden.com
(202) 371-7167

ALSO PRESENT: CONWAY BARKER, VIDEOGRAPHER.

P R O C E E D I N G S

THE VIDEOGRAPHER: In the United States District Court, Central District of California, Eastern Division, in the matter of Carter Bryant versus Mattel, Incorporated and other consolidated actions, Case Number CV 04-9049 SGL. This is the deposition of Ralph Oman. Today's date is March 31st, 2008. The location of the deposition is Skadden Arps, 1440 New York Avenue, Northwest, Washington, D.C. Will counsel please identify yourselves and state whom you represent?

MR. PLEVAN: Ken Plevan from Skadden Arps for MGA.

MR. MARSH: Philip Marsh from Skadden Arps for MGA.

MR. ZELLER: Mike Zeller for Mattel.

THE VIDEOGRAPHER: The court reporter is Karen Young. The videocamera operator is Conway Barker, both on behalf of Veritext. This deposition commences at 10:02. Please swear in the witness.

Whereupon,

RALPH OMAN,

called for examination by counsel for Defendant and having been duly sworn by the Notary Public, was examined

and testified as follows:

- - -

EXAMINATION

BY MR. PLEVAN:

Q. Good morning, Mr. Oman.

A. Good morning, Mr. Plevan.

Q. Mr. Oman, we will start by marking a copy, what I believe to be a copy of your expert report without the attachments, and Ms. Young, I'm told that the first number today should be 4700.

(Exhibit 4700 was marked for identification.)

BY MR. PLEVAN:

Q. Mr. Oman, if you would look at Exhibit 4700, which we've just marked, and confirm that this is a copy of your report without its attachments?

A. Yes, it is.

Q. And it's dated February 11th, 2008 and has your signature on the last page.

A. Yes, it does.

Q. Now, approximately how many times have you been an expert witness before in a lawsuit?

A. Fourteen or 15 times.

Q. Over what period of years?

A. It refers to the applicant who was seeking a patent for his or her invention.

Q. Do you use the word "authorship" to refer to inventors who are seeking patent protection for something?

MR. ZELLER: You mean in his report or just generally?

BY MR. PLEVAN:

Q. At any time do you use the word "authorship" to refer to patent subject matter?

MR. ZELLER: The question is vague.

A. There are many instances when a particular work of authorship could qualify for both a patent and a trademark, so I suppose in describing a computer program that represents considerable authorship, it would also represent an invention if certain aspects of it were eligible for patent protection.

Q. How did you use the phrase "authorship" in this report? Do you recall?

A. Well, I think in this case since I was focusing on copyright office procedures, I probably was talking in terms of copyrightable authorship in those normal areas of creativity that tend toward the copyright side of the spectrum rather than the

patent side of the spectrum.

Q. Is the term "sophisticated company" a term of art in copyright law?

A. Not that I'm aware of.

Q. Is it a term of art in patent law, to your knowledge?

A. Not that I'm aware of.

Q. And that's the kind of phrase that we would -- I take it you wouldn't find in a copyright office circular; is that correct?

MR. ZELLER: The question's overbroad.

A. I can't think of an instance where we used "sophisticated remitter" because it's laden with values I suppose, but it is a way of describing large corporations that have teams of legal experts or legal technicians who know the system, know the law and do these things routinely on a daily basis, to distinguish the sophisticated remitter from the poet or the artist who files maybe one registration or two registrations for copyright in a lifetime and is not sophisticated in terms of the process for seeking a patent or seeking a copyright.

Q. Do you consider Mattel to be a sophisticated company?

A. Yes, I would.

Q. Do you know how many lawyers worked at MGA in the year 2001?

A. I don't recall seeing any specific -- a number in any of the materials that I've seen but there are frequent references to -- in Mr. Larian's affidavits to his lawyers. Daphne Gronich is an experienced and very sophisticated lawyer. It's a list of names that I recall but I didn't ever remember forming an opinion as to the number -- total number of lawyers that MGA had either in house or relied upon routinely to handle these matters.

Q. When did Ms. Gronich join MGA?

A. I have no idea.

Q. And your -- the basis for your concluding that she was a sophisticated lawyer was what?

A. Yes.

Q. Is what? I'm sorry.

A. Oh, okay.

Q. I'm sorry, Mr. -- I think I let my voice drop. The basis for your concluding that she was a sophisticated lawyer was what?

A. I've been aware of her reputation. I think she was president of the copyright society chapter in Los Angeles. She was the daughter of a very famous copyright lawyer for the Motion Picture

Q. And these related to dates of creation?
A. Among other things, dates of creation were one of the -- one of the anomalies that I noted.
Q. And what dates did you have specific reference to?
A. I can't recall off the top of my head. I'm sorry, but there seemed to be a general effort to change the date for reasons that escape me.
Q. Do you remember any of the dates?
A. 2002.
Q. Was that a date it was changed to or changed from?
A. Your question asked me if I remember one of the dates. I didn't -- don't recall the context. I'd have to refresh my recollection on the dates. I don't have one of the -- one of the CAs, capital C, capital A, forms, which would indicate the changes.
Q. Is there a reason you did not include the specific dates that were changed in your expert report?
A. I don't recall not including them specifically. I just remembered there being changes in the dates.
Q. Well, do you see any of the dates that you have reference to in your expert report now as we

look at it?

A. No. I was making a general statement there. I was not talking specifics. I was just only aware of the fact that the dates were being changed in the CA forms, and at the time I wrote my report, I would have been focused on those specific dates but I didn't think they had any specific relevance. At least nothing that I was able to fathom.

Q. So at the time you were writing this report, you would have had the dates in front of you, the documents with the dates in front of you.

A. Yes.

Q. And you therefore could have at that time included the specific dates in the report that you wrote.

A. I imagine I could have and I didn't.

Q. And I'm asking you do you recall why you did not.

A. No, I didn't actually attach any -- not having the big picture in the entire legal proceeding, I did not attach any specific significance to one date being changed from one to another, but I suspect that there are reasons that I'm not aware of.

Q. Any other reason why as you sit here now you have for not having included the specific dates to which you had reference?

A. No, I actually can't think of why I didn't include a specific date or specific dates.

MR. PLEVAN: Can we take a break?

THE VIDEOGRAPHER. Off the record at 11:50.

(Recessed at 11:50 a.m.)

(Reconvened at 12:06 p.m.)

THE VIDEOGRAPHER: This is the beginning of Tape 2 in the deposition of Mr. Oman, on the record at 12:06.

BY MR. PLEVAN:

Q. Mr. Oman, what, if anything, did you do to prepare for today's deposition?

A. Can you repeat the question please?

Q. Yes. What, if anything, did you do to prepare for today's deposition?

A. I reviewed my expert report, I reviewed the materials that I had, and I reviewed some materials that I had not had previously, and I discussed several points with Mr. Zeller.

Q. Approximately how many hours did you spend reviewing materials?

week for three days and then in the Philippines the week of the 15th, but in complete communication with my office so it shouldn't be a problem.

MR. ZELLER: Okay. Well, if there's a problem --

MR. PLEVAN: I just suggested it because Jon had suggested it.

MR. ZELLER: That's fair.

MR. PLEVAN: And obviously reserve the right to read it and make corrections.

MR. ZELLER: Okay.

MR. PLEVAN: All right? Thank you. Off the record.

THE VIDEOGRAPHER: This deposition concludes at 12:30 and consists of two tapes.

(Whereupon, at 12:30 p.m., the taking of the instant deposition ceased.)

EXHIBIT 20

PAGE 210

CERTIFICATE OF DEPONENT

I have read and examined the foregoing 80 pages and find the answers contained therein with changes made by me, if any, to be true and correct.

______________________

RALPH OMAN

EXHIBIT 20
PAGE 271

UNITED STATES OF AMERICA )

ss:

DISTRICT OF COLUMBIA )

I, KAREN C. YOUNG, a Notary Public within and for the District of Columbia, do hereby certify that the witness whose deposition is hereinbefore set forth was duly sworn and that the within transcript is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 2nd day of April, 2008.

Karen C. Young

My Commission Expires:
July 31, 2009

EXHIBIT 21

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 22

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 23

THIS EXHIBIT IS FILED UNDER SEAL

PURSUANT TO PROTECTIVE ORDER

EXHIBIT 24

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 25

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 26

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 27

IN THE UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

Certified Copy

---------------------------

| | |
|---|---|
| CARTER BRYANT, Plaintiff, | ) |
| vs. | ) CV 04-9049 SGL |
| MATTEL, INC., a Delaware corporation, Defendant. | ) (RNBx) ) CV 04-09059 ) CV 05-2727 |

---------------------------

Videotaped deposition of JOHN L. ALEX, taken at 333 West Wacker Drive, Chicago, Illinois, commencing at 9:36 a.m., Wednesday, April 9, 2008, before Sandra L. Rocca, CSR, CRR, Notary Public.

PAGES 1 - 148

APPEARANCES OF COUNSEL:

FOR THE PLAINTIFF:

SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
BY: MR. DAVID W. HANSEN, ESQ.
525 University Avenue
Palo Alto, CA 94301
(650) 470-4560/Fax: (888) 329-1840
david.hansen@skadden.com

FOR THE DEFENDANT:

QUINN EMANUEL URQUHART OLIVER
& HEDGES, LLP
BY: MR. MICHAEL T. ZELLER, ESQ.
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3180/Fax: (213) 624-7707
michaelzeller@quinnemanuel.com

ALSO PRESENT:

PATTI PAGE, VIDEOGRAPHER

A. Well, again it depends on the facts and circumstances. So the answer is what I'm relating to here is a specific situation and that's -- in that situation, based on the evidence I've seen, I think there is enough of -- the violation I think is present on the facts in this case based on the evidence that's been made available to me. 10:51:38 10:51:48 10:51:56 10:52:01 10:52:09 10:52:13 10:52:17

Q. So in this case, it should be construed to be a knowing and willful misrepresentation? 10:52:19 10:52:21

A. I believe so. 10:52:23

Q. Are there circumstances when the -- when the -- when it would not need to be construed that way? 10:52:23 10:52:28 10:52:31

MR. ZELLER: Objection. 10:52:33

THE WITNESS: Are you talking about the facts here? 10:52:34 10:52:35

BY MR. HANSEN: 10:52:36

Q. I'm talking about the sentence claims as presented initially and later amended identify subject matter that can only be attributed to a person other than the named inventor, are there circumstances in which that would not be construed as a knowing and willful misrepresentation? 10:52:37 10:52:39 10:52:44 10:52:46 10:52:49 10:52:51

A. Depending on the facts as I understand them in this case, I think it would be very 10:52:53 10:52:58

difficult and highly unlikely that it was not a knowing and willful misrepresentation. 10:53:01 10:53:06

Q. And knowing and willful, that requires to look at the subjective intent? 10:53:07 10:53:09

A. That's right. And again, I'll make clear about that. I can't get into the heads of the people that were doing it, but I can look at the circumstances and I think under those circumstances, you can conclude that there was intent objectively. But subjectively, I can't answer that question. I can't make that statement. 10:53:12 10:53:14 10:53:17 10:53:21 10:53:26 10:53:32 10:53:36

Q. And when you say can't get into the heads of the people that were doing it, you're talking about you can't get into the heads in this instance of Mr. Larian or Mr. Bryant, is that right? 10:53:39 10:53:41 10:53:43 10:53:45

A. And probably the attorney too. 10:53:49

Q. Mr. Rose? 10:53:51

A. Yeah. 10:53:51

Q. So Mr. Rose may have had a part in all of this? 10:53:52 10:53:55

A. Well, it's possible. I don't know. I don't have any facts about him other than what I've seen in the record. Obviously he's not subject to being deposed anymore. 10:53:55 10:53:58 10:54:00 10:54:06

Q. He's dead? 10:54:09

A. That's my understanding. 10:54:09

Q. Can you tell me what facts you have regarding Mr. Larian as to his intent? 10:54:11 10:54:14

A. Well, it's my understanding that Mr. Larian has acknowledged that he did not have the idea of -- what do we call it -- replaceable or detachable feet and was not aware of it I thought until such time as it was provided to him in some documents generated by Mr. Bryant. 10:54:18 10:54:26 10:54:34 10:54:38 10:54:45 10:54:50

Q. That was in his most recent deposition? 10:54:56

A. It was in his deposition and I would also -- yes, I think that was in his deposition. I think he said -- you know, I have to correct myself on that. Let me think. I believe he has said he did not -- he first -- I thought he first became aware of the detachable feet when he met with Mr. Bryant which would be sometime in, according to the record at least that I saw, in the 2000 era which was -- and you combine that with the statement under oath of Mr. Bryant that he created the detachable feet and you look at that element as being -- that feature as being an element of the claims. 10:54:58 10:55:04 10:55:07 10:55:11 10:55:21 10:55:25 10:55:29 10:55:39 10:55:44 10:55:51 10:55:57 10:56:07 10:56:11

So therefore, it seems to follow that if Mr. Bryant introduced Mr. Larian to the concept of 10:56:13 10:56:20

Q. And if Mr. Larian's lawyer told him, right, in connection with the declaration that Mr. Larian signed regarding the '602 patent application that he was the "sole inventor" on that application, would that change your opinion as to Mr. Larian's intent to defraud the Patent Office? 11:18:53 11:18:57 11:19:01 11:19:05 11:19:09 11:19:11

MR. ZELLER: Incomplete hypothetical. 11:19:14

THE WITNESS: On the hypothetical, if you say Mr. Rose told Mr. Larian in my opinion, you're the sole inventor of this invention, then I would not attribute intent to deceive on the part of Mr. Larian there unless, unless there are other facts and circumstances surrounding that activity which could be other representations made by Mr. Larian in other contexts. I don't know. I didn't get into those others. I don't have access to those other facts. 11:19:16 11:19:18 11:19:30 11:19:34 11:19:40 11:19:44 11:19:47 11:19:50 11:19:54 11:19:56

But I want to make a point. I think this is again a pretty careful choice of words. If he was trying to say -- if he was told he was sole inventor, it seems to me he would be saying according to my lawyer, I can be considered the inventor. And the fact that he says an inventor at least opens up the suggestion that he's one of other -- you know, one of a group of inventors. 11:19:58 11:20:01 11:20:04 11:20:08 11:20:10 11:20:13 11:20:18 11:20:23

Q. Do you have any idea whether Mr. Larian relied on Mr. Rose, the lawyer, for purposes of what to do in connection with the '602 application? 11:20:27 11:20:29 11:20:34

A. All I know is Mr. Rose I think prepared and filed the application. So I don't know what you mean by rely. 11:20:37 11:20:40 11:20:44

Q. Do you know anything about the application with respect to -- as relates to Mr. Larian other than the fact that he signed the declaration? 11:20:45 11:20:47 11:20:50 11:20:51

MR. ZELLER: The question's overbroad. Are you talking about his particular involvement in the process? 11:20:54 11:20:58 11:21:01

MR. HANSEN: Yes. 11:21:02

THE WITNESS: You know, I have some -- I know some things based on what's occurred. I know for -- that there's no dispute that Mr. Bryant presented the idea of detachable feet in a doll to Mr. Larian. And Mr. Larian at the time was aware that Mr. Bryant was employed by Mattel. 11:21:10 11:21:12 11:21:17 11:21:26 11:21:35 11:21:45

So it seems to me that again, depending on all the facts and circumstances, a conclusion could be reached that there was an intentional reason to not include Mr. Bryant as an inventor because at the time the idea was created and 11:21:55 11:22:01 11:22:05 11:22:10 11:22:18

actually reduced to practice by drawings, Mr. Bryant was employed by Mattel. I know for a fact that Mr. Larian's company ultimately made product with detachable feet. And I would suggest that again from those facts, the trier of fact might conclude that it was a self-serving statement and may not be, but I'm not going to get into that. I'm not making a judgment. I think there's enough there for the trier of fact to conclude otherwise.

11:22:25 11:22:30 11:22:38 11:22:46 11:22:54 11:22:59 11:23:04 11:23:09 11:23:12

BY MR. HANSEN: 11:23:15

Q. Self-serving for what reason? 11:23:15

A. Well, if Mr. Larian -- I'm sorry, Mr. Bryant invented the feature of a doll having detachable feet while he was an employee of Mattel -- again I'm not testifying on this, I'm not getting into ownership, but it seems to me there's a possibility that one could argue what's in force that Mattel owned that feature and dolls having that feature.

11:23:16 11:23:22 11:23:32 11:23:35 11:23:44 11:23:45 11:23:49 11:23:53

Q. Do you have an opinion on that one way or another?

11:23:54 11:23:57

MR. ZELLER: About the ownership issue? 11:23:57

THE WITNESS: I did not address ownership in my opinion. I purposely focused on what was done in the Patent Office, but by bringing these

11:24:00 11:24:02 11:24:06

out, I mean, I have to use this. You know, I have to -- I'm applying what I view as agreed facts to a situation which could give rise to the suggestion that the failure to include was done intentionally. 11:24:09 11:24:12 11:24:19 11:24:23

BY MR. HANSEN: 11:24:28

Q. So you're inferring Mr. Larian's intent based on the circumstances that you're aware of, is that correct? 11:24:28 11:24:32 11:24:34

A. I believe -- what I'm saying is I think a trier of fact could reach that conclusion. 11:24:34 11:24:37

Q. Let's mark -- let's mark the application if we could. You know what I'm not going to mark it. 11:24:39 11:24:50 11:24:55

MR. ZELLER: It was previously -- 11:24:55

MR. HANSEN: 500. 11:24:56

MR. ZELLER: Yes. 11:24:58

MR. HANSEN: Let's just use the one to save some trees which I think is the goal here. 11:24:58 11:25:02

(Document marked previously as Exhibit 500 was presented.) 11:25:02 11:25:02

BY MR. HANSEN: 11:25:02

Q. This is the '602 application that we've been talking about? Sorry, let me rephrase it. Can you confirm for me that this is the '602 removable footgear application that we've been 11:25:04 11:25:06 11:25:13 11:25:16

me to read it into the record? 12:40:13

Q. Let me read it for you. Let's move it along. Paragraph 3. I'm sorry, I'll try and be clearer. Three, "I am familiar with the doll designs as shown in the attached drawings from the above-identified patent application." Do you see that? 12:40:14 12:40:16 12:40:18 12:40:21 12:40:24 12:40:27

A. Uh-huh. 12:40:27

Q. Those are the drawings that are attached to Exhibit 502? 12:40:27 12:40:29

A. Yes. 12:40:30

Q. So Mr. Bryant is saying he's familiar with the drawings that are attached to the declaration? 12:40:31 12:40:34 12:40:37

A. Yes. 12:40:37

Q. Then he goes on to say, "These dolls have strap type shoes, and the dolls have a snap-on feature at about the ankle of the dolls so the different footgear may be mounted on the doll." 12:40:38 12:40:42 12:40:46 12:40:48

A. That's correct. 12:40:52

Q. Do you see that? Have I read that correctly? Regarding -- the next sentence says, excuse me, "Regarding the strap type shoes, as disclosed in the patent application, the coloring of the skin tone on the exposed areas of the feet 12:40:52 12:40:54 12:40:57 12:41:00 12:41:02

are matched to the coloring of the lower legs of the dolls." Do you see that? 12:41:05 12:41:07

A. Yes, I see that. I agree that's what it says. 12:41:09 12:41:11

Q. And that's the configuration that Mr. Bryant was referring to in connection with paragraph 4 of his declaration? 12:41:11 12:41:13 12:41:16

MR. ZELLER: The question's overbroad. 12:41:18

THE WITNESS: That's what he refers to. That's correct. That's what he referenced. 12:41:20 12:41:23

BY MR. HANSEN: 12:41:25

Q. Do you know what configuration Mr. Bryant had in mind when he signed the declaration? 12:41:25 12:41:27

MR. ZELLER: This is asked and answered. 12:41:30

THE WITNESS: The answer is I don't know what he had in his mind when he signed the application. But I do know that the examiner referred in the prior art discussion to the doll you have in front of you. And I do know that that was not introduced as late as Mr. Bryant said. It was in the first wave or the first introduction of the Bratz doll. 12:41:31 12:41:35 12:41:38 12:41:43 12:41:48 12:41:52 12:42:00 12:42:03

BY MR. HANSEN: 12:42:04

Q. But you don't know what configuration Mr. Bryant had in mind when he signed the 12:42:04 12:42:07

EXHIBIT 27

declaration? 12:42:08

MR. ZELLER: Mischaracterizes the witness' testimony and asked and answered. 12:42:09 12:42:10

THE WITNESS: Yeah, I don't know what he had in mind, but I do know what he was addressing. He was addressing a prior art rejection based on the doll that you have in front of you and excuse me, I don't remember the name. What is that? 12:42:11 12:42:14 12:42:19 12:42:26 12:42:28

BY MR. HANSEN: 12:42:30

Q. Jade. 12:42:30

A. Jade, okay. He was on the Jade doll and that's what the examiner was talking about. And this was presented for the purpose of eliminating that as prior art. And since it incorrectly -- let me use that word -- it incorrectly references when that doll was introduced, it presents some problems as far as candor to the U.S. Patent and Trademark Office. 12:42:31 12:42:34 12:42:36 12:42:41 12:42:47 12:42:49 12:42:55 12:42:58

Q. Assuming your interpretation of the facts is correct, is it possible that Mr. Bryant simply made a mistake in this declaration? 12:42:58 12:43:01 12:43:03

MR. ZELLER: The question is an incomplete hypothetical. 12:43:06 12:43:07

THE WITNESS: I don't know. I think there's enough objective facts here to suggest that 12:43:08 12:43:09

I further certify that I am not counsel for nor related to any of the parties herein, nor am I interested in the outcome hereof.

In witness whereof, I have hereunto set my hand and seal of office this 15th day of April, 2008.

Sandra [signature]

Certified Shorthand Reporter # 84-3435

EXHIBIT 28

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 29

IN THE ARBITRATION OF

FUN 4 ALL CORPORATION, a Delaware corporation, and SCOTT BACHRACH, an individual,
Claimant/Counterclaim Respondent,
v.
ABC INTERNATIONAL TRADERS ,INC. d/b/a/ MGA ENTERTAINMENT, a California corporation,
Respondent/ Counter-Claimant.

Case No. (Unnumbered)
Volume II

Pages 346 - 652

TRANSCRIPT OF PROCEEDINGS
WEDNESDAY, MAY 29, 2002
10:39 A.M.

REPORTED BY: SYLVIA P. SHEAR
CSR NO. 3010, RPR

page 346

Continued Transcript of Proceedings, held before HONORABLE LAYN R. PHILLIPS, at 1800 Avenue of the Stars, Conference Room 6A, Los Angeles, California, on WEDNESDAY, MAY 29, 2002, at 10:39 A.M., before SYLVIA P. SHEAR, CSR No. 3010, RPR.

APPEARANCES:

ARBITRATOR:
HONORABLE LAYN R. PHILLIPS
United States District Judge (Retired)

FOR CLAIMANT/COUNTERCLAIM RESPONDENTS FUN 4 ALL CORPORATION AND SCOTT BACHRACH:
GREENBERG GLUSKER FIELDS CLAMAN MACHTINGER & KINSELLA LLP
BY: DALE F. KINSELLA, ESQ.
STEPHEN S. SMITH, ESQ.
1900 Avenue of the Stars
Suite 2100
Los Angeles, California 90067-4590

EXHIBIT 21
PAGE 429

(310) 553-3610

page 347

APPEARANCES (Continued):

FOR RESPONDENT/COUNTER-CLAIMANT ABC INTERNATIONAL TRADERS, INC. D/B/A MGA ENTERTAINMENT:

CHRISTENSEN, MILLER, FINK, JACOBS, GLASER, WEIL & SHAPIRO, LLP
BY: PATRICIA L. GLASER, ESQ.
(Pages 355-652)
LARRY S. GREENFIELD, ESQ.
CAROLINE H. MANKEY, ESQ.
(Pages 345-355)
2121 Avenue of the Stars
Eighteenth Floor
Los Angeles, California 90067
(310) 553-3000

page 348

APPEARANCES (Continued):

FOR THE WITNESS LON ROSS:

WHITE O'CONNOR CURRY GATTI & AVANZADO
BY: EDWARD E. WEIMAN, ESQ.
(Pages - 361-393)
10100 Santa Monica Boulevard
Suite 2300
Los Angeles, California 90067
(310) 712-6100

ALSO PRESENT:

ISAAC LARIAN

SCOTT ALLEN BACHRACH

page 349

I N D E X

| CLAIMANT WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| LON ROSS | | | | |
| Mr. Smith | 362 | | 391 | |
| Ms. Glaser | | 382 | | |
| | | | | 393 |

| RESPONDENT WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| VICTORIA O'CONNOR | | | | |
| Mr. Greenfield | 404 | | 618 | |
| | | | 633 | |
| | | | 639 | |
| Mr. Kinsella | | 540 | | 629 |
| | | | | 634 |
| | | | | 644 |

page 350

LOS ANGELES, CALIFORNIA
WEDNESDAY, MAY 29, 2002
10:39 A.M.

ARBITRATOR PHILLIPS: Let's go on the record. Let me have counsel enter their appearances in the Fun 4 All/MGA Arbitration. First on behalf of the petitioner.

MR. KINSELLA: Good morning, Your Honor.

EXHIBIT 29
PAGE 431

M 0060755

Treantafelles, Nana Oshang, Scott Bachrach. Some people were not in attendance for the entire meeting.

Q. Did anyone else come in or out --

A. Yes.

Q. -- during the course of the meeting?

A. I believe Paula Treantafelles might have come in a little late and perhaps left a little early. I can't quite recall. Isaac Larian also came in and left.

page 365

Q. Can you tell me is it Nano Oshang?

A. Nana, N-a-n-a.

Q. Can you tell me what Nana's position was?

A. She was an associate product manager.

Q. Was she one of the product managers you supervised?

A. No.

Q. Who were one of the product managers you supervised?

A. They came and gone, but their names of the people were Brian Schmit, Andreas Koch, Margo Chazen.

Q. Is that it?

A. Those were direct reports.

Q. Back to this meeting with Mr. Bachrach where he brought the -- well, about Bratz. Can you tell me what happened at the meeting?

A. Mr. Bachrach had come in with samples of plush that he had made off of a drawing that was given out at the Licensing Show. He had pitched for the plush rights to the Bratz line. We reviewed the samples. We spoke with Mr. Bachrach.

All the people that I had mentioned were in attendance. Nana Oshang, Paula Treantafelles had come in, Victoria O'Connor and myself. Mr. Larian

page 366

came in for a few minutes, said hello to Mr. Bachrach, looked at the dolls, nodded, said good-bye and left the meeting. And we just had a general meeting about the line. Mr. Bachrach was very enthusiastic about it. We had become very interested in it as well.

Q. Did the MGA representatives in attendance like the sample dolls he had brought to the meeting?

A. Overall we were surprised because they had

come out very, very -- they came out very nice and especially off of a sketch, off of a drawing. There was no parameters given.

Q. Prior to this meeting had you had any discussions with anyone at MGA about doing Bratz in a plush format?

A. There were several meetings. There was one meeting which was almost -- when I say "companywide," the marketing, product development, creative departments were gathered. In that meeting we ran through a list of what seemed like every possible category and sort of discussed whether or not -- which categories we wished to keep.

And there was some indecision there, some arguments back and forth. That was one meeting. There were some small -- probably some smaller

page 367

internal meetings prior to the Licensing Show. Of course during the Licensing Show, those were just informal meetings, you know, someone comes by and you discuss the possibility whether this is a viable category, whether it should be licensed, et cetera. And then after there were some discussions.

Q. The discussions that took place prior to the meeting with Mr. Bachrach, did MGA or anyone at MGA have anything to say about the ability to do plush or desire to do plush?

A. Yes. Yeah. Mr. Larian had felt that toy rights, plush in particular, plush and other items that fall -- that are sold into a toy store should be kept by MGA.

Q. So back to this meeting. Did you personally like the samples that Mr. Bachrach had brought?

A. Yes. I was surprised how nicely they came out.

Q. How did the meeting end?

A. The meeting ended, Mr. Bachrach was asked -- Victoria O'Connor said, "Can you leave me the samples to review so we can take a look at it." The general feeling was both she and myself liked the samples. Paula Treantafelles who was the

page 368

product manager on the line wasn't sure if plush was the right execution for the item. And I think the feeling was that we needed to convince her a little,

needed to talk it over. So Mr. Bachrach left the samples.

And I don't recall when he said he would pick them up, et cetera, but he left them and we said we would be in touch.

Q. After you left work for that day, did you receive a telephone call from Ms. O'Connor?

A. Yes.

Q. Is the contents of that telephone conversation you had with Ms. O'Connor reflected in paragraph 8 of your declaration?

A. Yes. Yes.

Q. Is that a "yes"?

Do you recall Ms. O'Connor specifically telling you that Ms. Gidget Earle had said that Mr. Larian had given her the dolls and told her to knock it off?

A. Yes.

MS. GLASER: Your Honor, we object to paragraph 8 because it is hearsay. And I understand your orders and the court's admonition yesterday, but I am just doing it for the record.

ARBITRATOR PHILLIPS: Before you arrived, all these exhibits were received without objection so I am going to allow the exhibit to remain in the record. And I think it's appropriate for you to bring to my attention any concerns you have with respect to the weight that I should accord exhibits based on hearsay. But absent anything further, the exhibit will stay and the objection will be overruled.

MR. SMITH: I did have just a response on the hearsay objection, Your Honor. It is an admission of a party opponent, so --

ARBITRATOR PHILLIPS: What paragraph are we dealing with? Frankly, I didn't pay much attention to it since it's in and it was in without objection. But I understand why you are saying this in light of my comment about weight, so let me take a look at it.

MS. GLASER: Paragraph 8 is the one that was just referred to, Your Honor.

ARBITRATOR PHILLIPS: All right. So tell me why this would not be a statement of a party opponent? For example, if this were a Federal Court, I would think this would be admissible under

page 651

□ STATE OF CALIFORNIA )

) ss:

COUNTY OF LOS ANGELES )

I, SYLVIA P. SHEAR, CSR #3010, in and for the State of California do hereby certify:

That said Transcript of Proceedings was taken down by me in shorthand at the time and place therein named, and thereafter reduced to typewriting under my direction, and the same is a true, correct and complete transcript of said proceedings.

I further certify that I am not interested in the event of the action.

WITNESS MY HAND this 3st day of May, 2002.

________________________________

Certified Shorthand Reporter
for the State of California

page 652

□

EXHIBIT 30

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 31

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

- - -

HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

- - -

CARTER BRYANT, PLAINTIFF,

VS.

MATTEL, INC., DEFENDANT.

AND RELATED ACTIONS,

NO. ED CV 04-09049 (LEAD LOW NUMBER)

CERTIFIED COPY

REPORTER'S TRANSCRIPT OF PROCEEDINGS

RIVERSIDE, CALIFORNIA

MONDAY, JUNE 26, 2006

10:56 A.M.

THERESA A. LANZA, RPR, CSR
FEDERAL OFFICIAL COURT REPORTER
3470 12TH STREET, RM. 134
RIVERSIDE, CALIFORNIA 92501
(951) 274-0844
CSR11457@SBCGLOBAL.NET

EXHIBIT 31

PAGE 454

APPEARANCES:

ON BEHALF OF PLAINTIFF/COUNTER DEFENDANT MATTEL, INC.:

QUINN EMANUEL
BY: JON D. COREY
BY: JOHN B. QUINN
865 S. FIGUEROA STREET,
10TH FLOOR
LOS ANGELES, CALIFORNIA 90017
(213) 624-7707

ON BEHALF OF PLAINTIFF/COUNTER COMPLAINANT/DEFENDANT, CARTER BRYANT:

LITTLER MENDELSON
BY: KEITH A. JACOBY
BY: DOUGLAS A. WICKHAM
2049 CENTURY PARK EAST,
FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90067
(310) 553-0308

ON BEHALF OF MGA ENTERTAINMENT:

O'MELVENY & MYERS LLP
BY: DIANA M. TORRES
BY: DALE CENDALI
400 SOUTH HOPE STREET
LOS ANGELES, CALIFORNIA 90071
(213) 430-6000

EXHIBIT 31
PAGE 455

BROUGHT. WHAT'S NOT CLEAR TO THE COURT AT THIS POINT IS EXACTLY WHAT ALLEGATIONS ARE SUPPORTING THESE CLAIMS.

FOR EXAMPLE, YOU ARGUE THAT IT'S UNCONSCIONABLE. WHAT ABOUT IT IS UNCONSCIONABLE? YOU CAN CERTAINLY CHARACTERIZE THIS VERY EASILY AS SOMETHING WHICH IS SIMPLY AN EFFORT -- EVEN IF I ASSUME THAT PROCEDURALLY IT'S AN ADHESION CONTRACT -- IS AN EFFORT BY MATTEL TO REQUIRE EMPLOYEE LOYALTY BY ITSELF UNCONSCIONABLE?

MR. WICKHAM: THE NINTH CIRCUIT IN THE LAST SEVERAL YEARS -- I'D SAY ACTUALLY ABOUT THE LAST SEVEN OR EIGHT YEARS -- HAS DEVELOPED A DOCTRINE AND A BODY OF LAW GOVERNING UNCONSCIONABILITY. ACTUALLY, IT'S SOME OFFSHOOT FROM CALIFORNIA COURT DECISIONS -- TING VERSUS AT&T AND INGALL VERSUS CIRCUIT CITY -- AND THOSE CASES HAVE ANALYZED THE UNCONSCIONABILITY ISSUE IN THE CONTEXT OF PRE-DISPUTE ARBITRATION AGREEMENTS IN THE EMPLOYMENT CONTEXT. THOSE CASES THEMSELVES APPLIED AND ANALYZED THE CALIFORNIA SUPREME COURT'S DECISION IN ALMENDAREZ.

THERE'S TWO ELEMENTS TO ESTABLISH A CLAIM OF UNCONSCIONABILITY: ONE IS PROCEDURAL UNCONSCIONABILITY; THE OTHER IS SUBSTANTIVE UNCONSCIONABILITY. THE PROCEDURAL UNCONSCIONABILITY GOES TO THE MANNER OF FORMATION. IS THE AGREEMENT ON A PRE-PRINTED FORM CONTRACT, A CONTRACT OF ADHESION? IS THERE ANY MEANINGFUL OPPORTUNITY FOR NEGOTIATIONS? IS IT PRESENTED TO THE EMPLOYEE ON A TAKE IT OR

11:0
11:0
11:09
11:10
11:10

EXHIBIT 31

PAGE 456

LEAVE IT BASIS?

WE WOULD SUBMIT THAT, FIRST OF ALL, THOSE ARE PLED IN THE COUNTERCLAIM AND THAT THOSE ESTABLISH THE EXISTENCE OF PROCEDURAL UNCONSCIONABILITY.

THE COURT: I'M ASSUMING THAT FROM MY QUESTION, IS THE SUBSTANTIVE UNCONSCIONABILITY --

MR. WICKHAM: WITH REGARD TO SUBSTANTIVE UNCONSCIONABILITY, THIS GOES TO SOME OF THE CLAIMS THAT ARE PART AND PARCEL OF THE 17200 CLAIM: ARE THERE PROVISIONS IN THE AGREEMENT THAT ARE UNFAIR OR UNLAWFUL?

AND WE WOULD SUBMIT THAT, FIRST OF ALL, WITH REGARD TO THE INVENTIONS ASSIGNMENT, AS DRAFTED HERE, IT VIOLATES CALIFORNIA LABOR CODE SECTION 2870 AND 2871.

THE COURT: WHICH IS SPECIFICALLY REFERENCED IN THE AGREEMENT, IS IT NOT?

MR. WICKHAM: YOUR HONOR, IT'S REFERENCED IN THE AGREEMENT, BUT IT IS NOT REFERENCED IN THE MANNER THAT THE STATUTE ACTUALLY CONTEMPLATES. THE STATUTE SPECIFICALLY CONTEMPLATES THAT THE NATURE OF ANY ASSIGNMENT, AS A SUBSTANTIVE MATTER OF THE CONTRACT, WOULD NOT EXTEND TO THOSE MATTERS. 2871 SAYS THAT ANY ASSIGNMENT THAT GOES BEYOND WHAT 2870 PERMITS IS, TO THAT EXTENT, VOID.

THE NATURE OF THE ASSIGNMENT HERE IS THAT IT IS A BROAD BASED ASSIGNMENT OF ALL INVENTIONS DURING THEIR EMPLOYMENT; ALL THINGS THAT WERE CONCEIVED AND PRACTICED.

11:1 11:1 11:1 11:11 11:11

EXHIBIT 31

NOW, TWO PARAGRAPHS DOWN, IT SAYS, 'OF COURSE, NOTHING IN HERE WILL APPLY IF 2870 APPLIES.'

WELL, THERE'S TWO RESPONSES WITH REGARD TO THAT.

FIRST OF ALL, THAT IS A SEPARATE NOTICE THAT THEY ARE REQUIRED TO PROVIDE IN THE CONTRACT UNDER 2872. AND SECONDLY, THAT IF YOU PUT YOURSELF IN THE POSITION OF AN EMPLOYEE WHO DOES NOT HAVE A COLLEGE DEGREE; WHO IS GETTING A $30,000 A YEAR JOB; WHO DOESN'T HAVE THE WHEREWITHAL TO RETAIN COUNSEL TO BE ABLE TO INFORM THEM WHAT 2870 MEANS... MY EYES ARE GLAZING OVER; I HAVE NO IDEA; I'M NOT A LAWYER ON THIS.

YOUR HONOR, WHAT IS PARTICULARLY TELLING ABOUT THIS IS THAT SUBSEQUENT TO THE MOTION, WE DEPOSED MR. BRYANT'S SUPERVISOR, ANN DRISCAL. THE AGREEMENT IS PREDICATED ON AN ASSIGNMENT OF THINGS THAT WERE CONCEIVED OR THAT WERE REDUCED TO PRACTICE.

I WILL CONFESS, YOUR HONOR, THAT PRIOR TO THIS CASE, I DID NOT KNOW WHAT 'REDUCED TO PRACTICE' WAS; AND, IN FACT, IT IS A TERM OF ART WHICH IS IN THE PATENT FIELD; AND AS AN EMPLOYMENT LAWYER, I'M NOT FAMILIAR WITH THAT. AND HERE WE'RE EXPECTING 30-YEAR OLD PEOPLE WITHOUT COLLEGE DEGREES TO KNOW WHAT 'REDUCED TO PRACTICE' MEANS?

WELL, WE ASKED MR. BRYANT'S SUPERVISOR, THE ONE WHO WAS CHARGED AT LEAST WITH SOME RESPONSIBILITY FOR THIS AGREEMENT; WE ASKED HER WHETHER OR NOT SHE KNEW WHAT LABOR CODE SECTION 2870 WAS.

11:1 11:1 11:1 11:1 11:1

EXHIBIT 31

PAGE 458

THE CLERK: COURT STANDS IN RECESS.

CERTIFICATE

I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

Theresa A. Lanza 7-3-06

THERESA A. LANZA, RPR, CSR DATE
OFFICIAL COURT REPORTER

EXHIBIT 31

459

EXHIBIT 32

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 33

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 34

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 35

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

- - -

HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

- - -

CERTIFIED COPY

CARTER BRYANT, ET. AL., PLAINTIFFS,

VS.

MATTEL, INC., ET. AL., DEFENDANTS.

AND CONSOLIDATED ACTIONS,

NO. ED CV 04-09049 (LEAD LOW NUMBER)

MOTIONS

REPORTER'S TRANSCRIPT OF PROCEEDINGS

RIVERSIDE, CALIFORNIA

MONDAY, JANUARY 7, 2008

10:11 A.M.

THERESA A. LANZA, RPR, CSR
FEDERAL OFFICIAL COURT REPORTER
3470 12TH STREET, RM. 134
RIVERSIDE, CALIFORNIA 92501
951-274-0844
CSR11457@SBCGLOBAL.NET

EXHIBIT 35

PAGE 401

APPEARANCES:

ON BEHALF OF CARTER BRYANT:

KEKER & VAN NEST
BY: CHRISTA M. ANDERSON
710 SANSOME STREET
SAN FRANCISCO, CALIFORNIA 94111-1704
415-391-5400

ON BEHALF OF MATTEL:

QUINN EMANUEL
BY: JOHN QUINN
BY: MICHAEL T. ZELLER
865 S. FIGUEROA STREET,
10TH FLOOR
LOS ANGELES, CALIFORNIA 90017
213-624-7707

ON BEHALF OF MGA ENTERTAINMENT:

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
BY: THOMAS J. NOLAN
BY: CARL ALAN ROTH
BY: AMY S. PARK
300 SOUTH GRAND AVENUE
LOS ANGELES, CALIFORNIA 90071-3144
213-687-5000

ON BEHALF OF GUSTAVO MACHADO:

OVERLAND BORENSTEIN COTE & KIM LLP
BY: MARK E. OVERLAND
300 SOUTH GRAND AVENUE
SUITE 2750
LOS ANGELES, CALIFORNIA 90071
213-613-4660

/ / /

/ / /

EXHIBIT 35

PAGE 402

APPEARANCES (CONT'D):

ON BEHALF OF NON-PARTY KAYE SCHOLER:

KAYE SCHOLER LLP
BY: BRYANT S. DELGADILLO
1999 AVENUE OF THE STARS
SUITE 1600
LOS ANGELES, CALIFORNIA 90067-6048
310-788-1341

ON BEHALF OF NON-PARTY STERN & GOLDBERG:

STERN & GOLDBERG:
BY: KIEN C. TIET
6345 BALBOA BOULEVARD,
SUITE 200
ENCINO, CALIFORNIA 91316
818-758-3940

ON BEHALF OF NON-PARTY FARHAD LARIAN:

CHRISTENSEN, GLASER, FINK,
JACOBS, WEIL & SHAPIRO, LLP
BY: ALISA MORGENTHALER LEVER
10250 CONSTELLATION BOULEVARD
LOS ANGELES, CALIFORNIA 90067
310-553-3000

ON BEHALF OF DEFENDANTS CLOONAN, MARLOW, HALPERN, LEAHY, AND ARONT:

KEATS MCFARLAND & WILSON, LLP
BY: LARRY W. MCFARLAND
9720 WILSHIRE BOULEVARD
BEVERLY HILLS, CALIFORNIA 90212
310-777-3750

EXHIBIT 35

PAGE 403

TELL WHETHER OR NOT IT'S PHASE ONE OR PHASE TWO?'

THAT ISSUE IS REMOVED BECAUSE OF THE HARD DISCOVERY STAY ON JANUARY 28TH. IF WE FOCUS ALL ON PHASE ONE --

**THE COURT:** LET ME HEAR MR. QUINN'S RESPONSE TO YOUR PROPOSAL. AND I DON'T MEAN TO MOVE YOU ALONG HERE, BUT WE HAVE TO MOVE YOU ALONG. 10:44

MR. QUINN, WHAT'S YOUR THOUGHT ON --

**MR. QUINN:** YOUR HONOR, BECAUSE I'M NOT INTIMATELY FAMILIAR WITH THE MATTERS THAT ARE TEED UP BEFORE JUDGE INFANTE ON THAT PORTION AND THE IDEA THAT BE DEFERRED TO MAGISTRATE BLOCK, I'D LIKE TO DEFER THAT TO MR. ZELLER. 10:45

BUT BEFORE I DO THAT, IF I COULD RESPOND TO THE PROPOSAL.

**THE COURT:** PLEASE.

**MR. QUINN:** WHAT I'M HEARING IS THAT MR. NOLAN IS PREPARED, IF WE REALLY NEED IT, TO GIVE US THREE MORE DEPOSITIONS ON PHASE ONE TOPICS. 10:45

**THE COURT:** I DON'T THINK HE'S LOCKED INTO THREE. I THINK HE WAS USING THREE AS AN EXAMPLE. BUT I THINK WHAT HE'S RELUCTANT TO DO IS GIVE YOU A BLANK CHECK. 10:45

WHAT I'M HEARING IS THAT IF YOU CAN IDENTIFY THOSE PARTICULAR DEPOSITIONS OR THAT PARTICULAR DISCOVERY THAT YOU NEED TO COMPLETE THE PHASE ONE DISCOVERY -- AND I DO ACCEPT THE NOTION THAT WE'RE AT A DIFFERENT POINT NOW THAN WE WERE SEVERAL MONTHS AGO IN TERMS OF BEING ABLE TO IDENTIFY WHAT IS PHASE ONE 10:46

35

AND PHASE TWO. I MEAN, WE SHOULD BE NEARING THE END. YOU SHOULD HAVE A PRETTY CLEAR SENSE OF WHAT YOU NEED TO TRY YOUR CASE AND WHAT THEY NEED TO TRY THEIR CASE.

MR. QUINN: RIGHT.

THE COURT: I THINK WE SHOULD BE AT A POINT WHERE PEOPLE OF THE CALIBER THAT ARE GATHERED HERE SHOULD BE ABLE TO SAY, 'THIS IS WHAT WE NEED TO PIN DOWN BEFORE WE CAN GO TO TRIAL.' AND YOU NEED SOME MORE; THEY NEED SOME MORE; LET'S GET THAT DONE.

10:46

THAT SUGGESTION IS SOMETHING THAT RESONATES WITH THE COURT QUITE WELL. IT REQUIRES THE LEVEL OF MATURITY THAT IS NOT ALWAYS PRESENT IN LITIGATION, BUT I TRUST IS PRESENT IN THIS COURTROOM.

10:46

MR. QUINN: YOUR HONOR, I THINK THERE IS SOME WISDOM THERE. THE DEVIL IS IN THE DETAILS.

10:46

THE COURT: AS ALWAYS.

MR. QUINN: LET ME SAY THAT JUST, FOR EXAMPLE, THE WEEK BEFORE LAST, WE TOOK -- AND THIS IS SOMETHING THAT HAPPENED SINCE THIS MOTION WAS FILED -- WE TOOK THE DEPOSITION OF A PERSON NAMED VERONICA MARLOW, WHO IS THEIR VENDOR FOR FASHION DESIGN FOR BRATZ, AND LEARNED IN THE COURSE OF THAT DEPOSITION THAT THREE MATTEL EMPLOYEES OTHER THAN CARTER BRYANT HAVE BEEN WORKING ON BRATZ FOR YEARS. THAT WAS THE TESTIMONY.

10:46

THIS WAS NEWS TO US.

MOREOVER, SHE TESTIFIED THAT SHE HAD A CONVERSATION

10:47

EXHIBIT 35

405

WITH AN MGA EXECUTIVE ABOUT THIS, WHERE SHE REFUSED TO ANSWER POINTED QUESTIONS ABOUT WHETHER THERE WAS SOMEBODY ELSE AT MATTEL WORKING ON THIS.

I SUBMIT, YOUR HONOR, THAT IS BLOCKBUSTER TESTIMONY, IN OUR VIEW. WE THOUGHT THIS WAS JUST CARTER BRYANT; SO THERE'S THREE EMPLOYEES, TWO OF WHICH ARE FORMER EMPLOYEES NOW, AND THIS EXECUTIVE, MEL WOODS -- HIS NAME ISN'T EVEN IN THIS LIST THAT WE'VE SUBMITTED -- THAT I THINK WE NEED TO TAKE THEIR DEPOSITIONS. 10:47

NOW, MR. NOLAN BANDIED ABOUT THE NUMBER OF 50. THE NUMBER ISN'T 50. WE'VE LISTED THE DEPOSITIONS IN OUR PROPOSED FORM OF ORDER THAT WE SUBMITTED TO THE COURT. I DO THINK WE COULD SIT DOWN AND SAY THIS GROUP -- AND MOST OF THEM ARE -- IS TRULY JUST PHASE TWO. THERE'S GOING TO BE A SIGNIFICANT CATEGORY THAT ARE BOTH PHASE ONE AND PHASE TWO, AND THEN THERE WILL BE SOME SMALLER NUMBER WHICH ARE PHASE ONE ALONE. 10:47 10:48

**THE COURT:** THIS IS HELPFUL IN TERMS OF THE COURT FASHIONING AN ORDER FOR THIS MOTION.

**MR. QUINN:** IN TERMS OF MR. BRYANT, YOUR HONOR, AND WHAT HAPPENED LAST FALL -- AND COUNSEL FOR MR. BRYANT SAID SHE DIDN'T HAVE ANYTHING BEFORE HER ABOUT THE ORDER THAT THE COURT ENTERED. WE RAISED THIS IN OUR MOVING PAPERS. WE CALLED THE COURT'S ATTENTION -- REMEMBER WHEN THEY WERE HERE BEFORE, ASKING TO CUT SOME SLACK FROM THE MAGISTRATE'S ORDER. IN THE MOVING ORDERS, PAGE 24, WE DISCUSSED THAT, AND AGAIN IN OUR 10:48 10:48

35

406

REPLY PAPERS ON PAGE 11; SO I SUBMIT, WE DID TEE UP THAT ISSUE. THIS IS AT LEAST AS COMPELLING A SITUATION TO TAKE ANOTHER LOOK AT WHAT JUDGE INFANTE RULED.

WITH RESPECT TO THE NIECE, THE NIECE HAD HIS COMPUTER. WE WENT THROUGH A RUNAROUND TO GET HIS COMPUTER. WE FOUND THIS 'EVIDENCE ELIMINATOR' -- THAT'S THE NAME OF A PROGRAM; IT'S NOT A GREAT NAME -- ON THE COMPUTER, AND JUST TO GET ASSURANCE THAT SOMEBODY WASN'T GOING TO SAY -- NOW, TELL ME I'M BEING TOO DEVIOUS AND OVER THINKING THIS HERE -- THAT SOMEBODY MIGHT SAY THE NIECE PUT 'EVIDENCE ELIMINATOR' ON THE COMPUTER. WE TOOK HER DEPOSITION FOR ONE HOUR AND 15 MINUTES; THAT WAS IT.

SO IF THE PROPOSITION IS THAT --

**THE COURT:** A LONG TIME TO ASK A QUESTION.

**MR. QUINN:** YEAH.

**THE COURT:** ALL RIGHT.

**MR. QUINN:** IF THE PROPOSITION IS THAT MR. NOLAN AND I SHOULD SIT DOWN AND FIGURE OUT WHICH ARE TRULY PHASE ONE AND WHICH ARE SORT OF A MIX AND WHICH ARE PHASE TWO AND WE CAN FORGET ABOUT FOR NOW, I'M SURE WE CAN DO THAT. BUT, AGAIN, I UNDERSCORE THE IDEA, IT'S NOT GOING TO BE THREE, AND IT'S NOT GOING TO BE TEN; IT'S GOING TO BE MORE THAN THAT THAT WE NEED FOR PHASE ONE.

**THE COURT:** I'LL TRY TO PROVIDE AS MUCH GUIDANCE AS I CAN IN THE COURT'S ORDER.

EXHIBIT 35

407

CERTIFICATE

I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

Theresa A. Lanza    1-16-08

THERESA A. LANZA, CSR, RPR    DATE
FEDERAL OFFICIAL COURT REPORTER

EXHIBIT 35

408

EXHIBIT 36

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 37

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 38

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**