EXHIBIT 1

1 | HOWARTH & SMITH
   | DON HOWARTH (State Bar No. 53783)
2 | SUZELLE M. SMITH (State Bar No. 113992)
   | BRIAN D. BUBB (State Bar No. 137408)
3 | ROBERT D. BRAIN (State Bar No. 98815)
   | 800 Wilshire Blvd.,  Suite 750
4 | Los Angeles, California  90017

5 | (213) 955-9400

6 | Attorneys for Plaintiff
   | FARHAD LARIAN
7

COPY

ORIGINAL FILED

AUG 2 5 2003

LOS ANGELES
SUPERIOR COURT

8 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

9 | FOR THE COUNTY OF LOS ANGELES

10

11 | FARHAD LARIAN,                          CASE NO.      BC301371

12 |     Plaintiff,                          VERIFIED COMPLAINT FOR:

13 |   vs.                               1)  FRAUD & DECEIT IN THE
                                             INDUCEMENT OF
14 | ISAAC LARIAN and DOES 1 through         ARBITRATION
    | 50, inclusive,                         AGREEMENT;
15
    |     Defendants.                    2)  BREACH OF FIDUCIARY
16                                           DUTIES;

17                                       3)  FRAUD & DECEIT IN THE
                                             CONDUCT OF
18                                           ARBITRATION PROCESS;

19                                       4)  BREACH OF IMPLIED
                                             COVENANT OF GOOD
20                                           FAITH AND FAIR DEALING;

21                                       5)  VIOLATION OF
                                             CALIFORNIA
22                                           CORPORATIONS CODE §§
                                             25401 AND 25501;
23
                                         6)  VIOLATION OF
24                                           CALIFORNIA
                                             CORPORATIONS CODE §§
25                                           25402 AND 25502;

26                                       7)  FRAUD & DECEIT RE
                                             DECEMBER 2000
27                                           AGREEMENT;

28

03:P391001.618                              FL 6465

                                            VERIFIED COMPLAINT

**EXHIBIT** 1

**PAGE** 19

| | |
|---|---|
| 1 | 8)  NEGLIGENT MISREPRESENTATION; |
| 2 | |
| 3 | 9)  UNFAIR COMPETITION, IN VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200; and |
| 4 | |
| 5 | |
| 6 | 10)  RESCISSION BASED ON MISTAKE |
| 7 | |
| 8 | DEMAND FOR JURY TRIAL |

Plaintiff, FARHAD LARIAN ("Plaintiff" or "Fred") alleges as follows:

## COMMON ALLEGATIONS

Parties and Venue

1.   Plaintiff Farhad Larian, also known as "Fred" Larian, is now, and at all times herein mentioned was, a resident of the State of California.  He is currently residing in Los Angeles County, California.

2.   Defendant Isaac Larian ("Isaac") is now, and at all time herein mentioned was, a resident of Los Angeles County, California.

3.   Plaintiff is unaware of the true names and capacities of Defendant DOES 1 through 50, inclusive, and therefore sues such Defendants by fictitious names.  Plaintiff will amend this complaint to show the true names and capacities of, and to make specific allegations against, these Defendants if and when additional information against them is ascertained.  Plaintiff is informed and believes and thereon alleges that each of the Defendants, including each fictitiously named Defendant, is liable in some manner for the events referred to in this complaint.

4.   At all times mentioned herein, each Defendant was the agent of each of the other Defendants, and was acting within the course and scope of said agency in performing the acts described herein.

5.   Venue is proper in Los Angeles County under California Code of Civil Procedure § 395 because Defendant Isaac Larian resides in Los Angeles County.

2

FL 6466

VERIFIED COMPLAINT

EXHIBIT __1__

PAGE __70__

General Background

6.      In or about 1979, two brothers, Plaintiff Fred Larian and Defendant Isaac Larian formed an equal partnership to import and distribute name brand consumer products, splitting the profits and losses 50/50.

7.      In or about 1982 the partnership was incorporated as ABC International Traders, Inc. ("ABC"), a closely-held, not publicly traded company, with each brother owning an equal 50 percent of the corporation. Upon incorporation, the brothers continued as before to divide the work and to split equally the profits in running the business. In or about 2002, the name of ABC was changed to MGA Entertainment, Inc. ("MGA).

8.      In or about 1985 or 1986, Fred's and Isaac's shares were diluted when ABC sold stock to their brother-in-law, Jahangir "Eli" Makabi. Such sale left Fred and Isaac each with an equal 45 percent share of the ownership of ABC. After the sale of the stock to Mr. Makabi, the brothers continued as partners and joint venturers in operating the Company, both continued to divide the work at ABC, and each sharing equally 45 percent of its profits.

9.      In or about 1994, Fred and Isaac also became equal 45 percent shareholders (with 10 percent going to Mr. Makabi) in MGA Hong Kong, Limited (together with MGA and ABC, "the Company"), and operated part of their business through such entity. At all times referenced herein, Isaac has served as the President of the Company. More recently, Isaac also acquired the additional title of CEO.

10.     Starting as far back as 1993, disputes arose between the brothers over the operation of the Company. In part, this was because, as Isaac put it, they were "equal partners in the Company" yet had different ideas on how best to make the Company prosper. Over the years, Fred and Isaac discussed various ways to resolve these disputes.

///
///
///

FL 6467

VERIFIED COMPLAINT

EXHIBIT  1
PAGE  21

1    11.    One method the brothers' discussed was having one brother buy out the

2    other's equity interest.  Over the years, various such purchases were discussed and on one

3    occasion an outside appraisal of the Company, performed at the specific request of Isaac,

4    valued the Company at $35 million to $40 million.

5    12.    By 1999, Isaac, as President, had assumed control of sales, product

6    development and financial matters.  At Isaac's direction, Fred assumed responsibility for

7    major projects such as customs regulations, facilities management and warehouse

8    distribution control, and was not as involved in the day-to-day sales or financial control

9    of the Company.  For his role, Isaac took a significantly greater salary.

10

11    Defendant's Concealment of the Bratz Doll Line

12    13.    Plaintiff is informed and believes that beginning in or about late 1999 and

13    early 2000, Isaac became aware of a potential new product line that had tremendous

14    potential for the Company.  The new product line involved the "Bratz" dolls and related

15    products.  Bratz dolls are "hipper" and more "edgy" than Barbie and Barbie-type dolls,

16    and are aimed at the post-adolescent, pre-teen and early teen market, i.e., a market where

17    the allure of playing with Barbie-type dolls wanes.

18    14.    Plaintiff is informed and believes that during this same time period, Isaac

19    devised a plan to keep this business opportunity secret from Fred and to gain control of

20    the Company by buying Fred's shares at a value which did not include this new business

21    opportunity.  Isaac concealed from Plaintiff, his brother and partner and stockholder,

22    knowledge he had, as well as his intentions and actions undertaken, regarding the Bratz

23    product line.

24    15.    In or about early 2000, Isaac called a meeting to discuss the new Bratz

25    product line with selected individuals in the Company.  Plaintiff is informed and believes

26    that those present at the meeting spoke enthusiastically of the tremendous opportunity the

27    Bratz line presented for the Company as, *inter alia*, it captured a vacant market niche.

28    ///

EXHIBIT    1

PAGE    22

4          FL 6468          VERIFIED COMPLAINT

1 Fred was not present for this meeting. Upon information and belief, Isaac took steps to
2 conceal the results of the meeting from Fred.

3     16.    Also in or about February 2000, Isaac tried to dissuade Fred from attending
4 the New York Toy Fair, even though Fred had routinely and regularly attended such toy
5 fairs in the past. The New York Toy Fair is an important venue for discussing and
6 researching the market potential of new product lines. Isaac was furious when he
7 discovered that Plaintiff was traveling to New York for the fair. Plaintiff was expelled by
8 Isaac from meetings he tried to attend and was excluded from any discussions Isaac may
9 have had relating to the Bratz line of products at the fair.

10     17. .   In early March 2000, while continuing to conceal from Fred the Company's
11 plans for the Bratz line, Isaac offered to purchase all of Plaintiff's 45 percent interest in
12 the Company for $9 million. The offer was based on a total value of the Company of $20
13 million. Upon information and belief, Isaac knew at the time he made the offer of the
14 Company's plans already in place, and actions already undertaken, regarding the Bratz
15 line, and that such plans made the Company worth well in excess of $20 million.

16     18.    As set forth herein, the two brothers divided responsibilities with Isaac,
17 assuming control of sales, product development and financial matters, and Fred assuming
18 responsibility for major projects. Financial information was handled by Isaac and the
19 Controller, Dennis Medici. Throughout 2000 Isaac repeatedly and routinely shared with
20 Fred any financial information that showed the Company was performing poorly, while
21 withholding any positive financial information about the Company, including the plans
22 for the Bratz line. Indeed, in May 2000 Isaac told the Company's the Controller, Dennis
23 Medici, that he was to no longer give Fred any information regarding the financial
24 operation of the Company. During this period, Isaac gave Fred only bleak financial news
25 about the Company and continued to conceal the Company's plans and actions
26 undertaken regarding Bratz.

27     19.    On or about September 18, 2000, Isaac caused the Company to enter into a
28 worldwide licensing agreement for the Bratz dolls and related items. The existence of

PAGE EXHIBIT Q3

03:P39T00L618     FL 6469     VERIFIED COMPLAINT

1  this license was concealed from Fred.  Upon information and belief, these important and

2  valuable rights are already generating revenues of in excess of $500 million a year and

3  are expected to exceed $3 billion in the next few years.

4

5  Fraud Regarding the Arbitration Agreement

6       20.    In or about September 2000, Isaac resumed his efforts to buy Fred's interest

7  in the Company.  Isaac kept the Bratz opportunity and other information about the true

8  financial condition of the Company hidden from Fred in an effort to secure Fred's

9  agreement to a proposed arbitration process with their Uncle Morad Zarabi.  Isaac agreed,

10  and induced Fred to agree, to the arbitration process without disclosing that during the

11  arbitration he would conceal the Company's plans and actions undertaken regarding the

12  Bratz line, and other financial information about the Company so that such information

13  would not be included in Mr. Zarabi's valuation of the Company.   In or about September

14  2000, Isaac and Fred executed the "Agreement to Arbitrate and Selection of Arbitrator"

15  ("Arbitration Agreement") attached hereto as Exhibit A.

16       21.    At all times before and up through his execution of the Arbitration

17  Agreement and for some considerable time thereafter, Fred was unaware of the true facts

18  regarding the new business opportunities and Bratz line of products, was unaware of the

19  true financial condition of the Company, and was unaware of the intention of Isaac to

20  conceal such material facts from the arbitrator and from him during the arbitration

21  process.  Had Fred been aware of the new business opportunities, the Bratz line of

22  products, the true financial condition of the Company, and/or the plans of Isaac to

23  conceal such material information from him and from the arbitrator, he would not have

24  agreed to enter into the arbitration process for the sale of his interest in the Company;

25  would not have agreed to the Arbitration Agreement; would not have agreed to have Mr.

26  Zarabi serve as arbitrator; and, would have placed greater restrictions and obligations on

27  the powers of any arbitrator, including without limitation a written requirement that the

28  Company be valued by an independent appraiser outside the family and that such

6

PAGE ___   EXHIBIT ___ 7⟂ ___

1  appraisal be distributed to the parties for comment before any decision in the arbitration
2  was reached.

3      22.    In or about, December 2000, as a result of the Arbitration Agreement, Fred
4  and Isaac entered into a settlement and resolution of their differences with Fred agreeing
5  to sell his shares to Isaac.  Fred and Isaac executed a written "Agreement for Sale of
6  Stock," dated as of December 4, 2000, ("December 2000 Agreement") attached hereto as
7  Exhibit B.  One of the factors in causing Fred to enter into the Agreement for Sale of
8  Stock was the fact that he had been fraudulently induced into entering into the Arbitration
9  Agreement.

10      23.    At the time Isaac agreed to have Mr. Zarabi arbitrate the value of the
11  Company and other issues, and at all relevant times thereafter, Isaac knew that he would
12  continue to conceal the existence of his and the Company's plans for the Bratz line from
13  Mr. Zarabi and Fred during the arbitration, and other financial information about the
14  Company, the result of which, Isaac knew and intended, would be a fraudulently
15  diminished value of Fred's shares from what they would be worth if all pertinent
16  financial information about the Company and its plans for the Bratz product line were
17  disclosed.  Isaac entered into the arbitration with the intent to induce Fred to rely on his
18  presenting Mr. Zarabi with all material information about the Company and its finances
19  so as to allow Mr. Zarabi to determine a fair value for the Company.  Fred did, in fact,
20  actually and reasonably rely on Isaac disclosing such material information in agreeing to
21  have Mr. Zarabi decide the value of the shares and other matters, and in executing the
22  "Arbitration Agreement".

23

24  <u>Fraud in the Conduct of the Ongoing Arbitration</u>

25      24.    Mr. Zarabi held various hearings and received financial and other
26  information about the Company in his role as arbitrator beginning in the Fall of 2000.
27  Isaac did not disclose to Fred the license the Company had obtained in September 2000
28  for the Bratz line, the plans the Company had to develop and distribute, or any other

PAGE     EXHIBIT
55

7

1 │ actions the Company had already undertaken regarding the Bratz product line and other
2 │ business opportunities, the true financial condition of the Company, or the other matters
3 │ alleged heretofore.  Upon information and belief, during this period, Isaac did not
4 │ disclose to Mr. Zarabi the license the Company had obtained in September 2000 for the
5 │ Bratz line, the plans the Company had to develop and distribute, or any other actions the
6 │ Company had already undertaken regarding, the Bratz product line and other business
7 │ opportunities, the true financial condition of the Company, or the other matters alleged
8 │ heretofore.

9 │     25.    At the time Isaac agreed to have Mr. Zarabi arbitrate the value of the
10 │ Company and other issues, and at all relevant times thereafter, Isaac knew that he would
11 │ continue to conceal the existence of his and the Company's plans for the Bratz line from
12 │ Mr. Zarabi and Fred during the arbitration, and other financial information about the
13 │ Company, the result of which, Isaac knew and intended, would be a fraudulently
14 │ diminished value of Fred's shares from what they would be worth if all pertinent
15 │ financial information about the Company and its plans for the Bratz product line were
16 │ disclosed.  Isaac entered into the arbitration with the intent to induce Fred to rely on his
17 │ presenting Mr. Zarabi with all material information about the Company and its finances
18 │ so as to allow Mr. Zarabi to determine a fair value for the Company.  Fred did, in fact,
19 │ actually and reasonably rely on Isaac disclosing such material information in agreeing to
20 │ have Mr. Zarabi decide the value of the shares and other matters, and in agreeing to the
21 │ arbitration process.

22 │     26.    In or about, December 2000, as a result of the arbitration process,
23 │ Fred and Isaac entered into a settlement and resolution of their differences with Fred
24 │ agreeing to sell his shares to Isaac.  Fred and Isaac executed a written "Agreement for
25 │ Sale of Stock," dated as of December 4, 2000, ("December 2000 Agreement") attached
26 │ hereto as Exhibit B.  One of the factors in causing Fred to enter into the Agreement for
27 │ Sale of Stock was the fraud and facts set forth heretofore.
28 │ ///

EXHIBIT

PAGE _____

_____

8

FL 6472

VERIFIED COMPLAINT

1  Fraud In the Agreement for Sale of Stock

2      27.    At all relevant times herein and during the negotiation of the December

3  2000 Agreement, Isaac continued his fraudulent concealment and nondisclosure as set

4  forth herein of the Company's plans, assets and steps undertaken, regarding the Bratz

5  product line as well as other financial information regarding the Company. But for the

6  fraud, and had Plaintiff known of the true facts regarding the Company's plans, assets

7  and steps undertaken regarding the Bratz product line, the true financial information

8  about the Company and the other matters alleged heretofore, he would not have agreed to

9  sell his shares to Isaac under the terms of the December 2000 Agreement.

10

11  Discovery of Fraud

12      28.    In or about late spring and summer 2002, Plaintiff first became aware of

13  the true scope of the Company's extraordinary plans, efforts and history regarding the

14  Bratz product line and other financial information about the Company that had been

15  concealed from him by Isaac, as the license had been concealed from him. In or about

16  the spring and summer 2002, Isaac asked Fred to audit payments that were due to the

17  Company. In that audit, Fred discovered information, for the first time, that the Company

18  had been receiving or was expecting significant revenues based on the Bratz product line.

19      29.    Fred then asked Mr. Zarabi whether Isaac had disclosed that information to

20  Mr. Zarabi and/or any appraiser involved with the arbitration. Plaintiff was told by Mr.

21  Zarabi that Isaac had not provided him with such information. Plaintiff made a demand

22  that Mr. Zarabi rectify the situation, but to date nothing has been done. Thereafter,

23  Plaintiff made a demand that Isaac pay the fair market value of Plaintiff's share of the

24  company, but Isaac has failed and refused to do so.

25  ///

26  ///

27  ///

28  ///

9

FL 6473

VERIFIED COMPLAINT

## FIRST CAUSE OF ACTION

(Fraud & Deceit in the Inducement of Arbitration Agreement)

30.   Plaintiff hereby reasserts and realleges Paragraphs 1 through 29 inclusive, as though set forth in full herein.

31.   In entering into the Arbitration Agreement, agreeing to participate in the arbitration process contemplated thereby, and offering to purchase Plaintiff's shares in the Company, Defendant knowingly made false representations of material fact to Plaintiff and/or concealed and/or failed to disclose material facts known to Defendant which he was under a duty to disclose to Plaintiff.  Such facts specifically include, without limitation, his intentions regarding the information he was planning to conceal from the arbitrator, otherwise fail to disclose during the course of the arbitration process, and/or had already concealed from Plaintiff, concerning the true and accurate financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line.

32.   Plaintiff actually, reasonably, and justifiably relied upon the false statements, concealments, and omissions of Defendant described above in agreeing to execute the Arbitration Agreement, participate in the arbitration process contemplated thereby, and sell his shares in the Company.  Had Plaintiff known of the true facts, specifically including the true facts concerning Defendant's intentions regarding, without limitation, the information he was planning to conceal from arbitrator, otherwise fail to disclose during the arbitration process and/or already had concealed from Plaintiff concerning the true and accurate financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line, Plaintiff would not have entered into the Arbitration Agreement, would not have agreed to participate in the arbitration process contemplated thereby, and would not have agreed to sell his shares of the Company.

33.   Defendant made the false representations, concealments and omissions alleged above with the intent to defraud Plaintiff and/or in reckless disregard of the truth

10

PAGE ___

EXHIBIT ___

1   for purposes of inducing Plaintiff to execute the Arbitration Agreement, agree to
2   participate in the arbitration process contemplated thereby, and sell his shares in the
3   Company at a below fair market price.

4        34.   At all material times, Plaintiff was unaware of the falsity of the
5   representations and disclosures of Defendant as alleged above and believed them to be
6   true. At all material times, Plaintiff was unaware of the material omissions, concealments
7   and misstatements of material facts by Defendant, and could not, in the exercise of
8   reasonable care, made himself aware of the falsity of such misrepresentations and
9   nondisclosures, or the existence of such omissions or concealments.

10        35.   As a direct and proximate result of the fraudulent conduct alleged above,
11   Plaintiff has been damaged, without limitation, in that he was fraudulently induced to
12   enter the Arbitration Agreement, participate in the arbitration process contemplated
13   thereby, sell his shares of the Company to Defendant at a below fair market price of less
14   than $9 million, and enter into the December 2000 sale agreement. Plaintiff is entitled to
15   rescission of the September agreement to arbitrate, rescission of the December 2000 stock
16   sale agreement and restitution of his shares in the Company. In the alternative, Plaintiff
17   is entitled to damages, the amount of such damage is not presently ascertainable, but will
18   be proven at trial.

19        36.   The conduct of Defendant as alleged above, was fraudulent, malicious,
20   oppressive, and despicable; has subjected Plaintiff to unjust hardship in conscious
21   disregard of his rights; and was done to vex, annoy, and harass Plaintiff so as to justify an
22   award of punitive damages against Defendant.

23

24   ## SECOND CAUSE OF ACTION

25   ### (Breach of Fiduciary Duties)

26        37.   Plaintiff hereby reasserts and realleges Paragraphs 1 through 36 inclusive,
27   as though set forth in full herein.
28   ///

PAGE   EXHIBIT   *2*

·11

1    38.    As alleged herein, as an officer, manager and major shareholder of the
2  Company in which Plaintiff was a shareholder, and as Plaintiff's partner and joint
3  venturer in the management and operation of the Company, and otherwise due to their
4  family relationship, Defendant owed Plaintiff fiduciary duties of loyalty, honesty, care
5  and fair dealing in all matters concerning the Company.

6    39.    At all times alleged herein, Plaintiff actually and reasonably reposed the
7  highest trust and confidence in Defendant's loyalty, honesty, care, and fair dealing in all
8  matters concerning the Company.

9    40.    Defendant repeatedly breached and violated such fiduciary duties owed
10  Plaintiff by, among other things, failing to inform Plaintiff, without limitation, of the true
11  and accurate financial condition of the Company, its financial prospects, its business
12  opportunities, the Company's plans and actions already undertaken concerning the Bratz
13  product line, and/or his intentions regarding the information he was planning to conceal
14  from the arbitrator and others in the course of the arbitration process stemming from the
15  Arbitration Agreement.

16    41.    Said breaches of fiduciary duties by Defendant have caused Plaintiff
17  damage, including but not limited to damages resulting from the sale of his shares of the
18  Company to Defendant at a below fair market price, in an amount not presently
19  ascertainable, but which will be proven at the time of trial.

20    42.    The conduct of Defendant, as alleged above, was fraudulent, malicious,
21  oppressive, and despicable; has subjected Plaintiff to unjust hardship in conscious
22  disregard of his rights; and was done to vex, annoy, and harass Plaintiff so as to justify an
23  award of punitive damages against Defendant.

24

25                    **THIRD CAUSE OF ACTION**

26          (Fraud & Deceit in the Conduct of the Arbitration Process)

27    43.    Plaintiff hereby reasserts and realleges paragraphs 1 through 42, inclusive,
28  as though set forth in full herein.

12

03:P391001.618                                              FL 6476                        VERIFIED COMPLAINT

PAGE    EXHIBIT    30

1    44.    In participating in the arbitration process contemplated by the Arbitration

2    Agreement, Defendant knowingly made false representations of material fact and/or

3    concealed and/or failed to disclose material facts known to Defendant which he was

4    under a duty to disclose to the arbitrator and otherwise during the arbitration. Such facts

5    specifically included, without limitation, information as to the true and accurate financial

6    condition of the Company, its financial prospects, its business opportunities, and/or the

7    Company's plans and actions already undertaken concerning the Bratz product line.

8    45.    Plaintiff actually, reasonably, and justifiably relied upon the false

9    statements, concealments, and omissions of Defendant described above in participating in

10    the arbitration process contemplated by the Arbitration Agreement. Had Plaintiff known

11    of the true facts, specifically including, without limitation, the scope of the information

12    Defendant concealed from the arbitrator and otherwise not disclosed in the course of the

13    arbitration process regarding the true and accurate financial condition of the Company, its

14    financial prospects, its business opportunities, and/or the Company's plans and actions

15    already undertaken concerning the Bratz product line, Plaintiff would not have

16    participated in the arbitration process or agreed to sell his shares of the Company.

17    46.    Defendant made the false representations, concealments and omissions

18    alleged above with the intent to defraud Plaintiff and/or in reckless disregard of the truth

19    for purposes of inducing Plaintiff to participate in the arbitration process contemplated by

20    the Arbitration Agreement and to sell his shares of the Company to Defendant at a below

21    market price.

22    47.    At all material times, Plaintiff was unaware of the falsity of the

23    representations and disclosures of Defendant as alleged above and believed them to be

24    true. At all material times, Plaintiff was also unaware of the material omissions,

25    concealments and misstatements of material facts by Defendant, and could not, in the

26    exercise of reasonable care, made himself aware of the falsity of such misrepresentations

27    and nondisclosures, or the existence of such omissions or concealments.

28    ///

PAGE   EXHIBIT   31

13

03:P391001.618

FL 6477

VERIFIED COMPLAINT

1      48.    As a direct and proximate result of the fraudulent conduct alleged above,

2   Plaintiff has been damaged in that he was fraudulently induced to participate in the

3   arbitration contemplated by the Arbitration Agreement and sell his shares of the Company

4   to Defendant at a below fair market price. Plaintiff is entitled to rescission of the

5   December 2000 stock sale agreement and restitution of his shares in the Company. In the

6   alternative, Plaintiff is entitled to damages, the amount of such damage is not presently

7   ascertainable, but will be proven at trial.

8      49.    The conduct of Defendant, as alleged above was fraudulent, malicious,

9   oppressive, and despicable; has subjected Plaintiff to unjust hardship in conscious

10   disregard of his rights; and was done to vex, annoy, and harass Plaintiff so as to justify an

11   award of punitive damages against Defendant.

12

13                          **FOURTH CAUSE OF ACTION**

14              (Breach of Implied Covenant of Good Faith and Fair Dealing in
                                the Arbitration Agreement)

15

16      50.    Plaintiff hereby reasserts and realleges paragraphs 1 through 49, inclusive,

17   as though set forth in full herein.

18      51.    The Arbitration Agreement contract executed by Plaintiff and Defendant

19   contained an implied covenant of good faith and fair dealing which imposed the

20   following, among others duties on Defendant: (a) a duty to act with honesty in fact in his

21   performance under the agreement; (b) a duty of fair, open and honest disclosure to

22   Plaintiff; (c) a duty to refrain from realizing secret gains at the expense of Plaintiff by

23   connivance, deceit, suppression of facts, or other improper means; and (d) a duty to

24   refrain from taking any action which would unfairly injure the rights of the Plaintiff or

25   interfere in his ability to recognize his reasonable expectations under, and benefits of, the

26   Agreement.

27      52.    By engaging in the conduct described above, specifically including, without

28   limitation, concealing from the arbitrator and otherwise failing to disclose material facts

                                                14

03:P391001.618                               FL 6478                    VERIFIED COMPLAINT

1  in the course of the arbitration process information regarding the true and accurate

2  financial condition of the Company, its financial prospects, its business opportunities,

3  and/or the Company's plans and actions already undertaken concerning the Bratz product

4  line, Defendant has breached his duties of good faith and fair dealing set forth above.

5     53.   At all times herein relevant, Plaintiff has performed and discharged all

6  covenants, conditions, and duties required of him under the Arbitration Agreement,

7  including all duties imposed by the covenant of good faith and fair dealing, except those

8  obligations, if any, which have been prevented by Defendant, those obligations Defendant

9  has waived by his words and/or conduct, or those obligations which Defendant is

10  estopped from asserting that Plaintiff has not performed as a result of Defendant's

11  conduct alleged herein.

12     54.   As a direct and proximate result of Defendant's actions and breaches as

13  alleged herein, Plaintiff has suffered, and continues to suffer damages in an amount as yet

14  unascertained but which will be established at trial.

15     55.   The conduct of Defendant, as alleged above, was fraudulent, malicious,

16  oppressive, and despicable; has subjected Plaintiff to unjust hardship in conscious

17  disregard of his rights; and was done to vex, annoy, and harass Plaintiff so as to justify an

18  award of punitive damages against Defendant.

19

20              **FIFTH CAUSE OF ACTION**

21        (Violation of California Corporations Code §§ 25401 and 25501)

22     56.   Plaintiff hereby reasserts and realleges paragraphs 1 through 55, inclusive,

23  as though set forth in full herein.

24     57.   In committing the acts, omissions, and concealments alleged herein,

25  Defendant has violated California Corporations Code, Section 25401 by, among other

26  things, offering to purchase a security in this State: (a) by means of written and/or oral

27  communications containing untrue statements of material facts, specifically including

28  untrue facts regarding the true and accurate financial condition of the Company, its

15

FL 6479              VERIFIED COMPLAINT

1  financial prospects, its business opportunities, and/or the Company's plans and actions

2  already undertaken concerning the Bratz product line; and/or (b) omitting to state material

3  facts necessary in order to make statements made, in light of the circumstances when they

4  were first made, not misleading, specifically regarding the true and accurate financial

5  condition of the Company, its financial prospects, its business opportunities, and/or the

6  Company's plans and actions already undertaken concerning the Bratz product line.

7      58.    As a direct and proximate result of the acts and conduct of Defendant,

8  Plaintiff is entitled to rescission of the sale and restitution of his shares of the Company

9  or damages under California Corporations Code § 25501, in an amount as yet

10  unascertained but which will be established at trial, plus such other relief as pled herein.

11

12                           SIXTH CAUSE OF ACTION

13              (Violation of California Corporations Code §§ 25402 and 25502)

14      59.    Plaintiff hereby reasserts and realleges paragraphs 1 through 58 inclusive,

15  as though set forth in full herein.

16      60.    At all times alleged herein, Defendant was an officer of the Company, a

17  director of the Company, a controlling person of the Company, and/or a person whose

18  relationship with the Company provided him access, directly and indirectly, to material

19  information about the Company, within the meaning of California Corporations Code §

20  25402.

21      61.    At all times alleged, Defendant had access to, and had information about,

22  the Company not generally available to the public or to Plaintiff, which would

23  significantly affect the value, and fair market price of the shares, of the Company,

24  specifically including, without limitation, information regarding the true and accurate

25  financial condition of the Company, its financial prospects, its business opportunities,

26  and/or the Company's plans and actions already undertaken concerning the Bratz product

27  line.

28  ///

03:P391001.618                    FL 6480              VERIFIED COMPLAINT

PAGE EXHIBIT 34

1      62.    At all times herein alleged, Defendant knew such information regarding,

2    without limitation, the true and accurate financial condition of the Company, its financial

3    prospects, its business opportunities, and/or the Company's plans and actions already

4    undertaken concerning the Bratz product line, was not generally available to the public or

5    to Plaintiff, and was not intended to be available to the public or to Plaintiff.

6      63.    In committing the acts, omissions, and concealments alleged herein,

7    Defendant has violated California Corporations Code, Section 25402 by, among other

8    things, purchasing and offering to purchase from Plaintiff his shares of the Company at a

9    time when he knew of material, non-public, undisclosed information about the Company

10    gained from his status as an officer, director, controlling person, and individual with

11    access to such information regarding, without limitation, the true and accurate financial

12    condition of the Company, its financial prospects, its business opportunities, and/or the

13    Company's plans and actions already undertaken concerning the Bratz product line.

14      64.    As a direct and proximate result of the acts and conduct of Defendant,

15    Plaintiff is entitled to rescission of the sale and restitution of his shares of the Company

16    or damages pursuant to California Corporations Code § 25502 in an amount as yet

17    unascertained but which will be established at trial, plus such other relief as pled herein.

18

19                  **SEVENTH CAUSE OF ACTION**

20          **(Fraud & Deceit Regarding the December 2000 Agreement)**

21      65.    Plaintiff hereby reasserts and realleges paragraphs 1 through 64 inclusive,

22    as though set forth in full herein.

23      66.    Prior to Plaintiff's entering into the December 2000 Agreement to sell

24    Plaintiff's stock in the Company to Defendant, Defendant knowingly made false

25    representations of material fact and/or concealed and/or failed to disclose material facts

26    known to Defendant which he was under a duty to disclose to Plaintiff. Such facts

27    specifically included, without limitation, the true and accurate financial condition of the

28    ///

                    FL 6481        VERIFIED COMPLAINT

1  Company, its financial prospects, its business opportunities, and/or the Company's plans
2  and actions already undertaken concerning the Bratz product line.

3      67.    Plaintiff actually, reasonably, and justifiably relied upon the false
4  statements, concealments, and omissions of Defendant described above in executing the
5  December 2000 Agreement and agreeing to sell his shares to Defendant. Had Plaintiff
6  known of the true facts, specifically including, without limitation, the facts concerning
7  true and accurate financial condition of the Company, its financial prospects, its business
8  opportunities, and/or the Company's plans and actions already undertaken concerning the
9  Bratz product line, Plaintiff would not have entered into the December 2000 Agreement,
10  or otherwise agreed to sell his shares in the Company at that time.

11      68.    Defendant made the false representations, concealments and omissions
12  alleged above with the intent to defraud Plaintiff and/or in reckless disregard of the truth
13  for purposes of inducing Plaintiff to execute the December 2000 Agreement and to sell
14  his shares in the Company to the Defendant at a below fair market price.

15      69.    At all material times, Plaintiff was unaware of the falsity of the
16  representations and disclosures of Defendant as alleged above and believed them to be
17  true. At all material times, Plaintiff was also unaware of the material omissions,
18  concealments and misstatements of material facts by Defendant, and could not, in the
19  exercise of reasonable care, made himself aware of the falsity of such misrepresentations
20  and nondisclosures, or the existence of such omissions or concealments.

21      70.    As a direct and proximate result of the fraudulent conduct alleged above,
22  Plaintiff has been damaged in that he was fraudulently induced to enter the December
23  2000 Agreement calling for the sale of his shares of the Company at a below fair market
24  price. The amount of such damage is not presently ascertainable, but will be proven at
25  trial.
26  ///
27  ///
28  ///

03:P391001.618        FL 6482        VERIFIED COMPLAINT

1    71.    The conduct of Defendant, as alleged above, was fraudulent, malicious,

2  oppressive, and despicable; has subjected Plaintiff to unjust hardship in conscious

3  disregard of his rights; and was done to vex, annoy, and harass Plaintiff so as to justify an

4  award of punitive damages against Defendant.

.5

6                        **EIGHTH CAUSE OF ACTION**

7                          (Negligent Misrepresentation)

8    72.    Plaintiff hereby reasserts and realleges paragraphs 1 through 70 inclusive,

9  as though set forth in full herein.

10    73.    Prior to Plaintiff's entering into the December 2000 Agreement to sell

11  Plaintiff's stock in the Company, Defendant owed Plaintiff a duty of reasonable care

12  regarding, without limitation, the accuracy and honesty of the statements made regarding

13  the true and accurate financial condition of the Company, its financial prospects, its

14  business opportunities, and/or the Company's plans and actions already undertaken

15  concerning the Bratz product line.

16    74.    Defendant breached his duty to Plaintiff by making misrepresentations of

17  material facts, and by omitting and failing to disclose material facts, which he knew, or in

18  the exercise of reasonable care, should have known were inaccurate and which he was

19  under a duty to disclose to Plaintiff, specifically including, without limitation,

20  information concerning the true and accurate financial condition of the Company, its

21  financial prospects, its business opportunities, and/or the Company's plans and actions

22  already undertaken concerning the Bratz product line.

23    75.    Defendant made such misrepresentations and omissions concerning,

24  without limitation, the true and accurate financial condition of the Company, its financial

25  prospects, its business opportunities, and/or the Company's plans and actions already

26  undertaken concerning the Bratz product line with the intent to induce Plaintiff into

27  executing the December 2000 Agreement and selling his shares to Defendant at below

28  fair market value price.

19

EXHIBIT

PAGE __

37

76.    Plaintiff actually, reasonably, and justifiably relied upon the false statements and omissions of Defendant described above in deciding to execute the December 2000 Agreement and sell his shares in the Company to Defendant. Had Plaintiff known of the true facts, specifically including, without limitation, the true and accurate financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line, Plaintiff would not have entered into the December 2000 Agreement, or otherwise agreed to sell his shares in the Company at that time.

77.    As a direct and proximate result of the negligent conduct alleged above, Plaintiff has been damaged in that he was improperly induced to enter the December 2000 Agreement and sold his shares of the Company at a below fair market price. The amount of such damage is not presently ascertainable, but will be proven at trial.

## NINTH CAUSE OF ACTION

(Unfair Competition in Violation of California
Business & Professions Code §§ 17200 et seq.)

78.    Plaintiff hereby reasserts and realleges paragraphs 1 through 77 inclusive, as though set forth in full herein.

79.    California Business and Professions Code §§ 17200 et seq. proscribes, in part, "any unlawful, unfair, or fraudulent business practice."

80.    By virtue of the conduct alleged above, Defendant has committed unlawful, unfair, and/or fraudulent business practices with regard to his dealings with Plaintiff.

81.    As a direct and proximate result of Defendant's violations Business and Professions Code §17200 et seq. alleged above, Plaintiff has been harmed and is entitled to restitution of the amounts to which he has been unjustly harmed, and Defendant unjustly enriched, and other relief as pled herein.

/ / /

/ / /

20

PAGE 39 EXHIBIT

## TENTH CAUSE OF ACTION

### (Rescission Based on Mistake)

82. Plaintiff hereby reasserts and realleges paragraphs 1 through 81, inclusive, as though set forth in full herein.

83. In entering into both the Arbitration Agreement and the December 2000 Agreement, Plaintiff was mistaken in his belief that Defendant planned to inform the arbitrator, and otherwise to disclose during the course of the arbitration proceeding, and/or had already had disclosed to Plaintiff, without limitation true and accurate information concerning the financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line.

84. The disclosure of true and accurate information to Plaintiff and to the arbitrator concerning, without limitation, the financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line was a basic assumption on which the Arbitration Agreement and/or the December 2000 Agreement rested.

85. Defendant's failure to accurately disclose true and accurate information to Plaintiff and to the arbitrator regarding, without limitation, the financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line had a such material effect on the Arbitration Agreement and/or the December 2000 Agreement that enforcement of either agreement against Plaintiff would be unfair and unconscionable.

86. Defendant both knew about, and was the cause of, Plaintiff's mistake in believing Defendant would accurately disclose to Plaintiff and to the arbitrator, without limitation, true and accurate information regarding the financial condition of the Company, its financial prospects, its business opportunities, and/or the Company's plans and actions already undertaken concerning the Bratz product line at the time Plaintiff executed those agreements.

21

FL 6485

VERIFIED COMPLAINT

03:P391001.618

1      87.    Plaintiff did not bear the risk of Defendant's entering into the Arbitration

2  Agreement and/or the December 2000 Agreement without disclosing to Plaintiff and to

3  the arbitrator, without limitation, true and accurate information regarding the financial

4  condition of the Company, its financial prospects, its business opportunities, and/or the

5  Company's plans and actions already undertaken concerning the Bratz product line.

6

7                      **PRAYER FOR RELIEF**

8     WHEREFORE, Plaintiff prays for judgment as follows:

9            **ON THE FIRST AND SECOND CAUSES OF ACTION**

10    1.    For rescission of the Arbitration Agreement;

11    2.    For rescission of Plaintiff's sale of his shares in the Company;

12    3.    For restitution of Plaintiff's shares in the Company;

13    4.    In the alternative of rescission of the sale of shares and restitution, for

14  damages according to proof;

15    5.    For punitive damages in an amount necessary to punish the Defendant, to

16  the extent permitted by law.

17    6.    For attorneys fees and cost of suit.

18    7.    For interest at the maximum rate allowed by law.

19    8.    For such other and further relief the Court may deem just, equitable, and/or

20  proper.

21

22            **ON THE THIRD AND SEVENTH CAUSES OF ACTION**

23    1.    For rescission of Plaintiff's sale of his shares in the Company;

24    2.    For restitution of Plaintiff's shares in the Company;

25    3.    In the alternative of rescission of the sale of shares and restitution, for

26  damages according to proof;

27    4.    For punitive damages in an amount necessary to punish the Defendant, to

28  the extent permitted by law.

    FL 6486

03:P391001.618                              VERIFIED COMPLAINT

EXHIBIT

PAGE 40

1  5. For attorneys fees and cost of suit.

2  6. For interest at the maximum rate allowed by law.

3  7. For such other and further relief the Court may deem just, equitable, and/or

4 proper.

5

6     <u>ON THE FOURTH AND EIGHTH CAUSES OF ACTION</u>

7  1. For damages according to proof;

8  2. For attorneys fees and cost of suit.

9  3. For interest at the maximum rate allowed by law.

10  4. For such other and further relief the Court may deem just, equitable, and/or

11 proper.

12

13     <u>ON THE FIFTH AND SIXTH CAUSES OF ACTION</u>

14  1. For rescission of Plaintiff's sale of his shares in the Company;

15  2. For restitution of Plaintiff's shares in the Company;

16  3. In the alternative of rescission of the sale of shares and restitution, for

17 damages according to proof;

18  4. For attorneys fees and cost of suit.

19  5. For interest at the maximum rate allowed by law.

20  6. For such other and further relief the Court may deem just, equitable, and/or

21 proper.

22

23     <u>ON THE NINTH CAUSE OF ACTION</u>

24  1. For restitution in an amount necessary to restore to Plaintiff the amount by

25 which Defendant has been unjustly enriched by means of the unlawful, unfair, and

26 fraudulent acts alleged above.

27  2. For attorneys fees and cost of suit.

28  3. For interest at the maximum rate allowed by law.

23

EXHIBIT PAGE 41

1    4.    For such other and further relief the Court may deem just, equitable, and/or

2  proper.

3

4               **ON THE TENTH CAUSE OF ACTION**

5    1.    For rescission of Plaintiff's sale of his shares in the Company;

6    2.    For restitution of Plaintiff's shares in the Company;

7    3.    For attorneys fees and cost of suit.

8    4.    For interest at the maximum rate allowed by law.

9    5.    For such other and further relief the Court may deem just, equitable, and/or

10  proper.

11

12               **DEMAND FOR JURY TRIAL**

13    Plaintiff hereby demands a trial by jury herein on all causes of action so triable.

14

15  DATED: August 25, 2003        HOWARTH & SMITH

16                         DON HOWARTH
                            SUZELLE M. SMITH

17                         BRIAN D. BUBB
                            ROBERT D. BRAIN

18

19                    By: _Don Howarth_

20                         Don Howarth

21                    Attorneys for Plaintiff
                    Farhad Larian

22

23

24

25

26

27

28

                        24

03:P391001.618              FL 6488        VERIFIED COMPLAINT

**VERIFICATION**

I, Farhad Larian, declare:

I am a party to this action, and I certify and declare that I have read the foregoing VERIFIED COMPLAINT and know its contents thereof. The same is true of my own knowledge, except as to those matters which are therein alleged on information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the State of California that this Verification was executed on August 22, 2003, at Los Angeles, California and that the foregoing is true and correct.

Farhad Larian

03:P390001.618

FL 6489

VERIFICATION

EXHIBIT 43

PAGE

**EXHIBIT A**

FL 6490

EXHIBIT _____1_____

PAGE _____44_____

## AGREEMENT TO ARBITRATE AND SELECTION OF ARBITRATOR

This Agreement is made between Isaac Larian ("Isaac"), Farhad Larian ("Farhad") and Morad Zarabi ("Morad") pursuant to the following recitals, terms and conditions.

A.  Isaac and Farhad each own a 45% shareholder interest in ABC Int'l Traders Inc., a California corporation ("Corporation").

B.  Disputes have arisen between Isaac and Farhad concerning the continuing operation of the Corporation and other matters such as partnerships. Isaac and Farhad have been unable to resolve their disputes and desire to conclude their disputes in an economical and timely manner, outside of the formal judicial process.

C.  Both Isaac and Farhad have great confidence in the business and personal judgment of Morad and desire to utilize the services of Morad as a binding arbitrator of the disputes between Isaac and Farhad.

D.  As an accommodation to Isaac and Farhad, Morad agrees to undertake the position as arbitrator.

Now Therefore, the parties agree as follows:

1.  Isaac and Farhad irrevocably appoint Morad to arbitrate their disputes with respect to the Corporation, its operation and their shareholder interests in the Corporation, and other disputes.

2.  Upon execution of this Agreement, Isaac and Farhad shall deliver their irrevocable shareholder proxy and share certificates to Morad so that Morad may vote their shares of Corporation as Morad so determines, including the voting for positions on the Board of Directors.

3.  Upon execution of this Agreement, Isaac and Farhad shall each deliver to Morad their personal check in the amount of $500,000.00 payable to the other, to be utilized as a down payment of the purchase price as determined in Section 5 of this Agreement for the Sale of either Isaac's or Farhad's shares of the Corporation to the other.

4.  Isaac and Farhad shall present their arguments and concerns to Morad in a manner as determined by Morad. Evidence may be admitted or excluded in the sole discretion of Morad. Morad shall then render his decisions with respect to the disputes and said decisions shall be binding and conclusive upon Isaac and Farhad.

5.  In rendering his decisions, Morad has the right and power to determine, among other issues, whether either Isaac or Farhad will have to sell his shares of Corporation to the other and the purchase price and terms of payment for said shares; setting the salaries of Isaac and Farhad; and the continuation of employment by the Corporation of either Isaac or Farhad.

EXHIBIT _____

PAGE _____ 45

FL 6491

6.   Isaac and Farhad agree to be bound by the terms of Morad's decisions and to implement the terms of Morad's decisions in the time parameters as established by Morad.

7.   Isaac and Farhad acknowledge that Morad has agreed to perform such services as arbitrator as an accommodation to Isaac and Farhad. Isaac and Farhad agree to hold Morad harmless and to indemnify Morad from any cost, liability, suit, claim, damage or judgment, including court costs and reasonable attorneys' fees arising out of or relating to this Agreement and the decisions made by Morad pursuant to the terms of this Agreement.

8.   Isaac and Farhad agree to pay equally the costs and expenses of Morad incurred by him, including his attorneys' fees, in drafting and implementing the terms of this Agreement and performing his responsibilities herein.

9.   Isaac and Farhad agree and intend hereby that Morad's decisions will constitute a full and final resolution of all disputes, past or present, between Isaac and Farhad concerning the Corporation, its operation their shareholder interests in Corporation, and other disputes.

10.  Any judgment or award rendered by Morad may be entered in any Court having jurisdiction over the disputes between Isaac and Farhad.

11.  To the extent not otherwise provided by this Agreement or determined by Morad, the rules governing the arbitration and enforcement of the arbitration award shall be governed by the California Arbitration Act, California Code of Civil Procedure, Section 1280 et seq.

Dated:_____, 2000


_____          _____          _____

ISAAC LARIAN                     FARHAD LARIAN                     MORAD ZARABI


EXHIBIT _____

PAGE _46_

FL 6492

**EXHIBIT  B**

EXHIBIT _____ \

PAGE ____ 47

FL 6493

AGREEMENT FOR SALE OF STOCK

This Agreement, made this 4TH day of December, 2000, by and between Farhad Larian ("SELLER"), and Isaac Larian ("BUYER").

Whereas, the SELLER is the owner of 10,000,000 shares of common stock of ABC International Traders Inc., a California corporation and 450 shares of MGA Entertainment Hong Kong Limited, a Hong Kong Corporation (collectively "CORPORATION"), with offices at 16730 Schoenborn Street, North Hills, California 91343-6122, and desires to sell to the BUYER, and the BUYER desires to purchase from the SELLER, these 10,000,000 and 450 shares of common stock of CORPORATION.

Now, therefore, in consideration of the promises and of the mutual covenants and agreements herein contained, the parties hereto hereby agree as follows:

1. At Closing, as defined hereinafter, SELLER shall sell, transfer and convey to BUYER and BUYER shall purchase from SELLER, SELLER'S 10,000,000 and 450 shares of common stock of CORPORATION.

2. The purchase price for said shares shall be the sum of Eight Million Seven Hundred Seventy Five Thousand Dollars ($8,775,000.00), payable as follows:

a. The sum of $500,000.00 at Closing, as defined hereinafter; plus

b. The sum of $8,275,000.00 evidenced by BUYER'S promissory note made payable to SELLER, in the form as attached hereto as Exhibit "A" and incorporated herein by reference. Said promissory note shall provide for a principal payment in the amount of $2,000,000.00, with interest at nine and one-half percent on or before April 15, 2001 and the remainder of the principal balance amortized in equal monthly payments of principal and interest over 120 months at an annual interest rate of nine and one-half percent commencing June

1

EXHIBIT 1

PAGE 48

1, 2001. The promissory note shall also provide that, in the event of default, BUYER agrees that SELLER'S personal residence located at 237 North Carolwood Drive, Los Angeles, CA shall be exempt from lien or attachment.

3.  BUYER agrees to secure his promissory note obligation to SELLER as follows:

BUYER shall execute a Pledge Agreement in favor of SELLER in the form as attached hereto as Exhibit "B" and incorporated herein by reference. Said Pledge Agreement shall be for the purposes of securing BUYER'S total shareholder interest in CORPORATION in favor of SELLER until such time as BUYER'S obligations pursuant to his promissory note in favor of SELLER has been paid in full. Said Pledge Agreement shall have restrictions imposed upon BUYER with respect to the amount of compensation paid to BUYER from CORPORATION during the period of time that BUYER'S promissory note in favor of SELLER remains outstanding.

4.  In addition to the purchase price as above stated, BUYER shall cause ABC International Traders Inc. to enter into a Consultation Agreement with BUYER in the form as attached hereto as Exhibit "C" and incorporated herein by reference.

5.  SELLER warrants and represents to the BUYER the following:

a.  That CORPORATION is a corporation duly organized, validly existing, and in good standing under the laws of California or Hong Kong, respectively, has all necessary corporate powers to own its properties and carry on its business as now owned and operated by it.

b.  That SELLER is the owner of and has the good and marketable title to the 10,000,000 shares and 450 shares, respectively, of stock agreed to be sold herein, representing 45% of the issued and outstanding shares of CORPORATION, and each of them, free of all encumbrances, liens and security interests.

2

EXHIBIT 1

PAGE 49

FL 6495

c. That the authorized capital stock of CORPORATION consists of 100,000,000 shares and 1,000 shares respectively of common stock no or nominal par value, of which 22,200,000 shares of ABC International Traders Inc. are presently issued and outstanding and 1,000 shares of MGA Entertainment Hong Kong Limited are presently issued and outstanding.

d. That any right of first refusal, stock option or any other agreement wherein SELLER has the right to purchase shares of CORPORATION is hereby terminated.

6. BUYER acknowledges that he is a current shareholder of CORPORATION, has been the President and a Director of CORPORATION; and an employee of CORPORATION for at least 18 years for ABC International Traders Inc. and at least 7 years for MGA Entertainment Hong Kong Limited, since the inception of CORPORATION. BUYER is thoroughly familiar with the operations of CORPORATION and purchases the shares of CORPORATION from SELLER with full knowledge of the business, prospects, liabilities, obligations, nature and salability of inventory, collectability of accounts receivable, condition of furniture, fixtures and equipment, and financial condition of CORPORATION. SELLER makes no warranty, either express or implied as to the business of CORPORATION, its prospects, liabilities, obligations, nature and salability of inventory, collectability of accounts receivable, condition of furniture, fixtures and equipment, or financial condition.

7. The consummation of the transaction contemplated by this Agreement ("Closing") shall take place at the offices of the CORPORATION on the 2nd day of January 2001, at 10:00 a.m., or such other time and place as the parties may agree. The sale shall be effective as of the close of business on December 31, 2000, the end of the calendar and fiscal year of CORPORATION. At the Closing the

3

EXHIBIT ___ )

PAGE ___ 50

FL 6496

following documents and instruments shall be exchanged between the parties:

a. SELLER shall deliver to BUYER:

(i). CORPORATION'S share certificate number 3 issued in favor of SELLER representing 10,000,000 shares of ABC International Traders Inc.; and share certificated number 2 issued in favor of SELLER representing 450 shares of MGA Entertainment Hong Kong Limited, duly endorsed by SELLER in favor of BUYER.

(ii). The resignation of SELLER as a Director and employee of CORPORATION.

(iii). Any and all records of CORPORATION in the possession of SELLER.

(iv). A Pledge Agreement executed by SELLER as the secured party in the form as attached hereto as Exhibit "B".

(v). A Consultation Agreement executed by SELLER in the form as attached hereto as Exhibit "C".

(vi). A Mutual Release executed by SELLER in the form as attached hereto as Exhibit "D".

b. BUYER shall deliver to SELLER:

(i). Cash in the sum of $500,000.00 in the form of a cashier's check, certified check or wired funds.

(ii). BUYER'S Promissory Note in the amount of $8,275,000.00 made payable to SELLER in the form as attached hereto as Exhibit "A".

(iii). A Pledge Agreement executed by BUYER as the securing party in the form as attached hereto as Exhibit "B".

(iv). A Consultation Agreement executed by ABC International Traders Inc. in the form as attached hereto as Exhibit "C".

(vi). A Mutual Release executed by BUYER in the form as attached

4

EXHIBIT

PAGE 51

hereto as Exhibit "D".

8.    The parties acknowledge that differences have arisen between them concerning the continued management and operation of CORPORATION, to the extent that the continued successful operation of CORPORATION is threatened unless one of the parties purchases the other party's shareholder interest.  The parties have each sought the assistance of Morad Zarabi ("Morad") as an "arbitrator" to determine the seller and buyer between the parties, the purchase price and the terms of the purchase.  The parties previously executed an Agreement To Arbitrate And Selection of Arbitrator setting forth their agreement in this regard.  Morad has determined the purchase price and terms of payment from consultations with each of the parties and by undertaking his own outside independent research as to the value of CORPORATION.  Morad shall not charge a fee for his services rendered herein.  The costs and expenses of Morad, including appraisal costs and attorneys' fees incurred by Morad in drafting this Agreement, the various Exhibits attached hereto and the Agreement To Arbitrate And Selection of Arbitrator shall be paid by the CORPORATION at time of closing.  The parties acknowledge that Morad agreed to undertake his duties as arbitrator as an accommodation to the parties.  Each of the parties agrees to indemnify Morad, his associates, employees, consultants, lawyers, family members and all other persons employed or consulted by Morad in connection with the consummation of this Agreement or the Agreements or other documents attached as Exhibits hereto, and hold him and them harmless from any suit, claim, liability, loss, expense or damage, including court costs and reasonable attorneys' fees, as a result Morad's actions as arbitrator or any other actions concerning the drafting or implementation of this Agreement or the Agreements or other documents attached as Exhibits hereto.

5

EXHIBIT_____1_____

PAGE_____52_____

9.   Except as otherwise provided in this Agreement, any controversy between the parties arising out of this Agreement or the Agreements contained in the Exhibits attached hereto shall be submitted to Morad who shall serve as sole arbitrator with respect to said disputes.   The decision of Morad shall be final and binding upon both parties.   In the event Morad is unavailable to so act, then Kambiz Zarabi shall serve as arbitrator.   Any arbitrator may appoint another person or entity to arbitrate, either currently or prospectively, in the event that both named arbitrators herein are unable to so act.

10.   The parties acknowledge that this Agreement, the Agreements attached hereto as Exhibits, and the Agreement To Arbitrate And Selection Of Arbitrator were drafted at the request of and on behalf of Morad by his attorneys, Stern & Goldberg.   The parties each acknowledge that Stern & Goldberg does not represent either party to this Agreement.   The parties have each been advised to seek legal counsel of their choice to represent their respective interests prior to entering into this Agreement and the Agreements attached hereto as Exhibits.   Each party shall have three business days from the date of signing this Agreement to consult with legal counsel of his choice concerning the terms and conditions of this Agreement.   Either party may terminate this Agreement without any further liability thereon, except to the extent such liability arises under the Agreement To Arbitrate And Selection of Arbitrator previously signed by the parties, in the event he notifies Morad and the other party in writing of his intent to do so within three business days from the signing of this Agreement.   In the event no such written notification has been given, it shall be assumed that each party has chosen either to have this Agreement reviewed by legal counsel of his choice and no objections to the form and content of this Agreement has been made; or said party has decided, in its unilateral discretion despite repeated warnings by

6

EXHIBIT ___1___

PAGE ___53___

FL 6499

Morad and his attorney to seek such independent legal review, not to seek such legal advice. The parties have initialed this section hereinafter indicating their knowledge of the provisions of this Section.

11. The parties agree that, to the extent required, the transfer of shares as contemplated by this Agreement will have been qualified with the California Commissioner of Corporations in accordance with the California Corporate Securities Law and the Commissioner's Rules and Regulations; and the appropriate Hong Kong governmental authorities, respectively. The parties agree to utilize their best efforts and timely file any applications, consents or notices to secure the Commissioner's and/or Hong Kong authorities consent to the transfer of shares as contemplated herein.

12. Each party represents and warrants that it has dealt with no broker or finder in connection with any transaction contemplated by this Agreement, and as far as it knows, no broker or other person is entitled to any commission or finder's fee in connection with any of these transactions. Each party will indemnify and hold one another harmless against any loss, liability, damage, cost, claim, or expense incurred by reason of any brokerage commission or finder's fee alleged to be payable because of any act, omission, or statement of the indemnifying party.

13. The parties intend that this Agreement and the parties timely compliance with the terms hereof shall resolve and settle all of the claims of either party against the other, including any claim one party may have against the other or CORPORATION for any prior monetary discrepancy whatsoever. The parties shall execute a Mutual Release in the form as attached hereto as Exhibit

7

EXHIBIT ____1____

PAGE ____54____

FL 6500

"D".

14.  BUYER agrees that, during the time that any portion of the promissory note from BUYER payable to SELLER as provided herein remains outstanding, BUYER shall cause CORPORATION to name Morad as a member of the Board of Directors of CORPORATION.

15.  This Agreement constitutes the entire agreement between the parties pertaining to the subject matter contained herein and supersedes all prior and contemporaneous agreements, representations, and understandings of the parties. No supplement, modification, or amendment to this Agreement shall be binding unless executed in writing by the parties.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provisions, whether or not similar, nor shall any waiver constitute a continuing waiver.  No waiver shall be binding unless executed in writing by the party making the waiver.

16.  This Agreement may be executed simultaneously in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

17.  This Agreement shall be binding on and shall inure to the benefit of the parties to it, and their respective heirs, legal representatives, successors and assigns; provided, however, no assignment by BUYER shall relieve BUYER of any of his obligations or duties under this Agreement.

18.  If any action or other proceeding is commenced to enforce the terms of this Agreement, the prevailing party, in addition to all other relief as appropriate under California law, shall be entitled to the recovery of court costs and reasonable attorneys fees.

19.  This Agreement shall be construed in accordance with and be governed

8

EXHIBIT _____ |

PAGE _____ 55

by the laws of the State of California.

IN WITNESS WHEREOF, the parties to this Agreement have duly executed it effective the day and year first above written.

BUYER:                          SELLER:

_____         _____
ISAAC LARIAN                    FARHAD LARIAN

EXHIBIT ___1___

PAGE ___50___

FL 6502

SPOUSAL CONSENT

The undersigned is the spouse of Farhad Larian. To the extent that the undersigned now has a community property interest in the shares of ABC International Traders Inc. registered in the name of her husband, the undersigned hereby acknowledges that she has read this Agreement For Sale Of Stock, understands its contents and agrees that her community property interest in the shares of said corporation registered in the name of her husband shall be bound by and subject to the terms of this Agreement.

Dated: _____, 2000    _____

10

EXHIBIT ____1____

PAGE ____57____

FL 6503

PROMISSORY NOTE

$8,275,000.00    Los Angeles, California,  January ___ 2001

    In installments as herein stated, for value received, the undersigned promises to pay to Farhad Larian, or order, at Los Angeles, California, the sum of Eight Million Two Hundred Seventy Five Thousand Dollars, with interest from date of making on unpaid principal, at the rate of nine and one-half percent per annum, payable in installments of principal and interest (amortized on $6,275,000.00 portion of note) of $83,798.90 or more on the first day of each successive month, commencing June 1, 2001. Principal and accrued interest on the above portion of the note shall be all due and payable on June 1, 2004. The undersigned shall have a ten (10) day grace period from and after the due date of any payment prior to being in default of his obligation herein. In addition thereto, the undersigned shall make a principal payment of $2,000,000.00, with interest thereon, on or before April 15, 2001.

    Should default be made in payment of any installment of principal or interest when due the whole sum of principal and interest shall become immediately due at the option of the holder of this note. Principal and interest payable in lawful money of the United States. If action be instituted on this note the undersigned promises to pay such sum as the Court may fix as attorney's fees.

    This Promissory Note is secured by a Pledge Agreement of even date executed by the undersigned and beneficiary herein.

    In the event of default, the principal residence of the undersigned, located at 237 North Carolwood Drive, Los Angeles, California 90077 shall not be subject to lien, attachment or seizure.

ISAAC LARIAN

EXHIBIT ___1___

PAGE ___58___

FL 6504

01-31-01   17:18   From-Stern & Goldberg          +310 278 0621          -755   P.003/007   F-722

## AMENDMENT TO PROMISSORY NOTE

On December 4, 2000, Farhad Larian ("Farhad"), Isaac Larian ("Isaac"), ABC International Traders Inc., a California corporation ("ABC") and/or Morad Zarabi ("Morad") entered into an Agreement For Sale of Stock, which included an $8,275,000.00 Promissory Note ("Note") executed by Isaac in favor of Farhad. The Note provided, in part, for a principal payment of $2,000,000.00 with interest thereon, on or before April 15, 2001.

Isaac and Farhad agree that the payment date for said $2,000,000.00 installment, plus interest, at the request of Isaac, be and is hereby extended to "on or before June 3, 2001".

All other terms of the Note shall remain in full force and effect.

Dated: 3/1/2001

_____
Farhad Larian

_____
Isaac Larian

1

EXHIBIT ____1____

PAGE ____59____

FL 6505

```
--------------------------------------------------------------------
                                          12-04-2000  17:59:53 Pg  1
--------------------------------------------------------------------

Compounding interval:  Monthly

Annual percentage rate......:   9.500%
Effective annual rate.......:   9.925%
Rate per compounding period.:   0.7917%
Equivalent daily rate....:..:   0.02603%

Valuation date: 01-01-2001     Value:  $  6,275,000.00

CASH FLOW DATA
--------------------------------------------------------------------
First date  Payment amount  -#- Interval   Last date
--------------------------------------------------------------------
06-01-2001  $     83,798.90  35 Monthly    04-01-2004
05-01-2004  $  5,211,001.13   1
```

AMORTIZATION SCHEDULE  -  Normal amortization

| Pmt | Date | Payment | Interest | Principal | Balance |
|-----|------|---------|----------|-----------|---------|
| | | | | Balance at 01-01-2001 | 6,275,000.00 |
| 1 | 06-01-2001 | 83,798.90 | 252,349.44 | 168,550.54– | 6,443,550.54 |
| 2 | 07-01-2001 | 83,798.90 | 51,011.44 | 32,787.46 | 6,410,763.08 |
| 3 | 08-01-2001 | 83,798.90 | 50,751.87 | 33,047.03 | 6,377,716.05 |
| 4 | 09-01-2001 | 83,798.90 | 50,490.25 | 33,308.65 | 6,344,407.40 |
| 5 | 10-01-2001 | 83,798.90 | 50,226.56 | 33,572.34 | 6,310,835.06 |
| 6 | 11-01-2001 | 83,798.90 | 49,960.78 | 33,838.12 | 6,276,996.94 |
| 7 | 12-01-2001 | 83,798.90 | 49,692.89 | 34,106.01 | 6,242,890.93 |
| 2001 totals | | 586,592.30 | 554,483.23 | 32,109.07 | |
| 8 | 01-01-2002 | 83,798.90 | 49,422.89 | 34,376.01 | 6,208,514.92 |
| 9 | 02-01-2002 | 83,798.90 | 49,150.74 | 34,648.16 | 6,173,866.76 |
| 10 | 03-01-2002 | 83,798.90 | 48,876.45 | 34,922.45 | 6,138,944.31 |
| 11 | 04-01-2002 | 83,798.90 | 48,599.98 | 35,198.92 | 6,103,745.39 |
| 12 | 05-01-2002 | 83,798.90 | 48,321.32 | 35,477.58 | 6,068,267.81 |
| 13 | 06-01-2002 | 83,798.90 | 48,040.45 | 35,758.45 | 6,032,509.36 |
| 14 | 07-01-2002 | 83,798.90 | 47,757.37 | 36,041.53 | 5,996,467.83 |
| 15 | 08-01-2002 | 83,798.90 | 47,472.04 | 36,326.86 | 5,960,140.97 |
| 16 | 09-01-2002 | 83,798.90 | 47,184.45 | 36,614.45 | 5,923,526.52 |
| 17 | 10-01-2002 | 83,798.90 | 46,894.58 | 36,904.32 | 5,886,622.20 |
| 18 | 11-01-2002 | 83,798.90 | 46,602.43 | 37,196.47 | 5,849,425.73 |
| 19 | 12-01-2002 | 83,798.90 | 46,307.95 | 37,490.95 | 5,811,934.78 |
| 2002 totals | | 1,005,586.80 | 574,630.65 | 430,956.15 | |
| 20 | 01-01-2003 | 83,798.90 | 46,011.15 | 37,787.75 | 5,774,147.03 |
| 21 | 02-01-2003 | 83,798.90 | 45,712.00 | 38,086.90 | 5,736,060.13 |

EXHIBIT ____1____

PAGE ____60____

```
                                        12-04-2000   17:59:53  Pg   2
```

| Pmt | Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|---|
| 22 | 03-01-2003 | 83,798.90 | 45,410.48 | 38,388.42 | 5,697,671.71 |
| 23 | 04-01-2003 | 83,798.90 | 45,106.57 | 38,692.33 | 5,658,979.38 |
| 24 | 05-01-2003 | 83,798.90 | 44,800.25 | 38,998.65 | 5,619,980.73 |
| 25 | 06-01-2003 | 83,798.90 | 44,491.51 | 39,307.39 | 5,580,673.34 |
| 26 | 07-01-2003 | 83,798.90 | 44,180.33 | 39,618.57 | 5,541,054.77 |
| 27 | 08-01-2003 | 83,798.90 | 43,866.68 | 39,932.22 | 5,501,122.55 |
| 28 | 09-01-2003 | 83,798.90 | 43,550.55 | 40,248.35 | 5,460,874.20 |
| 29 | 10-01-2003 | 83,798.90 | 43,231.92 | 40,566.98 | 5,420,307.22 |
| 30 | 11-01-2003 | 83,798.90 | 42,910.77 | 40,888.13 | 5,379,419.09 |
| 31 | 12-01-2003 | 83,798.90 | 42,587.07 | 41,211.83 | 5,338,207.26 |
| | 2003 totals | 1,005,586.80 | 531,859.28 | 473,727.52 | |
| | | | | | |
| 32 | 01-01-2004 | 83,798.90 | 42,260.81 | 41,538.09 | 5,296,669.17 |
| 33 | 02-01-2004 | 83,798.90 | 41,931.96 | 41,866.94 | 5,254,802.23 |
| 34 | 03-01-2004 | 83,798.90 | 41,600.52 | 42,198.38 | 5,212,603.85 |
| 35 | 04-01-2004 | 83,798.90 | 41,266.45 | 42,532.45 | 5,170,071.40 |
| 36 | 05-01-2004 | 5,211,001.13 | 40,929.73 | 5,170,071.40 | 0.00 |
| | 2004 totals | 5,546,196.73 | 207,989.47 | 5,338,207.26 | |
| | | | | | |
| | Grand totals | 8,143,962.63 | 1,868,962.63 | 6,275,000.00 | |

EXHIBIT _____ 1 _____

PAGE _____ 61 _____

FL 6507

PLEDGE AGREEMENT

THIS PLEDGE AGREEMENT made this __ day of _DEC._ , 2001, by and

between Isaac Larian hereinafter referred to as "Pledgor"; and Farhad Larian

hereinafter referred to as "Pledgee"; and Morad Zarabi hereinafter referred to

as "Trustee".

W I T N E S S E T H

Pledgor, as security for the performance of his obligations under and

pursuant to a promissory note payable to Pledgee of even date herewith in the

principal amount of $8,275,000.00, as well as the performance of all other

obligations contemplated hereby and pursuant to the terms of the Agreement For

Sale Of Stock dated December __, 2000 between Pledgor and Pledgee, pledges,

assigns and delivers to Trustee for the benefit of Pledgee the hereinafter

described shares of stock of ABC International Traders Inc., a California

corporation, and MGA Entertainment Hong Kong Limited, a Hong Kong corporation,

hereinafter collectively referred to as "Company", subject to the terms and

conditions hereinafter set forth.

NOW, THEREFORE, it is mutually agreed by the parties as follows:

1)    PLEDGE

(a)   Pledgor hereby delivers to Trustee certificates of stock in

ABC International Traders Inc. numbered 1 and 3 representing a total of

20,000,000 shares of common stock of ABC International Traders Inc.; and

certificates of stock in MGA Entertainment Hong Kong Limited numbered 1 and 2

representing a total of 900 shares of common stock of MGA Entertainment Hong

1

EXHIBIT 1

PAGE 42

FL 6508

Kong Limited issued in the name of Pledgor, together with an assignment

separate from certificate executed by Pledgor in favor of Pledgee assigning

said shares of common stock in Company to Pledgee, said stock certificates and

assignment to be held by Trustee as security for the payment of Pledgor's

promissory note and other obligations referred to above.

(b)  Pledgor warrants and represents that he owns said stock free

and clear of any liens or encumbrances except this Pledge Agreement; and

agrees not to encumber, transfer or otherwise hypothecate said stock during

the term of the Pledge Agreement.

(c)  In the event that during the term of this Pledge Agreement

any stock dividend, reclassification, readjustment, or other change is

declared or made in the capital stock of the Company which affects the pledged

shares, or any subscription, warrant, or other option is exercised with

reference to the pledged stock, all the new, substituted or additional shares,

or other securities issued pursuant to any such change or option shall be

delivered to Trustee by Pledgor and shall be held by Trustee under the terms

of this Pledge Agreement in the same manner as the stock originally pledged

hereunder.  Trustee shall have no duty or obligation to compel Pledgor to

deliver such new, substituted or additional shares, or other securities so

issued to Trustee.

2)    VOTING RIGHTS, DIVIDENDS AND OTHER RESTRICTIONS ON DISTRIBUTIONS:

(a)  Pledgor shall have the right to vote the stock pledged as

herein and to receive all cash dividends, as limited hereinafter, if any,

declared on said stock, so long as the Pledgor is not in default in the

performance of any of the terms of this Pledge Agreement, the Agreement For

Sale Of Stock or in the payment of the promissory note secured hereby during

2

EXHIBIT ___1___

PAGE ___63___

FL 6509

the term of this Pledge Agreement. In the event Pledgee notifies the Trustee

that Pledgor is in default hereunder, Pledgee shall be entitled to vote the

shares for which payment is in default. For voting purposes, Trustee shall be

entitled to rely upon the written representations of Pledgee concerning a

default relative to shares held by Trustee, and Trustee shall have no

obligation to make any such determination unless Pledgee sends to Trustee a

letter by certified mail specifying a default as set forth in Paragraph 4

below.

(b) During the term of this Pledge Agreement, Pledgor and his

immediate family members shall be limited in the aggregate annual amount of

distributions from ABC International Traders Inc., whether as salary,

dividends, perquisites or any other form to an amount no greater than the sum

of the annual principal and interest payments payable to Pledgee under the

promissory note plus the sum of $500,000.00 plus the amount of any federal and

state taxes payable by Pledgor on said amounts. Notwithstanding the above,

this distribution limitation shall not apply with respect to any distributions

to family members of Pledgor who are presently employed at Company.

3) RETURN OF COLLATERAL: At such time as Pledgor has presented to

Trustee evidence satisfactory to Trustee of full payment of Pledgor's

promissory note to Pledgee, and the complete performance of any other

obligation imposed on Pledgor pursuant to the terms of the Agreement For Sale

Of Stock above mentioned, Trustee shall deliver to Pledgor all of the stock

held hereunder together with the assignment executed by Pledgor.

4) DEFAULT: An event of default by Pledgor as used in this Pledge

Agreement shall be any and all of the following, provided, however, that the

default shall not be deemed to occur until the Pledgee shall have notified the

3

EXHIBIT _____

PAGE _____ 64

FL 6510

Pledgor in writing specifying the nature of the default, and until the time for curing the same, if any, following Pledgor's receipt of notice from Pledgee, has expired:

(a)  The failure of Pledgor to pay the indebtedness evidenced by the promissory note in favor of Pledgee in accordance with the terms thereof, should Pledgor fail to make such payment within thirty (30) days from the due date of any payment thereunder.

(b)  The failure of Pledgor to observe, keep or perform within ninety (90) days any covenant, agreement or condition required in this instrument or the Agreement For Sale Of Stock or the Promissory Note in favor of Pledgee herewith to be observed, kept or performed for the benefit of Pledgee.

(c)  If Pledgor is adjudicated a bankrupt, or requests, either by way of petition or answer, that Pledgor be adjudicated a bankrupt, or if any involuntary petition in bankruptcy be filed against Pledgor and the same shall not have been determined in favor of Pledgor or dismissed within ninety (90) days from the date thereof.

5)   RIGHTS ON DEFAULT:

(a)  Upon the happening of any of the events specified in Paragraph 4, Pledgee may, at Pledgee's election and upon proper notice and after the appropriate curative periods set forth in Paragraph 4, declare any and all obligations of the Pledgor in default secured hereby immediately all due and payable, and Pledgee is given the full power and authority to take possession of all stock pledged hereunder by the Pledgor in default from Trustee, and, at Pledgee's option, to sell and deliver the whole or any part of the herein described stock held by Trustee, or any substitutions or

4

EXHIBIT _____

PAGE _____ 65

FL 6511

additions thereto, at one or more private or public sales, with notice, as Pledgee shall determine.

(b)  Upon any such sale, Pledgee may become the purchaser of the whole, or any part, of such stock, discharged from any right of redemption, and after deducting all costs and expenses of collection, sale and delivery, including reasonable attorney's fees, may apply the residue of the proceeds of such collection, sale or sales, to the payment of the obligations secured hereby.  Any overage of the residue of the proceeds of such sales shall be forthwith returned to Pledgor.

(c)  In the event of any public sale of the stock hereunder, if any law or regulation of the Securities and Exchange Commission or the California Commissioner of Corporations, or any other Federal or state body having jurisdiction, shall require that the Company whose stock is pledged hereunder or Pledgee or Pledgor should take any action prior to the sale of said stock, each of the parties hereto shall use his or its respective best efforts to comply with all of the said requirements.  Pledgee agrees to indemnify and hold Pledgor and Company harmless against any liabilities incurred by either of them by virtue of Pledgee's sale of the stock in violation of any such law or regulation.

6)  LIENS:  Pledgor agrees to pay prior to delinquency all taxes, charges, liens and assessments against the stock pledged hereunder.

7)  CAPTIONS:  The paragraph captions are inserted in this Pledge Agreement merely for convenience and are not to be construed as a part of this Pledge Agreement, or in any way limiting or affecting the language of any paragraph in this Pledge Agreement.

8)  PLEDGE CONSENT:  Where the consent of the Pledgee is required in

5

EXHIBIT _____ 1 _____

PAGE _____ 46 _____

FL 6512

this Agreement, in connection with actions proposed to be taken by Pledgor, such consent shall not be withheld or delayed unreasonably. Consent shall be deemed to have been given to any specific action by Pledgor if Pledgee has not responded to written request for such consent within fifteen (15) days after receipt of notice in accordance with paragraph 12.of this Agreement.

9] GENDER: In this Agreement, whenever the context so requires, the masculine gender herein written shall include the feminine or the neuter and the singular number shall include the plural.

10) TRUSTEE:

(a) Trustee, by its signature hereto, consents to act as Trustee hereunder upon the express understanding that it shall be solely responsible for the physical holding of the shares described herein, and shall deliver said shares of stock to Pledgee in the event of default as hereinabove provided, together with the attached assignment; or to Pledgor upon full satisfaction of the promissory note and obligations pursuant to the Agreement For Sale Of Stock, both above described.

(b) It is expressly understood that the duties and obligations of the Trustee are to be strictly limited to the foregoing, and the parties acknowledge that they do hereby hold Trustee free and harmless from any and all liability, costs, and expenses, including attorney's fees, by reason hereof, and that said parties shall and do hereby indemnify Trustee therefrom. Pledgor does hereby acknowledge that the stock being deposited with Trustee hereunder is deposited upon the joint risk of Pledgor and Pledgee. Any fees of Trustee for acting as Trustee.shall be paid by Pledgor.

(c) Trustee shall have the power to appoint, currently or prospectively, a successor Trustee to so serve under the terms of this Pledge

6

EXHIBIT 1

PAGE 67

FL 6513

Agreement in the event Trustee is unable or unavailable to so act.

11)     SUCCESSORS AND ASSIGNS:  This Pledge Agreement shall be binding upon the parties hereto, and upon their respective heirs, personal representatives, successors and assigns.

12)     NOTICES:  Any and all notices to be served on or given to either Pledgor or Pledgee hereto, shall be in writing and shall be deemed duly served and given when personally delivered to either of the parties or in lieu of such personal service, when deposited in the United States mail, first-class, postage prepaid, addressed to Pledgor at 237 North Carolwood Drive, Los Angeles, California 90077, or to Pledgee at 2142 Century Park Lane, #6108, Los Angeles, CA 90067.  Any and all notices to be served on or given to Trustee shall be in writing and shall be deemed duly served and given upon receipt by Trustee.

13)     GOVERNING LAW:  This Agreement shall be governed and interpreted in accordance with the laws of the State of California.


IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and year first above written.


PLEDGEE:                                PLEDGOR:


_____               _____
FARHAD LARIAN                           ISAAC LARIAN


                    TRUSTEE:


                    _____
                    MORAD ZARABI

                              7

EXHIBIT ____1____

PAGE ____68____

<u>CONSULTING AGREEMENT</u>

This Consulting Agreement is entered into this <u>1</u> day of <u>JAN</u> 2001, by and between ABC International Traders Inc., a California corporation ("Company") and Farhad Larian ("Consultant").

WHEREAS, CONSULTANT was a former shareholder, Director and employee of COMPANY.

WHEREAS, COMPANY desires to have CONSULTANT perform certain services on behalf of COMPANY as an Independent Contractor.

NOW, THEREFORE, for valuable consideration, it is hereby agreed by the parties hereto as follows:

1.    <u>TERM</u>

The term of this Agreement shall be for a period of five years, commencing January 1, 2001 and terminating December 31, 2005, unless earlier terminated as provided hereinafter.

2.    <u>SERVICES</u>

(a)  CONSULTANT agrees to provide and make himself available to perform general administrative services, at the request of COMPANY, and/or otherwise make himself available to COMPANY for consultation by telephone, for a total period of time not more than ten hours per month, during the normal

1.

EXHIBIT ___1___

PAGE ___69___

FL 6515

business hours of COMPANY.

(b)  COMPANY hereby acknowledges that during the term of this
Agreement, CONSULTANT may engage in any other business or professional activity
provided that such activity does not directly compete with the business of
COMPANY within Los Angeles County, California, and the performance of such
activity does not interfere with his present work as a consultant for COMPANY.

(c)  CONSULTANT hereby acknowledges that he is being employed
as an Independent Contractor to render the services described herein and that
CONSULTANT shall be solely responsible for any Federal and State Income Tax
withholding or Estimated Tax Payments that CONSULTANT may be required to file
and/or pay.

3.    COMPENSATION

For all services rendered by CONSULTANT under this Agreement,
COMPANY shall pay to CONSULTANT the sum of $7,500.00 per month payable on the
first day of each month of the term hereof.

4.    TERMINATION

This Agreement may be terminated by either party for cause or
for breach by the other party of any provision contained in this Agreement.
COMPANY may not terminate CONSULTANT for a breach of this Agreement until COMPANY
has furnished CONSULTANT with written notice of the breach contended by COMPANY
and CONSULTANT fails to cure said breach within ten (10) days of receipt of said
notice.

After five years from the date hereof but not before, this
Agreement may be terminated by COMPANY upon payment in full of the promissory
note given by Isaac Larian to CONSULTANT as part of the purchase of CONSULTANT'S
shares of COMPANY.

2.

EXHIBIT _____1_____

PAGE _____70._____

FL 6516

This Agreement may be terminated by CONSULTANT, at any time, without cause, upon giving COMPANY thirty (30) days prior written notice.

5.     TRADE SECRETS

CONSULTANT acknowledges and represents that the sources of COMPANY's services, techniques, methods, products, manufacturing techniques, manufacturing requirements, pricing, customer lists and vendor lists are a trade secret and the property of COMPANY. It is agreed that all such data is confidential and that it shall not be disclosed, directly or indirectly, or used by CONSULTANT in any way, except on behalf of COMPANY, either during the term of this Agreement or at any time thereafter.

6.     NOTICES

Any notice required or permitted to be given under this Agreement shall be sufficient if in writing and if sent by registered mail to the principal office of COMPANY or personal residence of CONSULTANT.

7.     COUNTERPARTS

The within Agreement may be executed in duplicate counterparts and each such signed duplicate counterpart shall be deemed to be an original.

8.     TITLES AND CONSTRUCTION

The titles of the paragraphs in this Agreement are set forth for convenience only. This Agreement shall not be construed or interpreted for or against either of the parties hereto by reason of its draftsmanship by either party.

9.     ASSIGNMENT

The rights, benefits, duties and obligations of COMPANY and CONSULTANT under this Agreement may not be assigned without the express written permission of the other.

3

EXHIBIT ____ 1 ____

PAGE ____ 71 ____

FL 6517

10. ARBITRATION

Any controversy between the parties arising out of this Agreement shall be submitted to Morad Zarabi who shall serve as sole arbitrator with respect to said disputes. If Morad Zarabi is unable to so act, Kambiz Zarabi is appointed arbitrator. Either arbitrator can select another person or entity to serve as arbitrator, either currently or prospectively, if neither of the above two named arbitrators are available to so serve. The decision of the arbitrator shall be final and binding upon both parties.

11. ATTORNEYS' FEES

If any action or any other proceeding is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default, or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party or parties shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action or proceeding, in addition to any other relief to which they may be entitled.

12. ENTIRE AGREEMENT

(a) This Agreement constitutes the entire Agreement between the parties and contains all of the agreement between the parties with respect to the subject matter hereof; this Agreement supersedes any and all other agreements, either oral or in writing, between parties hereto with respect to the subject matter hereof.

(b) No change or modification of this Agreement shall be valid unless the same be in writing and signed by the person or party to be charged.

13. GOVERNING LAW

This Agreement shall be subject to and governed by the laws of the State of California.

-4-

EXHIBIT ___1___

PAGE ___72___

FL 6518

DATED: JAN 1 , 2001

COMPANY:

CONSULTANT:

ABC INTERNATIONAL TRADERS INC.

Farhad Larian

FARHAD LARIAN

By:

Isaac Larian, President

5

EXHIBIT ___1___

PAGE ___73___

FL 6519

## MUTUAL RELEASE

For valuable consideration, receipt of which is hereby acknowledged:

1. Isaac Larian, an individual, and ABC International Traders Inc., a California corporation, and each of them, on behalf of themselves, their associates, owners, stockholders, predecessors, successors, heirs, assigns, directors, officers, partners, employees, representatives, and all other persons acting by, through, under, or in concert with them, or any of them, do hereby acquit, release and forever discharge Farhad Larian, an individual, and his spouse, associates, successors, heirs, assigns, agents, representatives, and all other persons acting by, through, under, or in concert with him or any of them, of and from any and all cause or causes of action, suits, claims, demands, obligations, liabilities, damages, liens, contracts, agreements, promises, losses, costs, or expenses of any nature whatsoever, known or unknown, fixed or in equity, from the beginning of time to the date hereof with the exception of those obligations imposed under the terms of the Agreement For Sale Of Stock between Isaac Larian and Farhad Larian for the sale by Farhad Larian of his shareholder interest in ABC International Traders Inc. to Isaac Larian and the agreements attached as Exhibits to the Agreement For Sale Of Stock.

2. Farhad Larian, an individual, on behalf of himself, his spouse, associates, successors, heirs, assigns, agents, representatives, and all other persons acting by, through, under, or in concert with him or any of them, do hereby acquit, release and forever discharge Isaac Larian, an individual, and ABC International Traders Inc., a California corporation, and each of them, their respective associates, owners, stockholders, predecessors, successors, heirs, assigns, directors, officers, partners, employees, representatives, and all other persons acting by, through, under, or in concert with them, or any of them, of and from any and all cause or causes of action, suits, claims, demands, obligations, liabilities, damages, liens, contracts, agreements, promises, losses, costs, or expenses of any nature whatsoever, known or unknown, fixed or in equity, from the beginning of time to the date hereof with the exception of those obligations imposed under the terms of the Agreement For Sale Of Stock between Isaac Larian and Farhad Larian for the sale by Farhad Larian of his shareholder interest in ABC International Traders Inc. to Isaac Larian and the agreements attached as Exhibits to the Agreement For Sale Of Stock.

3. The foregoing release is and shall be a release of all claims, whether known or unknown, and each of the undersigned parties waives all rights reserved to him, it or them, by Section 1542 of the Civil Code of the State of California, which provided, as follows:

"A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the Release which if known by him must have materially affected his settlement with the debtor."

4. This Release shall be binding on, and shall inure to the benefit of, the parties to it and their respective heirs, legal representatives, successors and assigns.

Exhibit "D"

FL 6520

EXHIBIT _____

PAGE _____ 74 _____

5.  Each of the undersigned individuals represents that he signs this Release with the express authority of the party on whose behalf he signs.

IN WITNESS WHEREOF, the parties hereto have executed this Release on the 4TH day of DECEMBER          , 2002

_____          _____
ISAAC LARIAN                      FARHAD LARIAN


ABC INTERNATIONAL TRADERS INC.

By: _____
    Isaac Larian, President

EXHIBIT ____1____

PAGE ____75____

FL 6521

## AMENDMENT TO AGREEMENTS

On December 4, 2000, Farhad Larian ("Farhad"), Isaac Larian ("Isaac"), ABC International Traders Inc., a California corporation ("ABC") and/or Morad Zarabi ("Morad") entered into one or more of the following agreements concerning or relating to the sale by Farhad to Isaac of Farhad's shareholder interest in ABC and MGA Entertainment Hong Kong Limited, a Hong Kong corporation:

        A.  Agreement For Sale of Stock.

        B.  Promissory Note.

        C.  Pledge Agreement.

        D.  Consulting Agreement.

        E.  Mutual Release.

The parties desire to amend the agreements as specifically provided herein, and in all other respects, ratify and confirm said agreements.

1.  Agreement For Sale of Stock.

        a.  There should be inserted as a second paragraph at section 12 on page 7 to read as follows:

        "BUYER shall, and shall additionally cause CORPORATION to, indemnify and hold SELLER harmless from and against any claim, suit, liability, cause of action or damages arising from or related to SELLER's employment by CORPORATION, ownership of the stock in CORPORATION and/or any personal guarantees given by SELLER in his capacity as a shareholder, officer or employee of CORPORATION, to the greatest extent permitted by law. The provisions of this paragraph shall survive any termination of this Agreement. In addition thereto, BUYER shall, and shall additionally cause CORPORATION to, utilize all commercially reasonable efforts to have SELLER removed as a guarantor of any of the obligations of CORPORATION.  Notwithstanding the above, SELLER shall remain personally liable on the SBA guarantee concerning the real property located at 16730 Schoenborn Street, North Hills, CA 91343".

        b.  There should be inserted at the end of section 14 on page 8 the following additional sentence:

        "BUYER shall execute in favor of Morad or any successor pledgeholder under the Pledge Agreement a limited proxy to vote his shares of CORPORATION for the purpose of electing Morad or any successor pledgeholder as a member of the board of directors of CORPORATION, so that Morad or the successor pledgeholder will serve in such capacity until such time as the promissory note issued by BUYER in favor of SELLER has been paid in full."

1

EXHIBIT _____

PAGE _____ 76

FL 6522

2. Promissory Note.

a. The date of making for purposes of interest accruals shall be January 1, 2001.

b. There shall be added as Exhibit "1" to the Promissory Note the amortization schedule for the $6,275,000.00 principal as attached hereto.

c. There shall be inserted the following additional paragraph between the first and second paragraphs:

"In the case of a sale of at least a majority of the shares of ABC International Traders Inc. ("ABC") by the maker hereof in a single transaction or in a series of related transactions; or the sale of at least a majority of ABC's assets in a single transaction or a series of related transactions, then, in any such case and notwithstanding anything to the contrary contained in this promissory note, all or a portion of the remaining unpaid principal and then accrued interest thereon shall then become due and payable in the same fractional proportion as determined by a fraction the numerator of which is the sale proceeds received and the denominator of which is the total value of ABC shares or assets, as the case may be. In the event of an exchange by the maker of shares of ABC for shares in another corporation, Morad Zarabi, designated arbitrator under the Agreement For Sale Of Stock between maker and beneficiary herein, shall determine, in his sole discretion, whether some or all of the newly acquired shares shall be transferred to beneficiary herein in payment of a portion of the promissory note; or whether said newly acquired shares shall instead be substituted for ABC shares under the Pledge Agreement executed between the maker, beneficiary and Morad Zarabi."

d. There shall be added the following additional paragraph to the Promissory Note:

"Notwithstanding any other provision of this Promissory Note, any controversy between the parties concerning or arising from the Promissory Note shall be submitted to Morad Zarabi who shall serve as sole arbitrator with respect to said disputes. The decision of Morad shall be final and binding upon both parties. In the event Morad is unavailable to so act, then Kambiz Zarabi shall serve as arbitrator. Any arbitrator may appoint another person or entity to arbitrate, either currently or prospectively, in the event that both named arbitrators herein are unable to so act."

3. Pledge Agreement.

a. There shall be added an additional section 14, as follows:
"14) ARBITRATION: Any controversy between the parties concerning or

2

EXHIBIT

PAGE          77

FL 6523

arising from this Pledge Agreement shall be submitted to Morad Zarabi who shall serve as sole arbitrator with respect to said disputes. The decision of Morad shall be final and binding upon all parties. In the event Morad is unavailable to so act, then Kambiz Zarabi shall serve as arbitrator. Any arbitrator may appoint another person or entity to arbitrate, either currently or prospectively, in the event that both named arbitrators herein are unable to so act."

   4. Consulting Agreement.

      a. There shall be added an additional section 14, as follows:
      "14. INDEMNIFICATION
            To the maximum extent provided by law, COMPANY shall indemnify and hold CONSULTANT harmless from and against any claim, suit, liability, cause of action or damages arising from or related to CONSULTANT's services under the terms of this agreement or the past services of CONSULTANT as an employee of COMPANY. The provisions of this paragraph shall survive any termination of this Agreement."

   In Witness Whereof, the parties execute this Amendment To Agreements on the $\frac{31}{}$ day of December, 2000.


_____
Farhad Larian


_____
Isaac Larian


ABC International Traders Inc.


By: _____
   Isaac Larian, President


_____
Morad Zarabi


3

EXHIBIT _____

PAGE _____ 78

FL 6524

EXHIBIT 2

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 3

## DECLARATION OF FARHAD "FRED" LARIAN

I, FARHAD LARIAN declare as follows:

1. I am over the age of 18 and have personal knowledge of the facts herein and could and would competently testify thereto.

2. By 1999, I had been business partners with my brother, Defendant Isaac Larian ("Isaac"), for over 20 years. Our company ABC International Traders, Inc. (subsequently renamed by Isaac MGA Entertainment, Inc.) designs, licenses, imports and distributes toys worldwide.

3. Some time before September 2000, Isaac came upon a very lucrative business opportunity for the company -- becoming the exclusive distributor of a new line of dolls called "Bratz." Isaac secretly negotiated for and on September 18, 2000, secretly finalized and obtained a worldwide license agreement making Isaac and the company the exclusive worldwide distributor of Bratz dolls and related products. (Attached hereto as Exhibit A is a true and correct copy of the Carter Bryant License Agreement. The signed version is in the possession of Isaac Larian.)

4. Just ten days later, on September 28, 2000, Isaac fraudulently induced me into signing the Arbitration Agreement that is the subject of the First Cause of Action, without disclosing the Bratz opportunity and license. Based on newspaper articles, the Bratz product line has already generated several hundred million dollars in revenues for the company and is expected soon to earn more than $1 billion annually for the company.

5. At the time Isaac sought my consent to the arbitration agreement, Isaac had managed to conceal from me his obtaining the Bratz license and other material information about the Company, and also hid from me his intention to continue to conceal such information during the arbitration.

6. Isaac's goal was to use the arbitration process to award him my equity interest in the Company at a severely undervalued price. Believing that Isaac had already disclosed to me, and would continue to disclose during the arbitration, all material financial information about the Company, and that there was nothing unknown to me that would affect the price of my stock, I

/// 

AA 154

1

EXHIBIT ___3___

PAGE ___84___

signed a written "Agreement to Arbitrate" dated September 28, 2000, ("Arbitration Agreement"), which, *inter alia*, appointed our Uncle, Mr. Morad Zarabi, as the arbitrator.

7.     During the course of the few meetings that were held pursuant to the Arbitration Agreement, Isaac continued to keep from me, and kept from Mr. Zarabi, the information he knew about the execution of the Bratz license agreement, and other vital material and financial information affecting the Company. This claim is set out in my Fourth Cause of Action for Fraud and Deceit in the Conduct of the Arbitration process.

8.     During the course of the arbitration hearings, which were halted without an award being issued, Isaac and I negotiated a resolution of our differences, which resulted in my selling my shares to Isaac under a written "Agreement for Sale of Stock" dated December 4, 2000, ("Stock Sales Agreement").

9.     I uncovered the truth about Isaac's fraud in the middle of 2002, and thereafter brought this suit.

10.     On August 25, 2003, I filed a Verified Complaint alleging ten common law and statutory causes of action. The 10 causes of action alleged in the Verified Complaint are: (1) Fraud and Deceit in the Inducement of the Arbitration Agreement; (2) Beach of Fiduciary Duties; (3) Fraud and Deceit in the Conduct of the Arbitration process; (4) Breach of the Implied Covenant of Good Faith and Fair Dealing; (5) Violation of Corporations Code §§ 25401, 25501; (6) Violation of Corporations Code §§ 25402, 25502; (7) Fraud and Deceit in the Inducement of the December 2000 Agreement; (8) Negligent Misrepresentation; (9) Violation of Business and Professions Code § 17200 et seq.; and (10) Rescission based on Mistake. I hereby reaffirm and incorporate by reference as though set out in full herein each and every statement therein.

11.     The principal allegation of the pending suit, set forth in the First Cause of Action, is that I was fraudulently induced by Isaac into executing the Arbitration Agreement. That is, Isaac tricked me into agreeing to arbitration, knowing that he had already concealed, and would continue to conceal during the arbitration process, the company's license for the Bratz product line and other material financial information about the company, thereby misrepresenting to me the value of Arbitration Agreement among other things. Had I known of this concealed   AA 155

2

EXHIBIT ____3____

PAGE ____85____

16.     Isaac misrepresents my claim when he states: "Here, plaintiff's allegations do not that plaintiff's consent to have his disputes decided by arbitration was induced by fraud." exactly what I allege in my First Cause of Action, entitled "Fraud & Deceit in the ement of Arbitration Agreement" (Verified Complaint p. 10). The allegations of the . ied Complaint make it plain that my principal contention in the First Cause of Action is that raudulently obtained my consent to the Arbitration Agreement by concealing and olding of material financial information about the company. (Verified Complaint ¶¶ 19-20)

17.     There was never any award by any arbitrator. Isaac suggests that I "submitted fraud claims to the arbitrator for decision on January 26, 2003" and that this court should send it to arbitration. I never asked for any arbitrator to decide my claim that *I was dulently induced into entering into the Arbitration Agreement and therefore the Arbitration ement should be set aside.* Nowhere do I allege in my Verified Complaint that I submitted sue of whether I was fraudulently induced into the Arbitration Agreement to an arbitrator. the demurrer, Isaac suggests that because I asked Morad to "rectify the situation" that the plaint supports Isaac's assertion that the fraud-in-the-inducement of the Arbitration eement has been submitted to arbitration. (Verified Complaint ¶. 29) I have not.

18.     In the motion to compel arbitration, Isaac states there was a "one-day hearing" and mitted a list of issues to the arbitrator. In fact, the so-called one-day hearing, was about an or two discussion. I never asked Uncle Morad to decide the issue of whether I had been dulently induced by Isaac into entering the Arbitration Agreement and whether it should be aside.

19.     Isaac suggests that the following written statement forms the basis to find that all id claims were submitted to the arbitrator: ·

>     "The December 2000 appraisal of MGA, which the arbitrator relied upon to
>
>     establish the value of MGA, was substantially understated as a result of Isaac
>
>     Larian's concealment of the Bratz doll license agreement. That license agreement
>
>     was material to the value of MGA but was not considered in setting MGA's value
>
>     because of the concealment from the arbitrator." Motion To Compel Ex. C.   AA 157

BKE:P427001.618

EXHIBIT    3

PAGE    86

20.     The request submitted to Mr. Zarabi dealt only with Isaac's failure to come forward with information *as part of the arbitration process*, and not whether there was fraudulent inducement in September 2000 of my consent to the Arbitration Agreement.   When I found out that Isaac had failed to disclose material information to the arbitrator, the first thing I did was to find out if such information had been disclosed and then told the arbitrator.   Absolutely nothing in that statement suggests that I had asked the arbitrator to *set aside the Arbitration Agreement altogether because it had been induced by fraud.*  And certainly, it does not say that all fraud claims are to be submitted to arbitration.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 1st day of November, 2003 at Los Angeles, California.

FARHAD LARIAN

AA 158

5

OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION

EXHIBIT    3

PAGE    87

EXHIBIT 4

### DECLARATION OF MORAD ZARABI

1          I, Morad Zarabi, hereby declare:

2          1.    I am the uncle of Plaintiff Farhad Larian and Defendant Isaac Larian. I served as their arbitrator from 2000 to the present. The facts set forth in this Declaration are of my own personal knowledge, and if called as a witness, I could and would testify competently thereto.

          2.    This Declaration is filed in opposition to Plaintiff Farhad Larian's Motion to Compel Production of Documents of Ernest Dutcher.

          3.    In September, 2000, I was selected as the arbitrator to arbitrate a dispute which had arisen between Farhad and Isaac concerning their joint ownership in ABC International Traders, Inc. ("ABC" herein). I was expressly authorized to determine whether either Farhad or Isaac was to sell his shares to the other and the purchase price and terms of payment for the shares.

          4.    Beginning in Fall of 2000, I gathered financial and other information and held hearings in my role as arbitrator. I engaged the services of National Business Appraisers, LLC ("National Business" herein) for the purpose of providing me with a valuation of ABC.

          5.    In December, 2000, I rendered my decision which was embodied in a written Agreement for Sale of Stock dated December 4, 2000. As reflected in the Sale Agreement, Farhad was to be seller and Isaac was to be buyer, the price was to be $8,775,000.00, payable $500,000.00 at the closing, with a promissory note in the amount of $8,275,000.00.

          6.    In Summer of 2002, Farhad alleged that Isaac concealed from Farhad and myself certain facts pertaining to a product line of ABC called the "Bratz doll," which allegedly was of great value and would have justified a substantially higher price for Farhad's shares.

          7.    Thereafter, I began gathering financial and other information from Farhad and Isaac. In early 2003, I again engaged the services of National Business for the purpose of providing me, for my consideration and review in connection with my duties as arbitrator, with a valuation of ABC based upon information that I gathered in 2002.

          8.    On or about February 7, 2003, I met with Farhad and Isaac to discuss the issues. I heard arguments from both sides and took the matter under submission. Prior to me rendering my decision, Farhad filed this instant action with the Court. I remain willing and able to

C:\Docs\Client Legent\International Trader - Lat\Larian\Opposition.wpd          9

HS 01285

EXHIBIT _____4_____

PAGE _____88_____

Sep-15-2004 12:35pm    From-HOWARTH                                    T-371  P.013/013  F-923
                        From Signature & Goldberg              8197583040       T-248  P.003/003  F-880

1    continue with my duties as arbitrator should the Court ultimately decide that the dispute be

2    arbitrated.

3        I declare under penalty of perjury, pursuant to the State of California, that the foregoing

4    is true and correct, and that this Declaration was executed on this 14 day of September, 2004,

5    at Encino, California.

6

7

8                                        MORAD ZARABI

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

    C:\Documents...\Trader...\Opposition.wpd            10

                    OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS

HS 01286

EXHIBIT ___4___
PAGE ___89___

EXHIBIT 5

TRANSCRIPT OF AUDIOTAPED MEETING WITH

ERNEST DUTCHER, APPRAISER

**CERTIFIED
COPY**

Reported by:

JOHANNA M. BENNETT

CSR No. 5263

JOB No. 888989

ESQUIRE DEPOSITION SERVICES
(323) 938-2461

EXHIBIT ____5____

PAGE ____90____

KRANE 0039

1

2

3

4

5

6

7

8

9

10

11      Transcript of Audiotaped Meeting with

12  Ernest Dutcher, transcribed in Temple City,

13  California, on Wednesday, September 10, 2003,

14  by JOHANNA M. BENNETT, Certified Shorthand

15  Reporter No. 5263.

16

17

18

19

20

21

22

23

24

25

2

ESQUIRE DEPOSITION SERVICES
(323) 938-2461

EXHIBIT ____5____

PAGE ____91____

KRANE 0040

```
1    KNOWN APPEARANCES:

2

3

4           MORAD ZARABI

5           A MALE VOICE

6           ERNEST DUTCHER

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
                                                          3
```

ESQUIRE DEPOSITION SERVICES
(323) 938-2461

EXHIBIT _____5_____

PAGE _____92_____

KRANE 0041

1

2

3          MR. ZARABI:  Today is February 7.  I have a

4    meeting with Mr. Ernest.

5          MR. DUTCHER:  Ernest Dutcher.

6          MR. ZARABI:  Ernest, and -- today is February

7    7.  I have a meeting with Mr. Ernest and the gentleman,

8    he appraised ABC or MGA International and he allow me to

9    tape this conversation for the future if use it, if we

10   need it, even in the court.

11          Will you please say your name and everything,

12   please.

13          MR. DUTCHER:  My name is Ernest E. Dutcher.  My

14   designation is master certified business appraiser, and

15   my office is in Encino, California.

16          I received the instruction to provide a limited

17   letter report which means that the -- the valuation was

18   conducted in a manner that would be required for an

19   eventual full narrative report.

20          And at the time -- at the time of the appraisal

21   of December 31, 1999, I relied on information given to

22   me by management, and we provided the report and we've

23   come -- we've used three methodologies in trying to

24   determine or estimate the value of the company.

25          MR. ZARABI:  Mr. Ernest, I have a question for

4

EXHIBIT _____ 5 _____

PAGE _____ 93 _____

KRANE 0042

1   you.

2        MR. DUTCHER:  Uh-huh.

3        MR. ZARABI:  Have you appraised any toys

4   company before?

5        MR. DUTCHER:  I would have to research that

6   because I've been in this business for approximately 25

7   years, and I worked for some major companies and I'm

8   sure that during that time that that type of company

9   probably was one of the thing we did.

10        I can't say for sure, but I will say this, that

11   almost every company that is appraised is done almost

12   the same way.  It typically has many methodologies that

13   are available to the appraisers such as:  The income

14   approach, the market approach and the excess earnings

15   approach is three of them.  And that's the three I used

16   in doing this particular report.

17        And the reason that we can do it that way

18   instead of like one methodology -- one -- almost every

19   company that's appraised is appraised based on its

20   future earning potential.

21        And the fact that it's a toy company or a

22   manufacturer of doors and windows, it doesn't matter

23   because the basic bookkeeping, the basic financial

24   statements and so forth all resemble one another.

25        And based on that fact that we go through the

5

EXHIBIT _____5_____

PAGE _____94_____

KRANE 0043

1   potential of the company, we review the industry, which

2   in this case was rather, as I remember, rather volitile

3   at the time and probably still is, it's kind of a

4   volitile industry, up and down.

5           And so we felt and I still believe that we are

6   eminently qualified to do the job.

7           MR. ZARABI:  Okay.  My second question is:

8   Are you either, ah, licensee in this company?  Are you

9   base your appraisal is -- my (inaudible) there is the

10  (inaudible), if you see the licensee or you didn't see

11  the licensee affecting the appraisal or not?

12          MR. DUTCHER:  The licensee is a method to keep

13  the revenues rolling into the company.  We assume that

14  the licensee -- the license, which, by the way, can be

15  valued individually, with individual effort.  It would

16  not give the answers that you are looking for in this

17  appraisal.  You needed the overall value of the company

18  to determine what the buyout value of a 40 -- 45-percent

19  interest was.

20          It would serve no purpose to have a value of

21  each of the licenses.  And One other thing, licenses in

22  the toy industry, because of the fact that each toy

23  that's been designed has a quite a short life and there

24  has to be probably a lot of different licenses, so it

25  actually would be beyond the scope of what we were doing

6

EXHIBIT ___5___

PAGE ___95___

KRANE 0044

```
 1    to try to evaluate each individual license.

 2              MR. ZARABI:  All right.  I'm sure.

 3              A MALE VOICE:  I'm sorry.  (Inaudible) Jerard.

      I'm going to ask you a few questions myself.
 4

 5              MR. DUTCHER:  Sure.

 6              A MALE VOICE:  You said that the valuation was

 7    done December 31, 1999 or was that --

 8              MR. DUTCHER:  Date of value.

 9              A MALE VOICE:  In '99 you valued, end of '99

10    you valued or August or September of 2000?

11              MR. DUTCHER:  No.  That wasn't when I

12    valued it.  Somewhere probably in the mid -- I think

13    perhaps in July or August I probably received the

14    order.  I'd have to pull more of the file.  I didn't

15    have time to pull it all.

16              MR. ZARABI:  November -- the very first year

17    appraisal --

18              A MALE VOICE:  The appraisal is dated November

19    7, 2000, so your -- your --

20              MR. DUTCHER:  Let me see that.  I might be

21    looking at a different one.  I was looking at the first

22    one.  November 7, 2000.

23              A MALE VOICE:  So you --

24              MR. DUTCHER:  No, no, no, no.  The date of

25    valuation is December 31, 1999.  I have no right to use
```

                                                            7

EXHIBIT ___5___

PAGE ___96___

KRANE 0045

```
 1    anything that happened after that date.  Unless we move
 2    this date up to December 31, 2000, I couldn't consider
 3    anything that happened subsequent to this date.
 4            A MALE VOICE:  Okay.  So that's when the
 5    valuation was done?
 6            MR. DUTCHER:  That's the date --
 7            A MALE VOICE:  And you met with who for this
 8    valuation?
 9            MR. DUTCHER:  I met with Morad and I met with
10    the two shareholders.
11            A MALE VOICE:  The two main shareholders?
12            MR. DUTCHER:  Yes.
13            A MALE VOICE:  Isaac and Farhad?
14            MR. DUTCHER:  Right.
15            A MALE VOICE:  You met with both of them?
16            MR. DUTCHER:  With both of them one time, as I
17    recall.
18            A MALE VOICE:  At the same time, meeting in the
19    same meeting?
20            MR. DUTCHER:  Yes.
21            A MALE VOICE:  So you never had a separate
22    meeting with Farhad or Isaac, separately --
23            MR. DUTCHER:  I don't think so.  I do recall
24    it's back a ways, but I don't remember having any
25    separate valuations -- separate meetings.
```

8

EXHIBIT __5__

PAGE __97__

KRANE 0046

```
 1              A MALE VOICE:  And you had it sitting with both
 2    of them?
 3              MR. DUTCHER:  At the same time and I think
 4    Morad was present?
 5              A MALE VOICE:  Were you present at that
 6    meeting?
 7              MR. ZARABI:  I don't remember.  I don't recall.
 8              A MALE VOICE:  So you --
 9              MR. ZARABI:  I don't remember, when you say --
10              A MALE VOICE:  But you didn't have a separate
11    meeting with Isaac?
12              MR. DUTCHER:  I don't -- no, I don't think so.
13              A MALE VOICE:  Okay.  And --
14              MR. ZARABI:  Have you had a meeting with the
15    controller?
16              A MALE VOICE:  Did you have meetings with the
17    accounting people?
18              MR. DUTCHER:  Was it a lady?
19              MR. ZARABI:  A lady or a guy.
20.             MR. DUTCHER:  Just to give them the information
21    I needed to provide the report.
22              A MALE VOICE:  Okay.  What information, may I
23    ask, you asked them to give you?
24              MR. DUTCHER:  The financial data is for five
25    years.  I believe --

                                                        9
```

EXHIBIT _____5_____

PAGE _____98_____

KRANE 0047

```
 1        A MALE VOICE:  Last five years?
 2        MR. DUTCHER:  The prior five years --
 3        A MALE VOICE:  Right.
 4        MR. DUTCHER:  -- ending December 31, 1999.
 5        A MALE VOICE:  Okay.
 6        MR. DUTCHER:  And then kind of a tour of the
 7   facilities and general description of what the business
 8   was and the fact I was not providing a full narrative
 9   report, the actual detailed description of the market
10   and so forth was not included with the report.  We have
11   what we call a phase 1 and a phase 2 in our appraisals.
12        The phase 1 covers a letter report which is not
13   a full narrative report.  The letter report is
14   restricted -- is restricted to providing the financial
15   data only.
16        A MALE VOICE:  Uh-huh.
17        MR. DUTCHER:  -- with this minimal description
18   of the data and that is typically enough for a
19   friendly --
20        A MALE VOICE:  Break up.
21        MR. DUTCHER:  Yeah.  -- for a friendly break
22   up.
23        A MALE VOICE:  So phase 1 would be for a
24   friendly buyout?
25        MR. DUTCHER:  Yes.
```

10

EXHIBIT 5

PAGE 99

KRANE 0048

```
 1              A MALE VOICE:  And phase 2 would be?
 2              MR. DUTCHER:  Phase 2 would be in case any
 3    litigation was needed, and so forth, phase 2 had to be
 4    created and it can be done at any time.
 5              A MALE VOICE:  So for this purpose you only did
 6    a phase 1?
 7              MR. DUTCHER:  Phase 1, correct.
 8              A MALE VOICE:  Okay.  So --
 9              MR. ZARABI:  Let me ask a question.  The time
10    for the having meeting with Isaac, Farhad and his
11    controller or anybody in the MGA or ABC Corporation, did
12    they cooperate completely with you or not?
13              MR. DUTCHER:  They seemed to.  They seemed to
14    describe the business and so forth.  I had no reason to
15    believe that there was any problem between them and it's
16    not our --
17              MR. ZARABI:  Did you feel that anything they're
18    hiding for you something?
19              MR. DUTCHER:  I didn't get any -- any such
20    feeling, no.
21              MR. ZARABI:  No?
22              MR. DUTCHER:  I felt that everything was above
23    board.
24              A MALE VOICE:  I have further questions.
25              When you determined your future -- the

                                                            11
```

EXHIBIT ___5___

PAGE ___100___

KRANE 0049

```
 1    future -- I mean, how did you determine the cost -- I
 2    mean, did they give you any projections for the future
 3    of the sales of this company?
 4         MR. DUTCHER:  Typically I ask for their opinion
 5    of what the future can be, and I just don't remember.
 6    I'd have to go back and research the file completely,
 7    and -- and if I didn't ask for them, it would be
 8    unusual.
 9         MR. ZARABI:  So you must have asked for them
10    and you would have kept --
11         MR. DUTCHER:  My guess, my best guess would be
12    that I would have asked what they thought the future was
13    because my -- again, as I repeat, in appraising is
14    not -- the value of the company doesn't lie on what it
15    has done.  It lies in what the future holds for that
16    company.
17         MR. ZARABI:  As well, yes.
18         MR. DUTCHER:  So very few people would invest
19    in Enron right now because it was a wonderful company in
20    the past.
21         MR. ZARABI:  Right.
22         MR. DUTCHER:  Right now it has zero value.  So
23    we try our best to get a forecast from the responsible
24    people, marketing, so forth, try to get a feel for what
25    they think that the future holds for the business.
```

12

EXHIBIT 5

PAGE 101

KRANE 0050

1    In addition, we check to see what the market

2    is, like our market approach consists of looking into

3    various public companies that are involved in the same

4    business such as Mattel and so forth. We have a number

5    of them listed in the report.

6    We can get a feel for the -- actually, the toy

7    market or that type of market in general from that --

8    from that. From -- from these sources, we then come up

9    with a conclusion of value based on our experience and

10   estimating what the likelihood of the continuation of

11   the company and whether it has any value related to the

12   future. And the income approach and the other

13   approaches provide that for me.

14       A MALE VOICE: I just have a couple of

15   questions.                    Number one, you said that you

16   met with both of them. Would you have written that in

17   your paperwork if you had met with both of them?

18       MR. DUTCHER: Probably. If I -- I could go

19   back and research that because I usually keep track for

20   my time.

21       A MALE VOICE: I would like you, please, to do

22   that, doublecheck and make sure in that meeting when you

23   sat and gave them -- you wanted to sit down and discuss

24   with them, I want to make sure that both of them were

25   there or not, whether Fahrad's there or not. I just --

13

EXHIBIT 5

PAGE 102

KRANE 0051

```
 1          MR. DUTCHER:  Yes.

 2          A MALE VOICE:  Are you sure?

 3          MR. DUTCHER:  I'm positive they are both there

 4   because Morad took me over to the location, which is

 5   over behind the airport somewhere.

 6          A MALE VOICE:  Right.

 7          MR. DUTCHER:  And I remember going in and

 8   meeting both of them at the time.

 9          A MALE VOICE:  And sitting in the same meeting

10   with both of them present, when they were giving you

11   projections for the future?

12          MR. DUTCHER:  I think it all happened in the

13   same meeting.  I don't think there was more than one

14   meeting on gathering the information directly from the

15   people.

16          A MALE VOICE:  So, then, basically they both

17   sat there and gave you --

18          MR. ZARABI:  All the information.

19          A MALE VOICE:  -- all the information of what

20   they thought?

21          MR. DUTCHER:  That's my -- that's my

22   recollection of it, yes.

23          A MALE VOICE:  If you could go back and

24   doublecheck, we appreciate --

25          MR. DUTCHER:  I'll check the company notes on
```

                                                      14

EXHIBIT _____5_____

PAGE _____103_____

KRANE 0052

```
 1    it, yes.

 2            A MALE VOICE:  -- if you can send a letter on

 3    that.

 4            And secondly, again, going back to that same

 5    meeting, report of the potential future sales, you think

 6    both of them gave you that or was one of them more vocal

 7    than the other one?

 8            MR. DUTCHER:  No, I don't remember any -- I

 9    don't remember any outstanding big shining potential

10    that they brought out other than --

11            LEFT2:  (Inaudible.)

12            MR. DUTCHER:  -- doing in a normal course of

13    business.

14            A MALE VOICE:  So you just basically took the

15    normal increases on a yearly basis and that's what you

16    did?

17            MR. DUTCHER:  Yes.  Yes.

18            MR. ZARABI:  Let me ask a question.

19            MR. DUTCHER:  Uh-huh.

20            MR. ZARABI:  Even the time you -- first of all,

21    how long you have experience for the appraising the

22    business, completely?  10 years?  20 years?

23            MR. DUTCHER:  I have 20, 25 years.

24            MR. ZARABI:  20 years.

25            MR. DUTCHER:  I've owned my own businesses and
```

15

EXHIBIT ___5___

PAGE ___104___

KRANE 0053

1    I've --

2            MR. ZARABI:  And you -- because of your

3    conversation you say every court of law accept your

4    appraisal, right?

5            MR. DUTCHER:  I've never found one that didn't.

6            MR. ZARABI:  Okay.

7            MR. DUTCHER:  I've never been denied a position

8    of expertise.

9            MR. ZARABI:  My final question is:  If the

10   contract came to the table by September 18, year 2000 --

11           A MALE VOICE:  This was a license of September

12   18, 2000.

13           MR. DUTCHER:  Okay.

14           MR. ZARABI:  If you have on the table --

15           MR. DUTCHER:  Uh-huh.

16           MR. ZARABI:  -- with the other licensees, it

17   was affecting the price or no?

18           MR. DUTCHER:  It could have, but I'd have to

19   have a lot more information.  I can't say it wouldn't.

20           A MALE VOICE:  (Inaudible) check each license.

21           MR. ZARABI:  You never check any license?

22           A MALE VOICE:  He never checked any license.

23           MR. DUTCHER:  However, if there was one that

24   was really, really outstanding.

25           A MALE VOICE:  Did you check each license?

16

EXHIBIT 5

PAGE 105

KRANE 0054

```
 1          MR. DUTCHER:  No.

 2          A MALE VOICE:  No, you didn't.

 3          MR. DUTCHER:  No.

 4          A MALE VOICE:  And none of them were furnished

 5   to you?

 6          MR. DUTCHER:  Another thing, to answer that

 7   probably better, we know that through the period of the

 8   company, let's take a look at the --

 9          MR. ZARABI:  The (inaudible) --

10          MR. DUTCHER:  -- history.  Let's go back here

11   five years.  In 1995, we had 64 million in revenues.  In

12   1996 it dropped to 46 million in revenues.

13          In 1997 it recovers somewhat to 55 million in

14   revenues but dropped to 40 million, you know, that's a

15   big drop, by 1998.  Then it jumped in 1999 to 66 million

16   which told me this:  That at times they had a hot

17   product.  A hot product here, and they probably had a

18   hot product here --

19          A MALE VOICE:  In '97.

20          MR. DUTCHER:  -- another hot product here --

21          A MALE VOICE:  In --

22          MR. DUTCHER:  -- which we picked up here, and

23   then for the future it says, "These hot products will

24   come and go because the toy business is that way."

25          I don't say that because I know the toy
```

                                                          17

EXHIBIT ____5____

PAGE ____106____

KRANE 0055

```
 1    business itself.

 2              A MALE VOICE:  Uh-huh.

 3              MR. DUTCHER:  But I do know when you see an

 4    industry, there is such volatility --

 5              A MALE VOICE:  Volatility in the sales.

 6              MR. DUTCHER:  -- that tells the appraiser, that

 7    you better be careful on how much growth you are

 8    forecasting into the future because that is the basis of

 9    your value.

10              A MALE VOICE:  How much growth did you --

11              MR. DUTCHER:  And I think the growth was

12    probably estimated at 5 percent.  Yes.

13              A MALE VOICE:  Yes.

14              MR. DUTCHER:  We forecast a growth of 5 percent

15    a year because you know with that much -- a big jump and

16    a big drop and a big jump, there is no one on earth that

17    can forecast with any degree of accuracy of what's

18    really going to happen.

19              MR. ZARABI:  With your experience, there is any

20    way you can imagine this sale after two years instead of

21    5 percent jump to 25 percent?

22              MR. DUTCHER:  Well, I would say that --

23              A MALE VOICE:  Possible because --

24              MR. ZARABI:. (Inaudible.)

25              MR. DUTCHER:  -- might do that, but I recognize
```

18

ESQUIRE DEPOSITION SERVICES
(323) 938-2461

EXHIBIT 5

PAGE 107

KRANE 0056

1 | that, that it did do that. It jumped from 40 to 60.

2 | That's a huge jump and then it dropped back to 40. No,

3 | and that --

4 |     MR. ZARABI: It was not established company the

5 | way you see it?

6 |     MR. DUTCHER: Pardon?

7 |     MR. ZARABI: It was not established number

8 | company.

9 |     MR. DUTCHER: Well, the only thing I see is a

10 | begun of of hot products that came along, hot products

11 | that boosted it temporarily, but it didn't have a long

12 | life.

13 |     A MALE VOICE: I have another question for

14 | you. And this is I think that I would like to ask you

15 | somewhat of your experience not relating to this.

16 |     What happens when you value a company and then

17 | the company goes drastically lower in sales? So let's

18 | say they were doing an average of 60 and 70, went down

19 | to 20? What happens to them?

20 |     MR. DUTCHER: What happens to them is not

21 | important at the time I do the appraisal because we

22 | don't know what's going to happen to them.

23 |     We only can say based on history that the trend

24 | has been up, but how can you forecast anything when the

25 | trend is up and down and up and down.

19

EXHIBIT __5__

PAGE __108__

KRANE 0057

```
 1          You could -- I could -- even if I knew the

 2   company went bankrupt the next year, I would still have

 3   to put the valuation based on what I could see if I was

 4   there on December 31, 1999.

 5          A MALE VOICE:  Right.

 6          MR. DUTCHER:  I could not change my opinion

 7   based on a subsequent event.

 8          A MALE VOICE:  Who gave you the authorization

 9   to go up to December 31, 1999?

10          MR. DUTCHER:  I think it was --

11          A MALE VOICE:  Morad?

12          MR. DUTCHER:  I think you had said --

13          A MALE VOICE:  Morad said to him that the

14   valuation has to be as of December 31 --

15          MR. ZARABI:  December 31, 1999.

16          A MALE VOICE:  I think (inaudible) I have a

17   question, from whatever happens?

18          MR. ZARABI:  I didn't have the experience to

19   say to --

20          A MALE VOICE:  (Inaudible.)

21          MR. ZARABI:  -- 1999, but I don't remember but

22   you said based on your experience, you go to the 1999,

23   correct?

24          MR. DUTCHER:  Well --

25          MR. ZARABI:  Because I don't remember --
```

                                                              20

EXHIBIT ___5___

PAGE ___109___

KRANE 0058

```
 1          MR. DUTCHER:  -- because 1999 was a full year.
 2   December 31st was a full year.
 3          A MALE VOICE:  Yes.
 4          MR. DUTCHER:  And had we done a midyear which
 5   we could do --
 6          MR. ZARABI:  Uh-huh.
 7          MR. DUTCHER:  -- I would do one as of the date
 8   of that appraisal.
 9          MR. ZARABI:  Because of the full·year you had
10   the financial --
11          MR. DUTCHER:  Of course.
12          MR. ZARABI:  -- for 1999 --
13          MR. DUTCHER:  Of course.
14          MR. ZARABI:  -- you base it as of 1999?
15          MR. DUTCHER:  That is correct.
16          MR. ZARABI:  Even --
17          A MALE VOICE:  That was the record that they
18   could furnish him.  They couldn't furnish him -- if he
19   went there in September or October, he couldn't have
20   gotten information of what has happened in that -- in
21   that year because they wouldn't know because there would
22   be no physical audited information.  The only audited
23   information was end of ·99.
24          MR. DUTCHER:  Plus the fact usually toward the
25   end of the year, there's year-end adjustments and things
```

                                                        21

EXHIBIT ___5___

PAGE ___110___

KRANE 0059

```
 1    of that sort that happen.

 2            So we have had -- we can do appraisals due at

 3    the midyear, but we put lower weight on that simply

 4    because it's speculation.

 5            A MALE VOICE:  Not (inaudible).

 6            MR. ZARABI:  Robert says after (inaudible) base

 7    of the company going down instead of 50 million

 8    business, comes to the $20 million which is the

 9    (inaudible) assets.  Now I'm --

10            A MALE VOICE:  That's the valuation --

11            MR. DUTCHER:  If it went down the following

12    year, it would not change the valuation because I would

13    have to change the date of value.

14            A MALE VOICE:  Okay.  And then would any court

15    be able to cancel the contract because of that reason?

16            MR. DUTCHER:  If there were -- if the event,

17    the sale took place based on the appraisal and the

18    appraisal date was December 31, 1999, I could see no way

19    that they can rule any other way accept to state that

20    what happened in 1999, December 31, then prior to that

21    was the only thing that we can use.

22            A MALE VOICE:  But don't you think that if --

23    if there was things going on in December or even

24    January, but you had -- but in fact you had your

25    appraisal done six months to eight months later --
```

                                                            22

EXHIBIT ___5___

PAGE ___111___

KRANE 0060

```
 1        MR. DUTCHER:  Uh-huh.
 2        A MALE VOICE:  -- the fact still remains that
 3   they would have known the trend for the following year,
 4   and they would have been able to tell you that in their
 5   meeting, wouldn't you -- they?
 6        MR. DUTCHER:  Well, I would think so.  It -- if
 7   there was something on the horizon that was unusual, I
 8   would think they would have brought it out at that
 9   meeting.  I don't remember that.
10        A MALE VOICE:  Let's take it --
11        MR. ZARABI:  Opposite way.
12        A MALE VOICE:  -- the opposite way, okay?
13        MR. ZARABI:  Say, the dates are to which date
14   is this affecting.
15        A MALE VOICE:  The question is this:  In the
16   year 2000, let's take it the other way now, instead of
17   it going to 60 average million in sales it suddenly
18   jumped to 90 or 80 or 90 and probably jumps the year
19   after to a hundred and the following year jumps to
20   200,000 -- $200 million.
21        MR. DUTCHER:  Well, in other words, we can only
22   base our judgment on what has historically happened in
23   the past.  Typically, if we were to give an estimate out
24   in the future that it was going to grow at some
25   astronomical rate, we'd have to put a heavy discount
```

23

EXHIBIT 5

PAGE 112

KRANE 0061

```
 1  rate on that, on the probability or possibility it may
 2  not happen.
 3          So we used a discount rate here of 20.75
 4  percent which was probably based on the fact it was --
 5  even this number was -- had some risk in reaching it.
 6  In other words, that discount rate is a --
 7          MR. ZARABI:  But the final question is:  You
 8  appraise this company based on fairness, based on your
 9  experience.
10          There is any influence from either party, me --
11  I'm Morad, Isaac, Farhad, (inaudible), anything that is
12  affecting your appraisal or no?
13          MR. DUTCHER:  I would say that there was not
14  iota of pressure put on me one way or the other by
15  either yourself or the other two parties to have a
16  higher or lower number.
17          This is precisely my opinion of value at that
18  time and was not influenced by anyone else's input
19  except for the financial part of it.
20          MR. ZARABI:  Okay.  I thank you very much.  I
21  really appreciate it for you coming over here.
22          A MALE VOICE:  We might need you --
23          MR. ZARABI:  We might meet again.  Maybe we ask
24  you for the subpoena in the court of law, and I hope we
25  expecting to your cooperation.
```

                                                        24

EXHIBIT 5

PAGE 113

KRANE 0062

1

```
 1          MR. DUTCHER:  There's no question.  It's part
 2    of my job.
 3          MR. ZARABI:  Thank you very much and thanks
 4    again.
 5          MR. DUTCHER:  Okay.
 6                     *         *          *
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                                        25
```

ESQUIRE DEPOSITION SERVICES
(323) 938-2461

EXHIBIT ___5___

PAGE ___114___

KRANE 0063

1

2

3

4

5          I, the undersigned, a Certified Shorthand

6    Reporter of the State of California, do hereby certify:

7          That the foregoing audiotaped proceedings

8    were listened to and taken down by me using machine

9    shorthand which was thereafter transcribed under my

10   direction; further, that the foregoing is an accurate

11   transcription thereof.

12         I further certify that I am neither

13   financially interested in the action nor a relative or

14   employee of any attorney of any of the parties.

15         IN WITNESS WHEREOF, I have this date

16   subscribed my name.

17

18   Dated: _____ SEP 1 1 2003 _____

19

20

21           _Johanna M. Bennett_
             JOHANNA M. BENNETT
22           CSR No. 5263

23

24

25

EXHIBIT ___5___

PAGE ___115___

KRANE 0064