EXHIBIT 8

Wachovia Corporation
Legal Division
NC0630
One Wachovia Center
301 South College Street
Charlotte, NC 28288

Tel 704 374-6611

Fenita M. Shepard
Vice President
Assistant General Counsel
Direct Dial 704-383-4448
Fax 704-383-0649
fenita.shepard@wachovia.com



**WACHOVIA**

November 15, 2005

<u>VIA FAX AND US MAIL</u>
Robert G. Wilson, Esq.
Cotkin, Collins, & Ginsburg
300 South Grand Avenue, 24th Floor
Los Angeles, CA 90071-3134

RE:   LARIAN V. LARIAN ARBITRATION

Dear Mr. Wilson:

Not only do I concur with Mr. Feldman's position, but also there is absolutely no way that I can produce the documents to you by tomorrow. There are three (3) boxes of loan documents that need to be reviewed for responsiveness and privilege. Only after such a review, can these documents be made available.

Also, Mr. Laughton will be on vacation from November 21, 2005 through November 28, 2005. Please let me know if you are agreeable to a stipulation as to the authenticity of the documents so that Mr. Laughton will not have to appear. Otherwise, please let me know when, this week, you will need Mr. Laughton to testify.

Very truly yours,

Fenita M. Shepard

Cc:   Richard L. Kellner, Esq.
      Robert M. Turner, Esq.

CC 00570

EXHIBIT _____ B

PAGE _____ 270

Wachovia Corporation
Legal Division
NC0630
One Wachovia Center
301 South College Street
Charlotte, NC 28288

Tel 704 374-6611

Fe'   M. Shepard
Vice President
Assistant General Counsel
Direct Dial 704-383-4448
Fax 704-383-0649
fenita.shepard@wachovia.com



**WACHOVIA**

November 15, 2005

**VIA FAX AND US MAIL**
Robert G. Wilson, Esq.
Cotkin, Collins, & Ginsburg
300 South Grand Avenue, 24th Floor
Los Angeles, CA 90071-3134

RE:   LARIAN v. LARIAN ARBITRATION

Dear Mr. Wilson:

It is my understanding that the Defendants in the above referenced matter have filed a Motion to Quash ("Motion") seeking to quash the third party subpoena (duces tecum) served on Bruce Laughton, an employee of Wachovia Bank, N.A.  Without waiving any objections it may have to the third party subpoena, Wachovia Bank, N.A. will await a ruling from the Arbitration panel on Defendant's Motion before it responds to the subpoena.  Should you wish to discuss this further, please feel free to contact me.

Very truly yours,

Fenita M. Shepard
Fenita M. Shepard

Cc:   Richard L. Kellner, Esq.
Robert M. Turner, Esq.

**CC 00571**

EXHIBIT ___8___

PAGE ___229___

EXHIBIT 9

RightFAX                    8/30/2007 2:34    PAGE 002/006    Fax Server

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
Priority _____ Send _____
Entered _____ Closed _____
JS-5/JS-6 _____ JS-2/JS-3 _____
Scan Only_____ Docketed on CM _____
_____ THIS CONSTITUTES NOTICE OF
ENTRY AS REQUIRED BY FRCP 77(d)

8/29/07

EASTERN DIVISION
BY _____ DEPUTY

**PRIORITY SEND**
& ENTERED

## UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
CIVIL MINUTES -- GENERAL

Case No.    CV 04-09049 SGL (RNBx)                    Date:  August 27, 2007

Title:    CARTER BRYANT -v- MATTEL, INC.
          AND CONSOLIDATED ACTIONS
==================================================================

PRESENT:   HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

          Gina L. Guzman                      Theresa Lanza
          Courtroom Deputy Clerk              Court Reporter

ATTORNEYS PRESENT FOR CARTER          ATTORNEYS PRESENT FOR MATTEL:
BRYANT:

John W. Keker, Esq.                    John B. Quinn, Esq.
(morning session only)                 Michael T. Zeller, Esq.
                                       Jon D. Corey, Esq.

ATTORNEYS PRESENT FOR MGA:

Patricia Glaser, Esq.
Diana M. Torres, Esq.

PROCEEDINGS:    **ORDER DENYING MOTION FOR TERMINATING SANCTIONS;**
                **ORDER DENYING REQUEST FOR INTERLOCUTORY**
                **APPEAL; ORDER REQUIRING FILING OF AFFIDAVITS RE**
                **EVIDENCE PRESERVATION**

    This matter is before the Court on MGA's and Carter Bryant's Motion for Terminating
Sanctions, filed on July 24, 2007 (docket #689). This matter was heard on August 27, 2007, at
which time it was taken under submission. The Court has considered the moving, opposition, and
reply briefs, as well as the many declarations and other evidence presented by the parties. The

MINUTES FORM 90                              Initials of Deputy Clerk _ glg
CIVIL -- GEN                                 Time: 02/52
                              1              Docket No. 895

EXHIBIT        9

PAGE        230

Court has also considered the arguments presented at the August 27 hearing and the sworn
testimony given by Michael C. Moore, in-house counsel for Mattel. Although at the hearing the
Court indicated it would defer ruling on the present motion pending further filings by all parties
regarding their efforts to preserve evidence, upon further reflection the Court sees no reason to
delay ruling on the current motion.[1]  As set forth below, the Court DENIES the motion.

Based on their inherent power to sanction for "abusive litigation practices," district courts
may impose sanctions against a party who destroys evidence, including the ultimate sanction of
dismissal. Leon v. IDX Systems Corp., 464 F.3d 951, 958 (9th Cir. 2006). Dismissal is a harsh
sanction, which may nonetheless be imposed upon those parties who have "engaged deliberately
in deceptive practices that undermine the integrity of judicial proceedings." Anheuser-Busch, Inc.
v. Natural Beverage Distributors, 69 F.3d 337, 348 (9th Cir. 1995). However, before imposing the
ultimate sanction of dismissal, district courts should consider five factors: "(1) the public's interest
in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of
prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their
merits; and (5) the availability of less drastic sanctions." Id. Nevertheless, district courts need not
make explicit findings regarding each of these factors and, in any event, "a finding of willfulness,
fault, or bad faith is required for dismissal to be proper." Leon, 464 F.3d 951, 958 (9th Cir. 2006)
(internal quotation marks and citation omitted).

"A party's destruction of evidence qualifies as willful spoliation if the party has 'some notice
that the documents were potentially relevant to the litigation before they were destroyed.'" Id. at
959 (quoting United States v. Kitsap Physicians Serv., 314 F.3d 995, 1001 (9th Cir. 2002) (finding
no willful spoliation where documents were destroyed in the routine course of business)). Neither
Leon nor Kitsap elaborate on when a party has the "notice" necessary to trigger the duty to
preserve evidence. However, in In re Napster, Inc. Copyright Litigation, 462 F.Supp.2d 1060,
1068 (N.D. Cal. 2006), the district court presented a persuasive discussion of the standard, first
rejecting an argument that the duty to preserve evidence arises only when litigation is "imminent,"
and then setting forth a lesser standard. Specifically, the Napster court noted that the duty arose
"when a party should have known that the evidence may be relevant to future litigation," and that
any such "future litigation" must be "probable," and not merely "possibl[e]." (internal quotation
marks and citation omitted).

Keeping in mind these standards, the Court turns to the categories of evidence MGA and
Bryant allege that Mattel has despoiled. As articulated by the Court at the hearing on this matter,
those categories are (1) Mattel employees' emails, (2) documents maintained on the Zeus
document storage system, (3) the delay in producing certain Rule 30(b)(6) witnesses, (4) Carter

---

[1]  By the same token, upon further reflection, the Court sees no reason to delay ruling on
MGA's request for interlocutory appeal of the present order. See 28 U.S.C. § 1292(b) (stating that
certifications for interlocutory appeal should be set forth in the order to be appealed). The Court's
ruling on that matter appears infra.

MINUTES FORM 90
CIVIL – GEN

2

Initials of Deputy Clerk __glg____
Time: 02/52
Docket No. 895

EXHIBIT _____9_____

PAGE _____

Bryant's missing phone records, and (5) Carter Bryant's missing time records.

In considering the arguments of the parties regarding when Mattel's duty to begin to preserve evidence arose, the Court determines that November 24, 2003, marks the date when litigation between Mattel and Bryant became more than merely speculative and in fact became probable. On this date, in-house counsel for Mattel received in discovery in an unrelated action a copy of a contract between MGA and Bryant that pre-dated Bryant's resignation from Mattel. This contract appeared to Mattel to violate certain employment agreements executed by Bryant and Mattel, thus giving rise to one of the current consolidated actions. Although prior to this date an internal investigation may have raised a suspicion on Mattel's part that litigation might arise, there was no evidence presented to the Court that Mattel should have known it had a viable claim against Bryant before November 2003. Cf. Fed. R. Civ. P. 11(b)(3) ("By presenting to the court . . . a pleading . . . , an attorney
. . . is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, . . . the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery . . . .").

The Court heard testimony from Michael C. Moore, in-house counsel for Mattel, regarding the efforts to preserve email communications and other evidence. Counsel for MGA and Bryant cross-examined Mr. Moore at the hearing on this matter. The Court credits his testimony. The efforts Mr. Moore described regarding the preservation of emails is reasonable, and certainly does not amount to spoliation. Moore described communications with specific individuals identified by Mattel as those most likely to have information relevant to the litigation and efforts made to preserve any evidence those individuals had in their custody or control. Emails not otherwise archived from the relevant time period – mostly September and October, 2000 – had already been deleted from Mattel's email servers in accordance with its email retention policies. Mattel cannot be faulted for deleting these emails in the regular course of business before it had notice of its claims against Bryant.

In April, 2005, the current litigation took a dramatic turn, when MGA filed suit against Mattel. At that time, all Mattel employees were instructed to maintain any evidence potentially relevant to the litigation. When that suit was filed, Mattel took action to preserve all of its emails, capturing emails that date back to December, 2004. They retain these backup tapes to this day. MGA and Bryant make much of Mattel's failure to suspend its 90-day auto-delete policy regarding emails, but fail to address two key points: First, Mattel altered only the storage mechanism for its emails, it did not actually delete any emails; and second, Mattel, a number of years ago, informed MGA that it was not planning on suspending its 90-day auto-delete policy, and MGA did not at that time object.

As for the Zeus tapes, there is simply no evidence of spoliation. First and foremost, as the system has been described to the Court, the system is a cumulative file system that continues to accumulate. The system is still in operation, does not have an auto-delete function, and

MINUTES FORM 90
CIVIL -- GEN

                                          Initials of Deputy Clerk __glg_____
                                          Time: 02/52
                                          **Docket No. 895**

                              3

EXHIBIT _____9____

PAGE _____231___

information dating back to all relevant time period in this case may be accessed from it. Additionally, Mattel's in-house counsel testified as to the existence of several backup tapes that it can make available to MGA and Bryant. Finally, outside of pure speculation, there is no evidence that anyone has deleted anything from the Zeus system. Although production issues may still remain with respect to these data, preservation of this data, in the Court's view, is simply not an issue based on the record before the Court.

The delay in producing certain Rule 30(b)(6) witnesses is not a proper basis for terminating sanctions in this case. No motions to compel were brought to compel these witnesses's depositions at earlier times, and MGA and Bryant's accusations that the delay in producing them for deposition is part of a cover-up of the destruction of evidence is mere unfounded speculation. Moreover, the Court is mindful that MGA has been found by the discovery master to be guilty of the very same unexcused delay of which it accuses Mattel. See August 14, 2007, J. Infante Order, at 8 and 9 (attached to the Supplemental Proctor Decl. as Ex. 1).

Although Mattel is at a loss to explain the missing phone records from the critical month of October, 2000, there is no evidence that the records were destroyed. Moreover, other evidence presented by Mattel, especially phone records produced by Bryant that show he was in contact with MGA during that time period, suggest that the missing records would not assist Bryant.

The "missing" time records were either never created or were deleted. There is no evidence that the latter occurred. In fact, the only evidence on this point, from Mattel's Rule 30(b)(6) witness, is that although deletion of time records is possible, he was unaware of any instances of that occurring. Artavia Depo. 116, 170-71.

In sum, MGA and Bryant have failed to present any evidence regarding the "willfulness, fault, or bad faith" required to justify the imposition of terminating sanctions. Leon, 464 F.3d at 958. Many of MGA and Bryant's allegations, especially those raised in connection with Mattel's failure to suspend its auto-delete policy (portrayed as a wholesale failure to preserve emails less than 90-days old) and the availability of data from the Zeus system, are nothing more than rhetoric laced with hyperbole. Other allegations, such as Mattel's motive for delaying certain Rule 30(b)(6) depositions, and the destruction of Bryant's October, 2000, phone records and time records, are nothing more than sheer speculation, unsupported by evidence. Although counsel impressed upon the Court MGA's conviction of the righteousness of its cause, such overzealous conviction as witnessed by the Court at the hearing is no substitute for proof.

Accordingly, the Court **DENIES** MGA's and Bryant's Motion for Terminating Sanctions.

At the hearing, counsel for MGA and Bryant requested the Court certify the present order for interlocutory appeal. That request is **DENIED**. Permissive Interlocutory appeals are governed by 28 U.S.C. § 1292(b):

When a district judge, in making in a civil action an order not otherwise

MINUTES FORM 90
CIVIL – GEN

                                                    Initials of Deputy Clerk __plg_____
                                                    Time: 02/52
                            4                       Docket No. 895

EXHIBIT _____9_____

PAGE _____232_____

RightFAX                8/30/2007 2:34    PAGE 008/008   Fax Server

appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order.

*Id.* Here, there is no "controlling question of law" in controversy. The law is quite settled. Accordingly, certification for interlocutory appeal of the present order is unwarranted.

As stated at the hearing, the Court **ORDERS** all parties to set forth, in affidavit form, their preservation efforts and policies with respect to the present litigation on or before September 10, 2007.

**IT IS SO ORDERED.**

MINUTES FORM 90
CIVIL – GEN

5

Initials of Deputy Clerk ___glg____
Time: 02/52
**Docket No. 895**

EXHIBIT ___*9*___

PAGE ___*733*___

RightFAX        8/30/2007 2:34    PAGE 001/006    Fax Server

**From:**    Name:     United States District Court
                      312 North Spring Street
                      Los Angeles, CA 90012
         Voice Phone: (213) 894-5474

**To:**    Name:     Michael Zeller
         Company:
                      865 S Figueroa St, 10th Floor,
         City/State:    Los Angeles, CA 90017-2543
         Fax Number:   213-443-3100



**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

## Automated Document Delivery Service
*Notice pursuant to Rule 77(d) FRCiv.P*
*The attached copy is hereby served upon you pursuant to Federal Rule of Civil Procedure 77(d).*

Fax Notes:

Case 2:04-CV-09049 : CARTER BRYANT V. MATTEL INC

Pursuant to General Order 06-07, Section F, the following documents shall be submitted in the traditional manner: Pen Registers, Search Warrants, Seizure Warrants, Wire Taps, Bond Related Documents, Under Seal and In-Camera Documents, and All Charging Documents (Complaints, Informations, Indictments, and Superseding Charging Documents). All other documents filed in cases unassigned to a judge shall be filed electronically with a copy e-mailed to the criminal intake mailbox for the appropriate division. The proper e-mail address for each division is as follows:

Western Division: CrimIntakeCourtDocs-LA@cacd.uscourts.gov
Southern Division: CrimIntakeCourtDocs-SA@cacd.uscourts.gov
Eastern Division: CrimIntakeCourtDocs-RS@cacd.uscourts.gov

*For additional information and assistance, please refer to the CM/ECF page on the Court website at www.cacd.uscourts.gov.*

**Switch to e-mail delivery and get these documents sooner!**
**To switch, complete and submit**
**Optical Scanning Enrollment / Update form G-76.**
**Call 213-894-5474 for help and free technical support.**

*If you received this document in error because the attorney with whom this document is directed is no longer the attorney on the case, a Notice of Change of Attorney Information, form G-6, must be filed. If there are other cases which you've received documents for which you are no longer the attorney, separate notices must be filed for each case. Failure to do so will result in the continued sending of documents to you. Form G-6 is available on the court's website at www.cacd.uscourts.gov or at the Clerk's Office.*

Date and time of transmission:     Thursday, August 30, 2007 2:34:04 PM
Number of pages including this cover sheet:   06

EXHIBIT   *9.*

PAGE    *234*

EXHIBIT 10

**quinn emanuel** trial lawyers

LOS ANGELES | NEW YORK | SAN FRANCISCO | SILICON VALLEY | PALM SPRINGS | SAN DIEGO

WRITER'S DIRECT DIAL NO.
(213) 443-3675

WRITER'S INTERNET ADDRESS
taniakrebs@quinnemanuel.com

November 28, 2005

Robert Wilson
Cotkin Collins & Ginsburg
300 South Grand Avenue, 24th Floor
Los Angeles, CA 90071

Dear Bob:

As you know, this firm represents Mattel in ongoing litigation against Carter Bryant and MGA that involves, at least in part, events pertaining to Bratz dolls, including the conception, design, development and marketing of Bratz dolls.

We are aware that your client is in possession of documents that fall into the following general categories, among others: (1) internal MGA emails dating from the mid-1990s through 2005; (2) emails between MGA employees and individuals outside MGA dating from the mid-1990s through 2005; (3) emails between your client and various individuals regarding the timing of Bratz development in 2000; and (4) other emails between your client and Isaac Larian.

Documents that we are aware are in your client's possession, custody and control which are relevant to Mattel's litigation include -- but are in no way limited to -- the following:

- An internal MGA email dated November 16, 2000 that summarizes "last week's meeting" with K-Mart and references Bratz.

- An email from Fred Larian to Isaac Larian dated November 22, 2000 mentioning prices for a "Bratz Fashion Pack."

- A November 22, 2000 chart describing changes to the Bratz Doll Assortment and Bratz Holiday doll.

**quinn emanuel urquhart oliver & hedges, llp**

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-624-7707 FAX 213-624-0643
805 Third Avenue, 11th Floor, New York, New York 10022 | TEL 212-702-8100 FAX 212-702-8200
201 Sansome Street, 6th Floor, San Francisco, California 94104 | TEL 415-986-5700 FAX 415-986-5707
555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL 650-620-4500 FAX 650-620-4555
45-025 Manitou Drive, Suite 8, Indian Wells, California 92210 | TEL 760-345-4757 FAX 760-345-2414
4445 Eastgate Mall, Suite 200, San Diego, California 92121 | TEL 858-812-3107 FAX 858-812-3336

EXHIBIT 10

PAGE 235

- An August 19, 2005 Fred Larian email to Scott Bachrach (at scottbac@aol.com) inquiring about the first contact between Mr. Bachrach and MGA concerning Bratz, as well associated communications.

- An August 22, 2005 Fred Larian email to Colleen O'Higgins (colleenohiggins@msn.com) asking about Carter Bryant and Bratz licensees, as well as associated communications.

- Communications with Bin Ton regarding Bratz, including without limitation those relating to actual and/or draft Bin Ton declaration(s) regarding Bratz.

- Communications with Michael Lingg regarding Bratz, including without limitation those relating to actual and/or draft Lingg declaration(s) regarding Bratz.

- Communications with Jennifer Maurus regarding Bratz, including without limitation those relating to actual and/or draft Maurus declarations regarding Bratz.

- A December 21, 2000 email from Isaac Larian to Paul Warner, with copies to Dennis Medici and Fred Larian, that mentions TRU purchases for products including Bratz.

- An August 1, 2005 email from Fred Larian to Victoria O'Connor regarding Bratz licensees, as well as associated communications.

- An August 1, 2005 email chain between Fred Larian and employees at dng.com asking about Bratz, as well as associated communications.

- An August 7, 2005 email from Mark Fragel answering questions regarding Bratz materials shown to Paulette Prim in November 2000.

- A document entitled "Analysis of Design, Packaging & Mock-Up Expense for 6 Months Ending 6/30/99 and 6/30/00" attached to an August 11, 2000 email from Dennis Medici to Isaac Larian and Fred Larian.

- A May 24, 2000 Fred Larian email to Isaac Larian which asserts that Isaac had instructed Fred to withhold the originals of documents that had been located in connection with the Fireman's Fund case and "to tell him [an MGA attorney] we could not find the originals."

- An August 14, 2000 Isaac Larian email to Medici, Warner and Fred Larian that references cost tracking software used by Mattel that Isaac Larian says he learned about from interviewing Mattel employees.

- Emails between Isaac Larian and Jahangir Makabi requesting that Mr. Makabi sign an affidavit that he lost his original stock certificates despite Makabi's protestation that he never had any such certificates, as well as associated communications.

- A January 31, 2001 email from Isaac Larian to All in Marketing and Product Development, Medici and Didi Brown asserting that he (Isaac Larian) had been

EXHIBIT ___10___

PAGE ___236___

2

diagnosed with "Alzheimer's" and denying in substance that he ever said anything that cannot be confirmed by a writing.

- A November 15, 2000 Paula Treantafelles email to Fred Larian that says MGA will be selling a Bratz backpack and states that a design for it is attached.

As you also are aware, the MGA/Bryant litigation is currently stayed pending an interlocutory appeal to the Ninth Circuit on jurisdictional issues. When discovery resumes, we plan to serve your client with a subpoena for the production of documents that include without limitation the documents listed above as well as such other documents in his possession, custody or control that refer or relate to the design, development, marketing, sale and/or any other activities regarding Bratz prior to June 30, 2001. You and your client are obligated to ensure that your client preserves all such documents in the interim. Moreover, you and your client have an obligation to retain all electronic copies or versions of such documents that he has in his possession, custody or control and their associated metadata.

If you disagree with our view on the preservation obligations that you and your client have, or if your client has taken or intends to take any steps to dispose of or to otherwise dispossess himself of such documents, please let me know immediately so that we can seek Court intervention on the matter. Thank you in advance for your anticipated cooperation.

Very truly yours,

Tania M. Krebs

EXHIBIT  10

PAGE  237

3

EXHIBIT 11

THIS EXHIBIT IS FILED UNDER SEAL

PURSUANT TO PROTECTIVE ORDER

EXHIBIT 12

RECEIVED

SEP 1 0 2007

1   DALE M. CENDALI (admitted *pro hac vice*)
    dcendali@omm.com
2   DIANA M. TORRES (S.B. #162284)
    dtorres@omm.com
3   JAMES P. JENAL (S.B. # 180190)
    jjenal@omm.com
4   O'MELVENY & MYERS LLP
    400 South Hope Street
5   Los Angeles, CA  90071-2899
    Telephone:  (213) 430-6000
6   Facsimile:  (213) 430-6407

7   PATRICIA GLASER (S.B. #55668)
    CHRISTENSEN, GLASER, FINK,
8   JACOBS, WEIL & SHAPIRO, LLP
    10250 Constellation Boulevard, 19th Floor
9   Los Angeles, CA 90067
    Telephone:  (310) 553-3000
10  Facsimile:  (310) 557-9815

11  Attorneys for MGA Entertainment, Inc.

12              UNITED STATES DISTRICT COURT

13            CENTRAL DISTRICT OF CALIFORNIA

14

15  CARTER BRYANT, an individual,          Case No.  CV 04-09049 SGL (RNBx)
                                           (consolidated with CV 04-9059 & 05-
16              Plaintiff,                 2727)

17      v.

18  MATTEL, INC., a Delaware              **DECLARATION OF DAPHNE**
    Corporation,                          **GRONICH IN RESPONSE TO**
19                                        **COURT'S REQUEST FOR**
                Defendant.                **INFORMATION REGARDING**
20                                        **DOCUMENT PRESERVATION**

21

22                                        Discovery Cut-off:  March 3, 2008
                                          Pre-trial Conference:  June 2, 2008
23                                        Trial Date:  July 1, 2008

24                                        Judge:  Hon. Stephen G. Larson

25

26

27

28

LA2:841480.1                                           GRONICH DECL
                                                CV 04-09049 SGL (RNBX)

EXHIBIT ___12___

PAGE ___252___

I, Daphne Gronich, declare and state as follows:

1.     I am General Counsel for MGA Entertainment, Inc. ("MGA") and a resident of the state of California. All of the facts set forth herein are known to me personally, except for those stated on information and belief and if called as a witness, I could and would testify competently thereto.

**Document Preservation Communications**

2.     I have been MGA's General Counsel since December, 2003, and have had oversight responsibility for MGA's legal response to this litigation since its inception.   Shortly after Mattel sued Carter Bryant in April 2004, even though MGA had not been named as a defendant in that suit, I communicated to MGA employees that Mattel had filed suit against Carter Bryant alleging that he had breached his employment agreement with Mattel. I advised MGA's employees that MGA might at some point become involved in the litigation, and that it would be prudent for MGA to preserve all documents that might be potentially relevant to the claims at issue in the litigation. In addition to these initial communications, both I and my colleague, Rich Daniels, one of MGA's other in-house attorneys, repeated that advisement at numerous one-on-one and group meetings (including those held in Isaac Larian's office at MGA's former location on Schoenborn Avenue in North Hills) involving senior executives, creative staff members, sales and administration staff and others including IT personnel. These communications took place throughout the late-Spring and Summer of 2004.

3.     In addition to those communications, the legal department began locating and collecting documents and materials that might be relevant to the lawsuit against Mr. Bryant. In that regard we were aided by the company's previous efforts to collect certain documents and materials related to the origin and initial development of "Bratz," due to MGA's involvement in prior, unrelated litigation (that did not challenge MGA's ownership of "Bratz"). As a result, we

LA2:841480.1                                    - 1 -                        GRONICH DECL
                                                                            CV 04-09049 SGL (RNBX)

EXHIBIT _____ 12
PAGE _____ 253

1   were able to preserve potentially relevant documents and materials from MGA's

2   employees in California and its related company in Hong Kong, including Isaac

3   Larian, Paula Treantafelles (now Garcia), Dave Malacrida, Victoria O'Connor,

4   Becky Harris, Charles O'Connor, Aileen Storer, Mercedeh Ward, Marcy George,

5   Shirin Salemnia, Edmond Lee, Dennis Soai, Stephen Lee, Samuel Wong, Cecilia

6   Kwok and Franki Tsang.

7           4.      In addition to the communications described above, in the weeks

8   following the filing of Mattel's lawsuit against Carter Bryant, both I and Rich

9   Daniels and/or our outside counsel, spoke with and/or confirmed that MGA had the

10  documents of key potential witnesses, including Isaac Larian, Paula Garcia,

11  Victoria O'Connor, Charles O'Connor, Aileen Storer, Mercedeh Ward, Marcy

12  George, Dennis Soai, Shirin Salemnia, and Dave Malacrida.   During those

13  conversations, we again personally directed MGA's potential witnesses to preserve

14  their potentially relevant documents.

15          5.      As a result of those discussions, MGA's potential witnesses

16  were given express direction by myself, Mr. Daniels, or MGA's outside counsel to

17  preserve their relevant paper documents and to assist, as necessary, MGA's IT

18  department in preserving their emails and electronic documents.  We also directed

19  the IT department to segregate and preserve emails from MGA employees who had

20  since left the company, which former employees included some who had also been

21  previously employed by Mattel prior to working for MGA.

22          6.      In the years since the litigation began, I have sent out reminder

23  emails to MGA's employees reminding them of their continuing obligation to

24  preserve documents potentially relevant to this litigation, including reminder emails

25  that I sent to all MGA employees on April 14, 2005, December 5, 2006, and July 5,

26  2007.  In addition, other members of the legal department routinely advise the staff

27  members with whom they work to retain relevant documents.  For example, Sam

28  Khare, an MGA in-house lawyer who works closely with the product design teams,

LA2:841480.1                                    - 2 -                        GRONICH DECL
                                                                            CV 04-09049 SGL (RNBX)

EXHIBIT ___12___

PAGE ___254___

1    routinely reminds people in the design groups to retain documents.

2         7.    After we became aware of Mattel's claims against MGA, on

3    December 5, 2006 I sent an email to all MGA employees reminding them of their

4    ongoing obligations regarding Mattel's suit against Carter Bryant and informing

5    them of the nature of the new claims against MGA, including the allegation of trade

6    secret theft. I reminded MGA's employees of MGA's policy that its employees

7    must not bring with them to MGA the property or confidential or proprietary

8    information of their former employers, and instructed them to preserve all

9    documents and materials relevant to these new claims as well.

10        8.    In addition to that communication, we also began collecting and

11   segregating the documents of all former Mattel employees, including those who

12   were no longer employed by MGA.

13        9.    While MGA is ready and willing to produce its communications

14   for the Court's review, I have been informed by MGA's outside counsel that Mattel

15   has taken the position that "it cannot agree" that MGA's production of those

16   communications would not constitute a waiver of the attorney-client privilege.

17   Attached hereto as **Exhibit 1** is a true and correct copy of a letter from Mattel's

18   counsel, Jon Corey, to MGA's outside counsel, Bill Charron, asserting that

19   position. If the Court wishes to see such communications and agrees with MGA

20   that such production would not constitute a waiver of the attorney-client privilege,

21   MGA will produce its communications within 24 hours of receiving the Court's

22   guidance.

23

**Paper Document Preservation**

24        10.   MGA does not now, and never has had a policy to routinely

25   destroy paper documents. In particular, since this litigation began, MGA has

26   expressly retained paper files in the Creative Departments, character art files,

27   vendor files, executive files and others.

28

LA2:841480.1                                    - 3 -                    GRONICH DECL.
                                                                        CV 04-09049 SGL (RNBX)

EXHIBIT ____12____

PAGE ____255____

**Email Preservation**

11.     Since before 2004, MGA has used Microsoft's Exchange email system and the Outlook email client to provide email support to the company. MGA does not have, and never has had, a policy to auto-delete emails; to the contrary, employees are advised to retain work-related emails. I am informed by our IT staff that employees may, and often do, create email storage files (known as "pst" files) to which they can move emails from their mailbox on the Exchange server. MGA's practice is to preserve those pst files, and it has done so.

12.     MGA's process for preserving those emails has become more automated over time as our IT department has grown in its sophistication to meet the needs of the company, particularly as MGA itself has grown and expanded. I am informed that in January of 2000, MGA only had around eighty employees, whereas by January of 2004 that number had grown to 196 and by January of 2007 it was approximately 900 domestically and 670 internationally, including subsidiaries.

13.     In 2004, when an employee would leave the company, the IT department copied the pst files from the employee's computer and burned them onto CDs that were then retained by the IT department. I am informed that in September 2005, the system was improved so that instead of having to copy those pst files onto CDs, the IT department was then able to preserve those pst files on a network server.

14.     Emails in the departing employee's mailbox on our Exchange server are retained on the Exchange server. The IT department's network administrators change the access permissions on that employee's mailbox so that only the administrators can access it. In that way, those emails are retained and can be accessed when necessary with proper authorization.

15.     In the past year, an even more automated process was put in place to preserve and manage email. In January 2007, the IT department began

LA2:841480.1

- 4 -

GRONICH DECL
CV 04-09049 SGL (RNBX)

EXHIBIT ___10___

PAGE ___250___

1    using a system known as "Archive One" which I am informed automatically
2    archives emails older than 90 days once a user's mailbox exceeds a set size
3    threshold. In this way, access to older emails is retained, but the size of the user's
4    mailbox files on our Exchange server is controlled.

5          16.    MGA's Exchange email server is also backed up on a nightly
6    basis as a means of disaster recovery. Historically those backup tapes had been
7    rotated on a 90-day cycle. However, because we have no policy of auto-deleting
8    emails and because we preserve the mailboxes (and pst files) of former employees,
9    unless an employee violates MGA's policies, and the legal department's express
10   and repeated directives to preserve email, no email would be lost by recycling those
11   backup tapes.

12
13   **Other Electronic Document Preservation**

14         17.    Employees are encouraged to store other electronic documents
15   (such as Word documents or Excel spreadsheets) on a shared network file server.
16   Some employees may also save electronic documents in the "My Documents"
17   folder on their computer. As was the case for emails saved to local pst files, going
18   back to 2004, if an employee left the company the contents of the My Documents
19   folder was also copied onto CDs and preserved. Again, when the system evolved in
20   September of 2005, the My Documents folder was preserved onto a network server.
21   Since March of this year, the entire hard drive itself is preserved by the IT
22   department.

23         18.    In addition to those preservation methods when an employee
24   would leave the company, files saved to the shared network file server would be
25   retained indefinitely and protected by nightly backups. I am informed that since
26   this litigation began in April 2004, MGA has not suffered any server failures that
27   resulted in the loss of data.

28         19.    In April of this year, another automated capability was brought

LA2:841480.1                          - 5 -                    GRONICH DECL
                                                              CV 04-09049 SGL (RNBX)

EXHIBIT _____ 12

PAGE _____ 257

1　　online.　MGA has now installed an automated process that daily copies the

2　　contents of the My Documents folder and any pst files that are saved in the user's

3　　"Exchange" folder to a network file server.

4　　　　　　20.　　Within days of learning of Mattel's intent to bring claims

5　　against MGA, MGA made, and retains to this day, a complete backup of all of its

6　　servers.

7

8　　**Preservation of Data from Isaac Larian's Computer**

9　　　　　　21.　　I am informed by our IT department that there are always two

10　　laptop computers assigned to Mr. Larian – the computer that he is actively using,

11　　and a second, "mirrored" spare computer. Whenever Mr. Larian docks his

12　　computer into the MGA network, any changes that have been made to the files on

13　　his computer are automatically "mirrored" or copied to the spare. In that way, any

14　　potential data loss is minimized.

15　　　　　　22.　　I am also informed by our IT department that when Mr. Larian

16　　needs to replace his laptop, the IT department starts with the mirrored spare. If the

17　　hard drive on Mr. Larian's old laptop is still operable, they make sure that the files

18　　on the mirrored spare contain the most up-to-date information that can be read from

19　　the old hard drive. When all of that data has been copied onto the spare, it is

20　　provided to Mr. Larian and a new laptop becomes the mirrored spare.

21　　　　　　23.　　Personal computers at MGA frequently contain a great deal of

22　　MGA's confidential and trade secret information – and this is especially true for

23　　Mr. Larian's laptop. I am informed by our IT department that prior to instituting

24　　the present policy of retaining computer hard drives, whenever a computer that Mr.

25　　Larian had been using was to be retired from his use – whether due to damage or

26　　simply the need to provide newer technology – the hard drive was backed up to one

27　　of the IT department's archive servers so as to preserve the data that was on the

28　　hard drive in a secure location. Once the data had been safely preserved, the IT

LA2:841480.1　　　　　　　　　　　　　　- 6 -　　　　　　　　　　　GRONICH DECL
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　CV 04-09049 SGL (RNBX)

EXHIBIT ___12___

PAGE ___258___

1   department then reformatted the hard drive in such a way that the confidential and
2   trade secret data was no longer present on the hard drive. Thus, although the hard
3   drive had been "wiped" before being put back into service or disposed of, none of
4   the data had been lost to MGA as it remained preserved on one of the IT
5   department's archive servers. Today, we would simply retain the hard drive from
6   Mr. Larian.

7

8   **Other Corporate Data Preservation**

9        24.   In 2004, MGA used an enterprise accounting package known as
10  Great Plains. In January 2006, MGA converted to a newer system known as
11  Axapta and after that time, all new business transactions were processed on the
12  Axapta system. However, MGA has retained the Great Plains system and I am
13  informed that no data was lost in the conversion. Accordingly, MGA is able to
14  retrieve transaction data as needed going back to at least 1998.

15

16        I declare under penalty of perjury under the laws of the United States
17  that the foregoing is true and correct.

18        Executed this 10th day of September, 2007, at Van Nuys, California.

19

20                                              Daphne Gronich

21

22

23

24

25

26

27

28

LA2:841480.1                          - 7 -                        GRONICH DECL.
                                                              CV 04-09049 SGL (RNBX)

EXHIBIT ___ 12

PAGE ___ 259

EXHIBIT 13



QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
  John B. Quinn (Bar No. 090378)
  johnquinn@quinnemanuel.com
  Michael T. Zeller (Bar No. 196417)
  (michaelzeller@quinnemanuel.com)
  Jon D. Corey (Bar No. 185066)
  (joncorey@quinnemanuel.com)
  Timothy L. Alger (Bar No. 160303)
  (timalger@quinnemanuel.com)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100

Attorneys for Mattel, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>MATTEL, INC., a Delaware corporation,<br><br>Defendant.<br><br>AND CONSOLIDATED ACTIONS | CASE NO. CV 04-9049 SGL (RNBx)<br>Consolidated with<br>Case Nos. CV 04-09059 & CV 05-2727<br><br>Hon. Stephen G. Larson<br><br>MATTEL, INC.'S CORRECTED PHASE ONE WITNESS LIST<br><br>**Phase 1:**<br>Discovery Cut-Off:    January 28, 2008<br>Pre-Trial Conference: May 5, 2008<br>Trial Date:                May 27, 2008 |

EXHIBIT 13
PAGE 206

07209/2441845.7

-1-

1  TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2        Mattel, Inc. ("Mattel") hereby identifies the following witnesses that it

3  intends at this time to call at trial, other than those witnesses contemplated for

4  impeachment or rebuttal.  Mattel reserves the right to present these witnesses'

5  testimony through prior deposition or other testimony to the extent a witness is

6  unavailable to provide live testimony at trial or such testimony is otherwise

7  admissible.  Mattel reserves the right to call any witnesses included in the witness

8  lists of other parties to this action and any amendments thereto, including any expert

9  witnesses.  Mattel reserves the right to supplement or amend its designation of

10  witnesses and their testimony.

11

12          **Witnesses Mattel Intends to Call In Its Case In Chief**

13     1.   Nana Ashong

14     2.   Kerri Brode

15     3.   Carter Bryant

16     4.   Ana Isabel Cabrera

17     5.   Beatriz Morales

18     6.   Elise Cloonan

19     7.   Mel Woods

20     8.   Robert Eckert

21     9.   Lissa Freed

22    10.   Rachel Harris

23    11.   Andreas Koch

24    12.   Farhad Larian

25    13.   Isaac Larian

26    14.   Steven Linker

27    15.   Maria Veronica de Souza Marlow

28    16.   Liliana Martinez

EXHIBIT __ 12
PAGE __ 201

07209/2441845.7

-2-

| | | |
|---|---|---|
| 1 | 17. | Jennifer Maurus |
| 2 | 18. | Carl Meyer |
| 3 | 19. | Victoria O'Connor |
| 4 | 20. | Sarah Odom |
| 5 | 21. | Denise O'Neal |
| 6 | 22. | Jeff Weiss |
| 7 | 23. | Jacqueline Ramona Prince |
| 8 | 24. | Anna Rhee |
| 9 | 25. | David Rosenbaum |
| 10 | 26. | Maria Elena Salazar |
| 11 | 27. | Maureen Tkacik |
| 12 | 28. | Lisa Tonnu |
| 13 | 29. | Paula Dianthe Treantafelles (Garcia) |
| 14 | 30. | Anne Wang |
| 15 | 31. | Sandy Yonemoto |
| 16 | 32. | Kitty Hammons |
| 17 | 33. | Ivy Ross |
| 18 | 34. | Cassidy Park |
| 19 | 35. | Bryan Armstrong |
| 20 | 36. | Margaret Hatch-Leahy |
| 21 | 37. | Samir Khare |
| 22 | 38. | Sheila Kyaw |
| 23 | 39. | Edmond Lee |
| 24 | 40. | Mark Menz |
| 25 | 41. | Valery Aginsky |
| 26 | 42. | Lloyd Cunningham |
| 27 | 43. | William Flynn |
| 28 | 44. | Frank Keiser |

PAGE

EXHIBIT

⑳⑦⑧-

⑬

| | | |
|---|---|---|
| 1 | 45. | Lee Loetz |
| 2 | 46. | Ralph Oman |
| 3 | 47. | Walter Rantanen |
| 4 | 48. | Carol Scott |
| 5 | 49. | Michael Wagner |
| 6 | 50. | John Alex |
| 7 | 51. | Bruce Stein |
| 8 | 52. | Kenneth Hollander |
| 9 | 53. | Angel Gomez |
| 10 | 54. | Robert C. Lind |
| 11 | 55. | Heather McComb |
| 12 | 56. | Nicholas Mirzoeff |
| 13 | 57. | Denise Van Patten |
| 14 | 58. | Ginger McRae |
| 15 | 59. | Christopher Palmeri |
| 16 | 60. | Jill Nordquist |
| 17 | 61. | Arnold Artavia |
| 18 | | **Witnesses Mattel May Call In Its Case In Chief** |
| 19 | 62. | Joan Gaynor |
| 20 | 63. | Rene Pasko |
| 21 | 64. | Pedro Salazar |
| 22 | 65. | Rodney Palmer |
| 23 | 66. | Richard De Anda |
| 24 | 67. | Kami Gillmore-Bryant |
| 25 | 68. | Robert Hudnut |
| 26 | 69. | Cynthia Pierce |
| 27 | 70. | David Dees |
| 28 | 71. | Wendy Feinburg |

EXHIBIT 13
PAGE 203

07209/2441845.7

-4-

MATTEL, INC.'S PHASE ONE WITNESS LIST

| 1 | 72. | Schuyler Bacon |
| 2 | 73. | Robert Best |
| 3 | 74. | Sandra Bilotto |
| 4 | 75. | Ann Driskill |
| 5 | 76. | Brooke Gilbert |
| 6 | 77. | Daphne Gronich |
| 7 | 78. | Sarah Halpern |
| 8 | 79. | Rebecca Harris |
| 9 | 80. | Martin Hitch |
| 10 | 81. | Hoi Hoffman-Briggs |
| 11 | 82. | Don Howarth |
| 12 | 83. | Julia Jensen |
| 13 | 84. | Fred Kawashima |
| 14 | 85. | Cecelia Kwok |
| 15 | 86. | Steven Lee |
| 16 | 87. | Victor Lee |
| 17 | 88. | David Malacrida |
| 18 | 89. | Dennis Medici |
| 19 | 90. | Amy Myers |
| 20 | 91. | Joyce Ng |
| 21 | 92. | Charles O'Connor |
| 22 | 93. | Kislap Ongchango |
| 23 | 94. | Joni Pratte |
| 24 | 95. | William Ragsdale |
| 25 | 96. | Wendy Ragsdale |
| 26 | 97. | Lon P. Ross |
| 27 | 98. | Ellis Stern |
| 28 | 99. | Maureen Tafoya |

EXHIBIT 13

PAGE 204

07209/2441845.7

MATTEL, INC.'S PHASE ONE WITNESS LIST

| | |
|---|---|
| 1 | 100. Frankie Tsang |
| 2 | 101. Morad Zarabi |
| 3 | 102. Chris Sesto |
| 4 | 103. Patrica Glaser |
| 5 | 104. Scott Gizer |
| 6 | 105. Alisa Morganthaler-Lever |
| 7 | 106. Douglas Wickham |
| 8 | 107. Keith Jacoby |
| 9 | 108. Kenneth Lockhart |
| 10 | 109. Carmen Monteagudo |
| 11 | 110. Jessie Ramirez |
| 12 | 111. Neil Friedman |
| 13 | 112. Lucy Arant |
| 14 | 113. Michael Moore |
| 15 | 114. Debora Middleton |
| 16 | 115. Ernest Dutcher |
| 17 | 116. Robert G. Wilson |
| 18 | 117. Alan N. Goldgberg |
| 19 | 118. William Conkle |
| 20 | 119. Mark Kremer |
| 21 | 120. Bryant Delgadillo |
| 22 | 121. Larry Feldman |
| 23 | 122. Robert Turner |
| 24 | 123. Richard Kellner |
| 25 | 124. Ronald Brawer |
| 26 | 125. Carlos Gustavo Machado |
| 27 | 126. Nick Armando Contreras |
| 28 | 127. Mariana Trueba Almada |

MATTEL, INC.'S PHASE ONE WITNESS LIST

EXHIBIT ___

PAGE ___

| | |
|---|---|
| 1 | 128. Janine Brisbois |
| 2 | 129. Daniel Cooney |
| 3 | 130. Susana Kuemmerle |
| 4 | 131. Jean Gomez |
| 5 | 132. Janet Bryant |
| 6 | 133. Thomas Bryant |
| 7 | 134. Jeanne Galvano |
| 8 | 135. Richard Irmen |
| 9 | 136. Charnayne Brooks |
| 10 | 137. Sarah Choi |
| 11 | 138. Mei Wah (Sarah) Chui |
| 12 | 139. Larry Clayton |
| 13 | 140. Adrienne Fontenella |
| 14 | 141. Mitchell Kamarck |
| 15 | 142. Yim Chong Lo |
| 16 | 143. Ron Longsdorf |
| 17 | 144. Eli Makabi |
| 18 | 145. Susan G. McBride |
| 19 | 146. Colleen O'Higgins |
| 20 | 147. Kumi Croom |
| 21 | 148. Julia Marine |
| 22 | 149. Shirin Salemnia |
| 23 | 150. Richard Sandham |
| 24 | 151. Aileen Storer |
| 25 | 152. Stephen Tarmichael |
| 26 | 153. Ben Ton |
| 27 | 154. Evelyn Viohl |
| 28 | 155. Spencer Woodman |

EXHIBIT PAGE

07209/2441845.7

-7-

1    156.  Milton Zablow

2    157.  Joe Franke

3    158.  Larry McFarland

4    159.  Maureen Mullen Chianese

5    160.  Tina Patel

6    161.  Matt Bousquette

7    162.  Joe Tiongco

8    163.  Mercedeh Ward

9    164.  Alan Kaye

10    165.  Theresa Newcomb

11    166.  Paul Warner

12    167.  Helene Bartels

13    168.  Traci Feldman

14    169.  Michael Hebden

15

16  DATED: April 1, 2008      QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

17

18                      By Jon D. Corey

19                        Jon D. Corey
                             Attorneys for Plaintiff Mattel, Inc.

20

21

22

23

24

25

26

27

28

EXHIBIT 13

PAGE 702

07209/2441845.7

-8-

1

## PROOF OF SERVICE

2      I am employed in the County of Los Angeles, State of California.  I am over

3  the age of eighteen years and not a party to the within action; my business address is

4  865 South Figueroa Street, 10th Floor, Los Angeles, California 90017.

5      On April 1, 2008, I served true copies of the following documents described

6  as: **MATTEL, INC.'S CORRECTED PHASE ONE WITNESS LIST** on the

7  parties in this action as follows:

8

Thomas J. Nolan, Esq.
**Skadden, Arps, Slate, Meagher & Flom LLP**
300 South Grand Avenue, Suite 3400
Los Angeles, CA  90071
'tnolan@skadden.com'

Mark E. Overland, Esq.
David C. Scheper, Esq.
Alexander H. Cote, Esq.
**Overland Borenstein Scheper & Kim, LLP**
300 South Grand Avenue, Suite 2750
Los Angeles, CA 90071

'moverland@obsklaw.com'

John W. Keker, Esq.
Michael H. Page, Esq.
Christa M. Anderson, Esq.
**Keker & Van Nest, LLP**
710 Sansome Street
San Francisco, CA 94111

'MWerdegar@kvn.com'

17

**[X] BY ELECTRONIC MAIL TRANSMISSION:** By electronic mail transmission from monicaascarrunz@quinnemanuel.com on April 1, 2008, by transmitting a PDF format copy of such document(s) to each such person at the e-mail address listed below their address(es).  The document(s) was/were transmitted by electronic transmission and such transmission was reported as complete and without error.

Executed on April 1, 2008, at Los Angeles, California.

Tamar Buchakjian

EXHIBIT ___ 13

PAGE ___ 208

**PROOF OF SERVICE**

I am employed in the County of Los Angeles, State of California.. I am over the age of eighteen years and not a party to the within action; my business address is NOW Messenger Service, 1301 West Second Street, Suite 206, Los Angeles, California 90026.

On April 1, 2008, I served true copies of the following documents described as: **MATTEL, INC.'S CORRECTED PHASE ONE WITNESS LIST** on the parties in this action as follows:

Thomas J. Nolan, Esq.
**Skadden, Arps, Slate,
Meagher & Flom LLP**
300 South Grand Avenue, Suite 3400
Los Angeles, CA  90071

[X]    **PERSONAL:** By personally delivering the document listed above to the person(s) at the address(es) set forth above.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made

Executed on April 1, 2008, at Los Angeles, California.

_____
⟨ BRIAN SHORE

07209/2456597.176189/24
47320.2

Case No. CV 04-9049 SGL (RNBx)

PROOF OF SERVICE

EXHIBIT 14

1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
     John B. Quinn (Bar No. 090378)
2     johnquinn@quinnemanuel.com
     Michael T. Zeller (Bar No. 196417)
3     (michaelzeller@quinnemanuel.com)
     Jon D. Corey (Bar No. 185066)
4     (joncorey@quinnemanuel.com)
     Timothy L. Alger (Bar No. 160303)
5     (timalger@quinnemanuel.com)
     865 South Figueroa Street, 10th Floor
6  Los Angeles, California 90017-2543
     Telephone: (213) 443-3000
7  Facsimile:  (213) 443-3100

8  Attorneys for Mattel, Inc.

9                    UNITED STATES DISTRICT COURT

10                  CENTRAL DISTRICT OF CALIFORNIA

11                        EASTERN DIVISION

12  CARTER BRYANT, an individual,          CASE NO. CV 04-9049 SGL (RNBx)

13              Plaintiff,                 Consolidated with
                                           Case No. CV 04-09059
14         vs.                             Case No. CV 05-02727

15  MATTEL, INC., a Delaware              Hon. Stephen G. Larson
    corporation,
16                                         **MATTEL'S PROPOSED JURY**
              Defendant.                   **INSTRUCTIONS**
17

18  AND CONSOLIDATED ACTIONS
                                           **Phase 1:**
19
                                           Discovery Cut-Off:     January 28, 2008
20                                         Pre-Trial Conference:  May 5, 2008
                                           Trial Date:            May 27, 2008
21

22

23

24

25

26

27

28

09/2463941.1
                                      04-08-08
                         MATTEL'S PROPOSED JURY INSTRUCTIONS

EXHIBIT ___14___

PAGE ___270___

1     Plaintiff Mattel, Inc. ("Mattel") hereby proposes the following jury

2  instructions for Phases 1(a) and 1(b) of the trial in this matter. Mattel requests and

3  reserves the right to amend, modify, withdraw and/or supplement the following

4  instructions before or during the trial of this matter. Mattel intends to submit

5  further proposed jury instructions depending upon and based upon rulings issued in

6  connection with the parties' pending motions for partial summary judgment, any

7  motions in limine or other pre-trial or trial motions, and the evidence and theories

8  proffered by the parties during the course of the trial. <u>See</u> <u>Fed. R. Civ. P.</u> 51(a).

9  DATED: April __, 2008       QUINN EMANUEL URQUHART OLIVER &

10                                HEDGES, LLP

11

12                           By_____

13                              Jon D. Corey
                                  Attorneys for Mattel, Inc.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

09/2463941.1

MATTEL'S PROPOSED JURY INSTRUCTIONS

EXHIBIT    14

PAGE    271

1
2
3

## MATTEL'S SPECIAL JURY INSTRUCTION NO.

## EVIDENCE OF SPOLIATION

4      During the trial, the plaintiff, Mattel, intends to introduce evidence that the

5 defendants, including Carter Bryant, MGA, MGA's CEO Isaac Larian and/or MGA

6 Hong Kong, did not preserve evidence relevant to this case. In certain

7 circumstances, you may assume that such evidence is or would have been

8 favorable to Mattel and adverse to the defendants. At the end of the trial, I will

9 instruct you on the law in this regard.

10

11     **Authority:** *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir.1993); *Akonia v.*
12 *United States*, 938 F.2d 158, 161 (9th Cir.1991), *cert. denied*, 503 U.S. 962 (1992);
   *Housing Rights Center v. Sterling*, 2005 WL 3320739, *8 (C.D. Cal. 2005);
13 *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 110
   (2d Cir.2002); *Rogers v. T.J. Samson Community Hosp.*, 276 F.3d 228, 232-33 (6th
14 Cir.2002). This instruction will appropriately explain to the jury, at the start of
   trial, why evidence will be presented regarding the defendants' spoliation of
15 evidence. Without any foundational instruction, the jury may be confused by the
   presentation of spoliation evidence. This instruction lays an appropriate
16 foundation for the presentation of such evidence.

17
18
19
20
21
22
23
24
25
26
27
28

09/2463941.1

MATTEL'S PROPOSED JURY INSTRUCTIONS

EXHIBIT ___14___

PAGE ___272___

1

## MATTEL'S SPECIAL JURY INSTRUCTION NO. ___

2

## ADVERSE INFERENCE FROM SPOLIATION

3

4    The plaintiff, Mattel, contends that the defendants, including Carter Bryant,

5   MGA, Isaac Larian and MGA Hong Kong, did not take appropriate steps to

6   preserve relevant evidence and destroyed such evidence. The defendants deny that

7   contention.

8    If you find that relevant evidence that was within the defendants' control is

9   missing or has been destroyed and that the evidence is missing because of the

10  defendants' bad faith or negligent, unjustified or careless actions or inaction, you

11  may infer that such evidence, if available now, would have been favorable to

12  Mattel and adverse to the defendants.

13    Defendants' destruction of evidence was negligent, unjustified or careless if

14  they had notice that the evidence might be relevant to this litigation when they

15  destroyed the evidence or made the evidence unavailable. A person is under a duty

16  to preserve evidence that he or she knows, or reasonably should know, could be

17  relevant to a case.

18

19  **Authority:** *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993)("[A] trial
    court also has the broad discretionary power to permit a jury to draw an adverse
20  inference from the destruction or spoliation against the party or witness responsible
    for that behavior."); *Akiona v. United States*, 938 F.2d 158, 161 (9th Cir. 1991)
21  ("Generally, a trier of fact may draw an adverse inference from the destruction of
    evidence relevant to a case."); *Advantacare Health Partners v. Access IV*,
22  2004 WL 1837997, * 6 (N.D. Cal. 2004) ("In the Ninth Circuit, spoliation of
    evidence raises a presumption that the destroyed evidence goes to the merits of the
23  case, and further, that such evidence was adverse to the party that destroyed it.")
    (citations omitted). Importantly, "a finding of 'bad faith' is *not* a prerequisite to this
24  corrective procedure. *See, e.g., Glover*, 6 F.3d at 1330; *see Byrnie v. Town of
    Cromwell, Bd. of Educ.*, 243 F.3d 93, 109 (2d Cir. 2001) (culpable state of mind
25  for an imposition of an adverse inference includes negligence). A litigant has a
    freestanding duty "to preserve what it knows, or reasonably should know, is
26  relevant in the action, is reasonably calculated to lead to the discovery of
    admissible evidence, is reasonably likely to be requested during discovery and/or is
27  the subject of a pending discovery request." *Housing Rights Center v. Sterling*,
    2005 WL 3320739, *3 (C.D. Cal. 2005).

28

09/2463941.1

EXHIBIT ___14___

PAGE ___273___

1     An adverse inference jury instruction should be given where "[s]ufficient
2 evidence exists to permit a jury to determine the factual predicate" underlying a
claim of spoliation. *Rogers v. T.J. Samson Community Hosp.*, 276 F.3d 228,
3 234 (6th Cir. 2002). "When a genuine question exists as to whether a party's loss
or destruction of evidence was negligent (or worse), it is appropriate to defer that
4 question to the jury, by instructing jurors that if they find that the spoliation of
evidence was at least negligent, they may infer that the missing evidence would
5 favor the non-spoliating party." *One Beacon Ins. Co. v. Broadcast Development Group, Inc.*, 2005 WL 2077499, *5 (6th Cir. 2005).

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

09/2463941.1

-54-

EXHIBIT ___14___

PAGE ___274___

1      Plaintiff Mattel, Inc. ("Mattel") hereby proposes the following jury

2  instructions for Phases 1(a) and 1(b) of the trial in this matter. Mattel requests and

3  reserves the right to amend, modify, withdraw and/or supplement the following

4  instructions before or during the trial of this matter. Mattel intends to submit

5  further proposed jury instructions depending upon and based upon rulings issued in

6  connection with the parties' pending motions for partial summary judgment, any

7  motions in limine or other pre-trial or trial motions, and the evidence and theories

8  proffered by the parties during the course of the trial. See Fed. R. Civ. P. 51(a).

9

DATED: April ___, 2008       QUINN EMANUEL URQUHART OLIVER &

10                        HEDGES, LLP

11

12                        By_____

                            Jon D. Corey

13                            Attorneys for Mattel, Inc.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-1-

EXHIBIT ___14___

PAGE ___275___

EXHIBIT 15

● **ORIGINAL** ●

1 | William C. Conkle (SB# 076103)
Mark D. Kremer (SB# 100978)
2 | Eric S. Engel (SB# 105656), members of
CONKLE & OLESTEN
3 | Professional Law Corporation
3130 Wilshire Boulevard, Suite 500
4 | Santa Monica, California 90403-2403

5 | Telephone: (310) 998-9100

6 | Attorneys for Plaintiff Farhad Larian

7

8 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

9 | FOR THE COUNTY OF LOS ANGELES

10

11 | FARHAD LARIAN,                    ) CASE NO.   BC 329501
                                      )
12 |           Plaintiff,             ) VERIFIED COMPLAINT FOR:
                                      )
13 | v.                               ) 1)   FRAUD
                                      )
14 | MORAD ZARABI, ISAAC LARIAN       ) 2)   NEGLIGENT
AND KAMBIZ ZARABI AND DOES 1         )      MISREPRESENTATION
15 | through 5, INCLUSIVE             )
                                      ) 3)   CONSPIRACY
16 |           Defendants.            )
                                      ) 4)   DECLARATORY RELIEF
17 |                                  )
                                      ) 5)   CONSTRUCTIVE TRUST
18 |                                  )
                                      ) 6)   INJUNCTIVE RELIEF
19 |

20

21 |        Plaintiff alleges as follows:

22

23 |        1.     Plaintiff, Farhad Larian also known as Fred Larian ("FRED") is now and

24 | at all times relevant to this Complaint was a resident of Los Angeles County California.

25

26 |        2.     Defendant, Morad Zarabi ("MORAD") is now and at all times relevant to

27 | this Complaint was a resident of Los Angeles County California.

28

2221.002\9929

Complaint

FILED
LOS ANGELES SUPERIOR COURT
FEB 2 8 2005
JOHN A. CLARKE, EXECUTIVE OFFICER/CLERK
BY_____
J. SUNGA, DEPUTY

Case assigned to.
Judge   Paul Gutman   D24

SUMMONS ISSUED

EXHIBIT ___15___

PAGE ___276___

3.    Defendant, Isaac Larian ("ISAAC") is now and at all times relevant to this Complaint was a resident of Los Angeles County California.

4.    Defendant Kambiz Robert Zarabi ("KAMBIZ") is now and at all times relevant to this Complaint was a resident of Los Angeles County California.

5.    Plaintiff is unaware of the true names and capacities of Does 1 through 5 and therefore sues such defendants by such fictitious names. Plaintiff will amend this Complaint to identify the true names and capacities of these defendants if and when additional information against them is ascertained. Plaintiff is informed and believes that each of the doe defendants is liable in some manner for the acts and omissions and the injuries and damages alleged in this Complaint.

6.    At all times relevant to this Complaint, each defendant was the agent or employee of each of the other defendants as the case may have been, and was acting within the course of the scope of such agency or employment in performing the acts alleged in this Complaint.

7.    FRED and ISAAC are brothers who for over 20 years engaged in business as partners through equal ownership of several businesses and ventures they co-founded. They shared profits and losses on an equal basis.

8.    The businesses they co-founded included the companies known as ABC International Traders, Inc. ("ABC") and MGA Entertainment Hong Kong Ltd. ("MGAEHK"). ABC and MGAEHK collectively are referred to as "MGA". At all times relevant to this Complaint FRED and ISAAC each owned 45% of the outstanding stock, while their brother in law Jangahir Makabi ("MAKABI") owned 10% of MGA. FRED's 45% interest amounted to 10,000,000 shares of common stock in ABC and

2221.002\9929                          -2-
                                   Complaint

EXHIBIT __15__

PAGE __277__

1   450 shares of common stock in MGAEHK (collectively "FRED's Stock"). Over time

2   FRED and ISAAC divided responsibilities in MGA's business:  ISAAC, as CEO

3   assumed responsibility for finance, sales, marketing and product development while

4   FRED, as Executive Vice President was responsible for operations, including customs,

5   warehousing, distribution and facilities.

6

7        9.      MORAD is the uncle of ISAAC and FRED.

8

9        10.     In the spring of 2000 ISAAC offered to buy FRED's 45% interest in MGA

10   for $9,000,000 valuing MGA at $20,000,000.  FRED responded that he wanted an

11   appraisal of MGA to consider selling his interest.  Consequently, ISAAC and FRED

12   continued to negotiate a buy-sell agreement for ISAAC to buy FRED's Stock. ISAAC

13   told FRED that he only wanted to appraise MGA as of December 31, 1999.  FRED

14   demanded a current appraisal. To avoid an appraisal ISAAC suggested using a process

15   by which he or FRED would make an offer to buy the other's interest which if not

16   accepted would require the refusing party to purchase the offeror's interest for the same

17   price. FRED rejected the method telling ISAAC that FRED did not want to be a buyer.

18   Ultimately ISAAC refused to go through with a buy-sell agreement that required three

19   appraisals of MGA.

20

21        11.     From the inception of their partnership, FRED and ISAAC had agreed that

22   their salaries and other compensation from MGA would always be equal. They had

23   followed this agreement for more than twenty years, taking equal raises and pay-cuts

24   at the same time.  In early 2000, however, while he was attempting to buy FRED out

25   of MGA,  ISAAC secretly gave himself a $100,000 raise to about $325,000. ISAAC

26   later demanded that the MGA Board of Directors raise his salary to $500,000, ratify

27   $750,000 as a bonus for 1999, authorize a $1,500,000 bonus for 2000, and give him a

28   4% royalty on items he "personally develops for MGA's 2001 line or products".

2221.002\9929                          -3-
                                    Complaint

EXHIBIT  15

PAGE  278

1  Subsequently, Isaac's two brothers in-law purporting to act as MGA directors increased
2  ISAAC's salary to always be three times that of FRED's salary and authorized an
3  additional bonus of up to 50% of ISAAC's tripled salary.  FRED is informed and
4  believes that ISAAC engineered the compensation increase to put additional pressure
5  on FRED to sell out his interests in MGA.  FRED is further informed and believes that
6  in exchange for MAKABI's vote, ISAAC promised MAKABI some portion of FRED's
7  Stock if FRED agreed to sell it to ISAAC.

8

9     12.    In or around the summer of 2000, following ISAAC's refusal to proceed
10  with the buy-sell agreement, MORAD contacted FRED and urged him to let MORAD
11  arbitrate the impasse between ISAAC and FRED over the stock sale.  MORAD told
12  FRED that FRED should not wait any longer to resolve his disputes with ISAAC as
13  ISAAC was attempting to "take over the company" by the enormous raise in
14  compensation which MORAD said was "just a part of ISAAC's plans to oust FRED".
15  MORAD suggested that he determine which brother should sell his interest in MGA
16  and at what price.  FRED responded that he did not want to be a buyer and required for
17  any arbitration, that the price of his stock be determined by an appraisal of the current
18  value of MGA, as ISAAC had control of the financial and business information. FRED
19  also told MORAD he required a resolution of certain other partnership accounts.  In
20  response MORAD promised FRED that the price of FRED's interest in MGA would
21  be determined by a current and accurate appraisal of MGA that MORAD would obtain.
22  MORAD called the appraisal "the central piece of the arbitration".  MORAD also
23  promised to resolve the accounting of the other partnership accounts.

24

25     13.    In several communications with FRED, MORAD stressed his unique
26  position to serve as an arbitrator.  MORAD held out his familial relationship to the
27  brothers as assuring his impartiality and trustworthiness.  MORAD promised to treat
28  each brother "as one of his eyes", an expression meaning that MORAD would allow

2221.002\9929                              -4-

EXHIBIT    15
PAGE    279

1  no harm to come to either of them. MORAD claimed that his business experience
2  would assure the accuracy of the appraisal and the accounting and that he would hire
3  a CPA, Mike Shenassafar, to assist him. MORAD said that he would serve as an
4  arbitrator free of charge, requiring reimbursement only for expenses, such as fees for
5  the appraisal and the CPA. MORAD told FRED that he could trust MORAD to resolve
6  the brothers' dispute, ending the unhappiness it was causing their family.

7

8      14.    MORAD presented FRED with an Agreement for Arbitration and
9  Selection of Arbitrator ("Arbitration Agreement"), a copy of which is attached as
10 Exhibit 1 to this Complaint. FRED is informed and believes that MORAD's attorney
11 Ellis Stern drafted it. MORAD told FRED that he should not hire an attorney to advise
12 him about the Arbitration Agreement because "attorneys are in it for themselves and
13 would never allow this to end until they got all of the money for themselves".
14 MORAD reiterated to FRED that he could trust MORAD.

15

16     15.    In reliance on the representations of MORAD, on or about September 28,
17 2000 FRED signed the Arbitration Agreement without the advice of counsel and did
18 not hire counsel to represent him in the arbitration.

19

20     16.    Plaintiff is informed and believes that the representations of MORAD
21 were false when made in and around the summer of 2000 prior to FRED's execution
22 of the Arbitration Agreement. MORAD engaged in misrepresentations and
23 concealments to induce FRED's agreement to allow MORAD to arbitrate the
24 controversy with ISAAC so that MORAD could fix the sale price without an appraisal.
25 MORAD never intended to engage in any neutral arbitration using an accurate and
26 current appraisal of MGA and never intended to use a CPA to assist him with the
27 appraisal. MORAD intended to trick FRED to sell his interest in MGA to ISAAC and
28 settle the other partnership accounts by making FRED believe the price for FRED's

2221.002\9929                          -5-

EXHIBIT 15
PAGE 280

1  Stock had been established by an accurate appraisal and accounting, but in fact was
2  pre-determined by MORAD.  In furtherance of his plan, MORAD concealed from
3  FRED MORAD's inability to competently read and write English.

4

5      17.    Plaintiff is informed and believes that MORAD made his false
6  representations pursuant to an agreement and plan formed between MORAD and
7  ISAAC to induce FRED to give MORAD authority to determine a value for MGA and
8  trick FRED into selling his interests in MGA at a price pre-determined by ISAAC
9  without an appraisal.  Under the plan and agreement with ISAAC, MORAD agreed to
10  induce FRED's consent to the Arbitration Agreement, by promising FRED an accurate
11  and complete appraisal, but would fix the price for which FRED would sell his Stock
12  to ISAAC and settle the partnership accounts, at or below the $9,000,000 ISAAC had
13  previously offered to pay for FRED's Stock, irrespective of the true appraised value
14  of MGA.

15

16      18.    Following execution of the Arbitration Agreement, MORAD took steps
17  in accordance with his intent and the plan to defraud FRED into accepting a price for
18  his interests not determined by an appraisal including the following:

19          18.1   Consistent with ISAAC's earlier proposal to avoid an appraisal,
20  prior to commissioning the appraisal MORAD induced FRED to give him a written
21  offer to purchase ISAAC's 45% interest in MGA based upon a value of $17,500,000.
22  FRED withdrew the offer the same day.

23          18.2   MORAD hired National Business Appraisers ("NBA") to perform
24  an appraisal of ABC, and in order to lower the appraised value of ABC, allowed NBA
25  to restrict the valuation period to the end of December 1999 thereby eliminating year
26  2000 financial and business information from the appraisal, including information
27  relating to the "Bratz" product line.

28

2221.002\9929                        -6-
                                    Complaint

EXHIBIT     15

PAGE        781

1          18.3   MORAD allowed NBA to value only ABC and omit valuation of
2   MGAEHK.

3          18.4   Upon receiving the initial draft of NBA's appraisal of ABC with a
4   value of $26,942,000 as of December 31, 1999, MORAD instructed NBA to reduce the
5   valuation to get close to $20,000,000 which would yield a price of $9,000,000 for
6   FRED's interest.

7          18.5   MORAD subsequently concealed from FRED that the final reduced
8   appraisal of ABC was at $21,600,000 and represented that the appraisal found the value
9   of MGA to be $17,500,000.

10          18.6   On information and belief MORAD never involved the CPA in the
11   appraisal process, never showed the appraisal to the CPA, nor allowed him to review
12   it for accuracy.

13

14   19.   In or around late November or early December 2000, MORAD came to
15   FRED with a proposed price of $8,775,000 for sale of FRED's Stock to ISAAC
16   calculated on 45% of a combined valuation of $19,500,000 for MGA and the other
17   partnership accounts. MORAD represented to FRED that the appraisal placed the value
18   of MGA at $17,500,000.   MORAD said   the   $2,000,000 difference between   the
19   appraisal of $17,500,000 and the $19,500,000 was to satisfy the amount due from
20   ISAAC to FRED for the other partnership accounts. Believing in his uncle's integrity,
21   FRED trusted MORAD's representation of the value found by the appraisal.   In
22   reliance on MORAD's representations, FRED agreed to settle his disputes with ISAAC
23   by selling his interest at the price MORAD represented was determined by the appraisal
24   of MGA and the partnership accounts.

25

26   20.   MORAD's personal attorney Ellis Stern drew up agreements for the sale
27   and settlement of FRED's interest in MGA to ISAAC and the partnership accounts
28   including an Agreement for Sale of Stock, Pledge Agreement, Promissory Note, Mutual

2221.002\9929                           -7-
                                    Complaint

EXHIBIT 15

PAGE 202

1 Release and Consulting Agreement (collectively "December 2000 Agreement"). FRED
2 asked MORAD if FRED should have an attorney to advise him about the transaction.
3 MORAD said no. MORAD said that he would make sure the agreements accurately
4 reflected the transaction and protected both FRED and ISAAC. Based on MORAD's
5 representation, FRED did not have counsel advise him with respect to the transaction
6 and signed the December 2000 Agreement.

7

8  21. In inducing FRED's agreement to sell FRED's Stock to ISAAC, MORAD
9 continued to conceal his fraud and deceit from FRED. MORAD assured FRED that the
10 sale price based on a combined valuation of $19,500,000 for MGA and the partnership
11 accounts was determined by the appraisal and accounting. MORAD convinced FRED
12 to agree to resolve any disputes with ISAAC over the December 2000 Agreement by
13 arbitrating them before MORAD or if MORAD was unavailable before his son
14 KAMBIZ. MORAD repeated to FRED that he should keep resolution of such matters
15 in the family and FRED could trust both MORAD and KAMBIZ. MORAD also
16 claimed that as a director of MGA and as the arbitrator, he would be in a position to
17 protect FRED's interest. In reliance on MORAD's representations including that the
18 appraised value of MGA had been $17,500,000 upon which the sale price for his
19 interest in MGA was based, FRED agreed to the provisions for resolving any disputes
20 over the December 2000 Agreement by arbitrating before MORAD (and if MORAD
21 was unavailable to serve, MORAD's son KAMBIZ) ("December Arbitration
22 Provisions").

23

24  22. MORAD's representations to FRED that FRED should trust him to
25 continue to act as an impartial and honest arbitrator of disputes that might arise under
26 the December 2000 Agreement were false and were made to conceal MORAD's fraud
27 and deceit in the appraisal and valuation of MGA and to induce FRED's agreement to
28 the December Arbitration Provisions so to allow MORAD to hide his wrongful acts and

2221.002\9929   -8-
Complaint

EXHIBIT __15__

PAGE __883__

1  omissions and/or conspiracy with ISAAC. MORAD had not honestly and impartially
2  acted as an arbitrator in the past and had no intent to arbitrate or otherwise act
3  impartially and honestly to resolve any disputes that might arise under the December
4  2000 Agreement. MORAD intended only to use his position as arbitrator to continue
5  to conceal his fraud and deceit and other wrongful acts and omissions toward FRED.
6
7      23.    Under the December 2000 Agreement, MORAD became a director of
8  MGA and took possession of the share certificates for FRED's Stock as Trustee to be
9  held as collateral for ISAAC's payment of the full purchase price to FRED.
10
11     24.    Following the execution of the December 2000 Agreement, MORAD
12  requested FRED to "return the favor" for what MORAD called his "pro-bono
13  arbitration work" in 2000. MORAD requested $10,000.00 from FRED for MORAD's
14  relative. MORAD told FRED that ISAAC had already paid an identical amount.
15  FRED paid the money MORAD requested. In June 2004 FRED's attorneys asked
16  MORAD to disclose and produce evidence of these payments. MORAD, through his
17  attorney Ellis Stern, refused. In or around June 2004, in relation to FRED's inquiry
18  about these payments, MORAD publicly threatened that he "will destroy FRED and
19  make him equal to dirt". On information and belief MORAD sought and obtained a
20  larger payment from ISAAC for MORAD's "pro-bono arbitration work" and for that
21  reason refused to disclose such payments.
22
23     25.    In 2001, ISAAC was unable to make the payment under the promissory
24  note given FRED as part of the December 2000 Agreement. MORAD induced FRED
25  to extend the due date of the note and advanced money on behalf of ISAAC to FRED
26  for payments on the promissory note.
27
28

2221.002\9929                           -9-
                                     Complaint

EXHIBIT    15

PAGE       084

1  26. In or around the summer of 2002, FRED became aware of facts that
2 suggested the valuation of MGA in 2000 represented by MORAD may have been
3 inaccurate and that the actual valuation of MGA was significantly higher because of
4 a license and plans for a product line called "Bratz" which were undisclosed to FRED.
5 FRED requested a copy of the appraisal of MGA performed in 2000. MORAD refused,
6 maintaining that he was legally not allowed to disclose it. FRED did not suspect
7 MORAD of any wrong doing at this time, believing instead that ISAAC had withheld
8 the Bratz information from both FRED and MORAD without MORAD's knowledge
9 or consent.

10

11  27. Subsequently FRED submitted to MORAD his claim that FRED had been
12 defrauded by ISAAC.

13

14  28. A few months after FRED's submission of his claim to MORAD for the
15 fraud in the sale of FRED's Stock, MORAD called a meeting at his offices on January
16 26, 2003. He advised FRED that no lawyers would be allowed and that no evidence
17 would be presented as this was an informal meeting. MORAD tape recorded the
18 meeting which lasted less than two hours. After ISAAC left the meeting, he called
19 MORAD and MORAD reported to FRED that ISAAC said "figure out a way to pay
20 FRED something and get rid of him". On or about September 14, 2004 MORAD
21 declared under oath that the meeting occurred on a different day and was an
22 "arbitration hearing" upon which he "took the matter under submission"!

23

24  29. After the January meeting in several communications, MORAD and
25 KAMBIZ advised FRED ways to settle the claim against ISAAC including buying
26 back a portion of FRED's Stock, which MORAD said he had convinced ISAAC to
27 allow.

28

2221.002\9929    -10-

EXHIBIT 15
AGE 285

1   30.   In 2003, FRED learned that sometime after the January 26, 2003 meeting
2   MORAD had commissioned another appraisal of MGA ("2003 Appraisal"). MORAD
3   told FRED he had commissioned the 2003 Appraisal but did not show it to him. In
4   December 2004 FRED learned that the valuation date of the 2003 Appraisal was as of
5   December 31, 2000 (the effective date under the December 2000 Agreement) and that
6   it found the value of ABC to be $33,805,000. In December 2004 FRED also learned
7   that in or about April 2004, MORAD had commissioned yet another appraisal of MGA
8   based on a valuation date ending December 31, 2001 ("2004 Appraisal").

9

10   31.   Throughout 2003, FRED again asked MORAD and also KAMBIZ to
11   provide FRED a copy of the appraisals. They initially refused to disclose any of the
12   documentation for the appraisals. FRED filed suit in August 2003 against ISAAC for
13   fraud arising from the non-disclosure of the Bratz line (The "Bratz Action"). In
14   September 2003, MORAD promised to give FRED all documents and records relating
15   to the 2000 and 2003 appraisals in exchange for payment of $15,000. MORAD's
16   attorney, Ellis Stern corroborated MORAD's promise to give FRED all of the
17   documents and records related to the appraisal. FRED paid MORAD the $15,000 but
18   then MORAD refused to provide all of the records to FRED. MORAD said instead he
19   had turned over his records and files to his attorney Stern who refused to produce
20   copies to FRED.

21

22   32.   When FRED continued to press for production of MORAD's entire file
23   concerning the 2000 and 2003 appraisals, ISAAC opposed production and demanded
24   that no records from the appraisal be produced. Finally after the Court in the Bratz
25   Action ordered discovery, MORAD's attorneys produced certain of the documents
26   related to the 2000 appraisal but refused to produce documents related to the 2003
27   Appraisal. MORAD's attorney Stern represented to have produced all of the 2000
28   appraisal documentation and provided a privilege log which he later filed in Court. No

2221.002\9929                        -11-
                                    Complaint

EXHIBIT   15

PAGE   286

1   draft appraisals were produced to FRED by MORAD personally or by his attorneys.

2   The draft of the 2000 appraisal, the 2004 Appraisal, and some correspondence from

3   NBA relating to the 2000 appraisals were neither produced nor listed on the privilege

4   log Stern had submitted to FRED and the Court. FRED pursued discovery of NBA and

5   the appraiser but both ISAAC and MORAD opposed it. Ultimately it was not until

6   FRED went to NBA directly in December 2004 that he discovered the extent and nature

7   of MORAD's wrongful acts. The documents and information provided by NBA also

8   revealed that MORAD's attorney, Stern had submitted a false privilege log to FRED

9   and to the Court.

10

11       33.   In or around April to July 2004 FRED learned of translations that

12   MORAD had ordered including translations related to a January 30, 2003 letter

13   MORAD had received from FRED's attorney, and of MORAD's need to use translators

14   in the contemplated arbitration of FRED's claims against ISAAC. These facts and

15   documents were suppressed from FRED by MORAD and his attorney.

16

17       34.   In or around January 2004, FRED demanded of MORAD that FRED's

18   Stock held by MORAD as trustee pursuant to the December 2000 Agreement be

19   maintained pending resolution of FRED's claims against ISAAC. Through his attorney

20   Stern, MORAD agreed. In or around December 2004, FRED demanded that MORAD

21   show FRED the stock certificates. MORAD refused.

22

23       35.   In or around December 2004, FRED obtained documentation and

24   information directly from NBA disclosing that:

25       35.1   NBA had never provided MORAD with an appraisal valuing ABC

26   or MGA at $17,500,000 as MORAD had represented to FRED;

27       35.2   In or around October 2000 NBA transmitted to MORAD an initial

28   draft appraisal valuing ABC at $26,942,000. MORAD then instructed NBA to decrease

2221.002\9929           -12-
                            Complaint

EXHIBIT  15

PAGE  287

1 the value to get close to $20,000,000 and allowed the valuation date to be as of
2 December 31, 1999;

3        35.3 NBA's final reduced appraisal in November 2000 was
4 $21,600,000.00 for the period ending December 31, 1999 and excluded MGAEHK
5 from the valuation;

6        35.4 Commencing in February 2003, NBA met with MORAD and
7 KAMBIZ concerning the November 2000 appraisal because of FRED's claim against
8 ISAAC for fraud;

9        35.5 In February 2003, MORAD commissioned the appraisal of MGA
10 as of December 31, 2000 (2003 Appraisal) without consideration of the Bratz License
11 and product line. This appraisal found the value to be $33,805,000.00;

12        35.6 MORAD subsequently requested NBA to reduce the 2003 Appraisal
13 by applying a minority shareholder discount.

14        35.7 In 2000, NBA had given the draft 2000 appraisal to MORAD and
15 his attorneys.

16        35.8 In 2004, MORAD's attorneys advised NBA to destroy any drafts
17 of the 2000 appraisal.

18        35.9 In 2004 MORAD commissioned the appraisal of ABC as of
19 December 31, 2001 (2004 Appraisal) to obtain a valuation lower than the 2003
20 Appraisal. The 2004 Appraisal, the draft 2000 appraisal, and some correspondence
21 from NBA relating to the 2000 appraisals had been suppressed from FRED and omitted
22 from the privilege log Stern submitted to both FRED and the Court.

23

24     36. FRED is informed and believes that MORAD's suppression of the
25 appraisals, his attempts to destroy and prevent discovery of evidence, and his lies to
26 FRED were calculated to conceal his fraud in the inducement of the Arbitration
27 Agreement and December Arbitration Provisions, his corruption of the appraisal in

28

2221.002\9929          -13-
                  Complaint

EXHIBIT 15

PAGE 288

1   2000, and/or in furtherance of the conspiracy with ISAAC to trick FRED into selling
2   Fred's Stock at a price pre-determined by ISAAC and/or MORAD.

3

4   **FIRST CAUSE OF ACTION FOR PROMISSORY FRAUD INDUCING**
5   **CONSENT TO THE ARBITRATION AGREEMENT**
6   **AGAINST MORAD ZARABI**

7       37.    Plaintiff realleges paragraphs 1 through 36 of this Complaint.

8

9       38.    MORAD's representations to Plaintiff concerning MORAD's intention
10  to neutrally, honestly, completely and accurately appraise the current value of MGA,
11  and account for the other partnership matters, to resolve Plaintiff's disputes with
12  ISAAC were false and known by MORAD to be false when he made them.  The
13  misrepresentations and omissions were material and made to induce Plaintiff to consent
14  to the Arbitration Agreement and selection of MORAD as arbitrator.  The true facts
15  were that MORAD never intended to engage in an accurate, complete and current
16  appraisal of MGA or accounting of the other partnership matters, but rather to set a
17  pre-determined price for the sale of FRED's Stock to ISAAC.  In furtherance of this
18  intent, MORAD concealed his disability in reading and writing English.

19

20      39.    Reasonably relying on MORAD's representation of what MORAD
21  intended to do as an arbitrator and that Plaintiff could trust him, Plaintiff was induced
22  to sign the Arbitration Agreement and selection of MORAD as the arbitrator.  Had
23  Plaintiff known MORAD's true intentions, Plaintiff would not have signed the
24  Arbitration Agreement, and would not have agreed to the December Arbitration
25  Provisions.

26

27      40.    As a result of the fraud and deceit alleged herein, Plaintiff is entitled to
28  rescission of the Arbitration Agreement and the December Arbitration Provisions

2221.002\9929                     -14-
                                 Complaint

EXHIBIT    15
PAGE    209

1  proximately caused by it as well as restitution of all sums obtained by MORAD from
2  Plaintiff because of them.
3
4  ## SECOND CAUSE OF ACTION FOR NEGLIGENT
5  ## MISREPRESENTATIONS INDUCING CONSENT
6  ## TO THE ARBITRATION AGREEMENT
7  ## AGAINST MORAD ZARABI
8  41.  Plaintiff realleges paragraphs 1 through 36 of this Complaint.
9
10  42.  MORAD owed a duty of reasonable care in making representations and
11  statements to Plaintiff regarding MORAD's ability and intentions with respect to the
12  appraisal of MGA and the accounting of the other partnership matters.
13
14  43.  MORAD breached his duty to Plaintiff by making misrepresentations of
15  material facts and by omitting and failing to disclose material facts which he knew or
16  in the exercise of reasonable care should have known were untrue or inaccurate and
17  which he was under a duty to disclose to Plaintiff, including without limitation, his
18  inability to competently read and write English, his intent to set a pre-determined price
19  for Fred's Stock and the value of the other partnership accounts.
20
21  44.  MORAD made the misrepresentations and omissions with the intent to
22  induce Plaintiff to agree to the Arbitration Agreement consenting to arbitrate before
23  MORAD as the arbitrator of the disputes between Plaintiff and ISAAC over MGA and
24  the other partnership matters.
25
26  45.  Plaintiff actually, reasonably and justifiably relied upon the false
27  statements and omissions of MORAD and consented to the Arbitration Agreement.
28  Had Plaintiff known the true facts, Plaintiff would not have entered into the Arbitration

2221.002\9929                           -15-
                                    Complaint

EXHIBIT   15
PAGE      290

1  Agreement and selection of MORAD as the arbitrator, and would not have given

2  MORAD authority as arbitrator to determine the price at which Plaintiff would sell his

3  interest in MGA and the other partnership accounts.

4

5  46.  As a result of the misrepresentation alleged herein, FRED is entitled to

6  rescission of the Arbitration Agreement and the December Arbitration Provisions

7  proximately caused by it and restitution of all sums obtained by MORAD from Plaintiff

8  because of them.

9

10  ## THIRD CAUSE OF ACTION FOR CONSPIRACY TO COMMIT

11  ## PROMISSORY FRAUD INDUCING CONSENT TO THE

12  ## ARBITRATION AGREEMENT

13  ## AGAINST MORAD ZARABI AND ISAAC LARIAN

14  47.  Plaintiff realleges paragraphs 1 through 36 of this Complaint.

15

16  48.  Plaintiff is informed and believes that commencing in or around the

17  summer and fall of 2000, ISAAC and MORAD conspired and agreed together to induce

18  FRED to give MORAD power and authority as an arbitrator to set a price

19  pre-determined by ISAAC and/or MORAD, at which ISAAC would purchase FRED's

20  shares in MGA.

21

22  49.  In furtherance of the conspiracy, MORAD made the misrepresentations

23  and omissions of material facts alleged in this Complaint to induce FRED to consent

24  to arbitration before MORAD and to execute the Arbitration Agreement. MORAD's

25  representations were false and known by MORAD and ISAAC to be false when made.

26

27  50.  In reasonable reliance on the representations of MORAD, Plaintiff

28  executed the Arbitration Agreement.

2221.002\9929                    -16-
                                 Complaint

EXHIBIT 15

PAGE 21

1    51.    Plaintiff is entitled to rescission of the Arbitration Agreement and the
2  December Arbitration Provisions proximately caused by it and restitution of all sums
3  obtained by MORAD from Plaintiff because of them.

5        **FOURTH CAUSE OF ACTION FOR DECLARATORY RELIEF**
6          **OVER VALIDITY OF THE ARBITRATION AGREEMENT**
7            **AND THE DECEMBER ARBITRATION PROVISIONS**
8              **AGAINST MORAD ZARABI AND ISAAC LARIAN**
9    52.    Plaintiff realleges paragraphs 1 though 36 of this Complaint.

11    53.    An actual justiciable controversy exists between Plaintiff on the one hand,
12  and Defendants MORAD and ISAAC on the other hand in that Plaintiff contends that
13  the Arbitration Agreement was void ab initio due to the fraud and deceit of MORAD
14  and/or ISAAC inducing Plaintiff's consent to it; and that the December Arbitration
15  Provisions are likewise void because they were proximately caused by Plaintiff's
16  consent to the Arbitration Agreement.  Plaintiff is informed and believes that
17  Defendants MORAD and ISAAC contend that the Arbitration Agreement is valid and
18  enforceable and that there is no basis for invalidating or voiding the Arbitration
19  Agreement or the December Arbitration Provisions.

21    54.    Plaintiff has no accurate remedy at law and the parties require a judicial
22  declaration of their legal rights and obligations with respect to the Arbitration
23  Agreement and the December Arbitration Provisions.

2221.002\9929                          -17-
                                      Complaint

EXHIBIT  15

PAGE  292

## FIFTH CAUSE OF ACTION FOR FRAUD IN THE INDUCEMENT
## OF THE DECEMBER ARBITRATION PROVISIONS
## AGAINST MORAD ZARABI

55.     Plaintiff realleges paragraphs 1 through 36 of this Complaint.

56.     MORAD's representations to FRED in or around the end of November or the beginning of December 2000 concerning the accuracy of the appraisal of MGA, the appraised value being $17,500,000, and MORAD's honesty and trustworthiness were false when made and known by MORAD to be false when made. The true facts were that MORAD concealed the appraisal showing the value of MGA to be significantly greater than the representation to Plaintiff, and concealed the fact that he had corrupted and acted to distort the appraisal of MGA by ordering the appraiser to reduce the value to close to $20,000,000. In making the misrepresentations and omissions, MORAD intended to induce Plaintiff to agree to resolve any disputes arising from the December 2000 Agreement by arbitration before MORAD and/or KAMBIZ, so that MORAD could continue to conceal his fraud and deceit and his wrongful acts and omissions.

57.     The misrepresentations and omissions to Plaintiff were material and Plaintiff reasonably relied on them to his detriment and by them was induced to enter into the December Arbitration Provisions.

58.     As the result of MORAD's fraud and deceit, Plaintiff is entitled to rescission of the December Arbitration Provisions and restitution of all sums obtained by MORAD from Plaintiff because of them.

EXHIBIT    15

PAGE    273

### SIXTH CAUSE OF ACTION FOR NEGLIGENT
### MISREPRESENTATION INDUCING CONSENT TO
### THE DECEMBER ARBITRATION PROVISIONS
### AGAINST MORAD ZARABI

59.   Plaintiff realleges paragraphs 1 through 36 of this Complaint.

60.   MORAD owed a duty of reasonable care in making representations and statements to Plaintiff regarding the appraised value of MGA and the accounting of the other partnership matters.

61.   MORAD breached his duty to Plaintiff by making misrepresentations of material facts and by omitting and failing to disclose material facts which he knew or in the exercise of reasonable care should have known were inaccurate and which he was under a duty to disclose to Plaintiff, including without limitation, the true and correct valuation of MGA found by NBA's appraisal.

62.   MORAD made the misrepresentations and omissions with the intent to induce Plaintiff to consent to the December Arbitration Provisions selecting MORAD and his son KAMBIZ as the arbitrators with sole authority to determine disputes between Plaintiff and ISAAC arising from the December 2000 Agreement.

63.   Plaintiff actually, reasonably and justifiably relied upon the false statements and omissions of MORAD.  Had Plaintiff known the true facts, Plaintiff would not have entered into the December Arbitration Provisions which selected MORAD and his son KAMBIZ as the arbitrators.

2221.002\9929

-19-

Complaint

EXHIBIT  15

PAGE  214

64. As a result of MORAD's misrepresentations Plaintiff is entitled to rescission of the December Arbitration Provision and restitution of all sums obtained by MORAD from Plaintiff because of them.

## SEVENTH CAUSE OF ACTION FOR CONSPIRACY TO FRAUDULENTLY INDUCE EXECUTION OF THE DECEMBER ARBITRATION PROVISIONS AGAINST MORAD ZARABI AND ISAAC LARIAN

65. Plaintiff realleges paragraphs 1 through 36 of this Complaint.

66. Plaintiff is informed and believes that the misrepresentations and omissions by MORAD in late November to December 2000 were carried out pursuant to a conspiracy and agreement between MORAD and ISAAC to induce FRED to agree to arbitrate all disputes before MORAD and KAMBIZ so they could continue to conceal MORAD's and ISAAC's fraud and conspiracy.

67. In furtherance of the conspiracy, MORAD committed the acts alleged in this Complaint, including without limitation manipulating and corrupting the appraisal, lying to FRED about the appraised value of MGA and inducing FRED to resolve all disputes arising out of the agreement by arbitration before MORAD or KAMBIZ in order to conceal the conspiracy.

68. As the result of the misrepresentations by MORAD pursuant to the conspiracy of ISAAC and MORAD which induced FRED's consent to the December Arbitration Provisions, Plaintiff is entitled to rescission of the December Arbitration Provisions and restitution of all sums obtained by MORAD from Plaintiff because of them.

2221.002\9929                                      -20-

EXHIBIT __15__

PAGE __715__

**EIGHTH CAUSE OF ACTION FOR DECLARATORY RELIEF**
**OVER VALIDITY OF THE DECEMBER ARBITRATION PROVISIONS**
**AGAINST ISAAC LARIAN**

69.     Plaintiff reallages paragraphs 1 though 36 of this Complaint.

70.     An actual justiciable controversy exists between Plaintiff on the one hand and ISAAC on the other hand in that Plaintiff contends that the December Arbitration Provisions were void ab initio due to the fraud and deceit of MORAD and/or ISAAC inducing Plaintiff's consent to them while Plaintiff is informed and believes that ISAAC contends that the December Arbitration Provisions are valid and enforceable and that there is no basis for invalidating or voiding them, in whole or part.

71.     Plaintiff has no adequate remedy at law and the parties require a judicial declaration of their legal rights and obligations with respect to the December Arbitration Provisions.

**NINTH CAUSE OF ACTION FOR DECLARATORY JUDGMENT**
**OVER THE DISQUALIFICATION OF MORAD ZARABI**
**AND KAMBIZ ROBERT ZARABI FROM SERVING AS ARBITRATORS**
**AGAINST ISAAC LARIAN, MORAD ZARABI**
**AND KAMBIZ ROBERT ZARABI**

72.     Plaintiff realleges paragraphs 1 through 36 of this Complaint.

73.     An actual justiciable controversy exists between Plaintiff on the one hand and Defendants on the other hand in that Plaintiff contends that as a result of the position, facts and circumstances concerning MORAD and KAMBIZ alleged in this Complaint, they are disqualified under California law from exercising any power or authority as an arbitrator of any disputes between Plaintiff and Defendant ISAAC

EXHIBIT  15
PAGE  216

1  LARIAN; while Plaintiff is informed and believes that Defendants and each of them
2  contend that MORAD and KAMBIZ are not so disqualified.

4      74.    Plaintiff has no adequate remedy at law and the parties require a judicial
5  declaration of their legal rights and obligations with respect to the ability of MORAD
6  and KAMBIZ to exercise power and authority as arbitrators under the December 2000
7  Agreement.

9       **TENTH CAUSE OF ACTION  FOR DECLARATORY JUDGMENT**
10          **OVER ENFORCEABILITY OF ARBITRATION AGREEMENTS**
11                  **AGAINST ISAAC LARIAN**

12      75.    Plaintiff realleges paragraphs 1 through 36 of this Complaint.

14      76.    An actual justiciable controversy exists between Plaintiff on the one hand
15  and Defendant ISAAC LARIAN on the other hand in that Plaintiff contends that the
16  Arbitration Agreement and the December Arbitration Provisions are unenforceable in
17  that they are agreements to arbitrate solely before MORAD ZARABI and in the case
18  of the December Arbitration Provisions, KAMBIZ ZARABI if MORAD is unavailable
19  or such arbitrators as either of them might appoint if MORAD and KAMBIZ are both
20  unavailable.  Because MORAD and KAMBIZ are disqualified under California law,
21  neither may serve as arbitrator or appoint arbitrators. Plaintiff is informed and believes
22  that Defendant ISAAC LARIAN disputes the disqualification of MORAD and
23  KAMBIZ ZARABI and that notwithstanding any disqualification of MORAD and
24  KAMBIZ, contends the arbitration agreements are legally enforceable.

26      77.    Plaintiff has no adequate remedy at law and the parties require judicial
27  declaration of their rights and obligations with respect to the Arbitration Agreement
28  and the December Arbitration Provisions and their enforceability.

2221.002\9929                              -22-
                                        Complaint

EXHIBIT ___15___

PAGE ____717____

1   **ELEVENTH CAUSE OF ACTION FOR RESCISSION**
2   **OF THE DECEMBER 2000 AGREEMENT BASED ON PROMISSORY**
3   **FRAUD INDUCING CONSENT TO ARBITRATION AGREEMENT**
4   **AGAINST MORAD ZARABI AND ISAAC LARIAN**

5       78.     Plaintiff realleges paragraphs 1 through 36 of this Complaint.

6

7       79.     The fraud and deceit of MORAD and/or conspiracy of MORAD and
8   ISAAC to deceive and defraud, inducing Plaintiff to consent to the Arbitration
9   Agreement proximately caused Plaintiff's consent to the December 2000 Agreement.
10  As a consequence of Plaintiff's entitlement to rescission of the Arbitration Agreement,
11  Plaintiff is also entitled to rescission of the December 2000 Agreement, including the
12  Pledge Agreement and restitution of his stock in MGA subject to any accounting
13  required by law.

14

15      80.     As a proximate result of Defendants wrongful conduct, Plaintiff has been
16  damaged in an amount and of a nature according to proof at trial.

17

18      81.     MORAD's wrongful acts were conducted maliciously, oppressively and
19  fraudulently with the intent to injure Plaintiff. Plaintiff is therefore entitled to an award
20  of punitive damages sufficient to punish MORAD and deter such conduct in the future.

21

22              **TWELFTH CAUSE OF ACTION FOR RESCISSION**
23                  **OF THE DECEMBER 2000 AGREEMENT**
24              **AGAINST MORAD ZARABI AND ISAAC LARIAN**

25      82.     Plaintiff realleges paragraphs 1 through 36 of this Complaint.

26

27      83.     MORAD's fraud and deceit and/or the conspiracy of MORAD and ISAAC,
28  to defraud and deceive, inducing Plaintiff into believing that MORAD had carried out

2221.002\9929                         -23-
                              Complaint

EXHIBIT   15

PAGE   218

1  an accurate, complete, and current appraisal of MGA which purportedly had

2  determined the value of MGA to be $17,500,000 proximately caused Plaintiff to

3  consent to the December 2000 Agreement and consequently Plaintiff is entitled to

4  rescission of it, including the Pledge Agreement and restitution of his stock in MGA

5  subject to any accounting required by law.

7     84.    As a proximate result of Defendants wrongful conduct, Plaintiff has been

8  damaged in an amount and of a nature according to proof at trial.

10    85.    MORAD's wrongful acts were conducted maliciously, oppressively and

11  fraudulently with the intent to injure Plaintiff. Plaintiff is therefore entitled to an award

12  of punitive damages sufficient to punish MORAD and deter such conduct in the future.

14            **THIRTEENTH CAUSE OF ACTION FOR RESCISSION BASED ON**

15                  **NEGLIGENT MISREPRESENTATIONS INDUCING**

16                      **THE DECEMBER 2000 AGREEMENT**

17                          **AGAINST MORAD ZARABI**

18    86.    Plaintiff realleges paragraphs 1 through 36 of this Complaint.

20    87.    MORAD owed a duty of reasonable care in making representations and

21  statements to Plaintiff regarding a) his purported intention to impartially arbitrate the

22  sale of Plaintiff's interest in MGA by an accurate, complete, and current appraisal and

23  b) the true and correct appraised value of MGA and the accounting of the other

24  partnership matters.

26    88.    MORAD breached his duty to Plaintiff by making misrepresentations of

27  material facts and by omitting and failing to disclose material facts which he knew or

28  in the exercise of reasonable care should have known were inaccurate and which he

2221.002\9929                           -24-
                                      Complaint

EXHIBIT __15__

PAGE __217__

1  was under a duty to disclose to Plaintiff, including without limitation, MORAD's true
2  intentions regarding setting the price for Plaintiff's stock and the true and correct
3  valuation of MGA found by NBA's appraisal.

4

5       89.    MORAD's misrepresentations induced Plaintiff's execution of the
6  December 2000 Agreement and Plaintiff is entitled to rescission of it, including the
7  Pledge Agreement and to restitution of his stock in MGA subject to an accounting
8  required by law.

9

10      90.   As a proximate result of Defendants wrongful conduct, Plaintiff has been
11  damaged in an amount and of a nature according to proof at trial.

12

13             **FOURTEENTH CAUSE OF ACTION FOR DECLARATORY**
14        **RELIEF OVER VALIDITY OF THE DECEMBER 2000 AGREEMENT**
15                            **AGAINST ISAAC LARIAN**

16      91.    Plaintiff realleges paragraphs 1 through 36 of this Complaint.

17

18      92.    An actual justiciable controversy exists between Plaintiff on the one hand
19  and Defendant ISAAC on the other hand  in that Plaintiff contends that the December
20  2000 Agreement was void ab initio due to the fraud and deceit of MORAD and/or
21  ISAAC inducing Plaintiff's consent to it while Plaintiff is informed and believes that
22  ISAAC contends the December 2000 Agreement is valid, enforceable and that there is
23  no basis for invalidating or voiding it.

24

25      93.    Plaintiff has no accurate remedy at law and the parties require a judicial
26  declaration of their legal rights and obligations with respect to the December 2000
27  Agreement.

28

2221.002\9929                        -25-
                                   Complaint

EXHIBIT _15_

PAGE _300_

### FIFTEENTH CAUSE OF ACTION FOR CONSTRUCTIVE TRUST, PRELIMINARY INJUNCTION AND ACCOUNTING AGAINST MORAD ZARABI AND ISAAC LARIAN

94.    Plaintiff realleges paragraphs 1 through 36 of this Complaint.

95.    The share certificates for FRED's Stock were held in trust by MORAD pursuant to a pledge agreement made by ISAAC in connection with the December 2000 Agreement. Plaintiff has made demand on MORAD to show him the share certificates, but MORAD has failed and refused to do so. Plaintiff is informed and believes that MORAD has turned over the stock certificates or other instruments affecting the stock certificates to ISAAC.

96.    By virtue of their fraudulent acts, Plaintiff is entitled to rescission of the December 2000 Agreement and to restitution of his stock in MGA subject to an accounting by the Court of any amount of the consideration Plaintiff received for his stock that must be returned to Isaac, which Plaintiff hereby offers to restore. Defendants and each of them hold FRED's Stock as a constructive trustee for Plaintiff's benefit. Plaintiff is informed and believes that the stock certificates may be voided, lost or destroyed and Plaintiff's stock interest diluted or altered to Plaintiff's detriment unless Defendants and each of them are enjoined and restrained from taking any acts of any nature with respect to Plaintiff's stock certificates and stock interest.

97.    Plaintiff does not know what amounts, if any have accrued or been distributed on account of Plaintiff's MGA stock and an accounting is therefore necessary to determine what amounts, if any are due Plaintiff on account of his MGA stock.

2221.002\9929                                  -26-
                                           Complaint

EXHIBIT 15

PAGE 301

1    WHEREFORE, Plaintiff prays for judgment as follows:

2

3    1.    That the September 28, 2000 Agreement to Arbitrate and Selection of

4    Arbitrator is declared void ab initio or is rescinded;

5    2.    That the December Arbitration Provisions are declared void ab initio or

6    are rescinded;

7    3.    That MORAD ZARABI is judicially declared as disqualified from serving

8    as an arbitrator of any disputes between Plaintiff and Defendant ISAAC LARIAN;

9    4.    That KAMBIZ ROBERT ZARABI is judicially declared as disqualified

10   from serving as an arbitrator of any disputes between Plaintiff and Defendant ISAAC

11   LARIAN;

12   5.    That Defendants and each of them and their agents and employees hold

13   Plaintiff's MGA Stock as constructive trustees for Plaintiff's benefit;

14   6.    That Defendants and each of them, their agents, employees and all those

15   in active concert and participation with them are preliminarily and permanently

16   enjoining from transferring, disposing of, or altering FRED's Stock certificates or

17   interest in MGA;

18   7.    That the December 2000 Agreement (including all related agreements) is

19   declared void ab initio or is rescinded;

20   8.    That Plaintiff's stock in MGA be restored to him;

21   9.    For an accounting of all monies accruing to or distributed on account of

22   Plaintiff's stock in MGA;

23   10.   For damages as allowed by law and according to proof at trial;

24   11.   For reasonable attorneys fees;

25   12.   For costs as allowed by law;

26   13.   For punitive damages as allowed by law and according to proof at trial;

27   and

28

2221.002\9929                              -27-
                                        Complaint

EXHIBIT    15

PAGE    302

1   14.   For such other relief as the Court deems just and proper.

2

3   Dated: February 24, 2005                    William C. Conkle
                                                Mark D. Kremer
4                                               Eric S. Engel, members of
                                                CONKLE & OLESTEN
5                                               Professional Law Corporation

6

7                                    By: _____
                                                Mark D. Kremer
8                                               Attorneys for Plaintiff

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2221.002\9929                      -28-
                                Complaint

EXHIBIT    15

PAGE    303

1           <u>VERIFICATION</u>

2

3       I have read the foregoing **Verified Complaint** and know its contents.

4       ☒    I am a party to this action. The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

5

6       ☐    I am _____ of _____, a party to this action, and am authorized to make this verification for and on its behalf, and I make this verification for that reason.

7       ☐    I am informed and believe and on that ground allege that the matters stated in the foregoing document are true.

8

9       ☒    The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

10

11      ☐    I am one of the attorneys for _____, a party to this action. Such party is absent from the county of aforesaid where such attorneys have their offices, and I make this verification for and on behalf of that party for that reason. I am informed and believe and on that ground allege that the matters stated in the foregoing document are true.

12

13       Executed on February 25, 2005.

14       I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

15

16

17     <u>Farhad Larian</u>           Farhad L_____
        Print Name of Signator        Signature

18

19

20

21

22

23

24

25

26

27

28

Verification to Complaint

EXHIBIT _15_

PAGE _304_

**ORIGINAL**

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, state bar number, and address): | FOR COURT USE ONLY |
|---|---|
| Mark D. Kremer<br>Conkle & Olesten, Professional Law Corporation<br>3130 Wilshire Blvd., Suite 500<br>Santa Monica, CA 90403<br>TELEPHONE NO. 310-998-9100   FAX NO: 310-998-9109<br>ATTORNEY FOR (Name): Plaintiff | **FILED**<br>LOS ANGELES SUPERIOR COURT<br>FEB 2 8 2005<br>JOHN A. CLARKE, EXECUTIVE OFFICER/CLERK<br>BY<br>**J. SUNGA, DEPUTY** |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles
STREET ADDRESS: 111 N. Hill Street
MAILING ADDRESS:
CITY AND ZIP CODE: Los Angeles, CA 90012-3014
BRANCH NAME: Central District

| CASE NAME: Farhad Larian v. Morad Zarabi, et al. | |
|---|---|

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: |
|---|---|---|
| [X] Unlimited   [ ] Limited<br>(Amount demanded exceeds $25,000)   (Amount demanded is $25,000 or less) | [ ] Counter   [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 1811) | **BC 329501**<br>JUDGE:<br>DEPT: |

*All five (5) items below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

| Auto Tort | Contract | Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 1800–1812) |
|---|---|---|
| [ ] Auto (22)<br>[ ] Uninsured motorist (46)<br>**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**<br>[ ] Asbestos (04)<br>[ ] Product liability (24)<br>[ ] Medical malpractice (45)<br>[ ] Other PI/PD/WD (23)<br>**Non-PI/PD/WD (Other) Tort**<br>[ ] Business tort/unfair business practice (07)<br>[ ] Civil rights (08)<br>[ ] Defamation (13)<br>[ ] Fraud (16)<br>[ ] Intellectual property (19)<br>[ ] Professional negligence (25)<br>[ ] Other non-PI/PD/WD tort (35)<br>**Employment**<br>[ ] Wrongful termination (36)<br>[ ] Other employment (15) | [ ] Breach of contract/warranty (06)<br>[ ] Collections (09)<br>[ ] Insurance coverage (18)<br>[X] Other contract (37)<br>**Real Property**<br>[ ] Eminent domain/inverse condemnation (14)<br>[ ] Wrongful eviction (33)<br>[ ] Other real property (26)<br>**Unlawful Detainer**<br>[ ] Commercial (31)<br>[ ] Residential (32)<br>[ ] Drugs (38)<br>**Judicial Review**<br>[ ] Asset forfeiture (05)<br>[ ] Petition re: arbitration award (11)<br>[ ] Writ of mandate (02)<br>[ ] Other judicial review (39) | [ ] Antitrust/Trade regulation (03)<br>[ ] Construction defect (10)<br>[ ] Mass tort (40)<br>[ ] Securities litigation (28)<br>[ ] Environmental/Toxic tort (30)<br>[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)<br>**Enforcement of Judgment**<br>[ ] Enforcement of judgment (20)<br>**Miscellaneous Civil Complaint**<br>[ ] RICO (27)<br>[ ] Other complaint *(not specified above)* (42)<br>**Miscellaneous Civil Petition**<br>[ ] Partnership and corporate governance (21)<br>[ ] Other petition *(not specified above)* (43) |

2. This case [ ] is  [X] is not  complex under rule 1800 of the California Rules of Court. If case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties   d. [ ] Large number of witnesses
   b. [ ] Extensive motion practice raising difficult or novel   e. [ ] Coordination with related actions pending in one or more courts issues that will be time-consuming to resolve   in other counties, states or countries, or in a federal court
   c. [ ] Substantial amount of documentary evidence   f. [ ] Substantial post-judgment judicial supervision
3. Type of remedies sought *(check all that apply):*
   a. [X] monetary   b. [X] nonmonetary; declaratory or injunctive relief   c. [X] punitive
4. Number of causes of action *(specify):* 15
5. This case [ ] is  [X] is not  a class action suit.
Date: February 24, 2005
Mark D. Kremer
(TYPE OR PRINT NAME)                                                      (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
• Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate, Family, or Welfare and Institutions Code). (Cal. Rules of Court, rule 201.8.) Failure to file may result in sanctions.
• File this cover sheet in addition to any cover sheet required by local court rule.
• If this case is complex under rule 1800 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
• Unless this is a complex case, this cover sheet shall be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2003] | **CIVIL CASE COVER SHEET** | Legal<br>Solutions<br>Plus | Cal. Rules of Court, rules 201.8, 1800–1812;<br>Standards of Judicial Administration, § 19 |

EXHIBIT ___15___

PAGE ___305___

# ORIGINAL

| SHORT TITLE Farhad Larian v. Morad Zarabi, et al. | CASE NUMBER BC329501 |
|---|---|

## CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION
### (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

This form is required pursuant to LASC Local Rule 2.0 in all new civil case filings in the Los Angeles Superior Court.

Item I. Check the types of hearing and fill in the estimated length of hearing expected for this case:

JURY TRIAL? [X] YES  CLASS ACTION? [ ] YES  LIMITED CASE? [ ] YES  TIME ESTIMATED FOR TRIAL 7___ [ ] HOURS/ [X] DAYS.

Item II.  Select the correct district and courthouse location (4 steps – If you checked "Limited Case", skip to Item III, Pg. 4):

Step 1:  After first completing the Civil Case Cover Sheet Form, find the main civil case cover sheet heading for your case in the left margin below, and, to the right in Column A, the Civil Case Cover Sheet case type you selected.

Step 2:  Check one Superior Court type of action in Column B below which best describes the nature of this case.

Step 3:  In Column C, circle the reason for the court location choice that applies to the type of action you have checked. For any exception to the court location, see Los Angeles Superior Court Local Rule 2.0.

### Applicable Reasons for Choosing Courthouse Location (See Column C below)

1. Class Actions must be filed in the County Courthouse, Central District.
2. May be filed in Central (Other county, or no Bodily Injury/Property Damage).
3. Location where cause of action arose.
4. Location where bodily injury, death or damage occurred.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.
7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office.

Step 4:  Fill in the information requested on page 4 in Item III; complete Item IV.  Sign the declaration.

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| Auto Tort | Auto (22) | ☐ A7100  Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| | Uninsured Motorist (46) | ☐ A7110  Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1., 2., 4. |
| Other Personal Injury/Property Damage/Wrongful Death Tort | Asbestos (04) | ☐ A6070  Asbestos Property Damage | 2. |
| | | ☐ A7221  Asbestos - Personal Injury/Wrongful Death | 2. |
| | Product Liability (24) | ☐ A7260  Product Liability (not asbestos or toxic/environmental) | 1., 2., 3., 4., 8. |
| | Medical Malpractice (45) | ☐ A7210  Medical Malpractice - Physicians & Surgeons | 1., 2., 4. |
| | | ☐ A7240  Other Professional Health Care Malpractice | 1., 2., 4. |
| | Other Personal Injury Property Damage Wrongful Death (23) | ☐ A7250  Premises Liability (e.g., slip and fall) | 1., 2., 4. |
| | | ☐ A7230  Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.) | 1., 2., 4. |
| | | ☐ A7270  Intentional Infliction of Emotional Distress | 1., 2., 3. |
| | | ☐ A7220  Other Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| Non-Personal Injury/Property Damage/Wrongful Death Tort | Business Tort (07) | ☐ A6029  Other Commercial/Business Tort (not fraud/breach of contract) | 1., 2., 3. |
| | Civil Rights (08) | ☐ A6005  Civil Rights/Discrimination | 1., 2., 3. |
| | Defamation (13) | ☐ A6010  Defamation (slander/libel) | 1., 2., 3. |
| | Fraud (16) | ☐ A6013  Fraud (no contract) | 1., 2., 3. |
| | Intellectual Property (19) | ☐ A6016  Intellectual Property | 2., 3. |

CIV 109 03-04
LASC Approved

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

LASC, rule 2.0
Page 1 of 4
LA-461

EXHIBIT ___15___

PAGE ___306___

| SHORT TITLE: Farhad Larian v. Morad Zarabi, et al. | CASE NUMBER |
|---|---|

| A<br>Civil Case Cover<br>Sheet Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons<br>– See Step 3 Above |
|---|---|---|
| Professional Negligence<br>(25) | ☐ A6017  Legal Malpractice | 1., 2., 3. |
| | ☐ A6050  Other Professional Malpractice (not medical or legal) | 1., 2., 3. |
| Other (35) | ☐ A6025  Other Non-Personal Injury/Property Damage tort | 2., 3. |
| Wrongful Termination<br>(36) | ☐ A6037  Wrongful Termination | 1., 2., 3. |
| Other Employment<br>(15) | ☐ A6024  Other Employment Complaint Case | 1., 2., 3. |
| | ☐ A6109  Labor Commissioner Appeals | 10. |
| Breach of Contract/<br>Warranty<br>(06)<br>(not insurance) | ☐ A6004  Breach of Rental/Lease Contract (not Unlawful Detainer or wrongful eviction) | 2., 5. |
| | ☐ A6008  Contract/Warranty Breach-Seller Plaintiff (no fraud/negligence) | 2., 5. |
| | ☐ A6019  Negligent Breach of Contract/Warranty (no fraud) | 1., 2., 5. |
| | ☐ A6028  Other Breach of Contract/Warranty (not fraud or negligence) | 1., 2., 5. |
| Collections<br>(09) | ☐ A6002  Collections Case-Seller Plaintiff | 2., 5., 6. |
| | ☐ A6012  Other Promissory Note/Collections Case | 2., 5. |
| Insurance Coverage<br>(18) | ☐ A6015  Insurance Coverage (not complex) | 1., 2., 5., 8. |
| Other Contract<br>(37) | ☒ A6009  Contractual Fraud | 1., ②3., 5. |
| | ☐ A6031  Tortious Interference | 1., 2., 3., 5. |
| | ☐ A6027  Other Contract Dispute (not breach/insurance/fraud/negligence) | 1., 2., 3., 8. |
| Eminent Domain/Inverse Condemnation (14) | ☐ A7300  Eminent Domain/Condemnation   Number of parcels _____ | 2. |
| Wrongful Eviction<br>(33) | ☐ A6023  Wrongful Eviction Case | 2., 6. |
| Other Real Property<br>(26) | ☐ A6018  Mortgage Foreclosure | 2., 6. |
| | ☐ A6032  Quiet Title | 2., 6. |
| | ☐ A6060  Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2., 6. |
| Unlawful Detainer – Commercial (31) | ☐ A6021  Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 2., 6. |
| Unlawful Detainer – Residential (32) | ☐ A6020  Unlawful Detainer-Residential (not drugs or wrongful eviction) | 2., 6. |
| Unlawful Detainer – Drugs (38) | ☐ A6022  Unlawful Detainer-Drugs | 2., 6. |
| Asset Forfeiture (05) | ☐ A6108  Asset Forfeiture Case | 2., 6. |
| Petition re Arbitration (11) | ☐ A6115  Petition to Compel/Confirm/ Vacate Arbitration | 2., 5. |

Left margin vertical labels: Non-Personal Injury/Property Damage/ Wrongful Death Tort (Cont'd.) · Employment · Contract · Real Property · Unlawful Detainer · Judicial Review

CIV 109 03-04
LASC Approved

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

LASC, rule 2.0
Page 2 of 4

EXHIBIT ___15___

PAGE ___307___

| SHORT TITLE: Farhad Larian v. Morad Zarabi, et al. | CASE NUMBER | |
|---|---|---|

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| **Judicial Review (Cont'd.)** | Writ of Mandate<br>(02) | ☐ A6151  Writ - Administrative Mandamus<br>☐ A6152  Writ - Mandamus on Limited Court Case Matter<br>☐ A6153  Writ - Other Limited Court Case Review | 2., 8.<br>2.<br>2. |
| | Other Judicial Review<br>(39) | ☐ A6150  Other Writ / Judicial Review | 2., 8. |
| **Provisionally Complex Litigation** | Antitrust/Trade<br>Regulation (03) | ☐ A6003  Antitrust/Trade Regulation | 1., 2., 8. |
| | Construction Defect (10) | ☐ A6007  Construction defect | 1., 2., 3. |
| | Claims Involving Mass<br>Tort (40) | ☐ A6006  Claims Involving Mass Tort | 1., 2., 8. |
| | Securities Litigation (28) | ☐ A6035  Securities Litigation Case | 1., 2., 8. |
| | Toxic Tort<br>Environmental (30) | ☐ A6036  Toxic Tort/Environmental | 1., 2., 3., 8. |
| | Insurance Coverage<br>Claims from Complex<br>Case (41) | ☐ A6014 . Insurance Coverage/Subrogation (complex case only) | 1., 2., 5., 8. |
| **Enforcement of Judgment** | Enforcement<br>of Judgment<br>(20) | ☐ A6141  Sister State Judgment<br>☐ A6160  Abstract of Judgment<br>☐ A6107  Confession of Judgment (non-domestic relations)<br>☐ A6140  Administrative Agency Award (not unpaid taxes)<br>☐ A6114  Petition/Certificate for Entry of Judgment on Unpaid Tax<br>☐ A6112  Other Enforcement of Judgment Case | 2., 9.<br>2., 6.<br>2., 9.<br>2., 8.<br>2., 8.<br>2., 8., 9. |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ A6033  Racketeering (RICO) Case | 1., 2., 8. |
| | Other Complaints<br>(Not Specified Above)<br>(42) | ☐ A6030  Declaratory Relief Only<br>☐ A6040  Injunctive Relief Only (not domestic/harassment)<br>☐ A6011  Other Commercial Complaint Case (non-tort/non-complex)<br>☐ A6000  Other Civil Complaint (non-tort/non-complex) | 1., 2., 8.<br>2., 8.<br>1., 2., 8.<br>1., 2., 8. |
| **Miscellaneous Civil Petitions** | Partnership/Corporation<br>Governance (21) | ☐ A6113  Partnership and Corporate Governance Case | 2., 8. |
| | Other Petitions<br>(Not Specified Above)<br>(43) | ☐ A6121  Civil Harassment<br>☐ A6123  Workplace Harassment<br>☐ A6124  Elder/Dependent Adult Abuse Case<br>☐ A6190  Election Contest<br>☐ A6110  Petition for Change of Name<br>☐ A6170  Petition for Relief from Late Claim Law<br>☐ A6100  Other Civil Petition | 2., 3., 9.<br>2., 3., 9.<br>2., 3., 9.<br>2.<br>2., 7.<br>2., 3., 4., 8.<br>2., 9. |

CIV 109 03-04
LASC Approved

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

LASC, rule 2.0
Page 3 of 4

EXHIBIT ___ 15

PAGE ___ 308

| SHORT TITLE Farhad Larian v. Morad Zarabi, et al. | CASE NUMBER |
|---|---|

Item III. Statement of Location: Enter the address of the accident, party's residence or place of business, performance, or other circumstance indicated in Item II., Step 3 on Page 1, as the proper reason for filing in the court location you selected.

| REASON: CHECK THE NUMBER UNDER COLUMN C WHICH APPLIES IN THIS CASE | | | ADDRESS. |
|---|---|---|---|
| ☐1. ☒2. ☐3. ☐4. ☐5. ☐6. ☐7. ☐8. ☐9. ☐10. | | | 20120 Plummer Street |
| CITY Chatsworth | STATE. CA | ZIP CODE 91311 | |

Item IV. *Declaration of Assignment:* I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that the above-entitled matter is properly filed for assignment to the __Stanley Mosk__ courthouse in the __Central__ District of the Los Angeles Superior Court

(Code of Civ. Proc., § 392 et seq., and LASC Local Rule 2.0, subds. (b), (c) and (d)).

Dated: __February 24, 2005__

_____
(SIGNATURE OF ATTORNEY/FILING PARTY)

---

**PLEASE HAVE THE FOLLOWING DOCUMENTS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.

2. If filing a Complaint, a completed Summons form for issuance by the Clerk.

3. Civil Case Cover Sheet form JC 982.2(b)(1).

4. Complete Addendum to Civil Case Cover Sheet form CIV 109 _____ (eff. Date).

5. Payment in full of the filing fee, unless fees have been waived.

6. Signed order appointing the Guardian ad Litem, JC form 982(a)(27), if the plaintiff or petitioner is a minor under 18 years of age, or if required by Court.

7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

| CIV 109 03-04 LASC Approved | CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION | LASC, rule 2.0 Page 4 of 4 |
|---|---|---|

EXHIBIT __15__

PAGE __309__

EXHIBIT 16

Westlaw.

123 Cal.App.4th 751

123 Cal.App.4th 751, 19 Cal.Rptr.3d 916, 04 Cal. Daily Op. Serv. 9657, 04 Cal. Daily Op. Serv. 10,191, 2004 Daily Journal D.A.R. 13,211
(Cite as: 123 Cal.App.4th 751)

Page 1

**H**
Larian v. Larian
Cal.App. 2 Dist.,2004.

Court of Appeal, Second District, Division 5, California.
Farhad LARIAN, Plaintiff and Respondent,
v.
Isaac LARIAN, Defendant and Appellant.
No. B171891.

Oct. 28, 2004.
As Modified on Denial of Rehearing Nov. 16, 2004.

Background: Shareholder in family corporation sued president of corporation, alleging, inter alia, fraud in arbitration process leading to shareholder's sale of shares at below market value. President moved to compel arbitration pursuant to parties' agreement to arbitrate. The Superior Court, Los Angeles County, No. BC301371,Rodney E. Nelson, J., denied motion, and president appealed.

Holding: The Court of Appeal, Turner, P.J., held that there was no evidence of fraud in inception or execution of arbitration agreement, and thus shareholder's claim that president's fraud was sufficient to warrant nonenforcement of arbitration agreement was to be resolved in arbitral forum.

Reversed with directions.

Mosk, J., filed an opinion concurring in the result.
West Headnotes
**[1] Alternative Dispute Resolution 25T ⟜117**

25T Alternative Dispute Resolution
  25TII Arbitration

25TII(A) Nature and Form of Proceeding
  25Tk117 k. Preemption. Most Cited Cases
(Formerly 33k2.2 Arbitration)

**States 360 ⟜18.15**

360 States
  360I Political Status and Relations
    360I(B) Federal Supremacy; Preemption
      360k18.15 k. Particular Cases, Preemption or Supersession. Most Cited Cases
(Formerly 33k2.2 Arbitration)
The United States Arbitration Act was inapplicable to judicial resolution of arbitration agreement that provided that California law applied. 9 U.S.C.A. § 1 et seq.

**[2] Alternative Dispute Resolution 25T ⟜113**

25T Alternative Dispute Resolution
  25TII Arbitration
    25TII(A) Nature and Form of Proceeding
      25Tk113 k. Arbitration Favored; Public Policy. Most Cited Cases
(Formerly 33k1.2 Arbitration)
California law favors enforcement of arbitration agreements.

**[3] Alternative Dispute Resolution 25T ⟜139**

25T Alternative Dispute Resolution
  25TII Arbitration
    25TII(B) Agreements to Arbitrate
      25Tk136 Construction
        25Tk139 k. Construction in Favor of Arbitration. Most Cited Cases
(Formerly 33k7.1 Arbitration)
Any doubts as to whether an arbitration clause applies to a particular dispute should be resolved in favor of requiring the parties to arbitrate.

**[4] Alternative Dispute Resolution 25T ⟜112**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT _____ 16

PAGE _____ 310

123 Cal.App.4th 751                                                                          Page 2

123 Cal.App.4th 751, 19 Cal.Rptr.3d 916, 04 Cal. Daily Op. Serv. 9657, 04 Cal. Daily Op. Serv. 10,191, 2004
Daily Journal D.A.R. 13,211
(Cite as: 123 Cal.App.4th 751)

25T Alternative Dispute Resolution
   25TII Arbitration
     25TII(A) Nature and Form of Proceeding
       25Tk112 k. Contractual or Consensual
Basis. Most Cited Cases
   (Formerly 33k2.2 Arbitration)

**Alternative Dispute Resolution 25T ☜134(1)**

25T Alternative Dispute Resolution
   25TII Arbitration
     25TII(B) Agreements to Arbitrate
      25Tk131 Requisites and Validity
       25Tk134 Validity
        25Tk134(1) k. In General. Most
Cited Cases
   (Formerly 33k6.2 Arbitration)
The right to compel arbitration depends upon the
existence of a valid agreement to arbitrate between
the parties, and this question is determined by
reference to the law applicable to contracts
generally.

**[5] Alternative Dispute Resolution 25T ☜112**

25T Alternative Dispute Resolution
   25TII Arbitration
     25TII(A) Nature and Form of Proceeding
      25Tk112 k. Contractual or Consensual
Basis. Most Cited Cases
   (Formerly 33k1.1 Arbitration)
Although California has a strong public policy in
favor of arbitration, there is no preference for the
arbitral forum when the parties have not agreed to
arbitrate.

**[6] Alternative Dispute Resolution 25T ☜210**

25T Alternative Dispute Resolution
   25TII Arbitration
     25TII(D) Performance, Breach, Enforcement,
and Contest
      25Tk204 Remedies and Proceedings for
Enforcement in General
       25Tk210 k. Evidence. Most Cited
Cases
   (Formerly 33k23.10 Arbitration)
Before a party may be compelled to arbitrate a

claim, the petitioning party has the burden of
proving the existence of a valid arbitration clause
and the dispute is covered by the agreement.

**[7] Alternative Dispute Resolution 25T ☜210**

25T Alternative Dispute Resolution
   25TII Arbitration
     25TII(D) Performance, Breach, Enforcement,
and Contest
      25Tk204 Remedies and Proceedings for
Enforcement in General
       25Tk210 k. Evidence. Most Cited
Cases
   (Formerly 33k23.10 Arbitration)
If a party moving to compel arbitration meets its
burden of proving the existence of a valid
arbitration clause and the dispute is covered by the
agreement, the opponent of arbitration has to prove
by a preponderance of the evidence any defense to
the petition or motion to compel the dispute to be
arbitrated.

**[8] Alternative Dispute Resolution 25T ☜134(3)**

25T Alternative Dispute Resolution
   25TII Arbitration
     25TII(B) Agreements to Arbitrate
      25Tk131 Requisites and Validity
       25Tk134 Validity
        25Tk134(3) k. Validity of Assent.
Most Cited Cases
   (Formerly 33k6.2 Arbitration)
There was no evidence of fraud in inception or
execution of agreement to arbitrate between
shareholder and president of family corporation,
and thus shareholder's claim that president's fraud in
arbitration process, leading to shareholder's sale of
shares at below market value, was sufficient to
warrant nonenforcement of arbitration agreement
was to be resolved in arbitral forum; shareholder's
evidence indicated only fraud in inducement, which
was not sufficient to render agreement
unenforceable.
*See 6 Witkin, Cal. Procedure (4th ed. 1997)
Proceedings Without Trial, §§ 501, 502; Knight et
al., Cal. Practice Guide: Alternative Dispute
Resolution (The Rutter Group 2003) ¶ 5:112 et*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT _____ 16

PAGE _____ 311

123 Cal.App.4th 751, 19 Cal.Rptr.3d 916, 04 Cal. Daily Op. Serv. 9657, 04 Cal. Daily Op. Serv. 10,191, 2004
Daily Journal D.A.R. 13,211
(Cite as: 123 Cal.App.4th 751)

seq. (CAADR Ch. 5-D); Cal. Jur. 3d, Arbitration
and Award, § 36; Cal. Civil Practice
(Thomson/West 2003) Procedure, § 26:49.

**917 Kaye Scholer LLP, Larry R. Feldman,
Robert M. Turner, and J. Andrew Sjoblom, Los
Angeles, for Defendant and Appellant.
Howarth & Smith, Don Howarth, Suzelle M. Smith,
Brian D. Bubb, and Robert D. Brain, Los Angeles,
for Plaintiff and Respondent.TURNER, P.J.

*754 I. INTRODUCTION

Defendant, Isaac Larian, appeals from an order
denying his motion to compel arbitration. The
lawsuit containing numerous causes of action was
filed by plaintiff, Farhad Larian. Plaintiff and
defendant are brothers. We conclude there is no
evidence the parties signed the September 28, or
December 4, 2000, arbitration agreements because
of any fraud in the inception or execution as defined
by the California Supreme Court in Rosenthal v.
Great Western Fin. Securities Corp. (1996) 14
Cal.4th 394, 415-416, 58 Cal.Rptr.2d 875, 926 P.2d
1061. In the absence of evidence of fraud in the
inception or execution of the September 28 or
December 4, 2000, arbitration agreements, the trial
court was required to grant defendant's motion to
compel the parties to arbitrate their dispute. We
reverse the order denying the motion to compel
arbitration.

II. BACKGROUND

A. The Complaint

The complaint, containing 10 causes of action, was
filed on August 25, 2003. It alleges plaintiff and
defendant formed an equal partnership in 1979 to
import and distribute name brand consumer
products. In 1982, the partnership was
incorporated as a closely held corporation, ABC
International Traders, Inc. In 1985 or 1986, plaintiff
and defendant sold 10 percent of their stock to their
brother-in-law. After the sale, plaintiff and
defendant each owned 45 percent of the stock of the

company. In 1994, plaintiff and defendant became
equal 45 percent shareholders in MGA Hong Kong,
Limited and operated part of ABC International
Traders, Inc. through this entity. In 2002, the name
of ABC International Traders, Inc. was changed to
MGA Entertainment, Inc. In 1993, plaintiff and
defendant began having disputes over the operation
of the company. Plaintiff and defendant discussed
having one brother buy out the other's equity
interest. An outside appraisal of the company
valued the company at $35 million to $40 million.

**918 By 1999, defendant, as president, assumed
control of sales, product development, and financial
matters. Plaintiff was less involved in the
day-to-day sales and financial control of the
company. In late 1999 or early 2000, *755
defendant became aware of "Bratz" dolls, a new
product line which had a tremendous potential. The
complaint alleges that, after learning of the product
line, defendant devised a plan to keep the business
opportunity, the Bratz doll product line, secret from
plaintiff and to gain control of the company. The
complaint alleged that defendant intended to gain
control of MGA Entertainment, Inc. by buying
plaintiff's shares at a depressed value. The buyout
would not include the potential business opportunity
involving the new doll line.

In "early" 2000, defendant called a meeting to
discuss the new Bratz product line with selected
members of the company. Defendant concealed
the meeting and discussion about the proposed new
product line from plaintiff. In February 2000,
defendant tried to dissuade plaintiff from attending
the New York Toy Fair. Plaintiff had routinely
attended the New York Toy Fair in the past.
Defendant was furious with plaintiff for attending
the toy fair, where discussions and research for
market potential and new product lines take place.
Defendant expelled plaintiff from meetings plaintiff
tried to attend. Plaintiff was excluded from any
discussions defendant may have had relating to the
Bratz product line at the fair.

In early March 2000, defendant offered to purchase
all of plaintiff's 45 percent interest in the company,
MGA Entertainment, Inc., for $9 million. The

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT ___14___

PAGE ___312___

123 Cal.App.4th 751                                                                                        Page 4

123 Cal.App.4th 751, 19 Cal.Rptr.3d 916, 04 Cal. Daily Op. Serv. 9657, 04 Cal. Daily Op. Serv. 10,191, 2004
Daily Journal D.A.R. 13,211
(Cite as: 123 Cal.App.4th 751)

offer was based on a total value of the company at $20 million. This did not include plans and actions already taken regarding the Bratz product line, which allegedly would bring $3 billion in sales in the next few years. The financial information at the company was handled by defendant and its controller, Dennis Medici.

The complaint further alleged that throughout 2000, defendant repeatedly and routinely shared with plaintiff misleading financial information showing the company was performing poorly. In May 2000, defendant instructed Mr. Medici not to share any information about the financial operation of MGA Entertainment, Inc. with plaintiff. Defendant continued to conceal the company's plans and actions regarding the new doll line.

It is alleged that, on September 18, 2000, defendant caused the company to enter into a worldwide licensing agreement of the Bratz dolls and related items. Defendant concealed the existence of the licensing agreement from plaintiff. During September 2000, defendant continued to seek to buy plaintiff's interest in MGA Entertainment, Inc. The complaint alleges: "[Defendant] kept the Bratz opportunity and other information about the true financial *756 condition of the Company hidden from [plaintiff] in an effort to secure [plaintiff's] agreement to a proposed arbitration process with their uncle, Morad Zarabi. [Defendant] agreed, and induced [plaintiff] to agree, to the arbitration process without disclosing that during the arbitration he would conceal the Company's plans and actions undertaken regarding the Bratz line, and other financial information about the Company so that such information would not be included in Mr. Zarabi's valuation of the Company."

On September 28, 2000, plaintiff and defendant executed an "Agreement to Arbitrate and Selection of Arbitrator." Plaintiff alleges he was unaware of the true facts before executing the arbitration agreement; had he known the true facts, he would not have entered into the agreement to arbitrate and would not have **919 agreed to sell his shares; he would have placed greater restrictions and obligations on the powers of any arbitrator

including a requirement that the company be valued by an independent appraiser outside of the family; and defendant fraudulently concealed the true facts from plaintiff and the arbitrator during the arbitration process.

On December 4, 2000, as a result of the September 28, 2000, agreement to arbitrate the sale of the stock, the parties entered into a settlement and resolution of their differences, whereby plaintiff agreed to sell his shares to defendant at a below fair market price of less than $9 million. Plaintiff discovered the true facts in spring or summer 2002. Plaintiff requested rescission and damages based on the following theories: fraud and deceit in the inducement of the arbitration agreement (first); fiduciary duties breach (second); fraud and deceit in the arbitration process (third); breach of the implied covenant of good faith and fair dealing in the arbitration agreement (fourth); violation of California Corporations Code (fifth and sixth); fraud and deceit regarding the December 4, 2000 agreement (seventh); negligent misrepresentation (eighth); unfair competition in violation of Business and Professions Code section 17200 et seq. (ninth); and rescission based on mistake (10th).

B. The Motion to Compel Arbitration

On October 24, 2003, defendant moved to compel arbitration of the action on the grounds the parties entered into a broad arbitration agreement which covers the disputes alleged in the complaint; by executing the September 28, 2000, agreement, plaintiff agreed to submit the fraud claim asserted in the complaint to the arbitrator; and the arbitrator must decide the fraud claims as a matter of law. In support of the motion, defendant attached a copy of the *757 September 28, 2000, arbitration agreement. Paragraph 5 of the September 28, 2000, arbitration agreement gave an uncle, Morad Zarabi, the power to arbitrate the disputes between the brothers.

Defendant declared that the parties participated in the arbitration. The arbitrator, Mr. Zarabi, retained an appraiser, an accountant, and attorneys. Mr.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT ___ 16___

PAGE ___ 313___

123 Cal.App.4th 751                                                                                    Page 5

123 Cal.App.4th 751, 19 Cal.Rptr.3d 916, 04 Cal. Daily Op. Serv. 9657, 04 Cal. Daily Op. Serv. 10,191, 2004
Daily Journal D.A.R. 13,211
(Cite as: 123 Cal.App.4th 751)

Zarabi also gathered information and conducted hearings. In December 2000, Mr. Zarabi, the arbitrator, issued his award. The December 4, 2000, agreement required defendant to purchase plaintiff's stock. According to defendant, "[The award] was embodied in the Agreement for Sale of Stock drafted by the arbitrator's attorneys, Stern & Goldberg." Under the terms of the December 4, 2000, agreement, plaintiff was to receive $8,775,000 for his stock. For the stock, defendant was to pay plaintiff $500,000 at the closing of escrow. Defendant was also obligated to execute a promissory note for the balance. Under the terms of the promissory note, defendant was required to pay plaintiff $2 million by April 15, 2001. Moreover, defendant was obligated to pay plaintiff $83,798.90 commencing the first of each month commencing June 1, 2001. Interest was to accrue at the rate of 9.5 percent per annum on unpaid sums. Paragraph 9 of the December 4, 2000, sales agreement contains the following arbitration clause: "[A]ny controversy between the parties arising out of this Agreement or the Agreements contained in the Exhibits attached hereto shall be submitted to [Mr. Zarabi] who shall serve as sole arbitrator with respect to said disputes. The decision of [Mr. Zarabi] shall be final and binding upon both parties."

On January 26, 2003, plaintiff submitted a list of claims to the arbitrator, Mr. Zarabi. Plaintiff asserted these claims were subject to arbitration. The list included: "The December 2000 appraisal of MGA, **920 which the arbitrator relied upon to establish the value of MGA, was substantially understated as a result of [defendant's] concealment of the Bratz doll license agreement. That license agreement was material to the value of MGA but was not considered in setting MGA's value because of [defendant's] concealment from the arbitrator."

Plaintiff opposed the motion to compel arbitration on the grounds the court, not the arbitrator, must decide whether a party was fraudulently induced to consent to an arbitration agreement; fraud in the inducement of the arbitration agreement was not submitted to any arbitrator; and the court should resolve the fraud in the inducement claim because

the arbitration proceedings could be void. Plaintiff declared that on September 18, 2000, defendant secretly finalized and obtained a worldwide license agreement for *758 the Bratz dolls. The September 18, 2000, agreement provided that defendant and MGA Entertainment, Inc. were the exclusive worldwide distributors of Bratz dolls and related products. Ten days later, on September 28, 2000, defendant induced plaintiff to sign the arbitration agreement without disclosing the Bratz opportunity and licenses. The Bratz product line has generated several hundred million dollars in revenues for MGA Entertainment, Inc. and is expected to earn more than $1 billion annually for the company. Further, according to plaintiff, Mr. Zarabi never returned an award. Rather, the December 4, 2000, stock sale agreement was the result of negotiations between plaintiff and defendant.

In reply to the opposition, defendant argued plaintiff did not dispute the critical facts which required arbitration of the dispute. Those facts included that the parties agreed to arbitrate the sale of the stock in September 2000. Mr. Zarabi, the arbitrator, decided which party should sell his stock to the other and the price. On December 4, 2000, the brothers signed the sales agreement incorporating the price and terms as determined by the arbitrator, Mr. Zarabi. The parties have fully performed the sales transaction. Defendant contended plaintiff submitted the fraud issue to the arbitrator in January 2003. Defendant further argued that the complaint only alleges fraud during the events leading up to the agreements; it does not allege facts showing fraud in the inducement or execution of the arbitration clauses. According to defendant, the issue of whether he fraudulently withheld information during the arbitration process must be decided by the arbitrator.

The trial court denied the motion to compel concluding that the allegation of fraud in the execution of the arbitration agreement as alleged in the complaint must be decided by the court. In denying the motion, the court cited Code of Civil Procedure section 1281 [FN1]; Rosenthal v. Great Western Fin. Securities Corp., supra, 14 Cal.4th at

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT ____16____

PAGE ____314____

Page 6

123 Cal.App.4th 751

123 Cal.App.4th 751, 19 Cal.Rptr.3d 916, 04 Cal. Daily Op. Serv. 9657, 04 Cal. Daily Op. Serv. 10,191, 2004 Daily Journal D.A.R. 13,211
(Cite as: 123 Cal.App.4th 751)

page 419, 58 Cal.Rptr.2d 875, 926 P.2d 1061; and *Bolter v. Superior Court* (2001) 87 Cal.App.4th 900, 906, 104 Cal.Rptr.2d 888. The trial court ruled that the complaint adequately alleged that had plaintiff known about the pending Bratz product line, he would not have: signed the arbitration agreement, agreed to participate in the arbitration, and agreed to sell his shares in MGA Entertainment, Inc. The trial court further ruled: "It is true ... that there are references to the arbitration process in the [f]irst [c]ause of [a]ction. The concealment of the Bratz line from the arbitrator was a **921 ... piece of the process. That is, plaintiff would have no complaint if the full facts had been revealed in the arbitration. Both those references do not eliminate the allegations that he would not have entered into the arbitration agreement but for the alleged fraud."

FN1. All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

*759 III. Discussion

A. Overview

[1][2][3][4][5] The outcome of this appeal is controlled by the provisions of the California Arbitration Act. The September 28, 2000, arbitration agreement explicitly provides it is subject to the California Arbitration Act. Further, the December 4, 2000, agreement provides it is to be applied pursuant to California law. Hence, the United States Arbitration Act, title 9 United States Code section 1 et seq., is inapplicable to this appeal. (*Volt Information Sciences, Inc. v. Board of Trustees of Leland* (1989) 489 U.S. 468, 470, 109 S.Ct. 1248, 103 L.Ed.2d 488; accord, *Mount Diablo Medical Center v. Health Net of California, Inc.* (2002) 101 Cal.App.4th 711, 714-726, 124 Cal.Rptr.2d 607.) California law favors enforcement of arbitration agreements. (*Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 97, 99 Cal.Rptr.2d 745, 6 P.3d 669; *Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 9, 10 Cal.Rptr.2d 183,

832 P.2d 899.)Section 1281 provides: "A written agreement to submit to arbitration an existing controversy or a controversy thereafter arising is valid, enforceable and irrevocable, save upon such grounds as exist for the revocation of any contract." The trial court has authority to compel arbitration pursuant to section 1281.2, which provides in part: "On petition of a party to an arbitration agreement alleging the existence of a written agreement to arbitrate a controversy and that a party thereto refuses to arbitrate such controversy, the court shall order the petitioner and respondent to arbitrate the controversy if it determines that an agreement to arbitrate the controversy exists, unless it determines that ... [¶] (b) Grounds exist for the revocation of the agreement." Plaintiff argues that he was fraudulently induced to enter into the September 28, 2000, arbitration agreement. It is this fraud that plaintiff argues warrants revocation, or to be more precise, nonenforcement of the September 28, 2000, arbitration agreement. Any doubts as to whether an arbitration clause applies to a particular dispute should be resolved in favor of requiring the parties to arbitrate. (*Vianna v. Doctors' Management Co.* (1994) 27 Cal.App.4th 1186, 1189, 33 Cal.Rptr.2d 188; *United Transportation Union v. Southern Cal. Rapid Transit Dist.* (1992) 7 Cal.App.4th 804, 808, 9 Cal.Rptr.2d 702.) However, the right to compel arbitration depends upon the existence of a valid agreement to arbitrate between the parties. (*County of Contra Costa v. Kaiser Foundation Health Plan, Inc.* (1996) 47 Cal.App.4th 237, 245, 54 Cal.Rptr.2d 628; *Marsch v. Williams* (1994) 23 Cal.App.4th 250, 255, 28 Cal.Rptr.2d 398.) The question of whether a valid agreement to arbitrate exists is determined by reference to the law applicable to contracts generally.*760 *Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 971-973, 64 Cal.Rptr.2d 843, 938 P.2d 903; *Kinney v. United HealthCare Services, Inc.* (1999) 70 Cal.App.4th 1322, 1327-1328, 83 Cal.Rptr.2d 348.) Although, as noted, California has a strong public policy in favor of arbitration, there is no preference for the arbitral forum when the parties have not agreed to arbitrate. (*Freeman v. State Farm Mut. Auto. Ins. Co.* (1975) 14 Cal.3d 473, 481, 121 Cal.Rptr. 477, 535 P.2d 341; *Cione v. Foresters Equity Services, Inc.* (1997) 58

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT ____14____

PAGE ____315____

123 Cal.App.4th 751                                                                                           Page 7

123 Cal.App.4th 751, 19 Cal.Rptr.3d 916, 04 Cal. Daily Op. Serv. 9657, 04 Cal. Daily Op. Serv. 10,191, 2004 Daily Journal D.A.R. 13,211
(Cite as: 123 Cal.App.4th 751)

Cal.App.4th 625, 634, 68 Cal.Rptr.2d 167.)

**922 [6][7] Before a party may be compelled to arbitrate a claim, the petitioning party has the burden of proving the existence of a valid arbitration clause and the dispute is covered by the agreement. (*Engalla v. Permanente Medical Group, Inc., supra,* 15 Cal.4th at p. 972, 64 Cal.Rptr.2d 843, 938 P.2d 903; *Rosenthal v. Great Western Fin. Securities Corp., supra,* 14 Cal.4th at · pp. 413-414, 58 Cal.Rptr.2d 875, 926 P.2d 1061.) If the moving party meets its burden, the opponent of arbitration has to prove by a preponderance of the evidence any defense to the petition or motion to compel the dispute to be arbitrated. (*Engalla v. Permanente Medical Group, Inc., supra,* 15 Cal.4th at p. 972, 64 Cal.Rptr.2d 843, 938 P.2d 903; *Rosenthal v. Great Western Fin. Securities Corp., supra,* 14 Cal.4th at p. 413, 58 Cal.Rptr.2d 875, 926 P.2d 1061.) Each case must be decided on its ' own facts. (*King v. Larsen Realty, Inc.* (1981) 121 Cal.App.3d 349, 357, 175 Cal.Rptr. 226; *Williams Constr. Co. v. Standard-Pacific Corp.* (1967) 254 Cal.App.2d 442, 454, 61 Cal.Rptr. 912.)

### B. Supreme Court Authority

Three Supreme Court decisions define the limited scope of judicial review of a claim that fraud prevents enforcement of an arbitration clause. In *Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc. v. 100 Oak Street* (1983) 35 Cal.3d 312, 315, 197 Cal.Rptr. 581, 673 P.2d 251, a lease contained an arbitration clause. A dispute arose about the air conditioning in the premises and the tenant, a law firm, filed suit. The tenant argued it was fraudulently induced to enter into the lease which contained the arbitration clause. The trial court accepted the tenant's fraudulent inducement defense to the arbitration clause contention. The trial court entered an order denying the lessor's motion to compel arbitration.

The Supreme Court held that claims of fraud in the inducement must be resolved by the arbitrator: " Therefore, in the absence of indication of contrary intent, and where the arbitration clause is·

reasonably susceptible of such an interpretation, claims of fraud in the inducement of the contract (as distinguished from claims of fraud directed to the arbitration clause itself) *761 will be deemed subject to arbitration." (*Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc. v. 100 Oak Street, supra,* 35 Cal.3d at p. 323, 197 Cal.Rptr. 581, 673 P.2d 251.) Associate Justice Joseph R. Grodin then explained that the trial court's order denying the motion to compel the parties to arbitrate because of the fraudulent representations which induced the tenant to execute the lease which contained the arbitration clause was in error: " Indeed, the claim of substantive breach-that the air conditioning did not perform properly-is totally embraced within the claim of fraud-that the lessor knew, at the time of the lease, that the air conditioning would not perform. Thus, if the trial court were to proceed to determine the fraud claim it would almost certainly have to decide the claim of substantive breach as well, and the original expectations of the parties-that such questions would be determined through arbitration-would be totally defeated. However the fraud claim were determined, there would be virtually nothing left for the arbitrator to decide. We conclude that the arbitration clause is broad enough to include this claim of fraud in the inducement." (*Id.* at p. 324, 197 Cal.Rptr. 581, 673 P.2d 251.)

In *Rosenthal v. Great Western Fin. Securities Corp., supra,* 14 Cal.4th at page 415, 58 Cal.Rptr.2d 875, 926 P.2d 1061, the Supreme Court explained the distinction between arbitrable and nonarbitrable fraud claims which are asserted as grounds for voiding an arbitration clause: **923 " California law distinguishes between fraud in the ' execution' or 'inception' of a contract and fraud in the 'inducement' of a contract. In brief, in the former case " 'the fraud goes to the inception or execution of the agreement, so that the promisor is deceived as to the nature of his act, and actually does not· know what he is signing, or does not intend to enter into a contract at all, mutual assent is lacking, and [the contract] is *void.* In such a case it may be disregarded without the necessity of rescission.' "(*Ford v. Shearson Lehman American Express, Inc.* (1986) 180 Cal.App.3d 1011, 1028

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT ___ 14

PAGE ___ 316

Case 2:04-cv-09049-DOC-RNB Document 3337-4 Filed 04/28/08 Page 87 of 95 Page ID #:57835

123 Cal.App.4th 751

Page 8

123 Cal.App.4th 751, 19 Cal.Rptr.3d 916, 04 Cal. Daily Op. Serv. 9657, 04 Cal. Daily Op. Serv. 10,191, 2004 Daily Journal D.A.R. 13,211
(Cite as: 123 Cal.App.4th 751)

[225 Cal.Rptr. 895].) Fraud in the inducement, by contrast, occurs when " 'the promisor knows what he is signing but his consent is *induced* by fraud, mutual assent is present and a contract is formed, which, by reason of the fraud, is *voidable*. In order to escape from its obligations the aggrieved party must rescind....' " (*Ibid.*)"(*Rosenthal v. Great Western Fin. Securities Corp., supra,* 14 Cal.4th at p. 415, 58 Cal.Rptr.2d 875, 926 P.2d 1061; see *Pacific State Bank v. Greene* (2003) 110 Cal.App.4th 375, 389, fn. 7, 1 Cal.Rptr.3d 739.)

The Supreme Court then explained that when fraud in the inception or execution of the *arbitration clause* is present (the first of the two types of fraud identified in the immediately preceding citation), the dispute is not arbitrable: "[C]laims of fraud in the execution of the entire agreement are not arbitrable under either state or federal law. If the entire contract is void *ab initio* because of fraud, the . parties have not agreed to arbitrate any controversy . ... [¶] [By contrast,] fraud in the inducement relating to other *762 contractual terms does not render the arbitration agreement unenforceable, even when it might justify rescission of the contract as a whole. By entering into the arbitration agreement, the parties established their intent that disputes coming within the agreement's scope be determined by an arbitrator rather than a court; this contractual intent must be respected even with regard to claims of fraud in the inducement of the contract generally." (*Rosenthal v. Great Western Fin. Securities Corp., supra,* 14 Cal.4th at p. 416, 58 Cal.Rptr.2d 875, 926 P.2d 1061.) The Supreme Court summarized its analysis thusly: "Claims that a party has employed fraud in inducing consent specifically to the arbitration agreement (e.g., by actively concealing its existence or misrepresenting its meaning or value) are, under *Prima Paint* [ *v. Flood & Conklin* (1967) 388 U.S. 395, 404, 87 S.Ct. 1801], to be decided by the court, because they go to the valid making of the arbitration clause itself. Claims that, due to fraud in the execution of the agreement as a whole, the parties reached no contract containing an arbitration clause, are also to be decided by the court. But claims that the contract as a whole was obtained through fraud in the inducement are, in the absence of evidence of

the parties' contrary intent, arbitrable under *Prima Paint.* Included in this rule of arbitrability are claims of a 'grand scheme' of fraud, or fraud ' permeating' the transaction." (*Rosenthal v. Great Western Fin. Securities Corp., supra,* 14 Cal.4th at p. 419, 58 Cal.Rptr.2d 875, 926 P.2d 1061.)

In *Rosenthal,* when defining fraud in the inception or execution as it relates to an arbitration clause, the Supreme Court adverted directly to section 163 of the Restatement Second of Contracts including comments a and c, at pages 443-444. (*Rosenthal v. Great Western Fin. Securities Corp., supra,* 14 Cal.4th at p. 420, 58 Cal.Rptr.2d 875, 926 P.2d 1061.) Section 163 of the Restatement Second of Contracts which is part of the discussion of misrepresentation states, "If a misrepresentation as to the character or essential terms of a proposed contract induces conduct that appears**924 to be a manifestation of assent by one who neither knows nor has reasonable opportunity to know of the character or essential terms of the proposed contract, his conduct is not effective as a manifestation of assent." Comment a to section 163 of the Restatement Second of Contracts which is cited in *Rosenthal* states in part: "*Rationale.* Under the general principle stated in § 19(2), a party's conduct is not effective as a manifestation of his assent unless he knows or has reason to know that the other party may infer from it that he assents. This Section involves an application of that principle where a misrepresentation goes to what is sometimes called the 'factum' or the 'execution' rather than merely the 'inducement.' If, because of a misrepresentation as to the character or essential terms of a proposed contract, a party does not know or have reasonable opportunity to know of its character or essential terms, then he neither knows nor has reason to know that the other party may infer from his conduct that he assents to that contract." Comment c to section 163 of the Restatement Second of *763 Contracts which is cited in *Rosenthal* part merely indicates that an agreement described in this provision is a "void contract."

In *Rosenthal,* the Supreme Court reviewed the evidence presented by the different plaintiffs in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 16
PAGE 317

123 Cal.App.4th 751                                                                                        Page 9

123 Cal.App.4th 751, 19 Cal.Rptr.3d 916, 04 Cal. Daily Op. Serv. 9657, 04 Cal. Daily Op. Serv. 10,191, 2004
Daily Journal D.A.R. 13,211
(Cite as: 123 Cal.App.4th 751)

order to determine whether there was fraud in the inception or execution of the arbitration agreement. The fraud in the inception or execution evidence as it related to the arbitration clauses in *Rosenthal* differed amongst the plaintiffs. For varying reasons, some plaintiffs had not read the agreements containing the arbitration clauses. The Supreme Court adopted the following test for evaluating the fraud in the inception or execution claims of the plaintiffs which were asserted as a basis for voiding the arbitration clauses: "California law, like the Restatement, requires that the plaintiff, in failing to acquaint himself or herself with the contents of a written agreement before signing it, not have acted in an objectively unreasonable manner. One party's misrepresentations as to the nature or character of the writing do not negate the other party's apparent manifestation of assent, if the second party had ' reasonable opportunity to know of the character or essential terms of the proposed contract.' (Rest.2d Contracts, § 163, p. 443.) If a party, with such reasonable opportunity, fails to learn the nature of the document he or she signs, such 'negligence' precludes a finding the contract is void for fraud in the execution. (*C.I.T. Corporation v. Panac* [ (1944) ] 25 Cal.2d [547,] 549 [154 P.2d 710].)[¶] It follows that one party's *unreasonable* reliance on the other's misrepresentations, resulting in a failure to read a written agreement before signing it, is an insufficient basis, under the doctrine of fraud in the execution, for permitting that party to avoid an arbitration agreement contained in the contract." ( *Rosenthal v. Great Western Fin. Securities Corp., supra,* 14 Cal.4th at p. 423, 58 Cal.Rptr.2d 875, 926 P.2d 1061; see *Lovejoy v. A T & T Corp.* (2004) 119 Cal.App.4th 151, 161, 14 Cal.Rptr.3d 117; *Pacific State Bank v. Greene, supra,* 110 Cal.App.4th at p. 393, 1 Cal.Rptr.3d 739.) Based on this legal premise concerning the scope of fraud in the inception or execution, the Supreme Court concluded some of the plaintiffs acted unreasonably in not reading the arbitration clauses. As to these plaintiffs, the trial court was not authorized to pass on their fraud defenses posited in response to the motion to compel arbitration. (*Rosenthal v. Great Western Fin. Securities Corp., supra,* 14 Cal.4th at pp. 425-426, 58 Cal.Rptr.2d 875, 926 P.2d 1061.) But the Supreme Court noted that other plaintiffs

who executed investment contracts containing**925 arbitration clauses, some of whom had very limited understandings of English, were blind, or suffered from Alzheimer's disease, could reasonably rely on defendants' agents' representations as to the contents of the agreements including the arbitration clauses. This latter group of plaintiffs were entitled to have the trial judge evaluate their fraud defenses to the arbitration clauses. (*Id.* at pp. 427-428, 58 Cal.Rptr.2d 875, 926 P.2d 1061; *Jones v. Adams Financial Services* (1999) 71 Cal.App.4th 831, 837, 84 Cal.Rptr.2d 151 [legally blind signatory to agreement suffering from dementia entitled to void arbitration clause on fraud in execution grounds].)

*764 It bears emphasis that *Rosenthal* merely held that a fraud in the inception or execution defense to an arbitration demand was to be decided by a judge. A party is still entitled to argue a fraud defense before an arbitrator as a ground for invalidating the arbitration clause. The Supreme Court cautioned, " Whether a fraud claim that is insufficient as a defense to an arbitration demand may, if proven, nonetheless form the basis for equitable or other relief in the arbitral forum, is a separate issue, with which we have no concern in this case." (*Rosenthal v. Great Western Fin. Securities Corp., supra,* 14 Cal.4th at p. 423, 58 Cal.Rptr.2d 875, 926 P.2d 1061.)

The third Supreme Court case to hold that courts evaluate fraud in the inception or execution defense to an arbitration demand was *Engalla v. Permanente Medical Group, Inc., supra,* 15 Cal.4th at pages 973-984, 64 Cal.Rptr.2d 843, 938 P.2d 903.

In *Engalla,* the plaintiffs presented evidence that defendant, a medical group, made misrepresentations concerning its arbitration clause. The relevant portion of the health care plan made the following representations as to the promised speed of the arbitration process provided by the medical group: " 'Within 30 days after initial service on a Respondent, Claimant and Respondent each shall designate an arbitrator and give written notice of such designation to the other, and Claimant shall forward $150, made payable to Kaiser Foundation [¶] Health Plan Arbitration Account, to Kaiser Foundation Health Plan.... This

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT ___ 16___

PAGE ___ 318___

123 Cal.App.4th 751                                                                                    Page 10

123 Cal.App.4th 751, 19 Cal.Rptr.3d 916, 04 Cal. Daily Op. Serv. 9657, 04 Cal. Daily Op. Serv. 10,191, 2004
Daily Journal D.A.R. 13,211
(Cite as: 123 Cal.App.4th 751)

$150 will be deposited with Respondent's $150 in a special account maintained by Bank of America National Trust and Savings Association [and will] ... provide the initial funds to pay the fees of the neutral arbitrator and expenses of arbitration as approved by him or her.... Within 30 days after these notices have been given and payments made, the two arbitrators so selected shall select a neutral arbitrator and give notice of the selection to Claimant and all Respondents served, and the three arbitrators shall hold a hearing within a reasonable time thereafter ...."(*Id.* p. 962, fn. 3, 64 Cal.Rptr.2d 843, 938 P.2d 903.)There was evidence that in fact the arbitration process provided by the health care group took years to complete. The plaintiffs also presented evidence the medical group knew its agents would not timely appoint arbitrators nor move towards and arbitration hearing. (*Id.* at pp. 974-976, 64 Cal.Rptr.2d 843, 938 P.2d 903.) The Supreme Court concluded: "In sum, we conclude there is evidence to support the [plaintiffs'] claims that [the defendant] fraudulently induced [the plaintiffs] to enter the arbitration agreement in that it misrepresented the speed of its arbitration program, a misrepresentation on which [the plaintiffs'] employer relied by selecting [the defendant's] health plan for its employees, and that the [plaintiffs] suffered delay in the resolution of its malpractice claim as a result of that reliance, despite [the plaintiffs'] own reasonable diligence. The trial court, on remand, must resolve conflicting factual evidence in order to properly adjudicate **926 [the defendant's] petition to compel arbitration." (*Engalla v. Permanente Medical Group, Inc., supra,* 15 Cal.4th at pp. 981-982, 64 Cal.Rptr.2d 843, 938 P.2d 903, fns. omitted.) It bears emphasis that the misrepresentations constituting fraud in *765 the inception or execution related to whether the extraordinarily dilatory arbitral method at issue was really consistent with the promised arbitration process. In other words, in *Engalla,* there was evidence that the arbitral forum the defendant provided was far different from the promised manner in which arbitration hearings are normally conducted. (Knight et al., Cal. Practice Guide: Alternative Dispute Resolution (The Rutter Group 2003) ¶ 5:116.1, pp. 5-59-5-60 (rev.# 1, 2002).)

[8] In this case, there is no evidence of fraud in the inception or execution of the agreement as it relates to the arbitration clause. There is no evidence that plaintiff, to paraphrase section 163 of the Restatement Second of Contracts, as cited in *Rosenthal,*"neither kn[ew] nor ha[d a] reasonable opportunity to know of the character or essential terms of the" September 28 or December 4, 2000, arbitration agreements. Rather, the only evidence adduced by plaintiff indicates he was induced to enter into the September 28 arbitration and December 4, 2000, stock sale agreements because of defendant's misrepresentations concerning the prospective Bratz doll venture and the financial status of MGA Entertainment, Inc. which is fraud in the inducement. There is no evidence, as in *Engalla,* that the arbitration before Mr. Zarabi resulting from the September 28, 2000, arbitration agreement was other than as promised or reasonably expected. Further, there is no evidence of any false representations concerning any contemplated arbitral proceedings that will result from the arbitration clause in the December 4, 2000, stock sale agreement. Whether the alleged fraud concerning the concealment of the value and business prospects of MGA Entertainment, Inc. is legally or equitably sufficient to warrant nonenforcement of the September 28 or December 4, 2000, arbitration agreements is to be resolved in the arbitral forum. (*Rosenthal v. Great Western Fin. Securities Corp., supra,* 14 Cal.4th at p. 423, 58 Cal.Rptr.2d 875, 926 P.2d 1061.) Hence, the trial court was required to grant the motion to compel arbitration.

Given our resolution of the fraud in the inception or execution issues, we need not address the parties' remaining contentions. Further, our resolution of the fraud in the inception or execution issues renders all of defendant's judicial notice and additional evidence requests moot. They are denied on that basis. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1058, fn. 6, 60 Cal.Rptr.2d 225, 929 P.2d 544 [judicial notice]; *No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 89, fn. 26, 118 Cal.Rptr. 34, 529 P.2d 66 [new evidence on appeal].)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT _____ 16
PAGE _____ 319

123 Cal.App.4th 751                                                      Page 11

123 Cal.App.4th 751, 19 Cal.Rptr.3d 916, 04 Cal. Daily Op. Serv. 9657, 04 Cal. Daily Op. Serv. 10,191, 2004
Daily Journal D.A.R. 13,211
(Cite as: 123 Cal.App.4th 751)

### IV. DISPOSITION

The order denying the petition to compel arbitration is reversed. Upon issuance of the remittitur, the trial court is to grant the motion to compel *766 arbitration and stay civil proceedings. Defendant, Isaac Larian, is awarded his costs on appeal from plaintiff, Farhad Larian.

I concur: GRIGNON, J.MOSK, J., Concurring.
I concur in the result.

There was an arbitration pursuant to the September 28, 2000 Agreement to Arbitrate and Selection of Arbitrator. The arbitrator issued an award. Thus, because the arbitration had already taken place, there was no need to compel arbitration **927 under that agreement. The parties entered into a new agreement on December 4, 2000, and pursuant to that agreement signed mutual general releases. Therefore, the only existing agreement between the parties was the December 4, 2000 agreement. That agreement contained an arbitration provision. I believe that arbitration should be compelled on the basis of that arbitration provision.

The December 4, 2000 agreement that contains the operative arbitration provisions includes the following choice-of-law clause. "This agreement shall be construed in accordance with and be governed by the laws of the State of California." The majority conclude that this clause renders the Federal Arbitration Act, title 9, United States Code section 1, et seq. (FAA) "inapplicable."

I am not so certain that the choice-of-law clause does exclude the application of the FAA. The issue is whether the applicable choice-of-law clause manifests an intention to be governed by California procedural rules applicable to arbitrations. (See *Mount Diablo Medical Center v. Health Net of California, Inc.* (2002) 101 Cal.App.4th 711, 722, 124 Cal.Rptr.2d 607.) In *Mastrobuono v. Shearson Lehman Hutton, Inc.* (1995) 514 U.S. 52, 58-59, 115 S.Ct. 1212, 131 L.Ed.2d 76, the United States Supreme Court concluded that a choice-of-law clause dealing with a clause specifying that the agreement "shall be governed by

the laws of the State of New York" did not preclude the applicability of the FAA. In *Blue Cross of California v. Superior Court* (1998) 67 Cal.App.4th 42, 62-63, fn. 8, 78 Cal.Rptr.2d 779, we said that *Volt Information Sciences, Inc. v. Board of Trustees* (1989) 489 U.S. 468, 109 S.Ct. 1248, 103 L.Ed.2d 488 "does not stand for the proposition a general choice of law provision evidences in all cases an express intent to incorporate a state's arbitration rules into an arbitration agreement."

*767 If we did apply federal law, the result would be the same. Both federal and California state law have adopted the principle of separability by which the arbitrator is given the power to determine the validity of the contract without calling into question the validity of the arbitration clause from which he or she derives his or her power. (*Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc. v. 100 Oak Street* (1983) 35 Cal.3d 312, 315, 197 Cal.Rptr. 581, 673 P.2d 251; *Prima Paint Corp. v. Flood & Conklin Mfg. Co.* (1967) 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270; 1 Domke on Commercial Arbitration (3d ed.2003) § 11.2, pp. 11.6-11.10.)

Accordingly, I agree with the conclusion of the majority.

Cal.App. 2 Dist.,2004.
Larian v. Larian
123 Cal.App.4th 751, 19 Cal.Rptr.3d 916, 04 Cal. Daily Op. Serv. 9657, 04 Cal. Daily Op. Serv. 10,191, 2004 Daily Journal D.A.R. 13,211

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT ___16___

PAGE ___320___

EXHIBIT 17

Morad Zarabi
20120 Plummer Street
Chatsworth, CA. 91311

February 8, 2005

Facsimile Letter

Dear Gentlemen:

Please be advised that I am unavailable to act as an arbitrator regarding any disputes between Farhad Larian and Isaac Larian concerning the controversies that are the subject of my selection as arbitrator. For your reference, Kambiz Zarabi is also unavailable.

Accordingly, pursuant to paragraph 9 of the Sale Agreement, I am appointing Judicial Arbitration and Mediation Services, Inc. ("JAMS") as my successor arbitrator. The parties are instructed to select and hire one of the panel members with business dispute experience. If you are unable to agree upon an arbitrator within twenty (20) days after delivery of this letter, then JAMS is authorized to select the arbitrator for you in its discretion. Upon your advising me of the identity of the new arbitrator, I will forward all my files, including the original stock certificate evidencing the sale, to the new arbitrator. JAMS can be contacted at 213-620-1133.

Should you have any questions, please feel free to contact me in writing only.

Thank you and good luck,

Morad Zarabi

Cc:
By email:     Mr. Fred Larian
By email      Mr. Isaac Larian
              Mr. Ellis Stern
              Mr. Robert Turner Esq. – Attorney for Isaac Larian
              Mr. Mark D. Kremer – Attorney for Fred Larian

Exhibit 42
Page 1 of 1

EXHIBIT 17
PAGE 321

EXHIBIT 18

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| | | | |
|---|---|---|---|
| DATE: 05/04/05 | | | DEPT. 46 |
| HONORABLE RODNEY E. NELSON | JUDGE | E. LOPEZ | DEPUTY CLERK |
| HONORABLE | JUDGE PRO TEM | | ELECTRONIC RECORDING MONITOR |
| | C. VAUGHN/CTRM ASST | Deputy Sheriff | NONE | Reporter |

| | |
|---|---|
| 8:30 am  BC301371 | Plaintiff Counsel |
| FARHAD LARIAN VS ISAAC LARIAN ET AL | NO APPEARANCES Defendant Counsel |

---

NATURE OF PROCEEDINGS:

COURT ORDER

The Court is in receipt of Defendant's notice that the parties are unable to agree to an arbitrator.

The Court hereby selects Retired Judge Alan B. Haber as Arbitrator.

Counsel are to contact the Arbitrator and ensure that proceedings are realized.

Clerk to give notice.

         CLERK'S CERTIFICATE OF MAILING/
           NOTICE OF ENTRY OF ORDER

I, the below named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that this date I served Notice of Entry of the above minute order of 05/04/2005 upon each party or counsel named below by depositing in the United States mail at the courthouse in Los Angeles, California, one copy of the original entered herein in a separate sealed envelope for each, addressed as shown below with the postage thereon fully prepaid.

Date: May 4, 2005>

                    Page   1 of  2    DEPT. 46

MINUTES ENTERED
05/04/05
COUNTY CLERK

EXHIBIT ___18___

PAGE ___322___

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| | |
|---|---|
| DATE: 05/04/05 | DEPT. 46 |
| HONORABLE RODNEY E. NELSON    JUDGE | E. LOPEZ    DEPUTY CLERK |
| HONORABLE    JUDGE PRO TEM | ELECTRONIC RECORDING MONITOR |
| C. VAUGHN/CTRM ASST    Deputy Sheriff | NONE    Reporter |

8:30 am BC301371

FARHAD LARIAN
VS
ISAAC LARIAN ET AL

Plaintiff
Counsel          NO APPEARANCES
Defendant
Counsel

NATURE OF PROCEEDINGS:

John A. Clarke, Executive Officer/Clerk

By: _____/S/_____
         E. Lopez, Deputy Clerk


CONKLE & OLSTEN
ERIC ENGEL
3130 WILSHIRE BLVD., STE. 500
SANTA MONICA, CA 90403


KAY SCHOLER
LARRY FELDMAN
1999 AVENUE OF THE STARS, STE. 1700
LOS ANGELES, CA 90067


Page    2 of 2    DEPT. 46

MINUTES ENTERED
05/04/05
COUNTY CLERK

EXHIBIT    18

PAGE    323