EXHIBIT 19

NOV 28 2005 12:36PM   HP LASERJET 3200                              P.2

1  Honorable Alan B. Haber
   ADR SERVICES, INC
2  1900 Avenue of the Stars, Suite 250
   Los Angeles, California 90067-4303
3  (310) 201-0010 PH
   (310) 201-0016 FAX
4

5

6              IN THE MATTER OF THE ARBITRATION BETWEEN

7

8

9
   FARHAD LARIAN                    )
10                                  )
                                    )
11            Claimant             )      ADR Case No. 05-2096-ABH
                                    )
12 vs.                             )      LASC Case No. BC 301371
   ISAAC LARIAN                     )
13                                  )      FINAL ARBITRATION AWARD
                                    )
14            Respondent           )      DISMISSAL OF ALL CLAIMS WITH
                                    )              PREJUDICE
15                                  )

16

17

18

19

20

21

22

23

24  _____

25  CHRONOLOGY OF EVENTS:

26      This Binding Arbitration between the above-named claimant and respondent commenced

27  on November 16, 2005, at the ADR offices, Suite 250, 1900 Avenue of the Stars, Los Angeles,

28  90067.  This Arbitration was scheduled for hearings on November 16, 17, 18, 21, 22, 23 and

29  December 5, 2005.  Claimant Farhad was represented by Mr. Robert G. Wilson of the law firm

                                    1

Received  Nov-28-2005  12:38pm     From-              To-COTKIN COLLINS AND G    Page  002

                                                        CC 00546

EXHIBIT ___19___

PAGE ___324___

1   of Cotkin, Collins and Ginsburg and Mr. Richard Kellner of the law firm of Kabateck, Brown

2   and Kellner.   Respondent Isaac Larian was represented by Mr. Larry Feldman and Mr. Robert

3   Turner, both of the Kaye Scholer LLP law firm. Also in attendance was Ms. Daphne Gronich,

4   counsel for third-party intervenor, MGA Entertainment, Inc.

5        On November 17, 2005, the second day of the Arbitration proceedings, towards the end

6   of the full-day session, following the testimony of a witness called by claimant, claimant's

7   counsel called claimant Farhad Larian to testify as a witness.  Upon taking his place at the

8   witness chair, claimant Farhad Larian requested that he be permitted to address me, and the

9   assemblage of counsel, and announced that he wishes to "go off the record". I then requested that

10   claimant Larian consult privately with both of his counsel.  Claimant Farhad Larian declined my

11   request that he consult with his attorneys.  Both of his attorneys appeared ready to leave the

12   hearing room and consult with claimant Farhad Larian.    However, claimant Farhad Larian

13   continued to insist that he be permitted to address me and the assemblage of attorneys. I again

14   suggested that claimant Farhad Larian meet with his attorneys.  For a second time he insisted

15   that he be allowed to address me and the assemblage, and refused my second suggestion that it

16   would be advisable for him to speak to his attorneys.   I informed him that any remarks or

17   statements that he made would have to be "on the record"(at all times during the Arbitration

18   proceeding, a Certified Court Reporter was recording the proceedings).  Claimant Farhad Larian

19   then addressed the assemblage and explained that certain evidence presented thus far in the

20   proceedings caused him to conclude that his claims against respondent Isaac Larian were

21   unfounded and that it was his request that the proceedings be brought to a conclusion.

22   Thereupon, one of claimant's attorneys, Mr. Robert G. Wilson announced that he was resigning

23   as claimant's counsel.    In essence, and unquestionably, claimant Farhad Larian conceded that

24   his claims against Isaac Larian for breach of fiduciary duty, fraud, and unilateral mistake and

25   requests for monetary damages and recission should be "dropped", and the arbitration should be

26   terminated.  I suggested that a recess would be appropriate.  Claimant and his counsel, Mr.

27   Richard Kellner then retired to a different room.  I then left the hearing room and briefly spoke

28   with Mr. Kellner and claimant Farhad Larian and with Mr. Kellner's permission explained that if

29   his true intentions were to terminate the proceedings, that he and Mr. Kellner would have to

2

CC 00547

EXHIBIT ___19___

PAGE ___325___

1   return to the hearing room and agree "on the record" to dismiss all of the Arbitration claims,
2   and acknowledge that a dismissal with prejudice would mean that he would not be able to renew
3   or refile his claims in the future.  Claimant Farhad then acknowledge on the record that he
4   understood the consequences of a dismissal of his Arbitration claims, and that he wished for a
5   dismissal with prejudice of the claims.

6

7   **THE ARBITRATION AWARD:**

8       Based on my satisfaction that claimant Farhad Larian knowingly and voluntarily wished
9   for all of his Arbitration claims in this proceeding against respondent Isaac Larian be dismissed
10  with prejudice, and his acknowledgment that there was no merit to any of his claims in this
11  proceeding, I am ordering that all of the claims made by claimant Farhad Larian in this
12  proceeding be forthwith dismissed with prejudice, and issue an award in favor of respondent
13  Isaac Larian.

14

15  DATED: November 28, 2005                      _____

16                                                Hon. Alan B. Haber(ret.), Arbitrator

17
18
19
20
21
22
23
24
25
26
27
28
29

                                          3

CC 00548

EXHIBIT    19
PAGE       320

**PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is ADR Services, Inc., 1900 Avenue of the Stars, Suite 250 Los Angeles, California 90067.

On November 28, 2005, I served the foregoing document described as the FINAL ARBITRATION AWARD on the interested parties in this action by placing a true copy thereof enclosed in a sealed envelope addressed as follows:

Richard Kellner, Esq.
Michael R. Brown, Esq.
KABATECK BROWN & KELLNER LLP
350 South Grand Avenue, 39th Floor
Los Angeles, California 90071

Robert G. Wilson, Esq.
COTKIN COLLINS & GINSBURG
300 South Grand Avenue, 24th Floor
Los Angeles, California 90071

Larry R. Feldman, Esq.
KAYE SCHOLER
1999 Avenue of the Stars, Suite 1600
Los Angeles, California 90067

X   BY U.S. MAIL, I caused such envelope with postage thereon to be placed in the United States mail at Los Angeles, California.

X   BY FACSIMILE, I caused such to be faxed to the attorneys on November 28, 2005.

___   BY PERSONAL SERVICE I caused such envelope to be delivered by hand to:

X   STATE I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

___   FEDERAL I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on November 28, 2005 at Los Angeles, California.

Terry Shea

CC 00549

EXHIBIT 19
PAGE 327

EXHIBIT 20

1-20-06

1  KABATECK BROWN KELLNER LLP
   Richard L. Kellner, SBN 171416
2  Alfredo Torrijos, SBN 222458
   350 South Grand Avenue, 39th Floor
3  Los Angeles, California 90071
   Telephone: (213) 217-5000
4  Facsimile: (213) 217-5010

5  COTKIN, COLLINS & GINSBURG
   A PROFESSIONAL CORPORATION
6  Robert G. Wilson, SBN 58653
   300 South Grand Avenue, 24th Floor
7  Los Angeles, California 90071
   Telephone: (213) 688-9350
8  Facsimile: (213) 688-9351

9  Attorneys for Claimant
   Farhad Larian
10

11          ARBITRATION BEFORE ADR SERVICES, INC.
12

13  FARHAD LARIAN,                    ADRS CASE. NO. 05-2096-ABH

14       Claimant,                    THE HONORABLE ALAN HABER

15       v.
                                      DECLARATION OF CLAIMANT
16  ISAAC LARIAN,                     FARHAD LARIAN IN SUPPORT OF HIS
                                      OPPOSITION TO RESPONDENT ISAAC
17       Respondent.                  LARIAN'S MOTION FOR ATTORNEYS'
                                      FEES
18

19                                    [Filed concurrently with Claimant Farhad
                                      Larian's Opposition to Respondent Isaac
20                                    Larian's Motion for Attorneys' Fees; and
                                      Declaration of Richard L. Kellner in Support
21                                    of Claimant Farhad Larian's Opposition to
                                      Respondent Isaac Larian's Motion for
22                                    Attorneys' Fees]

23

24

25

26  ///

27  ///

28  ///

_____
     DECLARATION OF CLAIMANT FARHAD LARIAN IN SUPPORT OF HIS OPPOSITION TO
          RESPONDENT ISAAC LARIAN'S MOTION FOR ATTORNEYS' FEES

CC 00694

EXHIBIT 20

PAGE 328

### DECLARATION OF FARHAD LARIAN

I, FARHAD LARIAN, do hereby declare as follows:

1.     I am the Claimant in this action.  I have personal knowledge of the facts contained herein and if called to testify to the matters set forth herein, I could competently testify thereto.

2.     This case has not been easy for me.  I am an extremely emotional person and I have struggled greatly with the impact that this case has had on my family.  Despite our differences, Isaac and I are still brothers.  We spent many years working hard trying to make MGA Entertainment, Inc. what it is today.  Some of those years were good, some were bad, but we were working together and we were family.

3.     I do not (and never have) begrudge the fact that my brother has become very wealthy by virtue of his full ownership of MGA Entertainment, Inc.  He deserves it.  My brother is an extremely talented business person; I have never doubted or denied that.

4.     I brought this action because I had real and genuine doubts as to whether I received a fair price for the December 2000 sale of my stock in ABC International Traders, Inc. and MGA Entertainment Hong Kong Limited (later collectively known as, "MGA Entertainment, Inc.").  I genuinely believed that my brother Isaac had a responsibility for making up the difference in price between what my stock was actually worth (based on a valuation of December 2000) and what I was paid for that stock.  This differential would only represent a fraction of the gains that Isaac has subsequently earned due to his purchase of my stock.

5.     A few weeks before the arbitration, I was at Santa Monica beach with my family. On that day, my wife Lisa and I lost our four year old daughter.  Fortunately, after one terrible hour, we found our daughter at the police station.  The whole ordeal was agonizing, but it reminded me that there are more important things in life than this case -- that there are things that I would rather do than spend my time trying to prove that my brother had engaged in wrongful conduct against me.

6.     During the arbitration, sitting in the same room as my brother and his wife was difficult, much more difficult than I could have ever imagined.  As each hour of the arbitration progressed, I could not help but feel -- physically feel -- the hatred that Isaac had for me.  Right

— 2 —

DECLARATION OF CLAIMANT FARHAD LARIAN IN SUPPORT OF HIS OPPOSITION TO
RESPONDENT ISAAC LARIAN'S MOTION FOR ATTORNEYS' FEES

CC 00695

EXHIBIT _____ 20

PAGE _____ 329

then, I made a decision to abandon my claims in the arbitration and issue a public apology, hoping (perhaps in vain) that one day my brother and I could reconcile.

7. My brother was so moved by my public recant that he subsequently offered to pay me the difference between the appraised value of my stock in 2000 and the amount that I was paid for the stock. Attached hereto as Exhibit "A" is a true and correct copy of a print-out of the email that I received from my brother on November 29, 2005 and my responding email of December 1, 2005.

8. I am not a wealthy man. I simply could not have made the generous gesture of publicly abandoning my claims, if had known that Isaac's lawyers would come after me for their attorneys' fees.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _____ day of January 2006 at Los Angeles, California.

FARHAD LARIAN

— 3 —

DECLARATION OF CLAIMANT FARHAD LARIAN IN SUPPORT OF HIS OPPOSITION TO
RESPONDENT ISAAC LARIAN'S MOTION FOR ATTORNEYS' FEES

CC 00696



**EXHIBIT A**

CC 00697

EXHIBIT ___ 20

PAGE ___ 331

From: Fred Larian [mailto:fredlarian@sbcglobal.net]
Sent: Thursday, December 01, 2005 4:11 PM
To: 'Isaac Larian (President / CEO)'
Subject: RE: I am traveling

I did not call Shamsi. She called me and said she had suggested the new appraisal to you (and
later to me). I told her Isaac and I are supposed to talk directly. When are you back in town?

From: Isaac Larian (President / CEO) [mailto:LarianI1@mgae.com]
Sent: Tuesday, November 29, 2005 6:37 PM
To: fredlarian@sbcglobal.net
Subject: I am traveling

Fred,

I am traveling.

I got a call from Shamsi saying that you want a new appraisal,
as of year end 2000?

I thought we decided to talk directly?

I don't mind doing this if you want this and indeed have been
asking for it.  But , on one condition: A written contract that if
the appraisal was less than what you got paid, you will pay the
difference.

I am not going through this again.

I want me and my family to go on with our lives.

Let me know.


Isaac Larian
CEO

 MGA Entertainment, Inc.
16380 Roscoe Blvd. Suite 200
Van Nuys, California 91406
Tel: 818-894-3150


CC 00698

EXHIBIT _____ 70 _____

PAGE _____ 332 _____

email: larianl1@mgae.com
fax: 818-894-1267

WWW. BRATZ.COM
www.mgae.com
www.alienracers.com

CC 00699

EXHIBIT _____ 80

PAGE _____ 333

**PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

     I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 350 South Grand Avenue, 39th Floor, Los Angeles, CA 90071.

On **January 20, 2006**, I caused the foregoing document described as **CLAIMANT FARHAD LARIAN'S OPPOSITION TO RESPONDENT ISAAC LARIAN'S MOTION FOR ATTORNEYS' FEES** on the interested parties in this action as follows:

Larry R. Feldman, Esq.
Kaye Scholer LLP
1999 Avenue of the Stars, Suite 1700
Los Angeles, CA 90067
FAX NO: 310-788-1200

Robert Wilson, Esq.
Cotkin Collins & Ginsburg
300 South Grand Avenue, 24th Floor
Los Angeles, CA 90071

[X]   **VIA OVERNIGHT EXPRESS** – I am readily familiar with the firm's practice of collection and processing for overnight delivery. Under that practice it would be deposited in a box or other facility regularly maintained by Overnight Express, or delivered to an authorized courier or driver authorized by Overnight Express to receive documents, in an envelope or package designated by Overnight Express with delivery fees paid or provided for, addressed to the person on whom it is to be served, at the office address as last given by that person on any document filed in the cause and served on the party making service; otherwise at that party's place of residence.

[]   **VIA U.S. MAIL** - I deposited such envelope(s) with the United States Postal Service, enclosed in a sealed envelope, for collection and mailing with the United States Postal Service where it would be deposited for first class delivery, postage fully prepared, in the United States Postal Service that same day in the ordinary course of business. I am readily familiar with my employer's business practice for collection and processing of correspondence for mailing with the United States Postal Service.

Executed on **January 20, 2006**, at Los Angeles, California.

    I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

                   IRMA DELEON

Kabateck Brown Kellner LLP
350 South Grand Avenue, 39th Floor
Los Angeles, California 90071
FAX (213) 217-5010

PROOF OF SERVICE

CC 00700

EXHIBIT _____ 20

PAGE _____ 334

EXHIBIT 21

1   Honorable Alan B. Haber(Ret.)
   ADR SERVICES, INC.
2   1900 Avenue of the Stars, Suite 250
   Los Angeles, California 90067-4303
3   (310) 201-0010 PH
   (310) 201-0016 FAX

4

5

6

7

8              IN THE MATTER OF THE ARBITRATION BETWEEN

9

| | | |
|---|---|---|
| FARHAD LARIAN, | ) | LASC CASE No. BC301371 |
| | ) | |
| Claimant, | ) | ADR CASE No. 05-2096-ABH |
| | ) | |
| .Vs. | ) | |
| | ) | FINAL ARBITRATION AMENDMENT |
| ISAAC LARIAN, | ) | FOR RESPONDENT'S MOTION FOR |
| Respondent, | ) | PREVAILING PARTY ATTORNEY'S |
| | ) | FEES |
| | ) | |

     On November 28, 2005, my Arbitration Award was filed and served on counsel for the claimant and respondent. The Award entered a dismissal with prejudice of all claims in this arbitration proceeding.   This dismissal was requested by claimant on the second day of the Arbitration proceedings.   Respondent filed a Motion for Attorneys Fees, requesting fees and costs incurred by respondent during the course of this litigation.   I have considered the respondent's moving papers, and declaration, and have considered the respondent's opposition papers and the two declarations attached to the opposition papers.   The parties agreed to a telephonic conference call for oral argument in connection with this motion.   On February 1, this matter was argued by the parties by way of a telephonic conference call.  Present during the call for Claimant was Mr. Richard Kellner of the law firm of Kabateck Brown Kellner LLP, and present during the conference call for Respondent was Mr. Larry Feldman of the law firm of Kaye Scholer LLP.

<div align="center">1</div>

CC 00518

EXHIBIT     21

PAGE     335

FEB.03 2006 5:12PM    HP LASERJET 3200                                        P.3

## FINDINGS RE: THE JURISDICTION ISSUE

Claimant's counsel alleged (1) that as the Arbitrator I had no jurisdiction to issue an Arbitration Award and therefore there was no prevailing party; (2) that I should use my discretion and not award attorney's fees to the respondent Isaac Larian, and (3) attorneys fees and costs should not be awarded because the respondent's application for fees and costs is not adequate.  I find that the claimant's claim of lack of jurisdiction is not well-taken.  Judge Nelson appointed me as the arbitrator in this matter on May 4, 2005, following his having made a finding that the parties were unable to agree on an arbitrator.  Judge Nelson's ruling followed a remittitur from the Second District Court of Appeal, ordering that a prior ruling denying the respondent's request to arbitrate this matter be vacated, and that an arbitration go forward pursuant to Section 1281.6 of the California Code of Civil Procedure. The chronology of events leading up to my appointment as arbitrator establishes the hypocrisy of the claimant's claim that that my selection as arbitrator was improper.

On March 2, 2005(following the Court of Appeal's mandate to grant an order compelling arbitration) Judge Nelson ordered each party to submit a list of at least five(5) nominees to serve as the arbitrator.   Judge Nelson informed counsel that he would then select five(5) names for the two submitted lists, indicating that in the event the parties could not agree from his list, that he would select the arbitrator, in accordance with Section 1281.6 of the Code of Civil Procedure. Respondent provided five(5) names; my name was not on the list.  Claimant provided five names and my name was on the list.(Interestingly, claimant in their submission of five names, objected to Judge Nelson's procedure, and asserted that a principal term of the arbitration agreement provided that the arbitrator serve without charging a fee).  Finding a retired Judge to serve as a neutral arbitrator without monetary compensation in a case where a claimant(as in this case) is seeking six million dollars in monetary damages($600,000,000.) is probably more difficult than trying to locate Judge Crater.

On March 24, 2005, Judge Nelson selected retired Judge Robert Altman to serve as the arbitrator in this matter.  On April 4, 2005, Judge Nelson, having learned that Judge Altman withdrew as arbitrator, informed counsel that he would be sending a new list of five(5) arbitrator nominees. My name was on that list of five(5).  On April 15, claimant's counsel wrote to Judge

2

EXHIBIT _____ 21

PAGE _____ 336

FEB 03 2006 5:12PM    HP LASERJET 3200                                          P.4

1   Nelson listing claimant's nominees; once again my name was on claimant's list, and made

2   reference to the names of four of respondent's nominees. My name was not on the respondent's

3   list.  Once again, the parties could not agree on Judge Nelson's list of five.  On May 4, 2005,

4   Judge Nelson appointed me as the arbitrator pursuant to Section 1281.6 of the Code of Civil

5   Procedure.

6        The legal principles of estoppel and waiver have application to the claimant's claim of my

7   lacking jurisdiction to serve as the arbitrator.  At no time from the receipt of Judge Nelson's

8   minute order transmitted to me on May 4, 2005 and through and including my involvement in

9   pre-Arbitration proceedings, and the Arbitration, had claimant ever asserted to me that I lacked

10  jurisdiction to serve as the arbitrator in this matter.  The first time that I learned of the lack of

11  jurisdiction claim was upon receiving claimant's counsel's opposition brief to the respondent's

12  Motion for attorneys fees and costs.  I find that Judge Nelson's appointment of me as arbitrator is

13  the law of the case.

14

15  FINDINGS RE: ATTORNEYS FEES AND COSTS REQUESTS

16       As previously discussed, I find that the respondent is the prevailing party in this litigation.

17  The Stock Purchase Agreement provided that the prevailing party can recover attorneys fees and

18  costs.  I have considered and read respondent's moving papers and have reviewed all 97 exhibits

19  attached to respondent's declaration.  This case involved a claim for $600,000,000. in monetary

20  damages and was intensely litigated over an approximately two-year period.  The nature of this

21  case demanded skilled and experienced attorneys.  Claimant retained serially, three different law

22  firms  to represent him over the period of this case, as did respondent in hiring two attorneys who

23  have more than 60 combined years of heavy litigation experience and are highly skilled in their

24  profession.  Considering the nature of this case, I am satisfied that the records of hours kept by

25  claimant's counsel, and their hourly rates for counsel and paralegals was justified; that the hours

26  for which the claimant was billed were spent.  A review of the 97 exhibits provided by

27  respondent demonstrates the nature of the litigation pre-Arbitration; the extensive motions that

28  were litigated, the appellate matters and the time spent for preparation of the arbitration

29  proceedings.  I find that the fees charged by counsel for the respondents was reasonable.

                                          3

CC 00520

EXHIBIT _____21_____

PAGE _____337_____

FEB·03 2006 5:12PM    HP LASERJET 3200                                    P.5

1  THE ATTORNEYS FEES AWARD:

2    The attorneys fees award is the sum of $1,180,481.05: Judgment for respondent Isaac

3  Larian in the sum of $1,180,481.05 against respondent Farhad Larian.

4

5  DATED: February 3, 2006

6

7

8                                    Arbitrator, Judge Alan B. Haber(ret.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

Received  Feb-03-2006  05:14pm    From-              To-COTKIN COLLINS AND C    Page 005

CC 00521

EXHIBIT ___2___

PAGE ___338___

FEB '03 2006 5:12PM    HP LASERJET 3200                                    P.6

## PROOF OF SERVICE

### STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a
party to the within action; my business address is ADR Services, Inc., 1900 Avenue of the Stars, Suite
250 Los Angeles, California 90067.

On February 3, 2006, I served the foregoing document described as the **FINAL
ARBITRATION AMENDMENT FOR RESPONDENT'S MOTION FOR PREVAILING
PARTY ATTORNEY'S FEES** on the interested parties in this action by placing a true copy thereof
enclosed in a sealed envelope addressed as follows:

Richard Kellner, Esq.
Michael R. Brown, Esq.
KABATECK BROWN & KELLNER
350 South Grand Avenue, 39th Floor
Los Angeles, California 90071

Robert G. Wilson, Esq.                      Larry R. Feldman, Esq.
COTKIN COLLINS & GINSBURG                    Robert Turner, Esq.
300 South Grand Avenue, 24th Floor           KAYE SCHOLER
Los Angeles, California 90071                 1999 Avenue of the Stars, Suite 1600
                                             Los Angeles, California 90067

  X         **BY U.S. MAIL**, I caused such envelope with postage thereon to be placed in the
United States mail at Los Angeles, California.

  X         **BY FACSIMILE**, I caused such to be faxed to the attorneys on February 3, 2006.

             **BY PERSONAL SERVICE** I caused such envelope to be delivered by hand to:

  X         **STATE** I declare under penalty of perjury under the laws of the State of California that
the above is true and correct.

             **FEDERAL** I declare that I am employed in the office of a member of the bar of this
court at whose direction the service was made.

Executed on February 3, 2006 at Los Angeles, California.

Terry Shea

tcdleworkPROOF OF SERVICE - NONCERTIFIED MAIL 444

Received  Feb-03-2006  05:14pm    From-                To-COTKIN COLLINS AND G   Page 006

**CC 00522**

EXHIBIT _____ 21

PAGE _____ 339

EXHIBIT 22

THIS EXHIBIT IS FILED UNDER SEAL

PURSUANT TO PROTECTIVE ORDER

EXHIBIT 23



Corporate Office:

18380 Roscoe Boulevard
Van Nuys, CA  91406
Phone: 818/894-2525, ext. 6711
Fax:  818/895-0771

August 19, 2005

**VIA FACSIMILE**
Mark D. Kremer, Esq.
Conkle & Olesten,
Professional Law Corporation
3130 Wilshire Boulevard, Suite 500
Santa Monica, California 90403-2351

Dear Mr. Kremer:

It has come to our attention that your client, Fred Larian, has been using a confidential list of home telephone numbers that he obtained while at MGA to call current and former MGA employees at their homes and question them about MGA's early development of its "Bratz" line of dolls and to secure contact information of others -- presumably to seek the same information.

As a preliminary matter, MGA's employee home contact list is MGA's property for use, if necessary, by its current employees. Mr. Larian had no right to take that list with him or to use it after he left MGA, and certainly not in the context in which it is being used. Quite a few of MGA's current and former employees, some of whom have been called and contacted by Mr. Larian multiple times, have complained about his continuing calls and efforts to contact them, including, in some cases, after they have asked him not to contact them and/or have intentionally not returned his calls.

As Mr. Larian should know, MGA considers many aspects of the development of its products, including the identity of its specialized personnel, independent contractors and suppliers, to be proprietary, trade secret information, and vigorously protects that information from disclosure to third parties. In keeping with those efforts, MGA's employees -- both current and former -- are obligated by contract to maintain the confidentiality of its trade secret information and are further obligated to refer all requests for information sought in the context of litigation, whether against the company or against third parties, to the Legal Department.

Any attempt by Mr. Larian to obtain trade secret information concerning the development of the "Bratz" dolls from MGA's current or former employees or to obtain other proprietary information from such persons without MGA's consent, is an attempt to induce them to breach their obligations to MGA, not to mention a breach of his own obligations, as a former employee and officer of MGA. Employees and former employees of MGA have an obligation to only use proprietary and confidential information obtained during the course of their employment by the company only for the purpose of conducting the company's business, and such information

EXHIBIT _____ 23

PAGE _____ 341

CONFIDENTIAL  -  ATTORNEYS' EYES ONLY

MGA 3866369

2

may not be used, discussed or disclosed except as specifically authorized by MGA. In this regard, MGA has not authorized these discussions or disclosures, and has not waived its right to assert that they are unauthorized and that they must cease. As Mr. Larian also knows, MGA is in litigation concerning these rights and, thus, all communications with MGA personnel or MGA representatives about such matters, including its current and former outside counsel as well as third parties involved in the creation, development, production, distribution and sale of its proprietary materials, must be conducted through MGA's counsel to ensure that the rights of the company and its handling of discovery in connection with such litigation are not compromised. Mr. Larian's efforts in contacting certain current and former counsel of MGA to attempt to secure the release of information, is similarly improper and will not be tolerated. Any such information and files are the property of MGA and Mr. Larian can in no way suggest that he is entitled to such information or files, including as a result of having formerly been an officer of MGA f/k/a ABC International Traders, Inc.). MGA has not waived and will not waive any privileges that attach to such materials and must also insist that Mr. Larian cease all contacts and attempted contacts with MGA's counsel.

In conclusion, MGA requests that Mr. Larian cease all attempts to solicit information from MGA's former and current employees, independent contractors and outside counsel concerning MGA's proprietary and trade secret information, as well as information protected by the attorney-client privilege and attorney work product doctrine, and that he return to MGA all documents in his possession he took from MGA without consent, including all copies of home contact lists, as well as any materials that he may have obtained or compiled through his efforts.

At this time, MGA will give Mr. Larian the benefit of the doubt that he did not realize that his actions were interfering with existing contractual relations between MGA and others, or interfering with its legitimate efforts to maintain the confidentiality of proprietary or privileged information or that they were precluded by his on-going confidentiality obligations towards the company. Should he refuse to comply with the foregoing requests, however, MGA will be forced to view Mr. Larian's conduct as willful and reserves its rights to seek to protect its rights through the courts. MGA sincerely hopes that the parties can resolve this matter, now that you have been apprized of its concerns.

Please respond by noon on Tuesday, August 23, 2005. Thank you.

Sincerely,

Daphne Gronich
General Counsel

cc:    Diana Torres, Esq.

EXHIBIT ___23___

PAGE ___342___

CONFIDENTIAL – ATTORNEYS' EYES ONLY                    MGA 3866370

EXHIBIT 24

# *FAX TRANSMITTAL*

**CONFIDENTIAL**

## Conkle & Olesten

William C. Conkle
Christina Olesten
John A. Conkle
Mark D. Kremer
Eric S. Engel
Scott A. Hampton

**Professional Law Corporation**
**3130 Wilshire Boulevard, Suite 500**
**Santa Monica, California 90403**
**(310) 998-9100**
**FAX: (310) 998-9109**
Direct E-Mail: Attorney's Initials *@conklelaw.com*
Internet Homepage: *http://www.conklelaw.com*

DATE:   September 7, 2005               TOTAL PAGES:   3   (Including Cover)

FROM:   Mark D. Kremer

CLIENT/MATTER NAME:   Larian v. Larian

CLIENT/MATTER NUMBER:   2221.002

DOCUMENT NUMBER (IF APPLICABLE):   9787

DELIVER TO:   Daphne Gronich

FAX NUMBER:   818-895-0771

THIS FAX _x_ WILL __ WILL NOT BE FORWARDED UNDER SEPARATE COVER

MESSAGE:

## IN CASE OF TRANSMISSION PROBLEMS, CALL (310) 998-9100

The information transmitted in this fax message, including any attachments, is intended only for the addressee. The information may be
confidential and legally privileged under attorney-client, attorney work product, or other applicable privileges. Unauthorized access to this
message may violate federal and state civil and criminal laws. If you have received this message, but are not the addressee, you are
advised that any use, copying, disclosure or distribution of the information in this message is prohibited. Please call 310 998-9100 and
destroy all copies of this fax message. Thank you.

EXHIBIT ___24___

PAGE ___343___

FL 0274

CONFIDENTIAL

**CONKLE & OLESTEN**

PROFESSIONAL LAW CORPORATION

3130 WILSHIRE BOULEVARD, SUITE 500

SANTA MONICA, CALIFORNIA 90403-2304

TELEPHONE: (310) 998-9100

DIRECT E-MAIL: Attorney's Initials@conklelaw.com

INTERNET HOMEPAGE: http://www.conklelaw.com

WILLIAM C. CONKLE
CHRISTINA OLESTEN
JOHN A. CONKLE
MARK D. KREMER
ERIC S. ENGEL
SCOTT A. HAMPTON

TELECOPIER
(310) 998-9109
TAXPAYER ID #
95-3774554

September 7, 2005

Via Facsimile
and U.S. Mail

Daphne Gronich
16360 Roscoe Blvd.
Van Nuys, CA 91406

Re:  Farhad Larian/Isaac Larian and MGA Entertainment, Inc.
Our File No. 2221.002

Dear Ms Gronich:

Thank you for your letter of August 19, 2005. This shall constitute Farhad ("Fred") Larian's substance to response.

1.  Fred did not obtain while at MGA and does not have a confidential list of home telephone numbers of MGA's current or former employees.

2.  We are unaware of any current or former employee complaints about Fred's efforts to contact them. We are aware of persons reporting that they have been threatened by you and other lawyers acting on behalf of MGA with litigation in an effort to block disclosure of information. These activities raise ethical, not legal concerns and we suggest you look with some circumspection on them.

3.  Because of the generalizations you use to identify MGA's "trade secrets" we are unable to intelligently evaluate your claim that any are involved here, but we look with skepticism upon it. It is certainly not clear what, if any, information concerning development of the Bratz Dolls is a "trade secret". Isaac has made numerous public statements about the subject. Much of the information is so old that

2221.002\9787

EXHIBIT ___24___
PAGE ___344___

FL 0275

CONKLE & OLESTEN
PROFESSIONAL LAW CORPORATION

Daphne Gronich
September 7, 2005                                                    **CONFIDENTIAL**
Page 2

it cannot possibly have any commercial value from being "secret" assuming that it
ever did. Fred is not a competitor of MGA and has no use for any information which
would impair its commercial value to MGA. Fred's interest in the information is for
use in the arbitration over Isaac's concealment of it in 2000 when it should have been
disclosed to Fred and the appraisal. And in any event, MGA may not use a claim of
"trade secret" privilege to assist Isaac in perpetrating a fraud.

    4.    We cannot agree that Fred is attempting to induce any person to break
a contract. We are not aware of any contractual provision that would be violated by
Fred's request for information and as indicated earlier we are skeptical of the claim
that any of the information Fred wants would qualify as a trade secret. Please send us
a copy of the contact provisions upon which MGA relies so we may evaluate it.

    Please call me to have a full airing of MGA's and Fred's concerns.

Very truly yours,

Mark D. Kremer

MDK/pi

2221.002\9787

EXHIBIT _____24_____

PAGE _____345_____

FL 0276

EXHIBIT 25

RDB copy

**HOWARTH & SMITH**
ATTORNEYS AT LAW
800 WILSHIRE BOULEVARD
SUITE 750
LOS ANGELES, CALIFORNIA 90017
TELEPHONE: (213) 955-9400
FAX: (213) 622-0791
www.howarth-smith.com

DON HOWARTH                     April 6, 2004           DHowarth@howarth-smith.com
                                                        Direct Line: (213) 955-9400 Ext. 109

**VIA FACSIMILE AND U.S. MAIL**

Larry R. Feldman, Esq.
Kaye Scholer LLP
1999 Avenue of the Stars
Suite 1700
Los Angeles, California 90067

          Re: *Larian v. Larian*

Dear Larry:

          This letter is to follow up on our meeting at your office on February 26, 2004, and
our conversation by phone more recently. Since then I have also received a letter from
you dated March 29, 2004 asking about our progress in getting back to you. I trust you
received my message that I was out of the office in Hawaii last week and that I would get
back to you with a written response upon my return. This letter is the promised written
response.

          The facts of which we are presently aware clearly show that it is not correct, as you
stated in our meeting, that at the end of 2000, Isaac believed Bratz was just another doll,
or that Fred knew everything that Isaac knew. Indeed, even the limited evidence
immediately available without discovery having yet occurred demonstrates just the
reverse. For example:

•         The July 18, 2003, Wall Street Journal reports that sometime in 1999 Isaac
          had a conversation with a buyer from Wal-Mart in which the idea for a
          Bratz-type doll germinated. The article quotes Isaac as saying that "he was
          motivated by a challenge from a Wal-Mart Stores, Inc. buyer to 'give me
          something that can compete with Barbie.'" Isaac kept this conversation
          secret from Fred, and Fred found out about it for the first time when he read
          the published article.

04 L181001 086

**HS 03235**

EXHIBIT ____25____

PAGE ____346____

Larry R. Feldman, Esq.
April 6, 2004
Page 2

- By late 1999, Isaac had decided that MGA's challenger to Barbie should be a fashion-type doll. MGA had previously distributed other types of dolls, but never a fashion doll, as the WSJ article confirms. For the first time ever, Isaac conducted a contest to select a design for the doll, and selected Carter Bryant's Bratz doll line as the winner of the contest. It is plain that Isaac did not consider Bratz to be just another doll for MGA. The existence of this contest was concealed from Fred, and, in fact, Fred was never told that the Company was looking for a fashion-type doll to compete with Barbie or that the Bratz line was being developed by Isaac and MGA during 1999 and 2000, despite Fred's position as Isaac's partner and a co-founder of MGA.

- In late 1999, and continuing at least through the spring of 2000, Isaac ordered MGA employees to stop sharing financial information with Fred. Isaac threatened at least one employee's job if the employee did not follow Isaac's instructions and cut Fred out of the information loop. In addition, Isaac instructed an employee to stop sending Fred daily sales reports that up to that point, Fred had routinely received. The result of this concerted concealment effort was that Fred did not, and could not, know the complete financial picture of the Company.

- In February 2000, Isaac tried to keep Fred from attending the N.Y. Toy Fair, the venue in which information about new, upcoming products is reviewed.

- Beginning in early 2000, Isaac began systematically portraying Fred, both internally and to the outside world, as someone who had no role in the management and decision making of the Company; and that Isaac alone controlled the strategic moves for MGA. In or about February 2000, Isaac had Fred's name removed from the Company profile, and changed the document (and history) to list only Isaac as the founder of MGA. When Fred raised this issue with Isaac, he was told that "there is . . . a lot more to come."

- In the Spring of 2000, before the Agreement to Arbitrate was signed and before Isaac had announced his plans for Bratz either publicly or to Fred, Isaac took steps to personally profit from the Bratz program. On April 11,

04:L181001.086

HS 03236

EXHIBIT ___25___

PAGE ___347___

Larry R. Feldman, Esq.
April 6, 2004
Page 3

> 2000, Isaac sought the following from the Company's Board of Directors:
> (1) an increase in his annual salary from $221,000 to $500,000; (2) a bonus
> of $750,000 for 1999; (3) a bonus of $1.5 million in 2000 if EBITA for the
> year reached $8 million; and (4) a separate bonus of a 4% royalty on any
> new toy idea he personally developed in MGA's 2001 line. Paying Isaac a
> royalty for anything that he "personally developed" was an absolute first for
> the Company, and the target figures in (3) and (4) plainly indicate an
> unannounced, but real plan to exploit the Bratz market beginning in 2001.
> A successful Bratz roll-out in 2001 would allow Isaac personally to profit
> (at the expense of his fiduciary Fred) from the Bratz opportunity.

- In or about July or August 2000, Isaac called internal meetings with top
management at MGA about Bratz and his plans for seizing the opportunity
presented by the doll line. Isaac expressed optimism in these meetings that
the Bratz line could directly compete with Barbie, would appeal to an even
wider range of girls than did Barbie, and presented an opportunity he had
been looking to find for years. Fred, a 45% shareholder and officer of
MGA, was intentionally excluded from those meetings, and from the
special handling of Bratz.

- Roughly contemporaneously with these internal meetings, Isaac began
negotiating with Carter Bryant and eventually obtained from him the
worldwide licensing rights to Bratz. The license was unique in several
important respects. For the first time in the Company's history, the Bratz
license made Isaac and MGA the licensor of the product, allowing MGA to
control the licensing in an unlimited number of product categories
worldwide. In previous deals, MGA was just a distributor/licensee of a
product. The difference between being a licensee and a licensor is
enormous and becoming a licensor is something Isaac had wanted for a very
long time. Further, the Bratz deal was unique because MGA paid more for
that license of that doll than it ever had paid for a license of any other doll
in the Company's history. Fred was not told anything about the
unprecedented scope of the Bratz license prior to signing the Agreement to
Arbitrate, or the Stock Sales Agreement in December 2000.

04.L181001.086

. HS 03237

EXHIBIT_____25_____

PAGE_____348_____

Larry R. Feldman, Esq.
April 6, 2004
Page 4

- In the fall of 2000, Isaac began to develop the Bratz product line, including ordering prototypes and filing additional trademarks. Fred was intentionally kept unaware of the scope of Isaac's plans to develop and market Bratz at that time.

- During this time, including in the fall of 2000, Isaac followed a practice of passing along to Fred only negative financial news about the Company, such as a $2 million loss from cancelled Toys-R-Us orders, thus making the Company seem worth much less than it actually was. Isaac did not disclose to Fred news which would have a positive financial effect on the value of the Company, such as his plans for Bratz or other potential revenue streams for the Company.

- On December 11, 2000 MGA filed, and Isaac personally signed, applications for five new trademarks, including one for each of the names of the Bratz dolls. Isaac's personally signing such applications facilitated a plan to keep knowledge about the scope of the Bratz program tightly controlled.

- Then, in February 2001, with Fred out of the picture after his execution of the December Stock Sale Agreement, Isaac went public about the scope and significance of Bratz. He introduced the dolls at the February 2001 N.Y. Toy Fair with the public assertion that it was now "a Bratz world."

- Isaac's view of Bratz was further documented in June 2001, confirming that Bratz was MGA's "first intellectual property" and his belief that it was "sure to revolutionize the world of fashion dolls."

All of this and other evidence strongly indicates that Isaac made a concerted effort to get Fred out of the company so that he could exploit the unique Bratz opportunity without sharing the benefits with Fred.

When we met, you provided us with three e-mails which you claimed demonstrated that Fred knew all of what Isaac knew about Bratz when he signed the Agreement to Arbitrate. They do not. The e-mails – dated November 15, 2000, November 22, 2000, and April 30, 2001 – were all sent *after* execution of the September

04 L181001.086

HS 03238

EXHIBIT _____ 25

PAGE _____ 349

Larry R. Feldman, Esq.
April 6, 2004
Page 5

2000 Agreement to Arbitrate. Further, none of them give any indication of anything
unusual about Bratz that would alert Fred to its impact on the valuation of the Company.

You also asserted that the e-mails illustrate Fred's awareness of the Bratz program
earlier than the time alleged in the complaint on file in the action. Again that is not
correct. Paragraph 28 of the Complaint alleges that in late spring or summer 2002, Fred
first became aware of the "true scope of the Company's extraordinary plans, efforts and
history regarding the Bratz product line and other financial information about the
Company that had been concealed from him by Isaac, as the license had been concealed
from him." Nothing in the three e-mails is inconsistent with this allegation.

Additional evidence that Isaac attempted to defraud Fred into signing the
Agreement to Arbitrate and to pay him less than the true value of his shares comes from
Mr. Dutcher's appraisal. As may have been reported to you from the hearing on our
motion to take Mr. Dutcher's deposition, the Court recognized the significance of this
information, saying that, "[t]his information is directly relevant as it goes to whether
[plaintiff] was defrauded because information about this new product was withheld from
him." From what we can tell from the November 7, 2000, appraisal we have (and have
given to you), it seems apparent that Isaac did not provide Mr. Dutcher with information
about the Company's plans for Bratz or projections of its revenue potential for 2000,
2001 and beyond. We are advised that Isaac engaged in regular financial modeling for
the Company and that in those forecasts, revenue streams were projected for each item the
Company sold or was planning to sell. There is nothing in the appraisal itself indicating
that Mr. Dutcher received such 2000 or 2001 projections, either for the Company as a
whole or for Bratz. Further, it does not appear that the value of MGA Entertainment, HK
was included in the appraisal at all, and Fred's shares in that company were certainly part
of what was covered in the Agreement to Arbitrate. In any event, we will know more
about the information provided to Mr. Dutcher and how he proceeded when we get Mr.
Dutcher's files and take his deposition now that our motion has been granted.

You indicated to me that the Company actually lost money for 2000 after realizing
a profit in 1999, and thus using the 1999 figures in the appraisal worked in Fred's favor in
valuing the Company. First, it is not apparent to us that the Company lost money in 2000,
as Isaac has not provided to Fred the tax returns or necessary financial information to
verify that claim. From what we know, both sales and profits were expected to be much
greater in 2000 than they were in 1999. If there was a loss in 2000, it certainly could have
been the result of any number of things which would be largely irrelevant to a valuation

04 L181001 026

HS 03239

EXHIBIT     25

PAGE     350

Larry R. Feldman, Esq.
April 6, 2004
Page 6

of the Company – things such as one time writeoffs for non-repeating events, deferring
revenue and profit recognition into the future (perhaps as to Hallmark?), payment of large
bonuses to management, shifting profits into subsidiaries; etc. We do not yet know what
reserves were taken that may have reduced profits and we do not know what revenues
were attributed to or held by MGA Hong Kong. Until we are provided with the financial
information that will enable us to analyze the Company's P/L statement, cash statement,
cash flow analysis, and the like, and to have things fully audited, it is not helpful to be
advised there was a stated loss, especially on rising revenues.

        We do note that in the November 7, 2000 valuation, Mr. Dutcher states that "The
most recent year (1999) was weighted only minimally as the EBDITA appears
unreasonably high based on the two prior years." Mr. Dutcher was looking at EBDITA of
$2,915,000 for 1997; EBDITA of a loss of $86,000 for 1998; and EBDITA of $5,651,000
for 1999. Looking at just those numbers, one can see why he might assume that the 1999
numbers were "high" based on a 1998 loss of $86,000. However, as Isaac knew, the 1999
revenues were not at all "unreasonably high" compared to the prior years because in 1998
there was a one-time loss of approximately $10 million in revenues and $4.5 million in
profits due to a Toys-R-Us sanction of refusing to do business for 1 year. Further, the
actual numbers for 2000 were consistent with the Company's strong growth, and had Mr.
Dutcher had those numbers, he would have have seen that the 1999 numbers were not
unreasonably high. When we have complete information accounted for, it appears there
was a strong progression of $2.9 million for 1997, $4.5 million for 1998 and $5.6 million
for 1999.

        Because they are not as subject to management and accounting choices - which we
will need to examine - sales are important in looking at company valuation. It appears
that sales were about $40,732,000 in 1998, $66,350,000 in 1999 (from tax returns which
Dutcher used), and we believe they were much higher in 2000. However, Dutcher used
$70,331,000 as revenues for 2000 (a pro forma 6% increase over 1999). We have now
seen documents suggesting that revenues were already higher than this in 2000, perhaps
as high as $90,000,000 or more.

        Further evidence of how far off Mr. Dutcher was led by what Isaac gave him and
withheld from him is apparent when one looks at his 2003 projected revenues of
$72,793,000 (3.5% pro forma over 2002). The Wall Street Journal article reports

04 L181001 086

**HS 03240**

EXHIBIT ⎯⎯ 25 ⎯⎯⎯⎯

PAGE ⎯⎯ 351 ⎯⎯⎯⎯

Larry R. Feldman, Esq.
April 6, 2004
Page 7

expected sales of $800 million for 2003, 65% of which is accounted for by Bratz. The appraisal without the information on Bratz was thus more than 10 times lower in its projection for 2003 than it should have been.

When Isaac chose not to share key pieces of information about the scope of the Bratz project with Fred, and to selectively provide him and the appraiser with other financial information about the Company during 1999 and 2000 and projections for the future, there is no doubt that he violated California law requiring him as a fiduciary to disclose all such information to his partner and co-venturer, Fred. Being a fiduciary means that each owes the other the "duty of highest loyalty and utmost good faith, being charged not to take any unfair advantage or secret profit." *Universal Sales Corp. v. California Press Mfg. Co.*, 20 Cal. 2d 751, 772 (1942); BAJI 12.36. A fiduciary has a duty to make a full and fair disclosure of all facts which materially affect the rights and interest of the person to whom the duty is owed. A fiduciary must give priority to the best interest of the persons to whom the duty is owed. When there is a "fiduciary relationship any transaction by which one of the co-adventurers secures an advantage over the other or others is presumptively fraudulent and casts a burden on such party gaining advantage to show fairness and good faith in all respects." *Boyd v. Bevilacqua*, 247 Cal. App. 2d 272, 291 (1966).

It is also a well-settled and fundamental precept that a fiduciary such as Isaac may not usurp business opportunities such as Bratz for himself at the expense of Fred as his co-fiduciary. In *MacIsaac v. Pozzo*, 81 Cal. App. 2d 278 (1947), the parties entered into a partnership to do business together and had agreed to split profits equally. However, plaintiff went out on its own and improperly made a deal with a customer, Utah Fuel Co., and got the defendant to agree to take only 15% of the profit. When the proceeds from the Utah Fuel deal came in, a declaratory judgment action was instigated by the plaintiff and Pozzo defended on the ground that the agreement to split the profits 85/15 was procured by fraud. In agreeing with Pozzo, the court held the following:

> [I]f there is presented to a corporate officer or director a business opportunity which the corporation is financially able to undertake, is, from its nature, in the line of the corporation's business and is of practical advantage to it, is one in which the corporation has an interest or reasonable expectancy, and, by embracing the opportunity, the self-interest of the officer or director will be brought into conflict with that of his corporation, the law will not permit him to seize the opportunity for himself. And, if in

04 LI81001 086

HS 03241

EXHIBIT ___ 85

PAGE ___ 352

Larry R. Feldman, Esq.
April 6, 2004
Page 8

such circumstances, the interests of the corporation are betrayed, the
corporation may elect to claim all the benefits for itself, and the law will
impose a trust in favor of the corporation upon the property, interests and
profits so acquired.

The facts bring the case within the stated rule. While it has been
applied so generally in corporation cases to have become known as the
doctrine of corporate opportunity, it is founded in the doctrine of loyalty in
business which applies in all situations in which trust is reposed. *The
fiduciary is held to the utmost measure of loyalty and accordingly he may
not use a trust opportunity for personal advantage.* "The policy of the law
is to put fiduciaries beyond the reach of temptation by making it
unprofitable for them to yield to it."

The primary duty of the parties was to take no advantage of each
other within their fiduciary relationship by means of the slightest
concealment, misrepresentation, or adverse pressure. Defendant was
entitled to a complete disclosure as to the negotiations with Utah Fuel Co.,
and an equal opportunity to take advantage of them. Plaintiff contrived to
appropriate for itself the major share of the profits with the result that the
firm, when it took the contract and assumed the responsibility, stood
committed to an unequal division. Defendant could not be deprived of its
rights in this matter.

The judgment properly awarded defendant the amount by which
plaintiff profited through breach of duty. Whether it be regarded as
damages presumed to have been suffered through deprivation of a business
opportunity or as profits unjustly received by a plaintiff is immaterial.

*Id.* at 284-85 (emphasis supplied; extensive internal citations omitted). *See also, e.g.,*
Witkin, 9 Summary of California Law § 20, p. 419 (9th ed. 1990) ("The fiduciary
relationship . . . obviously makes applicable the rule which, in corporation law, is known
as the doctrine of 'corporate opportunities'"); *Air Purification v. Carle,* 99 Cal. App. 2d
258, 265 (1950) (holding ("[In] a trust relationship . . . one of the parties will not be
allowed to deal with the subject matter of the association for his own advantage.").

04:L181001 036

**HS 03242**

EXHIBIT _25_

PAGE _353_

Larry R. Feldman, Esq.
April 6, 2004
Page 9

Based on just what we know without discovery it is clear that Isaac has ignored the requirement that he not engage in "the slightest concealment." When Isaac put together the licensing deal for Bratz without informing Fred of his plans or sharing with Fred the financial expectations and rewards deriving therefrom, Isaac violated his duties as a fiduciary, and he will have to account to Fred.

In addition to Isaac's duties to disclose to Fred all material information relating to the Company, and to refrain from usurping a business opportunity – both of which arose from his fiduciary relationship with Fred – Isaac's actions in isolating the Bratz and other financial information from Fred also created an independent duty of disclosure. As Witkin notes, "The duty to disclose may arise without any confidential relationship where the defendant alone has knowledge of material facts which are not accessible to the plaintiff." Bernard E. Witkin, 5 Summary of California Law, § 700, p. 801 (9th ed. 1990; citations omitted). Here, as recited above – from holding secret meetings to instructing Company employees not to give Fred information – Isaac went to great lengths to make sure the material facts about the Bratz doll project were "not accessible" to Fred, when he had a duty to inform him of the scope of the Bratz program before entering into the Agreement to Arbitrate and Stock Purchase Agreement. It was impermissible for Isaac to keep his plans for the scope of the Bratz program secret. Also, note that ¶ 6 of the buy/sell agreement itself makes clear that it is Isaac, not Fred, who has "full knowledge of business prospects."

Isaac has indicated to Fred a willingness to address the merits and provide us with documents in his possession and control, including those held by the companies. Our outstanding discovery requests are a good listing of what we need, but in summary, we certainly need each of the following:

1. All documents that relate to Bratz from 1999 through 2003, including trademarks, license agreement negotiations with Carter Bryant, notes or agendas of meetings re: Bratz, prototypes, designs, correspondence with attorneys re: the license agreement or trademarks, and financial documents, including sales and revenue projections, audited and unaudited;

2. All documents that relate to the value, revenues and costs of MGA, ABC and MGA Hong Kong from 1999 through the present, including all internal materials, projections and tax returns, all reserves, write downs and supporting documentation;

04 L181001 086

HS 03243

EXHIBIT 25
PAGE 354

Larry R. Feldman, Esq.
April 6, 2004
Page 10

3. All information that Isaac and/or the companies provided to Morad and/or Mr. Dutcher;

4. All corporate minutes, shareholder resolutions, stock options grants or proposals and related documentation, and general ledgers for ABC, MGA and MGA Hong Kong.

In addition to this documentation from Isaac, we also need his reconfirmed agreement to allow Morad to release his file. We also need written confirmation by Isaac that he wants full and honest disclosure by any person who is a witness to the events herein; that he will not directly or indirectly retaliate against any person based on what they disclose; and that he is encouraging and requesting them to give Fred a candid, honest, and complete response to any questions Fred may have of them. In exchange for such complete disclosure, Fred is also willing to produce his records now.

Once we have received the above, and do our homework in connection with what we find, we will be in a position to make a recommendation as to proceeding with a binding reference of this matter to a retired judge, and what the order of reference would provide. We also have some candidates to put forward in this regard. If in the meantime you are interested in a non-binding mediation, we are prepared to support that immediately, and without further discovery beyond production of the materials indicated. We have some thoughts as to who might be able to get this sorted out between these brothers, so that the matter can be closed. Please let me know if this is an option.

Very truly yours,

Don Howarth

04.L181001.086

HS 03244

EXHIBIT 25
PAGE 305

Larry R. Feldman, Esq.
April 6, 2004
Page 11

bcc:   Mr. Farhad Larian (via U.S. Mail)

04-L181001.086

EXHIBIT _____ 25 _____

PAGE _____ 356 _____

HS 03245

**Howarth & Smith**
ATTORNEYS AT LAW
800 Wilshire Boulevard
Suite 750
Los Angeles, California 90017
(213) 955-9400
Fax: (213) 622-0791

# FAX COVER SHEET

*The information contained in this facsimile message is information protected by attorney-client and/or the attorney/work product privilege. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by facsimile. If the person actually receiving this facsimile or any other reader of the facsimile is not the named recipient or the employee or agent responsible to deliver it to the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone and return the original message to us at the above address via U.S. Postal Service.*

FAX NUMBER TRANSMITTED TO: (310) 788-1200

To:          Larry R. Feldman, Esq.

From:        Brian D. Bubb, Esq.

Number of pages including this page: 11

*       IF YOU DO NOT RECEIVE ALL PAGES, PLEASE TELEPHONE US IMMEDIATELY AT (213) 955-9400.

Sent by:     Jason Sickler                                      Date: April 6, 2004

Re:    Larian v. Larian

COMMENTS:

**HS 03246**

EXHIBIT  25

PAGE  357

Confirmation Report—Memory Send

Time       : Apr-05-2004  11:37pm
Tel line 1 :
Tel line 2 :
Name       : HOWARTH

| | | |
|---|---|---|
| Job number | : | 375 |
| Date | : | Apr-05 11:33pm |
| To | : | 53084498K001#13107861200R |
| Document Pages | : | 011 |
| Start time | : | Apr-05 11:33pm |
| End time | : | Apr-05 11:37pm |
| Pages sent | : | 011 |
| Status | : | OK |

Job number    : 375                    *** SEND SUCCESSFUL ***

Howarth & Smith
ATTORNEYS AT LAW
800 Wilshire Boulevard
Suite 750
Los Angeles, California 90017
(213) 955-9400
Fax (213) 622-0791

## FAX COVER SHEET

*The information contained in this facsimile message is information protected by attorney-client and/or the attorney/work product privilege. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by facsimile. If the person actually receiving this facsimile or any other reader of the facsimile is not the named recipient or the employer or agent responsible to deliver it to the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone and return the original message to us at the above address via U.S. Postal Service*

FAX NUMBER TRANSMITTED TO: (310) 788-1200

To:             Larry R. Feldman, Esq.

From:           Brian D. Bubb, Esq

Number of pages including this page: 11

·       IF YOU DO NOT RECEIVE ALL PAGES, PLEASE TELEPHONE US IMMEDIATELY AT (213) 955-9400

Sent by:   Jason Sickler                                          Date: April 6, 2004

Re:    Larian v. Larian

COMMENTS:

**HS 03247**

EXHIBIT _____ 25

PAGE _____ 358

EXHIBIT 26

THIS EXHIBIT IS FILED UNDER SEAL

PURSUANT TO PROTECTIVE ORDER

EXHIBIT 27

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 28

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 29

THIS EXHIBIT IS FILED UNDER SEAL

PURSUANT TO PROTECTIVE ORDER

EXHIBIT 30

THIS EXHIBIT IS FILED UNDER SEAL

PURSUANT TO PROTECTIVE ORDER

EXHIBIT 31

THIS EXHIBIT IS FILED UNDER SEAL

PURSUANT TO PROTECTIVE ORDER

EXHIBIT 32

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 33

THIS EXHIBIT IS FILED UNDER SEAL

PURSUANT TO PROTECTIVE ORDER

EXHIBIT 34

THIS EXHIBIT IS FILED UNDER SEAL

PURSUANT TO PROTECTIVE ORDER

EXHIBIT 35

EXHIBIT 36

THIS EXHIBIT IS FILED UNDER SEAL

PURSUANT TO PROTECTIVE ORDER

EXHIBIT 37

THIS EXHIBIT IS FILED UNDER SEAL

PURSUANT TO PROTECTIVE ORDER

EXHIBIT 38

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 39

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 40

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 41

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 42

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 43

THIS EXHIBIT IS FILED UNDER SEAL

PURSUANT TO PROTECTIVE ORDER

EXHIBIT 44

THIS EXHIBIT IS FILED UNDER SEAL

PURSUANT TO PROTECTIVE ORDER

EXHIBIT 45

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

# quinn emanuel trial lawyers

## MATTEL PDF COVER SHEET

ED(KSHN-EPPHPPPA-CRHY-PBKC-XDXB-ADNPXFHKYRBY)

Created By:     andreahoeven@quinnemanuel.com
Created On:     4/8/2008 6:46:43 PM
Expires On:     (no expiration)
Single Use?     No

## Scan Instructions:

1. **Print this routing sheet.**
2. **Take your routing sheet and hard-copy documents to the nearest Canon Copier/Scanner.**
3. **Unlock the copier using your Equitrac login information.**
4. **Place this routing sheet on top of your hard-copy documents facing up into the auto feeder.**
5. **Touch "Send" button on LCD panel.**
6. **Select "Scan" button on LCD panel.**
7. **Press "Start" button on the Canon Machine.**

ED(KSHN-EPPHPPPA-CRHY-PBKC-XDXB-ADNPXFHKYRBY)

**Place this Routing Sheet in Front of Hardcopy Document and then Scan or Fax**

EXHIBIT 46

EXHIBIT 47

| | |
|---|---|
| **From:** | 'Carter Bryant' <cbe1068@sbcglobal.net> |
| **To:** | Isaac Larian (President / CEO) <LarianI1@mgae.com> |
| **CC:** | LDjiguerian@mgae.com <LDjiguerian@mgae.com> |
| **Sent:** | 6/5/2006 9:38:52 AM |
| **Subject:** | RE: eBay |

OK will review when the ebay item comes in.
thanks!

Carter

*"Isaac Larian (President / CEO)" <LarianII@mgae.com> wrote:*

Thanks.

Guys, lets do this in BRATZ look ASAP. It will be HOT!!

**Isaac Larian**
**CEO**
**MG   Entertainment, Inc**
**A Consumer Entertainment Product Co.**
**" A man's every act begins with a dream and ends with one"-Herzl**

16380 Roscoe Blvd. Suite 200
Van Nuys, California 91406
Tel: 818-894-3150
email: lariani1@mgae.com
fax: 818-894-126"
www.mgae.com
www.bratz.com

**From:** Ninette Pembleton
**Sent:** Monday, June 05, 2006 9:01 AM
**To:** Isaac Larian (President / CEO)
**Cc:** Carter Bryant; Leon Djiguerian; Ray Martin
**Subject:** RE: eBay

Purchased one today and it should arrive by end of week.

Still bidding on a 2nd one.

See attached.

EXHIBIT __47__

PAGE __526__

**From:** Isaac Larian (President / CEO)
**Sent:** Saturday, June 03, 2006 5:58 PM
**To:** Ninette Pembleton
**Cc:** Carter Bryant; Leon Djiguerian; Ray Martin
**Subject:** eBay

Remember the talking parrot: Pete the Repeat?

Can you please get 2-3 samples on eBay.

I want to make a Bratz KIDZ version!

**Isaac Larian**
**CEO**
**MG   Entertainment, Inc**
**A Consumer Entertainment Product Co.**
**" Each day we need good thoughts to live by. And remember...you get**
**what you order in life." - Alfred Montapert**
16380 Roscoe Blvd. Suite 200
Van Nuys, California 91406
Tel: 818-894-3150
email: lariani1@mgae.com
fax: 818-894-1287
www.mgae.com
www.bratz.com

*********************************************************************
IMPORTANT NOTICE: This e-mail message (including any attachments) constitutes non-public information intended
to be conveyed only to specific recipients. It may contain information which is confidential, legally privileged and/or
exempt from disclosure under applicable law. If you are not the intended recipient (or a party responsible for delivering
this message to the intended recipient), you are hereby notified that you are NOT authorized to review, use, disclose,
distribute or copy this communication in any way. If you have received this message in error, please permanently delete
this e-mail and any copies from your computer system without delay. Please also notify the sender (or
administrator@mgae.com) by return e-mail, and thereafter delete your reply. Thank you.
*********************************************************************

U 7

PAGE      527

EXHIBIT 48

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 49

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 50



**CONFORMED COPY**

1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
     John B. Quinn (Bar No. 090378)
2    Michael T. Zeller (Bar No. 196417)
     Jon D. Corey (Bar No. 185066)
3    Tania M. Krebs (Bar No. 227281)
   865 South Figueroa Street, 10th Floor
4  Los Angeles, California 90017-2543
   (213) 443-3000 (telephone)
5  (213) 443-3100 (facsimile)

6  Attorneys for Plaintiff and Counter-Defendant
   Mattel, Inc.

7
   LITTLER MENDELSON
8    Robert F. Millman (Bar No. 062152)
     Douglas A. Wickham (Bar No. 127268)
9    Keith A. Jacoby (Bar No. 150233)
   2049 Century Park East, 5th Floor
10 Los Angeles, California 90067-3107
   (310) 553-0308 (telephone)
11 (310) 553-5583 (facsimile)

12 Attorneys for Defendant and Counter-Claimant
   Carter Bryant

13
                    UNITED STATES DISTRICT COURT
14
                   CENTRAL DISTRICT OF CALIFORNIA
15

16 MATTEL, INC., a Delaware corporation,  )  CASE NO. CV 04 9059 NM (RNBx)
                                          )
17                 Plaintiff,             )  **DISCOVERY MATTER**
                                          )
18        v.                              )  JOINT STIPULATION RE:
                                          )  MATTEL'S MOTION TO COMPEL
19 CARTER BRYANT, an individual, and      )  PRODUCTION OF DOCUMENTS
   DOES 1 through 10, inclusive,          )
20                 Defendants.            )  Hearing Date:   January 25, 2005
                                          )  Time:           9:30 a.m.
21 ───────────────────────────────────── )  Courtroom:      540
   CARTER BRYANT, on behalf of himself,   )
22 all present and former employees of    )  Hon. Robert N. Block
   Mattel, Inc., and the general public,  )
23                                        )  Discovery Cut-off: Not Set
                   Counter-Claimant,      )  Pretrial Conference: Not Set
24                                        )  Trial: Not Set
          v.                              )
25 MATTEL, INC., a Delaware corporation,  )
                                          )
26                 Counter-Defendant.     )
27 ───────────────────────────────────── )

28

7209/625168.1
1/4/05 15:53

**EXHIBIT** 50

**PAGE** 534

JOINT STIPULATION

1        Pursuant to <u>Federal Rule of Civil Procedure</u> 37 and <u>Local Rule</u> 37,

2    Plaintiff and Counter-Defendant Mattel, Inc. ("Mattel") and Defendant and Counter-

3    Claimant Carter Bryant ("Bryant") respectfully submit this Joint Stipulation on

4    Mattel's Motion to Compel Production of Documents.

5                        **Mattel's Introductory Statement**

6        Defendant and Counter-Claimant Carter Bryant is withholding relevant

7    documents and has refused to produce a complete privilege log.  Mattel therefore

8    respectfully seeks the Court's assistance to obtain the information it is entitled to.

9        **Mattel's Claims And Bryant's Counterclaims.**   Bryant is a former

10   Mattel employee.  He worked as a Mattel product designer from September 1995 to

11   April 1998, and then again from January 1999 to October 2000.[1]  Upon starting his

12   second term of employment with Mattel, Bryant executed an Employee Confidential

13   Information and Inventions Agreement.[2]  There, he agreed that during his Mattel

14   employment he would not, without Mattel's express written consent, "engage in any

15   employment or business other than for [Mattel], or invest in or assist (in any manner)

16   any business competitive with the business or future business plans of [Mattel]."

17   Bryant also assigned to Mattel, to the fullest extent of the law, all rights in

18   "inventions," including "designs," that he created during his Mattel employment.  In

19   his agreement, Bryant further promised not to disclose or misuse Mattel's proprietary

20   or confidential information, which is an obligation that continues to this day.

21       In November 2003, Mattel obtained a copy of a contract between Bryant

22   and a Mattel competitor, MGA Entertainment ("MGA").[3]  That contract--which

23   Bryant and MGA entered into while Bryant was employed by Mattel--required Bryant

24   to provide design services to MGA on a "top priority" basis, in conflict with his then-

25   _____

26       [1]  <u>See</u> Decl. of Michael T. Zeller, dated January 4, 2005 and filed concurrently
     herewith ("Zeller Dec."), Exh. 1 (Complaint at ¶ 9) & Exh. 6 (Cross-Complaint at ¶ 7).

27       [2]  Exhibit A to the Complaint (Zeller Dec., Exh. 1).

28       [3]  Zeller Dec., Exh. 15.

7209/625168.1
1/4/05  17:20

EXHIBIT ___50___                          1

PAGE ___535___                                         JOINT STIPULATION

1  existing obligations to Mattel. It also purported to grant MGA ownership of works
2  produced by Bryant, both before and after the agreement's effective date, in further
3  contravention of his obligations to Mattel.[4]

4         Mattel filed this suit for breach of contract, breach of fiduciary duty,
5  breach of the duty of loyalty, unjust enrichment and conversion.[5] Bryant has brought
6  counterclaims, seeking to invalidate Mattel's agreements with all of its past, present
7  and future employees, along with sweeping requests for damages and other relief

8         **Bryant's Refusal to Provide Full Discovery**. As shown in detail below,
9  discovery thus far has confirmed that Bryant did work for and aided MGA during his
10  Mattel employment. This included work on a doll line now known as "Bratz" and an
11  ostensibly separate doll called "Angel." There is also evidence that he used internal
12  Mattel information and resources to benefit himself and MGA, to Mattel's detriment.
13  While still employed by Mattel, he enlisted other Mattel employees to build a
14  "prototype" Bratz doll for his sales pitch to MGA–a pitch that he made while
15  employed by Mattel. Weeks before he left Mattel, and using Mattel resources Bryant
16  targeted Mattel vendors and engaged them to start their work on Bratz. According
17  to Bryant, he has earned "millions of dollars" from his relationship with MGA.[6]

18         At every possible step, Bryant has stonewalled Mattel's efforts to obtain
19  discovery into the full scope of his wrongdoing. Among many other things, he
20  evaded deposition for over four months. At one point, to avoid a motion to compel,
21  Bryant's counsel even gave their "word as attorneys" that he would sit for deposition
22

23         [4] Id., Exh. 15 at ¶¶ 3(a)-(b).

24         [5] Mattel originally filed this suit in Los Angeles County Superior Court, and Bryant
25  removed to this Court for the first time on May 14, 2004. By Order dated August 20, 2004,
   Judge Manella granted Mattel's motion for remand and sent the case back to state court.
26  Zeller Dec., Exh. 3. Bryant nevertheless turned around and removed for a second time on
   November 2, 2004. Mattel has a pending motion for remand on Bryant's second removal
27  that is currently set to be heard by Judge Manella on January 31, 2005.

28         [6] Zeller Dec., Exh. 4.

7209/625168.1
1/4/05 17:20

2

JOINT STIPULATION

EXHIBIT ___50___

___036___

1  on a date certain in August, only to unilaterally renege at the last minute. Even after
2  that, it took two Court Orders compelling Bryant's deposition before he appeared.

3          Bryant persists in similar tactics with respect to his document
4  production, despite Mattel's repeated efforts to resolve the matter without judicial
5  intervention. He either has failed or refused to produce key categories of information,
6  including documents directly relating to his breaches of his duties to Mattel. For
7  example, Bryant refuses to produce *any* responsive documents that were created after
8  this suit was filed in April 2004, even though there is no basis in law or logic for such
9  a limitation, especially in this case where his breached obligations to Mattel include
10 obligations that are still in force. He additionally has imposed a multitude of other
11 restrictions on his production by refusing to disclose documents "created" after
12 certain dates, even as to plainly relevant categories of information and even though
13 such information is relevant regardless of when it was "created."

14         Moreover, what Bryant has produced is woefully incomplete. He has not
15 produced all of his contracts with MGA and refuses to produce non-privileged
16 communications relating to those contracts. He is withholding entire categories of
17 financial information relating to his work for MGA, and the financial documents he
18 did produce are so heavily redacted that they are useless. Bryant has turned over
19 faxed documents that are missing fax header information and/or that lack fax cover
20 sheets. This is particularly troubling because timing and the chronology of events are
21 important to the merits of central issues in the case. His production also includes a
22 variety of documents that refer to other documents, including attachments, that have
23 not been produced. Although Bryant agreed weeks ago to inquire into these and other
24 deficiencies, he has not responded to Mattel's follow-up efforts on the matter.

25         Bryant also has failed to produce, even in hard copy form, emails and
26 other electronic documents that are known to exist relating to his work on the "Bratz"
27 project and for MGA. He nevertheless has rebuffed Mattel's requests to inspect the
28 hard drives of his computers, even though he himself has made no attempt to

7209/625168.1
1/4/05  17:20

JOINT STIPULATION

EXHIBIT _____ 80

PAGE _____ 087

1 | determine whether deleted files on the drives contain responsive information and
2 | even though the law is clear that Mattel is entitled to such information.

3 |          Mattel respectfully requests that its motion to compel be granted.

4 |

5 |                         **Bryant's Introductory Statement**

6 |          To understand and appreciate the issues raised in Plaintiff and
7 | Counter-defendant Mattel Inc.'s ("Mattel") discovery motion, it is critical for the
8 | Court to consider the procedural posture within which the motion arises. This case
9 | has been twice removed to Federal Court by Defendant and Counter-claimant Carter
10 | Bryant ("Bryant") on the grounds that diversity jurisdiction and federal question
11 | jurisdiction exist. Mattel has steadfastly insisted that no federal questions have been
12 | raised by its Complaint, and that diversity jurisdiction does not exist *because Bryant*
13 | *cannot prove that more than $75,000 is in controversy.* On one hand, Mattel has
14 | postured to Judge Manella that this case is a small employment lawsuit regarding
15 | Bryant's alleged performance of services for a competitor, in the weeks before he
16 | terminated his employment at Mattel. On the other hand, Mattel urges this Court to
17 | compel responses to *wide ranging* discovery requests, covering documents created
18 | by Bryant and others over the course of his entire life, on subject matters that could
19 | only be germane to this lawsuit if Mattel were seeking to recover all of the money
20 | Bryant has earned since leaving Mattel, *i.e.* royalties earned over the course of the
21 | past four years as a result of the sale of products sold under the trade name "Bratz."
22 | Mattel's inconsistent positions taken before Judge Manella and before this Court
23 | cannot be reconciled with each other.

24 |          Mattel should not be permitted to gain any advantage from its
25 | duplicitous assertions about the scope of this lawsuit. Mattel alleges Bryant violated
26 | his contractual duties and duty of loyalty to Mattel in the weeks leading up to his
27 | resignation. Bryant's compensation during his last weeks of employment at Mattel
28 | totaled less than **REDACTED**. Since then, he has earned **REDACTED** from

7209/625168.1
1/4/05 17:20

                                         4

EXHIBIT _____ 50

PAGE _____ 538

<div align="center">

**ISSUE NO. 5**

**Should Bryant Be Compelled To Produce His Communications With MGA Or Relating To Bratz, Including By Producing His Computer Hard Drives For Inspection And Unredacted Versions Of His Telephone Records?**

</div>

Set forth below are: (A) Mattel's Requests that are relevant to Issue No. 5 and Bryant's Responses to Mattel's Requests; (B) Mattel's position; and (C) Bryant's position.

**A.    Mattel's Requests And Bryant's Responses**

REQUEST FOR PRODUCTION NO. 23:

All COMMUNICATIONS between YOU and MGA that REFER OR RELATE TO any work or services that YOU performed for or on behalf of Mattel, Inc. or YOUR employment by Mattel, Inc.

RESPONSE TO REQUEST FOR PRODUCTION NO. 23:

Defendant incorporates by reference each and every objection set forth above in the General Objections. Defendant objects to this request on the grounds the terms "work" and "services" are vague, ambiguous and fail to identify with sufficient particularity the documents to be produced. Defendant further objects to this request on the grounds that it is overbroad, unduly burdensome and unintelligible to the extent it fails to identify a specific time period or proper subject matter, and on that basis seeks documents not relevant to this action and not reasonably calculated to lead to the discovery of admissible evidence. Defendant also objects to this request insofar as it invades the privacy and/or confidentiality of other individuals who are not parties to this action. Finally, Defendant objects to this request to the extent it seeks documents prepared in anticipation of litigation or that are protected by the

EXHIBIT _____ 50_____

PAGE _____ 637_____

1  employment by Mattel or work that he performed for Mattel, those documents are
2  plainly relevant.  They are pertinent to his knowledge of his obligations to Mattel
3  (which Bryant has put at issue in an effort to avoid his Mattel agreements) and to the
4  willfulness of his tortious conduct (which is relevant to punitive damages).  They
5  also, in themselves, may establish Bryant's liability, such as by proving additional
6  instances in which he used or conveyed to MGA internal Mattel proprietary
7  information in breach of his duties to Mattel.

8       Nor is there any legitimate justification for his unilateral limitation on
9  relevant communications unless they happened to be "created prior to October 21,
10 2000." For the reasons already shown, Bryant's artificial date restrictions improperly
11 deprive Mattel of discoverable information relating to Bryant's accused conduct and
12 are unsupported by law or common sense.  Indeed, that is particularly evident here.
13 He is refusing to turn over communications with MGA "created" after October 20,
14 2000 relating to his Mattel work.  If Bryant's restriction were adopted, he would be
15 free to conceal documents showing that, a week or a month or a year after he left
16 Mattel's employment, he further breached his on-going duties to Mattel by using or
17 disclosing yet more confidential Mattel information.  Bryant's limitation cannot be
18 sustained.

19      **Bryant Also Should Be Ordered To Turn Over His Hard Drives.**  A
20 request for "documents" under Rule 34 operates as a request for documents stored in
21 electronic form. See Playboy Enterprises, Inc. v. Welles, 60 F. Supp. 2d 1050, 1053
22 (S.D. Cal. 1999); Fed. R. Civ. P. 34, advisory committee's note.[66]  Yet, among the
23 documents and things that Bryant has refused to produce are the hard drives from his
24 computers.  Bryant used these computers to communicate with and perform work for
25
26
27 _____
   [66] Mattel's requests also explicitly defined "documents" to include electronic data
28 and documents. Zeller Dec., ¶ 10 and Exh. 12.

EXHIBIT _50_

PAGE _540_

1    MGA, but he refuses to allow Mattel to inspect any of their hard drives.[67]  Bryant
2    used three different computers that Mattel is aware of that are relevant here.  First,
3    Bryant purchased a desktop computer in October 2000 (the "Desktop").[68]  Bryant
4    admitted at deposition that he used this computer for a period of time and then gave
5    it to his niece.[69]  Second, Bryant purchased a laptop computer in November 2001.[70]
6    Third, Bryant testified that he used his parent's computer for a time, including during
7    the time that he purportedly created "Bratz."[71]

8             There is more than ample basis to believe that the hard drives of these
9    computers contain responsive documents and relevant information.  Bryant's
10   production includes a smattering of documents that were computer-generated or
11   printed from a computer, although he has not produced all such documents known to
12   exist as explained further below.  For example, Bryant has produced hard copies of
13   a few electronic-mail messages.[72]  He has also produced documents that were created
14   by computer, including correspondence.[73]

15            During a telephone conversation with Bryant's counsel, Mattel first
16   learned of the existence of the Desktop and that Bryant had purportedly given it away
17   to his niece.[74]  In later correspondence, Bryant's counsel indicated that he had looked
18   at the hard drive of the Desktop, but located no responsive documents.[75]  He refused

19

20

---

21       [67] Zeller Dec., Exh. 49.

22       [68] Zeller Dec., ¶ 30 and Exh. 72 (at 246:3-5).

23       [69] Zeller Dec., Exh. 72 (at 246:2-246:17).

24       [70] Zeller Dec., Exh. 72 (at 245:7-248:11).

         [71] Zeller Dec., Exh. 72 (at 245:25-246:1).
25
         [72] Zeller Dec., ¶ 30 and Exh. 26.
26
         [73] Zeller Dec., ¶ 31
27
         [74] Zeller Dec., ¶ 36 and Exh. 46.
28
         [75] Zeller Dec., ¶ 37 and Exh. 49.

EXHIBIT _____ 50
PAGE _____ 841

1    to allow Mattel to inspect the hard drive,[76] even though there is no evidence that

2    Bryant made any effort to conduct a forensic analysis of that hard drive or to

3    determine whether any deleted documents could be retrieved and produced.[77] Indeed,

4    because as far as Mattel could tell Bryant did not create any forensic copy of that (or

5    any other) hard drive, Mattel requested that Bryant's counsel take possession of the

6    hard drives to ensure that any evidence that they may contain is not destroyed.[78]

7    Counsel for Bryant never responded.[79]

8            Compelling the production of the hard drives to Mattel is appropriate for

9    two principal reasons. First, it is appropriate to ensure that evidence is not lost and

10   to permit Mattel to ascertain whether any files of relevant materials have been

11   deleted. Because Bryant's counsel will not make these hard drives available for

12   inspection (and indeed has not undertaken to secure the computers to ensure that no

13   electronic evidence is destroyed), Mattel should be permitted to make mirror-images

14   of the hard drives of each computer. Creating a mirror-image not only is forensically

15   sound, but it takes very little time and causes no disruption to the computer's

16   functionality. Even if the evidence on Bryant's computers has been or is deleted or

17   otherwise tampered with, the hard drives must be produced. Deleted computer

18   records are discoverable. See Simon Property Group L.P. v. mySimon, Inc., 194

19   F.R.D. 639, 640 (S.D. Ind. 2000) ("[C]omputer records, including records that have

20   been 'deleted,' are documents discoverable under Fed. R. Civ. P. 34.").

21            Second, Mattel is entitled to discovery to determine whether the

22   computers contain additional responsive documents. The evidence suggests that they

23   do. Bryant's counsel has represented that he looked at one hard drive for responsive

24   documents, but apparently has made no effort to look for or recover deleted data from

25

26

27

28

[76] Id.

[77] Zeller Dec., ¶ 37.

[78] Zeller Dec., ¶ 38.

[79] Zeller Dec., ¶ 38.

JOINT STIPULATION

EXHIBIT _____ 50 _____

PAGE _____ 542 _____

1 | that hard drive and made no effort to examine the other computers at all.[80]
2 | Deficiencies in Bryant's production confirms that the hard drives likely contain
3 | relevant materials. Bryant used email in his exchanges with MGA and others
4 | pertaining to Bratz.[81] He also recorded various e-mail addresses that he used and
5 | produced a document containing some of them to Mattel.[82] Elsewhere, in a letter,
6 | Bryant specifically invited the recipient to contact him by e-mail: "Please do not
7 | hesitate to email me if you have further questions."[83] Yet, there is irrefutable
8 | evidence that Bryant has not turned over even hard copies of all his responsive emails
9 | or their attachments. MGA, for example, produced e-mail messages that Bryant
10 | exchanged with Isaac Larian and Paula Treantafelles of MGA in 2000.[84] Yet, Bryant
11 | has not produced these emails in any form, and, given the dates on the emails, it is
12 | highly likely that files containing these and other emails are on the hard drive of his
13 | Desktop. Indeed, despite the existence of such known, additional electronic
14 | documents, Bryant's entire production (approaching 1600 pages) contains only a few
15 | pages of computer-generated documents: a few e-mail messages, four letters, and a
16 | résumé. Mattel is entitled to inspect the hard drives of Bryant's computers to
17 | determine whether they contain responsive documents.

18 | Bryant may argue that his "personal" computers should somehow be
19 | immune from discovery. That argument would be wrong. Courts permit inspection
20 | of home computers. See, e.g., Superior Consultant Co. v. Bailey, No. 00-CV-73439,
21 | 2000 WL 1279161, at *13 (E.D. Mich. Aug. 22, 2000) (ordering defendants to "create
22 | and produce to defense counsel a backup file of defendant Bailey's laptop computer,
23 | and a backup file of any personal computer hard-drive to which defendant Bailey has

24 |
25 | [80] Zeller Dec., ¶ 37.
26 | [81] Zeller Dec., Exhs. 24-26.
27 | [82] Zeller Dec., Exhs. 40 & 73 (at 400:11-21).
28 | [83] Zeller Dec., Exh. 21.
    | [84] Zeller Dec., Exhs. 24 & 25.

EXHIBIT ____ 50 ____

PAGE ____ 543 ____

1  had access at any time").  Such an inspection is particularly appropriate where, as

2  here, the responding party used the computer for business purposes.

3        For these reasons, Bryant should be ordered to make all computer hard

4  drives within his possession, custody or control available for Mattel's inspection and

5  forensic imaging.

6  **Bryant Should Be Compelled To Produce His Telephone Records**

7  **Without Redactions.**  Bryant's telephone records are responsive to these requests.

8  Bryant has produced some telephone records.[85]  He saw fit, however, to redact the

9  vast majority of the call information on these documents.  He went so far as to redact

10  *all* of the call information on his Pacific Bell telephone bills.[86]  Bryant has also

11  produced no telephone bills for a carrier known as "tti National, Inc." for any date

12  prior to October 23, 2000 for one phone number or any date prior to October 26, 2000

13  for another phone number.[87]  While Bryant may assert, yet again, that rights of

14  confidentiality or privacy justify his stonewalling, the Protective Order more than

15  adequately protects any such rights.  He should be ordered to produce the telephone

16  records in his possession without redaction.

17        Bryant's objections should be overruled in their entirety, and he should

18  be ordered to produce all responsive documents.

19

20  **C.   Bryant's Position**

21        There is perhaps nothing more far-fetched in this motion than Mattel's

22  contention that "Bryant has completely refused to produce communications between

23  himself and MGA."  Bryant has not "refused" to produce communications between

24  himself and MGA.  To the contrary, he has produced his agreement, his royalty

25  statements, all manner of artwork that was done for MGA or that was assigned to

26    [85]  See Zeller Dec., ¶ 28 and Exh. 34.

27    [86]  See Exhibit 34 to Zeller Dec.

28    [87]  Zeller Dec., Exh. 34.

7209/625168.1
1/4/05  17:20

64

EXHIBIT 50

PAGE 544

1  MGA. Moreover, and contrary to Mattel's contentions, Bryant has made an extensive

2  and diligent search for responsive and relevant information. As Bryant's counsel has

3  expressly told Mattel, Bryant made the hard drive of the computer he used from 2000

4  to 2002 available to his counsel, and counsel spent scores of attorney hours searching

5  for documents at Bryant's home and in his studio, and produced responsive

6  documents. Counsel has not found any responsive documents or relevant information

7  on his computer hard drives, however. (Jacoby Decl. ¶ 22). Mattel's unsubstantiated

8  comment that Bryant's counsel "apparently has made no effort to look for or recover

9  deleted data from that hard drive and made no effort to examine the other computers

10  at all" is a complete falsehood, and contradicts express representations made to

11  Mattel's counsel in the meet and confer that Bryant's counsel had expended

12  significant time examining the computer. While Bryant has tirelessly searched for

13  and inspected his computer hard drives for relevant information, there is irrefutable

14  evidence that Mattel has not turned over all of its electronic data related to Bryant,

15  such as responsive emails or their attachments, and Mattel has refused to make its

16  technical person knowledgeable available for deposition. (Jacoby Decl. ¶ 23).

17  Mattel complains that Bryant has not simply turned over the hard drive

18  from Bryant's home computer, which he gave to his niece in 2002. That hard drive,

19  however, contains personal information and data that is unquestionably protected by

20  his constitutional right of privacy, and that of his niece. See Cal. Const. art. I, § I.;

21  also see TBG Insurance Serv's Corp. v. Superior Court, 96 Cal. App. 4th 443 (2002)

22  (reasonable expectation of privacy exists in the use of a personal home computer that

23  is owned by a party). Federal law similarly supports Bryant's right to privacy.

24  Pursuant to the Erie doctrine, federal courts sitting in diversity should apply state

25  substantive law and federal procedural law. Other circuits have also held that a

26  reasonable expectation of privacy exists in home computers. U.S. v. Lifshitz,

27  369 F.3d 173 (2nd Cir. 2004); Trulock v. Freeh, 275 F.3d 391, 403 (4th Cir. 2001);

28  Guest v. Leis, 255 F.3d 325, 333 (6th Cir. 2001).

7209/625168.1
1/4/05 17:20

65

JOINT STIPULATION

EXHIBIT 50
PAGE 545

1    Mattel cites to <u>Superior Consultant Co. v. Bailey</u>, No. 00-CV-73439,
2    2000 WL 1279161, at *13 (E.D. Mich. Aug. 22, 2000) to support its contention that
3    Bryant has no privacy rights to his "personal" home computers. The facts in <u>Bailey</u>
4    are distinguishable from the case here, as in <u>Bailey</u>, the Plaintiff used his personal
5    computer to access his ex-employer's database of confidential, proprietary and trade
6    secret information. Here, Bryant has not done so.

7    Mattel also seeks unredacted versions of both Bryant's telephone records
8    and the telephone records of his parents and friends. Bryant already produced pages
9    of telephone records reflecting all phone calls between MGA and himself, redacted
10   to exclude his own personal (non-MGA related) phone calls and the phone calls of
11   his family and roommates (Richard Irman and Elise Cloonan). He also produced
12   redacted phone records from Veronica Marlow, the individual who introduced Bryant
13   to MGA. He produced those records in good faith, even though they are not his own,
14   because they were turned over by Marlow to his attorneys during this litigation
15   (Jacoby Decl. ¶ 25)

16   Mattel is not entitled to unredacted versions of Bryant's telephone
17   records. Those records contain calls to and from family and friends, and calls by his
18   roommates to others, which are obviously unrelated to this action. Under California
19   law, "A subscriber has a reasonably expectation that records of his calls will be
20   utilized only for the accounting functions of the telephone company in determining
21   his bills. He has no reason to expect that his personal life, as disclosed by the calls
22   he makes and receives, and the day and time of those calls, will be disclosed to
23   outsiders." <u>People v. McKunes</u>, 51 Cal. App. 3d 487 (1975). Bryant is entitled to a
24   reasonable expectation of privacy in the personal calls he received or made from his
25   home by any of his family members regarding issues unrelated to this case. Similarly,
26   Bryant's parents and friends are entitled to a reasonable expectation of privacy in the
27   personal calls they received or made from their home regarding issues unrelated to
28   this case. Therefore, there is nothing to compel here.

7209/625168.1
1/4/05  17:20

JOINT STIPULATION

EXHIBIT _____ 50

PAGE _____ 546

1    The Requests seeking communications with MGA or referring to "Bratz"
2  are also overbroad and burdensome, as stated, in that most of them contain no
3  limitation as to the type of communications or records sought. For example, Request
4  No. 27 asks for "ALL DOCUMENTS that REFER OR RELATE TO
5  COMMUNICATIONS between YOU and MGA after October 20, 2000." As framed,
6  Bryant would have to produce every piece of communication since October 20, 2000
7  until today between MGA and himself. As noted above, however, Bryant has already
8  produced the records of his communications with MGA that pertain to his initial
9  contract with MGA and his work on the First Generation "Bratz."

10

11                              **ISSUE NO. 6**

12    **Should Bryant Be Compelled To Produce Mattel-Related Documents?**

13

14    Set forth below are: (A) Mattel's Requests that are relevant to Issue
15  No. 6 and Bryant's Responses to Mattel's Requests; (B) Mattel's position; and (C)
16  Bryant's position.

17

18    **A.    Mattel's Requests And Bryant's Responses**

19

20  REQUEST FOR PRODUCTION NO. 51:

21    All DOCUMENTS that REFER OR RELATE TO Mattel, Inc., or that
22  were prepared, authored or created by Mattel, Inc. or any officer, director, employee
23  or representative of Mattel, Inc., that YOU have ever provided to, shown, described
24  to, communicated to or disclosed in any manner to MGA.

25

26

27

28

7209/625168.1
1/4/05 17:20
                              67
EXHIBIT _____ 50

JOINT STIPULATION

1 | answering discovery, however, only the most limited information must be disclosed.
2 | Letter after letter from Mattel's counsel cannot mask its duplicity.

3 |      Mattel is suing a Missouri individual, and litigating with the case with
4 | the vigor of a massive antitrust suit, or, more appropriately in this case, "bet the
5 | company" type of litigation. At each previous court hearing, Mattel has sent no less
6 | than *five attorneys - two partners and three associates -* to make and view the
7 | appearance. (Jacoby Decl. ¶ 45). There have also been four depositions. To attend
8 | Bryant's deposition, Mattel sent *four* attorneys - two partners, one associate and one
9 | in-house counsel - to Springfield, Missouri. For a third party witness, Mattel had two
10 | five attorneys - two partners (Mr. Quinn and Mr. Zeller), two in-house lawyers, and
11 | one associate. And, to <u>defend</u> the deposition of one Mattel witness, Mattel sent two
12 | Quinn Emanuel lawyers (one partner and one associate) <u>and</u> one in-house counsel.

13 |      Mattel's tactics of intimidation should not be rewarded. Its motion
14 | should be denied and, to the extent sanctions are awarded, they should be awarded
15 | against Mattel. Bryant's counsel has incurred in excess of $4500 in fees in opposing
16 | this motion (Jacoby Decl. ¶ 47), and pursuant to FRCP 37 (a)(4)(B), Bryant should
17 | be awarded that amount in partial compensation for the cost of opposing this motion.

18 |

19 | DATED: January 25, 2005         QUINN EMANUEL URQUHART
                                      OLIVER & HEDGES, LLP

20 |

21 |                                   By    *Michael T Zeller* / usc

22 |                                       Michael T. Zeller
                                      Attorneys for Plaintiff

23 |                                       Mattel, Inc.

24 | DATED: January 25, 2005         LITTLER MENDELSON, P.C.

25 |

26 |                                   By
                                      Keith A. Jacoby

27 |                                       Attorneys for Defendant
                                      Carter Bryant

28 |

EXHIBIT ___80___

PAGE ___548___

**PROOF OF SERVICE**

1013A(3) CCP Revised 5/1/88

STATE OF CALIFORNIA )
COUNTY OF LOS ANGELES )

        I am employed in the county of Los Angeles State of California. I am over the age of 18 and not a party to the within action; my business address is: 865 South Figueroa Street, 10th Floor, Los Angeles, CA 90012.

        On **January 4, 2005,** I served the foregoing document described as **JOINT STIPULATION RE: MATTEL'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS** on all interested parties in this action.

**SEE ATTACHED SERVICE LIST**

[ ]   By placing [ ] the original [X ] true copies thereof enclosed in sealed envelopes addressed as follows:

[ ]   **BY MAIL**

[ ]   I deposited such envelope in the mail at Los Angeles, California. The envelope was mailed with postage thereon fully prepaid.

[ ]   As follows: I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

[ ]   **BY OVERNIGHT COURIER** I caused each envelope with postage prepaid to be sent by Federal Express.

[ X ]   **BY TELECOPIER** By transmitting the above listed document(s) to the fax number(s) set forth above on this date.

[ X]   **BY PERSONAL SERVICE** I delivered such envelope by hand to the addressee.

Executed on **January 4, 2005,** at Los Angeles, California.

[ ]   (State) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

[X]   (Federal) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

_Maria A. West_
Print Name

_____
Signature

EXHIBIT _50_

PAGE _549_

EXHIBIT 51



ROBERT F. MILLMAN, Bar No. CA 062152
DOUGLAS A. WICKHAM, Bar No. CA 127268
KEITH A. JACOBY, Bar No. 150233
LITTLER MENDELSON
A Professional Corporation
2049 Century Park East, 5th Floor
Los Angeles, CA 90067.3107
Telephone:   310.553.0308
Facsimile:   310.553.5583

Attorneys for Defendant and Cross-Claimant
CARTER BRYANT

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTEL, INC., a Delaware Corporation, <br><br>       Plaintiff, <br><br> v. <br><br> CARTER BRYANT, an individual; and DOES 1 through 10, inclusive, <br><br>       Defendant. | Case No. CV 04-9059 NM (RNBx) <br><br> HON. NORA M. MANELLA <br><br> **DISCOVERY MATTER** <br><br> **[REDACTED] DECLARATION OF KEITH A. JACOBY IN SUPPORT OF DEFENDANT AND CROSS-CLAIMANT CARTER BRYANT'S PORTION OF JOINT STIPULATION** <br><br> [Local Rule 37-3] <br><br> Hearing Date:    January 25, 2005 |
| CARTER BRYANT, on behalf of himself, all present and former employees of Mattel, Inc., and the general public, <br><br>       Cross-Claimant, <br><br> v. <br><br> MATTEL, INC., a Delaware Corporation, <br>       Cross-Defendant. | |

LITTLER MENDELSON
A Professional Corporation
2049 Century Park East
5th Floor
Los Angeles, CA 90067.3107
310.553.0308

EXHIBIT ___51___

PAGE ___550___


## DECLARATION OF KEITH A. JACOBY

I, KEITH A. JACOBY, declare as follows:

1.      I am a shareholder of the law firm of Littler Mendelson, a Professional Corporation, counsel of record for Defendant Carter Bryant ("Bryant") in this matter. I have personal knowledge of the matters set forth herein and, if called as a witness, I could and would testify competently thereto.

2.      Mattel is an international toy manufacturer based in El Segundo, California that markets numerous lines of toys, including its most well-known product, the "Barbie" doll line. See Mattel's Complaint at ¶ 7.

3.      Defendant Carter Bryant was deposed in this matter on November 4, 5 and 8, 2004. True and correct copies of excerpts of his depositions transcript are attached as Exhibit "1" hereto.[1] At his deposition, Bryant testified to the following:

(a)     Bryant was formerly employed by Mattel as a designer of Barbie fashions. He worked from September 1995 to April 1998 in the "mainline Barbie" fashions department, and from January 4, 1999 to October 20, 2000 in the Barbie "Collectibles" unit. Deposition of Carter Bryant ("Bryant Depo."), Vol. 1, page 36, lines 10-11 and 14-16 (hereafter, 36:10-11 and 14-16); 37:3-5; Vol 2, 274:13.

(b)     During his 1998 hiatus from Mattel, Bryant moved to his family's home in Missouri, worked part time at Old Navy, and created artwork. One of his creations was drawings of hip teenage girls in funky modern clothes. He called the girls in these totally original drawings "Bratz," but he made no efforts to commercialize them at the time. Bryant Depo. Vol. 1, 9:5-12, 142:10-15, 144:19-20.

(c)     Needing money, and wanting to live on his own again, Bryant moved back to California and returned to work at Mattel in January 1999. Bryant Depo. Vol. 1, 44:15, 48:9-11.

---

[1] These deposition excerpts will be filed upon the Court's entry of a protective order in this case.

1.

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
2049 Century Park East
5th Floor
Los Angeles, CA 90067-3107
310 553 0308

EXHIBIT    51

PAGE    551

1   ever existed.  Attached hereto as Exhibit "2" is a true and correct copy of email
2   correspondence from Mr. Zeller to me, dated October 25, 2004.

3   16.     Mattel has utterly failed to show why a further production is required.  Bryant
4   has produced over one hundred of drawings related to the First Generation designs.
5   Given Mattel's position on the scope of this lawsuit, the First Generation "Bratz"
6   designs are the only designs relevant to the issues raised in this lawsuit.  Mattel's
7   theory is that Mr. Bryant breached his employee agreements with Mattel by working
8   for Mattel and MGA at the same time for approximately one month.  Thus, only the
9   work performed prior to joining Mattel or prepared in connection with his interviews
10  with MGA (all of which has been produced to the extent they remain in Bryant's
11  possession, custody and control), and thereafter, to the extent it relates to the First
12  Generation "Bratz" dolls, has any bearing on this lawsuit. MGA, for its part, has
13  produced hundreds of documents relating to the creation of the First Generation
14  "Bratz" prototypes for the 2001 Hong Kong and New York toy fairs.  Despite the
15  narrow frame of relevance, Mattel's improper and overbroad requests seek virtually
16  every Bryant document regarding Bratz, with no attendant time or scope limitations.
17  The requests, taken together, seek all "Bratz" related documents, from the beginning
18  of time through today.
19

20  17.     Mattel has sought Bryant's royalty statements from both Bryant and MGA.  The
21  royalty statements contain trade secret information of the most sensitive nature, and
22  much of that information is unrelated to this suit in the first instance.

23  18.     The unredacted Bryant royalty statements show SKU numbers for "Bratz" and
24  "Bratz" related products, the revenue generated from those products, and Bryant's
25  royalty.  In other words, they show how much revenue MGA earned on various
26  "Bratz" products.
27
28

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
2049 Century Park East
5th Floor
Los Angeles, CA 90067-3107
310 553 0308

5.

EXHIBIT ____51____

PAGE ____552____

1    19.    Contrary to Mattel's representations, Bryant does not object to producing
2    "responsive, non-privileged documents generated after the suit was filed." Rather,
3    Bryant asserted an objection – identical to one Mattel asserted – that was designed to
4    reserve Bryant's right not to place on a privilege log the innumerable privileged
5    documents and documents containing attorney work product that have been created
6    since this lawsuit was filed. Bryant is unaware of any unprivileged document which
7    does not contain attorney work product that is responsive to the requests and that was
8    created since the lawsuit was filed. The only document that conceivably falls into
9    these categories of documents that Mattel has conducted discovery on to date is
10   Bryant's retainer letter with Littler Mendelson. At deposition, Mattel's counsel
11   quizzed Bryant about his retainer and whether MGA agreed to pay his legal fees in
12   this matter. Bryant asserted the attorney client privilege and did not respond.

13
14   20.    Mattel has not produced its retainer letter in discovery, nor has it logged it on
15   any privilege log.

16   21.    Bryant has not "refused" to produce communications between himself and
17   MGA. To the contrary, he has produced his agreement, his royalty statements, all
18   manner of artwork that was done for MGA or assigned to MGA.

19
20   22.    Moreover, and contrary to Mattel's contentions, Bryant has conducted an
21   extensive and diligent search for responsive and relevant information. Bryant made
22   the hard drive of the computer he used from 2000 to 2002 available to his counsel, and
23   counsel have not found any responsive documents or relevant information in his
24   computer hard drives, or documents related to his communications with MGA.

25   23.    Mattel's speculation that Bryant's counsel "apparently has made no effort to
26   look for or recover deleted data from that hard drive and made no effort to examine
27   the other computers at all" is a complete falsehood, and contradicts express
28   representations made to Mattel's counsel in the meet and confer that such a search was

6.

LITTLER MENDELSON
A Professional Corporation
2049 Century Park East
5th Floor
Los Angeles, CA  90067.3107
310 553 0308

EXHIBIT ___51___

PAGE ___553___

1  undertaken and did not reveal any responsive documents.  It ignores the fact that that

2  Bryant's counsel has examined his hard drive extensively for any responsive

3  documents, and it has not found any.  It also ignores the fact that scores of attorney

4  hours have been spent searching for documents at Bryant's home and in his studio.

5  While Bryant has tirelessly searched for and inspected his computer hard drives for

6  relevant information, there is irrefutable evidence that Mattel has not turned over all of

7  Bryant's electronic data, such as responsive emails or their attachments.

8
9  24.    Further, the hard drive from Bryant's home computer, which he gave to his

10  niece in 2002, contains personal information and data that is unquestionably protected

11  by his constitutional right of privacy as well as that of his niece.

12  25.    Bryant has been even more accomodating in his furnishing of personal

13  telephone records, but to no avail. He has produced pages of telephone records

14  reflecting phone calls between MGA and himself.  He also produced redacted phone

15  records from Veronica Marlow, the individual that introduced Bryant to MGA.  He

16  produced those records in good faith, even though they are not his own, because they

17  were turned over by Marlow to his attorneys during this litigation.

18
19  26.    Those records contain calls to and from family and friends, and calls by his

20  roommates to others, which are obviously unrelated to this action.

21  27.    In its Motion, Mattel also seeks an order compelling Bryant to produce all

22  "Mattel-related" documents.  Bryant worked for Mattel for approximately five years,

23  and in that time, received innumerable documents from Mattel.  A vast majority of the

24  Mattel documents responsive to these requests have no bearing on any issue in this

25  case.  Documents that Bryant would have received from Mattel during his five years

26  of employment there would likely include insurance, benefits, employee handbooks,

27  administrative memoranda, reports, paychecks, etc.

28

7.

EXHIBIT  51

PAGE  554

28.   Mattel has imposed precisely the same type of limitation on its production, not even turning over portions of its employee handbook that it unilaterally deemed irrelevant to the case. Additionally, Mattel has admitted that most of the hundreds of Mattel documents Bryant has already produced in response to these requests are of little value.

29.   In addition, Mattel's counsel Michael Zeller and Tania Krebs have admitted in various meet and confers that there could be many documents responsive to its request that Mattel does *not* want. For example, Bryant offered to return to Mattel all original drawings belonging to Mattel in his possession, custody or control. Mattel's counsel refused this offer. Moreover, Mattel has again and again declined to narrow its requests in any way. As they are currently written, Mattel's requests are virtually unintelligible.

30.   Mattel cannot justify its position that it is entitled to production of a full array of Bryant's copyright, patent and other registrations, even those that pre-date his first term of employment with Mattel. It is questionable at best whether any patent or copyright applications filed on Bryant's behalf would even shed light on whether Bryant was represented by counsel at the time. As Mattel is undoubtedly aware, such applications would likely have been filed by his employer at the time or by MGA, and would not necessarily indicate that he was represented by counsel. Further, even assuming he retained counsel for the purpose of filing such applications on his behalf, that would have no tendency to disprove the fact that Bryant was not given the opportunity to consult counsel when required to execute Mattel's Employee Confidential Information and Inventions Agreement ("Agreement").

31.   Finally, at deposition, Mattel has already inquired of Bryant whether he was represented by counsel at the time it required him to execute the Agreement. Bryant responded in the negative.

8.

EXHIBIT ___5)___

PAGE ___555___

1   45.   Mattel is suing a Missouri individual, and litigating the case with the vigor of a

2   massive antitrust suit. At each previous court hearing, Mattel has sent no less than *five*

3   *attorneys – two partners and three associates* – to make and view the appearance.

4
5   46.   There have also been four depositions.  To attend Bryant's deposition, Mattel

6   sent *four* attorneys – two partners, one associate and one in-house counsel – to

7   Springfield, Missouri.  For a third party witness, Mattel had five attorneys – two

8   partners (Mr. Quinn and Mr. Zeller), two in-house lawyers, and one associate.[2] And,

9   to *defend* the deposition of one Mattel witness, Mattel sent *two* Quinn Emanuel

10   lawyers (one partner and one associate) and one in-house counsel.

11   47.   As Bryant's counsel, I have spent in excess of fifteen hours preparing Bryant's

12   portion of this joint stipulation. My hourly rate is $425 per hour. Pursuant to FRCP

13   37 (a)(4)(B), Bryant should be awarded that amount in partial compensation for the

14   cost of opposing this motion.

15
16       I declare under penalty of perjury under the laws of State of California

17   and the United States of America that the foregoing is true and correct.

18       Executed this 4th day of January, 2005, at Los Angeles, California.

19
20
21   KEITH A. JACOBY
22
23   Los_Angeles:389367.3 028307.1010
24
25
26
27
28   [2] The associate attended only part of that deposition.

12.

EXHIBIT  51

PAGE  556

EXHIBIT 52

1   DOUGLAS A. WICKHAM (S.B. #127268)
    dwickham@littler.com
2   KEITH A. JACOBY (S.B. #150233)
    kjacoby@littler.com
3   LITTLER MENDELSON
    A Professional Corporation
4   2049 Century Park East, 5th Floor
    Los Angeles, CA  90067.3107
5   Telephone:  (310) 553-0308
    Facsimile:   (310) 553-5583
6
    Attorneys for Carter Bryant
7

8                   UNITED STATES DISTRICT COURT
                  CENTRAL DISTRICT OF CALIFORNIA
9                        EASTERN DIVISION

10
    CARTER BRYANT, an individual,          Case No.  CV 04-09049 SGL (RNBx)
11                                         (consolidated with CV 04-9059 & 05-2727)

12                    Plaintiff,           **DISCOVERY MATTER**

13          v.                             **[To Be Heard By Discovery Master Hon.
                                           Edward Infante (Ret.) Pursuant To The
14  MATTEL, INC., a Delaware               Court's Order Of December 6, 2006]**
    Corporation,
15                                         SEPARATE STATEMENT OF
                      Defendant.           DEFENDANT CARTER BRYANT IN
16                                         OPPOSITION TO MATTEL'S MOTION
                                           TO COMPEL
17
                                           Hearing Date:  January 23, 2007
18                                         Time:   8:15 a.m.
                                           Place:  Telephonic
19
                                           Discovery Cut-off:  None set
20                                         Pre-trial Conference:  None Set
                                           Trial Date: None Set
21

22  CONSOLIDATED WITH
    MATTEL, INC. v. BRYANT and
23  MGA ENTERTAINMENT, INC. v.
    MATTEL, INC.
24

25

26

27                                                    222A

28

    EXHIBIT ___52___                      BRYANT'S SEPARATE STATEMENT IN
                                          OPPOSITION TO MATTEL'S MOTION TO
    PAGE ___557___                        COMPEL

1                                    **Bryant's Argument**

2              Bryant agreed in the Stipulation to conduct a "reasonably diligent search

3      for and produce any patent, copyright and trademark applications, registrations or

4      other non-privileged documents in his possession, custody or control that constitute or

5      relate to such applications and registrations obtained or applied in connection with"

6      (1) work on Bratz prior to January 1, 2001; (2) work related to the release of the First

7      Generation "Bratz" dolls that took place on or about June 2001; and (3) work related

8      to any work Bryant performed with, for or on behalf of MGA during the term of

9      Bryant's employment with Mattel. Accordingly, Mattel's motion to compel Bryant to

10     produce documents relating to registration and applications for registration is moot.

11

12     **VII.   BRYANT'S PRIOR PRODUCTION WAS PROPER.**

13             Mattel incorrectly claims that Bryant asserted a "blanket objection to

14     producing any document created after this lawsuit was filed in April 2004." Mattel

15     completely misrepresents the issue and Bryant's position. Bryant did not and does not

16     object to producing "responsive, non-privileged documents generated after the suit

17     was filed." Bryant only objects to having to log as privileged any post litigation

18     communications with counsel. Mattel has misconstrued this caveat as a wider refusal

19     to produce documents created after the lawsuit was filed. No such position has been

20     taken.

21     **A.      None Of The Information Redacted From The Produced Phone**

22     **Records Relate To MGA.**

23             Bryant agreed in the Stipulation that he will provide a signed verification

24     attesting that none of the information redacted from phone records that were produced

25     to Mattel relate or refer in any way to MGA, "Bratz" or any other project that Bryant

26     worked on with, for or on behalf of MGA prior to June 1, 2001.

27     **B.      Bryant Should Not Have To Identify On A Privilege Log Every**

28

EXHIBIT _____ 57

                                            38.        BRYANT'S SEPARATE STATEMENT IN
                                                       OPPOSITION TO MATTEL'S MOTION TO
                                                       COMPEL

PAGE _____ 558

1    **Communication He Has Had With His Counsel.**

2    Mattel mischaracterizes Bryant's good-faith assertion of privilege by

3    professing that Bryant has listed only 4 documents on his privilege log "likely because

4    most documents he has withheld on privilege grounds are not actually privileged–and

5    because the dates of these documents alone may refute Bryant's claims about the

6    timing and scope of his communications with MGA." Mattel's contention holds no

7    water. Since Mattel filed this action in April 2004, Bryant has had numerous

8    communications with his counsel regarding issues arising out of this lawsuit. Bryant

9    objected in order to reserve his right not to place on a privilege log the innumerable

10   privileged documents and documents containing attorney work product that have been

11   created since the inception of this lawsuit. Bryant respectfully requests this Court not

12   to order Bryant to serve a privilege log concerning his confidential communications

13   with his counsel which are undeniably protected by the attorney-client privilege.

14          C.    **Bryant's Hard Drive**

15   Bryant confirmed in the Stipulation that he made a diligent and

16   reasonable effort to locate all three computers referenced at his deposition, and that

17   after that search, he is only able to locate one of the old computers that he used and/or

18   owned. Bryant has also expressly agreed to conduct a reasonable and diligent search

19   for responsive documents, including a forensic search for data fragments, deleted

20   documents and data not readily viewable absent forensic analysis, and will produce

21   responsive documents in accordance with the stipulation. Accordingly, Mattel's

22   motion to compel Bryant's hard drive is no longer an issue.

23

24   **VIII. MATTEL SHOULD BE SANCTIONED**

25   The only party that should be sanctioned is Mattel. For the past two and

26   half years, Mattel has taken contradictory positions regarding the amount of money in

27   controversy in order to manipulate the forum and the scope of discovery, and has now

28   unilaterally reneged on an exhaustively negotiated stipulation because it does not want

EXHIBIT _____                    39.        BRYANT'S SEPARATE STATEMENT IN
                                                    OPPOSITION TO MATTEL'S MOTION TO
                                                    COMPEL
PAGE ____559____

1   to formally modify a single request. Mattel's counsel likely knew its requests were

2   facially improper when they engaged in a six month long negotiation to substantially

3   limit the requests, only to unceremoniously renege on the stipulation at the last second

4   and move on every request. Bryant has incurred more than $20,000 in fees

5   negotiating the stipulation that represented a considerable compromise on his part of

6   the issues raised in these requests.

7          Mattel's sweepingly overbroad and duplicative requests cannot stand on

8   their own and its tactics of intimidation should not be awarded. Its motion should be

9   denied and, to the extent sanctions are awarded, they should be awarded against

10  Mattel. Bryant's counsel has incurred in excess of $8,700 in fees in opposing this

11  motion, and pursuant to FRCP 37(a)(4)(B), Bryant should be awarded that amount in

12  partial compensation for the cost of opposing this motion. The stipulation of the

13  parties should be enforced as the recommendation of the Discovery Master, and as

14  such should end any further law and motion on the document requests moved upon in

15  the January 2005 and the current motion.

16

17  January 11, 2007

18                              DOUGLAS A. WICKHAM
                                KEITH A. JACOBY
19                              LITTLER MENDELSON
                                A Professional Corporation
20
21                              Keith A. Jacoby
22                              Attorneys for Defendant
                                CARTER BRYANT
23
24
25
26  Firmwide:81898672.3 028307.1010
27
28

EXHIBIT   52

PAGE   560

40.     BRYANT'S SEPARATE STATEMENT IN
        OPPOSITION TO MATTEL'S MOTION TO
        COMPEL