EXHIBIT 77

THIS EXHIBIT IS FILED UNDER SEAL

PURSUANT TO PROTECTIVE ORDER

EXHIBIT 78

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| CARTER BRYANT, | CASE NUMBER |
|---|---|
| PLAINTIFF(S), | CV 04-09049 SGL (RNBx) |
| v. | |
| MATTEL, INC., et al., | NOTICE OF CLERICAL ERROR |
| DEFENDANT(S), | |

TO:   U. S. District Judge(s)
       U. S. Magistrate Judge(s)
       Counsel of Record

You are hereby notified that due to a clerical error ☐ documents associated with the filing of the new action ☐ the following scanned document ☑ docket entry  have/has been corrected as indicated below.

Title of Scanned Document:  Minute Order of 4-25-08, Granting in part, Denying in part, and Deferring in Part the Parties' MSJ

Filed Date: 4-25-08 _____   Document Number: 3285 _____

☐   Incorrect case number _____ was assigned to this ☐ action ☐ document.

☐   Case number has been corrected.  The correct case number is _____

☐   Incorrect judge's initials were indicated on this ☐ action ☐ document.  The correct judge's initials are _____

☐   Incorrect magistrate judge's initials were indicated on this ☐ action ☐ document.  The correct magistrate judge's initials
       are _____.

☐   Case has been reassigned from ☐ Judge ☐ Magistrate Judge _____ to

       ☐ Judge ☐ Magistrate Judge _____.  The initials of the new judge(s) are _____

☐   Case was assigned to ☐ Western ☐ Southern ☐ Eastern division. Pursuant to General Order ☐ 349, ☐ 98-3 ☐ 02-06,

       the case has been reassigned to the ☐ Western ☐ Southern ☐ Eastern division. The former case number _____
       has been reassigned to new case number _____

☐   Subsequent documents must be filed at the ☐ Western ☐ Southern ☐ Eastern division. Failure to file at the proper location
       will result in your documents being returned to you.

☐   Case title is corrected from _____ to _____

☐   Document has been re-numbered as document number _____

☐   Incorrect ☐ Filed Date ☐ Date of Document ☐ ENTERED Date ☐ DATE ENTERED ON CM/ICMS was stamped on
       document.  The correct date is _____

☑   Document is missing page number(s):  7 and 8 _____

☐   To ensure proper routing of documents, all documents filed with the court must reflect the following case number and judge's
       initials: _____

☑   Other: a complete copy with missing pages are re-scanned for service on the parties.

CLERK, U.S. DISTRICT COURT

Date 4-25-08 _____   By: _____ Jim Holmes, CRD _____
                                                                      Deputy Clerk

cc: Intake Supervisor / Deputy In Charge

G-11 (06/05)                                         NOTICE OF CLERICAL ERROR

EXHIBIT 840
PAGE 70

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA  92501
CIVIL MINUTES -- GENERAL

Case No.   CV 04-09049 SGL(RNBx)                          Date:  April 25, 2008
Title:     CARTER BRYANT -v- MATTEL, INC.

Consolidated With Related Actions:
CASE NO. CV 04-09059 SGL(RNBx):  MATTEL, INC.,  v. CARTER BRYANT,
CASE NO. CV 05-02727 SGL (RNBx): MGA ENTERTAINMENT, INC., v. MATTEL, INC.,
==========================================================================

PRESENT:  HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

       Jim Holmes
       Courtroom Deputy Clerk

ATTORNEYS PRESENT FOR CARTER BRYANT:     ATTORNEYS PRESENT FOR MATTEL:

None Present                             None Present

ATTORNEYS PRESENT FOR MGA AND
ISAAC LARIAN:

None Present

PROCEEDINGS:   ORDER GRANTING IN PART, DENYING IN PART, AND DEFERRING IN
                    PART THE PARTIES' MOTIONS FOR PARTIAL SUMMARY JUDGMENT
                    (IN CHAMBERS)

     This matter is before the Court on the parties' motions for partial summary judgment.  The motions were heard on April 22, 2008, and the Court has set the motions for further hearing on May 19, 2008, at 1:30 p.m.  As set forth below, the Court rules on a number of issues presented by the motions for partial summary judgment and reserves ruling on other issues until after further hearing on the motions for partial summary judgment and, in the case of MGA's affirmative defenses, until after the Phase 1 trial.

     The parties have made hundreds of objections to evidence offered in support of and in opposition to the motions for partial summary judgment.  Although counsel for Bryant requested

MINUTES FORM 90
CIVIL -- GEN                          Page 1                     Initials of Deputy Clerk: jh

PAGE  EXHIBIT  18  841

explicit rulings on the objections raised by Bryant, the Court declines to do so. To the extent that this Order necessarily relies on evidence subject to any party's objections, the objections are implicitly overruled.

## PREEMPTION

MGA and Bryant seek summary judgment in their favor as to Mattel's claims for intentional interference with contractual relations, conversion, and unfair competition, arguing that these claims are preempted by the Copyright Act. They are partially correct.

A state law is preempted by the Copyright Act where (1) the work at issue comes within the subject matter of copyright, and (2) the state law rights are "equivalent to rights within the general scope of copyright[.]" Del Madera Properties v. Rhodes and Gardner, Inc., 820 F.2d 973, 977 (9th Cir.1987). "If a state law claim includes an 'extra element' that makes the right asserted qualitatively different from those protected under the Copyright Act, the state law claim is not preempted by the Copyright Act." Altera Corp. v. Clear Logic, Inc., 424 F.3d 1079, 1089 (9th Cir. 2005). Generally the Copyright Act does not preempt the enforcement of contractual rights. Id.

As to the first element, the intentional interference with contractual relations claim addresses generally an issue within the subject matter of copyright -- the underlying wrong upon which the claim is premised is Mattel's deprivation of rights to intellectual property.

As to the second element, it is clear that the tort of intentional interference with contractual relations is neither categorically preempted or categorically saved from preemption; rather, the Court must engage in a determination of whether the substance of the tort claim differs qualitatively from the copyright claim at issue. Compare Altera, 424 F.3d at 1089 (holding that a intentional interference claim was not preempted because it was based not on copyrights but on a contractual provision) with Laws v. Sony Music Entertainment, Inc., 448 F.3d 1134, 1144 (9th Cir. 2006) (holding preempted a singer's voice misappropriation claim was not qualitatively different from her copyright claim).

Here, to the extent that the tortious interference is premised upon MGA's alleged interference with any copyrights that Mattel may have under the Inventions Agreement, it is preempted. Such a claim is not qualitatively different from Mattel's copyright claim. However, to the extent that the claim is based on MGA's acts that may be found to have aided and abetted the breach or induced the breach of Bryant's fiduciary duty, the claim is not preempted. That claim is qualitatively different from Mattel's copyright claim.

Therefore, the tortious interference with contractual relations is preempted to the extent that it is based on Mattel's rights to Bratz. It is not preempted as to Mattel's claims for breach of fiduciary duty.

The parties' arguments regarding the conversion claim address two distinct issues: Conversion of ideas and conversion of tangible things. The Court addresses each in turn.

MINUTES FORM 90
CIVIL -- GEN

Page 2

Initials of Deputy Clerk: jh

EXHIBIT ___78___

PAGE ___842___

        Both sides acknowledge, as this Court certainly agrees, that one cannot copyright an idea.
Thus, it would seem, a claim for conversion of ideas is not subject to preemption because it is not
"within the subject matter of copyright." Del Madera, 820 F.2d at 977. MGA argues that ideas are
not subject to a claim of conversion, to which Mattel responds that such rights in ideas may be
created by contract. Mattel relies on Desny v. Wilder, 46 Cal.2d 715, 733 (1956) which,
remarkably, so holds. However, that case does not support the proposition that a breach of such
rights may be remedied by the tort claim of conversion rather than a breach of contract claim. The
law in California regarding the tort of conversion's applicability to ideas remains the same today as
in 1956: "The tort of conversion does not apply to ideas." Melchior v. New Line Productions, Inc.,
106 Cal.App.4th 779 (2003). Therefore, although this claim is not preempted, it is not actionable
as a tort claim. Accordingly, summary judgment in favor of MGA and Bryant is granted as to this
particular claim.

        Mattel also argues that its conversion claim is not preempted to the extent that it seeks the
return of tangible things, most notably the original Bratz drawings. This claim is "within the subject
matter of copyright," but the state rights go beyond the rights protected by the Copyright Act by
allowing for the return of property.

        At oral argument, counsel for MGA argued that Mattel seeks the rights that the drawings
represent, not the "paper and ink" of which those drawings are comprised. Mattel disagreed with
that interpretation, noting that it seeks the return of the original drawings and certain sculpts to
which it may have rights under the Inventions Agreement.

        The items to which Mattel lays claim are not like the manuscript at issue in Dielsi v. Falk,
916 F.Supp. 985, 992 (C.D. Cal. 1996), or the government documents at issue in Idema v.
Dreamworks, Inc., 162 F.Supp.2d 1129, 1192-93 (C.D. Cal. 2001), both of which had value merely
for their ability to hold and convey their contents. Rather, the materials Mattel seeks are works of
art that may have value apart from the copyrights they represent or the "paper and ink" and other
materials of which they are comprised. Given the role of the drawings and sculpts in developing a
new, commercially successful line of fashion dolls, and given the role of these items in the present
litigation, the Court discerns a possible inherent value to the materials themselves.

        MGA and Bryant also pressed at oral argument that Mattel had not advanced such a claim
for return of tangible items. The Court disagrees. Citing to its Complaint at ¶ 157, Mattel
contends it has long sought the return of tangible items.[1] An examination of Mattel's claim for
conversion reveals that it encompasses such a claim. Therefore, the conversion claim seeking
the return of tangible items is not preempted. MGA and Bryant's motions for summary judgment
on this issue are therefore denied.

        To the extent that Mattel's statutory unfair competition claim, discussed more fully below, is

_____

    [1]  From a review of the record, it is clear to the Court that Mattel intended to
cite ¶ 157 of its Amended Answer and Counterclaims, not its Complaint.

EXHIBIT  78
PAGE  843

based on copyright infringement, it is preempted, and the Court grants summary judgment in favor of MGA on this issue.

## STATUTE OF LIMITATIONS

The Court heard argument at length on the statute of limitations issue. Although it is not entirely clear, it appears to the Court from the hearing and from MGA's Rule 56(f) affidavit, that there remain outstanding discovery matters that may have the potential, if resolved in MGA's favor, to factor into the inquiry into the determination of the date of the accrual of any claims against Bryant and/or MGA. Accordingly, the Court defers ruling on the issue of statute of limitations at this time.

## INVENTIONS AGREEMENT

The Court addressed many issues of the enforceability of the Employee Confidentiality and Inventions Agreement in its July 17, 2006, Order. The Court finds no good reason to revisit or revise that Order.

Bryant argues that the Inventions Agreement is ambiguous on the issue of whether it covered anything other than "inventions" as that term is used in patent law. Here, Bryant was a fashion designer. He signed an agreement that assigned his "inventions" to Mattel. "Inventions" is defined by the agreement to include "designs," which was undeniably the focus of Bryant's employment with Mattel. In addition to assigning all rights to Bryant's "inventions" (i.e., "designs") to Mattel, the agreement also assigned to Mattel "all [Bryant's] right, title, and interest in any . . . copyrights . . . and copyright applications based [on those inventions]".

In order to conclude that the Inventions Agreement is ambiguous on the issue of whether it would include any copyrightable drawings or doll designs developed by an employee, the Court would have to read out of the agreement explicit terms assigning to the employer the rights to "designs," "copyrights," and "copyright applications." The Court is required to read the contract as a whole and, where possible, give effect to all its terms. Cal. Civ. Code § 1641 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."). To accept the interpretation advanced by Bryant, the Court would have to disregard this bedrock principle of contract construction by ignoring an explicit assignment by the employee to the employer of copyrights. The interpretation advanced by Bryant is therefore not reasonable, and the Court finds that the Inventions Agreement is not ambiguous on the issue of its scope with respect to copyrightable materials.

The Inventions Agreement explicitly conveys to Mattel an employee's interest in any copyrights or copyright applications. Assuming copyrightability and the resolution of certain (as yet unresolved) issues of timing of creation and/or alteration in Mattel's favor, the original Bratz drawings clearly fall within the scope of the Inventions Agreement.

Moreover, the Inventions Agreement incorporates, and therefore does not violate, Cal.

MINUTES FORM 90
CIVIL -- GEN

Page 4

Initials of Deputy Clerk: jh

EXHIBIT _____ 78
PAGE _____ 844

Case 2:04-cv-09049-DOC-RNB Document 3337-9 Filed 04/28/08 Page 9 of 99 Page ID
Case 2:04-cv-09049-SGL-RNB Document 3286 Filed 04/25/2008 Page 6 of 11
#:971

Labor Code § 2870. Pursuant to that statute (and its incorporation in the Inventions Agreement), because the subject matter at issue -- the Bratz dolls -- relate to Mattel's business of marketing fashion dolls, the factual question of whether Bryant worked on them on his own time, rather during his working hours at Mattel, is not relevant.

MGA argues that contracts of adhesion are unenforceable if they are either outside the scope of the parties' expectations or they are substantively unconscionable. The Court previously determined that the Inventions Agreement was not substantively unconscionable, and now determines that it is not outside the scope of the parties' expectations. As noted above, Bryant was a designer, and the plain language of the Inventions Agreement assigns his "designs" to his employer. Objectively, therefore, it would not be surprising that Mattel would lay claim to Bryant's rights to any doll or doll fashions he designed during the period of his employment with Mattel. Moreover, undisputed evidence establishes that Bryant's subjective understanding of the contract was that it transferred at least some of his rights to Mattel.

Bryant also argues that his actions went no further than lawful preparations to compete with his employer. The undisputed facts, however, tell a different story: Bryant directly competed with Mattel by entering into a contract with its competitor to produce a competing product while still employed by Mattel.

The Court grants summary judgment in favor of Mattel on the issue of the enforceability of the Inventions Agreement and the issue of applicability of the Inventions Agreement to any Bratz-related "inventions" (including any designs, improvements, ideas, concepts, and copyrightable subject matter) that he is found to have created during the period of his employment with Mattel.

## DUTY OF LOYALTY AND FIDUCIARY DUTY

Carter Bryant, like all other California employees, owed a duty of loyalty to Mattel while employed there. See Cal. Labor Code § 2863. The undisputed facts establish that he breached this duty by entering into a contract with Mattel's competitor, while still employed by Mattel, to produce a line of fashion dolls to be marketed in direct competition with Mattel's products. See Huong Que, Inc. v. Luu, 150 Cal.App.4th 400, 414 (2007) ("The duty of loyalty is breached, and the breach may give rise to a cause of action in the employer, when the employee takes action which is inimical to the best interests of the employer.") (internal quotation marks and citation omitted).

Bryant also owed a fiduciary duty to Mattel by virtue of the language set forth in ¶ 1(a) of the Inventions Agreement. Id. ("The value of the Proprietary Information depends on it remaining confidential. The Company depends on me to maintain that confidentiality, and I accept that position of trust."). Under California law, a confidential relationship that gives rise to a fiduciary duty is created "where a confidence is reposed by one person in the integrity of another, and . . . the party in whom the confidence is reposed . . . voluntarily accepts or assumes to accept the confidence . . . ." City Solutions, Inc. v. Clear Channel Communications, Inc., 201 F.Supp.2d 1048, 1050-51 (N.D. Cal. 2002). The Inventions Agreement imposed such a duty on Bryant.

Initials of Deputy Clerk: jh

EXHIBIT ___78___

PAGE ___84 5___

At the hearing on this matter, counsel contended that a required element for imposing a fiduciary duty -- that the party with the duty be in a superior position to the party to whom the duty is owed -- was missing. That element is described as follows: "[T]he essence of a fiduciary or confidential relationship is that the parties do not deal on equal terms, because the person in whom trust and confidence is reposed and who accepts that trust and confidence is in a superior position to exert unique influence over the dependent party." City Solutions, Inc. v. Clear Channel Communications, Inc., 201 F.Supp.2d 1048, 1050 (N.D. Cal. 2002) (internal quotation marks and citation omitted). The "superior position" to which California courts refer in this context is not superior bargaining power -- a position on which Mattel would apparently have the edge -- but rather it refers to a superior position vis-à-vis the duty imposed. Here, because the duty imposed upon Bryant was essentially to police his own actions by maintaining Mattel's confidentiality and communicating his own "inventions" to Mattel, Bryant was "in a superior position to exert unique influence over" Mattel because he was in the best position, arguably the only one in a position, to know of and police his actions.

As with the duty of loyalty, the undisputed facts establish that Bryant breached his fiduciary duty to communicate his inventions to Mattel when, rather than doing so, he secretly entered into a contract with Mattel's competitor, while still employed by Mattel, to produce a line of fashion dolls to be marketed in direct competition with Mattel's products.

Accordingly, the Court grants Mattel's motion for summary judgment on the issues of the existence and breach of the duty of loyalty. The Court grants Mattel's motion for summary judgment and denies Bryant's motion for summary judgment on the issue of the existence and breach of a fiduciary duty.

In its motion, MGA argued that there can be no liability for aiding and abetting a breach of fiduciary duty in the absence of a fiduciary duty. Because the Court has rejected this argument, the Court denies MGA's motion for summary judgment on this issue.

## INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS

MGA moved for summary judgment as to Mattel's claim for intentional interference with contractual relations.

The elements of a claim for intentional interference with contractual relations are stated as (1) a valid contract between a plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage. Family Home & Finance Center, Inc. v. Federal Home Loan Mortg. Corp., 461 F.Supp.2d 1188, 1193 (C.D. Cal. 2006) (citing Pac. Gas & Elec. Co. v. Bear Stearns Co., 50 Cal.3d 1118, 1126 (1990)).

The undisputed facts show that the first, third, and fifth elements are met. Mattel has raised a triable issue of fact as to the second. The fourth element may be resolved after the

EXHIBIT ____78____

PAGE ____846____

Court's further hearing on the motions for partial summary judgment. The Court therefore defers ruling on this issue.

## UNFAIR COMPETITION

MGA and Bryant's motions are granted in part and denied in part as to Mattel's unfair competition claims.

Mattel's statutory unfair competition claim, brought pursuant to Cal. Bus. & Profs. Code § 17200, survives summary judgment because Mattel has raised a triable issue of fact as to whether MGA tortiously interfered with Bryant and Mattel's contractual relationship and whether MGA engaged in commercial bribery.

However, two bases for this claim are foreclosed at this time. To the extent that the § 17200 claim is based on copyright infringement, it is preempted. To the extent that it is based on unfair conduct, summary judgment in favor of MGA is granted because the articulated unfair conduct does not approximate an antitrust violation that threatens competition. See Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., 20 Cal.4th 163, 186-87 (1999).

As to Mattel's common law unfair competition claim, summary judgment in favor of MGA and Bryant is granted. This claim is not, as it must be, based on the act of passing off another's goods as one's own. See Sybersound Records, Inc. v. UAV Corp., 517 F.3d 1137, 1153 (9th Cir. 2008) (citing Bank of the W. v. Superior Court, 2 Cal.4th 1254 (1992)).

## UNJUST ENRICHMENT

Because Mattel failed to oppose this portion of Bryant's motion, the Court grants Bryant's motion for partial summary judgment on the issue of unjust enrichment.

## AFFIRMATIVE DEFENSES

Mattel seeks summary judgment as to many of the affirmative defenses asserted by the MGA entities and Carter Bryant. Most of these defenses are essentially equitable in nature, and therefore the Court **DEFERS RULING** on them until after trial. Specifically, the Court **DEFERS RULING** on the affirmative defenses of abandonment, acts and omissions of others, acquiescence, consent, estoppel, failure to mitigate, laches, unclean hands, and waiver until after trial.

For the reason set forth above in a separate section, the Court defers ruling on Mattel's motion as to the statute of limitations defense.

The final affirmative defense is based on 17 U.S.C. § 205(d). With this affirmative defense, MGA essentially contends that it is a bona fide purchaser for value of the Bratz copyrights which

MINUTES FORM 90
CIVIL -- GEN

Page 7

Initials of Deputy Clerk: jh

EXHIBIT _____ 78

PAGE _____ 847

took the rights in good faith and without notice of any prior transfer of the rights therein to Mattel. As the issue is argued by the parties, the Court would be required to determine the legal issue of whether MGA's registration of the copyrights as an "assignment" constitutes "constructive notice" in the manner required to give MGA the protection of 17 U.S.C. § 205(d). In the Court's view, this is a complex legal issue that is not thoroughly addressed by the parties' briefs. Moreover, the Court notes that a trial on the merits is likely to resolve the less complex factual issue of whether MGA acted in good faith and without notice of an earlier assignment of rights. Accordingly, the Court **DEFERS RULING** on this issue until after the Phase 1 trial.

* * * *

The Court will consider a number of remaining issues at the further hearing on these motions, set for May 19, 2008. Specifically, referencing the parties' Notices of Motion, the Court will consider the following issues:

Mattel's motion: Issue (2)(c), whether there is a factual dispute regarding the timing of certain drawings and a dummy model; issue (3), whether the first-generation Bratz dolls are substantially similar to seventeen drawings and a doll sculpt drawing or blueprint created by Bryant and whether those are original, protectable works of expression; issue (5), whether MGA and Larian are liable for aiding and abetting Bryant's breaches of the duty of loyalty and fiduciary duty; and issue (6)(a) whether Mattel is entitled to summary judgment as to the affirmative defense of statute of limitations.

Bryant's motion: Whether Bryant is entitled to summary judgment as to Mattel's claim for copyright infringement; whether Bryant is entitled to summary judgment as to Mattel's breach of contract claim; and whether Bryant is entitled to summary judgment on any portion of his claim for declaratory relief.

MGA's motion: Whether Mattel's claims are time barred; and whether the fourth element of intentional interference with contractual relations -- actual breach or disruption of the contractual relationship -- can be resolved on summary judgment.

Except for any updates from any party regarding the outstanding discovery matters that may be relevant to the statute of limitations, these issues are considered by the Court to be fully briefed. Any supplemental briefs by the parties on any issue other than the statute of limitations will be stricken by the Court. Any supplemental filings regarding the statute of limitations issue shall be limited to addressing the status of outstanding discovery issues and/or recently produced evidence.

**IT IS SO ORDERED.**

EXHIBIT _7B_

PAGE _848_

## NOTICE PARTY SERVICE LIST

**Case No.**  CV 04-09049 SGL(RNBx)   **Case Title**  Carter Bryant v. Mattel, Inc.

**Title of Document**  Minute Order of April 25, 2008

| | |
|---|---|
| | Atty Sttlmnt Officer Panel Coordinator |
| | BAP (Bankruptcy Appellate Panel) |
| | Beck, Michael J (Clerk, MDL Panel) |
| | BOP (Bureau of Prisons) |
| | CA St Pub Defender (Calif. State PD) |
| | CAAG (California Attorney General's Office - Keith H. Borjon, L.A. Death Penalty Coordinator) |
| | Case Asgmt Admin (Case Assignment Administrator) |
| | Catterson, Cathy (9th Circuit Court of Appeal) |
| | Chief Deputy Admin |
| | Chief Deputy Ops |
| | Clerk of Court |
| | Death Penalty H/C (Law Clerks) |
| | Dep In Chg E Div |
| | Dep In Chg So  Div |
| | Federal Public Defender |
| | Fiscal Section |
| | Intake Section, Criminal LA |
| | Intake Section, Criminal SA |
| | Intake Supervisor, Civil |
| | PIA Clerk - Los Angeles (PIALA) |
| | PIA Clerk - Riverside (PIAED) |
| | PIA Clerk - Santa Ana (PIASA) |
| | PSA - Los Angeles (PSALA) |
| | PSA - Riverside (PSAED) |
| | PSA - Santa Ana (PSASA) |
| | Schnack, Randall (CJA Supervising Attorney) |
| | Statistics Clerk |

| | |
|---|---|
| | US Attorneys Office - Civil Division -L.A. |
| | US Attorneys Office - Civil Division - S.A. |
| | US Attorneys Office - Criminal Division -L.A. |
| | US Attorneys Office - Criminal Division -S.A. |
| | US Bankruptcy Court |
| | US Marshal Service - Los Angeles (USMLA) |
| | US Marshal Service -  Riverside (USMED) |
| | US Marshal Service -Santa Ana (USMSA) |
| | US Probation Office (USPO) |
| | US Trustee's Office |
| | Warden, San Quentin State Prison, CA |

| ✓ | **ADD NEW NOTICE PARTY** (if sending by fax, mailing address must also be provided) |
|---|---|

Name: Ambassador Pierre-Richard Prosper

Firm:

Address (include suite or floor): P.O. Box 581103

Salt Lake City, UT  84158

*E-mail: Prosper.Pierre@Arentfox.com

*Fax No.:

\* For CIVIL cases only

| *JUDGE / MAGISTRATE JUDGE (list below):* |
|---|
| |
| |
| |
| |

Initials of Deputy Clerk  jh

G-75  (03/07)                    NOTICE PARTY SERVICE LIST

EXHIBIT ____ 78

PAGE ____ 849

Case 2:04-cv-09049-DOC-RNB   Document 3337-9   Filed 04/28/08   Page 14 of 99   Page ID
Case 2:04-cv-09049-SGL-RNB   Document 3386   Filed 04/25/2008   Page 11 of 11
#:73386

# NOTICE PARTY SERVICE LIST

**Case No.** CV 04-09049 SGL(RNBx)   **Case Title** Carter Bryant v. Mattel, Inc.

**Title of Document** Minute Order of April 25, 2008

| | |
|---|---|
| | Atty Sttlmnt Officer Panel Coordinator |
| | BAP (Bankruptcy Appellate Panel) |
| | Beck, Michael J (Clerk, MDL Panel) |
| | BOP (Bureau of Prisons) |
| | CA St Pub Defender (Calif. State PD) |
| | CAAG (California Attorney General's Office - Keith H. Borjon, L.A. Death Penalty Coordinator) |
| | Case Asgmt Admin (Case Assignment Administrator) |
| | Catterson, Cathy (9ᵗʰ Circuit Court of Appeal) |
| | Chief Deputy Admin |
| | Chief Deputy Ops |
| | Clerk of Court |
| | Death Penalty H/C (Law Clerks) |
| | Dep In Chg E Div |
| | Dep In Chg So Div |
| | Federal Public Defender |
| | Fiscal Section |
| | Intake Section, Criminal LA |
| | Intake Section, Criminal SA |
| | Intake Supervisor, Civil |
| | PIA Clerk - Los Angeles (PIALA) |
| | PIA Clerk - Riverside (PIAED) |
| | PIA Clerk - Santa Ana (PIASA) |
| | PSA - Los Angeles (PSALA) |
| | PSA - Riverside (PSAED) |
| | PSA - Santa Ana (PSASA) |
| | Schnack, Randall (CJA Supervising Attorney) |
| | Statistics Clerk |

| | |
|---|---|
| | US Attorneys Office - Civil Division -L.A. |
| | US Attorneys Office - Civil Division - S.A. |
| | US Attorneys Office - Criminal Division -L.A. |
| | US Attorneys Office - Criminal Division -S.A. |
| | US Bankruptcy Court |
| | US Marshal Service - Los Angeles (USMLA) |
| | US Marshal Service - Riverside (USMED) |
| | US Marshal Service -Santa Ana (USMSA) |
| | US Probation Office (USPO) |
| | US Trustee's Office |
| | Warden, San Quentin State Prison, CA |

| | **ADD NEW NOTICE PARTY** (if sending by fax, mailing address must also be provided) |
|---|---|
| ✓ | |

Name: Hon. Edward A. Infante (Ret.)

Firm:

Address *(include suite or floor)*: Two Embarcadero

Center, Suite 1500, San Francisco, CA 94111

*E-mail:

*Fax No.:

* For CIVIL cases only

| ***JUDGE / MAGISTRATE JUDGE (list below):*** |
|---|
| |
| |
| |
| |

**Initials of Deputy Clerk** jh

EXHIBIT ___78___

PAGE ___850___

EXHIBIT 79

1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
      John B. Quinn (Bar No. 090378)
2      johnquinn@quinnemanuel.com
      Michael T. Zeller (Bar No. 196417)
3      (michaelzeller@quinnemanuel.com)
      Jon D. Corey (Bar No. 185066)
4      (joncorey@quinnemanuel.com)
   865 South Figueroa Street, 10th Floor
5  Los Angeles, California 90017-2543
   Telephone: (213) 443-3000
6  Facsimile:  (213) 443-3100

7  Attorneys for Mattel, Inc.

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10                 EASTERN DIVISION

| 11 | CARTER BRYANT, an individual, | CASE NO. CV 04-9049 SGL (RNBx) |
|---|---|---|
| 12 | Plaintiff, | Consolidated with Case No. CV 04-09059 Case No. CV 05-02727 |
| 13 | vs. | |
| 14 | MATTEL, INC., a Delaware corporation, | EXPERT REPORT OF RALPH OMAN |
| 15 | Defendant. | **Phase 1** |
| 16 | | Discovery Cut-Off:      January 28, 2008 Pre-Trial Conference:  May 5, 2008 Trial Date:              May 27, 2008 |
| 17 | AND CONSOLIDATED ACTIONS | |

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT __ 951 D

PAGE __

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### EXPERT REPORT OF RALPH OMAN

I have been retained by attorneys for Mattel, Inc. ("Mattel"). This report is submitted pursuant to Fed. R. Civ. P. 26 (a)(2). I reserve the right to supplement or amend this report pursuant to Fed. R. Civ. P. 26 (e) if additional information affecting my opinion becomes available.

### QUALIFICATIONS

Currently I am Practitioner-in-Residence at the George Washington University Law School in Washington, D.C. I have 32 years experience in domestic and international copyright administration. My qualifications, which are set forth in my *curriculum vitae* attached as Exhibit A, include my education, training, and experience in the area of U.S. Copyright Office practice and procedure.

From 1985 through 1993, I served as the Register of Copyrights of the United States. As the Register of Copyrights, I was the chief government official responsible for administering the U.S. copyright system. Among other responsibilities, the Register of Copyrights supervises the work of the corps of examiners and rules on the copyrightability of works. I am familiar with the U.S. copyright law and U.S. Copyright Office rules, regulations, practices, and procedures, including those that relate to the registration of pictorial, graphic, and sculptural works. During my tenure, I supervised the revision of the *Compendium of Copyright Office Practices*, which is a manual of practices and procedures that is primarily intended for the use of the Copyright Office's staff. I supervised the 1990 revision of Circular 40, which is an official publication that summarizes the registration and deposit procedures for works of the visual arts, including drawings, prints, sculptural works, and dolls and other 3-dimensional works based on 2-dimensional designs. This publication is intended for use by the general public.

As the Register of Copyrights, I acted as principal advisor to the U.S. Congress on copyright legislation, and served as principal advisor to the U.S.

PAGE ___ EXHIBIT ___ 992 ___ 19

EXPERT REPORT RALPH OMAN

1 Department of State on international copyright matters, including drafting,

2 negotiating and implementing international copyright treaties. During my tenure as

3

4 Register, I testified more than 40 times before Congress on proposed copyright

5 legislation, and I helped move the United States into the Berne Convention for the

6 Protection of Literary and Artistic Works.

7

8 Before becoming Register, I served in other government positions,

9 including Chief Counsel of the U.S. Senate Subcommittee on Patents, Copyrights,

10 and Trademarks, and Chief Counsel of the Senate Subcommittee on Criminal Law.

11

12 I also served as Chief Minority Counsel on the Senate Subcommittee on Patents,

13 Trademarks and Copyrights from 1975 to 1977. In that capacity, I participated in

14 the final drafting and negotiations that led to passage of the landmark U.S.

15

16 Copyright Revision Act of 1976, the current statute.

17 I am a graduate of Hamilton College (A.B., 1962) and Georgetown

18 University Law Center (J.D., 1973). I am a member of the bar for the District of

19

20 Columbia. I am a Past President of the Giles S. Rich American Inn of Court (which

21 is the intellectual property Inn for Washington, D.C.), a former Trustee of the

22 Copyright Society of the United States of America, and the American Bar

23

24 Association's Liaison to the Committee on Copyright at the World Intellectual

25 Property Organization in Geneva. In 2002, I received the Jefferson Medal from the

26 New Jersey Intellectual Property Law Association, in recognition of my life-long

27

28 commitment to the protection of intellectual property.

PAGE EXHIBIT 863 16

1   At the George Washington University Law School I teach U.S.

2   copyright law, including Copyright Office registration procedures and the

3

4   registration of works of the Visual Arts.  I have written numerous articles and

5   delivered many speeches addressing copyright and related rights, and I have testified

6   as an expert in the area of copyright law in a number of judicial proceedings.  A list

7

8   of the articles and major policy speeches I have authored in the past ten years on

9   subjects relating to copyright law is attached as Exhibit B.  My prior testimony is

10  listed in the attached Exhibit C.  I am also the author of a book entitled <u>Copyright:</u>

11

12  <u>Engine of Development,</u> published by UNESCO.  In 1993, I received the

13  International Book Award from the International Publishers Association.

14  **COMPENSATION**

15  My work on this case is being billed at my standard rate of $350 per

16

17  hour.  My payment is not contingent upon the outcome of the case.

18  **MATERIALS REVIEWED**

19  In the preparation of this report and for the expert testimony that I may

20  be called upon to provide, I reviewed the Plaintiff's Complaint in case number

21

22  CV05-02727 and the Defendant's Second Amended Answer and Counterclaims in

23  case number 05-2727, along with the exhibits thereto.  I reviewed the copyright

24  registration certificates and the supplementary registrations for the works involved

25

26  in this litigation, along with the deposit material, and I reviewed the affidavit of

27  Isaac Larian in a 2002 Hong Kong case, <u>ABC International Traders, Inc. doing</u>

28

PAGE  EXHIBIT  854  16

EXPERT REPORT RALPH OMAN

1  business as MGA Entertainment v. Toys & Trends (Hong Kong) Limited.  And I

2  also reviewed both volumes of the deposition of Bryan Armstrong in this case, the

3
4  deposition of Samir Kumar Khare, the six (6) Affidavits of Daphne

5  Gronich, Esquire, General Counsel of MGA, the three (3) affirmations of Lee Shiu

6  Cheung, Managing Director of MGA Hong Kong, the Affirmation of Wai Lim Fan,

7
8  MGA's Hong Kong Solicitor, and a portion of MGA's Response to Mattel's

9  Amended Supplemental Interrogatory Regarding Defendant's Affirmative Defenses.

10  Finally, I have examined certain Bratz dolls.

11

12                          **EXPERT OPINION**

13      **A.    Summary**

14          Based on my experience as the Register of Copyrights, I would like to

15  explain the nature of the registration system in the U.S. Copyright Office and the

16  significance of registration certificates.  In the context of that discussion, I will also

17
18  offer comments on the significance of supplementary registrations that seek to

19  correct or amplify the facts that were stated in the original applications.  And, last, I

20  will comment on the registration of a two-dimensional artwork and its relationship

21
22  to a three-dimensional work that derives from it, and the nature of the copyright

23  deposit that is required by Copyright Office regulations when filing the original

24  registration application.

25

26          At the outset, it is important to keep in mind that the copyright system

27  is very different than the patent system.  For patents, the U.S. Patent and Trademark

28

EXHIBIT 74

PAGE 855

EXPERT REPORT RALPH OMAN

1  Office actually grants patents. Either the Office issues the patent, or it doesn't. If it

2  doesn't grant the patent, you don't have one. For copyrights, the Copyright Office

3
4  registers a "claim" to copyright. It doesn't grant the copyright. Only a court can

5  deem a copyright enforceable.

6  **B.    The Practices and Procedures of the U.S. Copyright Office**

7  **Regarding the Registration of Pictorial, Graphic, and Sculptural**

8  **Works**

9       The Copyright Act defines "pictorial, graphic and sculptural works" as

10
11  "two-dimensional and three-dimensional works of fine, graphic, and applied art...."

12  17 U.S.C. § 101. In order to register a two- or three-dimensional work, the owner of

13
14  that work must comply with the practices and procedures described in the Copyright

15  Act, the Code of Federal Regulations, and Circulars 40 and 40A (*Copyright*

16  *Registration for Works of the Visual Arts, Deposit Requirements in Visual Arts*

17  *Material*). I will explain these practices and procedures from my vantage point as

18
19  the former U.S. Register of Copyrights.

20       **1.    Application Requirements.**

21       In order to register a claim to copyright in a work with the Copyright

22  Office, the applicant must complete the relevant application form, which varies

23
24  depending upon the nature of the work. In the case of a drawing or doll, the

25  applicant typically uses uses "Form VA," which stands for "visual arts."

26

27

28

EXHIBIT 7A

PAGE 856

EXPERT REPORT RALPH OMAN

PAGE _____

EXHIBIT _____

857

1

        (a)    **Title of the Work.**

2

3          In order to complete Form VA, the applicant should identify the title of

4    the work on line 1 of the application.

5          (b)    **Nature of the Work.**

6

7          The applicant should also identify the nature of the work on line 1 of

8    the application.  The nature of work space was added to form VA, because this form

9    "cover[s] a number of different categories of works, and it was believed the

10   additional information would clarify the general character or the type or category of

11

12   the work being registered."  Copyright Office, *Registration of Claims to Copyright,*

13   65 Fed. Reg. 41,508 (Jul 5, 2000).  Although the "nature of authorship" statement

14
     on line 2 is the "primary source" for identifying the nature of the applicant's claim
15

16   (as modified by the "derivative works" statements on lines 6(a) and 6(b) (if any)),

17   the nature of work statement usually provides "a supplementary description

18
     augmenting the statement of authorship."  *See id.*  For instance, if the applicant
19

20   submitted a photograph of an empty room, checked the "2 Dimensional Artwork"

21   box on line 2, and wrote "wallpaper" in the nature of work space, the examiner

22
     would assume that the applicant intended to register the wallpaper design that is
23

24   shown in the photograph, rather than the photograph itself.  Together, these

25   statements put the world on notice concerning the nature of the work that the

26
     applicant has created, and the nature of the authorship that appears in that work.
27

28   However, they do not define the specific metes and bounds of the copyright in that

EXPERT REPORT RALPH OMAN

1  work. The metes and bounds of the copyright are defined by the deposited work

2  itself, and by judicial interpretation.

3

4              **(c)     Name of the Author.**

5              The applicant must provide the name of the person who created the

6  work on line 2.

7

8              **(d)     Nature of Authorship.**

9              The applicant must describe the Nature of Authorship on line 2. The

10 applicant does not have to describe the nature of his or her authorship in any detail.

11 The applicant is only required to check the boxes that are printed on line 2 that

12

13 correspond to the type of authorship that the author has created (e.g., "2

14 Dimensional Artwork" for a fabric design, "3 Dimensional Sculpture" for a garden

15 gnome, "Jewelry Design" for a bracelet, etc.).

16

17              **(e)     Date of Publication.**

18              Next, the applicant must identify the year in which the work was

19 created (line 3(a)), and the specific date and nation where the work was first

20 published (line 3(b)). If the work has never been published, the applicant should

21 leave line 3(b) blank. "Publication" has a very specific meaning. It is "...the

22

23 distribution of copies...of a work to the public by sale or other transfer of

24 ownership.... The offering to distribute copies...to a group of persons for purposes

25 of further distribution...constitutes publication." 17 U.S.C. Section 101.

26

27

28

EXHIBIT 7

PAGE 858

**(f)** **Copyright Ownership.**

The applicant must provide the name and address of the copyright claimant on line 4. The copyright claimant is the person who owns the copyright in the work that the applicant has sought to register. In most cases, the author and the copyright claimant will be the same person. However, if they are different, the applicant must explain how the copyright claimant obtained his or her ownership of the copyright on line 4. The Copyright Office will normally accept a general "transfer of ownership" statement, such as "by assignment," "by will," "by contract," and the like.

**(g)** **Previous Registrations.**

If the work or a prior version of that work were previously registered with the Copyright Office, the applicant should disclose that information on line 5 of the application form. If so, the applicant must provide the previous registration number, and must explain why he or she seeks another registration.

**(h)** **Derivative Works.**

If the work is based upon or contains a substantial amount of, for example, previously registered or public domain material, the applicant should identify that preexisting work or material on line 6(a) of the application. This is known as a "derivative work statement." In addition, the applicant should identify the new and original material that the author has added to that preexisting material by describing that new material on line 6(b) of the application. This is known as the

EXPERT REPORT RALPH OMAN

EXHIBIT

PAGE

889

1   "material added" statement. The material added statement "generally delineates the

2   extent of the claim" in the new material that the author has created above and

3

4   beyond the preexisting material that the applicant has identified on line 6(a).

5   *Compendium II* § 325.02.

6        The applicant does not have to describe each aspect of the preexisting

7

8   material that appears in the work, or each aspect of the new material that he or she

9   has created. Instead, the applicant may provide a brief, general statement sufficient

10  to identify the preexisting material, such as "previous version," and, if necessary, a

11

12  brief, general statement sufficient to identify the new material that the author has

13  added to the work, such as "revised version," "artistic revisions," "additional

14  material," or the like. In this respect, as mentioned above, the examination process

15

16  at the U.S. Copyright Office is more informal than the examinations that are

17  conducted at the U.S. Patent and Trademark Office. When an applicant files a

18  patent application, the applicant must submit a list of "claims" describing each

19

20  aspect of the invention in great detail. If, after review, the examiner determines that

21  the applicant's invention is truly new and non-obvious, the Patent and Trademark

22  Office will issue a patent for the invention. By contrast, Copyright Office

23

24  examiners are not expected to make, and do not make, these types of evaluations.

25  The examiner will accept a general statement concerning the preexisting material

26  that may appear in the work, and a general statement concerning the new material

27

28  that has been added to that work. As a general rule, the examiner will not compare

PAGE ____ EXHIBIT ____

860    4

1  the new work that has been submitted with works that have been registered in the

2  past to determine if these statements are correct, or to determine if the new material

3
4  qualifies quantitatively and qualitatively for copyright registration.[1]

5          Let me expand a bit on this point, because it is very important in the

6  context of this case. This difference between the patent examination system and the

7
8  copyright examination system has an important consequence. For a patent, the

9  inventor must fully disclose all of the technical particulars of the invention so that

10 others can understand the invention completely, reproduce it, refine it, build on it,

11
12 invent around it. That full disclosure is a vital part of the patent bargain. In

13 exchange of that disclosure the inventor gets 20 years of exclusivity to exploit the

14 invention.

15

16         For a copyright, on the other hand, the registration serves a vastly

17 different purpose. The creator is frequently permitted to deposit a photograph of a

18 3-dimensional work or a drawing of the work, because the purpose of the deposit is

19
20 not to enable the reconstruction of the work at a later date, but for three other

21 purposes: (1) to enrich the collections of the Library of Congress, (2) to let the

22

23     [1]  When I served as Register of Copyrights, the Turner Broadcasting Company
24  sought to register colorized versions of black and white films that were either in the
    public domain or owned by TBS. I insisted that TBS submit a pristine copy of the
25  black and white version of each film so that the examiner could determine if the
26  colorization process added any new material to those preexisting works. I note,
    however, that this procedure was the exception to the general rule. In most cases,
27  the examiner makes this determination based solely on the statements that appear in
28  lines 6(a) and (b).

EXPERT REPORT RALPH OMAN

PAGE ___ EXHIBIT ___

1  examiner confirm that the work contains at least a minimal level of creativity to

2  satisfy the (admittedly low) standard for registration, and (3) for identification

3
4  purposes in case of litigation.  For many works, including toys and dolls, the Library

5  has no interest, so a deposit of the actual work itself is not required.  For example,

6
7  the Library normally having no interest in unpublished databases, Copyright Office

8  regulations permit the creator of an unpublished database to mask out large portions

9  of the work if it contains trade secrets or other sensitive information.  Similarly, a

10
11  computer programmer can block out large portions of the program's source code to

12  protect proprietary information or valuable code.  In some cases, the programmer

13  can refuse to supply any source code at all, and supply instead a sample of the object

14
15  code, which is indecipherable.  Moreover, a remitter can request special relief from

16  the deposit requirement entirely, based on undue burden, cost, or hardship.  None of

17  these exemptions to full disclosure would be permitted in a patent application.

18
19      For these reasons, Samir Khare is incorrect to say in his deposition on

20  page 258 that the two-dimensional drawings of the dolls cannot have been intended

21  to register the dolls themselves.  Confusing patents and copyright, he says that it is

22
23  "...impossible [to] go from a 2-D flat drawing to a 3-D doll.  You simply can't....

24  [The 2-D drawing] doesn't give you any dimensions at all....  You simply don't

25  capture enough detail."  Without dimensions, technical specification, and

26
27  manufacturing techniques, he suggests, one cannot reconstruct the dolls.  His

28  analysis misconstrues the basic rationale of the copyright registration system and the

EXHIBIT

PAGE

802  7a

EXPERT REPORT RALPH OMAN

1  purpose of the deposit requirement.  The drawings of the dolls fulfill the deposit

2  requirements of the Copyright Office.  They show the sufficiency of authorship for

3
4  registration purposes, and they permit the identification of the works for which

5  protection is claimed.  The drawings therefore are the proper deposit for the dolls.

6
             (i)      **Certification.**

7
8          Finally, the applicant must provide the name of a person who the

9  Copyright Office should contact if the examiner has any questions concerning the

10  application (line 7), and the applicant must sign a certification on line 8 confirming

11
12  that the statements in the application are correct to the best of the applicant's

13  knowledge.  Any person who knowingly makes a false representation of a material

14
15  fact in the application, or in a written statement filed in connection with that

16  application, may be fined up to $2,500.  (*See* 17 U.S.C. § 506(e).)  Normally, in a

17  case involving a willful false representation, the Copyright Office would also cancel

18
19  the registration.

20          Generally speaking, the Copyright Office insists on accuracy in

21  copyright applications.  If the Copyright Office registers the claim, or refuses to

22
23  register the claim, the court can draw conclusions from that office action.  But if the

24  applicant deliberately manipulates the process and thereby short-circuits an

25  informed assessment by the Copyright Office, then that purpose is thwarted.  For

26
27  that reason, the consequences of misrepresentation could be serious.  If an applicant

28  makes a material misrepresentation or a material omission in the application forms

1  or deposit materials, and if that misrepresentation or omission would have otherwise

2  prompted the examiner to reject the application, the registration could be invalidated

3

4  for committing fraud on the Copyright Office.

5         **2.     Deposit Requirements**

6         To register a pictorial, graphic, or sculptural work in the Copyright

7  Office, the applicant must provide the Office with a representation of that work.

8

9  Normally, as discussed above, the applicant will submit a photograph or a drawing

10  that is sufficient to identify the work that the applicant seeks to register.  In many

11  cases, the Copyright Office prefers not to accept physical samples of these works

12

13  because of spatial constraints and because the Library of Congress has no interest in

14  adding dolls and other ephemera to the collection of the national library.

15         **3.     Filing Fee**

16         In order to register a pictorial, graphic, or sculptural work, the applicant

17

18  must pay the usual non-refundable fee of $45.00 for each application, which is

19  intended to recapture a portion of the cost of processing all of the paperwork.

20         **4.     The Examination Process**

21         When the Copyright Office receives an application, the Receiving and

22

23  Processing Division stamps the application form to indicate the date that the

24  application, the fee, and deposit were filed with the Copyright Office and sends the

25  $45.00 filing fee to the U.S. Treasury.  If the Copyright Office subsequently issues a

26

27

28

PAGE ___  EXHIBIT ___ 864

EXPERT REPORT RALPH OMAN

1  registration certificate for the application, the filing date becomes the effective date

2  of the registration.

3
4         Next, the Copyright Office Receiving and Processing Division sends

5  the application and deposit to the Examining Division where the file is assigned to

6
7  an examiner.  The examiner will review the application and deposit material to

8  determine whether or not they are complete, and whether or not the work constitutes

9  copyrightable subject matter.  Over the past 20 years, this process has become

10
11  increasingly streamlined and automated – a modernization that began during my

12  tenure as Register– due to the large number of applications that the Copyright

13  Office receives each year, and the great pressure to reduce costs and downsize the

14
15  staff of the Office.  In fact, in most cases the examiner will review each routine

16  application for roughly 1 to 5 minutes, and then will move on to the next application

17  in the stack.

18
19         As discussed above, the examination process at the U.S. Copyright

20  Office is very different than the examinations that are conducted at the U.S. Patent

21  and Trademark Office.  Some would say that it is less rigorous, but that would

22
23  confuse the purpose of the two examinations.  For instance, the Copyright Office

24  examiner will not conduct an independent investigation to determine if the work for

25  which registration is sought were created by the person who has been identified on

26  line 2 of the application.  Likewise, the examiner will not second-guess the date of

27
28  publication specified on line 3, or compare the applicant's work with an earlier

PAGE ____ EXHIBIT ___ 7

805

EXPERT REPORT RALPH OMAN

1   similar work to determine if the new work contains enough new material to merit a

2   new copyright registration – even if the applicant has provided a "derivative work"

3
4   statement on lines 6(a) and 6(b).  Instead, the examiner will normally rely solely on

5   the information that the applicant provided in the application form, along with the

6   certification on line 8 which states that this information is correct.  Of course, if an

7
8   author submits a work that is known to be in the public domain, such as "The Star-

9   Spangled Banner" or "The Lord's Prayer," the examiner would question the

10  application.

11
12          In examining an application, the examiner will determine if any portion

13  of the work can reasonably be construed to contain copyrightable authorship.  If the

14  nature of work statement or the material added statement mentions material that

15
16  both falls within, and does not fall within, the subject matter of copyright – such as

17  "artwork and layout" for a book – the examiner normally will annotate the

18  application to indicate that the presumptions that attach to the registration only cover

19
20  the author's material that is copyrightable – such as "artwork" (with "layout" not

21  eligible for protection).  If the nature of work or the material added statement

22  contains claims that are unacceptable as a matter of law – e.g., "ideas," "process," or

23
24  "concepts" – the examiner will contact the person identified on line 7 by telephone,

25  email, or letter to make certain that the claim to copyright actually comprises

26  copyrightable subject matter.

27
28

EXPERT REPORT RALPH OMAN

PAGE EXHIBIT

If the examiner finds that the work likely satisfies at least one of the statutory registration requirements, he or she will approve the work for registration, create an online record, and send the package to the unit that generates the registration certificate. If the work has been published, the Copyright Office will assign a registration number beginning with the letters "VA," which, as already mentioned, stand for "visual arts." If the work is unpublished, the Office will assign a registration number beginning with the letters "VAu." If the examiner determines that the work fails to satisfy the statutory registration requirements, he or she will issue a formal refusal, and will explain the basis for the refusal in writing. Rejections are infrequent.

## 5.   Supplementary Registrations

If a registration certificate contains an error or omission, the registrant can correct that mistake with a "supplementary registration." A supplementary registration does not replace the original – or "basic" – registration certificate, but it can be used to correct or to amplify some of the information that appears in that certificate. For example, if the applicant failed to identify his or her work as a work made for hire, he or she can ask the Copyright Office to issue a supplementary registration to correct that mistake. Likewise, if the basic registration mentions only one author and one copyright claimant, the Copyright Office will accept an application for a supplementary registration from other authors who would like the

EXHIBIT ___ 76

PAGE ___ 0167

1  record to reflect their claim to authorship and/or ownership in the work that was

2  registered with the Copyright Office.

3
4          In order to obtain a supplementary registration, the registrant must

5  complete Form CA, which stands for "Correction/Amplification," and must pay a

6  filing fee of $115.00. If the Copyright Office decides to issue a supplementary

7
8  registration, the basic registration still remains in effect. As the Copyright Office's

9  information circular explains, "The basic registration will not be expunged or

10  cancelled, and the two registrations will both stand in the Copyright Office records."

11
12  *Circular 8, Supplementary Copyright Registrations* at p. 3. The supplementary

13  registration simply directs the public's attention to a possible error or omission in

14  the basic registration, and places what purports to be the correct information or the

15
16  missing information in the official record.

17

18    **C.    The Copyright Registrations**

19      **1.    The Importance of the Registration Certificates**

20          It is well established that the Copyright Office will register claims to

21
22  copyright in three-dimensional embodiments of two-dimensional drawings of a doll.

23  As long as the underlying drawings of the dolls qualify for copyright protection,

24  those registrations of the drawings protect not only the drawings but the dolls

25
26  themselves. The protectable elements of the drawings, when incorporated into the

27  form and appearance of the three-dimensional dolls, must of course be authorized by

28

EXHIBIT

PAGE

9108

79

EXPERT REPORT RALPH OMAN

1  the copyright owner of the drawings, or they will be infringing.  As Professor

2  Nimmer states in his treatise: "[C]ourts have correctly held three-dimensional dolls

3
4  copied from the copyrighted cartoon illustrations of 'Spark Plug, The Horse' and

5  'Betty Boop' to constitute infringement."  Nimmer on Copyright, 2.18 [H][1]

6
7  (footnotes omitted).  By way of illustration, the Disney company has the right to

8  create three-dimensional Mickey Mouse dolls based on the two-dimensional

9  drawings of the famous cartoon character.

10
11      Isaac Larian, when he sought to enforce MGA's claimed rights against

12  an accused infringer in the courts of Hong Kong, made the same point in his

13  affidavit to the court.  He correctly noted, after consultation with his lawyers, that

14
15  the creation of the original drawings of the dolls serve as the legal basis for claiming

16  copyright in the dolls themselves, and that he could sue the Hong Kong

17  manufacturer of the alleged knock-offs because they infringed the original drawings.

18
19  His actual words were as follow: "[T]he 3 dimensional Funky Tweenz dolls have

20  infringed the 2 dimensional drawings which are artistic works in which copyright

21  subsists."  Larian Affidavit at para. 12.

22
23      By way of amplification, I also note that, in her affidavits for the Hong

24  Kong litigation in 2002, Ms. Gronich repeatedly identifies the 15 drawings as the

25  "artistic works" upon which the 3 dimensional dolls are modeled.  Gronich Affidavit

26  at para. 4 and para. 5.  Lee Shiu Cheung also makes clear that [t]he designs of the

27
28  Bratz dolls are all original drawings created by Mr. Bryant using his own

EXPERT REPORT RALPH OMAN

PAGE ___ EXHIBIT ___

1   independent labour, skill and judgement [sic]," and the "17 initial concept drawings

2   of the first 4 Bratz dolls [were] designed by Mr. Bryant...." Lee Affirmation at

3
4   para. 8-9.

5          I also note that MGA's registration of Carter Bryant's drawings is itself

6   significant. In MGA's Response to Mattel's Supplemental Interrogatory, MGA
7
8   suggests that there were a number of prior works underlying Mr. Bryant's Bratz

9   drawings, and that the drawings are therefore largely non-original. However, MGA

10  itself registered those drawings and did not list any pre-existing works on which the
11
12  Bryant drawings were purportedly based. The Copyright office expects applicants

13  to identify previously registered or public domain materials on which the works are

14  based when they seek registration of those works. That MGA did not do so suggests
15
16  that it thought that Mr. Bryant's Bratz drawings were wholly original when it

17  registered them. Indeed, it is common sense that because the drawings were

18  registered as "original" works of art, MGA's registrations of the drawings reflect
19
20  that MGA believes that the drawings are original.

21          **2.      The Significance of the Supplementary Registrations**

22          The Copyright Office prides itself on the completeness and accuracy of
23
24  its public records. As the repository of vital copyright information, it helps authors

25  protect their rights, and it promotes trade and commerce in copyrighted materials.

26  For that reason, the Office encourages authors to correct that public record if they
27
28  discover errors or inaccuracies. That being said, the Copyright Office also

EXPERT REPORT RALPH OMAN

PAGE ____  EXHIBIT ____
810

1 discourages corrections of the record if the motivations are suspect. It is one thing

2 to correct a mistake, but another thing to attempt to manipulate the record to gain

3
4 some legal or competitive advantage. In this case, plaintiff has submitted a series of

5 supplementary applications that purport to correct various dates of creation and

6 dates of publication, and the status of various works as a derivative works, among

7
8 other things. I note that in my experience sophisticated companies such as MGA

9 generally do not make mistakes in their copyright applications. When asked about

10 the discrepancy between an original publication date on an MGA copyright

11

12 registration form and the "corrected" date on the CA Form, Mr. Khare confesses

13 that in "[a]ll honesty, I don't know. Because I can tell you, at the time that this

14
15 [original] Form VA was filled out, [MGA] had better information relating to when

16 this particular drawing may or may not have been—may have been published."

17 Khare Deposition at 253. The forms are typically filled out by well-trained staff

18
19 professionals who appreciate the importance of an accurate filing. It is a felony to

20 deliberately falsify a government document. When the Copyright Office sees a

21 flurry of CAs in contemplation of litigation, or after litigation has already

22
23 commenced, the Office will normally view them as self-serving and irrelevant. But

24 the Copyright Office doesn't challenge them because it knows that at that point the

25 matter is in the hands of the court.

26

27

28

EXHIBIT
PAGE
671

EXPERT REPORT RALPH OMAN

**D.**   **Anomalies**

Mr. Armstrong, at pages 268-69 in Volume 1 of his deposition, claims that in registering the Bryant drawings MGA was simply intending to register the packaging for the Bratz dolls. I have long experience with the registration process, and I have never encountered a similar contention—where a sophisticated company first registers a display box with graphics rather than registering the underlying work itself. (The fact that MGA, or its agent, maintains a deposit account at the Copyright Office suggests to me a frequent use of the registration system, and a sophisticated understanding of the registration process.) Nor have I encountered a situation where a sophisticated company contends that it registered the original drawings of doll designs in the Copyright Office for the purpose of registering, not the unique physical characteristics of the dolls, but their packaging materials. And, finally, I have also never encountered a situation where a sophisticated company claims to be registering packaging materials and, as the deposit, submits drawings of the item that is supposed to go in the packaging. Occasionally, the Office will accept a substitute deposit in place of the actual item being registered, as long as the substitute contains a clear and complete representation of all of the graphic authorship claimed in the application. But the Office will do so only when the item for which registration is sought is no longer available. The Office has some discretion in this regard under its Special Relief authority 37 CFR 202.20(d). That being said, during my tenure as Register, the Office would not accept a drawing or

PAGE ___ EXHIBIT ___ 872

1  photograph of, for example, a doll, for a claim to copyright in the packaging, with

2  its various original graphics and artwork.  Since the examiner would know that the

3

4  packaging itself was readily available, he or she would insist that the remitter submit

5  the actual packaging, or photographs of the packaging, as the only proper deposit.

6            Also anomalous is the series of supplementary registrations recently

7

8  made by MGA.  All of the corrections/amplifications seem to be an attempt to

9  rewrite the timeline of the creation of the dolls.  For the Hong Kong litigation MGA

10  sought to establish that all of the creative acts that culminated with the sale of the

11

12  Bratz dolls happened very early in the chronology.  In the current litigation, we see

13  an effort to create the impression that the various creative steps took place much

14  later, that the whole process should ratchet forward to make it seem that events were

15

16  much more recent than they actually were.

17

18  DATED:  February 11, 2008

19

20  

21  Ralph Oman

22

23

24

25

26

27

28

EXHIBIT   19

PAGE   873

EXHIBIT A

EXHIBIT _____79_____

PAGE _____874_____

## RALPH OMAN

**Current Position**

Practitioner-in-Residence, The George Washington University Law School, 20th and H Streets NW, Washington, D.C. 20006

**Professional Experience**

Counsel, Dechert LLP, 1775 I Street, N.W., Washington, D.C. 20006-2401. 1995-2008

Of Counsel, Mudge Rose Guthrie Alexander and Ferdon, 1994-1995

Register of Copyrights of the United States, 1985-1993

> The Register of Copyrights is the chief government official charged with administering the national copyright law. The Register supervises the work of 550 Copyright Office employees, rules on the copyrightability of works, acts as a principal advisor to Congress on copyright legislation and, during my tenure, to the Department of State on international copyright matters, drafting, negotiating, and implementing international copyright agreements.

Pravel Professorial Lecturer in Intellectual Property and Patent Law, The George Washington University Law School, 1993 - present.

Chief Counsel, Subcommittee on Patents, Copyrights, and Trademarks, Committee on the Judiciary, U.S. Senate, 1983-1985

Staff Director, then Chief Counsel, Subcommittee on Criminal Law, Committee on the Judiciary, U.S. Senate, 1981-1983

Legislative Counsel to Senator Charles McC. Mathias (R-Maryland), 1977-1981

Counsel to Senator Hugh Scott (R-Pennsylvania), Subcommittee on Patents, Trademarks, and Copyrights, Committee on the Judiciary, U.S. Senate, 1975-1977

Attorney, Antitrust Division, U.S. Department of Justice, 1974-1975

Law Clerk, Judge C. Stanley Blair, U.S. District Court for the District of Maryland, 1973-1974

U.S. Naval Flight Officer, 1965-1970, (Retired from the U.S. Naval Reserve with the rank of Captain, 1992)

Foreign Service Officer, U.S. Department of State, Dhahran and Jidda, Saudi Arabia, 1962-1964

EXHIBIT 1a

PAGE 815

EXHIBIT _____ A

PAGE _____ 24

**Education**
Georgetown University Law Center, J.D., 1973, Executive Editor, *Law and Policy in International Business*

Hamilton College, A.B., 1962

Sorbonne, Paris, France, 1960-1961

**Honors and Affiliations**
1990 Exemplary Public Service Award of the New York State Bar Association Arts, Sports and Entertainment Law Section

1993 International Book Award from the International Publishers Association

1993 Lifetime Achievement Medal, Foundation for a Creative America

Federal Bar Association, President, Capitol Hill Chapter 1993-1994

2002, The Jefferson Medal, awarded by the New Jersey Intellectual Property Law Association, in recognition of long professional commitment to strong intellectual property protection

Member, International Association for the Advancement of Teaching and Researching in Intellectual Property; ABA's Section on Intellectual Property Law, former chair of six of the eight copyright committees

Former Trustee, Copyright Society of the United States of America

Master of the Court, and Past President, Giles S. Rich Inn of Court, Washington, D.C.

Admitted to practice in District of Columbia and before the U.S. Supreme Court and the Fourth Circuit Court of Appeals

Who's Who in America

Who's Who in American Law

**Personal**
Married, three children

**Miscellaneous**
Fluent French, conversational Arabic, private pilot's license, qualified sailing instructor

PAGE ___ EXHIBIT ___ 070

EXHIBIT ___ A ___

PAGE ___ 25 ___

EXHIBIT B

EXHIBIT ___79___

PAGE ___877___

## Exhibit B

ARTICLES AND MAJOR POLICY SPEECHES BY RALPH OMAN (1997 - PRESENT)

(Authored or Co-Authored)

1.  "Copyright on the Global Internet: Trust Everybody - But Cut the Cards"  Delivered at Copyright on the Internet Seminar, Washington, D.C., November 8, 1996.

2.  "Copyright on the Global Internet: Two New Treaties"  IP WorldWide, 1997.

3.  "Copyright on the Internet"  Delivered at National CLE Conference, Vail, Colorado, January 16, 1997.

4.  "Copyright and Software: A Tour d'Horizon"  Delivered at Association of Corporate Patent Counsel, Palm Beach, Florida, January 27, 1997.

5.  "Copyright Protection for Software and Databases"  Delivered at SmithKline Beechem, IP Workshop, Upper Marion, PA., January 30, 1997.

6.  "New Global Treaties Protect Copyright Online" article for ABA IPL Newsletter, Winter 1997.

7.  "The World Intellectual Property Organization: A United Nations Success Story"  Gerald Mossinghoff and Ralph Oman, *World Affairs*, Fall 1997.

8.  "The Shape of Things to Come"  Remarks prepared for the International Council of the National Academy of Television Arts and Sciences, New York, March 6, 1997.

9.  "Performing Rights in the Digital Age: The International Perspective" Fordham Law School's International Intellectual Property Law and Policy, Spring 1997

10. "Copyright Protection for Software"  Delivered at Franklin Pierce Law Center, Concord, NH, April 12,1997.

11. "Copyright Liability on the Internet"  Delivered at American University, May 2, 1997.

12. "From Scourge to Savior: How Digital Technology Will Save Authorship in the Age of the Internet" Delivered at W.I.P.O. International Forum, Seville, Spain, May 14, 1997.

13. "Copyright in the Middle East: A Survey"  W.I.P.O. Arab Regional Symposium on the Agreement on Trade-Related Aspects of IP Rights, Amman, Jordan, June 17-19, 1997.

14. "Folkloric Treasures: The Next Copyright Frontier?"  Published in the ABA - IPL Section Newsletter, July 9, 1997.

EXHIBIT ____B____

PAGE ____26____

PAGE EXHIBIT 878 B

15. "Current Developments in Copyright: International Trends" Delivered at George Washington Law School, Summer Intellectual Training Program, July 10, 1997.

16. "Marketing Software, Databases, and Entertainment Media on the Internet: New Rules for the Digital Age" Delivered at All Ohio Annual Institute on Intellectual Property, September 11-12, 1997.

17. "The Need for Shared Liability on the Internet" Published in the *Federal Bar Association Journal*, Winter 1997.

18. "Copyright Basics" Delivered at ASAE, Capitol Hilton, Washington, D.C., October 6, 1997.

19. "Making the Internet Safe for the Songwriter: Copyright in the Digital Age" Delivered at the Copyright Society of the South, Nashville, October 13, 1997

20. "The Current State of International CopyrightLaw" Delivered at International Law Institute, Washington, D.C., October 16, 1997.

21. "The Current State of International Copyright Law" Delivered at the World Bank, Washington, D.C., March 3,1997. (also presented at the Bulgarian Intellectual Property Rights Group, The International Law Institute, Nov. 12, 1997)

22. "VideoWars - Copyright in the Digital Age" Seattle, Washington, January 1998.

23. "Strong Intellectual Property Protection: The Key to Sri Lanka's Economic Growth" Delivered in Colombo, Sri Lanka, January 1998.

24. "Copyright in the Digital Age" Delivered at Video Wars Seminar in Seattle, Washington, February 12-13, 1998.

25. "Making the Internet Safe for Authors and Composers: Copyright in the Digital Age" John Marshall Law School, Chicago, February 27, 1998.

26. "The Way to Net Infringers" *Legal Times*, March 23, 1998.

27. "Congress Civilizes the Internet" University of Akron School of Law, March 16, 1998.

28. "The Internet and the Law of Intellectual Property," Washington, D.C. Bar, April 4, 1998.

29. "Report on Copyright In China for the Standing Committee on Copyright Reform," Beijing/Shanghai/Tianjin, July 1-11, 1998.

30. "The Growing International Consensus on Computer Software Protection" ABA Annual Meeting, Toronto, August 1, 1998.

31. "The Digital Millennium Copyright Act of 1998: Congress Civilizes the Internet" Washington, D.C. Bar, August 31, 1998.

PAGE EXHIBIT 879 D

EXHIBIT _____ B _____

PAGE _____ 27 _____

2

32.   "Folkloric Treasures: The Next Copyright Frontier" ATRIP, Mexico City, August 24, 1998.

33.   "Congress Civilizes the Internet" NJIPLA, New Brunswick, New Jersey, October, 8, 1998.

34.   "Copyright in Cyberspace" Georgetown Law School, Washington, D.C., October 23, 1998.

35.   "Digital TV - Copyright in the Age of Digital Television" The Fourth Digital Television Forum, Los Angeles, December 1, 1998.

36.   "Creative Compromise" *Corporate Counsel Magazine*, December 1998.

37.   "The Digital Millennium Copyright Act: Congress Civilizes the Internet" D.C. Bar Association, Washington, D.C., December 11, 1998.

38.   "Congress Civilizes the Internet" *IP WorldWide*, January 1999.

39.   "The Cultural and Economic Importance of Copyright and Related Rights" U.S. Copyright Office, Library of Congress, March 18, 1999.

40.   "The Bazaar New World of E-commerce" *Corporate Counsel Magazine*, July 1999.

41.   "The Contours of International Copyright" Seminar sponsored by World Trade Organization and Organization of American States, Washington D.C., July 2, 1999.

42.   "The Contours of International Copyright" American Bar Association Young Lawyers Division, Atlanta, Georgia, August 9, 1999.

43.   "Database Protection in the Digital Age" National Institute of Health, Technology Transfer Office, Bethesda, Maryland, September 23, 1999.

44.   "The New Organum: Copyright in the Digital Age" International Judges Conference, Washington D.C., October 17, 1999, Published in the May 2000 issue of the Federal Circuit Bar Journal.

45.   "Copyright in the Digital Age" The Greater Richmond Intellectual Property Law Association, November 11, 1999

46.   "Collective Management in the Digital Age: A Report from the Republic of Technology" Spanish Society of Authors and Editors, Madrid, Spain, November 4, 1999.

47.   "Present at the Creation: Copyright in the Digital Age" Literary and Artistic Association for the Defense of the Rights of Authors, Alicante, Spain, November 8, 1999.

48.   "Copyright in the 20th Century: A Charter for a Living People" *Corporate Counsel Magazine*, December 1999.

49.   "Folkloric Treasures: The Next Copyright Frontier?" John Marshall Law School, January 4, 2000.

EXHIBIT ___B___

PAGE ___28___

EXHIBIT ___19___

PAGE ___888___

3

50. "Music in the Digital Age: An Overview" New York County Lawyers' Association, March 10, 2000

51. "Database Protection in the Digital Age", Intellectual Property Seminar, Dechert Price & Rhoads, May 8, 2000.

52. "Music in the Digital Age: An Overview", American Intellectual Property Law Association, h, PA, May 17, 2000.

53. "Congress Acts To Make The World Safe For E-Commerce" District of Columbia Bar Association, Washington, D.C., Continuing Legal Education "Taming the Wild Wild Web," August 31, 2000

54. "Present at the Creation: Copyright in the Digital Age" University of Guadalajara, Organization of American States, December 5, 2000

55. "The Digital Millenium Copyright Act: An Assessment" District of Columbia Bar Association, Washington, D.C., December 8, 2000

56. "Folkloric Treasures: The Next Copyright Frontier?", published in The John Marshall Law School, Winter 2000 edition, Vol. II, No. 1.

57. "Speech to Experts from Lebanon ", Washington, D.C., October 2001

58. "'Copyright and the 107[th] Congress", delivered at the New Jersey Intellectual Property Law Association, February 8, 2001, Metropark, N.J.

59. "The Role of Service and Access Providers in Digital Transmissions and their Responsibility Regarding Copyright," UNESCO Forum, April 12, 2001.

60. "Copyright and the 107[th] Congress," District of Columbia Bar Association, Washington, D.C.., April 30, 2001.

61. "Liability and Copyright in the Age of the Internet," Stockholm, Sweden, July 6, 2001.

62. Lebanon Speech (October 2001)

63. "Congress Wrestles with State Liability for Intellectual Property Violations: What Will Pass Constitutional Muster?", Intellectual Property & Technology Law Journal, Vol. 13, Number 12, December 2001.

64. "New Developments in Copyright Litigation," National CLE Conference in Steamboat Springs, Colorado, January 7, 2002.

65. "Copyright for Engineers", American Society of Mechanical Engineers, The Hilton, Alexandria, VA., May 6, 2002.

66. "Jefferson Medal Speech", presented at the NJ Intellectual Property Law Association

EXHIBIT B

PAGE 29

4

EXHIBIT

B

1988

67.    "Copyright for Architects", American Bar Association, Section of Intellectual Property Law, Philadelphia, PA, June 28, 2002.

68.    "Copymart: Harnessing the Power of Digital Technology," Copymart Symposium, Japanisch-Deutsches Zentrum, Berlin, Germany, September 6, 2002.

69.    "International Copyright: Engine of Progress," Georgetown University Law Center, November 18, 2002.

70.    "Copyright in the Digital Age," Delivered at the International Intellectual Property Week, Amman, Jordan, August 11, 2003.

71.    Public Administration of Copyrights, Amman, Jordan, August 13, 2003.

72.    "Copyright In Palestine," Delivered to the Ramallah, Palestine International Copyright Delegation, Ramallah Palestine, August 13-20, 2003.

73.    "Protection of Folklore: The Next Copyright Treaty," Delivered at the International Intellectual Property Week, Amman, Jordan, August 14, 2003.

74.    "Copyright and Developing Countries," "Enforcement of Copyright," and "Copyright Basics," Ramallah, Palestine, August 17-19, 2003.

75.    "The Protection of Actors Rights: The U.S. Perspective", Budapest, Hungary, September 17, 2003

76.    "Marketing Music Online," CIP Forum, Gütenborg, Sweden, October 6, 2003.

77.    "Annual Update of Copyright Law," AIPLA Annual Meeting, Washington, D.C., November 1, 2003.

78.    "The Role of the Private Sector in the International Harmonization of Copyright", Federalist Society's National Lawyers Convention, Washington, D.C., November 14, 2003

79.    "Going Back to First Principles", Santa Clara Computer & High Technology Law Journal Symposium, Santa Clara, CA, February 6, 2004

80.    "Panel on the Intellectual Property Legislative Process in European Union and United States", Fordham University School of Law, New York, NY, April 16, , 2004

81.    "Folklore, Broadcaster's Treaty, Audiovisual Performers Treaty," LAIPLA, Santa Barbara, CA, May 14-16, 2004

82.    "Curbing the Companies That Abet Online Piracy," The Boston Globe, August 9, 2004

83.    "Congress and the Courts Tackle the Digital Agenda . . . Again." The Annual Meeting of the American Intellectual Property Law Association, Washington, D.C., October 16, 2004

84.    "Liability on the Internet: A Comparative Study of Europe and the United States," VII SGAE International Seminar, Madrid, 1 and 2 December 2004

EXHIBIT _____ B _____

PAGE _____ 30 _____

PAGE  EXHIBIT  882

85. "The Securities Industry and Intellectual Property," New York, January 12, 2005

86. "GAME [ALMOST] OVER," University of Akron School of Law, Akron, Ohio, March 7, 2005

87. "The China Report," U.S.-Asia Foundation Sponsors. March 20 - March 30, 2005.

88. "Which File Swappers Are Vulnerable?" USA Today, June 28, 2005

89. "The Continuing Search for Copyright Balance on the Internet: The U.S. Supreme Court Bridles in Peer-to-Peer File-Sharing." WIPO Seminar on Collective Management of Copyright and Related Rights in the Digital era, New Delhi, India (September 13, 2005)

90. "Emerging Digital Technologies: Prospects and Opportunities for Creating New Business Models." WIPO Seminar on Collective Management of Copyright and Related Rights in the Digital era, New Delhi, India (September 14, 2005)

91. Introduction of Charlotte (January 24, 2006)

92. Tribute to Marybeth Peters–Commemorating 40 years of service. Library of Congress, Washington, D.C. (February 14, 2006)

93. Collective Management of Copyright in the Digital Age; delivered at The World Intellectual Property Organization - Geneva, Switzerland. (April 2006)

94. The Evolution of U.S. Copyright from Developing Country to World Leaders, by Ralph Oman given at the Georgetown University Law School Seminar, Nancy Linck's Class, on April 12, 2006.

95. Piracy in China and Russia, World Piracy Prevention Conference, Los Angles, CA. (Conf. was cancelled.) April 24-25, 2006.

96. How Digital Rights Management Will Save Authorship in the Age of the Internet; (May 22-23, 2006) (Denver)

97. "Copyright Piracy in China" delivered at The John Marshall School; Chicago, May 25-26, 2006.

98. "Copyright and the Arab Renaissance" delivered at the Judicial Workshop on Intellectual Property Rights, European Patent Office, Munich, Germany, September 11-13, 2006.

99. Tribute to Irwin Karp – Irwin Karp Memorial Service, Columbia Law School, New York, NY, October 20, 2006.

100. The Role of the U.S. Copyright Office in the Administration of the U.S. Copyright System, given at Michigan State Law School, November 15, 2006 [Doc. No. 13191159/bus].

101. Congress and Copyright: Going Back to First Principles, The Denver Chapter of the Copyright Society of the U.S.A., Denver, Colorado, March 27, 2007.

PAGE ___ EXHIBIT ___ 003 7a

EXHIBIT ___ B

PAGE ___ 31

6

102. Congress and Copyright: New Directions with a New Majority, The Rocky Mountain Chapter of the Copyright Society of the U.S.A., Denver, Colorado, March 27, 2007.

103. Speech presented at Breakfast given for His Excellency Ambassador Yang and distinguished guests on April 27, 2007.

104. "Lebanon: On the Threshold of a New Day," delivered at The Phoenicia Hotel in Beirut, Lebanon on July 30, 2007.

105. Presentation by Ralph Oman given to the American Bar Association's IPL Section in San Francisco on August 9-13, 2007.

106. Legislative Report on the 110th Congress, by Ralph Oman given at the IABM Conference in Atlanta, GA on October 5, 2007.

107. Speech presented at Suffolk University Law School on November 7, 2007.

PAGE 0884  EXHIBIT A

EXHIBIT ___B___

PAGE ___32___

7

EXHIBIT 7A
PAGE 885

# EXHIBIT C

EXPERT REPORTS, DECLARATIONS, DEPOSITION TESTIMONY,
AND TRIAL TESTIMONY (2003 - 2007)

| CASE CAPTION | PLEADING |
| --- | --- |
| *Karen Knauer, et al. v. Kaiser Permanente International, Inc., et al.,* Case No. C 02-05172 DLJ (N.D. Cal.) | EXPERT REPORT OF RALPH OMAN, ESQUIRE (October 3, 2003), DECLARATION OF RALPH OMAN, ESQUIRE (October 31, 2003), REBUTTAL EXPERT REPORT OF RALPH OMAN, ESQUIRE (November 14, 2003) (On behalf of defendant Kaiser Permanente)<br><br>On November 13, 2003 I was deposed by the plaintiff in my capacity as an expert on behalf of the defendants. |
| *Core Group PC v. Sprint PCS,* CASE NO. C 02-05172 DLJ (American Arbitration Association) | EXPERT REPORT OF RALPH OMAN, ESQUIRE (November 17, 2003) (On behalf of petitioner, Core Group PC)<br><br>On February 13, 2004 I testified before a panel of the American Arbitration Association in my capacity as an expert on behalf of the plaintiff. |
| *S&R Design, Inc. v. BH Multi Com Corp.* CASE NO. 04 CV 00223 (LTS) (S.D.N.Y.) | DECLARATION OF RALPH OMAN (on behalf of BH Multi Com Corp.) (April 22, 2004) |
| Société du troit de reproduction des auteurs, compositeurs et editeurs au Canada (SODRAC) (Tariff Proceedings Before the Copyright Board of Canada) | EXPERT REPORT OF RALPH OMAN, ESQUIRE (May 20, 2004) (On behalf of SODRAC)<br><br>My report was included as part of the record for this proceeding. |

EXHIBIT ___C___

PAGE ___33___

13980821.1.BUSINESS

| | |
|---|---|
| *New York Mercantile Exchange v. Intercontinental Exchange, Inc.* Case No. 02-CV 9277 (JGK) (DF) | EXPERT REPORT OF RALPH OMAN, ESQUIRE (August 12, 2004) (On behalf of plaintiff NYMEX)<br><br>On October 12, 2004 I was deposed by the plaintiff in my capacity as an expert on behalf of NYMEX. |
| *eScholar LLC v. Otis Educational Systems, Inc.,* Case No. 04 CIV. 4051 (SCR) (SDNY) | EXPERT REPORT OF RALPH OMAN, ESQUIRE (December 21, 2004) (On behalf of defendant Otis Educational Systems, Inc.)<br><br>On January 28, 2005 and February 9, 2005 I was deposed by the plaintiff in my capacity as an expert on behalf of Otis Educational Systems. |
| *Team Play Inc. et al. v. Boyer d/b/a Skyboy Productions,* Case No. 03 C 7240 (N.D. Ill.) | EXPERT REPORT OF RALPH OMAN (on behalf of plaintiff Team Play) (February 25, 2005) |
| *Express LLC v. Fetish Group Inc.,* Civil Action No. CV05-2931 (JTLx) (C.D. Cal.) | DECLARATION OF RALPH OMAN (September 9, 2005); SUPPLEMENTAL DECLARATION OF RALPH OMAN (September 16, 2005) (on behalf of plaintiff Fetish Group Inc.) |
| *Universal Furniture International, Inc. v. Collezione Europa USA, Inc.,* Case No. 1:04CV00977 (M.D.N.C.) | EXPERT REPORT OF RALPH OMAN, ESQUIRE (March 9, 2006) (on behalf of defendant Collezione Europa)<br><br>On June 2, 2006 I was deposed by the plaintiff in my capacity as an expert on behalf of Collezione Europa. |

PAGE EXHIBIT 889 C

13980821.1.BUSINESS

EXHIBIT _____ C _____

PAGE _____ 34 _____

| | |
|---|---|
| *Richard K. Niemi et al. v. American Axle Manufacturing & Holding Inc., et al*, Case No. 05-74210 (E.D. Mich.) | EXPERT REPORT OF RALPH OMAN, ESQUIRE (July 28, 2006) (on behalf of defendants American Axle Manufacturing & Holding et al.) |
| *Jaime Feliciano Caceres d/b/a JF & Assoc. et al. v. LandFill Technologies Corp., et al.*, Case No. 02-2697 (PG) (D.P.R.) | EXPERT OF RALPH OMAN, ESQUIRE (December 8, 2006) and SUPPLEMENTAL EXPERT REPORT OF RALPH OMAN, ESQUIRE (October 11, 2007) (on behalf of plaintiffs Jaime Feliciano Caceres, et al.) |
| *Bird Brain v. CVS Corp.*, Case No. 06-12799 (E.D. Mich.) | EXPERT OF RALPH OMAN, ESQUIRE (March 6, 2007) (on behalf of plaintiff Bird Brain) |
| | SUPPLEMENTAL EXPERT OF RALPH OMAN, ESQUIRE (March 22, 2007) (on behalf of plaintiff Bird Brain) |
| *Van Cleef & Arpels v. Frank Pollak and Sons,* | DECLARATION OF RALPH OMAN, ESQUIRE (May 2007) (on behalf of plaintiff Van Cleef & Arpels) |

PAGE ___ EXHIBIT ___ 888 ___

13980821.1.BUSINESS

EXHIBIT ___ C ___

PAGE ___ 35 ___

EXHIBIT 80

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 81

Copyright Office fees are subject to change

~~yright Office~~
~~te the Copy-~~
~~)~~

**Form CA**
For Supplementary Registration
UNITED STATES COPYRIGHT OFFICE

VA 1–301–530

| TX | TXU | PA | PAU | VA | VAU | SR | SRU | RE |

EFFECTIVE DATE OF SUPPLEMENTARY REGISTRATION

March 28 2005
Month   Day   Year

DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.

**A**

Title of Work ▼
Sasha Drawing

Registration Number of the Basic Registration ▼
VA 1-218-488

Year of Basic Registration ▼
2003

Name(s) of Author(s) ▼
Carter Bryant

Name(s) of Copyright Claimant(s) ▼
MGA Entertainment, Inc

**B**

Location and Nature of Incorrect Information in Basic Registration ▼

Line Number   3b   Line Heading or Description   Date of Publication

Incorrect Information as it Appears in Basic Registration ▼

February 12, 2001

Corrected Information ▼

at least as early as May 21, 2001

Explanation of Correction ▼

**C**

Location and Nature of Information in Basic Registration to be Amplified ▼

Line Number   Line Heading or Description

Amplified Information and Explanation of Information ▼



Δπ EXHIBIT 508
Deponent ARMSTRONG
Date 7/18/07 Rptr ACC
WWW.DEPOBOOK.COM

MORE ON BACK ▶   • Complete all applicable spaces (D-G) on the reverse side of this page   • See detailed instructions   • Sign the form at Space F

DO NOT WRITE HERE
Page 1 of ___ pages

EXHIBIT ___ 81 ___

PAGE ___ 901 ___

M 0110211

| FORM CA RECEIVED | FORM CA |
|---|---|
| **MAR 2 8 2005** | |
| FUNDS RECEIVED DATE | |
| EXAMINED BY | |
| | FOR COPYRIGHT OFFICE USE ONLY |
| CORRESPONDENCE | |
| REFERENCE TO THIS REGISTRATION ADDED TO BASIC REGISTRATION ☑ YES ☐ NO | |

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET**

Continuation of ☐ Part B or ☐ Part C

Correspondence: Give name and address to which correspondence about this application should be sent
Carol A. Witschel
White & Case LLP
1155 Avenue of the Americas
New York, New York  10036
Phone ( 212 )  819-8200          Fax ( 212 )  354-8113          Email  cwitschel@whitecase.com

Deposit Account. If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account

Name _____  ___ : Yn.

Account Number _____  ˅      ˅

Certification* I, the undersigned, hereby certify that I am the (Check only one)
☐ author          ☐ owner of exclusive right(s)
☐ other copyright claimant   ☑ duly authorized agent of  HGA Entertainment Inc.
                                    Name of author or other copyright claimant, or owner of exclusive right(s) ▲
of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge

Typed or printed name ▼  Carol A. Witschel                    Date ▼  March 24, 2005

Handwritten signature (X) ▼  _Carol A Witschel_

| Certificate will be mailed in window envelope to this address | Name ▼  Carol A. Witschel – White & Case LLP |
|---|---|
| | Number/Street/Apt ▼  1155 Avenue of the Americas |
| | City/State/ZIP ▼  New York, New York  10036 |

*17 U.S.C. § 506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.

Rev. July 2003—20,000   Web Rev. July 2003   Printed on recycled paper                    U.S. Government Printing Office: 2003   621-920/60109

EXHIBIT    81

PAGE    902

M 0110212

EXHIBIT 82

THIS EXHIBIT IS FILED UNDER SEAL

PURSUANT TO PROTECTIVE ORDER

EXHIBIT 83

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

EXHIBIT 84

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

CARTER BRYANT, an individual,

Plaintiff,

vs.

MATTEL, INC., a Delaware corporation,

Defendant.

AND CONSOLIDATED ACTIONS

CASE NO. CV 04-9049 SGL (RNBx)
Consolidated with
Case No. CV 04-09059
Case No. CV 05-02727

Hon. Stephen G. Larson

EXPERT REBUTTAL REPORT OF
ROBERT C. LIND

EXHIBIT ___ B4 ___

PAGE ___ 943 ___

## REBUTTAL TO EXPERT REPORT OF PETER S. MENELL
### BY ROBERT C. LIND

At the request of counsel for Mattel, Inc. ("Mattel"), I submit this rebuttal expert report pursuant to Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure. This report sets forth the opinions, and the basis thereof, about which I may be called to testify at trial at the request of counsel for Mattel. Specifically, this report is directed to testimony that I may be asked to provide in view of the expected testimony of Peter S. Menell, as embodied in his expert report ("the Menell report") on behalf of MGA Entertainment, Inc. ("MGA"). The Menell report is directed toward the copyrightability of drawings created by Carter Bryant, the subsequent assignment of the copyrights in those drawings to Mattel and the alleged infringement of those copyrights by MGA and its employees.

Matters raised by the Plaintiff and/or the Defendant subsequent to this report, that are within the scope of my expert representation and that are subject to contradiction and/or rebuttal may be addressed in subsequent reports. It may become necessary to refine and supplement this and subsequent reports as additional information becomes available.

I also reserve the right to add to or to modify this report in the event that inaccuracies or omissions are discovered. My testimony at trial will take into account the evidence all parties produce, including the testimony of other expert witnesses.

### QUALIFICATIONS, COMPENSATION, PRIOR TESTIMONY

I am currently a Professor of Law at Southwestern Law School in Los Angeles, California, where I teach copyright law, entertainment law, entertainment and dignitary rights, and advanced entertainment law. I have been a member of the Southwestern faculty for more than 26 years. In addition, I have taught at Loyola Law School (Los Angeles), George Washington Law School and Marymount College of Virginia. My qualifications are set forth in my curriculum vitae that is attached as Appendix A to the Rebuttal Report.

I began my study of copyright law under the tutelage of Professor Waldo Moore in January of 1978, while earning my juris doctor degree from The National Law Center of the George Washington University. I stayed at George Washington as a graduate student, teaching and completing my course work in furtherance of a Master of Laws degree. In 1981, I was hired by Southwestern University School of Law to teach copyright law and to assist students interested in the field of entertainment law. Since that time, I have taught more than 50 sections of the copyright law course and six sections of the advanced copyright law seminar. I have taught copyright law to more than 2,500 students.

I am the author or co-author of six books:

- Entertainment Law: Legal Concepts and Business Practices (2d ed. 1992 & 2008 Supp.) (Co-Author), a five volume treatise published by Thomson West. I am currently writing a third edition of this work.
- Newsgathering and the Law (3d ed. 2005 & 2007 Supp.) (Co-Author), published by

1

EXHIBIT ___84___

PAGE ___944___

LexisNexis Publishing.

- Copyright Law (3d ed. 2006), a substantive outline published by Carolina Academic Press.
- Trademark Law (3d ed. 2006), a substantive outline published by Carolina Academic Press.
- Entertainment Law (3d ed. 2003 & 1999 Document Supp.) (Co-Author), a casebook published by LexisNexis Publishing.
- Art and Museum Law: Cases and Materials (Co-Author) (2002), a casebook published by Carolina Academic Press.

I have published more than thirty articles and chapters and have given more than 100 lectures and presentations, the majority of which have been on the topic of copyright law. I have made copyright presentations to law firms and legal departments of motion picture studios and music publishers. I am recognized and quoted as an expert in the subjects of intellectual property, entertainment, art, museum and media law by The New York Times, The Los Angeles Times, and The Los Angeles Daily Journal among other newspapers, magazines, television and radio stations.

I am outside copyright counsel for Warner/Chappell Music Publishing and outside intellectual property counsel for Lions Gate Entertainment for whom I provide analysis and advice concerning transactional, clearance, preventative and litigation matters. In addition, I consult with several attorneys, governmental entities, nonprofit organizations and companies regarding various intellectual property, media, First Amendment and entertainment issues.

I am paid $300 per hour for my study and testimony in this case. I have not testified as an expert at trial or by deposition in any case during the past four years.

## INFORMATION CONSIDERED

In addition to the case law and materials cited in this report, I have reviewed and relied on the following documents in preparing this report:

- Copyright registration certificates, supplementary registrations and deposit material, for the works involved in this litigation.
- Expert Report of Lee Loetz
- Expert Report of Kenneth Hollander
- Deposition of Rebecca Harris
- Employee Confidential Information and Inventions Agreement
- Expert Report of Peter S. Menell
- Bratz dolls

2

EXHIBIT ___84___

PAGE ___945___

## EXPECTED TESTIMONY AND OPINIONS

### SUMMARY

This case involves the infringement of drawings made by Carter Bryant, the copyrights to which were assigned to Mattel. Employee Confidential Information and Inventions Agreement ("Inventions Agreement") ¶ 2(a). These drawings were made available to MGA and its employees when Bryant began working for MGA to develop a line of dolls. Both the Bryant drawings and the dolls were intended to be marketed to children. Access to the Bryant drawings has been admitted and there is evidence of direct copying by MGA. The Report by Professor Menell attempts to defend the actions of MGA by attacking the scope of copyright protection afforded the Bryant drawings, arguing that the individual elements contained in the drawings deserve little copyright protection and any claim of infringement of Mattel's compilation copyright must fail because MGA has not made an identical copy of those compilations.

These arguments are made without regard to Ninth Circuit legal precedent concerning intermediate copying, direct evidence of copying, the inverse ratio rule, the extrinsic test, the intrinsic test and the special rules of substantial similarity that are to accompany an analysis of works marketed to children. The legal framework and analysis provided by Professor Menell is heavily influenced by the law of the Second Circuit Court of Appeals. This is surprising, given that this action is pending in the United States District Court for the Central District of California, Eastern Division, which must apply the law of the Ninth Circuit Court of Appeals. The law of these two circuits often diverge, particularly regarding copyright infringement, the main focus of the Menell report.

There exist several significant differences between the Second Circuit law of copyright infringement and the law of the Ninth Circuit. One commentator has referred to these differences as a "chasm" between the two circuits. See William F. Patry, Patry on Copyright § 9:235 (2007). Several assertions made by Professor Menell in his report are at odds with the law enunciated by the Ninth Circuit. His inattention to Ninth Circuit precedent bypasses several Ninth Circuit rules regarding copyright infringement that are relevant to this litigation.

It is my opinion that the drawings created by Carter Bryant and assigned to Mattel meet the requirements for copyright protection, that it is likely that these drawings were directly copied by MGA during the development and marketing of the Bratz dolls and that many of the elements of the Bratz dolls are, at the very least, substantially similar to the Bryant drawings. Applying the current Ninth Circuit *Krofft* test, I have concluded that the ideas and expression found in the Bratz dolls are substantially similar to the ideas and expression of the Bryant drawings, satisfying the requirements of the extrinsic test for copyright infringement. A finder of fact would likely find that MGA's Bratz dolls took the total concept and feel of the Bryant drawings, satisfying the requirements of the intrinsic test for copyright infringement, particularly in light of their intended audience of young children. Finally, it is my view the facial, body and design elements of the Bryant drawings are protected as artistic works, and not just as compilations.

3

EXHIBIT _____ 84

PAGE _____ 946

## INAPPLICABILITY OF THE ABSTRACTION, FILTRATION, COMPARISON TEST

Professor Menell spends much time describing and applying the abstraction, filtration, comparison test set forth by the Second Circuit in *Computer Associates Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693 (2d Cir. 1992). Menell report at 16-22. This test is not applicable to this case for several reasons. First, this case has not been filed in the Second Circuit, but in the Ninth Circuit which has its own tests for determining claims of copyright infringement. In the Ninth Circuit it is not only permissible to compare the ideas in the defendant's work to the ideas in the plaintiff's work, but it is reversible error for a trial court to fail to do so. See *Jada Toys, Inc. v. Mattel, Inc.*, 2008 WL 450891, *6 (9th Cir. 2008) (district court's granting of summary judgment reversed because district court did not conduct an objective test of comparing both ideas and expression as required under the extrinsic test). Second, the *Computer Associates* test is not appropriate in cases, such as the case at bar, where the issue is primarily dealing with the alleged infringement of literal elements, rather than nonliteral elements. See *Lotus Development Corp. v. Borland Int'l, Inc.*, 49 F.3d 807, 814-15 (1st Cir. 1995) (while the *Altai* test may provide useful framework for assessing alleged nonliteral copying, it is of little help in assessing literal copying, where it may actually be misleading). Third, the dissection required by the test and the hypercritical analysis of the filtration step has been rightfully criticized when used in cases involving the visual arts because it improperly biases infringement decisions against copyright owners such as Mattel. This concern has been raised by Professor Paul Goldstein:

> Unlike literary or musical works, visual works can always be compared simultaneously, side-by-side, by judge or jury. Unlike literary and musical works, visual depictions are completely and graphically bounded by the artist's intentions. A picture is not only worth a thousand words; it also conveys its message in a single unambiguous image. As a consequence, the danger exists that, in dissecting the plaintiff's work to determine whether the defendant has appropriated any of its protected expression, courts will emphasize specific differences between works rather than their more substantial similarities.

II Paul Goldstein, Goldstein on Copyright § 10.2 (3d ed. 2007). With its copyright infringement tests, the Ninth Circuit has addressed this concern to a greater extent than has the Second Circuit.

Professor Menell spends several pages in his report itemizing the "wide range of influences" to which Carter Bryant is said to be exposed. See Menell report at 17-20. Apart · from the August 1998 issue of Seventeen Magazine, Professor Menell does not indicate that Bryant ever saw the examples given and certainly provides no evidence that they were the source of his initial drawings of the Bratz dolls. The itemized list of alleged influences, including cultural trends, draft report of an art/popular culture historian, Betty Boop, *Speed Racer*, Sailor Moon, Margaret Keane, *Friends*, Ally McBeal, *Sex and the City*, the Spice Girls, Lara Croft, Angelina Jolie, additional prior art, popular culture material, Internet image searches, doll illustration art, fashion illustration and the August 1998 issue of Seventeen Magazine, would ordinarily form the basis of an attempt at an independent creation defense. However, such a defense was made impossible by Carter Bryant's involvement in the development of both the

4

EXHIBIT 84

PAGE 947

drawings and the Bratz dolls.

## NINTH CIRCUIT INFRINGEMENT ANALYSIS

Rather than react to the attempted importation of the copyright infringement rules of the Second Circuit, my analysis is principally based on the law of copyright infringement applied in the Ninth Circuit. In order for a plaintiff to prevail in an action for copyright infringement in the Ninth Circuit, two elements must be established: Ownership of a valid copyright and the alleged infringer's violation of one or more of the exclusive rights granted to copyright holders under section 106 of the Copyright Act. *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1159 (9th Cir. 2007). Where the alleged infringement is of the reproduction right, the plaintiff must prove that the infringer copied the plaintiff's work either through evidence of direct copying, or circumstantial evidence of copying, i.e. access and substantial similarity. *Murray Hill Publications, Inc. v. Twentieth Century Fox Film Corp.*, 361 F.3d 312, 316 (9th Cir. 2004). The registration of the copyrights in the drawings with the Copyright Office, once by MGA and a second time by Mattel, creates a presumption that the drawings are protected by copyright. See *Smith v. Jackson*, 84 F.3d 1213, 1219 (9th Cir. 1996).

### Intermediate Copying

Professor Menell's report focuses largely on the MGA Bratz blank sculpt and the final version of the first generation Bratz dolls when analyzing the similarities between Bryant's drawings and MGA's allegedly infringing works. See Menell report at ¶¶ 53 & 54. In the Ninth Circuit, a broad view is taken of the rights protected by section 106(1) of the Copyright Act, the reproduction right. Ninth Circuit case law protects the copyright owner not only against the final product that is marketed commercially, but also against all prepatory items that may have led to the final revised copy. See *Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 518 (9th Cir. 1993); *Walker v. University Books, Inc.*, 602 F.2d 859, 864 (9th Cir. 1979) ("[T]he fact that an allegedly infringing work may itself be only an inchoate representation of some final product to be marketed commercially does not in itself negate the possibility of infringement."); *Walt Disney Productions v. Filmation Associates*, 628 F. Supp. 871, 875 (C.D. Cal. 1986).

Professor Menell assumes for purposes of his analysis that MGA's artists saw Carter Bryant's drawings, "worked from Carter Bryant's concepts" and that "[s]ome members of the creative team saw Carter Bryant's sketches and worked with his input." See Mennel report at ¶¶ 39 & 66. Professor Mennel does not specify how MGA employees "worked from" or "worked with" the drawings, but it appears that such activity encompassed reproduction of the drawings. There has been testimony that MGA prepared and used character art boards, also referred to as concept boards, created by Carter Bryant, that depicted drawings of the yet to be produced Bratz dolls, to buyers of several retailers such as Wal-Mart, Toys "R" Us, Kmart and Walgreens. Such material was also used at the Hong Kong Toy Fair. Deposition of Rebecca Harris, Volume 2 at 365-77 & 476-78 (Jan. 22, 2008). MGA's submission of deposit copies as

5

EXHIBIT ___ 84

PAGE ___ 948

part of its copyright registration applications of the Bryant drawings also constituted an unauthorized reproduction. Such a use of identical or substantially similar prepatory material in the product development stage or marketing stage is actionable infringement.

According to the Ninth Circuit, the Copyright Act proscribes unauthorized intermediate copying. *Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1518 (9th Cir. 1993) ("[T]he Copyright Act does not distinguish between unauthorized copies of a copyrighted work on the basis of what stage of the alleged infringer's work the unauthorized copies represent."). This is so, regardless of whether the end product of the copying also infringes the exclusive rights of the copyright owner. See *Sega*, 977 F.2d at 1519.

The application of this rule that is analogous to the present case occurred in *Walt Disney Productions v. Filmation Associates*, 628 F. Supp. 871 (C.D. Cal. 1986). In that case, the owner of the copyrights in classic feature-length animated motion pictures such as *Snow White and the Seven Dwarfs* and *Pinocchio* sued another animation studio, Filmation Associates, for copyright infringement. Disney claimed that Filmation was producing feature-length animated films based on the same public domain stories, such as *Pinocchio*, but had copied Disney's motion picture, series of designs and drawings of characters in the drawings, story boards, working model and advertising material Filmation had created for its *New Adventures of Pinocchio* motion picture that was being developed. *Disney*, 628 F. Supp. at 875.

Filmation defended its actions claiming that the materials it had created were only transitory steps en route to a fixed product, that it had yet to complete and distribute its motion picture and could not be said to have infringed Disney's copyrights until Filmation's motion picture was finished. *Disney*, 628 F. Supp. at 875-76. The United States District Court for the Central District of California rejected that argument, holding that any unauthorized reproduction of protected Disney material constituted copyright infringement, even though the preliminary works created in the production of Filmation's motion picture were merely part of the process by which Filmation planned to produce an ultimate product that would not be substantially similar to Disney's classic films. The court found that to constitute an actionable copy, Filmation's expression needed only to be a material object permanently cast in some intelligible form. The court deemed that Filmation's script, story board, story reel and promotional trailer constituted actionable copies, even though they may have been prepared only for the use of Filmation's animators. Copying of a work by a competitor is actionable, even though the copying is intended as part of a process to create a noninfringing work. "It is thus irrelevant that Filmation has not concluded or 'realized' what it considers to be a final motion picture: the Act prohibits the creation of copies, even if the creator considers those copies mere interim steps toward some final goal." *Disney*, 628 F. Supp. at 875.

The copying of the Bryant drawings by MGA, such as for use in sales pitches to retail stores, for use at a toy fair and to create deposit copies for the Copyright Office, all constitute actionable unauthorized reproductions.

6

EXHIBIT _____ 84
PAGE _____ 949

## Direct Evidence of Copying in the Ninth Circuit

In most copyright infringement actions, direct evidence of copying is not available. See *Swirsky v. Carey*, 376 F.3d 841, 844 (9th Cir. 2004); *Broderbund Software, Inc. v. Unison World, Inc.*, 648 F. Supp. 1127, 1135 (N.D. Cal. 1986). Therefore, a plaintiff often attempts to establish the defendant's copying through circumstantial evidence by showing that the infringer had access to the work and that the two works are substantially similar. *Roth Greeting Cards v. United Card Co.*, 429 F.2d 1106, 1110 (9th Cir. 1970). In his report, Professor Menell forthrightly admits to "skipping over the 'factual copying' element of the copyright infringement framework. . . ." Menell Report ¶ 39. This is in light of apparently direct evidence that MGA employees copied the Bryant drawings. MGA registered the same drawings of Jade (M 0110183), Sasha (M 0110187), Cloe (M 0110197), Yasmin (M 0110202) and Bratz Group (M 0110192), that have been registered with the Copyright Office by Mattel: Doll No. 2 (M 0059704), Group Drawing (M 0059708), Doll No. 3 (M 0059712), Doll No. 4 (M 0059716) and Doll No. 9 (M 0059736).

Professor Menell fails to address the implications of such evidence in the Ninth Circuit. Such unquestioned copying has significant ramifications under Ninth Circuit precedent. Where there is evidence of direct copying, there is no need to analyze the similarities of the plaintiff's and defendant's works. Compare *Funky Films, Inc. v. Time Warner Entertainment Co., L.P.*, 462 F.3d 1072, 1076 (9th Cir. 2006) (absent evidence of direct copying, proof of infringement involves demonstration of access and substantial similarity), with *Norse v. Henry Holt and Co.*, 991 F.2d 563, 566 (9th Cir. 1993) (substantial similarity analysis is inapposite to the copying issue where the defendant has admitted copying). Even if similarity is analyzed, the traditional rigor of the substantial similarity standard is eased both by the inverse ratio rule of the Ninth Circuit and by the fact that the intended audience for the works is young children.

## Proof of Access in the Ninth Circuit

In copyright infringement cases where copying must be proven through circumstantial evidence, access is shown through evidence that the infringer had actually read or heard plaintiff's work, or had a reasonable opportunity to view or hear the plaintiff's work. *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1163 (9th Cir. 1977); *Jason v. Fonda*, 698 F.2d 966, 967 (9th Cir. 1983) ("bare possibility" that the producers and broadcasters of the motion picture had access to the author's book was insufficient to prove access). Professor Menell states in his report that he bases his copyright infringement analysis "on the express assumptions that copyright in the sketches are owned by someone other than MGA and that MGA's artists saw Carter Bryant's sketches before conducting their own work." Menell Report at ¶ 39. When an employee of the copyright owner subsequently is employed by the defendant accused of copyright infringement, the connection provided by the employee is proof of defendant's access to the copyright owner's work. See *Johnson Controls, Inc. v. Phoenix Control Systems, Inc.*, 886 F.2d 1173, 1176 (9th Cir. 1989).

There can be no more direct access than a situation where both the protected work and the

7

EXHIBIT ___84___

PAGE ___950___

infringing work have been produced by the same person. When the creator of a copyrighted work, without the authority to do so, reproduces the copyrighted work or creates a derivative work based upon that copyrighted work, copying and infringement are proven.

This case is reminiscent of the classic "Cherry Ripe" case, *Gross v. Seligman*, 212 F. 930 (2d Cir. 1914). There, the creator of a photograph was found to have infringed its copyright by later creating a photograph of a substantially similar image In that case an artist posed a model in the nude and fixed the image in a photograph titled *Grace of Youth*. The artist subsequently assigned his copyright in the photograph to a third party. Two years later the artist photographed the same model in an identical pose, now smiling with a cherry stem held in her teeth. This photograph was titled *Cherry Ripe*. The court found that the artist had copied his earlier work, either from memory or with the use of a copy of the earlier photograph. "Whether the model in the second case was posed, and light and shade, etc., arranged with a copy of the first photograph physically present before the artist's eyes, or whether his mental reproduction of the exact combination he had already once effected was so clear and vivid that he did not need the physical reproduction of it, seems to us immaterial. The one thing, viz., the exercise of artistic talent, which made the first photographic picture a subject of copyright, has been used not to produce another picture, but to duplicate the original." *Gross*, 212 F. at 931. In spite of changes made to the background, slight differences in the model's figure, and the addition of a smile and the holding of a cherry stem between the model's teeth, the Court of Appeals affirmed the district court's finding of an infringement of the copyright in the initial photograph. *Gross*, F. at 931.

Similarly to the facts in *Gross*, Carter Bryant created the copyrighted drawings, assigned away his copyrights in those works, and subsequently assisted in recreating the original works without the permission of their copyright owner.

The holding of the Second Circuit in *Gross* is instructive in considering the hypercritical nature of Professor Menell's analysis of whether Carter Bryant's drawings have been infringed by Carter Bryant's Bratz dolls. The court in *Gross* concluded:

> The eye of an artist or a connoisseur will, no doubt, find differences between these two photographs. The backgrounds are not identical, the model in one case is sedate, in the other smiling; moreover the young woman was two years older when the later photograph was taken, and some slight changes in the contours of her figure are discoverable. But the identities are much greater than the differences, and it seems to us that the artist was careful to introduce only enough differences to argue about, while undertaking to make what would seem to be a copy to the ordinary purchaser who did not have both photographs before him at the same time. In this undertaking we think he succeeded.

212 F. 930, 931-32 (1914).

8

EXHIBIT ___84___

PAGE ___951___

*The Inverse Ratio Rule*

Having conceded access by MGA's employees, Professor Menell fails to address the impact this strong proof of access to Mattel's works by MGA's employees has on the amount of similarity that must be proven by Mattel pursuant to Ninth Circuit precedent. In the Ninth Circuit, when a high degree of access is shown, a lower standard of proof of substantial similarity is required. *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 485 (9th Cir. 2000); *Rice v. Fox Broadcasting Co.*, 330 F.3d 1170, 1178 (9th Cir. 2003). Where a high degree of access has been conceded, as Professor Menell has done in his report, the copyright owner's burden of proof of substantial similarity is commensurately lowered. See *Swirsky v. Carey*, 376 F.3d 841, 844-45 (9th Cir. 2004); *Metcalf v. Bochco*, 294 F.3d 1069, 1075 (9th Cir. 2002) ("If the trier of fact were to believe that [defendants] actually read [plaintiffs'] scripts . . . it could easily infer that the many similarities between plaintiffs' scripts and defendants' work were the result of copying, not mere coincidence.").

## Substantial Similarity

As indicated above in the discussion regarding the Ninth Circuit's inverse ratio rule, substantial similarity is inextricably linked to the issue of access. *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 485 (9th Cir. 2000). The quantum of similarity required in this case is decreased as a result. The Ninth Circuit has traditionally employed a two-part test to determine whether two works are substantially similar. In *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1164 (9th Cir. 1977), the Ninth Circuit adopted a bifurcated test to determine whether a defendant was to be held liable for the unauthorized reproduction of the plaintiff's work. Under this approach, after access has been proven, a court in a copyright infringement action alleging the infringement of the reproduction right of 17 U.S.C. § 106(1) is to apply an extrinsic test and an intrinsic test. *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994).

### The Extrinsic Test

As originally adopted in *Krofft*, the extrinsic test focused on the similarity of ideas between the plaintiff's work and the defendant's work. *Krofft*, 562 F.2d at 1164. The similarity of ideas was determined by external criteria, with analytic dissection and expert testimony permitted. *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1442 (9th Cir. 1994). The extrinsic test is an objective test that "depends not on the responses of the trier of fact, but on specific criteria which can be listed and analyzed." *Krofft*, 562 F.2d at 1164; *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002) ("'extrinsic test' is an objective comparison of specific expressive elements"). If the plaintiff satisfies the extrinsic test, the case is to go to trial where the trier of fact will apply both the extrinsic and intrinsic tests to determine whether the defendant has infringed the plaintiff's copyright. See *Smith v. Jackson*, 84 F.3d 1213, 1218 (9th

9

EXHIBIT ___84___

PAGE ___452___

Cir. 1996).

The extrinsic test is to utilize specific criteria that can be listed and analyzed. *Aliotti v. R. Dakin & Co.*, 831 F.2d 898, 900 (9th Cir. 1987). When analyzing these objective details, courts have found the evidence to fail the extrinsic test where there have been substantial differences between the plaintiff's and the defendant's works. See *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994). Subjective assessments of similarity in appearance between the plaintiff's work and the defendant's work are deemed best suited to the trier of fact as part of the intrinsic test. See *Shaw v. Lindheim*, 919 F.2d 1353, 1361 (9th Cir. 1990); *Cavalier v. Random House, Inc.*, 297 F.3d 815, 826 (9th Cir. 2002).

The extrinsic test has evolved into an objective consideration of "whether there are substantial similarities in *both* ideas and expression". *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1442 (9th Cir. 1994) (emphasis in original). See *Shaw v. Lindheim*, 919 F.2d 1353, 1355 (9th Cir. 1990); *Johnson Controls, Inc. v. Phoenix Control Systems, Inc.*, 886 F.2d 1173, 1176 (9th Cir. 1989). This focus on both ideas and expression continues to be required by the Ninth Circuit. See *Cavalier v. Random House, Inc.*, 297 F.3d 815, 827 (9th Cir. 2002) ("Although the concept of a built-in night light is not protectible under copyright law, the choice of a smiling moon or star face with pinkish cheeks surrounded by stars in a specific configuration, and situated above an encircled star 'on' button, constitutes protectible expression.").

In the recent case of *Jada Toys, Inc. v. Mattel, Inc.*, 2008 WL 450891 (9th Cir. 2008), the district court had granted summary judgment in a case where Mattel claimed that a competitor's flame logo infringed Mattel's logo used on its HOT WHEELS line of toy vehicles. "[T]he district court concluded that because the logos at issue were not similar, the extrinsic test was not met. It also found that since the logos were not similar, no reasonable person could believe that they conveyed a similar expression and, therefore, the intrinsic test had not been satisfied." *Jada Toys, Inc. v. Mattel, Inc.*, 2008 WL 450891, *6 (9th Cir. 2008). The Ninth Circuit reversed the district court's granting of summary judgment because the district court did not conduct an objective test as to both ideas and expression as required under the extrinsic test. *Id.*

Professor Menell's admonition that the filtration step of the *Computer Associates* test must filter out all ideas by draining them through his colander, leaving only protected expression to compare to the defendant's work, is contrary to the analysis required by the Ninth Circuit in *Jada Toys*.

When analyzing artworks under the extrinsic test, a court looks to the similarity of the objective details in appearance. See *Cavalier v. Random House, Inc.*, 297 F.3d 815, 826 (9th Cir. 2002) ("the precise factors evaluated for literary works do not readily apply to art works."). These objective details include type of artwork involved, materials used, subject matter, setting for the subject, shapes, colors, and the arrangement of the representations. See *Cavalier v. Random House, Inc.*, 297 F.3d 815, 826 (9th Cir. 2002); *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1164 (9th Cir. 1977). The cases that apply the *Krofft* test to artworks have identified several objective details that form the basis for analysis under the extrinsic test. These include the following:

10

EXHIBIT ⩔4

PAGE 953

### Type of artwork involved

Although the two-dimensional Carter Bryant drawings are a different type of artwork than the three-dimensional works of sculpture known as the Bratz dolls, they are integrally related to the origins and development of the Bratz product line. Drawings are traditionally the initial depictions of a new doll and constitute an important part of the process by which the doll is created. As confirmed by other expert reports on which I am relying, in this case the dolls appear to have been closely modeled on the drawings created by Carter Bryant. Furthermore, there is evidence that the three-dimensional sculpt for Bratz was based on Bryant's drawings and that Bryant himself made further contributions to the appearance of the sculpt.

### Materials used

A difference in media does not excuse copying or the making of unauthorized derivatives. The Bryant drawings constituted a fundamental step in the development of the Bratz dolls. The Bryant drawings were created with sufficient specificity to effectively aid in the translation of the images from two-dimensional to three-dimensional. In *Walt Disney Productions v. Filmation Associates*, 628 F. Supp. 871 (C.D. Cal. 1986), Filmation argued that its drawings which incorporated elements from Disney motion pictures, constituted a different media from the celluloid motion pictures produced by Disney. The court determined that the fact that the infringing copies were made in a medium different than that of the protected work was not a defense to copying. *Walt Disney Productions v. Filmation Associates*, 628 F. Supp. 871, 876 (C.D. Cal. 1986). See *Walker v. University Books, Inc.*, 602 F.2d 859, 864 (9th Cir. 1979).

### Subject matter

Both the Bryant drawings and the Bratz dolls depict the same subject matter: dolls to be marketed to young girls that have sultry looking faces and a funky urban fashion style with large heads, wide eyes, full lips, very small noses, short curvy torsos and large oversized feet that can be detached and replaced with interchangeable feet in different style shoes. This similarity of both ideas and expressions is sufficient to satisfy the extrinsic test. In *Aliotti v. R. Dakin & Co.*, 831 F.2d 898, 900-01 (9th Cir. 1987), the fact that the product lines of both plaintiffs and defendant depicted the same subject matter, stuffed dinosaur toys, was found to be sufficient to satisfy the extrinsic test.

Professor Menell argues that doll shapes and facial elements are entitled to only thin protection because their designs are based on the human anatomy and all artists are free to represent the human form. Menell report ¶ 47. This is not correct even under Second Circuit law. As the court in *Mattel, Inc. v. Goldberger Doll Mfg. Co.*, 365 F.3d 133 (2d Cir. 2004), points out, it would be the ubiquitous use of certain facial features in dolls that would raise doubt as to the originality of those features. 365 F.3d at 135 n.2. Courts protect specific features of dolls even though they are based on human physical attributes. See *Mattel, Inc. v. Azrak-*

11

EXHIBIT ___84___

PAGE ___954___

*Hamway Int'l, Inc.*, 724 F.2d 357, 360 (2d Cir. 1983) (per curiam) (accentuation of certain
muscle groups relative to others constituted protectible expression in Mattel's He-Man doll).
The creative choices that are available when designing a doll are so numerous, the fact that they
represent one or more of the many varieties of the human form will not preclude or limit the
copyright protection offered to original works of art.  In upholding the copyright protection for
the expressive features of a Barbie doll, the Second Circuit stated:

> There are innumerable ways of making upturned noses, bow lips, and widely
> spaced eyes.  Even if the record had shown that many dolls possess upturned
> noses, bow lips, and wide-spread eyes, it would not follow that each such doll –
> assuming it was independently created and not copied from others – would not
> enjoy protection from copying. We have often affirmed entitlement to copyright
> protection so long as the work was in fact created by its author, notwithstanding
> "lack of creativity," "lack of artistic merit" and absence of anything "strikingly
> unique or novel."

*Mattel, Inc. v. Goldberger Doll Manufacturing Co.*, 365 F.3d 133, 135 (2d Cir. 2004) (citations
omitted).

It is the particularized expression in the Bryant drawings that are protected by copyright
and which MGA is not permitted to copy. *Mattel, Inc. v. Goldberger Doll Manufacturing Co.*,
365 F.3d 133, 136 (2d Cir. 2004) (citations omitted).  It must be emphasized that to merit
protection from copying, a fixed work need only have been independently created by its author
and possess "some minimal degree of creativity," the requisite level of which "is extremely low;
even a slight amount will suffice.  The vast majority of works make the grade quite easily, as they
possess some creative spark, no matter how crude, humble or obvious it might be." *Feist
Publications, Inc. v. Rural Telephone Serv. Co.*, 499 U.S. 340, 345 (1991).


### Setting for the subject

Both the Bryant drawings and the Bratz dolls focus on multi-ethnic young images with an
interest in fashion that denotes a knowing, urban, hip attitude.


### Shapes

As set forth in the expert report of Lee Loetz, both the Bryant drawings and the Bratz
dolls are constructed of large heads, wide eyes, full lips, very small noses, short torsos, long thin
legs and large feet that can be detached and replaced with interchangeable feet in different style
shoes.  The proportionately large head is placed on a smaller body.  The shape of the faces is
similar and are of similar width and length.  The large inflated shape of the lips is similar.
Professor Menell opines that the Jade doll lips differ significantly from the Bryant drawing used
for comparison.  However, the lips on the Jade doll are very similar to the drawings numbered M

12



EXHIBIT ⑧4
PAGE 955

0110202 and M0110192, where the drawing depicts open lips of equal ratio with indented curvature at the top.

Professor Menell argues that there are significant differences between the drawings and the blank sculpt he uses to compare, rather than a completed Bratz doll. Menell report ¶ 54. However, the comparison at times is unfair, such as comparing the eyes even though there are no details in the eye sockets of the blank sculpt. At another point, Professor Menell points to the difference in the size of the feet depicted in the drawings and the bare feet depicted in the blank sculpt. Menell report ¶ 55. The fact that the drawing depicts the doll wearing large shoes accounts for the size differential. This comparison is particularly questionable in light of the fact that the Bratz dolls are popular for their shoes. Bates stamp MGA 0883400, ¶ 17.

As reflected in the Loetz Expert Report, each of the works of the parties, the almond shaped, upwardly angled, heavily lidded eye, as well as the placement of the pupil are similar. The eyeliner design and partially closed eyelids that cover half of the pupils in the drawings also appear in the dolls. Although Professor Menell provides several examples of eyes to compare with the style of eyes included in the drawings, none of the examples, except for the sculpt eye, share the half-closed eyelid, nor the upturned almond shape of the eye depicted in the Bryant drawing. See *Aliotti v. R. Dakin & Co.*, 831 F.2d 898, 901 (9th Cir. 1987) (eye style of stuffed dinosaurs was not dictated by the idea of stuffed dinosaur dolls and thus constituted protectable expression).

Professor Menell states that even if the Bryant drawings are protected by copyright, such protection is "thin" or "modest" due to the limiting doctrines of originality, merger, scenes a faire and functionality that are applied at the filtration stage of his analysis. The numerous creative choices available to a doll designer almost ensures sufficient originality for copyright protection where the doll has not been slavishly copied from another source. See *Mattel, Inc. v. Goldberger Doll Manufacturing Co.*, 365 F.3d 133, 135 (2d Cir. 2004). His report identifies several examples of dolls or images that depict a sassy, bratty attitude, an ensemble of four female friends, multi-racial or multi-ethnic elements, large head, large eyes, large feet, long legs. At no point does he indicate how these depictions have merged into an idea or how they are as a practical matter indispensable when designing a fashion doll.

As for functionality, Professor Menell parenthetically mentions "joint characteristics" without describing how those characteristics limit copyright protection. Menell report ¶ 54. He also makes a parenthetical reference to "aesthetic functionality" as a limiting factor due to social views of attractiveness. Menell report at ¶ 47. Although it may be conceded that dolls tend to incorporate attractive features (though images based on *Shrek* may belie that notion) Professor Menell makes no attempt to define the narrow confines of what he would consider socially acceptable attractiveness.

In essence, Professor Menell would have the reader of his report believe that although Carter Bryant was reportedly paid a large sum of money by MGA for the drawings, MGA found the drawings sufficiently original and developed to form the basis of its own copyright infringement action in Hong Kong and the Bratz doll line has been extremely successful, the drawings are merely commonplace and have only a "modest residue of copyright protection." Menell report ¶ 15.

13

EXHIBIT    84

PAGE    956

### Colors

Professor Menell points out that one of the Bryant drawings uses black coloring for the eyebrow while one of the Bratz dolls uses brown. Menell report ¶ 62. However, this may be due to the different skin color used on the two compared works.

### Arrangement of the representations

The body proportions of the Bryant drawings and dolls are largely identical. This is demonstrated by the alignments of the major anatomical landmarks of chins, shoulders, chests, waists, elbows, crotch, wrists, knees and ankles. The placements of the eyes, nose and lips on the dolls are also aligned in the same manner as they appear in the drawings. The eyes are equidistant in the dolls and the drawings, as are the eyebrows. A mole appears on the left eye in the dolls and the drawings. This strong similarity of body landmarks constitutes evidence that the drawings were a direct reference used to complete the dolls.

The similarities set forth above are sufficient to meet the requirements of the extrinsic test. Once that test is met, the trier of fact is to compare the total concept and feel of the competing works, without the assistance of expert witnesses and analytic dissection.

### The Intrinsic Test

The intrinsic test focuses on the similarity of expression. It is a subjective test that examines an ordinary person's subjective impressions of the similarities between the two works and is exclusively the province of the trier of fact. *Funky Films, Inc. v. Time Warner Entertainment Co., L.P.*, 462 F.3d 1072, 1077 (9th Cir. 2006). This subjective test does not permit expert testimony, nor does it allow analytic dissection. *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1442 (9th Cir. 1994); *Olson v. National Broadcasting Co.*, 855 F.2d 1446, 1449 (9th Cir. 1988); *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1164 (9th Cir. 1977). The trier of fact is not to analyze the works or examine external criteria. *Krofft*, 652 F.2d at 1164. Under the intrinsic test, the finder of fact must decide as an ordinary observer "whether the 'total concept and feel of the two works is substantially similar." *Berkic v. Crichton*, 761 F.2d at 1292. At this point the works are to be compared as a whole. "The two works . . . should be considered and tested, not hypercritically or with meticulous scrutiny, but by the observations and impressions of the average reasonable reader and spectator." *Twentieth Century-Fox Film Corp. v. Stonesifer*, 140 F.2d 579, 582 (9th Cir. 1944).

The similarities between the Bratz dolls and the Bryant drawings are much closer than the works at issue in *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157 (9th Cir. 1977), which were found to be infringing.

14

EXHIBIT ____84____

PAGE ____957____

*The Intended Audience*

In determining whether the defendant has taken the total concept and feel of the plaintiff's work, the Ninth Circuit uses the standard of the "reasonable person in the intended audience." See *Johnson Controls, Inc. v. Phoenix Control Systems, Inc.*, 886 F.2d 1173, 1176 n.4 (9th Cir. 1989). Professor Menell has disregarded the special consideration given to the intended audience of the works at issue. Where works are to be used by children, their relative lack of sophistication is taken into account when a comparison of similarities is made. In *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1166 (9th Cir. 1977), the Ninth Circuit noted: "The present case demands an even more intrinsic determination because both the plaintiffs' and defendants' works are directed to an audience of children. This raises the particular factual issue of the impact of the respective works upon the minds and imaginations of young people." *Krofft*, 562 F.2d at 1166. See also *Aliotti v. R. Dakin & Co.*, 831 F.2d 898, 902 (9th Cir. 1987) ("Because children are the intended market for the dolls, we must filter the intrinsic inquiry through the perception of children.").

This special consideration has also been adopted by the Second Circuit. See *Williams v. Crichton*, 84 F.3d 581, 589 (2d Cir. 1996) ("Consideration of the total concept and feel of a work, rather than specific inquiry into plot and character development, is especially appropriate in an infringement action involving children's works, because children's works are often less complex than those aimed at an adult audience."); *Well-Made Toy Mfg. Corp. v. Goffa Intern. Corp.*, 210 F. Supp. 2d 147, 161-62 (E.D.N.Y. 2002), aff'd, 354 F.3d 112, (2d Cir. 2003) ("some juvenilization of a judge's appreciation of what is important in dolls is tolerable").

And this is particularly so in the instant case where the basic consumer appeal is to youngsters. In applying the test of the average lay observer, they are not to be excluded-indeed they are the 'far-flung faithful . . . audience.' The television advertising campaign of plaintiff was directed toward acquainting these youngsters with Tammy and Pepper, its new teenage and pre-teen dolls. The impression of the faces and general appearance of the dolls was upon them. The plaintiff's and defendant's dolls are so substantially similar that the Randy doll, for example, would readily be mistaken for the Tammy doll. Both are slim, twelve-inch, not fully developed teenage female figures; both have full faces, large widely spaced eyes, pupils positioned to look to the left, long eyelashes, high eyebrows, pert upturned noses, bow lips, and puffed checks; both have movable heads, arms and legs, and both invite the child to acquire an accompanying wardrobe. In sum, the dolls create the same impression, both with respect to their appearances and the play-uses for which they are suited. It is the youngsters who, on the basis of this impression, go to the stores with their parents or at home make their wishes known for the dolls they desire after television has made its impact upon on them. In their enthusiasm to acquire Tammy or Pepper they certainly are not bent upon 'detecting disparities' or even readily observing upon inspection such fine details as the point at which the necks are molded.

15

EXHIBIT ____84____

PAGE ____958____

*Ideal Toy Corp. v. Fab-Lu Ltd.*, 261 F. Supp. 238, 241-42 (S.D.N.Y. 1966), aff'd, 360 F.2d 1021
(2d Cir. 1966).

The intended audience for the Bratz dolls is young girls. These girls will not be familiar
with the August 1998 issue of Seventeen Magazine or the litany of additional prior art provided
by Professor Menell. Neither will these young consumers focus on the hypercritical comparative
analysis of body elements and facial features presented in the Menell report.

## PROTECTION OF BRYANT DRAWINGS AS ALLEGED COMPILATIONS

The elements that make up the image of the drawings do not constitute a mere grouping
of random similarities that led to a finding of noninfringement in *Kouf v. Walt Disney Pictures &
Television*, 16 F.3d 1042, 1045 (9th Cir. 1994). Furthermore, under Ninth Circuit law, the
standard of infringement for a compilation of creative elements is substantial similarity, not the
identical or near identical standard argued for by Professor Menell. See *Apple Computer, Inc. v.
Microsoft Corp.*, 35 F.3d 1435, 1446-47 (9th Cir. 1994); *McCulloch v. Albert E. Price, Inc.*, 823
F.2d 316, 321 (9th Cir. 1987).

Professor Menell relies on *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197 (9th
Cir. 1989), for the proposition that the protection of compilations should be limited to proof of
virtual identity. The Bryant drawings are clearly artistic works and do not consist of the blank
forms, useful articles and common property such as standard calendars, rulers and area code/time
zone maps, the elements that comprised the organizer at issue in *Harper House*. As artistic
works, the Bryant drawings deserve the broader, more traditional protection of the substantial
similarity infringement standard because of the endless variation of expression that was available
to Carter Bryant when he created the drawings. See *McCulloch v. Albert E. Price, Inc.*, 823 F.2d
316, 321 (9th Cir. 1987). Such works are to be considered as a whole, including any elements
that may not be independently copyrightable apart from the work. See *McCulloch*, 823 F.2d at
321; *Roth Greeting Cards v. United Card Co.*, 429 F.2d 1106, 1109 (9th Cir. 1970).

## CONCLUSION

In my opinion, the analysis provided by Professor Menell in his report is not based on the
law relevant to this case. In light of the law applied by the Ninth Circuit, the evidence of direct
copying makes any the exercise of substantial similarity analysis unnecessary. Even assuming
that direct copying cannot be proven in the case of the final version of the Bratz dolls, the strong
showing of admitted access requires that the amount of similarity required to be proven by Mattel
is reduced pursuant to the inverse ratio rule. The degree of similarity must also be lowered in
light of the fact that the intended audience for these works are children. Comparing both the
ideas and expression found in the Bryant drawings and the Bratz dolls, it is clear that there exists
substantial similarity under the extrinsic test. As a result, the trier of fact, viewing the works
through the eyes of their intended audience, will likely find that MGA's dolls took the total

16

EXHIBIT ___84___

PAGE ___959___

concept and feel of the Mattel drawings, satisfying the requirements of the intrinsic test. I
reserve the right to supplement my testimony in light of any additional testimony by Professor
Menell or assertions or evidence proffered by MGA's experts or fact witnesses at trial.

Date: 3 −/7 −08

By: _____
Robert C. Lind

17

EXHIBIT _____ 84

PAGE _____ 960

# APPENDIX A

EXHIBIT _____ 84

PAGE _____ 901

March 4, 2008

## CURRICULUM VITAE

### OF

### ROBERT C. LIND

Office:

Home:

Southwestern Law School
675 S. Westmoreland Ave.
Los Angeles, CA 90005
(213) 738-6785
E-Mail: rlind@swlaw.edu

10217 Hadley Avenue
Northridge, California 91324-1118
Telephone: (818) 831-1156
Fax: (818) 360-4966
E-Mail: rlind@socal.rr.com

Education:

LL.M., 1983, The National Law Center, George Washington University, Washington, D.C. (Concentration in First Amendment Studies; University Fellow in Law; Graduation with Highest Honors; Thesis: "The Tort of Emotional Distress and the First Amendment Protection of Expression").

J.D., 1979, The National Law Center, George Washington University, Washington, D.C. (National Semi-Finalist in Giles Sutherland Rich Intellectual Property Moot Court Competition).

Bachelor of Elected Studies, 1976, University of Minnesota, Minneapolis, Minnesota. (Concentration in Legal and Intellectual History; Summa Cum Laude; Phi Beta Kappa; Phi Kappa Phi).

A.A., 1973, Anoka-Ramsey State Community College, Coon Rapids, Minnesota.

Educational Employment Experience:

1985-Present        SOUTHWESTERN UNIVERSITY SCHOOL OF LAW,
                              Los Angeles, California

                              Professor of Law, teaching courses in copyright; trademark; entertainment; torts and mass communications law; as well as seminars on defamation, privacy and emotional distress; museum and art law; advanced copyright law; advanced entertainment law

1

EXHIBIT 84

PAGE 962

and television production law.

1981-1985      SOUTHWESTERN UNIVERSITY SCHOOL OF LAW,
         Los Angeles, California

         Associate Professor of Law, teaching courses in torts, copyright, and mass communication law.

1980      MARYMOUNT COLLEGE OF VIRGINIA,
         Arlington, Virginia

         Visiting Lecturer in Business, teaching a course in labor-management relations.

1979-1981      THE NATIONAL LAW CENTER, GEORGE WASHINGTON UNIVERSITY,
         Washington, D.C.

         Lecturer in Law, teaching a first year course in legal research, writing and professional responsibility.

## Practice Experience:

### Employment

Consultant to a number of law firms and businesses on copyright, trademark, entertainment, defamation, right of publicity and privacy law matters.

Expert witness in cases dealing with intellectual property, entertainment and media issues.

Arbitrator, Screen Actors Guild Arbitration (1989).

Arbitrator, Los Angeles County Bar Association Arbitration (1985).

AMERICAN ASSOCIATION OF MUSEUMS, Washington, D.C. (1980-81). Legal Consultant on museum law.

AMERICAN LAW INSTITUTE-AMERICAN BAR ASSOCIATION COMMITTEE ON CONTINUING PROFESSIONAL EDUCATION (1977-81). Researcher in the areas of conflicts of interest and nonprofit organizations.

REICHELT, NUSSBAUM, BROWN & TOPF, Mt. Ranier, Maryland (1977-78). Duties consisted of research and writing in various areas of law.

2

EXHIBIT   84

PAGE   963

Admissions to Practice:

District of Columbia, 1980
United States District Court for the District of Columbia, 1980
United States Court of Appeals for the District of Columbia, 1980
California, 1981
United States District Court for the Central District of California, 1983
United States Court of Appeals for the Ninth Circuit, 1983
United States Court of Appeals for the Federal Circuit, 1986
Supreme Court of the United States, 2003

Professional Activities:

Honors

Excellence in Teaching Award, Upper Division Professor (2006).

Paul E. Treusch Professor of Law (2005-2006).

Copyright Fellow, The Center for Computer-Assisted Legal Instruction (2004-2005).

Trademark Fellow, The Center for Computer-Assisted Legal Instruction (2003-2004).

Irving D. and Florence Rosenberg Professor of Law (2001-2002).

Professional Associations

American Bar Association, Member of Committees on Communications Law, Entertainment
and Sports Industry, Legal Education, Patent, Trademark and Copyright Law.

District of Columbia Bar Association.

California Bar Association, Member of the Intellectual Property Section.

Los Angeles County Bar Association, Member of the Intellectual Property & Entertainment
Law Section.

Beverly Hills Bar Association

American Intellectual Property Law Association.

American Association of Museums.

3

EXHIBIT _____ 84

PAGE _____ 964

Los Angeles Copyright Society

## Governmental Activities

Member of the Mayor's Advisory Committee Regarding The Robert F. Kennedy
Assassination Investigation Materials, Los Angeles, California, 1986-1987.

Member of the Robert F. Kennedy Assassination Investigation Materials Special Advisory
Committee to the California State Archives, Sacramento, California, 1987-1989.

## Lectures and Presentations

"The Commodification of Lectures and the Teacher Exception to the Work-Made-For-Hire
Rules of Copyright Ownership," Southwestern Law School, Los Angeles, California,
September 26, 2007.

"The Demise of Record Companies?," Keynote Speech at the 2006 Music Law Conference
presented by the University of Florida, Levin College of Law, Gainesville, Florida, February
4, 2006.

"Copyright Protection for Digitized Analog Sound Recordings," Music Law Committee,
Intellectual Property and Entertainment Law Section of the Los Angeles County Bar
Association, Los Angeles, California, September 30, 2003.

"The Actor as Palette: The Intersection of Copyright, Actor Attributes and the Right of
Publicity," Southwestern University School of Law, Los Angeles, California, March 19,
2003.

"Year In Review - Trademarks," 2001 Spring Seminar, Orange County Patent Law
Association /San Diego Intellectual Property Law Association, Long Beach, California,
March 18, 2001.

"Fundamentals of Copyright Law," Law Art Seminars, Los Angeles, California, November
18, 2000.

"Fundamentals of Trademark Law," Law Art Seminars, Los Angeles, California, November
19, 2000.

"Recent Developments in Trademark Law," 25th Annual Intellectual Property Institute,
Intellectual Property Law Section of the State Bar of California, San Jose, California,
November 10, 2000.

"Copyright Practice," Half Moon Seminars, Newport Beach, California, June 16, 2000.

4

EXHIBIT 84

PAGE 965

"Copyright Responses to Digital Technology," Southwestern University School of Law, Los Angeles, California, January 27, 2000.

"Trademark Law Basics," Law Art Seminars, San Francisco and Los Angeles, California, November 13, 1999.

"Copyright Law Basics," Law Art Seminars, San Francisco and Los Angeles, California, November 12, 1999.

"The Digital Millennium Copyright Act & The Copyright Extension Act," Association of Clearance and Research Professionals, Los Angeles, California, May 19, 1999.

"Intellectual Property Concerns of Libraries and Museums," Riverside Local History Resource Center, Riverside, California, May 12, 1999.

"Digital Millennium Copyright Act," Copyright and Trademark Subcommittee of the Intellectual Property and Entertainment Section of the Los Angeles County Bar Association, Los Angeles, California, January 11, 1999.

"Trademark Law Basics," Law Art Seminars, San Francisco and Los Angeles, California, November 14, 1998.

"Copyright Law Basics," Law Art Seminars, San Francisco and Los Angeles, California, November 13, 1998.

"Copyright Term Extension Act," Copyright and Trademark Subcommittee of the Intellectual Property and Entertainment Section of the Los Angeles County Bar Association, Los Angeles, California, November 19, 1998.

"Copyright Duration & Reversion," Warner/Chappell Music Publishing, Los Angeles, California, February 4, 1998.

"Trademark Law Basics," Law Art Seminars, San Francisco and Los Angeles, California, October 24 & November 6, 1997.

"Copyright Law Basics," Law Art Seminars, San Francisco and Los Angeles, California, October 25 & November 7, 1997.

"Copyright Protection for Creations of Nonhumans: Celestial Beings, Chimpanzees and Computers," Los Angeles Copyright Society, Los Angeles, California, April 2, 1997.

"Museums, Artwork and Electronic Rights," California Western School of Law, San Diego, California, December 5, 1996.

"Comprehensive Copyright Law," Law Art Seminars, Los Angeles, California, November

5

EXHIBIT ____ 84

PAGE ____ 966

14, 1996.

"Copyright Law Basics," Law Art Seminars, San Francisco and Los Angeles, California, October 26 & November 2, 1995.

"Employment in the Entertainment Industry," Southwestern University School of Law, Los Angeles, California, October 11, 1995.

"Copyright Law Basics," Law Art Seminars, Los Angeles, California, April 22, 1995.

"Opportunities in Entertainment Law," Southwestern University School of Law, Los Angeles, California, September 28, 1994.

"Copyright Law Basics," Law Art Seminars, San Francisco and Los Angeles, California, November 1 & 11, 1994.

"Defamation and Journalistic Ethics," Filipino American Press Club of Los Angeles, Los Angeles, California, September 16, 1994.

"Copyright Law Basics," Law Art Seminars, Palo Alto and Los Angeles, California, April 22 & 29, 1994.

"Defamation and Privacy Law," Twentieth Century Fox, Los Angeles, California, June 10, 1993.

"Copyright Law Basics," Law Art Seminars, Los Angeles, California, May 8, 1993.

"Copyright Infringement Issues in Computer Software," Customs Law Committee of the Los Angeles County Bar Association, Los Angeles, California, December 19, 1991.

"Hate Speech," Southwestern University School of Law, Los Angeles, California, September 13, 1990.

"Copyright Made Simple," American Law Institute-American Bar Association Committee on Continuing Professional Education, St. Louis, Missouri, March 24, 1988.

"Media Law," California Intercollegiate Press Association, Santa Monica, California, March 10, 1984.

"Emotional Distress and the First Amendment: Of and Concerning Nazis, Gap Tooth Pornographers and other Meaningful Exercises in Bad Taste," Southwestern University School of Law, Los Angeles, California, November 22, 1983.

6

EXHIBIT 84

PAGE 467

Made various presentations to law firms and legal departments of motion picture studios and music publishers.

Recognized and quoted as an expert in the subjects of intellectual property, entertainment, art, museum and media law by The New York Times, The Los Angeles Times, and The Los Angeles Daily Journal among other newspapers, magazines, television and radio stations.

#### Panel and Program Participation

"Law Student Note Sharing – Websites, Copyright and Learning Styles," Legal Education and IT: Mirage or Oasis?, 17th Annual Conference for Law School Computing, Center for Computer-Assisted Legal Instruction, Las Vegas, Nevada, June 19, 2007.

"Law of Podcasts," Legal Education and IT: Mirage or Oasis?, 17th Annual Conference for Law School Computing, Center for Computer-Assisted Legal Instruction, Las Vegas, Nevada, June 18, 2007.

"Antitrust Analysis and the Special Nature of Copyright Protection," Antitrust and Intellectual Property in Global Context: A Symposium in Celebration of the Work of Lawrence A. Sullivan, Southwestern Law School, Los Angeles, California, February 23, 2007.

"Hollywood and Technology," The U.S. District Court of California, 1966-2006: Text and Context, Southwestern Law School, Los Angeles, California, October 27, 2006.

"The Legal Battle Lines Surrounding Digital Libraries," It's a Wrap: Cutting Edge Issues in Entertainment Litigation, Women Lawyers Association of Los Angeles, Los Angeles, California, January 28, 2006.

"Nuts and Bolts of Intellectual Property Law," Continuing Education of the Bar, Anaheim, California, January 27, 2006.

"To Clear or Not to Clear: Product Uses in Film and Television," Brave New World: Representing Clients in an Evolving and Regulated Environment, Donald E. Biederman Entertainment & Media Law Institute and the Media Law Resource Center, Los Angeles, California, January 26, 2006.

"Nuts and Bolts of Intellectual Property Law," Continuing Education of the Bar, San Diego, California, January 20, 2006.

"Nuts and Bolts of Intellectual Property Law," Continuing Education of the Bar, Los Angeles, California, January 13, 2006.

7

EXHIBIT _____ 84

PAGE _____ 968

"Defenses to Third-Party Liability," Third-Party Liability in Intellectual Property, Santa Clara University, Santa Clara, California, October 7, 2005.

"When Imitation Isn't Flattering: Dealing with Idea Submission Claims," I'm a Lawyer, Help Me Out Here!: Key Issues in Entertainment & Media Law, Donald E. Biederman Entertainment & Media Law Institute and the Media Law Resource Center, Los Angeles, California, January 27, 2005.

"Pitching Your Ideas," Film and Media Business Seminar, California Lawyers for the Arts, Los Angeles, California, October 30, 2004.

"The Dastar Case, Defining the Boundaries Between Copyright and Trademark Law," Intellectual Property Section of the Conejo Valley Bar Association, Westlake Village, California, July 1, 2004.

"Why Every Faculty Member Should Author a CALI Lesson," 14th Annual Conference for Law School Computing, Center for Computer-Assisted Legal Instruction, Seattle, Washington, June 17, 2004.

"What's Hot in the Right of Publicity Arena?," Intellectual Property Law, Internet & New Media Section of the Beverly Hills Bar Association, Beverly Hills, California, May 27, 2004.

"Play: The Revolution Arrives," Sony v. Universal: The Betamax Decision Twenty Years Hence, Southwestern University School of Law, Los Angeles, California, March 11, 2004.

"Hot Issues in Entertainment," The American Bar Association Forum on Communications Law, 9th Annual Conference, Boca Raton, Florida, January 23-24, 2004.

"Reflections on the Term Extension Case: What's Wrong with the U.S. Intellectual Property System," Southwestern University School of Law, Los Angeles, California, April 23, 2003.

"Trademark Year in Review," 27th Annual Intellectual Property Institute, Intellectual Property Law Section of the State Bar of California, Santa Barbara, California, November 9, 2002.

"Foreign Infringing Websites: Which Battleground Should You Choose?," Intellectual Property and Technology Law section of the Orange County Bar Association, Irvine,

8

EXHIBIT ___84___

PAGE ___969___

California, October 15, 2002.

"New Business in Show Business: The Latest Developments in Music Law," Music Lowdown 2002, Denver, Colorado, June 8, 2002.

"Copyright Wars," Association of Independent Music Publishers, Los Angeles, California, April 25, 2002.

"Entertainment and the Internet (Industry Perspective)," Entertainment Law in an Information Economy, William Mitchell College of Law, St. Paul, Minnesota, April 5, 2002.

"Legal Ethics: Confidentiality Issues," Legal Problems of Museum Administration, American Law Institute-American Bar Association Committee on Continuing Professional Education, Los Angeles, California, March 21, 2002.

"Trademark Law Update," 26th Annual Intellectual Property Institute, Intellectual Property Law Section of the State Bar of California, Anaheim, California, November 17, 2001.

"The Law of the Internet in California," National Business Institute, Los Angeles, California, July 31, 2001.

"Digital Copyright Issues," Judges of the Central District of California United States District Court, Los Angeles, California, June 1, 2001.

"Copyright, Copy Wrong: Copyright Issues in a Digital World," Metropolitan Cooperative Library System, Torrance, California, April 25, 2001.

"Intellectual Property Law Year in Review: Practical Implications of Recent Decisions," First Annual Symposium, Intellectual Property, Internet & New Media Section, Beverly Hills Bar Association, Beverly Hills, California, April 21, 2001.

"California Streamin' <2>: Riding the Wave of Success in Internet Content Delivery," Subscreen (for Television, Film, and the Internet) Subsection of the Intellectual Property and Entertainment Law Section of the Los Angeles County Bar Association, Los Angeles, California, April 18, 2001.

9

EXHIBIT  84

PAGE  970

"Update on Entertainment and Copyright Cases," 2001 Spring Copyright Conference, Los Angeles Copyright Society, Indian Wells, California, March 24, 2001.

"Capitalism & Art – Intellectual Property Protection and Free Expression in the Digital Age," 11th Annual Entertainment Industry Labor & Employment Law Conference, Labor & Entertainment Law Section of the Los Angeles County Bar Association, Santa Monica, California, December 15, 2000.

"Everything You Ever Wanted To Know About The Copyright Office," Association of Independent Music Publishers, Los Angeles, California, June 22, 2000.

"Protecting Trademarks, Copyrights, and Publicity Rights in Entertainment Media," University of California at Los Angeles, Los Angeles, California, May 6, 2000.

"Hot Issues in Newsgathering," The American Bar Association Forum on Communications Law, San Diego, California, February 18, 2000.

"'It's the Story, Stupid' Airtight Acquisitions, A Roundtable Discussion," Film & Television Subcommittee of the Intellectual Property and Entertainment Section of the Los Angeles County Bar Association, Los Angeles, California, February 16, 2000.

"Copyright Issues for the New Millennium," Intellectual Property Issues for the New Millennium, Thomson & Thomson, Los Angeles, California, September 28, 1999.

"Protecting Trademarks, Copyrights, and Publicity Rights in Entertainment Media," University of California at Los Angeles, Los Angeles, California, May 15, 1999.

"Software Protection From a Patent and Copyright Perspective," Kelley Drye & Warren, Los Angeles, California, October 14, 1997.

"Art and Literature on the Internet," 3rd Annual Entertainment Law Conference, California Western School of Law, San Diego, California, March 29, 1997.

"The Piracy of Intellectual Property in an International Arena," 3rd Annual Entertainment Law Conference, California Western School of Law, San Diego, California, March 29, 1997.

10

EXHIBIT ___ 8 4

PAGE ___ 9 7 1

"Intellectual Property on the Internet: Copyright and Trademark," Friends of the UCLA Library, Los Angeles, California, January 30, 1997.

"Download This! Indecency, the Internet, and the V-Chip: Implications for the Americas & Beyond," Southwestern Journal of Law and Trade in the Americas Symposium on Mass Media and Censorship in the Americas, Los Angeles, California, January 24, 1997.

"Copyright Workshop," Registrars Committee, Western Region, Western Museums Association, Salt Lake City, Utah, October 16, 1996.

"Media and the Courts," National Judicial College, Reno, Nevada, May 29-31, 1996.

"Photography and the Law: Surviving the End of the 20th Century," Artists & the Law Committee, Los Angeles County Bar Association, Los Angeles, California, May 18, 1996.

"Introduction to Patent, Trademark and Copyright Law Practice," California Continuing Education of the Bar, various locations in California, September 7-18, 1995.

"Introduction to Patent, Trademark and Copyright Law Practice," California Continuing Education of the Bar, various locations in California, January 13-25, 1993.

"Ethics: Progress Report on the American Association of Museums' Draft Code of Ethics," Legal Problems of Museum Administration, American Law Institute-American Bar Association Committee on Continuing Professional Education, Los Angeles, California, March 21, 1991.

"Providing Expert Opinions and Authentications: How Dangerous Can It Be?," Legal Problems of Museum Administration, American Law Institute-American Bar Association Committee on Continuing Professional Education, Los Angeles, California, March 20, 1991.

"Privacy & Emotional Distress: The Latest Libel Battleground," Orange County Press Club, Newport Beach, California, April 30, 1988.

"Some Common Tort Claims that Museum Visitors Have Asserted," Legal Problems of Museum Administration, American Law Institute-American Bar Association Committee on Continuing Professional Education, St. Louis, Missouri, March 24, 1988.

11

EXHIBIT _____ B4

PAGE _____ 972

"Responding to Copyright Claims by Others: Fair Use and Other Defenses," Legal Problems of Museum Administration, American Law Institute-American Bar Association Committee on Continuing Professional Education, St. Louis, Missouri, March 24, 1988.

"What Ethical Limits Apply when Museums Compete for Collections, Contributions, and Staff?," Legal Problems of Museum Administration, American Law Institute-American Bar Association Committee on Continuing Professional Education, Boston, Massachusetts, March 19, 1987.

"Museum and Professional Codes of Conduct: Are These Beginning to Acquire the Force of Law?," Legal Problems of Museum Administration, American Law Institute-American Bar Association Committee on Continuing Professional Education, Boston, Massachusetts, March 19, 1987.

"Legalizing Media Ethics," Association for Education in Journalism and Mass Communication, Memphis, Tennessee, August 6, 1985.

"Can Copyright Survive New Technology?," Association for Education in Journalism and Mass Communication, Corvallis, Oregon, August 8, 1983.

Law School Governance:

Present

Faculty Recruitment Committee; Externship Committee; Faculty Advisor to the Entertainment Law Society; Faculty Advisor for the Entertainment Law Externship Program.

Past

Tenure Committee; Library Committee; Sabbatical Committee; Faculty Development Committee; Student Faculty Relations Committee; Ad Hoc Committee on Enhancement of Student Life; Scholastic Standards Committee; 75th Anniversary Committee; Budget Committee; Ad Hoc Committee on Law Review and Moot Court; Torts Curriculum Committee; Law Review Advisor; Faculty Advisor to various moot court teams.

12

EXHIBIT 84
PAGE 973

Publications:

### Published Books and Chapters

ENTERTAINMENT LAW: LEGAL CONCEPTS AND BUSINESS PRACTICES (3d ed. 2007) (Volumes 1 & 2) (Co-Author).

TRADEMARK LAW (3d ed. 2006).

COPYRIGHT LAW (3d ed. 2006).

NEWSGATHERING AND THE LAW (3d ed. 2005 & 2007 Supp.) (Co-Author).

ENTERTAINMENT LAW: LEGAL CONCEPTS AND BUSINESS PRACTICES (2d ed. 1992 & 2008 Supp.) (Co-Author).

ENTERTAINMENT LAW (3d ed. 2003 & 1999 Document Supp.) (Co-Author).

ART AND MUSEUM LAW: CASES AND MATERIALS (Co-Author) (2002).

COPYRIGHT LAW: STUDENT STUDY GUIDE (2d ed. 2002).

TRADEMARK LAW: STUDENT STUDY GUIDE (2d ed. 2002).

*Copyright Law Basics, in* COPYRIGHT BASICS: OUTLINE AND MATERIALS 1 (8th ed. 2000).

*Trademark Law Basics, in* TRADEMARK BASICS: OUTLINE AND MATERIALS 1 (4th ed. 2000).

*A Copyright Law Compendium of Current Developments, Basic Concepts and Selected Statutes, in* INTRODUCTION TO PATENT, TRADEMARK, AND COPYRIGHT LAW PRACTICE vii (1995) (Co-author).

*Artworks in the Digital Era, in* THE VISUAL ARTIST'S BUSINESS AND LEGAL GUIDE 230 (Gregory Victoroff ed. 1994).

13

EXHIBIT ___84___

PAGE ___974___

*The Visual Artist and the Law of Privacy, in* THE VISUAL ARTIST'S BUSINESS AND LEGAL GUIDE 299 (Gregory Victoroff ed. 1994).

Published Articles

"Use of Loan-Out Corporations in the Entertainment Industry," ANDREWS ENTERTAINMENT INDUSTRY LITIGATION REPORTER, January 11, 2006, at 2 (Co-Author).

"Has Celebrity Been Federalized?: Section 43(a) of the Lanham Act as a Substitute for the Right of Publicity," MEDIA LAW RESOURCE CENTER BULLETIN, January 13, 2004, at 21 (Co-Author).

"Attorney-Client Privilege in the Museum Context," ALI-ABA COURSE OF STUDY: LEGAL PROBLEMS OF MUSEUM ADMINISTRATION 223 (2002) (Co-Author).

"The Constitutionality of the Driver's Privacy Protection Act," 17 COMM. LAW. 18 (Summer 1999) (Co-Author).

"Right of Publicity Concerns of Museums," WEST MUSE 9 (Fall 1998).

"Institutional Trademarks," WEST MUSE 8 (Fall 1997).

"Licensing and Use of Digital Reproductions of Museum Collections," Western Museums Association (1996) (Co-Author), *reprinted in* REGISTRARS' QUARTERLY 2 (Winter 1997).

"Gifts, Ethics, and Conflicts of Interest," WESTERN MUSEUMS ASSOCIATION NEWSLETTER (2 part series published Summer & Fall 1996) (Co-Author).

"Museum Concerns About Going Digital," WESTERN MUSEUMS ASSOCIATION NEWSLETTER (3 part series published Summer, Fall, Winter 1995) (Co-Author).

"The Visual Artist and the Law of Defamation," 2 UCLA ENT. L. REV. 63 (1995).

"Defender of the Faith in the Midst of the Simpson Circus," 24 SW. U. L. REV. 1215 (1995) (reviewing REX S. HEINKE, MEDIA LAW (1994)).

14

EXHIBIT  84

PAGE  975

"Ownership of Copyrighted Works," WESTERN MUSEUMS CONFERENCE NEWSLETTER 5 (Fall 1993).

"Institutional Regulation of Employee Expression: Writing as a Conflict of Interest Within Museums and Related Nonprofit Institutions," 32 SANTA CLARA LAW REVIEW 427 (1992) (Co-Author).

"Critical Opinions: You Have the Right to Remain Silent," 71 MUSEUM NEWS 86 (January/February 1992) (Co-Author).

"Legal Risks Associated With Providing Expert Opinions and Authentications," ALI-ABA COURSE OF STUDY: LEGAL PROBLEMS OF MUSEUM ADMINISTRATION 191 (1991).

"Personal Collecting: Proceed With Caution," 69 MUSEUM NEWS 33 (September/October 1990) (Co-Author).

"Consider the Potential Liability of Failing to Conserve Collections," 68 MUSEUM NEWS 32 (January/February 1989) (Co-Author).

Book Review of "Board Liability: Guide for Nonprofit Directors," 19 JOURNAL OF ARTS MANAGEMENT AND LAW 77 (1989) (Co-Author).

"The Falwell Decision: Analysis of the Conflict Between the Tort of Intentional Infliction of Emotional Distress and the First Amendment," 11 LOS ANGELES LAWYER 14 (July/August 1988).

"Copyright Made Simple," ALI-ABA COURSE OF STUDY: LEGAL PROBLEMS OF MUSEUM ADMINISTRATION 609 (1988).

"Responding to Copyright Claims by Others: The Fair Use Defense," ALI-ABA COURSE OF STUDY: LEGAL PROBLEMS OF MUSEUM ADMINISTRATION 597 (1988).

Book Review of "Art Law: Rights and Liabilities of Creators and Collectors," 67 MUSEUM NEWS 97 (January /February 1988).

"Museum and Professional Codes of Conduct: Are These Beginning to Acquire the Force of

15

EXHIBIT 84

PAGE 976

Law," 11 ALI-ABA COURSE MATERIALS JOURNAL 63 (June 1987) (Co-Author).

"What Legal Limits Apply When Museums Compete for Staff," ALI-ABA COURSE OF
STUDY: LEGAL PROBLEMS OF MUSEUM ADMINISTRATION 321 (1987).

"Justice Rehnquist: First Amendment Speech in the Labor Context," 8 HASTINGS
CONSTITUTIONAL LAW QUARTERLY 93 (1980).

"No Fool as a Client," 58 MUSEUM NEWS 37 (September/October 1979) (Co-Author).

"Liabilities of Museum Trustees," SOUTHEASTERN MUSEUM CONFERENCE JOURNAL 14
(November 1978) (Co-Author).

16

EXHIBIT ___84___

PAGE ___977___

1

## PROOF OF SERVICE

2

3       I am employed in the County of Los Angeles, State of California.  I am over the age of eighteen years and not a party to the within action; my business address is 865 South Figueroa Street, 10th Floor, Los Angeles, California 90017-2543.

4

5       On **March 17, 2008,** I served true copies of the following document described as: **Expert Rebuttal Report of Robert C. Lind** on the parties in this action as follows:

6    Mike Werdegar                              Carl Roth
     **Keker & Van Nest, LLP**                   **Skadden, Arps, Slate, Meageher & Flom**
7    710 Sansome Street                         **LLP**
     San Francisco, CA 94111                    300 South Grand Ave.,
8    *mwerdegar@kvn.com*                        Suite 3400
                                                Los Angeles, CA 90071
9                                               *carl.roth@skadden.com*

10

     Mark E. Overland
11   **Overland Borenstein Scheper & Kim LLP**
     300 South Grand Ave.
12   Suite 2750
     Los Angeles, CA 90071
13   *moverland@obsklaw.com*

14

15   **BY ELECTRONIC MAIL TRANSMISSION:** By electronic mail transmission per stipulation from the parties on March 17, 2008, by transmitting a PDF format copy of such document(s) to each such person at the e-mail address listed below their address(es).  The document(s) was/were transmitted by electronic transmission and such transmission was reported as complete and without error.

16

17       I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

18

19

20

21       Executed on March 17, 2008, at Los Angeles, California.

22

23                                       _Andrea Hoever_____

24                                       Andrea Hoeven

25

26

27

28

07975/2338347.1                                                    -2-

EXHIBIT ___84___

PAGE ___978___

Case No. CV 04-9049 SGL (RNBx)
PROOF OF SERVICE