1   QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
      John B. Quinn (Bar No. 090378)
2      (johnquinn@quinnemanuel.com)
      Michael T. Zeller (Bar No. 196417)
3      (michaelzeller@quinnemanuel.com)
      Jon D. Corey (Bar No. 185066)
4      (joncorey@quinnemanuel.com)
      Timothy L. Alger (Bar No. 160303)
5      (timalger@quinnemanuel.com)
    865 South Figueroa Street, 10th Floor
6   Los Angeles, California  90017-2543
    Telephone:   (213) 443-3000
7   Facsimile:    (213) 443-3100

8   Attorneys for Mattel, Inc.

9                   UNITED STATES DISTRICT COURT

10                 CENTRAL DISTRICT OF CALIFORNIA

11                        EASTERN DIVISION

12   | CARTER BRYANT, an individual, | CASE NO. CV 04-9049 SGL (RNBx) |
     |---|---|
13   | Plaintiff, | Consolidated with |
14   | vs. | Case No. CV 04-09059 Case No. CV 05-02727 |
15   | MATTEL, INC., a Delaware corporation, | **FINAL PRE-TRIAL CONFERENCE ORDER FOR PHASE 1 TRIAL** |
16   | Defendant. | Pretrial Conference:  May 19, 2008 |
17   |  | Time:                          10:00 a.m. Place:                         Courtroom 1 |
18   | AND CONSOLIDATED ACTIONS | Trial Date:                   May 27, 2008 |

| | | |
|---|---|---|
| I. | PARTIES ................................................................................ | 1 |
| II. | ABANDONED CLAIMS, COUNTERCLAIMS AND DEFENSES | 4 |
| III. | JURISDICTION AND VENUE ................................................ | 7 |
| IV. | TRIAL ESTIMATE ................................................................. | 8 |
| V. | TYPE OF TRIAL ................................................................... | 8 |
| VI. | STIPULATED FACTS ............................................................. | 9 |
| VII. | CLAIMS AND DEFENSES ..................................................... | 11 |
| | A. MATTEL INC.'S CLAIMS AND COUNTERCLAIMS ..................... | 11 |
| VIII. | BREACH OF CONTRACT (MC 1, AC 5) (AGAINST BRYANT) .............. | 33 |
| | A. A Valid Contract Existed Between Mattel And Bryant ....................... | 33 |
| | B. Bryant Breached His Contractual Obligations to Mattel ..................... | 36 |
| | C. Breaches of the Conflicts of Interest Questionnaire: ........................... | 48 |
| | D. Breach of The Proprietary Information Checkout Form: ..................... | 48 |
| IX. | BREACH OF FIDUCIARY DUTY (MC 2, AC 7)  (AGAINST BRYANT) ................................ | 50 |
| | A. Bryant Intended To And Did Form A Fiduciary Relationship With Mattel. ..................... | 50 |
| | B. Bryant Breached The Fiduciary Duty He Owed To Mattel ................. | 52 |
| X. | BREACH OF DUTY OF LOYALTY (MC 3, AC 9) (AGAINST BRYANT) ................................ | 56 |
| | A. Bryant Was Mattel's Employee and Owed A Duty of Loyalty to Mattel ..................... | 56 |
| | B. Bryant Knowingly Acted Against Mattel's Interests and Materially Breached the Duty of Loyalty He Owed to Mattel ........... | 57 |
| | C. Mattel Did Not Give Informed Consent To Bryant's Conduct ........... | 57 |
| XI. | CONVERSION (RE BRATZ; AC 11) (AGAINST BRYANT, MGA, MGA HK and LARIAN) ................................ | 58 |
| | A. Mattel Owns Valuable Property And Tangible Materials Including Drawings and Items Created By Bryant When He Was A Mattel Product Designer ................. | 58 |
| | B. Defendants' Wrongful Conversion of Mattel's Property Constituted A Substantial Interference With Mattel's Rights.............. | 59 |

C.       Mattel Did Not Consent To the Conversion ..........................................60

XII.    INTENTIONAL INTERFERENCE WITH CONTRACT (RE BRYANT; AC 6) (AGAINST MGA, LARIAN)............................................60

A.       Valid Agreements Existed between Mattel And Bryant......................60

B.       MGA And Larian Had Knowledge Of Mattel's Contracts With Bryant. ..........................................................................................63

C.       MGA and Larian Induced And Encouraged Bryant To Breach, and Disrupted The Performance of His Contracts With Mattel. ..........64

XIII.   AIDING AND ABETTING BREACH OF FIDUCIARY DUTY (RE: BRYANT; AC 8) (AGAINST MGA AND LARIAN)....................................67

A.       Bryant Owed And Breached A Fiduciary Duty To Mattel...................67

B.       MGA and Larian Knew That Bryant Was Engaging In Conduct That Constituted A Breach Of The Fiduciary Duty He Owed Mattel. ..........................................................................................68

C.       MGA and Larian Knowingly Assisted Bryant In Breaching His Fiduciary Duty Owed To Mattel..............................................69

XIV.    AIDING AND ABETTING BREACH OF DUTY OF LOYALTY (RE BRYANT; AC 10) (AGAINST MGA AND LARIAN) .................................70

XV.     STATUTORY UNFAIR COMPETITION  (RE BRYANT; AC 12) (AGAINST MGA, MGA HK, LARIAN AND BRYANT)...........................70

A.       Defendants Violated Section 17200 of the California Business and Professions Code By Engaging In An "Unlawful, Unfair Or Fraudulent Business Act Or Practice. . . . " ..........................................70

XVI.    DECLARATORY RELIEF (AC 13) (AGAINST MGA, MGA HK, LARIAN AND BRYANT) ...........................................................................73

A.       An actual controversy exists between Mattel and Defendants regarding Defendants' lack of ownership interests in Bratz works and Mattel's rights in the same..............................................73

B.       Defendants have no valid or protectible ownership rights or interests in Bratz works, and Mattel is the true owner of the same......73

C.       Mattel is entitled to an accounting and imposition of a constructive trust over Bratz, including without limitation registrations and applications for registrations relating thereto made or filed by Defendants and third parties, and over all revenues and other monies or benefits derived or obtained from MGA's and Bryant's purported ownership, use, sale, distribution and licensing of Bratz ........................................................73

XVII.   COPYRIGHT INFRINGEMENT (AC 1) (AGAINST MGA, MGA HK, LARIAN, BRYANT) ........................................................................74

A.    Mattel Is The Owner Of Valid Copyrights In Works That Are Fixed In Tangible Media Of Expression, And Are The Subject Of Federal Copyright Registrations ........................................................74

B.    Defendants Have Infringed Upon Mattel's Exclusive Rights In The Copyrighted Works, Including By Reproducing Them and Preparing Derivative Works From Them, Without Mattel's Authorization.................................................................................76

C.    Defendants' Infringement Or Substantial Contributions To Infringement Of Mattel's Copyrighted Works Without Mattel's Consent.....................................................................................79

XVIII. DAMAGES (RE ALL PHASE 1 CLAIMS) ...................................83

XIX.  BREACH OF CONTRACT (DAMAGES) (MC 1, AC 5)............................83

XX.    BREACH OF FIDUCIARY DUTY (DAMAGES) (MC 2, AC 7) (AGAINST BRYANT) ........................................................................84

XXI.  BREACH OF DUTY OF LOYALTY (DAMAGES) (MC 3, AC 9) (AGAINST BRYANT) ........................................................................86

XXII. CONVERSION (DAMAGES) (RE BRATZ; AC 11) (AGAINST BRYANT, MGA, MGA HK and LARIAN)......................................87

XXIII. INTENTIONAL INTERFERENCE WITH CONTRACT (RE BRYANT; AC 6) (AGAINST MGA, LARIAN)............................................88

XXIV. AIDING AND ABETTING BREACH OF FIDUCIARY DUTY (DAMAGES) (RE:  BRYANT; AC 8) (AGAINST MGA AND LARIAN)...................................................................................................89

XXV. AIDING AND ABETTING BREACH OF DUTY OF LOYALTY (DAMAGES) (RE BRYANT; AC 10).............................................................90

XXVI. COPYRIGHT INFRINGEMENT CLAIM (DAMAGES) (AC 1) (AGAINST MGA, MGA ENTERTAINMENT (HK) LIMITED, LARIAN, BRYANT) ...................................................................91

XXVII. MATTEL SEEKS PUNITIVE OR EXEMPLARY DAMAGES ON EACH PERTINENT CLAIM ........................................................................92

XXVIII. MATTEL'S PROPOSED EVIDENCE TO SUPPORT FINDING OF ADVERSE INFERENCE CONTENTIONS AGAINST COUNTER DEFENDANTS ....................................................................................93

XXIX. DEFENDANTS' AFFIRMATIVE DEFENSES ...................................98

XXX.  ISSUES TO BE TRIED ...............................................................120

XXXI. DISCOVERY ............................................................................120

XXXII. EXHIBITS...............................................................................121

1

XXXIII. WITNESSES ............................................................................................. 121

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>Cases</u>

*American Mortg. Network v. LoanCity.com*,
  2006 WL 3199291, at *15 (Cal. Ct. App. Nov. 7, 2006) .................................26

*Ananda Church of Self-Realization v. Mass. Bay Ins. Co.*, 95 Cal. App. 4th 1273,
  1282 (2002) .................................................................................................24

*Hamilton v. Signature Flight Support Corp.*,
  No. C-05-0490 CW (MEJ), 2005 WL 3481423, at * 3 (N.D. Cal. Dec. 20,
  2005)..............................................................................................................96

*Korea Supply Co. v. Lockheed Martin Corp.*,
  29 Cal. 4th 1134, 1144 (2003).......................................................................29

<u>Mattel v. Bryant, Inc.</u>,
  446 F.3d 1011, 1013 (9th Cir. 2006)................................................................7

*Melchior v. New Line Prods., Inc.*,
  106 Cal. App. 4th 779, 793 (2003).................................................................24

*Neilson v. Union Bank of Cal., N.A.*,
  290 F. Supp. 2d 1101, 1118-20 (C.D. Cal. 2003) .....................................27, 28

*PMC, Inc. v. Saban Entm't, Inc.*,
  45 Cal. App. 4th 579, 601 (1996)...................................................................26

*Reeves v. Hanlon*,
  33 Cal. 4th 1140, 1152-53 (2004) ..................................................................25

*Richard B. LeVine, Inc. v. Higashi*,
  131 Cal. App. 4th 566, 574 (2005).............................................................27, 28

*Saunders v. Superior Court*,
  27 Cal. App. 4th 832, 839 (1994)...................................................................29

*Unigard Sec. Ins. Co. v. Lakewood Eng. & Mfg. Corp.*, 982 F.2d 363, 368 (9th Cir.
  1992).............................................................................................................96

*Zubulake v. UBS Warburg, LLC*,
  220 F.R.D. 212, 216 (S.D.N.Y. 2003).............................................................96

<u>Statutes</u>

15 U.S.C. § 1116.............................................................................................7

17 U.S.C. § 503(a) ........................................................................................92

17 U.S.C. § 504(b) ........................................................................................91

17 U.S.C. § 101 et seq. ...................................................................................7

18 U.S.C. § 1964(c) ........................................................................................7

18 U.S.C. § 1965 ................................................................................................7

28 U.S.C. § 1331 ................................................................................................7

28 U.S.C. § 1332 ................................................................................................7

28 U.S.C. § 1367 ................................................................................................7

28 U.S.C. § 1391(b) ...........................................................................................7

28 U.S.C. 1391(d) ..............................................................................................7

28 U.S.C. 1391(f) ...............................................................................................7

28 U.S.C. 1400(a) ..............................................................................................7

*Cal Civ. Code* § 2223 .....................................................................................87

*Cal Civ. Code* § 2224 .....................................................................................87

*Cal. Civil Code* § 3294 ...................................................................................92

California Civil Code § 988 ..............................................................................31

U.S.C. § 1338(a) ................................................................................................7

## Other Authorities

*Cal. Bus. & Prof. Code* § 17200 et seq. ........................................................70

<u>Cal. Labor Code</u> § 2860 .............................................................................56

<u>Cal. Labor Code</u> §§ 2856 ..........................................................................56

<u>Cal. Labor Code</u> §§ 2863 ..........................................................................56

*Cal. Penal Code* § 641 ....................................................................................70

Copyright Act, § 204 .........................................................................................31

1    Following pretrial proceedings, pursuant to Federal Rule of Civil

2   Procedure 16 and Local Rule 16-1 et seq., and in accordance with the Court's

3   Scheduling Order entered February 22, 2007, IT IS ORDERED:

4

5                                      **I.**

6                                  **PARTIES**

7    For purposes of this Phase 1 trial, the parties are:

8   Mattel's position:

9    (a)    Plaintiff and Counter-Defendant Mattel, Inc. ("Mattel");

10    (b)    Defendant and Counter-Defendant Carter Bryant ("Bryant");

11    (c)    Defendant and Counter-Defendant MGA Entertainment, Inc.

12   ("MGA");

13    (d)    Defendant and Counter-Defendant Isaac Larian;

14    (e)    Defendant and Counter-Defendant MGA Entertainment (HK)

15   Limited ("MGA HK").

16    In addition, the following are parties to Phase 2 proceedings:

17    (f)    Counter-Defendant MGA de Mexico S.R.L. de C.V. ("MGA

18   Mexico"); and

19    (g)    Counter-Defendant Carlos Gustavo Machado Gomez

20   ("Machado").

21    Each of these parties has been served and has appeared.  For purposes

22   of this Phase 1 trial, and the claims and defenses to be tried therein, no party other

23   than those identified above has asserted a claim, been served, or asserted any

24   defense.  Because the Court has bifurcated these consolidated cases, the Court will

25   not at this point dismiss any other party, including any Doe defendants.

26    The MGA parties' and Bryant's position:

27    The MGA parties and Bryant agree with the list of Phase 1 parties set

28   forth by Mattel, with two exceptions:  Counter-Defendant MGA de Mexico S.R.L.

1

de C.V. ("MGA Mexico") and Counter-Defendant Carlos Gustavo Machado Gomez ("Machado").  These two parties are named as defendants only in claims that the Court has ordered, pursuant to its bifurcation and trial phasing order of July 2, 2007 [Docket No. 608], to be tried in Phase 2.  To the extent Mattel is seeking to inject Phase 2 claims or issues into the Phase 1 trial, the MGA parties and Bryant object to the inclusion of these parties in any Final Pretrial Conference Order to be entered by the Court pertaining to the Phase 1 trial.  Mattel has not provided any substantive or procedural basis for including these parties in Phase 1, and these parties would be prejudiced were they to be included at this late date in the Phase 1 trial.  Mattel never even copied counsel for Machado on its drafts of the joint proposed order, even though Mattel is well-aware that Mr. Machado is separately represented.

The MGA parties and Bryant agree with Mattel that each of these parties has been served and has appeared.  For purposes of this Phase 1 trial, and the claims and defenses to be tried therein, no party other than those identified above has asserted a claim, been served or asserted any defense.  Consistent with Appendix A to the Local Rules, all other parties named in the pleadings in connection with the claims to be tried in the Phase 1 trial (as set forth below), including any "Doe" defendants, should now be dismissed.

The pleadings that raise the issues are:

Mattel's position:

(a)     Complaint filed by Mattel, Inc. (Case No. BC314398) on April 27, 2004 in the Superior Court of the State of California for the County of Los Angeles (the "Bryant Case");

(b)     Answer to Plaintiff's Unverified Complaint filed by Carter Bryant on May 14, 2004;

(c)     Defendant/Cross-Complainant Carter Bryant's Cross-Complaint for (1) Unfair Competition; (2) Rescission; (3) Declaratory Relief; and (4) Fraud,

1  filed by Bryant on September 8, 2004 in the Superior Court of the State of

2  California for the County of Los Angeles;

3         (d)     Notice to Federal Court of Removal of Civil Action from State

4  Court Pursuant to 28 U.S.C. Section 1332(a)(1) and 1331, filed by defendant Carter

5  Bryant on November 2, 2004.  That notice removed the case to federal court on

6  November 2, 2004, where it was assigned Case No. 04-9059;

7         (e)     Complaint for: Declaratory Relief of Copyright Non-

8  Infringement filed by Bryant on November 2, 2004 in the District Court of the

9  Central District of California, Case No. 04-9049;

10        (f)     Stipulation Permitting MGA to Intervene as a Party to This

11 Action and Order, dated December 7, 2004, and MGA's Answer in Intervention.

12        (g)     Complaint filed by MGA Entertainment, Inc. (Case No. CV 05-

13 2727 SGL (RNBx)) on April 13, 2005 in the District Court of the Central District of

14 California (the "MGA Case"), as limited by the Court's Order dated August 25,

15 2005, striking allegations regarding the Brawer litigation;

16        (h)     Second Amended Answer and Counterclaims filed by Mattel,

17 Case No. CV 04-9059 SGL (RNBx) on July 12, 2007 in the District Court of the

18 Central District of California;

19        (i)     Carter Bryant's Second Amended Reply to Mattel's

20 Counterclaims filed by defendant Carter Bryant on October 16, 2007 in the District

21 Court of the Central District of California;

22        (j)     Amended Answer and Affirmative Defenses of MGA

23 Entertainment Inc., MGA Entertainment (HK) Limited and MGAE de Mexico

24 S.R.L. de C.V. to Mattel, Inc.'s Second Amended Answer and Counterclaims filed

25 by defendants MGA, MGA HK, and MGA Mexico (collectively, the "MGA

26 Defendants") on September 19, 2007 in the District Court of the Central District of

27 California;

28

1      (k)      Isaac Larian's Amended Answer and Affirmative Defenses to

2  Mattel, Inc.'s Second Amended Answer and Counterclaims filed by Larian on

3  November 8, 2007 in the District Court of the Central District of California; and

4      (l)      Amended Answer and Affirmative Defenses of Carlos Gustavo

5  Machado Gomez's to Mattel, Inc.'s Second Amended Answer and Counterclaims

6  filed by Machado on September 26, 2007.

7      By Order dated June 19, 2006, the Court consolidated the <u>Bryant</u> case

8  and the <u>MGA</u> case with <u>Bryant v. Mattel, Inc.</u>, Case No. 04-9049.

9      <u>MGA parties' and Bryant's position:</u>

10      For purposes of the Phase 1 trial, the MGA parties and Bryant agree

11  with the list of pleadings as set forth by Mattel, and as expressly limited by the

12  Court's bifurcation and trial phasing order dated July 2, 2007, with one exception:

13  *Amended Answer and Affirmative Defenses of Carlos Gustavo Machado Gomez's to*

14  *Mattel, Inc.'s Second Amended Answer and Counterclaims filed by Machado on*

15  *September 26, 2007.*  Mr. Machado is a defendant only as to claims that the Court

16  has ordered to be tried in Phase 2.  The MGA parties and Bryant object to the

17  inclusion of Mr. Machado's Amended Answer and Affirmative Defenses in any

18  Final Pretrial Conference Order to be entered by the Court pertaining to the Phase 1

19  trial.  Mattel has not provided any substantive or procedural basis for including this

20  pleading in the Phase 1 Final Pretrial Conference Order.  Mattel never copied

21  counsel for Machado on its drafts of the joint proposed order, even though Mattel is

22  aware Mr. Machado is separately represented.

23

24      **II.**

25      **ABANDONED CLAIMS, COUNTERCLAIMS AND DEFENSES**

26      The following claims, counter-claims, or defenses have been dismissed

27  or abandoned:

28      <u>Mattel's position:</u>

1    By Order dated July 17, 2006, the Court dismissed Defendant/Cross-
2    Complainant Carter Bryant's Cross-Complaint for (1) Unfair Competition; (2)
3    Rescission; (3) Declaratory Relief; and (4) Fraud; and Bryant's Complaint for
4    Declaratory Relief of Copyright Non-Infringement.  Bryant was given leave to
5    amend his Complaint and Cross-Complaint, but elected not to do so and the
6    dismissal became final.

7    Bryant's Ninth Affirmative Defense: Failure of Contract was withdrawn
8    by Bryant, by stipulation on October 5, 2007;

9    Bryant's Tenth Affirmative Defense: Duress/Unconscionability was
10    withdrawn by Bryant, by stipulation on October 5, 2007;

11    Bryant's Eleventh Affirmative Defense: Alleged Duties Contrary to
12    Law was withdrawn by Bryant, by stipulation on October 5, 2007;

13    MGA Defendants' Sixteenth Affirmative Defense:  Innocent Intent was
14    withdrawn by MGA Entertainment, Inc., by stipulation on September 5, 2007;

15    Larian's Sixteenth Affirmative Defense:  Innocent Intent was
16    withdrawn by MGA Entertainment, Inc., by stipulation on September 5, 2007;

17    MGA Defendants' Ninth Affirmative Defense:  Res Judicata was
18    withdrawn by MGA Entertainment, Inc., by stipulation on September 5, 2007;

19    Larian's Ninth Affirmative Defense:  Res Judicata was withdrawn by
20    MGA Entertainment, Inc., by stipulation on September 5, 2007;

21    MGA Defendants' Twelfth Affirmative Defense:  Lack of Ownership
22    was withdrawn by MGA Entertainment, Inc., by stipulation on September 5, 2007;

23    Unclean Hands Affirmative Defense was withdrawn with respect to
24    Phase 1 claims by the MGA Defendants by Notice on February 15, 2008;

25    Unclean Hands Affirmative Defense was limited by Carter Bryant as to
26    Phase 1 issues by letter dated February 27, 2008.

27    By Order dated April 25, 2008, the Court granted partial summary
28    judgment in favor of Bryant and the MGA Defendants on Mattel's claims for (1)

1  tortious interference with contractual relations, but only "to the extent that it is based
2  on Mattel's rights to Bratz," such that it remains in the case "as to Mattel's claims for
3  breach of fiduciary duty" (Order at 2); (2) conversion, but only to the extent it is
4  based on conversion of ideas, such that it remains in the case "to the extent it seeks
5  the return of tangible things" (*id.* at 3); (3) common law unfair competition (*id.* at 7);
6  and (4) unjust enrichment (*id.*).

7                                   <u>MGA parties and Bryant's position</u>:

8            The MGA parties and Bryant agree with Mattel's statement regarding
9  the abandoned claims, counterclaims and defenses with the exception of Mattel's
10  characterization that "Bryant was given leave to amend his Complaint and Cross-
11  Complaint, but elected not to do so and the dismissal became final," as misstating
12  the nature and content of the Order.

13            In addition, on April 25, 2008, the Court granted the MGA parties'
14  motion for summary judgment as follows:

15            • Mattel's claim for tortious interference is dismissed to the extent
16               it is based on Mattel's purported rights to Bratz.

17            • Mattel's claim for conversion is dismissed to the extent it is
18               based on an alleged conversion of ideas.

19            • Mattel's claim for statutory unfair competition is dismissed to the
20               extent it is based on alleged copyright infringement or alleged
21               "unfair" conduct.

22            • Mattel's common law claim for unfair competition is dismissed.

23            • Mattel's claim for unjust enrichment is dismissed.

24  MGA and Bryant disagree with Mattel's characterizations of the Court's April 25,
25  2008 Summary Judgment Order.

26            Any attempt by Mattel to suggest that the Court's summary judgment
27  ruling impacts claims or defenses relating to Mattel's "Inventions Agreement" or
28  claims or defenses relating to Bryant's alleged breach of fiduciary duties is

1  premature.  On May 2, 2008, Bryant filed a motion to reconsider or to certify for

2  appeal the Court's summary judgment ruling as to certain issues, including the

3  Court's decision regarding the breach of fiduciary duty claim and the interpretation

4  of Mattel's "Inventions Agreement."

5

6                                    **III.**

7                          **JURISDICTION AND VENUE**

8              Federal jurisdiction and venue are invoked upon the following grounds:

9              Mattel's position:

10             This Court has diversity jurisdiction over the claims asserted in Mattel

11  v. Bryant pursuant to 28 U.S.C. § 1332, as determined by the Ninth Circuit in Mattel

12  v. Bryant, Inc., 446 F.3d 1011, 1013 (9th Cir. 2006).  This Court has supplemental

13  jurisdiction over Mattel's state law claims in that case pursuant to 28 U.S.C. § 1367.

14             This Court has federal question jurisdiction over MGA's claims in

15  MGA Entertainment, Inc. v. Mattel, Inc. pursuant to 15 U.S.C. §§ 1116 and §1121"

16  \, 28 U.S.C. §§ 1331, 1338(a), and supplemental subject matter jurisdiction over

17  MGA's state law claims pursuant to 28 U.S.C. § 1367.

18             This Court has federal question jurisdiction over Mattel's counterclaims

19  in MGA Entertainment, Inc. v. Mattel, Inc. pursuant to 28 U.S.C. §§ 1331, 1338(a),

20  17 U.S.C. §§ 101 et seq., and 18 U.S.C. § 1964(c).  This court has supplemental

21  jurisdiction over Mattel's state law counterclaims pursuant to 28 U.S.C. § 1367.

22             MGA parties and Bryant's position:

23             The MGA defendants admit that the Court has federal question

24  jurisdiction over the MGA action pursuant to 28 U.S.C. §1331, 17 U.S.C. §§ 101 et.

25  seq. and 18 U.S.C. § 1964(c), but deny that the Court may assert jurisdiction over

26  the extraterritorial conduct alleged by Mattel in the Counterclaims.

27             Venue in this Court for Mattel Inc. v. Bryant is proper pursuant to

28  28 U.S.C. §§ 1391(b) - (d)1391, 1391(f)1391, 1400(a)1400.

Venue in this Court for <u>MGA Entertainment, Inc. v. Mattel, Inc.</u> is alleged to be proper pursuant to 28 U.S.C. §§ 1391(b) - (d), 1391(f) and 1400(a) and 18 U.S.C. § 1965.  The MGA defendants admit that venue is proper in this District for Mattel's claims based on conduct alleged to have occurred in this district and deny that venue is proper in this District for acts alleged to have occurred in Mexico, Canada, Hong Kong or other places outside of this District.

## IV.
## TRIAL ESTIMATE

The parties understand that the Court has directed each side to complete the presentation of evidence in Phase 1, including the examination and cross-examination of witnesses, in 66 hours.  The parties further understand that the 66 hours shall not apply to argument, jury selection, opening statements, side bars, or closing arguments.

<u>Mattel's position</u>:

Mattel further understands that this 66-hour limit may be enlarged upon a showing of good cause to the Court.

<u>MGA parties and Bryant's position</u>:

Consistent with the express language of the Court's April 7, 2008 Order [Docket No. 2998], the MGA parties and Bryant understand that the 66-hour limit may be enlarged "if extraordinary circumstances warrant such relief."  Apr. 7, 2008 Order, at 2.

## V.
## TYPE OF TRIAL

The trial is to be a jury trial, except for issues which are not properly tried to jury.  Pursuant to the Court's Scheduling Order, the parties shall deliver to the Court (a) a set of Joint Proposed Jury Instructions and (b) a set of disputed Jury

1 | Instructions, along with reasons supporting and opposing each disputed instruction,
2 | and (c) at the Pre-Trial Conference brief proposed voir dire questions for the jury.
3 |         The MGA parties and Bryant contend that all issues in the Phase 1 trial
4 | are tried to a jury.[1]

## VI.

## STIPULATED FACTS

    1.     The following facts have been stipulated, and shall be deemed established:[2]

### Parties

    1.     Mattel, Inc. is a corporation formed under the laws of the State of Delaware with its headquarters in El Segundo, California.

    2.     Carter Bryant, an individual, is a resident of Missouri.

    3.     MGA Entertainment, Inc. is a privately held California corporation.

    4.     MGA Entertainment (HK) Limited, a Hong Kong company, and MGAE de Mexico, S.R.L. de C.V., a Mexico corporation, are wholly owned subsidiaries of MGA Entertainment, Inc.

---

[1] "The parties to this action do not understand the rules to require the recitation of admissions from requests for admission in the Pre-Trial Conference Order for those admissions to be introduced at trial. Therefore, such admissions are not included herein."

[2] The parties to this action do not understand the rules to require the recitation of admissions in the Pre-Trial Conference Order for those admissions to be introduced at trial. Therefore, admissions are not included herein.

The parties' lists of facts herein are not exhaustive. The parties reserve the right to introduce additional evidence in support of their claims — or in opposition to affirmative defenses — at trial. In addition, the parties intend to introduce expert evidence not listed below in support of its claims.

5.   Isaac Larian, an individual, is the CEO and majority shareholder of MGA Entertainment, Inc. and is a resident of California.

**<u>Bryant's Employment at Mattel</u>**

6.   Carter Bryant first worked for Mattel in the mainline Barbie group from September 1995 to April 1998.

7.   Bryant signed a document titled "Employee Confidential Information and Inventions Agreement," dated November 6, 1995.

8.   Bryant signed a document titled "Conflict of Interest Questionnaire," dated November 6, 1995.

9.   Bryant left California in December 1997 and moved to Missouri to live with his parents, where he continued to do work for Mattel until April 1998.

10.   In late December 1998, Mattel offered Bryant a position in the Barbie Collectibles group.

11.   Bryant accepted Mattel's offer, moved back to California, and started work at Mattel on January 4, 1999.

12.   Bryant signed a document titled "Employee Confidential Information and Inventions Agreement" dated January 4, 1999.

13.   Bryant signed a document titled "Conflict of Interest Questionnaire," incorrectly dated January 4, 1998, instead of 1999.

14.   Before Bryant left Mattel, he was asked to and did participate in an exit interview.

15.   During his exit interview, Bryant signed a document titled "Proprietary Information Checkout," dated October 19, 2000.

# VII.

## CLAIMS AND DEFENSES

1.      In Phase 1 of the Trial, pursuant to the Court's July 5, 2007 Order, the parties' respective Claims and Affirmative Defenses are as follows:[3]

Mattel's position:

## A.      MATTEL INC.'S CLAIMS AND COUNTERCLAIMS

Mattel, Inc. plans to pursue the following claims and counterclaims against the defendants in Phase 1 trial as indicated:

**Claim 1:  Defendant Bryant breached his contracts with Mattel (Against Bryant).**

Elements to be Proven

(a)      That Mattel and Mr. Bryant entered into a contract or contracts;

(b)      That Mattel did all, or substantially all, of the significant things that the contract required Mattel to do;

(c)      That Mr. Bryant failed to do something that the contract required him to do or did something that the contract prohibited him from doing; and

(d)      That Mattel was harmed by that failure.[4]

**Claim 2:  Defendant Bryant breached the fiduciary duty he owed to Mattel (Against Bryant).**

---

[3]   Mattel has claims for misappropriation of trade secrets that are being reserved for Phase II of this litigation.  To the extent defendants seek to raise the issue of trade secrets during Phase I, either as a claim or as an affirmative defense, Mattel reserves its right to argue its misappropriation of trade secrets claim in Phase I.

[4]   The Court ruled in its April 25, 2008 Order (at 5) that "[t]he undisputed facts … [show] Bryant directly competed with Mattel by entering into a contract with its competitor to produce a competing product while still employed by Mattel."

Elements to be Proven

(a)     That Mr. Bryant was Mattel's employee;

(b)     That Mr. Bryant was entrusted with confidential, proprietary information at Mattel, or assumed a fiduciary duty to Mattel by agreement;

(c)     That Mr. Bryant failed to act in the best interests of Mattel while he was employed by Mattel;

(d)     That Mattel did not give informed consent to Mr. Bryant's conduct;

(e)     That Mattel was harmed; and

(f)     That Mr. Bryant's conduct was a substantial factor in causing Mattel's harm;[5]

**Claim 3:  Defendant Bryant breached his duty of loyalty owed to Mattel (Against Bryant).**

Elements to be Proven

(a)     That Mr. Bryant was Mattel's employee;

(b)     That Mr. Bryant knowingly acted against Mattel's interests while he was employed by Mattel;

(c)     That Mattel did not give informed consent to Mr. Bryant's conduct;

(d)     That Mattel was harmed; and

(e)     That Mr. Bryant's conduct was a substantial factor in causing Mattel's harm;[6]

---

[5]   This Court's April 25, 2008 Order (at 6) "grant[ed] Mattel's motion for summary judgment … on the issue of the existence and breach of a fiduciary duty."

[6]   This Court's April 25, 2008 Order (at 6) "grant[ed] Mattel's motion for summary judgment on the issues of the existence and breach of the duty of loyalty."

**Claim 4:  Conversion (Against Bryant, MGA, MGA HK and Larian).**

<u>Elements to be Proven</u>

      (a)     That Mattel was the rightful owner of the property at issue;

      (b)     That Bryant, Larian, MGA, or MGA HK intentionally took possession of such property for a significant period of time or deprived Mattel of the beneficial use of such property;

      (c)     That Mattel did not consent;

      (d)     That Mattel was harmed; and

      (e)     That Bryant's conduct was a substantial factor in causing Mattel's harm.

**Claim 5:  Intentional Interference with Contract (Against Larian and MGA).**

<u>Elements to be Proven</u>

      (a)     That there was a contract or contracts between Mattel and Carter Bryant;

      (b)     That MGA and/or Mr. Larian knew of the contract;[7]

      (c)     That MGA and/or Mr. Larian intended to disrupt the performance of this contract;

      (d)     That the conduct of MGA and/or Mr. Larian prevented performance or made performance more difficult;

      (e)     That Mattel was harmed; and

      (f)     That the conduct of MGA and/or Mr. Larian was a substantial factor in causing Mattel's harm.[8]

---

[7]  As explained below, Mattel's position is that willful blindness is equivalent to knowledge.

**Claim 6:  Aiding and Abetting Breach of Fiduciary Duty (Against Larian and MGA).**

Elements to be Proven

   (a) Mr. Bryant's conduct constituted a breach of a duty or duties;

   (b) MGA and/or Mr. Larian knew that Mr. Bryant's conduct constituted a breach of duty or duties; and

   (c) MGA and/or Mr. Larian gave substantial assistance or encouragement to Mr. Bryant to breach his duty or duties.[9]

**Claim 7:  Aiding and Abetting Breach of Duty of Loyalty (Against Larian and MGA).**

Elements to be Proven

   (a) Mr. Bryant's conduct constituted a breach of a duty or duties;

   (b) MGA and/or Mr. Larian knew that Mr. Bryant's conduct constituted a breach of duty or duties; and

   (c) MGA and/or Mr. Larian gave substantial assistance or encouragement to Mr. Bryant to breach his duty or duties.

**Claim 8:  Statutory Unfair Competition (Against Bryant, Larian, MGA, and MGA HK).**

Elements to be Proven

   (a) That any defendant engaged or engages in conduct that is unlawful, or fraudulent.

---

[8] Elements of this claim were already decided in Mattel's favor in the Court's Order dated April 25, 2008.

[9] Elements of this claim were already decided in Mattel's favor in the Court's Order dated April 25, 2008.

**Claim 9:  Declaratory Relief  (Against Bryant, Larian, MGA, and MGA HK) (ownership of original Bratz works and associated copyrights allegedly created by Bryant while employed by Mattel)**

Elements to be Proven

(a)     Mattel seeks a declaration of the Court that any and all agreements between Bryant, on the one hand, and MGA, on the other hand, in which Bryant purports to assign to MGA any right, title or interests in any work that he conceived, created or reduced to practice while a Mattel employee, including but not limited to Bratz designs, are void and of no effect, including because Bryant previously assigned all right, title or interest in Bratz to Mattel and because Mattel was otherwise the owner of said right, title or interest.

**Claim 10: Copyright Infringement (Against Bryant, Larian, MGA, and MGA HK)**

Elements to be Proven

(a)     Mattel is the owner of a valid copyright; and

(b)     The defendants infringed such copyright.

For Vicarious Liability (against Larian):

(a)     Mr. Larian profited directly from the infringing activity of MGA;

(b)     Mr. Larian had the right and ability to supervise/control the infringing activity of MGA; and

(c)     Mr. Larian failed to exercise that right and ability.

For Contributory Liability (against Bryant, Larian, and/or MGA HK):

(a)     Mr. Bryant, Mr. Larian and/or MGA HK knew or had reason to know of the infringing activity of MGA; and

(b)     Mr. Bryant, Mr. Larian and/or MGA HK intentionally materially contributed to MGA's infringing activity.

1    <u>The MGA parties' and Bryant's position as to Phase 1 claims and claim</u>

2    <u>elements</u>:

3            The MGA parties and Bryant object to Mattel's recitation of the

4    required elements of the claims Mattel contends are to be tried in Phase 1.  Mattel's

5    recitation misstates the applicable elements of its claims, as set forth in standard jury

6    instructions and/or relevant case law.  *See* L.R. 16, Appendix A.  The MGA parties

7    and Bryant submit that the elements that Mattel must prove to prevail on its Phase 1

8    claims are accurately stated as set forth below.  The authority supporting the MGA

9    parties' and Bryant's position with respect to the required claim elements is set forth

10   in their joint proposed jury instructions relating to these claims, their objections to

11   Mattel's proposed jury instructions, and their responses to Mattel's objections to

12   their proposed instructions.  Pursuant to stipulation of the parties, the parties'

13   objections and responses to the proposed jury instructions will be filed with the

14   Court on May 12, 2008.

15           Additionally, the MGA parties and Bryant object to any attempt by

16   Mattel to assert any claim for misappropriation of trade secrets in Phase 1 of this

17   case, as suggested by Mattel in a footnote in its section.  Pursuant to the Court's

18   bifurcation and trial phasing order dated July 2, 2007 [Docket No. 608], which

19   adopted as the order of the Court Mattel's trial phasing proposal dated June 20,

20   2008, Mattel's misappropriation of trade secrets claim is to be tried in Phase 2.  *See*

21   Mattel's Memo. Re: Trial Structure dated June 20, 2008, at 8.  Despite being asked

22   repeatedly by counsel for the MGA parties and Bryant, Mattel has provided no

23   procedural basis or authority for leaving open the possibility of seeking to pursue a

24   misappropriation of trade secrets claim in Phase 1 of this case.

25           The MGA parties and Bryant would be prejudiced by any reallocation

26   of claims from Phase 2 to Phase 1 at this late date.  The MGA parties and Bryant did

27   not focus their discovery efforts on Mattel's misappropriation of trade secrets claim

28   on the understanding that it was a Phase 2 claim and because they were never

07209/2474226.11

-16-

Case No. CV 04-9049 SGL (RNBx)

1   informed by Mattel that this claim related to ownership of Bratz.  Additionally, the

2   MGA parties and Bryant did not move for summary adjudication of this claim, again

3   because Mattel agreed and the Court ordered that this claim be adjudicated in Phase

4   2.

5          Finally, the MGA parties and Bryant object to Mattel's repeated

6   references to and characterizations of the Court's summary judgment ruling.  Among

7   other things, as Mattel is aware, Bryant filed a motion to reconsider or to certify for

8   appeal the Court's summary judgment ruling as to certain issues, including the

9   Court's decision regarding the breach of fiduciary duty claim and the interpretation

10  of Mattel's "Inventions Agreement."  In addition, several summary judgment issues

11  remain for decision and a hearing is set for May 19, 2008.  Mattel's characterizations

12  of the Court's rulings are thus premature and incomplete.

13  **MGA and Bryant Response to Mattel's Statement Re: Claim 1**:  Mattel

14  does not distinguish between the two contracts at issue, the Inventions Agreement

15  and the alleged contract entitled "Questionnaire," or between the two sections of

16  the Inventions Agreement that Mattel alleges Bryant breached.  This is prejudicial

17  particularly where, as here, the obligations of the provisions of the two alleged

18  contracts are distinct, the alleged conduct giving rise to the claim of breach is

19  distinct, and any alleged breach gives rise to distinct damages.  Further, element 1

20  fails to state that Mattel must show that the contract at issue is a valid and

21  enforceable one.  Mattel has omitted additional elements necessary to prove breach

22  of Section 2(a) of the Inventions Agreement:  (1) the term "inventions" in the

23  Inventions Agreement applies to the BRATZ sketches; and (2) Bryant "conceived"

24  or "reduced to practice" the "invention" during his employment at Mattel within

25  the meaning of the Inventions Agreement.  Moreover, to demonstrate Bryant

26  breached section 3(a) of the Inventions Agreement, Mattel must also demonstrate

27  that it was harmed <u>during the term of Bryant's employment</u>.  The elements should

28  be stated as follows:

<u>Elements to be Proven – Breach of Inventions Agreement Section 2(A)</u>

1) That the Inventions Agreement was a valid contract between Mattel and Bryant;

2) That Mattel did all, or substantially all, of the significant things that the contract required Mattel to do;

3) That all the conditions by the contract for Carter Bryant's performance had occurred;

4) That the term "inventions" in the Inventions Agreement applies to the BRATZ sketches;

5) That Carter Bryant "conceived" or "reduced to practice" the "invention" during his employment at Mattel within the meaning of the Inventions Agreement;

6) That Carter Bryant failed to communicate to Mattel the "invention" as promptly and fully as practicable;

7) That therefore Carter Bryant did something that the contract prohibited him from doing or failed to do something he was obligated to do; and

8) That Mattel was harmed by that failure.

<u>Elements to be Proven – Breach of Inventions Agreement Section 3(A)</u>

    1) That the Inventions Agreement was a valid contract between Mattel and Bryant;

    2) That Mattel did all or substantially all, of the significant things that the contract required it to do;

    3) That all the conditions by the contract for Carter Bryant's performance had occurred;

    4) That Carter Bryant did something that Section 3(a) prohibited him from doing or failed to do something he was obligated to do; and

    5) That Mattel was harmed by that failure during the term of Bryant's employment.

<u>Elements to be Proven – Breach of Conflict Of Interest Questionnaire</u>

    1) That the terms of the Conflict of Interest Questionnaire were clear enough that the parties could understand what each was required to do;

    2) That the parties agreed to give each other consideration;

3)  That the parties agreed to the terms of the contract;

4)  That therefore the Conflict of Interest Questionnaire was a valid contract between Mattel and Bryant;

5)  That Mattel did all or substantially all, of the significant things that the contract required it to do;

6)  That all the conditions by the contract for Carter Bryant's performance had occurred;

7)  That Carter Bryant did something that the Conflict of Interest Questionnaire prohibited him from doing or failed to do something he was obligated to do; and

8)  That Mattel was harmed by that failure.

**MGA and Bryant Response to Mattel's Statement Re: Claim 2**:  Element 2 incorrectly implies that any one of those circumstances is sufficient to give rise to a fiduciary duty, which is not in compliance with the law.  Further, entrusting confidential or proprietary information is insufficient to establish a fiduciary relationship under the California Supreme Court's recent decision in *City of Hope National Medical Center v. Genentech, Inc.*, No. S129463, ___ Cal. Rptr. 3d ___, 2008 WL 1820916, at * 11 (April 24, 2008).  Mattel also omits the complete requirements necessary for an "agreed upon" fiduciary duty to arise:  (1) that Bryant voluntarily and knowingly expressly agreed to act as a fiduciary for Mattel, to act on its behalf, and to hold Mattel's interests paramount over his own interests; (2) that Mattel entrusted its property or affairs to Bryant; (3) that Mattel gave

Bryant a broad grant of discretion; (4) that Mattel had little ability to monitor Bryant and therefore had to rely upon the truth of his representations; (5) that Mattel was vulnerable and dependent upon Bryant and that vulnerability was so substantial as to give rise to equitable concerns and create a relationship similar to other legally recognized fiduciary relationships such as that of an attorney/client, trustee/beneficiary, a corporate officer/corporation; and (6) that the employment contract did not preclude the existence of a fiduciary relationship. *City of Hope*, at *6-11. In addition, element 2 fails to explain that even if these elements are met, the employee does not necessarily become a fiduciary. *Id.* at *7-8. Nor does it explain that the reposing of trust and confidence in a party with whom one has a contractual relationship is not sufficient to create an agreed upon fiduciary relationship. *Id.* at *9. Further, element three is incorrect in that it states that Bryant's failure to act in the best interests of Mattel satisfies the element of breach. Instead, Mattel must show that Bryant knowingly acted against Mattel's interest by directly competing with Mattel prior to terminating his employment. Finally, Mattel must prove it was harmed during Bryant's employment <u>and not later by Bryant's competition with Mattel</u>. The elements should be stated as follows:

<u>Elements to be Proven</u>

1) That Bryant voluntarily and knowingly expressly agreed to act as a fiduciary for Mattel, to act on its behalf, and to hold Mattel's interests paramount over his own interests;

2) That Mattel entrusted its property or affairs to Bryant;

3) That Mattel gave Bryant a broad grand of discretion;

4) That Mattel had little ability to monitor Bryant and therefore had to rely upon the truth of his representations;

5) That Mattel was vulnerable and dependent upon Bryant and that vulnerability was so substantial as to give rise to equitable concerns and create a relationship similar to other legally recognized fiduciary relationships such as that of an attorney/client, trustee/beneficiary, a corporate officer/corporation;

6) That the employment contract did not preclude the existence of a fiduciary relationship;

7) That even if these elements are met, the employee does not necessarily become a fiduciary; and Mattel was harmed;

8) That the reposing of trust and confidence in a party with whom one has a contractual relationship is not sufficient to create a fiduciary relationship;

9) That therefore Bryant was a fiduciary of Mattel at the time of the acts complained of by Mattel;

10) That while in that capacity, Bryant acted against Mattel's interests

1    by directly competing with Mattel prior

2    to terminating his employment;

3    11)    That Mattel was harmed; and

4    12)    That Bryant's conduct was a

5    substantial factor in causing Mattel's

6    Harm.

7    **MGA and Bryant Response to Mattel's Statement Re: Claim 3**:  MGA and

8    Bryant disagree with Mattel's summation of the elements as follows:  to establish

9    the breach in question, Mattel must prove that Bryant directly competed with Mattel

10   <u>during the term of his employment with Mattel</u> in connection with his development

11   of the BRATZ sketches.  Mattel must also show that it did not otherwise ratify

12   Bryant's conduct.  Finally, Mattel must show it was harmed <u>during Bryant's</u>

13   <u>employment</u> by such direct competition.  The elements should be stated as follows:

14   <u>Elements to be Proven</u>

15   1)  That Bryant was Mattel's employee and

16       thus owed Mattel a duty of loyalty;

17   2)  That Bryant breached his duty of

18       loyalty by directly competing with

19       Mattel during the term of his

20       employment with Mattel in connection

21       with his development of the BRATZ

22       sketches;

23   3)  That Mattel did not give informed

24       consent to or otherwise ratify Bryant's

25       conduct;

26   4)  That Mattel was harmed during the

27       term of Bryant's employment; and

28

1    5)  That Bryant's conduct was a substantial

2         factor in causing Mattel's harm.

3  **MGA and Bryant Response to Mattel's Statement Re: Claim 4**:  According to

4  Mattel's Motion for Summary Judgment, there is no conversion claim asserted

5  against MGA in Phase One.  (*See* Mattel MSJ at 50:18-20.)  Moreover, the

6  elements as set forth above are objectionable to the extent they include ideas and

7  concepts as property in question for Mattel's conversion claim, as the Court already

8  dismissed Mattel's conversion claim to the extent it is based on conversion of

9  "ideas."  (*See* April 25, 2008 MSJ Order; see also Mattel MSJ Opp'n at 71-72,

10 citing *Melchior v. New Line Prods., Inc.*, 106 Cal. App. 4th 779, 793 (2003) ("[t]he

11 tort of conversion does not apply to ideas").)  The elements are further improper to

12 the extent they include discarded property.  *See* *Ananda Church of Self-Realization*

13 *v. Mass. Bay Ins. Co.*, 95 Cal. App. 4th 1273, 1282 (2002).  The elements should

14 be stated as follows:

15         Claim 4:  Conversion (Against Bryant).

16              Elements to be Proven

17    1)  That  Mattel  owned  the  BRATZ

18         sketches  under  Section  2(a)  of  the

19         Inventions Agreement and the rights to

20         a  Mattel  doll  head  and  Mattel's

21         telephones and fax machines;

22    2)  That  Bryant  intentionally  prevented

23         Mattel  form  having  access  to  the

24         above-mentioned items for a significant

25         period  of  time,  or  destroyed  Mattel's

26         personal property;

27    3)  That Mattel did not consent and did not

28         discard the property;

4) That Mattel was harmed; and

5) That Bryant's conduct was a substantial factor in causing Mattel's harm.

Claim 4:  Conversion (Against Larian, MGA, and MGA HK).

Elements to be Proven

1) That Mattel owned the BRATZ sketches under Section 2(a) of the Inventions Agreement and the rights to a Mattel doll head and Mattel's telephones and fax machines;

2) That Larian, MGA, or MGA HK intentionally prevented Mattel form having access to the above-mentioned items for a significant period of time, or destroyed Mattel's personal property;

3) That Mattel did not consent and did not discard the property;

4) That Mattel was harmed; and

5) That Larian's, MGA's, or MGA HK's conduct was a substantial factor in causing Mattel's harm.

**MGA Response to Mattel's Statement Re: Claim 5**:  The statement of elements above is objectionable to the extent it is based on Mattel's rights to BRATZ, as the Court has already held that claim to be preempted by the Copyright Act.  (_See_ April 25, 2008 MSJ Order.)  Further, Mattel omits the required element of a claim for intentional interference with an at-will employment relationship, which requires Mattel to prove that Larian and MGA engaged in wrongful conduct independent of

"interfering" with Bryant's contracts with Mattel.  *See* *Reeves v. Hanlon*, 33 Cal. 4th 1140, 1152-53 (2004) ("[T]o recover for a defendant's interference with an at-will employment relation, a plaintiff must plead and prove that the defendant engaged in an independently wrongful act – *i.e.*, an act 'proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard' – that induced an at-will employee to leave the plaintiff.") (citations omitted); *see also* *American Mortg. Network v. LoanCity.com*, 2006 WL 3199291, at *15 (Cal. Ct. App. Nov. 7, 2006) (holding that jury instruction that "[a]n employee is subject to liability for the tort of inducing breach of contract/unfair competition if, before or after leaving the employment, the employee uses unlawful or <u>unfair</u> means to cause fellow employees to break their contracts with the employer" was incorrect because "liability for unfair competition/ inducing breach of contract can be based only on <u>unlawful</u> conduct") (emphasis in original; citations omitted).

Mattel's statement of the elements is further objectionable to the extent it does not require Mattel to prove that the underlying contract was a valid and enforceable one.  *See* *PMC, Inc. v. Saban Entm't, Inc.*, 45 Cal. App. 4th 579, 601 (1996). Finally, the preceding statement is objectionable to the extent it suggests that proving all the elements as against <u>either</u> MGA <u>or</u> Larian establishes the liability of both.  The elements should be stated as follows:

Elements to be Proven

       1) That there was a valid and enforceable contract between Mattel and Carter Bryant;

       2) That MGA and Larian knew of the contract and its terms;

       3) That MGA and Larian intended to disrupt the performance of this contract;

4) That Larian and MGA engaged in wrongful conduct independent of "interfering" with Bryant's contracts with Mattel through (1) aiding and abetting Bryant in a breach of the duties he owed Mattel; (2) engaging in acts of unfair competition; or (3) infringing Mattel's BRATZ-related copyrights;

5) That the conduct of MGA and/or Mr. Larian prevented performance of the contract;

6) That Mattel was harmed; and

7) That the conduct of MGA and Larian was a substantial factor in causing Mattel's harm.

**MGA Response to Mattel's Statement Re: Claim 6**: Mattel's language incorrectly suggests that proving all the elements as against either MGA or Larian establishes the liability of both. The statement also omits the element requiring Mattel to prove that Bryant owed the duties in question. *See Richard B. LeVine, Inc. v. Higashi*, 131 Cal. App. 4th 566, 574 (2005). The statement is also misleading in that it does not specify that actual knowledge on behalf of MGA and Larian of the specific wrong they substantially assisted is required to find them liable for aiding and abetting. *See Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101, 1118-20 (C.D. Cal. 2003). The elements should be stated as follows:

Elements to be Proven

1) That Bryant owed a fiduciary duty to Mattel;

2)  That Bryant breached a fiduciary duty he owed to Mattel;

3)  That MGA and Larian substantially assisted or encouraged Bryant in accomplishing the breach; and

4)  That MGA and Larian had actual knowledge of the specific wrong they substantially assisted.

**MGA Response to Mattel's Statement Re: Claim 7**: Mattel's language incorrectly suggests that proving all the elements as against <u>either</u> MGA <u>or</u> Larian establishes the liability of both.  The statement also omits the element requiring Mattel to prove that Bryant owed the duties in question.  <u>See</u> <u>Richard B. LeVine, Inc. v. Higashi</u>, 131 Cal. App. 4th 566, 574 (2005).  The statement is also misleading in that it does not specify that <u>actual</u> knowledge on behalf of MGA and Larian of the specific wrong they substantially assisted is required to find them liable for aiding and abetting. <u>See</u> <u>Neilson v. Union Bank of Cal., N.A.</u>, 290 F. Supp. 2d 1101, 1118-20 (C.D. Cal. 2003).  The elements should be stated as follows:

<u>Elements to be Proven</u>

1)  Bryant owed a duty of loyalty to Mattel;

2)  Bryant breached any duty of loyalty he owed to Mattel;

3)  MGA and Larian substantially assisted or encouraged Bryant in accomplishing the breach and

4)  MGA and Larian had actual knowledge of the specific wrong they substantially assisted.

**MGA Response to Mattel's Statement Re: Claim 8**:  Statutory unfair competition involves business conduct that is either unfair, fraudulent, or unlawful that may be remedied equitably by restitutionary disgorgement.  *See Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1144 (2003). The Court has already dismissed Mattel's statutory unfair competition claims to the extent they are based on "unfair" conduct. (*See* April 25, 2008 MSJ Order.)  Further, Mattel has already conceded that its statutory unfair competition is not based on conduct that is fraudulent by failing to defend that part of its claim in opposition to MGA Parties' Motion for Partial Summary Judgment.  (*See* Mattel MSJ Opp'n at 65-70.)  As for "unlawful" conduct, it includes only business acts that are forbidden by civil, criminal, federal, state, municipal, statutory, regulatory or court-made law.  *See Saunders v. Superior Court*, 27 Cal. App. 4th 832, 839 (1994).

Furthermore, there are no unfair competition claims asserted against MGA or Bryant in Phase 1.  (*See* Mattel MSJ at 50:18-21; 4/25/08 Order at 7.)  To the extent Mattel attempts to assert a statutory unfair competition claim based on alleged copyright infringement by MGA or includes "unfair conduct" threatening competition, those claims already have been dismissed by the Court.  (*See* April 25, 2008 MSJ Order.)

Mattel's statutory unfair competition claims are not to be tried in Phase 1. However, out of an abundance of caution, and reserving the right to amend when these issues are properly before the Court, the MGA Parties and Bryant propose that the elements should be stated as follows:

Elements to be Proven

1) That Larian, MGA and MGA HK are "businesses" as defined under Cal. Bus. & Prof. Code Section 17200 <u>et seq.</u>;

2) That Larian, MGA and MGA HK engaged in conduct – other than copyright infringement – that is forbidden by civil, criminal, federal, state, municipal, statutory, regulatory or court-made law.

**MGA and Bryant Response to Mattel's Statement Re: Claim 9**:

The MGA parties and Bryant object to Mattel's failure to set forth any of the elements required to prevail on its request for declaratory judgment.  The correct elements are as follows:

Elements to be Proven – Declaratory Relief

1) That the Inventions Agreement was a valid contract between Mattel and Bryant;

2) That the term "inventions" in the Inventions Agreement applies to the BRATZ sketches;

3) That Carter Bryant "conceived" or "reduced to practice" the "invention" "during [his] employment" at Mattel;

4) That MGA did not purchase the rights in good faith;

5) That under section 204(a) of the Copyright Act and Section 988 of the California Civil Code, the Inventions Agreement clearly and unambiguously transferred any copyright ownership in the BRATZ sketches to Mattel.

-30-

**MGA and Bryant Response to Mattel's Statement Re: Claim 10**:

The elements set forth by Mattel are improper, as Mattel fails to distinguish among the defendants and require appropriate findings with respect to each defendant. Further, Mattel's contributory liability elements fail to clarify the requirements of showing intentional inducement, that is, that a defendant acted with the desire or purpose of intentionally inducing the infringement; mere awareness that potential infringing activity might result is not enough.  Further, the elements improperly cluster all defendants together in such a way that it suggests that a finding of contributory liability against one defendant would be sufficient to enter a finding against all defendants.  The elements are properly stated as follows:

<u>Elements to be Proven – Copyright Infringement</u>

   1) That the Inventions Agreement was a valid contract between Mattel and Bryant;

   2) That the term "inventions" in the Inventions Agreement applies to the BRATZ sketches;

   3) That Carter Bryant "conceived" or "reduced to practice" the "invention" during his employment at Mattel;

   4) That MGA did not purchase the rights in good faith;

   5) That under section 204(a) of the Copyright Act 204 and Section 988 of the California Civil Code 988, the Inventions Agreement clearly and unambiguously transferred any

copyright ownership in the BRATZ sketches to Mattel.

6) That in creating the BRATZ dolls, MGA actually copied the Bryant drawings in the BRATZ dolls.

7) That, even if copied, that there is "substantial similarity" between original protectible expression in the Bryant drawings and the BRATZ dolls to the level of "virtual identity."

Elements to be Proven – Vicarious Infringement (Larian)

1) That MGA or MGA Hong Kong infringed Mattel's copyrights in the Bryant sketches;

2) That Larian profited directly from the infringing activity of MGA or MGA Hong Kong;

3) That Larian had the right and ability to supervise the infringing activities of MGA and MGA Hong Kong; and

4) That Larian failed to exercise that right and ability.

Elements to be Proven – Contributory Infringement (Larian and Bryant)

1) That MGA or MGA Hong Kong infringed Mattel's copyrights in the Bryant sketches;

2) That Larian or Bryant knew or had reason to know of the infringing activity of MGA or MGA Hong Kong; and

3) That Larian or Bryant intentionally induced MGA or MGA Hong Kong's infringing activity.

<u>Mattel's Key Evidence:</u>

In brief, and without in any way waiving its right to rely on other evidence, Mattel's key evidence is summarized as follows:

**VIII.**

**BREACH OF CONTRACT**

**(MC 1, AC 5)[10]**

**(AGAINST BRYANT)**

**A.    <u>A Valid Contract Existed Between Mattel And Bryant</u>**

Although this Court has ruled on this issue in favor of Mattel in the April 25, 2008 Order, many of these facts are necessary background for the jury in determining the scope of the breach and damages.

1.    <u>Inventions Agreement</u>:  Bryant joined Mattel in September 1995, where he worked in Mattel's Design Center as a BARBIE product designer.  In or about April 1998, Bryant resigned his position with Mattel.  Late in 1998, Bryant

---

[10]   MC = Mattel's Claims in *Mattel v. Bryant (Case No. CV 04-9059 SGL (RNBx))*
     AC = Mattel's Counterclaims in *MGA v. Mattel (Case No. CV 05-2727 SGL (RNBx))*.

1  applied to Mattel to be rehired.  On January 4, 1999, he began working at Mattel in

2  Mattel's Design Center, again as a product designer, for Mattel's BARBIE

3  Collectibles line.

4          2.      Upon his return to Mattel in January 1999, Bryant executed an

5  Employee Confidential Information and Inventions Agreement (the "Inventions

6  Agreement").

7          3.      The Inventions Agreement provides at its outset that it "is

8  designed to make clear that … inventions that I create will be owned by the

9  Company"); it concludes with the capitalized, bold-faced statement that "**THIS**

10 **AGREEMENT CREATES IMPORTANT OBLIGATIONS OF TRUST AND**

11 **AFFECTS THE EMPLOYEE'S RIGHT TO INVENTIONS THE**

12 **EMPLOYEE MAY MAKE DURING HIS OR HER EMPLOYMENT**."

13         4.      In the Inventions Agreement, Bryant assigned to Mattel all rights

14 in "inventions . . . conceived or reduced to practice by [Bryant] (alone or jointly by

15 others at any time during [his] employment by the Company" to the fullest extent of

16 the law.  The assignment is broad and included "all [his] right, title and interest in

17 such inventions, and all [his] right title and interest in any patents, copyrights, patent

18 applications and copyright applications based thereon."  As this Court held in the

19 April 25, 2008 Order (at 4), "the Inventions Agreement explicitly conveys to Mattel

20 an employee's interest in any copyrights or copyright applications."  *See also id.* at 5

21 ("[T]he plain language of the Inventions Agreement assigns his 'designs' to his

22 employer.").

23         5.      The Court's April 25, 2008 Order further held (at 5) that the

24 Inventions Agreement assigns to Mattel "any Bratz-related 'inventions' (including

25 any designs, improvements, ideas, concepts, and copyrightable subject matter) that

26 [Bryant] is found to have created during the period of his employment with Mattel."

27 The Court's April 25, 2008 Order ruled (at 5) in addition that "because the subject

28 matter at issue -- the Bratz dolls -- relate to Mattel's business of marketing fashion

1  dolls, the factual question of whether Bryant worked on them on his own time,

2  rather than during his working hours at Mattel, is not relevant."

3        6.     The plain language of the Inventions Agreement confirms that

4  ideas and concepts are within its scope.  Most notably, paragraph 2(a) refers to

5  inventions that are "<u>conceived</u> or reduced to practice" (emphasis added).  <u>See also</u> ¶

6  2(b) (defining "inventions" to include "know-how" and "discoveries").

7        7.     As this Court held in the April 25, 2008 Order (at 5), Bryant

8  "owed a fiduciary duty to Mattel by virtue of the language set forth in ¶ 1(a) of the

9  Inventions Agreement."  The Inventions Agreement also required Bryant, during

10  and after his Mattel tenure, not to disclose or misuse Mattel's proprietary or

11  confidential information.

12        8.     The Inventions Agreement also precluded Bryant from engaging

13  in behavior that constituted a conflict of interest.

14        9.     <u>Conflict of Interest Questionnaire</u>.  Bryant further agreed, when

15  he started at Mattel in 1999, that he would immediately notify his supervisor of any

16  change in his situation that would cause him to change any of his certifications

17  regarding whether he was engaged in activities that could constitute a conflict of

18  interest.

19        10.    This Questionnaire, on its face, required Bryant to disclose to his

20  supervisor any work he did while employed by Mattel for a Mattel competitor,

21  including MGA, or on a competing line of dolls, including Bratz.

22        11.    <u>Proprietary Information Checkout</u>.  On Bryant's last day of

23  employment with Mattel, October 20, 2000, Bryant signed a further agreement,

24  called the "Proprietary Information Checkout" form.  Bryant acknowledged that "he

25  has agreed to transfer all inventions made or conceived during the period of his

26  employment to Mattel," and that "[m]y interest in (a) any and all inventions . . .

27  which I have made or conceived . . . and in (b) any . . . designs, trademarks,

28  copyright subject matter [or] . . . artistic works which I have made or conceived . . .

1   during the period of my employment which relate or are applicable directly or
2   indirectly to any phase of [Mattel's] business shall be the exclusive property of
3   [Mattel]."

4

5   **B.    Bryant Breached His Contractual Obligations to Mattel**

6           Again, although this Court has ruled on this issue in favor of Mattel in
7   the April 25, 2008 Order, *see id.* at 5 ("Bryant … argues that his actions went no
8   further than lawful preparations to compete with his employer.  The undisputed
9   facts, however, tell a different story:  Bryant directly competed with Mattel by
10  entering into a contract with its competitor to produce a competing product while
11  still employed by Mattel."), many of these facts are necessary background for the
12  jury in determining the scope of the breach and damages.

13          1.    Breach of Inventions Agreement:
14                a.    Bryant conceived, created, made, and reduced to practice during
15  his Mattel tenure all of the following:
16                      (i)    Bratz ideas and concepts;
17                      (ii)   Bratz drawings and designs, including without limitation Bratz
18                      drawings and designs which the Bratz dolls, their fashions and
19                      accessories and other Bratz products were based on or derived from or
20                      which the Bratz dolls otherwise infringed; and
21                      (iii)  Bratz prototypes, sculptures and other tangible items, including
22                      without limitation Bratz prototypes, sculptures and other tangible
23                      items which the Bratz dolls or products were based on or derived from
24                      or which the Bratz dolls or products otherwise infringed.
25                b.    Bryant admits that he failed to disclose to Mattel that he worked
26  on Bratz during his tenure at Mattel; he therefore breached the Agreement.
27                c.    Bryant also signed a contract purporting to assign *to MGA* all
28  "Bryant Work Product," which included copyrights to "all results and proceeds of

services provided during the term of this Agreement. . . ."  Bryant later signed a "Modification and Clarification" (of his MGA contract), which "confirms" that "it is the continuing intent, and has always been the intent of the parties from the beginning of their contractual relationship, that MGA shall own all Intellectual Property Rights subsisting in all Services and Materials created and worked on by Bryant."  This purported assignment indisputably includes the drawings (and associated copyrights) created during Bryant's Mattel tenure.  Indeed, paragraph 3.2 of the contract "confirms" assignment of "all work done by Bryant <u>prior to September 18, 2000</u>, which became known as the Bratz property. . . ."  Prior to September 18, 2000, Bryant was a Mattel employee.

        d.      Bryant also breached the term of the Inventions Agreement that prohibited him from "engag[ing] in any employment or business other than for the Company, or invest[ing] in or assist[ing] (in any manner) any business competitive with the business or future business plans of the Company," unless he had "the Company's express written consent."  As this Court found in the April 25, 2008 Order (at 5), "[t]he undisputed facts … [show] Bryant directly competed with Mattel by entering into a contract with its competitor to produce a competing product while still employed by Mattel."

        e.      While Bryant was employed by Mattel, Bryant and other defendants misappropriated and misused Mattel property and Mattel resources for the benefit of Bryant and MGA.  Such acts included, but are not limited to, the following:

        (i)      Using his exposure to Mattel development programs to create the concept, design and name of Bratz; while Bryant was employed at Mattel, he was routinely exposed to Mattel proprietary concepts that had elements which were later incorporated by Bryant and/or MGA into Bratz.  For example, a Mattel designer named Lily Martinez was working on a project in 1999 called Toon Teens.  Though the Toon

Teen dolls never went to market, Bryant had access to Martinez's sketches, which were posted in her cubicle for a period of time beginning in 1999. Furthermore, Carter Bryant's roommate, Elise Cloonan, worked on the Toon Teens project. As another example, starting in approximately the late 1999 and early 2000 time period, Mattel considered certain names for dolls in its line that ultimately became known as DIVA STARZ. The names Mattel considered included "Brats" and variations, including "Mall Brats," as well as other names such as "Boyz" and "Petz." Such names were either subsequently considered to be used or were used by MGA and Bryant in connection with Bratz. Mattel also commissioned drawings from outside vendor, Steve Linker, for its DIVA STARZ project that included elements later incorporated in Bratz by Bryant and/or MGA.

(ii)     Using Mattel resources, and while employed by Mattel, Bryant worked by himself and with other Mattel employees and contractors to design and develop Bratz, including without limitation by creating drawings and three-dimensional models of Bratz dolls, and fashion designs for the dolls' associated clothing and accessories;

(iii)    Using Mattel resources, and while employed by Mattel, Bryant took steps to assist MGA to produce Bratz dolls. By his account, Bryant met with MGA in August or September 2000, and eventually sold Bratz to MGA and quit Mattel to work with MGA on the Bratz dolls.

(iv)    A further example is the work that Bryant did in conjunction with Steve Linker, a Mattel vendor who created designs for Mattel for DIVA STARZ. In Summer 2000, Linker was contacted by an MGA employee — Paula Garcia — who had left Mattel in April 2000 to work for MGA. Garcia has testified that (i) when she left Mattel she

was aware of DIVA STARZ at Mattel through several of her Mattel colleagues and (ii) when she contacted Linker in Summer 2000 and asked him to do work for MGA, she knew that Linker had worked on DIVA STARZ for Mattel.  Linker has since testified and confirmed that Garcia made this approach, and that when he met with her and Bryant in October 2000, Bryant showed Linker "Bratz" artboards and illustrations.  Garcia knew that Linker had worked on, and had full access to, all of Mattel's DIVA STARZ property, and she pursued Linker to have him work on the Bratz project for MGA.

(v)     Bryant admitted creating a Bratz model using Mattel resources and that he paid at least one Mattel employee for her work on Bratz.

(vi)      Bryant admitted at deposition that he worked on his Bratz drawings while employed by Mattel and showed them to MGA while employed by Mattel; Bryant admitted creating drawings of Bratz characters wearing evening fashion designs in or about July 2000; he performed development-related work on Bratz while employed by Mattel and used Mattel employees and materials to prepare a three-dimensional doll prototype for his pitch to MGA — a pitch he made while employed by Mattel; he worked on an ostensibly separate doll for MGA while employed by Mattel; he targeted Mattel vendors and engaged them to start their work on Bratz before he left Mattel, using Mattel resources; MGA and Isaac Larian, MGA's CEO, were aware when Bryant first met with them that Bryant was still employed at Mattel; Bryant worked on Bratz with MGA for at least four hours per day starting weeks before he left Mattel; and one vendor alone billed for 169 hours of development services on Bratz before Bryant left Mattel.  Both MGA HK's Lee Shiu Cheung and MGA HK's outside counsel have separately declared under oath that "[t]he designs of the

Bratz dolls are all original drawings created by Mr. Bryant using his own independent labour, skill and judgement [sic]."

(vii)     A former Mattel employee, Veronica Marlow, worked with Bryant and MGA on Bratz products.  Ms. Marlow was originally employed at Mattel, where she knew Bryant, and began to work for MGA in or around 2000.  Marlow worked closely with Bryant and, according to Bryant, Marlow and some MGA witnesses, made an introduction for Bryant to MGA.  Bryant has paid and continues to pay Marlow — who Bryant claims introduced him to MGA — at least 10% of his 3% royalty from Bratz.  As a result, Ms. Marlow has since been paid millions of dollars by both Bryant and MGA.  Marlow induced Mattel employees Ana Cabrera, Beatrice Morales and Elena Salazar to work on Bratz for MGA and for Bryant during 2000 through 2005.  Marlow took steps to conceal the fact that Mattel employees were working on Bratz, including without limitation by paying them using false names and false social security numbers.

(viii)    Paula Garcia, MGA's Bratz project manager, worked for Mattel until April 2000.  Ms. Garcia was involved with the Bratz project, including when Bryant while employed by Mattel.  Ms. Garcia, among others working at MGA in 2000, had had access and knowledge of the DIVA STARZ project while she was still a Mattel employee.  In addition, Maureen Mullen, also a former Mattel employee, worked for MGA in 2000.  Ms. Mullen, one of the primary designers on DIVA STARZ, worked with Ms. Garcia at Mattel and was friends with her.  Concurrent with her consulting work on DIVA STARZ in 2000, Mullen was paid $17,000 by MGA for work on a doll design.  Ms. Garcia and Larian emailed Ms. Mullen in October

1    2000 asking if she could recommend Mattel personnel to work on

2    Bratz.

3        f.      During the time that he was employed by Mattel, Bryant

4    concealed his actions from Mattel, by, *inter alia*, failing to notify his supervisor of

5    the conflict of interest he created when he began working with MGA and when he

6    began receiving payments from MGA, by conceding Bratz, and by spoliating

7    evidence:

8        (i)      While he was still a Mattel employee, Bryant sent a fax to an

9    MGA attorney, David Rosenbaum, to provide information about his

10   Mattel employment and Mattel agreements to MGA.  In the fax, Bryant

11   advised MGA, "I am unable to look into this too much further with our

12   [i.e., Mattel's] Human Resources director without risking suspicion."

13   Bryant did send his offer letter from Mattel to MGA with this fax.

14   That letter made it clear to MGA that, as is standard in the industry and

15   standard within MGA as well, Bryant had signed an Inventions

16   Agreement with Mattel.

17   (ii)     MGA, Larian and Bryant altered numerous original Bratz

18   drawings created by Bryant by adding false and misleading date

19   notations of "8/1998" and "© 8/1998" to the drawings, even though the

20   drawings were not created in August 1998.  These notations were not

21   made in 1998, and defendants do not deny the drawings were not

22   completed in 1998.  Nevertheless, defendants falsely told the Copyright

23   Office they were completed in 1998.

24   (iii)    Jacqueline Ramona Prince, a third-party witness, has raised other

25   questions about the integrity of Bryant's documents.  According to both

26   Ms. Prince and Bryant, Bryant showed Ms. Prince his Bratz drawings

27   in August 1999, when he was employed by Mattel, and asked her to

28   notarize them "as of" 1998.  Ms. Prince, however, testified that

markings which now appear on the copy of a Bratz drawing produced by defendants did not appear on the original drawing that Bryant showed her in 1999.  This conflicts with Bryant's testimony about the drawing.  Furthermore, expert forensic analysis has shown that a key portion of the entry from Ms. Prince's notary book relating to certain of Bryant's Bratz drawings -- reflecting that those drawings are supposedly "From 1998 Missouri" -- was subsequently added to the book using different ink.

(iv)    As further examples, Bryant and MGA have produced other documents that appear to have been altered to conceal information, including without limitation to conceal the true timing of Bratz's creation and Bryant's involvement with MGA.  These include, most notably, faxes of Bratz drawings that have fax header dates of April 2000 and thereabouts — six months before Bryant left Mattel's employ.  One page produced by Bryant states that it was the third page of a fax transmission, but neither preceding nor subsequent pages, nor any cover sheet, has been produced.  Further, even though the fax headers on the produced pages have fields for both the sender's name and the sender's telephone number, neither the name of the sender nor the sender's telephone number appears in the fax headers — in violation of federal law, as the Court has recognized.

(v)    Bryant and MGA caused destructive testing to be performed on Bryant's original drawings without either advance notice to or approval by the Court or Mattel.  Some of these drawings — including the originals of documents BRYANT 192 and BRYANT 210 — had holes in them.  Bryant testified that his drawings did not have holes in them when he turned them over to defendants' counsel and that he was unaware of the origin of the holes.  As the Court has stated:  "That

1    there are serious questions concerning the handling of these critical

2    documents [by MGA] certainly causes the Court much concern about

3    whether the truth seeking functions of the adversarial system have been

4    fundamentally compromised in this case."  Order Re Motion for

5    Appointment of Expert Witnesses, at 11:10-13.

6    (vi)    Bryant also made affirmative misrepresentations to Mattel

7    management and employees immediately before his departure from

8    Mattel on October 20, 2000.  For example, during 2000, Bryant told

9    other Mattel employees that he was going to leave Mattel for "non-

10   competitive" pursuits.  Bryant knew at the time that this was false

11   because he was already working with MGA and had contracted with

12   MGA to assign Bratz works to MGA and to provide design and

13   development services to it.  Bryant also enlisted other Mattel

14   employees to perform work on Bratz during the time he was employed

15   by Mattel.  Bryant even misled some to believe that they were

16   performing work on a project for Mattel.

17   g.      Bryant and other Mattel employees working on a Bratz

18   prototype — without Mattel's knowledge — had designed and were far along in

19   development of Bratz prior to the time that Bryant left Mattel on October 20, 2000.

20   Such evidence includes, but is not limited to, the following:

21   (i)    Bryant created a key design drawing that was the basis for three-

22   dimensional Bratz dolls while employed by Mattel.  Bryant testified at

23   deposition that he created this drawing in November 2000, after he had

24   left Mattel.  However, Steve Linker, a third-party vendor working with

25   MGA, testified that he received that design drawing (as well as other

26   Bratz development documents) from MGA at a meeting held before

27   Bryant left Mattel.

28

(ii)     Bryant created Bratz designs that bear an April 2000 fax header date, six months before he left Mattel;

(iii)    Contrary to Bryant's testimony, Bryant had faces of three-dimensional Bratz dolls painted as of June 2000 (*i.e.*, some five months before he left Mattel).  Anna Rhee has testified that she was asked by Bryant and paid by MGA to paint Bratz doll heads in June 2000.

(iv)    Bratz design drawings produced by defendants with alleged "8/1998" creation dates (*i.e.*, purportedly when Bryant was not employed by Mattel) did not bear those dates as of October 2000 — in other words, the dates were added to the drawings after the fact.  These include drawings registered by MGA with the Copyright Office that bear false '8/1998' creation dates.

(v)     According to MGA's own e-mails, Bryant worked on Bratz with MGA for at least four hours per day starting weeks before he left Mattel.

(vi)    One vendor alone, Veronica Marlow, billed for 169 hours of development services on Bratz before Bryant left Mattel.

(vii)   While he was working for Mattel, Bryant contacted vendors for his own and MGA's benefit, including, but not limited to, vendors in Hong Kong for doll hair for Bratz and admitted to them that he was working with MGA.

(viii)  Not only did Bryant create and develop designs for the dolls as well as other aspects of the products such as their fashion accessories during the time he was employed by Mattel, but MGA showed Bratz prototypes and/or product to both focus groups and retailers in November 2000, less than three weeks after Bryant left Mattel.  Those meetings were arranged by Bryant, Larian and others at MGA, *i.e.*, while Bryant was still employed by Mattel.

(ix)     Anna Rhee was asked by Bryant and paid by MGA to paint Bratz doll heads in June 2000.  Ms. Rhee produced approximately twenty invoices for work that she performed on Bryant-related MGA projects in the year 2000.  These invoices also reveal that Ms. Rhee performed work with Bryant and MGA on at least seven separate occasions before Bryant's departure from Mattel — including one invoice that dates to June 12, 2000, well before Bryant claimed at deposition to have even heard of MGA.

(x)     Ms. Rhee testified that her work during that time period was for Bratz and that "Angel" was MGA's and Bryant's code name for Bratz. Thus, Ms. Rhee testified that her June 12, 2000 work was for face painting on two Bratz doll heads; her late August 2000 work was for face painting on four Bratz doll heads; and her work as of September 8, 2000 was for face painting on additional Bratz doll heads.  All of these are times when Bryant was employed by Mattel.

(xi)     According to defendants, Bryant made his Bratz pitch to MGA during the time when he was still employed with Mattel, and after Bryant's initial meeting with Ms. Garcia and Ms. Marlow.  Also according to defendants, present at that meeting were Isaac Larian, his daughter Jasmine, Paula Garcia, Veronica Marlow and Victoria O'Connor.  Also, while still employed by Mattel, Bryant solicited Margaret Hatch-Leahy, a Mattel employee until September 5, 2000, to sculpt the Bratz dolls and introduced her to MGA.  Bryant attended a meeting with Ms. Garcia and Margaret Leahy, to discuss Bratz doll sculptures during a time that Bryant was still employed at Mattel.  As a result of Bryant's and MGA's solicitation, Ms. Hatch-Leahy worked on Bratz sculpts while he was still a Mattel employee and under Bryant's creative direction.

(xii)   Further, MGA and those associated with MGA have made statements, including under oath, that confirm Bryant assisted and worked with MGA during his Mattel employment.  In statements to the press, for example, MGA's CEO, Isaac Larian, told the Wall Street Journal that "he chose Mr. Bryant's idea for the Bratz over several others after holding a sort of fashion-doll design contest in late 1999" — a time when Bryant was employed by Mattel and well before the time that MGA and Bryant claim in this case to have even been introduced.  In a sworn affidavit filed in a Hong Kong lawsuit brought by MGA, Isaac Larian stated that "[t]he Bratz dolls were first exhibited in the USA in November 2000," which further confirms that Bryant was working with and aiding MGA on the project prior to his departure from Mattel on or about October 20, 2000.

(xiii)  In an MGA e-mail dated September 9, 2001, authored by Nana Ashong, an associate product manager at MGA who worked on the Bratz project, Ms. Ashong gives the "key legally relevant dates for Bratz" as reflected by MGA's copyright registration applications, including a "date of creation" of September 18, 2000.  Sam Khare, an MGA Rule 30(b)(6) designee on the subject of MGA's copyright, trademark and patent applications and registrations and associated communications, confirmed that the meaning of Ms. Ashong's email was "that the Bratz dolls were created on September 18, 2000."

(xiv)  Additionally, Isaac Larian was sued for fraud and other claims by his brother and one-time partner in MGA, Farhad Larian.  Farhad Larian's verified Complaint asserts, among other things, that "in or about late 1999 and early 2000, Isaac became aware of a potential new product line that had tremendous potential for [MGA].  The new product line involved the 'Bratz' dolls and related products."  The

1    verified Complaint further states:  "In or about early 2000, Isaac called

2    a meeting to discuss the new Bratz product line with selected

3    individuals" at MGA, and took affirmative steps "to conceal" from

4    Farhad Larian MGA's "plans for the Bratz line" in February, March and

5    May 2000.  Bryant was working for Mattel during each of these time

6    periods.

7    (xv)   Other evidence adduced to date also confirms, among other

8    things, that Bryant designed Bratz while employed by Mattel and not in

9    1998 as he has asserted.  For example, Bryant and/MGA's use of

10   elements from Mattel projects created during the 1999 and 2000 time

11   period -- including elements from Toon Teens and DIVA STARZ

12   described above -- tend to show that Bratz was created while Bryant

13   was a Mattel employee and not in 1998 as he and MGA claims.

14   (xvi)  While Bryant was still employed by Mattel, he and MGA

15   employees repeatedly provided design and manufacturing information

16   to MGA HK for Bratz.

17   (xvii) Mattel will offer expert testimony regarding the timing of the

18   marketing research and sales of Bratz dolls, and other evidence

19   regarding the credibility of MGA's claims as to when it began to

20   develop the Bratz product line. This will include evidence showing that

21   the Bratz product line was developed in an earlier timeframe than

22   MGA now alleges; that events taking place within Mattel regarding its

23   own Toon Teens and DIVA STARZ projects indicate that Bratz had

24   sources of inspiration other than those identified by Bryant and that

25   Bratz was created while Bryant was employed by Mattel.

26          h.      It is beyond legitimate dispute that MGA -- a toy company -- was

27   and is "a business competitive with the business or future business plans of" Mattel

28   within the meaning of the Inventions Agreement.  It is also undisputed that Mattel

1   never granted Bryant "express written consent" to work with MGA while still
2   employed by Mattel.  Accordingly, Bryant's work with MGA while employed at
3   Mattel breached the Inventions Agreement.

4           i.      Bryant promised in the Inventions Agreement not to disclose or
5   misuse Mattel's proprietary or confidential information.  That obligation remains in
6   effect to this day, and continues to be violated by Bryant.

7           j.      Bryant's breaches of contract and defendants' other misconduct
8   has caused Mattel substantial harm.

9

10  **C.      Breaches of the Conflicts of Interest Questionnaire:**

11          Bryant breached the Conflict of Interest Questionnaire.  The
12  Questionnaire required Bryant to notify Mattel if he became engaged in any
13  business venture with a Mattel competitor that could be construed as a conflict of
14  interest.  Bryant worked on Bratz and with MGA while employed by Mattel.  He did
15  not notify Mattel of this fact.  Bryant misled others at Mattel upon his departure.

16          Bryant understood what the Conflict Questionnaire required because,
17  among other things, he disclosed on it the freelance work he had performed while in
18  Missouri for Ashton-Drake, but never disclosed the Bratz work he now claims he
19  did in 1998.

20

21  **D.      Breach of The Proprietary Information Checkout Form:**

22          Bryant's last day of employment with Mattel was October 20, 2000.  At
23  that time, he signed a further agreement, called the "Proprietary Information
24  Checkout" form.  In it, Bryant acknowledged that "he has agreed to transfer all
25  inventions made or conceived during the period of his employment to Mattel," and
26  that:

27          My interest in (a) any and all inventions . . . which I have
28          made or conceived . . . and in (b) any . . . designs,

1                        trademarks, copyright subject matter [or] . . . artistic works

2                        which I have made or conceived . . . during the period of

3                        my employment which relate or are applicable directly or

4                        indirectly to any phase of [Mattel's] business shall be the

5                        exclusive property of [Mattel].

6    Bryant executed the Proprietary Information Checkout form despite his execution of

7    the MGA/Bratz agreement purporting to convey Bryant's Bratz works to MGA.  Nor

8    did Bryant otherwise disclose to Mattel his MGA agreement or his work for MGA.

9    To the contrary, Bryant concealed from Mattel that he was going to a competitor

10   and explicitly told others at Mattel that he was going to do "non-competitive"

11   pursuits.  Bryant knew at the time that those representations were false and made

12   those false statements to conceal from Mattel the facts that he was already working

13   with MGA and that he had contracted with MGA purportedly to assign Bratz works

14   to MGA and to provide design and development services to MGA, a Mattel

15   competitor.

16           Mattel seeks an injunction barring defendants from further use and

17   possession of the converted property and requiring its return to Mattel.

# IX.

## BREACH OF FIDUCIARY DUTY

## (MC 2, AC 7)

## (AGAINST BRYANT)

Although this Court has ruled on this issue in favor of Mattel in the April 25, 2008 Order,[11] many of these facts are necessary background for the jury in determining the scope of the breach and damages.

**A.**     **Bryant Intended To And Did Form A Fiduciary Relationship With Mattel.**

1.     Bryant was Mattel's employee and was entrusted with confidential, proprietary information.  Mattel restates and hereby incorporates by reference the facts and evidence set forth above in relation to each claim asserted against Bryant.  Bryant's fiduciary duty to Mattel emanates from two sources:  (1) the Inventions Agreement, which by its terms imposed on Bryant an obligation of confidentiality and trust; (2) Bryant's role at Mattel, which endowed him with trust and gave him broad access to confidential information.

2.     Mattel's letter to Bryant offering him a position with Mattel conveyed the importance to Mattel of Bryant's preservation of confidentiality as a Mattel employee, stating that "this offer is contingent upon satisfactory verification of all information…, and the signing of a Confidential Information and Inventions Agreement."  The Inventions Agreement further manifested an intent to create a confidential relationship, underscoring the "competitive environment" in which Mattel operates and requiring Bryant to "maintain the confidentiality of the

---

[11]   April 25, 2008 Order at 6 ("The Court grants Mattel's motion for summary judgment and denies Bryant's motion for summary judgment on the issue of the existence and breach of a fiduciary duty.").

1    Company's trade secrets," and to "use those trade secrets for the exclusive benefit of

2    the Company."  In addition, it required that Bryant, during his Mattel employment,

3    would not "engage in any employment or business other than for [Mattel], or invest

4    in or assist (in any manner) any business competitive with the business or future

5    business plans of [Mattel]" without Mattel's express written consent.  Inventions

6    Agreement ¶ 3.  And upon leaving the Company, Bryant was obligated to "deliver

7    all tangible, written, graphical, machine readable and other materials (including all

8    copies) in my possession or under my control containing or disclosing Proprietary

9    information."  Taken together, these provisions, among others, clearly evince an

10   intent to create a close, confidential relationship between Mattel and Bryant.  These

11   provisions create a fiduciary duty under California law.   Bryant's acceptance of

12   these terms as a condition of employment manifests his intent to be bound.  As this

13   Court held in the April 25, 2008 Order (at 5), "Bryant … owed a fiduciary duty to

14   Mattel by virtue of the language set forth in ¶ 1(a) of the Inventions Agreement."

15          3.     Even apart from the Inventions Agreement, Bryant owed Mattel

16   a fiduciary duty because Mattel entrusted him with highly confidential information.

17   While at Mattel, Bryant had extensive access to and exposure to confidential and

18   proprietary information (including designs for BARBIE and proposed lines of other

19   dolls and toys); confidential knowledge relating to design, marketing, production,

20   sales; and access to the creative resources and concepts at the core of Mattel's

21   business.  He also supervised the work of others, exercised discretion and worked

22   independently in many of his job assignments and duties.  Bryant also represented

23   Mattel in its dealings with third parties and, in actions in the course and scope of his

24   employment with Mattel, was an agent of Mattel.  As this Court found in the April

25   25, 2008 Order (at 6), "Bryant was 'in a superior position to exert unique influence

26   over' Mattel because he was in the best position, arguably the only one in a position,

27   to know of and police his actions."

28

4.      Bryant thus occupied a position of trust within the company. Bryant admitted to this position of trust repeatedly.

5.      The Conflict of Interest Questionnaire Bryant executed on January 4, 1999, contained his certification that, other than as disclosed, he had not worked for any competitor of Mattel in the prior twelve months and had not engaged in any business venture or transaction involving a Mattel competitor that could be construed as a conflict of interest.  Pursuant to the Conflict Questionnaire, Bryant also agreed that he would immediately notify his supervisor of any change in his situation that would cause him to change any of the foregoing certifications.

6.      The effect of these circumstances and agreements was that Bryant owed Mattel a fiduciary duty that included, but was not limited to, an obligation not to take any action that would be contrary to Mattel's best interests or that would deprive Mattel of any opportunities, profit or advantage which Bryant might bring to Mattel.

**B.      Bryant Breached The Fiduciary Duty He Owed To Mattel**

Although this Court has ruled on this issue in favor of Mattel in the April 25, 2008 Order,[12] many of these facts are necessary background for the jury in determining the scope of the breach and damages.

1.      <u>Bryant failed to act in the best interests of Mattel while employed at Mattel.</u>  Among other things, Bryant worked with MGA and accepted payments from MGA while still a Mattel employee, entered in an agreement with a competitor, conveyed Mattel property and concepts to MGA, failed to disclose

---

[12]    *See* April 25, 2008 Order at 6 ("[T]he undisputed facts establish that Bryant breached his fiduciary duty to communicate his inventions to Mattel when, rather than doing so, he secretly entered into a contract with Mattel's competitor, while still employed by Mattel, to produce a line of fashion dolls to be marketed in direct competition with Mattel's products.").

inventions he created while a Mattel employee, failed to disclose his conflicts of interest, solicited and paid Mattel employees to work on Bratz, used Mattel resources for Bratz and to benefit himself and MGA and its affiliates, and misrepresented to Mattel his future plans. This pattern of conduct is a classic breach of fiduciary duty.

Bryant breached his duties by conveying to MGA drawings, sculpts and three-dimensional tangibles he created while employed by Mattel and those he may have created later but that derived from or otherwise infringed upon the works he created while a Mattel employee. As discussed above, the Inventions Agreement formalized this common law duty by explicitly prohibiting such a transfer. *See also* April 25, 2008 Order at 6 ("[T]he undisputed facts establish that Bryant breached his fiduciary duty to communicate his inventions to Mattel when, rather than doing so, he secretly entered into a contract with Mattel's competitor, while still employed by Mattel, to produce a line of fashion dolls to be marketed in direct competition with Mattel's products.").

Apart from his actual conveyance of these materials and concepts, Bryant breached his fiduciary obligations to Mattel by secretly contracting with MGA while employed by Mattel. Without Mattel's knowledge, and without its consent, Bryant entered into a contract with MGA dated as of September 18, 2000 -- while he was indisputably still employed by Mattel. The MGA-Bryant contract required Bryant to provide design services on Bratz, a line of dolls created by Bryant, to MGA on a "top priority" basis. This contract squarely conflicted with Bryant's pre-existing contractual obligations to Mattel. *See id.*

Bryant has admitted to conduct during his Mattel tenure that constituted multiple breaches of his duties to Mattel, including without limitation:

- **Drawing Bratz**. Bryant indisputably created and worked on Bratz drawings while employed by Mattel. He admitted this in binding

responses to requests for admission.  He also admitted he showed them to MGA while employed by Mattel.

- **Using Mattel resources for Bratz**.  Bryant used Mattel employees and materials to prepare a three-dimensional doll prototype for his pitch to MGA (a pitch he made while employed by Mattel), and separately paid at least one Mattel employee for such work on Bratz.  Bryant also called MGA dozens of times from his work telephone at Mattel and sent MGA faxes from Mattel's fax machine.

- **Soliciting Mattel vendors for Bratz**.  Bryant targeted Mattel vendors and engaged them to start their work on Bratz before he left Mattel. For example, he "learned about the existence of [a hair vendor] Universal in connection with [his] Mattel employment" and obtained its contact information from another Mattel employee.

- **Work on Another, Allegedly Separate MGA Project**.  Bryant worked for MGA on an allegedly separate (from Bratz) doll while employed by Mattel, and was paid by MGA for that work.

Bryant's work on Bratz while employed at Mattel cannot be dismissed as mere preparation to compete with Mattel, i.e., rather than actual competition which breached his duties.  This Court explicitly so found in the April 25, 2008 Order (at 5):  "Bryant … argues that his actions went no further than lawful preparations to compete with his employer.  The undisputed facts, however, tell a different story.  Bryant directly competed with Mattel by entering into a contract with its competitor to produce a competing product while still employed by Mattel."

As this Court also found (*id.* at 6), "Bryant breached his fiduciary duty to communicate his inventions to Mattel …."  Specifically, Bryant never disclosed his plans to Mattel.  Bryant concealed his creation of Bratz and relationship with MGA from Mattel.  Thus, he did not disclose his invention and/or assignment of Bratz to MGA in his exit interview or when he signed the Proprietary Information

Checkout Form, on October 19, 2000, in which he certified that "[a]ll documents … and other items including, but not limited to, … sketches … relating to the business of the Company, made or obtained by me while employed by the Company shall be the exclusive property of the Company and shall be delivered by me to the Company on termination of my employment or at any time as requested by the Company." Bryant also hid the truth from his co-workers.  For instance, Jill Nordquist testified that "[I asked] him if he was going to a competitor -- competitive doll company, to which he responded no."  Likewise, Ivy Ross recalled, "[Bryant] told me he was going to have more time on his hands, be able to sit at home and with his dog on his side and do drawings and spend more quality time at home, and it's just something he felt he really needed to do at this point in his life, and I asked if he was going to a competitor, and he said no, it was not a competitor ...."

2.   <u>Mattel did not give informed consent to Bryant's conduct.</u>

Bryant was a doll designer.  Rather than devote his talents to Mattel, Bryant plotted against Mattel, exploited the resources available to him, accepted secret payments, pitched his idea, drawings and model for a new doll line to MGA, secretly solicited and paid Mattel employees to work on Bratz, entered into a secret contract to work for MGA, and then took affirmative steps to conceal it.  Mattel never gave informed consent to this secret scheme.

# X.

## BREACH OF DUTY OF LOYALTY

## (MC 3, AC 9)

## (AGAINST BRYANT)

Although this Court has ruled on this issue in favor of Mattel in the April 25, 2008 Order,[13] many of these facts are necessary background for the jury in determining the scope of the breach and damages.

### A.   Bryant Was Mattel's Employee and Owed A Duty of Loyalty to Mattel

Mattel restates and hereby incorporates by reference the facts and evidence set forth above in relation to each claim asserted against Bryant.  Every California employee owes a duty of undivided loyalty to his employer and may not take any action that is adverse to his employer.  The duty of loyalty is also codified in the Labor Code, which obligates every employee to comply with his employer's directions, to assign to the employer everything (except compensation) the employee acquires by virtue of his employment, and to give preference to the business of the employer over his own similar interests.  Cal. Labor Code §§ 2856, 2860, 2863.

Pursuant to this duty, Bryant could not compete with Mattel or assist a competitor of Mattel during his employment with Mattel.  Bryant was required to give preference to Mattel's business over his own or others' interests during the course of his employment with Mattel.  While California law does permit an employee to seek other employment and even to make some "preparations to

---

[13]   April 25, 2008 Order at 6 (granting summary judgment to Mattel because "The undisputed facts establish that [Bryant] breached this duty [of loyalty] by entering into a contract with Mattel's competitor, while still employed by Mattel, to produce a line of fashion dolls to be marketed in direct competition with Mattel's products.").

1   compete" before resigning, an employee may not transfer his loyalty to a competitor

2   without violating his duty of loyalty.

3

4   **B.     Bryant Knowingly Acted Against Mattel's Interests and Materially**

5          **Breached the Duty of Loyalty He Owed to Mattel**

6          Mattel refers to and hereby incorporates by reference the facts set forth

7   above regarding Bryant's breaches of contract.  By their nature, and in these

8   circumstances, those breaches also constituted breaches of the duty of loyalty owed

9   by Bryant to Mattel.  As shown above, Bryant indisputably engaged in ongoing,

10   pervasive and secretive interactions with a competitor involved in the *same business*

11   as Mattel for private gain at his employer's expense.

12          Bryant breached his loyalty to Mattel in that, while employed by

13   Mattel, he secretly aided and assisted MGA and its affiliates, all of which are

14   competitors of Mattel, including without limitation by entering into an agreement

15   with MGA.  Bryant worked with MGA (and was paid by MGA) while employed by

16   Mattel.  The contract Bryant secretly entered into with MGA required him to

17   provide design services to MGA on a "top priority" basis while employed by Mattel.

18

19   **C.     Mattel Did Not Give Informed Consent To Bryant's Conduct**

20          Bryant worked on a line of dolls while employed by Mattel and did not

21   disclose that work to Mattel.  Bryant also breached the aforementioned duty by

22   aiding a Mattel competitor and using Mattel property and resources for the benefit

23   of, and to aid and assist, himself personally and MGA and its affiliates.  Mattel

24   never gave informed consent to Bryant's conduct.

25

26

27

28

# XI.

## CONVERSION

## (RE BRATZ; AC 11)

## (AGAINST BRYANT, MGA, MGA HK and LARIAN)

A.     **Mattel Owns Valuable Property And Tangible Materials Including Drawings and Items Created By Bryant When He Was A Mattel Product Designer**

Mattel restates and hereby incorporates by reference the facts and evidence set forth above in relation to each claim asserted against Bryant.  Mattel owned valuable tangible property created by Bryant while a Mattel employee, including without limitation Bratz drawings, Bratz sculpts and other three-dimensional items, and "Swan" drawings that Bryant created while employed by Mattel.  This property is referred to below for the purposes of this claim for conversion as "the Converted Property."

Defendants unlawfully converted the Converted Property by: (1) removing drawings, sculpts and other tangible materials owned by Mattel; and (2) unlawfully possessing such tangible materials.

In the Inventions Agreement, paragraph 2, Bryant assigned to Mattel all rights in "inventions," including "designs," that he created during his Mattel employment to the fullest extent of the law.  As Bryant's prior counsel has acknowledged, "[t]he nature of the assignment here is that it is a broad based assignment of all inventions during their employment; all things that were conceived and practiced."[14]  And this Court held in the April 25, 2008 Order (at 5) that "the plain language of the Inventions Agreement assigns [Bryant's] 'designs' to his

employer."  Mattel owns (among other things) all doll and toy designs and works that were created by Bryant during the term of his Mattel employment.  Without Mattel's knowledge, and while he was still employed by Mattel, Bryant entered into a contract with MGA dated as of September 18, 2000.[15]  That contract required Bryant to provide design services on Bratz, a line of dolls created by Bryant and marketed by MGA, to MGA on a "top priority" basis.  This agreement conflicted with Bryant's preexisting contractual obligations to Mattel.[16]  Paragraphs 1 and 2 of the September 18, 2000 Agreement with MGA purported to grant MGA ownership of works produced by Bryant both before and after the agreement's effective date, in further contravention of Bryant's obligations to Mattel under the Inventions Agreement.

The Converted Property was taken by Bryant from Mattel to further his own interests and provided by Bryant to Larian and MGA in furtherance of the interests of Bryant, Larian and MGA.  MGA and Isaac Larian met with Bryant, paid for his designs, and contracted with him for his services, all the time knowing that Bryant was a Mattel employee in a confidential role.  This appropriation of Mattel's tangible materials constituted conversion.

**B.**     **Defendants' Wrongful Conversion of Mattel's Property Constituted A Substantial Interference With Mattel's Rights.**

1.     The Converted Property was physically taken by Bryant from Mattel to further his own interests and provided by Bryant to Larian and MGA in furtherance of the interests of Bryant, Larian and MGA, and contrary to the interests

---

[15]   Consulting Agreement between MGA and Bryant dated as of September 18, 2000, Proctor Dec. Exh. 3.

[16]   Id. ¶ 1.

1  of Mattel, to this day Bryant, Larian and MGA retain possession of the Converted

2  Property.

3         2.      Mattel was also deprived of its enjoyment and usage of the

4  Converted Property, and was thereby injured and had its rights substantially

5  interfered with by defendants.

6

7  **C.   Mattel Did Not Consent To the Conversion**

8         1.      As set forth above in relation to Mattel's claim for breach of

9  fiduciary duty against Bryant, Bryant's wrongful conduct was secretive and Mattel

10  never consented to the conversion of its property.

11

12                                      **XII.**

13            **INTENTIONAL INTERFERENCE WITH CONTRACT**

14                         **(RE BRYANT; AC 6)**

15                      **(AGAINST MGA, LARIAN)**

16

17  **A.   Valid Agreements Existed between Mattel And Bryant**

18         1.      Mattel restates and hereby incorporates by reference the facts

19  and evidence set forth above in relation to each claim asserted against Bryant.

20         2.      <u>Inventions Agreement</u>:  Bryant joined Mattel in September 1995,

21  where he worked in Mattel's Design Center as a BARBIE product designer.  In or

22  about April 1998, Bryant resigned his position with Mattel.  Late in 1998, Bryant

23  applied to Mattel to be rehired.  On January 4, 1999, he began working at Mattel in

24  Mattel's Design Center, again as a product designer, for Mattel's BARBIE

25  Collectibles line.

26         3.      Upon his return to Mattel in January 1999, Bryant executed an

27  Employee Confidential Information and Inventions Agreement (the "Inventions

28  Agreement").

4.      The Inventions Agreement provides at its outset that it "is designed to make clear that … inventions that I create will be owned by the Company"); it concludes with the capitalized, bold-faced statement that "**THIS AGREEMENT CREATES IMPORTANT OBLIGATIONS OF TRUST AND AFFECTS THE EMPLOYEE'S RIGHT TO INVENTIONS THE EMPLOYEE MAY MAKE DURING HIS OR HER EMPLOYMENT**."

5.      In the Inventions Agreement, Bryant assigned to Mattel all rights in "inventions . . . conceived or reduced to practice by [Bryant] (alone or jointly by others at any time during [his] employment by the Company" to the fullest extent of the law.  The assignment is broad and included "all [his] right, title and interest in such inventions, and all [his] right title and interest in any patents, copyrights, patent applications and copyright applications based thereon."  As this Court held in the April 25, 2008 Order (at 4), "the Inventions Agreement explicitly conveys to Mattel an employee's interest in any copyrights or copyright applications." *See also id.* at 5 ("[T]he plain language of the Inventions Agreement assigns his 'designs' to his employer.").

6.      The Court's April 25, 2008 Order further held (at 5) that the Inventions Agreement assigns to Mattel "any Bratz-related 'inventions' (including any designs, improvements, ideas, concepts, and copyrightable subject matter) that [Bryant] is found to have created during the period of his employment with Mattel." The Court's April 25, 2008 Order ruled (at 5) in addition that "because the subject matter at issue -- the Bratz dolls -- relate to Mattel's business of marketing fashion dolls, the factual question of whether Bryant worked on them on his own time, rather than during his working hours at Mattel, is not relevant."

7.      The plain language of the Inventions Agreement confirms that ideas and concepts are within its scope.  Most notably, paragraph 2(a) refers to inventions that are "<u>conceived</u> or reduced to practice" (emphasis added).  <u>See also</u> ¶ 2(b) (defining "inventions" to include "know-how" and "discoveries").

8.     As this Court held in the April 25, 2008 Order (at 5), Bryant "owed a fiduciary duty to Mattel by virtue of the language set forth in ¶ 1(a) of the Inventions Agreement."  The Inventions Agreement also required Bryant, during and after his Mattel tenure, not to disclose or misuse Mattel's proprietary or confidential information.

9.     The Inventions Agreement also precluded Bryant from engaging in behavior that constituted a conflict of interest.

10.     <u>Conflict of Interest Questionnaire</u>.  Bryant further agreed, when he started at Mattel in 1999, that he would immediately notify his supervisor of any change in his situation that would cause him to change any of his certifications regarding whether he was engaged in activities that could constitute a conflict of interest.

11.     This Questionnaire, on its face, required Bryant to disclose to his supervisor any work he did while employed by Mattel for a Mattel competitor, including MGA, or on a competing line of dolls, including Bratz.

12.     <u>Proprietary Information Checkout</u>.  On Bryant's last day of employment with Mattel, October 20, 2000, Bryant signed a further agreement, called the "Proprietary Information Checkout" form.  Bryant acknowledged that "he has agreed to transfer all inventions made or conceived during the period of his employment to Mattel," and that "[m]y interest in (a) any and all inventions . . . which I have made or conceived . . . and in (b) any . . . designs, trademarks, copyright subject matter [or] . . . artistic works which I have made or conceived . . . during the period of my employment which relate or are applicable directly or indirectly to any phase of [Mattel's] business shall be the exclusive property of [Mattel]."

**B.**     **MGA And Larian Had Knowledge Of Mattel's Contracts With Bryant.**

1.     MGA and Larian knew and were willfully blind to the fact that Bryant had an inventions assignment agreement with Mattel.  Evidence so showing includes the following.  First, before Bryant signed a contract with MGA, Bryant provided MGA's attorney with a copy of his 1998 Mattel employment letter.  That letter specifically identified his Inventions Agreement with Mattel.  Bryant's cover letter to MGA's lawyers stated he was unable to ask Mattel Human Resources about agreements that he signed, as that would be "risking suspicion."  Second, David Rosenbaum, MGA's agent and the recipient of Bryant's "suspicion" memo, testified as to his awareness that Bryant's agreement with Mattel likely assigned to Mattel right, title and interest in designs and other works Bryant created while a Mattel employee.  Third, Bryant was a Mattel doll designer who was pitching a doll design to MGA while he was still working at Mattel.  MGA had its designers — and later Bryant — agree that work done by MGA designers belonged to MGA.  MGA knew that Mattel would require the same of its employees.  Fourth, Paula Treantafelles, as well as other former Mattel employees, worked at MGA in 2000; each of them had signed agreements identical or similar to Bryant's Mattel agreements as a condition of being hired by Mattel.  Each of them also knew that Bryant was required to do the same.  Fifth, MGA used other Mattel employees, including without limitation Cabrera, Morales and Salazar, to work on Bratz while they were still employed by Mattel.  MGA's knowledge can also be inferred from evidence of MGA's wrongdoing and concealment, such as the fact that MGA executive Victoria O'Connor, at Larian's direction, "whited-out" the "Barbie Collectibles" fax header on the copy of the signed contract that MGA had received from Bryant.  O'Connor has testified that she carried out Larian's instruction out of concern that the fax header showed Bryant was employed by Mattel at the time that he signed the agreement with MGA.  Other examples of MGA's and Larian's concealment include Larian's, Garcia's and other MGA personnel's instructions to others within MGA to conceal

1  Bryant's involvement with Bratz, Larian's and Garcia's false and misleading
2  statement to the public and the press regarding the origins and timing of Bratz, and
3  Larian's false and misleading statement to the Courts and public agencies, including
4  the United States Patent Office, regarding the origins and timing of Bratz.
5  Furthermore, MGA and its agents took steps to conceal their use of other Mattel
6  employees, including Cabrera, Morales and Salazar, for years on Bratz, including by
7  making payments under false names and false social security numbers.  MGA,
8  Larian and Bryant also all spoliated evidence to conceal their activities, further
9  giving rise to an inference of guilty knowledge, among other things.

10

11  **C.    MGA and Larian Induced And Encouraged Bryant To Breach, and**
12         **Disrupted The Performance of His Contracts With Mattel.**

13         1.    MGA and Larian paid Bryant to breach his contract with Mattel.

14         2.    While a Mattel employee, Bryant met with MGA employee
15  Paula Treantafelles and discussed the various resources that might be used to pull
16  the Bratz doll line together; Bryant admitted creating drawings of Bratz in or about
17  July 2000; MGA employee Anna Rhee testified that she was painting sculpted Bratz
18  heads in June 2000; Bryant wrote on a note to a vendor on September 18, 2000 that
19  he was "working with MGA Entertainment;" Bryant created a Bratz prototype using
20  Mattel doll parts; Bryant solicited and directed Margaret Hatch-Leahy to sculpt a
21  head for Bratz while he was at Mattel; according to an MGA email, Bryant was
22  spending at least four hours a day on Bratz while a Mattel employee during
23  September and October 2000; and both MGA HK's Lee Shiu Cheung and MGA
24  HK's outside counsel have separately declared under oath that "[t]he designs of the
25  Bratz dolls are all original drawings created by Mr. Bryant using his own
26  independent labour, skill and judgement [sic]."  MGA and Larian paid Bryant while
27  Bryant was still a Mattel employee.  In conjunction with the payment, MGA and
28  Larian required Bryant to make MGA "top priority."  For Bryant's efforts on Bratz

1  as set forth below, MGA has admitted to paying Bryant approximately $7,000.

2  MGA was the source of other deposits beginning in April 2000, the source of which

3  Bryant cannot recall.  MGA also directly interfered with Bryant's contract to assign

4  Bratz to Mattel when MGA induced Bryant to assign those same rights to Bratz to

5  MGA.

6          3.      Mattel will show that MGA induced Bryant to breach further

7  provisions of the Inventions Agreement.  For example, in Section 3, Bryant agreed:

8              My employment with the Company requires my undivided

9              attention and effort.  Therefore, during my employment

10             with the Company, I will fully comply with the Company's

11             Conflict of Interest Policy as it may be amended from time

12             to time.  I shall not, without the Company's express written

13             consent, engage in any engagements or business other than

14             for the Company, or invest in or assist [in any manner] any

15             business competitive with the business or future business

16             of the Company.

17         4.      MGA's CEO, Isaac Larian, ordered former MGA executive,

18  Victoria O'Connor, to redact "Barbie Collectibles" from the faxed version of

19  Bryant's Bratz agreement with MGA to conceal that Bryant had sent the contract

20  from Mattel's Design Center.  According to Ms. O'Connor, Bryant faxed a signed

21  copy of a Bryant/MGA contract to MGA from Mattel.  Upon receipt, each page of

22  the contract included a fax header that read "Barbie Collectibles" and bore the

23  number of the Mattel fax machine that it came from, revealing that it came from

24  Mattel's Designer Center where Bryant worked.  When Ms. O'Connor brought this

25  to the attention of Isaac Larian, Mr. Larian instructed her to "white-out" the fax

26  header information on all pages of the contract and send the contract, as altered, to

27  an outside MGA attorney and MGA's former counsel in this action, Patricia Glaser.

28  At Mr. Larian's direction, Ms. O'Connor proceeded to alter each page of the

1  contract in order to conceal, as Ms. O'Connor testified, that Bryant "was still

2  employed at Mattel at the time the contract [between MGA and Bryant] was

3  executed."

4          5.      MGA and Isaac Larian knowingly and intentionally made

5  conflicting and false claims, some under oath, regarding the origins and creation of

6  Bratz.  For example, MGA made public statements about the origins of Bratz in the

7  press that claimed persons other than Bryant created Bratz — sometimes Larian

8  took credit for inventing Bratz, sometimes he gave credit to his son for the idea.  At

9  points, MGA claimed that Larian chose Bratz during a "competition" hosted by

10  MGA.  In 2004, MGA submitted an Affidavit of Isaac Larian to the High Court of

11  Justice in the United Kingdom.  In that Affidavit, Mr. Larian swore:  "I established

12  the Claimant and *was the inspiration behind the BRATZ dolls*."

13          6.      In 2003, Larian represented to the U.S. Patent and Trademark

14  Office that Bratz originated from him.  The patent application credited Mr. Larian as

15  the sole "Inventor" and sought a patent for "changeable footwear."  Bryan

16  Armstrong, MGA's Rule 30(b)(6) witness on the subject of patent applications,

17  testified that the subject of this application was, in fact, the Bratz dolls.  The pre-

18  prepared Bratz pitch materials that Carter Bryant testified he first presented to MGA

19  in September 2000 — and, significantly, at the meeting where Mr. Larian and Mr.

20  Bryant claim they first had any contact with one another — also show Bratz dolls

21  with the features that are the subject of the claims of the patent application.

22  According to Bryant's deposition testimony, Bryant was the one who came up with

23  the changeable footgear for Bratz.  Nevertheless, Bryant also made false, sworn

24  statements to the U.S. Patent and Trademark Office in connection with the

25  application.  These are just a few examples of the well-documented false statements

26  that MGA, Larian and Bryant have made over the years (including in this case) with

27  respect to Bratz, including its origins, creation, design and development.

28

7.      MGA has spoliated electronic evidence.  For example, MGA engaged in the practice of "wiping" the hard drives on Mr. Larian's two computers every six months to a year.  MGA's designee on documentary and electronic evidence preservation and collection testified that the only effort made by MGA to collect e-mail messages was a search conducted in 2005 of the e-mail messages of Isaac Larian.  As another example, Farhad Larian, Isaac Larian's brother, former MGA shareholder and executive and an MGA consultant at the time, deleted emails and other electronic documents relating to Bratz and other relevant matters after this lawsuit was filed.  Bryant, too, destroyed electronic data from his computers after this suit was filed.  In a similar vein, as a tactical measure to conceal the truth, defendants refused to produce virtually any evidence or witnesses until ordered and often not even then.  For example, Bryant and Larian both refused to answer questions under oath until twice ordered by the Court to do so.  Defendants also redacted relevant information from their documents and concealed many of their documents until ordered to produce them.

## XIII.

## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
## (RE:  BRYANT; AC 8)
## (AGAINST MGA AND LARIAN)

A.      **Bryant Owed And Breached A Fiduciary Duty To Mattel**

1.      Mattel restates and hereby incorporates by reference the facts and evidence set forth above in relation to each claim asserted against Bryant.

**B.** **MGA and Larian Knew That Bryant Was Engaging In Conduct That Constituted A Breach Of The Fiduciary Duty He Owed Mattel.**

1.      MGA and Larian knew that Bryant was a Mattel employee when they first met with him.  They also knew that Bryant had pre-existing obligations to Mattel, including a duty to assign to Mattel all designs created while employed there.  MGA and Larian knew that Bryant held a position of trust and confidence at Mattel.  MGA and Larian knew that Bryant owed a fiduciary duty to Mattel not to take any action that would be contrary to Mattel's best interests, including but not limited to secretly developing and designing Bratz while employed by Mattel and by secretly assisting Larian and MGA.  Bryant told MGA that he had signed a confidentiality agreement with Mattel.

2.      MGA either knew of and willfully and intentionally blinded itself to (1) the terms of the Bryant-Mattel Inventions Agreement and (2) the nature of Bryant's role at Mattel.  For example, MGA knew — because Bryant told them and because MGA saw it mentioned in a copy of Mattel's offer letter to Bryant — that Bryant had signed an inventions agreement with Mattel; MGA also knew that Bryant could (but did not want to) procure a copy of the agreement from Mattel.  MGA did not press Bryant to obtain the copy or inquire as to the nature of his confidential role at Mattel.  Instead, it purportedly satisfied itself, without basis, with Bryant's "warranty that BRATZ was Bryant's exclusive property" and Bryant's promise to "indemnif[y] MGA and Larian against any claims raised by a third party."

MGA entirely ignored that Bryant informed MGA that he had entered into an agreement with Mattel, and that Bryant could (but did not want to) obtain a copy of that agreement.  MGA's lawyer Rosenbaum has admitted that he knew such an agreement likely meant that any work Bryant did while employed by Mattel would be owned by Mattel.  Notwithstanding this, MGA's "diligence" regarding Mattel's rights in Bratz amounted to approximately half of a five-minute

1  conversation in which Rosenbaum asked Bryant's attorney, Anne Wang, whether

2  Bryant owned the rights to Bratz.

3

4  **C.    MGA and Larian Knowingly Assisted Bryant In Breaching His Fiduciary**

5       **Duty Owed To Mattel.**

6       1.    Mattel hereby refers to and incorporates by reference the facts set

7  forth above in relation to the claim against MGA and Larian for Intentional

8  Interference with Bryant's Contract with Mattel and Bryant's breaches of fiduciary

9  duties.  As Mattel demonstrated, MGA's misconduct was an essential factor in

10  defendants' scheme to steal Bratz from Mattel.  MGA's agreement to purchase Bratz

11  aggravated Bryant's disloyalty.  Thus, for example, Bryant would not have

12  commenced his secret campaign of soliciting Mattel's vendors had MGA not agreed

13  to develop Bratz, and pay him handsomely for it.  Without MGA, Bryant was only a

14  willing seller of stolen property; MGA provided him a buyer.

15       2.    MGA concedes Bryant worked on and was paid for another,

16  allegedly separate MGA project while he was still employed by Mattel.  MGA knew

17  that Bryant was a Mattel employee at the time.

18       3.    MGA not only paid Bryant while employed by Mattel, it

19  reimbursed him for all expenses incurred regarding development of Bratz, thus

20  freeing Bryant from the burden of speculating on this concept and design on his own

21  dime.  MGA also dangled the carrot of revenue-sharing in the future, payments that

22  ultimately added up to millions of dollars.  MGA encouraged Bryant's

23  misappropriation of Bratz by promising him huge potential profits.

24       4.    Larian and MGA profited financially from encouraging Bryant to

25  breach his duties to Mattel, including by selling Bratz to MGA.  Such financial gain

26  corroborates the two elements of an aiding/abetting claim.  By their same conduct,

27  MGA and Larian intentionally and without justification solicited, encouraged, aided

28

1   and abetted and gave substantial assistance to Bryant to breach his fiduciary duties

2   to Mattel, knowing that their conduct would cause such a breach.

3

4                                    **XIV.**

5                **AIDING AND ABETTING BREACH OF DUTY OF LOYALTY**

6                          **(RE BRYANT; AC 10)**

7                        **(AGAINST MGA AND LARIAN)**

8                Mattel hereby refers to and incorporates by reference the facts and

9   evidence set forth above in relation to each claim above, and particularly the claims

10  against Bryant for breach of the duty of loyalty and breach of fiduciary duty, and the

11  claim against MGA for aiding and abetting Bryant's breach of fiduciary duty.

12

13                                   **XV.**

14               **STATUTORY UNFAIR COMPETITION**

15                          **(RE BRYANT; AC 12)**

16        **(AGAINST MGA, MGA HK, LARIAN AND BRYANT)**

17

18  A.    **Defendants Violated Section 17200 of the California Business and**

19         **Professions Code By Engaging In An "Unlawful, Unfair Or Fraudulent**

20         **Business Act Or Practice. . . . "**

21                1.     Mattel hereby refers to and incorporates by reference the facts

22  and evidence set forth above in relation to each claim above.  Defendants thereby

23  engaged in conduct that was unlawful and fraudulent.  MGA's and Larian's

24  commercial bribery of Bryant in violation of *Cal. Penal Code* § 641, constitutes

25  unlawful and/or fraudulent acts of unfair competition in violation of both the

26  common law of the State of California and *Cal. Bus. & Prof. Code* § 17200 et seq.

27  The evidence to support this claim includes:

28

(a)  The payments made by MGA to Bryant while he remained employed by Mattel.

(b)  MGA and Larian knew and were willfully blind to the fact that Bryant had an inventions assignment agreement with Mattel. Evidence so showing includes the following. First, before Bryant signed a contract with MGA, Bryant provided MGA's attorney with a copy of his 1998 Mattel employment letter. That letter specifically identified his Inventions Agreement with Mattel. Bryant's cover letter to MGA's lawyers stated he was unable to ask Mattel Human Resources about agreements that he signed, as that would be "risking suspicion." Second, David Rosenbaum, MGA's agent and the recipient of Bryant's "suspicion" memo, testified as to his awareness that Bryant's agreement with Mattel likely assigned to Mattel right, title and interest in designs and other works Bryant created while a Mattel employee. Third, Bryant was a Mattel doll designer who was pitching a doll design to MGA while he was still working at Mattel. MGA had its designers — and later Bryant — agree that work done by MGA designers belonged to MGA. MGA knew that Mattel would require the same of its employees. Fourth, Paula Treantafelles, as well as other former Mattel employees, worked at MGA in 2000; each of them had signed agreements identical or similar to Bryant's Mattel agreements as a condition of being hired by Mattel. Each of them also knew that Bryant was required to do the same. Fifth, MGA used other Mattel employees, including without limitation Cabrera, Morales and Salazar, to work on Bratz while they were still employed by Mattel. MGA's knowledge can also be inferred from evidence of

MGA's wrongdoing and concealment, such as the fact that MGA executive Victoria O'Connor, at Larian's direction, "whited-out" the "Barbie Collectibles" fax header on the copy of the signed contract that MGA had received from Bryant.  O'Connor has testified that she carried out Larian's instruction out of concern that the fax header showed Bryant was employed by Mattel at the time that he signed the agreement with MGA.  Other examples of MGA's and Larian's concealment include Larian's, Garcia's and other MGA personnel's instructions to others within MGA to conceal Bryant's involvement with Bratz, Larian's and Garcia's false and misleading statement to the public and the press regarding the origins and timing of Bratz, and Larian's false and misleading statement to the Courts and public agencies, including the United States Patent Office, regarding the origins and timing of Bratz.  Furthermore, MGA and its agents took steps to conceal their use of other Mattel employees, including Cabrera, Morales and Salazar, for years on Bratz, including by making payments under false names and false social security numbers.  MGA, Larian and Bryant also all spoliated evidence to conceal their activities, further giving rise to an inference of guilty knowledge, among other things.

(c)    The payments were intended to induce, and encourage Bryant to breach his contracts with and duties owed to Mattel.  Mattel hereby incorporates by reference the facts and evidence set forth above in relation to the claims for interference.

# XVI.

# DECLARATORY RELIEF

# (AC 13)

# (AGAINST MGA, MGA HK, LARIAN AND BRYANT)

**A.**   **An actual controversy exists between Mattel and Defendants regarding Defendants' lack of ownership interests in Bratz works and Mattel's rights in the same**

Mattel hereby refers to and incorporates by reference the facts and evidence set forth above in relation to each claim above.  Mattel seeks a declaration that it owns the Bratz works that Bryant created while at Mattel.

**B.**   **Defendants have no valid or protectible ownership rights or interests in Bratz works, and Mattel is the true owner of the same**

Mattel will present evidence of its contracts with Bryant, as set forth above in relation to the claim for breach of contract asserted against Bryant, and hereby incorporated by reference.  In addition, based on the facts summarized above and expert and other testimony, Mattel will show that Bryant created intellectual property (including without limitation designs, concepts, ideas, improvements, drawings and sculpts) relating to Bratz during his Mattel employment and that such intellectual property is therefore owned by Mattel.  For these same reasons, Bryant's later, conflicting assignment to and agreement with MGA was invalid and transferred no rights in Bratz to MGA or any other person or entity.

**C.**   **Mattel is entitled to an accounting and imposition of a constructive trust over Bratz, including without limitation registrations and applications for registrations relating thereto made or filed by Defendants and third parties, and over all revenues and other monies or benefits derived or**

-73-

1  **obtained from MGA's and Bryant's purported ownership, use, sale,**

2  **distribution and licensing of Bratz**

3  Mattel seeks a declaration by the Court that any and all agreements

4  between Bryant, on the one hand, and MGA, on the other hand, in which Bryant

5  purports or purported to assign to MGA any right, title or interests in any work that

6  he conceived, created or reduced to practice while a Mattel employee, including but

7  not limited to the Bratz designs, are void and of no effect, including because Bryant

8  previously assigned all right, title or interest in Bratz to Mattel and because Mattel

9  was otherwise the owner of said right, title or interest.  Mattel will provide expert

10  testimony regarding an accounting of the revenues from Bratz earned by Defendants

11  to prove the value of this entitlement to relief.

12

13  **XVII.**

14  **COPYRIGHT INFRINGEMENT**

15  **(AC 1)**

16  **(AGAINST MGA, MGA HK, LARIAN, BRYANT)**

17

18  A.   **Mattel Is The Owner Of Valid Copyrights In Works That Are Fixed In**

19  **Tangible Media Of Expression, And Are The Subject Of Federal**

20  **Copyright Registrations** [17]

21  1.   Mattel is the owner of copyrights in Bratz works that are fixed in

22  tangible media of expression.  Mattel owns valid, and subsisting, copyright

23  registrations in certain Bratz works, including without limitation, the works that are

24  _____

25  [17]   This includes, but is not limited to, Registration Nos. VA 1-378-648, VA 1-

26  378-649, VA 1-378-650, VA 1-378-651, VA 1-378-653, VA 1-378-655, VA 1-378-

27  656, VA 1-378-657, VA 1-378-659, VA 1-378-660, VAu 715-270, VAu 715-271
and VAu 715-273.

28

1   the subject of Registrations VA 1-378-648, VA 1-378-649, VA 1-378-650, VA 1-

2   378-651, VA 1-378-652, VA 1-378-653, VA 1-378-654, VA 1-378-655, VA 1-378-

3   656, VA 1-378-657, VA 1-378-658, VA 1-378-659, VA 1-378-660, VAu 715-270,

4   VAu 715-271 and VAu 715-273.

5           2.      Mattel will offer evidence and facts at trial set forth above in

6   relation to the claims against Bryant, and hereby incorporates the same by reference.

7   In sum, Bryant created and developed Bratz works while employed by Mattel.  By

8   virtue of its Inventions Agreement and related contracts with Bryant, Mattel owns

9   the Bratz drawings and other works created by Bryant during his Mattel

10  employment.

11          3.      The drawings are original works of authorship that qualify for

12  copyright protection.  Bryant admitted that the drawings at issue are original works

13  of authorship within the meaning of the Copyright Act.  Similarly, defendants MGA

14  and Isaac Larian have made admissions in other cases that judicially estop them

15  from arguing that the drawings are not original works.  When defendant Isaac Larian

16  sought to enforce MGA's copyrights in the courts of Hong Kong, he swore that the

17  defendant's dolls "have infringed the 2 dimensional drawings which are artistic

18  works in which copyright subsists."  Also, in <u>MGA v. Hunglam Toys</u>, Daphne

19  Gronich, MGA's former general counsel, repeatedly identified fifteen Bryant

20  drawings as "copyright works."  Similarly, the copyright registrations themselves

21  constitute prima facie evidence of the validity of the copyright and of the facts stated

22  in the certificate.  Accordingly, the drawings are presumed to be protectible original

23  works of authorship.

24

25

26

27

28

**B.**   **Defendants Have Infringed Upon Mattel's Exclusive Rights In The Copyrighted Works, Including By Reproducing Them and Preparing Derivative Works From Them, Without Mattel's Authorization.**

1.      MGA's principals have made admissions in other cases that judicially estop them from denying that the Bratz dolls are derivative works of the Bratz drawings.  When defendant Isaac Larian sought to enforce MGA's copyrights in the courts of Hong Kong, he swore that the defendant's dolls "have infringed the 2 dimensional drawings which are artistic works in which copyright subsists."  In MGA v. Hunglam Toys, Daphne Gronich, MGA's former general counsel, repeatedly identified fifteen Bryant drawings as the "copyright works" upon which the Bratz dolls are modeled.  Even MGA's complaint in this action is predicated on the uniqueness of Bratz:  "At approximately 9.5 to 10 inches tall, the 'BRATZ' dolls were intentionally shorter than 'Barbie' dolls and looked like no other, with disproportionately large heads, big, dramatic eyes and lips, small, thin bodies, oversized feet (to emphasize shoe fashion and to stand on their own, unlike 'Barbie' which requires a stand), and up-to-date fashions."  Bryant's complaint against Mattel that was dismissed by the Court also repeatedly admits that the Bratz drawings are original and that the Bratz dolls were based on those drawings.

In another action, MGA v. Double Grand Corp. Ltd., MGA obtained a judgment of infringement of Bryant's drawings.  There, MGA's managing director, Lee Shiu Cheung, declared under oath that "[t]he designs of the Bratz dolls are all original drawings created by Mr. Bryant using his own independent labour, skill and judgement [sic]."  Daphne Gronich, MGA's former general counsel, also identified Bryant's drawings as the "copyright works" upon which the three-dimensional Bratz dolls are modeled.  Based on these MGA sworn assertions and others, MGA obtained a ruling on summary judgment that the accused three-dimensional dolls and products infringe MGA's copyrights in Bryant's initial concept drawings, at issue here.  As a result, defendants may not argue to the contrary now.

2.    <u>The Bratz Dolls Are Substantially Similar To Bryant's Drawings</u>

The Bratz dolls are substantially similar to Mattel's copyrighted works. First, Defendants' access to the infringed work is clear and undisputed by MGA: MGA received the drawings at issue during Bryant's September 2000 pitch.  The Bratz dolls came on the market in the summer of 2001.  Thereafter, MGA submitted some of Bryant's drawings to the Copyright Office for registration.  Defendants repeatedly admitted that the Bratz dolls are based on Bryant's designs.

- Bryant's and MGA's 2004 Modification of their 2000 Agreement states that "all work done by Bryant prior to September 18, 2000 [] became known as the Bratz property." The Agreement explicitly confirms that Bryant's "work," which "became known" as the Bratz property, includes the Bratz drawings that are the subject of MGA's Copyright Registration Nos. VA 1-218-487, VA 1-218-488, VA 1-218-489, VA 1-218-490 and VA 1-218-491.

- Bryant admitted that he intended his Bratz drawings to serve as guides for creation of the Bratz dolls.  His now-dismissed complaint against Mattel also admitted that the Bratz dolls were based on the drawings.

- Defendant Larian testified in another case that the Bratz dolls he showed to retailers were based on Bryant's drawings.

- The copyright registrations for numerous Bratz dolls reflect that they are derived from Bryant's design drawings.  For example, according to MGA's registrations for the doll configurations, accessories and packaging for Jade (registration no. VA 1-301-533), Sasha (VA 1-301-534), Cloe (VA 1-301-535) and Yasmin (VA 1-301-536), these dolls are derived from Bryant's earlier

1    drawings, registered by MGA, discussed above, all claimed as

2    created before October 19, 2000.

3    •    In an April 25, 2001 email, Paula Garcia, MGA's Senior Project

4         Manager for Bratz, responded to several interview questions

5         posed by Dolls Magazine.  In response to one question, "How

6         did MGA design the four different girls [Cloe, Sasha, Jade and

7         Yasmin]?" Ms. Garcia stated: "The four girls were already

8         concepted [sic] when presented by the inventor during our first

9         meeting.  I thought they were incredible and I tried to stay true

10        [to] this inventor/creator's vision."

11   •    In <u>MGA v. Double Grand Corporation Limited</u>, MGA's Lee

12        Shiu Cheung declared under oath that "[t]he designs of the Bratz

13        dolls are all original drawings created by Mr. Bryant using his

14        own independent labour, skill and judgement [sic]."

15   •    In <u>MGA v. Hunglam Toys</u>, Daphne Gronich, MGA's former

16        general counsel, repeatedly identified fifteen Bryant drawings as

17        the "artistic works" upon which the Bratz dolls are modeled**.**

18        Based on this evidence, Mattel will show that defendants intended to

19   make the Bratz dolls as close to the drawings (and in turn the sculpts Bryant also

20   had prepared) as possible, and that any claimed dissimilarities are insignificant.

21   Important similarities exist between the drawings and the dolls, including but not

22   limited to body proportions, facial features, eyes, eye makeup, lips, hair styling,

23   clothing, accessories, footwear and postures and posing.

24        Mattel will show that the similarities between Bryant's drawings and

25   sculpts, on the one hand, and the dolls, on the other hand, are apparent upon first

26   glance.  The faces are substantially the same, the proportions are virtually identical,

27   the attitude projected is the same, and the clothes and the shoes are markedly

28   similar.  These similarities are pervasive.

(i)     The Bratz line of products constitutes defendants' reproduction and creation of derivative works from and infringement of the exclusive rights of Mattel in its protected works, including drawings and sculpts created by Bryant while a Mattel employee.  Mattel never authorized the use of its protected works in this manner.  The Bratz line of products includes numerous lines of dolls, each of which have subproducts within them.  The Bratz doll lines include but are not limited to the following dolls: Sasha, Jade, Yasmin, Chloe, Phoebe, Meygan, Alicia, Twins, Kumi, Felicia, Dana, Lana, Nevra, Sharidan, Fianna, Vanessa, Maribel, Lilee, Roxxi, Sorya and Sienna.

(ii)     The Bratz line of products is substantially similar to and derivative of the drawings and sculpts made by Bryant while employed by and under contractual obligations to Mattel.  The two-dimensional art work and sculpts were copied by Bryant, Larian, MGA, and MGA HK into the three dimensional dolls that became known as the Bratz product line.

## C.     <u>Defendants' Infringement Or Substantial Contributions To Infringement Of Mattel's Copyrighted Works Without Mattel's Consent</u>

1.     Mattel hereby incorporates the facts stated above by reference. The infringement of Mattel's copyrighted works is and has been made without Mattel's consent by each of defendants MGA, MGA HK, Larian, and Bryant. Mattel will show through financial statements and accounting records, and through expert testimony regarding copyright damages, that Defendants have profited substantially, using Mattel's copyrighted materials for commercial purposes and for their direct financial benefit.  Mattel will show that Larian and MGA have failed to exercise their right and ability to supervise the infringing activities of others within their control to refrain from infringing Mattel's copyrighted works and have failed to do so in order to further their significant financial interest in the infringement of Mattel's copyrighted works.  Mattel will also show that Bryant, Larian, and MGA

HK knew of the infringing activity of MGA, and intentionally and materially contributed to MGA's infringing activity.  Accordingly, Larian, MGA and Bryant have engaged in direct, contributory and vicarious infringement of Mattel's copyrighted works.  This infringement has been willful.

2.      From the time Bryant was induced to breach his contracts with Mattel, Larian and MGA have intentionally caused the further infringement of Mattel's copyrighted works.  The facts and evidence that will support the showing by Mattel set forth in relation to Mattel's claim for interference with contract above are hereby incorporated by reference.

## D.      Isaac Larian Is Vicariously Liable For Copyright Infringement.

Mattel restates and hereby incorporates by reference the facts and evidence set forth above in relation to Mattel's copyright claim.  Isaac Larian is vicariously liable for MGA's copyright infringement because he profited directly from MGA's infringement of Mattel's copyrights; he had the right and ability to supervise/control the infringing activity of MGA; and he failed to stop the infringement.

**1.      Mr. Larian profited directly from the infringing activity of MGA.**

Bratz has been a very successful product for MGA, and Isaac Larian, as CEO and owner of MGA, has directly profited from its sales.  In 1999, Mr. Larian purportedly listed his income on his tax returns as $466,895.  By 2002 -- the year after Bratz was released -- his reported income had sky-rocketed to nearly $34 million.  MGA and Larian have claimed in this litigation that Mr. Larian's current personal net assets are approximately $1.9 billion.  The vast majority of Mr. Larian's wealth stems from the sales of Bratz.

**2.      Mr. Larian had the right and ability to supervise/control the infringing activity of MGA.**

1    Mr. Larian supervised and/or controlled the creation and development

2 of the Bratz line, as well as the ongoing production, sales, and marketing of Bratz.

3 Mr. Larian met with Carter Bryant at least as early as early September 2000 and

4 made the decision to manufacture the Bratz dolls based on drawings shown to him at

5 the meeting.  Mr. Larian admitted in the case <u>Art Attacks Ink, LLC v. MGA</u>

6 <u>Entertainment, Inc.</u> that he is the person at MGA who determines what new products

7 MGA will manufacture.  He also admitted that he was "hands-on" with many

8 aspects of Bratz development, including, *inter alia*, setting shipping dates,

9 determining doll names, determining what items to sell with the dolls, and

10 advertising the Bratz line.  Mr. Larian stated in an affidavit in the case <u>MGA</u>

11 <u>Entertainment, Inc. and Thomas Christopher Joseph Metson</u>: "I established the

12 Claimant [MGA] and was the inspiration behind the BRATZ dolls.  I have been the

13 main driving force behind the success of the Claimant [MGA]."

14    **3.    Mr. Larian failed to exercise that right and ability.**

15    While Mr. Larian was in a supervisory and/or controlling position at

16 MGA, he failed to take any action to stop MGA from infringing intellectual property

17 that belonged to Mattel.  Instead, he actively participated in developing the Bratz

18 line of dolls.

19 **E.    Carter Bryant, Isaac Larian, and MGA HK Are Contributorily Liable**

20    **for Copyright Infringement.**

21    Mattel restates and hereby incorporates by reference the facts and

22 evidence set forth above in relation to Mattel's copyright claim and Mattel's

23 vicarious liability claim.  Carter Bryant, Isaac Larian, and MGA HK are

24 contributorily liable for MGA's copyright infringement because each of them knew

25 or had reason to know of MGA's infringing activity, and each also intentionally

26 materially contributed to MGA's infringing activity.

27    **1.    Mr. Bryant, Mr. Larian and/or MGA HK knew or had**

28 **reason to know of the infringing activity of MGA.**

Carter Bryant, Isaac Larian, and MGA HK knew or had reason to know that MGA was infringing Mattel's ownership rights in the Bratz drawings, and that Carter Bryant created and worked on Bratz while employed by Mattel.  Both Mr. Bryant and Mr. Larian knew that Mr. Bryant was employed by Mattel when Mr. Bryant pitched his idea for Bratz to MGA; when Mr. Bryant's employment agreement with MGA was created; when Mr. Bryant was set up as a vendor at MGA; when Mr. Bryant began receiving payments and reimbursements for expenses from MGA; and when Mr. Bryant began developing the Bratz line. Former MGA employee Rachel Harris testified that she and others knew by October 2000 that Mr. Bryant was a Mattel employee and that it would be "bad" for Mr. Bryant if Mattel learned he was presenting drawings to MGA while still employed by Mattel.

Mr. Bryant and Mr. Larian therefore tried to hide the fact that Bryant created and worked on Bratz while an employee of Mattel.  For example, Mr. Bryant wrote to counsel at MGA while he was still employed by Mattel and enclosed his Mattel employment agreement.  In asking for advice regarding that agreement, Mr. Bryant stated: "I am unable to look into this too much further with our Human Resources director without risking suspicion ..."

MGA's records also affirm that MGA took steps to conceal the fact that Mr. Bryant worked for Mattel during the time Bratz was being developed: in a list of former Mattel employees then working at MGA, under Bryant's name, both the end date at Mattel and the start date at MGA are denoted: "don't ask."  Further, in an e-mail an MGA employee sent to Mr. Larian in February 2003 regarding asking someone associated with Bratz to sign the packaging, she wrote: "Signed by....????? I know we want to keep Carter under wraps."

Like Mr. Larian and Mr. Bryant, MGA HK also knew or had reason to know that Bratz rightly belonged to Mattel.  When MGA and MGA Hong Kong sought to enforce MGA's copyrights in the courts of Hong Kong, the former

-82-

1   director of MGA Hong Kong swore in an affirmation that Mr. Bryant created 17

2   drawings as the "initial concept and design drawings of the Bratz dolls" "in the year

3   2000 pursuant to the [Bryant-MGA] Agreement."

4   **2.      Mr. Bryant, Mr. Larian and/or MGA HK intentionally**

5   **materially contributed to MGA's infringing activity.**

6   Carter Bryant, Isaac Larian, and MGA HK all intentionally materially

7   contributed to MGA's infringement of the Bratz drawings.  Carter Bryant

8   contributed by creating Bratz, taking the Bratz project to Mattel's competitor

9   (MGA), and working on the Bratz line -- all while still employed by Mattel.  Mr.

10  Larian similarly contributed to the infringing activity by (as described in more detail

11  in Section D2, *supra*) actively participating in bringing the Bratz project to MGA

12  and leading the development of it.  Additionally, MGA (under Mr. Larian's control)

13  paid Mr. Bryant for his Bratz expenses, among other things.  MGA also had Mr.

14  Bryant sign an agreement with MGA while Mr. Bryant was a Mattel employee,

15  which purported to require Mr. Bryant to work on Bratz on a "top priority" basis.

16  MGA HK materially contributed to MGA's infringing activity by

17  manufacturing the first Bratz dolls.

18

19  **XVIII.**

20  **DAMAGES**

21  **(RE ALL PHASE 1 CLAIMS)**

22

23  **XIX.**

24  **BREACH OF CONTRACT (DAMAGES)**

25  **(MC 1, AC 5)**

26  Pursuant to the Inventions Agreement, among other things, Mattel is

27  the owner of all Bratz-related "inventions," including without limitation designs,

28  concepts, ideas, drawings, sculpts and copyrightable subject matter that were

conceived, created, made or reduced to practice during Bryant's Mattel employment as well as all designs and works that are or have been derived therefrom.  Since 2001, MGA has distributed and sold Bratz and Bratz-related products throughout the world and also licenses Bratz to third parties.  Mattel will present evidence that MGA derives annual revenue from its sales and licenses of Bratz in excess of $500 million.  Mattel is entitled to all benefit that defendants received from their wrongful conduct.  Among other witnesses, Mattel's expert witness, Michael Wagner, will testify to such benefits.

Mattel will provide further expert testimony regarding the computation of the exact amount of damages it suffered and continues to suffer which will include, at a minimum and without limitation, the following:  (a) monies paid to Bryant by any Mattel competitor, including without limitation, MGA, during his periods of disloyalty; (b) monies paid to Bryant by any Mattel competitor, including without limitation, MGA, as a result of Bryant's misconduct; (c) disgorgement of any benefit, or its value, or its proceeds, derived or obtained by defendants as a result of misconduct; (d) the value of Mattel assets, resources, opportunities and/or property, including intellectual property, that defendants converted, diverted from Mattel or otherwise improperly used or usurped; (e) compensation paid by Mattel to Bryant during Bryant's breach; (f) all unjust enrichment obtained by defendants as a result of their misconduct; and (g) prejudgment interest, costs and attorneys' fees.

## XX.
## BREACH OF FIDUCIARY DUTY (DAMAGES)
## (MC 2, AC 7)
## (AGAINST BRYANT)

Mattel will present evidence through Bryant's financial records and revenue statements and through its experts to show the profits to be disgorged as a remedy for Bryant's breach of fiduciary duty.  Mattel's expert witness, Michael

Wagner, will testify at trial that Carter Bryant benefited and continues to benefit from his wrongdoing in the amount of $35,825,449 as of October 2007.  Mattel expects to present the current amount of Bryant's benefit at trial.  This number includes the compensation he received from Bratz.

Mattel will present evidence that since 2001, MGA has distributed and sold Bratz and Bratz-related products throughout the world.  Mattel will show that MGA also licenses Bratz to third parties.  Mattel will show through expert testimony and through MGA, Larian and Bryant's financial and accounting documents that MGA derives annual revenue from its sales and licenses of Bratz in excess of $500 million.  MGA and Bryant claim current ownership of Bratz, and all copyrights and copyright registrations attendant thereto.  Defendants' use, sale, distribution and licensing of Bratz infringe upon Mattel's rights and unlawfully enriches defendants.

Mattel will show through expert damages testimony the exact amount of damages it suffered and continues to suffer which will include, at a minimum and without limitation, the following:  (a) monies paid to Bryant by any Mattel competitor, including without limitation, counter-defendant MGA, during the periods of disloyalty; (b) monies paid to Bryant by any Mattel competitor, including without limitation, counter-defendant MGA, as a result of Bryant's misconduct; (c) disgorgement of any benefit, or its value, or its proceeds, derived or obtained by Bryant as a result of his disloyalty, his breach of contract and other misconduct or as a result of work that he performed for any Mattel competitor, including without limitation counter-defendant MGA, during their Mattel employment; (d) the value of Mattel assets, resources, opportunities and/or property, including intellectual property, that Bryant converted, diverted from Mattel or otherwise improperly used or usurped; (e) the value of confidential, proprietary or trade secret information and intellectual property owned by Mattel that Bryant provided to any Mattel competitor, including without limitation counter-defendant MGA, in violation of his obligations to Mattel; (f) compensation paid by Mattel to Bryant during Bryant's

periods of disloyalty; (g) disgorgement of any profits or other benefit, or its value, or its proceeds, derived or obtained by counter-defendants as a result of their misconduct including, without limitation, all profits obtained by counter-defendants that are attributable to the infringement of Mattel's copyrights, their breaches of duty to Mattel or other unlawful or improper conduct; (i) restitution of all amounts received by Bryant as a result of his misconduct; (j) all unjust enrichment obtained by Bryant as a result of his misconduct; (k) exemplary damages to which Mattel is entitled as a result of Bryant's oppressive, fraudulent and malicious conduct; (m) any profits and the value of any other benefits that others acting in concert with Bryant derived or obtained as a result of Bryant's misconduct; and (n) prejudgment interest, costs and attorneys' fees.

Mattel will also show through its internal documents and expert damages testimony that Bryant's conduct has caused, and unless enjoined will continue to cause, irreparable injury to Mattel that cannot be adequately compensated by money damages and for which Mattel has no adequate remedy at law.  Accordingly, the evidence will show that Mattel is entitled to an order restraining further breach of Bryant's fiduciary duty to Mattel and/or restraining Counter-defendants from continuing to benefit from such breach.

Mattel is seeking punitive and exemplary damages on this claim.

## XXI.

## BREACH OF DUTY OF LOYALTY (DAMAGES)

## (MC 3, AC 9)

## (AGAINST BRYANT)

Mattel incorporates by reference the discussion above regarding damages for breach of fiduciary duty.

Mattel is seeking punitive and exemplary damages on this claim.

## XXII.

## CONVERSION (DAMAGES)

## (RE BRATZ; AC 11)

## (AGAINST BRYANT, MGA, MGA HK and LARIAN)

As a result of Bryant's acts of conversion, Mattel is entitled to damages in an amount sufficient to indemnify Mattel for the loss suffered. Mattel suffered loss as a result of the conversion and Bryant obtained revenues that would not have been generated but for the conversion. Only such a measure of damages would fully and fairly compensate Mattel for the injury it suffered due to Bryant's acts of conversion.

Pursuant to Bryant's contract with Mattel, among other things, Mattel is the true owner of all Bratz-related "inventions," including without limitation designs, concepts, ideas, drawings, sculpts and copyrightable subject matter that were conceived, created or reduced to practice during Bryant's Mattel employment as well as all designs and works that are or have been derived therefrom. Since 2001, MGA has distributed and sold Bratz and Bratz-related products throughout the world. Among other witnesses, Mattel's expert witness, Michael Wagner, will testify at trial to defendants' benefits from their misconduct.

Mattel is also entitled to seek a constructive trust in relation to the converted property. *Cal Civ. Code* §§ 2223, 2224. Mattel also seeks an injunction barring defendants from further use and possession of the converted property and requiring its return to Mattel.

Bryant engaged in the acts of conversion with malice, fraud and oppression, and in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to recover exemplary damages from Bryant in an amount to be determined at trial.

Mattel is seeking punitive and exemplary damages on this claim.

# XXIII.

## INTENTIONAL INTERFERENCE WITH CONTRACT

## (RE BRYANT; AC 6)

## (AGAINST MGA, LARIAN)

Mattel will prove MGA's actual profits by expert testimony, and based on defendants' own accounting records and financial statements.  Mattel will provide expert testimony regarding the computation of the exact amount of its damages it seeks, which will include at a minimum and without limitation, the following: (a) monies paid to Bryant by MGA during his periods of disloyalty or misconduct, (b) disgorgement of any benefit, or its value, or its proceeds, derived or obtained by defendants as a result of their misconduct, (c) the value of Mattel assets, resources, opportunities and/or property, including intellectual property, that defendants converted, diverted from Mattel or otherwise improperly used or usurped, (d) the value of confidential, proprietary or trade secret information and intellectual property owned by Mattel that Bryant provided MGA in violation of their obligations to Mattel, (e) disgorgement of any profits or other benefit, or its value, or its proceeds, derived or obtained by defendants as a result of their misconduct including, without limitation, all profits that are attributable to their breaches of duty to Mattel or other unlawful or improper conduct, (f) all unjust enrichment obtained by defendants as a result of their misconduct, and (g) prejudgment interest, costs and attorneys' fees.

Mattel's claim for interference with contract can also result in making Larian and MGA a constructive trustee.

MGA and Larian engaged in the acts of interference with malice, fraud and oppression, and in conscious disregard of Mattel's rights.  Accordingly, Mattel is entitled to recover punitive and exemplary damages from MGA and Larian.

Mattel is seeking punitive and exemplary damages on this claim.

# XXIV.

## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY (DAMAGES)
## (RE:  BRYANT; AC 8)
## (AGAINST MGA AND LARIAN)

Mattel will present evidence and facts to show that as a direct and proximate result of MGA and Larian's conduct, Bryant breached his fiduciary duties to Mattel.  Mattel hereby incorporates the facts and evidence supporting its damages claim for breach of fiduciary duty from above.

Mattel will prove MGA's actual profits by expert testimony, and based on defendants' own accounting records and financial statements.  Mattel will provide expert testimony regarding the computation of the exact amount of its damages it seeks, which will include at a minimum and without limitation, the following: (a) monies paid to Bryant by MGA during his periods of disloyalty or misconduct, (b) disgorgement of any benefit, or its value, or its proceeds, derived or obtained by defendants as a result of their misconduct, (c) the value of Mattel assets, resources, opportunities and/or property, including intellectual property, that defendants converted, diverted from Mattel or otherwise improperly used or usurped, (d) the value of confidential, proprietary or trade secret information and intellectual property owned by Mattel that Bryant provided MGA in violation of their obligations to Mattel, (e) disgorgement of any profits or other benefit, or its value, or its proceeds, derived or obtained by defendants as a result of their misconduct including, without limitation, all profits that are attributable to their aiding and abetting breaches of duty to Mattel or other unlawful or improper conduct, (f) all unjust enrichment obtained by defendants as a result of their misconduct, and (g) prejudgment interest, costs and attorneys' fees.

Mattel's claim for aiding and abetting breach of fiduciary duty can also result in making Larian and MGA a constructive trustee.

1    MGA and Larian engaged in this conduct with malice, fraud and

2  oppression, and in conscious disregard of Mattel's rights.  Accordingly, Mattel is

3  entitled to recover exemplary damages from these defendants in an amount to be

4  determined at trial.

5    Mattel is seeking punitive and exemplary damages on this claim.

6

7  ## XXV.

8  ## AIDING AND ABETTING BREACH OF DUTY OF LOYALTY (DAMAGES)

9  ## (RE BRYANT; AC 10)

10    Mattel will present evidence and facts to show that as a direct and

11  proximate result of MGA and Larian's conduct, Bryant breached his duty of loyalty

12  to Mattel.  Mattel hereby incorporates the facts and evidence above.

13    Mattel will prove MGA's actual profits by expert testimony, and based

14  on defendants' own accounting records and financial statements.  Mattel will

15  provide expert testimony regarding the computation of the exact amount of its

16  damages it seeks, which will include at a minimum and without limitation, the

17  following: (a) monies paid to Bryant by MGA during his periods of disloyalty or

18  misconduct, (b) disgorgement of any benefit, or its value, or its proceeds, derived or

19  obtained by defendants as a result of their misconduct, (c) the value of Mattel assets,

20  resources, opportunities and/or property, including intellectual property, that

21  defendants converted, diverted from Mattel or otherwise improperly used or

22  usurped, (d) the value of confidential, proprietary or trade secret information and

23  intellectual property owned by Mattel that Bryant provided MGA in violation of

24  their obligations to Mattel, (e) disgorgement of any profits or other benefit, or its

25  value, or its proceeds, derived or obtained by defendants as a result of their

26  misconduct including, without limitation, all profits that are attributable to their

27  aiding and abetting breaches of duty to Mattel or other unlawful or improper

28

1  conduct, (f) all unjust enrichment obtained by defendants as a result of their

2  misconduct, and (g) prejudgment interest, costs and attorneys' fees.

3          Mattel's claim for aiding and abetting breach of duty of loyalty can also

4  result in making Larian and MGA a constructive trustee.

5          Mattel is seeking punitive and exemplary damages on this claim.

6

7                                **XXVI.**

8              **COPYRIGHT INFRINGEMENT CLAIM (DAMAGES)**

9                                **(AC 1)**

10        **(AGAINST MGA, MGA ENTERTAINMENT (HK) LIMITED,**

11                        **LARIAN, BRYANT)**

12          By virtue of defendants' infringing acts, Mattel is entitled to recover

13  defendants' profits, Mattel's costs of suit and attorneys' fees, and all other relief

14  permitted under the Copyright Act, including some relief that is available for willful

15  infringement.

16          Under the Copyright Act, a plaintiff is entitled to recover a "defendant's

17  profits" from the infringement.  17 U.S.C. § 504(b).  Here, in establishing

18  defendants' profits, Mattel is required to present proof only of defendants' gross

19  revenues, and the burden then shifts to defendants to prove deductible expenses and

20  any elements of profit attributable to factors other than the copyrighted work, if such

21  reductions are available.  *Id.* ("In establishing the infringer's profits, the copyright

22  owner is required to present proof only of the infringer's gross revenue, and the

23  infringer is required to prove his or her deductible expenses and the elements of

24  profit attributable to factors other than the copyrighted work").  Mattel seeks profits

25  on the Bratz product line.  Mattel seeks direct and indirect profits attributable to the

26  infringements.

27          Mattel's expert witness, Michael Wagner, will testify at trial that Carter

28  Bryant benefited and continues to benefit from his wrongdoing in the amount of

1   more than $35,825,449, as of October 2007.  This number includes the

2   compensation he received as a consultant on Bratz products. Wagner will testify at

3   trial that that MGA has made more than $599,665,188 in profits on Bratz, after

4   subtracting out all costs and distributions to shareholders for income taxes.  In

5   addition, Isaac Larian has received benefits exceeding $1,023,677,098.

6          Mattel also seeks an Order, pursuant to 17 U.S.C. § 503(a), impounding

7   all of defendants and counter-defendants' products and materials that infringe

8   Mattel's copyrights, as well as all plates, molds, matrices and other articles by which

9   copies of the works embodied in Mattel's copyrights may be reproduced or

10  otherwise infringed.

11         Mattel also seeks an Order mandating that defendants and counter-

12  defendants return to Mattel all tangible items, documents, designs, diagrams,

13  sketches or any other memorialization of inventions conceived, created, made or

14  reduced to practice during Bryant's employment with Mattel as well as all Mattel

15  property converted by defendants and counter-defendants, as well as all derivative

16  works.

17

18                          **XXVII.**

19      **MATTEL SEEKS PUNITIVE OR EXEMPLARY DAMAGES**

20             **ON EACH PERTINENT CLAIM**

21         Exemplary damages are available for the breach of an obligation not

22  arising from contract, where it is proven by clear and convincing evidence that the

23  defendant has been guilty of oppression, fraud, or malice, pursuant to *Cal. Civil*

24  *Code* § 3294.  As a result of defendants' oppression, fraud and malice, Mattel is

25  entitled to exemplary damages in relation to many of its claims and counter-claims.

26  Mattel incorporates by reference the discussion of claims, evidence and damages

27  above.

28

# XXVIII.

## MATTEL'S PROPOSED EVIDENCE TO SUPPORT FINDING OF ADVERSE INFERENCE CONTENTIONS AGAINST COUNTER DEFENDANTS

1.    Plaintiff's Adverse Inference Contentions Against MGA and Bryant.

Plaintiff intends to seek an adverse inference against MGA and Bryant based on their intentional spoliation of crucial documents and evidence.  This evidence includes, but is not limited to:

(a)    Bryant's Evidence Eliminator Software.

Bryant used and installed a program called "Evidence Eliminator" on his computers, including the desktop computer he purchased in October 2000.  The "Evidence Eliminator" program has only one purpose, which is permanently to destroy data from computer hard drives.  Although the desktop computer likely had documents from a key time period regarding Bratz, it appears that no Bratz documents from 2000 are on the desktop computer.  There are also only a few pages of Bratz documents from 2001 on the desktop computer.  Mattel will offer expert testimony in relation to computer forensics to show that evidence has been removed and or rendered irretrievable through Bryant's actions.

(b)    MGA's Destruction of Evidence Through Eric Speckin.

MGA's consultant Eric Speckin purports to be an expert in ink examination.  The manner in which Speckin transported, analyzed, tested, or otherwise used the documents that he tested will be the subject of evidence at trial.  Through such evidence Mattel intends to show that critical documents were destroyed or compromised.  In August 2006 Judge Larson noted concerns about MGA's and Bryant's potential spoliation with respect to key Bratz design, drawings and the destructive testing defendants' performed on them after this suit was filed, without prior notice to either the Court or Mattel.  Expert Order at 11:1-11:13 ("that

-93-

there are serious questions concerning the handling of these critical documents certainly causes the Court much concern about whether the truth seeking functions of the adversarial system have been fundamentally compromised in this case").  As the Court noted, the documents "are not peripheral to the case[,]" and their dating "is a fundamental, perhaps dispositive, issue to this case."  Expert Order 10:25-11:1, 11:9-110.

(c)     Alteration of Key Dates on Critical Documents.

MGA, Larian and Bryant altered numerous original Bratz drawings created by Bryant by adding false and misleading date notations of "8/1998" and "© 8/1998" to the drawings, even though the drawings were not created in August 1998. These notations were not made in 1998, and defendants do not deny the drawings were not completed in 1998.  Nevertheless, they falsely told the Copyright Office they were.

(d)     Removal of Fax Headers on a Critical Contract

Larian directed a subordinate to conceal a fax header from Bryant's signed contract signature page before sending the page to Patricia Glaser, Larian's attorney.  The concealed fax header would have shown that the page was faxed from "Barbie Collectibles."  Nor have defendants produced this spoliated evidence.

MGA executive Victoria O'Connor, at Larian's direction, "whited-out" the "Barbie Collectibles" fax header on the copy of the signed contract that MGA had received from Bryant.  O'Connor has testified that she carried out Larian's instruction out of concern that the fax header showed Bryant was employed by Mattel at the time that he signed the agreement with MGA.  Farhad Larian, Isaac Larian's brother, former MGA shareholder and executive and an MGA consultant at the time, deleted emails and other electronic documents relating to Bratz and other relevant matters after this lawsuit was filed.

Jacqueline Ramona Prince, a third-party witness, has raised questions about the integrity of Bryant's documents.  According to both Ms. Prince and

1  Bryant, Bryant showed Ms. Prince his Bratz drawings in August 1999, when he was

2  employed by Mattel, and asked her to notarize them "as of" 1998. Ms. Prince,

3  however, testified that markings which now appear on the copy of a Bratz drawing

4  produced by defendants did not appear on the original drawing that Bryant showed

5  her in 1999. This conflicts with Bryant's testimony about the drawing.

6  Furthermore, expert forensic analysis has shown that a key portion of the entry from

7  Ms. Prince's notary book relating to certain of Bryant's Bratz drawings -- reflecting

8  that those drawings are supposedly "From 1998 Missouri" -- was subsequently

9  added to the book using different ink.

10            The MGA parties' and Bryant's response and objections to Mattel's

11  alleged "Key Evidence":

12            The parties stipulated, and the Court agreed, that contentions of law and

13  fact, which is what the foregoing summary of "key evidence" proposed by Mattel

14  effectively constitutes, were not necessary and would not be productive, in light of

15  the parties' exhaustive briefing of the same issues in their cross-motions for partial

16  summary judgment and the fact that the Court has not yet ruled on certain of those

17  cross-motions. The MGA parties and Bryant submit that Mattel's insistence, over

18  their objections, on including the foregoing recitation of alleged "key evidence" is

19  contrary to the spirit, if not the letter, of the parties' stipulation and the Court's Order

20  regarding Contentions of Law and Fact. Apr. 4, 2008 Order.

21            Furthermore, the MGA parties and Bryant submit that inclusion of

22  Mattel's lengthy and argumentative recitation of the "key evidence" supporting its

23  claims in the parties' Joint Proposed Final Pretrial Conference Order is inappropriate

24  and contrary to Local Rule 16. Local Rule 16, and Appendix A thereto,

25  contemplates a "brief" summary of the plaintiff's key evidence. It does not

26  contemplate inclusion of what is, effectively the plaintiff's trial brief in the Court's

27  Final Pretrial Conference Order.

28

1    The MGA parties and Bryant object to Mattel's repeated references to

2 and characterizations of the Court's summary judgment ruling.  Among other things,

3 as Mattel is aware, Bryant filed a motion to reconsider or to certify for appeal the

4 Court's summary judgment ruling as to certain issues, including the Court's decision

5 regarding the breach of fiduciary duty claim and the interpretation of Mattel's

6 "Inventions Agreement."  In addition, several summary judgment issues remain for

7 decision and a hearing is set for May 19, 2008.  Mattel's characterizations of the

8 Court's rulings are thus premature and incomplete.

9    The MGA parties and Bryant also disagree with, and object to, Mattel's

10 characterization of the facts and the supposed evidence supporting that

11 characterization.  As discussed in great detail in the MGA parties' and Bryant's

12 motions for partial summary judgment, and as will be proven at trial, Mattel's

13 version of the "facts" is inaccurate and misleading.

14    The MGA parties and Bryant also object to any reference to the

15 supposed "key evidence" to support Mattel's request for an adverse inference

16 instruction at trial.  As set forth in the MGA parties and Bryant's joint Motion *in*

17 *Limine* No. 13, to exclude evidence and argument regarding alleged spoliation by

18 Bryant, a party is not permitted, as a matter of right, to present evidence and

19 argument of alleged spoliation to the jury at trial.  To the contrary, the presentation

20 of spoliation allegations to the jury-is an "extreme" sanction that may be imposed by

21 the Court only under limited circumstances, not present in this case.  *Thompson*, 219

22 F.R.D. at 100; *see also Zubulake v. UBS Warburg, LLC*, 220 F.R.D. 212, 216

23 (S.D.N.Y. 2003) (adverse inference instruction is an "extreme" sanction that should

24 "not be given lightly"); *see also Hamilton v. Signature Flight Support Corp.*, No.  C-

25 05-0490 CW (MEJ), 2005 WL 3481423, at * 3 (N.D. Cal. Dec. 20, 2005) ("Courts

26 determine the proper sanction for destruction of relevant evidence on a case-by-case

27 basis." (citing *Unigard Sec. Ins. Co. v. Lakewood Eng. & Mfg. Corp.*, 982 F.2d 363,

28 368 (9th Cir. 1992)).  Here, Mattel has failed to make the threshold evidentiary

1  showing that is required for Mattel to be entitled to present any evidence or

2  argument of spoliation to the jury, or for the Court to issue an adverse inference

3  instruction to the jury at trial.

4          Bryant already has submitted lengthy briefing and supporting evidence

5  to the Court explaining in detail why Mattel's "Evidence Eliminator" premised on

6  spoliation claims are without merit, in the form of (1) Bryant's Carter Bryant's

7  Opposition to Mattel Inc.'s Motion for an Order Enforcing Court's January 25, 2007

8  Order Compelling Bryant to Produce Computer Hard Drives and For Sanctions

9  [Docket  No. 1980], (2) the Declaration of Michael H. Page in support of that

10  Opposition [Docket No. 1981], both filed on February 7, 2008, (3) Carter Bryant's

11  Surreply Re: Mattel Inc.'s Motion for an Order Enforcing Court's January 25, 2007

12  Order Compelling Bryant to Produce Computer Hard Drives and For Sanctions

13  [Docket No. 2662], (4) the Page Declaration in support of that Surreply [Docket No.

14  2683], both filed on March 17, 2008, and (5) Bryant's and MGA's Joint Motion in

15  Limine No. 13 [Docket No. 3065].  Rather than repeating all of the information set

16  forth in these pleadings here, Bryant and the MGA parties respectfully refers the

17  Court to these pleadings, which he incorporates herein by reference.[18]

18          Mattel's claims of spoliation with respect to Erich Speckin's testing of

19  certain Bryant original documents is similarly without merit.  Indeed, the Court has

20  already addressed this issue at length, and concluded that the previous testing of the

21  drawings (though technically "destructive" of the tiny samples taken) did not alter

22  the drawings' evidentiary value or in any way affect Mattel's ability to conduct

23  similar testing.  Moreover, Mattel has had the opportunity to have its own experts

---

[18]  Bryant has not resubmitted all of these pleadings at this time in an effort not to
burden the Court with additional, redundant paper.  However, Bryant is of course
prepared to provide courtesy copies of all of the other pleadings to the Court, if such
copies would be of  use to the Court.

07209/2474226.11

Case No. CV 04-9049 SGL (RNBx)
FINAL PRE TRIAL CONFERENCE ORDER

inspect and conduct destructive testing on Bryant's original documents.  None of those experts has opined that Mr. Speckin's prior testing in any way affected their ability to perform their expert testing or analysis or otherwise adversely impacted Mattel's ability to present any evidence in support of its case at trial.  And, ironically, the MGA parties and Bryant just recently discovered that one of Mattel's experts knowingly violated the Court's Order setting forth the testing protocol by surreptitiously taking samples from certain documents without providing any notice to the MGA parties or Bryant.

Finally, the MGA parties and Bryant object to the categories of damages that Mattel intends to pursue in this matter – many of which are defective as a matter of law.  Nothing herein shall be deemed an acknowledgment of or consent to Mattel's attempt to pursue any categories of damages in this matter.  All rights to object to Mattel's claims of damages are reserved.

## XXIX.

## DEFENDANTS' AFFIRMATIVE DEFENSES

## MGA PARTIES' THIRD/BRYANT'S FOURTH AFFIRMATIVE DEFENSE

### (Laches)

Bryant, MGA, MGA (HK), and/or Larian must prove:

1.  Mattel's delay in filing suit was unreasonable in light of Mattel's knowledge of its claims against Bryant, MGA, MGA (HK), or Larian; and

2.  Mattel's delay was prejudicial to Bryant MGA, MGA (HK), or Larian in light of investments of time and money that MGA and Larian made; *or*

3.  Mattel's delay was prejudicial to Bryant, MGA, MGA (HK), or Larian in that substantial evidence has been lost and memories faded in the years since Mattel was first on notice of its claims.

## MGA PARTIES' FOURTH/BRYANT'S SIXTH AFFIRMATIVE DEFENSE
### (Statute of Limitations)

Bryant, MGA, MGA (HK), and/or Larian must prove:

1. <u>Intentional Interference with Contract (MGA and Larian)</u>: MGA and Larian must prove Mattel did not file its claims against them within two years of the occurrence of the acts that Mattel contends were wrongful, in this case the alleged breach of Carter Bryant's contracts with Mattel.  The claim "accrues" whether or not Mattel actually knew of the acts at the time.

2. <u>Aiding and Abetting Breach of Fiduciary Duty (Larian and MGA)</u>:  Isaac Larian and MGA must prove that Mattel did not file its claims against them within two years of the date when Mattel knew or when a reasonable person would have had any reason to suspect that wrongdoing had taken place, in this case when Bryant allegedly breached a fiduciary duty to Mattel.

3. <u>Aiding and Abetting Breach of Duty of Loyalty (Larian and MGA)</u>:  Isaac Larian and MGA must prove that Mattel did not file its claims against them within two years of the date when Mattel knew or when a reasonable person would have had any reason to suspect that wrongdoing had taken place, in this case when Bryant allegedly breached a duty of loyalty to Mattel.

4. <u>Copyright Infringement (Bryant, Larian, MGA and MGA (HK))</u>: Carter Bryant, Isaac Larian, MGA, and MGA (HK) must prove that Mattel did not file its claims within three years of when Mattel discovered or reasonably could have discovered that MGA was asserting ownership over property to which Mattel had a copyright interest.

5. <u>Conversion (Bryant, Larian and MGA (HK))</u>: Carter Bryant, Isaac Larian, and MGA (HK) must prove that Mattel did not file its claims within three years of the act of wrongfully taking the property that Mattel contends was converted.  The claim "accrues" whether or not Mattel actually knew of the acts at the time.

6. <u>Statutory Unfair Competition (Isaac Larian and MGA (HK))</u>: Isaac Larian and MGA (HK) must prove that Mattel did not file its claims within four years of when the acts that Mattel contends constitute unfair competition occurred. The claim "accrues" whether or not Mattel actually knew of the acts at the time.[19]

7. <u>Breach of Duty of Loyalty (Carter Bryant)</u>:  Carter Bryant must prove that Mattel did not file its claims within two years of when Mattel knew or when a reasonable person would have had any reason to suspect that wrongdoing had taken place, in this case when Bryant allegedly breached a duty of loyalty to Mattel.

## **MGA PARTIES' FIFTH AND SIXTH AFFIRMATIVE DEFENSES**

### **(205(d)/ Bona Fide Purchaser for Value)**

The MGA Parties must prove that the MGA-Bryant agreement was:

1. Recorded with the Copyright Office first in such a manner as to give Mattel constructive notice of the transfer; and

2. Executed in good faith; and

3. For valuable consideration; and

4. Without notice of an earlier transfer.

---

[19] Pursuant to the Court's 4/25/08 Order, it appears there is no statutory unfair competition claim remaining against Bryant.  However, Bryant joins in this defense in the event that the Court disagrees.

1  Recordation with the Copyright Office means either (1) the filing of the transfer
2  agreement itself, or (2) registration with the Copyright Office listing ownership by
3  assignment.

4  **MGA PARTIES' NINTH/BRYANT'S THIRD AFFIRMATIVE DEFENSE**
5  **(Estoppel)**

6  Bryant, MGA, MGA (HK), and/or Larian must prove:

7      1.    <u>Estoppel of Copyright Claims</u>: Bryant, MGA, MGA (HK), and/or
8  Larian must prove all of the following:

9          a)    That Mattel made a representation of fact by conduct intending
10          that Bryant, MGA, MGA (HK), and/or Larian should rely on it.
11          Conduct is used "in its broadest meaning as including … silence or
12          negative omission to do anything";

13          b)    That Mattel had knowledge that BRATZ potentially infringed on
14          its intellectual property and that Carter Bryant worked for MGA;

15          c)    That Carter Bryant, MGA, MGA (HK), and Larian were ignorant
16          of Mattel's claims of ownership of Bryant's BRATZ sketches; and

17          d)    That Carter Bryant, MGA, MGA (HK), and Larian reasonably
18          relied on Mattel's silence to their detriment.  MGA Parties' reliance and
19          Carter Bryant's reliance must be reasonable in the sense that under the
20          circumstances, a reasonable person would have acted as defendants did.

21      2.    <u>Estoppel of Employment Claims/Duty Claims</u>: Bryant, MGA, MGA
22  (HK), and/or Larian must prove all of the following:

23          a)    That Mattel made a representation of fact by conduct intending
24          that Defendant should rely on it.  Conduct is used "in its broadest
25          meaning as including … silence or negative omission to do anything."

26          b)    That Mattel had knowledge that its employees were
27          moonlighting or independent creation of artistic works;

28

c)      That Carter Bryant was ignorant of the fact that Mattel allowing moonlighting or the independent creation of artistic works was not intended as a policy; and

d)      That Carter Bryant, MGA, MGA (HK), and Larian reasonably relied on Mattel's silence to their detriment.  MGA Parties' reliance and Carter Bryant's reliance must be reasonable in the sense that under the circumstances, a reasonable person would have acted as defendants did.

## MGA PARTIES' TENTH/BRYANT'S FOURTEENTH AFFIRMATIVE DEFENSE

### (Acquiescence)

Bryant, MGA, MGA (HK), and/or Larian must prove:

(as to development and marketing of BRATZ)

1.  Mattel, through its acts or words, silence or inaction, as understood by a reasonable person, indicated the development and marketing of BRATZ was allowed, and

2.  Larian, MGA, Bryant and/or MGA (HK) understood that Mattel allowed the development and marketing of BRATZ.

(as to Bryant's alleged breaches of duties/contract and MGA Parties' alleged aiding & abetting/inducement, and interference with contract)

1.  Mattel, through its acts or words, silence or inaction, as understood by a reasonable person, indicated its employees were allowed to moonlight and/or develop their own artistic work; and

2.  Bryant understood that Mattel allowed its employees to moonlight and/or develop their own artistic work.

## MGA PARTIES' THIRTEENTH/BRYANT'S SECOND AFFIRMATIVE DEFENSE

### (Waiver)

Bryant, Larian, MGA and MGA (HK) must prove:

1.  Mattel was aware of its employees' alleged breaches of the provisions of the employment agreements at issue; and

2.  Mattel indicated, by its words, actions or silence that it did not intend to enforce the provisions of its employment agreements at issue.

## MGA PARTIES' FOURTEENTH/BRYANT'S FOURTEENTH AFFIRMATIVE DEFENSE

### (Abandonment)

Bryant, Larian, MGA and MGA (HK) must prove:

1.  Mattel intended to surrender ownership rights in the work; and

2.  Conduct by Mattel which was "consistent with an intent to abandon" or which "implies an abandonment."

## MGA PARTIES' FIFTEENTH/BRYANT'S FOURTEENTH AFFIRMATIVE DEFENSE

### (De Minimis Use)

Bryant, Larian, MGA and MGA (HK) must prove:

1.  any similarities between the protectable elements of the drawings and the protectable elements of the BRATZ dolls are *de minimis*; <u>or</u>

2.  if there was copying, it was not done to an unfair extent; <u>or</u>

3.  any similarities between the copyrighted work and the copied work consist only of unprotectable elements and elements in the public domain.

## MGA PARTIES' EIGHTEENTH/BRYANT'S FOURTEENTH AFFIRMATIVE DEFENSE

### (Good Faith)

The good faith of Carter Bryant, Larian, MGA, and MGA (HK) is a factor that should be considered when assessing any claim by Mattel that Carter Bryant, Larian, MGA, and MGA (HK) acted in bad faith or with bad intent.  To the extent Mattel's claims implicate defendants' intent or mental state, good faith is a relevant inquiry for which <u>Mattel bears the burden of proof</u>.

## MGA PARTIES' TWENTY-FIRST/BRYANT'S SECOND AFFIRMATIVE DEFENSE

### (Consent)

Bryant, Larian, MGA and MGA (HK) must prove:

1. Mattel indicated, by its words, actions or silence that it consented to its employees moonlighting and developing their own artistic work; and
2. Bryant understood that Mattel allowed its employees to moonlight and develop their own artistic work.

## BRYANT'S FIRST AFFIRMATIVE DEFENSE

### (Unclean Hands)

Bryant must prove that Mattel has acted unfairly or inequitably in matters related to Mattel's claims, including through Mattel's conduct both before and during this litigation, and/or its conduct towards other parties and witnesses related to its claims against Bryant, so that it would be unfair for Mattel to prevail.  Mattel's conduct need not be criminal or illegal, but may be any type of unfair conduct that violates conscience, good faith, or other equitable standards of conduct.

## MGA PARTIES' AND BRYANT'S AFFIRMATIVE DEFENSE TO COPYRIGHT DAMAGES

Bryant, MGA, MGA (HK), and/or Larian must prove:

1. Expenses deductible from gross revenues causally connected to the alleged infringement;

2. Elements of defendants' profit attributable to factors other than the copyrighted work.

## MGA PARTIES' AND BRYANT'S KEY EVIDENCE

The MGA parties and Bryant object to the discussion and inclusion of their contentions of fact surrounding their claims and defenses because the parties stipulated, and the Court ordered, that they are under no obligation to do so. However, because Mattel has chosen, notwithstanding that stipulation and order, to include its contentions of fact, out of an abundance of caution, the MGA parties and Bryant include a brief summary of illustrative key evidence that relates to their various affirmative defenses.  To the extent any evidence cited relates only to a defense asserted by a certain defendant(s), such evidence is only asserted on behalf of such defendant(s).  The following listing is not intended as a complete and exhaustive listing of all of the evidence and the MGA parties and Bryant reserve the right to rely on additional evidence not listed herein.

1. <u>Statute of Limitations</u>:  MGA parties and Bryant assert the following facts in support of this affirmative defense.  Mattel was on notice of its claims as early as October 2000 and no later than March 2002.

   a. In October of 2000, Bryant told Mattel that he was leaving to design a line of dolls.  (MGA Undisputed Facts ("UF") ¶ 27.)

   b. The personnel supervising Bryant suspected that he was going to a competitor (MGA UF ¶¶ 28-29), and Mattel had constructive notice that it was MGA (MGA UF ¶ 30; Mattel UF ¶ 8).

c.  Mattel's telephone records from September 2000 show that Bryant "placed dozens of calls to MGA" while still employed at Mattel. (Mattel UF ¶ 8; MGA OF ¶ 8.)

d.  A little over two months after Bryant left to "to work on [his] own doll line," prototypes of the BRATZ dolls were exhibited by MGA at the Hong Kong, Tokyo and New York Toy Fairs in January and February 2001, respectively.  (MGA UF ¶¶ 31-32, MGA MSJ at 18; MGA Opposed Facts ("OF") ¶¶ 109, 160.)

e.  The BRATZ display at the Hong Kong Toy Fair included not only doll prototypes, but also BRATZ drawings from Bryant's sketches. (OF ¶ 153.)

f.  Mattel saw and videotaped the BRATZ booth used by MGA at the Tokyo toy fair in February 2001, which had both dolls and drawings at it. (MGA OF ¶¶ 109, 155.)

g.  The New York Toy Fair is where speculation in the media started about alleged similarities between the BRATZ and Mattel's internal projects. (MGA UF ¶ 51 ("When I first saw the Bratz dolls at Toy Fair this year, they reminded me of Mattel Inc.'s … Diva Starz dolls.").)

h.  At the same time, in February of 2001, Larian began generating publicity as the man behind MGA's BRATZ dolls.  (MGA UF ¶ 36.)

i.  On March 5, 2001, the BRATZ drawings were published in a trade journal, with a write up of the BRATZ display at the New York Toy Fair. (MGA OF ¶ 157.)

j.  Mattel not only attended the New York Toy Fair (MGA UF ¶ 34), it actually saw the BRATZ and discussed with MGA that Mattel might carry and sell BRATZ (MGA UF ¶ 37).

k.  In March 2001, shortly after the fair, Mattel wrote MGA saying that Mattel would not carry BRATZ, noting that BRATZ "are very similar

1    to our [Mattel's] own concepts and this is a very sensitive issue with the

2    brand groups."  (<u>Id</u>.)

3  l.  Despite not wanting to distribute BRATZ because of supposed

4    similarities to Mattel's own products, Mattel apparently surreptitiously

5    placed the BRATZ line into Mattel's computer systems, a fact that

6    MGA confronted Mattel about in early April 2001.  (MGA UF ¶ 38.)

7  m.  At the 2001 toy fairs, Mattel saw the BRATZ prototypes and became

8    aware of the alleged similarities between them and Mattel's "Diva

9    Starz" and "Toon Teens."  (MGA MSJ at 8, 18.)

10  n.  Mattel's designers and executives (including the head of its Girls'

11    Division) believed as soon as the BRATZ was first publicly unveiled

12    (<i>i.e.</i>, at the Toy Fairs) that the BRATZ was copied from Mattel

13    products.  (MGA UF ¶¶ 47-50.)

14  o.  As of the time in 2001 of the first release of the BRATZ, it was

15    "common knowledge" within Mattel that Bryant was working at MGA

16    and was the designer of the BRATZ.  (MGA UF ¶¶ 52-54.)

17  p.  The Mattel "Toon Teens" line, which Mattel believed BRATZ looked

18    similar to, had never been released and remained within Mattel's

19    exclusive possession at all times.  (MGA OF ¶ 152.)

20  q.  In 2001, Mattel was bombarded by publicity surrounding BRATZ,

21    MGA and Larian. (MGA UF ¶¶ 35-36; MGA OF ¶¶ 154, 156-57, 160.)

22  r.  By February of 2002, Mattel was also on notice of Internet publications

23    linking the BRATZ with Mattel's line of "Diva Starz." On February 7,

24    2002 Mattel sent Larian a letter threatening him with a legal action if

25    the link between the products was not removed.  (MGA OF ¶ 82.)

26  s.  Indeed, as Mattel's letter indicated, anybody who searched the Internet

27    at that time for either Mattel's "Barbie" or "Divastar" would have been

28    directed to a Yahoo! discussion group devoted to BRATZ. (<u>Id</u>.)

t.  Crucially, the site that Mattel was monitoring identified Bryant as BRATZ's creator <u>and</u> linked him to MGA in March of 2002 (<u>id.</u>).

u.  By March 15, 2002, the facts known to Mattel materialized into its launch of a formal investigation into MGA and Larian's involvement in Bryant's creation and development of the BRATZ.  (MGA UF ¶¶ 56-58.)

v.  In August 2002, Mattel CEO Robert Eckert received an anonymous letter, in which Bryant is again accused of having created BRATZ while employed by Mattel and bringing it to MGA.  (UF ¶ 69.)  The letter specifically alleged that Bryant, a former Mattel employee, had taken the BRATZ concept to MGA Entertainment, confirming for Mattel's highest authority what nearly a year of "rumor and innuendo" had already revealed – that Bryant, Isaac Larian, and MGA had turned Bryant's idea into a highly successful line of dolls.

w.  Further, Mattel admits that if the allegations in the letter were true, then Mattel would have been on notice of the same claims that it is asserting in this case. (UF ¶ 72.)  Yet Mattel did nothing at all.

x.  Mattel admits that it was on notice of its claims no later than November 24, 2003.  (Mattel UF ¶ 26.)

y.  The earliest pleading in these consolidated proceedings is Mattel's '04 Complaint, filed on April 27, 2004 against a single defendant – Bryant – and ten "Doe" defendants.  Mattel's claims in that action focused on Bryant's involvement with an unnamed "competitor," which allegedly received from Bryant Mattel's intellectual property; this Complaint further alleged that Bryant used "Mattel's property and resources" for the benefit of himself and the aforementioned "competitor," and that Bryant "converted" Mattel's "intellectual property and intangible

1    property" by "asserting ownership" of that property and providing it to

2    "others."  ('04 Compl. ¶¶ 12, 18, 23, 24, 30, 31, 36, 41 & 42.)

3    z.  The '04 Complaint specified that no later than November 2003 Mattel

4        already knew that "Bryant had secretly aided, assisted and worked for a

5        Mattel competitor . . . by entering into an agreement with the

6        competitor, during the time [he] was employed by Mattel."  (*Id.* ¶ 12.)

7        Mattel also knew that "Bryant's agreement with the competitor

8        obligated Bryant to provide product design services to the competitor

9        on a 'top priority' basis."  (*Id.*)  Mattel also knew that Bryant's

10       agreement with that competitor "provided . . . that Bryant would

11       receive royalties and other consideration for sales of products on which

12       [he] provided aid or assistance; that all work and services furnished by

13       Bryant to the competitor under the agreement would be considered

14       'works for hire'; and that all intellectual property rights to preexisting

15       work by Bryant purportedly would be assigned to the competitor."

16       (*Id.*)  Mattel sought damages for the alleged misappropriation of its

17       property and an injunction against Bryant and "those acting in concert

18       and participation: with him, prohibiting them from continuing to

19       benefit from" Bryant's alleged misappropriation.  (*Id.* ¶¶ 19, 27, 29, 34

20       & 45.)

21  aa. Mattel candidly admitted in its motion for leave to assert the claims at

22       issue here that the discovery obtained by Mattel after it filed the '04

23       Complaint only "confirmed" what it had already suspected; namely,

24       that "Bryant created BRATZ designs, and aided MGA, during his

25       Mattel employment and that he did so using Mattel resources."

26       (Memorandum of Points and Authorities in Support of Mattel, Inc.'s

27       Motion for Leave to File Amended Complaint, at 5:7-10.)

28

bb. MGA Entertainment, Inc., by stipulation intervened in the April 2004 Action on December 7, 2004.  (*See* Stipulation and Order dated December 7, 2004, at 1:10-11, 1:14-15.)  Under the terms of that stipulation, the parties agreed that MGA would intervene "as a procedural matter" only.  (Id.)

cc. Mattel did not register any copyright interests in any of the BRATZ drawings it now claims to own until October 30, 2006.  (UF ¶ 80.)

dd. On November 20, 2006, Mattel – for the first time in the two and a half years since the inception of this litigation – moved to assert claims against MGA Entertainment, Inc., MGA (HK) and Isaac Larian.

2. <u>Laches</u>:  MGA parties and Bryant assert the following facts in support of this affirmative defense.  As described above, MGA Parties' evidence shows that Mattel waited over five years before challenging MGA's ownership of the highly successful BRATZ dolls, until MGA spent millions on development and production.  (MGA MSJ at 15-33 & MGA UF ¶¶ 32-36.)  Furthermore, MGA and Bryant were prejudiced by Mattel's destruction and "misplacing" of evidence from the relevant time period and Mattel's witnesses cannot recollect important events given the passage of time.  (MGA Opp'n at 29-30, MGA OF ¶ 120 (Mattel employee testimony that "[i]t's been too long" and "ten years is a long time").)

3. <u>205(d)/Bona Fide Purchaser for Value</u>:  MGA parties assert the following facts in support of this affirmative defense.  MGA registered Bryant's drawings on December 22, 2003, ***three years in advance of Mattel***. (Mattel UF ¶ 23.)  Each Certificate of Registration lists Bryant as the author of the drawings, 1998 as the year they were created, and that MGA obtained ownership through an "assignment."  (Id.)  When MGA registered its copyrights, Mattel had neither registered nor recorded any

alleged interest in Bryant's drawings (id. ¶ 24), even though Mattel admits it knew of its present claims.  Thus, when MGA registered, it took the assignment in good faith without notice of any earlier claims by Mattel (MGA UF ¶¶ 14-22; MGA OF ¶ 133), and it publicly filed documents noting its copyright interest came by assignment (Mattel UF ¶ 23).  In addition, by the time that MGA registered its copyright interests in BRATZ, Mattel had *actual* notice of the assignment from Carter Bryant to MGA as Mattel was in possession of a copy the contract between MGA and Bryant and had send the drawings that would be copyrighted by MGA. Thus, Mattel was not merely on constructive notice of MGA's claim to ownership, but also on actual notice.

4. <u>Estoppel as to Copyright Claims</u>:  MGA parties and Bryant assert the following facts in support of this affirmative defense.  As described above, despite knowing that Bryant created the BRATZ and believing that the BRATZ infringed on its copyright, Mattel took no action for five and a half years.  While Mattel sat on its claims, MGA spent millions of dollars marketing and developing the BRATZ.  (MGA MSJ at 15-33 & MGA UF ¶¶ 32-36.)  Moreover, by March 2002, Mattel began investigating MGA's ownership of BRATZ.  This investigation was headed by Mattel's chief internal investigator and was aided by Mattel's outside counsel Michael Zeller.  (MGA OF ¶¶ 57-58, 66, 68.)  This investigation, and the receipt of an anonymous letter claiming Bryant created the BRATZ, supported Mattel's prior belief that Bryant created the BRATZ.  (<u>Id.</u> ¶¶ 61-63, 66-67, 69-73.)

5. <u>Estoppel as to Employment Agreement Claims/Duty Claims</u>:  MGA parties and Bryant assert the following facts in support of this affirmative defense.  Mattel knew its employees were moonlighting for its competitors and/or creating their own independent artistic work.  (MGA OF ¶¶ 110,

-111-

124.)  Despite this knowledge, Mattel took no steps to prevent its employees from moonlighting or from working on their own independent artistic work.  In fact, Mattel's head of security (who himself moonlights (*id.* ¶ 171)) could not recall a single instance of investigating such behavior.  (Bryant UF ¶ 41.)  Every one of the employees that moonlighted or created independent artistic work while working at Mattel had a contract like Bryant's.  (*Id.* ¶¶ 9-11.)

6.   Acquiescence as to Bryant's Drawings:  MGA parties and Bryant assert the following facts in support of this affirmative defense.  Mattel contends that it owns various drawings and colorings on drawings done while Bryant was employed at Mattel, but the evidence is undisputed that such activities occurred, if at all, on Bryant's own time and not in the course and scope of his employment.  (MGA OF ¶ 175.)  As described above, Mattel had a longstanding practice of allowing its employees to moonlight or create their own artistic work; indeed, so many Mattel employees moonlighted with Mattel's competitors that they developed a name for these jobs.  (MGA OF ¶¶ 110, 124.)  Every one of these employees signed the same form employment agreement with Mattel as did Bryant.  (Bryant UF ¶¶ 9-11.)  Despite the widespread knowledge of this practice at Mattel, it never investigated or punished this behavior.  (*Id.* ¶ 41.)  Mattel knew (or should have known) of Bryant's conduct no later than 2001.  (MGA UF ¶¶ 53-54, 56.)  Nonetheless, it waited until 2004 to bring an action based on Bryant's employment agreement.  Moreover, Mattel never brought such an action against any of the other numerous employees who moonlighted or created their own artistic work during the same period.

7.   Acquiescence as to MGA's Alleged Copyright Violations:  MGA parties and Bryant assert the following facts in support of this affirmative defense.  As described above, Mattel learned of the BRATZ dolls five and a half

years before bringing an action against MGA Parties and meanwhile, the MGA Parties have expended millions of dollars marketing and developing the BRATZ.  (MGA UF ¶¶ 31-32, 34-37.)

8.   <u>Waiver</u>:  MGA parties and Bryant assert the following facts in support of this affirmative defense.  Mattel contends that it owns various drawings and colorings on drawings done while Bryant was employed at Mattel, but the evidence is undisputed that such activities occurred, if at all, on Bryant's own time and not in the course and scope of his employment. (MGA OF ¶ 175.)  Yet, as described above, Mattel knowingly allowed its employees to "moonlight" at competitors without protest and/or create their own artistic work.  (OF ¶¶ 110, 124 (citing Bryant UF ¶¶ 37- 38).) Everyone of these employees signed a contract with Mattel like Bryant. (Bryant UF ¶¶ 9-11.) Mattel did not conduct a single investigation into this conduct.  (<u>Id.</u> ¶ 41.)  Mattel has not produced any evidence that it has ever enforced its contracts to prevent employees from working for competitors on the side or from creating their own independent artistic work, despite repeated discovery requests from MGA.  (Nolan Decl. in support of MGA SJ ¶ 6.)

9.   <u>Abandonment</u>:  MGA parties and Bryant assert the following facts in support of this affirmative defense.  As discussed above, Mattel suspected that the BRATZ infringed on its copyrights in early 2001. (MGA UF ¶¶ 31-32, 34-37.)   To make a determination regarding this potential violation, Mattel conducted an investigation, headed by Mattel's director of security and aided by outside counsel, Michael Zeller.  (MGA OF ¶¶ 57-58, 66, 68.)  Mattel expended time, resources, and money on this investigation but decided not to pursue any claims against the MGA Parties, or even to contact the MGA Parties to resolve any remaining doubts concerning the alleged violations of Mattel's copyrights.

10. <u>Good Faith</u>:  MGA parties assert the following facts in support of this affirmative defense.  Before MGA entered into an agreement with Bryant on October 4, 2000, during negotiations with Bryant, the MGA Parties sought and received assurances from Bryant and his attorney that the BRATZ concept and drawings fell outside any contractual obligations owed to Mattel  (MGA UF ¶¶ 14-23; Mattel UF ¶ 94).  Bryant's contract with MGA and Larian included a warranty that BRATZ was Bryant's exclusive property and indemnified MGA and Larian against any claims raised by a third party.  (MGA UF ¶ 23, Mattel UF ¶¶ 97-98.)  Anything Bryant prepared while employed at Mattel to pitch the BRATZ idea to MGA was believed by MGA and Larian as also created outside the scope of his duties to Mattel, based on the representations of Bryant and his attorney.  (OF ¶¶ 6, 19, 133.)

11. <u>Consent</u>:  MGA parties and Bryant assert the following facts in support of this affirmative defense.  Mattel knew that its employees were moonlighting with its competitors and/or creating independent artistic works and did not object.  (OF ¶¶ 110, 124.)  Mattel consented when it allowed its employees, all of whom signed employment agreements like Bryant's, to engage in this behavior.

12. <u>Unclean Hands</u>:  Bryant asserts the following facts in support of this affirmative defense.  Mattel continues to assert rights to Bryant's BRATZ idea and sketches based on a deceptive Checkout form that the company forced Bryant to sign when he left his employment, and which blatantly misrepresented the terms of his actual agreement with the company.  (Bryant MSJ at 38-39.)  Mattel never explained its purported understanding of the Employment Agreement document as encompassing all elements of an employee's creative processes to its employees.  (<u>Id.</u> at 25-28.)  Although it was common knowledge at Mattel (including among

management) that many employees engaged in non-Mattel work on the side, Mattel never took any steps while Bryant was at Mattel to enforce its supposed prohibitions on non-Mattel work, or to explain its policies to employees.  (*Id.* at 7-8;  Bryant UF ¶¶ 37-41.)   Even after Bryant left Mattel, the company continued to ignore widespread moonlighting, until it discovered that certain seamstresses still in its employ had taken in side-work on BRATZ clothes; in the interests of obtaining an edge in this litigation, by any means possible, before firing them Mattel brutally interrogated them using plainly inequitable—if not illegal—methods. (Bryant OF ¶ 166; Declaration of Marcus R. Mumford in Support of MGA's and Carter Bryant's Motion For An Evidentiary Hearing Re: Witness Tampering (Docket No. 2651), Exs. 3-6.)  Mattel also delayed this suit for several years after it knew about Bryant's involvement in BRATZ, in order to maximize its damages and use Bryant to its advantage in another litigation.  (MGA MSJ at 15-29; Bryant OF ¶ 167.)

13.   <u>Deductible expenses</u>: MGA incurred substantial costs and expenses to develop, manufacture, market and sell the various products that Mattel now alleges infringe its copyrights.  At trial, MGA intends to present evidence of these costs, expenses and related deductions, including, but not limited to, the following:

   a.  Sales returns

   b.  Sales discounts and allowances

   c.  Costs of goods sold

   d.  Production costs

   e.  Other costs of sales

   f.  Ad production expense

   g.  Ad media expense

   h.  Other sales and marketing expense

i.   Product development expense

j.   Travel and entertainment expense

k.   Salaries and related expenses

l.   Professional fees

m. Premises-related expenses

n.   Supplies, postage and delivery expenses

o.   Other expenses

p.   Distribution expenses

q.   Mold depreciation

r.   Other depreciation and amortization

s.   Tax expense

14.   <u>Apportionment Factors</u>:  Substantial elements of the Defendants' profits were attributable to factors other than the copyrighted work.  At trial, the Defendants intend to introduce evidence confirming these factors as critical to the success of the allegedly infringing products.  This evidence will include, but will not necessarily be limited to, market research and related documents produced by MGA, Mattel and third parties.  MGA further expects to elicit testimony from lay witnesses and experts that supports these apportionment factors, consistent with MGA's Rule 26 disclosures.  In particular, the Defendants intend to introduce evidence supporting each of the apportionment factors below:

a.   <u>Design of the doll.</u>  The "design of the doll" refers to a variety of developmental steps, each of which involved substantial creative contributions.  These steps include:  (a) Carter Bryant's drawings, both before and after his departure from Mattel, (b) the sculpts for the Bratz dolls created by Margaret Leahy, (c) the engineering concepts that allowed for production of the doll, (d) the face painting of the dolls by Anna Rhee, and (e) the Bratz dolls hair rooting and hairstyling by Steve

1    Tarmichael.  All of these doll development steps were overseen by Ms.

2    Garcia.  As the evidence will show, Mr. Bryant's drawings had a

3    relatively minor contribution to the ultimate design of the Bratz dolls.

4    b.  <u>Themes associated with the doll</u>.  Fashion dolls are commonly sold

5    using doll "themes," and doll makers like MGA and Mattel expend

6    considerable resources developing fashions, packaging, accessories and

7    storylines consistent with those themes.  As the evidence will show,

8    successful execution of themes is critical to the sales of fashion dolls,

9    including Bratz.

10   c.  <u>Fashions sold with the doll</u>:  The evidence will further show that

11   MGA's continued development of cutting-edge, innovative fashions

12   helped drive and sustain the commercial success of the Bratz fashion

13   doll line.

14   d.  <u>Accessories sold with the doll:</u> The evidence will show that accessories

15   significantly enhance the "play value" of fashion dolls, including Bratz.

16   Thus, companies like Mattel and MGA expended substantial sums to

17   develop, test and market fashion doll accessories.  MGA's continued

18   development of high-quality and innovative doll accessories helped

19   drive and sustain the commercial success of the Bratz doll fashion line.

20   e.  <u>Characters associated with the doll line.</u>   The evidence will show that

21   girls must "relate" to a fashion doll if the doll is to enjoy commercial

22   success.  To that end, doll companies like Mattel and MGA invest

23   considerable resources to develop personalities, interests, storylines,

24   and even ethnicities for their fashion dolls.  As even Mattel's marketers

25   recognized, MGA was extraordinarily successful at imbuing its Bratz

26   fashion dolls with memorable personalities that, in turn, drove the sales

27   and profits of the fashion doll line.

28

f. <u>Packaging in which the dolls were sold.</u>  MGA intends to introduce evidence that it's innovative and award-winning packaging helped drive sales of fashion dolls.  Indeed, as the evidence will show, Mattel recognized the impact of Bratz's innovative packaging, and, in response, invested substantial amounts to makes its own doll packaging more attractive.  Even Mattel's own consumer research attests to the drawing power of Bratz's doll packaging, as the evidence will show.

g. <u>MGA's branding, marketing, and advertising efforts.</u>  As the evidence will show, MGA developed a strong Bratz brand in record time using skilled marketing and innovative branding techniques.  MGA intends to elicit expert testimony regarding the nature of MGA's branding efforts and the importance of branding, marketing and advertising to Bratz's commercial success.

15. <u>Apportionment Approaches:</u>  Based on the factors above, MGA intends to elicit expert testimony regarding approaches that may be used to apportion MGA's profits.  In support of these approaches, MGA may introduce documents and testimony further corroborating the apportionment calculations of its experts.  In particular, MGA intends to elicit expert testimony regarding the following apportionment approaches:

a. <u>Mattel's "Key Fashion Doll Attributes"</u>:  The apportionment approach is based on Mattel's own assessment of Bratz' performance along several "key fashion doll attributes."

b. <u>Royalties paid by MGA to Bryant</u>:  This approach uses the royalty rate paid to Mr. Bryant as a proxy for the value of Mr. Bryant's contribution to the Bratz doll line.

c. <u>Work tasks to develop the original Bratz doll</u>.  This approach compares the total work tasks of Mr. Bryant to the overall creative work tasks incurred by MGA to develop the original Bratz dolls.

d. <u>MGA's product development contributions to Bratz</u>. This approach apportions Bratz profits based on an equal weighting of the apportionment factors listed above.

e. <u>MGA's licensing in and licensing out royalty rates.</u>   This approach compares the "licensing in" royalty rate paid to Mr. Bryant to the average "licensing out" royalty rates for the Bratz property. The difference between these two rates is used as a proxy for the value added to the Bratz line by MGA.

f. <u>MGA's investment in the Bratz product line.</u> This approach compares MGA's costs to acquire the allegedly copyrighted property, i.e., royalties paid to Mr. Bryant, to MGA's costs associated with developing and marketing the Bratz doll line and other Bratz-branded merchandise.

g. <u>Sales variation among Bratz products</u>. This approach measures the variation in sales revenue among different Bratz doll SKUs containing the same doll design. The difference in sales can be fairly attributed to factors other than the allegedly infringing doll design, including fashions, themes, characters, accessories, and packaging.

h. <u>Brandware Group's "Bratz Doll Purchasing Influence Study"</u>: This approach apportions profits based on consumer research conducted by Thomas Gruca of Brandware Group. Mr. Gruca's research measured the relative importance of each of the apportionment factors identified above to consumers' decision to purchase Bratz dolls.

The foregoing apportionment methodologies result in a range of profits attributable to "doll design" from 14.3 percent (%) to 25.0 percent (%). As the evidence will further show, and as discussed above, "doll design" may be further apportioned between the contribution of the protectable elements of Carter Bryant's drawings (if any) on the one hand, and the contributions of others, including but not limited to

1  Margaret Leahy, Paula Garcia, Veronica Marlow,  Isaac Larian and Mr. Bryant

2  (following his departure from Mattel) on the other hand.

3

4

5  ## XXX.

6  ## ISSUES TO BE TRIED

7  In view of the admitted facts and the elements required to establish the

8  claims, counterclaims and affirmative defenses, the following issues remain to be

9  tried:

10  The Court's ruling on the outstanding summary judgment issues, motions *in limine*,

11  and Bryant's Motion for Reconsideration or to Certify for Appeal could materially

12  impact the issues to be tried in this case.  The parties will meet and confer and then

13  supplement this section of the Pretrial Order immediately after receiving the Court's

14  decision on the remaining motions.

15

16

17

18  ## XXXI.

19  ## DISCOVERY

20  Discovery is not complete.  Phase 2 discovery has been stayed.  Many

21  Phase 1 discovery motions remain to be heard.  Certain depositions of fact and

22  expert witnesses remain to be conducted.  The parties are working to complete them

23  as expeditiously as possible.

24

25

26

27

28

## XXXII.

### EXHIBITS

All disclosures under F.R.Civ. P. 26(a)(3) have been made.  The joint exhibit list of the parties will be filed pursuant to the schedule approved by the Court.

## XXXIII.

### WITNESSES

All disclosures under F.R.Civ.P. 26(a)(3) have been made.  Witness lists of the parties will be filed with the Court pursuant to the schedule approved by the Court.  Each party intending to present evidence by way of deposition testimony has marked such depositions in accordance with L.R. 16-2.7.  For this purpose, the following depositions shall be lodged with the Clerk as required by L.R. 32-1: William Ackerman (Art Attacks), Bryant Joseph Armstrong, Nana Ashong, Schuyler Bacon, Ronald Brawer, Kerry Brode, Charnayne Brooks, Carter Bryant, Carter Bryant (Art Attacks), Carter Bryant (Gunther-Wahl), Janet Bryant, Thomas Bryant, Ana Cabrera, Mei Wah (Sarah) Chui, Elise Cloonan, Nick Contreras, Daniel Cooney, Wendy Feinberg, Jeanne Galvano, Paula Garcia, Paula Garcia (Art Attacks), Brooke Gilbert, Kami Gillmour, Daphne Gronich, Sarah Halpern, Esther Han, Rachel Harris, Rebecca Harris (Art Attacks), Amy Hyland, Richard Irmen, Mitchell Kamarck, Samir Khare, Andreas Koch, Susana Kuemmerle, Robert Kullman, Farhad Larian, Isaac Larian, Isaac Larian (Art Attacks), Isaac Larian (Larian v. Larian), Isaac Larian (Ubisoft), Margaret Leahy, Edmond Lee, Steven Linker, Kenneth Lockhart, Jennifer Lynn Maurus (Larian v. Larian), Albert Lyter, David Malacrida, Peter Marlow, Veronica Marlow, Karl Meyer, Beatriz Morales, Amy Myers, Joyce Ng, Victoria O'Connor, Sarah D. Odom, Denise O'Neal, Jacqueline Prince, Jessie Ramirez, Anna Rhee, David Rosenbaum, Lon Ross (Fun4All), Maria Salazar, Shirin Salemnia, Joe Tiongco, Maureen Tkacik, Lisa

1  Tonnu, Anne Wang, Jeffrey Neil Weiss, Spencer Woodman, Mel Woods, and

2  MGA's 30(b)(6) witness regarding Larian v. Larian.

3      Additional depositions to be lodged: Ronald Brawer, Richard DeAnda, Ann

4  Driskill, Robert Eckert, Kevin Farr, Lissa Freed, Jeanne Galvano, Hoi Hoffman-

5  Briggs, Brian Hooks, Julia Jensen, Alan Kaye, Fred Kawashima, Tim Kilpin,

6  Liliana Martinez, Heather McComb, Ginger McRae, Nicholas Mirzoeff, Teresa

7  Newcomb, Jill Nordquist, Ralph Oman, Rodney Palmer, Joni Pratte, Jacqueline

8  Prince, Kathleen Simpson-Taylor, Maureen Tafoya, and Sandra Yonemoto.

9      Pursuant to ¶ 97 of the Court's Scheduling Order, the parties identify

10  the following expert witnesses to be called:

11      Mattel:  Valery Aginsky, John Alex, Lloyd Cunningham, William

12  Flynn, Frank Keiser, Lee Loetz, Mark Menz, Nicholas Mirzoeff, Ralph Oman,

13  Walter Rantanen, Carol Scott, Bryce Stein, Michael Wagner, Robert Lind, Angel

14  Gomez, Heather McComb, Ginger McRae, Denise Van Patten, and Kenneth

15  Hollander.

16      Defendants:  Mary Bergstein, D. Jan Duffy, Thomas S. Gruca, Erich

17  Joachimstaler, Robert D. Kullman, Albert H. Lyter, Peter Menell, Paul Meyer,

18  Debora Middleton, Robert Tonner, Glenn Vilppu, Douglas Kidder, and Gary Funck.

19      The following law and motion matters and motions in limine are

20  pending or contemplated:

21      Mattel has filed the following motions *in limine*:

22      1.      MIL No. 1 to exclude: (1) evidence or argument that Bryant's

23  invention assignment agreements are unfair or unconscionable; (2) evidence of other

24  versions of Mattel's inventions agreements; and (3) expert testimony of D. Jan

25  Duffy;

26      2.      MIL No. 2 to exclude evidence, argument or reference to

27  Mattel's alleged motive in filing suit or re consequences thereof;

28

1          3.     MIL No. 3 to exclude Phase 1(B) evidence in the Phase 1(A)

2    trial and Phase 2 evidence in the Phase 1 trials or, in the alternative, to permit

3    expedited Phase 2 discovery;

4          4.     MIL No. 4 to preclude introduction to jury of evidence and

5    testimony relating to equitable defenses to be tried by court;

6          5.     MIL No. 5 to exclude evidence of or argument concerning other

7    lawsuits and other purported bad acts and dismissed defenses;

8          6.     MIL No. 6 to exclude evidence or argument concerning actions

9    taken by or against Mattel employees other than Carter Bryant;

10          7.     MIL No. 7 to preclude the MGA Defendants from asserting or

11    relying on an advice of counsel defense

12          8.     MIL No. 8 to exclude evidence relating to whether Mattel would

13    have marketed Bratz;

14          9.     MIL No. 9 to exclude argument, evidence, or expert testimony

15    regarding Barbie and other Mattel dolls;

16          10.     MIL No. 10 to exclude testimony by Glenn v. Vilppu;

17          11.     MIL No. 11 to preclude Defendants from offering improperly

18    disclosed evidence;

19          12.     MIL No. 12 to exclude the testimony of Peter S. Menell;

20          13.     MIL No. 13 to exclude expert testimony of Mary Bergstein,

21    Robert Tonner, and Debora Middleton;

22          14.     MIL No. 14 to exclude evidence and argument related to certain

23    discovery matters.

24          15.     MIL No. 15 for a preclusion order regarding MGA's disqualified

25    expert Christina Tomiyama.

26    Defendants filed the following motions in limine:

27

28

1          1.     MGA Parties' Notice of Motion and Motion in Limine Number 1
to  Exclude All Evidence Relating to Litigation or Other Proceedings Between Isaac and Farhad Larian;

2.     MGA Parties' Notice of Motion and Motion in Limine Number 2 to  Exclude All Evidence Relating to Isaac Larian's Wealth and Assets;

3.     MGA Parties' Notice of Motion and Motion in Limine Number 3 to Exclude Reference to and Use of Evidence of Other Legal Proceedings ;

4.     MGA Parties' Notice of Motion and Motion in Limine Number 4 to Exclude Reference to and Use of MGA's Employment Agreements With its Employees;

5.     MGA Parties' Notice of Motion and Motion in Limine Number 5 to Exclude References to Prior Legal Representation;

6.     MGA Parties' Notice of Motion and Motion in Limine Number 6 to Exclude Reference to and Use of Phase Two Evidence;

7.     MGA Parties' Notice of Motion and Motion in Limine Number 7 to Exclude All References to and Use of Certain "Expert" Testimony Proffered by Mattel Witness Michael J. Wagner;

8.     MGA Parties' Notice of Motion and Motion in Limine Number 8 to Strike Expert Rebuttal Report of Kenneth Hollander and Sections of Expert Rebuttal Reports of Heather McComb, Denise Van Patten, and Nicholas Mirzoeff;

9.     MGA Parties' Notice of Motion and Motion in Limine Number 9 to Strike the Expert Report and Testimony of Ralph Oman and John Alex;

10.     MGA Parties' Notice of Motion and Motion in Limine Number 10 to Exclude All References to and Use of Certain "Expert" Testimony Proffered by Mattel Witness Carol A. Scott;

11.     MGA Parties' Notice of Motion and Motion in Limine Number 11 to Strike the Expert Rebuttal Report of Robert C. Lind;

1      12.    MGA Parties' Notice of Motion and Motion in Limine Number

2  12 to Strike Portion of the Expert Report of Lee Loetz;

3      13.    Motion in Limine Number 13:  To exclude evidence and

4  argument regarding alleged spoliation by Bryant;

5      14.    Motion in Limine Number 14:  To exclude evidence and

6  argument regarding Bryant's alleged "borrowing" of ideas or concepts from

7  preexisting Mattel projects, including Toon Teens, Diva Starz, the "Swan" line, and

8  Skipper.

9      Bifurcation of the claims and counterclaims was ordered pursuant to

10  the Court's Order of July 2, 2007.  The claims and counterclaims to be tried in Phase

11  1 trial are set forth herein.  The claims remaining for trial in Phase 2 are set forth on

12  pages 8-9 in Mattel's Memorandum of Trial Structure, filed June 20, 2007, as

13  adopted in the July 2, 2007 Order.

14      The foregoing admissions having been made by the parties, and the

15  parties having specified the foregoing issues of fact and law remaining to be

16  litigated, this Pretrial Conference Order shall supersede the pleadings as they relate

17  to claims or defenses to be tried in Phase 1 and govern the course of the trial of the

18  Phase 1 claims and defense, unless modified to prevent manifest injustice.

19

20

21  DATED:  May      . 2008

22

23         _____

24         HON. STEPHEN LARSON

25  Approved as to form by:

26

27

28

Case No. CV 04-9049 SGL (RNBx)
FINAL PRE TRIAL CONFERENCE ORDER

1  QUINN EMANUEL URQUHART OLIVER &
2  HEDGES, LLP

3  By  _John B. Quinn (by Heidi Frahm)_
4      John B. Quinn, Esq.
        Attorneys for Mattel, Inc.
5

6

7  KEKER & VAN NEST ,LLP

8

9  By  _____
10      Jon Keker, Esq.
        Attorneys for Carter Bryant
11

12 SKADDEN, ARPS, SLATE, MEAGHER &
13 FLOM LLP

14 By  _MGA Defendants (with authorisation)_
15      Thomas J. Nolan, Esq.
        Attorneys for MGA Entertainment, Inc.
16

17

18

19

20

21

22

23

24

25

26

27

28

1   QUINN EMANUEL URQUHART OLIVER &
    HEDGES, LLP
2

3    By _____
4          John B. Quinn, Esq.
           Attorneys for Mattel, Inc.
5

6

7   KEKER & VAN NEST ,LLP

8

9    By [Counsel for Mr. Bryant has been
        requested to provide authorisation]
10         Jon Keker, Esq.
           Attorneys for Carter Bryant
11

12

13  SKADDEN, ARPS, SLATE, MEAGHER &
    FLOM LLP
14

15   By _____
16         Thomas J. Nolan, Esq.
           Attorneys for MGA Entertainment, Inc.
17

18

19

20

21

22

23

24

25

26

27

28