# EXHIBIT 1

THIS EXHIBIT IS FILED UNDER SEAL

PURSUANT TO PROTECTIVE ORDER

# EXHIBIT 2

THIS EXHIBIT IS FILED UNDER SEAL

PURSUANT TO PROTECTIVE ORDER

# EXHIBIT 3

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

# EXHIBIT 4

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

# EXHIBIT 5

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

# EXHIBIT 6

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

# EXHIBIT 7

THIS EXHIBIT IS FILED UNDER SEAL

PURSUANT TO PROTECTIVE ORDER

# EXHIBIT 8

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

# EXHIBIT 9

1                UNITED STATES DISTRICT COURT
2             CENTRAL DISTRICT OF CALIFORNIA
3                    EASTERN DIVISION
4
5    MATTEL, INC., a Delaware        )     Certified Copy
     Corporation,                    )
6                                    )
                    Plaintiff,       )
7                                    )
                    vs.              )   No. CV 04-9059 NM
8                                    )        (RNBx)
     CARTER BRYANT, an individual;   )
9    and DOES 1 through 10,          )
     Inclusive,                      )
10                                   )
                    Defendants.      )
11   ----------------------------- )
     (COMPLETE CAPTION ON NEXT PAGE.)
12
13
14
15
16        Videotaped Deposition of ROBERT C. LIND,
17        taken on behalf of Defendants, at 300 South
18        Grand Street, Los Angeles, California,
19        beginning at 9:57 A.M. and ending at 3:40 P.M.,
20        on Friday, April 25, 2008, before Wendy S.
21        Schreiber, CSR No. 3558, RPR, CLR.
22
23
24
25   PAGES 1 - 189

                                                         1

EXHIBIT  9
PAGE  88

```
1                    UNITED STATES DISTRICT COURT
2                  CENTRAL DISTRICT OF CALIFORNIA
3                          EASTERN DIVISION
4
5    MATTEL, INC., a Delaware        )
     Corporation,                    )
6                                    )
                                     )
             Plaintiff,              )
7                                    )
                                     )
             vs.                     )   No. CV 04-9059 NM
8                                    )   (RNBx)
     CARTER BRYANT, an individual;   )
9    and DOES 1 through 10,          )
     Inclusive,                      )
10                                   )
                                     )
             Defendants.             )
11   ------------------------------- )
                                     )
     CARTER BRYANT, on behalf of     )
12   himself, all present and        )
     former employees of Mattel,     )
13   Inc., and the general public,   )
                                     )
14                Counter-Claimants, )
                                     )
15           vs.                     )
                                     )
16   MATTEL, INC., a Delaware        )
     Corporation,                    )
17                                   )
                  Counter-Defendant. )
18
19
20
21
22
23
24
25
```

EXHIBIT ___9___
PAGE ___89___

2

```
 1    APPEARANCES:

 2

 3        For the Plaintiff:

 4

 5            QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
              BY:   DAVID W. QUINTO, ESQ.

 6            865 South Figueroa Street, Tenth Floor
              Los Angeles, California 90017

 7            (213) 443-3000
              davidquinto@quinnemanuel.com

 8
                              -and-

 9

              MATTEL, INC.

10            333 Continental Boulevard
              El Segundo, California 90245-5012

11            (310) 252-2000
              (NOT PRESENT)

12

13

          For the Defendant and Counterclaimant Carter

14        Bryant:

15

16            KEKER & VAN NEST LLP
              710 Sansome Street

17            San Francisco, California 94111-1704
              (415) 391-5400

18            (NOT PRESENT)

19

20

21

22

23

24

25
                                                              3
```

EXHIBIT ___9___
PAGE ___90___

```
 1    APPEARANCES (Continued):

 2

 3       For Defendant MGA Entertainment, Inc.:

 4

 5           SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

 6           BY:  DAVID W. HANSEN, ESQ.

 7               DONNA HILL, ATTORNEY AT LAW

 8           300 South Grand Avenue

 9           Los Angeles, California 90071-3144

10           (213) 687-5000

11           david.hansen@skadden.com

12

13           Video Operator - David West

14

15

16

17

18

19

20

21

22

23

24

25
```

4

EXHIBIT __9__
PAGE __91__

1   classic Krofft test, you've got the intrinsic component,

2   the intrinsic test, where subjective, no expert

3   witnesses, no analytic dissection, and you looked at

4   substantial -- what -- you did not look at substantial

5   similarity of expression per se, you looked at whether

6   the defendant took the total concept and feel of the

7   plaintiff's work.

8           Subsequent to the classic Krofft test you had

9   various tests that were trying to apply the Krofft test

10  in certain circumstances with certain types of works,

11  and you had at one point Shaw versus Lindheim, and in

12  Shaw versus Lindheim it appears that the Ninth Circuit

13  tried to bring the extrinsic/intrinsic test more into

14  line with the traditional Einstein approach of the

15  Second Circuit so that you would -- with all of this you

16  have access first.

17          Then you needed to go to the extrinsic test,

18  and under Shaw versus Lindheim they said that was

19  substantial similarity of expression.  So that was

20  basically half of the copying phase of the Second

21  Circuit following a finding of access, and then the --

22  and then the -- for the intrinsic test under Shaw it was

23  basically the -- I would view it as the unfair taking --

24  the unlawful appropriation component, but the test that

25  was used is different than the Second Circuit.  The test

                                                        38

EXHIBIT _9_
PAGE _92_

1     is did the defendant take the total concept and feel?

2                Subsequently -- and so it looks like Shaw was

3     trying to bring the Ninth Circuit into line, but you

4     have the most -- I mean, you have other cases. Since

5     then the most relevant I think is the Jada case, where

6     the Ninth Circuit said the -- for works of art at least,

7     or graphic works, the extrinsic test requires an

8     analysis of the substantial similarity of expression and

9     ideas, and if you don't include a substantial similarity

10    analysis of ideas, it's reversible error.

11         Q.    When you say "graphic works," what are you

12    referring to?

13         A.    In that case it was a -- I think a flame decal

14    or a flame image, and then within it was the Mattel

15    logo.

16         Q.    It's the Hot Wheels case?

17         A.    Yes.

18         Q.    Do you have a general definition -- are you

19    talking -- strike that.

20                Are you looking at the Bryant sketches in this

21    case as graphic works?

22         A.    No.  Pictorial works.

23         Q.    How are they different?

24         A.    I would go by the definition, which isn't much

25    of a definition in the Copyright Act, as to the category

                                                              39

EXHIBIT  9
PAGE  013

1     of pictorial, graphic and sculptural works.

2              I think for pictorial works you are looking at

3     something that represents -- is representational.

4     Graphics would be more use of shapes and colors.  And

5     then sculptural works, either something that is

6     three-dimensional, either that's representational or

7     not.

8         Q.   In this case do you apply what you call the

9     classic Krofft test or do you apply something else?

10        A.   No, I don't think the classic Krofft test after

11    Jada is used.  I think -- because the classic Krofft

12    extrinsic test only looked at substantial similarity of

13    ideas, and after Jada I think it's substantial

14    similarity of ideas and expression.

15        Q.   And is Jada the first time that that's been

16    stated?  Is that a new holding --

17        A.   No, no, but I think -- I think what was new

18    about Jada is that it is reversible error if you don't.

19    There are many other decisions that refer to the

20    analysis under the extrinsic test as including both

21    expression and ideas.

22        Q.   So just -- I'm still a little bit unclear, but

23    maybe it's just me.

24              In terms of the -- does the Ninth Circuit apply

25    the bifurcated test that you mentioned?

                                                          40

EXHIBIT   9
PAGE   94

1      A.    And then --

2      Q.    On that point, right.  So if access is

3  disputed, then what -- is there a test for that?

4      A.    Whether the defendant had a reasonable

5  opportunity to view or hear the work, the plaintiff's

6  work.

7      Q.    Does substantial similarity come into that part

8  of the test at all?

9      A.    No.

10      Q.    So you have access as step -- putting aside the

11  other part standing -- so the first step is access?

12      A.    Yes.

13      Q.    And we're determining whether or not the

14  accused infringer had access which could be reasonable

15  opportunity to view the work?

16      A.    Correct.

17      Q.    Okay.  Then what do we do?

18      A.    Then you enter into the extrinsic test

19  analysis.

20      Q.    Okay.  And that's the one that we just talked

21  about, substantial similarity of ideas and expression?

22      A.    Correct.

23      Q.    Okay.  And then we have the intrinsic test?

24      A.    Correct.

25      Q.    And the intrinsic test I guess is -- strike

                                                              42

1    that.

2              And where then in this -- in the Ninth Circuit

3    scheme, where does the inverse ratio test fall?

4         A.    The inverse ratio test is going -- or it may

5    follow the analysis of the access, and that would then

6    inform the extrinsic test and would also -- or could

7    also inform the intrinsic test.

8         Q.    When you say -- so it has -- it may follow

9    access.  Is it part of the extrinsic test?  Is it

10   something that comes between access and extrinsic test?

11        A.    Well, in the sense that under the inverse ratio

12   rule of the Ninth Circuit variety.

13        Q.    That's what we're talking about.  Let's stick

14   with Ninth Circuit for a bit.

15        A.    Okay.  If you have a great degree of access,

16   then the Ninth Circuit says that the level of

17   substantial similarity required is going to be lowered.

18        Q.    For the extrinsic test?

19        A.    For the extrinsic test.  And I would suggest

20   that for the intrinsic test that would necessarily

21   follow.

22        Q.    How so?

23        A.    In that the finder of fact, the jury -- if we

24   assume that it's a jury situation -- the jury is going

25   to have heard the analysis as to access and the impact

43

EXHIBIT __9__
PAGE __96__

1    it had on the substantial similarity, and that is

2    probably going to influence a juror in making a

3    determination as to whether the defendant's work is so

4    similar to the plaintiff's work that it took the

5    plaintiff's total concept and feel.

6        Q.    In terms of -- I think I'm getting it now.   I'm

7    sorry.   I'm a little slow.

8        A.    It's the Ninth Circuit.

9        Q.    Yeah.   That's all right.   I just want to figure

10   out -- we're sitting in the Ninth Circuit; right?

11       A.    Right.

12       Q.    It's your opinion the Ninth Circuit law is the

13   law that should be applied in this case; right?

14       A.    Yes.

15       Q.    Are you aware of any -- do you know about the

16   Ben's Bargain case?

17       A.    Ben's Bargain, not by name.

18       Q.    Have you read the Ben's Bargain case?

19       A.    Not by name that I recall.

20       Q.    Are you aware of -- is there any controversy

21   over where -- how the inverse ratio should be applied in

22   the Ninth Circuit?

23       A.    Not from any of the Ninth Circuit cases that

24   I've read.

25       Q.    How about from any cases within the Ninth

44

```
 1              THE WITNESS:  Yes.

 2   BY MR. HANSEN:

 3       Q.   You -- in your report you express the view that

 4   the sketches are protected as artistic works; is that

 5   correct?

 6       A.   Yes.

 7       Q.   You also say that the sketches are protected as

 8   compilations; is that correct?

 9       A.   Yes.

10       Q.   Do you know if that's consistent with Mattel's

11   position in this case?

12              MR. QUINTO:  Again, I ask you not to speculate.

13              THE WITNESS:  I -- my recollection is that both

14   theories were addressed by Mattel.

15   BY MR. HANSEN:

16       Q.   What is your recollection based on in that

17   regard?

18       A.   I think from the summary judgment materials.

19       Q.   So as best as you know, your position in your

20   report is consistent with Mattel's position in the case?

21       A.   As far as I know, yeah.

22       Q.   Are the sketches protected on any grounds other

23   than as a -- as artistic work or compilation in your

24   opinion?

25       A.   By "artistic work," do you mean pictorial work?
                                                            65
```

1    Q.   I was using the phrase in your report.  Is

2    there a difference between artistic work or pictorial

3    work?

4    A.   Yes.  I believe that when you register a work

5    such as that it would be as a pictorial work, which is a

6    term of art, rather than artistic work.

7    Q.   So when you say artistic work in your report,

8    that's not a term of art?

9    A.   Not in terms of copyright registration.  I

10   think what I was referring to was that it was

11   creative -- particularly creative as opposed to factual,

12   as was claimed by Professor Menell in his -- in his

13   report.

14   Q.   So you're saying Professor Menell viewed the

15   sketches as factual, not creative?

16   A.   He seemed to be suggesting that; that -- yes,

17   he seemed to be suggesting that.

18   Q.   So Professor Menell didn't realize that the

19   sketches were creative in your view?

20   A.   I don't know if he realized it or not, but he

21   was certainly focusing on elements other than their

22   creativity.

23   Q.   What do you mean by "elements other than their

24   creativity"?

25   A.   He tried to apply his notion as to limiting

66

EXHIBIT  9
PAGE  99

1    factors in copyright law, which goes with his general

2    philosophy of trying to limit copyright protection, and

3    under his view, as I understood it, when you looked at

4    those sketches and you identified which of them were

5    either from the public domain or not original or scenes

6    l'affaire or were unprotected under merger, and even his

7    view, anything that was prior art that there was

8    basically nothing left to be protected.

9        Q.    And you disagree with that analysis?

10       A.    Yes, I do.

11       Q.    You critique Professor Menell for his reliance

12   on Second Circuit cases; is that right?

13       A.    I mostly critique Professor Menell for his

14   failure to address Ninth Circuit law because I -- I

15   refer to Second Circuit law myself.  You know, on

16   certain aspects I think it applies, but it should be

17   applied with Ninth Circuit law in mind.

18       Q.    So it's your opinion that Second Circuit law

19   and copyright and Ninth Circuit law and copyright

20   differ?

21       A.    Yes, in some aspects.

22       Q.    In some aspects?

23       A.    In other aspects they do not.

24       Q.    And is the -- I think you may have mentioned

25   that the Ninth Circuit is -- the Ninth Circuit copyright

                                                    67

EXHIBIT    9
PAGE    100

1    test is in flux or evolving?

2        A.    The copyright infringement test?

3        Q.    Yes.

4        A.    Yes.  It's I guess you would say dynamic.

5        Q.    It's dynamic?  So it's evolving?  Is it moving

6    more towards the Second Circuit view?

7        A.    It was at the time of Shaw versus Lindheim.

8    Now it's I think going off on its own tributary.

9        Q.    That's in the -- and that's from what?  Jada?

10        A.    Jada, among other courses -- other cases,

11   rather.

12        Q.    Any way, to predict -- leave it.  That's all

13   right.

14            So in certain instances relying on Second

15   Circuit decisions is acceptable because it's consistent

16   with Ninth Circuit law?

17        A.    Correct.  Or because it is a good analysis of a

18   basic principle that's relevant.

19        Q.    And at the end of the day there should be a

20   single national law, right?  I mean, copyright law, it's

21   decided by the various circuits, but in theory there's

22   supposed to be one copyright law governing the United

23   States, right?

24            MR. QUINTO:  I'll object as beyond the scope of

25   the witness' opinion.

68

1      Q.   So "Pretty Woman" didn't use the -- end the

2  dispute on fair use I guess?

3      A.   No.  But it should have ended the dispute as to

4  whether it's improper conduct to ask for permission to

5  use a work, and once being denied, then using the work

6  and relying on fair use that you should be allowed to do

7  it and you shouldn't be held -- it shouldn't be held

8  against you.  There are subsequent courts that have done

9  just that.  Even the Supreme Court said that's not

10  proper.

11      Q.   Did the Ninth Circuit used to follow the sweat

12  of brow test?  Are they one of the courts that did that?

13      A.   Yes.  They -- I think they had a reverse

14  telephone directory case that provided protection.

15      Q.   Feiss resolved that issue at least?

16      A.   I think so.  I think the lower courts have been

17  following that aspect of copyright law fairly

18  faithfully.

19      Q.   You mentioned, I believe, limiting factors in

20  copyright law in connection with your critique of

21  Professor Menell.

22      A.   Yes.

23      Q.   Are those -- those limiting factors, is that --

24  are those limiting factors pertinent to the extrinsic

25  test as a general matter in the Ninth Circuit?

                                                        70

1      A.   I think so because -- in this sense.  If you're
2   going to compare expression and ideas -- and I would
3   read that as including -- as almost equating ideas as
4   unprotected elements, not just ideas -- if you're going
5   to be comparing them, they should be identified.
6      Q.   "They" being the expression and the ideas?
7      A.   Yes.  But focusing on the ideas as -- as a
8   concept that is -- it encompasses more than ideas, and
9   since you have to compare those in addition to
10  expression they -- I don't know how you can do that
11  without identifying them.
12     Q.   So under the Ninth Circuit's extrinsic --
13  strike that.
14          So under the extrinsic part of the Ninth
15  Circuit's test you need to identify both the protectable
16  elements of expression and the ideas?
17     A.   It seems to me that that's the only way that
18  the test can operate, but it does not operate in a way
19  that then removes those elements, those otherwise
20  unprotected elements from the equation.
21     Q.   So is it your opinion that in connection with
22  the extrinsic test, under Ninth Circuit law the
23  unprotectable elements should not be removed in the
24  equation?
25     A.   Not at the extrinsic test.

71

EXHIBIT ___9___
PAGE ___103___

1    Q.   When should they -- should they be removed at

2  all?

3    A.   That's a good question.

4    Q.   Thank you.

5    A.   You weren't the first to ask it.  But the

6  problem is that the filtration approach that Professor

7  Menell utilizes and relies on to a great extent in his

8  report is a process that originated -- as he says in his

9  report when he's giving his tutorial to the MGA

10  employees, it began with a play as compared to a motion

11  picture.

12         It has been used in copyright infringement

13  actions dealing with novels, and it works -- or it is

14  workable with linear works.  And so -- just using as an

15  example, if I could with my outline, you -- if you have

16  a particular issue, you go straight to that issue and

17  you're able to do that because it is linear and you

18  don't discover everything at the same time.

19         And so with a three-dimensional work such as a

20  doll or an artistic work such as a pictorial work, a

21  drawing, the intent of the creator of that work and the

22  way the -- the user of the work or the consumer will

23  view it is to come upon it at one time, not piecemeal.

24         And so Professor Menell in his report has pages

25  where all you're looking at are eyes.  Well, a consumer

EXHIBIT  9
PAGE   104

Veritext National Deposition & Litigation Services
866 299-5127

1    protected elements.

2        Q.   Do you know whose burden it is to identify what

3    the protected elements are in the sketches?

4        A.   Generally it's going to be the plaintiff.

5        Q.   Do you know whether or not Mattel in this case

6    has identified any protected elements in the Bryant

7    sketches?

8            MR. QUINTO:   Again, I would ask you not to

9    speculate.

10           THE WITNESS:   I just -- I don't recall with the

11   summary judgment motion whether that was stated or

12   addressed.

13   BY MR. HANSEN:

14       Q.   Have you identified -- have you specifically

15   identified what protected elements there are --

16   "protectable elements" I guess is the right phrase -- in

17   the Bryant sketches?

18       A.   What I tried to do in my report was to do what

19   Krofft -- the Court Krofft stated should be done, and

20   that was to identify categories of elements that a

21   finder of fact would look to in making their -- its

22   comparison as to the total concept and feel test.

23           And so in my report I identified certain

24   categories that seemed rational to me and also had come

25   up in Ninth Circuit cases or decisions.

                                                        77

1     Q.    In your report did you include all of the

2     categories that you thought were appropriate for

3     consideration in that regard?

4     A.    Of -- so long as what I focused on were the

5     ones that had also been identified by Ninth Circuit case

6     law.   There may be others -- I haven't thought about it,

7     but there may be others that if I had my way I would

8     add, but these certainly seemed to be the most

9     important.

10    Q.    Did you make any effort to determine what

11    protectable elements are -- what, if any, protectable

12    elements there are in the Bryant sketches?

13    A.    I made an analysis by looking at other expert

14    witnesses and looking at the photographs, et cetera;

15    that such things as the eyes, the nose, the face, they

16    seemed to me to be something that a jury could find to

17    be protected.

18    Q.    Do you believe that those elements are -- was

19    that your attempt, to identify protectable elements?

20    A.    It was to -- it was my intent to look at those

21    elements that generally come up in a case dealing with

22    dolls -- that invariably seems to be eyes, eyebrows,

23    nose, lips, ears, chin, those sorts of elements -- and

24    place them in the context of this particular case and in

25    the context of Ninth Circuit categories.

78

1      Q.   The elements that you list -- let me ask you
2   this.   Strike that.   Let me ask it this way.
3           Can you tell me what elements you believe in
4   the Bryant sketches are elements that the jury could
5   find to be protectable elements?   Strike that.   Let me
6   start a different way.
7           Is it your opinion that whether or not elements
8   in the Bryant sketches are protectable is a subject for
9   jury determination?
10      A.   Yes.
11      Q.   That's not something the Court should do?
12      A.   I think in the intrinsic test, which is the
13   subjective test, that is certainly within the domain of
14   the trier of fact, the jury, if there's going to be a
15   jury, unless a court finds as a matter of law that no
16   reasonable jury could find that they were protected.
17      Q.   How about the extrinsic test?
18      A.   Most --
19      Q.   Let me ask first a question.   Strike that whole
20   thing, please.   If you could take that off the tape.
21           Let me ask a question first.   Is it -- the
22   extrinsic test, does the judge -- is it appropriate in
23   connection with the extrinsic test to filter unprotected
24   elements?   Strike that.   Let me start it a different
25   way.

79

1        A.    Correct.

2        Q.    Is there anything in terms of the protectable

3    versus unprotectable that would be unprotectable

4    potentially other than ideas?

5        A.    Yes.

6        Q.    Can you give me sort of general categories of

7    where that would -- what that might be?

8        A.    A scenes l'affaire.

9        Q.    Anything else?

10       A.    And the scenes l'affaire is of three types.

11   You have the expression that is necessary to deal with a

12   particular topic or subject.  There is the scenes

13   l'affaire which is expression that necessarily flows

14   from a particular idea.  And then there is scenes

15   l'affaire that is equated with a genre.

16            Other limiting factors in addition to scenes

17   l'affaire would be merger, would be non-original

18   material, material that's in the public domain, and also

19   increasingly and somewhat questionably, depending on the

20   subject matter, the Court may look at functionality.

21       Q.    Can you just tell me what you mean by

22   functionality?

23       A.    It should be equated with the useful article

24   analysis for pictorial, graphic and sculptural works,

25   but with cases such as Computer Associates versus Alti

                                                         82

1          And so icons, there's a merger -- possible

2    merger problem there, with the notion or concept of

3    using overlapping windows.  That's an idea not

4    protected.  Or scenes l'affaire may come into play.

5          But when you're dealing with a work such as a

6    pictorial work, a drawing that's artistic, the -- I

7    think most courts in the Ninth Circuit and others are

8    saying you deal with them differently than you do with a

9    screen display or with a novel or a play and so you look

10   at their entirety, and I don't believe that the jury is

11   going to be prohibited from looking at the entirety,

12   including some of these aspects that in another context

13   would be taken out of the equation.

14        Q.   Well, that was addressed in Apple though,

15   wasn't it?

16        A.   No.  Apple was not an artistic work.

17        Q.   So Apple -- the analysis in Apple you're saying

18   doesn't apply here?

19        A.   Correct.

20        Q.   And that's because of the other Ninth Circuit

21   decisions like Cavalier -- the ones that you mention in

22   your report?

23        A.   I'm sorry?

24        Q.   Sorry.  And what's the other one?  The Krofft

25   case?

84

EXHIBIT ___9___

PAGE ___107___

```
 1      A.   Right.   In addition to the fact that just as a

 2  theoretical notion that there's a substantial difference

 3  between how a artistic work, a graphic work, a pictorial

 4  work is going to be viewed by a consumer or by the

 5  average viewer and how a work that was mostly -- that

 6  was mostly factual would be viewed.

 7      Q.   How about the -- the Aliotto versus Dakin case?

 8      A.   That's the dragon dolls?

 9      Q.   Was it a dinosaur?

10      A.   Yeah.

11      Q.   The dinosaur case.  You cite that in your

12  report.

13      A.   Correct.

14      Q.   Did the -- did the Court in that case filter

15  out unprotected elements in determining -- in connection

16  with the infringement analysis?

17      A.   My recollection is that they said if someone is

18  going to just claim protection in a plush-stuffed

19  dinosaur, that that's just commonplace.  It's an idea

20  and not going to be protected if that's the sole -- the

21  sole claim.  But where you have specific elements, my

22  recollection is that they protected those specific

23  elements.

24      Q.   Just going back to the -- the Bryant sketches,

25  is it your opinion that all of the elements of the
```

85

1   Bryant sketches are protectable elements?

2     A.   No.  There's going to be elements that would

3   not solely be protected as an element.  The fact that

4   there are two eyes, the fact that there's hair, if

5   that's the sole basis for the infringement action, that

6   would not lie in the Ninth Circuit.

7     Q.   Okay.  So you're not saying then that the

8   limiting doctrines are inapplicable to pictorial works,

9   if I understand it.

10        You're saying that they shouldn't be

11   filtered -- the unprotected elements shouldn't be

12   filtered out in making the infringement analysis?

13     A.   Correct.

14     Q.   But do you still need to figure out what's

15   protectable and what's not protectable?

16     A.   Well, you'd have to do it at the extrinsic

17   stage.  I mean -- because you have to -- after Jada you

18   have to make that analysis.  You have to make that

19   comparison.  Then the question is once you've made the

20   comparison what do you do with it?  What happens in the

21   Ninth Circuit?

22        Well, whatever happens to it doesn't happen at

23   the extrinsic level because now -- now you've got the

24   Court saying either the plaintiff was able to show

25   substantial similarity of expression and ideas or they

86

EXHIBIT  9
PAGE   III

1    were not able to do that, and if the defendant makes a

2    summary judgment motion then the case is gone.  And so

3    that then means okay, what happens at the intrinsic

4    stage?

5         Now, when it gets to trial you have the summary

6    judgment and plaintiff has been successful in showing

7    that there's at least a jury question as to substantial

8    similarity between expression and ideas.

9         You then go to trial where you present that

10   evidence all over again in front of the jury and so --

11   because the jury has to decide -- for there to be

12   infringement has to decide that both the extrinsic test

13   has been met and the intrinsic test has been met.

14        And so the jury is going to hear the same

15   expert witness testimony, the same analytical

16   dissection, and you can't expect the jury to forget the

17   alphabet.  They're not going to unring the bell.  So

18   they're going to keep that in mind, that there's

19   expression, that there's ideas, and then they're going

20   to be told, "You have to decide whether the defendant

21   took the total concept and feel the plaintiff's work by

22   looking at the entire work."

23        Now, if -- if the jury decides that there's

24   infringement because the drawing and the Bratz dolls

25   both have two ears and two eyes, that's not going to be

                                                        87

EXHIBIT ___9___

PAGE ___112___

1    possible because you're not protecting anything that's

2    protected by copyright.  But if they -- if the jurors

3    look at the context, the entire context of the two

4    works, and in that context they say, "Well, both have

5    two eyes but they both have eyes that are half shut,

6    they both have eyes that have a particular type of

7    pupil, they both have mouths but they both have mouths

8    that have the same type of lip structure," that's going

9    to be acceptable.

10            And so I think that under Ninth Circuit law

11    they are able to take into account unprotected elements

12    in context, but if they -- if the juror solely

13    determines infringement on those unprotected elements

14    alone, I don't think it will stand up.

15        Q.   How does the jury know which elements are

16    unprotected?

17        A.   Because they've heard the extrinsic argument.

18    Folks like us, like myself, Peter Menell, and I'm sure

19    you folks when you're addressing the jury and presenting

20    evidence are going to be able to show them what's

21    protected, what's not, because they have -- the jury is

22    going to have to make a determination of the extrinsic

23    test.  They're not bypassed just because a summary

24    judgment proceeding has taken place.

25        Q.   Do you -- are you aware that Mattel has filed a

                                                              88

EXHIBIT ___9___
PAGE ___113___

Veritext National Deposition & Litigation Services
866 299-5127

1  pleading in which they say the analytical dissection of

2  protectable and unprotectable material presents an issue

3  of law to be addressed by the court?

4      A.    No.

5      Q.    Do you think that's correct?

6      A.    Depends on the circumstances.

7      Q.    What -- under what circumstances would that be

8  correct?

9      A.    If no -- no reasonable jury could find that it

10  was unprotected.

11     Q.    And in terms -- so the judge doesn't decide --

12  the judge doesn't instruct the jury after a hearing as

13  to what's protected and what's not protected?

14     A.    I'm not certain of that.

15     Q.    Is it -- you've heard of the concept of broad

16  versus thin protection?

17     A.    Yes.

18     Q.    And does the -- does the extent of protectable

19  expression in a work have any bearing on whether that

20  work is entitled to broad or thin protection?

21     A.    No.   I disagree with Professor Menell on that.

22     Q.    So it doesn't -- the determination of -- I'm

23  just speaking generally, but in general does the

24  extent -- so if a work has -- if a work consists --

25  let's say a pictorial work consists entirely of elements

                                                          89

EXHIBIT   9

PAGE   114

1    rules of the sweepstakes contest and so none of them are
2    protected by copyright.  That's the minority approach.
3         Q.   Okay.
4         A.   But the majority approach the -- it's the Jewel
5    B case where at issue was the making of a piece of
6    jewelry in the shape of a B and the courts found that
7    there's only limited number of means of expression and
8    we're going to protect each expression by copyright but
9    it's protected only against verbatim or near verbatim
10   taking.  It's not -- it does not protect against
11   substantial similarity.
12        Q.   Okay.  The Jewel B case is a Ninth Circuit
13   case?
14        A.   There's one in the Ninth Circuit and there's
15   also one in the Second Circuit.
16        Q.   It's a popular topic.
17        A.   Yes.
18        Q.   Okay, I forgot about the other one.
19             MR. QUINTO:  Common parties?
20             THE WITNESS:  Yes.
21   BY MR. HANSEN:
22        Q.   Okay.  That would be also I guess true for the
23   plumeria flower case?  Is that a similar concept or is
24   that different?  Do you know which one I mean?  The
25   Hawaii case where the jewelry of the plumeria flower --
                                                        98

EXHIBIT _9_
PAGE _115_

1      A.    Oh, yes.

2      Q.    Is that a merger type of case?

3      A.    I believe it was.

4      Q.    That's a -- is that a thing -- that's a things

5      in nature type of case?

6      A.    Yes, yes, and it -- it comes up in fabric

7      design cases where I've been involved in those where you

8      will have six roses per foot of fabric and you have to

9      look at both the depiction of the rose are they -- is it

10     the same or is it -- in essence is it verbatim, near

11     verbatim, but you also then look at it as a compilation.

12     Are they placed in the same manner.

13     Q.    Let me just finish the thread because

14     non-original material is another -- another filtering

15     concept that we discussed previously?

16     A.    Correct.

17     Q.    Is that something that is also applicable in

18     determining unprotectable elements in a pictorial work?

19     A.    Yes.

20     Q.    And the same question with respect to public

21     domain material.  Is that applicable in determining

22     protectable versus unprotectable elements of a pictorial

23     work?

24     A.    Yes.

25     Q.    And then the last one, functionality, is that

99

EXHIBIT 9
PAGE 116

1    also applicable in determining protectable versus

2    unprotectable elements in a pictorial work case?

3       A.   Generally not.  It's questionable as to when

4    you can use that at all under copyright and in its

5    traditional sense, meaning a useful article, it really

6    does not come into play with two-dimensional works.

7       Q.   In terms of just taking those concepts and

8    looking -- looking more specifically at this case,

9    you're aware that there is testimony at least that

10   Carter Bryant relied on certain materials in connection

11   with the Bratz -- the -- what do they call -- the

12   sketches -- his sketches?

13      A.   From Professor Menell's report he indicated --

14   he focused on this prior art which is I thought somewhat

15   unique because it doesn't come up in copyright cases, it

16   comes up in patent cases.  But he -- he went through a

17   litany of from Spice Girls to Ally MacBeal to a number

18   of different cultural examples.

19      Q.   Uh-huh.

20      A.   But I think I mention it in my report that I

21   think there's only one source that he actually indicates

22   that Carter Bryant knew of and looked at before making

23   the drawings and that was the issue of the magazine.

24      Q.   Seventeen Magazine?

25      A.   Yes.

100

EXHIBIT _9_

AGE _117_

1    Q.   Okay.  So focusing on the -- did you -- did you

2  review the various parts of the Seventeen Magazine that

3  Mr. Bryant says were his inspiration?

4    A.   I saw photographs or -- or images from them.

5    Q.   And do those images have any bearing whatsoever

6  in determining protectable versus unprotectable elements

7  in his sketches?

8    A.   Unless it can be shown that he copied those

9  elements when making the drawings I would say no.

10   Q.   And when you say "copied" and we're going back

11  to -- you know, we have this slippery slope of me trying

12  to copy something, I mean, is it -- when you say

13  "copied," what do you mean?  Identically reproduced or

14  something else?

15   A.   It doesn't have to be identically reproduced to

16  have copied it.  I don't have a good definition at the

17  ready because I could -- I could look at the -- at

18  the -- at Michelangelo's David and draw a stick figure.

19  I don't think that that's copying it.  You may have

20  better luck at, you know, filling it out and that would

21  be copying, but I just don't have a good way of

22  enunciating that.

23   Q.   Any sense of how close it has to be?

24   A.   Well, the easy question is, well, yeah, it's

25  substantially similar, but that's a little circular.

101

EXHIBIT ___9___
PAGE ___118___

1          Q.   Okay.  Is there a definition of "substantially

2     similar"?

3          A.   No.  Well, I mean, there is the definition of

4     the test that you use.

5          Q.   I mean the term itself is what I'm getting at.

6          A.   Yeah.  Not -- not one that is in the copyright

7     statute.

8          Q.   Yeah, okay.  I mean, it's the jury is typically

9     instructed on the words and they figure out what it

10    means?

11         A.   That's correct.

12         Q.   Okay.  In terms of the -- let's take -- do you

13    recall that the purpose or point of the Seventeen

14    Magazine stuff is that, you know, at least take the

15    Steve Madden ad that had like large feet.  Does that

16    strike a cord with you?

17         A.   I recall that argument, yes.

18         Q.   So in terms of the -- in terms of the large

19    feet being in the Steve Madden ad and then Bryant saying

20    he uses that as an inspiration, assuming that he's

21    testifying correctly does that have any bearing at all

22    in determining the protectability of his sketches?

23         A.   Yes, because if he relied on them, if he copied

24    them, I think inspiration may be not -- may not do it,

25    but if he copied them, then the drawings in that aspect

                                                     102

EXHIBIT _9_

PAGE _119_

1    comparison to the other portions?  The eyes, et cetera.

2        Q.   And the mere fact -- I'm sorry, go ahead.  I

3    didn't mean to interrupt you.

4        A.   So the -- the -- the fact that a large head in

5    a -- an advertisement that's in the Seventeen Magazine

6    was an inspiration to use your term or copy to use my

7    term is not really going to solve anything because

8    there's more specificity at issue.

9        Q.   And that's what I'm trying to get at.  From

10   your perspective how much specificity do we have to have

11   on that before it's potentially unprotectable?  Pick any

12   one of them.

13       A.   Well, not so much -- you mean, how much

14   specificity do we need before it's protectable?

15       Q.   Okay.  Is that the way to look at it?

16       A.   Right, because I would suggest that if it's

17   just the use of a big head --

18       Q.   Yeah.

19       A.   -- and that's the only thing that is the basis

20   for the infringement action, there's no infringement

21   action there, no successful infringement action there.

22       Q.   Okay.

23       A.   But -- because it's just too abstract.  He uses

24   Learned Hand's abstraction tests with the -- with the

25   pyramid which is exactly what I use in my class as well

                                                        105

EXHIBIT ___9___
PAGE ___120___

1    and all of that is towards the top of the pyramid.  It's

2    an idea not protected.  But it certainly seems that a

3    jury could find that the specifics here in terms of the

4    shape of the head, the size in comparison to others,

5    what the face looks like, that is something that a jury

6    could find to be protectable.

7        Q.    All right.  So maybe I'm looking at it

8    backwards.  The burden is to show that the elements are

9    protectable?

10       A.    Correct.

11       Q.    And then you look at -- is it then you can look

12   at other things to determine -- to undermine -- if it's

13   shown to be -- strike that.

14             Protectability in terms of say large head would

15   be the particularized large head is what you would look

16   at?

17       A.    Correct.

18       Q.    And then in terms of determining whether the

19   limiting doctrines are applicable, you would -- you

20   could potentially compare the ads that Mr. Bryant says

21   were his inspiration and determine whether those rise to

22   the level of con -- of undermining the originality of

23   the specific head that Bryant sketched?

24       A.    Yes.

25       Q.    That's the structure?

                                                              106

EXHIBIT ___9___
PAGE ___121___

1    A.    That's -- that's part of the structure because

2    the difficulty here is that these limiting factors come

3    into play at two -- at two different aspects of a

4    copyright infringement action.    The first is they come

5    in when the question is whether the plaintiff's work is

6    protected by copyright.

7    Q.    Okay.

8    A.    And that's where you've been focusing on it

9    seems.    The second is -- it comes into play on whether

10   the defendant has infringed plaintiff's work and where

11   these limiting factors come in.    The limiting factors

12   rarely result in a plaintiff's work not being protected.

13   Q.    Okay.

14   A.    So -- I mean, he talks about the case with the

15   play suing the studio for the Cohens and the Kellys.

16   Q.    Right.

17   A.    No question there that the play is protected by

18   copyright.    Even though the play has ideas in it, it has

19   stock characters in it, the play is protected by

20   copyright and that really wasn't the issue there.    And

21   it's rare that any of those limiting factors makes a

22   work unprotected.

23   Q.    Okay.

24   A.    The -- most of the time these questions come

25   into play after plaintiff's work has been found to be

                                                    107

EXHIBIT     9
PAGE     122

1    protected by copyright and then the question is has the

2    defendant infringed or violated any of the Section 106

3    exclusive rights and here we're talking about the

4    reproduction right primarily and so then the question

5    becomes, okay, what did the defendant take?  What did

6    the defendant copy?  What did the defendant use?  And is

7    what is being used infringing?  And so that's --

8    sometimes it's confusing as to where you're -- you're

9    dealing with the concepts.

10       Q.    I appreciate that.  That's a good point.  Now,

11   let's assume for this case you haven't -- you haven't

12   been told, I guess, that MGA does not dispute the

13   protectability of the sketches.

14       A.    No, because I went by what Professor Menell

15   said and he certainly wasn't taking that point of view.

16       Q.    Okay.  But assuming that the protection is not

17   disputed and for focusing on the infringement element of

18   it --

19       A.    Okay.

20       Q.    -- in terms of the protectability versus

21   unprotectability in the infringement context, is it --

22   where are the burdens in showing protectability?

23       A.    Okay, the -- in the Ninth Circuit a plaintiff

24   is going to have to show -- has to meet both the

25   extrinsic and the intrinsic test and so -- go ahead.

                                                          108

1     Q.    Okay.  I didn't want to interrupt you.  Sorry.

2     A.    Go ahead.

3     Q.    And in terms of then say the Bryant sketches,

4  is that -- do you look at the various elements and

5  determine the protectability of the various elements?

6     A.    For the extrinsic test?

7     Q.    Yes.

8     A.    You look at the various elements and you would

9  look at whether they are expression or ideas or any of

10  the other limiting factors, but you do not look at those

11  limiting factors as a basis for excluding any part of

12  those drawings.  You call them sketches, I call them

13  drawings.

14     Q.    Fine.  I won't quibble over that.  Not today.

15     A.    And -- and so for the purposes of the extrinsic

16  test it is -- it is not a question as to how much of the

17  work is protected.  You're not distilling out any

18  portion of it, you're identifying what those elements

19  are and then asking is there substantial similarity of

20  basically every component part of plaintiff's work to

21  the defendant's work.

22     Q.    But in that -- and what I'm trying to be clear

23  on is in terms of as you say expression or ideas or

24  limiting factors, in terms of the expression in the

25  sketches, the drawings -- whatever we want to call

                                                    109

1    them -- is it -- the plaintiff is to identify what the

2    plaintiff believes to be the protected expression in the

3    drawings?

4        A.    Yes.

5        Q.    And then the plaintiff identifies the protected

6    ideas?

7        A.    That I'm not certain of because generally again

8    with the Second Circuit approach that is something that

9    the defendant has the burden of doing, particularly

10   under the filtration approach, but when you look in the

11   Ninth Circuit and again looking at Apple versus

12   Microsoft, there the District Court had said to Apple

13   you have to set up what you're claiming as protected

14   material because Apple had basically said here's our

15   program, Judge.  You decide what's protectable.

16       Q.    Right.

17       A.    And the judge said, no, that's your job.  You

18   have to basically prove up the bill of particulars.  And

19   then the defendant is -- is given the opportunity to try

20   and identify what is a -- a limiting factor.

21       Q.    So the plaintiff -- do you think that's an

22   appropriate framework here for the Bryant sketches?

23       A.    I think so.

24       Q.    And so if I understand it, the plaintiff sets

25   up the protectable elements specifically and the

                                                         110

1    so as -- and he has in his report comparisons to show

2    that.

3         Q.    Okay.

4         A.    And when I was looking at all the drawings, I

5    just think he selectively used the drawings that helps

6    his argument and these are drawings that show that his

7    statement was incorrect.

8         Q.    Okay.  And that's the only purpose of these?

9         A.    Yes, for -- in connection with this portion of

10   my report.

11        Q.    You say on -- if we could look at paragraph --

12   page 13 --

13        A.    Yes, sir.

14        Q.    -- the section -- I guess it's the second full

15   paragraph that starts after "Menell report 54."

16        A.    Page 13 you said?

17        Q.    The first full paragraph, the second sentence

18   that begins "However."

19        A.    Okay, just a minute.  The paragraph begins

20   "Professor Menell argues"?

21        Q.    Exactly.

22        A.    Okay.  And you're asking me to look at the

23   second sentence that begins "However, the comparison"?

24        Q.    Yes.

25        A.    Okay.

                                                      178

EXHIBIT    9
PAGE    126

Veritext National Deposition & Litigation Services
866 299-5127

1      Q.   And it says "...at times is unfair."  Does that

2   mean at times it was fair?  Do you believe there was

3   anything fair about Professor Menell's comparison?

4      A.   Oh, he makes fair -- of course I don't agree

5   with his conclusions but I think you can -- you can take

6   certain aspects of the drawings, certain aspects of the

7   dolls, take a look at the entire drawing versus the

8   entire doll and I think -- I think it is -- it is fair

9   to compare them and to make your comparisons and to

10  argue about what standard of infringement should be used

11  and that sort of thing.  But I think he was -- and he

12  was mostly fair in that respect but I think one of

13  the -- one -- what was unfair was with the lips and the

14  other is -- is with the eyes where I think it's unfair

15  to compare similarity of eyes when you're -- when you're

16  dealing with a blank sculpt that doesn't even have an

17  eye.

18      Q.   Okay.

19      A.   I thought that was going a little far.

20      Q.   Okay.  If we could go then to -- if you would

21  flip for me to page 14 of your report.

22      A.   Yes, sir.

23      Q.   Thank you.  This is the body.  I want to look

24  at the "Arrangement of the representation" section.

25      A.   Yes.

                                                    179

```
 1        Q.   Talking about the -- it says "The body
 2   proportions of the Bryant drawings and dolls are largely
 3   identical."
 4             Do you see that?
 5        A.   Yes, I do.
 6        Q.   And that is -- could you look again -- I think
 7   you still have the Loetz report.  I think that's based
 8   on Exhibit 37?
 9        A.   Yes.
10        Q.   Is that what your -- is that what this portion
11   of your report is based on?
12        A.   Not just Exhibit 37.  My recollection is he
13   had --
14        Q.   It's also --
15        A.   He had several indications and comparisons.
16        Q.   But it's in part based on Exhibit 37?
17        A.   Yes.
18        Q.   Does -- let me ask you along this "major
19   anatomical landmarks of chin, shoulders, chests..." --
20   I'm sorry, I jumped back to your report.  I didn't
21   realize you closed it.
22        A.   On what page?
23        Q.   Still on page 14.
24        A.   I'm there.
25        Q.   The -- thank you.  You're talking about the
```

180

```
 1          IN WITNESS WHEREOF, I have subscribed my name
 2    this 26th day of April, 2008.
 3
 4
 5
 6    _____
 7          WENDY S. SCHREIBER, CSR No. 3558, RPR
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```
                                                            187

EXHIBIT ___9___
PAGE ___129___

Veritext National Deposition & Litigation Services
866 299-5127

# EXHIBIT 10

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

# EXHIBIT 11

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION

CARTER BRYANT, an individual,

        Plaintiff,

vs.

CASE NO.
CV 04-9040 SGL(RNBx)
Consolidated with
Case No. CV 04-09059
Case No. CV 05-02727

MATTEL, INC., a Delaware
corporation,

        Defendant.

**CERTIFIED
COPY**

AND CONSOLIDATED ACTIONS

DEPOSITION OF ROBERT ALLEN TONNER

New York, New York

Friday, March 21, 2008

Reported by:
Steven Neil Cohen, RPR

JOB NO. 84793

EXHIBIT __11__
PAGE __170__

1           March 21, 2008

2             10:00 a.m.

3

4           Videotaped Deposition of ROBERT

5    ALLEN TONNER, taken by Defendant, pursuant

6    to stipulation, at the offices of Quinn

7    Emanuel Urquhart Oliver & Hedges, LLP, 51

8    Madison Avenue, New York, New York, before

9    Steven Neil Cohen, a Registered Professional

10   Reporter and Notary Public of the State of

11   New York.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT _11_
PAGE ___171_

```
 1                    APPEARANCES
 2

 3   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
 4   Four Times Square
 5   New York, New York 10036
 6              Attorneys for MGA and Robert Allen
 7              Tonner
 8   BY:   KENNETH A. PLEVAN
 9

10   QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
11   865 South Figueroa Street
12   10th Floor
13   Los Angeles, California 90017
14
                  Attorneys for Defendant
15
     BY:   JON COREY, ESQ.
16

17

18   ALSO PRESENT:
19              Thomas DelVecchio, Videographer
20

21

22

23

24

25
```

EXHIBIT __11.__
PAGE __172__

1            IT IS HEREBY STIPULATED AND

2   AGREED, by and between counsel for the

3   respective parties hereto, that the sealing

4   and filing of the within deposition be

5   waived; that such deposition may be signed

6   and sworn to before any officer authorized

7   to administer an oath; that all objections,

8   except as to form are reserved to the time

9   of trial.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

EXHIBIT __11__
PAGE __173__

18:05:12   1                        CERTIFICATE

           2    STATE OF NEW YORK )

                                  :  Ss

           3    COUNTY OF NEW YORK)

           4             I, Steven Neil Cohen, a Registered

18:05:12   5    Professional Reporter and Notary Public

           6    within and for the State of New York, do

           7    hereby certify:  That ROBERT ALLEN TONNER,

           8    the witness whose deposition is herein

           9    before set forth, was duly sworn by me and

18:05:12  10    that such deposition is a true record of the

          11    testimony given by such witness.

          12             I further certify that I am not

          13    related to any of the parties to this action

          14    by blood or marriage and that I am in no way

18:05:12  15    interested in the outcome of this matter.

          16             I further certify that neither the

          17    deponent nor a party requested a review of

          18    the transcript pursuant to Federal Rule of

          19    Civil Procedure 30(e) before the deposition

18:05:12  20    was completed.

          21             In witness whereof, I have

          22    hereunto set my hand this 24th day of March

          23    2008.

          24                    _Steven Neil Cohen_____

                                STEVEN NEIL COHEN, RPR

          25

EXHIBIT __II__
PAGE ____174__

ROBERT ALLEN TONNER                          03/21/08

| | | |
|---|---|---|
| 11:38:52 | 1 | other people. |
| | 2 | What is your opinion about that? |
| | 3 | A.    The input from other people?  Oh, |
| | 4 | I see. |
| 11:39:00 | 5 | Q.    We are switching. |
| | 6 | You had identified two opinions |
| | 7 | for me; one related to the whether Bryant's |
| | 8 | inspiration story rang true. |
| | 9 | A.    Right. |
| 11:39:09 | 10 | Q.    The other one, at least the way I |
| | 11 | understood you phrased it, you were asked to |
| | 12 | opine on the input of other people and I |
| | 13 | think that is your phrase. |
| | 14 | I just want you to tell me what |
| 11:39:20 | 15 | your opinion is with respect to the input of |
| | 16 | other people. |
| | 17 | A.    I believe that in a project like |
| | 18 | this it is -- in a major project like this |
| | 19 | it takes multiple people, it takes multiple |
| 11:39:34 | 20 | skill sets and multiple talents to pull |
| | 21 | something together to make it a successful |
| | 22 | product. |
| | 23 | Q.    Anything else that is part of your |
| | 24 | opinion in this regard? |
| 11:40:05 | 25 | A.    And then, I mean, in my report I |

69

EXHIBIT  ll·'
PAGE  175

11:40:09  1    broke that down into different people who

2    might have contributed such as the sculptor,

3    face painters.

4         Q.    So just so I understand it, your

11:40:41  5    opinion is that other people contributed to

6    the Bratz product?

7         A.    Yes.

8         Q.    And I saw that in your rebuttal

9    report you said that you understood Bryant's

11:41:08  10   contribution to be about 15 or 20 percent?

11        A.    Yes.

12        Q.    What do you mean by that?

13        A.    If -- you know, you have the end

14   product -- you have the end product here.

11:41:20  15   So if you pulled that apart and said, well,

16   what is the idea worth, what is the other

17   contributions from other artists and other

18   people, what is that worth, I gave him 15 to

19   20 percent.

11:41:39  20        Q.    Percent of what?

21        A.    Of what eventually came out.

22             He was -- he came up with the idea

23   but then other people had to take it from

24   there and turn it into a viable product.

11:41:52  25        Q.    How do you arrive at that 15 to

EXHIBIT  11
PAGE     176

ROBERT ALLEN TONNER                                03/21/08

| 11:41:54 | 1 | 20 percent? |
| | 2 | A.    Well, there is no -- I couldn't |
| | 3 | look at it in a book or anything.  There is |
| | 4 | no set way to do that but, you know, in my |
| 11:42:05 | 5 | experience and in doll projects that I have |
| | 6 | been involved with or seen or watched come |
| | 7 | from something to the market. |
| | 8 | The idea is, you know, it is |
| | 9 | one -- it is a jumping off place. |
| 11:42:20 | 10 | From there on then it is who you |
| | 11 | have in the team that makes something work. |
| | 12 | So the idea is, it is important. |
| | 13 | Is it everything?  Absolutely not. |
| | 14 | You have to have the other stuff to make it |
| 11:42:37 | 15 | work. |
| | 16 | Q.    I understand that. |
| | 17 | I understand -- I mean, somebody |
| | 18 | has to pay for the plastic to make the doll, |
| | 19 | for example? |
| 11:42:46 | 20 | A.    Right. |
| | 21 | Q.    You can break this down kind of as |
| | 22 | finely as would you like. |
| | 23 | How do you arrive at 15 to |
| | 24 | 20 percent?  What is the thought process? |
| 11:42:58 | 25 | A.    Here is how I looked at it. |

71

EXHIBIT  11
PAGE  177

ROBERT ALLEN TONNER                          03/21/08

11:42:59  1          I thought, okay, he had an idea

         2    and then what happens after that, what I

         3    kind of took out of that 100 percent was I

         4    took out the clothing because, you know,

11:43:18  5    like I said in my report, the smallest

         6    changes change clothing, and the clothing

         7    was already out there.

         8          So did it belong to Carter, does

         9    it belong to MGA, does it belong to Mattel?

11:43:31 10    I don't think so.

        11          Then I looked at the value of

        12    someone like Paula Garcia who I understand

        13    was the project manager, someone like

        14    Margaret Leahy who was the sculptor, what

11:43:41 15    she put into it and I see the sculpting is

        16    20 percent of what makes it.

        17          Now if you had a good idea and a

        18    bad sculpt, that is not going to get you

        19    anywhere, or if you have a great sculpt but

11:43:53 20    you can't market it and the idea isn't very

        21    good, the doll is not going to work.

        22          That is what I mean by that.

        23      Q.    Can't the execution be perfect all

        24    the way through but if you have a bad idea

11:44:08 25    it goes nowhere?

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

EXHIBIT ___11___
PAGE ___178___

ROBERT ALLEN TONNER                    03/21/08

| 11:44:16 | 1 | A.    Will you repeat that? |
|          | 2 | Q.    Sure. |
|          | 3 | If your execution -- if the sculpt |
|          | 4 | is perfect -- |
| 11:44:22 | 5 | A.    Right. |
|          | 6 | Q.    -- if the marketing is perfect, if |
|          | 7 | the production is perfect and if the |
|          | 8 | distribution is perfect and if the price |
|          | 9 | point is perfect, if you have a bad idea |
| 11:44:31 | 10 | none of the rest of that matters, right? |
|          | 11 | A.    Right. |
|          | 12 | Q.    Have you ever done a product like |
|          | 13 | that or where the idea is just -- |
|          | 14 | A.    No.  All of my ideas are great. |
| 11:44:48 | 15 | Q.    You are under oath.  You need to |
|          | 16 | remember that. |
|          | 17 | Have you ever had that where you |
|          | 18 | think this is brilliant and apparently |
|          | 19 | nobody with dollars in their pocket even |
| 11:44:57 | 20 | ever agrees even though the execution was |
|          | 21 | perfect all the way down the line? |
|          | 22 | A.    To tell you the truth, I have |
|          | 23 | never seen that. |
|          | 24 | If the execution is perfect all |
| 11:45:06 | 25 | the way down the line it has a pretty good |

EXHIBIT  11
PAGE     179

```
11:45:08    1      slot.

            2              What I have seen, again, I would
            3      have to go through all the books and all
            4      this stuff and my memory about every
11:45:16    5      project, but there was a very interesting
            6      project where the idea that was about -- it
            7      is two or three years old and it was called
            8      Owren Village.
            9          Q.    What was it?
11:45:27   10          A.    Owren Village.
           11          Q.    O-R-E-N?
           12          A.    O-W-R-E-N, Owren Village.
           13              A guy out of Ohio.  He wrote books
           14      and had this idea for a doll line.
11:45:39   15              I thought that the idea had a shot
           16      because it was based on medieval and fantasy
           17      sort of stuff but he hired not a great
           18      sculptor and not a great designer and the
           19      taste level wasn't top so that idea failed.
11:45:57   20              I think that you can take lesser
           21      things and if the merchandising and all the
           22      stuff comes together I think it can work as
           23      long as there is money to supports it.
           24              Money is a big thing.  For
11:46:12   25      instance, American Girl, the American Girl
```

EXHIBIT __11__
PAGE ___180___

```
11:46:16   1   doll which is widely popular, and if you
           2   have girls, you know, that -- they took a
           3   doll, a German doll, to make the American
           4   Girl doll.  They took a German doll and
11:46:29   5   bought her.  The German doll did okay.  It
           6   wasn't, it didn't make -- break any records.
           7           But she added an incredible taste
           8   level and great marketing and all this so
           9   she took what was an idea that was out there
11:46:45  10   and all this and made it really work.
          11           I think the staff around a project
          12   is very, very important.
          13       Q.    Was the American Girl doll itself
          14   a game changing doll?
11:46:58  15       A.    I don't think so.  It is a
          16   marketing changing doll.  I don't think it
          17   was a --
          18       Q.    Go ahead.
          19       A.    To me it was a marketing idea, not
11:47:08  20   so much a doll idea.
          21       Q.    Do you consider the Bratz drawings
          22   and the Bratz doll to be game changing?
          23           MR. PLEVAN:  Can I have that read
          24       back?
11:47:20  25           (Record read)
```

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

EXHIBIT ___11___
PAGE ___181___

ROBERT ALLEN TONNER                          03/21/08

11:47:29   1           MR. PLEVAN:  I object to the form
           2      of the question, combining those two.
           3           Go ahead.  You are free to answer.
           4           THE WITNESS:  Okay.
11:47:36   5   BY MR. COREY:
           6      Q.    Let me withdraw the question.
           7           Do you consider the Bratz doll to
           8   be game changing?
           9      A.    Yes.
11:47:43  10      Q.    It is in a different category than
          11   the American Girl doll?
          12      A.    Yes.
          13      Q.    The American Girl doll is -- the
          14   doll itself is actually relatively
11:47:54  15   nondescript but someone has packaged it
          16   properly or packaged it to gain an
          17   advantage?
          18      A.    Yes.
          19      Q.    The Bratz dolls are not in that
11:48:05  20   category.  It is the dolls themselves that
          21   are pushing it, is that right?
          22      A.    The Bratz dolls?
          23      Q.    The Bratz dolls.
          24      A.    It is a combination with the Bratz
11:48:15  25   dolls.

                                                          76

EXHIBIT __11__
PAGE __182__

ROBERT ALLEN TONNER                                          03/21/08

11:48:17   1              Again, that doll is a unique look

           2      but it is a combination of the marketing,

           3      the packaging, the clothing design and all

           4      of that.  That is what makes that work.

11:48:27   5              That was -- that is a perfect

           6      storm of everybody getting everything right

           7      and that doesn't happen too often.

           8              What makes it, the doll, itself,

           9      game changing is it is kind of a category

11:48:41  10      breaker.

          11              The standard is Barbie -- was

          12      Barbie for 40 years, 40 some years, and then

          13      they came out with something that did not

          14      try to compete but it -- but as a fashion

11:48:52  15      doll, so --

          16          Q.    When you give your work or assign

          17      work to the freelance sculptors or even to

          18      your sculptor who is an employee you said

          19      you had him on a retainer.  Is he an

11:49:12  20      employee?

          21          A.    A retainer?  No.  We -- he has to

          22      pay his own taxes.

          23          Q.    Okay.  Who owns the work that they

          24      create?

11:49:23  25          A.    I do.

                                                                     77

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

EXHIBIT __11__
PAGE __103__

ROBERT ALLEN TONNER                    03/21/08

11:49:24   1         Q.     Why is that?

2         A.     It is a work for hire and they

3    understand that if I am hiring them to do a

4    specific job that it is mine, the copyrights

11:49:37   5    and everything.

6         Q.     I didn't mean to interrupt.

7                Did you finish your answer?

8         A.     Yes.

9         Q.     The designers understand that?

11:49:44  10         A.     The sculptors, yes.

11         Q.     The sculptors.

12                Have you run into a sculptor who

13    didn't understand that?

14         A.     I have heard of them.

11:49:53  15         Q.     You have never personally run into

16    somebody like that?

17         A.     Professional sculptors understand

18    that a work for hire, the work goes to --

19    you are buying the work, you are buying the

11:50:07  20    sculpt and the copyrights and everything to

21    that sculpt.

22         Q.     And all the rights that go with

23    that sculpt?

24         A.     Right.

11:50:13  25         Q.     What have you heard about people

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

78

EXHIBIT __11__
PAGE __184__

ROBERT ALLEN TONNER                          03/21/08

| | |
|---|---|
| 11:50:14 | 1 |

1   who don't understand that?

2             Let me ask the question first.

3             You said you heard about people

4   who don't understand that.  Is that

5   sculptors or --

6        A.    Sculptors.

7        Q.    Tell me what you heard about that.

8        A.    For instance, and this happened

9   just recently, a woman was hired to sculpt a

10  doll for the company.

11            They didn't get their agreements

12  right.  The doll turned out to do well and

13  so then the sculptor came back and then

14  wanted royalties and then wanted this and

15  upped her price after the doll got to

16  market.

17            To me that is an unprofessional

18  artist who hasn't been in the business

19  world.

20       Q.    Your understanding is that most

21  professional artists who do freelance work

22  understand their work is for hire?

23       A.    Right.

24       Q.    And the rights will vest with the

25  person paying for the design or sculpt,

EXHIBIT __11__
PAGE __185__

11:51:04  1    whatever the end work product is?

2         A.    Yes.

3         Q.    Do you think that Carter Bryant's

4    contribution on this scale of percentage is

11:51:26  5    higher than everyone else's?

6         A.    Are you talking about the

7    percentage that I gave?

8         Q.    Your percentage.

9         A.    20 percent, higher than anybody

11:51:38  10    else's.

11              That is why I gave the 15 to

12    20 percent.

13              I don't believe his should be

14    higher than anybody else's.

11:51:46  15              I think that, you know, if I had

16    to pick one person who got the highest,

17    taking MGA money people out because they

18    deserve the most credit, but taking them out

19    of the company, it is the person who had the

11:52:03  20    taste level.

21              I think it was the project manager

22    and from what I have read, all the

23    depositions and everything, it was the

24    project -- Paula Garcia was the person who

11:52:14  25    should get the biggest chunk there.

IBIT   11
GE   186

11:52:17   1          Q.      Have you met her?

           2          A.      No.

           3          Q.      What do you base that conclusion

           4   on that she should get the most amount of

11:52:23   5   credit?

           6          A.      Well, I understand that she was

           7   project manager on this.

           8                  It is an opinion based on me

           9   looking at tons of product over the years,

11:52:33  10   but I see -- every choice, everything that

          11   went into that first Bratz, that was a

          12   choice.

          13                  Every single thing, every color,

          14   every -- the kind of hair, the kind of

11:52:47  15   vinyl, the color of the vinyl, that was a

          16   choice.

          17                  My understanding, and reading

          18   Carter's deposition and all of this, he

          19   didn't have that knowledge.  It was somebody

11:52:58  20   who was further along in the -- or had more

          21   knowledge in making a doll about how to pull

          22   all of this together, and I believe it was

          23   her.

          24          Q.      Do you know how much experience

11:53:11  25   she had had doll making prior to this doll?

EXHIBIT  11
PAGE  187

ROBERT ALLEN TONNER                    03/21/08

11:53:16  1        A.      No.

          2        Q.      Do you know whether Mr. Larian had

          3   any experience doing a fashion doll prior to

          4   this time?

11:53:28  5        A.      I don't remember him doing a

          6   fashion doll before Bratz.

          7             I know he did a doll or two before

          8   Bratz but I don't remember him doing a

          9   fashion doll.

11:53:38 10        Q.      Have you ever spoken to Ms. Garcia

         11   on the telephone?

         12        A.      No.

         13        Q.      You conclude that she deserves the

         14   most amount of credit for -- just based on

11:53:52 15   the product that you see on the shelves?

         16        A.      Yes.

         17        Q.      Anything else?

         18        A.      I believe also that whoever -- and

         19   I think this name is in and around those

11:54:06 20   depositions, but whoever came up with the

         21   packaging design I felt was kind of

         22   brilliant.

         23             It was, you know, I think I said

         24   in my report, it is out-of-the-doll-box

11:54:16 25   thinking about how to put a doll on a shelf.

EXHIBIT __11__
PAGE __138__

03/21/08

11:54:19   1            They are not square boxes.  They

           2    were triangular shaped and so it was a very

           3    unique packaging.

           4        Q.    You have been waiting to say that

11:54:31   5    all day, right, out-of-the-doll-box

           6    thinking?

           7        A.    Right.

           8        Q.    Do you know whether the target

           9    consumers for the Bratz doll buy dolls

11:54:44  10    because of packaging?

          11        A.    I don't believe that a kid looks

          12    at it like that.

          13            I don't know if a kid can take the

          14    elements apart but what a kid would look at

11:54:56  15    is whether or not it appeals to them on the

          16    shelf and all those things -- kids, I like

          17    the doll but I don't like the packaging, or

          18    the doll sucks.  I don't think the kids

          19    think like that.

11:55:12  20            If the whole presentation is

          21    appealing I think that is how a kid will buy

          22    a doll.

          23        Q.    So are you distinguishing between

          24    buying -- having a kid buy a doll versus

11:55:29  25    having a kid buy kind of the whole package

                                                            83

EXHIBIT __11__
PAGE ____189____

ROBERT ALLEN TONNER                    03/21/08

11:55:32  1      as you refer to it?

          2              I am not sure I understand.

          3          A.    I am not sure I understand that

          4      question.

11:55:39  5          Q.    You said that you understand that

          6      a kid will buy the whole package that they

          7      find appealing on the shelf?

          8          A.    By "whole package" I don't mean

          9      the box.  I mean --

11:55:50 10          Q.    I understand that.

         11              What I am trying to do is I am

         12      trying to say what -- strike that.

         13              What is your basis for concluding

         14      that a girl will go in and will buy a

11:56:04 15      product based on the whole package;

         16      accessories, doll, chips inside the box,

         17      color, as opposed to the doll itself?

         18          A.    If -- well, personal experience.

         19      I would say personal experience more than

11:56:26 20      anything else.

         21          Q.    Personal experience with you

         22      buying dolls?

         23          A.    Well, yes, with -- seeing

         24      something appealing on the shelf, yes; toys,

11:56:35 25      whatever, yes.

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

EXHIBIT __11__
PAGE __190__

ROBERT ALLEN TONNER                    03/21/08

12:16:01  1    other ones are doing and staying consistent.

          2            Did you ever do that?

          3      A.    I think I did look at one person's

          4    report before the final draft.

12:16:18  5            Eventually it will come to me.  It

          6    is 55.  I don't know.

          7      Q.    When you were preparing your

          8    report did anybody besides you work on it?

          9      A.    No.

12:17:04 10      Q.    I know you have an assistant.

         11            Your assistant didn't provide you

         12    with any help on it?

         13      A.    No.

         14      Q.    How much of your time was spent

12:17:14 15    reading materials as opposed to writing your

         16    report?

         17      A.    You know, I would have to look at

         18    my invoices, but I tried to keep it -- if I

         19    was writing, I put "writing" on the invoice.

12:17:27 20            If I was reading like depositions

         21    and all of that, that is usually what I put

         22    on, so I would have to add it.

         23      Q.    You tried to draw that distinction

         24    in your invoices of actually putting pen to

12:17:38 25    paper as opposed to looking at things sent

                                                              101

EXHIBIT ___11___
PAGE ___191___

ROBERT ALLEN TONNER                                      03/21/08

12:17:41    1    to you?

            2        A.      Yes.

            3        Q.      Reading includes looking at the

            4    documents?

12:17:45    5        A.      The information that came to me,

            6    that was sent to me, yes.

            7        Q.      When did you decide that these two

            8    opinions that you have given to me, that

            9    those were your opinions?

12:18:16   10        A.      Sorry.

           11               Would you do that again?

           12        Q.      Sure.

           13               You have said that you are

           14    offering two opinions here today about --

12:18:23   15    one is about whether Carter Bryant's

           16    inspiration rang true, and the other is

           17    when -- is about the relative contributions

           18    of people to the Bratz dolls.

           19               When did you decide on those

12:18:36   20    opinions?

           21        A.      You know in my mind pretty much

           22    the first time I heard Carter's -- that

           23    story.

           24               I remember thinking that sounds

12:18:53   25    right.   That is the way you get inspiration.

EXHIBIT ___11___
PAGE ___192___

12:18:56  1            Then as far as the other part goes
          2    I think what -- no one had asked me what is
          3    his contribution worth until that January 3
          4    meeting and then Paul Meyer I believe asked
12:19:14  5    me what I thought and that is when it kind
          6    of gelled in me that it was -- I mean, I had
          7    been thinking along that line.
          8        Q.    So Mr. Meyer kind of asked you
          9    point-blank to put a number on it?
12:19:30 10        A.    Point-blank --
         11        Q.    I will withdraw the question.
         12            What did Mr. Meyer ask you to do
         13    or what did he ask you?
         14        A.    From what I remember it was just a
12:19:41 15    general discussion on what I thought the
         16    worth of the idea was.
         17        Q.    So you had reached that conclusion
         18    or that opinion at the January 3 meeting?
         19        A.    That is the first time anybody
12:20:04 20    asked me about it, but, you know, it was
         21    never -- I didn't go through this process
         22    and at one time go, oh, yes, that is what I
         23    know.
         24            I mean, the way the business works
12:20:19 25    is that, you know, there is an idea, there

EXHIBIT __11__
PAGE __193__

12:20:21  1   is different parts of it and that is what I

2   have always believed, that the idea can be

3   great but if people don't -- can't follow it

4   through it is worthless.

12:20:33  5            So that percentage thing was not

6   something that, you know, I was asked to

7   decide or whatever.  It was something that I

8   come to over years of being in this

9   business.

12:20:45 10       Q.    Is that true for -- is the

11   designer's input always worth 15 to

12   20 percent?

13       A.    Well, I think mine is worth more,

14   and I say that -- I am joking, but I do say

12:21:00 15   that in that I do more than that.

16            I come up with the idea but then I

17   sculpt it and then sometimes I design it.

18       Q.    I understand that in your company

19   you wear more than one of these hats.

12:21:13 20       A.    At times, yes.

21       Q.    My question is different.

22            As an industry standard is the

23   designer's input always worth 15 to

24   20 percent?

12:21:22 25       A.    The idea percent you mean?

EXHIBIT __11__
PAGE __194__

```
12:21:25   1        Q.    Yes.
           2        A.    I would say so.
           3        Q.    So for -- do you know what other
           4   products MGA carries?
12:21:35   5        A.    There is multiple fashionee or
           6   sort of little girl dolls.
           7             They do this thing, three hearts
           8   or two little girls together in a heart
           9   shaped box.  They have done that.
12:21:51  10             There is this long fashion doll
          11   that they have come out with.
          12             They have done a few kind of, I
          13   think, kind of trying to expand their --
          14   they have done princesses, stuff like that.
12:22:04  15             I should finish a sentence, right?
          16             Princesses and things like that
          17   that -- where they are trying to build their
          18   presence in the Toys-R-Us sort of
          19   environment.
12:22:17  20        Q.    It is your opinion that
          21   industry-wide, regardless of the product,
          22   fashion doll product, that the designer's
          23   portion is 15 to 20 percent?
          24        A.    Right.
12:22:28  25        Q.    That is true whether it is a game
```

EXHIBIT  11
PAGE  195

| 12:22:31 | 1 | changing doll like Bratz or whether it is |
| | 2 | the next doll that wets, the next baby that |
| | 3 | wets? |
| | 4 | A.   Well, I think you are talking |
| 12:22:42 | 5 | about two different things. |
| | 6 | Q.   That is right. |
| | 7 | Let's limit it to MGA's, the two |
| | 8 | girls in the heart shaped box that you |
| | 9 | identified. |
| 12:22:51 | 10 | Is that a game changing product? |
| | 11 | A.   No. |
| | 12 | Q.   Is the designer's -- how much is |
| | 13 | the designer's input worth on that, the idea |
| | 14 | designer? |
| 12:23:04 | 15 | A.   In retrospect, probably even less |
| | 16 | than 15 to 20 percent. |
| | 17 | Q.   Is there any instances where you |
| | 18 | can think of that the designer's input is |
| | 19 | worth less than 15 to 20 percent? |
| 12:23:18 | 20 | A.   Not off -- I don't believe so. |
| | 21 | Q.   How are you breaking this down? |
| | 22 | Are you breaking this down on kind |
| | 23 | of the time spent or what they are paid or |
| | 24 | what is the standard? |
| 12:23:33 | 25 | A.   I am using it as the springboard |

EXHIBIT __11__
PAGE __1916__

ROBERT ALLEN TONNER                    03/21/08

```
12:23:36   1    to get to a product.  That is what the idea
           2    is.
           3              The idea is the springboard.  That
           4    is where you jump off, and I believe it is
12:23:46   5    about that because, you know, if you
           6    can't -- if there is no -- if you can't make
           7    the product, you can't get it to market.
           8              If you can't design it right and
           9    all of this, then the idea is not worth very
12:23:57  10    much.
          11              Even if -- it is very hard to tell
          12    if there is an idea out there that could
          13    have been a big hit because it never got out
          14    there for one reason or another.
12:24:12  15              It may be a good idea sitting
          16    there that no one picks up on and things
          17    like that.
          18              That is why the idea is only worth
          19    so much.
12:24:21  20              If you can't get it out to market
          21    the idea is worthless.
          22        Q.    Isn't there some value in
          23    stockpiling ideas even if it is not brought
          24    to market, maybe it is a little ahead of its
12:24:33  25    time, something like that?
```

EXHIBIT   11
PAGE      197

| | | |
|---|---|---|
| 12:24:37 | 1 | A.    Stockpiling ideas? |
| | 2 | Q.    Sure. |
| | 3 | A.    What do you mean?  Like -- |
| | 4 | Q.    Well, you have not brought to |
| 12:24:47 | 5 | market every single idea you have? |
| | 6 | A.    No. |
| | 7 | Q.    You probably have what you think |
| | 8 | are 50 good ideas rolling around in your |
| | 9 | head or maybe that you documented somewhere? |
| 12:24:55 | 10 | A.    Yes. |
| | 11 | Q.    There is value in those, correct? |
| | 12 | There is value in you having those |
| | 13 | because you have your product line, things |
| | 14 | coming down your pipeline; is that right? |
| 12:25:06 | 15 | A.    There is value in me continuing to |
| | 16 | come up with ideas, yes. |
| | 17 | Q.    Then you make the strategic |
| | 18 | election as to when those ideas should be |
| | 19 | brought to market? |
| 12:25:16 | 20 | A.    Yes. |
| | 21 | Q.    How long had you had Tyler |
| | 22 | Wentworth in your head? |
| | 23 | A.    A fashion doll.  Forever. |
| | 24 | Tyler -- when -- Tyler, when I started |
| 12:25:34 | 25 | her -- at that point when I could afford it. |

108

EXHIBIT ___11___
PAGE ___198___

1

## PROOF OF SERVICE

2       I am employed in the County of Los Angeles, State of California. I am over the age of eighteen years and not a party to the within action; my business address is Now Legal Service,

3 1301 W. 2nd Street, Suite 206, Los Angeles, CA 90026.

4 On May 8, 2008, I served true copies of the following document(s) described as **SUPPLEMENTAL DECLARATION OF JON COREY IN SUPPORT OF MATTEL,**

5 **INC.'S MOTIONS IN LIMINE NOS. 1-14** on the parties in this action as follows:

6       Thomas J. Nolan               Mark E. Overland

      **Skadden, Arps, Slate, Meageher & Flom**   David C. Scheper

7       **LLP**                         Alexander H. Cote

      300 South Grand Ave., Ste. 3400      **Overland Borenstein Scheper & Kim**

8       Los Angeles, CA 90071           **LLP**

                                    601 West Fifth Street, 12th Floor

9                                     Los Angeles, CA 90017

10

11       John W. Keker, Esq.

      Michael H. Page, Esq.

12       Christina M. Anderson, Esq.

      **Keker & Van Nest, LLP**

13       710 Sansome Street

      San Francisco, CA 94111

14 **BY PERSONAL SERVICE:**  I delivered such envelope(s) by hand to the office of the person(s) being served.

15

16       I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

17       Executed on May 8, 2008, at Los Angeles, California.

18

19

20                     NOW LEGAL -- Dave Quintana

21

22

23

24

25

26

27

28

*(left margin: quinn emanuel)*

07209/2442344.1